# EXHIBIT 17

A

# The Weekly Law Reports
## Volume 3

*Containing those cases which are intended to be included in
The Law Reports*

B

C

Supreme Court

## Prest *v* Petrodel Resources Ltd and others

### [2013] UKSC 34

D

[On appeal from **Prest** *v* **Prest**]

2013 March 5, 6;       Lord Neuberger of Abbotsbury PSC, Baroness Hale
June 12     of Richmond, Lord Mance, Lord Clarke of Stone-cum-Ebony,
Lord Wilson, Lord Sumption JJSC, Lord Walker of Gestingthorpe

E *Husband and wife — Financial relief — Transfer of property — Properties held by
companies controlled by husband — Wife alleging that properties belonging
beneficially to husband — Husband and companies failing to comply with orders
for disclosure — Husband ordered to transfer properties to wife or to cause them
to be so transferred — Whether property to which husband "entitled" —
Whether conditions for piercing companies' corporate veils established —
Whether court entitled to draw adverse inferences as to beneficial ownership of
properties — Whether jurisdiction to order husband to transfer properties held*
F *by companies to wife — Matrimonial Causes Act 1973 (c 18), s 24(1)(a)*

The wife issued a claim for ancillary relief under section 23 of the Matrimonial
Causes Act 1973[1] against her husband, who was the sole owner of a number of
complexly structured offshore companies. The wife alleged that the husband had
used the companies to hold legal title to properties which belonged beneficially to
him. However, the husband failed to comply with orders for the full and frank
G disclosure of his financial position and the companies, which were joined as parties to
the proceedings, failed to file a defence or to comply with orders for disclosure.
The judge rejected the wife's submission that the husband had been guilty of any
impropriety in relation to the companies such as would entitle the court to pierce
the corporate veil, but held that, in matrimonial proceedings for ancillary relief,
section 24(1)(a) of the 1973 Act conferred a wider jurisdiction to pierce the corporate
veil. The judge concluded that, since the husband had the practical ability to procure
H the transfer of the properties, he was "entitled" to them within the meaning of

[1] Matrimonial Causes Act 1973, s 24(1): "On granting a decree of divorce . . . or at any time
thereafter . . . the court may make any one or more of the following orders, that is to say—
(a) an order that a party to the marriage shall transfer to the other party . . . such property as
may be so specified, being property to which the first-mentioned party is entitled, either in
possession or reversion; . . ."

section 24(1)(a), giving the court jurisdiction to make a transfer order in respect of them. Accordingly, he ordered the husband to transfer or cause to be transferred to the wife six properties and an interest in a seventh which were held in the name of two of the husband's companies. The Court of Appeal by a majority allowed an appeal by the companies, holding that the Family Division's practice of treating the assets of companies substantially owned by one party to the marriage as available for distribution under section 24(1)(a) was beyond the jurisdiction of the court unless the corporate personality of the company was being abused for a purpose which was in some relevant respect improper or, on the particular facts, it could be shown that an asset legally owned by the company was held in trust for the husband and that, since the judge had rejected both of those possibilities, he ought not to have made the order.

On the wife's appeal—

*Held*, (1) that the recognition of a limited power to pierce the corporate veil and to disregard the separate personality of a company in carefully defined circumstances was necessary if the law were not to be disarmed in the face of abuse and, provided that the limits were recognised and respected, it was consistent with the general approach of English law to the problems raised by the use of legal concepts to defeat mandatory rules of law; that, therefore, if a person were under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evaded or the enforcement of which he deliberately frustrated by interposing a company under his control, the court could pierce the corporate veil for the purpose, and only for the purpose, of depriving that company or its controller of the advantage which they would otherwise have obtained by the company's separate legal personality; but that the legal interest in the disputed properties was vested in the companies and, whatever the husband's reasons for organising matters in that way, there was no evidence that he was seeking to avoid any obligation which was relevant in the present proceedings; and that, accordingly, there was no justification as a matter of general legal principle for piercing the corporate veils of the companies (post, paras 27, 35–36, 57–58, 61, 80–82, 96, 97, 103, 104).

*Gilford Motor Co Ltd v Horne* [1933] Ch 935, CA, *Jones v Lipman* [1962] 1 WLR 832, *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734 and *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177 considered.

(2) That, where there were no justification as a matter of general legal principle for piercing the corporate veil, no special and wider principle applied in matrimonial proceedings by virtue of section 24(1)(a) of the Matrimonial Causes Act 1973; that section 24(1)(a) invoked concepts of the law of property, with an established legal meaning and recognised legal incidents under the general law, which could not be suspended or mean something different in matrimonial proceedings; that there was nothing in the 1973 Act, or in its purpose or broader social context, to indicate that the legislature had intended to authorise the transfer by one party to the marriage to the other of property which was not his to transfer; that such a transfer would ordinarily be unnecessary for the purpose of achieving a fair distribution of the assets of the marriage since, if assets belonged to a company owned by one party to the marriage, the proper claims of the other could ordinarily be satisfied by directing the transfer of shares and, so far as a party deliberately attempted to frustrate the exercise of the court's ancillary powers by disposing of assets, section 37 of the Act provided for the setting aside of those dispositions in certain circumstances; that the recognition of a jurisdiction such as the judge had sought to exercise would cut across the statutory schemes of company and insolvency law, which were essential for the protection of those dealing with a company; and that, accordingly, section 24(1)(a) did not give the judge power to order the husband to transfer to the wife property to which he was not in law entitled (post, paras 37–41, 57–58, 86, 88–89, 96, 97, 103, 104).

But, (3) allowing the appeal, that the companies could be ordered to convey the seven disputed properties to the wife under section 24(1)(a) of the 1973 Act if

A  the properties belonged beneficially to the husband by virtue of the particular circumstances in which they had come to be vested in the companies; that that issue required an examination of evidence which, almost entirely due to the husband's persistent obstruction and mendacity, was incomplete and in critical respects obscure; that in claims for ancillary relief in matrimonial proceedings, which had a substantial inquisitorial element, judges were entitled to draw on their experience and to take notice of the inherent probabilities when deciding what an

B  uncommunicative spouse was likely to be concealing; that the wife had expressly alleged that the husband had used the companies to hold legal title to properties which belonged beneficially to him and the judge's findings about the ownership and control of the companies meant that the companies' refusal to co-operate with the proceedings was a course ultimately adopted on the direction of the husband; that it was a fair inference that the main, if not the only, reason for the companies' failure to co-operate was to protect the seven properties, which in turn suggested that

C  proper disclosure of the facts would reveal them to have been held beneficially by the husband; and that, accordingly, the seven disputed properties were held by the companies on trust for the husband and, in those circumstances, the order of the judge requiring the properties to be transferred to the wife would be restored (post, paras 44–45, 55, 57–58, 84–85, 96, 97, 103, 104).

    *British Railways Board v Herrington* [1972] AC 877, HL(E) and *R v Inland Revenue Comrs, Ex p Coombs (TC) & Co* [1991] 2 AC 283, HL(E) considered.

D    *Per* Lord Neuberger of Abbotsbury PSC, Lord Clarke of Stone-cum-Ebony and Lord Sumption JJSC. If it is not necessary to pierce the corporate veil, it is not appropriate to do so, because on that footing there is no public policy imperative which justifies that course (post, paras 35, 62, 103).

    Dictum of Munby J in *Ben Hashem v Al Shayif* [2009] 1 FLR 115, para 164 approved.

    Dictum of the Court of Appeal in *VTB Capital plc v Nutritek International Corpn* [2012] 2 Lloyd's Rep 313, para 79, CA disapproved.

E    *Per* Lord Mance and Lord Clarke of Stone-cum-Ebony JJSC. The court should not seek to foreclose all possible future situations which may arise. However, the situations in which piercing the corporate veil may be available as a fall-back are likely to be very rare and no one should be encouraged to think that any further exception, in addition to the evasion principle, will be easy to establish (post, paras 100, 102, 103).

    *Per* Lord Sumption JSC. Whether assets legally vested in a company are

F  beneficially owned by its controller is a highly fact-specific issue. But, in the case of the matrimonial home, the facts are quite likely to justify the inference that the property was held on trust for a spouse who owned and controlled the company (post, para 52).

    Decision of the Court of Appeal [2012] EWCA Civ 1395; [2013] 2 WLR 557 reversed in part.

G  The following cases are referred to in the judgments:

*A v A* [2007] EWHC 99 (Fam); [2007] 2 FLR 467

*Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER 929, CA

*Alliance Bank JSC v Aquanta Corpn* [2012] EWCA Civ 1588; [2013] 1 All ER (Comm) 819; [2013] 1 Lloyd's Rep 175, CA

*Allied Capital Corpn v GC-Sun Holdings* (2006) 910 A 2d 1020

H  *Atlas Maritime Co SA v Avalon Maritime Ltd (No 1)* [1991] 4 All ER 769, CA

*Attorney General v Equiticorp Industries Group Ltd* [1996] 1 NZLR 528

*Attorney General's Reference (No 2 of 1982), In re* [1984] QB 624; [1984] 2 WLR 447; [1984] 2 All ER 216, CA

*Bank of Tokyo Ltd v Karoon (Note)* [1987] AC 45; [1986] 3 WLR 414; [1986] 3 All ER 468, CA

*Barcelona Traction, Light and Power Co Ltd (Second Phase) (Belguim v Spain), In re*   A
   [1970] ICJ Rep 3
*Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250; [1978] 3 WLR
   712; [1979] 1 All ER 118, CA
*Ben Hashem v Al Shayif* [2008] EWHC 2380 (Fam); [2009] 1 FLR 115
*Berkey v Third Avenue Railway* (1926) 155 NE 58
*Briggs v James Hardie & Co Pty Ltd* (1989) 16 NSWLR 549
*British Railways Board v Herrington* [1972] AC 877; [1972] 2 WLR 537; [1972]   B
   1 All ER 749, HL(E)
*Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd* 1995 (4) SA 790 (A)
*Constitution Insurance Co of Canada v Kosmopoulos* [1987] 1 SCR 2
*Darby, In re; Ex p Brougham* [1911] 1 KB 95
*R v Gomez* [1993] AC 442; [1992] 3 WLR 1067; [1993] 1 All ER 1, HL(E)
*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734
*Gilford Motor Co Ltd v Horne* [1933] Ch 935, CA   C
*Green v Green* [1993] 1 FLR 326
*Jenkins v Livesey (formerly Jenkins)* [1985] AC 424; [1985] 2 WLR 47; [1985] 1 All
   ER 106, HL(E)
*Jones v Lipman* [1962] 1 WLR 832; [1962] 1 All ER 442
*Kingston's (Duchess of) Case* (1776) 2 Smith's LC (13th ed) 644; 1 Leach 146
*Kremen v Agrest (No 2)* [2010] EWHC 3091 (Fam); [2011] 2 FLR 490
*La Générale des Carrières et des Mines Sarl v FG Hemisphere Associates LLC* [2012]   D
   UKPC 27; [2013] 1 All ER 409; [2012] 2 Lloyd's Rep 443, PC
*Lazarus Estates Ltd v Beasley* [1956] 1 QB 702; [1956] 2 WLR 502; [1956] 1 All ER
   341, CA
*Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627, HL(E)
*Macaura v Northern Assurance Co Ltd* [1925] AC 619, HL(I)
*McFarlane v McFarlane* [2006] UKHL 24; [2006] 2 AC 618; [2006] 2 WLR 1283;
   [2006] 3 All ER 1, HL(E)
*Mubarak v Mubarak* [2001] 1 FLR 673   E
*Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical*
   *Services Ltd* [1983] Ch 258; [1983] 3 WLR 492; [1983] 2 All ER 563, CA
*Nicholas v Nicholas* [1984] FLR 285, CA
*Nokes v Doncaster Amalgamated Collieries Ltd* [1940] AC 1014; [1940] 3 All ER
   549, HL(E)
*R v Inland Revenue Comrs, Ex p Coombs (TC) & Co* [1991] 2 AC 283; [1991]   F
   2 WLR 682; [1991] 3 All ER 623, HL(E)
*R v Secretary of State for the Home Department, Ex p Puttick* [1981] QB 767; [1981]
   2 WLR 440; [1981] 1 All ER 776, DC
*Salomon v A Salomon & Co Ltd* [1895] 2 Ch 323, CA; [1897] AC 22, HL(E)
*Secon Serv Sys Inc v St Joseph Bank & Trust Co* (1988) 855 F 2d 406
*Smith v Hancock* [1894] 2 Ch 377, CA
*Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391; [2009]
   3 WLR 455; [2009] 4 All ER 431, HL(E)   G
*Tjaskemolen (now Visvliet), The* [1997] 2 Lloyd's Rep 465
*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; [2001] 3 All ER 987
*VTB Capital plc v Nutritek International Corpn* [2012] EWCA Civ 808; [2012]
   2 Lloyd's Rep 313, CA; [2013] UKSC 5; [2013] 2 WLR 398; [2013] 1 All ER
   1296, SC(E)
*Wallersteiner v Moir* [1974] 1 WLR 991; [1974] 3 All ER 217, CA
*Welwyn Hatfield Borough Council v Secretary of State for Communities and Local*   H
   *Government* [2011] UKSC 15; [2011] 2 AC 304; [2011] 2 WLR 905; [2011]
   PTSR 825; [2011] 4 All ER 851, SC(E)
*Wisniewski v Central Manchester Health Authority* [1998] PIQR P324, CA
*Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90, HL(Sc)
*Wroth v Tyler* [1974] Ch 30; [1973] 2 WLR 405; [1973] 1 All ER 897

A    The following additional cases were cited in argument:

*BJ v MJ (Financial Order: Overseas Trust)* [2011] EWHC 2708 (Fam); [2012] 1 FLR 667
*Bank voor Handel en Scheepvaart NV v Slatford* [1953] 1 QB 248; [1952] 2 All ER 956, CA
*Bhullar v Bhullar* (unreported) 25 March 2002, Judge Behrens QC
*Blood v Blood* [1902] P 78
B    *Bosworthick v Bosworthick* [1927] P 64, CA
*Brooks v Brooks* [1996] AC 375; [1995] 3 WLR 141; [1995] 3 All ER 257, HL(E)
*Campbell (A Bankrupt), In re* [1997] Ch 14; [1996] 3 WLR 626; [1996] 2 All ER 537
*Charman v Charman (No 4)* [2007] EWCA Civ 503; [2007] 1 FLR 1246, CA
*Company, In re A* [1985] BCLC 333, CA
*Crews-Orchard v Crews-Orchard* (1970) 114 Sol J 150, CA
*Crown Prosecution Service v Compton* [2002] EWCA Civ 1720, CA
C    *D v D* [2009] EWHC 3062 (Fam); [2011] 2 FLR 29
*E v E (Financial Provision)* [1990] 2 FLR 233
*H (Restraint Order: Realisable Property), In re* [1996] 2 All ER 391, CA
*Hawkes v Cuddy* [2007] EWHC 2999 (Ch); [2008] EWHC 210 (Ch); [2009] EWCA Civ 291; [2009] 2 BCLC 427, CA
*Hope v Krejci* [2012] EWHC 1780 (Fam); [2013] 1 FLR 182
*Imerman v Tchenguiz* [2010] EWCA Civ 908; [2011] Fam 116; [2011] 2 WLR 592;
D    [2011] 1 All ER 555, CA
*Jones v Jones* [2011] EWCA Civ 41; [2012] Fam 1; [2011] 3 WLR 582, CA
*Maidment v Attwood* [2012] EWCA Civ 998, [2013] Bus LR 753, CA
*Midland Bank Trust Co Ltd v Green* [1981] AC 513; [1981] 2 WLR 28; [1981] 1 All ER 153, HL(E)
*Milne v Milne* (1871) LR 2 P & D 295
*Prinsep v Prinsep* [1929] P 265
E    *R v K* [2005] EWCA Crim 619; [2006] BCC 362, CA
*R (Prudential plc) v Special Comr of Income Tax (Institute of Chartered Accountants in England and Wales intervening)* [2013] UKSC 1; [2013] 2 WLR 325; [2013] 2 All ER 247, SC(E)
*Rackind v Gross* [2004] EWCA Civ 815; [2005] 1 WLR 3505; [2005] 4 All ER 735, CA
*Roberts Petroleum Ltd v Bernard Kenny Ltd* [1983] 2 AC 192; [1983] 2 WLR 305;
F    [1983] 1 All ER 564, HL(E)
*W v H (Family Division: Without Notice Orders)* [2001] 1 All ER 300

**APPEAL** from the Court of Appeal

By a petition dated 10 March 2008 the wife, Yasmin Aishatu Mohammed Prest, petitioned for a decree of divorce from her husband, Michael Jenseabla Prest. She applied in those proceedings for ancillary relief against
G    the husband. On 27 February 2009 and 14 April 2011 Petrodel Resources Ltd ("PRL"), Petrodel Resources (Nigeria) Ltd, Petrodel Upstream Ltd ("Upstream"), Vermont Petroleum Ltd ("Vermont"), Vermont Petroleum Ltd, Elysium Diem Ltd, Petrodel Resources (Nevis) Ltd and Elysium Diem (Nevis) Ltd, were joined as parties to the proceedings. By a judgment dated 4 October 2011 and order dated 16 November 2011 Moylan J ordered, inter alia, that the husband transfer or cause to be transferred to the wife (i) four
H    London properties and an interest in a fifth all held in the name of PRL and (ii) two London properties held in the name of Vermont.

By an appellant's notice filed on 7 December 2011 and pursuant to permission granted by the Court of Appeal (Thorpe LJ) on 16 February 2012 PRL, Upstream and Vermont (together "the Petrodel companies")

appealed. On 26 October 2012, the Court of Appeal (Rimer and Patten LJJ,    A
Thorpe LJ dissenting) allowed the appeal. On 21 November 2012, the
Court of Appeal granted an application by the wife for permission to appeal,
pursuant to which she appealed.

The issues for the Supreme Court, as set out in the parties' statement of
agreed facts and issues, were whether (1) the court had power in the context
of the Matrimonial Causes Act 1973 to order the transfer of assets, as part of    B
an ancillary relief award, which belonged to third party companies; (2) on a
proper analysis, the companies held the properties on trust for the husband
and as such the court was empowered to transfer those properties to the
wife; (3) section 24(1)(c)(d) of the Act empowered the court to alter the
settlement by which the husband was entitled to a beneficial interest in both
the shares in the companies and their assets; and (4) the circumstances were
such that the wife should be permitted to pierce the veil of incorporation    C
either on the ground of impropriety or in the interests of justice.

The facts are stated in the judgment of Lord Sumption JSC.

*Richard Todd QC, Daniel Lightman* and *Stephen Trowell* (instructed by
*Farrer & Co LLP*) for the wife.
*Tim Amos QC, Oliver Wise, Ben Shaw* and *Amy Kisser* (instructed by    D
*Jeffrey Green Russell Ltd* ) for the companies.
The husband did not appear and was not represented.

The court took time for consideration.

12 June 2013. The following judgments were handed down.

## LORD SUMPTION JSC    E

*Introduction*

1    This appeal arises out of proceedings for ancillary relief following a
divorce. The principal parties before the judge, Moylan J, were Michael and
Yasmin Prest. He was born in Nigeria and she in England. Both have dual
Nigerian and British nationality. They were married in 1993, and during the    F
marriage the matrimonial home was in England, although the husband was
found by the judge to have been resident in Monaco from about 2001 to
date. There was also a second home in Nevis. The wife petitioned for
divorce in March 2008. A decree nisi was pronounced in December 2008,
and a decree absolute in November 2011.

2    The husband is not party to the appeal in point of form, although he is    G
present in spirit. The appeal concerns only the position of a number of
companies belonging to the group known as the Petrodel Group which the
judge found to be wholly owned and controlled (directly or through
intermediate entities) by the husband. There were originally seven
companies involved, all of which were joined as additional respondents to
the wife's application for ancillary relief. They were Petrodel Resources Ltd
("PRL"), Petrodel Resources (Nigeria) Ltd ("PRL Nigeria"), Petrodel    H
Upstream Ltd ("Upstream"), Vermont Petroleum Ltd ("Vermont"), Elysium
Diem Ltd, Petrodel Resources (Nevis) Ltd ("PRL Nevis") and Elysium Diem
Ltd (Nevis). Three of these companies, PRL, Upstream and Vermont, all
incorporated in the Isle of Man, are the respondents in this court. PRL was

A  the legal owner of the matrimonial home, which was bought in the name of the company in 2001 but was found by the judge to be held for the husband beneficially. There is no longer any issue about that property, which is apparently in the process of being transferred to the wife. In addition, PRL was the legal owner of five residential properties in the United Kingdom and Vermont is the legal owner of two more. The question on this appeal is whether the court has power to order the transfer of these seven properties to
B  the wife given that they legally belong not to him but to his companies.

3  Part II of the Matrimonial Causes Act 1973 confers wide powers on the court to order ancillary relief in matrimonial proceedings. Section 23 provides for periodical and lump sum payments to a spouse or for the benefit of children of the marriage. Under section 24(1)(a), the court may order that "a party to the marriage shall transfer to the other party . . . such property as
C  may be so specified, being property to which the first-mentioned party is entitled, either in possession or in reversion". Section 25, as substituted by sections 3 and 48(2) of the Matrimonial and Family Proceedings Act 1984, provides for a number of matters to which the court must in particular have regard in making such orders, including, at section 25(2)(a), the "income, earning capacity, property and other financial resources which each of the
D  parties to the marriage has or is likely to have in the foreseeable future."

4  The proper exercise of these powers calls for a considerable measure of candour by the parties in disclosing their financial affairs, and extensive procedural powers are available to the court to compel disclosure if necessary. In this case, the husband's conduct of the proceedings has been characterised by persistent obstruction, obfuscation and deceit, and a contumelious refusal to comply with rules of court and specific orders.
E  The judge, Moylan J, recited in his judgment [2011] EWHC 2956 (Fam) the long history of successive orders of the court which were either ignored or evaded, the various attempts of the husband to conceal the extent of his assets in the course of his evidence, and the collusive proceedings in Nigeria by which he sought declarations that certain of the companies were held in trust for his siblings. The only evidence on behalf of the respondent
F  companies was an affidavit sworn by Mr Jack Murphy, a director of PRL and the corporate secretary of the three respondent companies, who failed to attend for cross-examination on it. The judge rejected his excuse that he was in bad health, and found that he was "unwilling rather than unable to attend court": para 69. His conclusion was that

> "as a result of the husband's abject failure to comply with his
G > disclosure obligations and to comply with orders made by the court
> during the course of these proceedings, I do not have the evidence
> which would enable me to assemble a conventional schedule of assets":
> para 13.

However, he found that the husband was the sole beneficial owner and the controller of the companies, and doing the best that he could on the material available assessed his net assets at £37·5m.
H  5  By his order dated 16 November 2011, Moylan J ordered that the husband should procure the conveyance of the matrimonial home at 16 Warwick Avenue, London W2 to the wife, free of incumbrances, and that he should make a lump sum payment to her of £17·5m and periodical payments at the rate of 2% of that sum while it remained outstanding,

**Prest v Prest (SC(E))**                                              [2013] 3 WLR
Lord Sumption JSC

together with £24,000 per annum and the school fees for each of their four    A
children. In addition he awarded costs in favour of the wife, with a payment
of £600,000 on account.  The judge ordered the husband to procure the
transfer of the seven UK properties legally owned by PRL and Vermont to
the wife in partial satisfaction of the lump sum order. He directed those
companies to execute such documents as might be necessary to give effect to
the transfer of the matrimonial home and the seven properties. Moreover,
in awarding costs to the wife, the judge directed that PRL, Upstream and    B
Vermont should be jointly and severally liable with the husband for 10% of
those costs. Corresponding orders were made against certain of the other
corporate respondents to the original proceedings, but they did not appeal,
either to the Court of Appeal or to this court, and are no longer relevant,
save in so far as the facts relating to them throw light on the position of the
three respondents. No order was made (or sought) for the transfer of any    C
assets of Upstream, but that company is interested in the present appeal by
virtue of its liability under the judge's order for part of the wife's costs.

6    The distinctive feature of the judge's approach was that he concluded
that there was no general principle of law which entitled him to reach
the companies' assets by piercing the corporate veil. This was because the
authorities showed that the separate legal personality of the company could    D
not be disregarded unless it was being abused for a purpose that was in some
relevant respect improper. He held that there was no relevant impropriety.
He nevertheless concluded that in applications for financial relief ancillary to
a divorce, a wider jurisdiction to pierce the corporate veil was available
under section 24 of the Matrimonial Causes Act 1973. The judge found that
the matrimonial home was held by PRL on trust for the husband, but he
made no corresponding finding about the seven other properties and refused    E
to make a declaration that the husband was their beneficial owner. It is
tolerably clear from his supplementary judgment of 16 November 2011
[2011] EWHC 3066 (Fam) (on the form of the order), that this was because
having decided that he was specifically authorised to dispose of the
companies' properties under section 24, it was unnecessary for him to do so
and undesirable because of "the potential tax consequences": para 14.    F
It is not clear what potential tax consequences he had in mind, but his
observation suggests that without them he might well have made the
declaration sought.

7    In the Court of Appeal, the three respondent companies challenged
the orders made against them on the ground that there was no jurisdiction to
order their property to be conveyed to the wife in satisfaction of the
husband's judgment debt. This contention, which has been repeated before    G
us, raises a question of some importance. For some years it has been the
practice of the Family Division to treat the assets of companies substantially
owned by one party to the marriage as available for distribution under
section 24 of the Matrimonial Causes Act, provided that the remaining
assets of the company are sufficient to satisfy its creditors. In the Court of
Appeal, the practice was supported by Thorpe LJ, but the majority
disagreed: [2013] 2 WLR 557. Rimer LJ, delivering the leading judgment    H
for the majority, held that the practice developed by the Family Division was
beyond the jurisdiction of the court unless (i) the corporate personality of the
company was being abused for a purpose which was in some relevant respect
improper, or (ii) on the particular facts of the case it could be shown that an

A  asset legally owned by the company was held in trust for the husband. He considered that the judge had rejected both of these possibilities on the facts, and that he ought not therefore to have made the order. In a short concurring judgment, Patten LJ, at para 161, said that the Family Division had developed "an approach to company owned assets in ancillary relief applications which amounts almost to a separate system of legal rules unaffected by the relevant principles of English property and company law."

B  The practice, he concluded, "must now cease". This has significant practical implications. Unless the UK properties of the Petrodel Group are transferred to Mrs Prest, it is possible (she says likely) that the lump sum order in her favour will remain wholly unsatisfied. To date, the matrimonial home has been transferred to her but only subject to a pre-existing charge in favour of BNP Paribas to secure a debt of undisclosed amount. 10% of the money

C  ordered to be paid on account of costs has been paid by the three respondents, but only in order to satisfy a condition imposed on them on their being granted leave to appeal to the Court of Appeal. Otherwise, apart from paying the children's school fees, the husband has not complied with any part of Moylan J's order and shows no intention of doing so if he can possibly avoid it.

D  *The issues*

8  Subject to very limited exceptions, most of which are statutory, a company is a legal entity distinct from its shareholders. It has rights and liabilities of its own which are distinct from those of its shareholders. Its property is its own, and not that of its shareholders. In *Salomon v A Salomon & Co Ltd* [1897] AC 22, the House of Lords held that these

E  principles applied as much to a company that was wholly owned and controlled by one man as to any other company. In *Macaura v Northern Assurance Co Ltd* [1925] AC 619, the House of Lords held that the sole owner and controller of a company did not even have an insurable interest in property of the company, although economically he was liable to suffer by its destruction. Lord Buckmaster said, at pp 626–627:

F      "no shareholder has any right to any item of property owned by the company, for he has no legal or equitable interest therein. He is entitled to a share in the profits while the company continues to carry on business and a share in the distribution of the surplus assets when the company is wound up."

In *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627 the House of

G  Lords held that documents of a subsidiary were not in the "power" of its parent company for the purposes of disclosure in litigation, simply by virtue of the latter's ownership and control of the group. These principles are the starting point for the elaborate restrictions imposed by English law on a wide range of transactions which have the direct or indirect effect of distributing capital to shareholders. The separate personality and property of a company is sometimes described as a fiction, and in a sense it is. But the

H  fiction is the whole foundation of English company and insolvency law. As Robert Goff LJ once observed, in this domain "we are concerned not with economics but with law. The distinction between the two is, in law, fundamental": *Bank of Tokyo Ltd v Karoon (Note)* [1987] AC 45, 64. He could justly have added that it is not just legally but economically

**Prest v Prest (SC(E))**                                          **[2013] 3 WLR**
Lord Sumption JSC

fundamental, since limited companies have been the principal unit of    A
commercial life for more than a century. Their separate personality and
property are the basis on which third parties are entitled to deal with them
and commonly do deal with them.

9    Against this background, there are three possible legal bases on which
the assets of the Petrodel companies might be available to satisfy the lump
sum order against the husband: (1) It might be said that this is a case in
which, exceptionally, a court is at liberty to disregard the corporate veil in    B
order to give effective relief. (2) Section 24 of the Matrimonial Causes Act
might be regarded as conferring a distinct power to disregard the corporate
veil in matrimonial cases. (3) The companies might be regarded as holding
the properties on trust for the husband, not by virtue of his status as their
sole shareholder and controller, but in the particular circumstances of this
case.                                                                      C

*The judge's findings: the companies*

10    Most of the judge's findings of fact were directed to two questions
which are no longer in dispute, namely whether the husband owned the
Petrodel Group and what was the value of his assets. For present purposes, it
is enough to summarise those which bear on the position of the three    D
corporate respondents.

11    At the time of the marriage, and throughout the 1990s, the husband
was employed by a succession of major international oil trading companies as
a trader, but in 2001 he left his last employer, Marc Rich, and began to
run his own companies. Initially, there were two principal companies
involved, Aurora and the Petrodel companies. In 2004 Aurora was wound
up and thereafter he operated mainly through the Petrodel companies.    E
The principal operating company of this group was PRL, a company
incorporated in the Isle of Man. Its financial statements record that it was
incorporated on 4 May 1993, was dormant until 1996, and did not begin
operations until 25 April 2002, i e after the husband had left Marc Rich and
set up on his own. Between 1996 and 2002, it is described in its financial
statements as a property investment company. Its sole function in that    F
period appears to have been to hold title to the matrimonial home at
16 Warwick Avenue in London and five residential investment properties in
London, and to act as a channel for funding property purchases by other
companies of the group. The husband's evidence was that the company had
engaged in substantial agricultural and oil related business in the 1990s,
in part in association with his then employer, Marc Rich. But this was
inconsistent with the company's financial statements, and the judge rejected    G
it. Mr Le Breton, a former business colleague of the husband, gave evidence
at the hearing which the judge accepted as reliable. Mr Le Breton said that
from about 2001 PRL was engaged in a limited way in oil trading and
shipping, and from 2006 moved into oil exploration and production in
Nigeria and West Africa. The latest disclosed accounts of PRL are draft
accounts for 2008 and 2009. The judge (para 147) declined to attach "any
significant weight" to the financial data in the 2008 accounts, which he    H
considered to have been manipulated. All the disclosed accounts are now
very much out of date. For what they are worth, the accounts for both years
show a substantial turnover and large balances. The husband's evidence was
that PRL ceased trading in 2010, when it lost its major exploration contract.

A   Given his evident determination to frustrate his wife's claims on him,
it cannot be assumed that the assets of the company recorded in the disclosed
accounts are still there.

12   Management control of PRL has always been in the hands of the
husband, ostensibly as chief executive under a contract of employment
conferring on him complete discretion in the management of its business.
B   The judge found that none of the companies had ever had any independent
directors. The husband is a director of PRL Nigeria, but otherwise the
directors are all nominal or professional directors, generally his relatives,
who accept directions from him. The directors of PRL are Mr Murphy
(the principal of its corporate secretary) and a lady in Nevis who appears to
have been the couple's cleaner there.

13   The ownership of the respondent companies proved to be more
C   difficult to establish. The husband did not admit to having any personal
interest in the shares of any company of the group, and declined to say who
the ultimate shareholders were. Substantially all of the issued shares of PRL
are owned by PRL Nigeria. Almost all the shares of that company are
owned by PRL Nevis, a company about which very little is known, but
whose accounts show substantial balances, apparently derived from trading.
D   The husband's evidence was that the shares of PRL Nevis were owned by its
own subsidiary PRL Nigeria. The judge described this as "puzzling"
(para 55) but made no finding as to whether it was true. More recently, it
has been suggested that PRL Nevis is owned by a family trust about which,
however, nothing has been disclosed. In the end, it did not matter, because
the judge cut through the complexities of the corporate structure by
accepting the evidence of the wife and Mr Le Breton that the husband was
E   the true owner of the Petrodel Group, as he had always told them he was,
even if the exact means by which he held it remained obscure. That
accounted for PRL, PRL Nigeria and PRL Nevis.

14   It also accounted for Vermont, whose shares are held 49% by PRL
and 51% by PRL Nigeria, and Upstream, which had a single issued share held
by PRL Nevis. Vermont was and possibly still is a trading company. The
husband's evidence was that it began to ship crude oil in 2010. The exact
F   nature of Upstream's business (if any) is unclear. It does not appear to trade.

15   The husband declined to answer the question whether he received
any benefits from PRL other than his salary, saying that this was an
"accounting question". The judge, however, made extensive findings about
this. He found that his personal expenditure substantially exceeded his
salary and bonuses as chief executive, and that the difference was funded
G   entirely by the company. There was no formality involved. The husband
simply treated the companies' cash balances and property as his own
and drew on them as he saw fit. The judge found that the husband had
"unrestricted access" to the companies' assets, unconfined by any board
control or by any scruples about the legality of his drawings: para 208. He
used PRL's assets to fund his and his family's personal expenditure, including
the substantial legal costs incurred in these proceedings. The group was
H   "effectively . . . the husband's money box which he uses at will": para 218.

*Piercing the corporate veil*

16   I should first of all draw attention to the limited sense in which this
issue arises at all. "Piercing the corporate veil" is an expression rather

indiscriminately used to describe a number of different things. Properly **A** speaking, it means disregarding the separate personality of the company. There is a range of situations in which the law attributes the acts or property of a company to those who control it, without disregarding its separate legal personality. The controller may be personally liable, generally in addition to the company, for something that he has done as its agent or as a joint actor. Property legally vested in a company may belong beneficially to the **B** controller, if the arrangements in relation to the property are such as to make the company its controller's nominee or trustee for that purpose. For specific statutory purposes, a company's legal responsibility may be engaged by the acts or business of an associated company. Examples are the provisions of the Companies Acts governing group accounts or the rules governing infringements of competition law by "firms", which may include groups of companies conducting the relevant business as an economic unit. Equitable **C** remedies, such as an injunction or specific performance may be available to compel the controller whose personal legal responsibility is engaged to exercise his control in a particular way. But when we speak of piercing the corporate veil, we are not (or should not be) speaking of any of these situations, but only of those cases which are true exceptions to the rule in *Salomon v A Salomon & Co Ltd* [1897] AC 22, i e where a person who owns **D** and controls a company is said in certain circumstances to be identified with it in law by virtue of that ownership and control.

17   Most advanced legal systems recognise corporate legal personality while acknowledging some limits to its logical implications. In civil law jurisdictions, the juridical basis of the exceptions is generally the concept of abuse of rights, to which the International Court of Justice was referring in *In re Barcelona Traction, Light and Power Co Ltd (Second Phase) (Belguim* **E** *v Spain)* [1970] ICJ Rep 3 when it derived from municipal law a limited principle permitting the piercing of the corporate veil in cases of misuse, fraud, malfeasance or evasion of legal obligations. These examples illustrate the breadth, at least as a matter of legal theory, of the concept of abuse of rights, which extends not just to the illegal and improper invocation of a right but to its use for some purpose collateral to that for which it exists.

18   English law has no general doctrine of this kind. But it has a variety **F** of specific principles which achieve the same result in some cases. One of these principles is that the law defines the incidents of most legal relationships between persons (natural or artificial) on the fundamental assumption that their dealings are honest. The same legal incidents will not necessarily apply if they are not. The principle was stated in its most absolute form by Denning LJ in a famous dictum in *Lazarus Estates Ltd v* **G** *Beasley* [1956] 1 QB 702, 712:

> "No court in this land will allow a person to keep an advantage which he has obtained by fraud. No judgment of a court, no order of a Minister, can be allowed to stand if it has been obtained by fraud. Fraud unravels everything. The court is careful not to find fraud unless it is distinctly pleaded and proved; but once it is proved, it vitiates judgments, contracts **H** and all transactions whatsoever . . ."

The principle is mainly familiar in the context of contracts and other consensual arrangements, in which the effect of fraud is to vitiate consent so that the transaction becomes voidable ab initio. But it has been applied

A  altogether more generally, in cases which can be rationalised only on grounds of public policy, for example to justify setting aside a public act such as a judgment, which is in no sense consensual, a jurisdiction which has existed since at least 1775: *Duchess of Kingston's Case* (1776) 2 Smith's LC (13th ed) 644, 646, 651. Or to abrogate a right derived from a legal status, such as marriage: *R v Secretary of State for the Home Department,*
B  *Ex p Puttick* [1981] QB 767. Or to disapply a statutory time bar which on the face of the statute applies: *Welwyn Hatfield Borough Council v Secretary of State for Communities and Local Government* [2011] 2 AC 304. These decisions (and there are others) illustrate a broader principle governing cases in which the benefit of some apparently absolute legal principle has been obtained by dishonesty.   The authorities show that there are limited circumstances in which the law treats the use of a company as a means of
C  evading the law as dishonest for this purpose.

19   The question is heavily burdened by authority, much of it characterised by incautious dicta and inadequate reasoning. I propose, first, to examine those cases which seek to rationalise the case law in terms of general principle, and then to look at a number of cases in which the court has been thought, rightly or wrongly, to have pierced the corporate veil in
D  order to identify the critical features of these cases which enabled them to do so.

20   Almost all the modern analyses of the general principle have taken as their starting point the brief and obiter but influential statement of Lord Keith of Kinkel in *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90. This was an appeal from Scotland in which the House of Lords declined to allow the principal shareholder of a company to recover
E  compensation for the compulsory purchase of a property which the company occupied. The case was decided on its facts, but at p 96, Lord Keith, delivering the leading speech, observed that "it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere facade concealing the true facts."

21   The first systematic analysis of the large and disparate body of
F  English case law was undertaken by a strong Court of Appeal in *Adams v Cape Industries plc* [1990] Ch 433 (Slade, Mustill and Ralph Gibson LJJ). The question at issue in that case was whether the United Kingdom parent of an international mining group which was, at least arguably, managed as a "single economic unit" was present in the United States for the purpose of making a default judgment of a United States court enforceable against it in England. Among other arguments, it was suggested that it was present in the
G  United States by virtue of the fact that a wholly owned subsidiary was incorporated and carried on business there.   Slade LJ, delivering the judgment of the court, rejected this contention: pp 532–544. The court, adopting Lord Keith's dictum in *Woolfson v Strathclyde*, held that the corporate veil could be disregarded only in cases where it was being used for a deliberately dishonest purpose: pp 539, 540. Apart from that, and from
H  cases turning on the wording of particular statutes, it held at p 536 that:

"the court is not free to disregard the principle of *Salomon v A Salomon & Co Ltd* [1897] AC 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their

parent companies, will nevertheless under the general law fall to be    A
treated as separate legal entities with all the rights and liabilities which
would normally attach to separate legal entities."

22   In *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177, Sir Andrew
Morritt V-C reviewed many of the same authorities.  Mr Smallbone, the
former managing director of Trustor, had improperly procured large
amounts of its money to be paid out of its account to a company called    B
Introcom Ltd, incorporated in Gibraltar.   Introcom was owned and
controlled by a Liechtenstein trust of which Mr Smallbone was a beneficiary.
Its directors acted on his instructions.  At an earlier stage of the litigation,
Trustor had obtained summary judgment on some of its claims against
Introcom, on the footing that the payments were unauthorised and a breach
of Mr Smallbone's duty as managing director, that the company was "simply    C
a vehicle Mr Smallbone used for receiving money from Trustor", and that his
knowledge could be imputed to the company.  The Vice-Chancellor was
dealing with a subsequent application by Trustor for summary judgment
against Mr Smallbone himself.  It was accepted that there was an arguable
defence to the claims against him for damages or compensation for breach
of his duties as a director of Trustor.  Accordingly the sole basis of the    D
application was that he was liable to account as a constructive trustee on the
footing of knowing receipt.  This depended on the proposition that he was to
be identified with Introcom and so treated as having received the money
himself.  It was submitted that the authorities justified piercing the corporate
veil in three, possibly overlapping, cases: (i) where the company was a
"facade or sham"; (ii) where the company was involved in some form of
impropriety; and (iii) where it was necessary to do so in the interests of    E
justice.  In each of these cases, the right of the court to pierce the corporate
veil was said to be subject to there being no third party interests engaged,
such as unconnected minority shareholders or creditors.   Sir Andrew
Morritt V-C concluded that the authorities supported the submission in
case (i), and also in case (ii) provided that the impropriety was a relevant
one, i e "linked to the use of the company structure to avoid or conceal
liability for that impropriety": para 22.  He followed *Adams v Cape*    F
*Industries plc* in rejecting the submission as applied to case (iii).   In
summary, the court was "entitled to 'pierce the corporate veil' and recognise
the receipt of the company as that of the individual(s) in control of it if the
company was used as a device or facade to conceal the true facts, thereby
avoiding or concealing any liability of those individual(s)": see para 23.

23   For years after it was decided, *Adams v Cape Industries plc* was    G
regarded as having settled the general law on the subject.  But for much of
this period, the Family Division pursued an independent line, essentially for
reasons of policy arising from its concern to make effective its statutory
jurisdiction to distribute the property of the marriage on a divorce.   In
*Nicholas v Nicholas* [1984] FLR 285, the Court of Appeal (Cumming-Bruce
and Dillon LJJ) overturned the decision of the judge to order the husband to
procure the transfer to the wife of a property belonging to a company in    H
which he held a 71% shareholding, the other 29% being held by his business
associates.  However, both members of the court suggested, obiter, that the
result might have been different had it not been for the position of the
minority shareholders.  Cumming-Bruce LJ, at p 287, thought that, in that

A  situation, "the court does and will pierce the corporate veil and make an order which has the same effect as an order that would be made if the property was vested in the majority shareholder." Dillon LJ said, at p 292, that "If the company was [a] one-man company and the alter ego of the husband, I would have no difficulty in holding that there was power to order a transfer of the property." These dicta were subsequently applied by judges of the Family Division dealing with claims for ancillary financial relief, who

B  regularly made orders awarding to parties to the marriage assets vested in companies of which one of them was the sole shareholder. Connell J made such an order in *Green v Green* [1993] 1 FLR 326. In *Mubarak v Mubarak* [2001] 1 FLR 673, 682C, Bodey J held that for the purpose of claims to ancillary financial relief the Family Division would lift the corporate veil not only where the company was a sham but "when it is just and necessary", the

C  very proposition that the Court of Appeal had rejected as a statement of the general law in *Adams v Cape Industries plc* [1990] Ch 433. And in *Kremen v Agrest (No 2)* [2011] 2 FLR 490, para 46, Mostyn J held that there was a "strong practical reason why the cloak should be penetrable even absent a finding of wrongdoing".

24    There were of course dissenting voices, even in decisions on ancillary relief. Much the most significant of them for present purposes was that of

D  Munby J. In *A v A* [2007] 2 FLR 467, paras 18–19, he drew attention to the robust approach which had always been adopted by judges of the Family Division in seeing through sham arrangements designed to hide the ownership of assets of the marriage by vesting them in relatives or companies which were in reality holding them as their nominees. But he warned against departing from fundamental legal principle. He observed, at

E  para 21:

"In this sense, and to this limited extent, the typical case in the Family Division may differ from the typical case in (say) the Chancery Division. But what it is important to appreciate (and too often, I fear, is not appreciated at least in this division) is that the relevant legal principles which have to be applied are precisely the same in this division as in the

F  other two divisions. There is not one law of 'sham' in the Chancery Division and another law of 'sham' in the Family Division. There is only one law of 'sham', to be applied equally in all three divisions of the High Court, just as there is but one set of principles, again equally applicable in all three divisions, determining whether or not it is appropriate to 'pierce the corporate veil.' "

G  25    In *Ben Hashem v Al Shayif* [2009] 1 FLR 115, another decision of Munby J, the difference between the approach taken in the Family Division and in other divisions of the High Court arose in a particularly acute form, because he was hearing the claim for ancillary relief in conjunction with proceedings in the Chancery Division. In the Family Division, the wife was seeking an order transferring to her a property which she was occupying but which was owned by a company controlled by the husband, while in the

H  Chancery proceedings the company was seeking a possession order in respect of the same property. After reminding himself of what he had said in *A v A* and conducting a careful review of both family and non-family cases, Munby J formulated six principles at paras 159–164 which he considered could be derived from them: (i) ownership and control of a company were

not enough to justify piercing the corporate veil; (ii) the court cannot pierce   A
the corporate veil, even in the absence of third party interests in the
company, merely because it is thought to be necessary in the interests of
justice; (iii) the corporate veil can be pierced only if there is some
impropriety; (iv) the impropriety in question must, as Sir Andrew
Morritt V-C had said in the *Trustor* case [2001] 1 WLR 1177, be "linked to
the use of the company structure to avoid or conceal liability"; (v) to justify   B
piercing the corporate veil, there must be "*both* control of the company by
the wrongdoer(s) *and* impropriety, that is (mis)use of the company by them
as a device or facade to conceal their wrongdoing"; and (vi) the company
may be a "facade" even though it was not originally incorporated with any
deceptive intent, provided that it is being used for the purpose of deception
at the time of the relevant transactions.  The court would, however, pierce
the corporate veil only so far as it was necessary in order to provide a remedy   C
for the particular wrong which those controlling the company had done.

   26   In *VTB Capital plc v Nutritek International Corpn* [2012] 2 Lloyd's
Rep 313, VTB Capital sought permission to serve proceedings out of the
jurisdiction on the footing that the borrower under a facility agreement was
to be identified with the persons who controlled it, so as to make the latter in
law parties to the same agreement.  The attempt failed in the Court of
Appeal because the court was not satisfied that that would be the            D
consequence of piercing the corporate veil even if it were legitimate to do so:
see paras 90–91.  The decision is not, therefore, direct authority on the
question whether the court was entitled to pierce the corporate veil.  But the
court considered all the principal authorities on that question and arrived at
substantially the same conclusions as Sir Andrew Morritt V-C and Munby J.
Munby J's statement of principle was adopted by the Court of Appeal         E
subject to two qualifications.  First, they said that it was not necessary in
order to pierce the corporate veil that there should be no other remedy
available against the wrongdoer, and so far as Munby J suggested that it
was, he had set the bar too high.  Secondly, they said that it was not enough
to show that there had been wrongdoing.  "The relevant wrongdoing must
be in the nature of an independent wrong that involves the fraudulent       F
or dishonest misuse of the corporate personality of the company for the
purpose of concealing the true facts": see paras 79–80.  On this point,
the case took the same course in the Supreme Court [2013] 2 WLR 398,
which dismissed VTB Capital's appeal.  So far as piercing the corporate
veil is concerned, the court's reasons were given by Lord Neuberger of
Abbotsbury PSC. He noted the broad consensus among judges and textbook
writers that there were circumstances in which separate legal personality of a   G
company might be disregarded and the company identified with those who
owned and controlled it.  However, he declined to decide whether the
consensus was right on an appeal from an interlocutory decision, given that,
like the Court of Appeal, he considered that even if the veil were pierced the
result would not be to make a company's controllers party to its contracts
with third parties.  But he adopted, as it seems to me, both the general
reasoning of the Court of Appeal and the view of Munby J that any doctrine   H
permitting the court to pierce the corporate veil must be limited to cases
where there was a relevant impropriety: see paras 128, 145.

   27   In my view, the principle that the court may be justified in piercing
the corporate veil if a company's separate legal personality is being abused

A for the purpose of some relevant wrongdoing is well established in the authorities. It is true that most of the statements of principle in the authorities are obiter, because the corporate veil was not pierced. It is also true that most cases in which the corporate veil was pierced could have been decided on other grounds. But the consensus that there are circumstances in which the court may pierce the corporate veil is impressive. I would not for my part be willing to explain that consensus out of existence. This is because B I think that the recognition of a limited power to pierce the corporate veil in carefully defined circumstances is necessary if the law is not to be disarmed in the face of abuse. I also think that provided the limits are recognised and respected, it is consistent with the general approach of English law to the problems raised by the use of legal concepts to defeat mandatory rules of law.

C   28   The difficulty is to identify what is a relevant wrongdoing. References to a "facade" or "sham" beg too many questions to provide a satisfactory answer. It seems to me that two distinct principles lie behind these protean terms, and that much confusion has been caused by failing to distinguish between them. They can conveniently be called the concealment principle and the evasion principle. The concealment principle is legally banal and does not involve piercing the corporate veil at all. It is that the D interposition of a company or perhaps several companies so as to conceal the identity of the real actors will not deter the courts from identifying them, assuming that their identity is legally relevant. In these cases the court is not disregarding the "facade", but only looking behind it to discover the facts which the corporate structure is concealing. The evasion principle is different. It is that the court may disregard the corporate veil if there is a E legal right against the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement. Many cases will fall into both categories, but in some circumstances the difference between them may be critical. This may be illustrated by reference to those cases in which the court has been thought, rightly or wrongly, to have pierced the corporate veil.

F   29   The first and most famous of them is *Gilford Motor Co Ltd v Horne* [1933] Ch 935. Mr E B Horne had been the managing director of the Gilford Motor Co. His contract of employment precluded him being engaged in any competing business in a specified geographical area for five years after the end of his employment "either solely or jointly with or as agent for any other person, firm or company". He left Gilford and carried on G a competing business in the specified area, initially in his own name. He then formed a company, JM Horne & Co Ltd, named after his wife, in which she and a business associate were shareholders. The trial judge, Farwell J, found that the company had been set up in this way to enable the business to be carried on under his own control but without incurring liability for breach of the covenant. However the reality, in his view, was that the company was being used as "the channel through which the defendant Horne was carrying H on his business": p 943. In fact, he dismissed the claim on the ground that the restrictive covenant was void. But the Court of Appeal allowed the appeal on that point and granted an injunction against both Mr Horne and the company. As against Mr Horne, the injunction was granted on the concealment principle. Lord Hanworth MR said, at pp 961–962, that the

company was a "mere cloak or sham" because the business was really being   A
carried on by Mr Horne. Because the restrictive covenant prevented
Mr Horne from competing with his former employers whether as principal
or as agent for another, it did not matter whether the business belonged to
him or to JM Horne & Co Ltd provided that he was carrying it on. The only
relevance of the interposition of the company was to maintain the pretence
that it was being carried on by others. Lord Hanworth MR did not explain   B
why the injunction should issue against the company, but I think it is clear
from the judgments of Lawrence and Romer LJJ, at pp 962 and 966, that
they were applying the evasion principle. Lawrence LJ, who gave the fullest
consideration to the point, based his view entirely on Mr Horne's evasive
motive for forming the company. This showed that it was "a mere channel
used by the defendant Horne for the purpose of enabling him, for his own
benefit, to obtain the advantage of the customers of the plaintiff company,   C
and that therefore the defendant company ought to be restrained as well as
the defendant Horne." In other words, the company was restrained in order
to ensure that Horne was deprived of the benefit which he might otherwise
have derived from the separate legal personality of the company. I agree
with the view expressed by the Court of Appeal in *VTB Capital v Nutritek*
[2012] 2 Lloyd's Rep 313, para 63, that this is properly to be regarded as a
decision to pierce the corporate veil. It is fair to say that the point may have   D
been conceded by counsel, although in rather guarded terms ("if the evidence
admitted of the conclusion that what was being done was a mere cloak or
sham"). It is also true that the court in *Gilford Motor Co Ltd v Horne*
[1933] Ch 935 might have justified the injunction against the company on
the ground that Mr Horne's knowledge was to be imputed to the company
so as to make the latter's conduct unconscionable or tortious, thereby   E
justifying the grant of an equitable remedy against it. But the case is
authority for what it decided, not for what it might have decided, and in my
view the principle which the Court of Appeal applied was correct. It does
not follow that JM Horne & Co Ltd was to be identified with Mr Horne for
any other purpose. Mr Horne's personal creditors would not, for example,
have been entitled simply by virtue of the facts found by Farwell J, to enforce
their claims against the assets of the company.   F

    30  *Jones v Lipman* [1962] 1 WLR 832 was a case of very much the same
kind. The facts were that Mr Lipman sold a property to the plaintiffs for
£5,250 and then, thinking better of the deal, sold it to a company called
Alamed Ltd for £3,000, in order to make it impossible for the plaintiffs to get
specific performance. The judge, Russell J, found that company was wholly
owned and controlled by Mr Lipman, who had bought it off the shelf and   G
had procured the property to be conveyed to it "solely for the purpose of
defeating the plaintiffs' rights to specific performance." About half of the
purchase price payable by Alamed was funded by borrowing from a bank,
and the rest was left outstanding. The judge decreed specific performance
against both Mr Lipman and Alamed Ltd. As against Mr Lipman this was
done on the concealment principle. Because Mr Lipman owned and
controlled Alamed Ltd, he was in a position specifically to perform his   H
obligation to the plaintiffs by exercising his powers over the company. This
did not involve piercing the corporate veil, but only identifying Mr Lipman
as the man in control of the company. The company, said Russell J
portentously at p 836, was "a device and a sham, a mask which [Mr Lipman]

A   holds before his face in an attempt to avoid recognition by the eye of equity."
On the other hand, as against Alamed Ltd itself, the decision was justified on
the evasion principle, by reference to the Court of Appeal's decision in
*Gilford Motor Co Ltd v Horne.* The judge must have thought that in the
circumstances the company should be treated as having the same obligation
to convey the property to the plaintiff as Mr Lipman had, even though it was
B   not party to the contract of sale. It should be noted that he decreed specific
performance against the company notwithstanding that as a result of the
transaction, the company's main creditor, namely the bank, was prejudiced
by its loss of what appears from the report to have been its sole asset apart
from a possible personal claim against Mr Lipman which he may or may not
have been in a position to meet. This may be thought hard on the bank, but
it is no harder than a finding that the company was not the beneficial owner
C   at all. The bank could have protected itself by taking a charge or registering
the contract of sale.

31   In *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734, the plaintiff made
a large number of claims against a former director, Mr Dalby, for
misappropriating its funds. For present purposes the claim which matters is
a claim for an account of a secret profit which Mr Dalby procured to be paid
by a third party, Balfour Beatty, to a British Virgin Island company under his
D   control called Burnstead. Rimer J held, at para 26, that Mr Dalby was
accountable for the money received by Burnstead, on the ground that the
latter was "in substance little other than Mr Dalby's offshore bank account
held in a nominee name", and "simply . . . the alter ego through which
Mr Dalby enjoyed the profit which he earned in breach of his fiduciary duty
to ACP." Rimer J ordered an account against both Mr Dalby and Burnstead.
E   He considered that he was piercing the corporate veil. But I do not think that
he was. His findings about Mr Dalby's relationship with the company
and his analysis of the legal consequences show that both Mr Dalby and
Burnstead were independently liable to account to ACP, even on the footing
that they were distinct legal persons. If, as the judge held, Burnstead was
Mr Dalby's nominee for the purpose of receiving and holding the secret
profit, it followed that Burnstead had no right to the money as against
F   Mr Dalby, who had in law received it through Burnstead and could properly
be required to account for it to ACP. Burnstead itself was liable to account to
ACP because, as the judge went on to point out, Mr Dalby's knowledge of
the prior equitable interest of ACP was to be imputed to it. As Rimer J
observed, "The introduction into the story of such a creature company is . . .
insufficient to prevent equity's eye from identifying it with Mr Dalby". This
G   is in reality the concealment principle. The correct analysis of the situation
was that the court refused to be deterred by the legal personality of the
company from finding the true facts about its legal relationship with
Mr Dalby. It held that the nature of their dealings gave rise to ordinary
equitable claims against both. The result would have been exactly the same
if Burnstead, instead of being a company, had been a natural person, say
Mr Dalby's uncle, about whose separate existence there could be no doubt.
H
32   The same confusion of concepts is, with respect, apparent in
Sir Andrew Morritt V-C's analysis in *Trustor AB v Smallbone (No 2)* [2001]
1 WLR 1177, which I have already considered. The Vice-Chancellor's
statement of principle at para 23 that the court was entitled to pierce the
corporate veil if the company was used as a "device or facade to conceal the

true facts thereby avoiding or concealing any liability of those individual(s)"  A
elides the quite different concepts of concealment and avoidance. As I read
his reasons for giving judgment against Mr Smallbone, at paras 24–25, he
did so on the concealment principle. It had been found at the earlier stage of
the litigation that Introcom was "simply a vehicle Mr Smallbone used for
receiving money from Trustor", and that the company was a "device or
facade" for concealing that fact. On that footing, the company received the     B
money on Mr Smallbone's behalf. This conclusion did not involve piercing
the corporate veil, and did not depend on any finding of impropriety. It was
simply an application of the principle summarised by the Sir Andrew
Morritt V-C at para 19 of his judgment, that receipt by a company will count
as receipt by the shareholder if the company received it as his agent or
nominee, but not if it received it in its own right. To decide that question, it
was necessary to establish the facts which demonstrated the true legal         C
relationship between Mr Smallbone and Introcom.    Mr Smallbone's
ownership and control of Introcom was only one of those facts, not in itself
conclusive. Other factors included the circumstances and the source of the
receipt, and the nature of the company's other transactions if any.

33   In the *Trustor* case, as in the *Gencor* case, the analysis would have
been the same if Introcom had been a natural person instead of a company.     D
The evasion principle was not engaged, and indeed could not have been
engaged on the facts of either case. This is because neither Mr Dalby nor
Mr Smallbone had used the company's separate legal personality to evade a
liability that they would otherwise have had. They were liable to account
only if the true facts were that the company had received the money as their
agent or nominee. That was proved in both cases. If it had not been, there
would have been no receipt, knowing or otherwise, and therefore no claim     E
to be evaded. The situation was not the same as it had been in *Gilford Motor
Co v Horne* [1933] Ch 935 and *Jones v Lipman* [1962] 1 WLR 832, for in
these cases the real actors, Mr Horne and Mr Lipman, had a liability which
arose independently of the involvement of the company.

34   These considerations reflect the broader principle that the corporate
veil may be pierced only to prevent the abuse of corporate legal personality.   F
It may be an abuse of the separate legal personality of a company to use it to
evade the law or to frustrate its enforcement. It is not an abuse to cause a
legal liability to be incurred by the company in the first place. It is not an
abuse to rely on the fact (if it is a fact) that a liability is not the controller's
because it is the company's. On the contrary, that is what incorporation is
all about. Thus in a case like *VTB Capital v Nutritek* [2012] 2 Lloyd's Rep
313; [2013] 2 WLR 398, where the argument was that the corporate veil      G
should be pierced so as to make the controllers of a company jointly and
severally liable on the company's contract, the fundamental objection to the
argument was that the principle was being invoked so as to create a new
liability that would not otherwise exist. The objection to that argument is
obvious in the case of a consensual liability under a contract, where the
ostensible contracting parties never intended that any one else should be
party to it. But the objection would have been just as strong if the liability in   H
question had not been consensual.

35   I conclude that there is a limited principle of English law which
applies when a person is under an existing legal obligation or liability or
subject to an existing legal restriction which he deliberately evades or whose

A    enforcement he deliberately frustrates by interposing a company under his
control. The court may then pierce the corporate veil for the purpose, and
only for the purpose, of depriving the company or its controller of the
advantage that they would otherwise have obtained by the company's
separate legal personality. The principle is properly described as a limited
one, because in almost every case where the test is satisfied, the facts will in
practice disclose a legal relationship between the company and its controller
B    which will make it unnecessary to pierce the corporate veil. Like Munby J in
*Ben Hashem v Al Shayif* [2009] 1 FLR 115, I consider that if it is not necessary
to pierce the corporate veil, it is not appropriate to do so, because on that
footing there is no public policy imperative which justifies that course.
I therefore disagree with the Court of Appeal in *VTB Capital v Nutritek*
[2012] 2 Lloyd's Rep 313 who suggested otherwise at para 79. For all of these
C    reasons, the principle has been recognised far more often than it has been
applied. But the recognition of a small residual category of cases where the
abuse of the corporate veil to evade or frustrate the law can be addressed only
by disregarding the legal personality of the company is, I believe, consistent
with authority and with long-standing principles of legal policy.

36    In the present case, Moylan J held that he could not pierce the
corporate veil under the general law without some relevant impropriety, and
D    declined to find that there was any. In my view he was right about this.
The husband has acted improperly in many ways. In the first place, he has
misapplied the assets of his companies for his own benefit, but in doing that he
was neither concealing nor evading any legal obligation owed to his wife.
Nor, more generally, was he concealing or evading the law relating to the
distribution of assets of a marriage on its dissolution. It cannot follow that
E    the court should disregard the legal personality of the companies with the
same insouciance as he did. Secondly, the husband has made use of the
opacity of the Petrodel Group's corporate structure to deny being its owner.
But that, as the judge pointed out, at para 219, "is simply [the] husband giving
false evidence." It may engage what I have called the concealment principle,
but that simply means that the court must ascertain the truth that he has
concealed, as it has done. The problem in the present case is that the legal
F    interest in the properties is vested in the companies and not in the husband.
They were vested in the companies long before the marriage broke up.
Whatever the husband's reasons for organising things in that way, there is no
evidence that he was seeking to avoid any obligation which is relevant in these
proceedings. The judge found that his purpose was "wealth protection and
the avoidance of tax": para 218. It follows that the piercing of the corporate
G    veil cannot be justified in this case by reference to any general principle of law.

### Section 24(1)(a) of the Matrimonial Causes Act 1973

37    If there is no justification as a matter of general legal principle for
piercing the corporate veil, I find it impossible to say that a special and wider
principle applies in matrimonial proceedings by virtue of section 24(1)(a) of
the Matrimonial Causes Act 1973. The language of this provision is clear.
H    It empowers the court to order one party to the marriage to transfer to
the other "property to which the first-mentioned party is entitled, either in
possession or reversion". An "entitlement" is a legal right in respect of the
property in question. The words "in possession or reversion" show that
the right in question is a proprietary right, legal or equitable. This section is

**Prest v Prest (SC(E))**                                    [2013] 3 WLR
**Lord Sumption JSC**

invoking concepts with an established legal meaning and recognised legal     A
incidents under the general law. Courts exercising family jurisdiction do not
occupy a desert island in which general legal concepts are suspended or
mean something different. If a right of property exists, it exists in every
division of the High Court and in every jurisdiction of the county courts. If it
does not exist, it does not exist anywhere. It is right to add that even where
courts exercising family jurisdiction have claimed a wider jurisdiction to     B
pierce the corporate veil than would be recognised under the general law,
they have not usually suggested that this can be founded on section 24 of the
Matrimonial Causes Act 1973. On the contrary, in *Nicholas v Nicholas*
[1984] FLR 285, 288, Cumming-Bruce LJ said that it could not.

    38  This analysis is not affected by section 25(2)(a) of the Matrimonial
Causes Act 1973. Section 25(2)(a) requires the court when exercising the
powers under section 24, to have regard to the "income, earning capacity,     C
property and other financial resources which each of the parties to the
marriage has or is likely to have in the foreseeable future". The breadth and
inclusiveness of this definition of the relevant resources of the parties to the
marriage means that the relevant spouse's ownership and control of a
company and practical ability to extract money or money's worth from it are
unquestionably relevant to the court's assessment of what his resources      D
really are. That may affect the amount of any lump sum or periodical
payment orders, or the decision what transfers to order of other property
which unquestionably belongs to the relevant spouse. But it does not follow
from the fact that one spouse's worth may be boosted by his access to the
company's assets that those assets are specifically transferrable to the other
under section 24(1)(a).

    39  Moylan J considered that it was enough to justify his order to     E
transfer the properties that the husband should have the practical ability
to procure their transfer, whether or not he was their beneficial owner.
He found that this was established in the present case because of the power
which the husband had over the companies by virtue of owning and
controlling them. The judge did not make any finding about whether the
properties of the corporate respondents were held in trust for the husband,     F
except in the case of the matrimonial home in Warwick Avenue, which
he found to be beneficially his. What he held was that the assets of the
companies were "effectively" the husband's property, because he treated
them as such. He was "able to procure their disposal as he may direct, based
again on his being the controller of the companies and the only beneficial
owner": para 210. The judge accepted that as a matter of company law, the
husband as shareholder had no more than a right of participation in     G
accordance with the company's constitution, and that that did not confer
any right to any particular property of the company. "But, what if the
shareholder is, in fact, able to procure the transfer to them of a particular
item of company property, such as a matrimonial home," the judge asked,
"as a result of their control and ownership of the company and the absence
of any third party interests." The judge's answer to that question was that
the "purpose and intention" of the Matrimonial Causes Act 1973 was that     H
the companies' assets should be treated as part of the marital wealth.
"Effectively", he said, "the husband, in respect of the companies and their
assets, is in the same position he would be in if he was *the beneficiary* of a
bare trust or the companies were his nominees": para 225.

A    40   I do not accept this, any more than the Court of Appeal did. The judge was entitled to take account of the husband's ownership and control of the companies and his unrestricted access to the companies' assets in assessing what his resources were for the purpose of section 25(2)(a). But he was not entitled to order the companies' assets to be transferred to the wife in satisfaction of the lump sum order simply by virtue of section 24(1)(a). I do
B    not doubt that the construction of section 24(1)(a) of the Act is informed by its purpose and its social context, as well as by its language. Nor do I doubt that the object is to achieve a proper division of the assets of the marriage. But it does not follow that the courts will stop at nothing in their pursuit of that end, and there are a number of principled reasons for declining to give the section the effect that the judge gave it. In the first place, it is axiomatic that general words in a statute are not to be read in a way which "would
C    overthrow fundamental principles, infringe rights, or depart from the general system of law, without expressing its intention with irresistible clearness". The words are those of Lord Atkin in *Nokes v Doncaster Amalgamated Collieries Ltd* [1940] AC 1014, 1031–1032, but the principle is very familiar and has been restated by the courts in many contexts and at every level. There is nothing in the Matrimonial Causes Act 1973 and nothing in its
D    purpose or broader social context to indicate that the legislature intended to authorise the transfer by one party to the marriage to the other of property which was not his to transfer. Secondly, a transfer of this kind will ordinarily be unnecessary for the purpose of achieving a fair distribution of the assets of the marriage. Where assets belong to a company owned by one party to the marriage, the proper claims of the other can ordinarily be satisfied by directing the transfer of the shares. It is true that this will not always be
E    possible, particularly in cases like this one where the shareholder and the company are both resident abroad in places which may not give direct effect to the orders of the English court. In an age of internationally mobile spouses and assets this is a more significant problem than it once was, but such cases remain the exception rather than the rule. Section 24 cannot be construed as if it were directed to that problem. Third, so far as a party to matrimonial
F    proceedings deliberately attempts to frustrate the exercise of the court's ancillary powers by disposing of assets, section 37 provides for the setting aside of those dispositions in certain circumstances. Section 37 is a limited provision which is very far from being a complete answer to the problem, but it is as far as the legislature has been prepared to go.

41   The recognition of a jurisdiction such as the judge sought to exercise in this case would cut across the statutory schemes of company and
G    insolvency law.    These include elaborate provisions regulating the repayment of capital to shareholders and other forms of reduction of capital, and for the recovery in an insolvency of improper dispositions of the company's assets. These schemes are essential for the protection of those dealing with a company, particularly where it is a trading company like PRL and Vermont. The effect of the judge's order in this case was to make the
H    wife a secured creditor. It is no answer to say, as occasionally has been said in cases about ancillary financial relief, that the court will allow for known creditors. The truth is that in the case of a trading company incurring and discharging large liabilities in the ordinary course of business, a court of family jurisdiction is not in a position to conduct the kind of notional liquidation attended by detailed internal investigation and wide publicity

which would be necessary to establish what its liabilities are. In the present    A
case, the difficulty is aggravated by the fact that the last financial statements,
which are not obviously unreliable, are more than five years old. To some
extent that is the fault of the husband and his companies, but that is unlikely
to be much comfort to unsatisfied creditors with no knowledge of the state of
the shareholder's marriage or the proceedings in the Family Division. It is
clear from the judge's findings of fact that this particular husband made free    B
with the company's assets as if they were his own. That was within his
power, in the sense that there was no one to stop him. But, as the judge
observed, he never stopped to think whether he had any right to act in this
way, and in law, he had none. The sole shareholder or the whole body of
shareholders may approve a foolish or negligent decision in the ordinary
course of business, at least where the company is solvent: *Multinational Gas
and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd*       C
[1983] Ch 258. But not even they can validly consent to their own
appropriation of the company's assets for purposes which are not the
company's: *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979]
Ch 250, 261 (Buckley LJ), *In re Attorney General's Reference (No 2 of
1982)* [1984] QB 624, *R v Gomez* [1993] AC 442, 496–497 (Lord Browne-
Wilkinson). Mr Prest is of course not the first person to ignore the separate    D
personality of his company and pillage its assets, and he will certainly not
be the last. But for the court to deploy its authority to authorise the
appropriation of the company's assets to satisfy a personal liability of its
shareholder to his wife, in circumstances where the company has not only
not consented to that course but vigorously opposed it, would, as it seems to
me, be an even more remarkable break with principle.

42   It may be said, as the judge in effect did say, that the way in which the    E
affairs of this company were conducted meant that the corporate veil had no
reality. The problem about this is that if, as the judge thought, the property
of a company is property to which its sole shareholder is "entitled, either in
possession or reversion", then that will be so even in a case where the sole
shareholder scrupulously respects the separate personality of the company
and the requirements of the Companies Acts, and even in a case where none
of the exceptional circumstances that may justify piercing the corporate veil    F
applies. This is a proposition which can be justified only by asserting that
the corporate veil does not matter where the husband is in sole control of the
company. But that is plainly not the law.

*Beneficial ownership of the properties*

43   It follows from the above analysis that the only basis on which the    G
companies can be ordered to convey the seven disputed properties to the wife
is that they belong beneficially to the husband, by virtue of the particular
circumstances in which the properties came to be vested in them. Only then
will they constitute property to which the husband is "entitled, either in
possession or reversion." This is the issue which the judge felt that he did not
need to decide. But on the footing that he was wrong about the ambit of
section 24(1)(a), it does need to be decided now. The issue requires an    H
examination of evidence which is incomplete and in critical respects obscure.
A good deal therefore depends on what presumptions may properly be made
against the husband given that the defective character of the material is
almost entirely due to his persistent obstruction and mendacity.

A    44   In *British Railways Board v Herrington* [1972] AC 877, 930–931,
Lord Diplock, dealing with the liability of a railway undertaking for injury
suffered by trespassers on the line, said:

"The appellants, who are a public corporation, elected to call no
witnesses, thus depriving the court of any positive evidence as to whether
the condition of the fence and the adjacent terrain had been noticed by any
B    particular servant of theirs or as to what he or any other of their servants
either thought or did about it. This is a legitimate tactical move under our
adversarial system of litigation. But a defendant who adopts it cannot
complain if the court draws from the facts which have been disclosed all
reasonable inferences as to what are the facts which the defendant has
chosen to withhold. A court may take judicial notice that railway lines are
regularly patrolled by linesmen and Bangers. In the absence of evidence to
C    the contrary, it is entitled to infer that one or more of them in the course of
several weeks noticed what was plain for all to see. Anyone of common
sense would realise the danger that the state of the fence so close to the live
rail created for little children coming to the meadow to play. As the
appellants elected to call none of the persons who patrolled the line there
is nothing to rebut the inference that they did not lack the common sense
D    to realise the danger. A court is accordingly entitled to infer from the
inaction of the appellants that one or more of their employees decided to
allow the risk to continue of some child crossing the boundary and being
injured or killed by the live rail rather than to incur the trivial trouble and
expense of repairing the gap in the fence."

The courts have tended to recoil from some of the fiercer parts of this
E    statement, which appear to convert open-ended speculation into findings of
fact. There must be a reasonable basis for some hypothesis in the evidence or
the inherent probabilities, before a court can draw useful inferences from a
party's failure to rebut it. For my part I would adopt, with a modification
which I shall come to, the more balanced view expressed by Lord Lowry
with the support of the rest of the committee in *R v Inland Revenue Comrs,
F    Ex p Coombs (TC) & Co* [1991] 2 AC 283, 300:

"In our legal system generally, the silence of one party in face of the
other party's evidence may convert that evidence into proof in relation to
matters which are, or are likely to be, within the knowledge of the silent
party and about which that party could be expected to give evidence. Thus,
depending on the circumstances, a prima facie case may become a
strong or even an overwhelming case. But, if the silent party's failure
G    to give evidence (or to give the necessary evidence) can be credibly
explained, even if not entirely justified, the effect of his silence in favour of
the other party, may be either reduced or nullified."

Cf *Wisniewski v Central Manchester Health Authority* [1998] PIQR P324,
P340.
45   The modification to which I have referred concerns the drawing of
H    adverse inferences in claims for ancillary financial relief in matrimonial
proceedings, which have some important distinctive features. There is a
public interest in the proper maintenance of the wife by her former husband,
especially (but not only) where the interests of the children are engaged.
Partly for that reason, the proceedings although in form adversarial have a

substantial inquisitorial element. The family finances will commonly have
been the responsibility of the husband, so that although technically a
claimant, the wife is in reality dependent on the disclosure and evidence of
the husband to ascertain the extent of her proper claim. The concept of the
burden of proof, which has always been one of the main factors inhibiting the
drawing of adverse inferences from the absence of evidence or disclosure,
cannot be applied in the same way to proceedings of this kind as it is in
ordinary civil litigation. These considerations are not a licence to engage in
pure speculation. But judges exercising family jurisdiction are entitled to
draw on their experience and to take notice of the inherent probabilities when
deciding what an uncommunicative husband is likely to be concealing. I refer
to the husband because the husband is usually the economically dominant
party, but of course the same applies to the economically dominant spouse
whoever it is.

46    The facts, so far as the judge was able to make findings about them,
are that the London properties were acquired as follows:

| December 1995 | Flat 4, 27 Abbey Road was transferred to PRL by the husband for £1. It had been bought by him in 1991, before the marriage and before the incorporation of PRL. There are two charges on the property, in favour of Ahli United Bank and BNP Paribas, apparently to secure loans made to PRL. Neither the husband nor PRL has complied with orders to disclose the loan agreement and related documents. |
|---|---|
|  | Flat 5, 27 Abbey Road was transferred to PRL on the same day, also for £1, by the husband's younger brother Michel. It had been bought in March of that year for £48,650 in Michel's name. The wife's evidence was that, at the time, Michel was a student in London with no substantial assets of his own who was being supported by her husband. She said that her husband had led her to believe that he had paid for it. |
| March 1996 | Flat 2, 143 Ashmore Road, is a leasehold property transferred to PRL for £1 by the wife. It had originally been bought by the husband in November 1992 in the name of someone called Jimmy Lawrence. There is no information about Jimmy Lawrence or the reasons for his involvement. According to the husband's evidence, the purchase money came from PRL, but since PRL was not incorporated until six months after that, this cannot be correct. At some stage, it is unclear when or how, the lease was transferred into the name of the wife, and she must have signed the transfer when it was conveyed to PRL, but she had no recollection of being involved or of ever having owned it. |

| 1998 | The wife transferred her interest in the freehold of 143 Ashmore Street to PRL. The freehold had originally been bought in 1996 in the name of the wife and one Esta Blechman, who was the leasehold owner of another flat in the building. There is no information about the consideration paid either in 1996 or in 1998. The husband's evidence was the funds to buy the wife's interest in 1996 came from PRL. |
| August 2000 | Flat 6, 62–64 Beethoven Street was transferred to PRL by the husband for £85,000. He had originally bought it in 1988 (before the marriage) for £70,500. The property is charged to secure the loans made by Ahli United Bank and BNP Paribas. |
| May 2001 | The matrimonial home, 16 Warwick Avenue, was bought in the name of PRL for £1·4m and subsequently refurbished at a cost of about £1m. The judge rejected the husband's evidence that the purchase price and refurbishment costs were funded by PRL, because at that stage the company had not commenced trading operations. He found that they were funded from bonuses earned by the husband, presumably, at this stage, from his last employer before he set up on his own. The judge found that PRL had always held this property on trust for the husband and that conclusion is not challenged on this appeal. The property is charged to secure the loans made by Ahli United Bank and BNP Paribas. In accordance with the judge's order PRL has now conveyed it to the wife, but subject to the charges. |
| July 2001 | Flat 310, Pavilion Apartments was bought in the name of Vermont for £635,000. The judge found that the money was derived from PRL. |
| January 2004 | 11 South Lodge, Circus Road, was bought in the name of Vermont for £700,000. The judge found that the purchase price was also derived from PRL. The property is charged to secure the loans made to Ahli United Bank and BNP Paribas. |

The judge recorded the wife's evidence that the husband had once advised her that if anything were to happen to him, she should sell all the properties, move to Nevis and use the proceeds of sale to meet her living expenses there.

47   The starting point is that in her points of claim the wife expressly alleged, among other things, that the husband used the corporate defendants to hold legal title to properties that belonged beneficially to him. All seven

of the properties in dispute on this appeal were identified in her pleading as
having been held for him in this way. In her section 25 statement, she gives
evidence of her belief that he was their beneficial owner, supported in some
cases by admittedly inconclusive reasons for that belief.   Neither the
husband nor the companies have complied with orders for the production of
the completion statements on the purchase of the properties and evidence of
the source of the money used to pay the purchase price. The companies
were joined to these proceedings only because they were alleged to be
trustees for the husband of the shareholdings and the properties and because
orders were being sought for their transfer to the wife. Yet the companies
failed to file a defence, or to comply with orders for disclosure. One of the
few things that is clear from Mr Murphy's affidavit was that the companies'
refusal to co-operate was deliberate, notwithstanding that they were
conscious that the London properties (unlike the other assets) were within
the jurisdiction of the court, which was in a position directly to enforce any
order that it might make in respect of them. The only explanation proffered
for their contumacy was that the information was confidential to the
companies' shareholders or "commercial partners". It is difficult to imagine
that any commercial partners could enjoy rights of confidence over
information concerning residential investment properties in London, and on
the judge's findings the only shareholder was the husband himself.
The only directly relevant evidence given by Mr Murphy in his affidavit
is a bald assertion that the companies are the sole beneficial owners of
the shareholdings and the properties, but he declined to appear for
cross-examination on it. The judge rejected his explanation that his health
was not up to it. The judge's findings about the ownership and control of
the companies mean that the companies' refusal to co-operate with these
proceedings is a course ultimately adopted on the direction of the husband.
It is a fair inference from all these facts, taken cumulatively, that the main, if
not the only, reason for the companies' failure to co-operate is to protect the
London properties. That in turn suggests that proper disclosure of the facts
would reveal them to have been held beneficially by the husband, as the wife
has alleged.

48  Turning to what is known about the acquisition of the disputed
properties, PRL acquired the legal interest in six London properties
(including the matrimonial home) between 1995 and 2001. All of these
properties were acquired by PRL before it began commercial operations and
began to generate funds of its own. This was the main basis on which the
judge found that the matrimonial home was held on trust for the husband
from its acquisition in 2001. Since, as the judge found, no rent was paid
to PRL for the family's occupation of the matrimonial home, this is a
particularly clear case of the husband using PRL as a vehicle to hold legal
title on trust for himself.

49  Of the other five properties owned by PRL, the first category
comprises the three properties (Flats 4 and 5, 27 Abbey Road, and Flat 2,
143 Ashmore Road) acquired by the company in December 1995 and
March 1996, in each case for a nominal consideration of £1. Since no
explanation has been forthcoming for the gratuitous transfer of these
properties to PRL, there is nothing to rebut the ordinary presumption of
equity that PRL was not intended to acquire a beneficial interest in them.
The only question is who did hold the beneficial interest. Flat 4, 27 Abbey

A  Road was transferred by the husband, who had originally bought it in his
own name in 1991, before PRL was incorporated. There is therefore an
ordinary resulting trust back to the husband, which is held by him subject
to the charges in favour of Ahli United Bank and BNP Paribas. Flat 5,
27 Abbey Road was transferred to PRL by the husband's younger brother
Michel. He had acquired title shortly before at a time when he could not
B  have paid for it himself. The wife's evidence was that the husband paid for
it. Again, there is no evidence to rebut the ordinary inference that the
husband was the beneficial owner of the property at the time of the transfer
to PRL, and that the company held it on a resulting trust for him. The
leasehold interest in Flat 2, 143 Ashmore Road was transferred to PRL by
the wife. The rather curious chain of title before that is summarised above.
The circumstances suggest that the husband must have provided the
C  purchase money and was the beneficial owner when the legal estate was
held by Jimmy Lawrence and also at the time of its transfer from him to
the wife. Either it then became the beneficial property of the wife (which is
what equity would initially presume); or else it remained in the beneficial
ownership of the husband, which is what I would on balance infer from the
wife's evidence that the transfer was procured by the husband without
her conscious involvement. In either case, the company as the legal owner
D  can be required to transfer this property to the wife. I conclude that
the husband was at all relevant times the beneficial owner of all three
properties.

50  The freehold interest in 143 Ashmore Road and Flat 6, 62–64
Beethoven Street come into a different category. Flat 6, 62–64 Beethoven
Street is known to have been acquired by PRL from the husband in August
E  1998 for substantial consideration. Since PRL had not begun operations
at that stage, I infer that the purchase money must have come from the
husband. Virtually nothing is known about the terms of acquisition of
the wife's interest in the freehold of 143 Ashmore Road, except that the
husband says that the money came from PRL. I infer for the same reason
that PRL was funded by the husband. In itself, that is consistent with PRL
being the beneficial owner if, for example, the husband provided the money
F  to the company by way of loan or capital subscription. But there is no
evidence to that effect, and I would not be willing to presume it in the
absence of any. I conclude that the husband was the beneficial owner of
these two properties.

51  That leaves the two London properties (Flat 310, Pavilion
Apartments and 11 South Lodge, Circus Road) which were acquired in the
G  name of Vermont for substantial consideration, in July 2001 and January
2004 respectively. Vermont is an oil trading company which according
to the husband started lifting oil in 2010. In the company's financial
statements for 2008, the two properties are listed as its only assets and there
were no liabilities apart from the bank loans charged on Flat 310, Pavilion
Apartments. Flat 310, Pavilion Apartments was acquired with funds derived
from PRL at a time when the company had not begun trading operations.
H  I infer that the funds were provided to PRL by the husband. The position is
the same in the case of 11 South Lodge, except that this was bought with
money provided by PRL at a time when it was an active trading company
and could therefore have funded the purchase itself. However, it is right to
note (i) that the ownership of residential investment property in London

appears to have nothing to do with the oil trading business in which PRL    A
was then engaged, and (ii) that at this stage of the history a consistent pattern
can be discerned by which the husband causes properties to be acquired with
funds provided by himself by companies under his control, nominally
funded by PRL but in fact by himself. If 11 South Lodge was the exception,
then it was a break with past practice. In the absence of any explanation
of these transactions by the husband or his companies, I conclude that both    B
of the properties acquired in the name of Vermont were beneficially owned
by the husband.

52  Whether assets legally vested in a company are beneficially owned
by its controller is a highly fact-specific issue. It is not possible to give
general guidance going beyond the ordinary principles and presumptions of
equity, especially those relating to gifts and resulting trusts. But I venture to
suggest, however tentatively, that in the case of the matrimonial home, the    C
facts are quite likely to justify the inference that the property was held
on trust for a spouse who owned and controlled the company. In many,
perhaps most cases, the occupation of the company's property as the
matrimonial home of its controller will not be easily justified in the
company's interest, especially if it is gratuitous. The intention will normally
be that the spouse in control of the company intends to retain a degree of    D
control over the matrimonial home which is not consistent with the
company's beneficial ownership. Of course, structures can be devised which
give a different impression, and some of them will be entirely genuine.
But where, say, the terms of acquisition and occupation of the matrimonial
home are arranged between the husband in his personal capacity and the
husband in his capacity as the sole effective agent of the company (or
someone else acting at his direction), judges exercising family jurisdiction    E
are entitled to be sceptical about whether the terms of occupation are really
what they are said to be, or are simply a sham to conceal the reality of the
husband's beneficial ownership.

*Nuptial settlement*

53  The wife sought special leave to argue that the companies    F
constituted a nuptial settlement within the meaning of section 24(1)(c) of the
Act. The court ruled in the course of the hearing that leave would be refused.
The point was not argued below and does not appear to be seriously
arguable here.

*Terms for permission to appeal*

54  Before parting with this case, I will only record my surprise that the    G
companies were given permission to appeal on such undemanding terms.
They were required to make a payment on account of costs, but they were
not required to purge their contempt in failing to disclose documents or
information, nor were they put on terms as to dealings with the properties.
There may have been good reasons for not imposing such terms, but on the
face of it the possibility was not even considered.    H

*Conclusion*

55  I would accordingly declare that the seven disputed properties vested
in PRL and Vermont are held on trust for the husband, and I would restore

A  para 6 of the order of Moylan J so far as it required those companies to
transfer them to the wife.

56  Subject to any contrary submissions as to costs, I would also restore
para 14 of the judge's order so far as it dealt with the costs payable by PRL
and Vermont, and would order them to pay the costs of the appeal to the
Court of Appeal and to this court. As at present advised, I would not require
Upstream, against whom no relief has ever been sought, to pay any costs, but
B  in the rather unusual circumstances of this case, I would not make any costs
order in their favour either.

## LORD NEUBERGER OF ABBOTSBURY PSC

57  I agree that Mrs Prest's appeal succeeds. More particularly, I agree
that her appeal should be (i) allowed on the basis that the properties were
C  acquired and held by the respondent companies on trust for the husband, but
(ii) dismissed in so far as it relies on piercing the veil of incorporation, or on
section 24(1)(a) or (c) of the Matrimonial Causes Act 1973.

58  I agree with all that Lord Sumption JSC says on (i) the construction
of section 24(1)(a) of the 1973 Act, in paras 37–42, (ii) the trust issue, in his
masterly analysis of the facts and inferences to be drawn from them,
in paras 43–52, (iii) the point sought to be raised under section 24(1)(c), in
D  para 53, and (iv) his conclusions in paras 55 and 56, and there is nothing
I wish to add on those issues.

59  I wish, however, to add a little to what Lord Sumption JSC says on
the question of whether, and if so, in what circumstances, the court has
power to pierce the corporate veil in the absence of specific statutory
authority to do so.

E  60  I agree that there are two types of case where judges have described
their decisions as being based on piercing the veil, namely those concerned
with concealment and those concerned with evasion. It seems to me that
Staughton LJ had a similar classification in mind in *Atlas Maritime Co SA v
Avalon Maritime Ltd (No 1)* [1991] 4 All ER 769, 779G (quoted in
*VTB Capital plc v Nutritek International Corpn* [2013] 2 WLR 398,
F  para 118), where he sought to distinguish between "lifting" and "piercing"
the corporate veil.

61  I also agree that cases concerned with concealment do not involve
piercing the corporate veil at all. They simply involve the application of
conventional legal principles to an arrangement which happens to include a
company being interposed to disguise the true nature of that arrangement.
Accordingly, if piercing the corporate veil has any role to play, it is in
G  connection with evasion.

62  Furthermore, I agree that, if the court has power to pierce the
corporate veil, Munby J was correct in *Ben Hashem v Al Shayif* [2009]
1 FLR 115 to suggest that it could only do so in favour of a party when all
other, more conventional, remedies have proved to be of no assistance (and
therefore I disagree with the Court of Appeal in *VTB Capital v Nutritek*
[2012] 2 Lloyd's Rep 313, para 79, who suggested otherwise).
H  63  However, as in the recent decision of this court in *VTB v Nutritek*,
it is not necessary to decide whether there is a principle that it is open to
a court, without statutory authority (or, possibly, in the absence of the
intention of contracting parties), to pierce the veil of incorporation
("the doctrine"), and, if it is, the scope, or boundaries, of the doctrine.

64  However, I can see considerable force in the view that it is    A
appropriate for us to address those matters now. This is the second case in
the space of a few months when the doctrine has been invoked before this
court on what are, on any view, inappropriate grounds. It is also clear from
the cases and academic articles that the law relating to the doctrine is
unsatisfactory and confused. Those cases and articles appear to me to
suggest that (i) there is not a single instance in this jurisdiction where the
doctrine has been invoked properly and successfully, (ii) there is doubt as to    B
whether the doctrine should exist, and (iii) it is impossible to discern any
coherent approach, applicable principles, or defined limitations to the
doctrine.

65  In these circumstances, there is obvious value in seeking to decide
whether the doctrine exists, and if so, to identify some coherent, practical
and principled basis for it, if we can do so in this case.    C

66  Any discussion about the doctrine must begin with the decision in
Salomon v A Salomon & Co Ltd [1897] AC 22, in which a unanimous
House of Lords reached a clear and principled decision, which has stood
unimpeached for over a century. The effect of the decision is encapsulated at
pp 30–31, where Lord Halsbury LC said that a "legally incorporated"
company "must be treated like any other independent person with its rights
and liabilities appropriate to itself . . . , whatever may have been the ideas or    D
schemes of those who brought it into existence." Whether that is
characterised as a common law rule or a consequence of the companies
legislation (or an amalgam of both), it is a very well established principle of
long standing and high authority. Writing extra-judicially, Lord Templeman
referred to the principle in the Salomon case as the "unyielding rock" on
which company law is constructed, and on which "complicated arguments"    E
might ultimately become "shipwrecked": Forty Years On (1990) 11 Co Law
10.

67  The decision in the Salomon case plainly represents a substantial
obstacle in the way of an argument that the veil of incorporation can be
pierced. Further, the importance of maintaining clarity and simplicity in this
area of law means that, if the doctrine is to exist, the circumstances in which
it can apply must be limited and as clear as possible.    F

68  Since the decision in the Salomon case, there have been a number of
cases where the courts have considered "piercing" or "lifting" the corporate
veil. The most important of those cases are discussed by Lord Sumption JSC
in paras 20–35 above. That discussion demonstrates, as I see it, the
following: (i) the decision of the International Court of Justice in In re
Barcelona Traction, Light and Power Co Ltd (Second Phase) (Belguim v    G
Spain) [1970] ICJ Rep 3 recognises the doctrine; however, that is in the
context of a civil law system which includes the principle of abuse of rights,
and begs the question whether, in a common law system, the doctrine should
be applicable by the courts in the absence of specific legislative sanction;
(ii) there are judgments in family cases based on obiter dicta in Nicholas v
Nicholas [1984] FLR 285 (e g the judgments of Thorpe LJ in this case and of
Mostyn J in Kremen v Agrest (No 2) [2011] 2 FLR 490), where the doctrine    H
has been treated as valid and applicable; but the application of the doctrine,
even if it exists, in these cases is unsound, as Munby J effectively (in both
senses of the word) indicated in A v A [2007] 2 FLR 467 and Ben Hashem v
Al Shayif [2009] 1 FLR 115; (iii) there are two cases outside the family law

A    context which laid the ground for the establishment of the doctrine, namely
the decisions of the Court of Appeal in *Gilford Motor Co Ltd v Horne*
[1933] Ch 935, and of Russell J in *Jones v Lipman* [1962] 1 WLR 832;
(iv) there are two subsequent decisions, one of the House of Lords, *Woolfson
v Strathclyde Regional Council* 1978 SC (HL) 90, the other of the Court of
Appeal, *Adams v Cape Industries plc* [1990] Ch 433, in which it was
assumed or accepted that the doctrine existed, but they cannot amount to
B    more than obiter observations, as in neither of them did the doctrine apply;
(v) in subsequent cases in the Court of Appeal and High Court, it has been
(unsurprisingly) assumed that the doctrine does apply, two recent examples
being the Court of Appeal decisions in *VTB v Nutritek* [2012] 2 Lloyd's Rep
313 and *Alliance Bank JSC v Aquanta Corpn* [2013] 1 All ER (Comm) 819;
(vi) however, in only two of those subsequent cases (the first instance
C    decisions in *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734 and *Trustor AB v
Smallbone (No 2)* [2001] 1 WLR 1177) has the doctrine actually been relied
on, and they each could have been decided the same way without recourse to
the doctrine, and therefore involved illegitimate applications of the doctrine
on any view: see para 62 above.

    69    On closer analysis of cases mentioned in subpara (iii) above, it does
not appear to me that the facts and outcomes in the *Gilford Motor* and *Jones*
D    cases provide much direct support for the doctrine. However, the decisions
can fairly be said to have rested on the doctrine if one takes the language of
the judgments at face value. Further, they indicate that, where a court is of
the view (albeit that I think that it was mistaken in those cases) that there is
no other method of achieving justice, the doctrine provides a valuable means
of doing so.

E    70    In the *Gilford Motor* case [1933] Ch 935, the legal argument at
first instance and on appeal seems to have concentrated on the validity of
the restrictive covenant: see pp 936–937, 950–952. It is also clear from
the judgment of Lord Hanworth MR, at p 961, that counsel for the
company conceded that if, contrary to his contention, the company was a
"mere cloak or sham" and that the business was actually being carried on
by Horne in breach of the restrictive covenant, then the company should
F    also be restrained. Further, in my view, as that passage indicates, the case
was one of concealment, and therefore did not really involve the doctrine
at all.

    71    In any event, it seems to me that the decision in the *Gilford Motor*
case that an injunction should be granted against the company was amply
justified on the basis that the company was Horne's agent for the purpose
G    of carrying on the business (just as his wife would have been, if he had
used her as the "cloak"); therefore, if an injunction was justified against
Horne, it was justified against the company.    There is nothing in the
judgments in the *Gilford Motor* case to suggest that any member of the
Court of Appeal thought that he was making new law, let alone cutting
into the well established and simple principle laid down in *Salomon v
A Salomon & Co Ltd* [1897] AC 22.
H
    72    It is by no means inconceivable that the three members of the Court
of Appeal in the *Gilford Motor* case were using the expression "cloak or
sham" to suggest, as a matter of legal analysis, a principal and agent
relationship. Lord Hanworth MR relied on a passage in a judgment of
Lindley LJ in *Smith v Hancock* [1894] 2 Ch 377, 385 (where the expression

"cloak or sham" appears to have originated), and in that passage, it seems to    A
me that the cloak or sham is treated as amounting to the business being
"carried on for the defendant". This view is supported by something Lord
Denning MR said in *Wallersteiner v Moir* [1974] 1 WLR 991, 1013, namely
it was "quite clear" that the companies in that case:

> "were just the puppets of Dr Wallersteiner . . . Transformed into legal
> language, they were his agents to do as he commanded. He was the    B
> principal behind them . . . At any rate, it was up to him to show that any
> one else had a say in their affairs and he never did so: cf *Gilford*."

73   As for *Jones v Lipman* [1962] 1 WLR 832, I am unconvinced that it
was necessary for Russell J to invoke the doctrine in order to justify an
effective order for specific performance, as sought by the plaintiffs in that
case.  An order for specific performance would have required Lipman not    C
merely to convey the property in question to the plaintiffs, but to do
everything which was reasonably within his power to ensure that the
property was so conveyed: see e g *Wroth v Tyler* [1974] Ch 30, 47–51.
Lipman and an employee of his solicitors were the sole shareholders and
directors of the company, and its sole liability appears to have been a loan of
£1,500 to a bank (borrowed to meet half the £3,000 which it paid for the    D
property).  In those circumstances, it seems clear that Lipman could have
compelled the company to convey the property to the plaintiffs (on the basis
that he would have to account to the company for the purchase price, which
would have ensured that the bank was in no way prejudiced).  Indeed,
I consider that the company could fairly have been described and treated as
being Lipman's "creature", without in any way cutting into the principle
established in *Salomon v A Salomon & Co Ltd* [1897] AC 22.    E
74   The history of the doctrine over 80 years of its putative life (taking
the *Gilford Motor* case [1933] Ch 935 as the starting point) is, therefore, at
least as I see it, a series of decisions, each of which can be put into one of
three categories, namely: (i) decisions in which it was assumed that the
doctrine existed, but it was rightly concluded that it did not apply on the
facts; (ii) decisions in which it was assumed that the doctrine existed, and it    F
was wrongly concluded that it applied on the facts; and (iii) decisions in
which it was assumed that the doctrine existed and it was applied to the
facts, but where the result could have been arrived at on some other,
conventional, legal basis, and therefore it was wrongly concluded that it
applied: see para 62 above. (The doctrine has been invoked in cases not
considered by Lord Sumption JSC, but they take matters no further: see the
decisions mentioned and briefly considered in *VTB v Nutritek* [2013]    G
2 WLR 398, paras 125, 127.)
75   The lack of any coherent principle in the application of the doctrine
has been commented on judicially in many of the major common law
jurisdictions.  In this country, Clarke J in *The Tjaskemolen (now Visvliet)*
[1997] 2 Lloyd's Rep 465, 471 said that "The cases have not worked out
what is meant by 'piercing the corporate veil' ".  In Australia, in *Briggs v
James Hardie & Co Pty Ltd* (1989) 16 NSWLR 549, 567, Rogers AJA in the    H
New South Wales Court of Appeal observed that "there is no common,
unifying principle, which underlies the occasional decision of courts to
pierce the corporate veil", and that "there is no principled approach to be
derived from the authorities".  In *Constitution Insurance Co of Canada v*

A  *Kosmopoulos* [1987] 1 SCR 2, para 12, Justice Wilson in the Supreme Court
of Canada said that "The law on when a court may . . . '[lift] the corporate
veil' . . . follows no consistent principle". The New Zealand Court of
Appeal in *Attorney General v Equiticorp Industries Group Ltd* [1996]
1 NZLR 528, 541, said that "'to lift the corporate veil' . . . is not a principle.
It describes the process, but provides no guidance as to when it can be used".

B  In the South African Supreme Court decision, *Cape Pacific Ltd v Lubner
Controlling Investments (Pty) Ltd* 1995 (4) SA 790 (A), 802–803,
Smalberger JA observed that "The law is far from settled with regard to the
circumstances in which it would be permissible to pierce the corporate veil."

76  Judges in the United States have also been critical, even though the
doctrine has been invoked and developed to a much greater extent than in
this jurisdiction. In *Secon Serv Sys Inc v St Joseph Bank & Trust Co* (1988)
C  855 F 2d 406, 414, Judge Easterbrook in the US Court of Appeals described
the doctrine as "quite difficult to apply, because it avoids formulating a real
rule of decision. This keeps people in the dark about the legal consequences
of their acts". And in *Allied Capital Corpn v GC-Sun Holdings* (2006) A 2d
1020, 1042–1043, the Delaware Court of Chancery said that the doctrine
has been "rightfully criticized for its ambiguity and randomness", and that
D  its application "yield[s] few predictable results".

77  The doctrine has fared no better with academics. Easterbrook and
Fischel, "Limited Liability and the Corporation" (1985) 52 Univ Chicago
L Rev 89, pithily observe that "'Piercing' seems to happen freakishly. Like
lightning, it is rare, severe, and unprincipled." The jurisprudence on the
doctrine has been described as "incoherent and unprincipled" by Farrar,
E  "Fraud, Fairness and Piercing the Corporate Veil" (1990) 16 Can Bus LJ 474,
478. C Mitchell, in "Lifting the Corporate Veil in the English Courts: An
Empirical Study" (1999) 3 Co Fin & Ins LR 15, 16 observes that "courts
have often used conclusory terms to express their decisions on the point,
which for all their vividness tell us nothing about the reasoning which
underpins these decisions." Neyers in "Canadian Corporate Law, Veil-
F  Piercing, and the Private Law Model Corporation" (2000) 50 Univ
Toronto LJ 173, 180, asks rhetorically: "How can the 'legal person doctrine'
that is so central to corporate law in one sentence be disregarded so casually
in the next?" D Michael in "To Know a Veil" (2000) 26 J Corp Law 41, 55,
refers to the doctrine as "a non-existent and false doctrine". Ramsay and
Noakes, "Piercing the Corporate Veil in Australia" (2001) 19 C & SLJ 250,
G  251, note that the doctrine "is far from clear in the case law." Oh, "Veil-
Piercing" (2010) 89 Texas Law Review 81, 84 says that "The inherent
imprecision in metaphors has resulted in a doctrinal mess".

78  This last view has some resonance with my remarks in *VTB v
Nutritek* [2013] 2 WLR 398, para 124, about the use of pejorative
expressions to mask the absence of rational analysis. It also chimes with
H  Justice Cardozo's reference to the "mists of metaphor" in company law,
which, "starting as devices to liberate thought, . . . end often by enslaving
it", in *Berkey v Third Avenue Railway* (1926) 155 NE 58, 61.

79  In these circumstances, I was initially strongly attracted by the
argument that we should decide that a supposed doctrine, which is
controversial and uncertain, and which, on analysis, appears never to have

been invoked successfully and appropriately in its 80 years of supposed existence, should be given its quietus. Such a decision would render the law much clearer than it is now, and in a number of cases it would reduce complications and costs: whenever the doctrine is really needed, it never seems to apply.

80  However, I have reached the conclusion that it would be wrong to discard a doctrine which, while it has been criticised by judges and academics, has been generally assumed to exist in all common law jurisdictions, and represents a potentially valuable judicial tool to undo wrongdoing in some cases, where no other principle is available. Accordingly, provided that it is possible to discern or identify an approach to piercing the corporate veil, which accords with normal legal principles, reflects previous judicial reasoning (so far as it can be discerned and reconciled), and represents a practical solution (which hopefully will avoid the problems summarised in para 75 above), I believe that it would be right to adopt it as a definition of the doctrine.

81  Having read what Lord Sumption JSC says in his judgment, especially in paras 17, 18, 27, 28, 34 and 35, I am persuaded by his formulation in para 35, namely that the doctrine should only be invoked where "a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control".

82  It appears to me that such a clear and limited doctrine would not fall foul of at least most of the strictures which have been made of the doctrine. In particular, (i) it should be of value in the few cases where it can be properly invoked; (ii) it is, I believe and hope, sufficiently clear as to render it unlikely to be raised in inappropriate cases; and (iii) it does not cut across the rule in *Salomon v A Salomon & Co Ltd* [1897] AC 22 because it is consistent with conventional legal principles.

83  It is only right to acknowledge that this limited doctrine may not, on analysis, be limited to piercing the corporate veil. However, there are three points to be made about that formulation. In so far as it is based on "fraud unravels everything", as discussed by Lord Sumption JSC in para 18, the formulation simply involves the invocation of a well established principle, which exists independently of the doctrine. In any event, the formulation is not, on analysis, a statement about piercing the corporate veil at all. Thus, it would presumably apply equally to a person who transfers assets to a spouse or civil partner, rather than to a company. Further, at least in some cases where it may be relied on, it could probably be analysed as being based on agency or trusteeship especially in the light of the words "under his control". However, if either or both those points were correct, it would not undermine Lord Sumption JSC's characterisation of the doctrine: it would, if anything, serve to confirm the existence of the doctrine, albeit as an aspect of a more conventional principle. And if the formulation is intended to go wider than the application of "fraud unravels everything", it seems to me questionable whether it would be right for the court to take the course of arrogating to itself the right to step in and undo transactions, save where there is a well established and principled ground for doing so. Such a course is, I would have thought, at least normally, a matter for the legislature. Indeed Parliament has decided to legislate to this effect in specified and limited circumstances with protection for third parties, in provisions such as

A  section 37 of the Matrimonial Causes Act 1973 and section 423 of the
Insolvency Act 1986.

**BARONESS HALE OF RICHMOND JSC** (with whom **LORD WILSON**
JSC agreed)

84  I agree that this appeal should succeed, on the basis that the
properties in question were held by the respondent companies on trust for
B  the husband. As he is beneficially entitled to them, they fall within the scope
of the court's power to make transfer of property orders under
section 24(1)(a) of the Matrimonial Causes Act 1973. It also means that the
court has power to order that the companies, as bare trustees, transfer these
properties to the wife.

85  The reasons for holding that these properties were beneficially
C  owned by the husband have been amply explained by Lord Sumption JSC.
I would only emphasise the special nature of proceedings for financial relief
and property adjustment under the Matrimonial Causes Act 1973, which he
explains in para 45. There is a public interest in spouses making proper
provision for one another, both during and after their marriage, in particular
when there are children to be cared for and educated, but also for all the
other reasons explored in cases such as *McFarlane v McFarlane* [2006] 2 AC
D  618. This means that the court's role is an inquisitorial one. It also means
that the parties have a duty, not only to one another but also to the court, to
make full and frank disclosure of all the material facts which are relevant to
the exercise of the court's powers, including of course their resources: see
*Livesey (formerly Jenkins) v Jenkins* [1985] AC 424. If they do not do so, the
court is entitled to draw such inferences as can properly be drawn from all
E  the available material, including what has been disclosed, judicial experience
of what is likely to be being concealed and the inherent probabilities, in
deciding what the facts are.

86  I also agree, for the reasons given by Lord Sumption JSC, that
section 24(1)(a) does not give the court power to order a spouse to transfer
property to which he is not in law entitled. The words "entitled, either in
possession or reversion" refer to a right recognised by the law of property.
F  This is clear, not only from the statutory language, but also from the
statutory history.

87  The words "entitled to any property either in possession or
reversion" first appeared in the Matrimonial Causes Act 1857 (20 & 21 Vict
c 85), which introduced judicial divorce to the law of England and Wales.
Section 45 gave the court power, when granting a decree of divorce on the
G  ground of the wife's adultery, to settle such property for the benefit of the
husband and/or the children of the marriage. The same words were used
in section 3 of the Matrimonial Causes Act 1884 (47 & 48 Vict c 68),
when extending the same power to a husband's application for restitution
of conjugal rights. They were carried through, respectively, into
section 191(1)(2) of the Supreme Court of Judicature (Consolidation) Act
H  1925, then into section 24(1)(2) of the Matrimonial Causes Act 1950, then
into sections 17(2) and 21(3) of the Matrimonial Causes Act 1965. The
decree of restitution of conjugal rights was abolished in the comprehensive
package of matrimonial law reforms which came into force on 1 January
1971. That package included, in section 4(a) of the Matrimonial
Proceedings and Property Act 1970, the power to order either spouse to

transfer to the other "property to which the first-mentioned party is entitled,    A
either in possession or reversion". This was an expansion, for the benefit
of either spouse and to outright transfer as well as settlement, of the
earlier power to settle the wife's property. Section 4(a) later became
section 24(1)(a) of the Matrimonial Causes Act 1973.

88   There is nothing in the language, the history, or indeed the report of
the Law Commission which led to the 1970 Act, *Report on Financial
Provision in Matrimonial Proceedings* (1969) (Law Com No 25), to suggest    B
that those words should be read to include "property over which the
first-mentioned party has such control that he could cause himself to become
entitled, either in possession or reversion". But of course such property can
be taken into account when computing that party's resources for the purpose
of section 25(2) of the 1973 Act, which lays down a non-exhaustive list of
factors to be taken into account by the court when deciding how to exercise    C
its various powers to make financial and property adjustment orders.

89   Nor is there anything in the language of section 24(1)(a) to suggest
that it was Parliament's intention to grant the divorce courts an express
power to "pierce the corporate veil" in such a way as to treat property
belonging to a limited company as property belonging to the spouse who
owns and/or controls the company. The question nevertheless arises as to
whether, in a case such as this, the courts have power to prevent the statutes    D
under which limited liability companies may be established as separate legal
persons, whether in this or some other jurisdiction, being used as an engine
of fraud. I agree with Lord Sumption JSC that "piercing the corporate veil"
is an example of that general principle, with which family lawyers are
familiar from *R v Secretary of State for the Home Department, Ex p Puttick*
[1981] QB 767.    E

90   Lord Sumption JSC refers to the process compendiously as
"disregarding the separate personality of the company" at para 16. When
considering its scope, however, it may be helpful to consider what the
purpose of doing this is. In *Salomon v A Salomon and Co Ltd* [1897] AC 22
the purpose was to go behind the separate legal personality of the company
in order to sue Aron Salomon personally for a liability that was legally that
of the company which he had set up (with himself and members of his family    F
as shareholders) to conduct his leather and boot-making business. This
succeeded at first instance and in the Court of Appeal, Lindley LJ going so far
as to say [1895] 2 Ch 323, 339 that "Mr Aron Salomon's scheme is a device
to defraud creditors". They did not think that Parliament had legislated for
the setting up of limited liability companies in order that sole traders should
be able to conduct their businesses on limited liability terms. But the House    G
of Lords disagreed: the company was a separate person from Mr Salomon
and he could not be made liable for the company's debts. They did not think
that there was any fraud involved simply in using a limited liability company
as a vehicle for conducting a legitimate business. Thus was the legal
structure of modern business born.

91   But there are a few cases where the courts have apparently been    H
prepared to disregard the separate personality of a company in order to
grant a remedy, not only against the company, but also against the individual
who owns and/or controls it. Both *Gilford Motor Co Ltd v Horne* [1933]
Ch 935 and *Jones v Lipman* [1962] 1 WLR 832 are examples of this. In both
those cases, it so happened that the controller had a pre-existing legal

A   obligation which he was attempting to evade by setting up a company, in the
    one case a contractual obligation not to compete with his former employers,
    in the other case a contractual obligation to sell some land to the claimant.
    In *In re Darby; Ex p Brougham* [1911] 1 KB 95, on the other hand, the
    liquidator of a creditor company was permitted to go behind the separate
    personality of a debtor company registered in Guernsey in order to obtain a
B   remedy personally against its promoters who had fraudulently creamed off
    the profit from the sale by the Guernsey company to the creditor company of
    a worthless licence to run a slate quarry in Wales.

    92   I am not sure whether it is possible to classify all of the cases in which
    the courts have been or should be prepared to disregard the separate legal
    personality of a company neatly into cases of either concealment or evasion.
    They may simply be examples of the principle that the individuals who
C   operate limited companies should not be allowed to take unconscionable
    advantage of the people with whom they do business. But what the cases do
    have in common is that the separate legal personality is being disregarded in
    order to obtain a remedy against someone other than the company in respect
    of a liability which would otherwise be that of the company alone (if it existed
    at all). In the converse case, where it is sought to convert the personal liability
    of the owner or controller into a liability of the company, it is usually more
D   appropriate to rely on the concepts of agency and of the "directing mind".

    93   What we have in this case is a desire to disregard the separate legal
    personality of the companies in order to impose on the companies a liability
    which can only be that of the husband personally. This is not a liability
    under the general law, for example for breach of contract. It is a very specific
    statutory power to order one spouse to transfer property to which he is
E   legally entitled to the other spouse. The argument is that that is a power
    which can, because the husband owns and controls these companies, be
    exercised against the companies themselves. I find it difficult to understand
    how that can be done unless the company is a mere nominee holding the
    property on trust for the husband, as we have found to be the case with the
    properties in issue here. I would be surprised if that were not often the case.

F   94   There is a statutory power to set aside certain dispositions made with
    the intention of defeating a claim for financial provision or property
    adjustment in section 37 of the Matrimonial Causes Act 1973. It is not
    suggested in this case that the expenditure involved in buying these
    properties, all of which were bought long before the marriage broke down,
    was made with that intention. If it had been, there might have been an
    argument that the exception for bona fide purchasers for value contained in
G   section 37(4) did not apply to a company where the controlling mind was
    acting with that intention. But that is not this case.

    95   *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391 is an example
    of going behind the separate legal personality of the company in order to "get
    at" the person who owned and controlled it, not for the purpose of suing
    him, but in order to attribute his knowledge to the company so that its
    auditors could raise a defence of ex turpi causa to the company's allegation
H   that they had negligently failed to detect the fraudulent nature of its business.

    96   For all those reasons, in addition to those given by Lord
    Sumption JSC, I would dismiss this appeal on all but the issue of whether
    either party had a beneficial interest in the properties in question but allow it
    on that ground. I fervently hope that the wife will gain some benefit from the

outcome of all this litigation, although in the light of the mortgages which      A
apparently encumber the properties I am not optimistic that she will.

## LORD MANCE JSC

97   I agree that the appeal should be allowed for the reasons given by
Lord Sumption JSC, supplemented in their essence by Lord Neuberger of
Abbotsbury PSC.

98   I agree with Lord Sumption JSC's analysis of the domestic case law      B
to date in which the metaphor of "piercing the veil" has been deployed as
part of the reasoning for a decision representing an exception to the basic
principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22.

99   In the upshot, the only cases which Lord Sumption JSC identifies in
which a principle of "piercing the veil" can be said to have been critical to
the reasoning can be rationalised as falling within what he describes as the      C
evasion principle. In other cases, the corporate entity was simply being
used to conceal the real actor, or some other analysis or relationship existed
(such as principal and agent, nominee or trustee-beneficiary) to explain the
decision.

100   It is however often dangerous to seek to foreclose all possible future
situations which may arise and I would not wish to do so. What can be said      D
with confidence is that the strength of the principle in *Salomon's* case and the
number of other tools which the law has available mean that, if there
are other situations in which piercing the veil may be relevant as a final
fall-back, they are likely to be novel and very rare.

101   In this connection, I have however in mind that, in giving the recent
Privy Council judgment in *La Générale des Carrières et des Mines Sarl v
Hemisphere Associates LLC (Jersey)* [2012] 2 Lloyd's Rep 443, para 77,      E
I said (in a context where Gécamines was a state corporation, not susceptible
of being wound up):

"The alternative way in which Hemisphere puts its case is to submit
that, if Gécamines is otherwise accepted as a separate juridical entity, the
facts found justify the lifting of the corporate veil to enable Hemisphere to
pursue Gécamines as well as the state. In the Board's view, this involves      F
a misapplication of any principles on which the corporate veil may be
lifted under domestic and international law. Assuming for the sake of
argument that the 'unceremonious' subjecting of Gécamines to the
controlling will of the state involved a breach by the state of its duty to
respect Gécamines as a separate entity, that might conceivably justify an
affected third party, possibly even an aggrieved general creditor of      G
Gécamines, in suggesting that the corporate veil should be lifted to make
the state, which had deprived Gécamines of assets, liable for Gécamines'
debts. The Board need express no further view on that possibility.
It represents the inverse of the present situation. There is no basis
for treating the state's taking or Gécamines' use of Gécamines' assets for
state purposes, at which Hemisphere directs vigorous criticism, as a
justification for imposing on Gécamines yet further and far larger burdens      H
in the form of responsibility for the whole of the debts of the Democratic
Republic of the Congo. In international law as in domestic law, lifting the
corporate veil must be a tailored remedy, fitted to the circumstances
giving rise [to] it."

A    102    It may be that the possibility on which I touched in para 77 would evaporate as a possible further exception to the principle in *Salomon's* case [1897] AC 22. It is certainly a different situation to those which Lord Sumption JSC discusses. But one would wish to hear further argument on this or any other suggested exception, in a case where it was directly relevant, before deciding this. No one should, however, be encouraged to
B    think that any further exception, in addition to the evasion principle, will be easy to establish, if any exists at all. The evident absence, under the close scrutiny to which Lord Sumption JSC has subjected the case law, of authority for any further exception speaks for itself.

## LORD CLARKE OF STONE-CUM-EBONY JSC

103    I agree with the other members of the court that the appeal should
C    be allowed for the reasons given by Lord Sumption JSC. I only wish to add a word on piercing the corporate veil. I agree that there is such a doctrine and that its limits are not clear. I also agree that Munby J was correct in *Ben Hashem v Al Shayif* [2009] 1 FLR 115 to suggest that the court only has power to pierce the corporate veil when all other more conventional remedies have proved to be of no assistance. It is thus likely to be deployed
D    in a very rare case. Lord Sumption JSC may be right to say that it will only be done in a case of evasion, as opposed to concealment, where it is not necessary. However, this was not a distinction that was discussed in the course of the argument and, to my mind, should not be definitively adopted unless and until the court has heard detailed submissions on it. I agree with Lord Mance JSC that it is often dangerous to seek to foreclose all possible future situations which may arise and, like him, I would not wish to do so.
E    I expressed a similar view in *VTB Capital plc v Nutritek International Corpn* [2013] 2 WLR 378 and adhere to it now. However, I also agree with Lord Mance JSC and others that the situations in which piercing the corporate veil may be available as a fall-back are likely to be very rare and that no one should be encouraged to think that any further exception, in addition to the evasion principle, will be easy to establish. It will not.
F

## LORD WALKER OF GESTINGTHORPE

104    Lord Sumption JSC has comprehensively analysed the rather confused evidence relating to beneficial ownership of the London properties. His conclusion that they are all in the beneficial ownership of Mr Prest is in my view irresistible, based as it is on positive evidence of the sources
G    from which the purchases were funded, as well as on inferences drawn from the failure of Mr Murphy, a director of PRL, to attend court for cross-examination. I also agree with all Lord Sumption JSC's observations as to the construction and effect of the Matrimonial Causes Act 1973, to which Baroness Hale of Richmond JSC has added a full account of its legislative history. The appeal should be allowed in the terms proposed by Lord Sumption JSC.
H
105    In these circumstances it is not strictly necessary for this court to add further general comments on the vexed question of piercing the corporate veil. But for my part I think it would be a lost opportunity—even perhaps a minor dereliction of duty—if we were to abstain from any further comment. I do therefore welcome the full discussion in the judgments

of Lord Neuberger of Abbotsbury PSC, Baroness Hale, Lord Mance and     A
Lord Sumption JJSC.

106  I am reluctant to add to the discussion but for my part I consider
that "piercing the corporate veil" is not a doctrine at all, in the sense of a
coherent principle or rule of law. It is simply a label—often, as Lord
Sumption JSC observes, used indiscriminately—to describe the disparate
occasions on which some rule of law produces apparent exceptions to the
principle of the separate juristic personality of a body corporate reaffirmed     B
by the House of Lords in *Salomon v A Salomon & Co Ltd* [1897] AC 22.
These may result from a statutory provision, or from joint liability in tort, or
from the law of unjust enrichment, or from principles of equity and the law
of trusts (but without any "false invocation of equity" in the phrase used by
C Mitchell in the article mentioned by Lord Neuberger PSC, at para 77).
They may result simply from the potency of an injunction or other court     C
order in binding third parties who are aware of its terms. If there is a small
residual category in which the metaphor operates independently no clear
example has yet been identified, but *Stone & Rolls Ltd v Moore Stephens*
[2009] AC 1391, mentioned in Baroness Hale JSC's judgment, is arguably
an example.

*Appeal allowed.*     D

JILL SUTHERLAND, Barrister

E

F

G

H