# EXHIBIT 18

## BEN HASHEM v AL SHAYIF
### [2008] EWHC 2380 (Fam)

Family Division

Munby J

22 September 2008

*Ancillary relief – Bigamy – Both husband and wife aware that marriage*
*bigamous at time of ceremony – Contemporaneous valid religious*
*ceremony – Impact of bigamy on award*

*Ancillary relief – Divorce – Piercing veil of incorporation – Whether*
*impropriety essential requirement*

The 'husband' and 'wife' went through a civil marriage ceremony in London, followed
by a religious marriage; both were aware that the husband was still married to another
woman, and that the marriage was therefore bigamous. The wife gave up her work in
England and moved to live in Saudi with the husband. Following a serious
disagreement, the wife returned to England and forced her way into a flat owned by a
family company. The company was incorporated in Jersey, 30% of the company's
shares were owned by the husband, the remaining 70% were divided between the
husband's four children; the company's English properties were sometimes used by the
family when visiting England. The children expressed their disapproval of the wife's
occupation of the property, but on the basis that the husband would cover the
outgoings, including the mortgage, they did not formally object. The marriage
recovered, but the wife remained in the English property, the husband visiting her there
quite frequently. When the relationship finally broke down the wife issued divorce
proceedings and sought ancillary relief from the court; the court declared the marriage
to be void because bigamous. The husband, who was still living in Saudi, was clearly
wealthy, although it was unclear how wealthy because he refused to participate
meaningfully in the ancillary relief process. The court found he was worth many
millions, although not hundreds of millions. The wife was seeking a lump sum of
£7,061,570, plus the transfer of the only two English properties still owned by the
company, an investment property and the property the wife was living in, plus her
costs. The wife argued that the English court should either: (a) treat all the company's
assets as beneficially owned by the husband; or (b) treat the company itself as
beneficially owned by the husband; or (c) pierce the veil of incorporation. The husband
had provided all the company's capital, and the proceeds of sale of any company assets
had all been paid to the husband, although the consent of the adult children
shareholders had been sought. The company issued proceedings in the Chancery
Division, seeking a possession order against the wife together with declarations that
the company owned the relevant properties; in addition the children sought a
declaration that they were the beneficial owners of the shares registered in their names.
The ancillary relief and Chancery proceedings were consolidated. The wife was
awarded maintenance pending suit, but the husband did not pay; by the date of the
hearing, the arrears amounted to £181,500. The husband's only participation in the
hearing was as a witness for the company and the children.

**Held** – awarding the wife a lump sum of £7,061,570 –

(1) The properties were owned beneficially as well as legally by the company, and
were not held in trust for the husband, otherwise the company's purpose of tax savings
would fail. Advances by the husband to the company had been treated by all concerned
as borrowings, increasing the company's loan account to the husband, with the
exception of one sum gifted to the company; this was both as a matter of fact and as a
matter of law inconsistent with any claim by the husband to a beneficial interest or to

any resulting trust. Control and direction of a company were not of themselves indicative that the company was not genuinely holding its assets or operating its business (see paras [120], [121], [123], [128]).

(2)   The children's shares in the company did not belong beneficially to the husband. If the company had been intended to be wholly owned beneficially by the husband, no shares would have been allotted to the children, let alone allocated to the children in specific and differing proportions (see paras [137], [140]–[142]).

(3)   To enable a court to pierce the veil of incorporation it was necessary to show not only control of the company by the wrongdoer(s) but also impropriety, that is (mis)use of the company by the wrongdoer(s) as a device or façade to conceal some wrongdoing that existed entirely outside the company. *Mubarak v Mubarak* [2001] 1 FLR 673 was not authority for the proposition that impropriety was not an essential requirement. A company could be a façade even though it had not originally been incorporated with any deceptive intent; the question was whether it was being used as a façade at the time of the relevant transactions. The court could not pierce the corporate veil merely because it was thought to be necessary in the interests of justice, and the required impropriety must be linked to the use of the company structure to avoid or conceal liability. The court would pierce the veil only so far as was necessary to provide a remedy for the particular wrong done by those controlling the company. The wife had failed to establish sufficient control of the company by the husband and there was no relevant impropriety; the court was not entitled to pierce the veil of incorporation in this case (see paras [159]–[164], [193], [198], [199], [201], [218]).

(4)   In relation to the investment property there was no post-nuptial settlement within the meaning of s 24 of the Matrimonial Causes Act 1973; the husband and wife's use of the property was too temporary to constitute the necessary 'continuing provision' and it was not nuptial in character. However, in relation to the property in which the wife had been living, there was a settlement that the court had jurisdiction to vary. The arrangement that had provided the wife with a home had a sufficient nuptial element and had been intended to make a continuing provision for a period, more than temporary, albeit undefined. However, all that was comprised in the settlement was a revocable licence (see paras [260], [266], [267], [270]–[272]).

(5)   The court's discretion to vary a nuptial settlement under s 24(1)(c) of the 1973 Act was both unfettered and, in theory, unlimited. However, a settlement ought not to be interfered with more than was necessary to do justice between the parties, and the court ought to be very slow to deprive innocent third parties of their rights under the settlement. If the interests of such third parties were to be adversely affected, then the court, looking at the wider picture, would normally seek to ensure that they received some benefit which, even if not pecuniary, was approximately equivalent. Having regard to the wife's use of the property as her home for 4 years during the marriage, and for a further year after the marriage broke down, but also the fact that she had remained in it for 2 years after the company brought possession proceedings, justice would be done if the company were required to give the wife 6 months notice. There was no benefit to the company or the children in making provision for the wife's housing at their expense; the statutory jurisdiction was a jurisdiction to vary, not a jurisdiction to confiscate. There was no principled basis for requiring the company to pay the mortgage or other outgoings (see paras [290], [294], [296], [297], [301]).

(6)   The wife was entitled to ancillary relief even though the marriage had been bigamous. In this case the impact of the bigamy was marginal: neither the husband nor the wife had been deceived as to the status of the marriage, and the contemporaneous religious marriage had been valid (see paras [321], [322]).

(7)   The award sought by the wife was entirely justified, and took into account all the circumstances including the bigamy. In principle the husband's loan account with the company should be transferred to the wife, as a set off (see paras [333], [336]).

**Statutory provisions considered**
Matrimonial Causes Act 1859, s 5
Accessories and Abettors Act 1861, s 8
Offences Against the Person Act 1861, s 57
Vendor and Purchaser Act 1874
Matrimonial Causes Act 1878, s 3
Settled Land Act 1882, s 2(2)
Perjury Act 1911, s 3(1), (5)
Supreme Court of Judicature (Consolidation) Act 1925, s 192
Settled Land Act 1925, ss 1(1), (4), 2
Matrimonial Causes Act 1950, s 25
Matrimonial Causes Act 1965, s 17
Matrimonial Causes Act 1973, ss 17(1), 23, 24(1)(b), (c), 37, 25(2)(a)–(h), (3), (4)
Companies Act 1985
Trusts of Land and Appointment of Trustees Act 1996
Family Proceedings Rules 1991 (SI 1991/1247)

**Cases referred to in judgment**
*A Company, Re* [1985] BCLC 333, CA
*A v A* [2007] EWHC 99 (Fam), [2007] 2 FLR 467, FD
*A v A (Maintenance Pending Suit: Provision for Legal Fees)* [2001] 1 WLR 605, [2001] 1 FLR 377, FD
*Al-Khatib v Masry* [2001] EWHC 108 (Fam), [2002] 1 FLR 1053, FD
*Aron Salomon (Pauper) v A Salomon and Company Ltd; A Salomon and Company Ltd v Aron Salomon* [1897] AC 22, HL
*Blood v Blood* [1902] P 78, PDAD
*Bosworthick v Bosworthick* [1927] P 64, CA
*Brooks v Brooks* [1996] AC 375, [1995] 3 WLR 141, [1995] 2 FLR 13, [1995] 3 All ER 257, HL
*Bugle Press Limited, Re* [1961] Ch 270, [1960] 3 WLR 956, [1960] 3 All ER 791, CA
*C v C (Ancillary Relief: Nuptial Settlement)* [2004] EWCA Civ 1030, [2005] Fam 250, [2005] 2 WLR 241 sub nom *Charalambous v Charalambous* [2004] 2 FLR 1093, [2004] All ER (D) 582 (Jul), CA
*C v C (Variation of Post-Nuptial Settlement: Company Shares)* [2003] EWHC 1222 (Fam), [2003] 2 FLR 493, FD
*Cartwright v Cartwright* (1983) 4 FLR 463, FD
*Colclough v Colclough and Fisher* [1933] P 143, PDAD
*Dadourian Group International Inc v Simms* [2006] EWHC 2973 (Ch), [2006] All ER (D) 351 (Nov), Ch D
*Dormer v Ward* [1901] P 20, CA
*E v E (Financial Provision)* [1990] 2 FLR 233, CA
*Egerton v Egerton* [1949] 1 All ER 670, PDAD
*F v F (Divorce: Insolvency: Annulment of Bankruptcy Order)* [1994] 1 FLR 359, FD
*Garforth-Bles v Garforth-Bles* [1951] P 218, [1951] 1 All ER 308, PDAD
*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734, [2000] All ER (D) 1067, Ch D
*Gilford Motor Company Limited v Horne* [1933] Ch 935, CA
*Gray v Barr* [1971] 2 QB 554, [1971] 2 WLR 1334, [1971] 2 All ER 949, CA
*Green v Green* [1993] 1 FLR 326, FD
*Hargreaves v Hargreaves* [1926] P 42, PDAD
*Hartopp v Hartopp and Akhurst* [1899] P 65, PDAD
*Hastings (No 3), Re* [1959] Ch 368, Ch D
*Hodgson Roberts v Hodgson Roberts and Whitaker* [1906] P 142, PDAD
*Hunter and Hewlett's Contract, Re* [1907] 1 Ch 46, Ch D
*Hussey v Palmer* [1972] 1 WLR 1286, [1972] 3 All ER 744, CA

*J v V (Disclosure: Offshore Corporations)* [2003] EWHC 3110 (Fam), [2004] 1 FLR 1042, FD

*Jones and Another v Lipman and Another* [1962] 1 WLR 832, [1962] 1 All ER 442, Ch D

*Lee v Lee's Air Farming Ltd* [1961] AC 12, [1960] 3 WLR 758, [1960] 3 All ER 420, PC

*Lort-Williams v Lort-Williams* [1951] P 395, [1951] 2 All ER 241, CA

*Macaura v Northern Assurance Company, Limited, and Others* [1925] AC 619, HL

*Miller v Miller; McFarlane v McFarlane* [2006] UKHL 24, [2006] 2 AC 618, [2006] 2 WLR 1283, [2006] 1 FLR 1186, [2006] 3 All ER 1, HL

*Moy v Moy and White* [1961] 1 WLR 552, [1961] 2 All ER 204, CA

*Mubarak v Mubarak* [2001] 1 FLR 673, FD

*Mubarak v Mubarak* [2007] EWHC 220 (Fam), [2007] 2 FLR 364, FD

*N v N and F Trust* [2005] EWHC 2908 (Fam), [2006] 1 FLR 856, FD

*Nicholas v Nicholas* [1984] FLR 285, CA

*Ord and Another v Belhaven Pubs Ltd* [1998] 2 BCLC 447, CA

*Pettitt v Pettitt* [1970] AC 777, [1969] 2 WLR 966, (1969) FLR Rep 555, [1969] 2 All ER 385, HL

*Prescott (formerly Fellowes) v Fellowes* [1958] P 260, [1958] 3 WLR 288, [1958] 3 All ER 55, CA

*Prinsep v Prinsep* [1929] P 225, PDAD

*Purnell v Purnell* [1961] P 141, [1961] 2 WLR 185, [1961] 1 All ER 369, PDAD

*R v Brawn* sub nom *R v Bawm* (1843) 7 JP 530, (1843) 1 Car & Kir 144

*Rampal v Rampal (No 2)* [2001] EWCA Civ 989, [2001] 3 WLR 795, [2001] 2 FLR 1179, CA

*Scollick v Scollick* [1927] P 205, PDAD

*Shephard v Cartwright* [1955] AC 431, [1954] 3 WLR 967, [1954] 3 All ER 649, HL

*Smith v Hancock* [1894] 2 Ch 377, CA

*Smith v Smith* [1945] 114 LJP 30, [1945] 173 LT 8, [1945] 1 All ER 584, PDAD

*Smith v Smith* [1970] 1 WLR 155, [1970] 1 All ER 244, CA

*Snook v London and West Riding Investments Ltd* [1967] 2 QB 786, [1967] 2 WLR 1020, [1967] 1 All ER 518, CA

*S-T (Formerly J) v J* [1998] Fam 103, [1997] 3 WLR 1287, sub nom *J v S-T (Formerly J) (Transsexual: Ancillary Relief)* [1997] 1 FLR 402, CA

*Street v Mountford* [1985] AC 809, [1985] 2 WLR 877, [1985] 2 All ER 289, HL

*Thomas v Thomas* [1995] 2 FLR 668, CA

*Tribe v Tribe* [1996] Ch 107, [1995] 3 WLR 913, [1995] 2 FLR 966, [1995] 4 All ER 236, CA

*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177, [2001] 3 All ER 987, [2001] 2 BCLC 436, Ch D

*Ulrich v Ulrich and Felton* [1968] 1 WLR 180, [1968] 1 All ER 67, CA

*W (Ex Parte Orders), Re* [2000] 2 FLR 927, FD

*Wallersteiner v Moir; Moir v Wallersteiner and Others* [1974] 1 WLR 991, [1974] 3 All ER 217, CA

*Wicks v Wicks* [1999] Fam 65, [1998] 1 FLR 470, CA

*Whig v Whig* [2007] EWHC 1856 (Fam), [2008] 1 FLR 453, FD

*Whiston v Whiston* [1995] Fam 198, [1995] 3 WLR 405, [1995] 2 FLR 268, [1998] 1 All ER 423, CA; reversing [1994] 2 FLR 906, FD

*Whitton v Whitton* [1901] P 348, PDAD

*Williams and Another v Natural Life Health Foods Ltd and Mistlin* [1998] 1 WLR 830, [1998] 2 All ER 577, HL

*Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90, HL

*Yukong Line Ltd of Korea v Rendsburg Investments Corporation of Liberia and Others (No 2)* [1998] 1 WLR 294, [1998] 4 All ER 82, [1998] 2 BCLC 485, QBD

*Judith Parker QC* and *Christopher Wagstaffe* for the applicant/defendant
*Jane Evans-Gordon* for the claimants/second respondent
The first respondent/Part 20 defendant did not appear and was not represented

*Cur adv vult*

## MUNBY J:

[1]    These are more than usually complicated ancillary relief proceedings which, in addition to all the issues which arise in any such case, raise interesting and important questions as to: (i) the ambit of the doctrine which, under certain circumstances, permits the 'piercing of the veil of incorporation'; (ii) the ambit and extent of the court's powers under s 24(1)(c) of the Matrimonial Causes Act 1973; and (iii) the impact, if any, of the fact that the 'marriage' was bigamous.

[2]    The case has been fought tenaciously, though with good humour on both sides, and with great skill and much learning, for which I am most grateful to counsel. Inevitably my judgment is somewhat lengthy. I am sorry that it has taken longer to finalise than I would have hoped.

### The background

[3]    The litigation arises out of the civil marriage celebrated in London on 3 October 1998 between Abdulhadi Ali Shayif, who was born on 10 May 1948, and Faiza Ben Hashem, who was born on 15 June 1959. Their Islamic marriage took place on 25 November 1998. I shall refer to them for convenience as 'the husband' and 'the wife' respectively although their marriage, valid by the law of their religion, was declared by Bennett J on 17 October 2005 to be void, the husband being still married to another woman. The husband had previously been married three times, in 1965, in 1978 and in 1985. He had divorced his first and second wives (by talaq) in 1979 but was still married in 1998 to his third wife.

[4]    The husband's marriage to the wife finally broke down in July 2004 when they separated. Following the decree nisi pronounced by Bennett J on 17 October 2005 the husband registered a talaq divorce in Saudi Arabia on 22 October 2005.

[5]    Both the husband and the wife are Muslims who originate from the Yemen.

[6]    The husband has spent his entire adult life in Saudi Arabia, of which he became a citizen in 1982 and where he is domiciled and resident with a house in Jeddah. After a long and successful career in banking he rose to become, in 1999, the general manager of the National Commercial Bank of Saudi Arabia, one of the most prominent banks in the Middle East. He retired in September 2005. It is plain, not least from his own evidence, that he is well connected and highly thought of in Saudi Arabian financial and business circles. Since his retirement he has held positions on the bank's board of directors and executive committee. Information gathered by the wife – the husband has declined to file his Form E (see below) – indicates that he continues to have various interests in a number of projects in the Middle East. Thus, in addition to continuing to serve on the board of the bank, he has joined the boards of several large organisations in Saudi Arabia, including the Saudi Railway Organisation, the Saudi Cable company, and the Federation of

Arab Banks. It appears that he is also involved with – according to the wife he
owns – various businesses including a real estate business and a business
which supplies hospital equipment.

[7]    Prior to her marriage the wife had been working in this country, of
which she is a naturalised citizen, as a landscape architect. Upon her marriage
she gave up this work at the husband's request.

[8]    The husband has four children, who I shall refer to collectively as 'the
children'. Isam, born on 11 June 1970, Aliyah, born on 6 November 1972, and
Abeer, born on 19 May 1976, are his children by his first marriage. Firas, born
on 6 June 1988, is his son by his third marriage. The wife has no children.

[9]    Radfan Limited ('the company') was incorporated in Jersey on 1 July
1988. According to the husband and the children its shares are held – and held
beneficially – as to 30% by the husband, 20% by Isam, 15% by Aliyah, 15%
by Abeer and 20% by Firas.

[10]   At various times the company has held a number of properties in this
country ('the properties') which I shall refer to respectively as 64 St John's
Wood Court, 215 The Quadrangle, 32 Forest House, 17 Kensington Heights
and 57 Forest House. By and large the properties were acquired as
investments and rented out, though there were periods when they (or some of
them) were used by the husband, the wife or the children whilst visiting,
holidaying or staying in this country. The first three (64 St John's Wood
Court, 215 The Quadrangle and 32 Forest House) have now been sold. The
other two (17 Kensington Heights and 57 Forest House) are still held by the
company.

[11]   Following difficulties in the marriage, and in particular following an
argument between the husband and the wife at the wedding of the husband's
daughter in August 2000, the wife, who had previously been living with the
husband predominantly in Saudi Arabia, where the main matrimonial home
was, returned to this country. She says he sent her back; he says she ran away
as a wilful and disobedient wife. Be that as it may, she forced her way into
17 Kensington Heights – having nowhere else to live – and changed the locks.
She has been living there ever since. Although the marriage recovered, the
wife remained based in this country, the husband in Saudi Arabia, though
visiting her quite frequently and, when he did, staying with her at
17 Kensington Heights.

*The proceedings*

[12]   Following the breakdown of the marriage the wife issued divorce
proceedings on 20 December 2004. The company issued proceedings in the
Chancery Division on 7 April 2006 seeking to make good its claim to
17 Kensington Heights and 57 Forest House. So, putting matters in a nutshell,
the wife seeks ancillary relief from the husband; at the same time there is a
dispute between the wife on the one side and the husband, the company and
the children on the other as to the true ownership of both the company and the
properties.

[13]   There are therefore two matters before me:

       (i)    First ('the ancillary relief proceedings'), there is the wife's

application against the husband. The wife's petition, as I have
said, was issued on 20 December 2004. She served her Form A
at the same time.

(ii) Secondly ('the Chancery proceedings'), there is an action by the
company and the children against the wife. The company seeks
declarations that 17 Kensington Heights and 57 Forest House
are owned by the company beneficially, an order for possession
of 17 Kensington Heights and the usual consequential relief. The
children seek a declaration that they are the beneficial holders of
the shareholdings in the company registered in their respective
names. The Chancery proceedings were issued on 7 April 2006.
The wife's defence and Part 20 claim were filed on 19 May
2006. Despite strenuous objection from the company, the
proceedings were transferred to the Family Division by Master
Moncaster on 7 June 2006.

[14]    By order of Roderic Wood J dated 12 October 2006 the company was
joined as second respondent to the ancillary relief proceedings. By the same
order Roderic Wood J injuncted the husband until final hearing or further
order from disposing of his shares in the company and the company from
disposing of or depleting the value of 17 Kensington Heights and 57 Forest
House. (A similar order was obtained by the wife in the Royal Court of Jersey
on 16 November 2006.) By an order made by Bennett J on 20 November 2006
the two sets of proceedings were consolidated. The consolidation order was
not drawn in the form familiar in the Chancery Division (see, for example,
*Heward*, Chancery Orders, 1986, p 95), hence the ungainly form of title
above.

[15]    The history of the ancillary relief proceedings has been characterised
throughout by the husband's failure – in truth, his adamant refusal – to engage
in any meaningful way with the process. He has failed to comply with the
relevant provisions of the Family Proceedings Rules 1991 (FPR) and has
disobeyed numerous orders of the court. He has never given proper disclosure.
These are all topics which I must return to in greater detail below when I
come to consider the husband's litigation misconduct and the inferences I can
properly draw from it.

[16]    For the moment I merely record that on 8 February 2006 Bennett J
made an order, backdated to the date of service of the petition on the husband,
requiring him to pay the wife maintenance pending suit at the rate of
£48,000 pa. The same order required the husband to pay the wife's costs in the
sum of £13,500 and (see *A v A (Maintenance Pending Suit: Provision for
Legal Fees)* [2001] 1 WLR 605, [2001] 1 FLR 377) a further £12,000 towards
her future litigation costs. No payment has ever been made by the husband
under that order and as at the date of the final hearing the maintenance arrears
amounted to £156,000. So the total sums outstanding under that order
amounted to £181,500. By a further order dated 11 April 2006 Bennett J
required the husband to continue paying the mortgage and service charge in
relation to 17 Kensington Heights. He has not done so.

[17]    After much interlocutory skirmishing, the bulk of it, it is quite clear,
necessitated by the husband's failure and refusal to engage in the forensic
process, the matters came on for hearing before me on 7 April 2008. The wife

was represented by Miss Judith Parker QC (as she then was) and Mr Christopher Wagstaffe, the company and the children by Miss Jane Evans-Gordon.

[18]   The husband was neither present nor represented though, pursuant to directions given by Holman J on 16 July 2007 (see below), he gave evidence by video-link on behalf of the company and the children. At the point where Miss Parker's cross-examination of the husband was about to move from those matters directly raised in the Chancery proceedings to the wider issues canvassed in the ancillary relief proceedings, the husband protested, seeking to assert that he should not be required to answer any more questions and indicating that he did not propose to take any further part in the hearing. I ruled that he could not choose the topics on which, having been sworn, he had to answer Miss Parker's questions, that they were plainly relevant to the ancillary relief proceedings and that I required him to answer her questions. The husband accepted my ruling and answered the remainder of Miss Parker's questions – whether satisfactorily is another matter. At the end of his evidence the husband withdrew from the proceedings.

[19]   In short, the husband's only participation in the hearing was as a witness called by the company and the children.

[20]   The paucity of the husband's disclosure was, in contrast to the very significant disclosure made by the company and the children, who between them have disclosed about 13 lever-arch files of documents covering the period from about 1985 to 2007. This enabled me to gain considerable insight into the history and activities of the company and the history of the properties. But it is to be noticed that this disclosure, massive though it was, is not comprehensive. For example, there were no accounts for the company later than for the year ended 31 March 1993, though whether this was because of inadequacies in the process of disclosure or because such accounts had never been prepared and do not exist, was never made clear to me.

[21]   During the course of the hearing I also heard oral evidence from (in this order) the wife, Mrs Penny (see below), Isam, Aliyah, Abeer and the husband.

[22]   The wife was frank, straight forward and reliable on matters of fact. Inevitably her knowledge of the properties and of the company's affairs was based in large measure on what she had gleaned from the husband. Mrs Penny was a patently honest witness doing her very best to assist. On matters within her knowledge she was accurate and reliable, but the focus of her activities had been on the management of the properties and so her knowledge of other aspects of the company's activities was limited. The evidence of the three children who gave evidence was reasonably frank, so far as it went. But I was left with the distinct impression that each could have said more than they chose to and that the similarities in their accounts strongly suggested that they had 'put their heads together'. The husband presented as respectable – even distinguished – but his account, insofar as he volunteered anything, had obviously been carefully prepared and was plainly an 'edited' version of the truth. He gave away no more than he chose to and was neither frank nor honest.

[23]   The hearing lasted 10 days (the first day being a reading day) and finished on 18 April 2008 when I reserved judgment. Further written submissions were filed by Miss Parker and Mr Wagstaffe on 29 April 2008, by

Miss Evans-Gordon on 1 May 2008 and, in response, by Miss Parker and
Mr Wagstaffe on 12 May 2008. I now (22 September 2008) hand down
judgment.

*The wife's claim*
[24]     Miss Parker has formulated the wife's claim with exact financial
precision. The wife seeks: (i) a lump sum of £7,061,570; (ii) an order that the
husband transfer or cause to be transferred to her both 17 Kensington Heights
and 57 Forest House (with liberty to the husband to set off the value of these
properties at the date of transfer against his liability to her under (i)) and (iii)
provision for her costs. I am told that the wife has outstanding legal costs of
close to £100,000 incurred before she obtained public funding and that her
publicly funded costs come to a similar figure.
[25]     The lump sum of £7,061,570 is calculated as the aggregate of: (a) the
wife's itemised income need of £113,326 pa, capitalised at £2,804,689; (b)
her housing needs put at £2.25m (inclusive of purchase costs) for a house in
London and £1m for a property in Saudi Arabia; (c) various other capital
needs (cars, debts, furniture, the cost of re-training, etc) totalling £756,881;
and (d) a 'fighting fund' (see *Al-Khatib v Masry* [2001] EWHC 108 (Fam),
[2002] 1 FLR 1053, at paras [130]–[135]) of £250,000 to enable her to pursue
enforcement proceedings overseas which, Miss Parker says, will doubtless be
resisted tooth and nail. The lump sum does *not* include the arrears of
maintenance pending suit amounting, as I have said, to more than £150,000
which the wife, I am told, proposes to enforce in full.
[26]     The only tangible assets within the jurisdiction are 17 Kensington
Heights and 57 Forest House. The former has been valued at £975,000 and is
subject to a mortgage of about £290,000. A 'drive by' valuation of the latter
puts its value in the bracket £280–330,000. It is mortgage free but is subject to
a charge, authorised by Holman J by orders dated 16 July 2007 and 31 July
2007, to enable the company to borrow in order to pay its costs of the
litigation. The amount secured by this charge is unknown to the wife.

*The husband's stance*
[27]     Initially the husband's stance was that the wife was not entitled to any
provision at all, a letter from his solicitors dated 28 February 2005 stating it to
be his case that 'she is not entitled to any financial provision, either on an
interim basis or otherwise'. Formally, it may be, this position has not changed,
but the reality is that, so far as concerns the 30% of the shares in the company
which are indubitably held by the husband, there is no issue. The husband has
accepted in terms (see para 33 of his witness statement in the Chancery
proceedings dated 3 July 2007) that he 'will not contest [the wife's] claim for
my share of [the company] which amounts to 30% of the net value of the
assets after discharge of all mortgages and fees etc'.

*The stance of the children and the company*
[28]     Neither the company nor the children have any interest in the ancillary
relief proceedings or as to their outcome, their only interest being to establish
their case that: (i) the husband's beneficial interest in the company is confined
to his 30% shareholding; (ii) the company is and always has been the
beneficial owner of both 17 Kensington Heights and 57 Forest House; and

(iii) the court either cannot or should not exercise its powers under s 24(1)(c) of the 1973 Act in relation to either 17 Kensington Heights or 57 Forest House.

[29]   However, and importantly, Miss Evans-Gordon accepts, on instructions, that if I make an order transferring the husband's 30% shareholding to the wife the children will be content to acquire the shares at a price equal to 30% of the value of the company's assets, that is, 30% of the net value of 17 Kensington Heights and 57 Forest House. As she put it in her skeleton argument, the company and the children accept that the husband's interest in the company, namely his shares, is property against which an order in the ancillary relief proceedings may be made. She adds that the company and the children 'will co-operate fully in realising that property should the court so order'.

*The factual background in more detail*
[30]   Before turning to address in more detail the various issues which arise, in particular as between the wife, the company and the children, I must first set out the relevant history of the company and of the acquisition and (as the case may be) disposal of the properties.

*The company*
[31]   The company, as I have said, was incorporated in Jersey on 1 July 1988, where it was bought 'off the shelf' by the husband.
[32]   I am satisfied that, in accordance with written advice dated 3 May 1988 received by the husband from accountants, the reason why the company was set up was to hold UK properties in such a way as would avoid capital gains tax and inheritance tax and would reduce income tax on the rental income. It is also clear that on 7 June 1988 the decision had been taken to use a Jersey company – in the event the company – to hold 215 The Quadrangle (see below), just as it is clear from a letter dated 13 August 1988 written by the husband's informal adviser, Mr Simon Penny, that the company was to be the vehicle for holding both 64 St John's Wood Close and 215 The Quadrangle. It is also clear that at the latest by 18 October 1988 it had been decided that not all the shares in the company would be issued to the husband.
[33]   Down the years the company has had various directors. For most of the time they were employees of or persons nominated by the various Channel Islands' management companies which from time to time were retained to manage the company. Those management companies and their employees were responsible for managing *the company* and for maintaining and preparing the company's accounts and other records. The management of *the properties*, on the other hand, was, by and large, the responsibility of Mr Penny's mother, Mrs Patricia Penny. She, with the assistance of her son whilst he was still alive (he died tragically young in 1994), operated the various bank accounts used in relation to the properties. Mrs Penny kept meticulous accounts of the various rental and other receipts and of the outgoings.
[34]   At the time of the husband's marriage to the wife in 1998 the directors were a Mr Harlow and a Mr Henning. On 31 January 2000 the husband, together with a Mr Farid ('Freddie') Shaibi and a Mr Ahmed Farid, were appointed additional directors. On 6 March 2002 a Mr Le Page was appointed

as an additional director. He resigned on 8 July 2003, on which date a Mr Taberner was appointed as an additional director. A document which has been produced indicates that Mr Farid resigned as a director on 13 September 2004, though it appears (see below) that in fact he remains a director. Following a change in the management company, on 8 February 2005 Mr Henning, Mr Harlow and Mr Taberner resigned and a Mr Hucker, a Mr Sutcliffe and a Mr Aycliffe were appointed as directors. They resigned on 29 April 2005. The register of directors shows that, as of 19 June 2007 (and the position, as I understand it, remains unchanged) the directors were the husband, Mr Farid and Mr Shaibi.

[35]    Mr Farid and Mr Shaibi were, and are, close business associates of the husband in Saudi Arabia. The other directors I have referred to were not; they were all, as I understand it, 'professional' directors supplied to act as such by, or on the nomination of, the various management companies.

[36]    The company's original issued share capital was nine shares of £100 each. They were transferred to the husband. On 2 December 1988 the board of the company resolved that the capital be increased to 2,400 shares and that the additional shares be issued as to 831 to the husband (giving him a total of 840 – 35%), as to 480 (20%) to Isam and as to 360 (15%) each to Aliyah, Abeer and Firas. As Miss Parker points out, at this time Isam, the eldest, was only 18 years old and the others were all minors, Firas being in fact only 6 months old. The capital of £240,000 was treated as having been provided by the husband.

[37]    Towards the end of 1999 there was discussion about a variation of the shareholdings. By 25 January 2000 this had crystallised in a plan that the husband would transfer 240 shares to Firas whilst Aliyah and Abeer would each transfer 60 shares to Isam. This would have given the husband, Isam and Firas 600 shares (25%) each, leaving the daughters, Aliyah and Abeer, with 300 (12 1/2%) each. But on 12 February 2000 this was being revised to a proposal that the only transfer would be of 240 shares by the husband to Firas. When it was noticed on 8 March 2000 that this would have given the husband and Firas 600 shares (25%) each but left Isam with only 480 (20%), corrected documents were prepared (in April 2000), reflecting a transfer by the husband to Firas of 120 shares.

[38]    The end result, reflected in new share certificates issued on 23 June 2000, is that the husband holds 720 shares (30%), Isam and Firas 480 (20%) each and the daughters, Aliyah and Abeer, 360 (15%) each.

*The properties*

[39]    It is clear that, save insofar as mortgage finance was obtained, the whole of the funds used in the acquisition of each of the properties came from the husband and that, insofar as the rental income was insufficient to service the mortgages, the further moneys required were also provided by the husband.

[40]    It is also important to note that each of the properties, although registered at Her Majesty's Land Registry in the name of the company, was subject to a restriction that 'no disposition by the proprietor of the land is to be registered without the consent of [the husband]'.

[41]    Furthermore, it is also clear that the proceeds of sale of each of 64 St John's Wood Court (£441,000), 215 The Quadrangle (£199,000) and

32 Forest House (£130,000) were paid to the husband, who also received
£50,000 on the re-mortgage of 17 Kensington Heights (see below). So, all in
all, the husband, has, between April 2000 and February 2001 (see below),
received a total of £820,000 from the realisation of the properties.

### The properties – 64 St John's Wood Court

[42]    This leasehold property was bought by the husband in his own name
in July 1985. On 2 December 1988 the board of the company resolved to
purchase the property from the husband for £290,000, with the assistance of a
mortgage loan of £150,000, on the basis that the husband was to execute a
deed of trust of the property in favour of the company.

[43]    On 6 November 1992 the landlord granted the husband licence to
assign the property to the company, the transfer of the lease (at the previously
agreed price of £290,000) following on 20 November 1992.

[44]    On 6 July 1995 the lease was extended for a further 50 years, the
premium of £10,750 being paid by the husband.

[45]    Pursuant to a board resolution dated 22 January 2001, the property
was sold on 14 February 2001 (contracts having been exchanged on
11 January 2001) for £460,000, the secured loan of £100,000 (see below)
being redeemed by increasing the loan secured on 17 Kensington Heights (see
below) by £100,000. The net proceeds of sale – some £441,000 – were
remitted in full to the husband. Initially the proceeds of sale were remitted to
the company in Guernsey. Mr Shaibi gave instructions for the entire proceeds
of sale to be paid to the husband's personal bank account, but the management
company indicated that although this would be done the consent of the adult
children would be required. Aliyah and Abeer provided consents on
10 February 2001 and Isam on 11 April 2001. The entire proceeds of sale
were remitted to the husband.

### The properties – 215 The Quadrangle

[46]    Pursuant to a board resolution dated 7 February 1989, this leasehold
property was bought in the company's name in March 1989 at a price of
£144,000 provided by the husband. Pursuant to a board resolution dated
27 March 2000, the property was sold to the husband's nephew on 4 April
2000 (contracts having been exchanged on 7 March 2000) for £200,000, the
wife suggests at an undervalue. The net proceeds of sale – £198,765.78 – were
remitted in full to the husband.

### The properties – 32 Forest House

[47]    Pursuant to board resolutions dated 30 October 1992 and
23 November 1992, this leasehold property was bought in the company's
name on 27 November 1992 (contracts having been exchanged on
6 November 1992) at a price of £108,000, £100,000 being borrowed on the
security of a mortgage of 64 St John's Wood Court (which it will be recalled
had been transferred by the husband to the company 7 days earlier). The
balance was provided by the husband. The property was sold in December
2000 for £130,000, the wife suggests at an undervalue. The proceeds of sale
were remitted in full to the husband.

*The properties – 17 Kensington Heights*

[48]    Pursuant to board resolutions dated 26 February 1993 and 29 March
1993, this leasehold property was bought in the company's name on 12 May
1993 (contracts having been exchanged on 3 May 1993) at a price of
£195,000, £120,000 being borrowed on the security of a mortgage of the
property. The balance was provided by the husband.

[49]    Following the argument in August 2000, the wife, as we have seen,
moved into the property where she has been living ever since.

[50]    In 2001, as we have seen, the mortgage loan was increased by
£100,000. Pursuant to a board resolution dated 7 March 2002, this mortgage
was redeemed on 2 April 2002 and the property was re-mortgaged to another
lender for £300,000. Of the surplus of some £75,000 thus released to the
company, £50,000 was on 19 June 2002 remitted to the husband.

[51]    Following the commencement of the divorce proceedings, the wife on
10 January 2005 registered a unilateral notice at the Land Registry in relation
to the property, on the grounds that she 'was advised by her husband … that
the company … is his'. Application was made on 27 January 2005 for the
cancellation of the notice, the wife registering her objection to this on
17 February 2005 on the basis that 'despite a company search revealing her
husband owns 30% of the company, the other shareholders are nominees of
her husband and the company and the property are his absolutely'. On
27 April 2005 the application for cancellation of the notice was withdrawn. A
further application for cancellation of the notice was made on 17 January
2006. This was referred by the Land Registry to the adjudicator, but that
aspect of the matter was overtaken by the company's issue of the Chancery
proceedings on 7 April 2006.

*The properties – 57 Forest House*

[52]    This leasehold property was bought in the company's name on
4 November 1996 at a price of £90,000, £85,000 being borrowed on the
security of a sum placed in a blocked bank account in the name of the
husband. The balance was provided by the husband. In June 2002 the husband
paid the £20,000 required as a contribution to the management company that
had been set up by the various leaseholders to acquire the freehold of the
block of flats. The relevant share in the management company was issued to
the company. Following on from this a new lease was acquired by the
company on 3 April 2003.

[53]    In the autumn of 2002 there had been a proposal that the property
should be transferred to the children. The board of the company passed a
resolution to that effect on 15 October 2002 and on 29 October 2002 the
husband wrote to the solicitors stating that he would like the ownership of the
property to be in the names of his children, with his sons owning 33% each
and his daughters 17% each. On 26 March 2003 the husband told the
solicitors to put the proposed transfer to the children on hold. On 3 April
2003, as we have seen, the new lease was acquired by the company and
thereafter registered in the company's name at the Land Registry. On 26 April
2003 the husband informed the solicitors that he did not propose to proceed
with the transfer of the property to his children.

[54]    Following the commencement of the divorce proceedings, the wife on
10 January 2005 registered a unilateral notice at the Land Registry in relation

to the property, on the same grounds as the corresponding notice in relation to 17 Kensington Heights. Thereafter matters proceeded in precisely the same way in relation to 57 Forest House as in relation to 17 Kensington Heights, so there is no need for me to repeat what I have already set out in para [51] above.

*The husband's approach to the litigation*

[55]    As Miss Parker rightly submits, the husband's approach to the litigation is important in a number of different ways. It is convenient to deal with it at this stage because my findings on this aspect of the matter must necessarily inform my consideration of the more central issues. There are, as it seems to me, four different elements to all this which I need to consider.

[56]    In the first place, as I have already observed, the history of the ancillary relief proceedings has been characterised throughout by the husband's failure – his adamant refusal – to engage in any meaningful way with the process. He has failed to comply with the relevant provisions of the FPR. He has disobeyed numerous orders of the court. He has never given proper disclosure. I can summarise the main features of all this as follows:

(i)    Even assuming that, despite an order made by Bennett J on 17 October 2005 requiring him to serve a Form E within 28 days (his appeal against this order being dismissed by the Court of Appeal on 26 January 2006), the husband was justified in not serving his Form E until his 'strike out' application (see below) had been dismissed on 11 April 2006, there is and can be no justification for his failure to do so thereafter. Yet the husband has never filed a Form E, despite being ordered to do so by Bennett J on 19 October 2006 (in an order which was endorsed with a penal notice) and despite the wife's application dated 26 February 2007 to commit him for contempt. The husband's only response was to write a letter to Bennett J on 27 March 2007 seeking to justify his stance. I set out this extraordinary document in an Appendix. In these circumstances, not surprisingly, no order was made on the wife's committal application when it came before Bennett J on 29 March 2007. The only disclosure the husband has ever made is in a manifestly inadequate affidavit which he swore on 8 February 2006 in response to the wife's application for maintenance pending suit (see below). As Miss Parker justly observes, the accuracy of that affidavit as a purportedly full and accurate statement of his means can be measured against his complaint, in the letter to Bennett J, against having to provide 'extensive details of every single asset I have'.

(ii)    On 8 February 2006, as we have seen, Bennett J made an order, backdated to the date of service of the petition on the husband, requiring the husband to pay the wife maintenance pending suit at the rate of £48,000 pa. And the same order required the husband to pay the wife's costs in the sum of £13,500 and a further £12,000 towards her future litigation costs. No payment has ever been made by the husband under that order. The

husband's failure to comply with this order is, as Miss Parker points out, aggravated by two features. In the first place the husband had made an open offer in a letter from his solicitors dated 7 February 2006 to pay the wife £36,000 pa (in addition to meeting the running costs of 17 Kensington Heights) yet he has paid nothing. Secondly, in the affidavit which he swore on 8 February 2006 the husband deposed to the fact that as well as an annual income of £160,000 he had £500,000 cash in bank accounts in Saudi Arabia – so he can scarcely plead poverty – yet he has paid her nothing. In the circumstances Miss Parker, in my judgment, is well justified in describing the husband's refusal to comply with this order as wilful and contumacious.

(iii)   By a further order dated 11 April 2006 Bennett J, as I have mentioned, required the husband to continue paying the mortgage and service charge in relation to 17 Kensington Heights. He has not done so.

(iv)   By an order made by Bennett J on 29 March 2007 the husband was ordered to attend the final hearing for cross-examination. On 16 July 2007 Holman J directed that the husband should attend the trial, though he also directed that arrangements should be made to receive the husband's evidence by video-link if he refused to attend. As we have seen, the husband did not attend the trial and tried to evade being cross-examined on matters to do with the ancillary relief proceedings.

[57]   Secondly, it is apparent that the husband's strategy has throughout been to 'string out' the proceedings as long as possible, his objective, I have no doubt, being to exhaust the wife financially so as to prevent her litigating. Bennett J referred on 17 October 2005 to 'the war of the long purse' and the Court of Appeal on 26 January 2006 to the 'perceptible risk that the wife would be worn down' by costs. There are repeated examples of this:

(i)   At the outset the husband adopted the stance that he should not be required to file his Form E pending judgment in the main suit.

(ii)   When on 17 October 2005 Bennett J gave judgment in the suit and ordered the husband to file his Form E, the husband's immediate response was two-fold: first, he sought permission to appeal against Bennett J's findings (seeking a rehearing on fresh evidence) and, when that was refused by Bennett J, renewed his application to the Court of Appeal; secondly, he sought an order staying the order requiring him to file his Form E and, when that also was refused by Bennett J, renewed his application to the Court of Appeal.

(iii)   When the Court of Appeal dismissed all his applications on 26 January 2006 the husband responded 5 days later (on 31 January 2006) with an application to strike out the wife's ancillary relief application on the ground that her participation in the bigamous marriage disentitled her to ancillary relief. On 8 February 2006 Bennett J listed that application for hearing on 11 April 2006. A matter of days before the hearing, the

husband's solicitors wrote to the wife's solicitors on 3 April 2006 saying that the husband would be placing himself on the record and that 'he does not propose to pursue his strike out application.' The next day (4 April 2006) the husband filed notice of acting in person, since when he has played no active part in the proceedings. He did not appear at the hearing on 11 April 2006 and his 'strike out' application was dismissed with costs.

(iv) The wife was then driven to apply on 26 April 2006 for a garnishee order in an ultimately futile attempt to recover the arrears of maintenance. When the order came to be enforced, it became apparent that all the husband's bank accounts in this country had either been emptied or closed.

[58]   Thirdly, there is what Miss Parker suggests is a close chronological connection between, on the one hand, the marital breakdown and the litigation and, on the other hand, the various realisations (or attempted realisations) of the properties. Miss Parker points to the following matters:

(i) 64 St John's Wood Court, 215 The Quadrangle and 32 Forest House were each sold (respectively in January 2001, March 2000 and December 2000) at around a time when, according to the wife, the husband was complaining of difficulties in the marriage. In each case the entire proceeds of sale were remitted to the husband.

(ii) The mortgage on 17 Kensington Heights was increased to £300,000 in April 2002, £50,000 being remitted, as we have seen, to the husband.

(iii) An attempted realisation of 57 Forest House in January 2005, less than a month after the wife had issued her divorce petition, failed only because of the wife's registration of the unilateral notice at the Land Registry. It will be recalled that the wife's petition was issued on 20 December 2004. On 19 January 2005 the husband gave telephone instructions to the company's solicitors that the property should be sold, followed up by written instructions the same day indicating that 'the purchaser is pressing for quick exchange and I would like you to expedite'. Only on 24 January 2005 was it discovered that the wife had registered her unilateral notice on 10 January 2005.

In relation to (i) and (ii) Miss Parker says that the justification for the remitter to the husband of no less than £820,000 (whether or not it was the sole justification) was to limit the husband's exposure to an ancillary relief claim from the wife in the event that the marriage failed. In relation to (iii), the company's case is that these instructions from the husband were given by him qua director of the company; Miss Parker says that it was, on any view, an attempt by the husband to place one of the two remaining properties beyond the reach of the court.

[59]   Fourthly, there is what Miss Parker suggests is a revealing chronological connection between events in the ancillary relief proceedings

and events in the Chancery proceedings. Pointing to the fact that the Chancery proceedings were issued on 7 April 2006, precisely 3 days after the husband had filed a notice of acting in person in the ancillary relief proceedings (and after which, as we now know, he took no further part in the proceedings), she says that what she calls the chronology of the company's involvement in these proceedings begins almost exactly at the point when the husband's engagement in the ancillary relief proceedings ends. She submits that this is no coincidence but rather a part of the husband's overall tactics, approach to the litigation and intention to pressurise the wife. In this connection Miss Parker also draws attention to the fact that, as she puts it, the company fought tooth and nail to keep the Chancery proceedings in the Chancery Division and separate from the ancillary relief proceedings.

[60]   For good measure Miss Parker suggests that the sense of cynicism relating to the Chancery proceedings is heightened when one looks at the various co-claimants. The company was obviously (and properly) a claimant but it is difficult, she suggests, to see what the legal justification was for including the children but not the husband as co-claimants. On one view, she says, the only necessary claimant given the company's case was the company itself; but if it was necessary for the individual shareholders to be co-claimants, it is difficult, she says, to see why the husband did not join in that exercise. With all respect to Miss Parker this is a thoroughly bad point. The reason why the children were joined as co-claimants was because the wife had put in issue their beneficial ownership of their shareholdings, so they accordingly sought the declaration I have mentioned. That claim was appropriately joined together with the company's claim for declaratory relief in relation to the properties. But for obvious reasons the wife had never put in issue the husband's beneficial ownership of his 30% shareholding in the company, so he did not need to bring declaratory proceedings of the type brought by the children whose shareholdings were under attack.

[61]   What does Miss Parker seek to derive from this? She makes a number of submissions:

    (i)    In the first place she submits that the husband has completely failed to engage properly in the ancillary relief proceedings, in particular by failing to make anything remotely approaching full and frank disclosure. In this connection she points out that, having indicated that his overall net worth is only £5m, the husband, if that were truly the case, would surely have been prepared to file a Form E to substantiate it.

    (ii)   Secondly, she says, this has been exacerbated by his disregard for and disobedience of court orders even when endorsed with penal notices.

    (iii)  Thirdly, she points to his complete failure to make *any* – let alone proper – provision for the wife, despite his promises to do so and even when specifically ordered to do so.

    (iv)  Fourthly, she points to what she says are his attempts to place assets beyond the jurisdiction of the court.

    (v)   Finally, she says, all this is to be contrasted with his involvement in, and what she asserts is his instigation of, the Chancery proceedings. It is, she submits, part of his campaign.

In short, she says, the husband has evinced his utter determination to defeat the wife's claim.

[62]    The last proposition I have no hesitation in accepting, just as I have no hesitation in accepting Miss Parker's submissions (i), (ii), (iii) and (iv). My only slight reservations are in relation to proposition (v).

[63]    The commencement of the Chancery proceedings, at the very time when the husband was, as we now know, effectively disengaging altogether from the ancillary relief proceedings, is obviously more than a mere coincidence. And I have little doubt that the overall litigation strategies of both the husband and the company were co-ordinated. I doubt, however, that the company or the children required much if any persuasion to launch the Chancery proceedings. I have the distinct impression, in the light of all the evidence I have read and heard, that the children had thoroughly disapproved of the wife's occupation of 17 Kensington Heights, both in 2000 and thereafter. They had been prepared to go along with it initially on the basis that the husband would be responsible in the short term for the outgoings and, in the longer term, for getting the wife out. By April 2006 they had every incentive – loyalty to their father quite apart from their interests in the company – for wanting to get the wife out without further delay. No doubt it suited the husband that the company was launching the Chancery proceedings, and no doubt he was happy to see the wife being put under pressure from both directions, but it is probably going too far to say, if this indeed is what Miss Parker is saying, that the Chancery proceedings were commenced only at his instigation and that they were nothing more than a part of his campaign.

## The extent of the husband's wealth

[64]    Leaving on one side the disputes as to the true extent of his interest in the company and of his interests (if any) in the properties, the husband admits to an income of £166,000 (including a pension income of £108,000) and assets worth some £5m. The wife says this is a grotesque and dishonest under-statement. The husband's account of his financial situation is, says Miss Parker, completely at odds with his lifestyle and that of his family. It is, she says, self-evident from the lifestyle the husband and wife enjoyed that the husband has a very high standard of living and access to considerable wealth. The wife's case – indeed, her belief – is that the husband's resources are in fact in excess of US$500m and may even exceed US$800m. Miss Parker invites me to find that the husband is worth in excess of £250m. Alternatively, she submits, even if I am not able to find that as a fact, I am able to and should find that he is more than able to satisfy the wife's claim in its entirety.

[65]    I remind myself that it is necessary to focus on the *evidence* and to bear in mind that general reputation prevailing in the community, and the mere opinions, inferences or beliefs of witnesses, are inadmissible in proof of material facts: see *Al-Khatib v Masry* at para [19]. On the other hand where, as here, there has been proven non-disclosure, the court is entitled to draw inferences adverse to the husband, and if in the result the outcome is unfair to him, then so be it. For, as Thorpe J put it in *F v F (Divorce: Insolvency: Annulment of Bankruptcy Order)* [1994] 1 FLR 359 at 367, better that the order is unfair to the husband whose defaults have obscured the court's vision

than that it be unfair to the wife: see the discussion of the authorities in *Al-Khatib v Masry* at paras [83]–[88].

[66]  Miss Parker in effect invited me to adopt the same approach here as the approach I adopted in that case, where I set out at para [92] the submission put forward by counsel for the wife:

'Let it be assumed for the sake of argument, he says, that there is no evidence before me which would justify a specific finding that the husband's wealth is the \$200 million mentioned by the wife or indeed which would justify a finding that the husband's wealth is £X, whatever specific figure one chooses to substitute for X. What he says I can safely infer is that the husband's wealth, whatever it may be, is such that, were he to make the full and frank disclosure which he ought to but has not made, the court … would award the wife even more than she is asking for … The only sensible inference, says Mr Mostyn, is that a frank revelation of the truth would be even more damaging to the husband than the adverse inferences to be drawn from his non-disclosure, that the truth would be more painful to him than the consequences of non-disclosure.'

In that case I accepted the submission, saying at para [96]:

'I do not accept Mr Mostyn's submission that the materials I have seen justify the inference that the husband's wealth amounts to the \$200 million which the wife believes it to be. I am not saying that it does not. All I am saying is that the materials I have seen do not properly justify an inferential finding that it does. But Mr Mostyn does not have to go that far. The inference which in my judgment I can properly draw, and which I do draw, is that the full extent of the husband's present wealth is such as will very comfortably justify … the kind of award which the wife is seeking.'

[67]  Every case has, of course, to be decided on its own particular facts, but, as it happens, my conclusion in this case is very similar to my conclusion in that case.

[68]  It is quite clear from the wife's evidence, which I accept, that she and the husband enjoyed a very high standard of living, just as it is quite obvious that the husband, whatever his origins, is now a man of significant wealth. But the picture must be kept within the bounds of reality. Whatever the wife's belief – and I neither dispute the honesty of her belief nor dispute that it *may* be correct – the evidence before me does nothing to support her case that the husband's wealth is to be measured in hundreds of millions. Their lifestyle was undoubtedly grand, but it was not marked with the opulence or extravagance one might have expected if the husband was really worth what she says, nor is she able to point to tangible assets remotely approaching in value what she says he is worth. It *may* be that there are hundreds of millions invested in intangibles – I am certainly not finding that there are not – but the picture I have does not suggest it. Theirs was not, for example, a lifestyle characterised by yachts and private jets, nor is there anything to suggest that

the husband ever engaged in the kind of expensive hobbies and pastimes one often associates with the mega – or even the very – rich.

[69]    And there are, as it seems to me, two telling indicators that his wealth, even if significantly greater than he has been willing to admit to, is not as the wife would have me accept. One relates to the matrimonial home in Saudi Arabia. It was obviously a large and very comfortable property – larger, more comfortable and, indeed, probably more opulent than the husband sought to paint it – but it was far short of the enormous or the palatial. The other relates to the properties, all of which, it is to be noted, were worth in the hundred thousands at most – and the low hundred thousands at that – rather than in the millions. And the same seems to go for the other properties owned by the husband in the Middle East. If this really is a man worth as much as the wife says, one might have expected him to own at least one property somewhere worth very much more than any of the properties which have been described to me. And bearing in mind his long-standing affection for this country – the country in which he went to school and the country with which, as the very acquisition of the properties demonstrates, he maintained a close connection – one might have expected the husband, if he really was worth as much as the wife says, to have had at least one really large, even if not opulent, house in this country. Yet the fact is that he did not.

[70]    The wife, in my judgment, has failed to establish that the husband is worth any of the sums she has mentioned or, indeed, anything approaching them. But just as in *Al-Khatib v Masry* and for precisely the same reasons, I find that the husband's wealth, whatever it is, is such as will justify very comfortably the kind of award the wife is seeking. In this case, as in that, this is, in my judgment, the only sensible inference to draw from the husband's behaviour in the litigation and, in particular, his failure, indeed refusal, to make proper disclosure. It is, moreover, an inference which does not attribute to him a degree of wealth in any way inconsistent with the overall picture I have formed on the basis of everything I have read and heard.

[71]    I am satisfied that the husband is worth many millions – and significantly more millions than he has been willing to admit – but nothing in the materials before me justifies a finding that he is worth hundreds of millions. It *may* be that he is worth that much, but the wife has not established that he is.

*The issues*
[72]    Against this factual background I turn to the various issues which I am required to resolve. It is convenient first to identify the various issues which arise in relation to the company and the children.

*The issues as between the wife, the company and the children*
[73]    The issues as between the wife, the company and the children have been identified with helpful precision by Miss Parker and Mr Wagstaffe. The wife puts her claims on the following bases:

    (i)    First, she asserts that the company is simply the husband's alter ego, the other shareholders being simply his nominees. Accordingly, she says, it is appropriate to pierce or lift the corporate veil.

(ii) Second, and given, she says, that the children did not themselves fund the purchase of their shares in the company, she asserts that their shareholdings are subject to resulting trusts in favour of the husband. (In response the children rely, inter alia, on the presumption of advancement.)

(iii) Third, and even if the children's shareholdings in the company are real and genuine, as opposed to merely nominal, she asserts that the company holds 17 Kensington Heights and 57 Forest House upon constructive trusts for the benefit of the husband alone.

(iv) Finally, and in the alternative to all the above, she asserts that 17 Kensington Heights and 57 Forest House can and should be regarded as having been settled on the husband (or on the husband and the wife) in such a way as to engage s 24(1)(c) of the 1973 Act, and that the court should accordingly exercise its power to vary those settlements by resettling the properties on her free from any trusts.

[74]    A number of other claims were pleaded by the wife in the defence she served in the Chancery proceedings on 19 May 2006. But it is to be noted that, whereas the wife's claim that the company's properties are held on constructive trusts for the husband was specifically pleaded as extending to both 17 Kensington Heights and 57 Forest House, these other defences were pleaded only in relation to 17 Kensington Heights and not in relation to 57 Forest House.

[75]    It was asserted that the husband had represented to her that she could live in 17 Kensington Heights and 'remain there indefinitely or until [he] provided alternative accommodation for her', that in making this representation the husband had the express, implied or ostensible authority of the company, and that the wife acted to her detriment in reliance upon the representation. It was pleaded that in these circumstances the company is estopped, either indefinitely or alternatively until the outcome of the ancillary relief proceedings, from recovering possession of 17 Kensington Heights, alternatively, that the wife has an irrevocable licence to occupy 17 Kensington Heights, granted by the husband as the agent of the company, alternatively to occupy 17 Kensington Heights until the outcome of the ancillary relief proceedings.

[76]    Although Miss Parker has expressly abandoned those defences, it is interesting to see the factual basis upon which the wife was putting them forward for, as we shall see, it is essentially the same facts which are now being relied upon in support of the claim based on s 24(1)(c). This is a point to which I must return in due course.

[77]    Miss Parker has also expressly disavowed any reliance on the doctrine of sham (in the sense in which that word was used by Diplock LJ in *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786, [1967] 2 WLR 1020 at 802 and 1030 respectively) and any reliance, as against the company or the children, on *Thomas v Thomas* [1995] 2 FLR 668.

[78]    So, as against the company and the children, the wife's case stands or falls on the four issues identified in para [73] above.

*The issues as between the wife and the husband*

[79]    In addition to all the issues that would arise in any claim for ancillary relief, there are two additional issues which arise as between the wife and the husband:

> (i)    First, the wife has to make good the various claims which she seeks to pursue against the company and the children, for otherwise her only claim by way of ancillary relief so far as concerns either the company or the properties will be a claim to the husband's 30% shareholding in the company.

> (ii)    Secondly, she has to meet the potential argument, which I have to address even though the husband is not before me, that the fact that the marriage was bigamous affects the way in which the court's discretion would otherwise be exercised in accordance with the provisions of the 1973 Act.

[80]    So far as concerns the 30% of the shares in the company which are indubitably held by the husband, there is, as I have said, no issue, for the husband has accepted in terms that she should have them. And, as I have said, Miss Evans-Gordon accepts that if I make an order transferring those shares to the wife the children will be content to acquire the shares at a price equal to 30% of the value of the company's assets, that is, 30% of the net value of 17 Kensington Heights and 57 Forest House. This pragmatic and sensible course thereby avoids the need for me to grapple, at least directly, with the issue which arose in *Green v Green* [1993] 1 FLR 326 (see below), though I will need to consider that authority when I come to consider the wife's claim to be entitled to pierce the veil of incorporation.

*The structure of the judgment*

[81]    It is convenient first to address the issues which arise as between the wife on the one hand and the company and the children on the other, before turning to consider the issues which arise exclusively as between the wife and the husband.

[82]    Although, as we have seen, Miss Parker arranged her submissions in a different sequence, the logical starting point, in my judgment, is to consider first the assertion that the company holds 17 Kensington Heights and 57 Forest House upon constructive trusts for the benefit of the husband alone – for if this claim is made good then none of the other claims arises – and then to turn to consider the assertion that the children's shareholdings in the company are all subject to resulting trusts in favour of the husband. Only if both those claims fail does the assertion that the company is simply the husband's alter ego, the other shareholders being simply his nominees, and that it is therefore appropriate to pierce or lift the corporate veil, arise for consideration.

[83]    Before turning to deal with all these various issues there are, however, some preliminary matters which it is convenient to deal with and some important preliminary observations that need to be made.

*Preliminary matters: the wife's case against the children and the company in outline*

[84]   Miss Parker's primary case, as she calls it, is that the husband and the company are one and the same, that the company is simply the husband by another name and that the other shareholders – the children – are simply his nominees. This is the foundation of her claim that the wife is entitled to pierce or lift the veil of incorporation. Her alternative claims, as we have seen, are that even if the wife cannot go behind the veil of incorporation either: (1) the two remaining properties are held on constructive trusts for the husband; or, alternatively (2) the children's shares in the company are held on resulting trusts for the husband. Miss Parker makes no bones about the fact that the evidence she relies upon in support of these alternative cases is largely the same as the evidence which she relies upon in support of her primary case. Indeed, in relation to both of her alternative bases of claim she says that they may not amount to much more than a reformulation of her primary case and are probably no more than variations of the main theme, 'whose money is it?'

[85]   Given that this is how Miss Parker puts her case, it is convenient before I turn to consider her alternative claims individually to summarise the factual basis of her case.

[86]   The starting point, as she correctly says, is that the company is on any footing a small family company. It is not, she says, a trading entity. Its directors, as we have seen, have largely been fee-paid professional company directors drawn from corporate service providers in the Channel Islands. They are certainly not full-time employees. There are no substantial creditors, whether trading associates, Her Majesty's Revenue & Customs or otherwise. The company was formed and exists, as the evidence amply demonstrates, to hold property in a tax-efficient manner. Its sole function is to hold property in England for, the wife contends, the husband alone.

[87]   Against this background Miss Parker points to what she says are the following specific and telling features of the evidence:

(i)    First, and as the wife has asserted from the very outset, there is her evidence – which I accept – that the husband on a number of occasions during the course of the marriage pointed out or referred to the properties as being 'his' – 'mine' – and similarly told her that the company was his.

(ii)   Second, the company was established in 1988, the husband providing the entire share capital, at a time when Isam was just 18, when the other children were all minors and when Firas was a very young baby. Of course, as Miss Parker accepts, even minors can legitimately own shares, and many fathers legitimately wish to make provision for their children by conferring shareholdings on them, but it is important, she says, to note that the company was in no way and never has been a joint venture between investors or a partnership of equals on the part of the husband and the children. The issue for the court, she says, is whether, at that stage, the husband genuinely intended to part, in favour of his children, with 70% of the value of the assets transferred into the company's name or, indeed, of those assets acquired subsequently. She submits that he did not.

(iii)   Third, and as the contemporary documents to which I have referred make clear, the purpose for which the company was established was not to make immediate provision for the children but to protect the husband from UK capital gains tax and inheritance tax. In particular, says Miss Parker, the references to inheritance tax indicate that the benefit of the company's assets was not to be enjoyed by the children until after the husband's death.

(iv)   Fourth, the only person to contribute funds to or to draw funds out of the company has been the husband. When funds have been required by the company he has provided them. (It is asserted that since about March 2006 some funds have been provided by Isam to meet various costs incurred by the company. Miss Parker says that, given the date and circumstances in which the Chancery proceedings were launched, it is not difficult to be cynical about that exercise; there is, moreover, she says, not a shred of evidence as to where Isam got the money from to make these contributions.) When the company has purchased properties, restrictions have been registered with the Land Registry so that the properties could not be sold without the husband's consent. Perhaps most important of all, and of particular significance given the amounts involved, she suggests, when the company's properties have been realised, the husband alone has received the proceeds of sale. She asserts (though this is hotly disputed) that not a penny of this has been paid to any of the children.

(v)   Fifth, whilst the various 'hired' directors or managers have dealt to a certain extent with various day-to-day matters, all the important decisions relating to the company, she says, have plainly been taken by the husband and all the professionals involved with the company plainly take their instructions from him. The documents disclosed by the company are simply littered, she says, with examples of the husband and the company being treated as interchangeable entities, and there is no example prior to 2006 of any of the other shareholders having anything other than a nominal relationship with the company.

(vi)   Sixth, the husband appears to have regarded himself as the ultimate beneficial owner. He refers to the company's property as 'my' property and to the company as a 'vehicle'; indeed the directors of the company refer to him as 'the company's beneficial owner' even though his shareholding, on the face of it, is only 30%. Such references to the interests of the other shareholders as there are (and they are, says Miss Parker, few and far between) present as formalities, rather than real issues or impediments.

(vii)   Seventh, the timing of the attempt to sell 57 Forest House, the evident haste in the husband's instructions, and the suggestion that the sale proceeds will be remitted outside the jurisdiction, are wholly consistent with a sense on the part of the husband of his personal property being threatened by the wife's application.

[88] Thus, says Miss Parker, simply on the basis of the contemporaneous records there is a compelling case that the company's assets are in reality regarded by all concerned as the husband's. Moreover, she says, his protestations – and the company's – fall to be considered in the light of what she says is the husband's unscrupulous conduct of the proceedings and his attempts to defeat the wife's claims by fair means or foul. She submits that when the case deployed by the wife is considered in the round the conclusion is inescapable that the properties are really the husband's, doubtless intended to benefit his children in time but still in his gift as at the date of the wife's application.

[89] These points were all developed in no little detail, particularly by reference to the many documents disclosed by the company, during the course of Miss Parker's opening, during the evidence and in the course of closing submissions. I shall return to the detail when I come to consider the wife's various heads of claim. For the moment it suffices to see the general thrust of her case.

*Preliminary matters: specific findings of fact sought by the wife against the children and the company*

[90] I should, however, set out at this point certain specific findings of fact which Miss Parker seeks in relation to the company:

(i) The husband was the source of all the funds injected into the company. What Miss Parker says was his inability to explain whether this was by way of gift or by loan is inconsistent with the case that the company was an arms length entity and supports the inference that it was not.

(ii) The husband placed a restriction against the titles to prevent sale or realisation of the properties without his consent, so as to ensure that his beneficial ownership was safeguarded as against the other shareholders.

(iii) On the sales of 215 The Quadrangle, 64 St John's Wood Court and 32 Forest House, the husband received all of the proceeds of sale as also £50,000 from the re-mortgage of 17 Kensington Heights.

(iv) The husband treated the moneys as his as did the children. On the only occasion when consents from the children were required by the administrators of the company the decision that the proceeds of sale be applied to the husband and the husband alone had already been taken. On other occasions consents were neither required nor obtained.

(v) All the properties in Saudi Arabia and their contents conveyed to the children were conveyed by way of gift without consideration. The purported shares of the children in the proceeds of sale of 215 The Quadrangle, 64 St John's Wood Court and 32 Forest House were not set off against the value of the gifts nor taken account of in any way.

(vi) The husband intended to retain ultimate ownership of the company and/or the properties and in fact did so. Whatever the formal position, the children regarded the husband as the

ultimate owner of the company and/or the properties. The
husband and the children all knew, and the children regarded
themselves, as holding the shares in name only. The inference to
be drawn from their actions and inaction in relation to the
proceeds of sale is that they regarded the husband as the ultimate
owner.

(vii) No distinction has ever been drawn by any of the directors or
shareholders as between funds to which the company is entitled
and funds to which the husband is entitled.

(viii) The directors of the company were nominees acting on the
husband's instructions so that the company can be regarded as
the husband's company and his intentions can be regarded as the
company's intentions.

(ix) The husband has evinced his utter determination to defeat the
wife's claim.

(x) If it were necessary so to find, the removal of the proceeds of
sale of 215 The Quadrangle, 64 St John's Wood Court and
32 Forest House, and £50,000 of the moneys obtained by the
re-mortgage of 17 Kensington Heights, were at least in part
motivated by the husband's desire to reduce his exposure to the
wife's potential claims.

(xi) The attempts to sell 57 Forest House and 17 Kensington Heights
were motivated by the desire to defeat the wife's claim.

(xii) The husband has instigated the company's claim and it is part of
his campaign.

*Preliminary matters: specific findings of fact sought by the wife against the
husband*

[91]   It is also convenient at this point to set out certain specific findings of
fact which Miss Parker seeks in relation to the wife's ancillary relief claim:

(i) The husband has evinced his utter determination to defeat the
wife's claim. The husband has instigated the company's claim
and it is part of his campaign.

(ii) The husband is worth in excess of £250m. Even if the court is
not able to find that as a fact it is able to and should find that he
is able to satisfy the wife's claim in its entirety.

(iii) The husband promised the wife that he would support her and
that she would never have to work again and assured Mrs Penny
that he would take care of the wife and she did not need to worry
about her future.

(iv) No distinction has ever been drawn as between funds to which
the company is entitled and funds to which the husband is
entitled. The assets held in the name of the company and the
shares in the company should be regarded as the husband's for
the purpose of identifying his assets.

(v) The wife is not a bigamist. On Bennett J's findings she may have
committed secondary offences, but any offence which either
party committed was immaterial within the context of the
marriage validly celebrated according to Quranic law and

custom. What was important to the husband was that he was
validly married according to Quranic law. The wife relies on
Bennett J's findings in respect of the husband's actions.

*Preliminary observations: the approach of the court*

[92]    So much for the facts as Miss Parker would have me find them. I turn
to the law.

[93]    As happens not infrequently in such situations, Miss Parker began her
submissions with a reference to the well-known passage in *J v V (Disclosure:
Offshore Corporations)* [2003] EWHC 3110 (Fam), [2004] 1 FLR 1042 at
para [130] where Coleridge J said:

'these sophisticated offshore structures are very familiar nowadays to
the judiciary who have to try them. They neither impress, intimidate,
nor fool any one. The courts have lived with them for years.'

[94]    My response to Miss Parker is precisely the same as my response to
Mr Philip Moor QC in *A v A* [2007] EWHC 99 (Fam), [2007] 2 FLR 467, at
paras [18]–[19]:

'[18]    … I agree entirely with Coleridge J that the court should adopt a
robust, questioning and, where appropriate, sceptical approach. As I
said myself in *Re W (Ex Parte Orders)* [2000] 2 FLR 927, at 938:

"the court will not allow itself to be bamboozled by husbands who
put their property in the names of close relations in circumstances
where, taking a realistic and fair view, it is apparent that the recipient
is a bare trustee and where the answer to the real question – Whose
property is it? – is that it remains the husband's property."

And I went on to refer to:

"the robustness with which the Family Division ought to deal in
appropriate cases with husbands who seek to obfuscate or to hide or
mask the reality behind shams, artificial devices and similar
contrivances. Nor do I doubt for a moment the propriety and utility
of treating as one and the same a husband and some corporate or
trust structure which it is apparent is simply the alter ego or creature
of the husband."

[19]    But this does not mean, and I am sure that Coleridge J did not
intend to suggest, that the court can simply ride roughshod over
established principle, least of all where there are, or appear to be, third
party interests involved. As I went on to comment in *Re W*, at 938:

"On the other hand, and as *Nicholas v Nicholas* [1984] FLR 285 …
demonstrates, the court does not – in my judgment cannot properly –
adopt this robust approach where, for example, property is held by a
company in which, although the husband has a majority
shareholding, the minority shareholdings are what Cumming-
Bruce LJ at 287G called 'real interests' held by individuals who, as
Dillon LJ put it at 292G, are not nominees but business associates of
the husband."'

[95]   I continued at para [20]:

'In deciding whether or not, and, if so, in what manner, these principles
operate in any particular case, the court will of course have regard to the
particular context and to the particular factual matrix. Thus it may be
easier, for example, to 'pierce the corporate veil' in the context of a
small family company than in some larger-scale or more purely
commercial context. Similarly, the inferences that can properly be
drawn in the case of an asserted resulting trust may differ, even in a
family context, depending upon the nature of the relationship between
the parties; an inference appropriate in the case of a married couple may
not be appropriate in the case of an unmarried couple, whilst an
inference appropriate in the case of a couple (whether married or
unmarried) may be wholly inappropriate as between siblings.'

Miss Parker submits, and I entirely agree, that in just the same way the
particular cultural context may be very important.
[96]   I concluded with this general observation at para [21]:

'In this sense, and to this limited extent, the typical case in the Family
Division may differ from the typical case in (say) the Chancery
Division. But what it is important to appreciate (and too often, I fear, is
not appreciated at least in this division) is that the relevant legal
principles which have to be applied are precisely the same in this
division as in the other two divisions. There is not one law of "sham" in
the Chancery Division and another law of "sham" in the Family
Division. There is only one law of "sham", to be applied equally in all
three Divisions of the High Court, just as there is but one set of
principles, again equally applicable in all three divisions, determining
whether or not it is appropriate to "pierce the corporate veil".'

[97]   As I had earlier commented at para [17]:

'even in the Family Division, a spouse who seeks to extend her claim
for ancillary relief to assets which appear to be in the hands of someone
other than her husband must identify, and by reference to established
principle, some proper basis for doing so. The court cannot grant relief
merely because the husband's arrangements appear to be artificial or
even "dodgy".'

[98]   I said much the same thing in *Whig v Whig* [2007] EWHC 1856
(Fam), [2008] 1 FLR 453, at paras [57]–[60]. That was a case in which I was
invited, but refused, to annul a husband's bankruptcy. Having referred to what
Vaisey J had said in *Re Hastings (No 3)* [1959] Ch 368 at 377–378, I observed
at para [60]:

'The Family Division applies *precisely* the same principles, and in
*precisely* the same way, as the Chancery Division, or for that matter the
Queen's Bench Division. A creditor is not to be prejudiced because a
wife's application to annul the bankruptcy order on which he depends is

heard by a Family Division judge (more properly, as Vaisey J explained, a judge of the High Court who is assigned for the time being to the Family Division) any more than a wife is to be prejudiced because her application is heard by a Chancery judge.'

[99]   These observations have a particular resonance in this case where I am trying not merely the ancillary relief proceedings but also the Chancery proceedings. The outcome of the Chancery proceedings cannot depend upon whether the case is heard, where it started, in the Chancery Division or, where it has been transferred, in the Family Division, any more than it can depend upon whether it is heard by a 'Chancery judge' or a 'Family Judge'.

[100]   Correctly, Miss Parker did not of course dissent from any of this.

*Preliminary observations: the rule in Salomon's case*

[101]   The need to adopt a principled approach makes it convenient at this point to draw attention to those elementary principles of company law forever to be associated with the fundamentally important decision of the House of Lords in A*ron Salomon (Pauper) v A Salomon and Company Ltd; A Salomon and Company Ltd v Aron Salomon* [1897] AC 22, the case which established once and for all that a 'one man company' is a legal entity distinct from its owner and controller and that that individual is not liable on the company's obligations.

[102]   For present purposes there is no need for me to rehearse the facts of the case. It suffices to identify the important point of principle it established. The general point was spelt out by Lord Halsbury LC at 30:

'it seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself, and that the motives of those who took part in the promotion of the company are absolutely irrelevant in discussing what those rights and liabilities are.'

[103]   Does it make any difference that the company is a 'one man company', the other shareholders being mere dummies or nominees? The answer given was a resounding 'No'. I go first to what Lord Herschell said at 45:

'It was said that in the present case the six shareholders other than the appellant were mere dummies, his nominees, and held their shares in trust for him. I will assume that this was so. In my opinion, it makes no difference. The statute forbids the entry in the register of any trust; and it certainly contains no enactment that each of the seven persons subscribing the memorandum must be beneficially entitled to the share or shares for which he subscribes. The persons who subscribe the memorandum, or who have agreed to become members of the company and whose names are on the register, are alone regarded as, and in fact are, the shareholders ... Whether they are beneficial owners or bare trustees is a matter with which neither the company nor creditors have anything to do: it concerns only them and their cestuis que trust if they have any.'

[104]  Lord Macnaghten said this at 53:

> 'It has become the fashion to call companies of this class "one man
> companies". That is a taking nickname, but it does not help one much in
> the way of argument. If it is intended to convey the meaning that a
> company which is under the absolute control of one person is not a
> company legally incorporated, although the requirements of the Act of
> 1862 may have been complied with, it is inaccurate and misleading: if it
> merely means that there is a predominant partner possessing an
> overwhelming influence and entitled practically to the whole of the
> profits, there is nothing in that that I can see contrary to the true
> intention of the Act of 1862, or against public policy, or detrimental to
> the interests of creditors.'

[105]  Finally, I go to what Lord Davey said at 54:

> 'I do not see my way to holding that if there are seven registered
> members the association is not a company formed in compliance with
> the provisions of the Act and capable of carrying on business with
> limited liability, either because the bulk of the shares are held by some
> only, or even one of the members, and the others are what is called
> "dummies", holding, it may be, only one share of 11 each, or because
> there are less than seven persons who are beneficially entitled to the
> shares.'

The result followed even though, as Lord Davey put it (at 55) 'any jury, if
asked the question, would say the business was Aron Salomon's and no one
else's'.

[106]  The applications of the principle in *Salomon's case* are legion. Two of
the most striking, perhaps, and they might well have surprised Lord Davey's
juryman, are to be found in the decisions of the Judicial Committee of the
Privy Council in *Lee v Lee's Air Farming Ltd* [1961] AC 12, [1960] 3 WLR
758 and of the House of Lords in *Williams and Another v Natural Life Health
Foods Ltd and Mistlin* [1998] 1 WLR 830, [1998] 2 All ER 577.

[107]  In *Macaura v Northern Assurance Company, Limited, and Others*
[1925] AC 619 at 626 Lord Buckmaster spelt out some of the implications of
the principle of a company's separate legal persona:

> 'no shareholder has any right to any item of property owned by the
> company, for he has no legal or equitable interest therein. He is entitled
> to a share in the profits while the company continues to carry on
> business and a share in the distribution of the surplus assets when the
> company is wound up.'

As Lord Wrenbury put it at 633:

> 'the corporator even if he holds all the shares is not the corporation, and
> ... neither he nor any creditor of the company has any property legal or
> equitable in the assets of the corporation.'

[108] It is, in my judgment, vital to keep these principles in mind throughout any consideration of this case.

*Constructive or resulting trusts of 17 Kensington Heights and 57 Forest House*

[109] Against this background, and reminding myself of the need to search for a principled conclusion, I turn to address the wife's assertion that the company holds 17 Kensington Heights and 57 Forest House upon constructive trusts for the benefit of the husband alone.

[110] How does Miss Parker put her case? She submits that, even if the company is not simply the husband by another name, and even if the children's shareholdings in the company are real and genuine, it does not follow that the company is necessarily the beneficial owner of the two properties. The evidence establishes, she says, that even if the husband cannot properly be regarded as the company's sole beneficial owner, nonetheless the company in truth has no beneficial interest in 17 Kensington Heights and 57 Forest House and holds them on constructive trusts for the benefit of the husband alone. (Miss Parker says the trusts are constructive trusts rather than resulting trusts though, in my judgment, nothing turns for present purposes on the distinction.) The evidence she relies upon in support of this assertion is largely the same as the evidence she relies upon in support of what she calls her primary case and which I have already summarised.

[111] The central core of her case is represented by the facts that the husband provided the purchase moneys for the properties, that he took the precaution of registering restrictions at the Land Registry in respect of the properties and that he received in full the proceeds of sale of three of the properties (together with a further sum raised on the re-mortgage of another of the properties), the latter in circumstances where there is no suggestion in any of the corporate documentation which has been produced to show that this was being treated as a distribution to shareholders. These facts have to be considered in the light of all the surrounding circumstances, not least the many references to the properties as being 'mine' or 'his' (including a number of statements to this effect which I am satisfied he made to the wife) and what Miss Parker says was the children's lack of involvement in the subsequent 'investment' in Saudi Arabia of what was at least in major part 'their' money.

[112] Again, it is necessary to start from first principles. The foundation of the wife's case is the undoubted fact that the husband funded the acquisitions of all five properties, save insofar as the rental incomes were sufficient to service the mortgage loans. But that, of itself, takes the wife nowhere. For someone may provide money used in the acquisition of a property without thereby acquiring any interest in that property. It all depends upon the *character* in which the money is provided. Was the money provided by way of gift, by way of loan or in the character of purchaser? Only in the last case will there be any question of a resulting or constructive trust. If there was in truth a gift, the donor has no claim at all. If there was a loan, the lender has a claim for the repayment of his money with interest but no claim to, or any interest in, the property (save insofar as the loan is secured by a charge or mortgage of the property). But if the payment was in the character of purchaser, the investor has a claim to a share in the property by way of a constructive or

resulting trust (for present purposes nothing turns on the important conceptual differences between these two classes of trust) and proportionate to his investment.

[113] A simple example will make the differences clear. Let us suppose that A provides £10 and B provides £90 towards the purchase of a property which is bought for £100 and eventually sold for £200. If A provided the £10 as a gift, then he gets nothing on the sale; the entire £200 goes to B. If, on the other hand, A provided the £10 as a loan, then he will recover the £10 plus interest (say £5) – a total of £15; the other £185 will go to B. But if A provided the £10 as a contribution to the purchase price and in the character of a purchaser, then, other things being equal, the proceeds of sale will be held on (constructive or resulting) trust as to 10% for A and 90% for B, so A will receive £20 and B will receive £180. (As will be appreciated, whether A is better off if he lent the money or if he invested it *qua* purchaser will depend upon whether the property is increasing in value at a rate greater than prevailing interest rates.)

[114] Now whether A provided the money by way of gift, or by way of loan, or qua purchaser is, in the final analysis, a simple question of fact, to be determined in the light of all the evidence as to the relevant circumstances, including, subject to the rule in *Shephard v Cartwright* [1955] AC 431, [1954] 3 WLR 967 (see per Viscount Simmonds at 445 and 970 respectively), the parties' evidence as to their intentions at the time.

[115] Sometimes the answer to the question will be obvious, indeed so obvious that the question never arises. A bank which advances money to fund a purchase will usually do so by way of loan, and it makes no difference for this purpose that the loan is secured by a charge or mortgage of the property. Where contributions are made by two people living together as a couple the obvious assumption will be that each is contributing qua purchaser, so their claims inter se, unless they are married, will fall to be resolved through the mechanism of trust law. In other situations the answer may be less obvious.

[116] An illuminating example of the factual difficulties is provided by the decision of the Court of Appeal in *Hussey v Palmer* [1972] 1 WLR 1286, [1972] 3 All ER 744. I say nothing as to the legal basis of the decision (which is controversial to say the least) and refer to the case simply to draw attention to the differing ways in which the judges analysed the facts with a view to determining whether the money provided by the defendant's mother-in-law, which he conceded had not been a gift, was provided, as Cairns LJ held, by way of loan or, as Lord Denning MR and Phillimore LJ held, *qua* purchaser entitling her to sue on a resulting trust.

[117] I have said that the question is one of fact. That is subject to the operation, where relevant, of the presumption of advancement. There is a presumption of advancement – a presumption of gift – if a father acquires property (land, shares or any other kind of property) in the name of, or transfers property into the name of, his son or daughter: see, for example, *Shephard v Cartwright* [1955] AC 431, [1954] 3 WLR 967 per Viscount Simmonds at 445. The presumption is, of course, rebuttable and, as Lord Upjohn commented in *Pettitt v Pettitt* [1970] AC 777, [1969] 2 WLR 966, (1969) FLR Rep 555 at 814, 990 and 579 respectively is 'readily rebutted by comparatively slight evidence'. Indeed, the practical forensic reality (see the observations of Lord Hodson at 811) is that the presumption is likely to have

any decisive effect only if there are no living witnesses and no other relevant evidence. Where there is such evidence then the question simply becomes one of fact on the totality of the evidence, to be decided, as it has often been put, by the judge acting as a jury. As Nourse LJ observed in *Tribe v Tribe* [1996] Ch 107, [1995] 3 WLR 913, [1995] 2 FLR 966 at 923 and 974 respectively, 'the presumption of advancement has … fallen into disfavour'.

[118] The presumption of advancement plainly cannot operate as between the husband and the company, and is therefore irrelevant to the matter I am now considering (the claim in relation to the properties), but it is relevant to, and is indeed relied upon by Miss Evans-Gordon in relation to, the wife's assertion that the children's shareholdings in the company are all subject to resulting trusts in favour of the husband. I shall return to it below.

[119] As I have said, whether A has provided the money by way of gift, or by way of loan, or qua purchaser is, in the final analysis, a simple question of fact, to be determined in the light of all the evidence as to the relevant circumstances. It is to that question that I accordingly turn.

[120] At the end of the day there are, in my judgment, three reasons why, despite everything pressed upon me by Miss Parker, the properties were held, beneficially as well as legally, by the company and why there is no trust (whether a constructive or a resulting trust) of the kind contended for by the wife.

[121] In the first place, as Miss Evans-Gordon points out, the contemporaneous documentation (in particular that which I have referred to in para [32] above) shows that the company was intended to hold the legal and beneficial interest in any properties acquired by it, not least because, if it did not, its purpose – its (entirely legitimate) tax avoiding and tax saving purpose – would fail.

[122] Secondly, the evidence and, indeed, the actions of both parties – the company and the husband – are quite inconsistent with the proposition that the husband's investment in any of the properties was *qua* purchaser. On the contrary, the husband received good consideration for the transfer of the beneficial interest in 64 St John's Wood Court, namely, the issue of, in all, 2,400 shares to himself and the children. (The fact that the major part of the shares went to the children is, for this purpose, neither here nor there: consideration has to move from the promisee but need not move to the promisor.) In those circumstances, as Miss Evans-Gordon correctly observes, it cannot be said that the company held 64 St John's Wood Court on a resulting trust for the husband, as he received full payment for the acquisition by the company of his previous interest.

[123] So far as concerns 215 The Quadrangle, 17 Kensington Heights and 57 Forest House, although these were all acquired using moneys initially provided by the husband, it is quite clear, both from such accounts of the company as I have seen and from the accounts in relation to the properties kept so meticulously by the careful Mrs Penny, that the husband's advances were treated, both by him and by the company, as borrowings, which went to increase the company's loan account with him and for which the company, plainly with his knowledge and acquiescence, treated itself as liable. The treatment in the company's books of the husband's advances is, both as a

matter of fact and as a matter of law, inconsistent with any claim by the husband to a beneficial interest or (putting the same point the other way round) to any resulting trust.

[124]   I should at this point go a little further into the facts. Mr Wagstaffe has prepared a most helpful analysis of the relevant entries in the company's books and accounts. This shows that the total of the funds introduced by the husband and added to his loan account with the company during the period from 1989 to 2005 amounted to £684,580. The company's accounts for the year ended 31 March 1989 show the company owing him £203,575. The corresponding figures for the next few years (as I have said, I have seen no accounts later than those for 1993 but there is no reason to think that there was any change in the company's accounting policies in later years) are: 1990 – £244,994; 1991 – £259,422; 1992 – £264,829; 1993 – £285,232. It is also to be noted that, consistently with this treatment of the husband's payments as loans, the company's accounts show 64 St John's Wood Court, 215 The Quadrangle and 17 Kensington Heights as assets of the company (57 Forest House was not acquired until 1996, after the last set of accounts I have seen).

[125]   So far as concerns 32 Forest House, Miss Evans-Gordon says that is clear from the contemporaneous documentation that the husband gifted the purchase moneys for this property to the company and in circumstances, moreover, where, she says, the contemporaneous documentation in relation to other properties previously acquired evidenced his intention to gift additional moneys to the company for the ultimate benefit of both himself and the children as shareholders. There is, as Miss Evans-Gordon submits, no reason to question this documentation, as there is no contemporary evidence or suggestion of wrongdoing. If the moneys were gifted to the company then that is, for reasons I have already explained, equally inconsistent with any claim in trust. It is to be noted that, as in the case of the other properties, 32 Forest House was shown in the company's accounts as an asset of the company.

[126]   It follows, says Miss Evans-Gordon, and I agree, that in these circumstances, there is nothing in the evidence, in the documents, or in the acts of the parties – the husband and the company – to suggest that the husband intended to retain, or that the company understood him to be retaining, any beneficial interest in any of the properties, save such interest as, consistent with the principles in *Macaura v Northern Assurance company Limited*, he had *qua* shareholder.

[127]   Thirdly, and insofar as the claim to a constructive trust is founded on a wider range of circumstances than the mere fact that the husband initially funded the acquisitions of the properties – in other words, is founded on an overall assessment of the conduct of the parties from which, it is submitted, one can properly infer a common intention justifying the imposition of such a trust – an overall analysis points, in my judgment, not in favour of the existence of any such trust but decisively in the other direction. I have already pointed to the company's treatment in its books of what it saw as its indebtedness to the husband. And it is, in my judgment, clear from everything I have read and heard that the husband believed and acted on the basis that his interest in the properties derived from his shareholding alone; it was not an interest directly in the properties. And what, asks Miss Evans-Gordon rhetorically, is there in the husband's conduct in any way inconsistent with what she says is the true view, namely that the husband's actions in relation to

the company and the properties were referable to his position as a director for
much of the time, to his shareholding and to the shareholdings of the children
for whom he acted? In this connection, as she points out, it is relevant to note
that in 1988 all except Isam, who had just reached his majority, were minors.

[128] I agree with Miss Evans-Gordon's analysis. As she correctly submits,
control and direction of a company are not in themselves indicative that the
company is not genuinely holding its assets or operating its business. At the
end of the day, she says, it cannot be unconscionable in the circumstances for
the company to claim ownership of the properties as against the husband. I
agree. Nor, she submits, can there be any question of unconscionable
behaviour in relation to the wife, who no longer asserts – and in any event, in
my judgment, cannot on the facts assert – that she has acted to her detriment
in reliance on any belief caused by anything done or said by the company.
Again, I agree.

[129] Before passing from this part of the case there are two other matters I
must deal with, not least because of the weight which, understandably,
Miss Parker placed on them.

[130] First, there is the undoubted fact that on many occasions the husband
referred to the properties and/or to the company as being his, a form of words
which, with other analogous expressions, is to be found liberally sprinkled
throughout the contemporaneous documentation. Indeed, as Miss Parker
points out, there are instances of the company's directors (and, I might add, its
solicitors) referring to the husband as being, or in effect treating him as if he
were, the owner.

[131] There are here, in my judgment, two general points to be made. First,
one has to have regard to the context in which such expressions are being
used. Often one can refer to something as 'mine' even though one knows very
well, and does not intend to suggest anything different, that it actually belongs
to someone else. One can invite relatives or friends down to stay at 'my house
in the country' even though, as they may or may not be aware, the title to the
property is actually vested in some family company or trust in which others
also have interests. If a rambler walking across the grounds of a stately home
comes across the Tenth Duke of Loamshire and asks 'Are you the owner, do
you mind if I walk across your land', he is likely to be given the answer 'yes'
to both questions rather than being referred to the trustees of the settlement
created by the Ninth Duke. If a traffic warden concerned about the illegal
parking of a company car says, whose car is this? The answer, even from a
lawyer, is going to be 'mine' and not 'Abracadabra plc'.

[132] I have carefully considered all the instances to which I have been
referred, but neither individually nor taken altogether, when properly assessed
in context, do they outweigh the much more compelling arguments which
Miss Evans-Gordon has been able to muster.

[133] The other point relates to what is in this context the important
distinction between the assertion in the husband's mouth that the *properties*
are 'mine' and his assertion that the *company* is 'mine' – both of which, I am
satisfied, he has said on many occasions. These are, and not merely in terms
of legal analysis, quite distinct propositions, and many of the words and other
matters relied on relate more to the company than to the properties. An

assertion that the company is 'mine' is in no way inconsistent, either as a matter of fact or a matter of law, with the company rather than the speaker being the owner of its property.

[134] In this context Miss Parker relies upon many specific references in the documents. I propose to comment on only a few. In 2000 the husband writing to solicitors refers to 'my apartment 215 Quadrangle', an example typical of many which, although suggestive, are in reality too ambiguous to be determinative. In relation to a much earlier period, a letter which Mrs Penny wrote in June 1990 to the local authority in relation to council tax, saying that 'Mr A Shayif (company name: Radfan) purchased this property' – that is, 215 The Quadrangle – neatly illustrates how careful one has to be in reading too much into loose or unguarded language. But there are other references which require more searching scrutiny. One of the matters on which Miss Parker places particular reliance, as we have seen, was the registration at the Land Registry of restrictions in relation to the properties. This was explained in a letter written by solicitors to a bank on 17 May 2002 as being 'to protect his interest in the property'. Earlier documents show that those solicitors were, of course, well aware that the properties were, as they put it, 'owned' by the company, so even lawyers were able to speak without any apparent difficulty of the husband having an interest in property which they well knew belonged to the company. Years earlier, in 1992, other solicitors had likewise referred to the purpose of the restriction as being to 'protect Mr Shayif's interest', though the same letter correctly described him, albeit as holding the largest block of shares in the company, as 'not a majority shareholder'. There is, in my judgment, no particular difficulty in understanding these references and in understanding what these two firms of solicitors were driving at, even if they expressed themselves in language which might have caused an old-fashioned black-letter conveyancer to wince. The reality was, of course, as they saw it, that the husband had a substantial loan account which was otherwise unsecured. In those circumstances he plainly had an interest, if not, strictly speaking in the properties, at least in ensuring that the properties were not realised without appropriate provision being made in relation to the company's indebtedness to him. So there is, in my judgment, a perfectly understandable reason why the restrictions were registered and why the solicitors said what they did, a reason, moreover, which is entirely consistent with Miss Evans-Gordon's case and which does not lead to, let alone compel, the conclusion for which Miss Parker contends.

[135] The other matter I must deal with is the undoubted fact that the entire proceeds of sale of three of the properties were remitted to the husband, who also received £50,000 on the re-mortgage of one of the properties. That is not, and cannot be disputed, but it is not inconsistent with the analysis for which Miss Evans-Gordon contends.

[136] In the first place, the husband, as I have pointed out, was a substantial creditor of the company. Moreover, although the precise details of much of this are far from clear, it is a fact, as I find, that the husband made generous provision for the children in the form of properties in Saudi Arabia which he acquired and gave them. True it is, as Miss Parker urges upon me, that even now there has never been any accounting by the husband to the children either in relation to any interim reinvestment of the proceeds of sale pending the later acquisitions of the properties in Saudi Arabia or, indeed, with a view to

demonstrating the extent to which the proceeds of sale were in fact used for that purpose. But it is clear from the contemporaneous documentation that, at least on one occasion, the three older children expressly gave their consent to the payment of the proceeds of sale to the husband. And looking to events more generally, I am satisfied on the basis of their oral evidence that the children were consulted at least informally by the husband as to what was going on and were content that he and the company should act as they did. Whatever the implications of that may be in relation to other parts of Miss Parker's case, it does nothing, in my judgment, to detract from the reality – the factual and legal reality – that, as between the husband and the company, the company was treated, by the husband, by the children, and by the directors and other agents of the company, as being the beneficial owner of the properties.

*Resulting trust of the children's shares in the company*

[137] I turn to consider the alternative case that, even if the properties belong (or belonged) beneficially to the company, the children's shares in the company belong beneficially to the husband.

[138] Miss Parker submits that, given that the children did not fund the purchase of their shares in the company themselves, the shareholdings are subject to resulting trusts in favour of the husband, who did fund the 'purchase'. Her riposte to the children's response, that they are entitled to rely on the presumption of advancement, is that *Tribe v Tribe* 'may create some difficulty for them in that regard' – a submission that was not developed in the course of argument and which, as I understand it, involves no more than reliance upon Nourse LJ's observation. Be that as it may, Miss Parker submits that the presumption is in any event manifestly rebutted on the evidence; the evidence she relies upon in this regard is, again, the evidence she relies upon to substantiate her primary case that the husband and the company are one and the same and that the other shareholders are simply his nominees. Again she comments that this may simply be a different way of formulating the same essential case.

[139] There are, in my judgment, two answers to this claim.

[140] In the first place, as Miss Evans-Gordon points out, if the company was intended to be wholly owned beneficially by the husband it would have been unnecessary for *any* shares to be allotted to the children. The husband could have held all or most of the shares himself, as in *Salomon*, or, alternatively, if he had wished to hide his involvement, he could have arranged for the shares to be held by a trust company or professional trustees. The important point is that either of these courses of action would have achieved the tax advantages sought by setting up the company in the first place. So there was no fiscal reason for having the children as shareholders and, as Miss Evans-Gordon points out, there is no evidence – or even any suggestion from Miss Parker – of any other motive or reason for the company to be acquired and structured in this way.

[141] Moreover, and this, in my judgment, points tellingly in the same direction, the shares were not allocated randomly to each shareholder; they were allocated to the children in specific, and differing, proportions, reflecting, even if not exactly, Islamic practice under which male offspring receive a greater share of their father's property than women. Furthermore,

and this is really, at the end of the day, the most telling point of all, there is, as Miss Evans-Gordon submits, simply no rational explanation for the redistribution of the shares in 2000 if the children did not own them beneficially. So the redistribution of the shares, relied upon by Miss Parker as one of the indicators that the husband treated the company and the shareholdings as his own, in fact, as it seems to me, points strongly in the other direction. (And, I might add, there is nothing to show that in procuring this redistribution the husband was riding roughshod over the interests of the children, for although at one stage the proposal had been that Aliyah and Abeer would transfer shares to Isam, the scheme as eventually implemented involved only the transfer of shares by the husband to Firas.)

[142]    I conclude, therefore, that the claim fails on the facts. In coming to this conclusion I have, of course, had regard to all the various points made by Miss Parker, including those in support of the corresponding claim in respect of the properties. I will not repeat what I have already said. To the extent that the same matters are relied upon in support of both claims, my reasons for rejecting the one are, mutatis mutandis, equally applicable in rejecting the other.

[143]    In any event, nothing that Miss Parker has been able to put forward would, in my judgment, prevent the children relying upon the presumption of advancement were it necessary for them to do so.

*Piercing the veil of incorporation*

[144]    I turn, therefore, to consider what is, in forensic reality, the real core of the wife's case, namely Miss Parker's contention that I can and should 'pierce' or 'lift' the veil of incorporation.

[145]    That case, as it has been developed before me, raises fundamental issues of legal principle which require consideration in some detail.

[146]    Miss Parker's starting point is that the mere fact that a certain percentage of the shares in the company are held in the names of persons other than the husband (in this case, the children) cannot mean that the company is, without more, immune from all attempts to pierce the corporate veil, that the company cannot be the husband's alter ego, or that the husband cannot in reality have overall control of the company. I agree. Nor does Miss Evans-Gordon contend otherwise.

[147]    Miss Parker submits that the evidence amply establishes that the company is simply the husband's alter ego and that he has overall control of the company, the other shareholders being simply his nominees. It is plain, she says, from the documentation which has been made available, as well as from the manner in which the company has acted, that the company is in fact no more than the husband's alter ego and a conventional tax shelter, notwithstanding the shares nominally held by his children. On that basis, she says, it would be manifestly appropriate for the corporate veil to be lifted. The court should, therefore, look through the corporate structure and its arrangements and treat the company's resources as the husband's absolutely.

[148]    Fundamentally, she submits, this case is about whether the ultimate beneficial owner of the properties is the husband alone, or the husband and his children in accordance with their shareholdings in the company. The task facing the court, she says, is, therefore, to undertake the familiar inquiry into the reality of the situation: on a fair and realistic view, are 17 Kensington

Heights and 57 Forest House ultimately the husband's property, the other
shareholders being in reality simply his nominees, or do the properties
ultimately belong to the husband and his children in accordance with their
shareholdings?

[149] I pause at this point to observe that, even if every one of the factual
premises which underlie Miss Parker's case thus summarised were made out,
it is quite clear, in my judgment, that the wife would nonetheless *not* be able
to pierce the veil. The blunt truth, at the end of the day, is that the wife's case
is founded on an implicit assumption as to the relevant legal principles, which
assumption, common, I suspect, to much thinking in this division, is simply
not well founded. To explain why, I must explore the law in some detail.

[150] It is common ground that there are circumstances where, despite the
principle in *Salomon's case*, the court can, as it is said, pierce or lift the veil of
incorporation – in this context the expressions are synonymous. What those
circumstances are, and whether they can be shown to exist in the present case,
have been the subject of great controversy before me.

[151] The starting point is the statement of principle by Lord Keith of
Kinkel in *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90 at 96:

> 'it is appropriate to pierce the corporate veil only where special
> circumstances exist indicating that it is a mere façade concealing the
> true facts.'

That statement was treated by the Court of Appeal in *Adams v Cape Industries
plc* [1990] Ch 433 at 539 as stating a 'well-recognised exception' to the rule
prohibiting the piercing of the corporate veil. It is, in my judgment, binding
upon me and definitive.

[152] There is no particular magic in the word façade, which is here plainly
being used in its secondary (and surprisingly recent) sense of 'an outward
appearance or front, especially a deceptive one'. Down the years a variety of
other epithets and metaphors have been used to express the same concept.

[153] In *Gilford Motor Company Limited v Horne* [1933] 1 Ch 935 Lord
Hanworth MR referred (at 956) to the company as having been 'formed as a
device, a stratagem, in order to mask the effective carrying on of the business
of Mr EB Horne'. He went on to describe the company as 'a mere cloak or a
sham', adopting (at 956, 961), as did both Lawrence LJ (at 965) and
Romer LJ (at 969), the phrase used by Lindley LJ in *Smith v Hancock* [1894]
2 Ch 377 at 385. Lawrence LJ, picking up a phrase which had been used by
Farwell J at first instance (see at 955) also referred to the company (at 965) as
'a mere channel used by the defendant Horne'.

[154] In *Bugle Press Limited, Re* [1961] Ch 270, [1960] 3 WLR 956
Harman LJ described the company (at 288 and 964 respectively) as 'nothing
but a little hut built around' the shareholders and their scheme a 'hollow
sham'.

[155] In *Jones v Lipman* [1962] 1 WLR 832, Russell J (who was later, as
Lord Russell of Killowen, to agree with Lord Keith of Kinkel in *Woolfson*)
referred (at 836) to the company as 'the creature of the first defendant, a
device and a sham, a mask which he holds before his face in an attempt to
avoid recognition by the eye of equity'.

[156]  And in *Wallersteiner v Moir; Moir v Wallersteiner and Others* [1974] 1 WLR 991, [1974] 3 All ER 217 Lord Denning MR described the companies (at 1013 and 238 respectively) as being 'just the puppets of Dr Wallersteiner' which 'danced to his bidding' as 'he pulled the strings' and were accordingly his 'creatures'. (In this Lord Denning was on his own, for both Buckley and Scarman LJJ differed from him on the facts.)

[157]  As to all that I would only add that I share the doubts expressed by Toulson J in *Yukong Line Ltd of Korea v Rendsburg Investments Corporation of Liberia and Others (No 2)* [1998] 1 WLR 294, [1998] 4 All ER 82 at 306–308 and 94–95 respectively as to whether 'sham' in this context is being used in the strict sense of the word as defined by Diplock LJ in *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786, [1967] 2 WLR 1020 at 802 and 1030 respectively. Indeed, I have some difficulty with the very suggestion that a company, so long as it remains on the register of companies, could ever properly be described as a sham in the *Snook* sense.

[158]  I have been taken to a number of cases on the topic. In addition to those I have just mentioned I must also refer to *Nicholas v Nicholas* [1984] FLR 285, *Green v Green, Ord and Another v Belhaven Pubs Ltd* [1998] 2 BCLC 447, *Wicks v Wicks* [1999] Fam 65, [1998] 1 FLR 470, *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734, *Mubarak v Mubarak* [2001] 1 FLR 673, *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177, [2001] 3 All ER 987 and *Dadourian Group International Inc v Simms* [2006] EWHC 2973 (Ch), [2006] All ER (D) 351 (Nov). I do not need to go through them all in turn, but the following principles can, in my judgment, properly be drawn from them.

[159]  In the first place, ownership and control of a company are not of themselves sufficient to justify piercing the veil. This is, of course, the very essence of the principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22, but clear statements to this effect are to be found in *Mubarak* at 682 per Bodey J and *Dadourian* at para [679] per Warren J. Control may be a necessary but it is not a sufficient condition (see below). As Bodey J said in *Mubarak* at 682 (and, dare I say it, this reference requires emphasis, particularly, perhaps, in this division): 'it is quite certain that company law does not recognise any exception to the separate entity principle based simply on a spouse's having sole ownership and control'.

[160]  Secondly, the court cannot pierce the corporate veil, even where there is no unconnected third party involved, merely because it is thought to be necessary in the interests of justice. In common with both Toulson J in *Yukong Line Ltd of Korea v Rendsburg Investments Corporation of Liberia and Others (No 2)* [1998] 1 WLR 294, [1998] 4 All ER 82 at 305 and 93 respectively and Sir Andrew Morritt V-C in *Trustor* at para [21], I take the view that the dicta to that effect of Cumming-Bruce LJ in *Re A Company* [1985] BCLC 333 at 337–338, have not survived what the Court of Appeal said in *Cape* at 536:

> '[Counsel for Adams] described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As [counsel for Cape] submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v Salomon & Co Ltd*

[1897] AC 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.'

[161] Thirdly, the corporate veil can be pierced only if there is some 'impropriety': see *Cape* at 544 and, more particularly, *Ord* at 457 where Hobhouse LJ said:

'it is clear … that there must be some impropriety before the corporate veil can be pierced.'

[162] Fourthly, the court cannot, on the other hand, pierce the corporate veil merely because the company is involved in some impropriety. The impropriety must be linked to the use of the company structure to avoid or conceal liability. As Sir Andrew Morritt V-C said in *Trustor* at para [22]:

'Companies are often involved in improprieties. Indeed there was some suggestion to that effect in *Salomon v A Salomon & Co Ltd* [1897] AC 22. But it would make undue inroads into the principle of *Salomon*'s case if an impropriety not linked to the use of the company structure to avoid or conceal liability for that impropriety was enough.'

[163] Fifthly, it follows from all this that if the court is to pierce the veil it is necessary to show *both* control of the company by the wrongdoer(s) *and* impropriety, that is, (mis)use of the company by them as a device or façade to conceal their wrongdoing. As the Vice Chancellor said in *Trustor* at para [23]:

'the court is entitled to "pierce the corporate veil" and recognise the receipt of the company as that of the individual(s) in control of it if the company was used as a device or facade to conceal the true facts thereby avoiding or concealing any liability of those individual(s).'

And in this connection, as the Court of Appeal pointed out in *Cape* at 542, the motive of the wrongdoer may be highly relevant.

[164] Finally, and flowing from all this, a company can be a façade even though it was not originally incorporated with any deceptive intent. The question is whether it is being used as a façade at the time of the relevant transaction(s). And the court will pierce the veil only so far as is necessary to provide a remedy for the particular wrong which those controlling the company have done. In other words, the fact that the court pierces the veil for one purpose does not mean that it will necessarily be pierced for all purposes.

[165] In *Trustor*, the defendant's plea (see para [16]) that Introcom had been formed in connection with an earlier scheme, having no connection with Trustor, and that it was a genuine company having its own separate existence, cut no ice with the Vice Chancellor, who nonetheless held that the corporate veil could be pierced. And as Warren J said in *Dadourian* at paras [682]–[683]:

'[682] In all of the cases where the court has been willing to pierce the corporate veil, it has been necessary or convenient to do so to provide the claimant with an effective remedy to deal with the wrong which has been done to him and where the interposition of a company would, if effective, deprive him of that remedy against him. It seems to me that the veil, if it is to be lifted at all, is to be lifted for the purposes of the relevant transaction. It must surely be doubtful at least that the ex-employee in *Gilford Motor Co v Horne* would have been liable for the company's electricity bill simply because he was using the company as a device and sham to avoid a covenant binding on him personally; and the same goes for the vendor of the property in *Jones v Lipman*.

[683] It is not permissible to lift the veil simply because a company has been involved in wrong-doing, in particular simply because it is in breach of contract. And whilst it is clear that the veil can be lifted where the company is a sham or façade or, to use different language, where it is a mask to conceal the true facts, it is, in my judgement, correct to do so only in order to provide a remedy for the wrong which those controlling the company have done.'

[166] It is to be noted that, in the various cases to which I have referred, the attempt to pierce the veil succeeded only in *Gilford*, *Jones v Lipman*, *Green*, *Gencor* and *Trustor*. In all the other cases it failed. It is, I think, useful, to examine briefly why the claim succeeded in those cases where it did and why, in the other cases, it did not.

[167] In *Gilford* the claim succeeded. It was held that the company was (as Lord Hanworth MR put it at 956, 961) formed in order to mask the effective carrying on of a business by Mr Horne, the purpose being to enable him to carry on that business in breach of a covenant he had entered into. The shareholders and directors of the company were Mr Horne's wife and one Howard, an employee of the company. Farwell J had found (see at 955) that the business was obviously carried on 'wholly' by Mr Horne, that Mrs Horne had taken no part in the business or its management, that Howard was an employee, and that those dealing with the company treated Mr Horne as being the 'boss' or 'guvnor'. Lawrence LJ observed (at 965) that although the inference to be drawn from those facts might have been displaced by evidence adduced on the part of Mr Horne and the company 'no such evidence was forthcoming', even though the issue had been plainly raised on the pleadings.

[168] The claim also succeeded in *Jones v Lipman* where Lipman had conveyed to a company land which he had already contracted to sell to the plaintiff, his purpose being to defeat the plaintiff's claim for specific performance. Russell J cited the key passages from *Gilford* and observed (at 836) that the comments in that case on the relationship between the individual and the company applied 'even more forcibly' to the present case. It appeared from the evidence (see at 835) that the only directors and shareholders of the company were Lipman and a clerk of his solicitors. Russell J described the company (at 835) as being 'under the complete control' of Lipman and said that the acquisition of the company and the transfer to it of the property was carried through 'solely for the purpose of defeating the plaintiff's rights to specific performance'.

**[169]**  In *Gencor* the defendant had placed moneys derived from his misfeasance as a director of ACP in a company called Burnstead. Explaining why in the circumstances it was appropriate to pierce the corporate veil, Rimer J said this at para [26]:

> 'Burnstead was an offshore company which was wholly owned and controlled by Mr Dalby and in which nobody else had any beneficial interest. Everything it did was done on his directions and on his directions alone. It had no sales force, technical team or other employees capable of carrying on any business. Its only function was to make and receive payments. It was in substance little other than Mr Dalby's offshore bank account held in a nominee name. In my view this is the type of case in which the court ought to have no hesitation in regarding Burnstead simply as the alter ego through which Mr Dalby enjoyed the profit which he earned in breach of his fiduciary duty to ACP. If the arrival at this result requires a lifting of Burnstead's corporate veil, then I regard this as an appropriate case in which to do so. Burnstead is simply a creature company used for receiving profits for which equity holds Mr Dalby to be accountable to ACP. Its knowledge was in all respects the same as his knowledge. The introduction into the story of such a creature company is, in my view, insufficient to prevent equity's eye from identifying it with Mr Dalby.'

**[170]**  In *Trustor*, where the claim also succeeded, the circumstances were very similar. Smallbone had transferred to Introcom substantial sums belonging to the claimant which he had removed in breach of his duty as managing director of the claimant. Rimer J had found (see at paras [7], [15], [24]) that Smallbone controlled Introcom, that the directors were nominees acting on his instructions, that the company had no independent business, third party directors, creditors or shareholders, that he was its directing mind and will and that 'Introcom was simply a vehicle Mr Smallbone used for receiving money from Trustor'. The Vice Chancellor held that the court was entitled to pierce the corporate veil and to regard the receipt by Introcom of the moneys as receipt by Smallbone. At para [25] he said:

> 'these conclusions are such as to entitle the court to recognise the receipt of the money of Trustor by Introcom as the receipt by Mr Smallbone too. Introcom was a device or facade in that it was used as the vehicle for the receipt of the money of Trustor. Its use was improper as it was the means by which Mr Smallbone committed unauthorised and inexcusable breaches of his duty as a director of Trustor.'

**[171]**  As will be observed, in each of these cases the wrongdoer controlled the company, which he used as a façade or device to facilitate and cover up his own wrongdoing – in the first two cases as a means of breaching his contract, in the latter two cases as a means of receiving money for which he was accountable. In other words, in each of these cases there were present the twin features of *control* and *impropriety*.

[172] The claim succeeded also in *Green*, an ancillary relief case where some land was vested in companies controlled by the husband. Connell J described it (at 329) as 'land which effectively he owns and certainly controls' and observed that the 'litigation has been conducted against the background that that land is to all intents and purposes the [husband]'s land'. Connell J justified his conclusion that he should pierce the veil of incorporation as follows (at 337):

'In this case the whole litigation has been conducted on the basis that the respondent has control over G Ltd and over the land which is owned by that company. As I have already indicated, he is the 100% shareholder in that company ... The whole background to the litigation, as I say, has been that the respondent has the effective control over that land via the company in which he owns all of the shares, and it would, it seems to me on the face of it, be an irony if the court was precluded from ordering a sale of the land which was very much central to the litigation, simply because a party has only a 100% interest in the shares in the company which owns the land, rather than the actual title to the land himself.'

[173] I have to say, with all respect to Connell J, that I have great difficulty with this decision. It did not find much favour with Peter Gibson LJ, who in *Wicks v Wicks* [1999] Fam 65, [1998] 1 FLR 470 commented at 89 and 490 respectively:

'I find it difficult to see how the application for ancillary relief in *Green v Green* [1993] 1 FLR 326 could have been said to relate to land when the husband merely owned shares in two companies which owned land. I can well understand Connell J's desire to find a solution so that the petitioner and her child could be provided with a home, but I do not think that the court had power in that case to order a sale of the land.'

Moreover, Connell J seems to have treated the fact of ownership and control alone as sufficient to justify piercing the veil, but as we have already seen subsequent authority makes it clear that that is not so. To refer again to what Bodey J said in *Mubarak v Mubarak* [2001] 1 FLR 673 at 682, 'it is quite certain that company law does not recognise any exception to the separate entity principle based simply on a spouse's having sole ownership and control'. There has also to be impropriety and the use of the company as a device or façade to facilitate the wrongdoing.

[174] These cases can be contrasted with the cases where the claim failed.

[175] In *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90, the claim failed because, as Lord Keith of Kinkel explained at 96:

'Woolfson holds two-thirds only of the shares in Solfred and Solfred has no interest in Campbell. Woolfson cannot be treated as beneficially entitled to the whole share-holding in Campbell, since it is not found that the one share in Campbell held by his wife is held as his nominee. In my opinion there is no basis consonant with principle upon which on

the facts of this case the corporate veil can be pierced to the effect of holding Woolfson to be the true owner of Campbell's business or of the assets of Solfred.'

[176] In *Nicholas v Nicholas* [1984] FLR 285, which was an ancillary relief claim in the Family division where the matrimonial home was vested in a company, the claim failed because, as Cumming-Bruce LJ put it (at 287):

'it is not possible to take the view that the minority interests in either company can be thus disregarded. The shareholdings are set out in the evidence and it is quite clear that they are of such a character that the minority interests are real interests and it would not be an appropriate case in which the court should exercise its power to pierce the corporate veil.'

As Dillon LJ said (at 292):

'If the company was a one-man company and the alter ego of the husband, I would have no difficulty in holding that there was power to order a transfer of the property, but that is not this case. The evidence shows that the husband only has a 71% interest in this company. The remaining 29% is held by individuals who, on the evidence available to this court, are not nominees but business associates of the husband.'

[177] A detailed explanation of why the claim failed in *Cape* would not, I think, assist in the present case or, indeed, in any case of the type which is likely to arise in this division. But a passage at 544 is worth quoting:

'we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the group (and correspondingly the risk of enforcement of that liability) will fall on another member of the group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law. [Counsel] urged on us that the purpose of the operation was in substance that Cape would have the practical benefit of the group's asbestos trade in the USA without the risks of tortious liability. This may be so. However, in our judgment, Cape was in law entitled to organise the group's affairs in that manner and ... to expect that the court would apply the principle of *Salomon v A Salomon & Co Ltd* [1897] AC 22 in the ordinary way.'

[178] In *Ord* the attempt to pierce the veil was based upon a corporate reorganisation which had left the defendant company, in the perception of the plaintiffs, a mere shell with insufficient assets to meet any judgment. That led to an application for leave to substitute the parent company as a defendant. The judge allowed the application but was reversed by the Court of Appeal, essentially on the ground that 'impropriety', an essential requirement if the

veil is to be pierced, was not even alleged. Hobhouse LJ, with whom both Brooke LJ and Sir John Balcombe agreed, said at 456:

> 'Nothing improper was done by the group or the companies in the group or their directors …
>
> Indeed, before us Mr Ashe has frankly accepted that he does not put his case in that way. He says no impropriety is alleged. He does not allege that there was any breach of the provisions of the 1986 Act, nor that there was any conduct on the part of the directors (or any other person) in 1992 or 1995 which would give rise to remedies under the Companies Act 1985 or under the 1986 Act. Therefore, he is not able to rely upon any concept of fault or indeed of fraud in support of his contention that the corporate veil should be pierced. It will be appreciated that this immediately puts the facts of this case into a completely different category from cases such as *Wallersteiner v Moir* [1974] 1 WLR 991. Furthermore, he is not able to make out any case that at any stage the company was a mere façade, or that it concealed the true facts, nor that there was any sham. All the transactions that took place were overt transactions. They were conducted in accordance with the liberties that are conferred upon corporate entities by the Companies Act 1985 and they do not conceal anything from anybody. The companies were operating at material times as trading companies and they were not being interposed as shams or for some ulterior motive.'

[179]  Having referred to both *Woolfson* and *Cape*, Hobhouse LJ continued at 457:

> 'The approach of the judge in the present case was simply to look to the economic unit, to disregard the distinction between the legal entities that were involved and then to say: since the company cannot pay, the shareholders who are the people financially interested should be made to pay instead. That of course is radically at odds with the whole concept of corporate personality and limited liability and the decision of the House of Lords in *Salomon v A Salomon & Co Ltd* [1897] AC 22.
>
> On the question of lifting the corporate veil, the Court of Appeal in *Adams v Cape Industries plc* [1990] Ch 433 at 544 expressed themselves similarly, but it is clear that they were of the view that there must be some impropriety before the corporate veil can be pierced. It is not necessary to examine the extent or the limitations of that principle because, in the present case no impropriety is alleged. For example, they quoted what was said by Lord Keith in *Woolfson* concerning the *DHN* decision [*DHN Ltd v Tower Hamlets LBC* [1976] 1 WLR 852]. I have some doubts whether in this respect the Court of Appeal properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist, indicating that it is a mere façade concealing the true facts.
>
> The plaintiffs in the present case cannot bring themselves within any such principle. There is no façade that was adopted at any stage; there was no concealment of the true facts.

We pressed Mr Ashe during the course of his submissions as to
whether he was making any such suggestion. He was unable to give a
satisfactory reply. This was obviously inevitable because there was no
basis for suggesting that there was any such façade. It was just the
ordinary trading of a group of companies under circumstances where, as
was said in *Adams v Cape Industries plc* [1990] Ch 433 at 544, the
company is in law entitled to organise the group's affairs in the manner
that it does, and to expect that the court should apply the principles of
*Salomon v A Salomon & Co Ltd* in the ordinary way.'

In that case, it may be noted, the corporate reorganisation took place during
the period between 1992 and 1995, *after* the plaintiffs had issued their writ in
1991.

[180] In *Mubarak* the reasons why the claim failed were explained by
Bodey J in passages which it is worth setting out in some detail. It is
important to appreciate at the outset that Bodey J was concerned with the
question of enforcement of an order for ancillary relief made in proceedings
where (see at 675) the husband had made a concession that he could be
treated as owning the assets of the trust, included in which were all the shares
in the relevant companies, DIL and DJL, and had subsequently (at 676)
submitted that there was no justification for the companies seeking to
intervene. Directing his attention to the husband's concession, Bodey J said
this at 683:

'Looking at the totality of the husband's presentation, it was, in my
view, sufficient to amount to a concession that he was to be treated for
the purpose of the proceedings as the ultimate owner, not only of the
company shares but also of the assets belonging to the companies.
However, that concession cannot, in my view, be binding on the
companies: he was not a director of DIL at the material time and did
not, on the evidence, have the authority to bind either Board of
Directors in saying that company assets could be seised and used for the
satisfaction of his personal liabilities towards the wife.'

He continued at 684:

'The fact that the husband purported and appeared to be able during the
various 'stay' hearings to use and control company assets as if his own
and the fact that the directors may in practice not have objected to that
course whilst a stay was in place or in the offing, does not prove that in
the last analysis he was able to establish and enforce against the
companies the right in law to do so.
    So although the earlier findings based on the husband's concession
that he was the owner of the companies are res judicata against him,
they are not binding on the companies.'

[181] Discussing the oral evidence he had heard, Bodey J referred (at 684) to
the evidence of a director of DIL, a Mr Aiyer:

'Mr Aiyer has been described on behalf of the wife as a mere cipher of
the husband, the implication being that he is masterminding the
companies' intervention and opposition to the seizure of its jewellery
simply to assist the husband in avoiding his proper obligations to the
wife. However, having seen Mr Aiyer, albeit briefly (and whilst I do not
doubt he has discussed with the husband the tactical advantages of the
companies fighting to retain the stock and that he is acting in line with
the husband's wishes) I conclude that, nonetheless, he is also genuinely
concerned with his duty as a director to safeguard company assets.

I did not get the impression from him that the board's resistance to
the order is driven purely by instructions from the husband, nor purely
by the board's wish to help the husband in resisting payment of the
lump sum order.'

[182]  Having referred (at 685) to 'the need for the court to be alive to the
position of creditors (and consequentially of the position at least of
oppositional directors)', Bodey J stated his conclusions as follows:

'At the end of the day, both companies are bona fide trading companies
incorporated well before the matrimonial difficulties of the husband and
wife. DIL is indeed incorporated outside this jurisdiction and the
husband is not a director. It is not suggested that they are as such being
used as a sham or device, albeit that their existence is very convenient to
the husband. In my judgment, there do exist genuine third party rights
and interests which ought to be respected, namely the interests of bona
fide commercial creditors (one of them secured on the jewellery) and
the position of directors who have fiduciary duties and who oppose the
seizure of stock in trade. The facts of this case are far away from those
of *Green v Green* [1993] 1 FLR 326 which Mr Pointer asks me to
follow.

Applying the above proposed approach as regards lifting the
corporate veil to the evidence now before me and having heard full legal
argument, I come to the conclusion that this case does not fall within the
necessarily circumscribed circumstances in which lifting the veil would
be acceptable. However much the court may wish to assist a wife and
children where a lump sum has not been paid, I am satisfied that doing
so here, whensoever it may be permissible, would be a step too far in all
the circumstances.'

[183]  In *Dadourian* the claim failed because although (see at para [689])
Jack and Helga owned and controlled the company, Charlton, neither the
chairman, Mr Simms, nor the managing director, Mr Rahman, was a mere
stooge. As Warren J explained at paras [690]–[691]:

'[690]  However, having seen Mr Simms give oral testimony, and
having read and re-read his statements, I do not see him as a man who
would be dictated to by Jack and Helga. He would, in the end, no doubt
comply with their instructions since they could ultimately "call the
shots": the money was their money (or on their case, money of the
Helga family trust) and not Mr Simms' money. He, however, was the

chairman of Charlton carrying out negotiations as he saw fit on behalf of Charlton: he was not simply the agent of Jack and Helga in doing so, still less their lackey to do their bidding.

[691]   It is also clear that Mr Rahman, when in Bangladesh and in dealing with the Bangladeshis, was acting as he saw fit and not in any way, on a day to day basis, at the direction of Jack and Helga. It was he alone who knew, and had contact with, the potential financiers and backers and he who dealt with the Bangladeshi banks. As managing director of Charlton, he took the day to day decisions about how to get the Bangladesh deal off the ground. Again, I have no doubt that Jack and Helga were kept fully informed and had input into decisions and could, ultimately, as I say, 'call the shots': nonetheless, so far as concerns the Bangladesh end of the transaction, Charlton was, so it seems to me, a genuine company which was not being used, *vis a vis* the Bangladeshis, as a sham or façade at all.'

[184]   It will be noted that each of these cases lacked at least one or other of the necessary ingredients. In four of the cases (*Woolfson, Nicholas, Mubarak* and *Dadourain*) the requisite degree of control was lacking; in the other two cases (*Cape* and *Ord*) there was no relevant impropriety.

[185]   This survey, both of the cases where the claim succeeded and of the cases where the claim failed, accords with, is entirely consistent with and, in my judgment, is wholly supportive of my earlier analysis of the relevant principles.

[186]   I have already set out the way in which Miss Parker puts her case, both generally and, more specifically, in relation to this particular part of it. Miss Evans-Gordon's riposte falls into four parts.

[187]   First, she points to the origins and history of the company. As she observes, the company was established in 1988 and the properties had all been acquired by the beginning of 1997, well before the parties met again and well before they first contemplated marriage. In these circumstances, as she points out, it cannot be said that the company was established to facilitate any wrong directed at the wife, nor, she says, does a bone fide arrangement become bogus or a sham simply as a result of a marriage breakdown. This was not, she says, a sophisticated off-shore structure. It is a simple corporate structure with the shareholdings clearly set out. Moreover, until the wife decided she wished to occupy 17 Kensington Heights, the company was not a dormant company simply holding property for its shareholders and dependent upon their largesse to maintain it. The company, as she points out, traded actively in the rental market as is evidenced by its accounts. And its rental income was used, as we have seen, to discharge its liabilities, including its mortgage obligations. (I do not, of course, overlook either the fact that the company was also dependent upon substantial cash investments from the husband or the fact that some of its properties were from time to time used by the husband, the children and the wife.)

[188]   Secondly, she says that this is a company in which the children have genuine shareholdings, in other words a company with real minority interests – indeed, interests which, in the aggregate, amount to 70% of the share capital.

[189] Thirdly, she says, there is no evidence that the various professional and independent directors of the company were parties to anything wrong or that they acted inappropriately, for instance by abdicating responsibility and simply doing whatever the husband required of them. Absent evidence to the contrary – and, she says, there is none – it is to be assumed that they were honest and acted appropriately, properly exercising their duties and responsibilities as directors. And in this connection, as she points out, it must not be forgotten that independent legal advisers were often involved, not merely in relation to the conveyancing of the properties but also in relation to the shareholdings. Miss Evans-Gordon accepts, of course, that the husband was, as she puts it, 'heavily involved' in the company's activities and, moreover, not merely when he was a director. (Miss Parker seeks to turn this last point to her advantage, saying that it merely shows how immaterial it was to the husband and the company whether he was or was not a director.) Miss Evans-Gordon accepts, for example, that he gave instructions directly to solicitors in relation to purchases and sales of the properties, that he negotiated with vendors and purchasers of the properties and that he dealt with banks in relation to the company's borrowings. She accepts that he was, as she puts it, the 'dominant' director. But, she insists, the other directors were 'proper' directors; they were not the husband's stooges, nor were they mere ciphers. And, she says, the evidence shows that, when taking these actions, the husband was acting with the authority of the directors and (as the case may be) for and on behalf of the children, as shareholders, having consulted with them and, in some cases, at their urging. Thus, she says, the proceeds of sale of 64 St Johns Wood Court, 215 The Quadrangle and 32 Forest House were paid, as she puts it, 'into his keeping' with the prior agreement of the children and for their benefit.

[190] Finally, she asserts that, as a matter of law, control of a company (even if established, which of course she disputes) is not sufficient to permit a court to pierce the corporate veil. There has to be some relevant form of impropriety, that is, she says, some impropriety or wrongdoing by an individual – here the husband – in which the company structure is being used by the wrongdoer so as to avoid personal liability for his wrongdoing. And here, she says, there is simply no such impropriety: there is no wrongdoing by the husband, let alone any wrongdoing in relation to which the company is being used as a means of diverting or avoiding liability.

[191] In short, says Miss Evans-Gordon, there are lacking in this case each of the two essential pre-requisites to any proper claim to pierce the veil: the husband does not control the company, nor has the company been involved in any impropriety of the kind which alone entitles the court to pierce the veil. Accordingly, she submits, the court should not – indeed cannot properly – make orders against either the company or its property.

[192] I accept both Miss Evans-Gordon's analysis of the law and her analysis of the facts. The wife's claim fails on each of two distinct grounds, either of which would, in my judgment, be fatal.

[193] In the first place, the wife has, in my judgment, wholly failed to establish that degree of 'control' over the company on the part of the husband without which the court cannot pierce the veil. The fact, in my judgment, is that there are here, as Miss Evans-Gordon submits, genuine third-party shareholdings which give each of the children real minority interests. No

doubt the children were, and are, and for a variety of reasons, some culturally motivated, inclined to defer to the husband and, within limits, to accommodate his wishes. But these are not nominee shareholdings; they are real shareholdings which, as I find, both the husband and the children have always treated as belonging to the children. The children, however submissive on occasions they may be to the husband's wishes, are not his nominees, nor are they simply his stooges or lackeys.

[194] That alone would be fatal to the wife's case but matters do not end there, for it is equally clear, in my judgment, that the company's directors were not mere men of straw, nor were they the husband's stooges or lackeys. To adopt Warren J's phrase, it may have been the husband who, subject, of course to being able to persuade the children to go along with him, tended to 'call the shots'. But this is a long way from saying that the other directors were mere ciphers, jumping to his orders and unthinkingly accommodating his requirements. The episode when they required him to obtain the three older children's consents to the payment to him of the proceeds of sale of 64 St John's Wood Court is demonstration of that. And whatever suspicions one might have about Mr Farid and Mr Shaibi – though those suspicions have to accommodate the fact that on at least some occasions they seem to have acted without first referring back to the husband – there is, in my judgment, no comparable cause for suspicion in relation to any of the 'professional' directors, who would, after all, have had little incentive to breach their fiduciary duties and imperil their standing merely to assist an 'investor' whose investment was on any basis fairly modest and which is unlikely to have been generating very substantial fees. And it is important to note that there were 'professional' directors in place until 29 April 2005 – in other words there were 'professional' directors in place at the time of each of the relevant sales (which, it will be remembered, took place between April 2000 and February 2001) and on each of the occasions when the impugned payments were made to the husband.

[195] I have naturally considered with care all the points made by Miss Parker, just as I have considered with care all the many documents to which I have been taken. Some I have already referred to, but there are many others. Here again Mr Wagstaffe has helpfully provided a schedule [not included in this report] summarising and analysing a large number of references in the documentation which, it is said, indicate that the company was simply the husband's alter ego. It would be a work of supererogation to go through all of these in any detail. A summary will suffice, focusing in particular upon what was being said at the time by Mrs Penny and by the company's solicitors.

[196] There are references to the husband having 'purchased' or 'sold' or being the 'owner' of one or other of the properties. There is reference to his 'UK property interests'. There is reference (in 1988) to the company as being 'his offshore company', reference (in 1992) in the minutes of the company's board to the husband as 'the company's beneficial owner', reference (in 2003) to the fact that 'the company exists simply to protect Mr Shayif's interest as regards UK capital taxes' and (in 2005) a reference to the company as 'his company'. One of the husband's Saudi Arabian business colleagues, who seems to have been involved as his 'adviser', as the husband put it, and who acted on occasions as his middleman in relation to the company's affairs,

described him as the 'owner' of the company. Solicitors acting on behalf of the company in various conveyancing transactions in relation to one or other of the properties referred to the husband as 'the underlying client' or 'our client'. There are references to actions having been taken on the husband's 'instructions' or as a result of what he has 'decided' or 'agreed', to him 'negotiating the sale' of one of the properties and, on another occasion, to him 'not wishing to sell' one of the properties 'at this time'. There are examples of Mrs Penny asking the husband 'if you wish to proceed'. There is a letter written by the husband to solicitors in 1999 referring to the properties as being 'held in the name of' and 'formally registered in the name of' the company. There are references to the purchaser of 215 The Quadrangle as being the 'vendor's nephew'.

[197] This is merely a selection, albeit a selection which I think gives a fair flavour of the whole. It shows the husband being, as Miss Evans-Gordon put it, 'heavily involved' and the 'dominant' director, but it does not, in my judgment, show the company to have been, or to be, the husband's alter ego, any more than it shows the other directors to have been his stooges or mere ciphers.

[198] Even if I am wrong in all that, the wife still faces what, in my judgment, is the insuperable obstacle that there was in any event no relevant impropriety. When I pressed Miss Parker as to what the impropriety was on which she was relying if, contrary to her prime submission, I held that this was an essential requirement, the best she could do – and this is no criticism whatever of her; it merely reflects the reality – was to submit that this ingredient was satisfied by the husband purporting that the company was beneficially owned by the shareholders (himself and others) whereas it was in fact, just like the properties, his own. I cannot, with all respect to Miss Parker, accept this.

[199] The common theme running through all the cases in which the court has been willing to pierce the veil is that the company was being used by its controller in an attempt to immunise himself from liability for some wrongdoing which existed entirely dehors the company. It is therefore necessary to identify the relevant wrongdoing – in *Gilford* and *Jones v Lipman* it was a breach of contract which, itself, had nothing to do with the company, in *Gencor* and *Trustor* it was a misappropriation of someone else's money which again, in itself, had nothing to do with the company – before proceeding to demonstrate the wrongful misuse or involvement of the corporate structure. But in the present case there is no anterior or independent wrongdoing. All that the husband is doing, in the circumstances with which he is now faced – the wife's claim for ancillary relief – is to take advantage, in my judgment legitimately to take advantage, of the existing corporate structure and, if one chooses to put it this way, to take advantage of the principle in *Salomon*.

[200] That does not involve any impropriety. Indeed, to assert that it does is really to seek to resurrect the views expressed by Cumming-Bruce LJ in *Re A Company* [1985] BCLC 333 which were rejected in *Cape*. The circumstances of the present case are, of course, very different from the circumstances in either *Cape* or *Ord*, but the essential motivation of the protagonists in all three cases is the same, namely to obtain perceived financial advantage from insisting upon a proper distinction between personal liability and corporate

liability. For better or worse, as the Court of Appeal put it in *Cape*, the *Salomon* principle is embedded in our law. And in my judgment, there is no more 'impropriety' in the present case than there was in either *Cape* or *Ord*. Indeed, allowing for the very different circumstances, the passages from *Cape* which I have quoted in paras [160] and [177] above, and the passage from *Ord* which I have quoted in para [178] above, indicate clearly enough, even if only by analogy, why there is simply no relevant 'impropriety' in the present case.

[201] Accordingly, in my judgment, I am not entitled to pierce the veil of incorporation. This part of the wife's case also must be rejected.

[202] It is, perhaps, appropriate to examine in rather more detail Bodey J's decision in *Mubarak*, not least because it is the most recent examination of the issue in the Family Division and the authority which in this context is most likely to come to the mind of practitioners in this division, and because Miss Parker seeks to read it as showing that Bodey J did not consider that impropriety needed to be alleged to pierce the veil, at least in the context with which he was involved.

[203] As I have already pointed out (see para [180] above), Bodey J was concerned with the question of enforcement of an order for ancillary relief made in proceedings where the husband had made a concession that he could be treated as owning the assets of the trust, included in which were all the shares in the relevant companies, DIL and DJL, and had subsequently submitted that there was no justification for the companies seeking to intervene. Bodey J formulated the issue before him (at 678) as being:

> 'whether the wife can seize and sell company assets by way of enforcement of her lump sum award. This raises the question whether on the facts of this case the court can ignore the company/trust structure through which the jewellery stock is owned, ie "lift the corporate veil".'

After a detailed examination of the authorities and the evidence he concluded, as we have seen, that the court could not.

[204] At the outset of his analysis Bodey J set out (at 678) the opposing contentions of counsel:

> 'The test propounded by Mr Pointer QC for the wife is that the court can lift the corporate veil and make an order directly against a company's assets binding on the company when it can be shown that the husband (as I shall assume) controls the company and when any minority interests can properly be disregarded, for example as being mere nominees of the husband.
>
> Mr Hunter QC, for DIL, supported by Miss Prevezer QC, for DJL, and by Mr Howard QC, for the husband, all challenge this proposition head-on and take issue with the basis of the Family Division's assuming this power directly or indirectly against company assets. They assert that the "veil of incorporation" can only be lifted in circumstances where a company has been formed or used as a device or sham: in other words where corporate status has been or is being abused, and not merely where the spouse in question has full ownership and control.'

I pause here to observe that the authorities which I have already analysed, including of course, authorities decided after *Mubarak*, demonstrate that the law is indeed as was submitted by Mr Hunter, Miss Prevezer and Mr Howard and not as Mr Pointer contended.

[205] Bodey J referred to what he called two strands of authority – those decided in the company/commercial sphere and those decided in the family sphere – and commented that so far as the authorities went there did not seem to be any decided case in which the authorities in the family sphere had been considered in the company sphere and that only in one of the family cases (*Green*) had any of the company authorities been referred to. The reasons for this are not altogether obvious, though the cynic might say that it reflects the inveterate belief of those who practise in the Family Division that it is a law unto itself and of those who practise in the other two divisions that nothing of any interest, let alone intellectual rigour, is ever to be found in the Family Division. Be that as it may, it is very much with Bodey J's observation in mind that I have quite deliberately in this judgment sought to analyse all the relevant decisions from all three divisions of the High Court.

[206] Bodey J than proceeded (at 678) to examine and analyse what he called the company law approach, referring amongst other authorities to *Gilford, Jones v Lipman, Cape* and *Ord*. He continued (at 679):

> 'Mr Hunter and Miss Prevezer rely here on the fact that there is no suggestion of a sham and that DIL and DJL have as such been run perfectly properly for their own legitimate trading purposes. They submit strongly, relying on *Adams and Others v Cape Industries plc and Another* [1990] Ch 433, that no principle exists whereby, if reliance on the strict technicalities would produce injustice, then the veil of incorporation can, without more, be lifted.'

In my judgment, that submission was quite plainly correct as a matter of law. Bodey J continued:

> 'One can well see that, at least conceptually, the willingness of those who deal commercially with companies large or small, could well be compromised if the general principle were that the former wife of the owner and alter ego of the company might be able, with an ancillary relief order in her favour, to make off with company assets.'

Save that I myself would omit the words 'at least conceptually' – for in my judgment the risk is real not notional – I would respectfully agree with this.

[207] Bodey J then turned (at 679) to examine and analyse what he called the family law approach, referring, amongst other authorities, to *Nicholas, Green* and *Wicks*. He observed (at 681) that:

> 'the precise extent of the Family Division's power to go directly against the property of a company owned or controlled by one of the spouses appears less than clear.'

[208] Concluding this portion of his judgment with the observation (at 682) which I have quoted in para [159] above, Bodey J then turned (at 682) to what he referred to as rationalisation of approach. He said:

'Ideally the Family Division and the Chancery Division should plainly apply a common approach. However, the fact remains that different considerations do frequently pertain: the company approach, on the one hand, being predominantly concerned with parties at arm's length in a contractual or similar relationship; the family approach, on the other hand, being concerned with the distributive powers of the court as between husband and wife applying discretionary considerations to what will often be a mainly, if not entirely, family situation.'

[209] Save that I would not myself qualify the proposition by the word 'ideally', for, as I have already sought to emphasise, both divisions can only apply the same law and therefore must adopt the same approach, I would tend to agree with this, although preferring myself to express the point as I did in the passages from my judgment in *A v A* which I have quoted in paras [94]–[97] above.

[210] Bodey J then made this observation about forensic practice in the Family Division:

'In practice, especially in "big money" cases, the husband (as I will assume) will often make a concession that company/trust assets can be treated as his, whereafter the case proceeds conveniently on that basis. It is pragmatic, saves expense and usually works. Problems such as have arisen in this case are rare and anyway can be avoided where there are other assets against which the lump sum order can be enforced.'

I entirely agree.

[211] The heart of Bodey J's judgment is contained in the following passage (at 682):

'The difficulty remains in defining those situations when lifting the veil is appropriate by way of enforcement following such a concession in ancillary relief proceedings. I would suggest that the Family Division can make orders directly or indirectly regarding a company's assets where (a) the husband (as I am assuming) is the owner and controller of the company concerned and (b) where there are no adverse third parties whose position or interests would be likely to be prejudiced by such an order being made. I include as third parties those with real minority interests in the company and (where relevant on the facts) creditors and directors.'

He adopted the following rationalisation offered by Mr Hunter:

'that it would amount merely to a short-circuiting of the full company law route, namely the declaration of a dividend to the husband comprising the company asset concerned (eg the matrimonial home) enabling him and/or the court then to transfer it onwards to the wife. It

would amount to his property for the purposes of s 24 in the same sense that the law may look on that as done as ought to be done'.

[212] Bodey J added this final observation (at 682):

'I would add that lifting the veil is most likely to be acceptable where the asset concerned (being the property of an effectively one-man company) is the parties' former matrimonial home, or other such asset owned by the company other than for day-to-day trading purposes.'

[213] Bodey J then turned to consider the facts and the evidence. I have already set out the relevant passages in his judgment (see paras [180]–[182] above).

[214] It is to the passages I have quoted in para [211] above that Miss Parker points as showing that Bodey J did not consider that impropriety needed to be alleged to pierce the veil. In relation to that, three observations are, I think, in order.

[215] In the first place, and with all respect to counsel who appears to have planted the thought in Bodey J's mind, it is not correct to say that 'the law' looks on that as done as ought to be done. The true principle is that 'equity looks on that as done which ought to be done' (emphasis added), this being one of the maxims of equity (see John McGee, Snell's Equity (Sweet and Maxwell, 30th edn, 2000) paras 3–25) and not, so far as I am aware, a principle of the common law. Its relevance, if any, to piercing the veil of incorporation – a doctrine which is not equitable in origin – is far from apparent.

[216] Secondly, and in any event, I have to say, with great respect to Bodey J, that so far as concerns this part of his judgment I am far from sure that I would necessarily want to follow his analysis, which comes uncomfortably close to the approach adopted by Connell J in Green and which is, I have to say, difficult to reconcile with the authorities – particularly the more recent authorities – stressing the need for 'impropriety' as well as control. But I need not explore this aspect of his judgment any further for the present case does not on any view, given my findings on the other aspects of the matter, satisfy the conditions identified by Bodey J as being necessary if there is to be the 'short-circuiting' he referred to. Here there are other shareholders – the children – who have, to use Bodey J's language, 'real interests'.

[217] Thirdly, and decisively, if it is to be said that anything Bodey J said is properly to be treated as negativing the general principle that impropriety has to be shown if the veil of incorporation is to be pierced, then I can only say that the proposition is, with all respect to those propounding it, plainly inconsistent, not merely with authorities such as Cape and, more particularly, Ord but also with Bodey J's own recognition in Mubarak that 'company law does not recognise any exception to the separate entity principle based simply on a spouse's having sole ownership and control'.

[218] I do not accept that in Mubarak, as Miss Parker puts it, impropriety 'was not considered to be an essential requirement of piercing the veil'. And if it was – which, to repeat, I do not accept – then Bodey J, with great respect, would have been wrong to take that view. For, as we have seen, in Ord (which

was cited to Bodey J and which, it is to be noted, he referred to without any critical comment and without the slightest indication that he was not loyally following it) the Court of Appeal made it quite clear, as Hobhouse LJ put it, that: 'there must be some impropriety before the corporate veil can be pierced'.

[219] *Mubarak*, accordingly, does not assist Miss Parker.

[220] Miss Parker asks rhetorically, if this is not a case in which the veil can properly be pierced, then in what ancillary relief case would the Family Division ever be justified in doing so? There are, I think, a number of responses to that observation.

[221] First, there is the similarly rhetorical response: in how many cases has the Family Division in fact been willing to pierce the veil of incorporation? Miss Parker and Mr Wagstaffe are able to point to only one: *Green v Green*. They are not aware of any other case, whether reported or unreported. Second, there is, as Bodey J recognised in *Mubarak v Mubarak* [2001] 1 FLR 673 at 682 in the passage I have already quoted, the reality of forensic practice in the Family Division:

'In practice, especially in "big money" cases, the husband (as I will assume) will often make a concession that company/trust assets can be treated as his, whereafter the case proceeds conveniently on that basis. It is pragmatic, saves expense and usually works. Problems such as have arisen in this case are rare and anyway can be avoided where there are other assets against which the lump sum order can be enforced.'

I entirely agree. Third, there is the fact that claims which might otherwise have to be made good, if at all, by application of the doctrine of piercing the veil can in appropriate circumstances be made good in the Family Division (though in the nature of things not elsewhere) by successful reliance upon either s 37 of the 1973 Act or the principle in *Thomas v Thomas*. Finally, and fundamentally, there is the point made by Hobhouse LJ in *Ord* at 457, that the concept of stripping or piercing the veil is 'extremely limited indeed'. Reported cases in any context where the claim has succeeded are few in number and striking on their facts.

*Section 24(1)(c)*

[222] So far as concerns the wife's claim against the children and the company, the final string to Miss Parker's bow is her assertion that 17 Kensington Heights and 57 Forest House are subject to post-nuptial settlements which the court has power to vary in accordance with s 24(1)(c) of the 1973 Act.

[223] As Miss Parker says, this point arises only if I conclude (as I have) that the company is not simply the husband's creature or alter ego, that the shareholders other than the husband are not simply his nominees, and that the properties do indeed belong beneficially to the company. But, as she correctly submits, even in those circumstances it does not necessarily follow that the court cannot deal with 17 Kensington Heights or 57 Forest House at all, if, that is, she is able to bring the circumstances within the ambit of s 24(1)(c).

[224] Miss Parker summarises her case as follows. She says that it does not appear to be disputed that the two properties, although held by the company,

have been used by the husband and the wife throughout the marriage as though the company's ownership was a mere formality. The company, as she correctly points out, has never received a penny piece in rent from the family for their occupation of the property, and 17 Kensington Heights, in particular, has been occupied exclusively since 2000 by the wife and (for part of the time) the husband. And thereafter, until after the wife had issued her proceedings, there was never any suggestion that either of the properties should be sold or let. In these circumstances, Miss Parker submits that both properties, or at the very least 17 Kensington Heights, have been settled on the husband and/or the wife in such a way as to engage s 24(1)(c). She relies in particular upon the decision of Coleridge J in *N v N and F Trust* [2005] EWHC 2908 (Fam), [2006] 1 FLR 856. She submits that, even if the company establishes that it is not simply the husband's creature or alter ego, it has been entirely complicit in his requirements, especially so far as dealing with the two properties is concerned. In such circumstances, it is difficult, she says, to avoid the conclusion that, as in *N v N and F Trust*, settlements in relation to these properties have come into being and are capable of being varied by the court. Whether they should be so varied will of course, she accepts, depend upon the court's assessment of the various s 25 factors.

[225] The court's power to vary ante-nuptial or post-nuptial settlements is now to be found in s 24 of the 1973 Act, which so far as material provides as follows:

> '(1) On granting a decree of divorce, a decree of nullity of marriage or a decree of judicial separation or at any time thereafter (whether, in the case of a decree of divorce or of nullity of marriage, before or after the decree is made absolute), the court may make any one or more of the following orders, that is to say—
>
>     ...
>
>     (c)    an order varying for the benefit of the parties to the marriage and of the children of the family or either or any of them any ante-nuptial or post-nuptial settlement (including such a settlement made by will or codicil) made on the parties to the marriage ...
>
> (2) The court may make an order under subsection (1)(c) above notwithstanding that there are no children of the family.'

[226] The reference to 'a decree of nullity' will be noted. The fact that the 'marriage' was bigamous is not, of itself, any obstacle to the exercise by the court of its powers under s 24(1)(c): see *Dormer v Ward* [1901] P 20. As Miss Parker correctly puts it, referring to Dyer et al, *Rayden and Jackson on Divorce and Family Matters* (Lexis Nexis, 18th edn, 2008) vol 1(1) at para 16.180, there can be a 'nuptial' settlement in respect of a marriage which is bigamous.

[227] The origin of s 24(1)(c) is to be found in s 5 of the Matrimonial Causes Act 1859, which provided that:

> 'The court after a final decree of nullity of marriage or dissolution of marriage may inquire into the existence of ante-nuptial or post-nuptial

settlements made on the parties whose marriage is the subject of the
decree, and may make such orders with reference to the application of
the whole or a portion of the property settled either for the benefit of the
children of the marriage or of their respective parents as to the court
shall seem fit.'

I need not trace this provision through its subsequent incarnations in s 192 of
the Supreme Court of Judicature (Consolidation) Act 1925, s 25 of the
Matrimonial Causes Act 1950, s 17 of the Matrimonial Causes Act 1965 and
s 24(1)(c) of the 1973 Act as originally enacted, save to note that the words
'the property settled' which had first appeared in the 1859 Act were omitted
for the first time when the provision was recast in 1973. However, and that
said, as Thorpe LJ noted in *C v C (Ancillary Relief: Nuptial Settlement)*
[2004] EWCA Civ 1030, [2005] Fam 250, [2005] 2 WLR 241 sub nom
*Charalambous v Charalambous* [2004] 2 FLR 1093 at para [27], 'it is
common ground that there is no material distinction throughout these
transitions'.

[228] I should add that the origin of s 24(2) is to be found in s 3 of the
Matrimonial Causes Act 1878.

[229] Three questions arise in a case such as this: (i) Is there a settlement
within the meaning of s 24(1)(c)? (ii) If so, what is the property comprised in
that settlement? (iii) If there is a settlement, how should the court exercise its
discretion? It is convenient in the present case to consider the first two
questions together, going first to the law.

[230] The starting point for any consideration today of s 24(1)(c) must be
the speech of Lord Nicholls of Birkenhead (with whom Lords Keith of
Kinkel, Ackner, Lloyd of Berwick and Steyn all agreed) in *Brooks v Brooks*
[1996] AC 375, [1995] 3 WLR 141, [1995] 2 FLR 13. At 391, 147 and 19
respectively Lord Nicholls said this:

'The section is concerned with a settlement "made on the parties to the
marriage". So, broadly stated, the disposition must be one which makes
some form of continuing provision for both or either of the parties to a
marriage, with or without provision for their children. Conversely, a
disposition which confers an immediate, absolute interest in an item of
property does not constitute a settlement of that property. The statutory
provision is concerned with an order varying the terms of a settlement.
This would not be an altogether apt exercise in relation to property
given out-and-out and belonging to one of the parties to the marriage as
his or her own absolute property. The context does not require that
outright gifts of this nature should fall within the scope of the variation
provision. In such a case the appropriate order on the dissolution of the
marriage, if an order is needed in respect of the property, is a property
transfer or property settlement order.'

[231] The phrase 'continuing provision' is important but not fortuitous, for it
has a long history in the authorities: see, for example, *Smith v Smith* [1945] 1
All ER 584 at 586 (Denning J) and *Smith v Smith* [1970] 1 WLR 155, [1970]
1 All ER 244 at 158 and 246 respectively (Lord Denning MR).

[232] Lord Nicholls of Birkenhead continued (at 392, 147 and 19 respectively):

> 'Beyond this the authorities have consistently given a wide meaning to settlement in this context, and they have spelled out no precise limitations. This seems right, because this approach accords with the purpose of the statutory provision. Financial provision that is appropriate so long as the parties are married will often cease to be appropriate when the marriage ends. In order to promote the best interests of the parties and their children in the fundamentally changed situation, it is desirable that the court should have power to alter the terms of the settlement. The purpose of the section is to give the court this power. This object does not dictate that settlement should be given a narrow meaning. On the contrary, the purpose of the section would be impeded, rather than advanced, by confining its scope. The continuing use of the archaic expressions 'ante-nuptial' and 'post-nuptial' does not point in the opposite direction. These expressions are apt to embrace all settlements in respect of the particular marriage, whether made before or after the marriage. In this connection, it should be noted in passing that a settlement may be made in respect of a particular marriage even though in certain circumstances the wife or husband by a subsequent marriage might be the person to take. *Lort-Williams v Lort-Williams* [1951] P 395 affords an illustration of this.'

Conversely, it may also be noted, a settlement which was nuptial when made may lose that character, depending on the facts and circumstances of the particular case: *C v C*, at para [44] (Thorpe LJ) and para [53] (Arden LJ).
[233] Again, as Lord Nicholls of Birkenhead pointed out, it has long been recognised that the word 'settlement' in this context has a wide meaning, indeed a meaning extending far beyond what a Chancery lawyer would understand in a conveyancing context: see, for example, *Bosworthick v Bosworthick* [1927] P 64 at 71 (Scrutton LJ) and at 72 (Romer J), *Lort-Williams v Lort-Williams* [1951] P 395, [1951] 2 All ER 241 at 403 and 245 respectively (Denning LJ) and *Prescott (formerly Fellowes) v Fellowes* [1958] P 260, [1958] 3 WLR 288 at 281 and 299 respectively (Romer LJ).
[234] In *Blood v Blood* [1902] P 78 Gorell Barnes J, considering the ambit of s 5 of the 1859 Act, said at 82:

> 'Those words are extremely wide, and I am anxious that they should not, by any construction the Court may put upon them, be narrowed in any way. To narrow them would be undesirable for this reason: the various circumstances which come before the Court, and for which this section is brought into operation, are so diverse that it is to my mind extremely important that, so far as possible, the Court should have power to deal with all the cases that come before it, and, in dealing with them, to meet the justice of the case. I, therefore, do not desire to see any narrow interpretation placed upon the words of the section.'

That policy seems to me to be as important and the approach, in my judgment, is as valid today as a century ago.

[235] One of the classic statements of what is meant by a nuptial settlement for this purpose is to be found in the judgment of Hill J in *Prinsep v Prinsep* [1929] P 225 at 232:

> 'Is it upon the husband in the character of husband or in the wife in the character of wife, or upon both in the character of husband and wife? If it is, it is a settlement on the parties within the meaning of the section. The particular form of it does not matter. It may be a settlement in the strictest sense of the term, it may be a covenant to pay by one spouse to the other, or by a third person to a spouse. What does matter is that it should provide for the financial benefit of one or other or both of the spouses as spouses and with reference to their married state.'

He added at 235:

> 'But whether a settlement is within s 192 does not depend on who is the settlor. In many ante-nuptial settlements, neither the husband nor the wife are themselves the settlors … But whether a settlement is within s 192 must depend on what it effects. If, in fact, it is a settlement on either husband or wife, or both in the character of husband or wife, it is wholly immaterial that it is prompted and stated to be prompted by affection only for one of them.
>
> On the question whether a settlement is a settlement within s 192, the motive of the settlor seems to me immaterial, except so far as it is given effect to by the terms of the deed.'

[236] In *N v N and F Trust* Coleridge J conducted a careful survey of the authorities. The case concerned a property which was owned, via a Bahamian company, by a Jersey based trust of which the husband was a beneficiary. It was common ground that the Jersey settlement was not per se a nuptial settlement which could be varied by the court under s 24(1)(c) of the 1973 Act. However the Jersey Trust had made available a property to the husband and wife which they used as their family home. The wife argued, and Coleridge J agreed, that the property was subject to an ante-nuptial settlement which could accordingly be varied. Referring to *Brooks v Brooks*, he said (para [30]) that 'There is nothing in that case which shows any departure from the previous approach of the court over the previous one hundred years'. I respectfully agree.

[237] Coleridge J described his approach as follows at para [33]:

> 'My task is to consider what the real substance of the arrangement was which governed this property. The authorities make it clear that I should consider the question broadly and ask myself whether or not it was an arrangement which made ongoing provision for the husband, wife and/or child in those capacities. Motive is irrelevant.'

He continued, at para [34]:

> 'This property was bought by the trust during the parties' engagement and prior to their marriage. I think there can be no doubt it was nuptial.

In terms of the question of ongoing provision for them during their
marriage, it is hard to think of any arrangement that is more ongoing
than the provision of a matrimonial home.'

A little further on, at para [38], he indicated that the task of the court was to
'examine the true character of the arrangement'.

[238] I respectfully agree with Coleridge J's approach. I would only add
that, where the relevant transaction is embodied in a formal written document,
the exercise involves the familiar process of construction of the document,
giving the appropriate legal effect to the words as properly construed. Where
the transaction, as in the present case, is not said to be embodied in any formal
document, the process is essentially one of finding the facts, a process which
can legitimately involve the process of drawing inferences with a view to
ascertaining what the terms of the transaction really are.

[239] It is quite clear as a matter of principle that what Miss Parker calls the
simple provision of the matrimonial home as a home for the family is capable
of being a settlement for this purpose; indeed, as she points out, *N v N and F
Trust* was just such a case.

[240] So much for the nature of a nuptial settlement. What is the property
comprised within the settlement? Here again the starting point is what Lord
Nicholls of Birkenhead said in *Brooks v Brooks* [1996] AC 375, [1995] 3
WLR 141, [1995] 2 FLR 13. At 392, 148 and 20 respectively he said:

'One feature of the power of the court under the section is to be noted.
The section gives the court power to vary a settlement. Inherent in this
provision is the notion that the court's jurisdiction extends to all the
property comprised in the settlement. Thus it includes any interest the
settlor himself thenceforth may have in the settled property by virtue of
his own settlement. Further, the court's power is not confined to varying
the interests of the parties to the marriage under the settlement. The
power includes, for instance, the interests in the settled property of the
children or, more widely, of others under an old-fashioned protective
trust. *Blood v Blood* [1902] P 78 is an example of the former, and *Marsh
v Marsh* (1878) 39 LT 107, 545, of the latter. Conversely, it is also
implicit in the section that the court's power does not extend to property
which is not part of the settled property. In some cases, of which
*Dormer v Ward* [1901] P 20 is an example, nice questions may arise
over whether property is or is not property brought into the settlement.'

[241] It is the latter part of those observations which have a particular
resonance in this case, for Miss Parker contends that even if the 'property
settled' in the present case is regarded as no more than a life interest in (say)
17 Kensington Heights, the company's reversionary interest – what she calls
'the settlor's interest in remainder' – is susceptible to the court's power to
vary. Indeed, she says, the same result follows even if all that was granted was
a bare licence to occupy. I quote: 'If therefore a settlement confers upon the
beneficiary a bare licence to occupy, the entire estate in the property is
retained by the settlor (subject to that licence); but that retained interest would
form part of the subject of the settlement'.

[242] In support of that seemingly surprising proposition Miss Parker relies in the first place on Lord Nicholls of Birkenhead's statement, in the passage in his speech in *Brooks* which I have just set out, that 'the property comprised in the settlement ... includes any interest the settlor himself thenceforth may have in the settled property by virtue of his own settlement.' In my judgment, neither that proposition nor the authorities to which I was referred in this context support Miss Parker's contention.

[243] In *Dormer v Ward* [1901] P 20 one of the assets included in the marriage settlement was a jointure rent-charge charged on certain specified hereditaments. One point which the Court of Appeal (Lord Halsbury LC, Sir AL Smith MR and Vaughan Williams LJ) had to consider on an appeal from Gorell Barnes J was whether what was brought into the settlement so as to be amenable to the court's statutory jurisdiction was the rent-charge or the hereditaments on which it was charged. Vaughan Williams LJ (with whom the Lord Chancellor and the Master of the Rolls agreed) held that it was the rent-charge. At 36 he said this:

'I agree with what I understand to be the opinion of Gorell Barnes J, that what has been brought into settlement, in this Settlement, so far as the charges are concerned, is not the property upon which the charges are made, but the charges themselves; but there is one argument which was brought before us by Mr Danckwerts, and was also urged by him before Gorell Barnes J, with which I have yet to deal. It is this – that the whole of the hereditaments and premises comprised in the schedules to the marriage settlement were property settled by that settlement, and that the Court could therefore under the terms of s 5, which gives the Court power to make orders with reference to the application of the whole or a portion of the property settled for the benefit of children or their respective parents, order that the whole or a portion of the hereditaments and premises be applied for the benefit of the petitioner. The judge answers this by saying, "It seems a very extraordinary proposition that, because a charge – it may be a very small one – is created on a large real estate by a marriage settlement, the whole estate can be dealt with by the Court under the powers created by the sections aforesaid". I agree with him as to this.'

[244] In *Hargreaves v Hargreaves* [1926] P 42 the marriage settlement included an annual sum of £500 appointed by the settler. The question (see at 44) was whether there was any property settled other than the £500. Hill J held that there was not, saying at 45:

'to my mind, the property settled is not the whole fund out of which the 500*l* was carved, but it is the 500*l* and nothing else.'

[245] These two authorities provide no support for Miss Parker's contention. Indeed, it might be thought that, making every appropriate allowance for the difference in subject-matter, Gorell Barnes J's and Vaughan Williams LJ's robust observations in *Dormer v Ward* argue strongly against it.

[246] I was referred in this context to two other authorities. Neither is particularly helpful.

[247] In *Brooks v Brooks* [1996] AC 375, [1995] 3 WLR 141, [1995] 2 FLR 13 (see at 394–395, 149–151 and 21–23 respectively) that the property subject to the settlement was the pension fund as settled by the husband but excluding a surplus in the fund which, it was held, belonged to the company, not the husband, and which therefore had not been part of the settlement created by the husband. The case is so far removed on the facts from the present one that this finding throws no useful light on anything I have to decide.

[248] In *N v N and F Trust* as we have seen, Coleridge J concluded that although the Jersey settlement creating the trust which owned the relevant property was not per se a nuptial settlement which could be varied by the courts under s 24(1)(c) of the 1973 Act, that property which the Jersey Trust had made available to the husband and wife and which they used as their family home was subject to an ante-nuptial settlement which could accordingly be varied. That case might have been of great significance if we knew more than Coleridge J's judgment reveals of what the precise arrangements were and if we knew precisely what the 'property' was which Coleridge J found to have been settled. As it is, the case does not assist on this point.

[249] Returning to what Lord Nicholls of Birkenhead said in *Brooks*, I see nothing in it to affect the principle exemplified by *Dormer v Ward*. Moreover, in the kind of case postulated by Miss Parker the settlor's reversion is not something which it holds 'by virtue of' the settlement, in the sense in which those words were used by Lord Nicholls of Birkenhead. The settlor's interest in the fee simple existed before the settlement and continues to exist dehors the settlement, the settled property being merely carved out of it.

[250] Seeking further support for her fundamental proposition, Miss Parker referred me to s 1(4) of the Settled Land Act 1925 which, reproducing the substance if not the precise language of s 2(2) of the Settled Land Act 1882 and defining the meaning of 'settlement' for the purposes of that Act, provides that:

> 'An estate or interest not disposed of by a settlement and remaining in or reverting to the settlor, or any person deriving title under him, is for the purposes of this Act an estate or interest comprised in the subject of the settlement and coming to the settlor or such person under or by virtue of the settlement.'

[251] She bolsters the argument with a reference to *Re Hunter and Hewlett's Contract* [1907] 1 Ch 46. In that case a moiety of a freehold was settled during the life of the trustees and the survivor of them for the benefit of the two daughters of the settlor, their husbands and issue. The reversion in fee expectant remained with the settlor. It was common ground that no greater estate than an estate pur autre vie in one moiety passed by the settlement. The question was whether the daughters could sell and convey the fee simple in one moiety or only a moiety in the estate *pour autre vie*. The reversion was separated from the estate. It may be noted that the issue arose on a purchaser's summons under the Vendor and Purchaser Act 1874, the question being whether the daughters could make a good title as tenants for life under the Settled Land Act 1882 to the moiety comprised in the settlement. Holding that they could Swinfen Eady J held at 49 that:

'Although the reversion is separated off from the particular estate by the
settlement itself and remains vested in the grantor, and is not in fact
comprised in the settlement, the effect of the Act is to treat it for the
purposes of the Act as if it were comprised in the subject of the
settlement. Therefore the settlement is for the purposes of the Settled
Land Act a settlement of the moiety of the fee, that moiety is settled
land for the purposes of the Act; and each daughter, having the powers
of a tenant for life, can sell and convey a half part of the moiety, the
purchase-money being paid to the trustees of the settlement.'

[252]  Miss Parker submits that, although there can be no new settlement of
land since the Trusts of Land and Appointment of Trustees Act 1996 came
into force on 1 January 1997, s 1 of the 1925 Act was in force when the 1973
Act was enacted and that therefore, notwithstanding that s 1 of the 1925 Act
defines settlements 'for the purposes of this Act', s 24(1)(c) of the 1973 Act
must be construed and interpreted consistently with its terms. The 1925 Act
was, as she puts it, part of the wide ranging property and trust legislation of
1925 and must be seen as the background to s 24(1)(c) of the 1973 Act and its
post 1925 predecessors.
[253]  Miss Parker submits that 'settlement' in s 24(1)(c) of the 1973 Act
bears the same meaning as 'settlement' in s 1(4) of the 1925 Act and its
predecessor, s 2(2) of the 1882 Act. Indeed, she submits, given what is said in
*Brooks* and the numerous earlier authorities to which I have referred as to the
wide meaning to be given to the word 'settlement' under s 24(1)(c) of the
1973 Act, it would be remarkable if the word 'settlement' had a narrower
meaning for the purposes of the 1973 Act than it did for the purposes of the
1925 Act. And since both the 1882 Act and the 1925 Act provide that
'settlement' includes not just that which is settled, but that which is retained
by the settlor or reverts to him, it follows, she says, that when a settlement
comes into being for the purposes of the 1973 Act, the 'settled property'
includes not only any interest created in favour of the beneficiary, but also any
interest retained by or reverting to the settlor.
[254]  She seeks to distinguish cases such as *Dormer v Ward* and *Hargreaves
v Hargreaves* on the basis of the distinction which she says ought to be drawn,
bearing in mind the 1925 Act, between settlements of personalty and
settlements of real property. She submits that where, as in *Dormer v Ward* and
*Hargreaves v Hargreaves*, the settlement consists of an obligation to provide a
fixed level of income, or a fixed cash payment to a beneficiary, there is
nothing which is retained or which reverts to the settlor (save that if the
beneficiary dies, the obligation upon the trustees to pay the stipulated income
dies with her). In the case of a settlement of land, plainly some form of
reversionary interest arises, whether in favour of the settlor or other
beneficiaries. She says that the 'nice questions' to which Lord Nicholls of
Birkenhead referred in *Brooks* undoubtedly arise as regards personalty but
asserts that Lord Nicholls of Birkenhead cannot have had settlements of land
in mind, particularly in a case which related to a pension and in which the
1925 Act does not appear to have been cited.
[255]  Therefore, submits Miss Parker, subject to any finding to the contrary
(these matters of course being, as she rightly accepts, primarily questions of
fact for the court), even if what was settled upon the husband and the wife was

simply a licence to occupy (and she emphasises that her primary case is that the whole of the property was in fact settled by the company), the entirety of the fee simple is nonetheless the subject of the settlement just as much as the licence itself. If so, then the company, she says, holds the entirety of its interest in the property or properties on trust for the husband and the wife with remainder to itself (and indirectly to its shareholders), the trust thus defined being one which I have power to vary under s 24(1)(c) of the 1973 Act.

[256] The argument founded on the 1925 Act is ingenious but, with all respect, ill founded in my judgment.

[257] In the first place it needs to be borne in mind that the 1882 Act had no predecessor, so there was no equivalent provision in force when the 1859 Act was enacted.

[258] Secondly, it is important to note, as Miss Parker recognises, that the relevant definition in the 1925 Act is stated in terms to be (see s 1(4)) 'for the purposes of this Act'. In my judgment, these words are crucial, and not to be passed over as Miss Parker would have me do.

[259] In this context one has to bear in mind the purpose and scheme of the 1882 Act and of its replacement, the 1925 Act: see Megarry and Wade, *The Law of Real Property* (Sweet and Maxwell, 5th edn, 1984) pp 317, 343. The 1882 Act marked a decisive break with the past, its purpose being essentially economic and its object, in pursuit of its economic aims, being to liberate settled land from the legal restrictions on alienation which often made good management impossible. The method adopted to achieve this object was to give the tenant for life under the settlement not merely full powers of management but also wide powers to sell or otherwise deal with the land, free from the trusts of the settlement and without the consent of the other beneficiaries, as if he were the owner in fee simple (the settlement, and with it the rights of the beneficiaries, being shifted from the land to its proceeds of sale). Much of the detail of the legislation was therefore directed to a variety of conveyancing devices designed to give the tenant for life the powers of a full owner. Section 1(4) has to be read in this context and, read in this context, its purpose and meaning is clear: it was simply to bring within the settlement, as defined by s 1(1) of the 1925 Act, the specific interests referred to in s 1(4) so that the tenant for life, in accordance with the general scheme of the legislation, would be able to sell the land free of those interests. In other words, s 1(4) is no more than a conveyancing device inserted to ensure that the statutory scheme operates notwithstanding that the settlor retains an interest in the settled land. Viewed in this light it can readily be seen that s 1(4) is needed because, and only because, of the particular scheme of the 1925 Act and why it is, therefore, expressed as applying 'for the purposes of' the 1925 Act.

[260] Thirdly, and in any event, the 1925 Act, as Miss Evans-Gordon correctly points out, simply has no application in the case postulated by Miss Parker. Section 1(1) of the 1925 Act defines what is meant by a settlement for the purposes of the Act (s 2 going on to provide that the land subject to the settlement is 'settled land'). Family charges under s 1(1)(v) apart, there is no settlement for this purpose unless land is 'limited in trust' either for an infant or for successive interests: see the definitions in ss 1(1)(i), (ii) and (iii). In the present case, nothing is limited in trust and there are no successive interests within the meaning of s 1; one is here, as it were, in the

realm of the law of landlord and tenant, not that of settled land. As Miss Evans-Gordon puts it, the argument is based on a confusion between interests in reversion or remainder under trusts (whether of land or personalty) and a landlord's reversion to a lease. Put another way, the creation of a lease, or the granting of a licence, does not give rise to any trust or settlement, let alone a settlement within the meaning of the 1925 Act. And for good measure Miss Evans-Gordon adds that a terminable licence to occupy does not create an estate in land (see *Street v Mountford* [1985] AC 809, [1985] 2 WLR 877 at 814 and 880 respectively) and therefore cannot be the subject of a settlement within the meaning of the 1925 Act.

[261] So much for the law. I turn to the facts. Was there a settlement? And if so, what is the property comprised in the settlement in respect of which the court can exercise its powers under s 24(1)(c)?

[262] Miss Parker says that there is a settlement in relation to both 17 Kensington Heights and 57 Forest House, as I understand it, essentially because they were made available by the company to the husband and the wife for occupation whenever they wanted to make use of them. This being so, she submits – the point of course being directed to 57 Forest House rather than to 17 Kensington Heights – that it would be irrelevant, even if the fact, that the wife had never occupied the property or never even been there.

[263] Miss Evans-Gordon says that, although a 'settlement' in the context of s 24(1)(c) of the 1973 Act can include many arrangements which would not normally be considered to be settlements, it is essential that the alleged settlement must be something that makes continuing provision and it must be 'nuptial', in that it must be concerned with the parties to the marriage and must be created to make provision for them as a spouse or spouses. So the fact that the husband and the other shareholders may have been permitted to use the properties is, she says, neither here nor there when the use is attributable to their status as shareholders. As she puts it, the husband had the same 'right' as the children, no more and no less, to occupy the properties and he, like they, did so *qua* shareholder. And the fact of the wife's marriage to a shareholder and her consequent occupation of 17 Kensington Heights cannot of itself turn company property into a nuptial settlement. The settlor's intention or purpose must, she says, be relevant, so a settlement cannot simply be the accidental consequence of something done for other reasons – here, permitting a shareholder and his wife to occupy company property from time to time. Moreover, as she correctly submits, the requirement that the settlement make 'continuing provision' for the parties means that there must be something more than the fleeting or the temporary.

[264] So far as concerns 57 Forest House there was, says Miss Evans-Gordon, simply no matrimonial connection at all. Even on the wife's own evidence it was never on any sensible meaning of the phrase a matrimonial home and whatever use she and the husband may have made of it was temporary and fleeting. Moreover, the property was also used from time to time by the adult children, a circumstance hardly consistent, she says, with it being either the wife's matrimonial home or with it being the subject of a nuptial settlement. The only remotely plausible case, she says, is in relation to 17 Kensington Heights following the events of 2000, but even there, she says, the company never committed itself to any arrangement sufficiently indefinite and prolonged as to satisfy the 'continuing provision' test or to any

arrangement having the necessary matrimonial character. At most, she says, expressing the arrangement in the language of landlord and tenant, there was a licence or tenancy revocable at will or on (short) reasonable notice. There was certainly nothing equivalent to a life interest, something – lifetime provision – which, as she correctly points out, the children would never have agreed to.

[265] So, she says, in the circumstances there is simply no settlement within the meaning of s 24(1)(c) of the 1973 Act which the court can vary, alternatively, that any settlement involves no more than a revocable licence or tenancy.

[266] I agree with Miss Evans-Gordon, and essentially for all the reasons she gives, that there was and is no settlement in relation to 57 Forest House. Such use as was ever made of this property by the husband and/or the wife lacked both of the two essential ingredients. It was too temporary and fleeting to constitute the necessary 'continuing provision' and it was not nuptial in character. Insofar as the husband and/or the wife ever used the property it was use, in common with the children, in or derived from the husband's status as a shareholder; nothing more and nothing less. (And I might add that even if there was a settlement, the settled property would amount to no more than a revocable licence.)

[267] The position in relation to 17 Kensington Heights is materially different and not so straight forward. I can see the force of Miss Evans-Gordon's analysis, and I confess that my mind has wavered on the point, but at the end of the day I am persuaded by Miss Parker that there was and is a settlement in relation to 17 Kensington Heights which I have jurisdiction to vary.

[268] Two separate pieces of evidence bring me to this conclusion. The first relates to the stance of the children. It is clear, in my judgment, that they were far from happy with the idea that the wife should be living in the property, and they seem to have made it plain to the husband that they expected him to sort the problem out – the phrase is mine but the sentiment was theirs – and that, in the meantime, they would expect him to be responsible for the outgoings. But, whatever their feelings, the fact as I see it is that they were prepared to go along with the wife occupying 17 Kensington Heights for an undefined time which was always going to be more than a few weeks or months and which, in the event (and seemingly without their objection) had lasted for some 4 years before the marriage finally broke down in July 2004.

[269] The other matter is a letter Mrs Penny wrote to the local authority, explicitly on the husband's behalf, to inform it that the wife would be taking up residence of 17 Kensington Heights from 1 April 2004 'on a permanent sole-occupier basis until further notice … she is likely to be in UK for long periods for some time to come'. That shows, as it seems to me, that this was being treated by the company – for why else was Mrs Penny involved at all – as at least a semi-formal arrangement to last 'until further notice' and probably 'for some time'. Moreover, it was an arrangement in relation to the wife, and not the husband.

[270] In these circumstances, adopting the approach indicated by Coleridge J in N v N and F Trust and having regard to the wide ambit of what, for this purpose, is to be treated as a 'settlement', I am persuaded, not without some misgivings I have to say, that there was, and is, a settlement in relation to 17 Kensington Heights. The arrangement which the children went along

with, and as described by Mrs Penny, had, in my judgment, a sufficient nuptial element – the provision of the (married) wife's home in this country – and was also intended to make continuing provision for that purpose throughout an undefined period, likely to be measured in at least months, and in the event measured in years, which was more than temporary, fleeting or transient.

[271] What exactly was comprised in that settlement? Miss Parker asserts, as we have seen, that it is the entirety of the company's interest in 17 Kensington Heights, a long leasehold. Miss Evans-Gordon disputes that, asserting that all that is comprised in the settlement is a revocable licence.

[272] In my judgment, on this point Miss Evans-Gordon is correct. Section 1(4) of the 1925 Act, as I have said, provides Miss Parker with no assistance and the principle of which *Dormer v Ward* is the most compelling example points clearly in the opposite direction from that in which Miss Parker would have me travel. To paraphrase the words which Gorell Barnes J used in *Dormer v Ward* and which Vaughan Williams LJ endorsed, it is an extraordinary proposition that because the owner of Blackacre has granted a married couple some revocable licence or tenancy to occupy, this court should have power to deal with the fee simple (or, as here, a long leasehold). Everything will, of course, depend upon the facts of the particular case. In some cases the facts will show that what has been created is an interest analogous to a life interest (or even successive life interests) or to a term of years certain. In some cases (and the present is one such case, in my judgment) the interest created, although sufficiently enduring to satisfy the criterion of making 'continuing provision', will be analogous to a licence or tenancy determinable either at will or on notice. It is all a matter of fact. In the present case, the facts, in my judgment, although establishing a sufficient degree of continuity to bring s 24(1)(c) into play, do not point in the direction of a life interest (let alone any greater interest); they point quite clearly, as it seems to me, in the direction of an interest analogous to a licence determinable on reasonable notice.

[273] How then can and should I exercise my discretion? In the light of my findings thus far, the point hardly arises, save in determining, as it were, the period of notice to which the wife is entitled if the company decides to have her removed from 17 Kensington Heights. But in case I am wrong in rejecting her argument to this effect, I need to determine how and on what basis I should exercise my discretion if Miss Parker is correct in submitting that the entire interest of the company in the property is subject to the court's jurisdiction so that I should, as she would say, transfer the entire property to the wife free from any trusts and, in particular, free of the company's interest in it.

[274] Miss Parker and Mr Wagstaffe have been able to find only five reported cases since 1973 which throw any light on how the discretion under s 24(1)(c) should be exercised: in addition to *Brooks* there are *Cartwright v Cartwright* (1983) 4 FLR 463, *E v E (Financial Provision) C v C (Variation of Post-Nuptial Settlement: Company Shares)* [2003] EWHC 1222 (Fam), [2003] 2 FLR 493, and *Mubarak v Mubarak* [2007] EWHC 220 (Fam), [2007] 2 FLR 364. For a variety of reasons these are, as Miss Parker points out, less helpful for present purposes than one might have hoped.

[275] There is much elderly learning as to how, at one time, the statutory discretion was to be exercised. Some of this is still of relevance and use even if much has become redundant in modern conditions.

[276] The starting point, perhaps, was the principle stated by Gorell Barnes J in *Hartopp v Hartopp and Akhurst* [1899] P 65 at 72:

'Now the guiding principle which will be found running through the cases is, in my opinion, this: Where the breaking up of the family life has been caused by the fault of the respondent, the Court, exercising its powers under the above section, ought to place the petitioner and the children in a position as nearly as circumstances will permit the same as if the family life had not been broken up.'

He continued:

'It follows that where the trust funds are settled, as is usual, upon the parents successively, or upon one of them for life, with remainder to the children, the Court, while it might extinguish the whole or a part of the guilty parent's life interest and his or her power of appointment, if any, amongst the children, would not interfere to deprive the children of those interests to which they are entitled under the settlement.'

[277] In relation to this there is an illuminating observation by Barnard J in *Egerton v Egerton* [1949] 1 All ER 670 at 672:

'No one could quarrel with this statement as a guiding principle, but at the same time I think it would be wrong to interpret it as meaning that it is a principle which must be applied in every case, regardless of its facts. That would, in my opinion, be placing fetters on the discretion of the court which the legislature never intended.'

In the final analysis the statutory discretion is both unlimited and unfettered.
[278] Another widely quoted principle was enunciated by Hill J in *Prinsep v Prinsep* [1929] P 225 at 236:

'The main object of variation is to make proper provision for the injured spouse and the children of the marriage. And prima facie, settlements ought not to be interfered with further than is necessary for that purpose. But the Court which has annulled the marriage must not only protect the injured party, but also be fair to the wrongdoing party.'

That approach was frequently approved and applied: see, for example, *Colclough v Colclough and Fisher* [1933] P 143 at 147 (Langton J), *Egerton v Egerton* [1949] 2 All ER 238 at 242 (Bucknill LJ) and *Garforth-Bles v Garforth-Bles* [1951] P 218, [1951] 1 All ER 308 at 221 and 309–310 respectively (Pearce J).
[279] Another principle which emerges clearly from the older cases was expressed in these words by Sir Francis Jeune P in *Whitton v Whitton* [1901] P 348 at 353:

'But one has in these cases to consider what is really for the benefit of the children, because I think the authorities shew that nothing must be done that on the whole would be for the disadvantage of the children. This does not so much turn on the words of the Act of Parliament, but generally on the principle that the children, being innocent parties, ought not to have their interests injuriously affected by the conduct of either of their parents.'

He added:

'It would be hard that a wife who is freed by the misconduct of her husband should not be able to appoint anything at all in favour of a second husband, or in favour of the children of a second marriage; and if, without substantial injury to the interests of the children of the first marriage, such an arrangement can be made, I think it is desirable and is in accordance with the spirit of the Act of Parliament.'

His approach was followed by Sir Gorell Barnes P in *Hodgson Roberts v Hodgson Roberts and Whitaker* [1906] P 142 at 144, by Hill J in *Scollick v Scollick* [1927] P 205, by Langton J in *Colclough v Colclough and Fisher* [1933] P 143 at 146 and by Cairns J in *Purnell v Purnell* [1961] P 141, [1961] 2 WLR 185 at 148 and 188 respectively.

[280]   What is clear, in my judgment, both as a matter of principle and on the authorities, is that, where children are involved, 'benefit' is not to be assessed in merely pecuniary terms. The point is well illustrated by a passage from the judgment of Pearce J in *Garforth-Bles v Garforth-Bles* [1951] P 218, [1951] 1 All ER 308 at 222 and 310 respectively:

'It is, in my view, to the child's interest in another respect to allow the husband to remove a part of his fund from the settlement. He brought into the settlement reversions that were substantially all that he possessed; he now has, apart from these funds, no expectations and very little property; if, as seems likely in view of his age, he remarries, he has extremely little to settle on any future wife or children. If I refuse his request and devote exclusively to this child all the money that came from him, allowing none of it to go to any future wife or child of his, it may quite reasonably give him a feeling of injustice and impair the satisfactory relationship between father and child, a relationship of whose existence his generous dealing with the question of her maintenance gives some indication. Moreover, in the eyes of fair-minded members of the family, or friends, and of the child herself when she grows up, such an order will probably seem unjust and an excessive preference of the child's interests to those of her father. To produce this result would cause a loss to the child which the retention of the money would not compensate. To produce a happier result by the surrender of some part of the husband's fund would, in my view, be a benefit to the child. There may be cases where financial stringency might compel one to disregard such a benefit, owing to the necessity of keeping every available penny for the child, but this is not such a case.'

[281] Cairns J adopted the same approach in *Purnell v Purnell* [1961] P 141, [1961] 2 WLR 185 at 148, 150 and 189, 190 respectively:

> 'Now it is well established by authority that the variation may be such as to confer a benefit on a stranger to the settlement provided it also confers a benefit on children interested in the settlement, and I think the authorities establish that it is sufficient if the variation contains some benefit to those children which can be regarded as being approximately equivalent to what is taken from them for the benefit of the stranger.
>
> … the court has jurisdiction to admit an adopted child to benefit under the settlement, provided that anything which the natural children of the marriage are called upon to give up is compensated for in some sufficient way. In considering this compensation the court cannot do any exact sum, because such intangible factors as the benefit of equality, or something approaching equality, within the family can be taken into account, though there must be some pecuniary benefit as well.'

[282] I should add that it is clear that in exercising discretion the variations effected by the order have to be considered as a whole: *Whitton v Whitton* [1901] P 348 at 353 and *Purnell v Purnell* [1961] P 141, [1961] 2 WLR 185 at 147 and 188 respectively.
[283] In modern conditions, where, except in the most egregious cases when s 25(2)(g) comes into play, we no longer have regard to spousal conduct, let alone to the concept of the 'guilty party', and where the court is rarely called upon to exercise its jurisdiction in relation to the traditional 'marriage settlement', these now increasingly elderly authorities have to be used with very considerable care.
[284] Even before the enactment of s 25 of the 1973 Act, the court was adopting a much more 'modern' approach to the exercise of its discretion in relation to nuptial settlements. Thus, as Lord Denning MR said in *Ulrich v Ulrich and Felton* [1968] 1 WLR 180, [1968] 1 All ER 67 at 187 and 71 respectively:

> 'under section 17(1) the court will not use its power to vary so as to punish either of the parties. It will try to do what is fair. If a wife, after her divorce, marries a rich man, the court might give her less and the husband more. Whereas if she is without means, she might be given more, and regard must be had to the children. The situations that may arise are so infinitely various that the only thing for the court is to do what is fair in the circumstances.'

(It may be noted that in the same case both Diplock LJ (at 190 and 73 respectively) and Edmund Davies LJ (at 191 and 73 respectively) referred to the principle that, although the statutory power is not intended to be used as a punishment of the guilty spouse, the object is to make good the pecuniary damage caused to the innocent party by the matrimonial offence of the guilty party and the breakup of the marriage: see *Moy v Moy and White* [1961] 1 WLR 552, [1961] 2 All ER 204 at 555 and 205 respectively, a case decided

under the predecessor of what is now s 24(1)(b) of the 1973 Act. At that time
the statute referred to 'the innocent party' where s 24(1)(b) now refers to 'the
other party to the marriage'.)

[285] In *Smith v Smith* [1970] 1 WLR 155, [1970] 1 All ER 244 at 158 and
246 respectively Lord Denning MR (with whom both Salmon and Edmund
Davies LJJ agreed) described the exercise of discretion as follows:

> 'The court can vary the established rights in those assets in whatever
> way it thinks fit. Its discretion is unlimited; see *Egerton v Egerton*
> [1949] 2 All ER 238. It can consider the conduct of the parties; the
> incomes of each; their earning capacity; their financial needs; their ages;
> their standards of living; the contributions made by each, and not
> merely their financial contributions, direct or indirect, but also any
> contributions made (particularly by the wife) by looking after the home
> and caring for the children. In short, the discretion is just as wide as that
> which is contained in the Matrimonial Proceedings and Property Bill
> now before Parliament. That will not become law until 1 January 1971.
> But meanwhile the courts have, by judicial decision, reached the same
> result.'

[286] Today the exercise of discretion under s 24(1)(c) necessarily begins
with s 25 of the 1973 Act. So the court must (see s 25(1)) have regard to all
the circumstances of the case, first consideration being given to the welfare,
while a minor, of any child of the family who has not attained the age of 18,
whilst in relation to a party to the marriage the court must (see s 25(2)) in
particular have regard to the matters listed in subss 25(2)(a)–(h): see *Mubarak
v Mubarak* [2007] EWHC 220 (Fam), [2007] 2 FLR 364 at para [157]. Where
the powers under s 24(1)(c) are being exercised in relation to a child of the
family (which is not, of course, the case here) the court must also have regard
to the matters listed in ss 25(3) and 25(4).

[287] The objective to be achieved is a result, as Coleridge J put it, echoing
what Lord Denning MR had earlier said in *Ulrich v Ulrich*, which, as far as it
is possible to make it, is one fair to both sides: *C v C (Variation of
Post-Nuptial Settlement: Company Shares)* at paras [36], [56]. In *E v E
(Financial Provision)* [1990] 2 FLR 233 at 249, Ewbank J identified one of
the considerations in dealing with a post-nuptial settlement as being that one
'should not interfere with it more than is necessary for the purposes of s 25' –
seemingly a reference back to what Hill J had said in *Prinsep v Prinsep*
[1929] P 225 at 236.

[288] In *Cartwright v Cartwright* (1983) 4 FLR 463, Sheldon J had to
consider a proposed variation which was said to be adverse to the interests of
the children under the marriage settlement. At 469, having posed the question
whether the courts have imposed any, and if so what, limitations on their
power under s 24(1)(c) to vary the terms of an ante-nuptial settlement, he said
'That there is such a limitation, particularly where the proposed variation
would affect the interests of the children, is clear'. He then cited the passage
from the judgment of Sir Francis Jeune P in *Whitton v Whitton* [1901] P 348
which I have already set out and, having referred to the judgment of Cairns J
in *Purnell v Purnell* [1961] P 141, [1961] 2 WLR 185, continued as follows
at 470:

'It is clear also from those cases that in deciding whether anything that the children may be called upon to give up under the terms of a proposed variation is compensated for in some other way, the court is not limited to monetary considerations but is entitled to take into account such intangible factors as the benefits likely to accrue to the children from (as in *Purnell*) the maintenance of equality in the family between themselves and an adopted child, or (as in *Garforth-Bles v Garforth-Bles* [1951] P 218) the preservation of a satisfactory relationship with their father. In my judgment, moreover, it is upon that basis that in this case any proposed variation of the marriage settlement should be weighed: namely, that if and in so far as it would affect the interests of the child, it should be permitted only if, after taking into account all the terms of the intended order, all monetary considerations and any other relevant factors, however intangible, it can be said, on the while, to be for their benefit or, at least, not to their disadvantage.'

[289]  In that case the order was for payment of a capital sum to a husband, the loss to the children by the consequential depletion of the trust fund being offset by the benefit to them of the discharge of the husband's contingent life-interest together with various non-monetary benefits. Sheldon J expressed his overall conclusion at 470 as follows:

'[T]aking everything into account, the proposed or necessary variations of the marriage settlement, taken as a whole, would be for the children's benefit; *a fortiori*, they would not be to their disadvantage. Any loss to them is to be found in the reduction of the capital of the trust-fund by £20,000. Against that, however, they would have gained financially – by the discharge of the respondent's contingent life interest in the trust-fund after their mother's death – a gain which it is impossible now to quantify in monetary terms but which could be considerable if by some mischance she were to die while relatively young. In addition, when considering the financial background of the parties, the standard of life that they and the children have been accustomed to, and that the children will undoubtedly continue to enjoy while living with the petitioner, I am of the opinion that it is of importance to the children, to their enjoyment of their father's company and of their visits to him, as well as to the maintenance of good relations between them, that he too should have a settled and secure home to which they can come. In my view, moreover, that is unlikely to be achieved unless he receives such a capital sum as that now proposed.'

[290]  Surveying all this learning, identifying what is of enduring significance whilst ruthlessly jettisoning what has become more or less irrelevant in modern conditions, I can perhaps summarise matters as follows:

(i)  The court's discretion under s 24(1)(c) is both unfettered and, in theory, unlimited. As Miss Parker put it, no limit on the extent of the power to vary or on the form any variation can take is specified, so it is within the court's powers to vary (at one end of the scale) by wholly excluding a beneficiary from a settlement,

> to (at the other end) transferring some asset or other to a
> non-beneficiary free from all trusts. She points to *E v E*
> *(Financial Provision)* and *C v C (Variation of Post-Nuptial*
> *Settlement: Company Shares)* as illustrations of property held on
> trust being transferred free from any trusts to the applicant, in *E*
> *v E* a sum of £50,000 and in *C v C* shares in a Cayman company.
>
> (ii)   That said, the starting point is s 25 of the 1973 Act, so the court
> must, in the usual way, have regard to all the circumstances of
> the case and, in particular, to the matters listed in s 25(2)(a)–(h).
>
> (iii)  The objective to be achieved is a result which, as far as it is
> possible to make it, is one fair to both sides, looking to the effect
> of the order considered as a whole.
>
> (iv)   The settlement ought not to be interfered with further than is
> necessary to achieve that purpose, in other words to do justice
> between the parties.
>
> (v)    Specifically, the court ought to be very slow to deprive innocent
> third parties of their rights under the settlement. If their interests
> are to be adversely affected then the court, looking at the wider
> picture, will normally seek to ensure that they receive some
> benefit which, even if not pecuniary, is approximately
> equivalent, so that they do not suffer substantial injury. As
> Sheldon J put it in the passage in *Cartwright* which I have
> already quoted: 'if and in so far as [the variation] would affect
> the interests of the child, it should be permitted only if, after
> taking into account all the terms of the intended order, all
> monetary considerations and any other relevant factors, however
> intangible, it can be said, on the while, to be for their benefit or,
> at least, not to their disadvantage.'

[291]   Miss Parker submitted that the central theme which permeates these
authorities is that it is permissible for the court to invade third party interests
within the confines of the trust structure, but only to the extent that fairness so
requires. It is acknowledged that in the generality of cases, the court should
indeed be slow to do so. Broadly speaking, I accept that submission.

[292]   Moreover, as she rightly points out, the court always retains a
discretion as to the extent of any variation. Even in circumstances where the
court could quite properly vary a post-nuptial settlement so as to transfer (say)
the matrimonial home to a wife free from any trusts, it may nonetheless direct
some less intrusive form of variation, such as to transfer the property to the
wife for life and thereafter to the other beneficiaries, to confirm the right to
remain in occupation indefinitely without any form of transfer, or to direct
that the applicant has a right to remain in occupation until (say) other orders
made have been complied with. All of this depends, of course, as she says, on
the court's views as to what is fair on the facts, as it finds them, of the
particular case.

[293]   So much for the principles involved, how then should discretion be
exercised?

[294]   On the basis of my findings thus far, the only question, as I have said,
is, as it were, to determine the period of notice to which the wife is entitled if
the company decides to have her removed from 17 Kensington Heights.

Having regard to all the circumstances, and in particular the fact that the
property had been the wife's home for some 4 years when the marriage finally
broke down and for well over 5 years before the company took steps to regain
possession, but also the fact that that was over 2 years ago, it seems to me that
justice will be done all round if I say that the wife is entitled to not less than 6
months' notice from the date when my order is finalised. That will give her
adequate time to reorganise her affairs and seek alternative accommodation if
in the meantime she is not able to buy out the company's interest – in
substance, the children's interests – in the property.

[295]  That is also the order I would make even if Miss Parker had been able
to persuade me that the court's powers extended to the company's entire
interest in 17 Kensington Heights. At the end of the day, the fact remains, in
my judgment, that all the company (or the children) ever intended to part with
when the wife was permitted to remain in the property was an interest in the
nature of a revocable licence. That being so, what basis would there be, either
in fairness or in justice, to give the wife a greater interest? There can, in my
judgment, be only one answer to that question. Why should the company be
deprived of its property to meet the ancillary relief claims of the wife of one
of its shareholders? Why should the children be deprived of part of what is, in
effect, their inheritance to meet the wife's claims? It is not the responsibility
of the children to look after their stepmother or to provide for her ancillary
relief. That is the responsibility of the husband, and the husband alone.

[296]  What benefit would it be to the company or the children to make such
provision at their expense? None has been suggested. There is none, whether
one looks for pecuniary benefit or for some form of non-pecuniary benefit.
The circumstances are far removed indeed from any of the cases to which I
have been referred. The court may have a general and unfettered discretion, as
between husband and wife, to re-arrange what can conveniently be referred to
as the 'family assets'. There is no such general jurisdiction to take away – in
plain language to confiscate – the children's property, let alone the
stepchildren's property, to meet claims brought by a wife, as here, only
because the person to whom she would normally be expected to look – the
husband – has so arranged his affairs to frustrate her.

[297]  When all is said and done, the statutory jurisdiction is a jurisdiction to
'vary', not a jurisdiction to confiscate, and what Miss Parker is inviting me to
do is far outside any legitimate exercise of the jurisdiction. As anyone who has
studied the case-law under s 24(1)(c) will appreciate, just as will anyone
familiar with the various jurisdictions to vary trusts exercisable by the
Chancery Division, 'benefit' is a wide and elastic concept. And 'benefit' can
be found in circumstances which would leave the untutored layman puzzled
or even astonished. But however far one can legitimately take the concept, it is
quite impossible, in my judgment, to see any benefit to the children in what is
proposed here by Miss Parker. And even assuming (without deciding) that
there is no absolute requirement to show 'benefit' to the other parties when
varying a settlement under s 24(1)(c), there must be a limit to what the court
can properly do. That limit, in my judgment, is defined at its extremity by
consideration of what is just and fair. What Miss Parker proposes is, with all
respect to her, neither just nor fair.

[298]  There is, as Miss Parker recognises, a difficulty if all the wife acquires
is a licence to go on occupying 17 Kensington Heights, for that would not

preclude the mortgagee from bringing possession proceedings in the event that the mortgage went unpaid and the wife has every reason to fear that, if she is left to occupy the property on that basis, the mortgage will not be paid.

[299] Miss Parker accepts that there is, of course, no power to order the company (not a party to the marriage) to make periodical payments. She submits, however, that there would be power in the court to vary the settlement in such a way as to require the company to pay the mortgage and other outgoings (relying for this purpose on the older authorities, *Hargreaves* being an example, where the court required the trustees of the settlement to provide a spouse with an annual income), whilst recognising the practicality that the court would in all probability have only limited ability to enforce such an order, bearing in mind the nature and extent of the company's assets and the extreme unlikelihood that either the husband or any of the children would put it in funds. Indeed, and Miss Parker makes no bones about it, it is for this very reason that the wife says that the only effective remedy would be a transfer to her of the property free from any trusts.

[300] Miss Evans-Gordon for her part submits that any legitimate variation could not require the introduction of new property from outside the settlement as would be necessary to pay the mortgage and other outgoings. I agree. The present case is quite different in this respect from *Hargreaves*. It is one thing to direct the trustees to pay income from the settled property; it is a very different thing indeed to direct trustees to pay income otherwise than from the settled property – and that, in reality, is what is proposed here. As Miss Evans-Gordon says, a court will never require trustees to pay out moneys when there are no moneys in the trust. She accepts that the court's powers under s 24(1)(c) are, as she puts it, extraordinary, but not so extraordinary that they bite on the genuine property interests of third parties which were always owned or held outside a nuptial settlement. And where, she asks rhetorically, if not from such third party interests is the money to pay the mortgage to come from? Miss Evans-Gordon puts the point succinctly but accurately: The court should not treat the husband, the company and the children as if they were one and the same; so far as concerns the wife's claim for ancillary relief both the company and the children are innocent third parties with pre-existing vested interests which should not be prejudiced; and the wife is not entitled to receive further moneys or property from either the company or the children.

[301] The wife's position as accurately described by Miss Parker is unfortunate, indeed, very unfortunate. That I readily accept. But that is no reason for making an unprincipled award for her benefit at the expense of either the company or the children. She is entitled, for the reasons I have given, to occupy 17 Kensington Heights on the basis I have described, but subject to the company's right to give her notice to go. But that is all she is entitled to. There is, in my judgment, no principled basis for requiring the company to pay the mortgage or other outgoings. That, as I have said, was always envisaged as being the responsibility of the husband. But if he fails to honour his obligations, as he has and as, no doubt, he will, that is no reason for foisting some corresponding burden on either the company or the children.

*Conclusions as between the wife, the company and the children*

[302] For all these reasons I have concluded that, subject only to one point, the wife has failed in all her claims against the company and the children, whether in respect of the properties or the children's shareholdings in the company. The one point on which she has succeeded is in establishing that the company cannot remove her from 17 Kensington Heights without giving her notice. But subject only to that qualification, the company and the children are entitled to the relief sought by them in the Chancery proceedings.

*The 'bigamy' point*

[303] I turn at last, therefore, to consider the wife's claim against the husband for ancillary relief.

[304] This 'marriage', as I have said, was bigamous. Does that affect the way in which the court's discretion would otherwise be exercised in accordance with the provisions of the 1973 Act?

[305] There was some debate before me as to whether the wife herself was guilty of the criminal offence of bigamy, given the language of s 57 of the Offences Against the Person Act 1861, which provides that:

'Whosoever, being married, shall marry any other person during the life of the former husband or wife, whether the second marriage shall have taken place in England or Ireland or elsewhere, shall be guilty of felony, and being convicted thereof shall be liable to be kept in penal servitude for any term not exceeding seven years.'

[306] So, says Miss Parker, a person (such as the wife here) who, not already being married herself, goes through a ceremony of marriage with a married person does not commit the offence of bigamy. The wife, she says, is not a bigamist. It was the husband who committed the primary offence.

[307] The plain fact, however, as Bennett J found, is that the wife was fully aware at the time (as obviously was the husband also) that the 'marriage' was bigamous, so it would seem to follow, as Miss Parker accepts, that the wife would be guilty of aiding, abetting, counselling or procuring the offence (see Halsbury's *Laws*, ed 4, vol 11(2) at para 828 citing *R v Brawn* sub nom *R v Bawm* (1843) 7 JP 530, (1843) 1 Car & Kir 144). And if that is so then, as Miss Evans-Gordon points out, the wife is liable in accordance with s 8 of the Accessories and Abettors Act 1861 to be tried as a principal offender whether or not the husband is convicted. Moreover, as Miss Parker also accepted, someone in the wife's position may be guilty of offences under ss 3(1) and 5 of the Perjury Act 1911.

[308] Be all that as it may, in my judgment none of this technicality matters. The fact is, as I have said, that the wife was well aware at the time that the 'marriage' was bigamous. That is what is relevant for present purposes, not the precise identification of the offence or offences which she may have committed let alone some subtle calibration, based merely upon the technicalities of the criminal law, of the respective (criminal) guilt of the wife and the husband.

[309] What, if any, is the effect of this finding?

[310] The two leading authorities on this point are *Whiston v Whiston* [1995] Fam 198 and *Rampal v Rampal (No 2)* [2001] EWCA Civ 989, [2001] 3 WLR

795, [2001] 2 FLR 1179, both decisions of the Court of Appeal. I go straight to *Rampal* because *Whiston* can only be understood in the light of the Court of Appeal's analysis in *Rampal*, including its analysis of the intervening decision, also of the Court of Appeal, in *S-T (Formerly J) v J* [1998] Fam 103, [1997] 3 WLR 1287, sub nom *J v S-T (Formerly J) (Transsexual: Ancillary Relief)* [1997] 1 FLR 402.

[311] The judgment in *Rampal* was given by Thorpe LJ, with whom both Robert Walker LJ and Dame Elizabeth Butler-Sloss P agreed. The facts for present purposes are straight forward and, somewhat simplified, can be summarised as follows: The applicant for ancillary relief (the respondent in the suit) was still married to his wife, a fact of which the petitioner 'wife' was aware at the time of the ceremony. The 'marriage' was accordingly bigamous, the applicant being guilty of an offence under s 57 of the Offences against the Person Act 1861 and the petitioner being guilty as a secondary party to the principal offence. Mr Stephen Bellamy QC (sitting as deputy High Court judge) held (see at paras [7], [9]) that the applicant 'husband' was debarred from applying for ancillary relief despite the fact that the 'wife' was a prominent party to the illegality, having engineered the 'marriage' with full knowledge of his status and thus effectively inducing the bigamous marriage.

[312] It is important to note, as Thorpe LJ made clear (at para [9]), that the sole point considered by the Court of Appeal was whether the 'husband' was debarred from claiming ancillary relief. The court was not concerned with how discretion was to be exercised if, as it held, he was not debarred, nor with any consideration of the extent to which, if at all, the bigamy had to be taken into account (assuming it did not debar the claim altogether) in adjusting what, absent the bigamy, would have been the appropriate award.

[313] Following an analysis of a number of authorities in other fields, Thorpe LJ said (at para [17]):

> 'That brief survey of recent authority relating to operation of public policy on statutory claims in other fields leads me to the conclusion that the general rule is that the ex turpi causa maxim is not applied absolutely but in the exercise of a proportionate judgment after careful scrutiny of the nature of the crime and the relevant surrounding circumstances.'

[314] He then turned to a detailed analysis of first *Whiston* and then *S-T*, before concluding, at para [27], that *Whiston* does not establish a rule that no bigamist is entitled to apply for ancillary relief. He went on to summarise his reasons for that conclusion. These included that 'The language of the judgments in *Whiston* does not unequivocally establish the existence of a universal rule precluding the bigamist from exercising the statutory right of application', that 'The crime of bigamy can surely not be said to be so serious as to suspend the general rule that whether or not the principle of public policy can be invoked to bar a claim depends upon an appraisal of the seriousness of the crime in all the circumstances' and that 'The authorities from *Gray v Barr* [1971] 2 QB 554, [1971] 2 WLR 1334 to *S-T v J* demonstrate that where an application to invoke statutory entitlement arises out of a criminal act the court must have regard to all the circumstances before deciding whether or not the applicant is debarred'.

**[315]** He added (at para [28]):

'I would be loathe to reach any other conclusion since absolute rules in
the field of family law are inevitably, and usually swiftly, challenged by
the exceptional case. Even the present case, not so exceptional on its
facts, challenges the application of the rule in *Whiston* to all culpable
bigamists. Here the wife engineered the ceremony and embraced the
desired respectability for some 22 years. She herself petitioned for
divorce and obtained her decree absolute. She too prayed for all forms
of ancillary relief. Only when confronted with her husband's money
claim did she play the bigamy card, falsely asserting that she, like
Mr Whiston, was the innocent victim of deception. She went to trial on
that issue plainly conceding that her attack on the husband's entitlement
to claim ancillary relief depended upon the court accepting her version
of the facts.'

**[316]** In para [29] Thorpe LJ indicated that distinctions were to be drawn not
'on the crude basis of the grounds for the decree of nullity' but rather 'on the
more sophisticated basis of a review of all relevant circumstances', before
concluding at paras [30]–[31]:

'I do not regard the rule in *Whiston v Whiston* as extending to exclude
every culpable bigamist whatever the circumstances of the case. The
court cannot be deprived of the freedom established through a line of
cases in other fields to evaluate the nature of the crime itself ... the rule
does not preclude this court from having regard to the nature of the
crime and all the surrounding circumstances.'

**[317]** His ultimate conclusion (at para [31]) was that, once the husband had
established the truth of his story, 'the gravity of his offence was not such as to
deny him his statutory rights on public policy grounds'. On that basis the
appeal was allowed.
**[318]** Thorpe LJ cited with evident approval the following passage in the
judgment of Sir Brian Neill in *S-T (Formerly J) v J* [1998] Fam 103, [1997] 3
WLR 1287, sub nom *J v S-T (Formerly J) (Transsexual: Ancillary Relief)*
[1997] 1 FLR 402 at 155, 1335 and 454 respectively:

'I would seek to explain my approach as follows. (1) In all the relevant
sections of the Act of 1973 dealing with ancillary relief all decrees of
nullity appear to be treated in the same way. (2) Section 25 of the Act of
1973 requires the court when exercising its powers under section 23
or 24 to take account of all the circumstances of the case. This
requirement suggests that the scope for the trial of a preliminary issue is
very limited. (3) The principle of public policy which can be invoked to
bar a claim depends on the establishment of a "serious" crime by the
claimant. In many cases, as it seems to me, a decision as to whether or
not a particular crime has crossed the threshold of seriousness may
involve an investigation of all the circumstances, including the effect on
the other party and any mitigating factors which may reduce the degree
of blame. In a case concerning a transsexual in particular such an

investigation may require detailed consideration of the medical treatment and advice which the applicant received over a period. (4) I have not been persuaded that in a case which involves the exercise of the court's discretion it is necessary or desirable to carry out a preliminary inquiry to determine one aspect of an applicant's conduct before the general merits of the claim are investigated. As I have already indicated, crimes may vary to an almost infinite degree in their seriousness. This is particularly true of offences under the Perjury Act 1911. (5) Though it is clear from the decision of the House of Lords in *Tinsley v Milligan* [1994] 1 AC 340 that where considerations of public policy intervene to prevent the enforcement of rights claimed under an illegal contract the court is precluded from carrying out a balancing operation, the situation appears to me to be different where parliament itself has conferred a discretion on the court and has included a requirement that the court in exercising that discretion should consider all the circumstances of the case.

For these reasons I would not decide the preliminary issue on the basis that the applicant is barred in limine from pursuing the claim because by signing the false declarations he had committed a serious crime. Nor would I bar him by the invocation of the wider doctrine of ex turpi causa without investigating all the circumstances of the case.'

[319] I take this as a helpful indication of the way in which the court should approach the exercise of discretion in such cases.

[320] At the hearing of the main suit the husband sought to blame the wife for the fact that the Registrar of Marriages had been misled as to his marital status. Miss Parker has to accept that, as she puts it, the wife did not emerge from the hearing wholly without blame or criticism, but she points out that Bennett J found that it was the husband who was the driving force behind the deception, found that the husband had procured the wife's own sister to give false evidence against her and held that his 'attempt to heap blame on her' was 'only done to enable him to obtain a significant, perhaps decisive, advantage in ancillary relief proceedings'.

[321] In my judgment, the essential factors in the present case – every case is unique and, as Sir Brian Neill made clear, one has to have regard to all the circumstances of the particular case – can be summarised as follows: both parties were aware that their civil (English) marriage was bigamous, both went into it with their eyes open, neither was the victim of any deception or overbearing conduct, and there is little to choose between them in terms of criminal, social or moral 'guilt', save to the limited extent indicated by Bennett J. An important 'mitigating factor', to adopt an expression used by Sir Brian Neill, is that the parties' contemporaneous religious marriage, which was obviously a matter of importance for each of them, was valid. So, whatever view the law of England may take, in their own eyes and in the eyes of their god, the husband and the wife were indeed just that – husband and wife.

[322] In all the circumstances, and bearing in mind in particular the factors I have just mentioned, the fact that this was a bigamous marriage has little, if any, impact on the quantum of the award to which the wife is entitled. There is, in my judgment, nothing here to justify either depriving the wife of all

relief or stripping her of the major part of what she would otherwise be entitled to. In this particular case – I stress that every case is unique and that in other cases the outcome may be very different – the impact of the bigamy is marginal.

*The ancillary relief claim*

[323] The wife's ancillary relief claim has, of course, to be assessed and evaluated by reference to the statutory factors as set out in s 25(2) of the 1973 Act. I need not set them out.

[324] The wife is 49 years old, the husband is 60. The 'marriage' lasted some 6 years until the parties separated, some 7 years until decree nisi. There are no children of the marriage. Neither the husband nor the wife suffers from any physical or mental disability.

[325] The wife has no assets of any value and her income and earning capacity at present is minimal. She has not worked as a landscape architect since 1998 and fears that her skills in this area are now outdated so that it would, she thinks, be impossible for her to return to this type of work at this stage even if she wanted to. Since the parties' separation in 2004 she has undertaken some part-time work, though her last employment (as a receptionist) was in 2006. In October 2005 she had to sell her jewellery (given to her by the husband) to raise £20,000 for the payment of her legal costs. She is at present unemployed, existing on job seekers allowance of £59.15 per week and borrowing from family and friends. She is heavily in debt, her debts, excluding the substantial legal costs to which I have already referred, amounting to some £63,000. Previously she had been funding this litigation out of her own pocket but since September 2006 has been in receipt of public funding. As she sees it, the reality is that her future ability to generate income will arise from her access to such capital resources as she manages to obtain as a result of this litigation.

[326] The wife's case is that the standard of living enjoyed by the parties during the marriage was extremely high: 'we were blessed with everything a human being could ask for.' She says that she made as full a contribution to the marriage as could be expected in the circumstances.

[327] Miss Parker accepts that this is 'manifestly' not a case where the starting point is an equal division of the husband's assets; it is, she says, primarily a 'needs' case. What, she says, the wife is entitled to and what she seeks is provision for her present and future needs, generously interpreted and assessed against the background of the husband's true resources and the standard of living enjoyed during the marriage. Her budget is put forward on that basis though, as Miss Parker correctly observes, if post trial the wife chooses to use part of the resources allocated to her on the basis of 'need' as part of a business venture, that is her prerogative.

[328] Miss Parker says that, if it were necessary to do so, the wife would deploy a 'compensation' based argument (see *Miller v Miller; McFarlane v McFarlane* [2006] UKHL 24, [2006] 2 AC 618, [2006] 2 WLR 1283, [2006] 1 FLR 1186) in recognition of her loss of employment and career prospects and the lost opportunity to acquire accommodation for herself on preferential terms. She recognises the reality, however, that the provision she seeks on behalf of the wife will amply compensate her for these losses on a 'needs'

basis without a further 'compensation' based adjustment. In these circumstances the argument was not developed any further and I need say nothing more about it.

[329] Miss Parker properly accepts that there is nothing in the husband's pre-separation conduct which would either augment or devalue the wife's claim but does assert that the husband's litigation conduct can and should properly be prayed in aid when it comes to drawing appropriate inferences as to his true resources, as also in relation to costs. That apart, I did not understand Miss Parker to be asserting that this was a case where the husband's (mis)conduct should be taken into account so as to increase the amount of the award which would otherwise be appropriate.

[330] Conversely, Miss Parker says, whatever might be its relevance in other cases, the fact of the bigamy should not in this case have any impact on the outcome; the wife's ancillary relief claim should, she says, be dealt with on its merits in the conventional way.

[331] I accept Miss Parker's analysis and approach. The wife is entitled in principle to have her needs met, that is, as Miss Parker correctly put it, her present and future needs, generously interpreted and assessed against the background of the husband's true resources and the standard of living enjoyed during the marriage.

[332] I have already evaluated the husband's resources and described the parties' standard of living. Neither may have been as opulent and magnificent as Miss Parker would have me accept, but that does not, in my judgment, affect the outcome. Essentially, as I have indicated, the wife seeks a 'Duxbury' fund capitalised at £2,804,689 and based on an annual budget of £113,326 and a 'housing fund' to provide a house in London at a cost of £2.25m and a house in Saudi Arabia at a cost of £1m. Neither, in my judgment, is at all extravagant in the circumstances. Both are easily justified on the basis of 'needs' generously interpreted, as also is the remaining part of the award which the wife seeks. The wife needs to have her debts paid if she is to be put back on her feet, just as she needs the costs of sensible re-training to be provided for her. She needs furniture and cars and, in the particular circumstances of this case, not least given the findings I have made as to the husband's litigation misconduct, she needs a 'fighting fund'.

[333] If and to the extent that it is appropriate to make some modest adjustment to reflect the fact that the 'marriage' was bigamous – and I am far from persuaded that this is in fact appropriate in the rather unusual circumstances of this particular case – that adjustment, in my judgment, has in effect if not in intention already been taken into account in Miss Parker's calculation of the wife's claim, for the claim as formulated is, I suspect, some way short of the maximum that might plausibly have been sought. Be that as it may, I am satisfied that, having regard to all the circumstances, including the fact that the 'marriage' was bigamous, the award sought by the wife is, in the light of my findings, entirely justified. I will make an order accordingly, structured along the lines suggested by Miss Parker.

[334] There is one final matter I must deal with.

[335] Miss Parker says that there is nothing in the corporate documentation which has been produced to show that the various payments to the husband totalling £820,000 were being treated either as a distribution or as repayment of his loan account. She submits that on the face of it the company

accordingly still owes the husband the £684,580 which he can be
demonstrated to have advanced to the company, as I have found by way of
loan and not *qua* purchaser. So, she says, included amongst the husband's
assets which I ought to transfer to the wife is his loan account.

[336] In principle I agree with Miss Parker that the husband's loan account,
whatever its amount, should be transferred to the wife. However, the precise
amount of the loan account is something on which, given that the company
has produced no accounts later than those for the year ended 31 March 1993,
I have no up-to-date information. I am not in a position to find that the loan
account stands at the figure of £684,580 or, indeed, at any other sum. What in
fact the company owes the husband is a matter to be determined if necessary
on some future occasion. I will, if need be, hear further argument on the
precise way in which my order should be expressed to cover this point. But in
principle the amount of the loan account, as and when received by the wife,
will be set off against her overall award.

*Outcome*

[337] I can summarise my conclusions as follows:

(i)   Subject to only one point, the wife has failed in her claims
against the company and the children, whether in respect of the
properties or the children's shareholdings in the company. The
one point on which she has succeeded is in establishing that the
company cannot remove her from 17 Kensington Heights
without giving her notice. But subject only to that qualification,
the company and the children are entitled to the relief sought by
them in the Chancery proceedings.

(ii)  The wife has succeeded in her claim for ancillary relief against
the husband in the amount she has claimed. She is entitled to an
order along the lines set out in para [24] above but including an
order for the transfer to her of the husband's loan account with
the company (the amount of which, when received by her, is to
be set off against her overall award). The various set offs should
be against the husband's total liabilities to the wife, including
the arrears of maintenance and any costs that he may have been
or may be ordered to pay; there is no reason why the wife should
be prejudiced by directing the set offs to be against the award of
£7,061,570.

*Order*

[338] I will ask counsel to draft the appropriate order or orders – it may be
convenient to have separate orders for the ancillary relief proceedings and the
Chancery proceedings, though that is a matter I leave for discussion between
Mr Wagstaffe and Miss Evans-Gordon (Miss Parker having since the hearing
moved on to other things).

*Appendix*

[339] The husband's letter to Bennett J dated 27 March 2007 was in the
following terms:

'The purpose of this letter is to explain my withdrawal from the above
proceedings and my non-attendance at the hearing on 29 March 2007.
In doing so, I am writing in my personal capacity in an attempt by what
seems to be the only way open to me to explain my position. I greatly
regret that I do not think that I can do more. I hope that you will accept
that I mean no disrespect to the Court by saying that, and I will explain
why I have come to this extremely unfortunate conclusion.

As anyone will attest, I have been a law-abiding and hard-working
person throughout my life. However, in this case I felt and continue to
feel that the odds are unfairly stacked against me. While I was
bewildered by what was said about me in your judgment, I do not for
one moment suggest that you were unreasonable. However, the same
cannot be said for the Petitioner. Despite my best efforts to reconcile
with her, through discussions with her family and other intermediaries,
she continues to act totally unreasonably by insisting that I am worth
over £500 million, based on no evidence, which is simply another
attempt on her part to deceive the Court and to pressurise me.
Presumably, she is trying to insinuate that I have at least substantially
more than I actually do in an attempt to force me to make payments that
could ruin me.

I stated in an Affidavit, in which I provided a breakdown, that I in fact
had little more than £5 million, and of course I have four children and a
wife (not to mention numerous other family members) to support. On
top of this, I had also agreed with her, as witnessed by her family, that in
case of divorce, I would pay her a lump sum of £200,000 as stipulated
in the written Islamic marriage certificate, which was provided to the
Court. Yet I was still required to prepare a statement requiring extensive
details of every single asset I have, despite the fact that most of these
assets are in Saudi Arabia. I feel that this inquiry is unjust and
excessive, particularly in light of the Petitioner's own conduct and the
nature of our relationship.

In the judgment of 8 February 2006, you said not only that the
Petitioner had obtained a marriage certificate on 30 October 1998 in the
full knowledge that I had previously been married (as I believe was
always an undeniable fact, and one which the Petitioner always knew),
but that she had tried to deceive the Court in applying for a decree of
divorce in December 2004 against this background. In my case, I
immediately admitted to the Court that I was still married at the time,
although I had not thought that it was a criminal offence:

You went on of course to consider who had "instigated" the deception
of the Registrar. In fact I had no reason to obtain an English certificate
bearing in mind that I lived in Saudi Arabia – the suggestion came
solely from the Petitioner. For that matter, living in England or
obtaining British residence or nationality was the furthest thing from
my mind. However, despite this, you found that I had "instigated" a
deception of the Registrar.

I continue to categorically and absolutely deny this or indeed any
improper conduct. My insistence that it was not my idea to obtain the
English certificate was only necessitated by the Petitioner's deception in
seeking that the court grant her a divorce. In other words, the only

reason it was an issue at all was her own deception and I also considered it to be irrelevant since both of us acted in the full knowledge that I was already married in Saudi Arabia, as you held was in fact the case.

Despite her deception of the Registrar and the Court, I feel that I was unfairly portrayed as the villain. I was then ordered to pay £45,000 pa in maintenance fees together with legal fees, all of which already adds up to a considerable amount of money (well over £100,000 as of this date). All this has happened against a background where it is not in dispute that the relationship between the Petitioner and me was strained from the very beginning. All in all, we lived together only for very brief periods since I continued to be based in Saudi Arabia. It seems now that she is seeking to send me to prison.

I regret to say that I sincerely believe that in light of what has happened it is very difficult for me to continue my involvement. Despite this, I mean no disrespect to you or the Court and I apologise sincerely, for my absence, which is the last thing I would normally have wished to happen.'

Solicitors:    *Osbornes* for the applicant/defendant
               *Radcliffes Le Brasseur* for the claimants/second respondent

PHILIPPA JOHNSON
*Law Reporter*