# EXHIBIT 19

# Manuchar Steel Hong Kong Ltd
v
# Star Pacific Line Pte Ltd

## [2014] SGHC 181

High Court — Originating Summons No 927 of 2013
Lee Kim Shin JC
17 February; 17 March; 28 April; 19 May; 23 September 2014

*Arbitration — Enforcement — Foreign awards — Whether foreign award enforceable against non-party to arbitration agreement and award on basis that non-party and award debtor were part of single economic entity — Whether concept of single economic entity recognised under Singapore law*

*Civil Procedure — Discovery of documents — Whether application for pre-action discovery ought to be granted*

**Facts**

The Plaintiff ("Manuchar") had chartered a vessel from a third party ("SPL Shipping"). A dispute in relation to the charter arose which led to the commencement of arbitration in London by Manuchar against SPL Shipping. SPL Shipping, a British Virgin Islands (BVI) company, did not participate in the arbitration. Eventually, two arbitral awards were rendered in Manuchar's favour ("the Awards"). Manuchar then took steps to enforce the Awards against SPL Shipping in Singapore, England and the BVI. However, Manuchar's enforcement steps were ineffectual; and no payment pursuant to the Awards was made by SPL Shipping.

Manuchar then intended to seek enforcement of the Awards in Singapore against the Defendant ("Star Pacific") on the ground that SPL Shipping and Star Pacific were part of a single economic entity. However, Manuchar claimed that it did not have enough documents to formulate its claim that SPL Shipping and Star Pacific were part of a single economic entity. It therefore sought an order from the court for pre-action discovery of certain classes of documents from Star Pacific.

**Held, dismissing the application:**

(1)    A plaintiff seeking pre-action discovery had to satisfy the court that the documents sought were relevant and necessary for the plaintiff to commence proceedings. The focus of the inquiry, in relation to the element of necessity, was whether the plaintiff had possession or knowledge of sufficient facts to formulate its intended claim: at [30], [36] to [39] and [63].

(2)    Although the documents sought by Manuchar were relevant to its intended claim that SPL Shipping and Star Pacific were part of a single economic entity, the evidence disclosed in the proceedings by Manuchar demonstrated that Manuchar had in its possession and knowledge sufficient information and facts to formulate, and hence commence, its intended action against Star Pacific: at [53] to [58].

(3)     Separately, Manuchar's intended cause of action against Star Pacific was
unviable on two levels. First, as a matter of arbitration law, the Awards could not
be enforced against Star Pacific because Star Pacific was neither a party to the
arbitration agreement, a party to the arbitration which made the Awards, nor a
named debtor under the Awards. To permit enforcement of the Awards against
Star Pacific would be anathema to the internal logic of the consensual basis of an
agreement to arbitrate: at [69] and [70].

(4)     Second, the single economic entity concept relied upon by Manuchar was
conceptually difficult to reconcile with the established doctrine of separate legal
personality and the narrow exceptions recognised at law for the piercing of the
corporate veil. Moreover, the single economic entity concept has not been
recognised in the case law from Singapore and other common law jurisdictions.
It was not even a clearly established concept in international arbitration: at [97]
to [99], [102] to [129], [134] and [135].

## Case(s) referred to

*Adams v Cape Industries plc* [1990] Ch 433 (refd)

*AG v Equiticorp Industries Group Ltd* [1996] 1 NZLR 528 (refd)

*Albacruz (Cargo Owners) v Albazero (Owners) (The Albazero)* [1977] AC 774
(refd)

*Antonio Gramsci Shipping Corp v Stepanovs* [2011] EWHC 333 (Comm) (refd)

*Aron Salomon v A Salomon and Co Ltd* [1897] AC 22 (refd)

*Asta Rickmers Schiffahrtsgesellschaft mbH & Cie KG v Hub Marine Pte Ltd*
[2006] 1 SLR(R) 283; [2006] 1 SLR 283 (distd)

*Bank of Tokyo Ltd v Karoon* [1987] AC 45 (refd)

*Briggs v James Hardie & Co Pty Ltd* (1989) 16 NSWLR 549 (refd)

*Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd* 1995 (4) SA 790 (A)
(refd)

*Cavenagh Investment Pte Ltd v Kaushik Rajiv* [2013] 2 SLR 543 (refd)

*Chimbusco Pan Nation Petro-Chemical Co Ltd v The Owners and/or Demise*
*Charterers of the Ship or Vessel "Decurion"* [2013] 2 Lloyd's Rep 407 (refd)

*China Ocean Shipping Co v Mitrans Shipping Co Ltd* [1995] 3 HKC 123 (refd)

*Ching Mun Fong v Standard Chartered Bank* [2012] 4 SLR 185 (folld)

*CME Czech Republic BV v The Czech Republic* (Final Award, dated 14 March
2003) (refd)

*DHN Food Distributors Ltd v Tower Hamlets London Borough Council* [1976]
1 WLR 852 (refd)

*Dorsey James Michael v World Sport Group Pte Ltd* [2014] 2 SLR 208 (folld)

*Dunning v Board of Governors of the United Liverpool Hospitals* [1973]
1 WLR 586 (refd)

*Kosmopoulos v Constitution Insurance Co of Canada* [1987] 1 SCR 2 (refd)

*Kuah Kok Kim v Ernst & Young* [1996] 3 SLR(R) 485; [1997] 1 SLR 169 (folld)

*Leads Engineering (S) Pte Ltd v Chin Choon Co (Pte) Ltd* [2009] SGHC 53 (refd)

*Ord v Belhaven Pubs Ltd* [1998] BCC 607 (refd)

*Peterson Farms Inc v C&M Farming Ltd* [2004] 1 Lloyd's Rep 603 (refd)

*PP v Lew Syn Pau* [2006] 4 SLR(R) 210; [2006] 4 SLR 210 (refd)

*Prest v Petrodel Resources Ltd* [2013] 2 AC 415 (refd)

*PT First Media TBK v Astro Nusantara International BV* [2014] 1 SLR 372 (refd)
*Skaw Prince, The* [1994] 3 SLR(R) 146; [1994] 3 SLR 379 (refd)
*Whang Tar Liang v Standard Chartered Bank* [2011] SGHC 154 (refd)
*Win Line (UK) Ltd v Masterpart (Singapore) Pte Ltd* [1999] 2 SLR(R) 24; [2000] 2 SLR 98 (refd)
*Woolfson v Strathclyde Regional Council* (1978) 38 P&CR 521 (refd)

**Legislation referred to**
International Arbitration Act (Cap 143A, 2002 Rev Ed) s 31(2)(*b*)
Rules of Court (Cap 322, R 5, 2014 Rev Ed) O 24 r 6(1), O 24 r 6(3)(*b*), O 24 r 7 (consd);
O 18 r 7, O 18 r 19(1)(*a*), O 18 r 19(1)(*b*)
Supreme Court of Judicature Act (Cap 322, 2007 Rev Ed) s 28B, First Schedule para 12
Land Compensation Act 1961 (c 33) (UK)

*Leong Lu Yuan (Ang & Partners) for the plaintiff;*
*Jeyabalen and Arthur Edwin Lim (Jeyabalen & Partners) for the defendant.*

23 September 2014

**Lee Kim Shin JC:**

**Introduction**

1      This was an application by Manuchar Steel Hong Kong Limited ("Manuchar") seeking pre-action discovery from Star Pacific Line Pte Ltd ("Star Pacific") of all documents relating to the hire, use or operation of a vessel, *Fusion 1*, by Star Pacific or its servants or agents.

2      Manuchar wanted the documents to determine if Star Pacific was part of a single economic entity which another company known as SPL Shipping Limited ("SPL Shipping") was also a part of. Manuchar had hoped to use the information in the documents to commence proceedings against Star Pacific to enforce two arbitral awards which it had obtained against SPL Shipping ("the Awards").

3      I dismissed the application for two reasons:

(a)     First, Manuchar could not persuade me that the documents that it sought were *necessary* for the purpose of determining if it had sufficient facts to allege that SPL Shipping and Star Pacific were a single economic entity to the extent that the Awards could be enforced against Star Pacific.

(b)     Second, in any event, Manuchar could not persuade me that its intended cause of action against Star Pacific was recognised at law under either the International Arbitration Act (Cap 143A, 2002 Rev Ed) ("IAA") or general company law.

4    Manuchar applied for leave to appeal my decision which I granted. As far as I am aware, no notice of appeal has been filed.

## Background

5    Manuchar is a global logistics services provider based in Hong Kong. Star Pacific is a Singapore-incorporated company. SPL Shipping is a company incorporated in the British Virgin Islands ("BVI") as a company limited by shares. SPL Shipping's incorporation was procured by its registered agent, Nerine Trust Company (BVI) Limited ("Nerine Trust").

6    Manuchar chartered the vessel, *Fusion 1*, from SPL Shipping under a charterparty dated 9 July 2008 brokered by agents. Manuchar candidly acknowledged that it was not aware, at the time it entered into the charterparty, that SPL Shipping was a BVI company. The charterparty provided for arbitration in London in the event of disputes.

## *Dispute, arbitration and the Awards*

7    Manuchar claimed moneys against SPL Shipping arising from disputes under the charterparty in 2008. In pursuit of its claim, Manuchar commenced arbitration proceedings in London but SPL Shipping did not participate at all in the arbitration. Under the Awards made in the arbitration, SPL Shipping was to pay Manuchar its principal claim in the amount of US$427,326.73, interest, and costs of the arbitration.

8    The substantive orders were made in October 2009, in the Final Award. The second award, a supplementary award, was issued months later in January 2011. It was issued to correct a heading in the Final Award which had misdescribed SPL Shipping as "SPL Shipping Limited of Singapore".

## *Enforcement of Awards*

9    The Awards were nothing more than paper judgments as far as Manuchar was concerned. It had taken various steps to enforce the Awards in three different jurisdictions but those efforts were in vain.

10    As early as 28 October 2009, Manuchar made a demand against SPL Shipping by fax for the sums under the Awards. It gave SPL Shipping until 6 November 2009 to comply. There was no response.

11    Manuchar then contacted SPL Shipping on three separate occasions, during the period between September 2010 and January 2011, essentially notifying SPL Shipping that the arbitrator would correct the heading of the Final Award which, as mentioned above, resulted in the supplementary award.

12    These notices were served on SPL Shipping at 5 Shenton Way, #27-08, an office building in Singapore. Interestingly, the person who received these

notices stamped the acknowledgment copies with SPL Shipping's corporate stamp.

13     Manuchar then sought registration of the Awards in Singapore, England and the BVI under the enforcement regimes of each jurisdiction.

14     Manuchar obtained an order from the Singapore High Court in early January 2012 granting it liberty to enforce the Awards against SPL Shipping. This was then served on SPL Shipping at its registered address in the BVI, although it was addressed to Nerine Trust. A manager from Nerine Trust acknowledged receipt of service on SPL Shipping's behalf. It was not entirely clear what role Nerine Trust played but it appears that they provided corporate secretarial services to SPL Shipping.

15     A similar enforcement order was obtained from the English High Court in early 2012. There was no evidence, however, of service of this order on SPL Shipping either in the BVI or in Singapore.

16     Finally, a similar enforcement order was obtained from the High Court of Justice in the BVI in July 2012. Manuchar, as creditor, then served a statutory demand on SPL Shipping at its registered address in the BVI in September 2012. Again, service was acknowledged by a manager from Nerine Trust. This statutory demand was issued pursuant to the Insolvency Act, 2003 (No 5 of 2003) which governed the law and procedure relating to insolvency in the BVI.

17     According to Manuchar, SPL Shipping completely ignored the relevant court processes and orders despite receiving service and notice of the various enforcement processes. No payment was made.

**Manuchar's case**

18     Consequently, Manuchar sought enforcement of the Awards against Star Pacific on the premise that SPL Shipping and Star Pacific are (or were) a single economic entity. Ms Leong Lu Yuan, counsel for Manuchar, explained that the concept of a single economic entity provided that two or more distinct and separate companies can be regarded at law as having the same corporate personality on the ground that they were part of a single economic entity. Ms Leong submitted that this concept has been recognised by the Singapore courts in appropriate cases.

19     Ms Leong provided five facts in support of the single economic entity argument:

        (a)     SPL Shipping and Star Pacific shared the same Singapore office, apparently being 80 Robinson Road, #09-02 ("the Robinson Road office"). I would just observe here that this was not the address which Manuchar sent the notices informing SPL Shipping of the misdescription in the Final Award (see [12] above).

(b)    Other parties in the chain of charterparties concerning *Fusion 1* appeared to have addressed their correspondence to Star Pacific.

(c)    Instructions and correspondence concerning *Fusion 1* appeared to have come from Star Pacific's employees and/or SPL Shipping's personnel signing off in the name of Star Pacific.

(d)    Documents sent to, or served on, SPL Shipping in Singapore at the Robinson Road office, were accepted and acknowledged as having been received by SPL Shipping. SPL Shipping and Star Pacific also shared the same fax number.

(e)    The plaintiffs in two separate civil suits in the US had similarly alleged that SPL Shipping and Star Pacific were one economic entity or in any case had no separate corporate identity. These plaintiffs are not connected or associated with Manuchar.

20    In this application, Manuchar provided an extensive set of documents including e-mails, letters and court documents which supported its factual assertions. However, Manuchar claimed that these documents were insufficient for the purposes of formulating its claim that SPL Shipping and Star Pacific are (or were) part of a single economic entity.

21    Manuchar therefore wanted pre-action discovery of "all documents which are or have been in [Star Pacific's] possession, custody or power, relating to the hire, use and/or operation of the vessel 'Fusion 1' by [Star Pacific] and/or their servants or agents", including but not limited to:

(a)    correspondence, notes and memoranda passing between SPL Shipping and Star Pacific in the period of June 2008 to September 2008;

(b)    the charterparty and/or fixture note and/or other similar document between Star Pacific and the owners and/or disponent owners of *Fusion 1* for the hire and/or use of the said vessel in the period of June 2008 to September 2008; and

(c)    bank statements, cash book entries and ledgers, and other documents relating to all financial transactions involving the hire, use and/or operation of *Fusion 1* in the period of June 2008 to September 2008.

**Star Pacific's case**

22    Star Pacific's case was put forward by its sole director and sole shareholder, one Mr Ham, who was neither a director nor employee of Star Pacific at the material time of the dispute in 2008. He only assumed directorship and ownership of Star Pacific in July 2010 from the previous South Korean director cum sole shareholder.

23    Mr Ham disputed the allegation that SPL Shipping and Star Pacific
are (or were) a single economic entity. He said that at the material time, Star
Pacific was only an agent of SPL Shipping, as evidenced by an agency
agreement. Although Star Pacific shared the same premises with SPL
Shipping, namely, the Robinson Road office, so too did at least three other
Korean companies. All of them were however separate entities albeit they
did, from time to time, take receipt of mail and other deliveries on behalf of
each other.

24    For good measure, Mr Ham insisted in his affidavit that he did not
have the documents sought by Manuchar (as described at [21] above).
Ms Leong, however, argued that Mr Ham's affirmation on oath was
insufficient as he had not made it clear that Star Pacific (as opposed to its
sole director) did not have the documents.

## My decision

### *What was meant by single economic entity*

25    I begin by explaining what I understood the single economic entity
concept to mean for the purposes of this application. The single economic
entity concept means different things in different contexts. It would be
dangerous to assume or, worse still, equate the understanding of the single
economic entity concept for statutory purposes (such as taxation or
competition laws) with the use of the single economic entity concept in the
present context, which is simply a dispute between companies over *liability
under a contract*.

26    The single economic entity concept that I understood Manchuar to
have relied on in this application may be described by the following
example. P enters into a contract with D which is related to a third
company, TC. The exact relationship between D and TC – whether parent-
subsidiary or two subsidiaries owned by the same parent – is unknown but
it is accepted that D and TC are part of the same corporate group. D
breaches the contract. However, as D is essentially a shell company with no
assets, P is considering two options:

    (a)    P commences proceedings against TC for D's breach of
    contract; or

    (b)    P commences proceedings against D first, and if P succeeds, P
    then enforces as against TC the judgment (or arbitral award) which it
    obtains against D.

27    In both options above, P intends to argue that it has a valid claim
against TC because TC and D operate as a single economic entity. The crux
of P's argument that TC is equally liable for D's breach is because TC and D
are part of a single economic entity, D's liability belongs as much to D as it
does to other members of the same economic entity, one of them being TC.

In the present application, Manuchar sought to make Star Pacific liable for SPL Shipping's breach via the second option.

### Pre-action discovery

28    I will now discuss the law relating to pre-action discovery.

29    Discovery applications may be made before the commencement of an action or proceedings against another party. This is expressly provided in O 24 r 6(1) of the Rules of Court (Cap 322, R 5, 2014 Rev Ed) which has as its source para 12 of the First Schedule to the Supreme Court of Judicature Act (Cap 322, 2007 Rev Ed) ("SCJA"): *Ching Mun Fong v Standard Chartered Bank* [2012] 4 SLR 185 ("*Ching Mun Fong*") at [16].

30    The Court of Appeal said in *Ching Mun Fong* at [18] that the plaintiff must satisfy the twin requirements of (a) relevance; and (b) necessity, to succeed in an application for pre-action discovery.

### Relevance

31    The requirement of relevance is prescribed in O 24 r 6(3)(*b*) but it is, in any case, self-evident. The documents sought must be relevant to an issue arising or likely to arise out of the potential claim against the defendant.

32    In the present case, it was difficult to argue that the documents sought were not relevant to the issue of whether SPL Shipping and Star Pacific are (or were) a single economic entity.

33    This may be why Mr Jeyabalen, counsel for Star Pacific, trained his attention chiefly on the necessity requirement.

### Necessity

34    Unlike the requirement of relevance, necessity is carved out as a standalone requirement under a separate rule, O 24 r 7, which reads:

> Discovery to be ordered only if necessary (O. 24, r. 7)
>
> 7.    On the hearing of an application for an order under Rule 1, 5 or 6, the Court may, if satisfied that discovery is not necessary, or not necessary at that stage of the cause or matter, dismiss or, as the case may be, adjourn the application and shall in any case refuse to make such an order if and so far as it is of opinion that discovery is not necessary either for disposing fairly of the cause or matter or for saving costs.

35    Saying that discovery of a document is a "necessity" or is "necessary" does not mean much. Necessity must be considered in relation to another concept; something is necessary only by reference to an identifiable end. Under O 24 r 7, necessity principally references two discrete considerations:

    (a)   fair disposal of the cause or matter; and

    (b)   saving costs.

36    These two considerations apply generally to discovery applications, not just pre-action discovery applications. But pre-action discovery is somewhat unique because it concerns disclosure even before proceedings have begun. In that specific context, the courts, in determining whether the necessity requirement is satisfied, generally ask whether the potential plaintiff has sufficient facts that would enable it to formulate a claim, and therefore be in a position to commence proceedings.

37    If a potential plaintiff is in possession of sufficient facts to commence proceedings, pre-action discovery is unnecessary and accordingly would not be granted (see *Ching Mun Fong* ([29] *supra*) at [23]).

38    Therefore, the crux relates to the sufficiency of knowledge that would place the plaintiff in a position to put forward a cause of action. As Prof Jeffrey Pinsler succinctly summarised, "if the claimant has sufficient evidence to mount a claim, he is not entitled to discovery before proceedings in order to complete his 'entire picture' of the case": *Singapore Court Practice 2009* (LexisNexis, 2009) at para 24/6/2. This comment was cited with approval by the Court of Appeal in *Ching Mun Fong* (at [26]).

39    The Court of Appeal in *Dorsey James Michael v World Sport Group Pte Ltd* [2014] 2 SLR 208 ("*Dorsey James Michael*") recently reaffirmed this. It held (at [48]) that if the plaintiff at the time of the making of the application can immediately commence proceedings against the defendant in relation to the controversy at hand without disclosure, that fact operates as a "significant consideration against the making of [the] order ... as pre-action disclosure is then not necessary".

*Fishing*

40    Before I address the facts of this case in relation to the requirement of necessity, I digress briefly to address the notion of "fishing expeditions" which is how discovery applications are frequently characterised. This was argued in the course of the hearings.

41    Fishing expeditions in discovery applications typically do not fare well – pre-action discovery will not be ordered to enable a plaintiff to go on a fishing expedition: *Kuah Kok Kim v Ernst & Young* [1996] 3 SLR(R) 485 ("*Kuah Kok Kim*") at [31].

42    However, whether a party is "fishing" is not strictly speaking a test, and the answer to that question has no consequence when considered in a vacuum. If "fishing" means asking for a generally broad category of documents, every pre-action discovery application will inevitably involve some amount of fishing. It would therefore not assist a defendant to say that the plaintiff is fishing for documents, without saying why the request for

those documents should be denied by reference to the twin requirements of relevance and necessity. The court would find greater assistance by submissions that explain whether the twin considerations of relevance and necessity are satisfied.

*Application to the facts*

43    Manuchar relied on the High Court decision in *Asta Rickmers Schiffahrtsgesellschaft mbH & Cie KG v Hub Marine Pte Ltd* [2006] 1 SLR(R) 283 ("*Asta Rickmers*") in which pre-action discovery was granted. Ms Leong submitted that I should follow *Asta Rickmers* because the fact pattern in that case and the present case were similar and the documents sought were "essentially [of] the same types".

44    *Asta Rickmers* does bear some resemblance to the present case. In that case, the operation of a vessel had been chartered by the plaintiff owner to a company known as Hub Lines Pte Ltd. The charterparty was then terminated by Hub Lines, an act which the plaintiff alleged was in breach of the charterparty. The matter proceeded to arbitration in London and it appeared that Hub Lines did not participate in those proceedings. The plaintiff was awarded approximately US$2.3m, interest and costs.

45    Shortly before the award was rendered, another creditor of Hub Lines commenced winding-up proceedings against Hub Lines. The plaintiff then sought to make the defendant in *Asta Rickmers*, Hub Marine, liable for the sum under the award by alleging that Hub Marine was the real charterer of the vessel; that Hub Lines was a front for Hub Marine; and that Hub Marine was a sub-charterer of the vessel under a back-to-back charterparty or similar arrangement with Hub Lines.

46    Tay Yong Kwang J affirmed the Deputy Registrar's decision to grant pre-action discovery on the basis that the documents would enable the plaintiff to ascertain if Hub Marine was in fact the real charterer of the vessel.

47    I chose not to follow the decision in *Asta Rickmers* for two reasons.

48    The first is factual. The plaintiff in *Asta Rickmers* wanted, through the pre-action discovery application, to ascertain the "true involvement of [Hub Marine] in the charterparty" (*Asta Rickmers* at [19]). However, all the evidence it had was circumstantial:

(a)    a survey report which named Hub Marine as the charterer;

(b)    letters to the master of the vessel, sailing instructions and a circular were all sent on the notepaper of Hub Marine;

(c)    evidence that Hub Marine paid most of the charter hire; and

    (d)   notes to the accounts and report of Hub Lines' auditors which made no mention of the claim on the charterparty made by the plaintiff.

49    In these circumstances, Tay J felt that it would assist the plaintiff if it had, in addition to the above evidence, documents from Hub Marine in the nature of correspondence, notes and memoranda relating to the hire, use and/or operation of the vessel. These documents would provide *direct* evidence of Hub Marine's principal involvement in the charterparty which was the plaintiff's purported objective in making the pre-action discovery application.

50    I could not say the same for Manuchar. Its intended cause of action was different.

51    Manuchar argued that the Awards could be enforced against Star Pacific on the basis that SPL Shipping and Star Pacific are (or were) a single economic entity. Manuchar was not seeking to ascertain Star Pacific's involvement in the charterparty as such, but that SPL Shipping and Star Pacific are (or were) operating as a single economic entity.

52    Mr Jeyabalen argued, in the main, that Manuchar had more than sufficient evidence in its possession and knowledge to commence and prosecute its claim, hence pre-action discovery was unnecessary. I agreed with this submission.

53    Manuchar was able to provide five facts to support its allegation of a single economic entity (see [19] above). More impressive, though, was the amount of documentary evidence adduced in the Plaintiff's supporting affidavit given by one Mr Maas. Mr Maas exhibited in his affidavit 49 items of mostly correspondence, e-mails, faxes, and letters spread over approximately 150 pages. These exhibits show, to varying extents, the closeness in proximity between SPL Shipping and Star Pacific.

54    The evidence was so comprehensive that it even showed that personnel who dealt with Manuchar on the *Fusion 1* charterparty had signed off on behalf of Star Pacific; and that other parties in the charterparty chain had at times addressed their correspondence to Star Pacific. Manuchar believed (and asserted in this application) that SPL Shipping and Star Pacific were operating as a single economic entity because of these documents.

55    Given that such documents were already in the possession and knowledge of Manuchar, I found it difficult to accept Ms Leong's argument that further documents held by Star Pacific in relation to its involvement with *Fusion 1* during the relevant period, if any, were *necessary* for commencing a claim that SPL Shipping and Star Pacific are (or were) operating as a single economic entity.

56    Manuchar appeared to be labouring under the impression that it required *evidence* to *prove* its single economic entity theory before it could commence proceedings. In Mr Maas' affidavit, he affirmed that Manuchar would sue Star Pacific upon "obtaining evidence of their right to do so". This was erroneous, as only facts, not evidence, need be pleaded (see O 18 r 7 and *Ching Mun Fong* ([29] *supra*) at [40]).

57    The focus of the law on pre-action discovery is the sufficiency of knowledge and possession of facts to plead and formulate a claim. It was therefore clear to me that Manuchar was adequately informed to formulate a pleading that Star Pacific and SPL Shipping operated as a single economic entity and commence proceedings on that basis.

58    Applying the formulation in *Whang Tar Liang v Standard Chartered Bank* [2011] SGHC 154 ("*Whang Tar Liang*") at [10], Manuchar was already in a position to "come to a determination of its cause(s) of action"; indeed, it already *knew* what its cause of action was and the facts that supported that cause of action. I did not think that the requirement of necessity was satisfied.

59    Before I leave the facts, I am compelled to mention that Ms Leong was unable to provide any meaningful response, when pressed, why discovery after the commencement of proceedings would not suffice. The Court of Appeal in *Dorsey James Michael* ([39] *supra* at [49]) noted, as a relevant consideration, that the plaintiff ought to give reasons why it was neither convenient nor just for the information to be sought *after* proceedings had been commenced. Against that backdrop, the absence of any explanation by Ms Leong made Manuchar's application rather weak.

60    This leads me to the second reason, a legal one, for not following *Asta Rickmers* ([43] *supra*). The law on pre-action discovery has received the benefit of clarification in subsequent cases which may have resulted in a different outcome in *Asta Rickmers* (had these cases been available when *Asta Rickmers* was decided).

61    The leading case when *Asta Rickmers* was decided was *Kuah Kok Kim* ([41] *supra*), which as a Court of Appeal decision, was binding on Tay J and was therefore duly applied (*Asta Rickmers* at [36]). However, the Court of Appeal clarified one aspect of *Kuah Kok Kim* in its more recent decision in *Ching Mun Fong* (at [19]–[23] and [27]–[28]).

62    The clarification related to the citation in *Kuah Kok Kim* (at [38]) of a statement made in *Dunning v Board of Governors of the United Liverpool Hospitals* [1973] 1 WLR 586 by Lord Denning MR. Lord Denning stated (at 590) that "[o]ne of the objects of [pre-action discovery] is to enable the plaintiff to find out – before he starts proceedings – whether he has a *good* cause of action or not" [emphasis added]. The court in *Ching Mun Fong* ([29] *supra*) was concerned that this statement may have created the impression that the purpose of pre-action discovery is to enable the plaintiff

to determine whether he had a cause of action which he could make out on the evidence and so, in that sense, is "good".

63    The court in *Ching Mun Fong* noted that such an interpretation was incorrect, as pre-action discovery was permitted not to assist a plaintiff in "developing and finessing his causes of action" or in "obtaining evidence to boost [its] case", but so that the plaintiff may discover a set of facts to fashion a claim against a potential defendant (see *Ching Mun Fong* at [21] and [28]). In other words, the effect of pre-action discovery on the merits of the plaintiff's claim was not a relevant consideration (see *Whang Tar Liang* at [10]). Rather, the focus was, as emphasised in *Ching Mun Fong* at [28], on the possession of facts sufficient to *formulate* a claim (see [37]–[39] above).

64    Therefore, whilst a court solely applying *Kuah Kok Kim* may have construed the law as allowing a more generous approach towards granting pre-action discovery, that is no longer a tenable approach after *Ching Mun Fong*.

65    Without *Asta Rickmers*, Manuchar had nothing left by way of authority to sustain its application. I would have dismissed it on the sole basis that the necessity requirement was not satisfied.

66    However, I would have dismissed the application for another reason – I was of the view that the intended cause of action was not viable at law.

### Viability of cause of action

#### Enforcement of arbitral awards against a non-party

67    To recapitulate, Manuchar's intended cause of action was to enforce the Awards against Star Pacific on the ground that SPL Shipping and Star Pacific operated as a single economic entity. I was skeptical, initially, whether such an action would be considered as disclosing no reasonable cause of action and therefore liable to be struck out under O 18 r 19(1)(*a*) in any event. Order 18 r 19(1)(*b*) was also another possibility. If that proved to be correct, Manuchar would not have a "good" cause of action, not in the sense that it would be unable to establish its cause of action on the facts, but in the sense that it did not even have a recognisable cause of action on which to proceed. I therefore requested the parties to provide further submissions on the nature of Maunchar's intended cause of action in law.

68    My initial skepticism was not unfounded. In particular, I appreciated Ms Leong's honest acknowledgment in her further submissions that pursuant to s 31(2)(*b*) of the IAA, "it [was] not possible to seek enforcement of an arbitration award against a non-party to the arbitration agreement". She also helpfully provided authority, in the form of Chan Leng Sun, *Singapore Law on Arbitral Awards* (Academy Publishing, 2001) at paras 7.55–7.56. Finally, she was candid enough to acknowledge that she

was not aware of any case where an arbitral award had been enforced against a party in Star Pacific's position.

69    To that I would add that Star Pacific was not just a stranger to the arbitration agreement in the charterparty. Star Pacific was not even named as a respondent in the arbitration that took place in London; and accordingly it never had an opportunity to decide if it wished to contest the claims made in the arbitration. Last but not least, Star Pacific was not the award debtor under the Awards.

70    Enforcing an award against a party in the shoes of Star Pacific in these circumstances would be anathema to the "internal logic of the consensual basis of an agreement to arbitrate", to borrow the words of the Court of Appeal in *PT First Media TBK v Astro Nusantara International BV* [2014] 1 SLR 372 ("*Astro*") at [198].

71    A decision of the English High Court supports my view that Manuchar did not have a cause of action recognised at law. In *Peterson Farms Inc v C&M Farming Ltd* [2004] 1 Lloyd's Rep 603 ("*Peterson Farms*"), the respondent in an arbitration sought a declaration from the court that certain findings in an award were made without jurisdiction because those findings related to members of the claimant group that did not enter into a binding arbitration agreement with the respondent.

72    The respondent's argument had been rejected by the arbitral tribunal because the tribunal accepted the "group of companies" doctrine. The arbitral tribunal's reasoning explains what it understood this doctrine to mean, and it is helpful to set out the relevant portion (*Peterson Farms* at [41]):

> ... The Tribunal does not consider that it is legally precluded from considering C&M's damages claims to cover and embrace the damages of all C&M Group companies. *The group of companies doctrine provides that an arbitration agreement signed by one company in a group of companies entitles (or obligates) affiliate non-signatory companies, if the circumstances surrounding negotiation, execution, and termination of the agreement show that the mutual intention of all the parties was to bind the non-signatories.* Following the Dow Chemical decision and ICC case numbers 2375 and 5103, *the Tribunal recognised that because a group of companies constitute the same 'economic reality' one company in the group can bind the other members to an agreement if such a result conforms to the mutual intentions of all the parties and reflects the good usage of international commerce.* This Tribunal considers that such circumstances are present in this case. ... [emphasis added in italics and bold italics]

73    Ostensibly, there is a striking similarity between the "group of companies" doctrine described above and the single economic entity concept that Manuchar was relying on (see [26]–[27] above). For present purposes, it is not necessary to comment on the Dow Chemical case, a decision of an ICC arbitral tribunal in 1982, which remains highly

controversial in many jurisdictions (see Gary Born, *International Commercial Arbitration* (Kluwer, 2nd Ed, 2014) ("*Born*") at pp 1450–1454). More germane to this present case was Langley J's decision in *Peterson Farms* on whether the arbitral tribunal had, by relying on the group of companies doctrine, wrongly assumed jurisdiction.

74    In his judgment (at [42]), Langley J considered the arbitral tribunal's decision "open to a number of substantial criticisms" and "seriously flawed in law". He held that the issue of whether the respondent had contracted with the other members of the claimant group was governed by the proper law of the contract which was Arkansas law and which the parties had agreed was the same as English law. On that basis, the arbitral tribunal should not have applied the "group of companies" doctrine as that doctrine "forms no part of English law" (at [59]).

75    I will discuss later (see [88]–[136] below) the broader issue of whether the single economic entity concept – which was argued to be a principle of general company law and not just arbitration law – has any standing in Singapore company law. For now, the import of *Peterson Farms* was that as a matter of arbitration principle, a tribunal has no jurisdiction to bind strangers to the arbitration agreement on the basis that these strangers are part of a larger group under the "group of companies" doctrine. This was yet another example of how stringently the courts regard consent to arbitration.

76    In my view, the decisions in *Peterson Farms* and *Astro* clarified beyond doubt that an arbitral award cannot impose enforceable obligations on strangers to an arbitration agreement. Star Pacific, being a stranger to the charterparty and by extension the arbitration agreement – and this was undisputed – could not be made liable for SPL Shipping's obligations under the Awards. Hence, Manuchar's attempt to enforce the Awards against Star Pacific was not viable at law.

77    Mr Jeyabalen characterised Manuchar's conduct in going after Star Pacific as a "witch hunt", which conduct was caused by Manuchar's own lack of due diligence in entering into a charterparty with a BVI entity. I did not think that the characterisation was fair or necessary or that he needed to go that far. Instead, I considered it material that Manuchar had commenced arbitration against SPL Shipping only and not Star Pacific as well. Perhaps Maunchar did not have sufficient confidence, at the time of commencement of the arbitration, that it would succeed before the tribunal in joining Star Pacific to the arbitration using the single economic entity (or any related) argument.

78    Manuchar's decision to prosecute the arbitration against SPL Shipping alone, in light of Ms Leong's concession, meant that I could not envisage how the court could justify ordering pre-action discovery in support of a cause of action which was unsustainable at law. Doing so

would have achieved the exact opposite outcome from the objective of pre-action discovery, that is, to minimise the unnecessary escalation of costs.

79     In these circumstances, I could see no principle or policy reason in favour of granting Manuchar's application. The high threshold required for the granting of pre-action discovery reflects the policy in the law that pre-action discovery "while not exceptional, is not usual" (*Dorsey James Michael* ([39] *supra*) at [49]). I did not think that the law should encourage parties who acknowledge that their intended cause of action against the defendant was not recognised at law to nevertheless commence pre-action discovery to obtain documents to support that cause of action.

*Pre-action discovery to assist execution proceedings*

80     Ms Leong then shifted the goalposts of Manuchar's case, in her further submissions, by arguing that even if Manuchar could not directly enforce the Awards against Star Pacific, it could obtain the sums payable under the Awards through other means such as commencing execution proceedings to obtain a garnishee order against Star Pacific. Ms Leong referred to the High Court case of *Leads Engineering (S) Pte Ltd v Chin Choon Co (Pte) Ltd* [2009] SGHC 53 ("*Leads Engineering*") in support of her new submission.

81     I did not find *Leads Engineering* helpful to Manuchar's case as the facts and issue in that case were not directly on point. The plaintiff there was the award creditor. It had been engaged by the defendant, the award debtor, to construct dwelling houses. The defendant was the main contractor for the project. There was a dispute that was referred to arbitration which resulted in an award in the plaintiff's favour. The plaintiff then applied to enforce the award and was given judgment against the defendant.

82     This was followed by execution proceedings in which the plaintiff obtained, *ex parte*, a garnishee order against one Mr Choo who had engaged the defendant as the main contractor. Mr Choo was, at that time, a director and shareholder of the defendant together with his sons. However, Mr Choo refused to attend the garnishee proceedings and passed away shortly thereafter. The plaintiff then took out an application for examination of judgment debtor against the late Mr Choo's son (who was the managing director of the defendant).

83     The only issue before Lai Siu Chiu J who heard the matter was whether the late Mr Choo's estate was indebted to the defendant for the purposes of deciding whether the garnishee order should be made absolute. She disbelieved the evidence from the late Mr Choo's son and found against the estate. The initial garnishee order was made absolute because the burden fell on the estate (as the garnishee) to prove that the late Mr Choo

did not owe any moneys to the defendant when the *ex parte* garnishee order was obtained.

84    I was not quite sure how *Leads Engineering* advanced Manuchar's case. The facts of *Leads Engineering* actually go against Manuchar's new intended cause of action. The late Mr Choo and his son were sought to be examined in their capacity as officers of the judgment debtor, the defendant, to determine if the defendant was owed moneys by the late Mr Choo which could then be garnished from his estate. The analogous situation in the present case would be examination of the corporate officers of SPL Shipping (and not Star Pacific) to determine if SPL Shipping was owed moneys by Star Pacific which Manuchar could then garnish. As far as I am aware, there was nothing stopping Manuchar from taking out examination of judgment debtor proceedings against SPL Shipping for that purpose.

85    There was a final point that I should address. Ms Leong submitted that the court in *Leads Engineering* had enforced the award "so to speak" by taking out garnishee proceedings against the late Mr Choo who was the defendant's alter ego. That submission is correct only to the extent that Ms Leong said that it was *not* enforcement of the award *against* the late Mr Choo (or his estate) as a third party in the same way that Star Pacific was a third party to the arbitration (and to the Awards obtained by Manuchar against SPL Shipping). The discussion of alter ego went only to the question of whether the late Mr Choo did owe the defendant moneys which could be the subject of a garnishee order.

86    Simply put, there was no decision that the award obtained against the defendant was enforceable *against* the late Mr Choo's estate on the basis that the estate was the alter ego of the defendant, in that the estate was in law the award debtor – just as how Star Pacific was sought to be made the award debtor for the Awards. Thus, it would be more accurate to understand the examination process as part of an execution process following a court judgment already obtained against the *defendant* (as opposed to the late Mr Choo or his estate) instead of framing the examination of judgment debtor proceedings as an enforcement of the award against a third party "so to speak".

*A broader consideration of the single economic entity concept*

87    Thus far, I have only considered the single economic entity concept in the context of the narrow question of whether the Awards can be enforced against Star Pacific under the IAA. This is a question of arbitration law.

88    However, there is a broader question, which is whether the concept of a single economic entity has wider acceptance under Singapore law as was submitted by Ms Leong (see [18] above).

89    I begin with the obvious premise that businesses may be structured to take advantage of any benefit or advantage conferred by law. A basic tenet of company law in Singapore since *Aron Salomon (Pauper) v A Salomon and Company, Limited* [1897] AC 22 ("*Salomon*") is that a company and its shareholders are separate legal persons. Save for very limited exceptions, most of which are statutory, the company has rights and liabilities of its own which are distinct from those of its shareholders.

90    This basic tenet is the cornerstone of commercial and corporate transactions, so much so that it has even been said that it cannot be disregarded on the mere justification that "justice so requires" (see *Adams v Cape Industries plc* [1990] Ch 433 ("*Adams*") at 536).

91    The law recognises that a company has a *corporate* legal personality independent and indeed separate from the legal personalities of its shareholders. It is not just Singapore law or even the wider common law that recognises the existence of this distinct corporate legal personality; this is the position in most advanced legal systems, as observed by Lord Sumption in *Prest v Petrodel Resources Ltd* [2013] 2 AC 415 ("*Prest*") at [17].

92    Because the law allows and treats a company as a separate entity from its shareholders in the ordinary circumstance, it is perfectly acceptable in many jurisdictions, including Singapore, for an enterprise to be established (and carry on business) as a BVI company, with the attendant advantages of non-transparency of ownership, management and financial position – generally, a BVI company need not make public details of its shareholders, directors or financial statements. That the shareholders of a BVI company are unknown or may not be identified through public means is not relevant to whether a BVI company has capacity to enter into legal relations; its capacity is derived not from its shareholders' legal personalities but from its separate and distinct corporate legal personality. Why any business person would choose to contract with, or accept the credit risk of, a BVI company (without extracting a personal guarantee or other security) is, of course, a separate matter.

93    That said, most legal systems, including Singapore, recognise that there are limits to the implications of a separate corporate legal personality. There are, thus, exceptional situations in which the law, by piercing through the corporate veil that separates the company from its shareholders, *ignores* the separate legal personalities of the company and its shareholders (see *PP v Lew Syn Pau* [2006] 4 SLR(R) 210 ("*Lew Syn Pau*") at [193]).

94    However, leaving aside statutory imperatives, most of which have to do with tax and competition law purposes, the precise circumstances in which the courts will pierce the corporate veil under common law are not exactly uniform or settled in many common law jurisdictions – there is "no

common, unifying principle" as such: see *Briggs v James Hardie & Co Pty Ltd* (1989) 16 NSWLR 549 at 567; *Prest* at [75]; *Kosmopoulos v Constitution Insurance Co of Canada* [1987] 1 SCR 2 at [12]; *Attorney-General v Equiticorp Industries Group Ltd (In Statutory Management)* [1996] 1 NZLR 528 at 541; *Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd* 1995 (4) SA 790 (A) at 802–803.

95    There is, nevertheless, a general thread that runs through all the authorities in support of the piercing of the corporate veil: the presence of abuse. Again, I can do no better than to repeat Lord Sumption's opinion in his judgment in *Prest* (at [27]) that "the recognition of a limited power to pierce the corporate veil in carefully defined circumstances is necessary if the law is not to be disarmed in the face of abuse". As for what amounts to abuse, Lord Sumption helpfully summarised it as follows (at [34]):

> … It may be an abuse of the separate legal personality of a company to use it to evade the law or to frustrate its enforcement. It is not an abuse to cause a legal liability to be incurred by the company in the first place. It is not an abuse to rely upon the fact (if it is a fact) that a liability is not the controller's because it is the company's. On the contrary, that is what incorporation is all about. …

96    Plainly, the law eschews disregard of the separate corporate legal personality of a company except in exceptional circumstances, and only where there has been some form of abuse. Respect for the separate corporate legal personality of a company, with the rights and liabilities attached to that personality, is sacrosanct in nearly every other circumstance.

97    Indeed, the single economic entity concept as argued by Manuchar goes even further than piercing the corporate veil. Manuchar was not merely seeking to claim against Star Pacific on the ground that Star Pacific was the mastermind behind SPL Shipping and because there had been some abuse or impropriety. No allegation of abuse or impropriety was made in Mr Maas' affidavit.

98    Rather, Manuchar was relying on the single economic entity concept to canvass the argument that the law recognises an overarching indivisible group corporate legal personality that transcends and supersedes all individual members' separate corporate legal personalities, and upon which rights and liabilities of each member of the group can be attached, with the consequence that the liabilities (and also rights) of a member of the group is shared by other members of the group *because* of the shared group corporate legal personality.

99    In other words, while the movement of liability under the piercing of the corporate veil doctrine is unidirectional (in the direction of the ultimate controller, usually the parent), the movement of liability under the concept of single economic entity argued in this application is multidirectional in

that all members of the group share in the same group corporate
personality. A subsidiary may be made liable for the liabilities of its sister
and parent companies, not because of control, but simply because all these
companies belong to the same corporate group. One for all and all for one.

100  Interestingly, Mr Gary Born, a prominent international disputes
practitioner and commentator, too, takes the view that the "group of
companies" doctrine (at [73] above), which I mentioned earlier is
conceptually similar to the single economic entity (though confined
primarily to the arbitration context), is fundamentally distinct from the
other techniques of disregarding separate legal personality (see *Born* ([73]
*supra*) at p 1449).

101  Apart from the conceptual difficulties I had with the doctrine as stated
above, I was also not persuaded by the case law that the single economic
entity concept was recognised under the common law, or at any rate under
Singapore law.

(1)   *Adams*

102  The leading case on the single economic entity concept is *Adams* ([90]
*supra*), a decision of the English Court of Appeal. *Adams* has been cited
with approval on numerous occasions in Singapore (see *eg, Lew Syn Pau*
([93] *supra*) and *Win Line (UK) Ltd v Masterpart (Singapore) Pte Ltd* [1999]
2 SLR(R) 24 ("*Win Line*")). The facts there are rather convoluted but it is
worth taking some time to explain the intricacies.

103  The first defendant in that case, Cape, presided over a group of
subsidiary companies engaged in the mining and marketing of asbestos.
Cape was an English company. The group had a subsidiary responsible for
marketing in the US, a US company called NAAC. The group also had a
worldwide marketing subsidiary called Capasco, which was an English
company. Some workers in a factory belonging to the group suffered
injuries as a result of exposure to asbestos dust and consequently sued
members of the group in the US. There were two separate actions of which
the first was settled. In relation to the second, Cape and Capasco took no
part in the US proceedings. They were prepared to let default judgments be
entered against them and later resist enforcement of those judgments in
England if enforcement was sought there.

104  Default judgment was then entered and the plaintiffs (bar one) sought
to enforce the default judgment against Cape and Capasco in England. One
of the main issues was whether the US court was entitled to take jurisdiction
over Cape and Capasco. The plaintiffs argued that the US court was so
entitled because Cape and Capasco were present in the US through NAAC
and later, by the creation of two new subsidiaries, AMC, a Liechtenstein
company, and CPC, a US company. Both AMC and CPC were involved in

marketing asbestos in the US although it was not disputed that AMC had no presence in the US at the material times.

105   At first instance, the High Court held that Cape and Capasco were not present as the presence of NAAC and CPC in the US and the business carried on from their respective offices did not constitute the presence of Cape or Capasco. The plaintiffs then appealed but their appeal was dismissed.

106   The plaintiffs submitted (at 532) that Cape, Capasco and CPC, which performed the same functions as those previously carried out by NAAC, constituted a single economic entity and for that reason, CPC's presence in the US sufficed to constitute the presence of Cape and Capasco. On that submission, Slade LJ who delivered the leading judgment for the Court of Appeal opened (at 532) by referring to Roskill LJ's exposition in *Albacruz (Cargo Owners) v Albazero (Owners) (The Albazero)* [1977] AC 774 at 807:

> ... [E]ach company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities so that the rights of one company in a group cannot be exercised by another company in that group even though the ultimate benefit of the exercise of those rights would enure beneficially to the same person or corporate body irrespective of the person or body in whom those rights were vested in law. It is perhaps permissible under modern commercial conditions to regret the existence of these principles. But it is impossible to deny, ignore or disobey them.

107   A company within a group may enjoy the benefits arising from the exercise of a right vested in another company, but that did not make the two companies one legal entity; they remain separate entities. Applying that logic, Slade LJ therefore held that it was indisputable that each of Cape, Capasco, NAAC and CPC were in law separate legal entities. The law, he said (at 536), for better or worse, recognises the creation of subsidiary companies which (though in one sense are the creatures of their parent companies) would nevertheless fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities. The court was not free to disregard the principle in *Salomon* ([89] *supra*) merely because it considered that justice so required.

108   The court could see the force of the submission that the set up and operations of the Cape group was such that the group was virtually the same as a partnership in which all the member companies were partners. The court could even accept that the evidence broadly supported the submission that Cape ran a single integrated division with little regard to corporate formalities as between members of the group.

109   However, Slade LJ held (at 538) that the court had "no discretion to reject the distinction between the members of the group", a distinction which in law has been said to be fundamental and cannot be bridged (see

*Bank of Tokyo Ltd v Karoon* [1987] AC 45 at 64). The distinction Slade LJ was referring to was, of course, the distinction between separate legal personalities of each member of the group.

110  Therefore, the flexibility enjoyed by shareholders to manage the business and liabilities of a company that flows from the principle in *Salomon* extends to a group of companies. It is entirely within the permissible boundaries of law for a corporate group to use whatever corporate structures are available to organise their legal liability in the most advantageous way, even to the extent of ensuring that legal liability in respect of particular future activities of the group will fall on a specific member of the group rather than another or to the group as a whole (see also *China Ocean Shipping Co v Mitrans Shipping Co Ltd* [1995] 3 HKC 123 and *Ord v Belhaven Pubs Ltd* [1998] BCC 607). Whether or not it is desirable, the right to use a corporate structure in any manner legally permissible is inherent in our corporate law: see *Adams* ([90] *supra*) at 544.

(2)  *DHN Food*

111  There is an English case, *DHN Food Distributors Ltd v Tower Hamlets London Borough Council* [1976] 1 WLR 852 ("*DHN Food*"), which used to be and is still sometimes cited for the proposition that the law does recognise in limited circumstances the single economic entity concept (for *eg*, see Thomas K Cheng, "The Corporate Veil Doctrine Revisited: A Comparative Study of the English and the US Corporate Veil Doctrines" (2011) 34 Boston College Int & Comp L Rev 328 at 388; and Albert Badia, "Piercing the Veil in Municipal Law" in *Piercing the Veil of State Enterprises in International Arbitration* (Albert Badia ed) (Kluwer, 2014) at pp 63–65).

112  In that case, a group of three companies, DHN, Bronze and Transport, all in voluntary liquidation at the relevant time, were seeking compensation under the Land Compensation Act 1961 following a compulsory purchase made by the respondent council. DHN held all the shares in Bronze and Transport. The three companies were associated in a wholesale grocery business. DHN was the parent company and owned the business; the land was owned by Bronze; and the vehicles were owned by Transport. The issue was whether DHN and Transport were entitled to compensation for disturbance as a result of the compulsory acquisition of land owned by Bronze by the respondent council. The Lands Tribunal held that DHN were licensees of Bronze and had no claim to compensation beyond a negligible sum permitted by statute. DHN appealed and succeeded.

113  Delivering the leading judgment of the English Court of Appeal, Lord Denning MR had this to say (at 860):

> *Third, lifting the corporate veil.* ... We all know that in many respects a group of companies are treated together for the purpose of general accounts,

balance sheet, and profit and loss account. They are treated as one concern.
Professor Gower in *Modern Company Law*, 3rd ed (1969), p 216 says:

> 'there is evidence of a general tendency to ignore the separate legal
> entities of various companies within a group, and to look instead at the
> economic entity of the whole group.'

This is especially the case when a parent company owns all the shares of the
subsidiaries – so much so that it can control every movement of the
subsidiaries. These subsidiaries are bound hand and foot to the parent
company and must do just what the parent company says. A striking instance
is the decision of the House of Lords in *Harold Holdsworth & Co (Wakefield)
Ltd v Caddies* [1955] 1 WLR 352 . So here. This group is virtually the same as
a partnership in which all the three companies are partners. They should not
be treated separately so as to be defeated on a technical point. They should
not be deprived of the compensation which should justly be payable for
disturbance. *The three companies should, for present purposes, be treated as
one, and the parent company DHN should be treated as that one. So DHN are
entitled to claim compensation accordingly.* It was not necessary for them to
go through a conveyancing device to get it.

[emphasis added in italics and bold italics]

114    The main concern of the court in *DHN Food* was identifying the
principal responsible for the business. Judging from the way the business
was structured and ran, the court found that DHN was that principal and
DHN should therefore be entitled to compensation. On a closer reading of
the case, I did not think that any of the judges had advocated a wider, if not
wholly new, concept of an overarching group corporate legal personality –
under which rights and liabilities accrued to and incurred by each member
of the group could be attributed to other members of the group because
each member was part of the single economic entity.

115    Instead of supporting a wider doctrine of single economic entity,
*DHN Food* can be described as a case of "self-piercing" – piercing the
corporate veil to gain an advantage (for an elaboration of the idea of self-
piercing, see Robert B Thompson, "Piercing the Corporate Veil: An
Empirical Study" (1991) 76 Cornell L Rev 1036). Indeed, as the prefatory
words to his reasoning (at [113] above) strongly suggest, it seemed to me
that Lord Denning similarly considered *DHN Food* as a case of lifting the
corporate veil. He was not relying on a different concept to find in favour of
DHN. Goff LJ, too (at 861–862), saw the court's reversal of the Land
Tribunal's decision as a consequence of the corporate veil being pierced.

116    But *DHN Food* is controversial precisely because the lifting of the
corporate veil element was not all that apparent, even on a closer
examination. Hence, the House of Lords thought it necessary in *Woolfson v
Strathclyde Regional Council* (1978) 38 P&CR 521 (in rejecting the
appellants' submission (at 525–526) that the three companies in question
should be treated as a single entity "embodied" in one of the three

companies) to express reservations over the Court of Appeal's application of the piercing of the corporate veil principle in *DHN Food*.

117  Any glimmer of hope that the single economic entity concept could subsist under English law was swiftly extinguished.

(3)  *Lew Syn Pau* and *Win Line*

118  There is also local jurisprudence on this issue.

119  Ms Leong in her submissions cited two decisions of the Singapore High Court, namely, *Lew Syn Pau* ([93] *supra*) and *Win Line* ([102] *supra*). Ms Leong cited other cases but I did not find these to be of direct assistance.

120  I shall begin with *Win Line*, a decision of Judith Prakash J. The defendant, Masterpart, chartered a vessel owned by the plaintiff, Win Line. Under the charterparty, Masterpart was listed as one of the group of companies of the second defendant, D&M. A dispute over Masterpart's alleged repudiation of the charterparty arose and Win Line sued both Masterpart and D&M. One of the grounds relied on by Win Line against D&M was that Masterpart and D&M were run as a single corporate entity and were therefore jointly liable for the breach of the charterparty.

121  Based on my reading of her judgment, Prakash J was obviously alive to the distinction between the piercing of the corporate veil doctrine and the single economic entity concept. Her characterisation of Win Line's submission is essentially identical to how I understood the Plaintiff's submission here. Prakash J said (at [43]–[44]):

> The plaintiffs also submitted that the evidence disclosed that Masterpart and D&M were organised as one economic entity *and for that reason it would be correct to make D&M responsible for the liabilities nominally incurred by Masterpart.* That argument is one that has been made in previous cases *to justify lifting the corporate veil* that exists between a parent company and its subsidiaries within the same group. Even in such a situation the argument has not been well received. ...
>
> ...
>
> ... *[W]hat the plaintiffs wish me to do here is to extend the principle [of piercing the corporate veil in a group of companies] into a completely different area and treat two companies which have no common shareholders or directors as being a single economic unit and thus a single legal unit. I cannot do this.*
>
> [emphasis added in italics and bold italics]

122  Prakash J then went on to state that, *in any event*, Masterpart and D&M were not a single economic unit on the facts. It may be that Prakash J's examination of the facts gave Ms Leong the confidence to submit that *Win Line* stands for the proposition that under Singapore law, "two companies can be found to be a single economic entity in the appropriate circumstances".

123  I did not read *Win Line* in this way. It was clear to me that Prakash J had rejected, as a matter of principle, the submission by Win Line that liability ought to be found against D&M on the basis that Masterpart and D&M were part of a single economic entity.

124  Compared to *Win Line,* the facts of *Lew Syn Pau* are much further from the present case. The broad issue in question was whether a company, BIGL, had committed an offence by giving prohibited financial assistance to a purchaser for the acquisition of BIGL's shares. Under the law, a company which is the target of an intended acquisition is prohibited, subject to certain statutory exceptions, from directly or indirectly giving any financial assistance for the purposes of or in connection with the acquisition. The financial assistance in *Lew Syn Pau* took the form of a loan by one of BIGL's subsidiaries, Compart Mauritius.

125  Sundaresh Menon JC (as he then was) considered (at [193]) that one way in which BIGL might be found to have given financial assistance indirectly was if the corporate veil between BIGL and Compart Mauritius could be pierced *such that* the acts of Compart Mauritius were to be treated as the acts of BIGL. I pause here to highlight again the distinction between the piercing of the corporate veil concept and the single entity economic entity concept. The situation in *Lew Syn Pau* ([93] *supra*) was, as Menon JC rightly characterised, a case of piercing the corporate veil because what was sought to be done was to attribute the act of a company to its controller.

126  There was no argument or discussion to the effect that *because* Compart Mauritius and BIGL, together with other entities, operated as a single economic entity, each belonged to that single economic entity with the consequence that the acts and liabilities of each of the companies in that entity may be attributed to the other.

127  In deciding whether the corporate veil ought to be pierced, Menon JC noted (at [195]) the concession by both parties' counsel that the separate corporate legal personality principle presented a considerable obstacle to a finding that the act of Compart Mauritius was to be taken as an act of BIGL.

128  Menon JC nevertheless went on to review a handful of authorities, including *Win Line* ([102] *supra*), at the end of which he concluded (at [202]) that the ordering of companies within a broader group structure did not mean that one could dispense with the need to view and understand each entity in the group as a separate legal entity. I agreed with this statement of principle.

129  Before I leave this discussion on the position under Singapore law, it should be noted that *Walter Woon on Company Law* (Tan Cheng Han gen ed) (Sweet & Maxwell, Revised 3rd Ed, 2009) at para 2.81 opines that the "courts are *far yet* from deciding that a group of companies is one super entity encompassing all the companies within the group" [emphasis added]. As far as I am aware, cases decided post-2009 (*Win Line* and *Lew Syn Pau*

were decided in 1999 and 2006 respectively) have not added very much to
this area of company law.

### (4)   One-ship companies

130   The law's take on the legitimacy of one-ship companies provides
another reason why the single economic entity concept has no place in
Singapore law.

131   It has been long and well established that one-ship companies are a
legitimate practice for businesses engaged in the shipping business to limit
their liability: see *The Skaw Prince* [1994] 3 SLR(R) 146 at [19]; and
*Cavenagh Investment Pte Ltd v Kaushik Rajiv* [2013] 2 SLR 543 at [41].
While exceptional circumstances indicating the presence of a façade or a
sham may sometimes warrant the lifting of the corporate veil against a one-
ship company (*Antonio Gramsci Shipping Corporation v Stepanovs* [2011]
EWHC 333 (Comm)), the general position that a one-ship company is not
liable for losses caused by a sister ship owned under another company
reinforces the *Salomon* principle (see Francis Rose, "Raising the Corporate
Sail" [2013] LMCLQ 565 at 577).

132   Thus, it was said in *Chimbusco Pan Nation Petro-Chemical Co Ltd v
The Owners and/or Demise Charterers of the Ship or Vessel "Decurion"*
[2013] 2 Lloyd's Rep 407 at [68] that:

> … notwithstanding the widespread use of one-ship shipowning companies
> controlled by a parent company, courts do not as a general course lift the
> corporate veil …

133   If the single economic entity concept were accepted, all such one-ship
companies would be considered as part of the same single economic entity
with the corollary that the liability of a one-ship company may be visited on
several (or all) of its other one-ship sister companies. The existence of
abusive conduct becomes irrelevant because liability can be established by
the mere fact of the existence of a group structure; the piercing of the
corporate veil exception would not even be needed. In short, there would be
no place for the survival of the one-ship companies practice and doctrine
which has long existed and recognised as a legitimate tool for limiting
liability.

### (5)   Others

134   Last but not least, I should mention that as far as I could tell, the single
economic entity concept has not received endorsement under US corporate
law (see Virginia Harper Ho, "Theories of Corporate Groups: Corporate
Identity Reconceived" (2012) Seton Hall L Rev 879 at 880–881). A
sprinkling of cases mention (with approval) a similar doctrine loosely
described as "enterprise liability", but on the whole, my assessment of the

cases in the US was that the single economic entity concept in the context of company law was not clearly settled.

135   Apart from the Dow Chemical arbitration case which I mentioned in passing above (see [72] and [73] above), I found that the single economic entity concept had very little traction in the international arbitration community, especially outside jurisdictional issues (such as whether a company within the group is part of the group for the purposes of jurisdiction). I found particularly helpful the tribunal's summary in the investment treaty arbitration case of *CME Czech Republic BV v The Czech Republic* (Final Award, dated 14 March 2003) at para 436:

> Only in exceptional cases, in particular in competition law, have tribunals or law courts accepted a concept of a 'single economic entity', which allows discounting of the separate legal existences of the shareholder and the company, mostly, to allow the joining of a parent of a subsidiary to an arbitration. Also a 'company group' theory is not generally accepted in international arbitration (although promoted by prominent authorities) and there are no precedents of which this Tribunal is aware for its general acceptance. ...

136   For all the foregoing reasons, I was not persuaded, on balance, that the single economic entity concept was recognised at law in Singapore nor was there a good legal basis to support its recognition.

**Conclusion**

137   I therefore dismissed the application, though I granted Manuchar's application for leave to appeal to the Court of Appeal. I awarded costs of $3,000 in total to Star Pacific, of which $1,000 was for a round of further arguments pursuant to s 28B of the SCJA (which Manuchar sought after I had given my decision).

138   In addition, since Mr Ham had consistently insisted on oath that he did not have the documents anyway, in the interests of saving time and costs and with the consent of both parties, I gave Mr Ham leave to file an affidavit *as if* I had granted Manuchar's application. This was done but Manuchar remained unsatisfied because Mr Ham only affirmed that Star Pacific did not have the documents since 19 July 2010, which was the date that he took over as director and owner of the company.

139   Finally, in fairness to Manuchar and for the avoidance of doubt, nothing that I have decided stands in the way of Manuchar commencing action against Star Pacific on any of the grounds that it had intimated in the course of the application.

Reported by Nicholas Poon.