UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

――――――――――――――――――   X
                                                    :
In re:                                              :
                                                    :
                                                    :    SIPA LIQUIDATION
BERNARD L. MADOFF INVESTMENT                        :
SECURITIES LLC,                                     :
                                                    :    No. 08-01789 (SMB)
        Debtor.                                     :
                                                    :
――――――――――――――――――-   X
                                                    :
IRVING H. PICARD, Trustee for the Liquidation       :
of Bernard L. Madoff Investment Securities LLC,     :
                                                    :
        Plaintiff,                                  :
                                                    :
            v.                                      :    Adv. Proc. No. 09-01182 (SMB)
                                                    :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,              :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,              :
ASCOT FUND LTD., GABRIEL CAPITAL                    :
CORPORATION,                                        :
                                                    :
        Defendants.                                 :
                                                    :
――――――――――――――――――   X

## NOTICE OF MOTION BY DEFENDANTS J. EZRA MERKIN
## AND GABRIEL CAPITAL CORPORATION FOR SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that, pursuant to Rule 56(a) of the Federal Rules of Civil

Procedure and Federal Rule of Bankruptcy Rule 7056, and upon the accompanying Joint

Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1, Declaration of Neil A.

Steiner, dated October 7, 2015, and all attached exhibits, and the accompanying Memorandum of

Law, Defendants J. Ezra Merkin and Gabriel Capital Corporation ("Merkin Defendants") will

move before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the

Southern District of New York, at the United States Bankruptcy Courthouse, One Bowling

Green, New York, New York, 10004-1408, at a date and time to be determined by the Court, for

an Order granting summary judgment to the Merkin Defendants as to the Trustee's remaining

claims, and for such other relief as the Court deems just and proper.

**NOTICE IS FURTHER GIVEN** that the Trustee's response to this Motion, if any, shall

be filed with the Bankruptcy Court and served on counsel for Merkin Defendants: Neil A.

Steiner, Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036-6797, no later than

November 25, 2015.

**DECHERT LLP**

New York, New York
October 7, 2015

By: /s/ Neil A. Steiner
Neil A. Steiner
neil.steiner@dechert.com
Andrew J. Levander
andrew.levander@dechert.com
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

*Attorneys for Defendants J. Ezra*
*Merkin and Gabriel Capital*
*Corporation*

15749653.1

2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————————— X
                                                  :
In re:                                            :
                                                  :       SIPA LIQUIDATION
                                                  :
BERNARD L. MADOFF INVESTMENT                      :
SECURITIES LLC,                                   :       No. 08-01789 (SMB)
                                                  :
            Debtor.                               :
                                                  :
—————————————————————————————— X
                                                  :
IRVING H. PICARD, Trustee for the Liquidation     :
of Bernard L. Madoff Investment Securities LLC,   :
                                                  :
                                                  :
            Plaintiff,                            :
                                                  :       Adv. Proc. No. 09-01182 (SMB)
            v.                                    :
                                                  :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,            :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,            :
ASCOT FUND LTD., GABRIEL CAPITAL                  :
CORPORATION,                                      :
                                                  :
            Defendants.                           :
                                                  :
—————————————————————————————— X

## DEFENDANTS J. EZRA MERKIN AND GABRIEL
## CAPITAL CORPORATION'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>


DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
*Attorneys for Defendants J. Ezra Merkin*
*and Gabriel Capital Corporation*

# Table Of Contents

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 4

    A.    BLMIS And The Madoff Ponzi Scheme ............................................. 4

    B.    Ascot Partners' Investments With BLMIS ......................................... 5

    C.    Merkin Defendants' Thorough Due Diligence ..................................... 7

    D.    The Trustee's Misguided Contentions ............................................. 13

ARGUMENT ..................................................................................................... 17

POINT I        THE TRUSTEE CANNOT PREVAIL ON HIS AVOIDANCE CLAIM
               BECAUSE THE MERKIN DEFENDANTS  WERE NOT WILLFULLY
               BLIND TO THE MADOFF FRAUD ................................................. 18

POINT II      THE TRUSTEE'S SUBSEQUENT TRANSFEREE  AND GENERAL
               PARTNER LIABILITY CLAIMS FAIL BECAUSE  THOSE CLAIMS
               ARE DERIVATIVE OF THE AVOIDANCE CLAIM ...................................... 26

POINT III     THE TRUSTEE'S EQUITABLE SUBORDINATION  CLAIM FAILS
               BECAUSE THERE WAS NEITHER  GROSS AND EGREGIOUS
               CONDUCT NOR INEQUITABLE CONDUCT ................................................. 29

CONCLUSION .................................................................................................... 31

-i-

## <u>Table of Authorities</u>

CASES

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)........................................................................................25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..............................................................................................18

*F.D.I.C. v. Great Am. Ins. Co.*,
  607 F.3d 288 (2d Cir. 2010)...................................................................................17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011)...........................................................................................19

*Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*,
  No. 08-15051, Adv. No. 10-5456, 2012 WL 4867376 (Bankr. S.D.N.Y. Oct. 12,
  2012) .....................................................................................................................30

*Gowan v. Wachovia Bank, N.A.* (*In re Dreier LLP*),
  453 B.R. 499 (Bankr. S.D.N.Y. 2011) ...............................................................29, 30

*Hyundai Translead, Inc. ex rel. Estate of Trailer Source, Inc. v. Jackson Truck & Trailer
  Repair Inc.*,
  419 B.R. 749 (M.D. Tenn. 2009).............................................................................27

*In re Assante*,
  No. 12 Civ. 5309 (CS), 2013 WL 787968 (S.D.N.Y. Mar. 4, 2013).......................29

*In re Beacon Assocs. Litig.*,
  745 F. Supp. 2d 386 (S.D.N.Y. 2010)....................................................................21

*In re Kalisch*,
  413 B.R. 115 (Bankr. S.D.N.Y. 2008), aff'd, No. 09 Civ. 1636 (PKC), 2009 WL
  2900247 (S.D.N.Y. Sept. 9, 2009) ........................................................................29

*In re Merkin & BDO Seidman Sec. Litig.*,
  817 F. Supp. 2d 346 (S.D.N.Y. 2011)........................................................20, 24, 25

*In re Tremont Sec. Law, State Law & Ins. Litig.*,
  703 F. Supp. 2d 362 (S.D.N.Y. 2010)....................................................................21

*Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*,
  505 F.3d 109 (2d Cir. 2007)...................................................................................30

*Meridian Horizon Fund, LP v. KPMG (In re Tremont Secs. Law, State Law & Ins. Litig.)*,
  487 F. App'x 636 (2d Cir. 2012) ...........................................................................20

*Newman v. Family Mgmt. Corp.*,
     530 F. App'x 21 (2d Cir. 2013) ...................................................................20

*Picard v. Katz*,
     11 Civ. 3605 (JSR), (S.D.N.Y. Mar. 14, 2012) ECF No. 177 ...........................19, 23

*Picard v. Katz*,
     462 B.R. 447 (S.D.N.Y. 2011)................................................................18, 19

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
     515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...................................................27, 28, 30

*Ressler v. Liz Claiborne, Inc.*,
     75 F. Supp. 2d 43 (E.D.N.Y. 1998) *aff'd sub nom.*, *Fishbaum v. Liz Claiborne, Inc.*,
     189 F.3d 460 (2d Cir. 1999)......................................................................25

*Saltz v. First Frontier, LP*,
     782 F. Supp. 2d 61 (S.D.N.Y. 2010) *aff'd*, 485 F. App'x 461 (2d Cir. 2012).......................20

*Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*,
     307 B.R. 744 (Bankr. S.D.N.Y. 2004) ...............................................................27

*SEC v. Cohmad Sec. Corp.*,
     No. 09 Civ 5680 (U.S.), 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ..............................21, 24

*Shubert v. Stranahan (In re Penn. Gear Corp.)*,
     Adv. Nos. 03–940 *et al.*, 2008 WL 2370169 (Bankr. E.D. Pa. Apr. 22, 2008) .......................27

*United States v. Fofanah*,
     765 F.3d 141 (2d Cir. 2014) *cert. denied*, 135 S. Ct. 1449 (2015) .........................19

## STATUTES

11 U.S.C. § 502.....................................................................................27, 30

11 U.S.C. § 546.........................................................................................1

11 U.S.C. § 548..................................................................................18, 27, 30

11 U.S.C. § 550....................................................................................26, 27

Del. Code Ann. Title 6, § 15-306 (West 2015)..........................................................26, 27

**Preliminary Statement**

Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC," with

Merkin, "Merkin Defendants," and collectively with Ascot Partners and Ascot Fund,[1]

"Defendants") respectfully submit this memorandum of law in support of their motion for

summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made

applicable to this proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure.

On August 12, 2014, the Court dismissed nine of the thirteen claims asserted by Plaintiff

Irving H. Picard (the "Trustee"), as Trustee for the Liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS").  Specifically, the Trustee's claims against the Defendant Funds for

constructive fraudulent conveyance under the Bankruptcy Code and constructive and actual

fraudulent conveyance under the New York Debtor and Creditor Law were barred by Section

546(e) of the Bankruptcy Code because the Trustee's Third Amended Complaint did not and

could not allege that the Merkin Defendants or the Defendant Funds had actual knowledge that

Bernard Madoff ("Madoff") was operating a massive Ponzi scheme at BLMIS and not engaging

in securities transactions.  In fact, at the oral argument on that motion, the Trustee's counsel

conceded that he "d[id]n't think he [Merkin] thought it was a Ponzi scheme."  (Transcript, Picard

v. Merkin, Adv. Proc. No. 09-01182 (SMB), Apr. 30, 2014, at 50:24-25.)  The Trustee's claim to

equitably disallow the Defendant Funds' customer claims in the SIPA proceeding was similarly

dismissed for failure to state a claim, because no such claim exists.  The Trustee thereafter settled

---

[1]     Ascot Partners, L.P. is referred to herein as "Ascot Partners," Ascot Fund Limited is referred to as "Ascot Fund," and Ascot Partners and Ascot Fund are referred to collectively as "Ascot."  The "Funds" include Ascot Partners, Ascot Fund, Gabriel Capital, L.P. ("Gabriel") and Ariel Fund Limited ("Ariel").  On June 23, 2015, the Court approved the Settlement Agreement between the Trustee and Bart M. Schwartz, as Receiver for Gabriel and Ariel.  As a result of that Settlement Agreement, Gabriel's and Ariel's net equity claims have been allowed in full and those funds have been dismissed from this litigation.

with Gabriel and Ariel, which included allowing in full their customer claims in the amount of

$163 million and $175 million, respectively.

The Trustee's remaining claims are to avoid and recover as actual fraudulent

conveyances the funds Ascot Partners withdrew from its BLMIS account within two years of the

commencement of the BLMIS SIPA proceeding and to collect all or a portion of those amounts,

to the extent not satisfied by Ascot Partners, from the Merkin Defendants either as alleged

subsequent transferees or because Merkin was the general partner of Ascot Partners. As an

alternative to its damage claims, the Trustee seeks equitable subordination of Ascot Partners'

customer claim in the SIPA proceeding.

All of the Trustee's remaining claims require him to prove, at a minimum, that

Defendants were "willfully blind" to Madoff's Ponzi scheme. Those claims should now be

dismissed because the evidence adduced during discovery – which included document

productions totaling more than 15 million pages, 33 fact depositions and 7 expert depositions –

leaves no doubt that, far from being willfully blind to the fraud, the Merkin Defendants

conducted extensive due diligence on Madoff and, like the SEC and thousands of other

sophisticated investors, were duped by Madoff in the biggest financial crime in history.

In other cases, the Trustee has alleged improprieties by fund managers who invested with

Madoff. By contrast, there are no such allegations in this case: There is not a single allegation

that Merkin ever received a payment from Madoff or BLMIS; not a single allegation that Merkin

had an account separate from the Funds that earned higher returns; not a single allegation that the

Funds' accounts earned outsized annual returns of approximately 100 percent or more; and not a

single allegation that Merkin requested or caused Madoff to backdate trades or direct winning or

losing trades at different points in time.

There is no genuine dispute that Merkin's extensive due diligence and monitoring of the Funds' investments with BLMIS included regular meetings and conversations with Madoff about Madoff's trading strategy and performance, multiple meetings that Merkin arranged and attended for sophisticated investors in Ascot to meet with Madoff as part of their due diligence on Ascot, numerous conversations and meetings with other Madoff investors as well as customers of Madoff's market making business, and Ascot Partners' receipt of trade confirmations from BLMIS of every purported trade in its account, which were reviewed by GCC's back office employees and input into a portfolio management system, which was reviewed by Merkin every night. Tellingly, *Merkin and his family had more than $110 million of their personal net worth exposed to Madoff through their investments in the Defendant Funds*. That enormous personal exposure alone defeats any notion that Merkin suspected that Madoff was committing a massive fraud and deliberately chose not to investigate it. *See infra* Point I.

Dismissal of the fraudulent conveyance claim against Ascot Partners also requires dismissal of the successor liability claim against the Merkin Defendants and the general partner liability claim against Merkin because those claims are derivative of, and dependent on, the Trustee's fraudulent conveyance claim against Ascot Partners. Even if the Trustee were to succeed on his fraudulent conveyance claim, the subsequent transferee and general partner liability claims still should be dismissed because there can be no dispute that Ascot Partners has more than sufficient assets to satisfy the primary liability. *See infra* Point II. And the Trustee's equitable subordination claim fails because there is no evidence that Defendants engaged in gross and egregious conduct. *See infra* Point III.

-3-

## Statement of Facts[2]

A.    BLMIS And The Madoff Ponzi Scheme

Prior to December 11, 2008, Madoff was a legend on Wall Street.  SOF ¶ 84.  Madoff

served as the chairman of NASDAQ and a director of the National Association of Securities

Dealers for many years, regularly met with industry leaders at the SEC and testified before

Congress.  SOF ¶¶ 79, 81.  Doing business with sophisticated customers such as Charles Schwab

and Fidelity, BLMIS broke the NYSE's monopoly on Big Board trading, and was estimated to

trade more than 10% of the total daily volume of the NYSE and an even higher percentage of the

trading of the stock of the largest companies.  SOF ¶¶ 82, 84, 175.  In 1999, BLMIS entered into

a joint venture with the major Wall Street firms, Goldman Sachs, Morgan Stanley, Salomon

Smith Barney, and Merrill Lynch, to establish the first electronic platform to trade stocks listed

on the New York Stock Exchange, American Stock Exchange, and NASDAQ.  SOF ¶ 106.

BLMIS registered with the SEC as an investment advisor in 2006, and in 2008 reported

approximately $17.1 billion in assets under management.  SOF ¶¶ 21-22.

On December 11, 2008, Madoff shocked Wall Street when he turned himself in and

admitted to having operated a massive Ponzi scheme for decades.  SOF ¶¶ 1, 37.  The BLMIS

fraud, which began at least as far back as the 1970s, is widely considered to be the largest in U.S.

history.  SOF ¶ 34; Dubinsky Report ¶ 18.  Over the years, Madoff conspired with than a dozen

of his employees, all of whom painstakingly carried out his fraudulent business.  SOF ¶ 35;

---

[2]    This Statement of Facts is supported by the undisputed facts and supporting evidence cited in the Joint
Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1 in Support of Defendants' Motions
for Summary Judgment, submitted herewith.  For purposes of this motion only, the Merkin Defendants
address in this Statement of Facts certain allegations made by the Trustee that are disputed or for which the
Trustee has no evidence, but even if established as true would not give rise to a genuine, material factual
dispute warranting a trial, and the Merkin Defendants reserve the right to challenge such unsubstantiated
allegations.  Similarly, the Merkin Defendants intend to move in limine to exclude the testimony of some or
all of the Trustee's purported expert witnesses in accordance with the deadlines set forth in the Tenth Case
Management Order, but address the opinions as well as the admissions made by the Trustee's proffered
experts as though such testimony is admissible for purposes of this motion only.

Dubinsky Report ¶¶ 48-75.  Madoff and his employees created custom-written software that "mimicked and back-filled the output that normally would be the result of trades actually being executed by a system using trading algorithms," and provided customers with hundreds of thousands of falsified customer statements and trade confirmations in furtherance of the fraudulent scheme.  SOF ¶¶ 31-33; Dubinsky Report ¶¶ 221, 224.  Madoff successfully solicited billions of dollars from some of the most sophisticated investors in the world, including JPMorgan, Deutsche Bank, and BNP Paribas.  SOF ¶¶ 36, 39-41.  In the end, Madoff deceived investors and regulators for more than 30 years until the 2008 financial crisis made his elaborate scheme unsustainable.  SOF ¶ 37; Ex. 3 (Dubinsky Dep.) at 87:24-88:3.

B.    Ascot Partners' Investments With BLMIS

Ascot Partners is a Delaware limited partnership formed to operate as a private investment partnership for U.S. investors.  SOF ¶¶ 42, 44.  Ascot Fund is a Cayman Island corporation whose investors are exclusively non-U.S. persons and certain tax-exempt U.S. persons.  SOF ¶¶ 43, 45.  Prior to 2003, Ascot Partners and Ascot Fund were operated as stand-alone entities.  SOF ¶ 46.  On January 1, 2003, Ascot Partners and Ascot Fund were reorganized into a "master-feeder" structure in which Ascot Fund invested all of its assets in Ascot Partners.  SOF ¶ 47.  Prior to the appointment of Receivers in 2009, Merkin was the general partner of Ascot Partners.  SOF ¶ 48.

All investors in Ascot Partners and Ascot Fund invested pursuant to an Offering Memorandum and signed Subscription Agreements and related documents in connection with their investments.  SOF ¶ 53 (Ascot Partners SA (Ex. 13); Ascot Fund SA (Ex. 14)).  At all relevant times, as permitted by its Offering Memoranda and Limited Partnership Agreement, Ascot Partners invested a significant portion of its assets, and as of December 2008 had invested

substantially all of its assets, in a brokerage account with BLMIS.[3]  SOF ¶ 59.  Madoff was

delegated discretion to trade equity and option securities on Ascot Partners' behalf in that

account.  SOF ¶ 61.

   The Trustee concedes that Ascot Partners is a substantial "net loser" in Madoff's fraud.

SOF ¶¶ 72-73; Ex. 6 at ¶ 95, Exs. 3D, 4P (expert report of Matthew B. Greenblatt); Ex. 5

(Greenblatt Dep.) at 78:12-79:3.  Specifically, the Trustee acknowledges that Ascot had net

equity in its BLMIS account of at least $226 million as of December 11, 2008.  SOF ¶ 64.  The

Ascot Receiver, on the other hand, claims net equity of more than $560 million, giving full credit

to the intra-account transfer from Ascot Fund to Ascot Partners in connection with the "master-

feeder" reorganization in January 2003, and net equity of $235,734,338 utilizing the Trustee's

methodology for intra-account transfers.  SOF ¶ 65.

   The approximately $9.7 million difference in the Trustee's and the Ascot Receiver's

calculation of net equity using the Trustee's methodology is attributable to a purported transfer

of $9.7 million worth of securities from Shalvah Fund to Ascot Fund in 1992 when Shalvah

Fund closed its account and became an investor in Ascot Fund.  SOF ¶ 66.  Even though Shalvah

Fund had net equity in its account of $9.7 million at the time of the transfer, and the Trustee

would have credited that amount to Ascot Fund had the purported transfer been of cash, the

Trustee refuses to give any credit for that transfer because it purported to be of a specifically

identified but fictitious security.  SOF ¶¶ 67-68; Ex. 5 (Greenblatt Dep.) at 89:2-19.  As a result,

the Trustee credits Ascot Partners $9.7 million less than his own methodology requires for the

2003 transfer from Ascot Fund to Ascot Partners.  *See* Ex. 5 (Greenblatt Dep.) at 89:6-19.

---

[3]     The Ascot Offering Memoranda explicitly identified Madoff as a principal prime broker and custodian of
the Fund in two places.  SOF ¶ 54; Ex. 15 (Ascot Partners OM) at 8, 28; Ex. 17 (Ascot Fund OM) at 13, 31.

C.    Merkin Defendants' Thorough Due Diligence

The Merkin Defendants' expert, Jeffrey Weingarten – a former senior executive of Goldman Sachs and successful hedge fund manager – explained that there is no set formula for due diligence; rather, a fund manager should develop an understanding of five essential characteristics before making a determination of whether to invest or maintain an investment. Weingarten described those characteristics as Philosophy, Process, Procedures, People and Performance. SOF ¶¶ 129, 135; Ex. 11 (Weingarten Report) at 2. The Trustee's purported expert, Steve Pomerantz, agreed with Weingarten's framework. SOF ¶ 129; Ex. 9A (Pomerantz Rebuttal Report) at ¶ 6; Ex. 9 (Pomerantz Dep.) at 39:19-23. After an exhaustive review of relevant documents and testimony, Weingarten concluded that "the due diligence performed by [the Merkin Defendants] met or exceeded industry standards." SOF ¶¶ 135-36; Ex. 11 (Weingarten Report) at 2.

Before investing with Madoff, Merkin was well aware of Madoff's reputation as a leading market maker, understood the regulatory structure governing Madoff's operations, and knew that the SEC and other regulators reviewed Madoff's business. SOF ¶¶ 78, 83-84; Ex. 85 (Merkin Dep., *In the Matter of Madoff Charities Investigation*, Jan. 30, 2009) at 9:5-10:14; 128:21-134:3. Merkin also had conversations with a number of sophisticated investors who were clients of Madoff and had accounts with BLMIS, concerning Madoff's reputation, trading strategy and risks. Those investors included Leon Meyers (at the time the manager of the Scheuer family office), Sandra Manske (at the time a senior executive of the Tremont funds and later the founder of the Maxam funds), David Gottesman (the founder of First Manhattan Corporation and a director of Berkshire Hathaway), Gedale Horowitz (who at the time ran Salomon Brothers' municipal bond department), and Daniel Hoffert (a successful Wall Street investor), all of whom spoke very highly of Madoff and his investment strategies. SOF ¶ 85; Ex.

-7-

85 (Merkin Dep., *In the Matter of Madoff Charities Investigation*, Jan. 30, 2009) at 9:5-10:14,
128:21-134:3; Ex. 84 (Merkin Dep.) at 147:11-16, 153:17-22, 154:11-156:9, 183:2-9, 255:25-
256:20; Ex. 10 (Weingarten Dep.) at 117:17-118:24.  Merkin also had conversations with
customers of BLMIS's market-making operations.  SOF ¶ 86.  And Merkin discussed Madoff
with his father, Hermann Merkin (a successful businessman and investor), who told his son that
"I know Bernie, and he's okay," which Merkin understood to be high praise coming from his
father.  SOF ¶¶ 88-89; Ex. 84 (Merkin Dep.) at 147:20-148:1, 149:15-150:7.

In addition, prior to investing with Madoff, Merkin met with Madoff in Madoff's offices,
and discussed Madoff's trading strategies as well as Madoff's market-making activities.  SOF ¶
90.  Madoff also explained that BLMIS operated a significant wholesale business, in which its
customers included Charles Schwab and Fidelity.  SOF ¶ 91.  They also discussed Madoff's and
Madoff's brother's involvement in industry affairs.  SOF ¶ 92.  As Merkin understood, Madoff at
that time had a sterling reputation and his firm was a very dominant market maker with an
extraordinary share of the trading in certain NYSE stocks, particularly heavily traded, large cap
stocks.  Indeed, Madoff subsequently became the chairman of NASDAQ.  SOF ¶¶ 80, 84.

Merkin first invested with Madoff and BLMIS through Meyers and the Scheuer family's
account with Madoff.  SOF ¶ 93; Ex. 84 (Merkin Dep.) at 149:11-14, 152:3-153:22.  After a
period of time and gaining additional comfort with Madoff and his trading strategies, Merkin
thereafter opened managed accounts with BLMIS on behalf of the Funds and delegated trading
authority over those accounts to Madoff.  SOF ¶ 94.

After the Defendant Funds began investing with Madoff, and throughout the more than
15 years they maintained their BLMIS accounts, Merkin had meetings and telephone calls with
Madoff approximately 10 to 15 times per year to discuss Madoff's strategy, upside potential,

-8-

downside risks, execution, and any issues that arose. SOF ¶ 100; Ex. 85 (Merkin Dep., *In the*

*Matter of Madoff Charities Investigation*, Jan. 30, 2009) at 9:5-10:14; 128:21-134:3.; Ex. 84

(Merkin Dep.) at 115:12-15, 147:11-16, 153:17-22, 154:11-156:9, 183:2-9, 186:8-187:1, 212:8-

213:6, 255:25-256:20, 428:18-231:13; Ex. 14 (Weingarten Dep.) at 117:17-118:24.  The Trustee

acknowledges that those conversations included discussions of relevant developments in the fund

industry, such as the revelation of the Bayou Ponzi scheme.  SOF ¶ 166 (citing TAC ¶ 93).

As an additional part of his due diligence on and monitoring of Madoff and BLMIS,

Merkin maintained a file that included newspaper articles and profiles of Madoff, notes of

certain of his meetings with Madoff, and information concerning other funds that had significant

investments with Madoff and BLMIS.  For example, Merkin reviewed and retained a 1989

article from *Forbes* describing how BLMIS made markets in 250 of the largest, most actively

traded stocks and identifying some of its biggest customers, including A.G. Edwards, Charles

Schwab, and Fidelity.  SOF ¶¶ 82, 102.  Another *Forbes* article, from 1992, similarly described

Madoff and his firm as one of the biggest of the new age traders on Wall Street who were

competing with the New York Stock Exchange for trades, and an April 1993 *International*

*Herald Tribune* likewise discussed how Madoff was gaining the upper hand in a competition

with the New York and American Stock Exchanges.  SOF ¶ 103.  Other articles reviewed and

retained by Merkin included one published in MARHedge and another in Barron's in 2001.  SOF

¶ 104; Ex. 21 (*MARHedge*, May 2001) at 3; Ex. 25 (Erin E. Arvedlund, "Don't Ask, Don't Tell,"

*Barrons*, May 6, 2001).  And a very significant *New York Times* article from 1992 discussed the

United States Securities and Exchange Commission's ("SEC") investigation into unregistered

notes being marketed by Avellino & Bienes, a Florida accounting firm, and reported on the

SEC's relief that all of the money that had been raised from the sale of the notes -- $440 million -

-9-

- had been deposited in an account with BLMIS and managed by Madoff, and was able to be liquidated and returned to the note purchasers almost immediately.  SOF ¶ 105.

Moreover, Madoff was widely credited with breaking the New York Stock Exchange's hegemony over Wall Street trading.  Thus, by 1999 -- as reflected in *New York Times* and *Wall Street Journal* articles that Merkin read and retained in his file -- BLMIS entered into a joint venture with Goldman Sachs, Morgan Stanley, Salomon Smith Barney, and Merrill Lynch to establish the first electronic trading platform for NYSE stocks.  SOF ¶ 106.  That those four well-established Wall Street firms were willing to enter into a joint venture with BLMIS further enhanced Madoff's reputation and provided additional comfort to Merkin.  SOF ¶ 106.  Moreover, as Merkin knew, Madoff frequently met with industry leaders at the SEC and regularly testified in Congress about developments in the securities industry and the ongoing transformation of the U.S. financial markets.  SOF ¶ 81.

Merkin knew that the SEC repeatedly examined and inspected BLMIS, including in 1992, 2006, and 2007, without raising any significant regulatory issues with his operations.  SOF ¶ 98; Ex. 84 (Merkin Dep.) at 157:16-158:22, 181:9-22, 188:20-189:13, 213:7-23; *see also* Ex. 24 (Binyamin Appelbaum, *Madoff Case 'Failures' Put SEC In Spotlight*, WASH. POST, Dec. 19, 2008) at A1.  As the SEC Office of Investigations acknowledged, "the fact the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him."  SOF ¶ 99; Ex. 34 (OIG Report) at 25.

Furthermore, the Funds had Trading Authorization Directives with BLMIS that defined the boundaries within which Madoff was allowed to trade, and had complete transparency to Madoff's purported trading.  SOF ¶¶ 61, 94.  The Funds received written confirmations of each

-10-

trade on a daily basis, which GCC employees entered into GCC's portfolio management system.

SOF ¶¶ 109, 111; Ex. 90 (Achilarre Dep.) at 32:8-33:6, 95:9-22, 96:18-97:13; Ex. 91 (Autera

Dep.) at 177:18-178:15; Ex. 96 (Gordon Dep.) at 12:21-14:4, 44:22-45:15, 48:21-49:5; Ex. 94

(Hess Dep.) at 86:6-87:18, 89:17-90:19, 113:2-9.  The system, in turn, generated profit-and-loss

reports that Merkin reviewed on a daily basis.  SOF ¶ 112; Ex. 84 (Merkin Dep.) at 168:5-

169:21, 201:15-16, 445:19-446:6.  Each month, the Funds received monthly statements from

Madoff, which GCC employees reviewed and reconciled against GCC's books and records.

SOF ¶ 113; Ex. 90 (Achilarre Dep.) at 34:22-24, 45:6-21; Ex. 84 (Merkin Dep.) at 232:6-239:13.

Merkin arranged for many investors in the Funds, at their request, to meet with Madoff.

For example, Merkin twice took representatives from Union Bancaire Privee ("UBP") – a

sophisticated Swiss bank and the largest single investor in Ascot, which had a total investment of

more than $487 million as of November 30, 2008 and net capital investments of $380 million

across several different accounts in both the domestic and offshore funds – to meet with Madoff

as part of their own due diligence.  SOF ¶¶ 139-41; Ex. 87 (Merkin Dep., *State of N.Y. v. Merkin*,

July 10, 2010) at 20:9-18.  One of these meetings was on November 25, 2008 and included

Madoff, Merkin, GCC's chief financial officer, Michael Autera, and a team of four people from

UBP.  SOF ¶ 142; Ex. 91 (Autera Dep.) at 164:20-170:24.  Following that meeting, UBP decided

to continue to invest hundreds of millions of dollars in Ascot.  SOF ¶ 143.

On another occasion, Merkin took an employee of another Swiss bank, Reichmuth & Co.,

as well as a representative from "Research Company A," to meet with Madoff.  SOF ¶ 144.

"Research Company A" is not a research firm, but an investment advisor that represented several

potential investors in Ascot.  As part of that firm's due diligence, it not only spoke to Merkin and

met with Madoff, but also reviewed several years' worth of BLMIS statements and trade

confirmations in Merkin's office. SOF ¶ 145. The clients advised by Research Company A

invested at least $20 million in Ascot following June 2003 conversations with Merkin and

maintained those investments through the time of Madoff's confession. SOF ¶ 146. Other

sophisticated investors for whom Merkin arranged and with whom Merkin participated in due

diligence meetings with Madoff included Gedale Horowitz, Ludwig Bravmann, Alec Hackel,

Christof Reichmuth, Patrick Erne, and Roman Igolnikov and others from Union Bancaire Privee.

SOF ¶¶ 150-52.

In addition, BDO Seidman, LLP ("BDO"), the fifth-largest accounting firm in the

country and a recognized leader in the audits of hedge funds, had a team of employees audit each

of the Funds every year for approximately six weeks at GCC's offices. SOF ¶¶ 115-17; Ex. █

█ at 26:2-9, 138:2-15; Ex. 90 (Achilarre Dep.) at 86:6-8. Defendants provided BDO

complete access to all requested documentation, including copies of Madoff's trading

confirmations and monthly statements, and access to GCC's books and records. SOF ¶ 121; Ex.

█ at 91:22-92:3, 104:6-105:2, 105:19-106:3, 164:2-5, 167:15-20; Ex. █

█ at 117:15-19; Ex. 84 (Merkin Dep.) at 191:16-193:11. Thus, BDO's yearly

audits of the Funds included a review of Madoff's trading activity for the Funds, confirmation of

the Funds' account balances with Madoff and review of Madoff's auditor's statement of internal

controls as deemed necessary by BDO. SOF ¶ 118.

BDO was well aware that Ascot had invested a significant portion of its assets in a

managed account with Madoff. SOF ¶ 120; Ex. █ at 163:17-167:1. BDO did not

see any BLMIS trades listed outside the possible range, confirmed the balances in the Madoff

accounts directly with Madoff's SEC registered broker-dealer, never expressed concerns about

any of the materials reviewed from or about Madoff, never raised an issue about Madoff's use of

-12-

Friehling & Horowitz as its auditor, and never suspected that BLMIS was operating a fraud.

SOF ¶¶ 122-26; Ex. ███████████ at 89:3-7, 89:25-90:4, 135:16-25, 164:6-21, 170:20-24,

175:5-8. To the contrary, BDO referred investors to Ascot knowing it was a "Madoff feeder

product." SOF ¶¶ 127; Ex. 84 (Merkin Dep.) at 600:24-601:10.

The Funds also promptly received payments for hundreds of millions of dollars in

redemptions whenever requested over a 15-year period. SOF ¶¶ 107-08. Perhaps most

significantly, at the time of Madoff's confession, Merkin and his family lost more than $110

million as a result of their own personal investments with Madoff (through the Funds). SOF ¶

159; Ex. 84 (Merkin Dep.) at 635:23-636:7.

D.    The Trustee's Misguided Contentions

Notwithstanding these extensive due diligence efforts, the Trustee contends that the

Merkin Defendants, and by imputation Ascot Partners, willfully turned a blind eye towards

Madoff's fraud and deliberately chose not to investigate circumstances that indicated a high

probability of fraud. The Trustee's theory is based almost exclusively on a laundry list of

generic purported "red flags" about Madoff that – to the extent they actually existed – were

equally available to Madoff's thousands of other customers.

For example, the Trustee asserts that the trade confirmations issued by BLMIS reflected

several hundred transactions (out of the tens of thousands of transactions in the Funds' accounts)

that occurred outside of the daily high-low price range for the stock at issue. TAC ¶ 169. But

the Trustee's expert, Steve Pomerantz, conceded during his deposition that he personally never

reviewed individual trade confirmations or compared securities transactions to the reported daily

high-low price range as part of any due diligence he ever conducted on another investment

advisor. SOF ¶¶ 131-32, 195; Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-20. Even worse,

Pomerantz admitted that the hundreds of supposed "outside the range" trades were the result of

-13-

his manipulation of the actual trade confirmations – adjusting every pre-2006 transaction by four cents per share – and that in the absence of his adjustments (and a few other errors in his calculations) there would be virtually no trades outside of the reported high-low range.  SOF ¶ 130, 169; Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-234:17.  Pomerantz further acknowledged that his manipulation of the trade data similarly impacted his analysis of volume weighted average price ("VWAP"), further undermining another of the Trustee's alleged red flags, that Madoff consistently sold securities for the Funds too near the daily highs and bought too near the daily lows.  SOF ¶ 170; Ex. 9 (Pomerantz Dep.) at 234:20-240:17.

Pomerantz's after-the-fact "expert" opinion that Madoff's trade execution was a red flag is fatally undermined by his own involvement in performing due diligence on a Madoff feeder fund prior to Madoff's confession.  Pomerantz admitted in his deposition that he personally was responsible for due diligence on behalf of a $200-$350 million fund of funds that had a $20 million investment in a Madoff feeder fund, which it maintained through Madoff's confession on December 11, 2008.  While Pomerantz now claims to have believed Madoff was operating a fraud, he conceded that in his meetings with investors and potential investors conducting due diligence on the fund of funds he never expressed the opinion that Madoff was a fraud or that his returns were too good to be true.

The Trustee likewise persists in claiming that the volume of options purchased or sold for the Funds' BLMIS accounts, in comparison to the reported volume on the Chicago Board Options Exchange, was a red flag that Merkin failed to investigate.  TAC ¶ 179.  But the undisputed evidence is that Merkin discussed options volume with Madoff and was told that Madoff conducted a substantial part of the options trading in the over-the-counter market.  SOF ¶ 172; Ex. 84 (Merkin Dep.) at 173:14-174:2, 203:12-205:16.  And it is undisputed that the volume

-14-

of options traded over-the-counter is unknown and unreported, but believed to far exceed the volume on the exchange.  Ex. 84 (Merkin Dep.) at 309:23-314:22.

The Trustee also contends that the lack of volatility on the returns for the BLMIS account was another red flag.  Another of the Trustee's experts, however, admitted that a higher Sharpe ratio (a measure of lack of volatility) was generally considered a positive, not a negative, and that in any event a Sharpe ratio should not be considered in isolation.  SOF ¶ 187; Ex. 7 (Hirsch Dep.) at 86:20-87:7.  And many successful hedge funds have high Sharpe ratios, including Elliot Associates, Millennium Partners, Soros, Renaissance Medallion Fund, SAC Capital, Baupost, SMN Diversified Futures Fund, Eclectica Fund, Episode Inc., Princeton/Newport and Ridgewood.  SOF ¶ 186; Ex. 7 (Hirsch Dep.) at 87:1-18; Ex. 12 (Weingarten Rebuttal Report) at 4; Ex. ████████ at 159:17-19.  Hirsch also acknowledged that reverse engineering of a fund's strategy is not standard due diligence procedure.  SOF ¶ 133; Ex. 7 (Hirsch Dep.) at 63:22-64:14.

The Trustee's assertion that the fact that BLMIS self-cleared was a red flag is similarly misplaced.  TAC ¶ 103.  Here, too, that supposed red flag was known or available to virtually all of Madoff's investors.  The evidence established that Madoff's self-clearing was not a cause for concern because he was operating an SEC-registered broker-dealer, not a hedge fund or pooled investment vehicle, and Goldman Sachs, Morgan Stanley and other brokerage firms regularly cleared their own managed accounts.  SOF ¶ 174; Ex. 90 (Achilarre Dep.) at 36:2-7, 59:24-60:4; Ex. 84 (Merkin Dep.) at 411:24-412:15.  Given that his market making business handled more than 10 percent of the volume of stock traded on the New York Stock Exchange, it would have been surprising if Madoff did not clear his own trades.  SOF ¶ 175; Ex. 86 (Merkin Dep., *State of N.Y. v. Merkin*, Mar. 4, 2010) at 411:24-412:15.  Indeed, Pomerantz admitted that in his business

dealings with Goldman Sachs, he was not concerned that it self-cleared because "Goldman Sachs is a large entity" with a well-known brand, and he goes to Goldman Sachs's offices periodically and that he meets with a lot of people.  SOF ¶¶ 194, 197; Ex. 9 (Pomerantz Dep.) at 59:21-60:10, 61:24-62:12.  The exact same was true of Merkin's dealings with BLMIS.

The Trustee's few Merkin-specific allegations fare no better.  The Trustee contends that in the early 1990s a former GCC employee, Victor Teicher, "warned Merkin about investing with BLMIS" and told Merkin that BLMIS "could be a Ponzi scheme."  (TAC ¶¶ 101-105.) Teicher himself does not remember ever saying that BLMIS might be a Ponzi scheme, and Merkin denied that Teicher ever said that.  SOF ¶ 199; Ex. 106 (Teicher Dep.) at 119:12-17; Ex. 84 (Merkin Dep.) at 493:10-14.  And the employee who supposedly overhead the comment, Jack Mayer, explained that Teicher's concerns about Madoff lessened over time.  SOF ¶ 200; Ex. 99 (Mayer Dep.) Tr. at 71:10-21.  Moreover, Teicher also explained that he never analyzed or attempted to understand Madoff's strategy; rather, his concerns stemmed from Madoff's name and the fact that his office was in the Lipstick building.  SOF ¶ 201; Ex. 107 (Teicher Dep., *New York Univ. v. Ariel Fund Ltd.*, Feb. 9, 2009) at 74:10-75:15.  As another money manager, ███████ ████████████████████ explained, a lack of understanding of a strategy often leads some people to leap to speculate that it is fraud, even when it is not.  SOF ¶ 188; Ex. ████ ██████████████ at 118:2-8 ("I've also – by the way, it's possible I might have heard things like front running or insider trading or Ponzi scheme with Steve Cohen.  I mean, when people don't understand certain investment techniques skepticism arises and from there you get all kinds of people sometimes making connections correctly or incorrectly.").

Nor does the evidence support the Trustee's contention that Merkin "conceded that BLMIS might be a Ponzi scheme in a 2003 meeting between Merkin and Research Company A,"

when Merkin "quipped that 'Charles Ponze [*sic*] would lose out because it would be called the

'Madoff Scheme.'" TAC ¶¶ 94-95; SOF ¶ 202. The founder of Research Company A denied

that Merkin suggested that he thought Madoff was engaged in a fraud. SOF ¶ 203. Most

tellingly, following that conversation, the clients of Research Company A invested at least $20

million in Ascot to gain exposure to Madoff, and maintained that investment through the time of

Madoff's confession. SOF ¶ 146. The Trustee cannot square the undisputed facts of that

significant investment with his desperate theory that Merkin told Research Company A that

BLMIS could be a Ponzi scheme.

Finally, the Trustee asserts that Merkin said in one telephone call with Madoff that he

told another Madoff investor that if Madoff did not like his questions then he should not ask so

many questions. TAC ¶ 151. Putting aside the question whether Merkin ever told another

Madoff investor not to ask too many questions of Madoff, the undisputed evidence in this case is

that Merkin regularly spoke and met with Madoff, asked and received answers to every question

he had, and accompanied other sophisticated investors with hundreds of millions of dollars

invested with BLMIS through Ascot on their due diligence visits during which all of their

questions were satisfactorily answered. SOF ¶¶ 85, 100-01, 142, 144-45, 150-52.

## Argument

Summary judgment dismissing the Trustee's remaining claims is appropriate here

because there is "no genuine dispute as to any material fact and the [Merkin Defendants are]

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also F.D.I.C. v. Great Am.

Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) ("To defeat a summary judgment motion, the non-

moving party 'must do more than simply show that there is some metaphysical doubt as to the

material facts.'") (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)). The factual record adduced through discovery leaves no doubt that the Trustee "has

-17-

failed to make a sufficient showing on an essential element of [his] case with respect to which

[he] has the burden of proof" at trial – namely his claim that Defendants were willfully blind to

Madoff's massive Ponzi scheme.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## POINT I

### THE TRUSTEE CANNOT PREVAIL ON HIS AVOIDANCE CLAIM BECAUSE THE MERKIN DEFENDANTS WERE NOT WILLFULLY BLIND TO THE MADOFF FRAUD

The Trustee's sole remaining claim for monetary damages against Ascot Partners is to

avoid and recover alleged actual fraudulent conveyances under Section 548(a)(1)(A) of the

Bankruptcy Code.  That Section allows the Trustee to avoid transfers that BLMIS "made during

the two years prior to bankruptcy 'with actual intent to hinder, delay, or defraud any' of its

creditors."  11 U.S.C.A. § 548(a)(1)(A); *see also Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y.

2011).  The Trustee cannot, however, avoid or recover transfers under Section 548(1)(A) where,

as here, the transferee "takes for value and in good faith."  *See* 11 U.S.C.A. § 548(c).  There is no

dispute that all of Ascot Partners' withdrawals from its BLMIS account were taken "for value"

because all withdrawals in Ascot Partners' history were partial withdrawals of principal from its

BLMIS accounts.  *See Katz*, 462 B.R. at 453.  As the Trustee concedes, Ascot Partners (like

Gabriel and Ariel) at all times maintained positive net equity in its BLMIS account and was one

of the biggest net losers in the Madoff fraud, having deposited into its BLMIS account over $225

million more than it ever withdrew.[4]  Hence, the only issue that must be decided on the

avoidance claim is whether the alleged fraudulent transfers were received in good faith, which

boils down to whether Defendants made the withdrawals from Ascot Partners' BLMIS account

---

[4]    Ascot Fund's ending net equity balance was exactly zero, because the amount of its net equity was transferred and credited to Ascot Partners when it closed its BLMIS account and became a feeder fund into Ascot Partners on January 1, 2003.

-18-

"without their having willfully blinded themselves to Madoff's scheme." *See* Trial Order at 1,

*Picard v. Katz*, 11 Civ. 3605 (JSR), (S.D.N.Y. Mar. 14, 2012) ECF No. 177.

As the Court explained in granting in part and denying in part Defendants' motions to

dismiss, to establish "willful blindness" the Trustee must prove that Defendants (i) "subjectively

believe[d] that there is a *high probability* that a fact exists" and (ii) "t[ook] deliberate actions to

avoid learning of that fact." Memorandum Decision at 27, Aug. 12, 2014, ECF No. 212 (citing

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)); *see* Transcript, *SIPC v.*

*Bernard L. Madoff Inv. Sec. LLC*, at 3 (Oct. 12, 2012) (Rakoff, J.) ("Essentially, with a very

slight massaging, the [standard] is a test set forth in *Global-Tech Appliances, Inc. v. SEB S.A.*,

131 S. Ct. 2060, 2070,  a 2011 decision of the Supreme Court.").  "Under this formulation, a

willfully blind defendant is one who takes *deliberate actions* to avoid confirming a high

probability of wrongdoing and who can almost be said to have actually known the critical facts."

*Global-Tech*, 131 S. Ct. at 2070-71 (emphasis added); *see Katz*, 462 B.R. at 455.  Notably,

willful blindness exists "only where it can almost be said that the defendant actually knew," and

therefore requires more than a showing of "merely a known risk" or "'deliberate indifference'"

to the risk.  *Global-Tech*, 131 S. Ct. at 2071; *see United States v. Fofanah*, 765 F.3d 141, 151 n.2

(2d Cir. 2014) (noting that the *Global-Tech* inquiry asks whether a defendant "deliberately

shield[ed] themselves from clear evidence of critical facts that are strongly suggested by the

circumstances") *cert. denied*, 135 S. Ct. 1449 (2015).

The Trustee's contention that Ascot Partners' withdrawals from its BLMIS account were

not made in good faith rests solely on the alleged willful blindness of Merkin, who was the

general partner of Ascot Partners at all relevant times.  As explained in detail above, the evidence

adduced through discovery demonstrates that, far from being willfully blind to Madoff's fraud,

Merkin conducted extensive due diligence on Madoff.  That due diligence and monitoring

included regular conversations and meetings with Madoff; accompanying many sophisticated

Ascot investors on their own due diligence meetings with Madoff; and tracking and monitoring

the Ascot portfolio on a daily basis.  SOF ¶ 111-12, 138, 141-42.  Indeed, it is undisputed that

Merkin had every incentive to monitor and oversee the Merkin Funds' investments with Madoff,

because Merkin believed that he and his family personally had more than $110 million invested

with BLMIS through their investments in the Funds.  SOF ¶ 159.

The generic purported "red flags" on which the Trustee relies were all widely known or

available to regulators, auditors, and virtually all of Madoff's thousands of other customers,

including dozens of other sophisticated investors.  These "red flags" have been virtually

universally rejected as insufficient as a matter of law to plead that an investment advisor was

reckless in investing funds in a managed account at BLMIS.  *See, e.g.*, *In re Merkin & BDO

Seidman Sec. Litig.*, 817 F. Supp. 2d 346, 356 (S.D.N.Y. 2011) ("[I]t is now well-established that

Madoff cleverly leveraged his considerable reputation in order to perpetrate his massive fraud,

for many years, without detection by some of the most sophisticated entities in the financial

world:  the SEC, Wall Street banks, and the like.  The list of victims that failed to detect

Madoff's fraud is lengthy.").[5]  *A fortiori*, these same generic "red flags" are insufficient to create

a triable issue of fact on the question of whether Merkin was willfully blind to Madoff's fraud.

---

[5]     *See also Newman v. Family Mgmt. Corp.*, 530 F. App'x 21, 26 (2d Cir. 2013) ("Madoff operated this fraud
without being discovered and with only a handful of investors withdrawing their funds as a result of their
suspicions." (internal quotation marks omitted)); *Meridian Horizon Fund, LP v. KPMG (In re Tremont
Secs. Law, State Law & Ins. Litig.)*, 487 F. App'x 636, 641 (2d Cir. 2012) ("'[T]he more compelling
inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his
scheme and deceiving the SEC and other financial professionals.'") (quoting *Meridian Horizon Fund, LP v.
Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (noting that many of the "red
flags" of the Madoff fraud were "plainly disclosed to . . . investors in and auditors of other Madoff feeder
funds, and the SEC, none of whom discovered the Madoff scheme")); *Saltz v. First Frontier, LP*, 782 F.
Supp. 2d 61, 72 (S.D.N.Y. 2010) ("For twenty years, Madoff operated this fraud without being discovered
and with only a handful of investors withdrawing their funds as a result of their suspicions.  An inference of

Even the Trustee's counsel has acknowledged that Madoff's fraud was "unprecedented" and has "stretched far and wide."  SOF ¶ 34; Ex. 33 (Messages from the SIPA Trustee's Chief Counsel, David J. Sheehan (May 18, 2012 and Nov. 7, 2012), *available at* http://www.madofftrustee.com/news-27.html).  In fact, starting from the premise that BLMIS was a Ponzi scheme – and not from the widely held premise prior to December 2008 that BLMIS was a major, SEC-registered broker-dealer run by a well-respected former Chairman of NASDAQ that accounted for a significant percentage of the daily trading on the NYSE – the Trustee's expert Dubinsky testified that it took him and his team of 75-80 experts more than eight months reviewing millions of pages of Madoff's files, at an expense to SIPA of more than $30 million, to reach the conclusion that BLMIS was actually a fraud.  SOF ¶ 18-19; Ex. 4 (Dubinsky Dep.) at 32:6-33:11.

Most of the "red flags" relied upon by the Trustee derive from his expert's analysis of the tens of thousands of trades in Ascot Partners' BLMIS account over more than a decade and supposedly finding hundreds of instances where Madoff purportedly bought or sold securities for Ascot Partners' account outside of the daily high-low range for the stock at issue.  Yet the Trustee's "expert" conceded in his deposition that he *never* performed such a price comparison in any due diligence examination that he conducted.  SOF ¶ 132.  Even worse, Pomerantz admitted that he manufactured virtually all of the pricing discrepancies by "adjusting" every pre-2006 stock transaction by four cents per share from the price reported on the BLMIS trade confirmation.  SOF ¶ 130; Ex. 9 (Pomerantz Dep.) at 226:25-227:9.  That is, Pomerantz

---

scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent.") *aff'd*, 485 F. App'x 461 (2d Cir. 2012); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393, 413-14 (S.D.N.Y. 2010) (Madoff "was a prominent and respected member of the investing community"); *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 370-71 (S.D.N.Y. 2010); *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680 (U.S.), 2010 WL 363844, at *3 (S.D.N.Y. Feb. 2, 2010).

subtracted four cents per share from the purchase price reported on the BLMIS confirmation sent

to Ascot Partners for every stock purchase, and added four cents per share to the sale price

reported on the BLMIS confirmation for every stock sale, and used those "adjusted" prices in his

comparison to the reported daily high-low range and his VWAP analysis. SOF ¶ 130; Ex. 9

(Pomerantz Dep.) at 230:6-23, 234:18-23. Nor did Pomerantz consider that these securities

could have been traded off-exchange.

The few Merkin-specific allegations are refuted by the actual testimony of the quoted

witnesses or simply do not give rise to a genuine dispute as to whether Merkin was willfully

blind to the BLMIS fraud. For example, the Trustee relies heavily on notes taken in June 2003

by an employee of an investment advisor (which the Trustee calls "Research Company A")

regarding a conversation with Merkin in which Merkin allegedly "quipped" that if Madoff were

a fraud "Charles Ponze [*sic*] would lose out because it would be called the 'Madoff Scheme.'"

*See* TAC ¶¶ 95, 98. But the more senior employee of Research Company A who also

participated in the call (as well as Merkin himself) denied that any such statement was made, and

testified at length to the contrary – that Merkin considered Madoff to be a premier money

manager, not someone who was even possibly engaged in a fraud. SOF ¶ 203. Moreover, the

employee who took the notes at issue then spent more than a day in GCC's offices reviewing

BLMIS trade confirmations, and the more senior employee visited Madoff with Merkin as well

as an employee of Reichmuth bank. SOF ¶¶ 144-45. And it is undisputed that Research

Company A's clients invested at least an additional $20 million in Ascot *following* the June 2003

conversation with Merkin and maintained these investments through the time of Madoff's

confession, further discrediting any notion that the notes somehow suggest that Merkin conveyed

a concern that Madoff could be running a Ponzi scheme. SOF ¶ 146; ███████ (Research Company

A Principal Dep.) at 168:14-17.  Thus, as the Court already concluded in granting in part

Defendants' motions to dismiss, if this statement was made at all, it seems "more like [a] joke[]

than [an] acknowledgment[] that BLMIS was a Ponzi scheme."  ECF 212 at 29.

      The Trustee's reliance on Victor Teicher is similarly misplaced.  The Trustee contends

that Teicher supposedly told Merkin in the early 1990s that Madoff's returns were too consistent

to be true.[6]  But Teicher himself testified that he never suggested to Merkin that Madoff was

running a Ponzi scheme, that he personally never analyzed or tried to understand Madoff's

strategy, and that his concerns about Madoff stemmed largely from the facts that emails

automatically changed "Madoff" to "made off" and that Madoff's office was in the Lipstick

Building, and lipstick is used to disguise a woman's appearance.  SOF ¶ 199, 201; Ex. 106

(Teicher Dep.) at 119:12-17; Ex. 107 (Teicher's Feb. 9, 2009 Dep. in *New York Univ. v. Ariel

Fund Ltd.*) at 74:10-75:15.  Especially since Teicher's supposed concerns dissipated over time,

his cavalier offhand comments are woefully insufficient to warrant a trial on the issue of willful

blindness.

      Nor is there any merit to the Trustee's allegations that the Merkin Defendants misled

investors about Madoff's role in the Funds and sought to conceal Madoff's role from potential

investors.  As a legal matter, even if those allegations are true, which they are not, they are

irrelevant to the Trustee's claim, which requires the Trustee to show that the Merkin Defendants

were willfully blind to Madoff's fraud.  *See* Trial Order at 1, *Picard v. Katz*, 11 Civ. 3605 (JSR),

(S.D.N.Y. Mar. 14, 2012) ECF No. 177.

      In any event, the Trustee's contention that Merkin deceived Ascot's investors about the

fund's investment in a BLMIS account or Madoff's role in managing that account is false as a

---

[6]    The GCC employee who supposedly overheard this comment, Jack Mayer, also testified that whatever
Teicher's supposed concerns were, they dissipated over time. SOF ¶ 200; Ex. 99 (Mayer Dep.) at 71:10-21.

matter of fact.  Ascot's governing documents expressly disclosed that Merkin may delegate

investment discretion for all or a portion of the Funds' assets to independent money managers

without prior notice or consent of investors in the Funds.  *See SEC v. Cohmad Sec. Corp.*, No. 09

Civ. 5680 (LLS), 2010 WL 363844, at *4 (S.D.N.Y. Feb. 2, 2010) (holding that Madoff's

secrecy "did not give notice of fraud because . . . anyone who watches TV commercials or reads

magazine ads can attest that the projection of an 'aura of exclusivity' is a common marketing

tactic" (internal quotation marks omitted)); *see also In re Merkin*, 817 F. Supp. 2d at 355-56

("Each Fund offering memoranda also warned that Defendant Merkin could delegate investment

discretion to third-party managers without notice to, or the consent of, any investor in the Funds,

and that when he delegated such authority he did not have responsibility for the 'investment

decisions of any independent money managers.'"); Chris Kentouris, "Hedge Funds Bracing for

Likely Disclosure Mandates," Sec. Indus. News, Dec. 1, 2008, at 1 ("[F]or many hedge funds,

proprietary trading strategies . . . are the secret sauce that allows them to generate above-market

returns and attract investors . . . .  Disclosing this confidential information to the public at large

would be like disclosing the formula for Coke." (internal quotation marks omitted)).  And the

undisputed evidence shows that the vast majority of Ascot investors knew about Madoff's role.

Indeed – and contrary to the Trustee's counsel's representation to the Court that Merkin

prevented customers from meeting Madoff (Aug. 18, 2015 Transcript, *Picard v. Merkin*, Adv.

Case No. 09-01182 (SMB), at 8:11-13) – Merkin arranged for many sophisticated investors in

Ascot to meet with Madoff as part of their due diligence on Ascot.  Those investors included

multiple representatives of UBP on two different occasions, two different individuals from

Reichmuth & Company also on two different occasions, a representative of Research Company

A, and Gedale Horowitz, the head of Salomon Brothers Municipal Department and chairman of

-24-

the Investment Committee of Yeshiva University.  SOF ¶ 138, 141-42, 144; Ex. 84 (Merkin

Dep.) at 387:16-389:14, 514:6-515:9, 516:16-517:22; Ex. 87 (Merkin Dep. (July 1, 2010)) at

20:9-18.  Thus, while the Trustee may have evidence that other fund managers sought to limit

their investors' direct contact with Madoff, it is undisputed that the exact opposite is the case

with Merkin.  That Merkin discussed Madoff with so many sophisticated investors also fatally

undermines the assertion that Merkin willfully blinded himself to Madoff's fraud.

     Tellingly, after conducting years of discovery in this case, not to mention his massive

Rule 2004 investigation, the Trustee does not, because he cannot, identify a *single* factual

impropriety of the nature alleged against many other investors:  There is not a single allegation

that Merkin ever received a payment from Madoff or BLMIS; not a single allegation that Merkin

had an account separate from the Funds that earned higher returns; not a single allegation that the

Funds' accounts earned outsized annual returns of approximately 100 percent or more; and not a

single allegation that Merkin requested or caused Madoff to backdate trades or direct winning or

losing trades at different points in time.

     Moreover, Merkin's significant personal exposure of more than $110 million to Madoff

soundly refutes any notion that he was willfully blind to the potential that Madoff was operating

a massive Ponzi scheme.  *See, e.g.*, *In re Merkin*, 817 F. Supp. 2d at 357 n.8; *Acito v. IMCERA

Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (defendants' continued investment undermines a

Section 10(b) securities fraud claim); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60

(E.D.N.Y. 1998) (defendants' continuous, substantial investment belies any inference of

fraudulent intent) *aff'd sub nom.*, *Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999).

And witnesses who saw or spoke to Merkin shortly after Madoff's confession about Merkin's

reaction to the news universally testified that Merkin was in total shock upon learning the news –

-25-

the exact opposite of someone who had suspected a fraud but deliberately chose not to

investigate.  SOF ¶ 158; ███████████████ at 128:20-24, 130:20-131:3; Ex. 99 (Mayer

Dep.) at 113:23-114:7; ████████████ at 46:4-11.

In view of the actual testimony and facts, the Trustee's sensational allegations are simply

insufficient to give rise to a genuine dispute of material fact on the claim that the Defendants

were willfully blind to Madoff's fraud.  To the contrary, all of the allegations demonstrate the

same thing:  Merkin, along with the SEC and thousands of other investors, was duped by Madoff

in the biggest financial crime in history.  The Trustee's remaining claims should be dismissed.

**POINT II**

**THE TRUSTEE'S SUBSEQUENT TRANSFEREE
AND GENERAL PARTNER LIABILITY CLAIMS FAIL BECAUSE
THOSE CLAIMS ARE DERIVATIVE OF THE AVOIDANCE CLAIM**

The Merkin Defendants are entitled to summary judgment dismissing Claims Nine

(subsequent transferee liability) and Ten (general partner liability) because each of those claims

is derivative of, and dependent on, the Trustee's claim to avoid and recover the two-year

withdrawals by Ascot (Claim Two).  That is, the Trustee can obtain a monetary recovery from

the Merkin Defendants *only* if he first prevails on his avoidance claim against Ascot Partners *and*

Ascot Partners is unable to satisfy any resultant judgment.  *See* 11 U.S.C. § 550(a),(d) (the

Trustee may recover against alleged subsequent transferees only "to the extent that a transfer is

avoided under section … 548 … of this title"); Del. Code Ann. tit. 6, § 15-306 (West 2015).  As

demonstrated above, the avoidance claim against Ascot Partners should be dismissed because the

undisputed facts show that Merkin was not willfully blind to Madoff's fraud.  *See supra* Point I.

Dismissal of the avoidance claim also mandates dismissal of the subsequent transferee and

general partner claims against the Merkin Defendants.

Even if the Trustee's avoidance claim against Ascot Partners were not dismissed, the

subsequent transferee and general partner liability claims against the Merkin Defendants should

nevertheless be dismissed for the independent reason that the Trustee "is entitled to only one

satisfaction," and it is undisputed that Ascot Partners would be able to satisfy any judgment that

could be entered on the avoidance claim.  *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec.*

*LLC*), 515 B.R. 117, 149 (Bankr. S.D.N.Y. 2014).  Once Ascot Partners satisfied any judgment,

the Trustee could not recover any additional amount from the Merkin Defendants.[7]  *See* Del.

Code Ann. tit. 6, § 15-306 (West 2015).

There is no dispute that Ascot Partners has more than sufficient assets – namely, its net

equity claim in this SIPA proceeding – to satisfy any judgment against it on the Trustee's claim.

Using the Trustee's calculation, Ascot's net equity claim in the SIPA Proceeding is in excess of

$226 million.  Greenblatt Report Ex. 4P.  The Trustee's two-year avoidance claim under Section

548(a)(1)(A) of the Bankruptcy Code against Ascot Partners is for $280 million.  *Picard*, 515

B.R. at 151.  Thus, in the highly unlikely event the Trustee prevailed on that claim, he would

obtain judgment against Ascot Partners for $280 million, but upon payment of that amount,

Ascot Partners would be entitled to a $280 million claim under Bankruptcy Code Section 502(h),

---

[7]    The Trustee cannot prevail on his general partner liability claim for the additional reason that Section 550
of the Bankruptcy Code provides the "*exclusive remedy*" for the Trustee's avoidance claims under either §§
544(b), 548.  *Savage & Assocs., P.C. v. BLR Servs. SAS (In re Teligent, Inc.)*, 307 B.R. 744, 749 (Bankr.
S.D.N.Y. 2004) ("Regardless of the source of the trustee's chapter 5 powers, § 550(a) defines the extent of
[his] remedy.") (emphasis added).  Here, "the court cannot invoke state law remedies to circumvent or
undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer."  *Hyundai
Translead, Inc. ex rel. Estate of Trailer Source, Inc. v. Jackson Truck & Trailer Repair Inc.*, 419 B.R. 749,
760 (M.D. Tenn. 2009) (internal quotations and citation omitted).  Although Judge Lifland rejected this
argument in his November 17, 2010 order, his decision did not rely on the law of this circuit; therefore, that
order does not bind the Court here.  *See In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 268-69
(Bankr. S.D.N.Y. 2010) (relying exclusively on *Shubert v. Stranahan (In re Penn. Gear Corp.)*, Adv. Nos.
03–940, *et al.*, 2008 WL 2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008)).  Therefore, the Trustee cannot
recover from Merkin as Ascot's general partner.

in addition to having its $226 million net equity claim allowed.[8]  Thus, Ascot would have a $506 million claim in the SIPA proceeding.

The Trustee's pending motion for a Sixth Interim Distribution, when granted, will bring distributions on allowed claims up to 55.685 cents on the dollar.  Motion for an Order Approving Sixth Allocation of Property to the Fund of Customer Property and Authorizing Sixth Interim Distribution to Customers, Motion to Approve at 7, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Apr. 15, 2015), ECF No. 9807.[9]  In other words, even if the Trustee prevailed on its avoidance claim against Ascot Partners, after approval of the pending distribution motion, Ascot Partners would be entitled to receive initial distributions of $281.77 million ($506 million x .55685 = $281.77 million), which would more than satisfy any judgment. Ascot Partners would actually receive many millions more in future distributions.  Hence, the Trustee cannot conceivably obtain an unsatisfied judgment against Ascot Partners.  Summary judgment dismissing his subsequent transferee and general partner liability claims against the Merkin Defendants is appropriate for this independent reason.

---

[8]      Even if the Trustee's equitable subordination claim were not dismissed, that does not alter the result.  The Court has already held that equitable subordination is only an alternative remedy to a recovery of monetary damages on the Trustee's avoidance claim against Ascot Partners.  *See Picard*, 515 B.R. at 160 ("It is well-settled that equitable subordination is an alternative to a monetary recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim based on the same wrong.").  Thus, if the Trustee were permitted and elected to pursue equitable subordination as a remedy, there would be no unsatisfied judgment against Ascot Partners for him to recover against the Merkin Defendants on either the subsequent transferee or general partner liability theories.

[9]      On October 5, 2015, the Supreme Court denied certain BLMIS customers' petition for a writ of certiorari on the time-based damages issue, clearing the way for approval of the Sixth Interim Distribution.  The Trustee has announced that he will now seek a prompt hearing on the distribution motion.  *See* Oct. 5, 2015 Trustee Statement (available at http://www.madofftrustee.com/statements-19.html).

## POINT III

## THE TRUSTEE'S EQUITABLE SUBORDINATION
## CLAIM FAILS BECAUSE THERE WAS NEITHER
## <u>GROSS AND EGREGIOUS CONDUCT NOR INEQUITABLE CONDUCT</u>

"Equitable subordination is an extraordinary remedy that is to be used sparingly." *In re*

*Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), aff'd, No. 09 Civ. 1636 (PKC), 2009 WL

2900247 (S.D.N.Y. Sept. 9, 2009); *see In re Assante*, No. 12 Civ. 5309 (CS), 2013 WL 787968,

at *3 (S.D.N.Y. Mar. 4, 2013) ("Equitable subordination is a drastic and unusual remedy . . . ."

(internal quotation marks omitted)).

To prevail on his equitable subordination claim, the Trustee would have to show that

Ascot Partners "engaged in 'gross and egregious' conduct 'tantamount to fraud,

misrepresentation, overreaching or spoliation.'" *Gowan v. Wachovia Bank, N.A.* (*In re Dreier*

*LLP*), 453 B.R. 499, 516 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) (quoting *80 Nassau Assocs. v.*

*Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 838-39 (Bankr. S.D.N.Y.

1994)).  As demonstrated above, no triable issue of fact exists on the question of willful

blindness, much less any fact to suggest that Ascot Partners knowingly participated in Madoff's

fraud, as would be necessary to support a finding of inequitable conduct.  Nor do the Trustee's

fraudulent conveyance allegations amount to the "gross and egregious" conduct necessary to

support any equitable subordination.  *See In re Dreier LLP*, 453 B.R. at 517 ("The allegations

that support a collapsing claim under the fraudulent transfer laws do not necessarily also support

an equitable subordination claim against a non-insider. . . .  For example, constructive fraudulent

transfers rarely if ever involve gross and egregious conduct."); *id.* ("'No authority supports the

Trustee's claim that independently tortious conduct is 'egregious' as a matter of law.'" (quoting

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortg. Co.)*, 471 F.3d 977, 1007

(9th Cir. 2006))).  This shortcoming alone is fatal to the Trustee's equitable subordination claim.

Further, this Court has already found that, even if the Trustee prevails on his claim for fraudulent two-year transfers under Section 548(a)(1)(A), any amount paid to satisfy that transfer would entitle the Defendants to an additional claim for the amount paid, pursuant to Section 502(h) of the Bankruptcy Code, and the Trustee would not be entitled to the remedy of equitable subordination. *Picard*, 515 B.R. at 161 ("It would seem that the Trustee should not be able to equitably subordinate the § 502(h) claim because the return of the avoided transfer would compensate the estate for the injury caused by the fraudulent transfer, and the estate cannot recover damages and equitable subordination for the same wrong."); *see In re Dreier LLP*, 453 B.R. at 517 ("Even when a complaint alleges gross and egregious conduct, equitable subordination is only an alternative to a monetary recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim based on the same wrong."); *see, e.g.*, *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 113 n.4 (2d Cir. 2007); *Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*, No. 08-15051, Adv. No. 10-5456, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012).

Thus, the Trustee's equitable subordination claim can proceed "only if the Trustee fails to succeed on his fraudulent transfer claims . . . but can nonetheless prove inequitable conduct that injured the creditors or conferred an unfair advantage." *Picard*, 515 B.R. at 161. As discussed above, if the Trustee prevails on his Section 548(a)(1)(A) claim and Defendants pay out the purported fraudulent transfers, then there can be no injury to creditors. *See In re Dreier LLP*, 453 B.R. at 517 ("Wachovia will not be entitled to any distribution unless it returns the fraudulent transfer. In that event, the estate will have been made whole, and will not be entitled to the additional remedy of equitable subordination."). And a showing of any sort of "unfair advantage" is inconceivable here. The Trustee has allowed the net equity claims of many other

-30-

"feeder funds" against which the allegations were far more egregious than the conduct at issue

here, and also allowed the net equity claims of former Defendants Gabriel and Ariel.  Because

those entities were also managed by the Merkin Defendants, if the Trustee actually believed that

the Merkin Defendants engaged in gross and egregious misconduct, he breached his duties as

Trustee by settling and allowing those claims, which resulted in initial net payments of more than

$144 million by the SIPA Estate.  It would therefore be inequitable, and unfair to Ascot Partners

and its investors (among the largest net losers from the Madoff fraud), to subordinate Ascot

Partners' net equity claim where the only difference is that Ascot Partners sought to challenge

the Trustee's allegations.

## <u>Conclusion</u>

For the foregoing reasons, Defendants J. Ezra Merkin and Gabriel Capital Corporation

respectfully request that the Court grant summary judgment and dismiss all of the Trustee's

remaining claims.


Dated:      New York, New York
            October 7, 2015

                                    DECHERT LLP

                                    By:    */s/ Neil A. Steiner*
                                                     Andrew J. Levander
                                                     Neil A. Steiner
                                    1095 Avenue of the Americas
                                    New York, New York 10036
                                    andrew.levander@dechert.com
                                    neil.steiner@dechert.com
                                    (212) 698-3500

                                    *Attorneys for Defendants J. Ezra Merkin and*
                                    *Gabriel Capital Corporation*