# Exhibit 1

Page 1

```
 1
 2          UNITED STATES DISTRICT COURT
 3          SOUTHERN DISTRICT OF NEW YORK
 4   --------------------------------x
     In re:                      SIPA LIQUIDATION
 5
     BERNARD L. MADOFF INVESTMENT    No. 08-01789(BRL)
 6   SECURITIES LLC,
 7                                (Substantively
                                  Consolidated)
 8            Debtor.
     --------------------------------x
 9   IRVING H. PICARD, Trustee of the
     Liquidation of Bernard L. Madoff
10   Investment Securities LLC,
11              Plaintiff,
                                  Adv. Pro. No.
12      vs.                      09-01182(BRL)
13   J. EZRA MERKIN, GABRIEL
     CAPITAL, L.P., ARIEL FUND LTD.,
14   ASCOT PARTNERS, L.P., GABRIEL
     CAPITAL CORPORATION,
15
              Defendants.
16   --------------------------------x
17
18    VIDEOTAPED DEPOSITION OF LISA M. COLLURA
19             New York, New York
20             June 18, 2015
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 94537
```

LISA M. COLLURA

1
2      A.    No.
3      Q.    When were you initially retained in
4  connection with the overall Madoff case?
5      A.    FTI Consulting, the company that I
6  work for, was retained in December of 2008.
7      Q.    So that was not long after the Ponzi
8  scheme was made public --
9      A.    Correct.
10     Q.    -- correct?
11          And who was FTI retained by?
12     A.    FTI was retained by the trustee
13  through his counsel, Baker & Hostetler.
14     Q.    When did you first become involved in
15  the overall Madoff matter?
16     A.    Pretty much since day one.
17     Q.    Approximately how many people at FTI
18  have been involved in the Madoff matter?
19     A.    It's -- I don't know the exact number.
20  It has varied over time.  It was -- it was
21  well -- more than 100.  I don't know the exact
22  number.
23     Q.    Who first contacted you to get
24  involved in the Madoff matter?
25     A.    An attorney over at Baker & Hostetler

LISA M. COLLURA

1
2  reached out to another senior managing director
3  at FTI.  It wasn't me personally.
4      Q.    And then who was it at FTI that
5  reached out to you and asked you to become
6  involved in this matter, in the Madoff matter?
7      A.    I believe it was Phil Stern.
8      Q.    And who is Phil Stern?
9      A.    Phil Stern is another senior managing
10  director in New York.
11     Q.    What were you asked to do in
12  connection with the Madoff matter; the overall
13  Madoff matter, not specifically the Merkin
14  matter yet?
15          MR. SONG:  At what point in time?
16          MS. ARCHER:  Initially when she was
17     first asked to participate.
18          THE WITNESS:  Me personally or FTI?
19  BY MS. ARCHER:
20     Q.    You, personally.
21     A.    I was initially tasked with reviewing
22  bank records of Madoff or BLMIS, determining
23  what were the available bank records for the
24  bank accounts used by BLMIS, and specifically
25  looking at those bank records to perform a

LISA M. COLLURA

1
2  reconciliation to the transactions that appeared
3  on the customer statements of Madoff.
4      Q.    Was it within your responsibility to
5  reconcile to every customer statement of Madoff,
6  or were there only specific ones that you were
7  reconciling?
8      A.    To every one that was -- could
9  possibly be reconciled to the available records.
10     Q.    Did you have a team assisting you on
11  reconciling the transactions that were on the
12  BLMIS account statements to the customers?
13     A.    I did.
14     Q.    Who was that?
15     A.    My team consisted of Laura Stahl,
16  Jackie Day, Casey Evans, Phil Nathan, Zahra
17  Giga, Katelyn Bickham, Sunita Iyre.  There may
18  have been one or two more, but those are who I
19  can recall right now.
20     Q.    Has that team stayed consistent
21  throughout your involvement in the Madoff
22  matter?
23     A.    Some of those people.  Not all.
24     Q.    Do you know how much FTI has received
25  in connection with its work on the Madoff

LISA M. COLLURA

1
2  matter?
3      A.    I believe our billings through April
4  of this year have totaled approximately $150
5  million.  That covers the time period from
6  December '08 through April of this year.
7      Q.    Out of that $150 million, do you know
8  what portion of that represents your work and
9  the work of your team in connection with the
10  reconciliation that you talked about?
11     A.    I -- it's very difficult to bifurcate
12  because there was a lot of work streams going on
13  at the same time, but I did -- in preparation
14  for the deposition, I looked at the people that
15  were on my team, and at their time from the
16  beginning through November 2011, which was the
17  first expert report that I prepared in the
18  overall case, the total time for that period for
19  my team was approximately $15 million.
20     Q.    Do you know how much your time has
21  been paid for from the very beginning until
22  whatever the most recent payment made was, just
23  your time?
24     A.    Just my time is, for the entire
25  period, has been about $5 and a half million.

LISA M. COLLURA

1
2    Q.   Is it correct that you -- that FTI is
3    being compensated at a rate of $554 an hour for
4    your time?
5    A.   That's the current rate.  That -- that
6    has changed once every the six- or seven-year
7    period.
8    Q.   And what did it change from?
9    A.   I believe before that it was $480.
10   Q.   When was that change?
11   A.   It was sometime in 2012 after my
12   promotion to senior managing director.
13   Q.   Am I correct that you have submitted a
14   number of expert reports in different
15   proceedings within the overarching Madoff
16   matter?
17   A.   That's correct.
18   Q.   How many expert reports?
19   A.   Forty-five.  And one more I finalized
20   and signed this morning, so 46.
21   Q.   The one this morning, what matter is
22   that in?
23   A.   I don't remember the adversary
24   proceeding number, but it was one of -- there
25   are two related cases.  One of the Aaron Levy

LISA M. COLLURA

1
2    cases.
3    Q.   When you were first asked to get
4    involved in the Madoff matter, was it your
5    understanding that you would be submitting
6    expert reports and potentially testifying?
7    A.   Not at the -- not at that time.  There
8    was a clause in the FTI's retention letter that
9    stated that there was a chance that somebody
10   within FTI or people within FTI may be called to
11   testify as expert witnesses, but at that time,
12   we had not identified specific individuals,
13   but -- so I didn't know specifically what would
14   happen in the upcoming years, but, you know,
15   then eventually it was -- I was deemed an expert
16   witness.
17   Q.   Other than the Madoff matter, have you
18   ever been retained by the firm of Baker &
19   Hostetler?
20   A.   FTI has.  I have not been involved in
21   a case with Baker & Hostetler before.
22   Q.   When did you first become aware that
23   the Madoff trustee would submit -- strike that.
24       When did you first get asked to
25   prepare an expert report in connection with the

LISA M. COLLURA

1
2    Merkin case?
3    A.   I began work on the draft of the
4    expert report in October of 2013.  I don't
5    recall exactly when it was discussed that that
6    report was required or that they needed a report
7    issued in that -- in this matter.
8    Q.   Do you recall who first raised with
9    you the fact that they wanted you to provide an
10   expert report in the Merkin matter?
11   A.   I don't recall.
12   Q.   Was it someone from Baker & Hostetler?
13   A.   Yes.
14   Q.   Do you know if, other than Baker &
15   Hostetler and possibly Mr. Picard, do you know
16   if anyone reviewed your expert report before it
17   was submitted to the defendants in the Merkin
18   case?
19   A.   Other than people on my team as well?
20   Q.   Yes.
21   A.   No, I'm not aware of anybody.
22   Q.   Do you know whether it was shared with
23   any other experts in this case?
24   A.   I'm not aware of it being shared.
25   Q.   Do you know Matthew Greenblatt?

LISA M. COLLURA

1
2    A.   I do.
3    Q.   Who is Mr. Greenblatt?
4    A.   Mr. Greenblatt is also a senior
5    managing director at FTI Consulting.
6    Q.   Am I correct that he has submitted an
7    expert report in the Merkin matter?
8    A.   Yes, he has.
9    Q.   And is it also correct that he has
10   submitted reports and/or provided expert
11   services in connection with the Madoff matter in
12   general, other than the Merkin matter?
13   A.   That's correct.
14   Q.   Did you discuss your report with Mr.
15   Greenblatt?
16   A.   I discussed generally that -- that I
17   was working on a report in this matter, but the
18   specifics of what's included in my report I did
19   not discuss with Mr. Greenblatt.
20   Q.   Do you know if he reviewed your report
21   before it was submitted to Baker & Hostetler
22   counsel in final form?
23   A.   I do not know.
24   Q.   Did you review Mr. Greenblatt's report
25   submitted in connection with the Merkin case?

LISA M. COLLURA

1
2     A.    No.
3           MR. SONG:  Just to be clear, that's
4     the specific Greenblatt report, not his
5     principal calculation report that he also
6     provided to you?
7           MS. ARCHER:  Well, since they were
8     both provided to us -- I understand your
9     clarification.  I was referring to both.
10    BY MS. ARCHER:
11    Q.    Have you reviewed any report submitted
12    by Mr. Greenblatt in connection with the Madoff
13    matter?
14    A.    Yes.
15    Q.    What is that?
16    A.    What's referred to as his Principal
17    Balance Calculation Report.
18    Q.    Can you briefly summarize what that
19    report reflects?
20    A.    That -- we refer to that as his -- the
21    Global Report because it covers the customer
22    statements, the information in the data that was
23    obtained from the customer statements, and the
24    related documentation at BLMIS, and I refer to
25    Matt's report in my report because the basis for

LISA M. COLLURA

1
2     my -- for the customer statement transactions
3     that I have in my exhibits related to the
4     Merkin-specific BLMIS accounts were gathered and
5     accumulated under Mr. Greenblatt's direction.
6     Q.    What do you mean when you say
7     "gathered and accumulated under Mr. Greenblatt's
8     direction"?
9     A.    So, as part of our investigation, we
10    accumulated as much information as possible
11    through various sources available to us from
12    BLMIS, and by "us," the FTI -- the FTI team, but
13    that team was led by Mr. Greenblatt.
14          So we gathered the and collected the
15    information from the customer statements
16    representing the cash transactions and the inner
17    account transfers that became the basis of
18    Matt's net equity calculation and his principal
19    balance calculation that's laid out in his
20    report, but those same set of transactions, the
21    cash transactions, the deposits and withdrawals,
22    were the same set of transactions that I have in
23    my exhibits to my report.
24    Q.    So is it just that you use the
25    information that Mr. Greenblatt collected and

LISA M. COLLURA

1
2     his team, presumably, or that you incorporated
3     some of his conclusions into your work?
4     A.    No, the former.  It was that that --
5     the same dataset that was used as a basis for
6     his principal balance calculation was the same
7     dataset that I used for my cash transactions
8     that are laid out in my report, and so I refer
9     to his report because he describes in his Global
10    Report the various sources of information from
11    which those cash transactions were obtained.
12          I don't do that in my report.  I refer
13    to his report because that was -- that was
14    really under his supervision.
15    Q.    Did he have a team working with him?
16    A.    Yes.
17    Q.    Approximately how many people would
18    you estimate were on that team?
19    A.    I don't know.
20    Q.    More than 50?
21    A.    No, I don't think it was 50.
22    Q.    Was there overlap between the team
23    that worked with Mr. Greenblatt and the team
24    that you described to us before who assisted
25    you?

LISA M. COLLURA

1
2     A.    At what point in time?
3     Q.    At any point.
4     A.    There may have been some of the people
5     on my team that -- that helped on certain
6     projects, but I think primarily the teams were
7     pretty structured that they -- they focused on
8     one area and under one -- taking direction from
9     one person.
10    Q.    Could I direct you to Exhibit 2 to
11    your report in that binder that you have in
12    front of you, and can you identify it for the
13    record, please?
14    A.    Exhibit 2 to my expert report is my --
15    the list of documents considered.
16    Q.    How was this compiled?  How was
17    Exhibit 2 compiled?
18    A.    There were two parts to this exhibit.
19    One was the documents supporting the Global
20    section of my report, which really was the first
21    overall reconciliation that we've discussed, and
22    then the case-specific documents.
23          So the Global -- the documents
24    supporting the Global section were identified as
25    and accumulated along the way as we conducted

Page 98

LISA M. COLLURA

1  last question.
2  Q.  Now, your report does not contain any
3  analysis of subsequent transfers to Ascot
4  Partners; is that correct?
5  A.  That's correct.
6  Q.  Were you asked to opine as to whether
7  Ascot Partners received any subsequent
8  transfers?
9  A.  We may have -- I may have discussed
10 that with counsel, I don't recall specifically,
11 but it wouldn't make much sense in my mind to
12 identify a subsequent transfer from an initial
13 transferee.  So to trace from an initial
14 transferee to a subsequent transferee, and they
15 are the same parties, in my mind that doesn't
16 make much sense.
17 Q.  So am I correct that you don't intend
18 to offer an opinion at trial that Ascot Partners
19 was the recipient of any subsequent transfers?
20 A.  That's correct.
21 Q.  Now, your report refers in certain
22 places to transfers between Ariel, Gabriel and
23 Ascot Partners, correct?
24 A.  Correct.

Page 99

LISA M. COLLURA

1  Q.  Am I correct that where there were
2  transfers between the bank accounts of those
3  entities, there were similar or offsetting
4  transactions within the BLMIS accounts for those
5  entities?
6  A.  Sometimes.
7  Q.  Was there ever a time that you did not
8  see a -- a transfer of funds between the
9  accounts -- the bank accounts or investment
10 accounts of those entities and where there was
11 no offsetting or corresponding transaction
12 between the BLMIS accounts?
13 A.  Yes.
14 Q.  Can you tell me where or when?
15 A.  Yes.  If you look at Exhibit 11.1,
16 which -- Exhibit 11.1 contains the transactions
17 between the three, Gabriel, Ariel and Ascot
18 Partners, accounts at Morgan Stanley, and on the
19 far right side of the exhibit indicates where
20 those -- where there was a corresponding
21 transfer at the BLMIS level, at the BLMIS
22 accounts.
23 So anytime it's blank, so even on page
24 1, it's pretty much the entire second half of

Page 100

LISA M. COLLURA

1  the page, all of these transfers that I have
2  identified between the Ariel and Gabriel, in
3  this case, there was no corresponding
4  transaction at the BLMIS level.
5  And so if you just flip through
6  Exhibit 11.1, you can see all the times where
7  that last series of columns to the far right is
8  blank.
9  Q.  I need a magnifying glass.
10 Am I correct that where there were
11 transfers between Ascot Partners and either
12 Ariel or Gabriel, there was always a
13 corresponding BLMIS transfer between those
14 funds?
15 A.  There were transfers between Ascot
16 Partners and Gabriel Capital that did not have a
17 corresponding transaction at the BLMIS level.
18 Q.  And what page are you referring to?
19 A.  I'm looking on page 4 of 12, probably
20 about halfway down the page, where it says
21 "Ascot Partners to Gabriel Capital."  So just as
22 an example, on January 10, 2000, there was $6.7
23 million from Ascot Partners to Gabriel Capital
24 that I did not see a corresponding transaction

Page 101

LISA M. COLLURA

1  or transfer on the BLMIS accounts.
2  Q.  Do you intend to offer any opinion in
3  this matter as to the proprietary of the
4  transfers between Ariel and Gabriel and Ascot,
5  between or among those funds?
6  A.  By "proprietary," do you mean
7  appropriateness?
8  Q.  Yes.
9  A.  No.
10 MR. SONG:  Judy, you've been about an
11 hour.
12 MS. ARCHER:  Sure, we can take a
13 break.  Yes, that's fine.
14 THE VIDEOGRAPHER:  The time is 2:57
15 p.m.  We're going off the record.
16 (Recess.)
17 THE VIDEOGRAPHER:  The time is 3:14
18 p.m.  We're back on the record, video number
19 3.
20 BY MS. ARCHER:
21 Q.  Now, you testified earlier about the
22 way in which you decided to use the five
23 methodologies.  Your report states that you were
24 directed by counsel for the trustee to apply

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01182 (SMB) |
| Plaintiff, | |
| v. | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

## EXPERT REPORT OF
## LISA M. COLLURA, CPA, CFE, CFF

**Proof of Transfers
To Defendants J. Ezra Merkin,
Gabriel Capital L.P., Ariel Fund Ltd.,
Ascot Partners, L.P., Ascot Fund Ltd., and
Gabriel Capital Corporation**

March 20, 2015

# TABLE OF CONTENTS

I. PROFESSIONAL BACKGROUND..................................................................................................2

II. SCOPE OF ASSIGNMENT .........................................................................................................2

III. METHODOLOGY ........................................................................................................................4

IV. SUMMARY OF FINDINGS ........................................................................................................6

V. RECONCILIATION OF CASH TRANSACTIONS FOR ALL BLMIS CUSTOMERS ...............9

    A.     OVERVIEW                                           9
    B.     BLMIS BANK ACCOUNTS                           9
    C.     RESULTS OF RECONCILIATION                    12

VI. RECONCILIATION OF CASH TRANSACTIONS FOR THE MERKIN ACCOUNTS.......................13

    A.     OVERVIEW                                           13
    B.     BLMIS BANK ACCOUNTS                           13
    C.     BLMIS CUSTOMER FILES                        14
    D.     MERKIN DEFENDANTS' QUICKBOOKS DATA        15
    E.     DOCUMENTS PRODUCED BY THE MERKIN DEFENDANTS TO THE TRUSTEE     15
    F.     RESULTS OF RECONCILIATION                    16

VII. TRACING CASH TRANSACTIONS IN THE MERKIN ACCOUNTS...............................................16

    A.     OVERVIEW                                           16
    B.     RESULTS OF TRACING                           17

VIII. COMMINGLING OF FUNDS .......................................................................................................18

    A.     OVERVIEW                                           18
    B.     RESULTS OF ANALYSIS                        20

IX. SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO THE MERKIN DEFENDANTS ......................29

    A.     OVERVIEW                                         29
    B.     LAST IN, FIRST OUT ("LIFO")                 31
    C.     FIRST IN, FIRST OUT ("FIFO")                32
    D.     LOWEST INTERMEDIATE BALANCE RULE ("LIBR")     34
    E.     RESTATED TRACING RULES ("RESTATED LIBR")     36
    F.     PROPORTIONALITY                        38

X. SUBSEQUENT SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO/FBO DEFENDANT J.EZRA MERKIN .......................39

    A.     OVERVIEW                                         39
    B.     LAST IN, FIRST OUT ("LIFO")                 41
    C.     FIRST IN FIRST OUT ("FIFO")                42
    D.     LOWEST INTERMEDIATE BALANCE RULE ("LIBR")     43
    E.     RESTATED TRACING RULES ("RESTATED LIBR")     44
    F.     PROPORTIONALITY                        45

XI. MANAGEMENT FEES FROM DEFENDANT ASCOT PARTNERS TO DEFENDANT GCC...........................47

    A.     OVERVIEW                                         47
    B.     RESULTS OF ANALYSIS                        47

XII. SIGNATURE AND RIGHT TO MODIFY................................................................................49

XI. LIST OF EXHIBITS...................................................................................................................50

## I. PROFESSIONAL BACKGROUND

1.          I am a Senior Managing Director in the Forensic and Litigation Consulting practice of FTI Consulting, Inc. ("FTI"), with more than 20 years of experience in accounting, auditing and litigation consulting services.  I specialize in providing forensic accounting and financial fraud investigative services in connection with internal investigations on behalf of trustees, boards of directors and audit committees of companies.

2.          I have extensive experience in conducting large-scale, fact-finding investigations into fraudulent financial transactions, including tracing significant flows of funds between accounts and entities.  During my career at FTI, I have assisted in the investigation of several of the largest fraud cases in the United States.

3.          I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), a member of the American Institute of Certified Public Accountants (AICPA) and am Certified in Financial Forensics (CFF) by the AICPA.  My curriculum vitae, attached as **Exhibit 1** to this report, further describes my professional credentials, experience and qualifications, including my testimony in the last four years.

## II. SCOPE OF ASSIGNMENT

4.          Bernard L. Madoff Investment Securities LLC ("BLMIS") was an investment firm owned and operated by Bernard L. Madoff ("Madoff").  On December 11, 2008, Madoff was arrested for violating multiple securities laws in connection with running a Ponzi scheme.   On December 15, 2008, Irving H. Picard was appointed as the Trustee for the liquidation of the business of BLMIS, and Baker & Hostetler LLP was retained as his counsel.  Shortly thereafter, FTI was retained by Baker & Hostetler LLP, on behalf of the Trustee, to analyze, among other things, the financial affairs of BLMIS and to assist the Trustee with the liquidation of BLMIS.  As part of our engagement, FTI was tasked with the exercise of reconstructing the books and records of BLMIS, including all records of the "cash in/cash out" transactions related to the BLMIS customer accounts as far back as the records allow.

5.          Matthew B. Greenblatt, also a Senior Managing Director at FTI, and a team of professionals working under his supervision, were specifically tasked with creating chronological listings of all cash and principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer account, as set forth more fully in the Expert Report of Matthew B. Greenblatt regarding the Methodology for the Principal Balance Calculation, dated November 15, 2012 (the "Principal Balance Calculation Report").

6.          The sources of cash deposit and withdrawal transactions related to BLMIS customer accounts consist of customer statements and other relevant information available within BLMIS's records, including

Portfolio Management Reports, Portfolio Management Transaction Reports, spiral-bound notebooks, and a data table from BLMIS's computer system referred to as the "Checkbook File," which is the only available BLMIS record of cash transactions for the time period from December 1, 2008 through December 11, 2008. *See* Principal Balance Calculation Report for further discussion regarding these sources. For purposes of my report, I use the term "customer statements" to refer to these sources collectively.

7.         I, along with a team working under my supervision, was specifically tasked with performing forensic analyses to determine the following:

- Whether the cash deposit and withdrawal transactions as reflected on the customer statements (as defined in paragraph 6) for *all* BLMIS customers reconciled (as further explained in paragraph 8) to available BLMIS bank records;

- Whether the cash deposit and withdrawal transactions reflected on the customer statements for *four* of the customer accounts at BLMIS that are at issue in this matter (the "Merkin Accounts"[1]) reconcile to available documentation;

- Whether, based on my review of available bank account records, the cash withdrawals (*i.e.*, transfers from BLMIS) reflected on the customer statements for the Merkin Accounts (the "Initial Transfers") could be traced (as further explained in paragraph 8) *to* bank accounts held by, or for the benefit of, the Merkin Defendants,[2] and whether cash deposits reflected on the customer statements for the Merkin Accounts could be traced *from* bank accounts held by, or for the benefit of, the Merkin Defendants;

- Whether there were sources of funds other than from BLMIS and therefore, commingling of funds, in certain bank accounts held by the Merkin Defendants;

- Whether any of the Initial Transfers of BLMIS funds were subsequently transferred to, or for the benefit of, the Merkin Defendants (the "Subsequent Transfers");

- Whether any of the Subsequent Transfers of BLMIS funds received by Defendant GCC were further transferred to, or for the benefit of, Defendant J. Ezra Merkin (the "Subsequent Subsequent Transfers"); and,

---

[1] Four of the BLMIS customer accounts that are at issue in this matter include: 1G0321 under the name "Gabriel Capital, L.P."; 1FR070 under the name "Ariel Fund Ltd"; 1A0058 under the name "Ascot Partners, L.P."; and 1FN005 under the name "Ascot Fund Ltd"(collectively, the "Merkin Accounts").

[2] The Defendants in this matter are J. Ezra Merkin, Gabriel Capital, L.P., Ariel Fund Ltd, Ascot Partners, L.P., Ascot Fund Ltd. and Gabriel Capital Corporation ("GCC"), (collectively, the "Merkin Defendants"). Defendants Gabriel Capital, L.P. ("Gabriel Capital"), Ariel Fund Ltd ("Ariel Fund"), Ascot Partners, L.P. ("Ascot Partners") and Ascot Fund Ltd. ("Ascot Fund") are also collectively referred to herein as the "Merkin Funds."

- Whether management fees were paid by Defendant Ascot Partners to Defendant GCC, and if so, quantify the amount of those management fees and identify what portion of those fees are Subsequent Transfers of BLMIS funds.

8.　　　For purposes of this report, I use the term "reconciled" to indicate when I have matched, agreed and/or determined consistency between cash deposits and withdrawals reflected on BLMIS customer statements to information or data per another source (*e.g.,* amounts on BLMIS bank records, correspondence between the customer and BLMIS regarding incoming deposits and/or requests for withdrawals, or documents produced by the Merkin Defendants to the Trustee).  For purposes of my report, I use the term "traced" to indicate when I have followed the flow of funds from one bank account (*e.g.,* BLMIS's bank account) to another bank account (*e.g.,* the Merkin Defendants' bank accounts).

9.　　　This report has been prepared in connection with the above-captioned litigation and is to be used only for the specific purposes of this lawsuit.  It is not to be used for any other purpose without the express written consent of FTI.  If called upon to testify in this matter, I intend to provide testimony regarding my analyses and conclusions consistent with this report.

10.　　　FTI is being compensated at a rate of $554 per hour for my professional time incurred in performing the work necessary to prepare this report.  FTI's fees are not contingent on the conclusions reached in this report or the outcome of this subject litigation.


## III. METHODOLOGY

11.　　　To determine whether the cash deposit and withdrawal transactions reflected on the customer statements for *all* BLMIS customers reconciled to available BLMIS bank records, I, using my experience as a forensic accountant and investigator, along with my staff, first identified and gathered the relevant and available records related to the BLMIS bank accounts.  We then performed the following procedures:

- Reviewed hundreds of thousands of pages of records related to BLMIS's bank accounts, including monthly bank statements, cancelled checks and deposit slips, obtained from BLMIS's files and/or produced by third-party financial institutions, which cover a ten-year period from December 1998 to December 2008;

- Analyzed close to 150,000  transactions reflected within these bank records; and

- Reconciled the cash deposit and withdrawal transactions reported in the available BLMIS bank records to the cash transactions reflected on the customer statements related to *all* BLMIS customer accounts.

12.        Next, to determine specifically whether the cash transactions reflected on the customer

statements for the Merkin Accounts reconciled to available documentation, I used the results of the forensic

analysis of the available BLMIS bank records as described above.  I also reviewed and analyzed other

documents and records maintained at BLMIS, including, but not limited to, documents contained in the

customer files related to the Merkin Accounts.  In addition, my team and I reviewed certain documents and

data received by the Trustee from the Merkin Defendants, including the following:

- Millions of pages of documents produced to date by the Merkin Defendants; and

- Tens of thousands of records of data from a QuickBooks financial program produced by the
   Merkin Defendants ("QuickBooks").

Based on my review and analysis of these materials, I identified the cash transactions related to the Merkin

Accounts that reconciled to these documents and data.

13.        Next, to determine whether the Initial Transfers of BLMIS funds (*i.e.*, cash withdrawals reflected

on the customer statements for the Merkin Accounts) could be traced to bank accounts held by, or for the

benefit of, the Merkin Defendants, I again used the available information from the BLMIS bank records as

discussed above.  I also reviewed records produced to the Trustee by the Merkin Defendants as well as by

third-party financial institutions related to bank accounts held by, or for the benefit of, the Merkin

Defendants.  Using these available bank records, I identified the recipients of the Initial Transfers from

BLMIS.  In addition, using these available bank records, I identified the sources of transfers to BLMIS (*i.e.*,

cash deposits reflected on the customer statements for the Merkin Accounts).

14.        Next, to determine whether there were sources of funds other than from BLMIS, and therefore,

commingling of funds in certain bank accounts held by the Merkin Defendants, I reviewed and analyzed

available records related to these bank accounts that were produced to the Trustee in this matter, and

identified, quantified and determined the purpose of, whenever possible, the transfers between and among

these Merkin Defendants' bank accounts.

15.        Next, to determine whether any of the Initial Transfers of BLMIS funds were subsequently

transferred to the Merkin Defendants, I reviewed records produced by third-party financial institutions, as

well as by the Merkin Defendants, related to bank accounts held by the Merkin Defendants, including bank

accounts that received Initial Transfers of BLMIS funds.  I also reviewed records of data from QuickBooks

that were produced by the Merkin Defendants to the Trustee.  I understand from counsel to the Trustee that

there are several tracing methods available within the court's discretion to trace funds through commingled

bank accounts.  I was directed by counsel to the Trustee to review and apply the following tracing methods to

the transactional data that I derived from the available bank records to identify Subsequent Transfers of BLMIS funds:

- Last In, First Out ("LIFO")

- First In, First Out ("FIFO")

- Lowest Intermediate Balance Rule ("LIBR")

- Restated Tracing Rules (referred to as "Restated LIBR" for purposes of this report)

- Proportionality

16.     Next, to determine whether any of the Subsequent Transfers of BLMIS funds received by Defendant GCC were subsequently transferred to Defendant J. Ezra Merkin, I again reviewed records received by the Trustee from the Merkin Defendants as well as by third-party financial institutions related to bank accounts held by Defendant GCC.  I also reviewed data from the Merkin Defendants' QuickBooks records produced by the Merkin Defendants.  I was again directed by counsel to the Trustee to review and apply the five tracing methods listed above to the transactional data that I derived from the available bank records to identify any Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to Defendant J. Ezra Merkin.

17.     Finally, to identify and quantify the management fees paid by Defendant Ascot Partners to Defendant GCC, I reviewed records related to bank accounts held by Defendant Ascot Partners, as well as data from the Merkin Defendants' QuickBooks records.  I then identified the portion of these fees that are Subsequent Transfers of BLMIS funds.

18.     The documents and data that I considered in connection with this report are listed in **Exhibit 2**.  I reserve the right to supplement my report based on any additional documents or information received.


**IV. SUMMARY OF FINDINGS**

19.     Based on the forensic analyses performed, as described above and throughout this report, as well as my skills, knowledge, experience, education and training that I applied to the documents and information available to me as of the date of this report, my findings are summarized as follows:

- My team and I reconciled 99% of the approximately 225,000 cash deposit and withdrawal transactions reflected on *all* BLMIS customer statements during the time period of December 1998 to December 2008 to the available BLMIS bank records for the same time period.  The remaining 1% that we were unable to reconcile consists primarily of withdrawal transactions for which copies of the related cancelled checks were not available.  Based on the results of our reconciliation of 99% of the

cash transactions, I can reasonably infer that my team and I would have been able to reconcile these withdrawal transactions had copies of the related cancelled checks been available. Only 13 transactions of this remaining 1% (representing less than 0.006% of the approximately 225,000 cash transactions) were reflected on the customer statements, but could not be reconciled to available BLMIS bank records.

- From January 1992 to December 2008, the customer statements for the Merkin Accounts reflected 89 cash deposit and withdrawal transactions. I reconciled all but five (or approximately 94%) of these 89 cash transactions reflected on the customer statements for the Merkin Accounts to available BLMIS bank records, documents and records maintained at BLMIS, and/or documents and data produced by the Merkin Defendants to the Trustee. I was unable to complete my reconciliation for the remaining five cash transactions reflected on the customer statements for the Merkin Accounts due to the unavailability of records related to cash transactions dated prior to December 1998. However, based on my review of documents maintained at BLMIS related to the Merkin Accounts, I have not found any instance of the Merkin Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash deposit or withdrawal transactions reflected on the customer statements for the Merkin Accounts.

- Based on available bank records from both BLMIS records and records produced to the Trustee from Morgan Stanley, I traced approximately 89% of the total dollar amount of Initial Transfers of BLMIS funds (consisting of 100% of the Initial Transfers in the ten year period for which BLMIS bank records are available) to bank accounts held by the Merkin Defendants. I was not able to trace the remaining 11% of the total cash withdrawals from the Merkin Accounts (consisting of cash withdrawals dated prior to December 1998) because the relevant bank records were not available. Based on the results of my tracing, I can reasonably infer that, to the extent additional bank records related to the cash withdrawals from the Merkin Accounts were to become available to me, these records would further support the results of my tracing and that I would be able to trace the additional cash withdrawals from BLMIS to bank accounts held by the Merkin Defendants. In addition, the results of my tracing support that 82% of the total dollar amount of cash deposits reflected on the customer statements for the Merkin Accounts came from bank accounts held by, or the benefit of, the Merkin Defendants. Further, I noted that over $100 million of the cash deposits sent to BLMIS for the benefit of one of the Merkin Accounts came from a bank account held by, or for the benefit of, one of the other Merkin Defendants.

- Based on my analysis of activity in five bank accounts held by the Merkin Defendants, I determined that there were sources of funds other than from BLMIS, and therefore, commingling of funds in these five bank accounts. Specifically, there were sources of funds in three bank accounts held by the Merkin Funds other than from BLMIS funds, including transfers between and among these three bank accounts. In addition, there were sources of funds in two bank accounts held by Defendant GCC other than BLMIS funds, including transfers from the three bank accounts held by the Merkin Funds (for purposes other than payment of fees or operating expenses).

- I identified the following amounts of Subsequent Transfers of BLMIS funds to Merkin Defendants under each of the tracing methods applied:

| Tracing Method | Subsequent Transfers since December 2003 | Subsequent Transfers in the Two Year Period[3] |
|---|---|---|
| LIFO | $135,205,256 | $32,487,075 |
| FIFO | $130,795,332 | $45,416,196 |
| LIBR | $126,691,488 | $38,420,211 |
| Restated LIBR | $161,242,358 | $51,121,812 |
| Proportionality | $135,789,024 | $37,530,921 |

- I identified the following amounts of Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin under each of the tracing methods applied:

| Tracing Method | Subsequent Subsequent Transfers since December 2003 | Subsequent Subsequent Transfers in the Two Year Period |
|---|---|---|
| LIFO | $13,060,921 | $6,351,125 |
| FIFO | $14,642,299 | $7,325,524 |
| LIBR | $13,033,005 | $5,420,503 |
| Restated LIBR | $21,859,325 | $9,957,970 |
| Proportionality | $12,548,019 | $4,746,330 |

- I identified $146,184,547 in management fees paid from Defendant Ascot Partners to Defendant GCC between 1998 and 2008 ($47,706,995 during the Two Year Period), of which the following amounts are Subsequent Transfers of BLMIS funds under each of the tracing methods applied:

---

[3] The Two Year Period is the period between and including December 11, 2006 and February 28, 2009.

| Tracing Method | Total Fee Payments Identified as Subsequent Transfers (1998 – 2008) | Total Fee Payments Identified as Subsequent Transfers (Two Year Period) |
|---|---|---|
| LIFO | $48,473,696 | $10,903,034 |
| FIFO | $46,637,220 | $10,887,171 |
| LIBR | $45,141,029 | $8,432,437 |
| Restated LIBR | $56,521,450 | $15,092,833 |
| Proportionality | $47,340,743 | $10,238,324 |

**V. RECONCILIATION OF CASH TRANSACTIONS FOR ALL BLMIS CUSTOMERS**

*A. OVERVIEW*

20.       As set forth in the Principal Balance Calculation Report, a team from FTI working under Mr. Greenblatt's supervision created chronological listings of all cash and principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer account.  I was tasked with reconciling the customer cash deposit and withdrawal transactions to available BLMIS bank records to assist in the determination of whether the cash transactions reported on the customer statements for all BLMIS customers were fairly and accurately represented.

*B. BLMIS BANK ACCOUNTS*

21.       My team and I reviewed available bank account records for more than 90 bank and brokerage accounts in the name of either BLMIS or Bernard L. Madoff,[4] and found that only the following three bank accounts were used by BLMIS for customer deposits and withdrawals during at least the ten-year period from December 1998 to December 2008:[5]

- JPMorgan Chase account #xxxxx1703 (the "703 Account")[6]

- JPMorgan Chase account #xxxxxxxxx1509 (the "509 Account")

- Bankers Trust account #xx-xx0-599 (the "BT Account")

[4] *See* **Exhibit 3** for a listing of known bank accounts held by BLMIS and/or Bernard L. Madoff.
[5] Between January 2006 and April 2006, there were four customer withdrawal transactions totaling $262,000,000 that were paid from account #xxx-xxx6-621 held at the Bank of New York (the "BONY 621 Account").  The BONY 621 Account was one of the primary operating bank accounts used by BLMIS's Proprietary Trading and Market Making businesses.  In June 2006, there were two transfers totaling $261,816,950 from the 703 Account to the BONY 621 Account, presumably to reimburse the BONY 621 Account for funding the withdrawals to customers.  A cash withdrawal from one of the Merkin Accounts was one of the four customer withdrawal transactions that were paid from the BONY 621 Account.  *See* **Exhibit 10** for further detail (transaction dated 4/4/2006).
[6] Personal Identifying Information has been redacted throughout this report and the accompanying exhibits in compliance with Fed. R. Bankr. P. 9037 and applicable federal and state law.

22.        Records for these three accounts consist of monthly bank statements, copies of deposited checks, deposit slips and cancelled checks.  Records related to the 703 Account and the 509 Account were available from December 1998 to December 2008 and were obtained from BLMIS's files as well as from JPMorgan Chase & Co. ("JPMC").[7]   In addition to hard copy documents, JPMC produced an electronic file that provides details of wire transfers in and out of the 703 Account from January 1, 2002 to December 11, 2008 (the "JPMC Wire File").[8]  Records related to the BT Account were available from December 1998 to May 1999 and were obtained from BLMIS's files.[9]

23.        In the aggregate, FTI had available bank records related to the BLMIS bank accounts used for customer deposits and withdrawals for a ten-year period from December 1998 to December 2008.  To assist in our analysis of these bank records, which included copies of monthly bank statements and cancelled checks, we captured the transaction information from these records and converted the information into an electronic format through the use of a combination of Optical Character Recognition (OCR) software and manual entry. This electronic data, which accurately reflects the underlying records, became the basis for our reconciliation of the cash transactions reported in the BLMIS bank records to the cash deposits and withdrawals reflected on BLMIS customer statements.

**The 703 Account**

24.        Based on my review of the available BLMIS bank records, I determined that the 703 Account was the primary bank account used for BLMIS customer deposits and withdrawals.  My team and I reviewed and analyzed every one of the transactions reported in the available monthly bank statements for the 703 Account

---

[7] The October 1999 bank statement for the 509 Account could not be located.  However, I was able to use other available documents, such as the 703 Account statements, to estimate the activity in the 509 Account during October 1999.  In addition, there is activity reflected on the monthly bank statements for the 703 Account and 509 Account for which corresponding copies of deposited checks, deposit slips and/or cancelled checks were missing from the documents produced by JPMC and/or could not be located in BLMIS's records.  As reflected in my summary of findings and other results described throughout my report, these missing documents had a minimal impact on my overall analysis and reconciliation.

[8] This file was missing data for transactions dated December 11, 2004 to December 31, 2004.  However, we were able to use other available documents, such as the 703 Account statements, to obtain the necessary information to complete our analysis and reconciliation.

[9] Statements for June through August 1999, October 1999, December 1999 and July 2000 for the BT Account were also found in BLMIS's records.  However, May 1999 appears to be the last month of significant activity in the BT Account. There was no activity in the account during the months of June through August 1999, and the statements for these months showed an ending balance of $26,523.  In October 1999, the only transaction in the account was to transfer the $26,523 remaining balance to the 703 Account and zero out the BT Account.  The December 1999 and July 2000 statements for the BT Account both showed a zero balance.

from December 1998 to December 2008 to determine, among other things, whether the transactions were related to a BLMIS customer deposit or withdrawal.

25.        The results of our analysis of the activity in the 703 Account from the available bank records for December 1998 to December 2008 are set forth in an Excel spreadsheet titled "JPMC 703 Account Activity – December 1998 to December 2008" which is attached as **Exhibit 4**.

26.        In conducting our reconciliation of the cash transactions reported in the 703 Account bank records to the cash transactions reflected on the BLMIS customer statements, we first matched transactions based on the transaction date and amount, but also manually reviewed thousands of transactions to confirm our results.  In addition, there were instances when we reconciled multiple transactions on the BLMIS customer statements to a single transaction on the BLMIS bank statements.  For example, a deposit into the 703 Account that related to multiple BLMIS customers appeared as one transaction on the monthly bank statement for the 703 Account.  In that case, we reconciled the 703 Account transaction to a combination of multiple BLMIS customer transactions.[10]

27.        FTI assigned a unique identification number to each of the transactions reported on the available 703 Account bank statements.  *See* "703 ID" in the first column of the detail tab of Excel spreadsheet "JPMC 703 Account Activity – December 1998 to December 2008" (attached as **Exhibit 4**).   FTI also assigned a unique identification number to each one of the customer deposit and withdrawal transactions for every BLMIS customer account.  *See* "CM ID" in a separate column of the detail tab of **Exhibit 4**.  Once a specific transaction reported in a 703 Account statement was matched to a specific customer deposit or withdrawal transaction reflected on the BLMIS customer statements, we recorded the corresponding unique CM ID in the respective column of **Exhibit 4**.  This matching formed a link between the cash transactions per the bank records and the cash transactions per the customer statements.  This link ensured that no two customer cash transactions were incorrectly matched to the same cash transaction per the bank records or vice versa.

28.        Based on my review of the activity in the 703 Account from December 1998 to December 2008, I determined that approximately 97% of the inflows into the account during this period related to customer deposits and approximately 98% of the outflows from this account during this period related to customer withdrawals.

---

[10] As another example, BLMIS withheld certain amounts from foreign and other account holders and made payments to the Internal Revenue Service on behalf of these BLMIS customers.  In these cases, we reconciled one payment from the 703 Account to multiple related transactions per the BLMIS customer statements.  Two of the Merkin Accounts (Ascot Fund and Ariel Fund) included these tax withholding transactions.

**The 509 Account**

29.        Based on my review of the available bank records related to the 509 Account, I determined that
the 509 Account was a checking account funded by the 703 Account.   From December 1998 to December
2008, the inflows into the 509 Account consisted solely of transfers from the 703 Account and the outflows
from the 509 Account were solely in the form of checks.

30.        My team and I performed an analysis of the activity in the 509 Account, similar to the analysis we
performed with respect to the 703 Account, to determine whether the outflows from the 509 Account were
related to BLMIS customer withdrawals.  However, in this case, our analysis relied more heavily on our
review of the cancelled checks because the statements themselves lacked the necessary detail.  The results of
our analysis of the activity in the 509 Account from the available bank records for December 1998 to
December 2008 are set forth in an Excel spreadsheet titled "JPMC 509 Account Activity – December 1998 to
December 2008" which is attached as **Exhibit 5**.

31.        Based on my review of the activity in the 509 Account, I determined that approximately 99% of
the checks written from the 509 Account from December 1998 to December 2008 were related to customer
withdrawals.

**The BT Account**

32.        Based on my review of the available bank records related to the BT Account, from at least
December 1998 through May 1999, the BT Account was also funded by transfers from the 703 Account.
Outflows from the BT Account were in the form of both checks and wire transfers.

33.        My team and I performed a reconciliation analysis of the activity in the BT Account, similar to
those described above, to determine whether the outflows from the BT Account were related to BLMIS
customer withdrawals.  The results of our analysis of the activity in the BT Account from the available bank
records for December 1998 to May 1999 are set forth in an Excel spreadsheet titled "BT 599 Account Activity –
December 1998 to May 1999" which is attached as **Exhibit 6**.

34.        Based on my review of the activity in the BT Account during this period, I determined that over
97% of the outflows from the BT Account were related to customer withdrawals.

C.   *RESULTS OF RECONCILIATION*

35.        My team and I reconciled 99% of the approximately 225,000 cash deposit and withdrawal
transactions reflected on *all* BLMIS customer statements during the time period of December 1998 to
December 2008 to the available BLMIS bank records for the same time period.  The majority of the remaining

1%, or approximately 2,200 transactions, consist primarily of withdrawal transactions for which copies of the related cancelled checks were not available. Based on the results of our reconciliation of 99% of the cash transactions, I can reasonably infer that my team and I would have been able to reconcile these withdrawal transactions had the related cancelled checks been available. Only 13 transactions of this remaining 1% (representing less than 0.006% of the approximately 225,000 cash transactions) were reflected on the customer statements, but could not be reconciled to available BLMIS bank records. The cash transactions in the Merkin Accounts are not among those included in the 1% of cash transactions that could not be reconciled to available BLMIS bank records.

## VI. RECONCILIATION OF CASH TRANSACTIONS FOR THE MERKIN ACCOUNTS

### A. *OVERVIEW*

36.        The chronological listings of all cash and principal transactions for every BLMIS customer account compiled by FTI include the cash transactions for the Merkin Accounts. From January 1992 to December 2008, the customer statements for the Merkin Accounts reflected 89 cash deposit and withdrawal transactions, which consisted of 68 deposits into the Merkin Accounts totaling $1,066,100,000[11] and 21 withdrawals from the Merkin Accounts totaling $557,880,000.[12] I was tasked with reconciling these 89 cash transactions to available BLMIS bank records, documents in BLMIS files and/or documents and data received from the Merkin Defendants. *See* **Exhibit 7** for a list of these cash deposit and withdrawal transactions; *see also* **Exhibit 10** – "Reconciliation and Tracing Results – Merkin Accounts."

### B. *BLMIS BANK ACCOUNTS*

37.        Of the 89 cash transactions reflected on the customer statements for the Merkin Accounts, 47 occurred in the ten-year period for which there were available bank records for the three BLMIS bank accounts described above. I have reconciled 100% of these 47 cash deposit and withdrawal transactions

---

[11] Two cash deposit transactions reflected on the customer statements for the Merkin Accounts were subsequently cancelled and are therefore excluded from the count of total cash deposit transactions.

[12] In addition to these 21 cash withdrawal transactions, there were nearly two thousand transactions that represented purported tax obligations being withheld from two of the Merkin Accounts - Ascot Fund (1FN005) and Ariel Fund (1FR070). Over the life of these two Merkin Accounts, the amount of tax withholding transactions totaled $5,146,622 and $3,318,697 for Ascot Fund and Ariel Fund, respectively. BLMIS withheld certain amounts from foreign and other account holders and made combined payments to the Internal Revenue Service (IRS), generally on a monthly basis, on behalf of these BLMIS customers. More specifically, BLMIS made one monthly payment from the 703 Account to the IRS related to multiple tax withholding transactions across multiple BLMIS customer statements (including Ascot Fund and Ariel Fund). The count of total withdrawals from the Merkin Accounts excludes these tax withholding transactions.

reflected on the customer statements during the period December 1998 to December 2008 to available BLMIS
bank records, including monthly bank statements, detail contained in the JPMC Wire File and wire detail
related to the BONY 621 Account.

38.        The 47 cash transactions were reconciled to the BLMIS bank accounts as follows:

- 703 Account – 46 transactions (36 deposits via wire transfer and 10 withdrawals via
  wire transfer)

- BONY 621 Account – one withdrawal via wire transfer

39.        Based on these results, I can reasonably infer that if BLMIS bank records prior to December 1998
were available to me, I would be able to reconcile the remaining pre-December 1998 cash transactions in the
Merkin Accounts.


C.    *BLMIS CUSTOMER FILES*

40.        In addition to reconciling the cash transactions for the Merkin Accounts to the available BLMIS
bank records as described above, I also reviewed documents from BLMIS's records, including customer files,
to identify correspondence related to the cash deposit and withdrawal transactions reflected on the customer
statements for the Merkin Accounts.

41.        Customer files related to customer accounts were maintained in BLMIS's records and were
generally organized by BLMIS account number.  These customer files contained documents including, but
not limited to, correspondence between the customer and BLMIS employees regarding incoming deposits
and/or requests for withdrawals, customer contact information, and customer, trust and other agreements.

42.        As part of my analysis, I identified the customer files related to the Merkin Accounts within
BLMIS's records.[13]  I reviewed the documents contained in these customer files to identify correspondence
that related to the cash transactions reflected on the customer statements for the Merkin Accounts.  I also
reviewed other files from BLMIS records that contained correspondence related to the Merkin Accounts.  I
identified letters and/or other correspondence in BLMIS's files to support 31 of the 89 cash transactions
reflected on the customer statements for the Merkin Accounts.  One of these letters, which is a request for a
cash withdrawal from one of the Merkin Accounts, is attached as **Exhibit 8.1** and is described further below:

- Correspondence, dated December 23, 2003, addressed to Frank DiPascali from Michael E.
  Autera Jr., requesting a wire in the amount of $12,000,000 from Defendant Ascot Partners'

---

[13] I identified two customer files in the BLMIS records related to the Merkin Accounts – one labeled 1FN005 for the Ascot
Fund (AMF00069999-AMF00070063) and one labeled 1FR070 for the Ariel Fund (AMF00076284-AMF00076314).
However, these customer files include documents related to cash transactions in all four of the Merkin Accounts.

BLMIS customer account (1A0058) to Defendant Ascot Partners' bank account at Morgan Stanley (account # xxx-x3021).

43.　　　　Furthermore, based on my review of the documents contained in the customer files for the Merkin Accounts, I have not found any instance of the Merkin Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash deposit or withdrawal transactions reflected on the customer statements for the Merkin Accounts.

## D. *MERKIN DEFENDANTS' QUICKBOOKS DATA*

44.　　　　The Merkin Defendants have produced over 60,000 records of electronic data that were generated from QuickBooks, the accounting program used by the Merkin Defendants to account for financial activity, including, but not limited to, activity in the Merkin Accounts and other cash transactions related to the Merkin Funds.[14]  The QuickBooks data provided by the Merkin Defendants covers the period from January 1995 to January 2009.  I reconciled the accounting entries included in this data to the cash transactions recorded in the BLMIS customer statements for the Merkin Accounts, and identified the accounting entries to record 76 of the 89 total cash transactions in the Merkin Accounts, which are all the transactions within the time period covered by the QuickBooks records.

## E. *DOCUMENTS PRODUCED BY THE MERKIN DEFENDANTS TO THE TRUSTEE*

45.　　　　As of the date of this report, millions of pages of documents have been produced by the Merkin Defendants to the Trustee.  My team and I conducted targeted searches to locate documentation regarding the cash transactions in the Merkin Accounts.  We identified letters, other correspondence, and/or schedules regarding cash transactions in the Merkin Accounts (titles of schedules include, "Summary of Account Allocations", "Summary of Capital Changes," and other similar titles) within the documents produced by the Merkin Defendants that support 79 of the 89 cash deposit and withdrawal transactions reflected on the BLMIS customer statements for the Merkin Accounts.  An example of correspondence, which is a letter requesting a cash withdrawal from one of the Merkin Accounts, is attached as **Exhibit 8.2** and is described further below:

- Correspondence dated September 30, 2008, addressed to Frank DiPascali from Michael E. Autera Jr., which states, "Following up on my conversation with Jodi earlier today, we need to withdraw $45,000,000 from the Ascot Partners account…" and includes instructions to

---

[14] Deposition of Michael Autera as designated Rule 30(b)(6) representative ("Autera Dep."), 102:12-20, Oct. 22, 2014.

wire the amount to Defendant Ascot Partners' bank account at Morgan Stanley (account #
xxx-x3021).

## F.   *RESULTS OF RECONCILIATION*

46.        In total, based on the analyses described above, I reconciled 84, or approximately 94%, of the 89
cash transactions reflected on the customer statements for the Merkin Accounts to available BLMIS bank
records, documentation contained in BLMIS files, the Merkin Defendants' QuickBooks records and/or other
documents produced by the Merkin Defendants to the Trustee.  **Exhibit 7**, which is a chart that lists each of
the 89 cash transactions for the Merkin Accounts, contains four columns that indicate the results of my
reconciliation to each of these sources of information.

47.        I was unable to complete my reconciliation for the remaining five cash transactions reflected on
the customer statements for the Merkin Accounts due to the unavailability of records related to cash
transactions dated prior to December 1998.[15]  However, as noted above, I have not found any instance of the
Merkin Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash
deposit or withdrawal transactions reflected on the customer statements for the Merkin Accounts.

## VII. TRACING CASH TRANSACTIONS IN THE MERKIN ACCOUNTS

## A.   *OVERVIEW*

48.        I also used the available BLMIS bank records, as described above, to determine whether I could
trace the funds that left BLMIS's bank accounts (*i.e.*, the Initial Transfers) to accounts held by, or for the
benefit of, the Merkin Defendants.  To make this determination, I performed a "Receiving Bank" analysis,
which traces transfers from BLMIS's bank accounts to bank accounts that received funds from BLMIS.

49.        The withdrawal transactions reflected on the customer statements for the Merkin Accounts were
in the form of wire transfers from the 703 Account and the BONY 621 Account.  My tracing of withdrawals
via wire transfers was based on the transaction description contained on the monthly bank statements.  Often,
the description on the bank statements included the identification of both the banking institution that
received the cash transfer as well as the beneficiary of the transfer.  In some cases, the description also
included the corresponding bank account number.  The JPMC Wire File produced to the Trustee by JPMC
detailing the activity in the 703 Account and wire detail provided to the Trustee detailing the activity in the

---

[15] *See* **Exhibit 7** for five transactions labeled "*n/a*" across all four "Reconciliation Results" columns.  All five of these
transactions were cash deposit transactions.

BONY 621 Account contained the same, and in some cases, additional detail related to the transactions via wire transfers.  Therefore, I also relied on this wire transfer detail to identify information regarding the flow of funds related to wire transfers in and out of the 703 Account and the BONY 621 Account.

50.         Further, to trace the cash withdrawals as reflected on the customer statements for the Merkin Accounts, I also reviewed documents related to the Merkin Defendants' bank accounts that were produced to the Trustee by the Merkin Defendants and by Morgan Stanley, one of the banking institutions used by the Merkin Defendants.

51.         In addition, as part of my tracing analysis, based on the same bank records described above, I also identified the source bank accounts from which cash deposits reflected on the customer statements for the Merkin Accounts were sent to BLMIS from the Merkin Defendants.  The cash deposit transactions reflected on the customer statements for the Merkin Accounts were in the form of wire transfers into the 703 Account.  I followed the same tracing methodology used to trace cash withdrawals from BLMIS to the Merkin Defendants (as explained above) to trace cash deposits from the Merkin Defendants to BLMIS.


B.  *RESULTS OF TRACING*

52.     **Figure 1** below summarizes the results of my Receiving Bank analysis and lists the bank accounts identified by tracing the Initial Transfers from BLMIS.[16]

**FIGURE 1**
**Initial Transfers Tracing Results**
**December 1998 – December 2008**

| Account Holder | Banking Institution | Account Number | Total Amount Traced |
|---|---|---|---|
| Ascot Partners, LP | Morgan Stanley | xx-x3021 | $461,000,000 |
| Ariel Fund Ltd | Morgan Stanley | xx-x3001 | $16,200,000 |
| Gabriel Capital, LP | Morgan Stanley | xx-x3003 | $17,400,000 |

53.         Based on available bank records from both BLMIS records and records produced to the Trustee by Morgan Stanley, I traced approximately 89% of the total dollar amount of Initial Transfers of BLMIS funds (consisting of 100% of the Initial Transfers in the ten year period for which BLMIS bank records are available) to bank accounts held by the Merkin Defendants.

54.         I was not able to complete this tracing analysis for the remaining cash withdrawals related to the Merkin Accounts because the relevant bank records for periods prior to December 1998 were not available.

---

[16] *See also* **Exhibit 9.1** and **Exhibit 10**.

However, based on the results of my tracing of the Initial Transfers from BLMIS, I can reasonably infer that, to the extent additional bank records related to the Merkin Defendants' cash withdrawals become available to me, these records would further support the results of my tracing and that I would be able to trace the remaining cash withdrawals from BLMIS to bank accounts held by the Merkin Defendants.

55.        **Exhibit 9.2** summarizes the results of my tracing analysis of the source of cash deposits reflected on the customer statements for the Merkin Accounts (based on both available BLMIS bank records and records related to the Merkin Defendants' bank accounts that were produced to the Trustee in this matter) and lists the source bank accounts identified by tracing cash deposits from the Merkin Defendants to BLMIS. The results of my tracing support that 82% of the total dollar amount of cash deposits reflected on the customer statements for the Merkin Accounts came from bank accounts held by, or for the benefit of, the Merkin Defendants.  I was not able to trace the remaining 18% of cash deposits from the Merkin Defendants to BLMIS due to the unavailability of bank records related to cash transactions dated prior to June 1998, the earliest month of available bank records related to the Merkin Defendants' bank accounts.

56.        **Exhibit 9.2** also shows that over $100 million of the cash deposits sent to BLMIS for the benefit of one of the Merkin Defendants came from a bank account held by, or for the benefit of, one of the other Merkin Defendants.  For example, $25,000,000 of cash deposits into Defendant Ascot Partners' BLMIS customer account came from a bank account held by Defendant Gabriel Capital.

## VIII. COMMINGLING OF FUNDS

### A.  *OVERVIEW*

57.        I was also asked to determine whether there were sources of funds other than from BLMIS funds and therefore, commingling of funds, in five bank accounts[17] held by the Merkin Defendants, as listed in **Figure 2**.  For purposes of this report, counsel to the Trustee has defined commingling as the combination of BLMIS funds (Initial Transfers and/or Subsequent Transfers) and other sources of funds in these five bank accounts, such that BLMIS funds become unidentifiable and/or inseparable.

---

[17] One or more of these five accounts may be considered brokerage accounts.  For purposes of my report, I will refer to these accounts as bank accounts.

**FIGURE 2**

| Account Holder | Banking Institution | Account Number | Months of Available Bank Statements |
|---|---|---|---|
| Ascot Partners, LP | Morgan Stanley | xx-x3021 | June 1998 – Feb 2009[18] |
| Ariel Fund Ltd | Morgan Stanley | xx-x3001 | June 1998 – Feb 2009[19] |
| Gabriel Capital, LP | Morgan Stanley | xx-x3003 | June 1998 – Feb 2009[20] |
| Gabriel Capital Corporation[21] | Morgan Stanley | xx-x3007 | June 1998 – Feb 2009[22] |
| Gabriel Capital Corporation | JPMC | xxx-xx2994 | Dec 1999 – Dec 2008[23] |

58.        The first three accounts listed in **Figure 2** are collectively referred to as the "Merkin Funds Bank Accounts" and are the same three accounts that I identified in **Section VII** above as ones that received Initial Transfers of BLMIS funds.  As I will describe further in this section of the report, the Merkin Funds Bank Accounts also received funds from other sources, including transfers between and among the three Merkin Funds Bank Accounts.

59.        The last two accounts listed in **Figure 2** are held by Defendant GCC and are referred to as the "GCC MS Account" and the "GCC JPMC Account," respectively (collectively referred to as the "GCC Bank Accounts").  Defendant GCC provides administrative and accounting services on behalf of the Merkin Funds.[24]  The GCC Accounts received Subsequent Transfers of BLMIS funds (as discussed in **Section IX**

---

[18] *See* MSMERKIN-00015831-MSMERKIN-00015958; MSYSAF0001128-MSYSAF0001485; MSYSAA0004859-MSYSAA0005067.

[19] *See* MSMERKIN-00008015-MSMERKIN-00011096; MSYSAF0000001-MSYSAF0001127; MSYSAA0000363-MSYSAA0000704.

[20] *See* MSMERKIN-00011097-MSMERKIN-00015689; MSYSAF0001486-MSYSAF0002925; MSYSAA0001427-MSYSAA0001941.

[21] The name on this account was Ariel Management Corporation prior to August 2001.  *See* MSMERKIN-00023349; MSMERKIN-00023352.

[22] *See* MSMERKIN-00023207-MSMERKIN-00024058.

[23] *See* GCC-P 0886934-GCC-P 0886984; GCC-P 0646975-GCC-P 0646992; GCC-P 0647013-GCC-P 0647028; GCC-P 0647034-GCC-P 0647050; GCC-P 0647056-GCC-P 0647059; GCC-P 0646935-GCC-P 0646962; GCC-P 0838683-GCC-P 0838686; GCC-P 0838987-GCC-P 0838991; GCC-P 0838954-GCC-P 0838958; GCC-P 0837777-GCC-P 0837780; GCC-P 0837739-GCC-P 0837742; GCC-P 0837675-GCC-P 0837678; GCC-P 0837450-GCC-P 0837454; GCC-P 0837348-GCC-P 0837352; GCC-P 0837273-GCC-P 0837277; GCC-P 0837028-GCC-P 0837032; GCC-P 0836998-GCC-P 0837001; GCC-P 0836795-GCC-P 0836799; GCC-P 0836724-GCC-P 0836727; GCC-P 0836648-GCC-P 0836651; GCC-P 0832841-GCC-P 0832844; GCC-P 0831708-GCC-P 0831712; GCC-P 0831784-GCC-P 0831786; GCC-P 0831895-GCC-P 0831898; GCC-P 0831947-GCC-P 0831951; GCC-P 0832011-GCC-P 0832016; GCC-P 0832117-GCC-P 0832121; GCC-P 0832133-GCC-P 0832137; GCC-P 0832239-GCC-P 0832298; GCC-P 0828014-GCC-P 0828144; GCC-P 0829257-GCC-P 0829274; GCC-P 0886911-GCC-P 0886928; JPMCMERK-0062-JPMCMERK-1137.

[24] Autera Dep. 40:13-21, 42:21-44:4, 58:2-59:11; 81:5-14, 101:2-17, Oct. 22, 2014.

below).  As I will describe further in this section of the report, the GCC Accounts also received funds from other sources including the Merkin Funds Bank Accounts.[25]

60.    To analyze the activity in these five bank accounts in order to identify sources of funds other than from BLMIS and therefore, commingling of funds in the bank accounts, my team and I first identified and gathered the relevant and available bank account records related to these bank accounts.  We then performed the following:

- Reviewed documents and data related to activity in and out of the five bank accounts, including thousands of pages of monthly bank statements, as well as electronic data containing detail of wire transfer activity, produced to the Trustee by Morgan Stanley and JPMC;

- Converted the information contained in the monthly bank statements to electronic data through Optical Character Recognition (OCR) software and/or manual data entry;

- Organized the electronic data by relevant bank account and incoming and outgoing cash transactions in chronological order;[26]

- Matched the related transactions from the wire transfer detail and the Defendants' QuickBooks records to the corresponding transactions from the monthly bank statements whenever possible; and,

- Determined, based on available bank records, wire transfer detail and Merkin Defendants' QuickBooks records, the source of incoming funds and the recipient of outgoing funds, as applicable.

61.    Next, in the chronological listings of transactions, I specifically identified transfers between and among the Merkin Funds Bank Accounts and the GCC Bank Accounts (which represent sources of funds other than from BLMIS).  I then used the Merkin Defendants' QuickBooks records to identify the purpose of each transfer, whenever possible.

## B.  *RESULTS OF ANALYSIS*

62.    Based on the analysis described above, and based on the definition provided to me by counsel to the Trustee, I determined that there was commingling of funds in the five bank accounts held by the Merkin Defendants.  Specifically, there were sources of funds in the Merkin Funds Bank Accounts other than from

---

[25] Counsel to the Trustee has instructed me to disregard transfers from the Merkin Funds Bank Accounts to the GCC Bank Accounts that were for payments of fees or operating expenses.

[26] For purposes of our analyses, same day transactions followed the order that the transactions appeared on the monthly bank statements.

BLMIS, including transfers between and among the three Merkin Funds Bank Accounts.[27]  In addition, there

were sources of funds in the GCC Bank Accounts other than from BLMIS, including transfers from the

Merkin Funds Bank Accounts (for purposes other than payment of fees or operating expenses).[28]


**Transfers Between and Among the Merkin Funds Bank Accounts**

63.         Between June 1998 and February 2009, there were millions of dollars of funds transferred

between the three Merkin Funds Bank Accounts.  Based on my review of the descriptions of the related

transactions per the bank statements and the Merkin Defendants' QuickBooks records, some of these

transfers appear to have been made in order to transfer investor money from one of the Merkin Funds to

another one of the Merkin Funds.  For other transfers, based on the available information, it appears that

transfers were made from one Merkin Fund Bank Account with a positive account balance to another Merkin

Fund Bank Account that had a balance close to zero or even negative.  For some transfers, the description per

QuickBooks contains a reference to "Madoff Reallocation" or some variation.  For other transfers, the

QuickBooks records reflect that an intercompany balance was recorded.  In many cases, based on my review

of the Merkin Defendants' QuickBooks records, the purpose of the transfer between the Merkin Funds Bank

Accounts is unclear.

64.         **Figure 3** below summarizes the transfers between and among the three Merkin Funds Bank

Accounts during the time period from June 1998 to February 2009 (the time period of available bank

statements related to the Merkin Funds Bank Accounts).[29]  *See also* **Exhibit 11.1** for a list of these transfers.

---

[27] These other sources of funds also include, among other things, investor contributions and other unidentifiable sources.
[28] These other sources of funds also include, among other things, investor contributions, inflows from Defendant J. Ezra
Merkin's personal bank accounts and other unidentifiable sources.
[29] The transfers between and among the Merkin Funds Bank Accounts include ones that I have identified as potential
transfers of investor funds based on the description of the corresponding records in the Merkin Defendants' QuickBooks
(*i.e.*, records referencing "CONT" or "DIST").  These potential transfers of investor funds consist of transfers between
Defendant Ascot Partners and Defendant Gabriel Capital (approximately $39.2 million from Ascot Partners to Gabriel
Capital and approximately $13.7 million from Gabriel Capital to Ascot Partners).  *See* **Exhibit 11.1** for details of these
transfers.

**FIGURE 3**
**Transfers Between and Among the Merkin Funds Bank Accounts**
**June 1998 – February 2009**



65.        An example of the transfers between the three Merkin Funds Bank Accounts occurred in October

2001.  The balance in Defendant Gabriel Capital's bank account at Morgan Stanley was approximately $2

million as of October 29, 2001.  The next day, on October 30, 2001, Defendant Ariel Fund transferred $24

million from its account at Morgan Stanley to Defendant Gabriel Capital's account at Morgan Stanley.  The

Merkin Defendants' QuickBooks records reflect this transaction as a reduction of a loan from Defendant

Gabriel Capital.[30]

66.        Another example of transfers between Defendant Ariel Fund and Defendant Gabriel Capital

occurred in October 1999.   Specifically, on October 6, 1999, Defendant Gabriel Capital transferred $17 million

from its bank account at Morgan Stanley to Defendant Ariel Fund's bank account at Morgan Stanley, which

was reflected in the Merkin Defendants' QuickBooks records for Defendant Gabriel Capital as "TO AF 10/6."

Approximately two weeks later, on October 25, 1999, Defendant Ariel Fund transferred $17 million from its

bank account at Morgan Stanley back to Defendant Gabriel Capital's bank account at Morgan Stanley.  This

transaction was reflected in the Merkin Defendants' QuickBooks records for Defendant Gabriel Capital as

"FROM AF 10/21."

67.        Another example of transfers between the three Merkin Funds Bank Accounts occurred on

January 4, 2007, as depicted in **Figure 4** and further described in the following paragraph:

---

[30] On October 4, 2001, Defendant Gabriel Capital transferred $24 million to Defendant Ariel Fund's bank account held at
MeesPierson/Fortis when the balance in this bank account was only $1.4 million.  *See* GCC-P 0834156.  The $24 million
from Defendant Gabriel Capital was reflected as a loan to Defendant Ariel Fund in the Merkin Defendants' QuickBooks
records.  *See* TxnID F2C-1004383915.

**FIGURE 4**

**January 4, 2007**



68.        The balance in Defendant Ascot Partners' bank account at Morgan Stanley at the beginning of January 4, 2007 was approximately $2.3 million.  During the day, there were outflows for investor distributions of $33.3 million (including $12.8 million for a distribution to Defendant Ascot Fund), which exceeded the balance in the account at the beginning of the day.  Also during the day, in addition to a small amount of inflows from investors totaling $425,000, Defendant Ariel Fund transferred $18.5 million and Defendant Gabriel Capital transferred $26.5 million from their respective accounts at Morgan Stanley to Defendant Ascot Partners' account at Morgan Stanley.  Without the transfers from Defendant Ariel Fund and Defendant Gabriel Capital, Defendant Ascot Partners would not have had enough money in its bank account at Morgan Stanley to fund the investor redemptions.  Further, these two transfers were recorded as transfers *to* Defendant Ariel Fund and Defendant Gabriel Capital  *from* Defendant Ascot Partners in their respective BLMIS customer accounts, as shown in **Figure 5**, and the Merkin Defendants' QuickBooks records for Defendant Ascot Partners described these transfers as "Withdrawal from Madoff(AF)" and "Withdrawal from Madoff(GC)," respectively.

**FIGURE 5**

**January 4, 2007**

69.        Based on my review of the BLMIS customer statements for the Merkin Accounts, I found many instances of transfers between the Merkin Accounts at BLMIS that corresponded to transfers between the Merkin Funds Bank Accounts.  **Figure 6** summarizes the transfers between the Merkin Accounts at BLMIS held by Defendants Ascot Partners, Gabriel Capital and Ariel Fund that correspond with transfers between their respective bank accounts at Morgan Stanley.[31]  *See also* **Exhibit 11.1** for the identification of these transfers.

**FIGURE 6**
**Summary of Transfers Between the Merkin Funds' BLMIS Customer Accounts**
**That Correspond with Transfers Between the Merkin Funds Bank Accounts at Morgan Stanley**



70.        An example of corresponding transfers occurred on January 5, 2006, as depicted in **Figure 7**.

---

[31] The direction of the flowchart in **Figure 6** reflecting the transfers between the Merkin Funds' BLMIS customer accounts is opposite that of the direction of the flowchart reflecting the transfers between the Merkin Funds Bank Accounts.  For example, the total transfers of $52M *from* Defendant Ascot Partner's bank account at Morgan Stanley *to* Defendant Ariel Fund's bank account at Morgan Stanley is reflected as $52M *to* Defendant Ascot Partner's BLMIS customer account *from* Defendant Ariel Fund's BLMIS customer account.  In addition, there are transfers between the Merkin Funds' BLMIS customer accounts that do not correspond with transfers between the three Merkin Funds Bank Accounts (the corresponding cash transfers occurred between bank accounts outside of the three Merkin Funds Bank Accounts).  These transfers include $13.2 million from Defendant Ariel Fund's BLMIS customer account to Defendant Ascot Partner's BLMIS customer account (consisting of a $6.7 million transfer million dated 7/15/2002 and a $6.5 million transfer dated 1/8/2003) and $17.4 million from Defendant Gabriel Capital's BLMIS customer account to Defendant Ascot Partner's BLMIS customer account (consisting of a $200,000 transfer dated 7/15/2002 and $17,203,000 of a $19,500,000 transfer dated 1/8/2003).  These transfers are excluded from the flowchart in **Figure 6**.

**FIGURE 7**

**January 5, 2006**



71.        The balance in Defendant Ascot Partners' bank account at Morgan Stanley at the beginning of

January 5, 2006 was approximately $2.4 million.  During the day, Defendant Ascot Partners made

distributions to investors totaling approximately $93 million, which exceeded the beginning balance in

Defendant Ascot Partners' bank account.  On the same day, in addition to inflows from investors of $13

million, Defendant Ariel Fund transferred $38 million and Defendant Gabriel Capital transferred $59 million

from their respective bank accounts at Morgan Stanley to Defendant Ascot Partners' bank account at Morgan

Stanley.  Without the $38 million and $59 million transferred from Defendant Ariel Fund and Defendant

Gabriel Capital, respectively, Defendant Ascot Partners would not have had enough funds in its bank account

at Morgan Stanley to fund the approximately $93 million in distributions to investors.  Further, as shown in

**Figure 8**, there was a corresponding transfer of $38 million from Defendant Ascot Partners' BLMIS customer

account to Defendant Ariel Fund's BLMIS customer account.  Similarly, there was a corresponding transfer of

$59 million from Defendant Ascot Partners' BLMIS customer account to Defendant Gabriel Capital's BLMIS

customer account.  The descriptions per the Merkin Defendants' QuickBooks records for these transactions

were "Madoff Withdrawal" for Defendant Ascot Partners and "Additional capital to Madoff" for Defendants

Ariel Fund and Gabriel Capital.  However, there were no cash deposits or cash withdrawals to or from

BLMIS for $38 million or $59 million on January 5, 2006.

25

**FIGURE 8**

**January 5, 2006**



72.        Another example of the corresponding transfers, as depicted in **Figure 9**, is on July 6, 2006, when
the balance in Defendant Ascot Partners' bank account at Morgan Stanley was approximately negative $20
million.  Defendant Gabriel Capital transferred $26 million from its bank account at Morgan Stanley to
Defendant Ascot Partners' bank account at Morgan Stanley.  The next day, on July 7, 2006, Defendant Ascot
Partners' BLMIS customer account transferred $26 million to Defendant Gabriel Capital's BLMIS customer
account.  The descriptions per the Merkin Defendants' QuickBooks records for these transactions were
"Decrease Madoff position" for Defendant Ascot Partners and "Increase Madoff position" for Defendant
Gabriel Capital.

**FIGURE 9**

73.        Further, approximately one week later, on July 11, 2006, when the balance in Defendant Ascot
Partners' bank account at Morgan Stanley had a balance of approximately $11 million, Defendant Gabriel

Capital transferred $25 million to BLMIS that was reflected as a cash deposit on the customer statements for

Defendant Ascot Partners' BLMIS customer account.  The next day, on July 12, 2006, Defendant Ascot

Partners' bank account at Morgan Stanley received $25 million from Defendant Ascot Fund's bank account at

MeesPierson/Fortis.  Defendant Ascot Partners then transferred $25 million to Defendant Gabriel Capital,

which was described in the Merkin Defendants' QuickBooks records as "Wire to GC MDFF Investment."

These transactions are depicted in **Figure 10**:



**FIGURE 10**

**Transfers Between the Merkin Funds Bank Accounts and the GCC Bank Accounts**

74.       In addition to the transfers of funds between and among the three Merkin Funds Bank Accounts,

as described above, there were also millions of dollars of funds transferred between the Merkin Funds Bank

Accounts and the GCC Bank Accounts.  The Merkin Funds paid management and other fees to Defendant

GCC.  In addition, the Merkin Funds paid Defendant GCC for certain operating expenses.[32]  At the direction

of counsel to the Trustee, I have disregarded transfers related to fees and operating expenses for purposes of

my analysis.[33]

75.       **Figure 11** summarizes the transfers between the Merkin Funds Bank Accounts and the GCC Bank

Accounts that were not related to fees or operating expenses.[34]  *See also* **Exhibit 11.2** for a list of these transfers.

---

[32] Autera Dep. 30:12-25, 36:13-38:18, 39:21-40:05, Oct. 22, 2014.

[33] I identified payments of expenses and/or fees based on the transaction description per the Morgan Stanley bank account statement and/or the memo field from the Merkin Defendants' QuickBooks records.  In addition, I analyzed the activity in specific general ledger accounts in the Merkin Defendants' QuickBooks records, including "RECEIVABLE – GABRIEL CAPTL CORP" and "PAYABLE TO INVESTMENT ADVISOR" for Defendant Ariel Fund, "REC – GABRIEL CAPITAL CORP" and "PAYABLE TO INVESTMENT ADVISOR" for Defendant Ascot Partners, and "PAYABLE – GABRIEL CAPITAL CORP" for Defendant Gabriel Capital.

[34] In addition to what is shown in **Figure 11**, there were millions of dollars of funds transferred from the GCC MS Account to the GCC JPMC Account.  *See* **Exhibit 16.5** for a list of these transactions from December 2003 to December 2008 that totaled approximately $110 million during this time-period.

**FIGURE 11**

**Transfers Between the Merkin Funds Bank Accounts and the GCC Bank Accounts**
**Excluding Transfers Related to Fees and Operating Expenses**
**June 1998 – February 2009**



76.     Based on my review of the descriptions per the bank statements and the Merkin Defendants'
QuickBooks records related to these transactions, in some cases, it appears that the transfers from the Merkin
Funds Bank Accounts to the GCC Bank Accounts were made to pay redemptions to investors, which would
not normally be paid by Defendant GCC.[35]

77.     For example, as shown in **Figure 12**, on January 3, 2008, Defendant Ascot Partners made three
transfers to Defendant GCC totaling $300,000.  The descriptions in the Merkin Defendants' QuickBooks
records for each of these three transactions indicate that the transfers were related to investor distributions
(*i.e.*, the descriptions included a reference to "1/1 Dist").  Five days later, on January 8, 2008, Defendant GCC
transferred $1 million from the GCC MS Account to the GCC JPMC Account, which was reflected as an
"ASCOT PARTNERS REDEMPTION – 12/31/07" in the Merkin Defendants' QuickBooks records.
Corresponding distributions to three investors were made from the GCC JPMC Account between January 3,
2008 and February 29, 2008.

---

[35] Autera Dep. 28:19-28:23, Oct. 22, 2014.

**FIGURE 12**



Accounting by GCC: "ASCOT PARTNERS
REDEMPTION - 12/31/07"

78.     In other cases, based on my review of the Merkin Defendants' QuickBooks records, there were transfers between the Merkin Funds Bank Accounts and the GCC Bank Accounts where Defendant GCC was advancing money to the Merkin Funds.  For example, on October 2, 2000, when the balance in Defendant Ascot Partners' bank account at Morgan Stanley was not enough to fund an investor distribution, Defendant GCC transferred $3.5 million to Defendant Ascot Partners on October 2, 2000.  This transfer from Defendant GCC was reflected in the Merkin Defendants' QuickBooks records as an "ADVANCE TO ASP." Approximately three weeks later, on October 27, 2000, Defendant Ascot Partners transferred $3.5 million back to Defendant GCC.

79.     There were also transfers between the Merkin Funds Bank Accounts and the GCC Bank Accounts where it appeared that the Merkin Funds were advancing or loaning money to Defendant GCC.  For example, on December 30, 2003, when the balance in the GCC MS Account was negative, Defendant Ascot Partners transferred $5 million from its bank account at Morgan Stanley to the GCC MS Account.  The next day, on December 31, 2003, when the balance in the GCC MS Account was positive, Defendant GCC transferred $5 million from its bank account at Morgan Stanley back to Defendant Ascot Partners' bank account at Morgan Stanley.  I was unable to identify transactions in the Merkin Defendants' QuickBooks records related to these transfers between Defendants Ascot Partners and Defendant GCC.

## IX. SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO THE MERKIN DEFENDANTS

### A.  *OVERVIEW*

80.     I was also asked to identify whether any of the Initial Transfers of BLMIS funds, identified in **Section VII** above, were subsequently transferred to, or for the benefit of, the Merkin Defendants.  If so, I was

then instructed to identify the pathways through which such Subsequent Transfers of BLMIS funds took

place and to identify the dates and amounts of such Subsequent Transfers.

81.     To identify Subsequent Transfers of BLMIS funds to, or for the benefit of, the Merkin Defendants,

I again used the chronological listings of transactions, as discussed above, related to the Merkin Funds Bank

Accounts that received Initial Transfers of BLMIS funds, as listed on **Exhibit 9.1**.  I also reviewed records of

data from QuickBooks that were produced by the Merkin Defendants to the Trustee.

82.     I understand from counsel to the Trustee that there are several tracing methods available within

the court's discretion to trace funds through commingled bank accounts.  I was directed by counsel to review

and apply the following tracing methods to the chronological listings of transactions that I derived from the

available bank records to identify Subsequent Transfers of BLMIS funds:

- Last In, First Out ("LIFO")

- First In, First Out ("FIFO")

- Lowest Intermediate Balance Rule ("LIBR")

- Restated Tracing Rules (referred to as "Restated LIBR" for purposes of this report)

- Proportionality

83.     Based on my review of the relevant bank records produced by Morgan Stanley to the Trustee, the

balances in the bank accounts at Morgan Stanley for Defendant Gabriel Capital (account #xx-x3003) and

Defendant Ariel Fund (account #xx-x3001) were negative at the time the accounts received the Initial

Transfers from BLMIS.[36]  I have assumed that the Initial Transfers from BLMIS were used to fund the

negative balances in Defendants Gabriel Capital's and Ariel Fund's bank accounts at Morgan Stanley, and

therefore, I have not applied the tracing methods listed above to these two bank accounts.  I have only

applied the tracing methods to the activity in Defendant Ascot Partners' bank account at Morgan Stanley

(#xx-x3021) (the "Ascot Partners MS Account") to identify Subsequent Transfers of BLMIS funds.  The

transactions in the Ascot Partners MS Account from December 2003 through February 2009[37] and the results

---

[36] I traced the cash withdrawal dated 7/7/2008 for $17.4 million reflected on the customer statements for Defendant Gabriel
Capital's customer account at BLMIS (1G0321) from BLMIS to Defendant Gabriel Capital's bank account at Morgan
Stanley (account #xx-x3003).  *See* **Exhibit 10**.  The balance in Defendant Gabriel Capital's bank account at Morgan Stanley
just prior to the receipt of $17.4 million from BLMIS was approximately negative $40 million.  *See* MSYSAA0001821-22.
Similarly, I traced the cash withdrawal dated 7/7/2008 for $16.2 million reflected on the customer statements for
Defendant Ariel Fund's customer account at BLMIS (1FR070) from BLMIS to Defendant Ariel Fund's bank account at
Morgan Stanley (account #xx-x3001).  *See* **Exhibit 10**.  The balance in Defendant Ariel Fund's bank account at Morgan
Stanley just prior to the receipt of $16.2 million from BLMIS was approximately negative $23 million.  *See*
MSYSAA0000610-11.
[37] The first Initial Transfer from BLMIS that I traced to the Ascot Partners MS Account was on December 2, 2003 (*see*
**Exhibit 10**) and the last monthly bank statement related to the Ascot Partners MS Account that the Trustee received from
Morgan Stanley is February 2009.

of my analyses of these transactions using the five tracing methods are set forth in an Excel spreadsheet titled "Ascot Partners MS Account Activity and Analysis" (attached as **Exhibit 12**).

### B. _LAST IN, FIRST OUT ("LIFO")_

84.         The LIFO method is an accounting practice used to determine the cost of inventory. LIFO assumes that the inventory sold during a certain period comes from the most recent inventory purchased. Simply, under LIFO, the last units of inventory purchased are the first units to be sold. LIFO is also a method applied to trace funds in and out of a commingled bank account. Using LIFO, the last money deposited into a commingled bank account is considered to be the first money disbursed from that bank account.

85.         As discussed above, there was commingling of funds in the Ascot Partners MS Account. Accordingly, I have been instructed by counsel to the Trustee to apply the LIFO tracing method to the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place.

86.         Based on applying the LIFO tracing method, I identified **$32,487,075** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 13**. _See also_ **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

**FIGURE 13**[38]

| Subsequent Transfers from Ascot Partners (_under LIFO_) | | | | | |
|---|---|---|---|---|---|
| Time Period | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[39] | TOTAL |
| Since Dec 2003 | $81,120,927 | $       - | $118,000 | $53,966,328 | $135,205,256 |
| Two Year Period | $21,081,296 | $       - | $       - | $11,405,779 | $32,487,075 |

87.         **Figure 14** is an example of Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account using the LIFO tracing method and illustrates the pathway through which the Subsequent Transfers took place.

---

[38] Any differences are due to rounding.
[39] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the LIFO method, $48,473,696 was for payments of management fees ($10,903,034 during the Two Year Period). _See_ **Exhibit 17**.

**FIGURE 14**



88.        The application of the LIFO tracing method in this example is shown in **Figure 15**, which includes an excerpt from the activity in the Ascot Partners MS Account on December 29, 2006:

**FIGURE 15**

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|---|---|---|---|---|---|
| | | **4,310,201** | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (10,000,000) | (104,539) |
| **Balance** | | **4,205,662** | | **-** | **4,205,662** |

89.        The Initial Transfer from BLMIS of $10 million occurred on 12/29/2006 (*see* **Exhibit 10**).  The transfer from Defendant Ascot Partners to Defendant GCC on 12/29/2006 was the next transaction[40] after the inflow of $10 million from BLMIS.  Under LIFO, the last money in (in this case, the $10 million from BLMIS) is the first money to be disbursed from the account.  Therefore, under LIFO, $10 million of the total transfer from Defendant Ascot Partners to Defendant GCC for management fees is considered a Subsequent Transfer of BLMIS funds.  (*See also* **Exhibit 13.4**).

## C.   *FIRST IN, FIRST OUT ("FIFO")*

90.        The FIFO method is another accounting practice used to determine the cost of inventory.  FIFO assumes that the inventory sold during a certain period comes from the oldest inventory purchased.  Simply, under FIFO, the first units of inventory purchased are the first units to be sold.  FIFO is also a method applied to trace funds in and out of a commingled bank account.  Using FIFO, the first money deposited into a commingled bank account is considered to be the first money disbursed from that bank account.  I have been

---

[40] As noted above, I have assumed that transactions occurring on the same day took place in the order that they appeared on the monthly bank statements.

instructed by counsel to the Trustee to apply the FIFO tracing method to the transactions in the Ascot

Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants,

and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place.

91.        Based on applying the FIFO tracing method, I identified **$45,416,196** in Subsequent Transfers of

BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 16**. *See also*

**Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent

Transfers to the Merkin Defendants by date and amount.

<div align="center">

**FIGURE 16**

</div>

| | Subsequent Transfers from Ascot Partners (*under FIFO*) | | | | |
|---|---|---|---|---|---|
| **Time Period** | **Ascot Fund** | **Ariel Fund** | **Gabriel Capital** | **GCC[41]** | **TOTAL** |
| Since Dec 2003 | $76,365,000 | $150,000 | $418,000 | $53,862,332 | $130,795,332 |
| Two Year Period | $33,365,000 | $        - | $        - | $12,051,196 | $45,416,196 |

92.        **Figure 17** shows the Subsequent Transfers of BLMIS funds (the same Initial Transfer of $10

million on 12/29/2006) from the Ascot Partners MS Account using the FIFO tracing method and illustrates the

pathway through which the Subsequent Transfers took place.

<div align="center">

**FIGURE 17**

</div>



93.        The application of the FIFO tracing method in this example is shown in **Figure 18**, which includes

an excerpt from the activity in the Ascot Partners MS Account on December 29, 2006:

---

[41] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the FIFO method, $46,637,220
was for payments of management fees ($10,887,171 during the Two Year Period). *See* **Exhibit 17**.

**FIGURE 18**

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|---|---|---|---|---|---|
| | | **4,310,201** | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (5,794,338) | (4,310,201) |
| | **Balance** | **4,205,662** | | **4,205,661** | **-** |

94.       Under FIFO, the first money in the account is the first money to be disbursed from the account. In this example, the transfer from Defendant Ascot Partners to Defendant GCC on 12/29/2006 for management fees is taken first from the balance in the account prior to the Initial Transfer of $10 million from BLMIS ($4,310,201), which consists of non-BLMIS funds. Once the non-BLMIS funds are used, the remainder of the transfer to Defendant GCC ($10,104,539 less $4,310,201 = $5,794,338) is considered a Subsequent Transfer of BLMIS funds under FIFO. Further, under FIFO, the remaining BLMIS funds were used for other disbursements.

## D.   *LOWEST INTERMEDIATE BALANCE RULE ("LIBR")*

95.       The Lowest Intermediate Balance Rule ("LIBR") is a tracing principal used to determine the rights to funds remaining in a commingled bank account (*e.g.*, the rights of a trust beneficiary or the rights of a secured party). LIBR assumes that trust or secured funds deposited into a commingled bank account are the last funds disbursed from that account, and any disbursements made from the account are taken first from funds other than the trust or secured funds until the balance in the account dips below the amount of those trust or secured funds. In other words, under LIBR, trust or secured funds are assumed to fall to the bottom of the commingled bank account and subsequent disbursements made from the commingled account are taken off the top first.

96.       I have been instructed by counsel to the Trustee to apply LIBR in this case to identify Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account. I have assumed that the BLMIS funds are equivalent to the trust or secured funds referred to in my explanation of LIBR above. In this case, BLMIS funds remain in the Ascot Partners MS Account until all non-BLMIS funds are disbursed from that account. Non-BLMIS funds deposited into the Ascot Partners MS Account under LIBR will sit on top of the BLMIS funds and will be used first for subsequent disbursements. Subsequent disbursements will be taken from the

BLMIS funds only when the non-BLMIS funds are used up and the balance in the Ascot Partners MS Account (*i.e.*, the lowest intermediate balance) falls below the amount of the BLMIS funds in the account.

97.        Based on applying the LIBR tracing method, I identified **$38,420,211** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 19**. *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

**FIGURE 19**

| Subsequent Transfers from Ascot Partners (*under LIBR*) | | | | | |
|---|---|---|---|---|---|
| **Time Period** | **Ascot Fund** | **Ariel Fund** | **Gabriel Capital** | **GCC[42]** | **TOTAL** |
| Since Dec 2003 | $73,255,395 | $       - | $919,972 | $52,516,121 | $126,691,488 |
| Two Year Period | $29,064,189 | $       - | $       - | $9,356,021 | $38,420,211 |

98.        Again, using the Initial Transfer of $10 million on 12/29/2006, **Figure 20** shows the Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account using the LIBR tracing method and illustrates the pathway through which the Subsequent Transfers took place.

**FIGURE 20**



99.        The application of the LIBR tracing method in this particular example yields the same results as the application of the FIFO tracing method described above, and is shown in **Figure 21**.

---

[42] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the LIBR tracing method, $45,141,029 was for payments of management fees ($8,432,437 during the Two Year Period).  *See* **Exhibit 17.**

**FIGURE 21**

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|------|--------|-----------------|----------------------------------------------------------------|-------------|-------------|
| | | **4,310,201** | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (5,794,338) | (4,310,201) |
| | **Balance** | **4,205,662** | | **4,205,661** | **-** |

100.    Under LIBR, the BLMIS funds deposited into the Ascot Partners MS Account on 12/29/2006 fall to the bottom of the account and the non-BLMIS funds in the account get disbursed first. Similar to FIFO, in this example, the transfer from Defendant Ascot Partners to Defendant GCC on 12/29/2006 for management fees is taken first from the balance in the account prior to the Initial Transfer of $10 million from BLMIS ($4,310,201), which consists of non-BLMIS funds. Because the non-BLMIS funds are now completely used and the balance in the account (*i.e.*, $4,205,662) has fallen below the $10 million of BLMIS funds in the account, the remainder of the transfer to Defendant GCC ($5,794,338) is considered a Subsequent Transfer of BLMIS funds under LIBR. Further, under LIBR, the remaining BLMIS funds ($4,205,662) were used for other disbursements.

## E.   *RESTATED TRACING RULES ("RESTATED LIBR")*

101.    Counsel to the Trustee has advised me that certain rules regarding tracing of funds through a commingled bank account were restated in 2011. I have been instructed by counsel to apply these restated tracing rules to the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place. For purposes of this report, I have referred to the application of these restated tracing rules as the "Restated LIBR" tracing method.

102.    Pursuant to these restated tracing rules, withdrawals from a commingled bank account can be "marshaled so far as possible in favor of the claimant" (here, the Trustee), and the claimant can "claim the entire advantage of beneficial withdrawals that can be attributable to the claimant's funds" (*i.e.*, BLMIS funds). Further, the claimant can trace to his benefit any withdrawal from the commingled bank account that does not exceed the lowest balance reached in that commingled account between 1) the point at which the Trustee's funds (*i.e.*, BLMIS funds) are deposited into the commingled bank account and 2) the point at which the withdrawal is made.

103.        Based on applying the Restated LIBR tracing method, I identified **$51,121,812** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 22**. *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

FIGURE 22

| | Subsequent Transfers from Ascot Partners (*under Restated LIBR*) | | | | |
|---|---|---|---|---|---|
| Time Period | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[43] | TOTAL |
| Since Dec 2003 | $93,615,000 | $300,000 | $2,630,910 | $64,696,449 | $161,242,358 |
| Two Year Period | $33,365,000 | $        - | $        - | $17,756,812 | $51,121,812 |

104.        Again, using the Initial Transfer of $10 million on 12/29/2006, **Figure 23** shows the Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account using the Restated LIBR tracing method and illustrates the pathway through which the Subsequent Transfers took place.

FIGURE 23



105.        The application of the Restated LIBR tracing method in this particular example yields the same results as the application of the LIFO tracing method described above, and is shown in **Figure 24**.

FIGURE 24

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|---|---|---|---|---|---|
| | | **4,310,201** | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (10,000,000) | (104,539) |
| | **Balance** | **4,205,662** | | - | 4,205,662 |

---

[43] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the Restated LIBR tracing method, $56,521,450 was for payments of management fees ($15,092,833 in the Two Year Period). *See* **Exhibit 17**.

106.        Under the Restated LIBR tracing method, as the balance of BLMIS funds in the Ascot Partners MS

Account at the time of the transfer to Defendant GCC for management fees was $10 million, all $10 million is

considered a Subsequent Transfer of BLMIS funds.

## F.  *PROPORTIONALITY*

107.        Proportionality (also known as pro rata) is another tracing method used to trace funds in and out

of a commingled bank account.  This method calculates the proportion of the balance in a bank account

between sources each time a deposit is made and applies that proportion to the next disbursement from the

account.

108.        I have been instructed by counsel to the Trustee to apply the proportionality tracing method to

the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS

funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of

BLMIS funds took place.  In this case, I calculated the proportion of the balance in the Ascot Partners MS

Account that was attributable to deposits from BLMIS verses deposits from other sources.  I then identified

the source of each disbursement according to the proportion in the bank account balance at the time of the

disbursement.

109.        Based on applying the proportionality tracing method, I identified **$37,530,921** in Subsequent

Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure

25**.  *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these

Subsequent Transfers to the Merkin Defendants by date and amount.

### FIGURE 25

| | Subsequent Transfers from Ascot Partners (*under Proportionality*) | | | | |
|---|---|---|---|---|---|
| Time Period | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[44] | TOTAL |
| Since Dec 2003 | $80,439,874 | $79,060 | $757,381 | $54,512,709 | $135,789,024 |
| Two Year Period | $25,984,614 | $       - | $       - | $11,546,306 | $37,530,921 |

110.        Using the Initial Transfer of $10 million on 12/29/2006, the following describes how the

proportionality tracing method is applied in the Ascot Partners MS Account:

- The balance in the account just prior to a deposit from BLMIS on December 29, 2006 was

    **$4,310,201**, which was comprised of 100% of funds from other sources

---

[44] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the Proportionality tracing
method, $47,340,743 was for payments of management fees ($10,238,324 in the Two Year Period).  *See* **Exhibit 17**.

- A deposit from BLMIS of $10,000,000 was then received into the account, bringing the account balance to **$14,310,201**

- The total account balance is now comprised of **70% BLMIS funds** ($10,000,000 divided by $14,310,201) and **30% other sources** ($4,310,201 divided by $14,310,201)

- The next disbursement from the account was **$10,104,539** to Defendant GCC for management fees

- Applying the proportion of the balance in the account (70% BLMIS / 30% other sources) results in allocating the transfer of $10,104,539 to Defendant GCC for management fees as follows:

  ➤ $7,061,074 – Subsequent Transfer of BLMIS funds

  ➤ $3,043,465  - transfer from other sources

- The remaining BLMIS funds ($10,000,000 less $7,061,074 = $2,938,926) were used for other disbursements

111.        The results of this example are depicted in **Figure 26**, which also illustrates the pathway through which the Subsequent Transfers took place:

<div align="center">

**FIGURE 26**

</div>



## X. SUBSEQUENT SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO/FBO DEFENDANT J.EZRA MERKIN

*A.   OVERVIEW*

112.        Counsel to the Trustee also asked me to identify whether any of the Subsequent Transfers of BLMIS funds to Defendant GCC, calculated under the five tracing methods explained in **Section IX** above, were subsequently transferred to, or for the benefit of, Defendant J. Ezra Merkin (as previously defined, "Subsequent Subsequent Transfers").  If so, I was then instructed to identify the pathways through which such Subsequent Subsequent Transfers of BLMIS funds took place and to identify the dates and amounts of such Subsequent Subsequent Transfers.

113.        To identify Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin, I again used the chronological listings of transactions, as discussed

above, related to the two GCC Bank Accounts, both of which received Subsequent Transfers of BLMIS funds, as listed on **Exhibit 13.4**.[45]

114.      The transactions in the GCC MS Account from December 2003 through February 2009[46] and the results of my analyses of these transactions using the LIFO and FIFO tracing methods are set forth in an Excel spreadsheet titled "GCC MS Account Activity and Analysis – LIFO and FIFO" (attached as **Exhibit 14.1**).  The same set of transactions in the GCC MS Account, and the results of my analyses of these transactions using the LIBR, Restated LIBR and Proportionality tracing methods are set forth in an Excel spreadsheet titled "GCC MS Account Activity and Analysis – LIBR, Restated LIBR and Proportionality" (attached as **Exhibit 14.2**).  The transactions in the GCC JPMC Account from December 2003 through January 2009[47] and the results of my analyses of these transactions using the LIFO and FIFO tracing methods are set forth in an Excel spreadsheet titled "GCC JPMC Account Activity and Analysis – LIFO and FIFO" (attached as **Exhibit 15.1**). The same set of transactions in the GCC JPMC Account, and the results of my analyses of these transactions using the LIBR, Restated LIBR and Proportionality tracing method are set forth in an Excel spreadsheet titled "GCC JPMC Account Activity and Analysis – LIBR, Restated LIBR and Proportionality" (attached as **Exhibit 15.2**).

115.      From these chronological listings of transactions in the GCC Bank Accounts, I specifically identified the incoming cash transactions reflecting the Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account (as well as the Subsequent Subsequent Transfers from the GCC MS Account to the GCC JPMC Account).  Pursuant to instructions from counsel to the Trustee, I then identified Subsequent Subsequent Transfers of BLMIS funds to, or for the benefit of, Defendant J. Ezra Merkin, based on the same five tracing methods (LIFO, FIFO, LIBR, Restated LIBR and Proportionality).

116.      **Figure 27** depicts generally the pathways through which Subsequent Subsequent Transfers of BLMIS funds took place.

---

[45] In addition, there were transfers from the GCC MS Account to the GCC JPMC Account that I identified as Subsequent Subsequent Transfers of BLMIS funds under each of the five tracing methods.  *See* **Exhibit 16.5**.

[46] The first Subsequent Transfer from the Ascot Partners MS Account to the GCC MS Account that I identified was on December 2, 2003 (*see* **Exhibit 13.4**) and the last monthly bank statement related to the GCC MS Account that the Trustee received from Morgan Stanley is February 2009.

[47] The first Subsequent Transfer from the Ascot Partners MS Account to the GCC JPMC Account that I identified was January 2008 (*see* **Exhibit 13.4**).  However, the first Subsequent Subsequent Transfer from the GCC MS Account to the GCC JPMC Account that I identified was on December 3, 2003 (*see* **Exhibit 16.5**).  In addition, the last monthly bank statement that the Trustee received related to the GCC JPMC Account ends January 12, 2009.

**FIGURE 27**



117.       To identify the transfers that were for the benefit of Defendant J. Ezra Merkin, I reviewed and

analyzed the Merkin Defendants' QuickBooks Records, including activity in the "REC - J. EZRA MERKIN"

account maintained in the records for Defendant GCC (the "JEM Receivable Account").  I understand that the

JEM Receivable Account was maintained to record transfers of funds that were for the benefit of Defendant J.

Ezra Merkin and basically functioned as a loan from Defendant GCC to Defendant J. Ezra Merkin.[48]  An

increase to the JEM Receivable Account reflects a payment from Defendant GCC to, or for the benefit of,

Defendant J. Ezra Merkin.  A decrease to the JEM Receivable Account reflects a reduction of the receivable

balance (*i.e.*, loan balance) owed to Defendant GCC.  Any increase to the JEM Receivable Account was

therefore identified as a transfer to, or for the benefit of, Defendant J. Ezra Merkin.

118.       In addition, to determine the transfers to Defendant J. Ezra Merkin, I also reviewed and analyzed

the "COMPENSATION – OWNER" account maintained in the records for GCC.  This account recorded

compensation paid by Defendant GCC to Defendant J. Ezra Merkin (through ADP Payroll Services).

*B.    LAST IN, FIRST OUT ("LIFO")*

119.       Based on applying the LIFO tracing method, as described in **Section IX** above, I identified

**$6,351,125** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of,

Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 28**.  *See also* **Exhibit 16** for a

summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these

Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

---

[48] Autera Dep. 91:23-92:6, Oct. 22, 2014; Autera Dep. 262:22-263:8, 326:17-329:3, Oct. 23, 2014.

**FIGURE 28**

|  | Subsequent Subsequent Transfers from GCC (*under LIFO*) | | |
| --- | --- | --- | --- |
| Time Period | J. Ezra Merkin | For the Benefit of J. Ezra Merkin | TOTAL |
| Since Dec 2003 | $1,238,798 | $11,822,124 | $13,060,921 |
| Two Year Period | $224,508 | $6,126,617 | $6,351,125 |

120.        In addition, I identified $4,752,917 of Subsequent Subsequent Transfers of BLMIS funds from the
GCC MS Account to the GCC JPMC Account using the LIFO tracing method.  *See* **Exhibit 16.5** for a detailed
list of these transfers by date and amount.

121.        **Figure 29** shows the Subsequent Subsequent Transfers of BLMIS funds (again, using the Initial
Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts to, or for the benefit of, Defendant J. Ezra
Merkin using the LIFO tracing method and illustrates the pathway through which the Subsequent
Subsequent Transfers of BLMIS funds took place.

**FIGURE 29**



C.    *FIRST IN FIRST OUT ("FIFO")*

122.        Based on applying the FIFO tracing method, as described in **Section IX** above, I identified
**$7,325,524** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of,
Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 30**.  *See also* **Exhibit 16** for a
summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these
Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

**FIGURE 30**

| | Subsequent Subsequent Transfers from GCC (*under FIFO*) | | |
|---|---|---|---|
| Time Period | J. Ezra Merkin | For the Benefit of J. Ezra Merkin | TOTAL |
| Since Dec 2003 | $2,071,026 | $12,571,273 | $14,642,299 |
| Two Year Period | $188,111 | $7,137,413 | $7,325,524 |

123.        In addition, I identified $13,599,607 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the FIFO tracing method.  *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

124.        **Figure 31** shows the Subsequent Subsequent Transfers of BLMIS funds (again, starting with the Initial Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts for the benefit of Defendant J. Ezra Merkin using the FIFO tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 31**



D.  *LOWEST INTERMEDIATE BALANCE RULE ("LIBR")*

125.        Based on applying the LIBR tracing method, as described in **Section IX** above, I identified **$5,420,503** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 32**.  *See also* **Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

**FIGURE 32**

| | Subsequent Subsequent Transfers from GCC (*under LIBR*) | | |
|---|---|---|---|
| Time Period | J. Ezra Merkin | For the Benefit of J. Ezra Merkin | TOTAL |
| Since Dec 2003 | $1,065,668 | $11,967,337 | $13,033,005 |
| Two Year Period | $        - | $5,420,503 | $5,420,503 |

126.        In addition, I identified $5,155,721 of Subsequent Subsequent Transfers of BLMIS funds from the
GCC MS Account to the GCC JPMC Account using the LIBR tracing method.  *See* **Exhibit 16.5** for a detailed
list of these transfers by date and amount.

127.        Again, using the Initial Transfer of $10 million on 12/29/2006, **Figure 33** shows the Subsequent
Subsequent Transfers of BLMIS funds from the GCC Bank Accounts to, or for the benefit of, Defendant J. Ezra
Merkin using the LIBR tracing method and illustrates the pathway through which the Subsequent
Subsequent Transfers of BLMIS funds took place.

**FIGURE 33**



*E.    RESTATED TRACING RULES ("RESTATED LIBR")*

128.        Based on applying the Restated LIBR tracing method, as described in **Section IX** above, I
identified **$9,957,970** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the
benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 34**.  *See also*
**Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists
of these Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and
amount.

**FIGURE 34**

| | Subsequent Subsequent Transfers from GCC (*under Restated LIBR*) | | |
|---|---|---|---|
| **Time Period** | **J. Ezra Merkin** | **For the Benefit of J. Ezra Merkin** | **TOTAL** |
| Since Dec 2003 | $5,263,334 | $16,595,991 | $21,859,325 |
| Two Year Period | $903,510 | $9,054,460 | $9,957,970 |

129.    In addition, I identified $18,057,895 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the Restated LIBR tracing method. *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

130.    **Figure 35** shows an example of Subsequent Subsequent Transfers of BLMIS funds (again, using the Initial Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts to, or for the benefit of, Defendant J. Ezra Merkin using the Restated LIBR tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 35**



*F.    PROPORTIONALITY*

131.    Based on applying the Proportionality tracing method, as described in **Section IX** above, I identified **$4,746,330** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 36**. *See also* **Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these Subsequent Subsequent Transfers by date and amount.

**FIGURE 36**

| Time Period | Subsequent Subsequent Transfers from GCC (*under Proportionality*) | | |
|---|---|---|---|
| | J. Ezra Merkin | For the Benefit of J. Ezra Merkin | TOTAL |
| Since Dec 2003 | $2,812,219 | $9,735,800 | $12,548,019 |
| Two Year Period | $292,663 | $4,453,667 | $4,746,330 |

132.    In addition, I identified $8,097,125 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the Proportionality tracing method. *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

133.    **Figure 37** shows an example of Subsequent Subsequent Transfers of BLMIS funds (again, using the Initial Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts for the benefit of Defendant J. Ezra Merkin using the Restated LIBR tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 37**



## XI. MANAGEMENT FEES FROM DEFENDANT ASCOT PARTNERS TO DEFENDANT GCC

*A.  OVERVIEW*

134.       Finally, I was asked to determine whether management fees were paid by Defendant Ascot Partners to Defendant GCC, and if so, quantify the amount of those management fees and identify what portion of those fees are Subsequent Transfers of BLMIS funds.  I reviewed records related to the Ascot Partners MS Account, as well as the GCC Bank Accounts, to identify when Defendant Ascot Partners paid management fees to Defendant GCC and the amounts paid.  I also reviewed the Merkin Defendants' QuickBooks records to identify the transactions related to management fee payments.  Further, based on the results of my application of the five tracing methods as described above, I identified the portion of the total management fees paid by Defendant Ascot Partners to Defendant GCC that are Subsequent Transfers of BLMIS funds.

*B.  RESULTS OF ANALYSIS*

135.       Based on my review of the available bank records for the Ascot Partners MS Account and the Merkin Defendants' QuickBooks records, I identified $146,184,547 management fees paid by Defendant Ascot Partners to Defendant GCC between 1998 to 2008 ($47,706,995 during the Two Year Period), as summarized in **Figure 38** and **Figure 39**.  These figures also identify the portion of the management fees that are Subsequent Transfers of BLMIS Funds under each of the five tracing methods that I applied.[49] *See also* **Exhibits 17** and **17.1**.

---

[49] The earliest Subsequent Transfer of BLMIS funds from the Ascot Partners MS Account to Defendant GCC was in December 2003.

**FIGURE 38**
**Management Fees Paid By Defendant Ascot Partners to Defendant GCC**
**1998 - 2008**

| Year | Total Fees | Subsequent Transfers of BLMIS Funds Under Each Tracing Method | | | | |
|---|---|---|---|---|---|---|
| | | LIFO | FIFO | LIBR | Restated LIBR | Proportionality |
| 1998 | $ 2,637,267 | n/a | n/a | n/a | n/a | n/a |
| 1999 | $ 3,341,820 | n/a | n/a | n/a | n/a | n/a |
| 2000 | $ 3,786,520 | n/a | n/a | n/a | n/a | n/a |
| 2001 | $ 4,094,673 | n/a | n/a | n/a | n/a | n/a |
| 2002 | $ 4,607,053 | n/a | n/a | n/a | n/a | n/a |
| 2003 | $ 18,083,968 | $ 15,616,261 | $ 16,079,576 | $ 15,063,791 | $ 16,629,643 | $ 15,251,454 |
| 2004 | $ 20,872,693 | $ - | $ - | $ - | $ - | $ - |
| 2005 | $ 30,463,559 | $ 21,954,401 | $ 18,805,555 | $ 18,682,489 | $ 22,174,444 | $ 19,529,185 |
| 2006 | $ 26,004,162 | $ 10,000,000 | $ 6,659,256 | $ 8,756,650 | $ 12,624,530 | $ 9,382,854 |
| 2007 | $ 28,292,833 | $ 903,034 | $ 1,092,833 | $ 903,034 | $ 1,092,833 | $ 1,002,147 |
| 2008 | $ 4,000,000 | $ - | $ 4,000,000 | $ 1,735,065 | $ 4,000,000 | $ 2,175,102 |
| **Total:** | **$ 146,184,547** | **$ 48,473,696** | **$ 46,637,220** | **$ 45,141,029** | **$ 56,521,450** | **$ 47,340,743** |

**FIGURE 39**
**Management Fees Paid By Defendant Ascot Partners to Defendant GCC**
**Two Year Period**

| Year | Total Fees | Subsequent Transfers of BLMIS Funds Under Each Tracing Method | | | | |
|---|---|---|---|---|---|---|
| | | LIFO | FIFO | LIBR | Restated LIBR | Proportionality |
| 2006[50] | $ 15,414,162 | $ 10,000,000 | $ 5,794,338 | $ 5,794,338 | $ 10,000,000 | $ 7,061,074 |
| 2007 | $ 28,292,833 | $ 903,034 | $ 1,092,833 | $ 903,034 | $ 1,092,833 | $ 1,002,147 |
| 2008 | $ 4,000,000 | $ - | $ 4,000,000 | $ 1,735,065 | $ 4,000,000 | $ 2,175,102 |
| **Total:** | **$ 47,706,995** | **$ 10,903,034** | **$ 10,887,171** | **$ 8,432,437** | **$ 15,092,833** | **$ 10,238,324** |

[50] The Two Year Period begins on December 11, 2006.

48

**XII. SIGNATURE AND RIGHT TO MODIFY**

136.        This report and the exhibits contained herein present my findings and the bases thereof.  To the
extent that any additional information is produced by any party, I reserve the right to incorporate such
additional information into my report or to modify my report as necessary.

By:

*Lisa M. Collura*

Lisa M. Collura, CPA, CFE, CFF

March 20, 2015

## XI. LIST OF EXHIBITS

Exhibit 1        Curriculum Vitae
Exhibit 2        Documents Considered
Exhibit 3        List of Known BLMIS/Bernard L. Madoff Bank and Brokerage Accounts
Exhibit 4        Excel Spreadsheet "JPMC 703 Account Activity – December 1998 to December 2008"
Exhibit 5        Excel Spreadsheet "JPMC 509 Account Activity – December 1998 to December 2008"
Exhibit 6        Excel Spreadsheet "BT 599 Account Activity – December 1998 to May 1999"
Exhibit 7        List of All Cash Transactions in the Merkin Accounts
Exhibit 8.1     Letter from BLMIS Files for Merkin Accounts
Exhibit 8.2     Letter from Merkin Defendants' Produced Documents for Merkin Accounts
Exhibit 9.1     Summary of Receiving Bank Analysis – Merkin Accounts
Exhibit 9.2     Summary of Source Bank Accounts – Merkin Accounts
Exhibit 10      Reconciliation and Tracing Results – Merkin Accounts
Exhibit 11.1   Transfers Between and Among Merkin Funds Bank Accounts
Exhibit 11.2   Transfers Between Merkin Funds Bank Accounts and GCC Bank Accounts
Exhibit 12      Excel Spreadsheet "Ascot Partners MS Account Activity and Analysis"
Exhibit 13      Summary of Subsequent Transfers from Ascot Partners
Exhibit 13.1   Subsequent Transfers from Ascot Partners to Ascot Fund
Exhibit 13.2   Subsequent Transfers from Ascot Partners to Ariel Fund
Exhibit 13.3   Subsequent Transfers from Ascot Partners to Gabriel Capital
Exhibit 13.4   Subsequent Transfers from Ascot Partners to GCC
Exhibit 14.1   Excel Spreadsheet "GCC MS Account Activity and Analysis – LIFO and FIFO"
Exhibit 14.2   Excel Spreadsheet "GCC MS Account Activity and Analysis – LIBR, Restated LIBR and
                   Proportionality"
Exhibit 15.1   Excel Spreadsheet "GCC JPMC Account Activity and Analysis – LIFO and FIFO"
Exhibit 15.2   Excel Spreadsheet "GCC JPMC Account Activity and Analysis – LIBR, Restated LIBR and
                   Proportionality"
Exhibit 16      Summary of Subsequent Subsequent Transfers from GCC Bank Accounts
Exhibit 16.1   Subsequent Subsequent Transfers from GCC MS Account to Defendant J. Ezra Merkin
Exhibit 16.2   Subsequent Subsequent Transfers from GCC MS Account For the Benefit of Defendant J. Ezra
                   Merkin
Exhibit 16.3   Subsequent Subsequent Transfers from GCC JPMC Account to Defendant J. Ezra Merkin
Exhibit 16.4   Subsequent Subsequent Transfers from GCC JPMC Account For the Benefit of Defendant J.
                   Ezra Merkin
Exhibit 16.5   Subsequent Subsequent Transfers from GCC MS Account to GCC JPMC Account
Exhibit 17      Summary of Management Fees Paid from Ascot Partners to GCC
Exhibit 17.1   Detail of Management Fees Paid from Ascot Partners to GCC

# Exhibit 3

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------X

     In re:                         SIPA LIQUIDATION
5

     BERNARD L. MADOFF INVESTMENT    No. 08-01789(SMB)
6    SECURITIES LLC.,

                                     (Substantively
7                                    Consolidated)

                    Debtor.
8    -------------------------------X

     IRVING H. PICARD, Trustee of the
9    Liquidation of Bernard L. Madoff
     Investment Securities LLC.,
10

                    Plaintiff,
11
                                     Adv. Pro. No.
                                     09-01182(SMB)
12             VS.

13   J. EZRA MERKIN, GABRIEL
     CAPITAL, L.P., ARIEL FUND LTD.,
14   ASCOT PARTNERS, L.P., GABRIEL
     CAPITAL CORPORATION,
15
                    Defendants.
16   -------------------------------X

17            **  REVISED  **

18

19    VIDEOTAPED DEPOSITION OF BRUCE G. DUBINSKY

20           Monday, April 27, 2015

21         1095 Avenue of the Americas

22             New York, New York

23

24   Reported by:
     AYLETTE GONZALEZ, RPR, CLR, CCR
25   JOB NO. 92955

1        BRUCE G. DUBINSKY
2    issued the current report.
3        Q.   What changes did you make from that
4    report to this report?
5        A.   I could tell you in -- in overall
6    generalities; I can't go through line by line.
7    I could, but I don't have them here in front
8    of me.
9             There was much more work done
10   looking at what I refer to in the report as
11   House 5, which was the prop trading and
12   market-making side of the business,
13   Mr. Madoff's business; looking at the
14   profitability of House 5 or the lack thereof;
15   looking at the fraud that occurred in House 5;
16   and ultimately rendering a conclusion that the
17   fraud was pervasive all throughout BLMIS.
18       Q.   And that's contrary to the opinion
19   that you offered in Katz/Wilpon?
20       A.   No, it's not contrary to the
21   opinion.
22       Q.   How does that differ from the
23   opinion that you offered in your initial
24   report?
25       A.   I just explained to you that my

1        BRUCE G. DUBINSKY
2    work continued.  At the time I issued the
3    initial report, which was November 2011, I had
4    only been hired about five or six months at
5    that point, and there were deadlines to get
6    the report out so I did the work that I had
7    done up to the point of issuing that report.
8    And then my work continued and I focused more
9    deeply on the House 5 side of the business.
10   And that's what -- the report that we keep
11   talking about that you have.
12       Q.   And there's another report in
13   between?
14       A.   There was.  It was the same report
15   that was issued in November 2011, I think it
16   was amended in January 2012.  There was a
17   slight amendment on one -- one schedule in the
18   report, the back of the report.
19       Q.   And what case was that issued in
20   connection with?
21       A.   I think the -- the case caption --
22   and I'd have to go back to those reports -- I
23   think are just a general caption for the --
24   the Madoff bankruptcy.  So again, without
25   looking at that report, I don't have it in

1        BRUCE G. DUBINSKY
2    front of me, I'd have to look at the case
3    caption.
4             But my understanding is, my reports
5    are going to be used across all of the cases.
6    And so, for instance, in this case, the Merkin
7    case, my report that you have was not amended
8    or added to for purposes of this specific
9    case.
10            So the reports, my understanding,
11   are kind of a -- a report that will be used
12   across all of the bankruptcy cases if need be.
13       Q.   So is there anything specific to
14   the Merkin case that you did in rendering your
15   opinions in the report that you issued in this
16   case?
17       A.   I wouldn't say specific to the
18   Merkin says.  It's no different than any other
19   case.  I could tell you there are
20   Merkin-related accounts that were subsumed in
21   analysis in -- in the report.  That was in the
22   report that was issued again that's being used
23   in all cases.
24            So just to clarify, there was
25   nothing that I added specifically for the

1        BRUCE G. DUBINSKY
2    Merkin case or took away.  The report is the
3    report.
4        Q.   Did you consider adding anything
5    specific to the Merkin case?
6        A.   No.  My -- my role for the trustee
7    was kind of an omnibus role across all of the
8    bankruptcy cases to look at the -- to look and
9    see if there was fraud at BLMIS, to determine
10   if it was a Ponzi scheme, to look at the
11   solvency, and to look at whether MSIL, which
12   was the European entity of Madoff, was
13   involved.  So again, it wasn't case specific
14   to any particular Defendant across the board.
15       Q.   Do you -- have you formed any
16   opinions that are not reflected in the report
17   that you issued in this case?
18       A.   Talking about expert opinions?
19       Q.   In -- in your capacity as an expert
20   in this case, have you formed any opinions
21   that aren't reflected in your written report
22   that you've issued in this case?
23       A.   No.  Everything that -- all of my
24   opinions are embodied in the report.
25       Q.   And I take it you don't intend to

BRUCE G. DUBINSKY

1 offer testimony in this case on topics that
2 are not -- or on opinions that are not written
3 in the report that you issued in this case?
4     A.   Presently I haven't been asked to
5 do so.  If I was asked to do so and there was
6 a -- an ability to update reports, if there
7 was a court order and I was asked to do so, I
8 would do that.  But at the present time, no, I
9 have not been asked to do that.
10     Q.   I think you say in your report that
11 you're not offering any opinion as to the
12 knowledge or involvement of any individual in
13 Madoff fraud; is that right?
14     A.   I don't recall saying that.  I know
15 there's a statement where I'm not opining on
16 the guilt or innocence of any party that's
17 been involved in that, if that's what you're
18 referring to.
19     Q.   And you're not offering -- and that
20 is solely with respect to employees of
21 Mr. Madoff's firm; is that right?
22     A.   That was with respect to -- to any
23 individual or entity -- I think there's a
24 footnote to that effect in the report that

BRUCE G. DUBINSKY

1 says to the effect of any individual or entity
2 that is named in the report, that I'm not
3 opining on the guilt or innocence of that
4 party or persons.
5     Q.   And that includes people who've
6 been found guilty or who've pled guilty to
7 committing securities fraud?
8     A.   In this case; is that what you're
9 asking?
10     Q.   That includes employees of
11 Mr. Madoff's firm who've either pled guilty or
12 been found by a jury to be guilty of engaging
13 in securities fraud.
14     A.   That is correct.
15     Q.   Okay.  And you're not opining as to
16 whether they had knowledge or involvement in
17 the scheme?
18     A.   No, I don't think I would agree
19 with you there.  I think when you read the
20 report, there are times when I reference
21 somebody's involvement in a document or
22 processes.  So that's detailed in the report.
23     Q.   Did you consider in any of your
24 work whether any investors with Mr. Madoff's

BRUCE G. DUBINSKY

1 firm or accountholders had knowledge of or
2 participated in the fraud at BLMIS?
3     A.   No, my role was focused on looking
4 at BLMIS, Bernard L. Madoff Investment
5 Securities; looking at whether there was fraud
6 in the organization; how that fraud was
7 perpetrated; whether again there was a Ponzi;
8 whether the entity was solvent or insolvent.
9 And as I mentioned the, MSIL, how MSIL was
10 involved.
11     So I was not tasked with looking at
12 any specific investor or group of investors or
13 funds as to what knowledge they may or may not
14 have had.
15     Q.   I think we can agree that you're
16 not -- you're not offering an opinion in this
17 case as to any -- as to the due diligence
18 performed by Mr. Merkin or any of the Merkin
19 funds on the investments with BLMIS; is that
20 right?
21     A.   That is correct, I have not been
22 asked to do so, and I don't have an opinion on
23 that.
24     Q.   And you don't -- and you don't have

BRUCE G. DUBINSKY

1 an opinion -- you're not intending to offer an
2 opinion as to knowledge by Mr. Merkin or any
3 of the funds; is that right, as to
4 Mr. Madoff's fraud?
5     MS. KOSACK:  Object to the form.
6 Could we just clarify the Merkin
7 funds?
8     MR. STEINER:  You can object to
9 the form.
10     A.   Again, my role -- and I don't
11 intend to testify about Funds' knowledge,
12 Mr. Merkin's knowledge.  My report is the
13 report, the opinions are contained therein.
14     Q.   And you understand -- are you
15 familiar with Ariel Fund Limited?
16     A.   Just from the context of this
17 litigation, but beyond that, no.
18     Q.   What do you understand Ariel Fund
19 Limited to be?
20     A.   It's one of the funds that
21 Mr. Merkin was involved with that invested in
22 BLMIS.
23     Q.   And are you familiar with Ascot
24 Partners, L.P.?

1        BRUCE G. DUBINSKY
2        A.   Again, generally in the same
3    concept.
4        Q.   And how about Gabriel Capital,
5    L.P.?
6        A.   It would be the same involvement in
7    those funds.  Some of these might have been
8    general partners of the funds, but again, just
9    a general knowledge.
10       Q.   So you're not sure whether Gabriel
11   Capital, L.P. was a fund or was a general
12   partner of a fund?
13       A.   I don't recall offhand.
14       Q.   All right.  And how about
15   Long-Horizon, are you familiar with that one?
16       A.   I've not heard that name before.
17       Q.   Do you know what involvement it has
18   in the case?
19       A.   I don't.
20       Q.   Okay.  Or Cerberus, are you
21   familiar with Cerberus?
22       A.   I've heard of Cerberus, which is
23   a -- I believe a private equity firm.
24       Q.   So that doesn't have any
25   involvement, right?

1        BRUCE G. DUBINSKY
2        A.   As to my opinion -- I don't know
3    what involvement it may or may not have as to
4    my opinions.  I don't have an opinion on that.
5        Q.   Are you familiar with
6    Jeffry Picower?
7        A.   I am.
8        Q.   Did you form any opinions about
9    Mr. Picower?
10       A.   Not that I recall, no.
11       Q.   Okay.  Were you asked to form any
12   opinions about Mr. Picower in any of your work
13   in connection with the Madoff cases?
14       A.   No, I was not.
15       Q.   So that I understand, you intend to
16   testify or you formed the opinion that BLMIS
17   was -- that there was a pervasive fraud at
18   BLMIS; is that correct?
19       A.   That is correct, that's part of the
20   opinion, yes.
21       Q.   And that Mr. Madoff was operating a
22   Ponzi scheme at BLMIS?
23       A.   I didn't render the opinion that
24   Mr. Madoff was operating the Ponzi scheme.
25   What I rendered was that there was a Ponzi

1        BRUCE G. DUBINSKY
2    scheme that was being operated at BLMIS, it
3    involved many people.
4            And again, as you pointed out, I
5    wasn't looking at the guilt or innocence of
6    any one party or person; I was looking at the
7    entity itself and did it function as a Ponzi.
8        Q.   Okay.  So you concluded that BLMIS
9    functioned as a Ponzi scheme?
10       A.   I think the terminology was BLMIS
11   was a Ponzi.
12       Q.   And how many people were involved
13   in operating the Ponzi scheme at BLMIS?
14       A.   I don't opine on that.  There are
15   people that I layout in the report that were
16   employees there, but I didn't do an
17   investigation beyond whether it was operating
18   as a Ponzi to look at people that might have
19   been on the outside that had involvement in
20   that Ponzi.  Again, I was focused on the
21   entity itself and whether the entity was
22   operating as a Ponzi.
23       Q.   And did you form an opinion that at
24   least a dozen internal employees were
25   participating in the operation of BLMIS as a

1        BRUCE G. DUBINSKY
2    Ponzi scheme?
3        A.   Again, I didn't render that
4    opinion.  What I detail in the report are
5    people that were working there, people that
6    had some involvement in there.  I detail
7    people that have now pled guilty and admitted
8    that they were involved in the Ponzi.
9            But the focus of my report was
10   looking at the entity itself, and was there a
11   fraud, was it a Ponzi, was it solvent.
12       Q.   And then you formed an opinion or
13   intend to offer the opinion that MSIL
14   participated in or had some role in connection
15   with the Ponzi scheme; is that right?
16       A.   That is correct.
17       Q.   Okay.  And aside from those three
18   opinions, are there -- are there any other
19   opinions that you're offering?
20       A.   I'm trying to think if it was three
21   or four.  It was -- it was a fraud, it was a
22   Ponzi, it was insolvent and MSIL was involved,
23   so there were four.
24       Q.   So the fourth opinion was that
25   BLMIS was insolvent?

BRUCE G. DUBINSKY

1  BRUCE G. DUBINSKY
2  up from there.
3  Q.  In terms of your work on this case,
4  how much have you been paid in connection with
5  the Madoff cases?
6  A.  It would be an estimate, I don't
7  know exactly, but it's probably presently
8  about 31- to $32 million.
9  Q.  That you've personally been paid?
10  A.  No.  When you say me, personally, I
11  work for a firm called Duff & Phelps, and the
12  firm is engaged, I'm an employee of the
13  company.  No, I don't get that money
14  personally.
15  Q.  So Duff & Phelps has been paid
16  about 31- or $32 million in connection with
17  the Madoff cases?
18  A.  That's an approximation, yes.
19  Q.  Is there work that Duff & Phelps is
20  doing aside from work in connection with your
21  provision of expert witness services?
22  A.  There is another team that's
23  providing support to Dr. Pomerantz.
24  Q.  And to your knowledge, that's the
25  only two areas where Duff & Phelps is engaged

1  BRUCE G. DUBINSKY
2  is to you and your support team and then a
3  support team for Dr. Pomerantz?
4  A.  As far as Duff & Phelps is
5  concerned, yes.
6  Q.  And does the 31- or $32 million
7  include the work on both parts of the
8  engagement or is that the work in connection
9  with your services?
10  MS. KOSACK:  Object to form.
11  A.  That's total for the firm, Duff &
12  Phelps.
13  Q.  How much relates to the work that
14  you've performed versus the work that the team
15  supporting Dr. Pomerantz has performed?
16  A.  I would be guessing at this point,
17  I don't know.
18  Q.  Do you have an approximation?
19  A.  I don't.
20  Q.  How many people are working -- is
21  there any overlap in the team that's
22  supporting Dr. Pomerantz and then your team?
23  A.  No, there's not.
24  Q.  How many people are working on the
25  team supporting Dr. Pomerantz?

1  BRUCE G. DUBINSKY
2  A.  To the best of my knowledge, three,
3  could have been four people at -- at a time,
4  but I think there's three people that are
5  working on it.
6  Q.  And how many people are working on
7  the team supporting you?
8  A.  Presently I think the team is down
9  to about four to five people.
10  Q.  Has it been bigger than that over
11  time?
12  A.  Yes.
13  Q.  Okay.  How big has it been at its
14  biggest?
15  A.  At its biggest, I had about 75 to
16  80 people working on the case.
17  Q.  How long did you have 75 to 80
18  people working on the case?
19  A.  I would say probably about eight
20  months initially and then the team started
21  getting smaller.
22  Q.  And you had about 75 to 80 people
23  working on the case in relation to the three
24  or four opinions that we've talked about,
25  which is that it was a fraud, it was a Ponzi

1  BRUCE G. DUBINSKY
2  scheme, it was insolvent, and then that MSIL
3  was somehow used in connection with the
4  scheme?
5  A.  That is correct.
6  Q.  And the 75 to 80 people weren't
7  working on anything else other than those four
8  topics?
9  A.  During the time they were working
10  on this case; no, those are the topics they
11  were focusing on.
12  Q.  How much -- and then are there
13  unpaid fees that have either been billed or
14  there's unbilled dollars owed to Duff & Phelps
15  on top of the 31- or $32 million that's been
16  paid?
17  A.  I think there were two questions in
18  there.  Let me take the first one.
19  There are always unpaid bills
20  because I send a bill out that takes about 60
21  to 90 days to get paid, so there are always
22  unpaid bills.
23  And your second question was
24  whether I think there's work in process.  And
25  there currently is work in process.  Again, we

1           BRUCE G. DUBINSKY
2  consider that nonpublic data; is that right?
3       A.  I think it's important of all the
4  data.  I don't single out a piece of data or a
5  certain fact as being the -- the smoking gun,
6  so to speak; it's the totality of everything
7  that I looked at in conducting the
8  investigation for me as an expert in rendering
9  the report to reach that reasonable degree of
10 accounting certainty, to render that BLMIS,
11 the fraud was pervasive there, the IA business
12 was a Ponzi and the other opinions that I
13 issue.
14      Q.  Could you take a look at
15 paragraph 35 of your report for a minute.
16      A.  Okay.
17      Q.  And you reference the fact that
18 BLMIS was registered as a broker-dealer with
19 the Securities and Exchange Commission
20 starting in January of 1960 --
21      A.  Correct.
22      Q.  -- do you see that?
23          And what was the significance of
24 that, the fact that BLMIS was registered with
25 the SEC to your work or opinions in this case?

1           BRUCE G. DUBINSKY
2       A.  This is laying out the factual
3  background so I understood it and then a
4  reader going into the -- the report would
5  understand the basic facts of the situation
6  and the entities involved and people that --
7  that were there.
8           So no independent piece of
9  significance just to that one fact, but in
10 totality, again, it tells a story.
11      Q.  And did you form an opinion as to
12 when the Ponzi scheme started?
13      A.  I say that the Ponzi scheme -- I
14 don't have a particular -- a specific date,
15 but I go back many years, as I said in the
16 report, that the fraud had started in the
17 late '70s.  The testing that I do takes it all
18 the way back to that point.
19          There's been pleas, plea
20 allocutions, people pled guilty after that
21 that have dated it back to the early '70s.  So
22 that's the time period, but I don't put a
23 specific start date on the actual Ponzi.
24      Q.  So your opinion would be at least
25 30 years and possibly longer?

1           BRUCE G. DUBINSKY
2       A.  That's a -- that's a fair
3  assumption, yes.
4       Q.  In terms of duration, how does that
5  compare to other Ponzi schemes that you're
6  familiar with that you either studied or
7  investigated?
8           MS. KOSACK:  Objection to form.
9       A.  It's probably the longest one that
10 I'm aware of in duration.
11      Q.  What -- after the Madoff Ponzi
12 scheme, what's the next longest duration Ponzi
13 scheme that you're aware of?
14      A.  I don't know specifically.  I think
15 I said the FirstPay was six to eight years.  I
16 don't know.
17      Q.  Is it difficult for a Ponzi scheme
18 to go on for that long?
19          MS. KOSACK:  Objection to form.
20      A.  Is it difficult for a Ponzi scheme
21 to go on that long?  It takes work.  It takes
22 work.
23      Q.  What type of work does it take?
24      A.  It takes people collaborating
25 together typically.  I mean, one person

1           BRUCE G. DUBINSKY
2  obviously couldn't -- couldn't pull off a
3  Ponzi scheme like this because of the volume
4  of work that's involved.  But it takes a team
5  of -- of closely collab- -- closely -- close
6  collaborators to keep it going, the moving
7  parts.  That's what it would take to keep it
8  going that long.
9       Q.  The -- now in your report -- and
10 I'll just give you as an example in -- if you
11 could turn to paragraph 96 and starting at 96
12 for the next bunch of paragraphs at least up
13 to, say, paragraph 104, you're talking about
14 convertible arbitrage transactions in the
15 1980s; is that right?
16      A.  The '70s and '80s, that's correct.
17      Q.  And you --
18      A.  Up -- up until the early '90s.
19      Q.  Okay.  And you understand that, for
20 example, these examples you give in 1982 and
21 1985, that that's before any of the Merkin
22 funds had accounts with BLMIS, right?
23      A.  That's my general understanding,
24 yes.
25      Q.  And then in paragraph 96 you talk

BRUCE G. DUBINSKY

1
2 side is buying it, you're going to get
3 something that said you sold, they're going to
4 get something that says they would buy.  These
5 were the only trade confirms that were
6 available at BLMIS.
7     Q.  So let me just break it down into a
8 couple of things.  So your testimony is
9 there's a difference between saying I sold and
10 you bought?
11     A.  You have to look at how -- how the
12 execution actually happens, that's correct.  I
13 mean, every transaction there's a party and a
14 counterparty, there has to be.
15     Q.  And here the counterparty is
16 blacked out, right?
17     A.  Correct, the name was the same as
18 the -- as the account statement.  So it's not
19 that there was a different counterparty that
20 would have been the other side of this.  If
21 you were to look at the unredacted version,
22 it's the same accountholder whose statement is
23 here and these are the trade confirmations.
24     Q.  And you said you based your opinion
25 that the trade confirmation was backwards on

BRUCE G. DUBINSKY

1
2 the account documentation for this
3 accountholder.
4     A.  For that, and it would make no
5 sense for the accountholder, so the same
6 accountholder in figure 7, to have ever
7 received a trade confirmation as in figure 8
8 with the same name.
9     Q.  Why would it not make sense for
10 someone who gets a -- a statement to also get
11 a trade confirmation?
12     A.  Let me ask you this:  Have you ever
13 trade stock, have you ever gotten a trade
14 confirmation from the counterparty on the
15 other side of your deal?  No, you get the
16 trade confirmation when you either sell or
17 buy.  The brokerage firm then facilities that
18 trade confirmation going to the counterparty
19 on the other side.
20        So it made no sense for you in my
21 hypothetical to sell a hundred shares of
22 Exxon, get a statement that says you sold a
23 hundred shares and get a trade confirmation
24 that you bought a hundred shares.  It wouldn't
25 make any sense.

BRUCE G. DUBINSKY

1
2     Q.  If you could go to paragraph 135.
3     A.  Okay.
4     Q.  The you refer to "DTC records"; do
5 you see that?
6     A.  I do.
7     Q.  And what are DTC records?
8     A.  The Depository Trust Corporation,
9 those are records where equities, treasuries
10 traded in the United States, it's a
11 clearinghouse that it goes through.  And so
12 actual transfers of stock goes through the
13 DTC, and there are DTC records for every
14 broker, whether it's Schwab or Morgan Stanley
15 or whoever, that evidence of those transfer of
16 shares.
17     Q.  And I take it in forming your
18 opinions you reviewed DTC records?
19     A.  That is correct.
20     Q.  And how does one go about obtaining
21 DTC records?
22     A.  Well, in the context of doing a --
23 a fraud examination as I did, I obtained --
24 the trustee had obtained them.  If you're
25 asking if somebody else could get those; yes,

BRUCE G. DUBINSKY

1
2 there's a procedure where an accountholder
3 could request from the broker or the
4 investment advisor a third-party confirmation
5 from DTC.
6        So in essence, if you had your
7 account at Charles Schwab, you could write to
8 Charles Schwab, ask them for a third-party
9 confirmation of your shares being held at DTC.
10 And then they would send that authorization to
11 DTC.  DTC then would respond to you directly.
12 It's a third-party type of audit confirmation.
13     Q.  Is that something that you've
14 personally done?
15     A.  I -- I have not, no.
16     Q.  Are you familiar with anyone
17 pers- -- are you personally familiar with
18 anyone doing that?
19     A.  I'm not, no.  I mean, the procedure
20 exists, but I am not.
21     Q.  And in all of your experience in
22 the investment industry, you're not familiar
23 with anyone going through that procedure?
24     A.  I'm not personally, no.
25     Q.  And how long were you in the

Page 102

BRUCE G. DUBINSKY
1
2    A.   Over different periods of time.
3    Yeah, the point is, you can't just look at one
4    day and say, Mr. Steiner, you did a great job
5    today because you bought four trades and they
6    were all three -- three points below the VWAP
7    average.
8    Q.   So -- right, so they grade over
9    some period of time?
10    A.   Correct.
11    Q.   And it's your opinion that you,
12    over a period of time, should be hitting
13    roughly at 50 percent of VWAP; is that right?
14    A.   Give or take a little bit, yes.
15    Q.   So how does a trader get a good
16    grade or a bad grade?
17    A.   Well, if they're -- if they're
18    executing -- again, if they're executing all
19    the buys above the average price, something's
20    going on.  So maybe they're not, you know,
21    reacting quick enough to something in the news
22    and they're coming in five minutes later after
23    a news story broke and they're buying it after
24    it's ticked up.  And it could be the converse,
25    they're selling, you know, at a point in time

Page 103

BRUCE G. DUBINSKY
1
2    below what the average is.
3    Q.   And I take it if there's a range of
4    grades, that over time some brokers do better
5    and some brokers do worse?
6    A.   That's true.  Again, the concept is
7    no one can time the market.  I mean, that's
8    been proven time and time again, and that over
9    time all traders -- I mean, unless they're
10    idiots -- should kind of fall into that
11    pattern of being close to the VWAP.
12    Q.   Let's go back to my question.  If
13    that's the case, what's the point of grading
14    the traders or how is it that some traders get
15    good grades and some traders get bad grades?
16    A.   So yeah, again in my example, say a
17    trader's asleep at the switch and they're
18    always buying things after a news story
19    breaks, it's too late, right.  You can't
20    capture the Ys in the market, this algorithmic
21    trading that happens instantaneously the
22    minute a story breaks.
23       If you're five minutes to the
24    terminal and place an order for your client,
25    you're going to be off -- because the volume

Page 104

BRUCE G. DUBINSKY
1
2    that's already traded is so great.  So it
3    depends on the broker.
4    Q.   And I take it you'd want to be on
5    the opposite side of the person who's always
6    five minutes late?
7    A.   Wouldn't that be ideal.  If I could
8    do that, you and I wouldn't be having this
9    conversation right now, I can assure you of
10    that.
11    Q.   $31 million is a lot of fees.
12       MS. KOSACK:  Objection.
13    A.   Not compared to what you -- not
14    compared to what you could make if you really
15    had that kind of clairvoyance in the market.
16    Q.   What is -- I just didn't
17    understand; what's -- what's the relevance of
18    MSIL to your work on this case?
19    A.   Again, in -- in rendering the
20    opinion that BLMIS was fraud there was
21    pervasive at BLMIS, I was looking at --
22    because it was basically a sister corporation
23    or sister entity to BLMIS, what was its
24    involvement because there was a tremendous --
25    as I detail in the report, a tremendous amount

Page 105

BRUCE G. DUBINSKY
1
2    of money being round-tripped using MSIL as a
3    device to perpetrate the fraud.  So it was
4    part of the fraud.
5    Q.   And did any of the Merkin funds
6    have any accounts or dealings with MSIL?
7    A.   I -- I don't think so, but I don't
8    know one way or another.
9    Q.   Now, you described in your report
10    fake DTC screens --
11    A.   Yes.
12    Q.   -- that were created by -- by
13    BLMIS?
14    A.   That is correct.
15    Q.   Had you ever heard of fake DTC
16    screens being created before?
17    A.   No, this is the first time I -- I
18    saw that.
19    Q.   So prior to Madoff's confession,
20    how -- how would you have gone about detecting
21    that something was a fake DTC screen?
22    A.   The same way that I did it in this
23    case.  I looked at the metadata on it, I was
24    able to determine how and when it was created,
25    and I would have done that -- say, I was

27 (Pages 102 to 105)

1          BRUCE G. DUBINSKY
2       A.  No.
3       Q.  Do you intend to offer any opinion
4   in this matter along the lines of that any of
5   the information in your report, in the 2013
6   report, should have been a red flag to
7   investors?
8       A.  I'm not being proffered as a due
9   diligence expert in this case.  If -- if that
10  issue were to come up during the course of
11  testimony, I think there are things in the
12  report that -- that talk about -- I don't know
13  if it talks about in the context of being a
14  red flag, but I think Mr. Steiner asked me
15  about a graph of -- that was in the report.
16      I mean, anything in the report I
17  would say is fair game.  I don't have opinions
18  outside of this report that I intend to
19  proffer dealing with due diligence or red
20  flags or any of that sort of information, but
21  anything that's in this report is my report.
22      Q.  As you sit here today, do you
23  intend to offer any opinion at the trial of
24  this case that either Mr. Merkin or any of the
25  funds should have seen any of the information

1          BRUCE G. DUBINSKY
2   in your report as a red flag?
3       MS. KOSACK:  Object to form.
4       A.  No, I haven't been asked to do so.
5   I don't anticipate that.  Again, weird things
6   have happened during trial, someone on cross
7   will ask me a question, open the door, and
8   then someone -- it leads somewhere.
9       But my report is the report, I've
10  testified about what the opinions are in here,
11  and that's what I intend to testify at the
12  trial in this case.
13      Q.  Have you reached any opinions,
14  regardless of whether you intend to offer them
15  at trial, that either Mr. Merkin GCC or any of
16  the funds should have taken any of the
17  information in your report as a red flag?
18      MS. KOSACK:  Object to form.
19      A.  Again, I wasn't asked to do so.  I
20  don't have any opinions.
21      Q.  You -- you're testifying here in
22  connection with a retainer agreement that's
23  been entered into between the trustee and its
24  counsel and Duff & Phelps, correct?
25      A.  That is correct.

1          BRUCE G. DUBINSKY
2       Q.  Okay.  Do you have a copy of that
3   retainer agreement?
4       A.  I do.  Not here today, but I do
5   have a copy of it.
6       Q.  No, I understand.
7       Do you know whether anyone other
8   than yourself and your colleagues at Duff &
9   Phelps and the lawyers at Baker and Hostetler
10  reviewed your report before it was finalized?
11      A.  I wouldn't.  I don't know who the
12  lawyers may have given it to.  I just know
13  who, you know, reviewed it at my shop.  And
14  no, so I don't have any knowledge.
15      Q.  You mentioned earlier that after
16  the initial report that you submitted, you
17  focused more deeply on House 5?
18      A.  Correct.
19      Q.  Was there a reason why that had not
20  been focused on prior to the submission of
21  your report in the Katz/Wilpon case?
22      A.  Yes, it was a function of time.  I
23  was hired in June of 2011; the first report in
24  the -- in the case was due I think in
25  November.  There was a tremendous amount of

1          BRUCE G. DUBINSKY
2   work to get done, I had to prioritize what
3   needed to be done in order to render the
4   opinions that I did knowing that the
5   investigation would continue.  So it was
6   merely a matter of timing, time available.
7       Q.  So it wasn't the case that you
8   decided that the focus on House 5 wasn't
9   relevant to the Katz/Wilpon case?
10      A.  No, not at all.
11      Q.  Let me ask you, I know that there
12  were a lot of things I'm sure that were done
13  by the -- the very large team that you used
14  and yourself and your colleagues, but I'd like
15  you to give me an overview of what that team
16  did that led to the preparation of your
17  report?
18      A.  Sure.  There were things, as I talk
19  about in -- and all this is detailed in the
20  report, but things like setting up a -- a
21  computer system that mirrored the Madoff
22  computer system.  So I went out and secured an
23  AS/400, took backup tapes, went to great
24  lengths to restore backup tapes and get
25  programs running so I had an operational

# Exhibit 4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, Defendant. | |
| In re: BERNARD L. MADOFF, Debtor. | |

# EXPERT REPORT OF BRUCE G. DUBINSKY
# MST, CPA, CFE, CVA, CFF, MAFF

new money.  Accordingly, a Ponzi scheme (*e.g.*, the IA Business), once initiated is hopelessly insolvent.[15]

33.    The solvency of a company in a bankruptcy setting is typically determined by applying one of three tests, as will be described in greater detail *infra*: i) the Balance Sheet Test; ii) the Capital Adequacy Test; and iii) the Ability to Pay Debts Test.  Under any of these tests, BLMIS was insolvent from at least December 11, 2002.  The liabilities of BLMIS far outweighed its assets; BLMIS did not have adequate capital; and BLMIS could not pay its debts as they came due.  Accordingly, BLMIS was deeply insolvent from at least December 11, 2002, and for all periods thereafter.

**OPINION NO. 3:  MSIL WAS USED TO FACILITATE THE TRANSFER OF FUNDS OUT OF THE IA BUSINESS**

34.    MSIL was wholly dependent on hundreds of millions of dollars in cash infusions from the IA Business to support its operations.  Furthermore, hundreds of millions of dollars in cash infusions, which kept the Proprietary Trading Business afloat, were made possible in part through the Proprietary Trading Business's transactions with MSIL.  MSIL advanced funds to the Proprietary Trading Business for the purported purchase of US Treasury bills that were recorded in an IA account in its name.  MSIL then received distributions for the purported sale of these same US Treasury bills from the IA Business.  Through these transactions, the Proprietary Trading Business received hundreds of millions of dollars in fraudulent revenue from the IA Business.

## V.    FACTUAL BACKGROUND[16]

### A.  BLMIS

35.    In 1960, Madoff founded BLMIS as a sole proprietorship.  BLMIS, a market making business in Over-the-Counter ("OTC") stocks, was registered as a broker-dealer with the Securities and

---

[15] *Armstrong v. Collins*, No. 01-CIV-2437, 2010 U.S. Dist. LEXIS 28075, at *64 (S.D.N.Y. Mar. 24, 2010); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 118 (Bankr. S.D.N.Y. 2011).

[16] My understanding of the factual background is based upon various sources of information including, but not limited to, the pleadings in this case, deposition transcripts and/or testimonial transcripts in connection with the parallel liquidation proceeding in the United Kingdom.

Exchange Commission ("SEC") as of January 19, 1960[17] and operated three business units: (i) a market making business; (ii) a proprietary trading business (together with the market making business known inside BLMIS as "House 5"); and (iii) an investment advisory business (known inside BLMIS as "House 17").

36.    In 1987, BLMIS moved from its location at 110 Wall Street to the iconic "Lipstick Building" located at 885 Third Avenue in Manhattan, eventually leasing the 17th, 18th, and 19th floors.[18] The Proprietary Trading Business was located on the 18th and 19th floors.[19]  Eventually, the IA Business moved from the 18th floor to the 17th floor.[20]

37.    In 2001, BLMIS was reorganized as a single-member LLC with Madoff as the sole member.[21]

38.    In August 2006, BLMIS registered as an investment adviser with the SEC claiming to have 23 accounts and $11.7 billion in assets under management.[22]

39.    During 2008, the IA Business's cash reserves dwindled to the point where customer redemption requests exceeded the cash balance available.  At his plea hearing on March 12, 2009, Madoff confessed to federal authorities that the IA Business was a fraud.[23]


### 1. The IA Business

40.    The IA Business customer accounts were administered in two groups: (i) the split-strike conversion accounts; and (ii) the non-split-strike conversion accounts (which included the convertible arbitrage accounts).

41.    The non-split-strike conversion accounts initially represented a significant portion of overall IA Business accounts, but became a small percentage of the total IA Business accounts in the 1990s.  Generally, the non-split-strike conversion accounts were held in the name of BLMIS's oldest IA Business customers and many of these accounts were overseen by BLMIS employee Annette Bongiorno ("Bongiorno").

---

[17] Form BD for Bernard L. Madoff, December 31, 1959 (PUBLIC0003607-PUBLIC0003614).
[18] Bernard L. Madoff Lease Summary 885 Third Avenue (CWIE-BR00002468).
[19] LAZAA0004351-LAZAA0004352.
[20] Bernard L. Madoff Lease Summary 885 Third Avenue (CWIE-BR00002468).
[21] BLMIS Articles of Organization for New York State (MADTSS01160346).
[22] BLMIS Form ADV at 8, Aug. 25, 2006 (PUBLIC0003729).
[23] Tr. of Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC), at 23 (S.D.N.Y. Mar. 12, 2009).

42. A convertible arbitrage trading strategy, as purported to have been executed by the IA Business, aims to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.

43. The split-strike conversion accounts were overseen by BLMIS employee Frank DiPascali ("DiPascali").[24]  This group of accounts purported to employ a strategy which invested in a basket of common stocks within the Standard & Poor's ("S&P") 100 Index.  These baskets were hedged by call and put options to limit customer gains and losses.  Madoff would purportedly decide when to unwind positions upon which the stocks were sold, and the investments were moved into US Treasuries and/or money market funds and cash reserves.

44. Although BLMIS was touted as one of the most technologically advanced brokerages in the country and was widely acknowledged as being "at the forefront of computerized trading,"[25] as discussed herein, the IA Business neither provided its customers with electronic customer statements nor provided real-time access to their individual IA Business accounts at BLMIS.

## 2. The Proprietary Trading Business

45. The Proprietary Trading Business operated as a securities broker-dealer registered with the SEC and was managed by the Co-Directors of Trading, Mark Madoff and Andrew Madoff.[26] It provided executions for broker-dealers, banks, and financial institutions, and was a member of the Financial Industry Regulatory Authority ("FINRA") (formerly the National Association of Securities Dealers ("NASD")).[27]  The business was a market maker primarily in S&P 500 stocks, US convertible bonds, preferred stocks, warrants, units and rights.[28]  The business also

---

[24] *See generally* DiPascali Plea Allocution, *United States v. Frank DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009); DiPascali Information, *United States v. Frank DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009).
[25] BLMIS web archive, (Oct. 23, 2005), http://web.archive.org/web/20051023123110/http://www.madoff.com/dis/display.asp?id=20 (accessed by searching for Madoff.com in the Internet Archive index).
[26] *See* Complaint, *Picard v. Madoff,* No. 08-01789 (BRL), at 10-11 (S.D.N.Y. Oct. 2, 2009).
[27] *Brokercheck Report for Bernard L. Madoff Investment Securities LLC,* FINRA, 6-7, http://brokercheck.finra.org/Search/SearchResults.aspx?SearchGroup=Firm&IndlText=&FirmText=Bernard+Madoff+Investment+Securities&PageNumber=1 (last visited July 16, 2012).
[28] *Madoff Securities: Quality Executions and Service Through Innovative Technology,* BLMIS (Feb. 15, 1998), http://web.archive.org/web/19980215105508/http://www.madoff.com/public.asp?info_id=9 (accessed by searching for Madoff.com in the Internet Archive index).

federal securities fraud and related offenses.[38]  On June 29, 2009, Judge Denny Chin
sentenced Madoff to the maximum of 150 years in federal prison.[39]

### 2. Peter Madoff

48.   Peter Madoff, Madoff's brother, started at BLMIS in 1965.  He served as the company's
Senior Managing Director and Chief Compliance Officer until its collapse in December 2008.
Peter was a licensed investment professional and served as Director of the Securities Industry
Financial Markets Association ("SIFMA"), as well as Vice Chairman of FINRA's Board of
Governors.[40]

49.   In June 2012, Peter Madoff pled guilty to charges of conspiracy and falsifying records in
relation to his employment at BLMIS.  He is awaiting sentencing.[41]

### 3. Mark Madoff

50.   Mark Madoff, Madoff's son, joined BLMIS in 1986 after graduating from college.  Mark held
the job titles Co-Director of Trading at BLMIS and Controller and Director at MSIL.  He
acquired the Series 7, 24 and 55 FINRA licenses and at one point, managed both the
proprietary trading desk and market making operations.  Mark Madoff served many industry
roles such as the Chairman of the FINRA Inter-Market Committee, Governor of the Securities
Traders Association ("STA") and Co-Chair of the STA Trading Committee, among others.[42]

---

[38] Madoff Plea Allocution, *United States v. Madoff*, 09-CR-213, at 7-8 (S.D.N.Y. Mar. 12, 2009).

[39] *Id.* at 49.  In his plea allocution, Madoff admitted to operating a Ponzi scheme "to the best of his recollection" from
the early 1990s until December 2008.  Additionally, he stated that no securities had ever been purchased on behalf of
the IA Business customers.  *Id.* at 24, 29.  While I have considered information contained in Madoff's Plea
Allocution, my opinions are in no way predicated or based upon information contained therein, and as set forth
herein, my investigation contradicts the length and duration of the fraud at BLMIS.  David Kugel also pled guilty in
this matter and has admitted that the fraud started in the early 1970s in the IA Business and that no trading activity
actually took place for IA Business customers, further corroborating my opinions contained in this
report.  Information contained in the Madoff Plea Allocution was considered solely as part of the record in this
matter.  *See generally,* David Kugel Plea Allocution, *United States v. David Kugel*, 10-CR-228 (LTS), at 35-36
(S.D.N.Y. Nov. 21, 2011).

[40] *See* Complaint, *Picard v. Madoff*, No. 08-01789 (BRL), at 4 (S.D.N.Y. Oct. 2, 2009).

[41] Peter Madoff Information, *United States v. Peter Madoff*, S7 10-CR-228 (LTS) (S.D.N.Y. 2012); Peter Madoff
Plea Agreement, *United States v. Peter Madoff,* S7 10-CR-228 (LTS), at 5 (S.D.N.Y. June 29, 2012).

[42] Madoff Complaint at 4-5.

### 4. Andrew Madoff

51.    Andrew Madoff, Madoff's other son, worked at BLMIS beginning in 1988 after graduating
from college.  He also held the titles Co-Director of Trading at BLMIS and Controller and
Director at MSIL.  Andrew Madoff managed many aspects of the trading operations,
including the trading floor, trade audit procedures and other related functions.  He obtained
the Series 7, 24 and 55 FINRA licenses.  He took on numerous industry positions such as the
Chairman of Trading, Trading Issues and Technology, and Decimalization and Market Data
Committees and Subcommittees at SIFMA, FINRA District Ten Committee Member, and
NASDAQ's Technology Advisory Committee Member.[43]

### 5. Shana Madoff

52.    Shana Madoff, Madoff's niece and Peter Madoff's daughter, joined BLMIS in 1995 after
graduating from law school.  At various times she held different roles at BLMIS, including,
Compliance Counsel, in-house Counsel, and Compliance Director.  Shana was a member of
the SIFMA Compliance and Legal Division Executive Committee, the FINRA Consultative
Committee, Security Traders Association of New York, the NASD's Market Regulation
Committee, the SIFMA Self-Regulatory and SRO Committee, and the SIFMA Continuing
Education Committee.[44]

### 6. Frank DiPascali

53.    DiPascali started at BLMIS in 1975 right after he graduated from high school.[45]  Over his
years with BLMIS, he worked as a research analyst and options trader,[46] in addition to other

---

[43] *Id.* at 5.
[44] *Id* at 6.
[45] DiPascali Plea Allocution at 45.
[46] *Id.*

roles.[47]  DiPascali managed the IA Business and was critical to its day-to-day activities,

interfacing with customers and overseeing IA Business employees.[48]

54.    In 2009, DiPascali was charged with a ten count criminal information, and he subsequently

entered into a plea agreement.  In his plea allocution, DiPascali admitted to learning of the

fraud in the late 1980s or early 1990s, and he stated that no purchases or sales of securities

actually took place in the customers' accounts.[49]  Instead, DiPascali created fraudulent

account statements using information gleaned from historical stock data to create the returns

that Madoff had promised his customers.[50]

55.    On August 11, 2009, DiPascali pled guilty to federal securities fraud and related offenses.

DiPascali is facing 125 years in prison, but is awaiting sentencing.


### 7. David Kugel

56.    David Kugel ("Kugel") worked for BLMIS for nearly 40 years, originally starting in 1970.[51]

Prior to working for BLMIS, Kugel worked as a trader specializing in convertible securities.[52]

For BLMIS, Kugel purportedly traded in convertible securities and applied an arbitrage

strategy to these stocks, buying both the convertible security and then shorting the underlying

stock.[53]  This arbitrage strategy is similar to the purported strategy that BLMIS claimed to

employ in IA Business accounts from at least the 1970s to the 1990s.[54]

57.    On November 21, 2011, Kugel pled guilty to federal securities fraud and related offenses,

admitting that the investment fraud in the IA Business started in the 1970s.[55]  He is awaiting

sentencing.[56]

---

[47] *Id.* at 47.
[48] *Id.*
[49] *Id.* at 46.
[50] *Id.* at 47.
[51] David Kugel Plea Allocution, *United States v. David Kugel*, 10-CR-228 (LTS), at 35-36 (S.D.N.Y. Nov. 21, 2011).
[52] *See generally id.*
[53] *See generally id.*
[54] *See infra* (discussing the convertible arbitrage strategy).
[55] Kugel stated the following:

As to Counts One, Three, Four, and Five, I provided historical trade information to other BLMIS employees,
which was used to create false, profitable trades in the Investment Advisory clients' accounts at
BLMIS.  Specifically, beginning in the early '70s, until the collapse of BLMIS in December 2008, I helped

### 8. Craig Kugel

58.    Craig Kugel began his affiliation with BLMIS in 2001 as an employee of Primex Trading,
N.A. ("Primex"), which was an electronic trading auctions system company nominally owned
in part by members of Madoff's family.[57]   At Primex, Craig Kugel completed tasks consistent
with the role of Controller and was ultimately offered a job at BLMIS in 2003.[58]   While at
BLMIS, he was responsible for the Proprietary Trading Business's budget forecasting,
BLMIS's healthcare plan, and certain employee-related forms and records.[59]

59.    On June 5, 2012, Craig Kugel pled guilty to one count of conspiracy and multiple counts of
falsifying documents.[60]   He is awaiting sentencing.[61]

### 9. Annette Bongiorno

60.    Bongiorno worked at BLMIS from July 1968 until December 11, 2008.[62]   She managed
hundreds of IA Business accounts and supervised IA Business employees including the key
punch operators responsible for entering the purported trades.[63]   Many of the accounts that
Bongiorno managed were close friends and family of Madoff and BLMIS employees, and
included some of the oldest Madoff clients.[64]

---

create fake, backdated trades.  I provided historical trade information – sorry – first to Annette Bongiorno,
and later to Joanne (*sic*) Crupi, and others which enabled them to create fake trades that, when included on
the account statements and trade confirmations of Investment Advisory clients, gave the appearance of
profitable trading when in fact no trading had actually occurred.  I helped Bongiorno, Crupi and others
create these fake, backdated trades based on historical stock prices and were executed only on paper.

David Kugel Plea Allocution at 32.
[56] *See generally* David Kugel Information, *United States v. David Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011).
[57] Craig Kugel Information, *United States v. Craig Kugel*, No. 10-CR-228 (LTS), at 2 (S.D.N.Y. June 6, 2012); *see also* Complaint, *Picard v. Madoff Technologies LLC*, No. 08-01789 (BRL) (S.D.N.Y. Jul. 29, 2010).
[58] Craig Kugel Information at 2.
[59] *Id.* at 2-3.
[60] Craig Kugel Cooperation Agreement, *United States v. Craig Kugel*, No. 10-CR-228 (LTS), at 2 (S.D.N.Y June 5, 2012).
[61] *Id.*
[62] Superseding Indictment, *United States v. Bonventre*, No. 10-CR-228, at 4 (S.D.N.Y. Oct. 1, 2012).
[63] *Id.* at 4.
[64] *See generally id.*

61.    Bongiorno was charged with federal securities fraud and related offenses on November 17, 2010.[65]  She is awaiting trial.


### 10. Daniel Bonventre

62.    As BLMIS's Director of Operations, Daniel Bonventre ("Bonventre") ran the back office at BLMIS and oversaw the firm's accounting and securities clearing functions for at least 30 years.[66]  He was responsible for overseeing the accounting functions for both the IA Business and the Proprietary Trading Business, including maintenance of the BLMIS general ledger.[67] Bonventre provided information that was used in the creation of the FOCUS reports and the BLMIS financial statements.[68]

63.    Bonventre was charged with federal securities fraud and related offenses.[69]  He is awaiting trial.


### 11. Enrica Cotellessa-Pitz

64.    Enrica Cotellessa-Pitz ("Cotellessa-Pitz") began working for BLMIS in June 1978, eventually becoming Controller in 1998.  She worked directly for Bonventre, helping to maintain the books and records of BLMIS, including the general ledger and the stock record, as well as the FOCUS reports and financial statements submitted to regulators.[70]

65.    In December 2011, Cotellessa-Pitz entered into a plea agreement, pleading guilty to charges that she conspired to falsify records of a broker-dealer, falsify records of an investment adviser, make false filings with the SEC, and obstruct and impede the lawful government function of the IRS, among other charges.[71]  She is awaiting sentencing.

---

[65] *Id.* at 94-152.
[66] *Id.* at 2-3.
[67] *Id.* at 2-3.
[68] *Id.* at 99-100.
[69] *Id.* at 94-152.
[70] Enrica Cotellessa-Pitz Cooperation Agreement, *United States v. Enrica Cotellessa-Pitz*, S5 10-CR-228 (LTS) (S.D.N.Y. Dec. 15, 2011).
[71] "I caused inaccurate ledgers and other books and records to be kept by BLMIS, including inaccurate general ledgers and stock records.  I then transferred the same inaccurate record entries into FOCUS reports and annual

## 12. Irwin Lipkin

66.    Irwin Lipkin, hired in 1964, was one of the first employees at BLMIS.  He helped grow the business from a few key employees to a large-scale operation, and was considered a member of Madoff's inner circle.  Through his positions as Officer and Controller at BLMIS, Irwin Lipkin participated in a variety of tasks in the IA Business, including monthly reviews of customer accounts and internal audits of securities positions.[72]

67.    On November 8, 2012, Irwin Lipkin pled guilty to securities fraud for, among other things, creating false financial records, and related offenses.[73]  He is awaiting sentencing.


## 13. Eric Lipkin

68.    Eric Lipkin started at BLMIS in the mid-1980s and by 1992 was working in BLMIS's payroll and benefits department, processing the payroll and administering the BLMIS 401(k) plan.[74]  By 1996, he began working with Bongiorno, Bonventre, DiPascali, Jodi Crupi, Jerry O'Hara, and George Perez to maintain false customer accounts.  Eric Lipkin created letters to customers indicating the purported balances in their BLMIS accounts.[75]

69.    Eric Lipkin admitted to manufacturing customer statements to reflect the false holdings of customer accounts, as well as, falsifying the books and records of BLMIS.  He was charged with federal securities fraud and related offenses.[76]  Eric Lipkin entered into a cooperation agreement and on June 6, 2011, pled guilty to all six counts.[77]  He is awaiting sentencing.

---

financial statements that I knew would be sent to the SEC."  Enrica Cotellessa-Pitz Plea Allocution, *United States v. Enrica Cotellessa-Pitz*, 55-CR-228 (LTS), at 30-31 (S.D.N.Y. Dec. 19, 2011).

[72] Complaint, *Picard v. Lipkin*, No. 08-01789 (BRL), at 3, 16-17 (S.D.N.Y. Nov. 11, 2010).

[73] Specifically, Irwin Lipkin pled guilty to securities fraud, falsifying records of a broker-dealer, falsifying records of an Investment Adviser, making false statements to the SEC and falsifying documents with respect to the Employee Retirement Income Security Act ("ERISA").  *See generally*, Irwin Lipkin Information, *United States v. Irwin Lipkin*, S9 10-CR-228 (LTS), (S.D.N.Y. Nov. 8, 2012); Irwin Lipkin Plea Agreement, *United States v. Irwin Lipkin*, S9 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012).

[74] Eric Lipkin Information, *United States v. Eric Lipkin,* No. 10-CR-228 (LTS), at 5 (S.D.N.Y. June 6, 2011); Press Release, U.S. Attorney's Office, *Manhattan U.S. Attorney Announces Guilty Plea Of Another Employee Of Bernard L. Madoff Investment Securities LLC* (June 6, 2011).

[75] Eric Lipkin Information at 5-7.

[76] *Id.* at 7-9.

[77] *See generally* Eric Lipkin Information; Minute Entry, *United States v. Lipkin*, 10-CR-228 (LTS) (S.D.N.Y. Nov. 17, 2010).

### 14. Joann "Jodi" Crupi

70. Joann "Jodi" Crupi ("Crupi"), who worked for BLMIS for approximately 25 years,[78] performed many tasks for BLMIS.  Crupi tracked the daily activity in the primary checking account for the IA Business operations to ensure there was enough money for pending redemptions, and she authorized wire transfers into and out of the account.  Crupi created a Daily Report, delivered to Madoff every day, which reflected the bank account balance, customer deposits, and all pending customer redemptions.[79]  Similar to Bongiorno, Crupi was also responsible for managing several IA Business customer accounts,[80] for which she manufactured statements in order to produce certain promised rates of return.[81]

71. Crupi was charged with federal securities fraud and related offenses on November 17, 2010.[82] She is awaiting trial.

### 15. Jerry O'Hara and George Perez

72. Jerry O'Hara ("O'Hara") was hired in 1990 as a computer programmer in the IA Business to create and maintain the systems and functions that falsified customer account statements.  George Perez ("Perez") was hired in 1991 to assist O'Hara.  Perez and O'Hara's programs and systems created fake trade blotters and reports.[83]  Additionally, they maintained the systems that falsified the trading data using historical stock prices to manufacture the customer statements and other reports sent to customers.[84]

73. O'Hara and Perez were both charged with federal securities fraud and related offenses.[85] They are awaiting trial.

---

[78] Superseding Indictment at 5.
[79] *Id.* at 5, 56-58.
[80] *Id.* at 16-17, 21-23, 29-30.
[81] *Id.* at 16-17, 21-23, 29-30, 38-39, 42-43.
[82] *Id.* at 94-152.
[83] *Id.* at 6, 11, 14, 31-51.
[84] *See, e.g.*, MDPTTT00000001-MDPTTT00002748.
[85] *See generally* Superseding Indictment.

### 16. Friehling and Horowitz

74.    The BLMIS financial statements were purportedly audited by Friehling and Horowitz, C.P.A.,
P.C. ("F&H"), a three-person CPA firm.[86]  Jerome Horowitz ("Horowitz"), a once licensed
CPA in the State of New York,[87] worked for Alpern & Avellino before establishing his own
accounting firm, F&H.  Saul Alpern was Madoff's father-in-law and founder of Alpern &
Avellino.  When Horowitz retired, his firm retained the Madoff account and continued to
perform the tax and audit services for the Madoff brokerage firm.  These duties were
transitioned to David G. Friehling ("Friehling") when Horowitz retired.

75.    On November 3, 2009, Friehling pled guilty to federal securities fraud and related offenses.[88]
As a result of the plea, Friehling was forced to surrender his CPA license to the State of New
York and is currently awaiting sentencing.

### D.  Bank Accounts

76.    The pervasive fraud in BLMIS was conducted through its main bank accounts.  In the IA
Business, the primary operating account was the JPMorgan Chase ("JPMC") account number
140-081703 (the "703 Account") and its associated controlled disbursement account, the
JPMC account number 6301428151-509 (the "509 Account").  As later discussed, other
money market accounts funded by the 703 Account were also used to perpetuate the fraud.

77.    In the Proprietary Trading Business, the primary operating account was the Bank of New
York ("BONY") account number 8661126621 (the "621 Account").

### E.  Computer Systems Overview

78.    In operating a market making business, a proprietary trading business, or an investment
advisory business, such as BLMIS, a minimum amount of computer hardware, software and
connections to information sources and regulatory systems is required.  Often, firms engaged

---

[86] *See* Audit Report to the 2000 audited financial statements (MADTEE00046020).
[87] *Office of the Professions*, New York State Education Department,
http://www.nysed.gov/coms/op001/opsc2a?profcd=07&plicno=017210&namecheck=HOR (last visited Nov. 20,
2011).
[88] David Friehling Superseding Information *U.S. v. Friehling*, No. 09-CR-700 (S.D.N.Y. Nov. 3, 2009); Minute
Entry of Plea entered by David Friehling, *U.S. v. Friehling*, No. 09-CR-700 (S.D.N.Y. Nov. 3, 2009) (Dkt. Entry 11-
03-2009).

## Figure 14



128.   A SSC investment strategy typically involves the buying of a basket of stocks closely
correlated to an index, while concurrently selling call options on the index and buying put
options on the index.  The IA Business purportedly used a SSC strategy that was purchasing a
basket of stocks and options based on the S&P 100 equity index, which included the 100
largest U.S. stocks as determined by the S&P Index Committee.[153]

129.   A SSC strategy reduces a portfolio's volatility (and risk) by limiting the investor's possible
gains and losses.  This is commonly referred to as a "collar strategy," in which the investor
purchases a put option to provide protection on the downside (*i.e.*, limiting losses the investor
would incur if the market value of the equity portfolio drops); this protection is partially paid
for by selling a call option that limits the upside gain.

130.   The collar strategy limits, but does not entirely eliminate, risk due to volatility.  In fact, a
properly designed and executed SSC strategy would trade with the same or very similar
volatility as the S&P 100 index (or other market index) anytime the market value of the
equity portfolio falls between the exercise prices of the options.

---

[153] Michael Ocrant, *Madoff tops charts; skeptics ask how* at 1, 89 MAR/Hedge, May 2001; *see also S&P 100*,
Standard & Poors, http://www.standardandpoors.com/indices/sp-100/en/us/?indexId=spusa-100-usduf--p-us-l-- (last
visited Nov. 6, 2012).

211.   The 29 accounts on the December 2003 special B.SCHUPT basket trading list were closely
analyzed to determine if the same or similar effect was present.  The average annualized
return for the Current Year as recorded on their respective November 2003 PMRs was 9%.
After the program was run for the month of December 2003, the average annualized return for
the Current Year on the December PMRs for the respective accounts was 21%.  Accordingly,
the running of the B.SCHUPT program increased purported annualized investment returns for
the 29 accounts by an average of 141% from November 2003 to December 2003.  This
process was nothing more than a total fabrication of further fictitious trades in an attempt to
"push" the investment returns close to the 18% Benchmark Rate of Return as originally
recorded on the PMRs for these accounts.

212.   Additional examples of the account listings and instructions were also located for the years
2002, 2004, 2005, 2006, and 2007.[195]  Similar to the instructions discussed above, the
additional listings also identified specific units of each fictitious trade to make for specific
accounts.  Account numbers and account holders varied by year.

213.   In those years, the fictitious trades allocated pursuant to the instructions yielded a range of
returns to each account over December of each year between 140% in 2002 and 268% in
2004.  Similar to the discussion above (in 2003) regarding the changes in the PMRs
subsequent to the fictitious trades being allocated, the PMRs for those accounts in 2002, 2004,
2005, 2006, and 2007 showed similar patterns.

### h.   The IA Business computer system was used to facilitate the fictitious trading activity and to print trading documentation and customer statements

214.   The Proprietary Trading Business and the IA Business computer systems' capabilities were
vastly different.  The Proprietary Trading Business systems contained many of the
components typically found in a broker-dealer environment where actual trades were being
executed.  The IA Business did not have these systems.

---

[195] *See* MADTSS01124251; MADTSS01124115; MADTSS01124117; MADTSS01124091-MADTSS01124093;
MADTSS01124095; MADTSS01124089; MADTSS01120262.  While a "schupt" file was not located for all years
other than those listed above, there were, however, other documents located that appeared to contain similar
information and to be following the same pattern.  *See, e.g.,* MADTSS01124131; *see also* **Exhibit 19** for documents
pertaining to the schupt lists.

215.    Figure 30 is a more detailed diagram of the trading systems in place at the Proprietary

Trading Business in December 2008:[196]

**Figure 30**



216.    Not surprisingly, none of these trading systems necessary for the execution of securities was

found in the IA Business computer environment.  In fact, as described below, the IA Business

relied on an AS/400 computer along with a local area network of personal computers to

generate the documentation necessary to support the fictitious trading activities.

---

[196] The figure was prepared by Lazard Ltd. ("Lazard") (LAZAA0004174).  Lazard was the financial advisor to the
Trustee who handled the liquidation sale of the Proprietary Trading Business's assets after Madoff's arrest in
December 2008.

217.    The software utilized by the Proprietary Trading Business was a combination of
commercially available, off-the-shelf software and interface systems (*e.g.*, Bloomberg,
Thomson One, DTC, OCC) as well as custom-programmed software (*e.g.*, MISS, M2).  In
contrast, the software utilized by the IA Business was primarily custom-built in-house
software, supported only partially by commercially available, off-the-shelf software not
designed for trade execution.

218.    While information in programs restored from IA Business backup tapes revealed certain
limited electronic communications and interfaces for the AS/400 system, it was determined
that the IA Business's custom RPG software did not communicate with any of the standard
platforms typically found in a trading and/or investment environment.  Investment-related
data received by the IA Business custom RPG software was received from the Proprietary
Trading Business through either an FTP or via a manual process by which an operator
inserted a tape into the IA Business AS/400 that contained data from the Proprietary Trading
Business custom software.  While the Proprietary Trading Business utilized extensive systems
to execute trades (*e.g.*, MISS, M2/Superbook) and receive market data (*e.g.*, Bloomberg,
Muller), there was no evidence to show that the IA Business communicated with any of the
connections available to the Proprietary Trading Business systems (*e.g.*, NASDAQ, DTC,
Bloomberg, Thomson, OATS).  As a result, the IA Business would have needed to place the
purported trades through either the Proprietary Trading Business or an outside broker-dealer;
evidence of that occurring was not found.

      i.   **The underlying computer code generated and utilized by the IA Business was
developed and modified over the years**

219.    During the investigation, a model 520 AS/400 and a Magstar 3570 tape subsystem were
procured and used to restore a working version of the IA Business AS/400 system to allow for
analysis.  (*See* **Exhibit 20** for restored menu screen shots.)  Numerous libraries (*i.e.*,

repositories of data or code) were restored which contained both code and data files.[197]  The
majority of the restored code used to run and operate the AS/400 was written in RPG II
language, which was identified from a number of factors including the following:

- The source from the restored backup tape was identified by the AS/400 system as
  "RPG36" code.  Attribute flags (*i.e.*, an identifying piece of data related to a
  particular source) identified that the code was created in the System/36 notation
  version of RPG II and, therefore, intended to run on an IBM System/36 platform.
- In order to work properly, the AS/400 had to be placed in System/36 emulation
  mode.[198]
- Also, the majority of the code was located in the IBM default location for creating
  RPG II code, which is a sub-library named QS36SRC within the TGIF library on
  the AS/400.

220.    Based on my review of the code, it appears that the majority of the code was developed in the
late 1970s through the early-to-mid 1980s.  It also appears that this code was initially used in
the Proprietary Trading Business and later was converted for use in the IA Business.
Programmer documentation contained within the programs themselves show that there were
hundreds, if not thousands, of modifications to the programs, many of which occurred in the
early 1990s at a time when the amount of BLMIS customers increased dramatically.  (*See*
discussion *supra* regarding A&B and the transition of its customers directly to BLMIS.)
Thus, my investigation has found that the originating code that was used in the IA Business
existed for decades.

---

[197] During the computer investigation, it became apparent that certain code and data files no longer existed on the
tapes containing the backup of the IA Business system from December 2008.  Restoration of prior backup tapes
confirmed this fact.
[198] If the program was started without being placed in System/36 emulation mode, the system consistently produced
an error.  For example, one such error indicated, "Command menu in library *LIBL not found."  However, when
placed into System/36 emulation mode, the error disappeared.

    (i)      **Underlying computer code in the IA Business produced a random order generator to support fictitious trades on customer statements**

221.    The IA Business custom-written software included code that enabled the assignment of prices and volumes for securities transactions to individual customer accounts.  The code allowed the IA Business to back into data that, in a legitimate business, would be generated through an order or time slicing trading system.

222.    In practice, it is a portfolio manager's decision to determine what stocks to buy and how many shares will be purchased.  Once determined, a trader's role is to determine how best to purchase those stocks, balancing transaction costs and associated market risks.  This role is often exclusively automated by computers programmed with basic (or sometimes very sophisticated) trading algorithms.

223.    Most common amongst these approaches is to either "volume-weight" or "time-weight" the execution of a large block of shares.  These approaches strike a balance between risk and cost.  A volume-weighted approach attempts to purchase shares at the same pace as the market is trading so that the buyer is never too large or too small a participant.  A time-weighted approach seeks to spread the desired transaction evenly over a fixed and predetermined period of time.[199]

224.    A detailed analysis of the code that was utilized shows that the IA Business did not have a legitimate trading system using algorithms to execute trades.  Instead, it had a self-created program that simply mimicked and backfilled the output that normally would be the result of trades actually being executed by a system using trading algorithms.

225.    A review of input and output files for the random order generator, as well as customer statements, indicates that a Java custom written application program utilized an input file containing trade dates, settlement dates, security descriptions, pricing, and other information, such as customer account numbers.  It also contained the price that was to be allocated to each transaction.

---

[199] *CFA Glossary,* CFA Institute, http://www.cfainstitute.org/about/investor/cfaglossary/Pages/index.aspx (last visited Nov. 1, 2012).

226.    The program utilized information from the input file and generated a random set of orders for the specific security, randomly varying both the number of shares and the price for each order.  The random number of shares was generated using a random function that was artificially limited by a configurable high and low value (*i.e.*, 500 shares as a minimum and 10,000 as a maximum).  The number of shares was also artificially limited by the total number of shares identified in the input file (*i.e.*, if the input file totaled one million shares across all transactions in the input file, then the output of the program did not exceed one million shares across all orders in the output file).  The random price for each order was also artificially limited by configurable parameters which limited the range in the generated prices (*i.e.*, a five cents boundary would limit the randomly generated price to within five cents of the price identified in the input file).

227.    Figure 31 shows the input, processing and results of the random order generator program. The first input file identifies the total number of shares, 1,039,261, of Abbott Laboratories, as well as the average price $48.41 assigned to that transaction on all applicable customer statements in the IA Business.[200]

---

[200] *See* MESTAAF00009202-MESTAAF00009203.

Figure 31[201]

| #T/D | S/D | Account Number | Trans # | B/S Side | Quantity | Cusip | Security Description | Price | Principal Amount | Commission | Net Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Abbott Laboratories Input for MADOFFRandomSimulationUtility for 10/26/2006 | | | | | |
| 23-Oct | 26-Oct | 1-C1260-3 | 52540 | S | 74885 | 2824100 | ABBOTT LABORATORIES | 48.41 | 3625182.85 | 2995 | 3628177.85 |
| 23-Oct | 26-Oct | 1-FN012-3 | 52554 | S | 217991 | 2824100 | ABBOTT LABORATORIES | 48.41 | 10552944.31 | 8719 | 10561663.31 |
| 23-Oct | 26-Oct | 1-FN043-3 | 52558 | S | 51 | 2824100 | ABBOTT LABORATORIES | 48.41 | 2468.91 | 2 | 2470.91 |
| 23-Oct | 26-Oct | 1-FN044-3 | 52559 | S | 493 | 2824100 | ABBOTT LABORATORIES | 48.41 | 23866.13 | 19 | 23885.13 |
| 23-Oct | 26-Oct | 1-FN045-3 | 52560 | S | 213282 | 2824100 | ABBOTT LABORATORIES | 48.41 | 10324981.62 | 8531 | 10333512.62 |
| 23-Oct | 26-Oct | 1-FN061-3 | 52562 | S | 190434 | 2824100 | ABBOTT LABORATORIES | 48.41 | 9218909.94 | 7617 | 9226526.94 |
| 23-Oct | 26-Oct | 1-FN086-3 | 52564 | S | 48943 | 2824100 | ABBOTT LABORATORIES | 48.41 | 2369330.63 | 1957 | 2371287.63 |
| 23-Oct | 26-Oct | 1-FN095-3 | 52568 | S | 85102 | 2824100 | ABBOTT LABORATORIES | 48.41 | 4119787.82 | 3404 | 4123191.82 |
| 23-Oct | 26-Oct | 1-FR010-3 | 52572 | S | 18853 | 2824100 | ABBOTT LABORATORIES | 48.41 | 912673.73 | 754 | 913427.73 |
| 23-Oct | 26-Oct | 1-FR062-3 | 52577 | S | | | | 48.41 | 15636.43 | 12 | 15648.43 |
| 23-Oct | 26-Oct | 1-FR074-3 | 52581 | S | **Total Shares** | | **1,039,261** | 48.41 | 72421.36 | 59 | 72480.36 |
| 23-Oct | 26-Oct | 1-FR080-3 | 52582 | S | **Price Assigned** | **$** | **48.41** | 48.41 | 1785844.9 | 1475 | 1787319.9 |
| 23-Oct | 26-Oct | 1-FR083-3 | 52583 | S | | | | 48.41 | 1186722.74 | 980 | 1187702.74 |
| 23-Oct | 26-Oct | 1-FR093-3 | 52587 | S | 11764 | 2824100 | ABBOTT LABORATORIES | 48.41 | 569495.24 | 470 | 569965.24 |
| 23-Oct | 26-Oct | 1-FR096-3 | 52589 | S | 20213 | 2824100 | ABBOTT LABORATORIES | 48.41 | 978511.33 | 808 | 979319.33 |
| 23-Oct | 26-Oct | 1-G0092-3 | 52606 | S | 11696 | 2824100 | ABBOTT LABORATORIES | 48.41 | 566203.36 | 467 | 566670.36 |
| 23-Oct | 26-Oct | 1-G0371-3 | 52611 | S | 510 | 2824100 | ABBOTT LABORATORIES | 48.41 | 24689.1 | 20 | 24709.1 |
| 23-Oct | 26-Oct | 1-M0232-3 | 52650 | S | 8058 | 2824100 | ABBOTT LABORATORIES | 48.41 | 390087.78 | 322 | 390409.78 |
| 23-Oct | 26-Oct | 1-N0016-3 | 52651 | S | 3264 | 2824100 | ABBOTT LABORATORIES | 48.41 | 158010.24 | 130 | 158140.24 |
| 23-Oct | 26-Oct | 1-P0045-3 | 52654 | S | 2329 | 2824100 | ABBOTT LABORATORIES | 48.41 | 112746.89 | 93 | 112839.89 |
| 23-Oct | 26-Oct | 1-S0382-3 | 52670 | S | 2261 | 2824100 | ABBOTT LABORATORIES | 48.41 | 109455.01 | 90 | 109545.01 |
| 23-Oct | 26-Oct | 1-T0027-3 | 52674 | S | 60027 | 2824100 | ABBOTT LABORATORIES | 48.41 | 2905907.07 | 2401 | 2908308.07 |
| 23-Oct | 26-Oct | 1-W0043-3 | 52676 | S | 2210 | 2824100 | ABBOTT LABORATORIES | 48.41 | 106986.1 | 88 | 107074.1 |
| 23-Oct | 26-Oct | 1-ZB434-3 | 52691 | S | 3672 | 2824100 | ABBOTT LABORATORIES | 48.41 | 177761.52 | 146 | 177907.52 |

228.    One of the accounts to which the purported Abbott Laboratories transactions was allocated
was account number 1-C1260-3.  The following excerpt from the customer statement for this
account demonstrates the Abbott Laboratories pricing.  (*See* Figure 32.)

---

[201] *See* MESTAAF00009202-MESTAAF00009285.

**Figure 32**



229.   Also found during the investigation was an output file generated by the Java random order
generation program that utilized the input files including the Abbott Laboratories shares and
pricing.[202]   The excerpts from the full output file (shown in **Exhibit 21**) show that the random
order generation utilized the total number of shares from the input file, as well as the price
from the input file, as the basis for generating the randomly priced and sized orders (*i.e.*,
number of shares).

230.   To confirm the processing performed by the Java random order generator code, the Java
program code found in the records was compiled and executed using the input file found
during the investigation.[203]   Although the order size (*i.e.*, quantity of shares) and price differ
at the individual transaction level, the total number of shares across all orders, as well as the
average price across all orders, is equal to the input values for Abbott Laboratories.  (*See*
**Exhibit 21**.)

231.   As confirmed by internal BLMIS emails, this process was used to generate support for the
fictitious backdated trades.  For example, an email on May 24, 2008 from BLMIS internal
computer programmers detailed the requirements for the program as they "needed to generate
about 600,000 random orders based on a set of criteria for the past 16 months."[204]

232.   A legitimate business conducting an investment advisory, market making or proprietary
trading business would have no need for a random order generation program for backfilling

---

[202] *See* MESTAAF00000037-MESTAAF00000041.
[203] *See* Java program code (MDPTGG00000002).
[204] KFON-BR00030551 (emphasis added).

trade data.  All of the orders in a legitimate business would have a record generated from an external party that registered the trade (*e.g.*, DTC) at the time the trade was properly executed, even for trades executed by a computer-based trading algorithm.  The fact that BLMIS built a random order generation program to backfill support for purported trades <u>after</u> the period during which they were purportedly executed further illustrates that the securities listed on IA Business customer statements were fictitious.

### j.   Various statements and reports that the IA Business prepared were false

### (i)   Customer statements contained fictitious trades that were backdated

233.   The IA Business customer statements contained trades that were backdated.  Specifically, some customer statements reported trades that were purportedly executed in a prior month's period, sometimes stretching back years, but in actuality were never recorded on that previous month's statement ("prior month backdated trades").  For example, a March 1998 statement for account 1-A0035-3 showed transactions that purportedly occurred in March 1998, as well as trades going back to <u>April 1997</u>.  If these trades had actually occurred and settled on the stated dates during the prior months or even years, they would have appeared on their respective monthly statement (*i.e.*, a transaction in April 1997 would have appeared on the April 1997 customer statement).  Many of these trades, however, did not appear on these previous month's statements.

234.   Customer statements were analyzed for instances of such backdating by comparing the IA Business customer statement date to the security transaction trade date.  In the aggregate, the customer statements show a total of 14,749 prior month backdated trades which took place between December 1995 and November 30, 2008 across 893 accounts.[205]  (*See* **Exhibit 22** – "IA Business Backdated Trade Detail, December 1995 to November 30, 2008".)  The number of backdated trades per account ranged from 1 to 3,669.  Furthermore, 50 of the 893 accounts contained more than 30 backdated trades.

---

[205] There are also instances prior to December 1995 where trades were backdated on customer statements.  *See, e.g.*, MF00027730.

235.    The ability of BLMIS to backdate trades in the IA Business was facilitated by the use of the custom software written by IA Business programmers in a module called STMTPro.[206] STMTPro allowed an IA Business user to restore a previous month's customer statement to the AS/400.  For example, the data tape containing the SETCSH17 data file for the desired month would be inserted into the AS/400.  STMTPro would then restore that version of the SETCSH17 to a temporary location on the AS/400.  STMTPro allowed the operator to change any item on a pre-existing customer statement (*e.g.*, a purchase or sale of a security, the payment of a dividend) through a data entry screen (*see* Figure 33 below for STMTPro directions).  It also allowed the operator to print a revised customer statement.  If these prior month backdated trades were an actual "error" in the customer statements, a corrected customer statement should have been issued as is standard in the industry.  This did not occur in the IA Business.  Instead, the IA Business backdated trades on one month's statement and did not produce or reissue to customers revised statements for the prior months that indicated that these were restated statements.

---

[206] STMTPro is the specific procedure that was executed on the AS/400.  The IA Business's Programming Development Manager Member List shows various modules such as STMTPRO03-Correct EOM Statements–User 1 and STMTMPRO08-Correct Prior STMTS From ASOF Trades (+Months) (MDPTSS00001484).  As detailed *supra*, STMTPro was not software identified in the Proprietary Trading Business.

# Exhibit 5

1           MATTHEW GREENBLATT
2         UNITED STATES DISTRICT COURT
3         SOUTHERN DISTRICT OF NEW YORK
4    ----------------------------------x
     In re:                        SIPA LIQUIDATION
5
     BERNARD L. MADOFF INVESTMENT     No. 08-01789(BRL)
6    SECURITIES LLC,
7                                     (Substantively
                                      Consolidated)
8              Debtor.
     ----------------------------------x
9    IRVING H. PICARD, Trustee of the
     Liquidation of Bernard L. Madoff
10   Investment Securities LLC,
11             Plaintiff,

                                     Adv. Pro. No.
12        vs.                        09-01182(BRL)
13   J. EZRA MERKIN, GABRIEL
     CAPITAL, L.P., ARIEL FUND LTD.,
14   ASCOT PARTNERS, L.P., GABRIEL
     CAPITAL CORPORATION,
15
               Defendants.
16   ----------------------------------x
17
18    VIDEOTAPED DEPOSITION OF MATTHEW GREENBLATT
19             New York, New York
20             August 17, 2015
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 96625

Page 50

MATTHEW GREENBLATT

1  chronological listings of all of the cash and
2  principal transactions.
3          So, in developing that methodology, it
4  was determined that the appropriate means with
5  which to calculate net equity for determination
6  were the inflows and outflows that I summarized
7  in my Global Report, the November 15 report.  So
8  those are the calculations -- those are the
9  elements of the calculation.
10         Specifically excluded from that I was
11 instructed to not account for, in these
12 principal balance calculations, any of the
13 fictitious trading, fictitious gains, or
14 fictitious securities.
15     Q.   So it wasn't you that determined the
16 appropriate means to calculate net equity,
17 correct?
18     A.   The appropriate means to calculate net
19 equity is a legal conclusion, and I have been
20 asked to accumulate the data and prepare the
21 calculation so that the net equity
22 determinations can be made by the trustee and
23 his counsel.
24     Q.   But you're not offering any opinion as

Page 51

MATTHEW GREENBLATT

1  to the appropriateness of the method to
2  calculate -- used to calculate net equity,
3  correct?
4      A.   You have asked that before, and I have
5  answered it's a legal determination.  It's
6  not -- that's not what the opinions in my report
7  are.
8      Q.   And what do you mean "not account for
9  fictitious securities"?
10     A.   So, as I was instructed, I believe
11 it's paragraph 18 in the Global Report, I was
12 instructed to exclude in the principal balance
13 calculation all things related to the fictitious
14 trading.  So the fictitious trading -- no credit
15 is given for the portion of inter-account
16 transfers -- I'm reading one sentence too far.
17         So no credit is given for gains or
18 losses resulting from trades reflected on
19 customer statements, and the principal balance
20 calculation does not include any impact of the
21 trading activity that was reflected on customer
22 statements.
23     Q.   Please turn to page 1 of your November
24 15 report.

Page 52

MATTHEW GREENBLATT

1      A.   Yes.
2      Q.   Does paragraph 5 accurately state the
3  scope of your engagement in this matter?
4          MR. SONG:  Object to the form.
5      A.   What was the specific question?  Does
6  it accurately reflect?
7      Q.   The scope of your engagement in the
8  Merkin matter.
9      A.   Well, with respect to this report,
10 yes.  I mean, there are other -- other
11 components of the engagement that are not
12 related to the Merkin matter, but for the Merkin
13 matter and for the Principal Balance Calculation
14 Report, yes, that summarizes the scope.
15     Q.   Have you formed any professional
16 opinions in connection with your work in the
17 Merkin matter that are not set forth in your
18 November 15 or March 20 reports?
19     A.   With regard to principal balance or --
20     Q.   With regard to anything.  Have you
21 formed any professional opinions in connection
22 with your work on the Merkin matter that are not
23 set forth in your November 15 or March 20
24 reports?

Page 53

MATTHEW GREENBLATT

1          MR. SONG:  Object to the form.
2      A.   With respect to the Merkin matter, no,
3  I think the professional opinions that I have
4  put forth are included here in this report.
5      Q.   Do you intend to offer any opinions
6  beyond what's contained in November 15 and
7  March 20 reports if you are called upon to
8  testify at trial?
9      A.   I don't think so, no.
10     Q.   If called upon to testify at trial, do
11 you intend to offer any opinions about the
12 documents you have reviewed in connection with
13 the Merkin matter that go beyond the opinions in
14 your reports?
15     A.   I don't think so, no.
16     Q.   If called upon to testify, do you
17 intend to offer any opinions about the testimony
18 you have reviewed that go beyond the opinions in
19 your reports?
20     A.   I don't think so, no.
21     Q.   Do you intend to offer any additional
22 summary exhibits if called to testify at trial?
23         MR. SONG:  Object to the form.
24     A.   I may use certain demonstratives to

MATTHEW GREENBLATT

1  B, whether Account B thought they were getting
2  them or not.  And in the situation of
3  fictitiously held securities that are attempted
4  to be delivered to the transferee, those
5  securities don't exist so the entire transaction
6  is considered to be part of the false reporting
7  within BLMIS, and so in that transaction,
8  nothing moves over and the principal stays with
9  the transferor.
10     Q.   In how many accounts did you observe
11  the transfer of fictitious securities?
12         MR. SONG:  Object to the form.
13         Are you referring to overall in BLMIS?
14         MS. BRONEN:  Yes.
15         THE WITNESS:  Overall, within BLMIS,
16  relative to the total number of accounts, a
17  very small percentage.  Of the 8,000-plus
18  accounts, I believe we identified it in less
19  than 50 or 60 of the accounts.  It was rare.
20  BY MS. BRONEN:
21     Q.   Did you maintain a list of those 50 or
22  60 accounts?
23     A.   Within the data that we have
24  collected, we have that information from the

MATTHEW GREENBLATT

1  trading activity readily available from the
2  electronic record period.
3         If you remember, we talked earlier
4  about the December 1995 time period forward.  So
5  from December 1995 time period forward, we have
6  all of the fictitious trading electronically.
7  In the microfilm period, from November 1995
8  prior, we have the cash and principal
9  transactions available and included in our data.
10        So from December 1995 forward, yes, we
11  have all of the instances in which accounts
12  attempted to transfer or deliver fictitiously
13  held securities.
14     Q.   Are you aware of any instances in
15  which the trustee gave credit to the
16  transferor -- transferee of any portion of
17  fictitious securities?
18        MR. SONG:  Object to the form.
19     A.   When you say the trustee has given
20  credit, in what capacity?  Because I can tell
21  you that the calculations of principal balance
22  that were used to determine net equity, I don't
23  believe that to be the case.
24     Q.   Are there any other situations in

MATTHEW GREENBLATT

1  which the trustee gave the transferee of
2  fictitious securities any benefit as a result of
3  those transfers?
4     A.   I mean, I'm not subject -- I'm not
5  privy to settlement discussions or any
6  negotiations that take place, but I suppose in
7  certain situations, the trustee could have
8  discussions like that.  But I can tell you that
9  in the calculations there is no credit granted
10  to any customer, Merkin or outside of
11  Merkin-related accounts, where any credit is
12  granted for the delivery of fictitiously held
13  securities.
14     Q.   Are there instances where you think it
15  would be appropriate to give credit for the --
16  to the transferee of a portion of the value of
17  the fictitious securities transferred?
18        MR. SONG:  Object to the form.
19     A.   And I'm not sure it's my place to
20  opine on appropriateness, but I believe that
21  this is the correct way to exclude the delivery
22  of fictitious securities from Account A to
23  Account B.  It's the correct way to account for
24  it under this methodology.

MATTHEW GREENBLATT

1     Q.   Did you consider using any other
2  methodologies?
3     A.   No.
4     Q.   Did you discuss using any other
5  methodologies?
6     A.   I don't think so.  I think that, from
7  the very beginning of this case, I was tasked
8  with identifying cash and principal transactions
9  to calculate net equity consistent with this
10  methodology.
11     Q.   Why didn't you consider any other
12  methodologies?
13     A.   For the same reason I would say
14  before, which is the determination of net
15  equity, which is what these principal balance
16  calculations are used for, is a legal
17  conclusion, and I was taking my direction from
18  the trustee and his counsel.
19     Q.   You performed the principal balance
20  calculation for each of the Merkin Funds' BLMIS
21  accounts, correct?
22     A.   Correct.
23     Q.   And you determined that Ascot
24  Partners, Ariel Fund Limited, Gabriel Capital,

Page 78

```
1           MATTHEW GREENBLATT
2    L.P. were each net losers as of December 2008,
3    correct?
4        A.   And I want to say "yes" to that, but
5    the term "net loser" I guess is a term of art in
6    that situation.  So when you say "net loser,"
7    what do you mean?
8        Q.   What do you think I mean?
9        A.   I think you mean that they had
10   deposited more than they had withdrawn when the
11   Ponzi scheme came to an end.
12       Q.   And do you agree that Ascot Partners,
13   Ariel Fund Limited, Gabriel Capital, L.P. had
14   all deposited more than they had withdrawn?
15       A.   I'm just going to confirm that answer,
16   but "yes" is my answer.  When you say Ariel
17   Fund, Ariel -- did you say Ariel Fund or Ariel
18   Capital?
19       Q.   Ariel Fund Limited.
20       A.   Yes.
21       Q.   And turning to Exhibit 3D in your
22   March 20 report.
23       A.   Yes.
24       Q.   You found that Ascot Partners had over
25   $226 million of principal left in its account in
```

Page 79

```
1           MATTHEW GREENBLATT
2    December 11, 2008, correct?
3        A.   Correct.
4        Q.   And turning to Exhibit 3E, you
5    determined that Ariel Fund had more than $175
6    million of principal left in its account on
7    December 11, 2008, correct?
8        A.   The -- and there were several Ariel
9    funds, some of which ended previously with zero
10   balances, but Ariel Fund Account 1FR070, yes.
11       Q.   And turning to Exhibit 3F, you
12   determined that Gabriel Capital, L.P. had more
13   than $163 million of principal left in its
14   account on December 11, 2008, correct?
15       A.   Correct.
16       Q.   And so, as you defined it, all three
17   of these accounts were net losers, correct?
18       A.   Correct.
19       Q.   And turning to paragraph 96 of your
20   report, your March 20 report, you also
21   determined that of the more than $974 million in
22   total principal invested in Ascot Partners'
23   account, only about $490 million was ever
24   withdrawn, correct?
25            MR. SONG:  Object to the form.
```

Page 80

```
1           MATTHEW GREENBLATT
2        A.   Yes.  In --
3        Q.   And --
4        A.   In cash.  Was withdrawn in cash.
5        Q.   And turning to paragraph 117 of your
6    March 20 report, you also determined that of the
7    more than $226 million in total principal
8    invested in Ariel Fund account, only about $16.5
9    million was ever withdrawn, correct?
10       A.   There are three components to
11   withdrawals.  So, yes, I agree that
12   approximately $16.2 million was withdrawn in
13   direct cash payments from BLMIS, and then
14   additional amounts of principal were withdrawn
15   for payments made on their behalf to the IRS and
16   other amounts of principal were withdrawn via
17   inter-account transfer.
18            So if you are asking about cash
19   payments, then I would clarify that a portion of
20   that were payments made directly to the IRS on
21   their behalf and a portion of it was paid to the
22   account holder.
23       Q.   Okay.  And turning to paragraph 135 in
24   your March 20 report, you determined that of the
25   more than $283 million of principal invested in
```

Page 81

```
1           MATTHEW GREENBLATT
2    Gabriel Capital, L.P.'s BLMIS account, only
3    $17.4 million in cash was ever withdrawn,
4    correct?
5        A.   Correct.
6        Q.   And given that you stated that Ascot
7    Partners, Ariel Fund and Gabriel Capital, L.P.
8    lost $22- -- $226 million, $175 million and $163
9    million, respectively, when the BLMIS fraud was
10   uncovered, you agree that, collectively, the
11   funds lost -- the Merkin Funds lost more than
12   $565 million in principal as a result of the
13   fraud, correct?
14            MR. SONG:  Object to the form.
15       A.   Well, that's the math of adding those
16   three across, but when you say lost as a result
17   of the fraud, ultimately, if they're able to
18   recover any, but at the moment, as that was -- I
19   will testify that, yes, that was the amount of
20   net losses as of December 11, 2008.
21       Q.   And do you know what portion of those
22   net losses belonged to Mr. Merkin and his family
23   personally?
24       A.   I do not.
25       Q.   Please turn to Exhibit 4P of your
```

Page 86

MATTHEW GREENBLATT

1    your March 20 report, and on page 3, toward the
2    bottom, is that transfer from Ariel Fund of
3    about $35 million to Ascot Fund on January 4,
4    1993, correct?
5        A.    Yes.
6        Q.    And then in column 8 is your
7    calculation of the principal balance available
8    in Ariel Fund in January of 1993, correct?
9        A.    Correct.
10       Q.    Please turn to page 2 of Exhibit A,
11   4A, of your March 20 report.
12       A.    Okay.
13       Q.    You credit a number of inter-account
14   transfers to Ariel Fund in calculating its
15   principal balance, correct?
16       A.    A number of transfers into?
17       Q.    You calculate -- yes.  In
18   calculating -- in calculating the principal
19   balance available in Ariel Fund in January 1993,
20   there are two transfers of principal credited to
21   Ariel Fund, correct?
22       A.    There are two transfers of principal
23   in, yes.
24       Q.    One of these transfers is a March 31,

Page 87

MATTHEW GREENBLATT

1    1992 transfer from BLMIS Account 1FN033?
2        A.    Correct, which you will see from that
3    line item at the time had the Account Number
4    105121-3-0.
5        Q.    And that's a Shalvah account, correct?
6        A.    That is correct.
7        Q.    And did you credit any other transfers
8    from Shalvah Fund to Ariel Fund --
9        A.    Yes.
10       Q.    -- in calculating the principal
11   balance?
12       A.    Yes.
13       Q.    Okay.  Where is that?
14       A.    The last line item, on May 29, 1992,
15   the last line item on page 2.
16       Q.    Were there any other transfers from
17   Shalvah to Ariel Fund included in your principal
18   balance calculation to Ariel Fund?
19       A.    Those were the only two transfers of
20   funds from Shalvah to Ariel Fund.  There was, as
21   we've been talking about for a while, there was
22   a transfer or a delivery of fictitiously
23   reported securities from Shalvah to Ariel, but
24   the securities didn't exist and, therefore,

Page 88

MATTHEW GREENBLATT

1    aren't included on this calculation.
2        Q.    Did the funds exist?
3        A.    The column 8 will tell you how much
4    principal was available in the account at the
5    time of each of those transfers.  So, yes, there
6    were -- they were in a positive principal
7    balance at the time, but, as we discussed
8    earlier, because the fictitious securities
9    didn't exist, they couldn't be delivered.
10       Q.    And you understand that Shalvah's
11   account was closed in about 1992, correct?
12           MR. SONG:  Object to the form.
13       A.    I know that the account activity
14   ceased, and I'm not sure whether or not it was
15   closed officially within Madoff's system or not,
16   but I know the account activity ceased and that
17   this was the account holder's final -- final set
18   of transactions within that account.
19       Q.    And as BLMIS operated, there was
20   nothing left in the account as of 1992, correct?
21           MR. SONG:  Object to the form.
22       A.    I believe that's the case, yes.  I'm
23   not sure when in 1992.  I believe in October or
24   November of 1992, yes.

Page 89

MATTHEW GREENBLATT

1        Q.    But you calculated that Shalvah had a
2    principal balance of 9. -- about $9.7 million in
3    October of 1992, correct?
4        A.    Correct.
5        Q.    And based on your calculations, you
6    would credit a principal balance of $9.7 million
7    to Shalvah as of December 11, 2008, correct?
8        A.    Correct, that's their principal
9    balance from October of 1992 continuing through
10   to December 11 of 2008.
11       Q.    And that's because you didn't reduce
12   that balance based on the securities transferred
13   out of the Shalvah account, correct?
14       A.    Because the fictitious securities
15   didn't exist, correct.
16       Q.    And you did not give Ariel Fund credit
17   for the transfer of those securities, correct?
18       A.    Correct.
19           MS. BRONEN:  Let's take a five-minute
20       break.
21           THE VIDEOGRAPHER:  We are going off
22       the record.  The time is 1:19 p.m.
23           (Recess.)
24           THE VIDEOGRAPHER:  The time is 1:33

# Exhibit 6

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 09-01182 (SMB) |
| v. | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

**EXPERT REPORT OF**
**MATTHEW B. GREENBLATT, CPA/CFF, CFE**
**SENIOR MANAGING DIRECTOR**
**FTI CONSULTING, INC.**

**PRINCIPAL BALANCE CALCULATION**
**AS APPLIED TO**
**THE MERKIN DEFENDANTS**

**March 20, 2015**

6.     The documents and data that I considered in connection with this report are listed in **Exhibit 2**.  I reserve the right to supplement my report based on any additional documents or information received.

## II.    SUMMARY OF THE MERKIN ACCOUNTS AND THE PRINCIPAL BALANCE CALCULATION

7.     The Principal Balance Calculation was performed for every BLMIS customer account, including the BLMIS accounts associated with the Defendants.  This section of the report provides a list of the accounts associated with the Defendants as well as a summary of specific issues relevant to the Principal Balance Calculation for the Defendants' BLMIS accounts.

### A.  The Merkin Accounts

8.     The Defendants maintained the following six BLMIS customer accounts (collectively, the "Merkin Accounts"):

- BLMIS Account 1FN004 held by Ariel Fund Limited (the "Ariel Fund Account 1FN004") was maintained with BLMIS beginning in October 1990;

- BLMIS Account 1A0042 held by Ariel Capital, L.P. (the "Ariel Capital Account 1A0042") was maintained with BLMIS beginning in October 1990;

- BLMIS Account 1FN005 held by Ascot Fund Limited (the "Former Ascot Fund Account 1FN005") was maintained with BLMIS beginning in January 1992;

- BLMIS Account 1A0058 held by Ascot Partners, L.P. (the "Ascot Partners Account 1A0058") was maintained with BLMIS beginning in January 1993;

- BLMIS Account 1FR070 held by Ariel Fund Limited (the "Ariel Fund Account 1FR070") was maintained with BLMIS beginning in August 2000; and

5

Partners Account 1A0058 of $258,504,709 and increases to the Principal Balances of Former Ascot Fund Account 1FN005 of $40,504,709, Gabriel Capital Account 1G0321 of $140,500,000, and Ariel Fund Account 1FR070 of $77,500,000.  (*See* **Exhibits 4O-4R**.)

    iii)    <u>The Principal Balance Calculation for Ascot Partners Account 1A0058</u>

94.    As summarized in **Exhibit 3D** and  detailed in **Exhibit 4P**, the Principal Balance Calculation for Ascot Partners Account 1A0058 included:

- Cash deposits totaling $552,335,889;
- Inter-account transfers of principal to Ascot Partners Account 1A0058 totaling $422,027,224 (excludes the portions of the reported inter-account transfer amounts which represented fictitious profits) (*See* **Exhibit 5**);
- Total cash withdrawals of $489,840,000; and
- Inter-account transfers of principal from Ascot Partners Account 1A0058 totaling $258,504,709.  (*See* **Exhibit 3D**.)

95.    Based on the cash and principal transactions in Ascot Partners Account 1A0058, there was $226,018,404 of principal in the account as of December 11, 2008.

96.    The Principal Balance Calculation for Ascot Partners Account 1A0058 demonstrates that between January 4, 1993 and December 11, 2008, of the $974,363,113 of principal available in the account, $258,504,709 was transferred to other BLMIS accounts and $489,840,000 was withdrawn.  Of these cash withdrawals, there were nine cash withdrawals totaling $461,000,000 within the six-year period prior to December 11, 2008.  Within the two-year period prior to December 11, 2008, $280,000,000 was withdrawn from Ascot Partners Account 1A0058.  (*See* **Exhibit 4P**.)

iv)    The Principal Balance Calculation for Ariel Fund Account 1FR070

115.    As summarized in **Exhibit 3E** and detailed in **Exhibit 4Q**, the Principal Balance Calculation for Ariel Fund Account 1FR070 included:

- Cash deposits totaling $144,300,000;
- Inter-account transfers of principal to Ariel Fund Account 1FR070 totaling $122,600,000 (excludes the portions of the reported inter-account transfer amounts which represented fictitious profits);
- Total cash withdrawals of $16,200,000;
- Total payments made by BLMIS to the IRS on Ariel Fund Account 1FR070's behalf prior to January 1, 2003 totaling $393,203; and
- Inter-account transfers of principal from Ariel Fund Account 1FR070 totaling $74,400,000.  (*See* **Exhibit 3E**.)

116.    Based on the cash and principal transactions, the Principal Balance Calculation for Ariel Fund Account 1FR070 demonstrates there was $175,906,797 of principal in the account as of December 11, 2008.

117.    The Principal Balance Calculation for Ariel Fund Account 1FR070 demonstrates that between August 2, 2000 and December 11, 2008, of the $266,900,000 of principal available in the account, $74,400,000 was transferred to other BLMIS accounts and $16,593,203 was withdrawn (comprised of one cash withdrawal in the amount of $16,200,000, which was made within the two-year period prior to December 11, 2008, and payments made by BLMIS to the IRS on Ariel Fund Account 1FR070's behalf prior to January 1, 2003 totaling $393,203).  (*See* **Exhibit 4Q**.)

### F.  Description of Account Activity in Gabriel Capital Account 1G0321

118.    Gabriel Capital Account 1G0321 was maintained with BLMIS from August 2000 through December 2008.

119.    Throughout its account history with BLMIS, Gabriel Capital Account 1G0321 had: (i) cash deposits; (ii) a cash withdrawal; (iii) inter-account transfers received from Former Ascot Fund Account 1FN005, Ascot Partners Account 1A0058, and Ariel Fund Account 1FR070; and (iv) inter-account transfers made to Former Ascot Fund Account 1FN005, Ascot Partners Account 1A0058, and Ariel Fund Account 1FR070.  All cash deposits, withdrawals, and

134.    Based on the cash and principal transactions in Gabriel Capital Account 1G0321, there was $163,700,000 of principal in the account as of December 11, 2008.

135.    The Principal Balance Calculation for Gabriel Capital Account 1G0321 demonstrates that between August 2, 2000 and December 11, 2008, of the $283,400,000 of principal available in the account, $102,300,000 was transferred to other BLMIS accounts and $17,400,000 was withdrawn.  The one cash withdrawal in the amount of $17,400,000 was made within the two-year period prior to December 11, 2008.  (*See* **Exhibit 4R**.)

## IV.    SIGNATURE AND RIGHT TO MODIFY

136.    This report and the exhibits contained herein present my findings and the bases thereof.  To the extent that any additional information is produced by any party, I reserve the right to incorporate such additional information to my report or to modify my report as necessary.


Respectfully submitted,


Matthew B. Greenblatt, CPA/CFF, CFE
Senior Managing Director
FTI Consulting, Inc.

Dated: March 20, 2015

# Exhibit 3D

# Exhibit 3D - Summary Schedule of Cash and Principal Activity in Ascot Partners Account 1A0058

| | 1A0042 | 1H0037 | 1B0079 | 1W0041 |
|---|---|---|---|---|
| **INFLOWS** | | | | |
| Cash Deposits | $13,628,922 | $1,300,000 | $1,500,000 | $3,000,000 |
| Transfers of Principal (In) | 7,914,373 | 0 | 0 | 0 |
| **Principal Available** | **$21,543,295** | **$1,300,000** | **$1,500,000** | **$3,000,000** |
| **OUTFLOWS** | | | | |
| Cash Withdrawals | $0 | $0 | $0 | $0 |
| Transfers of Principal (Out) | (21,543,295) | (1,300,000) | (1,500,000) | (3,000,000) |
| **Total Outflows** | **($21,543,295)** | **($1,300,000)** | **($1,500,000)** | **($3,000,000)** |
| **Total** | **$0** | **$0** | **$0** | **$0** |

## Merkin Accounts

| | 1FN005 | 1A0058 | 1FR070 | 1G0321 |
|---|---|---|---|---|
| **INFLOWS** | | | | |
| Cash Deposits | $242,764,111 | $552,335,889 | $144,300,000 | $126,700,000 |
| Transfers of Principal (In) | 76,408,398 | 422,027,224 | 122,600,000 | 156,700,000 |
| **Principal Available** | **$319,172,509** | **$974,363,113** | **$266,900,000** | **$283,400,000** |
| **OUTFLOWS** | | | | |
| Cash Withdrawals | ($39,488,580) | ($489,840,000) | ($16,593,203) | ($17,400,000) |
| Transfers of Principal (Out) | (279,683,929)[a] | (258,504,709) | (74,400,000)[b] | (102,300,000)[c] |
| **Total Outflows** | **($319,172,509)** | **($748,344,709)** | **($90,993,203)** | **($119,700,000)** |
| **Total** | **$0** | **$226,018,404** | **$175,906,797** | **$163,700,000** |

[a]   The $279,683,929 was transferred from Former Ascot Fund Account 1FN005 to other BLMIS accounts, 11 of which were transfers of principal in the aggregate amount of $265,283,929 to Ascot Partners Account 1A0058.  (*See* **Exhibits 4O** and **4P**.)

[b]   The $74,400,000 was transferred from Ariel Fund Account 1FR070 to other BLMIS accounts, eight of which were transfers of principal in the aggregate amount of $65,500,000 to Ascot Partners Account 1A0058.  (*See* **Exhibits 4P** and **4Q**.)

[c]   The $102,300,000 was transferred from Gabriel Capital Account 1G0321 to other BLMIS accounts, eight of which were transfers of principal in the aggregate amount of $63,900,000 to Ascot Partners Account 1A0058.  (*See* **Exhibits 4P** and **4R**.)

# Exhibit 3E

# Exhibit 3E - Summary Schedule of Cash and Principal Activity in Ariel Fund Account 1FR070

| | Merkin Accounts | | | |
| --- | --- | --- | --- | --- |
| | 1FN005 | 1A0058 | 1FR070 | 1G0321 |
| **INFLOWS** | | | | |
| Cash Deposits | $242,764,111 | $552,335,889 | $144,300,000 | $126,700,000 |
| Transfers of Principal (In) | 76,408,398 | 422,027,224 | 122,600,000 | 156,700,000 |
| **Principal Available** | **$319,172,509** | **$974,363,113** | **$266,900,000** | **$283,400,000** |
| **OUTFLOWS** | | | | |
| Cash Withdrawals | ($39,488,580) | ($489,840,000) | ($16,593,203) | ($17,400,000) |
| Transfers of Principal (Out) | (279,683,929)[a] | (258,504,709)[b] | (74,400,000) | (102,300,000)[c] |
| **Total Outflows** | **($319,172,509)** | **($748,344,709)** | **($90,993,203)** | **($119,700,000)** |
| **Total** | **$0** | **$226,018,404** | **$175,906,797** | **$163,700,000** |

[a]    The $279,683,929 was transferred from Former Ascot Fund Account 1FN005 to other BLMIS accounts, one of which was a transfer of principal in the amount of $7,100,000 to Ariel Fund Account 1FR070.  (*See* **Exhibits 4O** and **4Q**.)

[b]    The $258,504,709 was transferred from Ascot Partners Account 1A0058 to other BLMIS accounts, four of which were transfers of principal in the aggregate amount of $77,500,000 to Ariel Fund Account 1FR070.  (*See* **Exhibits 4P** and **4Q**.)

[c]    The $102,300,000 was transferred from Gabriel Capital Account 1G0321 to other BLMIS accounts, one of which was a transfer of principal in the amount of $38,000,000 to Ariel Fund Account 1FR070.  (*See* **Exhibits 4Q** and **4R**.)

# Exhibit 3F

# Exhibit 3F - Summary Schedule of Cash and Principal Activity in Gabriel Capital Account 1G0321

| | **Merkin Accounts** | | | |
|---|---|---|---|---|
| | **1FN005** | **1A0058** | **1FR070** | **1G0321** |
| **INFLOWS** | | | | |
| Cash Deposits | $242,764,111 | $552,335,889 | $144,300,000 | $126,700,000 |
| Transfers of Principal (In) | 76,408,398 | 422,027,224 | 122,600,000 | 156,700,000 |
| **Principal Available** | **$319,172,509** | **$974,363,113** | **$266,900,000** | **$283,400,000** |
| **OUTFLOWS** | | | | |
| Cash Withdrawals | ($39,488,580) | ($489,840,000) | ($16,593,203) | ($17,400,000) |
| Transfers of Principal (Out) | (279,683,929)[a] | (258,504,709)[b] | (74,400,000)[c] | (102,300,000) |
| **Total Outflows** | **($319,172,509)** | **($748,344,709)** | **($90,993,203)** | **($119,700,000)** |
| **Total** | **$0** | **$226,018,404** | **$175,906,797** | **$163,700,000** |

[a]    The $279,683,929 was transferred from Former Ascot Fund Account 1FN005 to other BLMIS accounts, one of which was a transfer of principal in the amount of $7,300,000 to Gabriel Capital Account 1G0321.  (*See* **Exhibits 4O** and **4R**.)

[b]    The $258,504,709 was transferred from Ascot Partners Account 1A0058 to other BLMIS accounts, seven of which were transfers of principal in the aggregate amount of $140,500,000 to Gabriel Capital Account 1G0321.  (*See* **Exhibits 4P** and **4R**.)

[c]    The $74,400,000 was transferred from Ariel Fund Account 1FR070 to other BLMIS accounts, two of which were transfers of principal in the aggregate amount of $8,900,000 to Gabriel Capital Account 1G0321.  (*See* **Exhibits 4Q** and **4R**.)

# Exhibit 4P

**Exhibit 4P - Detailed Schedule for the Principal Balance Calculation for Ascot Partners Account 1A0058**

BLMIS ACCOUNT NO. 1A0058 - ASCOT PARTNERS LP

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Transaction Description as Reported in | Amount as Reported in | | | | | | | | CUSTOMER STATEMENTS PRODUCED BY THE DEFENDANTS: |
| Date | Customer Statement | Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance | BLMIS SOURCE DOCUMENT: Beg Bates | End Bates | Bates Ref |
| 1/4/1993 | TRANS FROM 1W004130 (1W0041) | 3,155,660 [1] | - | - | 3,000,000 | - | 3,000,000 | MF00435941 | MF00435942 | Not Produced |
| 1/4/1993 | TRANS FROM 1B007930 (1B0079) | 1,712,463 [1] | - | - | 1,500,000 | - | 4,500,000 | MF00435941 | MF00435942 | Not Produced |
| 1/4/1993 | TRANS FROM 1A004230 (1A0042) | 25,759,317 [1] | - | - | 21,543,295 | - | 26,043,295 | MF00435941 | MF00435942 | Not Produced |
| 1/4/1993 | TRANS FROM 1H003730 (1H0037) | 1,485,398 [1] | - | - | 1,300,000 | - | 27,343,295 | MF00435941 | MF00435942 | Not Produced |
| 1/12/1993 | CHECK WIRE | 9,075,489 | 9,075,489 | - | - | - | 36,418,784 | MF00435941 | MF00435942 | Not Produced |
| 2/26/1993 | TRANS FROM 1H003730 (1H0037) | 789 [2] | - | - | - | - | 36,418,784 | MF00430536 | MF00430537 | Not Produced |
| 2/26/1993 | TRANS FROM 1W004130 (1W0041) | 1,077 [2] | - | - | - | - | 36,418,784 | MF00430536 | MF00430537 | Not Produced |
| 2/26/1993 | TRANS FROM 1A004230 (1A0042) | 14,276 [2] | - | - | - | - | 36,418,784 | MF00430536 | MF00430537 | Not Produced |
| 2/26/1993 | TRANS FROM 1B007930 (1B0079) | 904 [2] | - | - | - | - | 36,418,784 | MF00430536 | MF00430537 | Not Produced |
| 7/28/1993 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 39,418,784 | MF00396226 | MF00396227 | Not Produced |
| 7/29/1993 | TRANS FROM 1FN00530 (1FN005) | 1,695,510 | - | - | 1,695,510 | - | 41,114,294 | MF00396226 | MF00396227 | Not Produced |
| 1/11/1994 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 46,114,294 | MF00311269 | MF00311272 | Not Produced |
| 1/11/1994 | TRANS FROM 1FN00530 (1FN005) | 14,053,625 | - | - | 14,053,625 | - | 60,167,919 | MF00311269 | MF00311272 | Not Produced |
| 4/25/1994 | TRANS FROM 1FN00530 (1FN005) | 11,052,172 | - | - | 11,052,172 | - | 71,220,091 | MF00284348 | MF00284350 | Not Produced |
| 7/6/1994 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 78,220,091 | MF00229202 | MF00229204 | Not Produced |
| 7/12/1994 | TRANS TO 1FN00530 (1FN005) | (5,039,709) | - | - | - | (5,039,709) | 73,180,382 | MF00229202 | MF00229204 | Not Produced |
| 10/13/1994 | TRANS FROM 1FN00530 (1FN005) | 5,961,000 | - | - | 5,961,000 | - | 79,141,382 | MF00278562 | MF00278565 | Not Produced |
| 7/24/1995 | TRANS FROM 1FN00530 (1FN005) | 1,780,000 | - | - | 1,780,000 | - | 80,921,382 | MF00213417 | MF00213418 | Not Produced |
| 8/3/1995 | TRANS FROM 1FN00530 (1FN005) | 4,000,000 | - | - | 4,000,000 | - | 84,921,382 | MF00134134 | MF00134136 | Not Produced |
| 10/2/1995 | TRANS TO 1FN00530 (1FN005) | (500,000) | - | - | - | (500,000) | 84,421,382 | MF00113948 | MF00113948 | Not Produced |
| 12/28/1995 | CHECK WIRE | (6,000,000) | - | (6,000,000) | - | - | 78,421,382 | MDPTPP00019133 | MDPTPP00019133 | Not Produced |
| 1/23/1996 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 84,421,382 | MDPTPP00019135 | MDPTPP00019142 | Not Produced |
| 1/26/1996 | TRANS FROM 1FN00530 (1FN005) | 304,000 | - | - | 304,000 | - | 84,725,382 | MDPTPP00019135 | MDPTPP00019142 | Not Produced |
| 4/16/1996 | CHECK WIRE | 4,500,000 | 4,500,000 | - | - | - | 89,225,382 | MDPTPP00019164 | MDPTPP00019169 | Not Produced |
| 4/16/1996 | TRANS FROM 1FN00530 (1FN005) | 500,000 | - | - | 500,000 | - | 89,725,382 | MDPTPP00019164 | MDPTPP00019169 | Not Produced |
| 7/5/1996 | CHECK WIRE | 15,661,000 | 15,661,000 | - | - | - | 105,386,382 | MDPTPP00019191 | MDPTPP00019196 | Not Produced |
| 7/24/1996 | CHECK WIRE | 39,000 | 39,000 | - | - | - | 105,425,382 | MDPTPP00019191 | MDPTPP00019196 | Not Produced |
| 12/30/1996 | CHECK WIRE | (1,600,000) | - | (1,600,000) | - | - | 103,825,382 | MDPTPP00019228 | MDPTPP00019232 | Not Produced |
| 1/7/1997 | CHECK WIRE | (9,240,000) | - | (9,240,000) | - | - | 94,585,382 | MDPTPP00019234 | MDPTPP00019241 | Not Produced |
| 1/10/1997 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 93,585,382 | MDPTPP00019234 | MDPTPP00019241 | Not Produced |
| 4/8/1997 | CHECK WIRE | 8,500,000 | 8,500,000 | - | - | - | 102,085,382 | MDPTPP00019260 | MDPTPP00019266 | Not Produced |
| 7/8/1997 | CHECK WIRE | 1,400,000 | 1,400,000 | - | - | - | 103,485,382 | MDPTPP00019282 | MDPTPP00019287 | Not Produced |
| 7/10/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 104,485,382 | MDPTPP00019282 | MDPTPP00019287 | Not Produced |
| 10/8/1997 | CHECK WIRE | (2,500,000) | - | (2,500,000) | - | - | 101,985,382 | MDPTPP00019304 | MDPTPP00019308 | Not Produced |
| 12/30/1997 | CHECK WIRE | (6,000,000) | - | (6,000,000) | - | - | 95,985,382 | MDPTPP00019322 | MDPTPP00019322 | Not Produced |
| 1/7/1998 | CHECK WIRE | (2,500,000) | - | (2,500,000) | - | - | 93,485,382 | MDPTPP00019324 | MDPTPP00019330 | Not Produced |
| 1/9/1998 | TRANS TO 1FN00530 (1FN005) | (1,000,000) | - | - | - | (1,000,000) | 92,485,382 | MDPTPP00019324 | MDPTPP00019330 | Not Produced |
| 4/13/1998 | CHECK WIRE | 26,000,000 | 26,000,000 | - | - | - | 118,485,382 | MDPTPP00019349 | MDPTPP00019353 | Not Produced |
| 7/8/1998 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 128,485,382 | MDPTPP00019373 | MDPTPP00019378 | Not Produced |
| 4/5/1999 | CHECK WIRE | 18,685,400 | 18,685,400 | - | - | - | 147,170,782 | MDPTPP00019463 | MDPTPP00019470 | Not Produced |
| 4/12/1999 | CHECK WIRE | 11,400,000 | 11,400,000 | - | - | - | 158,570,782 | MDPTPP00019463 | MDPTPP00019470 | Not Produced |
| 4/14/1999 | TRANS FROM 1FN00530 (1FN005) | 1,950,000 | - | - | 1,950,000 | - | 160,520,782 | MDPTPP00019463 | MDPTPP00019470 | Not Produced |
| 7/12/1999 | TRANS TO 1FN00530 (1FN005) | (6,400,000) | - | - | - | (6,400,000) | 154,120,782 | MDPTPP00019493 | MDPTPP00019500 | Not Produced |
| 1/10/2000 | CHECK WIRE | 700,000 | 700,000 | - | - | - | 154,820,782 | MDPTPP00019545 | MDPTPP00019545 | GCC-NYAG 0260000 |
| 4/6/2000 | CHECK WIRE | 6,175,000 | 6,175,000 | - | - | - | 160,995,782 | MDPTPP00019578 | MDPTPP00019584 | GCC-NYAG 0259915 |
| 8/2/2000 | CHECK WIRE | 4,200,000 | 4,200,000 | - | - | - | 165,195,782 | MDPTPP00019620 | MDPTPP00019627 | GCC-NYAG 0259793 |
| 10/31/2000 | TRANS TO 1FN00530 (1FN005) | (11,900,000) | - | - | - | (11,900,000) | 153,295,782 | MDPTPP00019640 | MDPTPP00019652 | GCC-NYAG 0259675 |
| 1/8/2001 | TRANS TO 1FN00530 (1FN005) | (1,400,000) | - | - | - | (1,400,000) | 151,895,782 | MDPTPP00019672 | MDPTPP00019672 | GCC-NYAG 0259499 |
| 4/12/2001 | TRANS FROM 1FN00530 (1FN005) | (700,000) | - | - | - | (700,000) | 151,195,782 | MDPTPP00019703 | MDPTPP00019711 | GCC-NYAG 0259334 |
| 7/25/2001 | TRANS TO 1FR07030 (1FR070) | (1,600,000) | - | - | - | (1,600,000) | 149,595,782 | MDPTPP00019729 | MDPTPP00019740 | GCC-NYAG 0259193 |
| 7/25/2001 | TRANS FROM 1FN00530 (1FN005) | (13,100,000) | - | - | - | (13,100,000) | 136,495,782 | MDPTPP00019729 | MDPTPP00019740 | GCC-NYAG 0259193 |
| 7/25/2001 | TRANS FROM 1G032130 (1G0321) | (1,400,000) | - | - | - | (1,400,000) | 135,095,782 | MDPTPP00019729 | MDPTPP00019740 | GCC-NYAG 0259193 |
| 10/15/2001 | TRANS TO 1G032130 (1G0321) | (2,600,000) | - | - | - | (2,600,000) | 132,495,782 | MDPTPP00019762 | MDPTPP00019766 | GCC-NYAG 0259042 |
| 1/23/2002 | TRANS FROM 1FR07030 (1FR070) | 800,000 | - | - | 800,000 | - | 133,295,782 | MDPTPP00019788 | MDPTPP00019799 | GCC-NYAG 0258939 |
| 1/23/2002 | TRANS FROM 1G032130 (1G0321) | 3,700,000 | - | - | 3,700,000 | - | 136,995,782 | MDPTPP00019788 | MDPTPP00019799 | GCC-NYAG 0258939 |
| 1/23/2002 | TRANS FROM 1FN00530 (1FN005) | 2,500,000 | - | - | 2,500,000 | - | 139,495,782 | MDPTPP00019788 | MDPTPP00019799 | GCC-NYAG 0258939 |
| 5/6/2002 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 141,495,782 | MDPTPP00019850 | MDPTPP00019866 | GCC-NYAG 0258624 |

**Exhibit 4P - Detailed Schedule for the Principal Balance Calculation for Ascot Partners Account 1A0058**

BLMIS ACCOUNT NO. 1A0058 - ASCOT PARTNERS LP

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | | | | | | BLMIS SOURCE DOCUMENT: | | CUSTOMER STATEMENTS PRODUCED BY THE DEFENDANTS: |
| Date | | | Deposits | Withdrawals | Transfers In | Transfers Out | Balance | Beg Bates | End Bates | Bates Ref |
| 7/15/2002 | TRANS FROM 1G032130 (1G0321) | 200,000 | - | - | 200,000 | - | 141,695,782 | MDPTPP0019877 | MDPTPP0019891 | GCC-NYAG 0258430 |
| 7/15/2002 | TRANS FROM 1FR07030 (1FR070) | 6,700,000 | - | - | 6,700,000 | - | 148,395,782 | MDPTPP0019877 | MDPTPP0019891 | GCC-NYAG 0258430 |
| 10/8/2002 | TRANS TO 1FN00530 (1FN005) | (465,000) | - | - | - | (465,000) | 147,930,782 | MDPTPP0019915 | MDPTPP0019926 | GCC-NYAG 0258133 |
| 12/31/2002 | TRANS TO 1G032130 (1G0321) | (4,400,000) | - | - | - | (4,400,000) | 143,530,782 | MDPTPP0019943 | MDPTPP0019949 | GCC-NYAG 0257932 |
| 1/8/2003 | TRANS FROM 1FR07030 A/O 1/2/03 (1FR070) | 6,500,000 | - | - | 6,500,000 | - | 150,030,782 | MDPTPP0019951 | MDPTPP0019965 | GCC-NYAG 0257821 |
| 1/8/2003 | TRANS FROM 1G032130 A/O 1/2/03 (1G0321) | 19,500,000 | - | - | 19,500,000 | - | 169,530,782 | MDPTPP0019951 | MDPTPP0019965 | GCC-NYAG 0257821 |
| 1/8/2003 | TRANS FROM 1FN00530 A/O 1/2/03 (1FN005) | 551,296,800 [1] | - | - | 221,487,622 | - | 391,018,404 | MDPTPP0019951 | MDPTPP0019965 | GCC-NYAG 0257821 |
| 4/15/2003 | TRANS TO 1G032130 (1G0321) | 10,700,000 | - | - | 10,700,000 | - | 401,718,404 | MDPTPP0020007 | MDPTPP0020010 | GCC-NYAG 0257525 |
| 4/15/2003 | TRANS FROM 1FR07030 (1FR070) | 11,300,000 | - | - | 11,300,000 | - | 413,018,404 | MDPTPP0020007 | MDPTPP0020010 | GCC-NYAG 0257525 |
| 7/3/2003 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 443,018,404 | MDPTPP0020047 | MDPTPP0020062 | GCC-NYAG 0257182 |
| 7/3/2003 | TRANS FROM 1FR07030 (1FR070) | 8,000,000 | - | - | 8,000,000 | - | 451,018,404 | MDPTPP0020047 | MDPTPP0020062 | GCC-NYAG 0257182 |
| 7/3/2003 | TRANS FROM 1G032130 (1G0321) | 13,000,000 | - | - | 13,000,000 | - | 464,018,404 | MDPTPP0020047 | MDPTPP0020062 | GCC-NYAG 0257182 |
| 10/7/2003 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 489,018,404 | MDPTPP0020100 | MDPTPP0020111 | GCC-NYAG 0256860 |
| 10/7/2003 | TRANS FROM 1FR07030 (1FR070) | 12,000,000 | - | - | 12,000,000 | - | 501,018,404 | MDPTPP0020100 | MDPTPP0020111 | GCC-NYAG 0256860 |
| 10/7/2003 | TRANS FROM 1G032130 (1G0321) | 6,000,000 | - | - | 6,000,000 | - | 507,018,404 | MDPTPP0020100 | MDPTPP0020111 | GCC-NYAG 0256860 |
| 10/8/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 512,018,404 | MDPTPP0020100 | MDPTPP0020111 | GCC-NYAG 0256860 |
| 12/2/2003 | CHECK WIRE | (5,000,000) | - | (5,000,000) | - | - | 507,018,404 | MDPTPP0020128 | MDPTPP0020145 | GCC-NYAG 0256630 |
| 12/26/2003 | CHECK WIRE | (12,000,000) | - | (12,000,000) | - | - | 495,018,404 | MDPTPP0020128 | MDPTPP0020145 | GCC-NYAG 0256656 |
| 1/5/2004 | CHECK WIRE | 17,000,000 | 17,000,000 | - | - | - | 512,018,404 | MDPTPP0020147 | MDPTPP0020159 | GCC-NYAG 0256580 |
| 1/5/2004 | TRANS FROM 1FR07030 (1FR070) | 14,200,000 | - | - | 14,200,000 | - | 526,218,404 | MDPTPP0020147 | MDPTPP0020159 | GCC-NYAG 0256580 |
| 1/5/2004 | TRANS FROM 1G032130 (1G0321) | 5,800,000 | - | - | 5,800,000 | - | 532,018,404 | MDPTPP0020147 | MDPTPP0020159 | GCC-NYAG 0256580 |
| 7/14/2004 | TRANS TO 1FR07030 (1FR070) | (19,400,000) | - | - | - | (19,400,000) | 512,618,404 | MDPTPP0020240 | MDPTPP0020240 | GCC-NYAG 0256324 |
| 7/14/2004 | TRANS TO 1G032130 (1G0321) | (20,600,000) | - | - | - | (20,600,000) | 492,018,404 | MDPTPP0020240 | MDPTPP0020240 | GCC-NYAG 0256324 |
| 8/2/2004 | TRANS FROM 1G032130 (1G0321) | 5,000,000 | - | - | 5,000,000 | - | 497,018,404 | MDPTPP0020242 | MDPTPP0020255 | GCC-NYAG 0256261 |
| 8/2/2004 | TRANS FROM 1FR07030 (1FR070) | 6,000,000 | - | - | 6,000,000 | - | 503,018,404 | MDPTPP0020242 | MDPTPP0020255 | GCC-NYAG 0256261 |
| 8/3/2004 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 518,018,404 | MDPTPP0020242 | MDPTPP0020255 | GCC-NYAG 0256261 |
| 1/6/2005 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 618,018,404 | MDPTPP0020310 | MDPTPP0020322 | GCC-NYAG 0256021 |
| 4/5/2005 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 648,018,404 | MDPTPP0020347 | MDPTPP0020351 | GCC-NYAG 0255918 |
| 10/5/2005 | CHECK WIRE | 50,000,000 | 50,000,000 | - | - | - | 698,018,404 | MDPTPP0020416 | MDPTPP0020432 | GCC-NYAG 0255638 |
| 12/23/2005 | CHECK WIRE | (25,000,000) | - | (25,000,000) | - | - | 673,018,404 | MDPTPP0020444 | MDPTPP0020460 | GCC-NYAG 0255493 |
| 1/5/2006 | TRANS TO 1G032130 A/O 1/3 (1G0321) | (59,000,000) | - | - | - | (59,000,000) | 614,018,404 | MDPTPP0020462 | MDPTPP0020478 | GCC-NYAG 0255487 |
| 1/5/2006 | TRANS TO 1FR07030 A/O 1/3 (1FR070) | (38,000,000) | - | - | - | (38,000,000) | 576,018,404 | MDPTPP0020462 | MDPTPP0020478 | GCC-NYAG 0255487 |
| 1/6/2006 | CHECK WIRE | (63,000,000) | - | (63,000,000) | - | - | 513,018,404 | MDPTPP0020462 | MDPTPP0020478 | GCC-NYAG 0255487 |
| 4/4/2006 | CHECK WIRE | (76,000,000) | - | (76,000,000) | - | - | 437,018,404 | MDPTPP0020510 | MDPTPP0020524 | GCC-NYAG 0255376 |
| 7/7/2006 | TRANS TO 1G032130 (1G0321) | (26,000,000) | - | - | - | (26,000,000) | 411,018,404 | MDPTPP0020552 | MDPTPP0020564 | GCC-NYAG 0255236 |
| 7/12/2006 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 436,018,404 | MDPTPP0020552 | MDPTPP0020564 | GCC-NYAG 0255237 |
| 12/29/2006 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 426,018,404 | MDPTPP0020612 | MDPTPP0020628 | GCC-NYAG 0255029 |
| 1/4/2007 | TRANS TO 1G032130 (1G0321) | (26,500,000) | - | - | - | (26,500,000) | 399,518,404 | MDPTPP0020630 | MDPTPP0020635 | GCC-NYAG 0254998 |
| 1/4/2007 | TRANS TO 1FR07030 (1FR070) | (18,500,000) | - | - | - | (18,500,000) | 381,018,404 | MDPTPP0020630 | MDPTPP0020635 | GCC-NYAG 0254998 |
| 7/6/2007 | CHECK WIRE | 80,000,000 | 80,000,000 | - | - | - | 461,018,404 | MDPTPP0020710 | MDPTPP0020714 | GCC-NYAG 0254734 |
| 12/31/2007 | CHECK WIRE | (175,000,000) | - | (175,000,000) | - | - | 286,018,404 | MDPTPP0020788 | MDPTPP0020788 | GCC-NYAG 0254989 |
| 4/2/2008 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 311,018,404 | MDPTPP0020817 | MDPTPP0020826 | GCC-NYAG 0254342 |
| 7/2/2008 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 261,018,404 | MDPTPP0020848 | MDPTPP0020856 | GCC-NYAG 0254142 |
| 10/1/2008 | CHECK WIRE | (45,000,000) | - | (45,000,000) | - | - | 216,018,404 | MDPTPP0020882 | MDPTPP0020887 | GCC-NYAG 0254131 |
| 10/9/2008 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 226,018,404 | MDPTPP0020882 | MDPTPP0020887 | GCC-NYAG 0254131 |
| | Total: | $ 552,335,889 | $ (489,840,000) | $ 422,027,224 | $ (258,504,709) | $ 226,018,404 | | | | |

[1] Although BLMIS Customer Statements reflect that a larger transfer was made into the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the principal remaining in the originating account was transferred into this account on this date.

[2] Although BLMIS Customer Statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

# Exhibit 7

1                    AMY B. HIRSCH
2             UNITED STATES DISTRICT COURT
3             SOUTHERN DISTRICT OF NEW YORK
4    ----------------------------------x
     In re:                          SIPA LIQUIDATION
5

     BERNARD L. MADOFF INVESTMENT      No. 08-01789(BRL)
6    SECURITIES LLC,
7                                      (Substantively
                                        Consolidated)
8              Debtor.
     ----------------------------------x
9    IRVING H. PICARD, Trustee of the
     Liquidation of Bernard L. Madoff
10   Investment Securities LLC,
11                   Plaintiff,

                                       Adv. Pro. No.
12          vs.                        09-01182(BRL)
13   J. EZRA MERKIN, GABRIEL
     CAPITAL, L.P., ARIEL FUND LTD.,
14   ASCOT PARTNERS, L.P., GABRIEL
     CAPITAL CORPORATION,
15

                   Defendants.
16   ----------------------------------x
17
18       VIDEOTAPED DEPOSITION OF AMY B. HIRSCH
19                New York, New York
20                June 16, 2015
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 94520

Page 30

AMY B. HIRSCH

1
2      Q.   Do you have an opinion as to whether
3  that relates to the topic of due diligence
4  performed by Mr. Merkin on Madoff or Madoff
5  securities?
6      A.   My opinion, again, is stated in the
7  report.
8      Q.   Does Opinion I relate to the topic of
9  due diligence performed by Mr. Merkin on Madoff
10 or Madoff securities?
11     A.   Opinion I speaks to bookkeeping and
12 recordkeeping and accounting and the use of fund
13 assets and investor subscriptions.
14     Q.   Does that, in your mind, relate to due
15 diligence performed by Mr. Merkin?
16     A.   Again, it relates to bookkeeping and
17 accounting functions and transfers of assets and
18 the appropriateness of those transfers of
19 assets.
20     Q.   Are you able to answer my question as
21 to whether or not it relates to the topic of due
22 diligence performed by Mr. Merkin?
23     A.   This opinion is specifically focused
24 on bookkeeping and accounting and the transfer
25 of assets.  Due diligence is a very, very broad

Page 31

AMY B. HIRSCH

1
2  topic, and I'm not here to give an opinion on
3  that.  I'm only here to give an opinion on
4  what's in my report.
5      Q.   So then the answer to my question is
6  that opinion -- in your view, Opinion I does not
7  relate to the due diligence performed by Mr.
8  Merkin on Madoff or Madoff securities, correct?
9      A.   Again, it only relates to the
10 bookkeeping and accounting processes and the
11 appropriateness of transfers that were done.
12 That's what this opinion is.
13     Q.   And likewise, the words "due
14 diligence" don't appear in Opinion II; is that
15 right?
16     A.   I'm going to have to look at it.
17       (Document review.)
18     A.   No, they do not.
19     Q.   And am I correct that Opinion II does
20 not relate to the due diligence performed by Mr.
21 Merkin on Madoff or Madoff securities?
22     A.   Again, Opinion II discusses the
23 transfers and the proper documentation and
24 industry standards of transfers among the
25 Defendant Funds and between the management

Page 32

AMY B. HIRSCH

1
2  company, GCC.
3      Q.   So does that make the answer to my
4  question, yes, it's correct that Opinion II does
5  not relate to the due diligence performed by Mr.
6  Merkin on Madoff or Madoff securities?
7        MS. HOANG:  Objection.
8        You can answer.
9      A.   Again, the -- the opinion is relevant
10 to the Defendant Funds and the management
11 company and the transfers that went on in
12 between them.  That's what the opinion is.
13     Q.   And it's not related to the due
14 diligence performed by Mr. Merkin or the
15 Defendant Funds on Madoff or Madoff securities,
16 correct?
17        MS. HOANG:  Objection.
18     A.   The opinion is on the transfers that
19 went on between the Defendant Funds and between
20 the Defendant Funds and the management company.
21     Q.   Could you explain for me every way in
22 which, in your opinion, Opinion II relates to
23 the question of due diligence by Mr. Merkin or
24 the Defendant Funds or GCC on Madoff or Madoff
25 securities?

Page 33

AMY B. HIRSCH

1
2        MS. HOANG:  Objection.
3      A.   Once again, the opinion in Opinion II
4  talks to the assets commingling and transfers
5  between the Defendant Funds, among the Defendant
6  Funds and between and among the management
7  company and the Defendant Funds.
8      Q.   Does that in any way relate to the due
9  diligence performed by Merkin, GCC, or the
10 Defendant Funds on Madoff or Madoff securities?
11     A.   It relates to the transfers between
12 and among the Defendant Funds and the management
13 company.
14     Q.   Could you answer my question?
15        MR. STEINER:  If you could read it
16 back, please.
17       (Record read.)
18     A.   Once again, it relates to the
19 appropriateness of the transfers between and
20 among the Defendant Funds and the Defendant
21 Funds of the management company.
22     Q.   Does it relate in any way to the due
23 diligence performed by Merkin, GCC, or the
24 Defendant Funds on Madoff or Madoff securities?
25     A.   It relates to the appropriateness of

9 (Pages 30 to 33)

Page 62

AMY B. HIRSCH

1  letter to Mr. Merkin, and then the following
2  three pages are your notes and preliminary draft
3  of a due diligence report; is that right?
4      A.   They are the observations and
5  preliminary report, yes.
6      Q.   Aside from -- and ABH, that's you?
7      A.   That's me.
8      Q.   Aside from this preliminary report on
9  Ariel, was there any other work that was
10  performed in connection with the due diligence
11  on Ariel that your firm performed?
12      A.   No.
13      Q.   Why not?
14      A.   As I recall, we were never given the
15  materials to continue or conduct the full due
16  diligence.
17      Q.   What else would one of your due
18  diligence reports typically contain?
19      A.   Well, this is not --
20          MS. HOANG:  Objection.
21      A.   I'm sorry.  This is not a due
22  diligence report.  This is just the beginning of
23  a -- of a draft.
24          A full due diligence report would

Page 63

AMY B. HIRSCH

1  contain an analysis of the firm and its
2  personnel, all of the products that it has under
3  management, it would contain a review of the
4  strategy in its totality and a review of the
5  underlying investments in the strategy to the
6  best of our -- of our knowledge.
7          It would contain an analysis of risk
8  management, portfolio construction, execution,
9  risk management, operational efficiencies and
10  insufficiencies.
11          It would contain a complete
12  performance analysis and peer analysis, if
13  appropriate.  It would contain a variety of
14  different correlation analysis and market
15  analysis versus the performance.
16          Those are just some of the things that
17  a full report would contain.
18      Q.   Would it -- are you familiar with the
19  term "reverse engineering"?
20      A.   Yes, I'm familiar with it.
21      Q.   And would -- when you perform due
22  diligence, do you do reverse engineering of a
23  strategy?
24      A.   Not necessarily.

Page 64

AMY B. HIRSCH

1      Q.   Why not?
2      A.   We don't necessarily need to do
3  reverse engineering because you can find out --
4  there are different ways to get factors and
5  correlation analysis done to find out what
6  footprints are.  So in rare cases do we do --
7  will we do, or have to do, reverse engineering.
8      Q.   That's -- reverse engineering is
9  something that you do rarely?
10          MS. HOANG:  Objection.
11      A.   We -- we have not found a reason to,
12  to do it.  So it's not something that is done on
13  a standard basis, no.
14      Q.   As part of your standard due
15  diligence, do you try and do a quantitative
16  breakdown of the sources of a fund's return?
17      A.   Yes.
18      Q.   How do you do that?
19      A.   Well, it's done either through a
20  correlation analysis, factor analysis.  There
21  are a number of ways to achieve it.  There's a
22  breakdown of beta analysis and alpha analysis,
23  footprinting, et cetera.
24      Q.   What's footprinting?

Page 65

AMY B. HIRSCH

1      A.   Footprinting is -- is similar to
2  factor analysis.  You're trying to ascertain,
3  based on a benchmark, where you're seeing the
4  greatest correlation and where you're seeing the
5  footprints in the performance.
6          So if you take a short seller, for
7  example, and you do an analysis of the market
8  and you're seeing a lot of alpha in a bull
9  market, you know that there's something, you
10  know, very wrong, because he's a short seller
11  and it's a bull market.  So you're looking for
12  where -- where the manager actually is placing
13  their bets.
14      Q.   And with respect to the work that you
15  did on the Tremont Fund, was that a -- did you
16  do a complete due diligence analysis of the
17  Tremont Fund?
18      A.   It was not necessary, no.  We did an
19  analysis of performance and we reviewed the
20  document that we were given, but we never got
21  the information that we needed to do a complete
22  due diligence.
23      Q.   And when you did that work in 2003,
24  you certainly didn't identify that Mr. Madoff

17 (Pages 62 to 65)

AMY B. HIRSCH

1    
2    reward in a investment.
3        Q.    And how do you -- how do you use the
4    Sharpe ratio?
5        A.    For what, specifically?
6        Q.    Do you use the Sharpe ratio in your
7    work?
8        A.    It's one of the tools we look at, yes.
9        Q.    And why do you look at it?
10        A.    We look at it because in many
11    strategies it can give you a sense of the -- the
12    type of risk and reward you're getting for your
13    investment, and the issue with the Sharpe ratio
14    is that it penalizes for upside volatility, so
15    we only use it as one of the tools.  It wouldn't
16    be appropriate, for example, for managed futures
17    because it would -- it would hurt the manager.
18    But it's a great tool for using on most of the
19    equity strategies.
20        Q.    And as a general matter, is there a
21    direction of Sharpe -- do you prefer a higher
22    Sharpe ratio or a lower Sharpe ratio?
23        A.    You're looking for a higher Sharpe
24    ratio.
25        Q.    And that's typically a good thing?

AMY B. HIRSCH

1    
2        A.    It's not that it's a good thing, it's
3    just one of the tools in the toolbox of -- of
4    performance analysis.  It shouldn't be looked at
5    standalone.  We don't look at it standalone.  We
6    look at it in conjunction with a lot of other
7    performance indicators.
8        Q.    Are you aware of funds that have
9    Sharpe ratios in excess of 2 or 2 and a half?
10        A.    I am aware that there have been funds,
11    yes, with Sharpe ratios in excess of those.
12        Q.    Such as?
13        A.    Renaissance.  There are -- there were
14    a few equity managers that were in excess of 2.
15    I can't give you the --
16        Q.    Renaissance, that's the Jim Simons'
17    fund?
18        A.    Yes.
19        Q.    And Elliott, are you familiar with
20    Elliott?
21        A.    Elliott Partners?  Yes.
22        Q.    Elliott Capital Management?
23        A.    Yes.
24        Q.    And is their Sharpe ratio also
25    somewhere in excess of 2 or 2 and a half?

AMY B. HIRSCH

1    
2        A.    I don't recall what their Sharpe ratio
3    is.
4        Q.    And when Steve Cohen was running a
5    fund as opposed to his own money, was his Sharpe
6    ratio also up there?
7        MS. HOANG:  Objection.
8        A.    I don't know.  I didn't look at Mr.
9    Cohen's Sharpe ratio.
10        Q.    What about either Paulson or Citadel
11    or Eaton Park, some of the ones you have looked
12    at?
13        A.    Paulson's --
14        MS. HOANG:  Objection to form.
15        Go ahead.
16        A.    I apologize.
17        Paulson's Sharpe would not have gotten
18    over 2 because he was primarily doing mergers
19    and acquisitions back when, and it's an event
20    strategy, so you have a very lumpy return and it
21    wouldn't achieve a high Sharpe ratio.
22        Eaton Park, I'm not certain what their
23    Sharpe was.  I don't recall.  You know, we,
24    again, we ran the Sharpe as one of many tools in
25    our toolbox, so...

AMY B. HIRSCH

1    
2        Q.    And what about Kingdon?
3        A.    I would imagine that -- I can't recall
4    precisely, but again, based on his strategy, it
5    would be unlikely that it would be a very high
6    Sharpe ratio because he has a lot of volatility.
7        Q.    What about, did you ever look at --
8    it's not listed here, but D.E. Shaw?
9        A.    I have looked at D.E. Shaw, yes.
10        Q.    Are you familiar with what their
11    Sharpe ratios have been?
12        A.    No, I don't recall what his Sharpe is.
13        Q.    If we can flip to your Opinion II,
14    starting at paragraph 72.
15        A.    I'm sorry, starting at 72?
16        Q.    72 on page 29.
17        Now, do I understand correctly that
18    these -- that Opinion II and then the
19    explanation that's in paragraphs 72 to 129 is,
20    in essence, your attempt to apply your Opinion I
21    to the facts of this case?
22        MS. HOANG:  Objection.
23        A.    Opinion II is directly related to the
24    Defendant Funds and the management company.
25        Q.    And that's an attempt to apply kind of

# Exhibit 8

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>　　　　Plaintiff-Applicant, <br><br>v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>　　　　Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br>　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>　　　　Plaintiff, <br><br> v. <br><br> J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, <br><br>　　　　Defendants. | Adv. Pro. No. 09-01182 (SMB) |

# Expert Rebuttal Report of Paul K. Meyer

## TM Financial Forensics, LLC

## May 15, 2015

_____
Paul K. Meyer

CONFIDENTIAL MATERIAL

I.   **INTRODUCTION** ................................................................................................. **2**

A.  Background and Experience ............................................................................... 2

B.  Retention and Assignment ................................................................................. 3

C.  Information Considered ..................................................................................... 3


II.  **BACKGROUND** ................................................................................................. **4**

A.  BLMIS and Irving H. Picard ............................................................................. 4

B.  The Defendant Funds ........................................................................................ 4

C.  The Collura Report ............................................................................................ 6


III. **OPINIONS** ........................................................................................................ **8**

A.  Summary ............................................................................................................ 8

B.  Analysis of the Timing, Amounts and Purpose of the Withdrawals and Subsequent
Disbursements ........................................................................................................ 8

C.  LIFO And Proportionality Are The Most Appropriate Tracing Methods In These
Circumstances ...................................................................................................... 13

D.  FIFO, LIBR And Restated LIBR Tracing Methods Are Inconsistent With How Ascot
Partners Was Managed ......................................................................................... 14

## I. __INTRODUCTION__

### A. Background and Experience

1. I am a founder and the President of TM Financial Forensics, LLC ("TMF"). TMF is a business, economic, financial and damages consulting company that provides services to government agencies, corporations and counsel.

2. I am a Certified Public Accountant ("CPA"), Certified Fraud Examiner, Certified in Financial Forensics, Certified Licensing Professional and accredited in business valuation. I am a Consulting Professor at Stanford University in the Graduate School of Engineering, where I have been teaching courses covering accounting, quantitative methods and financial issues for twenty years. I am also a member of the Advisory Board for the McIntire School of Commerce at the University of Virginia. I graduated from the University of Virginia in 1979. I lecture on accounting, damages, and valuation issues, including at the USC Intellectual Property Institute and schools such as Santa Clara University and Stanford University.

3. Prior to founding TMF, I was a Managing Director at Navigant Consulting, Inc. ("NCI"). NCI is an international consulting company. Before joining NCI in February 2004, I was co-founder and President of Tucker Alan Inc. Tucker Alan Inc. was a business, economic, financial and damages consulting company with approximately 350 employees and 13 offices in the United States. Prior to founding Tucker Alan Inc. in July 1994, I was employed by Peterson Consulting, an international consulting firm. At Peterson Consulting, I held various positions including Executive Vice President and Member of the Board of Directors. Before joining Peterson Consulting in 1981, I worked for an international public accounting and consulting firm.

4. I have over thirty years of experience consulting on financial, accounting, economic and damages matters and am experienced in the matters related to the scope of my work, analysis and study on this matter. I have experience in matters involving financial institutions and financial asset management. I have consulted on many tracing, breach of contract, breach of fiduciary duty, and valuation matters. I have analyzed hundreds of claims for lost profits, royalties, increased costs, diminution in asset or business value and other financial and economic impacts. I am a Certified Fraud Examiner and have

significant experience in matters involving tracing, determining the sources and uses of funds, and the allocation of costs, expenses and claims.

5.      My curriculum vitae is included as Attachment 1 to this Report. A listing of cases in which I have testified as an expert witness at trial, arbitration and/or deposition in the last 4 years is included as Attachment 2 to this Report. My hourly billing rate on this matter is $650. I have no publications during the last ten years. TMF's compensation is not dependent on the outcome of this matter. TMF's work on this matter was performed by me or under my supervision.

## B.  Retention and Assignment

6.      Counsel for Bart M. Schwartz, the court-appointed receiver for Ariel Fund Ltd. ("Ariel") and Gabriel Capital, L.P. ("Gabriel") and counsel for Ascot Fund Ltd. ("Ascot Fund") and Ralph Dawson, the court-appointed receiver for Ascot Partners, L.P. ("Ascot Partners") retained TMF to review certain analyses and opinions set forth in the Expert Report of Lisa M. Collura dated March 20, 2015 ("the Collura Report").[1]

7.      Specifically, TMF was asked to review Ms. Collura's analysis of withdrawals by Ascot Partners from Bernard L. Madoff Investment Securities LLC ("BLMIS") and the subsequent disbursements to Ascot Fund, Ariel and Gabriel. Additionally, TMF was asked to determine if any particular tracing method was appropriate for identifying the amount of the alleged "Subsequent Transfers" identified by Ms. Collura.

## C. Information Considered

8.      **Attachment 3** to this Rebuttal Report contains a listing of various documents and information considered in this matter. Selected pages of the documents and information listed on **Attachment 3** may be used as exhibits. Additionally, I may prepare graphical or illustrative exhibits to use at trial based on the documents and information relied upon and our analysis of those documents and information.

9.      The opinions and analyses in this Rebuttal Report are based on currently available documents and information. Accordingly, if additional information becomes available, I may supplement and amend my opinions.

---

[1] The Collura Report.

10. TMF received and executed a copy of the protective order in this matter. Some of the documents considered have been designated as "CONFIDENTIAL MATERIAL." Accordingly, I understand that portions of this Report and Attachments may be designated as "CONFIDENTIAL MATERIAL."

## II. BACKGROUND

### A. BLMIS and Irving H. Picard

11. BLMIS was founded by Bernard Madoff in 1960 and became a limited liability company in the State of New York in 2001.[2] BLMIS operated two business units – investment advisory and market making and proprietary trading.[3] Through BLMIS, Mr. Madoff purported to invest funds on behalf of customers in various stocks in the S&P 100.[4] However, Mr. Madoff was operating a Ponzi scheme through BLMIS.[5] He was arrested on December 11, 2008, the BLMIS funds were frozen, and Irving H. Picard, Esq. was appointed the Trustee for BLMIS.[6]

### B. The Defendant Funds

12. *Ascot Partners*: Ascot Partners is a limited partnership formed in 1992.[7] Mr. Merkin was the general partner for the fund.[8] Ascot Partners had an account with BLMIS, and invested all or a majority of its assets with BLMIS since 1993.[9] Ascot Partners paid a management fee to Mr. Merkin, which I understand was paid into Gabriel Capital Corporation ("GCC") for most years.[10]

13. *Ascot Fund*: Ascot Fund is a Cayman Islands corporation formed in 1992.[11] Ascot Fund opened an account with BLMIS in January 1992, and invested all or a majority of its

---

[2] Third Amended Complaint, August 30, 2013: p. 7.
[3] Third Amended Complaint, August 30, 2013: p. 7.
[4] Third Amended Complaint, August 30, 2013: pp. 7-8.
[5] Third Amended Complaint, August 30, 2013: p. 9.
[6] Memorandum Decision Granting In Part and Denying In Part Defendants' Motion to Dismiss, August 12, 2014: p. 3.
[7] Third Amended Complaint, August 30, 2013: p. 13; Deposition of J. Ezra Merkin, February 24, 2015: Exhibit 366.
[8] Third Amended Complaint, August 30, 2013: p. 13.
[9] Third Amended Complaint, August 30, 2013: pp. 13, 15.
[10] Deposition of Michael Autera, October 22, 2014: pp. 38-40.
[11] Third Amended Complaint, August 30, 2013: p. 13.

assets with BLMIS.[12]    In 2003, Ascot Fund invested all of its capital with Ascot Partners, becoming the largest limited partner of Ascot Partners.[13]  At that time, Ascot Fund closed its account with BLMIS.[14]

14.    *Ariel*: Ariel was formed by Mr. Merkin in December 1988, and served as a fund for foreign investors, non-profit organizations and others.[15]  Ariel maintained an account with BLMIS, investing a portion of its assets in BLMIS from 2000 to 2008.[16]  Ariel paid GCC, its investment advisor, a management fee and deferred the payment of incentive fees.[17]

15.    *Gabriel:* Gabriel was formed by Mr. Merkin around 1989 and served as a fund for U.S. investors.[18]  Gabriel maintained an account with BLMIS, investing a portion of its assets in BLMIS from 2000 to 2008.[19]  Merkin served as the managing partner for Gabriel.[20]  Gabriel paid management fees and incentive fees to Mr. Merkin.[21]

16.    In this Rebuttal Report, I refer to Ascot Partners, Ascot Fund, Ariel and Gabriel collectively as the Defendant Funds.

17.    *GCC:* GCC was incorporated in 1988 as Ariel Management Corporation, later changing its name to GCC in 1998.[22]  GCC was the investment advisor to certain of the Defendant Funds.[23]  Additionally, GCC incurred expenses on behalf of the Defendant Funds, and as a result, allocated to each of the Defendant Funds the overhead of its office, which included employee compensation, rent, research, communication, quotation and other miscellaneous office expenses.[24]  Additionally, GCC could charge a

---

[12] Third Amended Complaint, August 30, 2013: p. 15.
[13] Third Amended Complaint, August 30, 2013: p. 14; Deposition of J. Ezra Merkin, February 24, 2015: p. 277.
[14] Third Amended Complaint, August 30, 2013: p. 14.
[15] Third Amended Complaint, August 30, 2013: p. 12.
[16] Third Amended Complaint, August 30, 2013: pp. 12, 14.
[17] Deposition of Michael Autera, October 22, 2014: pp. 30-31; Deposition of J. Ezra Merkin, February 24, 2015: pp. 127-128.
[18] Third Amended Complaint, August 30, 2013: p. 12.
[19] Third Amended Complaint, August 30, 2013: pp. 12, 14.
[20] Deposition of J. Ezra Merkin, February 24, 2015: pp. 127-128.
[21] Deposition of Michael Autera, October 22, 2014: p. 32-33.
[22] Third Amended Complaint, August 30, 2013: p. 12.
[23] Deposition of Michael Autera, October 22, 2014: pp. 30-31; Deposition of J. Ezra Merkin, February 24, 2015: pp. 127-128.
[24] Deposition of Michael Autera, October 22, 2014: pp. 36-37, 39-40, 42-44.

Defendant Fund for direct expense reimbursement, such as legal expenses or an auditing bill.[25]

## C. The Collura Report

18.    Lisa M. Collura submitted her expert report in this matter on March 20, 2015.[26]  Ms. Collura's opinions and findings include the following: (1) 99% of all BLMIS customer statements reconciled to available BLMIS bank statements from December 1998 to December 2008; (2) cash deposits and withdrawal transactions reflected on the BLMIS customer statements for the Defendant Funds between January 1992 and December 2008 reconciled to available BLMIS bank records and/or documents and data produced by the Defendant Funds; (3)  withdrawals of BLMIS funds from December 1998 to December 2008 can be traced to bank accounts held by the Defendant Funds; and (4) there were sources of funds other than from BLMIS in the five bank accounts held by Defendants.[27]

19.    Ms. Collura identified the following withdrawals from BLMIS to Defendant Funds during the period December 11, 2006 through February 28, 2009 ("the Two Year Period").

### Table 1:  BLMIS Withdrawals During the Two Year Period[28]

| Date | Amount | Transferred To: |
|---|---|---|
| 12/29/06 | $10,000,000 | Ascot Partners |
| 12/31/07 | $175,000,000 | Ascot Partners |
| 7/2/08 | $50,000,000 | Ascot Partners |
| 7/7/08 | $16,200,000 | Ariel |
| 7/7/08 | $17,400,000 | Gabriel |
| 10/1/08 | $45,000,000 | Ascot Partners |

20.    Additionally, Ms. Collura stated that she understands "from counsel to the Trustee that there are several tracing methods available within the court's discretion to trace funds through commingled bank accounts."[29]  Ms. Collura stated that she "was directed by

---

[25] Deposition of Michael Autera, October 22, 2014: pp. 36-37, 39-40, 42-44.
[26] The Collura Report.
[27] The Collura Report: pp. 6-9.
[28] The Collura Report: Exhibit 7.
[29] The Collura Report: p. 5.

counsel to the Trustee to review and apply" five tracing methods to identify alleged Subsequent Transfers of BLMIS Funds:    (1) Last In, First Out ("LIFO"); (2) First In, First, Out ("FIFO"); (3) Lowest Intermediate Balance Rule ("LIBR"); (4) Restated Tracing Rules ("Restated LIBR"); and (5) Proportionality.[30]  Ms. Collura assumed the withdrawals by Ariel and Gabriel from their respective BLMIS accounts were used to fund negative bank account balances that existed at the time of the withdrawal, and therefore only applied the tracing methods to withdrawals by Ascot Partners.[31]

21.    Ms. Collura identified the following alleged Subsequent Transfers for the Two Year Period based on the five tracing method.[32]

### Table 2:  Ms. Collura Identified Alleged Subsequent Transfers For The Two Year Period[33]

| Defendant | Tracing Methods | | | | |
|-----------|-----------------|-----------|-----------|---------------|-----------------|
|           | LIFO | FIFO | LIBR | Restated LIBR | Proportionality |
| Ascot Fund | $21,081,296 | $33,365,000 | $29,064,189 | $33,365,000 | $25,984,614 |
| Ariel | $0 | $0 | $0 | $0 | $0 |
| Gabriel | $0 | $0 | $0 | $0 | $0 |
| GCC | 11,405,779 | 12,051,196 | 9,356,021 | 17,756,812 | 11,546,306 |
| Total | $32,487,075 | $45,416,196 | $38,420,211 | $51,121,812 | $37,530,921 |

---

[30] The Collura Report: pp. 5-6.
[31] The Collura Report: p. 30.  As indicated on **Table 1** above, Ms. Collura did not identify any withdrawals from BLMIS to Ascot Fund.
[32] I understand that Ms. Collura additionally identified alleged Subsequent Transfers for the period December 2003 through present.  I understand, however, that the Court has dismissed all claims based upon transfers that occurred more than two years prior to December 11, 2008.  *See*, The Collura Report: p. 8; Memorandum Decision Granting in Part and Denying in Part Defendants' Motions to Dismiss, August 12, 2014: pp. 25, 51.
[33] The Collura Report: Exhibit 13.

## III.    OPINIONS

### A. Summary

22.     As stated above, I was asked by counsel to review Ms. Collura's identification of the
withdrawals by Ascot Partners and alleged subsequent disbursements to the Gabriel,
Ariel and Ascot Fund based on her five tracing methodologies.  Based on the results
shown in **Table 2** above, Ms. Collura did not attribute any alleged Subsequent Transfers
to Gabriel and Ariel for the Two Year Period.  I have confirmed that using the tracing
methods employed by Ms. Collura, there were no Subsequent Transfers to Gabriel and
Ariel for the Two Year Period.  Additionally, Ms. Collura did not identify any alleged
Subsequent Transfers to Ascot Partners for the Two Year Period or for the longer period
examined by Ms. Collura.

23.     As described in **Section B** below, my analysis indicates that Ascot Partners withdrew
funds from BLMIS at the end or beginning of a quarter, when Ascot Partners had an
immediate and specific cash need to meet redemption requests made by investors of
Ascot Partners, and pay management fees to GCC.  My analysis also indicates that
during those same periods, Ascot Partners transferred funds to Ascot Fund when Ascot
Fund had an immediate and specific cash need to meet redemption requests by Ascot
Fund investors.

24.     As explained in **Section C** below, my analysis of the amounts, timing and purpose of
the withdrawals from BLMIS, and subsequent disbursements, indicates that LIFO and
Proportionality are the most appropriate tracing methods for the identification of alleged
Subsequent Transfers in these circumstances.  As explained in **Section D** below, the
FIFO, LIBR and Restated LIBR tracing methods are inconsistent with how Ascot
Partners was managed and, therefore, are not appropriate for this matter.

### B.    Analysis of the Timing, Amounts and Purpose of the Withdrawals and Subsequent Disbursements

25.     For purposes of determining whether a particular tracing method is more appropriate for
identifying the amount of alleged Subsequent Transfers in the Two Year Period, I
analyzed the timing, amounts, and purpose of both the withdrawals from BLMIS to
Ascot Partners, and the subsequent disbursements of funds by Ascot Partners.  For

purposes of this analysis, I reviewed documents including: capital activity spreadsheets prepared by Mr. Michael Autera, CFO of GCC; QuickBooks files of the Defendant Funds; transactional data; bank statements; and deposition testimony. While my scope was to determine if any particular tracing methodology was more relevant for the Two Year Period, I reviewed the activity of Ascot Partners going back to 2003 to determine if the timing and purpose of the withdrawals from BLMIS by Ascot Partners and the subsequent disbursement of funds by Ascot Partners were consistent over a longer time period, and to observe any patterns.[34]

26.    *Analysis of Ascot Partners Withdrawals from BLMIS:*    I understand that Ascot Partners, as well as the other Defendant Funds, had written provisions that specified the terms and timing for when investors could contribute money to, or redeem money from, Ascot Partners.[35]    Ascot Partners, as well as some of the other Defendant Funds, generally allowed contributions and redemptions to occur at the end or beginning of each quarter ("break period").[36]    Additionally, Ascot Partners generally paid its management fee to GCC at the end of each year, which coincided with a break period that occurred in the fourth quarter.[37]    Ascot Partners primary brokerage account at Morgan Stanley that would receive and disburse investor contributions and redemptions, as well as pay GCC management fees, was account number xxx-x3021 ("Ascot Partners' Morgan Stanley Account").[38]    To the extent Ascot Partners had investor redemption and management fee obligations that exceeded expected investor contributions and the existing balance in the Ascot Partners' Morgan Stanley Account, Ascot Partners would have a cash requirement.

27.    Mr. Autera, CFO of GCC, maintained spreadsheets that assessed potential cash requirements of the Defendant Funds during the break periods ("Capital Activity Spreadsheets").[39]    The Capital Activity Spreadsheets included expected cash inflows

---

[34] **Attachment 4.**
[35] Deposition of Michael Autera, October 22, 2014: pp. 161-162; Mr. Merkin testified that he always received from BLMIS amounts requested to be withdrawn.  Deposition of J. Ezra Merkin, February 24, 2015: pp. 216-217.
[36] Deposition of Michael Autera, October 22, 2014: pp. 151-153, 161.
[37] Deposition of Michael Autera, October 23, 2014: pp. 226-227.
[38] See for example, MSYSAF0001128-MSYSAF1485.
[39] Deposition of Michael Autera, October 22, 2014: pp. 20, 201-203.  For example, see Capital Activity Spreadsheet, January 1, 2007: GCC-P 0114356.

(investor contributions) and outflows (investor redemptions and GCC management fees).[40]  When Mr. Autera received a request from an investor for a redemption or notice of a contribution, or if Mr. Autera anticipated a request for a redemption or contribution, he would enter that information into the Capital Activity Spreadsheet.[41]   When the redemption or contribution occurred during a break period, the activity would be entered into both QuickBooks as well as the Capital Activity Spreadsheets. [42]

28.    I have identified Capital Activity Spreadsheets from the third quarter of 2003 through the third quarter of 2008.[43]  As an example, I identified a Capital Activity Spreadsheet for the second quarter of 2008, dated July 1, 2008.[44]  Consistent with the testimony of Mr. Autera, the spreadsheet includes expected investor contributions and redemptions for the end of the second quarter of 2008 for the Defendant Funds.[45]  Specifically, the spreadsheet shows that Ascot Partners expected to receive contributions of approximately $9.7 million from 12 investors and expected to pay redemptions to 18 investors of approximately $59.3 million, resulting in a net cash requirement of approximately $49.6 million ($9.7 million - $59.3 million).[46]

29.    As shown on **Attachment 4**, Ascot Partners withdrew funds from BLMIS in the break periods where there was a net cash requirement that could not be met by the pre-existing balance in the Ascot Partners Morgan Stanley Account.[47]  For certain break periods, Ascot Partners would decrease the allocation of funds it held at BLMIS at the same time that Gabriel and/or Ariel would increase the allocation of funds they held at BLMIS.  At times, this would be processed by a transfer from Ascot Partners' BLMIS account (#1-A0058-3) to Gabriel's and/or Ariel's BLMIS account(s) (#1-G0321-3 and #1-FR070-3,

---

[40] Deposition of Michael Autera, October 22, 2014: pp. 201-203.  For example, see Capital Activity Spreadsheet, January 1, 2007: GCC-P 0114356.

[41] Deposition of Michael Autera, October 22, 2014: pp. 203-204, 206.

[42] Deposition of Michael Autera, October 22, 2014: pp. 203-204, 206.

[43] **Attachment 4**.

[44] Capital Activity Spreadsheet, July 1, 2008: GCC-P0116669.

[45] Capital Activity Spreadsheet, July 1, 2008: GCC-P0116669. Additionally, the Capital Activity Spreadsheets for the last quarter of the year include GCC management fees as expected cash outflows.  For example, see Capital Activity Spreadsheet, January 1, 2007: GCC-P 0114356.

[46] Capital Activity Spreadsheet, July 1, 2008: GCC-P0116669.

[47] **Attachment 4.**

respectively) and a and a corresponding transfer would be made by Gabriel and/or Ariel into Ascot Partners' Morgan Stanley Account.[48]

30.    As summarized in **Table 3** below, the total funds transferred to Ascot Partners from BLMIS, including those processed via Gabriel and Ariel as described in Paragraph 29, are consistent with the total cash requirements of Ascot Partners as indicated on the Capital Activity Spreadsheet for that break period.  As such, my analysis confirmed that Ascot Partners historically withdrew BLMIS funds only when there was an immediate need to cover investor redemptions or payment of GCC management fees, even outside of the Two Year Period.[49]

**Table 3: Ascot Partners Identified Net Cash Requirement and Related Inflows from BLMIS or Other Defendant Funds**[50]

| Break Period / Quarter Ending: | Ascot Partners' Cash Requirement | Transfers to Ascot Partners From: | | | Total Transfers to Ascot Partners |
|---|---|---|---|---|---|
| | | BLMIS | Gabriel | Ariel | |
| 2006 Q4 | $62,868,073 | $10,000,000 | $26,500,000 | $18,500,000 | $55,000,000 |
| 2007 Q4 | $182,223,412 | $175,000,000 | - | - | $175,000,000 |
| 2008 Q2 | $49,551,581 | $50,000,000 | - | - | $50,000,000 |
| 2008 Q3 | $45,727,278 | $45,000,000 | - | - | $45,000,000 |

31.    As shown on **Attachments 5.A** to **5.D**, I have summarized the expected capital activity for Ascot Partners from the Capital Activity Spreadsheets, the activity from Ascot Partners' Morgan Stanley Account per Ms. Collura's Exhibit 12, and the transactions from Ascot Partners' QuickBooks for the relevant break periods when Ascot Partners withdrew funds from BLMIS during the Two Year Period.[51]    As shown on **Attachments 5.A** to **5.D,** the expected investor redemptions, investor contributions and payment of management fees to GCC identified on the Capital Activity Spreadsheets are generally consistent with the actual deposits and withdrawals from Ascot Partners'

---

[48] For example, on January 4, 2007, Ascot Partners' Morgan Stanley Account received $26,500,000 from Gabriel and $18,500,000 from Ariel.  On that same day, Mr. Autera asked Frank DiPascali from Bernard L. Madoff & Co. to credit Gabriel's BLMIS account $26,500,000 from Ascot Partners BLMIS account and credit Ariel's BLMIS account $18,500,000 from Ascot Partners BLMIS account. *See* Deposition of Michael Autera, October 22, 2014: pp. 188-198; Exhibit 285; **Attachment 4**.

[49] **Attachment 4.**

[50] **Attachment 4**.

[51] **Attachments 5.A** to **5.D.**

Morgan Stanley Account and the transaction detail from Ascot Partners' QuickBooks files.

32.   _Analysis of Disbursements from Ascot Partners to Ascot Fund:_ As stated above, in 2003 Ascot Fund became a limited partner of Ascot Partners and invested all of its capital with Ascot Partners.[52]  I understand that to the extent an investor in Ascot Fund wanted to redeem all or a portion of their investment, the funds would be redeemed through Ascot Partners.

33.   Similar to Ascot Partners, Ascot Fund allowed contributions and redemptions to occur during a break period around the end of a quarter.[53]  Also similar to Ascot Partners, Mr. Autera maintained Capital Activity Spreadsheets for Ascot Fund that included expected investor cash contributions and redemptions, and indicated if there was a net cash requirement for a specific break period.[54]

34.   As summarized in **Table 4** below, for the break periods where Ascot Partners withdrew funds from BLMIS, the amount of transfers from Ascot Partners to Ascot Fund are consistent with Ascot Fund's net cash requirement identified for a given break period. Just as Ascot Partners' withdrawal of funds from BLMIS historically occurred only when it had a net cash requirement for investor redemptions and management fees, transfers to Ascot Fund similarly occurred to meet its net cash requirement due to investor redemptions and fees.

**Table 4: Ascot Fund Identified Net Cash Requirement and Related Transfers from Ascot Partners to Ascot Fund during the Two Year Period[55]**

| Break Period / Quarter Ending: | Ascot Fund Net Cash Requirement | Total Transfers to Ascot Fund From Ascot Partners |
|---|---|---|
| 2006 Q4 | $12,949,534 | $12,750,000 |
| 2007 Q4 | $13,824,662 | $13,825,000 |
| 2008 Q2 | $11,031,076 | $11,000,000 |
| 2008 Q3 | $8,396,575 | $8,500,000 |

---

[52] Third Amended Complaint, August 30, 2013: p. 14.
[53] Deposition of Michael Autera, October 22, 2014: pp. 151-153, 161.
[54] Deposition of Michael Autera, October 22, 2014: pp. 201-203.
[55] **Attachment 6.**

35.    As Ascot Fund's net cash requirement would be included as an expected investor redemption in Ascot Partners' Capital Activity Spreadsheet for each break period, Ascot Fund's net cash requirement contributed to the determination of the total amount that Ascot Partners would need to receive from BLMIS included in **Table 3** above. Therefore, a portion of each transfer to Ascot Partners would be subsequently disbursed by Ascot Partners to Ascot Fund in order to pay Ascot Fund's investor redemptions.

## C. LIFO And Proportionality Are The Most Appropriate Tracing Methods In These Circumstances

36.    As stated above, Ms. Collura identified alleged Subsequent Transfers using five different tracing methods: LIFO; FIFO; LIBR; Restated LIBR and Proportionality.  Ms. Collura stated that she was directed to apply the five different tracing methods, and she did not provide an opinion on the appropriateness of any particular method.

37.    After analyzing the timing, amounts and purpose of the withdrawals from BLMIS by Ascot Partners, and the subsequent disbursements from Ascot Partners following those withdrawals, I have determined that LIFO and Proportionality tracing methods are the most appropriate tracing methods in these circumstances to identify alleged Subsequent Transfers.

38.    The LIFO method is used to assign accounting value to "inventory" sold, and assumes that the last item of "inventory" acquired ("last in") is the first item that is sold ("first out").  The LIFO tracing method in this circumstance dictates that the last funds transferred into Ascot Partners, would be the first funds transferred out of Ascot Partners.  From an accounting perspective, LIFO generally matches an entity's most recent sales transaction with the most recent inventory cost, or as it relates to tracing the flow of funds, the most recent cash disbursements by a fund are matched with the most recent funds transferred in.  The LIFO tracing method is consistent with how Ascot Partners was actually managed.  As described above, Ascot Partners withdrew funds from BLMIS to satisfy a known, immediate and specific need to pay investor redemptions or management fees (including to meet the needs of Ascot Fund investor redemptions) during a specific break period. The LIFO tracing method is consistent with the nature of the transaction activity at issue.

39. Per Ms. Collura, for the Two Year Period, the LIFO tracing method indicates $21,081,296 in Subsequent Transfers to Ascot Fund and $11,405,779 in Subsequent Transfers to GCC, for a total of $32,487,075 in Subsequent Transfers.[56]

40. Proportionality is a tracing method used to associate disbursements from an account with funds originating from multiple sources.  In this case, funds in Ascot Partners' Morgan Stanley Account originated from investors, BLMIS, Ariel and Gabriel, as examples.  The Proportionality tracing method assumes that funds transferred out of Ascot Partners would be proportionately taken from the various sources of funds available to Ascot Partners at the time of the transfer.  The Proportionality tracing methodology is appropriate in these circumstances, as Ascot Partners' investor redemptions requirements and management fee payments to GCC were met through a combination of the most recent investor contributions in a break period and transfers from Gabriel and Ariel, in addition to withdrawals from BLMIS.

41. Per Ms. Collura, for the Two Year Period, the Proportionality tracing method indicates $25,984,614 in Subsequent Transfers to Ascot Fund and $11,546,306 in Subsequent Transfers to GCC, for a total of $37,530,921 in Subsequent Transfers.[57]

### D. FIFO, LIBR And Restated LIBR Tracing Methods Are Inconsistent With How Ascot Partners Was Managed

42. The FIFO, LIBR and Restated LIBR tracing methods employed by Ms. Collura are inconsistent with the how Ascot Partners was managed.

43. The FIFO method is used to assign accounting value to "inventory" sold, and assumes that the first item of "inventory" acquired ("first in") is the first item that is sold ("first out").  Unlike the LIFO method, the FIFO tracing method assumes that the "first funds" transferred into Ascot Partners would be the "first funds" transferred out.  As Ascot Partners withdrew funds from BLMIS, and then immediately transferred the funds out to pay investor redemptions and management fees, a FIFO tracing method is not consistent with how Ascot Partners operated.

[56] The Collura Report: Exhibit 13.
[57] The Collura Report: Exhibit 13.

44.     While I understand that LIBR and Restated LIBR are two additional tracing methods that are available to the Court, these tracing methods are not supported by how Ascot Partners operated in practice.  Under the LIBR tracing method, Ms. Collura assumed disbursements from Ascot Partners were first taken from sources of funds other than the BLMIS funds.[58]  Under the Restated LIBR tracing Method, Ms. Collura assumed that "withdrawals from a commingled bank account can be 'marshaled so far as possible in favor of the claimant' (here, the Trustee), and the claimant can 'claim the entire advantage of beneficial withdrawals that can be attributed to the claimant's funds' (*i.e.*, BLMIS funds)."[59]  In other words, Ms. Collura assumed disbursements to non-Defendants were taken from non-BLMIS funds, to the extent available, and disbursements to Defendants were taken from BLMIS funds, to the extent available.[60]

45.     Ascot Partners did not manage its account in a manner that resulted in paying investor redemptions or management fees from any one specific source of funds (e.g., BLMIS funds or investor contributions).  As demonstrated above, Ascot Partners would pay its redemption and management fee obligations through a combination of BLMIS funds and investor contributions.  As such, the LIBR and Restated LIBR tracing methods are inconsistent with how Ascot Partners was managed and not appropriate in these circumstances.

---

[58] The Collura Report: p. 34, Exhibit 12.
[59] The Collura Report: pp. 8, 36, Exhibit 12.  Ms. Collura determined that there was commingling of funds in Ascot Partners Morgan Stanley Account, because there were sources of funds other than from BLMIS.  As stated above, Ascot Partners received funds from investor contributions, as well as funds from BLMIS and/or Gabriel or Ariel to cover cash requirements.  The fact that Ascot Partners received funds from multiple sources is not improper, nor does Ms. Collura allege it is improper.  Additionally, as stated above, for the break periods where Ascot Partners received transfers from Gabriel or Ariel, corresponding transfers would be reflected in Ascot Partners' account at BLMIS to Gabriel or Ariel's account at BLMIS.
[60] The Collura Report: p. 36, Exhibit 12.



<div align="right">**ATTACHMENT 1**</div>

# Paul K. Meyer

Paul K. Meyer
President

TM Financial Forensics, LLC
2 Embarcadero Ctr., Suite 2510
San Francisco, CA 94111
Direct: 415.692.6360

Professional History
- TM Financial Forensics, LLC 2010 - Present
- Navigant Consulting - 2004 to 2010
- TUCKER ALAN INC. - 1994 to 2004
- Peterson Consulting L.P. & Peterson & Co. - 1981 and 1994
- Arthur Andersen LLP - 1979 to 1981

Education
- Bachelor of Science, Commerce: McIntire School of Commerce, University of Virginia, 1979

Professional Associations and Certifications
- Consulting Professor at Stanford University, School of Engineering, Department of Civil and Environmental Engineering (1994 – Present)
- Member of Advisory Board, McIntire School of Commerce, University of Virginia
- Certified Public Accountant licensed in Virginia and California
- Certified Fraud Examiner (CFE)
- Accredited in Business Valuation (CPA – ABV)
- Certified Licensing Professional (CLP)
- Member of Licensing Executive Society (LES)

Recognitions
- Recipient of "2003 Alumnus of the Year" Award, McIntire School of Commerce
- Wall Street Journal, March 2007

Mr. Meyer is President and Co-Founder of TM Financial Forensics, LLC. Mr. Meyer was formerly a Managing Director with Navigant Consulting and co-leader of the national intellectual property practice. Mr. Meyer was the President and co-founder of Tucker Alan. He is a Certified Public Accountant and Certified Fraud Examiner, as well as Accredited in Business Valuation (CPA-ABV). As a Consulting Professor, Mr. Meyer teaches a course at Stanford University's School of Engineering. Additionally, he frequently lectures on damages and valuation issues. Mr. Meyer has over 30 years of experience consulting on financial, accounting, economic and damages matters, as well as significant testimony experience. He has testified in over 200 depositions and approximately 75 trials and major arbitrations, including 35 jury trials.

## Professional Experience

### Economic, Financial Condition, Damage and Valuation Analyses

Analyzed the financial condition of corporations, partnerships and individuals under a variety of circumstances including lost profits claims, business interruption, business valuation, reduced profitability, troubled loan and bankruptcy, insolvency, reorganization, business failures, mergers and acquisitions, and various fraudulent activities.

Analyzed numerous lost profits and "loss of use" claims including economic analyses of past sales, future projections, costs of goods sold, relevant cost allocations, interest rates, and discount rates.

Business analysis and business valuation in a variety of circumstances, including business interruption, lender liability, consumer class action, and other disputes. Industries include: seafood, ship repair, freight and transportation, high technology, aquaculture, biotechnology, oil, automotive repair, wine, automotive sales, computer resellers, restaurants, service, e-commerce, real estate, hospitality and retail, as examples. Such valuations have involved extensive analysis of past operating results, future projections, comparable companies, capitalization multiples and market risk.

Analyzed the variable costs, indirect and overhead costs, and revenues of companies alleging loss of market share and revenue impact. Analyses of product pricing and discount issues including high technology, biotechnology, sporting goods, superstores, and insurance. Financial analyses of companies in industries including pharmaceutical, computer and equipment leasing, semiconductor, retail, maritime, automotive, service, agriculture, e-commerce, e-procurement, manufacturing, and high technology, as examples. Analyses of hotel and resort property financial operations and profitability. Analysis of impact on market of release of new pharmaceutical drug.

Analysis of damages and other financial and economic issues in various class action matters.

Prepared asset, economic benefit and business valuations, including the following:

- Electric and Gas Utility Asset Transfers, Including Intellectual Property
- Real Estate
- Software Development Company and Software
- High Capacity Disk Drive Development Joint Venture
- Wholesale Nursery
- Aquaculture Operation
- Life Sciences/Bio Marker Research

ATTACHMENT 1

- Contract Research Organization

- Hotel Properties

- Environmental Remediation Company/ Environmental Permits

- Concession and Merchandise Contract (Motor Sports)

- Office Equipment Distributor

- E-procurement / E-Commerce

- Freight and Transportation

- Professional Services

- Renewable Waste Water Technology

- Numerous Retail Businesses, Including Restaurants, Major Retailers and Stores

- Numerous Intellectual Properties

**Intellectual Property Consulting, including Licensing and Patent Infringement, Copyright, Trade Secret and Trademark Matters**

Analyzed the impacts due to alleged intellectual property infringements and misappropriation, including patents, trademarks, copyrights, trade secrets, trade dress and confidential information.

Analyzed lost profits related to lost sales, price erosion and convoyed sales. Evaluated and analyzed markets and potential, market share, historical and projected sales, ability to achieve projected sales, company and product profitability, revenue sources and trends, nature of costs and cost allocations, product pricing issues and cost of capital considerations.

Analyzed sales and profits, product features and other factors, production capacity, sales and distribution capacity, capital expenditures and resources required to bring products to market.

Analyzed and investigated licensing and royalty disputes. Investigated reported sales, guaranteed minimums, deductions from revenue such as returns and volume discounts, and compliance with contractual terms.

Analyzed and determined reasonable royalties. Determined reasonable royalties using a hypothetical negotiation approach. Considered cost savings and enhanced earnings related to licensing technology, licensing history and other license agreements, design-around considerations, head start advantages and avoided product development costs. Mr. Meyer has experience in the analysis of the Georgia-Pacific factors to determine reasonable royalties in numerous industries and with a wide variety of technologies. Mr. Meyer has analyzed hundreds of licensing arrangements, bringing a broad perspective to determining reasonable royalty damages.

Addressed fair, reasonable and non-discriminatory licensing (FRAND and RAND). Analyzed the fair market value of intellectual property related to its transfer and disposition. Valuation of technology transferred between holding companies and subsidiaries. Analyzed technology sharing agreements, including joint product development agreements and software development projects. Mr. Meyer has been in charge of valuation projects related to patents. Mr. Meyer has participated in licensing negotiations, providing inputs related to market, income and cost valuation approach metrics. These engagements have included high technology, aircraft and environmental technologies, as examples.

Analyses and valuation related to intellectual property have included a variety of industries, including computer hardware and software, file and data systems, integrated circuits, flash memory, mobile phones, consumer goods, eye care, pharmaceuticals, medical devices and equipment, cosmetics, apparel, office products, plastic bottling, personal hygiene, frozen foods, 3G and 4G wireless, WLAN, gaming, social networking, major motion pictures, highway sign reflective technology, dental technology, spinal implants, insulin pumps, utility partitioning software, e-commerce networking technology, telecommunications equipment, satellite television, web-conferencing, light emitting diodes (LEDS), liquid crystal displays, optical networking, telephonic billing systems, biotechnology, computer

**ATTACHMENT 1**

maintenance and servicing, hospitality, cellular communications, energy, aircraft, aerospace, flash memory, consumer credit scores, disc drives, CD-ROM controllers, flash memory, SLICs, ASICs, MOSFETS, IGBTs, nutritional supplements, software, video games, resettable fuses, knee braces, professional sports merchandise, laser measuring devices, sporting goods, VCR, architectural plans, RISC microprocessors, toys and games, and automotive diagnostic equipment, as examples. Analysis of pharmaceutical drug sales, medical devices and market issues. Analysis of computer sales, cost and financial issues related to Apple MAC clones and related manufacturing and supply issues.

Significant experience in matters involving software, including operating systems, human resource and time and reporting enterprise applications, business to business software solutions, database applications, application diagnostic tool software, natural language search software, web hosting software, customer management solutions, business analytics software, retail software packages, video games and emulation software, online auction software, application management solutions, mainframe tools, diagnostic service contracts and support, e-commerce, security and ETL software, as examples.

Significant experience in pharmaceutical and medical devices matters addressing market competitors, market shares, sales, profits and the costs of development. Technology includes drug-eluting stents, spinal implants, surgical devices, heart ablation, generic cyclosporine, insulin pumps, EPO, hepatitis vaccination and urinary drugs, as examples. Analyses and determination of damages.

Analysis of a variety of technology found in PC's and notebook computers including CPU's, memory devices, inverter controllers, hard drive partitioning, keyboard, graphic and audio acceleration, and computer locking devices, as examples.

Related to PC and notebook game play, analysis of financial, economic and royalty rate issues to graphic accelerators and audio acceleration technology. Technology addressed on chip data memory utilization to accomplish acceleration, as an example. Analyses of market issues, product refreshening, development costs, incremental margins earned and reasonable royalty rates. Analysis of numerous other notebook computer technologies related to processing, memory, utilities and other features.

Related to video games, analysis of intellectual property damage issues related to emulator software allowing Playstation games to be played on MAC and Windows' platforms. Analyses of sales, costs, market and other issues. Analysis of video game sales on various platforms. Analysis of MAC emulator software allowing for Windows' utility software to be used on MAC platforms.

Analyzed industry declared essential technologies in a variety of technologies including: WLAN, 2G/3G/4G, PCMCIA, digital compression, notebook computer security, as examples.

Analyzed value of athletic footwear cushioning and athletic performance technology.

Mr. Meyer has analyzed the financial and economic impacts of alleged trade secret misappropriation. He has determined the cost of the development of proprietary technologies and analyzed and valued the economic impact of trade secret misappropriation in a variety of industries. Mr. Meyer has analyzed revenues, apportionment issues and deductible costs in copyright and trade secret matters. Industries include software, semiconductor, mainframe computer, credit card, web conferencing, video games and book publishing, as examples.

Analyzed trademark value and alleged diminution in trademark value in matters involving consumer goods, entertainment, food, major motion picture, athletic footwear, semiconductor and other high technology, as examples. Analyzed corrective advertising issues, including the nature and amount of advertising, marketing, and selling expenditures, customer data, distribution and sales channels, and geographic considerations.

ATTACHMENT 1

**Financial Institution, Bankruptcy, Workout, Alter Ego, Class Action, General Management and Accounting Consulting**

Performed general consulting on accounting, economic, financial, management and business operations matters. Analyzed accounting issues and treatment under a variety of consulting circumstances. Analysis of revenue recognition and accounting for long-term projects. Experience in accounting issues related to high technology companies, including software sales, installation and support revenue recognition.

Performed compliance reviews, and determined the propriety of financial summaries and reports based upon the investigation of the underlying source documentation for a variety of industries and companies, including insurance, financial institutions, and Fortune 500 companies.

Performed detailed reviews of the "sources" and "uses" of cash and funds flow, which uncovered and documented check kiting, various investor "ponzi-type" schemes, fraudulent invoices, and other activities involving the misuse of an entity's assets. Assisted in financial statement audits of banks and other financial institutions.

Consulted to banks and federal government agencies on management procedures and controls, lender liability matters, troubled loan analyses, bankruptcy issues, compliance with policies and procedures, funds flow reviews and assessment of allegations of impropriety such as check kiting.

Significant experience in bankruptcy matters involving solvency analysis, review of reorganization and liquidation plans, reviews for preference items and fraudulent transfers, and analysis of claims.

Assisted corporations and other entities on management reviews of corporate departments and functions, merger and acquisition matters, cost determination studies, financial statement analyses, ability to pay analyses, avoiding or reducing the impact of disputes, cost competitiveness, financial statement disclosure and contract administration issues.

Significant experience in the analysis of the relationship and operations of companies addressing alter ego issues and single entity theory.

Reviews and analyses related to special purpose studies including the verification of account activity, transactions and licensing arrangements.

Consulting to companies on a variety of issues including profitability analysis, transfer pricing, accounting systems, internal controls, account segregation and affiliate issues, as examples.

Experience in the review and analysis of licenses, related business documents and records involving the licensing of intellectual property. This experience includes a variety of industries including athletic performance, consumer goods, household products, sports merchandising, high technology, biotechnology, telecommunications and entertainment, as examples.

Review and analysis of hundreds of talent contracts for actors, producers, directors and providers of rights in motion picture deals in class action dispute. Review and analysis of business and financial data in a variety of matters involving consumer issues and alleged unfair business practices, e.g., 17200.

Analysis of compensation of independent contractors for major freight shipping company in class action matters.

Analysis of damages and other financial and economic issues in various class action matters, including analysis related to class certification issues in financial services, DVD distribution, motor homes, insurance and movie theaters.

Experience in the review and analysis of compensation arrangements including contingent and commission structure consideration. Experience includes distributors and salespersons in industries such as high technology, oil and gas, retail, entertainment and financial services.

Teach accounting and financial class at Stanford University in the School of Engineering (over 20 years).

**Entertainment, Sports, Games, Toys and Related Assignments**

Consulting experience in entertainment and related industries, including motion picture, concert merchandising, and sporting goods. Consulting assignments related to toy and game licensing.

Analysis of producer and director compensation related to the release of major motion pictures by a leading studio. Analysis of front-end compensation as well as various forms of contingent compensation.

Research and analyses related to sales, markets, and damages related to videogames, video chips and underlying alleged proprietary technology. Issues related to the accused products of a market leader in the supply of performance 3D graphics processors for enhanced PC game performance, as an example. Study of distribution channels including board suppliers, OEM sales and retail sales. Consideration of products features. Analysis of economic and financial issues related to Soundblaster Live!™ audio card.

Analysis of copyright valuation and apportionment issues in music industry involving Rock Band and International Consumer Electronics Products Company. Addressed sales revenues and deductible costs. Examined sales and market issues related to songs, albums and online distribution channels. Analysis of profits, reasonable royalty issues and apportionment related to copyrighted property in the fashion doll industry.

Analyses related to major motion picture merchandising tie-in deals. Analysis of licensing agreements related to the movie Godzilla for toy distribution. Dispute related to scope of exclusivity arrangements and Classic Godzilla property.

Analysis of financial operations of international pop music star including concert tours, music contracts, appearances fees and endorsement agreements.

Analyses related to design mark issues concerning a major entertainment company and an internet search engine. Dispute related to Go Network.

Analysis related to board game property owned by Whiz Kids/The Topps Company concerning alleged use of a patented game dial. Analysis of licensing agreements related to "licensing in" property to incorporate into game board themes.

Analysis related to interactive toys for children. Patent dispute asserted against a former market leader. Study of learning pad sales, profits and licensing history. Analysis of technology-based educational product market, including major competitors.

Analysis of hundreds of talent contracts in a major class action related to seven Major Motion Picture Studios. Analysis of consideration paid to talent. Court granted summary judgment upon consideration of legal issues and results of analysis included in declaration related to form and nature of talent compensation including upfront and backend payments.

Analysis of financial results and changes in financial condition of professional football League member club. Analysis of revenue trends including ticket sales, suite income, concessions, parking, merchandising and TV and radio revenue sources. Comparisons to other league club local revenues. Review of entity capitalization over time.

Analysis of trademark and related property in a professional football league member club trust in conjunction with lawsuit brought by a team. Allegations were made related to diminution in the value of a specific team's trademark property. Analysis of licensing issues.

Royalty accounting related to professional baseball consumer product licenses. Analysis and audit of royalty payments under professional baseball licensing program for old-timers memorabilia program and merchandising agreements for trading cards, photographs, chess sets and other keepsakes. Analyses of royalties due, royalties underpaid, late payments and failure to meet minimum guarantees.

Analysis of financial issues related to professional soccer matches involving international teams playing friendly competitors in the United States.

Analysis of concessions and merchandise operations and contracts at a motor sports complex. Analyses of sales, costs and profits related to events such as stock cars and national drag races, as examples.

Analyses of athletic footwear market and sales issues related to a raw material supplier dispute and midsole shoe technology. Issues included the consideration of alternate design technology, athletic footwear market trends, and the specific cost structure and facilities of the supplier.

**ATTACHMENT 1**

### Securities and Related Analyses

Performed a variety of analyses in securities and securities-related matters including: forensic accounting in connection with criminal investigations and litigation; review and assessment of joint venture activities; analysis of complex related party transactions piercing the corporate veil; study of alleged departures from generally accepted accounting principles; funds tracing; asset valuation analyses; debt service analyses; real estate portfolio analyses; special reviews to assess insolvency and related issues; investigation of preference transactions and/or fraudulent conveyances in bankruptcy matters; evaluation of disclosures in financial statements and SEC filings; analysis of restitution damages and forensic analyses of why entities have not met planned and/or projected results.

Performed analyses of mutual fund trading activities in a variety of funds over an extended period of time. Documented and analyzed timing and nature of trades. Considered specific mutual fund investing objectives and investor prospectus.

### Antitrust

Experience on antitrust matters related to monopolization, tying arrangements, price maintenance and below cost pricing. Analyses of damages as well as studies of costs related to product pricing. Cost determination including the review of direct, indirect and overhead costs. Analysis of product and competitors' revenues, market shares, market issues, prices, costs and profits. Experience in various industries including computer hardware, software, diagnostics, spare parts, and documentation. Additional experience in wine, motion picture, sporting goods, insurance, oil and gas, pharmaceutical, construction, electronics, airlines and retail industries, as examples. Experience in class action matters requiring detailed forensic analysis of prices, price changes and costs.

### Forensic And Record Reconstruction

Significant experience in tracing and in financial and cost record reconstruction engagements. Analyses have included detailed reconstruction and record reconciliation in a variety of industries under different circumstances, including: bank trust accounts, gas well production and mineral rights, general liability insurance policies (dating back to the mid 1930's), incurred cost history of Nuclear Power plants, and intellectual property disputes involving audits of historical royalties due. These assignments have required various analyses and comparisons of historical production, trends, asset valuations and detailed transaction reviews. In some instances, third party information has been relied upon in efforts to gain an understanding of missing data, e.g. various third party disclosures, annual financial filings with regulators, insurance brokers files, beneficiaries portfolio listings, published industry data, and the like.

Analyses of costs and expenditures related to long-term contract between provider of HD television programming and satellite television provider. Analyses included review, aggregation and assessment of the amount and nature of costs reported as programming under a multi-year supply agreement. Consideration of overhead and administrative costs.

As part of special purpose assignment, analysis of advertising expenditures related to a large pizza franchise operation. Study of costs of producing ad campaign, including TV, radio and print campaigns, and in-store displays and giveaways. Analysis of production costs including talent contracts. Review of media placement costs and media placement. Review of Ad Fund collections and reserves related to franchisee contributions.

Significant experience in fraud and transactions reviews related to check kiting schemes, other asset transfers, fraudulent invoice schemes and alter ego analyses. Testimony in Federal Court on the results of tracing and reconstruction. Northern California engagement required six days of trial testimony (Judge Illston, Northern District Court of California, San Francisco).

Certified Fraud Examiner

# Testimony and Alternative Dispute Resolution Experience

### Testimony Experience

**ATTACHMENT 1**

Testimony in arbitration, state court, federal court, federal bankruptcy court, Court of Federal Claims and International Trade Commission.

Testimony has covered intellectual property valuation, licensing and reasonable royalty determination, lost profits, product and technology markets, technology valuation, business interruption, business value, increased costs, cost allocations, contract accounting and compliance,  tracing of funds flow, royalty audits, the nature and behavior of costs, insurance coverage, cost of capital, business plans and forecasts, and the financial operations and relationship of companies.

Presentation of damage analysis in mediation.

Served as an arbitrator on damages and financial issues.

Testimony, depositions and declarations in civil court and arbitration, as follows:

**The United States Federal District Courts for:**

- The Northern District Of California
- The District Of Delaware
- The Eastern District Of Texas
- The Southern District of Texas
- The Eastern District Of Massachusetts
- The Eastern District Of Virginia
- The District Of Colorado
- The Eastern District Of California
- The Central District Of California
- The District Of Montana
- The Northern District Of Illinois
- The Central District Of Illinois
- The Territory Of Guam
- The Eastern District Of Wisconsin
- The District of Minnesota (Minneapolis)
- The District of Arizona
- The District of Nevada
- The District of Washington
- The Eastern District of Kentucky (Lexington)
- The Southern District of Indiana (Indianapolis)

**Superior Courts for The State of California in the City and Counties of:**

- San Francisco
- San Mateo
- Santa Clara
- Sacramento
- Sonoma
- Alameda
- Napa
- Stanislaus
- Tulare
- Contra Costa
- Sutter
- Santa Cruz
- Martinez
- Monterey
- San Luis Obispo
- Los Angeles
- Orange
- Ventura

**Other State Courts:**

Supreme Court of the State of NY, County of NY

**ATTACHMENT 1**

(Commercial Division)

| **Federal Bankruptcy Court:** | **Arbitration:** |
|---|---|
| • Mississippi | • California |
| • California | • Hawaii |

**International Trade Commission (Washington D.C.)**        **Court of Federal Claims (Washington, D.C.)**

**London Court of International Arbitration (London, UK)**

**Alternative Dispute Resolution Experience**

Consulted to companies and law firms on techniques to avoid disputes and to minimize the impact of existing disputes.

Participated in numerous mediations and settlement negotiations presenting accounting, economic and business operations analyses, and assisting in developing alternative methods to resolve disputes.

Selected by mediators to assist in mediating financial issues between the parties in dispute.

Performed ability to pay analyses in the context of mediations and settlement discussions by analyzing financial statements, cash flows and other accounting and business records.

**Representative Topics Covered In Lectures And Speaking Assignments**

Accounting theory and application; finance and economics; financial statement analysis; tracing of funds flow; construction accounting issues; analysis of construction claims and long term contract claims; preparation and analysis of financial and economic damage claims; alternative dispute resolution / intellectual property; technology valuation and reasonable royalty determination; trademark valuation; intellectual property damages and economics; cost of capital; insurance coverage; antitrust licensing and financial issues; and employee compensation, including stock options.

# PAUL K. MEYER
## TESTIMONY LISTING SINCE 2011

**Spansion LLC v. Samsung Electronics Co. Ltd, et al**, In the United States District Court for the Eastern District of Virginia, Alexandria Division (Deposition), 2011

**ChampionsWorld, LLC v. United States Soccer Federation, Inc., Major League Soccer, LLC, et al.**, In the United States District Court for the Northern District of Illinois, Eastern Division (Deposition), 2011

**Personalized Media Communications, L.L.C. v. Motorola, Inc., EchoStar Corp., And DISH Network Corp. f/k/a EchoStar Communications Corp.** In the United States District Court for the Eastern District of Texas, Marshall Division (Deposition), 2011

**CTS Eventim AG v. Live Nation Worldwide, Inc. & Live Nation Entertainment, Inc**. In the International Court of Arbitration of the International Chamber of Commerce (ICC), London, U.K. (Arbitration), 2011

**Multimedia Patent Trust v. DIRECTV, et al.,** In the United States District Court for the Southern District of CA (Deposition), 2011

**Trend Micro, Inc., et al. v. Fortinet, Inc.,** In the Superior Court of the State of California, County of Santa Clara (Deposition), 2011

**Anvik Corporation v. Nikon Precision, Inc. et al.,** In the United States District Court for the Southern District of NY (Deposition), 2012

**Fujitsu Limited v. Belkin International, Inc, Belkin, Inc., et al.**, In the United States District Court for the Northern District of California, San Jose Division (Deposition, Trial), 2012

**3M Company and 3M Innovative Properties Company v. Avery Dennison Corporation,** In the United States District Court for the District of Minnesota (Deposition), 2012

**In The Matter Of:  Certain Wireless Devices with 3G Capabilities and Components Thereof (Huawei Technologies, et al.)**, United States International Trade Commission Investigation Number 337-TA-800, Washington D.C. (Deposition), 2012; (Trial), 2013

**Bath & Body Work Brand Management, Inc. v. Summit Entertainment, LLC,** In the United States District Court for the Southern District of NY (Deposition), 2012

**Morvil Technology, LLC v. Medtronic Ablation Frontiers LLC and Medtronic, Inc.,** In the United States District Court for the Southern District of California, (Deposition), 2013

**Mosaid Technologies Inc. v. LSI Corporation and Agere Systems, Inc.**, In the United States District Court for the District of Delaware (Deposition), 2013

**MobileMedia Ideas LLC v. Research In Motion Limited and Research In Motion Corporation**, In the United States District Court for the Northern District of Texas, Dallas Division (Deposition), 2013

**TESTIMONY LISTING SINCE 2011**                                    **ATTACHMENT 2**
**Page 2**

___

**In The Matter Of:  Certain Wireless Devices with 3G and/or 4G Capabilities and Components Thereof (_Huawei Technologies_, et al.)** United States International Trade Commission Investigation Number 337-TA-868, Washington D.C (Deposition), 2013

**Robyn Fenty and Tourihanna LLC v. Berdon LLP, Michael Mitnick and Peter Gounis**, In the United States District Court, Southern District of New York (Deposition), 2013

**US Airways, Inc. v. Sabre Holdings Corp., Sabre Inc. and Sabre Travel Int'l Ltd.,** In the United States District Court for the Southern District of New York (Deposition), 2014

**GPNE Corp. v. Apple Inc.,** In the United States District Court for the Northern District of California, San Jose Division (First Deposition), 2014

**Brandywine Communications Technologies, LLC v. AT&T Corp., et al.,** In the United States District Court for the Northern District of California, Oakland Division (Deposition), 2014

**GPNE Corp. v. Apple Inc.,** In the United States District Court for the Northern District of California, San Jose Division (Second Deposition, Trial), 2014

**Medtronic MiniMed Inc., Medtronic Puerto Rico Operations Co. and MiniMed Distribution Corp. v. Animas Corporation**, In the United States District Court for the Central District of California (Deposition), 2014

**InterDigital, Inc. v. Huawei Technologies Co., et al.;** International Chamber of Commerce, International Court of Arbitration, ICC Case 20171/RD, (Deposition), 2014, (Arbitration), 2015

___

**TM Financial Forensics**

## Documents Considered[1]                                          Attachment 3

| Beginning Bates | Ending Bates |
| --- | --- |
| AMF00070003 | AMF00070063 |
| AMF00076284 | AMF00076314 |
| BS0019173 | BS0019173 |
| BS0019179 | BS0019179 |
| GCC (NYU) 0012943 | GCC (NYU) 0012960 |
| GCC (NYU) 0014092 | GCC (NYU) 0014098 |
| GCC-NYAG 0029332 | GCC-NYAG 0029391 |
| GCC-NYAG 0052951 | GCC-NYAG 0052952 |
| GCC-NYAG 0052951 | GCC-NYAG 0052952 |
| GCC-NYAG 0062018 | GCC-NYAG 0062019 |
| GCC-NYAG 0062018 | GCC-NYAG 0062019 |
| GCC-NYAG 0107722 | GCC-NYAG 0107722 |
| GCC-NYAG 0108802 | GCC-NYAG 0108802 |
| GCC-NYAG 0111816 | GCC-NYAG 0111816 |
| GCC-NYAG 0111897 | GCC-NYAG 0111897 |
| GCC-NYAG 0113636 | GCC-NYAG 0113636 |
| GCC-NYAG 0114604 | GCC-NYAG 0114604 |
| GCC-NYAG 0114606 | GCC-NYAG 0114606 |
| GCC-NYAG 0114941 | GCC-NYAG 0114941 |
| GCC-NYAG 0161814 | GCC-NYAG 0161815 |
| GCC-NYAG 0161817 | GCC-NYAG 0161819 |
| GCC-NYAG 0236913 | GCC-NYAG 0236913 |
| GCC-NYAG 0236913 | GCC-NYAG 0236913 |
| GCC-NYAG 0349435 | GCC-NYAG 0349435 |
| GCC-NYAG 0349458 | GCC-NYAG 0349459 |
| GCC-NYAG 0351274 | GCC-NYAG 0351275 |
| GCC-P 0000396 | GCC-P 0000396 |
| GCC-P 0000432 | GCC-P 0000432 |
| GCC-P 0000439 | GCC-P 0000439 |
| GCC-P 0001977 | GCC-P 0001977 |
| GCC-P 0002013 | GCC-P 0002016 |
| GCC-P 0002177 | GCC-P 0002177 |
| GCC-P 0003725 | GCC-P 0003725 |
| GCC-P 0004245 | GCC-P 0004245 |
| GCC-P 0004280 | GCC-P 0004280 |
| GCC-P 0004655 | GCC-P 0004655 |
| GCC-P 0004657 | GCC-P 0004657 |
| GCC-P 0005135 | GCC-P 0005135 |
| GCC-P 0006175 | GCC-P 0006175 |
| GCC-P 0006189 | GCC-P 0006189 |
| GCC-P 0006228 | GCC-P 0006228 |
| GCC-P 0023813 | GCC-P 0023814 |
| GCC-P 0028281 | GCC-P 0028281 |
| GCC-P 0028802 | GCC-P 0028802 |

## Documents Considered[1]

<div align="right">Attachment 3</div>

| Beginning Bates | Ending Bates |
|---|---|
| GCC-P 0029598 | GCC-P 0029598 |
| GCC-P 0033432 | GCC-P 0033432 |
| GCC-P 0034205 | GCC-P 0034205 |
| GCC-P 0034770 | GCC-P 0034770 |
| GCC-P 0034793 | GCC-P 0034794 |
| GCC-P 0034797 | GCC-P 0034797 |
| GCC-P 0036303 | GCC-P 0036303 |
| GCC-P 0036601 | GCC-P 0036601 |
| GCC-P 0036608 | GCC-P 0036609 |
| GCC-P 0087007 | GCC-P 0087007 |
| GCC-P 0093192 | GCC-P 0093192 |
| GCC-P 0096009 | GCC-P 0096009 |
| GCC-P 0098135 | GCC-P 0098135 |
| GCC-P 0102414 | GCC-P 0102414 |
| GCC-P 0102587 | GCC-P 0102587 |
| GCC-P 0106068 | GCC-P 0106069 |
| GCC-P 0106361 | GCC-P 0106364 |
| GCC-P 0110406 | GCC-P 0110406 |
| GCC-P 0113092 | GCC-P 0113092 |
| GCC-P 0113100 | GCC-P 0113101 |
| GCC-P 0113123 | GCC-P 0113123 |
| GCC-P 0113135 | GCC-P 0113135 |
| GCC-P 0113155 | GCC-P 0113155 |
| GCC-P 0113561 | GCC-P 0113561 |
| GCC-P 0113775 | GCC-P 0113775 |
| GCC-P 0114356 | GCC-P 0114356 |
| GCC-P 0114695 | GCC-P 0114695 |
| GCC-P 0115047 | GCC-P 0115047 |
| GCC-P 0115053 | GCC-P 0115053 |
| GCC-P 0115293 | GCC-P 0115294 |
| GCC-P 0115469 | GCC-P 0115469 |
| GCC-P 0115474 | GCC-P 0115474 |
| GCC-P 0115571 | GCC-P 0115572 |
| GCC-P 0116079 | GCC-P 0116080 |
| GCC-P 0116081 | GCC-P 0116082 |
| GCC-P 0116196 | GCC-P 0116197 |
| GCC-P 0116669 | GCC-P 0116669 |
| GCC-P 0116977 | GCC-P 0116977 |
| GCC-P 0117005 | GCC-P 0117006 |
| GCC-P 0117011 | GCC-P 0117011 |
| GCC-P 0117618 | GCC-P 0117618 |
| GCC-P 0117629 | GCC-P 0117630 |
| GCC-P 0131535 | GCC-P 0131535 |
| GCC-P 0131940 | GCC-P 0131940 |

## Documents Considered[1]

<div align="right">Attachment 3</div>

| Beginning Bates | Ending Bates |
| --- | --- |
| GCC-P 0133044 | GCC-P 0133044 |
| GCC-P 0133934 | GCC-P 0133934 |
| GCC-P 0136881 | GCC-P 0136881 |
| GCC-P 0136935 | GCC-P 0136935 |
| GCC-P 0139097 | GCC-P 0139097 |
| GCC-P 0139132 | GCC-P 0139132 |
| GCC-P 0139135 | GCC-P 0139142 |
| GCC-P 0139310 | GCC-P 0139310 |
| GCC-P 0143948 | GCC-P 0143948 |
| GCC-P 0144052 | GCC-P 0144052 |
| GCC-P 0145483 | GCC-P 0145483 |
| GCC-P 0167346 | GCC-P 0167346 |
| GCC-P 0168443 | GCC-P 0168443 |
| GCC-P 0171955 | GCC-P 0171955 |
| GCC-P 0177436 | GCC-P 0177436 |
| GCC-P 0179532 | GCC-P 0179532 |
| GCC-P 0193094 | GCC-P 0193094 |
| GCC-P 0195882 | GCC-P 0195882 |
| GCC-P 0197353 | GCC-P 0197353 |
| GCC-P 0208793 | GCC-P 0208793 |
| GCC-P 0222672 | GCC-P 0222672 |
| GCC-P 0222774 | GCC-P 0222774 |
| GCC-P 0338864 | GCC-P 0338873 |
| GCC-P 0505811 | GCC-P 0505811 |
| GCC-P 0828014 | GCC-P 0828144 |
| GCC-P 0829257 | GCC-P 0829274 |
| GCC-P 0829391 | GCC-P 0829391 |
| GCC-P 0830470 | GCC-P 0830475 |
| GCC-P 0830587 | GCC-P 0830587 |
| GCC-P 0830682 | GCC-P 0830682 |
| GCC-P 0830914 | GCC-P 0830915 |
| GCC-P 0831045 | GCC-P 0831045 |
| GCC-P 0831274 | GCC-P 0831274 |
| GCC-P 0831279 | GCC-P 0831279 |
| GCC-P 0831708 | GCC-P 0831712 |
| GCC-P 0831784 | GCC-P 0831786 |
| GCC-P 0831849 | GCC-P 0831849 |
| GCC-P 0831895 | GCC-P 0831898 |
| GCC-P 0831947 | GCC-P 0831951 |
| GCC-P 0832011 | GCC-P 0832121 |
| GCC-P 0832133 | GCC-P 0832137 |
| GCC-P 0832239 | GCC-P 0832298 |
| GCC-P 0832841 | GCC-P 0832844 |
| GCC-P 0836605 | GCC-P 0836607 |

## Documents Considered[1]                                    Attachment 3

| Beginning Bates | Ending Bates |
| --- | --- |
| GCC-P 0836622 | GCC-P 0836622 |
| GCC-P 0836648 | GCC-P 0836651 |
| GCC-P 0836710 | GCC-P 0836710 |
| GCC-P 0836724 | GCC-P 0836727 |
| GCC-P 0836795 | GCC-P 0836799 |
| GCC-P 0836998 | GCC-P 0837001 |
| GCC-P 0837028 | GCC-P 0837032 |
| GCC-P 0837273 | GCC-P 0837277 |
| GCC-P 0837450 | GCC-P 0837454 |
| GCC-P 0837675 | GCC-P 0837678 |
| GCC-P 0837739 | GCC-P 0837742 |
| GCC-P 0837777 | GCC-P 0837780 |
| GCC-P 0838683 | GCC-P 0838686 |
| GCC-P 0838954 | GCC-P 0838958 |
| GCC-P 0838987 | GCC-P 0838991 |
| GCC-P 0841058 | GCC-P 0841059 |
| GCC-P 0842287 | GCC-P 0842288 |
| GCC-P 0842510 | GCC-P 0842511 |
| GCC-P 0883951 | GCC-P 0883966 |
| GCC-P 0883967 | GCC-P 0883970 |
| GCC-P 0886911 | GCC-P 0886928 |
| GCC-P 0886934 | GCC-P 0886984 |
| JPMCMERK-62 | JPMCMERK-1137 |
| JPMSAB0002865 | JPMSAB0002925 |
| MESTAAP01552457 | MESTAAP01552476 |
| MESTAAP01642302 | MESTAAP01642313 |
| MESTAAP01880213 | MESTAAP01880220 |
| MSYSAA0000378 | MSYSAA0000704 |
| MSYSAA0001427 | MSYSAA0001941 |
| MSYSAA0005026 | MSYSAA0005028 |
| MSYSAA0005056 | MSYSAA0005067 |
| MSYSAF0000001 | MSYSAF0002925 |
| MSYSAF0004859 | MSYSAF0005055 |

Notes:
[1] TMF additionally had access to the Reed Smith Relativity
database that included approximately one million documents.

## Documents Considered

| Expert Reports | Date |
|---|---|
| ● Expert Report and Exhibits of Matthew B. Greenblatt (Methodology for Principal Balance Calculation) | 11/15/2012 |
| ● Expert Report, Appendices and Exhibits of Bruce G. Dubinsky | 8/20/2013 |
| ● Expert Report, Exhibits and Native Files of Lisa M. Collura | 3/20/2015 |
| ● Expert Report and Appendices of Amy B. Hirsch on Fund Operations | 3/20/2015 |
| ● Expert Report and Appendices of Dr. Steve Pomerantz | 3/20/2015 |
| ● Expert Report and Exhibits of Jeffrey M. Weingarten | 3/20/2015 |
| ● Expert Report and Exhibits of Matthew B. Greenblatt | 3/20/2015 |

| Legal Filings | Date |
|---|---|
| ● Third Amended Complaint | 8/30/2013 |
| ● Memorandum Decision Granting in Part and Denying in Part Defendant's Motions to Dismiss | 8/12/2014 |
| ● Order Granting in Part and Denying in Part Defendants' Motions to Dismiss the Third Amended Complaint | 12/10/2014 |

| Depositions | Date |
|---|---|
| ● Deposition and Exhibits of Michael E. Autera | 10/22/2014 |
| ● Continued Deposition and Exhibits of Michael E. Autera | 10/23/2014 |
| ● Deposition and Exhibits of J. Ezra Merkin | 2/24/2015 |
| ● Continued Deposition and Exhibits of J. Ezra Merkin | 2/25/2015 |

| QuickBooks Files | Date |
|---|---|
| ● Ascot Partners QuickBooks Files | |
| ● Ascot Fund QuickBooks Files | |
| ● Ariel Fund QuickBook Files | |
| ● Gabriel Capital LP QuickBooks Files | |

**Comparison of Ascot Partners Capital Activity to Transfers from BLMIS, Gabriel Capital and Ariel Fund**
**Q3 2003 through Q3 2008**                                                                                   Attachment 4

| No. | Quarter | Ascot Partners Net Capital Activity | BLMIS Transfer Date | Total Transfers From: [1] | | | | Source |
| | | | | BLMIS | Gabriel Capital | Ariel Fund | Total | |
|---|---|---|---|---|---|---|---|---|
| 1 | 2003 Q3 | $ 48,061,154.59 | | $ - | | | | GCC-P 0087007 |
| 2 | 12/2/2003 | N/A | 12/2/03 | $ 5,000,000.00 [6] | $ - | | $ 5,000,000.00 | MSYSAF0001207 (at 208) / GCC-P 0836710 |
| 3 | 2003 Q4 | $ 26,764,045.43 | 12/26/03 | $ 12,000,000.00 [6] | $ - | | $ 12,000,000.00 | GCC-P 0028281 / MSYSAF0001207 (at 208) / GCC-P 0836605 |
| 4 | 2004 Q1 | $ 3,821,164.33 | | $ - | $ - | $ - | | GCC-P 0028802 |
| 5 | 2004 Q2 | $ (44,813,953.11) | 7/8/04 | $ - | $ 20,600,000.00 | $ 19,400,000.00 | $ 40,000,000.00 | GCC-P 0029598 / MSYSAF0001255 (at 256) / MSYSAF0000664 (at 669) / MSYSAF0002262 (at 267) / AMF00076286 (at 291) |
| 6 | 2004 Q3 | $ 100,426,959.74 | | $ - | | | | GCC-P 0093192 |
| 7 | 2004 Q4 | $ 12,439,516.15 | | $ - | $ - | $ - | | GCC-P 0096009 |
| 8 | 2005 Q1 | $ 30,211,741.55 | | $ - | | | | GCC-P 0098135 |
| 9 | 2005 Q2 | $ 88,915,188.99 | | $ - | | | | GCC-P 0033432 |
| 10 | 2005 Q3 | $ (42,798,896.64) [2] | | $ - | | | | GCC-P 0034205 |
| 11 | 2005 Q4 | $ (182,679,087.36) [3] | 12/23/2005, 1/6/2006 | $ 88,000,000.00 | $ 59,000,000.00 | $ 38,000,000.00 | $ 185,000,000.00 | GCC-P 0036303 / MSYSAF0001378 (at 379) / MSYSAF0001387 (at 389,391) / MSYSAF0002671 (at 283) / MSYSAF0000966 (at 971) / GCC-P 0841058 / GCC-P 0830587 |
| 12 | 2006 Q1 | $ (79,442,162.67) | 4/4/06 | $ 76,000,000.00 | $ - | | $ 76,000,000.00 | GCC-P 0002177 / MSYSAF0001415 (at 416) / GCC-P 0830914 |
| 13 | 2006 Q2 | $ 10,806,211.18 | | $ - | | | | GCC-P 0110406 |
| 14 | 2006 Q3 | $ 2,895,877.51 | | $ - | | | | GCC-P 0131535 |
| 15 | 2006 Q4 | $ (62,868,072.74) | 12/29/06 | $ 10,000,000.00 | $ 26,500,000.00 | $ 18,500,000.00 | $ 55,000,000.00 | GCC-P 0114356 / MSYSAA0004859 (at 861) / MSYSAA0004869 (at 872) / MSYSAA0001452 (at 463) / MSYSAA0000378 (at 381) / GCC-P 0113092 / GCC-P 0829391 |
| 16 | 2007 Q1 | $ 7,426,254.00 [4] | | $ - | $ - | $ - | | GCC-P 0133934 |
| 17 | 2007 Q2 | $ 87,836,055.61 | | $ - | | | | GCC-P 0114695 |
| 18 | 2007 Q3 | $ (11,294,725.58) [5] | | $ - | | | | GCC-P 0115047 |
| 19 | 2007 Q4 | $ (182,223,412.38) | 12/31/07 | $ 175,000,000.00 | | | $ 175,000,000.00 | GCC-P 0117011 / MSYSAA0004869 (at 963) / GCC-P 0830470 |
| 20 | 2008 Q1 | | | $ - | | | | |
| 21 | 2008 Q2 | $ (49,551,581.15) | 7/2/08 | $ 50,000,000.00 | $ - | | $ 50,000,000.00 | GCC-P 0116669 / MSYSAA0004969 (at 5015) / GCC-P 0116081 |
| 22 | 2008 Q3 | $ (45,727,278.02) | 10/1/08 | $ 45,000,000.00 | $ - | | $ 45,000,000.00 | GCC-P 0006175 / MSYSAA0004969 (at 5034) / GCC-P 0842510 |

Notes:

[1] This analysis includes all transfers from BLMIS for Q3 2003 through Q3 2008. This analysis only includes transfers from Gabriel Capital and Ariel Fund to Ascot Partners for the relevant period when the net capital activity of Ascot Partners was negative.

[2] Ascot Partners had sufficient funds in its account to cover its net cash requirement for this period. See The Collura Report, Exhibit 12; Ascot Partners, LP, Bank Statement for the period of October 1, 2005 through October 31, 2005: MSYSAF0001361-369 (at 361).

[3] Calculated as sum of net capital activity from Ascot Partners of $(156,090,138.28) and Management Fees of $(26,170,959.08) per the Capital Activity Spreadsheet and two disbursements that were sent in late 2005 [$(215,000) and $(203,000)] per the Capital Activity Spreadsheet. $(156,090,138.28) + $(26,170,959.08) + $(215,000) + $(203,000) = $(182,679,087.36).

[4] The April 1, 2007 Net Capital Activity includes the "possible add" of $30 million from Renco Group that was ultimately received by Ascot Partners on April 2, 2007.

[5] Ascot Partners had sufficient funds in its account to cover its net cash requirement for this period. See The Collura Report, Exhibit 12; Ascot Partners, LP, Bank Statement for the period of October 1, 2007 through October 31, 2007: MSYSAA0004869-968 (at 947).

[6] Ascot Partners redeemed $5,000,000 from BLMIS on December 2, 2003 and $12,000,000 from BLMIS on December 26, 2003, even though the Capital Activity Spreadsheet for the fourth quarter of 2003 showed a net capital activity inflow of $26,764,045.43. However, the running balance in Ascot Partners Morgan Stanley account was $2,470 on December 1, 2003, prior to the $5,000,000 BLMIS redemption on December 2, 2003. The three subsequent disbursements after the $5,000,000 BLMIS redemption were to GCC for the amount of $4,920,357.14. Furthermore, the running balance in Ascot Partners Morgan Stanley account was $632,112.47 on December 26, 2003, prior to the $12,000,000 BLMIS redemption on December 26, 2003. Within four days after the $12,000,000 BLMIS redemption, Ascot Partners subsequently disbursed $12,082,045 to GCC in two payments on December 29 and December 30. See Ascot Partners LP, Bank Statement for the period of December 1, 2003 through December 31, 2003: MSYSAF0001207-213.

**Reconciliation of Ascot Partners Capital Activity Report**  
**Q4 2006**

Attachment 5.A

## Per Collura Exhibit 12 [1]

| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
|---|---|---|---|---|---|
| ASC1245 | 12/19/2006 | 1,000,000.00 | 6,129,456 | ICE // FUNDS RECEIVED | Inflows From Other Sources |
| ASC1246 | 12/22/2006 | 166,763.63 | 6,296,220 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | Inflows From Other Sources |
| ASC2038 | 12/22/2006 | 1,020.00 | 6,297,240 | MARK TO THE MARKET | Inflows From Other Sources |
| ASC2039 | 12/22/2006 | (1,020.00) | 6,296,220 | MARK TO THE MARKET | Other Disbursements |
| ASC1247 | 12/27/2006 | 48,000.00 | 6,344,220 | LKM 2006 GIFT FUNDS RECEIVED | Inflows From Other Sources |
| ASC1248 | 12/27/2006 | 48,000.00 | 6,392,220 | JEM 2006 GIFT FUNDS RECEIVED | Inflows From Other Sources |
| ASC1249 | 12/27/2006 | (213,000.00) | 6,179,220 | ICE // PAY BRAVMANN FAMILY TRUST FUNDS PAID | Other Disbursements |
| ASC1250 | 12/27/2006 | (221,000.00) | 5,958,220 | ICE // PAY BRAVMANN FAMILY TRUST FUNDS PAID | Other Disbursements |
| ASC1251 | 12/27/2006 | 101,981.00 | 6,060,201 | ICE // FUNDS RECEIVED | Inflows From Other Sources |
| ASC1252 | 12/28/2006 | 250,000.00 | 6,310,201 | ICE // FUNDS RECEIVED | Inflows From Other Sources |
| ASC1253 | 12/28/2006 | (5,000,000.00) | 1,310,201 | TRANSFER FUNDS FUNDS PAID | Transfers to GCC MS Account |
| ASC1254 | 12/29/2006 | 3,000,000.00 | 4,310,201 | ICE // FUNDS RECEIVED | Inflows From Other Sources |
| ASC1255 | 12/29/2006 | 10,000,000.00 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | Inflows from BLMIS |
| ASC1256 | 12/29/2006 | (10,104,539.00) | 4,205,662 | ASP 2006 MF FUNDS PAID | Transfers to GCC MS Account |
| ASC2040 | 12/29/2006 | (680.00) | 4,204,982 | MARK TO THE MARKET | Other Disbursements |
| ASC2041 | 12/29/2006 | 680.00 | 4,205,662 | MARK TO THE MARKET | Inflows From Other Sources |
| ASC2208 | 1/1/2007 | 17,290.24 | 4,222,952 | CREDIT INTEREST FOR DECEMBER USD BALANCES | Inflows From Other Sources |
| ASC1300 | 1/1/2007 | 3,806.74 | 4,226,759 | DECEMBER DOMESTIC SHORT INTEREST ACCRUAL | Inflows From Other Sources |
| ASC1259 | 1/2/2007 | (100,000.00) | 4,126,759 | ICE // PAY CAROL BRAVMANN BERLI FUNDS PAID | Other Disbursements |
| ASC1260 | 1/2/2007 | (200,000.00) | 3,926,759 | ICE // PAY JUDITH KAUFTEAL FUNDS PAID | Other Disbursements |
| ASC1261 | 1/2/2007 | (100,000.00) | 3,826,759 | ICE // PAY TRUST DATE 0 MAY 13 1 FUNDS PAID | Other Disbursements |
| ASC1262 | 1/2/2007 | (30,000.00) | 3,796,759 | ICE // PAY GEORGE RUBIN FUNDS PAID | Other Disbursements |
| ASC1263 | 1/2/2007 | (300,000.00) | 3,496,759 | ICE // PAY LEONARD TO BOROFF FUNDS PAID | Other Disbursements |
| ASC1264 | 1/2/2007 | (375,000.00) | 3,121,759 | ICE // PAY IRWIN AND PHYLLIS FR FUNDS PAID | Other Disbursements |
| ASC1265 | 1/2/2007 | (392,800.00) | 2,728,959 | ICE // PAY GEDALE HOROWITZ 1992 FUNDS PAID | Other Disbursements |
| ASC1266 | 1/2/2007 | (25,000.00) | 2,703,959 | ICE // PAY MARCELLE QUINTON FUNDS PAID | Other Disbursements |
| ASC1267 | 1/2/2007 | (400,000.00) | 2,303,959 | ICE // PAY SAR ACADEMY FUNDS PAID | Other Disbursements |
| ASC1268 | 1/2/2007 | (500,000.00) | 1,803,959 | ICE // PAY DANIEL AND LYNNE ALP FUNDS PAID | Other Disbursements |
| ASC1269 | 1/2/2007 | 1,000,000.00 | 2,803,959 | ICE // FUNDS RECEIVED | Inflows From Other Sources |
| ASC1270 | 1/2/2007 | 200,000.00 | 3,003,959 | ICE // FUNDS RECEIVED | Inflows From Other Sources |

## Per Capital Activity Spreadsheet [2]

| Investor | Amount | Amount Wired | Variance from Collura Exh. 12 |
|---|---|---|---|
| BORN REALTY | $ 1,000,000.00 | $ 1,000,000.00 | - |
| ANGELICA BERRIE IRA | $ 166,763.63 | $ 166,763.63 | - |
| | | | 1,020.00 [4] |
| | | | (1,020.00) [4] |
| | | | 48,000.00 |
| | | | 48,000.00 |
| BRAVMANN B | $ (213,000.00) | $ (213,000.00) | - |
| BRAVMANN A | $ (221,000.00) | $ (221,000.00) | - |
| SJM PLAN - MORRIS SMITH | $ 101,981.00 | $ 101,981.00 | - |
| SKG - GOLDENSON | $ 250,000.00 | $ 250,000.00 | - |
| GP MANAGEMENT FEES | $ (26,004,161.79) | $ (5,000,000.00) | - [8] |
| SINSHEIMER - NY LAW | $ 3,000,000.00 | $ 3,000,000.00 | - |
| | | | 10,000,000.00 [5] |
| GP MANAGEMENT FEES | $ (26,004,161.79) | $ (10,104,539.00) | - [8] |
| | | | (680.00) [4] |
| | | | 680.00 [4] |
| | | | 17,290.24 [7] |
| | | | 3,806.74 [7] |
| CAROL BRAVMANN | $ (100,000.00) | $ 6.00 | (100,006.00) |
| JUDITH KAUFTHAL | $ (200,000.00) | $ (200,000.00) | - |
| LOUIS BACON TRUST | $ (100,000.00) | $ (100,000.00) | - |
| GEORGE RUBIN | $ (30,000.00) | $ (30,000.00) | - |
| LEONARD TOBOROFF | $ (300,000.00) | $ (300,000.00) | - |
| PHYLLIS FROMME | $ (375,000.00) | $ (375,000.00) | - |
| HOROWITZ CHARITABLE LEAI | $ (392,800.00) | $ (392,800.00) | - |
| | | | (25,000.00) [6] |
| SAR ACADEMY | $ (400,000.00) | $ (400,000.00) | - |
| GROWTH ASSOCIATES | $ (500,000.00) | $ (500,000.00) | - |
| GESHER FOUNDATION | $ 1,000,000.00 | $ 1,000,000.00 | - |
| JOSH BERMAN IRA | $ 200,000.00 | $ 200,000.00 | - |

## Per QuickBooks General Ledger [3]

| Date | Memo | Amount |
|---|---|---|
| 12/19/2006 | 1/07 Cont - Born | 1,000,000.00 |
| 12/26/2006 | 1/07 Cont - A. Berrie | 166,763.63 |
| 12/22/2006 | | |
| 12/22/2006 | | |
| 12/27/2006 | 1/07 Cont - Merkin Trust | 48,000.00 |
| 12/27/2006 | 1/07 Cont - Merkin Trust | 48,000.00 |
| 12/27/2006 | 12/31/06 Dist - Bravmann B | (213,000.00) |
| 12/27/2006 | 12/31/06 Dist - Bravmann A | (221,000.00) |
| 12/27/2006 | 1/07 Cont - M. Smith | 101,981.00 |
| 12/28/2006 | 1/07 Cont - S. Goldenson | 250,000.00 |
| 12/28/2006 | PARTIAL PYMNT OF 2006 MGMT FEES | (5,000,000.00) [8] |
| 12/29/2006 | 1/07 Cont - NY Law | 3,000,000.00 |
| 12/29/2006 | From Madoff | 10,000,000.00 [5] |
| 12/29/2006 | 2006 Mgmt fee paid | (10,104,539.00) [8] |
| 01/02/2007 | DEC CREDIT INT - MS | 17,290.24 [7] |
| 01/02/2007 | DEC CREDIT INT - MS | 3,806.74 [7] |
| 01/02/2007 | 1/1 Dist - C. Bravmann | (100,000.00) |
| 01/02/2007 | 1/1 Dist - J. Kaufthal | (200,000.00) |
| 01/02/2007 | 1/1 Dist - 5/13 Trust | (100,000.00) |
| 01/02/2007 | 1/1 Dist - G. Rubin | (30,000.00) |
| 01/02/2007 | 1/1 Dist - L. Toboroff | (300,000.00) |
| 01/02/2007 | 1/1 Dist - Fromme | (375,000.00) |
| 01/02/2007 | 1/1 Dist - G. Horowitz | (392,800.00) |
| 01/02/2007 | 1/1 Dist - Quinton | - |
| 01/02/2007 | 1/1 Dist - SAR Academy | (400,000.00) |
| 01/02/2007 | 1/1 Dist - Daniel & Lynne | (500,000.00) |
| 01/02/2007 | 1/1 Cont - Gesher | 1,000,000.00 |
| 01/02/2007 | 1/1 Cont - Berman IRA | 200,000.00 |

CONFIDENTIAL MATERIAL

Reconciliation of Ascot Partners Capital Activity Report
Q4 2006

Attachment 5.A

| Per Collura Exhibit 12 [1] | | | | | | | Per Capital Activity Spreadsheet [2] | | | | | Per QuickBooks General Ledger [3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category | | Investor | Amount | Amount Wired | Variance from Collura Exh. 12 | | Date | Memo | Amount |
| ASC1271 | 1/2/2007 | (150,000.00) | 2,853,959 | ICE // PAY HERBERT KASPER REVOC FUNDS PAID | Other Disbursements | | KASPER | $ (150,000.00) | (150,000.00) | - | | 01/02/2007 | 1/1 Dist - H. Kasper | (150,000.00) |
| ASC1272 | 1/2/2007 | 25,000.00 | 2,878,959 | ICE // RETURN WIRE REDACTED4040 FUNDS RECEIVED | Inflows From Other Sources | | | | | 25,000.00 [6] | | | | |
| ASC2042 | 1/2/2007 | 90,706.55 | 2,969,665 | CHK DEP 1-2-07 | Inflows From Other Sources | | SUZANNE GOLDENSON IRA | $ 90,706.55 $ | 90,706.55 | - | | | | |
| ASC2043 | 1/2/2007 | 13,903.00 | 2,983,568 | CHK DEP 1-2-07 | Inflows From Other Sources | | | | | 13,903.00 [6] | | | | |
| ASC1273 | 1/3/2007 | (25,504.07) | 2,958,064 | ICE // PAY JANICE KESTENBAUM F FUNDS PAID | Other Disbursements | | JAN KESTENBAUM | $ (25,504.07) $ | (25,504.07) | - | | 01/03/2007 | 1/1 Dist - J. Kestenbaum | (25,504.07) |
| ASC1274 | 1/3/2007 | (38,256.11) | 2,919,808 | ICE // PAY JAY AND HADASA POMRE FUNDS PAID | Other Disbursements | | POMRENZE FOUNDATION | $ (38,256.11) $ | (38,256.11) | - | | 01/03/2007 | 1/1 Dist - Pomrenze | (38,256.11) |
| ASC1275 | 1/3/2007 | (500,000.00) | 2,419,808 | ICE // PAY MAURICE B. FALK FUNDS PAID | Other Disbursements | | MAURICE FALK | $ (500,000.00) $ | (500,000.00) | - | | 01/03/2007 | 1/1 Dist - M. Falk | (500,000.00) |
| ASC1276 | 1/3/2007 | (58,293.46) | 2,361,515 | ICE // PAY HARRIS GUEDALIA FUNDS PAID | Other Disbursements | | HARRIS GUEDALIA | $ (58,293.46) $ | (58,293.46) | - | | 01/03/2007 | 1/1 Dist - Guedalia | (58,293.46) |
| ASC1277 | 1/3/2007 | (13,903.00) | 2,347,612 | HOBBY FARM TAX REFUND FUNDS PAID | Other Disbursements | | | | | (13,903.00) [6] | | | | |
| ASC1278 | 1/4/2007 | 45,000.00 | 2,392,612 | ICE // FUNDS RECEIVED | Inflows From Other Sources | | ANDY WEISS PSP | $ 45,000.00 $ | 45,000.00 | - | | 01/04/2007 | 1/1 Cont - A. Weiss | 45,000.00 |
| ASC1279 | 1/4/2007 | 30,000.00 | 2,422,612 | ICE // FUNDS RECEIVED | Inflows From Other Sources | | ANDY WEISS MONEY PENSION | $ 30,000.00 $ | 30,000.00 | - | | 01/04/2007 | 1/1 Cont - A. Weiss | 30,000.00 |
| ASC1280 | 1/4/2007 | 350,000.00 | 2,772,612 | ICE // FUNDS RECEIVED | Inflows From Other Sources | | ARLENE EIS PSP | $ 350,000.00 $ | 350,000.00 | - | | 01/04/2007 | 1/1 Cont - Alt Inv. EIS | 350,000.00 |
| ASC1281 | 1/4/2007 | (2,894,671.23) | (122,060) | ICE // PAY LEXINGTON CAPITAL PA FUNDS PAID | Other Disbursements | | LEXINGTON - BEINECKE | $ (3,216,301.37) $ | (2,894,671.23) | - | | 01/04/2007 | 1/1 Dist - Lexington Cap. | (2,894,671.23) |
| ASC1282 | 1/4/2007 | (2,611,783.66) | (2,733,843) | ICE // PAY PROSPECT CAPITAL PAR FUNDS PAID | Other Disbursements | | PROSPECT - BEINECKE | $ (2,901,981.84) $ | (2,611,783.66) | - | | 01/04/2007 | 1/1 Dist - Prospect | (2,611,783.66) |
| ASC1283 | 1/4/2007 | (12,750,000.00) | (15,483,843) | ICE // PAY FORTIS PRIME FUNDS FUNDS PAID | Transfers to Ascot Fund | | ASCOT FUND LTD | $ (12,750,000.00) $ | (12,750,000.00) | - | | 01/04/2007 | 1/1 Dist - Ascot Fund | (12,750,000.00) |
| ASC1284 | 1/4/2007 | (15,084,206.75) | (30,568,050) | ICE // PAY NYROY 1505 FUNDS PAID | Other Disbursements | | NYROY-ROSENBLOOM | $ (16,760,229.72) $ | (15,084,206.75) | - | | 01/04/2007 | 1/1 Dist - NYROY | (15,084,206.75) |
| ASC1285 | 1/4/2007 | 18,500,000.00 | (12,068,050) | JAN 1 2007 MADOFF REALLOCATE FUNDS RECEIVED | Inflows From Other Sources | | | | | 18,500,000.00 [5] | | 01/04/2007 | Withdrawal from Madoff (AF) | 18,500,000.00 [5] |
| ASC1286 | 1/4/2007 | 26,500,000.00 | 14,431,950 | JAN 1 2007 MADOFF REALLOCATE FUNDS RECEIVED | Inflows From Other Sources | | | | | 26,500,000.00 [5] | | 01/04/2007 | Withdrawal from Madoff (GC) | 26,500,000.00 [5] |
| ASC1287 | 1/5/2007 | (448,195.00) | 13,983,755 | ICE // PAY ZBS FAM CAPITAL INVE FUNDS PAID | Other Disbursements | | ZES-FAM CAPITAL | $ (448,195.56) $ | (448,195.00) | - | | 01/05/2007 | 1/1 Dist - Zes-Fam | (448,195.00) |
| ASC1288 | 1/5/2007 | 150,000.00 | 14,133,755 | ICE // FUNDS RECEIVED | Inflows From Other Sources | | LEA EISENBERG PSP | $ 150,000.00 $ | 150,000.00 | - | | 01/05/2007 | 1/1 Cont - Eisenberg | 150,000.00 |
| ASC2044 | 1/5/2007 | (10,303.26) | 14,123,452 | MARK TO THE MARKET | Other Disbursements | | | | | (10,303.26) [4] | | | | |
| ASC2045 | 1/5/2007 | 10,303.26 | 14,133,755 | MARK TO THE MARKET | Inflows From Other Sources | | | | | 10,303.26 [4] | | | | |
| ASC1289 | 1/8/2007 | (911,610.90) | 13,222,144 | ASP DIV W/H FUNDS PAID | Transfers to GCC MS Account | | | | | (911,610.90) | | 01/08/2007 | Pay Div W/H to GCC | (911,610.90) |
| ASC1290 | 1/8/2007 | (35,000.00) | 13,187,144 | HAAR REDEMPTION FUNDS PAID | Transfers to GCC MS Account | | DBH HAAR | $ (35,000.00) $ | (35,000.00) | - | | 01/08/2007 | 1/1 Dist - Haar | (35,000.00) |
| ASC1291 | 1/8/2007 | (100,000.00) | 13,087,144 | WEGIER REDEMPTION FUNDS PAID | Transfers to GCC MS Account | | HEDY WEGIER | $ (100,000.00) $ | (100,000.00) | - | | 01/08/2007 | 1/1 Dist - Wegier | (100,000.00) |
| ASC1292 | 1/8/2007 | (210,000.00) | 12,877,144 | FROMME REDEMPTION FUNDS PAID | Transfers to GCC MS Account | | IRWIN FROMME IRA | $ (210,000.00) $ | (210,000.00) | - | | 01/08/2007 | 1/1 Dist - Fromme | (210,000.00) |
| ASC1293 | 1/8/2007 | (25,000.00) | 12,852,144 | SELIGER REDEMPTION FUNDS PAID | Transfers to GCC MS Account | | CHARLES SELIGER IRA | $ (25,000.00) $ | (25,000.00) | - | | 01/08/2007 | 1/1 Dist - Seliger | (25,000.00) |
| ASC1294 | 1/10/2007 | (134,400.00) | 12,717,744 | JEM TRUST REDEMPTION FUNDS PAID | Other Disbursements | | MERKIN 1992 TRUSTS | $ (172,800.00) $ | (172,800.00) | 38,400.00 | | 01/10/2007 | 1/1 Dist - JEM Trust | (134,400.00) |

**Reconciliation of Ascot Partners Capital Activity Report**
**Q4 2006**

Attachment 5.A

| Per Collura Exhibit 12 [1] | | | | | |
|---|---|---|---|---|---|
| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
| ASC1295 | 1/10/2007 | (309,622.90) | 12,408,121 | 2006 MG BALANCE FUNDS PAID | Transfers to GCC MS Account |
| ASC1296 | 1/10/2007 | (134,400.00) | 12,273,721 | LKM TRUST REDEMPTION FUNDS PAID | Other Disbursements |
| ASC1297 | 1/10/2007 | (3,000,000.00) | 9,273,721 | ICE // PAY ANGELICA U BERRIE IR FUNDS PAID | Other Disbursements |
| ASC1298 | 1/12/2007 | (25,000.00) | 9,248,721 | ICE // PAY MARCELLE QUINTON FUNDS PAID | Other Disbursements |
| ASC2046 | 1/12/2007 | 37,910.00 | 9,286,631 | MARK TO THE MARKET | Inflows From Other Sources |
| ASC2047 | 1/12/2007 | (37,910.00) | 9,248,721 | MARK TO THE MARKET | Other Disbursements |
| ASC2048 | 1/19/2007 | 2,720.00 | 9,251,441 | MARK TO THE MARKET | Inflows From Other Sources |
| ASC2049 | 1/19/2007 | (2,720.00) | 9,248,721 | MARK TO THE MARKET | Other Disbursements |
| ASC2209 | 1/24/2007 | (2,338,500.00) | 6,910,221 | AMER EXPRESS CO COM | Other Disbursements |
| ASC2210 | 1/24/2007 | (425,200.00) | 6,485,021 | AMER EXPRESS CO COM | Other Disbursements |
| ASC2211 | 1/24/2007 | (412,700.00) | 6,072,321 | AMERIPRISE FINL INC COM STK | Other Disbursements |
| ASC1299 | 1/24/2007 | (75,040.00) | 5,997,281 | AMERIPRISE FINL INC COM STK | Other Disbursements |
| ASC2050 | 1/26/2007 | 205,060.00 | 6,202,341 | MARK TO THE MARKET | Inflows From Other Sources |
| ASC2051 | 1/26/2007 | (205,060.00) | 5,997,281 | MARK TO THE MARKET | Other Disbursements |
| ASC2052 | 1/31/2007 | (6,400.00) | 5,990,881 | MARK TO THE MARKET | Other Disbursements |
| ASC2053 | 1/31/2007 | 6,400.00 | 5,997,281 | MARK TO THE MARKET | Inflows From Other Sources |

| Per Capital Activity Spreadsheet [2] | | | |
|---|---|---|---|
| Investor | Amount | Amount Wired | Variance from Collura Exh. 12 |
| GP MANAGEMENT FEES | $ (26,004,161.79) | (309,622.90) | - [8] |
| | | | (134,400.00) |
| ANGELICA BERRIE IRA | $ (3,000,000.00) | $ (3,000,000.00) | - |
| MARCELLE QUINTON | $ (25,000.00) | $ (25,000.00) | - |
| | | | 37,910.00 [4] |
| | | | (37,910.00) [4] |
| | | | 2,720.00 [4] |
| | | | (2,720.00) [4] |
| | | | (2,338,500.00) [7] |
| | | | (425,200.00) [7] |
| | | | (412,700.00) [7] |
| | | | (75,040.00) [7] |
| | | | 205,060.00 [4] |
| | | | (205,060.00) [4] |
| | | | (6,400.00) [4] |
| | | | 6,400.00 [4] |

| Per QuickBooks General Ledger [3] | | |
|---|---|---|
| Date | Memo | Amount |
| 01/10/2007 | Pay '06 Mgmt fee balance | (309,622.90) [8] |
| 01/10/2007 | 1/1 Dist - LKM Trust | (134,400.00) |
| 01/10/2007 | 1/1 Dist - A. Berrie | (3,000,000.00) |
| 01/12/2007 | 1/1 Dist - Quinton | (25,000.00) |

Notes:
[1] Excerpt from Expert Report of Lisa M. Collura, March 20, 2015, Exhibit 12; Ascot Partners L.P; Bank Statement for the period of December 1, 2006 to December 31, 2006: MSYSAA0004859-868; Ascot Partners L.P; Bank
[2] Capital Activity - January 1, 2007, GCC-P 0114356
[3] Ascot Partners RS L.P. General Ledger as of December 31, 2006, GCC-P 0113135; Ascot Partners RS L.P. General Ledger as of December 31, 2007, GCC-P 0139097
[4] MARK TO THE MARKET transactions are not tracked on the Capital Activity Spreadsheet or QuickBooks. All transactions net to zero
[5] On January 4, 2007, Ascot Partners' Morgan Stanley account received $26,500,000 from Gabriel and $18,500,000 from Ariel. On that same day, Mr. Autera asked Frank DiPascali from Bernard L. Madoff & Co. to credit Gabriel's BLMIS account $26,500,000 from Ascot Partners BLMIS account and credit Ariel's BLMIS account $18,500,000 from Ascot Partners BLMIS account. See Deposition of Michael Autera, October 22, 2014: pp. 188-199; Exhibit 285. With the additional BLMIS inflows of $10,000,000, the total BLMIS inflows for this break period is $55,000,000 ($26.5M + $18.5M + $10M = $55M), which generally corresponds with Ascot Partners net cash requirement of $62,868,073.
[6] These transactions cannot be found on the Capital Activity Spreadsheet or QuickBooks, however the bank statements show reversing transactions that net to zero
[7] Interest, Ameriprise and American Express transactions do not appear on the Capital Activity Spreadsheet
[8] In addition to the three December 2006 and January 2007 disbursements on the bank statements related to 2006 Management Fees totaling $(15,414,161.90) [$(5,000,000.00) + $(10,104,539.00) + $(309,622.90) = $(15,414,161.90)] , the following disbursements and (one fee correction) were made in 2006 that relate to 2006 Management Fees: $(5,000,000.00 (6/5/06), $2,010,000.00 (6/6/06), $(3,000,000.00) (7/14/06), $(2,000,000.00) (10/3/06), $(2,600,000.00) (11/22/06) and $309,622.90) (1/10/07). The sum of all disbursements is $(26,004,161.90) [$(15,414,161.90) + $(5,000,000.00) + $2,010,000.00 + $(3,000,000.00) + $(2,000,000.00) + $(2,600,000.00) = $(26,004,161.90)].

**Reconciliation of Ascot Partners Capital Activity Report**
**Q4 2007**

Attachment 5.B

| Per Collura Exhibit 12 [1] | | | | | | | Per Capital Activity Spreadsheet [2] | | | | | Per QuickBooks General Ledger [3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category | | Investor | Amount | Amount Wired | Variance from Collura Exh. 12 | | Date | Memo | Amount |
| ASC1432 | 12/21/2007 | 95,709.00 | 11,346,638 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | | SJM PENSION - MORRIS SMITH | $    95,709.00 | $    95,709.00 | - | | 12/21/2007 | 1/08 Cont - SJM Pension | 95,709.00 |
| ASC1433 | 12/26/2007 | 300,000.00 | 11,646,638 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | | KEHILAH JESHRUM | $    300,000.00 | $    300,000.00 | - | | 12/26/2007 | 1/08 Cont - Kelihath | 300,000.00 |
| | | | | | | | MERKIN 2000 TRUSTS - LKM | $    103,987.38 | 103,987.38 | | | | | |
| | | | | | | | MERKIN 2000 TRUSTS - JEM | $    (17,825.58) | (17,825.58) | | | | | |
| ASC1434 | 12/27/2007 | 86,161.80 | 11,732,799 | TRANSFER BETWEEN ACCOUNTS - REDACTED4317 - REDACTED0618 FUNDS RECEIVED | Inflows From Other Sources | | *Total MERKIN 2000* | $    86,161.80 | 86,161.80 | | | 12/27/2007 | 1/08 CAPITAL ACTIVITY | 86,161.80 |
| ASC1435 | 12/27/2007 | (10,700,000.00) | 1,032,799 | TRANSFER FUNDS - REDACTED5462 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account | | 2007 MANAGEMENT FEES | $    (28,292,985.66) | $    (10,700,000.00) | - [5] | | 12/27/2007 | PAYMENT OF 2007 MGMT FEES | (10,700,000.00) [5] |
| ASC1436 | 12/27/2007 | (226,000.00) | 806,799 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | BRAVMANN A | $    (226,000.00) | (226,000.00) | - | | 12/27/2007 | 1/08 REDEMPTION TO BRAVMANN A | (226,000.00) |
| ASC1437 | 12/27/2007 | (229,000.00) | 577,799 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | BRAVMANN B | $    (229,000.00) | (229,000.00) | - | | 12/27/2007 | 1/08 REDEMPTION TO BRAVMANN B | (229,000.00) |
| ASC1438 | 12/28/2007 | 5,000,000.00 | 5,577,799 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | | SELECTINVEST ARV LP | $    5,000,000.00 | 5,000,000.00 | - | | 12/28/2007 | 1/08 Cont - Selectinvest | 5,000,000.00 |
| ASC1440 | 12/31/2007 | (5,500,000.00) | 77,799 | FROM REDACTED3007 TO REDACTED1654 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account | | 2007 MANAGEMENT FEES | $    (28,292,985.66) | (5,500,000.00) | - [5] | | 12/31/2007 | PAY 2007 MGMT FEE | (5,500,000.00) [5] |
| | | | | | | | | | | | | 12/31/2007 | 175MM redemption MDFF | 99,000,000.00 |
| | | | | | | | | | | | | 12/31/2007 | 175MM redemption MDFF | 76,000,000.00 |
| ASC1441 | 12/31/2007 | 175,000,000.00 | 175,077,799 | U.S. DOLLARS FUNDS RECEIVED | Inflows from BLMIS | | ASCOT GROUP TOTAL | (182,223,412.38) | (182,223,412.38) | (7,223,412.38) | | | *Total* | $    175,000,000.00 |
| ASC1495 | 1/1/2008 | 40,002.04 | 175,117,801 | CREDIT INTEREST FOR DECEMBER USD BALANCES | Inflows From Other Sources | | | | | 40,002.04 [4] | | 1/2/2008 | DEC INT RECD IN JAN | 40,002.04 |
| ASC1442 | 1/2/2008 | (130,000.00) | 174,987,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | ALIZA LIECHTUNG | $    (130,000.00) | $    (130,000.00) | - | | 1/2/2008 | 1/1 DIST - LEICHTUNG | (130,000.00) |
| ASC1443 | 1/2/2008 | (30,000.00) | 174,957,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | GEORGE RUBIN | $    (30,000.00) | $    (30,000.00) | - | | 1/2/2008 | 1/1 DIST - RUBIN | (30,000.00) |
| ASC1444 | 1/2/2008 | (25,000.00) | 174,932,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | HENRY KATZ IRA | $    (25,000.00) | $    (25,000.00) | - | | 1/2/2008 | 1/1 DIST - KATZ | (25,000.00) |
| ASC1448 | 1/2/2008 | (200,000.00) | 174,732,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | SYLVIA KORNGOLD | $    (200,000.00) | (200,000.00) | - | | 1/2/2008 | 1/1 DIST - KORNGOLD | (200,000.00) |
| ASC1446 | 1/2/2008 | (450,000.00) | 174,282,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | PHYLLIS FROMME | $    (450,000.00) | $    (450,000.00) | - | | 1/2/2008 | 1/1 DIST - FROMME | (450,000.00) |
| ASC1447 | 1/2/2008 | (1,000,000.00) | 173,282,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | LYNTON ASSET LP | $    (1,000,000.00) | $    (1,000,000.00) | - | | 1/2/2008 | 1/1 DIST - LYNTON | (1,000,000.00) |
| ASC1445 | 1/2/2008 | (200,000.00) | 173,082,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | ELAINE SARGENT | $    (200,000.00) | (200,000.00) | - | | 1/2/2008 | 1/1 DIST - SARGENT | (200,000.00) |
| ASC1449 | 1/2/2008 | (300,000.00) | 172,782,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | SKG PARTNERS - GOLDENSON | $    (300,000.00) | (300,000.00) | - | | 1/2/2008 | 1/1 DIST - SKG (GOLDENSON) | (300,000.00) |
| ASC1450 | 1/2/2008 | (300,000.00) | 172,482,801 | U.S. DOLLARS FUNDS PAID | Other Disbursements | | BRIAN GELL | $    (300,000.00) | (300,000.00) | - | | 1/2/2008 | 1/1 DIST - GELL | (300,000.00) |
| ASC1451 | 1/2/2008 | (13,750,000.00) | 158,732,801 | U.S. DOLLARS FUNDS PAID | Transfers to Ascot Fund | | ASCOT FUND LTD | $    (13,750,000.00) | (13,750,000.00) | - | | 1/2/2008 | 1/1 DIST - ASCOT FUND | (13,750,000.00) |
| ASC1452 | 1/3/2008 | (150,000.00) | 158,582,801 | 1/1 ASP DISTRIBUTION REDACTED2624 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account | | GORDIAN LTD | $    (150,000.00) | (150,000.00) | - | | 1/3/2008 | 1/1 Dist - Gordian Ltd | (150,000.00) |
| ASC1453 | 1/3/2008 | (100,000.00) | 158,482,801 | 1/1 ASP DISTRIBUTION REDACTED2623 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account | | HEDI WEGIER | $    (100,000.00) | (100,000.00) | - | | 1/3/2008 | 1/1 Dist - Weiger | (100,000.00) |
| ASC1454 | 1/3/2008 | (50,000.00) | 158,432,801 | 1/1 ASP DISTRIBUTION REDACTED2622 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account | | HAAR FOUNDATION - HAAR | $    (50,000.00) | (50,000.00) | - | | 1/3/2008 | 1/1 Dist - Haar | (50,000.00) |
| ASC1455 | 1/3/2008 | (138,859.04) | 158,293,942 | U.S. DOLLARS FUNDS PAID | Transfers to GCC JPMC Account | | | | | (138,859.04) | | 1/3/2008 | Dec Div W/H paid in Jan | (138,859.04) |

**Reconciliation of Ascot Partners Capital Activity Report**
**Q4 2007**

Attachment 5.B

### Per Collura Exhibit 12 [1]

| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
|---|---|---|---|---|---|
| ASC1456 | 1/3/2008 | (1,000,000.00) | 157,293,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| | | | | | |
| | | | | | |
| ASC1457 | 1/3/2008 | (16,000,000.00) | 141,293,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1458 | 1/3/2008 | (60,000.00) | 141,233,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1459 | 1/3/2008 | (20,000.00) | 141,213,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1460 | 1/3/2008 | (125,000.00) | 141,088,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1461 | 1/3/2008 | (2,800,000.00) | 138,288,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1462 | 1/3/2008 | (250,000.00) | 138,038,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1463 | 1/3/2008 | (400,000.00) | 137,638,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1464 | 1/3/2008 | (230,000.00) | 137,408,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1465 | 1/3/2008 | (250,000.00) | 137,158,942 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1466 | 1/3/2008 | (392,800.00) | 136,766,142 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1467 | 1/3/2008 | (25,050.00) | 136,741,092 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC2141 | 1/3/2008 | 200,000.00 | 136,941,092 | CHK DEP 01/03/2008 | Inflows From Other Sources |
| ASC1468 | 1/4/2008 | 750,000.00 | 137,691,092 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1469 | 1/4/2008 | 150,000.00 | 137,841,092 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1470 | 1/4/2008 | 10,160,000.00 | 148,001,092 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1471 | 1/4/2008 | (450,000.00) | 147,551,092 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1472 | 1/4/2008 | (21,233.77) | 147,529,859 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1473 | 1/4/2008 | (387,093.94) | 147,142,765 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1474 | 1/4/2008 | (31,850.65) | 147,110,914 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1475 | 1/4/2008 | (324,424.01) | 146,786,490 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1476 | 1/4/2008 | (959,061.06) | 145,827,429 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1477 | 1/4/2008 | (3,052,698.89) | 142,774,730 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1478 | 1/4/2008 | (9,350,725.17) | 133,424,005 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1479 | 1/4/2008 | (400,000.00) | 133,024,005 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1480 | 1/4/2008 | (770,644.93) | 132,253,360 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1481 | 1/4/2008 | (48,347.75) | 132,205,012 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1482 | 1/4/2008 | (16,748,585.60) | 115,456,427 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1483 | 1/4/2008 | (32,941,614.12) | 82,514,813 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1484 | 1/4/2008 | (51,471,494.80) | 31,043,318 | U.S. DOLLARS FUNDS PAID | Other Disbursements |

### Per Capital Activity Spreadsheet [2]

| Investor | Amount | Amount Wired | Variance from Collura Exh. 12 |
|---|---|---|---|
| CAYMEN PARTNERS | $ (1,000,000.00) | $ (1,000,000.00) | - |
| ALPINE - RHO/RUCH | $ (8,600,400.38) | (8,600,400.38) | |
| ALPINE I - RHO/RUCH | $ (7,399,599.62) | (7,399,599.62) | |
| *Total Alpine* | $ (16,000,000.00) | $ (16,000,000.00) | - |
| MARCELLE QUINTON | $ (60,000.00) | $ (60,000.00) | - |
| MATAN | $ (20,000.00) | $ (20,000.00) | - |
| PETER HIRSCHL | $ (125,000.00) | $ (125,000.00) | - |
| SPRING MOUNTAIN QP I | $ (2,800,000.00) | $ (2,800,000.00) | - |
| MORRIS SMITH | $ (250,000.00) | $ (250,000.00) | - |
| JUDITH BRAVMANN KAUFTHAL | $ (400,000.00) | $ (400,000.00) | - |
| IRWIN FROMME IRA | $ (230,000.00) | $ (230,000.00) | - |
| CAROL BRAVMANN | $ (250,000.00) | $ (250,000.00) | - |
| HOROWITZ CHARITABLE LEAD TRUST | $ (392,800.00) | $ (392,800.00) | - |
| SELIGER IRA | $ (25,050.00) | $ (25,050.00) | - |
| CHARLES SELIGER | 200,000.00 | 200,000.00 | - |
| YAD SARAH | 750,000.00 | 750,000.00 | - |
| LIECHTUNG | 150,000.00 | 150,000.00 | - |
| GROSSMAN CURRENCY - CALIBRE | 10,160,000.00 | 10,160,000.00 | - |
| CONGREGATION BETH PINCHAS | $ (450,000.00) | $ (450,000.00) | - |
| JAN KESTENBAUM | $ (21,233.77) | $ (21,233.77) | - |
| LEONARD TOBOROFF | $ (430,104.38) | $ (387,093.94) | - |
| POMRENZE | $ (31,850.65) | $ (31,850.65) | - |
| BURT ROSS | $ (324,424.01) | $ (324,424.01) | - |
| CHULA PARTNERS | $ (1,065,623.40) | $ (959,061.06) | - |
| MAX PALEVSKY 1993 TRUST | $ (3,391,887.65) | $ (3,052,698.89) | - |
| STERLING STAMOS SECURITY SELECT | $ (10,389,694.63) | $ (9,350,725.17) | - |
| MOLLIE ZWEIG | $ (400,000.00) | $ (400,000.00) | - |
| TRAVERSE PARK - BOWMAN | $ (856,272.14) | $ (770,644.93) | - |
| KASPER | $ (48,347.75) | $ (48,347.75) | - |
| STERLING STAMOS QUANT ARB | $ (18,609,539.56) | $ (16,748,585.60) | - |
| STRUCTURED FINANCE - DB | $ (36,601,793.47) | $ (32,941,614.12) | - |
| STERLING STAMOS SECURITY - BNP | $ (57,190,549.78) | $ (51,471,494.80) | - |

### Per QuickBooks General Ledger [3]

| Date | Memo | Amount |
|---|---|---|
| 1/3/2008 | 1/1 Dist - Caymen | $ (1,000,000.00) |
| | | |
| 1/3/2008 | 1/1 Dist - Alpine | $ (16,000,000.00) |
| 1/3/2008 | 1/1 Dist - Quinton | $ (60,000.00) |
| 1/3/2008 | 1/1 Dist - Amer. Friends Mata | $ (20,000.00) |
| 1/3/2008 | 1/1 Dist - Hirschl | $ (125,000.00) |
| 1/3/2008 | 1/1 Dist - SMC QP I | $ (2,800,000.00) |
| 1/3/2008 | 1/1 Dist - Smith | $ (250,000.00) |
| 1/3/2008 | 1/1 Dist - J. Bravmann (Kauf) | $ (400,000.00) |
| 1/3/2008 | 1/1 Dist - Fromme IRA | $ (230,000.00) |
| 1/3/2008 | 1/1 Dist - C. Bravmann (Berlin) | $ (250,000.00) |
| 1/3/2008 | 1/1 Dist - Horowitz | $ (392,800.00) |
| 1/3/2008 | 1/1 Dist - C. Seliger | $ (25,050.00) |
| 1/3/2008 | 1/1 Cont - L. Seliger | $ 200,000.00 |
| 1/4/2008 | 1/1 Cont - Yad Sarah | $ 750,000.00 |
| 1/4/2008 | 1/1 Cont - Liechtung | $ 150,000.00 |
| 1/4/2008 | 1/1 Cont - Grossman (Calibre) | $ 10,160,000.00 |
| 1/4/2008 | 1/1 Dist - Congregation Beth | $ (450,000.00) |
| 1/4/2008 | 1/1 Dist - Kestenbaum | $ (21,233.77) |
| 1/4/2008 | 1/1 Dist - Toboroff | $ (387,093.94) |
| 1/4/2008 | 1/1 Dist - Pomrenze | $ (31,850.65) |
| 1/4/2008 | 1/1 Dist - Ross | $ (324,424.01) |
| 1/4/2008 | 1/1 Dist - Chula | $ (959,061.06) |
| 1/4/2008 | 1/1 Dist - Palevsky | $ (3,052,698.89) |
| 1/4/2008 | 1/1 Dist - S. Stamos | $ (9,350,725.17) |
| 1/4/2008 | 1/1 Dist - Zweig | $ (400,000.00) |
| 1/4/2008 | 1/1 Dist - Traverse Park | $ (770,644.93) |
| 1/4/2008 | 1/1 Dist - Kasper | $ (48,347.75) |
| 1/4/2008 | 1/1 Dist - S. Stamos | $ (16,748,585.60) |
| 1/4/2008 | 1/1 Dist - DB Structured | $ (32,941,614.12) |
| 1/4/2008 | 1/1 Dist - S. Stamos (BNP) | $ (51,471,494.80) |

**Reconciliation of Ascot Partners Capital Activity Report**
**Q4 2007**

Attachment 5.B

### Per Collura Exhibit 12 [1]

| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
|--------|------|--------|-----------------|----------------------------------------------------------------|-------------------|
| ASC1485 | 1/4/2008 | (6,000.00) | 31,037,318 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1486 | 1/7/2008 | (786,332.30) | 30,250,985 | TRANSFER FUNDS - REDACTED0024 - REDACTED0618 FUNDS PAID | Other Disbursements |
| ASC1487 | 1/7/2008 | (45,794.03) | 30,205,191 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1488 | 1/7/2008 | (1,000,000.00) | 29,205,191 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1489 | 1/7/2008 | 200,000.00 | 29,405,191 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1490 | 1/8/2008 | (10,201.47) | 29,394,990 | U.S. DOLLARS FUNDS PAID | Transfers to GCC JPMC Account |
| ASC1491 | 1/9/2008 | (1,092,832.64) | 28,302,157 | BALANCE OF 2007 FEE - REDACTED0297 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account |
| ASC1492 | 1/9/2008 | (165,000.00) | 28,137,157 | ASP REDEMPTIONS - REDACTED0195 - REDACTED0618 FUNDS PAID | Other Disbursements [4] |
| ASC1493 | 1/9/2008 | (165,000.00) | 27,972,157 | ASP REDEMPTIONS - REDACTED0196 - REDACTED0618 FUNDS PAID | Other Disbursements [4] |
| ASC1494 | 1/11/2008 | (200,000.00) | 27,772,157 | U.S. DOLLARS FUNDS PAID | Other Disbursements |

### Per Capital Activity Spreadsheet [2]

| Investor | Amount | Amount Wired | Variance from Collura Exh. 12 | |
|----------|--------|--------------|-------------------------------|---|
| GOLDENSON IRA | $ (6,000.00) | $ (6,000.00) | - | |
| ESTATE OF MARTIN MEYERSON | $ (786,332.30) | $ (786,332.30) | - | |
| HARRIS GUEDALIA | $ (45,794.03) | $ (45,794.03) | - | |
| GERRY FABRIKANT | $ (1,000,000.00) | $ (1,000,000.00) | - | |
| | | | 200,000.00 | |
| | | | (10,201.47) | |
| 2007 MANAGEMENT FEES | $ (28,292,985.66) | (1,092,832.64) | - | [5] |
| MERKIN 1992 TRUSTS | $ (330,000.00) | $ (165,000.00) | - | [4] |
| MERKIN 1992 TRUSTS | $ (330,000.00) | $ (165,000.00) | - | [4] |
| | | | (200,000.00) | |

### Per QuickBooks General Ledger [3]

| Date | Memo | Amount | |
|------|------|--------|---|
| 1/4/2008 | 1/1 Dist - Goldenson | $ (6,000.00) | |
| 1/7/2008 | 1/1 Dist - Meyerson | $ (786,332.30) | |
| 1/7/2008 | 1/1 Dist - Geudalia | $ (45,794.03) | |
| 1/7/2008 | 1/1 Dist - Fabrikant | $ (1,000,000.00) | |
| 1/8/2008 | Div W/H PAID | $ (10,201.47) | |
| 1/9/2008 | Pay 2007 Mgmt fee | $ (1,092,832.64) | [5] |
| 1/9/2008 | 1/1 Dist - Merkin Trust | $ (165,000.00) | [4] |
| 1/9/2008 | 1/1 Dist - Merkin Trust | $ (165,000.00) | [4] |

Notes:
[1] Excerpt from Expert Report of Lisa M. Collura, March 20, 2015, Exhibit 12
[2] Capital Activity, December 31, 2007, GCC-P 0117011.
[3] Ascot Partners RS L.P. General Ledger as of September 30, 2008, GCC-P 0005135.
[4] Per the Capital Activity Spreadsheet, the investor redemption to MERKIN 1992 TRUSTS was $330,000. This amount is shown as two disbursements in the bank statements and QuickBooks.
[5] In addition to the three December 2007 and January 2008 disbursements on the bank statements related to 2007 Management Fees totaling $17,292,832.64 [$(10,700,000.00) + $(5,500,000.00) + $(1,092,832.64 = $17,292,832.64] , the following additional disbursements were made in 2007 that relate to Management Fees: $(4,000,000.00) (7/13/07), $(2,500,000.00) (7/30/07), $(3,500,000.00) (10/25/07) and  $(1,000,000.00) (11/6/07). The sum of all disbursements is $28,292,832.64 [$(17,292,832.64) + $(4,000,000.00) + $(2,500,000.00) + $(3,500,000.00) + $(1,000,000.00) = $(28,292,832.64)].
[6] Interest transactions do not appear on the Capital Activity Spreadsheet.

CONFIDENTIAL MATERIAL

**Reconciliation of Ascot Partners Capital Activity Report**
**Q2 2008**

Atachment 5.C

| | | Per Collura Exhibit 12 [1] | | | | | Per Capital Activity Spreadsheet[2] | | | | | Per QuickBooks General Ledger [3] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category | Investor | Amount | Amount Wired | Variance from Collura Exh. 12 | | Date | Memo | Amount |
| ASC1548 | 6/24/2008 | 3,000,000.00 | 17,481,915 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | CHASREL ASSOC - FELDMAN | $  3,000,000.00 | $  3,000,000.00 | - | | 6/24/2008 7/1 cont - Chasrel | $  3,000,000.00 |
| ASC1549 | 6/25/2008 | 1,000,000.00 | 18,481,915 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | ALICE SMOKLER - D KAHN | $  1,000,000.00 | $  1,000,000.00 | - | | 6/25/2008 7/1 Cont - Smokler | $  1,000,000.00 |
| ASC1550 | 6/26/2008 | 195,000.00 | 18,676,915 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | JOAN ROSS GRAT - ISAAC | $  195,000.00 | $  195,000.00 | - | | 6/26/2008 7/1 Cont - Ross | $  195,000.00 |
| ASC1551 | 6/26/2008 | 195,000.00 | 18,871,915 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | JOAN ROSS GRAT - KATHRYN | $  195,000.00 | $  195,000.00 | - | | 6/26/2008 7/1 Cont - Ross | $  195,000.00 |
| ASC1552 | 6/27/2008 | 2,026,889.24 | 20,898,804 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | CAROL GROSSMAN IRA (KAHN) | $  2,026,889.24 | $  2,026,889.24 | - | | 6/27/2008 7/1 Cont - Grossman | $  2,026,889.24 |
| ASC1554 | 6/30/2008 | 200,000.00 | 21,098,804 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | ROMAN IGOLNIKOV | $  200,000.00 | $  200,000.00 | - | | 6/30/2008 7/1 Cont - Igolnikov | $  200,000.00 |
| ASC1583 | 7/1/2008 | 18,951.73 | 21,117,756 | CREDIT INTEREST FOR JUNE USD BALANCES | Inflows From Other Sources | | | | 18,951.73 [5] | | 7/1/2008 JUNE CREDIT INT | $  18,951.73 |
| ASC1555 | 7/1/2008 | 98,000.00 | 21,215,756 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | ARLENE EIS | $  98,000.00 | $  98,000.00 | - | | 7/1/2008 7/1 Cont - Alt Inv | $  98,000.00 |
| ASC1556 | 7/1/2008 | 100,000.00 | 21,315,756 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | MALCOLM THOMSON | $  500,000.00 | $  100,000.00 | - [4] | | 7/1/2008 7/1 Cont - Thomson | $  100,000.00 [4] |
| ASC1557 | 7/1/2008 | 2,000,000.00 | 23,315,756 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | CHARLOTTE LIECHTUNG | $  2,000,000.00 | $  2,000,000.00 | - | | 7/1/2008 7/1 Cont - Liechtung | $  2,000,000.00 |
| ASC1558 | 7/1/2008 | 400,000.00 | 23,715,756 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources | MALCOLM THOMSON | $  500,000.00 | $  400,000.00 | - [4] | | 7/1/2008 7/1 Cont - Thomson | $  400,000.00 [4] |
| ASC1559 | 7/1/2008 | (100,000.00) | 23,615,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | LADY QUINTON | $  (100,000.00) | $  (100,000.00) | - | | 7/1/2008 7/1 Dist - Quinton | $  (100,000.00) |
| ASC1560 | 7/1/2008 | (30,000.00) | 23,585,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | GEORGE RUBIN | $  (30,000.00) | $  (30,000.00) | - | | 7/1/2008 7/1 Dist - Rubin | $  (30,000.00) |
| ASC1561 | 7/1/2008 | (70,000.00) | 23,515,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | MATAN | $  (70,000.00) | $  (70,000.00) | - | | 7/1/2008 7/1 Dist - Matan | $  (70,000.00) |
| ASC1562 | 7/1/2008 | (300,000.00) | 23,215,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | SYLVIA KORNGOLD | $  (300,000.00) | $  (300,000.00) | - | | 7/1/2008 7/1 Dist - Korngold | $  (300,000.00) |
| ASC1563 | 7/1/2008 | (6,000.00) | 23,209,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | DAN GOLDENSON IRA | $  (6,000.00) | $  (6,000.00) | - | | 7/1/2008 7/1 Dist - Goldenson | $  (6,000.00) |
| ASC1564 | 7/1/2008 | (20,000.00) | 23,189,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | SKG GOLDENSON | $  (20,000.00) | $  (20,000.00) | - | | 7/1/2008 7/1 Dist - SKG | $  (20,000.00) |
| ASC1565 | 7/1/2008 | (300,000.00) | 22,889,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | MILTON GILBERT | $  (300,000.00) | $  (300,000.00) | - | | 7/1/2008 7/1 Dist - Gilbert | $  (300,000.00) |
| ASC1566 | 7/1/2008 | (25,000.00) | 22,864,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | DAVID GORDON IRA | $  (25,000.00) | $  (25,000.00) | - | | 7/1/2008 7/1 Dist - Gordon IRA | $  (25,000.00) |
| ASC1567 | 7/1/2008 | (60,000.00) | 22,804,756 | U.S. DOLLARS FUNDS PAID | Other Disbursements | CAROL BRAVMANN | $  (60,000.00) | $  (60,000.00) | - | | 7/1/2008 7/1 Dist - Bravmann | $  (60,000.00) |
| ASC2143 | 7/1/2008 | 50,000.00 | 22,854,756 | CHK DEP 20080701 | Inflows From Other Sources | RON FRANK - RJF PENSION | $  50,000.00 | $  50,000.00 | - | | 7/1/2008 7/1 Cont - Frank | $  50,000.00 |
| ASC2144 | 7/1/2008 | 40,000.00 | 22,894,756 | CHK DEP 20080701 | Inflows From Other Sources | MICHAEL ROSENSWEIG | $  40,000.00 | $  40,000.00 | - | | 7/1/2008 7/1 Cont - Rosensweig | $  40,000.00 |
| ASC1568 | 7/2/2008 | 50,000,000.00 | 72,894,756 | U.S. DOLLARS FUNDS RECEIVED | Inflows from BLMIS | ASCOT GROUP LP | $  49,551,581.15 | $  49,551,581.15 | 448,418.85 | | 7/2/2008 7/1 Madoff redemption | $  50,000,000.00 |
| ASC1569 | 7/2/2008 | (21,340.83) | 72,873,415 | U.S. DOLLARS FUNDS PAID | Other Disbursements | JAN KESTENBAUM | $  (21,340.83) | $  (21,340.83) | - | | 7/2/2008 7/1 Dist - Kestenbaum | $  (21,340.83) |
| ASC1570 | 7/2/2008 | (32,011.24) | 72,841,404 | U.S. DOLLARS FUNDS PAID | Other Disbursements | JAY POMRENZE | $  (32,011.24) | $  (32,011.24) | - | | 7/2/2008 7/1 Dist - Pomrenze | $  (32,011.24) |
| ASC1571 | 7/2/2008 | (3,607,983.22) | 69,233,421 | U.S. DOLLARS FUNDS PAID | Other Disbursements | PHIBRO ANIMAL HEALTH | $  (3,797,877.07) | $  (3,607,983.22) | - | | 7/2/2008 7/1 Dist - Phibro | $  (3,607,983.22) |
| ASC1572 | 7/3/2008 | (24,209,122.50) | 45,024,298 | U.S. DOLLARS FUNDS PAID | Other Disbursements | TLL DUTCH - IDT | $  (26,899,025.53) | $  (24,209,122.50) | - | | 7/3/2008 7/1 Dist - TLL Dutch | $  (24,209,122.50) |
| ASC1573 | 7/3/2008 | (14,814,135.65) | 30,210,163 | U.S. DOLLARS FUNDS PAID | Other Disbursements | ALPINE - RUCH | $  (16,460,150.72) | $  (14,814,135.65) | - | | 7/3/2008 7/1 Dist - Alpine | $  (14,814,135.65) |

CONFIDENTIAL MATERIAL

**Reconciliation of Ascot Partners Capital Activity Report**
**Q2 2008**

Atachment 5.C

### Per Collura Exhibit 12 [1]

| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
|---|---|---|---|---|---|
| ASC1574 | 7/3/2008 | (11,000,000.00) | 19,210,163 | U.S. DOLLARS FUNDS PAID | Transfers to Ascot Fund |
| ASC2145 | 7/7/2008 | 400,000.00 | 19,610,163 | CHX DEP 20080707 | Inflows From Other Sources |
| ASC1575 | 7/9/2008 | (100,000.00) | 19,510,163 | REDACTED0277 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account |
| ASC1576 | 7/21/2008 | (30,000.00) | 19,480,163 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1577 | 7/22/2008 | (5,065.00) | 19,475,098 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1578 | 7/24/2008 | (1,000,000.00) | 18,475,098 | 2008 FEE ADVANCE ASP - REDACTED0151 - REDACTED0618 FUNDS PAID | Transfers to GCC JPMC Account |
| ASC1579 | 7/24/2008 | (1,000,000.00) | 17,475,098 | U.S. DOLLARS FUNDS PAID | Transfers to GCC MS Account |
| ASC1580 | 7/29/2008 | (1,646,015.07) | 15,829,083 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1581 | 7/29/2008 | (189,893.85) | 15,639,189 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1582 | 7/29/2008 | (2,689,903.03) | 12,949,286 | U.S. DOLLARS FUNDS PAID | Other Disbursements |

### Per Capital Activity Spreadsheet [2]

| Investor | Amount | | Amount Wired | | Variance from Collura Exh. 12 |
|---|---|---|---|---|---|
| ASCOT FUND LTD | $ | (11,000,000.00) | $ | (11,000,000.00) | - |
| DAVID KAHN | $ | 400,000.00 | $ | 400,000.00 | - |
| HEDY WEGIER | $ | (100,000.00) | $ | (100,000.00) | - |
| KASPER | $ | (30,000.00) | $ | (30,000.00) | - |
| SUZANNE GOLDENSON IRA | $ | (5,065.00) | $ | (5,065.00) | - |
| | | | | | (1,000,000.00) |
| | | | | | (1,000,000.00) |
| ALPINE - RUCH | $ | (1,646,015.07) | $ | (1,646,015.07) | - |
| PHIBRO ANIMAL HEALTH | $ | (189,893.85) | $ | (189,893.85) | - |
| TLL DUTCH - IDT | $ | (2,689,903.03) | $ | (2,689,903.03) | - |

### Per QuickBooks General Ledger [3]

| Date | Memo | Amount | |
|---|---|---|---|
| 7/3/2008 | 7/1 Dist - Ascot Fund | $ | (11,000,000.00) |
| 7/7/2008 | 7/1 Cont - Kahn | $ | 400,000.00 |
| 7/9/2008 | 7/1 Dist - Wegier | $ | (100,000.00) |
| 7/21/2008 | 7/1 Dist - Kasper | $ | (30,000.00) |
| 7/22/2008 | 7/1 Dist - Goldenson IRA | $ | (5,065.00) |
| 7/24/2008 | ASP Fee Advance to GCC Morgan | $ | (1,000,000.00) |
| 7/24/2008 | ASP Fee Advance to GCC Chase | $ | (1,000,000.00) |
| 7/29/2008 | 7/1 Final Payout - Alpine | $ | (1,646,015.07) |
| 7/29/2008 | 7/1 Final Payout - Phibro | $ | (189,893.85) |
| 7/29/2008 | 7/1 Final Payout - TLL Dutch | $ | (2,689,903.03) |

Notes:

[1] Excerpt from Expert Report of Lisa M. Collura, March 20, 2015, Exhibit 12; Ascot Partners L.P; Bank Statement for the period of June 1, 2008 to June 30, 2008: MSYSAA0004969-5055 (at 5007 - 013); Ascot Partners L.P; Bank Statement for the period of July 1, 2008 to July 31, 2008: MSYSAA0004969-5055 (at 5014 - 021).

[2] Capital Activity, July 1, 2008, GCC-P 0116669

[3] Ascot Partners RS L.P. General Ledger as of September 30, 2008, GCC-P 0005135.

[4] Per the Capital Activity Spreadsheet, the investor contribution from MALCOM THOMSON was $500,000. This amount is shown as two inflows in the bank statements and QuickBooks.

[5] Interest transactions do not appear on the Capital Activity Spreadsheet.

**Reconciliation of Ascot Partners Capital Activity Report**
**Q3 2008**

Attachment 5.D

## Per Collura Exhibit 12 [1]

| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
|---|---|---|---|---|---|
| ASC1589 | 9/24/2008 | 100,000.00 | 12,718,867 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1590 | 9/25/2008 | 100,000.00 | 12,818,867 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1591 | 9/26/2008 | 100,000.00 | 12,918,867 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1592 | 9/29/2008 | 750,000.00 | 13,668,867 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1593 | 9/29/2008 | 2,750,000.00 | 16,418,867 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1594 | 9/29/2008 | 100,000.00 | 16,518,867 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1595 | 9/29/2008 | (53,898.66) | 16,464,969 | U.S. DOLLARS FUNDS PAID | Transfers to GCC JPMC Account |
| ASC1597 | 9/30/2008 | 250,000.00 | 16,714,969 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1622 | 10/1/2008 | 15,177.76 | 16,730,147 | CREDIT INTEREST FOR SEPTEMBER USD BALANCES | Inflows From Other Sources |
| ASC1598 | 10/1/2008 | (8,500,000.00) | 8,230,147 | U.S. DOLLARS FUNDS PAID | Transfers to Ascot Fund |
| ASC1599 | 10/1/2008 | 45,000,000.00 | 53,230,147 | U.S. DOLLARS FUNDS RECEIVED | Inflows from BLMIS |
| ASC1600 | 10/2/2008 | (20,000.00) | 53,210,147 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1601 | 10/2/2008 | (75,000.00) | 53,135,147 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1602 | 10/2/2008 | (6,000.00) | 53,129,147 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1603 | 10/2/2008 | (6,300,000.00) | 46,829,147 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1604 | 10/2/2008 | (30,000.00) | 46,799,147 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1605 | 10/2/2008 | (35,000.00) | 46,764,147 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1606 | 10/3/2008 | (22,740,218.52) | 24,023,928 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1607 | 10/3/2008 | (42,147.25) | 23,981,781 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1608 | 10/3/2008 | (8,257,200.41) | 15,724,580 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1609 | 10/3/2008 | (28,098.16) | 15,696,482 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1610 | 10/3/2008 | (2,621,579.06) | 13,074,903 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1611 | 10/3/2008 | (582,917.41) | 12,491,986 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1612 | 10/7/2008 | 2,500,000.00 | 14,991,986 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1613 | 10/7/2008 | 2,500,000.00 | 17,491,986 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |
| ASC1614 | 10/7/2008 | (25,140.00) | 17,466,846 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC2146 | 10/7/2008 | 100,000.00 | 17,566,846 | CHECK DEPOSIT | Inflows From Other Sources |
| ASC1615 | 10/8/2008 | (20,730.00) | 17,546,116 | REDACTED5428 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account |
| ASC1616 | 10/9/2008 | (10,000,000.00) | 7,546,116 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1617 | 10/9/2008 | 5,000,000.00 | 12,546,116 | U.S. DOLLARS FUNDS RECEIVED | Inflows From Other Sources |

## Per Capital Activity Spreadsheet [2]

| Investor | Amount | Amount Wired | Variance from Collura Exh. 12 |
|---|---|---|---|
| NEW GUARDIAN TRUST - DRUCKER | $ 400,000.00 | $ 100,000.00 | - [4] |
| NEW GUARDIAN TRUST - DRUCKER | $ 400,000.00 | $ 100,000.00 | - [4] |
| NEW GUARDIAN TRUST - DRUCKER | $ 400,000.00 | $ 100,000.00 | - [4] |
| JOSHUA BERMAN IRA | $ 750,000.00 | $ 750,000.00 | - |
| ETZION FOUNDATION | $ 2,750,000.00 | $ 2,750,000.00 | - |
| NEW GUARDIAN TRUST - DRUCKER | $ 400,000.00 | $ 100,000.00 | - [4] |
|  |  |  | (53,898.66) |
| JEFF MARKOWITZ - APMONT PENSION | $ 250,000.00 | $ 250,000.00 | - |
|  |  |  | 15,177.76 [6] |
| ASCOT FUND LTD | $ (8,500,000.00) | $ (8,500,000.00) | - |
| ASCOT LP TOTAL | $ 45,727,278.02 | $ 45,727,278.02 | (727,278.02) |
| SKG - GOLDENSON | $ (20,000.00) | $ (20,000.00) | - |
| MARCELLE QUINTON | $ (75,000.00) | $ (75,000.00) | - |
| DANIEL GOLDENSON IRA | $ (6,000.00) | $ (6,000.00) | - |
| DANIEL STRAUS | $ (6,300,000.00) | $ (6,300,000.00) | - |
| GEORGE RUBIN | $ (30,000.00) | $ (30,000.00) | - |
| CAROL BRAVMANN | $ (35,000.00) | $ (35,000.00) | - |
| ILSHAR | $ (22,740,218.52) | $ (22,740,218.52) | - |
| POMRENZE | $ (42,147.25) | $ (42,147.25) | - |
| SMC ALTERNATIVE STEATEGIES | $ (8,691,789.91) | $ (8,257,200.41) | - [5] |
| KESTENBAUM | $ (28,098.16) | $ (28,098.16) | - |
| MILTON GILBERT | $ (2,759,556.91) | $ (2,621,579.06) | - [6] |
| ELMA GOLBERT | $ (613,597.27) | $ (582,917.41) | - [7] |
| SMC RESERVE FUND II | $ 2,500,000.00 | $ 2,500,000.00 | - |
| SPRING MOUNTAIN QP I | $ 2,500,000.00 | $ 2,500,000.00 | - |
| CHARLES SELIGER IRA | $ (25,140.00) | $ (25,140.00) | - |
| JEROME BALSAM | $ 100,000.00 | $ 100,000.00 | - |
| HOROWITZ LEAD TRUST | $ (20,730.00) | $ (20,730.00) | - |
|  |  |  | (10,000,000.00) |
|  |  |  | 5,000,000.00 |

## Per QuickBooks General Ledger [3]

| Date | Memo | Amount |
|---|---|---|
| 09/24/2008 | 10/1 Cont - New Guardian Trust | $ 100,000.00 [4] |
| 09/25/2008 | 10/1 Cont - New Guardian Trust | $ 100,000.00 [4] |
| 09/26/2008 | 10/1 Cont - New Guardian Trust | $ 100,000.00 [4] |
| 09/29/2008 | 10/1 Cont - Berman IRA | $ 750,000.00 |
| 09/29/2008 | 10/1 Cont - Etzion | $ 2,750,000.00 |
| 09/29/2008 | 10/1 Cont - New Guardian Trust | $ 100,000.00 [4] |
| 09/29/2008 | Pay Div W/H | $ (53,898.66) |
| 09/30/2008 | 10/1 Cont - Moskowitz (Apmont) | $ 250,000.00 |
| 10/01/2008 | Sept Credit Int - MS | $ 15,177.76 |
| 10/01/2008 | 10/1 Dist - ASF | $ (8,500,000.00) |
| 10/01/2008 | 10/1 Madoff redemption | $ 45,000,000.00 |
| 10/02/2008 | 10/1 Dist - SKG | $ (20,000.00) |
| 10/02/2008 | 10/1 Dist - Quinton | $ (75,000.00) |
| 10/02/2008 | 10/1 Dist - Goldenson | $ (6,000.00) |
| 10/02/2008 | 10/1 Dist - Straus | $ (6,300,000.00) |
| 10/02/2008 | 10/1 Dist - Rubin | $ (30,000.00) |
| 10/02/2008 | 10/1 Dist - Bravmann | $ (35,000.00) |
| 10/03/2008 | 10/1 Dist - Ilshar | $ (22,740,218.52) |
| 10/03/2008 | 10/1 Dist - Pomrenze | $ (42,147.25) |
| 10/03/2008 | 10/1 Dist - SMC Alt | $ (8,257,200.41) [5] |
| 10/03/2008 | 10/1 Dist - Kestenbaum | $ (28,098.16) |
| 10/03/2008 | 10/1 Dist - Gilbert | $ (2,621,579.06) [6] |
| 10/03/2008 | 10/1 Dist - Gilbert | $ (582,917.41) [7] |
| 10/07/2008 | 10/1 Cont - SMC Res II | $ 2,500,000.00 |
| 10/07/2008 | 10/1 Cont - SMC QP I | $ 2,500,000.00 |
| 10/07/2008 | 10/1 Dist - Seliger IRA | $ (25,140.00) |
| 10/07/2008 | 10/1 Cont - Balsam | $ 100,000.00 |
| 10/08/2008 | 10/1 Dist - Horowitz | $ (20,730.00) |
| 10/09/2008 | Additional capital to Madoff | $ (10,000,000.00) |
| 10/10/2008 | Wire from ASF reduce 10/1 dist | $ 5,000,000.00 |

**Reconciliation of Ascot Partners Capital Activity Report**
**Q3 2008**

Attachment 5.D

| Per Collura Exhibit 12 [1] | | | | | |
|---|---|---|---|---|---|
| FTI ID | Date | Amount | Running Balance | Description Per Morgan Stanley Account Statement - AS REDACTED | Transfer Category |
| ASC1618 | 10/16/2008 | (2,000,000.00) | 10,546,116 | REDACTED2318 - REDACTED0618 FUNDS PAID | Transfers to GCC MS Account |
| ASC1619 | 10/28/2008 | (30,679.86) | 10,515,436 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1620 | 10/28/2008 | (434,589.50) | 10,080,846 | U.S. DOLLARS FUNDS PAID | Other Disbursements |
| ASC1621 | 10/28/2008 | (137,977.85) | 9,942,869 | U.S. DOLLARS FUNDS PAID | Other Disbursements |

| Per Capital Activity Spreadsheet [2] | | | | |
|---|---|---|---|---|
| Investor | Amount | | Amount Wired | Variance from Collura Exh. 12 |
| | | | | (2,000,000.00) |
| ELMA GOLBERT | $ | (613,597.27) | $ (30,679.86) | - [7] |
| SMC ALTERNATIVE STEATEGIES | $ | (8,691,789.91) | $ (434,589.50) | - [5] |
| MILTON GILBERT | $ | (2,759,556.91) | $ (137,977.85) | - [6] |

| Per QuickBooks General Ledger [3] | | |
|---|---|---|
| Date | Memo | Amount |
| 10/16/2008 | FEE ADVANCE PAID TO GCC | $ (2,000,000.00) |
| 10/28/2008 | 10/1 Final Payout - Gilbert | $ (30,679.86) [7] |
| 10/28/2008 | 10/1 Final Payout - SMC Alt | $ (434,589.50) [5] |
| 10/28/2008 | 10/1 Final Payout - Gilbert | $ (137,977.85) [6] |

Notes:

[1] Excerpt from Expert Report of Lisa M. Collura, March 20, 2015, Exhibit 12; Bank Statement for the period of September 1, 2008 to September 30, 2008: MSYSAA0004969-5055 (at 5028 - 033); Ascot Partners L.P; Bank Statement for the period of October 1, 2008 to October 31, 2008: MSYSAA0004969-5055 (at 5034 - 041).

[2] Capital Activity, October 1, 2008, GCC-P 0006175.

[3] Ascot Partners RS L.P., QuickBooks General Ledger.

[4] Per the Capital Activity Spreadsheet, the investor contribution from NEW GUARDIAN TRUST - DRUCKER was $400,000. This amount is shown as four inflows on the bank statements and QuickBooks.

[5] Per the Capital Activity Spreadsheet, the investor redemption to SMC ALTERNATIVE STEATEGIES was $8,691,789.91. This amount is shown as two disbursements on the bank statements and QuickBooks.

[6] Per the Capital Activity Spreadsheet, the investor redemption to MILTON GILBERT was $2,759,556.91.  This amount is shown as two disbursements on the bank statements and QuickBooks.

[7] Per the Capital Activity Spreadsheet, the investor redemption to EMMA GILBERT was $613,597.27. This amount is shown as two disbursements on the bank statements and QuickBooks.

[8] Interest transactions do not appear on the Capital Activity Spreadsheet.

## Ascot Fund Identified Net Cash Requirement and Related Transfers from Ascot Partners to Ascot Fund

| Break Period / Quarter Ending: | Ascot Fund Net Cash Requirement | Total Transfers to Ascot Fund from Ascot Partners |
|---|---|---|
| 2005 Q4 [1] | $16,883,799 | $17,250,000 |
| 2006 Q1 [2] | $43,276,122 | $43,000,000 |
| 2006 Q4 [3] | $12,949,534 | $12,750,000 |
| 2007 Q4 [4] | $13,824,662 | $13,825,000 |
| 2008 Q2 [5] | $11,031,076 | $11,000,000 |
| 2008 Q3 [6] | $8,396,575 | $8,500,000 |

Notes:

[1] Capital Activity - January 1, 2006: GCC-P 0036303; Ascot Partners, LP, Bank Statement for the period of January 1, 2006 through January 31, 2006: MSYSAF0001387-398 (at 391); Ascot Partners, LP. QuickBooks General Ledger.

[2] Capital Activity - April 1, 2006: GCC-P 0002177; Ascot Partners, LP, Bank Statement for the period of April 1, 2006 through April 30, 2006: MSYSAF0001415-424 (at 417); Ascot Fund Ltd. QuickBooks General Ledger.

[3] Capital Activity - January 1, 2007: GCC-P 0114356; Ascot Partners, LP, Bank Statement for the period of January 1, 2007 through January 31, 2007: MSYSAA0004869-968 (at 872); Ascot Fund Ltd. QuickBooks General Ledger.

[4] Capital Activity - December 31, 2007: GCC-P 0117011; Ascot Partners, LP, Bank Statement for the period of January 1, 2008 through January 31, 2008: MSYSAA0004969-5055 (at 970); Ascot Partners, LP, Bank Statement for the period of February 1, 2008 through February 28, 2008: MSYSAA0004969-5055 (at 980); Ascot Fund Ltd. QuickBooks General Ledger.

[5] Capital Activity - July 1, 2008: GCC-P 0116669; Ascot Partners, LP, Bank Statement for the period of July 1, 2008 through July 31, 2008: MSYSAA0004969-5055 (at 5016); Ascot Fund Ltd. QuickBooks General Ledger.

[6] Capital Activity - October 1, 2008: GCC-P 0006175; Ascot Partners, LP, Bank Statement for the period of October 1, 2008 through October 31, 2008: MSYSAA0004969-5055 (at 5035); Ascot Fund Ltd. QuickBooks General Ledger.

# Exhibit 9(a)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT<br>SECURITIES LLC,<br><br>             Debtor, | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of<br>Bernard L. Madoff Investment Securities LLC,<br><br>             Plaintiff,<br><br>v.<br><br>J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,<br>ARIEL FUND LTD., ASCOT PARTNERS, L.P.,<br>ASCOT FUND, LTD., GABRIEL CAPITAL<br>CORPORATION,<br><br>             Defendants. | Adv. Pro. No. 09-1182 (SMB) |

**REBUTTAL EXPERT REPORT OF**

**DR. STEVE POMERANTZ**

# TABLE OF CONTENTS

I.    **Assignment and Summary of Opinion** ................................................................................ 1

II.    **MR. WEINGARTEN IS INCORRECT THAT MERKIN AND GCC PERFORMED
DUE DILIGENCE THAT MET OR EXCEEDED INDUSTRY STANDARDS** .................... 2

  A.    **Initial and Ongoing Due Diligence** ..................................................................... 3

  B.    **Weingarten's Five Ps** ........................................................................................... 3

    1.    **Process** ............................................................................................................. 4

    2.    **Performance** .................................................................................................... 6

    3.    **Philosophy** ..................................................................................................... 11

    4.    **Procedures** ..................................................................................................... 13

    5.    **People** ............................................................................................................ 14

  C.    **Merkin's Purported Due Diligence** .................................................................. 18

III.    **Conclusion** ................................................................................................................ 21

## LIST OF APPENDICES AND SCHEDULES

Appendix I          Recent Appearances

Appendix II         Documents Considered

Appendix III        Schedules

       Schedule 1          Defendant Funds' BLMIS Account Redemptions

       Schedule 2          30-Day Average Volatility (1990 – 1999)

       Schedule 3          30-Day Average Volatility (2000 – 2008)

1.   This report is offered pursuant to Federal Rule of Civil Procedure 26(a)(2) and is authored by Dr. Steve Pomerantz, president of Steve Pomerantz LLC (collectively, "Pomerantz"), an economic and financial consulting firm located in New York, NY. Pomerantz was retained in this matter by Irving H. Picard, Trustee ("Trustee") for the substantively consolidated Securities Investor Protection Act ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff") and by Baker & Hostetler, LLP ("Baker"), counsel for the Trustee.[1]  I submitted a report in the above-captioned proceeding on March 20, 2015, and a corrected version on April 13, 2015 (collectively, the "Pomerantz Report" or "Initial Report").  The opinions that I rendered in the Pomerantz Report, the documents that I considered in connection with that Report, and the accompanying Appendices to that Report, are all incorporated by reference.  All capitalized terms not defined herein shall have the meaning assigned to them in the Pomerantz Report.

I.    **Assignment and Summary of Opinion**

2.   In this report, I respond to the Expert Report of Jeffrey Weingarten ("Weingarten") dated March 19, 2015 and served on March 20, 2015 in the above-captioned proceeding (the "Weingarten Report").  Based on my review of the Weingarten Report, my nearly 30 years of professional experience, my independent review of documents and testimony, my own independent analysis, as well as customs and practices of the investment management industry, it is my opinion that Weingarten is incorrect that J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC") performed due diligence that met or exceeded industry standards.[2]  Specifically:

---

[1]   I retained Duff & Phelps, LLC, a valuation and corporate finance advisory firm ("D&P") to assist me in the preparation of this report. Employees of D&P worked under my direction and supervision in the preparation of work supporting my opinion contained herein.

[2]   As used in this report, "Merkin" refers to: (i) Merkin individually; (ii) Merkin as General Partner of defendant Gabriel Capital, L.P. ("Gabriel") and defendant Ascot Partners, L.P. ("Ascot"); and (iii) Merkin as owner and manager of GCC, the Investment Advisor for Ariel Fund Limited ("Ariel") and Ascot Fund Limited ("Former Ascot Fund").  Gabriel, Ariel, Ascot, and Former Ascot Fund are collectively referred to herein as the "Defendant Funds."  References to Merkin in this report include GCC.

- Weingarten's assessment of Merkin's Process-related due diligence and Madoff's purported investment strategy (the "Madoff SSC" strategy)[3] focuses on "benefits" yet he provides no definition of these benefits, no assessment of Madoff's ability to implement these benefits, nor any analysis of how these benefits contributed to the overall returns;

- Weingarten's assessment of Merkin's Performance-related due diligence is incorrect and insufficient, relying heavily on the availability of redemptions;

- Weingarten's assessment of Merkin's Philosophy-related due diligence is incorrect and includes a component that is irrelevant to the Madoff SSC strategy, was never claimed to be part of the Madoff SSC strategy, and was never purportedly implemented as part of the Madoff SSC strategy;

- Weingarten's assessment of Merkin's Procedures-related due diligence relies on Merkin's receipt of information from Madoff, yet disregards the importance of using that information to perform due diligence;

- Weingarten's assessment of Merkin's People-related due diligence relies too heavily on Madoff's reputation and the actions and words of other investors, and does not rise to a level of due diligence consistent with industry customs and practices; and

- Weingarten selectively omits a number of areas that Merkin identified as his purported due diligence. In my opinion, these activities do not constitute due diligence consistent with industry customs and practices.

## II.    MR. WEINGARTEN IS INCORRECT THAT MERKIN AND GCC PERFORMED DUE DILIGENCE THAT MET OR EXCEEDED INDUSTRY STANDARDS

3.    Weingarten claims at page 2 that "the due diligence performed by [Merkin and GCC] met or exceeded industry standards." However, Weingarten provides no analysis or references to specific documents to support this conclusion. Based on my review of the documents and my analyses, none of the activities performed by Merkin and/or identified by Weingarten exceeded, or even met, industry customs and practices for due diligence in the investment management industry.

---

[3]    All discussions of and opinions related to the Madoff SSC strategy, BLMIS trading activities, positions, or returns in the Merkin BLMIS Accounts are assumed herein to be purported.

### A.    Initial and Ongoing Due Diligence

4.    As noted in my Initial Report at § V.A, due diligence typically includes both an initial
and an ongoing component.  With respect to initial due diligence, Weingarten states at
page 3 that "certain information about prospective investments need to be adequately
obtained and verified."  While I agree that information about prospective investments
needs to be adequately obtained and verified, Weingarten does not indicate what due
diligence analyses Merkin performed as part of initial due diligence or refer to any
documents suggesting that Merkin performed any due diligence prior to the Defendant
Funds' investments with BLMIS.

5.    Regarding ongoing due diligence, Weingarten opines at page 3 that Merkin "obtained and
reinforced all of this information over the years in which the [Defendant] Funds invested
with Madoff."[4]  Weingarten also states at page 4 that Merkin had performance data
available "as part of the initial and ongoing due diligence process."  Based on my review
of the documents, the limited activities performed by Merkin and discussed below in
§ II.B and § II.C were cursory, insufficient, and lacked any substantive analyses.  Merkin
did not perform ongoing due diligence that met or exceeded industry customs and
practices.

### B.    Weingarten's Five Ps

6.    Weingarten's assessment of Merkin's due diligence centers around five "characteristics,"
or "Ps": Process, Performance, Philosophy, Procedures, and People.  While Weingarten's
Ps ("Weingarten Ps") are different than the Five Ps used in my Initial Report (Process,
Portfolio, People, Performance and Price),[5] they follow the same general framework.[6]
My response to Weingarten's assessment of Merkin's due diligence is organized around

---

[4]    Weingarten notes at page 3 that this information was "in various degrees documented in Mr. Merkin's files and
notes."

[5]    *See* Pomerantz Report § V.B.

[6]    Weingarten does not address Price, a key component of due diligence in the investment management industry.

the Weingarten Ps.

### 1.    Process

7.  Process is both one of the Weingarten Ps as well as one of the Five Ps I discussed in my
Initial Report.

### a)    Returns with "benefits"

8.  In Weingarten's assessment of Merkin's Process-related due diligence, he states at page 3
that the Madoff SSC strategy was a "Split Strike Conversion strategy but with added
'benefits.'"  Weingarten does not describe the Madoff SSC strategy in his report, and
states at page 3 that "[t]he 'with benefits' part of the process was understood to be how
the majority of the returns were to be generated."  While Weingarten does not define
these "benefits," he states at page 4 that "Mr. Merkin understood that Mr. Madoff
had…the knowledge and ability to take advantage of both market timing and stock
selection."[7]  Weingarten subsequently states at page 4 that the "Process was consistent
with the philosophy" of the Madoff SSC strategy.  Weingarten is incorrect in his
assessment of Madoff's "Process" for at least two reasons.

9.  First, if Madoff was generating the majority of returns through Weingarten's "benefit" of
market timing, Madoff should have invested in securities without hedges (or a collar).
Successful market timing[8] would obviate the need for hedges or collars because the
investment manager would only be investing in the market during periods of positive
returns.

10. Second, if a Fund Manager, such as Merkin, was invested in a strategy with Weingarten's
"benefits," it would be consistent with industry customs and practices to identify what
those benefits were and what impact they had on the investment strategy.  Identifying
those benefits would have been even more important given the lack of expected volatility

---

[7]    I have not seen the word "benefits" referenced in any of the Defendants' documents discussing the Madoff SSC
strategy.

[8]    As discussed below in § II.B.1.b, Madoff was not successful at market timing.

and correlation to the market that somehow produced significant appreciation in down markets.  (*See* my Initial Report at § VI.B.2, § VI.D.3 and § VI.A.2.a.)  Yet, Weingarten does not identify any due diligence performed by Merkin to identify these "benefits" or their purported impact on the returns.

11. Weingarten suggests that the Madoff SSC strategy could not itself have generated the purported returns without these additional benefits, and claims that these nebulous benefits were the source of the performance.  However, a due diligence process that parrots back a description of the purported strategy does not meet industry customs and practices.  My Initial Report makes it clear that the returns reported in the Merkin BLMIS Accounts were not generated by the Madoff SSC strategy, and Weingarten does not suggest otherwise.

### b)    Market Timing

12. Weingarten claims at page 4 that "Mr. Merkin understood that Madoff had the ability to predict short-term trends in the market," and Merkin has claimed that Madoff was successful at market timing.[9]  However, had Merkin performed due diligence related to market timing, he would have found that, for at least two reasons, Madoff could not time the market much better than if he had been flipping a coin.

13. First, as a trading strategy, it is undeniable that there are enormous potential gains to be made from successfully timing the market.  That is, the ability to predict when the market will go up and when it will go down could generate significant returns for an investor.  However, I am not aware of any investment manager implementing market timing as a successful trading strategy over the long term.[10]

---

[9]    Merkin Dep. 158:12-167:13, February 24, 2015; *New York v. Ascot Partners, LP et al.*, Merkin Dep. 150:11-19, July 1, 2010; *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 137:17-22, February 9, 2009.  A Fairfield Sentry document in the Madoff File also describes the Madoff SSC strategy as a "market timing strategy."  Trustee Ex. 363 (Fairfield Sentry Limited Semi-Annual Update, 3rd and 4th Quarters, 2005, March 14, 2006) (GCC-P 0393268-271).

[10]    *See, e.g.*, William F. Sharpe, *Likely Gains from Market Timing*, 31 Fin. Analysts J. 60, 60-69 (1975).  The Sharpe Ratio is named after William F. Sharpe.  Robert H. Jeffrey, *The Folly of Stock Market Timing*, Harv.

14. Second, and equally important, as discussed in my Initial Report at § VI.D.4.b, an analysis of trading activity for the Merkin BLMIS Accounts would have shown that the purported returns were not generated by market timing. For example, less than 5.5% of the purported returns between 1991 and 2008 were generated by market timing.

15. Weingarten has not indicated that Merkin performed any due diligence to test whether Madoff timed the market well. Instead, Weingarten claims at page 4 that Merkin understood Madoff's access to "order flow" contributed to Madoff's purported ability to time the market. However, the Merkin BLMIS Accounts were purportedly invested in the market for weeks at a time, and access to order flow on a daily basis would not have facilitated predicting long-term trends in the market.

16. Weingarten also states at page 4 that Merkin understood that a proprietary model contributed to Madoff's purported ability to time the market. However, it does not appear that Merkin performed any due diligence on a purported proprietary model, particularly to determine whether the proprietary model in fact predicted market movements with any success.[11]

        **c)    Stock Selection**

17. In his report at page 4, Weingarten claims that Madoff had the "knowledge and ability to take advantage of…stock selection." Stock selection (or "stock picking") would involve Madoff picking stocks within the S&P 100 that performed better than others. However, as discussed in my Initial Report at § VI.D.4.c, Madoff was not successful at stock picking. The stocks picked for only 17 out of 52 baskets (i.e., 33%) outperformed the S&P 100 between 2000 and 2008.

      **2.    Performance**

18. Performance is both one of the Weingarten Ps as well as one of the Five Ps I discussed in

---

Bus. Rev., July-Aug. 1984, at 102, 102-110; Richard J. Bauer & Julie R. Dahlquist, *Market Timing and Roulette Wheels*, 25 Fin. Analysts J. 37, 37-38 (2001).

[11] *See, e.g.*, Merkin Dep. 433:3-434:6, February 25, 2015.

my Initial Report.  Weingarten's assessment of Performance-related due diligence
includes an assessment of the "plausibility" of the returns, cursory peer analysis, and
emphasis on redemptions as an "absolutely critical" part of due diligence.  As discussed
below: (i) the returns were not plausible; (ii) peer analysis consistent with industry
customs and practices would have revealed a red flag; and (iii) the availability of
redemptions is the normal course of business, and not "absolutely critical" to due
diligence.

### a)      Plausibility

19. Weingarten claims at page 5 that while not part of his "formal" due diligence, he "often
applied the plausibility rule.  Is it plausible that these people doing this process in this
way could achieve these results?"  Weingarten states that, based on the documents he
reviewed, as well as the fact that Merkin knew other investors who were clients of
Madoff, Merkin had a "reasonable belief" that the returns reported in the Merkin BLMIS
Accounts were plausible.  However, Weingarten's "plausibility rule" fails when applied
to the Madoff SSC strategy and the returns.

20. I am not aware of any defined "plausibility rule" as part of any due diligence customs or
practices.  I have worked in the investment management industry for almost 30 years, and
Weingarten's discussion of a defined "plausibility rule" is the first time I have ever heard
the term.  Additionally, Weingarten has not indicated which documents he reviewed to
determine plausibility, or which investors Merkin knew or what they told Merkin.

21. Weingarten's plausibility rule appears to require at least two parts.  First, the strategy
must be understood.  Second, the results reported for the strategy must be compared
against the range of expectations under the strategy.  My analysis below follows these
two parts.

22. Weingarten does not provide a description of the Madoff SSC strategy nor describe what
returns would be plausible under the Madoff SSC strategy.  Weingarten instead notes at
page 3 that the strategy is "adequately described elsewhere," failing to cite any sources he
relies upon.  Weingarten also notes at page 5 that Madoff's returns were "uncommon"
but "not implausible," yet does not provide any support for this statement.

23. There are certain expectations given the Madoff SSC strategy (described in my Initial
Report at § VI.A.1). First, there should be some relationship between the purported
returns of the Madoff SSC strategy and the returns of the underlying stock or the S&P
100 Index. Second, by way of the collar, the put option should create a floor for the
returns and the call option should create a ceiling. As a result, the Madoff SSC strategy
was structured in a way for investors to reduce (but not eliminate) volatility by limiting
gains and losses.[12]

24. With this understanding of the strategy, we can now review the reported results from
implementing the strategy, and consider whether the results are plausible. Weingarten
claims beginning at page 4 that "[t]he returns were…better than would be expected from
a typical [SSC] strategy. When the market was down, the fund outperformed the overall
market." It is correct that when the market was down, the Merkin BLMIS Accounts
should have reported losses that were less than the market (because of the collar), and
therefore the returns could be said to outperform the market. However, the Merkin
BLMIS Accounts did not just report smaller losses than the market – they consistently
reported positive returns even when the market was down, which is not plausible given
the strategy.

25. Based on my review, the reported returns for the Merkin BLMIS Accounts: (i) were not
correlated with the S&P 100 Index; (ii) were almost always positive even when the S&P
100 Index returns were negative; and (iii) displayed a lack of volatility.[13] All of these
results are inconsistent with the expectations under the Madoff SSC strategy; therefore, it
was not plausible that this strategy was used to achieve the returns reported in the Merkin
BLMIS Accounts. Industry custom and practice would have been to perform additional
due diligence, including performance attribution, to understand how Madoff was
generating the purported returns. Had Merkin performed this analysis he would have
identified additional red flags, including an impossibility where the only reasonable

---

[12]    *See* Pomerantz Report § VI.A.1.

[13]    *See* Pomerantz Report § VI.B.2, § VI.A.2.a, § VI.D.3.

explanation was fraud.  I discuss these red flags in my Initial Report at § VI.D.4.

b)    **Peer Analysis**

26. In addition to the plausibility rule, Weingarten claims to have assessed peer analysis due diligence.  Specifically, he states at page 5 that while the "Sharpe ratio was relatively high for Madoff," he has "counted many funds with very high Sharpe ratios."  However, Weingarten does not offer the number of funds he counted, the types of funds, Sharpe Ratios of those funds, the time period over which he calculated the Sharpe Ratios, or any analysis whatsoever regarding Sharpe Ratios.

27. In my Initial Report at § VI.D.1, I calculated the Sharpe Ratios for the Merkin BLMIS Accounts, and compared those Sharpe Ratios to other funds as well, detailing my screening process and analysis.[14]  Based on my analyses, the Sharpe Ratios for the Merkin BLMIS Accounts were higher than the maximum Sharpe Ratio of any fund in the peer groups for every period for which data was analyzed.[15]

28. While it is possible to have a high Sharpe Ratio for a short period of time, it is increasingly difficult and uncommon to maintain a high Sharpe Ratio for an extended period of time.  Weingarten acknowledges this, and states at page 5 that the returns in the Merkin BLMIS Accounts were "uncommon."  However, the Sharpe Ratios for the Merkin BLMIS Accounts were higher than any other peer analyzed over any 10 year time period during the Defendant Funds' investments with BLMIS.[16]  This level of performance is more than just "uncommon," it is statistically improbable, if not impossible.  As discussed in my Initial Report at § VI.D.1, this level of performance was a red flag.

29. Even among the Elite Investment Advisors discussed in my Initial Report at § VI.D.1.c, the returns reported in the Merkin BLMIS Accounts were an outlier.  The Sharpe Ratios

---

[14]    For example, I provided the number of funds, the type of funds, and the time period over which I calculated the Sharpe Ratios.

[15]    *See* Pomerantz Report § VI.D.1.

[16]    *See* Pomerantz Report § VI.D.1.

for the Merkin BLMIS Accounts were higher than any of the Elite Investment Advisors by at least 44%.[17]

30. To further demonstrate the extent to which the returns reported in the Merkin BLMIS Accounts were an outlier, I assessed the cumulative Sharpe Ratios for the Merkin BLMIS Accounts and for a subset of the Hedge Fund Peer Group beginning in 1990.[18]  As Figure 1 illustrates, while it is possible to have uncommon performance in the short-term, it is not sustainable over a long period of time.

**Figure 1**
**Sharpe Ratio for Hedge Fund Peer Group v. Merkin BLMIS Accounts**
**Cumulative Periods October 1990 – July 2007[19]**



31. The Sharpe Ratios in Figure 1 illustrate the concept of "mean reversion."[20]  As illustrated, the maximum Sharpe Ratio for the peer group falls and the minimum Sharpe Ratio for the peer group rises as the period of time increases over which Sharpe Ratios are calculated.  However, the Sharpe Ratios for the returns reported in the Merkin BLMIS

---

[17]   *See* Pomerantz Report Fig. 30.

[18]   *See* Pomerantz Report § VI.D.1.a for a definition of the Hedge Fund Peer Group.

[19]   October 1990 through July 2007 is the longest time period with at least 30 funds reporting historical performance.  This subset of the Hedge Fund Peer Group contains the same 30 funds for each cumulative period.

[20]   Mean reversion refers to the tendency of a time series to "fall when its level is above its mean and rise when its level is below its mean." CFA Institute, *Ethical and Professional Standards, Quantitative Methods, and Economics CFA Curriculum Level II, Vol.1,* 312 (2015).

Accounts remained consistently high from year to year.

### c)    Redemptions

32. Weingarten states at page 5 that an "absolutely critical" part of due diligence is the
"determination that the performance [is] realizable," and defines it as the ability to "get
your money back" (i.e., redemptions).  Weingarten then highlights at page 5 that Madoff
was "always able to meet redemption requests on time and in the full amount" for the
Defendant Funds.

33. Based on my almost 30 years of experience, redemptions are not an "absolutely critical"
part of due diligence.  While investors should be able to make redemptions pursuant to
the terms of their investment or fund agreement, the ability of an investment manager to
fulfill redemptions is not due diligence.  Further, the ability to fulfill redemptions does
not indicate that reported "performance as depicted [is] real."[21]  Meeting redemption
requests is the normal course of business for investment managers.

34. Based on Weingarten's assessment that redemptions are an absolutely critical part of due
diligence, I reviewed the history of redemptions for the Defendant Funds to determine
how frequently redemptions were met by BLMIS.  **Schedule 1** shows the redemptions for
the Merkin BLMIS Accounts from 1995 to 2008.

35. I found that the Defendant Funds went almost six years without making a single
redemption request for any of the Merkin BLMIS Accounts.  Therefore, over this time
period, Weingarten's "absolutely critical" part of the due diligence process provided no
"determination that the performance was realizable."

### 3.    Philosophy

36. According to Weingarten at page 3, Philosophy addresses what "the manager [is] trying
to achieve in his strategy."  Weingarten's use of Philosophy is most closely related to the
Process and Portfolio areas of due diligence I discuss in my Initial Report under the Five

---

[21]    Weingarten Report 5.

Ps.

37. Weingarten's assessment of Philosophy-related due diligence at page 3 is limited and
appears to rely on Merkin's understanding of the strategy, particularly the "notion that
Madoff was investing to achieve good returns…with substantially below average risk."
Weingarten states at page 3 that the philosophy of the Madoff SSC strategy was that it
"would forgo potential higher profit opportunities in order to avoid risk of loss.  For
example, being out of the market around highly volatile periods during which options
expire would be part of the philosophy."

38. Weingarten's assessment of the Philosophy is incorrect and irrelevant to the Madoff SSC
strategy.  The example he uses was never claimed to be part of the Madoff SSC strategy,
and based on my review of the data, was never implemented as part of the Madoff SSC
strategy.

39. First, being out of the market around highly volatile periods is not a correct explanation
of how the Madoff SSC strategy would forgo profit to avoid loss.  The exact opposite is
true.  If Madoff was *in* the market during highly volatile times, it would more likely
demonstrate the philosophy of the Madoff SSC strategy of forgoing profit to avoid loss.
The collar would limit some of the losses in the Merkin BLMIS Accounts when the
market was down, at the expense of giving up larger gains when the market was up.

40. Second, being out of the market during highly volatile periods is not part of any SSC
strategy I am aware of.  The Madoff SSC strategy was intended to reduce wide
fluctuations in returns over time; as such, the volatility of the market is irrelevant to the
decision of when to enter or exit the market.  Volatility has no bearing on the
implementation of the Madoff SSC strategy other than contributing to the price of the
options.

41. Third, while Weingarten's example is claimed to be an activity that would be "part of the
philosophy," neither Merkin nor Madoff ever claimed this to be the case for the Madoff

SSC strategy.[22]

42. Finally, Madoff was not always out of the market when options expired,[23] let alone out of the market around highly volatile periods during which options expired as illustrated in **Schedules 2** and **3**.[24]

### 4.    Procedures

43. Procedures-related due diligence, according to Weingarten at page 3, addresses "how…the process [is] executed."  While Procedures is not one of the Five Ps discussed in my Initial Report, Procedures overlaps with certain Five Ps, including Process and Portfolio.  In his assessment of Procedures, Weingarten focuses solely on transparency.

44. Weingarten claims at page 4 that "[p]rocedures were also clearly and transparently…adhered to," noting that Merkin received "both literal and figurative [trade] confirmations."[25]  Weingarten further claims that the availability of these trade confirmations "made Madoff's procedure…more transparent than that of a typical fund manager," and "almost no amount of due diligence at the time would have made [it] obvious" that the trade confirmations were fabricated.  While Madoff provided trade confirmations, simply receiving this information, or any information, is not due diligence. What one does with the information is due diligence.

45. Weingarten fails to distinguish between having information and using it.  Because Merkin received trade confirmations and customer statements for the Merkin BLMIS

---

[22]   Merkin testified that the Madoff SSC "strategy needed volatility to work."  *Wiederhorn v. Merkin*, Hearing Transcript 336:23, December 3, 2009.

[23]   Examples include instances in which the rollover occurred before the expiration of the options (i.e., existing option positions were closed out through buy and sell transactions, and option positions were established with different expiration dates), as well as instances in which the rollover occurred at expiration (i.e., existing options expired, and new option positions were established to replace them). As such, Madoff was often still in the market when the options expired.

[24]   **Schedules 2** and **3** use the 30-day average price for the S&P 100 Volatility Index (Ticker: VXO), a measure of market expectations of near-term volatility conveyed by S&P 100 stock index option prices.  Using the 7-day average produces similar results.

[25]   It is unclear what Weingarten means by "figurative" trade confirmations.

Accounts, he would have had the data available to perform all of the quantitative analyses

described in my Initial Report as part of due diligence. However, Merkin did not use any

of this transparency to perform quantitative due diligence. It is consistent with industry

customs and practices to perform quantitative analyses with trade level data particularly

when there are outstanding questions regarding how an investment advisor generates

returns or if there is an inconsistency between the returns reported by the advisor and the

strategy purportedly followed (i.e., Weingarten's "plausibility test"). In either of these

cases (both of which existed for Merkin), it would be consistent with due diligence

customs and practices in the investment management industry to further analyze returns

and/or transaction level data.

### 5.    People

46. The category of People is both one of the Weingarten Ps as well as one of the Five Ps I

discussed in my Initial Report. Weingarten's assessment of People-related due diligence

purportedly performed by Merkin relies heavily on Madoff's reputation, and the actions

and existence of other investors to suggest that Merkin's due diligence met or exceeded

customs and practices.[26] However, Madoff's reputation outside of investment

management contributes little to due diligence, and relying on the actions or existence of

others is never sufficient due diligence when managing investor funds. Furthermore,

Weingarten's assessment is insufficient because it fails to recognize People-related due

diligence that would be important if there was a "black box" behind the trading

decisions.[27]

### a)    Madoff's Reputation

47. Weingarten states at page 4 that "Madoff was well known to Mr. Merkin" because of

---

[26]   In a response to interrogatories surrounding Merkin's due diligence, the majority of Merkin's response centered
around Madoff's reputation and people Merkin spoke to about Madoff. Trustee Ex. 354 (Defendants J. Ezra
Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories
and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[27]   Trustee Ex. 363 (Handwritten Notes of Call between Merkin and UBP, November 7, 2008) (GCC-P 0393138).

both Madoff's reputation in the "finance community at large" as well as Merkin's relationship with Madoff.  Reputation itself is a small component of due diligence and reliance on it is not a substitute for due diligence consistent with industry customs and practices.

48. First, Merkin relied heavily on Madoff's reputation in deciding to invest, and continuing to invest, with BLMIS.[28]  When Merkin initially came to know Madoff, Madoff had a reputation as a broker-dealer on Wall Street and was an acquaintance of Merkin's father.[29]  Merkin appears to have relied on these facts in deciding to invest with BLMIS.[30]  Subsequent information about Madoff was relied on as Merkin continued to invest with BLMIS.[31]  For example, Merkin testified he relied on Madoff's position as chairman of NASDAQ.[32]  However, serving as chairman of NASDAQ does not indicate that someone is capable of managing money.

49. Additionally, Merkin testified that it gave him "some sense of security and understanding as to…Bernie's ability to time small market swings up and Bernie's ability to do the executions that he required to give us these kinds of returns" that large firms, such as Goldman Sachs, Salomon, Merrill Lynch, and Smith Barney, were willing to join Madoff on a new trading platform endeavor.[33]  This trading platform, however, was entirely separate and apart from BLMIS's IA Business.  That is, these parties were not giving

---

[28] *New York v. Ascot Partners, LP et al.*, Merkin Dep. 20:19-23, July 1, 2010; *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009; Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[29] *In re Madoff Charities Investigation*, Merkin Dep. 7:21-8:15, January 30, 2009.

[30] Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[31] Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[32] *Wiederhorn v. Merkin*, Hearing Transcript 171:4-18, December 3, 2009; Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[33] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009.

money to BLMIS to invest.  The fact that these parties would join Madoff on a new
trading platform unrelated to the IA Business has no relevance from a due diligence
perspective.

50. Second, Weingarten states at page 4 that it was "clear from the outset that Mr. Merkin
knew the [p]eople who were going to do the investing" based on Madoff and Merkin's
"long-term relationship…dating back to the early 1990s."  However, having a personal or
business relationship with an individual does not absolve a Fund Manager from
performing due diligence.  As discussed in my Initial Report at § V.A, while the
investment management industry is built on relationships, it is not an industry where
"blind trust" prevails.  In my experience, Fund Managers typically follow the "trust but
verify" approach given the risk to which a Fund Manager exposes himself and his
investors by investing their money with an investment advisor.

### b)    BLMIS Employees

51. The People-related "due diligence" listed in the Weingarten Report only pertains to
Madoff and ignores the rest of the People (or lack thereof) in BLMIS's IA Business.
This is consistent with Merkin's claims that he only spoke to Madoff.[34]  However,
People-related due diligence should include an assessment of individuals with key roles,
the reporting structure of the business, and whether all team members understand the
philosophy and process they are supposed to be implementing.[35]

52. Weingarten does not mention any employees of BLMIS other than Madoff.  Had Merkin
performed any People-related due diligence on BLMIS rather than just on Madoff, he
would have seen that BLMIS was listed as having no more than five employees who
performed investment advisory functions.[36]

---

[34]    Merkin Dep. 431:8-13, February 25, 2015.

[35]    *See* Pomerantz Report § V.B.3.

[36]    SEC Form ADV, Bernard L. Madoff Investment Securities, August 25, 2006 (PUBLIC0003729 at 734).
BLMIS listed one-to-five total employees performing investment advisory functions.  This is inconsistent with

53. An evaluation of the people at BLMIS, other than Madoff, would be even more important if BLMIS was employing a black box or algorithm as part of its strategy. Testimony by Merkin and handwritten notes from Merkin discuss the use of a black box at BLMIS.[37] If BLMIS was employing a black box or algorithm it would require someone, most likely even a team, qualified to create, run, and maintain the model. As discussed in my Initial Report at § VI.C.2, due diligence would have revealed that BLMIS had a limited number of personnel, with no advanced education or training, purportedly implementing a multi-billion dollar investment strategy.

### c) Other BLMIS Investors

54. Weingarten states at page 5 that "Merkin knew that many other highly sophisticated and experienced investors were clients of Madoff." Simply knowing of or talking to other investors does not rise to the level of due diligence consistent with industry customs and practices.

55. Merkin listed the following people that he spoke with: Leon Meyers, Sandra Manzke, David Gottesman, Gedale Horowitz, and Daniel Hoffert.[38] In Merkin's testimony, he did not recall whether these conversations involved a discussion of due diligence that these people may have performed on BLMIS.[39]

56. Merkin also testified that he discussed Madoff with other professionals over the period of time in which the Defendant Funds invested with BLMIS.[40] Merkin stated that he had heard that there were skeptics of Madoff's operation, but Merkin claimed that there

---

other information Madoff told Merkin's investors at a meeting Merkin attended. Meeting notes indicated that Madoff had 12 people "dedicated to the [SSC] strategy." UBPAMERKIN00001711 at 711.

[37]   Trustee Ex. 363 (Handwritten Notes of Call between Merkin and UBP, November 7, 2008) (GCC-P 0393138); Merkin Dep. 308:8-20, February 24, 2015; Merkin Dep. 417:16-25, 433:3-434:6, 562:2-14, 574:8-13, February 25, 2015.

[38]   Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[39]   Merkin Dep. 374:13-16, 380:8-382:17, 382:22-387:15, 391:9-11, 401:8-10, February 25, 2015.

[40]   *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009.

would always be skeptics, implying that the existence of skeptics was not alarming.[41]  In
addition, Merkin indicated that the number of supporters outnumbered the number of
skeptics.[42]  Regardless of the number of skeptics, the fact that there were skeptics should
have prompted Merkin to perform due diligence beyond reliance on reputation alone.

### C.    Merkin's Purported Due Diligence

57. Weingarten also selectively omits a number of areas that Merkin identified as his
purported due diligence.  In my opinion, these activities do not constitute due diligence
consistent with industry customs and practices.

- Merkin testified that, "we looked at Mr. Madoff's returns in our office and
reached the conclusion that his returns were achievable…given what we thought
was the Madoff executions."[43]  I have not identified any documents that show any
analysis related to execution or that reveal what Merkin "thought was the Madoff
executions."[44]

- Merkin testified that he had a discussion with Madoff, "about those aspects of the
strategy that permitted him to generate the level of returns that he did with the
consistency that he was able to provide."[45]  For example, in Merkin's handwritten
notes of an October 2008 conversation with Madoff, Merkin noted that when
BLMIS is fully invested (in the market), "[Madoff] can catch a return of -1% to
2%…six to eight times a year.  With some luck, [he] can be fully invested six to
eight times a year with a 50 b.p. profit locked in, which can be helpful in lean
months."[46]  There are no indications that Merkin asked any questions regarding
precisely how Madoff earned these gains or what events or information led to him
going in and out of the market 6 to 8 times a year.

---

[41] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009.

[42] *Wiederhorn v. Merkin*, Hearing Transcript 137:24-138:9, December 3, 2009; *In re Madoff Charities
Investigation*, Merkin Dep. 201:25-202:14, January 30, 2009.

[43] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 115:12-116:11, February 9, 2009.

[44] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 115:12-116:11, February 9, 2009.

[45] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 144:23-145:7, February 9, 2009.

[46] Trustee Ex. 363 (Handwritten Notes of Meeting between Madoff, UBP, and Merkin, October 30, 2008) (GCC-P
0393146-148).

- Merkin testified that Madoff told him that he was using over-the-counter ("OTC") options in addition to listed options.[47]  In this arrangement there is significant counterparty risk because there is no formal clearing house for the trade. Therefore, if certain trades were performed OTC, it would have been industry custom and practice to perform due diligence related to these OTC transactions. For example, it would have been customary to obtain, review for reasonableness, and verify as necessary the names of counterparties, as well as obtain copies of option agreements.  Merkin, however, never verified counterparties,[48] and never obtained copies of any option agreements with counterparties.[49]

- Merkin testified that he discussed the posting of margin for OTC transactions with Madoff, and stated that he "went through [BLMIS's]…internal program of how they required margin posted."[50]  Yet I have not identified any documents suggesting how Merkin specifically "went through" Madoff's margin requirements, how these margin requirements were calculated, or if Merkin attempted to verify any of the information Madoff provided to him.  Additionally, it is not clear whether Merkin ever asked Madoff why the Defendant Funds never had to post margin for the OTC transactions since they were a party to these trades.[51]

---

[47]  *New York v. Ascot Partners, LP et al.*, Merkin Dep. 353:7-14, March 4, 2010.  Based on the trade confirmations provided to Merkin, Madoff was purportedly trading options on the Chicago Board Options Exchange ("CBOE"), where the Options Clearing Corporation ("OCC") would have cleared the trades. *See* Pomerantz Report § VI.A.2.b.

[48]  In October 2008, Merkin was asked various questions by Union Bancaire Privée ("UBP") to provide information regarding Ascot's investment with BLMIS.  Trustee Ex. 363 (Letter from UBP to Merkin, October 10, 2008) (GCC-P 0393142-143). In response, Merkin asked Madoff for a list of counterparties with which Madoff was purportedly executing OTC option transactions.  Merkin testified that he did not verify (or ask anyone to verify) that any of the institutions that Madoff mentioned were in fact trading options with BLMIS. *New York v. Ascot Partners, LP et al.*, Merkin Dep. 46:4-13, July 1, 2010.

[49]  *New York v. Ascot Partners, LP et al.*, Merkin Dep. 87:5-16, July 1, 2010; *Wiederhorn v. Merkin*, Hearing Transcript 243:18-244:3, December 3, 2009.

[50]  *In re Madoff Charities Investigation*, Merkin Dep. 134:13-135:24, January 30, 2009.

[51]  At minimum, it would have been consistent with industry customs and practices to have a netting agreement that would allow the Defendant Funds to use their stock to collateralize the short option position.

- Merkin claims to have performed something he calls "paper trading."[52]
  According to Merkin, this analysis was performed when Madoff entered the
  market to estimate how much Merkin could possibly lose (i.e., the maximum loss)
  and how much he could possibly gain (i.e., the maximum gain) given the reported
  trades that Madoff made in executing the Madoff SSC strategy.[53]  This type of
  analysis is typically called "scenario analysis."  I have not seen any
  documentation supporting the analysis purportedly performed by Merkin.
  However, based on his description of the analysis, Merkin omitted a key
  component, comparing the *range of possibilities* with the *actual results*.  As
  discussed in my Initial Report at § VI.D.5, had Merkin performed this part of his
  "paper trading" he would have seen that the returns for the Merkin BLMIS
  Accounts were outside the range of possibilities.

- It appears from the documents that Merkin asked Madoff about the lack of
  volatility.  Madoff's purported response did not explain the lack of volatility.  As
  discussed in my Initial Report at § VI.B.2, the lack of volatility in the Merkin
  BLMIS Accounts was a red flag that should have prompted additional due
  diligence, yet according to the documents and testimony, Merkin did not ask any
  additional questions and did not perform any analysis regarding the source of the
  returns.[54]  It would have been industry custom and practice to perform
  independent quantitative analyses (e.g., performance attribution) to confirm
  Madoff's response or help answer Merkin's own questions regarding volatility.
  (*See* my Initial Report at § VI.D.4 and § VI.B.2.)

- Merkin testified that "we tried" to replicate Madoff's returns.[55]  I have not seen
  any documentation supporting the analysis purportedly performed by Merkin, and

---

[52] *In re Madoff Charities Investigation*, Merkin Dep. 109:6-10, January 30, 2009.

[53] *In re Madoff Charities Investigation*, Merkin Dep. 109:6-25, January 30, 2009.

[54] *See, e.g.*, Trustee Ex. 363 (Telephone Conversation Transcript between E. Merkin and B. Madoff, January 14, 2002) (GCC-P 0393364-373).

[55] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 115:9-15, February 9, 2009.  Merkin also testified that he did not try to replicate the strategy.  *Wiederhorn v. Merkin*, Hearing Transcript 252:23-253:2, December 3, 2009.

Merkin testified that he did not perform any quantitative analysis to replicate the strategy and did not "build a trading model."[56]

- Merkin claims he relied on the favorable press coverage received by BLMIS's Proprietary Trading Business.[57]  However, Merkin's reliance on another BLMIS business unit is inconsistent with due diligence industry customs and practices, and not relevant to an assessment of BLMIS's IA Business.  (*See* my Initial Report at § V.A.)

## III.    Conclusion

58. Based on the analyses discussed above, it is my opinion that Weingarten's conclusion is incorrect.  Merkin's activities did not meet or exceed industry customs and practices related to due diligence.  Merkin primarily relied on Madoff's reputation, discussions with Madoff and the existence of, or discussions with, other BLMIS investors to reach the conclusion that the returns for the Merkin BLMIS Accounts were achievable.  There is no indication that Merkin performed any quantitative analysis, any returns comparison of the Madoff SSC strategy to other investment strategies, or any comparison of expected results with actual results.

59. Specifically, Merkin did not perform any of the following due diligence activities, which would have been industry custom and practice:

- Peer analysis;
- Performance attribution;
- Correlation analysis;
- Performance in periods of market stress;
- Quantitatively review Madoff's ability to time the market;

---

[56]  *Wiederhorn v. Merkin*, Hearing Transcript 252:23-253:3, December 3, 2009; *New York v. Ascot Partners, LP et al.*, Merkin Dep. 111:16-112:21, July 1, 2010.

[57]  *Straus v. Merkin*, Merkin Dep. 607:24-616:11, June 22, 2011; Trustee Ex. 363 (Richard L. Stern, *Living off the spread*, FORBES, July 1989) (GCC-P 0393118-119) ; Trustee Ex. 363 (Gary Slutsker, *If you can't beat 'em...*, FORBES, January 1992) (GCC-P 0393172).  Merkin also testified that he spoke with customers of BLMIS's Proprietary Trading Business, including Fidelity and Charles Schwab.  *Straus v. Merkin*, Merkin Dep. 577:8-578:7, June 22, 2011.

- Quantitatively review Madoff's ability to pick stocks;
- Ask for and review OTC counterparty contracts;
- Verify information related to margin requirements at BLMIS;
- Replicate the strategy for purposes of understanding expected returns and determining feasibility of returns reported for the Merkin BLMIS Accounts;
- Monitor the purported performance of the Merkin BLMIS Accounts relative to benchmarks in order to determine how much of the reported return for the Merkin BLMIS Accounts was due to general market behavior as opposed to active management;
- Conduct alpha analysis;
- Assess the individuals with key roles (other than Madoff), including the individual(s) responsible for any black box or algorithm; or
- Determine whether BLMIS team members understand the philosophy and process they are supposed to be implementing.

60. Therefore, it is my opinion that Weingarten is incorrect that Merkin and GCC performed due diligence that met or exceeded industry standards.

_____

Dr. Steve Pomerantz

May 15, 2015

Rebuttal Expert Report of Dr. Steve Pomerantz

**APPENDICES**

## Appendix I: Recent Appearances

I have testified three times since my Initial Report was submitted, as listed below.

Direct and Cross-Examination Testimony in Re: US Airlines, Pilots Board of Adjustment, 401(k) Analysis, April 2015

Deposition in Spano et al v. The Boeing Company, US District Court –Southern District of Illinois, 401(k) Analysis, April 2015

Deposition in Re: J.P. Morgan Stable Value Fund, US District Court – Southern District of New York, Investment Analysis, March 2015

## Appendix II: Documents Considered

In addition to the documents listed in Appendix II of my Initial Report, I have considered the pleadings in this case, as well as documents and other information produced by the parties to this case and gathered during my research.  Accordingly, my report contains various footnote references and discussion of documents specifically relied upon by me in issuing my expert opinion in this case.  In addition to the documents cited in my report, the following documents were considered by me in issuing my expert opinion in this report.  Documents identified below are to be considered inclusive of any and all exhibits to the particular document.

| Bates Begin | Bates End | Bates Begin | Bates End |
|---|---|---|---|
| 09-01182-BAMD-0055762 | 09-01182-BAMD-0055770 | GCC-P 0201921 | GCC-P 0201935 |
| 09-01182-BAMD-0072438 | 09-01182-BAMD-0072447 | GCC-P 0206960 | GCC-P 0206989 |
| 09-01182-BAMD-0082025 | 09-01182-BAMD-0082027 | GCC-P 0213041 | GCC-P 0213043 |
| 09-01182-BAMD-0093758 | 09-01182-BAMD-0093761 | GCC-P 0237755 | GCC-P 0237777 |
| 09-01182-BAMD-0097481 | 09-01182-BAMD-0097489 | GCC-P 0237811 | GCC-P 0237833 |
| 09-01182-BAMD-0097555 | 09-01182-BAMD-0097555 | GCC-P 0244665 | GCC-P 0244665 |
| 09-01182-HBEKER-0000223 | 09-01182-HBEKER-0000247 | GCC-P 0244700 | GCC-P 0244701 |
| 09-01182-HBEKER-0000248 | 09-01182-HBEKER-0000274 | GCC-P 0244902 | GCC-P 0244902 |
| 09-01182-HBEKER-0000288 | 09-01182-HBEKER-0000294 | GCC-P 0245104 | GCC-P 0245104 |
| BS00034648 | BS00034740 | GCC-P 0246091 | GCC-P 0246094 |
| BS00160930 | BS00160956 | GCC-P 0264472 | GCC-P 0334736 |
| BS00173660 | BS00173660 | GCC-P 0399139 | GCC-P 0399161 |
| BS00210984 | BS00210984 | GCC-P 0428837 | GCC-P 0428851 |
| BS00236966 | BS00237008 | GCC-P 0429179 | GCC-P 0429201 |
| BS00247488 | BS00247491 | GCC-P 0493162 | GCC-P 0493202 |
| BS00268136 | BS00268136 | GCC-P 0495348 | GCC-P 0495380 |
| BS00268724 | BS00268724 | GCC-P 0513191 | GCC-P 0513195 |
| BS00268744 | BS00268744 | GCC-P 0730818 | GCC-P 0730842 |
| BS00452912 | BS00452912 | GCC-P 0730843 | GCC-P 0730867 |
| BS00453763 | BS00453767 | GCC-P 0731045 | GCC-P 0731069 |
| BS00525906 | BS00525909 | GCC-P 0760903 | GCC-P 0760915 |
| BS00528297 | BS00528308 | GCC-P 0760932 | GCC-P 0760954 |
| BS00528392 | BS00528396 | GCC-P 0813366 | GCC-P 0813397 |
| BS00599620 | BS00599642 | GCC-P0367450 | GCC-P0367490 |
| BS00599676 | BS00599698 | GCC-P0367549 | GCC-P0367560 |
| CA027889 | CA028051 | GCC-P0367640 | GCC-P0367651 |
| CA028226 | CA028226 | GCC-P0367652 | GCC-P0367666 |
| CA028229 | CA028229 | GCC-P0367667 | GCC-P0367676 |
| CA028232 | CA028232 | GCC-P0367730 | GCC-P0367752 |
| CA028235 | CA028235 | GCC-P0367766 | GCC-P0367787 |
| CA028241 | CA028241 | GCC-P0367986 | GCC-P0368011 |
| GCC-P 0003239 | GCC-P 0003240 | GCC-P0368012 | GCC-P0368023 |
| GCC-P 0004291 | GCC-P 0004292 | GCC-P0368075 | GCC-P0368167 |
| GCC-P 0004293 | GCC-P 0004294 | GCC-P0368204 | GCC-P0368223 |
| GCC-P 0085412 | GCC-P 0085506 | GCC-P0368224 | GCC-P0368259 |
| GCC-P 0125101 | GCC-P 0125102 | GCC-P0368260 | GCC-P0368317 |
| GCC-P 0149343 | GCC-P 0149354 | GCC-P0368424 | GCC-P0368437 |
| GCC-P 0149856 | GCC-P 0149869 | GCC-P0378435 | GCC-P0378460 |
| GCC-P 0155053 | GCC-P 0155053 | GCC-P0386908 | GCC-P0386917 |
| GCC-P 0156398 | GCC-P 0156412 | GCC-P0389478 | GCC-P0389504 |
| GCC-P 0175190 | GCC-P 0175191 | GCC-P0389914 | GCC-P0389927 |
| GCC-P 0189926 | GCC-P 0189949 | GCC-P0389991 | GCC-P0390003 |
| GCC-P 0199332 | GCC-P 0199332 | GCC-SEC 0067675 | GCC-SEC 0067679 |

| Bates Begin | Bates End |
| --- | --- |
| GCC-NYAG 0052069 | GCC-NYAG 0052073 |
| GCC-NYAG 0175539 | GCC-NYAG 0175543 |
| GCC-NYAG 0264840 | GCC-NYAG 0264879 |
| GCC-NYAG 0264926 | GCC-NYAG 0264938 |
| SSKW00019094 | SSKW00019254 |
| SSMT01371455 | SSMT01371496 |
| SSMT02082806 | SSMT02082969 |
| SSMT02091181 | SSMT02091257 |
| SSMT02124151 | SSMT02124228 |
| SSMT02174772 | SSMT02175510 |
| SSMT02192450 | SSMT02192543 |
| SSMT02197860 | SSMT02198601 |
| SSMT02205125 | SSMT02205162 |
| SE_T564912 | SE_T565074 |

# Appendix III: Schedules

**Schedule 1**: **Defendant Funds' BLMIS Account Redemptions**

<div style="border:2px solid black; background:#b6dde8; padding:10px; text-align:center;">

### The Defendant Funds went as long as 5.6 years without redemptions

</div>



- The chart above shows the total redemptions per year from 1995 through 2008 for the Merkin BLMIS Accounts.

**Schedule 2**: **30-Day Average Volatility (1990 – 1999)**

> **The Merkin BLMIS Accounts were not always out of the market during volatile times**



- The chart above shows the 30-day average price for the S&P 100 Volatility Index (Ticker: VXO) from 1990 through 1999.
- VXO is a measure of market expectations of near-term volatility conveyed by S&P 100 stock index option prices.
- The black dotted sections of the line represent periods when the Merkin BLMIS Accounts were purportedly out of the market. The red solid sections of the line represent periods when the Merkin BLMIS Accounts were purportedly in the market.

Rebuttal Expert Report of Dr. Steve Pomerantz
Appendix III: Schedules

**Schedule 3**: **30-Day Average Volatility (2000 – 2008)**

The Merkin BLMIS Accounts were not always out of the market during
volatile times



- The chart above shows the 30-day average price for the S&P 100 Volatility Index (Ticker: VXO) from 2000 through 2008.
- VXO is a measure of market expectations of near-term volatility conveyed by S&P 100 stock index option prices.
- The black dotted sections of the line represent periods when the Merkin BLMIS Accounts were purportedly out of the market. The red solid sections of the line represent periods when the Merkin BLMIS Accounts were purportedly in the market.

# Exhibit 9

Page 1

1

2                  UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4        --------------------------------)
                                          )
5        In Re:                           ) SIPA LIQUDATION
                                          )
6        BERNARD L. MADOFF INVESTMENT     ) No. 08-01789 (BRL)
         SECURITIES LLC,                  ) (Substantively
7                                         )  Consolidated)
                          Debtor.         )
8                                         )
         --------------------------------)
9                                         )
         IRVING H. PICARD, Trustee of the )
10       Liquidation of Bernard L. Madoff )
         Investment Securities LLC,       )
11                                        )
                          Plaintiff,      )
12                                        )
                    vs.                   ) Adv. Pro. No.
13                                        ) 09-01182 (BRL)
         J. EZRA MERKIN, GABRIEL CAPITAL, )
14       L.P., ARIEL FUND LTD., ASCOT     )
         PARTNERS L.P., GABRIEL CAPITAL   )
15       CORPORATION,                     )
                                          )
16                        Defendants.     )
                                          )
17       --------------------------------)

18

19

20

          VIDEOTAPED DEPOSITION OF STEVE POMERANTZ, Ph.D.
21                    New York, New York
                       July 8, 2015

22

23

24       Reported by:  BONNIE PRUSZYNSKI, RMR, RPR, CLR
         JOB NO. 95461

25

Page 38

S. Pomerantz

far as the substance of the issues being
evaluated, I started this job in 1992, and I
was sitting in meetings with Cowen
Associates, Russell Investments, Wilshire
Associates. Their job was to evaluate Weiss,
Peck & Greer, and this is the framework that
they are engaging in as early as 1992.

Q    The -- have you ever described it
as a 4P or a 3P framework?

A    I am sure I have. The number of
P's is somewhat amorphous. The substance
remains the same. I think it just depends
how you want to communicate.

Q    The -- so, when you said you are
sitting next-door to people, and they were
your partners, how did that affect the due
diligence process?

A    Well, due diligence ultimately is
going to be defined by the information that
you have available to you; right? The
framework is -- is defined, but your ability
to implement is a function of the information
that you have at the time. And with
different people, you have different

Page 39

S. Pomerantz

information.

If I am acquiring somebody, if I am
negotiating with an outside hedge fund and I
am trying to acquire them, or I may be
talking to a hedge fund that has no track
record that doesn't exist, but somebody that
I want to ultimately seed and start up, or
somebody could be a partner of my -- Weiss
Peck & Greer is a partnership, so a lot of
the people who work there are partners, and
they have ongoing businesses that they have
been managing their funds for years.

So there is different levels of
information that I am getting from all of
these different people.

Q    Would you agree that due diligence
is a flexible process?

A    I guess I don't -- there are
aspects -- I don't know what you mean by the
process. I would like to think that the
process is objective and the process is well
defined by what Weingarten and I have said.
The actual implementation of it is going to
be constrained by the particulars of any

Page 40

S. Pomerantz

given situation.

So, in other words, somebody --
somebody may be in business for five years,
and they may have a track record, and I may
be able to analyze their historical track
record, but somebody else may just be out of
the box and be a totally new hedge fund, and
then they have no track record. So my
evaluation of their performance will mean
something different when I look at this
manager versus that manager, but the notion,
the concept of looking at performance is an
objective part of that process.

Q    When you performed due diligence on
one of your partners as compared to
performing due diligence on a fund that you
were considering acquiring, did you do
anything differently?

A    Well, again, if they are a partner,
if they are a part of Weiss, Peck & Greer, I
have access to all of their records. I know
their trading. I know what their
transactions are. I know what their trades
are. I can go talk directly to the head

Page 41

S. Pomerantz

trader at Weiss, Peck & Greer and get
information.

If I am trying to acquire someone
and they are using Goldman Sachs as a prime
broker, well, I can talk to Goldman Sachs,
but Goldman Sachs is clearly not going to
tell me the same things that the head trader
at Weiss, Peck & Greer is going to tell me.

So, again, there is differences
based on every situation.

Q    Why would the -- why would Goldman
Sachs not tell you the same things that the
head trader at Weiss, Peck & Greer would tell
you?

A    Because Goldman Sachs is a private
company, and there are limits to what they
need to communicate to the public.

(Discussion held off the record.)

BY MR. STEINER:

Q    The -- so, you said when you were
at Weiss, Peck & Greer, when you were
performing due diligence on your partners,
you had access to basically more information,
and a lot more information, than on a fund

Page 50

S. Pomerantz

1
2 retained the same portfolio management
3 responsibilities to those funds, as well
4 as -- well, through separate accounts, as
5 well as '40 Act funds and hedge funds.
6    Q    At New York Life?
7    A    Yes.
8    Q    When was that?
9    A    So all of this is in the '97 to
10 2003 time period.  That's when QED as an
11 entity goes from being an affiliate of Weiss,
12 Peck & Greer to an independent entity to an
13 affiliate of New York Life Investment
14 Management, in that time period.  And during
15 that time period, I'm involved in the
16 management of both '40 Act funds and hedge
17 funds, and then starting around 2003, I also
18 have portfolio management responsibilities
19 for another hedge fund independent of New
20 York Life.
21    Q    That you said starting in 2003?
22    A    Yes.
23    Q    And what is that?
24    A    It was a partnership called Lotus
25 Partners.

Page 51

S. Pomerantz

1
2    Q    How long did that last?
3    A    From '03 to '05.
4    Q    The -- by the way, is there a
5 reason that QED and Lotus don't appear on
6 your CV?
7    A    I -- I was a consultant for my
8 affiliation with them.
9    Q    You have produced CVs that include
10 references to your time with those entities;
11 right?
12    A    Yeah, but then I started to have a
13 lot of entities that I have done work for.  I
14 have done work for, if I want to name other
15 companies, Verizon, I have worked for.  I
16 have worked for an insurance company called
17 IFIC.  I have worked for other hedge funds
18 and other fund of funds.  But all of those
19 tasks have been inside my company, working as
20 a consultant.
21    Q    The -- what have you done for
22 Verizon?
23    A    I was involved in the management of
24 their defined benefit plan, primarily
25 designing hedge fund -- not hedge fund, I'm

Page 52

S. Pomerantz

1
2 sorry -- hedging strategies for their
3 corporate debt and corporate holdings in the
4 fund.
5    Q    Okay.  And what about, what did you
6 do for IFIC?
7    A    I -- actually, I managed the
8 defined benefit plan.  I -- I guess I
9 facilitate the management of the defined
10 contribution plan.  I am involved in the
11 oversight of the surplus and general account
12 of the insurance company.
13    Q    How large is the defined benefit
14 plan?
15    A    A few hundred million dollars.
16    Q    And how big is Verizon's defined
17 benefit plan?
18    A    Billions.  I don't know.
19    Q    And you manage the billion dollar
20 defined benefit plan?
21    A    No.  I manage the exposure that --
22 the hedge exposure of the -- basically of the
23 credit default swap portfolio.
24    Q    How big is that portfolio?
25    A    At the time it had been several

Page 53

S. Pomerantz

1
2 billion dollars.
3    Q    And you did that at -- while you --
4 as an outside consultant; is that right?
5    A    Yes.
6    Q    And you did it by yourself
7 without --
8    A    Actually, I started doing it while
9 I was at Weiss, Peck & Greer, and then when I
10 left Weiss, Peck & Greer, they retained me as
11 a consultant to perform that function, and I
12 did it with employees of Verizon.
13    Q    How many employees of Verizon
14 worked on that portfolio?
15    A    I don't know.  It was a large -- it
16 was -- their whole defined benefit department
17 was pretty large.
18    Q    So, what was your role compared to
19 the large number of in-house employees?
20    A    I mean, my responsibility was to
21 design the overlay, and to ultimately
22 negotiate with outside broker-dealers the
23 execution of that overlay.
24    Q    Which broker-dealers did you
25 negotiate with?

Page 54

1          S. Pomerantz
2     A     Goldman Sachs, JPMorgan, Morgan
3  Stanley, Bear Stearns.
4     Q     And at IFIC, what's your
5  responsibility?
6     A     I manage -- well, I manage -- I
7  oversee the management of the defined benefit
8  plan, as well as the general account and the
9  separate accounts, and most of that is being
10 managed by Goldman Sachs, and the defined
11 contribution plan is primarily executed
12 through mutual funds.
13    Q     On the -- you said the defined
14 benefit plan is mostly being managed by
15 Goldman Sachs?
16    A     Yes.
17    Q     So what is it that Goldman Sachs
18 does?
19    A     What do they do?  We have a
20 separate account that invests in fixed
21 income.  We have a separate account that
22 invests in equities, that invests in
23 international equities, and that invests in a
24 variety of alternative strategies.
25    Q     And Goldman has discretion over

Page 55

1          S. Pomerantz
2  that account essentially?
3     A     Discretion subject to investment
4  guidelines that the company has created.
5     Q     So, for example, Goldman will buy
6  U.S. equities or international equities for
7  the managed account using its discretion even
8  if there is some limitation on types of
9  stocks that the company doesn't want to be
10 invested in, for example?
11    A     I don't understand "even" -- I
12 mean, there is a set of guidelines that
13 govern what the equity portfolio needs to
14 look like, what the international equity
15 portfolio needs to look like.  We have
16 benchmarks.  We have tracking error targets.
17 We have all the typical types of constraints
18 on concentration, diversification, risk
19 management.  And then subject to those
20 conditions, Goldman has the flexibility to do
21 what they want.
22    Q     And there is an investment advisor
23 at Goldman who buys equities on a
24 discretionary basis subject to that set of
25 guidelines?

Page 56

1          S. Pomerantz
2     A     I would presume.
3     Q     Do you know?
4     A     There is many people that are
5  involved in the process.  I mean, I never
6  talked to the actual person who is doing the
7  buying and selling.  I mean, I am dealing
8  with the strategists.  I am dealing with a
9  variety of people at Goldman.  I probably
10 have about ten different people that I deal
11 with in terms of the creation and maintenance
12 and monitoring of all of this.
13    Q     But you don't talk to the person
14 who makes the trading -- not the trader, but
15 the person who makes the investment decision?
16    A     I talked to the -- like the people
17 who develop the strategy.  So in other words,
18 we actually do have like -- as an example, we
19 have a derivatives overlay inside this
20 portfolio.  There are specific structured
21 notes that are contained within this
22 portfolio.
23         And I know the person who is
24 developing those structured notes, and why
25 those structured notes are in the portfolio,

Page 57

1          S. Pomerantz
2  and her job is to design them and to develop
3  them, and I am performing due diligence on
4  her, in order to allow her to then have the
5  flexibility to implement those overlays.
6     Q     And somewhere Goldman has an
7  equities account that they manage on a
8  discretionary basis for IFIC; right?
9     A     That is pretty much an index
10 portfolio.  All of the -- all of the alpha,
11 so to speak, is coming via derivative
12 products and structured notes and things like
13 that, that are overlaid on top of basically
14 an index portfolio.
15    Q     So is there a discretionary equity
16 portfolio or not?
17    A     Well, the use of derivative
18 products is purely discretionary, and the
19 types of discretionary structures -- I'm
20 sorry, the types of derivative structures
21 that get created are discretionary.
22    Q     With respect to the equities, does
23 someone make a decision to buy at certain
24 times or sell at certain times?
25    A     The actual equities, as you

Page 58

S. Pomerantz

1  describe, are just -- are just an index.
2  Q    Large cap, small cap?
3  A    Everything. It's actually Russell
4  3000.
5  Q    And does that account hold all
6  3,000 names?
7  A    Yes. It's a commingled fund. It's
8  a commingled fund that has a lot more than
9  IFIC's assets.
10  Q    So, I thought you said earlier that
11  IFIC had a managed account for equities and a
12  managed account for international equities.
13  A    Yes.
14  Q    Right?
15  So, what's the difference between a
16  managed account and a commingled account?
17  A    Well, legally a commingled account
18  has more than one owner. A managed account
19  typically just has one owner.
20  Q    What is -- so, does IFIC have
21  specific rights to the securities in the
22  commingled account?
23  A    Legally, I think we own shares of
24  the commingled account.

Page 59

S. Pomerantz

1  Q    Of some Goldman fund?
2  A    Of a Goldman account. It's not a
3  '40 Act fund. It's an account. It's a
4  separately -- separate legal standing
5  account, and we own shares in that account.
6  Q    Just like an LLC or something?
7  A    It's like a hedge fund.
8  Q    And someone at Goldman manages that
9  fund?
10  A    It's an index fund, but presumably
11  somebody is managing it.
12  Q    And you don't know who that person
13  is?
14  A    It's probably a computer.
15  Q    Do you know what broker-dealer that
16  fund uses?
17  A    They probably use themselves.
18  Q    Goldman Sachs?
19  A    Yes.
20  Q    And that's not a problem for you?
21  A    That's not a problem.
22  Q    Why not?
23  A    I mean, Goldman Sachs is a large
24  entity. There is -- the broker-dealer and

Page 60

S. Pomerantz

1  the asset management arm are two distinct
2  entities. They report to different people.
3  They probably share a CEO and nothing but a
4  CEO.
5  Goldman has divisions of
6  responsibilities, and they have people who
7  are there to insure the division of
8  responsibility. I don't -- I don't see a
9  problem with that.
10  Q    And have you ever asked to see the
11  trade confirmations or monthly statements
12  from that account?
13  A    I get monthly statements. But
14  again, I get -- I get monthly statements
15  regarding -- actually, the total plan as well
16  as the individual pieces.
17  Q    And does the monthly statement show
18  the individual securities that are owned in
19  that account, or it shows the value of --
20  A    It would show me shares of --
21  shares of Goldman Sachs' total stock alpha
22  fund, and then the number of shares that I
23  own, and the NAV of those shares.
24  Q    It doesn't show you the underlying

Page 61

S. Pomerantz

1  holdings?
2  A    No.
3  Q    That is not a problem for you?
4  A    It's a Russell 3000 index fund.
5  Q    And so, it's okay with you to not
6  have the breakdown of individual holdings?
7  A    I don't need to see a list of 3,000
8  holdings. If I want to look at the annual
9  report, I could do that.
10  Q    Have you ever done that?
11  A    Maybe years ago.
12  Q    How do you know that that account
13  in fact owns all 3,000 stocks that you think
14  it owns?
15  A    I think there is -- how do I know
16  it owns 3,000? They have represented to me
17  that it owns 3,000. It performs like it owns
18  3,000. The returns match the returns of the
19  index.
20  I have no reason to believe that it
21  doesn't own 3,000. It behaves exactly the
22  way I expect it to behave.
23  Q    And that's good enough for you?
24  A    Not -- that fact alone is not good

16

Page 62

S. Pomerantz

1  enough.  I mean, there is -- there is a brand
2  that is involved.  I go to their offices
3  periodically.  I meet with a lot of people --
4  as I said, I have about ten contacts in the
5  company -- on a variety of issues involving
6  IFIC.  So I meet with, sometimes meet with
7  all of them, or sometimes meet with one or
8  two or three.
9       I feel very comfortable.  I have no
10  reason to believe that something is happening
11  that is not as being represented.
12       Q   I think you used the term "trust
13  but verify" --
14       A   Yes.
15       Q   -- in your report; right?
16       A   Yes.
17       Q   So in terms -- I understand the
18  "trust," and I understand people trust
19  Goldman Sachs.  In terms of the "verify,"
20  what do you do to verify those
21  representations, other than go to their
22  offices and meet with people?
23       A   I mean, this relationship has been
24  going on for about seven years.  I do get

Page 63

S. Pomerantz

1  statements.  I know how the funds are
2  performing.  They are performing in line with
3  what I expect.
4       I talk to people there who all seem
5  pretty competent to me at being able to do
6  the job that they are there to do.  I don't
7  have -- I don't have any reason to think
8  otherwise.
9       I get a statement from Chase
10  Manhattan every month that tells me how much
11  money is in my checking account.  I don't go
12  to Chase Manhattan and see the actual dollar
13  bills.  They probably don't even exist;
14  right?  Shares of stock don't really exist.
15       So I do what I can do and I do what
16  I think I need to do.
17       Q   By the way, you have a Chase
18  Manhattan account.  Do you have a brokerage
19  account anywhere?
20       A   I have a brokerage account at
21  Vanguard.
22       Q   So that's a -- it owns mutual
23  funds?
24       A   It owns mutual funds and stocks.

Page 64

S. Pomerantz

1       Q   Do you get monthly statements that
2  show the equity holdings?
3       A   There is monthly statements.  I can
4  go online any day and look at the holdings
5  that are in the portfolio.
6       Q   Do you make the buy and sell
7  decisions, or is there someone that does
8  that?
9       A   I make the decisions.
10       Q   Just on the -- sticking with
11  Goldman for a minute, what quantitative
12  analysis have you done with respect to this,
13  whatever you called it, Goldman alpha stock
14  fund?
15       A   Well, we have -- we have tracking
16  error targets for all of these different
17  products, as well as for the portfolio as a
18  whole.  I -- I do measure the tracking error
19  on that, on that fund, and confirm that it is
20  close to what it is we are trying to achieve.
21       Q   Do you do anything else?
22       A   I also look at the performance.
23  I -- I do what I -- what I call performance
24  attribution, to try to identify where the

Page 65

S. Pomerantz

1  sources of the returns are coming from.
2       Q   So with respect to this Goldman
3  Sachs alpha fund, what performance
4  attribution -- can you describe the
5  performance attribution you have done?
6       A   Typically, what I do is what's
7  called factor analysis or factor
8  decomposition, where I look at the returns of
9  the fund, and I look at a regression of those
10  returns, against a variety of factors, and
11  then you basically ask yourself how much of
12  the returns is coming about because of those
13  factors and what is the residual.
14       Q   Right.  So --
15       A   What's the unexplained piece, and
16  the variance of that unexplained piece is the
17  tracking error, and then the -- the
18  cumulative amount of that residual piece is
19  basically the return.
20       Q   So, I don't want to know what you
21  typically would do.  I want to know what you
22  have done with respect to IFIC.
23       A   That's exactly what I do for IFIC.
24       Q   And what do you then do with that

Page 86

S. Pomerantz

applied to every single investment, because
it couldn't be applied to every single
investment.  Certain strategies lend
themselves to certain types of analyses, and
other strategies don't.  And even strategies
that will lend themselves to a certain type
of investment might not be -- you might not
have the ability to implement them if you
don't have the data.
    So, this is a report of the due
diligence that could have been performed at
that time based upon the data available at
that time regarding a strategy like this.
    Q    Maybe I just misunderstood
something, because that was a lengthy report,
and it was probably late when I was reading
it.  But the -- I understood you to be
opining that these analytics were industry
standards that had to be applied during this
time period to due diligence of a hedge fund
or an investment advisor.
    MR. SHEEHAN:  Object to the form.
    Q    Did I miss something?
    A    That is not what I just answered

Page 87

S. Pomerantz

you.
    Q    Okay.  I'm talking about what I
understood your report to say, not what your
testimony was, so --
    A    No.  My report discusses the due
diligence that could have been performed at
this time regarding an investment like BLMIS
for someone who had access to the data that
Mr. Merkin had access to.  Had Mr. Merkin
chosen to engage in due diligence, according
to my objective framework, according to the
industry's objective framework, this is what
he could have discovered.
    Q    These are tests that he could have
run?
    A    I would like to call them tools,
just because that's what I am used to.  But
yes, that's my -- I mean, there is a basket
of tools that are available to someone like
Mr. Merkin at this time.  And these are --
these tools could be applied to that
investment.
    There are other tools that could be
applied to other investments, but these are

Page 88

S. Pomerantz

all tools that have direct application to a
BLMIS-type investment.
    Q    So, now let me make sure I
understand.  If I understand correctly, what
you are saying is that the industry standard
was the framework, the five P's; is that
right?
    A    Yes.
    Q    In your opinion?
    A    Yes.
    Q    And then there are lots of
different ways to go about implementing,
developing the information you need in the
five different P's; is that right?
    A    I mean the five P's are the
objective standard, and then it is incumbent
on a fiduciary to accomplish the due
diligence into each of those P's to the
extent that data and tools are available, and
circumstances warrant.
    Q    What do you mean by "circumstances
warrant"?
    A    Well, let's take BLMIS as an
example.  Perhaps what is being offered up as

Page 89

S. Pomerantz

an explanation for the performance is this
notion of market timing.  One can perform
objective assessment on that notion.  Is that
what is going on in the portfolio?  Is the
portfolio trying to engage in market timing?
And if it is, is it being successful or not
at doing that?
    That is something that would apply
here.  That will not apply to every hedge
fund.  I just mentioned the WPG Software Fund
as an example.  Market timing would not be an
issue.  That portfolio was always 100 percent
invested.  If it ever held cash, it's because
the portfolio manager did not have any
opportunities to invest in, but not because
he was trying to be defensive with respect to
how the market might perform.
    Q    And you said something about the
data that was available.  Could you elaborate
on that for me?
    A    Sure.  As an example of data that
was available to Mr. Merkin, I would cite
transaction records, actual confirmations of
trades and the transcription of those

Page 94

S. Pomerantz

1
2    Q    I take it it's your opinion that
3    that does not require in every circumstance
4    performing various quantitative analyses that
5    you have done in your report.
6    A    The only reason you wouldn't was if
7    you couldn't, it was physically impossible,
8    or if the analyses that I offer here are not
9    useful or applicable to a particular
10   strategy, or you have been able to confirm
11   information through some other method or
12   mechanism that I don't know about it.
13       I don't know how you can confirm
14   certain things without actually going through
15   these analyses.  Perhaps there are other
16   analyses that people will go through.  I'm
17   not aware of them.  I have never seen them.
18   These are all the standard types of analyses
19   that people go through to confirm certain
20   things.
21   Q    Going back to the software fund,
22   the WPG Software Fund, as an example, you had
23   transaction-level data available to you;
24   right?
25   A    I did.

Page 95

S. Pomerantz

1
2    Q    When you were doing due diligence
3    on that fund?
4    A    Yes.
5    Q    And so, you could have gone back
6    and looked at trade confirmations; right?
7    A    I would have no need to do that.
8    There was nothing about that particular
9    strategy that was contingent upon the
10   execution ability.
11   Q    So, you could have done it.  You
12   just concluded that you didn't need to.
13   A    Actually, you know, I take that
14   back.  That actually implicitly was done
15   within the analysis.  Within the performance
16   attribution framework, it would have
17   identified certainly types of -- it would
18   have identified some of the types of things
19   that are identified in this report.
20       Even though transaction-level
21   detail really is not relevant for that
22   particular strategy, the performance
23   attribution that was performed would
24   actually -- did actually identify certain
25   analyses that were transaction level, but

Page 96

S. Pomerantz

1
2    they were never significant.
3    Q    Did you go and look at individual
4    trade confirmations in your due diligence of
5    the software fund?
6    A    No, I didn't look at confirmations,
7    but I will give you as an example, I was
8    aware of where the fund traded relative to
9    VWAP.  I was aware of that.  And it just
10   didn't move me one way or another as being
11   significant.  It didn't raise a red flag.  It
12   didn't seem significant to me at all as far
13   as my understanding of that particular hedge
14   fund strategy, although implicitly, it's
15   actually being calculated, but that's just
16   because the software is doing it.
17   Q    Have you ever looked at trade
18   confirmations as part of your due diligence?
19   A    Actually, in a variety of the tax
20   shelter cases that I dealt with, the
21   confirmations were actually -- were actually
22   specifically looked at, and a variety of my
23   opinions actually centered around things that
24   were on the confirmations or that were not on
25   the confirmations that should have been.

Page 97

S. Pomerantz

1
2    Q    Those were confirmations of equity
3    trades?
4    A    Yeah.  They actually were
5    confirmations of equity trades, and there was
6    actually information on the trades that
7    should have been there and wasn't there, and
8    that was -- that was actually a part of my
9    opinion.  It was a small piece, but it was
10   actually a part of the opinion.
11   Q    Okay.  What information should have
12   been there in the tax shelter cases that
13   wasn't?
14   A    In those particular cases -- in
15   those particular cases, the stock was being
16   purchased on a forward basis, and there would
17   have been an implied interest rate, and on
18   the confirmation, there was actually a box
19   that said interest, in anticipation of a
20   forward settlement, and there was a zero in
21   that box, when there actually should have
22   been a real value.  The confirmation actually
23   did not represent the actual amount of money
24   that was supposed to move pursuant to that
25   stock transaction.

25

S. Pomerantz

I mean, there were a host of other
red flags and issues, but actually in that
particular matter, there was an issue with
the confirmations, and I did identify it as
part of my due diligence of the transaction.

Q    Well, you didn't do due diligence
of the transaction in the tax shelter cases;
right?

A    Yes, I did.

Q    You did due diligence in connection
with someone entering the transaction?

A    I did due diligence -- I actually
discussed the due diligence -- there were a
variety of partners involved in these
transactions, but there is a small piece of
the transaction where an investment advisor
is actually facilitating the execution of a
particular strategy, and my opinions had to
do with the due diligence that was being
performed by the investment advisor regarding
the totality of that transaction.

Q    So, in those cases, who -- what
brokerage firm issued the confirmations?

A    They were mainly coming from banks

S. Pomerantz

like UBS or Deutsche Bank, were the two large
banks that were involved.

Q    And those large banks issued faulty
confirmations?

A    I don't want to say faulty.  I'm
not here to assign value judgments or blames.
Part of my opinion was -- had to do with
information that was on the confirmation,
that should have been on the confirmation,
could have been on the confirmation.  I put
that information into my reports.  In some
cases, cases settled.  In some cases, the
courts opined as a result of litigation, and
it was what it was.

Q    What were the court opinions?

A    You could read Bemont versus United
States of America.  You could read New
Phoenix versus Commissioner of the IRS.
There is one other case that is in bankruptcy
court, and the plaintiff is listed on my CV.

Q    So back to my question, which was:
In connection with your due diligence of any
investment advisor or hedge fund, have you
ever reviewed trade confirmations?

S. Pomerantz

A    Well, I just gave you examples in a
litigation context.

Q    Right.  So, my question is:  In
your due diligence of -- in your performing
due diligence on an investment advisor or
hedge fund manager, have you ever reviewed
trade confirmations?

A    No.  I reviewed transaction-level
data, and I would input transaction-level
data into systems to perform certain
analyses.  But I -- I never had a need to
look at the confirmations.

Q    So, you never asked to look at
confirmations in any of the due diligence
that you have done over the last 20 years?

A    I was never -- I never had a need
to do that.

Q    And in your -- in due diligence --
by the way, when you referred to your work as
an expert in the tax shelter cases as due
diligence, that was always a review after the
fact after a challenge by the IRS; correct?

A    Yes.

Q    Okay.  So in your work performing

S. Pomerantz

due diligence on investment advisors or hedge
funds, have you -- have you had occasion
to -- strike that.

In your work performing due
diligence on hedge fund managers or on
investment advisors, have you ever compared
on a transaction-by-transaction basis
transaction price versus the daily high-low
range?  Has that been something you have done
in your due diligence work?

A    I have looked at transaction prices
against VWAP, but I have not looked at
transactions versus highs and lows.  But I
have looked against VWAP as part of my due
diligence.

Q    Why haven't you looked at
transactions versus highs and lows as part of
your due diligence?

A    I never had a reason to.

Q    And I take it you don't believe
that the due diligence that you have
performed has been faulty for not having
looked at that; correct?

A    It depends on the circumstances.

Page 170

S. Pomerantz

1
2      A    I mean, there is a legal
3  distinction of what they own; right.
4  Obviously, there is a legal difference
5  between what it is they own.  They either own
6  shares of a corporation or they own assets.
7      But you asked me is there an
8  advantage to owning the assets over the
9  shares of a corporation.  You know, I think
10  there is probably $100 trillion that says the
11  answer is no.  I mean, when you look at money
12  that is in the mutual fund industry and in
13  commingled trusts and unitized funds, I
14  don't -- I don't see what the advantage is to
15  actually owning assets over shares.
16      Q    So, in your opinion, you can't
17  think of any advantage to owning assets in a
18  separate account versus shares in a
19  commingled fund?
20      A    Well, first of all, these are
21  the -- these are the normal reasons.  Okay.
22  You and I both want to own a stock portfolio,
23  but you don't want to own tobacco-related
24  stocks and I do.  So, we can't be in the same
25  commingled fund, because we have different

Page 171

S. Pomerantz

1
2  guidelines on what we are doing.  But if we
3  are managed pari passu, that doesn't apply.
4      There also might be specific tax
5  reasons.  You might want to be able to
6  harvest tax losses differently than I do.  So
7  in a taxable account, that might -- there
8  might be some interest in having control
9  over -- over your money rather than being in
10  a commingled trust.
11      There might be some reason, if you
12  are in a taxable situation, but that's -- I
13  think that is a pretty rare situation.
14      Q    In terms of the legal ownership
15  structure, you can't think of an advantage,
16  why it might be better for someone to have
17  ownership of specific assets than ownership
18  of an interest in a pooled vehicle?
19      A    You are asking me if there is --
20  what the advantage is to owning the shares
21  outright than owning shares, what the
22  advantage is, and I -- especially if the
23  accounts are being managed pari passu, I
24  can't think of an advantage to owning the
25  shares outright.

Page 172

S. Pomerantz

1
2      Q    The -- in paragraph 46, you say,
3  "The responsibility of a broker-dealer is
4  limited to the execution of a transaction."
5      Do you see that?
6      A    Yes.
7      Q    Okay.  Do broker-dealers have any
8  other responsibilities in the investment
9  industry?
10      A    Well, in theory, they are supposed
11  to know their customer.  There is the "know
12  the customer" rule.  There are markup rules.
13  I mean, there is probably a whole host of
14  legal responsibilities, and I am not the
15  person to answer those questions for you.
16      I can tell you within the context
17  of investment management in general, the role
18  of the broker is execution-specific,
19  execution-centric, and the role of an advisor
20  or a manager is to be portfolio-centric, and
21  understand how different transactions are
22  going to interact with each other.
23      Q    What about custody?  Is a
24  broker-dealer responsible for custody?
25      A    The -- I mean, typically these

Page 173

S. Pomerantz

1
2  funds would have somebody to be the custodian
3  over the shares and to track dividends, to
4  track splits, to track a variety of corporate
5  actions.
6      Q    Is that typically a broker-dealer?
7      A    Yes.
8      Q    And that would be a responsibility
9  of a broker-dealer beyond execution of the
10  transaction?
11      A    Yes.
12      Q    And that would be an
13  investment-related responsibility?
14      A    I think of it as an administrative
15  responsibility.
16      Q    The -- going back to the Goldman
17  Sachs example, and certainly to your dealings
18  with Goldman Sachs, there would be no issue
19  in your mind if Goldman Sachs executed a
20  transaction as a broker and then maintained
21  custody for the client; correct?
22      A    That's correct.
23      Q    Now, are you familiar with the
24  registration requirements for broker-dealers?
25      A    Not really.

44

Page 226

S. Pomerantz

1
2     A     No.  I don't know why so many
3  trades are being done that require
4  cancellation.  That in and of itself is a
5  problem.
6     Q     So, in your view, a trade that is
7  canceled -- well, are there -- do you have an
8  understanding as to why trades are canceled
9  and corrected?
10    A     Somebody might type in a wrong
11  number somewhere.  Someone will type in a
12  wrong number somewhere, and a reconciliation
13  will fail, and two parties will have a
14  conversation, and realize what the mistake
15  was.  And it can happen.  It can happen once,
16  it can happen twice, it can happen three
17  times.  If it happens 20 times, 50 times,
18  100 times, that is very suspicious.
19    Q     So, in your view, it's appropriate
20  to count 129 trades that were marked on
21  tickets as canceled and corrected as trades
22  that occurred and were out of the day's high
23  and low?
24    A     Yes.
25    Q     And who made the determination that

Page 227

S. Pomerantz

1
2  the trade -- you are aware that for all of
3  the trades before September of 2006, you
4  adjusted the -- the transaction price by
5  four cents, reducing it for buys and
6  increasing it for sells; right?
7     A     Yes.
8     Q     And who made that determination?
9     A     I did.
10    Q     And what was your basis for making
11  that determination?
12    A     Because I assume that that's what
13  the -- the markup would have been, and that
14  the price that I am seeing might be
15  artificially different from where the actual
16  transaction was being done.  So, it's
17  possible that a trade actually could be in
18  the range but would show up as out of the
19  range because of that markup, and I don't
20  want to -- I don't want to consider that a
21  red flag.
22    Q     Could you explain that?
23    A     Yeah.  I'm interested if stocks are
24  trading outside of the range of a day, but if
25  the confirm says that I bought a stock at

Page 228

S. Pomerantz

1
2  $100.04, if that includes a four-cent markup,
3  it means that I really bought the stock when
4  it was trading at 100.  So, if the high of
5  the day was $100.02 cents, then $100.04 will
6  show up as out of range, when -- when $100 is
7  where the actual high was.
8     Q     Well, you understand that a
9  principal trade, the price that you pay to
10  the broker is the price of the transaction,
11  and the broker makes his or her money on the
12  spread; right?
13    A     Yes.
14    Q     Okay.  And in that circumstance, do
15  you know what price the broker reports to the
16  exchange, to the extent those -- yeah, to the
17  extent that broker reports and that gets
18  included in the high and low?
19    A     Well, the four cents is what I
20  understood the commission to be on the stock
21  transaction.
22    Q     Well, you understood that there
23  were principal trades; right?
24    A     Yes.
25    Q     And so, you understood that the

Page 229

S. Pomerantz

1
2  broker on the principal trade made his or her
3  profit by the spread and not by a commission;
4  right?
5     A     Well, he would make his profit by
6  marking it up.  So, if -- if the stock is
7  worth $100, I'm going to sell it to you for
8  $100.04.  I'm going to charge you $100.04,
9  even though -- so the confirm will say
10  $100.04, even though the stock was really
11  only at 100.
12    Q     And in that circumstance, do you
13  know whether the broker in the principal
14  trade has an obligation to report or doesn't
15  have an obligation to report to the exchange?
16    A     I don't know what they report.
17    Q     And so, you don't know what the
18  price that they report is, whether they would
19  report $100 or $100.04?
20    A     I don't know what they report, but
21  in that situation that you are describing, if
22  the high of the day as reported on the
23  exchange, from what I see, is $100.02, I
24  don't want to say $100.04 is out of the range
25  because I know that the transaction was

Page 230

S. Pomerantz

1
2  really done at 100.  So, in that scenario,
3  Madoff is actually in the range, but the
4  $100.04 will appear to be out of the range,
5  but it's not.
6      Q   So let's assume that the reported
7  range is -- that it's a buy on a principal
8  trade, and the price, inclusive of the dealer
9  markup, is $30.04, okay, and it's a buy by
10  Ascot.  Have you got that?
11     A   Yes.
12     Q   Okay.  And the reported range of
13  the day is $30.02 to $30.52.
14     A   Yes.
15     Q   In your opinion, is that trade
16  within the range or outside of the range?
17     A   If Bernie has marked up the trade
18  to $30.04, I'm going to consider that -- I'm
19  going to consider that as a trade that
20  actually took place at $30.
21     Q   And even though the price that
22  Madoff charged to Ascot was $30.04?
23     A   That's correct.
24     Q   And even though you don't know what
25  price that would be reported to the exchange

Page 231

S. Pomerantz

1
2  at?
3      A   That's correct.
4      Q   So, what's your basis for doing
5  that, given that you don't know whether
6  the -- and to the extent the trade is
7  reported by the -- by the broker acting as
8  principal to the exchange, that would be
9  included in setting the daily high and low;
10  right?
11     A   I'm going to look at the high and
12  low that the exchange tells me trades took
13  place at.
14     Q   Right.  And that -- and the
15  exchange's high and low, to the extent a
16  broker acting as a principal reports
17  information to the exchange, the exchange's
18  high and low would include the information
19  reported by the broker; right?
20     A   It would, but Bernie is really
21  getting a four-cent commission on that
22  particular trade that you are talking about.
23     Q   You agreed with me a few moments
24  ago that brokers don't get commissions on
25  principal trades, they earn a markup; right?

Page 232

S. Pomerantz

1
2      A   That's correct.  But when you look
3  at the high and the lows, those are numbers
4  that somebody else is also receiving a
5  commission on.  So I am taking Madoff's
6  commissions off the table.
7      Q   Well, the trade is between Madoff
8  and the customer; right?
9      A   Yes.
10     Q   And you don't know whether that
11  trade would be reported by BLMIS as a $30
12  trade or a $30.04 trade; right?
13     A   I don't know what Madoff is
14  reporting.
15     Q   And you don't know whether it's
16  actually required to be reported at all?
17     A   I don't know what Madoff is
18  reporting.
19     Q   And nevertheless, you -- and if
20  the --
21     A   I am trying to give Madoff the
22  benefit of the doubt by adjusting the price
23  on the confirm to be in line with what's
24  there, so I'm trying to give him four cents
25  grace on the price of the trade.

Page 233

S. Pomerantz

1
2      Q   If principal -- right.  If a
3  principal transaction earns the markup,
4  right, if that gets reported to the exchange
5  at $30.04, that would be in the range; right?
6      A   I don't know what Madoff's
7  reporting to the exchange.  I just know what
8  the exchange tells me the high and the low
9  is.  And then I try to be conservative in
10  estimating what Bernie is reporting on his
11  confirmation.
12     Q   As between -- on a principal trade,
13  there is no commission; right?
14     A   That's correct.
15     Q   Okay.  So, the price that Ascot
16  would pay in that situation would be $30.04;
17  right?
18     A   Yes.
19     Q   They wouldn't pay a commission on
20  top of it, but they would pay $30.04?
21     A   Yes.
22     Q   If they then -- and if someone had
23  done the analysis that you suggest of
24  comparing that price of 30 -- that they paid
25  of $30.04 to the range of $30.02 to $30.52,

Page 234

```
1            S. Pomerantz
2  that would be -- the $30.04 would be within
3  the range; correct?
4       A    Yes.
5       Q    And yet in your opinion, you have
6  considered that to be outside of the range by
7  deducting four cents; right?
8       A    Yes.
9       Q    And do you know how many of your
10 out-of-range trades fall into that category?
11      A    No.
12      Q    Would you be surprised if more than
13 half of the trades that you have identified
14 as being out of range fell into that
15 category?
16      A    No.  I would have to look and see,
17 but I don't know.
18      Q    And do you agree with me that for
19 purposes of determining -- strike that.
20           And by the way, this four-cent
21 adjustment that you made, that also affects
22 your VWAP analysis; right?
23      A    It -- it does.  My concerns about
24 VWAP, as I point out, go far beyond a
25 four-cent issue.  My analysis shows Madoff
```

Page 235

```
1            S. Pomerantz
2  doing 35 cents better than VWAP.  So, I don't
3  really even think about a four-cent
4  adjustment when he is 35 cents away.
5       Q    It would nevertheless change the
6  analysis; right?
7       A    You can choose to do it.  If you
8  choose to do the analysis that way, you can,
9  and it will change the number.  It won't
10 change -- it will not materially change the
11 35 number.
12      Q    Well, it will change it by four
13 cents each way; right?
14      A    Call it 30.  So, say the 35 is 30.
15 That is no material difference to me.
16      Q    And it would likewise change your
17 performance attribution analysis; correct?
18           MR. SHEEHAN:  Object to the form of
19      that question.
20      A    I don't know -- if you do it that
21 way, and you look at the performance
22 attribution that I have, you might -- I can't
23 even measure how much of a difference it will
24 be.  It could be a percent, I don't know.
25           It wouldn't -- I don't expect it to
```

Page 236

```
1            S. Pomerantz
2  be a significant number, because many of the
3  numbers that are there are calculated
4  independent of VWAP.  It would -- it might
5  change the residual, but --
6       Q    Well, isn't the first thing that
7  you did calculate the amount that was the
8  difference between the trade and VWAP, and
9  you -- and you put that into the first
10 category of execution?
11      A    Well, there are several things that
12 I am calculating in there; right?  I'm
13 calculating VWAP.  I'm also calculating
14 market timing.  I'm looking at the dividends
15 that are being paid.  I'm looking at the
16 pricing of options.  And then there is a
17 residual.
18           I don't think those numbers are
19 going to change very much if you want to
20 employ your approach.
21      Q    Did you -- in performing your
22 report or having someone else perform your
23 report, is that something that you checked,
24 how those numbers -- did you calculate what
25 those numbers would be --
```

Page 237

```
1            S. Pomerantz
2       A    No, I wouldn't calculate them.  I
3  understand your point, and I know that it has
4  minor impact.  It's not going to -- it's not
5  going to impact the options transactions.
6  It's not going to impact the market timing.
7  It's not going to impact the dividends.
8       Q    It's going to impact the execution;
9  right?
10      A    You might move a small piece of the
11 VWAP number into the residual or vice-versa.
12 But, you know, as I said, if your difference
13 from VWAP is 35 cents or 30 cents or four
14 cents, that is not a material difference to
15 me.
16      Q    If you -- do you know how many
17 total shares were traded in the time period
18 covered by your attribution analysis?
19      A    I don't recall.
20      Q    Do you think it was something in
21 excess of -- something in excess of
22 2 billion?
23      A    Two billion shares?  By Merkin?  I
24 don't know.  I would have to either look or
25 figure it out.  I don't know.
```

Page 238

S. Pomerantz

Q    That doesn't sound plausible to you?

A    I don't know.

Q    Well, do you have your backup in front of you?

A    If it's in the report, then I will have that number.

Q    Let me just ask.  Assume that there were 2 billion shares that traded and that had this four-cent adjustment.  How much of an impact would that have dollar-wise?

A    Two billion shares times four cents.  I don't know.  Calculate the number, 2 billion shares by four cents divided by --

Q    You are the math Ph.D., and you are looking at a room full of lawyers, so...

Eighty million?

A    But it is also only during this period where you have an issue on the four cents, which --

Q    Which is the period prior to 2006; right?

A    Yes.

Q    And by the way, weren't virtually

Page 239

S. Pomerantz

all of the out-of-range trades that you identified in that period before 2006?

A    I don't recall.

Q    The timing of them is not something you looked at?

A    You know, these are questions that have answers, and so I would just calculate them if you want.  I can't -- I can't know the answer to these questions without just doing the analysis.

Q    Would you agree with me that two billion times four cents is 80 million?

A    I think you are right.

Q    And a $80 million difference in the execution bucket of your performance attribution to you would not be a material change?

A    I -- I don't know -- I don't know the answer to your question.  I can calculate it.  I can tell you that my analysis, the number I know is that -- is that Madoff's transactions are 35 basis points away from VWAP.  If you want to move that number from 35 to 30, and I have to just give you a

Page 240

S. Pomerantz

number, then 35 to 30, under the best-case scenario under your approach, that is -- 30 over 35 is a 14 percent difference; right?

So, if I say the number is 50 percent, then it's only 86 percent of 50 percent.  But as far as the materiality of what you are suggesting, it's -- it's basically 15 percent of the total.

Q    And if you reduced the execution portion by that amount, how would that affect the other buckets?  Would it all go into unexplained, or where would it go?

A    Every bucket is calculated independently, so if you identify a change to the execution, to VWAP, it would go to the residual, yes.

Q    It wouldn't have any impact on any of the other numbers?

A    No.

Q    And if you -- if you assume that one of Madoff's advantages was represented to be execution capabilities, in your opinion, what percentage could that account for in doing a performance attribution?

Page 241

S. Pomerantz

A    It's kind of a loaded question.  I would probably have to say zero percent.  I mean, when you talk about VWAP, and this component, that is basically similar to looking at the performance of a mutual fund compared to its benchmark.  And so, your question is really equivalent to, you know, if a money manager said that they had some actively managed strategy and they were going to perform really well, how much of their performance do you think would be attributed to whatever it is you want to describe, and the data really shows that there is no advantage.

So, I don't -- I just don't know how to answer your question.  I don't know that Madoff claimed to have an advantage.  He talks about time slicing on the broker side.  And indeed, if he is time slicing, I would expect him to hit VWAP right on the nail.  That's what I would expect, if that's what he is really doing.  He says he's doing time slicing.  If that's what he is doing, then he should hit VWAP right on the nail, because

# Exhibit 10

**Picard v Merkin**                    **Weingarten 7/15/2015**

**CONFIDENTIAL**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------x
```
In Re:

BERNARD L. MADOFF INVESTMENT        Adv.Pro.No.
SECURITIES LLC,                     08-01789(BRL)

            Debtor.
```
-------------------------------x
```
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,

            Plaintiff,            Adv.Pro.No.
                                  09-1182(BRL)
            v.

J. EZRA MERKIN, GABRIEL CAPITAL,
L.P., ARIEL FUND LTD., ASCOT
PARTNERS, L.P., GABRIEL CAPITAL
CORPORATION,

            Defendants.
```
-------------------------------x
```
                *   *   *

                CONFIDENTIAL

            VIDEOTAPED DEPOSITION

            OF JEFFREY M. WEINGARTEN

                *   *   *

            TRANSCRIPT of testimony as reported
by NANCY C. BENDISH, Certified Court Reporter,
RMR, CRR and Notary Public of the State of
New York, at the offices of Baker Hostetler,
45 Rockefeller Plaza, New York, New York, on
Wednesday, July 15, 2015, commencing at 10:10 a.m.

**BENDISH REPORTING**
**877.404.2193**

Picard v Merkin                              Weingarten 7/15/2015

CONFIDENTIAL

Page 114

1  come to the understanding that Mr. Merkin had a
2  clear understanding of the investment philosophy
3  of Mr. Madoff and his investment advisory
4  options?
5      A.    I didn't hear the last part of
6  that.
7      Q.    I'm just reading the sentence that
8  you have there, the sentence that, "It is very
9  clear that Mr. Merkin had a clear understanding
10  of the investment philosophy of Mr. Madoff and
11  his investment advisory operations."
12          What is the basis of that
13  statement?
14      A.    Okay. So, investment philosophy,
15  certainly the way I would go about doing due
16  diligence, and indeed the way due diligence has
17  been done to me, one of the first questions that
18  people would ask me is philosophically how do
19  you believe that you can make money in the stock
20  market, or indeed how do you think you can make
21  money in asset management. What is your overall
22  philosophy about generating returns in investing
23  assets.
24          That's generally, in various
25  guises, the way the conversation begins with

Page 115

1  anybody who's doing due diligence. It's sort of
2  the highest level of what due diligence is:
3  What is your approach. And I would generally
4  ask the question, and indeed most of the people
5  who asked me would ask the question in the
6  broadest possible way and get a response that
7  would indicate, philosophically, how they
8  thought they could make money.
9          So there were people who thought
10  they could make money by, for example, trying to
11  find the next Apple computer or the next cell
12  gene or whatever it happened to be that they
13  would go to the extreme end of what I would call
14  the risk spectrum and try to uncover the next
15  big thing.
16          And then there were other people
17  who investment philosophy would be, well, I
18  don't think it's possible to beat the market on
19  any sustained basis, so I am going to adhere to
20  some sort of index or index-like adherence.
21          Some people who think that they
22  can beat the markets or invest money on a
23  statistical basis. So we talked about before,
24  quantitative approaches. There are some people
25  who think they can do it on an active basis.

Page 116

1      So, within those kind of broad
2  perimeters you would try then to narrow down,
3  okay, specifically where are you going to be on
4  the risk spectrum, how are you going to go about
5  doing it, what's your particular approach. And
6  I think that was something that Ezra Merkin had
7  a very clear understanding of in terms of what
8  Madoff was attempting to do, where he stood on
9  the risk spectrum, how he intended to generate
10  returns, and I think that part of it was, in
11  terms of the philosophy of how he was going to
12  do it, was very clear.
13      Q.    How do you know that Ezra
14  Merkin -- well, let me backtrack.
15          What's your understanding of
16  Mr. Madoff's philosophy and his investment
17  advisory operations?
18          MR. STEINER: Objection to form.
19      A.    Tell me -- ask that question
20  again.
21      Q.    Let me try to rephrase in light of
22  the objection.
23          Do you have an understanding of
24  what Mr. Madoff's philosophy was and of his
25  investment advisory operations?

Page 117

1      A.    Yeah. The way I would explain his
2  philosophy is that he was trying to generate
3  slightly better returns than could be obtained
4  in, for example treasury bills, by engaging in a
5  particular investment strategy, which was not
6  particularly high risk, but had the capability
7  of generating returns. As I said, slightly
8  above treasury bills. And it was a very
9  specific strategy.
10      Q.    And what was that strategy?
11      A.    Well, I think it's been referred
12  to many times as the split-strike conversion
13  strategy.
14      Q.    And how do you know that
15  Mr. Merkin understood that?
16          MR. STEINER: Objection to form.
17      A.    Well, what I do know is -- again,
18  from what I read in his notes, and going through
19  various documents described where Mr. Merkin
20  described what it was that Madoff allegedly was
21  doing in the split-strike conversion strategy.
22      Q.    What notes are you talking about?
23      A.    Notes where he communicated with
24  various people, notes where he talked with
25  Mr. Madoff where he took notes of conversations

**Picard v Merkin**                                    **Weingarten 7/15/2015**

## CONFIDENTIAL

Page 118

1  he had with Mr. Madoff, I believe there may have
2  been communications with clients that I looked
3  at. It was an opinion I formed on the basis of
4  various of the documents that I have read, that
5  either -- where Mr. Merkin was taking notes or
6  where he was communicating with other people.
7      Q.   Okay. And --
8      A.   Or indeed in some of the
9  transcripts.
10     Q.   And the various documents, what
11  are you talking about there?
12     A.   Oh, just slews of -- I don't have
13  the specific names. I think we did give you a
14  list of all the things that I had read.
15          As I said, there were numerous
16  notes that he had taken, conversations he had
17  with Madoff, numerous documents in which he was
18  deposed and talking about the strategy. It was
19  pretty clear to me that he understood exactly --
20  well, he understood what he thought Madoff was
21  doing. As we know, he wasn't doing that. But
22  he understood and had, over time, developed a
23  pretty clear understanding of what it was his
24  investment philosophy was.
25     Q.   When you talk about the slews of

Page 119

1  notes and documents, are you talking about, are
2  those the documents that are contained in what
3  we've called the Madoff file?
4          MR. STEINER: Objection to form.
5      A.   I don't know what you call the
6  Madoff file, so I can't answer that.
7          MS. HOANG: Mark this as
8  Trustee's --
9      Q.   This has already been previously
10  marked at the deposition of Mr. Merkin as
11  Exhibit 363. We're going to use the same
12  exhibits.
13     A.   I assume you don't want me to look
14  through every one of these right now?
15     Q.   No.
16     A.   So I don't know how to answer your
17  question.
18     Q.   Just take a quick look at it.
19  Just let me know when you're ready.
20     A.   Okay.
21     Q.   Have you ever seen this particular
22  compilation of documents before?
23     A.   I honestly don't know without
24  going through every single page in here. I'm
25  not sure that I -- I'm sure I have seen, over

Page 120

1  the course of time, numerous documents. Some of
2  these look familiar to me. I can't promise you
3  that every one of these documents I've looked
4  at, and certainly not looked at in the last
5  three or four months, but some of these, as I
6  leaf through it, look somewhat familiar to me.
7      Q.   Okay. On your documents
8  considered list that's attached to your initial
9  report, do you see there that you've indicated
10  Merkin's file on Madoff?
11     A.   I'm sorry, what am I looking at
12  now.
13     Q.   On your documents considered list,
14  Exhibit B to your initial report?
15     A.   B as in boy?
16     Q.   Yes.
17     A.   Yes.
18     Q.   Do you see there where you refer
19  to Merkin's file on Madoff?
20     A.   Yes.
21     Q.   Is this the file that is the file
22  that I've just given you as Trustee's prior
23  Exhibit 363 what you're referring to when you
24  say Merkin's file on Madoff?
25     A.   Again, much of this looks familiar

Page 121

1  to me. Without going through it page by page, I
2  can't tell you that this was everything that I
3  saw in the Madoff file is in here and everything
4  that is in here is on the Madoff file, but if
5  this is what is generically referred to as the
6  Madoff file, then I'm sure I've had exposure to
7  everything in here, but without going through it
8  page by page I can't promise you.
9      Q.   Did you review the deposition of
10  Ezra Merkin taken in this matter in the
11  preparation of your reports?
12     A.   I think I did, if it says here
13  that I did. I'm not sure if I... honestly, I've
14  read so many depositions over the course of the
15  last year or two, I don't know if I -- I don't
16  remember if I read the deposition in this one or
17  not, off the top of my head. If it's not listed
18  in here, I suspect I didn't.
19     Q.   Do you see where it says,
20  "Transcript of Merkin testimony in this action"?
21     A.   In this action, so then I did.
22     Q.   Did you review the exhibits that
23  were appended to that transcript?
24     A.   Again, I don't know what form I
25  saw the transcript in; if it was a draft form or

## BENDISH REPORTING
## 877.404.2193

Picard v Merkin                                    Weingarten 7/15/2015

CONFIDENTIAL

Page 218

1   what the nature of those in-person meetings was?
2        A.    My understanding was that they
3   took the form of phone calls and meetings in
4   Mr. Madoff's offices, and I'm not certain that
5   they didn't also include something beyond that,
6   whether there were social or other occasions in
7   which they also met up.  But I'm aware of phone
8   calls and I'm aware of that by virtue of the
9   fact that there were notes taken of those phone
10  calls, and I'm aware that there were meetings
11  with Mr. Madoff on at least one or two occasions
12  in which he brought clients to meet with
13  Mr. Madoff.
14       Q.    And is it your opinion that it was
15  sufficient for Mr. Merkin to have discussions
16  with Mr. Madoff and to bring clients to meet
17  Mr. Madoff for his due diligence?
18       A.    I'm sorry, I'm not sure I
19  understand what you're asking.
20       Q.    I'm going to try to rephrase that.
21  It's just a little confusing.
22            Would Mr. Merkin's discussions
23  with Mr. Madoff alone be sufficient due
24  diligence in your opinion?
25       A.    So, I would answer that in the

Page 219

1   negative in that that would be part of a due
2   diligence process that I outlined in here, but I
3   would also indicate to you that in my own
4   personal experience that I did have occasion to
5   sit down with a very sophisticated investor,
6   with whom I had a 90-minute conversation, at the
7   end of which he offered me $400 billion to
8   manage.
9            This was an investor by the name
10  of George Soros, who literally on the basis of
11  one in-person meeting, in which we discussed my
12  investment philosophy, the process, my
13  procedures, he knew a little bit about me and my
14  reputation, although he queried that, asked a
15  little bit about my performance over the course
16  of those 90 minutes.  And, frankly, when I
17  turned down the offer of a job working with him,
18  he then offered me $400 million to manage.
19            So, the answer to your question is
20  do I think it would have been sufficient?  No.
21  Nor did I mean to imply, by virtue of my report,
22  that I would have thought that was sufficient.
23  It was a component to it.
24            But having said that, I have had
25  the personal experience of someone very

Page 220

1   sophisticated, I think a reasonably accomplished
2   investor who, on the basis of just that kind of
3   thing, that was the extent of his, certainly
4   initial due diligence.
5        Q.    Initial due diligence.  Do you
6   know whether -- do you know for a fact that --
7   strike that.
8            Do you know whether or not
9   Mr. Soros conducted any other due diligence on
10  you?
11       A.    I don't know for a fact.  I
12  know -- what I do know is that when I met him he
13  had -- he did not know much about me or the fund
14  I was running.  So I know that prior -- and that
15  as I said, before I left he offered me the money to
16  me.  So he couldn't have done much due diligence
17  before that, and then afterwards he had a staff
18  of people who then I think more or less pro
19  forma did some due diligence, and then during
20  the course of the time that I managed money for
21  him we would periodically meet up and discuss
22  the portfolio in various parts of the world.
23       Q.    And when was that?
24       A.    I don't remember exactly, I want
25  to say somewhere around 2000, 2001 is when I got

Page 221

1   the money sometime and I managed it for three or
2   four years.
3        Q.    Mr. Weingarten, you mentioned that
4   you're aware that Mr. Merkin took some investors
5   to meet with Mr. Madoff.  Do you recall that?
6        A.    I'm sorry, would you say that
7   again.
8        Q.    Do you recall that you mentioned
9   that you were aware that Mr. Merkin took some
10  investors to meet with Mr. Madoff?  Do you
11  recall that?
12       A.    Yes.
13       Q.    If a particular investor had
14  voiced concerns to Mr. Merkin about investing
15  with BLMIS or Mr. Madoff, what would you -- what
16  would you expect Mr. Merkin to do with that
17  information, or that concern?
18       A.    I guess it would depend on what
19  the concern was and -- I guess it would depend
20  on what the concern was.  So, again, I can speak
21  from my own experience.  There were a lot of
22  people with whom I discussed my investment
23  philosophy and process and procedures.  And
24  there were people who thought that in my case I
25  had a very focused approach to investing.  I

# Exhibit 11

CONFIDENTIAL

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| In re: : | |
| : | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT : SECURITIES LLC, : | |
| : | No. 08-01789 (SMB) |
| Debtor. : X | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation : of Bernard L. Madoff Investment Securities LLC, : | |
| Plaintiff, : | |
| : | |
| v. : | Adv. Proc. No. 09-01182 (SMB) |
| : | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., : ARIEL FUND LTD., ASCOT PARTNERS, L.P., : ASCOT FUND LTD., GABRIEL CAPITAL : CORPORATION, : | |
| Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## Expert Report of Jeffrey M. Weingarten

### I.    Scope of Assignment

If called as an expert to testify in this action, I anticipate that my testimony would concern the matters addressed in this report, the opinions that I have formed, and the materials that I have relied upon in forming my opinions. Furthermore, I anticipate that my testimony would also address any response or rebuttal by any experts testifying on behalf of the Trustee.

### II.    Background and Qualifications

My background includes over 40 years of education and experience in finance, investment research, fund management and investing.

I received a BS Economics from the Wharton School of the University of Pennsylvania in 1970. Immediately upon graduation, I worked as a securities analyst for Scheinman, Hochstin & Trotta and then Wertheim & Co. until I joined Goldman Sachs in 1977.

My career at Goldman Sachs included tenure in the US research department both as an analyst and in charge of recruiting and training.  I then went to work in London as head of International Equity Research and a Global Investment Strategist.  Shortly after becoming a Partner in 1990, I became CEO of Goldman Sachs Asset Management International and Chief Investment Officer of Global Equities.  In 1996, I again became a Global Investment Strategist.

I retired as a General Partner in 1998 to form Buttonwood Capital Partners, a fund management company that ran European equity hedge funds.  I ran that company and those funds until 2008.

After retiring from the hedge fund business, I became a consultant and later Chairman of Grosvenor Fund Management, a property fund management business based in London.  With the retirement of the CEO, I took on those responsibilities on an interim basis from 2011 to 2013.  I am currently on the Board of Grosvenor Group Limited and on the Board of Aviva Investors. From 2010 to 2014, I also served on the foundation Board of the College of Charleston and on its Finance and Investment Committees.

In the course of my career, I have performed due diligence on companies, investment managers and of course had due diligence performed on me and the many funds which I managed. A copy of my curriculum vitae is attached at Exhibit A.

## III.    Materials Considered

In forming my opinions, I considered and relied on my forty year experience analyzing investments and twenty-plus years as a hedge fund manager.  In addition, I relied on knowledge of investment fund prospectuses and performance data accumulated over the course of my career.  Further, I considered the documents and testimony listed on Exhibit B.

## IV.    Compensation

I am being compensated at a rate of $800 per hour.  My fee is neither contingent on the outcome of this matter nor on the opinions provided herein.  A list of all cases in the last four years in which I have provided expert testimony, either in deposition or at trial, is attached at Exhibit C.

## V.    Summary of Conclusions

Having been retained to opine on the adequacy of the due diligence on Bernard Madoff and his organization, Bernard L. Madoff Investment Securities ("BLMIS") (collectively "Madoff"), I have reached the conclusion that the due diligence performed by J. Ezra Merkin and Gabriel Capital Corporation (collectively "Merkin Defendants") met or exceeded industry standards. The due diligence performed considered and evaluated all of the relevant investment factors normally associated with a money manager including:  Investment Philosophy, Process and Procedures.  Mr. Merkin also carefully considered the People involved in generating the investment returns and whether or not those returns were proportional to both the level of expected returns and the amount of risk incurred.  This due diligence process was undertaken on an ongoing basis throughout the time of Gabriel Capital, L.P.'s, Ariel Fund Limited's, Ascot Partners, L.P.'s and Ascot Fund Limited's (collectively, the "Funds") investment with Madoff. Moreover, Mr. Merkin was aware that various regulators, auditors, administrators, and

2

# Exhibit A

CONFIDENTIAL

# JEFFREY M. WEINGARTEN

## Education

| | |
|---|---|
| 1970 | BS Economics with Honors<br>The Wharton School of the University of Pennsylvania |

## Work Experience

| | |
|---|---|
| 1970-1971 | Securities Analyst Sheinman, Hochstin & Trotta<br>New York |
| 1971-1977 | Securities Analyst Tobacco & Beverages, Wertheim & Co<br>New York |
| 1977-1987 | Food Beverage and Tobacco Analyst, Goldman Sachs<br>Director of Recruiting and Training for Research Company<br>New York |
| 1987-1991 | Director of International Equity Research, Goldman Sachs<br>Global Investment Strategist<br>London |
| 1990-1998 | Partner, Goldman Sachs |
| 1991-1997 | CEO Goldman Sachs Asset Management International<br>CIO Goldman Sachs Asset Management International Equities |
| 1997-1998 | Global Investment Strategist, Goldman Sachs |
| 1999-2008 | Founder and Managing Director, Buttonwood Capital Partners |

## Awards and Honors

| | |
|---|---|
| 1976-1986 | Institutional Investor #1 Tobacco Analyst |
| 1977-1986 | Institutional Investor #2 – #3 Beverage Analyst |
| 1989-1991 | Institutional Investor #3 Investment Global Strategist |

## Other Interests

| | |
|---|---|
| 1998 to 2005 | The Wharton School of the University of Pennsylvania Advisory Board |
| 1995 to 2005 | Development Council National Theatre |
| 2004 to present | Student Disability Services Advisory Board at the University of Pennsylvania |
| 2009 to present | Consultant/Chairman of Grosvenor Fund Management/Member of Grosvenor Group Ltd. Board |
| 2009 to present | Member, Board of Advisors, School of Languages, Cultures, and World Affairs at the College of Charleston |
| 2010 to 2014 | Member, Foundation Board, College of Charleston |
| 2015 to present | Non-executive Director of Aviva Investors |

CONFIDENTIAL

**Jeffrey M. Weingarten**

Jeffrey M. Weingarten has almost 40 years of investment experience in investment research and fund management.

Jeffrey began his career as a securities analyst at Sheinman Hochstein & Trotta from 1970-1971 moving to Wertheim & Co from 1971-1977 as a securities analyst and Vice President.  In 1977 he joined the research division at Goldman Sachs & Co in New York and over the next ten years was voted Institutional Investor's top tobacco and beverage analyst in the US.  In 1987 he became Director of Research in London responsible for all non-US research activities as well as the International Portfolio Strategist.  He became a general partner of Goldman Sachs & Co in 1990.  From 1991-1997 Jeffrey was the Chief Investment Officer and Managing Director of Goldman Sachs Asset Management International.  In 1997 he returned to International Equity Research as the Global Strategist and retired as a General Partner in order to form Buttonwood in 1998.

Buttonwood was principally a European long short equity fund which produced superior returns for almost 10 years.  During that time Buttonwood Fund outperformed the European Index almost three times with much less volatility.

Jeffrey holds a BS Economics cum laude from The Wharton School, University of Pennsylvania, is a Certified Financial Analyst and was a member of the New York Society of Security Analysts and International Investment Analysts Group.

Jeffrey was a board member of the Wharton Executive Board for EMEA, board member of the Student Disability Services Advisory Board at the University of Pennsylvania and Chairman of Grosvenor Fund Management in London.  He is also on the Board of Advisors, School of Languages, Cultures, and World Affairs at the College of Charleston and was a member of the Foundation Board of the College.

Jeffrey is a director of Grosvenor Group Ltd. and a director of Aviva Investors.

CONFIDENTIAL

# Exhibit 12

**CONFIDENTIAL**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ X

In re:                                      :
                                            :
                                            :    SIPA LIQUIDATION
BERNARD L. MADOFF INVESTMENT                :
SECURITIES LLC,                             :
                                            :    No. 08-01789 (SMB)
            Debtor.                         :
                                            X
------------------------------------------

IRVING H. PICARD, Trustee for the Liquidation    :
of Bernard L. Madoff Investment Securities LLC,  :
                                                 :
            Plaintiff,                           :
                                                 :
                                                 :    Adv. Proc. No. 09-01182 (SMB)
                v.                               :
                                                 :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,           :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,           :
ASCOT FUND LTD., GABRIEL CAPITAL                 :
CORPORATION,                                     :
                                                 :
            Defendants.                          :

------------------------------------------ X

**<u>Rebuttal Expert Report of Jeffrey M. Weingarten</u>**

## I.    Scope of Assignment

I have considered the Initial Expert Witness Report of Dr. Steve Pomerantz. If called as an
expert to testify in this matter, in addition to the opinions expressed in my initial Expert Report,
and as noted in that report, I anticipate that my testimony would include a rebuttal to the opinions
offered by Dr. Pomerantz.

## II.    Materials Considered

In forming my opinions, in addition to the experience and materials relied on in my initial Expert
Report, I considered and relied on Dr. Pomerantz's Initial Expert Report and certain of the
exhibits on which he relied, specifically the 1997 and 2001 due diligence questionnaires
published by the Alternative Investment Management Association ("AIMA") as well as the book
*Investment Manager Analysis* by Frank J. Travers.

## III.    Summary of Conclusions

I disagree with the fundamental premise on which the report by Dr. Pomerantz was founded.
What is portrayed by Dr. Pomerantz was not even close to the customary standard of Due
Diligence at the time in question. What is not considered in the report is the important fact that
the mere fact of the Madoff fraud caused the entire industry to focus on issues that previously
were not standard concerns. The mere fact of the Madoff fraud exposed issues that were not
written into some of the Due Diligence templates referred to in the report. Almost none of the
after-the-fact forensics conducted by Dr. Pomerantz was routine before Madoff himself went
public with his fraud.

Moreover, most of what was written in the report as "concerns" were well covered by the many
articles written after the fact and indeed were even raised contemporaneously. These concerns
include, for example, the issue of BLMIS's accounting firm, the fact that confirms were manual,
the issue of self clearing. These issues were publically known and discussed at the time and did
not prevent some of the most sophisticated investors from investing with Madoff. It is worth
pointing out again and frequently that all of the regulators charged with oversight of Madoff's
business failed to uncover this fraud and they all had much greater access to information than
any outsider conducting Due Diligence would ever have had.

Another fundamental flaw in the logic suggested in Dr. Pomerantz's report is that the only
possible explanation for the results allegedly achieved by Madoff was fraud. This is clearly
NOT the only possibility. Most investors, including Mr. Merkin, were aware that there often
were some time lapses in effecting the split strike conversion strategy and these time lapses
would have permitted returns to exceed, even modestly, the results that would have resulted from
a simultaneous implementation of the trades. So much time and effort has been wasted by after
the fact forensic accountants and experts trying to replicate what Madoff allegedly was doing on
the assumption that all the trades were done at the same time. Even small gaps in executing the

2

sale of calls would be sufficient to achieve the results. Madoff was thought by many to have not only an ability to time the markets but had access to flow of funds information, which would have been beneficial to achieving these results. This access would not necessarily have been the result of nor caused by front running since the knowledge would have been general flows and did not necessarily result from running in front of client trades.

As is almost always true in the investment world, there will be more views on the appropriateness and the desirability of an investment strategy than there are investors making that determination. Many looked at Madoff's record and rejected it for any number of reasons. Many billions were invested by very sophisticated investors knowing the same facts as those who chose not to invest. The level of Due Diligence conducted by these investors varied considerably, as will always be the case. The level of Due Diligence suggested by Dr. Pomerantz, although with the perfect hindsight we now all possess would have been preferable, was not at that time the industry standard in numerous respects. For example, the AIMA guidelines issued in 1997 and reiterated in 2001 referenced by Dr. Pomerantz do not mention contacting counterparties. Nor does Mr. Travers' book. Similarly, extensive review of reported prices and volumes, undertaken after the fact by Dr. Pomerantz, was not indicated in either the AIMA guidelines or by Mr. Travers.

Industry Standard Due Diligence

As I indicated in my initial Expert Report, industry standard due diligence is something of a misnomer in that there was very wide variation in practice. Most industry "standards" revolved around determining the investment philosophy, process, people, performance and ultimately price. Although we used slightly different wording, there does not appear to be fundamental disagreement between Dr. Pomerantz and me on this approach.

Philosophy

It does not appear to be disputed that Mr. Merkin understood that he was investing with Madoff to achieve better than t-bill returns with substantially below average risk. It was clear to Mr. Merkin that foregoing potential higher returns was, or could be, the cost of avoiding volatility. This would certainly explain why he would accept that Madoff might be out of the market at certain periods of expected high volatility such as often occurred around the end of the quarter and certainly the end of the year. This understanding was critical to both the initial and ongoing Due Diligence conducted by Mr Merkin.

Process and Procedures

Several issues have been raised by Dr. Pomerantz regarding the Process and Procedures, again all with the benefit of perfect hindsight and again most of which were known concerns at the time when Mr. Merkin and many other investors were already investing with Madoff.

3

Among the issues raised was the use of written confirmations. But written confirmations were not unusual at the time the Funds first began investing with Mr. Madoff. Even at the time I was running a hedge fund in 2007, I was still receiving written and faxed confirmation from brokers.

## People

The reputation and qualification of the person or people doing the investing is critical to the Due Diligence process. To suggest otherwise is not only erroneous, it flies in the face of standard industry practice both before and after Madoff's fraud was uncovered. Indeed, in his book on hedge funds, Mr. Travers attaches 30% of the Due Diligence weight to the Investment Professionals, the highest weight of any other factor!

There are numerous examples of investors placing money with people who just by nature of the reputation of the firms for whom they once worked, have raised billions of dollars with no visible track record of managing money on their own. To suggest otherwise is at best naïve and certainly at variance with industry practice.

In the case of Madoff, Mr. Merkin had a long history of both familial and business relationships before investing. That ongoing relationship continued throughout the investing period.

Madoff's reputation as an industry leader and prominent figure in the investing community would certainly have been enough Due Diligence for many at the time and indeed would be a critical if not determinative factor in any Due Diligence conducted even today.

## Performance

Dr. Pomerantz makes a big deal about Sharpe ratios. A number of funds identified in Bloomberg had Sharpe ratios greater than 2.5, including SMN Diversified Futures Fund (4.68), the Eclectica Fund (3.80), and Episode Inc. (2.61), as of April 20, 2015. Similarly, several funds had more than 75% up months.

## IV.    Conclusion

As indicated above, several of the sources used by Dr. Pomerantz provide guides for what standard Due Diligence looked like at the time Mr. Merkin was conducting both initial and ongoing Due Diligence.  None of these even suggest the kind of backward looking forensics that Dr. Pomerantz suggested was standard.  While these forensics may have been possible, they were certainly not standard.  What has been done by Dr. Pomeratz rather represents fairly standard after the fact examination of information that, when you know the outcome, would lead you to conclude that the outcome was possibly a fraud.  It is proving what we know to be true.

It always needs to be pointed out that despite numerous regulators having investigated and numerous sophisticated investors performing Due Diligence, including sophisticated investors who discuss Madoff with Mr. Merkin, this very elaborate fraud eluded public detection for many years.  Going back now and determining how it was done is relatively easy.  Madoff in the end was determined to be a fraud only after he turned himself in.

Jeffrey M. Weingarten
May 14, 2015

5