# Exhibit 16

# ARIEL FUND LIMITED

*A Cayman Islands Exempted Company*

## CONFIDENTIAL OFFERING MEMORANDUM

*Relating to Class B Participating Shares*

*Par Value U.S. $0.01 per Share*

**March 2006**

**Investment Advisor:**
Gabriel Capital Corporation
450 Park Avenue
32nd Floor
New York, New York  10022

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ANY OF ITS CONTENTS, MAY VIOLATE APPLICABLE SECURITIES LAWS AND IS PROHIBITED WITHOUT THE EXPRESS PRIOR WRITTEN CONSENT OF THE INVESTMENT ADVISOR.

**The information contained herein is confidential and is furnished for informational purposes only. This Confidential Offering Memorandum supersedes all earlier disclosure concerning the Fund.**

10010873.14

**CONFIDENTIAL**

GCC-NYAG0000649

# CONFIDENTIAL OFFERING MEMORANDUM

## ARIEL FUND LIMITED

c/o Fortis Prime Fund Solutions (Cayman) Limited
P.O. Box 2003 GT
Grand Pavilion Commercial Center
802 West Bay Road
Grand Cayman
Cayman Islands

Ariel Fund Limited, a Cayman Islands exempted company formed on December 28, 1988 (the "Fund"), was organized to operate as a private investment fund for the benefit of non-U.S. Persons and Permitted U.S. Persons (as defined below) and any investors that the Fund's board of directors deems appropriate. The Fund's investment objective is to provide shareholders with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. Generally, the Fund will invest and trade in U.S. and non-U.S., marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, futures contracts (relating to stock indices, options on stock indices, commodities and options on commodities) and forward contracts. The Fund will invest in the securities of corporations believed to be fundamentally undervalued. The Fund will also make indirect investments with third-party managers, including investments through managed accounts and investments in mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), which engage in similar investment strategies as the Fund (collectively, "Other Investment Entities"). The Fund expects to invest in private and restricted securities. The Fund may utilize leverage when deemed appropriate by the Investment Advisor (as defined below), including to enhance the Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Fund's investment objective will be achieved.** (See "Investment Program.")

J. Ezra Merkin owns and manages Gabriel Capital Corporation which serves as the Investment Advisor of the Fund (the "Investment Advisor"). The Investment Advisor has ultimate responsibility for the management, operations and investment decisions made on behalf of the Fund. J. Ezra Merkin also serves as the general partner of Gabriel Capital, L.P., a Delaware limited partnership organized for U.S. taxable investors, which follows an investment program similar to that of the Fund (the "U.S. Partnership.")

This Confidential Offering Memorandum relates to an offering of non-voting shares in the Fund (the "Class B Participating Shares") to certain investors that, if accepted, will become shareholders of the Fund (each, a "Shareholder"). The Fund may offer Class B Participating Shares to prospective new Shareholders as of the beginning of each quarter (or at such other times as the board of directors of the Fund, in its sole discretion, may allow). The

10010873.14

CONFIDENTIAL

GCC-NYAG0000650

Fund issued 100 founders shares, with a par value of $1.00 per share, to the Investment Advisor, shortly after the Fund's incorporation (the "Founders Shares"). The Founders Shares are the only shares issued by the Fund that carry voting rights. All of the Founders Shares of the Fund are currently owned by Fortis Bank (Cayman) Limited, as trustee of The Ariel Trust, a Cayman Islands trust. Holders of Founders Shares are not entitled to participate in the appreciation of the Fund's assets, but are entitled to a return of par value upon liquidation or dissolution of the Fund.

It is anticipated that no dividends will be paid on the Class B Participating Shares. The Fund will retain and reinvest the net income derived from its investments.

Class B Participating Shares are being offered to (i) persons who are not "U.S. Persons", as that term is defined herein under "Suitability Requirements; Limitations on Transferability", and (ii) to Tax-Exempt U.S. Persons (as defined herein under "Tax Aspects-Tax-Exempt U.S. Persons") including tax-exempt entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons (collectively, "Permitted U.S. Persons"). Each Permitted U.S. Person that purchases Class B Participating Shares must be, among other things, an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, as amended (the "1933 Act") and a "qualified purchaser", as that term is defined in Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"). The board of directors of the Fund, in its sole discretion, may decline to admit a prospective investor for any reason or for no reason, even if it satisfies the Fund's suitability requirements.

Class B Participating Shares are suitable only for sophisticated investors (i) that do not require immediate liquidity for their investments, (ii) for which an investment in the Fund does not constitute a complete investment program and (iii) that fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. (See "Investment Program" and "Certain Risk Factors.")

Prospective investors should carefully read this Confidential Offering Memorandum. The contents of this Confidential Offering Memorandum, however, should not be considered legal or tax advice, and each prospective investor should consult its own counsel and advisers as to all matters concerning an investment in the Fund.

This Confidential Offering Memorandum has been prepared solely for the information of the person to whom it has been delivered on behalf of the Fund and may not be reproduced or used for any other purpose. The dissemination, distribution, reproduction or other use of all or any portion of this Confidential Offering Memorandum or the divulgence of any of its contents other than to the prospective investor's financial, tax or legal advisors, without the prior written approval of the Investment Advisor, is prohibited. Any person that receives this Confidential Offering Memorandum and does not purchase Class B Participating Shares is requested to promptly return this Confidential Offering Memorandum to the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative or other agent of such investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of (i) the Fund and (ii) any transactions

10010873.14

-ii-

GCC-NYAG0000651

GCC-P 0335721

described herein, and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Each person accepting this Confidential Offering Memorandum agrees to return it to the Fund promptly upon request. This Confidential Offering Memorandum is accurate as of its date, but no representation or warranty is made as to its continued accuracy after such date.

The Fund will not be registered as an investment company under the Investment Company Act and, therefore, will not be required to adhere to certain operational restrictions and requirements under the Investment Company Act. The Investment Advisor is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

All references to "dollars" or to "$" herein are to U.S. Dollars.

---

THE INVESTMENT ADVISOR IS EXEMPT FROM REGISTRATION WITH THE U.S. COMMODITY FUTURES TRADING COMMISSION ("CFTC") AS A COMMODITY POOL OPERATOR ("CPO") UNDER CFTC RULE 4.13(A)(4). THEREFORE, UNLIKE A REGISTERED CPO, THE INVESTMENT ADVISOR IS NOT REQUIRED TO PROVIDE PROSPECTIVE SHAREHOLDERS WITH A CFTC COMPLIANT DISCLOSURE DOCUMENT, NOR IS IT REQUIRED TO PROVIDE SHAREHOLDERS WITH CERTIFIED ANNUAL REPORTS THAT SATISFY THE REQUIREMENTS OF CFTC RULES APPLICABLE TO REGISTERED CPOS. THE FUND DOES, HOWEVER, INTEND TO PROVIDE SHAREHOLDERS WITH ANNUAL AUDITED FINANCIAL STATEMENTS.

THE CFTC EXEMPTION RULE REQUIRES, AMONG OTHER THINGS, THAT EACH SHAREHOLDER BE A NON-UNITED STATES PERSON UNDER CFTC RULES, SATISFY CERTAIN SOPHISTICATION CRITERIA, OR OTHERWISE BE AN ELIGIBLE INVESTOR SPECIFIED IN THE RULE. IT ALSO REQUIRES THAT CLASS B PARTICIPATING SHARES IN THE FUND BE EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, AND BE OFFERED AND SOLD WITHOUT MARKETING TO THE PUBLIC IN THE UNITED STATES. THE FUND'S CONFIDENTIAL OFFERING MEMORANDUM (THIS "MEMORANDUM") HAS NOT BEEN REVIEWED OR APPROVED BY THE CFTC.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM WILL BE EMPLOYED IN THE OFFERING OF THE CLASS B PARTICIPATING SHARES EXCEPT FOR THIS CONFIDENTIAL OFFERING MEMORANDUM, STATEMENTS CONTAINED HEREIN AND WRITTEN MATERIALS SPECIFICALLY APPROVED BY THE INVESTMENT ADVISOR. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THE CLASS B PARTICIPATING SHARES, EXCEPT FOR THE INFORMATION CONTAINED HEREIN.

---

THE FUND IS A REGULATED MUTUAL FUND FOR THE PURPOSES OF THE MUTUAL FUNDS LAW (2003 REVISION) OF THE CAYMAN ISLANDS. THE FUND IS REGISTERED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY PURSUANT

10010873.14

CONFIDENTIAL

GCC-NYAG0000652

CONFIDENTIAL

GCC-P 0335722

TO SECTION 4(3) OF THAT LAW AND THE PRESCRIBED DETAILS IN RESPECT OF THIS CONFIDENTIAL OFFERING MEMORANDUM HAVE BEEN FILED WITH THE MONETARY AUTHORITY. SUCH REGISTRATION DOES NOT IMPLY THAT THE MONETARY AUTHORITY IN THE CAYMAN ISLANDS HAS APPROVED THIS CONFIDENTIAL OFFERING MEMORANDUM OR THE OFFERING OF CLASS B PARTICIPATING SHARES HEREUNDER. FOR A SUMMARY OF THE CONTINUING REGULATORY OBLIGATIONS OF THE FUND AND A DESCRIPTION OF THE REGULATORY POWER OF THE CAYMAN ISLANDS MONETARY AUTHORITY, SEE THE SECTION ENTITLED "CAYMAN ISLANDS REGULATION" OF THIS CONFIDENTIAL OFFERING MEMORANDUM.

EXCEPT AS NOTED IN THE PRECEDING PARAGRAPH, THE OFFERING OF SECURITIES HEREBY HAS NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY OF ANY COUNTRY OR JURISDICTION, NOR HAS ANY SUCH REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. CLASS B PARTICIPATING SHARES ARE NOT REGISTERED FOR SALE, AND THERE WILL BE NO PUBLIC OFFERING OF THE CLASS B PARTICIPATING SHARES.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

---

EACH PROSPECTIVE INVESTOR IS INVITED TO MEET WITH THE INVESTMENT ADVISOR TO DISCUSS WITH, ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE FUND CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF THE CLASS B PARTICIPATING SHARES, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE FUND POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE INFORMATION CONTAINED HEREIN.

---

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY OF ANY COUNTRY OR JURISDICTION, NOR HAS ANY SUCH REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

---

10010873.14

-iv-

CONFIDENTIAL

GCC-NYAG0000653

THE CLASS B PARTICIPATING SHARES ARE NOT REGISTERED FOR SALE, AND THERE WILL BE NO PUBLIC OFFERING OF THE CLASS B PARTICIPATING SHARES. NO OFFER TO SELL (OR SOLICITATION OF AN OFFER TO BUY) WILL BE MADE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL. (SEE APPENDIX A.)

CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED TO THE PUBLIC IN THE CAYMAN ISLANDS.

*    *    *    *

10010873.14

-v-

CONFIDENTIAL

GCC-NYAG0000654

CONFIDENTIAL

GCC-P 0335724

| | |
|---|---|
| *THE FUND* | Ariel Fund Limited<br>c/o M&C Corporate Services Limited<br>P.O. Box 309 GT<br>Ugland House<br>South Church Street<br>George Town, Grand Cayman<br>Cayman Islands |
| *THE INVESTMENT ADVISOR* | Gabriel Capital Corporation<br>450 Park Avenue, 32nd Floor<br>New York, NY 10022 |
| *THE REGISTRAR* | Fortis Prime Fund Solutions (Cayman) Limited<br>P.O. Box 2003 GT<br>Grand Pavilion Commercial Center<br>802 West Bay Road<br>Grand Cayman, Cayman Islands<br>Attn: Share Registration Department |
| *AUDITORS* | BDO Tortuga<br>P.O. Box 31118 SMB<br>5th Floor Zephyr House<br>Mary Street<br>George Town, Grand Cayman<br>Cayman Islands |
| *U.S. LEGAL COUNSEL* | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York  10022 |
| *CAYMAN ISLANDS LEGAL COUNSEL* | Maples and Calder<br>P.O. Box 309GT<br>Ugland House<br>South Church Street<br>George Town, Grand Cayman<br>Cayman Islands |

10010873.14

CONFIDENTIAL

GCC-NYAG0000655

CONFIDENTIAL

GCC-P 0335725

## TABLE OF CONTENTS

Page

SUMMARY OF TERMS .................................................................................. 1

THE FUND ................................................................................................... 20

INVESTMENT PROGRAM .............................................................................. 20

THE INVESTMENT ADVISOR ......................................................................... 22

THE BOARD OF DIRECTORS ......................................................................... 22

THE REGISTRAR .......................................................................................... 23

SUBSCRIPTION PROCEDURE ........................................................................ 23

THE OFFERING OF SHARES .......................................................................... 24

THE SHARES ............................................................................................... 25

SPECIAL INVESTMENT SHARES ................................................................... 25

SALES CHARGES ......................................................................................... 26

DETERMINATION OF NET ASSET VALUE ...................................................... 27

INVESTMENT ADVISORY FEES; OPERATING AND OTHER EXPENSES ............ 28

REDEMPTIONS ............................................................................................ 29

CERTAIN RISK FACTORS ............................................................................. 31

CONFLICTS OF INTEREST ............................................................................ 43

BROKERAGE COMMISSIONS ........................................................................ 44

INVESTMENT ADVISORY AGREEMENT ......................................................... 44

TAX ASPECTS ............................................................................................. 47

ERISA CONSIDERATIONS ............................................................................ 53

ANTI-MONEY LAUNDERING REGULATIONS .................................................. 56

SUITABILITY REQUIREMENTS; LIMITATIONS ON TRANSFERABILITY ............ 57

COUNSEL ................................................................................................... 59

10010873.14

CONFIDENTIAL

GCC-NYAG0000656

CONFIDENTIAL

GCC-P 0335726

AUDITOR; REPORTS .................................................................................................................. 59

SUBSCRIPTION FOR SHARES ................................................................................................... 59

10010873.14

-ii-

CONFIDENTIAL

GCC-NYAG0000657

CONFIDENTIAL

GCC-P 0335727

# ARIEL FUND LIMITED

## SUMMARY OF TERMS

The following is a summary of the principal terms of the Fund (as defined below). The following summary is qualified in its entirety by the more detailed information set forth in this Confidential Offering Memorandum and by the terms and conditions of the Fund's Memorandum of Association and Articles of Association (together, the "Articles"), as the same may be amended from time to time. This summary should be read in conjunction with such detailed information.

**THE FUND:**

Ariel Fund Limited, a Cayman Islands exempted company formed on December 28, 1988 (the "Fund"), was organized to operate as a private investment fund for the benefit of non-U.S. and Permitted U.S. Persons (as defined below) and any investors that the Fund's board of directors deems appropriate.

Gabriel Capital, L.P., a Delaware limited partnership organized for U.S. taxable investors, follows an investment program substantially similar to that of the Fund (the "U.S. Partnership"). The owner of the Investment Advisor (as defined below) also serves as the general partner of the U.S. Partnership. The U.S. Partnership and the Fund will invest on a side-by-side basis, unless differences in the investments of the U.S. Partnership or the Fund are deemed to be in the best interests of the respective fund's investors.

**INVESTMENT PROGRAM:**

The Fund's investment objective is to provide shareholders with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. Generally, the Fund will invest and trade in U.S. and non-U.S., marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, futures contracts (relating to stock indices, options on stock indices, commodities and options on commodities) and forward contracts. The Fund will invest in the securities of corporations believed to be fundamentally undervalued. The Fund will also make indirect investments with third-party

10010873.14

1

CONFIDENTIAL

GCC-NYAG0000658

managers, including investments through managed accounts and investments in mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), which engage in similar investment strategies as the Fund (collectively, "Other Investment Entities"). The Fund expects to invest in private and restricted securities. The Fund may utilize leverage when deemed appropriate by the Investment Advisor (as defined below), including to enhance the Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Fund's investment objective will be achieved.** (See "Investment Program.")

When the Fund engages in investments through Other Investment Entities, fees, including performance-based fees, may be payable by the Fund, in addition to the fees payable to the Investment Advisor discussed below. In such cases, the Investment Advisor will retain overall investment responsibility for the portfolio of the Fund (although not the investment decisions of any independent money managers managing Other Investment Entities). Such arrangements are subject to periodic review by the Investment Advisor and are terminable at reasonable intervals in the Investment Advisor's discretion. The Fund may withdraw from or invest in different investment funds and terminate or enter into new investment advisory agreements without prior notice to, or consent of, the Shareholders. (See "Certain Risk Factors–Independent Money Managers.")

From time to time, the Investment Advisor may, in its sole discretion, acquire assets or securities that the Investment Advisor believes lack a readily ascertainable market value or otherwise lack sufficient liquidity. Certain of these investments (not exceeding 40% of the net asset value of the Class B Participating Shares (as defined below), calculated at the time such investments are designated, and with such investments valued at cost) may be designated special investments (each a "Special Investment") as the Investment Advisor shall determine in its sole discretion. In addition, existing investments may be designated Special Investments and will be valued at their carry value when so designated. **Shares attributable to a Special Investment are allocated** *pro rata* **to those investors that are Shareholders (defined below) at the time a Special**

2

10010873.14

**Investment is made (or designated)** (See "The Shares.")

The Investment Advisor will not permit more than the greater of 50% of the Fund's capital and 25% of the Fund's total assets (on a cost basis, giving consideration to hedging techniques utilized) to be invested in a single investment. Moreover, it will not permit more than 10% of the Fund's capital to be placed at risk in a single investment. The Investment Advisor will have the discretion to determine how much is at risk for purposes of this test.

**The Fund's investment program is speculative and may entail substantial risks. Since market risks are inherent in all investments to varying degrees, there can be no assurance that the Fund's investment objectives will be achieved. In fact, certain investment practices described above can, in some circumstances, substantially increase the adverse impact on the Fund's investment portfolios.** (See "Investment Program"; "Certain Risk Factors.")

**THE INVESTMENT ADVISOR:**
The Fund's assets are invested by Gabriel Capital Corporation (the "Investment Advisor"), a Delaware corporation, pursuant to the terms of an Investment Advisory Agreement between the Investment Advisor and the Fund (the "Investment Advisory Agreement") subject to the policies and control of the board of directors of the Fund (the "Board of Directors"). All of the outstanding capital stock of the Investment Advisor is owned or controlled by J. Ezra Merkin. (See "The Investment Advisor.")

The Investment Advisor is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

**THE BOARD OF DIRECTORS:**
The Fund has two directors who serve as the Board of Directors to the Fund. Don M. Seymour and Aldo Ghisletta serve as directors to the Fund and will remain directors until their resignation or removal. (See "The Board of Directors.")

**THE REGISTRAR:**
Fortis Prime Fund Solutions (Cayman) Limited acts as share registration and transfer agent of the Fund (the "Registrar") and is a company registered in the Cayman Islands. The Registrar has a Trust License issued under

10010873.14

3

CONFIDENTIAL

GCC-NYAG0000660

CONFIDENTIAL

GCC-P 0335730

the Banks and Trust Companies Law (2003 Revision) of the Cayman Islands and has an unrestricted Mutual Fund Administrator's License issued under the Mutual Funds Law (2003 Revision) of the Cayman Islands.

The Registrar is one of the largest of the Cayman Islands' licensed fund administrators providing full administrative services to over 450 funds with net assets in excess of $47 billion. The Registrar is a wholly-owned subsidiary of Fortis Bank (Cayman) Limited and is part of the Fortis Group. (See "The Registrar.")

**THE SHARES:**

This Confidential Offering Memorandum relates to an offering of non-voting Class B Participating Shares in the Fund (the "Class B Participating Shares") to certain investors that, if accepted, will become shareholders of the Fund (each, a "Shareholder.")

The Fund also has in issue Class A Participating Shares (the "Class A Participating Shares" and together with the Class B Participating Shares, the "Participating Shares"). The Class A Participating Shares are held by shareholders who invested in the Fund prior to February 1, 2006 and have different redemption rights and less exposure to Special Investments than the Class B Participating Shares. Class A Participating Shares purchased prior to February 1, 2006 may be redeemed on the last business day of each calendar quarter upon 30 days prior written notice to the Fund. In addition, up to 25% of the net asset value of Class A Participating Shares may be designated as Special Investments.

The Board of Directors may also establish other classes of shares at such times and on such terms as may be determined in its sole discretion. (See "The Shares.")

The Fund has issued 100 founders shares, with a par value of $1.00 per share which are currently owned by Fortis Bank (Cayman) Limited, as trustee of The Ariel Trust, a Cayman Islands trust (the "Founders Shares"). The Founders Shares are the only shares issued by the Fund that carry voting rights. Holders of Founders Shares are not entitled to participate in the appreciation of the Fund's assets, but are entitled to a return of par value upon liquidation or dissolution of the Fund. (See "The Shares.")

**SPECIAL INVESTMENT**

The Fund also has the authority to issue Special

10010873.14

4

GCC-NYAG0000661

CONFIDENTIAL

GCC-P 0335731

**SHARES:**

Investment Shares (defined below) to the extent that the Fund holds Special Investments. Upon the acquisition of a Special Investment (or designation of an existing investment as a Special Investment), the Fund will allocate a *pro rata* portion of its assets attributable to the Class B Participating Shares to a new series of special investment shares ("Special Investment Shares"), and such series will represent the Special Investment. Immediately upon the Fund making or designating a Special Investment, the Investment Advisor will determine the value of such Special Investment.

Special Investments generally will be valued at cost unless the Investment Advisor determines, in its sole discretion, that another valuation method represents the Special Investments' "fair value".

Special Investment Shares will be issued in series and each series will represent interests in one Special Investment of the Fund. A portion of each series of the Class B Participating Shares (based on each such series' *pro rata* portion of the Net Asset Value (as defined herein) of all Class B Participating Shares after taking into account any accrued Management Fee) having an aggregate Net Asset Value equal to the cost (or value, if appropriate) of the Special Investment will be converted (by redemption and reissue) to the new series of Special Investment Shares. Each holder of Class B Participating Shares shall receive a *pro rata* portion of the series of Special Investment Shares converted from Class B Participating Shares. Class B Participating Shares converted to Special Investment Shares will not be outstanding as of the date the related Special Investment is made or designated. A series of Special Investment Shares will not be converted back into the series of Class B Participating Shares (or the successor to such series) from which they were converted, until the Special Investment represented by such series of Class B Participating Shares is realized or the Investment Advisor determines that such investment should no longer be maintained as a Special Investment (any such determination by the Investment Advisor with respect to a Special Investment shall hereinafter be referred to as a "Deemed Disposition").

In the event the Fund makes an investment which the Investment Advisor determines is a follow-up investment to a Special Investment (each, a "Follow-Up

CONFIDENTIAL

GCC-NYAG0000662

CONFIDENTIAL

GCC-P 0335732

Investment"), the participating Shareholders in such Special Investment shall share in such Follow-Up Investment in proportion to their interest in the related Special Investment Shares; provided, however, that the Investment Advisor, in its reasonable discretion, may permit additional Shareholders in such Special Investment to participate in such Follow-Up Investment; provided further, however, that if a Shareholder shall have redeemed its shares from the Fund, the Investment Advisor shall equitably adjust the percentage interests of the remaining Shareholders to reflect such Withdrawn Shareholder's non-participation in the Follow-Up Investment. In its discretion, the Investment Advisor need not designate as a "Follow-Up Investment" an additional investment in the same or similar opportunity as the investment for which Special Investment Shares have been issued. Such investment may be designated as a new Special Investment. (See "Special Investment Shares.")

**OFFERING OF SHARES**

The Fund may offer Class B Participating Shares to prospective new Shareholders as of the beginning of each quarter (or at such other times as the Fund in its sole discretion may allow).

The Class B Participating Shares will be offered in series. The Class B Participating Shares that are issued on the first date that Class B Participating Shares are purchased will be designated Class B Participating Shares of the initial series (the "Initial Series"). A new series will be established on each date that Class B Participating Shares are issued. Class B Participating Shares issued to the same subscriber but on different days will also be issued in separate series. Upon the issuance of a series of Class B Participating Shares, an account for such series will be created to which shall be credited initially the subscription proceeds of such series and thereafter the prorated portion of the profits and gains (realized and unrealized) of the Fund and from which shall be debited prorated losses, expenses and liabilities of the Fund, including any accrued and unpaid fees owed to the Investment Advisor with respect to such series, and dividends and proceeds of redemption in respect of shares of that series when paid.

The Fund may consolidate different series of Class B Participating Shares into the Initial Series (or one or more other series of Class B Participating Shares) of

10010873.14

6

CONFIDENTIAL

GCC-NYAG0000663

such class (based on the net asset value of each such series being consolidated at the time of consolidation). Net appreciation in net asset value will not be reduced by prior years' investment losses (that is, there is no "high water mark" concept in connection with the consolidation of a series).

It is anticipated that no dividends will be paid on the Class B Participating Shares. The Fund will retain and reinvest the net income derived from its investments. (See "The Offering of Shares.")

**MINIMUM SUBSCRIPTION:**

The minimum initial subscription is $1,000,000 and subscriptions may be made in integral multiples thereafter of $1,000, subject to the discretion of the Fund to accept other amounts; provided, however, that under no circumstances shall the Fund accept initial subscriptions of less than $50,000 or such other minimum amount specified from time to time under Cayman Islands law. (See "The Offering of Shares.")

**ADDITIONAL SUBSCRIPTIONS:**

Shareholders may subscribe for additional shares in amounts of at least $250,000, subject to the discretion of the Board of Directors to accept other amounts. (See "The Offering of Shares.")

**SALES CHARGES:**

There are no sales charges payable by the Investment Advisor or the Fund in connection with the offering of Participating Shares. (See "Sales Charges.")

**FISCAL YEAR:**

The fiscal year of the Fund will end on December 31 of each calendar year.

**DETERMINATION OF NET ASSET VALUE**

The Board of Directors has delegated day-to-day responsibility for valuing the Fund's assets to the Investment Advisor. The net asset value of a class, or a series, of the Class B Participating Shares will be equal to the gross assets less the gross liabilities attributable to such class or series of Class B Participating Shares as of any date of determination.

Because the various series of a class of Participating Shares will be issued at different dates, the net asset value per Participating Share (the "Net Asset Value per Share") of each series of Participating Shares may differ. The Net Asset Value per Share is generally determined by first allocating any increase or decrease in the net asset value of the Fund for the period of

10010873.14

7

CONFIDENTIAL

GCC-NYAG0000664

calculation among each class of Participating Shares, then allocating any increase or decrease in the net asset value of the relevant class for such period among each series of Participating Shares of that class *pro rata* in accordance with the net asset value of each such series at the beginning of such period then dividing the net asset value of such series by the number of outstanding Participating Shares thereof. Participating Shares within a series will have the same Net Asset Value per Share. Any Management Fee (as defined below) or Incentive Fee (as defined below) determined with respect to a particular series of Participating Shares will be charged against such series.

Given the illiquid nature of the Special Investments, the net asset value of a series of Special Investment Shares cannot be determined with the same degree of certainty and will be carried on the books of the Fund at fair value (generally, at cost) as determined by the Investment Advisor until the occurrence of the realization or Deemed Disposition of the Special Investment (as described below).

In the case of a series of Class B Participating Shares to which a series of Special Investment Shares relates, the amount of any dividends or other distributions with respect to such Special Investment Shares and net profits or loss realized upon the realization or Deemed Disposition of such Special Investment Shares shall be included in the determination of the increase in the Net Asset Value attributable to such series of Class B Participating Shares in the period in which such dividends, distributions, realization or Deemed Disposition occurred.

Upon the realization or Deemed Disposition of a particular Special Investment (or a dividend or other distribution with respect thereto), each holder of Special Investment Shares of the series attributable to such Special Investment that continues to hold Class B Participating Shares of the series from which such Special Investment Shares were converted (a "Continuing Holder") shall have its Special Investment Shares of such series (or its portion of any dividend or distribution) converted into a new series of Class B Participating Shares. Immediately upon the realization or Deemed Disposition of a Special Investment (or dividend or other distribution with respect thereto), the Fund will allocate a

CONFIDENTIAL

GCC-NYAG0000665

CONFIDENTIAL

GCC-P 0335735

*pro rata* portion of its assets (or any such dividend or other distribution) attributable to such Special Investment (adjusted for distributions to a Withdrawn Shareholder (as defined below)) to the new series of Participating Shares, based on such series of Participating Shares' share (adjusted for any Withdrawn Shareholder) of the cost (or value, if appropriate) of the Special Investment. (See "Determination of Net Asset Value.")

**INVESTMENT ADVISORY FEES; OPERATING AND OTHER EXPENSES:**

The Fund pays the Investment Advisor or its designee, on a series-by-series basis, a Management Fee and an Incentive Fee. In the case of Class B Participating Shares held on or redeemed as of the end of a fiscal year, the Fund will pay as of the last day of such fiscal year (adjusted *pro rata* for any partial years): (i) a management fee equal to 1% of the beginning net asset value attributable to each such series of shares (including Special Investment Shares) (the "Management Fee") and (ii) an Incentive Fee equal to 20% of the increase, if any, in the net asset value attributable to each series of Class B Participating Shares as of the last business day of the fiscal year from either the net asset value attributable to each such series as of the first day of the fiscal year or, in the case of series of such Class B Participating Shares purchased during the fiscal year, the aggregate subscription price paid for such series (the "Incentive Fee"). Net appreciation in net asset value will not be reduced by prior years' investment losses (that is, there is no "high water mark" concept in the calculation of Incentive Fees) or by investment losses with respect to another series of Class B Participating Shares owned by such Shareholder.

The Fund has issued in the past, and may issue in the future, different classes of Participating Shares as to which the Management Fees and Incentive Fees are calculated on a different basis.

The Incentive Fee (and any accrued Management Fee) on Special Investment Shares will be paid out of the series of Class B Participating Shares (or the successor to such series) from which such shares were converted at the time of realization or Deemed Disposition of the Special Investment.

Upon a redemption of Class B Participating Shares for the purchase of Special Investment Shares, any accrued

10010873.14

9

CONFIDENTIAL

GCC-NYAG0000666

GCC-P 0335736

Incentive Fee shall be set aside (the "Set Aside Amount") until the realization or Deemed Disposition of the Special Investment to which such Special Investment Shares relate. Upon the realization or Deemed Disposition of a Special Investment, net realized or unrealized appreciation or depreciation attributable to such Special Investment shall be taken into account in determining the Incentive Fee at the end of such fiscal year and shall be aggregated with any Set Aside Amount.

The Fund and the Investment Advisor may agree to defer the Incentive Fee and/or the Management Fees due under the Investment Advisory Agreement. Up to 100% of the amount of any Management Fee and/or Incentive Fee which the Investment Advisor elects to defer in any year may be invested in the same manner or different manner as the Fund. As a result, the Investment Advisor may participate in the investment performance of the Fund. (See "Investment Advisory Agreement"; "Fees; Operating and Other Expenses.")

The Fund will bear its own operating and other expenses, including, but not limited to, investment-related expenses (e.g., brokerage commissions, clearing and settlement charges, custodial fees, interest expense, consulting, legal and other professional fees relating to particular investment opportunities, investment-related travel and lodging expenses, investment- and trading-related computer hardware and software, including, without limitation, trade order management software and risk management software and services), legal expenses, accounting, audit and tax preparation expenses, organizational expenses, expenses relating to the offer and sale of Participating Shares, Incentive Fees, Management Fees, extraordinary expenses and other similar expenses related to the Fund. Except for the Management Fee and the Incentive Fee, such expenses will be shared on a *pro rata* basis by all of the Shareholders of the Fund. A portion of research-related expenses may be paid for using "soft dollars" (as described below under "Brokerage Commissions"). To the extent that expenses to be borne by the Fund are paid by the Investment Advisor in excess of its ratable share, the Fund will reimburse the Investment Advisor for such expenses.

In addition, the Fund is responsible for certain expenses of the Investment Advisor, including, but not limited to,

10010873.14

10

CONFIDENTIAL

GCC-NYAG0000667

CONFIDENTIAL

GCC-P 0335737

rent and salaries of personnel. Historically, such expenses have not exceeded 1% of the Fund's net assets, however, there can be no assurance that this will continue to be true in the future.

If any of the above expenses are incurred jointly for the account of the Fund and any other investment funds or trading accounts sponsored or managed by the Investment Advisor or its affiliates, such expenses will be allocated to the Fund and such other funds or accounts in a manner as the Investment Advisor considers fair and reasonable. (See "Fees; Operating and Other Expenses"; "Brokerage Commissions"; "Auditors; Reports.")

**REDEMPTIONS:**

A Shareholder may redeem all or part of its Class B Participating Shares at the end of the calendar quarter after the two-year anniversary of the date such Class B Participating Shares were purchased (the "First Redemption Date") and, thereafter, on each anniversary of the First Redemption Date upon 30 days prior written notice to the Registrar.

Notwithstanding the foregoing, the redemption at the request of a holder of any series of Special Investment Shares is not permitted, and a Shareholder generally must hold Special Investment Shares until the realization or Deemed Disposition (described below) of the Special Investment represented by such Special Investment Shares.

In addition, if a Shareholder redeems all or substantially all of its outstanding Class B Participating Shares of a series (a "Withdrawn Shareholder") at a time when such Withdrawn Shareholder holds Special Investment Shares that were converted from Class B Participating Shares of such series (or the successor to such series), a portion of its proceeds with respect to such redemption may be reserved or held back to pay for the Management Fee expected to be earned over the life of the Special Investments. Any unearned portion of the Management Fee for which such reserve or holdback was made will be paid to the Shareholder at final realization or Deemed Disposition, together with Accrued Interest (as defined below). To the extent, the amount reserved or held back to pay Management Fees (as described above) does not cover Management Fees that would otherwise be payable over the life of the Special Investment, then such unpaid Management Fees may be paid out of profits, if any,

10010873.14

11

CONFIDENTIAL

GCC-NYAG0000668

earned in respect of such Special Investment for the period beginning from the time such shortfall begins to accrue until realization or Deemed Disposition. "Accrued Interest" is the amount of interest earned on any amount held back that, at the time of calculation, has not been applied to the Management Fees in respect of any Special Investment Shares of a Shareholder that has redeemed all or substantially all of its Class B Participating Share holdings.

Each date as of which a Shareholder redeems all or a portion of its Class B Participating Shares from the Fund is herein referred to as a "Redemption Date."

Redemption requests received for any Redemption Date may be limited to an amount equal to 25% of the net asset value of the Fund as of such date (the "Gate"). If redemption requests for a Redemption Date exceed the Gate, the Board of Directors may, in its sole discretion, (i) satisfy all such redemption requests or (ii) reduce such redemption requests *pro rata* in accordance with the aggregate net asset value of the Participating Shares held by each of the redeeming Shareholders, so that only 25% (or more, in the discretion of the Board of Directors) of the net asset value of the Fund is redeemed as of such date.

A redemption request that, solely as a result of the Gate, is not satisfied shall be carried forward for redemption or purchase as of the following Redemption Date until such request has been complied with in full; provided that requests for redemption which have been carried forward from an earlier Redemption Date shall (subject always to the foregoing limits) be complied with in priority to later requests.

The Board of Directors may waive notice requirements or permit redemptions under such circumstances and conditions as it, in its sole discretion, deems appropriate.

The redeeming Shareholder will receive the amount of its redeemed Class B Participating Shares in cash (less reserves determined by the Investment Advisor for contingent liabilities) within 90 days after redemption. If a Shareholder elects to redeem more than 95% of its Class B Participating Shares, the Fund will pay the Shareholder an amount equal to at least 95% (less a reserve of 5% pending audited financial statements) of

10010873.14

12

CONFIDENTIAL

GCC-NYAG0000669

CONFIDENTIAL

GCC-P 0335739

its estimated redemption proceeds (on the basis of unaudited data) as of the Redemption Date within 30 days after the Redemption Date, or sooner if the Board of Directors determines that funds to settle the redemption are available. The balance will be paid (subject to audit adjustments), without interest, within 30 days after completion of the audit of the Fund's books for such fiscal year.

The redemption price of Class B Participating Shares will be based on the per share net asset value of the Fund attributable to the series of Class B Participating Shares of which the redeemed Class B Participating Shares are a part as of the relevant Redemption Date. Partial redemptions are permitted so long as a redeeming Shareholder, after such redemption, continues to own at least $500,000 (or such other amount as the Board of Directors may from time to time determine either generally or in any particular case) of Class B Participating Shares of one or more series. (See "Redemptions.")

**SUSPENSION OF REDEMPTION RIGHTS; COMPULSORY REDEMPTION:**

The Board of Directors may declare a suspension of the determination of the prices of Participating Shares and the redemption rights of Participating Shares for the whole or any part of any period (i) during which by reason of the closure of or the suspension of trading on any money or foreign exchange market or commodities exchange or stock exchange, (ii) of a breakdown in any of the means normally employed by the Board of Directors or the Investment Adviser on behalf of the Board of Directors in ascertaining the value of securities or other assets, (iii) where, for any other reason, the value of any securities or assets owned or contracted for by the Fund cannot, in the opinion of the Board of Directors, be reasonably ascertained or (iv) where circumstances exist as a result of which, in their opinion it is not reasonably practicable for the Fund to realize any securities or other assets owned or contracted for by the Fund which together constitute a material proportion of the overall assets of the Fund.

Such suspension shall take effect at such times as the Board of Directors shall specify, but not later than the close of business of the business day following the declaration and shall continue until the Board of Directors declare the suspension at end, except that the suspension shall terminate in any event on the day following the first

10010873.14

13

CONFIDENTIAL

GCC-NYAG0000670

CONFIDENTIAL                                                    GCC-P 0335740

business day on which (i) the condition giving rise to the suspension ceases to exist and (ii) no other condition under which suspension is authorized exists.

In addition, the Board of Directors, by written notice to any Shareholder, may suspend the redemption rights of or payment of proceeds to such Shareholder if the Board of Directors reasonably deem it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Fund, the Investment Advisor or any of the Fund's other service providers. (See "Redemptions-Suspension of Redemption Rights; Compulsory Redemption; and Mandatory Redemption; Anti-Money Laundering Regulations.")

The Fund, in the Board of Directors' discretion, upon at least thirty days prior written notice to any Shareholder, may compel the redemption of all (but not some) of such Shareholder's Class B Participating Shares at any time, with or without cause if, in the opinion of the Board of Directors, the redemption of such Shareholder's Class B Participating Shares is, was or may be in the best interests of the Fund. (See "Redemptions-Suspension of Redemption Rights; Compulsory Redemption; Mandatory Redemption of All Shareholders; and Anti-Money Laundering Regulations.")

**MANDATORY REDEMPTION OF ALL SHAREHOLDERS:**

In addition, the Fund will mandatorily redeem all Shareholders of the Fund upon the first to occur of the following events: (i) on December 31, 2033, or the next succeeding business day; (ii) in the event of the termination of the agreement with the Investment Advisor unless a new agreement is entered into upon such termination with an investment advisor that is J. Ezra Merkin or an entity legally or beneficially owned as to 51% by J. Ezra Merkin or any family member of J. Ezra Merkin (iii) upon the incapacity or death of J. Ezra Merkin; or (iv) following a determination by the Directors that the Fund should be dissolved. (See "Redemptions-Mandatory Redemption of All Shareholders.")

**RESTRICTIONS ON TRANSFER:**

Class B Participating Shares and Special Investment Shares may not be pledged, assigned, hypothecated, sold, exchanged or transferred without the prior written consent of the Board of Directors, which consent may be given or withheld, in its discretion. Any attempt to pledge, assign, hypothecate, sell, exchange or transfer

10010873.14

14

CONFIDENTIAL

GCC-NYAG0000671

GCC-P 0335741

Class B Participating Shares and Special Investment Shares without the prior approval of the Board of Directors may subject such shares to compulsory redemption. There is no independent market for the purchase or sale of Class B Participating Shares or Special Investment Shares and none is expected to develop. Subscribers must represent that they are purchasing shares for investment. (See "Suitability Requirements; Limitations on Transferability.")

**CERTAIN RISK FACTORS:** There can be no assurance that the investment objective of the Fund will be achieved. Investments in illiquid securities and the use of short sales, options, leverage, futures and other derivative instruments may create special risks and substantially increase the impact of adverse price movements on the Fund's portfolio. The Incentive Fee to the Investment Advisor may create an incentive for the Investment Advisor to cause the Fund to make investments that are riskier than it would otherwise make. Moreover, an investment in the Fund provides limited liquidity since the Class B Participating Shares are not freely transferable, and the Shareholders will have limited redemption rights. (See "Certain Risk Factors.")

**LEVERAGE:** The Fund has the power to borrow and may do so when deemed appropriate by the Investment Advisor, including to enhance the Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. The use of leverage can, in certain circumstances, substantially increase the losses to which the Fund's investment portfolios may be subject. (See "Certain Risk Factors.")

**BROKERAGE COMMISSIONS:** Portfolio transactions for the Fund will be allocated to brokers on the basis of best execution and in consideration of a broker's ability to effect the transactions, its facilities, reliability and financial responsibility and the provision or payment by the broker of the costs of research and research-related services which are of benefit to the Fund, the Investment Advisor or related funds and accounts. Accordingly, the commission rates (or dealer markups and markdowns arising in connection with riskless principal transactions) charged to the Fund by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services. The Investment Advisor has not entered into,

10010873.14

15

CONFIDENTIAL

GCC-NYAG0000672

CONFIDENTIAL

GCC-P 0335742

and does not expect to enter into, any written soft dollar arrangements.

Morgan Stanley & Co., Inc. (the "Prime Broker") currently serves as the principal prime broker for the Fund and clears (generally on the basis of payment against delivery) the Fund's securities transactions that are effected through other brokerage firms. The Fund is not committed to continue its relationship with the Prime Broker for any minimum period and the Investment Advisor may select other or additional brokers to act as prime brokers for the Fund. (See "Brokerage Commissions.")

**CONFLICTS OF INTEREST:** The Investment Advisor and its affiliates will provide investment management services to managed accounts and other investment funds some of which have similar investment objectives to those of the Fund. Such activities may raise conflicts of interest. However, the Investment Advisor or its affiliates, as applicable, will undertake to do so in a manner that is consistent with their respective fiduciary duties to the Fund. (See "Conflicts of Interest.")

**U.S. REGULATORY MATTERS:** The Fund is not required to register as an investment company and, therefore, is not required to adhere to certain investment policies under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"). The Fund complies with Section 3(c)(7) of the Investment Company Act with respect to its sale of Shares to Permitted U.S. Persons (defined below) and, accordingly, such sales will be made on a private placement basis to Permitted U.S. Persons that are "qualified purchasers" as defined under the Investment Company Act.

The Investment Advisor is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "The Investment Advisor" and "Suitability Requirements; Limitations on Transferability.")

**SUITABILITY:** Class B Participating Shares are being offered to (i) persons who are not "U.S. Persons (as that term is defined herein under "Suitability Requirements; Limitations on Transferability"), and (ii) to Tax-Exempt U.S. Persons (as defined herein under "Tax Aspects-Tax-Exempt U.S. Persons") including tax-exempt

10010873.14

16

CONFIDENTIAL

GCC-NYAG0000673

CONFIDENTIAL

GCC-P 0335743

entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons (collectively, "Permitted U.S. Persons"). Each Permitted U.S. Person that purchases Class B Participating Shares must be, among other things, an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, as amended and a "qualified purchaser," as that term is defined in Section 2(a)(51) of the Investment Company Act. U.S. taxable investors should invest in the U.S. Partnership.

The Board of Directors, in its sole discretion, may decline to admit a prospective investor for any reason or for no reason, even if it satisfies the Fund's suitability requirements.    (See    "Suitability    Requirements; Limitations on Transferability.")

**TAXATION:**

Based on the Fund's organizational structure, anticipated methods of operation and features as described herein, the Fund generally should not be subject to U.S. federal income tax on gains from trading in securities and commodities.  In addition, interest from U.S. sources earned on bank deposits and "portfolio interest" as defined under the U.S. Internal Revenue Code of 1986, as amended, are not subject to withholding for U.S. federal income tax. However, dividend income and certain other interest from U.S. sources are subject to 30% withholding.

There is, at present, no direct taxation in the Cayman Islands and interest, dividends and gains payable to the Fund will be received free of all Cayman Islands taxes. The Fund is an exempted company under Cayman Islands law. The Fund has received an undertaking as to tax concessions pursuant to Section 6 of the Tax Concessions Law (1999 Revision) which provides that, for a period of 20 years from the date of issue of the undertaking (being 24 January 1989), no law thereafter enacted in the Cayman Islands imposing any taxes to be levied on profits, income, gains or appreciations will apply to the Fund or its operations.

There can be no assurance that the U.S. or Cayman Islands tax laws will not be changed adversely with respect to the Fund and its Shareholders or that the Fund's tax status will not be successfully challenged by such authorities.

30010873.14

17

CONFIDENTIAL

GCC-NYAG0000674

CONFIDENTIAL

GCC-P 0335744

Potential Shareholders should consult their own advisors regarding tax treatment by the jurisdiction applicable to them. Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them. (See "Tax Aspects.")

**ERISA AND OTHER TAX-EXEMPT ENTITIES:**

Tax-exempt entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other tax-exempt entities may purchase Class B Participating Shares of the Fund. Trustees or administrators of such entities are urged to carefully review the matters discussed in this Memorandum. Investment in the Fund by entities subject to ERISA and other tax-exempt entities requires special considerations. The Fund does not intend to permit investments by "benefit plan investors" (as defined in U.S. Department of Labor Plan Asset Regulation, 29 CFR 2510.3-101) to equal or exceed 25% of the value of any class of Class B Participating Shares in the Fund. (See "Certain Risk Factors", "Tax Aspects" and "ERISA Considerations.")

**AUDITORS:**

BDO Tortuga serves as the Fund's auditor. The Fund will provide to the Shareholders unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 120 days after year-end. Certain Shareholders may have access to certain information regarding the Fund that may not be available to other Shareholders. Such Shareholders may make investment decisions with respect to their investment in the Fund based on such information.

**LEGAL COUNSEL:**

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, acts as counsel to the Fund in connection with its offering of Class B Participating Shares. Schulte Roth & Zabel LLP also acts as counsel to the Investment Advisor and its affiliates. Maples and Calder, Grand Cayman, Cayman Islands, acts as Cayman Islands counsel to the Fund. In connection with the offering of Class B Participating Shares and subsequent advice to the Fund, the Investment Advisor, its affiliates, Schulte Roth & Zabel LLP and Maples and Calder will not be representing Shareholders. No independent counsel has been retained to represent Shareholders.

**SUBSCRIPTION FOR**

Prospective Shareholders interested in subscribing for

10010873.14

18

CONFIDENTIAL

GCC-NYAG0000675

**INTEREST:**          Class B Participating Shares will be furnished, and will be required to complete and return to the Fund, subscription documents.

10010873.14                                    19

CONFIDENTIAL                                    GCC-P 0335746

## THE FUND

Ariel Fund Limited, a Cayman Islands exempted company formed on December 28, 1988 (the "Fund"), was organized to operate as a private investment fund for the benefit of non-U.S. and Permitted U.S. Persons (as defined below) and any investors that the Fund's board of directors deems appropriate.

Gabriel Capital, L.P., a Delaware limited partnership organized for U.S. taxable investors, follows an investment program substantially similar to that of the Fund (the "U.S. Partnership"). The owner of the Investment Advisor (as defined below) also serves as the general partner of the U.S. Partnership. The U.S. Partnership and the Fund will invest on a side-by-side basis, unless differences in the investments of the U.S. Partnership or the Fund are deemed to be in the best interests of the respective fund's investors.

## INVESTMENT PROGRAM

The Fund's investment objective is to provide shareholders with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. Generally, the Fund will invest and trade in U.S. and non-U.S., marketable and non-marketable, equity and debt securities and options, as well as other evidences of ownership interest or indebtedness, including receivership certificates, and promissory notes and payables to trade creditors of distressed companies or companies in Chapter 11 bankruptcy proceedings, and commodities contracts, futures contracts (relating to stock indices, options on stock indices, commodities and options on commodities) and forward contracts. The Fund will invest in the securities of corporations believed to be fundamentally undervalued. The Fund will also make indirect investments with third-party managers, including investments through managed accounts and investments in mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), which engage in similar investment strategies as the Fund (collectively, "Other Investment Entities"). The Fund expects to invest in private and restricted securities. The Fund may utilize leverage when deemed appropriate by the Investment Advisor (as defined below), including to enhance the Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. There can be no assurance that the Fund's investment objective will be achieved.

When the Fund engages in investments through Other Investment Entities, fees, including performance-based fees, may be payable by the Fund, in addition to the fees payable to the Investment Advisor discussed below. In such cases, the Investment Advisor will retain overall investment responsibility for the portfolio of the Fund (although not the investment decisions of any independent money managers managing Other Investment Entities). Such arrangements are subject to periodic review by the Investment Advisor and are terminable at reasonable intervals in the Investment Advisor's discretion. The Fund may withdraw from or invest in different investment funds and terminate or enter into new investment advisory agreements without prior notice to, or consent of, the Shareholders.

From time to time, the Investment Advisor may, in its sole discretion, acquire assets or securities that the Investment Advisor believes lack a readily ascertainable market value or otherwise lack sufficient liquidity. Certain of these investments (not exceeding 40% of the net

10010873.14

20

CONFIDENTIAL

GCC-NYAG0000677

asset value of the Class B Participating Shares (as defined below), calculated at the time such investments are designated, and with such investments valued at cost) may be designated special investments (each a "Special Investment") as the Investment Advisor shall determine in its sole discretion. In addition, existing investments may be designated Special Investments and will be valued at their carry value when so designated. **Shares attributable to a Special Investment are allocated *pro rata* to those investors that are Shareholders (defined below) at the time a Special Investment is made (or designated).**

The Investment Advisor will not permit more than the greater of 50% of the Fund's capital and 25% of the Fund's total assets (on a cost basis, giving consideration to hedging techniques utilized) to be invested in a single investment. Moreover, it will not permit more than 10% of the Fund's capital to be placed at risk in a single investment. The Investment Advisor will have the discretion to determine how much is at risk for purposes of this test.

The Investment Advisor intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions he can follow more closely. The Investment Advisor expects to primarily engage in distressed and bankruptcy investing (including private equity investments) and risk and other arbitrage transactions (including capital structure arbitrage transactions). There can be no assurance that any of the hoped-for benefits of the foregoing approach will be realized. Moreover, the Investment Advisor reserves the right to deviate from the foregoing approach to the extent he deems appropriate. To the extent that the Fund trades in commodities and futures and related options, the Fund will incur additional risks. Because of the low margin deposits normally required in futures trading, the same risks as those resulting from leverage described below will be particularly present. In addition, due to market and regulatory factors, commodities and futures and related options may be less liquid than other types of investments.

The Investment Advisor reserves the right to alter or modify some or all of the Fund's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the Investment Advisor, in its sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the Investment Advisor considers an acceptable level of risk.

The Fund will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms.

* * *

The descriptions contained herein of specific strategies that the Fund may engage in should not be understood as in any way limiting the Fund's investment activities. The Fund may engage in investment strategies that are not described herein, but that Investment Advisor considers appropriate.

The Fund's investment program is speculative and may entail substantial risks. Since market risks are inherent in all investments to varying degrees, there can be no assurance that the Fund's investment objectives will be achieved. In fact, certain

10010873.14                                    21

CONFIDENTIAL                                    GCC-NYAG0000678

investment practices described above can, in some circumstances, substantially increase the adverse impact on the Fund's investment portfolios. (See "Certain Risk Factors").

## THE INVESTMENT ADVISOR

The Fund's assets are invested by Gabriel Capital Corporation (the "Investment Advisor"), a Delaware corporation, pursuant to the terms of an Investment Advisory Agreement between the Investment Advisor and the Fund (the "Investment Advisory Agreement") subject to the policies and control of the board of directors of the Fund (the "Board of Directors"). All of the outstanding capital stock of the Investment Advisor is owned or controlled by J. Ezra Merkin.

Mr. Merkin is currently the general partner of Gabriel Capital, L.P. and Ascot Partners, L.P. and is involved in managing several other offshore funds. Prior to that, Mr. Merkin served as Managing Partner of Gotham Capital, L.P., an investment Fund, from 1985 to 1988. Mr. Merkin was associated with Halcyon Investments from 1982 to 1985 and with the law firm of Milbank, Tweed, Hadley & McCloy from 1979 to 1982. Mr. Merkin graduated from Columbia College magna cum laude and is a member of Phi Beta Kappa. He is an honors graduate of Harvard Law School. Mr. Merkin currently serves as chairman of the investment committee of two private endowment funds.

The Investment Advisor is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

## THE BOARD OF DIRECTORS

The Fund has two directors who serve as the Board of Directors to the Fund. Don M. Seymour and Aldo Ghisletta serve as directors to the Fund and will remain directors until their resignation or removal. The directors, who each serve in a non-executive capacity, have delegated the day-to-day operation of the Fund to service providers, including the Investment Advisor and the Registrar (as defined below). In performing their duties, the directors are entitled to, and generally do, rely upon work performed by and information received from such service providers.

Biographical information relating to the directors is set forth below:

*Don M. Seymour.* Don Seymour is a Managing Director of dms Management Ltd., a company management firm licensed and regulated under the laws of the Cayman Islands, where he serves on the boards of several notable investment companies. He is also a previous Director of the Cayman Islands Monetary Authority, an independent government agency responsible for the regulation of the financial services industry and of Cayman Airways Limited, the national airline of the Cayman Islands. He is a Notary Public and a previous member of the Trade & Business Licensing Board of the Cayman Islands.

Prior to founding dms Management Ltd., Mr. Seymour was the Head of the Investment Services Division of the Cayman Islands Monetary Authority where he directed the authorization, supervision and enforcement of regulated mutual funds under the Mutual Funds Law, and the supervision of company managers under the Companies Management Law, of the Cayman Islands. Prior to that, he was a Manager, Audit and Business Advisory Services, with

10010873.14

22

CONFIDENTIAL

CONFIDENTIAL

Price Waterhouse where he was responsible for serving major investment management clients.

He holds a BBA degree in Accounting from the University of Texas at Austin and qualified as a Certified Public Accountant in the State of Illinois.

*Aldo Ghisletta.* Aldo Ghisletta is a Director of dms Management Ltd., a company management firm, licensed and regulated under the laws of the Cayman Islands. Previously, he was General Manager of Morval Bank & Trust Cayman Ltd. where he directed its private banking, mutual fund administration, trust and companies administration operations in the Cayman Islands. Prior to that, he was Vice-President of Banca Unione di Credito, a Swiss banking group, where he was responsible for its mutual funds administration, securities trading, accounting and administration operations in Lugano and Zurich. He holds a degree in Banking and Accounting from the Unione di Banche Svizzere, Bellinzona.

Additional directors may be appointed from time to time. The Articles of Association provide for the appointment of alternate directors who have all of the rights and powers of the directors in whose stead such persons are appointed. A director cannot vote in respect of any agreement or transaction in which he or she has a material interest unless the material facts of such interest are disclosed in good faith at a meeting of the directors, or in writing to the directors, and no other director objects to the interested director voting on such matter.

The Fund has agreed to indemnify and hold harmless members of the Board of Directors, auditors and officers from and against any loss or expense which they, or any of them, shall or may incur or sustain by reason of any act done or omitted in the execution of their duties in their respective offices, unless they incur or sustain such loss or expense by or through their own willful neglect or willful default.

Directors are each paid $5,500 annually for their services.

## THE REGISTRAR

Fortis Prime Fund Solutions (Cayman) Limited acts as share registration and transfer agent of the Fund (the "Registrar"), and is a company registered in the Cayman Islands. The Registrar has a Trust License issued under the Banks and Trust Companies Law (2003 Revision) of the Cayman Islands and has an unrestricted Mutual Fund Administrator's License issued under the Mutual Funds Law (2003 Revision) of the Cayman Islands.

The Registrar is one of the largest of the Cayman Islands' licensed fund administrators providing full administrative services to over 450 funds with net assets in excess of $47 billion. The Registrar is a wholly-owned subsidiary of Fortis Bank (Cayman) Limited and is part of the Fortis Group.

## SUBSCRIPTION PROCEDURE

Persons interested in subscribing for Class B Participating Shares (as defined below) will be furnished with, and will be required to complete and return to the Registrar, subscription documents and certain other documents and wire their subscription monies (net of charges) to the Fund's subscription account as detailed in the subscription document. The

10010873.14

23

CONFIDENTIAL

CONFIDENTIAL

Registrar's address is: P.O. Box 2003 GT, Grand Pavilion Commercial Center, 802 West Bay Road, Grand Cayman, Cayman Islands. Please direct inquiries to the Share Registration Group at the Registrar, Telephone: (345) 949-7942 and Facsimile: (345) 914-9903.

Each subscriber will also be required to acknowledge in its subscription application that the Fund, the Registrar and/or the Investment Advisor, and any of their affiliates, may disclose to each other, to any other service provider to the Fund or to any regulatory body in any applicable jurisdiction copies of the subscriber's subscription application, including details of that Shareholder's holdings in the Fund, historical and pending transactions in the Class B Participating Shares and the values thereof, and any information concerning the subscriber provided by the subscriber to the Fund, the Registrar, the Investment Advisor or to any of their affiliates and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on such person by law or otherwise.

## THE OFFERING OF SHARES

The Fund may offer Class B Participating Shares to prospective new Shareholders as of the beginning of each quarter (or at such other times as the Fund in its sole discretion may allow).

The Class B Participating Shares will be offered in series. The Class B Participating Shares that are issued on the first date that Class B Participating Shares are purchased will be designated Class B Participating Shares of the initial series (the "Initial Series"). A new series will be established on each date that Class B Participating Shares are issued. Class B Participating Shares issued to the same subscriber but on different days will also be issued in separate series. Upon the issuance of a series of Class B Participating Shares, an account for such series will be created to which shall be credited initially the subscription proceeds of such series and thereafter the prorated portion of the profits and gains (realized and unrealized) of the Fund and from which shall be debited prorated losses, expenses and liabilities of the Fund, including any accrued and unpaid fees owed to the Investment Advisor with respect to such series, and dividends and proceeds of redemption in respect of shares of that series when paid.

The Fund may consolidate different series of Class B Participating Shares into the Initial Series (or one or more other series of Class B Participating Shares) of such class (based on the net asset value of each such series being consolidated at the time of consolidation). Net appreciation in net asset value will not be reduced by prior years' investment losses (that is, there is no "high water mark" concept in connection with the consolidation of a series).

It is anticipated that no dividends will be paid on the Class B Participating Shares. The Fund will retain and reinvest the net income derived from its investments.

The minimum initial subscription is $1,000,000 and subscriptions may be made in integral multiples thereafter of $1,000, subject to the discretion of the Fund to accept other amounts; provided, however, that under no circumstances shall the Fund accept initial subscriptions of less than $50,000 or such other minimum amount specified from time to time under Cayman Islands law. Shareholders may subscribe for additional shares in amounts of at least $250,000, subject to the discretion of the Board of Directors to accept other amounts.

10010873.14                                        24

CONFIDENTIAL

GCC-NYAG0000681

In providing services to the Fund, neither the Board of Directors, the Investment Advisor nor the Registrar acts as guarantor or offeror of the Class B Participating Shares.

## THE SHARES

The Fund has authorized capital of 1,500,000 participating non-voting shares, of a nominal par value of $0.01 per share and 1,000 non-participating voting shares, of a nominal par value of $1.00 per share (the "Founders Shares"). The Fund is offering non-voting Class B Participating Shares pursuant to this Confidential Offering Memorandum (the "Class B Participating Shares"). The Fund has Class A Participating Shares outstanding that are held by shareholders who invested in the Fund prior to February 1, 2006 (the "Class A Participating Shares" and together with the Class B Participating Shares, the "Participating Shares") that have different redemption rights and less exposure to Special Investments than the Class B Participating Shares. Class A Participating Shares purchased prior to February 1, 2006 may be redeemed on the last business day of each calendar quarter upon 30 days prior written notice to the Fund. In addition, up to 25% of the net asset value of Class A Participating Shares may be designated as Special Investments. Class B Participating Shares may not be redeemed until the end of the calendar quarter after the two-year anniversary of the date such Class B Participating Shares were purchased (the "First Redemption Date") and, thereafter, on each anniversary of the First Redemption Date upon 30 days prior written notice to the Fund.

The Founders Shares are the only shares issued by the Fund that carry voting rights. All of the Founders Shares of the Fund are currently owned by Fortis Bank (Cayman) Limited, as trustee of The Ariel Trust, a Cayman Islands trust. Holders of Founders Shares are not entitled to participate in the appreciation of the Fund's assets, but are entitled to a return of par value upon liquidation or dissolution of the Fund.

The Board of Directors may also establish other classes of shares at such times and on such terms as may be determined in its sole discretion.

All Shareholders are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Memorandum of Association and Articles of Association of the Fund.

Under the terms of the Fund's Memorandum of Association and Articles of Association, the liability of the Shareholders is limited to any amount unpaid on their Shares. As the Shares can only be issued if they are fully paid, the Shareholders will not be liable for any debt, obligation or default of the Fund beyond their interest in the Fund.

## SPECIAL INVESTMENT SHARES

The Fund also has the authority to issue Special Investment Shares (defined below) to the extent that the Fund holds Special Investments. Upon the acquisition of a Special Investment (or designation of an existing investment as a Special Investment), the Fund will allocate a *pro rata* portion of its assets attributable to the Class B Participating Shares to a new series of special investment shares ("Special Investment Shares"), and such series will represent

10910873.14                                           25

CONFIDENTIAL                                                       GCC-P 0335752

the Special Investment. Immediately upon the Fund making or designating a Special Investment, the Investment Advisor will determine the value of such Special Investment.

Special Investments generally will be valued at cost unless the Investment Advisor determines, in its sole discretion, that another valuation method represents the Special Investments' "fair value".

Special Investment Shares will be issued in series, and each series will represent interests in one Special Investment of the Fund. A portion of each series of the Class B Participating Shares (based on each such series' *pro rata* portion of the Net Asset Value (as defined herein) of all Class B Participating Shares after taking into account any accrued Management Fee) having an aggregate Net Asset Value equal to the cost (or value, if appropriate) of the Special Investment will be converted (by redemption or reissue) to the new series of Special Investment Shares. Each holder of Class B Participating Shares shall receive a *pro rata* portion of the series of Special Investment Shares converted from Class B Participating Shares. Class B Participating Shares converted to Special Investment Shares will not be outstanding as of the date the related Special Investment is made or designated. A series of Special Investment Shares will not be converted back into the series of Class B Participating Shares (or the successor to such series) from which they were converted, until the Special Investment represented by such series of Class B Participating Shares is realized or the Investment Advisor determines that such investment should no longer be maintained as a Special Investment (any such determination by the Investment Advisor with respect to a Special Investment shall hereinafter be referred to as a "Deemed Disposition").

In the event the Fund makes an investment which the Investment Advisor determines is a follow-up investment to a Special Investment (each, a "Follow-Up Investment"), the participating Shareholders in such Special Investment shall share in such Follow-Up Investment in proportion to their interest in the related Special Investment Shares; provided, however, that the Investment Advisor, in its reasonable discretion, may permit additional Shareholders in such Special Investment to participate in such Follow-Up Investment; provided further, however, that if a Shareholder shall have redeemed its shares from the Fund, the Investment Advisor shall equitably adjust the percentage interests of the remaining Shareholders to reflect such Withdrawn Shareholder's nonparticipation in the Follow-Up Investment. In its discretion, the Investment Advisor need not designate as a "Follow-Up Investment" an additional investment in the same or similar opportunity as the investment for which Special Investment Shares have been issued. Such investment may be designated as a new Special Investment.

### SALES CHARGES

There are no sales charges payable to the Investment Advisor or the Fund in connection with the offering of Participating Shares.

### FISCAL YEAR

The fiscal year of the Fund will end on December 31 of each calendar year.

10010573:14

26

CONFIDENTIAL                                                    GCC-NYAG0000683

## DETERMINATION OF NET ASSET VALUE

The Board of Directors has delegated day-to-day responsibility for valuing the Fund's assets to the Investment Advisor. The net asset value of a class, or a series, of the Class B Participating Shares will be equal to the gross assets less the gross liabilities attributable to such class or series of Class B Participating Shares as of any date of determination.

Because the various series of a class of Participating Shares will be issued at different dates, the net asset value per Participating Share (the "Net Asset Value per Share") of each series of Participating Shares may differ. The Net Asset Value per Share is generally determined by first allocating any increase or decrease in the net asset value of the Fund for the period of calculation among each class of Participating Shares, then allocating any increase or decrease in the net asset value of the relevant class for such period among each series of Participating Shares of that class *pro rata* in accordance with the net asset value of each such series at the beginning of such period, then dividing the net asset value of such series by the number of outstanding Participating Shares thereof. Participating Shares within a series will have the same Net Asset Value per Share. Any Management Fee (as defined below) or Incentive Fee (as defined below) determined with respect to a particular series of Participating Shares will be charged against such series.

Given the illiquid nature of the Special Investments, the net asset value of a series of Special Investment Shares cannot be determined with the same degree of certainty and will be carried on the books of the Fund at fair value (generally, at cost) as determined by the Investment Advisor until the occurrence of the realization or Deemed Disposition of the Special Investment (as described below).

In the case of a series of Class B Participating Shares to which a series of Special Investment Shares relates, the amount of any dividends or other distributions with respect to such Special Investment Shares and net profits or loss realized upon the realization or Deemed Disposition of such Special Investment Shares shall be included in the determination of the increase in the Net Asset Value attributable to such series of Class B Participating Shares in the period in which such dividends, distributions, realization or Deemed Disposition occurred.

Upon the realization or Deemed Disposition of a particular Special Investment (or a dividend or other distribution with respect thereto), each holder of Special Investment Shares of the series attributable to such Special Investment that continues to hold Class B Participating Shares of the series from which such Special Investment Shares were converted (a "Continuing Holder") shall have its Special Investment Shares of such series (or its portion of any dividend or distribution) converted into a new series of Class B Participating Shares. Immediately upon the realization or Deemed Disposition of a Special Investment (or dividend or other distribution with respect thereto), the Fund will allocate a *pro rata* portion of its assets (or any such dividend or other distribution) attributable to such Special Investment (adjusted for distributions to a Withdrawn Shareholder (as defined below)) to the new series of Participating Shares, based on such series' of Participating Shares' share (adjusted for any Withdrawn Shareholder) of the cost (or value, if appropriate) of the Special Investment.

10010873.14                                    27

CONFIDENTIAL

GCC-NYAG0000684

## INVESTMENT ADVISORY FEES; OPERATING AND OTHER EXPENSES

The Fund pays the Investment Advisor or its designee, on a series-by-series basis, a Management Fee and an Incentive Fee. In the case of Class B Participating Shares held on or redeemed as of the end of a fiscal year, the Fund will pay as of the last day of such fiscal year (adjusted *pro rata* for any partial years): (i) a management fee equal to 1% of the beginning net asset value attributable to each such series of shares (including Special Investment Shares) (the "Management Fee") and (ii) an Incentive Fee equal to 20% of the increase, if any, in the net asset value attributable to each series of Class B Participating Shares as of the last business day of the fiscal year from either the net asset value attributable to each such series as of the first day of the fiscal year or, in the case of series of such Class B Participating Shares purchased during the fiscal year, the aggregate subscription price paid for such series (the "Incentive Fee"). Net appreciation in net asset value will not be reduced by prior years' investment losses (that is, there is no "high water mark" concept in the calculation of Incentive Fees) or by investment losses with respect to another series of Class B Participating Shares owned by such Shareholder.

The Fund has issued in the past, and may issue in the future, different classes of Participating Shares as to which the Management Fees and Incentive Fees are calculated on a different basis.

The Incentive Fee (and any accrued Management Fee) on Special Investment Shares will be paid out of the series of Class B Participating Shares (or the successor to such series) from which such shares were converted at the time of realization or Deemed Disposition of the Special Investment.

Upon a redemption of Class B Participating Shares for the purchase of Special Investment Shares, any accrued Incentive Fee shall be set aside (the "Set Aside Amount") until the realization or Deemed Disposition of the Special Investment to which such Special Investment Shares relate. Upon the realization or Deemed Disposition of a Special Investment, net realized or unrealized appreciation or depreciation attributable to such Special Investment shall be taken into account in determining the Incentive Fee at the end of such fiscal year and shall be aggregated with any Set Aside Amount.

The Fund and the Investment Advisor may agree to defer the Incentive Fee and/or the Management Fee due under the Investment Advisory Agreement. Up to 100% of the amount of any Management Fee which the Investment Advisor elects to defer in any year may be invested in the same manner or different manner as the Fund. As a result, the Investment Advisor may participate in the investment performance of the Fund.

Operating and Other Expenses.

The Fund will bear its own operating and other expenses, including, but not limited to, investment-related expenses (*e.g.*, brokerage commissions, clearing and settlement charges, custodial fees, interest expense, consulting, legal and other professional fees relating to particular investment opportunities, investment-related travel and lodging expenses, investment- and trading-related computer hardware and software, including, without limitation, trade order management software and risk management software and services), legal expenses, accounting, audit and tax preparation expenses, organizational expenses, expenses relating to the offer and

10010873.14

28

CONFIDENTIAL

GCC-NYAG0000685

CONFIDENTIAL

GCC-P 0335755

sale of the Participating Shares, Incentive Fees, Management Fees, extraordinary expenses and other similar expenses related to the Fund. Except for the Management Fee and the Incentive Fee, such expenses will be shared on a *pro rata* basis by all of the Shareholders of the Fund. A portion of research-related expenses may be paid for using "soft dollars" (as described below under "Brokerage Commissions"). To the extent that expenses to be borne by the Fund are paid by the Investment Advisor in excess of its ratable share, the Fund will reimburse the Investment Advisor for such expenses.

In addition, the Fund is responsible for certain expenses of the Investment Advisor, including, but not limited to, rent and salaries of personnel. Historically, such expenses have not exceeded 1% of the Fund's net assets, however, there can be no assurance that this will continue to be true in the future.

If any of the above expenses are incurred jointly for the account of the Fund and any other investment funds or trading accounts sponsored or managed by the Investment Advisor or its affiliates, such expenses will be allocated to the Fund and such other funds or accounts in a manner as the Investment Advisor considers fair and reasonable.

## REDEMPTIONS

A Shareholder may redeem all or part of its Class B Participating Shares as of the First Redemption Date, and, thereafter, on each anniversary of the First Redemption Date upon 30 days prior written notice to the Registrar.

Notwithstanding the foregoing, the redemption at the request of a holder of any series of Special Investment Shares is not permitted, and a Shareholder generally must hold Special Investment Shares until the realization or Deemed Disposition (described below) of the Special Investment represented by such Special Investment Shares.

In addition, if a Shareholder redeems all or substantially all of its outstanding Class B Participating Shares of a series (a "Withdrawn Shareholder") at a time when such Withdrawn Shareholder holds Special Investment Shares that were converted from Class B Participating Shares of such series (or the successor to such series), a portion of its proceeds with respect to such redemption may be reserved or held back to pay for the Management Fee expected to be earned over the life of the Special Investments. Any unearned portion of the Management Fee for which such reserve or holdback was made will be paid to the Shareholder at final realization or Deemed Disposition, together with Accrued Interest (as defined below). To the extent, the amount reserved or held back to pay Management Fees (as described above) does not cover Management Fees that would otherwise be payable over the life of the Special Investment, then such unpaid Management Fees may be paid out of profits, if any, earned in respect of such Special Investment for the period beginning from the time such shortfall begins to accrue until realization or Deemed Disposition. "Accrued Interest" is the amount of interest earned on any amount held back that, at the time of calculation, has not been applied to the Management Fees in respect of any Special Investment Shares of a Shareholder that has redeemed all or substantially all of its Class B Participating Share holdings.

Each date as of which a Shareholder redeems all or a portion of its Class B Participating Shares from the Fund is herein referred to as a "Redemption Date."

10010873.14

29

CONFIDENTIAL

CONFIDENTIAL

GCC-NYAG0000686

GCC-P 0335756

Redemption requests received for any Redemption Date may be limited to an amount equal to 25% of the net asset value of the Fund as of such date (the "Gate"). If redemption requests for a Redemption Date exceed the Gate, the Board of Directors may, in its sole discretion, (i) satisfy all such redemption requests or (ii) reduce such redemption requests pro rata in accordance with the aggregate net asset value of the Participating Shares held by each of the redeeming Shareholders, so that only 25% (or more, in the discretion of the Board of Directors) of the net asset value of the Fund is redeemed as of such date.

A redemption request that, solely as a result of the Gate, is not satisfied shall be carried forward for redemption or purchase as of the following Redemption Date until such request has been complied with in full; provided that requests for redemption which have been carried forward from an earlier Redemption Date shall (subject always to the foregoing limits) be complied with in priority to later requests.

The Board of Directors may waive notice requirements or permit redemptions under such circumstances and conditions as it, in its sole discretion, deems appropriate.

The redeeming Shareholder will receive the amount of its redeemed Class B Participating Shares in cash (less reserves determined by the Investment Advisor for contingent liabilities) within 90 days after redemption. If a Shareholder elects to redeem more than 95% of its Class B Participating Shares, the Fund will pay the Shareholder an amount equal to at least 95% (less a reserve of 5% pending audited financial statements) of its estimated redemption proceeds (on the basis of unaudited data) as of the Redemption Date within 30 days after the Redemption Date, or sooner if the Board of Directors determines that funds to settle the redemption are available. The balance will be paid (subject to audit adjustments), without interest, within 30 days after completion of the audit of the Fund's books for such fiscal year.

The redemption price of Class B Participating Shares will be based on the per share net asset value of the Fund attributable to the series of Class B Participating Shares of which the redeemed Class B Participating Shares are a part as of the relevant Redemption Date. Partial redemptions are permitted so long as a redeeming Shareholder, after such redemption, continues to own at least $500,000 (or such other amount as the Board of Directors may from time to time determine either generally or in any particular case) of Class B Participating Shares of one or more series.

Suspension of Redemption Rights; Compulsory Redemption.

The Board of Directors may declare a suspension of the determination of the prices of Participating Shares and the redemption rights of Participating Shares for the whole or any part of any period (i) during which by reason of the closure of or the suspension of trading on any money or foreign exchange market or commodities exchange or stock exchange, (ii) of a breakdown in any of the means normally employed by the Board of Directors or the Investment Advisor on behalf of the Board of Directors in ascertaining the value of securities or other assets, (iii) where, for any other reason, the value of any securities or assets owned or contracted for by the Fund cannot, in the opinion of the Board of Directors, be reasonably ascertained or (iv) where circumstances exist as a result of which, in their opinion it is not reasonably practicable for the Fund to realize any securities or other assets owned or contracted for by the Fund which together constitute a material proportion of the overall assets of the Fund.

10010873.14

30

CONFIDENTIAL

CONFIDENTIAL

Such suspension shall take effect at such times as the Board of Directors shall specify, but not later than the close of business of the business day following the declaration and shall continue until the Board of Directors declare the suspension at end, except that the suspension shall terminate in any event on the day following the first business day on which (i) the condition giving rise to the suspension ceases to exist and (ii) no other condition under which suspension is authorized exists.

In addition, the Board of Directors, by written notice to any Shareholder, may suspend the redemption rights or payment of proceeds of such Shareholder if the Directors reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Fund, the Investment Advisor or any of the Fund's other service providers.

The Fund, in the Board of Directors' discretion, upon at least thirty days prior written notice to any Shareholder, may compel the redemption of all (but not some) of such Shareholder's Class B Participating Shares at any time, with or without cause if, in the opinion of the Board of Directors, the redemption of such Shareholder's Class B Participating Shares is, was or may be in the best interests of the Fund.

Mandatory Redemption of All Shareholders.

In addition, the Fund will mandatorily redeem all Shareholders of the Fund upon the first to occur of the following events: (i) on December 31, 2033, or the next succeeding business day; (ii) in the event of the termination of the agreement with the Investment Advisor unless a new agreement is entered into upon such termination with an investment advisor that is J. Ezra Merkin or an entity legally or beneficially owned as to 51% by J. Ezra Merkin or any family member of J. Ezra Merkin (iii) upon the incapacity or death of J. Ezra Merkin; or (iv) following a determination by the Directors that the Fund should be dissolved.

## CERTAIN RISK FACTORS

PARTICIPATION BY INVESTORS IN THE FUND SHOULD BE CONSIDERED A HIGH RISK INVESTMENT. THE FOLLOWING SPECIAL CONSIDERATIONS AND RISKS TOGETHER WITH OTHER MATTERS SET FORTH ELSEWHERE IN THIS CONFIDENTIAL OFFERING MEMORANDUM SHOULD BE CONSIDERED CAREFULLY, BUT ARE NOT INTENDED TO BE AN EXHAUSTIVE LISTING OF ALL POTENTIAL RISKS ASSOCIATED WITH AN INVESTMENT IN THE FUND.

The Nature of Transactions Involving Reorganizations. The Fund will purchase securities and other instruments at a discount to their expected value upon consummation of an announced or anticipated reorganization. Such purchases may be made at prices which are only slightly below such expected value but are substantially in excess of the market price of the securities or other instruments prior to the announcement of the reorganization. In addition, if the Fund determines that the offer price for a security which is the subject of a tender offer is likely to be increased, either by the original bidder or by another party, the Fund may purchase securities above the offer price; such purchases are subject to a high degree of risk. As a result, if the reorganization is not consummated or is delayed, the value of such securities or other

10010873.14

31

CONFIDENTIAL

GCC-P 0335758

instruments may decline significantly and the Fund may sell them at a loss. In addition, if the ultimate value of the cash and/or securities distributed upon consummation of the reorganization is less than expected, the Fund may realize a loss. The potential for loss may be increased by the Fund's use of borrowings to purchase securities or other instruments.

No proposed reorganization is certain to be consummated. There are several factors which may result in the termination of a reorganization. These include opposition by the management or shareholders of the company or companies involved in the reorganization; opposition by regulatory agencies whose approval may be required; litigation; a material adverse change in the business of the company or companies involved in the reorganization or the securities markets generally; passage of legislation by governmental entities restricting certain types of reorganizations; and other circumstances, including, but not limited to, the failure to meet certain conditions customarily specified in acquisition agreements. These factors may also cause significant delays, during which the Fund's capital will be committed and interest charges on any funds borrowed to finance the Fund's investments may be incurred.

The Fund may also make certain speculative purchases and sales of securities. Such purchases and sales may include securities which the Investment Advisor believes to be undervalued or overvalued, as the case may be, or where other companies in the same or a related industry have been the subject of reorganizations. If the Fund purchases securities in anticipation of a reorganization, and a reorganization does not in fact occur, the Fund may sell the securities at a material loss. Further, when securities are purchased in anticipation of a reorganization, a substantial period of time may elapse between the Fund's purchase of the securities and the reorganization. During this period, a portion of the Fund's capital would be committed to the securities purchased, and the Fund may finance such purchases with borrowed funds on which it will have to pay interest.

The Investment Advisor will attempt to assess risk in determining the nature and extent of the investment the Fund will make in specific securities. However, many risks cannot be quantified.

Non-marketable Obligations. Non-marketable obligations include promissory notes and other evidences of ownership or indebtedness, as well as payables to trade creditors of distressed companies and companies in Chapter 11 bankruptcy proceedings. These securities and instruments ordinarily remain unpaid unless and until the company reorganizes and/or emerges from Chapter 11. There can be no assurance that a reorganization plan favorable to the class of securities held by the Fund will be adopted or that the subject company might not eventually be liquidated rather than reorganized. These obligations may be highly speculative and may have to be held for an extended period of time. The ultimate value realized upon redemption of such obligations depends upon the recapitalization or reorganization plan adopted in Chapter 11. There can be no assurance that the cash and/or securities, if any, ultimately received in redemption of the obligations will equal the Fund's cost. In a Chapter 11 proceeding, there can be considerable delay in reaching accord on a restructuring plan acceptable to a bankrupt company's lenders, bondholders and other creditors and then getting that plan approved by the bankruptcy court, and during this period a portion of the Fund's capital would be invested in the non-marketable obligations purchased, and the Fund may finance such purchases with borrowed funds on which it will have to pay interest. Furthermore, there is a risk that the Chapter 11 reorganization will be unsuccessful and that the obligations will become worthless.

10010873.14                                   32

CONFIDENTIAL                                   GCC-NYAG0000689

Arbitrage Transactions. The Fund may purchase securities at prices often only slightly below the anticipated value to be paid or exchanged for such securities in a merger, exchange offer or cash tender offer which the Fund determines is probable and substantially above the prices at which such securities traded immediately prior to announcement of the merger, exchange offer or cash tender offer. If the proposed transaction appears likely not to be consummated or in fact is not consummated or is delayed, the market price of the security to be tendered or exchanged may be expected to decline sharply, which would result in a loss to the Fund. Moreover, where a security to be issued in a merger or exchange offer has been sold short as a hedge in the expectation that the short position will be covered by delivery of such security when issued, failure of the merger or exchange offer to be consummated may force an arbitrageur to cover its short position in the market at a higher price than its short sale, with a resulting loss.

The consummation of mergers and tender and exchange offers can be prevented or delayed by a variety of factors, the likelihood of occurrence of which can be very difficult to evaluate. A tender or exchange offer by one company for the securities of another will often be opposed by the management or shareholders of the target company on the grounds that the consideration offered is inadequate or for a variety of other reasons. Even where a merger or tender or exchange offer has been agreed upon by the management of the two companies involved, its consummation may be prevented or delayed by intervention of a government regulatory agency; a shareholder's suit to enjoin the proposed transaction; in the case of a merger, the failure of the shareholders of the company to be acquired, and, where necessary, the acquiring company, to approve the merger; market conditions resulting in material changes in securities prices; and a variety of other circumstances. In case of a tender or exchange offer made for less than all outstanding securities of an issue with the provision that, if a greater number is tendered, securities will be accepted *pro rata*, a tendering arbitrageur may have returned, and be forced to sell at a loss, a portion of the securities tendered.

Other Transactions. The Fund may also make certain purchases of securities as to which no extraordinary corporate transaction has been announced. Such purchases may include securities which the Investment Advisor believes to be undervalued, or where a significant position in the securities of the particular company has been taken by one or more other persons or where other companies in the same or a related industry have been the subject of acquisition attempts. If the Fund purchases securities in anticipation of an acquisition attempt or reorganization, and an acquisition attempt or reorganization does not in fact occur, the Fund may sell the securities at a substantial loss. Further, when securities are purchased in anticipation of an acquisition attempt or reorganization, a substantial period of time may elapse between the Fund's purchase of the securities and the acquisition attempt or reorganization. During this period, a portion of the Fund's capital would be committed to the securities purchased, and the Fund may finance such purchases with borrowed funds on which it will have to pay interest.

Proxy Contests. The Fund may invest in securities of a company which is the subject of a proxy contest in the expectation that new management will be able to improve the company's performance or effect a sale or liquidation of its assets so that the price of the subject company's securities will increase to a price above that paid for the securities by the Fund. If the incumbent management of the subject company is not defeated or if new management is unable to improve the company's performance or sell or liquidate the company, the market price of the securities of the subject company will typically fall to a price below that paid for the securities

10010873.14

33

CONFIDENTIAL

GCC-NYAG0000690

by the Fund, causing the Fund to suffer a loss. In addition, even upon the successful completion of a proxy contest, the market price of the securities of the subject company may not rise to a price above that paid for the securities by the Fund.

Options Transactions. The Fund may engage from time to time in various types of options transactions, including hedging and arbitrage in options on securities. This activity is designed to reduce the risks attendant in short-selling and in taking long positions in certain transactions and may involve stock options on a registered option exchange and offsetting transactions in the underlying stock, or offsetting transactions in one or more options for stock. The Fund also may take positions in options on stock of companies which may, in the judgment of the Investment Advisor, be potential acquisition candidates in merger, exchange offer or cash tender offer transactions. If the potential acquisition candidate does not become the subject of a merger, exchange offer or cash tender offer, the Fund may suffer a loss.

When the Fund purchases an option, it must pay the price of the option and transaction charges to the broker effecting the transaction. If the option is exercised by the Fund, the total cost of exercising the option may be more than the brokerage costs which would have been payable had the underlying security been purchased directly. If the option expires, the Fund will lose the cost of the option. The ability to trade in or exercise options may be restricted in the event that trading in the underlying issue becomes restricted. Options trading may also be illiquid with respect to contracts with extended expirations.

In certain transactions the Fund may not be "hedged" against market fluctuations or, in liquidation situations, the hedge may not accurately value the assets of the company being liquidated. This can result in losses, even if the proposed transaction is consummated.

Futures Contracts. The value of futures depends upon the price of the instruments, such as commodities, underlying them. The prices of futures are highly volatile, and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Fund's positions trade or of its clearinghouses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses or from entering into desired trades. In extraordinary circumstances, a futures exchange or the CFTC could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.

Forward Trading. Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as

10010873.14                                      34

CONFIDENTIAL                                           GCC-NYAG0000691

principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade, and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in forward markets due to unusually high trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward (and futures) trading to less than that which the Investment Advisor would otherwise recommend, to the possible detriment of the Fund. Market illiquidity or disruption could result in significant losses to the Fund.

Participation in Unfriendly Transactions. The Fund may seek to initiate acquisition or restructuring transactions or proxy fights against the wishes of the subject company's management, or may actively participate in transactions of this sort initiated by others. Such transactions typically become embroiled in litigation, and participants therein may be found to have violated any of the many laws and regulations applicable thereto. This could impose substantial cost and expense (including litigation expense) on the Fund, and subject it to various legal remedies such as injunctions against future participation in these transactions, disgorgement of gains, loss of voting rights or forced disposition of the investment. Participation in such transactions may also require the Fund to make significant disclosure concerning its operations.

Short Selling. Short selling involves selling securities which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the investor to profit from a decline in market price to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. The extent to which the Fund engages in short sales will depend upon the Investment Advisor's investment strategy and opportunities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Fund of buying those securities to cover the short position. There can be no assurance that the Fund will be able to maintain the ability to borrow securities sold short. In such cases, the Fund can be "bought in" (i.e., forced to repurchase securities in the open market to return to the lender). There also can be no assurance that the securities necessary to cover a short position will be available for purchase at or near prices quoted in the market. Purchasing securities to close out a short position can itself cause the price of the securities to rise further, thereby exacerbating the loss.

Market Risk and Lack of Diversification. Substantial risks are involved in the acquisition or disposition of securities. Securities and their issuers are affected by, among other things: changing supply and demand; federal, state and governmental laws, regulations and enforcement activities; trade, fiscal and monetary programs and policies; and national and international political and economic developments. The concentration of assets in particular types of investments could subject the assets of the Fund to increased volatility. The Fund's investment plan does not constitute a balanced investment plan. The securities in which the Fund may invest may be regarded as of high risk. Such securities are subject to a number of risk

10010873.14

35

CONFIDENTIAL                                                    GCC-P 0335762

factors, including market volatility, creditworthiness of the issuer, liquidity of the secondary trading market, and availability of market quotations.

Leverage.    The Fund's anticipated use of short-term margin borrowings, investment in derivative securities and the use of repurchase agreements create certain risks to the Fund. The use of leverage may increase the Fund's risk of loss of capital or securities, as a relatively small price movement in an instrument may result in immediate and substantial loss. For example, should the securities pledged to brokers to secure the Fund's margin accounts decline in value, the Fund could be subject to a "margin call," pursuant to which the Fund must either deposit additional funds with the broker or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden, precipitous drop in value of the Fund's assets occasioned by a market "crash", the Fund might not be able to liquidate assets quickly enough to pay off its margin debt. Consequently, fluctuations in the value of the Fund's portfolio will have a significant effect in relation to the Fund's capital. Although currently the Fund utilizes leverage from time to time, as investment opportunities change (e.g., arbitrage opportunities increase) the amount of borrowings which the Fund may have outstanding at any time may be large in relation to its capital. In addition, the level of interest rates generally, and the rates at which the Fund can borrow in particular, will be an expense of the Fund and therefore affect the operating results of the Fund.

Derivatives.    Derivative securities, in addition to being highly volatile and speculative, may be internally leveraged such that each percentage change in interest rates will have a multiple effect on the derivative security. Certain positions, therefore, may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. Certain transactions in derivatives may expose the Fund to potential losses that exceed the amount originally invested by the Fund. Repurchase agreements are structured so that the Fund sells securities to another party, usually a bank or other securities firm, and agrees to repurchase them at an agreed upon price and date. A repurchase agreement is the equivalent of borrowing money and pledging securities as collateral.

Risks of Litigation.    Investing in distressed securities can be a contentious and adversarial process. Different investor groups may have qualitatively different, and frequently conflicting, interests. The Fund's investment activities may include activities that are hostile in nature and will subject it to the risks of becoming involved in litigation by third-parties. This risk may be greater where the Fund exercises control or significant influence over a company's direction. The expense of defending against claims against the Fund by third-parties and paying any amounts pursuant to settlements or judgments would be borne by the Fund and would reduce net assets. The Investment Advisor will be indemnified by the Fund in connection with such litigation, subject to certain conditions.

Lending of Portfolio Securities.    The Fund may from time to time lend securities from its portfolio to brokers, dealers and financial institutions such as banks and trust companies. The borrower may fail to return the securities involved in such transactions, particularly if such borrower is in financial distress, in which event the Fund may incur a loss.

Portfolio Turnover.    The Fund currently does not have high portfolio turnover, however, to the extent certain strategies become a larger part of the Fund's investment strategy

10010873.14

36

CONFIDENTIAL

CONFIDENTIAL

GCC-NYAG0000693

GCC-P 0335763

(e.g., arbitrage strategies), portfolio turnover may be high.  Typically, high portfolio turnover results in correspondingly high transaction costs, including brokerage commission expenses.

<u>Overall Investment Risk.</u>  All securities investments risk the loss of capital.  The nature of the securities to be purchased and traded by the Fund and the investment techniques and strategies to be employed by it may increase such risk.  Moreover, the identification of investment opportunities is a difficult task, and there can be no assurance that such opportunities will be successfully recognized by the Fund.  While the Investment Advisor will devote its best efforts to the management of the Fund's portfolio, there can be no assurance that the Fund will not incur losses.  Returns generated from the Fund's investments may not adequately compensate Shareholders for the business and financial risks assumed.  A Shareholder should be aware that it may lose all or a substantial part of its investment in the Fund.  Many unforeseeable events, including actions by various government agencies and domestic and international economic and political developments, may cause sharp market fluctuations that could adversely affect the Fund's portfolio and performance.

<u>Liquidity of Investments.</u>  The Fund may invest in unregistered securities of publicly held companies, securities of privately held companies and other illiquid securities.  Such investments may be difficult to value.  They may, by their nature, entail a prolonged investment horizon from the initial investment date to final disposition.  It may not be possible to sell such securities on short notice and, if possible, such sales may require substantial discounts.  Certain of these investments may be designated Special Investments.

<u>Currency Exchange Exposure.</u>  The Fund may invest a portion of its assets in the securities of non-U.S. issuers and other instruments denominated in non-U.S. currencies, the prices of which are determined with reference to currencies other than the U.S. dollar.  The Fund, however, values its securities and other assets in U.S. dollars.  The Fund may or may not seek to hedge its non-U.S. currency exposure by entering into currency hedging transactions, such as treasury locks, forward contracts and futures contracts.  There can be no guarantee that instruments suitable for hedging currency or market shifts will be available at the time when the Fund wishes to use them, or that hedging techniques employed by the Fund will be effective.  Furthermore, certain currency market risks may not be fully hedged or hedged at all.

To the extent unhedged, the value of the Fund's positions in non-U.S. investments will fluctuate with U.S. dollar exchange rates as well as the price changes of the investments in the various local markets and currencies.  In such cases, an increase in the value of the U.S. dollar compared to the other currencies in which the Fund makes its investments will reduce the effect of any increases and magnify the effect of any decreases in the prices of the Fund's securities in their local markets and may result in a loss to the Fund.  Conversely, a decrease in the value of the U.S. dollar will have the opposite effect on the Fund's non-U.S. dollar investments.

<u>Non-U.S. Investments.</u>  The Fund may invest in financial instruments of non-U.S. corporations and governments.  Investing in the financial instruments of companies (and, from time to time, governments) outside of the U.S. involves certain considerations that may not be associated with investing in financial instruments of U.S. companies or the U.S. Government, including political and economic considerations, such as greater risks of expropriation, nationalization, confiscatory taxation, imposition of withholding and other taxes on interest,

10010873.14                                        37

CONFIDENTIAL                                        GCC-NYAG0000694

CONFIDENTIAL                                        GCC-P 0335764

dividends, capital gains and other income, limitations on the removal of assets and general social, political and economic instability; the relatively small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; the evolving and unsophisticated laws and regulations applicable to the securities and financial services industries of certain countries; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict the Fund's investment opportunities. In addition, accounting and financial reporting standards that prevail outside of the U.S. may not be as high as U.S. standards and, consequently, less information is typically available concerning companies located outside of the U.S. than for those located in the U.S. As a result, the Fund may be unable to structure its transactions to achieve the intended results or to mitigate all risks associated with such markets. It may also be difficult to enforce the Fund's rights in such markets. For example, financial instruments traded on non-U.S. exchanges and the non-U.S. persons that trade these instruments are not subject to the jurisdiction of the Securities and Exchange Commission or Commodity Futures Trading Commission or the securities and commodities laws and regulations of the U.S. Accordingly, the protections accorded to the Fund under such laws and regulations are unavailable for transactions on foreign exchanges and with foreign counterparties.

  <u>Counterparty Risk</u>. Some of the markets in which the Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to the same credit evaluation and regulatory oversight as are members of "exchange–based" markets. In addition, many of the protections afforded to participants on some organized exchanges, such as the performance guarantee of an exchange clearinghouse, might not be available in connection with such "over-the-counter" transactions. This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a credit or liquidity problem, thus causing the Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties. The Investment Advisor is not restricted from dealing with any particular counterparty or from concentrating any or all of the Funds transactions with one counterparty. Moreover, the Investment Advisor has no formal credit function which evaluates the creditworthiness of the Fund's counterparties. The ability of the Fund to transact business with any one or number of counterparties, the lack of any meaningful and independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

  In addition, the counterparties with which the Fund effects transactions may, from time to time, cease making markets or quoting prices in certain of the instruments. In such instances, the Fund may be unable to enter into a desired transaction in currencies, or to enter into an offsetting transaction with respect to an open position, which might adversely affect its performance. Further, in contrast to exchange-traded instruments, forward, spot and option contracts on currencies do not provide a trader with the right to offset its obligations through an equal and opposite transaction. For this reason, in entering into forward, spot or options contracts, the Fund may be required, and must be able, to perform its obligations under the contract.

10010873.14

CONFIDENTIAL

GCC-NYAG0000695

CONFIDENTIAL

GCC-P 0335765

## The Fund

**Limited Liquidity.** An investment in the Fund provides limited liquidity since Class B Participating Shares are not freely transferable, and the redemption rights of the Shareholders are restricted. A Shareholder may not redeem any Special Investment Shares, unless otherwise determined by the Board of Directors. A Shareholder will retain its interest in any Special Investment Shares until the realization or Deemed Disposition of the Special Investment relating to such Special Investment Shares. Because the Fund may invest up to 40% of the net asset value of Class B Participating Shares in Special Investments, a Shareholder may not be able to redeem any of its Participating Shares for an indefinite period of time.

Furthermore, Shareholders are subject to the Gate (as defined below), and may only redeem Participating Shares subject to restrictions on timing. The Board of Directors may suspend redemption rights, in whole or in part, when there exists in the opinion of the Board of Directors a state of affairs where disposal of the Fund's assets, or the determination of the net asset value of the Fund, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming Shareholders. Such limitations on liquidity must be considered significant.

**Effect of Shareholder Redemption.** A significant redemption of Class B Participating Shares from the Fund may cause a temporary imbalance in the Fund's portfolio, which may adversely affect the remaining Shareholders.

**Valuation of the Fund's Assets.** The directors have delegated day-to-day responsibility for valuing the Fund's assets to the Investment Advisor. The Investment Advisor calculates the value of the assets of the Fund. If the Investment Advisor determines that the market price does not fairly represent the value of an investment, the Investment Advisor will value such investment as it reasonably determines. (See "Determination of Net Asset Value.")

**Required Redemptions.** The Class B Participating Shares of any Shareholder may be redeemed with or without cause by the Board of Directors of the Fund and such Shareholder may be required to redeem from the Fund, as of the last day of any calendar month, if the Board of Directors determines that such termination and redemption are in the best interests of the Fund. The Board of Directors shall give 30 days notice of any such determination to such Shareholder. Such mandatory withdrawal may create adverse tax and/or economic consequences to the Shareholder depending on the timing thereof in respect of the Fund and the Shareholder.

**Cross Series Liability.** All liabilities, irrespective of whatever series they are attributable to, shall (in the event of a winding up of the Fund or a redemption of all of the Class B Participating Shares of a series), unless otherwise agreed upon with the creditors, be binding on the Fund as a whole and, accordingly, liabilities of one series may impact on and be paid out of one or more other series.

**Layering of Fees.** The Fund may invest in Other Investment Entities. To the extent the Fund invests in such Other Investment Entities, Shareholders may be subject to management fees, incentive fees and expenses at both the level of the Fund and the level of the underlying Other Investment Entities.

10010873.14

39

CONFIDENTIAL

GCC-NYAG0000696

CONFIDENTIAL

GCC-P 0335766

<u>Reports to Shareholders</u>.  The Fund may offer certain Shareholders additional information and reporting that other Shareholders may not receive, and such information may affect a Shareholder's decision to request a redemption of its Class B Participating Shares.

<u>Competition</u>.  The securities industry generally, and the business of investing in reorganization related securities or instruments in particular, is extremely competitive, and is expected to remain so in the foreseeable future.  As a result, the Fund may under perform funds with similar investment strategies, or the market in general.

<u>Exculpation of the Registrar from Liability</u>.  The share registration agreement (the "Share Registration Agreement") between the Fund and Fortis Prime Fund Solutions (Cayman) Limited (the "Registrar") provides that the Registrar will not be liable for, and will be indemnified by the Fund against, any loss or damage unless such loss or damage is sustained or suffered by reason of the gross negligence or willful breach of duty of the Registrar.  As a result, investors in the Fund may be entitled to a more limited right of action against the Registrar than they would otherwise have had absent such a limitation in the Share Registration Agreement described herein.

<u>Success Dependent on Investment Advisor</u>.  The success of the Fund depends primarily upon the Investment Advisor.  The death or incapacity of J. Ezra Merkin would result in the required redemption of all Class B Participating Shares in issue upon a date at the redemption price upon such date as the Fund's Board of Directors may in their discretion determine.

<u>Incentive Fee</u>.  The Investment Advisor earns a fee based on the increase in the Fund's net asset value as an Incentive Fee.  Performance-based compensation is calculated on a basis which includes unrealized appreciation of the Fund's assets, and may be greater than if such allocation were based solely on realized gains.  It is possible that the Incentive Fee may be based, in part, on the unrealized appreciation of securities (including securities of Other Investment Entities in which the Fund may have invested) for which market quotations are not readily available.  The value of such securities will be determined solely by the Investment Advisor.  Any valuation of such securities will be based on the Investment Advisor's expertise and experience in valuing similar securities and will be reviewed by the Fund's independent auditors in preparing their annual certified audit of the Fund.

The Incentive Fee will be calculated on a series-by-series basis.  The period of time for which particular fee calculations are made may differ from series to series.  Thus, it is possible that an Incentive Fee may be earned by the Investment Advisor with respect to a series of shares that would not have been earned had the Incentive Fee been calculated on an aggregate -- and not series-by-series -- basis.

The Fund has issued in the past, and may issue in the future, Participating Shares for which the Incentive Fee is calculated on a basis different from the method of calculating the Incentive Fee set forth herein.  There is no "high water mark" concept in the calculation of Incentive Fees.

<u>Independent Money Managers</u>.  The Investment Advisor may delegate investment discretion for all or a portion of the Fund's funds to money managers, other than the Investment

10010873.14                                    40

CONFIDENTIAL

GCC-NYAG0000697

Advisor, or make investments with Other Investment Entities. Although the Investment Advisor will exercise reasonable care in selecting such independent money managers or Other Investment Entities and will monitor the results of those money managers and Other Investment Entities, the Investment Advisor may not have custody over the funds invested with the other money managers or with Other Investment Entities. The risk of loss of the funds invested with other money managers or with Other Investment Entities may not be insured by any insurance company, bonding company, governmental agency, or other entity and the Investment Advisor is not liable for any such loss. Independent money managers and managers of Other Investment Entities selected by the Investment Advisor may receive compensation based on the performance of their investments as well as asset-based management fees. Performance-based compensation usually is calculated on a basis which includes unrealized appreciation of the Fund's assets, and may be greater than if such compensation were based solely on realized gains. Further, a particular independent money manager or manager of an Other Investment Entity may receive incentive compensation in respect of its portfolio for a period even though the Fund's overall portfolio depreciated during such period. The independent money managers and Other Investment Entities will trade wholly independently of one another and may at times hold economically offsetting positions.

Indemnification of the Investment Advisor from Liability. The Investment Advisory Agreement provides that the Investment Advisor will not be liable for, and will be indemnified by the Fund against, any act or omission if such act or omission resulted from a mistake of judgment on the part of the Investment Advisor, or from action or inaction which the Investment Advisor and/or his legal representative reasonably believed to be in the best interests of the Fund. As a result, Shareholders may be entitled to a more limited right of action against the Investment Advisor than they would otherwise have had absent such a limitation in the Investment Advisory Agreement. Such indemnification, however, shall not relieve the Investment Advisor or his legal representative of any liability, to the extent that such liability may not be waived, modified or limited under applicable law (including, without limitation, liability under U. S. federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith).

Other Activities. In addition to managing the Fund, the Investment Advisor will manage other funds and managed accounts, which may have similar investment objectives to the Fund. The Investment Advisor will allocate overhead expenses among the Fund and the managed accounts on a fair basis, as determined by the Investment Advisor. These other activities will require a substantial amount of the Investment Advisor's time and effort.

Statutory Regulations and Non-Registration. The financial services industry generally, and the activities of hedge funds and their managers, in particular, have been subject to increasing regulation and oversight. This may increase the Fund's and the Investment Advisor's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight can also impose administrative burdens on the Investment Advisor, including, without limitation, responding to investigations and implementing new policies and procedures. Such burdens may divert the Investment Advisor's time, attention and resources from portfolio management activities.

The Fund is not required to be registered under the U.S. Securities Act of 1933, as amended (the "1933 Act"), or the U.S. Investment Fund Act of 1940, as amended (the

10010873.14

41

CONFIDENTIAL

GCC-NYAG0000698

"Investment Company Act"), or any similar state law. Sales to Permitted U.S. Persons are restricted to those persons that are "qualified purchasers" under Section 3(c)(7) of the Investment Company Act. In addition, the Investment Advisor is not registered, and is not required to be registered by reason of an exemption from registration, as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended (or any similar law). Thus, except for certain anti-fraud protections, investors in the Fund are not accorded the protection provided by such legislation.

The Investment Advisor has claimed an exemption under U.S. Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(4) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption. In accordance with such exemption, at all times either (a) the aggregate initial margin and premiums required to establish commodity interest positions will not exceed 5% of the liquidation value of the Fund's portfolio or (b) the aggregate net notional value of commodity interest positions will not exceed 100% of the liquidation value of the Fund's portfolio.

Factors Affecting Investments.  There are a number of factors which may adversely affect the ability of the Fund to pursue its investment strategy. There is a limited availability of debt financing for takeovers of highly leveraged companies. Mergers of a certain size require approval of the U.S. Federal Trade Commission (the "FTC") or other government agencies because of potential antitrust implications. It is possible at any time for the FTC or other governmental agency to more vigorously enforce the antitrust laws affecting mergers. In addition, there are state laws aimed at curbing takeovers and courts have given management greater authority to employ defensive measures in the face of hostile takeover attempts where management believes doing so is in the long-term interest of the company. Many companies generally have adopted various measures aimed at making takeovers more difficult and expensive. Similarly, changing economic conditions, accounting standards and tax and securities laws (among other factors) may impair the profitability of the types of transactions in which the Fund intends to invest, adversely affecting its operations.

Terrorist Action.  There is a risk of terrorist attacks on the United States and elsewhere which may cause significant loss of life and property damage and disruptions in global markets. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of any such event is unclear, but could have a material effect on general economic conditions and market liquidity.

PAST RESULTS OF THE FUND MAY NOT BE INDICATIVE OF FUTURE PERFORMANCE.  NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund. Prospective investors should read this entire Confidential Offering Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.

10010873.14

CONFIDENTIAL

GCC-NYAG0000699

CONFIDENTIAL

GCC-P 0335769

## CONFLICTS OF INTEREST

The Investment Advisor and its affiliates will provide investment management services to managed accounts and other investment funds, some of which have similar investment objectives to those of the Fund. The portfolio strategies the Investment Advisor and its affiliates may use for other investment funds or accounts could conflict with the transactions and strategies employed by the Investment Advisor in managing the Fund and affect the prices and availability of the securities and other financial instruments in which the Fund invests.

The Investment Advisor and its affiliates will devote as much of their time to the activities of the Fund as the Investment Advisor deems necessary and appropriate. The terms of the Investment Advisory Agreement do not restrict the Investment Advisor or its affiliates from forming additional investment funds, from entering into other investment management relationships, or from engaging in other business activities, even though such activities may be in competition with the Fund and/or may involve substantial time and resources of the Investment Advisor or its affiliates. In the event the Investment Advisor or any of its affiliates decide to engage in such activities in the future, the Investment Advisor or its affiliates, as applicable, will undertake to engage in such activities in a manner that is consistent with their fiduciary duties, if any, to the Fund. Nevertheless, these activities could be viewed as creating a conflict of interest in that the time and effort of the Investment Advisor and its affiliates will not be devoted exclusively to the business of the Fund, but will be allocated between the business of the Fund and the management of the monies of other advisees of the Investment Advisor and its affiliates.

When it is determined that it would be appropriate for the Fund and one or more other funds and managed accounts of the Investment Advisor or its affiliates to participate in an investment opportunity, the Investment Advisor will seek to execute orders for all of the participating investment accounts, including the Fund, on an equitable basis, taking into account such factors as the relative amounts of capital available for new investments, relative exposure to short-term market trends, and the investment programs and portfolio positions of the Fund and the affiliated entities for which participation is appropriate. Orders may be combined for all such accounts, and if any order is not filled at the same price, they may be allocated on an average price basis. Similarly, if an order on behalf of more than one account cannot be fully executed under prevailing market conditions, securities may be allocated among the different accounts on a basis that the Investment Advisor considers equitable.

The Investment Advisor may share office space with third-party money managers. If the managers were to acquire inside information with respect to certain securities, the Fund will be precluded from purchasing securities to which such inside information relates or be precluded from selling securities held by the Fund that were purchased before the inside information was acquired.

Subject to internal compliance policies and approval procedures, the Investment Advisor and its employees as well as members and employees of its affiliates, may engage, from time to time, in personal trading of securities and other instruments, including securities and instruments in which the Funds may invest. Any such trading will be effected after the Funds have effected their transactions.

10010873.14

43

CONFIDENTIAL

GCC-NYAG0000700

CONFIDENTIAL

GCC-P 0335770

## BROKERAGE COMMISSIONS

Portfolio transactions for the Fund will be allocated to brokers on the basis of best execution and in consideration of a broker's ability to effect the transactions, its facilities, reliability and financial responsibility and the provision or payment by the broker of the costs of research and research-related services which are of benefit to the Fund, the Investment Advisor or related funds. Accordingly, the commission rates (or dealer markups and markdowns arising in connection with riskless principal transactions) charged to the Fund by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services. The Investment Advisor has not entered into, and does not expect to enter into, any written soft dollar arrangements.

Investors in the Fund may include fund of funds affiliated with brokers or, possibly, brokerage firms themselves. The fact that any such investor has invested in the Fund will not be taken into consideration in selecting brokers (including prime brokers).

The Fund's securities transactions can be expected to generate a substantial amount of brokerage commissions and other compensation, all of which the Fund, not the Investment Advisor, will be obligated to pay. The Investment Advisor will have complete discretion in deciding what brokers and dealers the Fund will use and in negotiating the rates of compensation the Fund will pay.

Morgan Stanley & Co., Inc. (the "Prime Broker") currently serves as the principal prime broker for the Fund, and clears (generally on the basis of payment against delivery) the Fund's securities transactions that are effected through other brokerage firms. The Prime Broker also acts as custodian of the Fund's securities, but receives no separate fees therefor. The Fund is not committed to continue its relationship with the Prime Broker for any minimum period and the Investment Advisor may select other or additional brokers to act as prime brokers for the Fund.

From time to time, brokers (including the Prime Broker) may assist the Fund in raising additional funds from investors, and representatives of the Investment Advisor may speak at conferences and programs sponsored by the Prime Broker for investors interested in investing in hedge funds. Through such "capital introduction" events, prospective investors in the Fund and the Domestic Fund have the opportunity to meet with the Investment Advisor. Neither the Investment Advisor nor the Fund compensates the Prime Broker for organizing such events or for any investments ultimately made by prospective investors attending such events. However, such events and other services (including, without limitation, capital introduction services) provided by the Prime Broker may influence the Investment Advisor in deciding whether to use such prime broker in connection with brokerage, financing and other activities of the Fund. However, the Investment Advisor will not commit to a broker to allocate a particular amount of brokerage in any such situation.

## INVESTMENT ADVISORY AGREEMENT

The Investment Advisor has entered into an investment advisory agreement with the Fund (the "Investment Advisory Agreement"). Pursuant to the Investment Advisory Agreement, the Investment Advisor provides investment advisory services to the Fund. The

10010873.14

44

CONFIDENTIAL

GCC-NYAG0000701

CONFIDENTIAL

GCC-P 0335771

Investment Advisory Agreement shall continue until such time as (i) the Fund sells all or substantially all of the assets not in the ordinary course of business; or (ii) the Fund is liquidated or dissolved and its assets are distributed.

Pursuant to the Investment Advisory Agreement, the Fund pays the Investment Advisor or its designee, on a series-by-series basis, a Management Fee and an Incentive Fee. In the case of Class B Participating Shares held on or redeemed as of the end of a fiscal year, the Fund will pay as of the last day of such fiscal year (adjusted *pro rata* for any partial years): (i) a management fee equal to 1% of the net asset value attributable to each such series of shares (including Special Investment Shares) (the "Management Fee") and (ii) an Incentive Fee equal to 20% of the increase, if any, in the net asset value attributable to each series of Class B Participating Shares as of the last business day of the fiscal year from either the net asset value attributable to each such series as of the first day of the fiscal year or, in the case of a series of such Class B Participating Shares purchased during the fiscal year, the aggregate subscription price paid for such series. Net appreciation in net asset value will not be reduced by prior years' investment losses (that is, there is no "high water mark" concept in the calculation of Incentive Fees) or by investment losses with respect to another series of Class B Participating Shares owned by such Shareholder. Given the illiquid nature of Special Investments, the net asset value of a series of "Special Investment Shares" (described below) cannot be determined with the same degree of certainty and will be carried on the books of the Fund at fair value (generally, at cost) as determined by the Investment Advisor until the occurrence of the realization or Deemed Disposition of the Special Investment (as described below).

In the case of a series of Class B Participating Shares to which a series of Special Investment Shares relates, the amount of any dividends or other distributions with respect to such Special Investment Shares and net profits or loss realized upon the realization or Deemed Disposition of such Special Investment Shares shall be included in the determination of the increase in the Net Asset Value attributable to such series of Class B Participating Shares in the period in which such realization or Deemed Disposition occurred.

The Fund and the Investment Advisor may agree to defer the Incentive Fee and/or the Management Fee under the Investment Advisory Agreement. Up to 100% of the amount of any Management Fee which the Investment Advisor elects to defer in any year may be invested in the same manner or different manner as the Fund. As a result, the Investment Advisor may participate in the investment performance of the Fund.

The Fund will indemnify the Investment Advisor for any losses due to action or inaction that the Investment Advisor reasonably believed to be in the best interests of the Fund, and the Investment Advisor will not be liable to the Fund for such action or inaction. The Investment Advisor may take market positions for the account of other funds or for its own account which are different from or opposite to the Fund's positions. Such indemnification, however, shall not relieve the Investment Advisor or his legal representative of any liability, to the extent that such liability may not be waived, modified or limited under applicable law (including, without limitation, liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith).

In planning the Fund's investment strategy and making trading decisions, the Investment Advisor, at its sole discretion, may consult with other professionals active in the

10010873.14

45

CONFIDENTIAL

GCC-NYAG0000702

CONFIDENTIAL

GCC-P 0335772

markets, including independent money managers and investment advisors to Other Investment Entities with whom, or in which, the Fund's assets are invested.

CONFIDENTIAL

GCC-NYAG0000703

CONFIDENTIAL                                                                GCC-P 0335773

## TAX ASPECTS

**CIRCULAR 230 NOTICE.** THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE SHAREHOLDERS. EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT ITS PROFESSIONAL TAX ADVISOR WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR STATUS OF A PROSPECTIVE SHAREHOLDER. IN ADDITION, SPECIAL CONSIDERATIONS (NOT DISCUSSED HEREIN) MAY APPLY TO PERSONS WHO ARE NOT DIRECT SHAREHOLDERS IN THE FUND BUT WHO ARE DEEMED TO OWN SHARES AS A RESULT OF THE APPLICATION OF CERTAIN ATTRIBUTION RULES.

The Fund has not sought a ruling from the U.S. Internal Revenue Service (the "Service") or any other U.S. federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has it obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain potential U.S. federal tax consequences which may be relevant to prospective shareholders. The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practices, all of which are subject to change, retroactively as well as prospectively. A decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND OPERATIONS OF THE FUND THE FUND GENERALLY SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

U.S. Trade or Business

Section 864(b)(2) of the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), provides a safe harbor (the "Safe Harbor") applicable to a non-U.S. corporation (other than a dealer in securities) that engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its own account pursuant to which such non-U.S.

10010873.14                                             47

CONFIDENTIAL

GCC-NYAG0000704

CONFIDENTIAL                                             GCC-P 0335774

corporation will not be deemed to be engaged in a U.S. trade or business. The Safe Harbor also provides that a non-U.S. corporation (other than a dealer in commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place." Pursuant to proposed regulations, a non-U.S. taxpayer (other than a dealer in stocks, securities or derivatives) that effects transactions in the United States in derivatives (including (i) derivatives based upon stocks, securities, and certain commodities, and (ii) certain notional principal contracts based upon an interest rate, equity, or certain commodities and currencies) for its own account is not deemed to be engaged in a United States trade or business. Although the proposed regulations are not final, the Service has indicated in the preamble to the proposed regulations that for periods prior to the effective date of the proposed regulations, taxpayers may take any reasonable position with respect to the application of Section 864(b)(2) of the IRC to derivatives, and that a position consistent with the proposed regulations will be considered a reasonable position.

The Fund intends to conduct its business in a manner so as to meet the requirements of the Safe Harbor. Thus, the Fund's securities and commodities trading activities should not constitute a U.S. trade or business and, except in the limited circumstances discussed below, the Fund should not be subject to the regular U.S. income tax on any of its trading profits. Other Investment Entities that meet the Safe Harbor will also not be subject to regular U.S. income tax. However, if certain of the Fund's or Other Investment Entities' activities were determined not to be of the type described in the Safe Harbor, the activities of the Fund or such Other Investment Entities, respectively, may constitute a U.S. trade or business in which case the Fund or such Other Investment Entities would be subject to U.S. income and branch profits tax on the income and gain from those activities. In addition, if any credit default swap is characterized as a contract of insurance or a guarantee, payments to the Fund or on Other Investment Entities under such credit default swap may be subject to an excise tax or a withholding tax.

Even if the Fund's or Other Investment Entities' securities trading activity does not constitute a U.S. trade or business, gains realized from the sale or disposition of stock or securities (other than debt instruments with no equity component) of U.S. Real Property Holding Corporations (as defined in Section 897 of the IRC) ("USRPHCs"), including stock or securities of certain Real Estate Investment Trusts ("REITs"), will be generally subject to U.S. income tax on a net basis. However, a principal exception to this rule of taxation would apply if such USRPHC has a class of stock which is regularly traded on an established securities market and the Fund or Other Investment Entities generally did not hold (and was not deemed to hold under certain attribution rules) more than 5% of the value of a regularly traded class of stock or securities of such USRPHC at any time during the five year period ending on the date of disposition.[1] Moreover, if the Fund or Other Investment Entities were deemed to be engaged in

---

[1]    The Fund will also be exempt from tax on dispositions of REIT shares, whether or not those shares are regularly traded, if less than 50% of the value of such shares is held, directly or indirectly, by non-U.S. persons at all times during the five-year period ending on the date of disposition. However, even if the disposition of REIT shares would be exempt from tax on a net basis, distributions from a REIT (whether or not such REIT is a USRPHC), to the extent attributable to the REIT's disposition of interests in U.S. real property, are subject to tax on a net basis when received by the Fund and may be subject to the branch profits tax. Under new legislation, distributions from certain publicly traded REITs to non-U.S.

CONFIDENTIAL

GCC-NYAG0000705

CONFIDENTIAL                                                                          GCC-P 0335775

a U.S. trade or business as a result of owning a limited partnership interest in a U.S. business partnership or a similar ownership interest, income and gain realized from that investment would be subject to U.S. income and branch profits tax.

### U.S. Withholding Tax

In general, under Section 881 of the IRC, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding. Income subject to such a flat tax rate is of a fixed or determinable annual or periodic nature, including dividends and certain interest income. There is presently no tax treaty between the U.S. and the Cayman Islands.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the IRC. Under certain circumstances, interest on bearer obligations may also be considered portfolio interest.

### Redemption of Class B Participating Shares

Gain realized by shareholders who are not U.S. persons within the meaning of the IRC ("non-U.S. shareholders") upon the sale, exchange or redemption of Class B Participating Shares held as a capital asset should generally not be subject to U.S. federal income tax provided that the gain is not effectively connected with the conduct of a trade or business in the U.S. However, in the case of nonresident alien individuals, such gain will be subject to the 30% (or lower tax treaty rate) U.S. tax if (i) such person is present in the U.S. for 183 days or more during the taxable year (on a calendar year basis unless the nonresident alien individual has previously established a different taxable year) and (ii) such gain is derived from U.S. sources.

Generally, the source of gain upon the sale, exchange or redemption of Class B Participating Shares is determined by the place of residence of the shareholder. For purposes of determining the source of gain, the IRC defines residency in a manner that may result in an individual who is otherwise a nonresident alien with respect to the U.S. being treated as a U.S. resident only for purposes of determining the source of income. Each potential individual shareholder who anticipates being present in the U.S. for 183 days or more (in any taxable year) should consult his tax advisor with respect to the possible application of this rule.

---

shareholders owning 5% or less of the shares are subject to a 30% gross withholding tax on those distributions and are not subject to tax on a net basis.

10010873.14

49

CONFIDENTIAL

GCC-NYAG0000706

Gain realized by a non-U.S. shareholder engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax upon the sale, exchange or redemption of Class B Participating Shares if such gain is effectively connected with its U.S. trade or business.

Non-U.S. shareholders may be required to make certain certifications to the Fund as to the beneficial ownership of the Class B Participating Shares and the non-U.S. status of such beneficial owner, in order to be exempt from U.S. information reporting and backup withholding on a redemption of Class B Participating Shares.

## Tax-Exempt U.S. Persons

The term "Tax-Exempt U.S. Person" means a U.S. person within the meaning of the IRC that is exempt from payment of U.S. federal income tax. Generally, a Tax-Exempt U.S. Person is exempt from federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity. This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business. This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Tax-Exempt U.S. Person. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Tax-Exempt U.S. Person's exempt purpose or function. UBTI also includes (i) income derived by a Tax-Exempt U.S. Person from debt-financed property and (ii) gains derived by a Tax-Exempt U.S. Person from the disposition of debt-financed property.

In 1996, Congress considered whether, under certain circumstances, income derived from the ownership of the shares of a non-U.S. corporation should be treated as UBTI to the extent that it would be so treated if earned directly by the shareholder. Subject to a narrow exception for certain insurance company income, Congress declined to amend the IRC to require such treatment. Accordingly, based on the principles of that legislation, a Tax-Exempt U.S. Person investing in a non-U.S. corporation such as the Fund should not realize UBTI with respect to an unleveraged investment in Class B Participating Shares. Tax-Exempt U.S. Persons are urged to consult their own tax advisors concerning the U.S. tax consequences of an investment in the Fund.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Fund. Charitable remainder trusts should consult their own tax advisors concerning the tax consequences of such an investment on their beneficiaries.

## Reporting Requirements for U.S. Persons

Any U.S. person within the meaning of the IRC owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the shares of a non-U.S. corporation such as the Fund will likely be required to file an information return with the Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation. The Fund has not committed to provide all of the information about the Fund or its shareholders needed to complete the return. In addition, a U.S. person within the meaning of the IRC that transfers cash to a non-U.S. corporation may be

I0010873.14

50

CONFIDENTIAL

GCC-NYAG0000707

GCC-P 0335777

required to report the transfer to the Service if (i) immediately after the transfer, such person holds (directly, indirectly or by attribution) at least 10% of the total voting power or total value of such corporation or (ii) the amount of cash transferred by such person (or any related person) to such corporation during the twelve-month period ending on the date of the transfer exceeds $100,000.

Furthermore, certain U.S. persons within the meaning of the IRC will have to file Form 8886 ("Reportable Transaction Disclosure Statement") with their U.S. tax return, and submit a copy of Form 8886 with the Office of Tax Shelter Analysis of the Service if the Fund engages in certain "reportable transactions" within the meaning of recently issued U.S. Treasury Regulations. Shareholders required to file this report include a U.S. person within the meaning of the IRC if the Fund is treated as a "controlled foreign corporation" and such U.S. person owns a 10% voting interest. In certain situations, there may also be a requirement that a list be maintained of persons participating in such reportable transactions, which could be made available to the Service at its request. Moreover, if a U.S. person within the meaning of the IRC recognizes a loss upon a disposition of Class B Participating Shares, such loss could constitute a "reportable transaction" for such shareholder, and such shareholder would be required to file Form 8886. Under new legislation, a significant penalty is imposed on taxpayers who fail to make the required disclosure. The penalty is generally $10,000 for natural persons and $50,000 for other persons (increased to $100,000 and $200,000, respectively, if the reportable transaction is a "listed" transaction). Shareholders who are U.S. persons within the meaning of the IRC are urged to consult their own tax advisors concerning the application of these reporting obligations to their specific situations and the new penalty discussed above.

Estate and Gift Taxes

Individual holders of Class B Participating Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Class B Participating Shares.

Cayman Islands

There are no income, corporation, capital gains or other taxes in effect in the Cayman Islands on the basis of present legislation. The Fund is an exempted company under Cayman Islands law. The Fund has received an undertaking as to tax concessions pursuant to Section 6 of the Tax Concessions Law (1999 Revision) which provides that, for a period of 20 years from the date of issue of the undertaking (being 24 January 1989), no law thereafter enacted in the Cayman Islands imposing any taxes to be levied on profits, income, gains or appreciations will apply to the Fund or its operations. It is anticipated that the Fund will apply for a further tax exemption undertaking from the Cayman Islands authorities upon expiry of the existing one. No capital or stamp duties are levied in the Cayman Islands on the issue, transfer or redemption of Class B Participating Shares. The only taxes chargeable on the Fund in the Cayman Islands are (i) an annual charge calculated on the nominal amount of its authorised share capital, which is approximately US$575 per annum; and (ii) an annual fee of approximately US$3,000 under the Mutual Funds Law (2003 Revision). There are no currency exchange controls in the Cayman Islands.

10010873.14

51

CONFIDENTIAL

GCC-NYAG0000708

CONFIDENTIAL                                                                                    GCC-P 0335778

### European Union Savings Directive

Shareholders who are individuals resident in a Member State of the European Union or certain other jurisdictions referred to below should be aware of the provisions of the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "Directive") pursuant to which income realized upon the sale or redemption of shares in undertakings for collective investment, as well as any income in the form of dividends or other distributions made by such undertakings for collective investment, may (depending upon the location, classification and investment portfolio of the undertaking) become subject to the reporting regime or withholding tax regime imposed by the Directive, if such payment is made by a paying agent established either in a Member State of the European Union or in certain other jurisdictions which have agreed to introduce an equivalent reporting or withholding tax regime in respect of such payments. The provisions of the Directive apply to payments made on or after July 1, 2005.

However, as a result of the classification by the Cayman Islands of funds such as the Fund established in its jurisdiction, payments made directly by the Fund through the Registrar to shareholders who are individual beneficiaries will not be subject to the reporting (or withholding tax) regime. Nevertheless, because these rules are complex and their implementation has to be effected by each Member State and the other jurisdictions referred to above through their own national legislation, application of the regime to payments deriving from the Fund but ultimately made by certain other entities (e.g. acting as nominee) located elsewhere in the European Union or in these other jurisdictions, although not anticipated, cannot as yet be excluded. Accordingly, shareholders who are individuals or acting as nominees and who are resident in the European Union or in any of the other jurisdictions referred to above should consult their own tax advisers.

### Other Jurisdictions

Interest, dividend and other income realized by the Fund or Other Investment Entities from non-U.S. sources, and capital gains realized on the sale of securities of non-U.S. issuers, may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. It is impossible to predict the rate of foreign tax the Fund or Other Investment Entities will pay since the amount of the assets to be invested in various countries and the ability of the Fund or Other Investment Entities to reduce such taxes, are not known.

### Future Changes in Applicable Law

The foregoing description of U.S. and Cayman Islands tax consequences of an investment in and the operations of the Fund is based on laws and regulations which are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund to taxes or subject shareholders to increased taxes.

### Other Taxes

Prospective shareholders should consult their own counsel regarding tax laws and regulations of any other jurisdiction which may be applicable to them.

I0010873.14

52

CONFIDENTIAL

GCC-NYAG0000709

CONFIDENTIAL

GCC-P 0335779

THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE, AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE TO PROSPECTIVE SHAREHOLDERS.

## ERISA CONSIDERATIONS

CIRCULAR 230 NOTICE - THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF ERISA IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO A FUND OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE FUND AND THE INVESTOR.

### General

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "ERISA Plan"), an individual retirement account or a Keogh plan subject solely to the provisions of the IRC[2] (an "Individual Retirement Fund") should consider, among other things, the matters described below before determining whether to invest in the Fund.

ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("DOL") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding

---

[2]   References hereinafter made to ERISA include parallel references to the IRC.

10010873.14                                    53

CONFIDENTIAL                                                    GCC-P 0335780

objectives, and the limitation on the rights of shareholders to redeem all or any part of their Class B Participating Shares or to transfer their Class B Participating Shares. Before investing the assets of an ERISA Plan in the Fund, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Fund may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

### Plan Assets Regulations

The DOL has published a regulation (the "Regulation") describing when the underlying assets of an entity in which certain benefit plan investors ("Benefit Plan Investors") invest constitute "plan assets" for purposes of ERISA. Benefit Plan Investors include employee benefit plans as defined in Section 3(3) of ERISA, whether or not subject to Title I of ERISA, plans described in Section 4975(e)(1) of the IRC, government plans, church plans, non–U.S. employee benefit plans, certain insurance company general and separate accounts, and entities the underlying assets of which include plan assets by reason of investment therein by Benefit Plan Investors. The effect of the Regulation is to treat certain entities as pooled funds for the collective investment of plan assets.

The Regulation provides that, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security;" nor (b) a security issued by an investment fund registered under the Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that:

    (i)    the entity is an "operating company;" or

    (ii)    the equity participation in the entity by Benefit Plan Investors is not "significant."

Equity participation in an entity by Benefit Plan Investors is considered "significant" if 25% or more of the value of any class of equity interests in the entity is held by such Benefit Plan Investors. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether equity participation by Benefit Plan Investors is significant. The Regulation provides that the 25% of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that the redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the 25% test at the time of the redemption.

10010873.14

54

CONFIDENTIAL

GCC-NYAG0000711

## Limitation on Investments by Benefit Plan Investors

It is the current intent of the Investment Advisor to monitor the investments in the Fund to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the Class B Participating Shares in the Fund so that equity participation by Benefit Plan Investors in the Fund will not be considered "significant" under the Regulation and, as a result, the underlying assets of the Fund will not be deemed "plan assets" for purposes of the Regulation. Class B Participating Shares held by the Investment Advisor and its affiliates are not considered for purposes of determining whether equity participation by Benefit Plan Investors is significant. If the assets of the Fund were regarded as "plan assets" of a Benefit Plan Investor that is an ERISA Plan or an Individual Retirement Fund, the Investment Advisor would be a "fiduciary" (as defined in ERISA and the IRC) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. In such circumstances, the Fund would be subject to various other requirements of ERISA and the IRC. In particular, the Fund would be subject to rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries which might result in a violation of ERISA and the IRC unless the Fund obtained appropriate exemptions from the DOL allowing the Fund to conduct its operations as described herein. As described above, under "Mandatory Redemption", the Board of Directors of the Fund reserves the right to redeem all or a part of the Class B Participating Shares held by any shareholder, subject to the aforesaid, including, without limitation, to ensure compliance with the above percentage limitation. The Investment Advisor reserves the right, however, to waive the 25% limitation and thereafter to comply with ERISA.

## Representations by Plans

An ERISA Plan proposing to invest in the Fund will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Fund's investment objective, policies and strategies, and that the decision to invest plan assets in the Fund was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

WHETHER OR NOT THE UNDERLYING ASSETS OF THE FUND ARE DEEMED PLAN ASSETS UNDER THE REGULATION, AN INVESTMENT IN THE FUND BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE FUND.

## ERISA Plans and Individual Retirement Funds Having Prior Relationships with the Investment Advisor or its Affiliates

Certain prospective ERISA Plan and Individual Retirement Funds investors may currently maintain relationships with the Investment Advisor or other entities that are affiliated with the Investment Advisor. Each of such entities may be deemed to be a party in interest to and/or a fiduciary of any ERISA Plan or Individual Retirement Fund to which any of the Investment Advisor or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and

CONFIDENTIAL

GCC-NYAG0000712

CONFIDENTIAL                                                      GCC-P 0335782

also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which it or certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the IRC with respect to Individual Retirement Funds. ERISA Plan and Individual Retirement Fund investors should consult with counsel to determine if participation in the Fund is a transaction that is prohibited by ERISA or the IRC.

The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Potential Investors should consult with their legal advisors regarding the consequences under ERISA of the acquisition and ownership of Class B Participating Shares.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's responsibility for the prevention of money laundering, the Fund and the Registrar (including their affiliates, subsidiaries or associates) will require a detailed verification of the applicant's identity and the source of payment. Depending on the circumstances of each application, a detailed verification might not be required (but may in certain circumstances) where:

(a)   the applicant is a recognized financial institution which is regulated by a recognized regulatory authority and carries on business in a country listed in Schedule 3 of the Money Laundering Regulations (2005 Revision) of the Cayman Islands (as amended)(a "Schedule 3 Country"); or

(b)   the application is made through a recognized intermediary which is regulated by a recognized regulatory authority and carries on business in a Schedule 3 Country. In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

(c)   the subscription payment is remitted from an account (or joint account) held in the applicant's name at a bank in the Cayman Islands or a bank regulated in a Schedule 3 Country. In this situation the Fund may require evidence identifying the branch or office of the bank from which the monies have been transferred, verify that the account is in the name of the applicant and retain a written record of such details. The Fund and the Registrar reserve the right to request such information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Registrar will refuse to accept the application and the subscription monies relating thereto.

If any person who is resident in the Cayman Islands (including the Registrar) has a suspicion obtained in the course of business that any other person is engaged in money laundering that person is required to report such suspicion pursuant to The Proceeds of Criminal Conduct Law (2005 Revision).

10010873.14

56

CONFIDENTIAL

GCC-NYAG0000713

CONFIDENTIAL

GCC-P 0335783

By subscribing, applicants consent to the disclosure by the Fund and the Registrar of any information about them to regulators and others upon request in connection with money laundering and similar matters both in the Cayman Islands and in other jurisdictions.

Each subscriber and Shareholder is required to make such representations to the Fund as the Fund, the Registrar and the Investment Advisor require in connection with any applicable anti-money laundering laws, including, without limitation, representations to the Fund that such subscriber or Shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such Shareholder must also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## SUITABILITY REQUIREMENTS; LIMITATIONS ON TRANSFERABILITY

Prospective Shareholders must be non-U.S. Persons or Permitted U.S. Persons and must meet other suitability requirements described below and in the Subscription Documents. The Fund, in its sole discretion, may decline to accept the subscription for Class B Participating Shares of any prospective Shareholder.

The term "U.S. Person" means, with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least 31 days during such year and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 1/3 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days. With respect to persons other than individuals, the term "U.S. Person" means (i) a corporation or partnership created or organized in the United States or under the law of the United States or any state, (ii) a trust where (a) a U.S. court is able to exercise primary jurisdiction over the trust and (b) one or more U.S. persons have the authority to control all substantial decisions of the trust and (iii) an estate which is subject to U.S. tax on its worldwide income from all sources. The term "U.S. Person" also means any individual or entity that would be a U.S. Person under Regulation S of the U.S. Securities Act of 1933, as amended (the "Securities Act"). The Regulation S definition is set forth in Appendix B to this Memorandum.

Each subscriber for Class B Participating Shares will be required to certify to the Fund, among other things, that the Class B Participating Shares are not being acquired and will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person (other than a Permitted U.S. Person) or any non-U.S. Person subject to the above restrictions. Shareholders are required to notify the Fund immediately of any change in such information. IT IS THE RESPONSIBILITY OF EACH SHAREHOLDER TO VERIFY THAT IT IS NOT A

10010873.14

57

CONFIDENTIAL

GCC-NYAG0000714

CONFIDENTIAL

GCC-P 0335784

U.S. PERSON THAT WOULD BE PROHIBITED FROM OWNING CLASS B
PARTICIPATING SHARES IN THE FUND.

Each subscriber for Class B Participating Shares who is a Permitted U.S. Person
will be required to certify to the Fund, among other things, that such investor is: (i) an accredited
investor under Regulation D under the Securities Act, and (ii) a "qualified purchaser" under
Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "Investment
Company Act").

Each prospective Shareholder is urged to consult with its own advisors to
determine the suitability of an investment in the Class B Participating Shares, and the
relationship of such an investment to the purchaser's overall investment program and financial
and tax position. Each purchaser of Class B Participating Shares is required to represent further
that, after all necessary advice and analysis, its investment in the Fund is suitable and
appropriate, in light of the foregoing considerations.

Class B Participating Shares and Special Investment Shares may not be pledged,
assigned, hypothecated, sold, exchanged or transferred without the prior written consent of the
Board of Directors, which consent may be given or withheld, in its discretion. Any attempt to
pledge, assign, hypothecate, sell, exchange or transfer Class B Participating Shares and Special
Investment Shares without the prior approval of the Board of Directors may subject such shares
to compulsory redemption.

## CAYMAN ISLANDS MUTUAL FUNDS LAW

The Fund falls within the definition of a "Mutual Fund" in terms of the Mutual
Funds Law (2003 Revision) of the Cayman Islands (the "Law"), and accordingly is regulated in
terms of such Law. However, the Fund is not required to be licensed or to employ a licensed
mutual fund administrator since the minimum aggregate investment purchasable by a prospective
investor in the Fund exceeds $50,000 or its equivalent in any other currency.

As a regulated mutual fund, the Fund is subject to the supervision of the Cayman
Islands Monetary Authority (the "Monetary Authority"). The Fund must file this Memorandum
and any changes that materially affect any information in this document with the Monetary
Authority. The Monetary Authority may, at any time, instruct the Fund to have its accounts
audited and to submit them to the Monetary Authority within such time as the Monetary
Authority specifies. In addition, the Monetary Authority may ask the Board of Directors to give
the Monetary Authority such information or such explanation in respect of the Fund as the
Monetary Authority may reasonably require to enable it to carry out its duty under the Law.

The Board of Directors must give the Monetary Authority access to or provide at
any reasonable time all records relating to the Fund and the Monetary Authority may copy or
take an extract of any record to which it is given access. Failure to comply with these requests
by the Monetary Authority may result in substantial fines on the part of the Board of Directors
and may result in the Monetary Authority applying to a court to have the Fund wound up.

The Monetary Authority may take certain actions if it is satisfied that a regulated
mutual fund:

10010873.14

58

CONFIDENTIAL

GCC-NYAG0000715

GCC-P 0335785

(i)     is or is likely to become unable to meet its obligations as they fall due;

(ii)     is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors;

(iii)     is not being managed in a fit and proper manner; or

(iv)     has persons appointed as directors, managers or officers that are not fit and proper persons to hold the respective position.

The powers of the Monetary Authority include *inter alia* the power to require the substitution of directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

## COUNSEL

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, acts as counsel to the Fund in connection with its offering of Class B Participating Shares. Schulte Roth & Zabel LLP also acts as counsel to the Investment Advisor and its affiliates. Maples and Calder, Grand Cayman, Cayman Islands, acts as Cayman Islands counsel to the Fund. In connection with the offering of Class B Participating Shares and subsequent advice to the Fund, the Investment Advisor, its affiliates, Schulte Roth & Zabel LLP and Maples and Calder will not be representing Shareholders. No independent counsel has been retained to represent Shareholders.

## AUDITOR; REPORTS

BDO Tortuga serves as the Fund's auditor. The Fund will provide to the Shareholders unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 120 days following the end of each fiscal year. Certain Shareholders may have access to certain information regarding the Fund that may not be available to other Shareholders. Such Shareholders may make investment decisions with respect to their investment in the Fund based on such information.

## SUBSCRIPTION FOR SHARES

Persons interested in subscribing for Class B Participating Shares will be furnished with, and will be required to complete, execute and return to the Investment Advisor, subscription                                                                              documents.

10010873.14

59

CONFIDENTIAL

CONFIDENTIAL

## APPENDIX A

### Restrictions On Sales In Selected Jurisdictions

#### NOTICE TO RESIDENTS OF AUSTRALIA

NO OFFER FOR SUBSCRIPTION OR PURCHASE OF THE CLASS B PARTICIPATING SHARES OFFERED HEREBY, NOR ANY INVITATION TO SUBSCRIBE FOR OR BUY SUCH CLASS B PARTICIPATING SHARES HAS BEEN MADE OR ISSUED IN AUSTRALIA, OTHERWISE THAN BY MEANS OF AN OFFER THAT DOES NOT REQUIRE DISCLOSURE WITHIN THE MEANING OF SECTION 708 OF THE CORPORATIONS LAW. ACCORDINGLY, THIS MEMORANDUM HAS NOT BEEN LODGED WITH THE AUSTRALIAN SECURITIES & INVESTMENTS COMMISSION. FURTHER, THE CLASS B PARTICIPATING SHARES OFFERED HEREBY MAY NOT BE RESOLD IN AUSTRALIA WITHIN A PERIOD OF TWELVE MONTHS AFTER THE DATE OF ISSUE OTHERWISE THAN BY MEANS OF AN OFFER THAT DOES NOT REQUIRE DISCLOSURE PURSUANT TO SECTION 708 OF THE CORPORATIONS LAW.

#### NOTICE TO RESIDENTS OF THE COMMONWEALTH OF THE BAHAMAS

THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD OR OTHERWISE DISPOSED OF IN ANY MANNER TO PERSONS OR ENTITIES DEEMED BY THE CENTRAL BANK OF THE BAHAMAS (THE "BANK") AS "RESIDENT" FOR EXCHANGE CONTROL PURPOSES.

#### NOTICE TO RESIDENTS OF BAHRAIN

ALL APPLICATIONS FOR INVESTMENT SHOULD BE RECEIVED, AND ANY ALLOTMENTS MADE, FROM OUTSIDE BAHRAIN.

#### NOTICE TO RESIDENTS OF THE BRITISH VIRGIN ISLANDS

THE COMPANY, THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES OFFERED HEREBY HAVE NOT BEEN, AND WILL NOT BE, RECOGNIZED OR REGISTERED UNDER THE LAWS AND REGULATIONS OF THE BRITISH VIRGIN ISLANDS. THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD IN THE BRITISH VIRGIN ISLANDS EXCEPT IN CIRCUMSTANCES IN WHICH THE COMPANY, THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES DO NOT REQUIRE THE RECOGNITION BY OR REGISTRATION WITH THE AUTHORITIES OF THE BRITISH VIRGIN ISLANDS.

#### NOTICE TO RESIDENTS OF BRUNEI

THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES HAVE NOT BEEN DELIVERED TO, REGISTERED WITH, NOR APPROVED BY THE REGISTRAR OF COMPANIES.

10010873.14

A-1

CONFIDENTIAL

GCC-NYAG0000717

## NOTICE TO RESIDENTS OF CANADA

THIS MEMORANDUM IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, A PUBLIC OFFERING OF SECURITIES OR AN OFFERING OF SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFERING WOULD BE UNLAWFUL. NO SECURITIES COMMISSION OR SIMILAR AUTHORITY IN CANADA HAS IN ANY WAY PASSED UPON THE MERITS OF THE SECURITIES OFFERED HEREBY AND ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. PERSONS WHO WILL BE ACQUIRING SECURITIES PURSUANT TO THIS MEMORANDUM WILL NOT HAVE THE BENEFIT OF A REVIEW OF THE MATERIAL BY ANY SECURITIES REGULATORY AUTHORITY IN CANADA.

BY ACCEPTING THEIR SUBSCRIPTION DOCUMENTS, THE COMPANY SHALL BE GRANTING TO SHAREHOLDERS IN THE PROVINCES OF ALBERTA, BRITISH COLUMBIA AND ONTARIO WHO HAVE RECEIVED THIS MEMORANDUM A CONTRACTUAL RIGHT OF ACTION FOR DAMAGES OR RESCISSION AGAINST THE FUND IF THIS MEMORANDUM, OR ANY AMENDMENT THERETO, CONTAINS A MISREPRESENTATION, PROVIDED THAT:

(A)   IN BRITISH COLUMBIA, THE RIGHT IS ONLY EXERCISABLE ON WRITTEN NOTICE GIVEN NOT MORE THAN 90 DAYS SUBSEQUENT TO THE DATE OF THE INVESTMENT;

(B)   IN ALBERTA, NO ACTION SHALL BE COMMENCED TO ENFORCE A CONTRACTUAL RIGHT OF ACTION UNLESS THE RIGHT IS EXERCISED:

(I)   IN THE CASE OF RESCISSION, ON NOTICE TO THE ISSUER NOT LATER THAN 180 DAYS, OR

(II)   IN THE CASE OF DAMAGES, ON NOTICE TO THE ISSUER NOT LATER THAN ONE YEAR FROM THE DATE OF THE TRANSACTION THAT GAVE RISE TO THE CAUSE OF ACTION;

(C)   THE COMPANY WILL NOT BE LIABLE IF IT IS PROVED THAT, AT THE TIME OF THE TRANSACTION, THE SHAREHOLDER KNEW OF THE ALLEGED MISREPRESENTATION;

(D)   IN AN ACTION FOR DAMAGES, THE COMPANY IS NOT LIABLE FOR ALL OR ANY PORTION OF SUCH DAMAGES THAT THE COMPANY PROVES DO NOT REPRESENT THE DEPRECIATION IN VALUE OF THE SECURITIES AS A RESULT OF THE MISREPRESENTATION;

(E)   IN NO CASE SHALL THE AMOUNT RECOVERABLE EXCEED THE PURCHASE PRICE FOR THE SECURITIES; AND

(F)   THIS RIGHT OF ACTION IS IN ADDITION TO ANY OTHER RIGHT OR REMEDY AVAILABLE TO THE SHAREHOLDER AT LAW.

10010873.14

A-2

CONFIDENTIAL

GCC-NYAG0000718

CONFIDENTIAL

GCC-P 0335788

FOR THESE PURPOSES A "MISREPRESENTATION" MEANS AN UNTRUE STATEMENT OF A MATERIAL FACT OR AN OMISSION TO STATE A MATERIAL FACT THAT IS NECESSARY IN ORDER TO MAKE ANY STATEMENT NOT MISLEADING IN LIGHT OF THE CIRCUMSTANCES IN WHICH IT WAS MADE. A "MATERIAL FACT" MEANS A FACT THAT SIGNIFICANTLY AFFECTS, OR WOULD REASONABLY BE EXPECTED TO HAVE A SIGNIFICANT EFFECT ON, THE MARKET PRICE OR VALUE OF THE CLASS B PARTICIPATING SHARES.

### NOTICE TO RESIDENTS OF THE CAYMAN ISLANDS

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE CLASS B PARTICIPATING SHARES. CAYMAN ISLANDS EXEMPTED AND ORDINARY NON-RESIDENT COMPANIES AND CERTAIN OTHER PERSONS ENGAGED IN OFFSHORE BUSINESS, HOWEVER, MAY BE PERMITTED TO ACQUIRE CLASS B PARTICIPATING SHARES.

### NOTICE TO RESIDENTS OF FINLAND

THIS MEMORANDUM HAS BEEN PREPARED FOR PRIVATE INFORMATION PURPOSES OF INTERESTED INVESTORS ONLY. IT MAY NOT BE USED FOR AND SHALL NOT BE DEEMED A PUBLIC OFFERING OF CLASS B PARTICIPATING SHARES. THE RAHOITUSTARKASTUS HAS NOT AUTHORIZED ANY OFFERING OF THE SUBSCRIPTION OF CLASS B PARTICIPATING SHARES IN THE COMPANY; ACCORDINGLY, CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD IN FINLAND OR TO RESIDENTS THEREOF EXCEPT AS PERMITTED BY FINNISH LAW. THIS MEMORANDUM IS STRICTLY FOR PRIVATE USE BY ITS HOLDER AND MAY NOT BE PASSED ON TO THIRD-PARTIES.

### NOTICE TO RESIDENTS OF FRANCE

THIS MEMORANDUM IS FURNISHED TO YOU SOLELY FOR YOUR INFORMATION AND MAY NOT BE REPRODUCED OR REDISTRIBUTED TO ANY OTHER PERSON. IT IS STRICTLY CONFIDENTIAL AND IS SOLELY DESTINED TO PERSONS AND INSTITUTIONS TO WHICH IT WAS INITIALLY SUPPLIED. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR AN INVITATION TO SUBSCRIBE FOR OR PURCHASE ANY CLASS B PARTICIPATING SHARES, AND NEITHER THIS MEMORANDUM NOR ANYTHING CONTAINED HEREIN SHALL FORM THE BASIS OF ANY CONTRACT OR COMMITMENT WHATSOEVER.

THIS MEMORANDUM MAY NOT BE DISTRIBUTED TO THE PUBLIC IN FRANCE OR USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION OR SALE OF SECURITIES IN FRANCE OTHER THAN IN ACCORDANCE WITH ARTICLE 6 AND 7 OF THE ORDINANCE NO. 67-833 OF 28 SEPTEMBER 1967. THIS MEMORANDUM HAS NOT BEEN SUBMITTED TO THE "COMMISSION DES OPÉRATIONS DE BOURSES" FOR APPROVAL AND DOES NOT CONSTITUTE AN OFFER FOR SALE OR SUBSCRIPTION OF CLASS B PARTICIPATING SHARES.

CONFIDENTIAL

GCC-NYAG0000719

CONFIDENTIAL                                              GCC-P 0335789

**NOTICE TO RESIDENTS OF GERMANY**

THE CLASS B PARTICIPATING SHARES MAY ONLY BE ACQUIRED IN ACCORDANCE WITH THE GERMAN WERTPAPIERVERKAUFS-PROSPEKTGESETZ (SECURITIES SELLING PROSPECTUS ACT) AND THE AUSLANDSINVESTMENTGESETZ (ACT ON FOREIGN INVESTMENT FUNDS). THE CLASS B PARTICIPATING SHARES ARE NOT REGISTERED OR AUTHORIZED FOR DISTRIBUTION UNDER THE ACT ON FOREIGN INVESTMENT FUNDS AND ACCORDINGLY MAY NOT BE, AND ARE NOT BEING, OFFERED OR ADVERTISED PUBLICLY OR OFFERED SIMILARLY UNDER §1 OF THE ACT ON FOREIGN INVESTMENT FUNDS OR SECURITIES SELLING PROSPECTUS ACT. THEREFORE THIS OFFER IS ONLY BEING MADE TO RECIPIENTS TO WHOM THIS MEMORANDUM IS PERSONALLY ADDRESSED AND DOES NOT CONSTITUTE AN OFFER OR ADVERTISEMENT TO THE PUBLIC. THE CLASS B PARTICIPATING SHARES CAN ONLY BE ACQUIRED FOR A MINIMUM PURCHASE PRICE OF $75,000 EXCLUDING COMMISSION AND OTHER FEES PER PERSON.

**NOTICE TO RESIDENTS OF GREECE**

THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES TO WHICH IT RELATES AND ANY OTHER MATERIAL RELATED THERETO MAY NOT BE ADVERTISED, DISTRIBUTED OR OTHERWISE MADE AVAILABLE TO THE PUBLIC IN GREECE.

THE GREEK CAPITAL MARKET COMMITTEE HAS NOT AUTHORIZED ANY PUBLIC OFFERING OF THE SUBSCRIPTION OF CLASS B PARTICIPATING SHARES IN THE COMPANY; ACCORDINGLY, CLASS B PARTICIPATING SHARES MAY NOT BE ADVERTISED, DISTRIBUTED OR IN ANY WAY OFFERED OR SOLD IN GREECE OR TO RESIDENTS THEREOF EXCEPT AS PERMITTED BY GREEK LAW.

**NOTICE TO RESIDENTS OF HONG KONG**

NO STEPS HAVE BEEN TAKEN TO REGISTER THIS MEMORANDUM AS A PROSPECTUS IN HONG KONG OR IN ANY OTHER JURISDICTION. SUBSCRIPTION WILL NOT BE ACCEPTED FROM ANY PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM HAS BEEN DELIVERED. THIS MEMORANDUM IS DELIVERED ONLY TO THE RECIPIENT AND MAY NOT BE USED, COPIED, REPRODUCED OR DISTRIBUTED IN WHOLE OR IN PART, TO ANY OTHER PERSON.

**NOTICE TO THE RESIDENTS OF INDONESIA**

THE COMPANY HAS AGREED THAT IT MAY NOT MAKE A PUBLIC OFFERING (AS THAT TERM IS DEFINED IN LAW OF THE REPUBLIC OF INDONESIA NO. 8 OF 1995 CONCERNING THE CAPITAL MARKETS) OF THE CLASS B PARTICIPATING SHARES.

I0010873.14                        A-4

**CONFIDENTIAL**

GCC-NYAG0000720

## NOTICE TO RESIDENTS OF IRELAND

THIS MEMORANDUM IS NOT A PROSPECTUS AND DOES NOT CONSTITUTE OR FORM PART OF ANY OFFER OR INVITATION TO THE PUBLIC TO SUBSCRIBE FOR OR PURCHASE CLASS B PARTICIPATING SHARES IN THE COMPANY AND SHALL NOT BE CONSTRUED AS SUCH AND NO PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM HAS BEEN ADDRESSED OR DELIVERED SHALL BE ELIGIBLE TO SUBSCRIBE FOR OR PURCHASE CLASS B PARTICIPATING SHARES IN THE COMPANY.

## NOTICE TO RESIDENTS OF THE ISLE OF MAN

THE COMPANY IS NOT A RECOGNIZED COLLECTIVE INVESTMENT SCHEME FOR THE PURPOSES OF SECTIONS 12 OR 13 OF THE FINANCIAL SERVICES ACT 1988 ("THE ACT") OF THE ISLE OF MAN AND IS ACCORDINGLY SUBJECT TO THE PROHIBITION ON THE PROMOTION OF COLLECTIVE INVESTMENT SCHEMES AS CONTAINED IN SECTION 1(1) OF THE ACT. ACCORDINGLY, THIS MEMORANDUM MAY ONLY BE ISSUED OR PASSED ON TO ANY PERSON IN THE ISLE OF MAN BY WAY OF THE TWO LIMITED EXCEPTIONS TO THIS GENERAL PROHIBITION CONTAINED IN SECTION 1(2) OF THE ACT AND THE FINANCIAL SUPERVISION (PROMOTION OF UNREGULATED SCHEMES (EXEMPTION) REGULATIONS 1992 ("THE EXEMPTION REGULATIONS"). UNDER REGULATION 3(2) OF THE EXEMPTION REGULATIONS, ANY ADVERTISEMENT ISSUED IN THE ISLE OF MAN IN CONNECTION WITH THE COMPANY MUST CONTAIN A STATEMENT EITHER (A) THAT PARTICIPANTS IN THE COMPANY ARE NOT PROTECTED BY ANY STATUTORY COMPENSATION SCHEME; OR (B) THAT PARTICIPANTS IN THE COMPANY ARE PROTECTED BY A STATUTORY COMPENSATION SCHEME AND PARTICULARS SUFFICIENT TO IDENTIFY THE COMPENSATION ARRANGEMENTS.

## NOTICE TO RESIDENT OF ISRAEL

ISRAELI RESIDENTS, OTHER THAN THOSE CONSIDERED "EXEMPTION HOLDERS" UNDER THE GENERAL CURRENCY CONTROL PERMIT, 1978, REQUIRE A SPECIAL PERMIT FROM THE ISRAELI CONTROLLER OF FOREIGN CURRENCY IN ORDER TO PURCHASE THE CLASS B PARTICIPATING SHARES. THE CLASS B PARTICIPATING SHARES ARE OFFERED TO A LIMITED NUMBER OF SOPHISTICATED INVESTORS, IN ALL CASES UNDER CIRCUMSTANCES DESIGNED TO PRECLUDE A DISTRIBUTION WHICH WOULD BE OTHER THAN A PRIVATE PLACEMENT. THE MEMORANDUM MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE, NOR BE FURNISHED TO ANY OTHER PERSON OTHER THAN THOSE TO WHOM COPIES HAVE BEEN SENT.

## NOTICE TO RESIDENTS OF ITALY

NO ACTION HAS OR WILL BE TAKEN WHICH WOULD ALLOW AN OFFERING OF CLASS B PARTICIPATING SHARES TO THE PUBLIC IN ITALY. ACCORDINGLY, THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED, SOLD OR DELIVERED AND NEITHER THIS MEMORANDUM NOR ANY OTHER OFFERING

10010873.14

A-5

CONFIDENTIAL

GCC-NYAG0000721

MATERIAL RELATING TO THE CLASS B PARTICIPATING SHARES MAY BE DISTRIBUTED OR MADE AVAILABLE TO THE PUBLIC IN ITALY. INDIVIDUAL SALES OF THE CLASS B PARTICIPATING SHARES TO ANY PERSON IN ITALY MAY ONLY BE MADE ACCORDING TO ITALIAN SECURITIES, TAX AND OTHER APPLICABLE LAWS AND REGULATIONS.

## NOTICE TO RESIDENTS OF JAPAN

THE CLASS B PARTICIPATING SHARES DO NOT CONSTITUTE SECURITIES TO BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN AND THEREFORE HAVE NOT BEEN REGISTERED AND WILL NOT BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN. THIS MEMORANDUM IS CONFIDENTIAL AND IS INTENDED SOLELY FOR THE USE OF ITS RECIPIENT. ANY DUPLICATION OR REDISTRIBUTION OF THIS MEMORANDUM IS PROHIBITED. THE RECIPIENT OF THIS MEMORANDUM, BY ACCEPTING DELIVERY THEREOF, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE RECIPIENT ELECTS NOT TO PURCHASE ANY OF THE CLASS B PARTICIPATING SHARES OR IF EARLIER REQUESTED BY THE COMPANY'S BOARD OF DIRECTORS.

## NOTICE TO RESIDENTS OF JERSEY

THIS MEMORANDUM RELATES TO A PRIVATE PLACEMENT AND DOES NOT CONSTITUTE AN OFFER TO THE PUBLIC OF JERSEY TO SUBSCRIBE FOR THE CLASS B PARTICIPATING SHARES OFFERED HEREBY. NO REGULATORY APPROVAL HAS BEEN SOUGHT TO THE OFFER IN JERSEY. THE OFFER OF THE CLASS B PARTICIPATING SHARES IS PERSONAL TO THE PERSON TO WHOM THIS MEMORANDUM IS BEING DELIVERED BY OR ON BEHALF OF THE COMPANY, AND A SUBSCRIPTION FOR THE CLASS B PARTICIPATING SHARES WILL ONLY BE ACCEPTED FROM SUCH PERSON. THE MEMORANDUM MAY NOT BE PRODUCED OR USED FOR ANY OTHER PURPOSE, NOR BE FURNISHED TO ANY OTHER PERSON OTHER THAN THOSE TO WHOM IT HAS BEEN SO DELIVERED.

## NOTICE TO RESIDENTS OF LIECHTENSTEIN

THE CLASS B PARTICIPATING SHARES ARE OFFERED TO A NARROWLY DEFINED CATEGORY OF INVESTORS, IN ALL CASES UNDER CIRCUMSTANCES DESIGNED TO PRECLUDE A PUBLIC SOLICITATION. THE MEMORANDUM MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE, NOR BE FURNISHED TO ANY OTHER PERSON OTHER THAN THOSE TO WHOM COPIES HAVE BEEN SENT.

## NOTICE TO RESIDENTS OF LUXEMBOURG

THIS MEMORANDUM IS STRICTLY PRIVATE AND CONFIDENTIAL, IS BEING ISSUED TO A LIMITED NUMBER OF SOPHISTICATED INVESTORS, AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE, NOR PROVIDED TO ANY PERSON OTHER THAN THE RECIPIENT THEREOF.

10010873.14

A-6

CONFIDENTIAL

GCC-NYAG0000722

## NOTICE TO THE RESIDENTS OF MALAYSIA

SINCE THE SALE OF THESE CLASS B PARTICIPATING SHARES WILL NOT BE MADE PURSUANT TO AN APPROVED DEED (AS DEFINED IN SECTION 85 OF THE COMPANIES ACT, 1965), THE COMPANY CANNOT ISSUE OR OFFER TO THE PUBLIC FOR PURCHASE OR SUBSCRIPTION OR INVITE THE PUBLIC TO SUBSCRIBE FOR OR PURCHASE ANY CLASS B PARTICIPATING SHARES. THESE CLASS B PARTICIPATING SHARES ARE BEING OFFERED TO INVESTORS UNDER A VERY LIMITED AND EXCLUSIVE PRIVATE PLACEMENT. INVESTORS MAY NOT OFFER TO THE PUBLIC FOR PURCHASE OR INVITE THE PUBLIC TO OR PURCHASE ANY CLASS B PARTICIPATING SHARES INVESTORS ACQUIRE FROM THE COMPANY IF SUCH SALE WOULD CONTRAVENE THE ABOVE RESTRICTIONS.

## NOTICE TO RESIDENTS OF MANITOBA

IN MANITOBA, ANY PURCHASER OF SECURITIES WHO IS AN INDIVIDUAL:

A)  WILL NOT BE BOUND BY THE CONTRACT OF PURCHASE IF THE COMPANY RECEIVES WRITTEN OR TELEGRAPHIC NOTICE EVIDENCING THE PURCHASER'S INTENTION NOT TO BE BOUND NOT LATER THAN MIDNIGHT ON THE SECOND BUSINESS DAY AFTER THE MEMORANDUM OR AMENDED MEMORANDUM IS RECEIVED OR DEEMED TO BE RECEIVED;

B)  HAS THE RIGHT TO RESCIND THE CONTRACT OF PURCHASE WHILE STILL THE OWNER OF THE SECURITIES IF THE MEMORANDUM OR ANY AMENDED MEMORANDUM AS OF THE DATE OF RECEIPT OR DEEMED RECEIPT CONTAINS ANY MISREPRESENTATION, BUT NO ACTION TO ENFORCE THIS RIGHT MAY BE COMMENCED AFTER THE EXPIRATION OF THE LATER OF 180 DAYS FROM THE DATE OF RECEIPT OR DEEMED RECEIPT BY THE PURCHASER OR THE AGENT OF THE PURCHASER OF THE MEMORANDUM OR AMENDED MEMORANDUM OR THE DATE OF THE CONTRACT OF PURCHASE;

C)  IF THE MEMORANDUM OR ANY AMENDED MEMORANDUM CONTAINS ANY MISREPRESENTATION, HAS A RIGHT OF ACTION FOR DAMAGES AGAINST THE COMPANY AND THE DIRECTORS THEREOF FOR ANY LOSS OR DAMAGES THAT THE PURCHASER SUSTAINED AS A RESULT OF THE PURCHASE OF THE SECURITIES UNLESS IT IS PROVED THAT:

I)  THE MEMORANDUM OR AMENDED MEMORANDUM WAS DELIVERED TO PROSPECTIVE PURCHASERS WITHOUT THE DIRECTOR'S KNOWLEDGE OR CONSENT; OR

II)  AFTER DELIVERY OF THE MEMORANDUM OR AMENDED MEMORANDUM AND BEFORE THE PURCHASE OF THE

10010873.14

A-7

CONFIDENTIAL

CONFIDENTIAL

SECURITIES, ON BECOMING AWARE OF ANY FALSE STATEMENT, THE DIRECTOR WITHDREW HIS CONSENT TO THE DELIVERY OF THE MEMORANDUM OR AMENDED MEMORANDUM TO PROSPECTIVE PURCHASERS AND GAVE REASONABLE PUBLIC NOTICE OF SUCH WITHDRAWAL AND THE REASON THEREFORE; OR

III) WITH RESPECT TO ANY FALSE STATEMENT, THE DIRECTOR HAD REASONABLE GROUNDS TO BELIEVE AND DID BELIEVE THAT THE STATEMENT WAS TRUE; OR

IV) WHERE THE FALSE STATEMENT WAS THAT OF AN EXPERT, THE DIRECTOR HAD NO REASONABLE GROUNDS TO BELIEVE THAT THE EXPERT WAS NOT COMPETENT TO MAKE THE STATEMENT, VALUATION OR REPORT; OR

V) WHERE THE FALSE STATEMENT PURPORTS TO BE FROM AN OFFICIAL SOURCE, IT WAS A CORRECT AND FAIR REPRESENTATION OF THE STATEMENT;

BUT NO ACTION TO ENFORCE THESE RIGHTS OF ACTION FOR DAMAGES MAY BE COMMENCED BY A PURCHASER AFTER THE EXPIRATION OF THE LATER OF ONE YEAR FROM THE DATE OF RECEIPT OR DEEMED RECEIPT OF THE MEMORANDUM OR AMENDED MEMORANDUM BY SUCH PURCHASER OR HIS AGENT OR THE DATE OF THE CONTRACT TO PURCHASE THE SECURITIES.

## NOTICE TO RESIDENTS OF THE NETHERLANDS

IN THE NETHERLANDS, CLASS B PARTICIPATING SHARES HAVE NOT AND SHALL NOT BE OFFERED, SOLD, TRANSFERRED OR DELIVERED TO ANY INDIVIDUAL OR LEGAL ENTITY AS PART OF THEIR INITIAL DISTRIBUTION, OR AT ANY TIME THEREAFTER, OTHER THAN TO INDIVIDUALS OR LEGAL ENTITIES WHO OR WHICH TRADE OR INVEST IN SECURITIES IN THE COURSE OF THEIR PROFESSION OR TRADE, WHICH INCLUDE BANKS, SECURITIES FIRMS, INVESTMENT INSTITUTIONS, BROKERS, DEALERS, INSURANCE COMPANIES, PENSION FUNDS, OTHER INSTITUTIONAL INVESTORS AND COMMERCIAL ENTERPRISES REGULARLY, AS AN ANCILLARY ACTIVITY, INVESTING IN SECURITIES.

## NOTICE TO THE RESIDENTS OF NEW ZEALAND

THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR AND THE OFFER MADE IN IT IS MADE SOLELY TO HABITUAL INVESTORS (BEING PERSONS DEFINED IN SECTION 3(2)(A)(II) OF THE NEW ZEALAND SECURITIES ACT 1978).

10010873.14

A-8

CONFIDENTIAL

GCC-NYAG0000724

## NOTICE TO RESIDENTS OF OMAN

PROSPECTIVE INVESTORS SHOULD SEEK PROFESSIONAL ADVICE BEFORE MAKING ANY INVESTMENT.

## NOTICE FOR RESIDENTS OF ONTARIO

THE SECURITIES BEING OFFERED ARE THOSE OF A FOREIGN ISSUER AND ONTARIO PURCHASERS WILL NOT RECEIVE THE CONTRACTUAL RIGHT OF ACTION PRESCRIBED BY SECTION 32 OF THE REGULATION UNDER THE SECURITIES ACT (ONTARIO). AS A RESULT, ONTARIO PURCHASERS MUST RELY ON OTHER REMEDIES THAT MAY BE AVAILABLE, INCLUDING COMMON LAW RIGHTS OF ACTION FOR DAMAGES OR RESCISSION OR RIGHTS OF ACTION UNDER THE CIVIL LIABILITY PROVISIONS OF THE U.S. FEDERAL SECURITIES LAWS.

ALL OF THE ISSUER'S DIRECTORS AND OFFICERS, AS WELL AS THE EXPERTS NAMED HEREIN, MAY BE LOCATED OUTSIDE OF CANADA AND, AS A RESULT, IT MAY NOT BE POSSIBLE FOR ONTARIO PURCHASERS TO EFFECT SERVICE OF PROCESS WITHIN CANADA UPON THE ISSUER OR SUCH PERSONS. ALL OR SUBSTANTIAL PORTION OF THE ASSETS OF THE ISSUER AND SUCH PERSON MAY BE LOCATED OUTSIDE OF CANADA AND, AS A RESULT, IT MAY NOT BE POSSIBLE TO SATISFY A JUDGMENT AGAINST THE ISSUER OR SUCH PERSONS IN CANADA OR TO ENFORCE A JUDGMENT OBTAINED IN CANADIAN COURTS AGAINST SUCH ISSUER OR PERSONS OUTSIDE OF CANADA.

## NOTICE TO RESIDENTS OF SINGAPORE

THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD, NOR MAY ANY DOCUMENT OR OTHER MATERIAL IN CONNECTION THEREWITH BE ISSUED, CIRCULATED OR DISTRIBUTED, EITHER DIRECTLY OR INDIRECTLY, TO PERSONS IN SINGAPORE OTHER THAN UNDER CIRCUMSTANCES IN WHICH SUCH OFFER OR SALE DOES NOT CONSTITUTE AN OFFER OR SALE OF THE CLASS B PARTICIPATING SHARES TO THE PUBLIC IN SINGAPORE OR TO PERSONS WHOSE ORDINARY BUSINESS IT IS TO BUY OR SELL CLASS B PARTICIPATING SHARES OR DEBENTURES, WHETHER AS PRINCIPAL OR AGENT.

## NOTICE TO RESIDENTS OF SOUTH AFRICA

THE CLASS B PARTICIPATING SHARES OFFERED HEREIN ARE FOR YOUR ACCEPTANCE ONLY AND MAY NOT BE OFFERED OR BECOME AVAILABLE TO PERSONS OTHER THAN YOURSELF AND MAY NOT BE PUBLICLY OFFERED, SOLD OR ADVERTISED IN SOUTH AFRICA AND THIS MEMORANDUM MAY ONLY BE CIRCULATED TO SELECTED INDIVIDUALS.

## NOTICE TO RESIDENTS OF SPAIN

THIS MEMORANDUM HAS NOT AND WILL NOT BE REGISTERED WITH LA COMISION NACIONAL DEL MERCADO DE VALORES OF SPAIN AND MAY NOT BE DISTRIBUTED IN SPAIN IN CONNECTION WITH THE OFFERING AND SALE OF

10010873.14

CONFIDENTIAL

CONFIDENTIAL

GCC-NYAG0000725

GCC-P 0335795

CLASS B PARTICIPATING SHARES WITHOUT COMPLYING WITH ALL LEGAL AND REGULATORY REQUIREMENTS IN RELATION THERETO.

### NOTICE TO RESIDENTS OF SWITZERLAND

THE COMPANY HAS NOT BEEN AUTHORIZED BY THE SWISS FEDERAL BANKING COMMISSION AS A FOREIGN INVESTMENT FUND UNDER ARTICLE 45 OF THE SWISS FEDERAL LAW ON INVESTMENT FUNDS OF MARCH 18, 1994. ACCORDINGLY, THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR DISTRIBUTED ON A PROFESSIONAL BASIS OR BE MADE KNOWN TO THE PUBLIC IN OR FROM SWITZERLAND, AND NEITHER THIS MEMORANDUM NOR ANY OTHER OFFERING MATERIAL RELATING TO THE CLASS B PARTICIPATING SHARES MAY BE ISSUED IN CONNECTION WITH ANY SUCH OFFER OR DISTRIBUTION.

### NOTICE TO RESIDENTS OF TAIWAN

CLASS B PARTICIPATING SHARES ACQUIRED IN THE DISTRIBUTION OF CLASS B PARTICIPATING SHARES HAVE NOT BEEN OFFERED, SOLD OR DELIVERED, AND WILL NOT BE OFFERED, SOLD OR DELIVERED AT ANY TIME, DIRECTLY OR INDIRECTLY, IN THE REPUBLIC OF CHINA IN A MANNER THAT WOULD CONSTITUTE A PUBLIC OFFERING.

### NOTICE TO RESIDENTS OF THE UNITED ARAB EMIRATES

THE SALE OF ANY CLASS B PARTICIPATING SHARES DESCRIBED IN THIS MEMORANDUM OR ANY OTHER OFFERING MATERIALS WILL NOT TAKE PLACE IN THE UNITED ARAB EMIRATES.

### NOTICE TO RESIDENTS OF THE UNITED KINGDOM

THE COMPANY IS NOT A RECOGNIZED COLLECTIVE INVESTMENT SCHEME FOR THE PURPOSES OF SECTION 264 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 OF THE UNITED KINGDOM (THE "ACT"). THE PROMOTION OF THE COMPANY AND THE DISTRIBUTION OF THIS CONFIDENTIAL MEMORANDUM IN THE UNITED KINGDOM IS ACCORDINGLY RESTRICTED BY LAW.

THIS CONFIDENTIAL MEMORANDUM IS BEING ISSUED IN THE UNITED KINGDOM BY THE COMPANY TO, AND/OR IS DIRECTED AT, PERSONS TO WHOM IT MAY LAWFULLY BE ISSUED OR DIRECTED AT UNDER THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2001 INCLUDING PERSONS WHO ARE AUTHORIZED UNDER THE ACT ("AUTHORIZED PERSONS"), CERTAIN PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS, HIGH NET WORTH COMPANIES, HIGH NET WORTH UNINCORPORATED ASSOCIATIONS OR PARTNERSHIPS, TRUSTEES OF HIGH VALUE TRUSTS AND PERSONS WHO QUALIFY AS CERTIFIED SOPHISTICATED INVESTORS. THE CLASS B PARTICIPATING SHARES ARE ONLY AVAILABLE TO SUCH PERSONS IN THE UNITED KINGDOM AND THIS CONFIDENTIAL MEMORANDUM MUST NOT BE RELIED OR ACTED UPON BY ANY OTHER PERSONS IN THE UNITED KINGDOM.

10010873.14

CONFIDENTIAL

GCC-NYAG0000726

CONFIDENTIAL                                                                                    GCC-P 0335796

IN ORDER TO QUALIFY AS A CERTIFIED SOPHISTICATED INVESTOR A PERSON MUST A) HAVE A CERTIFICATE IN WRITING OR OTHER LEGIBLE FORM SIGNED BY AN AUTHORIZED PERSON TO THE EFFECT THAT HE IS SUFFICIENTLY KNOWLEDGEABLE TO UNDERSTAND THE RISKS ASSOCIATED WITH PARTICIPATING IN UNRECOGNIZED COLLECTIVE INVESTMENT SCHEMES AND B) HAVE SIGNED, WITHIN THE LAST 12 MONTHS, A STATEMENT IN A PRESCRIBED FORM DECLARING, AMONGST OTHER THINGS, THAT HE QUALIFIES AS A SOPHISTICATED INVESTOR IN RELATION TO SUCH INVESTMENTS.

THIS CONFIDENTIAL MEMORANDUM IS EXEMPT FROM THE GENERAL RESTRICTION IN SECTION 21 OF THE ACT ON THE COMMUNICATION OF INVITATIONS OR INDUCEMENTS TO ENGAGE IN INVESTMENT ACTIVITY ON THE GROUNDS THAT IT IS BEING ISSUED TO AND/OR DIRECTED AT ONLY THE TYPES OF PERSON REFERRED TO ABOVE.

THE CONTENT OF THIS CONFIDENTIAL MEMORANDUM HAS NOT BEEN APPROVED BY AN AUTHORIZED PERSON AND SUCH APPROVAL IS, SAVE WHERE THIS CONFIDENTIAL MEMORANDUM IS DIRECTED AT OR ISSUED TO THE TYPES OF PERSON REFERRED TO ABOVE, REQUIRED BY SECTION 21 OF THE ACT.

ACQUIRING CLASS B PARTICIPATING SHARES MAY EXPOSE AN INVESTOR TO A SIGNIFICANT RISK OF LOSING ALL OF THE AMOUNT INVESTED. THE COMPANY IS A LIMITED LIABILITY COMPANY AND ANY PERSON WHO ACQUIRES CLASS B PARTICIPATING SHARES WILL NOT THEREBY BE EXPOSED TO ANY SIGNIFICANT RISK OF INCURRING ADDITIONAL LIABILITY. ANY PERSON WHO IS IN ANY DOUBT ABOUT INVESTING IN THE COMPANY SHOULD CONSULT AN AUTHORIZED PERSON SPECIALIZING IN ADVISING ON SUCH INVESTMENTS.

10010873.14

A-11

CONFIDENTIAL

GCC-NYAG0000727

## APPENDIX B

The definition of "U.S. Person" under Regulation S of the U.S. Securities Act of 1933, as amended (the "Securities Act"), is set forth below.

(1)　　"U.S. person" means:

(i)　　any natural person resident in the United States;

(ii)　　any partnership or corporation organized or incorporated under the laws of the United States;

(iii)　　any estate of which any executor or administrator is a U.S. person;

(iv)　　any trust of which any trustee is a U.S. person;

(v)　　any agency or branch of a foreign entity located in the United States;

(vi)　　any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

(vii)　　any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or

(viii)　　any partnership or corporation if:

(A)　　organized or incorporated under the laws of any foreign jurisdiction; and

(B)　　formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

(2)　　Notwithstanding (1) above, any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States shall not be deemed a "U.S. person."

(3)　　Notwithstanding (1) above, any estate of which any professional fiduciary acting as executor or administrator is a U.S. person shall not be deemed a U.S. person if:

(i)　　an executor or administrator of the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estate; and

(ii)　　the estate is governed by foreign law.

10010873.14

B-1

CONFIDENTIAL

GCC-NYAG0000728

CONFIDENTIAL

GCC-P 0335798

(4)    Notwithstanding (1) above, any trust of which any professional fiduciary acting as trustee is a U.S. person shall not be deemed a U.S. person if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person.

(5)    Notwithstanding (1) above, an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country shall not be deemed a U.S. person.

(6)    Notwithstanding (1) above, any agency or branch or a U.S. person located outside the United States shall not be deemed a "U.S. person" if:

     (i)    the agency or branch operates for valid business reasons; and

     (ii)    the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located.

(7)    The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans shall not be deemed "U.S. persons."

10010873.14

B-2

CONFIDENTIAL

GCC-NYAG0000729

CONFIDENTIAL

GCC-P 0335799