# Exhibit 17

# ASCOT FUND LIMITED

*A Cayman Islands Exempted Company*

## CONFIDENTIAL OFFERING MEMORANDUM

*Relating to Class B Participating Shares*

*Par Value U.S. $0.01 per Share*

**October 2006**

c/o Fortis Prime Fund Solutions (Cayman) Limited
P.O. Box 2003 GT
Grand Pavilion Commercial Center
802 West Bay Road
Grand Cayman
Cayman Islands

ANY REPRODUCTION OR DISTRIBUTION OF THIS CONFIDENTIAL OFFERING MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ANY OF ITS CONTENTS, MAY VIOLATE APPLICABLE SECURITIES LAWS AND IS PROHIBITED WITHOUT THE EXPRESS PRIOR WRITTEN CONSENT OF THE FUND. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EACH INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF (I) THE FUND AND (II) ANY OF ITS TRANSACTIONS, AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE INVESTOR RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.

The information contained herein is confidential and is furnished for informational purposes only. This Confidential Offering Memorandum supersedes all earlier disclosure concerning the Fund.

10139194.6

CONFIDENTIAL

GCC-NYAG0000047

# CONFIDENTIAL OFFERING MEMORANDUM

## ASCOT FUND LIMITED

c/o Fortis Prime Fund Solutions (Cayman) Limited
P.O. Box 2003 GT
Grand Pavilion Commercial Center
802 West Bay Road
Grand Cayman
Cayman Islands

Ascot Fund Limited, a Cayman Islands exempted company formed on February 10, 1992 (the "Fund"), was organized to operate as a private investment fund to facilitate investment by non-U.S. Persons and any investors that the Fund's board of directors deems appropriate.

The Fund will invest all of its assets in Ascot Partners, L.P., a Delaware limited partnership (the "Partnership" or the "Master Fund"). The Fund's investment objective, through its investment in the Master Fund, is to provide shareholders with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. The Master Fund engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities. The Master Fund will make investments through third-party managers using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the Master Fund's (collectively, "Other Investment Entities"). The Master Fund may utilize leverage when deemed appropriate by the General Partner (as defined below), including to enhance the Master Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Master Fund's investment objective will be achieved.** (See "Investment Program.")

J. Ezra Merkin will serve as the general partner of the Master Fund (the "General Partner"). The General Partner is responsible for the investment management of the Master Fund and has discretion over the Master Fund's investments.

This Confidential Offering Memorandum relates to an offering of non-voting shares in the Fund (the "Class B Participating Shares") to certain investors that, if accepted, will become shareholders of the Fund (each, a "Shareholder"). The Fund may offer Class B Participating Shares to prospective new Shareholders as of the beginning of each quarter (or at such other times as the board of directors of the Fund, in its sole discretion, may allow). The Fund issued 100 founders shares, with a par value of $1.00 per share, to Gabriel Capital Corporation, shortly after the Fund's incorporation (the "Founders Shares"). The Founders Shares are the only shares issued by the Fund that carry voting rights. All of the Founders

10139194.6

CONFIDENTIAL

GCC-NYAG0000048

Shares of the Fund were assigned to, and are currently held by, Fortis Bank (Cayman) Limited, as trustee of the Ascot Fund Limited Star Trust, a Cayman Islands trust. Holders of Founders Shares are not entitled to participate in the appreciation of the Fund's assets, but are entitled to a return of par value upon liquidation or dissolution of the Fund.

It is anticipated that no dividends will be paid on the Class B Participating Shares. The Fund will retain and reinvest the net income derived from its investments, including its investment in the Master Fund.

Class B Participating Shares are being offered to persons who are not "U.S. Persons" (as that term is defined herein under "Suitability Requirements; Limitations on Transferability") and each investor must be, among other things, an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, as amended (the "1933 Act") and a "qualified purchaser," as that term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). U.S. taxable investors and Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons should invest in the Partnership. The board of directors of the Fund, in its sole discretion, may decline to admit a prospective investor for any reason or for no reason, even if it satisfies the Fund's suitability requirements.

Class B Participating Shares are suitable only for sophisticated investors (i) that do not require immediate liquidity for their investments, (ii) for which an investment in the Fund does not constitute a complete investment program and (iii) that fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. (See "Investment Program" and "Certain Risk Factors.")

Prospective investors should carefully read this Confidential Offering Memorandum. The contents of this Confidential Offering Memorandum, however, should not be considered legal or tax advice, and each prospective investor should consult its own counsel and advisers as to all matters concerning an investment in the Fund.

This Confidential Offering Memorandum has been prepared solely for the information of the person to whom it has been delivered on behalf of the Fund and may not be reproduced or used for any other purpose. The dissemination, distribution, reproduction or other use of all or any portion of this Confidential Offering Memorandum or the divulgence of any of its contents other than to the prospective investor's financial, tax or legal advisors, without the prior written approval of the Fund, is prohibited. Any person that receives this Confidential Offering Memorandum and does not purchase Class B Participating Shares is requested to promptly return this Confidential Offering Memorandum to the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative or other agent of such investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of (i) the Fund and (ii) any transactions described herein, and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Each person accepting this Confidential Offering Memorandum agrees to return it to

10139194.6

-ii-

CONFIDENTIAL

GCC-NYAG0000049

GCC-P 0335119

the Fund promptly upon request. This Confidential Offering Memorandum is accurate as of its date, but no representation or warranty is made as to its continued accuracy after such date.

Neither the Fund nor the Master Fund will be registered as an investment company and, therefore, will not be required to adhere to certain operational restrictions and requirements under the U.S. Investment Company Act of 1940, as amended. The General Partner is not presently registered as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended.

All references to "dollars" or to "$" herein are to U.S. Dollars.

---

THE GENERAL PARTNER IS EXEMPT FROM REGISTRATION WITH THE U.S. COMMODITY FUTURES TRADING COMMISSION ("CFTC") AS A COMMODITY POOL OPERATOR ("CPO") UNDER CFTC RULE 4.13(A)(4). THEREFORE, UNLIKE A REGISTERED CPO, THE GENERAL PARTNER IS NOT REQUIRED TO PROVIDE PROSPECTIVE SHAREHOLDERS WITH A CFTC COMPLIANT DISCLOSURE DOCUMENT, NOR IS IT REQUIRED TO PROVIDE SHAREHOLDERS WITH CERTIFIED ANNUAL REPORTS THAT SATISFY THE REQUIREMENTS OF CFTC RULES APPLICABLE TO REGISTERED CPOS. THE FUND DOES, HOWEVER, INTEND TO PROVIDE SHAREHOLDERS WITH ANNUAL AUDITED FINANCIAL STATEMENTS.

THE CFTC EXEMPTION RULE REQUIRES, AMONG OTHER THINGS, THAT EACH SHAREHOLDER BE A NON-UNITED STATES PERSON UNDER CFTC RULES, SATISFY CERTAIN SOPHISTICATION CRITERIA, OR OTHERWISE BE AN ELIGIBLE INVESTOR SPECIFIED IN THE RULE. IT ALSO REQUIRES THAT CLASS B PARTICIPATING SHARES IN THE FUND BE EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, AND BE OFFERED AND SOLD WITHOUT MARKETING TO THE PUBLIC IN THE UNITED STATES. THE FUND'S CONFIDENTIAL OFFERING MEMORANDUM (THIS "MEMORANDUM") HAS NOT BEEN REVIEWED OR APPROVED BY THE CFTC.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM WILL BE EMPLOYED IN THE OFFERING OF THE CLASS B PARTICIPATING SHARES EXCEPT FOR THIS CONFIDENTIAL OFFERING MEMORANDUM, STATEMENTS CONTAINED HEREIN AND WRITTEN MATERIALS SPECIFICALLY APPROVED BY THE FUND. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THE CLASS B PARTICIPATING SHARES, EXCEPT FOR THE INFORMATION CONTAINED HEREIN.

---

THE FUND IS A REGULATED MUTUAL FUND FOR THE PURPOSES OF THE MUTUAL FUNDS LAW (2003 REVISION) OF THE CAYMAN ISLANDS. THE FUND IS REGISTERED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY PURSUANT TO SECTION 4(3) OF THAT LAW AND THE PRESCRIBED DETAILS IN RESPECT OF THIS CONFIDENTIAL OFFERING MEMORANDUM HAVE BEEN FILED WITH THE

10139194.6

-iii-

CONFIDENTIAL

GCC-NYAG0000050

GCC-P 0335120

MONETARY AUTHORITY. SUCH REGISTRATION DOES NOT IMPLY THAT THE MONETARY AUTHORITY IN THE CAYMAN ISLANDS HAS APPROVED THIS CONFIDENTIAL OFFERING MEMORANDUM OR THE OFFERING OF CLASS B PARTICIPATING SHARES HEREUNDER. FOR A SUMMARY OF THE CONTINUING REGULATORY OBLIGATIONS OF THE FUND AND A DESCRIPTION OF THE REGULATORY POWER OF THE CAYMAN ISLANDS MONETARY AUTHORITY, SEE THE SECTION ENTITLED "CAYMAN ISLANDS REGULATION" OF THIS CONFIDENTIAL OFFERING MEMORANDUM.

EXCEPT AS NOTED IN THE PRECEDING PARAGRAPH, THE OFFERING OF SECURITIES HEREBY HAS NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY OF ANY COUNTRY OR JURISDICTION, NOR HAS ANY SUCH REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. CLASS B PARTICIPATING SHARES ARE NOT REGISTERED FOR SALE, AND THERE WILL BE NO PUBLIC OFFERING OF THE CLASS B PARTICIPATING SHARES.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

---

EACH PROSPECTIVE INVESTOR IS INVITED TO MEET WITH THE FUND TO DISCUSS WITH, ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE FUND CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF THE CLASS B PARTICIPATING SHARES, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE FUND POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE INFORMATION CONTAINED HEREIN.

---

THE DISTRIBUTION OF THIS CONFIDENTIAL MEMORANDUM AND THE OFFER AND SALE OF THE SHARES IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW. THIS CONFIDENTIAL MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SHARES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL OR TO ANY INVESTOR TO WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER IN SUCH JURISDICTION. NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT A PUBLIC OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE. ACCORDINGLY, THE SHARES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS CONFIDENTIAL MEMORANDUM MAY NOT BE DISTRIBUTED, IN ANY JURISDICTION, EXCEPT IN

10139194.6

CONFIDENTIAL

GCC-NYAG0000051

CONFIDENTIAL

GCC-P 0335121

ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION. SHARES THAT ARE ACQUIRED BY PERSONS NOT ENTITLED TO HOLD THEM WILL BE COMPULSORILY REDEEMED. (SEE APPENDIX A FOR ADDITIONAL DISCLOSURES.)

CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED TO THE PUBLIC IN THE CAYMAN ISLANDS.

\*      \*      \*      \*

10139194.6

-v-

CONFIDENTIAL

GCC-NYAG0000052

CONFIDENTIAL

GCC-P 0335122

_THE FUND_

Ascot Fund Limited
c/o Fortis Prime Fund Solutions (Cayman) Limited
P.O. Box 2003 GT
Grand Pavilion Commercial Center
802 West Bay Road
Grand Cayman, Cayman Islands
Attn: Share Registration Department

_THE GENERAL PARTNER OF THE MASTER FUND_

J. Ezra Merkin
Gabriel Capital Corporation
450 Park Avenue, 32nd Floor
New York, NY 10022

_THE REGISTRAR_

Fortis Prime Fund Solutions (Cayman) Limited
P.O. Box 2003 GT
Grand Pavilion Commercial Center
802 West Bay Road
Grand Cayman, Cayman Islands
Attn: Share Registration Department

_AUDITORS_

BDO Tortuga
P.O. Box 31118 SMB
5th Floor Zephyr House
Mary Street
George Town, Grand Cayman
Cayman Islands

_U.S. LEGAL COUNSEL_

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022

_CAYMAN ISLANDS LEGAL COUNSEL_

Maples and Calder
P.O. Box 309GT
Ugland House
South Church Street
George Town, Grand Cayman
Cayman Islands

10139194.6

CONFIDENTIAL

GCC-NYAG0000053

CONFIDENTIAL

GCC-P 0335123

## TABLE OF CONTENTS

|  | Page |
|---|---|
| SUMMARY OF TERMS | 1 |
| THE FUND | 16 |
| INVESTMENT PROGRAM | 16 |
| THE GENERAL PARTNER OF THE MASTER FUND | 17 |
| THE BOARD OF DIRECTORS | 18 |
| THE REGISTRAR | 19 |
| SUBSCRIPTION PROCEDURE | 19 |
| THE OFFERING OF SHARES | 19 |
| THE SHARES | 20 |
| SALES CHARGES | 21 |
| FISCAL YEAR | 21 |
| DETERMINATION OF NET ASSET VALUE | 21 |
| INVESTMENT ADVISORY FEES; OPERATING AND OTHER EXPENSES | 22 |
| REDEMPTIONS | 22 |
| CERTAIN RISK FACTORS | 24 |
| CONFLICTS OF INTEREST | 29 |
| BROKERAGE COMMISSIONS | 31 |
| TAX ASPECTS | 32 |
| ANTI-MONEY LAUNDERING REGULATIONS | 37 |
| SUITABILITY REQUIREMENTS; LIMITATIONS ON TRANSFERABILITY | 38 |
| CAYMAN ISLANDS MUTUAL FUNDS LAW | 39 |
| COUNSEL | 40 |
| AUDITOR; REPORTS | 40 |

10139194.6

CONFIDENTIAL

GCC-NYAG0000054

GCC-P 0335124

SUBSCRIPTION FOR SHARES ................................................................................ 40

10139194.6

-ii-

CONFIDENTIAL

GCC-NYAG0000055

# ASCOT FUND LIMITED

## SUMMARY OF TERMS

The following is a summary of the principal terms of the Fund (as defined below). The following summary is qualified in its entirety by the more detailed information set forth in this Confidential Offering Memorandum and by the terms and conditions of the Fund's Memorandum of Association and Articles of Association (together, the "Articles"), as the same may be amended from time to time. This summary should be read in conjunction with such detailed information.

**THE FUND:**

Ascot Fund Limited, a Cayman Islands exempted company formed on February 10, 1992 (the "Fund"), was organized to operate as a private investment fund to facilitate investment by non-U.S. Persons and any investors that the Fund's board of directors deems appropriate.

Ascot Partners, L.P., a Delaware limited partnership formed on August 17, 1992 (the "Partnership"), was organized to operate as a private investment partnership for the benefit of U.S. taxable investors and Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons. The Partnership acts as a "master fund" (the "Partnership" or the "Master Fund") for the Fund, which will invest substantially all of its assets in the Master Fund.

The Fund is a limited partner of the Master Fund.

**INVESTMENT PROGRAM:**

The Fund's investment objective, through the Master Fund, is to provide Shareholders with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. The Master Fund engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities.

The Master Fund primarily follows a strategy in which

10139194.6

1

CONFIDENTIAL

GCC–NYAG0000056

the Master Fund purchases a portfolio of large-cap U.S. equities drawn from the S&P 100. In order to hedge its exposure to these securities, the Master Fund simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the Master Fund's long portfolio. The purchase of the put option allows the Master Fund to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the Master Fund to partially finance the purchase of the put option while at the same time also partially hedging the Master Fund's portfolio against any downward movement in the S&P 100.

The Master Fund will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the Master Fund's (collectively, "Other Investment Entities"). The Master Fund may utilize leverage when deemed appropriate by the General Partner (as defined below), including to enhance the Master Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Fund's investment objective will be achieved.**

When the Master Fund engages in investments through Other Investment Entities, fees, including performance-based fees, may be payable by the Master Fund, in addition to the fees payable to the General Partner discussed below. In such cases, the General Partner will retain overall investment responsibility for the portfolio of the Master Fund (although not the investment decisions of any independent money managers managing Other Investment Entities). Such arrangements are subject to periodic review by the General Partner and are terminable at reasonable intervals in the General Partner's discretion. The Master Fund may withdraw from or invest in different investment funds and terminate or enter into new investment advisory agreements without prior notice to, or consent of, the Shareholders (as defined below). (See "Certain Risk Factors — Independent Money Managers.")

10139194.6

2

CONFIDENTIAL

GCC-NYAG0000057

CONFIDENTIAL

GCC-P 0335127

The General Partner intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions that he can follow more closely. The Master Fund is expected to engage in hedging and short sales. There can be no assurance that any of the hoped-for benefits of the foregoing approach will be realized. Moreover, the General Partner reserves the right to deviate from the foregoing approach to the extent he deems appropriate. To the extent that the Master Fund trades in commodities and futures and related options, the Master Fund will incur additional risks. Because of the low margin deposits normally required in futures trading, the same risks as those resulting from leverage described below will be particularly present. In addition, due to market and regulatory factors, commodities and futures and related options may be less liquid than other types of investments.

The General Partner reserves the right to alter or modify some or all of the Master Fund's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the General Partner, in his sole discretion, considers an acceptable level of risk. (See "Investment Program.")

\* \* \*

**The descriptions contained herein of specific strategies that the Fund, through the Master Fund, may engage in should not be understood as in any way limiting the Master Fund's investment activities. The Master Fund may engage in investment strategies that are not described herein, but that General Partner considers appropriate.**

**The Fund's investment program is speculative and may entail substantial risks. Since market risks are inherent in all investments to varying degrees, there can be no assurance that the Fund's investment objectives will be achieved. In fact, certain investment practices described above can, in some circumstances, substantially increase the adverse impact on the Fund's investment portfolio. (See**

10139194.6

3

CONFIDENTIAL

GCC-NYAG0000058

"Certain Risk Factors.")

**THE GENERAL PARTNER OF THE MASTER FUND:**

J. Ezra Merkin will serve as the general partner of the Master Fund (the "General Partner"). The General Partner is responsible for the investment management of the Master Fund and has discretion over the Master Fund's investments.

Neither the Fund nor the Master Fund will be registered as an investment company and, therefore, will not be required to adhere to certain operational restrictions and requirements under the U.S. Investment Company Act of 1940, as amended. The General Partner is not presently registered as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended. (See "The General Partner of the Master Fund.")

**THE BOARD OF DIRECTORS:**

The Fund has two directors who serve as the Board of Directors to the Fund. Don M. Seymour and Aldo Ghisletta currently serve, in a non-executive capacity, as directors to the Fund and will remain directors until their resignation or removal (See "The Board of Directors.")

**THE REGISTRAR:**

Fortis Prime Fund Solutions (Cayman) Limited acts as share registration and transfer agent of the Fund (the "Registrar") and is a company registered in the Cayman Islands. The Registrar has a Trust License issued under the Banks and Trust Companies Law (2003 Revision) of the Cayman Islands and has an unrestricted Mutual Fund Administrator's License issued under the Mutual Funds Law (2003 Revision) of the Cayman Islands.

The Registrar is one of the largest of the Cayman Islands' licensed fund administrators providing full administrative services to over 450 funds with net assets in excess of $47 billion. The Registrar is a wholly-owned subsidiary of Fortis Bank (Cayman) Limited and is part of the Fortis Group. (See "The Registrar.")

**THE SHARES:**

This Confidential Offering Memorandum relates to an offering of non-voting Class B Participating Shares in the Fund (the "Class B Participating Shares") to certain investors that, if accepted, will become shareholders of the Fund (each, a "Shareholder").

The Fund also has in issue Class A Participating Shares (the "Class A Participating Shares" and together with the

10139194.6

4

CONFIDENTIAL

GCC-NYAG0000059

CONFIDENTIAL

GCC-P 0335129

"Class B Participating Shares", the "Participating Shares"). The Class A Participating Shares are held by Shareholders who invested in the Fund prior to February 1, 2006 and have different redemption rights than the Class B Participating Shares. Class A Participating Shares purchased prior to February 1, 2006 may be redeemed on the last business day of each calendar quarter upon 30 days prior written notice to the Fund. The redemption rights for Class B Participating Shares are set forth below.

The Board of Directors may also establish other classes of shares at such times and on such terms as may be determined in its sole discretion. (See "The Shares.")

**OFFERING OF SHARES**

The Fund may offer Class B Participating Shares to prospective new Shareholders as of the beginning of each quarter (or at such other times as the Fund in its sole discretion may allow).

The Class B Participating Shares will be offered in series. The Class B Participating Shares that are issued on the first date that Class B Participating Shares are purchased will be designated Class B Participating Shares of the initial series (the "Initial Series"). A new series will be established on each date that Class B Participating Shares are issued. Class B Participating Shares issued to the same subscriber but on different days will also be issued in separate series. Upon the issuance of a series of Class B Participating Shares, the Master Fund will establish a capital account for such series which will be credited initially the subscription proceeds of such series and thereafter allocated its *pro rata* share of the profits and losses (realized and unrealized), and expenses including, the Investment Advisory Fee (as defined below) and liabilities, of the Master Fund.

The Fund will consolidate different series of Class B Participating Shares into the Initial Series (or one or more other series of Class B Participating Shares) of such class (based on the net asset value of each such series being consolidated at the time of consolidation).

It is anticipated that no dividends will be paid on the Class B Participating Shares. The Fund will retain and reinvest the net income derived from its investments, including its investment in the Master Fund. (See "The

10139194.6

5

CONFIDENTIAL

GCC-NYAG0000060

CONFIDENTIAL

GCC-P 0335130

Offering of Shares.")

**MINIMUM SUBSCRIPTION:**

The minimum initial subscription is $500,000 and subscriptions may be made in integral multiples thereafter of $1,000, subject to the discretion of the Fund to accept other amounts; provided, however, that under no circumstances shall the Fund accept initial subscriptions of less than $50,000 or such other minimum amount specified from time to time under Cayman Islands law. (See "The Offering of Shares.")

**ADDITIONAL SUBSCRIPTIONS:**

Shareholders may subscribe for additional shares in amounts of at least $250,000, subject to the discretion of the Board of Directors to accept other amounts. (See "The Offering of Shares.")

**SALES CHARGES:**

There are no sales charges payable by the General Partner or the Fund in connection with the offering of Participating Shares. (See "Sales Charges.")

**FISCAL YEAR:**

The fiscal year of the Fund will end on December 31 of each calendar year.

**DETERMINATION OF NET ASSET VALUE**

The net asset value ("NAV") of the Master Fund will be equivalent to its respective gross assets less its gross liabilities as of any date of determination. To the extent feasible, expenses, fees and other liabilities will be accrued. The Board of Directors has delegated the day-to-day responsibility for valuing the Fund's assets to the General Partner.

Substantially all of the net assets of the Fund are invested in interests of the Master Fund. Accordingly, appreciation or depreciation in the NAV of a series of Participating Shares is based upon the NAV of the Master Fund capital account attributable to such series of Participating Shares, with appropriate adjustments for liabilities of the Fund. The NAV of a Participating Share is determined by dividing the NAV of such share's series at the beginning of the period by the number of outstanding shares of such series of Participating Shares.

NAV will be calculated at the end of each quarter, and estimated NAV will be calculated at the end of each month. Shares within a series will have the same NAV per Share. An Investment Advisory Fee charged to the Master Fund, which is attributable to a particular series

10139194.6

6

CONFIDENTIAL

GCC-NYAG0000061

GCC-P 0335131

of Participating Shares, will be reflected in the NAV of such series.

To the extent feasible, expenses, fees and other liabilities are accrued using generally accepted accounting principles as a guideline. Reserves may be taken for estimated or accrued expenses, liabilities or contingencies.

All matters concerning valuation of securities, as well as accounting procedures, not expressly provided for in the Articles and policies adopted by the Board of Directors may be determined by the Board of Directors, whose determination is final and conclusive as to all Shareholders. (See "Determination of Net Asset Value.")

**INVESTMENT ADVISORY FEES; OPERATING AND OTHER EXPENSES:**

The Master Fund's assets are invested by the General Partner, who has full discretionary authority to invest the assets of the Master Fund.

The Fund will be a limited partner in the Master Fund pursuant to the Master Fund's limited partnership agreement, as amended from time to time (the "Partnership Agreement"). The Master Fund will pay the General Partner or its designee an investment advisory fee as of the last business day of each fiscal year based on the value of each capital account in the Master Fund as of the end of such fiscal year and, with respect to any limited partner withdrawing as of a date other than the Master Fund's fiscal year-end, the accrued advisory fee attributable to such limited partner's withdrawal amount (the "Investment Advisory Fee"). The Investment Advisory Fee is equal to 1.5% (pro rated for periods of less than a year) of the ending value of a capital account in the Master Fund, as adjusted to take account of capital withdrawn during such period. Each series of the Fund will have a corresponding capital account in the Master Fund. The Fund may issue in the future different series of Class B Participating Shares as to which the Investment Advisory Fee is calculated on a different basis.

The Fund will bear its own operating costs (e.g. legal and accounting fees) and its *pro rata* share of the Master Fund's expenses including, but not limited to (i) all costs, fees (including the Investment Advisory Fee), operating expenses and other expenses of the Master Fund, including the costs, fees and expenses of attorneys,

10139194.6

7

CONFIDENTIAL

GCC-NYAG0000062

CONFIDENTIAL

GCC-P 0335132

accountants or other professionals incurred in organizing the Master Fund and in pursuing and conducting, or otherwise related to, the activities of the Master Fund; and (ii) will reimburse the General Partner for any out-of-pocket costs, fees and expenses incurred by him in connection therewith. In addition, the Fund will bear its *pro rata* share of the Master Fund's expenses related to direct costs, fees and expenses incurred in connection with the purchase, sale or carrying of any security, including, but not limited to, brokerage and other transaction costs and margin interest expenses and fees, including performance-based fees payable to investment managers or partners of private investment partnerships, closed-end funds or other pooled investment vehicles.

If any of the above expenses are incurred jointly for the account of the Fund and any other investment funds or trading accounts sponsored or managed by the General Partner or his affiliates, such expenses will be allocated to the Fund and such other funds or accounts in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

**REDEMPTIONS:**

A Shareholder may redeem all or part of its Class B Participating Shares on the date immediately preceding the one-year anniversary of the date such Class B Participating Shares were purchased (the "First Redemption Date") and, thereafter, on each anniversary of the First Redemption Date upon 45 days prior written notice to the Registrar.

Each date as of which a Shareholder redeems all or a portion of its Class B Participating Shares from the Fund is herein referred to as a "Redemption Date."

Redemption requests received for any Redemption Date may be limited to an amount equal to 25% of the net asset value of the Fund as of such date (the "Gate"). If redemption requests for a Redemption Date exceed the Gate, the Board of Directors may, in its sole discretion, (i) satisfy all such redemption requests or (ii) reduce such redemption requests *pro rata* in accordance with the aggregate net asset value of the Participating Shares held by each of the redeeming Shareholders, so that only 25% (or more, in the discretion of the Board of Directors) of the net asset value of the Fund is redeemed

10139194.6

8

CONFIDENTIAL

GCC-NYAG0000063

as of such date.

A redemption request that, solely as a result of the Gate, is not satisfied shall be carried forward for redemption or purchase as of the following Redemption Date until such request has been complied with in full; provided that requests for redemption which have been carried forward from an earlier Redemption Date will (subject always to the foregoing limits) be complied with in priority to later requests.

The Board of Directors may waive notice requirements or permit redemptions under such circumstances and conditions as it, in its sole discretion, deems appropriate.

The redeeming Shareholder will receive the amount of its redeemed Class B Participating Shares in cash (less reserves determined by the Board of Directors for contingent liabilities) within 90 days after redemption. If a Shareholder elects to redeem more than 95% of its Class B Participating Shares, the Fund will pay the Shareholder an amount equal to at least 95% (less a reserve of 5% pending audited financial statements) of its estimated redemption proceeds (on the basis of unaudited data) as of the Redemption Date within 30 days after the Redemption Date, or sooner if the Board of Directors determines that funds to settle the redemption are available. The balance will be paid (subject to audit adjustments), without interest, promptly after completion of the audit of the Fund's books for such fiscal year.

The redemption price of Class B Participating Shares will be based on the per share net asset value of the Fund attributable to the series of Class B Participating Shares of which the redeemed Class B Participating Shares are a part as of the relevant Redemption Date. In the event that a request for redemption would result in a Shareholder owning less than $500,000 worth of Class B Participating Shares then the Board of Directors, in their sole discretion, may redeem either all of the Shareholders Class B Participating Shares or such smaller number of shares that would result in such holder continuing to own such amount of Class B Participating Shares after such redemption. (See "Redemptions.")

**ADDITIONAL REDEMPTION**

10139194.6

Holders of Participating Shares may request more

9

CONFIDENTIAL

GCC-NYAG0000064

**RIGHTS:**

frequent redemption rights upon written request to the Registrar. The Board of Directors shall seek, but is not required, to accommodate all such redemption requests as it deems appropriate in its sole discretion.

**SUSPENSION OF
REDEMPTION RIGHTS;
COMPULSORY REDEMPTION:**

The Board of Directors may declare a suspension of the determination of the prices of Participating Shares for the whole or any part of any period during which by reason of the closure of or the suspension of trading on any money or foreign exchange market or commodities exchange or stock exchange or of a breakdown in any of the means normally employed by the Board of Directors or the administrator on behalf of the Board of Directors in ascertaining the value of securities or other assets or for any other the reason the value of any securities or other assets owned or contracted for by the Fund cannot, in the opinion of the Board of Directors, be reasonably ascertained or circumstances exist as a result of which, in their opinion, it is not reasonably practicable for the Fund to realize any securities or other assets owned or contracted for by it which together constitute a material proportion of the overall assets of the Fund.

Such suspension shall take effect at such times as the Board of Directors shall specify, but not later than the close of business of the business day following the declaration and shall continue until the Board of Directors declare the suspension at end, except that the suspension shall terminate in any event on the day following the first business day on which (i) the condition giving rise to the suspension ceases to exist and (ii) no other condition under which suspension is authorized exists.

The Board of Directors will notify the Shareholders each time it exercises its right to suspend the determination of the prices of Class B Participating Shares and each time the suspension has ended.

In addition, the Board of Directors, by written notice to any Shareholder, may suspend the payment of proceeds to such Shareholder if the Board of Directors reasonably deem it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Fund, the Investment Advisor or any of the Fund's other service providers. (See "Redemptions-Suspension of Redemption Rights; Compulsory Redemption; and Mandatory Redemption; Anti-Money Laundering

10139194.6

10

CONFIDENTIAL

GCC-NYAG0000065

CONFIDENTIAL

GCC-P 0335135

Regulations.")

The Class B Participating Shares of any Shareholder may be compulsorily redeemed by the Board of Directors of the Fund and such Shareholder may be required to withdraw from the Fund, as of the last day of any calendar month, if the Board of Directors determines that such termination and withdrawal are in the best interests of the Fund. The Board of Directors shall give 30 days' prior written notice of any such determination to such Shareholder. (See "Redemptions-Suspension of Redemption Rights; Compulsory Redemption; Mandatory Redemption of All Shareholders; and Anti-Money Laundering Regulations.")

**MANDATORY REDEMPTION OF ALL SHAREHOLDERS:**

In addition, the Fund will mandatorily redeem all Shareholders of the Fund upon the first to occur of the following events: (i) on December 31, 2033; (ii) upon the incapacity or death of J. Ezra Merkin; (iii) following a determination by the Directors that the Fund should be dissolved; or (iv) upon the occurrence of an event causing the dissolution of the Fund. (See "Redemptions-Mandatory Redemption of All Shareholders.")

**RESTRICTIONS ON TRANSFER:**

Class B Participating Shares may be transferred subject to the approval of the Board of Directors, which consent may be given or withheld, in its discretion. (See "Suitability Requirements; Limitations on Transferability.")

**CERTAIN RISK FACTORS:**

There can be no assurance that the investment objective of the Fund will be achieved. Investments in illiquid securities and the use of short sales, options, leverage, futures and other derivative instruments may create special risks and substantially increase the impact of adverse price movements on the Fund's portfolio. An investment in the Fund provides limited liquidity since the Class B Participating Shares are not freely transferable, and the Shareholders will have limited redemption rights. (See "Certain Risk Factors.")

10139194.6

11

CONFIDENTIAL

GCC-NYAG0000066

CONFIDENTIAL

GCC-P 0335136

**LEVERAGE:**

The Master Fund has the power to borrow and may do so when deemed appropriate by the General Partner, including to enhance the Master Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. The use of leverage can, in certain circumstances, substantially increase the losses to which the Fund's investment portfolios may be subject. Currently, the General Partner does not intend to employ leverage, but Other Investment Entities may do so. (See "Certain Risk Factors.")

**BROKERAGE COMMISSIONS:**

Portfolio transactions for the Master Fund will be allocated to brokers by the General Partner and such third-party manager consistent with best execution. In selecting brokers and dealers to execute portfolio transactions, the General Partner and/or any other third-party managers have authority to and may consider several different factors, including, among others, a broker's or dealer's ability to provide best execution, its willingness to commit capital, its financial stability, its systems, facilities and recordkeeping and its experience in handling similar transactions (based on size, market conditions and type of security, among other factors). The General Partner and third-party managers may also take into account a broker's and dealer's relative performance on industry surveys and studies of execution quality, the broker's and dealer's rates of commission, mark-ups and mark-downs, its applicable margin levels and financing rates and other applicable fees and charges, its overall responsiveness and the broker's or dealer's provision of research, brokerage and other products and services pursuant to soft dollar arrangements.

The Master Fund's securities transactions may generate a substantial amount of brokerage commissions and other compensation, a *pro rata* portion of which the Fund, not the General Partner, will be obligated to pay. The General Partner and any third-party managers will have complete discretion in deciding what brokers and dealers the Master Fund will use and in negotiating the rates of compensation the Master Fund will pay.

The Master Fund will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and

12

10139194.6

CONFIDENTIAL

GCC-NYAG0000067

custodial services will be provided by one or more unaffiliated brokerage firms. Bernard L. Madoff Investment Securities, LLC and Morgan Stanley & Co., Inc. (the "Prime Brokers") currently serve as the principal prime brokers and custodians for the Master Fund, and clear (generally on the basis of payment against delivery) the Master Fund's securities transactions that are effected through other brokerage firms. The Master Fund is not committed to continue its relationship with the Prime Brokers for any minimum period and the General Partner may select other or additional brokers to act as prime brokers for the Master Fund. (See "Brokerage Commissions.")

**CONFLICTS OF INTEREST:**

The General Partner and his affiliates will provide investment management services to managed accounts and other investment partnerships or funds, some of which may have similar investment objectives to those of the Fund (and thus the Master Fund). Such activities may raise conflicts of interest. However, the General Partner or his affiliates, as applicable, will undertake to provide such investment management services in a manner that is consistent with their respective fiduciary duties to the Master Fund. (See "Conflicts of Interest.")

**U.S. REGULATORY MATTERS:**

Neither the Fund nor the Master Fund will be registered as an investment company in the United States under the U.S. Investment Company Act of 1940, as amended. (the "Company Act").

The Fund and the Master Fund rely on the exclusion provided in Section 3(c)(7) of the Company Act, which permits private investment companies to sell their interests, on a private placement basis, to an unlimited number of "qualified purchasers," as defined in Section 2(a)(51) of the Company Act.

The General Partner is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "The General Partner of the Master Fund" and "Suitability Requirements; Limitations on Transferability.")

**SUITABILITY:**

Class B Participating Shares are being offered to persons who are not "U.S. Persons" (as that term is defined herein under "Suitability Requirements; Limitations on Transferability") and each investor must be, among other things, an "accredited investor" as

10139194.6

13

CONFIDENTIAL

CONFIDENTIAL

defined in Rule 501 under the Securities Act of 1933, as amended (the "1933 Act") and a "qualified purchaser," as that term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). U.S. taxable investors and Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons should invest in the Partnership. The board of directors of the Fund, in its sole discretion, may decline to admit a prospective investor for any reason or for no reason, even if it satisfies the Fund's suitability requirements.

The Board of Directors, in its sole discretion, may decline to admit a prospective investor for any reason or for no reason, even if it satisfies the Fund's suitability requirements.    (See    "Suitability    Requirements; Limitations on Transferability.")

**TAXATION:**

Based on the Fund's and the Master Fund's organizational structure, anticipated methods of operation and features as described herein, the Fund and the Master Fund generally should not be subject to U.S. federal income tax on gains from trading in securities and commodities. In addition, interest from U.S. sources earned on bank deposits and "portfolio interest" as defined under the U.S. Internal Revenue Code of 1986, as amended, are not subject to withholding for U.S. federal income tax. However, dividend income and certain other interest from U.S. sources are subject to 30% withholding.

The Fund is an exempted company under Cayman Islands law. The Fund has received an undertaking as to tax concessions pursuant to Section 6 of the Tax Concessions Law (Revised) which provides that, for a period of 20 years from the date of issue of the undertaking, no law thereafter enacted in the Cayman Islands imposing any taxes or duty to be levied on income or capital assets, gains or appreciation will apply to any income or property of the Fund.

There can be no assurance that the U.S. or Cayman Islands tax laws will not be changed adversely with respect to the Fund, the Master Fund or their

101391946

14

CONFIDENTIAL

GCC-NYAG0000069

CONFIDENTIAL

GCC-P 0335139

shareholders or partners, as applicable, or that the Fund's or the Master Fund's income tax status will not be successfully challenged by such authorities.

Potential shareholders should consult their own advisors regarding tax treatment by the jurisdiction applicable to them.   Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them.  (See "Tax Aspects".)

**AUDITORS:**

BDO Tortuga serves as the Fund's auditor.  The Fund will provide to the Shareholders unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 120 days following the end of each fiscal year.   Certain Shareholders may have access to certain information regarding the Fund that may not be available to other Shareholders.  Such Shareholders may make investment decisions with respect to their investment in the Fund based on such information.

**LEGAL COUNSEL:**

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, acts as U.S. counsel to the Fund in connection with this offering of Class B Participating Shares.  Schulte Roth & Zabel LLP also acts as counsel to the General Partner, the Master Fund and their affiliates. Maples and Calder, Grand Cayman, Cayman Islands, acts as Cayman Islands counsel to the Fund.  In connection with this offering of the Class B Participating Shares and subsequent advice to the Fund, the Master Fund, the General Partner and their affiliates, neither Schulte Roth & Zabel LLP nor Maples and Calder will be representing Shareholders.  No independent counsel has been retained to represent Shareholders.

**SUBSCRIPTION FOR INTEREST:**

Prospective Shareholders interested in subscribing for Class B Participating Shares will be furnished, and will be required to complete and return to the Fund, subscription documents.

10139194.6

15

CONFIDENTIAL

GCC-NYAG0000070

CONFIDENTIAL

GCC-P 0335140

## THE FUND

Ascot Fund Limited, a Cayman Islands exempted company formed on February 10, 1992 (the "Fund"), was organized to operate as a private investment fund to facilitate investment by non-U.S. Persons and any investors that the Fund's board of directors deems appropriate.

Ascot Partners, L.P., a Delaware limited partnership formed on August 17, 1992 (the "Partnership"), was organized to operate as a private investment partnership for the benefit of U.S. taxable investors and Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons. The Partnership acts as a "master fund" for the Fund (the "Partnership" or the "Master Fund"), which will invest substantially all of its assets in the Master Fund.

The Fund is a limited partner of the Master Fund.

## INVESTMENT PROGRAM

The Fund's investment objective, through the Master Fund, is to provide Shareholders with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. The Master Fund engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities.

The Master Fund primarily follows a strategy in which the Master Fund purchases a portfolio of large-cap U.S. equities drawn from the S&P 100. In order to hedge its exposure to these securities, the Master Fund simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the Master Fund's long portfolio. The purchase of the put option allows the Master Fund to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the Master Fund to partially finance the purchase of the put option while at the same time also partially hedging the Master Fund's portfolio against any downward movement in the S&P 100.

The Master Fund will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the Master Fund's (collectively, "Other Investment Entities"). The Master Fund may utilize leverage when deemed appropriate by the General Partner (as defined below), including to enhance the Master Fund's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Fund's investment objective will be achieved.**

When the Master Fund engages in investments through Other Investment Entities, fees, including performance-based fees, may be payable by the Master Fund, in addition to the fees payable to the General Partner discussed below. In such cases, the General Partner will

CONFIDENTIAL

GCC-NYAG0000071

CONFIDENTIAL

GCC-P 0335141

retain overall investment responsibility for the portfolio of the Master Fund (although not the investment decisions of any independent money managers managing Other Investment Entities). Such arrangements are subject to periodic review by the General Partner and are terminable at reasonable intervals in the General Partner's discretion. The Master Fund may withdraw from or invest in different investment funds and terminate or enter into new investment advisory agreements without prior notice to, or consent of, the Shareholders (as defined below). (See "Certain Risk Factors – Independent Money Managers.")

The General Partner intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions that he can follow more closely. The Master Fund is expected to engage in hedging and short sales. There can be no assurance that any of the hoped-for benefits of the foregoing approach will be realized. Moreover, the General Partner reserves the right to deviate from the foregoing approach to the extent he deems appropriate. To the extent that the Master Fund trades in commodities and futures and related options, the Master Fund will incur additional risks. Because of the low margin deposits normally required in futures trading, the same risks as those resulting from leverage described below will be particularly present. In addition, due to market and regulatory factors, commodities and futures and related options may be less liquid than other types of investments.

The General Partner reserves the right to alter or modify some or all of the Master Fund's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the General Partner, in his sole discretion, considers an acceptable level of risk.

* * *

The descriptions contained herein of specific strategies that the Fund, through the Master Fund, may engage in should not be understood as in any way limiting the Master Fund's investment activities. The Master Fund may engage in investment strategies that are not described herein, but that General Partner considers appropriate.

The Fund's investment program is speculative and may entail substantial risks. Since market risks are inherent in all investments to varying degrees, there can be no assurance that the Fund's investment objectives will be achieved. In fact, certain investment practices described above can, in some circumstances, substantially increase the adverse impact on the Fund's investment portfolio. (See "Certain Risk Factors.")

* * *

## THE GENERAL PARTNER OF THE MASTER FUND

J. Ezra Merkin will serve as the general partner of the Master Fund (the "General Partner"). The General Partner is responsible for the investment management of the Master Fund and has discretion over the Master Fund's investments.

Neither the Fund nor the Master Fund will be registered as an investment company and, therefore, will not be required to adhere to certain operational restrictions and

10139194.6                                    17

CONFIDENTIAL

GCC-NYAG0000072

requirements under the U.S. Investment Company Act of 1940, as amended. The General Partner is not presently registered as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended.

## THE BOARD OF DIRECTORS

The Fund has two directors who serve as the Board of Directors to the Fund. Don M. Seymour and Aldo Ghisletta currently serve, in a non-executive capacity, as directors to the Fund and will remain directors until their resignation or removal. In performing their duties, the directors are entitled to, and generally do, rely upon work performed by and information received from the Fund's service providers.

Biographical information relating to the directors is set forth below:

*Don M. Seymour.* Don Seymour is a Managing Director of dms Management Ltd., a company management firm licensed and regulated under the laws of the Cayman Islands, where he serves on the boards of several notable investment companies. He is also a previous Director of the Cayman Islands Monetary Authority, an independent government agency responsible for the regulation of the financial services industry and of Cayman Airways Limited, the national airline of the Cayman Islands. He is a Notary Public and a previous member of the Trade & Business Licensing Board of the Cayman Islands.

Prior to founding dms Management Ltd., Mr. Seymour was the Head of the Investment Services Division of the Cayman Islands Monetary Authority where he directed the authorization, supervision and enforcement of regulated mutual funds under the Mutual Funds Law, and the supervision of company managers under the Companies Management Law. Prior to that, he was a Manager, Audit and Business Advisory Services, with Price Waterhouse where he was responsible for serving major investment management clients.

He holds a BBA degree in Accounting from the University of Texas at Austin and qualified as a Certified Public Accountant in the State of Illinois.

*Aldo Ghisletta.* Aldo Ghisletta is a Director of dms Management Ltd., a company management firm, licensed and regulated under the laws of the Cayman Islands. Previously, he was General Manager of Morval Bank & Trust Cayman Ltd. where he directed its private banking, mutual fund administration, trust and companies administration operations in the Cayman Islands. Prior to that, he was Vice-President of Banca Unione di Credito, a Swiss banking group, where he was responsible for its mutual funds administration, securities trading, accounting and administration operations in Lugano and Zurich. He holds a degree in Banking and Accounting from the Unione di Banche Svizzere, Bellinzona.

Additional directors may be appointed from time to time. The Articles of Association provide for the appointment of alternate directors who have all of the rights and powers of the directors in whose stead such persons are appointed.

The Fund has agreed to indemnify and hold harmless members of the Board of Directors, auditors and officers from and against all actions, proceedings, costs, charges, losses, damages and expenses which they, or any of them, shall or may incur or sustain by reason of any

10139194.6

18

CONFIDENTIAL

GCC-NYAG0000073

act done or omitted in the execution of their duties in their respective offices, unless they incur or sustain such costs, charges, losses, damages and expenses by or through their own willful neglect or willful default.

Directors are each paid $5,500 annually for their services.

## THE REGISTRAR

Fortis Prime Fund Solutions (Cayman) Limited acts as share registration and transfer agent of the Fund (the "Registrar"), and is a company registered in the Cayman Islands. The Registrar has a Trust License issued under the Banks and Trust Companies Law (2003 Revision) of the Cayman Islands and has an unrestricted Mutual Fund Administrator's License issued under the Mutual Funds Law (2003 Revision) of the Cayman Islands.

The Registrar is one of the largest of the Cayman Islands' licensed fund administrators providing full administrative services to over 450 funds with net assets in excess of $47 billion. The Registrar is a wholly-owned subsidiary of Fortis Bank (Cayman) Limited and is part of the Fortis Group.

## SUBSCRIPTION PROCEDURE

Persons interested in subscribing for Class B Participating Shares (as defined below) will be furnished with, and will be required to complete and return to the Registrar, subscription documents and certain other documents and wire their subscription monies (net of charges) to the Fund's subscription account as detailed in the subscription document. The Registrar's address is: P.O. Box 2003 GT, Grand Pavilion Commercial Center, 802 West Bay Road, Grand Cayman, Cayman Islands. Please direct inquiries to the Share Registration Group at the Registrar, Telephone: (345) 949-7942 and Facsimile: (345) 914-9903.

Each subscriber will also be required to acknowledge in its subscription application that the Fund, the Registrar and the General Partner and any of their affiliates, may disclose to each other, to any other service provider to the Fund or to any regulatory body in any applicable jurisdiction copies of the subscriber's subscription application, including details of that Shareholder's holdings in the Fund, historical and pending transactions in the Class B Participating Shares and the values thereof, and any information concerning the subscriber provided by the subscriber to the Fund, the Registrar, the General Partner or to any of their affiliates and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on such person by law or otherwise.

## THE OFFERING OF SHARES

The Fund may offer Class B Participating Shares to prospective new Shareholders as of the beginning of each quarter (or at such other times as the Fund in its sole discretion may allow).

The Class B Participating Shares will be offered in series. The Class B Participating Shares that are issued on the first date that Class B Participating Shares are purchased will be designated Class B Participating Shares of the initial series (the "Initial Series"). A new series will be established on each date that Class B Participating Shares are

10139194.6

19

CONFIDENTIAL

GCC-NYAG0000074

issued. Class B Participating Shares issued to the same subscriber but on different days will also be issued in separate series. Upon the issuance of a series of Class B Participating Shares, the Master Fund will establish a capital account for such series which will be credited initially the subscription proceeds of such series and thereafter allocated its *pro rata* share of the profits and losses (realized and unrealized), and expenses including, the Investment Advisory Fee (as defined below) and liabilities, of the Master Fund.

The Fund will consolidate different series of Class B Participating Shares into the Initial Series (or one or more other series of Class B Participating Shares) of such class (based on the net asset value of each such series being consolidated at the time of consolidation).

It is anticipated that no dividends will be paid on the Class B Participating Shares. The Fund will retain and reinvest the net income derived from its investments, including its investment in the Master Fund.

The minimum initial subscription is $500,000 and subscriptions may be made in integral multiples thereafter of $1,000, subject to the discretion of the Fund to accept other amounts; provided, however, that under no circumstances shall the Fund accept initial subscriptions of less than $50,000 or such other minimum amount specified from time to time under Cayman Islands law. Shareholders may subscribe for additional shares in amounts of at least $250,000, subject to the discretion of the Board of Directors to accept other amounts.

## THE SHARES

The Fund has authorized capital of 1,000,000 participating non-voting shares, of a nominal par value of $0.01 per share and 1,000 non-participating voting shares, of a nominal par value of $1.00 per share (the "Founders Shares"). The Fund is offering non-voting Class B Participating Shares pursuant to this Confidential Offering Memorandum (the "Class B Participating Shares"). The Fund has Class A Participating Shares outstanding that are held by Shareholders who invested in the Fund prior to February 1, 2006 (the "Class A Participating Shares" and together with the Class B Participating Shares, the "Participating Shares") that have different redemption rights than the Class B Participating Shares. Class A Participating Shares purchased prior to February 1, 2006 may be redeemed on the last business day of each calendar quarter upon 30 days prior written notice to the Fund. Class B Participating Shares may be redeemed on the date immediately preceding the one-year anniversary of the date such Class B Participating Shares were purchased (the "First Redemption Date") and, thereafter, on each anniversary of the First Redemption Date upon 45 days prior written notice to the Registrar.

The Founders Shares are the only shares issued by the Fund that carry voting rights. All of the Founders Shares of the Fund were assigned to, and are currently held by, Fortis Bank (Cayman) Limited, as trustee of the Ascot Fund Limited Star Trust, a Cayman Islands trust. Holders of Founders Shares are not entitled to participate in the appreciation of the Fund's assets, but are entitled to a return of par value upon liquidation or dissolution of the Fund.

The Board of Directors may also establish other classes of shares at such times and on such terms as may be determined in its sole discretion.

10139194.6

20

CONFIDENTIAL

GCC-NYAG0000075

GCC-P 0335145

All Shareholders are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Memorandum of Association and Articles of Association of the Fund.

Under the terms of the Fund's Memorandum of Association and Articles of Association, the liability of the Shareholders is limited to any amount unpaid on their Shares. As the Shares can only be issued if they are fully paid, the Shareholders will not be liable for any debt, obligation or default of the Fund beyond their interest in the Fund.

## SALES CHARGES

There are no sales charges payable to the General Partner or the Fund in connection with the offering of Participating Shares.

## FISCAL YEAR

The fiscal year of the Fund will end on December 31 of each calendar year.

## DETERMINATION OF NET ASSET VALUE

The net asset value ("NAV") of the Master Fund will be equivalent to its respective gross assets less its gross liabilities as of any date of determination. To the extent feasible, expenses, fees and other liabilities will be accrued. The Board of Directors has delegated the day-to-day responsibility for valuing the Fund's assets to the General Partner.

Substantially all of the net assets of the Fund are invested in interests of the Master Fund. Accordingly, appreciation or depreciation in the NAV of a series of Participating Shares is based upon the NAV of the Master Fund capital account attributable to such series of Participating Shares, with appropriate adjustments for liabilities of the Fund. The NAV of a Participating Share is determined by dividing the NAV of such share's series at the beginning of the period by the number of outstanding shares of such series of Participating Shares.

NAV will be calculated at the end of each quarter, and estimated NAV will be calculated at the end of each month. Shares within a series will have the same NAV per Share. An Investment Advisory Fee charged to the Master Fund, which is attributable to a particular series of Participating Shares, will be reflected in the NAV of such series.

To the extent feasible, expenses, fees and other liabilities are accrued using generally accepted accounting principles as a guideline. Reserves may be taken for estimated or accrued expenses, liabilities or contingencies.

All matters concerning valuation of securities, as well as accounting procedures, not expressly provided for in the Articles and policies adopted by the Board of Directors may be determined by the Board of Directors, whose determination is final and conclusive as to all Shareholders.

10139194.6

CONFIDENTIAL

GCC-NYAG0000076

CONFIDENTIAL                                                GCC-P 0335146

## INVESTMENT ADVISORY FEES; OPERATING AND OTHER EXPENSES

The Master Fund's assets are invested by the General Partner, who has full discretionary authority to invest the assets of the Master Fund.

### Investment Advisory Fee

The Fund will be a limited partner in the Master Fund pursuant to the Master Fund's limited partnership agreement, as amended from time to time (the "Partnership Agreement"). The Master Fund will pay the General Partner or its designee an investment advisory fee as of the last business day of each fiscal year based on the value of each capital account in the Master Fund as of the end of such fiscal year and, with respect to any limited partner withdrawing as of a date other than the Master Fund's fiscal year-end, the accrued advisory fee attributable to such limited partner's withdrawal amount (the "Investment Advisory Fee"). The Investment Advisory Fee is equal to 1.5% (pro rated for periods of less than a year) of the ending value of a capital account in the Master Fund, as adjusted to take account of capital withdrawn during such period. Each series of the Fund will have a corresponding capital account in the Master Fund. The Fund may issue in the future different series of Class B Participating Shares as to which the Investment Advisory Fee is calculated on a different basis.

### Operating and Other Expenses

The Fund will bear its own operating costs (e.g. legal and accounting fees) and its *pro rata* share of the Master Fund's expenses including, but not limited to (i) all costs, fees (including the Investment Advisory Fee), operating expenses and other expenses of the Master Fund, including the costs, fees and expenses of attorneys, accountants or other professionals incurred in organizing the Master Fund and in pursuing and conducting, or otherwise related to, the activities of the Master Fund; and (ii) will reimburse the General Partner for any out-of-pocket costs, fees and expenses incurred by him in connection therewith. In addition, the Fund will bear its *pro rata* share of the Master Fund's expenses related to direct costs, fees and expenses incurred in connection with the purchase, sale or carrying of any security, including, but not limited to, brokerage and other transaction costs and margin interest expenses and fees, including performance-based fees payable to investment managers or partners of private investment partnerships, closed-end funds or other pooled investment vehicles.

If any of the above expenses are incurred jointly for the account of the Fund and any other investment funds or trading accounts sponsored or managed by the General Partner or his affiliates, such expenses will be allocated to the Fund and such other funds or accounts in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

## REDEMPTIONS

A Shareholder may redeem all or part of its Class B Participating Shares on the date immediately preceding the one-year anniversary of the date such Class B Participating Shares were purchased (the "First Redemption Date") and, thereafter, on each anniversary of the First Redemption Date upon 45 days prior written notice to the Registrar.

10139194.6

22

CONFIDENTIAL

GCC-NYAG0000077

Each date as of which a Shareholder redeems all or a portion of its Class B Participating Shares from the Fund is herein referred to as a "Redemption Date."

Redemption requests received for any Redemption Date may be limited to an amount equal to 25% of the net asset value of the Fund as of such date (the "Gate"). If redemption requests for a Redemption Date exceed the Gate, the Board of Directors may, in its sole discretion, (i) satisfy all such redemption requests or (ii) reduce such redemption requests *pro rata* in accordance with the aggregate net asset value of the Participating Shares held by each of the redeeming Shareholders, so that only 25% (or more, in the discretion of the Board of Directors) of the net asset value of the Fund is redeemed as of such date.

A redemption request that, solely as a result of the Gate, is not satisfied shall be carried forward for redemption or purchase as of the following Redemption Date until such request has been complied with in full; provided that requests for redemption which have been carried forward from an earlier Redemption Date will (subject always to the foregoing limits) be complied with in priority to later requests.

The Board of Directors may waive notice requirements or permit redemptions under such circumstances and conditions as it, in its sole discretion, deems appropriate.

The redeeming Shareholder will receive the amount of its redeemed Class B Participating Shares in cash (less reserves determined by the Board of Directors for contingent liabilities) within 90 days after redemption. If a Shareholder elects to redeem more than 95% of its Class B Participating Shares, the Fund will pay the Shareholder an amount equal to at least 95% (less a reserve of 5% pending audited financial statements) of its estimated redemption proceeds (on the basis of unaudited data) as of the Redemption Date within 30 days after the Redemption Date, or sooner if the Board of Directors determines that funds to settle the redemption are available. The balance will be paid (subject to audit adjustments), without interest, promptly after completion of the audit of the Fund's books for such fiscal year.

The redemption price of Class B Participating Shares will be based on the per share net asset value of the Fund attributable to the series of Class B Participating Shares of which the redeemed Class B Participating Shares are a part as of the relevant Redemption Date. In the event that a request for redemption would result in a Shareholder owning less than $500,000 worth of Class B Participating Shares then the Board of Directors, in their sole discretion, may redeem either all of the Shareholders Class B Participating Shares or such smaller number of shares that would result in such holder continuing to own such amount of Class B Participating Shares after such redemption.

Additional Redemption Rights.

Holders of Participating Shares may request more frequent redemption rights upon written request to the Registrar. The Board of Directors shall seek, but is not required, to accommodate all such redemption requests as it deems appropriate in its sole discretion.

Suspension of Redemption Rights; Compulsory Redemption.

10139194.6

23

CONFIDENTIAL

GCC-NYAG0000078

GCC-P 0335148

The Board of Directors may declare a suspension of the determination of the prices of Participating Shares for the whole or any part of any period during which by reason of the closure of or the suspension of trading on any money or foreign exchange market or commodities exchange or stock exchange or of a breakdown in any of the means normally employed by the Board of Directors or the administrator on behalf of the Board of Directors in ascertaining the value of securities or other assets or for any other reason the value of any securities or other assets owned or contracted for by the Fund cannot, in the opinion of the Board of Directors, be reasonably ascertained or circumstances exist as a result of which, in their opinion, it is not reasonably practicable for the Fund to realize any securities or other assets owned or contracted for by it which together constitute a material proportion of the overall assets of the Fund.

Such suspension shall take effect at such times as the Board of Directors shall specify, but not later than the close of business of the business day following the declaration and shall continue until the Board of Directors declare the suspension at end, except that the suspension shall terminate in any event on the day following the first business day on which (i) the condition giving rise to the suspension ceases to exist and (ii) no other condition under which suspension is authorized exists.

The Board of Directors will notify the Shareholders each time it exercises its right to suspend the determination of the prices of Class B Participating Shares and each time the suspension has ended.

In addition, the Board of Directors, by written notice to any Shareholder, may suspend the payment of proceeds of such Shareholder if the Directors reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Fund, the General Partner or any of the Fund's other service providers.

The Class B Participating Shares of any Shareholder may be compulsorily redeemed by the Board of Directors of the Fund and such Shareholder may be required to withdraw from the Fund, as of the last day of any calendar month, if the Board of Directors determines that such termination and withdrawal are in the best interests of the Fund. The Board of Directors shall give 30 days' prior written notice of any such determination to such Shareholder.

## Mandatory Redemption of All Shareholders.

In addition, the Fund will mandatorily redeem all Shareholders of the Fund upon the first to occur of the following events: (i) on December 31, 2033; (ii) upon the incapacity or death of J. Ezra Merkin; (iii) following a determination by the Directors that the Fund should be dissolved; or (iv) upon the occurrence of an event causing the dissolution of the Fund.

## CERTAIN RISK FACTORS

PARTICIPATION BY INVESTORS IN THE FUND SHOULD BE CONSIDERED A HIGH RISK INVESTMENT. THE FOLLOWING SPECIAL CONSIDERATIONS AND RISKS TOGETHER WITH OTHER MATTERS SET FORTH ELSEWHERE IN THIS CONFIDENTIAL OFFERING MEMORANDUM SHOULD BE CONSIDERED CAREFULLY, BUT ARE NOT INTENDED TO BE AN EXHAUSTIVE

10139194.6

24

CONFIDENTIAL

GCC-NYAG0000079

CONFIDENTIAL

GCC-P 0335149

## LISTING OF ALL POTENTIAL RISKS ASSOCIATED WITH AN INVESTMENT IN THE FUND.

Risk Factors. The principal activity of the Master Fund will be index arbitrage, option arbitrage and investments in other securities. Because of the inherently speculative nature of these activities, the results of the Master Fund's operations may be expected to fluctuate from period to period. There can be no assurance that the Master Fund's investments will generate a profit or that material losses may not be incurred.

Restrictions on Transferability and Redemption. Each investor who becomes a Shareholder will be required to represent that he is acquiring the Class B Participating Shares for investment and not with a view to distribution or resale; that he understands he must bear the economic risk of an investment for an indefinite period of time because the Class B Participating Shares have not been registered with the Securities and Exchange Commission ("SEC") or any other state or governmental agency; and that he understands the Interests cannot be sold unless an exemption from such registration is available. Class B Participating Shares are transferable, subject to the approval of the Board of Directors. None of the Fund, other than pursuant to a withdrawal as described herein, Master Fund, the General Partner or any of his affiliates has agreed to purchase or otherwise acquire from any Shareholder any Class B Participating Shares or assumes the responsibility for locating prospective purchasers of such Class B Participating Shares. In no event may transfers be made which would cause a violation of any federal or state securities laws. Consequently, the purchase of Class B Participating Shares should be considered only as a long-term and illiquid investment.

A Shareholder may redeem all or part of its Class B Participating Shares as of the First Redemption Date and, thereafter, on each anniversary of the First Redemption Date upon 45 days prior written notice to the Registrar.

Absence of Regulatory Oversight. Neither the Fund nor the Master Fund is required to register as an investment company under the Investment Company Act of 1940, as amended (the "Company Act"), and, accordingly, the provisions of the Company Act (which, among other protections, require investment companies to have a majority of disinterested directors and limits on use of leverage) will not be applicable.

Dependence on the General Partner. All decisions with respect to the management of the capital of the Master Fund are made exclusively by J. Ezra Merkin. Consequently, the Master Fund's success depends to a great degree on the skill and experience of Mr. Merkin.

The Investment Advisory Fee. With respect to the Investment Advisory Fee paid to the General Partner, a conflict of interest exists because the Investment Advisory Fee is based on the value of the Master Fund which is valued solely by the General Partner.

Independent Money Managers. The General Partner may delegate investment discretion for all or a portion of the Master Fund's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Consequently, the success of the Master Fund may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the General Partner will exercise reasonable care in

10139194.6

25

CONFIDENTIAL

GCC-NYAG0000080

CONFIDENTIAL

GCC-P 0335150

selecting such independent money managers or Other Investment Entities and will monitor the results of those money managers and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities. Hence, the actions or inactions on the part of other money managers or the investment advisors to Other Investment Entities may affect the profitability of the Master Fund. Independent money managers and managers of Other Investment Entities selected by the General Partner may receive compensation based on the performance of their investments. Performance-based compensation usually is calculated on a basis which includes unrealized appreciation of the Master Fund's assets, and may be greater than if such compensation were based solely on realized gains. Further, a particular independent money manager or manager of an Other Investment Entity may receive incentive compensation in respect of its portfolio for a period even though the Master Fund's overall portfolio depreciated during such period. The independent money managers and Other Investment Entities may trade wholly independently of one another and may at times hold economically offsetting positions.

Options Transactions. The Master Fund will engage in various types of options transactions. This activity is designed to reduce the risks attendant in short-selling and in taking long positions in certain transactions and will involve stock options on a registered option exchange and offsetting transactions in the underlying stock, or offsetting transactions in one or more options for stock.

Call Options. There are risks associated with the sale and purchase of call options. The seller (writer) of a call option that is covered (e.g., the writer holds the underlying security) assumes the risk of a decline in the market price of the underlying security below the purchase price of the underlying security less the premium received, and gives up the opportunity for gain on the underlying security above the exercise price of the option. The seller of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying security above the exercise price of the option. The securities necessary to satisfy the exercise of an uncovered call option may be unavailable for purchase, except at much higher prices, thereby reducing or eliminating the value of the premium. Purchasing securities to cover the exercise of an uncovered call option can cause the price of the securities to increase, thereby exacerbating the loss. The buyer of a call option assumes the risk of losing its entire premium investment in the call option. The Master Fund does not currently intend to sell uncovered call options.

Put Options. There are risks associated with the sale and purchase of put options. The seller (writer) of a put option which is covered (e.g., the writer has a short position in the underlying security) assumes the risk of an increase in the market price of the underlying security above the sales price (in establishing the short position) of the underlying security plus the premium received, and gives up the opportunity for gain on the underlying security if the market price falls below the exercise price of the option. The seller of an uncovered put option assumes the risk of a decline in the market price of the underlying security below the exercise price of the option. The buyer of a put option assumes the risk of losing its entire investment in the put option. The Master Fund does not currently intend to sell uncovered put options.

Short Selling. Short selling involves selling securities which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the investor to profit from a decline in market price to the extent such decline exceeds the transaction costs and the costs of

10139194.6

26

CONFIDENTIAL

CONFIDENTIAL

borrowing the securities. The extent to which the Master Fund engages in short sales will depend upon the General Partner's investment strategy and opportunities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Master Fund of buying those securities to cover the short position. There can be no assurance that the Master Fund will be able to maintain the ability to borrow securities sold short. In such cases, the Master Fund can be "bought in" (i.e., forced to repurchase securities in the open market to return to the lender). There also can be no assurance that the securities necessary to cover a short position will be available for purchase at or near prices quoted in the market. Purchasing securities to close out a short position can itself cause the price of the securities to rise further, thereby exacerbating the loss.

Leverage. The Master Fund's investment in derivative securities may create certain risks to the Master Fund. The use of leverage may increase the Master Fund's risk of loss of capital or securities, as a relatively small price movement in an instrument may result in immediate and substantial loss. For example, should the securities pledged to brokers to secure the Master Fund's margin accounts decline in value, the Master Fund could be subject to a "margin call," pursuant to which the Master Fund must either deposit additional funds with the broker or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden, precipitous drop in value of the Master Fund's assets occasioned by a market "crash", the Master Fund might not be able to liquidate assets quickly enough to pay off its margin debt. Consequently, fluctuations in the value of the Master Fund's portfolio will have a significant effect in relation to the Master Fund's capital. Although currently the Master Fund does not intend to utilize leverage, as investment opportunities change the General Partner may decide to implement short-term borrowings to facilitate the Master Fund's investment program. In addition, the level of interest rates generally, and the rates at which the Master Fund can borrow in particular, will be an expense of the Master Fund and therefore affect the operating results of the Master Fund.

Counterparty Risk. Some of the markets in which the Master Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to the same credit evaluation and regulatory oversight as are members of "exchange–based" markets. In addition, many of the protections afforded to participants on some organized exchanges, such as the performance guarantee of an exchange clearinghouse, might not be available in connection with such "over-the-counter" transactions. This exposes the Master Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a credit or liquidity problem, thus causing the Master Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Master Fund has concentrated its transactions with a single or small group of counterparties. The General Partner is not restricted from dealing with any particular counterparty or from concentrating any or all of the Master Fund's transactions with one counterparty. Moreover, the General Partner has no formal credit function which evaluates the creditworthiness of the Master Fund's counterparties. The ability of the Master Fund to transact business with any one or number of counterparties, the lack of any meaningful and independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Master Fund.

10139194.6

27

CONFIDENTIAL

GCC-NYAG0000082

**Effect of Shareholder Redemption.**  A significant redemption of Participating Shares from the Fund may cause a temporary imbalance in the Fund's and consequently, the Master Fund's portfolio, which may adversely affect the remaining Shareholders.

**Lack of Management and Investment Control by Shareholders.**  Holders of Participating Shares will take no part in the management, control or operation of the Fund and consequently, the Master Fund. Subscribers of Participating Shares must rely on the General Partner with respect to the management and investment decisions of the Master Fund. The Partnership Agreement gives the General Partner broad authority to expand the Master Fund's activities within the areas described herein and therein.

**Exculpation of the General Partner from Liability.**  The Partnership Agreement provides that the General Partner will not be liable for, and will be indemnified by the Fund against, any act or omission unless such act or omission constitutes bad faith, gross negligence, recklessness, fraud or intentional misconduct.  As a result, investors may be entitled to a more limited right of action against the General Partner than they would otherwise have had absent such a limitation in the Partnership Agreement.

**Conflicts of Interest.**  The General Partner has broad powers to conduct investment and money management activities outside the Master Fund. These activities, which include management of one or more other domestic investment partnerships and one or more offshore managed funds (the "Managed Funds"), may create conflicts of interest with the Master Fund with regard to such matters as allocation of opportunities to participate in particular investments. Other accounts affiliated with the General Partner may hold positions opposite to positions maintained on behalf of the Master Fund. The Master Fund will obtain no interest in any such outside investments or activities. The Partnership Agreement does not require the General Partner or his employees to devote all or any specified portion of their time to managing the Master Fund's affairs, but only to devote so much of their time to the Master Fund's affairs as they reasonably believe necessary in good faith. The Partnership Agreement does not prohibit the General Partner or his affiliates from engaging in any other existing or future business, and the General Partner or his affiliates currently provide and anticipate continuing to provide investment management services to other clients. In addition, the General Partner or his employees may invest for their own accounts in various investment opportunities, including in investment Master Funds. The General Partner may determine that an investment opportunity in a particular investment Master Fund is appropriate for a particular account, or for him, but not for the Master Fund.

**Business and Regulatory Risks of Hedge Funds.**  Legal, tax and regulatory changes could occur during the term of the Master Fund that may adversely affect the Master Fund. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Master Fund and the ability of the Master Fund to obtain the leverage it might otherwise obtain or to pursue its trading strategies. The SEC, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. In addition, the regulation of derivatives transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on the Master Fund could be substantial and adverse.

10139194.6

28

GCC-NYAG0000083

GCC-P 0335153

<u>Terrorist Action</u>.  There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in global markets. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced.  The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

<u>The Fund</u>

<u>Limitations on Redemptions</u>.  A Shareholder may redeem all or part of its Class B Participating Shares as of the First Redemption Date and, thereafter, on each anniversary of the First Redemption Date upon 45 days prior written notice to the Registrar.  Class B Participating Shares may also be redeemed at the discretion of the Board of Directors of the Fund. Distribution of cash in respect of all or any part of a holder's redeemed Participating Shares need not be made until 90 days after the Redemption Date.

Furthermore, Shareholders are subject to the Gate (as defined below), and may only redeem Participating Shares subject to restrictions on timing.  The Board of Directors may suspend redemption rights, in whole or in part, when there exists in the opinion of the Board of Directors a state of affairs where disposal of the Fund's assets, or the determination of the net asset value of the Fund, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming Shareholders.  Such limitations on liquidity must be considered significant.

<u>Required Redemptions</u>.  The Class B Participating Shares of any Shareholder may be compulsorily redeemed by the Board of Directors of the Fund and such Shareholder may be required to withdraw from the Fund, as of the last day of any calendar month, if the Board of Directors determines that such termination and withdrawal are in the best interests of the Fund. The Board of Directors shall give 30 days' prior written notice of any such determination to such Shareholder.

<u>Reports to Limited Partners</u>.  The Fund may offer certain investors additional information and reporting that other investors may not receive, and such information may affect an investor's decision to request a redemption of its Class B Participating Shares.

PAST  RESULTS  MAY  NOT  BE  INDICATIVE  OF  FUTURE PERFORMANCE.  NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Master Fund.  Prospective investors should read this entire Confidential Offering Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Master Fund.

<u>CONFLICTS OF INTEREST</u>

The Fund is subject to a number of actual and potential conflicts of interest.  Certain inherent conflicts of interest arise from the fact that the General Partner and his affiliates provide investment management services to the Fund and the Master Fund and they also provide investment management services for other clients, including other investment funds, client accounts and proprietary accounts of the General Partner or his affiliates in which the Fund will

10139194.6

29

CONFIDENTIAL

GCC-NYAG0000084

GCC-P 0335154

have no interest (collectively with the Master Fund, "Other Accounts"). The discussion herein relating to conflicts to which the Fund is subject includes conflicts that arise as a result of the Fund's investments through the Master Fund.

The General Partner and his affiliates will provide investment management services to managed accounts and other investment partnerships or funds, some of which may have similar investment objectives to those of the Master Fund. The portfolio strategies the General Partner and his affiliates may use for other investment funds or accounts could conflict with the transactions and strategies employed by the General Partner in managing the Master Fund and affect the prices and availability of the securities and other financial instruments in which the Master Fund invests.

The General Partner has agreed to devote substantially his entire time and effort during normal business hours to the management of the Master Fund and other investment entities managed by the Managing Partner, or their respective successors; provided, however, that the General Partner may act, consistent, however, with the foregoing, as a director, officer or employee of any corporation (including any corporation in which the Master Fund is invested), a trustee of any trust, an executor or administrator of any estate, a partner of any partnership (including a partnership in which the Master Fund is invested) or an administrative official of any other business entity, and may receive compensation and participate in profits in connection with any of the foregoing, and may trade in securities for his own account or for other accounts for investors including securities which are the same or different from those traded in or held by the Master Fund. The terms of the Partnership Agreement do not restrict the General Partner or his affiliates from forming additional investment funds, from entering into other investment advisory relationships, or from engaging in other business activities, even though such activities may be in competition with the Master Fund and/or may involve substantial time and resources of the General Partner or his affiliates. In the event the General Partner or any of his affiliates decide to engage in such activities in the future, the General Partner or his affiliates, as applicable, will undertake to engage in such activities in a manner that is consistent with their fiduciary duties, to the Master Fund. Nevertheless, these activities could be viewed as creating a conflict of interest in that the time and effort of the General Partner and his affiliates will not be devoted exclusively to the business of the Master Fund but will be allocated between the business of the Master Fund and the management of the monies of other advisees of the General Partner and his affiliates.

When it is determined that it would be appropriate for the Master Fund and one or more other funds and managed accounts managed by the General Partner or his affiliates to participate in an investment opportunity, the General Partner will seek to execute orders for all of the participating investment accounts, including the Master Fund, on an equitable basis, taking into account such factors as the relative amounts of capital available for new investments, relative exposure to short-term market trends, and the investment programs and portfolio positions of the Master Fund and the affiliated entities for which such participation is appropriate. Orders may be combined for all such accounts, and if any order is not filled at the same price, they may be allocated on an average price basis. Similarly, if an order on behalf of more than one account cannot be fully executed under prevailing market conditions, securities may be allocated among the different accounts on a basis that the General Partner considers equitable.

10139194.6

30

CONFIDENTIAL

GCC-NYAG0000085

The General Partner may share office space with third-party money managers. If the managers were to acquire inside information with respect to certain securities, the Master Fund will be precluded from purchasing securities to which such inside information relates or be precluded from selling securities held by the Master Fund that were purchased before the inside information was acquired.

Subject to internal compliance policies and approval procedures, the General Partner and his employees as well as members and employees of his affiliates, may engage, from time to time, in personal trading of securities and other instruments, including securities and instruments in which the Master Funds may invest. Any such trading will be effected after the Master Funds have effected their transactions.

## BROKERAGE COMMISSIONS

Portfolio transactions for the Master Fund will be allocated to brokers by the General Partner and such third-party manager consistent with best execution. In selecting brokers and dealers to execute portfolio transactions, the General Partner and/or any other third-party managers have authority to and may consider several different factors, including, among others, a broker's or dealer's ability to provide best execution, its willingness to commit capital, its financial stability, its systems, facilities and recordkeeping and its experience in handling similar transactions (based on size, market conditions and type of security, among other factors). The General Partner and third-party managers may also take into account a broker's and dealer's relative performance on industry surveys and studies of execution quality, the broker's and dealer's rates of commission, mark-ups and mark-downs, its applicable margin levels and financing rates and other applicable fees and charges, its overall responsiveness and the broker's or dealer's provision of research, brokerage and other products and services pursuant to soft dollar arrangements.

The Master Fund's securities transactions may generate a substantial amount of brokerage commissions and other compensation, a *pro rata* portion of which the Fund, not the General Partner, will be obligated to pay. The General Partner and any third-party managers will have complete discretion in deciding what brokers and dealers the Master Fund will use and in negotiating the rates of compensation the Master Fund will pay.

The Master Fund will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms. Bernard L. Madoff Investment Securities, LLC and Morgan Stanley & Co., Inc. (the "Prime Brokers") currently serve as the principal prime brokers and custodians for the Master Fund, and clear (generally on the basis of payment against delivery) the Master Fund's securities transactions that are effected through other brokerage firms. The Master Fund is not committed to continue its relationship with the Prime Brokers for any minimum period and the General Partner may select other or additional brokers to act as prime brokers for the Master Fund.

10139194.6

31

CONFIDENTIAL

GCC-NYAG0000086

## TAX ASPECTS

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE SHAREHOLDERS. EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT ITS PROFESSIONAL TAX ADVISOR WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR STATUS OF A PROSPECTIVE SHAREHOLDER. IN ADDITION, SPECIAL CONSIDERATIONS (NOT DISCUSSED HEREIN) MAY APPLY TO PERSONS WHO ARE NOT DIRECT SHAREHOLDERS IN THE FUND BUT WHO ARE DEEMED TO OWN SHARES AS A RESULT OF THE APPLICATION OF CERTAIN ATTRIBUTION RULES.

Neither the Fund nor the Master Fund has sought a ruling from the U.S. Internal Revenue Service (the "Service") or any other U.S. federal, state or local agency with respect to any of the tax issues affecting the Fund or the Master Fund, nor has either obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain potential U.S. federal tax consequences which may be relevant to prospective shareholders. The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practices, all of which are subject to change, retroactively as well as prospectively. A decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND OPERATIONS OF THE FUND AND THE MASTER FUND, THE FUND AND THE MASTER FUND GENERALLY SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

<u>U.S. Trade or Business</u>

Section 864(b)(2) of the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), provides a safe harbor (the "Safe Harbor") applicable to a non-U.S. corporation (other than a dealer in securities) that engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its own account pursuant to which such non-U.S.

101391946

32

CONFIDENTIAL

GCC-NYAG0000087

GCC-P 0335157

corporation will not be deemed to be engaged in a U.S. trade or business. The Safe Harbor also provides that a non-U.S. corporation (other than a dealer in commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place." Pursuant to proposed regulations, a non-U.S. taxpayer (other than a dealer in stocks, securities or derivatives) that effects transactions in the United States in derivatives (including (i) derivatives based upon stocks, securities, and certain commodities, and (ii) certain notional principal contracts based upon an interest rate, equity, or certain commodities and currencies) for its own account is not deemed to be engaged in a United States trade or business. Although the proposed regulations are not final, the Service has indicated in the preamble to the proposed regulations that for periods prior to the effective date of the proposed regulations, taxpayers may take any reasonable position with respect to the application of Section 864(b)(2) of the IRC to derivatives, and that a position consistent with the proposed regulations will be considered a reasonable position.

The Fund and the Master Fund (which is treated as a partnership for U.S. tax purposes and thus is not in any event subject to U.S. income tax) intend to conduct their businesses in a manner so as to meet the requirements of the Safe Harbor. Thus, the Fund's and the Master Fund's securities and commodities trading activities should not constitute a U.S. trade or business and, except in the limited circumstances discussed below, the Fund should not be subject to the regular U.S. income tax on any of its or the Master Fund's trading profits. Other Investment Entities that meet the Safe Harbor will also not be subject to regular U.S. income tax. However, if certain of the Fund's or the Master Fund's activities were determined not to be of the type described in the Safe Harbor, the Fund's, the Master Fund's or Other Investment Entities' activities may constitute a U.S. trade or business, in which case the Fund or certain Other Investment Entities would be subject to U.S. income and branch profits tax on the income and gain from those activities. The Master Fund may be required to withhold on a quarterly basis amounts attributable to the Fund's distributive share of the Master Fund's income that is outside of the Safe Harbor.

Even if the Fund's, the Master Fund's or the Other Investment Entities' securities trading activity does not constitute a U.S. trade or business, gains realized from the sale or disposition of stock or securities (other than debt instruments with no equity component) of U.S. Real Property Holding Corporations (as defined in Section 897 of the IRC) ("USRPHCs"), including stock or securities of certain Real Estate Investment Trusts ("REITs"), will be generally subject to U.S. income tax on a net basis. However, a principal exception to this rule of taxation would apply if such USRPHC has a class of stock which is regularly traded on an established securities market and the Fund or certain Other Investment Entities generally did not hold (and was not deemed to hold under certain attribution rules) more than 5% of the value of a regularly traded class of stock or securities of such USRPHC at any time during the five year period ending on the date of disposition.[1] Moreover, if the Fund, the Master Fund or the Other

---

[1] The Fund will also be exempt from tax on direct or indirect dispositions of REIT shares, whether or not those shares are regularly traded, if less than 50% of the value of such shares is held, directly or indirectly, by non-U.S. persons at all times during the five-year period ending on the date of disposition. However, even if the direct or indirect disposition of REIT shares would be exempt from tax on a net basis, distributions from a REIT (whether or not such REIT is a USRPHC), to the extent attributable to the REIT's disposition of interests in U.S. real property, are subject to tax on a net basis when directly or

10139194.6

33

CONFIDENTIAL

CONFIDENTIAL

Investment Entities were deemed to be engaged in a U.S. trade or business as a result of owning a limited partnership interest in a U.S. business partnership or a similar ownership interest, income and gain realized from that investment would be subject to U.S. income and branch profits tax.

## U.S. Withholding Tax

In general, under Section 881 of the IRC, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding. Income subject to such a flat tax rate is of a fixed or determinable annual or periodic nature, including dividends and certain interest income. There is presently no tax treaty between the U.S. and the Cayman Islands.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the IRC. Under certain circumstances, interest on bearer obligations may also be considered portfolio interest. In addition, the Fund's allocable share of income realized by the Master Fund from certain notional principal contracts and certain transactions involving foreign currencies may be characterized as U.S. source income that is subject to U.S. withholding tax.

## Redemption of Shares

Gain realized by shareholders who are not U.S. persons within the meaning of the IRC ("non-U.S. shareholders") upon the sale, exchange or redemption of Shares held as a capital asset should generally not be subject to U.S. federal income tax provided that the gain is not effectively connected with the conduct of a trade or business in the U.S. However, in the case of nonresident alien individuals, such gain will be subject to the 30% (or lower tax treaty rate) U.S. tax if (i) such person is present in the U.S. for 183 days or more during the taxable year (on a calendar year basis unless the nonresident alien individual has previously established a different taxable year) and (ii) such gain is derived from U.S. sources.

Generally, the source of gain upon the sale, exchange or redemption of Shares is determined by the place of residence of the shareholder. For purposes of determining the source of gain, the IRC defines residency in a manner that may result in an individual who is otherwise a nonresident alien with respect to the U.S. being treated as a U.S. resident only for purposes of

---

indirectly received by the Fund and may be subject to the branch profits tax. Under new legislation, distributions from certain publicly traded REITs to non-U.S. shareholders owning 5% or less of the shares are subject to a 30% gross withholding tax on those distributions and are not subject to tax on a net basis.

CONFIDENTIAL

GCC-NYAG0000089

CONFIDENTIAL

GCC-P 0335159

determining the source of income. Each potential individual shareholder who anticipates being present in the U.S. for 183 days or more (in any taxable year) should consult his tax advisor with respect to the possible application of this rule.

Gain realized by a non-U.S. shareholder engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax upon the sale, exchange or redemption of Shares if such gain is effectively connected with its U.S. trade or business.

Non-U.S. shareholders may be required to make certain certifications to the Fund as to the beneficial ownership of the Shares and the non-U.S. status of such beneficial owner, in order to be exempt from U.S. information reporting and backup withholding on a redemption of Shares.

Estate and Gift Taxes

Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Shares.

Cayman Islands

The Government of the Cayman Islands, will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the Shareholders. The Cayman Islands are not party to any double taxation treaties.

The Fund has applied for and can expect to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (1999 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

European Union Savings Directive

Shareholders who are individuals resident in a Member State of the European Union or certain other jurisdictions referred to below should be aware of the provisions of the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "Directive") pursuant to which income realized upon the sale or redemption of shares in undertakings for collective investment, as well as any income in the form of dividends or other distributions made by such undertakings for collective investment, may (depending upon the location, classification and investment portfolio of the undertaking) become subject to the reporting regime or withholding tax regime imposed by the Directive, if such payment is made by a paying agent established either in a Member State of the European Union or in certain other jurisdictions which have agreed to introduce an equivalent reporting or

10139194.6

35

CONFIDENTIAL

GCC-NYAG0000090

GCC-P 0335160

withholding tax regime in respect of such payments. The provisions of the Directive apply to payments made on or after July 1, 2005.

However, as a result of the classification by the Cayman Islands of funds such as the Fund established in its jurisdiction, payments made directly by the Fund through the Registrar to shareholders who are individual beneficiaries will not be subject to the reporting (or withholding tax) regime. Nevertheless, because these rules are complex and their implementation has to be effected by each Member State and the other jurisdictions referred to above through their own national legislation, application of the regime to payments deriving from the Fund but ultimately made by certain other entities (e.g. acting as nominee) located elsewhere in the European Union or in these other jurisdictions, although not anticipated, cannot as yet be excluded. Accordingly, shareholders who are individuals or acting as nominees and who are resident in the European Union or in any of the other jurisdictions referred to above should consult their own tax advisers.

Other Jurisdictions

Interest, dividend and other income realized by the Fund, the Master Fund or Other Investment Entities from non-U.S. sources, and capital gains realized on the sale of securities of non-U.S. issuers, may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. It is impossible to predict the rate of foreign tax the Fund, the Master Fund or Other Investment Entities will pay since the amount of the assets to be invested in various countries and the ability of the Fund, the Master Fund or Other Investment Entities to reduce such taxes, are not known.

Future Changes in Applicable Law

The foregoing description of U.S. and Cayman Islands income tax consequences of an investment in and the operations of the Fund and the Master Fund is based on laws and regulations which are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund or the Master Fund to income taxes or subject shareholders to increased income taxes.

Other Taxes

Prospective shareholders should consult their own counsel regarding tax laws and regulations of any other jurisdiction which may be applicable to them.

THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE, AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE TO PROSPECTIVE SHAREHOLDERS.

10139194.6

36

CONFIDENTIAL

GCC-NYAG0000091

CONFIDENTIAL

GCC-P 0335161

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's responsibility for the prevention of money laundering, the Fund and the Registrar (including their affiliates, subsidiaries or associates) will require a detailed verification of the applicant's identity and the source of payment. Depending on the circumstances of each application, a detailed verification might not be required (but may in certain circumstances) where:

(a)    the applicant is a recognized financial institution which is regulated by a recognized regulatory authority <u>and</u> carries on business in a country listed in Schedule 3 of the Money Laundering Regulations (2005 Revision) of the Cayman Islands (as amended)(a "Schedule 3 Country"); or

(b)    the application is made through a recognized intermediary which is regulated by a recognized regulatory authority <u>and</u> carries on business in a Schedule 3 Country. In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

(c)    the subscription payment is remitted from an account (or joint account) held in the applicant's name at a bank in the Cayman Islands or a bank regulated in a Schedule 3 Country. In this situation the Fund may require evidence identifying the branch or office of the bank from which the monies have been transferred, verify that the account is in the name of the applicant and retain a written record of such details.   The Fund and the Registrar reserve the right to request such information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Registrar will refuse to accept the application and the subscription monies relating thereto.

If any person who is resident in the Cayman Islands (including the Registrar) has a suspicion obtained in the course of business that any other person is engaged in money laundering that person is required to report such suspicion pursuant to The Proceeds of Criminal Conduct Law (2005 Revision).

By subscribing, applicants consent to the disclosure by the Fund and the Registrar of any information about them to regulators and others upon request in connection with money laundering and similar matters both in the Cayman Islands and in other jurisdictions.

Each subscriber and Shareholder is required to make such representations to the Fund as the Fund, the Registrar and the General Partner require in connection with any applicable anti-money laundering laws, including, without limitation, representations to the Fund that such subscriber or Shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such Shareholder must

101391943

37

CONFIDENTIAL

GCC-NYAG0000092

GCC-P 0335162

also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## SUITABILITY REQUIREMENTS; LIMITATIONS ON TRANSFERABILITY

Prospective Shareholders must be non-U.S. Persons and must meet other suitability requirements described below and in the Subscription Documents. The Fund, in its sole discretion, may decline to accept the subscription for Class B Participating Shares of any prospective Shareholder.

The term "U.S. Person" means, with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least 31 days during such year and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 1/3 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days. With respect to persons other than individuals, the term "U.S. Person" means (i) a corporation or partnership created or organized in the United States or under the law of the United States or any state, (ii) a trust where (a) a U.S. court is able to exercise primary jurisdiction over the trust and (b) one or more U.S. persons have the authority to control all substantial decisions of the trust and (iii) an estate which is subject to U.S. tax on its worldwide income from all sources. The term "U.S. Person" also means any individual or entity which would be a U.S. Person under Regulation S of the U.S. Securities Act of 1933, as amended (the "Securities Act"). The Regulation S definition is set forth in Appendix B to this Memorandum.

Each subscriber for Class B Participating Shares will be required to certify to the Fund, among other things, that the Class B Participating Shares are not being acquired and will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person or any non-U.S. Person subject to the above restrictions. Shareholders are required to notify the Fund immediately of any change in such information. IT IS THE RESPONSIBILITY OF EACH SHAREHOLDER TO VERIFY THAT IT IS NOT A U.S. PERSON THAT WOULD BE PROHIBITED FROM OWNING CLASS B PARTICIPATING SHARES IN THE FUND.

Each subscriber for Class B Participating Shares who is a non-U.S. Person will be required to certify to the Fund, among other things, that such investor is: (i) an accredited investor under Regulation D under the Securities Act, and (ii) a "qualified purchaser" under Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act").

Each prospective Shareholder is urged to consult with its own advisors to determine the suitability of an investment in the Class B Participating Shares, and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of Class B Participating Shares is required to represent further

10139194.6

38

CONFIDENTIAL

GCC-NYAG0000093

GCC-P 0335163

that, after all necessary advice and analysis, its investment in the Fund is suitable and appropriate, in light of the foregoing considerations.

Class B Participating Shares may be transferred subject to the approval of the Board of Directors, which consent may be given or withheld, in its discretion.

## CAYMAN ISLANDS MUTUAL FUNDS LAW

The Fund falls within the definition of a "Mutual Fund" in terms of the Mutual Funds Law (2003 Revision) of the Cayman Islands (the "Law"), and accordingly is regulated in terms of such Law. However, the Fund is not required to be licensed or to employ a licensed mutual fund administrator since the minimum aggregate investment purchasable by a prospective investor in the Fund exceeds $50,000 or its equivalent in any other currency.

As a regulated mutual fund, the Fund is subject to the supervision of the Cayman Islands Monetary Authority (the "Monetary Authority"). The Fund must file this Memorandum and any changes that materially affect any information in this document with the Monetary Authority. The Monetary Authority may, at any time, instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies. In addition, the Monetary Authority may ask the Board of Directors to give the Monetary Authority such information or such explanation in respect of the Fund as the Monetary Authority may reasonably require to enable it to carry out its duty under the Law.

The Board of Directors must give the Monetary Authority access to or provide at any reasonable time all records relating to the Fund and the Monetary Authority may copy or take an extract of any record to which it is given access. Failure to comply with these requests by the Monetary Authority may result in substantial fines on the part of the Board of Directors and may result in the Monetary Authority applying to a court to have the Fund wound up.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund:

(i)    is or is likely to become unable to meet its obligations as they fall due;

(ii)    is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors;

(iii)    is not being managed in a fit and proper manner; or

(iv)    has persons appointed as directors, managers or officers that are not fit and proper persons to hold the respective position.

The powers of the Monetary Authority include *inter alia* the power to require the substitution of directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

10139194.6

39

CONFIDENTIAL

GCC-NYAG0000094

## COUNSEL

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, acts as U.S. counsel to the Fund in connection with this offering of Class B Participating Shares. Schulte Roth & Zabel LLP also acts as counsel to the General Partner, the Master Fund and their affiliates. Maples and Calder, Grand Cayman, Cayman Islands, acts as Cayman Islands counsel to the Fund. In connection with this offering of the Class B Participating Shares and subsequent advice to the Fund, the Master Fund, the General Partner and their affiliates, neither Schulte Roth & Zabel LLP nor Maples and Calder will be representing Shareholders. No independent counsel has been retained to represent Shareholders.

## AUDITOR; REPORTS

BDO Tortuga serves as the Fund's auditor. The Fund will provide to the Shareholders unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 120 days following the end of each fiscal year. Certain Shareholders may have access to certain information regarding the Fund that may not be available to other Shareholders. Such Shareholders may make investment decisions with respect to their investment in the Fund based on such information.

## SUBSCRIPTION FOR SHARES

Persons interested in subscribing for Class B Participating Shares will be furnished with, and will be required to complete, execute and return to the General Partner, subscription documents.

10139194.6

40

CONFIDENTIAL

GCC-NYAG0000095

CONFIDENTIAL

GCC-P 0335165

## APPENDIX A

### Restrictions On Sales In Selected Jurisdictions

#### NOTICE TO RESIDENTS OF AUSTRALIA

NO OFFER FOR SUBSCRIPTION OR PURCHASE OF THE CLASS B PARTICIPATING SHARES OFFERED HEREBY, NOR ANY INVITATION TO SUBSCRIBE FOR OR BUY SUCH CLASS B PARTICIPATING SHARES HAS BEEN MADE OR ISSUED IN AUSTRALIA, OTHERWISE THAN BY MEANS OF AN OFFER THAT DOES NOT REQUIRE DISCLOSURE WITHIN THE MEANING OF SECTION 708 OF THE CORPORATIONS LAW. ACCORDINGLY, THIS MEMORANDUM HAS NOT BEEN LODGED WITH THE AUSTRALIAN SECURITIES & INVESTMENTS COMMISSION. FURTHER, THE CLASS B PARTICIPATING SHARES OFFERED HEREBY MAY NOT BE RESOLD IN AUSTRALIA WITHIN A PERIOD OF TWELVE MONTHS AFTER THE DATE OF ISSUE OTHERWISE THAN BY MEANS OF AN OFFER THAT DOES NOT REQUIRE DISCLOSURE PURSUANT TO SECTION 708 OF THE CORPORATIONS LAW.

#### NOTICE TO RESIDENTS OF THE COMMONWEALTH OF THE BAHAMAS

THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD OR OTHERWISE DISPOSED OF IN ANY MANNER TO PERSONS OR ENTITIES DEEMED BY THE CENTRAL BANK OF THE BAHAMAS (THE "BANK") AS "RESIDENT" FOR EXCHANGE CONTROL PURPOSES.

#### NOTICE TO RESIDENTS OF BAHRAIN

ALL APPLICATIONS FOR INVESTMENT SHOULD BE RECEIVED, AND ANY ALLOTMENTS MADE, FROM OUTSIDE BAHRAIN.

#### NOTICE TO RESIDENTS OF THE BRITISH VIRGIN ISLANDS

THE COMPANY, THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES OFFERED HEREBY HAVE NOT BEEN, AND WILL NOT BE, RECOGNIZED OR REGISTERED UNDER THE LAWS AND REGULATIONS OF THE BRITISH VIRGIN ISLANDS. THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD IN THE BRITISH VIRGIN ISLANDS EXCEPT IN CIRCUMSTANCES IN WHICH THE COMPANY, THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES DO NOT REQUIRE THE RECOGNITION BY OR REGISTRATION WITH THE AUTHORITIES OF THE BRITISH VIRGIN ISLANDS.

#### NOTICE TO RESIDENTS OF BRUNEI

THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES HAVE NOT BEEN DELIVERED TO, REGISTERED WITH, NOR APPROVED BY THE REGISTRAR OF COMPANIES.

10139194.6

A-1

CONFIDENTIAL

GCC-NYAG0000096

GCC-P 0335166

**NOTICE TO RESIDENTS OF CANADA**

THIS MEMORANDUM IS NOT, AND UNDER NO CIRCUMSTANCES IS TO BE CONSTRUED AS, A PUBLIC OFFERING OF SECURITIES OR AN OFFERING OF SECURITIES IN ANY JURISDICTION IN WHICH SUCH OFFERING WOULD BE UNLAWFUL. NO SECURITIES COMMISSION OR SIMILAR AUTHORITY IN CANADA HAS IN ANY WAY PASSED UPON THE MERITS OF THE SECURITIES OFFERED HEREBY AND ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL. PERSONS WHO WILL BE ACQUIRING SECURITIES PURSUANT TO THIS MEMORANDUM WILL NOT HAVE THE BENEFIT OF A REVIEW OF THE MATERIAL BY ANY SECURITIES REGULATORY AUTHORITY IN CANADA.

BY ACCEPTING THEIR SUBSCRIPTION DOCUMENTS, THE COMPANY SHALL BE GRANTING TO SHAREHOLDERS IN THE PROVINCES OF ALBERTA, BRITISH COLUMBIA AND ONTARIO WHO HAVE RECEIVED THIS MEMORANDUM A CONTRACTUAL RIGHT OF ACTION FOR DAMAGES OR RESCISSION AGAINST THE FUND IF THIS MEMORANDUM, OR ANY AMENDMENT THERETO, CONTAINS A MISREPRESENTATION, PROVIDED THAT:

(A) IN BRITISH COLUMBIA, THE RIGHT IS ONLY EXERCISABLE ON WRITTEN NOTICE GIVEN NOT MORE THAN 90 DAYS SUBSEQUENT TO THE DATE OF THE INVESTMENT;

(B) IN ALBERTA, NO ACTION SHALL BE COMMENCED TO ENFORCE A CONTRACTUAL RIGHT OF ACTION UNLESS THE RIGHT IS EXERCISED:

(I) IN THE CASE OF RESCISSION, ON NOTICE TO THE ISSUER NOT LATER THAN 180 DAYS, OR

(II) IN THE CASE OF DAMAGES, ON NOTICE TO THE ISSUER NOT LATER THAN ONE YEAR FROM THE DATE OF THE TRANSACTION THAT GAVE RISE TO THE CAUSE OF ACTION;

(C) THE COMPANY WILL NOT BE LIABLE IF IT IS PROVED THAT, AT THE TIME OF THE TRANSACTION, THE SHAREHOLDER KNEW OF THE ALLEGED MISREPRESENTATION;

(D) IN AN ACTION FOR DAMAGES, THE COMPANY IS NOT LIABLE FOR ALL OR ANY PORTION OF SUCH DAMAGES THAT THE COMPANY PROVES DO NOT REPRESENT THE DEPRECIATION IN VALUE OF THE SECURITIES AS A RESULT OF THE MISREPRESENTATION;

(E) IN NO CASE SHALL THE AMOUNT RECOVERABLE EXCEED THE PURCHASE PRICE FOR THE SECURITIES; AND

(F) THIS RIGHT OF ACTION IS IN ADDITION TO ANY OTHER RIGHT OR REMEDY AVAILABLE TO THE SHAREHOLDER AT LAW.

10139194.6

A-2

**CONFIDENTIAL**

GCC–NYAG0000097

FOR THESE PURPOSES A "MISREPRESENTATION" MEANS AN UNTRUE STATEMENT OF A MATERIAL FACT OR AN OMISSION TO STATE A MATERIAL FACT THAT IS NECESSARY IN ORDER TO MAKE ANY STATEMENT NOT MISLEADING IN LIGHT OF THE CIRCUMSTANCES IN WHICH IT WAS MADE. A "MATERIAL FACT" MEANS A FACT THAT SIGNIFICANTLY AFFECTS, OR WOULD REASONABLY BE EXPECTED TO HAVE A SIGNIFICANT EFFECT ON, THE MARKET PRICE OR VALUE OF THE CLASS B PARTICIPATING SHARES.

## NOTICE TO RESIDENTS OF THE CAYMAN ISLANDS

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE CLASS B PARTICIPATING SHARES. CAYMAN ISLANDS EXEMPTED AND ORDINARY NON-RESIDENT COMPANIES AND CERTAIN OTHER PERSONS ENGAGED IN OFFSHORE BUSINESS, HOWEVER, MAY BE PERMITTED TO ACQUIRE CLASS B PARTICIPATING SHARES.

## NOTICE TO RESIDENTS OF FINLAND

THIS MEMORANDUM HAS BEEN PREPARED FOR PRIVATE INFORMATION PURPOSES OF INTERESTED INVESTORS ONLY. IT MAY NOT BE USED FOR AND SHALL NOT BE DEEMED A PUBLIC OFFERING OF CLASS B PARTICIPATING SHARES. THE RAHOITUSTARKASTUS HAS NOT AUTHORIZED ANY OFFERING OF THE SUBSCRIPTION OF CLASS B PARTICIPATING SHARES IN THE COMPANY; ACCORDINGLY, CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD IN FINLAND OR TO RESIDENTS THEREOF EXCEPT AS PERMITTED BY FINNISH LAW. THIS MEMORANDUM IS STRICTLY FOR PRIVATE USE BY ITS HOLDER AND MAY NOT BE PASSED ON TO THIRD-PARTIES.

## NOTICE TO RESIDENTS OF FRANCE

THIS MEMORANDUM IS FURNISHED TO YOU SOLELY FOR YOUR INFORMATION AND MAY NOT BE REPRODUCED OR REDISTRIBUTED TO ANY OTHER PERSON. IT IS STRICTLY CONFIDENTIAL AND IS SOLELY DESTINED TO PERSONS AND INSTITUTIONS TO WHICH IT WAS INITIALLY SUPPLIED. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR AN INVITATION TO SUBSCRIBE FOR OR PURCHASE ANY CLASS B PARTICIPATING SHARES, AND NEITHER THIS MEMORANDUM NOR ANYTHING CONTAINED HEREIN SHALL FORM THE BASIS OF ANY CONTRACT OR COMMITMENT WHATSOEVER.

THIS MEMORANDUM MAY NOT BE DISTRIBUTED TO THE PUBLIC IN FRANCE OR USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION OR SALE OF SECURITIES IN FRANCE OTHER THAN IN ACCORDANCE WITH ARTICLE 6 AND 7 OF THE ORDINANCE NO. 67-833 OF 28 SEPTEMBER 1967. THIS MEMORANDUM HAS NOT BEEN SUBMITTED TO THE "COMMISSION DES OPÉRATIONS DE BOURSES" FOR APPROVAL AND DOES NOT CONSTITUTE AN OFFER FOR SALE OR SUBSCRIPTION OF CLASS B PARTICIPATING SHARES.

10139194.6

A-3

CONFIDENTIAL

GCC-NYAG0000098

GCC-P 0335168

## NOTICE TO RESIDENTS OF GERMANY

THE CLASS B PARTICIPATING SHARES MAY ONLY BE ACQUIRED IN ACCORDANCE WITH THE GERMAN WERTPAPIERVERKAUFS-PROSPEKTGESETZ (SECURITIES SELLING PROSPECTUS ACT) AND THE AUSLANDSINVESTMENTGESETZ (ACT ON FOREIGN INVESTMENT FUNDS). THE CLASS B PARTICIPATING SHARES ARE NOT REGISTERED OR AUTHORIZED FOR DISTRIBUTION UNDER THE ACT ON FOREIGN INVESTMENT FUNDS AND ACCORDINGLY MAY NOT BE, AND ARE NOT BEING, OFFERED OR ADVERTISED PUBLICLY OR OFFERED SIMILARLY UNDER §1 OF THE ACT ON FOREIGN INVESTMENT FUNDS OR SECURITIES SELLING PROSPECTUS ACT. THEREFORE THIS OFFER IS ONLY BEING MADE TO RECIPIENTS TO WHOM THIS MEMORANDUM IS PERSONALLY ADDRESSED AND DOES NOT CONSTITUTE AN OFFER OR ADVERTISEMENT TO THE PUBLIC. THE CLASS B PARTICIPATING SHARES CAN ONLY BE ACQUIRED FOR A MINIMUM PURCHASE PRICE OF $75,000 EXCLUDING COMMISSION AND OTHER FEES PER PERSON.

## NOTICE TO RESIDENTS OF GREECE

THIS MEMORANDUM AND THE CLASS B PARTICIPATING SHARES TO WHICH IT RELATES AND ANY OTHER MATERIAL RELATED THERETO MAY NOT BE ADVERTISED, DISTRIBUTED OR OTHERWISE MADE AVAILABLE TO THE PUBLIC IN GREECE.

THE GREEK CAPITAL MARKET COMMITTEE HAS NOT AUTHORIZED ANY PUBLIC OFFERING OF THE SUBSCRIPTION OF CLASS B PARTICIPATING SHARES IN THE COMPANY; ACCORDINGLY, CLASS B PARTICIPATING SHARES MAY NOT BE ADVERTISED, DISTRIBUTED OR IN ANY WAY OFFERED OR SOLD IN GREECE OR TO RESIDENTS THEREOF EXCEPT AS PERMITTED BY GREEK LAW.

## NOTICE TO RESIDENTS OF HONG KONG

NO STEPS HAVE BEEN TAKEN TO REGISTER THIS MEMORANDUM AS A PROSPECTUS IN HONG KONG OR IN ANY OTHER JURISDICTION. SUBSCRIPTION WILL NOT BE ACCEPTED FROM ANY PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM HAS BEEN DELIVERED. THIS MEMORANDUM IS DELIVERED ONLY TO THE RECIPIENT AND MAY NOT BE USED, COPIED, REPRODUCED OR DISTRIBUTED IN WHOLE OR IN PART, TO ANY OTHER PERSON.

## NOTICE TO THE RESIDENTS OF INDONESIA

THE COMPANY HAS AGREED THAT IT MAY NOT MAKE A PUBLIC OFFERING (AS THAT TERM IS DEFINED IN LAW OF THE REPUBLIC OF INDONESIA NO. 8 OF 1995 CONCERNING THE CAPITAL MARKETS) OF THE CLASS B PARTICIPATING SHARES.

10139194.6                          A-4

CONFIDENTIAL

GCC-NYAG0000099

## NOTICE TO RESIDENTS OF IRELAND

THIS MEMORANDUM IS NOT A PROSPECTUS AND DOES NOT CONSTITUTE OR FORM PART OF ANY OFFER OR INVITATION TO THE PUBLIC TO SUBSCRIBE FOR OR PURCHASE CLASS B PARTICIPATING SHARES IN THE COMPANY AND SHALL NOT BE CONSTRUED AS SUCH AND NO PERSON OTHER THAN THE PERSON TO WHOM THIS MEMORANDUM HAS BEEN ADDRESSED OR DELIVERED SHALL BE ELIGIBLE TO SUBSCRIBE FOR OR PURCHASE CLASS B PARTICIPATING SHARES IN THE COMPANY.

## NOTICE TO RESIDENTS OF THE ISLE OF MAN

THE COMPANY IS NOT A RECOGNIZED COLLECTIVE INVESTMENT SCHEME FOR THE PURPOSES OF SECTIONS 12 OR 13 OF THE FINANCIAL SERVICES ACT 1988 ("THE ACT") OF THE ISLE OF MAN AND IS ACCORDINGLY SUBJECT TO THE PROHIBITION ON THE PROMOTION OF COLLECTIVE INVESTMENT SCHEMES AS CONTAINED IN SECTION 1(1) OF THE ACT. ACCORDINGLY, THIS MEMORANDUM MAY ONLY BE ISSUED OR PASSED ON TO ANY PERSON IN THE ISLE OF MAN BY WAY OF THE TWO LIMITED EXCEPTIONS TO THIS GENERAL PROHIBITION CONTAINED IN SECTION 1(2) OF THE ACT AND THE FINANCIAL SUPERVISION (PROMOTION OF UNREGULATED SCHEMES (EXEMPTION) REGULATIONS 1992 ("THE EXEMPTION REGULATIONS"). UNDER REGULATION 3(2) OF THE EXEMPTION REGULATIONS, ANY ADVERTISEMENT ISSUED IN THE ISLE OF MAN IN CONNECTION WITH THE COMPANY MUST CONTAIN A STATEMENT EITHER (A) THAT PARTICIPANTS IN THE COMPANY ARE NOT PROTECTED BY ANY STATUTORY COMPENSATION SCHEME; OR (B) THAT PARTICIPANTS IN THE COMPANY ARE PROTECTED BY A STATUTORY COMPENSATION SCHEME AND PARTICULARS SUFFICIENT TO IDENTIFY THE COMPENSATION ARRANGEMENTS.

## NOTICE TO RESIDENT OF ISRAEL

ISRAELI RESIDENTS, OTHER THAN THOSE CONSIDERED "EXEMPTION HOLDERS" UNDER THE GENERAL CURRENCY CONTROL PERMIT, 1978, REQUIRE A SPECIAL PERMIT FROM THE ISRAELI CONTROLLER OF FOREIGN CURRENCY IN ORDER TO PURCHASE THE CLASS B PARTICIPATING SHARES. THE CLASS B PARTICIPATING SHARES ARE OFFERED TO A LIMITED NUMBER OF SOPHISTICATED INVESTORS, IN ALL CASES UNDER CIRCUMSTANCES DESIGNED TO PRECLUDE A DISTRIBUTION WHICH WOULD BE OTHER THAN A PRIVATE PLACEMENT. THE MEMORANDUM MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE, NOR BE FURNISHED TO ANY OTHER PERSON OTHER THAN THOSE TO WHOM COPIES HAVE BEEN SENT.

## NOTICE TO RESIDENTS OF ITALY

NO ACTION HAS OR WILL BE TAKEN WHICH WOULD ALLOW AN OFFERING OF CLASS B PARTICIPATING SHARES TO THE PUBLIC IN ITALY. ACCORDINGLY, THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED, SOLD OR DELIVERED AND NEITHER THIS MEMORANDUM NOR ANY OTHER OFFERING

10139194.6

A-5

CONFIDENTIAL

GCC-NYAG0000100

GCC-P 0335170

MATERIAL RELATING TO THE CLASS B PARTICIPATING SHARES MAY BE DISTRIBUTED OR MADE AVAILABLE TO THE PUBLIC IN ITALY. INDIVIDUAL SALES OF THE CLASS B PARTICIPATING SHARES TO ANY PERSON IN ITALY MAY ONLY BE MADE ACCORDING TO ITALIAN SECURITIES, TAX AND OTHER APPLICABLE LAWS AND REGULATIONS.

### NOTICE TO RESIDENTS OF JAPAN

THE CLASS B PARTICIPATING SHARES DO NOT CONSTITUTE SECURITIES TO BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN AND THEREFORE HAVE NOT BEEN REGISTERED AND WILL NOT BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN. THIS MEMORANDUM IS CONFIDENTIAL AND IS INTENDED SOLELY FOR THE USE OF ITS RECIPIENT. ANY DUPLICATION OR REDISTRIBUTION OF THIS MEMORANDUM IS PROHIBITED. THE RECIPIENT OF THIS MEMORANDUM, BY ACCEPTING DELIVERY THEREOF, AGREES TO RETURN IT AND ALL RELATED DOCUMENTS TO THE COMPANY IF THE RECIPIENT ELECTS NOT TO PURCHASE ANY OF THE CLASS B PARTICIPATING SHARES OR IF EARLIER REQUESTED BY THE COMPANY'S BOARD OF DIRECTORS.

### NOTICE TO RESIDENTS OF JERSEY

THIS MEMORANDUM RELATES TO A PRIVATE PLACEMENT AND DOES NOT CONSTITUTE AN OFFER TO THE PUBLIC OF JERSEY TO SUBSCRIBE FOR THE CLASS B PARTICIPATING SHARES OFFERED HEREBY. NO REGULATORY APPROVAL HAS BEEN SOUGHT TO THE OFFER IN JERSEY. THE OFFER OF THE CLASS B PARTICIPATING SHARES IS PERSONAL TO THE PERSON TO WHOM THIS MEMORANDUM IS BEING DELIVERED BY OR ON BEHALF OF THE COMPANY, AND A SUBSCRIPTION FOR THE CLASS B PARTICIPATING SHARES WILL ONLY BE ACCEPTED FROM SUCH PERSON. THE MEMORANDUM MAY NOT BE PRODUCED OR USED FOR ANY OTHER PURPOSE, NOR BE FURNISHED TO ANY OTHER PERSON OTHER THAN THOSE TO WHOM IT HAS BEEN SO DELIVERED.

### NOTICE TO RESIDENTS OF LIECHTENSTEIN

THE CLASS B PARTICIPATING SHARES ARE OFFERED TO A NARROWLY DEFINED CATEGORY OF INVESTORS, IN ALL CASES UNDER CIRCUMSTANCES DESIGNED TO PRECLUDE A PUBLIC SOLICITATION. THE MEMORANDUM MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE, NOR BE FURNISHED TO ANY OTHER PERSON OTHER THAN THOSE TO WHOM COPIES HAVE BEEN SENT.

### NOTICE TO RESIDENTS OF LUXEMBOURG

THIS MEMORANDUM IS STRICTLY PRIVATE AND CONFIDENTIAL, IS BEING ISSUED TO A LIMITED NUMBER OF SOPHISTICATED INVESTORS, AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE, NOR PROVIDED TO ANY PERSON OTHER THAN THE RECIPIENT THEREOF.

10139194.6

A-6

CONFIDENTIAL

GCC-NYAG0000101

GCC-P 0335171

## NOTICE TO THE RESIDENTS OF MALAYSIA

SINCE THE SALE OF THESE CLASS B PARTICIPATING SHARES WILL NOT BE MADE PURSUANT TO AN APPROVED DEED (AS DEFINED IN SECTION 85 OF THE COMPANIES ACT, 1965), THE COMPANY CANNOT ISSUE OR OFFER TO THE PUBLIC FOR PURCHASE OR SUBSCRIPTION OR INVITE THE PUBLIC TO SUBSCRIBE FOR OR PURCHASE ANY CLASS B PARTICIPATING SHARES.    THESE CLASS B PARTICIPATING SHARES ARE BEING OFFERED TO INVESTORS UNDER A VERY LIMITED AND EXCLUSIVE PRIVATE PLACEMENT.  INVESTORS MAY NOT OFFER TO THE PUBLIC FOR PURCHASE OR INVITE THE PUBLIC TO OR PURCHASE ANY CLASS B PARTICIPATING SHARES INVESTORS ACQUIRE FROM THE COMPANY IF SUCH SALE WOULD CONTRAVENE THE ABOVE RESTRICTIONS.

## NOTICE TO RESIDENTS OF MANITOBA

IN MANITOBA, ANY PURCHASER OF SECURITIES WHO IS AN INDIVIDUAL:

A)  WILL NOT BE BOUND BY THE CONTRACT OF PURCHASE IF THE COMPANY RECEIVES WRITTEN OR TELEGRAPHIC NOTICE EVIDENCING THE PURCHASER'S INTENTION NOT TO BE BOUND NOT LATER THAN MIDNIGHT ON THE SECOND BUSINESS DAY AFTER THE MEMORANDUM OR AMENDED MEMORANDUM IS RECEIVED OR DEEMED TO BE RECEIVED;

B)  HAS THE RIGHT TO RESCIND THE CONTRACT OF PURCHASE WHILE STILL THE OWNER OF THE SECURITIES IF THE MEMORANDUM OR ANY AMENDED MEMORANDUM AS OF THE DATE OF RECEIPT OR DEEMED RECEIPT CONTAINS ANY MISREPRESENTATION, BUT NO ACTION TO ENFORCE THIS RIGHT MAY BE COMMENCED AFTER THE EXPIRATION OF THE LATER OF 180 DAYS FROM THE DATE OF RECEIPT OR DEEMED RECEIPT BY THE PURCHASER OR THE AGENT OF THE PURCHASER OF THE MEMORANDUM OR AMENDED MEMORANDUM OR THE DATE OF THE CONTRACT OF PURCHASE;

C)  IF THE MEMORANDUM OR ANY AMENDED MEMORANDUM CONTAINS ANY MISREPRESENTATION, HAS A RIGHT OF ACTION FOR DAMAGES AGAINST THE COMPANY AND THE DIRECTORS THEREOF FOR ANY LOSS OR DAMAGES THAT THE PURCHASER SUSTAINED AS A RESULT OF THE PURCHASE OF THE SECURITIES UNLESS IT IS PROVED THAT:

I)  THE MEMORANDUM OR AMENDED MEMORANDUM WAS DELIVERED TO PROSPECTIVE PURCHASERS WITHOUT THE DIRECTOR'S KNOWLEDGE OR CONSENT; OR

II)  AFTER DELIVERY OF THE MEMORANDUM OR AMENDED MEMORANDUM AND BEFORE THE PURCHASE OF THE

10139194.6

A-7

GCC-NYAG0000102

CONFIDENTIAL                                                        GCC-P 0335172

SECURITIES, ON BECOMING AWARE OF ANY FALSE STATEMENT, THE DIRECTOR WITHDREW HIS CONSENT TO THE DELIVERY OF THE MEMORANDUM OR AMENDED MEMORANDUM TO PROSPECTIVE PURCHASERS AND GAVE REASONABLE PUBLIC NOTICE OF SUCH WITHDRAWAL AND THE REASON THEREFORE; OR

III)   WITH RESPECT TO ANY FALSE STATEMENT, THE DIRECTOR HAD REASONABLE GROUNDS TO BELIEVE AND DID BELIEVE THAT THE STATEMENT WAS TRUE; OR

IV)   WHERE THE FALSE STATEMENT WAS THAT OF AN EXPERT, THE DIRECTOR HAD NO REASONABLE GROUNDS TO BELIEVE THAT THE EXPERT WAS NOT COMPETENT TO MAKE THE STATEMENT, VALUATION OR REPORT; OR

V)   WHERE THE FALSE STATEMENT PURPORTS TO BE FROM AN OFFICIAL SOURCE, IT WAS A CORRECT AND FAIR REPRESENTATION OF THE STATEMENT;

BUT NO ACTION TO ENFORCE THESE RIGHTS OF ACTION FOR DAMAGES MAY BE COMMENCED BY A PURCHASER AFTER THE EXPIRATION OF THE LATER OF ONE YEAR FROM THE DATE OF RECEIPT OR DEEMED RECEIPT OF THE MEMORANDUM OR AMENDED MEMORANDUM BY SUCH PURCHASER OR HIS AGENT OR THE DATE OF THE CONTRACT TO PURCHASE THE SECURITIES.

## NOTICE TO RESIDENTS OF THE NETHERLANDS

IN THE NETHERLANDS, CLASS B PARTICIPATING SHARES HAVE NOT AND SHALL NOT BE OFFERED, SOLD, TRANSFERRED OR DELIVERED TO ANY INDIVIDUAL OR LEGAL ENTITY AS PART OF THEIR INITIAL DISTRIBUTION, OR AT ANY TIME THEREAFTER, OTHER THAN TO INDIVIDUALS OR LEGAL ENTITIES WHO OR WHICH TRADE OR INVEST IN SECURITIES IN THE COURSE OF THEIR PROFESSION OR TRADE, WHICH INCLUDE BANKS, SECURITIES FIRMS, INVESTMENT INSTITUTIONS, BROKERS, DEALERS, INSURANCE COMPANIES, PENSION FUNDS, OTHER INSTITUTIONAL INVESTORS AND COMMERCIAL ENTERPRISES REGULARLY, AS AN ANCILLARY ACTIVITY, INVESTING IN SECURITIES.

## NOTICE TO THE RESIDENTS OF NEW ZEALAND

THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR AND THE OFFER MADE IN IT IS MADE SOLELY TO HABITUAL INVESTORS (BEING PERSONS DEFINED IN SECTION 3(2)(A)(II) OF THE NEW ZEALAND SECURITIES ACT 1978).

10139194.6

A-8

CONFIDENTIAL

GCC-NYAG0000103

## NOTICE TO RESIDENTS OF OMAN

PROSPECTIVE INVESTORS SHOULD SEEK PROFESSIONAL ADVICE BEFORE MAKING ANY INVESTMENT.

## NOTICE FOR RESIDENTS OF ONTARIO

THE SECURITIES BEING OFFERED ARE THOSE OF A FOREIGN ISSUER AND ONTARIO PURCHASERS WILL NOT RECEIVE THE CONTRACTUAL RIGHT OF ACTION PRESCRIBED BY SECTION 32 OF THE REGULATION UNDER THE SECURITIES ACT (ONTARIO). AS A RESULT, ONTARIO PURCHASERS MUST RELY ON OTHER REMEDIES THAT MAY BE AVAILABLE, INCLUDING COMMON LAW RIGHTS OF ACTION FOR DAMAGES OR RESCISSION OR RIGHTS OF ACTION UNDER THE CIVIL LIABILITY PROVISIONS OF THE U.S. FEDERAL SECURITIES LAWS.

ALL OF THE ISSUER'S DIRECTORS AND OFFICERS, AS WELL AS THE EXPERTS NAMED HEREIN, MAY BE LOCATED OUTSIDE OF CANADA AND, AS A RESULT, IT MAY NOT BE POSSIBLE FOR ONTARIO PURCHASERS TO EFFECT SERVICE OF PROCESS WITHIN CANADA UPON THE ISSUER OR SUCH PERSONS. ALL OR SUBSTANTIAL PORTION OF THE ASSETS OF THE ISSUER AND SUCH PERSON MAY BE LOCATED OUTSIDE OF CANADA AND, AS A RESULT, IT MAY NOT BE POSSIBLE TO SATISFY A JUDGMENT AGAINST THE ISSUER OR SUCH PERSONS IN CANADA OR TO ENFORCE A JUDGMENT OBTAINED IN CANADIAN COURTS AGAINST SUCH ISSUER OR PERSONS OUTSIDE OF CANADA.

## NOTICE TO RESIDENTS OF SINGAPORE

THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR SOLD, NOR MAY ANY DOCUMENT OR OTHER MATERIAL IN CONNECTION THEREWITH BE ISSUED, CIRCULATED OR DISTRIBUTED, EITHER DIRECTLY OR INDIRECTLY, TO PERSONS IN SINGAPORE OTHER THAN UNDER CIRCUMSTANCES IN WHICH SUCH OFFER OR SALE DOES NOT CONSTITUTE AN OFFER OR SALE OF THE CLASS B PARTICIPATING SHARES TO THE PUBLIC IN SINGAPORE OR TO PERSONS WHOSE ORDINARY BUSINESS IT IS TO BUY OR SELL CLASS B PARTICIPATING SHARES OR DEBENTURES, WHETHER AS PRINCIPAL OR AGENT.

## NOTICE TO RESIDENTS OF SOUTH AFRICA

THE CLASS B PARTICIPATING SHARES OFFERED HEREIN ARE FOR YOUR ACCEPTANCE ONLY AND MAY NOT BE OFFERED OR BECOME AVAILABLE TO PERSONS OTHER THAN YOURSELF AND MAY NOT BE PUBLICLY OFFERED, SOLD OR ADVERTISED IN SOUTH AFRICA AND THIS MEMORANDUM MAY ONLY BE CIRCULATED TO SELECTED INDIVIDUALS.

## NOTICE TO RESIDENTS OF SPAIN

THIS MEMORANDUM HAS NOT AND WILL NOT BE REGISTERED WITH LA COMISION NACIONAL DEL MERCADO DE VALORES OF SPAIN AND MAY NOT BE DISTRIBUTED IN SPAIN IN CONNECTION WITH THE OFFERING AND SALE OF

10139194.6

CONFIDENTIAL

CONFIDENTIAL

GCC-NYAG0000104

GCC-P 0335174

CLASS B PARTICIPATING SHARES WITHOUT COMPLYING WITH ALL LEGAL AND REGULATORY REQUIREMENTS IN RELATION THERETO.

## NOTICE TO RESIDENTS OF SWITZERLAND

THE COMPANY HAS NOT BEEN AUTHORIZED BY THE SWISS FEDERAL BANKING COMMISSION AS A FOREIGN INVESTMENT FUND UNDER ARTICLE 45 OF THE SWISS FEDERAL LAW ON INVESTMENT FUNDS OF MARCH 18, 1994. ACCORDINGLY, THE CLASS B PARTICIPATING SHARES MAY NOT BE OFFERED OR DISTRIBUTED ON A PROFESSIONAL BASIS OR BE MADE KNOWN TO THE PUBLIC IN OR FROM SWITZERLAND, AND NEITHER THIS MEMORANDUM NOR ANY OTHER OFFERING MATERIAL RELATING TO THE CLASS B PARTICIPATING SHARES MAY BE ISSUED IN CONNECTION WITH ANY SUCH OFFER OR DISTRIBUTION.

## NOTICE TO RESIDENTS OF TAIWAN

CLASS B PARTICIPATING SHARES ACQUIRED IN THE DISTRIBUTION OF CLASS B PARTICIPATING SHARES HAVE NOT BEEN OFFERED, SOLD OR DELIVERED, AND WILL NOT BE OFFERED, SOLD OR DELIVERED AT ANY TIME, DIRECTLY OR INDIRECTLY, IN THE REPUBLIC OF CHINA IN A MANNER THAT WOULD CONSTITUTE A PUBLIC OFFERING.

## NOTICE TO RESIDENTS OF THE UNITED ARAB EMIRATES

THE SALE OF ANY CLASS B PARTICIPATING SHARES DESCRIBED IN THIS MEMORANDUM OR ANY OTHER OFFERING MATERIALS WILL NOT TAKE PLACE IN THE UNITED ARAB EMIRATES.

## NOTICE TO RESIDENTS OF THE UNITED KINGDOM

THE COMPANY IS NOT A RECOGNIZED COLLECTIVE INVESTMENT SCHEME FOR THE PURPOSES OF SECTION 264 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 OF THE UNITED KINGDOM (THE "ACT"). THE PROMOTION OF THE COMPANY AND THE DISTRIBUTION OF THIS CONFIDENTIAL MEMORANDUM IN THE UNITED KINGDOM IS ACCORDINGLY RESTRICTED BY LAW.

THIS CONFIDENTIAL MEMORANDUM IS BEING ISSUED IN THE UNITED KINGDOM BY THE COMPANY TO, AND/OR IS DIRECTED AT, PERSONS TO WHOM IT MAY LAWFULLY BE ISSUED OR DIRECTED AT UNDER THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2001 INCLUDING PERSONS WHO ARE AUTHORIZED UNDER THE ACT ("AUTHORIZED PERSONS"), CERTAIN PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS, HIGH NET WORTH COMPANIES, HIGH NET WORTH UNINCORPORATED ASSOCIATIONS OR PARTNERSHIPS, TRUSTEES OF HIGH VALUE TRUSTS AND PERSONS WHO QUALIFY AS CERTIFIED SOPHISTICATED INVESTORS. THE CLASS B PARTICIPATING SHARES ARE ONLY AVAILABLE TO SUCH PERSONS IN THE UNITED KINGDOM AND THIS CONFIDENTIAL MEMORANDUM MUST NOT BE RELIED OR ACTED UPON BY ANY OTHER PERSONS IN THE UNITED KINGDOM.

10139194.6

A-10

CONFIDENTIAL

GCC-NYAG0000105

GCC-P 0335175

IN ORDER TO QUALIFY AS A CERTIFIED SOPHISTICATED INVESTOR A PERSON MUST A) HAVE A CERTIFICATE IN WRITING OR OTHER LEGIBLE FORM SIGNED BY AN AUTHORIZED PERSON TO THE EFFECT THAT HE IS SUFFICIENTLY KNOWLEDGEABLE TO UNDERSTAND THE RISKS ASSOCIATED WITH PARTICIPATING IN UNRECOGNIZED COLLECTIVE INVESTMENT SCHEMES AND B) HAVE SIGNED, WITHIN THE LAST 12 MONTHS, A STATEMENT IN A PRESCRIBED FORM DECLARING, AMONGST OTHER THINGS, THAT HE QUALIFIES AS A SOPHISTICATED INVESTOR IN RELATION TO SUCH INVESTMENTS.

THIS CONFIDENTIAL MEMORANDUM IS EXEMPT FROM THE GENERAL RESTRICTION IN SECTION 21 OF THE ACT ON THE COMMUNICATION OF INVITATIONS OR INDUCEMENTS TO ENGAGE IN INVESTMENT ACTIVITY ON THE GROUNDS THAT IT IS BEING ISSUED TO AND/OR DIRECTED AT ONLY THE TYPES OF PERSON REFERRED TO ABOVE.

THE CONTENT OF THIS CONFIDENTIAL MEMORANDUM HAS NOT BEEN APPROVED BY AN AUTHORIZED PERSON AND SUCH APPROVAL IS, SAVE WHERE THIS CONFIDENTIAL MEMORANDUM IS DIRECTED AT OR ISSUED TO THE TYPES OF PERSON REFERRED TO ABOVE, REQUIRED BY SECTION 21 OF THE ACT.

ACQUIRING CLASS B PARTICIPATING SHARES MAY EXPOSE AN INVESTOR TO A SIGNIFICANT RISK OF LOSING ALL OF THE AMOUNT INVESTED. THE COMPANY IS A LIMITED LIABILITY COMPANY AND ANY PERSON WHO ACQUIRES CLASS B PARTICIPATING SHARES WILL NOT THEREBY BE EXPOSED TO ANY SIGNIFICANT RISK OF INCURRING ADDITIONAL LIABILITY. ANY PERSON WHO IS IN ANY DOUBT ABOUT INVESTING IN THE COMPANY SHOULD CONSULT AN AUTHORIZED PERSON SPECIALIZING IN ADVISING ON SUCH INVESTMENTS.

10139194.6

A-11

CONFIDENTIAL

GCC-NYAG0000106

CONFIDENTIAL

GCC-P 0335176

## APPENDIX B

The definition of "U.S. Person" under Regulation S of the U.S. Securities Act of 1933, as amended (the "Securities Act"), is set forth below.

(1)    "U.S. person" means:

    (i)    any natural person resident in the United States;

    (ii)    any partnership or corporation organized or incorporated under the laws of the United States;

    (iii)    any estate of which any executor or administrator is a U.S. person;

    (iv)    any trust of which any trustee is a U.S. person;

    (v)    any agency or branch of a foreign entity located in the United States;

    (vi)    any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

    (vii)    any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or

    (viii)    any partnership or corporation if:

        (A)    organized or incorporated under the laws of any foreign jurisdiction; and

        (B)    formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

(2)    Notwithstanding (1) above, any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States shall not be deemed a "U.S. person."

(3)    Notwithstanding (1) above, any estate of which any professional fiduciary acting as executor or administrator is a U.S. person shall not be deemed a U.S. person if:

    (i)    an executor or administrator of the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estate; and

    (ii)    the estate is governed by foreign law.

10139194.6

B-1

CONFIDENTIAL

GCC-NYAG0000107

CONFIDENTIAL

(4)     Notwithstanding (1) above, any trust of which any professional fiduciary acting as trustee is a U.S. person shall not be deemed a U.S. person if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person.

(5)     Notwithstanding (1) above, an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country shall not be deemed a U.S. person.

(6)     Notwithstanding (1) above, any agency or branch or a U.S. person located outside the United States shall not be deemed a "U.S. person" if:

      (i)     the agency or branch operates for valid business reasons; and

      (ii)     the agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located.

(7)     The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans shall not be deemed "U.S. persons."

10139194.6

B-2

CONFIDENTIAL

GCC-NYAG0000108

# Exhibit 18

# THE WALL STREET JOURNAL.

# MONEY & INVESTING

**WEDNESDAY, DECEMBER 16, 1992  C1**

| | | | | |
|---|---|---|---|---|
| Money Rates.................. | C21 | Odd-Lot Trading .............. | C9 |
| Mutual Funds................ | C22 | Oil Prices ...................... | C14 |
| Nasdaq Stocks, ADRs........ | C5 | OTC Prices .................... | C1 |
| New Securities Issues......... | C3 | Stock Market Data Bank ..... | C2 |
| NYSE/Amex Bonds ........... | C16 | Treasury/Agency Issues...... | C17 |
| NYSE Highs & Lows .......... | C4 | U.S. Regional Markets....... | C10 |
| NYSE Stocks | C3 | World Markets................. | C11 |

**JOURNAL PHONE** ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ 1-900-JOURNAL

# Wall Street Mystery Features a Big Board Rival

By RANDALL SMITH
Staff Reporter of THE WALL STREET JOURNAL

Here's a tantalizing Wall Street mystery:

The Securities and Exchange Commission recently cracked down on one of the largest-ever sales of unregistered securities. Investors had poured $440 million into investment pools raised by two Florida accountants who for more than a decade took in money without telling the SEC or making required financial disclosures to investors.



Bernard L. Madoff

The pair had promised investors hard-to-believe annual returns of 13.5% to 20%—to be obtained by turning the money over to be managed by an unnamed broker.

Regulators feared it all might be just a huge scam. "We went into this thinking it could be a major catastrophe," says Richard Walker, the SEC's New York regional administrator.

But, when a court-appointed trustee went in, what a surprise: All there. Indeed, the mystery money manager was beating the promised returns by such a wide margin that the two accountants ditched their accounting business in 1994 to concentrate on their more lucrative investing

Who was the broker with the Midas touch? The SEC, which last month went to court to shut down the operation, won't say. Neither will the lawyer for the two accountants, Frank J. Avellino and Michael S. Bienes of Fort Lauderdale.

But the mystery broker turns out to be none other than Bernard L. Madoff — a highly successful and controversial figure on Wall Street, but until now not known as an ace money manager.

Mr. Madoff is one of the masters of the off-exchange "third market" and the bane of the New York Stock Exchange. He has built a highly profitable securities firm, Bernard L. Madoff Investment Securities, which siphons a huge volume of stock trades away from the Big Board. The $740 million average daily volume of trades executed electronically by the Madoff firm off the exchange equals 9% of the New York exchange's.

Mr. Madoff's firm can execute trades so quickly and cheaply that it actually pays other brokerage firms a penny a share to execute their customers' orders, profiting from the spread between bid and asked prices that most stocks trade for.

In an interview, the 54-year-old Mr. Madoff says he didn't know the money he was managing had been raised illegally. And he insists the returns were really nothing special, given that the Standard & Poor's 500-stock index generated an average annual return of 16.3% between November 1982 and November 1992. "I would have been surprised if anybody thought that matching the S&P over 10 years was

In fact, most investors would have been delighted to be promised such returns in advance, as the accountants' investors were. That's especially true since the majority of money managers actually trailed the S&P 500 during the 1980s.

The best evidence that the returns were very attractive: the size of the pools mushroomed by word-of-mouth, without any big marketing effort by the Avellino & Bienes partnership. The number of investors eventually grew to 3,200 in nine accounts with the Madoff firm. "They took in nearly a half a billion dollars' worth of money totally outside the system that we can monitor and regulate," says the SEC's Mr. Walker. "That's pretty frightening."

An SEC civil complaint filed in New York federal court Nov. 17 charged that Messrs. Avellino and Bienes "have operated A&B as an unregistered investment company and have engaged in the unlawful sale of unregistered securities," and ordered the money returned to investors by a court-appointed trustee, New York attorney Lee Richards.

The two 56-year-old accountants declined to comment. Their attorney, Ira Lee Sorkin, says they didn't know that the notes they had issued to their clients should have been registered with the SEC, and he says that investors got their money back and had never complained.

If the notes had been registered, they would have had to include a description of how the money was being invested, and by whom. In addition, Avellino & Bienes would have had to send investors annual

But how did Mr. Madoff rack up his big investment returns? Early investors in the late 1970s were told – and Mr. Madoff confirms—that their money was being used to engage in so-called convertible arbitrage in securities of such companies as Occidental Petroleum Corp., Limited Stores Inc. and Continental Corp.

In such a strategy, an investor buys a company's preferred stock or bonds that pay high dividends and are convertible into the company's common stock; the investor simultaneously sells borrowed common stock of the same company in a "short sale" to hedge against a stock-price decline.

The investor earns the spread between the higher dividend paid on the convertible securities and the lower dividend on the common stock, plus interest from investing the proceeds of the stock short sale. Using borrowed money, or leverage, to magnify returns, an investor can reap double-digit returns. But the strategy carries big risks if interest rates rise and stock prices go down.

Mr. Madoff said his investment strategy changed around 1982, when his firm began using a greater variety of strategies tied to the stock market, including the use of stock-index futures and "market-neutral" arbitrage, which can involve buying and selling different stocks in an industry group.

Mr. Madoff said, "The basic strategy was to be long a broad-based portfolio of S&P securities and hedged with derivatives." such as futures and options. Such a

# A Wall Street Mystery Features New York Stock Exchange Rival

*Continued From Page C1*

strategy, he said, allowed the investors "to participate in an upward market move while having limited downside risk." For example, he said, the Madoff firm made money when the stock market crashed in 1987 by owning stock-market index puts, which rose in value as the market declined.

In the mid-1980s, one investor says, the limited reports that Avellino & Bienes sent to investors changed, and investors stopped being told in which securities their money was invested. The interest rate on some new notes sold by the accountants was also lowered to 16% or less. One investor who complained about the vaguer reports said he was told that if he didn't like the reports, he could withdraw his investment. The investor chose to remain.

Perhaps the biggest question is how the investment pools could promise to pay high interest rates on a steady annual basis, even though annual returns on stocks fluctuate drastically. In 1984 and 1991, for example, the stock market delivered a negative return, even after counting dividends. Yet Avellino & Bienes — and Mr. Madoff — maintained their double-digit returns.

The answer could be that Mr. Madoff's use of futures and options helped cushion the returns against the market's ups and downs. Mr. Madoff says he made up for the cost of the hedges — which could have caused him to trail the stock market's returns — with stock-picking and market timing.

One person familiar with the Avellino & Bienes case speculated that having the assets of the investment pools under management may have helped Mr. Madoff's firm by giving him an inventory of securities that could help him to execute other trades for his firm. Not true, said Mr. Madoff: "One thing has nothing to do with another."

As the investment pools swelled, two other accountants, Steven Mendelow of New York City and Edward Glantz of Lake Worth, Fla., started their own pool, Telfran Ltd., to invest in Avellino & Bienes notes. Telfran by itself sold $89.6 million in unregistered notes, a separate SEC civil lawsuit charges. The two men, also represented by Mr. Sorkin, declined to comment. The SEC said Telfran made money by investing in Avellino & Bienes notes paying 15% to 19% annually, while paying Telfran investors lower rates.

All the while, Mr. Madoff was scoring investment returns that comfortably exceeded the hefty returns Avellino & Bienes was promising its noteholders. That excess return generated big profits for the two accountants, the SEC suit indicates. The SEC has asked that those profits be returned as "unjust enrichment," a demand Mr. Sorkin calls "totally unwarranted." For his part, Mr. Madoff says he charged the investment pools only what he described as standard brokerage commissions. He termed turnover in the accounts "not very active," almost nil in some years.

DEC 16 1992

CONFIDENTIAL

GCC-P 0393126

# Exhibit 19

To stay in business, the Midwest Stock Exchange has
gone in for electronic trading, bypassing the specialists.

# If you can't
# beat 'em . . .

### By Gary Slutsker

YOU BUY 1,000 shares of General Motors from a full-service stockbroker whose firm is a member of the New York Stock Exchange. Your commission will be around $500. If the broker sends your order to the Big Board to be filled, part of this commission, $26.50, or 2.65 cents a share, goes to the exchange itself.

But the New York Stock Exchange no longer has a monopoly on trading the stocks listed on it. The broker could equally well send your order to a regional stock exchange. Or he could send it to one of the new electronic trading systems operated by firms like Jefferies & Co. or Bernard L. Madoff Investment Securities (FORBES, July 10, 1989).

Bernie Madoff has become, by far, the biggest of these new age traders through a simple practice. He pays the brokers a penny a share to get their market orders. This saves them $26.50 a

fee per 1,000 shares to the NYSE, and puts a little extra money in the brokers' pockets.

But one man's saving is another man's loss, and the diversion or business is hurting the NYSE and other exchanges. As of September, Madoff alone handled about 10% of all trades in NYSE-listed stocks. Since 1980 the Big Board's share of trades in NYSE-listed stocks has dropped from 85% to 68%—a reason the price of a seat on the exchange has plunged from a precrash high of $1.15 million in 1987 to a recent $431,000.

How can Madoff afford to pay for the right to execute a trade? Simple. He lives off trading profits and the spread, the normal eighth-of-a-point difference between bid and asked.

Intelligent people can disagree as to whether this is good or bad for investors. Madoff and other electronic traders do cut transaction costs dra-

matically. But some critics argue they may reduce liquidity in markets. The Securities & Exchange Commission is about to begin a yearlong study that will generate some answers.

This much is clear: The established stock exchanges can ignore the Madoffs of the world only at their peril.

Charles Doherty isn't ignoring them. Doherty, 58, is president of Chicago's Midwest Stock Exchange, the country's largest regional exchange. The Midwest's share of trades in NYSE-listed stocks grew from just under 4% in 1980 to a peak of 11% in 1989—but has since dropped back to 8%, thanks to competition from off-exchange traders like Madoff.

To save his exchange, Doherty is converting the Midwest into a high-tech exchange, rivaling Madoff's. In 1991 he spent $13 million to develop fancy computer systems to route orders directly from its customers and execute those orders automatically.

One of Doherty's secret weapons is MAX, a proprietary software program that automatically fills certain orders at the best price quoted on the national Intermarket Trading System screen, bypassing specialists. Much of the time. That means that if your broker sends an order to the Midwest to sell 1,000 shares of IBM at 90, but the NYSE is advertising a bid of 90⅛, MAX will automatically execute the trade on the floor of the Midwest Exchange at the New York price.

Doherty has also told his specialists: If getting the business means paying the brokers for their orders as Madoff does, pay them.

With all this the Midwest Exchange has managed to hold on to its profitable block-trading business, which still requires the intervention of skilled human specialists as well as computers and accounts for about a third of the exchange's revenues. But this computerization squeezes the profits. Doherty's motto: Better squeezed than dead.

To meet the challenge of electronic traders, will the New York Stock Exchange adopt Chuck Doherty's aggressive defensiveness? Not if it means going to electronic trading. "The best deal in town is here," says NYSE Executive Vice President Lewis Horowitz. "It may not be the cheapest, but people know it's the best."



ABOVE:
Electronic trader Bernie Madoff.
RIGHT:
The Midwest's Chuck Doherty.
*Stock exchanges ignore
the Madoffs of the world
only at their peril.*



48

Forbes ■ January 6, 1992

CONFIDENTIAL

# Exhibit 20

*Bernie Madoff pays brokers for the privilege of executing their orders. How can this be? He is taking advantage of an obsolete New York Stock Exchange rule that protects specialists at the expense of everybody else.*

# Living off
# the spread



### By Richard L. Stern

**O**N A RECENT WEEKDAY tourists waited more than 90 minutes to get into the New York Stock Exchange visitors' gallery for a glimpse into the inner workings of the American capitalist system. One elderly visitor was explaining to his young grandson that somewhere in the noisy bustle below them, grandpa's gift of 100 shares of AT&T had been filled.

Not necessarily, Grandpa. In today's stock trading, things are seldom what they seem.

As things now work, an order to buy or sell New York Stock Exchange-listed securities may or may not be executed there. It may instead be executed on a regional exchange. Or it may never have gone to an exchange floor at all but to a small midtown Manhattan firm called Bernard L. Madoff Investment Securities, which is not a member of the exchange but nevertheless makes markets in the Big Board's 250 biggest-trading stocks.

Why should stock exchange members deal with Bernie Madoff instead of with each other? Simple. It's often cheaper to execute the customer's order through Madoff than on the floor of an exchange.

Madoff won't say which firms are sending him orders. This is a sensitive area because his customers don't want to offend the Big Board or its specialists. But over 100 member firms are doing business with Madoff. These include A.G. Edwards & Co., Minneapolis-based Dain Bosworth, Texas' Rauscher Pierce Refsnes and—especially—big discounters like Charles Schwab & Co., Quick & Reilly and Fidelity Brokerage Services.

Each morning, Bernie Madoff's 20 traders sit in front of computer screens on the 18th floor of a midtown Manhattan office building. When they go home in the evening, the 20 will have handled execution of about 2% of the volume in NYSE-listed stock—sometimes as many as 5 million shares.

Why do brokers deal with Bernie Madoff? Simple. He saves them money. Not only does he not charge the usual specialists' commissions and Big Board fees, but he will often pay the brokers a small fee for the privilege of executing their orders as well.

What goes on here?

It's very simple. Bernie Madoff lives off the spread between bid and asked, a spread that usually amounts to one-eighth of a point on shares of the most liquid stocks.

In addition to pocketing the spread as their price for maintaining liquidity, the specialists charge the brokers an average 1¾ cents a share to hold limit orders. That's $17.50 for 1,000 shares. It may not sound like a lot of money until you realize that a discount broker gets maybe $171 commission for 1,000 shares of a $40 stock, $99 for 1,000 shares of a $10 stock. Doing business with Madoff can make the difference between making a profit and just breaking even on a small trade.

That's for limit orders. On average, an executive of one large firm estimates he pays $6 an order in direct costs in transaction fees and specialist charges for a New York Stock Exchange execution. On regional exchanges like the Pacific and the Midwest stock exchanges, the average trade is at least 75% cheaper, but it still costs maybe $1.25 an order.

Madoff can save the brokers the $1.25 or $6 per order, but he goes further: He actually pays them for the privilege of executing some of their orders. He pays the brokers—something under one cent a share—for the orders they send him. "Not only do I save 1¾ cents a share on a limit order, Madoff gives me a penny," says an official of a small broker/dealer. "That's a 3-cent turnaround as far as I'm concerned." On a 1,000-share order, that works out as a saving of $30.

Does the broker's customer get a raw deal when orders go to Madoff? Probably not. Madoff guarantees to buy or sell orders of up to 3,000 shares at the best price quoted among the New York and regional exchanges. That's the best "bid" when a customer is selling and the best "ask" when a customer is buying. Moreover, Madoff's guarantee of 3,000 shares is frequently larger than what Big Board specialists are willing to guarantee.

In some cases, the ultimate customer might do better on the floor. An exchange gives the buyer's broker a chance to meet the seller's broker and possibly strike a price at what brokers call "in between the spread." That is, at prices that are better than the best bid or ask.

Say, for example, a stock is 29¾ bid, 30 asked. On an exchange, it is possible that a buyer could get the stock at 29⅞. But this works only for the less actively traded stocks. On actively traded stocks—GM, IBM, AT&T—the spread isn't wide enough to permit that kind of bargaining. Madoff points out that he deals only in the biggest Big Board stocks, where the spreads generally are so small there's no margin for investors to do better.

Bernie Madoff, 51, has gotten very rich living off the spread. He grew up in a middle-class section of the New York City Borough of Queens and never quite finished Brooklyn Law School. He won't say how much his firm makes, but the word is that despite hard times on The Street, Ma-



Peter and Bernie Madoff in their small trading room
*Even their own monopoly won't last forever.*

doff is very profitable. During the last few years, even through the tough years of 1987 and 1988, he added about $6 million a year to the firm's capital position—which recently was $50 million, according to Security & Exchange Commission documents.

Madoff founded his firm in 1960 to do riskless arbitrage and make a market in over-the-counter stock. To make money in these highly competitive businesses, he had to work with complex computer systems—and that has been the key to his success. Visit the offices of Madoff Investment and you may be taking a walk into the future of stock trading. Unlike in most trading rooms, where negotiations are still done largely by telephone, the phones hardly ring. When

they do, it is for orders of over 3,000 shares, which are negotiated. Anything under 3,000 shares, that is to say 95% of the orders, is handled by their computers.

An order comes in from computers at Charles Schwab & Co. to buy 3,000 shares of IBM, for instance. Madoff's computer software system, designed by his younger brother, Peter, 43, director of trading, automatically sells the stock at the best "ask" price in the markets and sends a confirmation back to Schwab untouched by human decision or hands. Time elapsed: 4 seconds.

The computer executions lower Madoff's costs, of course. But Madoff's computer operation is far more sophisticated than one designed sole-

ly to cut handling costs. A key to profitability in marketmaking is the ability to hedge positions, Madoff explains. Once the computer has that IBM stock it just bought, it shows the trader various ways of hedging his position and the costs. It even shows the carrying costs for not hedging. That hedging is done by Peter Madoff's software system. The Madoffs' computer hedging is far ahead of anything that the specialists have.

Why can't member firms simply make markets for their customers in listed securities, as Madoff does? The New York Stock Exchange won't let them. The Big Board protects a kind of monopoly by its specialists through the NYSE Rule 390. This essentially prevents most Big Board members from making markets for their own accounts in most NYSE-listed securities. That forces the members to bring orders either to the New York floor, to another exchange or to someone like Madoff.

Madoff saw opportunity in this rule in the mid-1970s through the Cincinnati Stock Exchange, a near-defunct attempt to create a fully electronic, computerized stock exchange. Madoff spent over $250,000 upgrading Cincinnati's computers and began making markets in listed stocks.

The advantage of Cincinnati for Madoff is that, as an accredited exchange, it allows him to participate in an intermarket trading system put into place in the late 1970s at the insistence of the SEC to lessen New York's monopoly on the nation's biggest stocks.

Bernie Madoff is very much aware that his own monopoly won't last forever. Deregulation is everywhere in the air, and Big Board monopoly via Rule 390 will one day cease.

At least two congressional agencies currently are investigating whether the rule violates congressional mandates for a national market system that would be more efficient and fairer to investors.

One day, probably sooner rather than later, there will be a nationwide computerized system that, with luck, will preserve the present exchange auction system, which allows customer orders to meet within the spread. It will also eliminate specialists and floor brokers and let buying broker and selling broker meet without intermediary. The technology is not new or difficult. The New York Stock Exchange has been a major hindrance. Bernie Madoff just has the first fully automated firm to show brokers the economic benefits of getting rid of Rule 390. ∎

CONFIDENTIAL

GCC-P 0393119