# Exhibit 35

1

98B6DIP                        Plea

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

        v.                              09 CR 764 (RJS)

FRANK DIPASCALI,

             Defendant.
------------------------------x

                             New York, N.Y.
                             August 11, 2009
                             3:15 p.m.

Before:

                 HON. RICHARD J. SULLIVAN,

                           District Judge

                    APPEARANCES

LEV L. DASSIN
    United States Attorney for the
    Southern District of New York
MARC LITT
LISA BARONI
    Assistant United States Attorney

BRACEWELL & GIULIANI
    Attorneys for Defendant
MARC L. MUKASEY
CRAIG S. WARKOL
JAMIE RENNER
DANIEL S. CONNOLLY

Also Present:

Special Agent Keith D. Kelly
Special Agent Julia Hanish
Special Agent Steven Garfinkel
Natasha Ramesar, Pretrial Services

1125.0001

2

98B6DIP                    Plea

1              (In open court; case called)

2              THE DEPUTY CLERK:  All parties can state their

3      appearances for the record, please.

4              MR. LITT:  Good afternoon, your Honor.  Marc Litt for

5      the United States.  With me at counsel table is Lisa Baroni,

6      Keith Kelley of the FBI, Julia Hanish, and Steven Garfinkel of

7      the FBI, and Natasha Ramesar of the U.S. Pretrial Services

8      Office.

9              THE COURT:  Good afternoon to each of you.

10             For the defense.

11             MR. MUKASEY:  Good afternoon, your Honor. Marc Mukasey

12     from the law firm Bracewell & Giuliani for the defendant Frank

13     DiPascali, who is seated to my left.  With me are Dan Connolly,

14     Craig Warkol, and Jamie Renner.

15             THE COURT:  Good afternoon to each you and to Mr.

16     DiPascali.

17             Let me just get a little bit of background so it is

18     clear since this is the first appearance of anyone on this

19     case.  On Friday I received a letter from the government, Mr.

20     Litt and Ms. Baroni, advising me that the defendant, Mr.

21     DiPascali, was prepared to waive the indictment and plead

22     guilty pursuant to an information in this case.

23             The government also included a notice of intent to

24     file an information as opposed to an indictment, as well as a

25     motion pursuant to Title 18, United States Code, Section 3771

1125.0002

98B6DIP                    Plea

1    regarding the right of victims.  The government also provided a

2    disclosure statement setting forth a list of potential victims

3    of the criminal activity alleged in the case.  This statement

4    contained a 61-page, single-spaced list of victims which the

5    government conceded was not an exhausted or complete list but

6    was a list that they had been able to put together over the

7    course of the investigation.

8           Mr. Litt, so far so good?

9           MR. LITT:  Yes.  I believe it is only institutional

10   victims, corporate parties.

11          THE COURT:  That's right.  61 pages of institutional

12   victims.

13          In light of this fact that this case has not been

14   assigned a docket number, it will not receive a docket number

15   today after the defendant formerly waives indictment and pleads

16   here in open court.

17          The government requested that I issue an order

18   directing that its letter of August 7th be posted and the other

19   materials I mentioned be posted on the web page created by the

20   U.S. Attorney's Office for Madoff related cases.  In the

21   government's view this was the most practical and efficient way

22   to notify potential victims of today's proceeding.  So I issued

23   such an order on Friday, August 7th.

24          Late yesterday afternoon I received a copies of a

25   proposed information, a plea agreement, as well as a letter

1125.0003

4

98B6DIP                          Plea

1    from the government setting forth the bail conditions proposed

2    by the parties in this case.  I ordered that the last of these

3    be posted similarly on the and U.S. Attorney's Office web page

4    page.  The information and plea agreement will presumably be

5    posted today presuming the defendant waives indictment and

6    executes the agreement that I received a draft of yesterday.

7          To ensure at least some notice to the victims,

8    including those who may be present here today, I directed the

9    government to summarize and post on the web page the charges

10   contained in the information and the nature of the proposed

11   plea agreement between the parties.

12         So are there any other additional facts that I left

13   out, Mr. Litt?

14         MR. LITT:  I don't believe so.  No, your Honor.

15         THE COURT:  Mr. Mukasey, anything you think is

16   relevant to the record?

17         MR. MUKASEY:  No, Judge.  I think that is it.

18         THE COURT:  Mr. Mukasey, I understand that your client

19   wishes to plead guilty pursuant to the information that has

20   been drafted and provided to me, is that correct?

21         MR. MUKASEY:  That's correct, your Honor.

22         THE COURT:  Mr. DiPascali, before I accept your guilty

23   plea -- you can sit for the moment.  Before I accept your

24   guilty plea, I am going to ask you certain questions to ensure

25   first of all that you are pleading guilty because you are

1125.0004

1  guilty and not for some other.  And also to make sure that you
2  fully understand your rights, your Constitution and statutory
3  rights, including your right to a trial.
4        So if at any point during the course of my questioning
5  you don't understand my question or require some further
6  elaboration on my part, let me know and I will do everything to
7  clarify.  If at any point you wish to confer with Mr. Mukasey
8  or your other attorneys, that is perfectly fine.  I will give
9  you as much time as I need.  I don't want you to feel rushed
10 into a plea in this matter.
11       At this point I am going to ask Ms. Levine to
12 administer the oath.  This is an oath that I ask you to rise
13 for.  This is an oath that you will answer truthfully my
14 questions.
15       THE DEPUTY CLERK:  Please raise your right hand.
16       (Defendant sworn)
17       THE COURT:  Mr. DiPascali, having taken that oath, do
18 you understand that any false answers to my questions could
19 subject you to the penalties for perjury or for making a false
20 statement, which would carry separate penalties and be accept
21 and distinct from any of the crimes charged in the information
22 in this matter?
23       THE DEFENDANT:  I do, your Honor.
24       THE COURT:  Again, if at any point you wish to confer
25 with your attorneys before answering, that is fine.  If at any

98B6DIP                         Plea

1    point you would like me to clarify a question before answering,

2    that is also fine.  In fact, you should do that.  But don't

3    make any false statements because that will compound any

4    problems that you may already have.

5               THE DEFENDANT:  Understood.

6               THE COURT:  Mr. DiPascali, could you state your full

7    name for the record?

8               THE DEFENDANT:  Frank DiPascali, Jr.

9               THE COURT:  How old are you, Mr. DiPascali?

10              THE DEFENDANT:  52.

11              THE COURT:  How far you go in school?

12              THE DEFENDANT:  High school.

13              THE COURT:  Where was that?

14              THE DEFENDANT:  Archbishop Malloy High School in

15   Briarwood, Queens.

16              THE COURT:  Are you now or have you recently been

17   under the care of a doctor or a psychiatrist?

18              THE DEFENDANT:  No.

19              THE COURT:  Have you ever been treated for any type of

20   mental illness or any type of addiction, including drug or

21   alcohol addiction?

22              THE DEFENDANT:  No, sir.

23              THE COURT:  Have you taken any drugs or any medicine

24   or any pills or have you drunk any alcohol in the past 48

25   hours?

1125.0006

98B6DIP                    Plea

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  Tell me about that.

3              THE DEFENDANT:  I had a glass of wine at dinner the

4      night before last.

5              THE COURT:  The night before last?

6              THE DEFENDANT:  That's correct.

7              THE COURT:  No medication, no pills, no drugs of any

8      kind?

9              THE DEFENDANT:  No, sir.

10             THE COURT:  No other alcohol?

11             THE DEFENDANT:  Correct.

12             THE COURT:  Is your mind clear today?

13             THE DEFENDANT:  Crystal clear, sir.

14             THE COURT:  Do you under the nature of this proceeding

15     and what is going to take place here today?

16             THE DEFENDANT:  I do.

17             THE COURT:  Mr. Mukasey, do you have any doubt as to

18     your client's mental competence to enter an informed plea at

19     this time?

20             MR. MUKASEY:  None whatsoever.

21             THE COURT:  Let me ask Mr. Litt and Ms. Baroni if they

22     share your confidence in that regard.

23             Mr. Litt?

24             MR. LITT:  We do.  We have no reason to think

25     otherwise.

98B6DIP                    Plea

1              THE COURT:  On the basis of Mr. DiPascali's responses

2     to my questions, my observations of his demeanor, and on the

3     representations of his counsel and the prosecutors, I find that

4     Mr. DiPascali is competent to enter an information plea at this

5     time.

6              Now, Mr. DiPascali, as I understand it you wish to

7     plead guilty to an information, is that correct?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Have you had enough of an opportunity to

10    discuss this information and the charges contained in it with

11    your attorney, Mr. Mukasey?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  Are you satisfied with Mr. Mukasey's

14    representation of you?

15             THE DEFENDANT:  Absolutely.

16             THE COURT:  Do you feel you need or require any

17    additional time to review the information or review any of the

18    other documents associated with this matter?

19             THE DEFENDANT:  No, sir.

20             THE COURT:  Now, have you received a copy of the

21    information that I've been referring to?

22             THE DEFENDANT:  I have.

23             THE COURT:  Have you read it yourself?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Have you discussed it with your attorney

1125.0008

98B6DIP                          Plea

1    Mr. Mukasey?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  Do you waive the public reading of that

4    information, or would you like me to read it to you here in

5    open court?

6           THE DEFENDANT:  I would prefer it to be waived.

7           THE COURT:  You will waive the public reading.  That's

8    fine.

9           Now, do you have in front of you -- I don't know

10   whether you have the original in front of you -- a waiver of

11   indictment form?

12          THE DEFENDANT:  I do.

13          THE COURT:  Is that your signature on that document?

14          THE DEFENDANT:  It is.

15          THE COURT:  When did you sign that?

16          THE DEFENDANT:  About 15 minutes ago.

17          THE COURT:  Prior to signing that document had you

18   reviewed the information in this case and discussed it with

19   Mr. Mukasey?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  Mr. Mukasey, is your signature on that

22   form as well?

23          MR. MUKASEY:  It is, Judge.

24          THE COURT:  And prior to signing it, did you review

25   the information and discuss it with your client?

1125.0009

98B6DIP                        Plea

1          MR. MUKASEY:  Extensively.

2          THE COURT:  Now, I want to make sure you understand,

3    Mr. DiPascali, that you have a right, a constitutional right,

4    to proceed by way of an indictment, which is a charging

5    instrument returned by a grand jury rather than an information,

6    which is simply a charging instrument brought by prosecutors.

7          Do you understand that?

8          THE COURT:  I do.  Under the Constitution you have a

9    right to have evidence underlying the crimes charged in the

10   information brought before the grand jury, which is a group of

11   23 citizens who would decide by majority vote whether probable

12   cause had been established to demonstrate that you had

13   committed the crimes charged in the charging instrument.

14         Do you understand that?

15         THE DEFENDANT:  Yes, I do.

16         THE COURT:  Only if the grand jury reached that

17   determination of probable cause by a majority vote with a

18   proper quorum of grand jurors present could those charges be

19   returned against you.

20         Do you understand that?

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  By waiving indictment, you will be giving

23   up that right and you will be agreeing to go forward on the

24   charges contained in the information without ever having the

25   evidence brought before a grand jury.

1125.0010

98B6DIP                        Plea

1          Do you understand that?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Are you voluntarily and freely giving up

4    that right to proceed by a grand jury?

5          THE DEFENDANT:  Absolutely.

6          THE COURT:  Now, I want to explain to you your other

7    constitutional rights.  Have you had a chance to review with

8    your attorney, Mr. Mukasey, a three-page document probably

9    entitled Advice of Rights Form that should have been provided

10   to you by my chambers?

11         THE DEFENDANT:  I have.

12         THE COURT:  Is your signature on the second page of

13   that document?

14         THE DEFENDANT:  It is.

15         THE COURT:  Before you signed that document, did you

16   review it carefully with your attorney, Mr. Mukasey?

17         THE DEFENDANT:  Yes, we did.

18         THE COURT:  Did you have an opportunity discuss with

19   him any questions you may have had or any further explanation

20   of the rights described in that document?

21         THE DEFENDANT:  Thoroughly.

22         THE COURT:  Mr. Mukasey, did you sign the third page?

23         MR. MUKASEY:  I did, Judge.

24         THE COURT:  Before signing it, did you have a full and

25   extensive opportunity to discuss the rights described in that

1125.0011

98B6DIP                          Plea

1   document with your client?

2          MR. MUKASEY: Yes.

3          THE COURT:  I am going to mark that as a court

4   exhibit.  I will mark it as Court Exhibit 1.  I will date it

5   and I will initial it.

6          I am also going to ask you in open court, Mr.

7   DiPascali, some questions about the rights that are contained

8   in this document.  The reason I do that is because these rights

9   are so vitally important and it is so essential that you

10  understand these rights because they are there rights that you

11  will would be waiving.  In addition to this document, I want to

12  make sure you have had an ample opportunity to consider them so

13  I will ask you questions that may seem redundant but I think is

14  it a price worth paying for rights that are this serious.

15          Mr. DiPascali, under the Constitution and laws of the

16  United States, you would be entitled to a speedy and public

17  jury trial on the charges contained in the information.

18          Do you understand that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  At trial you would be presumed to be

21  innocent and the government would be required to prove you

22  guilty by competent evidence beyond a reasonable doubt before

23  you could be found guilty.

24          Do you understand that?

25          THE DEFENDANT:  Yes, I do.

1125.0012

13

98B6DIP                          Plea

1          THE COURT:  Now, at trial a jury of 12 people would

2    have to agree unanimously that you were guilty before you could

3    be found guilty.

4          Do you understand that?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  You would not have to prove that you were

7    innocent if you went to trial.

8          Do you understand that?

9          THE DEFENDANT:  I understand.

10          THE COURT:  The jury would have to be persuaded beyond

11   a reasonable doubt and they would have to be persuaded

12   unanimously of that fact before you could be found guilty.

13          Do you understand that?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Now, at trial and at every stage of your

16   case, you would be entitled to be represented by an attorney

17   and if you couldn't afford an attorney, one would be appointed

18   for you at no cost to you.

19          Do you understand that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  During a trial, the witnesses for the

22   government would have to come into court and testify in your

23   presence.

24          Do you understand that?

25          THE DEFENDANT:  Yes, sir.

1125.0013

98B6DIP                              Plea

1           THE COURT:  It is called your right to confront your

2    accusers.  It is the confrontation clause of the Constitution.

3    What that means is the witnesses would have to come and sit

4    right here or in a box like it if it were in a different

5    courtroom and you would be able to see them and hear them and

6    they would be able to see you.

7           Do you understand that?

8           THE DEFENDANT:  Yes.

9           THE COURT:  At trial your attorney Mr. Mukasey would

10   have an opportunity to cross-examine those witnesses.

11          Do you understand that?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  I have seen him do it.  He is really good

14   at it.  You would have that opportunity.

15          THE DEFENDANT:  That is why I sit next to him.

16          THE COURT:  He would also have an opportunity to

17   object to the government's evidence if he wished and if he felt

18   appropriate.

19          Do you understand that?

20          THE DEFENDANT:  Yes, sir.

21          THE COURT:  At trial you would have the right to have

22   subpoenas issued, or other compulsory process used to compel

23   witnesses to testify if you wished.

24          Do you understand that?

25          THE DEFENDANT:  Yes, sir.

1125.0014

98B6DIP                          Plea

1              THE COURT:  If there are witnesses who you felt had

2     valuable testimony, valuable to your defense and they didn't

3     wish to testify, you could compel them to testify through

4     subpoenas.

5              Do you understand that?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  At trial you yourself would have the right

8     to testify if you chose.

9              Do you understand that?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Would you also have the right not to

12    testify if you chose not to testify.  If you chose not to

13    testify then no one, particularly the jury, could draw any

14    negative inference or any suggestion of your guilt by virtue of

15    the fact that you chose not to testify.

16             Do you understand that?

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  I would tell the jury that more than once.

19    I tell them at the beginning and I would tell them in the

20    middle and at the end that this was a fundamental right and

21    principle of bedrock proportions in our constitutional system,

22    that the criminal defendant never has any obligation to do

23    anything at a trial.  The burden also rests with the

24    government.  So if a defendant were not to testify, they could

25    not and must not draw any negative inference against that

1125.0015

98B6DIP                    Plea

1    witness by virtue of that nontestimony.

2              Do you understand that?

3          THE DEFENDANT:  I do.

4          THE COURT:  Now, do you understand that if you went to

5    trial and you were convicted at trial, you would then have a

6    right to appeal the jury's verdict if you wished.

7              Do you understand that?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Now, if you plead guilty and if I accept

10   your guilty plea, you will give up your right to a trial and

11   all the other rights I have just described.

12             Do you understand that?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  The only exception to that would be your

15   right to counsel.  That right would continue through your plea,

16   through sentencing, and through appeal if you wished to appeal.

17             Do you understand that?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  But the other rights that I just described

20   and are described in the document that we talked about before,

21   Court Exhibit 1, those would be gone.  You would be waiving

22   those.

23             Do you understand that?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Do you understand you have a right to

1125.0016

98B6DIP                              Plea

1    change your mind even now?

2            THE DEFENDANT:  Yes.

3            THE COURT:  There are a lot of people here, and your

4    lawyers are here, the government is here.  That is well and

5    good but if you want to go to trial, you have a right to go to

6    trial and nobody will be upset with you and annoyed at you.

7            Do you understand that?

8            THE DEFENDANT:  I understand, sir.

9            THE COURT:  Do you nevertheless wish to go forward

10   with your guilty plea at this time?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  Now, do you understand that if you plead

13   guilty and if I accept your guilty plea then you will be

14   sentenced on the basis of that guilty plea among other things;

15   do you understand that?

16           THE DEFENDANT:  Yes, sir.

17           THE COURT:  Do you understand that if you plead

18   guilty, there will be no appeal on the question of whether or

19   not you committed the offenses to which you pled guilty; do you

20   understand that?

21           THE DEFENDANT:  Yes, I do.

22           THE COURT:  Do you also understand if you plead

23   guilty, I am going to ask you questions about what you did.  I

24   am going to ask you basically to give up your right not to

25   incriminate yourself because I am going to need you to tell me

1125.0017

98B6DIP                          Plea

1    what you did that makes you guilty of these crimes before I

2    will accept the plea; do you understand that?

3                 THE DEFENDANT:  Yes, sir.

4                 THE COURT:  I said a minute ago if you went to trial

5    you would have a right not to testify and that of course is

6    true.  No negative inference could be drawn against you or

7    considered by the jury.  If you are going to plead guilty then

8    I will need to be persuaded that you are pleading guilty

9    because you are guilty and not for some other reason.  So that

10   is why I am going to ask you questions about what you did and

11   how that makes you guilty of the offense.

12                Do you understand?

13                THE DEFENDANT:  Yes, sir.

14                THE COURT:  Do you understand each and everyone of

15   these rights, Mr. DiPascali?

16                THE DEFENDANT:  I do.

17                THE COURT:  Are you waiving your rights to a trial and

18   all the other rights I just mentioned?

19                THE DEFENDANT:  Yes, sir.

20                THE COURT:  Now, the information that you have

21   indicated you've read charged you in 10 separate counts.

22                Do you understand that?

23                THE DEFENDANT:  Yes.

24                THE COURT:  I am not going to go through it in detail.

25   I am not going to read it.  The first count charges you with

1125.0018

98B6DIP                          Plea

1   conspiracy to commit securities fraud, investment advisory

2   fraud, falsify books and records of a broker/dealer, falsify

3   books and records of an investment fund, mail fraud, wire

4   fraud, money laundering all in violation of Title 18, United

5   States Code, Section 371-72.

6          Count Two charges you with a substantive count of

7   securities fraud violation of 15, United States Code, Section

8   78j(b), 78ff.

9          The third count charges you with investment adviser

10  fraud, in violation of Title 15, United States Code, Section

11  80b-6 and 80b-17.

12         The fourth count charges you with falsifying

13  broker/dealer books and records in violation of Title 15,

14  United States Code, Sections 78q(a) and 78ff as well as the

15  regulation that is promulgated thereafter 17, C.F.R., Section

16  240.17(a)(3).

17         The fifth count charges you with falsifying investment

18  adviser books and records in violation of 15, United States

19  Code, Section 80(b)(4) and 80b-17 as well as a code section of

20  the C.F.R.

21         Count Six charges you with mail fraud in violation of

22  18, United States Code, Section 1341.

23         Count Seven charges you with wire fraud in violation

24  of Title 18, United States Code, 1343.

25         Count Eight charges you with money laundering in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                    Plea

1    violation of Title 18, United States Code, Section 1956(a)(2).

2              Count Nine charges you with perjury in violation of

3    Title 18, United States Code, Section 1621.

4              Count Ten charges you with income tax evasion in

5    violation of Title 26, United States Code, Section 7201.

6              So those are the 10 counts.

7              Do you understand that?

8              THE DEFENDANT:  Yes, I do.

9              THE COURT:  In addition the information contains two

10   forfeiture allegations.  The first calls for you to forfeit all

11   property and proceeds deprived from the crimes charged in

12   Counts One, Two, Six and Seven for a total amount of $170

13   billion.

14             Do you understand that?

15             THE DEFENDANT:  Yes I do.

16             THE COURT:  Billion with a "B."

17             And the second forfeiture allegation charges or

18   contains an allegation which would call for you to forfeit all

19   the property derived from the money laundering count, Count

20   Eight.  That is for a total amount of at least $250 million.

21             Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  I am going to ask the government now to

24   state the elements of the offense.  These are the things that

25   the government would have to prove and the jury would have to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                    Plea

1   find beyond a reasonable doubt for you to be convicted on those

2   counts of the information.  These are the things that I will

3   have to find have been demonstrated before I will accept the

4   guilty plea on those counts.  So I want you to listen very

5   carefully as Mr. Litt or Ms. Baroni describes these elements.

6   It may take a while frankly.  But it is essential that you

7   understand these elements.

8          I assume you have discussed the elements of these

9   offenses with your attorney Mr. Mukasey.

10          MR. MUKASEY:  In detail.

11          THE COURT:  So, mr. Litt, do you want to go through

12   the counts in the indictment and the elements?  In the

13   information.  I think I said indictment.  Information.

14          MR. LITT:  With respect to Count One conspiracy, in

15   order to prove the crime of conspiracy the government must

16   establish each of the following elements beyond a reasonable

17   doubt:

18          First, that the conspiracy charged in the

19   information existed.  In other words, that there was in fact an

20   agreement or understanding to violate the law of the United

21   States;

22          Second, that the defendant knowingly, willingly,

23   and voluntarily became a member of the conspiracy charged;

24          Third, that any one of the co-conspirators

25   knowingly committed at least one overt act in the Southern

1125.0021

98B6DIP                    Plea

1    District of New York in furtherance of the conspiracy during

2    the life of the conspiracy.

3         Count Two, securities fraud.  In order to prove the

4    crime of securities fraud, the government must prove each of

5    the following beyond a reasonable doubt:

6              First, that in connection with the purchase or

7    sale of a security the defendant did any one or more of the

8    following:

9              1:  Employed a device, scheme or artifice to

10   defraud or,

11             2:  Made an untrue statement of a material fact

12   or omitted to state a material fact which made what was said

13   under the circumstances misleading or,

14             3:  Engaged in an act, practice, or course of

15   business that operated or would operate as a fraud or deceit

16   upon a purchaser or seller.

17             Second, that the defendant acted knowingly,

18   willfully, and with the intent to defraud; and,

19             Third, that the defendant knowingly used or

20   caused to be used any means or instruments of transportation or

21   communication in interstate commerce or the use of the mails in

22   furtherance of the fraudulent conduct.

23        Count Three, investment adviser fraud.  In order to

24   prove the crime of investment adviser fraud, the government

25   must prove beyond a reasonable doubt the four following

1125.0022

98B6DIP                         Plea

1    elements:

2                First, that the defendant was an investment

3    adviser;

4                Second, that the defendant either (A) employed a

5    device, scheme, or artifice to defraud clients and prospective

6    clients, (B) engaged in a transaction, practice, or course of

7    business which operated as a fraud and deceit upon those

8    clients and perspective clients, or (C) engaged in an act,

9    practice, and course of business that was fraudulent, deceptive

10   and manipulative;

11               Third, that the defendant devised or participated

12   in such allege device, scheme, or artifice to defraud, or

13   engaged in such alleged transaction, practice, or course of

14   business knowingly, willfully, and with the intent to defraud;

15               Fourth, that the defendant employed such alleged

16   device, scheme, or artifice to defraud or engaged in such

17   alleged transaction, practice, or course of business by use of

18   the mails or other instrumentality of interstate commerce.

19          Count Four, falsifying broker/dealer books and

20   records.  In order to prove the crime of falsifying

21   broker/dealer books and records, the government must prove

22   beyond a reasonable doubt the following elements:

23               First, that at the time of the alleged offense,

24   Bernard L. Madoff Investment Securities was a registered

25   broker/dealer;

1125.0023

24

98B6DIP                          Plea

1           Second, that that company failed to make and keep
2   certain accurate records as required under the SEC's rules and
3   regulations;
4           Third, that the defendant aided and abetted the
5   failure of that company to make and keep accurate records; and
6           Fourth, that the defendant acted knowingly and
7   willfully.
8       Count Five, falsifying books and records of an
9   investment adviser.  In order to prove this crime, the
10  government must prove beyond a reasonable doubt each of the
11  following:
12          First, that at the time of the alleged offense,
13  the Madoff firm was an investment adviser;
14          Second, that the firm failed to make and keep
15  certain accurate records as required under the SEC's rules and
16  regulations;
17          Third, that the defendant aided and abetted the
18  failure of the firm to make and keep accurate records;
19          Fourth, that the defendant acted knowingly and
20  willfully;
21          Fifth, that the offense involved the use of the
22  mails and means of instrumentalities of interstate commerce.
23      In order to prove Count Six, mail fraud, the
24  government must establish beyond a reasonable doubt each of the
25  following:

1125.0024

98B6DIP                    Plea

1          First, that on or about the time alleged in the

2     information, there was a scheme or artifice to defraud in order

3     to obtain money or property by false and fraudulent pretenses,

4     representations, or promises;

5          Second, that the false or fraudulent statements

6     and representations concerned material facts;

7          Third, that the defendant knowingly and willfully

8     devised or participated in the scheme or artifice to defraud

9     with knowledge of its fraudulent nature and with specific

10    intent to defraud;

11         Fourth, that the United States mails or a

12    commercial carrier were used in furtherance of the scheme

13    specified in the information.

14         In order to prove the crime of wire fraud, Count

15    Seven, the government must establish beyond a reasonable doubt

16    the following four elements:

17         First, that at or about the time alleged in the

18    information, it was a scheme or artifice to defraud in order to

19    obtain money or property by false and fraudulent pretenses,

20    representations, or promises;

21         Second, that the false or fraudulent statements

22    and representations concerned material facts;

23         Third, that the defendant knowingly and willfully

24    devised or participated in the scheme or artifice to defraud

25    with knowledge of its fraudulent nature and with specific

1125.0025

98B6DIP                    Plea

1    intent to defraud; and

2            Fourth, that interstate or foreign wire

3    facilities were used in furtherance of the scheme to defraud

4    and specified in the information.

5            In order to prove the crime of unlawful transportation

6    of funds or monetary instruments with the intent to promote the

7    carrying on of a specified unlawful activity --

8            THE COURT:  This is what we are referring to as the

9    money laundering count?

10           MR. LITT:  Count Eight, money laundering count, the

11   government must establish the following elements:

12           First, that the defendant transported a monetary

13   instrument or funds from a place in the United States to or

14   through a place outside the United States, or to a place in the

15   United States from or through a place outside of the United

16   States;

17           Second, that the defendant did so with the intent

18   promote the carrying on specified unlawful activity.

19           In order to prove Count Nine, perjury, the government

20   must prove beyond a reasonable doubt each of the following

21   elements:

22           First, that the defendant took an oath to testify

23   truly before the Securities and Exchange Commission, a body

24   authored by law to administer oaths;

25           Second, that the defendant made false statements

98B6DIP                           Plea

1    as to matters about which the defendant testified under oath

2    and set forth in the information;

3                    Third, that the matters as to which it is charged

4    that the defendant made false statements were material to the

5    issues under inquiry by the Securities and Exchange Commission;

6    and

7                    Fourth, that such false statements were willfully

8    made.

9            To prove the offense of the attempting to evade or

10   defeat a tax or the payment thereof, which is Count Ten, the

11   government must prove the following elements:

12                   First, that the defendant attempted to evade or

13   defeat a tax;

14                   Second, that additional taxes were due and owing

15   by the defendant;

16                   Third, that the defendant acted knowingly and

17   willfully.

18           I should point out that there are aiding and abetting

19   charges as well with respect to the substantive counts set

20   forth in Counts Two through Eight.  So if the defendant caused

21   or aided and abetted another in committing any of those crimes,

22   he would be guilty as if a principal.

23           THE COURT:  I think I may have neglected to mention

24   the aiding and abetting counts.

25           You understand, Mr. DiPascali, in addition to the

1125.0027

98B6DIP                          Plea

1   substantive crimes charged after the conspiracy count, Counts

2   Two through 10, some of those, most of those also charge aiding

3   and abetting so that even if you didn't commit the crime, it is

4   alleged that you aided and abetted others to commit the crime

5   and so each of the elements would have to be met for aiding and

6   abetting; all right?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Do you understand those are the elements

9   of the offenses?

10         THE DEFENDANT:  I do.

11         THE COURT:  It took a long time but is that consistent

12   with what you discussed with your attorney?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Mr. Mukasey, do you agree those are the

15   elements to the offenses in the information?

16         MR. MUKASEY:  I do, Judge.

17         THE COURT:  I want to go over with you, Mr. DiPascali,

18   the maximum penalties you face for each of these offenses.

19   Count One, the conspiracy count, carries a maximum term of

20   imprisonment of five years, a maximum term of supervised

21   release of three years, a maximum fine of the greatest of

22   either $250,000, or twice the gross pecuniary or financial loss

23   to persons, other than yourself, resulting from the offense, or

24   twice the gross pecuniary gain derived from the offense,

25   whichever is greatest of those three alternatives is the

1125.0028

98B6DIP                         Plea

1    maximum fine.  In addition as part of your sentence, I can

2    order restitution be paid to any victims and I can also order

3    that you forfeit the proceeds or least -- Count One carries at

4    least part of the forfeiture allegation, right?

5           MR. LITT:  Yes.

6           THE COURT:  In addition, Count One carries a mandatory

7    special assessment of $100.  That is in addition to any fine or

8    forfeiture or restitution.

9           Count Two, which is the securities fraud count,

10   carries a maximum term of imprisonment of 20 years, a maximum

11   term of supervised release of three years, a maximum fine of

12   the greatest of $5 million, or twice the gross gain or twice

13   the gross loss as I previously described those things so

14   whichever is greatest of those three, as well as restitution

15   and forfeiture and $100 special assessment.  The 100-dollar

16   special assessment would be mandatory.

17          Count Three, which is the investment adviser fraud

18   count, carries a maximum term of imprisonment of five years, a

19   maximum term of supervised release of three years, a maximum

20   fine of the greatest of either $250,000, or twice the gross

21   pecuniary gain deprived from the offense or twice the gross

22   pecuniary loss to persons, other than yourself, as well as

23   restitution to any persons injured by this conduct, and a

24   mandatory special assessment of $100.

25          Count Four, which is falsifying books and records of a

1125.0029

98B6DIP                         Plea

1   broker/dealer carries a maximum term of imprisonment of 20

2   years, a maximum term of supervised release of three years, a

3   maximum fine again of the greatest $5 million, or twice the

4   gross gain or twice the gross loss to persons, other than

5   yourself, from the offense, as well as restitution, and again a

6   mandatory special assessment of $100.

7        Counts Five, which is falsifying books and records of

8   an investment adviser carries a maximum term of imprisonment of

9   five years, a maximum term of supervised release of three

10  years, a maximum fine of the greatest of $10,000, or twice the

11  gross gain derived from the offense, or twice gross pecuniary

12  loss to persons, other than yourself, resulting from offense,

13  as well as restitution and again a $100 special assessment.

14       Count Six is the mail fraud count.  It carries a

15  maximum term of imprisonment of 20 years, a maximum term of

16  supervised release of three years, a maximum fine of $250,000,

17  or twice the gross gain or twice the gross loss, as well as

18  restitution, and a mandatory special assessment of $100.

19       County Seven, wire fraud, carries similar penalties.

20  Again, a 20-year maximum term of imprisonment, a three-year

21  term of supervised release, a maximum fine of the greatest of

22  250,000, or twice the gross gain or twice the gross loss to

23  persons, other than yourself, as well as a potential for

24  restitution to any victims, and a $100 special assessment.

25       Count Eight, which is a money laundering count,

1125.0030

98B6DIP                         Plea

1   carries a maximum term of imprisonment of five years, a maximum

2   term of supervised release of three years, a maximum fine of

3   the greatest of $500,000, or twice the gross gain or twice the

4   gloss loss resulting from the offense, as well as restitution

5   to any victims, and a mandatory special assessment of $100.

6           Count Nine carries a maximum term of imprisonment of

7   five years, the perjury count, a maximum term of supervised

8   release of three years, a maximum fine of the greatest of

9   $250,000, or twice the gross gain or twice the gross loss, and

10  a mandatory special assessment of $100.

11          Count Ten, which is the tax evasion count, carries a

12  maximum term of imprisonment five years, a maximum term of

13  supervised of three years, a maximum fine of the greatest of

14  $250,000, or twice the gross gain or twice the gross loss,

15  whichever is the greatest, as well as restitution, and a

16  mandatory special assessment of $100.

17          Do you understand those are the maximum penalties?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Mr. Litt, something you wanted to add?

20  Did I misstate something?

21          MR. LITT:  Your Honor, with respect to Count Six,

22  Seven, and Eight, mail fraud, wire fraud, and money laundering,

23  forfeiture is also a possible penalty.

24          THE COURT:  Yes.  I was going to mention the

25  forfeiture.  I thought I did with respect to the individual

1125.0031

98B6DIP                          Plea

1     counts.  Understand for those counts for which the forfeiture

2     allegation as been set forth in the information, in addition to

3     any fine, in addition to any restitution, in addition to any

4     mandatory special assessment you could also be ordered to

5     forfeit any of the proceeds from the offense.

6              Do you understand that?

7              THE DEFENDANT:  I do.

8              THE COURT:  The maximum possible penalties combined

9     would be a maximum term of imprisonment of 125 years.

10             Do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  The maximum special assessment, when you

13    collectively add up would be $1,000, as well as the fines and

14    everything else I mentioned.

15             Do you understand that?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  Are you a United States citizen, Mr.

18    DiPascali?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Do you understand as a result of your

21    conviction, you could lose certain valuable civil rights,

22    including your right to hold public office, your right to serve

23    on a jury, your right to vote, and your right to possess any

24    kind of firearm; do you understand that?

25             THE DEFENDANT:  I do.

98B6DIP                          Plea

1          THE COURT:  Now, are you serving any other sentences

2     to day, state, federal or local at this time?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  Now, with respect to supervised release,

5     you should be aware that there are terms and conditions

6     associated with supervised release.  If you were to violate the

7     terms of your supervised release, you then could be returned to

8     prison for the full period of your supervised release and you

9     would not get any credit for the good time on which you are on

10    supervised release.

11         Do you understand that?

12         THE DEFENDANT:  I do.

13         THE COURT:  I will give an illustration because it is

14    not always clear.  If I sentenced you to a term of imprisonment

15    and then sentenced you to five years of supervised -- three

16    years of supervised release, we will say, three years.  What

17    that means is after you have finished your prison sentence, you

18    will be released and you would be supervised by the Probation

19    Department.  There will be conditions associated with your

20    supervision including, among other things, that you not commit

21    any further crimes, you not possess a firearm, you not use or

22    possess any kinds of drugs, among other things.

23         Well, if for 35 months you were perfect, you did

24    everything you were asked to do and then in the 36th month, the

25    last month of supervised release you committed another crime,

1125.0033

34

98B6DIP                          Plea

1    or you possessed a firearm illegally, well, then I could

2    violate your supervised release and I could return you to

3    prison for three full years, the full term of supervised

4    release even though for 35 out of 36 months you were perfect.

5           Do you understand that?

6           THE DEFENDANT:  I do.

7           THE COURT:  Do you understand that parole has been

8    abolished so you would not be released from prison any earlier

9    as a result of parole?

10          THE DEFENDANT:  I do.

11          THE COURT:  Parole doesn't exist in the federal

12   system.  It exists in certain state systems, including New York

13   State.  It used to exist in the federal system and what that

14   meant typically is a judge would impose a sentence usually of

15   an indeterminate nature, five to 10 years, and someone else, a

16   parole board typically, would determine when would be the

17   appropriate time for the defendant to be released depending on

18   whether or not they had been rehabilitated or are ready to

19   resume life in the community.  That is not a part of this

20   federal system.  So whatever sentence I impose is the sentence

21   you will serve.

22          Do you understand that?

23          THE DEFENDANT:  I do.

24          THE COURT:  The only exception to that is that you

25   could receive up to 15 percent off for good behavior.  That

98B6DIP                    Plea

1   would be a determination made by Bureau of Prisons and it would

2   be no more than 15 percent of the sentence imposed.

3        Do you understand that?

4        THE DEFENDANT: I do.

5        THE COURT: I want to go over a few other things with

6   sentencing. First of all, in terming what your sentence will

7   be, that is a decision for me to make.

8        Do you understand that?

9        THE DEFENDANT: I do.

10       THE COURT: For the Court and no one else.

11       So whatever your attorneys may have told you, whatever

12   the government may have told you, whatever any one else may

13   have told you, that is not binding on me.

14       Do you understand that?

15       THE DEFENDANT: I do.

16       THE COURT: I will determine what is the appropriate

17   sentence after reviewing the presentence report, after

18   reviewing submissions made by you if you wish, made by the

19   government, made by the victims of the offenses.

20       Do you understand that?

21       THE DEFENDANT: Yes, sir.

22       THE COURT: Only then will I decide what is the

23   appropriate sentence.

24       Now, I also want to go over with you the current state

25   of the law. Under the law I am required to consider certain

98B6DIP                         Plea

1   factors before imposing sentence.  I will tell you quite

2   candidly even if I weren't required to consider these things, I

3   would consider them.  These are the factors that I think any

4   civilized society would take into account in imposing a

5   sentence on another human being.

6          Those things include, among other things, your own

7   personal history and background.  It also includes obviously

8   the nature and circumstances of the offenses to which you have

9   offered to plea guilty.  It includes the need for me to impose

10  a sentence that reflects the seriousness of the offenses and

11  the need to promote respect for the law.

12         Another objective for sentencing is deterrence, that

13  is both general and specific deterrence.  I would be obliged to

14  fashion a sentence that prevents you from committing crimes of

15  this sort or any other sort in the future and that also would

16  have the effect of deterring others who might consider engaging

17  in this kind of criminal conduct to think twice, general

18  deterrence.

19         I would consider your own needs, your own

20  rehabilitative needs, your own medical needs, your own

21  educational needs, those things.  For you and for any defendant

22  who comes before me I would consider those things before

23  imposing a sentence.

24         I would also consider the needs of the victims of

25  these crimes to receive restitution.  That is obviously an

1125.0036

98B6DIP                        Plea

1    important factor that would have to be considered in imposing a

2    sentence.

3             I would also consider the United States Sentencing

4    Guidelines.  Are you familiar with the Sentencing Guidelines,

5    Mr. DiPascali?

6             THE DEFENDANT:  I am.

7             THE COURT:  You have discussed those with your

8    attorney?

9             THE DEFENDANT:  In detail.

10            THE COURT:  I am not going to go over them in great

11   detail.  The United States Sentencing Guidelines are a big

12   book.  A new edition comes out each year.  This year's version

13   is about 600 pages long.  I am not going to go into it in any

14   kind of detail.  What these guidelines attempt to do is provide

15   objectives and transparent criteria by which an individual and

16   the criminal conduct that an individual engaged in can be

17   evaluated.

18            These guidelines are advisory.  They are not binding

19   on me.  I am not required to follow them.  I am required to

20   consider them and I will consider them.  What they essentially

21   do is that for each crime or type of crime, they provide a

22   framework to assess the seriousness of that crime.  There are

23   two calculations that are done.  First, is a offense level

24   calculation.  For financial frauds, for example, the

25   calculation would focus on the amount of loss involved, the

1125.0037

98B6DIP                          Plea

1   number of victims, the nature of the offense.  And for each of

2   those factors, it would be numerical value ascribed.  And so in

3   calculating these things, the Court would basically do math and

4   come up with a number, which would be the offense level.

5        In addition there is a separate calculation for

6   criminal history category and so not surprisingly a person

7   engaged in other criminal conduct who has prior convictions and

8   prior sentences would be treated more seriously and would get

9   more criminal history points than someone who has no criminal

10  history.  On the basis of those two calculations, offense level

11  on the one hand and criminal history category on the other, the

12  guidelines comes up with a range in terms of months which in

13  the view of the Commission that prepares these guidelines would

14  be appropriate in the ordinary case.

15       So as I said I will consider those calculations, I

16  will make calculations, and I will certainly consider the range

17  that is provided for and proposed by these guidelines.  At the

18  end of the day, ultimately I don't have to follow them and I am

19  free to go higher or lower as I see fit.

20       Do you understand that?

21       THE DEFENDANT:  I do.

22       THE COURT:  Finally, I want to make sure that you

23  understand whatever sentence I impose no matter how unhappy you

24  may be with it, you will not be entitled to withdraw your

25  guilty plea at that point and go forward with the trial.

1125.0038

98B6DIP                         Plea

1          Do you understand that?

2          THE DEFENDANT:  I do.

3          THE COURT:  You will be entitled to your opinion that

4    I got it wrong or I was too harsh, but you would not be able to

5    say I would like to turn the clock back to August 11th and go

6    to trial now because that option will have gone.

7          Do you understand that?

8          THE DEFENDANT:  I do.

9          THE COURT:  I understand there is a plea agreement in

10   this case, is that correct?

11         MR. MUKASEY:  That's correct.

12         MR. LITT:  Yes.

13         THE COURT:  Is the original with you, Mr. Mukasey?

14         MR. MUKASEY:  It is, your Honor.

15         THE COURT:  You can keep that there for the moment.  I

16   received a draft.  I have not received an executed or signed

17   copy.  Let me make sure it is the same as what you have.  Bear

18   with me for a second.

19         (Pause)

20         It is an August 11th letter.  It is a seven-paged,

21   single-spaced letter.  It is from the government, Ms. Baroni

22   and Mr. Litt, to Mr. Mukasey, your attorney.

23         Do you have a copy of this in front you, or the

24   original in front of you?

25         THE DEFENDANT:  I have the original.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                        Plea

1       THE COURT:  Is your signature on the last page?

2       THE DEFENDANT:  It is.

3       THE COURT:  When did you sign it?

4       THE DEFENDANT:  35 minutes ago.

5       THE COURT:  Before you signed it, did you have an

6   opportunity to read this agreement?

7       THE DEFENDANT:  In detail.

8       THE COURT:  Did you have an opportunity discuss it

9   with Mr. Mukasey in detail?

10      THE DEFENDANT:  We have.

11      THE COURT:  Do you require any additional time to

12  review this agreement?

13      THE DEFENDANT:  No, sir.

14      THE COURT:  Mr. Mukasey, is that your signature on the

15  last page as well?

16      MR. MUKASEY:  It is, Judge.

17      THE COURT:  Before you signed it, did you review this

18  agreement in detail with your client?

19      MR. MUKASEY:  Yes, we did.

20      THE COURT:  Now, Mr. DiPascali, I am not going to go

21  over this in tremendous detail because as I said it is a

22  seven-paged, single-spaced letter.  I want to make sure you

23  understand the nature of this agreement.  This agreement is

24  what is known as cooperation agreement.

25      Is that your understanding?

1125.0040

98B6DIP                          Plea

1              THE DEFENDANT:  Yes, it is.

2              THE COURT:  By this agreement you have agreed to

3    cooperate with the government and to take on certain

4    obligations that are set forth in this agreement.

5              Is that correct?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  The government has agreed if you provide

8    substantial assistance, well, they will make a motion to the

9    Court to apprise me of that assistance, which would then allow

10   me for sentence you below the Sentencing Guidelines.  So that

11   is essence what the agreement is.

12             Is that your understanding?

13             THE DEFENDANT:  Exactly, sir.

14             THE COURT:  Is there any other agreement that you have

15   besides this one, besides this August 11th agreement?

16             THE DEFENDANT:  No, sir.

17             THE COURT:  Is there any other oral agreement or any

18   side agreement that exists beyond the confines of these seven

19   pages?

20             THE DEFENDANT:  No, sir.

21             THE COURT:  Has anybody attempted to threaten you or

22   induce you or otherwise persuade you to plead guilty to the

23   charges contained in the information or to accept and sign this

24   plea agreement?

25             THE DEFENDANT:  No, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                    Plea

1          THE COURT:  You signed it of your own free will and
2    voluntarily?
3          THE DEFENDANT:  I have.
4          THE COURT:  Now, I want to make sure you understand if
5    the government decides that you provided substantial
6    assistance -- as I say they can make this motion -- I am not
7    required to follow it and I will still ultimately decide what
8    is the proper sentence.
9          Do you understand that?
10          THE DEFENDANT:  I do.
11          THE COURT:  Now, if the government decides that you
12    did not provide substantial assistance, then that may limit my
13    ability to sentence you below the guidelines.  As I said the
14    guidelines are just advisory so it ultimately wouldn't bar me
15    from doing so.  There was a time when it would have, but it
16    wouldn't today.  Certainly the government has the exclusive
17    right to decide whether or not you provided substantial
18    assistance under this agreement.
19          Do you understand that?
20          THE DEFENDANT:  I do.
21          THE COURT:  Mr. Mukasey, are you aware of any of valid
22    defense that would apply as a matter of law or any other reason
23    why your client should not be allowed to enter a plea at this
24    time?
25          MR. MUKASEY:  No, Judge.

1125.0042

98B6DIP                          Plea

1          THE COURT:  Now, at this point I am going to ask you

2    to stand, Mr. DiPascali.  I want you to tell me in your own

3    words what it is that you did that makes you guilty of the

4    offense -- excuse me -- the offenses charged in the

5    information.  So since there are 10 counts, this may take a

6    while.  I am not sure if you discussed with your lawyer how is

7    the best way to do this, either count by count or groups of

8    counts.

9          Mr. Mukasey, do you have a view?

10          MR. MUKASEY:  Judge, we have we have worked together

11   to prepare a statement that I think covers all the counts.  I

12   think we can have Mr. DiPascali read it if that is okay with

13   the Court.  I think that he will hit all the elements of all

14   the counts.  If you would like he can advise the Court of the

15   counts that he is about to discuss if that is helps focus the

16   Court.

17          THE COURT:  Whatever you think is most appropriate.

18   There is nothing wrong with reading a statement, Mr. DiPascali,

19   as long as they are really your words.  It is not usual a

20   defendant in your position would work with their attorney to

21   prepare a statement that would be their allocution to crimes

22   charged in the information.  But it is important that they be

23   your words and that is something you are just reciting or

24   reading.

25          I may ask you some questions or interrupt along the

1125.0043

98B6DIP                     Plea

1    way.  If you have a statement, why don't we start with that and

2    we will see if it is necessary to follow up in certain areas.

3              MR. MUKASEY:  May I have one moment?

4              THE COURT:  Yes.

5              While you are conferring if you could hand to

6    Ms. Levine the plea agreement, I will mark that as a court

7    exhibit.  I will mark that as Court Exhibit 2.  I will initial

8    and date it as well.

9              (Pause)

10              THE COURT:  Mr. DiPascali, are you ready?

11              THE DEFENDANT:  Yes, I am.

12              THE COURT:  Let me ask you to read slowly so the court

13    reporter can get it down.  We have very good court reporters,

14    probably the best in the world, but there are limits to what 10

15    fingers can do.  I frequently speak too quickly and they are

16    too polite to remind me, but I will remind you.

17              THE DEFENDANT:  Thank you, your Honor.

18              I am standing here today to say that from the early

19    1990s until December of 2008 I helped Bernie Madoff, and other

20    people, carry out the fraud that hurt thousands of people.  I

21    am guilty and I want to explain a little bit about what I did

22    and how I want everybody everyone to know that I take

23    responsibility for my conduct.

24              Judge, I started working for Bernard Madoff Investment

25    Securities in 1975 right after a graduated from high school.  I

1125.0044

98B6DIP                              Plea

1    was a kid from Queens.  I didn't have a college degree.  I

2    didn't know anything about Wall Street.  I ended up spending

3    the next 30 years working for Bernie Madoff and his firm until

4    December 11th, 2008.

5            Over the first 15 or so years at the Madoff firm, I

6    had a bunch of different jobs.  I worked a research analyst,

7    and options trader, and a guy who basically did whatever I was

8    told to do around the office.

9            In 1987 I helped move our firm from the office at 110

10   Wall Street to our new office at 885 Third Avenue.  Eventually

11   Bernie Madoff's investment advisory business, which managed

12   client accounts, took space on the 17th floor of 885 Third

13   Avenue and I became sort of a supervisor of that floor.

14           During that first 15 or so years, I watched Bernie

15   Madoff and other people at the firm.  I learned how the

16   securities industry worked, or at least how it worked in the

17   Madoff universe.  I thought I worked for a prestigious and

18   successful securities firm.

19           By 1990 or so Bernie Madoff was a mentor to me and a

20   lot more.  I was loyal to him.  I ended up being loyal to a

21   terrible, terrible fault.  By the early 1990s Bernie Madoff had

22   stable clients whose accounts he managed as an investment

23   adviser.  He attracted a lot of these clients by telling them

24   that the firm would apply a hedged investment strategy to their

25   money.  The clients were told that the strategy involved

1125.0045

98B6DIP                    Plea

1   purchasing what we call basket of blue chip common stocks.

2   Hedging those investments by buying and selling option

3   contracts, getting in and out of the market at opportune times

4   and investing in government securities at other times.

5       By 2008 Bernie Madoff had thousands of clients who

6   believed their funds were being invested this way.  For years I

7   was a main point of contact for many of those clients when they

8   had questions about their account.

9       From at least the early 1990s through December of

10  2008, there was one simple fact that Bernie Madoff knew, that I

11  knew, and that other people knew but that we never told the

12  clients nor did we tell the regulators like the SEC.  No

13  purchases of sales of securities were actually taking place in

14  their accounts.  It was all fake.  It was all fictitious.  It

15  was wrong and I knew it was wrong at the time, sir.

16      THE COURT:  When did you realize that?

17      THE DEFENDANT:  In the late '80s or early '90s.

18      I would like to address some of the counts in the

19  information.  Regarding Count One, conspiracy; Count Two,

20  securities fraud; and Count Three, investment adviser fraud.

21      From our office in Manhattan at Bernie Madoff's

22  direction, and together with others, I represented to hundreds,

23  if not thousands, of clients that security trades were being

24  placed in their accounts when in fact no trades were taking

25  place at all.

1125.0046

98B6DIP                    Plea

1        THE COURT:  How did you do that?  Through documents or

2    through oral communications?

3        THE DEFENDANT:  Both.

4        THE COURT:  Both.

5        THE DEFENDANT:  Most of the time the clients' money

6    just simply went into a bank account in New York that Bernie

7    Madoff controlled.  Between the early '90s and December '08 at

8    Bernie Madoff's direction, and together with others, I did

9    follow things:  On a regular basis I told clients over the

10   phones and using wires that transactions on national securities

11   exchanges were taking place in their account when I knew that

12   no such transactions were indeed taking place.  I also took

13   steps to conceal from clients, from the SEC, and from auditors

14   the fact that no actual security trades were taking place and

15   to perpetuate the illusion that they actually were.

16        On a regular basis I used hindsight to file historical

17   prices on stocks then I used those prices to post purchase of

18   sales to customer accounts as if they had been executed in

19   realtime.  On a regular basis I added fictitious trade data to

20   account statements of certain clients to reflect the specific

21   rate of earn return that Bernie Madoff had directed for that

22   client.

23        Regarding Count Six, mail fraud, on a regular basis I

24   caused the U.S. mail to be used to send fraudulent account

25   statements to clients from our office in Manhattan.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                    Plea

1   account statements listed security transactions that had

2   supposedly taken place in the client accounts, although I knew

3   that no such transactions had indeed taken place.  For example,

4   in December of 2008, I caused fake accounts statements to be

5   mailed from the Madoff firm to a client in Manhattan.

6          Regarding the wire fraud, or Count Seven, on a regular

7   basis I caused money to be wired from bank accounts in that New

8   York to bank accounts in London, and other places abroad.  For

9   example, in March of '07 I caused about $14 million to be sent

10  by wire from a bank account in London to a bank account in New

11  York in furtherance of this fraudulent scheme.

12          THE COURT:  How did it further this scheme?

13          THE DEFENDANT:  Bernie Madoff was trying to present

14  the scenario, Judge, to regulators and others that he was

15  earning commission income on these fictitious trades in order

16  to substantiate the ruse.  He had me wire funds -- excuse me.

17  He had our London office wire funds to New York that

18  represented the theoretical amount of those commissioned

19  incomes, had the regulators come in and added up all the

20  tickets, if you will, to see our customer commissions.  And in

21  the example I cited in that particular instance, we would have

22  had we actually done those trades earned $14 million in

23  commission income.  So he had the London office wire to the New

24  York office a figure of about $14 million.

25          THE COURT:  What was your role in connection with

98B6DIP                    Plea

1    those wire transfers?

2          THE DEFENDANT:   I calculated the theoretical

3    commissions and advised the London office where to send the

4    money.

5          On Count Eight, sir, international money laundering,

6    between 2002 and 2008, I caused money to be wired from a Madoff

7    firm bank account in New York to a Madoff account in London,

8    which again was used to continue this fraud.   I participated in

9    falsifying documents that were required to be made and kept

10   accurately under the SEC rules and regulations, including

11   ledgers, trade blotters, customer statements, and trade

12   confirmations.

13         On Count Four and five, falsifying broker/dealer books

14   and records and falsifying investment adviser books and

15   records, between 2004 and 2008 the firm was a registered

16   broker/dealer.   Between September '06 and December '08 when the

17   firm was also a registered as an investment adviser, it was

18   required to make accurate books and records under the SEC

19   rules.   In January of '06, together with others, I used data

20   from the Internet to create fake trade blotters that were made

21   and kept and produced for the SEC.

22         In April of '08, together with others, I caused fake

23   trade blotters, ledgers, and other books and records to be made

24   and kept by the firm.

25         In order to discuss Count Nine, which is perjury, on

1125.0049

98B6DIP                        Plea

1  January 26, 2006, at Bernie Madoff's direction I lied to the

2  SEC during testimony I gave under oath in Manhattan about the

3  activities of the Madoff firm.  My false testimony is set out

4  in Paragraph 61 of the information.

5          I did all of these fraudulent activities, your Honor,

6  in Manhattan.

7          THE COURT:  Let me ask you about the perjury count.

8  There is a number of specifications of false statements, eight,

9  in particular with an underlying portions which I gather are

10  the false or allegedly false statements.  Is your statement

11  here today that the underlying portions set forth in pages 41

12  through 43 were in fact false statements?

13          THE DEFENDANT:  Yes, your Honor.

14          THE COURT:  At the time you uttered these

15  statements -- this is a transcript of your testimony, is that

16  correct?

17          THE DEFENDANT:  It is indeed a transcript describing

18  the Madoff trading operation, which I knew at time when I was

19  describing it was entirely fraudulent.

20          THE COURT:  So you anticipated my next question.  You

21  knew at the time you made these statements that portions of the

22  statements, in particular the underlying portions, were false?

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  You did this to mislead the SEC?

25          THE DEFENDANT:  Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                          Plea

1              THE COURT:  For what purpose?

2              THE DEFENDANT:  To throw them off their tracks, sir.

3              THE COURT:  Did you have a sense they were on the

4    track?

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  At that point?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  These statements were made all on one

9    occasion, January 26, 2006?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  And where was that?

12             THE DEFENDANT:  Down at the SEC offices in the World

13   Trade Center.

14             THE COURT:  World Financial Center?

15             THE DEFENDANT:  Correct.

16             THE COURT:  I interrupted you.  I think you were

17   proceeding on to another count.

18             THE DEFENDANT:  Judge, thousands of clients,

19   institutions, individuals, funds, charities were all misled

20   about the status of their accounts, what was being done with

21   their money, and what their accounts were worth.

22             In order to discuss Count Ten, which is tax evasion,

23   let me say that in the years 2002, 5, 6 and 7, I evaded federal

24   taxes that I owed by putting some of my income in the name of a

25   corporation I controlled and that I didn't fully and truthfully

1125.0051

98B6DIP                    Plea

1    report my income on my federal income tax returns.

2         Your Honor, while this was going on, I knew no trades

3    were happening.  I knew I was participating in a fraudulent

4    scheme.  I knew what was happening was criminal and I did it

5    anyway.

6         I thought for a long time that Bernie Madoff had other

7    assets that he could liquidate if the clients requested the

8    return of their money.  That is not an excuse.  There is no

9    excuse.  I knew everything that I did was wrong and it was

10   criminal and I did it knowingly and willfully.  I regret

11   everything that I did.  I accept complete responsibility for my

12   conduct.  I don't know how I went from an 18-year-old kid

13   happening to have a job to before someone standing before the

14   Court today.  I can only say I never wanted to hurt anyone.  I

15   apologize to every victim of this catastrophe and to my family

16   and to the government.  I am very, very sorry.

17        THE COURT:  Thank you, Mr. DiPascali.

18        Let me ask you a couple questions about the tax fraud

19   count.

20        This is the years between 2002 and 2007.  It sound

21   like it is 2002, 2005, 2006, and 2007; is that correct?

22        THE DEFENDANT:  Yes, sir.

23        THE COURT:  And when you made the false statements to

24   the IRS, where were you when you did that?  This was in your

25   tax returns you made these false statements?

1      THE DEFENDANT:  In those years, sir, I did not file

2   tax returns.

3      THE COURT:  But at the time you either filed false tax

4   returns or didn't file tax returns, you understood that you

5   were liable for additional taxes, that you had hidden income so

6   to speak through this company that you controlled?

7      THE DEFENDANT:  Yes, sir.

8      THE COURT:  Did any of the fraud associated with the

9   tax evasion take place in New York?

10      MR. MUKASEY:  May I have one moment, your Honor?

11      THE COURT:  Certainly.

12      (Pause)

13      MR. MUKASEY:  Your Honor, with respect to the venue on

14   Count Ten, I think it is fair to say that the evidence would

15   show that the income that was evaded was earned in New York and

16   the money was transferred into this corporation from an account

17   in New York.  To the extent that that establishes venue, we

18   offer that for venue.  If not, Judge, we are willing to waive

19   venue as to Count Ten.

20      He is a resident of New Jersey.  A lot of his personal

21   accounting actions take place in New Jersey.  So it is a

22   movement of the money into this account that he controlled in

23   the Southern District of New York.  If it is not enough to

24   establish venue, we will waive venue on Count Ten.

25      THE COURT:  Mr. DiPascali, do you understand what

98B6DIP                              Plea

1    Mr. Mukasey just said?

2            THE DEFENDANT:  I do, sir.

3            THE COURT:  We didn't talk really about venue when we

4    were going through the elements of the offense.  These are the

5    10 elements that Mr. Litt described and these were things that

6    would have to be demonstrated and proven beyond a reasonable

7    doubt if you went to trial.

8            Each of the counts of the information also have a

9    requirement that venue be established.  The standard of proof

10   for venue is lesser.  It is by a preponderance.  It means a

11   little more than halfway basically.  So what Mr. Mukasey has

12   said is he thinks there is such basis for venue to be

13   established on the tax evasion case; but if there weren't that

14   you would you be prepared to waive venue, which you can do.

15           Is that your understanding?  Is that what you wish to

16   do?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  Give me a minute.  There are 10 counts

19   here so I want to take a quick look to make sure we covered the

20   elements.

21           While I am doing that, Mr. Litt, to your mind is that

22   a sufficient allocution with respect to each of the 10 Counts

23   of the information?

24           MR. LITT:  Yes, your Honor.

25           THE COURT:  Mr. Mukasey, do you agree?

1125.0054

98B6DIP                           Plea

1           MR. MUKASEY:  I do, your Honor.

2           Mr. DiPascali, has one or two more sentences.

3           THE COURT:  I am sorry.  I didn't mean to cut you off,

4      Mr. DiPascali.

5           THE DEFENDANT:  I wanted to make it very, very clear I

6      know my apology means almost nothing but I hope my actions

7      going forward with the government will mean something and I

8      promise to dedicate all my energy to try to explain to others

9      how this happened.  I hope my help will bring some small

10     measure of comfort to those who have been harmed.

11          THE COURT:  Thank you.

12          THE DEFENDANT:  Thank you.

13          (Pause)

14          THE COURT:  Mr. Litt, let me ask you to summarize the

15     government's evidence if it were to go to trial.

16          Mr. DiPascali, let me ask you to listen carefully to

17     Mr. Litt as he summarizes the evidence and also as he

18     summarizes your role in these offenses.  Because after he is

19     done, I am going to ask you if you take issue with or dispute

20     anything he just said.  So I want you to pay close attention.

21          MR. LITT:  Yes, your Honor.  If this case were to have

22     proceeded to trial, the government would have proven through

23     testimony and evidence beyond a reasonable doubt the facts set

24     forth in the information.  In summary, the government would

25     have proven that beginning at least as early as the 1980s, a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                    Plea

1    conspiracy existed between Mr. DiPascali, Mr. Madoff, and

2    others, to commit securities fraud, investment adviser fraud,

3    falsifying books and records of a broker/dealer and of an

4    investment adviser, mail fraud, wire fraud, and money

5    laundering.

6           Mr. Madoff's firm, Bernard L. Madoff Investment

7    Securities, LLC., was a registered broker/dealer throughout the

8    period and was a registered investment adviser between about

9    September 2006 and December 11th of 2008.

10          Mr. DiPascali worked at the firm in New York, New

11   York, where the firm was located beginning in 1975. By the

12   early 1990s, Mr. DiPascali was responsible under the direction

13   of Mr. Madoff for a major part of the firm's investment

14   advisory business.  That part of the business purported to

15   invest client funds in the basket of stocks from the S & P 100

16   hedged by options transactions.  In fact, the evidence would

17   demonstrate that Mr. DiPascali, Mr. Madoff, and others knew

18   that no stocks or options were being purchased as had been

19   promised to investors.

20          Mr. Madoff, Mr. DiPascali, and other co-conspirators

21   made it appear as though clients' investments with the firm

22   were profitable by sending those clients literally millions of

23   pages of false account statements and trade confirmations

24   through the U.S. mails.  Those account statements and trade

25   confirmations reported or purported to report transactions that

1125.0056

98B6DIP                    Plea

1    had been made up using historical price data and with the

2    benefit of hindsight.  None of the reported transactions were

3    real.

4           In later years when revenues from other parties of

5    Mr. Madoff's business declined, Mr. Madoff and Mr. DiPascali

6    wired hundreds of millions of dollars of invested funds to a

7    bank account in London and sent some of that money back to New

8    York, New York to an operating account that funded other

9    parties of Mr. Madoff's business.  Among the uses of interstate

10   wires -- I should say Mr. DiPascali used interstate wires in

11   connection with the fraud both in speaking with investors

12   located outside New York as well as to transfer money to and

13   from bank accounts in New York, New York.

14          The government also would have proven that to conceal

15   the fraud and to deceive the SEC under the direction of

16   Mr. Madoff, Mr. DiPascali and other co-conspirators created

17   false books and records, records that were required to be kept

18   and maintained by the firm and were required by SEC regulation

19   to contain true data.

20          THE COURT:  Can I ask -- perhaps I should have asked

21   Mr. DiPascali this -- is Mr. DiPascali an advisement adviser or

22   broker/dealer licensed to do these things, or the firm does and

23   he worked with the firm?

24          MR. LITT:  He is not.  He worked for the firm.  And

25   the aiding and abetting charges in the information cover that.

1125.0057

98B6DIP                    Plea

1            THE COURT:  Thank you.

2            MR. LITT:  As I was saying for the books and records,

3    SEC rules and regulations require the firm to keep various

4    books and records both in its capacity as a broker/dealer and

5    as an investment adviser and Mr. Madoff, Mr. DiPascali, and

6    others caused false and fraudulent records to be created, some

7    of which were presented to the SEC as well.  They did that to

8    conceal the fraud and conceal some of the activities that the

9    firm was engaged in.

10           At Mr. Madoff's direction Mr. DiPascali also committed

11   perjury in sworn testimony from the SEC in New York.  There are

12   several instances of that set forth under the indictment.

13           THE COURT:  Information.

14           MR. LITT:  Sorry.

15           THE COURT:  I did it before, too.

16           MR. LITT:  In sum that false testimony disguised the

17   nature and scale of the investment advisory business that the

18   firm was engaged in.

19           Finally, the defendant attempted to evade federal

20   income taxes by taking income through a nominee LLC, limited

21   liability corporation, in which he controlled in failing to

22   declare and pay taxes on that income.

23           THE COURT:  Do you have a view with respect to venue

24   on that count, Count Ten?

25           MR. LITT:  I think the transfer of the money from New

1125.0058

98B6DIP                          Plea

1   York, New York probably is sufficient; but I think out of an

2   abundance of caution I think a waiver of venue is appropriate

3   and covers venue.

4           THE COURT:  Is a waiver of venue contained in the

5   agreement between the parties on Count Ten?

6           MR. LITT:  It is not.

7           THE COURT:  So that would be something that Mr.

8   DiPascali has agreed to waive venue on Count Ten but it is not

9   contained in the agreement?

10          MR. LITT:  Yes.

11          THE COURT:  Mr. DiPascali, did you hear what Mr. Litt

12  just said.

13          THE DEFENDANT:  I have.

14          THE COURT:  Do you disagree or take issue with any of

15  his characterization of the facts or the evidence in this case?

16          THE DEFENDANT:  No, sir, I don't.

17          THE COURT:  Have a seat.

18          At this time I had put out a couple sign-in sheets

19  before to provide for victims if they wish to be heard on the

20  issue of whether or not the plea should be accepted and the

21  plea agreement should be accepted, and if they wish to speak

22  later on the issue of bail and remand.  I had one victim sign

23  the sheet to be heard as to whether or not the plea and plea

24  agreement should be accepted.  That is Miriam seed man.

25          Is Ms. Seed man here?

98B6DIP                        Plea

1          Ms. Seed man, would you still like to be heard on this

2     issue.

3          MS. SIEGMAN:  I would.

4          THE COURT:  Come up and use the lecturn if you don't

5     mind.  While I am here, if there is any other victim who wishes

6     to be heard on this issue, and this issue only, who did not get

7     a chance to sign, perhaps you can raise your hand now and I can

8     send the sheet your way.

9          Is there anyone?

10         Let the record reflect that there is no other person

11    here in the courtroom has signified that they wish to speak as

12    a victim with respect to the issue of whether or not the Court

13    should accept the plea and the plea agreement.

14         Ms. Siegman, identify yourself for the record, speak

15    slowly, spell your name too, and then I am happy to hear you.

16         MS. SIEGMAN:  Thank you, Judge Sullivan.

17         Can you hear me?

18         THE COURT:  I can.

19         MS. SIEGMAN:  My name is Miriam Siegman.  M-i-r-i-a-m,

20    last name, S-i-e-g-m-a-n.

21         THE COURT:  I probably mispronounced your name.  I

22    apologize.

23         MS. SIEGMAN:  That's fine.

24         I am a 65-year-old Madoff victim now penniless and

25    facing homelessness.  I stand before you, Judge Sullivan, to

98B6DIP                    Plea

1    ask that you consider rejecting this deal.

2         Criminal defendants in the Madoff case central to this

3    murderous fraud want to cut deals by swapping information,

4    naming names in exchange for lighter sentences.  That, of

5    course, is their right.  To some victims, not all, but to some

6    this behind-closed-doors bargaining seems to depend heavily on

7    the quality and connectedness of the defendants' lawyers and a

8    quest for expediency.

9         I ask, and others as well:  Should these factors trump

10   the victims and the public's need for the truth, the full truth

11   that could come of a trial or the chance for victims to hear in

12   open court evidence, witnesses' questioned, and cross-examined,

13   or the chance to have brought before the mighty power of the

14   Bench even the most exalted, the most highly placed, including

15   government officials, and elected officials?

16        Has it been decided somewhere that a trial is too

17   great a luxury, too much of an expense for the public quest for

18   truth, too time consuming and bothersome or politically

19   unpleasant?

20        Why, Judge Sullivan, am I asking you to consider my

21   request to reject a deal?  The crimes allegedly committed by

22   Mr. DiPascali and already admitted to by Mr. Madoff, Mr.

23   DiPascali's boss of 30 years, are enormous in scope.  These

24   crimes have affected thousands of men, women, and children,

25   whole generations of families have been decimated, children,

1125.0061

98B6DIP                         Plea

1    parents, dependents who are ill.  None of these victims knows

2    how or why this has happened to them.  The defendants won't say

3    a word until today, even then very little, and the prosecutors

4    have said very little to victims.

5           The alleged crimes were vast and systematic, executed

6    with great attention to detail.  The result total:  Total

7    destruction of normal daily life now and likely forever for

8    thousands of us, certainly for me.  Dazed, we are told that we

9    have no need to know how the crimes against us were carried

10   out.  Today, a few tasty tidbits were thrown out into the court

11   and I could see every snap to attention with a genuine interest

12   in hearing those details and the need to know them.

13          Then there is the astonishing duration of the crime.

14   Mr. DiPascali was an employee of Madoff for 30 -- well over 30

15   years or around 30 years.  The criminal enterprise went and on.

16   He, of course, had ample opportunity to do the right thing.

17   Victims have no idea how this could have been possible, this

18   long duration.  Though, there are hints of horrendous

19   dereliction of duty within and outside of government and in the

20   street.  One sentence about lying to the SEC doesn't tell the

21   story.

22          There is also the corrupting ripple effect of Mr.

23   DiPascali's alleged activities, activities which in the view of

24   many victims encouraged and enabled criminal activity on the

25   part of others, but we have learned nothing about how or why

1125.0062

98B6DIP                    Plea

1   and likely we will learn nothing about how or why.

2          And Finally, and perhaps the most troubling of all for

3   me, the possible purchase of influence with the goal of

4   protecting Madoff from investigation and legislation.  Victims,

5   and as importantly the American public, the little guy with a

6   401K or pension desperately need light to shine on this

7   process.  Victims want more than confirmation.  They need

8   information and knowledge.  We want the kind of justice that

9   allows the truth to be spoken out loud in a courtroom and we

10  want to know that prosecutors will not conveniently pass over

11  the too highly placed.

12         The crimes committed against me and others are

13  life-shattering and they are forever.  I want no others to

14  suffer in this way.  Judge Sullivan, you have the power to show

15  the American people that justice works for victims and society

16  as a whole as well as for defendants.  Take the process out

17  from behind closed doors and reject this plea deal.

18         In closing, if in the end you cannot, will you or

19  someone help me and others victims understand why and how a

20  plea deal will help them and the American public and allow men

21  and women who run our public institutions to learn from this

22  tragedy.

23         Thank you.

24         THE COURT:  Thank you, Mr. Siegman.  I appreciate the

25  time and attention you obviously put into preparing those

1125.0063

98B6DIP                          Plea

1    remarks.

2              Is there any other victim that wishes to be heard?

3              Let me ask Mr. Litt or Mr. Mukasey if they wish to

4    respond to anything that Ms. Siegman just said?

5              MR. LITT:  Not at this time, your Honor, no.

6              THE COURT:  Mr. Mukasey.

7              MR. MUKASEY:  Simply that I think the allocution was

8    sufficient for acceptance by the Court, Judge.

9              THE COURT:  Ms. Siegman, I am certainly sensitive to

10   the points you've made, but I think there is a difference

11   between a criminal trial and a truth commission, which each may

12   have their benefits to be sure.  But I think a criminal trail

13   is less ambitious than a truth commission.

14             Mr. Mukasey I think is correct in saying that the

15   allocution that Mr. DiPascali gave is sufficient under the law

16   and so the issue for me is there something manifestly unjust

17   about the plea agreement or the plea that has been offered

18   here.  I don't believe that the request for the truth ends

19   today.  Certainly sentencing will not take place for several

20   months.  But before imposing sentence, I would expect to have

21   more information than what I've heard today and what you've

22   heard today.  So I expect there will be more information and

23   the Court will sentence on the basis of additional information.

24   I assume that to be the case.

25             So in light of those remarks I will, I believe, accept

1125.0064

98B6DIP                    Plea

1    the plea.  I have a few other things I would like to take up

2    with Mr. DiPascali.  I am certainly sensitive to your concerns,

3    which I think are probably the concerns of many other people as

4    well.  Thank you for your time.

5           Let's me ask you now to rise again, Mr. DiPascali.

6           How do you now plead to Counts One through Ten of the

7    information, guilty or not guilty?

8           THE DEFENDANT:  Guilty, your Honor.

9           THE COURT:  Did you do the things you are charged with

10   doing in the information?

11          THE DEFENDANT:  Indeed I did.

12          THE COURT:  Are you pleading guilty because you are

13   guilty?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Are you pleading guilty voluntarily and of

16   your own free will?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Mr. DiPascali, because you acknowledge

19   that you are guilty as charged in Counts One through Ten of the

20   information, because you know your rights and are waiving those

21   rights, because your plea is entered knowingly and voluntarily

22   and is supported by an independent basis in fact for each of

23   the elements of the offenses charged in the information, I

24   accept your guilty plea and I adjudge you guilty on Counts One

25   through Ten of the information.

1125.0065

98B6DIP                        Plea

1              You may have a seat.

2              Mr. Litt.

3              MR. LITT:  I would ask if the Court could inquire

4     about whether the defendant Mr. DiPascali admits to the

5     forfeiture allegations.

6              THE COURT:  Fair enough.

7              Mr. DiPascali, let me also ask you about the

8     forfeiture allegations.  There are two forfeiture allegations

9     in the information.

10             You indicated you have read them both, is that

11    correct?

12             THE DEFENDANT:  That's correct.

13             THE COURT:  Do you admit the facts that are contained

14    in each of the allegations?

15             THE DEFENDANT:  Yes, I do.

16             THE COURT:  Is that sufficient, Mr. Litt?

17             MR. LITT:  Yes, it is.

18             THE COURT:  Thank you.

19             Let's talk about sentencing now.  The parties

20    requested the sentencing be put over for a number of months in

21    light of Mr. DiPascali's cooperation and had requested that I

22    set a control date in May of 2010.

23             Is that still the position of the parties?

24             MR. LITT:  It is of the government, your Honor.

25             THE COURT:  Mr. Mukasey.

1125.0066

98B6DIP                        Plea

1          MR. MUKASEY:  It is the position of the defense,

2    Judge.

3          THE COURT:  Tell me what exactly it is that you have

4    in mind?  So by that date I would get another submission or

5    letter from the parties, or by that date we would have

6    presumably a sentencing unless I adjourned it?

7          MR. LITT:  Well, I think you would get a letter from

8    the parties, your Honor.

9          THE COURT:  On that date or a date before that date?

10         MR. LITT:  On that date.

11         THE COURT:  On that date.  You expect that the

12   cooperation will be going for at least that long?

13         MR. LITT:  Yes, your Honor.

14         THE COURT:  Or approximately that long?

15         MR. LITT:  I would say at least.

16         THE COURT:  Mr. Mukasey, that is your position as

17   well?

18         MR. MUKASEY:  Yes, Judge.

19         THE COURT:  May 15th.  I will expect a letter from the

20   government apprising the Court as to whether or not it is

21   prepared to go forward with sentencing, and if not proposing

22   another control date.  Obviously Mr. Mukasey should be CC'd on

23   any correspondence.

24         Let's talk about bail pending sentencing.  Title 18,

25   Section 3143(a) provides that a defendant shall be detained

1125.0067

98B6DIP                          Plea

1    following a plea or conviction, unless the judicial officer

2    finds by clear and convincing evidence that the person is not

3    likely to flee.  This is for the period between a jury's

4    verdict or in the case of today a guilty plea and the

5    sentencing.

6          So I had also had sign-in sheet to hear from any

7    victims who wish to be heard on this sheet.  No one has signed

8    that sheet.

9          Does anyone wish to be heard with respect to bail or

10    remand?

11          The parties have submitted a letter, which I

12    referenced earlier.  Bear with me while I am looking for it.  I

13    remember it well.  It provided for a bond of $400,000 -- excuse

14    me, $2.5 million to be secured by three financially responsible

15    persons, to be secured with property of $400,000 which would in

16    essence be the equity value in the home of Mr. DiPascali's

17    sister, surrender of all travel documents with no new

18    applications permitted, and travel restricted to the Southern

19    District of New York, Eastern District of New York, and here it

20    says the District of Pennsylvania but Pennsylvania has more

21    than one district, as well as regular pretrial supervision.

22          Is that the position of the parties?

23          MR. LITT:  We meant to say the Eastern District of

24    Pennsylvania and the District of New Jersey, which is where the

25    defendant lives.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98B6DIP                    Plea

1           MR. MUKASEY:  That's right.

2           THE COURT:  I see.  Anything else that the parties

3    wish to say on this?

4           MR. LITT:  No, your Honor.

5           MR. MUKASEY:  Yes, your Honor.

6           THE COURT:  Mr. Mukasey.

7           MR. MUKASEY:  By agreement with Mr. Litt, subject to

8    approval of the Court, we would ask for one week from today

9    until August 18th to satisfy those bail conditions if they are

10   acceptable to your Honor.

11          THE COURT:  I am not sure they are.  I should state

12   that up front.  Following a jury's verdict or following a

13   guilty plea there is a presumption that the defendant will be

14   detained, remanded pending sentencing.  That is for a variety

15   of reasons.  That is the Bail Reform Act of 1984.  I think

16   everyone at the front two tables understands that.

17          So I want to explore that.  It seems to me that this

18   defendant has ample incentive to flee.  I understand he is

19   cooperating with the government, but the defendant is 52 years

20   old.  He is facing a maximum term of imprisonment of 125 years.

21   Although the plea agreement has no guidelines calculation, I

22   certainly have done an admittedly quick and dirty guidelines

23   calculation.  But based on just the fraud counts, it seems to

24   me that the guidelines calculation comes out at a fairly

25   astronomical place based on the amount of the loss involved,

98B6DIP                    Plea

1  based on the abuse of trust that was involved in the course of

2  the schemes to which Mr. DiPascali admitted.

3          So it seems to me under the guidelines, even with the

4  acceptance the guidelines would call for a range of mandatory

5  life.  Now, because the maximum sentence is not life but 125

6  years, under the guidelines before considering cooperation,

7  before considering the Section 3553(a) factors, the guidelines

8  would be recommending a life term.  So that is certainly

9  serious, serious consequences facing Mr. DiPascali.

10          Now, the bail package proposed here by normal

11  standards would seem pretty considerable.  There is 2.5 million

12  dollar bond that would have three financially responsible

13  persons and property that is valued -- at least the equity

14  value is $400,000.  So by most standards that would be a pretty

15  large package.  But that amount is completely dwarfed by the

16  amount of restitution and forfeiture in this case.  $170

17  billion is what the plea agreement provides for Mr. DiPascali

18  to forfeit.  So it would seem to me that a 2.5 million dollar

19  bond thrown on top of that mountain doesn't count for much.

20          Now, the next argument would be that the financially

21  responsible persons, the co-signers and Mr. DiPascali's sister

22  would have some moral suasion over him, that he would be

23  disinclined to flee or do anything that might put them at risk,

24  and only that might be persuasive.  But in this case there are

25  thousands of victims who many of them lost more than $2.5

1125.0070

98B6DIP                          Plea

1    million.  So the fact that three more victims might be thrown

2    on top of a long list of victims doesn't strike me as a

3    terribly compelling basis to believe that Mr. DiPascali would

4    be deterred from engaging in conduct that would constitute a

5    violation of the terms of his bail or flight.

6         Now, the penalties for bail jumping are by most human

7    standards considerable.  It is five years' imprisonment,

8    maximum, with a two-level enhancement for obstruction of

9    justice on top of the guidelines calculation in this case.  But

10   here it would be again virtually meaningless.  It would expand

11   the maximum penalty from 125 years to 130 years.  It would

12   expand the guidelines calculation from what I think looks like

13   a level 46 to a level 48.  And for those of you unfamiliar with

14   the guidelines level 43 is life.  So you can't do much more

15   than that.

16         So in light of this, the package strikes me as fairly

17   symbolic and not terribly onerous in light of the other facts

18   in this case.  So it seems to me that it is really we are on an

19   honor system.  I am being asked to believe that Mr. DiPascali

20   is not going to run away because he has turned his life around

21   and that I should credit his statements here today that he is

22   sorry for what he has done and he is committed to making amends

23   to the best of his ability, which I can understand the

24   sentiment.  But the fact of the matter is the defendant's

25   conduct which is admitted today doesn't give me great

98B6DIP                    Plea

1    confidence on that store.

2          Mr. DiPascali has admitted to a 20-year period of

3    fraud in which he committed perjury to the SEC under oath.  He

4    maintained and manufactured false books and records that were

5    designed to mislead regulators and auditors.  He issued by his

6    own account and the government's account literally thousands or

7    even millions of statements to investors that were designed to

8    mislead them and lull them into maintaining investments they

9    had made or increasing the investments that they had made.  The

10   money laundering that is set forth in one of the accounts

11   describes a fairly massive-scale scheme that continued as

12   recently as December of 2008.

13         So I think all of that suggests to me that Mr.

14   DiPascali is not a good bet.  I think the argument that I

15   anticipate is that, Well, Mr. DiPascali understands that if he

16   violates the terms of his bail then his cooperation agreement

17   will be ripped up and any hope he would have for a sentence

18   below the guidelines would be greatly diminished.  I understand

19   that as well.  But I don't think it would be irrational for a

20   defendant faced with the kind of sentence that Mr. DiPascali is

21   facing to decide that maybe cooperation is not going to do it.

22         So all of this basically leads me to the statute, back

23   to the statute which is that I need to be persuaded as the

24   judicial officer that there is clearing and convincing evidence

25   that he is not going to flee and at this point I am not really

98B6DIP                      Plea

1    there.

2              So let me hear from counsel if they want to be heard

3    on this.  Mr. Mukasey.

4              MR. MUKASEY:  Thirty seconds, Judge, to confer?

5              THE COURT:  Certainly.

6              (Pause)

7              MR. MUKASEY:  Judge, if I could be heard on the issue.

8              THE COURT:  Certainly.

9              MR. MUKASEY:  Mr. DiPascali, your Honor, has known

10   that he has been under investigation that could put him in jail

11   for the rest of his life since December 11th, 2008.  At that

12   time he was served with a grand jury subpoena.  He has known

13   that this day was coming for probably eight months.

14             THE COURT:  Can I interrupt you?

15             Because it seems to me that based on what has been

16   described to me is that Mr. DiPascali must have known that this

17   house of cards was going to come crashing down for years but it

18   didn't prevent him from doing what he did up until December of

19   2008.

20             MR. MUKASEY:  As Mr. DiPascali mentioned, Judge, I

21   think that he always thought that there would be a safe landing

22   for many investors and it wasn't until really the end that he

23   learned the full truth of this.

24             I would like to address my comments really to his ties

25   to the community and why I think notwithstanding your guideline

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1125.0073

'98B6DIP                        Plea

1    analysis, which is pretty darn accurate, and notwithstanding

2    the really cataclysmic nature of the fraud here, I think Mr.

3    DiPascali is a clear and convincing bet to return to court.

4         He has known he has been under investigation for the

5    better part of nine months. He has been speaking with the U.S.

6    Attorney's Office. He has been following the guidance by the

7    FBI. I am not shy to say that I believe he has established a

8    relationship with the agents of trust. He is where he is

9    supposed to be when they ask him to be there. He has been at

10   every proffer, at every meeting, and every location that he is

11   supposed to be at. He understands that he has but one way to

12   ever see the light of day and that is to satisfy the government

13   that he is trustworthy person.

14        I think the government is signing him up to the

15   cooperation agreement says something about their trust in him.

16   He understands that he has got miles to go in terms of

17   providing substantial assistance. He is here today and he has

18   known he was going to be here today to try to reach that goal.

19   He understands that he is working his way down from probably a

20   life sentence. I anticipate Mr. DiPascali, and I think the

21   government would back me up on this, to be a cooperator in a

22   white-collared case in a historic nature, somebody who can pull

23   the curtain back on a fraud and answer a lot of questions that

24   Ms. Siegman wants to be answered and the whole world wants to

25   be answered.

1      We would not have gone through what was really a

2   grueling process to convince the government that he was a

3   person worthy of its trust if we didn't want to see this

4   through to the end.  Mr. DiPascali does want to see it through

5   to the end and that is why he came here and admitted in open

6   court a fraud of 30 years or the better part of 20 or 30 years.

7      Let me talk a little bit, Judge, about Mr. DiPascali's

8   background.  He has in Bridgewater, New Jersey, four children.

9   He comes from an extremely close family.  In fact, this is the

10  first time I have ever seen him discuss the fraud without

11  breaking down and crying.  He is an emotional person.  He is

12  not a person that would ever do anything to harm his family.  I

13  think that really in the back of his mind he wasn't convinced

14  that investors would be hurt here.  Of course they could have

15  been.  I am not sure he was convinced that they would have been

16  had Mr. Madoff actually had assets to back this up.

17      Let me tell you a little bit about each of Mr.

18  DiPascali's kids and the relationship he has with them as well

19  has his siblings.  He has a daughter today who is starting

20  Brooklyn Law School.  Yesterday he went with her to move her

21  in.  He is incredibly close with her.

22      He has three sons -- Frank, Jr., Greg, and Mike.  The

23  two young ones live at home.  Mr. DiPascali is their world and

24  he is their world.  He supports his mother who is 77 years old

25  and also lives in Bridgewater with one of his sisters.  Then he

98B6DIP                    Plea

1   has the other sister who is willing to post her house to show

2   her confidence in Mr. DiPascali.

3          I think that if the amount of the bond were raised and

4   perhaps if we could somehow find additional security that that

5   could be thrown on to the pile as well.  There is not a bail

6   package in the universe that is not without some risk, but I

7   think this is a bail package that can be fashioned into a bail

8   package that gives the Court comfort, like the government has

9   comfort in Mr. DiPascali.

10          It is worth pointing out that since January Mr.

11  DiPascali has been operating under, to use your term, the honor

12  system with the government.  They have never frozen his assets.

13  They never seized his bank accounts.  He voluntarily turned

14  over to the U.S. Marshal some of his property.  He is prepared

15  to turn over his property.  He has been operating since January

16  on really a letter agreement with the government regarding his

17  spending knowing that he would be ultimately subject to a

18  forfeiture order.  He has not violated the government's trust

19  once.

20          Every month we report to the government the amount of

21  money he is spending.  They are keeping him on a tight leash

22  and he is abiding by that.  He has almost no assets that are

23  not forfeitable.  So as soon as the government moves to freeze

24  the bank accounts and seize the bank accounts, he is not going

25  to have disposable income.  He doesn't have an ability to flee.

1125.0076

98B6DIP                    Plea

1   He doesn't have anywhere to go frankly.  We turned over his

2   passport.  My office has kept the passport for months.

3       To the extent it is worth knowing, he has put hundreds

4   of hours into preparing to proffer with the government,

5   learning about what it means to be a government witness,

6   learning what it means to accept responsibility and hopefully

7   get a 5K1 letter because he wants it not because he wants to

8   take off.  He takes care of his mother.  The Pretrial Services

9   officer asked this morning, Do you speak to your mother and

10  your sisters on a weekly basis?  And he said, No, much more

11  than that.  He speaks to them not on a daily basis but

12  sometimes on a multiple-times-in-a-day basis.

13      It sounds maybe odd stacked up against this fraud, but

14  he is a family person.  He doesn't travel.  He doesn't go on

15  lavish vacations.  He is a homebody.  He wants to cause no more

16  pain to his kids.  He sat in our office a couple nights ago

17  explaining to his family the possibilities and the

18  consequences.  He has been straight up with them, he has been

19  straight up with us, and he has been straight up with the

20  government.

21      You can take this bet, Judge, Mr. DiPascali is here to

22  do the right thing.  He wants the 5K letter.  It would be inane

23  for him to flee and leave his family with nothing as it is.

24  They are going to have to endure very, very rough times.  I

25  don't think he thinks about it in terms of, Well, I am facing

1125.0077

98B6DIP                    Plea

1   life in prison, what is another two years if I get a bail

2   jumping charge.  He thinks of it in the opposite way, which is

3   I am facing life in prison and I better show up every darn day

4   if I am to avoid anything but that.

5         That is why we entered into the cooperation agreement.

6   That is why we hope Mr. DiPascali can satisfy the Miriam

7   Siegmans of the world and the government and this Court.  I

8   don't want to put anybody on the spot.  I think the FBI agents

9   would speak to diligence and his compliance and his ability to

10  be trusted to continue to work with them.  I think they would

11  establish a very good relationship with him, professional and

12  arm's length but very trusting.  You can imagine the hill that

13  the government faced in offering him a cooperation agreement.

14  They I think came at this perhaps at the beginning with the

15  same scepticism that your Honor does and he won them over.  If

16  your Honor releases him on an appropriate bail package, he will

17  win your Honor over with trust and with compliance.

18         May I have one moment, Judge?

19         THE COURT:  Certainly.

20         (Pause)

21         MR. MUKASEY:  Thank you for hearing me, Judge.

22         THE COURT:  Mr. Litt, anything you want to add?

23         MR. LITT:  I would ask a couple of points that I think

24  your Honor anticipated in the arguments.  Mr. Mukasey hit on

25  some of them.

1125.0078

98B6DIP                          Plea

1          Mr. DiPascali, we do believe has known since very

2     early on -- December 11th, 12th -- that he was a key player in

3     this and he was under investigation and has not fled.  He has

4     always cooperated with the government to date and appeared when

5     called upon to do so.  He showed up today knowing what the

6     consequences of his actions today would be and certainly

7     deserves credit for that.

8          He does appear to be close to his family and he does

9     have significant ties to the community.  The plea agreement

10    that he has entered into gives him every incentive to appear

11    and to try to fulfill the terms of that agreement because to do

12    otherwise would likely confine him to the rest of his life in

13    jail.

14          THE COURT:  If he flees and you were able to get him

15    back.

16          MR. LITT:  Yes.  That's right, your Honor.

17          With respect to the bail package and amount, the

18    reason why there is less securities than there is in some other

19    cases there might have been is related to the forfeiture issue

20    and the fact that most of Mr. DiPascali's assets are subject to

21    forfeiture.  And over the coming weeks we expect to be

22    presenting preliminary orders or forfeiture to your Honor which

23    may be submitted any time prior to sentencing to start the

24    process of accomplishing that.  We have already to date

25    confiscated some of Mr. DiPascali's assets.

1125.0079

98B6DIP                          Plea

1        Finally, the government believes that the assistance,

2   if we did not believe that he could provide substantial

3   assistance to the government, we wouldn't have entered into

4   this agreement.  We do believe that he can provide substantial

5   assistance and we believe that his ability to do so would be

6   hampered were he to be detained.

7        THE COURT:  Why is that?

8        MR. LITT:  This is a very documented intensive

9   investigation, among other things.  There are literally

10  millions of pages of documents and data and computer equipment

11  and the like that it will be very beneficial were he to be able

12  to have access to provide the substantial assistance that we

13  expect he will be able to do.

14        I think some of the concerns that your Honor has can

15  be addressed in part through electronic monitoring and home

16  detention if your Honor thinks that would add such an

17  additional layer of surety about flight.  There are flaws with

18  that as your Honor well knows.  There is no substitute in terms

19  of assuring somebody's presence in court other than

20  incarceration, but the government certainly believes that given

21  his connections to the community, again his record with the

22  government to date, the fact that he has not fled in the last

23  eight months, the fact that he showed up today and admitted his

24  guilt, exposed himself to 125 years of incarceration, that he

25  has three family members who would be tremendously harmed were

98B6DIP                    Plea

1    he to flee if they were approved as cosigners on the package,

2    that those things even without home detention and electronic

3    monitoring in the government's view provide clear and

4    convincing evidence in this case, and every case must be viewed

5    on its own facts, to reasonably assure clear and convincing

6    evidence that Mr. DiPascali would appear when required.

7    Certainly those factors when necessary combined with home

8    detention and electronic monitoring would do that.

9            THE COURT:  Mr. Litt, I am looking at a submission you

10   made to me in another case, which you reminded me that the Bail

11   Reform Act of 1984 creates no general expectation of post

12   verdict liberty.  To the contrary, it establishes as a

13   presumption in favor of detention.  You then went on to remind

14   me that "the interest in detaining defendants who have been

15   found guilty beyond a reasonable doubt of such crimes also

16   includes the need to encourage general respect for the law by

17   signaling that a guilty person will not be able to avoid or

18   delay imposition and service of the sentence prescribed by

19   law."

20           So, look, let me say this:  I have great respect for

21   the lawyers in this room.  I know them.  I think they are good

22   at what they do and I have great respect for them.  Clearly

23   they have taken the positions they take because they believe

24   them and I don't disregard that lightly.  On the other hand, I

25   think everybody recognizes that each of us has an independent

1125.0081

98B6DIP                          Plea

1    role to play in this process.

2         Mr. Litt and Mr. Mukasey have focused on what Mr.

3    DiPascali has done since December of 2008.  I keep focusing on

4    what he did for 20 or 30 years before that.  I keep thinking of

5    how many people put their trust in Mr. DiPascali and have lived

6    to regret it deeply and I am frankly reluctant to put my trust

7    in Mr. DiPascali.  I don't see why he would anymore respect the

8    oath he would take on a bail package than he would respect the

9    oath he took in front of the SEC, another arm of the

10   government.  So I think we may have disagreement on this one.

11        I am not persuaded.  Maybe I haven't heard enough

12   about how remand would affect his ability to cooperate with the

13   government.  I think there are lots of individuals who are in

14   custody who can still cooperate very effectively and work with

15   law enforcement agents very effectively.  On this record, in

16   the length of time that this conspiracy went on, again the

17   amount and nature of the misrepresentations to clients, to

18   government entities, to auditors, I just cannot find by clear

19   and convincing evidence that Mr. DiPascali does not pose a risk

20   of flight.  I just can't do it.

21        MR. MUKASEY:  Judge, if I could add some facts to the

22   record that might help persuade you that he is a trustworthy

23   defendant.  In terms of your concern about how he would be

24   hampered from cooperating were he detained, not only he is

25   going to cooperate with the U.S. Attorney's Office and with the

1125.0082

98B6DIP                        Plea

1    FBI, I can tell you from having been in these proffers, it is

2    an extremely onerous process involving computers and documents

3    and account statements and it requires the sort of 8-hour,

4    10-hour, 12-hour sessions that you just cannot have when you

5    are remanded.

6            He is also going to be cooperating with the SEC, with

7    the IRS, with any agency that wishes to speak with him, and we

8    hope and we believe there will be a number of agencies both

9    inside New York and outside New York that wish to speak with

10   him.  We've discussed among ourselves the Massachusetts

11   Attorney General has been very, very active in this case.

12           Obviously he is a U.S. Attorney's Office cooperator,

13   but I would hope that when the Madoff cases are going to spring

14   up all over the country, Mr. DiPascali will be at least a very

15   valuable witness to debrief to understand the operations and he

16   is not a testifying witness.  There are civil lawsuits that he

17   may be able to help people out.  I think he is going to be

18   working chiefly with the FBI and SEC here in New York, but he

19   can and is ready, willing and able to work with these other

20   agencies.

21           The SEC of course have their limitations on where they

22   can do and when they can go and when Mr. DiPascali can go if he

23   were detained.  I think it would seriously hinder his ability

24   to work with the SEC.  Part of what the world wants to know

25   here is how did the SEC fail to catch this for lack of a better

98B6DIP                        Plea

1    phrase and just to use the terms of discussion of the day.  I

2    don't know the case that your Honor read back Mr. Litt's

3    language to him but I would ask the Court consider whether that

4    was a case of cooperation.

5              THE COURT:  It was not.

6              MR. MUKASEY:  And you make a good point obviously

7    about --

8              THE COURT:  You have to say that, Mr. Mukasey.

9              MR. MUKASEY:  I am not saying I agree with everything.

10   You make a good point about how do trust a guy who basically

11   has been a fraudster for 25 years.  Here is the answer:  He

12   lived in a universe for 25 years that he doesn't live in

13   anymore.  On December 11th he exited that universe.  Once he

14   got out of that universe -- by the way that universe was

15   twisted and it was perverted, and it was almost impossible for

16   somebody who wasn't living in that universe to understand.  It

17   was an alternative reality.  It was not the kind of conspiracy

18   where a bunch of people are down in the dungeon plotting how to

19   rip off innocent old ladies.  It wasn't like that.

20             Mr. DiPascali started with Mr. Madoff when he was 18

21   or 19 years old.  He didn't know the way things run at Goldman

22   Sachs.  He didn't know the way things run at Morgan Stanley.

23   So sat and watched and he learned and listened and at some

24   point after several years I think a light went off, I think he

25   said to himself, This is kind of a bizarre universe but this is

98B6DIP                    Plea

1    my universe.  This is what Bernie tells me to do and this is

2    what I am doing.  By the way no one is going to get hurt at the

3    end because Bernie Madoff has been telling me he has assets

4    abroad and in real estate and in commodities that are going to

5    make sure that all the clients' money will be able to be

6    returned.

7            So he wasn't out there sort of ripping and robbing and

8    stealing as you might think of it.  He is guilty?  1,000

9    percent.  No question about it.  There is no way we could have

10   a trial in this matter.  He is absolutely guilty.  He was

11   living in a universe creating fake trade tickets and creating

12   fake trade blotters.  It is the way you did things.  It was

13   okay because Bernie was going to take care of it.  Don't worry,

14   Bernie will take care of it.  That is how he went to sleep at

15   night.  That was the universe he was living in for 25 years, 20

16   years.

17           On December 11th he came to my office shaking, crying

18   out of that universe.  He stepped out of that universe and

19   stepped into the real kind of world, the world that Ms. Siegman

20   lives in, I live in, you live in.  The world where you cannot

21   create a fake trade ticket and say, Don't worry it is okay

22   because no one is going to get hurt here.  He realizes now, he

23   is out of that universe.  He is in a universe with laws and

24   rules and regulations and oaths and promises and trusts.

25           I am happy to tell you that we had to knock hard on

98B6DIP                        Plea

1   the door of the U.S. Attorney's Office to get Mr. DiPascali in

2   there because they originally have the same -- I don't want to

3   speak for them.  I would imagine prosecutors in the real world

4   have the same degree of scepticism.  The guy was a fraudster

5   for 25 years.  How could I trust him?  How can I put him on the

6   witness stand?  Well, you know what?  He earned their trust.

7   He now I think has their trust.  Because he stepped out of the

8   universe, the one that you are focusing on, the one that said

9   you have wanton disregard for these victims and you have a

10  20-year history of fraud.

11         He is in a new world where he talks to the FBI agents

12  almost every day.  They were at his house yesterday.  He goes

13  to the U.S. Attorney's Office at his job.  It is going be his

14  full-time job.  Never has never missed an appearance.  He comes

15  early.  He stays late.  He goes outside to smoke and gets a

16  class of water.  Otherwise he is in there looking at records,

17  explaining history.

18         So you are right there was a world that he is going

19  get punished for.  He doesn't live in that world anymore.  Now

20  he is in this world.  Now he is in the world where he has got

21  to live up to what he says and he has to tell the truth or he

22  is going to go right back to that world where the only other

23  inhabitant is Bernie Madoff spending 150 years in prison.

24         THE COURT:  I understand the arguments and the

25  sincerity of what you are saying and what Mr. Litt is saying

1125.0086

1   that you have each reached a conclusion that Mr. DiPascali

2   would do that.  Perhaps you know him better than I.  I don't

3   think I can overlook the conduct that he admitted to today,

4   which I think coupled with the seriousness of the penalties

5   that he is looking at I think provides ample incentive to flee

6   if cooperation doesn't look like it is going to pan out the way

7   he thought, or as he gets closer to the day of sentencing that

8   the harsh realities of a sentence for this conduct starts

9   staring him in the face.  I think in light of all facts and all

10  the conduct in this case and in light that Mr. DiPascali has

11  made false statements to the SEC and to others and in light of

12  the fact for decades he made false statements to people that

13  entrusted him with their life savings -- I am not going to

14  trust him with his life savings.  I am just hoping he shows up

15  to court.  People entrusted him with the life savings.  I am

16  unpersuaded respectfully.

17        MR. MUKASEY:  Perhaps if we can add some heft to the

18  bail package, something such as home detention.

19        THE COURT:  Well, look, I don't rule out the

20  possibility of the parties to make another motion.  Based on

21  what is before me today and based on the proposal that has been

22  made jointly by the parties for bail, I am going to deny that

23  request.  I am going to remand Mr. DiPascali.  It not designed

24  to be punitive.  Time for sentencing is later.  It is designed

25  really I think to meet the objectives of the statute in light

98B6DIP                    Plea

1    of the facts as I understand them.

2          Mr. DiPascali, it may not be what you wanted or

3    expected today but --

4          MR. MUKASEY:  May I have one moment to discuss one

5    matter with the government?

6          THE COURT:  Certainly.

7          (Pause)

8          MR. LITT:  Your Honor, if I could at the risk of

9    trotting over ground that we've covered, first with respect to

10   the brief that your Honor mentioned that, as your Honor knows,

11   was in a case following three and a half years of intense

12   litigation and a nine-week trial, not a cooperator.

13         THE COURT:  A man whose fraud, total fraud was tiny in

14   comparison to this defendant's, right.

15         MR. LITT:  Yes.  Absolutely, your Honor.

16         THE COURT:  I don't want anyone to be in the dark

17   here.  I am referring to Mr. Litt's submission in the case of

18   *United States v. Alberto Villar*, 05 CR 621.

19         MR. LITT:  That's right.  I guess what I am having

20   difficulty articulating is it is essential I think is that we

21   believe that Mr. DiPascali's cooperation, what he wants to do,

22   what he says he wants to do will be hampered if we --

23         THE COURT:  You have to take him out in order to bring

24   him to the FBI.  Look, we are all experienced with cooperators.

25   We all know there are many cooperators who are in custody who

1125.0088

1    are able to cooperate and meet with law enforcement officials

2    and engage in cooperation.  He is not doing anything activity.

3    He is not wearing a wire and going out.  I am not sure I am

4    persuaded that he needs to be out to be able to effectively

5    cooperate.

6          MR. LITT:  The documents involved in this case fill a

7    half a floor of a New York office building and about 6,000

8    boxes in a warehouse and a computer server that was dedicated

9    in large part to the investment advisory activities, a computer

10   that Mr. DiPascali has a certain amount of specialized

11   knowledge about, a server that has proprietary software, that

12   is ancient by modern standards in terms of technology and the

13   operating system and the like.  The records and the unraveling

14   of what happened in this case over decades requires looking

15   through exactly what I just described, a half of a floor of an

16   office building.

17         In going through this process, and I will just speak

18   in hypotheticals, to present a document to a witness that

19   triggers a recollection of something else.  It is one thing to

20   be able to walk across the room or pull a file and present that

21   file in realtime and through that process get to the bottom of

22   what happened and a very small piece of what happened in this

23   case then it would be to do that process through the cumbersome

24   circumstance of Mr. DiPascali's being incarcerated.

25         I think it will just be a lot more efficient, the

98B6DIP                         Plea

1    government will be able to get Mr. DiPascali's cooperation much

2    more fully, completely, efficiently, and quicker if he is out.

3    I would just urge the Court --

4            THE COURT:  Let's me interrupt you, though.  That is

5    not really the consideration of 3143.  It doesn't say or if the

6    government thinks it would be more convenient to have a person

7    out.  So clearly the government has reached a conclusion.  And

8    I don't mean this disrespectfully.  Clearly you reached a

9    determination that bail is appropriate.  I understand that.  I

10   am not persuaded by clear and convincing evidence that Mr.

11   DiPascali is going to be here at the time of sentencing given

12   the monumental sentence he is facing and given the amount of

13   cooperation that is going to be needed to put a dent into that

14   sentence.

15           So, look, I don't think there is much more that you

16   folks can say today that is going to persuade me.  If you want

17   to make another submission, I will consider it.  But on the

18   basis of the facts as I have laid them out, I am not prepared

19   to agree to the bail package that you have all proposed.

20           MR. MUKASEY:  Understood that the current bail package

21   on the table needs to be withdrawn and obviously I am told

22   needs some more energy and some more heft.  Judge, we were

23   obviously surprised by your Honor's take on this and what I

24   would propose is to allow us to brief this issue and or -- I

25   guess the law is pretty clear.  I am not sure how much briefing

1125.0090

1   there is going to be, but Mr. DiPascali's family is completely

2   unprepared for this.  He is completely unprepared for this.  He

3   is the financial provider to his family.  I frankly didn't

4   recognize --

5          THE COURT:  Is he working, though?

6          MR. MUKASEY:  No.  But I think he is certainly taking

7   care of his family, the four kids and the girl in law school

8   and the boys that are home for the summer.  I think that we can

9   probably work out a package if your Honor were to give us 48

10  hours, 72 hours that was strict, that satisfied your Honor of

11  his ties to the community.

12         I agree that cooperation is not one of the 3142, 43

13  prongs.  However, I think it bears some thinking about really

14  how he will be able to cooperator or not cooperate if he is

15  remanded, and probably satisfy your Honor with a package that

16  includes home detention, strict Pretrial Services reporting,

17  perhaps less travel, and a lot more for those he loves to lose.

18         THE COURT:  I am reacting to what I have in front of

19  me now.  The statute is pretty clear that unless I make the

20  finding that I am not prepared to make, Mr. DiPascali is

21  remanded.  So I am going to order his remand without prejudice

22  to renewing a motion whenever you see fit with whatever

23  submissions you think appropriate.

24         Mr. DiPascali, we have not set a sentencing date for

25  you.  That is because it has been represented to me that your

1125.0091

98B6DIP                    Plea

1    cooperation will continue for some time. We have a control

2    date in May. Then perhaps we will have more information as to

3    when we will go forward with sentencing. I want to make sure

4    you understand about sentencing, however. As I said before,

5    the Probation Department will prepare a report, a presentence

6    report, that will be quite extensive. They will interview a

7    number of people, including the government to get more

8    information about the offenses that are in the information, and

9    also interview you, among others. So I would ask that you be

10   cooperative with the Probation Department as they prepare that

11   report.

12          Mr. Mukasey, I assume you wish to be present for any

13   interview?

14          MR. MUKASEY: Yes, Judge.

15          THE COURT: I will direct that no interview is to take

16   place unless Mr. Mukasey is present. So if they show up to

17   interview you and Mr. Mukasey is not there, you remind them

18   that I told you not to go forward. If Mr. Mukasey directs you

19   not for answer certain questions, listen to him, but don't make

20   any false statements to the Probation Department. If you were

21   to do that, it could be a separate offense or an enhancement

22   for obstruction of justice. So I think that would serve no

23   one's interest. Be as cooperative as you can be.

24          Mr. Mukasey.

25          MR. MUKASEY: I am going to back to the bail issue. I

98B6DIP                    Plea

1    think that it might persuade your Honor what Mr. DiPascali is

2    looking forward to in terms of his cooperation and the ties

3    that he has to his family and the community and the cooperation

4    that he has already given to the government is perhaps if I

5    were allowed to ask the FBI Agent Keith Kelley some questions

6    that --

7              THE COURT:  Asking here in open court, you mean?

8              MR. MUKASEY:  Yeah.  I don't want to do anything that

9    will put anybody on the spot, but I think there is a

10   relationship of trust here that can be considered a tie to the

11   community, in addition with the FBI and the government, which I

12   think Special Agent Kelley would shed some light on, in

13   addition to the very, very close ties Mr. DiPascali has with

14   his family.

15             THE COURT:  I am not sure what you are asking me.  Are

16   you asking me to put Mr. Kelley on the stand and let you

17   examine him?

18             (Pause)

19             THE COURT:  Counsel.

20             Mr. Mukasey.

21             MR. MUKASEY:  I am going to withdraw that application.

22             THE COURT:  If you folks want to renew the

23   application, you can do so.  I think I've explained what my

24   concerns are and what the burden is.

25             Is there anything else we need to cover today,

94

98B6DIP                              Plea

1    Mr. Litt?

2            MR. LITT:  No, your Honor.

3            THE COURT:  Mr. Mukasey?

4            MR. MUKASEY:  If I can have just one moment?

5            (Pause)

6            MR. MUKASEY:  Nothing further, Judge.

7            THE COURT:  Thank you all.  I will hear from you May

8    15th if not before then.   I appreciate all your time.   Thank

9    you to the court reporter, the marshals, and all the victims

10   who came as well.

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# Exhibit 36

1

166dlipp
PLEA
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   UNITED STATES OF AMERICA,                    New York, N.Y.
3
4               v.                                S3 10 Cr. 228 (LTS)
4
5   ERIC S. LIPKIN,
5
6               Defendant.
6
7   ------------------------------x
7
8
8                                                 June 6, 2011
9                                                 11:11 a.m.
9
10
10  Before:
11
11                  HON. LAURA TAYLOR SWAIN,
12
12                                           District Judge
13
13
14                      APPEARANCES
14
15  PREET BHARARA
15      United States Attorney for the
16      Southern District of New York
16  BY:  JULIAN MOORE
17      LISA A. BARONI
17      MATTHEW SCHWARTZ
18      Assistant United States Attorneys
18
19  JAMES K. FILAN
19      Attorney for Defendant
20
21          - also present -
22  SA Paul Takla, FBI
22  SA Greg Hagarty, FBI
23  Natasha Ramesar, Pretrial Services Officer
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1126.0001

166dlipp

PLEA

```
 1              THE CLERK:  I call the case, United States of America
 2   versus Eric Lipkin.
 3              MR. MOORE:  Good morning, your Honor.  Julian Moore
 4   for the government.  With me are my colleagues Lisa Baroni and
 5   Matthew Schwartz, of the U.S. Attorney's office, along with
 6   Special Agents Greg Hagarty and Paul Takla, of the FBI, and
 7   Natasha Ramesar of the United States Pretrial Services.
 8              THE COURT:  Good morning, Mr. Moore, Ms. Baroni and
 9   Mr. Schwartz, Agent Hagarty, Agent Takla, and Officer Ramesar.
10              MR. FILAN:  Good morning, your Honor.  James K. Filan,
11   counsel on behalf of Mr. Lipkin, who is seated at the table
12   next to me.
13              THE COURT:  Good morning, Mr. Filan.  Good morning,
14   Mr. Lipkin.
15              And, again, good morning all of you who have attended
16   today.
17              Is this Mr. Lipkin's first appearance?
18              MR. FILAN:  Yes, it is, your Honor.
19              THE COURT:  All right.  Well, then, let's deal with
20   the advice of rights matters first.
21              Mr. Lipkin, would you please stand.
22              Please state your full name.
23              THE DEFENDANT:  Eric Lipkin.
24              THE COURT:  How old are you, sir?
25              THE DEFENDANT:  37.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

166dlipp

PLEA

1       THE COURT:  I will now explain certain rights that you
2  have under the Constitution of the United States.
3       You have the right to remain silent.  You need not
4  make any statement.  Even if you have already made statements
5  to the authorities, you need not make any additional
6  statements.  Any statements that you do make can be used
7  against you.
8       Do you understand these rights?
9       THE DEFENDANT:  Yes, I do.
10      THE COURT:  You have the right to be released either
11  conditionally or unconditionally pending trial unless I find
12  that there are no conditions that would reasonably assure your
13  presence at future court hearings and the safety of the
14  community.  If the government were to ask me to detain you
15  pending trial, you are entitled to a prompt hearing on whether
16  such conditions exist.
17      Do you understand this right?
18      THE DEFENDANT:  Yes, I do.
19      THE COURT:  Are you a citizen of the United States?
20      THE DEFENDANT:  Yes, I am.
21      THE COURT:  You have the right to be represented by an
22  attorney today and at all future proceedings in this case, and
23  if you are unable to afford an attorney, I will appoint an
24  attorney to represent you.  Do you understand these rights?
25      THE DEFENDANT:  Yes, I do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

166dlipp
PLEA

```
 1           THE COURT:  Do you wish to have and are you able to
 2   obtain and afford counsel on your own?
 3           THE DEFENDANT:  Yes, I am.
 4           THE COURT:  Have you retained Mr. Filan to represent
 5   you?
 6           THE DEFENDANT:  I have.
 7           THE COURT:  And it is your desire to proceed in these
 8   matters with Mr. Filan as your retained counsel?
 9           THE DEFENDANT:  Yes.
10           THE COURT:  And I am informed that -- Mr. Filan
11   informed that Mr. Lipkin has an application to waive indictment
12   and enter a guilty plea to the six-count Superseding
13   Information that is labeled S3 10 Criminal 228.
14           Is that correct?
15           MR. FILAN:  That is correct, your Honor.
16           THE COURT:  And this plea is pursuant to the agreement
17   that has been marked as Government Exhibit 1, and is at defense
18   table now?
19           MR. FILAN:  That is correct, your Honor.
20           THE COURT:  And you and Mr. Lipkin have also reviewed
21   and signed the advice of rights form that has been marked as
22   Court Exhibit 1.
23           MR. FILAN:  We have, your Honor.
24           THE COURT:  Thank you.  I have a question for
25   Mr. Moore at this point.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

166dlipp
                                  PLEA
1              Mr. Moore, would you please make a statement for the
2      record as to the government's victim notification activities in
3      connection with this matter.  I note that the courtroom is full
4      and that I signed an order requiring certain information be
5      posted on the website, but perhaps you can bring us up to date.
6              MR. MOORE:  Yes, your Honor.
7              Last week we issued a letter to your attention
8      requesting that we make public that this proceeding will be
9      occurring today, namely, that Mr. Lipkin will be pleading to a
10     superseding S3 Information to the counts, which we will go
11     through today.  We also requested that we be able to post this
12     announcement on the U.S. Attorney's Madoff website.
13             Your Honor kindly ordered -- so ordered that letter on
14     Thursday, and those conditions did happen as of that date.
15             THE COURT:  Thank you.
16             Now, I had received a call indicating that there was
17     one victim who wished to be heard today.  This morning we
18     received a further message that that person is unable to attend
19     court today.
20             Is the government aware of any victims who are here
21     present today who wish to be heard?
22             MR. MOORE:  We are not, your Honor.  However, we are
23     aware that your deputy, Ms. Ng, did make a sign-up sheet
24     available, but we do not believe anyone signed that sheet.
25             THE COURT:  It's my understanding that no one has
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

6

166dlipp
PLEA

1  signed on the sheet.
2           Is there anyone here who does wish to be heard?
3           (Pause)
4           All right.  We will proceed, then.
5           Mr. Lipkin, before I accept your Waiver of Indictment
6  and your guilty plea, there are a number of questions that I
7  must ask you while you are under oath to assure that it is a
8  valid waiver and plea.  At times I may cover a point more than
9  once, and I may cover matters that were also addressed in the
10  advice of rights form that you have seen.  But if I do so, that
11  is because it is very important that you understand what is
12  happening here today.
13           If you don't understand something that I ask you,
14  please say so and I will reword the question or you may speak
15  with your attorney.  Do you understand that?
16           THE DEFENDANT:  I do.
17           THE COURT:  Ms. Ng, would you please administer the
18  oath.
19           THE CLERK:  Please raise your right hand.
20           (The defendant was sworn)
21           THE COURT:  Would you please state your full name for
22  the record.
23           THE DEFENDANT:  Eric Scott Lipkin.
24           THE COURT:  Mr. Lipkin, do you understand that you
25  have solemnly promised to tell the truth, and that if you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1126.0006

166dlipp                                                            7
                              PLEA
 1    answer any of my questions falsely, your false or untrue
 2    answers may later be used against you in another prosecution
 3    for perjury or making a false statement?
 4              THE DEFENDANT:  I do.
 5              THE COURT:  You can be seated for the next portion of
 6    the proceeding.
 7              You indicated that your age is 37, is that correct?
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  How far did you go in school?
10              THE DEFENDANT:  I graduated from Ramapo College.
11              THE COURT:  In what field of study?
12              THE DEFENDANT:  Economics.  I also have an associates
13    degree in finance.
14              THE COURT:  Are you able to speak, read and understand
15    the English language well?
16              THE DEFENDANT:  Yes.
17              THE COURT:  And you are a citizen of the United
18    States?
19              THE DEFENDANT:  I am.
20              THE COURT:  Are you now or have you recently been
21    under the care of a doctor or a psychiatrist?
22              THE DEFENDANT:  No.
23              THE COURT:  Have you ever been treated or hospitalized
24    for any mental illness or for any type of addiction, including
25    drug or alcohol addiction?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

166dlipp

                              PLEA

```
 1              THE DEFENDANT:  No.
 2              THE COURT:  Have you ever been addicted to any drugs
 3    or alcohol?
 4              THE DEFENDANT:  No.
 5              THE COURT:  In the past 24 hours, have you taken any
 6    drugs, medicine, or pills, or have you drunk any alcohol?
 7              THE DEFENDANT:  No.
 8              THE COURT:  Is your mind clear today?
 9              THE DEFENDANT:  It is.
10              THE COURT:  Are you feeling well physically today?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Are you represented by a lawyer here
13    today?
14              THE DEFENDANT:  I am.
15              THE COURT:  What is your attorney's name?
16              THE DEFENDANT:  James Filan.
17              THE COURT:  Mr. Filan, Mr. Moore, does either of you
18    have any doubt as to Mr. Lipkin's competence to waive
19    indictment and enter a plea at this time?
20              MR. MOORE:  No, your Honor.
21              MR. FILAN:  I have no knowledge.  He should be able
22    to, yes, your Honor.
23              THE COURT:  Thank you.  You have no knowledge of any
24    reason for me --
25              MR. FILAN:  I have no reason to believe that he is
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

166dlipp
                                    PLEA
1   unable to enter a plea.  I'm sorry.
2             THE COURT:  Thank you.
3             Mr. Lipkin, your attorney has informed me that you
4   wish to waive indictment and enter a plea of guilty to an
5   information.  Do you wish to waive indictment and enter a
6   guilty plea?
7             THE DEFENDANT:  Yes.
8             THE COURT:  Have you fully discussed your case with
9   your attorney, including the charges to which you intend to
10  plead guilty and any possible defenses you may have to those
11  charges?
12            THE DEFENDANT:  I have.
13            THE COURT:  Have you and your attorney also discussed
14  the consequences of entering a guilty plea?
15            THE DEFENDANT:  Yes, we have.
16            THE COURT:  Are you satisfied with your attorney and
17  his representation of you?
18            THE DEFENDANT:  I am.
19            THE COURT:  On the basis of Mr. Lipkin's responses to
20  my questions and my observations of his demeanor, I find that
21  he is fully competent to enter an informed plea at this time
22  and to waive indictment.
23            Before I accept your plea, sir, I am going to ask you
24  many so more questions.  These questions are intended to
25  satisfy the Court that you wish to plead guilty because you are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

166dlipp

                            PLEA

1   in fact guilty and that you fully understand your rights and
2   the consequences of your plea.  I am now going to describe to
3   you certain rights that you have under the Constitution and
4   laws of the United States.  You will be giving up these rights
5   if you enter a guilty plea.  Please listen carefully.  If you
6   do not understand something that I'm saying or describing, stop
7   me and I or your attorney will explain it more fully.
8              Under the Constitution and laws of the United States,
9   you have the right to a speedy and public trial by a jury on
10  the charges against you that are set out in the Information.
11             Do you understand that.
12             THE DEFENDANT:  I do.
13             THE COURT:  Do you understand that you have the right
14  to plead not guilty and to continue to plead not guilty?
15             THE DEFENDANT:  I do.
16             THE COURT:  If there were a trial, you would be
17  presumed innocent and the government would be required to prove
18  you guilty by competent evidence and beyond a reasonable doubt.
19  You would not have to prove that you were innocent at a trial.
20  Do you understand that?
21             THE DEFENDANT:  I do.
22             THE COURT:  If there were a trial, a jury composed of
23  12 people selected from this district would have to agree
24  unanimously in order to find you guilty.  Do you understand
25  that?

1126.0010

166dlipp
                                    PLEA
1              THE DEFENDANT:  I do.
2              THE COURT:  If there were a trial, and at all stages
3     leading up to it, you would have the right to be represented by
4     an attorney, and if you could not afford one, an attorney would
5     be provided to you free of cost.  Do you understand that?
6              THE DEFENDANT:  I do.
7              THE COURT:  If there were a trial, you would have the
8     right to see and hear all of the witnesses against you and your
9     attorney could cross-examine them.  You would also have the
10    right to have your attorney object to the government's evidence
11    and offer evidence on your behalf, if you so desired.  In
12    addition, you would have the right to have witnesses required
13    to come to court to testify in your defense, and you would have
14    the right to testify yourself but you would not be required to
15    testify.
16             Do you understand all of that?
17             THE DEFENDANT:  I do.
18             THE COURT:  Do you understand that if there were a
19    trial and you decided not to testify, no adverse inference
20    could be drawn against you based on your decision not to
21    testify?
22             THE DEFENDANT:  Yes.
23             THE COURT:  Do you understand that if you were
24    convicted at a trial, you would have the right to appeal that
25    verdict?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

166dlipp
```
                              PLEA
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  Do you understand each and every one of
 3   these rights that I've asked you about?
 4              THE DEFENDANT:  I do.
 5              THE COURT:  Do you have any questions about any of
 6   these rights?
 7              THE DEFENDANT:  No, I do not.
 8              THE COURT:  Do you understand that by entering a
 9   guilty plea today you will be giving up each and every one of
10   these rights?
11              THE DEFENDANT:  I do.
12              THE COURT:  Do you also understand that you will be
13   giving up any possible claim that your constitutional rights
14   may have been violated?
15              THE DEFENDANT:  I do.
16              THE COURT:  And do you understand that you will have
17   no trial if you plead guilty?
18              THE DEFENDANT:  Yes.
19              THE COURT:  Do you understand that by entering a
20   guilty plea, you will also have to give up your right not to
21   incriminate yourself because I will ask you questions about
22   what you did in order to satisfy myself that you are guilty as
23   charged and you will have to admit and acknowledge your guilt?
24              THE DEFENDANT:  Yes.
25              THE COURT:  Do you understand that you can change your
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp

13

PLEA

1    mind right now and refuse to enter a plea of guilty?  You do
2    not have to enter this plea if you do not want to for any
3    reason.  Do you understand this fully?
4                THE DEFENDANT:  Yes.
5                THE COURT:  Do you still wish to plead guilty?
6                THE DEFENDANT:  I do.
7                THE COURT:  The document that contains the charges to
8    which you've indicated you wish to plead guilty is called an
9    information.  It has been issued by the United States Attorney.
10   You have a constitutional right to be charged by an indictment
11   rather than an information.  An indictment would be a charge
12   issued from the grand jury.  Do you understand that?
13               THE DEFENDANT:  I do.
14               THE COURT:  Mr. Filan, would you please show
15   Mr. Lipkin the Waiver of Indictment form.
16               (Pause)
17               Mr. Lipkin, have you signed this Waiver of Indictment?
18               THE DEFENDANT:  I have.
19               THE COURT:  Did you read it before you signed it?
20               THE DEFENDANT:  I did.
21               THE COURT:  You did discuss it with your attorney
22   before you signed it?
23               THE DEFENDANT:  Yes.
24               THE COURT:  Did you understand it before you signed
25   it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp

14

PLEA

```
 1          THE DEFENDANT:  Yes, I did.
 2          THE COURT:  Do you understand that if you do not waive
 3  indictment, if the government wished to prosecute you on these
 4  particular charges that are in the Information, the government
 5  would have to present the case to the grand jury, which might
 6  or might not indict you on those charges?
 7          THE DEFENDANT:  Yes.
 8          THE COURT:  Do you understand that you are under no
 9  obligation to waive indictment?
10          THE DEFENDANT:  Yes.
11          THE COURT:  Do you understand that by waiving
12  indictment, you are giving up your right to have the case
13  presented to the grand jury?
14          THE DEFENDANT:  Yes.
15          THE COURT:  Do you understand what a grand jury is?
16          THE DEFENDANT:  I do.
17          THE COURT:  Did anyone make any threats or promises to
18  get you to waive indictment?
19          THE DEFENDANT:  No, they did not.
20          THE COURT:  Have you seen a copy of the Third
21  Superseding Information that has the word "Information" at the
22  top and the number S3 10 Cr. 228 on it?
23          THE DEFENDANT:  I did.
24          THE COURT:  Have you read it?
25          THE DEFENDANT:  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp
                              PLEA
1           THE COURT:  Have you discussed it with your attorney?
2           THE DEFENDANT:  Yes, we have.
3           THE COURT:  Do you understand the charges against you
4    that are detailed in the Information?
5           THE DEFENDANT:  I do.
6           THE COURT:  If you would like, I can read the
7    Information out loud now here in court to you.  Do you want me
8    to read it out loud to you?
9           THE DEFENDANT:  No.
10          THE COURT:  I find that Mr. Lipkin's Waiver of
11   Indictment is knowing and voluntary.  I accept it and I so
12   order it.
13          Mr. Lipkin, do you understand that Count One of the
14   Superseding Information charges you with violating Section 371
15   of Title 18 of the United States Code by participating in a
16   conspiracy to, one, violate 15 United States Code, Sections
17   78q(a) and 78ff and Title 17 of the Code of Federal
18   Regulations, Section 240.17a-3 by falsifying books and records
19   of a broker-dealer, as well as conspiring to violate Title 15
20   of the United States Code, Sections 80b-4 and 80b-17 and 17
21   C.F.R., Section 275.204-2 by falsifying books and records of an
22   investment advisor, and also conspiring to violate Title 18 of
23   the United States Code, Sections 1027 and 2 by falsifying
24   statements to facilitate the theft concerning ERISA, that being
25   the Employee Retirement Income Security Act?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

166dlipp                                                        16
                              PLEA
 1          THE DEFENDANT:  Yes.
 2          THE COURT:  Do you understand that Count Two of the
 3   Superseding Information charges you with violating Title 18 of
 4   the United States Code, Section 371 by participating in a
 5   conspiracy to violate Title 18, Section 1344, by defrauding a
 6   financial institution, the deposits of which were then insured
 7   by the Federal Deposit Insurance Corporation?
 8          THE DEFENDANT:  Yes.
 9          THE COURT:  Do you understand that Count Three of the
10   Superseding Information charges you with falsifying books and
11   records of a broker-dealer, in violation of 15 United States
12   Code, Sections 78q(a) and 78ff; 17 of the Code of Federal
13   Regulations, Section 240.17a-3; and Title 18 of the United
14   States Code, Section 2?
15          THE DEFENDANT:  Yes.
16          THE COURT:  Do you understand that Count Four of the
17   Superseding Information charges you with falsifying books and
18   records of an investment advisor, in violation of Title 15 of
19   the United States Code, Sections 80b-4 and 80b-17; 17 Code of
20   Federal Regulations, Section 275.204-2; and Title 18 of the
21   United States Code, Section 2?
22          THE DEFENDANT:  Yes.
23          THE COURT:  Do you understand that Count Five of the
24   Superseding Information charges you with making false
25   statements to facilitate a theft concerning ERISA, in violation
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1126.0016

166dlipp
PLEA
```
 1   of 18 United States Code, Sections 1027 and 2?
 2            THE DEFENDANT:  Yes.
 3            THE COURT:  And do you understand that Count Six of
 4   the Superseding Information charges you with committing bank
 5   fraud with respect to a federally insured bank, in violation of
 6   Title 18 of the United States Code, Sections 1344 and 2?
 7            THE DEFENDANT:  Yes.
 8            THE COURT:  Do you understand that the government
 9   would have to prove each and every part or element of each of
10   these charges beyond a reasonable doubt at trial if you did not
11   plead guilty?
12            THE DEFENDANT:  I do.
13            THE COURT:  Mr. Moore, would you please explain for
14   the record the elements that the government would have to prove
15   if you were to go to trial on these charges?
16            MR. MOORE:  Certainly, your Honor.
17            With regard to Counts One and Two, the conspiracy
18   counts, in order to prove the crime of conspiracy, the
19   government must establish each of the following elements beyond
20   a reasonable doubt:
21            First, that the conspiracy charged in the Information
22   existed, in other words, that there was in fact an agreement or
23   understanding to violate the laws of the United States;
24            Second, your Honor, that the defendant knowingly,
25   willingly and voluntarily became a member of the conspiracy
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

166dlipp
                              PLEA
1    charged;
2              And, third, that any one of the conspirators, not
3    necessarily the defendant, knowingly committed at least one
4    overt act in the Southern District of New York in furtherance
5    of the conspiracy during the life of that conspiracy.
6              With regard to Count Three, your Honor, falsifying
7    broker-dealer books and records, in order to prove this crime,
8    the government must prove beyond a reasonable doubt the
9    following elements:
10             First, that at the time of the alleged offense,
11   Bernard L. Madoff Investment Securities, otherwise known as
12   "BLMIS," was a registered broker;
13             Second, that BLMIS failed to make and keep certain
14   accurate records, as required under the SEC's rules and
15   regulations;
16             Third, that the defendant aided and abetted BLMIS'
17   failure to make and keep accurate records; and
18             Fourth, that the defendant acted knowingly and
19   willfully.
20             With regard to Count Four, your Honor, falsifying
21   books and records of an investment advisor, the government must
22   prove beyond a reasonable doubt:
23             First, that at the time of the alleged offense BLMIS
24   was an investment advisor; second, that BLMIS failed to make
25   and keep certain accurate records as required under the SEC's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

1126.0018

166dlipp
                                    PLEA
1    rules and regulations; third, that the defendant aided and
2    abetted BLMIS' failure to make and keep accurate records;
3    fourth, that the defendant acted knowingly and willfully; and,
4    fifth, the offense involved the use of the mails and means and
5    instrumentalities of interstate commerce.
6              With regard to Count Five, falsifying statements to
7    facilitate a theft concerning ERISA, in order to prove this
8    crime the government must demonstrate beyond a reasonable doubt
9    that, first, that at the time of the alleged offense, the
10   defendant made a false statement; second, that the defendant
11   knew the statement to be false; and, third, that the defendant
12   made a false statement in a document required by ERISA.
13             Finally, your Honor, with regard to Count Six, bank
14   fraud, in order to prove this crime beyond a reasonable doubt,
15   the government must demonstrate, first, that at the time of the
16   alleged offense the defendant executed or attempted execute a
17   scheme or artifice to defraud a bank, or that the defendant
18   execute or attempted to execute a scheme or artifice to obtain
19   money owned by or under the custody or control of that bank by
20   means of false or fraudulent pretense, representations or
21   promises; second, your Honor, the defendant engaged in a scheme
22   or artifice knowingly and willfully and with the specific
23   intent to defraud the bank; and, third, that the bank involved
24   was a federally chartered or insured financial institution.
25             THE COURT:  Thank you.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

166dlipp
                                    PLEA
 1             Mr. Lipkin, do you understand the matters that the
 2    government would have to prove if you did not plead guilty?
 3             THE DEFENDANT:  Yes, I do.
 4             THE COURT:  Do you understand that the maximum
 5    possible penalty for the crime with which you are charged in
 6    Count One is five years of imprisonment, plus a fine of the
 7    greatest of $250,000, twice the gain resulting from the offense
 8    or twice the loss to other people resulting from the offense,
 9    plus a $100 special assessment, plus full restitution to all
10    persons injured as a result of your criminal conduct, plus
11    three years of supervised release after your term of
12    imprisonment?
13             THE DEFENDANT:  I do.
14             THE COURT:  Do you understand that the maximum
15    possible penalty for the crime with which you are charged in
16    Count Two is five years of imprisonment, plus a fine of the
17    greatest of $250,000, twice the gain resulting from the offense
18    or twice the loss to other people resulting from the offense,
19    plus a $100 special assessment, plus full restitution to all
20    persons injured as a result of your criminal conduct, plus
21    three years of supervised release after your term of
22    imprisonment?
23             THE DEFENDANT:  I do.
24             THE COURT:  Do you understand that the maximum
25    possible penalty for the crime with which you are charged in
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

166dlipp
                              PLEA
1    Count Three is 20 years of imprisonment, plus a fine of the
2    greatest of $5 million, twice the gain resulting from the
3    offense or twice the loss to other people resulting from the
4    offense, plus a $100 special assessment, plus full restitution
5    to all persons injured as a result of your criminal conduct,
6    plus three years of supervised release after your term of
7    imprisonment?
8              THE DEFENDANT:  I do.
9              THE COURT:  Do you understand that the maximum
10   possible penalty for the crime with which you are charged in
11   Count Four is five years of imprisonment, plus a fine of the
12   greatest of $250,000, twice the gain resulting from the offense
13   or twice the loss to other people resulting from the offense,
14   plus a $100 special assessment, plus full restitution to all
15   persons injured as a result of your criminal conduct, plus
16   three years of supervised release after your term of
17   imprisonment?
18             THE DEFENDANT:  I do.
19             THE COURT:  Do you understand that the maximum
20   possible penalty for the crime with which you are charged in
21   Count Five is five years of imprisonment, plus a fine of the
22   greatest of $250,000, twice the gain resulting from the offense
23   or twice the loss to other people resulting from the offense,
24   plus a $100 special assessment, plus full restitution to all
25   persons injured as a result of your criminal conduct, plus
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

166dlipp
                          PLEA
1   three years of supervised release after your term of
2   imprisonment?
3            THE DEFENDANT:  I do.
4            THE COURT:  Do you understand that the maximum
5   possible penalty for the crime with which you are charged in
6   Count Six is 30 years of imprisonment, plus a fine of the
7   greatest of $1 million, twice the gain resulting from the
8   offense or twice the loss to other people resulting from the
9   offense, plus a $100 special assessment, plus full restitution
10  to all persons injured as a result of your criminal conduct,
11  plus five years of supervised release after your term of
12  imprisonment?
13           THE DEFENDANT:  I do.
14           THE COURT:  Do you understand that the maximum
15  possible combined penalty for the six crimes with which you are
16  charged is 70 years of imprisonment plus a fine of $7 million
17  or, if greater, the sums of the relevant gains and losses and
18  statutory amounts relating to your offenses, plus full
19  restitution to all persons injured by your criminal conduct,
20  plus a $600 mandatory special assessment, plus supervised
21  release for five years after your term of imprisonment?
22           THE DEFENDANT:  I do.
23           THE COURT:  I will now give you some information to
24  verify your understanding of the supervised release aspect of
25  the potential penalty.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

166dlipp
PLEA

1          "Supervised release" means that you will be subject to
2     monitoring when you are released from prison.  Terms and
3     conditions will be imposed.  If you violate any of the set
4     terms and conditions, you can be reimprisoned without a jury
5     trial.
6          If you were on supervised release and do not comply
7     with any of the set terms or conditions, you can be returned to
8     prison for the remainder of the term of supervised release, you
9     will be given no credit for the time that you served in prison
10    as a result of your sentence and no credit for any time spent
11    on post-release supervision.  So, for example, if you received
12    a prison term and then a three-year term of supervised release
13    and after you left prison you lived up to the terms of
14    supervised release for two years but then you violated some
15    term of the supervised release, you could be returned to prison
16    for three full years.
17          Do you understand that?
18          THE DEFENDANT:  I do.
19          THE COURT:  Do you also understand that if I accept
20    your guilty plea and adjudge you guilty, that adjudication may
21    deprive you of valuable civil rights, such as the right to
22    vote, the right to hold public office, the right to serve on a
23    jury, and the right to possess any kind of firearm?
24          THE DEFENDANT:  I do.
25          THE COURT:  Do you understand that there are
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

24

166dlipp
PLEA
1    Sentencing Guidelines that the Court must consider in
2    determining your sentence?
3            THE DEFENDANT:  I do.
4            THE COURT:  Has your attorney discussed the Sentencing
5    Guidelines with you?
6            THE DEFENDANT:  He has.
7            THE COURT:  Do you understand that in determining your
8    sentence, the Court has an obligation to calculate the
9    applicable Sentencing Guidelines' range and to consider that
10   range, possible departures under the Sentencing Guidelines, and
11   other sentencing factors under Title 18 of the United States
12   Code, Section 3553(a)?
13           THE DEFENDANT:  I do.
14           THE COURT:  Do you understand that if your attorney or
15   anyone else has attempted to estimate or predict what your
16   sentence will be, their estimate or prediction could be wrong?
17           THE DEFENDANT:  Yes.
18           THE COURT:  Do you also fully understand that even if
19   your sentence is different from what your attorney or anyone
20   else told you it might be, or if it is different from what you
21   expect, you will still be bound to your guilty plea and you
22   will not be allowed to withdraw your plea of guilty?
23           THE DEFENDANT:  Yes.
24           THE COURT:  Do you understand that the sentence to be
25   imposed will be determined solely by the Court and that I can
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

166dlipp
                              PLEA
1    only determine the sentence after the Probation Department
2    prepares a presentence report?
3              THE DEFENDANT:  I do.
4              THE COURT:  Do you understand that the Court has
5    discretion, while taking into account the specific provisions
6    and policy statements in the guidelines, to sentence you to any
7    number of years imprisonment between zero and the combined
8    statutory maximums of 70 years?
9              THE DEFENDANT:  I do.
10             THE COURT:  Are you now serving any state or federal
11   sentence, or are you being prosecuted for any other crime?
12             THE DEFENDANT:  I'm not.
13             THE COURT:  Do you understand that the Superseding
14   Information also includes a forfeiture allegation in which the
15   government asserts that you are required to forfeit to the
16   United States any and all property constituting and derived
17   from any proceeds that you obtained as a result of the crimes
18   charged in Counts One, Two, Three and Six, including up to
19   approximately $143.2 million as to Counts One and Three and
20   approximately $700,000, including your interest in certain real
21   property, as to each of Counts Two and Six?
22             MR. FILAN:  Your Honor, Mr. Lipkin understands that he
23   has to admit to the forfeiture allegation regarding the bank
24   fraud crimes in Two and Six, but he is not admitting today to
25   Count One and Three.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

166dlipp
                              PLEA
 1          THE COURT:  Yes.  In this section of the allocution, I
 2  am confirming his understanding that there is a forfeiture
 3  allegation.  We will get to the admission issues later.
 4          MR. FILAN:  Absolutely, your Honor.  I just wanted --
 5  he showed some confusion there, and I wanted to make sure he
 6  understood that.
 7          THE COURT:  Mr. Filan, would you please show
 8  Mr. Lipkin the agreement, Government Exhibit 1.
 9          (Pause)
10          MR. FILAN:  Yes, your Honor.
11          THE COURT:  Mr. Lipkin, have you signed this
12  agreement?
13          THE DEFENDANT:  I have, your Honor.
14          THE COURT:  Did you read it before you signed it?
15          THE DEFENDANT:  Yes.
16          THE COURT:  Did you fully discuss it with your
17  attorney before you signed it?
18          THE DEFENDANT:  Yes, we did.
19          THE COURT:  Did you fully understand it before you
20  signed it?
21          THE DEFENDANT:  Yes.
22          THE COURT:  Does the agreement accurately reflect your
23  complete and total understanding of the entire agreement
24  between the government, your attorney and you?
25          THE DEFENDANT:  Yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

166dlipp
PLEA

```
 1          THE COURT:  Is everything that you understand about
 2   your plea, cooperation and sentence covered in this agreement?
 3          THE DEFENDANT:  Yes.
 4          THE COURT:  Has anything been left out?
 5          THE DEFENDANT:  I don't believe so.
 6          THE COURT:  Has anyone made any promises to you other
 7   than what is set out in that agreement or threatened you or
 8   forced you to plead guilty or to enter into this agreement?
 9          THE DEFENDANT:  No.
10          THE COURT:  Do you understand that even if the
11   government does not oppose or take a position on what your
12   attorney will ask as a sentence, I am free to impose whatever
13   sentence I believe is appropriate under the circumstances and
14   the applicable law and you will have no right to withdraw your
15   plea?
16          THE DEFENDANT:  Yes.
17          THE COURT:  Do you understand that this agreement
18   provides that prior to the date of sentencing, you must file
19   accurate amended tax returns for the years 2006, 2007, 2008 and
20   2009, and pay or enter into an agreement to pay past taxes due
21   and owing by you to the Internal Revenue Service, including any
22   applicable penalties?
23          THE DEFENDANT:  Yes.
24          THE COURT:  Do you understand that the agreement
25   provides that you must cooperate fully with the office of the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp
                              PLEA
 1    United States Attorney, the Federal Bureau of Investigation,
 2    and any other law enforcement agency designated by the United
 3    States Attorney?
 4              THE DEFENDANT:  I do.
 5              THE COURT:  Do you understand that the agreement does
 6    not bind any federal, state or local prosecuting authority
 7    other than the United States Attorney?
 8              THE DEFENDANT:  I do.
 9              THE COURT:  Do you understand that the agreement
10    provides that if the United States Attorney determines that you
11    have provided substantial assistance in an investigation or
12    prosecution, and if you have fully complied with the
13    understandings specified in the agreement, that the United
14    States Attorney will file a motion pursuant to Section 5K1.1 of
15    the Sentencing Guidelines requesting that the Court sentence
16    you in light of the factors set forth in subdivision (a)(1)
17    through (5) of that Section of the guidelines?
18              THE DEFENDANT:  Yes, I do.
19              THE COURT:  Do you understand that the factors that
20    the Court may consider under Section 5K1.1 include the
21    significance and usefulness of your assistance, taking into
22    account the government's evaluation of your assistance; the
23    truthfulness, completeness and reliability of any information
24    or testimony you provided; the nature and extent of your
25    assistance; any injuries suffered or any danger or risk of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

166dlipp

                              PLEA
1  injury to you on your family as a result of your assistance;
2  and the timeliness of your assistance?
3              THE DEFENDANT:  Yes, I do.
4              THE COURT:  Do you understand that even if the United
5  States Attorney files such a motion, the sentence to be imposed
6  on you remains within the sole discretion of the Court?
7              THE DEFENDANT:  Yes.
8              THE COURT:  Do you understand that you will not be
9  entitled to withdraw your plea if the Court denies the motion?
10             THE DEFENDANT:  I do.
11             THE COURT:  Do you understand that if United States
12 Attorney determines that you have not provide substantial
13 assistance in an investigation or prosecution or that you have
14 violated any provision of the agreement, the United States
15 Attorney is not obligated to file a motion under Section 5K1.1?
16             THE DEFENDANT:  I do.
17             THE COURT:  Do you understand that you will not be
18 entitled to withdraw your guilty plea even if the United States
19 Attorney has not filed a motion?
20             THE DEFENDANT:  I do.
21             THE COURT:  Do you understand that your agreement
22 provides that if you commit any further crimes or if it is
23 determined that you gave false, incomplete or misleading
24 testimony or information, or that you otherwise violated any
25 provision of the agreement, you will be subject to prosecution

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

166dlipp

30

PLEA

1    for any federal violations of which the United States Attorney
2    has knowledge, including perjury and obstruction of justice?
3                THE DEFENDANT:  I do.
4                THE COURT:  Do you understand that your agreement
5    provides that if you commit any further crimes, or if it is
6    determined that you gave false, incomplete or misleading
7    testimony or information, or that you otherwise violated any
8    provision of this cooperation agreement, all statements made by
9    you to the United States Attorney or other designated law
10   enforcement agents and any testimony given by you before a
11   grand jury or other tribunal may be admissible in evidence in
12   any criminal proceedings against you?
13               THE DEFENDANT:  I do.
14               THE COURT:  Do you understand that your agreement also
15   provides that you may not assert a claim that such statements
16   should be suppressed from evidence and that you are waiving
17   your right to claim that such statements should be suppressed?
18               THE DEFENDANT:  I do.
19               THE COURT:  Do you understand that on page 3, this
20   agreement also includes your agreement to forfeit to the United
21   States any and all property constituting and derived from any
22   proceeds that you obtained as a result of the crimes charged in
23   Counts One, Two, Three and Six in an amount to be determined by
24   the Court as to Counts One and Three, and as to Counts Two and
25   Six, that you are agreeing to the entry of a money judgment

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1126.0030

166dlipp
                              PLEA
1    against you in the total amount of $1.4 million in United
2    States currency, and that you will forfeit all of your interest
3    in certain real property in Ridgewood, New Jersey and in
4    certain accounts held in the names of or for the benefit of
5    you, your wife and minor children at Fidelity Investments?
6              THE DEFENDANT:  Yes.
7              THE COURT:  Mr. Filan, is that a correct statement?
8              MR. FILAN:  Absolutely, your Honor.  Thank you.
9              THE COURT:  Mr. Lipkin, do you still wish to plead
10   guilty pursuant to this agreement?
11             THE DEFENDANT:  I do.
12             THE COURT:  Mr. Filan, do you know of any valid reason
13   why Mr. Lipkin would prevail at trial?
14             MR. FILAN:  I do not, your Honor.
15             THE COURT:  Do you know any reason why he should not
16   be permitted to plead guilty?
17             MR. FILAN:  I do not.
18             THE COURT:  Mr. Lipkin, would you please stand at this
19   time and tell me what you did that makes you guilty of each of
20   the crimes charged in the third Superseding Information.
21             THE DEFENDANT:  Your Honor, I would like to first
22   apologize to my family, my friends, and all the victims in this
23   case.  I'm very sorry for my conduct.
24             I now want to address my actions as they relate to the
25   charges against me.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

166dlipp

PLEA

1        With regard to the conspiracy charged in Count One and
2   also charged in Counts Three, Four and Five, I worked with
3   Bernard L. Madoff Investment Securities' employees to deceive
4   others.  I created fake DTC reports in New York City.
5        I created these documents knowingly and willingly.  I
6   knew that these documents were fake because they were created
7   by me and not by the DTC.  I created them to match documents
8   given to me by other BLMIS employees.  My understanding was
9   that the fake DTC reports that were prepared were being given
10  to the auditors to mislead them.
11       Also as part of the conspiracy charged in Count One
12  and the charges in Count Three, Four and Five, it was my job to
13  prepare the BLMIS payroll documents and records.  As part of my
14  job from at least 1996 in New York City, I created fake, false
15  payroll records and also submitted to the Department of Labor
16  inaccurate form 5500s.  These forms falsely showed that a
17  number of people were employees of BLMIS when in fact I knew
18  they were not working for BLMIS.
19       For instance, sometime in 2008, Daniel Bonventre
20  instructed me to include one of his sons as an employee when I
21  knew he wasn't working there, and I agreed to do it; and I
22  created BLMIS payroll records to reflect that he worked there.
23       Further, beginning in 2007, in New York City, I
24  knowingly certified on the Form 5500 that there were people who
25  worked at BLMIS when in fact they did not.  I also understood

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp

33

PLEA

1  that the Form 5500 contained a certification that all
2  information on the form was accurate, and I signed it knowing
3  it was not accurate and then I submitted it to the Department
4  of Labor using Federal Express.
5       Counts Two and Six.
6       Regarding Count Two, conspiracy to commit bank fraud,
7  and Count Six, bank fraud, I was attempting to get a
8  construction loan.  In order to ensure I received the loan, I
9  went to Frank DiPiscali to create a new BLMIS account in my
10 name that falsely said my account value was greater than it
11 was.  I knew I could ask Frank DiPiscali to do this for me
12 because I knew it had been done previously for other BLMIS
13 employees.
14      That account statement was created in New York at
15 BLMIS in November of 2008.  Once I got the fake statement, I
16 sent it from New York City to a bank in Florida.  I knew that
17 the account did not have the money in it that the statement
18 said it did and that it was wrong to mislead the lender to get
19 the loan.
20      THE COURT:  Would you remain standing.  I have a few
21 more questions for you.
22      You indicated that the fake DTC reports that you were
23 making were going to be given to the auditors in order to
24 deceive auditors.  What did you understand the auditors were
25 going to do with that information?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1126.0033

166dlipp

PLEA

```
 1              THE DEFENDANT:  It was to confirm positions at several
 2   investment advisory accounts that we were reporting at.
 3              THE COURT:  And to what persons or entities were the
 4   reports going to be made?
 5              THE DEFENDANT:  The SEC.
 6              THE COURT:  And you use the term "DTC," what does that
 7   mean?
 8              THE DEFENDANT:  Depository Trust Company.
 9              THE COURT:  You used the term "5500" reports.  What
10   are those?
11              THE DEFENDANT:  Those are reports that certify monies
12   that are in a 401(k) plan.
13              THE COURT:  And is the 401(k) plan a type of plan
14   that's governed by the Employee Retirement Income Security Act?
15              THE DEFENDANT:  It is.
16              THE COURT:  And to what agency, if any, of the
17   government are the 5500s submitted?
18              THE DEFENDANT:  The federal government, the IRS -- the
19   Department of Labor.  I'm sorry.
20              THE COURT:  I notice that you were looking at some
21   notes as you were speaking.  Do those notes accurately reflect
22   truthful information and actions that you yourself took?
23              THE DEFENDANT:  Yes, they do.
24              THE COURT:  When you did these things that you have
25   described, did know that what you were doing was wrong and
```

166dlipp

                              PLEA
1    illegal?
2              THE DEFENDANT:  Yes.
3              THE COURT:  Mr. Moore, does the government wish any
4    further factual matters to be addressed in the plea allocution?
5              MR. MOORE:  No.  Thank you, your Honor.
6              THE COURT:  Mr. Moore, would you please summarize the
7    government's evidence against Mr. Lipkin.
8              And, Mr. Lipkin, you can be seated, please.
9              MR. MOORE:  Certainly, your Honor.
10             Had this case proceeded to trial, the government would
11   have proven, through testimony and evidence, beyond a
12   reasonable doubt the facts set forth in the Superseding
13   Information.  Specifically, the government would have proven
14   with respect to Counts One, Three, Four and Five of the
15   Information a conspiracy to falsify books and records of a
16   broker-dealer and investment advisor and conspiracy to falsify
17   statements to facilitate a theft concerning ERISA, along with
18   the corresponding substantive charges:  That Mr. Lipkin was
19   employed by BLMIS from in or about the mid-1980s through at
20   least on or about December 11, 2008, when BLMIS collapsed.  In
21   or about 1996, Mr. Lipkin began working with his
22   co-conspirators in falsifying the books and records at BLMIS.
23             For instance, Mr. Lipkin, working with other
24   co-conspirators, created fraudulent account statements
25   detailing the account values of several investment advisory, or
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

166dlipp
                              PLEA
1    "IA", accounts at BLMIS.  In furtherance of this fraud, your
2    Honor, Mr. Lipkin prepared letters and statements setting out
3    fake holdings purportedly held in multiple BLMIS IA accounts.
4            Further, in connection with reviews by the SEC and a
5    European accounting firm, Mr. Lipkin and other co-conspirators
6    created false and fraudulent BLMIS books and records as well as
7    false documents purportedly obtained from third parties in the
8    ordinary course of business at BLMIS.  For example, Mr. Lipkin
9    and others created fake reports purportedly obtained by the
10   Depository Trust Company, or "DTC."  These fake DTC reports
11   purported to show the securities holdings of BLMIS IA clients,
12   which in fact did not exist.  Mr. Lipkin knew the purpose of
13   these fake DTC reports was to mislead the auditors.
14           During his tenure at BLMIS, and at the direction of
15   other co-conspirators, Mr. Lipkin also created false BLMIS
16   books and records reflecting individuals who did not actually
17   work at BLMIS.  Mr. Lipkin was responsible for processing the
18   payroll and administering the 401(k) plans at BLMIS, and in
19   this capacity, your Honor, Mr. Lipkin was responsible for
20   preparing and maintaining internal BLMIS payroll records.  He
21   was aware that there were individuals on BLMIS's payroll who
22   did not work for the firm but who nevertheless received
23   salaries and benefits.  Mr. Lipkin created false internal BLMIS
24   payroll records reflecting that these individuals worked at
25   BLMIS.  Furthermore, he included a number of fake employees in
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

166dlipp
                              PLEA
 1   the total number of employees that he reported to the
 2   Department of Labor.
 3            With respect to Counts Two and Six, conspiracy to
 4   commit bank fraud and bank fraud, your Honor, the government
 5   would prove that in or about 2008, Mr. Lipkin prepared and
 6   submitted a loan application to a lending institution insured
 7   by the Federal Deposit Insurance Corporation, or "FDIC," which
 8   purported to represent accurately his personal and financial
 9   information.  However, he fraudulently improved his
10   creditworthiness by falsifying his personal and financial
11   information in a manner that was material to the lending
12   institution in making its lending decision.  Specifically,
13   Mr. Lipkin, working with others, prepared and submitted false
14   and misleading information concerning his assets.
15            THE COURT:  Mr. Moore, before you sit down, or I will
16   ask you to stand back up, would you just map for me a little
17   more precisely the nature of the violation of the
18   ERISA-specific charge, which we've referred to as facilitating
19   false statements to facilitate a theft concerning ERISA, the
20   elements had been recited, and the allocution here deals with
21   the falsification of plan financial reports by including people
22   who were not employees.
23            Is there also a specific theft element?  Is there a
24   necessity to show intent that plan assets were actually to be
25   given to someone who wasn't entitled to them?  I just don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

166dlipp
                              PLEA
1    understand the nexus between the theft concept and the false
2    statements to my satisfaction.
3         MR. MOORE:  Sure.  Your Honor, I don't believe that is
4    an essential element of the crime, but we have alleged that and
5    I believe defendant has admitted to that nevertheless.
6         It is our understanding -- and we would prove this
7    beyond a reasonable doubt should this case go to trial -- that
8    Mr. Lipkin submitted the Form 5500, which is a reporting form
9    that goes to the Department of Labor, which essentially lists
10   the number of employees at the employer's institution.  In this
11   case, Mr. Lipkin inflated that number, therefore misreporting
12   the number of employees who were working at BLMIS, when he in
13   fact knew that there were fewer employees working at that
14   institution.  As a result of doing so, he also put them on the
15   internal payroll records at BLMIS, thus giving those employees
16   who in fact never worked at BLMIS 401(k) plans and other
17   salaries and benefits.
18        Can you hold on one second, your Honor?
19        (Pause)
20        Right.  Entitling them to benefits provided under the
21   Social Security Administration as well as under a 401(k) plan,
22   your Honor.  As a result of that, your Honor, the Form 5500
23   that goes to the Department of Labor does concern ERISA, and,
24   therefore, we believe Mr. Lipkin has met all the three elements
25   for Count Five, falsifying statements to facilitate a theft
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

39

166dlipp

PLEA

1  concerning ERISA.
2          THE COURT:  Mr. Lipkin, is Mr. Moore's summary of the
3  nature and significance in terms of entitlement to benefits
4  under an ERISA government plan accurate with respect to your
5  own activities in falsifying the 401(k) plan records?
6          THE DEFENDANT:  It is, your Honor.
7          THE COURT:  Mr. Lipkin, would you please stand again.
8          Mr. Lipkin, how do you now plead to the charge against
9  you in Count One of the third Superseding Information, not
10 guilty or guilty?
11         THE DEFENDANT:  Guilty.
12         THE COURT:  How do you now plead to the charge against
13 you in Count Two of the third Superseding Information, not
14 guilty or guilty?
15         THE DEFENDANT:  Guilty.
16         THE COURT:  How do you now plead to the charge against
17 you in Count Three of the third Superseding Information, not
18 guilty or guilty?
19         THE DEFENDANT:  Guilty.
20         THE COURT:  How do you now plead to the charge against
21 you in Count Four of the third Superseding Information, not
22 guilty or guilty?
23         THE DEFENDANT:  Guilty.
24         THE COURT:  How do you now plead to the charge against
25 you in Count Five of the third Superseding Information, not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp

PLEA

```
 1   guilty or guilty?
 2            THE DEFENDANT:  Guilty.
 3            THE COURT:  And how do you now plead to the charge
 4   against you in Count Six of the third Superseding Information,
 5   not guilty or guilty?
 6            THE DEFENDANT:  Guilty.
 7            THE COURT:  Are you pleading guilty to each of these
 8   charges because you are in fact guilty of the conduct charged
 9   in each count?
10            THE DEFENDANT:  I am.
11            THE COURT:  Are you pleading guilty voluntarily and of
12   your own free will?
13            THE DEFENDANT:  I am.
14            THE COURT:  Mr. Filan, would you please show
15   Mr. Lipkin Court Exhibit 1, the advice of rights form.
16            Mr. Lipkin, have you signed this form?
17            THE DEFENDANT:  I have.
18            THE COURT:  Did you read it before you signed it?
19            THE DEFENDANT:  I did.
20            THE COURT:  Did you discuss it with your attorney
21   before you signed it?
22            THE DEFENDANT:  We did.
23            THE COURT:  Did you understand it before you signed
24   it?
25            THE DEFENDANT:  I did.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1126.0040

166dlipp
PLEA

```
 1              THE COURT:  Mr. Filan, did you also review and sign
 2    Court Exhibit 1?
 3              THE DEFENDANT:  I did, your Honor.
 4              THE COURT:  Mr. Filan, are there any other questions
 5    that you believe I should ask Mr. Lipkin in connection with
 6    this plea?
 7              MR. FILAN:  No, your Honor.
 8              THE COURT:  Mr. Moore, are there any other questions
 9    that you believe I should ask Mr. Lipkin in connection with
10    this plea?
11              MR. MOORE:  No.  Thank you, your Honor.
12              THE COURT:  And are there any victims who wish to
13    speak in connection with this matter?
14              (Pause)
15              I note that no one has raised their hand.
16              Mr. Lipkin, you have acknowledged that you are guilty
17    as charged in the Information.  I find that you know your
18    rights and that you are waiving them voluntarily.
19              Because your plea is entered knowingly and voluntarily
20    and is supported by an independent basis in fact containing
21    each of the essential elements of each of the offenses, I
22    accept your guilty plea, and I adjudge you guilty of the
23    offenses charged in Counts One, Two, Three, Four, Five and Six
24    of the third Superseding Information in this case, which is
25    numbered 10 Criminal 228.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

166dlipp
                              PLEA
1           You can be seated now.  Thank you.
2           THE DEFENDANT:  Thank you.
3           THE COURT:  Mr. Filan, do you wish to be present for
4    any interview of Mr. Lipkin in connection with the preparation
5    of the presentence report?
6           MR. FILAN:  I do, your Honor.
7           THE COURT:  I will make that direction.
8           MR. FILAN:  Thank you.
9           THE COURT:  Mr. Moore, what is the parties' request
10   with respect to the setting of a sentencing date or a control
11   date?
12          MR. MOORE:  Your Honor, at this time, we request that
13   we have six months for a sentencing control date.
14          THE COURT:  And that a presentence report not be
15   ordered at this point?
16          MR. MOORE:  That is correct, your Honor.
17          THE COURT:  Ms. Ng, may we have a control date six
18   months out?
19          THE CLERK:  Thursday, December 15, 2011, at 11 a.m.
20          THE COURT:  The sentencing control date is set for
21   December 15, 2011, at 11 in the morning.
22          In advance of that date, Mr. Moore, will the
23   government inform the Court as to whether it is appropriate to
24   commence the preparation of the presentence report or to
25   further extend the control date?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

43

166dlipp
                              PLEA
1          MR. MOORE:  We will, your Honor.
2          THE COURT:  Thank you.
3          When it is time for sentencing, counsel, I just wish
4    to ask and to remind you to be prompt in getting any objections
5    or additional information to Probation after the draft report
6    is disclosed, and any 5K1.1 letter or letter indicating an
7    intention to make a motion pursuant to 5K1.1 must be prepared
8    and submitted to the Court and the Probation Department before
9    the probation report is completed so that I can have the
10   benefit of the Probation Department's thinking in that regard
11   as well.
12         Sentencing submissions are governed by my sentencing
13   submission procedures, which are available on the court's
14   website and also here in hard copy in the courtroom.
15         Mr. Lipkin, the Probation Office will be preparing a
16   presentence report at some point to assist me in sentencing
17   you.  You will be interviewed by the Probation Office.  It is
18   important that the information that you give to the probation
19   officer be truthful and accurate.  The report is important in
20   my decision as to what your sentence will be.  You and your
21   attorney have a right and will have an opportunity to examine
22   the report, to challenge or comment on it, and to speak on your
23   behalf before sentencing.
24         Failing to be truthful with the Probation Office and
25   the Court may have an adverse effect on your sentence and may
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1126.0043

44

166dlipp

PLEA

```
1    subject you to prosecution.
2              Do you understand that?
3              THE DEFENDANT:  I do.
4              THE COURT:  Thank you.
5              Now, give me just one moment here.
6              (Pause)
7              Section 3143 of Title 18 provides that the Court is to
8    order a person who has been found guilty of an offense and who
9    is awaiting sentencing as a general matter to be detained
10   unless the judicial officer finds by clear and convincing
11   evidence that the person is not likely to flee or pose a danger
12   to the safety of any other person or the community if released.
13             Do the parties have a proposal with respect to
14   detention or release, and would the government set forth its
15   position as to the 3143 factors?
16             MR. MOORE:  Yes, your Honor.  In light of Mr. Lipkin's
17   cooperation and his full disclosure of his financial assets,
18   his dealings at BLMIS, we are confident that he will be
19   following the rules as set in our proposed bail package that we
20   would like to present to the Court; namely, that his bail be
21   secured by a $2.5 million personal recognizance bond, secured
22   by $800,000 in cash or property.
23             THE COURT:  And that would be property other than the
24   residential property that has been mentioned in connection with
25   the --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

45

166dlipp
                              PLEA
1           MR. MOORE:  Absolutely, your Honor.
2           We also request that he be subject to strict pretrial
3    supervision; that his travel be restricted to the Southern and
4    Eastern Districts of New York, the District of New Jersey,
5    where he resides, and the District of Connecticut, where his
6    attorney practice.
7           Your Honor, we also request that he surrender all of
8    his travel documents and make new no travel applications.
9           Your Honor, we would request that these conditions be
10   met no later than this Friday.
11          THE COURT:  And have you had sufficient dealings up to
12   now with Mr. Lipkin to have a view as to his reliability in
13   keeping appointments, his ability to be trusted at his word in
14   such relevant matters?
15          MR. MOORE:  We have, your Honor, as well as the
16   agency, the FBI, has been working with him.
17          In addition, your Honor, to ensure our confidence in
18   Mr. Lipkin, we have already interviewed a number of cosigners
19   that have volunteered to serve as suriters for his bond.
20   Specifically, we've interviewed seven cosigners that he has
21   proposed, and at this time we are prepared to approve all of
22   them.
23          THE COURT:  And is there anything that you wish to say
24   to me with respect to community or family ties and the
25   significance of those matters in terms of risk of flight?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

166dlipp
                              PLEA
 1          MR. MOORE:  Yes, your Honor, which was a factor in our
 2  determination.  Mr. Lipkin is a long-time resident of the New
 3  York/New Jersey area.  He resides in New Jersey with his wife
 4  and children along with several other family members, your
 5  Honor.  And as a result we are satisfied that he is not a risk
 6  of flight, that he does not pose a danger to the community, so
 7  long as the conditions that we had proposed are also assigned
 8  with his release.
 9          THE COURT:  Are you confident of your assessment in
10  terms of the potential availability of assets to facilitate
11  flight?
12          MR. MOORE:  Your Honor, as a part of this process, and
13  one of the reasons why we have expressed some confidence in
14  Mr. Lipkin, is that he has fully disclosed his assets to us.
15  He has filled out financial affidavits with our office fully
16  disclosing the whereabouts of all of his funds.  And I believe,
17  as Mr. Filan will attest, he has also agreed to allow us to
18  immediately start forfeiting those proceeds.
19          THE COURT:  And you and your colleagues or
20  investigators have traced monies that to your knowledge went
21  from BLMIS to Mr. Lipkin and have mapped his disclosures
22  against known assets?
23          MR. MOORE:  That's correct, your Honor, which also
24  proves some confidence in Mr. Lipkin, that our own independent
25  evaluation matched up with what proved to be Mr. Lipkin's
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1126.0046

47

166dlipp
                              PLEA
1   truthful disclosure about his own financial assets and the
2   whereabouts of those assets.
3           THE COURT:  Given the termination of operations of
4   BLMIS, does the government have a view as to potential danger
5   to the community?  Is that an issue here?
6           MR. MOORE:  We do not believe it is an issue in this
7   case, your Honor.  No.
8           THE COURT:  And I understand that Mr. Lipkin is
9   recently unemployed.  What is the government's position as to
10  the significance of that status with respect to risk of flight?
11          MR. MOORE:  Your Honor, Mr. Lipkin, from our
12  understanding, will be assisting his wife with the children.
13  His wife is a full-time employee and is fully employed.  And we
14  believe, in light of those conditions, your Honor, he is not a
15  risk of flight, particularly if, as we have requested, the
16  conditions are assigned for strict pretrial supervision and the
17  security that he is willing to post, including the $800,000 of
18  cash which is coming from close family members of the
19  defendant.  As well, your Honor, a number of the cosigners we
20  do believe have a significant moral suasion over the defendant
21  in light of their close relationship to him.
22          THE COURT:  Thank you.
23          Officer Ramesar, I've reviewed your report, for which
24  I thank you.
25          MS. RAMESAR:  You are welcome.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1126.0047

48

166dlipp

PLEA

 1        THE COURT:  Is there anything in particular or in
 2    addition to or different from what Mr. Moore has argued that
 3    you wish to bring to my attention at this point?
 4        MS. RAMESAR:  No, your Honor.
 5        THE COURT:  Thank you.
 6        Mr. Filan, did you wish to be heard?
 7        MR. FILAN:  Just to say, your Honor, that we have
 8    Mr. Lipkin's passport, which we will surrender today to
 9    Pretrial Services, as the government requests.  And we also
10    have two cosigners here with us today, who will execute the
11    appearance bond today before they leave the courthouse to begin
12    that process.
13        And we urge the Court to release Mr. Lipkin for the
14    reasons that Mr. Moore covered.  I have really nothing further
15    to add to that.
16        THE COURT:  Thank you.
17        MR. FILAN:  Thank you, your Honor.
18        THE COURT:  Mr. Moore, the summary of the proposed
19    conditions that you've provided deals with the surrender of
20    Mr. Lipkin's travel documents.  Is there a reason why there is
21    no provision for the surrender of the travel documents of
22    immediate family members?
23        MR. MOORE:  Your Honor, we have no objection to the
24    wife keeping her passport.  In fact, it is our understanding
25    that she will be taking herself and her children to a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

166dlipp
                              PLEA
1    destination this summer.
2            However, if the Court feels that she should surrender
3    her travel passports, we would have no objection to that
4    condition being added.
5            THE COURT:  It seems to me prudent to do that, given
6    the magnitude of the exposure.
7            So I will direct that the travel documents of the wife
8    and children also be surrendered without prejudice to specific
9    application, on notice, for return in connection with specific
10   travel approved by the Pretrial Services Department to which
11   there is no other objection.  If there is an objection, I will
12   hear it.
13           MR. MOORE:  Thank you, your Honor.
14           THE COURT:  Mr. Filan.
15           MR. FILAN:  That is fine, your Honor.  Thank you.
16           THE COURT:  Thank you.
17           Having carefully considered all that I have heard here
18   today, including the admissions of criminal activity, the
19   result of the investigation of Pretrial Services, the
20   government's extensive account of its activities and evaluation
21   with respect to risk of flight and potential for danger to the
22   community presented by Mr. Lipkin, I find that there is clear
23   and convincing evidence that with the imposition of the
24   proposed conditions Mr. Lipkin is not likely to flee or pose a
25   danger to the safety of any other person or the community.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

166dlipp
                              PLEA
1              Accordingly, I will grant him release on the
2       conditions that have been proposed, with the modification that
3       we just discussed concerning the surrender of family travel
4       documents.
5              I am now going to prepare a bail disposition sheet
6       enumerating these conditions, and then I will distribute that
7       in draft to the parties so that we can be sure that I've gotten
8       everything correct.  So bear with me as I type this up, please.
9              (Pause)
10             What I've written is this:  "$2.5 million PRB secured
11      by $800,000 cash and property, and 7 FRPs.  Travel restricted
12      to DNJ, D Conn, E.D.N.Y. and S.D.N.Y.  All travel documents of
13      Defendant, wife and children to be surrendered, with no new
14      applications (without prejudice to application for return of
15      documents of wife and children for particular preauthorized
16      travel).  Strict pretrial supervision.  All conditions must be
17      met by 4:00 p.m. on June 10, 2011."
18             Does that cover everything accurately?
19             MR. MOORE:  That is our understanding.  Thank you,
20      your Honor.
21             MR. FILAN:  Yes, your Honor.  Thank you.
22             THE COURT:  I will fix one typo and then I will sign.
23      How many copies are needed?
24             THE CLERK:  Six.
25             THE COURT:  OK.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

51

166dlipp
                              PLEA
 1          (Pause)
 2          THE COURT:  Now, Mr. Moore and Ms. Baroni, can you
 3  shepherd things through the Magistrate Clerk's office here, or
 4  whatever section of the Clerk's Office --
 5          MR. MOORE:  We will, your Honor.  Thank you.
 6          THE COURT:  And, also, Mr. Filan and Mr. Lipkin will
 7  need to go over to the Probation Department as well to get
 8  paper work set up and get any specifics as to what needs to be
 9  done there today that will be carried out.
10          MR. FILAN:  Thank you, your Honor.
11          THE COURT:  Thank you.  Is there anything further that
12  we need to take up together this afternoon?
13          MR. MOORE:  Can you give us one moment, your Honor?
14          THE COURT:  Yes.
15          MR. MOORE:  Nothing further on the government's part.
16  Thank you, your Honor.
17          MR. FILAN:  Nothing from the defendant, your Honor.
18          THE COURT:  All right.  Thank you.  We are adjourned.
19          THE DEFENDANT:  Thank you, your Honor.
20          THE CLERK:  All rise.
21
22                          -  -  -
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

# Exhibit 37

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC

885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

GCv

October 22, 2002

To Our Valued Client:

The USA PATRIOT Act of 2001 requires all United States broker/dealers to obtain and keep current certain client information. In order for us to be certain that the information we have on file is both current and accurate, we are asking our clients to complete the enclosed forms and return them to us.

These new forms will replace your existing account forms in our files.

We thank you in advance for your prompt attention.

Sincerely,

Bernard L. Madoff

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1X 5AD. Tel 020-7493 6222

CONFIDENTIAL



**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

**TAX ID # or SOCIAL SECURITY #**

13 - 3621277

Mr./Mrs./Ms.     Gabriel Capital, L.P.
**NAME**     450 Park Avenue, #3201
**STREET**     NY     NY     10022
**CITY**     STATE     ZIP
212-838-7200     212-838-9603 (F)
**TEL. NUMBER**     **BUSINESS**     **RESIDENCE**

WE DEEM THE QUESTIONS CONTAINED IN THIS SECTION TO BE REQUIRED BY THE
"KNOW YOUR CUSTOMER" RULE OF THE NATIONAL ASSOCIATION OF SECURITY
DEALERS, AND, THEREFORE, MUST BE ANSWERED IN FULL.

**RESIDENCE**     N/A

N/A
**NAME OF EMPLOYER (IF HOUSEWIFE, NAME THE HUSBAND'S EMPLOYER)**

**EMPLOYER'S ADDRESS**

**OCCUPATION**     un-registered Investment Partnership

**BANK REFERENCE AND ADDRESS**

**OTHER BROKERAGE ACCOUNTS**     Morgan Stanley & Co. Ink.

### FOR OFFICE USE ONLY

**ACCOUNT # ASSIGNED**

**R R.'S ESTIMATE OF CLIENTS NET WORTH**

**IS CLIENT OVER 21 YEARS OF AGE**     YES     NO

**HOW LONG HAVE YOU KNOWN CLIENT**

**CLIENT IS CITIZEN OF**

**APPROVED BY**

**DATE SENT TO CLIENT**

**CORPORATE RESOLUTION**
**JOINT AGREEMENT**
**CORPORATE ACCOUNT FORM**
**CO-PARTNERSHIP FORM**

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

CONFIDENTIAL

GCC-P 0366171

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

Congress has mandated that all interest and dividend payers including banks, corporations and funds must withhold 10% of all dividends or interest paid UNLESS you complete and return the form at the bottom of this page.

### Important New Tax Information

"Under the Federal income tax law, you are subject to certain penalties as well as with-holding of tax at a 20% rate if you have not provided us with your correct social security number or other taxpayer identification number. Please read this notice carefully.

You (as a payee) are required by law to provide us (as payer) with your correct taxpayer identification number. If you are an individual, your taxpayer identification is your social security number. If you have not provided us with your correct taxpayer identification number, you may be subject to a $50 penalty imposed by the Internal Revenue Service. In addition, divided payments that we make to you may be subject to backup withholding starting on January 1, 1984.

Backup withholding is different from the 10% withholding on interest and dividends that was repealed in 1983. If backup withholding applies, payer is required to withhold 20% of dividend payments made to you. Backup withholding is not an additional tax. Rather, the tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund may be obtained".

Please sign the form and return it to us.

Even if you have already provided this information it is required by the IRS that all information requested below be provided again.

Thank you for your cooperation.

------------------------------------------------------------

### SUBSTITUTE INTERNAL REVENUE SERVICE FORM W-9

Account Number(s): _____

Taxpayer Identification Number:

13-3621277

Name: _____ Gabriel Capital, L.P. _____

Address: _____ 450 Park Avenue, #3201, NY NY 10022 _____

(Signature) _____

"Under penalties of perjury, I certify that the number shown On this form is my correct Taxpayer Identification Number".

Please fill in your name, address, taxpayer identification number, and sign above.

Affiliated with:
**Madoff Securities International Limited**
12 Berkeley Street, Mayfair, London W1X 5AD. Tel 020-7493 6222

CONFIDENTIAL                                                                   GCC-P 0366172

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

# OPTION AGREEMENT

In order to induce you to carry accounts ("Option Accounts") for me (however designated) for transactions in option contracts (including, without limitations, purchase, sale, transfer, exercise and endorsement) ("Option Transaction"), I hereby warrant, represent and agree with you as set forth below on this Option Agreement.

1.    I understand, and am well aware, that option trading may be highly speculative in nature. I am also aware that on certain days, option trading may cease and this could result in a financial loss to me. I agree to hold the company, its other divisions, and its officers, directors and agents harmless for such loss.

2.    I understand that any option transaction made for any account of mine is subject to the rules, regulations, customs and usages of The Options Clearing Corporation and of the registered national securities exchange, national securities association, clearing organization or market where such transaction was executed. I agree to abide by such rules, regulations, custom and usages and I agree that, acting individually or in concert with others, I will not exceed any applicable position or exercise limits imposed by such exchange, association, clearing organization or other market with respect to option trading.

3.    If I do not satisfy, on a timely basis, your money or security calls, you are authorized in your sole discretion and without notification, to take any and all steps you deem necessary to protect yourself (for any reason) in connection with option transactions for my account including the right to buy and/or sell (including short or short exempt) for my account and risk any part or all of the shares represented by options handled, purchased, sold and/or endorsed by you for my account or to buy for my account and risk any option as you may deem necessary or appropriate. Any and all expenses or losses incurred in this connection will be reimbursed by me.

4.    In addition to the terms and conditions hereof, my option account will be subject to all of the terms and conditions of all other agreements heretofore or hereafter at any time entered into with you relating to the purchase and sale of securities and commodities except to the extent that such other agreements are contrary to or inconsistent herewith.

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1X 5AD. Tel 020-7493 6222

CONFIDENTIAL                                                                      GCC-P 0366173

5.  This agreement shall apply to all puts or call which  you may have executed, purchased, sold  or handled for any account of mine   and also   shall apply to all puts, or calls which   you may hereafter purchase, sell, handle or execute for any account of  mine.

6.  I have received from   the company the most recent risk disclosure   documents entitled "Understanding the Risks and Uses of Listed Options",   "Listed Options on Stock Indices", "Listed Options on Foreign Currencies", and "Listed Options in Debt Instruments".  I have read and understand the information contained in these documents.

7.  I understand that you assign exercise notices on a random basis   except that with respect to options on the following debt instruments: Treasury Bonds, Treasury Notes, Treasury Bills and GNMAS, you may preferentially   assign exercises of block-size (i.e. covering $1,000,000 or more of   underlying securities) to block-size writing positions and you may   preferentially assign smaller exercises to smaller writing positions.  I  understand that upon my request you will provide me with further  information regarding the procedure used to assign exercise notices.


DATED _____ 11/4/02 _____          ACCOUNT NO. _____


SIGNATURES


(If a Corporation)                          (If Individuals)


_____              _____
(Name of Corporation)

By_____              _____
                                     (Second Party if Joint Account)

Title_____             (If a Partnership)

                                     Gabriel Capital, L.P.
                                     (Name of Partnership)

        SEAL

                                     By ___ J Emme Mnkim ___
                                          (A Partner)


CONFIDENTIAL                                           GCC-P 0366174

| MADF | **BERNARD L. MADOFF**<br>INVESTMENT SECURITIES LLC<br>885 Third Avenue New York, NY 10022 | 212 230-2424<br>800 334-1343<br>Fax 212 486-8178 |
|---|---|---|

## TRADING AUTHORIZATION LIMITED TO PURCHASES
## AND SALES OF SECURITIES AND OPTIONS

To Whom It May Concern:

The undersigned hereby authorizes Bernard L. Madoff (whose signature appears below) as his agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with your terms and conditions for the undersigned's account and risk and in the undersigned's name, or number on your books. The undersigned hereby agrees to indemnify and hold you harmless from, and to pay you promptly on demand any and all losses arising therefrom or debit balance due thereon. However, in no event will the losses exceed my investment.

In all such purchases, sales or trades you are authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with you; and he is authorized to act for the undersigned and in the undersigned's behalf in the same manner and  with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades.   All purchases, sales or trades shall be executed strictly in accordance with the established trading authorization directive.

The undersigned hereby ratifies and confirms any and all transactions with you heretofore or hereafter made by the aforesaid agent or for the undersigned's account.

This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between the undersigned and your firm.

This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice addressed to you and delivered to your office at 885 Third Avenue but such revocation shall not affect any liability in any way resulting from transaction initiated prior to such revocation.  This authorization and indemnity shall enure to the benefit of your present firm and any successor firm or firms irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.

Dated, _____11/5/02_____

|  NY  |  NY  |
|---|---|
| (City) | (State) |

Very truly yours, _____Gabriel Capital, L.P._____ ×
(Client Signature)

Signature of Authorized Agent: _____

**Affiliated with:**
**Madoff Securities International Limited**
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

CONFIDENTIAL                                                                                           GCC-P 0366175

## BERNARD L. MADOFF
### INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

## CUSTOMER AGREEMENT

In consideration for you (the "Broker") opening or maintaining one or more accounts (the "Customer"), the Customer agrees to the terms and conditions contained in this Agreement. The heading of each provision of the Agreement is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision. For purposes of this Agreement, "securities and other property" means, but is not limited to money, securities, financial instruments and commodities of every kind and nature and related contracts and options, except that the provisions of paragraph 13 herein (the arbitration clause) shall not apply to commodities accounts. This definition includes securities or other property currently or hereafter held, carried or maintained by you or by any of your affiliates, in your possession or control, or in the possession or control of any such affiliate, for any purpose, in and for any of my accounts now or hereafter opened, including any account in which I may have an interest.

### 1. APPLICABLE RULES AND REGULATIONS

All transactions in the Customer's Account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed by the Broker or its agents, including its subsidiaries and affiliates. Also, where applicable, the transactions shall be subject (a) to the provisions of (1) the Securities Exchange Act of 1934, as amended, and (2) the Commodities Exchange Act, as amended; and (b) to the rules and regulations of (1) the Securities and Exchange Commission, (2) the Board of Governors of the Federal Reserve System and (3) the Commodities Futures Trading Commission.

### 2. AGREEMENT CONTAINS ENTIRE UNDERSTANDING/ASSIGNMENT

This Agreement contains the entire understanding between the Customer and the Broker concerning the subject matter of this Agreement. Customer may not assign The rights and obligations hereunder without first obtaining the prior written consent of the Broker.

### 3. SEVERABILITY

If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not effect the validity of the remaining provisions of this Agreement.

### 4. WAIVER

Except as specifically permitted in this Agreement, no provision of this Agreement can be, nor be deemed to be, waived, altered, modified or amended unless such is agreed to in a writing signed by the broker.

### 5. DELIVERY OF SECURITIES

Without abrogating any of the Broker's rights under any other portion of this Agreement and subject to any indebtedness of the Customer to the Broker, the Customer is entitled, upon appropriate demand, to receive physical delivery of fully paid securities in the Customer's Account.

### 6. SALES BY CUSTOMER

The Customer understands and agrees any order to sell "short" will be designated as such by the Customer, and that the Broker will mark the order as "short". All other sell orders will be for securities owned ("long"), at that time, by the Customer by placing the order the Customer affirms that he will deliver the securities on or before the settlement date.

**Affiliated with:**
**Madoff Securities International Limited**
**12 Berkeley Street, Mayfair, London W1X 5AD. Tel 020-7493 6222**

CONFIDENTIAL

GCC-P 0366176

**7. BROKER AS AGENT**

The customer understands that the Broker is acting as the Customer's agent, unless the Broker notifies the Customer, in writing before the settlement date for the transaction, that the Broker is acting as dealer for its own account or as agent for some other person.

**8. CONFIRMATIONS AND STATEMENTS**

Confirmations of transactions and statements for the Customer's Account(s) shall be binding upon the Customer if the Customer does not object, in writing, within ten days after receipt by the Customer.

**9. SUCCESSORS**

Customer hereby agrees that this Agreement and all the terms thereof shall be binding upon Customer's heirs, executors, administrators, personal representatives and assigns. This Agreement shall ensure to the benefit of the Broker's present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever.

**10. CHOICE OF LAWS**

THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF _____ *N Y* _____ AND SHALL BE CONSTRUED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF _____ *N Y* _____.

**11. CAPACITY TO CONTRACT, CUSTOMER AFFILIATION**

By signing below, the Customer, represents that he/she is of legal age, and that he/she is not an employee of any exchange, or of any corporation of which any exchange owns a majority of the capital stock, or of a member of any exchange, or of a member firm or member corporation registered on any exchange, or of a bank, trust company, insurance company or of any corporation, firm or individual engaged in the business of dealing, either as broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper, and that the Customer will promptly notify the Broker in writing if the Customer is now or becomes so employed. The Customer also represents that no one except the Customer has an interest in the account or accounts of the Customer with you.

**12. ARBITRATION DISCLOSURES**

    • **ARBITRATION IS FINAL AND BINDING ON THE PARTIES.**

    • **THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.**

    • **PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.**

    • **THE ARBITRATORS AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.**

    • **THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.**

CONFIDENTIAL



**13. ARBITRATION**

THE CUSTOMER AGREES, AND BY CARRYING AN ACCOUNT FOR THE CUSTOMER THE BROKER AGREES THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN US CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN US PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE DESIGNATED IN PARAGRAPH 10, BEFORE THE AMERICAN ARBITRATION ASSOCIATION, OR BEFORE THE NEW YORK STOCK EXCHANGE, INC. OR AN ARBITRATION FACILITY PROVIDED BY ANY OTHER EXCHANGE OF WHICH THE BROKER IS A MEMBER, OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. OR THE MUNICIPAL SECURITIES RULE MAKING BOARD AND IN ACCORDANCE WITH THE RULES OBTAINING OF THE SELECTED ORGANIZATION. THE CUSTOMER MAY ELECT IN THE FIRST INSTANCE WHETHER ARBITRATION SHALL BE BY THE AMERICAN ARBITRATION ASSOCIATION, OR BY AN EXCHANGE OR SELF-REGULATORY ORGANIZATION OF WHICH THE BROKER IS A MEMBER, BUT IF THE CUSTOMER FAILS TO MAKE SUCH ELECTION, BY REGISTERED LETTER OR TELEGRAM ADDRESSED TO THE BROKER AT THE BROKER'S MAIN OFFICE, BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM THE BROKER TO MAKE SUCH ELECTION, THEN THE BROKER MAY MAKE SUCH ELECTION, THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

**14. DISCLOSURES TO ISSUERS**

Under rule 14b-1(c) of the Securities Exchange Act of 1934, we are required to disclose to an issuer the name, address, and securities position of our customers who are beneficial owners of that issuer's securities unless the customer objects. Therefore, please check one of the boxes below:

✓ Yes, I do object to the disclosure of information.

___ No, I do not object to the disclosure of such information.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 13.

(X) _Gabriel Capital, L.P._                    (X) _____
(Customer Signature/date)   11\5\02              (Customer Signature/date)

_[signature]_

(Customer Address)                              (Account Number)

450 Park Ave.
#3201
NY NY 10022

                                    GCC-P 0366178

# Exhibit 38

**BERNARD L. MADOFF**
**Investment Securities**

885 Third Avenue New York, NY 10022

Ezra,

enclosed our copies of signed account papers from our files.

regards,

Bernie

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

October 22, 2002

To Our Valued Client:

The USA PATRIOT Act of 2001 requires all United States broker/dealers to obtain and keep current certain client information.  In order for us to be certain that the information we have on file is both current and accurate, we are asking our clients to complete the enclosed forms and return them to us.

These new forms will replace your existing account forms in our files.

We thank you in advance for your prompt attention.

Sincerely,

Bernard L. Madoff

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1X 5AD. Tel 020-7493 6222

CONFIDENTIAL

| MADF | **BERNARD L. MADOFF**<br>INVESTMENT SECURITIES LLC<br>885 Third Avenue New York, NY 10022 | | 212 230-2424<br>800 334-1343<br>Fax 212 486-8178 |

*| A0058*

TAX ID # or SOCIAL SECURITY #

_____ 13- 3693341

Mr./Mrs./Ms. **NAME** _Ascot Partners, L.P._

**STREET** _450 Park Avenue, #3201_

**CITY** _NY_ **STATE** _NY_ **ZIP** _10022_

**TEL. NUMBER** _212-838-7200_ **BUSINESS** _212-838-9603 (F)_ **RESIDENCE**

**WE DEEM THE QUESTIONS CONTAINED IN THIS SECTION TO BE REQUIRED BY THE
"KNOW YOUR CUSTOMER" RULE OF THE NATIONAL ASSOCIATION OF SECURITY
DEALERS, AND, THEREFORE, MUST BE ANSWERED IN FULL.**

**RESIDENCE** _N/A_

_N/A_

**NAME OF EMPLOYER (IF HOUSEWIFE, NAME THE HUSBAND'S EMPLOYER)**

**EMPLOYER'S ADDRESS**

**OCCUPATION** _Un-registered Investment Partnership_

**BANK REFERENCE AND ADDRESS**

**OTHER BROKERAGE ACCOUNTS** _Morgan Stanley &Co._

**CLIENT INTRODUCED BY**

### FOR OFFICE USE ONLY

**ACCOUNT # ASSIGNED**

 **R R'S ESTIMATE OF CLIENTS NET WORTH**

**IS CLIENT OVER 21 YEARS OF AGE**          YES_____     NO_____

**HOW LONG HAVE YOU KNOWN CLIENT**

**CLIENT IS CITIZEN OF**

**APPROVED BY**

**DATE SENT TO CLIENT**                    **DATE SENT TO CLIENT**

| **MARGIN AGREEMENT** _____ | **MAIL WAIVER FORM** _____ |
| **JOINT AGREEMENT** _____ | **MULTIPLE A/C FORM** _____ |
| **CORPORATE ACCOUNT FORM** _____ | **CORPORATE RESOLUTION** _____ |
| **CO-PARTNERSHIP FORM** _____ | |

**Affiliated with:**
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

CONFIDENTIAL

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

Congress has mandated that all interest and dividend payers including banks, corporations and funds must withhold 10% of all dividends or interest paid UNLESS you complete and return the form at the bottom of this page.

### Important New Tax Information

"Under the Federal income tax law, you are subject to certain penalties as well as with-holding of tax at a 20% rate if you have not provided us with your correct social security number or other taxpayer identification number. Please read this notice carefully.

You (as a payee) are required by law to provide us (as payer) with your correct taxpayer identification number. If you are an individual, your taxpayer identification is your social security number. If you have not provided us with your correct taxpayer identification number, you may be subject to a $50 penalty imposed by the Internal Revenue Service. In addition, divided payments that we make to you may be subject to backup withholding starting on January 1, 1984.

Backup withholding is different from the 10% withholding on interest and dividends that was repealed in 1983. If backup withholding applies, payer is required to withhold 20% of dividend payments made to you. Backup withholding is not an additional tax. Rather, the tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of taxes, a refund may be obtained".

Please sign the form and return it to us.

Even if you have already provided this information it is required by the IRS that all information requested below be provided again.

Thank you for your cooperation.

------------------------------------------------

### SUBSTITUTE INTERNAL REVENUE SERVICE FORM W-9

Account Number(s): _____

Taxpayer Identification Number:

13- 369 3341

Name: _Ascot Partners, L.P._

Address: _450 Park Avenue, #3201, NY NY 10022_

(Signature) _____

"Under penalties of perjury, I certify that the number shown
On this form is my correct Taxpayer Identification Number".

Please fill in your name, address, taxpayer identification number, and sign above.

**Affiliated with:**
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1X 5AD. Tel 020-7493 6222

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

## CUSTOMER AGREEMENT

In consideration for you (the "Broker") opening or maintaining one or more accounts (the "Customer"), the Customer agrees to the terms and conditions contained in this Agreement. The heading of each provision of the Agreement is for descriptive purposes only and shall not be deemed to modify or qualify any of the rights or obligations set forth in each such provision. For purposes of this Agreement, "securities and other property" means, but is not limited to money, securities, financial instruments and commodities of every kind and nature and related contracts and options, except that the provisions of paragraph 13 herein (the arbitration clause) shall not apply to commodities accounts. This definition includes securities or other property currently or hereafter held, carried or maintained by you or by any of your affiliates, in your possession or control, or in the possession or control of any such affiliate, for any purpose, in and for any of my accounts now or hereafter opened, including any account in which I may have an interest.

### 1. APPLICABLE RULES AND REGULATIONS

All transactions in the Customer's Account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed by the Broker or its agents, including its subsidiaries and affiliates. Also, where applicable, the transactions shall be subject (a) to the provisions of (1) the Securities Exchange Act of 1934, as amended, and (2) the Commodities Exchange Act, as amended; and (b) to the rules and regulations of (1) the Securities and Exchange Commission, (2) the Board of Governors of the Federal Reserve System and (3) the Commodities Futures Trading Commission.

### 2. AGREEMENT CONTAINS ENTIRE UNDERSTANDING/ASSIGNMENT

This Agreement contains the entire understanding between the Customer and the Broker concerning the subject matter of this Agreement. Customer may not assign The rights and obligations hereunder without first obtaining the prior written consent of the Broker.

### 3. SEVERABILITY

If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not effect the validity of the remaining provisions of this Agreement.

### 4. WAIVER

Except as specifically permitted in this Agreement, no provision of this Agreement can be, nor be deemed to be, waived, altered, modified or amended unless such is agreed to in a writing signed by the broker.

### 5. DELIVERY OF SECURITIES

Without abrogating any of the Broker's rights under any other portion of this Agreement and subject to any indebtedness of the Customer to the Broker, the Customer is entitled, upon appropriate demand, to receive physical delivery of fully paid securities in the Customer's Account.

### 6. SALES BY CUSTOMER

The Customer understands and agrees any order to sell "short" will be designated as such by the Customer, and that the Broker will mark the order as "short". All other sell orders will be for securities owned ("long"), at that time, by the Customer by placing the order the Customer affirms that he will deliver the securities on or before the settlement date.

**Affiliated with:**
**Madoff Securities International Limited**
**12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222**

CONFIDENTIAL

**7. BROKER AS AGENT**

The customer understands that the Broker is acting as the Customer's agent, unless the Broker notifies the Customer, in writing before the settlement date for the transaction, that the Broker is acting as dealer for its own account or as agent for some other person.

**8. CONFIRMATIONS AND STATEMENTS**

Confirmations of transactions and statements for the Customer's Account(s) shall be binding upon the Customer if the Customer does not object, in writing, within ten days after receipt by the Customer.

**9. SUCCESSORS**

Customer hereby agrees that this Agreement and all the terms thereof shall be binding upon Customer's heirs, executors, administrators, personal representatives and assigns. This Agreement shall ensure to the benefit of the Broker's present organization, and any successor organization, irrespective of any change or changes at any time in the personnel thereof, for any cause whatsoever.

**10. CHOICE OF LAWS**

THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF _____NY_____ AND SHALL BE CONSTRUED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF _____NY_____

**11. CAPACITY TO CONTRACT, CUSTOMER AFFILIATION**

By signing below, the Customer, represents that he/she is of legal age, and that he/she is not an employee of any exchange, or of any corporation of which any exchange owns a majority of the capital stock, or of a member of any exchange, or of a member firm or member corporation registered on any exchange, or of a bank, trust company, insurance company or of any corporation, firm or individual engaged in the business of dealing, either as broker or as principal, in securities, bills of exchange, acceptances or other forms of commercial paper, and that the Customer will promptly notify the Broker in writing if the Customer is now or becomes so employed. The Customer also represents that no one except the Customer has an interest in the account or accounts of the Customer with you.

**12. ARBITRATION DISCLOSURES**

* ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

* THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

* PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

* THE ARBITRATORS AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

* THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

CONFIDENTIAL



MADF

**13. ARBITRATION**

THE CUSTOMER AGREES, AND BY CARRYING AN ACCOUNT FOR THE CUSTOMER THE BROKER AGREES THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN US CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN US PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE DESIGNATED IN PARAGRAPH 10, BEFORE THE AMERICAN ARBITRATION ASSOCIATION, OR BEFORE THE NEW YORK STOCK EXCHANGE, INC. OR AN ARBITRATION FACILITY PROVIDED BY ANY OTHER EXCHANGE OF WHICH THE BROKER IS A MEMBER, OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. OR THE MUNICIPAL SECURITIES RULE MAKING BOARD AND IN ACCORDANCE WITH THE RULES OBTAINING OF THE SELECTED ORGANIZATION. THE CUSTOMER MAY ELECT IN THE FIRST INSTANCE WHETHER ARBITRATION SHALL BE BY THE AMERICAN ARBITRATION ASSOCIATION, OR BY AN EXCHANGE OR SELF-REGULATORY ORGANIZATION OF WHICH THE BROKER IS A MEMBER, BUT IF THE CUSTOMER FAILS TO MAKE SUCH ELECTION, BY REGISTERED LETTER OR TELEGRAM ADDRESSED TO THE BROKER AT THE BROKER'S MAIN OFFICE, BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM THE BROKER TO MAKE SUCH ELECTION, THEN THE BROKER MAY MAKE SUCH ELECTION, THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

**14. DISCLOSURES TO ISSUERS**

Under rule 14b-1(c) of the Securities Exchange Act of 1934, we are required to disclose to an issuer the name, address, and securities position of our customers who are beneficial owners of that issuer's securities unless the customer objects. Therefore, please check one of the boxes below:

___✓___ Yes, I do object to the disclosure of information.

_____ No, I do not object to the disclosure of such information.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 13.

(X) _Ascot Partners, L.P._          (X) _____.
   (Customer Signature/date)  11|5|02        (Customer Signature/date)

_(signature)_

(Customer Address)                   (Account Number)

450 Park Ave. #3201
NY NY 10022

CONFIDENTIAL                                                    GCC-P 0366163

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

## OPTION AGREEMENT

In order to induce you to carry accounts ("Option Accounts") for me (however designated) for transactions in option contracts (including, without limitations, purchase, sale, transfer, exercise and endorsement) ("Option Transaction"), I hereby warrant, represent and agree with you as set forth below on this Option Agreement.

1. I understand, and am well aware, that option trading may be highly speculative in nature. I am also aware that on certain days, option trading may cease and this could result in a financial loss to me. I agree to hold the company, its other divisions, and its officers, directors and agents harmless for such loss.

2. I understand that any option transaction made for any account of mine is subject to the rules, regulations, customs and usages of The Options Clearing Corporation and of the registered national securities exchange, national securities association, clearing organization or market where such transaction was executed. I agree to abide by such rules, regulations, custom and usages and I agree that, acting individually or in concert with others, I will not exceed any applicable position or exercise limits imposed by such exchange, association, clearing organization or other market with respect to option trading.

3. If I do not satisfy, on a timely basis, your money or security calls, you are authorized in your sole discretion and without notification, to take any and all steps you deem necessary to protect yourself (for any reason) in connection with option transactions for my account including the right to buy and/or sell (including short or short exempt) for my account and risk any part or all of the shares represented by options handled, purchased, sold and/or endorsed by you for my account or to buy for my account and risk any option as you may deem necessary or appropriate. Any and all expenses or losses incurred in this connection will be reimbursed by me.

4. In addition to the terms and conditions hereof, my option account will be subject to all of the terms and conditions of all other agreements heretofore or hereafter at any time entered into with you relating to the purchase and sale of securities and commodities except to the extent that such other agreements are contrary to or inconsistent herewith.

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

CONFIDENTIAL

5.   This agreement shall apply to all puts or call which  you may have executed, purchased, sold  or handled for any account of mine  and also  shall apply to all puts, or calls which  you may hereafter purchase, sell, handle or execute for any account of  mine.

6.   I have received from  the company the most recent risk disclosure  documents entitled "Understanding the Risks and Uses of Listed Options",  "Listed Options on Stock Indices", "Listed Options on Foreign Currencies", and "Listed Options in Debt Instruments".  I have read and understand the information contained in these documents.

7.   I understand that you assign exercise notices on a random basis  except that with respect to options on the following debt instruments:  Treasury Bonds, Treasury Notes, Treasury Bills and GNMAS, you may preferentially  assign exercises of block-size (i.e. covering $1,000,000 or more of  underlying securities) to block-size writing positions and you may  preferentially assign smaller exercises to smaller writing positions.  I  understand that upon my request you will provide me with further  information regarding the procedure used to assign exercise notices.

DATED _____ 11/5/02 _____          ACCOUNT NO._____

SIGNATURES

(If a Corporation)                                    (If Individuals)

_____          _____
(Name of Corporation)

By_____          _____
                                                     (Second Party if Joint Account)

Title_____          (If a Partnership)

                                             Ascot Partners, L.P.
                                             (Name of Partnership)

              SEAL

                                             By_____
                                                     (A Partner)



**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
885 Third Avenue New York, NY 10022

212 230-2424
800 334-1343
Fax 212 486-8178

## TRADING AUTHORIZATION LIMITED TO PURCHASES
## AND SALES OF SECURITIES AND OPTIONS

To Whom It May Concern:

The undersigned hereby authorizes Bernard L. Madoff (whose signature appears below) as his agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities in accordance with your terms and conditions for the undersigned's account and risk and in the undersigned's name, or number on your books. The undersigned hereby agrees to indemnify and hold you harmless from, and to pay you promptly on demand any and all losses arising therefrom or debit balance due thereon. However, in no event will the losses exceed my investment.

In all such purchases, sales or trades you are authorized to follow the instructions of Bernard L. Madoff in every respect concerning the undersigned's account with you; and he is authorized to act for the undersigned and in the undersigned's behalf in the same manner and with the same force and effect as the undersigned might or could do with respect to such purchases, sales or trades as well as with respect to all other things necessary or incidental to the furtherance or conduct of such purchases, sales or trades. All purchases, sales or trades shall be executed strictly in accordance with the client's trading authorization directive.

The undersigned hereby ratifies and confirms any and all transactions with you heretofore or hereafter made by the aforesaid agent or for the undersigned's account.

This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which you may have under any other agreement or agreements between the undersigned and your firm.

This authorization and indemnity is also a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice addressed to you and delivered to your office at 885 Third Avenue but such revocation shall not affect any liability in any way resulting from transaction initiated prior to such revocation. This authorization and indemnity shall enure to the benefit of your present firm and any successor firm or firms irrespective of any change or changes at any time in the personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.

Dated, ___11|5|02___

NY                                        NY
_____        _____
(City)                                    (State)

Very truly yours, _Ascot  Partners, L.P._    _____
(Client Signature)

Signature of Authorized Agent: _____

**Affiliated with:**
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1J 8DT. Tel 020-7493 6222

CONFIDENTIAL                                                                GCC-P 0366166



## TRADING AUTHORIZATION DIRECTIVE

Bernard L. Madoff, acting as the undersigned's agent and attorney-in-fact, has not been granted, nor shall he exercise, any investment discretion as to the selection of securities or other property purchased or sold by or for the undersigned's account, except with respect to the timing and size of transactions and to the extent set forth below.  The purchase or sale of securities shall further be limited as to issuer, contract and quantity, and shall include only executions that are in accordance with the following parameters:

With respect to the establishment of a position:

- The undersigned's account may purchase a portfolio consisting only of the types of instruments mentioned herein.

- Purchases of equities must be purchases of no less than thirty-five (35) U.S. equities, all of which must be resident within the Standard and Poors 100 Index at the time of execution.

- The sum total of the combined market capitalization of the equities purchased must, at the time of completion, be in excess of seventy-five percent (75%) of the total market capitalization, as measured by Standard and Poors, of the entire Standard and Poors 100 Index components.

- The resulting portfolio, when measured against the Standard and Poors 100 Index, shall at the time or execution completion reflect an overall correlation in excess of ninety-five percent (95%).

- Each equity security holding within the portfolio shall be dollar weighted proportionately to the market capitalization of that particular issue in the Standard and Poors 100 Index at the time of execution.

- Contemporaneously with the purchase of the equity securities, the undersigned's account shall purchase Standard and Poors 100 Index Put Options.  The underlying value of these contracts shall correspond to the market value of equities in the portfolio at the time of purchase.

GCC-P 0366167



- The strike price of these put options shall not be greater than three percent (3%) below the prevailing Standard and Poors 100 Index at the time of purchase.

- Upon establishing the equities and Standard and Poors 100 Index Put Option positions as outlined above, the undersigned's account shall sell Standard and Poors 100 Index Call Options. The underlying value of these contracts shall not exceed the market value of the equities in the portfolio at the time of purchase. There is no restriction on the strike price of the Standard and Poors 100 Index Call Options to be sold.

With respect to the liquidation of a position:

- Upon the sale of equity securities in the undersigned's account, a contemporaneous repurchase of Standard and Poors 100 Index Call Options shall be made. If less than all the equity securities in the undersigned's account are sold at one time, the number of Standard and Poors 100 Index Call Options contemporaneously repurchased shall be proportionately reduced to reflect the value of the equity securities retained in the undersigned's account.

- The Standard and Poors 100 Index Put Options previously purchased shall be sold only after (and then only to the extent that) the equity securities in the undersigned's account have been liquidated and the Standard and Poors 100 Index Call Options repurchased as set forth above in the immediately preceding bullet.

- Whenever the undersigned's account has completed the execution of the above-outlined investment strategy, the undersigned's account shall purchase U.S. Treasury Bills. The U.S. Treasury Bills may be held until the undersigned's account repeats the execution of the investment strategy outlined above. The maturities of said U.S. Treasury Bills shall not exceed nine (9) months.

Agreed by:

Bernard L. Madoff, Authorized Agent

# Exhibit 39

B. L. Madoff     May 23, 1995

360 brokerage clients
80 of them NASDAQ
now doing top 100 NASDAQ names
ahead of the regulators

baskets have moved from 15 to 21 to 35.
wholesale operation doing $200 B a year.
35,000 trades a day.
computer cost $24 M
back own 10% of NYSE trading vol.

25 traders in NYC
25       in Queens
10       in London
50   variations

GCC-P 0393211

# Exhibit 40

# GABRIEL CAPITAL GROUP

450 Park Avenue
New York, NY 10022
TELEPHONE  212 838-7200
FACSIMILE  212 838-9603

June 2001

Tel call with B.L. Madoff.
Discussed possible use of LEAPs
in our strategies. He thought the
idea made sense (not the first
time we talked about it), but thought
the size of most LEAPs mkts
were to small for the volume he
trades. We turned to the possibility
of him working on a LEAPs program
that he would seriously consider
for one or two smaller accounts.
He thought that volatility would be
higher, as would profitability. As a
% of our total strategy, could be
quite interesting, since volatility is
otherwise so low.

CONFIDENTIAL

GCC-P 0393259

# Exhibit 41

GABRIEL CAPITAL GROUP

450 Park Avenue
New York, NY 10022
TELEPHONE   212 838-7200
FACSIMILE   212 838-9603

Bernard L. Madoff   2-20-03

Seeing as much volatility as he could
possibly want. Momentum is much
constrained, however.

In 2002, one or two (May, July) big tidal
waves successfully surfed. This year,
will have to catch a larger number of
smaller waves. Get in and get out.
Ironically, this makes it more
profitable for BLM, who picks up
commission on the turnarounds.
He claims is now making 1% p.a.
on this business down from 3% if
you. This would rise if turnarounds
went up.

Been close to flat for five mos. Swears
it's all part of the program.

GCC-P 0393317

# Exhibit 42

# GABRIEL CAPITAL GROUP

450 Park Avenue
New York, NY 10022
TELEPHONE 212 838-7200
FACSIMILE 212 838-9603

June 2005

Tel call with B.L. Madoff

Referencing the trading directive, and many conversations. the 'bends' in which he sets up the trades have been formalized in writing. This has formed the basis of several basic conversations on the strategy. Returns to it again and again.

At the end of his Tle, we reviewed the positions and related the executions to the bends, just to make sure. The OEX They above the maximum risk loss projected, which was reassuring.

GCC-P 0393139