# Exhibit 70

**From:** J. Ezra Merkin

**Sent:** Mon, 15 Mar 2004 23:26:31 GMT

**To:** AUTERA, MIKE

**Subject:** Ariel/Amber and Ascot

---

-----Original Message-----
**From:** Igolnikov, Roman [mailto:RI@UBPAM.COM]
**Sent:** Saturday, March 13, 2004 2:08 PM
**To:** J. Ezra Merkin
**Subject:** Ariel/Amber and Ascot

Ezra,

Just in case I attached the latest letter from the other feeder into Bernie. I appreciate very much your effort in putting our meeting together. I feel fortunate having been able to develop friendship with you that was clearly the catalyst for setting up the meeting.

As for Amber and Ariel, I would like to have the following info:

- presentation of the investment strategy, specification of assets (not just distressed debt, but what kind of debt - public/private, snior/subordinated, bank debt, stage of bunkruptcy, geography), themes in the portfolio, typical number of trades in the portfolio, rate/return objective - for the fund and for each of the themes, risk management (position limits, stop losses);
- monthly track record;
- terms (fees, liquidity, share classes);
- third party providers (primarily administrator and its role);
- AUM (both domestic and offshore);
- your assessment of the opportunity (current level of credit spreads and falling default rates);
- anything special about the funds.

Thanks a lot,

noble

**Confidential**

## Fairfield Sentry Fund

**Semi-Annual Update – Sentry Class A**                    **Fourth Quarter, 2003**

January 28, 2004

Dear Investor:

Fairfield Greenwich (Bermuda) Ltd. ("FGBL"), the Investment Manager of Fairfield Sentry Ltd. ("Sentry," or the "Fund"), and Fairfield Greenwich Group ("FGG"), of which FGBL is a member company, are pleased to provide you with the following fourth quarter 2003 update on the progress of the Fund. The next semi-annual update will be distributed in July 2004.

Throughout its 13-year history, the Fund has offered investors a low volatility strategy with little correlation to traditional asset classes with which to protect and grow their capital. It has delivered superior risk-adjusted performance through several market cycles and has done so with only seven down months in its 156-month history.

### Overall Performance

During the 12-month period ending December 2003, Sentry Class A posted a return of 8.21% net to investors with a standard deviation of 2.33 (see Table I). Although the performance of the Fund in 2003 has lagged that of previous years on an absolute basis, it has remained remarkably consistent over time when measured relative to short-term interest rates. Figure I plots the compounded return of Sentry A relative to the compounded return of one-month USD LIBOR. We see that Sentry A (the solid line) has, since the Fund's assets topped $100 million in 1993, consistently returned on average more than 7.00% over USD LIBOR (the dashed line).

**Figure I: Sentry A Returns vs. LIBOR**



Sentry A vs. 1-month USD LIBOR

Source: FGG, Bloomberg

Figure II displays the trailing 12-month rolling standard deviation of Sentry returns against that of the S&P 100 Index, and Figure III plots the trailing 12-month Sharpe Ratio of the Fund against the Sharpe Ratio of the S&P 100 Index. Both charts communicate the relative out-performance of the Fund over time.

**Figure II: 12-month Rolling Standard Deviation**



Sentry Class A vs. S&P 100 Index

Source: FGG, Bloomberg

Sentry's split-strike conversion strategy (the "Strategy") entails the purchase of a basket of about 40 to 50 large-cap U.S. equities drawn from the S&P 100 constituents and the simultaneous purchase of S&P 100 Index put options with approximately the same notional value as the basket of equities. The same number of S&P 100 Index call options are then sold to partially finance the purchase price of the put options and increase the standstill rate of return.

**Confidential**                                                    **GCC-P 0152947**

## Fairfield Sentry Fund

### Semi-Annual Update – Sentry Class A

**Fourth Quarter, 2003**

During 2003, the strike prices of both options have typically been one strike out-of-the-money (OTM) at the time the basket was constructed and have always been for front month expiration.

**Figure III: 12-month Rolling Sharpe Ratio**



Sentry Class A vs. S&P 100 Index

Source: FGG, Bloomberg

The basket of equities is constructed with the purpose of emulating the return of the S&P 100 Index without purchasing the full index. In fact, it exhibits a correlation to the S&P 100 Index in excess of 95%, and represents a market capitalization of at least 75% of the market capitalization of the S&P 100 Index at the time of construction.

The Strategy was implemented during two-thirds of the trading days in 2003, with some level of investment occurring in each month except for April. There were a total of seven separate implementation cycles in 2003 during which the equity basket and options collar were constructed. On four of these occasions the options collar was rolled to the following month's expiration. This level of activity was slightly more than that of previous years.

For the fourth quarter of 2003, Sentry generated over $84 million in gross trading profits from the split-strike conversion strategy, with equities contributing about 70% of the gains and the options positions contributing about 20% (See Figure V). Overall in 2003, Sentry added over $410 million to P&L before fees, with all securities components posting profits (see Figures V and VI).

**Figure IV: Sentry Returns vs. Benchmarks**

| | Q4 2003 | 2003 Annual | Risk[*] |
|---|---|---|---|
| Sentry[**] | 1.57 | 8.21 | 2.33 |
| S&P 100 DRI | 11.06 | 26.24 | 10.74 |
| Lehman Aggregate | 0.35 | 4.35 | 5.49 |

Source: FGG, Bloomberg.
[*] Risk is measured by trailing 12-month standard deviation
[**] Sentry performance relates to Class A shares.

### Portfolio Activity

In October 2003, the Fund legged into a fully invested position in the Strategy in three roughly equal increments early in the month. The Strategy was rolled one day before options expiration to higher strikes and held through the end of the month, returning 1.32% in October. November trading activity consisted of unwinding the equity positions and the options collar during the week of options expiration in four roughly equal increments. The Fund then purchased U.S. Treasury Bills with the proceeds. The Fund returned -0.08% in November. In December, the Fund invested about 22% of the assets in the Strategy and held this partially invested position for about a week, unwinding the basket of equities and option hedge just prior to expiration, and then maintained an all-cash position for the remainder of the month. For December, Sentry's net return was 0.32%, and 1.57% for the fourth quarter of 2003.

Overall, the Fund captured slightly less than a third of the 26.24% move in the S&P 100 during 2003, with about one-fifth of the volatility of the Index (See Figure VII).

2 of 5

## Fairfield Sentry Fund

**Semi-Annual Update – Sentry Class A**  **Fourth Quarter, 2003**

**Figure V: Income Summary for Fourth Quarter 2003**

**Figure VI: Income Summary for Fiscal Year 2003**





**Figure VII: Unit Value Growth of Sentry vs. S&P 100 Index
(From inception to December 31, 2003)**



3 of 5

## Fairfield Sentry Fund

### Semi-Annual Update – Sentry Class A                    Fourth Quarter, 2003

### Seeding Initiative

As we have informed you in previous letters, the Sentry Seeding Initiative is designed to invest a small portion of the Fund's assets with experienced management teams seeking to establish new fund businesses, and is limited to an aggregate of no more than 5% of the Fund's assets. In December this year, Sentry redeemed $18 million of the initial $30 million seeding made on October 1, 2002 to Fairfield Redstone Ltd., resulting in a partial realization of trading profits earned in that strategy. Thus, currently the Fund has about 1.62% of net assets (or approximately $72 million) invested with three Seedling Managers: Fairfield Redstone Ltd. (**"Redstone"),** Fairfield Schlarbaum Offshore Fund Ltd. ("Schlarbaum"), and EMF Corporate Bond Arbitrage Fund, Ltd. ("EMF") (collectively, the "Seedlings").

These managers have performed well since the inception of the Seeding Program on October 1, 2002 (see Figure VIII). Their performance has contributed approximately 24 basis points to Sentry's return, from inception of the Seeding Program to December 31, 2003. Figure VIII presents the performance of the Seedling managers against selected indices.

**Figure VIII: Seedling Returns vs. Indices**

|  | Q4 2003 | 2003 Annual | Risk[*] |
|---|---|---|---|
| **Redstone**[**] | 3.69 | 22.37 | 6.80 |
| **Russell 2000** | 14.19 | 45.36 | 15.53 |
| **Schlarbaum**[**] | 3.23 | (1.87) | 4.30 |
| **S&P 600** | 14.53 | 37.53 | 14.64 |
| **EMF**[**] | 1.92 | 8.73 | 0.81 |
| **Lehman Agg** | 0.35 | 4.35 | 5.49 |

Source: FGG, Bloomberg
[*] Risk is measured by trailing 12-month standard deviation
[**] Seedling performance based on 0% / 20%

As many of our investors know, we continue to identify, analyze, and monitor a number of prospective managers for the Sentry Seeding Initiative. All managers with whom we partner must provide full transparency and strong levels of liquidity, and above all, share our core capital preservation, relative low volatility philosophy. As with FGG's other core funds, seedling managers must submit to our rigorous due diligence and risk monitoring processes.

. . . . . . . . . . . .

**Confidential**

**GCC-P 0152950**

## Fairfield Sentry Fund

### Semi-Annual Update – Sentry Class A                    Fourth Quarter, 2003

For further details regarding the Sentry Seeding Initiative or Redstone, Schlarbaum, EMF, please consult FGG's Monthly Strategy Reviews, Monthly Portfolio Update Webcasts and transcripts, and other FGG publications available via the FGG Web site (www.fggus.com) and our automated FGG e-NAV reporting service, as well as from your FGG representative.

If you have any questions regarding the foregoing, please contact your FGG representative.  We thank you for your support, and look forward to continuing to serve your alternative investing needs.

Sincerely,

Fairfield Greenwich (Bermuda) Ltd.

**Notes and Disclaimers**

Performance results for Fairfield Sentry Ltd. are for Class A shares and are net of all fees and expenses.

No information provided herein shall constitute, or be construed as, an offer to sell or a solicitation of an offer to acquire any security, investment product or service, nor shall any such security, product or service be offered or sold in any jurisdiction where such offer or solicitation is prohibited by law or regulation.  Recipients of this document who intend to apply for shares in Fairfield Sentry Ltd. or any FGG Fund are reminded that any such application may be made solely on the basis of the information and opinions contained in such Fund's Offering Memorandum.

Fairfield Greenwich (UK) Limited is authorized and regulated by the Financial Services Authority.

**Confidential**                                                      **GCC-P 0152951**

# Exhibit 71

**From:**   AUTERA, MIKE

**Sent:**   Thu, 29 May 2003 14:19:38 GMT

**To:**   J. Ezra Merkin

**Subject:** FW: Contact Information

_____

Ezra,

This guy called me requesting information on our "Madoff feeder product" at the suggestion of Michael Andreola.   He is interested in an investment of approximately $2mm.   I will arrange to send the docs if you do not object.

Mike

----------
**From:  Rosenbloom, Keith [SMTP:KeithR@comw.com]**
Sent:  Thursday, May 29, 2003 10:19 AM
To:  auteram@gabrielCapital.com
Subject:  Contact Information

Per our conversation please forward to me documents regarding the ascott partners, LP and ascott partners, ltd.

Keith M. Rosenbloom
Commonwealth Associates
830 Third Avenue
New York, NY 10022
212 829-5833
800 422-1253
e-mail: KeithR@comw.com

www.CommonwealthAssociates.com

**Confidential**                                                                    **GCC-P 0149520**

# Exhibit 72

**From:**    AUTERA, MIKE
**Sent:**    Thu, 17 Jun 2004 14:49:18 GMT
**To:**    's3.takahashi@aozorabank.co.jp'
**CC:**    'CBRODY@aol.com'
**Subject:** RE: Follow up

Substantially all of Ascot Fund's assets are allocated and held at Bernard L. Madoff Investment Securities LLC.    Ascot has no clearing, trading, or prime brokerage arrangements with other investment firms at this time.

-----Original Message-----
From: s3.takahashi@aozorabank.co.jp [mailto:s3.takahashi@aozorabank.co.jp]
Sent: Thursday, June 17, 2004 5:32 AM
To: AUTERA, MIKE
Cc: 'CBRODY@aol.com'
Subject: RE: Follow up

Mike,

Thank you for your prompt response.

Could you provide us the same kind of information not only about Ariel but also about Ascot? Your DDQ says Bernard L. Madoff & Co. is the sole custodian and prime broker for Ascot Fund Limited.

We really appreciate your assistance.

Best regards,

Seiichiro
-------------------------------------
SEIICHIRO   TAKAHASHI
AOZORA BANK, LTD.
Credit Products Division
3-1, Kudan-minami 1-chome
Chiyoda-ku, Tokyo 102-8660, Japan
Phone: +81-3-5212-9845
Facsimile: +81-3-3222-1287
E-mail: s3.takahashi@aozorabank.co.jp
URL: http://www.aozorabank.co.jp/
-------------------------------------


    "AUTERA, MIKE"



Confidential

GCC-P 0155285

<AUTERAM@GABRIELCA    宛先:    "'s3.takahashi@aozorabank.co.jp'" <s3.takahashi@aozorabank.co.jp>,
"'CBRODY@aol.com'"

PITAL.com>            <CBRODY@aol.com>

cc:

2004/06/17 08:17      件名:  RE: Follow up

Seiichiro,
        We have requested the audited financial statements and the independent auditor's report on internal control for Bernard L.
Madoff

Investment Securities LLC.  This is an entity at which Ascot and Ariel
maintains brokerage accounts.  I will forward these reports to you as soon
as I receive them.
        The percentage of Ariel's capital allocated to its Madoff account has varied between 10% and 25% depending upon
opportunities in the strategy and the overall liquidity of the Ariel portfolio.

        Ariel Fund Ltd maintains regular brokerage/trading accounts with
most of the large Investment firms in the United States and Europe.   In
addition, Ariel has prime brokerage agreements with several firms.  Morgan
Stanley & Co and Bear Stearns (both in New York) are Ariel's primary prime brokers  (the overwhelming bulk of Ariel's marketable
and publicly traded

securities are held at one of these two firms).  The prime brokers also
hold cash balances on behalf of Ariel.  These securities and cash serve as collateral for any amounts due to the brokers as well as
collateral for any swaps or short sales.

        Ariel may have counterparty risk with the firms in which it trades
during the period between trade date and settlement date.   Ariel may also
have credit risk with those firms that hold assets (cash and fully paid for
securities) on its behalf.
        Please let me know if additional questions arise.  Best
regards,
Mike


-----Original Message-----
From: s3.takahashi@aozorabank.co.jp [mailto:s3.takahashi@aozorabank.co.jp]
Sent: Wednesday, June 16, 2004 6:33 PM
To: auteram@gabrielcapital.com
Subject: Fwd: Follow up


Michael,

Thank you very much for sending us DDQs and other materials both for Ariel and Ascot. We really appreciate your assistance.

Confidential                                                        GCC-P 0155286

Although we've got them, we still need more information about the prime broker and the custodian. As Chris already asked you in the previous e-mail (see attached below), we would repeat the following questions;

1. Do you get audits for the entity that clears with at Bernie Madoff's? 2. What percentage of Ariel's assets are traded, cleared and kept at Madoff's? 3. Do you have any counter party risk and who else do you clear through or have counter party risk with? (Ezra mentioned Goldman Sacks and Morgan

Stanley)
(additionally) 4. Could you send us a copy of the most recent audit of the custodian ("Bernard L. Madoff & Co.") of the fund?

We would appreciate if you could provide us these information within a few days since we're preparing for our Investment Committee early next week.

Seiichiro Takahashi
------------------------------------
SEIICHIRO   TAKAHASHI
AOZORA BANK,   LTD.
Credit Products Division
3-1, Kudan-minami 1-chome
Chiyoda-ku, Tokyo 102-8660, Japan
Phone: +81-3-5212-9845
Facsimile: +81-3-3222-1287
E-mail: s3.takahashi@aozorabank.co.jp
URL: http://www.aozorabank.co.jp/
------------------------------------


-----Original Message-----
From: CBRODY@aol.com [mailto:CBRODY@aol.com]
Sent: Tuesday, June 01, 2004 10:38 PM
To: auteram@gabrielcapital.com
Cc: JEMerkin@gabrielcapital.com; s3.takahashi@aozorabank.co.jp
Subject: Follow up

Michael,

Could you please let us know when the following documents will be available:

Due diligence questionnaire on Ascot and;

Due diligence questionnaire on Ariel.

Also, in our meetings Ezra mentioned that Bernie Madoff clears his owns trades.  In their due diligence review a manager mentioned he was not sure if Bernie Madoff's organization published financial audits to the public.

Do you get audits for the entity that clears with at Bernie Madoff's?

What percentage of Ariel's assets are traded, cleared and kept at Madoff's?

Do you have any counter party risk and who else do you clear through or have counter party risk with? (Ezra mentioned Goldman Sacks and Morgan Stanley)

**Confidential**

**GCC-P 0155287**

We plan on finishing our review in the next 2 weeks ad going to
investment committee thereafter with the intention of funding by July
1, 2004.

Thank you for your assistance.

Christopher Brody
Aozora Bank, Ltd.

**Confidential**

# Exhibit 73





# About BDO

BDO brings world-class resources and exceptional service to each and every one of our clients.

## Exceptional service. Worldwide.

BDO delivers assurance, tax, financial advisory, and consulting services to clients throughout the country and around the globe. We offer numerous industry-specific practices, world-class resources, and an unparalleled commitment to meeting our clients' needs. We currently serve more than 400 publicly traded domestic and international clients.

- Unparalleled partner-involvement
- Deep industry knowledge and participation
- Geographic coverage across the U.S.
- Cohesive global network
- Focused capabilities across disciplines

BDO brings world-class resources and exceptional service to each and every one of our clients. BDO USA is a member of BDO International, the world's fifth largest accounting and consulting network.

# Exhibit 74



# Hedge Fund Auditor Market Share

POSTED ON **MAY 14, 2014** BY **JOHN PAKALUK**

**7**

With **rumors** continuing to circulate that KPMG is in the midst of a transaction to acquire Rothstein Kass, it **has been speculated** that Rothstein's extensive private fund practice has been the driving factor of the acquisition. Just how large is the hedge fund practice of Rothstein Kass? The table below shows the ten audit firms cited most frequently by hedge funds in their Form ADVs.

| Auditor | Hedge Funds |
|---|---|
| Ernst & Young | 3,583 |
| PricewaterhouseCoopers | 3,483 |
| Rothstein Kass | 2,063 |
| Deloitte & Touche | 1,727 |
| KPMG | 1,616 |
| EisnerAmper | 507 |
| BDO | 358 |
| McGladrey | 356 |
| Spicer Jeffries | 342 |
| Grant Thornton | 320 |
| Others | 2,318 |
| **Total Unique Funds** | **16,673** |

**Source:** www.AuditAnalytics.com   508.476.7007
Note: Data as of 5/13/14

As you can see, Rothstein comes in third on the list, with about 12% of the total market, and more hedge fund engagements than both Deloitte and KPMG.[1] The top five have about 75% of the total market share between them, so Rothstein is clearly one of the major firms in this **market niche**.

Assuming KPMG were to retain all of Rothstein's hedge fund clients, then KPMG would leapfrog both PwC and EY on its way to the total engagement leader in the hedge fund auditor market.

1. This analysis of engagements counts all affiliate firms associated with a unique Fund ID as one instance. So, for example, if one unique Fund ID cites both BDO USA and BDO Cayman as its auditor in the Form ADV, we counted that as one fund for BDO. ~

---

Posted in **Auditor Market Share**, **Financial Services (OIA)**, **Hedge Funds** by **John Pakaluk**

# Exhibit 75

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number: 2625** |
| **ADV - SEC, Page 1** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

**ADV Part 1A, Page 1**

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 3.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you.

A.    Your full legal name (if you are a sole proprietor, your last, first, and middle names):
BERNARD L. MADOFF INVESTMENT SECURITIES LLC

B.    Name under which you primarily conduct your advisory business, if different from Item 1.A.
BERNARD L. MADOFF INVESTMENT SECURITIES LLC
*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

C.    If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.), enter the new name and specify whether the name change is of
⌐ your legal name or ⌐ your primary business name:

D.    If you are registered with the SEC as an investment adviser, your SEC file number: 801-67134

E.    If you have a number ("*CRD Number*") assigned by *NASD's* CRD system or by the IARD system, your *CRD* number: 2625
*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number: 2625** |
| **ADV - SEC, Page 2** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

**Item 1 Identifying Information (Continued)**

F.    *Principal Office and Place of Business*

(1)    Address (do not use a P.O. Box):
Number and Street 1:                    Number and Street 2:
885 THIRD AVENUE

City:       State:       Country:       ZIP+4/Postal Code:
NEW YORK       NY       USA       10022

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for registration, or are registered only, with the SEC, list the largest five offices in terms of numbers of employees.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:

⦿ Monday-Friday    ○ Other:

Normal business hours at this location:
9AM - 5PM

(3) Telephone number at this location:
212-230-2424

(4) Facsimile number at this location:
212-486-8178

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:       Number and Street 2:

City:       State:       Country:       ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:       Number and Street 2:

City:       State:       Country:       ZIP+4/Postal Code:

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** **2625** |
| **ADV - SEC, Page 3** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

**Item 1 Identifying Information (Continued)**

                                           **YES NO**

I. Do you have World Wide Web site addresses?      ⦿ ○

*If "yes," list these addresses on Section 1.I. of Schedule D. If a web address serves as a portal through which to access other information you have published on the World Wide Web, you may list the portal without listing addresses for all of the other information. Some advisers may need to list more than one portal address. Do not provide individual*

electronic mail addresses in response to this Item.

J.  Contact *Employee*:

Name:
PETER MADOFF

Title:
PRINCIPAL

Telephone Number:
212 230 2424

Facsimile Number:
212 486 8178

Number and Street 1:
885 THIRD AVENUE

Number and Street 2:

City:
NEW YORK

State:
NY

Country:
USA

ZIP+4/Postal Code:
10022

Electronic mail (e-mail) address, if contact *employee* has one:
PMADOFF@MADOFF.COM
*The contact employee should be an employee whom you have authorized to receive information and respond to questions about this Form ADV.*

| | YES | NO |
|---|---|---|
| K.  Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? If "yes," complete Section 1.K. of Schedule D. | ○ | ◉ |

| | YES | NO |
|---|---|---|
| L.  Are you registered with a *foreign financial regulatory authority*? Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes", complete Section 1.L. of Schedule D. | ○ | ◉ |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | CRD Number: **2625** |
| **ADV - SEC, Page 4** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

## Item 2 SEC Registration

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2 only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration.

A.  To register (or remain registered) with the SEC, you must check at least one of the Items 2.A(1) through 2.A(11), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A(12). You:

☑ (1)  have *assets under management* of $25 million (in U.S. dollars) or more;

*See Part 1A Instruction 2.a. to determine whether you should check this box.*

☐ (2)  have your *principal office and place of business* in Wyoming;

☐ (3) have your *principal office and place of business* outside the United States;

☐ (4) are an investment adviser (or sub-adviser) to an investment company registered under the Investment Company Act of 1940;

    *See Part 1A Instruction 2.b. to determine whether you should check this box.*

☐ (5) have been designated as a nationally recognized statistical rating organization;

    *See Part 1A Instruction 2.c. to determine whether you should check this box.*

☐ (6) are a pension consultant that qualifies for the exemption in rule 203A-2(b);

    *See Part 1A Instruction 2.d. to determine whether you should check this box.*

☐ (7) are relying on rule 203A-2(c) because you are an investment adviser that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

    *See Part 1A Instruction 2.e. to determine whether you should check this box. If you check this box, complete Section 2.A(7) of Schedule D.*

☐ (8) are a newly formed adviser relying on rule 203A-2(d) because you expect to be eligible for SEC registration within 120 days;

    *See Part 1A Instruction 2.f. to determine whether you should check this box. If you check this box, complete Section 2.A(8) of Schedule D.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** |
| | **2625** |
| **ADV - SEC, Page 5** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

## Item 2 SEC Registration (Continued)

☐ (9) are a multi-state adviser relying on rule 203A-2(e);

    *See Part 1A Instruction 2.g. to determine whether you should check this box. If you check this box, complete Section 2.A(9) of Schedule D.*

☐ (10) are an Internet investment adviser relying on rule 203A-2(f);

    *See Part 1A Instructions 2.h. to determine whether you should check this box.*

(11) have received an SEC *order* exempting you from the prohibition against registration

☐    with the SEC;

*If you checked this box, complete Section 2.A(11) of Schedule D.*

☐    (12) are no longer eligible to remain registered with the SEC.

*See Part 1A Instructions 2.i. to determine whether you should check this box.*

B.    Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings.* If this is an initial application, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to direct your *notice filings* to additional state(s), check the box(es) next to the state (s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☐ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☑ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VI |
| ☐ GA | ☐ MI | ☐ OH | ☐ VA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WA |
| ☐ HI | ☐ MS | ☐ OR | ☐ WV |
| | | | ☐ WI |

*If you are amending your registration to stop your notice filings from going to a state that currently receives them and you do not want to pay that state's notice filing fee for the coming year, your amendment must filed before the end of the year (December 31).*

## Item 3 Form Of Organization

A.  How are you organized?

○ Corporation    ○ Sole Proprietorship    ○ Limited Liability Partnership (LLP)

○ Partnership    ● Limited Liability Company (LLC)    ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

**CRD Number:**
**2625**

**ADV - SEC, Page 6**

**Rev. 02/2005**

**8/25/2006 10:20:03 AM**

---

### Item 3 Form Of Organization (Continued)

B.  In what month does your fiscal year end each year?
    October

C.  Under the laws of what state or country are you organized?
    NEW YORK
    *If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

    *If you are changing your response to this Item, see Part 1A Instruction 4.*

---

### Item 4 Successions

|  |  | YES | NO |
|---|---|---|---|
| A. | Are you, at the time of this filing, succeeding to the business of a registered investment adviser? | ○ | ◉ |

   *If "yes," complete Item 4.B. and Section 4 of Schedule D.*

B.  Date of Succession: (MM/DD/YYYY)

   *If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

### Item 5 Information About Your Advisory Business

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly-formed advisers for completing this Item 5.

*Employees*

A.  Approximately how many *employees* do you have? Include full and part-time *employees* but do not include any clerical workers.

   ○ 1- 5        ○ 6-10        ○ 11-50        ◉ 51-250        ○ 251-500

   ○ 501-1,000   ○ More than 1,000     If more than 1,000, how many? (round to the nearest 1,000)

B.

   (1)  Approximately how many of these *employees* perform investment advisory functions (including research)?

      ○ 0          ◉ 1-5         ○ 6-10        ○ 11-50        ○ 51-250

      ○ 251-500    ○ 501-1,000   ○ More than          If more than 1,000, how many?

(2) Approximately how many of these *employees* are registered representatives of a broker-dealer?

○ 0          ○ 1-5          ○ 6-10          ○ 11-50          ● 51-250

○ 251-500    ○ 501-1,000    ○ More than      If more than 1,000, how many?
                                 1,000          (round to the nearest 1,000)

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Items 5.A(1) and 5.B(2). If an employee performs more than one function, you should count that employee in each of your responses to Item 5.B(1) and 5.B(2).*

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: 2625 |
| ADV - SEC, Page 7 | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

## Item 5 Information About Your Advisory Business (Continued)

(3) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

● 0          ○ 1-5          ○ 6-10          ○ 11-50          ○ 51-250

○ 251-500    ○ 501-1,000    ○ More than      If more than 1,000, how many?
                                 1,000          (round to the nearest 1,000)

*In your response to Item 5.B(3), do not count any of your employees and count a firm only once -- do not count each of the firm's employees that solicit on your behalf.*

*Clients*

C. To approximately how many *clients* did you provide investment advisory services during your most-recently completed fiscal year?

● 0          ○ 1-10          ○ 11-25          ○ 26-100          ○ 101-250

○ 251-500    ○ More than 500    If more than 500, how many?
                                  (round to the nearest 500)

D. What types of *clients* do you have? Indicate the approximate percentage that each type of *client* comprises of your total number of *clients*.

| | | None | Up to 10% | 11-25% | 26-50% | 51-75% | More Than 75% |
|---|---|:---:|:---:|:---:|:---:|:---:|:---:|
| (1) | Individuals (other than *high net worth individuals*) | ● | ○ | ○ | ○ | ○ | ○ |
| (2) | *High net worth individuals* | ○ | ○ | ● | ○ | ○ | ○ |
| (3) | Banking or thrift institutions | ○ | ● | ○ | ○ | ○ | ○ |
| (4) | Investment companies (including mutual | ● | ○ | ○ | ○ | ○ | ○ |

|  |  |  |  |  |  |  |  |
|--|--|--|--|--|--|--|--|
| | funds) | | | | | | |
| (5) | Pension and profit sharing plans (other than plan participants) | ○ | ● | ○ | ○ | ○ | ○ |
| (6) | Other pooled investment vehicles (e.g., hedge funds) | ○ | ○ | ○ | ○ | ● | ○ |
| (7) | Charitable organizations | ○ | ● | ○ | ○ | ○ | ○ |
| (8) | Corporations or other businesses not listed above | ○ | ○ | ● | ○ | ○ | ○ |
| (9) | State or municipal *government entities* | ● | ○ | ○ | ○ | ○ | ○ |
| (10) | Other: | ● | ○ | ○ | ○ | ○ | ○ |

*The category "individuals" includes trusts, estates, 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*

*Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, check "None" in response to Item 5.D(4).*

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|--|--|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number: 2625** |
| **ADV - SEC, Page 8** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

## Item 5 Information About Your Advisory Business (Continued)

Compensation Arrangements

E. You are compensated for your investment advisory services by (check all that apply):

- ☐ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☑ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

Assets Under Management

|  |  | YES | NO |
|--|--|--|--|
| F. (1) | Do you provide continuous and regular supervisory or management services to securities portfolios? | ● | ○ |

(2) If yes, what is the amount of your assets under management and total number of accounts?

| | U.S. Dollar Amount | Total Number of Accounts |
|--|--|--|
| Discretionary: | (a) $ 11711451428 .00 | (d) 23 |
| Non-Discretionary: | (b) $ 0 .00 | (e) 0 |

|  |  |  |  |
|---|---|---|---|
| Total: | (c) $ 11711451428 .00 | (f) 23 |

*Part 1A Instruction 5.b. explains how to calculate your assets under management. You must follow these instructions carefully when completing this Item.*

Advisory Activities

G.  What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☑ (2) Portfolio management for individuals and/or small businesses
- ☐ (3) Portfolio management for investment companies
- ☑ (4) Portfolio management for businesses or institutional *clients* (other than investment companies)
- ☐ (5) Pension consulting services
- ☐ (6) Selection of other advisers
- ☐ (7) Publication of periodicals or newsletters
- ☐ (8) Security ratings or pricing services
- ☐ (9) Market timing services
- ☐ (10) Other (specify):

*Do not check Item 5.G(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940.*

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC

CRD Number:
2625

ADV - SEC, Page 9
8/25/2006 10:20:03 AM

Rev. 02/2005

**Item 5 Information About Your Advisory Business (Continued)**

H.  If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○ 0
- ○ 1-10
- ○ 11-25
- ○ 26-50
- ○ 51-100
- ○ 101-250
- ○ 251-500
- ○ More than 500

If more than 500, how many?
(round to the nearest 500)

I.  If you participate in a *wrap fee program*, do you (check all that apply):

- ☐ (1) *sponsor* the *wrap fee program* ?
- ☐ (2) act as a portfolio manager for the *wrap fee program* ?

*If you are a portfolio manager for a wrap fee program, list the names of the programs and their sponsors in Section 5.I(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients , or you advise a mutual fund that is offered through a wrap fee program, do not check either Item 5.I(1) or 5.I(2).*

## Item 6 Other Business Activities

In this Item, we request information about your other business activities.

A. You are actively engaged in business as a (check all that apply):

- ☑ (1) Broker-dealer
- ☐ (2) Registered representative of a broker-dealer
- ☐ (3) Futures commission merchant, commodity pool operator, or commodity trading advisor
- ☐ (4) Real estate broker, dealer, or agent
- ☐ (5) Insurance broker or agent
- ☐ (6) Bank (including a separately identifiable department or division of a bank)
- ☐ (7) Other financial product salesperson (specify):

|   |   | YES | NO |
|---|---|-----|-----|
| B. | (1) Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ● |
|   | (2) If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B. of Schedule D.*

|   |   | YES | NO |
|---|---|-----|-----|
|   | (3) Do you sell products or provide services other than investment advice to your advisory *clients*? | ● | ○ |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** |
| | **2625** |
| **ADV - SEC, Page 10** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

## Item 7 Financial Industry Affiliations

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

Item 7 requires you to provide information about you and your *related persons*. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

A. You have a *related person* that is a (check all that apply):

- ☑ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer
- ☐ (2) investment company (including mutual funds)
- ☐ (3) other investment adviser (including financial planners)
- ☐ (4) futures commission merchant, commodity pool operator, or commodity trading advisor

☐ (5) banking or thrift institution
☐ (6) accountant or accounting firm
☐ (7) lawyer or law firm
☐ (8) insurance company or agency
☐ (9) pension consultant
☐ (10) real estate broker or dealer
☐ (11) sponsor or syndicator of limited partnerships

*If you checked Item 7.A(3), you must list on Section 7.A. of Schedule D all your related persons that are investment advisers. If you checked Item 7.A(1), you may elect to list on Section 7.A. of Schedule D all your related persons that are broker-dealers. If you choose to list a related broker-dealer, the IARD will accept a single Form U-4 to register an investment adviser representative who also is a broker-dealer agent ("registered rep") of that related broker-dealer.*

|  | YES | NO |
|---|---|---|

B. Are you or any *related person* a general partner in an *investment-related* limited partnership or manager of an *investment-related* limited liability company, or do you advise any other "private fund" as defined under SEC rule 203(b)(3)-1?   ○ ⦿

*If "yes," for each limited partnership or limited liability company, or (if applicable) private fund, complete Section 7.B. of Schedule D. If, however, you are an SEC-registered adviser and you have related persons that are SEC-registered advisers who are the general partners of limited partnerships or the managers of limited liability companies, you do not have to complete Section 7.B. of Schedule D with respect to those related advisers' limited partnerships or limited liability companies.*

*To use this alternative procedure, you must state in the Miscellaneous Section of Schedule D: (1) that you have related SEC-registered investment advisers that manage limited partnerships or limited liability companies that are not listed in Section 7.B. of your Schedule D; (2) that complete and accurate information about those limited partnerships or limited liability companies is available in Section 7.B. of Schedule D of the Form ADVs of your related SEC-registered advisers; and (3) whether your clients are solicited to invest in any of those limited partnerships or limited liability companies.*

### Item 8 Participation or Interest in *Client* Transactions

In this Item, we request information about your participation and interest in your *clients'* transactions. Like Item 7, this information identifies areas in which conflicts of interest may occur between you and your *clients*.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*.

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

**ADV - SEC, Page 11**

**CRD Number:**
**2625**
**Rev. 02/2005**

8/25/2006 10:20:03 AM

## Item 8 Participation or Interest in *Client* Transactions (Continued)

Proprietary Interest in *Client* Transactions

A. Do you or any *related person*:                                                                    **Yes  No**

(1) buy securities for yourself from advisory *clients,* or sell securities you own to advisory       ○    ◉
clients (principal transactions)?

(2) buy or sell for yourself securities (other than shares of mutual funds) that you also             ◉    ○
recommend to advisory *clients*?

(3) recommend securities (or other investment products) to advisory *clients* in which you            ○    ◉
or any *related person* has some other proprietary (ownership) interest (other than
those mentioned in Items 8.A(1) or (2))?

Sales Interest in *Client* Transactions

B. Do you or any *related person*:                                                                    **Yes  No**

(1) as a broker-dealer or registered representative of a broker-dealer, execute securities            ○    ◉
trades for brokerage customers in which advisory *client* securities are sold to or
bought from the brokerage customer (agency cross transactions)?

(2) recommend purchase of securities to advisory *clients* for which you or any *related*             ○    ◉
*person* serves as underwriter, general or managing partner, or purchaser
representative?

(3) recommend purchase or sale of securities to advisory *clients* for which you or any               ○    ◉
*related person* has any other sales interest (other than the receipt of sales
commissions as a broker or registered representative of a broker-dealer)?

Investment or Brokerage Discretion

C. Do you or any *related person* have *discretionary authority* to determine the:                    **Yes  No**

(1) securities to be bought or sold for a *client's* account?                                         ◉    ○

(2) amount of securities to be bought or sold for a *client's* account?                               ◉    ○

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account?        ○    ◉

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions?       ○    ◉

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** **2625** |
| **ADV - SEC, Page 12** | **Rev. 02/2005** |

8/25/2006 10:20:03 AM

## Item 8 Participation or Interest in *Client* Transactions (Continued)

D. Do you or any *related person* recommend brokers or dealers to *clients*?                          ○    ◉

E. Do you or any *related person* receive research or other products or services other than           ○    ◉
execution from a broker-dealer or a third party in connection with *client* securities
transactions?

F. Do you or any *related person*, directly or indirectly, compensate any *person* for *client*       ○    ◉
referrals?

*In responding to this Item 8.F., consider in your response all cash and non-cash compensation that you or a related person gave any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

## Item 9 *Custody*

In this Item, we ask you whether you or a *related person* has *custody* of *client* assets. If you are registering or registered with the SEC and you deduct your advisory fees directly from your *clients'* accounts but you do not otherwise have *custody* of your *clients'* funds or securities, you may answer "no" to Item 9A.(1) and 9A.(2).

|  |  | Yes | No |
|---|---|---|---|
| A. | Do you have *custody* of any advisory *clients'*: | | |
| | (1) cash or bank accounts? | ● | ○ |
| | (2) securities? | ● | ○ |
| B. | Do any of your *related persons* have *custody* of any of your advisory *clients'*: | | |
| | (1) cash or bank accounts? | ○ | ● |
| | (2) securities? | ○ | ● |
| C. | If you answered "yes" to either Item 9.B(1) or 9.B(2), is that *related person* a broker-dealer registered under Section 15 of the Securities Exchange Act of 1934? | ○ | ○ |

## Item 10 *Control Persons*

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you.

If you are submitting an initial application, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application, you must complete Schedule C.

|  | YES | NO |
|---|---|---|
| Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ● |

*If yes, complete Section 10 of Schedule D.*

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** **2625** |
| **ADV - SEC, Page 13** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

## Item 11 Disclosure Information

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A(1), 11.A(2), 11.B(1), 11.B(2), 11.D (4), and 11.H(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

For "yes" answers to the following questions, complete a Criminal Action DRP:

|  |  | YES | NO |
|---|---|---|---|
| A. | In the past ten years, have you or any *advisory affiliate*: | | |
| (1) | been convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ⦿ |
| (2) | been *charged* with any *felony*? | ○ | ⦿ |

*If you are registered or registering with the SEC, you may limit your response to Item 11.A(2) to charges that are currently pending.*

|  |  | YES | NO |
|---|---|---|---|
| B. | In the past ten years, have you or any *advisory affiliate*: | | |
| (1) | been convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ⦿ |
| (2) | been *charged* with a *misdemeanor* listed in 11.B(1)? | ○ | ⦿ |

*If you are registered or registering with the SEC, you may limit your response to Item 11.B(2) to charges that are currently pending.*

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: 2625 |
| ADV - SEC, Page 14 | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

**Item 11 Disclosure Information (Continued)**

For "yes" answers to the following questions, complete a Regulatory Action DRP:

C.  Has the SEC or the Commodity Futures Trading Commission (CFTC) ever:    **YES  NO**

   (1)  *found* you or any *advisory affiliate* to have made a false statement or omission?    ○  ◉

   (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes?    ○  ◉

   (3)  *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○  ◉

   (4)  entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity?    ○  ◉

   (5)  imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity?    ○  ◉

D.  Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

   (1)  ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical?    ○  ◉

   (2)  ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes?    ○  ◉

   (3)  ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○  ◉

   (4)  in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity?    ○  ◉

   (5)  ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity?    ○  ◉

E.  Has any *self-regulatory organization* or commodities exchange ever:

   (1)  *found* you or any *advisory affiliate* to have made a false statement or omission?    ○  ◉

   (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the SEC)?    ◉  ○

   (3)  *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○  ◉

   (4)  disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?    ○  ◉

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

CRD Number: **2625**

**ADV - SEC, Page 15**

Rev. 02/2005

**8/25/2006 10:20:03 AM**

---

**Item 11 Disclosure Information (Continued)**

F.  Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?    ○  ◉

G.  Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?    ○  ◉

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

H.  (1)  Has any domestic or foreign court:    YES    NO

    (a)  in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity?    ○  ◉

    (b)  ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?    ○  ◉

    (c)  ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*?    ○  ◉

    (2)  Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H(1)?    ○  ◉

---

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC <u>and</u> you indicated in response to Item 5.F(2)(c) that you have assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

---

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

CRD Number: **2625**

**ADV - SEC, Page 16**

Rev. 02/2005

**8/25/2006 10:20:03 AM**

---

**Item 12 Small Businesses (Continued)**

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown

on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).

- Control means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to control the other *person*.

|  | YES | NO |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B. Do you:

|  | | |
|---|---|---|
| (1) *control* another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

C. Are you:

|  | | |
|---|---|---|
| (1) *controlled* by or under common *control* with another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: 2625 |
| ADV - SEC, Part 1B, Page 1 | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

**You must complete this Part 1B only if you are applying for registration, or are registered, as an investment adviser with any of the *state securities authorities*.**

## Part 1B Item 1 - State Registration

Complete this Item 1 if you are submitting an initial application for state registration or requesting additional state registration(s). Check the boxes next to the states to which you are submitting this application. If you are already registered with at least one state and are applying for registration with an additional state or states, check the boxes next to the states in which you are applying for registration. Do not check the boxes next to the states in which you are currently registered or where you have an application for registration pending.

| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
|---|---|---|---|
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |

| | | | |
|---|---|---|---|
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☐ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☐ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VI |
| ☐ GA | ☐ MI | ☐ OH | ☐ VA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WA |
| ☐ HI | ☐ MS | ☐ OR | ☐ WV |
| | | | ☐ WI |

**Part 1B Item 2 - Additional Information**

A. Person responsible for supervision and compliance:
Name:

Title:

Telephone:                                          Fax:

Number and Street 1:              Number and Street 2:

City:              State:              Country:              ZIP+4/Postal Code:

Email address, if available:

If this address is a private residence, check this box: ☐

B. Bond/Capital Information, if required by your *home state*.

(1) Name of Issuing Insurance Company:

(2) Amount of Bond:
$   .00

(3) Bond Policy Number:

|  | Yes | No |
|---|---|---|
| (4) If required by your home state, are you in compliance with your home state's minimum capital requirements? | ○ | ○ |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

**ADV - SEC, Part 1B, Page 2**

**8/25/2006 10:20:03 AM**

CRD Number:

**2625**

**Rev. 02/2005**

---

### Part 1B Item 2 - Additional Information (Continued)

| | Yes | No |
|---|---|---|

For "yes" answers to the following question, complete a Bond DRP.

    C.  Has a bonding company ever denied, paid out on, or revoked a bond for you?    ○   ○

For "yes" answers to the following question, complete a Judgment/Lien DRP:

    D.  Do you have any unsatisfied judgments or liens against you?    ○   ○

For "yes" answers to the following questions, complete an Arbitration DRP:

    E.  Are you, any *advisory affiliate*, or any *management person* currently the subject of, or have you , any *advisory affiliate*, or any *management person* been the subject of, an arbitration claim alleging damages in excess of $2,500, involving any of the following:

        (1)  any investment or an *investment-related* business of activity?    ○   ○

        (2)  fraud, false statement, or omission?    ○   ○

        (3)  theft, embezzlement, or other wrongful taking of property?    ○   ○

        (4)  bribery, forgery, counterfeiting, or extortion?    ○   ○

        (5)  dishonest, unfair, or unethical practices?    ○   ○

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

    F.  Are you, any *advisory affiliate*, or any *management person* currently subject to, or have you, any *advisory affiliate*, or any *management person* been *found* liable in a civil, *self-regulatory organization*, or administrative *proceeding* involving any of the following:

        (1)  an investment or *investment-related* business or activity?    ○   ○

        (2)  fraud, false statement, or omission?    ○   ○

        (3)  theft, embezzlement, or other wrongful taking of property?    ○   ○

        (4)  bribery, forgery, counterfeiting, or extortion?    ○   ○

        (5)  dishonest, unfair, or unethical practices?    ○   ○

    G.  Other Business Activities

        (1)  You are actively engaged in business as a(n) (check all that apply):

            ☐ Attorney

            ☐ Certified Public Accountant

            ☐ Tax Preparer

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

**ADV - SEC, Part 1B, Page 3**

CRD Number:

**2625**

**Rev. 02/2005**

8/25/2006 10:20:03 AM

---

**Part 1B Item 2 - Additional Information (Continued)**

(2) If you are actively engaged in any business other than those listed in Item 6.A of Part 1A or Item 2.G(1) of Part 1B, describe the business and the approximate amount of time spent on that business:

H.  If you provide financial planning services, the investments made based on those services at the end of your last fiscal year totaled:

| | Securities Investments | Non-Securities Investments |
|---|---|---|
| Under $100,000 | ○ | ○ |
| $100,001 to $500,000 | ○ | ○ |
| $500,001 to $1,000,000 | ○ | ○ |
| $1,000,001 to $2,500,000 | ○ | ○ |
| $2,500,001 to $5,000,000 | ○ | ○ |
| More than $5,000,000 | ○ | ○ |

If securities investments are over $5,000,000, how much?   (round to the nearest $1,000,000)

If non-securities investments are over $5,000,000, how much?   (round to the nearest $1,000,000)

| | Yes | No |
|---|---|---|
| I.  *Custody* | | |
| (1) Do you withdraw advisory fees directly from your *clients'* accounts? If you answered "yes", respond to the following: | ○ | ○ |
| (a) Do you send a copy of your invoice to the custodian or trustee at the same time that you send a copy to the *client*? | ○ | ○ |
| (b) Does the custodian send quarterly statements to your *clients* showing all disbursements for the custodian account, including the amount of the advisory fees? | ○ | ○ |
| (c) Do your *clients* provide written authorization permitting you to be paid directly for their accounts held by the custodian or trustee? | ○ | ○ |
| (2) Do you act as a general partner for any partnership or trustee for any trust in which your advisory *clients* are either partners of the partnership or beneficiaries of the trust? If you answered "yes", respond to the following: | ○ | ○ |
| (a) As the general partner of a partnership, have you engaged an attorney or an independent certified public accountant to provide authority permitting each direct payment or any transfer of funds or securities from the partnership account? | ○ | ○ |
| (3) Do you require the prepayment of fees of more than $500 per *client* and for six months or more in advance? | ○ | ○ |

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

CRD Number: **2625**

**ADV - SEC, Part 1B, Page 4**

Rev. 02/2005

**8/25/2006 10:20:03 AM**

---

**Part 1B Item 2 - Additional Information (Continued)**

|  | Yes | No |
|---|---|---|

J. If you are organized as a sole proprietorship, please answer the following:

   (1) (a) Have you passed, on or after January 1, 2000, the Series 65 examination?   ○ ○

   (b) Have you passed, on or after January 1, 2000, the Series 66 examination and also passed, at any time, the Series 7 examination?   ○ ○

   (2) (a) Do you have any investment advisory professional designations?   ○ ○
       *If "no", you do not need to answer Item 2.J(2)(b).*

   (b) I have earned and I am in good standing with the organization that issued the following credential:

      ☐ Certified Financial Planner ("CFP")
      ☐ Chartered Financial Analyst ("CFA")
      ☐ Chartered Financial Consultant ("ChFC")
      ☐ Chartered Investment Counselor ("CIC")
      ☐ Personal Financial Specialist ("PFS")
      ☐ None of the above

   (3) Your Social Security Number:

---

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

CRD Number: 2625

**ADV-SEC, Part 2**

Rev. 02/2005

**8/25/2006 10:20:03 AM**

---

Amend, retire or file new brochures:

---

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

CRD Number: **2625**

**ADV - SEC, SCHEDULE A**

Rev. 02/2005

**8/25/2006 10:20:03 AM**

---

**Form ADV, Schedule A**

---

## Direct Owners and Executive Officers

1. Complete Schedule A only if you are submitting an initial application. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2. Direct Owners and Executive Officers. List below the names of:

   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required and cannot be more than one individual), director, and any other individuals with similar status or functions;

   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);

   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?  ○ Yes  ◉ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| NA - less than 5% | B - 10% but less than 25% | D - 50% but less than 75% |
| A - 5% but less than 10% | C - 25% but less than 50% | E - 75% or more |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No., or Employer ID No. |
|---|---|---|---|---|---|---|---|
| MADOFF, BERNARD LAWRENCE | I | SOLE MEMBER/PRINCIPAL | 01/2001 | E | Y | N | 316687 |
| MADOFF, PETER BARNETT | I | DIRECTOR OF TRADING/CHIEF COMPLIANCE OFFICER | 06/1969 | NA | Y | N | 316688 |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

---

**Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC**    **CRD Number:**

**ADV - SEC, SCHEDULE B**    **2625**

**8/25/2006 10:20:03 AM**    **Rev. 02/2005**

---

**Form ADV, Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| | | |
|---|---|---|
| C - 25% but less than 50% | E - 75% or more | |
| D - 50% but less than 75% | F - Other (general partner, trustee, or elected manager) | |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| No Indirect Owner Information Filed |
|---|

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** |
| | 2625 |
| **ADV - SEC, SCHEDULE C** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

| Form ADV, Schedule C |
|---|

**Amendments to Schedules A and B**

1. Use Schedule C only to amend information requested on either Schedule A or Schedule B. Refer to Schedule A and Schedule B for specific instructions for completing this Schedule C. Complete each column.

2. In the Type of Amendment column, indicate "A" (addition), "D" (deletion), or "C" (change in information about the same *person*).

3. Ownership codes are:

| | | |
|---|---|---|
| NA - less than 5% | C - 25% but less than 50% | G - Other (general partner, trustee, or elected member) |
| A - 5% but less than 10% | D - 50% but less than 75% | |
| B - 10% but less than 25% | E - 75% or more | |

4. List below all changes to Schedule A (Direct Owners and Executive Officers):

| No Changes to Direct Owner / Executive Officer Information Filed |
|---|

5. List below all changes to Schedule B (Indirect Owners):

| No Changes to Indirect Owner Information Filed |
|---|

# FORM ADV

# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: |
| | 2625 |
| ADV - SEC, SCHEDULE D Page 1 | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

## Form ADV, Schedule D Page 1

Certain items in Part 1A of Form ADV require additional information on Schedule D. Use this Schedule D Page 1 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

### Section 1.B. Other Business Names

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D for each business name.

No Information Filed

### Section 1.F. Other Offices

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Page 1 for each location. If you are applying for registration, or are registered, only with the SEC, list only the largest five (in terms of numbers of *employees*).

No Information Filed

### Section 1.I. World Wide Web Site Addresses

List your World Wide Web site addresses. You must complete a separate Schedule D for each World Wide Web site address.

World Wide Web Site Address: WWW.MADOFF.COM

### Section 1.K. Locations of Books and Records

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D Page 1 for each location.

No Information Filed

## FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: |
| | 2625 |
| ADV - SEC, SCHEDULE D, Page 2 | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

## Form ADV, Schedule D Page 2

Use this Schedule D Page 2 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

### Section 1.L. Registration with *Foreign Financial Regulatory Authorities*

List the name, in English, of each *foreign financial regulatory authority* and country with which you are registered. You must complete a separate Schedule D Page 2 for each *foreign financial regulatory authority* with whom you are registered.

No Information Filed

### Section 2.A(7) Affiliated Adviser

No Information Filed

### Section 2.A(8) Newly Formed Adviser

If you are relying on rule 203A-2(d), the newly formed adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

### Section 2.A(9) Multi-State Adviser

If you are relying on rule 203A-2(e), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 30 or more states to register as an investment adviser with the securities authorities in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 25 states to register as an investment adviser with the securities authorities of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 25 states to register as an investment adviser with the securities authorities in those states.

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name:** BERNARD L. MADOFF INVESTMENT SECURITIES LLC | **CRD Number:** |
| | 2625 |
| **ADV - SEC, SCHEDULE D, Page 3** | **Rev. 02/2005** |

8/25/2006 10:20:03 AM

---

### Form ADV, Schedule D Page 3

Use this Schedule D Page 3 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

#### Section 2.A(11) SEC Exemptive *Order*

No Information Filed

#### Section 4 Successions

Complete the following information if you are succeeding to the business of a currently-registered investment adviser. If you acquired more than one firm in the succession you are reporting on this Form ADV, you must complete a separate Schedule D Page 3 for each acquired firm. See Part 1A Instruction 4.

No Information Filed

#### Section 5.I(2) *Wrap Fee Programs*

If you are a portfolio manager for one or more *wrap fee programs*, list the name of each program and its *sponsor*. You must complete a separate Schedule D Page 3 for each *wrap fee program* for which you are a portfolio manager.

No Information Filed

#### Section 6.B. Description of Primary Business

No Information Filed

#### Section 7.A. Affiliated Investment Advisers and Broker-Dealers

You MUST complete the following information for each investment adviser with whom you are affiliated. You MAY complete the following information for each broker-dealer with whom you are affiliated. You must complete a separate Schedule D Page 3 for each listed affiliate.

No Information Filed

# FORM ADV
## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC

CRD Number: 2625

ADV - SEC, SCHEDULE D, Page 4

Rev. 02/2005

8/25/2006 10:20:03 AM

---

### Form ADV, Schedule D Page 4

Use this Schedule D Page 4 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

#### Section 7.B. Limited Partnership Participation or Other Private Fund Participation

You must complete a separate Schedule D Page 4 for each limited partnership in which you or a *related person* is a general partner, each limited liability company for which you or a *related person* is a manager, and each other private fund that you advise.

No Information Filed

### Section 10 *Control Persons*

You must complete a separate Schedule D Page 4 for each *control person* not named in Item 1.A. or Schedules A, B, or C that directly or indirectly *controls* your management or policies.

No Information Filed

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: 2625 |
|---|---|
| ADV - SEC, SCHEDULE D, Page 5 | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

### Form ADV, Schedule D Page 5

Use this Schedule D Page 5 to report details for items listed below. Report only new information or changes/updates to previously submitted information. Do not repeat previously submitted information.

### Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

No Information Filed

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | CRD Number: 2625 |
|---|---|
| ADV - SEC, DRP Pages | Rev. 02/2005 |
| 8/25/2006 10:20:03 AM | |

### CRIMINAL DISCLOSURE REPORTING PAGE (ADV)

No Information Filed

### REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ⦿ INITIAL *OR* ◯ AMENDED response used to report details for affirmative responses to Items 11.C., 11.D., 11.E., 11.F. or 11.G. of Form ADV.

Check item(s) being responded to:

*Regulatory Action*

| | | | |
|---|---|---|---|
| ☐ 11.C(1) | ☐ 11.C(5) | ☐ 11.D(4) | ☐ 11.E(3) |
| ☐ 11.C(2) | ☐ 11.D(1) | ☐ 11.D(5) | ☐ 11.E(4) |
| ☐ 11.C(3) | ☐ 11.D(2) | ☐ 11.E(1) | ☐ 11.F |
| ☐ 11.C(4) | ☐ 11.D(3) | ☑ 11.E(2) | ☐ 11.G |

Use a separate DRP for each event or *proceeding*. The same event or *proceeding* may be reported for

more than one *person* or entity using one DRP. File with a completed Execution Page.

One event may result in more than one affirmative answer to Items 11.C., 11.D., 11.E., 11.F. or 11.G. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details to each action on a separate DRP.

## PART I

A. The *person(s)* or entity(ies) for whom this DRP is being filed is (are):

○ You (the advisory firm)

○ You and one or more of your *advisory affiliates*

○ One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name).

If the *advisory affiliate* has a *CRD* number, provide that number. If not, indicate "non-registered" by checking the appropriate box.

| ADV DRP - *ADVISORY AFFILIATE* |
|---|
| No Information Filed |

☐ This DRP should be removed from the ADV record because the *advisory affiliate(s)* is no longer associated with the adviser.

☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

If you are registered or registering with a *state securities authority*, you may remove a DRP for an event you reported only in response to Item 11.D(4), and only if that event occurred more than ten years ago. If you are registered or registering with the SEC, you may remove a DRP for any event listed in Item 11 that occurred more than ten years ago.

B. If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.

○ *Yes* ○ *No*

*NOTE:* The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

## PART II

1. Regulatory Action initiated by:

○ SEC ○ Other Federal ○ State ● *SRO* ○ Foreign
(Full name of regulator, *foreign financial regulatory authority*, federal, state, or *SRO*)
NASD

2. Principal Sanction:

Other Sanctions:

---

3.  Date Initiated (MM/DD/YYYY):

    07/06/2005  ⦿ Exact  ○ Explanation

    If not exact, provide explanation:

---

4.  Docket/Case Number:

    CLG050081

---

5.  *Advisory Affiliate* Employing Firm when activity occurred which led to the regulatory action (if applicable):

---

6.  Principal Product Type:

    No Product

    Other Product Types:

---

7.  Describe the allegations related to this regulatory action (your response must fit within the space provided):

    SEC RULE 11AC1-4 - THE FIRM FAILED TO DISPLAY IMMEDIATELY CUSTOMER LIMIT ORDERS IN NASDAQ SECURITIES IN ITS PUBLIC QUOTATION, WHEN EACH SUCH ORDER WAS AT A PRICE THAT WOULD HAVE IMPROVED THE FIRM'S BID OR OFFER IN EACH SUCH SECURITY; OR WHEN THE ORDER WAS PRICED EQUAL TO THE FIRM'S BID OR OFFER AND THE NATIONAL BEST BID OR OFFER FOR EACH SECURITY, AND THE SIZE OF THE ORDER REPRESENTED MORE THAN A DE MINIMUS CHANGE IN RELATION TO THE SIZE ASSOCIATED WITH THE FIRM'S BID OR OFFER IN EACH SECURITY

---

8.  Current status ?  ○ Pending  ○ On Appeal  ⦿ Final

---

9.  If on appeal, regulatory action appealed to (SEC, *SRO*, Federal or State Court) and Date Appeal Filed:

---

If Final or On Appeal, complete all items below. For Pending Actions, complete Item 13 only.

10. How was matter resolved:

    Acceptance, Waiver & Consent(AWC)

---

11. Resolution Date (MM/DD/YYYY):

    07/06/2005  ⦿ Exact  ○ Explanation

    If not exact, provide explanation:

---

12. Resolution Detail:

    A.  Were any of the following Sanctions *Ordered* (check all appropriate items)?

        ☑ Monetary/Fine Amount:$ 7000

        ☐ Revocation/Expulsion/Denial          ☐ Disgorgement/Restitution

---

☑ Censure      ☐ Cease and Desist/Injunction

☐ Bar      ☐ Suspension

B. Other Sanctions *Ordered*:

Sanction detail: if suspended, *enjoined* or barred, provide duration including start date and capacities affected (General Securities Principal, Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to requalify/retrain, type of exam required and whether condition has been satisfied. If disposition resulted in a fine, penalty, restitution, disgorgement or monetary compensation, provide total amount, portion levied against you or an *advisory affiliate*, date paid and if any portion of penalty was waived:

WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS, THEREFORE THE FIRM IS CENSURED AND FINED $7,000.00.

13. Provide a brief summary of details related to the action status and (or) disposition and include relevant terms, conditions and dates (your response must fit within the space provided.)

| CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV) |
|---|
| No Information Filed |

| Bond DRPs |
|---|
| No Information Filed |

| Judgment/Lien DRPs |
|---|
| No Information Filed |

| Arbitration DRPs |
|---|
| No Information Filed |

# FORM ADV
# UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **CRD Number:** 2625 |
| **ADV - SEC, Execution Pages** | **Rev. 02/2005** |
| **8/25/2006 10:20:03 AM** | |

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena,

summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature:<br>BERNARD L. MADOFF | Date: MM/DD/YYYY<br>08/22/2006 |
| Printed Name:<br>BERNARD L. MADOFF | Title:<br>SOLE MEMBER |
| Adviser *CRD* Number:<br>2625 | |

### *NON-RESIDENT* INVESTMENT ADVISER EXECUTION PAGE

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature: | Date: MM/DD/YYYY |
| --- | --- |
| Printed Name: | Title: |
| Adviser *CRD* Number: 2625 | |

### State Registered Investment Adviser Execution Page

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for state registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the legally designated officers and their successors, of the state in which you maintain your *principal office and place of business* and any other state in which you are applying for registration or amending your registration, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of

1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are applying for registration or amending your registration.

## 2. State-Registered Investment Adviser Affidavit

If you are subject to state regulation, by signing this Form ADV, you represent that, you are in compliance with the registration requirements of the state in which you maintain your principal place of business and are in compliance with the bonding, capital, and recordkeeping requirements of that state.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature | Date MM/DD/YYYY |
|---|---|
| CRD Number 2625 | |
| Printed Name | Title |

Privacy    Legal    Use of Web CRD® or IARD^SM is governed by the  Terms & Conditions.
©2008 FINRA. All rights reserved. FINRA is a trademark of the Financial Industry Regulatory Authority, Inc.

# Exhibit 76

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | IARD/CRD Number: **2625** |
|---|---|
| | Rev. 02/2005 |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 3.

## Item 1 Identifying Information

Responses to this Item tell us who you are, where you are doing business, and how we can contact you.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
BERNARD L. MADOFF INVESTMENT SECURITIES LLC

B.  Name under which you primarily conduct your advisory business, if different from Item 1.A.
BERNARD L. MADOFF INVESTMENT SECURITIES LLC
*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D.  If you are registered with the SEC as an investment adviser, your SEC file number:
801- 67134

E.  If you have a number ("*CRD* Number") assigned by *NASD's CRD* system or by the IARD system, your *CRD* number: 2625
*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

F.  *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 885 THIRD AVENUE | | | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| NEW YORK | NY | USA | 10022 |

If this address is a private residence, check this box: ☐
*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for registration, or are registered only, with the SEC, list the largest five offices in terms of numbers of employees.*

(2) Days of week that you normally conduct business at your *principal office and place of business*:
◉ Monday-Friday ○ Other:

Normal business hours at this location:
9AM - 5PM

(3) Telephone number at this location:
212-230-2424
(4) Facsimile number at this location:
212-486-8178

G. Mailing address, if different from your *principal office and place of business* address:
Number and Street 1:                    Number and Street 2:

City:          State:          Country:          ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:
Number and Street 1:                    Number and Street 2:
City:          State:          Country:          ZIP+4/Postal Code:

|  | YES | NO |
|---|---|---|
| I. Do you have World Wide Web site addresses? | ● | ○ |

*If "yes," list these addresses on Section 1.I. of Schedule D. If a web address serves as a portal through which to access other information you have published on the World Wide Web, you may list the portal without listing addresses for all of the other information. Some advisers may need to list more than one portal address. Do not provide individual electronic mail addresses in response to this Item.*

J. Contact *Employee*:
Name:                              Title:
Telephone Number:                  Facsimile Number:
Number and Street 1:               Number and Street 2:
City:          State:              Country:          ZIP+4/Postal Code:
Electronic mail (e-mail) address, if contact *employee* has one:
*The contact employee should be an employee whom you have authorized to receive information and respond to questions about this Form ADV.*

|  | YES | NO |
|---|---|---|
| K. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? | ○ | ● |

*If "yes," complete Section 1.K. of Schedule D.*

|  | YES | NO |
|---|---|---|
| L. Are you registered with a *foreign financial regulatory authority*? | ○ | ● |

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes", complete Section 1.L. of Schedule D.*

# FORM ADV
OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
|  | Rev. 02/2005 |

**Item 2 SEC Registration**

Responses to this Item help us (and you) determine whether you are eligible to register with the

SEC. Complete this Item 2 only if you are applying for SEC registration or submitting an *annual
updating amendment* to your SEC registration.

A. To register (or remain registered) with the SEC, you must check at least one of the Items 2.A
(1) through 2.A(11), below. If you are submitting an *annual updating amendment* to your SEC
registration and you are no longer eligible to register with the SEC, check Item 2.A(12). You:

☑(1)have *assets under management* of $25 million (in U.S. dollars) or more;

   *See Part 1A Instruction 2.a. to determine whether you should check this box.*

☐(2)have your *principal office and place of business* in Wyoming;

☐(3)have your *principal office and place of business* outside the United States;

☐(4)are an investment adviser (or sub-adviser) to an investment company registered under
the Investment Company Act of 1940;

   *See Part 1A Instruction 2.b. to determine whether you should check this box.*

☐(5)have been designated as a nationally recognized statistical rating organization;

   *See Part 1A Instruction 2.c. to determine whether you should check this box.*

☐(6)are a pension consultant that qualifies for the exemption in rule 203A-2(b);

   *See Part 1A Instruction 2.d. to determine whether you should check this box.*

☐(7)are relying on rule 203A-2(c) because you are an investment adviser that *controls*, is
*controlled* by, or is under common *control* with, an investment adviser that is registered
with the SEC, and your *principal office and place of business* is the same as the registered
adviser;

   *See Part 1A Instruction 2.e. to determine whether you should check this box. If you
   check this box, complete Section 2.A(7) of Schedule D.*

☐(8)are a newly formed adviser relying on rule 203A-2(d) because you expect to be eligible
for SEC registration within 120 days;

   *See Part 1A Instruction 2.f. to determine whether you should check this box. If you check
   this box, complete Section 2.A(8) of Schedule D.*

☐(9) are a multi-state adviser relying on rule 203A-2(e);

   *See Part 1A Instruction 2.g. to determine whether you should check this box. If you
   check this box, complete Section 2.A(9) of Schedule D.*

☐(10)are an Internet investment adviser relying on rule 203A-2(f);

   *See Part 1A Instructions 2.h. to determine whether you should check this box.*

☐(11)have received an SEC *order* exempting you from the prohibition against registration
with the SEC;

   *If you checked this box, complete Section 2.A(11) of Schedule D.*

☐(12)are no longer eligible to remain registered with the SEC.

*See Part 1A Instructions 2.i. to determine whether you should check this box.*

B. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. If this is an initial application, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to direct your *notice filings* to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☐ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☑ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VI |
| ☐ GA | ☐ MI | ☐ OH | ☐ VA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WA |
| ☐ HI | ☐ MS | ☐ OR | ☐ WV |
| | | | ☐ WI |

*If you are amending your registration to stop your notice filings from going to a state that currently receives them and you do not want to pay that state's notice filing fee for the coming year, your amendment must filed before the end of the year (December 31).*

# FORM ADV
**OMB: 3235-0049**

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
| | **Rev. 02/2005** |

## Item 3 Form Of Organization

A. How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ● Limited Liability Company (LLC)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B. In what month does your fiscal year end each year?
October

C. Under the laws of what state or country are you organized?
NEW YORK

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

# FORM ADV

**OMB: 3235-0049**

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name:** BERNARD L. MADOFF INVESTMENT SECURITIES LLC | **IARD/CRD Number:** 2625 |
| | **Rev. 02/2005** |

**Item 4 Successions**

**YES  NO**

A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser? 

*If "yes," complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)


*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

**FORM ADV**

**OMB: 3235-0049**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION**

| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | IARD/CRD Number: **2625** |
|---|---|
| | **Rev. 02/2005** |

**Item 5 Information About Your Advisory Business**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly-formed advisers for completing this Item 5.

*Employees*

A. Approximately how many *employees* do you have? Include full and part-time *employees* but do not include any clerical workers.

  ○ 1- 5     ○ 6-10     ○ 11-50     ◉ 51-250     ○ 251-500

  ○ 501-1,000     ○ More than 1,000     If more than 1,000, how many? (round to the nearest 1,000)

B.

(1) Approximately how many of these *employees* perform investment advisory functions (including research)?

  ○ 0     ◉ 1-5     ○ 6-10     ○ 11-50     ○ 51-250

  ○ 251-500     ○ 501-1,000     ○ More than 1,000     If more than 1,000, how many? (round to the nearest 1,000)

(2) Approximately how many of these *employees* are registered representatives of a broker-dealer?

  ○ 0     ○ 1-5     ○ 6-10     ○ 11-50     ◉ 51-250

  ○ 251-500     ○ 501-1,000     ○ More than 1,000     If more than 1,000, how many? (round to the nearest 1,000)

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Items 5.A(1) and 5.B(2). If an employee performs more than one function, you should count that employee in each of your responses to Item 5.B(1) and 5.B(2).*

(3) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

  ◉ 0     ○ 1-5     ○ 6-10     ○ 11-50     ○ 51-250

  ○ 251-500     ○ 501-1,000     ○ More than 1,000     If more than 1,000, how many? (round to the nearest 1,000)

*In your response to Item 5.B(3), do not count any of your employees and count a firm only once -- do not count each of the firm's employees that solicit on your behalf.*

### *Clients*

C. To approximately how many *clients* did you provide investment advisory services during your most-recently completed fiscal year?

  ○ 0     ○ 1-10     ◉ 11-25     ○ 26-100     ○ 101-250

  ○ 251-500     ○ More than 500     If more than 500, how many? (round to the nearest 500)

D. What types of *clients* do you have? Indicate the approximate percentage that each type of *client* comprises of your total number of *clients.*

| | | None | Up to 10% | 11-25% | 26-50% | 51-75% | More Than 75% |
|---|---|---|---|---|---|---|---|
| (1) | Individuals (other than *high net worth individuals*) | ◉ | ○ | ○ | ○ | ○ | ○ |
| (2) | *High net worth individuals* | ○ | ○ | ◉ | ○ | ○ | ○ |
| (3) | Banking or thrift institutions | ○ | ◉ | ○ | ○ | ○ | ○ |
| (4) | Investment companies (including mutual funds) | ◉ | ○ | ○ | ○ | ○ | ○ |
| (5) | Pension and profit sharing plans (other than | | | | | | |

|  | | | | | | |
|---|---|---|---|---|---|
| plan participants) | ○ | ◉ | ○ | ○ | ○ | ○ |
| (6) Other pooled investment vehicles (e.g., hedge funds) | ○ | ○ | ○ | ○ | ◉ | ○ |
| (7) Charitable organizations | ○ | ◉ | ○ | ○ | ○ | ○ |
| (8) Corporations or other businesses not listed above | ○ | ○ | ◉ | ○ | ○ | ○ |
| (9) State or municipal *government entities* | ◉ | ○ | ○ | ○ | ○ | ○ |
| (10) Other: | ◉ | ○ | ○ | ○ | ○ | ○ |

*The category "individuals" includes trusts, estates, 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*

*Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, check "None" in response to Item 5.D(4).*

## Compensation Arrangements

E. You are compensated for your investment advisory services by (check all that apply):

- ☐ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☑ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

## Assets Under Management

**YES   NO**

F. (1) Do you provide continuous and regular supervisory or management services to securities portfolios?   ◉   ○

(2) If yes, what is the amount of your assets under management and total number of accounts?

| | U.S. Dollar Amount | Total Number of Accounts |
|---|---|---|
| Discretionary: | (a) $ 17091640696.00 | (d) 23 |
| Non-Discretionary: | (b) $ 0.00 | (e) 0 |
| Total: | (c) $ 17091640696.00 | (f) 23 |

*Part 1A Instruction 5.b. explains how to calculate your assets under management. You must follow these instructions carefully when completing this Item.*

## Advisory Activities

G. What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☑ (2) Portfolio management for individuals and/or small businesses
- ☐ (3) Portfolio management for investment companies
- ☑ (4) Portfolio management for businesses or institutional *clients* (other than investment companies)

☐ (5) Pension consulting services

☐ (6) Selection of other advisers

☐ (7) Publication of periodicals or newsletters

☐ (8) Security ratings or pricing services

☐ (9) Market timing services

☐ (10) Other (specify):

*Do not check Item 5.G(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940.*

H. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

○ 0          ○ 1-10          ○ 11-25          ○ 26-50          ○ 51-100
○ 101-250    ○ 251-500       ○ More than 500   If more than 500, how many?
                                              (round to the nearest 500)

I. If you participate in a *wrap fee program*, do you (check all that apply):

☐ (1) *sponsor* the *wrap fee program*?

☐ (2) act as a portfolio manager for the *wrap fee program*?

*If you are a portfolio manager for a wrap fee program, list the names of the programs and their sponsors in Section 5.I(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check either Item 5.I(1) or 5.I(2).*

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **IARD/CRD Number: 2625** |
|---|---|
| | **Rev. 02/2005** |

## Item 6 Other Business Activities

In this Item, we request information about your other business activities.

A. You are actively engaged in business as a (check all that apply):

☑ (1) Broker-dealer

☐ (2) Registered representative of a broker-dealer

☐ (3) Futures commission merchant, commodity pool operator, or commodity trading advisor

☐ (4) Real estate broker, dealer, or agent

☐ (5) Insurance broker or agent

☐ (6) Bank (including a separately identifiable department or division of a bank)

☐ (7) Other financial product salesperson (specify):

| | | | YES | NO |
|---|---|---|---|---|
| B. | (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| | (2) | If yes, is this other business your primary business? | ○ | ○ |
| | | *If "yes," describe this other business on Section 6.B. of Schedule D.* | | |
| | | | YES | NO |
| | (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ◉ | ○ |

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| | |
|---|---|
| **Primary Business Name:** BERNARD L. MADOFF INVESTMENT SECURITIES LLC | **IARD/CRD Number:** 2625 |
| | Rev. 02/2005 |

## Item 7 Financial Industry Affiliations

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

Item 7 requires you to provide information about you and your *related persons*. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

A. You have a *related person* that is a (check all that apply):
- ☑ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer
- ☐ (2) investment company (including mutual funds)
- ☐ (3) other investment adviser (including financial planners)
- ☐ (4) futures commission merchant, commodity pool operator, or commodity trading advisor
- ☐ (5) banking or thrift institution

☐ (6) accountant or accounting firm
☐ (7) lawyer or law firm
☐ (8) insurance company or agency
☐ (9) pension consultant
☐ (10) real estate broker or dealer
☐ (11) sponsor or syndicator of limited partnerships

*If you checked Item 7.A(3), you must list on Section 7.A. of Schedule D all your related persons that are investment advisers. If you checked Item 7.A(1), you may elect to list on Section 7.A. of Schedule D all your related persons that are broker-dealers. If you choose to list a related broker-dealer, the IARD will accept a single Form U-4 to register an investment adviser representative who also is a broker-dealer agent ("registered rep") of that related broker-dealer.*

**YES NO**

B. Are you or any *related person* a general partner in an *investment-related* limited partnership or manager of an *investment-related* limited liability company, or do you advise any other "private fund" as defined under SEC rule 203(b)(3)-1?    ○ ◉

*If "yes," for each limited partnership or limited liability company, or (if applicable) private fund, complete Section 7.B. of Schedule D. If, however, you are an SEC-registered adviser and you have related persons that are SEC-registered advisers who are the general partners of limited partnerships or the managers of limited liability companies, you do not have to complete Section 7.B. of Schedule D with respect to those related advisers' limited partnerships or limited liability companies.*

*To use this alternative procedure, you must state in the Miscellaneous Section of Schedule D: (1) that you have related SEC-registered investment advisers that manage limited partnerships or limited liability companies that are not listed in Section 7.B. of your Schedule D; (2) that complete and accurate information about those limited partnerships or limited liability companies is available in Section 7.B. of Schedule D of the Form ADVs of your related SEC-registered advisers; and (3) whether your clients are solicited to invest in any of those limited partnerships or limited liability companies.*

# FORM ADV

**OMB: 3235-0049**

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | IARD/CRD Number: **2625** |
|---|---|
| | **Rev. 02/2005** |

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients'* transactions. Like Item 7, this information identifies areas in which conflicts of interest may occur between you and your *clients*.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*.

Proprietary Interest in *Client* Transactions

|  |  | Yes | No |
|---|---|---|---|
| A. Do you or any *related person*: |  |  |  |
| (1) buy securities for yourself from advisory *clients,* or sell securities you own to advisory *clients* (principal transactions)? |  | ○ | ◉ |
| (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? |  | ◉ | ○ |
| (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A(1) or (2))? |  | ○ | ◉ |

**Sales Interest in *Client* Transactions**

|  |  | Yes | No |
|---|---|---|---|
| B. Do you or any *related person*: |  |  |  |
| (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? |  | ○ | ◉ |
| (2) recommend purchase of securities to advisory *clients* for which you or any *related person* serves as underwriter, general or managing partner, or purchaser representative? |  | ○ | ◉ |
| (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? |  | ○ | ◉ |

**Investment or Brokerage Discretion**

|  |  | Yes | No |
|---|---|---|---|
| C. Do you or any *related person* have *discretionary authority* to determine the: |  |  |  |
| (1) securities to be bought or sold for a *client's* account? |  | ◉ | ○ |
| (2) amount of securities to be bought or sold for a *client's* account? |  | ◉ | ○ |
| (3) broker or dealer to be used for a purchase or sale of securities for a *client's* account? |  | ○ | ◉ |
| (4) commission rates to be paid to a broker or dealer for a *client's* securities transactions? |  | ○ | ◉ |
| D. Do you or any *related person* recommend brokers or dealers to *clients*? |  | ○ | ◉ |
| E. Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party in connection with *client* securities transactions? |  | ○ | ◉ |
| F. Do you or any *related person*, directly or indirectly, compensate any *person* for *client* referrals? |  | ○ | ◉ |

*In responding to this Item 8.F., consider in your response all cash and non-cash compensation that you or a related person gave any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
|  | Rev. 02/2005 |

**Item 9 *Custody***

In this Item, we ask you whether you or a *related person* has *custody* of *client* assets. If you are

registering or registered with the SEC and you deduct your advisory fees directly from your *clients'* accounts but you do not otherwise have *custody* of your *clients'* funds or securities, you may answer "no" to Item 9A.(1) and 9A.(2).

|  |  | Yes | No |
|---|---|---|---|
| A. Do you have *custody* of any advisory *clients'*: |  |  |  |
| (1) cash or bank accounts? |  | ⦿ | ○ |
| (2) securities? |  | ⦿ | ○ |
| B. Do any of your *related persons* have *custody* of any of your advisory *clients'*: |  |  |  |
| (1) cash or bank accounts? |  | ○ | ⦿ |
| (2) securities? |  | ○ | ⦿ |
| C. If you answered "yes" to either Item 9.B(1) or 9.B(2), is that *related person* a broker-dealer registered under Section 15 of the Securities Exchange Act of 1934? |  | ○ | ○ |

# FORM ADV                                          OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
|  | Rev. 02/2005 |

### Item 10 Control Persons

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you.

If you are submitting an initial application, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application, you must complete Schedule C.

|  | YES | NO |
|---|---|---|
| Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete Section 10 of Schedule D.*

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
|  | Rev. 02/2005 |

### Item 11 Disclosure Information

In this Item, we ask for information about your disciplinary history and the disciplinary history of

all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A(1), 11.A (2), 11.B(1), 11.B(2), 11.D(4), and 11.H(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

For "yes" answers to the following questions, complete a Criminal Action DRP:

|  |  | YES | NO |
|---|---|---|---|
| A. In the past ten years, have you or any *advisory affiliate*: | | | |
| (1) been convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | | ○ | ◉ |
| (2) been *charged* with any *felony*? | | ○ | ◉ |

*If you are registered or registering with the SEC, you may limit your response to Item 11.A(2) to charges that are currently pending.*

|  |  | YES | NO |
|---|---|---|---|
| B. In the past ten years, have you or any *advisory affiliate*: | | | |
| (1) been convicted of or plead guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | | ○ | ◉ |
| (2) been *charged* with a *misdemeanor* listed in 11.B(1)? | | ○ | ◉ |

*If you are registered or registering with the SEC, you may limit your response to Item 11.B(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

|  |  | YES | NO |
|---|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | | ○ | ◉ |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | | ○ | ◉ |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* | | ○ | ◉ |

business having its authorization to do business denied, suspended, revoked, or restricted?

(4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity?

(5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity?

D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

(1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical?

(2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes?

(3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?

(4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity?

(5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity?

E. Has any *self-regulatory organization* or commodities exchange ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission?

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the SEC)?

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?

F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?

G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

H. (1) Has any domestic or foreign court:                                    **YES NO**

(a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity?

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*?

> (2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could ○ ⦿
> result in a "yes" answer to any part of Item 11.H(1)?

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **IARD/CRD Number:** **2625** |
|---|---|

Rev. 02/2005

## Item 12 Small Business

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC <u>and</u> you indicated in response to Item 5.F(2)(c) that you have assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:
- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- Control means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to control the other *person*.

|  | YES | NO |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B. Do you:

| | YES | NO |
|---|---|---|
| (1) *control* another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

C. Are you:

| | YES | NO |
|---|---|---|
| (1) *controlled* by or under common *control* with another investment adviser that had assets under management of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
| | Rev. 02/2005 |

**Part 2 Brochures**

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: **BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **IARD/CRD Number:** **2625** |
|---|---|
| | **Rev. 02/2005** |

---

**Form ADV, Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2. Direct Owners and Executive Officers. List below the names of:

   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required and cannot be more than one individual), director, and any other individuals with similar status or functions;

   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);

   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (c) if you are organized as a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?  ○ Yes  ◉ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| NA - less than 5% | B - 10% but less than 25% | D - 50% but less than 75% |
|---|---|---|
| A - 5% but less than | C - 25% but less than | E - 75% or more |

10%                    50%

7. (a)  In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b)  In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c)  Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No., or Employer ID No. |
|---|---|---|---|---|---|---|---|
| MADOFF, BERNARD LAWRENCE | I | SOLE MEMBER/PRINCIPAL | 01/2001 | E | Y | N | 316687 |
| MADOFF, PETER BARNETT | I | DIRECTOR OF TRADING/CHIEF COMPLIANCE OFFICER | 06/1969 | NA | Y | N | 316688 |

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
| | Rev. 02/2005 |

### Form ADV, Schedule B

#### Indirect Owners

1.  Complete Schedule B only if you are submitting an initial application. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2.  Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

(a)  in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

(b)  in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

(c)  in the case of an owner that is a trust, the trust and each trustee; and

(d)  in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's

capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:

| | C - 25% but less than 50% | E - 75% or more |
| | D - 50% but less than 75% | F - Other (general partner, trustee, or elected manager) |

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons.*

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| No Indirect Owner Information Filed |
| --- |

# FORM ADV

OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| **Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC** | **IARD/CRD Number: 2625** |
| --- | --- |
| | **Rev. 02/2005** |

**Form ADV, Schedule D**

### Section 1.B. Other Business Names

List your other business names and the jurisdictions in which you use them. You must complete a separate Schedule D for each business name.

| No Information Filed |
| --- |

### Section 1.F. Other Offices

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Page 1 for each location. If you are applying for registration, or are registered, only with the SEC, list only the largest five (in terms of numbers of *employees*).

| No Information Filed |
| --- |

### Section 1.I. World Wide Web Site Addresses

List your World Wide Web site addresses. You must complete a separate Schedule D for each World Wide Web site address.

World Wide Web Site Address:  WWW.MADOFF.COM

### Section 1.K. Locations of Books and Records

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D Page 1 for each location.

| No Information Filed |
|---|

## Section 1.L. Registration with *Foreign Financial Regulatory Authorities*

List the name, in English, of each *foreign financial regulatory authority* and country with which you are registered. You must complete a separate Schedule D Page 2 for each *foreign financial regulatory authority* with whom you are registered.

| No Information Filed |
|---|

## Section 2.A(7) Affiliated Adviser

| No Information Filed |
|---|

## Section 2.A(8) Newly Formed Adviser

If you are relying on rule 203A-2(d), the newly formed adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

## Section 2.A(9) Multi-State Adviser

If you are relying on rule 203A-2(e), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 30 or more states to register as an investment adviser with the securities authorities in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 25 states to register as an investment adviser with the securities authorities of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 25 states to register as an investment adviser with the securities authorities in those states.

## Section 2.A(11) SEC Exemptive *Order*

| No Information Filed |
|---|

## Section 4 Successions

Complete the following information if you are succeeding to the business of a currently-registered investment adviser. If you acquired more than one firm in the succession you are reporting on this Form ADV, you must complete a separate Schedule D Page 3 for each acquired firm. See Part 1A Instruction 4.

No Information Filed

### Section 5.I(2) *Wrap Fee Programs*

If you are a portfolio manager for one or more *wrap fee programs*, list the name of each program and its *sponsor*. You must complete a separate Schedule D Page 3 for each *wrap fee program* for which you are a portfolio manager.

No Information Filed

### Section 6.B. Description of Primary Business

No Information Filed

### Section 7.A. Affiliated Investment Advisers and Broker-Dealers

You MUST complete the following information for each investment adviser with whom you are affiliated. You MAY complete the following information for each broker-dealer with whom you are affiliated. You must complete a separate Schedule D Page 3 for each listed affiliate.

No Information Filed

### Section 7.B. Limited Partnership Participation or Other Private Fund Participation

You must complete a separate Schedule D Page 4 for each limited partnership in which you or a *related person* is a general partner, each limited liability company for which you or a *related person* is a manager, and each other private fund that you advise.

No Information Filed

### Section 10 *Control Persons*

You must complete a separate Schedule D Page 4 for each *control person* not named in Item 1.A. or Schedules A, B, or C that directly or indirectly *controls* your management or policies.

No Information Filed

### Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

No Information Filed

# FORM ADV                                                    OMB: 3235-0049

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
| | Rev. 02/2005 |

**Form ADV, DRPs**

### CRIMINAL DISCLOSURE REPORTING PAGE (ADV)

No Information Filed

### REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ☒ INITIAL **OR** ○ AMENDED response used to report details for affirmative responses to Items 11.C., 11.D., 11.E., 11.F. or 11.G. of Form ADV.

Check item(s) being responded to:

| | *Regulatory Action* | | |
|---|---|---|---|
| ☐ 11.C(1) | ☐ 11.C(5) | ☐ 11.D(4) | ☐ 11.E(3) |
| ☐ 11.C(2) | ☐ 11.D(1) | ☐ 11.D(5) | ☐ 11.E(4) |
| ☐ 11.C(3) | ☐ 11.D(2) | ☐ 11.E(1) | ☐ 11.F |
| ☐ 11.C(4) | ☐ 11.D(3) | ☒ 11.E(2) | ☐ 11.G |

Use a separate DRP for each event or *proceeding*. The same event or *proceeding* may be reported for more than one *person* or entity using one DRP. File with a completed Execution Page.

One event may result in more than one affirmative answer to Items 11.C., 11.D., 11.E., 11.F. or 11.G. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details to each action on a separate DRP.

| PART I |
|---|

A. The *person(s)* or entity(ies) for whom this DRP is being filed is (are):

  ◉ You (the advisory firm)

  ○ You and one or more of your *advisory affiliates*

  ○ One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name).

If the *advisory affiliate* has a *CRD* number, provide that number. If not, indicate "non-registered" by checking the appropriate box.

| ADV DRP - *ADVISORY AFFILIATE* |
|---|
| No Information Filed |

☐ This DRP should be removed from the ADV record because the *advisory affiliate(s)* is no longer associated with the adviser.

☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

If you are registered or registering with a *state securities authority*, you may remove a DRP for an event you reported only in response to Item 11.D(4), and only if that event occurred more than ten years ago. If you are registered or registering with the SEC, you may remove a DRP for any event listed in Item 11 that occurred more than ten years ago.

B. If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.

  ○ *Yes* ○ *No*

*NOTE:* The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

**PART II**

1.  Regulatory Action initiated by:

    ○ SEC    ○ Other Federal    ○ State    ◉ *SRO*    ○ Foreign

    (Full name of regulator, *foreign financial regulatory authority*, federal, state, or *SRO*)
    NASD

2.  Principal Sanction:

    Other Sanctions:

3.  Date Initiated (MM/DD/YYYY):

    07/06/2005 ◉ Exact    ○ Explanation

    If not exact, provide explanation:

4.  Docket/Case Number:
    CLG050081

5.  *Advisory Affiliate* Employing Firm when activity occurred which led to the regulatory action (if applicable):

6.  Principal Product Type:
    No Product
    Other Product Types:

7.  Describe the allegations related to this regulatory action (your response must fit within the space provided):

    SEC RULE 11AC1-4 - THE FIRM FAILED TO DISPLAY IMMEDIATELY CUSTOMER LIMIT ORDERS IN NASDAQ SECURITIES IN ITS PUBLIC QUOTATION, WHEN EACH SUCH ORDER WAS AT A PRICE THAT WOULD HAVE IMPROVED THE FIRM'S BID OR OFFER IN EACH SUCH SECURITY; OR WHEN THE ORDER WAS PRICED EQUAL TO THE FIRM'S BID OR OFFER AND THE NATIONAL BEST BID OR OFFER FOR EACH SECURITY, AND THE SIZE OF THE ORDER REPRESENTED MORE THAN A DE MINIMUS CHANGE IN RELATION TO THE SIZE ASSOCIATED WITH THE FIRM'S BID OR OFFER IN EACH SECURITY

8.  Current status ?    ○ Pending    ○ On Appeal    ◉ Final

9.  If on appeal, regulatory action appealed to (SEC, *SRO*, Federal or State Court) and Date Appeal Filed:

    If Final or On Appeal, complete all items below. For Pending Actions, complete Item 13 only.

10. How was matter resolved:
    Acceptance, Waiver & Consent(AWC)

11. Resolution Date (MM/DD/YYYY):

    07/06/2005 ◉ Exact    ○ Explanation

If not exact, provide explanation:

12. Resolution Detail:

    A. Were any of the following Sanctions *Ordered* (check all appropriate items)?

       ☑ Monetary/Fine Amount: $ 7000

       ☐ Revocation/Expulsion/Denial        ☐ Disgorgement/Restitution

       ☑ Censure        ☐ Cease and Desist/Injunction

       ☐ Bar        ☐ Suspension

    B. Other Sanctions *Ordered*:

      Sanction detail: if suspended, *enjoined* or barred, provide duration including start date and capacities affected (General Securities Principal, Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to requalify/retrain, type of exam required and whether condition has been satisfied. If disposition resulted in a fine, penalty, restitution, disgorgement or monetary compensation, provide total amount, portion levied against you or an *advisory affiliate*, date paid and if any portion of penalty was waived:
      WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS, THEREFORE THE FIRM IS CENSURED AND FINED $7,000.00.

13. Provide a brief summary of details related to the action status and (or) disposition and include relevant terms, conditions and dates (your response must fit within the space provided.)

*GENERAL INSTRUCTIONS*

This Disclosure Reporting Page (DRP ADV) is an ◉ INITIAL *OR* ○ AMENDED response used to report details for affirmative responses to Items 11.C., 11.D., 11.E., 11.F. or 11.G. of Form ADV.

Check item(s) being responded to:

| *Regulatory Action* | | | |
|---|---|---|---|
| ☐ 11.C(1) | ☐ 11.C(5) | ☐ 11.D(4) | ☐ 11.E(3) |
| ☐ 11.C(2) | ☐ 11.D(1) | ☐ 11.D(5) | ☐ 11.E(4) |
| ☐ 11.C(3) | ☐ 11.D(2) | ☐ 11.E(1) | ☐ 11.F |
| ☐ 11.C(4) | ☐ 11.D(3) | ☑ 11.E(2) | ☐ 11.G |

Use a separate DRP for each event or *proceeding*. The same event or *proceeding* may be reported for more than one *person* or entity using one DRP. File with a completed Execution Page.

One event may result in more than one affirmative answer to Items 11.C., 11.D., 11.E., 11.F. or 11.G. Use only one DRP to report details related to the same event. If an event gives rise to actions by more than one regulator, provide details to each action on a separate DRP.

PART I

A. The *person(s)* or entity(ies) for whom this DRP is being filed is (are):

  ☉ You (the advisory firm)

  ○ You and one or more of your *advisory affiliates*

  ○ One or more of your *advisory affiliates*

If this DRP is being filed for an *advisory affiliate*, give the full name of the *advisory affiliate* below (for individuals, Last name, First name, Middle name).

If the *advisory affiliate* has a *CRD* number, provide that number. If not, indicate "non-registered" by checking the appropriate box.

| ADV DRP - *ADVISORY AFFILIATE* |
|---|
| No Information Filed |

☐ This DRP should be removed from the ADV record because the *advisory affiliate(s)* is no longer associated with the adviser.

☐ This DRP should be removed from the ADV record because: (1) the event or *proceeding* occurred more than ten years ago or (2) the adviser is registered or applying for registration with the SEC and the event was resolved in the adviser's or *advisory affiliate's* favor.

If you are registered or registering with a *state securities authority*, you may remove a DRP for an event you reported only in response to Item 11.D(4), and only if that event occurred more than ten years ago. If you are registered or registering with the SEC, you may remove a DRP for any event listed in Item 11 that occurred more than ten years ago.

B. If the *advisory affiliate* is registered through the IARD system or *CRD* system, has the *advisory affiliate* submitted a DRP (with Form ADV, BD or U-4) to the IARD or *CRD* for the event? If the answer is "Yes," no other information on this DRP must be provided.

  ○ *Yes* ○ *No*

*NOTE:* The completion of this form does not relieve the *advisory affiliate* of its obligation to update its IARD or *CRD* records.

## PART II

1. Regulatory Action initiated by:

  ○ SEC ○ Other Federal ○ State ☉ *SRO* ○ Foreign

  (Full name of regulator, *foreign financial regulatory authority*, federal, state, or *SRO*)

  NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

2. Principal Sanction:

  Civil and Administrative Penalt(ies) /Fine(s)

  Other Sanctions:

  CENSURE

3. Date Initiated (MM/DD/YYYY):

  02/26/2007 ☉ Exact ○ Explanation

  If not exact, provide explanation:

4. Docket/Case Number:

  2005009132/20050010261

5. *Advisory Affiliate* Employing Firm when activity occurred which led to the regulatory action (if applicable):

6. Principal Product Type:
   Equity - OTC
   Other Product Types:

7. Describe the allegations related to this regulatory action (your response must fit within the space provided):
   THE FIRM SUBMITTED AN AWC THAT WAS ACCEPTED BY THE NASD FOR VIOLATIONS OF LIMIT ORDER DISPLAY AND LIMIT ORDER PROTECTION.

8. Current status ?  ○ Pending    ○ On Appeal    ◉ Final

9. If on appeal, regulatory action appealed to (SEC, *SRO*, Federal or State Court) and Date Appeal Filed:

If Final or On Appeal, complete all items below. For Pending Actions, complete Item 13 only.

10. How was matter resolved:
    Acceptance, Waiver & Consent(AWC)

11. Resolution Date (MM/DD/YYYY):
    02/27/2007  ◉ Exact   ○ Explanation
    If not exact, provide explanation:

12. Resolution Detail:
    A. Were any of the following Sanctions *Ordered* (check all appropriate items)?

       ☑ Monetary/Fine Amount:$ 8500
       ☐ Revocation/Expulsion/Denial          ☐ Disgorgement/Restitution
       ☑ Censure                              ☐ Cease and Desist/Injunction
       ☐ Bar                                  ☐ Suspension

    B. Other Sanctions *Ordered*:

       Sanction detail: if suspended, *enjoined* or barred, provide duration including start date and capacities affected (General Securities Principal, Financial Operations Principal, etc.). If requalification by exam/retraining was a condition of the sanction, provide length of time given to requalify/retrain, type of exam required and whether condition has been satisfied. If disposition resulted in a fine, penalty, restitution, disgorgement or monetary compensation, provide total amount, portion levied against you or an *advisory affiliate*, date paid and if any portion of penalty was waived:
       WITHOUT ADMITTING OR DENYING THE ALLEGATIONS, THE FIRM CONSENTED TO THE DESCRIBED SANCTIONS AND TO THE ENTRY OF FINDINGS, THEREFORE THE FIRM WAS CENSURED AND FINED $8,500.00.

13. Provide a brief summary of details related to the action status and (or) disposition and include relevant terms, conditions and dates (your response must fit within the space

provided.)

| CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV) |
|---|
| No Information Filed |

# FORM ADV

**OMB: 3235-0049**

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION

| Primary Business Name: BERNARD L. MADOFF INVESTMENT SECURITIES LLC | IARD/CRD Number: 2625 |
|---|---|
| | Rev. 02/2005 |

**Form ADV, Signature Page**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having custody or possession of these books and records to make them available to federal and state regulatory representatives.

| Signature: BERNARD L. MADOFF | Date: MM/DD/YYYY 01/07/2008 |
|---|---|
| Printed Name: BERNARD L. MADOFF | Title: SOLE MEMBER |
| Adviser *CRD* Number: | |

2625

**_NON-RESIDENT_ INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for SEC registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a _notice filing_, as your agents to receive service, and agree that such _persons_ may accept service on your behalf, of any notice, subpoena, summons, _order_ instituting _proceedings_, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative _proceeding_ or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, _proceeding_, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is _founded_, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a _notice filing_.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. _Non-Resident_ Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any _person_ subject to your written irrevocable consents or powers of attorney or any of your general partners and _managing agents_.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the _non-resident_ investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any _person_ having custody or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                      Date: MM/DD/YYYY


Printed Name:                                   Title:

Adviser *CRD* Number:
2625

## State Registered Investment Adviser Execution Page

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for state registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the legally designated officers and their successors, of the state in which you maintain your *principal office and place of business* and any other state in which you are applying for registration or amending your registration, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are applying for registration or amending your registration.

## 2. State-Registered Investment Adviser Affidavit

If you are subject to state regulation, by signing this Form ADV, you represent that, you are in compliance with the registration requirements of the state in which you maintain your principal place of business and are in compliance with the bonding, capital, and recordkeeping requirements of that state.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature | Date MM/DD/YYYY |
| CRD Number 2625 | |
| Printed Name | Title |

# EXHIBIT 77

# FILED UNDER SEAL

# EXHIBIT 78

# FILED UNDER SEAL

# EXHIBIT 79

# FILED UNDER SEAL

# Exhibit 80

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Tel:  (212) 698-3500
Fax: (212) 698-3599
Andrew J. Levander
andrew.levander@dechert.com
Gary J. Mennitt
gary.mennitt@dechert.com
Neil A. Steiner
neil.steiner@dechert.com

*Attorneys for Defendants J. Ezra Merkin*
*and Gabriel Capital Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------- X

In re:                                        :
                                              :
BERNARD L. MADOFF INVESTMENT                  :    SIPA LIQUIDATION
SECURITIES LLC,                               :
                                              :    No. 08-01789 (BRL)
                Debtor.                       :
-------------------------------------------- X
IRVING H. PICARD, Trustee for the Liquidation :
of Bernard L. Madoff Investment Securities LLC, :
                                              :
                Plaintiff,                    :
                                              :
                v.                            :    Adv. Proc. No. 09-01182 (BRL)
                                              :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,        :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,        :
GABRIEL CAPITAL CORPORATION,                  :
                                              :
                Defendants.                   :
-------------------------------------------- X

**DEFENDANTS J. EZRA MERKIN AND GABRIEL CAPITAL CORPORATION'S**
**SUPPLEMENTAL RESPONSES TO PLAINTIFF'S SECOND SET OF**
**INTERROGATORIES AND REQUESTS FOR ADMISSIONS**
**<u>IN ACCORDANCE WITH DECISION #3</u>**

15019907

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (made applicable by Rules 7026 and 7033 of the Federal Rules of Bankruptcy Procedure), Rule 7033-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and Judge Cyganowski's Decision #3, Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC" and with Merkin, "Defendants"), by their attorneys, Dechert LLP, hereby supplement their responses to Interrogatories No. 1, 2, 3, 7, 8, 9, 10, 11, 13, 15 and 16 of Plaintiff's Second Set of Interrogatories and Request No. 9 of Plaintiff's Requests for Admissions. These supplemental responses incorporate by reference the General Objections and each of the Specific Objections set forth in Defendants' Answers and Objections to Plaintiff's Second Set of Interrogatories and Responses to Plaintiff's Requests for Admissions, as if fully set forth herein, and are made without waiver of any such objections.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NOS. 1, 2, 3, 7, 8, 9, 10, 11 AND 13:**

Subject to and without waiving their objections, and expressly preserving the right to supplement this Interrogatory Response, Defendants state as follows:

Prior to investing with Mr. Madoff, Mr. Merkin had conversations with a number of sophisticated investors who were clients of Mr. Madoff and had accounts with his firm, Bernard L. Madoff Investment Securities, LLC ("BLMIS"), concerning Mr. Madoff's reputation, trading strategy and risks. Those investors included Leon Meyers (at the time the manager of the Scheuer family office), Sandra Manske (at the time a senior executive of the Tremont funds and later the founder of the Maxam funds), David Gottesman (the founder of First Manhattan Corporation and a director of Berkshire Hathaway), Gedale Horowitz (who at the time ran Salomon Brothers' municipal bond department), and Daniel Hoffert (a successful Wall Street investor), all of whom spoke very highly of Mr. Madoff and his investment

2

strategies.  Mr. Merkin also had conversations with customers of BLMIS's market-making

operations.  And Mr. Merkin discussed Mr. Madoff with his father, Hermann Merkin (a

successful businessman and investor), who told his son that "I know Bernie, and he's okay,"

which Ezra Merkin understood to be high praise coming from his father.

In addition, prior to investing with Mr. Madoff, Mr. Merkin met with Mr. Madoff in

Mr. Madoff's offices, and discussed Mr. Madoff's trading strategies as well as Mr. Madoff's

market-making activities.  Mr. Madoff also explained that BLMIS operated a significant

wholesale business, in which its customers included Charles Schwab and Fidelity.  They also

discussed Mr. Madoff's and his brother's involvement in industry affairs.  As Mr. Merkin

understood, Mr. Madoff at that time had a sterling reputation; was heavily involved in

industry affairs; and his firm was a very dominant market maker with an extraordinary share

of the trading in certain NYSE stocks, particularly heavily traded, large cap stocks.  Indeed,

Mr. Madoff subsequently became the chairman of NASDAQ.

Mr. Merkin first invested with Mr. Madoff and BLMIS through Mr. Meyers and the

Scheuer family's account with Mr. Madoff.  After a period of time and gaining additional

comfort with Mr. Madoff and his trading strategies, Mr. Merkin thereafter opened managed

accounts with BLMIS on behalf of Gabriel Capital L.P., Ariel Fund Limited, Ascot Fund

Limited (which was subsequently transferred to the account of Ascot Partners, L.P., in

connection with a reorganization of the domestic and offshore Ascot funds), and Ascot

Partners, L.P. (collectively, the "Funds"), and delegated trading authority over those accounts

to Mr. Madoff.

As an additional part of his due diligence on and monitoring of Mr. Madoff and

BLMIS, Mr. Merkin maintained a file that included newspaper articles and profiles of Mr.

Madoff, notes of certain of his meetings with Mr. Madoff, and information concerning other funds that had significant investments with Mr. Madoff and BLMIS.  For example, Mr. Merkin reviewed and retained a 1989 article from *Forbes* describing how BLMIS made markets in 250 of the largest, most actively traded stocks and identifying some of its biggest customers, including A.G. Edwards, Charles Schwab, and Fidelity.  Another *Forbes* article, from 1992, similarly described Mr. Madoff and his firm as one of the biggest of the new age traders on Wall Street who were competing with the New York Stock Exchange for trades, and an April 1993 *International Herald Tribune* likewise discussed how Mr. Madoff was gaining the upper hand in a competition with the New York and American Stock Exchanges. And a very significant *New York Times* article from 1992 discussed the United States Securities and Exchange Commission's ("SEC") investigation into unregistered notes being marketed by Avellino & Bienes, a Florida accounting firm, and reported on the SEC's relief that all of the money that had been raised from the sale of the notes -- $440 million -- had been deposited in an account with BLMIS and managed by Mr. Madoff, and was able to be liquidated and returned to the note purchasers almost immediately.

Moreover, Mr. Madoff was widely credited with breaking the New York Stock Exchange's hegemony over Wall Street trading.  Thus, by 1999 -- as reflected in *New York Times* and *Wall Street Journal* articles that Mr. Merkin read and retained in his file -- BLMIS entered into a joint venture with Goldman Sachs, Morgan Stanley, Salomon Smith Barney, and Merrill Lynch to establish the first electronic trading platform for NYSE stocks.  That those four well-established Wall Street firms were willing to enter into a joint venture with BLMIS further enhanced Mr. Madoff's reputation and provided additional comfort to Mr. Merkin.  Moreover, as Mr. Merkin knew, Mr. Madoff frequently met with industry leaders at

the SEC and regularly testified in Congress about developments in the securities industry and the ongoing transformation of the U.S. financial markets.

As an additional part of his due diligence and monitoring of the Funds' investments, Mr. Merkin met with Mr. Madoff ten to fifteen times a year by phone or in person to discuss trading strategies.  These conversations ranged from general discussions of Mr. Madoff's trading strategies, to potential changes in or refinements of the trading strategies, to discussions about the market, then-current market trends, and other market participants.  From time to time, Mr. Merkin arranged and participated in meetings between Mr. Madoff and certain investors in the Funds, including Gedale Horowitz, Ludwig Bravmann, Alec Hackel, Christof Reichmuth, Patrick Erne, Michael Matlin, and Roman Igilnikov and others from Union Bancaire Privee.  Mr. Merkin also discussed Mr. Madoff and his investment strategy with many other customers of Mr. Madoff and BLMIS, including Ludwig Jesselson, David Gottesman, and Leon Meyers, as well as with other sophisticated investors including people who served on the Yeshiva University Investment Committee.  Mr. Merkin also discussed Mr. Madoff, his trading strategy and BLMIS with representatives of BNP Paribas as part of their due diligence in connection with a proposal to create a levered version of Ascot.

Mr. Merkin also knew that BLMIS was a registered broker-dealer and later registered as an investment advisor, and therefore was subject to periodic and surprise inspections by its primary regulator, the SEC.  The fact that Mr. Madoff and his firm were regularly inspected by the SEC and the SEC had never raised any significant issue about the firm's operations -- in one of their many conversations, Mr. Madoff reported that the SEC had visited BLMIS's offices to conduct reviews eight times in sixteen years -- gave Mr. Merkin additional comfort about Mr. Madoff's bona fides.

As a further part of the due diligence on and monitoring of the Funds' investments, Mr. Merkin had complete transparency to what he -- and many others -- understood was the trading being conducted by Mr. Madoff in the Funds' accounts.  BLMIS sent confirmations of every trade supposedly made in the accounts, which were reviewed by GCC employees and input into GCC's portfolio management system ("PMS").  GCC employees then reconciled GCC's accounting records against to the monthly statements received from BLMIS.  The PMS system enabled GCC employees to generate daily reports showing any transactions as well as profit and loss information for the portfolio, which Mr. Merkin would review on a daily basis.  Mr. Merkin also regularly checked the portfolio to ensure that there were a sufficient number of put options to cover the value of the equities owned when the account was invested in the market.

Another important part of Defendants' due diligence and monitoring of the Funds' investments was the annual audit of the Funds' financial statements conducted by BDO Seidman LLP ("BDO").  BDO was given unfettered access to GCC's employees and records to conduct its audits of the financial statements in accordance with generally accepted auditing standards.  As part of its audit, BDO reviewed and tested various trade confirmations and monthly statements, and communicated directly with BLMIS concerning the value of the Funds' investments.  In addition, BDO requested and received copies of audited financial statements and statements of internal controls certified by BLMIS's auditor, and never raised any issue about either the contents of those statements or the identity or qualifications of BLMIS's auditor (Mr. Madoff had explained to Mr. Merkin that he used a small accounting firm because they understood his business and provided superior customer service and partner-level attention compared to a larger firm).

Perhaps most significantly, Mr. Merkin had a nearly two-decade track record of receiving timely withdrawals on demand from the Funds' BLMIS accounts, and was aware that other clients of Mr. Madoff had a similar experience. The ability timely to withdraw capital from the BLMIS accounts provided additional comfort as part of Mr. Merkin's due diligence and monitoring of the Funds' investments.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NOS. 15 AND 16:**

Subject to and without waiving their objections, Defendants state that information responsive to this request can be found in documents produced to Plaintiff, including Defendants' tax returns for the years 2000 to 2008, as part of Defendants' May 22, 2013 production. These tax returns can be located in documents bearing Bates numbers GCC-P 0602380-0605295 and GCC-P 0628856-0636284.

**SUPPLEMENTAL RESPONSE TO REQUESTS FOR ADMISSION NO. 9:**

Denied.

Dated: New York, New York
      August 30, 2013

                         DECHERT LLP

By: _____
                Andrew J. Levander
                Gary J. Mennitt
                Neil A. Steiner
                1095 Avenue of the Americas
                New York, New York 10036
                (212) 698-3500
                andrew.levander@dechert.com
                gary.mennitt@dechert.com
                neil.steiner@dechert.com

                *Attorneys for Defendants J. Ezra Merkin*
                *and Gabriel Capital Corporation*

# Exhibit 81



Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   SECURITIES INVESTOR

6   PROTECTION CORPORATION,      Case No. 08-1789

7                 Debtor.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   PICARD,

10                  Plaintiff,

11   v.                          Adv. Case No. 09-01182(SMB)

12   MERKIN, ET AL.,

13                  Defendants.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   IRVING H. PICARD, TRUSTEE

16   FOR THE LIQUIDATION OF

17   BERNARD L. MADOFF

18   INVESTMENT SECURITIES LLC,

19                  Plaintiff,

20   v.                          Adv. Case No. 09-01305(SMB)

21   COHMAD SECURITIES

22   CORPORATION,

23                  Defendant.

24   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

25

Page 2

```
 1                   U.S. Bankruptcy Court

 2                   One Bowling Green

 3                   New York, New York

 4

 5                   August 18, 2015

 6                   10:04 AM

 7

 8

 9

10    B E F O R E :

11    HON STUART M. BERNSTEIN

12    U.S. BANKRUPTCY JUDGE

13

14

15

16    Hearing re:  Adv. Case 09-01182 - Status Conference

17

18    Hearing re:  Adv. Case 09-01305 - Motion to Quash A Subpoena

19    upon non-party Citibank, N.A. and upon non-party JP Morgan

20    Chase, N.A.

21

22

23

24

25    Transcribed by:  Dawn South
```

Page 3

1    A P P E A R A N C E S :

2    BAKER HOSTETLER

3         Attorneys for the Trustee

4         45 Rockefeller Plaza

5         New York, NY 10111

6

7    BY:  DAVID J. SHEEHAN, ESQ.

8         LAN HOANG, ESQ.

9         BRIAN W. SONG, ESQ.

10

11   DECHERT LLP

12        Attorney for Defendants

13        1095 Avenue of the Americas

14        New York, NY 10036-6797

15

16   BY:  NEIL A. STEINER, ESQ.

17

18   NORTON ROSS FULBRIGHT US LLP

19        Attorneys for Ascot Receiver and Ascot Fund

20        666 Fifth Avenue

21        New York, NY 10103-3198

22

23

24   BY:  JAMI MILLS VIBBERT, ESQ.

25        JUDITH A. ARCHER, ESQ.

Page 4

1   BAKER HOSTETLER

2        Attorneys for Trustee

3        45 Rockefeller Plaza

4        New York, NY 10111

5

6   BY:   KARIN SCHOLZ JENSON, ESQ.

7        KATHRYN M. ZUNNO, ESQ.

8        ESTERINA GIULIANI, ESQ.

9

10  FOX ROTHSCHILD LLP

11       Attorney for Defendant Jonathan Greenberg

12       100 Park Avenue

13       Suite 1500

14       New York, NY 10017

15

16  BY:   ERNEST E. BADWAY, ESQ.

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  Madoff?

3              MR. SHEEHAN:  There's a few, Your Honor, you

4    wanted to do --

5              THE COURT:  Well, I only have two on the calendar.

6    I only have two matters on the calendar.  The motion to

7    quash and the -- I guess the case conference in Merkin.

8              MR. SHEEHAN:  Right.  Which one do you want to do

9    first?

10             THE COURT:  I'll do Merkin first.

11             MR. SHEEHAN:  Okay.

12        (Pause)

13             THE COURT:  I got -- I received letters from

14   counsel for Ascot or the Ascot entities I guess, then the

15   Merkin defendants suggesting that the remainder of this

16   action can be disposed of on a motion for summary judgment.

17   Is that --

18             MR. STEINER:  Correct, Your Honor.

19             THE COURT:  Okay.  Tell me why.

20             MR. STEINER:  Well, Your Honor, as we laid out in

21   the letters there are two issues, Your Honor.

22             First the claims with respect to the Merkin

23   defendants are two grounds for summary judgment.  The first

24   applies to Ascot Partners as well, which is in order to any

25   claim against the Merkin defendants, the trustee must first

Page 6

1    prevail on its claim against Ascot Partners, that's the

2    primary --

3              THE COURT:  Let me just ask a question.  Has the

4    trustee recovered the full amount of the two-year transfers

5    from Gabriel and Ariel (ph)?

6              MR. SHEEHAN:  Yes, Your Honor.

7              THE COURT:  All right.  So there could be no

8    subsequent transferee for those claims.

9              MR. SHEEHAN:  That's correct, Your Honor.

10             THE COURT:  Okay.  That wasn't stated in your

11   letter, but --

12             MR. STEINER:  We apologize, Your Honor.

13             THE COURT:  -- I figured it out.

14             MR. STEINER:  So the only claims that remain are

15   the claims for two-year transfers against Ascot Partners,

16   and then the effort to recover -- to the extent any of those

17   claims were successful, to recover those from the Merkin

18   defendants either as subsequent transferees for a small

19   portion or on the grounds that Mr. Merkin is the general

20   partner of Ascot Partners.

21             And as against Ascot Partners we believe there's

22   no triable issue of fact, because notwithstanding all the

23   allegations of the complaint when the Court considers what

24   evidence has been deduced through discovery or adduced

25   through discovery in this case, we don't believe that

Page 7

```
 1    there's any material factual issue left would warrant a

 2    trial.  Even --

 3              THE COURT:  Well the issue turns really I guess on

 4    the factual issue on Merkin's willful blindness.

 5              MR. STEINER:  That's correct.

 6              THE COURT:  So tell me why there's no factual

 7    issue regarding that.

 8              MR. STEINER:  Because, Your Honor, we believe that

 9    notwithstanding the inflammatory allegations, all there are

10    here are the generic so-called red flags that apply to every

11    investor in -- that had an account with BLMIS, which

12    includes many other sophisticated investors, many other

13    funds, and we don't believe that those facts, nor the

14    supposed expert testimony about those facts, when you

15    consider what the expert then actually admitted in his

16    deposition and what these factors are, leaves any issue to

17    be tried.

18              And so we believe that, Your Honor, when you have

19    the statements of material and undisputed facts, have the

20    briefs, we'll be able to dispose of that issue on summary

21    judgment.

22              THE COURT:  Mr. Sheehan, what are the factual

23    issues regarding Merkin's willful blindness?

24              MR. SHEEHAN:  Well starting first with Mr. Merkin

25    himself, he asserts that he did proper due diligence.  We
```

Page 8

1    challenged that, we think he did virtually no due diligence

2    other than accepting the word of Mr. Madoff that everything

3    was fine --

4              THE COURT:  Well --

5              MR. SHEEHAN:  -- and never doing any due diligence

6    on that.

7              THE COURT:  -- but the letter said that he

8    accompanied Ascot investors on meetings with -- to Madoff --

9              MR. SHEEHAN:  That's not true.

10             THE COURT:  -- and attracted the investors.

11             MR. SHEEHAN:  But as far as I know when people

12   wanted to meet Mr. Merkin they didn't meet Mr. Merkin.

13             THE COURT:  You mean Madoff?

14             MR. SHEEHAN:  Now, I've made my peace with Bernie,

15   says Mr. Merkin about, I've made my peace with Bernie, I

16   don't ask questions, I just accept the results.

17             So in other words, Your Honor, for everything that

18   Mr. -- I disagree with everything he says in the letter, so

19   I didn't bother writing you one, and Your Honor is

20   intimately familiar with the willful blindness aspects of

21   the case from your decision last year.

22             So at the same time it didn't seem to us to make

23   any sense that if you go through it point by point, and if

24   Your Honor wants to go through that we're not adamantly

25   opposed to this, we're very comfortable that no motion to

Page 9

1    dispose of this will ever be granted.

2           THE COURT:  A motion for summary judgment is a lot

3    of work for everybody.

4           MR. SHEEHAN:  I understand that.

5           THE COURT:  And if it turns out that will are

6    simple questions of fact about Merkin's knowledge of willful

7    blindness it'd have to be disposed of at trial then there's

8    no point going through the exercise, I'll schedule a trial

9    in the matter, if it's ready to be tried.

10          MR. STEINER:  Well, Your Honor, it is -- we are

11   ready to be tried.  We believe that it can be disposed of on

12   summary judgment.  We don't think that the summary judgment

13   briefing should delay a trial date.  We're here to ask both

14   for a schedule to brief summary judgment, which we think

15   will be over the next several months, and -- for a trial,

16   and we would propose a trial next spring, you know, in the

17   March time frame, depending on Your Honor's schedule, but

18   we're here both to request a briefing schedule for summary

19   judgment and to request a trial date.

20          THE COURT:  I can't tell you not to make a motion

21   for summary judgment, it just sounds like it may be a waste

22   of time.

23          MR. STEINER:  Understood, but we believe there's

24   merit to it and we'd like the opportunity.

25          THE COURT:  You raised a couple of points though

Page 10

1   in your letter, which I don't agree with.

2          You seem to suggest that the trustee can't collect

3   from the subsequent transferees unless the initial

4   transferees are unable to pay, and I don't believe that's

5   the bar.

6          MR. STEINER:  Well, I believe here any judgment

7   would be satisfied immediately, because Ascot would have not

8   just its net equity claim, but to the extent there was any

9   recovery by the trustee, it would have a 502(h) claim.

10          THE COURT:  First of all, while the trustee can

11   make settlements, which he credits customers for the net

12   equity claim, your claim is disallowed until in this case

13   Ascot repays the money.

14          So if the trustee wants to stand on his rights

15   Ascot had got to come up with the $280 million, or whatever

16   the number is, and pay the trustee, and then the trustee

17   would allow the net equity claim.

18          MR. STEINER:  But as a practical matter, Your

19   Honor, while we believe that Your Honor and other judges in

20   this court routinely have just the net payment when you net

21   out everything --

22          THE COURT:  But those are -- Mr. Steiner, those

23   are often parts of the settlements that the trustee has

24   agreed to, but the law is pretty clear that you don't get a

25   set off under 502(d), which is essentially what you're

Page 11

```
1    arguing.

2              MR. STEINER:  And, Your Honor, I don't believe

3    that that's the case.  I believe when the body of cases were

4    tried the ultimate judgments in the Bayou case were net

5    judgments considering both the amount recovered and the

6    502(h) claims.

7              But regardless of that whether it's done on a net

8    payment basis or whether it's done as a payment one way if

9    there's any recovery even after summary judgment briefs and

10   a trial, but a net payment one way and then a credit back

11   and payment the other way, given what the numbers are, as a

12   practical matter it's difficult to conceive that Ascot

13   wouldn't be able to make that payment to get a much larger

14   claim back in its favor.

15             And so the practical reality of anything to

16   collect from either Ascot Fund or the Merkin defendants we

17   believe can be pretty readily disposed of.

18             MR. SHEEHAN:  Your Honor --

19             THE COURT:  I guess saying that as a practical

20   matter even if you recover the money you're going to have to

21   give them a credit for their claim.

22             MR. SHEEHAN:  But the point is that the

23   misunderstanding of the law, to be blunt, by my adversary is

24   (indiscernible) at settlement, so just leave it at that.

25             The bottom line is, is that at the end of the day
```

Page 12

1    unless he wins he gets nothing, all right?  Nothing.  And,

2    yeah, manufacture out of thin air to suggest that what he is

3    saying is the law would mean that we'd never have any money

4    to distribute, because we'd be constantly paying back

5    everybody's money that supposedly they were entitled to get

6    when in fact that's what 502(d) is all about.

7            They will end up at the end of this day with

8    nothing.  And they don't quite understand that.  And I've

9    tried to explain it, but Your Honor has as well.

10           Your Honor, with regard to the scheduling, we

11   have, you know, no objection to the scheduling that was

12   outlined just by, you know, by my adversary, no problem with

13   that whatsoever.  If Your Honor wants to schedule it so that

14   it ends up with a March trial date that's fine with me too.

15           THE COURT:  Well, I guess you two can discuss the

16   schedule --

17           MR. SHEEHAN:  Sure.

18           THE COURT:  -- for the motion for summary

19   judgment.  If you want otherwise I'll figure the schedule if

20   you can't.

21           MR. SHEEHAN:  Okay, we'll talk among ourselves.

22   On that stuff we're pretty good.

23           THE COURT:  Let me just reemphasize that

24   Mr. Sheehan is right, that unless you've settled you're not

25   going to get the credit you think you're going to get until

Page 13

1    you repay all of the money that the trustee recovers.

2              MR. STEINER:  Right.  Well, Your Honor, what

3    Mr. Sheehan --

4              THE COURT:  I have one other point to make.  There

5    have been no trials, so don't suggest that at the end of the

6    day the recoveries are netted out against the net equity

7    claim, that's all going to be subject to settlements, and

8    that's the way the trustee settles the cases.

9              MR. STEINER:  I understand that, Your Honor, but

10   what I believe Mr. Sheehan has recognized is that his

11   maximum claim here is a $280 million claim on two-year

12   recoveries, and that if he prevails on that claim upon

13   payment of that amount, whether it's by Ascot Partners,

14   whether it's by someone on behalf of Ascot Partners, there

15   will then be an allowed claim for the net equity, which is

16   approximately $235 million, plus the $280 million under

17   502(h).

18             THE COURT:  Well are you prepared to make the same

19   deal that all the other defendants have made and allow 100

20   percent to your claim and then they get what 88 percent of

21   the 502(h) claim?

22             MR. STEINER:  We're not, Your Honor --

23             THE COURT:  All right.

24             MR. STEINER:  -- because we believe our facts are

25   better, and that we're here, we can try this case if we need

Page 14

1    to, and I don't think Your Honor wants to get into what the

2    settlement discussions have been, but I believe --

3              THE COURT:  No, I don't.

4              MR. STEINER:  -- I believe what Mr. Sheehan has

5    represented is not an accurate statement of a breakdown in

6    settlement communications.

7              THE COURT:  Yeah, he's right though, if you go to

8    trial and you lose you have to come up with $280 million

9    before you have a net equity claim.  That's basically it.

10             MR. STEINER:  And we're correct that once we do

11   that you would have both the net equity claim plus the

12   502(h) claim.

13             MR. SHEEHAN:  I just want to add one thing, Your

14   Honor.  I've informed my adversary, with all due respect to

15   Your Honor's opinion on actual intent in this case, we

16   intend to appeal that.

17             THE COURT:  Okay.

18             MR. SHEEHAN:  We think that standard is

19   inappropriate from Judge Rakoff, your application of it is

20   your application.  When we did the 54(b) you asked the right

21   question, am I deal with you or am I dealing with Judge

22   Rakoff?  And I'm really trying to deal with Judge Rakoff.

23             THE COURT:  I understand.

24             MR. SHEEHAN:  Okay.

25             THE COURT:  All right.  Why don't you discuss the

Page 15

1    schedule between yourselves, I'm not going to schedule a

2    trial date if he's making a motion for summary judgment.

3              MR. STEINER:  Right.

4              THE COURT:  And if you can't agree on something

5    just write me a letter and we'll have another conference and

6    I'll fix the schedule.

7              MR. STEINER:  Sounds perfect, Your Honor.  Thank

8    you.

9              THE COURT:  All right.  Thanks.

10             MR. STEINER:  Okay.

11             MR. SHEEHAN:  Thank you, Your Honor.

12             UNIDENTIFIED SPEAKER:  Thank you.

13        (Pause)

14             THE COURT:  All right.  I'll hear the motion to

15   quash now.

16             MR. BADWAY:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. BADWAY:  Ernest Badway, Fox Rothschild, for

19   the defendant Jonathan Greenberg.

20             MS. JENSON:  Karin Jenson with Katie Zunno,

21   Esterina Giuliani for the trustee.

22             THE COURT:  How do you do?

23             UNIDENTIFIED SPEAKER:  Good morning.

24             THE COURT:  Go ahead, Mr. Badway.

25             MR. BADWAY:  Yes.  Good morning, Your Honor.

Page 16

1           Your Honor, our papers are fairly self-explanatory

2   and detailed, and the trustee's opposition has also detailed

3   their position, but I do want to highlight a couple of

4   points, Your Honor.

5           We have two subpoenas to third parties here.  They

6   are the banks of my client.  What the trustee is seeking is

7   16 years worth of bank records from my client.

8           THE COURT:  Is your client being sued as a

9   subsequent transferee?

10          MR. BADWAY:  No, Your Honor, my client is being

11  sued -- he was a Cohmad broker --

12          THE COURT:  Right.

13          MR. BADWAY:  -- and he's being sued for actually

14  receiving compensation from his employer.

15          THE COURT:  Yeah, but I thought the allegation is

16  Cohmad got most of its money from BLMIS, so that the money

17  that Cohmad paid to your client presumably made him a

18  subsequent transferee.  Is that the theory of the case?

19          MS. JENSON:  That's correct.

20          THE COURT:  Because these are transfer cases.

21          MR. BADWAY:  That's right, Your Honor.

22          THE COURT:  They're not aiding and abetting cases.

23          MR. BADWAY:  Your Honor, I think that's accurate.

24  The only reason I was saying about that is because my

25  understanding from reading some of the allegations, given

1    the fact that my client has seeked a commission, which is

2    essentially the share with what Cohmad got and what --

3            THE COURT:  Yeah, but it's still a transfer.

4            MR. BADWAY:  Exactly, Your Honor.

5            THE COURT:  And that why we're talking about

6    transfers and whether they were made in good faith or for

7    consideration or whatever.

8            MR. BADWAY:  Correct, Your Honor, yes.

9            THE COURT:  It's a different issue.

10           MR. BADWAY:  Yeah, Your Honor.  Yes, Your Honor,

11   Your Honor is absolutely correct, that's exactly where my

12   client stands in this particular case.

13           And, Your Honor, my client is now being subject to

14   these subpoenas where his confidential banking information

15   is supposed to be exposed to the public.  The allegations

16   are that he received these as commissions.  His salary, his

17   earnings from his employer.

18           THE COURT:  Right.

19           MR. BADWAY:  That's what he had and that's what he

20   used.  He paid taxes on this money, Your Honor.

21           THE COURT:  Everybody paid taxes on it.

22           MR. BADWAY:  I understand Judge, under, but what

23   I'm saying is, Your Honor, what -- in terms of like with

24   some of these other subsequent transferees who may have sent

25   money down the road or down the pike this is an individual

Page 18

```
1    who actually received his compensation from his employer.

2              THE COURT:  But you're not arguing or you're not

3    -- you're not arguing that because it's compensation I

4    should dismiss the complaint, right?

5              MR. BADWAY:  No.

6              THE COURT:  I have transfers out there.

7              MR. BADWAY:  Exactly, Your Honor.

8              THE COURT:  And the trustee is trying to identify

9    the transfers.

10             MR. BADWAY:  Well, Your Honor, it's a little more

11   than that.  I think what the trustee is assuming is the

12   trustee is assuming that it has already obtained a judgment

13   and can go after where the money may have gone down the

14   road.

15             THE COURT:  Yeah, the trustee has brought a

16   subsequent transfer claim, there's been no motion to dismiss

17   those claims, although I have dismissed some of these

18   claims, depending on the pleading.  So, I have a living

19   subsequent transfer claim, and it may look like a sub pro

20   proceeding, but the trustee is entitled, I would think, to

21   follow the money to the subsequent transferees, who are

22   defendants in this action.

23             MR. BADWAY:  Your Honor, I'm not sure why they're

24   entitled to look at the private financial bank records of my

25   client when they haven't actually demonstrated and proven
```

Page 19

1    their claim that my client is in fact the subsequent

2    transferee.

3              THE COURT:  Did your client receive money from

4    Cohmad?

5              MR. BADWAY:  Yes, he did, Your Honor.

6              THE COURT:  So what else do they have to prove?

7              MR. BADWAY:  Well, Your Honor, they have to prove

8    that my client wasn't entitled to that money.

9              THE COURT:  I don't think that's --

10             MR. BADWAY:  Well, Judge, their complaint --

11             THE COURT:  As I understand it their contention is

12   not only did he received the money, but he knew what was

13   going on, and that under those circumstances -- and I've

14   looked at the allegations --

15             MR. BADWAY:  Yeah.

16             THE COURT:  -- and I know that they're conclusory,

17   but there's also a context in which they're alleged.  So --

18             MR. BADWAY:  And you know it's -- Judge, it's

19   built upon a number of different sort of like, you know,

20   house of cards.

21             THE COURT:  Okay.  But you start with the

22   transfers and then there's issues of good faith and

23   consideration and who's got to plead them and who's got to

24   prove them and how far back it can go, but before you get to

25   any of that there's the issue of the transfers.

Page 20

1              Have the parties -- have you attempted to

2      stipulate to all the transfers that your client received

3      during the six years preceding bankruptcy?  Which is -- I

4      mean I don't know why you're looking for 1993, but for the

5      six years proceeding.

6              MR. BADWAY:  Judge, I'd stipulate in open court

7      today, we'd stipulate to the monies that he received from

8      Cohmad.  They have all of those records.

9              THE COURT:  Do you have all of those records,

10     Ms. Jenson?

11             MR. BADWAY:  They have all Cohmad records.

12             THE COURT:  You know, you're asking for some guy's

13     private banking records.

14             MS. JENSON:  Understood.  We're just -- we are

15     seeking the discovery to make sure that we know the full

16     universe of transfers that defendant Greenberg received.  We

17     do know that he received compensation from Cohmad, but we

18     also have information that some of the registered

19     representatives received transfers in other ways, and we

20     need to satisfy ourselves.

21             THE COURT:  Well what other ways of transfers from

22     BLMIS or Cohmad?

23             MS. JENSON:  Transfers directly from BLMIS.  We

24     are still investigating the returns.

25             THE COURT:  Well he an account -- I know he had

Page 21

1    several accounts at BLMIS also didn't he?

2          MS. JENSON:  Defendant Greenberg had one account

3    with BLMIS.  Direct account, yes.

4          THE COURT:  Well have you attempted to stipulate

5    to the transfers and then move onto these other issues,

6    whether it's consideration or commissions or anything like

7    that?

8          MR. BADWAY:  If Your Honor is suggesting the

9    stipulation as to what he received from Cohmad, absolutely,

10   Judge, we'll stipulate to that.  They don't need bank

11   records from my client for those.

12         THE COURT:  Well, I'm just wondering unless

13   there's a wire transfer record how you're going to know

14   where money coming into the account came from?

15         MS. JENSON:  Into the JP Morgan or Citibank

16   accounts?

17         THE COURT:  Into Greenberg -- well,

18   Mr. Greenberg's account, wherever it was.

19         MS. JENSON:  Right.  And that's what we're seeking

20   to confirm here is that are there transfers that weren't

21   directly from Cohmad that are reflected in the Cohmad

22   records or from BLMIS directly that aren't reflected in the

23   BLMIS.  And if he's willing to sit down with us and talk

24   about the scope of the transfers and how he received money

25   from BLMIS and from Cohmad then we're happy do that.

Page 22

```
 1              THE COURT:  What about that suggestion?  I think,

 2     you know, you have this -- you're kind of coming into this

 3     with this understanding or belief that you're not going to

 4     have to turn over any records, and that's not the case.

 5              While I am happy to listen to streamlining

 6     discovery requests, for instance not going back to 1993, I

 7     don't know why that's in there, but the only way that the

 8     trustee can confirm what transfers there were is to look at

 9     bank records.  And I suppose the trustee could say, I just

10     want the records related to transfers from BLMIS and Cohmad,

11     but the bank is not going to be able to do -- figure that

12     out.

13              MR. BADWAY:  But, Your Honor -- Your Honor, with

14     all candor to the Court I actually expected you not to give

15     me anything, so I just wanted you to be aware that's when I

16     came in.

17              But in terms of a stipulation, Your Honor, in

18     terms of that we'll go through the bank records ourselves

19     and we'll see --

20              THE COURT:  I thought you didn't have bank

21     records?

22              MR. BADWAY:  No, that's not what I said, Judge.

23              THE COURT:  I thought I read in here that they had

24     represented that they only turned over some income returns

25     and they didn't have all the records.
```

Page 23

1             MS. JENSON:  That's correct.  We have income

2       returns for certain of the years and we have one check that

3       was made out by one of the referred accounts to BLMIS.

4             THE COURT:  So now you have a bank record?

5             MR. BADWAY:  Judge, just -- no, no.  First of all,

6       I never said that we didn't have a bank records, what I said

7       was they weren't entitled to subpoena JP Morgan and Citibank

8       for these particular records.

9             THE COURT:  I think there was a response to a

10      document request back in 2010 or 2011 in which after all the

11      objections you said we don't have all the records.  Isn't

12      that in there?

13            MS. JENSON:  That's correct, Your Honor, it's at

14      page 4 of our opposition.

15            THE COURT:  Yeah.

16            MR. BADWAY:  Judge, in terms of person, but we'll

17      go to JP Morgan and Citibank and get the records.  That's

18      different than saying that we have in our possession bank

19      records.  That's what I'm saying.  I'd go ahead -- my client

20      would go ahead --

21            THE COURT:  Well --

22            MR. BADWAY:  -- and actually ask for the records.

23            THE COURT:  -- how does the trustee know that

24      you're turning over the records at this point?  I guess if

25      you had the records then I guess you'd be in the same

Page 24

1    situation though.

2            MR. BADWAY:  Judge -- by the way, Judge, this is

3    another issue that trustee's counsel has just raised.  Those

4    tax returns and that check were provided to them in

5    contemplation of settlement talks.  They're not allowed to

6    use them in this particular --

7            THE COURT:  That I don't know about.

8            MR. BADWAY:  No, but I'm just saying --

9            THE COURT:  That's not the issue before me.

10           MR. BADWAY:  I know, but I just wanted to raise

11   that issue.

12           THE COURT:  Well look, I think you ought to

13   discuss and it figure out a way that the trustee is either

14   going to get the information or get comfortable with

15   whatever you tell them about the information, but the bottom

16   line up is the trustee is entitled to inquire the transfers

17   within six years of the bankruptcy from Cohmad or BLMIS.

18           MS. JENSON:  Your Honor, just one clarification --

19           THE COURT:  And the alternative is simply to have

20   the trustee get it, hold it in confidence, figure out what's

21   in there that you need, dispose of the rest, and we can deal

22   with it that way too.

23           MS. JENSON:  And just one point of clarification.

24           We are seeking to go back beyond six years --

25           THE COURT:  Well --

Page 25

1                MS. JENSON:  -- based on the discovery rule and

2      surviving motions to dismiss on actual knowledge.

3                THE COURT:  You're saying if he had actual

4      knowledge you can go back beyond six years?

5                MS. JENSON:  We have --

6                THE COURT:  Basically you seek the LR discovery

7      rule?

8                UNIDENTIFIED SPEAKER:  Yeah.  Correct, Your Honor.

9                THE COURT:  I don't quite understand, I know it's

10     raised in another motion I heard, but I don't quite

11     understand how that discovery rule works.

12               MS. JENSON:  The -- Judge Rakoff has already

13     addressed this and -- I'm sorry -- Judge Lifland when we had

14     the motion to dismiss --

15               THE COURT:  Right.

16               MS. JENSON:  -- back in 2011 I believe, that we've

17     adequately pled the discovery rule on the face of the

18     complaint.

19               THE COURT:  Well maybe they are entitled to go

20     back to 1993.  Judge Lifland has ruled on it.

21               MR. BADWAY:  But, Judge, we don't have the same

22     interpretation of Judge Lifland's rule as they do, Judge.

23               THE COURT:  Well this certainly doesn't come out

24     of the letters.  Let me suggest that you talk about it.  I

25     need more information about this case, and if Judge Lifland

1    issued a ruling that addresses this specific issue, and I

2    know it was raised in another motion, please bring it to my

3    attention, because I don't go back and read all the stuff I

4    have in my chambers every time.  I'm sure you don't either.

5         What do you propose?

6         MR. BADWAY:  Well, Judge, what I would propose is

7    to follow along with Your Honor and what Your Honor is

8    saying.

9         We will go back and we will request the records

10   from JP Morgan and Citi for the last six years, and if there

11   are --

12        THE COURT:  I'm limiting it to six years based

13   upon what I've been told, and that's going to require some

14   further argument or information.

15        MR. BADWAY:  Then probably best, Your Honor, to

16   just table it right now to adjourn the motion and then wait

17   to see what they come up with in terms of their argument

18   regarding --

19        THE COURT:  Well why don't you give them -- make a

20   representation or stipulation regarding all the transfers

21   that were received.

22        MR. BADWAY:  Sure.

23        THE COURT:  And that's a place to start, because

24   you have that knowledge, they don't have that knowledge.

25   Maybe they have the transfers from BLMIS, but not

Page 27

1    necessarily from Cohmad.

2              MR. BADWAY:  Well, Judge, they do because they

3    have Cohmad's payroll records.

4              THE COURT:  Those are just payroll records.

5              MR. BADWAY:  That's all they received, Judge, and

6    they mentioned this BLMIS account, Judge --

7              THE COURT:  Do you contend that he received

8    anything from Cohmad beyond the payroll records?

9              MS. JENSON:  We don't have that information and

10   the investigation is ongoing.

11             MR. BADWAY:  Judge, they could always ask them in

12   a deposition, Judge.

13             THE COURT:  Well they don't -- look, they ask for

14   documents and that's the way you start.  You get the

15   documents.  And the more I'm hearing you the more I'm

16   convinced that maybe your motion lacks merit.  So why don't

17   you do this.

18             MR. BADWAY:  Sure, Judge.

19             THE COURT:  I'll give you an opportunity to

20   discuss the matter.  Is anybody going on vacation or

21   anything like that?

22             MS. JENSON:  No.

23             THE COURT:  Want to come back in a week?  Is that

24   too soon?  I know you'll say it's too soon, Mr. Badway.

25             MS. JENSON:  I apologize.  I'm not going on

Page 28

```
 1    vacation, but I am traveling for business all of next week.

 2    I'm available on the 31st and the 1st.

 3              THE COURT:  How about September 1st?  It's before

 4    Labor Day.

 5              MR. BADWAY:  Your Honor, just so the record is

 6    clear I am available next week.

 7              THE COURT:  Okay.  I'm not looking to interfere

 8    with anyone's vacation plans.

 9              MR. BADWAY:  September 1st is fine with me, Your

10    Honor.

11              THE COURT:  All right.  I'll adjourn this to

12    September 1st at 10 o'clock.

13              I would suggest that you work out the procedure by

14    which either the trustee gets the information and holds it

15    in confidence for the time being.  And it sounds to me like

16    a lot of this stuff isn't going to have any particular

17    relevance to the case.  And I understand Mr. Greenberg's

18    desire to keep his private banking records confidential.  On

19    the other hand if there's something in there that is

20    indicative of a transfer that he won't stipulate to that's

21    certainly relevant.

22              MS. JENSON:  And I would say the disposition of

23    the transfers as well.  What defendant Greenberg did --

24              THE COURT:  Are you going to follow it to the next

25    person?
```

Page 29

```
 1            MS. JENSON:  Yes.

 2            MR. BADWAY:  Electric power and light, Judge.

 3            THE COURT:  I don't think they're interested in

 4    that, but --

 5         (Simultaneous speaking)

 6            MS. JENSON:  That's the issue with regard to the

 7    other information that is not direct transfers from Cohmad

 8    or BLMIS.  What happened to that money?  Where did it go?

 9    What did defendant Greenberg do with it?

10            THE COURT:  Well you're talking about you want

11    information that he paid more than household bills or his

12    mortgage or things like that?

13            MS. JENSON:  I'm sorry?

14            THE COURT:  Are you looking for records relating

15    to payments of mortgages and utilities and household bills?

16            MS. JENSON:  Not necessarily, but also transfers

17    to other people in his family, for example.

18            MR. BADWAY:  I gave a Hanukkah present or

19    something to a nephew or something --

20            THE COURT:  That's a gift.  That could be a

21    fraudulent transfer.

22            Well why don't you see if you can come up with a

23    protocol, otherwise my inclination is to have the records

24    turned over either to the trustee or to Mr. Greenberg with

25    some other method of working out what to do with it.
```

1          My inclination again is to have it turned over the

2     trustee, treat it as confidential, and then deal with its

3     disclosure at some future time.

4          MS. JENSON:  And just to clarify that point then,

5     if these records are designated confidential they don't go

6     into our non-confidential data room where they're viewed

7     by --

8          THE COURT:  Well there's a concern that thousands

9     of people would see it.

10          MS. JENSON:  Right.  That's not the case.  They

11    are designated confidential, they go into the confidential

12    third-party data room where only people who use search terms

13    that implicate those documents can see them, and then only

14    after permission from the producing party.

15          So in this case JP Morgan and Citibank would have

16    to release the documents.

17          THE COURT:  Well they may not care.

18          MS. JENSON:  Right.

19          THE COURT:  He's the one who cares, Mr. Greenberg.

20          MS. JENSON:  Right.  In our experience the banks

21    generally speak with the defendants before releasing

22    documents.

23          THE COURT:  Well we'll deal with that, but my

24    inclination is just to hold it in confidence, and I don't

25    care how you do it, until disclosure of the documents is

Page 31

1    worked out between the parties here.  As I say, the banks --

2    he's not going to depend on the banks to protect his privacy

3    interests --

4         MS. JENSON:  Understood.

5         THE COURT:  -- he's in a better position to do

6    that.  All right?

7         MR. BADWAY:  Your Honor, just so that we're clear

8    on the record, Your Honor, we would strongly request from

9    the Court that the records be produced to me and not to the

10   trustee, and I'll hold them in escrow pending a

11   determination by the Court.  If they're going to be produced

12   at all they should be produced to me, given --

13        THE COURT:  What difference is it if they're

14   produced to the trustee under a confidentiality order?

15        MR. BADWAY:  Well, Judge, given my experience with

16   the trustee and the fact that she mentions today, Judge,

17   that she talks about a tax return that wasn't produced to

18   them in the course of discovery, because it's part of a

19   settlement, which they're now using as part of this case.

20        THE COURT:  I don't know anything about that.

21        MR. BADWAY:  No, I know that, Judge.  I know that.

22   I'm just raising it as an issue.  I think in terms --

23        THE COURT:  You're raising it as an issue, but

24   you're also raising it as an argument as to why you should

25   hold the bank records.

Page 32

1          MR. BADWAY:  Judge, what's the difference between

2     me having -- me holding them and the trustee?  You're going

3     to order me to turn it over if that's your ultimate ruling,

4     Your Honor.  That's what I'm saying.  And at least we can

5     keep the privacy, we can keep the confidentiality without it

6     going into the netherworld of the trustee.

7          THE COURT:  It's not going into the netherworld.

8     All right.  I'll see you on the 1st.

9          MS. JENSON:  Thank you.

10          MR. BADWAY:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12      (Whereupon these proceedings were concluded at 10:31

13     AM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 33

1                    C E R T I F I C A T I O N

2

3     I, Dawn South, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5     Dawn South    Digitally signed by Dawn South
                    DN: cn=Dawn South, o, ou,
6     _____ email=digital1@veritext.com, c=US
                    Date: 2015.08.21 15:35:08 -04'00'

7     Dawn South

8     AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12    Date:  August 20, 2015

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501

**0**

**08-1789**  1:6
**09-01182**  1:11 2:16
**09-01305**  1:20 2:18

**1**

**10**  28:12
**100**  4:12 13:19
**10017**  4:14
**10036-6797**  3:14
**10103-3198**  3:21
**10111**  3:5 4:4
**1095**  3:13
**10:04**  2:6
**11501**  33:25
**1500**  4:13
**16**  16:7
**18**  2:5
**1993**  20:4 22:6
   25:20
**1st**  28:2,3,9,12 32:8

**2**

**20**  33:12
**2010**  23:10
**2011**  23:10 25:16
**2015**  2:5 33:12
**235**  13:16
**280**  10:15 13:11,16
   14:8

**3**

**300**  33:24
**31st**  28:2
**330**  33:23

**4**

**4**  23:14
**408**  33:8
**45**  3:4 4:3

**5**

**502**  10:9,25 11:6
   12:6 13:17,21 14:12
**54**  14:20

**6**

**666**  3:20

**8**

**88**  13:20

**a**

**aaert**  33:8
**abetting**  16:22
**able**  7:20 11:13
   22:11
**absolutely**  17:11
   21:9
**accept**  8:16
**accepting**  8:2
**accompanied**  8:8
**account**  7:11 20:25
   21:2,3,14,18 27:6
**accounts**  21:1,16
   23:3
**accurate**  14:5 16:23
   33:4
**action**  5:16 18:22
**actual**  14:15 25:2,3
**adamantly**  8:24
**add**  14:13
**addressed**  25:13
**addresses**  26:1
**adduced**  6:24
**adequately**  25:17
**adjourn**  26:16
   28:11
**admitted**  7:15
**adv**  1:11,20 2:16,18
**adversary**  11:23
   12:12 14:14
**agree**  10:1 15:4
**agreed**  10:24
**ahead**  15:24 23:19
   23:20
**aiding**  16:22
**air**  12:2
**al**  1:12
**allegation**  16:15
**allegations**  6:23 7:9
   16:25 17:15 19:14
**alleged**  19:17
**allow**  10:17 13:19
**allowed**  13:15 24:5

**alternative**  24:19
**americas**  3:13
**amount**  6:4 11:5
   13:13
**anybody**  27:20
**anyone's**  28:8
**apologize**  6:12
   27:25
**appeal**  14:16
**application**  14:19
   14:20
**applies**  5:24
**apply**  7:10
**approximately**
   13:16
**archer**  3:25
**arguing**  11:1 18:2,3
**argument**  26:14,17
   31:24
**ariel**  6:5
**ascot**  3:19,19 5:14
   5:14,24 6:1,15,20
   6:21 8:8 10:7,13,15
   11:12,16 13:13,14
**asked**  14:20
**asking**  20:12
**aspects**  8:20
**asserts**  7:25
**assuming**  18:11,12
**attempted**  20:1
   21:4
**attention**  26:3
**attorney**  3:12 4:11
**attorneys**  3:3,19 4:2
**attracted**  8:10
**august**  2:5 33:12
**available**  28:2,6
**avenue**  3:13,20 4:12
**aware**  22:15

**b**

**b**  2:10 14:20
**back**  11:10,14 12:4
   19:24 22:6 23:10
   24:24 25:4,16,20
   26:3,9 27:23
**badway**  4:16 15:16
   15:18,18,24,25

**alternative** (col 4 start)
16:10,13,21,23 17:4
17:8,10,19,22 18:5
18:7,10,23 19:5,7
19:10,15,18 20:6,11
21:8 22:13,22 23:5
23:16,22 24:2,8,10
25:21 26:6,15,22
27:2,5,11,18,24
28:5,9 29:2,18 31:7
31:15,21 32:1,10
**baker**  3:2 4:1
**bank**  16:7 18:24
   21:10 22:9,11,18,20
   23:4,6,18 31:25
**banking**  17:14
   20:13 28:18
**bankruptcy**  1:1 2:11
   2:12 20:3 24:17
**banks**  16:6 30:20
   31:1,2
**bar**  10:5
**based**  25:1 26:12
**basically**  14:9 25:6
**basis**  11:8
**bayou**  11:4
**behalf**  13:14
**belief**  22:3
**believe**  6:21,25 7:8
   7:13,18 9:11,23
   10:4,6,19 11:2,3,17
   13:10,24 14:2,4
   25:16
**bernard**  1:17
**bernie**  8:14,15
**bernstein**  2:11
**best**  26:15
**better**  13:25 31:5
**beyond**  24:24 25:4
   27:8
**bills**  29:11,15
**blindness**  7:4,23
   8:20 9:7
**blmis**  7:11 16:16
   20:22,23 21:1,3,22
   21:23,25 22:10 23:3
   24:17 26:25 27:6
   29:8

**blunt** 11:23
**body** 11:3
**bother** 8:19
**bottom** 11:25 24:15
**bowling** 2:2
**breakdown** 14:5
**brian** 3:9
**brief** 9:14
**briefing** 9:13,18
**briefs** 7:20 11:9
**bring** 26:2
**broker** 16:11
**brought** 18:15
**built** 19:19
**business** 28:1

### c

**c** 3:1 5:1 33:1,1
**calendar** 5:5,6
**called** 7:10
**candor** 22:14
**cards** 19:20
**care** 30:17,25
**cares** 30:19
**case** 1:6,11,20 2:16
2:18 5:7 6:25 8:21
10:12 11:3,4 13:25
14:15 16:18 17:12
22:4 25:25 28:17
30:10,15 31:19
**cases** 11:3 13:8
16:20,22
**certain** 23:2
**certainly** 25:23
28:21
**certified** 33:8
**certify** 33:3
**cet** 33:8
**challenged** 8:1
**chambers** 26:4
**chase** 2:20
**check** 23:2 24:4
**circumstances**
19:13
**citi** 26:10
**citibank** 2:19 21:15
23:7,17 30:15

**claim** 5:25 6:1 10:8
10:9,12,12,17 11:14
11:21 13:7,11,11,12
13:15,20,21 14:9,11
14:12 18:16,19 19:1
**claims** 5:22 6:8,14
6:15,17 11:6 18:17
18:18
**clarification** 24:18
24:23
**clarify** 30:4
**clear** 10:24 28:6
31:7
**client** 16:6,7,8,10
16:17 17:1,12,13
18:25 19:1,3,8 20:2
21:11 23:19
**cohmad** 1:21 16:11
16:16,17 17:2 19:4
20:8,11,17,22 21:9
21:21,21,25 22:10
24:17 27:1,8 29:7
**cohmad's** 27:3
**collect** 10:2 11:16
**come** 10:15 14:8
25:23 26:17 27:23
29:22
**comfortable** 8:25
24:14
**coming** 21:14 22:2
**commission** 17:1
**commissions** 17:16
21:6
**communications**
14:6
**compensation**
16:14 18:1,3 20:17
**complaint** 6:23 18:4
19:10 25:18
**conceive** 11:12
**concern** 30:8
**concluded** 32:12
**conclusory** 19:16
**conference** 2:16 5:7
15:5
**confidence** 24:20
28:15 30:24

**confidential** 17:14
28:18 30:2,5,6,11
30:11
**confidentiality**
31:14 32:5
**confirm** 21:20 22:8
**consider** 7:15
**consideration** 17:7
19:23 21:6
**considering** 11:5
**considers** 6:23
**constantly** 12:4
**contemplation** 24:5
**contend** 27:7
**contention** 19:11
**context** 19:17
**convinced** 27:16
**corporation** 1:6,22
**correct** 5:18 6:9 7:5
14:10 16:19 17:8,11
23:1,13 25:8
**counsel** 5:14 24:3
**country** 33:23
**couple** 9:25 16:3
**course** 31:18
**court** 1:1 2:1 5:2,5
5:10,13,19 6:3,7,10
6:13,23 7:3,6,22 8:4
8:7,10,13 9:2,5,20
9:25 10:10,20,22
11:19 12:15,18,23
13:4,18,23 14:3,7
14:17,23,25 15:4,9
15:14,17,22,24 16:8
16:12,15,20,22 17:3
17:5,9,18,21 18:2,6
18:8,15 19:3,6,9,11
19:16,21 20:6,9,12
20:21,25 21:4,12,17
22:1,14,20,23 23:4
23:9,15,21,23 24:7
24:9,12,19,25 25:3
25:6,9,15,19,23
26:12,19,23 27:4,7
27:13,19,23 28:3,7
28:11,24 29:3,10,14
29:20 30:8,17,19,23

**31:5,9,11,13,20,23**
**32:7,11**
**credit** 11:10,21
12:25
**credits** 10:11
**customers** 10:11

### d

**d** 5:1 10:25 12:6
33:8
**data** 30:6,12
**date** 9:13,19 12:14
15:2 33:12
**david** 3:7
**dawn** 2:25 33:3,7
**day** 11:25 12:7 13:6
28:4
**deal** 13:19 14:21,22
24:21 30:2,23
**dealing** 14:21
**debtor** 1:7
**dechert** 3:11
**decision** 8:21
**deduced** 6:24
**defendant** 1:23 4:11
15:19 20:16 21:2
28:23 29:9
**defendants** 1:13
3:12 5:15,23,25
6:18 11:16 13:19
18:22 30:21
**delay** 9:13
**demonstrated**
18:25
**depend** 31:2
**depending** 9:17
18:18
**deposition** 7:16
27:12
**designated** 30:5,11
**desire** 28:18
**detailed** 16:2,2
**determination**
31:11
**difference** 31:13
32:1
**different** 17:9 19:19
23:18

difficult  11:12
diligence  7:25 8:1,5
direct  21:3 29:7
directly  20:23 21:21
  21:22
disagree  8:18
disallowed  10:12
disclosure  30:3,25
discovery  6:24,25
  20:15 22:6 25:1,6
  25:11,17 31:18
discuss  12:15 14:25
  24:13 27:20
discussions  14:2
dismiss  18:4,16
  25:2,14
dismissed  18:17
dispose  7:20 9:1
  24:21
disposed  5:16 9:7
  9:11 11:17
disposition  28:22
distribute  12:4
district  1:2
document  23:10
documents  27:14
  27:15 30:13,16,22
  30:25
doing  8:5
due  7:25 8:1,5
  14:14

**e**

e  2:10,10 3:1,1 4:16
  5:1,1 33:1
earnings  17:17
effort  6:16
either  6:18 11:16
  24:13 26:4 28:14
  29:24
electric  29:2
electronic  33:8
employer  16:14
  17:17 18:1
ends  12:14
entities  5:14
entitled  12:5 18:20
  18:24 19:8 23:7

24:16 25:19
equity  10:8,12,17
  13:6,15 14:9,11
ernest  4:16 15:18
escrow  31:10
esq  3:7,8,9,16,24,25
  4:6,7,8,16
essentially  10:25
  17:2
esterina  4:8 15:21
et  1:12
everybody  9:3
  17:21
everybody's  12:5
evidence  6:24
exactly  17:4,11 18:7
example  29:17
exercise  9:8
expected  22:14
experience  30:20
  31:15
expert  7:14,15
explain  12:9
explanatory  16:1
exposed  17:15
extent  6:16 10:8

**f**

f  2:10 33:1
face  25:17
fact  6:22 9:6 12:6
  17:1 19:1 31:16
factors  7:16
facts  7:13,14,19
  13:24
factual  7:1,4,6,22
fairly  16:1
faith  17:6 19:22
familiar  8:20
family  29:17
far  8:11 19:24
favor  11:14
fifth  3:20
figure  12:19 22:11
  24:13,20
figured  6:13
financial  18:24

fine  8:3 12:14 28:9
first  5:9,10,22,23,25
  7:24 10:10 23:5
fix  15:6
flags  7:10
follow  18:21 26:7
  28:24
foregoing  33:3
fox  4:10 15:18
frame  9:17
fraudulent  29:21
fulbright  3:18
full  6:4 20:15
fund  3:19 11:16
funds  7:13
further  26:14
future  30:3

**g**

g  5:1
gabriel  6:5
general  6:19
generally  30:21
generic  7:10
gift  29:20
giuliani  4:8 15:21
give  11:21 22:14
  26:19 27:19
given  11:11 16:25
  31:12,15
go  8:23,24 14:7
  15:24 18:13 19:24
  22:18 23:17,19,20
  24:24 25:4,19 26:3
  26:9 29:8 30:5,11
going  9:8 11:20
  12:25,25 13:7 15:1
  19:13 21:13 22:3,6
  22:11 24:14 26:13
  27:20,25 28:16,24
  31:2,11 32:2,6,7
good  12:22 15:16
  15:17,23,25 17:6
  19:22
granted  9:1
green  2:2
greenberg  4:11
  15:19 20:16 21:2,17

28:23 29:9,24 30:19
greenberg's  21:18
  28:17
grounds  5:23 6:19
guess  5:7,14 7:3
  11:19 12:15 23:24
  23:25
guy's  20:12

**h**

h  1:15 10:9 11:6
  13:17,21 14:12
hand  28:19
hanukkah  29:18
happened  29:8
happy  21:25 22:5
hear  15:14
heard  25:10
hearing  2:16,18
  27:15
highlight  16:3
hoang  3:8
hold  24:20 30:24
  31:10,25
holding  32:2
holds  28:14
hon  2:11
honor  5:3,18,20,21
  6:6,9,12 7:8,18 8:17
  8:19,24 9:10 10:19
  10:19 11:2,18 12:9
  12:10,13 13:2,9,22
  14:1,14 15:7,11,16
  15:25 16:1,4,10,21
  16:23 17:4,8,10,10
  17:11,13,20,23 18:7
  18:10,23 19:5,7
  21:8 22:13,13,17
  23:13 24:18 25:8
  26:7,7,15 28:5,10
  31:7,8 32:4,10
honor's  9:17 14:15
hostetler  3:2 4:1
house  19:20
household  29:11,15

| i | j | | |
|---|---|---|---|

**i**

identify  18:8
immediately  10:7
implicate  30:13
inappropriate
  14:19
inclination  29:23
  30:1,24
includes  7:12
income  22:24 23:1
indicative  28:20
indiscernible  11:24
individual  17:25
inflammatory  7:9
information  17:14
  20:18 24:14,15
  25:25 26:14 27:9
  28:14 29:7,11
informed  14:14
initial  10:3
inquire  24:16
instance  22:6
intend  14:16
intent  14:15
interested  29:3
interests  31:3
interfere  28:7
interpretation
  25:22
intimately  8:20
investigating  20:24
investigation  27:10
investment  1:18
investor  1:5 7:11
investors  7:12 8:8
  8:10
irving  1:15
issue  6:22 7:1,3,4,7
  7:16,20 17:9 19:25
  24:3,9,11 26:1 29:6
  31:22,23
issued  26:1
issues  5:21 7:23
  19:22 21:5
it'd  9:7

**j**

j  3:7
jami  3:24
jenson  4:6 15:20,20
  16:19 20:10,14,23
  21:2,15,19 23:1,13
  24:18,23 25:1,5,12
  25:16 27:9,22,25
  28:22 29:1,6,13,16
  30:4,10,18,20 31:4
  32:9
jonathan  4:11
  15:19
jp  2:19 21:15 23:7
  23:17 26:10 30:15
judge  2:12 14:19,21
  14:22 17:22 19:10
  19:18 20:6 21:10
  22:22 23:5,16 24:2
  24:2 25:12,13,20,21
  25:22,22,25 26:6
  27:2,5,6,11,12,18
  29:2 31:15,16,21
  32:1
judges  10:19
judgment  5:16,23
  7:21 9:2,12,12,14
  9:19,21 10:6 11:9
  12:19 15:2 18:12
judgments  11:4,5
judith  3:25

**k**

karin  4:6 15:20
kathryn  4:7
katie  15:20
keep  28:18 32:5,5
kind  22:2
knew  19:12
know  8:11 9:16
  12:11,12 19:16,18
  19:19 20:4,12,15,17
  20:25 21:13 22:2,7
  23:23 24:7,10 25:9
  26:2 27:24 31:20,21
  31:21

knowledge  9:6 25:2
  25:4 26:24,24

**l**

l  1:17
labor  28:4
lacks  27:16
laid  5:20
lan  3:8
larger  11:13
law  10:24 11:23
  12:3
leave  11:24
leaves  7:16
left  7:1
legal  33:22
letter  6:11 8:7,18
  10:1 15:5
letters  5:13,21
  25:24
lifland  25:13,20,25
lifland's  25:22
light  29:2
limiting  26:12
line  11:25 24:16
liquidation  1:16
listen  22:5
little  18:10
living  18:18
llc  1:18
llp  3:11,18 4:10
look  18:19,24 22:8
  24:12 27:13
looked  19:14
looking  20:4 28:7
  29:14
lose  14:8
lot  9:2 28:16
lr  25:6

**m**

m  2:11 4:7
madoff  1:17 5:2 8:2
  8:8,13
making  15:2
manufacture  12:2
march  9:17 12:14

**material**  7:1,19
matter  9:9 10:18
  11:12,20 27:20
matters  5:6
maximum  13:11
mean  8:13 12:3
  20:4
meet  8:12,12
meetings  8:8
mentioned  27:6
mentions  31:16
merit  9:24 27:16
merkin  1:12 5:7,10
  5:15,22,25 6:17,19
  7:24 8:12,12,15
  11:16
merkin's  7:4,23 9:6
method  29:25
million  10:15 13:11
  13:16,16 14:8
mills  3:24
mineola  33:25
misunderstanding
  11:23
money  10:13 11:20
  12:3,5 13:1 16:16
  16:16 17:20,25
  18:13,21 19:3,8,12
  21:14,24 29:8
monies  20:7
months  9:15
morgan  2:19 21:15
  23:7,17 26:10 30:15
morning  15:16,17
  15:23,25
mortgage  29:12
mortgages  29:15
motion  2:18 5:6,16
  8:25 9:2,20 12:18
  15:2,14 18:16 25:10
  25:14 26:2,16 27:16
motions  25:2
move  21:5

**n**

n  3:1 5:1 33:1
n.a.  2:19,20

**necessarily** 27:1
29:16
**need** 13:25 20:20
21:10 24:21 25:25
**neil** 3:16
**nephew** 29:19
**net** 10:8,11,17,20
10:20 11:4,7,10
13:6,15 14:9,11
**netherworld** 32:6,7
**netted** 13:6
**never** 8:5 12:3 23:6
**new** 1:2 2:3,3 3:5,14
3:21 4:4,14
**non** 2:19,19 30:6
**norton** 3:18
**notwithstanding**
6:22 7:9
**number** 10:16
19:19
**numbers** 11:11
**ny** 3:5,14,21 4:4,14
33:25

**o**

**o** 2:10 5:1 33:1
**o'clock** 28:12
**objection** 12:11
**objections** 23:11
**obtained** 18:12
**okay** 5:11,19 6:10
12:21 14:17,24
15:10 19:21 28:7
**old** 33:23
**once** 14:10
**ongoing** 27:10
**open** 20:6
**opinion** 14:15
**opportunity** 9:24
27:19
**opposed** 8:25
**opposition** 16:2
23:14
**order** 5:24 31:14
32:3
**ought** 24:12
**outlined** 12:12

**p**

**p** 3:1,1 5:1
**page** 23:14
**paid** 16:17 17:20,21
29:11
**papers** 16:1
**park** 4:12
**part** 31:18,19
**particular** 17:12
23:8 24:6 28:16
**parties** 16:5 20:1
31:1
**partner** 6:20
**partners** 5:24 6:1
6:15,20,21 13:13,14
**parts** 10:23
**party** 2:19,19 30:12
30:14
**pause** 5:12 15:13
**pay** 10:4,16
**paying** 12:4
**payment** 10:20 11:8
11:8,10,11,13 13:13
**payments** 29:15
**payroll** 27:3,4,8
**peace** 8:14,15
**pending** 31:10
**people** 8:11 29:17
30:9,12
**percent** 13:20,20
**perfect** 15:7
**permission** 30:14
**person** 23:16 28:25
**ph** 6:5
**picard** 1:9,15
**pike** 17:25
**place** 26:23
**plaintiff** 1:10,19
**plans** 28:8
**plaza** 3:4 4:3
**plead** 19:23
**pleading** 18:18
**please** 26:2
**pled** 25:17
**plus** 13:16 14:11
**point** 8:23,23 9:8
11:22 13:4 23:24

24:23 30:4
**points** 9:25 16:4
**portion** 6:19
**position** 16:3 31:5
**possession** 23:18
**power** 29:2
**practical** 10:18
11:12,15,19
**preceding** 20:3
**prepared** 13:18
**present** 29:18
**presumably** 16:17
**pretty** 10:24 11:17
12:22
**prevail** 6:1
**prevails** 13:12
**primary** 6:2
**privacy** 31:2 32:5
**private** 18:24 20:13
28:18
**pro** 18:19
**probably** 26:15
**problem** 12:12
**procedure** 28:13
**proceeding** 18:20
20:5
**proceedings** 32:12
33:4
**produced** 31:9,11
31:12,14,17
**producing** 30:14
**proper** 7:25
**propose** 9:16 26:5,6
**protect** 31:2
**protection** 1:6
**protocol** 29:23
**prove** 19:6,7,24
**proven** 18:25
**provided** 24:4
**public** 17:15

**q**

**quash** 2:18 5:7
15:15
**question** 6:3 14:21
**questions** 8:16 9:6
**quite** 12:8 25:9,10

**r**

**r** 2:10 3:1 5:1 33:1
**raise** 24:10
**raised** 9:25 24:3
25:10 26:2
**raising** 31:22,23,24
25:12
**rakoff** 14:19,22,22
25:12
**read** 22:23 26:3
**readily** 11:17
**reading** 16:25
**ready** 9:9,11
**reality** 11:15
**really** 7:3 14:22
**reason** 16:24
**receive** 19:3
**received** 5:13 17:16
18:1 19:12 20:2,7
20:16,17,19 21:9,24
26:21 27:5,7
**receiver** 3:19
**receiving** 16:14
**recognized** 13:10
**record** 21:13 23:4
28:5 31:8 33:4
**records** 16:7 18:24
20:8,9,11,13 21:11
21:22 22:4,9,10,18
22:21,25 23:6,8,11
23:17,19,22,24,25
26:9 27:3,4,8 28:18
29:14,23 30:5 31:9
31:25
**recover** 6:16,17
11:20
**recovered** 6:4 11:5
**recoveries** 13:6,12
**recovers** 13:1
**recovery** 10:9 11:9
**red** 7:10
**reemphasize** 12:23
**referred** 23:3
**reflected** 21:21,22
**regard** 12:10 29:6
**regarding** 7:7,23
26:18,20

regardless 11:7
registered 20:18
related 22:10
relating 29:14
release 30:16
releasing 30:21
relevance 28:17
relevant 28:21
remain 6:14
remainder 5:15
repay 13:1
repays 10:13
representation 26:20
representatives 20:19
represented 14:5 22:24
request 9:18,19 23:10 26:9 31:8
requests 22:6
require 26:13
respect 5:22 14:14
response 23:9
rest 24:21
results 8:16
return 31:17
returns 20:24 22:24 23:2 24:4
right 5:8 6:7 12:1 12:24 13:2,23 14:7 14:20,25 15:3,9,14 16:12,21 17:18 18:4 21:19 25:15 26:16 28:11 30:10,18,20 31:6 32:8
rights 10:14
road 17:25 18:14 33:23
rockefeller 3:4 4:3
room 30:6,12
ross 3:18
rothschild 4:10 15:18
routinely 10:20
rule 25:1,7,11,17,22

ruled 25:20
ruling 26:1 32:3

**s**

s 3:1 5:1
salary 17:16
satisfied 10:7
satisfy 20:20
saying 11:19 12:3 16:24 17:23 23:18 23:19 24:8 25:3 26:8 32:4
says 8:15,18
schedule 9:8,14,17 9:18 12:13,16,19 15:1,1,6
scheduling 12:10,11
scholz 4:6
scope 21:24
search 30:12
securities 1:5,18,21
see 22:19 26:17 29:22 30:9,13 32:8
seek 25:6
seeked 17:1
seeking 16:6 20:15 21:19 24:24
self 16:1
sense 8:23
sent 17:24
september 28:3,9 28:12
set 10:25
settled 12:24
settlement 11:24 14:2,6 24:5 31:19
settlements 10:11 10:23 13:7
settles 13:8
share 17:2
sheehan 3:7 5:3,8 5:11 6:6,9 7:22,24 8:5,9,11,14 9:4 11:18,22 12:17,21 12:24 13:3,10 14:4 14:13,18,24 15:11
simple 9:6

simply 24:19
simultaneous 29:5
sit 21:23
situation 24:1
six 20:3,5 24:17,24 25:4 26:10,12
small 6:18
smb 1:11,20
solutions 33:22
song 3:9
soon 27:24,24
sophisticated 7:12
sorry 25:13 29:13
sort 19:19
sounds 9:21 15:7 28:15
south 2:25 33:3,7
southern 1:2
speak 30:21
speaker 15:12,23 25:8
speaking 29:5
specific 26:1
spring 9:16
stand 10:14
standard 14:18
stands 17:12
start 19:21 26:23 27:14
starting 7:24
stated 6:10
statement 14:5
statements 7:19
states 1:1
status 2:16
steiner 3:16 5:18,20 6:12,14 7:5,8 9:10 9:23 10:6,18,22 11:2 13:2,9,22,24 14:4,10 15:3,7,10
stipulate 20:2,6,7 21:4,10 28:20
stipulation 21:9 22:17 26:20
streamlining 22:5
strongly 31:8

stuart 2:11
stuff 12:22 26:3 28:16
sub 18:19
subject 13:7 17:13
subpoena 2:18 23:7
subpoenas 16:5 17:14
subsequent 6:8,18 10:3 16:9,18 17:24 18:16,19,21 19:1
successful 6:17
sued 16:8,11,13
suggest 10:2 12:2 13:5 25:24 28:13
suggesting 5:15 21:8
suggestion 22:1
suite 4:13 33:24
summary 5:16,23 7:20 9:2,12,12,14 9:18,21 11:9 12:18 15:2
suppose 22:9
supposed 7:14 17:15
supposedly 12:5
sure 12:17 18:23 20:15 26:4,22 27:18
surviving 25:2

**t**

t 33:1,1
table 26:16
talk 12:21 21:23 25:24
talking 17:5 29:10
talks 24:5 31:17
tax 24:4 31:17
taxes 17:20,21
tell 5:19 7:6 9:20 24:15
terms 17:23 22:17 22:18 23:16 26:17 30:12 31:22
testimony 7:14
thank 15:7,11,12 32:9,10,11

**[thanks - zunno]**

| | | | |
|---|---|---|---|
| **thanks** 15:9 | 13:8 15:21 16:6 | **w** | **york** 1:2 2:3,3 3:5 |
| **theory** 16:18 | 18:8,11,12,15,20 | **w** 3:9 | 3:14,21 4:4,14 |
| **thin** 12:2 | 22:8,9 23:23 24:13 | **wait** 26:16 | **z** |
| **thing** 14:13 | 24:16,20 28:14 | **want** 5:8 12:19 | **zunno** 4:7 15:20 |
| **things** 29:12 | 29:24 30:2 31:10,14 | 14:13 16:3 22:10 | |
| **think** 8:1 9:12,14 | 31:16 32:2,6 | 27:23 29:10 | |
| 12:25 14:1,18 16:23 | **trustee's** 16:2 24:3 | **wanted** 5:4 8:12 | |
| 18:11,20 19:9 22:1 | **try** 13:25 | 22:15 24:10 | |
| 23:9 24:12 29:3 | **trying** 14:22 18:8 | **wants** 8:24 10:14 | |
| 31:22 | **turn** 22:4 32:3 | 12:13 14:1 | |
| **third** 16:5 30:12 | **turned** 22:24 29:24 | **warrant** 7:1 | |
| **thought** 16:15 | 30:1 | **waste** 9:21 | |
| 22:20,23 | **turning** 23:24 | **way** 11:8,10,11 13:8 | |
| **thousands** 30:8 | **turns** 7:3 9:5 | 22:7 24:2,13,22 | |
| **time** 8:22 9:17,22 | **two** 5:5,6,21,23 6:4 | 27:14 | |
| 26:4 28:15 30:3 | 6:15 12:15 13:11 | **ways** 20:19,21 | |
| **today** 20:7 31:16 | 16:5 | **we've** 25:16 | |
| **told** 26:13 | **u** | **week** 27:23 28:1,6 | |
| **transcribed** 2:25 | **u.s.** 2:1,12 | **whatsoever** 12:13 | |
| **transcriber** 33:8 | **ultimate** 11:4 32:3 | **willful** 7:4,23 8:20 | |
| **transcript** 33:3 | **unable** 10:4 | 9:6 | |
| **transfer** 16:20 17:3 | **understand** 9:4 | **willing** 21:23 | |
| 18:16,19 21:13 | 12:8 13:9 14:23 | **wins** 12:1 | |
| 28:20 29:21 | 17:22 19:11 25:9,11 | **wire** 21:13 | |
| **transferee** 6:8 16:9 | 28:17 | **wondering** 21:12 | |
| 16:18 19:2 | **understanding** | **word** 8:2 | |
| **transferees** 6:18 | 16:25 22:3 | **words** 8:17 | |
| 10:3,4 17:24 18:21 | **understood** 9:23 | **work** 9:3 28:13 | |
| **transfers** 6:4,15 | 20:14 31:4 | **worked** 31:1 | |
| 17:6 18:6,9 19:22 | **undisputed** 7:19 | **working** 29:25 | |
| 19:25 20:2,16,19,21 | **unidentified** 15:12 | **works** 25:11 | |
| 20:23 21:5,20,24 | 15:23 25:8 | **worth** 16:7 | |
| 22:8,10 24:16 26:20 | **united** 1:1 | **write** 15:5 | |
| 26:25 28:23 29:7,16 | **universe** 20:16 | **writing** 8:19 | |
| **traveling** 28:1 | **use** 24:6 30:12 | **x** | |
| **treat** 30:2 | **utilities** 29:15 | **x** 1:4,8,14,24 | |
| **triable** 6:22 | **v** | **y** | |
| **trial** 7:2 9:7,8,13,15 | **v** 1:11,20 | **yeah** 12:2 14:7 | |
| 9:16,19 11:10 12:14 | **vacation** 27:20 28:1 | 16:15 17:3,10 18:15 | |
| 14:8 15:2 | 28:8 | 19:15 23:15 25:8 | |
| **trials** 13:5 | **veritext** 33:22 | **year** 6:4,15 8:21 | |
| **tried** 7:17 9:9,11 | **vibbert** 3:24 | 13:11 | |
| 11:4 12:9 | **viewed** 30:6 | **years** 16:7 20:3,5 | |
| **true** 8:9 33:4 | **virtually** 8:1 | 23:2 24:17,24 25:4 | |
| **trustee** 1:15 3:3 4:2 | | 26:10,12 | |
| 5:25 6:4 10:2,9,10 | | | |
| 10:14,16,16,23 13:1 | | | |

# Exhibit 82

## CUSTOMER CLAIM

Claim Number_____

Date Received_____

## BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

### DECEMBER 11, 2008

(Please print or type)

Name of Customer:  Ascot Partners, LP
Mailing Address:    450 Park Avenue, #3201
City: New York                State: NY        Zip: 10022
Account No.:  1-A0058-3-0, 1-A0058-4-0
Taxpayer I.D. Number (Social Security No.): 13-3693341

NOTE:    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY
THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM
SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL
PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE
RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS
RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE
SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON
TERMS LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM
FORM BY CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

************************************************************************

1.    Claim for money balances as of **December 11, 2008**:

a.    The Broker owes me a Credit (Cr.) Balance of                    $1,861,885,900

**but in no event less than** $560,494,555.

b.    I owe the Broker a Debit (Dr.) Balance of                        $0

c.    If you wish to repay the Debit Balance
please insert the amount you wish to repay and
attach a check payable to "Irving H, Picard, Esq., Trustee for Bernard L.
Madoff Investment Securities LLC."
If you wish to make a payment, it **must be enclosed**                $0
with this claim form.

d.    If balance is zero, insert "None."                              None[1]

---

[1] Ascot Partners, LP assumes question 1.d. refers to the net balance owed to Bernard L. Madoff Investment
Securities, LLC.
SRZ-10846152.3

2

2.  Claim for securities as of **December 11, 2008**:

**PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.**

|   |   | YES | NO |
|---|---|---|---|
| a. | The Broker owes me securities | N/A | N/A |
| b. | I owe the Broker securities | N/A | N/A |
| c. | If yes to either, please list below: | N/A | N/A |

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
|  |  | Number of Shares or Face Amount of Bonds | |
| N/A | N/A | N/A | N/A |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or information regarding any withdrawals you have ever made or payments received from the Debtor.**

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received. **PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

NOTE:    IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT. IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|  |  | YES | NO |
|---|---|---|---|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. |  | x |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? |  | x |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? |  | x |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) |  | x |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. |  | x |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. |  | $x^2$ |
| 9. | Have you or any member of your family ever filed a claim under the Securities Investor Protection Act of 1970? if so, give name of that broker. |  | x |

Please list the full name and address of anyone assisting you in the preparation of this claim form: Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Lawrence V. Gelber and David J. Karp.

If you cannot compute the amount of your claim, you may file an estimated claim. In that

---

[2] Ascot Partners, LP assumes that the definition of "any person" in question 8 excludes Bernard L. Madoff.

SRZ 10840152.1

4

case, please indicate your claim is an estimated claim.

**IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM. CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.**

**THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION AND BELIEF.**

Date _____3\2\09_____    Signature_____

J. Ezra Merkin
General Partner of Ascot Partners, LP

(If ownership of the account is shared, all must sign above. Give each owner's name, address, phone number, and extent of ownership on a signed separate sheet. If other than a personal account, *e.g.,* corporate, trustee, custodian, etc., also state your capacity and authority. Please supply the trust agreement or other proof of authority.)

**This customer claim form must be completed and mailed promptly, together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

SRZ-10846152.3

<u>ATTACHMENT TO CLAIM</u>

**THIS CLAIM IS AN ESTIMATED CLAIM.**

**THIS CLAIM IS FILED WITHOUT PREJUDICE TO THE RIGHT OF EACH
INVESTOR IN ASCOT PARTNERS, LP TO FILE, ASSERT, AND PROSECUTE
ANY CLAIM AS A CUSTOMER OF BERNARD L. MADOFF INVESTMENT
SECURITIES, LLC OR OTHERWISE, TO THE FULLEST EXTENT PERMITTED BY
LAW.**

<u>Ascot's Express Reservations</u>
Ascot Partners, LP ("Ascot") reserves its right to amend, modify, and/or supplement any of the claims
set forth herein, and to file in accordance with Court orders and procedures amended, modified,
supplementary, and/or other additional claims, including, but not limited to, claims under Section 502(h)
of Title 11 of the United States Code, or similar law, that Ascot may have against Bernard L. Madoff
Investment Securities, LLC ("BMIS").

Ascot reserves the right to attach, produce, and/or rely upon additional documents supporting its claims
and additional documents that may become available after further investigation or discovery.

This claim is filed under compulsion of the deadline to file claims and is filed to protect Ascot from
forfeiture of its claims. The filing of this claim shall <u>not</u> constitute a waiver or release of any of Ascot's
rights:

- Against any person, entity, or property;

- To contest the jurisdiction of this Court with respect to the subject matter of the claims set forth
  herein, to object to any other proceeding commenced with respect thereto, or to object to any
  other proceeding commenced in this case against or otherwise involving Ascot; and/or

- To elect remedies or choice of law.

The filing of this claim shall <u>not</u> constitute a concession or admission by Ascot of liability or facts with
respect to any claim that has been or may be asserted against Ascot or BMIS by third parties.

Nothing contained herein shall limit the rights of Ascot to file any proceeding or to take any action
concerning its claims.

Nothing in this claim is intended to nor shall waive or release any right, remedy, or claim of Ascot
against any person or entity, including, without limitation, any affiliate of, or entity otherwise related to,
BMIS.

If any person or entity asserts claims against Ascot, Ascot intends to defend such claims. Ascot
reserves all rights, defenses and remedies thereto, including, without limitation, the rights of setoff or
recoupment, which may or may not affect the total amount of Ascot's claims.

<u>Documentation Available Upon Request</u>
The claims described herein are evidenced by various agreements, instruments, and other documents
that are too voluminous to attach hereto. Copies of the agreements, instruments, and other documents
are available from Ascot's attorneys upon reasonable request by the Trustee.

SRZ-10846152.3

# Exhibit 83

1

1                C O N F I D E N T I A L

2            UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK

3

4    ------------------------------x
     In Re:

5

     BERNARD L. MADOFF INVESTMENT          Adv.Pro.No.
6    SECURITIES LLC,                       08-01789(BRL)

7              Debtor.
     ------------------------------x
8    IRVING H. PICARD, Trustee for the
     Liquidation of Bernard L. Madoff
9    Investment Securities LLC,

10             Plaintiff,                   Adv.Pro.No.
                                            09-1182(BRL)
11             v.

12   J. EZRA MERKIN, GABRIEL CAPITAL,
     L.P., ARIEL FUND LTD., ASCOT
13   PARTNERS, L.P., GABRIEL CAPITAL
     CORPORATION,

14
               Defendants.
15   ------------------------------x

16

17           DEPOSITION of JEROME BALSAM as taken

18   by and before MONIQUE VOUTHOURIS, Certified Court

19   Reporter, RPR, CRR and Notary Public of the States

20   of New York and New Jersey, at the offices of Baker

21   & Hostetler, 45 Rockefeller Plaza, New York, New

22   York, on Tuesday, October 25, 2011, commencing at

23   11:00 a.m.

24

25

IRVING H. PICARD v. J. EZRA MERKIN, et al.    CONFIDENTIAL    JEROME BALSAM 10/25/11

## 88

```
 1   strategy.  Is that a term that you used at all with       12:47:08
 2   regard to that Madoff methodology?                        12:47:10
 3       A.    I did not use that term prior to                 12:47:13
 4   December 11th, 2008.                                       12:47:15
 5       Q.    But what you've described is what you            12:47:17
 6   understood Madoff to be doing?                             12:47:19
 7       A.    I think what I described is                      12:47:21
 8   consistent with that term.                                 12:47:24
 9       Q.    Okay.  And how did you learn about               12:47:27
10   the strategy Madoff claimed to be employing?              12:47:29
11       A.    My father told me about it.                      12:47:33
12       Q.    What does your father do?                         12:47:36
13       A.    My father at the time was the chief             12:47:39
14   financial officer of a public company.                     12:47:41
15       Q.    Which one?                                        12:47:44
16       A.    The Fur Vault.                                    12:47:44
17       Q.    F-e-r-v-a-l-t?                                    12:47:48
18       A.    F-u-r new word Vault, V-a-u-l-t.                  12:47:50
19       Q.    Okay.  Trying to be too cute.                    12:47:56
20             Do you recall approximately when it              12:48:06
21   was that he told you about this strategy?                  12:48:10
22       A.    I believe it was in the 1980s.                   12:48:12
23       Q.    So before you ever joined Gabriel,              12:48:15
24   you had an idea what Madoff was supposedly -- how he       12:48:19
25   was supposedly investing?                                 12:48:24
```

## 89

```
 1       A.    That's correct.                                  12:48:25
 2       Q.    From the time you joined Gabriel, did           12:48:26
 3   anyone at Gabriel, any investment managers ever try,      12:48:33
 4   to your knowledge, to replicate the Madoff strategy?      12:48:38
 5       A.    I'm not aware whether they did or               12:48:40
 6   not.                                                       12:48:44
 7       Q.    Did you ever hear any discussion of             12:48:44
 8   attempting to do so either in the past or on a going       12:48:51
 9   forward basis?                                             12:48:56
10       A.    No.                                              12:48:57
11       Q.    Was your father investing with                  12:48:58
12   Madoff?                                                    12:49:23
13       A.    There was a period of time in which            12:49:24
14   he was.                                                    12:49:26
15       Q.    But he got out?                                  12:49:29
16             MR. STEINER:  Objection to form.                12:49:31
17       A.    My understanding is that he closed             12:49:32
18   the position prior to December of 2008.                    12:49:34
19       Q.    He was a wise man.                               12:49:39
20             I've also heard others refer to the             12:49:47
21   Madoff purported strategy as a black box strategy.        12:49:54
22   Have you ever heard that term?                             12:49:59
23             MR. STEINER:  Objection to form.                12:50:00
24       A.    I have.                                          12:50:01
25       Q.    And what do you understand that to             12:50:02
```

## 90

```
 1   mean?                                                      12:50:03
 2       A.    Meaning that the mechanism by which            12:50:04
 3   the manager achieved profits was not disclosed to          12:50:08
 4   outside parties.                                           12:50:15
 5       Q.    And would that accurately describe,            12:50:21
 6   to your understanding, assuming he had a strategy,         12:50:24
 7   what Madoff's strategy was?                                12:50:27
 8       A.    I'm not certain whether the Madoff             12:50:29
 9   strategy, as I understood it, fit the definition of        12:50:33
10   a black box.  I more often heard it in the case of         12:50:36
11   managers such as James Simons where no one knew what       12:50:42
12   transactions he was entering and he would just             12:50:46
13   indicate this is the return that I achieved.               12:50:49
14       Q.    Okay.  So you draw a distinction               12:50:53
15   between having no information whatsoever as opposed        12:50:57
16   to not knowing when he enters the market, when he          12:50:59
17   exits the market, what the triggers are and things         12:51:02
18   of that nature?                                            12:51:05
19       A.    Correct.                                        12:51:06
20             MR. STEINER:  Objection to form.                12:51:07
21       Q.    Prior to December of '08, did you              12:51:16
22   ever have occasion to discuss Madoff's performance         12:51:20
23   with anybody at Gabriel?                                   12:51:25
24       A.    I recall one conversation like that.           12:51:27
25       Q.    What was that -- when was that                 12:51:35
```

## 91

```
 1   conversation?                                              12:51:37
 2       A.    I don't remember when it was.                  12:51:38
 3       Q.    Who was involved in it?                         12:51:41
 4       A.    Mr. Merkin and I.                               12:51:43
 5       Q.    And what do you recall about it?               12:51:46
 6       A.    I recall Mr. Merkin saying that he             12:51:47
 7   has been fortunate to be able to work professionally       12:51:51
 8   with two very astute managers, one of them is Steven       12:51:55
 9   Feinberg and the other one was Bernard Madoff.             12:52:01
10       Q.    Was that the sum and substance of the          12:52:05
11   discussion of Madoff?                                      12:52:07
12       A.    That's the part that I recall.                 12:52:09
13       Q.    Okay.  And other than that, you don't         12:52:10
14   recall any conversation prior to December of '08           12:52:14
15   with anybody involving Madoff.  Is that right?            12:52:16
16       A.    That's correct.                                 12:52:19
17       Q.    All right.  And just let me ask some           12:52:20
18   specifics, did you have any discussion prior to            12:52:23
19   December of '08 with anybody at Gabriel concerning         12:52:27
20   Madoff's ability to produce consistent returns in          12:52:31
21   both good and bad markets?                                 12:52:33
22             MR. STEINER:  Objection to form.                12:52:35
23       A.    I believe when I helped Mr. Merkin             12:52:39
24   finalize a PowerPoint presentation that provided           12:52:44
25   information on the funds for which he was                   12:52:50
```

25 (Pages 88 to 91)

08-01789-cgm   Doc 11718-12   Filed 10/09/15   Entered 10/09/15 12:21:52   Exhibit
70-85   Pg 148 of 205

IRVING H. PICARD v. J. EZRA MERKIN, et al.   CONFIDENTIAL   JEROME BALSAM 10/25/11

## 92

1    responsible, that he might have observed that when        12:52:53
2    you look at Ascot's returns, the consistency of           12:52:57
3    positive returns and positive compounding made for a      12:53:01
4    very good long-term result.                               12:53:05
5         Q.   But just all you recall is that sort            12:53:09
6    of general discussion of it?                              12:53:12
7         A.   Yes.                                            12:53:14
8         Q.   And how about did you ever have a               12:53:14
9    conversation that you can recall with anybody at          12:53:17
10   Gabriel concerning the total value of assets under        12:53:19
11   management at Madoff?                                     12:53:24
12        A.   No.                                             12:53:25
13        Q.   Did you have any idea, prior to                 12:53:26
14   Madoff's arrest, what the total amount of assets          12:53:34
15   under management Madoff had might have been?              12:53:38
16        A.   No.                                             12:53:41
17        Q.   Did you ever have a conversation with           12:53:42
18   anybody at Gabriel about Madoff's strategy of going       12:53:45
19   into treasuries at the end of each quarter?               12:53:48
20             MR. STEINER:  Objection to form.                12:53:52
21        A.   I was aware of the existence of that            12:53:53
22   strategy.  I don't remember discussing it                 12:53:56
23   substantively.                                            12:53:58
24        Q.   And how were you aware of the                   12:53:59
25   existence of that strategy?                               12:54:00

## 93

1         A.   I don't remember if that's something           12:54:02
2    I heard from my father in a pre-Gabriel discussion,       12:54:03
3    or something I heard at Gabriel.                          12:54:07
4         Q.   Did you discuss Madoff with your                12:54:09
5    father from time to time?                                 12:54:13
6         A.   I would guess over the years between            12:54:15
7    the first conversation and December of 2008 there         12:54:18
8    might have been five, eight such conversations.           12:54:23
9         Q.   Did you ever have a conversation with           12:54:27
10   anybody at Gabriel, or with your dad for that             12:54:29
11   matter, about why Madoff went into treasuries at the      12:54:33
12   end of each quarter?                                      12:54:40
13             MR. STEINER:  Objection to form.                12:54:42
14        A.   Not that I recall.                              12:54:43
15        Q.   Did you ever sort of ask yourself why           12:54:44
16   does he do this at the end of each quarter?               12:54:46
17        A.   Unfortunately, I did not.                       12:54:49
18        Q.   I mean, did it ever strike you as odd           12:54:52
19   that he would do that, did you ever -- did it ever        12:54:55
20   strike you as odd than he would go into treasuries        12:55:00
21   at the end of each quarter?                               12:55:05
22        A.   It did not.                                     12:55:07
23        Q.   And did anybody ever explain to you             12:55:09
24   or give you a reason why he would allegedly go into       12:55:12
25   treasuries at the end of each quarter?                    12:55:17

## 94

1              MR. STEINER:  Objection to form.                12:55:19
2         A.   I don't recall such an explanation.             12:55:20
3         Q.   Okay.  Now, at some point you became            12:55:23
4    aware of the fact that portions of Ariel Fund and         12:55:32
5    Gabriel Fund were also invested through BLMIS.  Is        12:55:36
6    that correct?                                             12:55:41
7         A.   Yes.                                            12:55:41
8         Q.   And do you recall when you learned of           12:55:42
9    that?                                                     12:55:44
10        A.   I believe it was no later than 2002.            12:55:44
11        Q.   And how did that come to your                   12:55:51
12   attention?                                                12:55:55
13        A.   There was a spreadsheet that I was              12:55:55
14   working on at that time that so reflected.                12:55:58
15        Q.   And what were you working on the                12:56:05
16   spreadsheet for?                                          12:56:10
17        A.   As I recall it, I was performing a              12:56:11
18   ministerial function on that spreadsheet in               12:56:13
19   Mr. Autera's absence from the office, I believe, and      12:56:18
20   the document in question showed an allocation to          12:56:23
21   Madoff.                                                   12:56:26
22        Q.   Did you ask anybody about that when             12:56:27
23   you noticed it?                                           12:56:31
24        A.   Not that I recall.                              12:56:32
25        Q.   Were you -- prior to the time you               12:56:37

## 95

1    became aware of the allocation to Madoff you've just      12:56:39
2    described, did you have an understanding as to where      12:56:43
3    Ariel and Gabriel's assets were invested?                12:56:47
4         A.   Do you mean prior to my learning that           12:56:50
5    Mr. Madoff was responsible for some of Gabriel and        12:56:53
6    Ariel's investment, or --                                 12:56:57
7         Q.   Yes.                                            12:56:59
8         A.   Well, the strategies that the funds             12:57:00
9    were involved in changed over the years, but at the       12:57:03
10   outset of my employment by Gabriel Capital                12:57:07
11   Corporation the funds focused on merger arbitrage         12:57:11
12   and distressed investing.  There came a time where        12:57:15
13   merger arbitrage was de-emphasized and some of that       12:57:19
14   money moved, and for that matter, so was distressed       12:57:27
15   investing, some of that money moved into private          12:57:31
16   equity-type positions over the years and some of it       12:57:34
17   moved into an account with Madoff.                        12:57:37
18             MR. COLOMBO:  Excuse me.  I have to             12:57:47
19   read that.                                                12:58:16
20        Q.   At the time -- okay.  Continuing, at            12:58:20
21   the time when it came to your attention that some of      12:58:24
22   the money was with Madoff, did you understand where       12:58:26
23   the rest of the money was allocated?                      12:58:28
24        A.   Certainly not close percentages or              12:58:30
25   exact percentages, but a general idea of what the         12:58:33

26 (Pages 92 to 95)

IRVING H. PICARD v. J. EZRA MERKIN, et al.    CONFIDENTIAL    JEROME BALSAM 10/25/11

128

| | | | |
|---|---|---|---|
| 1 | A. | Prior to December -- | 02:43:57 |
| 2 | Q. | Yes, prior to December '08. | 02:43:58 |
| 3 | A. | No, no. | 02:44:02 |
| 4 | Q. | And let me ask you just broadly, did | 02:44:02 |
| 5 | you ever hear from anyone in the whole wide world | | | 02:44:05 |
| 6 | that Mr. Teicher had expressed a concern that Madoff | | | 02:44:09 |
| 7 | might be running a Ponzi scheme? | | | 02:44:13 |
| 8 | A. | Prior to December -- | 02:44:15 |
| 9 | Q. | Prior to December '08. | 02:44:18 |
| 10 | A. | I have no such recollection. | 02:44:21 |
| 11 | Q. | Here is an even broader question -- | 02:44:25 |
| 12 | well, maybe not. | | | 02:44:28 |
| 13 | | MR. STEINER: Objection. | 02:44:30 |
| 14 | Q. | Did you ever hear of anyone at | 02:44:40 |
| 15 | Gabriel ever use the expression "Ponzi scheme" in | | | 02:44:42 |
| 16 | reference to Mr. Madoff prior to December 2008? | | | 02:44:46 |
| 17 | A. | No, sir. | 02:44:48 |
| 18 | Q. | Did you ever hear anyone at Gabriel | 02:44:55 |
| 19 | raise any issue or concern of any nature about | | | 02:44:57 |
| 20 | Mr. Madoff's operation prior to December 2008? | | | 02:45:02 |
| 21 | A. | Only in the very broadest sense where | 02:45:06 |
| 22 | Mr. Merkin once said to me, in what context I don't | | | 02:45:09 |
| 23 | recall, that the returns have been good, but that | | | 02:45:12 |
| 24 | doesn't guarantee they will be in the future. | | | 02:45:17 |
| 25 | Q. | Seems like something you read in most | 02:45:19 |

129

| | | | |
|---|---|---|---|
| 1 | quarterly reports. Okay. But that was the only | | | 02:45:23 |
| 2 | reference that you can recall of anybody saying | | | 02:45:28 |
| 3 | anything about Madoff and his operations? | | | 02:45:30 |
| 4 | A. | Well, saying about -- | 02:45:34 |
| 5 | Q. | That might be a concern? | 02:45:36 |
| 6 | A. | Correct. | 02:45:37 |
| 7 | Q. | Now, at some time when you were at | 02:45:47 |
| 8 | Gabriel did you become aware of this whole Bayou | | | 02:45:51 |
| 9 | Ponzi scheme situation? | | | 02:45:56 |
| 10 | A. | Yes. | 02:45:58 |
| 11 | Q. | How did you become aware of that? | 02:45:58 |
| 12 | A. | I believe it appeared in press | 02:46:02 |
| 13 | accounts and I'm sure I must have discussed it with | | | 02:46:04 |
| 14 | Mr. Merkin. | | | 02:46:07 |
| 15 | Q. | Do you recollect anything about any | 02:46:14 |
| 16 | discussion of it you may have had with Mr. Merkin? | | | 02:46:15 |
| 17 | A. | If it appeared in a quarterly letter, | 02:46:19 |
| 18 | then we would have discussed it. I remember one of | | | 02:46:24 |
| 19 | the quarterly letters talked about another fund that | | | 02:46:27 |
| 20 | had imploded, albeit through other means, called | | | 02:46:31 |
| 21 | Amaranth, A-m-a-r-a-n-t-h. As to Bayou, if it | | | 02:46:36 |
| 22 | didn't appear in a quarterly letter, then I don't | | | 02:46:42 |
| 23 | have a specific recollection of when we might have | | | 02:46:45 |
| 24 | discussed it or what we might have said. | | | 02:46:47 |
| 25 | Q. | Did you or did anybody else at | 02:46:49 |

130

| | | | |
|---|---|---|---|
| 1 | Gabriel dig in to the Bayou situation beyond what | | | 02:46:52 |
| 2 | appeared in press accounts to find out what had gone | | | 02:46:57 |
| 3 | on? | | | 02:47:01 |
| 4 | A. | I don't recall doing so. I don't | 02:47:01 |
| 5 | know what others did. | | | 02:47:03 |
| 6 | Q. | Do you recall anybody ever reporting | 02:47:04 |
| 7 | to you or reporting generally to people at Gabriel | | | 02:47:08 |
| 8 | about the Bayou situation? | | | 02:47:11 |
| 9 | A. | I don't recall that. | 02:47:13 |
| 10 | Q. | Do you recall any discussion at | 02:47:14 |
| 11 | Gabriel about whether -- strike that. | | | 02:47:22 |
| 12 | | Was there any discussion that you're | 02:47:40 |
| 13 | aware of at Gabriel after the Bayou implosion of | | | 02:47:42 |
| 14 | changing any of the protocols for selecting | | | 02:47:47 |
| 15 | portfolio managers or monitoring investments or | | | 02:48:05 |
| 16 | anything of that nature? | | | 02:48:09 |
| 17 | A. | I don't recall any such discussion. | 02:48:10 |
| 18 | Q. | Let me ask it more broadly then. | 02:48:12 |
| 19 | After the Bayou implosion, was there ever any | | | 02:48:15 |
| 20 | discussion of changing any of the policies and | | | 02:48:18 |
| 21 | procedures at Gabriel? | | | 02:48:21 |
| 22 | | MR. STEINER: Objection to form. | 02:48:24 |
| 23 | A. | I don't recall anything to that | 02:48:26 |
| 24 | effect. | | | 02:48:27 |
| 25 | Q. | Did you ever have a discussion at -- | 02:48:43 |

131

| | | | |
|---|---|---|---|
| 1 | strike that. | | | 02:48:51 |
| 2 | Q. | Were you aware of who Madoff's | 02:48:51 |
| 3 | accountant was prior to December of '08? | | | 02:48:56 |
| 4 | A. | I'm not sure I was. | 02:48:58 |
| 5 | Q. | You don't have any recollection of | 02:49:00 |
| 6 | any discussion at Gabriel about Friehling & | | | 02:49:01 |
| 7 | Horowitz, Madoff's accountant, prior to December of | | | 02:49:04 |
| 8 | '08? | | | 02:49:06 |
| 9 | A. | Correct, I do not. | 02:49:07 |
| 10 | | MR. COLOMBO: Would you mark that as | 02:49:54 |
| 11 | Exhibit 7, please. | | | 02:49:55 |
| 12 | | (Exhibit Balsam-7, E-mail January 17, | 02:49:58 |
| 13 | 2007, Bates BS00156935-156936, marked for | | | 02:50:00 |
| 14 | identification.) | | | 02:50:00 |
| 15 | Q. | Okay, Mr. Balsam, I'm now handing you | 02:50:00 |
| 16 | what we've marked as Exhibit 7. It appears to be an | | | 02:50:03 |
| 17 | e-mail chain -- no, not an e-mail chain. An e-mail | | | 02:50:07 |
| 18 | from you to Mr. Merkin regarding a former senior | | | 02:50:10 |
| 19 | trader at a hedge fund, Millenium Partners, being | | | 02:50:19 |
| 20 | sentenced to probation after being guilty of | | | 02:50:23 |
| 21 | improper trading. Do you recollect seeing that? | | | 02:50:26 |
| 22 | A. | Not the specific e-mail, but the | 02:50:28 |
| 23 | incident it describes. | | | 02:50:30 |
| 24 | Q. | Okay. What do you recollect about | 02:50:31 |
| 25 | the incident? | | | 02:50:32 |

35 (Pages 128 to 131)

132

```
1      A.    That Millenium was under            02:50:33
2  investigation for trades that it made in mutual 02:50:37
3  funds, I think the area was broadly called market 02:50:39
4  timing, and we were aware of that going on, it was 02:50:42
5  in the press and that's what I remember about it.  02:50:48
6      Q.    Do you remember why you might have   02:50:54
7  sent this e-mail to Mr. Merkin?                 02:50:56
8      A.    Because we did business with        02:51:00
9  Millenium and I thought it would be of interest to 02:51:02
10 him.                                            02:51:06
11     Q.    What sort of business did you do with 02:51:06
12 Millenium?                                      02:51:08
13     A.    Gabriel Capital Corporation managed  02:51:09
14 an account for Millenium.                       02:51:12
15     Q.    You'll have to excuse my ignorance on 02:51:22
16 this, but was Millenium a fund that Mr. Merkin had 02:51:24
17 any involvement with?                           02:51:28
18         MR. STEINER: Objection to form.        02:51:30
19     A.    When you say any involvement, what do 02:51:31
20 you mean?                                       02:51:32
21     Q.    Let me restate it.                    02:51:33
22         Other than Gabriel managing this fund  02:51:38
23 for Millenium --                                02:51:40
24     A.    This account.                         02:51:42
25     Q.    This account, did you have any        02:51:42
```

133

```
1  other -- did Mr. Merkin have any other involvement 02:51:44
2  in connection with Millenium?                   02:51:48
3      A.    I think he knows -- I know he knows   02:51:50
4  the principal of Millenium. I don't know that there 02:51:52
5  is any other involvement.                       02:51:55
6      Q.    He doesn't have an ownership interest 02:51:56
7  in Millenium or anything of that nature?        02:51:58
8      A.    To the best of my knowledge he did   02:52:00
9  not.                                            02:52:02
10     Q.    Do you recall discussing this issue  02:52:02
11 with Mr. Merkin, the Millenium situation?       02:52:11
12     A.    I'm sure we talked about it. I don't 02:52:17
13 remember what we said.                          02:52:19
14     Q.    You said you thought it generally    02:52:21
15 involved an issue of market timing. Did anybody 02:52:26
16 ever express concerns that Mr. Madoff might be doing 02:52:31
17 something inappropriate with respect to market  02:52:36
18 timing?                                         02:52:38
19     A.    Not to me.                            02:52:39
20     Q.    Did you ever hear anyone mention     02:52:41
21 market timing with respect to Madoff?           02:52:46
22     A.    Prior to December 2008?              02:52:48
23     Q.    Yes, prior to December 2008.         02:52:49
24 Sorry --                                        02:52:51
25     A.    No.                                   02:52:51
```

134

```
1      Q.    -- I need to keep qualifying. And    02:52:53
2  the answer is?                                  02:52:57
3      A.    No.                                   02:53:00
4      Q.    Did you know this individual Steven  02:53:07
5  Markovitz who this article Exhibit 7 refers to? 02:53:11
6      A.    No.                                   02:53:16
7      Q.    The article also refers to an ongoing 02:53:17
8  investigation involving certain other companies and 02:53:23
9  individuals. Did Gabriel have any relationship with 02:53:27
10 any of those persons listed in the last three   02:53:31
11 paragraphs?                                     02:53:35
12         MR. STEINER: Objection to form.        02:53:35
13     A.    I think Bear Stearns, I think we did 02:53:36
14 work with Bear Stearns at some point.           02:53:39
15     Q.    How about any of those individuals?  02:53:42
16     A.    I don't recognize any of those names. 02:53:45
17     Q.    Do you recall if you ever sent       02:54:00
18 Mr. Merkin any articles dealing with the Bayou  02:54:04
19 situation that we discussed a few minutes ago?  02:54:08
20     A.    I don't recall whether I did, but    02:54:11
21 it's very possible that I did.                   02:54:14
22     Q.    And to be fair, it would also be     02:54:16
23 possible that you sent him articles on other similar 02:54:23
24 types of issues if you noticed them?            02:54:26
25         MR. STEINER: Objection to form.        02:54:28
```

135

```
1      A.    I've sent Mr. Merkin any number of   02:54:30
2  articles over the years, and if it was related to 02:54:32
3  our industry and our business and might be relevant 02:54:35
4  to him, there is a decent chance that I would send 02:54:38
5  him something on that subject.                  02:54:41
6      Q.    Did he ever send you articles?       02:54:42
7      A.    Sure.                                 02:54:44
8      Q.    Do you remember any of them that he  02:54:45
9  sent you?                                       02:54:46
10     A.    The ones that stick out in my mind   02:54:48
11 were related to the New York Yankees.           02:54:52
12     Q.    Let's leave those aside. Any         02:54:54
13 regarding business? Not that the Yankees aren't a 02:54:56
14 business.                                       02:55:01
15     A.    I'm sure there were. I don't, as I   02:55:01
16 sit here now, recall what they might have been   02:55:03
17 about.                                          02:55:07
18     Q.    Might as well ask it. And as you sit 02:55:19
19 here you have no recollection of him ever sending 02:55:23
20 you an article about Madoff. Is that correct?    02:55:25
21     A.    That's correct.                       02:55:27
22     Q.    And "him" being Mr. Merkin.           02:55:28
23     A.    Correct.                              02:55:30
24     Q.    Okay. Now we're going to talk for a  02:55:44
25 while about after December 2008, so all these    02:55:47
```

36 (Pages 132 to 135)

# Exhibit 84

**Picard v. Merkin**                                                    **J. Ezra Merkin  2-24-15**

**Page 1**

```
          UNITED STATES BANKRUPTCY COURT

          SOUTHERN DISTRICT OF NEW YORK


    --------------------------------x
    In Re:


    BERNARD L. MADOFF INVESTMENT        Adv.Pro.No.

    SECURITIES LLC,                     08-01789(BRL)

              Debtor.
    --------------------------------x
    IRVING H. PICARD, Trustee for the

    Liquidation of Bernard L. Madoff

    Investment Securities LLC,

              Plaintiff,                Adv.Pro.No.

                                        09-1182(BRL)

              v.

    J. EZRA MERKIN, GABRIEL CAPITAL,

    L.P., ARIEL FUND LTD., ASCOT

    PARTNERS, L.P., GABRIEL CAPITAL

    CORPORATION,


              Defendants.
    --------------------------------x



         VIDEOTAPED DEPOSITION OF J. EZRA MERKIN,

    as reported by Nancy C. Bendish, Certified Court

    Reporter, RMR, CRR, and Notary Public of the

    State of New York, at the offices of Baker

    Hostetler, 45 Rockefeller Plaza, New York, New

    York, on Tuesday, February 24, 2015, commencing

    at 9:47 a.m.
```

**Page 58**

1  next line.
2      A.    Um-hum.
3      Q.    What is your understanding of the
4  term "options arbitrage"?
5      A.    Well, substantially all of the
6  assets of Ascot at that point were managed by
7  the Madoff organization and Bernie Madoff
8  specifically and they were engaging in what I
9  would consider options arbitrage.  Meaning
10  arbitraging prices of -- the prices of options
11  and the prices of the securities to which those
12  options can be converted into or exercised into
13  or assigned to.  So that it's your arbitraging
14  price relationships between underlying
15  securities and options struck against those
16  securities.
17      Q.    Okay.  And then skip over
18  Cerberus.  It then says "managing partner" and
19  it has your name.
20      A.    Um-hum.
21      Q.    Were you the managing partner --
22  well, you've said Capital Group was just a term
23  used.  Of what organizations were you managing
24  partner?
25      A.    One that comes to mind I'm pretty

**Page 59**

1  sure was Gabriel Capital LP which was the
2  domestic version of that.  Almost all of our
3  strategies had pairs of funds, meaning we did
4  the same strategy domestically and offshore.
5  The offshore limited partnerships generally --
6  I'm sorry, the domestics are limited partners
7  partnerships generally -- did I garble that too
8  badly or did you get that?  Okay.  And the
9  offshore entities are generally corporations.
10  So you're a partner generally in a limited
11  partnership, but not in an offshore corporation,
12  be it shareholder, be some other legal form of
13  ownership.
14      Q.    All right.  Probably get into that
15  a little bit more later.
16          (Comments off the record.)
17      Q.    Let's turn to the next page if we
18  could.  The title of it is -- again, I'm just
19  reading, it says "J. Ezra Merkin."  And we've
20  covered a couple of things already here.  But I
21  just wanted to ask you, it says at this time --
22  this is April of 2008, were you the chairman of
23  the board of GMAC?
24      A.    Yes.
25      Q.    How did you get that job?

**Page 60**

1      A.    I was involved in a group, with a
2  group that bought 51 percent of the ownership of
3  GMAC from General Motors Corporation a few years
4  prior to that and had been nominated by the
5  group and accepted by the chairman and president
6  of General Motors to chair the board.  In other
7  words, our group was going to chair the board;
8  we were not going to basically run the company.
9  The CEO didn't change.  The CEO at some point
10  changed, but it didn't change when we bought the
11  company right away.  I don't know whether it
12  changed by April of 2008.  It might have.  But
13  that's how that came.  And that was done
14  together with Cerberus and Steve Feinberg.
15      Q.    That may answer my next question,
16  which was is there a legal entity for that group
17  that purchased GMAC?
18      A.    There surely is.  I mean --
19      Q.    Yeah, I didn't think you did it on
20  your own.
21      A.    Yes.  What's the name of that?
22      Q.    Yes.
23      A.    You know what, I'm sure I will
24  remember, I'm just drawing a blank at the
25  moment.  Unless that's Cerberus FIM.  It might

**Page 61**

1  be Cerberus FIM.  That might have been used for
2  Chrysler, I just don't remember.
3      Q.    Okay.  And who were the members of
4  that group, besides yourself?
5      A.    The members of what group?
6      Q.    The group that bought GMAC.
7      A.    A separate vehicle, a special
8  purpose vehicle was formed for that purpose.
9  And there may have been, within an overall
10  rubric several, one dominant one, one or two
11  smaller ones, and there's a large number of
12  investors.  The total investment that was made,
13  the total consideration paid for half the
14  business was something I believe either around
15  or slightly in excess of $7 billion.
16          So it's a very long list and I'm
17  sure I don't know it, or even close to it.  But
18  let me just say for the purposes of answering
19  the question our funds were investors in that
20  entity and therefore investors in the GMAC deal.
21      Q.    Did that group, given the size,
22  have an executive committee?
23      A.    The group itself?
24      Q.    Yes.
25      A.    I don't remember any formal

                                    **16  (Pages 58 to 61)**

**Page 110**

1    Q.    Well, I'm gonna ask you that but,
2  yes, I think I understand.
3    A.    So we don't have to -- do you want
4  me to address that now?
5    Q.    Yeah, what is your understanding
6  of what the Ascot strategy was?
7    MR. STEINER:  And I'm going to
8  interrupt both of you before the court reporter
9  does, that you're getting too talking over each
10  other.  And so maybe I can't direct Mr. Sheehan,
11  but I will tell you, you've got to let him
12  finish before you start responding.
13    MR. SHEEHAN:  Did you get all
14  that?
15    THE REPORTER:  I did.
16    MR. SHEEHAN:  She did.  We're
17  good.
18    A.    Question on the table is?
19    Q.    Now you got me confused here.
20  There it is.
21    Q.    What is your understanding of what
22  the Ascot strategy was?
23    A.    So for those parts of the Ascot
24  portfolio over which Mr. Madoff had discretion,
25  which were substantially all the assets for most

**Page 111**

1  of the period but not always all of them, so
2  that's now what I mean by Ascot.  Now I'm just
3  addressing the Madoff strategy.  They're not the
4  same things always.
5    Originally we were long a stock,
6  I'm gonna say IBM, long a put struck underneath
7  the stock, and short a call struck over the
8  stock.  So that if IBM traded at, take an
9  example we've tossed around on other occasions,
10  say at 92, we might be long 100 shares of the
11  stock, short the equivalent -- at 92, short the
12  equivalent in calls, the equivalent number of
13  calls struck at 95, and we collected some money
14  for being short those, right?  And we bought a
15  put at 90.  And when we were doing individual
16  stocks and options, which was only at the
17  beginning, we were never partially hedged.  In
18  other words, you may know enough about options
19  contracts to know that -- how the multipliers
20  are, they're not the same as in stocks.
21    Q.    Um-hum.
22    A.    So we were long and short the
23  correct amount of options.  We weren't open, we
24  weren't -- we didn't take an exposure anywhere.
25    So, what that meant is from --

**Page 112**

1  what that meant is we had limited risk and
2  limited upside.  We were selling off the upside
3  above the strike at which the call was sold.
4  And if you want to add in the premium that's
5  collected, right, so if we sold the call at 95
6  and collected a dollar, the stock could go to a
7  thousand, we stop making money at 96.  We also
8  stop losing money beneath 90.
9    So, I would call that a hedged
10  position, in a very natural way.  I think that
11  is a hedged position.  When we're doing
12  individual stocks we might have had, to pick a
13  characteristic but not necessarily specific
14  example, 30 of those at a time.  30 different
15  stocks with puts and calls.  Long the stock,
16  long the put and short the calls.
17    So I would say it was a portfolio,
18  a basket of hedged positions, fully hedged
19  positions.  Doesn't mean riskless, means hedged.
20    Q.    Um-hum, okay.
21    A.    Those evolved over time to
22  something from which they emanated and there's a
23  resemblance, but it's a different thing.  The 35
24  grew to probably over 50 positions.  But instead
25  of having the individual puts, going back to my

**Page 113**

1  example IBM, we no longer had IBM puts and were
2  no longer short IBM calls.  We had 50 stocks,
3  50-ish stocks in the S & P 100 and were long
4  puts on the S & P 100 and short calls on the
5  S & P 100.
6    So that the relationship that
7  existed is we had -- we were always long puts,
8  always short calls and for the, for the long,
9  instead of the stock we had a basket of stocks,
10  all of whom were in the S & P 100.
11    So I would consider that a fully
12  hedged position.  Not riskless; fully hedged.
13    Q.    This is a little out of the area
14  but I've got to ask it.
15    A.    Sure.
16    Q.    In your entire experience with
17  Ascot, did anybody ever exercise the call?
18    A.    Exercise the call.  Well, we were
19  short -- were we ever -- I don't remember.  I
20  just have to differentiate the answer.
21    In the individual stock days, say
22  the IBM example, it's just too long ago for me
23  to remember.
24    Q.    All right.
25    A.    That's not to say no, but I just

Page 114

1    don't remember.
2        In the basket days -- remember
3    you're getting -- you've sold the call on the
4    S & P 100, on an index that -- let's just --
5    that's called the OEX. The process of
6    exercising index options is very different than
7    the process of exercising individual stock
8    options. And as a generality we either rolled
9    or got out and were not ever exercised against
10   or assigned, which is what I think you're asking
11   me.
12        You're asking me about a short
13   call. We were short the call. So the person
14   who bought the call or the party that bought the
15   call could have exercised it, which is your
16   question.
17       Q.    Right.
18       A.    I just don't remember. But
19   generally we rolled around things. Rolled as a
20   term of art. I'm not describing a physical
21   movement.
22       Q.    On the other side, your
23   recollection again in Ascot, did anyone ever --
24       A.    So, we were long the puts. So
25   it's only the entity that's long the option that

Page 115

1    can exercise.
2        Q.    Right.
3        A.    So if it's anyone -- did anyone
4    ever exercise is a different question.
5        Q.    Right.
6        A.    Because the only person that can
7    exercise the put is us.
8        Q.    Yes.
9        A.    Is the owner of the put.
10       Q.    Did you ever do that?
11       A.    Don't remember.
12       Q.    Did there ever come a time when
13   you discussed with Mr. Madoff why are we buying
14   puts?
15       A.    Sure. All the time.
16       Q.    And what was that conversation?
17   We didn't put the time on it and everything.
18   We'll get back to the W's later. But just --
19       A.    We're gonna get back to the W's
20   later?
21       Q.    The W's, who, what, where, when.
22       A.    Oh. I thought you were talking
23   about a position. I didn't know what you meant.
24       Q.    I'm sorry. Let me be less glib
25   here. I asked you if you had a conversation

Page 116

1    about not buying puts. Do you remember the
2    first time you had that conversation?
3        MR. STEINER:  Not buying puts or
4    about buying puts?
5        MR. SHEEHAN:  No, no.
6        Q.    Yeah, not buying puts.
7        A.    The question I answered was did
8    you ever have a conversation with Mr. Madoff
9    about buying puts.
10       Q.    Yes.
11       A.    Okay. And the answer to that is
12   yes. Okay?
13       Q.    I thought I said not buying puts,
14   but go ahead.
15       A.    The presence of the puts, the cost
16   of the puts, puts cost money, puts are
17   insurance.
18       Q.    Yes.
19       A.    Essentially it's an insurance
20   concept because by buying it, by adjusting the
21   strike down, you're taking a deductible. And
22   insurance policies decline in cost as the
23   deductible increases.
24        So we had quite a number of
25   conversations about where the puts should be

Page 117

1    struck, where does the band go, how out of the
2    money should we strike the put in order
3    simultaneously to change the performance of the
4    deductible and either decrease the cost of it or
5    increase the cost of it.
6        The intention of the program all
7    along was to be hedged. The hedge in the case
8    of this program was achieved through the
9    purchase of the put. Right?
10       Q.    I understand.
11       A.    The sell of the call helped
12   finance the put and the sell of the call also
13   did some other things, and certainly, certainly
14   it limited the upside. But if you're long a
15   call -- if you're long a stock and short a call,
16   which is called the covered right in the options
17   industry, you're partially hedged on the upside
18   and you've reduced your cost, but you're not
19   really hedged on the downside.
20       Q.    Yes.
21       A.    You will lose -- you won't lose
22   the first movement down because your first loss
23   will be covered to the extent that you pocketed
24   something for the call. So if you bought a
25   stock at 92 and you sold a 95 call at a dollar

30  (Pages 114 to 117)

1    A.    No.
2    Q.    Why don't you take a look at it
3  right now.  It's going to take a little bit of
4  time but I think it will be worthwhile, because
5  we're going to refer to it.
6         MR. STEINER:  The one thing I
7  noticed, the original interrogatory answers that
8  these are supplementing would have had the
9  questions that were being responded to and this
10  just refers back to those questions.
11        MR. SHEEHAN:  Yes.
12        MR. STEINER:  So to the extent
13  your questions embed in them references to 1,
14  2 -- interrogatories 1, 2, 3, 7, 8, 9, 10, 11
15  and 13, then perhaps we should make those
16  available for the witness also.  But to the
17  extent your questions don't require that, you
18  know, the answer is the answer.
19        MR. SHEEHAN:  I don't think it
20  will, Neil, but if it comes up we'll certainly
21  retrieve those.
22  BY MR. SHEEHAN:
23    Q.    Directing your attention if I
24  could to page 3, starting at the first full
25  paragraph, and I'm going to just read to make

1  sure we're in the same place.  It says, "In
2  addition, prior to investing with Mr. Madoff
3  Mr. Merkin met with Mr. Madoff in Mr. Madoff's
4  offices," et cetera.  Do you see that paragraph?
5    A.    I do.
6    Q.    I want to ask you just a few
7  questions about your relationship with
8  Mr. Madoff.
9         Do you recall when this meeting
10  took place?
11    A.    This meeting would have taken
12  place in the late '80s, I think, but I don't
13  recall specifically when.  This was -- this was
14  just as we were beginning the due diligence
15  process that we were doing with Mr. Madoff and
16  that's roughly when that would have happened.
17    Q.    Okay.  Had you met Mr. Madoff in
18  any capacity prior to this?
19    A.    I don't think so.
20    Q.    In the immediately preceding
21  paragraph, in fact right above the paragraph I
22  just read from, it says that, in addition to
23  other things, that your father, who was a
24  successful businessman and investor, "I know
25  Bernie, and he's okay."  Do you see that?

1    A.    I do.
2    Q.    Do you know how your father knew
3  Mr. Madoff, how he came to know him?
4    A.    I have a vague recollection that
5  they met on matters that pertained to a friend
6  in common of the two of them, who had a, some
7  sort of a brokerage firm downtown that was what
8  was called a member firm of the New York Stock
9  Exchange, they were members of the New York
10  Stock Exchange.  Not a listed firm but a member
11  firm.
12    Q.    Right.
13    A.    And this friend was a friend of
14  theirs in common.  And by this time it's
15  possible, I just don't know for sure, when or as
16  of when my father may have entrusted Mr. Madoff
17  with capital to manage.
18    Q.    What do you know about that?  That
19  is, what do you know about the capital that your
20  father gave to Madoff to manage?
21        MR. STEINER:  Objection to form.
22    A.    I don't know much at all.
23    Q.    Well, were you aware of how much
24  he invested with Mr. Madoff?
25    A.    No.

1    Q.    Do you know when he invested with
2  Mr. Madoff?
3    A.    I don't know.  I don't know.  It
4  may have been a number of years prior to this.
5  If this is the late '80s, this might have been
6  either directly or perhaps with friends, and I'm
7  just not sure, he may have been an investor as
8  much as a decade earlier or sometime in between
9  and it may have been not under his name.  So,
10  that is he may have been an investor in an
11  entity that was an investor of Mr. Madoff's.  My
12  first investment with Mr. Madoff was through
13  something called 61M Associates, something like
14  that.
15    Q.    Did you ever discuss with your
16  father his investment experience with
17  Mr. Madoff?
18    A.    My father was not a person of many
19  words and my father was very sparing in praise
20  and had a very constructive opinion of
21  Mr. Madoff and his investing abilities.
22    Q.    That sounds, pardon me, like a
23  conclusion.  What I'm asking is whether or not
24  you ever discussed the actual investment
25  experience that your dad had with Mr. Madoff.

## Page 150

1    A.    So when I said he was a person of
2  spare praise and few words, he spoke in
3  conclusions.  So he would say I knew Bernie, I
4  know Bernie and Bernie's okay, or I know Bernie
5  and he's okay.  That's what I mean.  You
6  consider that is a conclusion, perhaps, but
7  that's what he said.
8    Q.    Is that the extent of the
9  conversation you and he had?
10    A.    At that particular time, that is
11  certainly the extent that I remember.  This is
12  going back a while.
13    Q.    I understand.
14    A.    I don't remember -- I don't
15  remember specifics about what was bought or sold
16  or owned for that investment process.
17    Q.    Okay.  Did there come a time after
18  that when you had any, any discussions with your
19  father about investing with Bernie Madoff?
20    A.    Well, my father died in 1999 and
21  so let's just say roughly ten years later, then
22  this period of time, so maybe '11, I don't know,
23  the late '80s versus the late '90s -- no, I do
24  know when my father passed away but I'm
25  saying -- so my father was 92 -- was not quite

## Page 151

1  92 when he died, and I didn't have that many
2  further discussions that I remember with him on
3  that subject.
4    Q.    Okay.  Let's go back to your
5  meeting, if I may, with Mr. Madoff.
6          So, how was it that you came to
7  meet with him in the first place?
8    A.    I don't remember the circumstances
9  of the first meeting and I don't remember when
10  the first meeting was, exactly, and I have a
11  vague memory that I met Bernie downtown, meaning
12  he -- it may have been before he moved his
13  office uptown and I don't know when he moved his
14  office uptown.  I have a vague memory that I met
15  him still when he was on Wall Street.  I mean
16  that literally, that he had an office on a
17  street called Wall Street.  I don't mean the
18  financial district.
19    Q.    I understand.
20    A.    It's in the financial district but
21  if there was there was one.  This was the
22  beginning of our due diligence process and the
23  discussions that I remember more clearly are
24  already uptown at Third Avenue in the east 50s.
25    Q.    What were you doing at that time?

## Page 152

1  Were you still with Gotham when you met with
2  Bernie?
3    A.    This would have been after
4  Gotham -- I don't remember.  I don't remember
5  specifically, as I say, the first investment
6  was -- of mine, was at -- through 61M
7  Associates.  61M was a, call it an account or
8  call it an investment vehicle that was managed
9  out of the Scheuer family office, which had
10  possibly also migrated uptown but for many years
11  was at 61 Broadway, and then at the Empire State
12  Building.
13          61M was an account that invested
14  money with the Madoff -- with Bernie Madoff, and
15  had a number of persons who had contributed to
16  61M for that purpose.  And the person who ran
17  the Scheuer family office as an entirety and a
18  61 account was a gentleman named Leon Meyers.
19    Q.    How was it that you came to make
20  that investment in 61?
21    A.    Leon and I had developed a pattern
22  of, you know, sort of talking about managers we
23  liked or managers we thought were interesting.
24  I'm not sure that he was the first person --
25  certainly among the very first, I don't know how

## Page 153

1  that dovetailed with my dad, but he was
2  certainly -- it was certainly -- that was
3  certainly the vehicle through which I first
4  invested, and that was just me.  In other words,
5  or maybe it was the kids or something, but it
6  wasn't for the fund and it wasn't for any
7  additional limited partners.
8    Q.    Okay.  I may not -- I don't think
9  I do remember this.  Did you invest in 61 before
10  the meeting with Bernie or after?
11    A.    I invested in 61 I -- you know
12  what, I don't remember precisely.  The answer is
13  about the same time.  Ask me what took place
14  first and what took place second, I don't
15  remember.
16    Q.    All right.
17    A.    I think of both the investment
18  personally only and the meeting with Madoff, the
19  meetings with Madoff as part of the initial due
20  diligence that preceded any investments on the
21  part of the funds, and was sort of just the
22  beginning of the due diligence process.
23    Q.    So, again, returning to page 3,
24  the second line in that first full paragraph
25  says:  Discuss Mr. Madoff's trading strategies

**Page 154**

1   as well as Mr. Madoff's market making
2   activities. Let's take those one at a time.
3            What did you recall, what do you
4   recall discussing with Mr. Madoff about his
5   marketing strategies?
6            MS. ARCHER: Object to the form.
7       A.   Either trading strategies or
8   market making? Which one did you --
9       Q.   Did I mess that up? I'm sorry.
10  Let me rephrase it, in light of the objection.
11           You note that you discussed with
12  Mr. Madoff trading strategies, right. It says
13  Mr. Madoff trading strategies. Can you tell me
14  what you discussed?
15      A.   So you're asking about the trading
16  strategies.
17      Q.   Yes, I am.
18      A.   So the trading strategies were
19  what strategies did Mr. Madoff use to invest
20  money on behalf of persons who entrusted him
21  with capital.
22      Q.   Right.
23      A.   Which at that time would have
24  been, you know, the single stock put underneath
25  the stock and the call above the stock and not

**Page 155**

1   the indices, and would have been perhaps, and
2   this is now guessing, maybe 30 names, maybe
3   less, maybe -- no, would have been less than 30
4   names actually at that time. And he was just
5   coming over toward the end of the period in
6   which he might want to do converts, but converts
7   had been things he had been trading, you know,
8   for a number of years prior to that. Converts
9   meaning convertible. Arbitrage meaning also a
10  strategy of long and short. Long and short
11  something that directly related to each other.
12      Q.   And you also say Mr. Madoff's
13  market making activities.
14      A.   Um-hum.
15      Q.   What did you discuss with
16  Mr. Madoff about his market making activities?
17      A.   Well, he referred to those market
18  making activities as his wholesale business in
19  which he was a wholesale broker for
20  institutional clients rather than, let's say,
21  individual clients. So they would be the
22  Fidelities and the Charles Schwabs in this
23  world. In fact, I think the next sentence, when
24  it says Mr. Madoff also explained that BLMIS
25  operated a significant wholesale business in

**Page 156**

1   which his customers included Charles Schwab and
2   Fidelity, I'm inadvertently repeating myself.
3       Q.   Yes.
4       A.   That's what he said at the time.
5   So he would have a very significant order flow
6   from, he always called them Charlie Schwabs, I
7   don't know if he was referring to the person
8   Charlie Schwab or that was just a nickname for
9   the company, and Fidelity.
10      Q.   Down below, if you travel down the
11  rest of this paragraph, and I'm reading from the
12  third line from the next-to-last sentence. It
13  reads: "His firm was a very dominant market
14  maker with an extraordinary share of the trading
15  and certain NYES stocks, particularly heavy
16  traded large cap stocks."
17      A.   Um-hum.
18      Q.   Did that -- the fact that he did
19  that, did that have any influence in your
20  thinking of evaluating Mr. Madoff as to how that
21  might impact his trading strategies?
22           MR. STEINER: Objection to form.
23      Q.   Do you understand my question?
24      A.   Not exactly.
25      Q.   Okay. In other words, why was it

**Page 157**

1   important, if you're investing with his trading
2   operation, why do you care about his market
3   making?
4       A.   So, again, this goes to early due
5   diligence.
6       Q.   Yup.
7       A.   And what was involved in that
8   process, that long process. So, generally
9   establishing a reputation or examining a
10  reputation that has been established is part of
11  that due diligence process. This is as compared
12  with, say, to we talked before about GMAC. This
13  is a different due diligence process, where it's
14  not people combing over, you know, bond
15  indentures.
16           It was important to me that Madoff
17  had a sterling reputation. It was important to
18  me that he was heavily involved in the industry.
19  It certainly was of significance to me that he
20  became the chairman of NASDAQ and that his
21  brother was the governor of NASDAQ. And those
22  things were accomplished through, in part, their
23  dominant market share in the wholesale business.
24  That's what -- that's one of the things that
25  Madoff was known for.

**Page 166**

1  charge you for that.  The government still pays
2  you something.  That may change, too, but that's
3  at the moment snapshot.
4       So every now and then I would say,
5  Bernie, we're going to miss the market, you
6  know, if this market's got to catch a rally,
7  whatever, whatever.  I learned over time that
8  his near term market timing sense was much
9  better than mine and that when he thought we
10 might catch a turn he was almost all the time
11 right and when we disagreed either about getting
12 in or getting out he was very often right.
13      He emphasized, I don't remember
14 this specific to the first conversation at all,
15 what I'm about to say to you, but he emphasized
16 certainly over time and maybe even at the first
17 conversation that the elements of -- no, the
18 indicators and the algorithms that helped create
19 his trading program, what you quote in here
20 trading strategies and I mean the same by that,
21 so I'll just say trading strategies rather than
22 to introduce a new phrase.
23      Q.    Understood.
24      A.    Were very much computer assisted
25 in the sense that he spent a lot of money on

**Page 167**

1  software that would help get a sense of market
2  movements from the order flow in the wholesale
3  business.  That's very different to my mind than
4  what you call skimming, and certainly to
5  front-running and, importantly as to your last
6  question, that his gut feeling about which way
7  the market was going to go controlled those
8  signals from his programs and rather than the
9  other way around.
10      In other words, it was a very large
11 sophisticated system that was subject to his, if
12 you want to put it somewhat, perhaps too
13 colloquially, his gut check.
14      Q.    As part of your -- this
15 interrogatory answer we're looking at, as part
16 of your due diligence, as I understand it, did
17 you as part of your due diligence ask for any
18 insight or transparency into the algorithm that
19 gave him the ability to have -- to time the
20 market?
21      A.    The ultimate expression of the
22 algorithm, ultimate expression of the algorithm,
23 is the tickets.
24      Q.    Right.
25      A.    In other words, the algorithm

**Page 168**

1  produced buys, presumably.  I mean, I'm
2  simplifying a little bit, but I'm not even so
3  sure I'm simplifying all that much.
4       Q.    I understand.
5       A.    So one of the important things to
6  me about Madoff, and this stayed the way
7  throughout time, is there are, there are money
8  managers who have had superb records over very
9  long periods of time.  Very, very low
10 volatility, two and three times Bernie's
11 absolute returns, from whom you simply get a
12 number at the end of the month, this is what we
13 did this month.  Then they don't tell you what
14 the positions are, they certainly don't give you
15 confirmations, don't give you copies of the
16 tickets.  And you literally get a telephone
17 number -- you either get a number off the
18 telephone, in the old days maybe you got a fax,
19 but that's all you saw.
20      In Bernie's case you had complete
21 transparency over the trading strategy.  That
22 is, there was not a trade that he did that you
23 didn't get your confirmation of.  And you
24 certainly got monthlies.  So that -- and we put
25 these up -- we posted these every day, to the

**Page 169**

1  extent there was a trade every day, and there
2  certainly wasn't, but we had an annual daily
3  report that showed us when we were in what the
4  positions were, where the bands were struck, how
5  the puts and the calls were doing, and we marked
6  the P & L to market every night.  That was on my
7  desk by, I don't know, quarter to five, five
8  o'clock in the afternoon.  Market closes at
9  four.  Sometimes they're earlier.
10      So, we had transparency as to
11 every single trade and that was very significant
12 to me.
13      Madoff's stature in the industry,
14 among customers on the wholesale business,
15 clients on the money management business, and
16 regulatorily speaking with NASDAQ and the SEC
17 was hugely important because he self-cleared.
18 In other words, at the end of the day it was
19 usually important because he's a -- these are
20 very important indices in any manager, but we
21 were getting tickets from him.
22      Q.    Did the market making operation
23 self-clear?
24      A.    The market making operation?
25      Q.    Right.

**Page 170**

1      A.    I was never a market making
2   customer.
3      Q.    Do you know whether it
4   self-cleared?
5      A.    So I don't know.
6      Q.    You don't know.
7      A.    Or if I knew, if I knew, I don't
8   remember.
9      Q.    Well, when he told you he
10  self-cleared at the investment advisory end, was
11  that a red flag to you?
12          MR. STEINER:  Objection to form.
13          MR. SIEV:  Objection to form.
14      Q.    They're objecting because I didn't
15  ask what a red flag is, so let's do that.
16      A.    I'm sorry?
17      Q.    They didn't like me using red
18  flag.  So let me ask you this.
19      A.    You just lost me for a second.
20      Q.    I know.  It's a lawyer thing, they
21  call it foundation, whatever.  You know what I
22  was talking about but the record doesn't.  In
23  any event --
24      A.    In the meantime you lost me, and
25  not them.  You really lost me.

**Page 171**

1      Q.    They're with me, they're having a
2   good time.
3          Anyway, the bottom line is this.
4   Do you know what a red flag is in terms of in
5   the investment advisory business, a red flag?
6          MR. SIEV:  Objection to the form.
7      A.    I'm not sure exactly what you
8   mean, but I take you to mean some sort of a
9   caution.
10      Q.    Okay.  Well, I don't want you to
11  take that from my question.  I'm asking you
12  independently of me saying that, does the term
13  "red flag" mean anything to you?
14      A.    Let me just be, perhaps, a little
15  bit clearer.  I'm not sure whether by red flag
16  you mean something that would be an absolute
17  bar --
18      Q.    No.
19      A.    -- or something that would be a
20  caution.  That's what I was getting at.
21      Q.    Let me rephrase it then.  That's a
22  very good point.
23          Something that would expose
24  something as a risk factor that needed to be
25  examined.

**Page 172**

1      A.    So you think a red flag means a
2   risk factor?
3      Q.    Yes.
4      A.    Okay, fine.
5      Q.    All right.  So, would you -- how
6   do you view self-clearing that, in terms of a
7   risk factor?
8      A.    Normally speaking?  Look, I had
9   accounts with persons who self -- with firms who
10  self-cleared for a long time.  If you go back
11  long enough, many more people self-cleared until
12  clearing was made part of the industry.
13          So clearing, which relates a
14  little bit to who has custody, presuming the
15  clearing broker has custody, is one of the
16  attributes that we didn't speak about all that
17  much in terms of prime broker, but when earlier
18  you had asked me what a prime broker is and I
19  said there's many many -- there's several
20  different attributes to them, custody is also
21  something that a prime broker has.
22      Q.    Right.
23      A.    So, one might think of somebody
24  who is a custodian as a prime broker by virtue
25  of that alone.

**Page 173**

1      Q.    Right.
2      A.    To this day, I sort of said this
3   earlier, if you have an account at Goldman
4   Sachs, the one I was referring to, this
5   hypothetical account this morning, you're gonna
6   clear at Goldman Sachs.  If you have an account
7   at Merrill Lynch, you're going to clear at
8   Merrill Lynch.  Merrill Lynch is not in the
9   business of giving the profitable clearing part
10  of their business away to Goldman Sachs, or vice
11  versa.  I don't say that with encyclopedic
12  knowledge, but that's not the way the business
13  works.
14          In Mr. Madoff's case, it was very
15  clear, he made very clear that the accounts were
16  maintained at his shop and the confirmations and
17  the monthlies that you received were on his
18  letterhead.  By letterhead I don't mean an 8-1/2
19  by 11 letter, but the tickets had his firm on
20  them.
21          That seemed to me to be a risk
22  factor to be weighed, but it was inconceivable
23  to me that somebody who had his prominence both
24  within the industry, to some extent his
25  legendary status in the industry, the sheer

**Page 174**

1 volume of business he did on the wholesale side,
2 that was always of interest to me.
3         These Fidelity and Charles Schwab
4 orders are sought after. They are the staff of
5 life to people who handle their business. And
6 Madoff was, I spoke to somebody at Fidelity,
7 that's what I mean as a customer at this time,
8 and got back very positive review, all part of
9 the due diligence process.
10         I spoke to investors of his,
11 clients of his as distinct from customers.
12 Clients on the market-making side at that time,
13 who I think are some of the single most able
14 people I've met in the investment business,
15 still think so. I still think that about some
16 of these people. And, you know, they all had
17 very positive things to say.
18     Q.    Do you know if Mr. Madoff paid for
19 order flow?
20     A.    Pay for order flow was a subject
21 of his over a number of years. It subsided over
22 time. The whole -- I'm moving ahead in time
23 frame, so if that's not where you want to go --
24     Q.    At the time you're doing your due
25 diligence here?

**Page 175**

1     A.    Initially.
2     Q.    Yeah, initially. Did you know at
3 that time that perhaps one of the reasons he had
4 the clients he did is because he paid for order
5 flow?
6     A.    I don't remember whether it came
7 up in the first meeting or two or not. I just
8 don't remember.
9     Q.    Did you subsequently learn that he
10 paid for order flow?
11     A.    I certainly know that payment for
12 flow was something that he said that he was open
13 to and did. I was not a wholesale customer, I
14 can't -- the way you worded the question, can I
15 confirm to you independently that he paid for
16 order flow, I cannot. I can only tell you what
17 he told me.
18     Q.    When you talked to Fidelity did
19 you talk about paying for order flow?
20     A.    Certainly not at that first
21 meeting.
22     Q.    Did you ever talk to him about it?
23     A.    Not that I recall.
24     Q.    Let's go back to clearing broker
25 again.

**Page 176**

1     A.    Um-hum.
2     Q.    Does Merrill Lynch clear trades?
3     A.    Does Merrill Lynch clear some
4 trades?
5     Q.    Yes.
6     A.    I would imagine so.
7     Q.    Do you have any knowledge that
8 they clear trades?
9     A.    I believe they do.
10     Q.    And they were cleared -- do you
11 know what the term "introducing broker" means?
12     A.    Not very precisely, no.
13     Q.    Do you know if introducing broker
14 clears trades?
15     A.    I don't know -- the answer is I'm
16 not sure.
17     Q.    When the person who clears the
18 trade -- like Merrill Lynch is clearing trades
19 for Madoff, let's assume that he was clearing
20 his trades through Merrill Lynch, right?
21     A.    I don't think he did.
22     Q.    No, no, but I'm asking you to
23 assume that he did.
24     A.    Okay.
25     Q.    You would know, would you not,

**Page 177**

1 that when you got a statement from Merrill Lynch
2 that they held a certain stock long that they
3 had that stock, would you not?
4     A.    I just don't follow. You're
5 saying now that I got a, let's say a monthly
6 statement from Merrill Lynch that Bernard L.
7 Madoff had bought a hundred shares from me and
8 that was held at Merrill?
9     Q.    Yes.
10     A.    I just don't see the nexus to
11 Bernie. I'm missing something.
12     Q.    If Bernie is using Merrill Lynch
13 to clear his trades. He's not clearing them
14 himself.
15     A.    I would have known -- I would have
16 known -- had Bernie cleared our account at
17 Merrill Lynch, I would have had statements from
18 Merrill Lynch that would have reported that
19 information to me, yes.
20     Q.    And would -- are there regulations
21 governing clearing brokers?
22     A.    I would think yes.
23     Q.    Are you familiar with them?
24     A.    Not terribly well, no.
25     Q.    When Bernie was clearing his own

**45  (Pages 174 to 177)**

**Page 178**

1   trades and sending you a statement that he held
2   a certain stock, did that mean he had the stock?
3       A.   If Bernie sent me a statement that
4   said that we own on your behalf these shares?
5       Q.   Yes.
6       A.   Again, your behalf means the
7   funds?
8       Q.   Right.
9       A.   So the customer was, say, Ascot,
10  not Ezra Merkin.
11      Q.   Right.
12      A.   I did not have separately a
13  managed account at Madoff's. My Madoff exposure
14  was through the funds other than the 61M at the
15  beginning.
16      Q.   Sorry, I'm speaking empirically
17  and I shouldn't. So, if Epcot got a statement
18  that said they held certain stocks and Bernie
19  told you he had those, would you really know
20  whether he had the stocks?
21      A.   Yes.
22      Q.   How would you know?
23      A.   He told me he had them.
24      Q.   Other than that, you had no
25  information?

**Page 179**

1       A.   I'm not sure what you're asking
2   me. How is it different than Merrill Lynch
3   telling me it has them?
4       Q.   Because it isn't Merrill Lynch
5   controlled as a clearing broker as to what it
6   has to do.
7       A.   I'm sorry?
8       Q.   As a clearing broker, does it not
9   have to hold the stock that it's clearing for
10  someone else?
11      A.   If Bernie self-cleared and we got
12  a statement from Bernie that said we own this
13  hundred shares -- I don't remember your example
14  anymore -- and we had a statement from Merrill
15  that said we owed -- we own, pardon me, the same
16  hundred shares, let's just say we like the
17  investment and we've given Merrill an order to
18  buy a hundred shares of one of the stocks in the
19  basket. And we have both of those monthly
20  statements in front of us at the end of the
21  month or in the beginning of the next month.
22  Why -- what -- why would I see those two
23  statements as being any different as to the
24  ownership of those shares?
25      Q.   Well then why doesn't everybody

**Page 180**

1   self-clear?
2       A.   Because it's expensive to
3   self-clear unless you get to a certain critical
4   mass of capital. That's why most people -- not
5   most. Many people have moved out of the
6   self-clearing business and because there are
7   clear significant economies of scale in
8   self-clearing and you can clear less expensively
9   per trade for a very large group of customers
10  than an individual customer may be able to do
11  for himself.
12      Q.   Is it not true that the risk
13  factor for self-clearing is self-dealing?
14      A.   The risk factor for self-clearing
15  I would say is -- this goes back to what we
16  talked about a little bit before. One of the
17  attributes of prime brokerage is custody and
18  clearing. So, if the firm that has custody of a
19  hundred shares goes under, right, you have risk.
20  You're an unsecured creditor of that firm. So
21  you care about the credit quality of the firm
22  that owns your -- that holds your securities for
23  you.
24      Q.   Right.
25      A.   This was a huge issue in '08 when

**Page 181**

1   there was systemic risk everywhere, people
2   worried about contra-party risk.
3       Q.   When you heard that Bernie
4   self-cleared -- keep calling him that but we
5   know who I'm talking about. Mr. Madoff
6   self-cleared.
7       A.   Yeah, yeah, fine. You made that
8   very clear from the beginning.
9       Q.   Did you do a credit analysis of
10  Madoff's organization to give you comfort with
11  regard to that?
12          MR. STEINER:  Objection to form.
13      A.   I think we looked into one or two
14  things. I don't remember the specifics at the
15  time, but whether it was then or later, but we
16  tried to develop a sense of what his regulatory
17  capital was in his business.
18      Q.   And what does that mean, tried to
19  develop a sense of his regulatory capital?
20      A.   Asked them and tried to look at
21  filings, you know, thereabout, as to that
22  subject.
23      Q.   Did you ever ask to look at his
24  focus reports?
25      A.   I don't remember.

**Page 182**

1      Q.    Did you ever look at his focus
2  reports?
3      A.    I don't remember.  Certainly
4  discussed his focus reports.  I'm not sure I
5  discussed the focus reports with him with them,
6  with the focus reports, or just discussed them
7  with him without the focus reports.
8      Q.    Did it surprise you to learn that
9  his focus reports never reported the IA
10  business?
11          MR. STEINER:  Objection to form.
12      A.    I don't know.  I don't know
13  whether I knew that or not.  I can't remember
14  whether I knew that or not.  I think he
15  discussed them -- there's one conversation I
16  have in the back of my mind which was not then
17  which would -- which would not necessarily make
18  that a surprise.  I just truly don't remember.
19      Q.    My colleague points out that you
20  keep using the term "we."  I wasn't picking up
21  on that.  When you say "we" with regard to this,
22  Mr. Merkin, did anybody assist you with regard
23  to this endeavor to do due diligence on Mr.
24  Madoff?
25      A.    Back there at the first meeting?

**Page 183**

1      Q.    Yeah.
2      A.    Probably at the first meeting it
3  was me, myself and Mr. Madoff.  Subsequently,
4  certainly once we had made investments, Mike
5  Autera who runs my back office was on the phone
6  and participated in meetings at the Madoff
7  office and had his own phone calls with
8  certainly one of the persons in the Madoff
9  organization.
10          And the overall due diligence
11  process goes far beyond, at least in my head,
12  goes far beyond me.  The discussions with
13  investors over time, you know, the ongoing work
14  on the confirmations, the trips to his office
15  with investors, the visits there, their
16  questions of him, their questionnaires to us
17  about him, visits there in the office was part
18  of the due diligence process that makes "we" not
19  figurative, but it involves a number of
20  different people.
21      Q.    I understand that, but I was
22  talking specifically about your organization,
23  whether it's GCC, which didn't exist at that
24  point, as I understand it; is that correct?
25      A.    There was probably a management

**Page 184**

1  company then.  It might have not had that name.
2      Q.    Maybe it was Ariel Capital Corp.?
3      A.    Might have been Ariel Capital
4  Corp.
5      Q.    My question is just that.  I'm not
6  talking about other people who were investors
7  you may have talked to and other things.  My
8  question when I said "we," is there anyone else
9  within your organization, like Mike Autera, who
10  did due diligence with regard to the investments
11  in Mr. Madoff?
12          MR. STEINER:  Object to the form.
13      A.    By Mike I mean Mike Autera.  Mike
14  came with me to the office, to the Madoff
15  office, bringing investors to the Madoff office
16  and listening to their questions and his
17  answers, big part of the due diligence process.
18      Q.    I understand that and I appreciate
19  that testimony.  My question very specific
20  was --
21      A.    You're saying not including that?
22      Q.    Yeah, not including any of them.
23  Who, if anyone, in your organization, whether it
24  was Ariel or Gabriel Capital Corp., did due
25  diligence with regard to BLMIS?

**Page 185**

1      A.    The Madoff relationship in our
2  organization was heavily managed by Mike and me.
3  I'm not saying to the absolute exclusion of
4  everybody else, but it was basically Mike and
5  me.
6      Q.    Let's just go back just to that
7  last answer, the penultimate answer, actually.
8  That is, when you say you went to Mr. Madoff
9  with other investors and you talked to other
10  investors, did that -- well, let me start first
11  with the other investors.  The other investors,
12  did they know anything more than you knew?
13      A.    From time to time, sure.
14      Q.    What did they know, they told you
15  that you didn't know from talking to Mr. Madoff?
16      A.    I think from time to time they had
17  insights into the process that I might have
18  learned of from them in the first instance.
19      Q.    Such as?
20      A.    Than from him.
21      Q.    Such as?
22      A.    I'm not sure.  There's
23  something -- if you leave that question with me
24  I'll try to come up with something more
25  concrete.

**Page 186**

1    Q.   We'll come back to it. What I'm
2  looking at is, by talking to others and by
3  bringing people to talk to Madoff, was there
4  anything different going on there than you just
5  talking one on one with Madoff?
6        MR. SIEV: Objection to the form.
7    A.   There might have been -- if you
8  meet somebody for the first -- I talked to
9  Bernie somewhere between 10 and 15 times a year.
10 Spoke or met with him between 10 and 15 times a
11 year for many years.
12   Q.   Right.
13   A.   I'm going to say roughly, very
14 roughly once a month. It wasn't always every
15 month and those 10 or 15 times were not
16 separated by the same amount of time every
17 week -- every conversation. But the importance
18 of listening to Bernie present what he did to
19 someone who met him for the first time is always
20 helpful. Because you don't refer to things you
21 talked about five years ago or seven years ago
22 or last week, and it's not -- it's less
23 conversational and it's an introduction to a
24 fresh pair of eyes, a fresh pair of ears, a
25 thinking head and a critical acumen, and that

**Page 187**

1  can be very, very, very additive.
2    Q.   You indicated -- I'm sorry, I'm
3  moving around. I'm going to page 5 of this
4  document, 354. Down in the last paragraph.
5    A.   Just one second.
6    Q.   Sure, take your time.
7    A.   Just trying to get there. Sorry.
8    Q.   It's a paragraph that starts,
9  "Mr. Merkin also knew." And if you travel on
10 down, you start -- you discuss the SEC. I want
11 to be sure I don't miss something here. Sorry,
12 I might have jumped over something.
13   A.   It's okay.
14   Q.   Boy, your memory place tricks
15 here.
16   A.   Would you say that for the record,
17 please.
18   Q.   I would readily admit it to the
19 jury. Just ask Brian Williams.
20       Let's go back to page 5 and the
21 SEC.
22   A.   Last paragraph?
23   Q.   Yeah, last paragraph. I'm going
24 to just read it. "In one of their many
25 conversations, Mr. Madoff reported that the SEC

**Page 188**

1  had visited BLMIS's offices to conduct reviews
2  eight times in 16 years, and that gave you
3  additional comfort about Mr. Madoff's bona
4  fides." Do you see that?
5    A.   I do.
6        MR. STEINER: It wasn't exactly a
7  correct reading, but close enough.
8        MR. SHEEHAN: All right. I stand
9  by the record, not by what I said, all right?
10 Just suggesting a question.
11   Q.   But can you tell me what you
12 discussed that gave you comfort?
13   A.   Unless I'm missing, it says -- the
14 specific reference to the SEC reviews?
15   Q.   Yes. Did he tell you what they
16 did?
17   A.   Oh. I thought you were saying
18 something about the comfort.
19   Q.   No.
20   A.   He had either scheduled or
21 surprise visits from the SEC with some
22 regularity and some frequency, perhaps more on
23 the regular than on the surprises. He was very
24 proud of his overall compliance record and just
25 sort of a clean bill of health with occasional

**Page 189**

1  references to one or two smaller things, and it
2  certainly meant a great deal to me that the SEC,
3  with the power of subpoena, with the ability to
4  spend days at the firm, which is how he
5  presented it, came away and said, you know,
6  thank God for Bernie. And that was very
7  significant to me.
8    Q.   My question, though, was, maybe I
9  wasn't clear so I'll restate it.
10       Did he tell you what exactly the
11 SEC did during these visits?
12   A.   Yeah. He -- his operation was
13 reviewed by the SEC. It is my memory on the --
14 on what I thought of as the two sort of aspects
15 of the business.
16   Q.   What I'm asking you for is
17 specifically, for example, did he tell you that
18 they asked for access to DTCC to verify the fact
19 that he had the stock he said he had?
20   A.   I don't remember that
21 conversation.
22   Q.   Did he ever represent to you that
23 that happened?
24   A.   I truly don't remember.
25   Q.   Okay. Page 6 if you would,

**Page 190**

1  Mr. Merkin, I'm sorry.  It's the last paragraph.
2  Why don't you read the whole thing because I'm
3  going to ask about this.
4       A.    You want just that bottom
5  paragraph, right?
6       Q.    Yes.  "Another important part" it
7  starts.
8       A.    Got it.
9            Okay.
10      Q.    The first sentence states, I'm
11 just going to read it and I'll try to do a
12 better job this time:  "Another part of
13 defendant's due diligence in monitoring of the
14 fund's investments was the annual audit of the
15 fund's financial statements conducted by BDO."
16           Can you explain to me how auditing
17 your own financial statements was due diligence
18 with regard to Mr. Madoff.
19           MR. STEINER:  Objection to form.
20 Also separate from that, you left out the word
21 "important."
22           MR. SHEEHAN:  I'm sorry.  Such a
23 poor reader.  My reading comprehension was never
24 good.
25      Q.    But anyway, do you understand my

**Page 191**

1  question or do you want it read back?
2           MR. STEINER:  We'll stipulate.
3           MR. SHEEHAN:  Thank you.
4       A.    Let me make sure I understand the
5  question.  Why was BDO's audit of our fund's
6  financial statements, right, part of my due
7  diligence?
8       Q.    With regard to Mr. Madoff.
9       A.    I'm not sure I understand your
10 question.
11      Q.    Well, it says here that they
12 audited the funds, meaning your funds, financial
13 statements.  How does that provide you an
14 insight into -- or provide you with due
15 diligence into what Mr. Madoff is doing?
16      A.    Because of the following
17 sentences.  BDO was given unfettered access to
18 GCC's employees and records, they reviewed and
19 tested trade confirmations and monthly
20 statements and were in direct contact with the
21 Madoff organization.  That's how I read BLMIS,
22 as distinct from Madoff.  Or perhaps in addition
23 to.  Concerning the value of the fund's
24 investment.
25           It's a form of review and due

**Page 192**

1  diligence.  You want to make sure that there's
2  an auditor that's confirming the existence of
3  these trades, and you have an auditor saying
4  that these trades took place and that to the
5  extent that they satisfied themselves regarding
6  testing and whatever they needed to be
7  communicated to them regarding these trades from
8  the Madoff organization, they got.
9       Q.    How -- I'm sorry.
10      A.    So that's very, very important.
11 You have a third party who does this for a
12 living, who confirms the trades.  The existence
13 of these trades.  They got whatever they needed.
14 Whatever they asked for they got.  They were not
15 told that they couldn't ask for anything else.
16 They were not told that they could only ask for
17 this.  Part of that process included a review of
18 his auditor.  They were accountants, they didn't
19 raise any issues about his auditor.  So a very,
20 very important part of the whole process.
21      Q.    Did --
22      A.    And in general if you're an
23 investor in funds, just to add so it isn't so
24 Madoff specific, you want to see an audit on a
25 fund.  It's always part of the due diligence.

**Page 193**

1  You'd much rather have an audited figure than an
2  unaudited figure.
3       Q.    I understand that.  But what I'm
4  asking you is how does looking at your trade
5  confirmations and the monthly statements you
6  received confirm the fact that he was actually
7  executing the trades?
8       A.    Because they had to confirm the --
9  they had to take whatever steps they needed
10 vis-à-vis the Madoff organization to confirm the
11 existence of those trades.
12      Q.    And what did they do?
13      A.    Whatever an accountant or an
14 auditor is supposed to do in the performance of
15 their function.
16      Q.    Do you have any idea what they
17 did?
18           MR. STEINER:  Objection to form.
19      A.    In terms of the audit?
20      Q.    Yes, in terms of the audit.
21      A.    I have -- this is an issue that
22 has, where I really have to draw a distinction
23 between what I remember now -- what I remember
24 now of what I remember from then and what has
25 come up in the six-ish years since then, because

**Page 198**

1        MR. STEINER:  We don't even need
2   tomorrow.
3        MR. SHEEHAN:  Barely scratched the
4   surface.  Sorry, Mr. Merkin.
5        THE WITNESS:  There's nothing to
6   apologize for.
7   BY MR. SHEEHAN:
8        Q.    One question I should ask,
9   probably been asked of you many times, but were
10  there any documents exchanged at this meeting,
11  this initial meeting with Mr. Madoff?
12       A.    Who remembers?  Not me.
13       Q.    Did you make any notes of the
14  meeting or anything like that?
15       A.    I truly don't remember.
16       Q.    Just had to ask.  Could be these
17  golden notes hanging around if we don't ask, we
18  don't get it.  That's how Neil is.
19       MR. STEINER:  Must be some other
20  Neil.
21       MR. SHEEHAN:  Yeah, exactly.
22  You're such a cupcake.  Anyway.
23  BY MR. SHEEHAN:
24       Q.    We talked about this a little bit
25  before, but I've never asked you one of these

**Page 199**

1   questions.
2        We talked about the fact that for
3   a while he was in a single stock with a collar
4   and then he went to an index strategy.  Do you
5   know why he did that?  Were you part of that
6   process in any way?
7        A.    We certainly talked about it when
8   he did it and he certainly didn't do it without
9   asking first.
10       Q.    Yes.
11       A.    I think he thought that he had the
12  potential for capturing a relationship among
13  those three pieces.  I remember one of those
14  pieces is multi-pieces.
15       Q.    Right.
16       A.    Meaning the only ex-put, the only
17  ex-call and the basket.  So the move to the
18  basket was to give him the ability to catch, to
19  trap an arbitrage certain price relationships
20  that were more multiple, therefore more
21  sophisticated, therefore more subtle than
22  strictly the stock, the put and the call.
23  Because it was one dimensional in a way compared
24  to the two-dimensionalness of I've got the
25  basket to work with against -- I've got the

**Page 200**

1   basket to work with against the index as a
2   whole.  And then I've got the options on top of
3   that.
4        Q.    Time slicing, do you have an
5   understanding of that term?
6        A.    Only very recently have I come
7   across an understanding of that.  So as I sit
8   here today I think I'd probably know what it's
9   referring to, although it's not a phrase I think
10  I -- that's assuming that I'm correct, then I
11  have some idea of what it is.  I could be wrong.
12       Q.    Let's deal with what you know
13  right now and then we'll travel back in time.
14       A.    We'll time slice.
15       Q.    We're time slicing.
16       What do you understand --
17       A.    It may just be jargon for getting
18  out over a longer period of time than otherwise.
19  In which case I might just say getting out over
20  a longer period of time than otherwise, instead
21  of time slicing.
22       Q.    Do you know if Mr. Madoff executed
23  trades using time slicing?
24       A.    Did he do what?
25       Q.    Executed trades using time

**Page 201**

1   slicing?
2        A.    Using time slicing the way I just
3   said, getting out over a long period of time?
4        Q.    Yes.
5        A.    If it means what I think it means,
6   that he didn't get all in or all out in one
7   trade but might have done it in several trades
8   over several days, sort of multiple bites at the
9   apple rather than one chomp --
10       Q.    Yes.
11       A.    -- then I would say yes.
12       Q.    When he's buying in a particular
13  day, is he buying -- to your understanding of
14  watching his strategy and you say you did this
15  P & L and looked at the trades, right?
16       A.    Yes.
17       Q.    We'll get to that in a minute.
18  Did he execute or do the trades at one time
19  during the day or during the course of the day?
20       MR. STEINER:  By the way, I assume
21  for all of this you're asking what Mr. Merkin
22  believed Mr. Madoff was doing at the time
23  because we all, because we all know now --
24       MR. SHEEHAN:  Oh, yeah, we all
25  know that nothing was happening.  But the point

**Page 210**

1    A.    I remember the industry changing.
2  I don't remember when it was.
3    Q.    Do you have an understanding of
4  the term "decimalization"?
5    A.    As you used it now, I think you're
6  referring to quotation of stocks in decimals,
7  rather than in fractions.
8    Q.    Right.  In the old days they would
9  trade them in steenths, would you agree?
10   A.    In the old old days, they'd trade
11 them in 30 seconds, but I think --
12   Q.    I'm not that old.
13   A.    -- 30 seconds were reduced to
14 steenths.  They were also called teenies.
15   Q.    Yeah, exactly.  To your knowledge,
16 to your knowledge, did the changeover to the
17 decimalization have an impact upon the market
18 making platform of Mr. Madoff?
19   A.    I had conversations with
20 Mr. Madoff about the impact of decimalization.
21 I don't remember them very carefully as a topic.
22 I'm not sure it came about -- I'm not sure it
23 focused on the market making stuff.
24        The market making -- I just don't
25 remember.  I don't remember such a conversation.

**Page 211**

1  I remember conversations about decimalization,
2  but I don't remember something about the market
3  making.
4    Q.    This may be drilling down too far,
5  but in any event, see if you would agree with
6  this statement.  After decimalization, in order
7  to make money you had to act as an agent, not as
8  a principal, would you agree with that?
9    A.    In what line of endeavor?
10   Q.    In trading, market making of
11 stocks.
12   A.    And before that as a principal?
13   Q.    Yes.
14   A.    Run it by me again, I'm sorry.
15   Q.    Okay.  Let me just drop it.  I
16 think I'm going into an area that's just of
17 interest to me but probably doesn't mean much
18 anyway.
19   A.    Okay.
20        THE VIDEOGRAPHER:  Off the record,
21 3:18.
22        (Recess taken.)
23        THE VIDEOGRAPHER:  We're back on,
24 3:40.
25 BY MR. SHEEHAN:

**Page 212**

1    Q.    Earlier today we were talking
2  about monitoring due diligence.  My question is
3  did you ever do monitoring due diligence on
4  BLMIS, on behalf of any of your funds?
5    A.    Yes.
6    Q.    What did that monitoring due
7  diligence consist of?
8    A.    Some of these things we have
9  talked about before the break and perhaps even
10 before then, but if one is approximately 10 or
11 15 conversations a year, conversations either in
12 person or on the phone, were meant to continue
13 to monitor and continue to perform due
14 diligence.
15        I just want to make sure he's
16 okay.  Yes, he is.  Are you okay?  Okay, sorry.
17 I thought you had a problem.
18        Was a form of continuing due
19 diligence on the Madoff organization and the
20 organization of the Madoff function.  That is,
21 we didn't just get on the boat, wave farewell
22 after we started investing.  There were
23 numerous, numerous conversations.
24        Madoff's role in the affairs of
25 Yeshiva University was such that I was likely to

**Page 213**

1  bump into him then a couple times a year for
2  that.  And there was always or almost always an
3  opportunity to ask him something that I wasn't
4  sure about in terms of where the strategy --
5  whether it had been executed properly or where
6  the strategy might be headed to next.
7        Madoff's continued and growing
8  success and prominence in the securities
9  industry was very significant.  He did end up in
10 the position he achieved at NASDAQ, as its
11 chairman, and he went to Washington for hearings
12 for testimony.
13        I remember an occasion when he and
14 the president of the stock exchange and a former
15 chairman of the SEC were basically the three
16 persons who congressional committees wanted to
17 speak to.  That all goes to various and
18 different forms of due diligence.
19        Continued to talk to investors,
20 continued to talk to investors of his not
21 through us, who I thought were thoughtful and
22 insightful investors, bringing investors to see
23 him was a big part of what we were after.
24        Various events that took place in
25 the securities industry mattered to me a great

Page 214

1  deal.  Not at the very beginning but closer to
2  then than the end the way an accounting firm
3  called Avellino & Bienes' pool was unwound by
4  the SEC's regional administrator in New York,
5  all the assets, or very substantially all the
6  assets to be managed at Madoff and with the very
7  clear reassurance from the SEC that every penny
8  was properly accounted for, was a very important
9  piece of information.
10         It meant that the SEC, which had
11  every reason to look especially careful,
12  especially carefully at a fund that had been put
13  together that had clear legal issues, forcing
14  the liquefaction of the fund and putting the
15  fund out of business was basically saying we
16  found the fund to be managed by Madoff and we
17  were very, very happy to tell you that
18  everything is there.
19         There was a quote from Richard
20  Walker who was then the regional administrator
21  in an article in the Wall Street Journal, and it
22  was very important.  The development of
23  something called Primex, which was a trading
24  platform, that was to be managed by Madoff.
25         Madoff didn't really look for

Page 215

1  partners in trading platforms but at some point
2  Primex first started with I think two partners.
3  Might have been two of the following four:
4  Goldman, Solomon, Merrill and Morgan.  Hard to
5  imagine a better or stronger quartet from the
6  street.  They were the four horsemen, with all
7  acknowledgements to Grantland Rice, and not
8  people quick to put their name as a partner of
9  somebody in a Wall Street trading vehicle had
10  they not completed due diligence.
11         If you want to do something and
12  joint venture with Goldman Sachs and you get
13  Goldman Sachs to put their name on your trading
14  platform, you've gone through a very, very
15  extensive vetting process and vetting is not
16  very different from due diligence in certain
17  phases of it.  That was true about Goldman, that
18  was true about Morgan, that was true about
19  Merrill, that was true about Solomon.
20         All these things happened
21  subsequent to the beginning and therefore sort
22  of fit in in terms of followup and managed due
23  diligence.  That's all critically important in
24  terms of what happens to -- you know, what
25  happens to him and what his role is in the

Page 216

1  securities industry.
2         So you've got competitors who feel
3  that they partner with him, you've got customers
4  who are saying very nice things about him, and
5  you've got clients who are saying very nice
6  things about him.  Plus the overall process of
7  the returns, the tickets, the confirmations, the
8  audits from Beidman, from BDO Seidman, are all
9  very, very critical.
10         I would say high on, high on
11  certainly my list of things were redemptions.
12  When we wanted money back, I said, Bernie, I
13  need -- I'm just making up a number, I need $60
14  million the next time we're in cash or at the
15  end of a quarter or at the end of the year.
16  Never a word.  The monies always came back, they
17  always tied to the penny to what we had on our
18  last monthly statement so there was not a
19  discrepancy between what we got back and the
20  valuation of the account.  So, in other words,
21  it netted correctly.
22         I don't think Mr. Madoff ever
23  asked for more time.  I don't think he ever
24  asked me to wait longer.  He certainly never
25  asked me to raise money for him.  Certainly

Page 217

1  never asked me to give him more money.  And it
2  was certainly a lot easier to get money out than
3  it was to get money in.
4         If -- I had suggested to him from
5  time to time that we would like to increase what
6  we were doing, either because Ascot was growing
7  or because the allocations were going to be run
8  a little differently, you would get push-back.
9  Sometimes the push-back would, you know, he
10  would relinquish and he'd give in and take the
11  money and sometimes he said you have to wait or
12  I'm not ready for it or my traders are not ready
13  for it.  But he would -- it was always easier to
14  get money out than to put money in and that to
15  me is a very positive sign.
16         The times of the redemptions, the
17  fact that they showed up on the day promised, in
18  the amount promised, everything reconciled, to
19  me a very, very positive sign about the way a
20  man runs his business.  So those were all parts
21  of the ongoing due diligence.
22      Q.    You I think mentioned this
23  earlier, Portfolio Management System, do you
24  remember?
25      A.    Portfolio management?

**Page 230**

1  with me?
2        Q.    Yes, I am.
3        A.    And then if you flip to the very
4  last page, in principle what you'll see is the
5  market value, the daily P & L, which in this
6  particular case is either zero or not filled in,
7  but if we were all in treasuries, the daily
8  P & L would be either very little or quite
9  possibly zero or, at least as a possibility, not
10 filled in.  But it wouldn't be extraordinary if
11 you had a portfolio full of three-month
12 treasuries that there was literally no P & L
13 that day.
14        Then there's the monthly P & L,
15 which we previously discussed, the quarterly
16 P & L and the annual P & L.  The annual
17 meaning -- not the annual.  The year-to-date
18 P & L.
19       Q.    I have another document I want to
20 mark here but I want to ask this one question.
21 When we see the treasuries, in fact they
22 actually start on the -- they're actually
23 throughout.
24       A.    Well, on the bottom of the --
25 little bit at the bottom of the page 2, then

**Page 231**

1  they go to page 3.  Then page 4 is just the
2  summaries.
3       Q.    Right.  Okay.  Let me ask this
4  question first.
5        If we look on the last page, this
6  one, and we look at the --
7       A.    The fourth page in the packet.
8       Q.    Thank you very much.
9        Market value, see it has 484
10 million?  Do you see that?
11      A.    Yes.
12      Q.    What does that represent?
13      A.    In all likelihood, without looking
14 further, the market value of the existing
15 positions that we have.
16      Q.    And where would you get that
17 number from?
18      A.    What does that mean?
19      Q.    In other words, did Mr. Madoff
20 tell you what the value of those T-bills was and
21 you --
22      A.    This is our PMS again.
23      Q.    I understand.
24      A.    So we -- this looks like it was
25 compared to a Madoff statement.

**Page 232**

1       Q.    Okay.
2       A.    So my guess is that November 29th,
3  2002, that in 2002, November 29th was a last
4  business day.
5       Q.    Right.
6       A.    Not a terrible hypothesis.  It has
7  a two out of -- well, I guess potentially one
8  out of seven chance.  But at any rate, what I'm
9  saying is that it's a -- chances are actually
10 high, but that's the last business day.  This
11 comes -- this is a very important piece of
12 information to us and it's a perfectly good
13 example of significant ongoing due diligence
14 because what we're saying here is that our PMS,
15 which created this value, agrees to their last
16 monthly statement as to the terms of the total
17 assets.
18      Q.    Okay.
19      A.    That's what I read this
20 handwriting to say.  And I can just tell you
21 that that handwriting is not mine and I don't
22 know whose it is.  I don't recognize the
23 handwriting.
24      Q.    And forgive my ignorance as I plow
25 through this, but what I'm looking for four

**Page 233**

1  hundred --
2       A.    Mr. Sheehan, so we're on the same
3  page.  I'm on this page.  Am I on the wrong
4  page?
5       Q.    No, I'm on this page.
6       A.    Just want to make sure.
7       Q.    Says October something or other.
8       A.    It's 230 on the bottom right-hand
9  corner?  I just have this uneasy feeling --
10      Q.    230.  We're totally in sync here.
11      A.    Okay.
12      Q.    Okay.  So, what I'm trying to --
13 let me just state it plainly and then if I have
14 to rephrase it, I will.
15       Is the 484 million, I'm leaving
16 out some of the other digits, is that a number
17 that you arrived at independently from the
18 materials given to you by Mr. Madoff?  In other
19 words, do you go into the market and say if he
20 bought treasuries today, this is what he would
21 have gotten?
22      A.    I believe that that is a number
23 that we would have arrived at.  We have put in
24 prices.
25      Q.    Right.

**Page 234**

1    A.    For all these treasuries.
2    Q.    Yup.
3    A.    The individual treasury
4  description, if I may use the word describe to
5  mean description, and the amount we're getting
6  from confirmations.
7    Q.    Okay.
8    A.    We are pricing these securities
9  ourselves.
10   Q.    So you're marking them to market
11 by going to where?
12   A.    I didn't mark these sheets and I
13 didn't perform that function.  But marking a
14 three-month treasury is not a difficult
15 undertaking.
16   Q.    I'm not suggesting it's rocket
17 science.
18   A.    You can get it from any number of
19 places and a -- three-month treasuries are
20 marked very tight, .000 something.  It's not any
21 different than my saying to you to pick a stock
22 on the front page.  If you asked me to mark
23 Coca-Cola, it isn't hard to mark Coca-Cola at
24 the end of the day.
25   Q.    I understand that.

**Page 235**

1    A.    You get a pricing service, it's
2  silly to speculate, my guess is we used Morgan
3  Stanley pricing service because that sometimes
4  also relates to when, if you have a prime
5  brokerage, in addition to things we talked
6  about, things like clearing and custodial and
7  money in and money out.
8        So we ran this past -- let's just
9  assume that that's right because it just doesn't
10 make that big a difference if it's wrong.  Let's
11 just assume it was done off of Morgan Stanley's
12 pricing run.
13   Q.    Yeah, I'm good with that.
14   A.    So we then have to do a pretty
15 significant adding function and say this is the
16 total value of the account.  That number is
17 produced by us very possibly a day's antecedent
18 to our receipt of the monthly statement, but
19 certainly independent of it.
20   Q.    Okay.
21   A.    So the fact that it squares, the
22 fact that we've done the comparison and this
23 page 4, this page that ends 230.
24   Q.    Yup.
25   A.    The one that we discussed

**Page 236**

1  previously.
2        So what this note is saying is --
3  and I can just tell you, if you've ever added
4  rows of columns, one of the things you start to
5  do is put check marks in or if you ever checked
6  and said --
7    Q.    Sure, of course.
8    A.    So we're saying this thing agrees
9  in two ways.  We're saying that the November
10 29th, '02 value is the 484 plus that you
11 previously read out loud, right?
12   Q.    Right.
13   A.    And we're saying that the 433
14 number that you see --
15   Q.    I see it.  It's net, looks like.
16   A.    I'd have to study this a little
17 bit more, but there's a second agreement.  If
18 you take the difference between the 433 and the
19 484, and you'll agree with me that that's
20 roughly 51 million.
21   Q.    Yes.
22   A.    That's the 51 million you see in
23 the right-hand corner box, I believe.  I
24 believe.  I'm not sure.
25   Q.    Okay.

**Page 237**

1    A.    Okay.  So, there's also what we
2  call a -- we are comparing and reconciling so it
3  works that way as well.
4    Q.    Um-hum.  I think one last
5  question.
6    A.    Sure.
7    Q.    Is the -- say you were using the
8  Morgan Stanley to check the prices?
9    A.    Pricing service, right.  It's a
10 computer run.  They just give --
11   Q.    I understand.  But is that
12 reflected anywhere on the PMS?
13   A.    Is what reflected?
14   Q.    The price that they had to show
15 it's the same.
16   A.    I'm sorry?
17   Q.    In other words, you're taking the
18 prices from the confirmations and you're putting
19 them on the PMS, right?
20        MR. STEINER:  Objection to form.
21   Q.    I thought that's what you said.
22   A.    I'm saying for starters we take
23 the quantity of the security, the description
24 and the cost that we -- that it cost us, that we
25 bought it for.

Page 238

1    Q.    Right.
2    A.    That's our cost.  There's nothing
3  we can do about that.
4    Q.    Exactly.
5    A.    It's what's on the confirmation.
6    Q.    Right.
7    A.    We then price it and every single
8  day and there's -- there either is or isn't a
9  P & L that day.  Most days there is.  It's very
10  rare that there's zero -- it's just too calm a
11  scene if it's to have no movement.  Then at the
12  end of the month we are in a position to develop
13  a monthly P & L.
14          This looks like I'm hypothesizing
15  is the following:  Both a last day of the month
16  and a period in time in which at the last day of
17  the month we had -- we were not in, we were out.
18    Q.    Um-hum, I understand that.
19    A.    I'm not sure that that's true.
20  I'm pretty sure it is true, in other words I'm
21  not swearing it's true, but I think both of
22  those things are likely to be true for me to
23  make sense of this particular PMS.
24          So therefore you just don't see a
25  lot of P & L that day and since it's the last

Page 239

1  day of the month, you see attempts to reconcile
2  it, compare -- well, compare, reconcile and
3  agree.
4    Q.    So why are you comparing and
5  reconciling?
6    A.    Because it's $485 million, it's a
7  lot of money and that's what we do as part of
8  our daily due diligence.
9    Q.    And you would therefore go to a
10  third party for comparison, like Morgan Stanley?
11    A.    For pricing.
12    Q.    For pricing.
13    A.    Right.
14    Q.    Right, okay.  And would you do the
15  same for stocks?
16    A.    Yes.  You just happened to show me
17  one that's --
18    Q.    Perfect segue, right here.
19    A.    We could do this on television
20  together, we can do this, you know...
21    Q.    I think we'll just stick to this
22  right here.  I think I peaked.
23    A.    Is that in this stack or yet a
24  different stack?
25          (Exhibit Trustee 359 marked for

Page 240

1  identification.)
2    Q.    Mr. Merkin, I'm going to hand to
3  you, let me rephrase that, Trustee Exhibit 359
4  which has as its Bates numbers GCC-SEC 0040626
5  and the last page is GCC-SEC 0040690.
6          Now I'm handing it to you.  Take a
7  look at that.
8          MR. SONG:  This has been
9  previously marked as Autera Exhibit 106.
10    Q.    Once you've had a chance to look
11  at it, I want you to do the same thing for me
12  that we did earlier, and that is to go across
13  the top column.  There seems to be some
14  additional information here so I thought maybe
15  you could help us by telling us again what's
16  under each one of these.  For example, I think
17  we now have a market value in the daily P & L,
18  which I don't think we had before.
19    A.    You picked an historic day.
20    Q.    Indeed.
21    A.    Do you know why?
22    Q.    It was --
23    A.    I wasn't trying to put you on --
24    Q.    No, well, I do know this is the
25  last day for which the 11/30 statements probably

Page 241

1  reflected.
2    A.    But it's also 11/30/08.
3    Q.    Right, I know.  About eight days
4  before the end date.
5    A.    Right.  So it's certainly the last
6  monthly statement that we produced.
7    Q.    Yes, correct.
8    A.    That we thought was 100,000
9  percent bona fide and authentic.
10    Q.    Right.
11    A.    And wasn't.
12    Q.    Yes.
13    A.    Despite our 100,000 percent view.
14          You know, after years and years
15  and years of looking at these things every day
16  and every month, it's just -- it's still amazing
17  to think what happened.  But it's an historic
18  thing because it's the last monthly statement,
19  that now means things in litigation and had
20  no -- nothing to do with nothing.
21    Q.    Correct.  And at a break I'll tell
22  you an anecdote that fits right into that.  But
23  let's go back to the document which is 359.
24    A.    Mr. Sheehan, you are looking at
25  something that I would call in portrait and I'm

61  (Pages 238 to 241)

**Page 254**

1     Q.   What do you understand a trading
2  authorization directive to be?
3     A.   Okay.  It's not -- is the prior
4  page part of this?  Is that your sense of it?
5     Q.   Not really, but it could -- I
6  think they're probably -- probably connected,
7  yeah, I would think so.
8     A.   I'm trying to figure out what this
9  has to do, if anything -- it starts on October
10  22nd.  Isn't that much earlier than the November
11  5th, the November 5th, to do things that
12  looks -- purport to do things that are very
13  Patriot Act related.
14     Q.   Yup.
15     A.   And maybe that's the next two
16  pages.
17     Q.   Yup.
18     A.   You'll notice by the unregistered
19  concept there.  But I don't believe that what
20  starts -- at any rate, my sense of the trading
21  directive, which is the question I was trying --
22  the question you asked and the question I'm
23  trying to answer, not sure has anything to do
24  with the Patriot Act or anything that precedes
25  it in this packet.  I'm not sure.

**Page 255**

1     Q.   All right.  Just to move it along,
2  and again Neil can point out if I leave a word
3  out, but I'll try not to.  I'm going to read
4  that first paragraph.  It reads:
5          "Bernard L. Madoff acting as the
6  undersigned's agent and attorney in fact has not
7  been granted, nor shall he exercise any
8  investment discretion as to the selection of
9  securities or other purchase or sold by or --"
10  did I leave it out?  "-- or other property
11  purchased or sold by or for the undersigned
12  account, except with respect to the timing and
13  size of transactions and to the extent set forth
14  below.  Purchase and sale of securities shall
15  further be limited to issuer --"
16          MR. STEINER:  As to issuer.
17     Q.   "-- as to issuer contract and in
18  quantity and shall include only executions that
19  are in accordance with the following
20  parameters."
21     A.   Yes.
22     Q.   With that in mind, did you and
23  Mr. Madoff sit down and decide what the
24  directives would be as to his trading strategy?
25     A.   If you asked me independent of

**Page 256**

1  this piece of paper and over the course of time,
2  the way you asked the question, yes, we had any
3  number of conversations over a sweep of years as
4  to the strategy, what it encompassed.
5          The simple move from individual
6  options to baskets makes the answer to your
7  question yes, because he certainly asked us
8  about it and we talked about it beforehand.
9          We often talked about when he was
10  gonna come in beforehand, not necessarily
11  always.  You know, the overall catching of turns
12  and whether their strategy could be widened,
13  narrowed, broadened, heightened, sweetened, made
14  better, you know, the usual, the two twin
15  objectives, less risk and more reward.
16          So, yes, sure, we talked about the
17  trading strategy all the time.  Not necessarily
18  in connection with this piece of paper.  He and
19  I did not sit down and hammer out this piece of
20  paper together.
21     Q.   When you received this piece of
22  paper -- let me rephrase that.
23          Is it your testimony then you had
24  nothing to do with the drafting of this
25  document?

**Page 257**

1     A.   As best as I remember today, I
2  don't think I had any -- I certainly didn't
3  draft it, I certainly didn't word it and
4  discussed it after -- discussed it with
5  Mr. Madoff after I received it.  Meaning I
6  certainly did do the latter.  I did discuss it
7  with him after I received it.
8     Q.   Was it your understanding upon
9  reading this that Mr. Madoff would comply with
10  all of these directives as he managed the fund?
11     A.   It was my understanding that he
12  would do so and that we had the prerogative of
13  changing it whenever we wanted.  So that it
14  wasn't necessarily something that we were going
15  to be wedded to forever, nor was it presented as
16  a significant departure from what we -- what he
17  was heretofore doing for us.  Maybe I should say
18  theretofore and not heretofore.
19     Q.   There's one in particular I want
20  to ask about.  It's one, two, three, four -- the
21  fourth bullet point.
22     A.   Okay.
23     Q.   Starting with the words "The
24  resulting portfolio."  See that?
25     A.   Yes.



**Page 306**

**Page 307**

12  A.    I think I've told you that I don't
13 remember the specifics today of any call --
14  Q.    Right.
15  A.    I'm sorry, of any issues or any
16 subjects I discussed on that call. I observed
17 that the quotes are not used only to reflect a
18 direct quote, as you suggested, but can also be
19 used to frame a paraphrase, or so the
20 parenthetical suggests, about halfway in the
21 middle of the page.
22  Q.    Yup.
23  A.    That is the editor's explanation
24 of how he uses quotes. So, you know, I don't
25 know what he quoted and I don't know what he

**Page 308**

1 paraphrased.
2       I think -- let's put it this way,
3 to the extent that I can make some sense of
4 this -- I don't really -- if we discussed --
5 Madoff was, was, I don't think Madoff failed to
6 answer too many questions certainly that I put
7 to him.
8       Where he would say that's -- that
9 that is a subject that he considers somewhat
10 proprietary is what you called the algorithm.
11 In other words, he wasn't that interested in
12 training people -- he used to say, I'm not that
13 interested in training people in Madoff. And by
14 that he meant to say, in the algorithm. In
15 other words, this is the thing that we do that
16 we think is proprietary, it comes out of the
17 totality of what we spend on the computer
18 systems and the order flow and it lets us judge
19 these turns. That was something that he would
20 answer and consider proprietary.
21       So I'm just guessing -- doesn't
22 even relate to this, so I don't know. I've
23 spent five minutes looking at this document, I
24 wouldn't put this at the top of the list of what
25 he got wrong. I think the top of the list is

**Page 309**

1 crowded with other things that are just
2 factually wrong. This one I think he either --
3 just assuming that he was on the same phone
4 call. I don't know.
5  Q.    Let me just offer that and move
6 off the document for a minute.
7       You know, did you ever have a
8 concern, from a scalability standpoint, of the
9 ability of Merkin to -- Merkin -- Mr. Madoff to
10 purchase options consistent with the strategy?
11  A.    So purchase, you mean puts?
12  Q.    Yeah, purchasing puts, or selling
13 calls. One or the other that, since he had to
14 do both theoretically under the split-strike,
15 that the volume of those options on either side
16 of the collar, whether that volume was available
17 to him given the size of his investments?
18       MR. STEINER: Objection to form.
23  A.    Mr. Madoff and I certainly
24 discussed that over time and he certainly made
25 clear that an ever evolving higher percentage of

BENDISH REPORTING
877.404.2193

**Picard v. Merkin**                                                    **J. Ezra Merkin  2-25-15**

**Page 321**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


---------------------------------x

In Re:


BERNARD L. MADOFF INVESTMENT          Adv.Pro.No.

SECURITIES LLC,                        08-01789(BRL)

          Debtor.

---------------------------------x

IRVING H. PICARD, Trustee for the

Liquidation of Bernard L. Madoff

Investment Securities LLC,

          Plaintiff,                   Adv.Pro.No.

                                       09-1182(BRL)

          v.

J. EZRA MERKIN, GABRIEL CAPITAL,

L.P., ARIEL FUND LTD., ASCOT

PARTNERS, L.P., GABRIEL CAPITAL

CORPORATION,


          Defendants.

---------------------------------x



          CONTINUED VIDEOTAPED DEPOSITION OF

J. EZRA MERKIN, as reported by Nancy C. Bendish,

Certified Court Reporter, RMR, CRR, and Notary

Public of the State of New York, at the offices

of Baker Hostetler, 45 Rockefeller Plaza, New

York, New York, on Wednesday, February 25, 2015,

commencing at 9:42 a.m.

**Page 378**

1    Q.    If you can find page 3127, Bates
2  number 3127.
3    A.    3127.
4    Q.    Are you there?
5    A.    Yes.
6    Q.    Is document 3127, is that the
7  document you were referring to earlier that
8  Mr. Meyers gave to you?
9    A.    May I just look elsewhere in this
10  same pack, part of the file?
11    Q.    Absolutely.
12    A.    This might just take me a minute.
13  So I'm just going to pull this out, okay.
14        I'm not sure.  I have a distant
15  memory that there was something, on the sheet of
16  paper that I thought I remembered, that there
17  was a -- something, one or two words, in hand,
18  in handwriting.  In handwritten.  And this has
19  none.  This could well be it because it's the
20  relevant time period.  Well, is it?  Yeah, it
21  looks like it's the relevant time period.
22    Q.    Okay.
23    A.    I don't know where I got this
24  from.  This might have been it.  It might be
25  something else in the file but I've looked at

**Page 379**

1  that and I'm not sure that's one or the other or
2  either.
3    Q.    What's the other document that you
4  were looking at?
5    A.    It's just another performance
6  thing, that's what I was looking at, 3106.  But
7  it certainly would not have been at the time
8  that you were speaking of because it goes to
9  1996 and we're talking like 1990-ish, right?
10    Q.    Yes.
11    A.    But ish is not '96, is what I'm
12  trying to say.
13    Q.    Yes, right.
14    A.    So I guess I'm not sure.
15    Q.    Put that back together and put it
16  aside for now.
17    A.    Let me just put this rubber band
18  around it or else I'll never be...
19        There may be another one, I didn't
20  look at all of it, but those are the two that I
21  just looked at in answering your question.
22    Q.    Okay.  You should keep the
23  interrogatory response out.
24    A.    You want that back?  That's this,
25  right, that's 354?

**Page 380**

1    Q.    That is 354, yes.  Back on page 2
2  of 354, the second name listed --
3    A.    One moment, one moment.  Okay,
4  yes, I'm with you.
5    Q.    The second name listed after Leon
6  Meyers was Sandra Manzke.  Do you see that?
7    A.    Yes.
8    Q.    Who is Sandra Manzke?
9    A.    Sandra Manzke is exactly what the
10  parenthetical reference to her identifies her as
11  being.  She was a very senior person in the
12  Tremont organization and later started Maxam.
13    Q.    Do you have a relation -- did you
14  have a relationship with Ms. Manzke in the late
15  '80s?
16    A.    Yes.
17    Q.    How would you describe that
18  relationship?
19    A.    We were friendly, we would compare
20  notes occasionally on the investment world, on
21  managers and things like that.
22    Q.    So in this time period being late
23  '80s, prior to 1990, do you know if Ms. Manzke
24  had a -- any relationship with BLMIS?
25    A.    As I remember it today, I think

**Page 381**

1  she did.
2    Q.    What do you recall that
3  relationship to be?
4    A.    I think she had an -- she
5  supervised either a pooled vehicle there or a
6  series of accounts, and was proficient on the
7  subject and knew what she was talking about.
8    Q.    Do you recall when you had those
9  discussions with -- let me back up.
10        When do you recall having
11  discussions with Ms. Manzke about BLMIS?
12    A.    The specific dates?  I don't
13  remember.  Early that period of time, perhaps
14  very late '80s, perhaps not quite so late '80s,
15  perhaps '90, around that period of time.
16    Q.    Do you know if you had more than
17  one conversation with Ms. Manzke?
18    A.    Yes.  I mean, yes I -- either in
19  person or on the phone?
20    Q.    Yes.
21    A.    Including those conversations,
22  yes.
23    Q.    Do you have an estimate as to how
24  many times you spoke to her prior to investing
25  with BLMIS?

**Page 386**

1     It was not quite at this time, but
2  Mr. Gottesman's decision to have Mr. Madoff join
3  the university board and become the chairman of
4  their business school board, become at some
5  point the treasurer of the university, a member
6  of the executive committee, were later events,
7  some of them not that much later because that
8  takes place over a series of years, that I think
9  reflected those views.
10     Q.    Did Mr. Gottesman ever share with
11  you how much he invested in BLMIS?
12     A.    I don't remember.
13     Q.    Would the amount of money that
14  Mr. Gottesman placed with BLMIS be of any
15  significance to you?
16     MS. ARCHER:  Object to the form.
17     A.    I don't remember.  At the time
18  Mr. Gottesman had -- was a very, very, very
19  significant investor in Berkshire Hathaway.
20  It's possible that even then I was aware, or I
21  believe is the case which is he was the largest
22  single individual shareholder in Berkshire other
23  than Mr. Buffett.  They're institutional
24  investors, but I think at some point I realized
25  he had a larger -- perhaps was a larger investor

**Page 387**

1  than anybody -- any other individual.
2     So nothing -- he was never going
3  to invest with some other person.  Just for
4  sheer size, of what he might have had with
5  Berkshire and therefore what he had someplace
6  else was not something that I necessarily asked
7  about or remember hearing about or paid that
8  much attention to.  Unless it was trivial, but I
9  don't have any memory that it was trivial.
10     Q.    What would be a trivial amount in
11  your mind?
12     A.    Then?
13     MR. STEINER:  Objection to form.
14     Q.    Yes.
15     A.    I don't know.
16     Q.    The next name on the list is
17  Mr. Gedale Horowitz.
18     A.    Um-hum.
19     Q.    Again, prior to 1990, did you have
20  a relationship with Mr. Horowitz?
21     A.    Yes.
22     Q.    How would you describe that
23  relationship?
24     A.    I knew him.  I knew him probably a
25  little bit less well than I knew Mr. Gottesman

**Page 388**

1  but not that much less well.  He was a -- had
2  been a figure at the Yeshiva University board.
3  I'm not sure he was still on the board but he
4  was the chairman of their investment committee
5  at that time and I had, by then I'm pretty sure,
6  joined the investment committee.  I'm not sure I
7  necessarily was then chairing it.  Pardon me.
8  Can't quite place the time sequence today.
9     He ran Solomon Brothers' municipal
10  department, municipals department which, when he
11  ran it, until -- the department was closed, was
12  sort of a huge firm within a firm.  He was
13  probably one of the leading spokesmen for the
14  muni industry.  The nature of the muni industry
15  is such that government relations are very
16  critical because municipals are debt securities
17  issued by government entities, perhaps without
18  exception.  They don't qualify for their tax
19  advantages.
20     What I remember from a
21  conversation with him, very specifically at that
22  time, was the extent to which the regulatory
23  world and the congressional world held
24  Mr. Madoff in such high esteem.  That would have
25  been something that would have been important to

**Page 389**

1  me and he would have been a very critical figure
2  in knowing, because he was constantly traveling
3  among states, and specifically to Congress in
4  Washington, on governmental relations, because
5  they're so important to the muni industry, and
6  because Solomon was such a dominant name in
7  municipals.  And he kept saying to me -- he was
8  the person who said to me at that time, Bernie
9  Madoff, a legend on Wall Street.  He said, but
10  you -- but possibly even more so, even more than
11  a legend in Congress.  Given Bernie's testifying
12  down there and given the extent to which they
13  had looked to him for certain issues in the
14  securities industry.
15     Q.    Did you know whether or not
16  Mr. Horowitz had a -- any kind of a personal
17  relationship with Mr. Madoff at that point in
18  time?
19     A.    I don't really remember today
20  whether that was the case or not.  I have very
21  specific memories of their knowing each other
22  subsequent to that time.  In other words, I can
23  tell you about things subsequent to that, but
24  they did very clearly know each other, but I
25  don't remember today whether I knew that then or

**Page 394**

1  was a bit of discussion about SEC chairman but
2  I'm not sure I -- that is is in front of me.
3  That is what I remember their talking about.
4      Q.   Did you arrange the meeting
5  between Mr. Horowitz and Mr. Madoff?
6      A.   I think so.
7      Q.   Do you know why you needed to
8  arrange the meeting if Mr. Horowitz and
9  Mr. Madoff had a personal relationship?
10     A.   I think Mr. Horowitz, as either a
11 fiduciary for or as an investor in Ascot
12 Partners LP, thought that that was the way to
13 have the introduction, or have the request made.
14     Q.   And did you take any notes from
15 this meeting?
16     A.   Again, I'm not sure I was at the
17 meeting or this is my memory of what they told
18 me about the meeting.  They meaning mostly
19 Gedale.
20     Q.   Other than this one meeting that
21 we were discussing, do you recall any other
22 occasions in which you arranged a meeting
23 between Mr. Horowitz and Mr. Madoff?
24     A.   I don't remember if there was a
25 request for another meeting, that didn't happen

**Page 395**

1  or did happen.  I mean, their paths might have
2  crossed.  There was a -- I think I mentioned
3  there was some point Mr. Madoff became the
4  chairman of the board of the Yeshiva
5  University's business school and there was a
6  fund raiser done at which the then president of
7  the New York Stock Exchange was, I suppose you
8  could say the guest of honor, I think Mr. Madoff
9  was sort of the host, and I think Dale spoke at
10 that meeting.  Spoke meaning said a few words.
11     Q.   That was a meeting that you
12 arranged, correct, sir?
13     A.   At that meeting there was
14 discussion about -- that was not a meeting I
15 arranged.  That was a fund raiser for the
16 school.  But I think what I said I remembered
17 from that meeting might also have come up at
18 that occasion, and I may be conflating the
19 meeting of the two of them together with this
20 fund raiser, because there was a bit of
21 discussion of that there as well.  So I just
22 want to identify and to some extent apologize
23 for not -- my memory isn't strong enough to say
24 it happened here or it happened there.
25     Q.   Understood.  The next name on the

**Page 396**

1  list is Daniel Hoffert.  Am I saying that right?
2      A.   Hoffert, I think.
3      Q.   Prior to -- again prior to 1990
4  did you have a relationship with Mr. Hoffert?
5      A.   Yes.
6      Q.   And how would you describe that
7  relationship?
8      A.   I knew Mr. Hoffert, he was
9  probably older than I am, and he was someone I
10 knew from our neighborhood and community in New
11 York City when I was growing up.  He no longer
12 lived in New York City, probably even then, he
13 lived in Florida.
14     Q.   Mr. Merkin, can I ask you not to
15 put your hand to your mouth.
16     A.   Okay.
17     Q.   Did there come a time in which
18 Mr. Hoffert became an investor with Gabriel?
19     A.   Yes.  Or some family entity did.
20     Q.   And do you recall when you first
21 met Mr. Hoffert to discuss BLMIS?
22     A.   I don't remember that, when we met
23 to discuss it.  I think he was already in
24 Florida, called me and asked me one or two
25 questions about Madoff.  He said he had had -- I

**Page 397**

1  think I remember the conversation going
2  something like as follows, because I told him
3  that Gabriel Capital LP -- this is either around
4  the time that he became an investor, or maybe it
5  was earlier.  We had discussed the merger
6  arbitrage business and he said to me, you must
7  know somebody else who's in the merger arbitrage
8  business.  That's not such an infrequent
9  question.  And I said, who'd you have in mind
10 and he said, Bernie Madoff.  And I said, I would
11 not think of Bernie Madoff as someone who is in
12 the merger arbitrage business.  And he said, no,
13 no, no, not merger arbitrage business.
14 Arbitrage business.  He's an arbitrager.  "He"
15 meaning Madoff, not Mr. Hoffert.  And I thought
16 in some sense that made some sense.  And he sent
17 me some form of either a confirmation or perhaps
18 it was a monthly statement to give me some sense
19 of why he called him an arbitrager and what he
20 was doing with him.
21     Q.   I'm going you to go back to your
22 Madoff file.
23     A.   To the rubber bands?
24     Q.   Yes.  This will be relatively easy
25 to find.

**Page 406**

1   quite remember.  It may have been prior to that
2   as well.  It is surely the case that I read the
3   newspaper accounts about it, but that's not the
4   part I'm qualifying.  I can't remember whether
5   with -- it came up with Leon or came up once in
6   a conversation, I'm just not sure.
7       Q.   Okay.  So sitting here today you
8   can't recall whether you had any conversations
9   with Mr. Levy regarding BLMIS?
10      A.   Sitting here today, I think in all
11  likelihood, I didn't.  But I'm not sure I can
12  swear that I didn't.  I think the very strong
13  likelihood is that I didn't.
14      Q.   Mr. Levy is not someone you would
15  include as a person in which you talked to in
16  your ongoing due diligence of Mr. Madoff?
17      A.   Just to make sure, the Mr. Levy
18  you're talking about is --
19      Q.   Norman.
20      A.   Norman.  Yes, that is correct.
21      Q.   Here's another name I'm
22  potentially going to butcher, but do you know
23  Mr. Edgar de Picciotto?
24      A.   I think it's de Picciotto, but I
25  wouldn't swear to that, either.  I know -- we

**Page 407**

1   had met once or twice.
2       Q.   And did you ever speak to Mr. de
3   Picciotto regarding investments with BLMIS?
4       A.   Directly with him?
5       Q.   Yes.
6       A.   Not that I recall.
7       Q.   Do you know whether Mr. de -- did
8   you know prior to 2008 whether Mr. de Picciotto
9   had any personal investments, meaning him or his
10  family, in BLMIS?
11      A.   So, he owned, and for all I know
12  still owns, he and his family own something
13  called UBP, and I certainly knew that UBP had
14  hundreds of millions of dollars with Mr. Madoff,
15  if not more than hundreds of millions of
16  dollars.  In part because they had hundreds of
17  millions of dollars there, I suppose, with us.
18  I don't know that he had a -- that part of that
19  was his money or not his money, but I know what
20  Mr. Madoff told me Mr. de Picciotto had with him
21  personally.  At the time believed it, I'm not
22  sure that that was necessarily the case.  I'm
23  not sure today I would say that that was
24  necessarily the case.  But at the time I know
25  what that figure was.  And I know that part of

**Page 408**

1   the UBP staff and senior people with whom I did
2   spend endless amounts of time due diligencing
3   Mr. Madoff occasionally made references to Mr.
4   de Picciotto being an investor, but didn't say
5   through them, independently, and it's also
6   broadly speaking supporting their investment.
7       Mr. de Picciotto by reputation I
8   think is one of the most gifted investors of his
9   generation.  So there was a person that used to
10  go interview him periodically and literally
11  print all of his predictions, kind of, I think
12  used to refer to him as the smartest man he knew
13  or the smartest man in the west or something
14  like that.
15      And over a series of years
16  reading -- he's a very, very (indiscernible)
17  investor.  And I just remember once thinking,
18  okay, this one he's really really going to get
19  wrong, and then a year or two later, he was
20  absolutely right.
21      Q.   Did you ever attempt to speak to
22  Mr. de Picciotto regarding his investments with
23  BLMIS?
24      A.   I think I might have.  It was a
25  very brief snatch and didn't really leave a

**Page 409**

1   reportable impression that I can convey to you,
2   this is what he said.
3       Q.   Do you know --
4       A.   Can you just give me one moment?
5       Q.   Sure.
6       A.   I just want to check something.
7   Okay.
8       Q.   Do you know Ludwig Jesselson?
9       A.   I did.
10      Q.   How would you describe your
11  relation -- how would you have described your
12  relationship with Mr. Jesselson?
13      A.   Well, Mr. Jesselson was a very
14  good friend of my father's, and roughly a
15  contemporary of his.
16      Q.   And did Mr. Jesselson's family
17  have investments with Ascot and Gabriel?
18      A.   One of Mr. Jesselson's sons,
19  Benjamin, had investments in those funds I think
20  on behalf of either family members in trust or
21  perhaps for a foundation.  So I don't think it
22  was theirs, in the sense that you asked the
23  question.
24      Q.   Okay.  Was Mr. Jesselson
25  someone -- withdrawn.

**Page 418**

1    Jack was something of a market
2  timer himself, or certainly market timing was a
3  subject and an issue that occupied him and
4  challenged him through many, many years. And
5  someone whom he thought was doing a good job of
6  market timing is someone he would have been very
7  interested in establishing a relationship with.
8    Q.    Did Mr. Nash tell you -- Mr. Jack
9  Nash tell you that at some point he redeemed his
10  investment from BLMIS?
11    A.    I don't remember whether he told
12  me. I knew that -- I knew that it had happened.
13  I knew, and I attached some -- I attached enough
14  significance to that to talk to Mr. Madoff about
15  it. I served on various committees with Jack
16  and I knew that he was the quickest trigger out
17  of funds of virtually anyone I knew, and an
18  extraordinarily high percentage of his
19  investments he redeemed. He basically was not
20  somebody who really easily trusted others with
21  money. That was just his nature.
22    It was an ongoing source of some
23  humor, some, between me and him that one could
24  put together an extraordinarily successful group
25  of -- successful fund of funds with managers

**Page 419**

1  whom he had redeemed from in the first quarter
2  year, very early on because something moved left
3  that he thought should have moved right and he
4  got out.
5    Bernie's version of it was that
6  Jack had asked him too many questions about are
7  you in or not in. And he felt that Jack was
8  trying to trade capital around his market
9  entrances and departures, and was very happy
10  just to say, you know, this is either not the
11  information I'm willing to tell you about or it
12  sounded as if they were very happy to part
13  company as client and manager.
14    Q.    Did Mr. Nash ever tell you that he
15  was -- that he had an issue with BLMIS's
16  auditor?
17    MR. STEINER:  Objection to form.
18    A.    No.
19    Q.    Did you ever discuss with Mr. Levy
20  Mr. Nash's decision to redeem from BLMIS?
21    A.    I don't remember whether it came
22  up or whether it didn't come up, but there might
23  have been a reference made to it, and a comment
24  by Mr. Levy that that was not by itself going to
25  end his interest.

**Page 420**

1    Q.    The meeting that you referred to
2  earlier that you tried to set up between
3  Mr. Levy and Mr. Madoff, do you recall, did you
4  email Mr. Levy?
5    A.    I don't remember. If so, not a
6  lot, but I just don't remember.
7    Q.    Would there be any documentation
8  that evidences you trying to set up that
9  meeting? In other words, was it just over the
10  phone or --
11    A.    Would that document have been
12  something that should have been produced by us
13  because it was responsive to a subpoena from the
14  Trustee or counsel? In your opinion. If the
15  answer is yes and we haven't produced it, then
16  the answer is no. If the answer to my question
17  is yes and we haven't produced it, then the
18  answer to your question is no.
19    Do you understand what I'm saying?
20    Q.    I understand what you're saying.
21    A.    If you then said to me it wouldn't
22  necessarily have been responsive, then I'm not
23  so sure, but I don't remember any such document.
24  If we didn't produce one and it was something
25  that would have been subpoenaed, then the answer

**Page 421**

1  is there isn't one.
2    Q.    Okay.
3    A.    Did we produce such a document?
4    Q.    Not that I'm aware of.
5    A.    Okay. And would it have been
6  called for?
7    Q.    Yes, it would have.
8    A.    Okay, so then I was right. So the
9  answer to my question is -- your question is yes
10  and the answer to my question is no.
11    Q.    Okay. I think I've lost who's
12  asking questions.
13    MR. STEINER:  You're not the only
14  one.
15    Q.    The record will so reflect.
16    A.    Right.
17    Q.    Mr. Merkin, do you know Zev
18  Wolfson?
19    A.    I did.
20    Q.    And who is Mr. Wolfson?
21    A.    Mr. Wolfson is an immigrant to
22  this country, sometime I think in the late '40's
23  or early '50s, and made a series of fortunes in
24  different businesses, real estate -- well, the
25  real estate business, the construction business,

## Page 422

1  as a backer, very, very early backer of certain
2  funds, as a subsequent early backer heavily into
3  strategies that would broadly be described as
4  private equity strategies.
5      Q.   Did you ever have any discussions
6  with Mr. Wolfson regarding your investments with
7  BLMIS?
8      A.   With?
9      Q.   With Mr. Wolfson.
10      A.   My investments with -- just the
11  last.
12      Q.   With BLMIS.
13      A.   Oh.  I thought you said Leon
14  Meyers. I'm sorry, I just didn't hear you. I
15  was going to say, I don't think so.
16          Yes.
17      Q.   When did you have those
18  conversations?
19      A.   Over a series of years. And they
20  would have been perhaps with him and also with
21  one or another of his sons. It was a family
22  office.
23      Q.   Do you know whether or not
24  Mr. Wolfson or his family office had investments
25  with BLMIS?

## Page 423

1      A.   I believe they did.
2      Q.   Was that the subject of your
3  conversations?
4      A.   I'm sure it came up.
5      Q.   And do you know whether
6  Mr. Wolfson or his family office conducted due
7  diligence on BLMIS?
8      A.   I believe they did.
9      Q.   What is the basis for your belief?
10      A.   The fact they were there, that
11  they went to -- had been to the office, they'd
12  had conversations, that it was something they
13  had looked into.
14      Q.   Did Mr. Wolfson tell you that he
15  had visited BLMIS's offices?
16      A.   I don't remember specifically
17  whether it was him or a son and I just don't
18  remember.
19      Q.   Did Mr. Wolfson or his son send
20  you any documentation regarding their
21  investments with BLMIS?
22      A.   Not that I recall.
23      Q.   If you can turn to page 5.
24      A.   Still in the same document?
25      Q.   Same document.

## Page 424

1      A.   Wow, okay.
2      Q.   In the middle of the first
3  paragraph, basically in the middle of the page,
4  after Leon Meyers it says, "as well as with
5  other sophisticated investors, including people
6  who served on the Yeshiva University investment
7  committee."
8      A.   Wait, wait, I have lost you.
9  "Mr. Merkin also discussed Mr. Madoff"?
10      Q.   It's before that. It's about four
11  lines up from --
12      A.   There are two sentences that the
13  first four words of which --
14          MR. STEINER:  The first of those
15  two.
16      A.   Right, it's the first of those
17  two.
18      Q.   Yes.
19      A.   The two lines that have the first
20  six words.
21      Q.   So I'm referring to the first --
22      A.   Of those two.
23      Q.   The first of those two, yes.
24  Referring to Mr. Merkin also discussed
25  Mr. Madoff and his investment strategy with many

## Page 425

1  other customers of Mr. Madoff. Then we
2  discussed Mr. Jesselson, Mr. Gottesman and
3  Mr. Meyers. And then it's other sophisticated
4  investors, including people who served on the
5  Yeshiva University investment committee.
6      A.   Um-hum.
7      Q.   Could you tell me who those other
8  sophisticated investors are?
9      A.   Well, surely Mr. Horowitz. On the
10  YU investment committee, I would probably
11  include in that Morris Smith, Jonathan Kolatch.
12  Don't want to repeat names, so...
13          Those are the names that come to
14  mind at the moment. I'm sure there are more,
15  but those are the ones that I remember at the
16  moment.
17      Q.   What do you recall discussing --
18  we've already covered Mr. Horowitz. What do you
19  recall discussing with Mr. Smith?
20      A.   He was just present at YU
21  investment committees, either he or an entity
22  that he was related to were limited partners or
23  became limited partners in Ascot Partners LP,
24  probably as well as Gabriel, if I remember
25  correctly. And I think it's possible his

Page 426

1    mother-in-law became an investor.  So it was
2    ongoing conversations.
3              The Ascot investment was a, not
4    necessarily every meeting but was a fairly
5    constant motif at YU investment committee
6    meetings.  I don't remember when Morris joined
7    the committee, but he was pretty diligent in
8    attendance, less diligent in attentiveness
9    because he was constantly on his phone.  You
10   know, he was constantly emailing throughout the
11   meetings.  But he came.  Morris worked at my
12   office for a period of years and a lot of the
13   meetings were in my office.
14             So Madoff came up and Morris was a
15   fan.  Morris was a fan of Ascot generally.
16   Ascot was, some of that would -- Gedale always
17   asked about, Mr. Gottesman asked about, came up,
18   conversations and so forth.  Also as I've
19   previously alluded to Mr. Madoff became
20   something of a figure at Yeshiva University
21   board, chairman of the business school, officer
22   of the board when he became the treasurer, and
23   the executive committee, which was only eight or
24   nine people, included him.
25        Q.    Still on page 5, if you go to the

Page 427

1    top of that paragraph, the first full paragraph
2    on the page where it says, as an --
3         A.    Same paragraph, right?
4         Q.    Same paragraph.  As an initial
5    part of his due diligence in monitoring, it says
6    that you met with Mr. Madoff 10, 15 times a year
7    by phone or in person.  See that?
8         A.    Approximately, yes.
9         Q.    Was it your practice then to speak
10   to Mr. Madoff about once a month?
11        A.    I think I said yesterday that it
12   may well have averaged once a month but I didn't
13   necessarily speak to him once a month and
14   conversations could be bunched.
15        Q.    And does that 10 -- is that 10 to
16   15 times a year purely business conversations
17   that you had with Mr. Madoff?  In other words,
18   discussions about the investments, about funds?
19        A.    You mean with no other subjects
20   ever coming up?
21        Q.    Being the primary purpose of the
22   conversation.
23        A.    Yes.
24        Q.    And so would you have other
25   conversations with Mr. Madoff purely on a

Page 428

1    personal nature?
2         A.    I had conversations with
3    Mr. Madoff about issues that were not -- or
4    subjects that were not business.  One was
5    Yeshiva University.  He knew less about Yeshiva
6    perhaps than other trustees when they first
7    joined and would ask me a lot, ask me questions
8    about Yeshiva.
9              As a member of the executive
10   committee, he was entitled to a vote on who the
11   new president would be.  There were only I think
12   nine such people who had a real vote.  And there
13   were one or two occasions in which he
14   interviewed prospective candidates for that job
15   and asked me to join the interview.  That's the
16   one or two meetings I can think of that were
17   basically not business.
18        Q.    And what year did you start
19   speaking to Mr. Madoff 10 to 15 times per year?
20        A.    Don't remember.  Fairly early on
21   but I don't remember.
22        Q.    Any recollection, starting from
23   1990?
24        A.    I can't tell you that in 1990 I
25   spoke to him 13 times, and if I spoke to him

Page 429

1    nine times it would have been less than 10 to
2    15.  But I spoke to him regularly starting
3    fairly early on.
4         Q.    And you visited Mr. Madoff in
5    person on occasion, correct?
6         A.    Yes.
7         Q.    And were those occasions in his
8    office?
9         A.    Yes.
10        Q.    How often in a year would you go
11   to visit Mr. Madoff's offices?
12        A.    Don't remember exactly.  Several.
13        Q.    So out of the 10 to 15 times --
14        A.    A minority.
15        Q.    A minority of that 10 to 15 times?
16        A.    I would think so, although it
17   doesn't mean I didn't see him at -- later on I
18   would see him, we both attended certain
19   university meetings, so I would see him there.
20   Don't think we met socially very often at all.
21   So an extraordinarily high percentage of my
22   meetings with Bernie were in his office.
23        Q.    And where were you -- where would
24   you physically meet with Mr. Madoff in his
25   office?  When you say his office, that's kind of

28  (Pages 426 to 429)

**Page 430**

1   a broad term.  Where would you actually sit down
2   and talk to him?
3       A.    In his office.
4       Q.    In his actual office?
5       A.    Well, his office, if I remember,
6   migrated over the years that I met with him.
7       Q.    In other words, you didn't meet
8   with him in a conference room or walking on the
9   trading floor?
10      A.    I mean, do you want this in some
11  detail?  I mean, I met with him in his office, I
12  met with him adjoining the -- I'll just take the
13  examples that you brought up.
14          So, earlier on he had an office
15  immediately adjacent to his trading room, which
16  was separated by glass and I think the glass
17  could be opened but it was partitioned off.  It
18  wasn't like a wall.  And I walked through the
19  trading room with him certainly once that I can
20  remember, maybe more than -- once, twice, maybe
21  three times but not more than that, I don't
22  think, and I had a series of meetings with him
23  over the years there.  His office within their
24  complex at 85 Third moved a floor away and then
25  I would meet with him there.  And depending on

**Page 431**

1   how many people I was bringing in to visit, if
2   the number of people exceeded what his own
3   office could hold, let's say comfortably, we
4   would go a couple of doors down and sit in a
5   conference room.
6          So, the answer to your question I
7   guess is all of the above.
8       Q.    Yes.  Other than Mr. Madoff, did
9   you meet with anybody else during these
10  sessions?
11      A.    From his office?
12      Q.    From his office.
13      A.    No.
14      Q.    Mr. DiPascali -- do you know Frank
15  DiPascali?
16      A.    No.  To answer your question, I
17  believe I met him once.  He was passing by and
18  poked his head in the door and Madoff said Frank
19  and I said, that must be Mr. DiPascali.
20      Q.    Did you know Peter Madoff?
21      A.    I met Peter Madoff maybe once or
22  twice.  I remember in a conference room we were
23  sitting with a number of people, he poked his
24  head in the door and mostly wanted to ask Bernie
25  something and all these people here or

**Page 432**

1   something.
2          Peter Madoff's son died, his son
3   Roger died in the spring of, I don't remember,
4   and I went with somebody who very much wanted to
5   pay a condolence call, so I joined them and saw
6   Peter then, say within a few days after his son
7   had died.  And then I think Peter came -- so I
8   came to these -- get the right name -- Gift of
9   Life Foundation meetings from time to time, and
10  Bernie was the chairman and I think Mrs. Madoff
11  was the vice-chairman of that foundation.
12          So I would see there, you know,
13  some fairly sophisticated investors who were
14  investors of Bernie who were either supporters
15  of the foundation or on the board.  Richard Joel
16  who was the president of Yeshiva University
17  would be there, I think Michael Jesselson was
18  there, a son of Ludwig's, and a brother of
19  Benjamin's.  I think Fred Wilpon was there, I
20  was there, and I think Bernie was there -- I'm
21  sorry, Peter was there.
22      Q.    And you're referring to a specific
23  meeting of the Gift of Life?
24      A.    (Witness nods.)
25      Q.    Was that meeting in December of

**Page 433**

1   2008?
2       A.    Yes.
3       Q.    Who did you understand -- who did
4   you understand operated the computer algorithm
5   that Mr. Madoff purportedly used?
6       A.    I'm not sure I -- in the sense
7   that you mean, I'm not sure I understood that
8   anybody in particular did.  If there was such a
9   person, I'm not sure I have a name to report to
10  you.
11      Q.    Did Mr. Madoff ever show you how
12  the computer algorithm worked?
13      A.    Not that I recall.
14      Q.    And did Mr. Madoff ever express to
15  you that he had employees of BLMIS who helped
16  either create the algorithm or monitor the
17  algorithm?
18      A.    Mr. Madoff talked about how many
19  employees he had, how many people worked at the
20  organization, including the wholesale end of the
21  business and over time that number went up.  So
22  I remember stops along the way, you know,
23  perhaps 85 to 100 and then 200 and then 300.
24          Talked about the computer system,
25  didn't really tell me specifically who was

**Page 442**

1    A.    Yes. But I might have had one or
2  two things that I kept at her desk because I
3  wanted to look at. In other words, it didn't
4  necessarily migrate there immediately.
5          More specifically, there may have
6  been -- may have been -- so now there's three
7  sources. There's a Madoff file that I kept,
8  there were pieces that belonged in that file
9  that hadn't gotten there yet when the bomb went
10  off. So, you know, we had an order in place in
11  terms of, you know, document preservation. So
12  those might have migrated over to there when
13  they were produced to you. And we may have --
14  just, I don't know, I'm speculating, which is
15  not purposeful here, that Mike's stuff may have
16  been produced to you at the same time, in the
17  same, in the same file, so to speak, so it's
18  hard to distinguish between what was there and
19  not there. And that may not be the case. I
20  don't know.
21    Q.    Well, the documents that we've
22  looked at so far in your -- in what we've called
23  the Madoff file.
24    A.    Okay.
25    Q.    Do you recall handing those to

**Page 443**

1  your assistant to file in some central file?
2          MR. STEINER: Objection to form.
3    A.    Some, yes. The one or two things
4  I thought -- oh, were they in this pile? There
5  are one or two things I think you showed me that
6  I wasn't sure I'd -- that I'm not certain I had
7  seen before.
8    Q.    If a document in that stack has
9  "file" and "Madoff" written on it in your
10  handwriting, does that indicate to you that you
11  handed it to Ms. Ferro to file for you?
12    A.    Very likely.
13          MR. STEINER: I think he said or
14  put it in the outbox to her.
15    A.    Right. I'm not sure I handed it
16  to her.
17    Q.    You directed Ms. Ferro to file it
18  for you.
19    A.    Right.
20          MR. SONG: All right. I think
21  it's a good time for lunch. All right. Why
22  don't we break for lunch.
23          THE VIDEOGRAPHER: Off the record
24  12:29.
25          (Luncheon recess taken.)

**Page 444**

1          THE VIDEOGRAPHER: Back on 1:28.
2  BY MR. SONG:
3    Q.    Mr. Merkin, do you recall in some
4  of your earlier testimony when we were
5  discussing Mr. Madoff's strategy you discussed
6  that Mr. Madoff was trying to catch, catch
7  market turns intra-quarter? Do you recall
8  saying that?
9          MR. STEINER: Objection to the
10  form.
11    A.    I don't recall saying that in
12  those words. I think I might well have said
13  that he was trying to catch a turn, but it
14  certainly didn't have to be a turn in a calendar
15  quarter. I might have either said or trying to
16  suggest that he would catch a turn that would --
17  could often last 90 days duration. Another way
18  of saying that is three months, just distinct
19  from a calendar quarter.
20    Q.    Do you recall in your experience
21  with Mr. Madoff, was he always able to catch a
22  turn at the beginning of a quarter of a calendar
23  year?
24    A.    I don't remember.
25    Q.    Was he ever, excuse me, did he

**Page 445**

1  ever exit a quarter -- I'm sorry.
2          Were you ever not in treasuries at
3  the end of a quarter of a calendar year?
4    A.    Probably --
5          MR. STEINER: End of the quarter
6  or end of the calendar year?
7          MR. SONG: End of a quarter of
8  each calendar year.
9          MR. SIEV: Objection to the form.
10    A.    Four quarters a year for however
11  many years, so I'm just gonna say, 50 odd
12  quarters. Were we ever in treasuries -- were we
13  ever not in treasuries at the end of those 50
14  odd quarters.
15    Q.    Instead being in the basket
16  position, yes.
17    A.    I don't remember.
18    Q.    Did you ever check?
19    A.    I always knew whether we were
20  invested or not, on any given day, unless there
21  was activity going on, so we were partially
22  coming in and I might have thought we were -- we
23  were fully coming in, I might have thought we
24  were partially coming in. But I checked every
25  single day the P & L and the balance sheet. I

**Page 446**

1  mean and the position sheet, were we invested,
2  were we not invested, or how much.
3      Q.    Did Mr. Madoff ever tell you that
4  it was important to his strategy to exit the
5  market before the end of a quarter?
6      A.    No.
7      Q.    It was your understanding that the
8  market turns that he was trying to catch by and
9  large lasted 90 days?
10          MR. STEINER:  Objection to form.
11     A.    My understanding from a
12  conversation with him?
13     Q.    Yes.
14     A.    Not that I specifically remember.
15     Q.    Before lunch we were discussing
16  the recordings of telephone calls that you had
17  with Mr. Madoff; do you recall that discussion?
18     A.    Yes.
19     Q.    What mechanism did you use in
20  order to record conversations with Mr. Madoff?
21     A.    Pushed the button on my telephone
22  console, whatever you -- telephone box.
23     Q.    And was it a tape or a digital
24  recorder or how exactly did it work?
25     A.    I told you the extent of what I

**Page 447**

1  know.  I pushed the button and one could record
2  telephone calls on the unit that we had by
3  pushing a button that very likely said "record."
4      Q.    And did you have some of these
5  recordings transcribed?
6      A.    Yes.
7      Q.    And why would you choose to --
8  certain recordings to transcribe?
9      A.    The recordings were made in the
10  first instance because I thought we were
11  covering important material and I wasn't able to
12  make a note of it and grasp it at the same time.
13  So the way I would make a note of it was if I
14  thought it was of sufficient importance was to
15  have it transcribed, and then I would put a copy
16  in the file.
17     Q.    And who did the transcriptions?
18     A.    My guess is Naomi Ferro.
19     Q.    And did you review the
20  transcriptions after Mr. Ferro had completed the
21  transcription process?
22     A.    Did I renew them?
23     Q.    Did you review them.
24     A.    Oh, review them.  I mean, I read
25  them.

**Page 448**

1      Q.    Did you check them for errors?
2      A.    I don't believe that I read them
3  and listened to the tape again to see whether
4  they were properly transcribed or not.  I read
5  them because I read them.  Not because I was
6  necessarily trying to correct something -- I
7  wasn't comparing them to anything.
8      Q.    And did you know, going into a
9  conversation with Mr. Madoff, that this would be
10  a conversation I would need to record or was
11  that something that sort of happened in the
12  course of the conversation?
13     A.    As I testified before lunch, the
14  latter.
15     Q.    I told you to keep the big stack
16  handy.
17     A.    Certainly did.
18     Q.    I'd like you to turn to --
19     A.    So we're done with this, the one
20  you also --
21     Q.    You should keep that handy as
22  well.  We'll be referring back to that later.
23     A.    Okay.
24     Q.    If you can turn to page 3384.
25     A.    I'm just going to break this up a

**Page 449**

1  little bit because there's going to be too much.
2  33 -- this is now toward the end.
3      Q.    Yes.
4      A.    Oh, here we go, one second.  So
5  I'm going to take 3384 to 3387, right?
6      Q.    That's correct.  If you could just
7  take a minute to look at 3384 to 3387.
8      A.    One second, please.
9          You want me to actually read the
10  whole thing?
11     Q.    If you can just review it and then
12  tell me if you recognize it and then I'll ask
13  you specific questions.
14     A.    Just one moment.  Okay.
15     Q.    Do you recognize this document?
16     A.    Yes.
17     Q.    Can you tell me what it is?
18     A.    It purports to be a transcript of
19  a part of a conversation starting somewhere in
20  the middle, that I had by telephone with
21  Mr. Madoff on or around May 1st of 2000.
22     Q.    And you say on or around May 1st
23  of 2000.  The document itself is dated May 1st,
24  2000, correct?
25     A.    Yes.

**Page 490**

1    Mr. Elden is referencing a Ponzi scheme?
2    A.    I don't know.  I don't know -- I
3  thought maybe I would catch what is only here as
4  phonetic, as I listened to it.  I'm assuming
5  that there's a missing word or something?
6    Q.    It's a word that seems to be a
7  little garbled and so the court reporter wasn't
8  able to determine what that word was.
9    A.    As I listened I was trying to see
10  if I could catch that word, but I can't say that
11  I did.  So...
12    Q.    We could play it again if you'd
13  like to listen to it again.
14    A.    It's up to you.
15    Q.    Oleg, can we play that.
16    A.    Just that section.
17        (Audio played.)
18        (Comments off the record.)
19    Q.    Did that help?
20    A.    No, sorry.
21    Q.    Do you recall -- let me back --
22  other than this conversation with Mr. Elden, did
23  you have any other conversations with Mr. Elden
24  regarding BLMIS?
25    A.    Yes.

**Page 491**

1    Q.    Why -- when were those
2  conversations?
3    A.    Over the years it was a subject
4  that came up in discussions between Mr. Elden
5  and me.
6    Q.    What was the nature of those
7  discussions?
8    A.    I mean, I'm not sure I have any
9  specific discussions in mind at the moment.  I
10  think at some point it was certainly my
11  impression that Mr. Elden was a limited --
12  sorry, not a limited partner, an investor of
13  Mr. Madoff.
14        Mr. Elden, the things that he says
15  here, reputation, the money, but he'll tell you,
16  he's very frank, he's very forthcoming, he got
17  some insight in to know how he operates, what he
18  does and doesn't do.  These were all the kinds
19  of things that Dick would tell me if he had had
20  a meeting with Bernie, and clearly he had, what
21  was to his way of thinking, a very constructive
22  meeting, whenever it was, how long prior to
23  whenever we had this conversation.
24    Q.    Do you know why you recorded this
25  conversation?

**Page 492**

1    A.    I don't know.
2    Q.    And given the fact that you don't
3  recall this conversation, I'm guessing you don't
4  recall how or where in the flow of the
5  conversation this recording took place?
6    A.    Oh, I don't doubt that this
7  conversation took place.  When I said I don't
8  remember it, I'm saying I don't remember it -- I
9  can't tell you when it happened, and I wouldn't
10  have remembered, you know, the words that he
11  said or be able to quote it.  But I wasn't
12  casting doubt on the --
13    Q.    No, I understand.  You don't
14  recall the impetus for this conversation or why
15  you chose to record and keep this conversation?
16    A.    Why I chose to record it, I don't
17  know.  I can observe that I didn't -- I gather
18  from you that I didn't transcribe it.
19    Q.    We don't have a transcription of
20  this.
21    A.    Had there been a transcription of
22  this, I guess we would have furnished it,
23  although it's not per se a reference to
24  Mr. Madoff.  But the -- don't know.  I can't
25  tell you why I recorded it.  May have liked the

**Page 493**

1  sound of his voice, I don't know.
2    Q.    Other than in this conversation
3  with Mr. Elden, did you have any conversations
4  with any other BLMIS investor where you
5  discussed a Ponzi scheme?
6        MR. STEINER:  Objection to form.
7    A.    I didn't discuss Ponzi scheme.  I
8  wasn't the person who said anything about a
9  Ponzi scheme.
10    Q.    Did any other BLMIS investor other
11  than Mr. Elden ever mention Ponzi scheme to you
12  in the context of BLMIS?
13        MR. STEINER:  Objection to form.
14    A.    Not that I recall.
15    Q.    You can put that one aside and
16  we're going to turn to 368.
17    A.    368?
18    Q.    Yes.
19    A.    So this is part of this?  Yes.
20  Okay.
21        I know you're Nancy.  Are you
22  Nancy Bendish?
23        THE REPORTER:  Yes.
24    Q.    Trustee's 368 is a transcription
25  of an audio file produced to us as bd.mp3.

44 (Pages 490 to 493)

Page 506

1      A.    Yes.
2      Q.    Should that be order flow?
3      A.    Might be.  I mean, I was --
4  wouldn't say that it is, but certainly might be.
5      Q.    And are you able to identify Male
6  Voice number 2?
7      A.    Yes.  That's me.
8      Q.    And do you recall having this
9  conversation with Mr. Madoff?
10     A.    Not specifically, no.
11     Q.    Do you know what your -- next page
12  where you reference Bayou.
13     A.    Do you have some idea what is said
14  on line 22?
15     Q.    I do not.
16     A.    Okay.
17     Q.    That's why the dashes are there.
18     A.    Can possibly figure that one out.
19     Q.    See on page 3 you reference Bayou.
20     A.    Um-hum.
21     Q.    What is Bayou?
22     A.    Let me just say that line 3, as I
23  listened to it very quickly I thought I said I'm
24  sure you got one or two.  But I could listen
25  again and tell you if that's what I really said

Page 507

1  or not.  And it doesn't make a lot of difference
2  but that's what I heard rather than "one too."
3      Q.    Okay.  Why don't we play it again
4  and you can put your headphones on or you can
5  listen.
6      A.    Okay.
7            (Audio played.)
8      A.    Could you just hold for a second?
9  Where it says we should reinstitute dash dash
10  dash dash, it's something for order flow.  You
11  see that line 12?
12     Q.    Um-hum.
13     A.    You want to play it again?  I'm
14  asking you, you don't have to.  It's up to you,
15  Brian.
16     Q.    I want to get it as accurate as
17  possible.
18     A.    If that's what you want, then do
19  you mind playing that again.
20            (Audio played.)
21     A.    Stop.  I think that's what it
22  says.
23     Q.    Okay.
24     A.    Not sure, but I think that's what
25  it says.

Page 508

1            Okay, go ahead.  Sorry, line 14.
2            (Audio played.)
3      Q.    My original question was what is
4  Bayou?
5      A.    I'm not sure if it's one or two;
6  it could be "one too."  This transcript could be
7  correct.
8      Q.    Okay.
9      A.    Bayou is a -- was a fund, you'll
10  do a better job in supplying the date than I
11  will, that ended up in scandal, the details of
12  which I don't remember at the moment, but I
13  think monies were stolen, people went to jail,
14  so on and so forth.
15     Q.    Do you recall having conversations
16  with Mr. Madoff regarding Bayou, other than in
17  this transcript?
18     A.    I do.
19     Q.    And what were those conversations?
20     A.    I recall his -- maybe this is the
21  conversation I recall, something about when
22  there's a scandal or a scam I guess is the word
23  that's used here in the hedge fund industry
24  questions come up about other managers
25  routinely.  One of those managers -- questions

Page 509

1  come up about a lot of funds, about a lot of
2  different strategies.  At that time I was
3  sitting on investment committees and so the
4  investment committee people would ask, well,
5  Bayou -- none of the committees that I chaired
6  had investments with Bayou.  So we weren't
7  focused on Bayou, Bayou was not a particularly
8  big issue for those committees or in my office.
9            But an issue with a fund might
10  provoke questions about other funds, and
11  questions might easily come up about Bernie
12  because so many of the persons who were
13  investors of his didn't have the transparency.
14  They just got a number, so at that point you
15  would say, you might if you were the recipient
16  of that information, here is at least something
17  that looks -- that all I have is a number.  Do I
18  have any evidence of the trades.
19            So that's why, as people reacted
20  to a scam by saying, oh, let's try to figure out
21  if all of my money is safe in all these other
22  places, you get lots of questions about other
23  places, and questions about Bernie as well.
24            I just must say, Bernie sounds
25  incredibly relaxed about the whole thing, as I

48  (Pages 506 to 509)

**Picard v. Merkin**                                                                    **J. Ezra Merkin  2-25-15**

---

**Page 510**

1  listen to it today.  Where you can sort of hear
2  him a little bit kind of working the con, in a
3  way.
4       Q.    Did you do anything as a result --
5  did you change your due diligence practices as a
6  result of Bayou?
7       A.    I don't -- I certainly spent time
8  talking to Madoff about issues that related to
9  Bayou.  I'm not sure that we announced a whole
10  new revision to our due diligence procedures.
11       MR. SONG:  Now is a good point for
12  a break.
13       THE VIDEOGRAPHER:  Off the record
14  2:52 p.m.
15       (Recess taken.)
16       THE VIDEOGRAPHER:  Back on 3:12.
17  BY MR. SONG:
18       Q.    Mr. Merkin, if you could turn to
19  Trustee's Exhibit 354 and go to page 5 of that
20  exhibit.  First full paragraph, within that
21  first full paragraph there's a discussion of the
22  meetings that you arranged and participated
23  between Mr. Madoff and certain investors in the
24  funds.  Do you see that?
25       A.    Starting with the third sentence?

---

**Page 511**

1       Q.    From time to time.
2       A.    Yes.
3       Q.    We talked about Mr. Horowitz
4  already, correct?
5       A.    Um-hum.
6       Q.    Who is Ludwig Bravmann?
7       A.    Ludwig Bravmann is a gentleman who
8  was, I must say, very proud of the fact that he
9  was Bernard Madoff's predecessor as treasurer of
10  Yeshiva University, so he used to identify
11  himself from time to time, who is now I think a
12  vice-chairman of Yeshiva University and has been
13  a member of the Yeshiva University investment
14  committee certainly all the time that I sat on
15  that committee, which is probably 18-ish plus or
16  minus years.  Has had a very long career in the
17  securities industry going back to early Op Co
18  days, Oppenheimer & Company days, probably in
19  the early '50s.
20       Q.    Are you aware whether Mr. Bravmann
21  had a BLMIS investment?
22       A.    Well, various entities that relate
23  to him, certainly fiduciarily speaking, were
24  limited partners in Ascot Partners LP.  I don't
25  know if he had any other.

---

**Page 512**

1       Q.    You're not aware of a direct
2  investment with BLMIS?
3       A.    I'm not aware of one but I would
4  not necessarily be aware of one.
5       Q.    And what were the circumstances
6  related to the meeting that you set up between
7  Mr. Bravmann and Mr. Madoff?
8       A.    Don't remember.
9       Q.    Do you recall what time frame this
10  was in?
11       A.    No.
12       Q.    Did you attend that meeting?
13       A.    I don't remember.
14       Q.    Did you have -- did you take any
15  notes of that meeting?
16       A.    I don't remember.
17       Q.    And do you know if you have any
18  documentation at all evidencing this meeting?
19       A.    Did we produce any, may I ask?
20       Q.    Would you have had an email, say,
21  with Mr. Bravmann setting up the meeting?
22       A.    I might have.  I don't know.  I
23  would not testify that we didn't but I don't --
24  I don't know that that's the way it would have
25  happened.  It may have just been telephone calls

---

**Page 513**

1  that, for all I know, my secretary did and got
2  the times that worked for both of them.
3       They were -- they meaning neither
4  Mr. Bravmann or Mr. Madoff, as best as I can
5  remember, were very big on emails.
6       Q.    The next two names on the list
7  here are Alec Hackel and Christof Reichmuth.  Do
8  you see those?
9       A.    I do.
10       Q.    Who is Alec Hackel?
11       A.    Alec Hackel is a, I think, German,
12  of German origination, possibly a spot of South
13  Africa in there as well, very senior figure in
14  the commodities industry at Philip Brothers and
15  at Marc Rich & Company, who was based, in
16  relevant times, in Zug, Switzerland or in
17  Meggen, Switzerland and was, I think, the
18  chairman of the board, but certainly the senior
19  figure from the point of view of the
20  capitalization of a money management operation,
21  later licensed Swiss bank, called Reichmuth &
22  Company that had been started by Christof
23  Reichmuth's father Carl.
24       And perhaps to save you some
25  questions, at which Patrick Erne, which is the

---

49 (Pages 510 to 513)

**Page 514**

1  name after Christof Reichmuth, so to take those
2  three names together rather than two names
3  together...
4     Q.   Sure.
5     A.   ...worked.
6     Q.   Did there come a time when you set
7  up a meeting between Mr. Reichmuth, Mr. Hackel
8  and Mr. Madoff?
9     A.   I set up meetings for Mr. Hackel,
10 I set up meetings for Mr. Reichmuth, I set up
11 meetings for Mr. Erne.  I don't know at which
12 meetings the two of them might have overlapped.
13    Q.   Did -- I want to start with
14 Mr. Reichmuth.  Do you recall when you set up
15 the meeting for Mr. Reichmuth?
16    A.   Christof?
17    Q.   Yes.
18    A.   This would have probably been not
19 that long after Reichmuth & Company was started
20 by his father.  So early in the period we're
21 talking about, but I don't remember when.
22    Q.   Does the late 1990s sound correct
23 to you?
24    A.   That's early in the period we're
25 talking about, so I can't remember exactly when.

**Page 515**

1  I would have conjectured 2000 but, you know,
2  it's not a different -- not a completely
3  different answer.
4     Q.   Do you recall attending the
5  meeting with Mr. Reichmuth and Mr. Madoff?
6     A.   I recall attending meetings at
7  Mr. Madoff's office with various members of the
8  Reichmuth family.  I'm not sure I remember this
9  one specifically.
10    Q.   Okay.  Do you recall what the
11 purposes were of the -- do you recall what the
12 purposes of the meeting between Mr. Reichmuth
13 and Mr. Madoff were?
14    A.   Broadly speaking, Reichmuth &
15 Company had money management clients, of which
16 possibly Mr. Hackel was one and then had a whole
17 series of clients who I didn't know, and they
18 had -- over a period of time were in the process
19 of setting up at least one and probably two what
20 became fairly large fund of funds.
21    In the first one, chronologically,
22 they had a very large position relative to the
23 size of the fund in Ascot Fund Limited.
24    Q.   Did you ever tell Mr. Reichmuth
25 that BLMIS only acted as a broker for Ascot

**Page 516**

1  Fund?
2     A.   No.
3     Q.   Do you recall how many meetings
4  you set up between Mr. Reichmuth and Mr. Madoff?
5  Mr. Christof Reichmuth.
6     A.   No.
7     Q.   Was it more than one?
8     A.   Could very well be.
9     Q.   Did you ever disclose to
10 Mr. Christof Reichmuth that Ariel had capital
11 invested with BLMIS?
12    A.   To Christof specifically?
13    Q.   Yes.
14    A.   I don't remember a specific
15 conversation with Christof.
16    Q.   Okay.  Do you recall setting up a
17 meeting for Mr. Patrick Erne and Mr. Madoff in
18 October of 2007?
19    A.   Sounds right.
20

21

22

23    Q.   And do you recall anybody else
24 that attended that meeting?
25    A.   Me.

**Page 517**

1     Q.   Anybody else from GCC?
2     A.   Don't think so.  I don't remember,
3  but -- not that I remember.
4     Q.   Why was this meeting arranged?
5     A.   I'm sorry?
6     Q.   Why was the meeting arranged?
7

8

9

10

11

12

13

14

15

16

17

18

19    A.   It was one meeting.
20    Q.   It was one meeting.  And all four
21 of you were together at the meeting?
22    A.   Correct.
23    Q.   Do you have any specific
24 recollection of what was discussed?
25    A.   I think we started from scratch

**50  (Pages 514 to 517)**

Page 574

1  not, so I don't recall that at all.
2      Q.    Did Mr. Madoff ever tell you that
3  his algorithm or black box had a specific name
4  or code name in this case?
5      A.    I'm sorry, too many ors.  I don't
6  remember hearing the phrase "time slicing" from
7  Mr. Madoff, if that's your question.
8      Q.    Did he ever give you a name for
9  the algorithm?
10     A.    He would talk about our strategy
11 and about our program.  I truly don't believe I
12 ever heard -- no, not -- let me just say, not
13 that I recall.
14     Q.    Did Mr. Madoff tell UBP during the
15 November 25th, 2008 meeting that he never
16 overrides the algorithm but personally makes
17 decisions when to enter into a trade?
18     A.    Well, those -- the two halves of
19 those sentences are not sustainable in one
20 sentence.
21     Q.    Okay, let me try --
22     A.    What Mr. Madoff told me any number
23 of occasions, and I don't remember how this came
24 up in November -- I don't know how he said it in
25 the meeting on November 25th, and I think we've

Page 575

1  discussed this already, is the algorithms were
2  incredibly important and were subject to and
3  subordinate to his, what I said colloquially was
4  a gut check.  That the algorithms could be
5  beeping buy buy buy buy; if it didn't go along
6  with his overall sense of the market, he wasn't
7  buying.
8      Q.    Okay, you can put that to the
9  side.
10         MR. STEINER:  Might be a good time
11 for a break.
12         MR. SONG:  All right.  If we can
13 keep it short so we can get Mr. Merkin out as
14 quickly as possible.
15         THE VIDEOGRAPHER:  Off the record
16 4:35.
17         (Recess taken.)
18         THE VIDEOGRAPHER:  We're back on
19 the record 4:54.
20         THE WITNESS:  Just want to mention
21 something to you, make sure that one of my
22 answers is as clear as possible.
23         You had asked me about various
24 persons at Reichmuth & Company and about
25 Reichmuth & Company as a firm as to whether or

Page 576

1  not they knew of the Madoff involvement in
2  Ascot, and whether they knew about the Madoff
3  involvement in Ariel.
4      Q.    Yes.
5      A.    If they knew of the Madoff
6  involvement in Ascot, in my opinion, is a fact.
7  I think it's more likely than not that they knew
8  of the involvement in Ariel.  My level of
9  conviction there is not as high as it was or is
10 on the Ascot piece, and we did not challenge
11 them on Ariel.  We challenged them only on Ascot
12 for that reason.
13     Q.    And you're referring to some sort
14 of litigation between you and Reichmuth &
15 Company?
16     A.    Yes.
17     Q.    Mr. Merkin, do you recall
18 yesterday you referred to an accounting firm
19 called Avellino & Bienes?
20     A.    Yes.
21     Q.    And Avellino & Bienes was the
22 subject of several news articles that you kept
23 in your Madoff file, correct?
24     A.    I don't know how many, but yes.
25     Q.    Other than those articles, did you

Page 577

1  have any other source of information regarding
2  Avellino & Bienes?
3      A.    Other than a discussion with
4  Mr. Madoff about them, no.
5      Q.    And what was --
6      A.    In addition to that I'm saying, in
7  addition to the articles I had conversations
8  with Bernie about them, but that was it.
9      Q.    And what was your discussions with
10 Mr. Madoff about it?
11     A.    He kind of said, yeah, it was me
12 and them.  I didn't know anything about Avellino
13 & Bienes until I read the first of the articles
14 that I read, which was the Wall Street Journal
15 article, and it was already over.
16     Q.    And did you and Mr. Madoff discuss
17 the subsequent SEC investigation of Avellino &
18 Bienes?
19     A.    I don't know if it was subsequent.
20 That is, I have to go back and read the Journal
21 article and see whether that was written only
22 after the SEC investigation was over.  I doubt
23 it, but I just don't remember the sequence.
24     Q.    Take out the word "subsequent."
25 Did you have a conversation with Mr. Madoff

**Page 578**

1  regarding an SEC investigation into Avellino &
2  Bienes?
3      A.   There's a reference to the SEC
4  investigation in that article.  And Richard
5  Walker, who was the regional administrator in
6  New York at the SEC at that time, is quoted.  I
7  don't remember exactly what he says in that
8  quote, because I don't remember the article that
9  well, but I believe he is named or maybe he's
10 just referred to and there's not a quote in
11 quotations.  I just don't remember it that
12 clearly.
13      But we discussed the article and
14 we may have discussed Richard Walker, in which
15 case the answer to your question did we discuss
16 anything about the SEC would have been yes.  If
17 we didn't bring up Richard Walker, I don't
18 remember otherwise a discussion about the SEC.
19      Q.   How often would you talk about the
20 SEC with Mr. Madoff?
21      A.   I don't know.
22      Q.   In your 10 to 15 conversations per
23 year, do you recall whether you had a
24 conversation once or twice per year or was it
25 one time in your entire, the entire span of your

**Page 579**

1  relationship?
2      A.   I don't think it was one time in
3  the entire span of the relationship, and I don't
4  know how often.  I just don't remember.  I'm
5  sure it was not in every conversation.  I'm sure
6  it was not only once, and between those two, I'm
7  not sure.
8      Q.   And you're aware at some point
9  Mr. Madoff registered as an investment advisor
10 with the SEC?
11     A.   I am.
12     Q.   And were you -- you've referred to
13 form ADV filings in your prior testimony?
14     A.   Mangled it a few times and with
15 your able assistance, got it right.
16     Q.   And did you review the form ADV
17 filings starting in 2006?
18     A.   I'm not sure -- I just don't
19 remember when I started reviewing them and how
20 many I reviewed.  I remember the last one.  I
21 don't remember if there was any -- the last one
22 stands out.  I'm not sure what I did with the
23 prior ones.
24     Q.   So your -- you do recall reviewing
25 the one filed in 2008?

**Page 580**

1      A.   Well, I should add something,
2  which is -- I should ask you.  You're
3  undoubtedly asking me whether I remember now
4  that I reviewed it before December 11th, 2008?
5      Q.   That's correct.
6      A.   Okay.  So the simple truth is I
7  have been asked questions about that document
8  enough times in enough proceedings since, let's
9  say, January 2009 or since early 2009, that I
10 can't tell you today whether what I see in front
11 of me in my mind's eye as the document is
12 something that I remember from, say, the second
13 half or sometime in 2008 or that I remember only
14 from those proceedings.
15     Q.   Okay.  You also mentioned in your
16 earlier testimony some due diligence done by
17 some French banks.  Do you recall that
18 testimony?
19     A.   Earlier today?
20     Q.   Yes.
21     A.   I remember the reference to the
22 French banks, yes.
23     Q.   And one of those banks is BNP
24 Paribas?
25     A.   I believe so.

**Page 581**

1      Q.   Was BNP Paribas interested in
2  creating a leveraged product with Ascot?
3      A.   Yes.
4      Q.   And did anyone from BNP Paribas
5  tell you that they had conducted due diligence
6  on BLMIS?
7      A.   I think so.
8      Q.   Who was that person?
9      A.   Don't remember the names.
10     Q.   What was the due diligence that
11 they conducted?
12     A.   Let me just say what I remember.
13 There were possibly two different sources of
14 credit, of debt, and I had meetings in offices
15 in New York City possibly with more than one
16 group.  There was a series of meetings in a
17 group that then had an office and, for all I
18 know, still does at 9 West 57th Street.  If you
19 know that that's who BNP Paribas -- if you know
20 them to have been at 9 West.  There was a group
21 called IXIS, I can't remember, something like
22 that.  It's either a subsidiary of one of these
23 banks or -- either a subsidiary of BNP or the
24 other one, I had meetings with them.  I had
25 meetings, I believe, at the Madoff office.  I

**Page 598**

1    Q.   I'm not talking about
2  Mr. DiPascali. I'm just talking about when
3  would you authorize Mr. Autera --
4    A.   I was talking about Mr. DiPascali.
5  Meaning, I don't know what happens when Mr. --
6  what would have happened when Mr. Autera spoke
7  to -- to Mr. DiPascali. I tried to make it a
8  practice, certainly as best as I could, my
9  practice to call Bernie with our adds and
10 subtracts.
11        I would say as a broad matter that
12 Mike knew what the adds and subtracts were going
13 to be. He ran the back office.
14   Q.   Mr. Merkin, you testified earlier
15 regarding the audits that BDO was performing on
16 behalf of the defendant funds.
17   A.   I'm sorry, we're done with this,
18 right?
19   Q.   Yes.
20   A.   Are we done with this or still not
21 yet?
22   Q.   Not yet.
23   A.   Wow, okay.
24        I did.
25   Q.   And I believe you testified that

**Page 599**

1  you thought that BDO was independently verifying
2  the funds' assets at BLMIS; is that correct?
3        MR. STEINER: Objection to form.
4    A.   I think I was reading something
5  that we had previously submitted.
6        "As part of the audit BDO reviewed
7  and tested various trade confirmations, monthly
8  statements, communicated directly with BLMIS,"
9  meaning the Madoff office, "concerning the value
10 of the funds' investments."
11       And BDO audited our books and
12 represented the value of those funds as of the
13 date of which the audit spoke.
14   Q.   Did you ever talk to Mr. Madoff
15 about giving BLMIS -- giving BDO access to
16 BLMIS's books and records?
17   A.   I might well have. I don't
18 remember.
19   Q.   Do you recall ever speaking with
20 your auditors directly?
21   A.   To BDO as a firm?
22   Q.   To any member of the audit team
23 that would come to GCC.
24   A.   I don't remember such a
25 conversation.

**Page 600**

1    Q.   Did you do anything to ensure that
2  BDO was reviewing the BLMIS material it
3  received?
4        MS. ARCHER: Object to the form.
5    A.   BDO was the auditor we engaged.
6  We engaged them to audit our other funds. I
7  don't remember specifically having a
8  conversation of the type that you described.
9    Q.   Are you aware that your attorneys
10 have argued that BDO referred investors to
11 Ascot?
12       MR. STEINER: Objection to the
13 form.
14   A.   Am I aware that the attorneys have
15 argued that?
16   Q.   That your attorneys in this
17 litigation have argued that BDO has referred
18 investors to Ascot?
19   A.   I'm not aware of what my attorneys
20 argued in this litigation. So you're saying
21 that -- I guess I don't understand the question.
22   Q.   Let me ask it this way.
23   A.   Okay.
24   Q.   Did BDO refer investors to Ascot?
25   A.   I believe they did.

**Page 601**

1    Q.   And what's the basis for that
2  claim?
3    A.   Conversations with BDO in which
4  they were -- they certainly knew what Ascot was,
5  they certainly understood the strategy, they
6  certainly reviewed confirmations, they certainly
7  knew the returns, because they audited them.
8  There was a time that they produced a
9  compilation of the returns and asked whether
10 they could introduce an investor to the fund.
11   Q.   And who were these conversations
12 with?
13   A.   The one about introducing an
14 investor to the fund?
15   Q.   Yes.
16   A.   Well, with me.
17   Q.   Who at BDO I mean?
18   A.   Oh. Michael Andreola.
19   Q.   And is Michael Andreola an
20 auditor?
21   A.   I mean, does he work at BDO
22 Seidman? Is he an accountant there? Yes.
23   Q.   Your understanding is he's an
24 accountant?
25   A.   I believe so.

**Page 606**

1    A.    I might have, sure.
2    Q.    You don't recall specifically?
3    A.    I don't recall specifically any --
4  I don't recall the specifics of a conversation
5  with them.
6    Q.    Did Mr. Joel Ehrenkranz ever tell
7  you that he met with Mr. Madoff?
8    A.    I don't remember.
9    Q.    Did he ever tell you that he
10 declined to invest with BLMIS?
11   A.    Directly?
12   Q.    Yes.
13   A.    Not that I recall.
14   Q.    Did Mr. Joel Ehrenkranz ever tell
15 you that he had concerns about Madoff's auditor?
16   A.    No.
17   Q.    Did Mr. Joel Ehrenkranz ever tell
18 you that he -- that he was concerned that BLMIS
19 self-cleared?
20   A.    Might have come up as a subject,
21 might have been a subject that came up in our
22 conversations.  I don't remember that
23 specifically.
24   Q.    Do you recall whether or not the
25 Ehrenkranzes redeemed the investment that they

**Page 607**

1  were associated with in Ascot Partners at the
2  end of 1995?
3    A.    I know that they redeemed and I
4  don't know when it was.
5    Q.    Did they tell you that they had
6  concerns that Madoff's, Mr. Madoff's returns
7  were too consistent to be believed?
8    A.    Not that I recall.
9    Q.    Are you familiar with an entity
10 known as Ivy Asset Management?
11   A.    Yes.
12   Q.    And what is Ivy Asset Management?
13   A.    As I remember it, or as I know it,
14 Ivy Asset Management was an investment advisory
15 firm based in Garden City, Long Island that
16 managed one or another fund of funds.
17   Q.    And were you aware that Ivy Asset
18 Management had investments with BLMIS?
19   A.    When?
20   Q.    In the '90s.
21   A.    When was I aware, I'm sorry?  To
22 make the question clear.
23   Q.    Were you aware in the 1990s that
24 Ivy Asset Management had an investment with
25 BLMIS?

**Page 608**

1    A.    I just don't remember.
2    Q.    Did you ever meet with Howard
3  Wohl?
4    A.    Yes.
5    Q.    And was Mr. Wohl at Ivy Asset
6  Management at the time?
7    A.    I believe so.
8    Q.    Did you ever meet with Fred Sloan?
9    A.    Yes.
10   Q.    Was Mr. Sloan also at Ivy Asset
11 Management?
12   A.    I believe so.
13   Q.    Did you ever have meetings with
14 Mr. Sloan or Mr. Wohl and discuss BLMIS?
15   A.    Surely possible, yes.
16   Q.    Did you ever discuss Ascot's
17 capital allocation with Mr. Sloan or Mr. -- I'm
18 sorry, with representatives from Ivy Asset
19 Management?
20   A.    I might have.
21   Q.    Did you tell Ivy Asset Management
22 that Ascot is a Madoff-type basket strategy that
23 you could do but not as well as Bernie?
24   A.    I don't remember saying that.
25   Q.    Did you ever tell representatives

**Page 609**

1  from Ivy Asset Management that you were a
2  fiduciary to Madoff's children?
3    A.    I doubt that.  I don't think I did
4  say that.  And I wasn't, so I guess that means I
5  didn't say it.
6    Q.    Did you ever --
7    A.    So the answer to your question is
8  no.
9    Q.    Did you ever refer to -- did you
10 ever say to Ivy Asset Management that
11 understanding Madoff is like finding Pluto?
12   A.    As I sit here today, I don't
13 remember saying that at any particular time.  I
14 don't remember saying it.
15   Q.    Do you remember saying it to
16 anyone?
17   A.    I don't remember any specific
18 conversation in which I said that.
19   Q.    Did Mr. Madoff attend your
20 children's bar and bat mitzvahs?
21   A.    Mr. Madoff certainly attended one
22 or another of them.  I don't remember which he
23 did -- well, I remember which he did, I'm not
24 sure -- I'm not sure I remember which he did and
25 which he didn't.

**Page 610**

1    Q.    So he attended at least one of
2    your children's --
3    A.    Correct.  And very possibly more
4    than one.
5    Q.    Do you know Noreen Harrington?
6    A.    Again, please.
7    Q.    Do you know Noreen Harrington?
8    A.    No.
9    Q.    Do you recall meeting -- do you
10   know an entity known as Sterling Stamos?
11   A.    Yes.
12   Q.    And was Sterling Stamos an
13   investor in Ascot?
14   A.    Yes.
15   Q.    Do you recall having a meeting in
16   June of 2003 with representatives from Sterling
17   Stamos?
18   A.    Not specifically.
19   Q.    What general recollections do you
20   have?
21   A.    Of that meeting in June 2003?
22   Q.    Yes.
23   A.    None.  But that just means I don't
24   remember there being a meeting.
25   Q.    Are you familiar with an entity

**Page 611**

1    known as Aozora Bank?
2    A.    Yes.
3    Q.    What is Aozora Bank?
4    A.    Aozora is a Japanese bank.
5    Q.    And was Aozora Bank an investor in
6    Ascot Fund?
7    A.    Yes.
8    Q.    Were they also an investor in
9    Ariel Fund?
10   A.    Yes.
11   Q.    And are you aware whether Aozora
12   Bank had a representative with Spring Mountain
13   Capital?
14   A.    I believe they did.
15   Q.    What is your understanding of that
16   relationship?
17   A.    I think Spring Mountain Capital
18   acted as an advisor to Aozora in the placement
19   of funds with various money management
20   strategies, hedge funds included, over a period
21   of time.
22   Q.    I'm not sure if we actually have
23   ever covered this, but did you have a
24   relationship with Spring Mountain Capital?
25   A.    Yes.

**Page 612**

1    Q.    What was your relationship with
2    Spring Mountain Capital?
3    A.    I was a, I suppose a consultant to
4    them, a supply of credit and may have had other
5    affiliations with them as well.  I was an
6    investor in investment products of theirs and
7    they were investors in investment products of
8    ours.
9    Q.    Mr. Merkin, the court reporter is
10   handing you what's been previously marked as
11   Trustee's 142.  It's Bates number is BS00078912,
12   ending at 916.
13   Do you see on page 912 there's a
14   reference to an interview on May 19th, 2004?
15   Near the top of the page.  There's a number 1,
16   the interview on May 19th, 2004.
17   A.    I'm not sure I've seen this
18   before.  Do you have any idea that I have or --
19   unless you want me to read the whole thing,
20   which I don't mind doing, you have to point me
21   at what you want me to read.
22   Q.    I'm just pointing you to the stop
23   of the first page where it says the interview on
24   May 19th, 2004.
25   A.    I see that caption, if that's the

**Page 613**

1    right word for it.
2    Q.    And then below that do you see
3    where it says "Inagaki-san, myself, Chris,
4    Seiichiro met with Ezra to talk about Ariel Fund
5    and Ascot Fund."  Do you see that?
6    A.    Yes.  Who is myself?
7    Q.    It's not entirely clear who the
8    "myself" is, but do you know who -- well, one,
9    do you remember having a meeting on May 19th,
10   2004 with representatives of Aozora Bank?
11   A.    Not specifically, no.
12   Q.    Do you have any reason to doubt
13   that such a meeting took place?
14   A.    No.
15   Q.    Do you know who Inagaki-san is, or
16   Inagaki-san I believe it should be?
17   A.    I'm not sure.
18   Q.    And the Chris that's referenced
19   here, do you know who that is?
20   A.    I'm not sure.
21   Q.    Could it be Chris Brody?
22   A.    I mean when you --
23   (Interruption)
24   A.    Excuse me.  Sorry, meant to leave
25   this in the other room.  Apologize.  Let me see

**Page 634**

1     Meaning we had, say, in Ariel Fund
2  for periods of the fund's history, quarterly
3  outs with 30 days prior redemptions.  30 days
4  notice, quarterly outs.
5     If you were doing, to take an
6  extreme, merger arbitrage, that was probably a
7  perfectly unmismatched of an asset with a
8  liability.  The asset being the funds you
9  managed, the liabilities being the portfolios.
10  For the moment.
11     And so we did various things in
12  the portfolios and in the contractual agreements
13  with the investors to straighten out mismatches.
14  Introduced things like side pockets, required
15  all investor permission to do that.
16     The law changed at one point and
17  we made changes in the liquidity terms of the
18  investors to reflect changes in the law.  The
19  law changed again.  We reversed some of those in
20  one case, kept them in other cases.  And tried
21  to be aware of the need for a pool of cash or a
22  pool of buying power that could be available
23  should we need it.
24     Q.   I am going to hopefully move to my
25  last topic.  We'll see if I can get you out of

**Page 635**

1  here in the next 20 minutes or so.
2     Let me get tab 8, 6, 7 and I guess
3  there should be 9.
4     MR. STEINER:  But not 6, 7, 8 and
5  9?
6     A.   This goes back to yesterday,
7  right, Brian?
8     MR. STEINER:  Doesn't matter.
9     MR. SONG:  Doesn't matter.  It's
10  all one.
11     Q.   Doesn't matter.
12     (Comments off the record.)
13     (Exhibit Trustee 375 marked for
14  identification.)
15     Q.   Mr. Merkin, before we get to the
16  exhibit, you testified I believe yesterday
17  regarding personal exposure that you and your
18  family had through the defendant funds to BLMIS.
19  Do you recall that testimony?
20     A.   I think I -- if I know what you
21  are referring to, not that I'm reading your mind
22  here, yes, I do.
23     Q.   You said -- I believe you said
24  that you had somewhere 110, $120 million in
25  exposure; is that right?

**Page 636**

1     A.   I don't think I said quite that,
2  no.  I think I said I don't think it was as high
3  as 120.  I think it might have been something
4  closer to 110, 112, something like that.  Across
5  the --
6     Q.   Across the defendant funds?
7     A.   Right.
8     Q.   The court reporter has handed you
9  what's been marked as Trustee's Exhibit 375.
10  What I would like to do is try to figure out
11  exactly where the exposure lies.
12     And let me say for the record
13  Trustee's 375 is Bates number GCC-P 0463582.  It
14  is a native file, which is why the Bates number
15  doesn't appear on the document.
16     Mr. Merkin, do you recognize
17  Trustee's 375?
18     A.   Does recognize mean have I seen
19  this before and therefore can recognize it?
20     Q.   Yes.
21     A.   I don't really know.  It says it's
22  a list of the Ascot Partners LP investor capital
23  accounts.
24     Q.   But you haven't seen this document
25  or another document like it before?

**Page 637**

1     A.   I'm not sure.  I'm not sure I've
2  seen this document before.
3     Q.   Okay.  Could you turn to the last
4  page of the document.
5     A.   The very last page of the
6  document?
7     Q.   Yes.
8     A.   Sure.  Okay.
9     Q.   Do you see that there's, at the
10  bottom of the page, certain entities that are
11  broken out from the other limited partners?
12     A.   Yes.
13     Q.   Is it your understanding that
14  these entities listed here are associated with
15  either you or your family?
16     A.   You're talking about lines 234 to
17  238 or maybe I should say 240?
18     Q.   Yes.
19     A.   Yes.
20     Q.   And the first one there is listed
21  as Hobby Farm.  What is Hobby Farm?
22     A.   It's some form of a family trust,
23  I think.
24     Q.   Were you including Hobby Farm's
25  investment in Ascot Partners in the $110

# Exhibit 85

1

1

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

3             IN THE MATTER OF

4    MADOFF CHARITIES INVESTIGATION

     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5

6                          120 Broadway
                           New York, New York

7
                           January 30, 2009

8                          10:02 a.m.

9

10           EXAMINATION UNDER OATH of J.

11   EZRA MERKIN, pursuant to Subpoena, held at

12   the above place, date and time, before

13   Alice Schulman, a Notary Public of the

14   State of New York.

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL                                          BS00001025

9

1                        J. E. Merkin

2          A.      I believe.

3          Q.      And describe how that came

4     about.

5          A.      We had had several

6     conversations, meetings or telephone in

7     which he described market making

8     activities in his office and money

9     management activities in his office.

10              He walked through a strategy

11    that he was then interested in executing

12    on behalf of clients, and the decision

13    came about that it made sense to allocate

14    some capital to him and invest some

15    capital in those strategies.

16         Q.      What was the strategy he

17    described to you?

18         A.      At that time the strategy

19    involved the purchase of individual

20    stocks, preponderantly the purchase of

21    individual stocks, puts were beneath them

22    and the puts were to be bought, the calls

23    were to be sold and the stocks were to be

24    bought.  So you would long a stock, long a

25    put option that would have a strike price

VERITEXT REPORTING COMPANY

CONFIDENTIAL                                        BS00001033

10

1                         J. E. Merkin

2    beneath the price of that stock and short

3    a call that had a strike price above the

4    price of the stock.

5                    The put and the call had the

6    same expiration dates, the options had the

7    same expiration dates.

8         Q.    Is there a name associated with

9    that strategy?

10        A.    If it's done on individual

11   stocks, it might be called a split strike

12   strategy.  It might be called buying the

13   puts, writing the calls, something like

14   that.

15        Q.    And had you done the strategy

16   yourself?

17        A.    We had looked at options related

18   strategies and options arbitrage of

19   related strategies in which they thought

20   there may be some market inefficiencies

21   between premiums or premium on puts and

22   calls relative to stocks.  I don't think

23   we had done much with it.

24        Q.    And the split strike strategy,

25   is that one that stayed constant

CONFIDENTIAL                                        BS00001034

128

J. E. Merkin

1

2      Q.      Just to clarify, what I'm

3  understanding you to say, and tell me if

4  this is a fair characterization, the play

5  in execution was for the vast most part in

6  the option trading, and the option trading

7  that was over-the-counter or unreportable?

8      A.      If you permit me to edit what

9  you said, I would take out vast.  I would

10  say for the most part, I'm not sure I

11  would say the vast most part.  That was

12  formidable on his stocks.

13          Maybe this is worth a word or

14  two.  When you said Madoff was a legend,

15  he was a legendary person, he was.  I

16  don't know if you were saying that

17  seriously or facetiously.

18          MR. LEVANDER:  We are talking

19      about a legend of one kind pre

20      December 11th.

21      A.      Fair enough.  You're talking

22  about a guy who had a broker-dealer

23  license for 38 years.  You're talking

24  about somebody who had massive market

25  share.  He was the guy that took on the

CONFIDENTIAL                                          BS00001152

129

1          J. E. Merkin

2    New York Stock Exchange and eventually

3    won.   They had hegemony.   He shed them of

4    it.   He did it by basically being a

5    wholesale upstairs trader.

6              He would say to me routinely if

7    I asked him regularly, which doesn't mean

8    every time but reasonably frequently, what

9    percentage of the New York Stock Exchange

10   volume are you doing today. The answer was

11   low teens, sometimes eight or nine.

12             At the beginning he was the

13   source, he was the beneficiary of the

14   Stock Exchange off-board trading room.   So

15   if you were a member firm, if you were

16   Merrill Lynch, I'm picking on Merrill,

17   it's not meant to be any specific example,

18   you could not change New York Stock

19   Exchange stocks other than through the

20   floor, originally 24 hours a day, and then

21   nine to four.

22             He didn't have a seat.   He

23   wasn't a member firm, so he could do the

24   upstairs trading all day, every day.   The

25   13 percent sounds like an incredibly high

CONFIDENTIAL                                          BS00001153

130

1                          J. E. Merkin

2      figure but it's really incredibly

3      understated because that's the whole stock

4      exchange trading in the 150 (check) names

5      that he cared about he could be 40 percent

6      of the volume.

7                 When we were in the merger

8      arbitrage business, okay, when there was

9      just more to do in the merger arbitrage

10     business, which has relevance to Bernie's

11     strategy, we would occasionally get a name

12     which was Bernie's name, Pfizer is buying

13     Wyeth.  If Wyeth was a name of Bernie's

14     150 names, he was 40 or 50 percent of the

15     volume in the wholesale area, not in what

16     we were doing together but in that

17     incredible market making business he had,

18     and that was the real legend.

19                 And at the end of the Madoff

20     investigation we'll find out if the market

21     making business was for real or not real,

22     but I bet you it was.  This is just a

23     hunch.  That was where a lot of the

24     executions came and it played off on

25     options, that's where you really had

CONFIDENTIAL                                          BS00001154

131

1                    J. E. Merkin

2      the --

3              MR. LEVANDER:  To put it in

4         perspective, we have given you, among

5         other things that we've given you,

6         articles that were thrown into the due

7         diligence file.  And if you look at

8         those articles in 1990, and I may be

9         off, but I think this is right, the

10        Wall Street Journal and New York Times

11        said that five entities got together

12        to create an electronic trading

13        exchange.  Those were Citi, which were

14        Soloman Smith Barney, Merrill, Goldman

15        Sachs, Morgan Stanley and Bernie

16        Madoff.  And that's the scope and

17        stature he had in that business.

18              MR. CORNGOLD:  I think we

19        understand that.

20              MR. LEVANDER:  Fine.  I'm trying

21        to be helpful.

22        A.    I would only amend what Andy

23    said.  You look at him and tick off his

24    fingers, those four were half the

25    business, he was the other half.  He

CONFIDENTIAL                                      BS00001155

132

J. E. Merkin

1    wasn't 20 percent.  Those four guys came

2    to him and said would he like to do a

3    joint venture on the market making side.

4    EXAMINATION BY

5    MR. SANGEAP:

6        Q.    Was he a market maker in

7    options?

8        A.    I think the answer is yan,

9    meaning yes and no. Bernie didn't boast

10   much. Bernie claimed to me he had a very

11   significant role in inventing the OEX.

12        If you know about the history of

13   options, it would be a very big thing.  I

14   asked a couple of guys in Chicago, I said

15   is this right or wrong, they said more

16   right than wrong.  This is all third-hand

17   conversations.  They don't mean a lot.

18        He had a significant volume in

19   options that he was doing as a market

20   maker, significant volume when the big

21   board refused to let their floor

22   specialists make markets in options in the

23   names that they were specialists in at the

24   same time.

CONFIDENTIAL                                    BS00001156

133

1          J. E. Merkin

2          It was called side-by-side

3    market making, and it was forbidden on the

4    floor.  For whatever policy reasons that I

5    don't know, and the little I do know don't

6    make a lot of sense.  So when he had this,

7    when the cartel gave him this opportunity,

8    he sat and made options.

9          This goes back quite awhile, but

10   I remember a visit to Bernie and his

11   traders when he showed me what they called

12   a Madoff screen which was a proprietary

13   screen on which they spent fortunes every

14   year upgrading and keeping up the same

15   thing where they would show stocks and

16   their options on the same screen.  It was

17   like a quarter panel that was the options

18   screen, and they were making option

19   markets in the options.  But those were in

20   stocks and not necessarily OEX's.

21          Later on, I mean later on the

22   whole thing changed.  Later on the

23   off-board trading changed.  Nothing stays

24   that static in markets.  The whole New

25   York Stock Exchange thing, and that was a

CONFIDENTIAL                                          BS00001157

134

1       J. E. Merkin

2   lot of conversations, where do changes in

3   these markets bring the strategy.

4       Q.    Just focussing on the last five

5   years.    Are you aware of whether Mr.

6   Madoff made a market in --

7       A.    OEX's?

8       Q.    -- OEX's or the 100 stocks --

9           MR. LEVANDER:   Let him finish

10      his question.

11      Q.    -- stock options?

12      A.    I don't know for sure.

13      Q.    Did you have any conversations

14  with him concerning whether he made

15  markets for S&P 100 options?

16      A.    My most recent conversation with

17  him about that subject, okay, was so near

18  the end that I'm not sure today I believe

19  anything said in, in the fourth quarter of

20  '08.    It was either October or November.

21      Q.    What did he say in that

22  conversation?

23      A.    We had a conversation about the

24  contraparty risk in the puts, what

25  percentage of listed puts I was using

212-267-6868

516-608-2400

CONFIDENTIAL

BS00001158