# Exhibit 86

241428.TXT

248

```
 1

 2

 3   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 4   -------------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 5   By ANDREW M. CUOMO, Attorney General
     of the State of New York,
 6
                         Plaintiff,     Index No.
 7      - against -                      450879/2009

 8   J. EZRA MERKIN and GABRIEL CAPITAL
     CORPORATION,
 9                       Defendants,
                -and-
10
     ASCOT PARTNERS L.P., ASCOT FUND LIMITED,
11   GABRIEL CAPITAL L.P., ARIEL FUND LIMITED,
     GABRIEL ASSETS LLC, and GABRIEL ALTERNATIVE
12   ASSETS LLC,
                         Relief Defendants
13   -------------------------------------------x
                         March 4, 2010
14                       10:03 a.m.

15

16

17       CONTINUED EXAMINATION BEFORE TRIAL of

18   Defendant J. EZRA MERKIN, taken by Plaintiff,

19   pursuant to Notice, at the State of New York

20   Office of the Attorney General, 120 Broadway,

21   New York, New York 10271-0332, before Donna

22   A. Metz, a Registered Professional Reporter

23   and Notary Public in and for the State of

24   New York.

25
```

249

```
 1
```

Page 1

CONFIDENTIAL

BS00000225

241428.TXT

13        Q.   Well, what is the risk?  They could

14   be lost?  They could be stolen?

15             What is the risk?

16        A.   If you have money in a bank you have

17   risk at the bank, depending on how much it is

18   and what the nature of the risk is.

19             If you own treasuries and they are

20   custodied in a shop that files for bankruptcy,

21   those treasuries could be at risk; could be.

22        Q.   Now, is the risk, such as it may be,

23   compounded -- the risk that securities will be

24   lost, stolen or not exist --

25        A.   What I was alluding to now and also

411

1              J. Ezra Merkin

2    yesterday when I talked about 2008, just look

3    at the overnight risk issues that came about

4    in 2008 from Lehman's filing.  That's the

5    risk.

6         Q.   Is the risk also having an

7    independent -- most investment managers have

8    independent brokers and custodians; correct?

9              It is somewhat unusual for the same

10   investment manager to be also acting as the

11   custodian and prime broker; isn't that true?

12        A.   Are you talking about us, now?

13        Q.   I am not talking about you.

14        A.   Focus me.

15        Q.   Is it somewhat unusual for a money

Page 148

CONFIDENTIAL                                                    BS00000372

241428.TXT

16    manager to also be acting as the prime broker

17    and custodian?

18        A.    If you open an account at Goldman

19    Sachs and you say to Goldman Sachs, whether

20    you give them discretion over that account or

21    whether you retain discretion over that

22    account, you expect that account to be housed

23    and custodied at Goldman Sachs.

24            Any managed account -- I can't say

25    that this is without exception, but the

412

1                J. Ezra Merkin

2    presumption is that a managed account is

3    custodied at the brokerage firm at which the

4    account is held.

5            Madoff is a registered

6    broker-dealer.  He has been a registered

7    broker-dealer under the SEC for decades.  He

8    has been vetted by the SEC for decades.  This

9    is before we get to his registration as an

10    investment advisor.

11            Accounts held at Madoff are no

12    different than the accounts held at Goldman

13    Sachs, wherein the overnight custody was at

14    Goldman Sachs.  It's no different than being

15    held at Morgan Stanley.

16        Q.    If Madoff had been acting purely as

17    a broker or later investment advisor with a

18    separate custodian and using a separate

Page 149

CONFIDENTIAL

BS00000373

241428.TXT

19   custodian, this Ponzi scheme would have been

20   impossible; correct?

21        A.   It's a speculative answer.  I can

22   see why it would have been harder, but you are

23   talking about somebody who pulled off, you

24   know, the swindle of the decade in

25   extraordinarily artful and innovative ways.

413

1                  J. Ezra Merkin

2           For all I know he had accounts that

3    he cleared someplace else, and whether they

4    were part of the swindle or not, I just don't

5    know.

6        Q.   If there was an independent

7    custodian or an independent prime broker it

8    would have been impossible for him to have

9    created these confirms and to carry on his

10   Ponzi scheme; isn't that true?

11           MR. ELLENHORN:  I will go on to

12        something else.

13           It is withdrawn.

14           MR. LEVANDER:  Thank you.

15       Q.   Would you look at the document in

16   front of you Bates No. IVYMAC 00085331, dated

17   January 14, 1997.

18       A.   I have it.  This is 224; right.

19       Q.   Exhibit 224.

20           This references a meeting with you.

21   It says, "Meeting with Ezra Merkin FS. PD
                    Page 150

                                              BS00000374

# Exhibit 87

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-------------------------------------------X

THE PEOPLE OF THE STATE OF

NEW YORK BY ANDREW M. CUOMO,

ATTORNEY GENERAL OF THE STATE

OF NEW YORK,

                  Plaintiff,

       -against-          Index No.:

                          450879/2009

ASCOT PARTNERS, LP,

ASCOT FUND LIMITED,

GABRIEL CAPITAL, LLC, and

GABRIEL ALTERNATIVE ASSETS,

                  Defendants.

-------------------------------------------X

                  120 Broadway

                  23rd Floor

                  New York, New York 10271

                  July 1, 2010

                  10:11 a.m.

      EXAMINATION BEFORE TRIAL of J. EZRA

MERKIN, a representative of the Defendant in

the above-entitled action, taken on behalf

of the Plaintiff, held at the above time and

place, and taken before Binita Shrestha, a

reporter and Notary Public within and for

the State of New York.

[Page 20]

1                    J. E. MERKIN

2    about options strategies, and think that I

3    understood what that strategy was, what it

4    purported to be, and how basically it

5    worked.

6              I spent a lot of time doing due

7    diligence on what the strategy was with

8    Mr. Madoff and about Mr. Madoff's firm with

9    others on Wall Street.  We had any number of

10   meetings with Mr. Madoff about the options.

11   Even late in the game when we set up

12   meetings for UBP and the fourth quarter of

13   2008, we focused on the options, we focused

14   on how they worked with the stocks, we

15   focused on how the strategy was meant to

16   deliver the kind of return it did.  I don't

17   think options were something that were new

18   to me, alien to me, or not understood by me.

19              I think Mr. Madoff's role in the

20   industry, I think Mr. Madoff's stature and

21   his firm's stature were all things we took

22   into account in considering the

23   appropriateness of the strategy.

24        Q.  Have you now finished your answer?

25        A.  Yes.

# Exhibit 88

[Page 1]

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-------------------------------------------X

THE PEOPLE OF THE STATE OF

NEW YORK BY ANDREW M. CUOMO,

ATTORNEY GENERAL OF THE STATE

OF NEW YORK,

                    Plaintiff,

          -against-              Index No.:

                                450879/2009

ASCOT PARTNERS, LP,

ASCOT FUND LIMITED,

GABRIEL CAPITAL, LLC, and

GABRIEL ALTERNATIVE ASSETS,

                    Defendants.

-------------------------------------------X

                    120 Broadway

                    23rd Floor

                    New York, New York 10271

                    July 1, 2010

                    10:11 a.m.


          EXAMINATION BEFORE TRIAL of J. EZRA

MERKIN, a representative of the Defendant in

the above-entitled action, taken on behalf

of the Plaintiff, held at the above time and

place, and taken before Binita Shrestha, a

reporter and Notary Public within and for

the State of New York.

[Page 20]

1                    J. E. MERKIN

2    about options strategies, and think that I

3    understood what that strategy was, what it

4    purported to be, and how basically it

5    worked.

6           I spent a lot of time doing due

7    diligence on what the strategy was with

8    Mr. Madoff and about Mr. Madoff's firm with

9    others on Wall Street.  We had any number of

10   meetings with Mr. Madoff about the options.

11   Even late in the game when we set up

12   meetings for UBP and the fourth quarter of

13   2008, we focused on the options, we focused

14   on how they worked with the stocks, we

15   focused on how the strategy was meant to

16   deliver the kind of return it did.  I don't

17   think options were something that were new

18   to me, alien to me, or not understood by me.

19           I think Mr. Madoff's role in the

20   industry, I think Mr. Madoff's stature and

21   his firm's stature were all things we took

22   into account in considering the

23   appropriateness of the strategy.

24     Q.  Have you now finished your answer?

25     A.  Yes.

# Exhibit 89

1

1

2    AMERICAN ARBITRATION ASSOCIATION

3    NEW YORK, NEW YORK - COMMERCIAL RULES

4    -----------------------------------x

5    MOSHAEL J. STRAUS,

6              Claimant,

7

8         v.              Arbitration No.

9                    13 148 Y 01800 10

10   J. EZRA MERKIN,

11             Respondent.

12   -----------------------------------x

13             June 21, 2011

14             Cravath, Swaine & Moore LLP

15             Worldwide Plaza

16             825 Eighth Avenue

17             New York, New York

18             10:05 a.m.

19

20   B E F O R E :

21   WILLIAM A. DREIER, P.J.A.D. (ret.) - The Chairman

22   THOMAS J. FLEMING, ESQ. - Panel Member

23   RORY O. MILLSON, ESQ. - Panel Member

24

25      Amy Klein Campion - Hearing Reporter

CONFIDENTIAL                                        GCC-P 0494401

**44**

1    Merkin - Direct/Bamberger
2    if you can or can't.
3        THE WITNESS:  I can't shift
4    down.
5        MR. LEVANDER:  Don't fall off
6    the step.
7        THE WITNESS:  I can possibly
8    move up the chair.
9    DIRECT EXAMINATION
10    BY MR. BAMBERGER:
11    Q.    Mr. Merkin, good morning.
12    A.    Good morning.
13    Q.    As you know, I'm David Bamberger
14    and I represent the Claimant, Moshael
15    Straus.
16        Sir, when and where were you
17    born?
18    A.    I was born in New York City in
19    1953.
20    Q.    Where did you go to school as a
21    youth?
22    A.    Well, at least starting in high
23    school, I went to a high school called
24    Ramaz School.  After that I studied for a
25    few years abroad, went to Columbia College

**REDACTED**

**43**

1    Opening Statement - by Claimant
2        THE CHAIRMAN:  Thank you.
3        Mr. Bamberger, call your first
4    witness, please.
5        MR. BAMBERGER:  Claimant calls
6    Ezra Merkin, your Honor.
7        THE CHAIRMAN:  Will you swear
8    the witness.
9    J. EZRA  MERKIN,
10    called as a witness on behalf of the
11    Claimant, having been first duly affirmed
12    by the Court Reporter, was examined and
13    testified as follows:
14        THE WITNESS:  My name is J. Ezra
15    Merkin.  I live at 740 Park Avenue,
16    New York, New York 10021.
17        MR. LEVANDER:  Mr. Chairman, a
18    question.  Logistics here -- it's a
19    beautiful courtroom, I don't fault for
20    that for a second.  The sight lines
21    actually aren't so great.
22        If Mr. Merkin can shift a little
23    bit over so I can actually see the
24    witness and I can hear him better, I
25    would be appreciative.  I don't know

**45**

1    Merkin - Direct/Bamberger
2    and then to Harvard Law School.
3    Q.    Okay.  When you say you studied
4    a few years abroad, where were you?
5    A.    I lost the question.
6        MR. BAMBERGER:  We'll slow down.
7    Q.    When you studied for a few years
8    abroad, where did you study?
9    A.    Israel and Europe.
10    Q.    Were you in Yeshiva in Israel?
11    A.    Yes.
12    Q.    What were your years at Columbia
13    College, please?
14    A.    I graduated class of 1976.
15    Q.    When did you meet Danny Straus?
16    A.    I don't remember exactly.
17    Q.    Do you recall where you met him?
18    A.    No.
19    Q.    Do you recall if it was in your
20    college years or later?
21    A.    You asked me for the first time,
22    not ever, right?
23    Q.    Yes.
24    A.    I don't remember the first time
25    I met him.

12  (Pages 42 to 45)

CONFIDENTIAL                                                    GCC-P 0494402

Page 46

1          Merkin - Direct/Bamberger
2     Q.    Did you become friends with
3   Danny Straus?
4     A.    I became acquainted with Danny
5   Straus.  I don't think we're terribly,
6   terribly close.
7     Q.    How did you become acquainted
8   with Danny Straus?
9     A.    Are you asking me for the first
10  time or over time?
11    Q.    Over time.
12    A.    Well, over time Danny was in
13  some form a limited partner of ours.  And
14  that is, he came to the office a couple of
15  times and we had discussions about the
16  world of money management.  We talked a
17  little bit about his business, talked a
18  little bit about his family.  Saw him on
19  one occasion or another.
20    Q.    An LP of ours, is that a
21  reference to Ascot and Gabriel?
22    A.    Might be.
23    Q.    Was he an investor with your
24  father before that?
25    A.    Was he an investor of...?

Page 47

1          Merkin - Direct/Bamberger
2     Q.    Was he an investor with your
3   father before that?
4     A.    Not that I'm aware of.
5     Q.    Do you recall Emmes Partners?
6     A.    Do I recall...?
7     Q.    Do you recall Emmes Partners?
8     A.    M as in Mary --
9     Q.    Emmes as in truth.  Emmes
10  Partners.  Do you recall that entity?
11    A.    Hmmm, not as I sit here today.
12    Q.    Do you recall your father being
13  a general partner in something called
14  Emmes Partners?
15    A.    I do not.
16    Q.    After you graduated college,
17  what did you do?
18    A.    After I graduated college I
19  attended law school.
20    Q.    That was at Harvard?
21    A.    Yes.
22    Q.    What were the years?
23    A.    I graduated Harvard class of
24  '79.
25    Q.    What did you do after that?

Page 48

1          Merkin - Direct/Bamberger
2     A.    I worked at a law firm downtown.
3     Q.    Was it Milbank Tweed?
4     A.    It was.
5     Q.    What were the years?
6     A.    '79 to '82.
7     Q.    What, briefly, did you do at
8   Milbank?
9     A.    I did rotations and spent a fair
10  amount of time focusing on bankruptcy and
11  restructuring work.
12    Q.    What did you do after Milbank?
13    A.    I joined an investment firm
14  called Halcyon Partners.
15    Q.    And for how long were you with
16  Halcyon Partners?
17    A.    About three years.
18    Q.    Who was its principal?
19    A.    A gentleman named Alan Slifka,
20  S-l-i-f-k-a.  Middle initial B.
21    Q.    What kind of work did you do
22  there?
23    A.    I was a research analyst
24  analyzing the investment prospects of
25  various bankruptcy restructurings and

Page 49

1          Merkin - Direct/Bamberger
2   merger arbitrage deals.
3     Q.    At some point you got your
4   Series 7 license; is that correct?
5     A.    That's right.
6     Q.    When was that?
7     A.    I think later than that, if I
8   remember correctly.  I think in the
9   mid-eighties.
10    Q.    And you left Halcyon, correct?
11    A.    Yes.
12    Q.    Why did you leave?
13    A.    I'm assuming that is a bump.
14  I'm sorry, what was your -- I couldn't
15  hear you.
16    Q.    No problem.
17          Why did you leave Halcyon?
18    A.    I left Halcyon to join a
19  colleague named Joel Greenblatt at a firm
20  called Gotham Capital.
21    Q.    Were you a partner of
22  Mr. Greenblatt's when you joined?
23    A.    Yes.
24    Q.    For how long were you with
25  Gotham?

13 (Pages 46 to 49)

CONFIDENTIAL
GCC-P 0494403

---

**50**

Merkin - Direct/Bamberger

1   A.   Three or four years.

2   Q.   What did you do there?

3   A.   Helped in the process of

4 analyzing investments and managing a

5 portfolio.

6   Q.   Did you do anything else?

7   A.   At -- at Gotham?

8   Q.   Yes.

9   A.   Helped manage the enterprise.

10   Q.   Okay, correct to say that in the

11 world of asset management there are two

12 primary functions that need to be played:

13 One, for want of a better word, is asset

14 gathering.  The other would be asset

15 deployment.

16       True?

17   A.   I think there are many more

18 functions than those two.  I'm not sure

19 what you mean by "primary."  Those are two

20 functions.

21   Q.   Would you agree with me those

22 are the primary functions, without being

23 philosophical.  I don't want to have a

24 debate with you.

---

**51**

Merkin - Direct/Bamberger

1   A.   Asset deployment, you mean

2 investing in capital?

3   Q.   Raising the capital and

4 investing the capital, those are the

5 two --

6   A.   Those are two very important

7 functions.

8   Q.   And correct to say that at

9 Gotham you began to be more involved,

10 based upon your connections, in capital

11 raising, than in capital deployment or

12 investment?  Fair summary?

13   A.   No.  In Gotham I think for a

14 period of time we were very deliberately

15 not interested in raising additional

16 capital.  So it wouldn't have been

17 something I did.

18   Q.   Where did you meet Victor

19 Teicher?

20   A.   I'm not sure where I met him for

21 the first time.  It might have been in the

22 back of a courtroom in Brooklyn where we

23 both came to listen to some matter that

24 pertained to an investment he might have

---

**52**

Merkin - Direct/Bamberger

1 had or I might have had.

2   Q.   About what year was that?

3   A.   That would have been, I guess,

4 mid-eighties.  I'm not quite sure.

5   Q.   When did you and Victor Teicher

6 begin to work together?

7   A.   I would think that that would be

8 toward the later eighties.

9   Q.   What brought you together?

10   A.   I'm sorry?

11   Q.   What brought you together?  Why

12 did you begin to work with Mr. Teicher?

13   A.   I thought Mr. Teicher had skills

14 in the investment management business, and

15 he and I began to work together with

16 respect to certain assets that we had

17 under management.

18   Q.   When did you leave Gotham?

19   A.   Let's see...

20       Roughly '87 or '88.  Probably

21 '88 or '89, actually.

22   Q.   Why did you leave Gotham?

23   A.   Gotham, as it was then

24 constituted, pretty much went out of

---

**53**

Merkin - Direct/Bamberger

1 business.  Not formally perhaps, but the

2 Greenblatt family had sold the business,

3 raised a fair amount of capital, and

4 pretty much from that time on, Joel

5 Greenblatt, who I referred to earlier, was

6 interested in managing the capital of his

7 family, and maybe one or two, but very

8 few, if any, outside additional investors.

9   Q.   Is it a fair summary to say that

10 at that point when you left Gotham you

11 pretty much broke out on your own, as an

12 asset manager/gatherer; fair summary?

13   A.   I was no longer in business with

14 Joel, that is true.

15   Q.   You went into business for

16 yourself?

17   A.   Yes.

18   Q.   And you began to work with

19 Victor Teicher very closely at that time;

20 is that a fair summary?

21   A.   I began to work with Victor at

22 that time, I think -- I'm not sure it

23 started the next day, but more or less at

24 that time is when it happened, yes.

---

14 (Pages 50 to 53)

CONFIDENTIAL                               GCC-P 0494404

54

1        Merkin - Direct/Bamberger
2     Q.    And you formed a firm of your
3   own, did you not?
4     A.    I formed -- I just didn't hear
5   you.
6     Q.    No problem.
7         You formed a firm of your own at
8   that time?
9     A.    Yes.
10    Q.    What was the name of that
11  firm --
12    A.    At that time --
13    Q.    What was the name of the firm?
14    A.    At that time we had a fund
15  called Ariel Capital LP, and I believe
16  Ariel was the name of the firm.
17    Q.    It's hard for me to hear now.
18        You said Ariel?
19    A.    Yes.
20    Q.    Was it Ariel Management
21  Corp. that was the name of the management
22  company, and Ariel Capital I was the name
23  of the fund?
24    A.    I believe that's correct.
25    Q.    What was the specializations of

55

1        Merkin - Direct/Bamberger
2   the Ariel Partners fund, when you formed
3   it?  What did it do?  How did it invest?
4     A.    By and large we looked at ideas
5   that came out of restructurings, either
6   equity-driven restructurings which might
7   be speculating in announced transactions
8   or announced takeovers of companies, or
9   debt-driven restructurings, which would be
10  either bankruptcies or other forms of
11  reorganizations.
12    Q.    At that time did Ariel, in the
13  beginning -- that's about 1989, sir, if I
14  have that right?
15    A.    I think that's right.
16    Q.    -- did Ariel open any accounts
17  at Bernard L. Madoff?
18    A.    I believe we had some capital
19  with Madoff.  I can't tell you whether it
20  started at the very beginning, but I would
21  say at the very, very late eighties
22  through probably something like 1992 we
23  had some capital with Madoff.
24    Q.    Okay.  Do you understand my
25  slight difficulty when you say, "we had

56

1        Merkin - Direct/Bamberger
2   some capital"?  I'm thinking about legal
3   entities.  And one was called Ariel
4   Capital I, correct?
5     A.    (No response.)
6     Q.    And at some point that name --
7   the en -- the name of that entity was
8   changed to Gabriel Capital LP, correct?
9     A.    Yes.
10    Q.    Then, separately from that, at a
11  point in time you formed an entity called
12  Ascot Partners LP, and your documents say
13  that that occurred in late 1992.  Are you
14  aware of that, sir?
15    A.    I'm not sure what you're asking
16  me.  I'm aware that Ariel was renamed
17  Gabriel and I'm aware that we started
18  something called Ascot.
19    Q.    Talking specifically about the
20  Ariel Fund, which would of course be the
21  fund in whose name and account would be
22  opened at Madoff, was an account opened at
23  Madoff by Ariel in or about 1989 or 1990?
24    A.    I think so.  Yes.
25    Q.    How was that account used at

57

1        Merkin - Direct/Bamberger
2   that time?
3     A.    I'm not sure what you're asking.
4     Q.    Did you in fact invest monies in
5   Ariel in an account at Madoff for Ariel in
6   1989?
7     A.    Yes.
8     Q.    Generally speaking, what portion
9   of its capital would be allocated to the
10  Madoff account, in the very earliest
11  years?
12    A.    A small fraction.  I don't
13  recall the exact percentage.
14    Q.    Would it be under ten percent?
15    A.    It might have been.  And it
16  might have been over.  I just don't recall
17  the percentage.  The percentage might have
18  varied over a period of two or three
19  years.
20    Q.    Let me make sure I understand.
21        In my understanding, having
22  reviewed certain materials and talking to
23  people -- but I want your understanding.
24        Is it not correct that you
25  opened Ascot Partners LP for the specific

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                                    GCC-P 0494405

58

1    Merkin - Direct/Bamberger
2    purpose of pooling all the money that
3    would be transferred to Madoff, and that
4    its role would be different from
5    Ariel/Gabriel in that way?
6        A.   Ascot had a different function
7    than Ariel and Gabriel.
8        Q.   Thank you.
9            Put it in your terms.  What was
10   its different function?
11       A.   Ascot was interested in
12   allocating money to strategies that were
13   possibly lower return, possibly lower
14   volatility, and generally higher
15   liquidity, meaning, more easily redeemed,
16   more easily turned into liquid assets,
17   than Ariel or Gabriel.  Thinking of Ariel
18   and Gabriel as one.
19       Q.   And that was its purpose from
20   day one, correct?
21       A.   Its purpose from day one was to
22   allocate capital to those kinds of
23   strategies, including strategies that were
24   not performed entirely in our shop.  And
25   for that reason, from day one had a

59

1    Merkin - Direct/Bamberger
2    different and distinctive fee structure
3    that reflected that fact.
4        Q.   Okay.  That fee structure at the
5    time was simply 1 percent of assets under
6    management?
7        A.   Assets under management, hence a
8    management fee.
9        Q.   Okay.  Did you call it a
10   management fee way back then?
11       A.   In the early document?
12       Q.   Yes.
13       A.   I don't recall as I sit here.
14       Q.   From the very earliest time
15   Ariel/Gabriel, what became Gabriel, its
16   fee structure was different?
17       A.   Yes.
18       Q.   What was its fee structure, from
19   the beginning of time?
20       A.   It had a management fee and an
21   incentive fee.
22       Q.   What was the incentive fee at
23   the time?
24       A.   The incentive fee was 20 percent
25   of net realized and unrealized net gains

60

1    Merkin - Direct/Bamberger
2    and losses.
3            That is, at the end of a
4    calendar year all positions were marked to
5    market.  All positions were marked to
6    market every day, but for purposes of
7    computing the fee, positions marked to
8    market were netted, gains and losses, then
9    netted against each other.  And if there
10   was a profit during the course of that
11   year, 20 percent of that profit was
12   allocated to that general partnership.
13           There was no incentive fee of
14   any sort in Ascot.
15       Q.   And that reflected the different
16   purposes that those funds would be
17   performing, correct?
18       A.   That reflected not merely the
19   different objectives, but the different
20   management of capital.  The allocation of
21   capital, substantially all of the assets
22   outside of the shop and the use of third
23   parties, and the emphatic use of third
24   parties, suggested to me a management fee
25   only, and no use of an incentive fee.

61

1    Merkin - Direct/Bamberger
2        Q.   Okay.  Just whenever possible,
3    sir, if you don't mind answering my
4    questions "yes" or "no," or feel free to
5    say you can't answer "yes" or "no," and
6    I'll let you answer.  But let's try to
7    keep it as straightforward as we can.
8        A.   I'll do the best that I can.
9        Q.   Did Victor Teicher play any role
10   with respect to Ascot?
11       A.   No.
12       Q.   Now, as you may know -- you may
13   know; tell me if you don't -- but the
14   parties exchanged proposed stipulations of
15   uncontested fact?
16       A.   The parties in this arbitration?
17       Q.   Yes.
18       A.   I know I saw a draft of
19   something.  I'm not aware that anything
20   was finally agreed to.
21       Q.   Did you approve the draft before
22   it went out?
23           MR. LEVANDER:  Objection.
24       There's been no agreement.
25           If there's a discussion between

16  (Pages 58 to 61)

CONFIDENTIAL                                                    GCC-P 0494406

62

1     Merkin - Direct/Bamberger
2 the counsel and the client, this is an
3 invasion of the attorney-client
4 privilege.
5     THE CHAIRMAN:  Sustained.
6 BY MR. BAMBERGER:
7     Q.   I want to know if the facts that
8 were set forth in that document are true
9 to the best of your knowledge.  I assume
10 the answer is yes.
11     MR. LEVANDER:  Objection --
12     THE CHAIRMAN:  Sustained.
13     MR. LEVANDER:  If you could just
14 ask questions and not make speeches,
15 we would be moving ahead.
16     MR. BAMBERGER:  That was a
17 speech.
18 BY MR. BAMBERGER:
19     Q.   At some point in time
20 substantially all of the assets of Ascot
21 Partners LP were held, so far as you knew,
22 were in accounts of Bernard L. Madoff
23 Investment Securities?
24     A.   Substantial assets were held
25 there, yes.

63

1     Merkin - Direct/Bamberger
2     Q.   When did that begin to be true?
3     A.   I don't know the date.
4     You're asking me about Ascot,
5 right?
6     Q.   I am.
7     A.   I would say '92/'93.
8     Q.   All right.
9     Are you aware that in this case
10 documents have been provided, including a
11 single page, that says Ascot Partners LP
12 and predecessor accounts, and that that
13 goes back to 1988?
14     I assume that reference to the
15 predecessor accounts means before the
16 formation of Ascot.  Is that right?
17     A.   I honestly don't know the
18 document you're referring to.  I don't
19 know that Ascot existed before '92, '93.
20     Q.   We'll show you the document in a
21 few minutes.
22     But there's no question that you
23 were managing or administering individual
24 accounts that were held at Madoff for a
25 fee as early as 1988 and 1989, correct?

64

1     Merkin - Direct/Bamberger
2     A.   I -- I don't think so.  No, I
3 don't think that's correct.
4     Q.   There are two transcribed
5 tape-recordings between you and Mr. Madoff
6 that have been produced in this case,
7 correct?
8     A.   I believe so, yes.
9     Q.   At the end of one of them, which
10 occurred in January of 2002, you noted on
11 the tape that you had been investing with
12 Mr. Madoff for 13 years.
13     You're aware of that, right?
14     A.   I don't remember that.  But if
15 you tell me it's there, I'm sure it is.
16     Q.   Did you personally ever open an
17 account at Mr. Madoff's shop in your own
18 name?
19     A.   I don't recall.  I had been an
20 investor with Mr. Madoff through an entity
21 called 61M Associates, which -- or 61M
22 Partners, I can't remember which one it
23 is -- which was an entity that had been
24 administered through the Scheure family
25 office in the late eighties.

65

1     Merkin - Direct/Bamberger
2     Q.   Did you have any other indirect
3 investments with Mr. Madoff?
4     A.   Hmmm -- I don't think so.
5     Q.   Did any other members of your
6 family have such investments?
7     A.   In 61M?
8     Q.   Yes.
9     A.   Not that I'm aware of.
10     Q.   How about in other vehicles?
11     A.   Say it more slowly.
12     Q.   How about any other vehicles
13 which in turn invested with Mr. Madoff?
14     A.   I lost you.  Ask the whole
15 question.
16     Q.   Sure.
17     Did any family members or
18 foundations or other entities with which
19 you're associated invest with Mr. Madoff
20 through an entity such as 61M Associates
21 besides yourself and besides the testimony
22 you just gave?
23     A.   When?
24     Q.   From 1960 on.
25     A.   I just don't know.  It's too

17 (Pages 62 to 65)

CONFIDENTIAL                                                                 GCC-P 0494407

66

```
1         Merkin - Direct/Bamberger
2   broad.  I don't know.
3      Q.   Okay.
4         Now, you're aware that
5   Mr. Steinhardt was quoted in a published
6   book as saying that your father and Bernie
7   Madoff were close friends.
8         Is Mr. Steinhardt correct when
9   he says that?
10     A.   I never heard that from
11  Mr. Steinhardt.
12        My father and Mr. Madoff were
13  acquaintances.  I would not think of them
14  as close friends.
15     Q.   All right.
16        Right in the beginning, what
17  efforts did you make to understand how
18  Mr. Madoff made his profits?
19     A.   At some point I went to visit
20  Mr. Madoff, more than once had
21  conversations with him about what the
22  strategy was that he was using, what the
23  strategy had been in the past, what the
24  strategy might be in the future, what it
25  might evolve to.
```

67

```
1         Merkin - Direct/Bamberger
2         Looked at physical evidence of
3   the strategy.
4         Spoke to investors of his, spoke
5   to customers of his, those being two
6   different types of relationships; that is,
7   spoke to investors of his in the money
8   management end of what he was doing, and
9   spoke to customers of his in the wholesale
10  trading end of what he was doing, and had
11  a general idea of his reputation and
12  stature on Wall Street, which was very
13  considerable.
14     Q.   I'm asking you what you
15  understood his investment strategy to be.
16        In the very earliest years, what
17  did you understand his investment strategy
18  to be?  How was he actually making money?
19  In your earliest years.
20     A.   In the earliest years of my
21  conversations with him, as distinct from
22  his earliest years, so I want to make sure
23  that's the question you asked, it was
24  essentially the strategy consisted of
25  buying stocks, individual stocks, puts
```

68

```
1         Merkin - Direct/Bamberger
2   beneath those stocks, and selling calls
3   above those stocks.
4      Q.   In the earliest years how many
5   stocks did you understand were involved?
6      A.   There's no limit to the number
7   of stocks that could be involved.  But, I
8   mean -- maybe I don't understand the
9   question.  Involved how?  In the
10  portfolio?
11     Q.   Yes.
12     A.   At any one time -- I'm just...
13     Q.   I don't want to short-circuit
14  this.
15        Am I not correct to say that you
16  always received monthly account statements
17  and could simply look at the portfolio of
18  stocks at any given?
19     A.   I thought you were still talking
20  about early conversations.
21        Yes.  The portfolio generally
22  consisted of a number of large cast stocks
23  with puts beneath those stocks, but puts
24  struck on those stocks.
25        In other words, let's say the
```

69

```
1         Merkin - Direct/Bamberger
2   stock was IBM or XYZ.  The XYZ stock, a
3   put that was struck on XYZ at a strike
4   price for a preferred period of time, and
5   short a call at an XYZ call.
6         And there may have been, I would
7   guess, something like 15 to 20 of those
8   stocks and puts and calls at that time.
9         It might have been a little bit
10  less than that.  I don't think it was
11  necessarily much more than that --
12     Q.   Okay.  There came a time --
13     A.   -- as I can recall today.
14     Q.   Thank you.
15        There came a time when he
16  changed that strategy, correct, and began
17  to use index options, including index puts
18  and index calls, correct?
19     A.   Well, the strategy evolved.  The
20  strategy had already evolved at that time,
21  but it evolved further, to, instead of
22  say -- I'll stick with my number -- say 17
23  or 18 or 20 individual stocks, puts and
24  calls, there would be a number of stocks,
25  common to all of them was their presence
```

18  (Pages 66 to 69)

CONFIDENTIAL
GCC-P 0494408

70

1     Merkin - Direct/Bamberger
2   and membership in the S&P 100, and instead
3   of specific puts and specific calls
4   specific to those stocks, he would use OEX
5   puts and OEX calls which were struck on
6   the S&P 100 index.
7       So the OEX's are not the SPX's
8   and the 100 are not the 500.
9       Q.   About what year did he start to
10  do that, in your understanding?
11      A.   Early to mid nineties.
12      Q.   So 1992, '93?
13      A.   Early to mid nineties.
14      Q.   And when he started to buy and
15  sell OEX puts as opposed to puts on
16  individual stocks, did his selection of
17  stocks for the portfolio change?
18      A.   Well, I think I said that all of
19  the stocks were in the S&P 100.  And to
20  the extent that he had previously used
21  stocks outside of the S&P 100, I just
22  don't remember.
23      They were always very large cap
24  stocks.  I don't think that many were lost
25  by -- in that move.  I just don't

71

1     Merkin - Direct/Bamberger
2   remember.
3       And the number of shares -- the
4   number of components in the S&P 100 that
5   we used in the portfolio went up over
6   time.
7       Q.   You say that "we used"?  Did I
8   hear you say "we used"?
9       A.   I don't remember --
10      Q.   I thought I heard you say "we
11  used."
12      A.   What I said was there was a
13  basket of stocks.  All the stocks were in
14  the S&P 100.  The number of shares in the
15  basket, the total number of shares,
16  increased over time.
17      Q.   Now, in late 2002 Mr. Madoff
18  delivered a trading authorization
19  directive to you for both Gabriel and
20  Ascot, correct?
21      A.   Yes.
22      Q.   Okay.  Would you agree with me
23  that certainly by that time Mr. Madoff was
24  no longer engaged in the practice of
25  stock-picking?  True?

72

1     Merkin - Direct/Bamberger
2       A.   I don't know what you mean by
3   that.
4       You're suggesting that he was in
5   a practice of stock-picking and he stopped
6   doing that.
7       I never thought of him as being
8   in the practice of stock-picking as that
9   phrase is conventionally used.  And you
10  may be using it in a different way.
11  Stock-picking, to me, is somebody who
12  picks the stocks, goes long stocks, holds
13  them for really, really long periods of
14  time and tries to earn monies.  He's
15  actually an investor.
16      In Madoff's case I believe he
17  was trying to create a rate of return by
18  using stocks, puts and calls.
19      Confining the upside by selling
20  calls is basically antithetical to the
21  process of stock-picking because you're
22  always capping your return.
23      Q.   To generate a return a rate
24  that's capped in the way described to make
25  money you've still got to pick stocks,

73

1     Merkin - Direct/Bamberger
2   right, sir?  Yes or no?
3       A.   You have to pick -- you're
4   basically arbitraging a relationship
5   between an index, its components and
6   options on those components.
7       Arbitrage activities, where
8   you're trying to underwrite a certain risk
9   and earn a rate of return as a
10  consequence, to me is different than
11  stock-picking.
12      That's the way I use the phrase.
13      Q.   That's fine.  You can use words,
14  as long as you explain them.
15      A.   As I use those words, I would
16  not have thought of Madoff at any of those
17  junctures engaged in stock-picking, if
18  only for no other reason than his average
19  holding period was running, broadly, one
20  to six months -- much more specifically
21  one, two, three or four months -- and
22  turnover was running several hundred
23  percent; that is, the portfolio turned
24  over a number of times a year.  There was
25  virtually never any long-term realized

19 (Pages 70 to 73)

CONFIDENTIAL

GCC-P 0494409

Pg 22

74

Merkin - Direct/Bamberger

1    Merkin - Direct/Bamberger
2  gains.
3        And all those things are
4  incidence of stock-picking, rather than
5  someone who's engaged in the rate of
6  return business, as I use those words.
7    Q.   Well, you understood, did you
8  not, that to make money doing this you had
9  to own stocks for a period of time and the
10 value of those stocks had to rise,
11 otherwise you couldn't make money doing
12 what he was doing, correct?
13   A.   The positions he put on had to
14 behave profitably for you to make money.
15 The positions consisted of long stocks,
16 long puts and short calls.
17        For you to make money, ideally
18 stocks would go up, puts would go down,
19 and above the strikes on the calls you
20 would simply stop making money.
21        Because you had sold away that
22 upside above the strike price, net of the
23 price of the actual option -- that of the
24 money you collected for the -- for the
25 calls you were short.

75

1    Merkin - Direct/Bamberger
2    Q.   Would you agree with me, sir,
3  that the term "arbitrage" classically
4  means -- classically involves riskless
5  transactions?  It's the selling of one
6  asset on one exchange and the buying of
7  another on a different exchange, and
8  profiting on a relatively small difference
9  based upon the price disparity; would you
10 agree with that, sir?
11   A.   I would agree that that's what
12 riskless arbitrage is.
13        I'm not sure that arbitrage is
14 only riskless.  I think arbitrage has been
15 applied to risk arbitrage, merger
16 arbitrage, index arbitrage.
17        Arbitrage been applied to many
18 different things.
19   Q.   When you speak of risk
20 arbitrage, and that term came to apply to
21 the form of arbitrage in connection with a
22 merger, where you're betting on whether a
23 merger will close or not, the Street began
24 to use the word "risk arbitrage" for that
25 particular activity, correct?

76

1    Merkin - Direct/Bamberger
2    A.   The process of answering your
3  questions might be aided -- especially the
4  very, very long ones -- I have a screen
5  here, and it's just blank.  Can I turn the
6  screen on and see what you're saying?
7    Q.   Of course.
8        THE WITNESS:  Does someone know
9  how to do that -- I can't read what
10 you're saying.
11   A.   You have to parse it, or else
12 I'm not going to be able to answer your
13 question.
14        I'll take a shot at something.
15        Risk arbitrage was not in
16 anticipation of a merger.  Risk arbitrage
17 is when a merger is announced and you're
18 trying to arbitrage the difference between
19 the price at which someone is willing to
20 pay for a security, in the simplest form,
21 if it's cash, and the price at which the
22 stock trades.
23   Q.   Okay.  The reason there is the
24 difference there is that the market
25 recognizes there's a slight chance that

77

1    Merkin - Direct/Bamberger
2  the merger isn't going to be consummated,
3  correct?
4    A.   The market may think there's a
5  huge chance, in which case the discount
6  between those two prices may be very
7  large, and you may or may not be willing
8  to speculate that the deal occurs.
9        If you are willing to speculate,
10 it could be a very large discount, and if
11 you speculate correctly you'll get paid,
12 because you will make the gap between what
13 you paid for the security and what the
14 buyer will pay you for the shares of the
15 company.
16   Q.   Okay.  I'd like to turn your
17 attention to a document --
18        MR. BAMBERGER:  I'll need one
19 second, Mr. Chairman, if I can, just
20 to get it out myself and refer the
21 Panel to it.
22        There are boxes of exhibits to
23 Mr. Fleming's right --
24        THE CHAIRMAN:  A couple of
25 things.

20  (Pages 74 to 77)

CONFIDENTIAL                                                      GCC-P 0494410

78

1      Merkin - Direct/Bamberger
2          First, we might want to take a
3  short break.
4          Do you have an exhibit book
5  that --
6          MR. BAMBERGER:  I do, sir.
7          THE CHAIRMAN:  -- that the three
8  of us could have so we could follow
9  documents?
10         MR. BAMBERGER:  Absolutely,
11  Mr. Chairman.  They are to
12  Mr. Fleming's right.  I know you don't
13  have a great deal of room up there.
14         I'll ask you to pull out Binder
15  2, and we'll start with it after our
16  break.
17         MR. LEVANDER:  Off the record.
18         (Discussion off the record.)
19         THE CHAIRMAN:  Let's resume.
20  BY MR. BAMBERGER:
21     Q.   Mr. Merkin, can you place Binder
22  Number 2 in front of you.
23     A.   Is this where it is --
24         MR. BAMBERGER:  If I may
25  approach.  I'll take care of it.

79

1      Merkin - Direct/Bamberger
2          (Handing to the witness.)
3  BY MR. BAMBERGER:
4      Q.   Sir, can you turn to tab 47,
5  please.
6          (The witness complies.)
7      Q.   And the first page of that
8  document appears to be a cover note from
9  Bernie Madoff.
10         Do you see that?
11     A.   Yes.
12     Q.   Is that his handwriting?
13     A.   I don't really know his
14  handwriting.  The one or two notes I've
15  got from him look like that.
16     Q.   I didn't hear you.
17     A.   One or two notes that I've
18  gotten from him over time look like that.
19         They're not much longer than
20  that, and I don't have many of them.
21     Q.   Sir, can you identify Exhibit
22  47?
23     A.   Well, you've just done that.
24  It's a cover note from Mr. Madoff on the
25  first page.

80

1      Merkin - Direct/Bamberger
2      Q.   And the rest of it?
3      A.   I'll take a look...
4      Q.   And not to be cute, this was
5  provided by your counsel as a single
6  document, meaning it was stapled or
7  otherwise delivered together in some
8  fashion.
9          (The witness reviews document.)
10     A.   Just turning the first two or
11  three pages it looks like account
12  documentation.
13     Q.   Okay.  Do you recall the
14  occasion on which you received this?  Why
15  you received it?
16         (The witness reviews document.)
17     A.   No.
18     Q.   Okay.
19         What you see on the second page
20  of the document, there's a letter
21  apparently signed by Bernard Madoff
22  explaining this has something to do with
23  the U.S.A. Patriot Act of 2001; do you see
24  that?
25     A.   Yes, I do.

81

1      Merkin - Direct/Bamberger
2      Q.   And among the documents that
3  appear to have been transmitted, the very
4  last document is a trading authorization
5  directive?
6      A.   This is the last document in
7  that tab?
8      Q.   The last two pages in that tab,
9  yes.
10         (The witness reviews document.)
11     A.   I do.
12     Q.   Okay.  And now your handwritten
13  notes make reference to these last two
14  pages, do they not?
15     A.   My handwritten notes...?
16     Q.   In your diligence file for
17  Mr. Madoff make explicit reference to
18  Mr. Madoff, correct?
19     A.   That's correct.
20     Q.   When you say in those notes that
21  "the bands have been formalized," you're
22  talking specifically about these last two
23  pages, correct?
24     A.   I assume I might have been, but
25  I don't know off the top of my head

21 (Pages 78 to 81)

CONFIDENTIAL                                                    GCC-P 0494411

Pg 82

```
1        Merkin - Direct/Bamberger
2    exactly what you're referring to.
3        Q.   Why did the bands have to be
4    formalized?
5        A.   I don't know what you mean.
6        Q.   Well, when you said in your
7    notes that the bands were formalized, what
8    did you mean?
9        A.   I don't know.  Show me the notes
10   and I'll explain it to you.
11       Q.   Do you need to see the notes to
12   answer my question?
13       A.   It might help.
14       Q.   Now, the reality is that this
15   trading authorization pretty much
16   describes what would be called a collar,
17   correct?
18            You already described that
19   collar to some extent.  You buy the
20   underlying number of stocks in a basket,
21   you buy puts and you sell calls, correct?
22   That's a collar?
23       MR. LEVANDER:  Your Honor, I
24   object.  Just as a general thing,
25   there's three different questions he
```

Pg 83

```
1        Merkin - Direct/Bamberger
2    just asked in one sentence.
3        If Mr. Bamberger could ask a
4    question, it would be easier for the
5    witness to give an answer, as opposed
6    to you ask the question and then he
7    goes on and asks another question.
8    It's hard for the witness.
9        MR. BAMBERGER:  I will try and
10   be careful of that.
11       I would prefer that he just say
12   "Objection" --
13       THE CHAIRMAN:  These speaking
14   objections can be very useful for the
15   jury in the box.  But as I look over
16   to the jury box --
17       MR. LEVANDER:  I'm trying to be
18   polite as to --
19       THE CHAIRMAN:  There's no
20   problem.
21       With the objection, which is to
22   a compound question, if all parts of
23   it are easily answered "yes" or "no,"
24   there's nothing that terrible about a
25   compound question.
```

Pg 84

```
1        Merkin - Direct/Bamberger
2        When it starts having several
3    different aspects and it might be
4    "yes" or "no" to a part or not
5    understood, it's best to break up the
6    question.
7        MR. BAMBERGER:  Thank you,
8    Mr. Chairman.
9    BY MR. BAMBERGER:
10       Q.   Mr. Merkin, is it correct that a
11   collar has three components?
12       A.   I don't think so.
13       Q.   Is it correct to say that
14   Mr. Madoff's collar, as described in the
15   trading authorization, had three
16   components?
17       A.   I think this trading
18   authorization describes a position that
19   has many, many components.  One of which
20   is short options, short call options, and
21   you may think of all of that as a collar.
22       I would not think of all of that
23   as a collar.
24       Q.   Whenever possible, just answer
25   my question "no" if you disagree with me.
```

Pg 85

```
1        Merkin - Direct/Bamberger
2    Then I'll ask my question.
3        The Panel will decide for itself
4    whether there's three components being
5    that are described here?
6        No doubt that the purpose of
7    this directive was that Mr. Madoff was
8    putting himself under certain limitations,
9    correct?  That's what it does?
10       A.   The directive?
11       Q.   Yes.
12       A.   The directive explains in fair
13   detail what a position understood in terms
14   of the portfolio as a whole is the basket,
15   the puts and the calls.
16       Q.   And he signs it.  He's telling
17   you that this is what he's going to be
18   doing, correct?  You're not telling him,
19   correct?
20       A.   He signs it.
21       Q.   All right.  Correct to say that
22   from this point forward, certainly from
23   November 2002, he said that the total of
24   the combined market capitalization of the
25   equities purchased must, at the time of
```

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494412

**86**

1       Merkin - Direct/Bamberger
2  completion, be in excess of 75 percent of
3  the total capitalization of the entire S&P
4  100 index, correct?
5     A.   Where are you reading?
6     Q.   Bullet point 3.
7     A.   Sorry.
8       (The witness reads document.)
9     A.   That's what that says, yes.
10    Q.   Okay.  And the prior bullet
11  point says that he can only buy these
12  types of instruments, and he must buy at
13  least 35 names, correct?
14       (The witness reads document.)
15    A.   When the position is complete,
16  yes.
17    Q.   Okay.  And then in bullet 4 he
18  says that what he buys at the time of
19  execution must reflect the performance of
20  95 percent of the S&P index, correct?
21    A.   The entire portfolio, when it is
22  fully executed, completely executed, has
23  to correlate at that percentage with the
24  overall movement of the S&P 100.
25    Q.   So he's clearly by this time out

**87**

1       Merkin - Direct/Bamberger
2  of the stock-picking business, as far as
3  you're concerned, correct?
4    A.   As far as I was concerned he was
5  never in the stock-picking business.
6    Q.   As you've testified.
7    A.   Correct.
8    Q.   He was a pure market-timer;
9  that's your understanding?
10    A.   No.  Certainly not.
11    Q.   Well, besides stock-picking and
12  market timing, in your understanding at
13  any time prior to December 11th, 2008 how
14  was Bernie Madoff doing it?
15    A.   A combination of market timing
16  to be sure.  But when you said "pure," I
17  thought you meant exclusively market
18  timing.  It's market timing, plus an
19  arbitrage function, plus executions.
20       He's creating a rate of return.
21  He's not picking stocks.
22    Q.   And of those three components,
23  what contribution did market timing make
24  to the overall performance?  Ten percent,
25  50 percent, 90 percent?

**88**

1       Merkin - Direct/Bamberger
2    A.   Neither ten nor 90.
3    Q.   Which one?
4    A.   I don't know the exact number.
5    Q.   Which one?
6    A.   Neither ten nor 90.
7    Q.   Can you pick a number between
8  them?
9    A.   Not 20, not 80, and it may have
10  changed over time.  I would not just say
11  50.  I think that's too --
12    Q.   Arbitrage?
13    A.   -- too arbitrary.  It couldn't
14  have constantly been exactly half.
15    Q.   What percentage of total
16  performance did arbitrage represent?
17    A.   Varied from time to time.  It
18  varied from times that we came in.  There
19  were times where some of the arbitraging
20  function may have already suggested some
21  slight wind at our back because of the --
22  because of its ability to arbitrage among
23  the components of this trade.  And that
24  also turned a little bit on his
25  executions.

**89**

1       Merkin - Direct/Bamberger
2    Q.   I kind of lost you there.
3       So you can't apply a percentage
4  to the arbitrage as a component of the
5  overall performance; is that right?
6    A.   Overall over a long period of
7  time I don't have a percentage.
8       There are specific occasions
9  where clearly arbitrage matters.
10    Q.   Okay.  How about good execution?
11  What percentage of his overall performance
12  do you attribute to that?
13    A.   Executions are the way in
14  which -- in the end executions ultimately
15  are everything.  It is how well you
16  execute your strategy.  You can have a
17  great strategy.  If you execute it
18  clumsily, you're not going to have a great
19  strategy.  Executions matter.
20       To the extent that it's
21  arbitrage and you're talking about fine
22  differences, executions matter that much
23  more.
24    Q.   Well, in 2002, when the S&P 100
25  lost something like 23 percent and Ascot

23  (Pages 86 to 89)

CONFIDENTIAL      GCC-P 0494413

90

1     Merkin - Direct/Bamberger
2   reported a gain of around 12 percent,
3   you're not saying that arbitrage had
4   anything significant to do with that
5   performance that year, are you?
6     A.   It certainly might have.
7     Q.   Uh-hum.
8     A.   It very easily could have.  I'm
9   not saying it did because I just don't
10  remember.
11       But the overall correlation
12  between the S&P and the market strategy's
13  performance was exceedingly low.
14    Q.   Could you look, then, as Exhibit
15  47, which I would like to mark into
16  evidence.
17       MR. LEVANDER:  No objection.
18       (Claimant's Exhibit 47, received
19  in evidence.)
20  BY MR. BAMBERGER:
21    Q.   The sixth bullet point down
22  Mr. Madoff writes that:
23  "Contemporaneously with the purchase of
24  equity securities the undersigned accounts
25  shall purchase S&P 100 Index put options."

91

1     Merkin - Direct/Bamberger
2       Do you see that?
3     A.   I do.
4     Q.   "The underlying value of these
5   contracts shall correspond to the market
6   value of equities in the portfolio at the
7   time of purchase."
8       Do you see that?
9     A.   I do.
10    Q.   Now, why was that important,
11  that the value of the puts had to equal
12  the value of the portfolio?
13    A.   Again, the strategy was designed
14  to create a rate of return.  Overall
15  performance had a very, very low
16  correlation with broad markets.
17  Uncorrelated strategy.
18       An important component in that
19  strategy is the notion that we own -- this
20  says at least 35.  Let's say it's
21  typically it's 50 stocks.  They are all in
22  the OEX, they are all in the S&P 100.
23  That's the long side of the portfolio.
24       To the extent that we own the
25  entire S&P 100 and had OEX puts, we would

92

1     Merkin - Direct/Bamberger
2   have something closer to an absolutely
3   riskless trade, other than the
4   underwriting that we were doing by
5   striking the puts beneath the value of the
6   S&P.
7       What this says is, is that you
8   had to have puts on the portfolio, they
9   had to equal the market value of the
10  equities in the portfolio, and the
11  question of where you would place that put
12  is also the subject of this directive.
13    Q.   The correct answer to the
14  question I just asked is one word, and
15  that word is "insurance," correct?
16       That was the purpose of the
17  puts, to buy insurance?  And that's why
18  the total market value of the puts had to
19  equal the total market of the portfolio;
20  true?  Yes or no?
21    A.   I have no idea.  I don't know
22  what you mean by "insurance."
23    Q.   Well --
24    A.   As I thought of the concept --
25    Q.   No question.

93

1     Merkin - Direct/Bamberger
2     A.   As I thought of the concept,
3   that would not be the answer to the
4   question.
5     Q.   Can you look at the next bullet
6   point?
7     A.   Next --
8     Q.   Next bullet point, on the next
9   page.
10    A.   Okay.
11       (The witness reads document.)
12    Q.   The strike price on the puts
13  that he was saying he would buy could not
14  be greater than 3 percent below the
15  prevailing market price of the S&P 100
16  index, correct?
17    A.   That's what it says.
18    Q.   So he was allowing the portfolio
19  so that it could drift down somewhat in
20  value before the put would kick in of
21  protection, but it couldn't move below the
22  3 percent of the value at the time of
23  execution, correct?
24    A.   Essentially, yes.
25    Q.   That's something he had to do,

24 (Pages 90 to 93)

CONFIDENTIAL                                                    GCC-P 0494414

---

**94**

1    Merkin - Direct/Bamberger
2  right?  He had to buy those puts, right?
3    A.    That's what the directive as a
4  whole says, yes.
5    Q.    You or Mr. Autera checked to
6  make sure he did that, right?
7    A.    Yes.
8    Q.    And he always did, right?
9    A.    By the time the trade was fully
10  executed, we had -- I can't really
11  remember an exception, but we had puts
12  that protected us on the portfolio as a
13  whole, at some initial downside loss to
14  us.
15    Q.    Once the puts were in place,
16  according to the next bullet item, then he
17  could go sell calls, correct?
18    A.    The next bullet item on the same
19  page?
20    Q.    Right.
21    A.    One second.
22        (The witness reads document.)
23    Q.    Correct?
24    A.    Yes.
25    Q.    Okay.  And there was no

---

**95**

1    Merkin - Direct/Bamberger
2  restriction as to price, correct?
3    A.    Correct.
4    Q.    Okay.  So if he is shorting the
5  calls, he can short the calls at a high
6  price or he can short the calls at a low
7  price relative to the market, whatever he
8  would want to do, and that would have
9  implications for the amount of premium he
10  would cull up, correct?
11    A.    As far as the directive was
12  concerned, that's correct.
13    Q.    Now, this is totally different
14  from arbitrage, in that this is something
15  that he was duty-bound to do, whereas
16  arbitrage involves looking for price
17  disparities between options on a computer
18  terminal, there might be a very short
19  opportunity that you could do, let's say
20  in 12 minutes or less, on a very limited
21  stock, not an entire index representing
22  the market, correct?
23        This is not a discussion of
24  arbitrage at all?
25        MR. LEVANDER:  Objection;

---

**96**

1    Merkin - Direct/Bamberger
2  compound.
3        THE CHAIRMAN:  I'm going to
4  overrule.
5        The question, it seems to be
6  defining what he meant by the term.
7  BY MR. BAMBERGER:
8    Q.    Would you agree that this is not
9  what's meant by the term "arbitrage," sir?
10  Correct?
11    A.    The strategy that's described in
12  these two pages?
13    Q.    Yes.
14    A.    It is an arbitrage strategy, in
15  my opinion.
16    Q.    Okay, thank you.
17        And the rest of the item
18  reflects the sales of the positions.
19        Did you ask for this document or
20  did it just appear on your door one day?
21    A.    It did not just appear on my
22  door one day.  It was discussed ahead of
23  time.
24    Q.    What did he tell you about it?
25    A.    Don't remember the conversation

---

**97**

1    Merkin - Direct/Bamberger
2  specifically.  But it was announced that
3  we would be -- that he wanted something
4  like this.
5    Q.    Tell me, sir -- if I'm wrong
6  you'll just come right out and tell me I'm
7  wrong.  This will be a long question.
8        Isn't it right by this time, in
9  November of 2002, we had had a protracted
10  bear market, we had 9/11, we had had
11  WorldCom, we had Arthur Andersen, we had
12  had a terrible economy, and yet Mr. Madoff
13  was reporting positive results, not merely
14  every quarter, but virtually every month,
15  and people wanted to understand, how are
16  you doing this; is this some kind of
17  magic?
18        And in response he sent this, as
19  to say no magic at all, look what I can
20  do.
21        In summary, isn't that what was
22  happening at that time in the market?
23        MR. LEVANDER:  Objection.  You
24  don't want my speaking objection, but
25  it seems to be about a two-paragraph

25  (Pages 94 to 97)

CONFIDENTIAL                                                GCC-P 0494415

98

1      Merkin - Direct/Bamberger
2    question with at least three or four
3    or five subparts.
4         THE CHAIRMAN:  He asked to tell
5    him if he was wrong that the following
6    had occurred.  He can answer that yes
7    or no, if it was wrong or it wasn't
8    wrong.
9    BY MR. BAMBERGER:
10    Q.    I made a speech, it's true.
11         Was my speech basically true?
12    wasn't it right?
13    A.    Your speech?
14    Q.    Yes.
15    A.    Entirely wrong.
16    Q.    Thank you.
17         Can you account for the timing
18    of this issuance of the trading
19    authorization in any way?
20    A.    Well, let me say a couple of
21    things.
22         You've said that it was November
23    of 2002.
24         You've said it several times.
25    I'm not sure that that's right.  I'm also

99

1      Merkin - Direct/Bamberger
2    not sure that it's wrong.
3    Q.    Did I misspeak?
4         Well, it said the document's
5    dated October 22, 2002.  I'm willing to be
6    corrected, but --
7    A.    You put it in a tab along with
8    documents that way.
9         I don't know that this trading
10    directive came along with the documents
11    that -- or the pages that preceded in tab
12    47.
13    Q.    Your counsel produced this to me
14    as a single document, implying to me that
15    in some way in your file it existed
16    together with the earlier documents.
17    A.    I have no idea how they provided
18    it to you.  I could remind you that we had
19    a discussion as to the dating of the
20    trading authorization.  I'm not sure what
21    the date of it is.
22         THE CHAIRMAN:  If I can --
23    A.    It may well have been --
24         THE CHAIRMAN:  Is there a date
25    on page stamped 4884 of November 5th,

100

1      Merkin - Direct/Bamberger
2    2002, two lines above your signature?
3    If that is your signature.
4         THE WITNESS:  I'm sorry.  Just
5    direct me again.  What page?
6         MR. MILLSON:  The page before
7    the trading record.
8         THE WITNESS:  It's entitled
9    "Trading Authorization."  There's a
10    date on the left-hand side just above
11    where the "Ascot Partners" signature
12    line is.
13         THE WITNESS:  Yes.
14         THE CHAIRMAN:  November 5, 2002.
15    (The witness reviews document.)
16         THE WITNESS:  Yes.  Yes, that is
17    my signature and, yes, that is the
18    date on the document.
19         THE CHAIRMAN:  Did that document
20    accompany the next page?
21         THE WITNESS:  Just one moment.
22    (The witness reads document.)
23         THE WITNESS:  It may have.  I
24    don't know.  It appears to.  I was
25    looking at -- at the pages earlier in

101

1      Merkin - Direct/Bamberger
2    this tab, which were October 2002.
3    But --
4         THE CHAIRMAN:  That's apparently
5    when it was sent to you --
6         THE WITNESS:  It appears to.
7         THE CHAIRMAN:  It may be wrong.
8    But then the Option Agreement is dated
9    November 5th.  The Trading
10    Authorization is dated November 5.
11    The Trading Authorization Directive,
12    which is the next page, is undated,
13    but at least from the exhibit
14    assembly, apparently followed the
15    Trading Authorization, limited to
16    purchase and sales of securities and
17    other --
18         THE WITNESS:  I would draw the
19    same conclusion from the assembly.
20    I'm just not 100 percent sure that the
21    assembly -- that this came in that
22    way.  But if it did, I would think the
23    conclusion is right.
24         THE CHAIRMAN:  We're just
25    looking at the last two pages --

26  (Pages 98 to 101)

CONFIDENTIAL                                                          GCC-P 0494416

102

Merkin - Direct/Bamberger

1
2    THE WITNESS:  That is the
3    conclusion I would draw as well.
4    THE CHAIRMAN:  Then the date of
5    November 2002 would be appropriate?
6    THE WITNESS:  Yes.
7    THE CHAIRMAN:  Okay, go ahead.
8    MR. BAMBERGER:  Thank you,
9    Mr. Chairman.
10   BY MR. BAMBERGER:
11   Q.   Isn't it correct that by the
12   time this trading authorization was
13   received by you certainly the article
14   about Mr. Madoff had occurred in MARHedge,
15   the trade letter, correct?
16   A.   I think that's correct.
17        Let me pick up my answer --
18   Q.   I'm sorry about this.  But I get
19   to run the show here, and then your
20   counsel will ask you questions.  That's
21   how it works.
22        If you can't answer a question
23   of mine "yes" or "no," in general I'll
24   ask --
25   A.   I was answering your prior

103

Merkin - Direct/Bamberger

1
2    question.  If you want to ask me a
3    different question, you'll ask me a
4    different question.
5    Q.   I will do that.  That's my job.
6    A.   Please.
7    Q.   This trading authorization was
8    certainly issued after the publication of
9    the Barrons article about Mr. Madoff,
10   correct?
11   A.   I believe that's correct.
12   Q.   We'll look at it more carefully,
13   but the sum and substance of those
14   articles were there was at least a number
15   of people in the financial community
16   expressing a great deal of skepticism
17   about Mr. Madoff, correct?
18   A.   I think that's an incorrect
19   characterization of those articles.
20   Q.   Isn't it true that effective
21   January 1, 2003 you increased the
22   management fee applicable to Ascot by a
23   factor of 50 percent?
24   A.   The management fee went from 1
25   to 1½, I think in January 2003, that's

104

Merkin - Direct/Bamberger

1
2    correct.
3    Q.   And you resolicited all your
4    investors, right?  You have to give them a
5    right of exit at that point, correct?
6    A.   It was not involuntary.
7    Q.   You had to give them a right to
8    exit, correct?
9    A.   Yes.
10   Q.   And, therefore, you're
11   transacting with your beneficiaries at
12   that point, are you not?
13   A.   I am doing what?
14   Q.   You're proposing to alter the
15   transaction with your beneficiaries at
16   that point?
17   A.   We changed the fee from -- a
18   management fee from 1 to 1½.  It was not
19   involuntary; an investor can stay, an
20   investor can leave, whatever the investor
21   wanted.
22   Q.   Is it correct that you didn't
23   tell any of your Ascot investors in
24   writing that your strategy by that time
25   was simply to wire substantially all of

105

Merkin - Direct/Bamberger

1
2    Ascot's assets to Bernard Madoff for a
3    custody, portfolio management, execution,
4    et cetera?  Correct?  You didn't tell
5    anybody --
6    A.   Are we still on the trading
7    directive --
8    Q.   Yes.
9    A.   In connection with the trading
10   directive, there was nothing in the
11   trading directive that was a surprise.
12   There's no surprises coming by virtue of
13   the trading directive, since it describes
14   what the strategy had been.
15        Your question assumes, I think,
16   that we had given Mr. Madoff a lump sum of
17   money and that he simply gave us a number
18   every month or every quarter.
19        We had complete transparency on
20   the strategy.  The strategy was exactly
21   what the trading directive said it was
22   supposed to be.  It was 35 to probably, at
23   its peak, something approaching 60, stocks
24   in the S&P 100 and the options we talked
25   about.

27  (Pages 102 to 105)

CONFIDENTIAL                                                                    GCC-P 0494417

106

1        Merkin - Direct/Bamberger
2        So the notion that this
3    directive was done, to answer the question
4    of how did Mr. Madoff do it, is silly,
5    because how Mr. Madoff was doing it was
6    something we saw every day, ins and outs,
7    because there was trading every day,
8    looked at every day, and had quarterly
9    compilations of and monthly compilations
10   of.
11       Q.   It's possible to have
12   transparency without understanding it,
13   isn't that right, Mr. Merkin?
14       A.   Philosophically-speaking?
15       Q.   Yes, sir.
16       A.   Many things are transparent and
17   don't necessarily immediately make sense.
18       Q.   And in your understanding of
19   Mr. Madoff's strategy, how he actually
20   produced the results would be one of those
21   things?
22       A.   Not at all.
23       Q.   It didn't make sense to you,
24   sir, right?
25       A.   You just asked me that question.

107

1        Merkin - Direct/Bamberger
2        The answer is, when you have
3    complete transparency, and you have a
4    daily P&L, what the accumulated P&L is,
5    what the monthly P&L is, what the annual
6    P&L is, when those returns are audited,
7    you understand the strategy.
8        Q.   And if you have complete
9    transparency and the strategy makes no
10   sense to you, the only other alternative
11   is Ponzi scheme, correct, in the context
12   in which we're dealing here; true?
13       A.   Absolutely not.  You're assuming
14   that things -- your question assumes that
15   it's not understandable.  I've just gotten
16   done telling you that it is
17   understandable.
18       But to answer your question,
19   something that is transparent and not
20   understandable is not necessarily a Ponzi
21   scheme.  There are many things in life
22   that are legitimate that may not be
23   something you understand.
24       You're describing what is
25   typically one of the sort of black boxes,

108

1        Merkin - Direct/Bamberger
2    that are not transparent and returns may
3    not be that understandable.
4        If you don't understand the
5    return, you don't have to invest.
6        But the notion that something
7    that any individual doesn't understand is
8    per se a Ponzi scheme is a form of, I
9    think, ego.
10       Q.   So the extent of your
11   understanding of what Mr. Madoff was doing
12   at this point was that basically he was
13   just using a black box which was highly
14   proprietary and he didn't want to share
15   with you and it was okay that you had no
16   understanding?
17       A.   I said nothing that suggested
18   anything like that.  This is the third
19   time in about ten minutes you
20   mischaracterized my answers.
21       Q.   All right, thank you.
22       Sir, can you turn to tab 27 of
23   this volume, please.
24       (The witness complies.)
25       Q.   Can you identify what 27 is?

109

1        Merkin - Direct/Bamberger
2        A.   In a moment.
3        Tab 27 is a letter -- this one
4    seems to be actually addressed to me at
5    our business office, dated April 2004, and
6    I think signed by me.
7        Let me just double-check the
8    last page -- yes.
9        Q.   Did you sign each of these
10   letters individually?
11       A.   Each of what letters?
12       Q.   Your quarterly letters to
13   limited partners in Gabriel Capital LP.
14       A.   Likely, yes.
15       Q.   Same answer with respect to your
16   quarterly letters to limited partners --
17   to investors in Ariel?
18       (The witness reviews document.)
19       A.   Most likely, yes.
20       Q.   And at this time Ariel and
21   Gabriel were essentially onshore/offshore
22   managed accounts?  They did similar
23   things, but one was onshore and one was
24   offshore?
25       A.   Neither was a managed account.

28  (Pages 106 to 109)

CONFIDENTIAL                                                          GCC-P 0494418

**110**

Merkin - Direct/Bamberger

1 So they were not managed accounts. So the
2 answer is no.
3 Q. They were fund to funds?
4 A. Neither was a fund to fund, so
5 the answer to your question was no.
6 Q. Neither were a fund to funds?
7 A. The answer to your question is
8 they were not managed accounts. They were
9 not fund to funds. Each of them was a
10 pooled vehicle. One was a domestic entity
11 and one was an offshore entity.
12 Q. The offshore entity was Ariel?
13 A. The offshore entity was Ariel.
14 Ariel Fund Limited, a Cayman corporation,
15 Cayman Islands corporation.
16 Q. That was for offshore investors
17 who did not wish to have profits withheld,
18 in a nutshell?
19 A. I don't know what you're talking
20 about. What does "profits withheld" mean?
21 Q. I withdraw the question.
22 Why did you --
23 A. We had any number of domestic
24 investors --

**111**

Merkin - Direct/Bamberger

1 Q. Sir, I withdrew the question.
2 Why did you send quarterly
3 letters to investors in Gabriel and Ariel
4 and not to -- not to investors in Ascot?
5 A. We did send quarterly letters to
6 Ascot investors.
7 Q. They didn't discuss the
8 performance of the portfolio, what Ascot
9 did, correct?
10 A. They certainly reported the
11 performance of the portfolio. That's
12 exactly what they did.
13 Q. They had an NAV number and told
14 investors how much their portfolio had
15 appreciated for the prior quarter and
16 year-to-date, correct, sir?
17 A. I don't know that they had an
18 NAV number. But they reported the
19 quarterly performance, and they might very
20 well have reported the year-to-date
21 performance as well.
22 Q. Unlike this letter that was
23 directed to Gabriel Limited Partners,
24 there was no commentary whatsoever as to

**112**

Merkin - Direct/Bamberger

1 how Ascot was then invested, correct?
2 A. I think that's correct.
3 Q. Now, why was that?
4 A. Why was what?
5 Q. Why did you send extensive
6 letters to investors in Gabriel and Ariel
7 telling them the breakdown of their
8 portfolio -- for example, the category
9 description on page 252 -- and discuss the
10 market and make various other
11 commentaries, why did investors in Gabriel
12 receive such a letter and investors in
13 Ascot did not?
14 A. Investors in Ascot received a
15 quarterly letter telling them of the
16 profitability, or lack of it, in a
17 quarter, and where things stood
18 year-to-date.
19 The single most important
20 factor, perhaps is the right word,
21 governing the returns for the quarter
22 reported on essentially is whether the
23 fund was in or out.
24 Q. Why didn't you send a letter

**113**

Merkin - Direct/Bamberger

1 telling them that?
2 A. I'm not finished with my answer.
3 Q. Please. Pardon me.
4 A. The overwhelming, supermajority
5 of our investors in Ascot understood the
6 strategy and understood the Madoff
7 organization role in the strategy, and,
8 therefore, understood that the single most
9 important characteristic for the return
10 is -- for that quarter is did we catch a
11 turn or did we not catch a turn.
12 And that didn't seem to me to be
13 something worth putting in a letter.
14 Q. When you used the words "catch a
15 turn," are those words you would use with
16 those overwhelming majority of investors,
17 "catch a turn"?
18 A. Yes.
19 Q. Were you either stating or
20 implying that all volatility was good and
21 when using an arbitrage strategy you don't
22 care if the market goes up or down, you're
23 just looking for price disparities, and
24 therefore you're trying to catch a turn?

29 (Pages 110 to 113)

CONFIDENTIAL                                                                    GCC-P 0494419

114

1          Merkin - Direct/Bamberger
2     Is that the nature of the comment to
3     investors?
4          A.   If I can parse that correctly,
5     all volatile markets go up and down.
6          Q.   Okay.
7          A.   So to say that a market is
8     volatile, your question suggests --
9     implies that there's volatility that is
10    not up and down.  There is no volatility
11    that is not up and down.
12         Q.   The trading authorization
13    directive we just looked at clearly
14    reflects a bullish strategy with respect
15    to stocks, right?
16              That's obvious.
17         A.   I don't know that -- about
18    stocks.  The trading authorization that is
19    as the tag end of tab 47 works in bullish
20    markets in terms of profitability in very,
21    very narrow segments of both.  That's the
22    whole concept of a turn.  You catch a turn
23    in a volatile market that is particularly
24    appropriate for the strategy.
25              Catching a turn doesn't require

115

1          Merkin - Direct/Bamberger
2     a bull market.
3          Q.   Right.
4          A.   So that's an important
5     distinction.
6          Q.   Exactly my point.
7          A.   If you understand that, you'll
8     understand how the strategy works.
9          Q.   Arbitrage strategy is always
10    understood to be indifferent to the
11    overall movements in the market?
12         A.   No.  Almost no strategy is
13    completely indifferent to the market.
14    It's just a lower correlation, but not
15    indifferent.
16         Q.   But an arbitrage strategy is
17    very highly indifferent --
18         A.   There are arbitrage strategies
19    and there's arbitrage strategies.  What
20    you're really talking about to some extent
21    is a beta.
22              In other words, you're really
23    suggesting that there are arbitrage
24    strategies that have higher betas and
25    lower betas, higher correlations with

116

1          Merkin - Direct/Bamberger
2     markets and lower correlations.
3              This strategy overall had a low
4     correlation with the S&P's performance,
5     but it was able to catch turns within bull
6     and bear markets that worked for the
7     strategy.
8              And that, in a nutshell, was how
9     the strategy works.
10         Q.   You told New York Law School
11    Finance Committee that your strategy
12    worked in any market, correct?
13         A.   I don't think I said that, no.
14         Q.   You told New York Law School
15    Finance Committee that you only had to be
16    right 22 percent of the time and Ascot
17    would be profitable, correct?
18         A.   I can't imagine what I said that
19    they transcribed into that sentence.
20              But that is a transparently, and
21    understandably, on the basis of the
22    transparency, idiotic statement for
23    someone to think that I made.
24         Q.   Do you deny that when you had
25    the on-site visit with Spring Mountain

117

1          Merkin - Direct/Bamberger
2     Capital that you described four different
3     strategies to the people that were
4     listening to you that day?
5          A.   As best as I remember sitting
6     here today I think that sounds right.
7          Q.   You described both a bull
8     strategy and a bear strategy, correct?
9          A.   I don't remember that document
10    in detail, but I think I might have.
11         Q.   But I'm right that that
12    document -- there are diligence notes --
13    was a document that to your knowledge was
14    sent to third parties that were
15    considering a possible investment in
16    Ascot; true?
17         A.   Which document are you talking
18    about?
19         Q.   The minutes of the on-site visit
20    that you had with Spring Mountain Capital.
21         A.   Okay, I thought you were back --
22    so what was your question about that?
23         Q.   You knew for a fact that that
24    document was being forwarded by e-mail to
25    other prospective investors in Ascot,

30  (Pages 114 to 117)

CONFIDENTIAL                                                        GCC-P 0494420

118

1        Merkin - Direct/Bamberger
2    correct?
3        A.    I had no idea.
4        Q.    And you never stopped that
5    process from occurring, correct?
6        A.    I had no idea -- I hear it
7    suggested now for the first time.
8        Q.    By 2004 you were certainly a
9    very busy man; fair comment?
10       A.    I suppose so.
11       Q.    Did you write the first drafts
12   of these quarterly letters to Gabriel
13   Limited Partners?
14       A.    Such as the one behind tab 27?
15       Q.    Yes.
16       A.    I wrote a lot of them on my own
17   up until a certain time. Had somehow --
18   had considerable help with them after
19   Gerry Balsam joined our shop.
20       Q.    I kind of figured that.
21             When --
22       A.    All you had to do was ask.
23       Q.    No problem.
24             When did Gerry Balsam join your
25   shop?

119

1        Merkin - Direct/Bamberger
2        A.    I think it is about 12 or 13
3    years ago. It might have been a little
4    bit longer than that. I just don't
5    remember exactly.
6        Q.    Once he joined the shop, is it
7    correct to say that he wrote the entire
8    first draft?
9        A.    No. I mean -- you're asking me
10   how the first draft came about?
11       Q.    No. For example, this paragraph
12   says "Lost in the Magic Kingdom."
13             Do you see that?
14       A.    I see -- just that little
15   heading, where --
16       Q.    There's a reference to Señor
17   Bozo, and his daughter, and Goofy and
18   Dopey.
19             Do you see all that?
20       A.    I do.
21       Q.    Those are all Mr. Balsam's words
22   in the first instance, correct?
23       A.    No. No.
24       Q.    Are you kidding me?
25       A.    That came directly out of a trip

120

1        Merkin - Direct/Bamberger
2    we had made -- my family had made to
3    Disney World not a terribly long time
4    before then.
5        Q.    Okay. What you talk about here
6    is that investors may want to have some
7    idea of where their money's parked, in
8    effect, correct? Just like someone wants
9    to know where their car is parked in the
10   Disney parking lot, the various fields
11   with the different names, correct?
12       A.    What you are asking me is
13   correct.
14       Q.    I think the letter speaks for
15   itself, so I'm going to move on.
16       A.    Okay.
17       Q.    So turning your attention to the
18   second page of the letter, "Understanding
19   Details At a Minimum." Do you see that
20   paragraph?
21       A.    Yes.
22       Q.    The asset classes in which the
23   manager is active, that an investor should
24   know, correct?
25       A.    I'm sorry, what are you asking

121

1        Merkin - Direct/Bamberger
2    me is correct?
3        Q.    That's something that an
4    investor should know; in other words, the
5    asset class in which he's being invested?
6             MR. LEVANDER: I have an
7        objection for the Panel, which is
8        going to be rife through a number of
9        exhibits.
10            There are a lot of hand markings
11       in the exhibits that Mr. Bamberger
12       puts forwards. Those are his hand
13       markings in these instances. I don't
14       think it's appropriate for counsel to
15       mark up the exhibits.
16            MR. BAMBERGER: I apologize for
17       that. I'll indicate --
18            THE CHAIRMAN: I know when you
19       say a lot of hand markings -- there's
20       a couple of lines on the last
21       paragraph on page 2. There is a line
22       and an asterisk on the top of page 3.
23       So I think that's it.
24            MR. LEVANDER: On this
25       particular one -- I'm making a

31 (Pages 118 to 121)

CONFIDENTIAL                                    GCC-P 0494421

122

1        Merkin - Direct/Bamberger
2    point -- you're going to see documents
3    that he has numbers 1 to 20.  You're
4    going to see documents, asterisk, no,
5    yes, fraud --
6        MR. BAMBERGER:  No, that's not
7    true, sir.  That's not true.
8        THE CHAIRMAN:  I assume that if
9    there is anything such as that the
10   marginalia will be disregarded by this
11   Panel.
12       MR. LEVANDER:  Thank you.
13       MR. BAMBERGER:  Thank you.  And
14   Mr. Levander can show me where in
15   these books use the word "fraud."
16       I apologize to the Panel, of
17   course.  I should have told you that
18   those markings were there.
19   BY MR. BAMBERGER:
20       Q.    You knew that those markings
21   were not on the letter to yourself,
22   correct?  That doesn't change your
23   answers?
24       A.    The only marking I've seen so
25   far is that something that looks like an

123

1        Merkin - Direct/Bamberger
2    "N" on the bottom right-hand corner on
3    page 2.
4        Q.    In that chart of categories,
5    that chart reflected essentially every
6    last dollar of how Gabriel Capital LP was
7    invested at that particular time, correct?
8        A.    This chart speaks as of the end
9    of the first quarter and tries to divide
10   our capital into those categories.
11       Q.    At that time a not
12   inconsiderable portion of Gabriel Capital
13   LP's assets were being held, so far as you
14   knew, in accounts at Madoff, correct?
15       A.    Well, that would not be the
16   purpose of this chart, but that might be
17   correct, yes.
18       Q.    Again, whenever possible, I
19   think you understand, I'm going to ask you
20   questions, do your best to answer them
21   "yes" or "no."
22       Your counsel will drive at the
23   points he wants.
24       If I were to look at this chart,
25   I would not know that I have even one

124

1        Merkin - Direct/Bamberger
2    dollar with Bernard L. Madoff Investment
3    Securities, correct?
4        A.    Well, you would if you asked me
5    and you got an explanation as to what
6    arbitrage-related securities is.
7        Q.    But only if I did that; is that
8    right?  Only if I did that, if I asked you
9    or someone else who was willing to tell
10   me?
11       A.    Off of this chart?
12       Q.    Right.
13       A.    Just off of the categories?  The
14   word "Madoff" is not there.
15       Q.    That's true of every letter that
16   your organization ever sent to any
17   investor in Gabriel Partners LP through
18   November of 2008, correct?
19       A.    I believe that is true.
20       Q.    The word "Madoff" doesn't appear
21   in any of those letters, right?
22       A.    I believe that is true.
23       Q.    Okay.
24       Now, since you are more
25   knowledgeable, you know that Madoff is

125

1        Merkin - Direct/Bamberger
2    reflected in one or more of these
3    percentages on page 2 of the letter,
4    correct?
5        (The witness reviews document.)
6        A.    Madoff is reflected in
7    arbitrage-related securities in the list
8    of categories that appears in the middle
9    of page 2.
10       Q.    And only in that category?
11       A.    I believe so.
12       Q.    And is that category entirely
13   Madoff?
14       A.    I believe not.
15       Q.    What else was in there?
16       A.    I don't remember what was in
17   there on March 31, 2004.  There may have
18   been additional Madoff -- additional
19   non-Madoff positions, and there may not
20   have been.
21       And on March 31, 2004, I just
22   don't know the component of that category
23   at this time.
24       Q.    But all Madoff was in that
25   category, correct?  All Madoff to which

32  (Pages 122 to 125)

CONFIDENTIAL                                                          GCC-P 0494422

126

1         Merkin - Direct/Bamberger
2    Gabriel had exposure was in that category,
3    correct?
4         A.    Yes.
5         Q.    Is it correct to say that that
6    category was substantially all Madoff at
7    any given time?
8            MR. LEVANDER:  Asked and
9        answered.
10           MR. BAMBERGER:  No.  I'm asking
11       now -- he said maybe not every last
12       position.
13       Q.    But the great bulk of this
14   category in every quarterly letter would
15   be Madoff; is that correct?
16       A.    In absolutely every one of these
17   letters?  I doubt it.
18       Q.    Now, to understand these
19   categories, one can flip to a -- I see --
20   I don't see it in this particular chart,
21   but later in time you provided an appendix
22   that described what each of these
23   categories was doing, correct?
24       A.    I applied -- there's an appendix
25   to some of the letters, correct.

127

1         Merkin - Direct/Bamberger
2         Q.    When did you begin putting that
3    appendix in?
4         A.    Hmmm, I don't remember.
5    Probably around this time.  Maybe a letter
6    or two --
7         Q.    Why did you start including an
8    appendix describing these categories?
9         A.    I thought it might be helpful to
10   some readers to explain what portion of
11   our overall portfolio that was then
12   invested in distressed or
13   insolvency-driven reorganizations, break
14   down into where in the long timeline of
15   insolvency-driven reorganizations a
16   particular position is at a particular
17   time or at the end of a particular
18   quarter.
19       Q.    In the sentence where what you
20   call the "N" is, it says:  "Our goal then
21   is to help you understand the section in
22   which we are part and within that section
23   how much risk we take."
24       Do you see that?
25       A.    No.  What page are you on?

128

1         Merkin - Direct/Bamberger
2         Q.    Bottom of page 2.
3         A.    Okay.
4         Q.    The question of how much risk
5    you take, there couldn't be a question
6    more central to the investment equation
7    than that, right, sir?
8         A.    Than...?
9         Q.    Knowing how much risk you take
10   for a certain level of potential reward.
11   There isn't anything more important than
12   knowing how much risk you're taking at any
13   time?
14       A.    How much risk you're taking and
15   how much reward you might get are very
16   central questions.
17       Q.    Now, correct to say that by this
18   time, April of 2004, you recognized that
19   there was a risk that Bernard Madoff was
20   conducting a Ponzi scheme, correct?
21       A.    Absolutely not.
22       Q.    You had concluded that there was
23   zero risk of that?
24       A.    I thought that there was
25   absolutely no risk that Bernard Madoff was

129

1         Merkin - Direct/Bamberger
2    conducting a Ponzi scheme on April 22,
3    2004, the date of this letter.
4         Q.    Zero?
5         A.    Absolutely not.
6         Q.    What work did you do to conclude
7    that?
8         So I'm being clear, I'm not
9    saying thought, believed.  I'm saying
10   concluded?
11       By that time you had weighed the
12   possibility that this man was conducting a
13   Ponzi scheme, correct?
14       A.    I don't think that I thought for
15   a moment that this man was conducting a
16   Ponzi scheme.
17       Q.    Do you remember Bayou?  That was
18   a hedge fund that imploded because of a
19   Ponzi scheme run by Sam Israel, correct?
20       A.    I think that's what happened
21   with Bayou, yes.
22       Q.    Ever since Charles Ponzi we have
23   been living with the threats of Ponzi
24   schemes in the financial community,
25   correct?

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                    GCC-P 0494423

---

130

Merkin - Direct/Bamberger

1  A.   I suppose so.
2  Q.   So there's always some chance
3  that somebody's conducting a Ponzi scheme?
4  A.   Yes.
5  Q.   It's just a question of whether
6  it's a low probability or one that needs
7  to be taken -- a very low probability or a
8  high probability, correct?
9  A.   If you want to ask about any
10  individual manager, could he be conducting
11  a Ponzi scheme; is that your question?
12  Q.   Yes.  There's always that
13  possibility, right?  It's inherent?
14  A.   I guess in theory, yes.
15  Q.   Leon Meyers knew that, right?
16  He told you that?  You knew that?  There's
17  always that risk, right?
18  A.   I don't know what you're
19  referring to.
20  Q.   By this time certainly a number
21  of individuals had told you that they were
22  suspicious of Madoff and the consistency
23  of his returns; true?
24  A.   Not a single individual at that

---

131

Merkin - Direct/Bamberger

1  time, prior to that time, or prior to
2  December 11th, 2008, told me that they
3  thought that Madoff was conducting a Ponzi
4  scheme, that the whole thing was a
5  criminal fraud, that no trading ever
6  existed and that the record wasn't honest
7  and accurate.  That conversation never
8  took place.
9  Q.   Is that your way --
10  MR. LEVANDER:  Can the witness
11  be allowed to finish his answer?
12  MR. BAMBERGER:  Sure.
13  A.   That conversation never took
14  place.
15  Q.   My question was:  Correct to say
16  that by this time there were certainly
17  people in the investment community that
18  had relayed their suspicions of Madoff to
19  you?
20  A.   No skepticism about Madoff
21  relayed to me, to use your description,
22  ever suggested that the entire office, the
23  entire money management operation, was one
24  pathological lie.

---

132

Merkin - Direct/Bamberger

1  Q.   I understand that, sir, and I
2  accept that.  I'm asking you a slightly
3  different question.
4  I'm asking you:  Certainly by
5  this time certain people had come to you,
6  and you were aware of their critique of
7  Mr. Madoff, and they were quite skeptical
8  of him?  They just didn't understand how
9  he was doing it?
10  A.   The word that I used was
11  skeptical.
12  Whatever skepticism was
13  expressed about Madoff did not go to the
14  genuineness of the returns.
15  Q.   Okay.
16  A.   The numbers --
17  Q.   Thank you, sir.  That sounds
18  like an answer.  Do you want to continue
19  or not?
20  A.   I was going to continue, but ask
21  another question.
22  Q.   Again, my question is:  The
23  skepticism that was said to you is that
24  people couldn't understand how he did it.

---

133

Merkin - Direct/Bamberger

1  And when they tried to reverse engineer
2  his returns they couldn't do it?  That's
3  the kind of comment you heard, right?
4  A.   No.
5  Q.   The people that were skeptical,
6  what did they say?
7  A.   The overwhelming bulk of the
8  skepticism was he departed from an
9  approach very similar to the one that you
10  articulated three-quarters of an hour ago;
11  that the whole thing was some sort of a,
12  you know, unexplained strategy.
13  You gave Madoff a certain amount
14  of money and you got a monthly report or a
15  quarterly report or an annual report.
16  Most people who didn't
17  understand what Madoff was doing never had
18  the transparency.
19  The overwhelming bulk of people
20  who had the transparency were perfectly
21  clear as to how the results were achieved.
22  The P&L added up, to the penny,
23  to what the returns were.  And all the
24  steps that we had taken on due diligence

34 (Pages 130 to 133)

**VERITEXT REPORTING COMPANY**
(212) 279-9424        www.veritext.com        (212) 490-3430

CONFIDENTIAL    GCC-P 0494424

134

1          Merkin - Direct/Bamberger
2   to confirm the accuracy of the returns all
3   worked.
4          So that the returns were
5   perfectly plausible, the returns were
6   confirmed by -- if nothing else -- the
7   absolutely sterling record in redemptions;
8   that is, any time we needed to take money
9   back, we got it back, square to the penny
10  of what the returns were, never asked for
11  extra time and never asked for extra
12  money.
13         So the skepticism as a whole
14  generally was articulated by people who
15  didn't see the transparency.
16   Q.   Well, getting your money back,
17  that just means that you could be
18  conducting a Ponzi scheme, right, sir?
19   A.   No.
20   Q.   But it would be consistent with
21  that possibility?  If you pay your
22  redemption on time, that is equally
23  consistent with the possibility of running
24  a Ponzi scheme?
25   A.   If you pay all your redemptions

135

1          Merkin - Direct/Bamberger
2   on time to the tune of hundreds and
3   hundreds and hundreds of millions of
4   dollars over an 18-year period, that is,
5   in my opinion, a profound refutation of a
6   Ponzi scheme.
7    Q.   By this time Mr. Madoff was
8   using what you understood to be a
9   proprietary black box, correct?
10   A.   I wouldn't used those words.  I
11  wouldn't think of it in those terms.  I
12  would use different terms to describe
13  that.
14   Q.   Okay.  Well, I thought you said
15  he did make substantial use of a
16  proprietary black box?
17   A.   No.  I contrasted Mr. Madoff's
18  transparency to what is conventionally
19  seen as a black box in order to say that
20  he wasn't a black box.
21         You weren't merely putting some
22  money in and getting some money out.  You
23  had complete transparency on the account.
24   Q.   Turn to the top of page 3 --
25   A.   So it was the opposite of what

136

1          Merkin - Direct/Bamberger
2   you suggested I said.
3    Q.   Turning to top of page 3 of your
4   letter of April 22, it says:  "It is
5   possible to have transparency without
6   understanding."  Do you see that it goes
7   on there?
8    A.   Yes.  That's the sentence you
9   previously quoted.
10   Q.   You said:  "We can imagine a
11  hypothetical manager who has stupendous
12  risk-adjusted returns for many years."
13         Do you see that?
14   A.   Do you want me to read the whole
15  paragraph?
16   Q.   Sure.
17   A.   Okay.
18         (The witness reads document.)
19   Q.   Now Mr. Balsam --
20   A.   Wait.  Okay.
21   Q.   That sentence, "He may well
22  disclose to investors all his positions,
23  but as long as he has a proprietary black
24  box approach no one outside his firm
25  really understands how those results are

137

1          Merkin - Direct/Bamberger
2   achieved," that certainly would describe
3   Mr. Madoff at the time?
4    A.   You're asking me if that
5   question describes Mr. Madoff?
6    Q.   I'm asking if that sentence
7   correctly describes Mr. Madoff in April of
8   2004.
9    A.   No.
10   Q.   Well, Mr. Madoff disclosed his
11  positions to you, correct, and anybody who
12  held an account?
13   A.   I don't know about anybody who
14  held an account.  Our account we got the
15  trading records, yes.
16   Q.   Okay.
17         Sir, it's a fact that that
18  reference there was specifically to Bernie
19  Madoff, and that the point of this
20  paragraph was that you were contrasting
21  your approach to disclosure to his; that
22  he may not tell the investors every
23  position you hold, but you're going to
24  tell your investors where in general their
25  investment car is parked, right?

35 (Pages 134 to 137)

CONFIDENTIAL                                    GCC-P 0494425

138

Merkin - Direct/Bamberger

1  A.   This letter is written seven
2  years ago.  Okay?  That is the first time
3  I ever had the remotest thought that that
4  might refer to Mr. Madoff.
5     Q.   Uh-hum.
6        Sir, if can understand this
7  generally -- we'll look at the numbers --
8  you would agree that over many years the
9  S&P 100, the S&P 500, has had wild
10  fluctuations up and down, correct?
11     A.   Over a very long period of time?
12     Q.   Yeah.
13     A.   It trends up.
14     Q.   We can have that discussion --
15  but certainly, for example, in the oil
16  shock years in '73/'74, the S&P 100 was
17  down 18 percent and then 30 percent in
18  those two years, right?
19     A.   I think it dropped by about
20  half.
21     Q.   Turning your attention to the
22  eighties, the record reflects that in '81
23  the S&P 100 was down about 10 percent --
24        MR. LEVANDER: I don't

139

Merkin - Direct/Bamberger

1  understand the relevance of what
2  happened in the seventies and
3  eighties.
4        MR. BAMBERGER:  I'll get there
5  quickly.
6     Q.   And there were other years when
7  it was up a lot; there were other years it
8  broke even?
9     A.   The S&P?
10     Q.   Yes.
11     A.   The S&P was down, the S&P was
12  up, the S&P broke even.  The longer you
13  look at the measure of time, the more the
14  trend is up; the more you isolate it and
15  look only at the down years it will be
16  down and suffer a loss.
17     Q.   No matter what happened to the
18  S&P, whether it was down or up, Mr. Madoff
19  throughout the eighties reported results
20  of 20 percent per year, clockwork,
21  correct?
22     A.   Don't remember exactly, but he
23  was certainly making money.
24        MR. BAMBERGER:  I'd like to

140

Merkin - Direct/Bamberger

1  admit 27 into evidence, please.
2        MR. LEVANDER:  No objection.
3        (Claimant's Exhibit 27, received
4  in evidence.)
5  BY MR. BAMBERGER:
6     Q.   Could you look, sir, at tab 49,
7  please.
8     A.   This is a bad habit.  Do I need
9  a sticker or anything?
10     Q.   Not yet.  49 I will ask you to
11  sticker.
12     A.   Are you asking for 29 or 49?
13     Q.   49.
14        Now, each of the pages for 49
15  I'll represent to you were produced to me
16  from your due diligence file on
17  Mr. Madoff.
18     A.   Right.  But that wouldn't be the
19  whole file.
20     Q.   Of course not.
21     A.   Okay.
22     Q.   They are your handwritten notes,
23  right?
24     A.   Among other things.

141

Merkin - Direct/Bamberger

1     Q.   The first page of 49, the
2  handwriting there is a bit cut off.  It
3  says "Bernard Madoff track record."
4        Do you see that?
5     A.   I do.
6     Q.   Is that your handwriting?
7     A.   No.
8     Q.   Whose handwriting is it?
9     A.   I don't know.
10     Q.   Do you have any ideas?
11     A.   No.
12     Q.   Did you receive this in '97?
13     A.   I assume I received this when
14  the fax number -- when those little
15  telltale things are up at the upper
16  left-hand corner.  But I'm not sure it was
17  faxed to me.  It may have been faxed to
18  somebody else who gave it to me.
19     Q.   It's hard to read.  V-e-t-i-a?
20  Do you know what that is?
21     A.   I'm just -- where are you
22  reading?
23     Q.   It's cut off -- on top of the
24  word, "Madoff's" --

36  (Pages 138 to 141)

CONFIDENTIAL

GCC-P 0494426

142

1        Merkin - Direct/Bamberger
2        A.    I see it now.  I didn't see it
3    before.
4        Q.    No problem.
5        A.    That says "Vetia."
6        Q.    What is that?
7        A.    I think that's a money
8    management firm in New Jersey that is -- I
9    associate that with a particular person in
10   a particular fund.
11          Vetia was their management
12   company.
13       Q.    You received this document and
14   saw that Mr. Madoff had never once lost
15   money between 1980 and 1996.  And in,
16   fact, his results were remarkably
17   consistent and nonvolatile, correct, sir?
18   No matter what the S&P 100 did.
19       A.    I'm not sure what you're asking
20   me.  These are the results that I was
21   given.  Now you're asking me to
22   characterize them?
23       Q.    I see what lesson you drew --
24   whether the S&P 100 went up or it went
25   down, by a little or a lot, the S&P was

143

1        Merkin - Direct/Bamberger
2    down 10 percent or 30 percent, it didn't
3    matter to Bernie Madoff's results,
4    correct?
5        A.    Bernie Madoff's returns were not
6    an S&P-driven return strategy, and had a
7    very low correlation with the S&P.  I
8    would not have picked the S&P as his
9    benchmark, for example.
10       Q.    And on the second page you see
11   it says "BEMIS"?
12       A.    I'm turning the page?
13       Q.    Please.
14       A.    I do see that.
15       Q.    This you understood to be
16   another Madoff account?
17       A.    Yes.
18       Q.    And his strategy is described
19   there, correct?
20       A.    Yes.
21       Q.    Not as an arbitrage strategy,
22   correct?
23       A.    Point me in what direction?
24   "Strategy"?
25       Q.    2, "Strategy."

144

1        Merkin - Direct/Bamberger
2        A.    It's described as something that
3    is said in parenthesis as "split
4    conversions."
5        Q.    The performance there is always
6    remarkably consistent.  It's between 22
7    percent and 28 percent, each and every
8    year?
9        A.    You will note that the benchmark
10   that is picked is three-month Treasury
11   bill.
12       Q.    That's the benchmark you used
13   for Ascot as well, correct?
14       A.    I believe that's right.
15          Because when you're looking at a
16   rate of return strategy you benchmark it
17   very often against the risk-free money
18   market rate of return.
19       Q.    And the benchmark that you used
20   for Gabriel would be the S&P 500, correct,
21   sir?
22       A.    I believe that's correct.
23       Q.    That was your way of saying
24   Ascot was a safer, more conservative
25   strategy, on which you would obtain less

145

1        Merkin - Direct/Bamberger
2    return than the Gabriel strategy, correct?
3        A.    I'm not sure that that's the way
4    I would say it.
5          I wouldn't necessarily
6    communicate that alone by virtue of a
7    choice of benchmark.
8          But the choice of benchmark
9    basically has to do to what -- the choice
10   of benchmark has something to do with
11   correlation with S&P.  It's not -- it
12   doesn't, per se, make it less risky or
13   more risky, which is what I thought you
14   were asking, or suggesting.  It might very
15   well be less risky, or more, but it's not
16   a per se thing.
17       Q.    By using a multiple of the
18   90-day Treasury bill rate for Ascot, you
19   were saying to people, in essence, that
20   this is a very safe investment, and you
21   should evaluate my success by reference to
22   the return on the 90-day Treasury bill,
23   correct?
24       A.    If that's the same question you
25   asked me two minutes ago, I've already

37  (Pages 142 to 145)

CONFIDENTIAL                                                    GCC-P 0494427

146

Merkin - Direct/Bamberger

1    answered no.
2    Q.    Correct to say that insofar as
3    you came to "manage" charity money,
4    foundation money, college endowments --
5    and now I have in mind everyone from Elie
6    Wiesel, to Bard, to NYU -- you generally
7    steered them to the Ascot account, because
8    you understood that to be a safer
9    possibility for them, correct?
10    A.    Incorrect.  Incorrect.
11    For no other reason than we
12    never managed a penny of Elie Wiesel's
13    money.
14    Q.    And not ever a penny of Elie
15    Wiesel's foundation money, too?
16    A.    True.
17    Q.    Mr. Madoff, too?
18    A.    So I read in the newspapers.
19    Q.    Did you ever discuss Mr. Madoff
20    with Elie Wiesel?
21    A.    Not until after December 11,
22    2008.
23    Q.    How did you come to possess this
24    second page BEMIS?
25

147

Merkin - Direct/Bamberger

1    A.    I don't know.
2    Q.    But you kept it all those years
3    in the diligence file?
4    A.    So you tell me.
5    Q.    I'm asking you, sir.  I wasn't
6    there.
7    A.    If this came out of the
8    diligence file, yes.  Very likely, yes.
9    Q.    And the third page, is that your
10    handwriting, "File, Bernard L. Madoff"?
11    A.    Yes.
12    Q.    Who provided that to you?
13    A.    I don't remember.
14    Q.    And in mid 2000, it was provided
15    to you in or about in mid 1995?
16    A.    It was awhile ago.  I don't
17    remember who gave it to me.  It's a
18    partial for 1995.  So my guess I didn't
19    get -- I assume he had this by, say the
20    third quarter of 1995.
21    MR. BAMBERGER:  I move that
22    document into evidence.
23    MR. LEVANDER:  No objection.
24    (Claimant's Exhibit 49, received
25

148

Merkin - Direct/Bamberger

1    in evidence.)
2    BY MR. BAMBERGER:
3    Q.    Sir, turn to tab 50.
4    You collected those documents as
5    well?
6    A.    One moment.
7    (The witness reviews document.)
8    A.    I don't remember these
9    documents.
10    Q.    You don't remember 50, but I'll
11    represent to you it was produced out of
12    your diligence file.
13    A.    Okay.  I'll accept that
14    representation.
15    Q.    And this first page shows the
16    monthly performance of what you understood
17    to be a 100 percent Madoff strategy being
18    executed by Fairfield Sentry; is that
19    right?
20    A.    I don't know.  Let me take a
21    look at it.
22    (The witness reviews document.)
23    A.    I don't know.  Does it say that?
24    Q.    You came to understand that
25

149

Merkin - Direct/Bamberger

1    Fairfield Sentry became the single biggest
2    feeder fund into Bernard Madoff by far?
3    A.    Yes.  I'm not sure this is 100
4    percent.  You said 100 percent.  I'm not
5    sure it's 100 percent strategy.  It may
6    very well be.  It just doesn't say it.
7    Q.    Well, you see it says "The
8    investment strategy," and then it goes on
9    there.
10    Do you see that?
11    A.    Yes, I do.
12    Q.    Now, the line that says, "The
13    sale of the calls is designed to increase
14    the standstill rate of return, while
15    allowing upward movement of the stock
16    portfolio to the strike price of the
17    calls," that was also your understanding
18    of what Mr. Madoff was doing for you,
19    correct?
20    A.    Not sure what "standstill rate
21    of return" means.
22    Q.    "The puts, funded in large part
23    by the sale of the calls, limit the
24    portfolio's downside."
25

38 (Pages 146 to 149)

CONFIDENTIAL                                                                GCC-P 0494428

150

1          Merkin - Direct/Bamberger
2          Do you see that?
3     A.    Yes.
4     Q.    And that's a reference to
5  insurance, as I described it earlier,
6  correct?
7     A.    That's not how I would use the
8  word "insurance."
9     Q.    Withdrawn.  Withdrawn.
10 Withdrawn.  I know we had that debate, so
11 let's not have it again.
12         The word "arbitrage," though, is
13 not used in this paragraph, correct?
14    A.    I'll have to read the paragraph.
15         (The witness reads document.)
16    A.    It isn't, but its function is
17 described in the second sentence.
18         Correlation language is an
19 arbitrage -- how shall I say -- term of
20 art.  It's an arbitrage-rich vocabulary.
21    Q.    We're getting philosophical
22 here.
23         The sentence, "A bullish or
24 bearish bias can be achieved by adjusting
25 the strike prices of the options.

151

1          Merkin - Direct/Bamberger
2  Overweighting the puts or underweighting
3  the calls" -- now we know for sure we're
4  out of the world of arbitrage, and we're
5  looking for changes in the underlying
6  value of the market, correct?
7          You're taking a view on the
8  future movement of the market; true?
9     A.    Well, you're adding that.
10 You're not out of the world of arbitrage
11 completely.  You're adding a market call
12 bias to the arbitrage activity.  And that
13 is -- this is reading it very quickly in
14 one sentence -- precisely what was
15 precluded by the trading directives.
16         You could not do that under the
17 trading directives.  You are out of any
18 kind of a bias if that clearly happened,
19 and you are squarely in arbitrage land.
20    Q.    That part we disagree with.
21         By that time he wasn't trying to
22 achieve a bullish or bearish bias after
23 2000 by adjusting the strike prices of the
24 options.  He was buying the puts a strike
25 below the market and he was selling the

152

1          Merkin - Direct/Bamberger
2  call a strike above the market?
3     A.    Not entirely.  Once again,
4  you're oversimplifying it.
5          The directives permitted a very
6  confined expression of a bearish or
7  bullish bias, much more than in this
8  sentence.  But specifically the way you're
9  allowed to play with the level of the
10 calls, if you thought the market was going
11 straight up -- okay? -- the directive very
12 clearly said there is no equivalent to
13 that 3 percent tether as there is on the
14 puts.
15         So the directive permitted some
16 expression of bullishness or bearishness.
17 It permitted some expression of sectors,
18 because of the 95 percent or 75 percent
19 things.  It just confined them.
20    Q.    If the OEX is at 500, and you're
21 buying the puts a strike below, you're
22 buying the puts at 495, correct?
23    A.    Yes.
24    Q.    If you're selling the calls one
25 strike above, you're selling the calls at

153

1          Merkin - Direct/Bamberger
2  505, correct?
3     A.    Yes.
4     Q.    And if you were doing that, that
5  would be purely mechanical.  And if you
6  were buying the same number of puts that
7  you were selling the calls, you would be
8  expressing no bias whatsoever, right?
9     A.    No.  Because you're -- no,
10 that's not correct.
11    Q.    Okay.
12         MR. BAMBERGER:  I move that
13    document into evidence.
14         MR. LEVANDER:  I'm not sure
15    where it comes from.  I'm not sure
16    whether it's relevant to this.  For
17    what it's worth, we have no objection.
18         (Claimant's Exhibit 50, received
19    in evidence.)
20 BY MR. BAMBERGER:
21    Q.    Page 5644, those are not my
22 circles.  I'll just indicate, those
23 circles indicate there are only four
24 losing months in the period depicted
25 there, using the strategy.

39 (Pages 150 to 153)

CONFIDENTIAL

GCC-P 0494429

---

### 154

Merkin - Direct/Bamberger

1  A.   What page are you talking about?
2  THE CHAIRMAN:  What page are you
3  talking about.
4  Q.   Page 5644.
5  MR. FLEMING:  Which exhibit?
6  MR. BAMBERGER:  Exhibit 50.
7  THE CHAIRMAN:  Here it is.  Out
8  of sequence.
9  MR. LEVANDER:  Going back to my
10  comment a moment ago, he selected
11  certain pages.  I don't know where the
12  pages are between.  I just don't know
13  what exactly this is.  So I have some
14  concerns about it.
15  THE CHAIRMAN:  If you had no
16  objection --
17  MR. BAMBERGER:  I was just
18  putting materials together that
19  related to Fairfield Sentry.  I see
20  that the first three pages are one
21  document and these appear to be loose.
22  With that objection noted...
23  BY MR. BAMBERGER:
24  Q.   This chart shows only four

*(Note: line numbering above corresponds to lines 2–25)*

### 155

Merkin - Direct/Bamberger

1  losing months for this strategy in all the
2  time depicted, correct?
3  A.   I don't know what you're talking
4  about.  Just give me a page.
5  Q.   5644.
6  A.   Okay.
7  Q.   In this exhibit it's the --
8  A.   It says "net of fees" on the top
9  of it?
10  Q.   Yes.  It says "net of fees" in
11  handwriting.
12  A.   I'm not sure I've ever seen this
13  before.
14  Q.   Do you know whose handwriting
15  that is, "net of fees"?
16  A.   I do not.
17  Q.   The next page it says "File,
18  Madoff."  It says "Attention, Mr. Merkin."
19  Is the bottom your handwriting?
20  A.   No.
21  Q.   Turning to 51, now, that is your
22  handwriting in the upper right-hand
23  corner, is it not?
24  A.   One moment.

### 156

Merkin - Direct/Bamberger

1  Tab 51, first page, top right --
2  yes, that is my handwriting.
3  MR. BAMBERGER:  This is one
4  consecutive document.  I move it into
5  evidence.
6  THE CHAIRMAN:  Mr. Levander?
7  MR. LEVANDER:  No objection.
8  (Claimant's Exhibit 51, received
9  in evidence.)
10  BY MR. BAMBERGER:
11  Q.   We'll look together later
12  whether the word arbitrage was ever used
13  here.
14  It says it uses the Madoff
15  strategy?
16  A.   What are you asking me to
17  confirm?
18  Q.   This document describes the
19  Madoff strategy?
20  A.   What are you pointing me at?
21  Q.   On page 2 of 5, where it starts
22  with, "The basket of equities is
23  constructed"?
24  A.   Page 205?

### 157

Merkin - Direct/Bamberger

1  Q.   2 of 5.
2  A.   Oh, I'm sorry.
3  Q.   The paragraph that says "The
4  basket of equities is constructed."
5  A.   Well, that first sentence is
6  not -- is not the overall strategy.  The
7  first sentence says instead of the S&P 100
8  index, I'm going to create a basket which
9  will let me arbitrage the underlying
10  components of the S&P index, the ones that
11  I choose to own, against the S&P index as
12  a whole.
13  That is exactly an arbitrage
14  strategy.
15  Q.   The word "arbitrage" is not
16  used?
17  A.   The word "arbitrage" is not used
18  because it describes it more fully.
19  Possibly.  I didn't write this.
20  Q.   And 52, is that your handwriting
21  on the top?
22  A.   2...
23  (The witness reads document.)
24  A.   Page 52?

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494430

158

1    Merkin - Direct/Bamberger
2    Q.    Tab 52.
3    A.    You're just going a little bit
4 too quickly for me.
5        Yes, that is my handwriting.
6    Q.    And tab 53?
7    A.    Yes, that is my handwriting.
8    Q.    And tab 55?
9    A.    Tab 55, that is my handwriting.
10    Q.    Why were you collecting these
11 semiannual updates on the Fairfield Sentry
12 Fund?
13    A.    I don't think I was collecting
14 them. I think I had --
15    Q.    Why were you receiving them?
16    A.    My guess is someone sent them to
17 me.
18    Q.    Who?
19    A.    I don't know.
20    Q.    Did different people send you
21 the semiannual updates?
22    A.    I said my guess is it might have
23 been different people. I don't know who
24 sent them to me.
25    Q.    Can you think of anyone who sent

159

1    Merkin - Direct/Bamberger
2 you the Fairfield Sentry updates?
3    A.    I believe Roman Igolnikov once
4 sent me one.
5    Q.    Why would he send you them?
6    A.    I'm not sure what his purpose
7 was.
8    Q.    That -- UBP was a major investor
9 in Ascot, correct?
10    A.    Yes.
11    Q.    And they certainly knew that
12 Ascot was managed by Madoff, correct?
13    A.    Yes.
14    Q.    What did they understand your
15 role to be?
16    A.    UBP?
17    Q.    Yes.
18    A.    Precisely the role in the Ascot
19 documents, page 1.
20    Q.    And your role, as distinguished
21 from Madoff's role, is what?
22    A.    I'm responsible for the
23 allocation of the assets, the supervision
24 of the strategies, the organization of the
25 audits, and the consideration of other

160

1    Merkin - Direct/Bamberger
2 strategies. It's contractual.
3    Q.    Right.
4        Do you agree you never did any
5 portfolio management for Ascot?
6    A.    Strongly disagree.
7        MR. BAMBERGER:  I'd move all of
8 those exhibits into evidence, through
9 55.
10        MR. LEVANDER:  Excuse me.
11        MR. BAMBERGER:  I move exhibits
12 52 through 55 into evidence at this
13 time.
14        MR. LEVANDER:  You didn't ask
15 about 54.
16        MR. BAMBERGER:  I didn't.
17    Q.    54 is another document -- is
18 that your handwriting in the upper
19 left-hand corner that says MEA?  Is that
20 your handwriting?
21    A.    No, it is not.
22    Q.    Do you know what "MEA" refers
23 to?
24    A.    I'm guessing, Michael E. Autera.
25    Q.    Okay?

161

1    Merkin - Direct/Bamberger
2    A.    But that is not my handwriting.
3        MR. BAMBERGER:  I move those
4 documents into evidence.
5        MR. LEVANDER:  Subject to
6 relevance, I have no objection.
7        (Claimant's Exhibits 52 through
8 55, received in evidence.)
9 BY MR. BAMBERGER:
10    Q.    With respect to Exhibit 55, you
11 make a point of placing the confidential
12 offering memorandum of Greenwich Sentry,
13 what was then known as Greenwich Sentry,
14 into your file, correct?
15    A.    I made a point of writing "File,
16 Madoff" and put it in my out box.
17    Q.    Why did you keep it, sir?
18    A.    No particular reason.  I think I
19 got this from somebody long after this
20 document actually had happened -- had come
21 about.
22        And I think my purpose in
23 looking at it in the first place was
24 simply to see how they described the
25 strategy.  I think.  I'm not sure I

41 (Pages 158 to 161)

CONFIDENTIAL                    GCC-P 0494431

162

1    Merkin - Direct/Bamberger
2    remember that quite that way. It was a
3    Madoff document. I put it in the Madoff
4    file.
5    Q. You understood one of the
6    principals of what was then Greenwich
7    Sentry was Jeffrey Tucker, correct?
8    A. I doubt it.
9    Q. You came to know that at a later
10    time?
11    A. I'm not sure I knew the name
12    Jeffrey Tucker until after December 11,
13    2008. If I did, it certainly did not
14    stick with me.
15    Q. Do you know the name Walter
16    Noel --
17    A. I heard the name. I didn't know
18    him.
19    Q. Did you know this fund was the
20    single biggest fund utilizing the Madoff
21    strategy?
22    A. I thought that Fairfield and
23    its -- what should I say -- fund
24    affiliates were a very, very, very large
25    feeder. I'm not sure that I knew they

163

1    Merkin - Direct/Bamberger
2    were the biggest.
3    Q. Did you take comfort from the
4    fact that they were doing -- Greenwich
5    Sentry, later Fairfield Sentry, exactly
6    what you were doing in Ascot, which was
7    leaving all the money for management with
8    Madoff?
9    A. Did I take comfort --
10    Q. Why you glad that someone else
11    was doing what you were doing?
12    A. I'm not sure -- you mean -- did
13    I take comfort from their due diligence on
14    Madoff, and saying that somebody else had
15    done a lot of work on it and concluded
16    that this was a viable strategy?
17    I'm not sure what you're asking.
18    Q. You can start by answering that
19    question.
20    A. Yes, I think so.
21    Q. Did you review all of those
22    periodic updates that came to you when
23    they were received?
24    A. I don't remember getting
25    anywhere near that number. That's why I'm

164

1    Merkin - Direct/Bamberger
2    not sure they came from my file. Some of
3    these things look new to me for the first
4    time now. Which is not to say that they
5    were not in my file; I just don't
6    remember.
7    Q. Now, no doubt about it -- look
8    at tab --
9    THE CHAIRMAN: Let him finish
10    the answer before you start the next
11    question. You clip off the end of the
12    answer.
13    And for the witness, you start
14    answering before he finishes the
15    question.
16    You are making this double
17    overlap very difficult for the
18    reporter.
19    MR. BAMBERGER: Thank you,
20    Mr. Chairman. I apologize to the
21    reporter.
22    BY MR. BAMBERGER:
23    Q. Mr. Merkin, turning your
24    attention to tab 55, please.
25    A. Tab 55, yes.

165

1    Merkin - Direct/Bamberger
2    Q. Right at the very first
3    paragraph of this memorandum --
4    A. The very front page?
5    Q. Well, we can start there, yes.
6    A. If you want to go to another
7    page, go to another page.
8    Q. It says that: "The firm employs
9    an options trading strategy described as
10    split-strike conversion."
11    Do you see that?
12    A. I do.
13    Q. Will you turn to page, lower
14    right-hand corner, 5700 --
15    A. One moment. What am I looking
16    at on page 5700?
17    Q. First full paragraph, beginning
18    with the words "Greenwich Sentry LP."
19    A. Okay.
20    Q. It says that its objective is to
21    achieve capital appreciation by allocating
22    its assets in an account at Bernard L.
23    Madoff Investment Securities.
24    Do you see that?
25    A. I do.

42  (Pages 162 to 165)

CONFIDENTIAL

GCC-P 0494432

**166**

1         Merkin - Direct/Bamberger
2     Q.    Have you had a chance to review
3   this document?
4     A.    No.
5     Q.    When did you first read this
6   document?
7     A.    I'm not sure I ever read the
8   entire document. And I don't know when I
9   got this. But it's got to be probably
10  something like 15 years ago? That may be
11  too long. Something like that.
12    Q.    Sir, can you turn your attention
13  to page 5706.
14    A.    Okay.
15    Q.    Do you see, under the column
16  "Investment Objective," beside the words
17  "Investment Objective" there's disclosure,
18  under "Summary"? Do you see that?
19    A.    Wait. Do you mean on the
20  left-hand column, "Investment Objectives"?
21    Q.    Yes.
22    A.    Yes, I see those two words.
23    Q.    On the right-hand side there's a
24  paragraph describing the objective and
25  strategy of the partnership.

**167**

1         Merkin - Direct/Bamberger
2         Do you see that?
3     A.    Yes.
4     Q.    Do you see that it says that
5   Madoff does not share in the profits of
6   the partnership?
7     A.    Yes. As defined. Yes.
8     Q.    Okay.
9         Turn your attention, please,
10  sir, to page 5711.
11    A.    Okay.
12    Q.    Do you see this document clearly
13  says that "All investment decisions in the
14  account at BLM are effected by persons
15  associated with ELM"?
16    A.    The first -- the bottom half of
17  the page?
18    Q.    Yes. Under "Investment
19  Program."
20    A.    One second.
21        (The witness reads document.)
22    A.    Yes. That's the discussion of
23  stocks and convertibles, yes.
24    Q.    Correct to say in the
25  approximate 16 years of Ascot's existence,

**168**

1         Merkin - Direct/Bamberger
2   from 1992 to 2008, you never made a
3   similar disclosure in writing to any Ascot
4   investor; true?
5     A.    Similar to what?
6     Q.    A clear statement that all
7   investment decisions for this fund are
8   made by Bernard L. Madoff.
9     A.    That would have been completely
10  untruthful.
11    Q.    So you made investment
12  decisions, too, for Ascot?
13    A.    Ascot was not confined to a
14  strategy at Bernard L. Madoff, and didn't
15  have a document that sought to confine it
16  in that manner, nor would I ever have used
17  the words "split-strike conversions," nor
18  did I ever hear that phrase come from
19  Mr. Madoff.
20    Q.    On 5712 do you see the third
21  full paragraph? It talks about a bullish
22  or bearish bias?
23    A.    Yes.
24    Q.    Now, that statement is correct,
25  that the further away the strike prices

**169**

1         Merkin - Direct/Bamberger
2   are from the price of the S&P 100 the more
3   bullish the strategy? That's true, right?
4     A.    Just one moment.
5         (The witness reads document.)
6     A.    Hmmm, let's think about that.
7   It would depend on the tandem more than
8   anything else. So that certainly might be
9   right.
10        I'm not sure it's always right.
11        But if you want me to think
12  about it, you've got to give me a moment.
13    Q.    If you want to come back to it,
14  you may.
15    A.    Just a moment. Just a moment.
16    Q.    At the bottom of 5712, do you
17  see that this document discloses very
18  clearly that the options transactions are
19  executed primarily --
20    A.    If you add the word riskier --
21  the riskier and possibly more bullish the
22  strategy.
23        But you're just widening the
24  area of possible and profitability.
25        What was your question?

43 (Pages 166 to 169)

CONFIDENTIAL                                                          GCC-P 0494433

170

1        Merkin - Direct/Bamberger
2        Q.    On the bottom of page 5712, the
3    second paragraph from the bottom, this
4    document clearly discloses that the
5    options transactions effectuated for the
6    benefit of this partnership are
7    effectuated primarily in the
8    over-the-counter and not on a registered
9    options exchange.
10        Clear disclosure there, right
11    sir?
12        A.    That's what that sentence says.
13        Q.    Why is it important for an
14    investor to know this?
15        A.    I'm not the author of this
16    document.  It would perhaps put the
17    question of counterparty risk in front of
18    the investor.
19        Q.    There's a general consensus that
20    there's essentially no counterparty risk
21    on the CBOE because there's an implicit
22    guarantee of all transactions in the CBOE,
23    whereas in the over-the-counter-market you're
24    taking the over-the-counter risk of the
25    counterparties?

171

1        Merkin - Direct/Bamberger
2        A.    You're not getting a guarantee
3    on CBOE, but there's the Options Clearing
4    Corporation which, within some limits, is
5    designed to step in and clear the trade.
6    Costs of that end up being assessed.  And
7    it's certainly not a guarantee.
8        On the over-the -- on the
9    over-the-counter options, depending on the
10    quality of your counterparty you will have
11    more or less risk.
12        Q.    Turning to page 5717.
13        Now, sir, do you understand that
14    we're now in the portion of the memo
15    called "Risk Factors"?
16        A.    No.
17        Q.    Confirm that for yourself,
18    please.
19        A.    Okay.
20        THE CHAIRMAN:  How much longer
21    with this document?
22        MR. BAMBERGER:  I'm sorry.
23        THE CHAIRMAN:  Are you going to
24    be much longer with this document?
25        MR. BAMBERGER:  Not much longer.

172

1        Merkin - Direct/Bamberger
2        THE CHAIRMAN:  I think after
3    that we will break for lunch.
4        MR. BAMBERGER:  That's fine.
5        Were we agreed to break for
6    lunch around 1 o'clock.
7        THE CHAIRMAN:  It depends where
8    you are with the witness and where
9    your adversary is.
10        MR. BAMBERGER:  Okay.  I just
11    have a couple minutes.  Then we'll
12    break.
13    BY MR. BAMBERGER:
14        Q.    Sir, now, do you see that the
15    author of this document is saying that one
16    risk factor is it its dependence upon
17    Bernard L. Madoff Investment Securities?
18    Do you see that?
19        A.    Where are you pointing me?  What
20    page and what paragraph?
21        Q.    Paragraph 4 on page 5717.
22        A.    No, it's not saying that.
23        Q.    Okay.  It's not saying that one
24    of the risk factors is dependent upon
25    Madoff?

173

1        Merkin - Direct/Bamberger
2        Of course it talks about the
3    principals of the partnership as well, but
4    it's saying another risk factor is
5    dependence on Bernie Madoff, correct?
6        A.    Either one way or the other way.
7    You can't have it both ways.
8        It says the services of
9    Messrs. Kohlberg, Berman, Tucker and Noel,
10    and Bernard L. Madoff Investment
11    Securities, no longer a Messr., are
12    essential to the continued operations of
13    the partnership.
14        It doesn't say that -- it
15    doesn't so much say that they're going to
16    make it profitable or unprofitable.  It
17    says it would be nice if these fellows
18    were around if the partnership is to
19    continue in operation.
20        Q.    They say there that they
21    delegated all investment management
22    decisions to Bernard L. Madoff.
23        Do you see that?
24        A.    Yes.  It's a -- it's a very
25    narrow mandate.  It's a deliberately

44 (Pages 170 to 173)

**VERITEXT REPORTING COMPANY**

(212) 279-9424         www.veritext.com         (212) 490-3430

CONFIDENTIAL                                                GCC-P 0494434

174

1        Merkin - Direct/Bamberger
2   narrowed mandate.
3       Q.    And you did, too?
4       A.    That's precisely what I did not
5   do.
6            MR. BAMBERGER:  Okay.  Just --
7   again, I'm almost done now.  I think
8   we can move this document into
9   evidence, or do I need that confirmed
10  now?
11           Mr. Levander?
12           MR. LEVANDER:  I think it's
13  already in evidence.
14      Q.    Also it is correct to say that
15  this document disclosed the monthly
16  results on page 17 --
17      A.    I'm sorry, are you directing me
18  to page 17.
19      Q.    I am.  Page 5717, on the bottom.
20      A.    I got it.
21      Q.    So an investor who is interested
22  could look at the exact performance of
23  this strategy in time, correct?
24      A.    I'm not sure what you're asking
25  me.

175

1        Merkin - Direct/Bamberger
2            There's monthly performance on
3   page 17 that starts in 1993.
4       Q.    You didn't make it a habit to
5   provide every prospective investor in
6   Ascot monthly, quarterly or annual
7   performance of Ascot, correct?
8       A.    I almost surely did make it a
9   habit.
10      Q.    Uh-hum.  You wouldn't dispute
11  that Mr. Moshael Straus never received it,
12  correct?  You don't have evidence that he
13  did?
14      A.    I can't imagine he didn't if he
15  was an investor.  He certainly had
16  returns.
17      Q.    I'm talking about when he made
18  his decision as a prospective investor --
19      A.    Oh, I see.
20      Q.    -- in March of '99, you're not
21  here to say that you are certain that he
22  got information on Ascot's performance
23  going back to 1992, are you?
24      A.    I can't say with certainty that
25  he received that information.

176

1        Merkin - Direct/Bamberger
2       Q.    Or a five-year performance?
3       A.    I didn't -- what's the
4   difference in the question?  I'm sorry.
5       Q.    Just the lengths of time.
6            Isn't it typical to give five
7   years' historical returns?
8       A.    When we give investors,
9   prospective investors, even existing
10  investors, performance information for
11  Ascot, it may have been in certain cases
12  annual, it may have been certain cases
13  monthly, or quarterly, but in the
14  preponderance -- I mean, they always got
15  something, and it would always be, since
16  inception.
17      Q.    My last question before lunch
18  is:
19           Since you clearly could have
20  done so, why did you make the decision not
21  to disclose Bernard Madoff's role or roles
22  for Ascot in your offering memoranda for
23  Ascot?
24      A.    The offering -- well, his role
25  was disclosed in later offering memoranda.

177

1        Merkin - Direct/Bamberger
2   So if you point me at a specific time,
3   there's three of them or four of them that
4   come down the pike.
5            It's simply unfair to say that
6   it wasn't disclosed in there.
7            The simple reality is Ascot was
8   formed to allocate money to managers who
9   could have low volatility, lower return
10  strategies, they were also very liquid.
11           The primary strategy -- the fact
12  that there was a primary strategy, the use
13  of third parties, the notion that we could
14  give all of that money to one-third party,
15  the custody risk, the notion that all of
16  it could be at one place with custody
17  clearly at that place, are all disclosed
18  in every document since inception, with
19  the primary strategy very, very clearly
20  outlined.
21           In addition to that, I told
22  everybody.  And I told virtually every
23  investor in the fund that the monies were,
24  over a long period of time, invested with
25  Madoff.

45  (Pages 174 to 177)

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                                GCC-P 0494435

---

178

1          Merkin - Direct/Bamberger
2      Q.   We know you certainly didn't
3   tell Moshael Straus that.  That was in
4   your counsel's opening?
5      A.   Slowly?
6      Q.   You personally didn't tell
7   Moshael Straus that?
8      A.   I don't recall such a
9   conversation.
10         If you told me I had told him, I
11  certainly would think that that's entirely
12  plausible.
13     Q.   It was in 2006 that your
14  offering memorandum for Ascot first makes
15  mention of Bernard L. Madoff Investment
16  Securities, correct?
17     A.   I think that's correct.
18     Q.   And at that time you say he's
19  one of two prime brokers for Ascot,
20  correct?
21     A.   I think that's right.
22     Q.   All right.
23         And the other being Morgan
24  Stanley & Co.?
25     A.   Right.

---

179

1          Merkin - Direct/Bamberger
2      Q.   And you further say that he is
3   prime broker, and he is custodian,
4   correct?
5      A.   Correct.
6      Q.   You do not disclose that he is
7   investment manager, correct, yes or no?
8      A.   I don't remember those words,
9   no.
10     Q.   You do not disclose that he has
11  discretion over the Ascot account,
12  correct?
13     A.   I think we emphatically say
14  about ten or 12 times in that document --
15     Q.   Sir, I'm asking you a
16  question -- pardon my interruption.
17     A.   I'm answering your question.
18         If you want to interrupt --
19     Q.   I don't mean to, sir.
20     A.   We disclosed, probably nine, 10
21  or 11 times in that document, the use of
22  third parties, and emphasize that those
23  third parties could have all the money,
24  this is with Madoff, and emphasize very
25  clearly that they could have custody.

---

180

1          Merkin - Direct/Bamberger
2      MR. BAMBERGER:  Okay, nothing
3   else for you right now, prior to
4   lunch.  Thank you.
5      THE CHAIRMAN:  We'll break.
6      (Luncheon recess:  12:58 p.m.)

---

181

1        Merkin - Direct/Bamberger
2   A F T E R N O O N   S E S S I O N:
3      (Time noted:  1:55 p.m.)
4      THE CHAIRMAN:  All right, we'll
5   resume.
6      MR. BAMBERGER:  Thank you very
7   much, Judge.
8   J. E Z R A   M E R K I N,
9   resumed, having been previously duly
10  affirmed, was examined and testified
11  further as follows:
12  CONTINUED DIRECT EXAMINATION
13  BY MR. BAMBERGER:
14     Q.   Mr. Merkin, in addition to
15  Gabriel and Ariel, which I understand are
16  brother/sister funds, and Ascot, in the
17  last years of your organization there was
18  a fourth entity for which BDO would
19  prepare financial statements.  And that
20  entity was Amber, correct?
21     A.   Yes.
22     Q.   Were you or an entity under your
23  control the general partner of Amber?
24     A.   Amber was a corporation.  It did
25  not have a general partnership.  It wasn't

46 (Pages 178 to 181)

CONFIDENTIAL                                                    GCC-P 0494436

182

1        Merkin - Direct/Bamberger
2   a partnership.  It was a corporation.
3        Q.   It was a corporation.
4        When was that corporation
5   formed?
6        A.   Hmmm, I don't remember.  I guess
7   early to mid 2000s.
8        Q.   Can you do any better than that?
9        A.   If you perhaps suggest a better
10  date, it might refresh my memory.
11       Q.   I wish I could, sir.  I don't
12  know.
13       A.   I don't think it was less than
14  that.  It may have been a little bit
15  older than that.  It might have been in
16  existence by ' 08 for as much as eight or
17  ten years, I just don't remember.
18       Q.   Your wife is named Lauren
19  Merkin, correct?
20       A.   She is.
21       Q.   And is she today on the Board of
22  Trustees of an entity called AVI CHAI?
23       A.   She is.
24       Q.   Has she been on the Board of
25  Trustees of AVI CHAI for many years?

183

1        Merkin - Direct/Bamberger
2        A.   Yes.
3        Q.   Is or was AVI CHAI an investor
4   in Amber?
5        A.   Yes.
6        Q.   Is it correct to say that at no
7   time Amber had any Madoff exposure?
8        A.   Yes, that's correct.
9        Q.   If you know, how big an
10  investment did AVI CHAI initially make in
11  Amber?
12       A.   Some multiple of 10 million.  I
13  don't remember the exact number.
14  Mid-multiple.  I just don't remember.
15       Q.   Now, the records that have been
16  produced in this case -- and here I will
17  suggest to you that I think I read in the
18  records -- that the Leon Levy Foundation
19  was also an investor in Amber.
20       Does that accord with your
21  recollection?
22       A.   Yes.
23       Q.   Okay.  When he was alive was
24  Leon Levy also an investor in Amber?
25       A.   I don't think so.

184

1        Merkin - Direct/Bamberger
2        Q.   Why did you form Amber, sir?
3        A.   Amber was formed with the
4   objective of asking investors with Amber,
5   shareholders in Amber, for a much longer
6   lockup than we might have had in Gabriel
7   or Ariel at that time.
8        And to then pursue strategies
9   that deliberately eschewed any objective
10  of managing the liquidity of the
11  portfolio.
12       Q.   What was the lockup applicable
13  to Amber?
14       A.   At the beginning I think it was
15  three years, and then I think it could
16  be -- if I remember correctly, and I'm not
17  sure I do -- it might also have
18  extensions.
19       Q.   Did you offer Amber in general
20  to prospective investors in your capital
21  group?
22       A.   It certainly wasn't -- if it
23  sounded -- I would say that they were
24  generally, yes.  Specifically, I don't
25  remember specific circumstances.

185

1        Merkin - Direct/Bamberger
2        Q.   Correct to say that it never had
3   a dollar of Madoff exposure for the
4   existence of the corporation?
5        A.   I'm sorry?
6        Q.   Is it correct to say it never
7   had any exposure to Madoff in its life?
8        A.   Amber?
9        Q.   Amber.
10       A.   Yes.
11       Q.   Correct to say that Amber in
12  general invested side by side with Gabriel
13  Partners LP?
14       A.   In the sense that I take that,
15  no, that's not correct.
16       Q.   And in the sense that I would
17  take it -- I'm kidding with you, sir.
18  That was meant as a joke.  It's not funny.
19       When I say "side by side," there
20  are many complexities.  One can be a
21  co-investor.  One can invest in a common
22  fund.  There are various different ways to
23  do it mechanically for various different
24  reasons.
25       But is it not correct to say

47 (Pages 182 to 185)

CONFIDENTIAL                                                                    GCC-P 0494437

186

1    Merkin - Direct/Bamberger
2    that basically the private equity
3    investments that Gabriel made Amber would
4    also participate in?
5        A.    You mean Gabriel Capital LP?
6        Q.    Yes.
7        A.    The purpose of Amber was to
8    focus very deliberately on the highly
9    illiquid and very long time to resolve
10    positions.
11        And, therefore, because it asked
12    for a lockup, there was no need to manage
13    the liquid of the portfolio.
14        It was very clear to all Amber
15    prospective investors and investors that
16    should Amber decide to invest in a
17    transaction in which Gabriel was also
18    deciding to invest in, it would be pari
19    passu'd by available buying power with any
20    of our groups that invested in that
21    position.
22        Amber could not in any way
23    disadvantage investors in an existing
24    fund.
25        Q.    Understood, thank you.

187

1        Merkin - Direct/Bamberger
2        A.    It was not, as I would take it
3    to mean, side by side.
4        Q.    Can you identify other major
5    investments that were made by both Gabriel
6    and Amber?
7        A.    What period are you talking
8    about?
9        Q.    From the inception of Amber.
10        A.    A whole list, since the
11    beginning of Amber's existence?
12        Q.    I would assume the list is not
13    too long, but you can tell me.
14        Would Bank Leumi be one?
15        A.    Yes.
16        Q.    Would investments in GMAC be
17    another?
18        A.    Yes.
19        Q.    Help me, sir. What were the
20    other common investments made by Gabriel
21    and Amber?
22        A.    Chrysler, Talecris, a Japanese
23    bank, an Austrian bank, several
24    domestic -- meaning not overseas --
25    financial entities. Some things that

188

1        Merkin - Direct/Bamberger
2    might be real estate-related.
3        Generally, the focus was on
4    private equity.
5        Q.    Some of the names that you've
6    just given me, could they be distressed
7    investments, too, or not necessarily?
8        A.    Well, the real private equity
9    wasn't. It certainly wasn't intended to
10    be.
11        By the time Amber came into
12    existence it was partly created because of
13    the liquidity of the mainstream
14    opportunities that we were seeing in
15    Gabriel had moved sequentially down.
16        In other words, the things that
17    we were doing way back -- let's say, for
18    example, merger arbitrage, were a
19    relatively liquid strategy.
20        We moved to distressed and
21    bankruptcies, less liquid than merger
22    arbitrage, but more liquid in the sense
23    that it involved, at least in part, public
24    securities, than some of the things we
25    were doing in private equity, or some of

189

1        Merkin - Direct/Bamberger
2    the things that we were doing in debt
3    pieces that we originated and were
4    completely private.
5        Q.    For the periods of time that
6    Amber was awaiting the consummation of an
7    investment, how would it allocate its
8    cash? Into what kinds of investments?
9        A.    I don't think Amber ever had a
10    whole lot of cash.
11        Q.    But when it did have cash, what
12    would you do with it?
13        A.    It would probably sit in an
14    account of Morgan Stanley or would own
15    even Morgan Stanley paper -- I just don't
16    know. I don't remember.
17        Q.    To get it an enhanced return why
18    didn't you put it with Bernard Madoff?
19        A.    Well, the objective of Amber was
20    not to get an enhanced return on its cash,
21    nor was that, frankly, the reason we had
22    money necessarily with Madoff in Gabriel.
23        The purpose of Amber, as I just
24    said, was to invest in highly illiquid
25    attractive investments with the strength

48 (Pages 186 to 189)

CONFIDENTIAL                                                                    GCC-P 0494438

190

```
1          Merkin - Direct/Bamberger
2    and the benefit of a very long lockup.
3        Q.   Why did it make sense to put up
4    to 30 to 35 percent of Gabriel's assets in
5    Madoff?
6        A.   I'm not sure the percentage was
7    anything near that high.
8            The role of the Madoff positions
9    in the Gabriel portfolio was we saw those
10   positions as an interesting alternative
11   for a portion of our liquidity
12   requirement.
13           And as we managed the liquidity
14   of the portfolio, and as other pieces of
15   the portfolio became increasingly
16   attractive and increasingly illiquid, it
17   was an interesting alternative to our
18   liquidity in management.
19       Q.   Correct to say that one of the
20   persons associated with AVI CHAI told you,
21   in words or substance, that they did not
22   want Madoff exposure; true?
23       A.   No, I don't think so.
24       Q.   Now, sir, you produced certainly
25   e-mails in this case indicating that
```

191

```
1          Merkin - Direct/Bamberger
2    actual and prospective investors in Ascot,
3    at least some of them, knew that Ascot was
4    a Madoff strategy.
5            But were you equally as
6    forthcoming with individuals that invested
7    in Gabriel that Madoff was playing a role
8    there, too?
9        A.   I'm not sure what you're asking.
10   Discussions of Gabriel very, very rarely
11   focused on the Madoff role.
12           It was a tool for liquidity
13   management. It wasn't, let's say, the
14   characterizing portions of the portfolio.
15   It surely wasn't where we thought we were
16   taking risk.
17           The risk to opening capital in
18   any quarter that we had capital with
19   Madoff for Gabriel probably didn't exceed
20   a half a percent. And surely never made
21   it to a percent. But I don't think --
22   honestly don't think it got up above a
23   half-percent. And it wasn't what people
24   came to Gabriel for.
25           It was a tool of liquidity
```

192

```
1          Merkin - Direct/Bamberger
2    management to enable us to offer to
3    investors, was what they came to Gabriel
4    for.
5        Q.   Okay.
6            Sir, in the volume still before
7    you --
8        A.   Actually, it isn't. It's
9    probably right here.
10       Q.   If you can take it back,
11   please. I think we're still working out
12   of Volume 2.
13       A.   Okay.
14       Q.   Let's finish with that.
15       A.   Just one second. I have to go
16   off a step.
17       Q.   Turning your attention to tab
18   57, please.
19           (The witness complies.)
20       Q.   This seems to be a stand-alone
21   paragraph drawn from one of the earlier
22   Fairfield Sentry documents we talked
23   about, describing the strategy. Do you
24   see that? It seems to be drawn out of
25   Exhibit 50.
```

193

```
1          Merkin - Direct/Bamberger
2        A.   Can I take a look at Exhibit 50?
3        Q.   Let me represent to you that
4    it's the same.
5        A.   Fine with me.
6            This is the same that we looked
7    at in that opening paragraph in 50?
8        Q.   Yes.
9        A.   I'm surprised to see that.
10       Q.   Do you know what the purpose was
11   of Exhibit 57?
12       A.   No. Where did this come from?
13       Q.   Well, out of your files, is all
14   I can say.
15       A.   Let me take a look at it for one
16   moment?
17       Q.   Sure.
18           (The witness reviews document.)
19       A.   No.
20       Q.   No recollection as to why it
21   might have been snipped for any purpose
22   that you can think of?
23       A.   I just don't remember.
24           MR. BAMBERGER: I would like to
25   mark it into evidence, Mr. Levander.
```

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                    GCC-P 0494439

---

194

1          Merkin - Direct/Bamberger
2          MR. LEVANDER:  Again, I don't
3    know what the relevance is, but no
4    objection.
5          MR. BAMBERGER:  Thank you.
6          (Claimant's Exhibit 57, received
7    in evidence.)
8    BY MR. BAMBERGER:
9     Q.    Turning to 58, is that your
10   handwriting on that page?
11         MR. LEVANDER:  What exhibit?
12   I'm sorry.
13         MR. BAMBERGER:  Exhibit 58,
14   Mr. Levander.
15    Q.    This is another page from your
16   diligence file.
17         (The witness reviews document.)
18    A.    Just one moment.
19    Q.    Can you tell us, is that your
20   handwriting?
21    A.    Tab 58?
22    Q.    Yes.  Top right-hand corner of
23   58.
24    A.    Yeah, that looks like my
25   handwriting.

195

1          Merkin - Direct/Bamberger
2     Q.    You were collecting information
3    about the monthly performance of other
4    Madoff strategies?
5     A.    I doubt I was collecting it.  My
6    guess is somebody sent it to me and I put
7    it in the file.
8     Q.    Did you look at it?
9     A.    I don't remember.
10         MR. BAMBERGER:  I move that into
11   evidence, please.
12         THE WITNESS:  Likely, yes.
13         MR. LEVANDER:  No objection;
14   same comment.
15         MR. BAMBERGER:  Can we do that?
16   Can we say that all my exhibits are
17   irrelevant, unless you say so?
18         (Claimant's Exhibit 58, received
19   in evidence.)
20   BY MR. BAMBERGER:
21    Q.    Can you turn to page 59?  This
22   was produced out of your diligence file.
23   It appears to have been sent by Tremont
24   Advisors.  Do you see that on the bottom?
25    A.    I see "Tremont Advisors" upside

196

1          Merkin - Direct/Bamberger
2    down on the bottom.
3     Q.    Do you have a recollection as to
4    why or how this document came into your
5    diligence file?
6     A.    A personal guess, by fax.  But I
7    don't remember.
8     Q.    King Gate was another Madoff
9    feeder fun?
10    A.    Yes.
11    Q.    As was Thema?
12    A.    I have to go back and look.  I
13   don't remember Thema by name.  But it
14   certainly looks like that way from the very
15   brief second I took a look at the page --
16         MR. BAMBERGER:  I move 59 into
17   evidence.
18         Claimant moves 59 into evidence.
19         MR. LEVANDER:  Same comment; no
20   objection.
21         (Claimant's Exhibit 59, received
22   in evidence.)
23   BY MR. BAMBERGER:
24    Q.    Mr. Merkin, I would like to
25   direct your attention to Exhibit 60,

197

1          Merkin - Direct/Bamberger
2    please.
3          Is that your handwriting on the
4    top?
5     A.    On the top the date isn't and
6    the name is.
7     Q.    This document runs -- one, two,
8    three, four, five -- six pages.  And if
9    you could go to the last two pages, do you
10   see in the bottom, or the last three
11   pages, there's a bracket and the word
12   "out"?
13         Do you see that?
14    A.    I'm on the wrong page -- oh, I
15   see.  This is the second-to-the-last page?
16    Q.    Yes.  The last three pages I see
17   on the bottom, "out," "out," "out."
18         Do you see that?
19    A.    Yes.
20    Q.    And that's your handwriting,
21   isn't it?
22    A.    It looks like it, yes.
23    Q.    And the top, about comparing
24   Primeo manager, Series B, the word "out"
25   also appears, correct?

50 (Pages 194 to 197)

CONFIDENTIAL                                                                    GCC-P 0494440

198

```
 1        Merkin - Direct/Bamberger
 2    A.   You are on 5457?
 3    Q.   I am.
 4    A.   Yes.
 5    Q.   And that's also true of 5458?
 6    A.   Yes.
 7    Q.   Okay.  Now, pointing that out,
 8 can you recollect how you might have used
 9 this document?
10        Did you, for example, instruct
11 your personnel to remove that information
12 and use it for a presentation, for
13 example?
14    A.   I doubt it.  But I don't
15 remember.
16    Q.   Why would you instruct someone
17 to take out something on the top and the
18 bottom of a page like this?
19    A.   I'm not sure I did.
20    Q.   That is your handwriting, "out"?
21    A.   That's a bracket in my
22 handwriting.  I don't remember telling him
23 to take it out.
24    Q.   Why does it say "out" there,
25 sir?
```

199

```
 1        Merkin - Direct/Bamberger
 2    A.   I have no idea.
 3    Q.   You have no idea?
 4    A.   (No response.)
 5    Q.   Okay.  Anyway, this document is
 6 a more in-depth analysis of Mr. Madoff's
 7 amazing returns than some of the others we
 8 looked at, correct?
 9    A.   I would have to look at it.
10    Q.   When it came in did you look at
11 it?
12    A.   As I sit here today, I don't
13 remember.  It looks like it came in in
14 '96, and it speaks for the period of time
15 from '89 to the end of 1995.  So that
16 would be a pretty good guess as to when it
17 came in.
18        I don't remember looking at it,
19 I don't remember what use I put this to,
20 if any, and I just don't remember.
21    Q.   Okay.
22    A.   And I'm not sure all these marks
23 are mine.
24    Q.   In this case I should represent
25 that none of them are mine.
```

200

```
 1        Merkin - Direct/Bamberger
 2    A.   I'm not suggesting that.
 3    Q.   Right.  But I wanted to be
 4 clear.
 5    A.   These circles around "Primeo,"
 6 these brackets, they certainly don't look
 7 like mine.  I just don't know.
 8        The uncompleted brackets in the
 9 right-hand corner, 5455, I don't know what
10 that's from.
11    Q.   Primeo was another Madoff feeder
12 fund?
13    A.   I would assume so.  Primeo -- I
14 would assume I knew that at some point.
15        Sitting here today, it rings a
16 bell.
17    Q.   Look at the top of page 5454.
18        Assuming the accuracy of the
19 document, Madoff's returns looks like a
20 bond, doesn't it?
21    A.   You wanted to ask me something
22 about 5454, something that looked like a
23 bomb?
24    Q.   A bond, at the top.
25    A.   I thought you were being...
```

201

```
 1        Merkin - Direct/Bamberger
 2        Explain to me what you mean by
 3 that.
 4    Q.   I'll withdraw it.
 5        On the bottom you see
 6 performance versus the S&P 500?
 7    A.   Yes.
 8    Q.   And this strategy only has
 9 one/seventh of the down months of the S&P
10 500, correct?
11    A.   Just one moment.
12    Q.   I did that wrong?
13    A.   It doesn't look that way to me.
14    Q.   No.  A 9, right?
15    A.   I think it's closer to a 10 in
16 that sentence I think.
17    Q.   To me it looks exactly like a 9.
18 But I could be wrong again.  One to 9.
19 But we needn't go about that.
20        On the top, this performance is
21 essentially twice the performance of the
22 S&P 500 over the period depicted?
23    A.   We're back on that line on the
24 top?
25    Q.   The page 5455.  Trying to go
```

51 (Pages 198 to 201)

CONFIDENTIAL    GCC-P 0494441

---

**202**

1    Merkin - Direct/Bamberger
2  quickly.
3    A.  No.  It's about 50 percent
4  better.
5    Q.  Ah, yes.
6    And 3 is a graph of
7  multi-performance of manager while the S&P
8  500 was down, correct?
9    A.  3 isn't a graph.
10    Q.  Right.  Chart.
11    A.  It's a table.
12    Whoever Manager B is, is set
13  forth next to the S&P 500 for that month.
14    Q.  Now, when you wrote "out," and
15  put this in the file called "Madoff," did
16  you have any question in your own mind as
17  to who Manager B was?
18    A.  I'm -- I assume some very small
19  question, but it's pretty likely that I
20  thought it was Madoff.
21    Q.  Do you recall who your contact
22  was at Primeo?
23    A.  I'm not sure I remember who
24  Primeo is.  If it is who I think it is,
25  then I recall the contact.

---

**203**

1    Merkin - Direct/Bamberger
2    Q.  Look at the bottom of 5455 of
3  August '90.
4    A.  Just one second.  The bottom of
5  5455, August '90?
6    Q.  Yes.
7    A.  Just wait, wait, wait.  Because
8  you go too fast and then I make mistakes.
9    August '90.  Got it.
10    Q.  Do you see there's a difference
11  of more than 15 percentage points in the
12  performance of Manager B versus the S&P
13  500 in that single month?
14    A.  Yes.
15    Q.  You thought that was arbitrage,
16  sir?
17    A.  You didn't ask me whether I
18  thought that was arbitrage.
19    Q.  Now I am.
20    A.  What's your question?
21    Q.  Did you ever investigate how he
22  could perform so much better than the S&P
23  500 in that month?
24    A.  Yes.  I don't recall
25  specifically that month.

---

**204**

1    Merkin - Direct/Bamberger
2    Q.  Now, would you agree that the --
3  this chart shows remarkable performance by
4  the manager, extraordinary performance by
5  the manager; true?
6    A.  No.  It probably shows the
7  opposite.  It shows good performance, but
8  nothing better than that.  Probably middle
9  of the pack.  And not remarkable and not
10  wonderful, off of the figures that appear
11  beneath the column marked Manager B in the
12  table that's number 3.
13    Beneath that column, it is good,
14  and not extraordinary.
15    Q.  Wouldn't you agree it's quite
16  one thing for Mr. Madoff to report results
17  around 20 percent or so per annum in the
18  second half of the nineties, when Clinton
19  wins his second term, and we're not
20  actually running a deficit for those
21  years?  Do you recall those years -- the
22  impeachment proceedings --
23    A.  So we're way past '95, which is
24  the end of the table.  You just have to
25  focus me --

---

**205**

1    Merkin - Direct/Bamberger
2    Q.  I know I'm going fast.
3    Do you agree it's a horse of a
4  different color to produce annualized
5  returns of around 20 percent a year during
6  the second half of the nineties than it
7  was in the first half of the nineties;
8  true?  Using the same strategy?
9    A.  The art in the strategy is to
10  catch the turn.
11    I would have to take a look and
12  see what -- how extended the potential
13  turns were, how frequent, how high.
14    So, for example, take your
15  August '90 comparison, which I know is not
16  the second half of the decade.  If
17  something happened intra-August that
18  permitted a return, because sharp down
19  markets are often very volatile, that
20  would have been less extraordinary than
21  your question suggested.
22    Q.  When you were a lad, did you
23  work in your father's brokerage firm?
24    A.  No.
25    Q.  Did you ever go down and

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494442

206

1        Merkin - Direct/Bamberger
2    visit it?
3        A.    Yes.
4        Q.    He had a seat on the New York
5    Stock Exchange, the American Stock
6    Exchange?
7        A.    Yes.
8        Q.    Did you ever work summers there?
9        A.    Yes.
10       Q.    Did you ever go down to the
11   trading floor?
12       A.    Yes.
13       Q.    So you had a general awareness
14   of the specialist system?
15       A.    General would be a good word,
16   yes.
17       Q.    Agree that it's one thing to
18   predict the future prices of relatively
19   thinly traded stocks, but when you're
20   talking about the giant stocks, with tens
21   and tens of billions of dollars of market
22   capitalization, there's no man alive that
23   can predict when to get in that market to
24   make money and when to get out?  There's
25   no man who can do it?

207

1        Merkin - Direct/Bamberger
2        A.    I would totally disagree.  The
3    more heavily a stock, the more easy it is
4    to predict a pattern.
5            When you have a thinly traded
6    stock you have no data points and it's
7    very hard to construct a real pattern.
8        Q.    Let's say you're superior at
9    execution.  And everyone agrees that
10   Bernard Madoff was, right?
11       A.    Yes.
12       Q.    Your counsel has said in other
13   cases and other contexts he broke the
14   monopoly on the Big Board.
15           No dispute about that, right?
16       A.    Yes.
17       Q.    And he did that by making better
18   prices on the NYSE-listed stocks, making
19   that market off-Exchange, correct?
20       A.    Essentially.
21       Q.    So what he could do by doing
22   that was just getting a little bit of
23   better execution than those specialists on
24   the NYSE.  And people, particularly the
25   discount brokerages, were attracted to

208

1        Merkin - Direct/Bamberger
2    that and eventually did business with
3    Madoff, when they saw that he could fill
4    orders at this price, correct?
5        A.    Yes.  He built order flow
6    through executions.
7        Q.    And essentially he'd actually
8    rebate a penny to his major clients who
9    were placing orders through him as opposed
10   to going on the Exchange, correct?
11       A.    I think that comes at a later
12   time than you're talking about, and stops.
13   But, yes, for a short period of time he
14   did that.
15       Q.    But all he could offer people
16   was maybe a penny here or a penny there in
17   their execution.  He had no ability to
18   make an unprofitable investment
19   profitable.  All he could do is get you a
20   slightly better price on a big trade you
21   wanted to place, and business like that
22   migrated to him, correct?
23       A.    He certainly had no ability to
24   take an unprofitable trade and make it
25   profitable.

209

1        Merkin - Direct/Bamberger
2            He had order flow.  With order
3    flow comes market share.  With market
4    share comes additional order flow.
5            And he built up dominant market
6    share in his name from a far higher
7    percentage than the already high
8    percentage he had in the overall Stock
9    Exchange trading.
10           With order flow comes some sense
11   of market events, market timing, market
12   predictability, to some extents computer
13   aided and to some extent, to a lesser
14   extent, just sheer experience.
15       Q.    Sir, Goldman Sachs is out there,
16   Morgan Stanley is out there, there are
17   dozens and dozens of firms that have way
18   more capability than this other man with a
19   black box, right?
20       A.    Well, I wasn't describing a
21   black box.  The question of how he could
22   compete with the Street, in the sense that
23   I think you just intended it, is something
24   I discussed with him more than once.
25           And his view was that the little

53  (Pages 206 to 209)

CONFIDENTIAL

GCC-P 0494443

---

**210**

Merkin - Direct/Bamberger

1    guys didn't have the flow, and the bigger
2    guys, who might have had the flow, had
3    either regulatory disabilities that took
4    them out of the flow game or simply had
5    restricted lists.
6         He had no advisory business. He
7    had nothing that said you can't trade IBM
8    because you're their decades-long banker
9    and you're doing a financing and you're
10   doing advisory work on a transaction.
11        So that where he was, he said,
12   really unusually well situated is he had
13   the order flow of the big guys without any
14   of their regulatory or legal restrictions.
15   Q.   And that would give you an
16   advantage, sir, for about ten minutes; you
17   knew that?
18   A.   Well, I think it's much longer
19   than ten minutes. But a real ten-minute
20   edge in the trading business you may think
21   is a penny here and a penny there, but on
22   volumes of shares it's a phenomenal amount
23   of money.
24   Q.   No, sir. I disagree with you.


*(Lines 1–25, left column, page 210)*

1    guys didn't have the flow, and the bigger
2    guys, who might have had the flow, had
3    either regulatory disabilities that took
4    them out of the flow game or simply had
5    restricted lists.
6         He had no advisory business. He
7    had nothing that said you can't trade IBM
8    because you're their decades-long banker
9    and you're doing a financing and you're
10   doing advisory work on a transaction.
11        So that where he was, he said,
12   really unusually well situated is he had
13   the order flow of the big guys without any
14   of their regulatory or legal restrictions.
15
16   Q.   And that would give you an
17   advantage, sir, for about ten minutes; you
18   knew that?
19   A.   Well, I think it's much longer
20   than ten minutes. But a real ten-minute
21   edge in the trading business you may think
22   is a penny here and a penny there, but on
23   volumes of shares it's a phenomenal amount
24   of money.
25   Q.   No, sir. I disagree with you.

---

**211**

Merkin - Direct/Bamberger

1
2    A.   I think you're wrong. I think
3    you're seriously wrong.
4    Q.   Well, I think you're seriously
5    wrong, so that makes two of us.
6         MR. LEVANDER: We can swear him
7    in and I can cross-examine him.
8         THE CHAIRMAN: We don't want you
9    arguing with the witness.
10   A.   If you're telling me he had a
11   ten-minute advantage, that's a huge thing.
12   It's a huge thing to anybody in the
13   business. And I'm not telling you it's
14   ten minutes.
15   Q.   Maybe it was less than ten
16   minutes. Maybe it was a minute. We'll
17   hear from the experts who know.
18        But you know that superior
19   execution --
20   A.   Superior -- I didn't hear?
21   Q.   Superior execution --
22   A.   Right.
23   Q.   -- hardly explains the results
24   of August '99, and hardly explains the
25   results on the rest of the chart that

---

**212**

Merkin - Direct/Bamberger

1
2    we've looked at here --
3    A.   I've said nothing of '99.
4    That's not on the chart.
5    Q.   August '90.
6    A.   I said nothing about superior
7    executions explaining a return or a result
8    that is now 22 years ago, and I just don't
9    remember.
10        I did say that superior
11   executions, combined with some of the
12   other things we talked about before lunch,
13   in my opinion accounted for the returns in
14   a very full and complete way. It is not
15   superior executions all by itself. And I
16   never suggested that it was.
17   Q.   No, you didn't.
18        How do you arbitrage a basket of
19   50 stocks that are supposed to correlate
20   to 95 percent of the portfolio of the S&P
21   100? How could you arbitrage that?
22   A.   Because you had flexibility to
23   emphasize near-term performance of certain
24   stocks in certain sectors. Exactly as the
25   directive lays out.

---

**213**

Merkin - Direct/Bamberger

1
2         MR. BAMBERGER: I move Exhibit
3    60 into evidence, please.
4         MR. LEVANDER: No objection.
5    Continuing relevance question.
6         (Claimant's Exhibit 60, received
7    in evidence.)
8         MR. BAMBERGER: Do you object to
9    61 on relevance grounds?
10        MR. LEVANDER: You may ask away.
11   BY MR. BAMBERGER:
12   Q.   Sir, turning your attention to
13   tab 61, please --
14   A.   Tab 61.
15   Q.   -- now, this is the article in
16   MARHedge that appeared, correct?
17   A.   Yes.
18   Q.   And you received it when it was
19   published in May of 2001?
20   A.   No, I don't think so.
21   Q.   When did you receive it?
22   A.   Sometime after that. I didn't
23   subscribe to MARHedge. I didn't read
24   MARHedge. I've read one or two MARHedge
25   articles in my life.

---

54  (Pages 210 to 213)

CONFIDENTIAL

GCC-P 0494444

214

Merkin - Direct/Bamberger

1
2      MARHedge is an industry rag
3  that's mostly a gossip sheet, and a friend
4  of mine sent it to me some time after its
5  appearance.
6      Q.    I would love it if you'd answer
7  my question.  I guess I understand.
8      A.    Okay.
9      Q.    Did you receive it in the month
10  of May of 2001?
11      A.    In the month of May?
12      Q.    Yes.
13      A.    I doubt it.
14      MR. BAMBERGER:  Okay, I move 61
15  into evidence.
16      MR. LEVANDER:  I previously said
17  there's no objection.
18      (Claimant's Exhibit 61, received
19  in evidence.)
20  BY MR. BAMBERGER:
21      Q.    Did you receive it in June of
22  2001?
23      A.    I don't remember.
24      Q.    Could you look at tab 62,
25  please.

215

Merkin - Direct/Bamberger

1
2      (The witness complies.)
3      Q.    Now, sir, correct to say that
4  the article in Barrons -- and this is the
5  on-line version -- was published after the
6  MARHedge article was published; true?
7      A.    I believe so, yes.
8      Q.    Okay.
9      A.    I believe just a summary of the
10  MARHedge article.
11      Q.    Well, it will speak for itself.
12      Anyway, Gerry Balsam sent it to
13  you?  That's at the top of Exhibit 62?
14      A.    Yes.
15      Q.    And in this case -- and there's
16  another version of it a little bit later.
17      In this case he cc's Naomi Ferro
18  and Jack Balsam?
19      A.    Bcc's.
20      Q.    Did I not say that?
21      A.    I don't know.
22      Q.    I need coffee.
23      In that case, he bcc's it.
24      Who is Jack Balsam?
25      A.    I believe it is his father.

216

Merkin - Direct/Bamberger

1
2      Q.    What's his business?
3      A.    I believe he's an accountant.
4      Q.    Did he play any role with
5  Gabriel Capital Group?
6      A.    No.
7      Q.    Who is Naomi Ferro?
8      A.    My secretary.
9      Q.    Why is he bcc'ing your
10  secretary, if you know?
11      A.    I don't know.
12      Q.    Further in Exhibit 62 there's a
13  second version of the same Barrons
14  article, and this is sent just to you; it
15  doesn't show the bcc.
16      So I assume this is the one that
17  you received, you personally received on
18  your computer.
19      (The witness reviews document.)
20      A.    It's a good guess.  I don't
21  know.
22      Q.    And the Barrons article does
23  refer to the MARHedge publication as a
24  trade publication, in the third paragraph?
25      A.    Just one moment.

217

Merkin - Direct/Bamberger

1
2      (The witness reads document.)
3      A.    Yes, it does.
4      Q.    And would it be natural to say,
5  sir, if you saw that in Barrons -- you
6  don't say Barrons is an industry rag, do
7  you, sir?
8      A.    I do.
9      Q.    Barrons is also an industry rag?
10      A.    I didn't say it's an also an
11  industry rag.  It's a different
12  publication, but it has a rag quality to
13  it to some extent.
14      Q.    Uh-hum.
15      A.    It's nothing near as raggy as
16  MARHedge.
17      Q.    You understood that one theme in
18  the Barrons article that Bernie Madoff
19  just didn't want people knowing what he
20  was doing, that that's something that you
21  had experienced as well, correct?  He
22  wanted secrecy, to the extent he could
23  obtain it; true?
24      A.    Certainly not from me.
25      Q.    Did you ever ask him why he

55 (Pages 214 to 217)

CONFIDENTIAL                                                                                    GCC-P 0494445

218

1      Merkin - Direct/Bamberger
2  wanted such secrecy?
3          MR. LEVANDER:  Objection.  He
4  just said he didn't ask him that.
5          So I don't know how he can begin
6  to answer the next question.
7          MR. BAMBERGER:  I can withdraw
8  the question.
9          THE CHAIRMAN:  I was just going
10  to just sustain the objection and ask
11  you to rephrase it.
12  BY MR. BAMBERGER:
13      Q.   Now, when you read the MARHedge
14  article was there anything in that article
15  that you didn't know?
16      A.   I'm sure there was.
17      Q.   And what specifically?
18      A.   I don't remember it.  But there
19  must have been something in there that I
20  didn't know.
21      Q.   When you read it, I take it you
22  noticed the comment on the bottom of page
23  4923, left-hand column:  "Throughout the
24  entire period Madoff has managed the
25  assets, the strategy, which claims to use

219

1      Merkin - Direct/Bamberger
2  OTC options almost entirely, has appeared
3  to work with remarkable results."
4          Do you see that?
5      A.   I see it.
6      Q.   Okay.  Well, when you read that,
7  you said -- just so we're clear, that that
8  second page, in the left-hand column,
9  under the word "Hedge," I just read to you
10  the second full paragraph on the bottom.
11          MR. FLEMING:  Can you give a
12  page?
13          MR. BAMBERGER:  It's tab 61 --
14          MR. FLEMING:  It's a different
15  page.
16          MR. BAMBERGER:  I'm sorry.  I
17  don't think I said it.  Tab 61 in the
18  MARHedge article.
19          MR. FLEMING:  Which page in the
20  paragraph?
21          THE CHAIRMAN:  Second page.
22          MR. MILLSON:  Second paragraph
23  from the bottom.
24          MR. FLEMING:  Thank you.
25  BY MR. BAMBERGER:

220

1      Merkin - Direct/Bamberger
2      Q.   This is a quite extensive cover
3  story, correct, sir?  It runs four pages?
4      A.   It runs four pages.
5      Q.   It certainly grabbed your
6  attention because at this time you had
7  upwards of a billion dollars with
8  Mr. Madoff, correct?
9      A.   I would have read any article
10  that was four pages on Mr. Madoff.
11      Q.   Correct to say that it was your
12  understanding that you were the second or
13  third biggest feeder fund to him at that
14  time; that is, Ascot?
15      A.   Not remotely.
16      Q.   At the time?  You didn't believe
17  you were?
18      A.   I don't think so.
19      Q.   All right.
20          And, then, turning your
21  attention to that paragraph that I read,
22  when you read that, that he claimed to use
23  almost exclusively OTC options, that was a
24  surprise to you, correct, sir?
25      A.   I'm sorry, you're asking me

221

1      Merkin - Direct/Bamberger
2  about the same paragraph you read before?
3      Q.   I am.  But I neglected to point
4  out to the Chairman where I was, so I'm
5  going to do it again.
6      A.   Okay.
7      Q.   When you read that paragraph
8  that was a surprise to you, sir, wasn't
9  it?
10      A.   I don't remember as I sit here
11  today what my reaction was when I read
12  that paragraph.
13          If there was something that
14  caught my attention --
15      Q.   I'm only going to ask you about
16  this paragraph.
17          You don't recall being
18  surprised?
19      A.   As I sit here today I just don't
20  recall what my sort of response was or
21  reaction was or reply was when I read that
22  paragraph.
23      Q.   Let me suggest to you, sir, that
24  you must have been surprised, because your
25  finance staff, under the guidance of

56 (Pages 218 to 221)

CONFIDENTIAL                    GCC-P 0494446

222

1      Merkin - Direct/Bamberger
2    Mr. Autera, had been receiving
3    confirmations for options transactions for
4    years, and they always had the CBOE CUSIP
5    number on them.
6         A.   Well, what I started to say was
7    if I had been surprised by anything, as I
8    sit here today, it's the "almost entirely"
9    language.
10        Q.   Because you thought it was
11   entirely over-the-counter?
12        A.   No.  Because I thought it was a
13   mix of listed and unlisted options.
14        Q.   And by "mixed" you mean pretty
15   close to 50/50, or 80 percent CBOE and 20
16   percent over-the-counter, or you're not
17   really sure?
18        A.   I don't recall as I sit here
19   today.
20             I do recall that I did go to see
21   Mr. Madoff, if not entirely, in part, to
22   discuss this article with him.  And the
23   question of options, CBOE, meaning, you
24   know, listed or unlisted options, came up
25   in that conversation.

223

1      Merkin - Direct/Bamberger
2         Q.   Am I right that you have not
3    produced any handwritten notes of that
4    conversation with Mr. Madoff in which you
5    discuss the MARHedge article?
6         A.   I don't remember.  But I don't
7    think you're right.  I think there's a
8    note that refers to our discussion of the
9    article.  I think there is.  And I could
10   be wrong.
11        Q.   Take a look.
12        A.   I'm not affirming it.
13        Q.   We'll take a look.
14             And, sir, just to get off the
15   topic for one second, you agree you
16   produced two transcripts of tape-recorded
17   conversations that you had with
18   Mr. Madoff?
19        A.   Yes.
20        Q.   All right.  And just so I'm
21   clear, sir, at an earlier time in another
22   case we had you put an answer in which you
23   said you had 10 to 15 conversations per
24   year with Mr. Madoff about Ascot's
25   strategy.

224

1      Merkin - Direct/Bamberger
2             And in your answer in this case
3    you don't say that at all, correct?
4         A.   The answer to the first part is
5    I'm sure I have said that I had 10 to 15
6    conversations a year with Mr. Madoff about
7    the strategy.
8             And I didn't catch the second
9    part.
10        Q.   In your answer in this case you
11   no longer contend that you had 10 to 15
12   conversations a year specifically about
13   what Ascot was doing in the market?
14        A.   I'm missing something.  What
15   gives you that impression?  Nothing I
16   said, I don't think.
17        Q.   My reading of the answer.  And I
18   assume you reviewed it before it was
19   filed?
20        A.   You have to point me in the
21   direction of something.  If you ask me the
22   question de novo, did I think I had 10 to
23   15 conversations with Mr. Madoff a year
24   about the strategy, I would say I did.
25        Q.   Did you record all of your

225

1      Merkin - Direct/Bamberger
2    conversations with Mr. Madoff over the
3    years?
4         A.   No.
5         Q.   How did you decide when to
6    record your conversations with him and
7    when not to?
8         A.   A little bit exactly like Amy.
9             When things got way too fast in
10   a conversation and he talked almost as
11   fast as you and I do and I realized that I
12   couldn't take notes or make some small
13   notes along the way, I would push a
14   certain button on my telephone record it
15   and sit back and listen for content,
16   rather than to try to catch it at the same
17   time.
18             And I told him that.
19        Q.   Well, only two transcripts have
20   been delivered.  Were other tapes made and
21   retained?
22        A.   There may have been another tape
23   made and retained.  I'm not sure.
24        Q.   Wouldn't your discussion with
25   him about the truth of the MARHedge story

57 (Pages 222 to 225)

CONFIDENTIAL                                                          GCC-P 0494447

**226**

1        Merkin - Direct/Bamberger
2    or the insinuations of the MARHedge story,
3    wouldn't that have been an important
4    conversation with him to tape?
5        A.    Certainly not if I was having it
6    with him in person.  And I think I
7    testified that I went to see him.
8        Q.    Okay.  We'll look at your
9    handwritten notes in a second.
10        But you certainly would be
11    deeply interested in knowing in what
12    market Mr. Madoff was actually purchasing
13    the puts for the Ascot account, correct?
14    No doubt about that?
15        A.    I would be interested in knowing
16    whether we were doing a mix, and that
17    would have come up in conversation.
18        Q.    It did come up in a series of
19    conversations, and at no time did he tell
20    you that he was using less than 20 to 25
21    percent CBOE options, correct?
22        A.    That's about right.  I don't
23    remember a conversation in which the
24    figure shrunk to less than 20 percent of
25    listed options.

**227**

1        Merkin - Direct/Bamberger
2        Q.    And, therefore, it would have
3    been an easy thing for you, at any time
4    during that period when he told you that,
5    just to look at your Bloomberg terminal or
6    look at Investor's Business Daily, and see
7    if there were enough transactions over the
8    CBOE to cover 20 percent of the positions
9    that you just understood had been
10    purchased for the Ascot account standing
11    alone; true?
12        A.    Entirely untrue.
13        Q.    You could not have just gotten
14    the volume for a given contract that was
15    delivered into your account by -- you're
16    interrupting me this time -- you could not
17    have gotten onto your Barrons terminal and
18    just looked to see on that particular day
19    and occasion the contract that Mr. Madoff
20    represented had been delivered to your
21    account in fact traded on the CBOE and
22    whether there was sufficient volume on
23    that contract on that day to cover what
24    Ascot bought?
25        A.    Could not have done that for

**228**

1        Merkin - Direct/Bamberger
2    three reasons:
3        I didn't have a Bloomberg
4    terminal.  I didn't read Investor's Digest
5    Daily.  And the whole concept of, say,
6    50/50, 75/25, 25/75, is not a snapshot
7    concept.
8        Meaning, on any given day, any
9    given turn, it always has to be that way.
10    It's not vertical, it's horizontal, it's
11    over a period of time and over a period of
12    turns and years.
13        Q.    But to silence the critics and
14    to perform a test to see whether
15    Mr. Madoff's transactions were real,
16    that's one thing you certainly could have
17    done?  You could have paid for a Bloomberg
18    terminal and looked closely at options,
19    where they're being purchased and how much
20    is being bought for your account, correct?
21        That would be a simple check you
22    could perform without having to bother
23    Mr. Madoff, right?
24        A.    None of the skeptics that came
25    to me talked about where the options

**229**

1        Merkin - Direct/Bamberger
2    volume of the business was getting done.
3        Q.    Correct to say that your
4    staff -- I showed you and that you knew --
5    that irrespective of how many put options
6    Mr. Madoff allegedly bought for the Ascot
7    account, the price for those options was
8    almost always between the low and the high
9    for that contract on the CBOE on the day
10    in question?
11        A.    I'm just not sure what you mean
12    by the staff -- I didn't catch the first
13    part of the question.  Can you explain
14    that to me?
15        Do you want me to have it read
16    back?
17        Q.    What is the PMS system?  Could
18    you briefly tell the Panel?
19        A.    The PMS system?
20        Q.    Yes.
21        A.    Is a system that our office used
22    in which our Madoff portfolio was
23    basically contained in a daily reporting
24    sheet.
25        Q.    You got those reports on a daily

58  (Pages 226 to 229)

CONFIDENTIAL                                                    GCC-P 0494448

230

1       Merkin - Direct/Bamberger
2   basis?  Meaning, the next day, right?
3       A.   No.  I got those reports after
4   the close of business -- after the close
5   of trading -- pardon me -- at the end of
6   the day.  Let's just pick Tuesday, because
7   today is Tuesday.  I would get a Tuesday
8   report sometime between 4:10 and 4:45,
9   I'll leave myself room and say 5:00, but
10  pretty soon after trading was over, with
11  the day's report and the day's P&L.
12      Q.   Based on the confirms that your
13  office had received from Mr. Madoff,
14  correct?
15      A.   Based on the positions that were
16  shown on that sheet of paper.
17      Q.   The sheet of paper was based on
18  the confirms that came in from Mr. Madoff,
19  correct?
20      A.   Yes.
21      Q.   So you didn't actually see in
22  real-time or on a next-day basis what the
23  Ascot account was buying or selling; you
24  learned that after the paper confirms came
25  into your office, correct?

231

1       Merkin - Direct/Bamberger
2       A.   I not only didn't learn it until
3   the paper confirms came into the office, I
4   wouldn't have seen them until those were
5   shown up in our daily report.
6       Q.   When the paper confirms --
7       A.   The office took those confirms.
8   I didn't see the confirms -- I wouldn't
9   say never, but quite rarely.  And then
10  they showed up on the report, which might
11  have had -- basically, one or two or
12  three, or maybe three or four, modes.
13  Either we're not in, in which case there's
14  an odd piece of a Treasury that comes in,
15  or maybe there's some income interest;
16  we're in, in which case there really is a
17  remarking potentially of every position we
18  own; or there are trades that add or there
19  are trades that drop.
20      So it's adds, drops and the P&L.
21      Q.   Right.  When those confirms came
22  in, you received the PMS report, you could
23  have easily checked to see whether the
24  price at which the options transactions
25  were said to have been done was in the

232

1       Merkin - Direct/Bamberger
2   high/low for the contract on the day in
3   question, correct?
4       A.   I'm not sure that that
5   information was on the -- I just don't
6   remember.
7       You're asking me to compare
8   something to something.  Right?
9       Q.   Yeah.
10      A.   So what are you asking me to
11  compare?
12      Q.   I think the point's obvious, and
13  I think I'll move on.
14      When a confirm comes in you see
15  a price for a trade, correct?
16      A.   No.  I just told you, when the
17  confirms come in, I don't see the price.
18      Q.   But somebody does, right?
19      A.   Somebody puts it into the PMS
20  system.
21      Q.   Somebody, if they were
22  concerned, could easily have gone back and
23  seen whether the price reported on that
24  confirm was in the high/low for that
25  contract on the day of the alleged trade,

233

1       Merkin - Direct/Bamberger
2   correct?  Somebody could have done that?
3       A.   I thought you asked me about me.
4   Are you now asking me about somebody else?
5       The person receiving that ticket
6   could have done that, yes.
7       Q.   As far as you know they did do
8   that, right?  They performed checks to see
9   whether the price as reported by
10  Mr. Madoff was within the high/low of
11  CBOE?
12      A.   I don't know.
13      Q.   There's no reason, when you're
14  trading over-the-counter, let's say with a
15  counterparty in Europe, and the
16  transaction is 100 times the size of the
17  total volume of that same contract on the
18  CBOE in the U.S., there's no reason that
19  that price would always be within the
20  high/low range for the few contracts that
21  are sold over the CBOE in U.S., right?  No
22  natural reason?
23      A.   Why not?
24      Q.   Well, the market's open hours
25  earlier.

59  (Pages 230 to 233)

CONFIDENTIAL

GCC-P 0494449

234

1    Merkin - Direct/Bamberger
2    A.    I can think of several reasons.
3    Q.    The market opens hours earlier.
4  Just before the market in the U.S. opens,
5  people bicker about price, they agree on a
6  price, that's the price that gets
7  confirmed, and that has nothing to do with
8  what happens hours later in Chicago,
9  correct?
10    A.    No.  I guess -- if that's what
11  you meant, I would say not only could I
12  think of several reasons why it should, I
13  would, broadly speaking, disagree with
14  you.
15        I think there's every reason to
16  think it has something to do with what's
17  happening in the American markets.
18    Q.    Correct to say that the CUSIP
19  number on the confirms that your
20  organization received for the options
21  transactions was always the CBOE CUSIP for
22  the OEX 100; true?
23    A.    The CUSIP number for the listed
24  options we received?
25    Q.    Well, good question.

235

1        Merkin - Direct/Bamberger
2        You only received one confirm
3  for a transaction, correct?  For an
4  options transaction?
5    A.    I don't know about all the time.
6    Q.    Well, your records speak for
7  themselves.
8        But there was never any division
9  within a given trade between a CBOE trade
10  and an over-the-counter trade; you know
11  that, right?
12    A.    If you're asking me what the
13  confirmations looked like?
14    Q.    Yes.
15    A.    I would not have seen the
16  confirmations.  I would have looked at our
17  system.
18    Q.    On page 17 of the article --
19  well, page 17 of MARHedge, 4925 -- on the
20  bottom, the right-hand side --
21    A.    Yes, sir.
22    Q.    -- it says:  "'The worst market
23  to operate in using the strategy,' he
24  adds -- that would be Madoff -- "'would be
25  a protracted bear market or a flat dull

236

1        Merkin - Direct/Bamberger
2  market.'"
3        Do you see that?
4    A.    Yes.
5    Q.    From May 2001.  This was, I
6  guess -- what?  Six months or less before
7  9/11?
8    A.    I didn't catch you -- I got the
9  quote.  After that I didn't hear what you
10  said.  I'm sorry.
11    Q.    What I said:  After May of 2001
12  we experienced just that, a protracted
13  bear market in the U.S.?
14    A.    No.
15    Q.    We didn't?
16    A.    I don't think this is what this
17  gets at.  What this gets at would be --
18  either side of the word "or" in that
19  paragraph is no volatility.
20        He needs volatility to get his
21  program to work.  He needs volatility to
22  catch the turn.  So a flat dull market has
23  no volatility, and a protracted bear
24  market, which is straight down, won't help
25  much.  You need to be able to catch turns

237

1        Merkin - Direct/Bamberger
2  within a bear market.
3    Q.    Because not only was the
4  strategy participating in arbitrage, it
5  was always going to revert to the mean.
6  If the market went down a little bit on
7  Monday, it was sure to go up on Friday,
8  right?  Because markets always revert to
9  the mean?
10    A.    I have no idea what you're
11  asking me.
12    Q.    All right.
13    A.    You have to define --
14    Q.    I'll withdraw it if I'm not
15  clear.
16        Both these articles speak of
17  Madoff's business being up to $6 or $7
18  billion during this period.
19        Do you see that?
20    A.    Yes.
21    Q.    I will represent that both
22  articles use that figure --
23    A.    No.
24    Q.    Was that consistent with your
25  understanding of the size of the accounts

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494450

238

1      Merkin - Direct/Bamberger
2  managed --
3      A.   When?  This is 2000 --
4      Q.   It's May of 2001, sir.
5      A.   I can't quite work it out.
6          We were, at the end, something
7  like 3½ or 4 percent of its capital.  And
8  I want to see if that works with what we
9  were then.  I just can't remember.
10         When I say "at the end," at the
11 end of the end, when the bomb went off in
12 December of '08, given what we were, and
13 given what was reported under management
14 we were about 4 percent of that figure.
15     Q.   Correct to say that when you
16 read this, that he did not deny that he
17 was managing 6 to $7 billion, that was not
18 a surprise to you, that it had grown that
19 large?
20     A.   I don't remember that being a
21 surprise.
22     Q.   That he would be among the three
23 largest hedge funds in the world, had he
24 been a hedge fund; that would not be a
25 surprise to you?

239

1      Merkin - Direct/Bamberger
2      A.   I'm not so sure that would make
3  him one of the three largest at that time.
4      Q.   Can you turn to 63, please.
5          (The witness complies.)
6          MR. BAMBERGER:  I apologize, 61
7  and 62 is in evidence, Mr. Levander.
8          MR. LEVANDER:  I've objected to
9  neither.
10         MR. BAMBERGER:  So 61 and 62 are
11 in evidence.
12         (Claimant's Exhibit 62, received
13 in evidence.)
14 BY MR. BAMBERGER:
15     Q.   Now, sir, what I tried to do in
16 63 is try to put in a single place all the
17 handwritten notes that I can find that
18 were in your diligence file.
19         And if you remember, in the
20 prior go-around with the arbitration your
21 counsel had pointed out one that I had
22 missed, and I'll represent to you that
23 I've included it in here this time.
24         I've also included in here a
25 letter that seems to have been co-signed

240

1      Merkin - Direct/Bamberger
2  both by Roman, who you referred to
3  earlier, and by a Paul Olin, who signed as
4  head of structural risk of UBP Alternative
5  Investments.
6          Do you see that?
7      A.   I don't, but I'm sure it's here.
8      Q.   Now, there did come a time when
9  UBP called upon you to arrange a meeting
10 at the lipstick building with Bernie
11 Madoff, correct?
12     A.   That's not quite the way it came
13 about.  Such a meeting did come about.  I
14 offered it to them.
15     Q.   And they took you up on it?
16     A.   Yes.
17     Q.   Did Mr. Olin, the risk manager,
18 did he actually attend that meeting?
19     A.   I believe so.  There were four,
20 five people there from UBP.  I'm not sure
21 exactly who was whom.
22         Mr. Igolnikov was there.
23     Q.   This is about two months before
24 Mr. Madoff is arrested, correct?
25     A.   Yeah -- it's in the fourth

241

1      Merkin - Direct/Bamberger
2  quarter.
3      Q.   Now, is it correct to say that
4  Mr. Madoff shared with you from time to
5  time that he was facing massive
6  redemptions, especially in the second half
7  of calendar year 2008?
8      A.   No.
9      Q.   Did the subject ever arise
10 between you and him?
11     A.   "The subject" being...?
12     Q.   The level of redemptions that he
13 was seeing.
14     A.   Once, that I can remember.
15     Q.   When?
16     A.   He and I began to have a
17 conversation in the fourth quarter of '08,
18 when I began to give him a sense of what
19 our year-end redemptions might be.
20     Q.   Right.
21     A.   And I asked him, you know, how
22 are you handling redemptions.
23         Meaning, are they under control.
24     Q.   Right.
25     A.   And he said yes.

61  (Pages 238 to 241)

CONFIDENTIAL                                    GCC-P 0494451

242

1        Merkin - Direct/Bamberger
2     Q.    UBP Asset Management was one of
3   the parties that served a redemption
4   notice on you, correct?
5     A.    They served a redemption notice,
6   which in significant part they retracted.
7     Q.    What was the redemption
8   amount -- the initial --
9     A.    I don't remember.  It was not a
10  small redemption.
11    Q.    It was over 200 million, was it
12  not?
13    A.    I just don't remember.  It was
14  certainly over 100 million.  It was in the
15  100 millions.  I just don't remember.
16    Q.    Correct to say that by far UBP
17  was the largest single investor in Ascot?
18    A.    It was the largest single
19  investor in Ascot.
20    Q.    Correct to say that UBP knew
21  fully that this was a Madoff strategy,
22  correct?
23    A.    Yes.
24    Q.    In the first paragraph of UBP's
25  letter --

243

1        Merkin - Direct/Bamberger
2     A.    Can you just point me to the
3   letter, if you want me to look at it or
4   focus on it --
5     Q.    Sure.  5382.
6     A.    And this is in tab 63, right?
7     Q.    It is.
8     A.    5382.
9           These numbers are out of
10  sequence, right?
11    Q.    Yes.
12    A.    Okay.
13    Q.    In this case I have put a page
14  number in handwriting in the lower
15  right-hand column, 1 through 18, just for
16  easy reference to this exhibit.  They are
17  not part of the evidence.
18          Do you understand that?
19    A.    Yes, I do.
20    Q.    Okay.  So to be clearer, I'm
21  just referring to my handwritten page 10.
22    MR. LEVANDER:  Mr. Bamberger,
23  I'm not quite sure.  You've got a 2.1,
24  a 2-1 --
25    MR. BAMBERGER:  Same deal.

244

1        Merkin - Direct/Bamberger
2     MR. LEVANDER:  What does that
3   mean?
4     MR. BAMBERGER:  It means that I
5   paginated these documents in that way.
6   And I may have used 2.1.  And between
7   2 and 3 it appears I did.
8   BY MR. BAMBERGER:
9     Q.    That's just for identification,
10  so you and I can talk efficiently about
11  the documents.  They are not part of the
12  evidence.
13          The letter from UBP speaks of
14  Madoff as an execution manager.
15          Do you see that?
16    A.    This is the letter of October
17  10, 2008, right?
18    Q.    Yes.
19          (The witness reads document.)
20    A.    Yes.
21    Q.    Okay.  And he is asking various
22  diligence questions, correct?
23    A.    He's asking diligence questions
24  to Ascot, about Ascot, and about Madoff.
25    Q.    And one speaks specifically of

245

1        Merkin - Direct/Bamberger
2   segregation of duties.  Do you see that,
3   sir?
4     A.    No, but I'm sure it's here -- is
5   that in the numbered paragraph?
6     Q.    Paragraph 1.
7           (The witness reads document.)
8     A.    Yes.
9     Q.    The investor, Mr. Madoff, gets
10  an F for segregation of duties; is that a
11  fair summary?
12          He just fails that particular
13  category; true?
14    A.    I don't know what you're asking.
15  I don't understand the question.
16    MR. BAMBERGER:  Okay, I withdraw
17  it.
18    A.    Okay.
19    Q.    Do you see in paragraph 9 -- by
20  the way, did you ever make a determination
21  about whether this was principally written
22  by Mr. Olin or Mr. Igolnikov?
23    A.    The letter?
24    Q.    Yes.
25    A.    No.

62  (Pages 242 to 245)

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494452

246

Merkin - Direct/Bamberger

1    Q.   This is more the kind of letter
2    that a head of structural risk might
3    write, rather than the chief information
4    officer?
5    A.   It is not chief information
6    office.  It's the chief investment
7    officer.
8    Q.   I apologize, sir, of course.
9    I'm sorry.  I'm tired.
10   A.   I don't know why it would be
11   more one than the other.
12   Q.   Really?
13   A.   Yes.
14   Q.   Well, you had never received a
15   letter like this from UBP before, had you?
16   A.   I don't know a letter.  We
17   certainly had conversations with UBP over
18   the years, and lots of questions.
19        These sort of came a little more
20   formally put together, mostly because they
21   wanted written answers rather than only
22   telephone answers.
23   Q.   It's a fact, is it not, that you
24   had an e-mail with Roman, and asked Roman

*(line numbers 1–25)*

247

Merkin - Direct/Bamberger

1    whether Paul Olin was an adversary or an
2    ally?
3        Do you recall that e-mail?
4    A.   I don't know, but it's true I
5    had many, many, many more conversations
6    with Roman than I did with Paul.
7    Q.   In number 9 Paul says that, in
8    effect, UBP understands how we make money
9    if the market goes up, but please
10   illustrate how we make money using the
11   strategy when the market goes down.
12       Do you see that?
13   A.   What numbered paragraph are you
14   up to?
15   Q.   Nine.
16   A.   Okay.
17   Q.   You try to answer that question,
18   correct?
19   A.   Yes.  I think the long-form
20   answers in the one perhaps that you
21   withdrew a couple of pages behind it were
22   correlating to the numbers of the
23   paragraphs.
24   Q.   Good.

*(line numbers 1–25)*

248

Merkin - Direct/Bamberger

1    Sir, in this exhibit will you
2    agree, maybe from the last time, that
3    there are a number of notes that say, in
4    words or substance, telephone conversation
5    with Bernard L. Madoff, and then rather
6    than having a date it will have just a
7    month and a year?
8    A.   There are such notes, yes.
9    Q.   Correct to say the sum and
10   substance of your testimony last time is
11   that these really were reconstructions
12   years after the fact of conversations and
13   calls that you would have had, or to the
14   best of your memory you did have, with
15   Madoff years earlier; true?
16       MR. LEVANDER:  Blatantly false.
17   There's no such testimony as that.  I
18   object.
19       THE CHAIRMAN:  Whoa, whoa, whoa.
20   Are you answering the question?
21       MR. LEVANDER:  This is --
22       THE CHAIRMAN:  If you object say
23   "I object" and then the legal basis of
24   the objection.  Not answering for the

*(line numbers 1–25)*

249

Merkin - Direct/Bamberger

1    witness, please.
2        MR. LEVANDER:  Okay.
3        MR. BAMBERGER:  Maybe I should
4    withdraw my question.
5        THE CHAIRMAN:  All right,
6    rephrase it.
7        MR. BAMBERGER:  Since only one
8    of you sat in the prior matter.
9        MR. LEVANDER:  Can I just state
10   my objection?
11       MR. BAMBERGER:  I withdrew my
12   objection.
13       THE CHAIRMAN:  The question is
14   withdrawn.
15       MR. BAMBERGER:  Mr. Chairman,
16   with your permission I'm going to use
17   my pagination of the document.
18   BY MR. BAMBERGER:
19   Q.   Looking at page 1, sir?
20   A.   We're at tab -- same tab?  This
21   is going to be, bottom right-hand, 1?
22   That's the very first page?
23   Q.   1 is usually the first page.
24   A.   I didn't realize that was a 1.

*(line numbers 1–25)*

63  (Pages 246 to 249)

CONFIDENTIAL                                    GCC-P 0494453

250

1        Merkin - Direct/Bamberger
2      Q.    Your an honors graduate of
3    Harvard Law School, right?
4      A.    If you say that's page 1, then
5    it's page 1.
6          THE CHAIRMAN:  Let's not be
7    facetious.
8          MR. BAMBERGER:  I'm actually
9    not.
10          THE CHAIRMAN:  It looks like a
11    line on the bottom.  He said, oh,
12    that's a 1.
13          Cool it all down, please.
14    BY MR. BAMBERGER:
15      Q.    Although, sir, it's a fact;
16    either you did graduate Harvard Law School
17    cum laude or you didn't, right?
18          You just have to review your
19    diploma --
20      A.    I don't know about the diploma,
21    but it's a fact that you either did or
22    didn't.
23      Q.    And you didn't --
24      A.    I did not.
25      Q.    -- graduate cum laude?

251

1        Merkin - Direct/Bamberger
2      A.    You mumbled.
3      Q.    You didn't graduate cum laude.
4    But you told people in a succession of
5    biographies that you graduated Harvard Law
6    School with honors?
7      A.    I had a paragraph at one point
8    that had a bio made that referred to an
9    honors that I got in Harvard Law School.
10          It did not say I was a cum laude
11    graduate.
12      Q.    Right.  "Cum laude" means with
13    honors?
14          THE CHAIRMAN:  "With praise."
15      A.    I think "with praise," is the
16    Latin...
17          THE CHAIRMAN:  "With praise."  I
18    was a classics major.  Sorry.
19          MR. BAMBERGER:  No problem, sir.
20    You don't need to --
21      A.    For what it's worth.
22      Q.    That was a little puffing on
23    your part, was it not, sir?
24      A.    I didn't think so.
25      Q.    On page 1, the lower right-hand

252

1        Merkin - Direct/Bamberger
2    corner, this was with a note of a conversation
3    that you had with Mr. Madoff?
4      A.    Yes.
5      Q.    You had it on May 23 of 1995?
6      A.    That's what this says.
7      Q.    Any reason to believe it was any
8    other day?
9      A.    No.
10      Q.    Do you recall why you took this
11    note?
12      A.    Let me read the note for a
13    moment.
14          (The witness reads document.)
15      A.    Yes, it has a fair amount of
16    interesting information.
17      Q.    Okay, thank you.
18          Page 2.  Only because for time
19    management reasons, sir -- I'm not trying
20    to cut you off -- I want to stick with
21    most important.
22          That document also has a full
23    date of September 30, 1999, correct?
24      A.    Yes, it does.
25      Q.    Any question that you, in fact,

253

1        Merkin - Direct/Bamberger
2    made that note on September 30, 1999?
3      A.    No.
4      Q.    The next document, for example,
5    says telephone call?  "Tele call with BL
6    Madoff."  But it doesn't have a date.  It
7    just says "June 2001."
8          Do you see that?
9      A.    It has a date of June 2001.
10      Q.    By "date" I mean the actual day
11    that the conversation occurred.
12      A.    Okay.  It says "June 2001."
13      Q.    But in general, sir, is it not
14    your habit that, when you're having a
15    telephone conversation with a person, and
16    you're making a note of it, that you write
17    down the exact day on which the
18    conversation occurred?
19      A.    Yes.  Unless there was more than
20    one conversation in that month, or we were
21    discussing events that took place in that
22    month, perhaps a little bit later or
23    perhaps a little bit earlier.
24          So this may be a continuation of
25    a conversation we had had perhaps in late

64 (Pages 250 to 253)

CONFIDENTIAL                                        GCC-P 0494454

254

1    Merkin - Direct/Bamberger
2    May, perhaps in June.  It may have even
3    applied to what we were doing in early
4    July.
5    Q.    Isn't it possible, sir, that you
6    made this note in very late 2008 or in
7    2009, after the arrest of Madoff?
8    A.    No.
9    Q.    You're sure it's not a
10   recreation of something that happened
11   years earlier?
12   A.    I'm absolutely certain.
13   Q.    When did you actually put pen to
14   paper and draft the note that became 2.1?
15   A.    I think I answered that.  It
16   would have been very near June 2001,
17   referring to events that took place
18   perhaps slightly earlier or perhaps
19   slightly later.
20       But I would say that at the very
21   latest, you know, July of that -- the
22   following month, at the latest.
23   Q.    Okay.
24       So it wasn't made
25   contemporaneously with the phone call?

255

1    Merkin - Direct/Bamberger
2    A.    This note?
3    Q.    Yes.
4    A.    I don't remember.
5        You asked me what is the latest
6    it could possibly have been.  With a phone
7    call it's entirely possible that Madoff
8    was going so fast that I wrote down, very
9    fast, some notes, and then turned it into
10   this.
11       And that is, I wasn't writing as
12   we spoke on the phone, which is what I
13   take you to mean by "contemporaneous."
14   Q.    Now, in December of 2002, a year
15   and a half later, you did, in fact, inform
16   the Board of Trustees at Yeshiva
17   University, in connection with your
18   raising the fee on Ascot by 50 percent
19   effective January 1, 2003, that you needed
20   to charge the increased fee to cover $20
21   million of new hardware and software
22   costs, to cover the cost of a possible
23   LEAPS strategy that you personally would
24   execute, correct?
25   A.    Everything, I think, sounds

256

1    Merkin - Direct/Bamberger
2    reasonably right.  I'm not sure I
3    personally would execute.
4        But I don't think that the
5    conception was that nobody else, in either
6    my organization or the Madoff
7    organization, would have nothing to do
8    with the strategy or its execution.
9    Q.    Could you turn to page 3?
10       (The witness complies.)
11   Q.    Now, here I do see --
12   A.    I'm sorry.
13   Q.    Did you make the note of page 3
14   on February 20 of 2003?
15   A.    I believe so.
16   Q.    It says: "In 2002, one or two,
17   May, July, big tidal waves successfully
18   surfed."
19       Did I read that right?
20   A.    Yes.
21   Q.    Surfing waves, that's not part
22   of an arbitrage strategy, is it, sir?
23   A.    It's certainly part of the
24   notion that we were trying to catch a
25   turn.

257

1    Merkin - Direct/Bamberger
2        If you look at the next sentence
3    and read the two together, or perhaps read
4    the three sentences together, you'll
5    understand what this was trying to convey,
6    which was that in the prior year, in a
7    sentence, we were likely to have in '03,
8    as compared to '02 -- '02 having a smaller
9    number of larger turns, there would be one
10   or two or perhaps more, but really large
11   opportunities -- whereas, in '03, it was
12   going to be more in and out, there were
13   going to be a larger number of turns, and
14   we were going to make less per turn.
15   Q.    And catching that wave meant
16   being in the market when it was about to
17   go up, correct?
18   A.    That's what the phrase "catching
19   the turn" means?
20   Q.    Yes.  Catching a wave?
21   A.    Oh, catching a wave?
22   Q.    "This year we'll have to catch a
23   larger number of smaller waves."
24   A.    Right.  A larger number of
25   smaller turns.  That's the same concept.

65 (Pages 254 to 257)

CONFIDENTIAL                                                    GCC-P 0494455

258

Merkin - Direct/Bamberger

1
2  Q.   "Turns" meaning it could go up
3  or it could go down, either's fine?
4  A.   No.  "Turns" meaning -- you
5  certainly weren't guaranteed
6  profitability.  But you were going to try
7  to come in, catch a turn in the market
8  that you were successfully set up for,
9  either achieve the profitability you
10 wanted or not make money or lose.
11      But it was going to be -- we
12 were going to be in the market for a
13 shorter period of time and have more ins
14 and outs than the previous year.
15      The previous year we might have
16 been out of the market for months and
17 months and months because the turns were
18 smaller in number and just steeper.
19 Q.   Could you turn to page 4,
20 please.
21      (The witness complies.)
22 A.   Page 4, yes.
23 Q.   Correct to say that this page
24 and page 2.1 were made on the same day?
25 A.   Let me just go back to page 2.1.

259

Merkin - Direct/Bamberger

1
2      I would say that that is
3  unlikely -- not unlikely.  That's wrong.
4  Q.   Well, which is it?  Was it
5  unlikely, which was your first answer, or
6  wrong?
7  A.   Wrong.
8  Q.   Well, I notice that they both
9  say a "Tele call with BL Madoff."  You
10 used that expression both times.
11      Do you see that?
12 A.   Just one moment.
13      Yes.  My guess is the words "BL
14 Madoff," Bernard Madoff, and a date,
15 appear on virtually all of these.
16 Q.   And is this note on page 4, is
17 that a writing down of what you talked
18 about in a call with Mr. Madoff in June of
19 2005?
20 A.   Let me just take a look and read
21 this.
22      (The witness reads document.)
23 A.   What was the question?
24 Q.   Is this a transcription of what
25 you talked about with Mr. Madoff that day?

260

Merkin - Direct/Bamberger

1
2  A.   I'm sure it wasn't a
3  transcription.  It was probably a summary.
4  Q.   But you never talked to him
5  before a particular trade about where
6  the -- what the strike price would be of
7  the put, or the strike price of the calls,
8  or whether to invest the entire account or
9  80 percent at that moment?  You never had
10 such conversations with Mr. Madoff,
11 correct?
12 A.   No.  That's not correct.
13 Q.   That's not correct...
14      By why are you writing a note of
15 a telephone call with Mr. Madoff and
16 saying that this -- meaning the
17 formalization of the bands in writing --
18 has been the subject of several basic
19 conversations, returns to it again and
20 again?
21      I mean, why are you narrating
22 something in a call with Bernie Madoff?
23 A.   I guess I don't understand your
24 question.
25      If that's the conversation we've

261

Merkin - Direct/Bamberger

1
2  had and I was trying to summarize it, why
3  would that not be something I would do?
4  Q.   But it may have been in haste,
5  you may have been very upset.
6      The bands were formalized in
7  November of 2002, or thereabouts, correct?
8  A.   Are you referring to the trading
9  directive?
10 Q.   Yes.
11 A.   They're certainly formalized
12 there, but the trading directive does
13 nothing but put into writing what had
14 previously been the case, with some small
15 changes.
16      It's not a novel -- it doesn't
17 transform the relationship or the nature
18 of the money management enterprise.
19 Q.   Can you turn to page 5, please.
20      (The witness complies.)
21 A.   As it suggests, it says -- you
22 know -- has formed the basis.
23      Page 5.
24 Q.   This doesn't contain a month or
25 a year.  I put it there, not knowing where

66 (Pages 258 to 261)

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494456

262

1    Merkin - Direct/Bamberger
2  to put it.
3        Did I put it in the right place?
4        (The witness reviews document.)
5    A.   Well, it's not dated, so I
6  don't -- and you put it somewhere between
7  June of 2005 and November of 2006.
8    Q.   I did.
9    A.   Okay. I don't know.
10   Q.   Do you have any explanation as
11  to why it's not dated?
12   A.   Haste, forgetfulness. I don't
13  remember.
14   Q.   Did you ever agree with him
15  during that period about how much risk
16  could be taken, how much the stocks would
17  fall before the puts kicked in?
18   A.   Yes. Surely so. That is the
19  principal theme, to me, of the trading
20  directive, and the principal theme of the
21  entire relationship, and many, many, many
22  conversations: What is the risk that
23  we're taking. How much can we lose.
24   Q.   "Bernie repeated that he would
25  check each time he is ready to come in on

263

1    Merkin - Direct/Bamberger
2  the absolute loss tolerated and its
3  relation to the gain possibly achieved on
4  a percentage basis."
5        Did you mean -- or did Bernie
6  say that he would check with you? Is that
7  what you were saying there?
8    A.   Yes.
9    Q.   Well, he certainly didn't do
10  that, did he, sir?
11   A.   The fact that I wrote it down
12  suggests that he didn't do it every time.
13       But it would be very typical and
14  very usual for us to have a conversation
15  if we were out. Meaning in Treasuries.
16  For him to say, this looks like -- you
17  know, the constellation of the market
18  looks auspicious for us and we're looking for
19  considering coming in, we're looking for
20  an entry level.
21       And then we would have a
22  discussion of how much we could be risking
23  in order to make how much.
24   Q.   Are you able to say at all when
25  you made this note, sir?

264

1    Merkin - Direct/Bamberger
2    A.   I'm sorry -- I didn't catch the
3  question.
4    Q.   Are you able to say at all when
5  you made the note?
6    A.   It's very possible you guessed
7  right in where you put it. I don't know.
8        It would seem to me to be -- in
9  many ways -- timeless. This is what the
10  relationship was about. It was a
11  matter --
12   Q.   I think you hit it right on the
13  head, sir. It's timeless.
14   A.   It was a question of risk and
15  reward. And whether this came before the
16  trading directive or after the trading
17  directive, the strategy was that was the
18  strategy.
19   Q.   Looking at page 6, please --
20       THE CHAIRMAN:  It's a little
21  after 3 and the court reporter has
22  asked for a short break.
23       MR. BAMBERGER:  That's fine.
24       THE CHAIRMAN:  Unless you're
25  going to finish with the witness in

265

1    Merkin - Direct/Bamberger
2  another five minutes.
3        MR. BAMBERGER:  The witness?
4  Not a chance. But the document, yes,
5  sir.
6        THE WITNESS:  Are we taking a
7  break?
8        THE CHAIRMAN:  Yes, sir.
9        (A recess was taken.)
10       MR. BAMBERGER:  Mr. Chairman,
11  should I continue?
12       THE CHAIRMAN:  Please.
13  BY MR. BAMBERGER:
14   Q.   Mr. Merkin, returning your
15  attention to page 6 of Tab 63.
16       This certainly isn't a verbatim
17  note of a telephone call you had with BL
18  Madoff, correct?
19   A.   It certainly isn't.
20   Q.   You wouldn't know if it was a
21  long telephone call until it was over,
22  correct?
23   A.   At some point, if it's long
24  enough, you know halfway through.
25   Q.   Right. But, again, this is not

67 (Pages 262 to 265)

CONFIDENTIAL

GCC-P 0494457

266

1      Merkin - Direct/Bamberger
2  the actual writing down of a note while
3  you're talking on the telephone to Bernie
4  Madoff, correct?  This was prepared after
5  that call?
6      A.    I should read it.  But my guess
7  is I'm going to tell you it's a summary
8  and not a transcript.
9      Q.    Any explanation for why there's
10  not a full date, why it just says November
11  2006?
12          (The witness reads document.)
13      A.    Well, I think as I previously
14  suggested, when it was a month and a year
15  was the date, it referred to the period of
16  time, including possibly a little bit of
17  time before it, a little bit of time after
18  it.
19          And perhaps more than one phone
20  call in that period of time.
21      Q.    Do you know when Roger Madoff
22  died?
23      A.    Roger Madoff died in the spring,
24  I believe, of 2006.
25      Q.    Correct.  Now, if you're having

267

1      Merkin - Direct/Bamberger
2  10 to 15 calls a year with Mr. Madoff, the
3  subject of Roger's death wouldn't
4  obviously come out six months later, I'm
5  asking, or could it?
6      A.    He talked about it obsessively.
7      Q.    Mr. Madoff did?  Mr. Bernie
8  Madoff did?
9      A.    Correct.
10      Q.    When you said, "pulled out
11  sheets, reviewed with him," could you give
12  us a little more color on that?  What does
13  that mean?
14      A.    Well, the "pulled out sheets"
15  was me.
16      Q.    All right.  What was he looking
17  at?
18      A.    I'm not sure he was looking -- I
19  don't know what he was looking at, since
20  this was on the telephone.
21          But I was -- it's got to be that
22  I was looking at that day's set of sheets.
23      Q.    Those sheets wouldn't have given
24  you the purchase price, correct?
25      A.    Those sheets were a P&L.  In

268

1      Merkin - Direct/Bamberger
2  order to calculate the P&L we needed to
3  compare the purchase price with the last
4  sale of that security.
5      Q.    Why were you reviewing those
6  sheets with Mr. Madoff?
7      A.    I don't know the specific reason
8  then, but surely to check something
9  regarding either the correct number of
10  options, or what the -- how big the risk
11  was that we were looking at on the sheets.
12      Q.    Why does choppiness help
13  returns?
14      A.    Are you quoting something from
15  this?  It says choppiness helps return --
16  there it is.
17          Choppiness is no different than
18  market volatility, essentially.  This is
19  the same thing you asked me about the
20  MARHedge article.  If you have a perfectly
21  calm, flat sea, the strategy needs
22  volatility to make money.
23      Q.    Because the market will always
24  ratchet back?  A few days after the market
25  goes up, it always goes down again?  A few

269

1      Merkin - Direct/Bamberger
2  days after it goes down it will always go
3  up again?  That's what choppiness is?
4      A.    No.  I'm not saying that markets
5  go down, don't go back up.
6          You need an entry level.  You
7  need to be able to get in, catch a turn,
8  and get out.
9      Q.    That's not possible, sir; no one
10  can do that?
11      A.    There's similar -- they are
12  different expressions for the same basic
13  phenomenon.
14      Q.    Sir, can you turn to page 7 of
15  your notes.
16          (The witness complies.)
17      Q.    And this is a note of both a
18  visit and a follow-up telephone call?
19      A.    Let me just take a look at this.
20          (The witness reads document.)
21      A.    I'm having a tough time reading
22  it, because the paper's so thin.  Can you
23  just give me a second?
24          (The witness reads document.)
25      A.    That's correct.

68 (Pages 266 to 269)

CONFIDENTIAL

GCC-P 0494458

270

1          Merkin - Direct/Bamberger
2      Q.    All right.  So this is 13 months
3  or so before Mr. Madoff is arrested?
4      A.    Yes.
5      Q.    We don't have a date for the
6  visit or the telephone call?
7      A.    Well, you do.  We have a date of
8  November 2007.  As I previously testified,
9  either very shortly before or perhaps
10  shortly thereafter, but in that immediate
11  period of time there is both a visit and a
12  telephone call.
13          My guess is -- it says
14  "follow-up" -- I had questions about it,
15  or was thinking about the visit, and I put
16  it into one note and dated it November of
17  2007.
18      Q.    Where was the visit?
19      A.    In his office.
20      Q.    Would that entry be reflected in
21  your monthly calendar for November of
22  2007?
23      A.    Might be.  I don't know.
24      Q.    Most of the note, though, the
25  last two-thirds of it, deals with the

271

1          Merkin - Direct/Bamberger
2  question of where the puts are being
3  bought and sold, correct?
4      A.    There's some important
5  information prior to that, which is the
6  stocks expand in number up past 50 out of
7  100 OEX's.  That's an important fact.
8      Q.    That hadn't occurred in 2004,
9  early 2005?
10      A.    I don't remember.  I think it
11  goes up, comes back down and then it goes
12  back up again.
13      Q.    It says:  "Increasing puts
14  achieved through use of OTC puts,
15  discuss" -- discuss manner -- excuse me --
16  "discussed names, total number, 16 to 20,
17  my percentage moving well above half."
18          Now, the reference there to
19  "total number," that's the total number of
20  his OTC counterparties for the puts?
21      A.    Can I just correct one or two
22  things -- one thing that you read wrong?
23      Q.    Absolutely.
24      A.    Going back to the thing that
25  starts, "Discuss," with a capital D.

272

1          Merkin - Direct/Bamberger
2      Q.    Yes?
3      A.    "Discuss names, total number (16
4  to 20 and percentage)."  Okay?
5      Q.    Uh-hum.
6      A.    Hyphen, "moving well above half.
7  Not my percentage.  And percentage."
8      Q.    All right, thank you.
9          That means in the markets where
10  he's purchasing the puts, now more than 50
11  percent are being purchased in general
12  OTC; is that right?
13      A.    Well above half.
14      Q.    "Posting of margin and structure
15  percentage allocation of contra-parties to
16  each managed account across the entire
17  book of customer business, also
18  discussed."
19      A.    Uh-hum.
20      Q.    "This means that every managed
21  account shares pro rata in all the names.
22  They are not selected and assigned, say,
23  five (of the 16 to 20) to each account."
24          So in other words, all the
25  managed accounts are going to take the

273

1          Merkin - Direct/Bamberger
2  risk of any particular counterparty who
3  may fail, they're all going to participate
4  pro rata, right?
5      A.    You have a diversified, and
6  equally diversified.
7          Let's say the number really was
8  20, and not 16 to 20.  You're not going to
9  get a quarter of those names, you're going
10  to get all of them.  Every managed account
11  got every name.
12      Q.    And the counterparty in those
13  cases would be Ascot -- Ascot Partners LP,
14  correct?
15          They would be the party that
16  would enter into the transaction;
17  Mr. Madoff would have authority to enter
18  into such a transaction on Ascot Partners'
19  behalf, correct?
20      A.    I believe the way you asked the
21  question the answer is no.  No, the
22  counterparty is the 16 to 20 names.
23      Q.    Who is that party dealing with?
24      A.    That party, Ascot Partners -- if
25  it's Ascot Partners LP -- had a managed

69 (Pages 270 to 273)

CONFIDENTIAL                                                    GCC-P 0494459

274

1      Merkin - Direct/Bamberger
2  account at Madoff that gave him the
3  authority to do this.
4      Q.    So Madoff would be entering into
5  confirms and master agreements, in your
6  understanding, on behalf of Ascot?
7      A.    Correct.
8      Q.    You would have to enter into
9  those ISDA agreements and confirms with
10  the thousands of parties whose accounts he
11  managed, correct?
12      A.    I don't know.  But that -- I
13  don't know what he was doing with
14  thousands of accounts.  He would have to
15  be doing that for this strategy
16  (indicating).
17      Q.    Every one of those people would
18  have to have their own confirm, have to be
19  redelivered, et cetera?
20      A.    Well, no.  That's what a pooled
21  vehicle is.  You get one.
22      Q.    You got one, but I understand
23  you to be saying that Madoff would get,
24  for Ascot, one confirm from each of the 16
25  to 20 counterparties, and he would get one

275

1      Merkin - Direct/Bamberger
2  confirm for every one of his managed
3  accounts for each of his counterparties,
4  if the business is conducted that way?
5      A.    With a big "if," yes.  For those
6  businesses that he conducted that way, the
7  answer would be yes.
8      Q.    Why did this subject arise in
9  November of 2007?
10      A.    I'm not sure I remember any
11  specific reason.  Fourth quarter was
12  generally the time for, you know, a
13  conversation, where are we, where are we
14  going, are there changes in the strategy,
15  is there changes in the market, is the
16  strategy less efficient, is there
17  competition, are you tweaking it, should
18  there be a change in the directive.  I
19  don't know.  That's when we discussed
20  these things.
21      Q.    As a result of this note did you
22  do any fresh due diligence, looking at
23  your confirms and comparing those confirms
24  to actually reported transactions on the
25  CBOE?

276

1      Merkin - Direct/Bamberger
2      A.    I looked at actual confirms
3  very, very rarely.
4      Q.    And did you instruct Mr. Autera
5  or anyone else in your organization to
6  look at those confirms as a result of this
7  new information?
8      A.    I don't remember any such
9  conversation.
10      Q.    Well, by now the market should
11  becoming a higher level of anxiety,
12  generally, in the market?
13      If we look at the VIX, for
14  example, this should be a lot higher by
15  November of 2007 than it was before the
16  mortgage-backed Bear Stearns funds
17  collapsed, correct?  More nervousness now?
18      A.    The Bear Stearns funds collapse,
19  in your head, is when?
20      Q.    Well, I thought it was -- it was
21  announced that Bear Stearns wasn't going
22  to support them in the summer of '07, and
23  they collapsed a couple of months later.
24      A.    I just can't place them within
25  the sequence.  That is why I'm asking the

277

1      Merkin - Direct/Bamberger
2  question.
3      You're talking about the
4  collapse of the Bear Stearns funds and not
5  the collapse of Bear Stearns?
6      Q.    Oh, sure, right.
7      A.    I just want to make sure I
8  understood.
9      I can't fit that into November
10  of 2007.
11      Q.    Bear Stearns didn't collapse.
12  It was taken over by merger.  Correct?
13      A.    But a stock that goes from 100
14  to 2, I guess you could call that a
15  collapse.
16      Q.    When did you make the note on
17  page 7?
18      A.    Page 7 -- you've asked me this.
19  So this was a note that referred to both a
20  visit and a telephone call that took place
21  in November 2007, or slightly before, or
22  slightly later.
23      And, therefore, I would have
24  made this note either in the middle, the
25  end of November, or maybe very early

70  (Pages 274 to 277)

CONFIDENTIAL                                            GCC-P 0494460

278

1      Merkin - Direct/Bamberger
2  December.
3      Q.    Okay.  Now, turning your
4  attention to page 8, and this is a note
5  that you and I have discussed more
6  extensively before, correct?
7      A.    Today?
8      Q.    No.  The Weidenhorn case.
9      A.    I don't remember.  We
10  discussed --
11      Q.    Maybe I'm wrong.
12      A.    But if you ask me a question to
13  it that reminds me of a discussion I'll be
14  happy to tell you yes.
15      Q.    When did you make the note on
16  page 8?
17      A.    Either slightly before April
18  or -- when did I make the note?  Probably
19  toward the middle of April.  It might have
20  been a little bit later.  I don't remember
21  exactly when.
22      Q.    How could you have made the note
23  before April 2008, when it's talking about
24  whether we're in the market or not?
25      A.    I didn't say I did.

279

1      Merkin - Direct/Bamberger
2      Q.    Is it necessarily the case that
3  you made this note on or after April 1,
4  2008?
5      A.    It's highly likely that I did.
6  Almost surely I made it after April 1st.
7  I might have made it on April 1st.  But I
8  didn't make it in March.
9      Q.    I misunderstood an answer you
10  gave.
11      You certainly didn't make it in
12  March?
13      A.    Right.  That doesn't mean it
14  didn't necessarily refer to events in
15  March.
16      I say again, when there's months
17  without days, they refer to events that
18  may have taken place before or nearly
19  after that month, and were generally made
20  in that period of time.
21      If you go back to page 7, there
22  was both a phone call and a visit.  It was
23  November of 2007.  It may have referred to
24  things that took place before November, it
25  may have been made toward the end of

280

1      Merkin - Direct/Bamberger
2  November, it may have been made in early
3  December.
4      The analog and parallel folds
5  perfectly between page 7 and page 8.
6      Q.    I appreciate that you're a
7  highly trained lawyer, but I would like
8  you to do your best to answer my
9  questions, if you can, if you don't
10  remember our conversations about this in
11  the prior case.
12      MR. LEVANDER:  Move to strike.
13      MR. BAMBERGER:  Granted.
14  BY MR. BAMBERGER:
15      Q.    Do you recall that records
16  produced by the accountants show that
17  Ascot was in the market -- in other
18  words, owned stocks, owned puts, and sold
19  calls -- each and every trading day in
20  April of 2008, including April 1 of 2008?
21      A.    I remember that -- this is what
22  you referred to, our prior conversation?
23      Q.    Yes.
24      A.    This is important.  You asked me
25  if I remember this going back to April

281

1      Merkin - Direct/Bamberger
2  2008, or going back to our prior
3  conversation?
4      Q.    What I pointed out to you in the
5  prior matter is that the statement, "we're
6  out of the market," you confirmed meant
7  that you were jotting down your
8  understanding was that Mr. Madoff at some
9  point was telling you that Ascot did not
10  own stocks and puts, but was in
11  Treasuries?  That's what "we're out of the
12  market" means, correct?
13      A.    Yes.  I would have known that --
14      Q.    If I'm wrong you'll tell me, but
15  I thought we confirmed the last time at no
16  time in April of 2008 was that correct;
17  you were always in the market, in fact
18  owning stocks, in Ascot?
19      A.    That may very well be the case.
20  I thought you were asking me now if I
21  remember that; that is my memory
22  today of what I remembered in April of
23  2008.
24      It is very possibly my memory of
25  what we discussed at a period of time well

71  (Pages 278 to 281)

CONFIDENTIAL                                                    GCC-P 0494461

282

1      Merkin - Direct/Bamberger
2    subsequent to April 2008.  But I think
3    that that is what is reflected in some of
4    the things you've shown me the last time
5    we discussed this particular note.
6      Q.    Forgetting about the last
7    hearing, your considered testimony under
8    oath is your best recollection would be
9    that you made this note either in --
10    sometime in April 2008 or shortly
11    thereafter, correct?
12      A.    Describing events that took
13    place in April 2008 or earlier.  Correct.
14      Q.    It says here:  "The Treasuries
15    have been purchased in the names of the
16    investors and are held in the deposit at
17    the Treasury."  Correct?
18      A.    Yes.
19      Q.    So that means that these
20    Treasuries couldn't possibly be on an
21    account statement issued by Bernard
22    L. Madoff Investment Securities, LLC,
23    correct?
24      A.    I don't know why not.
25      Q.    Well, because if they're held at

283

1      Merkin - Direct/Bamberger
2    the Treasury, that's where they're held,
3    and you can't very well say -- a person
4    such as Bernard Madoff can't put out an
5    account statement saying the securities
6    are in his custody when they're not.  That
7    would be fraud.
8      A.    I would consider that sentence,
9    if I were you, and wonder the irony of it.
10          You're telling me that Bernard
11    Madoff wouldn't put out a statement that
12    wasn't fraudulent.
13      Q.    I'm asking you something much
14    more prosaic.
15          Couldn't you have looked at your
16    account statements for the month-ended
17    August of 2008, delivered to you by
18    Bernard L. Madoff, seeing that the account
19    statements say the Treasuries were held at
20    Bernard L. Madoff, compared to the
21    information that you were told at the time
22    that they are all being held in the
23    Treasury, and immediately throw up your
24    hands and become extremely, extremely
25    concerned?

284

1      Merkin - Direct/Bamberger
2      A.    Do you mean August or do you
3    mean a different month?
4      Q.    If I said August, I meant April.
5      A.    In April I think we were in.  At
6    the end of April I think we were in.  If
7    we were in and we were fully in, there
8    would be no Treasuries.
9      Q.    Okay.
10      A.    I think that is exactly what you
11    asked me to reconfirm from our last
12    discussion.
13      Q.    You said here that there was a
14    time, whether it was in March or April,
15    that Treasuries had been purchased in the
16    names of investors that are being held at
17    the U.S. Treasury, correct?  Whether it
18    was in March or April.  That was your
19    understanding?
20      A.    Yes.  That's what this says.
21      Q.    So you could have easily
22    looked at your statements issued by
23    Bernard L. Madoff Investment Securities
24    for either March or April and seen that
25    what Mr. Madoff had just told you was a

285

1      Merkin - Direct/Bamberger
2    lie; true?
3      A.    I don't think so.  No.
4      Q.    But if they are held in
5    Treasury, they can't be held in your
6    Madoff account; they can't be in two
7    different places at once?
8      A.    The question, did Ascot own
9    those Treasuries.
10      Q.    No, that's not my question, sir.
11      A.    I didn't say that was your
12    question.  That was my answer.
13      Q.    My question was more broadly:
14          What diligence did you do to the
15    truth of the statement that Mr. Madoff had
16    just made?
17      A.    Well, certainly by the time this
18    note is done, we're back in.
19      Q.    Okay.  And that's not my
20    question.
21      A.    So I don't remember, as I sit
22    here today, that I did or didn't do any
23    particular diligence.
24          So the answer to your question
25    is I don't remember.

72  (Pages 282 to 285)

CONFIDENTIAL                                                                    GCC-P 0494462

286

1      Merkin - Direct/Bamberger
2      Q.    "No contra-party risk.  Can't be
3  borrowed, can't be margined."
4          That's because the securities
5  are over at the Treasury, right?
6      A.    No.  It could also mean that
7  they're simply not in an account that lets
8  the Treasuries be what is called
9  hypothecated in the place of Treasuries.
10         It basically says that nobody
11  could have borrowed these and failed to
12  return them because they filed for
13  bankruptcy.
14     Q.    They weren't being counted in
15  anybody's capital, they couldn't be lent,
16  they couldn't be margined against, they
17  couldn't be the subject of security, et
18  cetera.  They are all in Treasury.  You,
19  Mr. Merkin, don't need to worry, thank
20  God, it's a terrible market.
21         And then you do nothing to see
22  if that statement is true or not?
23     A.    The first part of that speech is
24  wrong.  They were our Treasuries --
25         THE CHAIRMAN:  Fellows, please,

287

1      Merkin - Direct/Bamberger
2  one at a time.  Finish the question,
3  finish the answer.  The other one
4  shouldn't break in.
5      A.    Okay.  Who's speaking?  You are?
6  Go right ahead.
7      Q.    Sir, at some point in or around
8  March or April of 2008 you were told that
9  securities to which you had title were
10  being held, not at Bernard L. Madoff but
11  at the Treasury, and you never
12  investigated that -- investigated whether
13  that was true or not, correct?
14     A.    I don't remember.  By the time
15  we had the discussion we were in.
16     Q.    Would you turn to page 9,
17  please.
18         (The witness complies.)
19     Q.    This note does appear to have a
20  complete date.  Do you see that?
21     A.    Yes, I do.
22     Q.    Is that June 22 of 2008 or...?
23     A.    Now you're asking a hard
24  question.
25     Q.    The other one wasn't hard?  This

288

1      Merkin - Direct/Bamberger
2  one's hard?
3      A.    I would guess 22.
4      Q.    Okay.  Any particular reason why
5  this note does get a date?
6      A.    Does or doesn't?
7      Q.    Does get a full date.
8      A.    I would have to read the note.
9          (The witness reads document.)
10     A.    Yes.  Probably.
11     Q.    Did you place the call or did
12  he?
13     A.    I don't remember.  It's entirely
14  possible that I placed the call and he
15  called me back, or he placed the call and
16  I called him back.
17     Q.    Did you record the call?
18     A.    Did I report it?
19     Q.    Record the call.
20     A.    I don't think so.
21     Q.    Did you record the call of
22  March/April 2008?
23     A.    The prior page?
24     Q.    Yes.
25     A.    Page 8?

289

1      Merkin - Direct/Bamberger
2          I don't think so.
3      Q.    Well, in this increasingly
4  uncertain time wouldn't it have been a
5  good idea to tape-record the conversations
6  with Mr. Madoff about what he's telling
7  you?
8      A.    I don't think so.
9      Q.    Well, during this time, in 2008,
10  he was once again reporting gains each and
11  every quarter.  Maybe there was one month
12  that he was down one-tenth of a percent.
13  But while the market is down 20, 25
14  percent, he's basically breaking even at
15  this time.  That's what he's reporting to
16  you, right?
17     A.    That's consistent with the
18  second paragraph on page 9, because what
19  this note tells you is we've been out of
20  the market since late May.  Okay?  And
21  we're not coming back in until July.
22         Which is probably why the note
23  has a date.  Because it doesn't really
24  discuss events in July, because he's
25  telling you that he's not looking for an

73  (Pages 286 to 289)

CONFIDENTIAL

GCC-P 0494463

290

1    Merkin - Direct/Bamberger
2  entry level -- an entry point until July.
3    And one of the specific features
4  of the account in 2008 is we spent a fair
5  amount of time on the sidelines. Spend
6  time on the sidelines, you can break even.
7    Q.    Although the record reflects
8  that he claims to have gotten in on April
9  1 of 2008, when the market was up 2.2
10  percent, the day after Lehman announced
11  that it had fresh buyers for 3 or $4
12  billion of preferred and might live to see
13  another day, right? He just happened to
14  get in that day?
15    A.    That sounds right.
16    This is something else. This
17  says we're out since the second half of
18  May and we're going to spend all of June
19  on the sidelines, into July.
20    Q.    Why did the subject of FOCUS
21  Reports arise?
22    A.    Don't remember.
23    Q.    Did he raise it or did you?
24    A.    I don't remember. It -- I -- I
25  would be totally guessing from the last

291

1    Merkin - Direct/Bamberger
2  sentence in that paragraph that maybe the
3  SEC was in to visit him on a surprise
4  basis at that time. I'm just totally
5  guessing. Maybe that's why it came up.
6    But that's entirely speculative.
7    Q.    Okay. Now, turning to your
8  notes of pages 12/13.
9    A.    Just one moment. Okay.
10    Q.    This was your first stab to
11  answer the diligence you got from UBP
12  Asset Management. The numbers correspond
13  to the questions?
14    A.    Just one moment.
15    (The witness reviews document.)
16    A.    You're on 12 now?
17    Q.    12/13, yes.
18    A.    So there are ten numbered
19  questions in 10 and 11, right?
20    Q.    Yep.
21    A.    And these numbers on 12 and I
22  guess 13 -- it's one note with two
23  sides -- refer to those paragraphs.
24    Q.    Pages 14, 15, 16 are your
25  expanded answers to the same first nine

292

1    Merkin - Direct/Bamberger
2  questions?
3    A.    My recollection or my pretty
4  good guess is that I think I went to see
5  Bernie. The 12 and 13 are very fast notes
6  I took while I was there. And there are
7  more just notes to myself.
8    They've expanded into what you
9  have as 14, 15 and 16. Okay?
10    Q.    All right.
11    A.    Then there was a conference
12  call, which is 17, and then there's a
13  visit, which is 18.
14    Q.    Right. We're not quite there
15  yet.
16    A.    Right. I understand that.
17    Q.    This was an actual physical
18  meeting at 885?
19    A.    Which is "this" now? 12?
20    Q.    12, 13 and 14, 15, 16 are just
21  you and Mr. Madoff?
22    A.    12 and 13 for sure.
23    14, 15 and 16 is just the
24  more -- is the longer and more literal and
25  fuller version of 12 and 13.

293

1    Merkin - Direct/Bamberger
2    Q.    Okay.
3    A.    I don't think it was an
4  additional visit. There may have been a
5  phone call in between, I don't remember.
6  But they both reference the 10-paragraph
7  letter.
8    And then there's a long phone
9  call with UBP people and people from my
10  office on the basis of 14, 15 and 16.
11    And then there's a visit with
12  the full UBP team and Mike and me at 885
13  Third Avenue, which is what you see on 18.
14    Q.    And turning your attention to
15  13, please?
16    A.    13. Not 12/13, just the last
17  part of it?
18    Q.    Yep.
19    A.    Okay.
20    Q.    And this is an answer to the
21  question of where are the options traded
22  by Madoff, whether they're Exchange-listed
23  or traded over-the-counter?
24    A.    You asked me about paragraph 8?
25    Q.    Yep.

74  (Pages 290 to 293)

CONFIDENTIAL    GCC-P 0494464

294

1        Merkin - Direct/Bamberger
2        A.    I'm just going to go back and
3    read the question.
4            (The witness reads document.)
5        A.    Okay.  So that's paragraph 8 on
6    page 11.
7        Q.    They want to know about the
8    credit exposure.
9            And is this information that
10   Mr. Madoff is giving you?
11       A.    Yes.
12       Q.    So it says "Exchange-listed and
13   OTC firm trades"?  In other words, his
14   firm trades both?
15       A.    No, I don't think so.
16   Exchange-listed and OTC.
17       Q.    Next line?
18       A.    Period.  Firm trades OTC when
19   there is no OCC -- okay, let me just --
20       Q.    I don't want you to do that.
21       A.    Okay.
22       Q.    "Firm trades OTC when no OCC."
23       A.    No, that's not what that says.
24       Q.    What does it say?  When...
25   "Firm trades OTC."

295

1        Merkin - Direct/Bamberger
2        A.    Period.
3        Q.    "When no OCC" --
4        A.    Comma.
5        Q.    -- "require performance
6    assurances" -- in quotation marks -- "20
7    percent of the underlying index still
8    prefer OCC."
9            Do I have that correct?
10       A.    The easiest way to understand --
11       Q.    I'm sorry, sir --
12       A.    I'm not sure you do.  I would
13   suggest that you look at paragraph 8, the
14   fuller version of it that was done, on the
15   next page.
16       Q.    We'll get there, sir.
17       A.    Okay.
18       Q.    Don't you worry about that.
19           But my question is:  Were these
20   words that Bernie Madoff was saying to
21   you?
22           And in this case were you trying
23   to take down verbatim exactly what he told
24   you?
25       A.    I think I previously testified

296

1        Merkin - Direct/Bamberger
2    that none of this is a transcript.
3        Q.    I'm asking you about 8.
4        A.    The only words that I would
5    suggest were words that he said verbatim
6    are the two words that are in quotes.
7    That's why they're in quotes.
8        Q.    Well, you wouldn't write "20
9    percent of the underlying index still
10   prefers OCC" unless he told you that,
11   right?  You're not going to come up with
12   that by telepathy?
13       A.    You're just mangling what it
14   says here.  Let me try to answer your
15   question.
16           "Performance assurances, 20
17   percent of the underlying index" -- that
18   has to do with the nature of the
19   performance assurance and how much it is.
20   It has nothing -- it's not nothing.
21   Period.
22           So let me try this again.
23           "Exchange-listed and OTC."
24   Period.  "Firm trades OCC."  Period.
25   "When no OCC" -- no Options Clearing

297

1        Merkin - Direct/Bamberger
2    Corporation, which is what you get with an
3    OTC trade -- "require performance
4    assurances, 20 percent on the underlying
5    index."  Period.  "Still prefer OTC."
6           Okay, it's a different thought.
7    It's related it's paragraph 8, but it's a
8    different thought.
9           We did this the last time,
10   because you pointed out the Hebrew.
11       Q.    Does that say "still prefer
12   OTC," or "OCC"?  And you better be
13   careful.
14       A.    The short answer is --
15       Q.    Yeah, the short answer.
16       A.    -- OCC.
17       Q.    You just said OTC.
18           And that paren is a "firm
19   invented the OEX"?  Is that what it says?
20       A.    Yes.
21       Q.    And that reference to "firm"
22   meant Bernard L. Madoff Securities?
23       A.    Yes.
24       Q.    There's no basis for saying
25   that, right?  His firm didn't invent the

75 (Pages 294 to 297)

CONFIDENTIAL                                                    GCC-P 0494465

298

1      Merkin - Direct/Bamberger
2  OEX index?
3      A.   Is there no basis for saying
4  that?
5      Q.   Yes.
6      A.   That's what he said.  He said
7  that the firm played a very significant
8  role in the creation of index options,
9  including the OEX and its parallel on the
10  S&P 500.  That was something that had
11  kicked around in the industry amount.
12      Q.   That was Hebrew for "worth
13  noting"?
14      A.   If I may josh you slightly, you
15  did better the last time.
16      It's Ra-ui le-Tsiun.  It means
17  "noteworthy."  It has nothing to do with
18  Zion.
19      Q.   I'm just asking.
20      Contra -- what's the rest of it?
21      A.   Just one second.
22      (The witness reads document.)
23      Q.   Is it "Outside of OCC a
24  counterparty could fail"?
25      A.   That's very likely right.  If

299

1      Merkin - Direct/Bamberger
2  you permit me to turn to page 15, it might
3  shed some light on it.
4      Q.   Okay.  And you told the Attorney
5  General in your deposition in 2009 that
6  when -- in one of your last conversations
7  with Madoff he was telling you that he
8  still was purchasing 20 to 25 percent of
9  the puts on the CBOE?  In other words,
10  buying OCC-eligible options.
11      That's what you testified to,
12  correct?
13      A.   It certainly could be.  I just
14  don't remember the specific testimony.
15      Q.   And you could have easily
16  checked out if that was true at the time,
17  right?
18      A.   Hmmm, not so sure.
19      I previously testified, again,
20  the 20 percent is not a snapshot.  It's
21  not, okay, at any one day and every single
22  day it's 80/20.  It's over a period of
23  time.
24      That's what I meant earlier when
25  I was referring to a horizontal and not a

300

1      Merkin - Direct/Bamberger
2  vertical, and perhaps I said it in too
3  short form of manner.
4      It refers to an overall
5  relationship that abided over a
6  significant period of turns and
7  expirations.  Not that day, not that
8  snapshot.
9      Q.   And, sir, it would be easy to
10  have looked at an entire quarter or year's
11  worth of prior results to see whether this
12  was in general true, that he was still
13  buying at least 20 percent of options on
14  the CBOE, correct?  You could have easily
15  done that?
16      A.   I don't know.
17      THE CHAIRMAN:  You don't know
18  whether you could have checked on
19  this?
20      THE WITNESS:  It would not have
21  been difficult to check.  It would
22  depend on the period of time.
23      In other words, the further you
24  get away from a daily concept the more
25  work you have to do to get it right.

301

1      Merkin - Direct/Bamberger
2  It should not, in principle, be that
3  difficult.
4  BY MR. BAMBERGER:
5      Q.   Sir, when he said "when no OCC,"
6  that must have struck you as incredibly
7  odd; is that right?
8      Because why would he be able to
9  buy options in monstrous quantities
10  over-the-counter that were of interest to
11  him, and be unable to trade and buy those
12  same options over-the-counter?
13      A.   I just didn't follow the
14  question, I'm sorry.
15      Q.   And I may have misspoken.
16      The CBOE is the much more
17  efficient market for the purchase and sale
18  of options and over-the-counter, correct?
19      Price discovery, et cetera,
20  standard confirmations, OCC guarantee.
21  Way easier and way cheaper to trade on the
22  CBOE than it is over-the-counter; true?
23      A.   Well, depends what your
24  objective is.
25      The principal advantage of

76 (Pages 298 to 301)

CONFIDENTIAL

GCC-P 0494466

302

1    Merkin - Direct/Bamberger
2  having the OCC in the picture was the
3  significant reduction of the
4  over-the-counter -- of the contra-party
5  risk.
6        After that there's many reasons
7  not to trade on a listed basis, including
8  you can shape things the way you want
9  them, including a much longer trading day,
10  including a little bit less bound or
11  tethered to the American markets, and
12  including discretion, and including size,
13  and including volume.
14        If you're a retail investor and
15  small, some of the things we're saying
16  matter more.
17    Q.    Sir, on the bottom of 14 --
18    A.    Bottom of 14?
19    Q.    Yes.
20        -- in answer to question 3 --
21  you say this both on 12 and 14 in answer
22  question 3 -- that your accounts at Madoff
23  are cash accounts, not margin, and that's
24  certainly clear on the face of the
25  statement.

303

1        Merkin - Direct/Bamberger
2        And then you say with respect to
3  3 on page 14, "when in Treasuries
4  segregated at the depository in individual
5  customer names."
6        Do you see that?
7    A.    I do.
8    Q.    You could simply ask for -- look
9  at the statement, and if you see them
10  being held at Madoff, that makes no sense?
11    A.    I'm truly not sure that's true.
12        I think a little bit depends on
13  what the individual -- who the individual
14  -- or who or what the individual customer
15  was.
16    Q.    Okay. And your notes on page 17
17  and 18 are fully --
18    A.    I'm sorry, 17 and 18?
19    Q.    17 and 18.
20        -- are fully dated notes,
21  correct?
22    A.    Just one moment.
23        Yes.
24    Q.    Who is Laurie, at the top of
25  page 17? If it is Laurie.

304

1    Merkin - Direct/Bamberger
2    A.    That is Lauren. I can't
3  remember her last name. She is an
4  in-house compliance person at UBP, and I
5  have her face in front of me, and her card
6  in front of me. She was at the meeting.
7        And I can't remember her last
8  name.
9    Q.    Okay. And there was an actual
10  meeting with Bernie Madoff and the UBP
11  people two or three weeks before he was
12  arrested, on November 25, '08, correct?
13  That's page 18?
14    A.    Yes.
15    Q.    All right.
16    A.    The phone call that you've asked
17  about on 17 precedes that, just to be
18  clear.
19    Q.    Okay.
20    A.    Just to be clear. Appreciate
21  that.
22    Q.    Is it correct to say that at
23  this meeting he said that reversion to
24  mean was the key to the strategy?
25    A.    He -- it says "he harps on

305

1        Merkin - Direct/Bamberger
2  reversion to mean" -- I am sure it was the
3  key to the strategy, although that's what
4  it says.
5        He talked about reversion to
6  mean being something he had done -- as a
7  factor in the businesses he had run going
8  back to his early days in the convertible
9  arbitrage business.
10        MR. BAMBERGER: I move 63 into
11  evidence at this time.
12        MR. LEVANDER: No objection.
13        (Claimant's Exhibit 63, received
14  in evidence.)
15  BY MR. BAMBERGER:
16    Q.    Turning your attention to
17  Exhibit 64, please --
18    A.    Can I take one minute and have a
19  drink of water here one second?
20    Q.    I'm sorry?
21    A.    Can I have a drink of water here
22  for one second?
23    Q.    Sure.
24    A.    Tab 64?
25    Q.    Yes. This was a document that

**VERITEXT REPORTING COMPANY**
(212) 279-9424        www.veritext.com        (212) 490-3430

CONFIDENTIAL

GCC-P 0494467

306

1        Merkin - Direct/Bamberger
2    was marked for identification at your
3    deposition by the Attorney General,
4    correct?
5        (The witness reads document.)
6    A.   I don't know.  What are you
7    referring to?
8    Q.    That label in the upper
9    right-hand corner has a date, January 30,
10   2009.
11       I'll just indicate, that's about
12   six weeks after Madoff was arrested and
13   that the Attorney General in fact took
14   your deposition on that day.
15   A.   Okay.
16   Q.    State of New York.
17       You did in fact attend a meeting
18   of the Law School Finance Committee on
19   November 14, 2006?
20   A.   I believe so.
21   Q.    And all of those persons were
22   present?
23   A.   I don't remember.  I'm sure they
24   were all there.
25   Q.   All right.

307

1        Merkin - Direct/Bamberger
2    A.   I would guess that while I was
3    there not all the guests were there.  I
4    think it was me or the other guy.
5    Q.    Had you met Ralph Sinscheimer
6    before that meeting?
7    A.   I think I have, yes.
8    Q.    What was your impression of
9    Mr. Sinscheimer?
10   A.   He seemed like a very nice
11   person.  A somewhat rare type-B
12   personality in a business that is people
13   with As and triple As.
14   Q.    Under what circumstance did you
15   first meet him?
16   A.   I just don't remember.  I think
17   he took over responsibility for whatever,
18   you know, his shop, Solaris, does for an
19   existing limited partner.
20   Q.    Who was that limited partner?
21   A.   Well, if I remember correctly
22   that that was the first time, then that
23   would have been someone related I think to
24   the Barry family.
25   Q.   Am I correct, on the second full

308

1        Merkin - Direct/Bamberger
2    page of the document, 1217 --
3    A.   Who was the first --
4    Q.    Is it correct to say -- turning
5    your attention to page 1217 -- that you
6    presented Ascot Partners fund or Ascot
7    Partners LP to the group on that occasion?
8    A.   Yes.
9    Q.    Why was it that you presented
10   Ascot and not Gabriel?
11   A.   I think that's what
12   Mr. Sinscheimer asked me to do.
13   Q.    Correct to say that you told the
14   meeting on that day that Ascot had never
15   had a calendar quarter --
16   A.   I'm sorry?
17   Q.    Correct to say that on that
18   occasion you told those assembled that
19   Ascot had never had a negative calendar
20   quarter?
21   A.   It's likely that I said that.
22   Q.    Correct to say that you said at
23   the meeting that Ascot's worst year it was
24   up 8.07 percent?
25   A.   I don't remember.  I could well

309

1        Merkin - Direct/Bamberger
2    imagine I said that.
3    Q.    Is it correct to say that you
4    said the annual return was three times
5    annual Treasuries?
6    A.   Not sure I said that.  I could
7    have said some sort of a benchmark against
8    Treasuries, or tried to explain to some
9    extent what our objectives might me.
10       Actually, that's our annual
11   goal.
12   Q.    Correct to say that you told
13   those assembled that the fund did not use
14   any leverage?
15   A.   It's correct that it doesn't.  I
16   don't remember saying it.  I imagine I
17   did.
18   Q.    Correct to say that you,
19   Mr. Merkin, tried to exploit short-term
20   pricing discrepancies in the options
21   market?
22   A.   I'm sure I didn't say that
23   sentence the way it's written.
24   Q.    Correct to say you told those
25   assembled that proprietary computer-driven

78 (Pages 306 to 309)

CONFIDENTIAL                                          GCC-P 0494468

310

1        Merkin - Direct/Bamberger
2    models guide you and your team to
3    situations that are priced outside the
4    limits of the put/call parody
5    relationship?
6        A.   I am now entirely sure that I
7    never used the phrase put/call parody
8    relationship. I'm not sure it means, here
9    or otherwise. And I think it's probably a
10   summary done by whoever authored this
11   report, and, as you'll see, begins to get
12   things rather wrong.
13       Q.   Correct to say that you told
14   those at the meeting that each position is
15   hedged, so that there are maximum gains
16   and losses with each scenario but with
17   higher potential on the upside?
18       A.   Doubt it.
19       Q.   I'm sorry?
20       A.   I don't think that's the case, I
21   don't think I said that. I might have
22   talked about a strategy that talked about
23   hedging. But I'm not sure each position
24   is hedged. It's long past the point of
25   individual stocks and individual puts.

311

1        Merkin - Direct/Bamberger
2        So unless somebody said how did
3    this evolve, and maybe I talked about
4    that, and I certainly don't remember that
5    being the case. I certainly don't
6    remember talking about an individual
7    position.
8        Q.   But it is possible there could
9    have been some puffing going on at the
10   meeting? After all, America's built on
11   puffing; fair summary? We are all
12   salesmen to a greater or lesser extent, in
13   the end, aren't we?
14       A.   I'm not sure what your question
15   is. I'm not sure America is built on
16   puffing.
17       I think I would probably agree
18   with that. It's not something you
19   probably want to go too far down the line
20   with.
21       Q.   Is it correct that you said most
22   of the positions used listed options, so
23   for these there is no counterparty risk?
24       A.   My guess is that on that
25   sentence and the next one --

312

1        Merkin - Direct/Bamberger
2        Q.   Sir, please?
3        A.   -- the exact contrary is what I
4    might have said.
5        Q.   Ah. So some things he gets
6    right and some things he gets wrong?
7        A.   Most of the things he gets
8    wrong, and most of the things he mangles
9    rather badly. Not just gets wrong.
10       Q.   The minutes, you understand,
11   were approved by the entire committee,
12   correct?
13       MR. BAMBERGER:  Withdrawn.
14       A.   But the next sentence is a good
15   example of something that he gets mangled.
16       Q.   Sir, give me a chance.
17       Here's my question, sir:
18       Is it correct to say that you
19   told those at the meeting that about 15
20   percent of Ascot utilizes longer duration
21   options, or LEAPS, which you trade through
22   Bernie Madoff? In words or substance,
23   isn't it correct to say you did tell the
24   meeting that? Right?
25       A.   In words or substance, I did not

313

1        Merkin - Direct/Bamberger
2    tell the meeting that. I told the meeting
3    something entirely contrary to that.
4        There's four mistakes in that
5    one sentence.
6        We weren't doing LEAPS in any
7    big way. I probably told him we could do
8    as much as 10 or 15 percent of the fund
9    not through Bernie Madoff, the rest
10   through Bernie Madoff. And some examples
11   of what we might do, not through him,
12   might be LEAPS. It would be something we
13   would do not through him if we were going
14   to clear the LEAPS ourselves.
15       But it's precisely not the 15,
16   but the 85, that is mangled and not right.
17       The basic message was that
18   there's a self-clearing risk here, which
19   seems to have been retained in the last
20   sentence.
21       Q.   Is it correct to say at the
22   meeting that Ralph pointed out that there
23   was a higher level of risk on the portion
24   of the fund that is traded through
25   Mr. Madoff?

79  (Pages 310 to 313)

**VERITEXT REPORTING COMPANY**

(212) 279-9424            www.veritext.com            (212) 490-3430

CONFIDENTIAL                                                GCC-P 0494469

314

Merkin - Direct/Bamberger

1     A.    My assumption is that Ralph
2  wrote this memo, so he recorded himself
3  correctly.
4     Q.    And my question to you, sir --
5  okay.  You didn't take any notes at this
6  meeting.  You were presenting, correct?
7     A.    Correct.
8     Q.    Did you present with any written
9  materials at the meeting?
10    A.    I just don't remember.
11    Q.    The next paragraph -- do you
12  know who David Cornstein is?
13    A.    Well, his name appears as a
14  Board committee member of the New York Law
15  School Finance Committee meeting on the
16  top of the minutes of the page, so to that
17  extent I know who he is.
18    Q.    Is that the only time you met
19  David Cornstein?
20    A.    Could very well be.  I don't
21  remember.
22    Q.    Did you understand what he did
23  for a living?
24    A.    No.

315

Merkin - Direct/Bamberger

1     Q.    Did he ask you if Ascot utilizes
2  shorting techniques?  "Yes," "no," "I
3  don't recall."
4     A.    It looks like he did.  I don't
5  remember.
6     Q.    Did you tell them that you had
7  several implementation strategies, some of
8  which require shorting the underlying
9  equity if dictated by the prices of the
10  related put/call contracts?
11    A.    I don't know what that sentence
12  means.
13    Q.    Well, he says you said it.  Are
14  you saying you didn't say it?
15    A.    If you put quotes around that
16  sentence?
17    Q.    In sum or substance, yeah.  In
18  sum or substance --
19    A.    My guess is I might have said
20  something about shorting, meaning shorting
21  calls, is an important part of the
22  strategy.  So I don't know how that
23  becomes that (indicating).
24    Q.    Everybody understands what the

316

Merkin - Direct/Bamberger

1  calls are and what the underlying equity
2  is, right?  That's easy to understand,
3  correct?
4     A.    You would not be short the
5  underlying equity by being short the
6  calls.  You would be long the underlying
7  basket of stocks, long puts and short
8  calls.
9     Q.    So it is your testimony that you
10  could not possibly have said or suggested
11  anything remotely like the second sentence
12  of this paragraph, correct?
13    A.    I just don't remember -- I'm not
14  saying it's impossible I didn't say
15  anything like it.
16        I can't think of what that might
17  be as I sit here today.  I just don't
18  know.  I -- I just don't know what the
19  sentence refers to.
20        You're asking me to make sense
21  of it.  You're asking me to interpret it.
22  I don't know what it says.
23    Q.    I'm actually not trying to do
24  that.  I'm asking you if this is largely,

317

Merkin - Direct/Bamberger

1  in your recollection, an accurate
2  reflection of what you did or would have
3  said in this meeting on such an occasion
4  which, after all, wasn't so long ago.
5     A.    No.
6     Q.    Did you say that the fund can
7  make money in any type of market?  And
8  make the comment that's ascribed to you
9  there about the market price of puts and
10  calls?
11        (The witness reads document.)
12    A.    I might have said something
13  about the overvaluation of calls in bull
14  markets and puts in bear markets, and that
15  the overvaluation of the puts in bear
16  markets is higher than the overvaluation
17  of calls in bull markets.
18        But unless we have the right
19  positions on, we can't make any money in
20  any market.
21        It's a silly thing to say, it's
22  a silly thing to understand one as having
23  said.
24        You can't have the same

80  (Pages 314 to 317)

CONFIDENTIAL                                                      GCC-P 0494470

318

1       Merkin - Direct/Bamberger
2   positions and make money in any kind of
3   market.  It doesn't make any sense.
4       Q.   Well, actually the line is
5   remarkably similar to a statement made in
6   the Spring Mountain Capital note of a year
7   earlier, correct?  Remarkably similar
8   sentiment as expressed?
9       A.   I don't know what you're
10  referring to.
11      Q.   All right.  We'll look at it.
12      A.   Okay.
13      Q.   Did you say hundreds of trades
14  need to be implemented?
15      A.   I don't know what this refers
16  to.  I might have been referring to the
17  fact that if you hypothesize a certain
18  number of turns a year, and say a 50 -- 50
19  stocks in the basket, and then try to
20  calculate how many trades that becomes in
21  a given year, it would be hundreds and
22  hundreds.  It would be something closer to
23  a thousand, than hundreds.
24      Q.   Did you say that you only need
25  to be right approximately 22 percent of

319

1       Merkin - Direct/Bamberger
2   the trades in order to break even?
3       A.   I thought you referred to that
4   earlier in the day.  That's something that
5   I just can't imagine what I said that's
6   gotten mangled into this.
7            This is one that I think a
8   little bit kind of defies understanding.
9   Either the fellow went very fast when he
10  was writing stuff down -- very fast when
11  he was creating this memo and didn't
12  bother to understand it all.  But that one
13  just makes no sense.
14      Q.   Did Mr. Cornstein ask you why
15  your strategy was not exploited by others?
16      A.   He might have.  I don't remember
17  the specific question.
18      Q.   Did the people at this meeting
19  know that Ascot was formed in 1992 and had
20  been trading continuously since that time,
21  so that the remark that it never had a
22  negative calendar quarter went back to
23  sometime in late 1992?
24      A.   I don't remember if we had given
25  them the record going back to inception

320

1       Merkin - Direct/Bamberger
2   before the meeting or not.  If we did then
3   they would know that from the record, not
4   because it was necessarily said at the
5   meeting.
6       Q.   Wouldn't it be part of your
7   presentation?  Wouldn't you say that Ascot
8   was formed in 1992?
9       A.   I don't think I started by
10  saying Ascot was formed in 1992.  You
11  generally don't do these things
12  historically.  You generally explain what
13  you do.  In other words, you start with
14  the present.
15      Q.   When you said he said that you
16  say that you applied to the strategies not
17  scalable, did you do that?
18      A.   Just one second.  I lost my
19  place.
20           So I got past the 22 percent
21  comment, which I don't understand -- where
22  are -- this strategy is not scalable?
23           No.  My guess is that -- I don't
24  know what that comes from.  The question
25  on banks and competitors I think goes

321

1       Merkin - Direct/Bamberger
2   back, if it was asked, to the answer we
3   talked about before, which is you need to
4   be pretty big to get the flow.  And then
5   if you're the Street the which you think
6   of the Street, you end up with legal
7   restrictions and regulatory issues.
8   That's not scalable.
9       Q.   Sorry.
10           What does it mean for a strategy
11  not to be scalable?
12      A.   It means different things in
13  different contexts.
14           Broadly speaking, it means that
15  you can run $100 million in a strategy
16  efficiently and profitably, but may not be
17  able to run $500 million in that strategy.
18  Or it means you can run $500 million of
19  that strategy, or it means you can run $20
20  billion from that strategy and you may not
21  be able to run 40 or 50.
22      Q.   And that was certainly an issue
23  that you had for Mr. Madoff, right, sir?
24      A.   Scaling of his business?
25      Q.   Yes.

81  (Pages 318 to 321)

CONFIDENTIAL                                                    GCC-P 0494471

322

Merkin - Direct/Bamberger

1
2    A.    That's something that he and I
3    discussed as a light motif all the time.
4    Q.    That did worry you, right?
5    A.    Worry -- it was an issue for
6    anybody who had -- who was scaling up
7    assets.
8         It was an issue that was
9    prevalent in the money management industry
10   throughout a prolonged bull market.
11   Q.    At the meeting did you make any
12   commentary as to what percentage of your
13   personal family assets were invested in
14   Ascot?
15   A.    I think I might have.  I would
16   never have said 60 percent of the assets
17   come from my personal family assets.  Mr.
18   Sinscheimer had the audits.  The fund was
19   about a billion-7.  60 percent would be a
20   billion dollars.
21        There's not a chance that I
22   suggested that a billion dollars of family
23   money was in Ascot.  Not a chance.
24        If that is what Mr. Sinscheimer
25   understood, I would wonder why he thought

323

Merkin - Direct/Bamberger

1
2    I was coming to make a presentation for
3    what ended up as a $3 million investment
4    at a 1½ percent management fee if I had a
5    billion dollars of my own money in the
6    strategy.  This just doesn't make any
7    sense.
8         MR. BAMBERGER:  I move 64 into
9    evidence, please?
10        MR. LEVANDER:  I object.  This
11   witness didn't write this.  This is
12   loaded with errors.  Mr. Sinscheimer
13   is going to be called.  He's going to
14   testify that there are errors in that
15   document.  Let's wait until
16   Mr. Sinscheimer comes.
17        MR. BAMBERGER:  I withdraw my
18   request.
19        Everything that Mr. Levander
20   said is true.  Not the part about a
21   lot of errors, but that
22   Mr. Sinscheimer is going to come.
23   BY MR. BAMBERGER:
24   Q.    Okay, you can put that down.
25        Can you pick up Binder 1,

324

Merkin - Direct/Bamberger

1
2    please?
3    A.    Just one moment.
4         (The witness complies.)
5    Q.    I'd like to direct your
6    attention to Exhibit 1, please.
7    A.    Binder one is tab 1.
8    Q.    Binder 1, tab 1.
9    A.    Got it.
10   Q.    And if you could thumb through
11   the document.  Do you see that this is a
12   document that Mr. Straus signed on March
13   26, 1999 pursuant to which he invested $3
14   million into Ascot?
15        (The witness reviews document.)
16   A.    Yep, looks that way.
17   Q.    Okay.  And he lived in New
18   Jersey at the time, correct?
19   A.    I have to turn the page.
20        Yes.
21   Q.    Okay.  Now, on the first
22   paragraph of that document, there's a
23   reference in the bottom of that paragraph
24   to a confidential offering memorandum of
25   the partnership dated June 1998.

325

Merkin - Direct/Bamberger

1
2         Do you see that?
3         (The witness reads document.)
4    A.    Yes.
5    Q.    And this is in fact a document
6    to be used for transactions in Ascot
7    Partners, correct?
8    A.    Not as you said it, no.  It's
9    not used for transaction -- this is part
10   of a subscription agreement.
11   Q.    Right.
12   A.    Okay.
13   Q.    When a person invests $3 million
14   they have to sign a subscription
15   agreement, correct?
16   A.    Right.
17   Q.    Now, are you aware that your
18   counsel has not produced a confidential
19   offering memorandum of Ascot dated June
20   1998?
21   A.    No.
22   Q.    Okay.  Well, let me represent
23   that to be the case.
24        Do you have any explanation for
25   why that is?  Why an investor is signing a

82  (Pages 322 to 325)

CONFIDENTIAL                                                        GCC-P 0494472

**326**

1      Merkin - Direct/Bamberger
2   subscription agreement and making
3   reference to an offering memorandum that
4   no one has been able to find?
5      A.   Does -- does the person who
6   signed the subscription agreement have the
7   offering memorandum?
8      Q.   No.
9      A.   No.
10     Q.   Do you see in the first line it
11  says: "The undersigned is executing and
12  delivering this agreement in connection
13  with this subscription for an additional
14  limited partnership interest"?
15        Do you see that?
16     A.   I do.
17     Q.   That's inaccurate, correct?
18  This is Mr. Straus's first investment in
19  Ascot, correct?
20     A.   I don't know.  If you say so --
21     Q.   I'll represent that to be the
22  case.
23     A.   If you represent that to be the
24  case, then I'm sure you're right.
25     Q.   I'm representing to you he made

**327**

1      Merkin - Direct/Bamberger
2   his first investment effective as of April
3   1, 1999, and signed this and only this
4   document in connection with that
5   investment.
6        And my question is:
7        Why would he sign a form that
8   says that he's subscribing for an
9   additional limited partnership interest;
10  do you know?
11     A.   No.
12        MR. BAMBERGER: I move that
13  document into evidence.
14        MR. LEVANDER: No objection.
15        (Claimant's Exhibit 1, received
16     in evidence.)
17  BY MR. BAMBERGER:
18     Q.   Turning your attention to tab 2,
19  that's the investor questionnaire that
20  Mr. Straus would have completed at that
21  time?
22        (The witness reviews document.)
23     A.   Just one moment.
24     Q.   Directing you to pages 10 and 11
25  in particular.

**328**

1      Merkin - Direct/Bamberger
2      A.   Let's see...
3        Looks that way.
4      Q.   By this time were you chairman
5   of the investment committee at Yeshiva
6   University?
7      A.   When was this time?
8      Q.   By April 1 of 1999.
9      A.   I think so.
10     Q.   And were you a member of the
11  Board of Trustees of Yeshiva University by
12  that date?
13     A.   I don't think so.
14     Q.   How did you become Chairman of
15  the investment committee of Yeshiva
16  University?
17     A.   Several members of the
18  investment committee asked me to become
19  the chairman.
20        MR. BAMBERGER: I move this
21  document into evidence at this time.
22        MR. LEVANDER: No objection.
23        (Claimant's Exhibit 2, received
24     in evidence.)
25  BY MR. BAMBERGER:

**329**

1      Merkin - Direct/Bamberger
2      Q.   Directing your attention to the
3   third document, tab 3.
4        (The witness complies.)
5      Q.   I represent to you that this is
6   a form of limited partnership agreement of
7   Ascot dated as of November 6 of 1999.
8        Do you see that?
9      A.   No.
10     Q.   The bottom of tab 3.  The first
11  page.
12     A.   It's 1992, not 1999.
13     Q.   Excuse me, '92.
14        Was this the first limited
15  partnership agreement of Ascot?
16     A.   I think so.
17     Q.   And this document provides that
18  you will use your best efforts to manage
19  the affairs of the partnership, correct?
20     A.   I wouldn't be surprised if it
21  said that.  I'm just -- if you'll turn me
22  to a page, a provision.
23     Q.   Paragraph 7 on page 14.
24     A.   Page 14.  Paragraph 7?
25     Q.   .01.

83  (Pages 326 to 329)

**VERITEXT REPORTING COMPANY**
(212) 279-9424        www.veritext.com        (212) 490-3430

CONFIDENTIAL        GCC-P 0494473

330

1      Merkin - Direct/Bamberger
2         (The witness reads document.)
3    A.   Yes, it says that.
4    Q.   You understood that was an
5  obligation over and above a normal
6  contractual good faith obligation; that
7  that implies that you need to use the best
8  efforts to your personal capability in
9  managing the affairs of this partnership,
10  correct?
11    A.   I'm not sure that I knew at that
12  time or remember today that I knew at that
13  time a distinction between a best efforts
14  obligation and however you described the
15  other one.
16    Q.   Turning your attention to
17  "Liability of General Partners," 7.04, on
18  page 16.
19         (The witness complies.)
20    A.   7.04.
21    Q.   Yes. 7.04 on page 16.
22    A.   I got it.
23    Q.   This limitation says that you
24  won't be responsible for "acts or
25  omissions unless due to bad faith, gross

331

1      Merkin - Direct/Bamberger
2  negligence, recklessness, fraud or
3  intentional misconduct," correct?
4    A.   Yes.
5    Q.   In your understanding, when you
6  proposed this document to investors you
7  were lining up those five exceptions in
8  terms of relative mens rea; from the least
9  culpable to the most culpable, true?
10    A.   As I sit here today, I don't
11  remember if that's what I thought 20 years
12  ago. And I'd be surprised if I did.
13         Because I think I hear that
14  suggestion of five in a row with ascending
15  something, or descending something, for
16  the first time.
17    Q.   So certainly you'll grant me
18  that gross negligence is not the only
19  thing you're responsible for; other things
20  include bad faith and recklessness,
21  correct?
22    A.   Intentional misconduct is
23  covered. What I think isn't covered, what
24  is specifically exculpated, is negligence.
25    Q.   Certain terms were used. "Gross

332

1      Merkin - Direct/Bamberger
2  negligence" and "recklessness" are the two
3  different terms, correct?
4    A.   We just got done saying five
5  different terms were used. So it's not
6  two.
7    Q.   Your offices were at 455 Park
8  Avenue by this time, correct?
9    A.   '92, I would think so.
10         MR. BAMBERGER: I move this
11  document into evidence at this time.
12         MR. LEVANDER: No objection.
13         (Claimant's Exhibit 3, received
14  in evidence.)
15  BY MR. BAMBERGER:
16    Q.   Turn your attention to tab 4.
17         (The witness complies.)
18    A.   Page 4.
19         MR. LEVANDER: Tab 4.
20    A.   Tab 4.
21    A.   I got it.
22    Q.   This is an amended and restated
23  LPA of Ascot?
24    A.   Yes.
25    Q.   Why did you issue this?

333

1      Merkin - Direct/Bamberger
2    A.   I don't remember the specific
3  legal issues or change in regulatory
4  latticework that may have caused counsel
5  to advise us to issue new documents, and
6  there may have been change -- I just don't
7  remember.
8    Q.   Forgetting all the latticework,
9  is it at this time you increased your fee,
10  so you needed to enter into a new
11  partnership agreement with your partners?
12    A.   That might have been it.
13    Q.   Now, when you issued this, you
14  didn't issue a new, fresh offering
15  memorandum, correct, when you sent this
16  around to your limited partners? You
17  didn't issue a revised offering memorandum
18  to existing investors, correct?
19    A.   I'm not sure that's correct.
20    Q.   Well, why would you send an
21  offering memorandum to all of your
22  existing investors if they haven't shown
23  an interest in making a new investment and
24  you're not soliciting them for more funds?
25  Why would you send them an offering

84 (Pages 330 to 333)

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL

GCC-P 0494474

334

1        Merkin - Direct/Bamberger
2    memorandum?
3        A.   I would have done so if that's
4    what legal counsel advised, and I might
5    have done so if there was a change in the
6    fee structure.
7        Q.   You think it would be necessary
8    to send an offering memorandum if there is
9    a change in the fee structure?
10       A.   If that's what legal counsel
11   advised, that's what I would have done.
12       Q.   You're aware, are you not, that
13   you did send a letter to all Ascot
14   investors advising them of the proposed
15   fee structure and advising them that they
16   had the right to exit, correct?
17       A.   Correct.
18       Q.   If you sent them that letter,
19   you wouldn't also send them an offering
20   memorandum, correct?
21       A.   I'm not sure.  If legal counsel
22   said send them an offering memorandum, we
23   would have drafted up an offering
24   memorandum and sent it to them.
25          I don't know that they did.  I

335

1        Merkin - Direct/Bamberger
2    am just saying, I would have done it on
3    the advice of a lawyer.
4        Q.   Your counsel was Schulte at that
5    time, right?
6        A.   Yes.
7           MR. BAMBERGER:  I move this
8    document into evidence as Number 4.
9           MR. LEVANDER:  No objection.
10          (Claimant's Exhibit 4, received
11   in evidence.)
12   BY MR. BAMBERGER:
13       Q.   Turning your attention to tab 5.
14   That's the second amended LPA.
15          Do you have any recollection of
16   why this document was prepared?
17       A.   This document I think was
18   prepared because we made a change or we
19   were seeking approval for a change that I
20   would think of as rather more material
21   than the change in the fee structure,
22   which is the lockup was being extended
23   very considerably in response to proposed
24   changes by the Securities and Exchange
25   Commission in terms of who did or didn't

336

1        Merkin - Direct/Bamberger
2    need -- or what kind of partnership needed
3    to register.
4        Q.   And that was only for new
5    investors, correct?  That would be subject
6    to the longer lockup.  Prior investors
7    would be grandfathered, correct?
8        A.   The simple truth of the matter
9    is that in the event it didn't work out
10   that way.  So I don't know what I was
11   thinking for a four-month period.  You may
12   recall that the SEC lost the case in
13   Washington.  And the steps we took in
14   April of 2006 we untook.
15       Q.   Right.  That was the Goldstein
16   case, correct?
17       A.   Yes.
18       Q.   And the Court found that the SEC
19   exceeded its powers by imposing this
20   two-year requirement?
21       A.   Correct.
22          MR. BAMBERGER:  I move Number 5
23   into evidence, please.
24          MR. LEVANDER:  No objection.
25          (Claimant's Exhibit 5, received

337

1        Merkin - Direct/Bamberger
2    in evidence.)
3    BY MR. BAMBERGER:
4        Q.   And Number 6 -- you just
5    referenced that Federal case.
6           Number 6 was issued as a result
7    of that Federal case?
8        A.   Yeah.  I mean, we had gotten
9    people's agreement.  We didn't feel we
10   needed to hold their money that long given
11   the liquidity of Ascot, so I undid the
12   steps that we had taken -- I undid in the
13   fall steps we had taken in the spring.
14       Q.   And you went back to a one-year
15   lockup?
16       A.   I think it was a one-year
17   lockup.
18       Q.   With Gabriel you never used a
19   high water mark concept, did you?
20       A.   Too many double negatives.
21          The answer is we did.  The
22   answer to the question is we did.
23       Q.   You did use a high watermark for
24   Gabriel?
25       A.   Yes, we had a down year and we

85  (Pages 334 to 337)

CONFIDENTIAL                                                          GCC-P 0494475

338

1       Merkin - Direct/Bamberger
2    said we could take the incentive fee only
3    above the high watermark.
4       Should I explain that?
5    Q.    No.
6    A.    Okay.
7    Q.    In 2006 did Gabriel still use a
8    high watermark?
9    A.    I would assume so, but I just
10   don't remember sitting here. I think the
11   high watermark was one that we said we
12   would accept.
13       We had had one down year
14   subsequent to that. We said we would
15   accept a high watermark; wrote that to all
16   the investors near the fourth quarter that
17   year. And, of course, used it and, you
18   know -- used it in terms of calculating
19   any relevant fees.
20       Don't know whether it made its
21   way into the document or not.
22       MR. BAMBERGER: I move 6 into
23   evidence.
24   A.    We had very little applicable to
25   Ascot. There was no incentive fee.

339

1       Merkin - Direct/Bamberger
2       MR. LEVANDER: No objection.
3       (Claimant's Exhibit 6, received
4    in evidence.)
5    BY MR. BAMBERGER:
6    Q.    Turning to tab 7 for ID, this is
7    an offering memorandum for Ascot, correct?
8    A.    I'm just a half a step behind
9    you. 7.
10       This is an offering memorandum
11   of February of '96. So... you're going
12   backwards in time.
13   Q.    Sorry. February of 1996.
14   That's a couple of years before Moshael
15   invested. But as far as we know, Ascot
16   didn't issue another offering memorandum
17   until December of 2002.
18       As far as your lawyers can find
19   in your files the offering memorandum that
20   you were using for Ascot for about six and
21   a half years was the February 1996
22   offering memorandum, correct?
23   A.    If that's what our lawyers have
24   told you, then I'm sure it's right.
25   Q.    That's what people have found,

340

1       Merkin - Direct/Bamberger
2    is what I'm representing.
3    A.    I don't challenge that at all.
4       MR. BAMBERGER: I move 7 into
5    evidence.
6       MR. LEVANDER: No objection.
7       (Claimant's Exhibit 7, received
8    in evidence.)
9    BY MR. BAMBERGER:
10   Q.    Turning your attention to
11   "Investment Approach" at page 5.
12   A.    We're still in tab 7?
13   Q.    Yes.
14   A.    Okay, sorry.
15   Q.    You chose to make a disclosure
16   about your investment approach, correct?
17   A.    Yes.
18   Q.    All right. Now, it's not true
19   that as of 1996 or '97, or '98, '99, 2000
20   or 2001, that Ascot was engaged in
21   convertible arbitrage; true?
22   A.    I didn't catch all of those
23   years, but I believe that is true.
24   Q.    Also true that you make a
25   distinction between index arbitrage and

341

1       Merkin - Direct/Bamberger
2    options arbitrage, correct?
3    A.    I'm not sure I make a
4    distinction between them, I think they are
5    very related things.
6    Q.    You say Ascot engaged primarily
7    in index arbitrage, correct?
8    A.    Just give me one moment. Let me
9    look at this thing.
10       (The witness reviews document.)
11   A.    Yes.
12   Q.    In fact, on the top of 7 you
13   say, under "Risk Factors," "The principal
14   activity of the partnership will be index
15   arbitrage and investments in other
16   securities."
17       Do you see that?
18   A.    Yes.
19   Q.    So a reasonable reader would
20   take that to mean you do more index
21   arbitrage and you do some options
22   arbitrage, understanding those to be two
23   different things, correct?
24   A.    I thought I just said that I
25   wasn't sure those are two different

86 (Pages 338 to 341)

CONFIDENTIAL                                                          GCC-P 0494476

342

1        Merkin - Direct/Bamberger
2    things. You can do arbitrage index
3    through the use of options.
4        Q.    Sir, in the next sentence you
5    make the clearest of declarative
6    statements that "These strategies are used
7    to take advantage of price disparities
8    among related securities."
9            Do you see that?
10        A.    What page are you on?
11        Q.    Page 5.
12        A.    I was on page 7. Are you back
13    on page 5?
14        Q.    I am.
15        A.    Okay.
16        Q.    You say all the strategies
17    you're doing are being used to take
18    advantage of price disparities among
19    related securities, right?
20        A.    Uh-hum.
21        Q.    You're not engaged in the
22    strategies in hopes the market's going to
23    go up?
24        A.    Insofar as this sentence is
25    concerned?

343

1        Merkin - Direct/Bamberger
2        Q.    Right.
3        A.    This sentence described what I
4    would say is an arbitrage strategy.
5            You're trying to arbitrage price
6    disparities, not between identical
7    securities -- which is how you presented
8    arbitrage only several hours ago -- but
9    among related securities things that
10    convert from one to the other, which is
11    why we might have had an interest in
12    convertible arbitrage, or things that are
13    struck against each other, which we have
14    an interest in options that struck on
15    stocks, because at some point we are
16    arbitraging price disparities between the
17    underlying security and the thing that is
18    struck against it, or, way back when,
19    converted.
20        Q.    Could you look at the next
21    sentence, please, and read the entire next
22    sentence to yourself.
23        A.    The one that begins "With the
24    partnership..."?
25        Q.    Yes.

344

1        Merkin - Direct/Bamberger
2            (The witness reads document.)
3        Q.    Do you contend that what
4    Mr. Madoff was doing falls into any of
5    those categories in that sentence?
6        A.    Highly, highly unlikely. Unless
7    his business evolved to those.
8            But I'd say basically, no.
9        Q.    Okay. So the reader of these
10    clauses so far would understand two
11    things:
12            One, that your partnership
13    engages in certain activities, and that
14    you may also make investments in other
15    investment entities, but so far as you
16    know those other investment entities do
17    not include Mr. Madoff.
18            Correct?
19            (The witness reads document.)
20        A.    I think you went a little bit
21    too far.
22            We reserve the right to make
23    many kinds of different investments
24    precisely because we weren't tethered to
25    one strategy.

345

1        Merkin - Direct/Bamberger
2        Q.    But the intent of these
3    sentences is to say that the partnership
4    does certain things, and we may also place
5    money with others to do similar things.
6            Correct?
7        A.    I don't know about the "similar"
8    part.
9        Q.    "Similar" is your word, sir.
10    "Which engage in similar investment
11    strategies."
12            The word "similar" there would
13    have to be similar to what we've already
14    described the partnership itself does?
15        A.    No. Certainly not. If you give
16    me a moment, I'll read it again. I don't
17    think that's what that sentence says.
18        Q.    When it speaks of "similar
19    strategies" in that sentence, similar to
20    what?
21            (The witness reads document.)
22        A.    Including investments in funds,
23    partnerships -- I'm sorry --
24        Q.    I don't need it read to me, sir.
25        A.    Investments in mutual funds,

87 (Pages 342 to 345)

CONFIDENTIAL

GCC-P 0494477

346

1        Merkin - Direct/Bamberger
2   private partnerships, closed-end funds and
3   other pooled vehicles which engage in
4   investment strategies similar to the ones
5   that we might benefit from if we invested
6   in funds, private investment partnerships
7   or closed-end funds.
8        This refers to similar
9   strategies in a different structure.
10   Q.   By this time substantially all
11   capital placed with Ascot for investment
12   was being transferred to Mr. Madoff's
13   accounts, correct?
14        Accounts of Ascot being
15   maintained at the Madoff firm, correct?
16   Substantially all?
17   A.   You asked me too many questions.
18   I don't follow you.
19   Q.   To simplify it, by this time
20   Mr. Madoff was managing substantially all
21   of Ascot's portfolio, correct?
22   A.   This is February of '96?
23   Q.   Correct.
24   A.   Yes.
25   Q.   And you agree that in this

347

1        Merkin - Direct/Bamberger
2   memorandum Mr. Madoff is not mentioned in
3   any capacity, there's just no reference to
4   him at all?
5   A.   I believe that's true.  Okay.
6   The strategy is described -- the strategy
7   is described as the principal strategy --
8   Q.   Sir, it's not necessary for you
9   to comment.  Let me ask the simplest
10   question I can and you give the simplest
11   answer you can.  We should both be better
12   at it.
13        In the sentence, when the
14   partnership engages in directing
15   investments in other investment entities,
16   from what I heard you just say, that does
17   not mean Mr. Madoff because Mr. Madoff is
18   not one of those other defined investment
19   entities; true?
20   A.   I don't understand your
21   question.
22   Q.   You just said that it is very,
23   very unlikely that Mr. Madoff falls within
24   the defined term "other investment
25   strategies" in the first paragraph of this

348

1        Merkin - Direct/Bamberger
2   disclosure, correct?
3   A.   You pointed to "similar
4   investment strategies"?
5   Q.   Sir, I ask you to listen to me.
6        You gave an answer that said
7   very unlikely that Mr. Madoff is subsumed
8   within, falls within, the defined term
9   "other investment entities" in the first
10   full paragraph under "Investment
11   Approach."  Correct?
12        (The witness reads document.)
13   A.   Correct.
14   Q.   So all of these things that
15   Mr. Levander talked about, when the
16   partnership engages, none of that has to
17   even do with Mr. Madoff; true?
18   A.   I just don't follow.  All other
19   things -- just direct me, focus me.
20   Q.   That's an answer.  I tried to
21   focus you.
22   A.   You want to try again?
23   Q.   No.
24   A.   Okay.  When you say Mr. Levander
25   talks about, I don't know what you're

349

1        Merkin - Direct/Bamberger
2   referring to.
3   Q.   Turn to the top of page 6.  It
4   says that "the managing partner intends,
5   to the extent circumstances permit, to
6   adopt a selective approach in evaluating
7   potential investment situations, generally
8   concentrating on relatively fewer
9   transactions that he can follow more
10   closely."
11        Right?
12   A.   That's what it says.
13   Q.   That bears no correspondence
14   whatsoever to what Mr. Madoff is doing,
15   correct?  He's investing in lots of
16   companies, coming in and out of the market
17   all the time.
18        You're not really concentrating
19   on anything with respect to that, are you?
20   A.   Too long a question.
21        This is exactly perhaps what we
22   were looking for.  This says that we are
23   going to concentrate on a strategy.
24   Q.   All right.  And then on 7 you
25   begin to talk about risk factors, correct?

88  (Pages 346 to 349)

CONFIDENTIAL                                                    GCC-P 0494478

350

1      Merkin - Direct/Bamberger
2      A.   Yes.  We addressed that
3  paragraph before, I think.
4      Q.   All right.  Correct.
5          By the way, when you served on
6  the faculty of the Benjamin N. Cardozo Law
7  School, that's right on top of that place,
8  that's 11 years you were there, on the
9  faculty?
10     A.   Sounds right.
11     Q.   That's a school of Yeshiva
12  University?
13     A.   That is the law school of
14  Yeshiva University.
15     Q.   What did you do on the faculty?
16     A.   Taught a number of different
17  classes.  For one, I think I taught -- at
18  one point I think I took over and taught
19  some first-year contracts classes, and
20  taught some topics that related to either
21  security -- I'm sorry, corporate finance,
22  negotiating, and very elementary
23  structuring of documents.
24     Q.   Okay.  The discussion about
25  options transactions that appears on 7, is

351

1      Merkin - Direct/Bamberger
2  that intended to be a reference to
3  Mr. Madoff's activities?
4      A.   I'll tell you in a moment.
5          (The witness reads document.)
6      A.   It might be -- you're talking
7  about just the first paragraph?
8      Q.   Yes.
9      A.   In part, yes.
10     Q.   So are you telling the world you
11  were using options for both arbitrage and
12  hedging, two different purposes?
13         (The witness reads document.)
14     A.   Sure.  That's exactly what you
15  use options for.
16     Q.   All right.
17     A.   You hedge losses and you
18  arbitrage the things that those options
19  are struck against.
20         That's why in the same paragraph
21  you talk about the use of options, for
22  example, in risk arbitrage and merger
23  arbitrage, because at the end of the day
24  you can't lose more than you put up for
25  the cost of the call.

352

1      Merkin - Direct/Bamberger
2      Q.   Okay.  Neither of us needs to
3  repeat himself.
4          Is there any reason why this
5  paragraph speaks only of stock options on
6  a registered option exchange, and doesn't
7  mention OTC options?
8      A.   I'm -- I just don't remember the
9  conversations that resulted in this
10  particular sentence.
11     Q.   Okay.  By this time Mr. Madoff
12  certainly was not buying and selling stock
13  options, correct?  He was selling index
14  options, buying and selling index options,
15  correct?
16     A.   "By this time" is '96?
17     Q.   Yes.
18     A.   I just forgot.  Let me look at
19  the page.  Yes, this is '96.
20         Yes.  I think that's correct.
21     Q.   The reference below that says
22  "arbitrage transactions."  That's a
23  reference to merger arbitrage?
24     A.   I think that's correct.
25     Q.   And then later in the document

353

1      Merkin - Direct/Bamberger
2  you talk about possible investments in
3  bankruptcy situations, other transactions,
4  proxy contests, maybe we'll buy some
5  commodities, maybe we'll do some short
6  selling.
7          Do you see that?
8      A.   I'm getting there as I turn the
9  page.
10     Q.   You're putting the reader on
11  notice that you're considering all of
12  those things, right?
13     A.   Yes.
14     Q.   Why didn't you just tell the
15  reader what you actually were doing was
16  that substantially all the assets were
17  with Bernie Madoff, just like Fairfield
18  Sentry had disclosed?
19     A.   Because we didn't want to be
20  Fairfield Sentry.
21     Q.   Why didn't you just be clear
22  with people, this is what we're doing
23  today and we reserve the right to change
24  it tomorrow, in whole or in part --
25     A.   Okay.  So --

89  (Pages 350 to 353)

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                                    GCC-P 0494479

354

```
 1        Merkin - Direct/Bamberger
 2     Q.   -- but you should know how we're
 3   doing this?
 4     A.   -- we told the reader what the
 5   primary strategy was.  We described the
 6   primary strategy.  We told the reader we
 7   were using third parties.  We told the
 8   reader all of it could be one-third party.
 9     Q.   Did you tell the reader you
10   could put it with one-third party?
11     A.   I believe so.
12     Q.   Show me where.
13     A.   Let me take a minute and finish
14   my sentence.
15        We told the reader there was
16   custodial risk that was connected with one
17   or other third party.
18     Q.   The more assets you put with
19   somebody the greater custodial risk you
20   were taking, isn't that right, sir?
21     A.   Well, at the end of the year,
22   you put 100 percent of your assets
23   someplace --
24     Q.   Right.  But there's the 10
25   percent rule --
```

355

```
 1        Merkin - Direct/Bamberger
 2     A.   -- so there's custodial risk
 3   where you put assets.
 4     Q.   That's why you don't put all of
 5   your eggs in one basket; because a guy may
 6   abscond with your basket?
 7     A.   I'm not sure what you're saying.
 8     Q.   Isn't it true by the late '90s,
 9   that there were increasing amounts of
10   attention paid in the hedge fund world to
11   the need to do due diligence and the need
12   to be alert to Ponzi schemes?
13     A.   Will you just remind me, for
14   purposes of answering your question,
15   roughly when the Bayou scandal was, if you
16   know the answer?
17     Q.   2005.  When he goes off the
18   bridge and says he is committing suicide.
19     A.   When is that?
20     Q.   2005.
21     A.   So it's not the late nineties.
22     Q.   From the late nineties to 2005
23   there's increasing attention paid in the
24   hedge fund industry to formalizing due
25   diligence, doing it more aggressively and
```

356

```
 1        Merkin - Direct/Bamberger
 2   recognizing that a Ponzi scheme is an
 3   omnipresent risk?
 4     A.   I'm not aware of any sharp
 5   increase in that trend in that period of
 6   time.
 7     Q.   Sir, turn to the bottom of 10,
 8   please.
 9        Do you see the caption for the
10   bottom-most paragraphs, "Independent Money
11   Managers"?
12     A.   Uh-hum.
13     Q.   I haven't added it up, but is it
14   correct to say that every time there's a
15   reference to a third-party it's always to
16   "independent money managers," always using
17   an "s," maybe 10 or 12 times in that
18   paragraph?
19     A.   I haven't totalled it up.  But
20   this certainly doesn't suggest that we
21   have to use money managers.  It says we
22   may.
23     Q.   Well, it says "we may put all or
24   a portion of your money with others."
25        So it could have easily said,
```

357

```
 1        Merkin - Direct/Bamberger
 2   with one or more independent money
 3   managers, right?
 4     A.   You just said all or a portion
 5   with a money manager.
 6     Q.   All other things being equal, if
 7   you put your money with two money managers
 8   rather than one, you'll do 50 percent
 9   better -- assuming there's a Ponzi scheme,
10   you'll do 50 percent better if only you
11   put your money with two different
12   managers, rather than one?  That would be
13   a very simple way to hedge your portfolio
14   against the risk of a Ponzi scheme; true?
15     A.   That's not what you're looking
16   for when you hedge your portfolio.
17        The answer to your question is
18   consider what happened in the fall of
19   2008.  If you had two managers, you were
20   concerned about strictly Ponzi risk --
21   that's the only reason, the only factor
22   using and allocating your portfolio -- you
23   gave money to any money manager that
24   cleared Lehman, and had money with Madoff.
25     Q.   This time when you used the
```

90 (Pages 354 to 357)

CONFIDENTIAL

GCC-P 0494480

358

1    Merkin - Direct/Bamberger
2   phrase "other investment entities," you
3   used it as a defined term, did you mean it
4   the same way you meant it the first time?
5   It seems to me you've defined it twice and
6   differently.
7        A.   I would have to spend a few
8   minutes to read both of these and try to
9   get an answer to your question.
10       Q.   But do you recognize in that
11  paragraph that a risk of placing your
12  money any time you deal with others is the
13  risk associated with lack of custody?
14  That is something you --
15       A.   You went too fast.  I didn't
16  hear you.
17       MR. BAMBERGER:  Withdrawn.
18       A.   I think that paragraph discusses
19  risk of loss with funds invested with
20  another money manager.  And it's not
21  insured.  And the investor is liable for
22  the risk of loss.
23       Q.   Would you agree with me, sir,
24  that, in general, that this offering
25  memorandum gives the impression that

359

1    Merkin - Direct/Bamberger
2   you're doing one thing principally --
3   namely, index arbitrage -- and that you're
4   reserving the right to do many other
5   different things?
6        A.   You asked me what I think this
7   document gives the impression?
8        Q.   Yes.
9        A.   This document gives the
10  impression that we had a principal
11  strategy that is described that we have
12  the right to use only one outside manager;
13  we have the right to use a number of
14  outside managers, we can have it all in
15  one place; there's custody risk; there's
16  third-party risk; that we're not
17  necessarily managing the money; and that
18  we're supervising the portfolio and making
19  allocation decisions.
20       Q.   You would agree with me that
21  nowhere does this offering memorandum
22  disclose, as Fairfield Sentry was doing by
23  '93, '94, '95, that this is our precise
24  strategy:  We buy stocks; we try to
25  achieve a long/short bias; we buy puts to

360

1    Merkin - Direct/Bamberger
2   protect the position; we sell calls to
3   finance in part the sale of the puts?
4        There's none of that discussion
5   in the '96 offering memorandum, correct?
6        A.   I don't know where the Fairfield
7   discussion comes from, but if it's after
8   the trading directive, you're right.  And
9   I'm not sure it accurately describes
10  options.
11       We weren't Fairfield.  We didn't
12  want a Fairfield document.  We weren't
13  taking Fairfield fees.  Fairfield, for its
14  good and well reasons, was taking, I
15  believe, an incentive fee.
16       We were taking a management fee
17  and trying to convey to the investor that
18  that's what we think we deserve because
19  the strategies were basically allocating
20  money out.
21       Q.   Well, the reason you only
22  charged a management fee is because the
23  profits were not expected to be terribly
24  big.  You were regularly underperforming
25  the S&P 500, but you were making money

361

1    Merkin - Direct/Bamberger
2   each and every quarter; and, therefore, it
3   was safe an investment, and the limited
4   fee would attract those people who were
5   trying to be safe with their money?  That
6   was the true reason?
7        A.   I don't think so.  I think if
8   you recognized that it was the case that
9   we underperformed the S&P, then you would
10  recognize it was just basically a lower
11  correlation strategy.  And that's what we
12  were looking for.
13       Lower returns, lower volatility
14  and higher liquidity.
15       Q.   But by 2000 you certainly
16  greatly outperformed the S&P 500, correct?
17       A.   It all depends on point in time.
18  A moment ago you said we didn't.
19       Q.   Come rain or shine, whether the
20  S&P was down 10 percent, 20 percent, Ascot
21  Partners remained the same?  And we'll
22  look at the exact numbers when we're
23  fresh.  But that was the story?
24       A.   I keep thinking, it's a lower
25  correlation strategy.  If the S&P was up

91 (Pages 358 to 361)

CONFIDENTIAL     GCC-P 0494481

362

1      Merkin - Direct/Bamberger
2    40, we were so widely ope -- you know,
3    wildly left in the dust by the S&P that we
4    could be choking on it.
5        Q.   Right.
6        A.   You have it several different
7    ways.  And you can't have it several
8    different ways.
9        Q.   Well, it's actually you that
10   wants it several different ways; isn't it,
11   sir?
12       A.   I would say strongly to the
13   contrary.
14           MR. BAMBERGER:  I move 7 into
15   evidence.
16           MR. LEVANDER:  No objection.
17   BY MR. BAMBERGER:
18       Q.   Turning your attention to 8 --
19       A.   Yes, sir.
20       Q.   -- Tab 8.  Is it correct to say
21   this offering memorandum is quite similar
22   to the 1996 offering memorandum, but it
23   was issued at the time that you were
24   increasing your fee and you were
25   re-soliciting and using a new LPA,

363

1      Merkin - Direct/Bamberger
2    correct?
3        A.   So you suggested before.
4           And if you think that's right,
5    that's fine with me.
6        Q.   Okay, thank you.
7           One difference is on page 12.
8    Did you look there?  "Other Risk Factors"?
9        A.   This is page 12 of tab 8, right?
10       Q.   Correct.
11       A.   Okay.  "Risk Factors" on page
12   12?
13       Q.   We are in the "Risk Factors"
14   section --
15       A.   Okay.
16       Q.   -- and I would like to draw
17   your attention to the risk factor that
18   begins, "Depending on the managing
19   partner..."
20           Do you see that, sir?
21       A.   Just on the very bottom there?
22       Q.   Yes.
23       A.   Okay.
24       Q.   That's you, correct?
25       A.   Yes.

364

1      Merkin - Direct/Bamberger
2        Q.   You're saying there that, in the
3    present tense, that all decisions with
4    respect to the management of the capital
5    of the partnership are made exclusively by
6    you?  That's what it says, right?  That's
7    present tense.
8        A.   It's in the present tense.
9        Q.   And in other places where you
10   talk about third-party managers you say
11   you may do this, you may do that, but this
12   is what's happening.
13           And at the bottom of 12 you say
14   I'm making the decisions with the
15   management of the capital, right?
16       A.   No.  It depends on the managing
17   partner is a risk factor.
18           This is a little bit akin to
19   that sentence you showed me before in
20   connection with Madoff and the list of
21   four or five people at another fund.  That
22   might have been the Fairfield.
23           At the end of the day the
24   decisions are mine.  I have to allocate
25   the capital.  And that's what I did.

365

1      Merkin - Direct/Bamberger
2        Q.   Right.  Or allocate it and not
3    take it back.
4           I think we had in the other
5    case, each day you decided not to take it
6    back, right?
7        A.   You totally lost me.
8           MR. BAMBERGER:  Withdrawn.
9        Q.   I don't want to be unfair, but
10   you said in the last arbitration one of
11   the reasons you felt you earned the
12   management fee was that you effectively
13   decided each and every day not to take the
14   money away from Mr. Madoff?
15       A.   No.  That was not what I said
16   just now.
17           I was referring to a
18   conversation that we had earlier today in
19   one of these looseleaf books in connection
20   with a Fairfield document.
21           I don't know what you're
22   referring to about another arbitration.
23       Q.   On the top of 13 you write,
24   "Consequently, the partnership's success
25   depends to a great degree on the skill and

92 (Pages 362 to 365)

CONFIDENTIAL                                                              GCC-P 0494482

366

1          Merkin - Direct/Bamberger
2    experience of Mr. Merkin."
3          Do you see that?
4       A.   I do.
5       Q.   Do you think it's really a fair
6    disclosure, having told people that the
7    partnership is dependent upon you -- and
8    now we're in 2002, so you have been
9    conducting business exactly the same way
10   for ten years -- not to at least mention
11   Mr. Madoff, that he is also kind of
12   important to this venture?
13      A.   But, again, we make it as clear
14   as possible -- you have --
15      Q.   I'm asking from the heart, sir.
16   Do you really think that's a fair --
17      A.   We made it as clear as possible
18   that we were using independent money
19   managers.  We said that.  We said what the
20   primary strategy was.  We said that there
21   was going to be risk of everything being
22   in one place.  We said that there was
23   going to be custody risk and we said that
24   at the end of the day we're not
25   guaranteeing the custody risk.  That's

367

1          Merkin - Direct/Bamberger
2    what we said.
3       Q.   Did you consider disclosing
4    Mr. Madoff in this offering memorandum and
5    decided not to do it?
6       A.   I don't remember any specific
7    conversations today about what we didn't
8    think or did think of doing prior to
9    December of 2002 when we issued this.
10         MR. BAMBERGER:  I move the
11   document into evidence.
12         MR. LEVANDER:  No objection.
13         (Claimant's Exhibit 8, received
14   in evidence.)
15   BY MR. BAMBERGER:
16      Q.   Can you turn you tab 9, please.
17         This appears to be an offering
18   memorandum of Ascot Partners dated October
19   of 2006; is that correct?
20      A.   Yes.
21      Q.   Okay.  This is a more
22   professional and longer-looking document,
23   correct?
24      A.   I guess it was done by the exact
25   same law firm.  I'm not sure how more

368

1          Merkin - Direct/Bamberger
2    professional it could have been.  I just
3    don't remember.
4       Q.   Well, it had certain terms,
5    where the other ones didn't?
6       A.   Okay.
7       Q.   You had prepared a similar
8    memorandum in March of 2006; is that
9    right?
10         This is during that regulatory
11   period that we talked about.
12      A.   I think so -- I don't see it.  I
13   mean, you may have it in a separate tab.
14         Did we go by it and I didn't
15   notice it.
16         This would be the second of
17   those two.
18      Q.   All right.  Now, here, under
19   page 392 --
20      A.   Just one moment.
21      Q.   -- the summary under "Investment
22   Program," you have the same statement
23   about engaging in arbitrage, although you
24   limit it to index and options.
25         You're no longer mentioning

369

1          Merkin - Direct/Bamberger
2    convertible arbitrage.  You throw that
3    out.  But you do say that the strategies
4    are used to take advantage of price
5    disparities among related securities,
6    correct?
7       A.   Yes.
8       Q.   Then there's a break, and it
9    says that "The partnership primarily
10   follows..." -- and then there's a further
11   discussion.
12         Do you see that?
13      A.   Yes.
14      Q.   Why did you decide for the first
15   time in 2006 to disclose this strategy,
16   this further explanation about what you're
17   doing, buying a portfolio of large cap
18   equities, buying puts and selling calls?
19      A.   I'm not sure this is a whole lot
20   different than what we had said before.
21   It's a primary strategy.  It's an attempt
22   to present it.
23      Q.   If you didn't hear my question
24   or it wasn't a clear one:
25         Why did you decide for the first

93  (Pages 366 to 369)

CONFIDENTIAL                                                    GCC-P 0494483

370

1    Merkin - Direct/Bamberger
2    time to explain what Mr. Madoff was
3    actually allegedly doing?
4    A.    I'm not sure we -- this
5    description is terribly different than
6    what we said before.  This is -- I'm
7    sorry --
8    Q.    This is 2006?
9    A.    '06.
10    Q.    Right.
11    A.    Any notions that we were doing
12    things with single options and single puts
13    and single calls seemed a little bit
14    dated.
15        We talked about the baskets and
16    the S&Ps.
17        This comes as no surprise to the
18    overwhelming supermajority of the
19    investors.
20    Q.    I understand, sir, that's your
21    position.
22        Certainly, if you added it up in
23    dollars -- I bet you're right -- with the
24    biggest players like UBP, et cetera -- I
25    don't represent them, you know that -- I'm

371

1    Merkin - Direct/Bamberger
2    representing a number of individual
3    investors that claim not to know what
4    Ascot was doing until December 11 of 2008,
5    or very soon after that.  You know that.
6    A.    What are asking me that I know?
7    Q.    You know I'm not representing a
8    large hedge fund.  I'm representing a
9    number of individuals who said they did
10    not know that Ascot was Madoff.
11    A.    I don't know what your clients
12    are saying or are not saying to you.
13        I would say the majority, both
14    in terms of the capital, and to a lesser
15    extent but still overwhelming majority, of
16    the individual investors.
17    Q.    You could have made a disclosure
18    in 2006 that I see on the bottom about
19    what the primary strategy is, you could
20    have disclosed that earlier, correct?
21    Could have?  It was true earlier?
22    A.    I suppose I could have said
23    something earlier, if it was true earlier.
24    Q.    Now, the next paragraph,
25    however, "The partnership will make

372

1    Merkin - Direct/Bamberger
2    investments through" -- and there's a long
3    list --
4    A.    What page are you on?
5    Q.    No problem, sorry.  393.  Page 2
6    of the summary, but 393.
7    A.    Okay.
8    Q.    Here it says, "The
9    partnership" -- which is Ascot, right?
10    A.    Yes.
11    Q.    -- "will make investments
12    through" -- and then there's a long list,
13    right?
14    A.    Just one moment.  Yes.
15    Q.    -- "through third party
16    managers" -- right?
17    A.    Just one moment.  Yes.
18    Q.    -- "using managed accounts."
19    A.    Well, not only --
20    Q.    That's certainly a reference to
21    Mr. Madoff, correct?
22    A.    It certainly describes
23    Mr. Madoff, I think.
24    Q.    There's no "or" there.  The rest
25    of that sentence says you will make

373

1    Merkin - Direct/Bamberger
2    investments "through third-party managers
3    using managed accounts, mutual funds,
4    private investment partnerships,
5    closed-end funds and other pooled
6    investment vehicles, including special
7    purpose vehicles, each of which is
8    intended to engage in investment
9    strategies similar to the Partnership's."
10        Do you see that?
11    A.    Yes.
12    Q.    So you and the partnership were
13    doing one thing, and you were going to ask
14    other third parties to do something, too,
15    and the something they do was going to be
16    similar to what you do, right?
17    A.    No.  Absolutely not.
18    Q.    With respect to -- you know who
19    Richard Hirsch is, right?
20    A.    That is not an accurate
21    characterization of what this says and
22    what my intent was.
23    Q.    Right after Mr. Madoff was
24    erected -- I said "erected."
25    A.    You did.  That's not the first

94  (Pages 370 to 373)

CONFIDENTIAL

GCC-P 0494484

374

1    Merkin - Direct/Bamberger
2    time.
3    Q.    Right after Madoff was arrested
4    a number of people came to you, sir, that
5    said, very specifically -- Richard Hirsch
6    being one of them -- I didn't understand
7    you were doing everything through Madoff;
8    I understood you were doing things that
9    were similar to Madoff, right?
10    A.    No.
11    Q.    Well, Richard Hirsch is one that
12    thought that, right?
13    A.    I don't remember such a
14    conversation with Richard Hirsch.
15        You're talking about very late
16    in '08 or early '09?
17    Q.    I'm talking about within days of
18    the arrest of Madoff or early '09.  Yes, I
19    mean exactly that.
20    A.    No, I don't remember such a
21    conversation.
22    Q.    Do you remember Richard Hirsch
23    being very angry about his loss in Ascot?
24    A.    Absolutely the contrary.  I
25    remember Richard Hirsch asking me how I

375

1    Merkin - Direct/Bamberger
2    was doing.  I remember Richard Hirsch
3    asking me to go for a walk with him.
4    Asking me what he could do to help, could
5    he buck me up, and so on and so forth.
6    Q.    Yeah, and then he learned the
7    truth.
8        MR. LEVANDER:  I object to the
9    speeches.
10        Since it's past 5, I ask that we
11    adjourn for the day.  But the
12    testimony from Mr. Bamberger is really
13    out of bounds.
14        MR. BAMBERGER:  I'm allowed to
15    ask questions.  I will withdraw that.
16        I should ask the question, what
17    you and Mr. Hirsch discussed, but it's
18    not necessary.
19        I know it is approaching the end
20    of the day.  Do we need to leave right
21    on time, Mr. Chairman?
22        I have just a couple more
23    minutes.
24        THE CHAIRMAN:  If you want to
25    finish with this exhibit or --

376

1    Merkin - Direct/Bamberger
2        MR. BAMBERGER:  With this
3    exhibit, yes, thank you.
4        THE CHAIRMAN:  -- that's fine.
5    All right.
6    BY MR. BAMBERGER:
7    Q.    But is it correct to say, sir,
8    that after the Madoff arrest there were
9    people who approached you who expressed
10    surprise that Ascot --
11        MR. LEVANDER:  Objection.  He
12    just said he was going to go on this
13    exhibit.  You have him leads to go
14    beyond the 5 o'clock on this exhibit.
15        He is now going on to a
16    different topic.
17        MR. BAMBERGER:  I'm not.  I'm on
18    the same topic.
19        THE CHAIRMAN:  I understand what
20    he is doing.  He's questioning about
21    the scope of the investments and what
22    was understood by the investors.
23        Perhaps you could just ask it
24    generally, and then if you have
25    specific witnesses that will testify

377

1    Merkin - Direct/Bamberger
2    to the contrary at some point, you
3    might bring them in, providing you
4    give them notices.
5        MR. BAMBERGER:  Okay.  Thank
6    you, Mr. Chairman.  Those are all good
7    points, especially at 5 o'clock.
8    BY MR. BAMBERGER:
9    Q.    But, sir, do you see how a
10    reasonable reader could understand that
11    you were doing certain things --
12    A.    Slowly.  Slowly.  Slowly.
13    Q.    Do you understand however --
14    A.    Starting with everything after
15    "5 o'clock."
16    Q.    Sir, do you understand that a
17    reasonable reader reading that paragraph
18    could understand that you were doing
19    certain things for the partnership and
20    that you were also placing money with
21    others who were going to do similar
22    things?
23    A.    That could be the case, yes.
24        That that was the case, no.
25    It's not what it says.  That is not what I

95  (Pages 374 to 377)

CONFIDENTIAL                                                    GCC-P 0494485

378

1       Merkin - Direct/Bamberger
2   tell them.
3           And there wasn't an investor of
4   mine that came running into my office or
5   the telephone and said, did you read the
6   middle paragraph of page 2 of this
7   offering memorandum and it says something
8   different.
9       Q.   Correct to say that the
10  partnership did not in fact make any
11  investments in a mutual fund, in or after
12  2006?
13      A.   I believe that's correct.
14      Q.   Correct to say that the
15  partnership did not, in fact, make any
16  investments in any private investment
17  partnerships?
18      A.   We certainly considered a
19  fair --
20      Q.   No, sir, I'm sorry.  This
21  says --
22          THE CHAIRMAN:  Please.
23      Q.   I'm sure this is not pleasant,
24  and I apologize.  But I'm simply asking a
25  question.

379

1       Merkin - Direct/Bamberger
2           Did the partnership make
3   investments in private investment
4   partnerships, yes or no?  In and after
5   2006.
6       A.   I think it did.
7       Q.   Which?
8       A.   I think we had an investment in
9   an investment called Mark Millennium --
10  that might be it -- that I think the
11  structure was a private investment
12  partnership.
13      Q.   And the "we" in that sentence is
14  Ascot?
15      A.   (No response.)
16      Q.   Sir?
17      A.   Yes.  I'm talking about Ascot
18  Partners LP.  I'm just not sure of the
19  date.
20      Q.   Correct that the partnership in
21  or after 2006 did not make any investment
22  in a closed-end fund?
23      A.   I think that's correct.
24      Q.   You didn't make any investments
25  in any other pooled investment vehicles?

380

1       Merkin - Direct/Bamberger
2       A.   I think we did.
3       Q.   Which?
4       A.   I think Mark Millennium is a
5   pooled vehicle.
6       Q.   So it's both a private
7   investment partnership and another pooled
8   investment vehicle?
9       A.   Almost all -- private investment
10  partnerships are pooled vehicles.
11      Q.   You had no intention in 2006 to
12  alter anything about Ascot's strategy,
13  correct?
14      A.   What does that mean?
15      Q.   In 2006 you had not formed a
16  plan to change to any material degree
17  what Ascot was then doing, correct?
18      A.   No.  Not correct.
19      Q.   You had developed a plan to do
20  something different than give the money to
21  Madoff?
22      A.   We had certainly -- we were
23  certainly considering very seriously in
24  2006 investments that were not Madoff,
25  looked at them, and decided at some point

381

1       Merkin - Direct/Bamberger
2   and some point in the future not to do
3   them.
4           But considering alternatives to
5   Madoff, we absolutely did that all the
6   time.
7           Other investment ideas,
8   regardless of their structure, whether
9   they were managed accounts or a pooled
10  vehicle was something we looked at all the
11  time.
12      Q.   You didn't do what you said you
13  would do here, sir, which is make
14  investments in closed-end funds and mutual
15  funds, correct?
16      A.   That is incorrect.  That's not
17  what this says.
18      Q.   Sir, at the bottom of page 8 and
19  then we're done.  That's on 399.
20      A.   Bottom of page -- one second --
21  okeydoke.
22      Q.   This is a discussion of
23  brokerage commissions, correct?
24      A.   Yes.
25      Q.   Okay.  You're certainly not

96  (Pages 378 to 381)

**VERITEXT REPORTING COMPANY**
(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                                      GCC-P 0494486

382

```
1        Merkin - Direct/Bamberger
2   bringing this to anybody's attention, that
3   some or all of your assets are housed with
4   Bernard L. Madoff?  This is not the risk
5   factor section, for example, correct?
6        A.   I don't know.  I would have to
7   go back and look.
8        Q.   You say on the bottom of 399,
9   "The partnership will execute its trades
10  through unaffiliated brokers, who may be
11  selected on a basis other than that which
12  will necessarily result in the lowest cost
13  for each trade."
14       You say that clearing --
15       A.   That's a perfectly good
16  example --
17       Q.   Sir, I'm going to ask a question
18  here.
19       A.   Well --
20       Q.   You say "clearing, settlement
21  and custodial services will be provided by
22  one or more unaffiliated brokerage firms."
23  Correct?
24       A.   Uh-hum.
25       Q.   But you don't say that portfolio
```

383

```
1        Merkin - Direct/Bamberger
2   management will be provided by one or more
3   unaffiliated brokerage firms; true?
4        A.   That sentence does not say that.
5        Q.   You say that Morgan Stanley and
6   Bernard Madoff currently serve as
7   principal prime brokers and custodians,
8   right?
9        A.   Yes.
10       Q.   But you don't say that either or
11  both currently serves as 98 or 99 or 99.8
12  percent portfolio managers, correct?
13       A.   I missed it.  Say it again.  I
14  missed when you got the figures.
15       Q.   You made the disclosure that
16  these folks, these two firms, serve as
17  your principal prime broker, and as
18  custodians for the partnership, but having
19  mentioned them, you don't mention that one
20  of them, Mr. Madoff, is also responsible
21  for 99 percent plus of portfolio
22  management; true?
23       A.   I'm not sure that was the
24  correct number.
25       The document makes very clear
```

384

```
1        Merkin - Direct/Bamberger
2   that we are using third parties for
3   portfolio management.
4        Q.   And you say in the sentence --
5        A.   The document suggests that 100
6   percent of the capital is managed
7   elsewhere.
8        Q.   The sentence also says that
9   "between them," Madoff and Morgan Stanley,
10  "also clear the partnership's securities
11  transactions that are effected through
12  other brokerage firms," correct?
13       A.   Uh-hum.
14       Q.   Bernard Madoff certainly didn't
15  do that, correct?
16       A.   It didn't say that he did.
17       Q.   You make no distinction in that
18  paragraph between the role played by
19  Morgan Stanley and the role played by
20  Bernard L. Madoff, correct?
21       A.   As it comes to principal prime
22  broker and custodian of the partnership.
23       Q.   You make no distinction between
24  their roles with respect to any function,
25  correct?
```

385

```
1        A.   I'm sorry.  Is that a different
2   question.
3        Q.   It's intended to be a different
4   question.
5        You make no distinction between
6   the functions played by Morgan Stanley and
7   Bernard L. Madoff?
8        A.   In that sentence?
9        Q.   Right.
10       A.   Yes.
11       Q.   Anywhere else in that document
12  do you make a distinction between what
13  Morgan Stanley does and Bernard L. Madoff
14  does for Ascot Partners?  Anywhere else?
15       A.   I just don't remember sitting
16  here.
17       Q.   I'll represent to you that you
18  don't.  There's a repetition later in the
19  document, but you say nothing here.
20       Why if Bernard L. Madoff was
21  custodian for in excess of -- what number
22  should I use?  98 percent of the
23  securities?
24       A.   90.
```

**VERITEXT REPORTING COMPANY**
(212) 279-9424        www.veritext.com        (212) 490-3430

CONFIDENTIAL                                                      GCC-P 0494487

386

1         Merkin - Direct/Bamberger
2    Q.    No, sir. 90?
3    A.    At certain times.
4    Q.    Of the securities? Of the
5    securities?
6         Cash may have come in and out of
7    Morgan Stanley, but not securities, right?
8    A.    There were positions that we --
9    vis-a-vis which they were housed in Morgan
10   Stanley, security positions and cash.
11   Q.    Why did you name Morgan Stanley
12   first?
13   A.    First? I'm sorry?
14   Q.    Why did you name Morgan Stanley
15   first in this sentence?
16   A.    I'm not sure there's any great
17   reasoning to it.  Possibly because Morgan
18   Stanley is the entity that an investor met
19   first, if he invested.
20        Morgan Stanley was our home
21   base.  Morgan Stanley was where the money
22   came in.  So you wired money to Morgan
23   Stanley.
24   Q.    No.  You wired money to Morgan
25   Stanley.

387

1         Merkin - Direct/Bamberger
2    A.    No, we didn't.  Not if I was as
3    in -- if the investor in order to invest,
4    wired money to Morgan Stanley --
5    Q.    Right.  And Morgan Stanley wired
6    money to you in this case --
7    A.    I meant the investor.  It was an
8    account over which we had discretion at
9    Morgan Stanley.
10        That was home base.  That's
11   where investors sent their money to and
12   that's where investors got their money
13   back from.
14   Q.    They didn't clear any monies for
15   Ascot in 2006?
16   A.    I don't remember specifically
17   for 2006, but they certainly cleared
18   securities for Ascot over time.
19   Q.    When?
20   A.    I said over time.  Over the
21   existence of the fund.
22   Q.    When?
23   A.    I'd rather be accurate than
24   guess.  I just don't remember sitting here
25   in what years.

388

1         Merkin - Direct/Bamberger
2    Q.    You can think about that and let
3    us know tomorrow.
4         Was the LEAPS program -- and you
5    did engage in a few LEAPS transactions --
6    were they cleared through Morgan Stanley?
7    A.    Yes.
8    Q.    The LEAPS were?
9    A.    Yes.
10   Q.    Any others?
11   A.    Securities.
12   Q.    Other securities were cleared
13   through Morgan Stanley?
14   A.    I will check and tell you
15   tomorrow, but I think there were
16   securities that we cleared through Morgan
17   Stanley.  The LEAPS, certainly.
18   Q.    Why, if you mention that Bernard
19   Madoff was playing the role of prime
20   broker and as custodian, do you not also
21   say that he was overwhelmingly responsible
22   for portfolio management?
23        Let me hear a clear answer to
24   that?
25   A.    I think we said, clear as a

389

1         Merkin - Direct/Bamberger
2    bell, that we were using third parties to
3    manage the accounts.
4         Bernard L. Madoff was not a
5    person who did anything other than manage
6    the monies that were in accounts that were
7    at Madoff.
8         We said we were going to use
9    third parties.  We said we could use --
10   all of it could be at a third-party.  We
11   said there was custody risk.  We said that
12   those were all risks that an investor was
13   going to have to take.
14        That's what this document said.
15        We said there was a primary
16   strategy, and we described it.
17   Q.    You understand that Bernard
18   Madoff was controversial as a money
19   manager by 2006, right?  You understood
20   that?
21   A.    (No response.)
22   Q.    That people regarded him --
23   A.    I think there were skeptics
24   about Madoff in 2006.
25        I think if you created a list of

98   (Pages 386 to 389)

**VERITEXT REPORTING COMPANY**

(212) 279-9424          www.veritext.com          (212) 490-3430

CONFIDENTIAL                                    GCC-P 0494488

390

1          Merkin - Direct/Bamberger
2    people that thought he was an extremely
3    talented manager, and created a list of
4    people who thought -- who thought -- who
5    had some skepticism about him, the list of
6    folks who thought he was an extremely
7    talented manager was far larger than the
8    list of people who had some skepticism.
9          Q.   Before you withdrew your answer
10   you told the Attorney General in your
11   January 2009 deposition that Bernard
12   Madoff had lots of skeptics, right?
13         And then you took that answer
14   back; true?
15         A.   I just --
16         Q.   True?
17         A.   I'm not sure what you're saying.
18         Are you talking about an answer
19   I took back in January 2009?
20         Q.   Right after giving it.
21         A.   If it is right after I gave it,
22   if it's one answer, I don't remember the
23   specific question and answer.
24         Q.   Okay.  And true -- last
25   question -- on page 17, page JEM 408 --

391

1          Merkin - Direct/Bamberger
2          A.   17?
3          Q.   Yes.
4          -- once again, you say, under
5    "Dependence on General Partner," under
6    "Risk Factors," that "All decisions with
7    respect to the management of the capital
8    of the partnership are made exclusively by
9    J. Ezra Merkin.  Consequently, the
10   partnership's success depends to a great
11   degree on the skill and experience of
12   Mr. Merkin."
13         Having just mentioned Bernard
14   Madoff, but having relegated him to a
15   position of prime broker, meaning, an
16   adjunct to you, don't you think it would
17   have been more fair and more correct to
18   disclose that this partnership is also
19   dependent upon the success and the skill
20   and the experience of Bernard L. Madoff?
21         A.   Go to the very next sentence.
22   And what does it say?  "The General
23   Partner may delegate investment discretion
24   for all or a portion of the partnership's
25   funds to money managers other than the

392

1          Merkin - Direct/Bamberger
2    General Partner, or make investments with
3    other investment entities as defined.
4    Consequently, the success of the
5    partnership may be dependent upon other
6    money managers."
7          That's what this says.  It's the
8    very next sentence and the very next
9    sentence after that.
10         Q.   If you read that sentence,
11   there's a three-letter little word there,
12   is there not, sir:  "May"?
13         A.   What are you pointing me at?
14         Q.   Other times you use the present
15   tense, "engages."  Other times you say
16   "will."  Here you're saying "may."  As
17   though it's conditional or possible, not
18   actual?
19         A.   No.  I think it's very clear to
20   an investor, if you come in, this is what
21   you ought to know, this is what is the
22   case, this is what could be the case, this
23   is what may evolve in the future.  This is
24   a risk factor that you are tolerating.
25         Two or three sentences further

393

1          Merkin - Direct/Bamberger
2    down makes very clear that custody is not
3    with the General Partner.
4          Q.   Mr. Merkin, thank you.
5          Two or three sentences down it
6    says that custody may not be with the
7    General Partner.
8          A.   Correct.  What do you think that
9    means to an investor?
10         Q.   "May not be."
11         The Panel will decide.  Thank
12   you.
13         You have no documentary proof
14   that your firm ever sent either the 2006
15   offering memorandum, March of 2006 or
16   October 2006, to Moshael Straus, correct?
17         A.   Are you asking me a question
18   that's not about the document?
19         Q.   Yes.
20         A.   I didn't get the question, I'm
21   sorry.
22         Q.   You have no documentary proof
23   whatsoever, of any kind, that your firm
24   ever transmitted either the March 2006 or
25   the October 2006 Ascot offering memorandum

99 (Pages 390 to 393)

CONFIDENTIAL                                                    GCC-P 0494489

394

1      Merkin - Direct/Bamberger
2  to Moshael Straus?
3      A.   I don't know.  I don't know the
4  answer to the question.  I believe we sent
5  it to everybody.  I'm sure Moshael was on
6  the list.  I'm sure we sent it to him.
7      Q.   You're sure of all that?
8      A.   I'm sure he got it.
9      Q.   Where's the list?
10     A.   As I sit here right now?  I have
11 no idea where it is.  It's not in my
12 pocket.  I have no idea where it is.
13     Q.   Why would you produce the
14 Gabriel offering memorandum of 2006 in
15 connection with Modan and not produce
16 Ascot, if you had it?
17     A.   Are you telling me he doesn't
18 have it?
19     Q.   Yes.
20     A.   That's news to me.  Or news to
21 me today.
22     Q.   Why would you send an offering
23 memorandum to an investor that's not
24 making a fresh investment in Ascot?
25     A.   Who is --

395

1      Merkin - Direct/Bamberger
2      Q.   Not indicating a desire to make
3  a new investment in Ascot.
4      A.   I'm missing something pretty
5  basic.  We're in '06?
6      Q.   Yes.
7      A.   In '06 we're telling every
8  single investor, I think, that we are
9  changing the lockup, and then we're
10 telling them we're not.
11     Q.   Right.  That's in the
12 partnership agreement.  You don't need to
13 send the offering memorandum to do that,
14 correct?
15     A.   I don't know.
16     Q.   An explanatory letter that sends
17 along the new LPA would tell them why
18 you're sending them the new LPA.
19          There would be no reason to
20 confuse an investor by sending him an
21 offering memorandum that he neither
22 wanted, nor sought, nor needs; true?
23     A.   No.  I think we would have sent
24 them an offering memorandum if that had
25 been the advice of our counsel.

396

1      Merkin - Direct/Bamberger
2      Q.   You send offering memo --
3      A.   Why would that confuse an
4  investor?
5          THE CHAIRMAN:  Mr. Bamberger,
6  you're arguing with the witness.
7          MR. BAMBERGER:  You've been more
8  than kind with me.
9          THE CHAIRMAN:  You had one more
10 question to ask about 15 minutes ago.
11         We will adjourn now until
12 10 o'clock tomorrow.
13         [Time noted:  5:19 p.m.]

REDACTED

100  (Pages 394 to 397)

CONFIDENTIAL                    GCC-P 0494490

# Exhibit 90

Page 1

1                 C O N F I D E N T I A L

2            UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK
3

4    --------------------------------x
     In Re:
5
     BERNARD L. MADOFF INVESTMENT          Adv.Pro.No.
6    SECURITIES LLC,                       08-01789(BRL)

7                 Debtor.
     --------------------------------x
8    IRVING H. PICARD, Trustee for the
     Liquidation of Bernard L. Madoff
9    Investment Securities LLC,

10                Plaintiff,               Adv.Pro.No.
                                           09-1182(BRL)
11                v.

12   J. EZRA MERKIN, GABRIEL CAPITAL,
     L.P., ARIEL FUND LTD., ASCOT
13   PARTNERS, L.P., GABRIEL CAPITAL
     CORPORATION,

14
                  Defendants.
15   --------------------------------x

16

17            DEPOSITION of MICHAEL J. ACHILARRE as

18   taken by and before NANCY C. BENDISH, Certified

19   Court Reporter, RMR, CRR and Notary Public of the

20   States of New York and New Jersey, at the offices of

21   Baker & Hostetler, 45 Rockefeller Plaza, New York,

22   New York on Tuesday, August 9, 2011, commencing at

23   10:00 a.m.

24

25

Page 30

1      A.      The back office would be the
2  accounting staff which would be headed by Mike
3  Autera and then myself, Ralph Sanchez and Steven
4  Askling.  That's the back office.
5      Q.      And so Cohanzick, if they had trade
6  tickets if they traded on a particular day, are they
7  physical pieces of paper trade tickets or are they
8  electronic?
9      A.      Physical.
10      Q.      And so how would they arrive at your
11  office?
12      A.      They would walk them into our office
13  at the end of the day.
14      Q.      And they did that every day?
15      A.      Every day that they traded.
16      Q.      Did they trade every day?
17      A.      Pretty much every day, yeah.
18      Q.      What would you do with the tickets
19  once you had them?
20      A.      When you say you, it's not me
21  specifically.
22      Q.      Sure.  Okay.
23      A.      The back office, it depends -- that
24  was typically Ralph Sanchez's role.  Other people
25  could have done it on a given day should Ralph not

Page 31

1  be there.
2      Q.      Okay.
3      A.      He would get the tickets from the
4  trader, he would book the trades into our internal
5  portfolio management system.  We then were able to
6  take those trades and upload them to our prime
7  broker, Morgan Stanley, to assist in settling the
8  trades.
9      Q.      When you had the trade tickets, then
10  you put them into your portfolio management system,
11  did the portfolio management system ever check the
12  price?
13      A.      No, it did not have that capability.
14      Q.      What about when it was uploaded to
15  Morgan Stanley, could they determine whether the
16  prices were accurate?
17      A.      Yes.
18      Q.      What about trade tickets for
19  Cerberus, did you receive those?
20      A.      No.  Those were all kept at Cerberus.
21      Q.      So on a daily basis if they made
22  trades, you would not receive the tickets?
23      A.      That's correct, would not.
24      Q.      Would you ever receive the tickets?
25      A.      No.

Page 32

1      Q.      Do you know why?
2      A.      They're responsible for the trading.
3  They have authority to trade on behalf of the funds
4  that they manage money for and they are in charge of
5  keeping the tickets.  They're in charge of the
6  portfolios.  So they have their own back office
7  services for the money that they manage for us.
8      Q.      All right.  And then what about
9  Madoff trade confirmations?
10      A.      We would receive those by mail.
11      Q.      And how often would you receive
12  those?
13      A.      Madoff traded -- did not trade as
14  frequently as the in-house investment, David
15  Sherman, so we would not know when we'd be getting
16  tickets.  They would arrive by mail and that's when
17  we would know that trades were done.  When I say we,
18  I mean the back office.
19      Q.      Sure, okay.  So, the back office
20  would receive the trade tickets?
21      A.      Um-hum.
22      Q.      And then what protocol would you
23  follow?
24      A.      We would then -- and this was Ralph
25  Sanchez's job typically.  He would receive the trade

Page 33

1  tickets and then he would then take the tickets
2  manually and put them into our portfolio management
3  system.
4      Q.      Okay.
5      A.      And then reconcile to make sure that
6  everything was booked correctly.
7      Q.      So when you described Cohanzick
8  before, you said you would upload them to JPMorgan
9  for settlement?
10      A.      Um-hum.
11      Q.      So you would not do that for Madoff?
12      A.      No.
13      Q.      And that is because?
14      A.      They were settling -- my
15  understanding, they were settling through Madoff.
16      Q.      So they were already settled?
17      A.      They were already -- the trades were
18  settled.
19      Q.      All right.  So you said you received
20  Cohanzick trade tickets on the same day as the
21  trades were made?
22      A.      Yes.
23      Q.      What about for Madoff?
24      A.      Madoff would take a couple days in
25  that we got them by mail.  They weren't in a space

9 (Pages 30 to 33)

IRVING H. PICARD v. J. EZRA MERKIN            CONFIDENTIAL            MICHAEL J. ACHILARRE 8/9/11

Page 34

1 where they could walk over the tickets. They mailed
2 them to us.
3        Q.       Was it usually just a couple days or
4 did you ever have to wait for trade tickets for
5 Madoff?
6        A.       What's a couple? It was more than
7 one or two, but it wasn't weeks.
8        Q.       What about monthly statements? Did
9 you receive monthly statements from Cohanzick?
10       A.       No. Cohanzick managed money for us.
11 They wouldn't provide monthly statements. They
12 weren't a broker.
13       Q.       Is it the same for Cerberus?
14       A.       Once again, they're not the broker,
15 so they don't provide us monthly statements. Well,
16 Cerberus provides us our books monthly, but it's not
17 statements -- I think what you're asking about is
18 broker statements.
19       Q.       Right.
20       A.       That's not a role that Cohanzick or
21 Cerberus would provide.
22       Q.       So you did receive monthly statements
23 from Madoff?
24       A.       Yes.
25       Q.       Because he was the broker and he

Page 35

1 managed the funds; is that correct? How did that
2 work?
3        A.       He managed the funds and there was
4 a -- Bernard L. Madoff Securities was the brokerage
5 firm, as I understand it.
6        Q.       Okay.
7        A.       I want to clarify, you're not really
8 asking the question -- I think I know what you want
9 to ask. I know you said don't think.
10       Q.       Sure, no. I appreciate it.
11       A.       Cohanzick would manage money for us
12 and they employed Morgan Stanley as their prime
13 broker. So when we uploaded the trades, Morgan
14 Stanley was the broker for that portfolio. We would
15 receive broker statements from them on a monthly
16 basis.
17       Q.       Okay.
18       A.       Bernard Madoff firm also managed
19 money for us.
20       Q.       So you would receive monthly
21 statements from JPMorgan?
22       A.       From Morgan Stanley.
23       Q.       From Morgan Stanley, okay. All
24 right, I've got that. Then for Madoff?
25       A.       Once again, they're another broker of

Page 36

1 ours, we received broker statements.
2        Q.       Okay. Did you think it was unusual
3 that Madoff did the trades and was the broker, as
4 opposed to Cohanzick?
5        A.       No.
6        Q.       That didn't strike you as unusual?
7        A.       No.
8        Q.       Did you do anything to confirm that
9 the trade tickets were accurate in terms of the
10 price at which the stock was sold?
11       MR. WHITE: When you say "you," you
12 mean --
13       MS. HARTMAN: I mean the back office.
14       A.       No.
15       Q.       No?
16       A.       No.
17       Q.       You just took the trade ticket -- you
18 meaning Gabriel Corporation Capital took the tickets
19 at face value, you didn't check the values that were
20 listed on the trade tickets?
21       A.       Well, in order for a trade to settle,
22 the price would need to be right for our in-house
23 portfolio managed by David Sherman. So we would
24 upload the security to Morgan Stanley and if the
25 trade didn't match the other side of that, the trade

Page 37

1 would, what you call, break, so it wouldn't settle.
2        Q.       How often would trades break?
3        A.       Not very often.
4        Q.       And what would happen when the trade
5 broke?
6        A.       We'd just be notified that what you
7 reported to us is not what the other side of that
8 transaction reported to us.
9        Q.       Okay. So when you received the trade
10 tickets from Madoff, my understanding is that the
11 trades were already settled. Did you ever check the
12 prices on those trade tickets against the market?
13       A.       No. Not that I'm aware of. I
14 didn't.
15       Q.       Would anyone in the office be --
16       A.       Not that I'm aware of. It would be a
17 very -- seems to be something that would not
18 typically be done.
19       Q.       Was there any difference in
20 monitoring Ascot compared to Gabriel and Ariel, from
21 an accounting perspective, from your department's
22 perspective?
23       A.       No.
24       Q.       You treated it the same in terms of
25 your accountings and your monthly reports?

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN      CONFIDENTIAL      MICHAEL J. ACHILARRE 8/9/11

Page 42

1          (Exhibit Achilarre-1 marked for
2  identification.)
3     Q.    Have you had a chance to look at it?
4     A.    Yes.
5     Q.    Could you just tell me what this is.
6     A.    This is an email from Mike Autera to
7  me.
8     Q.    Okay.
9     A.    And this is providing me with the
10  information I needed to come up with our monthly
11  estimate.  So this information allowed me to
12  determine the monthly P & L for our Madoff
13  investments.
14     Q.    And so you received this information
15  from Mike Autera before you received the statements
16  from Madoff?
17     A.    Yes.  This information would go --
18  this would come from Madoff to Mike and then Mike
19  Autera would forward it to me to do what I needed to
20  do, and then I would take the broker statements that
21  I got and make sure that they tied back to the
22  values that were given to me on the second,
23  typically the second business day of the month.
24     Q.    Where was Mr. Autera getting his
25  numbers?

Page 43

1     A.    This was an email provided by someone
2  at Madoff.
3     Q.    So he called or he emailed someone?
4     A.    I don't know.  I just know that he
5  would forward me the -- take a step back.  I don't
6  know how exactly he got these numbers, if it was a
7  phone call or if it was email.  Mike would send me
8  that information.
9     Q.    Would he send it to you on a monthly
10  basis?
11     A.    Yes.  I would get this every month.
12     Q.    But, again, you don't know where he
13  received --
14     A.    I know he got it from Madoff.  I just
15  don't know in what capacity.
16     Q.    Whether it was email or telephone?
17     A.    Or telephone, right.
18     Q.    Do you know who he dealt with at
19  Madoff?
20     A.    My understanding is that he dealt
21  with someone by the name of Frank DiPascali.
22     Q.    Is that the only person he dealt
23  with?
24     A.    That's the only name that I remember.
25     Q.    And when it says here, "They said

Page 44

1  these numbers represent a .8 MTD increase," what
2  does that mean?  Month to date?
3     A.    That means when I calculate the P & L
4  using these numbers, there should be a .8 percent
5  month-to-date performance.
6     Q.    Would that be the same for Ascot as
7  well?
8     A.    They should be similar, yes.
9     Q.    So, did Gabriel and Ariel have the
10  same positions as Ascot?
11     A.    I don't know for sure, but I believe
12  they did.
13     Q.    So you think -- were the portfolios
14  identical?
15     A.    The positions I believe were very
16  similar.
17     Q.    So across the three funds they were
18  similar?
19     A.    Yes.
20     Q.    So there wasn't a different strategy
21  employed?
22     A.    No.  No.
23     Q.    I want to introduce Achilarre exhibit
24  number 2.
25          (Exhibit Achilarre-2 marked for

Page 45

1  identification.)
2     Q.    Again, this is a similar email.
3     A.    Um-hum.
4     Q.    And this time you respond.
5     A.    That's correct.
6     Q.    And you say, "These numbers have been
7  confirmed by the broker statements we received
8  today."
9     A.    That's right.
10     Q.    So, my understanding of this process
11  is Mr. Autera would receive numbers from someone at
12  BLMIS and then you would compare them?
13     A.    That's right.  I basically am telling
14  Mike that information that they provided to us on
15  the second business day ties to the actual broker
16  statements which we received.  And that would have
17  been on the 5th.
18     Q.    I know that there are many months in
19  a year, you've worked there from 2004 for four years
20  on a monthly basis.  Did the numbers generally tie?
21     A.    Yes, absolutely.
22     Q.    Really?  Okay.  Well, why wouldn't
23  Ariel or Gabriel have dividends if Ascot has
24  dividends?
25     A.    Ariel and Gabriel would have had

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN                    CONFIDENTIAL                    MICHAEL J. ACHILARRE 8/9/11



Page 50

1  would have been my thought and that's why I asked
2  Mike to double-check.
3       Q.     Did the dividend misreporting happen
4  frequently?
5       A.     As I said before, I recalled the one
6  time and maybe it was two times, but this was not a
7  frequent occurrence.
8       Q.     But could there have been another
9  time, you just don't remember?
10      A.     Could have been, but pretty unlikely.
11 The statements that -- the numbers that we received
12 on the second business day, from what I can
13 remember, virtually always tied to the statements
14 that we would then receive a couple days after that.
15      Q.     So you're saying the numbers that
16 Mr. Autera gave you most of the time corresponded to
17 the statements --
18      A.     The actual broker statement.
19      Q.     So you were never put on notice that
20 the numbers are funny or they don't match?
21      A.     No.
22      Q.     Based on Mr. Autera's email?
23      A.     No.
24             MS. HARTMAN:  I'd like to introduce
25 Exhibit 5.

Page 51

1             (Exhibit Achilarre-5 marked for
2  identification.)
3       Q.     What's going on here in this email?
4       A.     This is an email, Mike says, "We
5  should receive 25 million into Ascot Partners," and
6  then an account number from Madoff.  That means we
7  instructed Madoff to -- we checked them for
8  redemption requests.  We asked for $25 million.
9       Q.     And who would have done that?
10      A.     Mike Autera would have done that.  I
11 was responsible for checking the daily activity in
12 all our brokerage accounts.  This is around
13 Christmastime, so Mike was probably not in the
14 office, just asked me if I could let him know if
15 they did indeed send us the money we requested.
16      Q.     Did the money hit?  Do you remember?
17      A.     The money hit.  We never had any
18 issues with pulling money out of these accounts.
19      Q.     So when Mr. Autera said check to let
20 me know if the money hit, the money usually hit from
21 Ascot or Gabriel or Ariel in Madoff?
22      A.     Yes, correct.
23      Q.     Did he ask you to do that for the
24 other funds, like Cohanzick?
25      A.     Yes.

Page 52

1       Q.     He would ask you to make sure
2  redemptions hit or that money transfers hit?
3       A.     Cohanzick and Madoff are two totally
4  different things.  But Mike would ask me to, any
5  time we would be wiring money out of our funds or
6  expected to receive money into our funds in any
7  capacity, Mike would ask me to double-check.  And I
8  would double-check anyway.
9       Q.     Okay.  Do you know, in this
10 particular instance, 2005, if positions were
11 liquidated, how would you have the $25 million
12 transferred?  Was something redeemed?  Where would
13 that money be coming from?
14      A.     Positions would need to be
15 liquidated.
16      Q.     And would you have any role in making
17 those decisions?
18      A.     No.
19      Q.     Who would have that role?
20      A.     That would be Bernard Madoff's
21 company.  They managed the money.
22      Q.     But somebody at Gabriel Capital
23 Corporation must have asked for $25 million?
24      A.     Right.
25      Q.     Based on -- did they instruct which

Page 53

1  positions to liquidate in order to get the 25
2  million?
3       A.     Bernard Madoff is an account that we
4  had that managed money on our behalf.
5       Q.     Sure.
6       A.     Like any other account that you have,
7  you can ask for money back.
8       Q.     Sure.
9       A.     I don't believe anyone would tell the
10 money manager what positions to sell, but that's not
11 my role.  All I know is we asked for $25 million and
12 we got $25 million.  That's really how I see it.
13      Q.     Okay.  Because your understanding is
14 that he directed the fund -- Bernard Madoff directed
15 the fund, so if you needed money, you would ask for
16 money, you wouldn't instruct which positions he
17 should liquidate?
18      A.     Right.
19      Q.     Okay.  I'd like to introduce Exhibit
20 Achilarre 6.
21             (Exhibit Achilarre-6 marked for
22 identification.)
23      Q.     What is this email about?
24      A.     There's not a lot written here, so...
25             MS. STROKER:  There is no Bates stamp

14 (Pages 50 to 53)

Page 58

1  this document, my understanding is you think he's
2  putting together some performance summary?
3      A.    I remember Lisa working on some sort
4  of performance package, whatever you want to call
5  it, a performance summary for all of our
6  investments.
7      Q.    Okay.
8      A.    David was assisting.  As I said,
9  David was -- he played many roles, we all play many
10 roles in a small office.
11     Q.    And Lisa worked for David?
12     A.    Lisa was a Gabriel assistant.
13     Q.    Okay.  Got it, thanks.
14         MS. HARTMAN:  Okay.  I'd like to
15 Exhibit 7.
16         MR. WHITE:  Why don't we take a
17 break.
18         (Recess taken 11:03-11:12 a.m.)
19 BY MS. HARTMAN:
20     Q.    Let's start again.
21         You explained to me about the broker
22 system versus just the fund managers, but
23 essentially when Madoff purchased a stock, he
24 retained custody of it?
25     A.    That's my understanding.

Page 59

1      Q.    Did anyone at Gabriel Capital discuss
2  Madoff's failure to use a third-party custodian?
3      A.    I never heard that.
4      Q.    Did you ever think it was odd?
5      A.    I can't say I thought it was odd.  I
6  don't recall seeing it in my other funds, but I only
7  work for -- I've only seen a small number of funds
8  over the years.
9      Q.    What about at Eisner, did you deal
10 with third-party custodians at Eisner?
11     A.    The funds had prime brokers.
12     Q.    So all the funds at Eisner had prime
13 brokers?
14     A.    From what I can remember.
15     Q.    And so then Madoff was the only one
16 who didn't have -- who was a broker himself?
17         MS. STROKER:  Objection.
18         MS. HARTMAN:  I'll rephrase the
19 question.
20     Q.    So at Eisner you dealt with
21 custodians?  Or all the funds had custodians?
22         MR. WHITE:  Objection.  Rephrase the
23 question so it's one question.
24     Q.    So Madoff's failure to use a
25 third-party custodian was not notable to you?

Page 60

1         MR. WHITE:  Objection.  It's been
2  asked and answered.
3      Q.    You can still answer.
4      A.    No.
5      Q.    At Eisner did the funds use
6  third-party custodians generally?
7         MR. WHITE:  You mean Eisner's
8  clients?
9         MS. HARTMAN:  Yes.
10     A.    The funds that I worked on would
11 typically have a structure similar to the David
12 Sherman portfolios at Gabriel.  They would have a
13 portfolio manager who would then use a prime broker.
14     Q.    Okay.  Do you know how the fund
15 managers, Cerberus and Cohanzick, were compensated?
16     A.    They were paid a management fee.
17     Q.    And what was the management fee for
18 Cerberus?
19     A.    One percent of the assets that they
20 managed for us.
21     Q.    And what about Cohanzick?
22     A.    I believe it is also one percent --
23 they are paid a percentage of the assets that they
24 manage.  I'm not sure of the exact number.
25     Q.    What about Madoff, how was he

Page 61

1  compensated?
2      A.    We did not pay a management fee to
3  Madoff.  From what I understand, the money was made
4  through commissions, but we did not pay a fee.
5      Q.    Did you think that was unusual?
6      A.    It was new to me.  I did not think it
7  was unusual.
8      Q.    Did you ever discuss it with Autera?
9      A.    No.
10     Q.    Did you ever discuss Madoff's failure
11 to use a third-party custodian with Autera?
12     A.    No.
13     Q.    Did you ever discuss it with
14 Mr. Sanchez?
15     A.    No.
16     Q.    Mr. Askling?
17     A.    No.
18     Q.    Did anyone -- so you thought that
19 Madoff was compensated through trade commissions?
20 How did you think Madoff made --
21     A.    It's not really --
22         MR. WHITE:  Let her finish the
23 question.
24     Q.    So for managing his fund, how do you
25 think -- while you were working pre-arrest did you

16 (Pages 58 to 61)

IRVING H. PICARD v. J. EZRA MERKIN                    CONFIDENTIAL                    MICHAEL J. ACHILARRE 8/9/11

Page 86

1  typical then for an auditor to determine whether a
2  stock is overvalued or undervalued?
3      A.    Yes. They have a whole valuation
4  team that will look at the processes that a fund
5  uses to determine the value of a position.
6      Q.    Okay. And the auditors did that for
7  all four of your funds?
8      A.    Yes.
9          MS. HARTMAN: Let's introduce Exhibit
10  13.
11          (Exhibit Achilarre-13 marked for
12  identification.)
13      Q.    Is this a document that you might
14  have prepared yourself?
15      A.    Part of it, maybe. I don't recognize
16  this, I'll say first off. It's an income statement
17  analytical, so I would think this is another
18  internal BDO report. The numbers that are on here
19  would have been taken off of a schedule that I would
20  have provided them with, but I don't remember doing
21  this report.
22      Q.    Do you have an understanding as to
23  why the figures are in parentheticals? Because my
24  understanding of accounting procedures is that
25  parentheticals mean a negative value.

Page 87

1      A.    No, that's actually incorrect. A
2  negative income number is a gain. So if you receive
3  cash and a dividend, you would debit cash, positive,
4  credit income, negative. So I would read this as --
5  it says rep and then says rep 12/05. I don't know
6  what the first column is. I would venture to say
7  that based on what I'm reading here, where it says
8  rep 12/05, that's our 2005 P & L.
9          I just unfortunately can't give you
10  much detail as to what this is. It could be similar
11  to one of the exhibits you presented before when
12  they analyzed the income statement where I had spoke
13  about how the dividend was higher in one year
14  previous to the other, because we were in the common
15  stock for a longer period of time. This is probably
16  something similar to that.
17      Q.    Okay. But just to be clear, you
18  prepared the first exhibit that you were talking
19  about?
20      A.    Yes.
21          MS. STROKER: Which exhibit is that?
22          MS. HARTMAN: Exhibit 7.
23      A.    Correct.
24      Q.    But you don't know who prepared
25  Exhibit 13?

Page 88

1      A.    That's correct.
2      Q.    Would the auditors when they finished
3  their work give a report to you? Would they produce
4  a report to you?
5      A.    Well, the financials they come up
6  with, they sign off on our financial statements.
7  Audited financial statements are a report that comes
8  from the auditor. They're reviewing our work and we
9  take responsibility for the numbers, but the report
10  that's generated at the end of an audit is the
11  report of the auditor's set of financial statements
12  that are then sent to investors.
13      Q.    I want to turn back now to Madoff and
14  your sense of the work that he performed. While you
15  were at Gabriel Capital, did anyone in the office,
16  including you, ever discuss the size of BLMIS?
17          MS. STROKER: Anyone in his office?
18          MR. WHITE: Objection. What do you
19  mean the size?
20      Q.    The size, how many investors BLMIS
21  had.
22      A.    No.
23      Q.    Were you aware that he had -- were
24  you aware that Madoff had over a billion dollars
25  from Merkin?

Page 89

1      A.    Well, I was aware that Ascot Partners
2  had a billion dollars there and that's a Merkin
3  entity. So I guess the answer to that question
4  would be yes, but I can only speak on the funds that
5  were controlled by Ezra Merkin.
6      Q.    Okay. Was there any discussion ever
7  internally, whether it be you or if you heard
8  somebody else discuss or express concern over the
9  fact Ascot had 100 percent of its assets in Madoff?
10      A.    I never heard any concern over that.
11      Q.    Never?
12      A.    No.
13      Q.    Did you personally as an accountant
14  think it was unusual that all of the funds were
15  concentrated in Ascot?
16      A.    No.
17          MS. STROKER: Objection.
18      Q.    Were you aware of Madoff's reputation
19  in the industry?
20      A.    Not really, no.
21      Q.    Did you ever discuss his option
22  strategy?
23      A.    No.
24      Q.    Did you ever compare him or his
25  performance to Cohanzick or Cerberus?

23 (Pages 86 to 89)

Page 90

1     A.     I noticed it, just because I prepared
2  the performance, but I never took the time and
3  analyzed his performance versus anyone else.
4     Q.     What were your observations?
5     A.     My observations were kind of like I
6  said before. The years 2004 leading up to the third
7  and fourth quarter of 2008, all of our investments
8  were generally up. I noticed that Madoff had good
9  returns, but nothing more than that.
10     Q.     Were they steady returns?
11     A.     They seemed to be steady returns.
12     Q.     Were you ever concerned about the
13  fact that Madoff did not give his investors
14  electronic access?
15     A.     That did not concern me.
16     Q.     Did you ever try to obtain electronic
17  access from Madoff?
18     A.     I did early in my time at Gabriel. I
19  was trying to automate things a little bit better,
20  something I thought I could help with when I got
21  there. I asked Mike Autera if we could get online
22  access and I don't remember what the exact answer
23  was, but I do remember him saying, if you want to
24  call or Ralph can call over and see if we can get
25  it. I don't remember what happened. Bottom line is

Page 91

1  we did not have electronic access. I was under
2  the -- I was under the assumption that it was not
3  available. No one told me that directly, but we did
4  not have electronic access for that account.
5     Q.     Did you or Ralph ever discuss the
6  lack of electronic access?
7     A.     I do believe I asked Ralph if he had
8  asked them and from what I can recall that's why I
9  came to the conclusion that it was not available. I
10  think Ralph was the one that told me it was not
11  available.
12     Q.     Did you ever have a sense that
13  eventually Madoff might have electronic access?
14     A.     No.
15     Q.     Were you ever concerned about any
16  errors in the monthly statements from BLMIS?
17     A.     No.
18     Q.     Were you ever concerned about trades
19  on the Madoff statements that were conducted outside
20  the daily range for stocks?
21     A.     No.
22     Q.     Were you ever concerned about the
23  consistency of the return?
24     A.     No.
25     Q.     I believe I asked you before, but you

Page 92

1  said you were never concerned about the custodian
2  issue?
3     A.     I was not. It's just not my role.
4     Q.     Did you discuss it with Autera at
5  all?
6     A.     No.
7     Q.     Did you discuss it with Ralph?
8     A.     No.
9     Q.     It seems as if you understood fairly
10  well that in and out strategy in the market, the
11  variance analysis that we talked about before, that
12  he was in the market part of the time and then he
13  left the market.
14     MR. WHITE: I'm sorry, ask your
15  question.
16     Q.     Did you ever discuss that strategy
17  with anyone?
18     MR. WHITE: Let me just object to the
19  characterization that you added in the beginning
20  that he understood something fairly well.
21     MS. HARTMAN: Okay.
22     A.     Right.
23     Q.     You had an understanding of Madoff's
24  strategy; is that correct?
25     A.     I saw what Madoff did. I saw the

Page 93

1  trades that he did. I knew what he traded.
2     Q.     Okay.
3     A.     I don't know how he came up with the
4  idea of what day to buy this or sell that. So I
5  wouldn't say I was an expert in his strategy. I was
6  aware of the types of instruments he was trading.
7     Q.     Did you ever see any articles in the
8  newspaper, the financial press like Barron's,
9  discussing Bernie Madoff?
10     A.     Not prior to December 2008.
11     Q.     Did you ever hear the term
12  "front-running" in connection with Bernie Madoff?
13     A.     No. Not prior to 2008.
14     Q.     Did you ever hear the phrase "cherry
15  picking" in connection with --
16     A.     No.
17     MS. HARTMAN: I'd like to now mark
18  Exhibit 12 -- I'm sorry. It's 14. We're up to 14.
19     (Exhibit Achilarre-14 marked for
20  identification.)
21     Q.     This is a daily P & L statement; is
22  that correct?
23     A.     The first page is a daily P & L
24  statement.
25     Q.     In the second page --

24 (Pages 90 to 93)

Page 94

1      A.      The subsequent pages are the
2 month-end broker statement for Ariel's portfolio at
3 Madoff.
4      Q.      Let's focus on the first page.  Who
5 would generate this information?
6      A.      This is a report that comes directly
7 out of our portfolio management system.  And Ralph
8 Sanchez would have printed this.
9      Q.      On a daily basis?
10     A.      Yes.
11     Q.      And the check marks mean what?
12     A.      The check marks mean he reconciled
13 our portfolio to the portfolio provided below,
14 beneath.
15     Q.      This is something that he did on a
16 daily basis.  Would he print out a daily P & L, like
17 say October 30th, 2008?  Or is it just an end of the
18 month?
19     A.      Clarity.  The top report is a daily
20 report.
21     Q.      Okay.
22     A.      This report below, the Madoff report
23 is a monthly report.  So this is the month-end
24 broker statement.  We get this once a month.
25     Q.      Right.

Page 95

1      A.      The report above it is a daily report
2 that was printed daily.
3      Q.      So perhaps they're just together in
4 Bates ranges and that's why I stapled them.
5      A.      Well, I think they're together
6 because the reconciliation is done once a month and
7 that's done from the broker's statement to the
8 report above it.
9      Q.      Okay.  Let's go to page 2.  And I
10 understand that Mr. Sanchez did this, not you, but
11 he's checking the dates, October 1st there's a check
12 mark.
13     A.      Yes.
14     Q.      What is he checking that against?  A
15 trade ticket?
16     A.      Yes.
17     Q.      So he would have the trade ticket for
18 October 10th and he would check it to Baxter
19 International; is that correct?
20     A.      Right.  The tick mark is probably
21 ticking that what we have in our system ties to
22 this.  He booked a Baxter dividend in our system for
23 10/1, it's on 10/1 here and he's just checking his
24 work.
25     Q.      What does MFA mean?

Page 96

1      A.      MFA is the fund identifier in our
2 system.  So if he wanted to run a report for the
3 Madoff Ariel portfolio, he would have to tell our
4 system to run the MFA report.  So just an identifier
5 for the fund.
6      Q.      The numbers are values on this sheet.
7 They were never checked against realtime Bloomberg
8 figures; is that correct?
9      A.      That's correct.
10     Q.      So you were checking what Madoff gave
11 you against your internal account --
12         MS. STROKER:  Objection.
13         MR. WHITE:  Just clarify again who
14 you mean by "you."
15     Q.      One, Gabriel Capital.
16     A.      The back office, the accounting
17 group?
18     Q.      Yes.  You would check, you meaning
19 Mr. Sanchez, would check Madoff's statements against
20 Gabriel Capital's accounting records?
21     A.      That's correct.
22     Q.      So you never -- so Gabriel Capital
23 never went outside its own records or Madoff's
24 records to check the value of the stocks?
25     A.      No, that's not true.  The value of

Page 97

1 the stocks is the market price.  That would come
2 from Bloomberg.
3      Q.      It would?
4      A.      The market price for a held position,
5 yes.  So, for instance, at this month end they're
6 holding treasury bills, so we would verify the
7 price, I'm not sure what treasury bills, but the
8 price where you see price column, I believe that
9 does come out of Bloomberg.  The price on the top
10 page.
11     Q.      Oh, okay.
12     A.      So price, that comes from Bloomberg.
13 And then that would tie to the statement.
14     Q.      Okay.
15         MR. WHITE:  Are you referring to the
16 column that says "cost"?
17         THE WITNESS:  I'm referring to the
18 price.  So price per share.
19     Q.      So price per share would be generated
20 from Bloomberg.
21     A.      Right.  And then it would tie to the
22 statement behind.
23     Q.      And from your work in the back office
24 did you ever hear Mr. Sanchez say, oh, these numbers
25 aren't making sense or, oh, this doesn't tie?

25 (Pages 94 to 97)

IRVING H. PICARD v. J. EZRA MERKIN          CONFIDENTIAL          MICHAEL J. ACHILARRE 8/9/11

Page 98

1      A.      No.
2      Q.      He never complained about the Madoff
3   statements?
4      A.      No.
5      Q.      Did Mr. Autera ever complain about
6   the Madoff statements?
7      A.      No.
8      Q.      So no one in the back office thought
9   there was anything amiss with Madoff's statements?
10      A.      That's correct.
11          MS. HARTMAN:  Left's mark as Exhibit
12   15.
13      A.      If I could just clarify, I think
14   before you said never.  I don't like to use the word
15   "never."
16      Q.      Sure.
17      A.      In any back office, errors do arise
18   at times, but there were no general instances of
19   anyone having any questions over the Madoff
20   statements, in general.  There were specific
21   instances, maybe, of like the dividend issue you
22   brought up before.
23      Q.      Okay.
24      A.      But there were no general concerns.
25      Q.      Can you recall any other specific

Page 99

1   concerns?
2      A.      I can't, and that's what I was
3   answering before when you asked about -- I think you
4   used the word "never."  So I just wanted to clarify.
5   I don't like to give a yes or no for a question,
6   never.
7          (Exhibit Achilarre-15 marked for
8   identification.)
9      Q.      This is Exhibit 15.  This is another
10   daily P & L.  I wasn't sure what this notation at
11   the bottom that said "actual 1,470,245" meant in
12   comparison with the monthly P & L.  What does it
13   mean by actual down there?  Do you know whose
14   handwriting -- I asked you a series of questions, so
15   I'm sorry.  Do you know what the actual means there?
16      A.      I don't.
17      Q.      Do you know whose handwriting that
18   might be?
19      A.      I don't know.  It's not mine.
20      Q.      I look up above and it says "Madoff -
21   Ascot Fund, Madoff - Ascot Partners, Madoff - Ariel
22   Fund, Madoff - Gabriel Capital, LP."
23      A.      Um-hum.
24      Q.      Does that mean all those entities
25   were invested in these treasuries?

Page 100

1      A.      That means these treasuries listed
2   were held by one of these accounts.  So this is a
3   report that's showing all of the Madoff investments.
4   It could be that all five were invested in all of
5   these, but I can't say for sure.  If you want to
6   take an example, just the very first line item, the
7   US Treasury bill, that's the total amount between
8   those five funds for that T-bill.
9      Q.      Okay.  So collectively that's how
10   much --
11      A.      Collectively, exactly.
12      Q.      And then at one point you would
13   allocate, at a later point on another report you
14   would allocate the profits?
15      A.      Exactly.  Exhibit 14 is just the
16   Ariel piece.  So it's the same report but Exhibit 14
17   showing just the Ariel piece, while Exhibit 15 is
18   showing all the Madoffs together.
19      Q.      Okay.  And these numbers, could you
20   tell me the open price, are those numbers that you
21   received from Bloomberg?
22      A.      No.  The column "Open" and the column
23   "Close," that's quantity.  So that's the shares that
24   we had in each of these investments, and that would
25   come from the activity that we received from Madoff.

Page 101

1   So all the buys and sells would equal the closing
2   quantity.  The price would come from Bloomberg.
3      Q.      Where would the market value come
4   from?
5      A.      That's just close times price.
6      Q.      Let me back up.  Did you say close is
7   from Madoff?
8      A.      Close is the -- yes, took all the
9   trades that Madoff did in that security, you get
10   your closing quantity.
11      Q.      Okay.  Did the back office ever
12   encounter an instance where the market value was off
13   on the Madoff numbers?
14          MS. STROKER:  Objection.
15      A.      That's a little bit of a hard
16   question, because we were taking the price from
17   Bloomberg at month-end here or on a daily basis.  We
18   would get a month-end from Madoff.  Our prices
19   should match.  And if they didn't, that would be a
20   reason for something to be off.  I can't recall if
21   there was a time when a price differed from
22   Bloomberg to Madoff at a month-end.
23          MS. HARTMAN:  Exhibit 16.
24          (Exhibit Achilarre-16 marked for
25   identification.)

26 (Pages 98 to 101)

Page 114

1  business relationship with Mr. Merkin.  We talked
2  but it was typically just friendly chatter.  Should
3  Mike Autera not be in the office for vacation, and
4  Ezra needed something, he would come to me.  But it
5  was not regular, we didn't meet on a regular basis.
6       Q.      Could you give me one example of
7  something Mr. Merkin might have asked you about in
8  Mr. Autera's absence.
9       A.      He could ask me for a portfolio, can
10  you run me this portfolio, the value of an
11  investor's capital account.  Along those lines.
12       Q.      Do you know if Mr. Merkin had access
13  to the PMS system?
14       A.      I can't say for sure.  He may have.
15       Q.      Did Mr. Autera have access to the PMS
16  system?
17       A.      Yes.
18       Q.      And Mr. Sanchez?
19       A.      Yes.
20       Q.      And Mr. Askling?
21       A.      Yes.
22       Q.      Anyone else?
23       A.      No.  That would be it.
24       Q.      All right.  And when did you learn
25  about Madoff's arrest?

Page 116

1  more, really, or any less work on those accounts.
2  They were confirmed by audits at year-end.
3            So, sure, when I read what people
4  call red flags, I say to myself, oh, you know,
5  that's interesting, but I to this date don't feel
6  that we did anything where we should have picked up
7  on this.
8       MS. HARTMAN:  Any other questions?
9       MS. STROKER:  Not at this time.
10       MR. LAFFEY:  No.  We'll reserve our
11  rights.
12       MS. MALASKA:  Same, no questions.
13  We'll reserve our right to ask questions later.
14       THE WITNESS:  I don't have any
15  questions.
16       MS. HARTMAN:  Thank you very much for
17  your patience and your cooperation.  We're done.
18       (Deposition concluded 1:20 p.m.)
19            -o0o-
20
21
22
23
24
25

Page 115

1       A.      I saw it on TV the day of December
2  11th, 2008.
3       Q.      And did Mr. Autera then have any
4  specific instructions for you?
5       MR. WHITE:  In connection with the
6  recent arrest?
7       MS. HARTMAN:  After the news of the
8  arrest.  Thank you.
9       A.      Yeah, he just simply told me if
10  investors are to contact you, that I can forward
11  them to him.
12       Q.      And after reading the articles about
13  Madoff's arrest and the Ponzi scheme, is there
14  anything now in retrospect you say to yourself, oh,
15  yeah, well, that was kind of unusual in dealing with
16  him?
17       MR. WHITE:  Objection.
18       MS. STROKER:  Objection.
19       Q.      Please answer.
20       A.      I think everything that we did in
21  regards to the Madoff account was correct.  We had a
22  year-end audit.  To me the Madoff account was an
23  account no different than our accounts at Morgan
24  Stanley, in that it was an accredited broker.  Our
25  records tied to their records.  We didn't do any

Page 117

1            CHANGES AND SIGNATURE
2
3  WITNESS NAME:  MICHAEL J. ACHILARRE
4  PAGE/LINE          CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

30 (Pages 114 to 117)

# Exhibit 91

Page 61

1                 C O N F I D E N T I A L

2            UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK

3

4       --------------------------------x
        In Re:

5

        BERNARD L. MADOFF INVESTMENT            Adv.Pro.No.
6       SECURITIES LLC,                         08-01789(BRL)

7                    Debtor.
        --------------------------------x
8       IRVING H. PICARD, Trustee for the      VOLUME II
        Liquidation of Bernard L. Madoff
9       Investment Securities LLC,

10                   Plaintiff,                 Adv.Pro.No.
                                                09-1182(BRL)
11                   v.

12      J. EZRA MERKIN, GABRIEL CAPITAL,
        L.P., ARIEL FUND LTD., ASCOT
13      PARTNERS, L.P., GABRIEL CAPITAL
        CORPORATION,

14

15                   Defendants.
        --------------------------------x

16

17            DEPOSITION of MICHAEL E. AUTERA, JR.,

18      as taken by and before NANCY C. BENDISH, Certified

19      Court Reporter, RMR, CRR and Notary Public of the

20      States of New York and New Jersey, at the offices of

21      BAKER & HOSTETLER, 45 Rockefeller Plaza, New York,

22      New York on Wednesday, October 19, 2011, commencing

23      at 10:32 a.m.

24

25

Page 106

1  funds.
2      Q.      The calculation of fees?
3      A.      The charging of the fees to limited
4  partners and shareholders of the two funds.
5      Q.      Was that a decision made by
6  Mr. Merkin?
7      A.      Yes.
8      Q.      Did you have any discussions with him
9  about that decision?
10      A.      This was in the aftermath of the
11  Madoff announcement and in speaking with counsel --
12      MR. ANELLO:  If your conversation
13  with Mr. Merkin resulted in him relaying information
14  from counsel or analysis from counsel, you should
15  avoid going into the substance of the conversation,
16  either with counsel or Mr. Merkin, if it's based on
17  counsel's conversation.
18      A.      I believe it was based on
19  conversations with counsel.
20      Q.      So you don't recall any conversation
21  with Mr. Merkin other than conversation revealing
22  information based on discussions he had with
23  counsel?
24      A.      Or in which I was involved that
25  counsel was present, not that I recall.

Page 107

1      Q.      Tell me in layman's terms, what is a
2  management fee?
3      A.      A management fee is a fee that's
4  based on the level of assets managed in the fund.
5  That's my understanding of a management fee.
6      Q.      And then the same question for
7  incentive fee.
8      A.      An incentive fee is a fee based on a
9  percentage of the appreciation earned in that fund.
10      MR. KITCHEN:  This would be a good
11  time to break for five or ten minutes.
12      MR. ANELLO:  Sure.
13      (Recess 11:38-11:48 a.m.)
14  BY MR. KITCHEN:
15      Q.      Mr. Autera, before the break we
16  discussed a number of, I guess one prospectus and a
17  number of offering memoranda for the various funds
18  that invested through BLMIS.  Are you aware in any
19  of those documents of any reference to either
20  Mr. Madoff or to BLMIS?
21      A.      My recollection is that the Ascot
22  offering memorandum mentioned the Madoff firm.
23      Q.      In what context?
24      A.      As being custodian or broker for
25  Ascot.

Page 108

1      Q.      Were either Mr. Madoff or BLMIS ever
2  referenced as a money manager in any of these
3  documents?
4      A.      By name, not that I'm aware of.
5      Q.      Or as an investment adviser?
6      A.      Again, by name not that I'm aware of.
7      Q.      Are you aware as to how Mr. Madoff
8  and BLMIS were compensated for the work they
9  purportedly did on behalf of Ascot, Ariel and
10  Gabriel?
11      A.      My understanding is that they
12  received a trade -- a commission on the trading.
13      Q.      What was the size of that commission?
14      A.      I don't recall specifically.  Four
15  cents, five cents.
16      Q.      Do you recall if it ever changed?
17      A.      I don't know.
18      Q.      How are you aware of that?
19      A.      I believe it was as a result of
20  conversation with Mr. Merkin.
21      Q.      Would that be information that would
22  be available in the trade confirmations that you
23  received, and that you or your staff reviewed?
24      A.      Some confirmations showed the
25  commission, but many of the confirmations reflected

Page 109

1  a net price, so the confirmation was part of the
2  price of the security sold and purchased.
3      Q.      You testified earlier that you had
4  involvement as far as providing information for
5  these offering memoranda and prospectus.  Did you
6  ever have discussions with Mr. Merkin as to whether
7  or not more disclosure should be made concerning the
8  management that was being done by BLMIS on behalf of
9  these funds?
10      A.      Not that I recall.
11      Q.      Do you recall ever having questions
12  by investors as to whether or not more disclosure
13  should be made?
14      A.      Not that I recall.
15      MR. KITCHEN:  Mr. Bitman, do you have
16  the next exhibit.
17      (Exhibit Autera-15 marked for
18  identification.)
19      Q.      I ask you to look over this group of
20  documents.  Tell me if you recognize them.
21      A.      Okay.
22      Q.      What is this set of documents?
23      A.      This is the subscription agreement
24  related to my IRA's investment in Ascot Partners,
25  LP.

13 (Pages 106 to 109)

08-01789-cgm    Doc 11718-13    Filed 10/09/15    Entered 10/09/15 12:21:52    Exhibit
86-99    Pg 118 of 148

BLMIS v. MERKIN, et al.                    CONFIDENTIAL                    MICHAEL E. AUTERA, JR. 10/19/11

Page 110

1        Q.      In connection with that subscription,
2    do you remember submitting any other documents other
3    than those that are reflected here?
4        A.      I'm not sure.
5        Q.      If you look at the last page, again,
6    is that Mr. Merkin's signature on behalf of Ascot
7    Partners?
8        A.      Yes, it is.
9        Q.      Can you tell me who the other -- I
10   guess the other signature is a Notary.  Did you fill
11   out the information on this page?
12       A.      I did not.
13       Q.      Who would have done that?
14       A.      It would have been someone at the IRA
15   fiduciary, at Delaware Charter.
16       Q.      They would have done that at your
17   instruction?
18       A.      I would have asked them, I would have
19   made the decision to invest in Ascot Partners on
20   behalf of my IRA and they would have done the
21   paperwork.
22       Q.      Tell me why you made the decision to
23   invest in Ascot Partners?
24       A.      I don't recall specifically, but I
25   thought that Ascot was a good investment.

Page 111

1        Q.      Do you recall if you approached
2    Mr. Merkin about that or if he approached you, or
3    some other arrangement?
4        A.      I don't recall approaching him.  It
5    would have been my decision.
6        Q.      The acknowledgement on the last page
7    is dated December 16th, 1999.  And then the
8    subscription itself, the subscription agreement is
9    marked December 15th, 1999.  Do you recall if that
10   is when, there in the month of December 1999, that
11   you subscribed to Ascot Partners?
12       A.      I don't believe -- my subscription I
13   believe was as of January 1st, 2000.
14       Q.      Do you know what the size of that
15   subscription was?
16       A.      Specifically, no.
17       Q.      Do you have a general understanding?
18       A.      I believe it was somewhere between
19   600 and $700,000.  That's my recollection.
20       Q.      Prior to Mr. Madoff's arrest, did you
21   make any redemptions from that investment?
22       A.      No.
23       Q.      Do you recall what the size of the
24   investment was at the end of November 2008?
25       A.      I believe it was approximately $1.8

Page 112

1    million.
2                MR. POWERS:  Point 8 or point 4?
3                THE WITNESS:  1.8, I think.  I don't
4    recall the exact amount.
5        Q.      On the very first page is a
6    handwritten note -- have you had any withdrawals or
7    redemptions since Mr. Madoff's arrest?
8        A.      No.
9        Q.      Or distribution?
10       A.      No.
11       Q.      The note on the first page, I believe
12   that reads:  "Client's check will be wired directly
13   to you," do you know whose handwriting that is?
14       A.      I do not.
15       Q.      I'd like to talk to you about the, I
16   guess the mechanics of how money actually was put in
17   when either you or another investor subscribed to
18   Ascot Partners.  Was money initially placed by wire?
19                MR. ANELLO:  For whom?  For him or
20   others?
21       Q.      How would money be placed from an
22   investor subscribing in Ascot?
23       A.      An investor could either write a
24   check to Ascot Partners or could wire funds into
25   Ascot Partners.

Page 113

1        Q.      If they wired it, where would the
2    wire go to?
3        A.      For Ascot Partners it would go to
4    Ascot's brokerage account at Morgan Stanley &
5    Company.
6        Q.      And a check, where would that go?
7        A.      The check would come to Gabriel
8    Capital Corp.  Gabriel Capital Corp. would deposit
9    it at the Morgan Stanley account.
10       Q.      For the portion of Ascot that was
11   invested through BLMIS, take me through the steps of
12   how that money went from the Morgan Stanley
13   brokerage account to the custody of BLMIS.
14       A.      Mr. Merkin would decide the amount
15   of -- if there was a change, he decided to make a
16   change, whether to add money to the Madoff account
17   or take money out of the Madoff account, that
18   decision would be made, and he would let me know and
19   I would send a wire request.  If the money was going
20   to the Madoff account, generally I would send a
21   request to Morgan Stanley asking them to wire funds
22   to Morgan Stanley -- to Madoff.  And if Madoff, if
23   we were taking money out of the Madoff account, I
24   would send instructions to the Madoff firm asking,
25   telling them -- instructing them to wire the funds

14 (Pages 110 to 113)

BLMIS v. MERKIN, et al.                    CONFIDENTIAL                    MICHAEL E. AUTERA, JR. 10/19/11

Page 114

1  to Morgan Stanley.
2       Q.    The wires to and from BLMIS, do you
3  recall where that account was?  Where the money
4  actually would have gone?
5       A.    My recollection is that Madoff
6  Securities used a bank account at JPMorgan.
7       Q.    And within the account, turning to
8  the Morgan Stanley brokerage account, was there any
9  segregation of assets there for investors in Ascot
10  versus Ariel and Gabriel, or was it all just one
11  fund -- one account?
12      A.    I'm sorry, just ask that again,
13  please.
14      Q.    Sure.  You said for investors in
15  Ascot that whether it was by wire or check being
16  deposited, eventually the money ends up in a
17  brokerage account at Morgan Stanley, correct?
18      A.    Yes.
19      Q.    Is that also the case for investors
20  in Ariel and Gabriel?
21      A.    Yes.
22      Q.    And specifically is it correct then
23  that investors in Ariel and Gabriel, their money
24  either by wire or check would find its way into the
25  Morgan Stanley brokerage account?

Page 115

1       A.    It would be an account in the name of
2  whichever fund it was going to.  So, Ariel had its
3  own Morgan Stanley account, Gabriel had its own
4  Morgan Stanley account, and the two Ascots had their
5  own.
6            I should clarify that the offshore
7  fund subscriptions, if someone was wiring, would
8  have gone not to a Morgan Stanley account.  It would
9  have gone to an account at the Cayman Island
10  registrar because those were offshore funds.
11      Q.    Do you recall who the Cayman Island
12  registrar was?
13      A.    It varied over the course of time.
14  It began as MeesPierson.  Actually began as Pierson,
15  Heldring & Pierson.  Then MeesPierson and then
16  Fortis was the final.  They were all registrars in
17  Cayman.
18      Q.    And then for investments or money
19  placed for Ascot Partners, other than through BLMIS,
20  for instance I believe that you testified last time
21  that there were other investments at different
22  points in time with Pzena, Marque Millennium and
23  in-house trading.  For each of those, can you tell
24  me the mechanics of where the money would go from
25  the Morgan Stanley brokerage account?

Page 116

1       A.    Again, Mr. Merkin would decide to
2  allocate, let's say, Ascot monies to Pzena.  In the
3  case of Pzena, there was a separate Morgan Stanley
4  account in the name of Ascot Partners that we would
5  wire those funds to.  So we would instruct Morgan
6  Stanley to transfer the funds from the account I
7  mentioned before to this other account at Morgan
8  Stanley in the name of Ascot Partners.
9       Q.    That's for Pzena.  Is that also the
10  case for Marque Millennium?
11      A.    Marque Millenium was different.  That
12  was a fund that -- that was an outside fund, so
13  instructions would have been given to Morgan Stanley
14  to wire the funds from the Ascot account to Marque
15  Millenium for a subscription in that fund.
16      Q.    With regard to, limit it to the three
17  funds we've been talking about, Ascot, Ariel and
18  Gabriel, do you know if at any points in time
19  Mr. Merkin gave advice to investors or prospective
20  investors as to whether they should invest in one of
21  those funds versus others?
22      A.    Gave advice, whether...?
23      Q.    I'll strike that.
24            When investors first subscribed,
25  prior to that would they have conversation with

Page 117

1  Mr. Merkin as to the different funds Mr. Merkin
2  oversaw into which they could subscribe?
3       A.    Yes, I believe they did.
4       Q.    In those conversations would
5  Mr. Merkin -- what advice did he provide as to why
6  one should invest in Ascot as opposed to Ariel or
7  Gabriel or vice versa?
8       A.    I'm not sure.
9       Q.    Did you have those conversations with
10  him when you decided to invest in Ascot?
11      A.    No.  Not that I recall.
12      Q.    Did you consider investing in Ariel
13  or Gabriel?
14      A.    I was an investor in Gabriel as well.
15      Q.    When did you first subscribe to
16  Gabriel?
17      A.    I don't recall the specific date.  It
18  would have been I think this time period, around
19  2000.
20      Q.    Around the 2000 time period.
21      A.    I don't recall specifically.
22      Q.    We talked about Pzena and Marque
23  Millennium.  How much was that initial subscription
24  in Gabriel?
25      A.    Sitting here today I just don't

08-01789-cgm   Doc 11718-13   Filed 10/09/15   Entered 10/09/15 12:21:52   Exhibit
86-99   Pg 120 of 148

BLMIS v. MERKIN, et al.                    CONFIDENTIAL                    MICHAEL E. AUTERA, JR. 10/19/11

Page 118

1  recall.
2      Q.      Do you have a general recollection?
3  For Ascot you said between six and 700,000.  Was it
4  somewhere around there?
5      A.      I'm not sure.  I think it started as
6  smaller subscriptions but there were subsequent
7  subscriptions.
8      Q.      So initially started smaller than the
9  subscription to Ascot?
10     A.      Again, I just don't recall.
11     Q.      Do you recall if you ever made
12  withdrawals or redemptions from that investment?
13     A.      I did not.
14     Q.      Do you recall what the size of the
15  investment was as of December 11, 2008?
16     A.      I believe it was somewhere around a
17  million and a half dollars, I think.
18     Q.      Do you know if you received any,
19  either by way of redemption or withdrawal or
20  distributions, received any of those monies back
21  since December 11, 2008?
22     A.      I have not.
23     Q.      For the portions of Ascot you
24  testified previously there was a portion that was
25  allocated to in-house trading.

Page 119

1      A.      Yes.
2      Q.      In those events, take me through the
3  mechanics of where the money would go, if anywhere,
4  from the Morgan Stanley brokerage account.
5      A.      We're talking about the initial
6  account that an investor would wire their funds
7  into.  I believe that's the account where the
8  trading was done at Morgan Stanley.
9      Q.      So it didn't move, it was in the same
10  account?
11     A.      It did not move.
12     Q.      When an investor decided to redeem or
13  withdraw money as an Ascot investor, walk me through
14  the mechanics of where that money would come from.
15  Did it also come out of the Morgan Stanley brokerage
16  account?
17     A.      Ascot Partners?
18     Q.      Yes.
19     A.      Redemption proceeds would come out
20  of -- would be sent out of that account, yes.
21     Q.      Is there any other place they would
22  be sent out of?
23     A.      For Ascot Partners, yes.
24     Q.      Is that also the case for investors
25  in Ariel and Gabriel?  I should limit it, to

Page 120

1  Gabriel?
2      A.      Again, Gabriel would send its
3  redemption proceeds out of its Morgan Stanley
4  account, the account that was used to accept
5  subscriptions in.
6      Q.      For the portions of Gabriel that were
7  invested through BLMIS, were the mechanics the same
8  as you testified to about Ascot as far as money
9  being sent to BLMIS's JPMorgan account?
10     A.      Yes.  If a decision was made to
11  invest additional monies in the Madoff account, we
12  would instruct Morgan Stanley to wire funds in, if
13  the proceeds were -- if the amount coming was coming
14  from excess capital at Morgan Stanley.
15     Q.      For the years 2002 through 2008, can
16  you tell me the places where money was placed for
17  Ariel and Gabriel other than BLMIS?
18     A.      2002 through 2008?
19     Q.      Yes.
20     A.      There were various places.  We had
21  accounts managed by Cerberus.  We had in-house
22  trading.
23     Q.      In-house, would that be Mr. Jack
24  Mayer?
25     A.      It would be an account that he

Page 121

1  managed, yes.
2      Q.      Cohanzick and David Sherman, were
3  they in-house?  How were they treated?
4      A.      Well, I don't know how they were
5  treated.  David Sherman had an account at Morgan
6  Stanley that he managed on behalf of -- he had an
7  account for Ariel and an account for Gabriel.  There
8  were Pzena accounts for both.
9      Q.      And for Mayer, it was the same as
10  with Mr. Sherman, that there were separate accounts
11  at Morgan Stanley for the assets entrusted to him?
12     A.      Ariel had an account and Gabriel had
13  an account.  They were separate, yes.
14     Q.      Within those accounts -- how was the
15  accounting done as to here's the money entrusted to
16  Mr. Mayer as opposed to here's the money entrusted
17  to Mr. Sherman?
18     A.      How was -- I'm not sure I understand
19  your question.
20     Q.      If Mr. Merkin decided at some point
21  in time, I'm going to place additional monies with
22  Cohanzick, the mechanics of the money entrusted,
23  what would happen to it?  Would it leave the Morgan
24  Stanley brokerage account?
25     A.      It could.  Generally excess cash was

Page 130

1      Q.      To your knowledge is this an accurate
2  representation of the levels of compensation as
3  reflected here?
4      A.      I believe it is.
5      Q.      Is it accurate then that when the
6  compensation drops to zero that indicates that the
7  individual has left GCC?
8          MR. ANELLO:  Well, there are zeros in
9  the beginning and the end.
10     A.      In the column where it says H or T,
11 those are my notes for hire or terminate.  So
12 anything with a "T" was someone who left the firm,
13 anyone with an "H" was someone who came to the firm.
14     Q.      The individuals you identified,
15 starting with Mr. Gordon, what was the scope of his
16 duties in connection with the work he did for you?
17     A.      His work for Gabriel Capital Corp.,
18 he was responsible for the management information,
19 putting -- inputting into the management information
20 system.  He was responsible for doing kind of the
21 back office brokerage reconciliations and things
22 like that.
23     Q.      When you say input into the
24 management system, what was he inputting?
25     A.      Again, trade confirmations that would

Page 131

1  come in from the various places, he would input that
2  information into our management information
3  reporting system.
4      Q.      Did he have any other
5  responsibilities?
6      A.      He may have done some accounting
7  type, general ledger type work, but that wasn't the
8  main focus.
9      Q.      Mark Wiener, what was the scope of
10 his duties under you?
11     A.      Mark Wiener did some of that as well
12 but was more focused on the accounting from the
13 standpoint of the general ledger, dealing with the
14 audits and things like that.
15     Q.      Ralph Sanchez?
16     A.      Ralph Sanchez's role was much more
17 like Andrew Gordon's role.  He was responsible for
18 inputting trades into our system and dealing with
19 kind of the brokers in the back office.
20     Q.      Mr. Achilarre?
21     A.      Mr. Achilarre was much more -- he was
22 similar to Mark Wiener in that he was responsible
23 more for the accounting, the general ledger, office
24 related things, human resources, things like that,
25 and then dealing with auditors and those kinds of

Page 132

1  things.
2      Q.      Did he have any involvement in the
3  inputting of confirmations or other information in
4  the system?
5      A.      He could certainly have done that,
6  but that was not his main focus.
7      Q.      And then, lastly, Mr. Askling, what
8  were his duties?
9      A.      Mr. Askling was much more like the
10 role of Ralph and Andrew in that he's inputting
11 information into our system and dealing with the
12 brokers from a reconciling standpoint, things like
13 that.
14     Q.      Other than Messrs. Gordon, Sanchez
15 and Askling, were there any individuals you recall
16 in the period 2002 through 2008 whose duties -- who
17 had a substantial portion of their time taken up
18 with inputting information into the system, as you
19 described it?
20     A.      Again, other than Mark Wiener and
21 Mike Achilarre, who certainly had access to the
22 system and could have done it, the only other person
23 would have been me.
24     Q.      Do you recall having discussions with
25 any of these individuals at any point regarding

Page 133

1  Mr. Madoff or BLMIS?
2          MR. ANELLO:  Which individuals?
3          MR. KITCHEN:  Messrs. Gordon, Sanchez
4  and Askling.
5      A.      No.
6          MR. ANELLO:  I'm sorry, was your
7  question limited to a time?
8          MR. KITCHEN:  It was not.
9      Q.      Do you recall having any discussion
10 with these three individuals at any point in time
11 regarding the trade confirmations that they were
12 inputting?
13     A.      I don't recall any specific
14 conversations.
15     Q.      Do you recall generally talking about
16 the trade confirmations with him?
17     A.      Again, that was their role in
18 inputting the system, so I very well might have, but
19 I don't recall specific conversations.
20     Q.      Do you recall if at any point in time
21 these individuals raised concerns regarding the
22 information displayed in the trade confirmations?
23     A.      No.
24     Q.      Both before and after Mr. Madoff's
25 arrest?

19 (Pages 130 to 133)

Page 134

1      A.      I don't recall any conversation.
2      Q.      These individuals also input
3 information into the system taken from the monthly
4 statements provided you by BLMIS; is that correct?
5      A.      They would have, yes.
6      Q.      Do you recall if at any point in time
7 any of them raised concerns about the information
8 displayed in those monthly statements?
9      A.      Not that I recall.
10      Q.      Which individual or individuals at
11 GCC actually received the trade confirmations and
12 the monthly statements sent to GCC by BLMIS?
13      A.      The mail for the firm comes into the
14 receptionist.  So I guess initially the receptionist
15 would have received trade confirmations from Madoff
16 and the other brokers.
17      Q.      So they were sent just generically to
18 Gabriel Capital, not to the attention of either
19 yourself or Mr. Sanchez or anyone else?
20      A.      My recollection is they were
21 addressed to the fund that they related to.
22      Q.      And that's correct for 2002 through
23 2008?
24      A.      Yes.
25      Q.      Once the receptionist received them,

Page 135

1 who would then take custody?
2      A.      The receptionist would have given
3 them to one of those three people whose
4 responsibility was to input trade confirmations.
5      Q.      And so after the information was
6 input -- is that also the case with monthly
7 statements?
8      A.      I think so, yes.
9      Q.      So after the information was input
10 off of the confirmations and the monthly statements,
11 how was that information used by you in the back
12 office?
13      A.      The information would be part of our
14 management information reporting system.  So we
15 would have position sheets, we would have activity
16 reports, and we would have profit and loss
17 statements.
18          So that information, along with the
19 information from all the other brokers we dealt
20 with, would have been used by me or other
21 accounting personnel to prepare financial
22 statements, to prepare performance reporting, to
23 prepare exposure-type reporting.  All of the
24 accounting-type functions.
25      Q.      Were those reports used in any manner

Page 136

1 to conduct due diligence of Mr. Madoff or BLMIS?
2      A.      Again, they were used by me for those
3 purposes I just mentioned.  Clearly those reports
4 were also given to Mr. Merkin --
5      Q.      I'm not asking about the purpose.
6          MR. ANELLO:  He's not finished.
7      A.      -- and utilized by him to review all
8 the activity of the Madoff account and all the other
9 places that money was invested.
10      Q.      You mentioned an activity report.
11 What is that?
12      A.      That would be a report that would
13 just show all the buys and sells, dividends,
14 interest.  All the activity in a given account.
15      Q.      So what was the purpose of that type
16 of report for either yourself or Mr. Merkin?
17      A.      To see the activity for the fund.
18 You could see each -- it would be the detail behind
19 the profit and loss report or the position report
20 that's generated.
21      Q.      You mentioned an exposure report.
22 What is that?
23      A.      Well, it's not an exposure report.
24 It's exposure reporting.  So the value of the
25 investments where the funds -- you know, where the

Page 137

1 exposure is, the market value, the notional value,
2 things like that.
3      Q.      And how is that report used by
4 yourself or Mr. Merkin?
5      A.      From my standpoint, the amount of
6 exposure was used for financial statements, long
7 market value, short market value.  Exposure was also
8 reflected in the quarterly letters that went out to
9 investors for Ariel and Gabriel.  That's it.
10      Q.      Specifically as to BLMIS, when the
11 reports show exposure, was it exposure to Mr. Madoff
12 as an investment adviser, or was it exposure to the
13 specific equities and options that he purportedly
14 traded on their behalf?
15      A.      Well, it could be both.  The
16 reporting could be for the Madoff account in total,
17 or it could show the exposure to a given security
18 within that account, or -- it would be both.
19      Q.      Looking again at Exhibit 16, the
20 compensation summary, towards the bottom of that
21 list is listed Mr. Ezra Merkin.
22      A.      Yes.
23      Q.      Compensation for each year between
24 2000 and I guess 2006.  Is that correct?  Does this
25 accurately reflect all of the compensation

08-01789-cgm   Doc 11718-13   Filed 10/09/15   Entered 10/09/15 12:21:52   Exhibit
86-99   Pg 123 of 148

BLMIS v. MERKIN, et al.                          CONFIDENTIAL                      MICHAEL E. AUTERA, JR. 10/19/11

Page 162

1  sale there was a 9,000-dollar profit?
2        MR. ANELLO:  You're saying the first
3  page reflects after the sale --
4        MR. POWERS:  I'm trying to tie them
5  together.
6        Q.     Is this not the right transaction to
7  tie this together?
8        A.     This could be one of the
9  transactions.  The proceeds of 1,771,000 would be
10 part of the 9,000 -- would be part of the
11 calculation to come up with the $9,101 of proceeds.
12       Q.     Right.  And it could be the entire
13 methodology if there's nothing else reflected in
14 this particular monthly statement of a transaction
15 in that stock?  Or no, because in fact it could have
16 been in earlier purchase and sales of American
17 Express?
18       A.     Correct.
19       Q.     So this is really a report that's for
20 an annualized basis, cumulative over time?
21       A.     The P & L numbers are cumulative from
22 whatever period.  If it's the year-to-date, it's
23 since January 1st.  If it's quarterly, it's from the
24 first day of the quarter.  If it's monthly it's the
25 first day of the month and if it's daily, it's that

Page 163

1  day.
2        Q.     So this would be reflective then, if
3  you look at the second page of this P & L, of this
4  exhibit, it shows that the only numbers have, under
5  the market value column, treasuries, that the
6  positions as of October 31st were all in treasury
7  securities at that time.  Do I understand now what
8  this purports to represent?
9        A.     Right.  The only positions that this
10 report shows as of October 31st, 2000 would be a
11 small Fidelity cash reserve amount and then
12 treasuries.
13       Q.     Did you have any conversations with
14 Mr. Merkin -- withdrawn.
15             Did you say you have or have not
16 spoken to Mr. Madoff?
17       A.     I've spoken to Mr. Madoff.  I've been
18 in a meeting with him.
19       Q.     How many different meetings?
20       A.     Two that I recall.
21       Q.     When?
22       A.     One was in the early 1990s when the
23 account was first opened, and the next meeting that
24 I recall was in November of 2008.
25       Q.     And in that first meeting what was

Page 164

1  discussed?
2        A.     I don't recall specifically.
3        Q.     Which account was being opened at
4  that time?
5        A.     To my recollection it was the Gabriel
6  account and an Ariel account.
7        Q.     Who was present?
8        A.     I went over to their offices with
9  Mr. Merkin.
10       Q.     Anyone else present besides
11 Mr. Madoff?
12       A.     I believe I met Frank DiPascali at
13 that meeting.
14       Q.     Did he identify him, who
15 Mr. DiPascali was?
16       A.     I don't recall specifically, but I
17 knew that Mr. DiPascali would be the one I would be
18 working with on kind of the back office things
19 associated with the account.
20       Q.     When you next spoke -- excuse me, met
21 with Mr. Madoff in November 2008, where was that?
22       A.     Where was it?
23       Q.     Yes.
24       A.     It was in the Madoff offices.
25       Q.     Who was present?

Page 165

1        A.     Mr. Merkin, Mr. Madoff and four
2  representatives from one of Ascot's limited
3  partners.
4        Q.     Which limited partner?
5        A.     Union Bank Privee.
6        Q.     What was the purpose of the meeting?
7        A.     The meeting was set up so that the
8  people from UBP could meet and ask questions of
9  Mr. Madoff.
10       Q.     Why was that set up for that purpose?
11       A.     Prior to the meeting the UBP people
12 had requested some information regarding Ascot and
13 Madoff in a letter to, I believe Mr. Merkin.
14             Subsequent to that there was a call
15 with the UBP people in which Mr. Merkin provided
16 information and answered questions to them.  At some
17 point during that conversation Mr. Merkin offered to
18 have them come, arrange a meeting with Mr. Madoff if
19 they wanted to do that.
20       Q.     What information were they seeking
21 from Mr. Madoff and Mr. Merkin?
22       A.     Sitting here I don't recall
23 specifically.  There were various questions that
24 they had.
25       Q.     How long was the meeting?

BLMIS v. MERKIN, et al.                    CONFIDENTIAL                    MICHAEL E. AUTERA, JR. 10/19/11

Page 166

1      A.      Couple of hours, two hours.
2      Q.      How much money did UBP itself or with
3  its clients have invested in the funds?
4      A.      I don't know exactly.
5      Q.      Approximately?
6      A.      My recollection is they were, Ascot,
7  either Ascot Partners or Ascot Fund combined, the
8  largest investor.  Again, I don't recall exactly.
9  Several hundred million dollars.
10      Q.      What issues or concerns had they
11  expressed -- withdrawn.
12              Were you present when they expressed
13  issues or concerns to Mr. Merkin with respect to the
14  account and the use of Mr. Madoff and his firm?
15      A.      I'm not aware of any issues or
16  concerns that they had.  Again, they sent a letter
17  asking questions.
18      Q.      But presumably they weren't satisfied
19  with those answers and therefore that precipitated a
20  meeting; would that be fair?
21      A.      I don't know if they were satisfied
22  or not.  There may have been questions that we
23  couldn't -- Mr. Merkin or I couldn't answer.
24      Q.      Well, was that the case?
25      A.      I don't recall specifically.

Page 167

1      Q.      So you don't recall whether or not it
2  was because you didn't know the answers to the
3  questions or whether or not they were unsatisfied
4  with the answers?
5      A.      I don't recall them being unsatisfied
6  with the answers.  Again, I think Mr. Merkin offered
7  to set up a meeting, a direct meeting between them
8  and they accepted that.
9      Q.      Okay.  What questions do you recall
10  being asked by UBP?
11      A.      At the meeting?
12      Q.      At the meeting, yes.  Thanks for
13  clarifying that.
14              MR. ANELLO:  The meeting with Madoff?
15              MR. POWERS:  Yes.  Thank you.
16      A.      I recall they asked about the option
17  counterparties.  That was discussed.  They asked
18  about the auditor of the Madoff firm.  Again, I just
19  don't recall other questions.
20      Q.      So those are the only two topics you
21  recall, asking about the option counterparties and
22  the auditor?
23      A.      Those are the only two I remember
24  now.
25      Q.      What were they inquiring about with

Page 168

1  respect to the option counterparties.
2      A.      They wanted to know whether or not
3  the options were done over the counter or on
4  exchanges, and just what sorts of -- I recall that
5  he spoke about performance guarantees that he
6  required of all his option counterparties.
7      Q.      And what did Mr. Merkin say about --
8  excuse me.  What did Mr. Madoff say about these
9  comments?
10      A.      I recall he said he had a diverse
11  group of 20 or so counterparties and that he did
12  require certain performance guarantees from them.
13      Q.      Did he indicate what kind of
14  guarantees?
15      A.      Not that I recall.
16      Q.      Did he indicate the names of the
17  counterparties?
18      A.      Not that I recall.
19      Q.      Was he asked for the names?
20      A.      I'm not sure.
21      Q.      Do you have any reason to know why he
22  didn't volunteer any of the names?
23      A.      No.
24      Q.      What else do you recall was discussed
25  during that meeting on the topic of option

Page 169

1  counterparties?
2      A.      Nothing else comes to mind right now.
3      Q.      With respect to the auditor, what was
4  UBP's issue on that?
5      A.      I don't know if they had an issue.
6  They asked why he used the firm that he used.  I do
7  recall he said they had been the long-time auditors
8  for his firm and that he felt the cost and level of
9  service of some of the larger public accounting
10  firms just wasn't worth it for him.
11      Q.      Did you have any follow-up --
12  withdrawn.
13              After the meeting were there other
14  conversations you had, Mr. Merkin had with UBP
15  concerning the topics discussed at the meeting?
16      A.      Did I have?
17      Q.      Um-hum.
18      A.      My follow-up was more in relation to
19  proposed redemptions that UBP had for their
20  investments in Ascot.  After the meeting, they
21  rescinded a large part of those redemption requests.
22  So, my role was to just kind of effect those changes
23  from the standpoint of revised requests and things
24  like that.
25      Q.      Those requests to be effective when?

28 (Pages 166 to 169)

Page 170

1    A.    December 31st, 2008.
2    Q.    Put it at least 45 days in advance in
3  accordance with terms of the PPM?
4    A.    Correct.
5    Q.    What portion of -- well, you said a
6  large portion.  Do you recall if they rescinded all
7  of that or not?
8    A.    No, they didn't.  My recollection is
9  that their original redemption request was for a
10  very large percentage of their total investment.
11    Q.    Which was, approximately?
12    A.    Again, several hundred million
13  dollars.
14    Q.    Several hundred million, 300 million?
15    A.    I believe more than that.
16    Q.    Okay, half a million?
17    A.    Probably less.
18    Q.    Okay.  Thank you.  Somewhere between.
19    A.    After the meeting and speaking to
20  their operations people, I think they cut back their
21  redemption requests by more than half.
22            MR. MENNITT:  I'm sorry, what was the
23  answer; by more than half?
24            THE WITNESS:  By more than half.
25    Q.    And then you know on December 11th

Page 171

1  there was the confession, right?  And did they
2  receive any redemptions subsequent to the
3  confession?
4    A.    No.
5    Q.    So none of their redemption requests
6  were satisfied?
7    A.    There were no redemption proceeds
8  sent out.
9    Q.    Was there ever any discussion raised
10  by UBP or other investors as to why it was the
11  monies that were placed at BLMIS were treasuries,
12  appeared to be treasuries at the end of certain
13  months?  Going back to the exhibit.
14    A.    I do recall that UBP at the meeting
15  with Mr. Madoff asked about how he timed his
16  investments into the strategy and out of the
17  strategy.  I believe that was asked.
18    Q.    What was his response?
19    A.    I don't recall specifically, but,
20  again, I think he described the strategy and
21  explained that that was the key to his success, was
22  coming up with the timing.
23    Q.    Looking at page 3 of this document,
24  there appears to be handwriting.  See where it says
25  last month and then there's some numbers there?

Page 172

1    A.    Yes.
2    Q.    Do you know whose handwriting appears
3  on this page?
4    A.    I believe it's -- I think it's Mike
5  Achilarre's.
6    Q.    What is this reflective of?
7    A.    I believe the value of Ascot
8  Partners -- Ascot Funds Madoff account at the end of
9  the previous month was, he's saying it's 306 million
10  990 and then on October 1st, I think this means that
11  an additional 11,900,000 was put into the account.
12    Q.    Okay.  Looking right above there,
13  there are columns off to the middle of the page,
14  talk about open/closed positions and market value,
15  quarterly P & L, year-to-date P & L.  There's the
16  number 360 -- is that 367,360 dollars 902 dollars --
17  let me start again.  367,360 -- let me start again.
18  367 million 360,902 dollars.  Do you see that?
19    A.    That's total market value.  It looks
20  like it's 357.
21    Q.    Okay.  Your glasses are more
22  effective than mine.
23            That would be the current market
24  value, right, consistent with what you said before?
25    A.    That would be the total of the

Page 173

1  open -- the market value, the total of the market
2  value positions on this sheet.  So I believe this
3  speaks as of October 31st.
4    Q.    So these would just be the money
5  market and the treasuries then, right?
6    A.    Yes.
7    Q.    And then quarterly P & L would be for
8  the month, purportedly what was profit, right?
9  714,000, correct?
10    A.    No.  It would be the 4 million 884.
11  The 714 was the P & L -- quarterly P & L only for
12  the open positions, which would be the treasuries
13  and the money market.
14    Q.    Right.  Okay.  So the year-to-date
15  P & L would be reflective of what?  1,138,000.
16    A.    That would be the year-to-date P & L
17  for the positions that were open as of this date.
18  So the treasuries and...
19    Q.    And the closed ones which would
20  include, for example, the American Express we talked
21  about earlier, would be the next colummn and so in
22  year-to-date there appears to be 37 million plus
23  profit from those positions, correct?
24    A.    For that period for the positions
25  that were open at some point during the period and

29 (Pages 170 to 173)

Page 174

1  then were not open as of the end of the period.
2        Q.      The period being from January 1
3  through October 31?
4        A.      For the year-to-date column, yes.
5        Q.      Yes, okay.  And for a total P & L for
6  this Ascot Fund of approximately 38 million?  Am I
7  reading it correctly?
8        A.      For the year-to-date, yes.
9              (Autera Exhibits 102 through 106
10  marked for identification.)
11        Q.      At this time have you looked at what
12  we've marked as Exhibit 102, which are monthly
13  statements for the period of February 2003; Exhibit
14  103, which are for the period of August 2004;
15  Exhibit 104 for the period of March 2006; 105 for
16  the period of September 2007; and 106 for the period
17  of November 2008.
18              I'm going to give them all to you to
19  take a look at it and generally authenticate that
20  that's what they are, if you would.  I'm not going
21  to go into detail on each one of them.
22              (Comments off the record.)
23        Q.      Can you generally identify these
24  documents, sir?
25        A.      Again, without looking at every

Page 175

1  single page, they are either extracts or copies of
2  profit and loss reports from our management
3  information reporting system, GCC's management
4  information reporting system and monthly brokerage
5  statements received that reflect the given month
6  coming from Bernard L. Madoff Investment Securities.
7  And they're for different periods.
8        Q.      And would the P & L be the similar
9  type, the columns and the calculations be similar to
10  the first one that we went through, would you say?
11        A.      Yes.
12        Q.      Let me turn just for a moment to some
13  handwriting on 102.  It's document page 43 -- the
14  SEC number of 43338.
15        A.      Okay.
16        Q.      I just want to know if you're able to
17  identify for the record whose handwriting that is.
18        A.      Again, it appears to be Mike
19  Achilarre's handwriting.
20        Q.      The check marks?  See the check marks
21  above that?
22              MR. ANELLO:  You're asking who he
23  believes -- whose check marks those are?
24        Q.      Take your counsel's question.
25        A.      I'm not sure, but I assume they're

Page 176

1  his.
2        Q.      Would it have been your practice to
3  check -- withdrawn.
4              How would you evidence -- withdrawn.
5              Did you review these from time to
6  time?
7        A.      Yes.
8        Q.      How frequently would you review
9  these?  And by these I'm talking about the P & Ls
10  that came out, certainly weekly, monthly or daily.
11        A.      I certainly would receive them daily.
12  From the standpoint of the monthly reporting, I
13  would review them monthly.
14        Q.      So these are ones that appear to be
15  indicative of the monthly reporting?  Are we right
16  about that?
17        A.      They appear to relate to a month-end
18  period.
19        Q.      Okay.  And then if -- okay.  And you
20  said that you then would review then these reports
21  for the month-ends for purposes of doing the
22  financial reporting?
23        A.      Generally I would, yes.
24        Q.      MFA is in quotes.  What does MFA
25  stand for?

Page 177

1        A.      That's the internal designation that
2  we use in our internal management information
3  reporting system for the Ariel Fund account at
4  Madoff & Company.
5        Q.      Thank you.
6              MR. POWERS:  At this time I'm going
7  to ask the reporter to mark Exhibit 107.  107
8  appears to be a series of confirmations for the
9  Ascot account maintained at BLMIS for the period of,
10  starting from the period of I believe sometime in
11  1998 through 2008.  There are approximately 453
12  confirmations.
13              (Autera Exhibit 107 marked for
14  identification.)
15        Q.      I'm not going through every one of
16  these, but can you tell us what these appear to be,
17  sir?
18        A.      These appear to be the trade
19  confirmations that we would receive from the Madoff
20  firm for activity done in the account that's
21  identified on the face of the confirmation.
22        Q.      And from time to time would you look
23  through these?  Not these particular ones, but
24  confirmations that came from BLMIS for any of the
25  three accounts?

Page 178

1    A.    At one point I would have done that
2  very early on.  I would have been the one possibly
3  inputting into our system.  But for the most part I
4  didn't necessarily look at trade confirmations that
5  came in.
6    Q.    At what point was that, when you
7  would have been the one that looked at it and done
8  the input?
9    A.    Very early on.
10    Q.    What years are that, sir?
11    A.    Probably 1990.  I don't know when I
12  stopped.  It would have been when Andrew Gordon was
13  hired and he took on responsibility for inputting.
14    Q.    When was that, approximately?
15    A.    The mid-'90s, early '90s.
16    Q.    And you said for the most part you
17  wouldn't look at them but would you from time to
18  time look at the monthly statements -- excuse me,
19  confirmations?
20    A.    I could.
21    Q.    Would it be -- okay.
22        This is a -- the first document, 107
23  appears to be a confirmation for the Ascot Partners
24  Fund; you see that to the left?
25    A.    Ascot Partners, LP, yes.

Page 179

1    Q.    Right.  For the purchase of Coca-Cola
2  securities, correct?
3    A.    Ascot Partners was selling Coca-Cola.
4    Q.    The "we" column, we bought, would be
5  reflective of the "we" being whom in this instance?
6    MR. ANELLO:  Where are you?  What's
7  your Bates number?
8    MR. POWERS:  48.
9    MR. ANELLO:  I have a different Bates
10  number, 35.  Oh, you have 48.  I have 35.
11    MR. POWERS:  You got it now.  Turned
12  it over?
13    MR. ANELLO:  Yup.
14    A.    On the trade confirmations the "we"
15  is the broker-dealer, the Madoff broker-dealer.
16    Q.    So they bought basically from Ascot
17  then?
18    A.    Ascot sold.
19    Q.    So would that -- and that would
20  indicate it was acting as a principal or as an agent
21  on that trade?
22    A.    I'm not sure.
23    Q.    But as you read it, you understood
24  this to be a sale by Ascot of whatever, 75,000 plus
25  shares of Coca-Cola, correct?

Page 180

1    A.    Yes.
2    Q.    And it reflects a price of $46.37,
3  correct?
4    A.    Yes.
5    Q.    The trade appears to be July 19,
6  2001.  Do you see that, sir?
7    A.    Yes.
8    Q.    At that -- withdrawn.
9        Do you know what the settlement dates
10  are for stocks, securities transactions?
11    A.    It's varied over the course of time.
12    Q.    Let's start with since 1985.
13    A.    I believe it's five days back then.
14    Q.    What about 1995?
15    A.    I'm not sure.
16    Q.    What do you understand it to be
17  today, sir?
18    A.    Depending on the security, it could
19  be two days.
20    Q.    Stock, common stock.  Traded on an
21  exchange in the United States of America, sir.  Is
22  it your testimony that it could be two days?
23    A.    I'm not sure.  Next day settlement.
24    Q.    Next --
25    A.    It could be.

Page 181

1    Q.    Stocks, securities transactions you
2  understand have a settlement date of one day?
3    A.    I'm not sure what they currently are.
4    Q.    What about options?
5    A.    Options are -- again, have changed,
6  but I think that's --
7    Q.    Let's use the period 2002 to the
8  present, sir.
9    A.    I'm not sure.
10    Q.    So I just want to be clear.  You're
11  the CFO of Gabriel Capital Corp.  You acknowledge a
12  part of your duties and responsibilities are to
13  monitor the activities, protect the assets of the
14  funds, and as you sit here now you're just not sure
15  how many days there are for the settlement of either
16  options or common stocks?
17    MR. ANELLO:  I'm not sure that your
18  preamble, A, was necessary or, B, was accurate, but
19  do you have a question for him?
20    MR. POWERS:  Yes.
21    Q.    I just want to be clear, is it your
22  testimony as you sit here now that you are unaware
23  of what the settlement date is for common equity
24  securities on the United States exchanges?  Is that
25  your testimony?

31 (Pages 178 to 181)

# EXHIBIT 92

# FILED UNDER SEAL

# EXHIBIT 93

# FILED UNDER SEAL

# Exhibit 94

1

1          UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     In Re
3
     BERNARD L MADOFF            Adv. Pro. No.
4    INVESTMENT SECURITIES LLC,    08-01789 (BRL)
5          Debtor.
     ------------------------------x
6    IRVING H. PICARD, Trustee
     for the Liquidation of
7    Bernard L. Madoff Investment
     Securities LLC,
8                               Adv. Pro. No.
             Plaintiff,         09-1182 (BRL)
9          v.
10   J. EZRA MERKIN, GABRIEL CAPITAL,
     L.P., ARIEL FUND LTD., ASCOT
11   PARTNERS, L.P., GABRIEL CAPITAL
     CORPORATION,
12
             Defendants.
13   ------------------------------x
14                    October 11, 2012
                      10:05 a.m.
15
16        VIDEOTAPED DEPOSITION of DANIEL HESS,
17   a Witness on behalf of Defendants, taken by
18   Plaintiffs, held at the Law Office of Gregory P.
19   Joseph, 485 Lexington Avenue, New York, New York,
20   before Eileen Mulvenna, CSR/RMR/CRR, Certified
21   Shorthand Reporter, Registered Merit Reporter,
22   Certified Realtime Reporter and Notary Public of
23   the State of New York.
24
25

| | 84 |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    So you remember meeting him before |
| 3 | or around 2001.  Did you meet him at the offices |
| 4 | of Gabriel Capital Corporation then? |
| 5 | A.    Yes. |
| 6 | Q.    How did you meet him there? |
| 7 | A.    He spent some time in the office, |
| 8 | You know, he went on to start -- I believe it's |
| 9 | Spring Mountain Capital.  And I believe my letter |
| 10 | to him was an attempt to try to raise some money. |
| 11 | Q.    Do you have any understanding of |
| 12 | what he was doing there around 2001 at GCC? |
| 13 | A.    He had left Merrill Lynch and I |
| 14 | believe was pondering starting a fund-to-funds or |
| 15 | his own fund. |
| 16 | Q.    Did you have many discussions with |
| 17 | him? |
| 18 | A.    Not a lot, but a couple of times. |
| 19 | Q.    So what's the purpose of this e-mail |
| 20 | sent from you to Mr. Steffens, Ho and Mr. Merkin |
| 21 | in December of 2006? |
| 22 | A.    This is basically trying to raise |
| 23 | capital for Logik and just trying to show what a |
| 24 | model portfolio would look like at the time, what |
| 25 | our expected returns might be and try to woo him |

| | 85 |
|---|---|
| 1 | into spending a little time with us and maybe |
| 2 | invest with us. |
| 3 | Q.    Did Spring Mountain ever invest with |
| 4 | you? |
| 5 | A.    No. |
| 6 | Q.    Did any of Mr. Merkin's funds ever |
| 7 | invest with you? |
| 8 | A.    No. |
| 9 | Q.    At the time you were -- the document |
| 10 | says soliciting investment from Spring Mountain |
| 11 | and also Mr. Merkin, do you recall if either of |
| 12 | them sent you any due diligence questionnaires to |
| 13 | complete? |
| 14 | A.    I don't believe so. |
| 15 | Q.    Did they -- |
| 16 | A.    I did go over and meet with |
| 17 | Mr. Steffens in his office, but I don't believe |
| 18 | we -- it went any farther than that. |
| 19 | Q.    Apart from personal meetings, was |
| 20 | there any -- were there any steps that you would |
| 21 | have characterized as due diligence that they |
| 22 | performed on you? |
| 23 | A.    I don't believe so. |
| 24 | Q.    Going back to your time at GCC, did |
| 25 | you have any involvement in the review of trade |

| | 86 |
|---|---|
| 1 | confirmations that came into the company? |
| 2 | A.    Only trades that I might have done, |
| 3 | you know.  If something didn't clear properly, |
| 4 | whatever, we would straighten that up.  You had a |
| 5 | couple of days to do that.  Other than that, no. |
| 6 | Q.    Did you have day-to-day |
| 7 | responsibilities to see if the trades did match? |
| 8 | A.    Yes.  I was again the -- it was |
| 9 | mostly done by the CFO and his guys.  If |
| 10 | something didn't match, they would let us know. |
| 11 | Q.    The CFO was Mr. Autera? |
| 12 | A.    Yes. |
| 13 | Q.    Who were his guys? |
| 14 | A.    He had Mark Weiner and Andrew |
| 15 | Gordon. |
| 16 | Q.    So is it correct then that they |
| 17 | primarily had the responsibility for looking at |
| 18 | the trade confirmations? |
| 19 | A.    Yes. |
| 20 | Q.    When would you have involvement with |
| 21 | them? |
| 22 | A.    If there was an error. |
| 23 | Q.    Do you recall any time when there |
| 24 | was an error? |
| 25 | A.    Occasionally a commission might be a |

| | 87 |
|---|---|
| 1 | little different or the price.  There could be a |
| 2 | discrepancy.  And usually nothing big, but they |
| 3 | couldn't clear unless you really had it down to |
| 4 | the penny, so -- |
| 5 | Q.    How often would you estimate that |
| 6 | there would be that kind of a circumstance? |
| 7 | A.    Once or twice a week. |
| 8 | Q.    And what would you do then to |
| 9 | address it? |
| 10 | A.    We would just confirm the price with |
| 11 | whomever we did the trade with, or the quantity |
| 12 | or the commission, whatever might be disputed, |
| 13 | and try and settle it. |
| 14 | Q.    Would a new confirmation issue? |
| 15 | A.    I believe so. |
| 16 | Q.    Do you remember any time when one of |
| 17 | those issues couldn't be resolved? |
| 18 | A.    No. |
| 19 | Q.    And again, was the purpose of that |
| 20 | exercise to just compare and make sure the |
| 21 | confirmation matched what the -- |
| 22 | A.    With what we made, yes. |
| 23 | Q.    Did you consider that review of the |
| 24 | trade confirmations to be due diligence? |
| 25 | A.    Not really. |

24 (Pages 84 to 87)

**PICARD v. MERKIN**                                    **DANIEL HESS    10/11/12**

---

88

1      Q.    Did you conduct any analysis at GCC,
2  not just to see if the confirmations matched the
3  trade, but whether or not that trade was
4  possible?
5      A.    Not to my . . .
6      Q.    So specifically whether or not the
7  purported price was within the daily range of
8  reported prices?
9          I'm sorry, can we go back and -- I
10  want to ask this question again here.
11          Did you conduct any analysis at GCC,
12  not just to see if the confirmations matched the
13  trade, but whether or not the trade was possible?
14      A.    Not to my knowledge.
15      Q.    Either by yourself or Mr. Autera and
16  his staff or anyone else at GCC, do you know if
17  anyone compared those confirmations to see if the
18  purported prices --
19      A.    I don't -- no, I don't believe so,
20  but I'm not -- I'm not sure.
21      Q.    Same question.
22          Was there any analysis to see if the
23  settlements were within the correct range
24  following the trade settlement dates?
25      A.    I mean, like a bank debt trade,

---

89

1  something like this, might take a little bit
2  longer to clear.  If there was some sort of
3  documentation attached to that.  But, no, usually
4  most of these things closed within a certain time
5  frame.
6          There was not -- you had -- with
7  equities and options, you have a specific -- I
8  believe at the time it was trade date plus --
9  might have been two or five days.  With some
10  debt, it was a little bit more open-ended.  But
11  for the most part, nothing ever --
12      Q.    So you don't recall there being any
13  kind of systemic review to make sure that those T
14  plus two or T plus five rules were being
15  followed?
16      A.    No.
17      Q.    During your time at GCC, did you
18  have any responsibility for creating or reviewing
19  profit and loss statements?
20      A.    Not really.  I mean, we got -- we
21  received the daily P&L and would review it, but
22  it was not, again, looking for -- I mean, for the
23  most part, you knew what happened that day.  And
24  I guess if something was egregious, it would
25  stick it and you'd question it, but --

---

90

1      Q.    Did anybody have responsibility for
2  creating those?
3      A.    Creating the sheets?
4      Q.    Yes.
5      A.    They came through -- I believe it
6  was pretty automated.  We'd get a sheet from Mike
7  or Mark or Andrew.
8      Q.    What would you review it for?
9      A.    Again, just to see if it was what --
10  in line with what we thought the day's activity
11  might have been.
12      Q.    Did you consider that review of
13  profit and loss statements relating to your
14  portion of the portfolio to be due diligence?
15      A.    Not really.
16      Q.    What did you consider it to be?
17      A.    Again, more of a reconciliation than
18  probably due diligence.  Again, looking more for
19  an error on a trade or a misprice or something.
20      Q.    You said it came from Mr. Autera and
21  his group?
22      A.    Yes.
23      Q.    And he was the CFO?
24      A.    Yes.
25      Q.    The people working under him were

---

91

1  accountants?
2      A.    I believe so.
3      Q.    Would it be accurate to say it was
4  more of an accounting exercise than due
5  diligence?
6      A.    Correct.
7          MS. MOON:  Objection.
8  BY MR. KITCHEN:
9      Q.    Mr. Hess, can you identify for me
10  every discussion that you recall ever hearing
11  relating to Mr. Madoff or BLMIS?
12      A.    I mean, specifically, no.
13      Q.    Are there any --
14      A.    I guess throughout the years, you
15  know, some stories may have manifested, but I
16  really recall no -- you know, I do recall money
17  going to him and that being money we didn't have.
18  Specific conversations about him, I really -- I
19  really don't recall.  It was a long time ago.
20      Q.    I believe in -- earlier this morning
21  in your testimony, you referred to one discussion
22  you recall in the early '90s.  Do you remember
23  any such discussion regarding Mr. Madoff?
24      A.    Specifically, no.
25      Q.    As to general discussions, do you

---

25 (Pages 88 to 91)

**BENDISH REPORTING, INC.**
**877.404.2193**

112

1  difference between a hedge fund and an
2  SEC-regulated broker/dealer; is that right?
3      A.    Yes.
4      Q.    You also testified about money that
5  was allocated to outside money managers during
6  your time at GCC.
7          Do you remember that?
8      A.    Yes.
9      Q.    Would you agree that Mr. Teicher was
10  jealous of money allocated to other money
11  managers?
12          MR. KITCHEN:  Objection to form.
13          THE WITNESS:  Yes.
14  BY MS. MOON:
15      Q.    And would you agree that part of
16  that was that he didn't have the opportunity to
17  earn fees on that money?
18      A.    Exactly.
19      Q.    And would you agree that in
20  Mr. Teicher's mind, there was no money manager
21  that was as good as Victor Teicher?
22          MR. KITCHEN:  Objection to form.
23          THE WITNESS:  I would agree with
24      that.
25

113

1  BY MS. MOON:
2      Q.    You were also asked some questions
3  about a daily P&L sheet while you were at GCC?
4      A.    Yes.
5      Q.    Would you agree that the review of
6  those sheets by others that were senior to you at
7  GCC was part of their oversight, monitoring and
8  diligence of your actions?
9      A.    Yes.
10          MS. MOON:  I don't think we have any
11      other questions.
12          MR. LAFFEY:  I have no questions,
13      but reserve all rights.
14          MR. KITCHEN:  Thank you.
15          MR. NEWCOMB:  I have no questions.
16          MR. KITCHEN:  Anyone else?
17      We have no further questions.
18          MR. JOSEPH:  The deposition is
19      concluded.  Thank you all very much.
20          THE VIDEOGRAPHER:  Going off the
21      record.  The time is 12:32.
22
23
24
25

114

1  October 11, 2012
2              I N D E X
3  WITNESS          EXAMINATION BY          PAGE
4
   DANIEL HESS
5
       MR. KITCHEN          5
6      MS. MOON          111
7
8          E X H I B I T S
9  TRUSTEE                          PAGE
10
11  Exhibit 43      No Bates numbers, Subpoena      10
12  Exhibit 44      Bates No. BS00307734,           28
13          Victor Teicher & Co., L.P.
14          Investment in Ariel
15          Capital, L.P. 1991
16  Exhibit 45      Bates Nos. BS00161789           59
17          through 199, Coast Event
18          Opportunities Fund October
19          2007 Presentation
20  Exhibit 46      Bates Nos. BS00160183           82
21          through 71, E-mail dated
22          12/7/06 from Hess to Merkin
23          with attachments
24
25

115

1  (Continued)
2              E X H I B I T S
3
4  Exhibit 47      Bates Nos. BS00261648          100
5          through 52, E-mail dated
6          1/20/09 from Schultz to
7          undisclosed recipients with
8          attachments
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**BENDISH REPORTING, INC.**
**877.404.2193**

# EXHIBIT 95

# FILED UNDER SEAL

# Exhibit 96

Page 1

 1                C O N F I D E N T I A L

 2           UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK
 3

 4   -------------------------------x
     In Re:
 5
     BERNARD L. MADOFF INVESTMENT        Adv.Pro.No.
 6   SECURITIES LLC,                     08-01789(BRL)

 7                Debtor.
     -------------------------------x
 8   IRVING H. PICARD, Trustee for the
     Liquidation of Bernard L. Madoff
 9   Investment Securities LLC,

10                Plaintiff,             Adv.Pro.No.
                                         09-1182(BRL)
11           v.

12   J. EZRA MERKIN, GABRIEL CAPITAL,
     L.P., ARIEL FUND LTD., ASCOT
13   PARTNERS, L.P., GABRIEL CAPITAL
     CORPORATION,

14                Defendants.
15   -------------------------------x

16

17           DEPOSITION of ANDREW GORDON, as taken

18   by and before NANCY MAHONEY, Certified Court

19   Reporter, RPR and Notary Public of the States of New

20   York and New Jersey, at the offices of Baker &

21   Hostetler, 45 Rockefeller Plaza, New York, New York

22   on Monday, August 16, 2011, commencing at 10 a.m.

23

24

25

Page 10

1    Q.    Other than the MBA, any post-graduate
2  courses of significance that you've taken?
3    A.    No.
4    Q.    And what is your current employment?
5    A.    It's Marathon Asset Management, which
6  is at One Bryant Park.
7    Q.    How long have you been with Marathon?
8    A.    Since March of -- March of '08.
9    Q.    And before Marathon, where were you
10 employed?
11   A.    I was at Bear Stearns.  If you
12 remember, March of '08 was a very interesting time
13 for Bear Stearns.
14   Q.    What years were you at Bear Stearns?
15   A.    I think it was '04 to '08.
16   Q.    And before Bear Stearns?
17   A.    I was unemployed for four months,
18 something like that, and I was at a place, Cathay
19 Financial.
20   Q.    Cathay?
21   A.    Cathay.
22   Q.    C-a-t-h-a-y?
23   A.    Yes.
24   Q.    And what years were you at Cathay?
25   A.    It was probably '01 to '04.  I went

Page 11

1  from Gabriel to Cathay.
2    Q.    Okay.  And working backwards -- I
3  normally work forwards, I don't know why I'm going
4  backwards -- you were at Gabriel for what period of
5  time?
6    A.    I think it was '92 to '01 in various
7  different jobs.
8    Q.    And before Gabriel Capital, where did
9  you work?
10   A.    I was at Chase Manhattan.
11   Q.    What years?
12   A.    So that was probably '90 to '92,
13 right -- right --
14   Q.    Right after graduation?
15   A.    Yeah.
16   Q.    Okay.  When you said you were at
17 Gabriel Capital from '92 to '01, was that always
18 called Gabriel Capital or --
19   A.    I mean, it was a host of different
20 things.  I primarily worked for Gabriel, but, you
21 know, in some various jobs.
22   Q.    Is there a company called Victor
23 Teicher & Company, also?
24   A.    Well, Victor was the portfolio
25 manager, so I had an interview with Victor.  And

Page 12

1  then I think there might be a Teicher & Co., or
2  something like that.  There was a lot of different
3  entities.  I know Victor went out to Carmel, or
4  something, was the name of one of his companies, but
5  I really don't -- I just remember working for
6  Gabriel.  I don't --
7    Q.    But your recollection is you worked
8  for Gabriel Capital at the time?
9    A.    Right, right.
10   Q.    Okay.  Let's just go over these jobs
11 a little bit.
12        At Chase Manhattan, what was your
13 position?
14   A.    I was kind of like a staff
15 accountant, but really very, very junior, just kind
16 of -- it was almost like data entry, but I think
17 they called it staff accountant.  Basically the
18 system did most of the accounting for us.  So
19 input -- I was in the private banking area, so input
20 monthly transactions and ...
21   Q.    And how about at Gabriel, you were
22 there for a long time, did you have one job or did
23 you have a series of jobs?
24   A.    I had a series of jobs.  I was hired
25 to do reporting, which was basically also inputting

Page 13

1  trades, making sure that the traders had -- you
2  know, basically if we bought a thousand shares of
3  IBM, we bought another thousand, the report the next
4  day says we have 2,000 IBM, whatever.
5        So they kind of know what we own, as
6  well as P&L, which is all done by the system.  Then
7  I would take the report and put it on everybody's
8  desk that night, as well as do kind of a
9  reconciliation with the bank.
10       So if we did a trade, to make sure
11 that Morgan Stanley, who was our prime broker, would
12 know that we had 2,000 shares of IBM and the bank
13 knew we had -- so there was, you know, kind of
14 daily, you know, discussion to make sure that the
15 bank knew what our records showed.
16   Q.    So make sure that what the trade
17 ticket showed was consistent with what the prime
18 broker showed?
19   A.    Correct.
20   Q.    Okay.  And --
21   A.    Not necessarily -- you trade ticket
22 one, so then there's three people.  You do a trade,
23 say Gabriel does a trade with Goldman Sachs and then
24 the shares go to Morgan Stanley.
25       So I have to make sure Goldman knows

4 (Pages 10 to 13)

IRVING H. PICARD v. J. EZRA MERKIN          CONFIDENTIAL          ANDREW GORDON 8/16/11

Page 14

1  the same trade that Gabriel knows, right, so the
2  counterbroker knows the same, and then at the end
3  make sure that Morgan Stanley knows and the total
4  amount is the same.
5          Does that make sense?
6      Q.    As much as it's going to.
7          So this was in '92 when you were
8  hired?
9      A.    Right.
10     Q.    And you indicated you had some other
11 positions or other roles over the years.
12     A.    During that earlier stage, I was
13 doing the same thing for -- it wasn't really the
14 same thing -- but for Madoff, also. It was
15 basically a five-minute kind of reconciliation. We
16 didn't do much. It was a very small amount.
17     Q.    You indicated you were doing these
18 reconciliations. Who were those for?
19     A.    The ones that I said before were
20 really for Gabriel was my primary job.
21     Q.    But who was doing the trades, Gabriel
22 itself?
23     A.    Yeah, Gabriel.
24     Q.    So if Gabriel did the trades, you had
25 this reconciliation process you went through with

Page 15

1  Morgan Stanley?
2      A.    Right.
3      Q.    If Madoff was doing trades, what did
4  you do?
5      A.    So they would send me tickets -- I
6  don't know if they were tickets or confirmations, I
7  don't recall that, but they basically showed the
8  trade. And I would get them in stacks every month,
9  but that really didn't have anything to do with
10 Morgan Stanley. This was separate.
11         So, like I said, there was a lot of
12 different groups, a lot of different funds that we
13 managed at -- I call it Gabriel, but there was
14 Gabriel, there was Ariel, which is the offshore
15 vehicle, and then Madoff had their own -- kind of
16 like their own thing.
17     Q.    So there was no Morgan Stanley
18 involved as far as the Madoff trades were concerned?
19     A.    No.
20     Q.    Because Madoff handled that aspect
21 himself?
22     A.    Correct.
23     Q.    Okay. And did your role at Gabriel
24 Capital evolve or change at some point?
25     A.    Yeah. As I kind of, I guess, grew in

Page 16

1  my role, I wanted to become -- I always wanted to be
2  a trader.
3          So once I started going back to
4  school, I was starting to have kind of a dual job,
5  some of the reconciliation, we had a couple of
6  people in the group, and eventually I transitioned
7  to become an analyst.
8      Q.    Over what period of time did that
9  transition take place?
10     A.    I mean, I talked about it forever,
11 but I think probably more -- I started probably '06,
12 '07 -- maybe '06 -- '06, '07, something like that.
13     Q.    And when you were functioning as an
14 analyst, who were you doing the analysis for?
15     A.    Guy by the name Elie Naufal.
16     Q.    N-a-u-f-t-e-l?
17     A.    I don't think there's a T.
18     Q.    N-e-u-f-e-l?
19     A.    Something like that, yeah.
20         MR. STEINER: I don't want to
21 interrupt. The witness just lost a decade.
22         THE WITNESS: I'm sorry, '96, so it
23 was -- the lost decade. I'm sorry.
24     A.    So it was '92 to '96, not '06.
25     Q.    So around '96 --

Page 17

1      A.    Around '96, I started --
2      Q.    -- is when you started working as an
3  analyst?
4      A.    Again, that's my recollection. It
5  could have been '97.
6      Q.    I understand these are approximate
7  dates. No one is going to hold you to them.
8          And Elie Naufal was -- he was making
9  trades?
10     A.    So Victor had left, then I think
11 there was this other guy -- I can't think of his
12 name -- but he was basically the Victor, he was the
13 head portfolio manager at that time.
14     Q.    All right. And previously Victor --
15 that's Victor Teicher, correct?
16     A.    Right.
17     Q.    -- had managed the portfolio, the
18 assets for the various funds under the Merkin
19 umbrella?
20     A.    I think it was just Gabriel. I mean,
21 there was probably a couple -- I don't recall, but
22 basically Gabriel was the biggest.
23     Q.    The Gabriel fund?
24     A.    Right.
25     Q.    And how about Ariel fund?

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN                    CONFIDENTIAL                    ANDREW GORDON 8/16/11

Page 34

1     Q.     -- to financial information, stock
2  prices, stock --
3     A.     No, there weren't Bloombergs back
4  then.  I mean -- no, my computer -- my main -- I
5  mean, I had access because the traders did, but I
6  didn't go there.  I would really just sit at my desk
7  with my computer.  It wasn't like feeds to Reuters
8  or any of that stuff.
9     Q.     So if you wanted to know how much GE
10 stock sold on a given day, you could just hit a
11 couple buttons and get it on your computer?
12    A.     No.  I could get it from the traders,
13 but I couldn't just do it on my computer.
14    Q.     Traders had the information, you
15 didn't?
16    A.     Right.  That's how most places were
17 back then.
18    Q.     At any time when you were at Gabriel
19 Capital, were you ever asked to do anything to --
20 other than reconciling trade tickets, were you ever
21 asked to do anything to investigate Madoff's
22 operations or BLMIS?
23    A.     Investigate their operations?  Like
24 do due diligence or something?
25    Q.     To do due --

Page 35

1     A.     No.
2     Q.     To do due diligence or to look into
3  anything involving the company?
4     A.     No.
5     Q.     Are you aware of anyone else at
6  Gabriel Capital while you were there who was
7  involved in due diligence on Madoff or investigating
8  any particular questions about his company?
9     A.     I wouldn't have any idea.  That
10 wouldn't be anything that I would know.
11    Q.     When you were reconciling trades, was
12 Mr. Madoff the only portfolio manager who cleared
13 his own trades?
14           MR. STEINER:  Objection to form.
15    A.     I'm just trying to think where we did
16 Cerberus.  I don't recall where Cerberus did it, and
17 so outside of Gabriel and Ariel and the main thing,
18 yes.
19    Q.     Okay.  And were there any sort of --
20    A.     Trying to think if Cerberus -- I
21 don't recall what Cerberus did.  They had another
22 one, also -- I don't recall.  There might have been
23 another fund, and I can't remember the name of that
24 one either.  We had a lot of different funds at that
25 time, some small, some large.

Page 36

1     Q.     Now, when you were involved in
2  reconciling trades, you explained to me earlier how
3  you would get information from Victor Teicher or his
4  people --
5     A.     Traders, yeah.
6     Q.     -- and you would get information from
7  Morgan Stanley who would be, what, the prime broker?
8     A.     Prime broker, yeah.
9     Q.     And you would reconcile that
10 information?
11    A.     Correct.
12    Q.     From those two independent sources,
13 correct?
14    A.     Correct.
15    Q.     All right.  Now, in terms of
16 Mr. Madoff, was there an independent source against
17 which you reconciled the information you got from
18 him?
19    A.     No.  I mean, there was BDO, right,
20 who audited, I think, at the end, but, no.
21           Basically I got the tickets, I would
22 put them in the system and then reconcile with their
23 month end statements.
24    Q.     With Madoff's own month end
25 statements?

Page 37

1     A.     Yeah, correct.
2     Q.     Did you ever hear through the
3  grapevine or in any other way that the Ralph who
4  replaced you at Gabriel Capital had committed
5  suicide in early 2009?
6     A.     I did.
7     Q.     From whom did you hear that?
8     A.     It could have only been Dan or Mark.
9     Q.     Dan Hess --
10    A.     Right.
11    Q.     -- or Mark --
12    A.     Mark Weiner.
13    Q.     -- Mark Weiner?
14    A.     It would have been one of those two.
15 I think it was Dan.
16    Q.     And do you remember when you heard
17 about it, was it more or less at the time when it
18 took place or sometime later?
19    A.     I don't recall, but I think it was
20 probably, you know, sometime soon after.
21    Q.     What do you remember Dan telling you
22 about it?
23    A.     I really don't.  I don't know.  I
24 mean, I know he said basically what you said.
25    Q.     That Ralph had committed suicide?

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN          CONFIDENTIAL          ANDREW GORDON 8/16/11

Page 42

1  portfolio manager, did you have any conversations at
2  Gabriel Capital about that?
3      A.    You know, I didn't.  I didn't.  I had
4  heard afterwards that he has very consistent
5  performance.
6      Q.    From whom?
7      A.    I don't -- you know, I've been
8  thinking about it since the -- whatever, the other
9  DA came in and, you know, asked similar questions.
10 I just remember hearing that -- that he had
11 consistent performance, but I don't remember when I
12 was there ever really talking about it, but I do
13 remember hearing that he had consistent performance.
14 But I'm just trying to think of if it was during the
15 years that I was there or not.
16     Q.    Did you do anything while you were
17 there at any time in terms of evaluating the
18 performance of the various portfolio managers?
19     A.    No.
20     Q.    Was there anyone who did that, to
21 your knowledge?
22     A.    Not to my knowledge.  I mean, I would
23 think it would -- you mean evaluate -- oh,
24 evaluate -- no, no, no, not me and I would not know
25 who would do that, but I surely didn't.

Page 43

1      Q.    Okay.  During the time you were at
2  Gabriel Capital, did you ever hear anyone express
3  any concerns of any type about Madoff or Madoff's
4  operations?
5      A.    No.
6      Q.    How about Victor Teicher, did he ever
7  express concerns about Madoff?
8      A.    No.  I mean, not that I knew of.
9      Q.    Right.  We're just talking about what
10 you know.
11     A.    Right.
12     Q.    Did you, yourself, ever express
13 concerns regarding anything you saw in connection
14 with Madoff's operations?
15     A.    No.
16     Q.    Did you ever express concerns about
17 errors in any reports you received from Madoff?
18     A.    I wouldn't say it's a concern, but I
19 think what you're alluding to is that I did -- every
20 so often my numbers wouldn't tie at the end of the
21 month and I would kind of wonder why.  So I would
22 call, and there would be tickets or confirmations
23 that would make them tie.
24            So I thought that I was just missing
25 the tickets, somehow it got lost in the mail.  What

Page 44

1  happens is you would get them in the mail, and I
2  just would figure that I didn't get them.
3      Q.    Let me see if I understand this.
4            You said that there were some months
5  when the numbers wouldn't tie at the end of the
6  month.
7            What do you mean by that, the numbers
8  wouldn't tie?
9      A.    So, you know, I would get my tickets
10 and put them in the system and you get a certain
11 amount.  So then at the end of the month -- it
12 didn't happen too often, but every once in a while
13 it would happen where the numbers didn't tie to what
14 I was getting from the statement.
15     Q.    So the daily tickets would not tie
16 with the monthly statement?
17     A.    Right.
18     Q.    Okay.  And --
19     A.    I don't think that they're daily -- I
20 always thought of them as confirmations, but
21 whatever they were.
22     Q.    The confirmations wouldn't tie --
23     A.    Right.
24     Q.    -- with the monthly statement?
25            And you said you would call.  Who

Page 45

1  would you call?
2      A.    What's his name?
3      Q.    Frank DiPascalli?
4      A.    Yeah.
5      Q.    So you call Frank DiPascalli who
6  worked for Madoff.  And then what would happen, he
7  would get --
8      A.    We would try and figure out what
9  the problem -- I mean, things happened like that in
10 all the accounts that things didn't tie out.  This
11 isn't a one -- so things didn't tie and then, you
12 know, I would get a ticket or would get tickets to
13 make the numbers tie.
14            So the tickets -- it would be like I
15 was missing confirmations somehow.
16     Q.    Okay.  So at the end of the month,
17 the monthly statement didn't tie with the tickets
18 that you would put into the system.  You would call
19 Frank DiPascalli and then he would send you
20 additional --
21     A.    We would go and try and figure it
22 out, yeah.
23     Q.    And then they would send you
24 additional tickets that would make the numbers tie?
25     A.    Or maybe it was something that I did

12 (Pages 42 to 45)

IRVING H. PICARD v. J. EZRA MERKIN                 CONFIDENTIAL                 ANDREW GORDON 8/16/11

Page 46

1    that was wrong, but, either way, there were times
2    where I got tickets.
3        Q.      And would these tickets be corrected
4    tickets from what you got previously or would they
5    be additional or supplemental tickets or might they
6    be either?
7        A.      They would be supplemental tickets.
8        Q.      And you said you also experienced
9    this not only with Madoff but also with some of the
10   other funds?
11       A.      Yeah, generally it would be, you
12   know, the ticket was on the desk and maybe I didn't
13   get it in that hour or, you know, it was, you know,
14   just a daily course of events where we would --
15   where numbers wouldn't tie, but generally they did.
16       Q.      Let me ask:  With regard to the other
17   funds, was there ever a situation in which they sent
18   you supplemental tickets to make the numbers tie
19   out?
20       A.      Yes, but it would probably be because
21   for some reason I didn't get the ticket, but it
22   wasn't -- maybe it was on the desk and, you know, it
23   was never handed to me for some reason, but it would
24   get done pretty quickly.  The next day, you would
25   get something in from Morgan Stanley saying, oh, we

Page 47

1    did this extra trade, oh, it's on the blotter but I
2    didn't get the ticket, so let's figure out, you
3    know, where it was and it got reconciled.
4        Q.      Were the problems more frequent with
5    the Madoff account than with the other accounts?
6        A.      I wouldn't say more frequent, but it
7    was just different because I was in the office with
8    the guys, so, you know -- I was really working for
9    the Gabriel account and it was easier to go to the
10   guys that were on the desk and say did you do these
11   trades.
12       Q.      So with the Gabriel and Ariel
13   account, it was easier to get the people to verify
14   the information promptly?
15       A.      I would just say that -- yeah, I
16   mean, with the other stuff, also, it was on a
17   monthly basis, right, so I'm kind of getting -- with
18   Madoff, I was getting it on a monthly basis, so I
19   was -- you know, you're getting it -- you're
20   reconciling every month, besides reconciling every
21   day or T plus five, you know, three or five days.
22       Q.      So how is that different from what
23   you were doing with the in-house traders?
24       A.      With the in-house traders, you're
25   reconciling more on a daily basis versus a monthly

Page 48

1    basis.  Like, I was getting the statement at the end
2    of the month, so I wouldn't know middle month if
3    there was an issue, right.
4        Q.      So you get more to reconcile with
5    Madoff at the end of the month?
6        A.      Yeah.  I mean, it was -- yeah, it
7    was -- more to reconcile?
8        Q.      I'm just trying to understand.  I got
9    the sense that you were doing the other ones on a
10   daily basis?
11       A.      Right.
12       Q.      But with Madoff, you had to --
13       A.      It was on a monthly basis, right.
14       Q.      Okay.  So you had a bigger pile of
15   material to reconcile.
16              Is that right?
17       A.      Yeah, but, I mean, as I got the
18   confirms, you know, I would put them in, right, so
19   it wasn't -- it wasn't a lot of work.  It was pretty
20   easy to do.
21       Q.      About how often would you have these
22   issues arise where --
23       A.      It wasn't often.
24       Q.      Let me finish.
25              How often did you have these issues

Page 49

1    arise where you needed to get supplemental trade
2    tickets from Madoff or the --
3              MR. STEINER:  Objection to form.
4        A.      It wasn't often.  How often?  Twice a
5    year maybe, once a year, once or twice a year.
6        Q.      Were these issues with the
7    reconciliation, were they typically very minor
8    numbers that needed to be reconciled, or were they
9    sometimes more substantial numbers?
10       A.      I would say sometimes they were
11   bigger and sometimes they were smaller.  It really
12   depended, but there were big numbers and small
13   numbers.  Sometimes it was a big movement, sometimes
14   it was a small movement.
15       Q.      Other than this issue you've
16   described with the trade tickets, did you ever
17   observe any other problems or express any other
18   concerns to anybody about any of the information you
19   received from Madoff?
20              MR. STEINER:  Objection to form.
21       A.      No, never.
22       Q.      All right.  And these issues with the
23   tickets, did you ever bring this to anyone's
24   attention?
25       A.      Probably the first time that it

13 (Pages 46 to 49)

# EXHIBIT 97

# FILED UNDER SEAL

# EXHIBIT 98

# FILED UNDER SEAL

# Exhibit 99

Page 1

1               C O N F I D E N T I A L

2           UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF NEW YORK
3

4    -------------------------------x
     In Re:
5
     BERNARD L. MADOFF INVESTMENT          Adv.Pro.No.
6    SECURITIES LLC,                       08-01789(BRL)

7               Debtor.
     -------------------------------x
8    IRVING H. PICARD, Trustee for the
     Liquidation of Bernard L. Madoff
9    Investment Securities LLC,

10              Plaintiff,                 Adv.Pro.No.
                                          09-1182(BRL)
11              v.

12   J. EZRA MERKIN, GABRIEL CAPITAL,
     L.P., ARIEL FUND LTD., ASCOT
13   PARTNERS, L.P., GABRIEL CAPITAL
     CORPORATION,

14              Defendants.
15   -------------------------------x

16

17           DEPOSITION of JACK N. MAYER, as taken

18   by and before NANCY C. BENDISH, Certified Court

19   Reporter, RMR, CRR and Notary Public of the States

20   of New York and New Jersey, at the offices of

21   BAKER & HOSTETLER, 45 Rockefeller Plaza, New York,

22   New York on Tuesday, October 11, 2011, commencing at

23   10 a.m.

24

25

PICARD v. MERKIN                          CONFIDENTIAL                          JACK N. MAYER 10/11/11

Page 70

1  said.
2      Q.      What do you generally recall him
3  saying?
4      A.      Generally, not agreeing.
5      Q.      What do you recall as to what he may
6  have indicated or stated as to his general
7  disagreement with Mr. Teicher's statement that this
8  was a Ponzi scheme?
9          MR. STEINER:  Objection to form.
10     A.      I never said that Mr. Teicher said
11 that it was a Ponzi scheme.
12     Q.      You used the phrase "could be a Ponzi
13 scheme."
14     A.      Correct.
15     Q.      So we're affirming that that's the
16 statement as best you recall, sir?
17         MR. STEINER:  Objection to form.
18     A.      Yes.
19     Q.      What did Mr. Merkin say generally, if
20 anything, where he expressed his general
21 disagreement with the fact -- this is the assertion
22 by Mr. Teicher -- that Mr. Madoff could be running a
23 Ponzi scheme?
24         MR. STEINER:  Objection to form.
25     A.      My general recollection is that he

Page 71

1  thought it was not.
2      Q.      Did Mr. Merkin state anything in
3  particular as to why he thought it was not?
4      A.      I don't recall.
5      Q.      At any point in time thereafter,
6  after this early conversation in the 1990s, did
7  Mr. Merkin ever explain to you, any conversations
8  ever, in writing or otherwise, as to why he thought
9  it was not?
10     A.      The only thing that I can tell you
11 about that is generally, over a period of years, I
12 don't remember specifically when or why, this type
13 of conversation would come up from time to time, and
14 that, generally speaking, over the years, as
15 Mr. Madoff continued to provide decent returns and
16 as his enterprise had not blown up, there was a
17 general sense that whatever suspicions or concerns
18 there could be about him running a Ponzi scheme were
19 lessened by the passage of time.
20     Q.      Lessened in the eyes of Mr. Merkin?
21     A.      And Mr. Teicher.
22     Q.      Did Mr. Teicher in this early
23 conversation indicate the reasons, if any, he
24 believed that Mr. Madoff could be running a Ponzi
25 scheme?

Page 72

1      A.      I thought I answered that.
2      Q.      I want to make sure the record is
3  absolutely clear.
4          MR. VINEGRAD:  What was the question?
5          MR. STEINER:  Objection to form.
6          (Pending question read.)
7          MR. VINEGRAD:  You already said.
8          MR. STEINER:  Objection to form.
9      A.      I don't recall him saying anything
10 beyond that.
11     Q.      Steadiness of returns is one thing
12 you said, correct?
13     A.      Right.
14     Q.      And size is another thing?
15     A.      It's the combination of steadiness
16 and size.
17     Q.      Size, what did you mean by size?
18 Excuse me.  Withdraw that.
19         What did he mean by size?
20         MR. STEINER:  Objection.
21     Q.      As you understood it.
22     A.      I didn't say that he used the word
23 "size."
24     Q.      But you did in your testimony a few
25 moments ago.

Page 73

1      A.      If somebody is getting two percent
2  returns annually, steadily -- I mean, he can do that
3  by buying treasuries.  So it's the combination of
4  size and steadiness.
5      Q.      Oh, so the size of the returns?
6      A.      Yes.
7      Q.      Not necessarily the size of the
8  portfolio or assets under management?
9          MR. STEINER:  Objection to form.
10     A.      Correct.
11     Q.      Anything else you recall being stated
12 as a basis by Mr. Teicher as to why it could be a
13 Ponzi scheme during that early time?
14         MR. STEINER:  Objection.
15     A.      I don't recall anything.
16     Q.      Did Mr. Merkin, during that time
17 period, indicate what, if any, actions he had taken
18 to assure himself or assuage himself that there
19 was -- that everything that Madoff was doing was
20 legitimate?
21     A.      I don't recall.
22     Q.      Did he ever do that for you?
23     A.      I don't recall.
24     Q.      When you say you don't recall, are
25 you saying he may have or you're saying that you

19 (Pages 70 to 73)

Page 110

1      A.     Yes.
2      Q.     Following Mr. Madoff's arrest, did
3  you have any conversations with anyone, apart from
4  Mr. Balsam telling you of the exposure, concerning
5  Mr. Madoff?
6              MR. VINEGRAD:  He's mindful of
7  privilege.
8              MR. STEINER:  Right.  I caution him
9  not only with respect to his own privilege but with
10  respect to GCC's privilege.
11             MR. VINEGRAD:  I understand.  That's
12  the one I was referring to.
13      Q.     Excluding any conversations with
14  counsel or concerning advice of counsel, did you
15  ever discuss Mr. Madoff following his arrest?
16      A.     Yes.
17      Q.     With who?
18      A.     I mean in a general sense, probably
19  dozens of people.
20      Q.     Did you have discussions with
21  Mr. Teicher?
22      A.     Yes.
23      Q.     What did he say?
24      A.     Mr. Teicher called me that night,
25  December 11th, and, well, basically said words to

Page 111

1  the effect that, you know, I was right.
2      Q.     Did he feel vindicated?
3      A.     Well, he said that he felt he was
4  right all along and he expressed thoughts in the
5  direction of saying that Ezra was greedy and that's
6  why he got into this mess.
7      Q.     Anything else?
8      A.     He said something about having sent
9  Ezra an email, the details of which I don't recall
10  other than my reaction to it as being, I thought,
11  gratuitous and nasty.
12      Q.     When he said he was right all along,
13  did he discuss any of the specific concerns he had
14  had earlier?
15             MR. STEINER:  Objection to the form.
16      A.     I don't recall.
17      Q.     Did he discuss consistency of returns
18  as to size of returns?
19      A.     I don't recall.
20      Q.     Besides that phone call, did you have
21  any conversations with Mr. Teicher following the
22  arrest?
23             MR. POWERS:  Excuse me.
24  BY MR. POWERS:
25      Q.     When he said these things on the

Page 112

1  initial phone call, December 11th, what did you say?
2      A.     Very little.
3      Q.     What do you recall saying?  Yes, you
4  were right, I can't believe it, this is horrible
5  news?  You must have said something.
6              MR. STEINER:  Object to the form.
7      A.     I probably --
8      Q.     Your best recollection.
9      A.     My best recollection is that I said
10  some things along those lines.
11      Q.     No, no, no.
12      A.     You're asking --
13             MR. VINEGRAD:  Please.  What do you
14  recall saying to Mr. Teicher during that call?
15  That's the question.
16      Q.     Right.  Your best recollection.
17      A.     My best recollection is generally
18  just remarking what a terrible thing it was and how
19  sad it was.
20      Q.     Anything else?
21      A.     And as I told you before, telling
22  him, after he read me this email or repeated it to
23  me in sum and substance, that I thought that he was
24  being gratuitous and nasty.
25      Q.     Anything else?

Page 113

1      A.     Not that I recall.
2              MR. POWERS:  Thank you.
3  BY MR. KITCHEN:
4      Q.     Did you make any response to his
5  statement that he was right all along?
6              MR. STEINER:  Objection to form.
7      A.     I don't recall.
8      Q.     Following that conversation, did you
9  have any other conversations with Mr. Teicher
10  concerning Mr. Madoff?
11      A.     I vaguely recall one additional one
12  but I don't recall details of that.
13      Q.     Do you remember when it was?
14      A.     Very soon thereafter.
15      Q.     Substantively was it any different
16  than the first call?
17      A.     I have a vague sense of him
18  acknowledging that he had been unduly nasty, but
19  that's about it.
20      Q.     Do you have any recollection of what
21  you said then, in that conversation?
22      A.     No.
23      Q.     Apart from Mr. Teicher, did you have
24  any conversations with Mr. Merkin following
25  Mr. Madoff's arrest?