UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:                                                        :

BERNARD L. MADOFF INVESTMENT                :        Adv. Proc. No. 08-01789 (SMB)
SECURITIES LLC,                                           :
                                                                   :        SIPA LIQUIDATION
                                                                   :        (Substantively Consolidated)
                                  Debtor.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

PERTAINS TO THE FOLLOWING CASE:         :
                                                                   :
IRVING H. PICARD, Trustee for the Liquidation  :
of Bernard L. Madoff Investment Securities LLC, :        Adv. Proc. No. 09-1182 (SMB)
                                                                   :
                                  Plaintiff,                   :
                   -v-                                            :
                                                                   :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,      :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,       :
ASCOT FUND LTD., GABRIEL CAPITAL             :
CORPORATION,                                             :
                                                                   :
                                  Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## JOINT STATEMENT OF MATERIAL FACTS
## PURSUANT TO LOCAL BANKRUPTCY RULE 7056-1
## IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
*Attorneys for Defendants J. Ezra Merkin
and Gabriel Capital Corporation*

NORTON ROSE FULBRIGHT US LLP
666 Fifth Avenue
New York, New York 10103
(212) 318-3000
*Attorneys for Ralph C. Dawson, as Receiver
for Defendant Ascot Partners, L.P., and
Ascot Fund Ltd.*

Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC") (collectively, "Merkin Defendants"), and Ralph C. Dawson, as Receiver for Ascot Partners, L.P. ("Ascot Partners"), and Ascot Fund Limited ("Ascot Fund") (Ascot Partners and Ascot Fund, collectively "Ascot"), in support of their respective motions for summary judgment jointly submit this statement of material facts for which there is no genuine issue to be tried.[1]

## I.    **Procedural History**

1.      On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested and the Securities and Exchange Commission ("SEC") initiated a fraud action against him after learning that he had confessed to committing fraud in connection with his business, Bernard L. Madoff Investment Securities LLC ("BLMIS").  *United States v. Madoff*, 586 F. Supp. 2d 240, 244-45 (S.D.N.Y. 2009).

2.      Less than a week later, the United States District Court for the District of New York appointed Irving H. Picard as Trustee for BLMIS, and the Securities Investor Protection Corporation ("SIPC") then removed the case ("the SIPA Proceeding") to this Court.  Order, *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Dec. 16, 2008), ECF No. 1.

3.      On December 23, 2008, Bankruptcy Judge Burton R. Lifland entered a Claims Procedures Order, which directed creditors to file claims with the Trustee no later than July 2,

---

[1]      For purposes of their motions for summary judgment, Defendants address in this Statement of Material Facts certain allegations made by the Trustee that are disputed or for which the Trustee has no evidence, but even if established as true would not give rise to a genuine, material factual dispute warranting a trial. Defendants reserve the right to challenge such unsubstantiated allegations.  Similarly, Defendants intend to move in limine to exclude the testimony of some or all of the Trustee's purported expert witnesses in accordance with the deadlines set forth in the Tenth Case Management Order, but address the opinions as well as the admissions made by the Trustee's proffered experts as though such testimony is admissible for purposes of this motion only.

2009.  Order, *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.

4.      The Merkin Defendants did not file customer claims or any other claims in the proceeding.  *See* Declaration of Neil A. Steiner ("Steiner Decl.") at ¶ 3.

5.      Ascot Partners filed a customer claim on March 3, 2009.  Steiner Decl. Ex. 82 (Ascot claim form).

6.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff.  Involuntary Petition, *In re Bernard L. Madoff*, 09-11893 (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1.

7.      On June 10, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the SIPA Proceeding.  Consent Order, *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252.

8.      The Trustee filed an initial complaint against the Merkin Defendants on May 7, 2009.  Complaint, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. May 7, 2009), ECF No. 1.

9.      The Trustee filed the Amended Complaint on August 6, 2009.  Am. Compl., *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Aug. 6, 2009), ECF No. 10.

10.      The Trustee filed the Second Amended Complaint on December 23, 2009.  Second Am. Compl., *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Dec. 23, 2009), ECF No. 49.

11.      On August 30, 2013, the Trustee filed the Third Amended Complaint ("TAC"), alleging 13 claims for, *inter alia*, avoidance of preferential and fraudulent transfers, recovery of subsequent transfers, and disallowance and equitable subordination of the net equity claims of

the Defendant Funds.  Third Am. Compl., *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y.

Aug. 30, 2013), ECF No. 151.

12.     Defendants moved to dismiss the TAC on October 11, 2013.  Defendants J. Ezra

Merkin's and Gabriel Capital Corporation's Notice of Motion, *Picard v. Merkin*, No. 09-01182

(Bankr. S.D.N.Y. Oct. 11, 2013), ECF No. 165; Defendant Ascot Partners, L.P.'s Notice of

Motion to Dismiss, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Oct. 11, 2013), ECF No.

168.

13.     On August 12, 2014, this Court dismissed nine of the Trustee's claims.

Memorandum Decision, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Aug. 12, 2014), ECF

No. 212.

14.     The Court held that the TAC failed to plead factual allegations that, if true, would

show that Merkin had actual knowledge of Madoff's scheme.  *Id.* at 29-30.

15.     The Court therefore limited the Trustee's avoidance claims to alleged fraudulent

transfers made within a two-year period after the SIPA Proceeding was filed.  *Id.* at 50-51.  The

Court denied the motion to dismiss the Trustee's claims to recover all or a portion of any avoided

transfers from the Merkin Defendants as subsequent transferees and from Merkin as the general

partner of Ascot Partners.  *Id.* at 51.  The Court allowed the Trustee to maintain his equitable

subordination claim as an alternative remedy to his claims for monetary damages.  *Id.* at 66.  All

of the Trustee's other claims were dismissed.  *Id.* at 3.

## II.     **The Parties Have Engaged in Extensive Discovery**

16.     Over the past six years, Defendants and the Trustee have engaged in extensive

discovery.

17.     The parties have produced more than 15 million pages of discovery.  The parties
have taken 40 depositions in this case, including seven expert depositions.[2]

18.     The Trustee's experts have involved more than 100 people in investigations
related to the SIPA proceeding, including 75-80 experts that spent approximately eight months
assisting Dubinsky on his analysis.  Steiner Decl. Ex. 1 (Collura Dep.) at 14:17-22; Ex. 4
(Dubinsky Dep.) at 32:6-33:11.

19.     The Trustee spent approximately $31-32 million on expert services from the firm
Duff & Phelps, Steiner Decl. Ex. 4 (Dubinsky Dep.) at 30:3-31:12, which provided support to
Dubinsky in his effort to determine whether "there was fraud at BLMIS, to determine if it was a
Ponzi scheme, to look at the solvency, and to look at whether MSIL, which was the European
entity of Madoff, was involved."  Steiner Decl. Ex. 4 (Dubinsky Dep.) at 17:6-14.

## III.     BLMIS's Wide-Ranging Fraud

20.     Madoff founded BLMIS in 1960.  BLMIS was an SEC-registered broker-dealer
and had a market making business in an off-exchange trading of New York Stock Exchange
("NYSE") stocks.  Steiner Decl. Ex. 5 (Dubinsky Report), at ¶ 35; Ex. 80 (Merkin Defendants'
Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

21.     BLMIS registered as an investment advisor with the SEC in August of 2006.  *See*
Steiner Decl. Ex. 75 at 8 (BLMIS Form ADV dated Aug. 25, 2006).

22.     In 2008, BLMIS reported approximately $17.1 billion in assets under
management.  *See* Steiner Decl. Ex. 76 at 8 (BLMIS Form ADV dated Jan. 7, 2008).

---

[2] Defendants object to the admissibility of the Trustee's expert reports and testimony and reserve the right to have
them excluded from evidence at trial.  Nevertheless, for purposes of this motion for summary judgment, Defendants
will address the opinions offered by the Trustee's experts as if those opinions will be admissible evidence at trial.
Moreover, concessions made by the Trustee's experts in their reports and depositions are admissions that may be
considered by the Court in connection with these summary judgment proceedings.

23.     As of December 31, 2007, BLMIS had approximately 4,900 active customer accounts with a purported value of $74 billion under management.  Steiner Decl. Ex. 4 at (Dubinsky Report) ¶ 242.

24.     Over the life of the business, Madoff had over 8,000 customer accounts.  *Id.*

25.     One portion of BLMIS's business involved managing investments in customer accounts on a discretionary basis (the "IA Business").  Steiner Decl. Ex. 4 (Dubinsky Report), at ¶ 35.

26.     Madoff purportedly followed a "split-strike conversion" strategy in managing customer accounts.  *Id.* at ¶¶ 40-41.

27.     The split-strike conversion strategy purportedly entailed purchasing a basket of common stocks from within the Standard & Poor's ("S&P") 100 Index, buying a put on the S&P 100 Index and selling a call on the S&P 100 Index.  *Id.* at ¶ 43.

28.     A split-strike conversion strategy reduces a portfolio's volatility (and risk) by limiting the investor's possible gains and losses.  *See id.* at ¶¶ 128-29.

29.     As Merkin understood the strategy, Madoff was buying a basket of fully hedged positions.  So, while the strategy was not riskless, it was hedged, such that Ascot Partners "had limited risk and limited upside."  Steiner Decl. Ex. 84 (Merkin Dep.) at 110:21-112:19.

30.     BLMIS used sophisticated software that was created and built in-house to facilitate the fraud.  *See* Steiner Decl. Ex. 4 (Dubinsky Report), at ¶¶ 214-35.

31.     The software "mimicked and back-filled the output that normally would be the result of trades actually being executed by a system using trading algorithms," and provided customers with hundreds of thousands of falsified customer statements and trade confirmations in furtherance of the fraudulent scheme.  *See id.* at ¶¶ 221, 224.

32.    The IA Business custom-written software enabled the assignment of prices and volumes for securities transactions to individual customer accounts. The code allowed the IA Business to back into data that, in a legitimate business, would be generated through an order or time slicing trading system. *See id.* at ¶ 221.

33.    BLMIS informed customers that it conducted some trades on the over-the-counter ("OTC") market after hours, bolstered by BLMIS's periodic wires of tens of millions of dollars to a BLMIS affiliate.  TAC, ECF No. 151, ¶ 31.

34.    "Madoff's unprecedented fraud stretched far and wide," and is among the largest in the world.  Steiner Decl. Ex. 33 (Messages from SIPA Trustee's Chief Counsel, David J. Sheehan).

35.    The BLMIS fraud involved the participation of more than a dozen BLMIS employees, all of whom painstakingly carried out the fraudulent business.  *See* Steiner Decl. Ex. 4 (Dubinsky Report), at ¶¶ 48-75; Ex. 3 (Dubinsky Dep.) at 23:21-24:7, 88:11-89:8; Ex. 35 (transcript of Frank DiPascali plea hearing); Ex. 36 (transcript of Eric Lipkin plea hearing).

36.    Madoff solicited billions of dollars from sophisticated investors.  *See supra* ¶¶ 23-24; *see infra* ¶¶ 39-41.

37.    Madoff deceived investors and regulators for more than 30 years until admitting to operating a Ponzi scheme in December 2008.  *See* Steiner Decl. Ex. 3 (Dubinsky Dep.) at 87:24-88:3.

38.    On March 12, 2009, Madoff pleaded guilty to an 11-count criminal information and was later sentences to 150 years in prison.  Steiner Decl. Ex. 4 (Dubinsky Report), ¶ 47.

**IV.    Many Sophisticated Individuals And Entities Invested With BLMIS**

39.    Many sophisticated individuals and entities invested with BLMIS and thought Madoff was a very good money manager.  *See* Steiner Decl. Ex. ▮▮▮▮▮▮ at 172:25-

173:15  (dismissing possibility that "Madoff might be engaged in fraudulent activity" and stating that he "did not believe Madoff was a fraud up until the time that the fraud was revealed"); Ex. ████ ████████████████████████ at 171:8-21 (similar).

40.    "There were a lot of sophisticated investors who thought [Madoff] was very good, and I was aware that Jack Nash had invested with him and recommended him to others."  Steiner Decl. Ex. ██████████ Dep.) at 40:23-41:4; 104:16-105:14 (listing sophisticated investors who invested with Madoff, including Jack Nash and Richard Eldin).

41.    JPMorgan, Deutsche Bank, BNP Paribas, Zev Wolfson and his family, UBP, Aozora, Yeshiva University, David S. Gottesman, Saul Katz, Fred Wilpon, and Societe Generale all had significant investments with BLMIS.  *See* Steiner Decl. Ex. ████████ at 139:10-14; 150:17-152:8, 161:8-162:7; Ex. 84 (Merkin Dep.) at 407:7-408:20; 421:17-423:18.

## V.    **Ascot's Investments With BLMIS**

42.    Ascot Partners is a Delaware limited partnership formed in 1992.  *See* Steiner Decl. Ex. 15 at i, 1 (Confidential Offering Memorandum of Ascot Partners, L.P.).

43.    Ascot Fund is a Cayman Islands corporation formed in 1992.  *See* Steiner Decl. Ex. 17 at i, 1 (Confidential Offering Memorandum of Ascot Fund Ltd.).

44.    Ascot Partners was formed to operate as a private investment partnership for U.S. investors.  *See* Steiner Decl. Ex. 15 at i, 1 (Confidential Offering Memorandum of Ascot Partners, L.P.).

45.    Ascot Fund's investors are exclusively non-U.S. persons and certain tax-exempt U.S. persons.  *See* Steiner Decl. Ex. 17 at i, 1 (Confidential Offering Memorandum of Ascot Fund Ltd.).

46.    Prior to 2003, Ascot Partners and Ascot Fund were operated as stand-alone entities.  TAC, ECF No. 151, at ¶ 55; Answer and Affirmative Defenses of Defendants J. Ezra

7

Merkin and Gabriel Capital Corporation, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Feb. 5, 2015), ECF No. 261 ("Answer"), at ¶ 55.

47.     On January 1, 2003, Ascot and Ascot Fund were reorganized into a "master-feeder" structure in which Ascot Fund invested all of its assets in Ascot.  TAC, ECF No. 151, ¶ 55; Answer, ECF No. 261, at ¶ 55.

48.     Merkin was the general partner of Ascot Partners from its inception until the appointment of a Receiver in 2009.  TAC, ECF No. 151, at ¶ 51; Answer, ECF No. 261, at ¶ 51.

49.     Ascot Partners had an account with BLMIS continuously from 1993 through Madoff's confession in December 2008.  TAC, ECF No. 151, at ¶¶ 65, 68; Answer, ECF No. 261, at ¶¶ 65, 68.

50.     Ascot Fund opened an account with BLMIS in January 1992, and maintained that account continuously until Ascot Partners and Ascot Fund were reorganized in a "master-feeder" structure on January 1, 2003.  TAC, ECF No. 151, at ¶¶ 55, 64; Answer, ECF No. 261, at ¶¶ 55, 64.

51.     From January 1992 until January 2003, Ascot Fund invested at least a majority of its assets with BLMIS.  Autera Dep. at 106:4-15; Ex. 85 (Merkin Dep. dated Jan. 30, 2009 in *In the Matter of Madoff Charities Investigation*) at 178:17-180:2.

52.     The Trustee's expert determined that, at the time Ascot Fund invested with Ascot Partners, it transferred net equity of at least $221,487,622.  Steiner Decl. Ex. 6 (Greenblatt Report) at Ex. 4O.

53.     All investors in Ascot Partners and Ascot Fund invested pursuant to an Offering Memorandum and signed Subscription Agreements and related documents in connection with

their investments.  *See* Steiner Decl. Ex. 13 (undated Subscription Agreement for Ascot Partners, L.P.); Ex. 14 (undated Subscription Documents for Non-U.S. Investors for Ascot Fund Limited).

54.    The Ascot Offering Memoranda explicitly identified Madoff as a principal prime broker and custodian of the Fund in two places.  *See* Steiner Decl. Ex. 15 at 8, 28 (Confidential Offering Memorandum of Ascot Partners, L.P.); Ex. 17 at 13, 31 (Confidential Offering Memorandum of Ascot Fund Limited).

55.    Ascot Partners' Offering Memorandum gave Merkin "ultimate responsibility" for all decisions, including investment decisions.  *See* Steiner Decl. Ex. 15 at i, 3, 13 (Confidential Offering Memorandum of Ascot Partners, L.P.).

56.    Merkin had the "sole discretion" to seek out investments and to "engage in investment strategies that are not described herein, but that [Merkin] considers appropriate."  *See id.* at 3, 13.

57.    Merkin "reserve[d] the right to alter or modify some or all of the Partnership's investment strategies . . . where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors."  *See id.* at 3, 13.

58.    Merkin also reserved the right to invest with and to delegate investment decisions to other money managers.  *See id.* at 17.

59.    At all relevant times, as permitted by its Offering Memoranda and Limited Partnership Agreement, Ascot Partners invested at least a significant portion of its assets with BLMIS, and as of December 2008 had invested substantially all of its assets in its BLMIS account.  *See id.* at i, 3, 13, 17 (Confidential Offering Memorandum of Ascot Partners, L.P.); Steiner Decl. Ex. 84 (Merkin Dep.) at 58:5-9, 110:23-111:2; Ex. ███████ at 163:17-20.

60.    Those assets were held in Ascot Partner's brokerage account at BLMIS.    Steiner

Decl. Ex. 15 at 8-9, 28 (Confidential Offering Memorandum of Ascot Partners, L.P.).

61.    The Funds had Trading Authorization Directives that delegated discretion to

Madoff to trade equity and option securities in the Funds' BLMIS accounts on the Funds' behalf.

*See* Steiner Decl. Ex. 37 (November 2002 Trading Authorization Directive for Ascot Partners,

LP); Ex. 38 (November 2002 Trading Authorization Directive for Gabriel Capital, L.P.).

62.    The Trustee concedes that Ascot Partners is a substantial "net loser" in Madoff's

fraud.  *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶ 95, Exs. 3D, 4P; Ex. 5 (Greenblatt Dep.)

at 78:12-79:3.

63.    As of November 2008, Ascot had approximately 300 investor accounts with

approximately $1.8 billion under management.  TAC, ECF No. 151, ¶ 68.

64.    The Trustee acknowledges that Ascot had net equity in its BLMIS account of at

least $226 million as of December 11, 2008.  *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶ 96,

Exs. 3D, 4P; Ex. 5 (Greenblatt Dep.) at 78:24-79:3.

65.    The Ascot Receiver claims net equity of more than $560 million giving full credit

to the intra-account transfer from Ascot Fund to Ascot Partners in connection with the "master-

feeder" reorganization in January 2003, and net equity of $235,734,338 using the Trustee's

methodology for intra-account transfers.  Steiner Decl. Ex. 82 (Ascot Partners Customer Claim).

66.    The approximately $9.7 million difference in the Trustee's and the Ascot

Receiver's calculation of net equity using the Trustee's methodology is attributable to a

purported transfer of $9.7 million worth of securities from Shalvah Fund to Ascot Fund in 1992

when Shalvah Fund closed its account.  Ex. 5, (Greenblatt Dep.) at 88:11-89:19.

67. The Trustee refuses to give any credit for that transfer because it purported to be of a specifically identified but fictitious security, despite the fact that $10 million in cash had been deposited into the Shalvah account. *Id.* at 89:2-19.

68. The Trustee's expert admitted that, had a book entry at Shalvah fictitiously changed the securities to cash directly before transferring that equity to Ariel Fund Limited, he would have considered that an inter-account transfer. *Id.* at 95:7-19.

69. Merkin was also the general partner of Gabriel Capital L.P. ("Gabriel") and GCC was the investment advisor of Ariel Fund Ltd. ("Ariel") (with Ascot, Ascot Fund, and Gabriel, the "Funds") until Receivers were appointed for those funds in 2009. TAC, ECF No. 151, at ¶¶ 45, 47; Answer, ECF No. 261, at ¶¶ 45, 47.

70. From 2000 through 2008, Ariel and Gabriel had brokerage accounts with BLMIS that were managed by Bernard Madoff. *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶ 8; TAC, ECF No. 151, at ¶¶ 57, 61; Answer, ECF No. 261, at ¶¶ 57, 61.

71. Those two funds allocated a portion of their assets, ranging from zero to approximately 30 percent, to their respective BLMIS accounts. *See* Steiner Decl. Ex. ██████ ████ at 163:21-164:1; Ex. 72 (June 17, 2004 email from Michael Autera) at GCC-P 0155286.

72. Ariel and Gabriel were also "net losers" in the Madoff fraud. *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶¶ 116, 134, Exs. 3E, 3F; Ex. 5 (Greenblatt Dep.) at 78:12-20, 79:4-18.

73. The Trustee recognized that they had net equity claims of at least $175 million and $163 million, respectively, at the time the Madoff fraud was exposed. *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶¶ 116, 134, Exs. 3E, 3F; Ex. 5 (Greenblatt Dep.) at 78:12-20, 79:4-18.

11

74.    Ariel and Gabriel recently settled this action with the Trustee, paying the Tsrustee 100% of the initial two-year transfers alleged against them by the Trustee and receiving allowed net equity claims in full, as well as 85% of their payment to the Trustee under 11 U.S.C. § 502(h).  The initial net payouts from the SIPA estate to Ariel and Gabriel at closing of the settlement totaled more than $144 million.  *Picard v. Merkin*, No. 09-01182 (SMB), Dkt. 266.

75.    The Trustee's expert on the inter-account transfers between the Defendant Funds does not have an opinion as to the appropriateness of the method he applied to calculate net equity.  *See* Steiner Decl. Ex. 5 (Greenblatt Dep.) at 50:16-51:8; 77:12-19.

76.    The Trustee's expert on subsequent transfers, Lisa Collura, did not opine, and her report did not contain, any analysis or reference to subsequent transfers to Ascot Partners.  *See* Steiner Decl. Ex. 2 (Collura Report); Ex. 1 (Collura Dep.) at 98.

77.    Ms. Collura testified that "it wouldn't make much sense in [her] mind to identify a subsequent transfer from an initial transferee."  Steiner Decl. Ex. 1 (Collura Dep.) at 98.

**VI.    Defendants' Extensive Due Diligence into Madoff**

78.    Prior to December 11, 2008, Madoff "was a prominent and respected member of the investing community."  *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393 (S.D.N.Y. 2010); Steiner Decl. Ex. ▮▮▮▮▮▮▮▮ at 39:6-40:6 ("[J]ust anybody who was a professional investor in hedge funds would have heard of Madoff," who had "been a known name in the financial world for at least a couple of decades."); Ex. ▮▮▮▮▮▮ at 163:8-12 (agreeing that BLMIS was "a substantial, well-known broker-dealer"); Ex. ▮▮▮▮▮▮ at 149:16-18 (Madoff "was certainly in [the investment] community well respected, well thought of."); Ex. ▮ at 18:18-23 ▮▮▮▮▮▮▮▮▮▮▮▮ (Madoff "was a name known on the street because [] Madoff Securities is one of the big market makers."); Ex. ▮▮▮▮▮▮ at 135:6-12 (Madoff was "a very large market maker").

12

79.    Madoff "had served as a member of the NASDAQ stock market's Board of Governors and as the vice-chairman of the National Association of Securities Dealers." *In re Beacon*, 745 F. Supp. 2d at 393.

80.    Merkin knew that Madoff also served as the chairman of NASDAQ and a committee head for the Security Industry Association. *See* Steiner Decl. Ex. ▇▇▇▇▇▇▇▇ at 149:10-21, 150:6-8; Ex. 84 (Merkin Dep.) at 157:16-25.

81.    Merkin knew that Madoff frequently met with industry leaders at the SEC and regularly testified in Congress about developments in the securities industry and the ongoing transformation of the U.S. financial markets.  Steiner Decl. Ex. 84 (Merkin Dep.) at 213:7-12; Ex. ▇ (Research Company A Principal Dep.) at 143:5-7; Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 4-5.

82.    Merkin knew that Madoff regularly did business with sophisticated market participants including Charles Schwab & Co. and Fidelity Brokerage Services, and broke the NYSE's monopoly on Big Board trading.  *See* Steiner Decl. Ex. 19 at 48 (*Forbes* article dated January 6, 1992); Ex. 20 at 66 (*Forbes* article dated July 10, 1989).

83.    Merkin knew that BLMIS was ranked as one of the top three market makers in NASDAQ stocks, reputed as an active market maker in European and Asian equity markets, and a pioneer in over-the-counter trading in NYSE-listed stocks.  *See* Steiner Decl. Ex. 21 at 1 (*MAR/Hedge* article dated May 2001); Ex. ▇▇▇▇▇▇▇ at 39:10-17; Ex. ▇▇▇▇ ▇▇▇ at 149:19-21.

84.    Before investing with Madoff, Merkin was aware of Madoff's sterling reputation as a leading market maker with an extraordinary share of the trading in certain NYSE stocks, particularly heavily traded, large cap stocks.  Merkin also understood the regulatory structure

13

governing Madoff's operations, and knew that the SEC and other regulators regularly reviewed Madoff's business. *See* Steiner Decl. Ex. 85 (Merkin Dep. dated Jan. 30, 2009 in *In the Matter of Madoff Charities Investigation*), at 9:5-10:14; 128:21-134:3; Ex. 84 (Merkin Dep.) at 157:16-158:22, 181:9-22, 188:20-189:13, 213:7-23; Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

85.     Before investing with Madoff, Merkin had several meetings with Madoff himself and meetings with several of Madoff's customers concerning Mr. Madoff's reputation, trading strategy and risks.  Those investors included Leon Meyers (at the time the manager of the Scheuer family office), Sandra Manske (at the time a senior executive of the Tremont funds and later the founder of the Maxam funds), David Gottesman (the founder of First Manhattan Corporation and a director of Berkshire Hathaway), Gedale Horowitz (who at the time ran Salomon Brothers' municipal bond department), and Daniel Hoffert (a successful Wall Street investor), all of whom spoke very highly of Mr. Madoff and his investment strategies.  *See* Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 2-3; Ex. 85 (Merkin Dep. dated Jan. 30, 2009 in *In the Matter of Madoff Charities Investigation*), at 9:5-10:14; 128:21-134:3; Ex. 84  (Merkin Dep.) at 147:11-16, 153:17-22, 154:11-156:9, 183:2-9, 255:25-256:20; Ex. 10 (Weingarten Dep.) at 117:17-118:24.

86.     Merkin also had conversations with customers of BLMIS's market-making operations.  *See* Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

87.     Merkin found that Madoff's customers had "very positive things to say" about Madoff.  Steiner Decl. Ex. 84 (Merkin Dep.) at 174:3-17 (discussing Merkin's conversations with Madoff's customers, including Fidelity).

14

88.     Prior to investing with Madoff, Merkin knew that his father, Hermann Merkin (a successful businessman and investor), had invested money with Madoff "and had a very constructive opinion of Mr. Madoff and his investing abilities."   Steiner Decl. Ex. 84 (Merkin Dep.) at 149:18-21; Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

89.     Merkin's father told Merkin "I know Bernie, and he's okay" – which Merkin understood to be high praise coming from his father, a savvy Wall Street investor.  *Id.* at 147:20-148:1, 149:15-150:7.

90.     Prior to investing with Madoff, Merkin met with Madoff in Madoff's offices, and discussed Madoff's trading strategies as well as Madoff's market-making activities.   Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

91.     Madoff also explained that BLMIS operated a significant wholesale business, in which its customers included Charles Schwab and Fidelity.  *Id.*

92.     They also discussed Madoff's and Madoff's brother's involvement in industry affairs.  *Id.*

93.     Merkin first invested with Madoff and BLMIS through Meyers and the Scheuer family's account with Madoff.  *Id.*

94.     After a period of time and gaining additional comfort with Madoff and his trading strategies, Merkin thereafter opened managed accounts with BLMIS on behalf of the Funds and delegated trading authority over those accounts to Madoff.  *Id.*; Steiner Decl. Ex. 84 (Merkin Dep.) at 149:11-14, 152:3-153:22.

95.    The Trustee alleges that Merkin had a close business and personal relationship to Madoff and touted such relationship to others.  TAC, ECF No. 151, ¶¶ 3, 84, 86.

96.    Madoff attended at least one of Merkin's children's bar or bat mitvahs.  Steiner Decl. Ex. 84 (Merkin Dep.) at 609:19-610:4.

97.    Merkin would also see Madoff occasionally at meetings of the Gift of Life Foundation, of which Madoff was the Chairman.  Steiner Decl. Ex. 84 (Merkin Dep.) at 432:2-11.

98.    The SEC examined and inspected BLMIS, including in 1992, 2006, and 2007, but did not uncover the fraud.  *See* Steiner Decl. Ex. 24 at A1 (Dec. 19, 2008 *Washington Post* article).

99.    The SEC Office of Investigations acknowledged that "the fact the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him."  Steiner Decl. Ex. 34 at 25, 429 (OIG Report).

100.    Merkin had meetings and telephone calls with Madoff approximately ten to fifteen times per year to discuss Madoff's trading strategy and execution.  Steiner Decl. Ex. 84 (Merkin Dep.) at 115:12-15, 186:8-187:1, 212:8-213:6, 255:25-256:20, 428:18-431:13; Exs. 39-49 (Merkin's handwritten notes and call transcripts on discussions with Madoff).

101.    As an additional part of his due diligence on and monitoring of Madoff and BLMIS, Merkin maintained a file that included newspaper articles and profiles of Madoff, notes of certain of his meetings with Mr. Madoff, and information concerning other funds that had significant investments with Madoff and BLMIS.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3-4.

102.    For example, Merkin reviewed and retained a 1989 article from Forbes describing how BLMIS made markets in 250 of the largest, most actively traded stocks and identifying some of its biggest customers, including A.G. Edwards, Charles Schwab, and Fidelity.  *See id.*

103.    Another Forbes article, from 1992, similarly described Madoff and his firm as one of the biggest of the new age traders on Wall Street who were competing with the New York Stock Exchange for trades, and an April 1993 International Herald Tribune likewise discussed how Madoff was gaining the upper hand in a competition with the New York and American Stock Exchanges.  *See id.*

104.    Other articles reviewed and retained by Merkin included one published in MARHedge and another in Barron's in 2001.  *See id.*; Steiner Decl. Ex. 21 at 3 (*MARHedge* article dated May 2001); Ex. 25 (*Barrons* article dated May 7, 2001).

105.    A *New York Times* article from 1992 discussed the United States Securities and Exchange Commission's investigation into unregistered notes being marketed by Avellino & Bienes, a Florida accounting firm, and reported on the SEC's relief that all of the money that had been raised from the sale of the notes -- $440 million -- had been deposited in an account with BLMIS and managed by Madoff, and was able to be liquidated and returned to the note purchasers almost immediately.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 4.

106.    Madoff was widely credited with breaking the New York Stock Exchange's hegemony over Wall Street trading.  By 1999 -- as reflected in New York Times and Wall Street Journal articles that Merkin read and retained in his file -- BLMIS entered into a joint venture with the major Wall Street firms Goldman Sachs, Morgan Stanley Dean Witter, Citigroup's Salomon Smith Barney, and Merrill Lynch to establish the first electronic platform to trade

stocks listed on the New York Stock Exchange, American Stock Exchange, and NASDAQ.  That those four well-established Wall Street firms were willing to enter into a joint venture with BLMIS further enhanced Madoff's reputation and provided additional comfort to Merkin.  *See* Steiner Decl. Ex. 22 (*New York Times* article dated June 8, 1999); Ex. 23 (*New York Times* article dated September 14, 1999); Exs. 26-32 (newspaper and media articles covering the electronic trading platform and Madoff); Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 4.

107.    The Funds promptly received payments for hundreds of millions of dollars in redemptions whenever requested over a 15-year period.  Steiner Decl. Ex. 90 (Achilarre Dep.) at 51:16-18; Ex. 84 (Merkin Dep.) at 216:10-217:21.

108.    Merkin testified that "it was certainly a lot easier to get money out than it was to get money in."  Steiner Decl. Ex. 84 (Merkin Dep.) at 217:1-3.

109.    Defendants had complete transparency to Madoff's purported trading and received written confirmations of each trade.  *See ¶ 96-99, infra.*

110.    GCC employees entered each trade into GCC's portfolio management system. Steiner Decl. Ex. 90 (Achilarre Dep.) at 32:8-33:6, 95:9-22, 96:18-97:13; Ex. 84 (Merkin Dep.) at 168:5-169:21, 445:19-446:6; Ex. 91 (Autera Dep.) at 177:18-178:15.

111.    GCC employees checked the BLMIS trade confirmations on a daily basis and resolved any discrepancies with BLMIS.  *See* Steiner Decl. Ex. 96 (Gordon Dep.) at 44:22-45:15, 48:21-49:5; Ex. 94 (Hess Dep.) at 86:6-87:18.

112.    GCC's portfolio management system generated profit-and-loss reports that Merkin and others at GCC reviewed on a daily basis.  *See* Steiner Decl. Ex. 96 (Gordon Dep.) at

18

12:21-14:4; Ex. 94 (Hess Dep.) at 89:17-90:19, 113:2-9; Ex. 84 (Merkin Dep.) at 168:5-169:21, 201:15-16.

113.    Each month, the Funds received monthly statements from Madoff, which GCC employees reviewed and reconciled against GCC's books and records.  Steiner Decl. Ex. 90 (Achilarre Dep.) at 34:22-24, 45:6-21; Ex. 80 (Merkin Dep.) at 232:6-239:13.

114.    No GCC employee thought that there was anything amiss with BLMIS's statements.  *See* Steiner Decl. Ex. 90 (Achilarre Dep.) at 98:8-10, 115:20-116:2.

115.    BDO Seidman, LLP ("BDO") is the fifth-largest accounting firm in the country and a recognized leader in the audits of hedge funds.  *See* Steiner Decl. Ex. 73 (BDO "About Us"); Ex. 74 (*Audit Analytics* post dated May 14, 2014)

116.    BDO had a team of employees audit each of the Funds every year.  *See* Steiner Decl. Ex. ▮▮▮▮▮▮▮▮ at 26:2-9; Ex. 90 (Achilarre Dep.) at 86:6-8.

117.    The BDO audits took approximately six weeks, with the bulk of that time spent at GCC's offices.  *See* Steiner Decl. Ex. ▮▮▮▮▮▮▮▮ at 138:2-15.

118.    BDO's yearly audits of the Funds included a review of Madoff's trading activity for the Funds, confirmation of the Funds' account balances with Madoff and review of Madoff's auditor's statement of internal controls as deemed necessary by BDO. *See* Steiner Decl. Exs. 50-59 (showing auditor communication between BDO and funds).

119.    BDO issued clean audit opinions each year for the Funds, with the exception of one presentation item in 2001 related to the condensed schedule of investments.  *See* Steiner Decl. Ex. ▮▮▮▮▮▮▮▮ at 170:9-19.

120.    BDO was well-aware of the Funds' investments with BLMIS, including that Ascot Partners had invested substantially all of its assets in a managed account with BLMIS.  *See*

Steiner Decl. Ex. ████████████ at 163:17-164:1; Ex. ████████████. dated May 18, 2009 in *In the Matter of Madoff Charities Investigation*), at 13:4-16, 38:10-18.

121.    Defendants provided BDO complete access to all requested documentation, including copies of Madoff's trading confirmations and monthly statements, and access to GCC's books and records.  *See* Steiner Decl. Ex. ████████████ at 91:22-92:3, 104:6-105:2, 105:19-106:3, 164:2-5, 167:15-20; Ex. ████████████ at 117:15-19; Ex. 84 (Merkin Dep.) at 191:16-193:11.

122.    BDO did not note any BLMIS trades listed outside the possible range.  *See* Steiner Decl. Ex. ████████████ at 175:5-8.

123.    BDO had confirmed the balances in the BLMIS accounts directly with the SEC-registered broker-dealer.  *See* Steiner Decl. Ex. ████████ Dep.) at 89:3-7, 89:25-90:4, 164:6-21.

124.    BDO was aware that Madoff was audited by Friehling & Horowitz.  Steiner Decl. ████████████████ ; Ex. 110 (BDO_S_0003891).

125.    BDO was not troubled by the size or qualifications of Madoff's auditor.  Steiner Decl. Ex. ████████████ at 135:16-25.

126.    BDO never expressed concerns about any of the materials reviewed from or about Madoff, and never suspected that BLMIS was operating a fraud.  Steiner Decl. Ex. ████████ ████ at 170:20-24.

127.    BDO referred investors to Ascot knowing it was a "Madoff feeder product."  *See* Steiner Decl. Ex. 71 (email from Michael Autera to J. Ezra Merkin dated May 29, 2003); Ex. 84 (Merkin Dep.) at 600:24-601:10.

128.    A BDO partner recommended Ascot to at least one investor.  *See* Steiner Decl. Ex. 71 (email from Michael Autera to J. Ezra Merkin regarding "FW: Contact Information" dated May 29, 2003).

129.    There is no set formula for due diligence.  *See* Steiner Decl. Ex. 11 (Weingarten Report), at 2; Ex. ████████ at 148:8-15 ("'[D]ue diligence' is a term of art.  It doesn't have any prescribed methodologies.  They differ from firm to firm, people to people . . . ."); Ex. 9 (Pomerantz Dep.) at 39:17-41:11, 88:16-21  ("I mean the five P's are the objective standard, and then it is incumbent on a fiduciary to accomplish the due diligence into each of those P's to the extent that data and tools are available, and circumstances warrant."); *see also* Ex. 9(a) (Pomerantz Rebuttal Report) at ¶ 6; Ex. 9 (Pomerantz Dep.) at 39:19-23.

130.    Pomerantz admitted that he manufactured virtually all of the pricing discrepancies by "adjusting" every pre-2006 stock transaction by four cents per share from the price reported on the BLMIS trade confirmation by subtracting four cents per share from the purchase price reported on the BLMIS confirmation sent to Ascot Partners for every stock purchase, and adding four cents per share to the sale price reported on the BLMIS confirmation for every stock sale. Steiner Decl. Ex. 9 (Pomerantz Dep.) at 226:25-227:9.  He used the "adjusted" prices in his comparison to the reported daily high-low range and his VWAP analysis.  *Id.* at 230:6-23, 234:18-23.

131.    In conducting due diligence, Pomerantz reviewed transaction-level data but never looked at trade confirmations.  *See* Steiner Decl. Ex. 9 (Pomerantz Dep.) at 100:4-13.

132.    In conducting due diligence, Pomerantz never looked at stock transaction prices compared to daily highs and lows.  Steiner Decl. Ex. 9 (Pomerantz Dep.) at 101:5-20.

133.    The Trustee's expert acknowledged that reverse engineering of fund's strategy is not standard due diligence procedure.  Steiner Decl. Ex. 7 (Hirsch Dep.) at 63:22-64:14.

134.    The Merkin Defendants' due diligence expert, Jeffrey Weingarten, was a senior executive of Goldman Sachs and a successful hedge fund manager.  *See* Steiner Decl. Ex. 11 (Weingarten Report), at 1, Ex. A.

135.    After an exhaustive review of relevant documents and deposition testimony, Weingarten concluded that Merkin had obtained a clear understanding of each of the key characteristics essential to making a determination of whether to invest in a fund manager (Philosophy, Process, Procedures, People and Performance). *See* Steiner Decl. Ex. 11 (Weingarten Report), at 6.

136.    Weingarten concluded that "the due diligence performed by [the Merkin Defendants] met or exceeded industry standards."  Steiner Decl. Ex. 11 (Weingarten Report), at 2.

## VII.    Defendants' Transparency

137.    The Trustee alleges that, as a result of Merkin's knowledge of the BLMIS fraud, Merkin "misled certain investors as to Madoff's role in the operation of the Defendant Funds, and in fact sought to conceal from investors Madoff's involvement in the Defendant Funds' investments and/or the amount of investment with BLMIS."  (TAC ¶ 109).

138.    Merkin arranged for many investors in the Funds to meet with Madoff and do their own direct due diligence.  Steiner Decl. Ex. ████████████ at 43:6-18; Ex. 84 (Merkin Dep.) at 183:2-20, 184:13-17, 306:23-307:6 ("[A]s part of what they were doing and part of what [Research Company A Principal] was doing, he asked for a visit and we set up a visit."); Ex. █ ███████████████ at 19:24-20:6; Ex. 12 (Weingarten Dep.) at 218:2-13; Ex. 62 (J. Ezra Merkin calendar); Ex. 63-70 (Various emails).

139.    The largest single investor in Ascot was Union Bancaire Privee ("UBP"), a sophisticated Swiss bank. *See* Steiner Decl. Ex. 91 (Autera Dep.) at 166:2-9.

140.    UBP had total investments in Ascot of more than $487 million as of November 30, 2008 and net capital investments of $380 million across several different accounts in both the domestic and offshore funds. *See* Steiner Decl. Ex. 77 (Ascot Fund Investor Capital Accounts, GCC-P 0878185) at GCC-P 0878185, -92, -99; Ex. 79 (Ascot Partners Investor Capital Accounts, GCC-P 0878213) at GCC-P 0879316, -880408, -880434, -880512, -880564, -881006.

141.    Merkin twice took representatives of UBP to meet with Madoff as part of UBP's due diligence on Ascot.  Steiner Decl. Ex. 87 (Merkin Dep. dated July 1, 2010), at 20:9-18; Ex. 91 (Autera Dep.) at 164:20-170:24.

142.    One of these meetings was on November 25, 2008 and included Madoff, Merkin, GCC's chief financial officer Michael Autera, and a team of four people from UBP. *See* Steiner Decl. Ex. 91 (Autera Dep.) at 164:20-170:24.

143.    Following that meeting, UBP decided to continue to invest hundreds of millions of dollars in Ascot. *See* Steiner Decl. Ex. 91 (Autera Dep.) at 164:20-170:24.

144.    Merkin also took employees of another Swiss bank, Reichmuth & Co., to meet with Madoff on two separate occasions.  On one of those occasions, Merkin also brought a representative from "Research Company A" to the meeting with Madoff.  Steiner Decl. Ex. 64 (email from Patrick Erne to J. Ezra Merkin regarding "RE: Meeting Request" dated October 3, 2007); Ex. 84 (Merkin Dep.) at 514:6-515:9, 516:16-517:22.

145.    As part of Research Company A's due diligence, it not only spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS statements and trade

confirmations in Merkin's office.  *See* Steiner Decl. Ex. ■ (Research Company A Principal

Dep.) at 19:24-20:6.

146.    One of the clients advised by Research Company A invested at least $20 million

in Ascot following June 2003 conversations with Merkin and maintained those investments

through the time of Madoff's confession.  *See* Steiner Decl. Ex. ■ (Research Company A

Principal Dep.) at 168:14-17.

147.    Yeshiva University was another investor in Ascot.  The University had a net

capital investment of approximately $14.5 million purportedly worth approximately $109 million

as of November 30, 2008.  *See* Steiner Decl. Ex. 78 (Ascot Partners Investor Capital Accounts,

GCC-P 0882913) at GCC-P 0882927.

148.    Merkin was Chairman of the Investment Committee of Yeshiva and a member of

the University's Board of Trustees.  Steiner Decl. Ex. 84 (Merkin Dep.) at 395:2-10; 428:2-17;

TAC, ECF No. 151, at ¶ 41; Answer, ECF No. 261, at ¶ 41.

149.    Until December 11, 2008, Madoff was a Trustee of Yeshiva University as well as

its Treasurer and Chairman of the Business School.  Steiner Decl. Ex. 84 (Merkin Dep.) at 395:1-

10; 426:18-24; TAC, ECF No. 151, at ¶ 85; Answer, ECF No. 261, at ¶ 85.

150.    In 2003, Merkin arranged a meeting for himself, Gedale Horowitz, himself an

Ascot investor and also the head of Salomon Brothers Municipal Department and chairman of

the investment committee of Investment Committee of Yeshiva University, and Madoff.  Steiner

Decl. Ex. 57 (email from J. Ezra Merkin to Naomi Ferro regarding "Odds and Ends" dated

February 9, 2003) at 20:9-18; Ex. 84 (Merkin Dep.) at 387:16-389:14.

151.    Merkin also arranged meetings with Madoff for Alec Hackel, a sophisticated

investor involved in the commodities industry at Philipp Brothers, at Marc Rich & Company,

and on the board of Reichmuth & Company.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 5; Ex. 84 (Merkin Dep.) at 513:10-514:12.

152.    Other sophisticated investors for whom Merkin arranged and with whom Merkin participated in due diligence meetings with Madoff included Ludwig Bravmann, Patrick Erne, and Roman Igolnikov and others from Union Bancaire Privee.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 5.

153.    Merkin openly discussed his conversations with Madoff with others.  *See* ¶ 154, *infra*.

154.    ███████████████████████████████ testified that he and Merkin "discussed numerous times the conversations that [Merkin] had with Bernie Madoff in terms of looking at how Ascot was structured and whether Bernie was going to change some of his particular views and whether Ezra agreed with that or didn't agree with that."  Steiner Decl. Ex. ██████████ at 40:14-41:9, 80:12-21 ("Ezra related some of those meetings [with Madoff] or the results of some of those meetings to me").

155.    Merkin also provided multiple years of BDO's audited statements of the Funds to investors and potential investors.  Steiner Decl. Ex. ██████████ at 69:7-22 ("BDO Seidman had been [the Funds'] auditor I believe for 10 or 12, 15 years.  So a very long time. And so they provided audited statements every year that said the securities were there.  And I reviewed seven to ten years of those audit statements in conjunction with making those investments.  I thought that it was interesting, they were very specific.  It said it had $225 million worth of these treasury bills and they were responsible to be Ascot's auditors and they've been doing it for a long time, and so I took great comfort in that.").

25

156.    Merkin provided copies of BLMIS trade confirmations as well as profit and loss statements generated by GCC's portfolio management system to investors. Steiner Decl. Ex. ██ ████████████ at 75:7-18 ("[Merkin] got trade notification from Madoff.  He put them into his own forms, which I saw on numerous occasions, which outlined the positions that Ascot had at any given time.  And I saw those trade sheets . . . that Ezra produced fairly frequently."); Ex. ██ ████████████████████ at 44:19-45:5 ("We examined all the documents that [] were provided by Ascot Fund as offering documents, articles, the statements. . . .  We were looking at the trade tickets of Ascot Funds to get better idea of the execution of those trades and if it makes sense."); Ex. ██ ████████████████████ at 20:3-19 (discussing visit to GCC offices "to obtain further transparency into the investment by looking at monthly statements and trade tickets from Mr. Madoff").

157.    Merkin regularly spoke to investors and potential investors regarding Madoff and the Funds.  Steiner Decl. Ex. ██ ████████████████████ at 44:25-45:1, 67:21-68:2, 136:24-137:1.

158.    Merkin was "obviously quite distressed" and "very emotional" after Madoff's confession.  Steiner Decl. Ex. ████████████ at 130:18-131:3; Ex. ████████████ at 113:23-114:7; Ex. ████████████ at 46:4-11.

159.    At the time of Madoff's confession, Merkin and his family lost more than $110 million as a result of their own personal investments with Madoff (through the Funds). *See* Steiner Decl. Ex. 84 (Merkin Dep.) at 635:23-636:7.

160.    Michael Autera invested between $600,000 and $700,000 with Madoff through Ascot Partners, which was worth approximately $1,800,000 as of December 2008.  Steiner Decl. Ex. 91 (Autera Dep.) at 111:6-112:1.

161.    Mr. Autera also was an investor in Gabriel.  His Gabriel investment was worth approximately $1,500,000 prior to Madoff's confession, and he knew that approximately a quarter of that was invested with Madoff.  Steiner Decl. Ex. 91 (Autera Dep.) at 117-14-118:22.

162.    Merkin never restricted access to Madoff nor concealed Madoff's role.  *See* ¶¶ 126, 129, 132, 139, 141, 142-44, *infra*.

## VIII.    Defendants Did Not Intentionally Disregard Red Flags

163.    "Merkin had every reason to believe that [Madoff] was highly reputable, highly regarded and had direct and relevant experience in managing money in precisely the manner in which he intended to do."  Steiner Decl. Ex. 11 (Weingarten Report), at 4.

164.    Merkin "always or almost always [had] an opportunity to ask him [Madoff] something that I wasn't sure about in terms of where the strategy -- whether it had been executed properly or where the strategy might be headed to next."  Steiner Decl. Ex. 84 (Merkin Dep.) at 212:22-213:6.

165.    The Trustee does not allege that Merkin ever received a payment from Madoff or BLMIS; that Merkin had an account separate from the Funds that earned higher returns; that the Funds' accounts earned outsized annual returns of approximately 100 percent or more; or that Merkin requested or caused Madoff to backdate trades or direct winning or losing trades at different points in time.  *See generally* TAC.

166.    The Trustee alleges that Merkin's conversation with Madoff concerning the disclosure of the Bayou Group Ponzi scheme indicates that Merkin believed Madoff might have been a fraud.  (TAC ¶ 93).

167.    Merkin discussed Bayou with Madoff because an issue with a fund like Bayou "might provoke questions about other funds." Steiner Decl. Ex. 84 (Merkin Dep.) at 508:20-509:23.

168.    The Trustee asserts that the trade confirmations issued by BLMIS reflected several hundred transactions (out of the tens of thousands of transactions in the Funds' accounts) that occurred outside of the daily high-low price range for the stock at issue.  TAC ¶ 169.

169.    The Trustee's expert, Dr. Pomerantz, testified that those "outside the range" trades were the result of his manipulation of the actual trade confirmations – adjusting every pre-2006 transaction by four cents per share – and that in the absence of his adjustments (and a few other errors in his calculations) there would be virtually no trades outside of the reported high-low range.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-234:17.

170.    Pomerantz further acknowledged that his manipulation of the trade data similarly impacted his analysis of volume weighted average price.  Ex. 9 (Pomerantz Dep.) at 234:20-240:17.

171.    The Trustee also alleges that Merkin "acknowledged he was 'aware'" of "the fact that the options market lacked the volume necessary to sustain BLMIS's trading."  (TAC ¶ 99.) The Trustee contends that Merkin responded to challenges by explaining that "[U]nderstanding Madoff is like finding Pluto . . . you can't really see it . . . you do it through inference, its effect on other objects"; and by commented that "Toto is still tugging at the curtain," to which Merkin replied, "I would say that the curtain is winning."  (TAC ¶¶ 100-101.)

172.    Merkin discussed options volume with Madoff and was told that Madoff conducted a substantial part of the options trading in the over-the-counter market.  Steiner Decl. Ex. 84 (Merkin Dep.) at 173:14-174:2, 203:12-205:16.

173.    It is not unusual that BLMIS cleared its own trades and had custody of its own assets because BLMIS was an SEC-registered broker-dealer, not a hedge fund or pooled

investment vehicle. Steiner Decl. Ex. 90 (Achilarre Dep.) at 36:2-7, 59:24-60:4; Ex. 86 (Merkin

Dep. dated March 4, 2010 in *State of New York v. J. Ezra Merkin et. al*), at 411:24-412:15.

174.     Goldman Sachs, Morgan Stanley and other brokerage firms regularly cleared their

own trades and custodied their customers' assets. Steiner Decl. Ex. 84 (Merkin Dep.) at 173:2-

13; Ex. 86 (Merkin Dep. dated March 4, 2010 in *State of New York v. J. Ezra Merkin et. al*), at

411:24-412:15; Ex. ███████████ at 168:3-11; *see also* Ex. 9 (Pomerantz Dep.) at

173:16-22; Ex. ███████████ at 46:21-23 ("[I]f somebody really has the intent to defraud

you, I'm not sure if a prime broker is going to stand in the place.").

175.     Given that Madoff's market making business handled more than 10 percent of the

volume of stock traded on the New York Stock Exchange, it would have been surprising if

Madoff did not clear his own trades. Steiner Decl. Ex. 86 (Merkin Dep. dated March 4, 2010 in

*State of New York v. J. Ezra Merkin et. al*), at 411:24-412:15; Ex. ███████████ at 130:15-22.

176.     BLMIS's steady returns did not cause Defendants any concern. Steiner Decl. Ex.

90 (Achilarre Dep.) at 90:5-15, 91:22-24.

177.     Other funds had consistently positive returns, including Princeton/Newport and

Ridgewood. Steiner Decl. Ex. ███████████ at 158:18-159:10.

178.     It was not unusual and was not a cause of concern that Defendants did not have

electronic access to BLMIS. Steiner Decl. Ex. 90 (Achilarre Dep.) at 90:12-15.

179.     Defendants never had any issues withdrawing money from the Funds' BLMIS

accounts. Steiner Decl. Ex. 90 (Achilarre Dep.) at 51:17-18.

180.     If BDO was concerned in any way with Madoff, it would have notified

Defendants. With the exception of one presentation item in 2001, BDO issued unqualified audit

opinions every year and understood that Defendants might rely on those audits as evidence that BLMIS was not engaged in a fraud.  Steiner Decl. Ex. ████████ at 169-71.

181.    Defendants relied upon BDO's audits as evidence that Madoff was not engaged in a fraud.  Steiner Decl. Ex. 96 (Gordon Dep.) at 36.

182.    Merkin respected Madoff as an investment advisor and often spoke very highly of him.  Steiner Decl. Ex. 83 (Balsam Dep.) at 91:6-9 ("I recall Mr. Merkin saying that he has been fortunate to be able to work professionally with two very astute managers, one of them is Steven Feinberg and the other one was Bernard Madoff."))

183.    The only negative thing Balsam ever heard from Merkin regarding Madoff was "that the returns have been good, but that doesn't guarantee they will be in the future."  Steiner Decl. Ex. 83 (Balsam Dep.) at 128:21-24.

184.    BLMIS's structure of maintaining separately managed accounts for each of its customers was transparent and allowed investors to see all trades in their account.  Steiner Decl. Ex. ████████ at 96:9-97:25  (testifying he felt there was "perfect transparency"); Ex. ██ ████████ at 47:20-48:3 (stating that a Madoff sample report to a client was "very clear" and "wonderfully transparent").

185.    Madoff's high Sharpe ratio was not unusual or concerning.  *See* Steiner Decl. Ex. 12 (Weingarten Rebuttal Report), at 4.

186.    Other funds had high Sharpe ratios, including the Renaissance Medallion Fund, Soros, Elliott Associates, Millennium Partners, SAC Capital, Baupost, SMN Diversified Futures Fund, Eclectica Fund, Episode Inc., Princeton/Newport and Ridgewood.  Ex. 7 (Hirsch Dep.) at 87:1-18; Ex. 12 (Weingarten Rebuttal Report) at 4; Ex. ████████ at 159:17-19.

187.    One of the Trustee's experts, Amy Hirsch, explained that investors generally look for a higher Sharpe ratio and that she does not rely on Sharpe ratios in isolation.  Steiner Decl. Ex. 7 (Hirsch Dep.) at 86:20-87:7.

188.    A lack of understanding of a strategy often leads some people to leap to speculate that it is fraud, even when it is not.  Steiner Decl. Ex. ███████████ at 118:2-8 ("I've also – by the way, it's possible I might have heard things like front running or insider trading or Ponzi scheme with Steve Cohen.  I mean, when people don't understand certain investment techniques skepticism arises and from there you get all kinds of people sometimes making connections correctly or incorrectly.").

189.    Defendants were not obligated to obtain DTC records.

190.    The Trustee's expert had never heard of anyone in the investment industry obtaining DTC records.  Steiner Decl. Ex. 3 (Dubinsky Dep.) at 96:20-97:24.

191.    The Trustee's expert had never heard of a manager creating fake DTC screens before this case.  Steiner Decl. Ex. 3 (Dubinsky Dep.) at 105:15-18.

192.    None of the Trustee's experts in this case have offered an opinion as to whether Defendants were willfully blind to the BMIS fraud.   Steiner Decl. Ex. 3 (Dubinsky Dep.) at 19:24-21:14; 146:22-147:12.

193.    Hirsch does not offer an opinion on the appropriateness of the due diligence performed by Merkin on Madoff or BLMIS.  Steiner Decl. Ex. 7 (Hirsch Dep.) at 31:5-12.

194.    Dr. Pomerantz did no further due diligence on some of his investments than Merkin did on BLMIS.  For example, he helps manage Verizon's defined benefit plan, a portion of the funds in the plan have been placed into a comingled account at Goldman Sachs, which is an index fund.  Steiner Decl. Ex. 9 (Pomerantz Dep.) at 52:5-23, 57:6-14).  Dr. Pomerantz

assumes that the index fund is managed by a computer and that Goldman Sachs acts as its own broker-dealer with respect to that fund. *Id.* 59:9-22. Dr. Pomerantz explained that this is not a problem because "Goldman Sachs is a large entity." *Id.* 59:21-60:10.

195.    Dr. Pomerantz receives monthly statements for this account and has never asked to see trade confirmations. *Id.* 60:11-24, 96:3-6.

196.    Dr. Pomerantz feels comfortable that the account in fact owns all 3,000 stocks that he thinks it owns because Goldman Sachs has "represented to [him] that it owns 3,000. It performs like it owns 3,000. The returns match the returns of the index. [He has] no reason to believe that it doesn't own 3,000. It behaves exactly the way [he] expect[s] it to behave." *Id.* 61:13-23.

197.    Dr. Pomerantz also relies on the fact that Goldman Sachs is a well-known brand, and that he goes to Goldman Sachs' offices periodically and that he meets with a lot of people. *Id.* 61:24-62:12.

> Q      So in terms -- I understand the "trust," and I understand people trust Goldman Sachs. In terms of the "verify," what do you do to verify those representations, other than go to their offices and meet with people?
>
> A      I mean, this relationship has been going on for about seven years. I do get statements. I know how the funds are performing. They are performing in line with what I expect.
>
> I talk to people there who all seem pretty competent to me at being able to do the job that they are there to do. I don't have -- I don't have any reason to think otherwise.
>
> I get a statement from Chase Manhattan every month that tells me how much money is in my checking account. I don't go to Chase Manhattan and see the actual dollar bills. They probably don't even exist; right? Shares of stock don't really exist.
>
> So I do what I can do and I do what I think I need to do.

*Id.* 62:18-63:17.

198.    The Trustee alleges that one of Merkin's money managers, Victor Teicher, "warned Merkin about investing with BLMIS" and told Merkin that BLMIS "'could be a Ponzi scheme." (TAC ¶¶ 101-105.)

199.    Teicher does not remember telling Merkin that Madoff was operating a Ponzi scheme, and Merkin does not recall Teicher ever saying that. Steiner Decl. Ex. 106 (Teicher Dep.) at 119:12-17; Ex. 89 (Merkin Dep. dated June 21, 2011 in *Straus v. Merkin*) at 130:21-131:25 ("Not a single individual . . . prior to December 11th, 2008, told me that they thought Madoff was conducting a Ponzi scheme . . . .").

200.    Jack Mayer, an employee who supposedly overheard Teicher's comment, testified that Teicher's concerns about Madoff lessened over time. Ex. 99 (Mayer Dep.) Tr. at 71:10-21.

201.    Teicher also testified that he never analyzed or attempted to understand Madoff's strategy; rather, his concerns stemmed from Madoff's name and the fact that his office was in the Lipstick building. Ex. 107 (Teicher's Feb. 9, 2009 Dep. in *New York Univ. v. Ariel Fund Ltd.*) at 74:10-75:15.

202.    The Trustee alleges that Merkin "conceded that BLMIS might be a Ponzi scheme in a 2003 meeting between Merkin and Research Company A," when Merkin "quipped that 'Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme.''" (TAC ¶¶ 94-95.)

203.    The founder of Research Company A denied that Merkin suggested that he thought Madoff was engaged in a fraud:

> A.  I think he sarcastically implied that if Madoff would ever be a fraud, then it would be much bigger than -- than Ponzi, than Charles Ponzi. But it just was a sarcastic, you know, the way he talks, it's typical of him to express himself.
>
> Q.  Well, in connection with the same conversation, the bullet immediately preceding that is advice from Mr. -- a tribute that --

[Research Company A Employee] is attributing to Mr. Merkin stating that – advising that you shouldn't have too much exposure to Madoff.  Correct?

A.  Yes.

Q.  Was Mr. Merkin stating that one of the reasons why you shouldn't have too much exposure to Madoff is because it could be a Ponzi scheme?

A.  I think as I mentioned before, he was teaching me a lesson that it's important to be -- it's important to be well diversified. It doesn't matter how much you love the investment. You just -- it's just the rule, one of the, you know, main rules of the investment, you have to be diversified.

Steiner Decl. Ex. ■ (Research Company A Principal Dep.) at 84:15-85:11.

Dated:  New York, New York
         October 7, 2015

                                    DECHERT LLP

                                    By:  /s/ Neil A. Steiner
                                            Andrew J. Levander
                                            Neil A. Steiner
                                            Daphne T. Ha
                                            Mariel R. Bronen
                                    1095 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 698-3500
                                    andrew.levander@dechert.com
                                    neil.steiner@dechert.com
                                    daphne.ha@dechert.com
                                    mariel.bronen@dechert.com

                                    *Attorneys for Defendants J. Ezra Merkin
                                    and Gabriel Capital Corporation*

                                    NORTON ROSE FULBRIGHT US LLP

                                    By:  /s/ Judith A. Archer   __
                                            Judith A. Archer
                                            Jami Mills Vibbert
                                            David B. Schwartz

666 Fifth Avenue
New York, New York  10103
Tel.:  (212) 318-3000
Fax:  (212) 318-3400
judith.archer@nortonrosefulbright.com
jami.vibbert@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

*Attorneys for Ralph C. Dawson, as Receiver
for Defendant Ascot Partners, L.P., and
Ascot Fund Ltd.*