LAW OFFICE OF
RICHARD E. SIGNORELLI
799 Broadway, Suite 539
New York, NY 10003
Telephone:     212 254 4218
Facsimile:     212 254 1396
rsignorelli@nycLITIGATOR.com℠
www.nycLITIGATOR.com℠
*Attorneys for the Defendants identified on*
*Exhibit 1 to the Notice of Motion*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                     Plaintiff-Applicant,

                     v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                     Defendant.

:  Adv. Pro. No. 08-01789 (SMB)

:  SIPA LIQUIDATION

:  (Substantively Consolidated)

-------------------------------------------------------------------x

In re:

BERNARD L. MADOFF,

                     Debtor.

-------------------------------------------------------------------x

IRVING PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                     Plaintiff,

                     v.

RICHARD M. GLANTZ, et al.

                     Defendants.

:  Adv. Pro. No. 10-5394 (SMB)

-------------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................iii

ARGUMENT..................................................……….....................................................1

POINT I

THE CLAIMS SEEKING AVOIDANCE
UNDER § 548(a)(1)(B) AND UNDER THE
NYDCL MUST BE DISMISSED IN LIGHT
OF § 546(e)'S SAFE HARBOR PROVISION...……….......................................................1

A.    The Allegations Concerning The Commissions/Referral Fees
      Are Insufficient To Show Actual Knowledge Of The Fraud...................................2

      1.    The Allegations That The Payments Were Made In A
            Manner Not Consistent With Normal Business Practice..............................3

      2.    The Allegations That The Option Transactions Used To
            Pay The Commission/Referral Fees Were Consistently
            Profitable, Virtually Matched The Predetermined
            Amounts, And Were Always Recorded In December.................................4

      3.    The Allegations That The Option Transactions Used To
            Pay The Commission/Referral Fees Were Not
            Consistent With The Split-Strike Conversion Strategy.................................7

      4.    The Allegations Concerning Edward Glantz's
            Conversation With Joel Levey In 1992...........................................8

B.    The Allegations Concerning Alleged Guaranteed And
      Consistently Positive Double-Digit Annual Returns Are
      Insufficient To Show Actual Knowledge Of The Fraud...........................................9

C.    The Allegations Concerning The Short-Term Interest
      Free Loans Are Insufficient To Show Actual Knowledge
      Of The Fraud.................................................................................12

i

D.      The Allegations Concerning BLMIS's Use Of An Unqualified
        Auditing Firm Are Insufficient To Show Actual Knowledge Of
        The Fraud...........................................................................................................13

E.      The Allegations Concerning Madoff's Lack Of Transparency
        Are Insufficient To Show Actual Knowledge Of The Fraud.....................................14

POINT II

THE TRUSTEE MAY NOT SEEK AVOIDANCE
OF TRANSFERS UNDER § 548(a) TO THE
EXTENT THE TRANSFERS CONSIST OF
PRINCIPAL AND COMMISSION/REFERRAL FEES...................................................17

POINT III

IMPUTED KNOWLEDGE/WILLFUL BLINDNESS IS
INSUFFICIENT TO SATISFY THE SUBJECTIVE STATE
OF MIND REQUIREMENTS UNDER § 546(e) AND § 548(c)................…..................20

POINT IV

THE TRUSTEE FAILS TO PROPERLY
ALLEGE A CONSTRUCTIVE FRAUDULENT
TRANSFER CLAIM UNDER EITHER THE
BANKRUPTCY CODE OR THE NYDCL.................…………..................…............................21

POINT V

THE CLAIMS AGAINST THE ESTATE OF
EDWARD R. GLANTZ ARE TIME-BARRED..............................................................23

POINT VI

COUNT EIGHT SHOULD BE DISMISSED IN ITS ENTIRETY...……..........................24

CONCLUSION..................…………......................................................................................26

# TABLE OF AUTHORITIES

## Cases

Balaber-Strauss v. Sixty-Five Brokers, 264 B.R. 303 (S.D.N.Y. 2001)...................................17, 18

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)....................................................................2

Croscill, Inc. v. Gabriel Capital, L.P., 817 F.Supp.2d 346 (S.D.N.Y. 2011)................................20

Dobler v. Arluk Medical Ctr. Indus. Group, Inc.,
      89 Cal. App.4th 530 (Cal. Ct. App. 2001).........................................................................23

Picard v. Avellino, 469 B.R. 408 (S.D.N.Y. 2012).......................................................................19

Picard v. Ceretti, 2015 Bankr. LEXIS 2674
      (Bankr. S.D.N.Y. Aug. 11, 2015) ("Kingate")...........................................................passim

Picard v. Charles Ellerin Revocable Trust,
      2012 Bankr. LEXIS 1088 (Bankr. S.D.N.Y. Mar. 14, 2012)...........................................24

Picard v. Merkin, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("Merkin II").............................passim

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
      2013 U.S. Dist. LEXIS 56042 (S.D.N.Y. Apr. 15, 2013)..................................................24

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
      516 B.R. 18 (S.D.N.Y. 2014) (Good Faith Decision)..............................................3, 18, 19

Sharp Int'l Corp. v. State Street Bank & Trust Co., 403 F.3d 43 (2nd Cir. 2005)........................22

Wagner v. Wagner, 75 Cal. Rptr. 3d 511 (Cal. Ct. App. 2008)....................................................23

## Statutes

11 U.S.C. § 105.................................................................................................................................1

11 U.S.C. § 546(e)....................................................................................................1, 20, 24, 25

11 U.S.C. § 548(a)(1)(A)...........................................………...................................................17, 24

11 U.S.C. § 548(a)(1)(B)...........................................………...................................1, 17, 21, 22

11 U.S.C. § 548(c)..................................................................................................17, 18, 20, 21

11 U.S.C. § 550(b)(1)......................................…………...........................................25

11 U.S.C. § 550(a)..........................................…………...........................................24, 25

California Code of Civil Procedure § 366.2..........................................................22, 23

**<u>Rules</u>**

Fed. R. Bankr. P. 7008(a)......................................…………..........................................1

Fed. R. Bankr. P. 7009 ..........................................…………..........................................1

Fed. R. Bankr. P. 7012(b)......................................…………..........................................1

Fed. R. Civ. P. 8(a)..............................…………................................................1

Fed. R. Civ. P.  9(b)..........................................…………..........................................1

Fed. R. Civ. P. 12(b)(1)..............................…………................................................1

Fed. R. Civ. P. 12(b)(2)..........................................…………..........................................1

Fed. R. Civ. P. 12(b)(6)..........................................…………..........................................1

Defendants respectfully submit this reply memorandum of law in further support of their motion to dismiss the Trustee's first Amended Complaint ("FAC") pursuant to Rules 8(a), 9(b), 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure and Rules 7008(a), 7009 and 7012(b) of the Federal Rules of Bankruptcy Procedure or, alternatively, for a stay of this action pursuant to 11 U.S.C. § 105.[1]

## ARGUMENT[2]

### POINT I

### THE CLAIMS SEEKING AVOIDANCE UNDER § 548(a)(1)(B) AND UNDER THE NYDCL MUST BE DISMISSED IN LIGHT OF § 546(e)'S SAFE HARBOR PROVISION

Counts Two through Seven of the FAC should be dismissed in their entirety in light of § 546(e)'s safe harbor. The "actual knowledge" exception to the safe harbor is not applicable here because the FAC fails to plausibly allege that defendants had actual knowledge of Madoff's fraud.

The allegations in the FAC that the Trustee claims show that Richard M. Glantz ("Glantz") and Edward Glantz had actual knowledge of the fraud fall into five categories: (1) allegations concerning the commission/referral fees that they received from Bernard L. Madoff Investment Securities LLC ("BLMIS"); (2) allegations concerning the allegedly guaranteed and consistently positive annual rates of return; (3) allegations concerning short-term interest-free loans given to their accounts: (4) allegations concerning BLMIS's use of an unqualified auditing

---

[1] The moving defendants are identified on Exhibit 1 to the Notice of Motion.

[2] Defendants stand on the law and argument set forth in their main moving papers with respect to any contention raised by the Trustee in his opposition papers that is not expressly addressed herein.

firm; and (5) allegations concerning Madoff's lack of transparency.

For all the reasons discussed below and in defendants' main moving papers, the FAC fails to plausibly allege that Glantz and/or Edward Glantz had actual knowledge of Madoff's fraud. The allegations simply do not connote "the absence of doubt associated with actual knowledge." Picard v. Merkin, 515 B.R. 117, 140 (Bankr. S.D.N.Y. 2014) ("Merkin II").

**A.    The Allegations Concerning The Commissions/Referral Fees
Are Insufficient To Show Actual Knowledge Of The Fraud**

Initially, the Trustee accuses defendants of "attempting now to characterize" the compensation that Glantz and Edward Glantz received for bringing investments directly to BLMIS "as simple 'commission/referral fees'". (Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Trustee's Amended Complaint ("Trustee's Opp. Mem.") at 24). But it is the Trustee himself who acknowledged in the FAC that the payments "were in the nature of a commission or referral fee[.]" (FAC ¶ 177). While the Trustee also labels these payments as "Fraudulent Side Payments", the Court should disregard such labels in evaluating whether the FAC adequately pleads actual knowledge in this case. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (a plaintiff must allege "more than labels and conclusions" to meet pleading burden).

The pertinent issue here is whether the FAC adequately alleges that Glantz and Edward Glantz actually knew that the option transactions by which the commission/referral fees payments were made were fraudulent. In his opposition papers the Trustee points to certain suspicious circumstances alleged in the FAC which he contends show that Glantz and Edward Glantz had such actual knowledge. (Trustee's Opp. Mem. at 25). This contention is meritless.

2

As discussed below, these allegations do not show that they had such actual knowledge.

1.    **The Allegations That The Payments Were Made In A
Manner Not Consistent With Normal Business Practices**

The FAC alleges that the commission/referral fees were paid in a manner "not . . .

consistent with normal business practices for payments of commissions or referral fees", in that

they were not paid "by a BLMIS deposit or check" but instead by option transactions entered in

Glantz's and Edward Glantz's accounts.  (FAC ¶ 177; Trustee's Opp. Mem. at 25).  However,

there is no allegation that Glantz and/or Edward Glantz were actually aware that this method of

payment was not consistent with "normal business practices".  The Trustee does not argue

otherwise in his opposition papers.

In any event, even if it is assumed that the FAC plausibly alleges that Glantz and

Edward Glantz were actually aware and understood that this method of payment was not

consistent with "normal business practices", this is not the sort of egregious "red flag" that would

lead them to conclude that BLMIS was a fraudulent operation.  Essentially, they were paid via

"the proceeds of a securities transaction" entered in their accounts.  Securities Inv. Prot. Corp. v.

Bernard L. Madoff Inv. Sec. LLC, 516 B.R. 18, 22 (S.D.N.Y. 2014) ("Good Faith Decision").

Drawing all inferences in the Trustee's favor, it is at most something not ordinarily done that

arguably "would have caused a reasonable person in the transferee's position to investigate the

matter further."  Id. at 21.  It does not connote "the absence of doubt associated with actual

knowledge."  Merkin II at 140.  Notably, in Merkin II, the Trustee similarly alleged that Merkin

knew that BLMIS had an unusual fee structure that was not consistent with normal industry

practice.  See id. at 133.  The Court found those and numerous other alleged "red flags" that

3

Merkin was actually aware of insufficient to show that he had actual knowledge of Madoff's

fraud. <u>See</u> <u>id.</u> at 140-41.

> 2.    **The Allegations That The Option Transactions Used To
> Pay The Commission/Referral Fees Were Consistently
> Profitable, Virtually Matched The Predetermined
> Amounts, And Were Always Recorded In December**

The FAC alleges that the option transactions used to make the

commission/referral fees payments "were consistently and hugely profitable"; "purported to

create gains each year that virtually matched the predetermined amounts of" the payments; and

were always recorded in December each year. (FAC ¶¶ 179-81; Trustee's Opp. Mem. at 25).

These allegations do not show that Glantz and/or Edward Glantz had actual

knowledge of Madoff's fraud. First, as discussed at length in the main moving papers, in <u>Merkin</u>

<u>II</u> this Court found much more serious allegations of suspicious and implausible option

transactions insufficient to show actual knowledge of the fraud. In that case the Trustee alleged,

among other things, that Merkin was aware that BLMIS' "returns were too consistent" and "just

not possible." <u>Merkin II</u> at 129. Further, Merkin allegedly "acknowledged the impossibility of

the volume of Madoff's trading activity[.]" <u>Id.</u> The Trustee also alleged that:

> Merkin knew that the volume of daily put and call options BLMIS
> supposedly bought and sold for the Defendant Funds exceeded the
> daily volume of the Chicago Board Options Exchange [] and were
> impossible, and demonstrated that BLMIS was not actually making
> the trades represented on the trade confirmations provided to
> Merkin.

<u>Id.</u> The Court found these and numerous other allegations of suspicious and implausible option

transactions insufficient to show that Merkin had actual knowledge of Madoff's fraud. <u>See</u> <u>id.</u> at

4

140-41.[3]

Second, as alleged in the FAC, BLMIS agreed to pay Glantz and Edward Glantz annual commission/referral fees equal to a fixed percentage of the total amount of money that their former investors reinvested with BLMIS after the Avellino & Bienes feeder fund operation was shut down.  (FAC ¶¶ 189-92, 200-203).  Glantz and Edward Glantz thus expected these "predetermined" annual commission/referral fees to be paid to them each year.  That the payments were in fact made as they expected and were in the agreed-upon amounts and were made at around the same time each year thus would not have been viewed and understood by them as evidence that BLMIS was a fraudulent operation. They were simply payments of commission/referral fees that BLMIS had agreed to make and was making.

Finally, that the FAC fails to plausibly allege the requisite actual knowledge is further illustrated by this Court's decision in Picard v. Ceretti, 2015 Bankr. LEXIS 2674 (Bankr. S.D.N.Y. Aug. 11, 2015) ("Kingate").  In Kingate, the Trustee alleged, inter alia, that the defendants actively analyzed and prepared "monthly spreadsheets" of the trades reported by BLMIS and discovered (and thus had actual knowledge of) thousands of "impossible trades."  Id. at *42.  According to the Trustee, one of the defendants "would conduct an extensive analysis of the Kingate portfolio on a monthly basis, and compare the prices of the trade with the range of prices of the day on which the trades took place."  Id. at *21.  The defendants allegedly "also

---

[3]The Trustee attempts to distinguish Merkin II by asserting that some of the allegations in the FAC "were not present in Merkin II."  (Trustee's Opp. Mem. at 32-33).  However, as detailed in the main moving papers, while not all the allegations in the two actions are identical, the FAC contains many of the same or similar allegations of actual knowledge/willful blindness that the Trustee made in Merkin II.  In fact, the allegations of trading impossibilities and other highly suspicious circumstances showing Merkin's knowledge of the fraud are much more serious and compelling than the allegations in the FAC.

5

reviewed the BLMIS trade confirmations, which showed the price for every purchase and sale of

stocks and options, on a monthly basis." Id. at *21.  The Trustee alleged that these monthly

reviews and analyses revealed to the defendants that "[b]etween 1998 and 2008, BLMIS reported

equity [and] options trades outside the daily price range 281 times [] and U.S. Treasury Bills

trades outside the daily price range on 836 occasions."  Kingate, 2015 Bankr. LEXIS 2674 at

*42.  These "impossible trades" were identified in the monthly spreadsheets created by one of the

defendants which were reviewed by the other defendants.  Id.  In addition, the defendants

allegedly "reviewed and verified thousands of trades outside of the daily price range, none of

which could be legitimate."  Id. 22.

   Based on these and other allegations the Court found that the Trustee had

plausibly alleged that the defendants in Kingate "knew that Madoff was not engaging in the

securities transactions he reported, and that many of the entries in the statements and trade

confirmations depicted trades that could not have taken place."  Id. at *41.  The Court concluded

that "[t]he totality of the allegation in the FAC paint a picture of sophisticated financial

professionals who knew that Madoff was reporting fictitious transactions, and took steps to

prevent any inquiry."  Id. at *46 (emphasis added).

   This case stands in stark contrast to Kingate.  While the FAC alleges that Glantz

and Edward Glantz "received and closely reviewed" the statements for the accounts in which the

option transactions used to pay their commissions/referral fees were recorded (Trustee's Opp.

Mem. at 25), there is no allegation that they actively analyzed those transactions and compared

them against the daily price range of the security purportedly traded or conducted any other

analysis that would have showed that those transactions were impossible and could not have been

6

legitimate.  It is obvious that merely reviewing the monthly account statements, no matter how closely and carefully, would not have revealed that the reported trades were fraudulent.  Only active analyses of the sort performed by the defendants in <u>Kingate</u> would have revealed that the transactions were impossible and thus fraudulent.  Glantz and Edward Glantz did not do that, and there is no allegation that they did.

> **3.    The Allegations That The Option Transactions Used To Pay The Commission/Referral Fees Were Not Consistent With The Split-Strike Conversion Strategy**

The FAC alleges that "Madoff's use of [the split-strike conversion ("SSC") strategy] was widely known" and that the option transactions used to make the commission/referral fee payments "were inconsistent with Madoff's purported strategy and noticeably different from the option transactions typically represented as occurring in Glantz's and Edward Glantz's BLMIS accounts."  (FAC ¶ 183-86; Trustee's Opp. Mem. at 25).

These allegations are insufficient to show actual knowledge of Madoff's fraud.  First, it is not clear how the fact that BLMIS purported to engage in some option transactions that are different from other option transactions that it also purported to engage in shows that it was a fraudulent operation.  In any event, as discussed at length in defendants' main moving papers, there is no allegation that Glantz or Edward Glantz knew, understood and purposely ignored this supposed "red flag."  There is no allegation that they were actually aware and understood that the option transactions used to pay the commission/referral fees were inconsistent with the SSC strategy.

The Trustee alleges that "[t]hese facts were readily apparent on the face of the [account] statements" and that, since Glantz and Edward Glantz reviewed the account statements,

7

they had actual knowledge of the fraud. (FAC ¶ 163-65, 169; Trustee's Opp. Mem. at 25-26).

But as in Merkin II, such allegations "do not imply the level of certainty or absence of

substantial doubt associated with actual knowledge" of the fraud Merkin II at 140. As discussed

above, there is no allegation that Glantz and/or Edward Glantz conducted any analysis of the

transactions that would have revealed the fraud as the defendants did in Kingate. Essentially, the

Trustee's position is that anyone who reviewed their BLMIS account statements has actual

knowledge of the fraudulent transactions recorded on those statements. That position is patently

untenable.

Significantly, in Merkin II the Trustee also alleged that Merkin knew that BLMIS

engaged in transactions that were "inconsistent with its purported investment strategy[.]" Merkin

II at 129. The Court found those allegations (and numerous allegations of other "red flags" that

Merkin was actually aware of) insufficient to show that Merkin had actual knowledge of the

fraud. See id. at 140-41. There is nothing different here that would warrant a different result.

### 4. The Allegations Concerning Edward Glantz's Conversation With Joel Levey In 1992

The FAC alleges that Edward Glantz knew that the option transactions used to pay

the commission/referral fees "were fictitious transactions" because he allegedly told Joel Levey

in a conversation in 1992 "that, if Joel Levey opened a BLMIS account, Joel Levey would

receive, in addition to whatever return he would otherwise receive, an extra payment equal to

$155,000 each year, based on the amount that former Telfran investors reinvested with BLMIS."

(FAC ¶ 174).

This alleged conversation on its face does not show that Edward Glantz had actual

8

knowledge of the fraud.  He was simply telling Levey, who was one of the owners of Telfran,

that BLMIS would pay him certain commission/referral fees – or, to use the Trustee's words, "an

extra payment" – as compensation for having former Telfran investors reinvest their money with

BLMIS.  There is nothing in this alleged conversation that shows that Edward Glantz knew in

advance that the option transactions that would be used to make the payments would be

fictitious, or that he even knew that the payments would be made via option transactions, or that

he knew "about Madoff's intent to manipulate accounts that were opened by certain select

individuals" as the Trustee alleges  (Trustee's Opp. Mem. at 26).  The Trustee, quite plainly, is

making inferences not supported by the allegations in the FAC.  There is nothing in the alleged

conversation with Levey that indicates that Edward Glantz had "the level of certainty or absence

of substantial doubt" with respect to the fraud that is "associated with actual knowledge." Merkin

II at 140.

       In sum, the allegations in the FAC concerning the commission/referral fees paid to

Glantz and Edward Glantz are insufficient to show that they had actual knowledge of the fraud.

**B.     The Allegations Concerning Alleged Guaranteed And
Consistently Positive Double-Digit Annual Returns Are
Insufficient To Show Actual Knowledge Of The Fraud**

       In his opposition papers the Trustee points to the allegations that the rates of

return in Glantz's and Edward Glantz's accounts were "guaranteed", contending that this "is a

significant fact and further demonstrates [their] knowledge of fraud."  (Trustee's Opp. Mem. At

27).  This contention is meritless.

       As discussed in the main moving papers, the allegations in the FAC regarding the

alleged guaranteed rates of return are actually contradictory and are not plausible.  While alleging

9

that Glantz's and Edward Glantz's accounts received guaranteed rates of return, the FAC also

alleges, contradictorily, that the returns paid to their accounts actually varied over the years.

(FAC ¶¶ 214, 222).  In other words, there was no guaranteed, fixed annual rate of return.

Moreover, there is no allegation that Glantz or Edward Glantz was informed in

advance by anyone at BLMIS what return their accounts would receive each year.  By definition,

if there was any guarantee made as to the rates of return, such guarantee would have had to have

been made to them by someone from BLMIS.  But there is no allegation that anyone at BLMIS

actually gave them such a guarantee.  The allegation that Glantz issued promissory notes

guaranteeing rates of return to investors in one of the accounts he allegedly controlled does not

show that someone at BLMIS actually provided him with a guarantee as to the rates of return for

that account.  (FAC ¶ 215).  On its face this allegation simply does not connote the "level of

certainty or the absence of substantial doubt associated with actual knowledge."  Merkin II at

140.  As a matter of fact, there actually appears to be substantial uncertainty and doubt in this

regard: while alleging that Glantz guaranteed rates of return to his investors, the Trustee also

admits in the FAC that for many of these investors Glantz did not actually promise any fixed rate

of return but instead provided a "range" as to the returns they might expect to receive.  (FAC ¶

223).

The Trustee also contends that Glantz's and Edward Glantz's actual knowledge of

the fraud is shown by the allegations in the FAC that the consistent returns they received "were

not correlated to the performance of the S&P 100 Index" and not reconcilable with actual

securities trading using the SSC strategy .  (FAC ¶¶ 212, 216, 230-41; Trustee's Opp. Mem. at

27).  These allegations are addressed at length in defendants' main moving papers, and the

10

Trustee's contention is meritless for all the reasons set forth therein. Notably, in Merkin II the Trustee alleged detailed facts showing that Merkin was actually aware of and understood that the consistent returns in his funds were impossible and could not be reconciled with actual securities trading in the marketplace. The Court's ruling that those allegations were insufficient to show that Merkin had actual knowledge of the fraud forecloses any finding that the much less compelling allegations here are sufficient to show actual knowledge. See Merkin II at 140-41.

The Trustee's reliance on Kingate here is misplaced. (Trustee's Opp. Mem. at 27-28). As discussed above, in Kingate, the Trustee alleged that the defendants actively analyzed and prepared "monthly spreadsheets" of the trades reported by BLMIS and discovered (and thus was actually aware) of thousands of "impossible trades" outside the daily price range that were clearly fraudulent. See Kingate at *42. Based on these and other allegations the Court found that the Trustee had plausibly alleged that the defendants "knew that Madoff was reporting fictitious transactions" and thus had actual knowledge of Madoff's fraud. Id. at *41.

Here, while the FAC alleges that Glantz and Edward Glantz "received and reviewed" monthly accounts statements and/or trade confirmations for their accounts,[4] there is no allegation that they analyzed the reported trades against the daily price range of the security purportedly traded and discovered that any of the trades was outside the daily price range and thus was impossible. Nor is there any allegation that they conducted any other analysis that otherwise revealed that the reported trades were impossible. As discussed above, it is obvious that merely reviewing the account statements and trade confirmations will not reveal that the reported trades were fraudulent. Otherwise any of the thousands of BLMIS customers who

---

[4] FAC ¶¶ 141, 145, 146, 149, 151, 152, 153, 154. 155, 157, 160, 161, 163.

11

reviewed their account statements and/or trade confirmations may be charged with actual

knowledge of the fraud.  But that is all that is alleged here, that Glantz and Edward Glantz

monitored their accounts and reviewed their account statements (and performed various day-to-

day administrative/ministerial tasks associated with the accounts):

> 163.  . . . Glantz and those under his supervision tracked and
> monitored account performance.  This activity included reviewing
> monthly account statements received from BLMIS, corresponding
> with BLMIS regarding deposits and withdrawals, preparing books
> and records to account for and allocate purported gains among
> investors, calculating investors' quarterly returns, and issuing end-
> of-year tax statements to investors.

> 164.  Glantz and those under his supervision thoroughly reviewed
> account performance, as evidenced by numerous instances of
> marking individual line items on the monthly account statements,
> calculating expected and purported returns, monitoring purported
> account transactions, commenting on purported account balances,
> and identifying apparent discrepancies contained in statements.

(FAC ¶¶ 163-64).  Quite simply, the allegations showing that the defendants in <u>Kingate</u> "knew

that Madoff was reporting fictitious transactions" are completely absent here.

In sum, the allegations in the FAC concerning the guaranteed and consistently

positive double-digit annual returns are insufficient to show that Glantz and Edward Glantz had

actual knowledge of the fraud.

**C.      The Allegations Concerning The Short-Term Interest
         Free Loans Are Insufficient To Show Actual Knowledge
         Of The Fraud**

The FAC alleges that BLMIS provided Glantz's and Edward Glantz's accounts

with short-term loans without charging interest.  (FAC ¶¶ 212, 249).  As discussed at length in

defendants' main moving papers, these allegations are insufficient to show that Glantz and

Edward Glantz had actual knowledge of Madoff's fraud.

The Trustee wrongly suggests in his opposition papers that this Court found in Kingate that such interest-free loans "evidenced fraudulent activity, or at least a high probability of fraud." (Trustee's Opp. Mem. at 29 (quoting Kingate at *25)). The Court did not make any such finding in Kingate. The language from Kingate quoted by the Trustee is not actually a finding by the Court but, rather, just the Court's recitation of the conclusory allegation in the Trustee's complaint. See Kingate at *8.

That allegations concerning short-term interest free loans like those in the FAC are insufficient to demonstrate actual knowledge of Madoff's was established in Merkin II. In that case the Trustee alleged, inter alia, that Merkin's funds "often had negative cash balances" which "purportedly arose from purchases, withdrawals or transfers" and that "BLMIS never charged margin interest to [the funds], effectively giving them interest-free loans." Merkin II at 133. This Court found these and allegations of numerous other red flags insufficient to show that Merkin had actual knowledge of the fraud. See id. at 140-41.

D.    **The Allegations Concerning BLMIS's Use Of An Unqualified Auditing Firm Are Insufficient To Show Actual Knowledge Of The Fraud**

The FAC alleges that Glantz and Edward Glantz knew that Friehling & Horowitz was BLMIS's purported auditor and that this firm was not capable of auditing BLMIS. (FAC ¶¶ 271-72). It is clear from Merkin II that such allegations are insufficient to show actual knowledge of Madoff's fraud. The allegations against Merkin concerning Friehling & Horowitz were in fact much stronger than those in the FAC here. Among other things, the Trustee alleged that Merkin had been explicitly "warned . . . that Madoff's failure to use a large, public

13

accounting firm was a 'potential red flag.'" <u>Merkin II</u> at 134.  The Court found these and

numerous other alleged red flags insufficient to show that Merkin had actual knowledge of

Madoff's fraud.  <u>See</u> <u>id.</u> at 140-41.

        <u>Kingate</u> also does not help the Trustee here.  In his opposition papers the Trustee

asserts that the Court in <u>Kingate</u> "not[ed] that Madoff's use of Friehling and Horowitz was a

'badge of fraud'".  (Trustee's Opp. Mem. at 30 (quoting <u>Kingate</u>)).  That is not true.  In <u>Kingate</u>

the Court discussed the Trustee's allegations concerning Friehling & Horowitz in a section under

the heading "F. The Badges of Fraud Indicated from Other Sources".  <u>Kingate</u> at *25, 30.  The

Court made clear, however, that the headings used in the opinion "are derived from the FAC.

They are descriptive only, and do not necessarily imply the Court's views of the allegations."  <u>Id.</u>

at *2.  Significantly, in its analysis the Court did not cite BLMIS's use of Friehling & Horowitz

as a factor in concluding that the Trustee had plausibly alleged that the defendants had actual

knowledge of Madoff's fraud.  <u>Id.</u> at *41-47.

        In sum, for the reasons discussed above and in the main moving papers, the

allegations in the FAC concerning BLMIS's use of Friehling and Horowitz as its auditor are

insufficient to show that Glantz and Edward Glantz had actual knowledge of the fraud.

**E.**      **The Allegations Concerning Madoff's Lack Of Transparency**
              **<u>Are Insufficient To Show Actual Knowledge Of The Fraud</u>**

        The Trustee contends that Glantz knowingly facilitated Madoff's fraud by

"systematically and actively limit[ing] possible scrutiny by institutional investors and industry

professionals."  (Trustee's Opp. Mem. at 30).  But that is not what is alleged in the FAC.

Stripped of the hyperbolic language, the FAC essentially alleges that Glantz: (1) was aware that

Madoff did not allow due diligence to be conducted and in some instances prohibited any

disclosure in writing that money would be invested with him; (2) conveyed to some investors and

prospective investors that Madoff would not allow due diligence to be conducted; and (3) did not

identify Madoff to some investors and prospective investors.  (FAC ¶¶ 313-25).

   According to the Trustee's own allegations in the FAC, Glantz did not actually

prevent or obstruct anyone from conducting due diligence on BLMIS.  Rather, when an investor

or potential investor asked to conduct due diligence, he duly passed on the request to BLMIS and

then conveyed BLMIS's response to the investor. This is plain from the allegations concerning

Glantz's communications with the ABN AMRO representative.  As alleged in the FAC, in

response to the representative's request for access to conduct due diligence "Glantz wrote that he

had spoken with Madoff and that Madoff would not allow any such due diligence[.]" (Id. ¶ 320).

Specifically, as alleged in the FAC, Glantz wrote:

> In response to your request as to having access for due diligence
> with Madoff, I spoke to Frank DiPascalli [sic] who is his
> operations chief who referred me directly to Bernie.  Bernie simply
> said no.  He does not do this. . . . He said he will not have a direct
> relationship with any bank on any account.
>
> Bernie is in this way difficult and problematic.
>
> AB AMRO [sic] can get copies of all the transactions direct from
> Madoff at the same time I get them.  I will be happy to explore
> ways in which [to] assist AB AMRO [sic] to have sufficient
> control of the account.  If credit needs to meet with Bernie or tour
> his plant, that is not possible now or in the future.

(Id. ¶ 320).   Glantz also had a similar exchange with other potential investors.  (Id. ¶ 324).

   These alleged communications show that, far from acting to prevent or obstruct

potential investors from conducting due diligence on BLMIS as the Trustee claims, Glantz was

15

actually trying to help them gain the access they need to conduct their due diligence by passing

on their requests to BLMIS/Madoff.   It was Madoff, not Glantz, who rebuffed the requests and

prevented any due diligence from being conducted.   The Trustee's assertion that the "exchange

with ABN AMRO demonstrates the lengths to which Glantz went in dissuading potential

investors from attempting to perform diligence on Madoff" is totally unsupported and, in fact, is

contradicted by the allegations in the FAC.  (Trustee's Opp. Mem. at 31).

       Indeed, that Glantz actually contacted BLMIS/Madoff and conveyed the requests

is smoking gun proof that he did not know that BLMS was a fraudulent operation.  If he was in

on the fraud and was helping to cover it up by "systematically and actively limit[ing] possible

scrutiny by" potential investors as the Trustee asserts, why would he bother actually calling

BLMIS/Madoff and asking them to give the potential investors  access to conduct due diligence

that would have probably revealed the fraud.[5]

       In this regard also this case is markedly different from Kingate.  Critically, in

Kingate the Trustee had plausibly alleged that the defendants "knew that Madoff was reporting

fictitious transactions" and thus had actual knowledge of Madoff's fraud.  Kingate at 41.

Knowing that BLMIS was a fraud, the defendants affirmatively "took steps to prevent any

inquiry" that would have disclosed the fraud.  Kingate at *46.  For example:

> When a Hemisphere employee told Ceretti in May 2000 that a
> potential investor expressed concern with Madoff's role as both
> broker and manager, Ceretti responded "keep them away from now
> on and let me know if they contact you again."  When outside

---

[5]The Trustee contends that defendants are improperly raising issues of fact on this motion
by arguing that Glantz "did not prevent or obstruct anyone from conducting due diligence on
Madoff."  (Trustee's Opp. Mem. at 30).  However, as is clear from the above, defendants'
argument is based entirely on the allegations in the FAC.

analysts raised questions or issued warnings about Madoff's lack of
transparency or his conflicting roles as investment advisor, broker
and custodian, Ceretti and/or Gross responded with *ad
hominem* attacks, and in one instance, a veiled threat to HSBC that
it could lose the business of the Funds, other funds and clients that
banked with HSBC.  As a result, HSBC backed off and assured
Ceretti that it would fire anyone responsible for issuing the
warning.

Id. at *43-44 (internal citations omitted).

Here, in contrast to Kingate, the Trustee has not plausibly alleged that Glantz
and/or Edward Glantz had actual knowledge of Madoff's fraud.  And the Trustee's own
allegations in the FAC, discussed above, show that they did not take any affirmative step to
prevent or obstruct anyone from conducting due diligence on BLMIS.

In sum, for the reasons discussed above and in the main moving papers, the
allegations in the FAC concerning BLMIS's lack of transparency are insufficient to show that
Glantz and Edward Glantz had actual knowledge of the fraud.

**POINT II**

**THE TRUSTEE MAY NOT SEEK AVOIDANCE
OF TRANSFERS UNDER § 548(a) TO THE
EXTENT THE TRANSFERS CONSIST OF
PRINCIPAL AND COMMISSION/REFERRAL FEES**

Pursuant to § 548(c)'s good faith defense, Count One and Count Two of the FAC,
which seek avoidance under § 548(a)(1)(A) and § 548(a)(1)(B), respectively, should be
dismissed to the extent the transfers that the Trustee is seeking to avoid consist of principal or
commission/referral fees paid to Glantz and Edward Glantz.[6]

---

[6] Count Two is also subject to dismissal in its entirety in light of § 546(e)'s safe harbor as
discussed above.

17

The Trustee contends that defendants' reliance on Balaber-Strauss v. Sixty-Five Brokers, 264 B.R. 303 (S.D.N.Y. 2001) is misplaced because the District Court held in that case that a broker's services constitutes value only if the broker acted "with no knowledge of any wrongdoing." (Trustee's Opp. Mem. at 35). But that is not what the District Court held in that case. Rather, the District Court held that, in determining whether a broker's services constitutes "value" to the debtor, "[t]he focus of the Court's inquiry is 'the value of the goods and services provided rather than [] the impact that the goods and services had on the bankrupt enterprise' or the fact that it facilitated what later turned out to be a *Ponzi* scheme." Balaber-Strauss, 264 B.R. at 308. Pursuant to Balaber-Strauss, the services performed by Glantz and Edward Glantz in bringing investors to BLMIS constitutes "value" to BLMIS notwithstanding the fact that BLMIS turned out to be a Ponzi scheme. Thus the payments of commissions/referral fees to them for their services may not be avoided if they took in good faith.

The Trustee has not met the burden of pleading and proving the transferee's lack of good faith under § 548(c). See Good Faith Decision at 24. "Good faith" in this context "means that the transferee neither had actual knowledge of the Madoff Securities fraud nor willfully blinded himself to circumstances indicating a high probability of such fraud." Id. at 23.

Here, as discussed above, the FAC fails to plausibly allege that Glantz or Edward Glantz had actual knowledge of Madoff's fraud. Thus, to overcome § 548(c)'s good faith defense, the FAC must plausibly allege that they willfully blinded themselves to Madoff's fraud. In his opposition papers the Trustee does not present any argument specifically addressing the allegations in the FAC with respect to this issue. Instead he simply relies on the arguments he makes on the issue of actual knowledge. (Trustee's Opp. Mem. at 35-36). For all the reasons

18

discussed above and in the main moving papers, defendants respectfully submit that the FAC

fails to plausibly allege that they were willfully blind to facts indicating a high probability that

BLMIS was a fraudulent operation.

The Trustee contends that Glantz had a duty to investigate BLMIS and that, as to

him, "willful blindness is properly inferred from the information he had and the duty he

assumed." (Trustee's Opp. Mem. at 37). This contention is meritless. The Trustee is essentially

arguing that the objective inquiry notice standard for good faith should be applied to Glantz. But

that standard has been emphatically rejected by the District Court. See, e.g., Good Faith

Decision at 22-23; Picard v. Avellino, 469 B.R. 408, 412 (S.D.N.Y. 2012). The District Court

did not make any exception for sophisticated investors or investors who have allegedly assumed

fiduciary duties to other investors in rejecting that standard. There is no basis for applying that

standard to Glantz as the Trustee is attempting to do here.

Finally, the Trustee disputes that Glantz and Edward Glantz had any personal

exposure in BLMIS because, according to the Trustee, "by late 2000 and early 2001", they had

already withdrawn the principal that they had invested. (Trustee's Opp. Mem. at 38). This

contention misses the point. Until Madoff's fraud was revealed, all the money in the accounts of

EJS Associates, L.P. ("EJS"), Jelris & Associates, L.P. ("Jelris"), Grace & Company, and The

Glantz Family Foundation, Inc. and in Glantz's and Edward Glantz's IRA accounts – whether

principal or profits – were simply money that belonged to Glantz and Edward Glantz and their

close relatives. Their personal exposure stems from having their money, or believing that they

had their money, in these BLMIS accounts. Whether the money consists of principal or profits is

immaterial in this regard. Their significant personal exposure renders implausible any allegation

19

that they were willfully blind to Madoff's fraud.  See Croscill, Inc. v. Gabriel Capital, L.P., 817

F.Supp.2d 346, 357 n.8 (S.D.N.Y. 2011) ("Defendant Merkin's significant personal exposure to

Madoff's fraud also belies any inference of intent."). It makes no sense to suggest as the Trustee

is doing that they were more likely to be willfully blind because the money in the accounts

consists of profits and not principal.

**POINT III**

**IMPUTED KNOWLEDGE/WILLFUL BLINDNESS IS
INSUFFICIENT TO SATISFY THE SUBJECTIVE STATE
OF MIND REQUIREMENTS UNDER § 546(e) AND  § 548(c)**

To invoke the exception to the safe harbor under § 546(e) and to overcome §

548(c)'s good faith defense with respect to Counts One through Seven, the Trustee must allege

and prove: (1) that Glantz's and Edward Glantz's alleged actual knowledge and/or willful

blindness is imputable to the other defendants; and (2) that such imputed knowledge/willful

blindness is equivalent to the subjective states of mind required to invoke the exception to §

546(e)'s safe harbor and to overcome § 548(c)'s good faith defense.  He cannot do so.  For the

reasons discussed in the main moving papers, any imputed actual knowledge or willfulness

blindness cannot equate with the subjective states of mind required to invoke the exception to the

safe harbor under § 546(e) and to overcome § 548(c)'s good faith defense.

The Trustee suggests that this Court has already decided this issue in Merkin II

and Kingate. (Trustee's Opp. Mem. at 40-41).  However, in Merkin II, the only issues raised

with respect to imputation and addressed by the Court was whether Merkin acted outside the

scope of his agency and whether the adverse interest exception was applicable.  See Merkin II at

146-49.  Those were also the only two issues relating to imputation addressed by the Court in

20

Kingate.  See Kingate at *47-52.  The issue raised here – whether any imputed actual knowledge

or willfulness blindness can equate with the subjective states of mind required to invoke the

exception to the safe harbor under § 546(e) and to overcome § 548(c)'s good faith defense – was

not raised and was not addressed by the Court in either Merkin II or Kingate.

   With regard to Elaine Ostrin, it is important to note that, during the entire period

when she was allegedly a general partner of EJS and Jelris, there was positive net equity in both

the EJS and Jelris accounts at BLMIS.  (Exh. B to FAC).  It was not until much later, long after

Jelris and EJS were reorganized as limited partnerships and she ceased being a general partner,

that allegedly fictitious profits were withdrawn from those accounts.  (Id.).  The Trustee does not

dispute that after Jelris and EJS were reorganized as limited partnerships (on March 28, 1995 and

on January 1, 1998, respectively) there is no basis under any principle of agency or partnership

law for imputing Glantz's or Edward Glantz's knowledge to Elaine Ostrin.  (Trustee's Opp.

Mem. at 42).

## POINT IV

### THE TRUSTEE FAILS TO PROPERLY
### ALLEGE A CONSTRUCTIVE FRAUDULENT
### TRANSFER CLAIM UNDER EITHER THE
### BANKRUPTCY CODE OR THE NYDCL

   The FAC fails to properly allege the requisite lack of "value" or "fair

consideration" in connection with the constructive fraudulent transfer claims under 11 U.S.C. §

548(a)(1)(B)(i) and under the New York Debtor and Creditor Law ("NYDCL") (Counts Two,

Four, Five and Six).

   The Trustee contends that "only good faith investors have provided value to the

21

debtor", and that defendants' argument "is faulty because it relies on the premise that Defendants

acted in good faith." (Trustee's Opp. Mem. at 53). However, "good faith" and "value" are

distinct concepts under 11 U.S.C. § 548. See, e.g., 11 U.S.C. § 548(c) (transferee "that takes for

value and in good faith . . . may retain any interest transferred . . . to the extent that such

transferee . . . gave value to the debtor in exchange for such transfer"). None of the cases cited

by the Trustee supports his injection of a separate "good faith" requirement into the "reasonably

equivalent value" element under § 548(a)(1)(B)(i). None of those cases says that "reasonably

equivalent value" under § 548(a)(1)(B)(i) also requires a showing of good faith. Notably, all the

cases cited by the Trustee are from courts outside the Second Circuit. The Trustee does not cite

any case law from the Second Circuit in support of his position on this issue.

In short, regardless of the transferee's good faith or lack thereof, to state a

constructive fraudulent transfer claim under the Bankruptcy Code the Trustee must allege facts

showing that the debtor "received less than a reasonably equivalent value in exchange for such

transfer[.]" 11 U.S.C. § 548(a)(1)(B)(i). The Trustee fails to do so in this case as discussed in

the main moving papers.

The FAC also fails to allege the requisite lack of "fair consideration" in

connection with the constructive fraudulent transfer claims under the NYDCL. While "fair

consideration" under the NYDCL arguably also has a good faith component, the FAC here fails

to plausibly allege lack of good faith as discussed above and in the main moving papers. See

Sharp Int'l Corp. v. State Street Bank & Trust Co., 403 F.3d 43, 53-56 (2nd Cir. 2005).

22

## POINT V

## THE CLAIMS AGAINST THE ESTATE OF
## EDWARD R. GLANTZ ARE TIME-BARRED

The FAC should be dismissed as against the Estate of Edward R. Glantz ("ERG Estate") because the claims against the estate are time-barred under California Code of Civil Procedure § 366.2.  Section 366.2's one-year limitations period is "an outside time limit".  It overrides any other limitations period for claims asserted against a decedent that would have otherwise been applicable.  See Cal. Code Civ. Proc. § 366.2 (one-year limitations period applies to claims against a decedent, "and the limitations period that would have been applicable [to the claims] does not apply"); see Dobler v. Arluk Medical Ctr. Indus. Group, Inc., 89 Cal. App.4th 530, 535 (Cal. Ct. App. 2001) (§ 366.2 "provides for an outside time limit of one year for filing any claim against a decedent").   This one-year restriction on claims against a decedent "serves the strong public policies of expeditious estate administration and security of title for distributees, and is consistent with the concept that a creditor has some obligation to keep informed of the status of the debtor."  Wagner v. Wagner, 75 Cal. Rptr. 3d 511, 515 (Cal. Ct. App. 2008).

Accordingly, § 366.2's one-year limitations period overrides any other limitations period that may otherwise be applicable to the Trustee's claims against the ERG Estate.   Since they were brought more than one year after Edward Glantz's death on February 9, 2007, all of the Trustee's claims against the estate are time-barred.

23

## POINT VI

## COUNT EIGHT SHOULD BE
## DISMISSED IN ITS ENTIRETY

Count Eight, which seeks recovery of subsequent transfers pursuant to 11 U.S.C.

§ 550(a), should be dismissed.  The Trustee contends that this claim is adequately pled because

the FAC identifies the initial transfers that he is seeking to avoid as well as the subsequent

transfers that he is seeking to recover.  (Trustee's Opp. Mem. at 42).  However, as the Trustee

does not dispute, the FAC fails to identify the particular initial transfer(s) from which each of the

allegedly recoverable subsequent transfers was made.  It is simply impossible to determine from

the FAC which subsequent transfers were made from which initial transfers.  Thus the FAC fails

to allege "sufficient facts to show the relevant pathway through which the funds were transferred

from BLMIS to [the subsequent transferees.]"  Picard v. Charles Ellerin Revocable Trust, 2012

Bankr. LEXIS 1088, at *9 (Bankr. S.D.N.Y. Mar. 14, 2012).

This information – i.e., from which initial transfer(s) each of the alleged

subsequent transfers was made – is crucial because where, as here, "Section 546(e) applies to the

Trustee's claims, the Trustee may only proceed against a subsequent transferee insofar as he

seeks to recover those subsequent transfers under Section 550(a) as to which he could have

avoided the initial transfer under Section 548(a)(1)(A)."  Securities Inv. Prot. Corp. v. Bernard L.

Madoff Inv. Sec. LLC, 2013 U.S. Dist. LEXIS 56042 at *41 (S.D.N.Y. Apr. 15, 2013).  Because

the FAC fails to link each subsequent transfer to the initial transfer(s) from which it was

allegedly made, it is impossible to determine which, if any, of the subsequent transfers were

made from initial transfers that are avoidable under § 548(a)(1)(A) and, thus, impossible to

24

determine which if any of the subsequent transfers are recoverable under § 550(a).

The Trustee also contends that "even if the Court dismisses any of the Trustee's claims based on § 546(e), the Trustee may still recover those transfers from any subsequent transferees deemed to have had actual knowledge of Madoff's fraud." (Trustee's Opp. Mem. at 44). The Trustee is wrong. The FAC only purports to allege that Glantz and Edward Glantz had actual knowledge of Madoff's fraud. Thus any actual knowledge that any subsequent transferee may be deemed to have can only be that imputed to them from Glantz or Edward Glantz. If the Court dismisses any of the Trustee's claims pursuant to § 546(e), that would necessarily mean that the Court found that the FAC fails to plausibly allege that Glantz and/or Edward Glantz had actual knowledge. In that case, there would be no basis for imputing any actual knowledge to any subsequent transferee. And since the FAC does not allege any other basis for finding that any subsequent transferee had actual knowledge, there would be no other basis whatsoever for deeming any subsequent transferee to have actual knowledge.

Finally, the Trustee contends that The Estate of Thelma Glantz ("TG Estate") and Austin Bosarge ("Bosarge") are not entitled to have the subsequent transferee claim against them dismissed under 11 U.S.C. § 550(b)(1). (Trustee's Opp. Mem. at 44). But the Court need not reach that issue. That is because the claim against these two defendants is subject to dismissal pursuant to § 546(e)'s safe harbor. As discussed int the main moving papers, the FAC does not allege that either the TG Estate or Bosarge have actual knowledge of Madoff's fraud. Nor does it allege that Glantz's or Edward Glantz's alleged actual knowledge should be imputed to either of them. Thus there is no basis for invoking the actual knowledge exception to § 546(e)'s safe harbor against them.

25

## CONCLUSION

For the foregoing reasons and all the reasons set forth in defendants' main moving papers, the Court should dismiss the FAC in its entirety or, alternatively, grant a stay of this action.

Dated:  New York, New York
        October 9, 2015

                                    Respectfully submitted,

                                    LAW OFFICE OF
                                    RICHARD E. SIGNORELLI

                    By:    /s/ Richard E. Signorelli
                           _____
                           Richard E. Signorelli
                           Bryan Ha
                           799 Broadway, Suite 539
                           New York, NY 10003
                           Telephone:    212 254 4218
                           Facsimile:    212 254 1396
                           rsignorelli@nycLITIGATOR.com[SM]
                           www.nycLITIGATOR.com[SM]
                           Attorneys for Defendants


FILING AND SERVICE VIA ELECTRONIC FILING