0.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In re:                                                          :
                                                                :
BERNARD L. MADOFF INVESTMENT                                    :        Case No. 08-99000 (SMB)
SECURITIES LLC,                                                 :        Adv. Proc. No. 08-01789 (SMB)
                                                                :        SIPA LIQUIDATION
                                        Debtor.                 :

------------------------------------------------------------------X

IRVING H. PICARD, Trustee for the Liquidation                  :
of Bernard L. Madoff Investment Securities LLC,                :
                                                                :
                                        Plaintiff,             :
                                                                :        Adv. Proc. No. 10-05383 (SMB)
STANLEY SHAPIRO, et al.,                                        :
                                                                :
                                        Defendants.            :

------------------------------------------------------------------X

### MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE TRUSTEE'S SECOND AMENDED COMPLAINT

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
   *Trustee for the Liquidation of*
   *Bernard L. Madoff Investment Securities LLC*
   *and the Estate of Bernard L. Madoff*
45 Rockefeller Plaza
New York, NY 10111

         David J. Sheehan, Esq.
         Fernando A. Bohorquez, Jr., Esq.
         Torello H. Calvani, Esq.
         Marc E. Hirschfield, Esq.
         Ona T. Wang, Esq.
                 Of Counsel

LAX & NEVILLE LLP
*Attorneys for Defendants Stanley Shapiro, Renee Shapiro*
   *S&R Investment Co., LAD Trust, David Shapiro,*
   *Rachel Shapiro, David Shapiro 1989 Trust,*

*Leslie Shapiro Citron, Leslie Shapiro 1985 Trust,*
*Trust F/B/O [A.J.C.], [K.F.C.], and [L.L.C.],*
*Kenneth Citron, Trust F/B/O [W.P.S.] & [J.G.S.]*
1450 Broadway, 35th Floor
New York, NY 10018

       Barry R. Lax, Esq.
       Brian J. Neville, Esq.
       Gabrielle J. Pretto, Esq.
       Raquel Terrigno, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Defendant Stanley Shapiro and members of his family owned and/or controlled multiple accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"). For nearly thirty years before it collapsed, BLMIS made numerous transfers to the owners of these accounts. The BLMIS trustee, Irving H. Picard (the "Trustee"), has sued Stanley Shapiro, his family and their trusts (collectively, the "Defendants") as initial transferees and subsequent transferees to avoid and recover these transfers. (*See* Second Amended Complaint, dated July 8, 2014 ("SAC") (ECF Doc. # 33).)

The Defendants have moved to dismiss the SAC. For the reasons that follow, the Defendants' motion is denied with respect to Count I, granted in part and denied in part with respect to Counts II through VII and granted with respect to Counts VIII through XI.

## BACKGROUND

### I.    The Ponzi Scheme[1]

The background information is taken from the well-pleaded factual allegations of the

SAC and other information that the Court may consider on a motion to dismiss for failure to state

a claim.  Bernard L. Madoff, through BLMIS, operated a Ponzi scheme inducing investors to

open discretionary trading accounts with BLMIS for the ostensible purpose of buying and selling

securities.  Madoff purported to invest in a basket of stocks within the Standard & Poor's 100

Index ("S&P 100 Index") that was intended to mimic the S&P 100 Index.  (¶ 22.)[2]  As a hedge,

BLMIS would sell call options and buy put options on the S&P 100 Index.  (*Id.*)  Madoff

supposedly timed the purchases and sales to maximize the strategic timing of trades, and at

times, the funds would be out of the market and completely invested in U.S. Treasury securities.

(¶ 23.)  None of this actually happened.  No securities were purchased, and instead, BLMIS used

the money invested by BLMIS customers to make distributions to other BLMIS customers.  (¶

24.)

Madoff was arrested on December 11, 2008 (the "Filing Date").  (¶ 11.)

Contemporaneously, the Securities and Exchange Commission initiated a fraud action against

him.  (*Id.*)  Upon application by the Securities Investor Protection Corporation ("SIPC") made

pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*,

the District Court appointed the Trustee, and removed the case to this Court.  (¶ 12.)  Madoff

---

[1]        Headings are derived from the SAC.  They are descriptive only, and do not necessarily imply the Court's view of the allegations.

[2]        The parenthetical citations to paragraph numbers refer to the paragraphs in the SAC.

pleaded guilty on March 12, 2009 to an 11-count criminal information, admitting he "operated a

Ponzi scheme through the investment advisory side of [BLMIS]."  (¶ 16.)

## II.    The Defendants

Stanley Shapiro ("Stanley") and his wife Renee Shapiro ("Renee," and together with

Stanley, the "Shapiros") are New York City residents.  (¶ 30.)  Leslie Shapiro Citron ("Leslie")

and David Shapiro ("David") are the Shapiros' daughter and son, respectively.  (¶¶ 32-33.)

Rachel Shapiro ("Rachel") is David's wife, (¶ 32), and Kenneth Citron ("Kenneth") is Leslie's

husband.  Kenneth and Leslie are sometimes referred to collectively as "Citrons".  (¶ 33.)

The Shapiros are general partners of S&R Investment Co. ("S&R"), a New York

partnership, (¶ 31), and the trustees of (i) the LAD Trust, established for the benefit of their

children, (¶ 34), (ii) the David Shapiro 1989 Trust (the "David Trust") and (iii) the Leslie

Shapiro 1985 Trust (the "Leslie Trust").  (¶ 35.)  David is the sole trustee of Trust f/b/o [J.G.S.]

and [W.P.S.], David's and Rachel's children (the "Shapiro Children's Trust"), (¶ 36), and

Kenneth is the trustee of the Trust f/b/o [A.J.C.], [K.F.C.], [L.C.C.], Kenneth's and Leslie's

children (the "Citron Children's Trust" and together with the "Shapiro Children's Trust," the

"Children's Trusts").  (¶ 37.)

S&R, the David Trust, the Leslie Trust, David, Leslie and Kenneth received transfers

from BLMIS within the six years preceding the Filing Date, and are sometimes referred to

collectively as the "Initial Transferees."  According to the SAC, Stanley, Renee and LAD Trust

also received initial transfers from BLMIS, (*see* ¶ 106), presumably more than six years before

the Filing Date, and the Trustee seeks to recover those transfers pursuant to Count VII of the

SAC.  These three are sometimes referred to collectively in this context as the "Other Initial

Transferees."

The Defendant subsequent transferees include Stanley, Renee, the LAD Trust, David,

Rachel, Leslie, Kenneth, the Leslie Trust, the David Trust and the Children's Trusts.

## III.    The BLMIS Accounts

The SAC lists twenty-four accounts that the Defendants held over the years with BLMIS

(collectively, the "Accounts").  (SAC, Ex. A.)  The following accounts received initial transfers

aggregating approximately $41 million within six years of the Filing Date (the "Six Year

Period"), of which $39,939,486 constituted fictitious profits (¶ 108):

| Defendants' Accounts Table | | | |
|---|---|---|---|
| BLMIS Account No. | Description[3] | Addressed to: | 6-year transfers |
| 1C1251 | Leslie Shapiro Citron Kenneth Citron J/T WROS | Citrons'  address | $270,000 |
| 1S0306 | David Shapiro | David's address with copies of statements sent to Stanley's home address | $5,088,989 |
| 1SH014 (formerly 103013) | S&R Investment Co. Stanley Shapiro | Stanley's home address | $17,350,000 |
| 1SH028 (formerly 103065) | David Shapiro Trust | Stanley's home address | $1,420,000 |
| 1SH030 (formerly 103066) | Leslie Shapiro Citron Trust | Stanley's home address | $2,170,000 |
| 1SH171 | Leslie S. Citron | Not specified | $4,527,497 |
| 1SH172 | S&R Investment and Co c/o Stanley Shapiro | Stanley's home address | $10,240,000 |

---

[3]        The names of the accounts are listed exactly as they appear in the SAC, Exhibit A.

(*Id.* at ¶¶ 39-45, Ex. B.)  The SAC refers to the Accounts 1SH014, 1SH028, and 1SH030 together with Account 1SH079 (which was held in the name of S&R (¶ 40) and did not receive any initial transfers within six years of the Filing Date) as the Core Accounts.  (¶ 41.)

The balance of the approximately $54 million transferred by BLMIS to the Defendants was presumably transferred more than six years before the Filing Date.

IV.    **Stanley Knew of Fraud at BLMIS**

A.    **Stanley Enjoyed Unusual Access to Madoff and Others Involved in the Investment Advisory Business**

Stanley enjoyed a close relationship with Madoff.  Stanley worked in the garment industry, eventually serving as president of Kay Windsor, Inc.  (¶ 50.)  Kay Windsor, Inc. was owned by Carl Shapiro (no relation), who recommended that Stanley invest with BLMIS. (¶¶ 50-51.)  Madoff hired Stanley in 1995 as a salaried, part-time consultant and proprietary trader at BLMIS with a 19th floor office adjacent to Madoff's.  (¶ 52.)  Stanley was not a registered trader, but traded fashion industry stocks with BLMIS capital to varying results. (¶ 53.)

At Madoff's direction, Stanley hired Paul Konigsberg in 1996 to provide tax and other advice relating to the Accounts.  (¶ 54.)  Konigsberg pleaded guilty in 2014 to a three-count superseding criminal information for, among other things, falsifying BLMIS's books and records, and admitted at his plea hearing that he conspired with others to falsify the books and records of BLMIS and to obstruct the administration of federal tax law.  (*Id.*)  Konigsberg regularly provided Stanley with schedules of the purported gains and losses in the Core

6

Accounts.  (¶ 55.)  Stanley met frequently with Madoff and spoke with him by telephone "dozens of times."  (¶ 56.)  The Shapiros travelled with Madoff and his wife on a private jet more than twenty-five times between 2002 and 2008.  (*Id*.)

Annette Bongiorno, a BLMIS employee who was later convicted of fraud and other crimes in connection with Madoff's Ponzi scheme, (¶ 19), worked on BLMIS's 17th floor from where she personally managed the Core Accounts and worked closely with Stanley.  (¶¶ 4, 57.)  Stanley visited the 17th floor more than 150 times between 2005 to 2008.  (¶ 57.)

### B.  The Accounts Earned Implausible Rates of Return

The Accounts reported impossible rates of return.  The Accounts aggregated $1.75 million as of March 1981.  (¶ 59.)  The family deposited less than $2 million into the Accounts during the subsequent 27 years.  Yet more than $37 million was thereafter withdrawn (most often entirely on margin) from several accounts held by S&R (Nos. 1-03069-1-8, 1-03058-1-1, 1-03009-1-1, 1-03013-3-0 (which was renumbered 1SH014), 1SH079, and 1SH172), and the accounts still held $50 million in equity in November 2008.  (*Id*.)  Similarly Leslie and David withdrew $13 million from their accounts (Nos. 1SH028, 1SH030, 1SH171, and 1S0306) that Stanley and Renee established for them.  (*Id*.)

The rates of return were consistently and implausibly high.  For many years, BLMIS reported to Stanley that its "benchmark rate of return" for each of the Core Accounts was 29.00% (later lowered to 20% in 2003).  (¶ 61.)  Nevertheless, BLMIS reported rates of return higher than the benchmark rate.  S&R Account 1SH014 reportedly achieved a positive rate of return every year from 1999 through 2008.  In 1999, BLMIS reported that the account achieved an "annualized return" of more than 68%.  (*Id*.)

### C. Stanley Closely Monitored and Managed His Family's Accounts and Regularly Directed BLMIS to Generate Specific Gains and Losses

#### i. Stanley Could "Cancel" Trades Reported in the Core Accounts

Stanley directed BLMIS and Bongiorno to cancel purported trades previously reported on the Core Accounts' monthly statements. (¶ 63.) He faxed Konigsberg on February 25, 2000, pointing him to the January statements "indicating *trades* covering short positions and I believe creating losses." (*Id.* fig.1, n.1) (emphasis in original).) Even though he was referring to past trades reflected in the previous month's account statements, he asked, "Why should we do these?" (*Id.*) In the next sentence, he indicated his "thinking that we would like to *cancel* these trades. . . . Annette gave me a 'deadline' of today." (*Id.* (emphasis in original).) Bongiorno told Stanley he could cancel all the trades. (¶ 64.) Stanley cancelled one of the January 2000 trades, and the cancellation appeared on the face of the February 2000 account statement for the S&R account numbered 1SH079. (*Id.*)

#### ii. Stanley Directed BLMIS to Generate Short-term "Gains" and "Losses" in the Core Accounts

Near the end of every year, Stanley reviewed his and his family's purported realized and unrealized gains and losses in the Core Accounts, conveyed through schedules prepared first by his bookkeeper and then by Konigsberg Wolf & Co., to gauge their projected tax liability. (¶ 65.) On numerous occasions, Stanley directed BLMIS to arrange, for tax purposes, that particular "gains" or "losses" be realized in one or more of the Core Accounts. (*Id.*) Although BLMIS purportedly employed a long-term, buy and hold strategy for Stanley's accounts, Bongiorno did not sell a long-held position in order to generate a specific gain or loss, and instead, backdated stock sales that were turned around quickly rather than as part of a long-term strategy. (¶ 66.)

For example, in a November 10, 2000 note from Stanley to Bongiorno, Stanley requested a "loss of about $50,000" in the S&R Account 1SH014 by selling stock in Abercrombie & Fitch Co. (¶ 67.) Instead, BLMIS generated the requested "loss" by reporting on the November 2000 statement for Account 1SH014 that it had purchased a block of Oracle Corp. stock (5,000 shares at $34.50 per share) on October 27, 2000 (which settled on November 1, 2000) and then sold the block at a much lower price ($25.00 per share) just two weeks later for an apparent $47,500 loss. (*Id.*)

In the same November 10 note, Stanley wrote that he needed a "loss of about $100,000/110,000" in Account 1SH030 held by the Leslie Trust and a "loss of about $60,000" in Account 1SH028 held by the David Trust, and suggested that BLMIS sell Proctor & Gamble stock reportedly held in each account. (¶ 68.) In the November 2000 statement for Account 1SH030, BLMIS instead reported an intra-month buy and sell of a block of Oracle stock (5,000 shares at prices of $34.50 and $25.00) for a $47,000 loss, the same as it had done for S&R Account 1SH014. (*Id.*) In addition, BLMIS reported for the same account that it had also purchased and sold a block of Gateway, Inc. stock (4,000 shares) at prices ($52.75 and $37.25) within the span of three weeks for an additional $62,000 in losses. (*Id.*) These transactions reportedly yielded an aggregate loss of $109,000, almost matching the "100,000/110,000" loss Stanley had requested. (*Id.*) For the David Trust Account 1SH028, BLMIS reported that it had bought and sold a slightly larger block of Oracle stock (6,000 shares) at the same prices as reported in the other Core Accounts ($34.50 and $25.00) resulting in a loss of $57,000, just "about" the $60,000 loss that Stanley had requested. (*Id.*)

A year later, Stanley told Bongiorno in a November 1, 2001 note that he needed a $360,000 gain in S&R Account 1SH014. (¶ 70.) In response, BLMIS reported a purchase of

9

Sabre Holdings stock on October 31 that it sold three weeks later for a $360,770 gain.  (*Id*.)

Stanley contacted Bongiorno again on December 12, 2001 to say he needed a $125,000 loss in

the same S&R account.  (¶ 71.)  BLMIS reported a November 30 purchase of Too Inc. that it

sold two weeks later for a $124,380 loss.  (*Id*.)  BLMIS reported that the transactions had

occurred on dates that preceded Shapiro's request.  (*Id*.)

### D.  During 2002 and 2003, Stanley Caused BLMIS to Fabricate Large Groups of Backdated Trades in the Core Accounts

#### i.  At Stanley's Request, BLMIS Fabricated Revised 2002 Monthly Statements for the Core Accounts to Reverse Millions in Previously Reported Paper Losses

During the stock market downturn in 2002, BLMIS's statements sent to Stanley and

Konigsberg reflected minimal trading activity and a decline in value.  (¶ 74.)  The BLMIS

monthly statements indicated that the total value of the Core Accounts dropped by more than $50

million through September of 2002.  S&R Account 1SH014 alone dropped from approximately

$71 million at the start of 2002 to $40 million at the end of September 2002.  (¶ 75.)  At the same

time, the margin balance in S&R Account 1SH014 stood at more than $46 million.  (¶¶ 75-76.)

Because BLMIS "purchased" securities in the Core Accounts on margin, (¶ 58), the net values of

the Core Accounts including the David and Leslie Trust accounts were below zero.  (¶ 76.)

In late 2002, Stanley met with Madoff.  Madoff told Stanley that he would fix the

problem and advised Stanley to see Bongiorno.  Stanley and Konigsberg subsequently met with

Bongiorno on BLMIS's 17th Floor.  (¶ 77.)  After the meeting, Bongiorno used a program called

STMTPro to generate multiple revised account statements for Stanley after fabricating back-

dated short-against-the-box sales[4] to eliminate the losses in the 2002 crash.  (¶ 78.)  For example,

S&R Account 1SH014 had reportedly held 345,000 shares of Siebel Systems, Inc. stock which

had reportedly lost $11 million between January and October 2002.  (¶ 79.)  A new January 2002

statement reflected a short sale of all the shares (at its $37 peak) which improved the value of the

account as of September 2002 by $11 million, wiping out the paper loss.  (*Id.*)  BLMIS

backdated 25 more trades in this fashion for the 1SH014 account.  (*Id.*)

BLMIS also prepared STMTPro statements for 1SH030 and 1SH028, the Core Accounts

held, respectively, by the Leslie Trust and the David Trust.  The original statements reported that

the collective value of the holdings of Broadcom and Intel securities in these accounts had fallen

by $5 million between January and September 2002 resulting in unrealized losses totaling $1

million.  (¶ 80.)  BLMIS sent revised statements with newly-fabricated, backdated short sales of

Broadcom and Intel that entirely eliminated the $5 million decline in value and turned the unrealized

$1 million loss into a nearly $4 million unrealized gain.  (*Id.*)  The new STMTPro statements for

these three accounts (1SH014 (S&R), 1SH028 (David Trust) and 1SH030 (Leslie Trust)) show

multiple fabricated short sales that increased the value in S&R Account 1SH014 by more than

$40 million and the David and Leslie Trust Accounts by $12 million in each.  (¶ 81 & fig.2.)

Stanley and Konigsberg still had the original monthly statements.  Before issuing the

STMTPro statements to Stanley and Konigsberg, BLMIS asked them to return their original

statements. They complied and returned all of their original Core Account monthly statements, (¶

82), and BLMIS sent the revised statements.  (¶ 78.)

---

[4]        A short-against-the-box sale is a short sale of stock one already owns.  (¶ 78.)

### ii.    At Stanley's Request, BLMIS Fabricated Numerous Groups of Trades in the Core Accounts in 2003 to Generate Millions in Reported Losses to Eliminate an Apparently Huge Tax Liability

As a result of the backdated trades, the accounts incurred millions of dollars in tax liability for 2002 and 2003.  (¶¶ 84-85.)  For example, the Shapiros reportedly realized short-term capital gains of more than $27 million in January of 2003.  (¶ 85.)  But Stanley did not pay any estimated taxes in the first quarter of 2003, (¶ 86), and wrote to Konigsberg on April 27, 2003, "Here is copy of note on details I worked with Annette.  Both Bernie + Annette are aware of problems *we* have.  June is target for action [.]"  (¶ 86 n.2 (emphasis in original).)

Subsequently, Bongiorno and BLMIS began fabricating trades to generate losses to avoid the tax liability.  (¶ 87.)

a.  In the April 2003 statement for the 1SH014 account, BLMIS purportedly bought and sold a block of HCA Inc. stock for a $1.5 million loss in two transactions that supposedly occurred weeks apart but were nevertheless reported in consecutive transaction numbers. (¶ 88.)

b.  BLMIS reported a short sale of KB Homes stock in May which it covered in June for a $3.1 million loss.  (*Id.*)

c.  In June 2003, BLMIS reported a purchase of National Semiconductor Corp. and a sale in July for a $1.5 million loss.  (*Id.*)

d.  BLMIS reported purchases and sales of Apple Computers Inc., Delta Airlines, Inc. and Priceline.com Inc. for a total $2.5 million loss in November 2003.  (*Id.*)

e.  BLMIS created a subaccount to the 1SH079 Account in late 2003, and reported that the subaccount had previously sold Sears Roebuck stock short in March 2003 that it supposedly covered in November 2003, generating a loss of $12 million.  (¶ 89.)

f.  BLMIS reported realized gains totaling more than $27 million in January 2003 and $20 million in losses from March through December 2003, (*id.*, fig. 5), and sent Shapiro revised account statements.  (¶ 90.)  The fabricated losses substantially resolved the Shapiros' tax problems and, instead of owing taxes for 2003, the Shapiros received a $629 federal refund.  (¶ *Id.*)

The David Trust and Leslie Trust also faced taxable gains in 2003 that were offset by fabricated and backdated short sales. BLMIS reported numerous transactions resulting in losses: one short sale of Amazon stock created a $3 million loss; another of Sony Corp. produced a $635,000 loss. (¶ 91.)

The fabricated losses negatively impacted the reported value in the Core Accounts, so Bongiorno boosted the value of the Core Accounts with backdated trades. (¶ 92.) Using the 1SH079 account, for instance, Bongiorno issued a STMTPro statement in late 2003 indicating a March 2003 purchase of Genentech, Inc. stock which tripled in value by December. (*Id*.) This backdated transaction increased the value of the 1SH079 account by $13 million. (*Id*.) The Konigsberg schedules for the first two quarters of 2003 did not list any Genentech position because Bongiorno used STMTPro to backdate the March trade. (*Id*.)

### E.    Customer Claims

The Initial Transferees filed a total of seven claims relating to their respective accounts. (¶ 98; SAC, Ex. A.) The Trustee issued claims determinations denying the claims, (¶ 99), and only Kenneth filed an objection contesting the determination to disallow Claim # 013658 relating to Citron Account 1C1251. (¶ 100.) That objection remains pending. (*Id*.)

The Children's Trusts, which held Accounts 1S0540 and 1C1345, respectively, also filed several claims designated as Customer Claims # 005116 and # 005656, respectively. (¶ 102; SAC, Ex. A.) These claims also remain unresolved. (¶¶ 103-04.)

### F.    The Subsequent Transfers

The Initial Transferees and Other Initial Transferees transferred $53,778,486 of the BLMIS transfers to Stanley, Renee, the LAD Trust, David, the David Trust, the Leslie Trust,

13

Rachel, the Citrons and the Children's Trusts (collectively, the "Subsequent Transferees"). (¶ 110.)

## VI.    This Adversary Proceeding

The Trustee commenced this adversary proceeding on December 9, 2010 and filed the SAC on July 8, 2014.  The SAC asserts eleven claims for relief summarized in the following table:

| Count | ¶¶ | Defendant(s) | Description of Claim(s) |
|-------|-----|--------------|-------------------------|
| 1 | 114-19 | Initial Transferees | Avoid and recover the actual two-year fraudulent transfers, and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 (until repaid), under 11 U.S.C. §§ 502(d) 548(a)(1)(A), 550(a), 551, and 15 U.S.C § 78fff-2(c)(3). |
| 2 | 120-28 | Initial Transferees | Avoid and recover the constructive two-year fraudulent transfers, and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656  (until repaid), under 11 U.S.C. §§ 502(d) 548(a)(1)(B), 550(a), 551, and 15 U.S.C § 78fff-2(c)(3). |
| 3 | 129-34 | Initial Transferees | Avoid and recover the actual six-year fraudulent transfers, and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276, 276-a, 278, 279. |
| 4 | 135-40 | Initial Transferees | Avoid and recover the constructive six-year fraudulent transfers, and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 273, 278, 279. |
| 5 | 141-46 | Initial Transferees | Avoid and recover the constructive six-year fraudulent transfers, and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 (until repaid), under 11 U.S.C. §§ 502(d) |

| | | | 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 274, 278, 279. |
|---|---|---|---|
| 6 | 147-52 | Initial Transferees | Avoid and recover the constructive six-year fraudulent transfers, and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 275, 278, 279. |
| 7 | 153-59 | Initial Transferees and Other Initial Transferees | Avoid and recover the undiscovered fraudulent transfers (initial transfers), and disallow Customer Claim # 013658 and Related Account Customer Claims # 005116 and # 005656 (until repaid), under 11 U.S.C. §§ 502(d) 544(b), 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276, 276-a, 278, 279, N.Y. C.P.L.R. 203(g), 213(8). |
| 8 | 160-66 | Subsequent Transferees | Recover the subsequent transfers pursuant 11 U.S.C. §§ 550(a), 551, 15 U.S.C § 78fff-2(c)(3), N.Y. Debtor and Creditor Law §§ 276-a, 278. |
| 9 | 167-71 | Citrons and the Children's Trust | Disallow any and all claims against BLMIS based on their knowledge of the fraud, under 11 U.S.C. § 502(a), 502(b)(1), 15 U.S.C. § 78fff(b), 78fff-1(a). |
| 10 | 172-77 | Citrons and the Children's Trust | Equitable subordination of any and all claims under 11 U.S.C. §§ 105(a), 510(c). |
| 11 | 178-83 | Citrons and the Children's Trust | Equitable disallowance of any and all claims due to Defendants' failure to deal fairly and in good faith. |

The Defendants have moved to dismiss the SAC on several grounds. In their memorandum, (*Defendants' Memorandum of Law In Support of Their Motion to Dismiss the Trustee's Second Amended Complaint*, dated Aug. 28, 2014 ("*Defendants' Memo*") (ECF Doc # 38)) they primarily argue that the safe harbor, 11 U.S.C. § 546(e), bars all of the avoidance claims other than the intentional fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(A), and § 548(c) bars all of the avoidance claims, including the claim under 11 U.S.C. § 548(a)(1)(A), because the Initial Transferees received the initial transfers in good faith and for value. The

Defendants also argue that Stanley's knowledge cannot be imputed to the other Defendants, the

SAC fails to plead sufficient facts relating to inter-account transfers and subsequent transfers,

and the Court should dismiss the equitable disallowance and equitable subordination claims.

## DISCUSSION

### A.    Standards Governing the Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570. Courts do not decide plausibility in a

vacuum. Determining whether a claim is plausible is "a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *Twombly*, 550

U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

*Iqbal* outlined a two-step approach in deciding a motion to dismiss. First, the court

should begin by "identifying pleadings that, because they are no more than [legal] conclusions,

are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the

elements of a cause of action supported by conclusory statements" are not factual. *See id.* at 678.

16

Second, the court should give all "well-pleaded factual allegations" an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief.  *Id.* at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The court may also consider documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *McKevitt v. Mueller*, 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010).  Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.  *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1532 n.23 (S.D.N.Y. 2010).

## B.    Counts I through VII (Avoidance Claims)

### 1.    Introduction

Counts I through VI seek to avoid and recover actual and constructive fraudulent transfers made to the Initial Transferee Defendants under New York and federal bankruptcy law up to six years before the Filing Date.  Count VII seeks to avoid and recover "undiscovered" transfers that occurred prior to the six-year reach back period under New York law.  These Counts also ask the Court to disallow the pending, unresolved claims filed on behalf of the Citrons and the Children's Trusts.

The Trustee's ability to avoid and recover transfers has been limited by several decisions

issued by the Second Circuit Court of Appeals and the District Court.  In light of the safe harbor

granted under 11 U.S.C. § 546(e), the Trustee may only avoid and recover intentional fraudulent

transfers under § 548(a)(1)(A) made within two years of the filing date, *Picard v. Ida Fishman

Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied*, 135 S.Ct. 2859

(2015); *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) ("*Katz*"), *interlocutory appeal

denied*, 466 B.R. 208 (S.D.N.Y. 2012), unless the transferee had actual knowledge of Madoff's

Ponzi scheme, or more generally, "actual knowledge that there were no actual securities

transactions being conducted."  *SIPC v. BLMIS* (*In re BLMIS*), No. 12 Misc. 115 (JSR), 2013

WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").  The safe harbor was intended,

among other things, to promote the reasonable expectations of legitimate investors.  If an

investor knew that BLMIS was a Ponzi scheme, he had no reasonable expectation that he was

signing a securities contract with BLMIS for the purpose of trading securities for his account.  *Id.*

In that event, the Trustee may avoid and recover actual and constructive fraudulent transfers to

the full extent permitted under state and federal bankruptcy law.  *See id.* at *6.

The transferee's knowledge is also relevant under 11 U.S.C. § 548(c).  Section 548(c)

provides a defense to a fraudulent transfer claim brought under Bankruptcy Code § 548(a) to the

extent the transferee "takes for value and in good faith."  11 U.S.C. § 548(c).  Where, as here, the

Trustee seeks to recover the transfer of principal rather than fictitious profits he must plead the

transferee's lack of subjective good faith.  *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 24

(S.D.N.Y. 2014) ("*Good Faith Decision*").  Lack of objective good faith is not enough "because

the securities laws do not ordinarily impose any duty on investors to investigate their brokers,

[and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent

18

failure to so inquire." *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012); *accord Katz*, 462

B.R. at 455.  If the SAC does not plead actual knowledge, the Trustee can still recover

intentional fraudulent transfers pursuant to Bankruptcy Code § 548(a)(1)(A) under Count I if he

pleads and proves that the Initial Transferee Defendants willfully blinded themselves to the fact

that BLMIS was not engaged in the actual trading of securities.  *See Good Faith Decision*, 2014

WL 1651952, at *4; *Katz*, 462 B.R. at 454, 455-56.

### 2.      Knowledge

In *Cohmad*, the Trustee sued, *inter alia*, Robert Jaffe, an owner and executive of Cohmad

Securities Corporation ("Cohmad"), a company formed by Madoff and Sonny Cohn.  The

Trustee alleged that Jaffe "took the Fifth" when asked about certain fees he received for referring

customers to BLMIS, had an arrangement whereby he and others closely associated with him

could withdraw more money than they had invested with BLMIS, and directed BLMIS to

"execute" back-dated trades on a number of occasions to provide him with fictitious gains and

losses in the exact dollar amounts requested.  The Trustee further alleged that Jaffe made these

demands because he knew that BLMIS could fabricate gains and losses based on fictitious trades

with the stroke of a key.  2013 WL 1609154, at *6.  The District Court denied Jaffe's motion to

dismiss stating that the allegations "sufficiently allege actual knowledge of, and indeed

participation in, every aspect of Madoff's Ponzi scheme that, on the Court's foregoing analysis,

would negate applicability of Section 546(e)."  *Id.*

Here, the Trustee has pled, "at a minimum, that [Stanley] had actual knowledge that there

were no actual securities transactions being conducted."  *Id.* at *4.  Stanley was a long-time

Madoff associate and former BLMIS employee who had direct access to Madoff, Bongiorno and

the notorious 17th floor from which Madoff ran the investment advisory business.  Between

2005 and 2008 alone, he visited the 17th floor on more than 150 occasions.  (¶ 57.)  He (directly

or indirectly) or his family withdrew significantly more from their BLMIS accounts than they

invested.  The SAC also alleges numerous instances in which Stanley collaborated with and

directed BLMIS personnel, including Bongiorno, to "cancel" trades that appeared on earlier

monthly statements, (¶¶ 63-64), to generate specific gains or losses, sometimes back-dated to

before the request, in the Core Accounts, (¶¶ 67-71) and during 2002 and 2003, to fabricate large

numbers of back-dated trades to increase the value of the Core Accounts, (¶¶ 73-83), and

thereafter, to manufacture back-dated losses to eliminate the adverse tax consequences resulting

from the fictitious value.  (¶¶ 84-91.)

The "transactions" in the Core Accounts in 2002 provide the most graphic example of

this collaboration and Stanley's knowledge.  Stanley knew that the reported value in the Core

Accounts had dropped as a result of the stock market's crash.  (¶ 77.)  He met with Madoff who

told Stanley that he (Madoff) would fix the problem, and sent him to Bongiorno.  (*Id.*)  After that

meeting, BLMIS issued "revised" monthly statements reflecting fictitious trades that, through

pure financial alchemy, wiped out the lost value.  The newly manufactured gains created tax

liability in 2003.  Shortly after apprising Konigsberg of his "problem," of which Madoff and

Bongiorno were aware, Bongiorno began to manufacture significant short-term losses to offset

the tax liability.  Most telling, after BLMIS created fictitious, back-dated trades that had not

appeared in the originally monthly statements, but before it would give Stanley the revised

statements, he (and Konigsberg) had to return the original statements to BLMIS.  (¶¶ 48, 82.)

Like Jaffe in *Cohmad*, Stanley demanded canceled trades and the fabrication of back-

dated, fictitious trades because he knew that BLMIS could generate the trades through its

STMTPro computer program with the stroke of a key.  He was aware that the transactions in the

revised statements, whether they markedly increased the value of the accounts or decreased the

owners' tax liabilities, could not be real.  He also knew that the other "trades" reflected in the

monthly statements "made" in direct response to his instructions to Bongiorno and BLMIS to

create specific gains and losses were not real.[5]  Furthermore, he had to return the original

monthly statements before he could get the revised monthly statements that depicted the newly

fabricated trades.  Accordingly, the Trustee has pleaded that Stanley knew, at a minimum, that

BLMIS was not actually trading the securities it reported it had traded in the monthly statements

relating to the Core Accounts.

### 3.      Imputation

In *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117 (Bankr. S.D.N.Y. 2014), the Court

explored the rules relating to imputation of knowledge acquired by an agent.  Generally,

knowledge acquired by an agent while acting within the scope of his authority is imputed to the

principal.  But the agent's knowledge will not be imputed under the adverse interest exception if

he totally abandons his principal's interests and acts entirely for his own or another's purposes; it

is not enough that the agent has a conflict of interest or does not act primarily for the benefit of

his principal.  Furthermore, the law distinguishes between frauds that benefit the principal and

frauds that hurt the principal, and frauds whose harm flows from the discovery of the fraud rather

than the fraud itself.  If the fraud does not hurt the principal, or the harm flows from the

discovery of the fraud rather than the fraud itself, the adverse interest exception does not apply.

*See Merkin*, 515 B.R. at 146-47.  The family defendants argue that Stanley's knowledge should

---

[5]      Even if the direction to make future "trades" to generate specific gains and losses, particularly at the end of
the year, could be explained by tax planning, the fabrication of back-dated trades cannot be justified under any
circumstances.

not be imputed because he was not their agent, but if he was, the adverse interest exception

applies because he abandoned their interests by investing in BLMIS.  (*Defendants' Memo* at 20-

21.)

The SAC alleges facts supporting the conclusion that Stanley was an agent with respect

to each of the Core Accounts.  S&R, a New York partnership, held Core Accounts 1SH014 and

1SH079.  S&R also held non-Core Account 1SH172.  S&R is a New York partnership, Stanley

is a general partner of S&R, and his knowledge is imputed to S&R under New York law.  *See*

N.Y. P'SHIP LAW § 23 (McKinney 2015); *Stellar X Prods. v. Int'l Bus. Machs. Corp.*, 03 Civ.

5739 (JSR), 2003 WL 22928636, at *2 (S.D.N.Y. Dec. 10, 2003) ("[U]nder … New York law,

the knowledge of each partner is attributed to the partnership…."); *Picard v. Chais* (*In re*

*BLMIS*), 445 B.R. 206, 224 (Bankr. S.D.N.Y. 2011) ("[T]he knowledge of a general partner can

be imputed the limited partnership.");  *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829

(N.Y. 1985) ("The general rule is that knowledge acquired by an agent acting within the scope of

his agency is imputed to his principal and the latter is bound by such knowledge although the

information is never actually communicated to it.").  Furthermore, Stanley and Renee are liable

as general partners of S&R for the fraudulent transfers that S&R received.[6]  *See* N.Y. P'SHIP

LAW § 26; *Ederer v. Gursky*, 881 N.E.2d 204, 209 (N.Y. 2007) ("Partnership Law § 26 … [has]

always been understood to mean what they plainly say: general partners are jointly and severally

liable to nonpartner creditors for all wrongful acts and breaches of trust committed by their

---

[6]        The SAC does not include a separate count against Shapiros based on their liability as general partners of
S&R.  However, the caption named them, *inter alia*, in their capacities as general partners of S&R, and the Trustee
asserted in his memorandum, albeit in a footnote, that Shapiros "are liable as general partners of S&R for the
fraudulent transfers received by S&R, *see* N.Y. P'ship Law § 26(a)."  (*Memorandum of Law in Opposition to
Defendants'  Motion to Dismiss the Trustee's Second Amended Complaint,* dated Oct. 23, 2014 ("*Trustee Memo*"), at
33 n. 27 (ECF Doc. # 40).)  The Shapiros have not taken issue with this unremarkable proposition.

partners in carrying out the partnership's business, and jointly liable for all other debts to third

parties."), *reargument denied*, 886 N.E.2d 776 (N.Y. 2008).  In addition, Stanley is a trustee of

the David Trust, which holds Account 1SH028, and the Leslie Trust which holds Account

1SH030.  As trustee, his knowledge is imputed to the trusts.[7]  *Picard v. Chais*, 445 B.R. at 224

("[A] trust can be attributed with the knowledge of the individual or entity by which it is

controlled or dominated."); *see S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 730

(S.D.N.Y. 2003) ("Trusts, like corporations, must make their decisions through

individuals….And where an individual so dominates or controls the activities of some entity

such as the trust, the entity may also be held responsible for the same acts committed by the

individual.").

Other allegations add additional support to the conclusion that Stanley was the agent for

the holders of the S&R, Leslie Trust and David Trust Accounts.  "A principal-agent relationship

may be established by evidence of the consent of one person to allow another to act on his or her

behalf and subject to his or her control, and consent by the other so to act, even where the agent

is acting as a volunteer." *Art Fin. Partners, LLC v. Christie's Inc.*, 870 N.Y.S. 2d 331, 331 (N.Y.

App. Div. 2009) (quotation marks and citation omitted).  Stanley created the Accounts for the

benefit of himself and his family, the account statements were sent to the Shapiros at their home

address, Stanley reviewed those statements and he directed BLMIS to execute fabricated trades

in the Core Accounts for the purpose of increasing their market value or decreasing the owners'

tax liability.  These allegations support the plausible inference that Stanley acted as the agent for

---

[7]        Stanley was also a trustee of LAD Trust.

the holders of the Core Accounts as well as S&R Account 1SH172 in their dealings with

BLMIS.  *See Picard v. Chais*, 445 B.R. at 224.

Furthermore, the adverse interest exception does not bar the imputation of Stanley's

knowledge with respect to these accounts.  As note, he created the Core Accounts and S&R

Account 1SH172 for the respective owners' benefit, and in four cases, the account holder

withdrew more than had actually been invested.[8]  Thus, the Initial Transferees benefitted from

Stanley's "trades" for nearly thirty years, and undoubtedly would have continued to benefit if

Madoff's Ponzi scheme remained a secret known only to a few.

The SAC does not, however, allege facts supporting the imputation of Stanley's

knowledge to the Initial Transferees, the Citrons (Account 1C1251), David (Account 1S0306)

and Leslie (1SH171).  The Trustee does not allege any specific facts showing that Stanley

directed any transactions in these accounts.  Moreover, the Citrons account statements were sent

to their home, (¶ 45), and the SAC doesn't allege, even in conclusory terms, that Stanley ever

reviewed these statements.  The SAC alleges that the address of David's account was originally

reported as the Shapiros' home address and then was changed to David's and Rachel's home

address with duplicate statements sent to the Shapiros.  (¶ 42.)  The SAC does not allege the

address of Leslie's account or where the statements were sent.

Finally, the SAC alleges in conclusory fashion that the Defendants, including Kenneth,

David and Leslie, authorized Stanley to act as their agent, (¶ 95), and Stanley reviewed their

---

[8]     The aggregate withdrawals from Accounts 1SH014, 1SH028, 1SH030 and 1SH172 exceeded the aggregate
deposits by more than $42 million.  (*See* SAC, Ex. B, at Bates Nos. 00000091, 00000095, 00000099, 00000102.)
The fourth Core Account, 1SH079, was funded entirely by fictitious profits.  Although, there were no withdrawals,
the inter-account transfer of fictitious profits created the appearance of substantial net equity and the opportunity for
withdrawals.  (*See* SAC, Ex. B, at Bates No. 00000100.)

statements and had access to the funds in their accounts.  (¶ 96.)  These conclusory allegations

are insufficient to imply that Stanley acted as the Citrons', David's or Leslie's agent with respect

to these three accounts, and Counts II through VII are dismissed as to these three defendants.

Count I, however, is not dismissed.  According to Exhibit B to the SAC, the Citrons,

David and Leslie received transfers of fictitious profits within two years of the Filing Date in the

amounts of $150,000 (Citrons Account 1C1251), (SAC, Ex. B, at Bates No. 00000084),

$1,014,121 (David Account 1S0306), (*id.*, Ex. B, at Bates No. 00000087), and $678,304 (Leslie

Account 1SH171).  (*Id.*, Ex. B, at Bates No. 00000101.)  The safe harbor does not prevent the

Trustee from recovering two year transfers under 11 U.S.C. § 548(a)(1)(A).  Furthermore, even

if these Initial Transferees lacked knowledge of Madoff's fraud, they did not give value for those

fictitious profits for the reasons discussed in the next section.

### 4.      Antecedent Debt Defense

The Defendants argue that they received the initial transfers in good faith and for value

under 11 U.S.C. § 548(c), and the transfers cannot, therefore, be avoided.  Bankruptcy Code §

548(c) provides a defense in a fraudulent transfer action under § 548 to the extent a transferee

takes "for value and in good faith," 11 U.S.C. § 548(c).  The Trustee must plead the Defendants'

lack of good faith, *Good Faith Decision*, 516 B.R. at 24, that is, "that the customer either

actually knew of the broker's fraud or 'willfully blinded' himself to it."  *Picard v. Avellino,* 469

B.R. at 412; *accord Good Faith Decision*, 516 B.R. at 23 ("'[G]ood faith' means that the

transferee neither had actual knowledge of the Madoff Securities fraud nor willfully blinded

himself to circumstances indicating a high probability of such fraud.").  The SAC adequately

pleads that Stanley's actual knowledge of BLMIS' fraudulent trading activities is imputed to

25

S&R, the David Trust and the Leslie Trust. Because they had actual knowledge, they did not receive the transfers in good faith.

The SAC, on the other hand, does not plead that Kenneth, David and Leslie had actual knowledge that the BLMIS trades in their accounts were fictitious. Furthermore, the SAC does not include allegations that Kenneth, David and Leslie were suspicious of Madoff's fraudulent activities and "willfully blinded" themselves to Madoff's conduct. Accordingly, they received the transfers in good faith.[9]

They also argue that they received the transfers for value, but they are foreclosed from making this argument. District Judge Rakoff previously withdrew the reference to determine, among other things, "whether and to what extent . . . transfers made by Madoff Securities that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that Madoff Securities owed to the Antecedent Debt Defendants at the time of the transfers." (*Order*, dated May 12, 2012, at ¶ 1 (*SIPC v. BLMIS* (*In re BLMIS*), 12-mc- 115 (S.D.N.Y.) ECF Doc. # 107)).) This adversary proceeding was one of the withdrawn proceedings. (*Id.*, Ex. A at p. 8 of 56.)

Judge Rakoff subsequently decided that the claims asserted by the defendants in the withdrawn proceedings grounded in state and federal law "cannot provide value against the

---

[9]    The most that the SAC pleads on this score is that the David Trust and the Leslie Trust Core Accounts received implausibly high returns, (¶ 61), and David and Leslie withdrew more than $13 million from their accounts over 27 years despite the fact that the Accounts were funded with minimal deposits. (¶ 59.) The consistent profitability of the BLMIS investments is one of the many red flags frequently encountered in Madoff-related litigation. The existence of red flags is insufficient to trigger actual knowledge or willful blindness regarding Madoff's scheme unless the Trustee also alleges that the Defendants were aware of the red flags. *See Merkin*, 515 B.R. at 144 (collecting cases). The SAC does not allege facts showing that Kenneth, David or Leslie were aware of any red flags relating to their accounts.

separate customer property estate" because those claims, if they exist at all, run "against Madoff

Securities' general estate, not the customer property estate, and therefore cannot be the basis of

the retention of customer property under section 548(c)." *SIPC v. BLMIS* (*In re BLMIS*), 499

B.R. 416, 424-25 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"); *accord id.* at 430 ("In

summary, the Court concludes that claims against the general Madoff Securities estate do not

constitute 'value' within the meaning of section 548(c) to the extent that they would be used to

withhold fraudulent transfers owing to the customer property estate under SIPA.").[10]  The

District Court returned the withdrawn adversary proceedings, including this one, "for further

proceedings consistent with this Opinion and Order."  *Id.* at 430.

Seeking to circumvent the effect of Judge Rakoff's ruling, the Defendants state that they

"do not rely upon the holdings in Judge Rakoff's October 15, 2013 antecedent debt opinion."

(*Defendants' Memo* at 11.)  Instead, they argue that the transfers satisfied the antecedent debts

arising from their state and federal law claims and, therefore constituted value under 11 U.S.C. §

548(c).  This is the very argument they made and Judge Rakoff rejected, and they cannot escape

its fate by ignoring it.  The order that re-referred this adversary proceeding directed me to

proceed in accordance the *Antecedent Debt Decision*.  The Defendants have not pointed to any

intervening change in the law that might merit its reconsideration, and they cannot collaterally

attack Judge Rakoff's reference order in this Court.  In short, their "value" argument is

foreclosed by the *Antecedent Debt Decision*.

---

[10]     The antecedent debt issue has been raised and rejected on three separate occasions.  *See SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 461-70 (Bankr. S.D.N.Y. 2015) ("*Omnibus Motion to Dismiss Decision*").

5.      **Inter-Account Transfers**

The only other pleading deficiency directed at the initial transfer relates to the inter-account transfers.  In *SIPC v. BLMIS* (*In re BLMIS*)*,* 522 B.R. 41 (Bankr. S.D.N.Y. 2014) ("*Inter–Account Transfer Decision* "), *appeal docketed*, No. 15 cv 01151 (PAE) (S.D.N.Y. Feb. 18, 2015), the Court considered the correct method for calculating the net equity where a customer account had received a transfer from another BLMIS account (hereinafter, the "Inter-Account Method").  First, the Trustee must compute the amount of net equity in the transferor account on the date of the transfer under the Net Investment Method approved by the Second Circuit in *In re BLMIS*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012).  Second, the Trustee must credit the transferee with the amount of the transfer up to the amount of net equity in the transferor account.  *See Inter–Account Transfer Decision,* 522 B.R. at 62.

Certain of the Defendants received inter-account transfers from other BLMIS accounts. The Trustee used the Inter-Account Method to compute and discount the fictitious profits in the transferee's account.  The Inter-Account Method also computes the good faith transferee's clawback exposure.[11]  If the transferor had negative net equity (or less positive equity than the amount of the transfer), the transferee did not receive credit to the extent of the negative net equity.  The less credit the transferee received, the more likely the transferee's subsequent withdrawals from the transferee account would represent withdrawals of fictitious profits rather than the return of principal.

The Defendants contend that (1) the use of the Inter-Account Method allows the Trustee

---

[11]      Objections based on the use of the Inter-Account Method are irrelevant to the extent the SAC states avoidance claims for all amounts withdrawn.  These claims do not depend on the amount of credit given for an inter-account transfer.

to avoid transfers beyond the applicable statute of limitations; (2) the SAC does not contain

specific factual allegations regarding the inter-account transfers, including the identity of the

owner of the transferor account, the relationship between the owner of the transferor account

and the Defendants, or the transactions in the transferor account from which it could be

determined whether the Defendants' withdrawals from their BLMIS accounts represented the

withdrawal of actual deposits or fictitious profits; and (3) since federal securities laws provide

that the establishment of a discretionary securities account constitutes an investment contract,

and that there is no requirement that the customer identify a specific security within the

meaning of Rule 10b-5, the Defendants who funded their account with an inter-account transfer

should be afforded the full protection of the federal securities laws.  (*Defendants' Memo* at 34-

35.)

 These arguments have been addressed and rejected in prior decisions by the Court and the

District Court.  First, the *Antecedent Debt Decision* rejected the argument that the failure to treat

the pre-reach-back period transfers as principal allowed the Trustee to indirectly avoid transfers

that were beyond the statute of limitations.  There is no time limit on what constitutes value

under 11 U.S.C. § 548(c), and an inter-account transfer of fictitious profits does not morph into a

transfer of principal just because it occurred long ago and beyond the statute of limitations to

avoid the transfer.  *Antecedent Debt Decision,* 499 B.R. at 429.  Furthermore, "[a] customer can't

transfer what he doesn't have.  The Inter–Account Method does not disturb or avoid the transfer;

it merely determines the value of what was transferred based on the net investment in the

transferor's account."  *Inter-Account Transfer Decision*, 522 B.R. at 53.

 Second, although the SAC does not allege how the Trustee computed the amount of the

inter-account transfer (that is, the net equity in the transferor account), the exhibit states what the

29

Trustee contends was the date of each transfer, the amount of the transfer according to BLMIS's books and records, and the amount of the transfer as calculated by the Trustee under the Inter-Account Method.  Hence, it provides adequate notice of the Trustee's claims to the defendants. *Omnibus Motions to Dismiss Decision*, 531 B.R. at 479.  Exhibit B also identifies the number of the transferor account, and Exhibit A and the SAC matches the number with the name of the transferor.[12]  (¶¶ 39-46.)

Third, SIPA's definition of "security" includes investment contracts, but only "if such investment contract . . . is the subject of a registration statement with the [SEC] pursuant to the provisions of the Securities Act of 1933."  SIPA § 78*lll* (14); *accord Inter-Account Transfer Decision*, 522 B.R. at 56.  The SAC does not plead that the Defendants' "investment contracts" were the subject of registration statements with the SEC pursuant to the 1933 Securities Act. Accordingly, the SAC does not plead on its face that the Defendants' "investment contracts" are securities subject to the federal securities laws.  Furthermore, the Defendants do not explain how the Inter-Account Method violates the federal securities laws.

In summary, the motion to dismiss Count I is denied as to the Initial Transferees, the Other Initial Transferees and Stanley and Renee, except that the claims against the Citrons, Leslie and David under Count I are limited to the fictitious profits they withdrew.  The motion to dismiss Counts II through VII is granted as to the Citrons, Leslie and David but is otherwise denied.

---

[12]     The relevance of the identity of the transferor and its relationship to the transferee-customer is not apparent.

C.      **Count VIII (Subsequent Transfers)**

The Court has previously considered the standards for pleading a subsequent transferee claim under 11 U.S.C. § 550(a)(2), most recently in the *Omnibus Motion to Dismiss Decision*. In brief, the Trustee must first allege that the initial transfer is avoidable. Here, the Trustee has pleaded the avoidability of all of the transfers to the Initial Transferees and the two year transfers under 11 U.S.C. § 548(a)(1)(A) to the Other Initial Transferees.

The Trustee must also plead that the initial transfers (or subsequent transfers of the initial transfers) were transferred to the subsequent transferee. Rule 8(a) governs this portion of the claim. The Trustee must allege facts that support the inference that the funds at issue originated with the BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity as a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient. *Omnibus Motion to Dismiss Decision*, 531 B.R. at 472-74.

The SAC lacks the vital statistics necessary to support a subsequent transfer claim. It alleges the subsequent transfers "upon information and belief" without any detail. (*See* ¶ 43, 46, 102; *cf.* ¶ 110 ("Based on the Trustee's investigation to date, the Initial Transferee Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS" to the Subsequent Transferee Defendants).) Count VIII then alleges that "Subsequent Transfers were transferred by the Initial Transferee Defendants to the Subsequent Transferee Defendants," each Subsequent Transfer "was made directly or indirectly to one or more of the Subsequent Transferee Defendants," the "Subsequent Transferee Defendants are immediate or mediate transferees from

31

the Initial Transferee Defendants," and they "received the Subsequent Transfers with knowledge

of and/or willfully blind to BLMIS's fraudulent scheme." (¶¶ 162-65.) The SAC does not tie

any initial transfer to any subsequent transfer or Subsequent Transferee. Moreover, it does not

plausibly imply that the initial transferees even made subsequent transfers to the Subsequent

Transferees as opposed to third parties, or that they made the subsequent transfers rather than

simply keep the initial transfers for themselves.

Accordingly, Count VIII is dismissed without prejudice.

### D.    Counts IX-XI (Disallowance and Equitable Subordination)

The last three Counts seek to disallow or subordinate the pending customer claims,

including the portions reflecting positive net equity, filed by the Citrons and the Children's

Trusts based on theories that the claimants were aware of Madoff's scheme, furthered it and

engaged in inequitable conduct.[13]    (¶¶ 168-70 (Count IX), 173-75 (Count X), 179-81 (Count

XI).) The Citrons hold Account 1C1251, one of the claimants, and David, as trustee of the

Shapiro Children's Trust (Account 1S0540) and Kenneth, as trustee of the Citron Children's

Trust (Account 1C1345), hold the other outstanding claims. The Court has already discussed the

failure to plead Kenneth's actual knowledge or willful blindness with respect to the Citron

account, and hence, he lacks the necessary knowledge to impute to the Citron Children's Trust in

his capacity as trustee.[14] Similarly, the Court previously concluded that the SAC failed to plead

---

[13]    The Trustee contends that Counts IX through XI seek to disallow or subordinate only the Children's Trusts Accounts. (*Trustee Memo* at 37.) However, the Citron Customer Claim # 013658, which corresponds to Account 1C1251, is still pending, (¶¶ 98-100), and the Counts seek to disallow or equitably subordinate this claim. (¶¶ 171, 173, 182.) In addition, the three Counts refer to Kenneth's claim, but Account 1C1251 is jointly owned by Kenneth and Leslie.

[14]    The Citrons' claim is nonetheless subject to disallowance under 11 U.S.C. § 502(d) because they withdrew $150,000 in fictitious profits within two years of the Filing Date, (SAC Ex. B, at Bates No. 00000084), and did not give value for those transfers within the meaning of 11 U.S.C. § 548(c). Because the Citrons and the Citron

facts supporting a plausible inference that David had actual knowledge of Madoff's scheme or willfully blinded himself to that fact. Hence, actual knowledge or willful blindness cannot be imputed to the Shapiro Children's Trust.

The disallowance claims (Counts IX and XI) also fail for entirely separate reasons. A bankruptcy court does not have the power, which Count XI seeks to invoke, to disallow a claim under general principles of equity unless applicable non-bankruptcy law permits it to do so. *Merkin*, 515 B.R. 156-57. Count XI does not invoke non-bankruptcy law, and is insufficient as a matter of law.

Count IX relies on equitable principles of disallowance that purport to arise under applicable provisions of SIPA, including section 78fff-2(b), and hence, are incorporated in 11 U.S.C. § 502(b)(1). The Court discussed the relationship between Bankruptcy Code § 502(b)(1) and SIPA in *Merkin*, 515 B.R. at 153–56, and concluded that inequitable conduct barred the customer from receiving SIPC insurance, but "unless the customer lacked title to the property entrusted to the broker-dealer because of the customer's fraud or for another reason, there is no basis in equity to disallow his right to his property in a SIPA proceeding." *Id.* at 156. The Trustee contends that the claimants lacked title to the funds deposited in their BLMIS accounts because the "Family, with knowledge of Madoff's fraud, funded the accounts with subsequent transfers of customer property," and "the Shapiro Family lacked title to the property as it belongs to the BLMIS estate for equitable distribution to innocent customers." (*Trustee Memo* at 38.)

The SAC shows otherwise, at least with respect to the Children's Trusts. According to

---

Children's Trust are different entities, the Citrons receipt of avoidable transfers does not mandate the disallowance of the Citron Children's Trust's customer claim under § 502(d).

Exhibit B, Accounts 1C1345 and 1S0540 had positive net equity.  (SAC Ex. B, at Bates Nos. 00000086, 00000088.)  Exhibit B shows that many of the deposits in these accounts took the form of "checks" rather than inter-account transfers, and the SAC does not allege facts suggesting that these "checks" were funded by other customers' money.  In addition, Account 1C1345 received an inter-account transfer from an existing account for the benefit of the Citron children that included $442,000 in principal.  (SAC Ex. B, at Bates Nos. 00000085, 00000086.)  The $442,000 was funded entirely with "checks," and did not consist of any inter-account transfers.  (*Id.*, Ex. B, at Bates No. 00000085.)

Citron Account 1C1251 was funded with a positive inter-account transfer ($27,000) and a $100,000 check, but had negative net equity.  (SAC, Ex. B, at Bates No. 00000084.)  The SAC pleads facts mandating the disallowance of the Citrons claim under 11 U.S.C. § 502(d), and the claim appears to be subject to disallowance on the separate ground that it has negative net equity.  To the extent, however, that a positive equity is attributed to the Citrons' account as a result of the receipt of funds derived without Citrons' knowledge from other customers, the Trustee has not cited any authority to support his argument that their customer claim should be disallowed under equitable principles arising from SIPA.  As discussed in *Merkin*, the Trustee would have to show that the Citrons lacked title to the hypothetical money attributable to their account.  They presumably had legal title to the funds in their account, and Trustee has not cited any authority under New York law to show that equitable title lies elsewhere given the circumstances of the case.  Accordingly, Counts IX, X and XI are dismissed.

The Court has considered the parties' remaining arguments and concludes that they have been rendered moot by the disposition of the motion to dismiss, or lack merit.  Settle order on notice.

Dated:          New York, New York
                November 25, 2015

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge