**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 09-01182 (SMB) |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

## TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard,*
*Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Estate of Bernard L.*
*Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

PROCEDURAL HISTORY.................................................................... 4

STATEMENT OF FACTS .................................................................... 6

    A.    Madoff's Ponzi Scheme ........................................................ 6

    B.    Merkin, His Investments In BLMIS, And His Funds ............................... 6

        1.    Merkin Is A Sophisticated Investor ............................... 6

        2.    Merkin Creates GCC and the Merkin Funds ................................ 7

        3.    Defendants' Due Diligence Duties ............................... 8

        4.    Merkin Begins Investing With BLMIS But Does No Initial Due Diligence ................................ 9

        5.    Merkin Opens The Merkin BLMIS Accounts, Hides The BLMIS Relationship From His Investors, All The While Collecting Huge Fees ................................ 11

    C.    Merkin Was Aware Of Facts Suggesting A High Probability Of Fraud ................................ 16

        1.    Merkin Was Aware That Madoff Was Not Conducting The Purported Split-Strike Conversion Strategy ................................ 16

        2.    Merkin Was Aware That BLMIS Was Engaging In A Speculative Options Strategy Inconsistent With The Madoff SSC Strategy ................................ 19

        3.    Merkin Was Aware That The Options Volume Traded In The Merkin BLMIS Accounts Exceeded The Total Market Volume ................................ 20

        4.    Merkin Was Aware Of Significant Numbers Of Out-Of-Range Transactions In The Merkin BLMIS Accounts ............... 21

        5.    Merkin Was Aware Of Additional Red Flags Relating To BLMIS's Operations ................................ 22

            (a)    Merkin Was Aware That BLMIS Did Not Use A Well-Known And Established Auditor ................................ 22

# TABLE OF CONTENTS
## (continued)

**Page**

(b)    Merkin Was Aware Of BLMIS's Unusual Fee Structure ........................................................................ 23

(c)    Merkin Was Aware That BLMIS Self-Cleared Its Trades .............................................................................. 24

6.    Merkin Discussed Red Flags With Third Parties ......................... 25

D.    Merkin Intentionally Refused To Learn More About The Facts That Suggested A High Probability Of Fraud ........................................ 27

1.    Consistency of Returns ................................................................ 28

2.    Scalability Of The Madoff SSC Strategy .................................... 29

3.    Out-Of-Range Options And Options Volumes ............................ 31

4.    Bayou Fraud Concerns ................................................................ 32

E.    Merkin's Purported "Diligence" Is A Mere Cover For His Avoidance Of Facts Suggesting Fraud At BLMIS ................................. 33

F.    Merkin's Personal Losses Are Unsubstantiated ..................................... 38

ARGUMENT ....................................................................................................................... 38

I.    LEGAL STANDARDS .......................................................................... 38

A.    Summary Judgment Standard .................................................................. 38

B.    Standards Of Good Faith Under Section 548(c) And Willful Blindness ................................................................................................. 41

II.    SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE STATE OF MIND IS THE CENTRAL ISSUE FOR LIABILITY IN THIS CASE ............. 42

III.    DEFENDANTS CANNOT ESTABLISH THROUGH UNDISPUTED FACTS THAT DEFENDANTS RECEIVED THE TRANSFERS IN GOOD FAITH ......................................................................................... 45

A.    Defendants Were Aware Of Facts Suggesting A High Probability Of Fraud ................................................................................................. 46

1.    Defendants Were Aware Of Numerous Red Flags Suggesting Fraud At BLMIS ...................................................... 46

## TABLE OF CONTENTS
### (continued)

**Page**

    2.    Defendants' Own Statements And Communications Demonstrate An Awareness Of Facts Indicating A High Probability Of Fraud At BLMIS .................................................. 50

  B.    Defendants Took Deliberate Steps To Avoid Learning The Truth About Fraud At BLMIS ........................................................................... 51

    1.    Defendants Purposely Chose Not To Conduct Any Meaningful Due Diligence On BLMIS Even Though They Were Under A Duty To Do So .................................................. 52

    2.    Merkin Had Compelling Motives To Avoid The Fraud .............. 54

    3.    Defendants Ask The Court To Infer Mere Negligence, Which Is Improper At Summary Judgment And Implausible In Any Event ............................................................ 56

  C.    Defendants Fail To Establish Their Good Faith As A Matter Of Law But At Best Identify Factual Disputes For The Jury ....................... 56

IV.    MERKIN'S KNOWLEDGE AND CONDUCT SHOULD BE IMPUTED TO ASCOT FUND ............................................................................................ 58

V.    THE SUBSEQUENT TRANSFER COUNT IS NEITHER RIPE NOR APPROPRIATE FOR SUMMARY JUDGMENT............................................. 60

VI.    DEFENDANTS ARE NOT ENTITLED TO A SETOFF UNDER SECTION 502................................................................................................... 62

VII.    ASCOT PARTNERS' CLAIM SHOULD BE EQUITABLY SUBORDINATED ........................................................................................... 65

CONCLUSION.................................................................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*),
 169 B.R. 832 (Bankr. S.D.N.Y. 1994) ............................................................................66, 67

*Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns
 Corp.*),
 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ....................................................................................68

*Air Line Pilots Ass'n v. Am. Nat'l Bank & Trust Co. of Chicago* (*In re Ionosphere
 Clubs, Inc.*),
 156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .......................................68

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ..........................................................................................................39, 50

*Anwar v. Fairfield Greenwich Ltd.*,
 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ....................................................................................49

*Arista Records LLC v. Lime Group LLC*,
 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ....................................................................................40

*AUSA Life Ins. Co. v. Dwyer* (*In re JWP Inc. Secs. Litig.*),
 928 F. Supp. 1239 (S.D.N.Y. 1996) .......................................................................................57

*Austin v. Chisick* (*In re First Alliance Mortg. Co.*),
 298 B.R. 652 (C.D. Cal. 2003) ..............................................................................................66

*Bear, Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*),
 397 B.R. 1 (S.D.N.Y. Dec. 17, 2007) .....................................................................................40

*Benjamin v. Diamond* (*In re Mobile Steel Co.*),
 563 F.2d 692 (5th Cir. 1977) ............................................................................................65, 66

*Benjamin v. Kim*,
 No. 95-cv-9597, 1999 WL 249706 (S.D.N.Y. Apr. 28, 1999) ...............................................57

*Calpine Corp. v. Rosetta Resources, Inc.* (*In re Calpine Corp.*),
 377 B.R. 808 (Bankr. S.D.N.Y. 2007) ...............................................................................64, 65

*Carlton v. Mystic Transp., Inc.*,
 202 F.3d 129 (2d Cir. 2000) ...................................................................................................43

*In re Celestica Inc. Sec. Litig.*,
 No. 07-cv-0312, 2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014) .............................................50

*Celotex Corp. v. Catrett, Administratrix of the Estate of Catrett*,
 477 U.S. 317 (1986) ...............................................................................................................38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Group, LLC*),
439 B.R. 284 (S.D.N.Y. 2010) ................................................................................................ 40

*Civil Serv. Emp. Ass'n, Inc. v. N.Y. State Dep't of Parks, Recreation and Historic Pres.*,
689 F. Supp. 2d 267 (N.D.N.Y. 2010) .................................................................................... 59

*CNB Int'l., Inc. v. Kelleher* (*In re CNB Intern., Inc.*),
393 B.R. 306 (Bankr. W.D.N.Y. 2008) .................................................................................. 63

*Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
942 F. Supp. 735 (D. P.R. 1996) ............................................................................................ 53

*Delphi Corp. v. Appaloosa Mgmt. L.P.* (*In re Delphi Corp.*),
No. 05-44481, 2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 11, 2008) .................................... 66

*Dlugash v. SEC*,
373 F.2d 107 (2d Cir. 1967) ................................................................................................... 53

*Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*,
691 F.3d 134 (2d Cir. 2012) ................................................................................................... 39

*Eldesouky v. Aziz*,
No. 11-cv-6986, 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) ............................................ 43

*EMI Catalogue P'ship v. Hill*,
228 F.3d 56 (2d Cir. 2000) ..................................................................................................... 43

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
391 U.S. 253 (1968) ................................................................................................................ 39

*In re Fischbach Cor. Secs. Litig.*,
No. 89-cv-5826, 1992 WL 8715 (S.D.N.Y. Jan. 15, 1992) ............................................. 54, 56

*Fischl v. Armitage*,
128 F.3d 50 (2d Cir. 1997) ..................................................................................................... 39

*Fisher v. Sellis* (*In re Lake States Commodities, Inc.*),
253 B.R. 866 (Bankr. N.D. Ill. 2000) .................................................................................... 40

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) ................................................................................................ 48

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*General Builders Supply Co. v. River Hill Coal Venture*,
   796 F.2d 8 (1st Cir. 1986)............................................................................53

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011).............................................................................41

*Gowan v. Amaranth Advisers L.L.C.* (*In re Dreier LLP*),
   No. 10-03493, 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ............................61

*Gowan v. HSBC Mortg. Corp.* (*USA*) (*In re Dreier LLP*),
   No. 08-15051, 2012 WL 4867376 (Bankr. S.D.N.Y. Oct. 12, 2012)......................64

*Gowan v. Patriot Grp., LLC* (*In re Dreier LLP*),
   452 B.R. 391 (Bankr. S.D.N.Y. 2011)...............................................................45

*Gowan v. Westford Asset Mgm't LLC* (*In re Dreier LLP*),
   462 B.R. 474 (S.D.N.Y. 2011)...........................................................42, 49, 53, 55

*Gummo v. Village of Depew, N.Y.*,
   75 F.3d 98 (2d Cir. 1996) ...............................................................................39

*Hayes v. New York City Dep't of Corrections*,
   84 F.3d 614 (2d Cir. 1996).............................................................................39

*Hirsch v. Pa. Textile Corp. Inc.* (*In re Centennial Textiles, Inc.*),
   227 B.R. 606 (Bankr. S.D.N.Y. 1998).............................................................67

*Hollin v. Scholastic Corp.* (*In re Scholastic Corp. Secs. Litig.*),
   252 F.3d 63 (2d Cir. 2001), *cert. denied*, 534 U.S. 1071 (2001)............................54

*IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*),
   408 F.3d 689 (11th Cir. 2005) ........................................................................63

*Kalisch v. Maple Trade Fin. Corp.* (*In re Kalisch*),
   413 B.R. 115 (Bankr. S.D.N.Y. 2008)...............................................................66

*Kipperman v. Circle Trust F.B.O., Michele Montano* (*In re Grafton Partners*),
   321 B.R. 527 (B.A.P. 9th Cir. 2005)................................................................40

*Knight v. U.S. Fire Ins. Co.*,
   804 F.2d 9 (2d Cir. 1986) ...............................................................................39

*Krishna v. Colgate Palmolive Co.*,
   7 F.3d 11 (2d Cir. 1993)................................................................................43

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Krys v. Aaron* (*In re Refco Inc. Secs. Litig.*),
    826 F. Supp. 2d 478 (S.D.N.Y. 2011) ....................................................................54

*Lang v. Ret. Living Publ'g Co.*,
    949 F.2d 576 (2d Cir. 1991) ................................................................................43

*Magique v. Chippendales, Inc.*,
    628 F. Supp. 106 (S.D.N.Y. 1986) ........................................................................50

*Merrill v. Abbott* (*In re Indep. Clearing House Co.*),
    77 B.R. 843 (D. Utah 1987) ................................................................................40

*In re Mid-Am. Waste Sys., Inc.*,
    274 B.R. 111 (Bankr. D. Del. 2001) ....................................................................68

*Mishkin v. Siclari* (*In re Adler, Coleman Clearing Corp.*
    277 B.R. 520 (S.D.N.Y. 2002) ............................................................................66

*Murray Hill Manor Co. v. Destination Paradise, Inc.*,
    266 A.D.2d 132, 698 N.Y.S.2d 482 (1st Dep't 1999) ............................................59

*Official Comm. Of Unsecured Creditors v. Blomen* (*In re Hydrogen, LLC*),
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..................................................................65

*Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In
    re Verestar, Inc.*),
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ..................................................................66

*In re Optimal US Litig.*,
    No. 10-cv-4095, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ........................48, 49

*Picard v. Ceretti* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ............41, 42, 67

*Picard v. Charles Ellerin Irrevocable Trust* (*In re Bernard L. Madoff Inv. Secs.
    LLC*),
    No. 10-04398, 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012) ........................60

*Picard v. Cohmad Secs. Corp.* (*In re Bernard L. Madoff Inv. Secs. LLC*),
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..................................................................60

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012) ............................................................................41

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Picard v. Katz,*
    462 B.R. 447 (S.D.N.Y. 2011)...................................................................41, 60, 66

*Picard v. Katz,*
    466 B.R. 208 (S.D.N.Y. 2012)................................................................................45

*Picard v. Katz,*
    No. 11-3605 (JSR), 2012 WL 691551 (S.D.N.Y. Mar. 5, 2012)............................45

*Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    440 B.R. 243 (Bankr. S.D.N.Y. 2010)..................................................................62

*Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)........................................................ *passim*

*Poller v. Columbia,*
    368 U.S. 464 (1962).............................................................................................54

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414 (1968).............................................................................................68

*R.G. Gr'p, Inc. v. Horn & Hardart Co.,*
    751 F.2d 69 (2d Cir. 1984)..................................................................................39

*Reeves v. Sanderson Plumbing Prods.,*
    530 U.S. 133 (2000).............................................................................................44

*Reznor v. J. Artist Mgm't, Inc.,*
    365 F. Supp. 2d 565 (S.D.N.Y. 2005)..................................................................59

*Sartor v. Arkansas Natural Gas Corp.,*
    321 U.S. 620 (1944).............................................................................................44

*Savino v. Town of Southeast,*
    983 F. Supp. 2d 293 (S.D.N.Y. 2013)..................................................................43

*Sec. Inv'r Prot. Corp. v. BLMIS,*
    513 B.R. 437 (Bankr. S.D.N.Y. June 30, 2014) .......................................62, 63, 64

*Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    499 B.R. 416 (S.D.N.Y. 2013)............................................................................64

*Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    501 B.R. 26 (S.D.N.Y. 2013)..............................................................................63

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    516 B.R. 18 (S.D.N.Y. 2014) ........................................................................41, 60

*Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*),
    654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) ...................4, 6

*Sec. Inv'r Prot. Corp. v. BLMIS*,
    No. 12 Misc. 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...........................41, 48

*Sec. Inv'r Prot. Corp. v. Rossi* (*In re Cambridge Capital, LLC*),
    331 B.R. 47 (Bankr. E.D.N.Y. 2005) ...................................................................40

*SEC v. Cohmad Secs. Corp.*,
    No. 09-cv-5680, 2010 WL 363844 (S.D.N.Y. Feb. 2, 2010) ......................................48

*SEC v. Cole*,
    No. 12-cv-8167, 2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ..................................54

*SEC v. Cooper*,
    402 F. Supp. 516 (S.D.N.Y. 1975) .................................................................48, 56

*SEC v. Kelly*,
    765 F. Supp. 2d 301 (S.D.N.Y. 2011) ................................................................43

*SEC v. Old Naples Secs., Inc.* (*In re Old Naples Secs., Inc.*),
    No. 96-896, 2005 WL 419718 (Bankr. M.D. Fla. Jan 5, 2005) ...................................44, 57

*Sullivan v. Messer* (*In re Corcoran*),
    246 B.R. 152 (E.D.N.Y. 2000) .......................................................................40

*United States v. Natelli*,
    527 F.2d 311 (2d Cir. 1975) .........................................................................53

*United States v. Samaria*,
    239 F.3d 228 (2d Cir. 2001) .........................................................................42

*United States v. Tusaneza*,
    116 Fed. App'x 305 (2d Cir. 2004), *cert. denied*, 546 U.S. 874 (2005) .........................46

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
    588 F.3d 805 (2d Cir. 2009) .......................................................................38, 39

*Wechsler v. Steinberg*,
    733 F.2d 1054 (2d Cir. 1984) ........................................................................54

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Williams v. City of White Plains,*
  718 F. Supp. 2d 374 (S.D.N.Y. June 16, 2010) .......................................................44

*Woods & Erickson, LLP v. Leonard (In re AVI, Inc.),*
  389 B.R. 721 (B.A.P. 9th Cir. 2008) ........................................................................63


**Statutes**

11 U.S.C. § 502(d) ...................................................................................................62, 63

11 U.S.C. § 502(h) ................................................................................................. *passim*

11 U.S.C. § 510(c) .........................................................................................................65

15 U.S.C. § 78aaa *et seq.* ...............................................................................................1

15 U.S.C. § 78fff-2(a)(3) ...............................................................................................64

Del. Code Ann. tit. 6 § 15–306(a) ................................................................................62

Del. Code Ann. tit. 6 § 17–403(b) ...............................................................................62


**Rules**

Fed. R. Bankr. P. 7056...................................................................................................38

Fed. R. Civ. P. 56(a) .....................................................................................................38


**Other Authorities**

Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable*
  *Subordination as Applied to Nonmanagement Creditors*, 40 Bus. Law. 417
  (1985) ........................................................................................................................67

4 Collier on Bankruptcy ¶ 502.09[2] (16th ed. 2012) .................................................64

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, and the estate of Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, respectfully submits this Memorandum of

Law in Opposition to the Motions for Summary Judgment filed by Defendants J. Ezra Merkin

("Merkin") and Gabriel Capital Corporation ("GCC," collectively, the "Merkin Defendants"),

and by Ascot Partners L.P., ("Ascot Partners") and Ascot Fund Ltd. ("Ascot Fund," collectively,

the "Ascot Defendants" and together with the Merkin Defendants, "Defendants").

## PRELIMINARY STATEMENT

The overarching issue in this case is Merkin's state of mind—whether he was willfully

blind to facts suggesting a high probability of fraud at BLMIS. Defendants have chosen to

burden this Court with motions that reveal numerous issues of fact and credibility. As this Court

has previously cautioned, state of mind and credibility are classic issues of fact that are

inappropriate for resolution by summary judgment. Summary judgment would be appropriate,

therefore, only if the Trustee had offered no evidence to support the specific allegations in the

operative pleading or if all of the Trustee's evidence somehow had been conclusively disproved.

Defendants have made no such showing.

The overwhelming evidence, not addressed by Defendants, shows that Merkin

subjectively knew and understood various red flags suggesting fraud at BLMIS. And it shows

that Merkin demonstrated his awareness of the red flags by trying unsuccessfully to explain away

trading impossibilities, consistent returns year after year and particularly during periods of

significant market downturns, and other glaring indicia of fraud at BLMIS in his conversations

with third parties. Tellingly, what is missing is any evidence that Merkin conducted any

"diligence" consistent with industry custom or practice, followed up on a single warning that was

expressed to him, or attempted to verify the information from BLMIS with any independent sources.

Defendants principally rely upon Merkin's denial that he was not willfully blind. Not only is this testimony unsupported or contradicted by the evidence, it merely confirms that disputed material facts regarding Merkin's state of mind exist and can only be resolved by the factfinder. To deflect from the numerous fact and credibility issues, Defendants resort to challenging the facial sufficiency of the Trustee's pleading and raising a litany of red herrings about what the Trustee did not plead. For example, Defendants argue that summary judgment must be granted because the Trustee has not alleged that Merkin received payments from BLMIS or that he backdated trades in the Merkin Funds' accounts (defined below). But this Court already has determined that the Trustee's pleading sufficiently alleges that Merkin was willfully blind to the fraud at BLMIS. And on those well-pleaded allegations, the Trustee has adduced more than sufficient evidence of Merkin's willful blindness to sustain his avoidance and recovery claims.

The other arguments that Defendants rehash on summary judgment have already been rejected by this Court as insufficient as a matter of law. For example, Defendants argue that the "red flags" the Trustee alleges were publicly known, not unique to Madoff, and do not show a high probability of fraud. But this Court already has considered and rejected that argument, finding that the complaint alleges that Merkin "saw them, understood them, and purposely ignored them." *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*), 515 B.R. 117, 144 (Bankr. S.D.N.Y. 2014) ("*Merkin*"). Similarly, Defendants repeat their argument that Merkin's purported personal exposure of $110 million to BLMIS refutes the notion that he was willfully blind, even though this Court already noted that Merkin's "substantial fees can explain why they

would turn a blind eye to a fraud." *Id.* at 143. The parties have adduced significant conflicting evidence on all of the allegations addressed in this Court's prior decision. Where the parties advance conflicting evidence on sustained allegations, such evidence should not be summarily dismissed on summary judgment but resolved by a factfinder.

For the same reasons that a factfinder must determine the willful blindness issues, a factfinder must determine the Trustee's equitable subordination claim. Decisions of the District Court and this Court state that a claim may be subordinated in this liquidation proceeding upon a showing of the very same conduct required to sustain the Trustee's avoidance claims—willful blindness to facts suggesting a high probability of fraud. Thus, the same credibility and state of mind arguments that require denial of summary judgment on the avoidance claims also require denial of summary judgment on the equitable subordination claim.

Defendants' remaining arguments are meritless. Defendants have repeatedly argued to this Court that they can "setoff" the Trustee's avoidance claims against a potential net equity claim and a claim under section 502(h) of the Bankruptcy Code, meaning that they would not actually have to pay any money to the Trustee out of their own pockets to satisfy the judgment. But that is not how the Bankruptcy Code works. As this Court has already explained to Defendants, there is no setoff under section 502(d). If the Trustee obtains a judgment of avoidance against Ascot Partners, he is legally entitled to disallow Ascot Partners' net equity claim under section 502(d) until the judgment amount is repaid *in full* to the estate. The Trustee may seek payment of this judgment amount from Ascot Partners, Merkin as its general partner, or a portion of this amount from any of the subsequent transferees—simultaneously. And quite simply, until all outstanding amounts are repaid to the estate, there is no net equity claim to be had. Finally, any right to a section 502(h) claim and the estate against which it would be

asserted—the customer property estate or the general estate—has yet to be resolved by this Court.

Defendants have failed to discharge their burden on summary judgment.  As the Trustee has set forth ample evidence to support his allegations, he is entitled to a trial and a determination of Merkin's credibility and his state of mind.  Accordingly, Defendants' motions should be denied.

## **PROCEDURAL HISTORY**

The procedural history of this SIPA proceeding and facts surrounding Bernard L. Madoff's Ponzi scheme are well-known to this Court and have been recounted in numerous decisions.  *Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*), 654 F.3d 229, 231-33 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) ("*Net Equity Decision*").

The Trustee commenced this action on May 7, 2009 against defendants Merkin, GCC, Ascot Partners, Ariel Fund Limited ("Ariel"), and Gabriel Capital, L.P. ("Gabriel," and collectively with Ascot Defendants and Ariel, the "Merkin Funds"), for avoidance and recovery of preferential and fraudulent transfers relating to their BLMIS accounts under the Bankruptcy Code and SIPA.  Compl., ECF No. 1.  The Trustee amended his pleading several times, including adding Ascot Fund as a defendant.  Third Amend. Compl., ECF No. 151.  The operative pleading, the Third Amended Complaint ("TAC"), was filed on August 30, 2013.  *See id.*  Motions to dismiss the TAC were filed by Defendants in Fall 2013.  Defs. Mot. Dismiss, ECF Nos. 165-69; Ascot Fund Mot. Dismiss, ECF Nos. 182-84.

On August 12, 2014, the Court entered a decision finding that although the Trustee did not sufficiently plead "actual knowledge," he did meet the pleading standard for "willful blindness."  *Merkin*, 515 B.R. at 141, 146.  Accordingly, the Court denied the motions to dismiss

4

the Trustee's actual fraudulent transfer claims brought under section 548(a)(1)(A), recovery claims under section 550 for initial and subsequent transfers, general partner liability claims, and equitable subordination. *See id.* at 141-46, 149, 152-53, 161. This Court granted the motions as to the Trustee's claims under section 548(a)(1)(B), section 544(b)(1), and the New York Debtor & Creditor Law, as well as the claims disallowance counts. *See id.* at 141, 156-57.

On June 23, 2015, this Court entered an order approving the settlement between the Trustee and Ariel, Gabriel, and their Receiver. Order Approving Settlement Agreement, ECF No. 270. Those parties were dismissed from this proceeding on September 9, 2015. Stip. Dismissal and Consent Order, ECF No. 282.

The remaining defendants in this action are Merkin, GCC, Ascot Partners and Ascot Fund. Third Amend. Compl., ECF No. 151. The Trustee seeks to avoid and recover $280,000,000 in initial transfers to Ascot Partners in the two years preceding December 11, 2008 (the "Filing Date") under section 548(a)(1)(A). *See id.* ¶¶ 333-37. As the general partner of Ascot Partners, Merkin is jointly and severally liable for the debts of Ascot Partners. *See id.* ¶¶ 385-86, 388. The Trustee also seeks the recovery of any subsequent transfers up to $280,000,000.[1] *See id.* ¶¶ 379-83. Finally, the Trustee seeks, in the alternative, equitable subordination of Ascot Partners' SIPA claim under section 510(c). *See id.* ¶¶ 402-08.

On October 6, 2015, Defendants moved for summary judgment. Defs. Mot. Summ. J., ECF Nos. 283-87. This opposition follows.

---

[1] Because the Trustee recovered the full amounts of the initial transfers to Ariel and Gabriel as part of the settlement with those parties, he is not seeking subsequent transfers relating to those funds. *See* Order Approving Settlement Agreement, ECF No. 270; Mot. Entry of Order Approving Settlement Agreement, ECF No. 266, Exhibit A.

## STATEMENT OF FACTS

### A.    Madoff's Ponzi Scheme

On March 12, 2009, Madoff pleaded guilty to operating BLMIS's investment advisory

business as a Ponzi scheme.  (Trustee's Resp. Def.'s Joint Statement of Material Facts ("SOF

Response"), ¶¶ 1, 20, 21, and 38).  Rather than investing customers' funds and purchasing

securities, Madoff generated fictitious account statements and paper trading confirmations.  *Net

Equity Decision*, 654 F.3d at 231.  The accounts statements and confirmations did not reflect any

actual holdings or securities trading by Madoff, nor did BLMIS ever engage in a split-strike

conversion strategy.  *See id.* at 232; (SOF Response, ¶ 26).

### B.    Merkin, His Investments In BLMIS, And His Funds

#### 1.    Merkin Is A Sophisticated Investor

Merkin has impeccable credentials, having graduated from Columbia College and

Harvard Law School and then beginning his career as an associate with the law firm of Milbank,

Tweed, Hadley & McCloy.  (Trustee's Statement of Additional Material Facts Pursuant to L.

Bankr. R. 7056-1 ("Tr. SOF"), ¶¶ 1, 2).  He entered the investment management industry in

1982, starting at a money management firm called Halcyon Investments and then moving to

Gotham Capital L.P. in 1985, where he served as the Managing Partner.  (Tr. SOF, ¶ 3).

Following his tenure at Gotham Capital L.P., Merkin went into the hedge fund business for

himself, creating a group of investment funds that invested wholly or partially with BLMIS.  (Tr.

SOF, ¶¶ 21-24, 28, 36, 42; SOF Response, ¶¶ 48, 55).

In addition to running his own hedge funds, Merkin served in other prominent corporate

capacities, including as the chairman of the board of General Motors Acceptance Corporation

from 2006 to 2009.  (Tr. SOF, ¶ 4).  Merkin variously served on the investment committees, as

chairman or member, or on the board of directors, of at least six major New York educational

and cultural institutions, including Yeshiva University and Carnegie Hall.  (Tr. SOF, ¶¶ 5-8).

### 2.    Merkin Creates GCC And The Merkin Funds

Beginning in the late 1980s, Merkin formed GCC (f/k/a Ariel Management Corporation),

an investment advisor and investment management company.  (Tr. SOF, ¶ 18).  He was GCC's

sole shareholder, sole director, and sole decision-maker.  (Tr. SOF, ¶¶ 18-19).

Merkin then formed the following entities, for which he and GCC provided investment

advisory and administrative services:

| Entity | Year Formed | Merkin Defendants' Roles |
|--------|-------------|--------------------------|
| Ariel | 1988 | GCC – Investment Advisor. |
| Ariel Capital, L.P./Gabriel[2] | 1989 | Merkin – General Partner. |
| Ascot Partners | 1992 | GCC – Management and administrative services.<br><br>Merkin – General Partner. |
| Ascot Fund | 1992 | GCC and Merkin – Investment Advisor by written agreement from 1992-2002; continued to provide investment advisory and administrative services after 2002-2008. |

(Tr. SOF, ¶¶ 21, 22, 23, 43, 203, 208; SOF Response, ¶¶ 42, 43, 46, 47, 48).

Merkin, either as general partner, individually, or through GCC, had ultimate

responsibility for the management, operations and investment decisions for the Merkin Funds

through December 2008.  (Tr. SOF, ¶¶ 23, 43, 208).

Merkin managed Ascot Fund *pari passu* with Ascot Partners.  (SOF Response, ¶ 46).

Although Ascot Fund became a limited partner in Ascot Partners in 2003 through a master-

feeder relationship, terminating its formal investment advisor agreement with GCC, Merkin and

---

[2] Gabriel was originally known as Ariel Capital, L.P.  (Tr. SOF, ¶ 22).

GCC continued to provide the same services to Ascot Fund after 2003.  (SOF Response, ¶ 46;

Tr. SOF, ¶¶ 203, 208).  Ascot Funds' directors, Donald Seymour and Aldo Ghisletta, testified

that the investment manager—Merkin—maintained sole authority over Ascot Fund, and they had

no role in the investment decisions or overall strategy of the Ascot Fund, which could not be

changed without Merkin's approval.  (Tr. SOF, ¶¶ 204, 209, 210, 212).  Indeed, Merkin

continued meeting with investors on behalf of Ascot Fund after January 2003.  (Tr. SOF, ¶ 203).

And, Ascot Fund's January 2003 prospectus continued to represent "[t]he success of the Master

Fund depend[ed] primarily upon the Managing Partner of the Master Fund [J. Ezra Merkin]."

(Tr. SOF, ¶ 203).

### 3.    Defendants' Due Diligence Duties

As far back as 1997, custom and practice of the investment management industry

provided that fund managers and hedge funds typically performed due diligence on investments.

(SOF Response, ¶ 129; Tr. SOF, ¶ 54).  Recognized custom and practice includes conducting due

diligence prior to making any investment and then evaluating and monitoring the investment on

an ongoing basis.  (Tr. SOF, ¶¶ 52, 54).  The due diligence process (both before and after an

investment is made) is designed to identify red flags as early as possible.  (Tr. SOF, ¶¶ 52-53).

Initial due diligence requires investigation of the potential investments in order to assess

the attractiveness of an opportunity, the quality of the management team, and the key risks

associated with the opportunity.  (Tr. SOF, ¶¶ 52, 53, 55).  Thus, initial due diligence includes

interviews with the staff of the investment advisor, review of historical monthly returns of the

fund, an analysis of the strategy, and any other information that can be collected prior to

investing.  (Tr. SOF, ¶ 56).

Once an investment is made, ongoing due diligence is necessary to evaluate whether the

performance of the investment is consistent with the stated strategy and investment advisor's

representations. (Tr. SOF, ¶ 57). Such due diligence independently verifies what an investment advisor has told a fund manager. (Tr. SOF, ¶ 57). Ongoing due diligence confirms the legitimacy of an investment and eliminates fraud concerns. (Tr. SOF, ¶ 63). This due diligence may include conducting both qualitative and quantitative analyses, including analyses with trade level data whenever available, particularly when red flags or other concerns arise about the legitimacy of the investment. (Tr. SOF, ¶ 63; SOF Response, ¶¶ 109, 132).

When initial or ongoing/monitoring due diligence reveals a red flag where the only reasonable explanation is fraud, a fund manager typically stops the due diligence process and either does not invest or redeems the fund's investment. (Tr. SOF, ¶ 58). If due diligence uncovers a red flag that is an indicia of fraud or creates an opportunity for fraud, it is industry custom and practice for a fund manager to perform additional due diligence. (Tr. SOF, ¶ 59; SOF Response, ¶ 129). This is particularly true when red flags are uncovered that indicate the advisor is not executing the stated strategy, is operating inconsistently with the stated strategy, or when the returns differ from expectations based on the strategy. (Tr. SOF, ¶ 60).

### 4. Merkin Begins Investing With BLMIS But Does No Initial Due Diligence

Merkin claims that he conducted initial due diligence on BLMIS in accordance with his duties as a fund manager. But the evidence adduced by the parties contradicts Merkin's testimony regarding his due diligence efforts.

Prior to his first investment with BLMIS on behalf of Gabriel and Ariel in October 1990, Merkin claims to have personally invested with BLMIS through a managed investment vehicle known as 61M, which had a direct BLMIS account and was run by Leon Meyers ("Meyers"). (Tr. SOF, ¶ 10). Merkin stated that this personal investment "preceded any investments on the

part of the funds, and was sort of the initial due diligence process."  (Tr. SOF, ¶¶ 9, 11; SOF

Response, ¶¶ 93, 94).

Other than Merkin's testimony, however, there is no evidence that he invested in 61M

prior to October 1, 1990 when he made his first investment in BLMIS on behalf of Ariel and

Gabriel.  (Tr. SOF, ¶¶ 12-17).  The only document produced by Merkin related to 61M reflects

returns for the period from January 1, 1992 through December 31, 1992, well after Gabriel's and

Ariel's initial investments in October 1990.  (Tr. SOF, ¶ 16).  Merkin cannot even recall if he

met Madoff before or after he began his investment with 61M.  (SOF Response, ¶ 90).

Merkin further claims that, as part of his initial due diligence, he reviewed a particular

document regarding BLMIS's investment performance that was provided to him by Meyers.  (Tr.

SOF, ¶ 14).  Although there is a document in his files identifying "BEMIS" [sic] performance

data, this document sets forth data compiled from 1980 through 1991, and therefore could only

have been prepared after 1991.  (Tr. SOF, ¶ 15).  As such, there are no documents regarding

BLMIS's purported investment performance in Merkin's "Madoff file" that could predate

Merkin's investments in BLMIS in October 1990 on behalf of Ariel and Gabriel.  (Tr. SOF, ¶

15).

Merkin also claims that he spoke to numerous individuals as part of his due diligence,

including Meyers, Sandra Manzke, David Gottesman, Gedale Horowitz ("Horowitz"), Daniel

Hoffert and customers of BLMIS's market-making operations, prior to investing with Madoff.

(SOF Response, ¶¶ 85, 86).  But again, there is no evidence to support Merkin's claims.  And

when pressed about what information he obtained from these conversations, Merkin could not

recall whether the individuals he spoke with conducted due diligence or ever discussed due

diligence with Merkin.  (Tr. SOF, ¶ 12; SOF Response, ¶¶ 85-87).  Likewise, there is no

10

documentary support that Merkin met with Madoff to discuss Madoff's trading strategies prior to investing.  (SOF Response, ¶ 90).

>    **5.    Merkin Opens The Merkin BLMIS Accounts, Hides The BLMIS Relationship From His Investors, All The While Collecting Huge Fees**

Despite having done no initial due diligence, Merkin began investing the Merkin Funds' money with BLMIS in 1990.  Over the years, he opened the following accounts on behalf of his funds:

| BLMIS Account Number[3] | Entity | Month / Year Opened |
|---|---|---|
| 1FN004 | Ariel | October 1990 |
| 1A0042 | Ariel Capital, L.P. | October 1990 |
| 1FN005 | Ascot Fund | January 1992 |
| 1A0058 | Ascot Partners | January 1993 |
| 1FR070 | Ariel | August 2000 |
| 1G0321 | Gabriel | August 2000 |

(Tr. SOF, ¶¶ 24, 28, 34, 35, 36, 42).

Merkin understood that part of his role in running the Merkin Funds was "to explain what the strategy is about and what we're doing" to his investors.  (Tr. SOF, ¶ 150).  Instead, Merkin misrepresented, obfuscated or omitted the relationship between the funds and BLMIS in his communications with his investors.

Merkin represented to some of his investors that he—not Madoff—actively managed the Merkin Funds' investments.  The offering documents for Ascot Partners and Ascot Fund represented that Merkin ran the strategy of the funds on a day-to-day and transaction-by-transaction basis.  (Tr. SOF, ¶ 153).  Merkin further represented to his investors that Ascot's

---

[3] Gabriel's, Ariel's, Ascot Partner's, and Ascot Fund's BLMIS accounts are collectively referred to herein as the "Merkin BLMIS Accounts."

success depended on his skill as a money manager.  (Tr. SOF, ¶ 154).  In reality, however, Madoff managed substantially all of the assets of the Ascot Defendants.  (SOF Response, ¶ 54).

Merkin did not disclose that BLMIS had any association with the Merkin Funds to certain investors for many years, if ever.  Neither Ariel's nor Gabriel's offering memoranda ever mentioned BLMIS or Madoff at any point in time.  (Tr. SOF, ¶ 151).  The offering memoranda for Ascot Partners and Ascot Fund did not mention BLMIS at all until 2006 when it was disclosed as a "prime broker" or "custodian," even though BLMIS's role was not limited to prime brokerage or custodian services, as Merkin himself conceded.  (SOF Response, ¶ 54). Additionally, none of the Merkin Funds' other communications with investors ever mentioned BLMIS.  (Tr. SOF, ¶ 152).

Merkin's guileful portrayal of BLMIS's role extended beyond the misrepresentations and omissions in the Merkin Funds' offering documents.  Merkin actively led certain investors to believe that BLMIS was nothing more than the executing broker for Ascot Partners and Ascot Fund.  (Tr. SOF, ¶ 165; SOF Response, ¶¶ 138, 144, 151, 152).  Merkin told Christof Reichmuth ("Reichmuth") and Patrick Erne ("Erne"), two Merkin Fund investors, that BLMIS acted solely as Ascot Fund's executing broker.  (SOF Response, ¶¶ 138, 144, 151, 152).  Similarly, Merkin told Morris Smith ("Smith"), a portfolio manager for the Magellan Fund at Fidelity Investments, that Merkin was the decision-maker for Ascot Partners and that BLMIS acted merely as Ascot Partners' executing broker that carried out the trades for Merkin's strategy.  (Tr. SOF, ¶¶ 160-63, 165).  Merkin also told Smith that Morgan Stanley was Ascot Partners' custodian, omitting BLMIS.  (Tr. SOF, ¶ 164).  These statements by Merkin were lies because virtually all of Ascot Partners' assets were invested with and custodied by BLMIS.  (Tr. SOF, ¶ 50).

Although to certain investors he distanced the Merkin Funds from BLMIS, Merkin led other investors to believe that he was actively involved with Madoff.  For example, during a November 2005 meeting between Merkin, Jason Orchard ("Orchard") of Spring Mountain Capital, and representatives of Aozora Bank, Merkin made several misrepresentations regarding the Ascot Defendants' investment strategy.  (Tr. SOF, ¶¶ 183-85, 187).  Merkin described four types of "trading strategies that Merkin and Madoff would employ to take advantage of arbitrage opportunities in the marketplace."  (Tr. SOF, ¶¶ 183-84).  Of these four strategies, two were strategies never employed by BLMIS, one was a strategy not employed by BLMIS since the early 1990s, and the remaining strategy was the split-strike conversion strategy that BLMIS was purportedly utilizing in 2005 when this conversation took place.  (Tr. SOF, ¶¶ 183-84; SOF Response, ¶¶ 26-27).

In order to maintain the façade that Merkin was actively involved in the trading strategy of the Merkin Funds, Merkin simply made stuff up.  When explaining the execution of the trades in Ascot Partners' BLMIS account, Merkin told Orchard that Ascot's positions were typically held for three to six months and that Ascot Partners' trades would sometimes be outside the S&P 100.  (Tr. SOF, ¶ 185).  Merkin also told Orchard that "when the funds were not invested, they were in cash at Morgan Stanley and the cash would be held there."  (Tr. SOF, ¶ 185).  Merkin explained that Ascot Partners' utilized a "12-minute rule" where Merkin and Madoff had to put on the trades within twelve minutes.  (Tr. SOF, ¶ 185).  None of this was true, or even consistent with what Madoff purported to do on behalf of the Merkin Funds.

Merkin also claimed that in the past "Ascot [Partners] executed these trades as well as allowed Mr. Madoff to clear some of these trades through his broker-dealer," but that "the execution ability of Madoff, especially in the option market, has proven to have done better than

13

Ascot [Partners'] own execution and therefore, the majority of the trade execution and clearing is

now done at Madoff Securities."  (Tr. SOF, ¶ 186).  But there is no evidence that Ascot Partners

ever executed its own trades.

Significantly, Merkin lied in the face of direct questioning or warnings by investors that

they did not want to be invested with BLMIS.  New York University ("NYU") initially invested

$20 million with Ariel in 1993, an investment they maintained through December 2008.  (Tr.

SOF, ¶ 196).  Tina Surh ("Surh"), a director of investments at NYU at the time, testified that

Merkin suggested that NYU consider investing with BLMIS, but acknowledged that the fact that

BLMIS self-cleared was a "significant negative."  (Tr. SOF, ¶¶ 197, 198; SOF Response, ¶ 173).

Surh informed Merkin that the lack of a third-party administrator "would be a non-starter" and

would make an opportunity to invest with BLMIS "unpalatable" for NYU.  (SOF Response, ¶

173).  Merkin never disclosed to NYU that it was in fact already invested with BLMIS through

its investment with Ariel.  (SOF Response, ¶ 157).  Following the collapse of BLMIS, Surh

received Merkin's investor letter and testified that she was "pretty shocked this fund was in

Ariel's portfolio given how we told him that we could never invest in a fund like that."  (Tr.

SOF, ¶ 199).

Even when Merkin knew that an investor had previously redeemed its investment from

BLMIS, Merkin kept quiet.  Josh Nash ("Nash") is a sophisticated money manager who knew

Merkin both socially and professionally for over twenty years.  (Tr. SOF, ¶ 188).  Nash invested

in Gabriel, both personally and through his family's fund, the Nash Family Partnership.  (Tr.

SOF, ¶ 189).  Merkin was aware that Nash did not want to be invested with BLMIS and that

Nash (through his family) had previously invested directly with and fully redeemed from BLMIS

because of concerns, amongst others, that BLMIS used a small, unknown auditor.  (Tr. SOF, ¶¶

14

190-91, 194).  Merkin, however, never disclosed to Nash that Gabriel was invested with BLMIS.

(Tr. SOF, ¶ 195; SOF Response, ¶ 157 (testifying that he learned of Madoff exposure in Gabriel

for the first time after the fraud was revealed, "I was shocked because I thought I knew Ezra well

and thought I knew what he did and didn't expect to have Madoff in that fund.")).  Again, Nash

only learned that Gabriel was invested with BLMIS after it collapsed.

While lying to investors to keep them invested, Merkin profited handsomely as a result of

the BLMIS investments.  Merkin, individually and through GCC, received or claimed

entitlement to $552,986,312[4] in management and incentive fees charged to the Merkin Funds

from 1990 through 2008.  (Tr. SOF, ¶ 269 n.10).  From 1998 through 2008, GCC's books and

records reflect that Ascot Partners alone paid $146,184,547 in management fees to Merkin.  (Tr.

SOF, ¶ 270).

Merkin, as Gabriel's general partner, was entitled to a management fee of 1% based on

each limited partner's capital account balance and contributed capital and an incentive fee equal

to 20% of Gabriel's net income.  (Tr. SOF, ¶ 267).  Ascot Partners paid Merkin a 1%

management fee, which was increased to 1.5% in 2003.  (Tr. SOF, ¶¶ 265-66).  Merkin, as the

sole shareholder of GCC, was entitled to a management fee of 1% of the net asset value and a

20% incentive fee for any increase to the net asset value per share for Ariel.  (Tr. SOF, ¶ 268).

Ascot Fund also paid GCC a 1% investment advisory fee of the net asset value of Ascot Fund's

shares up until January 2003.  (Tr. SOF, ¶ 264).

---

[4] This number excludes management fees for Ariel and Gabriel from 1994 through 1999 when
those funds had no exposure to BLMIS.  It also does not include fees that GCC received for
administering other BLMIS accounts in the early 1990's.

C.     **Merkin Was Aware Of Facts Suggesting A High Probability Of Fraud**

Merkin claims that he had no way of learning about fraud at BLMIS and that he was not

aware of anything suspicious at BLMIS.  But the evidence shows that over the course of his

eighteen-year relationship with BLMIS and Madoff, Merkin had numerous conversations with

Madoff and third parties concerning the trading impossibilities, and that he was aware of and

understood numerous "red flags" suggesting a high probability of fraud at BLMIS.  In fact, the

evidence shows that Merkin was not only aware of facts suggesting a high probability of fraud at

BLMIS but that he lied to cover up his knowledge of those facts.

### 1.     Merkin Was Aware That Madoff Was Not Conducting The Purported Split-Strike Conversion Strategy

The evidence is commanding that Merkin knew Madoff was not utilizing the split-strike

conversion strategy that he said he was.  Madoff's split-strike conversion strategy initially

consisted of purportedly buying a stock, buying a put option on that stock, and selling a call

option of that stock.  This strategy was reflected on the Merkin Funds' BLMIS customer

statements through 1991.  (SOF Response, ¶ 27).  Beginning in 1991, Madoff began to

purportedly implement a split-strike conversion strategy using a basket of stocks in the S&P 100

Index, selling call options on and buying put options on the S&P 100 Index (the "Madoff SSC

Strategy").  (SOF Response, ¶ 27).  The basket would be "correlated" with the S&P 100 Index

by at least 95%, meaning that the value of his subset of stocks moved in a manner similar to the

S&P 100 Index.  (Tr. SOF, ¶ 68).

Merkin understood the Madoff SSC strategy, including that the strategy purported to use

options to create "fully hedged positions" where it is "long and short the correct amount of

options."  (Tr. SOF, ¶ 103).  Thus, any gains generated by the strategy should not have been as

big as the largest gains in the underlying stock or the S&P 100 Index and any losses should not

have been as big as the largest loss in the underlying stock or the S&P 100 Index. (Tr. SOF, ¶ 72).

The Madoff SSC strategy should have produced returns correlated (*i.e.*, related from a statistical perspective) to the returns of the S&P 100 Index. (Tr. SOF, ¶¶ 71-72). In turn, because the S&P 100 is comprised of the larger, more stable companies included in the S&P 500, the performance of the S&P 100 Index should be highly correlated to the performance of the S&P 500 Index. (Tr. SOF, ¶ 74 n.2).

But as early as February 1996, Merkin was aware that BLMIS's performance was independent of the returns of the S&P 500 Index. (Tr. SOF, ¶ 73). In Merkin's own "Madoff" file, he had a document that plotted the monthly returns of the S&P 500 Index against Primeo's [a BLMIS feeder fund] monthly returns. (Tr. SOF, ¶ 74). This document showed that BLMIS's returns performed independent of the S&P 500 Index, "whether the S&P trends up or down." (Tr. SOF, ¶ 74).

Merkin knew that BLMIS generated consistently positive returns even when the S&P 100 Index was down. Merkin and others at GCC routinely reviewed GCC profit and loss reports. (SOF Response, ¶ 112; Tr. SOF, ¶ 94). Those reports summarized the information from the Merkin BLMIS Accounts' statements and trade confirmations (Tr. SOF, ¶ 94) and showed that Madoff's returns were consistently positive regardless of what occurred in the market. (Tr. SOF, ¶¶ 77, 80-83). In addition, the Primeo document in Merkin's "Madoff file" depicted quantitative analysis confirming that BLMIS consistently generated positive returns. (Tr. SOF, ¶ 74).

Not only did BLMIS post consistent returns to the Merkin BLMIS Accounts year after year, but BLMIS managed to do so during every period of market stress. (Tr. SOF, ¶ 80). The Merkin BLMIS Accounts posted remarkably positive returns during the "dot-com" collapse in

2000, the 2000-2002 bear market, the September 11, 2001 terrorist attacks, the WorldCom bankruptcy, and the 2007 recession.  (Tr. SOF, ¶ 80).  For example, from November 2007 through November 2008, during the financial crisis, the reported returns for Merkin BLMIS Accounts were up 11.4%, while the S&P 100 Index fell 40.2% amid fears of a financial crisis and extended recession.  (Tr. SOF, ¶ 82).

In the middle of the tech-bubble burst in 2000, Merkin asked Madoff for permission to open new accounts for Ariel and Gabriel.  (Tr. SOF, ¶¶ 32-33, 81).  The accounts were opened with deposits totaling $85 million.  (Tr. SOF, ¶¶ 34-35).  Reliably, between April 2000 and March 2001, the Merkin BLMIS Accounts purportedly generated returns of 13.3%, even though the S&P 100 lost 27.4%.  (Tr. SOF, ¶ 81).  Overall, from December 1991 through November 2008, the S&P 100 Index incurred losses 40.7% of the time (83 out of 204 months).  (Tr. SOF, ¶ 77).  For that same time period, the Merkin BLMIS Accounts reflected negative return months less than 4% of the time (8 out of 204 months).  (Tr. SOF, ¶ 77).

Because the Merkin BLMIS Accounts were up when the S&P 100 was down, Merkin knew that the returns being generated by BLMIS were not correlated with the S&P 100 Index. From that, Merkin knew that Madoff could not have been conducting the Madoff SSC strategy because the Madoff SSC strategy should have been correlated to the S&P 100.

Merkin tried to explain away the lack of correlation between the returns and the S&P 100 by representing that the Madoff SSC strategy involved "market timing," meaning that Madoff went in and out of the market at optimal times.  (Tr. SOF, ¶¶ 84-85).  Merkin says he "always knew whether we were invested or not, on any given day . . . ."  (Tr. SOF, ¶ 89).  However, the Merkin Funds' BLMIS statements showed that Madoff's "market timing" was inconsistent with the purported opportunistic nature of the Madoff SSC strategy.  (Tr. SOF, ¶¶ 88, 91).

18

Instead, Merkin also repeatedly made excuses or posited explanations for Madoff's consistent results.  (Tr. SOF, ¶¶ 84-85, 123).  Merkin tried to explain that the success of the Madoff SSC strategy was driven by market timing—the "strategy in part was implemented through very good execution," meaning "by and large when he wanted to get in, he got in" and "when he wanted to get out, he got out."  (Tr. SOF, ¶ 125).  Yet there is no evidence that Merkin ever attempted to determine whether Madoff's ability to "execute" generated the returns reported by BLMIS.  (Tr. SOF, ¶ 126).  Had he undertaken such analyses, it would have revealed that out of the 84 baskets that Madoff purportedly entered into between December 1991 and November 2008 on behalf of the Merkin Funds, the S&P 100 was up only 45 times, or only 54% of the time.  (Tr. SOF, ¶ 121).  Therefore, market timing contributed very little (only 4.7%) to the purported returns for the Merkin BLMIS Accounts.  (Tr. SOF, ¶ 122).

Additionally, for 15 straight years, Madoff was "out" of the market at the end of each year.  (Tr. SOF, ¶ 86).  Madoff also was "out" of the market at the end of each quarter since the third quarter of 2002.  (Tr. SOF, ¶ 87).  It is implausible that the right opportunity to enter and exit the market would present itself on these particular months or days of the year for years on end.  (Tr. SOF, ¶¶ 87-88).

### 2.    Merkin Was Aware That BLMIS Was Engaging In A Speculative Options Strategy Inconsistent With The Madoff SSC Strategy

Merkin knew that BLMIS was not hedging options consistent with the Madoff SSC strategy.  Instead, BLMIS was purportedly engaging in a speculative options strategy to generate a profit.  (Tr. SOF, ¶¶ 103-06).  The Madoff SSC strategy purported to use options to hedge an equity position.  (Tr. SOF, ¶ 103).  When Madoff purportedly put on a new basket of equities, he would need hedge the equity position using options.  (Tr. SOF, ¶ 103).  In the Merkin BLMIS Accounts, however, a significant number of option transactions were used to generate a profit

rather than to hedge equity transactions, as reflected on their account statements and summarized below:

| Time Period | Number of Transactions (Inclusive) | Purported Profit (Inclusive) |
|---|---|---|
| By December 1995 | 56 | $6.7 million |
| By May 2001 | 120 | $20.0 million |
| By August 2005 | 172 | $67.4 million |
| By November 2008 | 200 | $94.2 million |

(Tr. SOF, ¶ 104).  These speculative option trades were inconsistent with the Madoff SSC strategy and should have prompted Merkin to conduct additional due diligence.  (Tr. SOF, ¶ 106-107).

### 3.    Merkin Was Aware That The Options Volume Traded In The Merkin BLMIS Accounts Exceeded The Total Market Volume

BLMIS was reporting option trading volume in the Merkin Funds' accounts in excess of the total volume on the Chicago Board Options Exchange ("CBOE") for the options traded.  (Tr. SOF, ¶ 92).  Merkin and GCC, having received and tracked the trade confirmations, knew this and over time, the cumulative number of unique transactions that exceeded market volume was revealing.  (Tr. SOF, ¶ 94).  As early as the end of 1993, there had been 21 unique call transactions and 22 unique put transactions purportedly traded across the Merkin BLMIS Accounts that exceeded the total market volume traded for that day.  (Tr. SOF, ¶ 92).  By May 2001, the unique call transactions increased to 101 and unique put transactions increased to 66.  (Tr. SOF, ¶ 92).  By September 2005, there were 292 unique call transactions and 232 unique put transactions that exceeded the total market volume traded that day.  (Tr. SOF, ¶ 92).  In addition, there were 15 instances in the Merkin BLMIS Accounts where BLMIS reported buying and selling call options on days when no volume traded.  (Tr. SOF, ¶ 92).

Aware of these trading impossibilities in the Merkin BLMIS Accounts, Merkin tried to explain away this red flag by stating that he was told that Madoff conducted a substantial part of his options trading in the over-the-counter market ("OTC").  (SOF Response, ¶ 172).  But Merkin and GCC knew otherwise based on their back-office review of the BLMIS trade confirmations.  (Tr. SOF, ¶ 94).  The trade confirmations contained a CUSIP number for each trade, indicating the options were traded on the CBOE, not OTC.  (Tr. SOF, ¶ 96).

Moreover, Merkin knew that the absence of counterparties on the trade confirmations indicated that the trades were not done OTC.  Industry custom and practice holds that counterparties to an OTC transaction be listed on a trade confirmation so that the customer can assess the counterparty risk associated with the trade.  (Tr. SOF, ¶ 97).  For the Merkin Funds, the trade confirmations either failed to identify a counterparty or misidentified the Merkin Funds as counterparties, which would have meant that the Merkin Funds were trading with themselves.  (Tr. SOF, ¶ 97).

Merkin himself acknowledged specific concerns regarding the volume of purported option trading at BLMIS.  Merkin told Research Company A Director of Research that the "bigger question is volume in options."  (Tr. SOF, ¶ 176).  Following that discussion, the Director of Research concluded that "Ezra did not have a good explanation for how Madoff executes option trades in such size."  (Tr. SOF, ¶ 178).

### 4.    Merkin Was Aware Of Significant Numbers Of Out-Of-Range Transactions In The Merkin BLMIS Accounts

The Merkin BLMIS Accounts had hundreds of instances where BLMIS reported to buy and sell equity transactions at prices either above the high stock price for the day or below the low stock price for the day, as reported by Bloomberg.  (Tr. SOF, ¶ 100).  As early as 1993, the trade confirmations showed that there had been 124 equity transactions and 152 options

transactions across the Merkin BLMIS Accounts that reported prices outside of the daily price range. (SOF Response, ¶ 130). By the end of 1995, there were cumulatively 265 out-of-range equity transactions and 247 out-of-range options transactions. (SOF Response, ¶ 130). The out-of-range equity transactions increased from 501 to 961 and the out-of-range options transactions increased from 299 to 362 between May 2001 and August 2005. (SOF Response, ¶ 130).

In questioning the Trustee's expert, Dr. Steve Pomerantz ("Pomerantz"), on these transactions, Defendants inquired whether including Madoff's $0.04 commission on the trade price (as set forth on the back of the trade confirmations) would explain the number of equity transactions outside the daily range. (SOF Response, ¶ 130). It would not. Prior to September 2006, BLMIS trade confirmations stated that the trade price "includes a commission equivalent of $.04 per share." (SOF Response, ¶ 130). Therefore, in order to conduct an analysis of the share prices in the equity transactions, Pomerantz properly removed the commission from the share price for trades prior to September 2006. (SOF Response, ¶ 130). Defendants' unsupported view would require a reading of the trade confirmation contrary to its explicit terms and assumes that BLMIS did not charge any fees for its purported services. (SOF Response, ¶ 130). In any event, even if the reported trade prices were not adjusted for commissions, there were still 462 equity transactions—a significant number—across the Merkin BLMIS Accounts that reported prices outside of the daily price range. (SOF Response, ¶ 130).

### 5. Merkin Was Aware Of Additional Red Flags Relating To BLMIS's Operations

#### (a) Merkin Was Aware That BLMIS Did Not Use A Well-Known And Established Auditor

Merkin knew that BLMIS had as much as $7 billion under management as of 2001. (Tr. SOF, ¶ 111). Merkin also knew that BLMIS employed Friehling & Horowitz—a firm with a single active accountant—as its auditor. (Tr. SOF, ¶¶ 137-38). Friehling & Horowitz did not

have the capacity to audit a company with $7 billion under management.  (Tr. SOF, ¶ 138).  The

lack of a credible auditor creates an opportunity for fraud because it is easier for an investment

advisor to produce fictitious numbers or fraudulent financial statements if the auditor is not

equipped or does not have the requisite expertise to identify fraudulent activity.  (SOF Response,

¶¶ 125, 166).

    Not only did Merkin fail to question the use of Friehling & Horowitz, there is no

evidence that Merkin attempted to independently verify the information provided by Friehling &

Horowitz.  Instead of acknowledging this shortcoming and its consequences, Merkin points to

his reliance upon the Merkin Funds' own auditor, BDO Seidman, LLP ("BDO").  Merkin

insinuates that he relied on BDO to audit the Merkin Funds' investments in BLMIS.  But other

than Merkin's own testimony, the evidence rejects this notion.  Robert Castro ("Castro") of BDO

testified that BDO performed an audit of GCC and the Merkin Funds only.  (SOF Response, ¶

118).  He further testified that BDO performed only a reconciliation of documents received from

BLMIS with the documents and records of GCC and the Merkin Funds and did not include any

third party confirmation.  (SOF Response, ¶ 118).  Moreover, Castro testified that BDO was not

retained to and did not conduct due diligence, particularly not the level of due diligence required

of a fund manager.  (SOF Response, ¶ 118).

### (b)    Merkin Was Aware Of BLMIS's Unusual Fee Structure

    Merkin was aware that BLMIS did not charge traditional performance fees.  (Tr. SOF, ¶

139).  Typically, a fund manager charges management fees of 1% and performance fees of 20%.

(Tr. SOF, ¶ 140).  BLMIS, however, charged only a $0.04 commission per share on stock

transactions and a $1 commission per option contract.  (Tr. SOF, ¶ 141).  It is inconsistent with

industry custom and practice for an investment advisor to charge only transaction fees.  (Tr.

SOF, ¶ 142).  The Merkin Funds on average paid $27 million less each year under the BLMIS

fee structure than they would have under a traditional fee structure.  (Tr. SOF, ¶ 143).  Merkin

had a conversation with Madoff on why he [Madoff] didn't charge 20%, which culminated in

Merkin stating, "I know why you don't do it.  Because you're Bernie.  Because that's not the

way the good Lord made you.  If he made you a little differently, you would."  (Tr. SOF, ¶ 144).

(c)     <strong>Merkin Was Aware That BLMIS Self-Cleared Its Trades</strong>

BLMIS operated as its own broker-dealer, custodian, and administrator, which was not

consistent with industry custom and practice.  (SOF Response, ¶ 166).  Most funds do not serve

as their own prime broker because the absence of a third-party prime broker creates the

opportunity for fraud.  (SOF Response, ¶ 166).  Similarly, where funds are managed by an

investment advisor and that advisor is executing the trades, a separate third-party custodian is

used to hold the funds or securities and as a check on the investment advisor.  (SOF Response, ¶

166).

When an investment management firm also operates as its own service provider, rarely

does it provide all services of a broker-dealer, custodian, and administrator.  (SOF Response, ¶

166).  In those instances, investment management firms maintain adequate segregation of

employees and duties in order to provide checks and balances between the broker-dealer

services, the custodian services, and the administrative services, to safeguard against

opportunities for fraud.  (SOF Response, ¶ 166).  No such segregation or checks and balances

were in place at BLMIS.  (SOF Response, ¶ 166).

Merkin had ready access to Madoff and claims to have talked with him between 10 to 15

times per year.  (SOF Response, ¶ 100).  As such, Merkin was aware that Madoff solely made all

investment decisions at BLMIS, and that BLMIS served as its own prime broker, custodian, and

administrator.  (SOF Response, ¶ 173).  Merkin was aware of and acknowledged the fraud

concerns associated with a single person or entity holding these multiple roles from the Bayou

24

Fund, which collapsed in 2005 because it was a Ponzi scheme. (SOF Response, ¶ 166). Within days of the Bayou Ponzi scheme being revealed, Merkin circulated a list of "[i]ssues we should be asking each of our money managers," which included: (i) "Clearing firm;" (ii) "Unusual, unconventional, or self-owned broker-dealer relationships;" (iii) "Auditing firm;" and (vi) "Pricing of fund." Each of these concerns was present with BLMIS. (SOF Response, ¶ 166).

### 6. Merkin Discussed Red Flags With Third Parties

Merkin openly discussed all of these red flags with others, including specific concerns that BLMIS was a fraud or even a Ponzi scheme.

As early as 1992 or 1993, Merkin was warned by Victor Teicher ("Teicher"), an investment manager for Ariel and Gabriel to whom Merkin entrusted hundreds of millions of dollars of his investors' funds. (SOF Response, ¶¶ 173, 176, 199, 200). Teicher told Merkin that what Madoff was doing "was just not possible" and that Madoff's "track record didn't sound right, didn't smell right." (SOF Response, ¶ 176). Jack Mayer, a former GCC employee, testified that he recalled a conversation from the early 1990's between himself, Merkin and Teicher "in which [Teicher] expressed concerns that it could be a Ponzi scheme." (SOF Response, ¶ 200).

Teicher also warned Merkin that delayed trade confirmations were "troublesome." (SOF Response, ¶ 178). Merkin knew that BLMIS did not provide real-time access to account data via the internet, but instead sent paper trade confirmations and customer statements. (SOF Response, ¶ 178). GCC received trade confirmations three to five days after the purported trades were made. (SOF Response, ¶ 178). Sometimes, GCC received "supplemental" trade confirmations "to make the numbers tie," indicating that a previous trade was done at a different price. (SOF Response, ¶ 111).

Teicher further discussed with Merkin that BLMIS self-cleared its trades and that was a significant red flag. (SOF Response, ¶ 173). Specifically, Teicher warned "[t]here have been cases in the past that were frauds that the people were self-clearing." (SOF Response, ¶ 173).

Similarly, in 1995, Joel Ehrenkranz ("Ehrenkranz"), an investor in Ascot Partners, told Merkin that he decided not to invest with BLMIS because he was concerned that BLMIS self-cleared and lacked independent verification. (SOF Response, ¶ 138). Ehrenkranz also discussed with Merkin the implausible consistency of the BLMIS returns. (SOF Response, ¶ 176). Ehrenkranz ultimately redeemed his investment because, as he told Merkin, the "stability of the returns began to belie [his] understanding how it was possible to achieve, and [they] just became sufficiently uncomfortable with the whole idea of [Madoff's] ability to do this." (SOF Response, ¶ 138). Ehrenkranz further informed Merkin that "it was very hard to achieve these kinds of returns and just almost impossible." (SOF Response, ¶ 138).

Nash also told Merkin that he was skeptical of BLMIS and, as a fiduciary, was not comfortable investing with BLMIS. (Tr. SOF, ¶ 194). After reviewing the statements, Nash testified that he "didn't understand how, by buying stocks, selling calls and buying puts, one would have made money every month." (Tr. SOF, ¶ 193). Even after meeting with Madoff to discuss the investment approach, Nash was not comfortable with Madoff's explanations because "it wasn't clear to us how he made the money" and redeemed. (Tr. SOF, ¶¶ 190-92). Nash voiced his concerns to Merkin, stating, "[t]he lack of a major accounting firm to me was a red flag" and that Merkin "knew that I was skeptical of [BLMIS]." (Tr. SOF, ¶ 194).

In June 2003, Merkin had a telephonic meeting with Research Company A Principal and its Director of Research. (SOF Response, ¶ 146). During that meeting, Merkin commented that Madoff's scheme was bigger than Ponzi's, and "Charles Ponze [sic] would lose out because it

would be called the 'Madoff Scheme.'" (SOF Response, ¶¶ 146, 203). Defendants cite only to the testimony of Principal, a former employee of GCC (SOF Response, ¶ 203), to suggest that Merkin's statement was a joke. But the Director of Research, whose notes transcribe what Merkin stated during that meeting, testified that he did not believe that Merkin made this comment sarcastically. (SOF Response, ¶¶ 146, 203). Based on the meeting, the Director of Research concluded that there "[s]eems to be some probability even in Ezra's mind that this could be a fraud." (Tr. SOF, ¶ 179).

And in 2008, as discussed above, Surh discussed NYU's concerns about BLMIS's lack of a third-party administrator with Merkin. It was a "significant negative" and made BLMIS "unpalatable" for NYU. (Tr. SOF, ¶¶ 197, 198; SOF Response, ¶ 173).

### D. Merkin Intentionally Refused To Learn More About The Facts That Suggested A High Probability Of Fraud

As set forth above, Merkin was aware of significant red flags suggesting fraud at BLMIS, and even suggesting that BLMIS was a Ponzi scheme. Yet he did nothing to investigate those red flags other than to ask Madoff himself, the suspected fraudster. (Tr. SOF, ¶¶ 144, 147). Instead of investigating the red flags and providing salient information to his investors, Merkin lied to his investors about the red flags in order to keep their investments in the Merkin Funds and with BLMIS. (Response SOF, ¶ 157; Tr. SOF, ¶ 150-199).

Merkin's investors were specifically assured that Merkin was performing due diligence on their behalf. For example, Merkin's quarterly newsletter to his clients said that "[o]ur first objective, therefore is to control risk," and while "[i]nvestors often look up, enchanted by upside and profits, but that works only if their managers spend time and money looking down." (Tr. SOF, ¶ 64). Merkin also told his clients that "an exceptional run of superior performance in virtually any business is almost impossible to perpetuate . . . [and] our job, as we understand it, is

to keep our guard up at all times." (Tr. SOF, ¶ 65). Merkin performed no investigation or due diligence in the face of the red flags that he appreciated, chose instead to ignore his own concerns, and did not conduct the diligence that he promised. For doing so, Merkin received a continuously increasing stream of performance and management fees directly tied to the amount of paper profits reflected on the Merkin BLMIS Accounts' statements. (SOF Response, ¶ 109; Tr. SOF, ¶¶ 64-65, 263).

### 1.    Consistency Of Returns

As set forth above, Merkin knew and acknowledged that BLMIS's returns were inconsistent with the Madoff SSC strategy. (Tr. Response, ¶ 176). Yet again, he refused to take any action to investigate and confirm how Madoff achieved his results. When there are outstanding questions regarding how an investment advisor generates returns or if there is an inconsistency between the returns reported by the advisor and the strategy purportedly followed, quantitative analyses should be performed, particularly with the trade level data that was available to Merkin and GCC. (SOF Response, ¶ 109). Merkin did none of this.

Merkin purported to understand that Madoff used a "black box" or "algorithm" as part of his trading strategy. (Tr. SOF, ¶ 85; SOF Response, ¶ 109). Merkin did not learn, however, how the algorithm or black box allowed Madoff to time the market. (SOF Response, ¶ 109). Merkin never met with anyone at BLMIS other than Madoff and never asked to speak to any BLMIS employee who was responsible for the algorithm. (SOF Response, ¶ 109).

Similarly, Merkin tried to explain that the success of the Madoff SSC strategy was driven by stock selection. (Tr. SOF, ¶¶ 123, 125-26). But there is no evidence that Merkin ever attempted to determine whether stock picking contributed to the purported returns generated by BLMIS. (Tr. SOF, ¶ 123). Again, had Merkin performed an analysis of his purported explanation, he would have learned that BLMIS could not have generated its returns by stock

picking. The stocks in each of the baskets in the Merkin BLMIS Accounts from 2000 to 2008 outperformed the S&P 100 in only 17 out of the 52 baskets (33%). (Tr. SOF, ¶ 124). This could not explain the consistently profitable returns that BLMIS posted to the Merkin BLMIS Accounts' statements.

As is commonly done by portfolio managers, Merkin could have simply compared stock transaction prices against Volume Weighted Average Price ("VWAP") in order to track trade execution effectiveness. (Tr. SOF, ¶ 127). VWAP is a publicly available trading metric calculated by weighting each transaction price by the volume for the transaction. (Tr. SOF, ¶¶ 127-28). The industry norm targets trade execution at VWAP, meaning that 50% of shares should be above VWAP and 50% should be below VWAP. (Tr. SOF, ¶ 131). From January 1996 to November 2008, 81.3% of the Merkin BLMIS Accounts purported buy transactions were executed below VWAP, while 74.9% of the purported sell transactions were executed above VWAP. (Tr. SOF, ¶ 130). BLMIS's purported ability to buy and sell at these levels was virtually impossible, and the only reasonable explanation for BLMIS's ability to consistently execute at a level better than VWAP is fraud. (Tr. SOF, ¶ 132). There is no evidence that Merkin looked at VWAP.

### 2. Scalability Of The Madoff SSC Strategy

Merkin ignored his own concerns that the Madoff SSC was not "scalable." Scalability refers to the concept that as a fund increases its assets under management, it becomes increasingly difficult for that fund to find investment opportunities of a scale proportional to the growing size of the fund. (Tr. SOF, ¶ 108). In order to implement the strategy, Madoff needed to buy stock and sell call options in the same notional amount. (Tr. SOF, ¶ 115). Therefore, if Madoff was managing approximately $7 billion, he would have needed approximately $7 billion in call options in terms of notional value. (SOF Response, ¶¶ 111-15). Had Merkin investigated

his scalability concerns, he would have confirmed that by 2001, and every period thereafter,
there was simply not enough call option notional value to support the Madoff SSC strategy. (Tr.
SOF, ¶ 115). As Madoff's AUM increased from $13 billion to $17 billion (set forth in BLMIS's
publically filed SEC Form ADVs in 2007 and 2008, respectively), such impossibility in
executing the Madoff SSC strategy becomes even more apparent. (Tr. SOF, ¶ 114).

Merkin recognized that the "God of size comes to visit everybody," meaning that "if you
keep growing, growing and growing assets, you will see some impact on performance." (Tr.
SOF, ¶ 110). In a conversation with Madoff in January 2002, Merkin stated that "one of the
tenets of the investment business, right or wrong, is that there is some basic connection between
size and profitability." (Tr. SOF, ¶ 112).

As early as 1999, Merkin expressed concerns to Smith, an Ascot Partners investor, that
Ascot Partners was "bumping up against the limits of being able to do the trades profitably,"
meaning the "thinness of the market as far as being able to execute the option trades related to
owning—owning or shorting the stocks underneath." (Tr. SOF, ¶ 109). Merkin told Smith that
Merkin thought the limit for Ascot Partners' trading strategy in the options market was "about a
billion dollars." (Tr. SOF, ¶ 109). But by May 2001, Merkin knew that BLMIS had as much as
$7 billion in assets under management. (Tr. SOF, ¶ 111). Instead of investigating or performing
analyses to determine if the execution of the Madoff SSC strategy was possible with $7 billion
under management, Merkin reasoned that Madoff's business was scalable simply because "in
Bernie's case he's been defying gravity for long enough that at some point you could stop caring
that much." (Tr. SOF, ¶ 113).

In 2005, Merkin reiterated his scalability concerns in a meeting with Jason Orchard and
Aozora Bank, stating that he "believes the Ascot [Partners] strategy will stop working one day,"

explaining that as "more and more capital is employed to exploit that arbitrage, it eventually goes away." (Tr. SOF, ¶ 110). Despite recognizing that scalability was an eventual roadblock to Madoff's strategy (Tr. SOF, ¶ 110), Merkin did nothing about it.

### 3.    Out-Of-Range Options And Options Volumes

Merkin represented to Research Company A Director of Research that he "audits Bernie for fraud" and also "checks the daily highs and lows on the NYSE and Madoff['s] trades [were] almost always between." (SOF Response, ¶ 146). But as set forth above, Merkin knew this was a lie. From GCC's review of the trade confirmations and statements between 1990 and 2008, Defendants knew that the Merkin BLMIS Accounts reported prices outside the daily price range. Specifically, there were 985 transactions, reflecting over 56 million equity shares, and 382 transactions, representing 545,828 options contracts across the Merkin BLMIS Accounts that reported prices outside the daily price range. (Tr. SOF, ¶¶ 100-01). Merkin performed no investigation of these impossible transactions because such an investigation would confirm what he already knew—there were trading impossibilities occurring in the Merkin BLMIS Accounts.

The same could be said of Merkin's feigned concerns about the volume of options that Madoff was purportedly trading. (SOF Response, ¶ 172; Tr. SOF, ¶ 176) ("The bigger question is volume in options."). As set forth above, the trade confirmations listed a CUSIP number and therefore, all transactions would have had to have taken place on the CBOE, not OTC. (Tr. SOF, ¶ 96). Rather than performing any investigation of the numerous red flags relating to the purported options trading, Merkin deliberately turned a blind eye. He tried to make that appear innocent by rationalizing "[he has] come to accept there are things that [he doesn't] understand." (Tr. SOF, ¶ 177). Diligence into facts—not blind acceptance of fantasy—is the hallmark of the securities industry.

### 4.   Bayou Fraud Concerns

Despite his recommendations to other fund managers, Merkin refused to follow up on behalf of the Merkin Funds regarding concerns he raised following the Bayou Fund collapse. (SOF Response, ¶ 166).  Merkin advised other fund managers that it would be necessary going forward to investigate investment managers for specific indicators of fraud, including: (i) any investment that had a self-owned broker-dealer; (ii) any investment that had a questionable auditing firm; and (iii) any investment that had an unusual pricing or fee structure.  (SOF Response, ¶ 166).  Merkin knew that BLMIS had all three specific indicators of fraud he identified.  (SOF Response, ¶ 166).  Yet, rather than conduct any due diligence, Merkin commented to Madoff that "as soon as there is a scam in the hedge fund industry, someone's gonna call about Bernie," adding "it's guaranteed."  (SOF Response, ¶ 166).  He did nothing else.

Merkin had a longstanding, close relationship with Madoff—"he's been a good friend, he's been a very good client."  (Tr. SOF, ¶ 33).  As such, Merkin was ideally positioned to investigate the red flags he saw and understood.  He could have easily asked for additional information concerning the purported stock transactions, the trading strategy, and the execution of the trading strategy.  But he did none of that.  In fact, not only did Merkin refuse to investigate the red flags on behalf of his investors, he did not care that red flags existed: "I don't really care, because I've made my peace with Bernie."  (Tr. SOF, ¶ 147).

It is not surprising that Merkin made his peace with Madoff.  All the while accepting his

management fees for investments with BLMIS, Merkin took his own advice:

> I can always tell when people are going to ask me about Bernie,
> because when people come to the office, ask me what we're doing
> and I give them a little sense of it, and they look around and say I
> know I'm not supposed to talk about this, but can I ask you the
> following question? So I told one person, look, you can ask me
> how Bernie does it and that's fine, but when are you going to ask
> Bernie? So he said, look, if I asked him, he'd throw me out. I said,
> look, *all I can tell you is don't ask so many questions. Sit tight. And
> that's what I tell everybody* ….

(Tr. SOF, ¶ 148 (emphasis added)).

### E.  Merkin's Purported "Diligence" Is A Mere Cover For His Avoidance Of Facts Suggesting Fraud At BLMIS

As demonstrated above, Merkin was aware of facts suggesting a high probability of fraud

at BLMIS, including, for example, that BLMIS was not executing the Madoff SSC strategy, that

BLMIS's performance was independent of the S&P 100, that BLMIS was not conducting the

options trading OTC, and that the volume of options that Madoff purported to trade was not

possible.  These red flags—known and understood by Merkin—suggested that there was fraud at

BLMIS or, at the very least, an opportunity for fraud.  When fund managers are faced with such

circumstances, industry custom and practice requires that they either redeem their investment or

perform additional due diligence.  (Tr. SOF, ¶¶ 58-60).

Merkin claims that he performed "thorough due diligence."  (Merkin Br. at 7; Ascot Br.

at 14).  But Merkin's "diligence"—far from being consistent with industry custom and

practice—was meaningless because it did not address any of the specific concerns that Merkin

had or resolve any of the indicia of fraud that were revealed to and understood by Merkin.  (Tr.

SOF, ¶ 57).  Instead, Merkin's due diligence can be distilled to two useless endeavors: talking to

Madoff and confirming that one set of data from BLMIS (trade confirmations) matched a second

set of data from BLMIS (customer statements).  (SOF Response, ¶¶ 101, 111).  There is no

evidence that Merkin followed up on a single warning that was expressed to him, or attempted to

verify the information from BLMIS with any independent sources.

Merkin maintained a "Madoff file," consisting of approximately 500 pages of documents,

purportedly accumulated over an eighteen-year period.  (SOF Response, ¶ 101).  Merkin

characterized this file as one that included newspaper articles and profiles of Madoff, notes of

certain of his meetings with Madoff, and information concerning other funds that had significant

investments with Madoff and BLMIS.  (SOF Response, ¶ 101).  The newspaper articles in this

file profiled BLMIS's proprietary trading business—not the investment advisory business in

which Merkin's Funds were invested.  (SOF Response, ¶¶ 101, 106).  Review of a smattering of

articles does not rise to the level of due "diligence" by a fund manager when he is faced with

fraud or an opportunity for fraud.  (SOF Response, ¶ 101).

Merkin also makes much of the fact that he and the Merkin Funds received trade

confirmations from BLMIS and manually input the information into GCC's portfolio

management system.  (Tr. SOF, ¶ 94).  At month-end, GCC employees checked to see if the

trade confirmation data matched the fraudulent BLMIS month-end statements.  (SOF Response,

¶ 111).  Because GCC employees did not reconcile BLMIS trade confirmations on a daily basis,

they "wouldn't know middle month if there was an issue" with the confirmations.  (SOF

Response, ¶ 111).  When there were discrepancies between the trade confirmations and the

monthly statements, BLMIS sent "supplemental" tickets "to make the numbers tie."  (SOF

Response, ¶ 111).  GCC employees did not check the prices reported on the trade confirmations

and the monthly statements against the prices reported in the market.  (SOF Response, ¶ 111).

Instead, GCC employees did nothing more than match one set of Madoff documents to another

set of Madoff documents.  (SOF Response, ¶ 111).  Confirming that the fraudster's documents

match one another is not "diligence" consistent with industry custom and practice, particularly

when faced with red flags indicating fraud or an opportunity for fraud.  (SOF Response, ¶¶ 57,

59).

Similarly, although BDO was engaged to audit the Merkin Funds, the audit was not

intended to serve as third party confirmation of the trading at BLMIS, nor was it designed to

detect fraud at BLMIS.  (SOF Response, ¶ 118 ("We have no ability to go outside the entity, to

start auditing other entities for which it does business with.")).  The BDO audit was not a

substitute for Merkin's obligations to perform due diligence on BLMIS.

BDO testimony indicated that they do not generally scrutinize a client's broker-dealer or

investment advisor.  (SOF Response, ¶ 129).  And specifically here, BDO confirmed that they

did not audit Madoff.  (SOF Response, ¶¶ 118, 120).  BDO's audit consisted of reviewing a

"random sample" of "no more than a handful [of trade confirmations] on each engagement."

(SOF Response, ¶ 118).  BDO tied the BLMIS-issued trade confirmations back to the BLMIS-

issued brokerage statements to confirm that GCC's books—not BLMIS's—reconciled.  BDO did

not conduct any testing to see if the trades at BLMIS actually occurred.  (SOF Response, ¶ 118).

BDO did not conduct any examination of the trading volumes reported in the Merkin Funds'

BLMIS statements.  (SOF Response, ¶ 118).  BDO did not test to see how often BLMIS trades

occurred at the highs and lows of the day.  (SOF Response, ¶ 122).  Merkin did not retain BDO

to audit Madoff and thus he knew contemporaneously that they were not performing these

functions.  (SOF Response, ¶ 118).

Merkin also points to receipt of redemption requests as a form of due diligence.

However, the ability of a manager to meet redemptions is not due diligence because meeting

redemptions is the normal course of business.  (SOF Response, ¶ 179).  In fact, Ascot Partners

made no redemptions from BLMIS for nearly a five year period between December 1998 and

December 2003; and then again for nearly a two year period from December 2003 to December

2005.  (Tr. SOF, ¶ 245).  Instead, Ascot Partners improperly moved money between the Merkin

Funds—all separate entities—to pay redemptions of other funds.  (Tr. SOF, ¶¶ 245-56).[5]  Thus,

the fact that BLMIS could meet its redemptions has no bearing on the specific trading

impossibilities and indicia of fraud that Merkin was keenly aware of and understood.  (SOF

Response, ¶ 179).

      In support of his claim of "diligence," Merkin next points to the fact that he arranged

meetings with Madoff for other investors, including Horowitz, Ludwig Bravmann

("Bravmann"), Alec Hackel ("Hackel"), Reichmuth, Erne, and Roman Igolnikov ("Igolnikov").

(Merkin Br. at 11-12; Ascot Br. at 13; SOF Response, ¶¶ 85, 138, 144, 150, 151, 152).  But when

pressed about details of these meetings, Merkin's memory fades.  As to the Horowitz meeting,

Merkin testified that he was "not sure I was at the meeting or this is my memory of what they

told me about the meeting."  (SOF Response, ¶¶ 138, 150).  The only details that Merkin recalled

were that Madoff and Horowitz traded "old war stories" and discussed mutual acquaintances.

(SOF Response, ¶ 150).  Similarly, as to Bravmann, Merkin does not recall the circumstances of

the meeting, when the meeting purportedly took place, or if he even attended the meeting.  (SOF

Response, ¶ 152).  As for Igolnikov, Merkin testified he does not recall attending the meeting but

---

[5] In fact, the evidence shows that, in order to meet redemption and management fee payments,
Merkin elected to improperly commingle assets among his various Funds rather than take
redemptions from BLMIS.  (Tr. SOF, ¶¶ 245-256).  For example, Ascot Partners did not have
enough funds on hand to pay for redemption requests in January 2007.  (Tr. SOF, ¶¶ 261-62).
Rather than redeem from BLMIS, Merkin directed that Ariel and Gabriel transfer funds to Ascot
to cover the redemption requests.  (Tr. SOF, ¶¶ 257-62).

recalled its purpose was that "Roman wanted to meet with Madoff." (SOF Response, ¶¶ 138,

141, 152). There is no documentation of these purported meetings in the record and simply

knowing of discussions with other investors in BLMIS does not rise to the level of due diligence

consistent with industry customs and practices. (SOF Response, ¶ 85).

Reichmuth testified that he recalled attending one meeting between Merkin, Madoff, and

Hackel in the end of the 1990s but cannot recall who set up the meeting or why it was arranged.

(SOF Response, ¶ 151). Similarly, Erne testified that, in his meeting with Madoff, they had a

general discussion about the "brokering business" at BLMIS, that he could not recall discussing

"investments at all, or an investment strategy or any returns" and that he did not "think [he] even

knew that there was an investment advisory business unit" at BLMIS. (SOF Response, ¶ 152).

Merkin points to the meetings he set up between Madoff and UBP but concedes that UBP

met with Madoff "as part of [UBP's] own due diligence." (Merkin Br. at 11; Ascot Br. at 13).

The fact that UBP conducted its own diligence—in November 2008—(SOF Response, ¶¶ 140-

42) says nothing about Merkin's diligence from 1990-2008. Despite Merkin's claim that UBP

continued to invest in Ascot Fund following that meeting, UBP had in fact placed a redemption

for almost 50% of their total investment. (SOF Response, ¶ 143). And whether UBP would

have maintained its remaining investment, as Merkin claims, is nothing but speculation because

BLMIS collapsed a mere fifteen days after this meeting. (SOF Response, ¶ 143).

Finally, Merkin claims that the SEC's examination and inspections of BLMIS formed

part of his due diligence prior to BLMIS's collapse. In support, Defendants point to an article in

the Washington Post regarding the SEC's inspections of BLMIS. (SOF Response, ¶ 98).

However, this article is dated December 19, 2008, and could not have been the basis for

Merkin's understanding of the SEC's examination and inspection of BLMIS. (SOF Response, ¶

98).  Merkin's purported understanding about the SEC investigations only came from

discussions with Madoff.  (SOF Response, ¶ 98).  And Merkin presented no other evidence that

he knew about any SEC examinations, contemporaneously, in 2006 or 2007.[6]

### F.    Merkin's Personal Losses Are Unsubstantiated

In order to mitigate the significant fees he reaped, Merkin claims that he personally lost

$110 million to Madoff's fraud.  Other than Merkin's uncorroborated testimony, there is no

support for this claim in the record nor is there any way to evaluate whether Merkin is including

fictitious profits in that amount.  (SOF Response, ¶ 159).

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Summary Judgment Standard

Summary judgment is appropriate only if the court determines that there is no genuine

issue of material fact to be tried.  *Celotex Corp. v. Catrett, Administratrix of the Estate of Catrett*,

477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56(a) (2015); Fed. R. Bankr. P. 7056 (2015).  "A

dispute about a genuine issue exists for summary judgment purposes where the evidence is such

that a reasonable jury could decide in the non-movant's favor."  *United Transp. Union v. Nat'l*

---

[6] The Merkin Defendants refer to a 1992 New York Times article that discussed the SEC's investigation into Avellino & Bienes.  (Merkin Br. at 9-10; SOF Response, ¶ 105).  But this document was not in Merkin's "Madoff file;" nor did Defendants independently produce it in discovery.  (SOF Response, ¶ 105).  However, a 1992 Wall Street Journal article in Merkin's records regarding Avellino & Bienes states that the "biggest question" regarding the situation was how Avellino & Bienes, who invested their clients' money with Madoff (who himself was "scoring investment returns that comfortably exceeded the hefty returns Avellino & Bienes was promising its noteholders") could "promise to pay high interest rates on a steady annual basis, even though annual returns on stocks fluctuate drastically.  (SOF Response, ¶ 105).  It further notes that "[i]n 1984 and 1991, for example, the stock market delivered a negative return, even after counting dividends.  Yet Avellino & Bienes—and Mr. Madoff—maintained their double digit returns."  (SOF Response, ¶ 105).

*R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009) (internal quotations and citations omitted).

Defendants have the burden of demonstrating that there are no genuine issues of material fact. *Id.* "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). Any ambiguities must be resolved and all inferences must be drawn against the moving party. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir. 1986). Thus, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Gummo v. Village of Depew, N.Y.,* 75 F.3d 98, 107 (2d Cir. 1996).

The court does not, on summary judgment, weigh the evidence, access credibility, or choose between conflicting versions of events. *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 146 (2d Cir. 2012) (reversing grant of summary judgment because plaintiff presented genuine issue of material fact) (citing *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (reversing grant of summary judgment because court improperly assessed credibility of evidence)). The court "cannot *try* issues of fact, but can only determine whether there are issues of fact to be tried." *R.G. Gr'p, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations and citations omitted) (emphasis in original). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [factfinder] functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 265 (1986).

Applying these standards, courts in the Second Circuit deny motions for summary judgment on actual fraudulent conveyance claims where genuine issues of fact exist as to either the elements of the claim or its affirmative defenses. *See, e.g.*, *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 439-40 (S.D.N.Y. 2011) (denying summary judgment on fraudulent conveyance claim because genuine issues of material fact existed about defendant's intent); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Group, LLC*), 439 B.R. 284, 322 (S.D.N.Y. 2010) (reversing and precluding summary judgment where defendants' good faith under section 548(c) is a question for the jury); *Bear, Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 22-26 (S.D.N.Y. Dec. 17, 2007) (partially reversing grant of summary judgment because genuine issues of material fact existed requiring trial as to defendant's good faith under section 548(c)); *Sec. Inv'r Prot. Corp. v. Rossi* (*In re Cambridge Capital, LLC*), 331 B.R. 47, 57-61 (Bankr. E.D.N.Y. 2005) (denying summary judgment for failing to show the absence of genuine issues of material facts relating to the actual fraudulent transfer claim); *Sullivan v. Messer* (*In re Corcoran*), 246 B.R. 152, 161-62 (E.D.N.Y. 2000) (denying summary judgment for actual fraud under N.Y. Debt. & Cred. Law § 276 because it would have required the court to choose between competing evidence about knowledge and fair consideration); *Kipperman v. Circle Trust F.B.O., Michele Montano* (*In re Grafton Partners*), 321 B.R. 527, 532 n.5 (B.A.P. 9th Cir. 2005) (noting that question of whether defendant received a transfer in "good faith" under section 548(c) is not appropriate for summary judgment) (internal citation omitted); *Fisher v. Sellis* (*In re Lake States Commodities, Inc.*), 253 B.R. 866, 879 (Bankr. N.D. Ill. 2000) (denying renewed motion for summary judgment where defendant failed to establish "as a matter of law and undisputed fact that he is entitled to judgment on his good faith defense" under section 548(c)); *Merrill v. Abbott* (*In re Indep.*

*Clearing House Co.*), 77 B.R. 843, 862 (D. Utah 1987) (precluding entry of summary judgment

because a "defendant's good faith (or lack thereof) is a genuine question of material fact" under

section 548(c)).

### B.    Standards Of Good Faith Under Section 548(c) And Willful Blindness

Prior decisions of the District Court and this Court have limited the Trustee's claims in

this adversary proceeding.  Under those rulings, the Trustee may only avoid and recover

intentionally fraudulent transfers made to Defendants under section 548(a)(1)(A) that were made

within the two years preceding the Filing Date.  *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y.

2011) ("*Katz Decision*"); *Merkin*, 515 B.R. at 138 (citing *Picard v. Greiff*, 476 B.R. 715, 718

(S.D.N.Y. 2012)).[7]  Section 548(c) provides Defendants with an affirmative defense to the extent

that the transferee "takes for value and in good faith."  11 U.S.C. § 548(c).  To defeat a good

faith defense under section 548(c), the Trustee must show that Defendants "willfully blinded

[themselves] to circumstances indicating a high probability of [Madoff's] fraud."  *Sec. Inv'r

Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*), 516 B.R. 18, 23 (S.D.N.Y. 2014)

("*Good Faith Decision*").

Willful blindness involves two elements: "(1) the defendant must subjectively believe

that there is a high probability that a fact exists and (2) defendant must take deliberate actions to

avoid learning of that fact."  *Merkin*, 515 B.R. at 139 (quoting *Global-Tech Appliances, Inc. v.*

---

[7] This Court previously ruled that the Trustee did not adequately plead that Defendants had
"actual knowledge" of Madoff's fraud.  *Merkin*, 515 B.R. at 141; *Katz Decision*, 462 B.R. at 454.
In cases where the Trustee does adequately plead actual knowledge of the defendants, *Picard v.
Ceretti* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 08-99000 (SMB), 2015 WL 4734749, at
*13-15 (Bankr. S.D.N.Y. Aug. 11, 2015), the section 546(e) safe harbor is not applicable and the
Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the
full extent permitted by state and federal bankruptcy law.  *See id.* at *12 (citing *Sec. Inv'r Prot.
Corp. v. BLMIS*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *6 (S.D.N.Y. Apr. 15, 2013)).

*SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)).  "[W]illful blindness connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence."  *Merkin*, 515 B.R. at 139-140; *see also Ceretti*, 2015 WL 4734749, at *13.[8]

Moreover, proof of a defendant's subjective belief does not require a direct admission from the defendant; it may be inferred from objective facts.  Defendants here are a sophisticated hedge fund manager, a fund management company, and hedge funds with investments of hundreds of millions of dollars—and each owed a separate duty of care in selecting their outside money-managers and their investments.  *Merkin*, 515 B.R. at 145.  As discussed below, the evidence is clear that Defendants were subjectively aware of facts that demonstrated a high likelihood of fraud.

## II.  SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE STATE OF MIND IS THE CENTRAL ISSUE FOR LIABILITY IN THIS CASE

Defendants improperly ask this Court to resolve, on summary judgment, disputed issues of fact about whether Merkin was willfully blind to Madoff's fraud.  Defendants' motions should be denied out of hand on that basis alone: Merkin's state of mind—a classic issue of fact—is the central issue for liability in this case and cannot be resolved on summary judgment.

The Second Circuit and its courts repeatedly deny attempts to resolve factual issues like state of mind on summary judgment, instead finding that "[s]ummary judgment is notoriously

---

[8] As this Court previously noted, willful blindness is equivalent to the doctrine of conscious avoidance in the criminal law context.  *See, e.g., Merkin*, 515 B.R. at 139 n.15 (citing *United States v. Samaria*, 239 F.3d 228, 239 (2d Cir. 2001)).  The doctrine of conscious avoidance provides that "a defendant's knowledge of a fact required to prove the defendant's guilt may be found when the jury 'is persuaded that the defendant consciously avoided learning that fact while aware of a high probability of its existence.'"  *Id.* (citation omitted); *see also Gowan v. Westford Asset Mgm't LLC* (*In re Dreier LLP*), 462 B.R. 474, 490-91 (S.D.N.Y. 2011).

inappropriate for determination of claims in which issues of intent, good faith and other

subjective feelings play dominant roles." *Krishna v. Colgate Palmolive Co.,* 7 F.3d 11, 16 (2d

Cir. 1993) (internal quotation marks omitted); *EMI Catalogue P'ship v. Hill*, 228 F.3d 56, 68 (2d

Cir. 2000) (citing *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 538 (2d Cir. 1991); *Carlton v.

Mystic Transp., Inc.*, 202 F.3d 129, 134, 138 (2d Cir. 2000) (reversing grant of summary

judgment based on unresolved issues of material fact including intent); *see also Eldesouky v.

Aziz*, No. 11-cv-6986, 2014 WL 7271219, at *15 (S.D.N.Y. Dec. 19, 2014) (denying summary

judgment because scienter is determined by finder of fact); *Savino v. Town of Southeast*, 983 F.

Supp. 2d 293, 300-01 (S.D.N.Y. 2013) (citations omitted) (denying summary judgment because

"issue of intent . . . generally belongs to the trier of fact"); *SEC v. Kelly*, 765 F. Supp. 2d 301,

319 (S.D.N.Y. 2011) (denying summary judgment on securities claims because defendants' state

of mind is for resolution by the trier of fact) (citation omitted).  Indeed, this Court has cautioned

Defendants numerous times in three separate hearings that summary judgment is not likely to be

appropriate in this case given that the liability depends on Merkin's knowledge and willful

blindness.[9]

Issues of intent and state of mind must go to the factfinder because the factfinder must be

able to assess the overall credibility and demeanor of the witness.  As explained in a 2005 SIPA

case, "[t]he intent of an actor who is charged with the receipt of the fruits of a fraudulent transfer

is a matter of fact and cannot be resolved, and should not be resolved, by summary judgment for

the simple reason that the trier of the facts must consider the behavior and the conduct and the

---

[9] Tr. Oct. 2, 2014 Hr'g at 31:15-19, 41:13-17, and 41:22-42:2, ECF No. 241; Tr. May 7, 2015
Hr'g at 7:7-11, ECF No. 265; Tr. August 18, 2015 Conf. at 9:2-22, ECF No. 281.

demeanor of the witnesses." *SEC v. Old Naples Secs., Inc.* (*In re Old Naples Secs., Inc.*), No. 96-896, 2005 WL 419718, at *8 (Bankr. M.D. Fla. Jan 5, 2005).

Ignoring the law and this Court's prior statements, Defendants have chosen to burden this Court with motions for summary judgment that fail on their face. Defendants do not—and cannot—dispute that Merkin's state of mind is at issue. In fact, their submissions are replete with references to Merkin's motives, his beliefs, his knowledge, and his decisions to ignore red flags indicative of fraud at BLMIS, all of which raise classic fact issues regarding Merkin's state of mind and his credibility. Defendants' speculation about Merkin's state of mind or his credibility is no substitute for the judgment of a factfinder and is hardly a basis to grant summary judgment.

Moreover, the essence of their motions as to why this Court should find—on summary judgment—that Merkin was not willfully blind is that Merkin says so. A defendant's testimony about his own mental state is not the kind of uncontradicted, unimpeachable evidence from a disinterested witness that may be accepted for purposes of a summary judgment motion. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). Merkin's self-serving statements do not, as a matter of law, refute the Trustee's allegations. As the Supreme Court has stated, "[t]he mere fact that that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627-28 (1944) (quotations omitted); *see also Williams v. City of White Plains*, 718 F. Supp. 2d 374, 377 (S.D.N.Y. June 16, 2010) (considering affidavits and testimony from interested witness on summary judgment constitutes inappropriate fact-finding).

Here, the Trustee has offered evidence supporting his allegations as to Defendants'

mental state, and Defendants offer evidence and arguments that they say weigh against the

Trustee's conclusion.  Courts have rejected similar prior attempts to obtain summary judgment

against the Trustee where the defendant's state of mind about Madoff's fraud was at issue.  The

District Court denied summary judgment to the defendants in *Picard v. Katz*, finding that the

issue of whether they acted in good faith or were willfully blind—the same key issue here—must

be resolved at trial.  *See Picard v. Katz*, No. 11-3605 (JSR), 2012 WL 691551 (S.D.N.Y. Mar. 5,

2012); *see also Picard v. Katz*, 466 B.R. 208, 211 (S.D.N.Y. 2012) ("states of minds of the

defendants in the instant case will be one of the key issues in the forthcoming trial"); *Gowan v.

Patriot Grp., LLC* (*In re Dreier LLP*), 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011)

("[d]etermining the Defendants' good faith [under section 548(c)] is an indisputably factual

inquiry") (internal citations omitted).

As this Court has observed, summary judgment is not the appropriate vehicle to

determine the disputed issue of Merkin's state of mind.  Rather, the factfinder must assess at trial

Merkin's state of mind, his credibility, and any other evidence put forth by the parties.  Summary

judgment is unwarranted and should be denied.

## III.   DEFENDANTS CANNOT ESTABLISH THROUGH UNDISPUTED FACTS THAT DEFENDANTS RECEIVED THE TRANSFERS IN GOOD FAITH

To obtain summary judgment, Defendants bear the burden of establishing through

undisputed facts that the transfers at issue were received for value and in good faith.  Defendants

do not, because they cannot, deny that Merkin was aware of facts evidencing fraud at BLMIS.

Indeed, they rely on Merkin's after-the-fact commentary about some of these facts to argue that

he was not "willfully blind."  The evidence adduced by the parties shows that Merkin willfully

blinded himself to fraud at BLMIS.  Rather than meet their burden, Defendants' motions only

45

highlight the factual dispute as to Merkin's willful blindness. A trial is necessary and a trial is the proper place for Defendants to dispute these material facts.

### A.      Defendants Were Aware Of Facts Suggesting A High Probability Of Fraud

Defendants' awareness of facts suggesting a high probability of fraud is primarily demonstrated through evidence regarding: (1) the presence of "red flags" that were known to Merkin; (2) Merkin's discussions with others about these red flags; and (3) Merkin's lies to his investors about BLMIS.[10]

### 1.      Defendants Were Aware Of Numerous Red Flags Suggesting Fraud At BLMIS

The evidence shows that Defendants saw these red flags and understood them, giving them an awareness of a high probability of fraud at BLMIS. This Court has held that willful blindness may be inferred from the presence of a pattern of "red flags" putting defendant on notice of illegitimate conduct. *See Merkin*, 515 B.R. at 139-40 (citing *United States v. Tusaneza*, 116 Fed. App'x 305, 306 (2d Cir. 2004), *cert. denied*, 546 U.S. 874 (2005)).

Merkin understood that Madoff was not conducting the Madoff SSC strategy. Based on his knowledge of the strategy, Merkin knew that the returns should be correlated with the S&P 100 and, concomitantly, the S&P 500. (Tr. SOF, ¶¶ 68-69, 103). But as of February 1996, Merkin's BLMIS returns were entirely independent of the S&P 500—generating consistently positive returns even in times of severe market stress. (Tr. SOF, ¶¶ 73, 74, 77, 80-83). Merkin further knew that Madoff engaged in options trading that was not used to hedge equity

---

[10] In their motion, the Merkin Defendants rely upon the testimony of their proffered expert, Jeffrey Weingarten, to counter the Trustee's evidence regarding Merkin's due diligence efforts. Weingarten's testimony raises disputed issues of material fact that make this case inappropriate for summary judgment. The Trustee reserves all rights to object to the admissibility of Defendants' proffered expert testimony at the appropriate time.

transactions as the Madoff SSC strategy required.  (Tr. SOF, ¶¶ 103-06).  Merkin's BLMIS

statements reflected a significant number of options transactions that were not used to hedge

equity transactions.  (Tr. SOF, ¶ 104).

Similarly, Merkin knew, from receiving and tracking the trade confirmations (Tr. SOF, ¶

94), that BLMIS was reporting option trading volume in excess of the total volume on the

CBOE.  By September 2005, there were hundreds of put and call transactions purportedly traded

in the Merkin Accounts that exceeded the total market volume for that day.  (Tr. SOF, ¶ 92).

Although Merkin tried to explain these discrepancies away by saying that he believed that

Madoff traded options OTC, the trade confirmations that Merkin received reflected a CUSIP

number, indicating that the trades were done on the CBOE.  (SOF Response, ¶ 172; Tr. SOF, ¶¶

94, 98).  Even if Merkin's claim that he believed the trades were done OTC could be credited on

summary judgment—which is impermissible—OTC transactions list counterparties.  (Tr. SOF, ¶

97).  The trade confirmations sent to Merkin either failed to identify counterparties or

nonsensically listed the Merkin Funds themselves as counterparties, meaning that the Merkin

Funds were trading with themselves.  (Tr. SOF, ¶ 97).  Merkin was similarly aware that there

were out of range trades in his BLMIS accounts, for which there is no explanation but fraud.

(SOF Response, ¶ 130).

Even aside from the quantitative red flags for which the only explanation is fraud, Merkin

was aware of the litany of more basic red flags.  Merkin knew that BLMIS had a small auditor

(Tr. SOF, ¶¶ 137-38), had an unusual fee structure that permitted Merkin to pay less fees for

BLMIS's management of his Merkin Funds' money (Tr. SOF, ¶¶ 139-41, 143), that BLMIS self-

cleared trades (SOF Response, ¶¶ 166, 173), and that BLMIS had no checks and balances to

ensure that assets were properly segregated and safe-guarded.  (SOF Response, ¶¶ 138, 166).

As they did on the motion to dismiss, Defendants try to deflect from these red flags by

once again citing to decisions that discuss generic red flags about Madoff in the securities fraud

context.  (Merkin Br. at 20 n.5; Ascot Br. at 32-33.)  But as this Court previously found, those

cases are not relevant here.  Instead, the issues that remain for trial are the facts and information

known specifically by Defendants, whether or not some of that information also should have

been known to others.  *Merkin*, 515 B.R. at 145.[11]  And as to those specific facts, Defendants'

attempt to refute them through their selective and incomplete record references is fatal to a grant

of summary judgment.

Defendants' understanding can be inferred based on what similarly situated industry

professionals would or should have understood based on similar facts.  *See, e.g.*, *In re Optimal*

*US Litig.*, No. 10-cv-4095, 2011 WL 4908745, at *8 (S.D.N.Y. Oct. 14, 2011) (finding scienter

was adequately plead where defendants' agent was aware of reports about concerns with Madoff

and was told by law firms to review transaction tickets to verify trading but did not); *SEC v.*

*Cooper,* 402 F. Supp. 516, 521 (S.D.N.Y. 1975) ("*Cooper*") ("As a sophisticated, experienced

and knowledgeable broker, [defendant] would have had to have been blind not to see what was

going on[.]"); *Gebhart v. SEC,* 595 F.3d 1034, 1042 n.11 (9th Cir. 2010) (citation omitted)

(affirming SEC's finding that licensed registered representatives had requisite scienter where

they departed from ordinary standards of care by making statements to investors for which they

knew they did not have sufficient information).

---

[11] Defendants also rely on *SEC v. Cohmad Secs. Corp.*, No. 09-cv-5680, 2010 WL 363844
(S.D.N.Y. Feb. 2, 2010), reliance upon which was previously rejected by this Court.  *Merkin*,
515 B.R. at 144.  Notably, the Trustee filed a separate action against the same defendants, and
Judge Rakoff found sufficient allegations of defendants' "actual knowledge of, and indeed
participation in, every aspect of Madoff's Ponzi scheme."  *In re Bernard L. Madoff Inv. Sec.,*
*LLC*, 2013 WL 1609154, at *6.

Merkin's repeated, irrelevant theme throughout this case that other investors were negligent in spotting these red flags cannot prevent a trial on the Trustee's claims about red flags to which Merkin chose to turn a blind eye. As this Court already ruled, the Trustee's allegation is not that Merkin *should have seen* the evidence that Madoff was a fraud; it is that Merkin saw it, understood it, and chose to ignore it. *Merkin*, 515 B.R. at 144. Unlike other "mere investors," Merkin "agreed to keep a sharp lookout for fraud" and had a duty to his investors to do so. *Merkin*, 515 B.R. at 145.

Moreover, Defendants cannot defeat a claim of willful blindness, nor the Trustee's right to a trial on his claims, merely by denying an understanding of the significance of the facts that were laid out before them. As this Court explained in an analogous context under the New York Debtor & Creditor Law, the "rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do no evil.' . . . [The law] does not tolerate a person shutting his eyes to a fact . . . *after* realizing its high probability in order to deny that he acted with the requisite knowledge and intent to discriminate." *In re Dreier LLP*, 462 B.R. at 491 (citations and internal quotation marks omitted); *see also In re Optimal US Litig.*, 2011 WL 4908745, at *8 (defendants' awareness of red flags at BLMIS leads to a fair inference that defendants failed to see the perceptible signs of fraud because they chose to wear blinders); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 407-08, 424 (S.D.N.Y. 2010) (citations omitted) (the "red flags" known to defendants about Madoff's operations leads to the more compelling inference that [defendants] were "closing their eyes to a known danger."). This after-the-fact rationalizing is of no avail. *See In re Dreier LLP*, 462 B.R. at 491.

49

Finally, summary judgment does not "authorize[] trial on affidavits." *Anderson*, 477 U.S. at 255. Here, the reports and testimony of the respective experts of the Trustee and Defendants are directly at odds as to whether Merkin conducted due diligence consistent with industry custom and practice. Courts have recognized that where contradictory expert reports and affidavits are submitted, summary judgment is inappropriate because material issues of fact exist. *See In re Celestica Inc. Sec. Litig.*, No. 07-cv-0312, 2014 WL 4160216, at *12 (S.D.N.Y. Aug. 20, 2014) (competing expert testimony as to materiality of alleged misstatements and omissions relevant to investment decisions); *Magique v. Chippendales, Inc.*, 628 F. Supp. 106, 107-08 (S.D.N.Y. 1986) (denying summary judgment and finding a trial necessary when contradictory expert affidavits were submitted in relation to the summary judgment motion "[i]n order to avoid 'trial by affidavit'").

### 2. Defendants' Own Statements And Communications Demonstrate An Awareness Of Facts Indicating A High Probability Of Fraud At BLMIS

Merkin's awareness of facts indicating a high probability of fraud is also demonstrated by Merkin's conversations and observations discussed with third parties, and his misrepresentations and omissions to his investors regarding the true nature of the BLMIS relationship. (Tr. SOF, ¶¶ 151, 152, 161, 165, 167, 175, 176, 183-85, 195; SOF Response, ¶¶ 138, 146, 173, 178, 197, 198, 200, 203).

From the early 1990s, Merkin was warned that BLMIS could be a Ponzi scheme, that his delayed trade confirmations were troublesome, and that the fact that Madoff self-cleared could be an opportunity for fraud. (SOF Response, ¶¶ 138, 146, 173, 178, 197, 198, 200, 203). Merkin also discussed the implausible consistency of BLMIS's returns, the lack of clarity with regard to how specifically Madoff earned those returns, and BLMIS's lack of a qualified and capable auditor. (SOF Response, ¶¶ 125, 138, 176, 194). Merkin knew that these issues with

BLMIS would be unpalatable to any reputable investor and so he hid them from his investors to ensure that they stayed invested with the Merkin Funds.  (Tr. SOF, ¶¶ 151-152, 195, 199;SOF Response, ¶ 173).  At times, Merkin hid the Merkin Funds' relationship with BLMIS from his investors entirely.  (Tr. SOF, ¶¶ 151, 152, 158, 166, 195, 199).  At other times, Merkin led them to believe that BLMIS merely served as the executing broker.  (SOF Response, ¶¶ 54, 138, 144, 151, 152; Tr. SOF, ¶¶ 160-63, 165).  And at yet other times, Merkin led investors to believe that he (Merkin) was implementing the strategy.  (Tr. SOF, ¶¶ 183-86).

Merkin further misrepresented other critical facts, including that Morgan Stanley was the only custodian for Ascot Partners.  (Tr. SOF, ¶¶ 164, 185; SOF Response, ¶ 154).  Merkin knew full well that BLMIS had custody of the Merkin Funds' investments and self-cleared its trades but instead tried to imbue an aura of legitimacy with the Morgan Stanley name.  (SOF Response, ¶¶ 154, 173, 199).  Merkin's conversations with others and his own statements demonstrated his awareness of facts suggesting a high probability of fraud at BLMIS.

### B.    Defendants Took Deliberate Steps To Avoid Learning The Truth About Fraud At BLMIS

The second prong of a willful blindness showing is that Defendants took deliberate actions to avoid confirming the fraud at BLMIS.  Here again, Defendants do not refute the Trustee's evidence but instead point to other evidence that, they say, undercuts it.  The evidence adduced during discovery amply demonstrates actions by Defendants undertaken to deliberately avoid confirming the fraud at BLMIS.  At best, Defendants' motions have identified factual disputes that can be resolved only by trial on the merits.

1.    **Defendants Purposely Chose Not To Conduct Any Meaningful Due Diligence On BLMIS Even Though They Were Under A Duty To Do So**

Merkin was fund manager, general partner, and/or decision-maker for GCC, Ascot Partners, and Ascot Fund. *Merkin*, 515 B.R. at 125-27; (Tr. SOF, ¶¶ 18-19, 21-23, 43, 203, 208-10, 212). Merkin had a duty to his investors to conduct diligence on BLMIS, which included "investigat[ing] an investment to assess the attractiveness of an opportunity, the quality of the management team, the key risks associated with the opportunity, and continu[ing] to evaluate and monitor the investment on an ongoing basis." (Tr. SOF, ¶ 52). These duties included performing qualitative and quantitative analysis to confirm the legitimacy of the investment and the lack of fraud. (Tr. SOF, ¶ 63).

Indeed, investors were specifically assured that Merkin was investigating BLMIS and performing diligence on their behalf. (Tr. SOF, ¶¶ 64-65). Investors were told that the Merkin Defendants "spend time and money looking down," and how "an exceptional run of superior performance in virtually any business is almost impossible to perpetuate . . . [and] our job, as we understand it, is to keep our guard up at all times." (Tr. SOF, ¶¶ 64-65).

Rather than conduct any due diligence consistent with industry custom and practice, Merkin instead engaged in empty endeavors that were not designed to address the specific red flags of which he was aware and understood. Merkin touts, among other things, his conversations with Madoff, his "Madoff file," the fact that BDO was the Merkin Funds' auditor, and that GCC input trade confirmation information from BLMIS into their own systems. (SOF Response, ¶¶ 101, 111, 116, 118). But none of these activities were designed to ferret out information that related to the specific concerns of which Merkin was aware. At bottom, Merkin did nothing more than keep clippings in a file, ensure that one set of documents that Madoff sent him matched the second set of documents that Madoff gave to him, and ask Madoff himself for

assurances. (SOF Response, ¶¶ 101, 111). Courts reject the notion that a party can rely upon the assurances of the broker or investment advisor to show adequate due diligence. *See General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 13 (1st Cir. 1986) (finding that investors did not exercise due diligence where they relied on assurances of promoter and broker); *Cooperativa Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 942 F. Supp. 735, 739 (D. P.R. 1996) ("blind faith in the assurances of an investment advisor does not constitute due diligence . . ."). Moreover, not only is the "diligence" Merkin performed inadequate as a general matter, it permitted Merkin to specifically avoid learning anything further about the specific concerns of which he was aware.

This Court has noted in an analogous context under the New York Debtor & Creditor Law that where a defendant has a duty to investors to perform diligence and fails to do so, he is charged with the knowledge of "what was obvious but ignored, or doubtful but not explored." *In re Dreier LLP*, 462 B.R. at 491; *see also Merkin,* 515 B.R. at 140. Thus, Merkin's failure to learn specific facts he was under a duty to know constitutes willful blindness and entitles the Trustee to a trial on his claims. *See, e.g.*, *United States v. Natelli*, 527 F.2d 311, 323 (2d Cir. 1975) (holding defendant deliberately closed eyes to facts he had duty to see when defendant "is under a specific duty to discover true facts, the facts tendered are suspect, and he does nothing to correct them"); *Dlugash v. SEC*, 373 F.2d 107, 109 (2d Cir. 1967) (finding principals of broker-dealer to be willfully blind where they claimed they did not know suspicious facts, but "the circumstances were such that they should have known").

Merkin's unsupported claim that he performed adequate due diligence rings hollow in the face of the evidence adduced by the parties. Even if his version of events is credited for purposes of summary judgment—which, as the movant, it should not be—all it shows is that

Defendants raise material issues of fact about whether his diligence efforts constitute willful

blindness.

### 2.    Merkin Had Compelling Motives To Avoid The Fraud

In addition to the facts demonstrating that Merkin took deliberate steps to avoid learning

about Madoff's fraud, the record amply demonstrates Merkin's strong motives to do so—

hundreds of millions in fees.  (Tr. SOF, ¶¶ 263, 269-70).  The Trustee is entitled to test those

motives at trial.  *See Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984) ("Issues of

motive and intent are usually inappropriate for disposition on summary judgment."); *cf. Poller v.*

*Columbia*, 368 U.S. 464, 473 (1962) ("summary procedures should be used sparingly in complex

antitrust litigation where motive and intent play leading roles . . . It is only when the witnesses

are present and subject to cross-examination that their credibility and the weight to be given their

testimony can be appraised"); *see also SEC v. Cole*, No. 12-cv-8167, 2015 WL 5737275, at *5

(S.D.N.Y. Sept. 19, 2015) (disputes of fact regarding scienter preclude summary judgment).

In determining whether a defendant consciously avoided learning the truth about a fraud,

courts look at whether the defendant had a motive for ignoring signs of fraud.  "Typically, the

defendant enjoys a profitable financial association with another who is willfully committing

fraud . . . and is motivated not to 'open his eyes' to the underlying facts, since this would place

him in a position of terminating his profitable financial situation."  *In re Fischbach Cor. Secs.*

*Litig.*, No. 89-cv-5826, 1992 WL 8715, at *6 (S.D.N.Y. Jan. 15, 1992) (internal citation

omitted); *see also Hollin v. Scholastic Corp.* (*In re Scholastic Corp. Secs. Litig.*), 252 F.3d 63,

74-76 (2d Cir. 2001), *cert. denied*, 534 U.S. 1071 (2001) (reinstating plaintiff's securities fraud

claims where plaintiff alleged defendant had access to inside information and motive to keep

stock prices high because he profited from arrangement); *Krys v. Aaron* (*In re Refco Inc. Secs.*

*Litig.*), 826 F. Supp. 2d 478, 517-18 (S.D.N.Y. 2011) (finding defendant's awareness of

underlying breaches of his duty to investors indicative of intent to consciously avoid learning

about the fraud for financial gain).

Defendants, particularly Merkin, had substantial motive to avoid confirming fraud at

BLMIS.  Merkin reaped hundreds of millions of dollars in management and performance fees

from investors through the Merkin Funds.  (Tr. SOF, ¶ 269).  Over the life of the Merkin Funds'

investments with BLMIS, Merkin received or was entitled to $552,986,312 in management and

performance fees from the Merkin Funds in return for investing his investors' monies with

BLMIS.  (Tr. SOF, ¶ 269 n.10).  Merkin ignored the trading impossibilities, red flags, and indicia

of fraud, and lied to investors so that he could continue to collect his management and

performance fees.  Hundreds of millions in fees presents compelling motive to ignore the fraud at

BLMIS.  *See Merkin*, 515 B.R. at 143; *see In re Dreier LLP,* 462 B.R. at *14 (defendants

"blindly invested in the Note Fraud in the hopes of turning a huge profit at the expense of later

investors").

To minimize the impact of the significant fees he earned, Merkin suggests that "his

significant personal exposure" to BLMIS negates any motive he may have had to willfully blind

himself to fraud at BLMIS.  (Merkin Br. at 25; Ascot Br. at 26).  But Merkin cites nothing in the

record to support that he lost funds through BLMIS, Merkin was not able to identify how he

derived the amount of his personal exposure in his deposition, and Merkin did not offer any

expert testimony to quantify his exposure and losses in any way, including what portion of his

claimed loss amount constitutes fictitious profits.  (SOF Response, ¶ 159).  The Trustee is

entitled to challenge at trial Merkin's otherwise uncorroborated assertion of losses.

### 3. Defendants Ask The Court To Infer Mere Negligence, Which Is Improper At Summary Judgment And Implausible In Any Event

Merkin's defense essentially boils down to the idea that at best, the Trustee can show that Merkin was negligent, not that he was willfully blind. But the state of mind that should be inferred from the record is a classic question of fact that can only be resolved through a trial. To the extent an inference should be drawn before trial, mere negligence is not plausible given the facts known to Merkin, a sophisticated industry professional whose duty it is to discover facts. *See In re Fischbach Corp. Secs. Litig.*, 1992 WL 8715, at *6 (securities defendants are usually not neophytes in marketplace and inference of negligence should not be drawn for failure to investigate); *Cooper*, 402 F. Supp. at 521 ("As a sophisticated, experienced and knowledgeable broker, he would have had to have been blind not to have seen what was going on"). Even if negligence were one plausible inference, on summary judgment, all inferences must be drawn in favor of the Trustee, the non-moving party. The Trustee is entitled to test Merkin's "negligence" defense at trial.

### C. Defendants Fail To Establish Their Good Faith As A Matter Of Law But At Best Identify Factual Disputes For The Jury

The record establishes the allegations in the TAC, and thus demonstrates Merkin's willful blindness to BLMIS's fraud. Defendants' motions ask this Court to reconsider the facial sufficiency of the Trustee's allegations, (*see* Ascot Br. at 25 ("[n]one of [the Trustee's] allegations is sufficient to prove Merkin's willful blindness")), offer facts and testimony that purport to place the Trustee's allegations in dispute, and ask the Court to draw inferences in their favor. None of these exercises is appropriate for summary judgment.

Defendants' argument is that "[i]n view of the actual testimony and facts, the Trustee's sensational allegations are simply insufficient to give rise to a genuine dispute of material fact on the claim that the Defendants were willfully blind to Madoff's fraud." (Merkin Br. at 26; Ascot

Br. at 25 (the Trustee's allegations are not "sufficient to prove Merkin's willful blindness, and accordingly Ascot Partners' bad faith")).  Tellingly, they do not suggest that the Trustee has failed to offer any testimony and facts to support his "sensational" allegations.  This is because the record contains ample evidence supporting the Trustee's allegations as discussed herein. Moreover, their laundry list of allegations that the Trustee never asserted in the first place—like backdating trades or receiving payments from BLMIS—cannot discharge their burden on summary judgment.  The absence of these allegations is neither here nor there since this Court has found that the Trustee's allegations adequately plead Merkin's willful blindness.  *Merkin*, 515 B.R. at 146.

Defendants have not and cannot demonstrate their good faith as a matter of law, or that there are no facts in the record from which a factfinder could conclude that Merkin was willfully blind to BLMIS's fraud.  At best, they have raised factual disputes that must be resolved at trial on the totality of the evidence.  *See, e.g.*, *In re Old Naples Secs., Inc.*, 2005 WL 419718, at *8 (denying summary judgment because "fraudulent intent can rarely, if ever, be proven by direct evidence and it must be determined from a totality, if there is one, of all the testimonial and documentary evidence"); *AUSA Life Ins. Co. v. Dwyer* (*In re JWP Inc. Secs. Litig.*), 928 F. Supp. 1239, 1257 (S.D.N.Y. 1996) (finding that totality of circumstances raises factual issues for jury to determine whether defendants acted with scienter); *see also Benjamin v. Kim*, No. 95-cv-9597, 1999 WL 249706, at *8-9 (S.D.N.Y. Apr. 28, 1999) (holding that "the combination of these facts should have made [defendant] aware of, or at least suspicious about, possible fraudulent practices or accounting irregularities . . . and that any failure to discover such facts amount to willful blindness on his part").

IV.   **MERKIN'S KNOWLEDGE AND CONDUCT SHOULD BE IMPUTED TO ASCOT FUND**

In a single line in their brief, the Ascot Defendants claim this Court held that Merkin's knowledge cannot be imputed to the Ascot Fund.  (Ascot Br. at 3).[12]  Yet this Court made no such finding.  The Court merely stated that "it does not appear that [Merkin's] knowledge can be imputed to Ascot Fund which became a feeder fund to Ascot [Partners] at the beginning of 2003 and severed its direct connection to Merkin at that time . . . ."  *Merkin*, 515 B.R. at 151.

But the evidence shows that, contrary to the arguments made by counsel on the motion to dismiss (Tr. April 30, 2014 Hr'g at 31:3-5, ECF No. 210), Ascot Fund did not sever its connections with Merkin as he continued to manage and handle all of the daily activities for Ascot Fund after it entered into a master-feed relationship with Ascot Partners in 2003.  GCC also continued to perform its daily functions for Ascot Fund.  (Tr. SOF, ¶¶ 203, 208-10, 212; SOF Response, ¶ 46).  Ascot Fund's January 2003 prospectus stated that its success depended upon Merkin.  (Tr. SOF, ¶ 203).  Merkin retained ultimate authority over the fund after 2003. Ascot Funds' directors testified that the investment manager—Merkin—maintained sole authority over Ascot Fund, and they had no role in the investment decisions or overall strategy of the Ascot Fund, which could not be changed without Merkin's approval.  (Tr. SOF, ¶¶ 209, 210, 212).

Further, notwithstanding the master-feeder agreement, Ascot Fund ignores that the relevant period here stretches back to 1992.  (Tr. SOF, ¶¶ 200, 214).  The Trustee is not limited to imputing to Ascot Fund only the knowledge and intent that Merkin may have acquired after

_____

[12] Although GCC and Ascot Partners did not even raise imputation in their motions, the evidence demonstrates that Merkin's knowledge may be imputed to Defendants and the Trustee is entitled to get to a factfinder on his claims.

2003.  From 1992 to 2003, Merkin was Ascot Fund's undisputed agent.  (Tr. SOF, ¶ 200).

During this period, Merkin—and therefore Ascot Fund—saw and appreciated trading

impossibilities, indicia of fraud, and other red flags in the Merkin BLMIS Accounts, as discussed

above.  Merkin also had discussions with third parties about the trading impossibilities,

incredible consistency of the returns, self-custody of securities, self-clearing of trades, and

BLMIS's unqualified auditor.  (SOF Response, ¶¶ 125, 138, 173, 176).  The fact that Ascot Fund

became a limited partner in Ascot Partners in 2003 (Tr. SOF, ¶ 203), does not mean that facts

Merkin learned before that time cannot be imputed to Ascot Partners.

At a minimum, the Trustee is entitled to present the imputation issue at trial for its

determination.  *See generally Civil Serv. Emp. Ass'n, Inc. v. N.Y. State Dep't of Parks,*

*Recreation and Historic Pres.*, 689 F. Supp. 2d 267, 279 (N.D.N.Y. 2010) (denying summary

judgment because plaintiffs presented genuine issues of material fact on imputation); *Reznor v. J.*

*Artist Mgm't, Inc.,* 365 F. Supp. 2d 565, 575 (S.D.N.Y. 2005) (Rakoff, J.) (denying summary

judgment because "[n]umerous disputed questions remain as to the nature and scope of their

agency that must be resolved before one can determine the effect of such imputed knowledge");

*Murray Hill Manor Co. v. Destination Paradise, Inc.,* 266 A.D.2d 132, 698 N.Y.S.2d 482 (1st

Dep't 1999) (affirming denial of summary judgment after finding that issues of fact existed as to

whether defendants were acting for non-corporate purpose or exercised domination and control

over corporation).

V.    **THE SUBSEQUENT TRANSFER COUNT IS NEITHER RIPE NOR
APPROPRIATE FOR SUMMARY JUDGMENT**

Defendants seek summary judgment on the subsequent transfer claims for the same

reasons they seek summary judgment on the initial transfer claims—that the transfers are not

avoidable—and for the same reasons, they fail.  The record amply supports more than an

inference that the Merkin Defendants, and by imputation the Ascot Defendants, did not receive

subsequent transfers in good faith.  *Good Faith Decision*, 516 B.R. at *21 (quoting *Katz

Decision*, 462 B.R. at 455).  Issues of material fact exist on these core disputes, making summary

judgment inappropriate.

The Ascot Defendants separately argue that the Trustee has not met his burden to show

that the subsequent transfers originated with the debtor.  The Ascot Defendants are incorrect.

The Trustee's burden "is not so onerous as to require a dollar-for-dollar accounting of the exact

funds at issue."  *Picard v. Cohmad Secs. Corp.* (*In re Bernard L. Madoff Inv. Secs. LLC*), 454

B.R. 317, 340 (Bankr. S.D.N.Y. 2011) (internal quotations and citations omitted).  Instead, the

Trustee is only required to show the relevant pathways by which the monies were sent from

BLMIS to Defendants, by putting forth the "'necessary vital statistics—the who, when, and how

much' of the purported transfers to establish an entity as a subsequent transferee of the funds."

*Merkin*, 515 B.R. at 150-51 (citations omitted); *Picard v. Charles Ellerin Irrevocable Trust* (*In

re Bernard L. Madoff Inv. Secs. LLC*), No. 10-04398, 2012 WL 892514, at *3 (Bankr. S.D.N.Y.

Mar. 14, 2012) ("*Charles Ellerin*") (citations omitted).  Commingling of fraudulent transfers

with other property of the defendant does not change this analysis.  *Charles Ellerin*, 2012 WL

892514, at *2 (citations omitted).  So long as the Trustee puts forth evidence to support an

inference that some portion of the debtor's money was transferred to Defendants, summary

60

judgment should be denied.  *See Gowan v. Amaranth Advisers L.L.C.* (*In re Dreier LLP*), No.

10-03493, 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014).

The Trustee has presented ample evidence regarding the origin of the funds transferred to

Defendants.  The Trustee is seeking the return of subsequent transfers received by Merkin, GCC,

and Ascot Fund.  (Tr. SOF, ¶¶ 219-42).  Ascot Partners received initial transfers out of BLMIS to

its Morgan Stanley account.  (Tr. SOF, ¶¶ 217-18).  Thereafter, Ascot Partners sent a portion of

these BLMIS funds from its Morgan Stanley account to GCC and Ascot Fund.  (Tr. SOF, ¶ 219).

In turn, GCC subsequently transferred a portion of these BLMIS funds to, or for the benefit of,

Merkin.  (Tr. SOF, ¶ 235).

Although there was commingling of funds from BLMIS (initial and/or subsequent

transfers) with other funds in Defendants' respective bank accounts, the Trustee's expert, Lisa

M. Collura, has set forth several tracing methods to identify the subsequent transfers of BLMIS

funds.  (Tr. SOF, ¶¶ 222-42).  Using these various methods, which the Ascot Defendants' expert,

Paul K. Meyer, had no issue with, the Trustee has identified the "who, when, and how much" of

the purported transfers to the various subsequent transferees.  (Tr. SOF, ¶¶ 243-44).

## VI.    DEFENDANTS ARE NOT ENTITLED TO A SETOFF UNDER SECTION 502

Defendants argue that summary judgment should be granted for the subsequent transferee and general partner liability claims because Ascot Partners, an initial transferee, is capable of satisfying the $280 million potential judgment at stake here.[13]  Defendants erroneously reason that Ascot Partners has both a net equity claim in excess of $226 million plus a section 502(h) claim for any recovery by the Trustee of the $280 million, for a total claim of $506 million.  As the Trustee's distribution on allowed claims was 55.685% at the time of their motions, Defendants argue that Ascot Partners is entitled to a distribution of $281.77 million, which can satisfy the two-year amount being sought by the Trustee of $280 million.

As this Court has already explained to Defendants, there is no setoff under section 502(d).  Section 502(d) requires a court to "disallow any claim . . . from which property is recoverable . . . or avoidable . . . unless such entity or transferee had paid the amount, or turned over any such property, for which such entity or transferee is liable."  11 U.S.C. § 502(d); *see also Sec. Inv'r Prot. Corp. v. BLMIS*, 513 B.R. 437, 444 (Bankr. S.D.N.Y. June 30, 2014) ("*502 Decision*") ("the estate should receive the property due to it before a liable creditor of the estate may obtain payment on its own claims."); Tr. August 18, 2015 Conf. at 10:24-11:1, ECF No. 281

---

[13] The Merkin Defendants' argument that the Trustee cannot recover against Merkin as a general partner is not only wrong on the law but misplaced on a motion for summary judgment.  As this Court has recognized "[u]nder applicable Delaware law, a general partner of a limited partnership is jointly and severally liable for all of the debts and obligations of the partnership," including a fraudulent transfer judgment.  *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*), 440 B.R. 243, 268 (Bankr. S.D.N.Y. 2010) (citing Del. Code Ann. tit. 6 §§ 15–306(a), 17–403(b)).  Although Defendants cite to two inapposite cases—one regarding a state law breach fiduciary duty claim and the other regarding the availability of punitive damages in a bankruptcy case—neither contradicts nor even addresses the well-accepted principle that general partners are liable for the debts of a partnership.  In any event, this argument is premature since there is no judgment against Ascot Partners yet.

("the law is pretty clear that you don't get a set off under 502(d), which is essentially what you're arguing.").

In the settlement context, the Trustee and an avoidance defendant may structure the terms of a deal in a mutually beneficial way, including by netting out payments to and from one another. A defendant against whom a judgment is entered, however, is not legally due any such courtesy. Thus, where an avoidance judgment is entered, the Bankruptcy Code allows the Trustee to demand payment from Ascot Partners before allowing any claim against the estate. *See* 11 U.S.C. § 502(d); *502 Decision*, 513 B.R. at 444; Tr. August 18, 2015 Conf. at 10:12-13, ECF No. 281.

And contrary to Defendants' misstatement of the law (Merkin and GCC's Mem. Mot. Summ. J. 27-28, ECF No. 285), the Trustee does not have to wait until Ascot Partners fails to pay the judgment in order to seek the relevant amounts from Merkin or other subsequent transferees. The Trustee can pursue all avenues of recovery simultaneously, up to the amount of the avoidable initial transfer of $280 million. *See Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*), 501 B.R. 26, 31 (S.D.N.Y. 2013) (holding trustee can recover from subsequent transferees before avoiding and recovering transfer from initial transferee); *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706-07 (11th Cir. 2005) ("nothing in the language of section 550 requires a plaintiff . . . to avoid the transfer received by the initial transferee before continuing with the avoidance actions down the line of transfers."); *Woods & Erickson, LLP v. Leonard* (*In re AVI, Inc.*), 389 B.R. 721, 735 (B.A.P. 9th Cir. 2008) (trustee not required to avoid initial transfer from initial transferee before seeking recovery from subsequent transferees); *cf.*, *CNB Int'l., Inc. v. Kelleher* (*In re CNB Intern., Inc.*), 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008) ("to the extent an initial transferee would have liability for a fraudulent transfer,

a trustee may recover that transfer from a subsequent transferee, without the necessity for allocation among all subsequent transferees," subject to the limits imposed by section 550(d)). And until the judgment is satisfied in full by a payment to the Trustee, no claim—net equity or otherwise—will be allowed against the estate. In fact, as discussed in more detail below, the Trustee may elect to seek subordination of Ascot Partners' claim rather than continue fruitless recovery efforts against Defendants. Such are the risks of litigation.

Finally, contrary to the Merkin Defendants' arguments, it is far from clear whether they would in fact be entitled to a claim under section 502(h) of the Bankruptcy Code or what the amount of that claim would be if they were found to have received fraudulent transfers. SIPA § 78fff-2(a)(3); *see also Gowan v. HSBC Mortg. Corp. (USA)* (*In re Dreier LLP*), No. 08-15051, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012) (restoration under 502(h) applies only to the extent transferee gave consideration for the transfer); 4 Collier on Bankruptcy ¶ 502.09[2] (16th ed. 2012) (the amount of a section 502(h) claim is based on value of consideration provided and not property recovered). Nor is it clear against which estate—the customer property estate or the general estate—a section 502(h) claim may be asserted. *Cf. Sec. Inv'r Prot. Corp. v. BLMIS* (*In re Bernard L. Madoff Inv. Sec. LLC*), 499 B.R. 416, 425 (S.D.N.Y. 2013) (holding that customers cannot assert claims for value under section 548(c) against customer property estate but must instead assert them against general estate); *but see 502 Decision*, 513 B.R. at 445 ("assuming that the defendants eventually do return any transfers for which they are liable to the estate, they would at that point *likely be* entitled to a recalculation of their net equity claim, erasing any potential double-counting") (emphasis added).

Quite simply, Defendants' speculation about the potential claims of Ascot Partners is of no moment. As explained in *Calpine Corp. v. Rosetta Resources, Inc.* (*In re Calpine Corp.*), an

argument that a recovery would "be negated by a claim . . . under section 502(h) is simply that—speculation." 377 B.R. 808, 815 (Bankr. S.D.N.Y. 2007). Thus, the allowance of any section 502(h) claim, the amount, and the estate against which it may be asserted are all issues for another day.

## VII.   ASCOT PARTNERS' CLAIM SHOULD BE EQUITABLY SUBORDINATED

Defendants seek summary judgment dismissing the Trustee's equitable subordination claim against Ascot Partners. Setting aside the fact that evaluating an equitable subordination claim is a fact-based inquiry not amenable to resolution on summary judgment, the evidence described above and in the Trustee's supporting documents demonstrates that Ascot Partners has engaged in exactly the type of conduct that should result in equitable subordination.

Equitable subordination is codified in section 510(c) of the Bankruptcy Code which provides in relevant part:

> (c) . . . [A]fter notice and a hearing, the court may –
> (1)       under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest.

11 U.S.C. § 510 (c).

Claims will be subordinated under section 510(c) when (i) a claimant engaged in inequitable conduct, (ii) which conduct injured creditors of the estate or conferred an unfair advantage on the claimant and (iii) equitable subordination is consistent with bankruptcy law. *Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692, 699-700 (5th Cir. 1977); *see also*

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*)*,* 169 B.R. 832, 836-37

(Bankr. S.D.N.Y. 1994).[14]

The requisite conduct required to warrant equitable subordination of a claim has been

described as lawful conduct that shocks "good conscience." *In re 80 Nassau Assocs.*, 169 B.R.

at 837. For non-insiders, "the proponent of subordination has the burden of proving, among

other things, that the claimant engaged in egregious, improper or wrongful conduct that damages

creditors." *Kalisch v. Maple Trade Fin. Corp.* (*In re Kalisch*), 413 B.R. 115, 133 (Bankr.

S.D.N.Y. 2008) (citing *Delphi Corp. v. Appaloosa Mgmt. L.P.* (*In re Delphi Corp.*), No. 05-

44481, 2008 WL 3486615, at *22 (Bankr. S.D.N.Y. Aug. 11, 2008)). Such conduct must be

"tantamount to fraud, misrepresentation, overreaching, spoliation or conduct involving moral

turpitude." *Austin v. Chisick* (*In re First Alliance Mortg. Co.*), 298 B.R. 652, 667 (C.D. Cal.

2003).

This Court has already ruled that a showing of willful blindness satisfies the standard for

equitable subordination. *Merkin*, 515 B.R. at 160. In *Katz*, the District Court stated that "the

Trustee can subordinate the defendants' own claims against the estate only by making the same

showing required under Count 1 [actual fraudulent transfer] or its equitable equivalent." *Katz*

*Decision,* 462 B.R. at 456-57 (applying *Mobile Steel* standard); *see also Mishkin v. Siclari* (*In re*

*Adler, Coleman Clearing Corp.* 277 B.R. 520, 554 and 567 (S.D.N.Y. 2002) (subordinating

claim of defendant who knowingly closed his eyes to a fraud). Here, disputed material facts

demonstrate that Ascot Partners, through Merkin, was willfully blind to facts indicating a high

---

[14] The third prong may be moot given that the Bankruptcy Code now specifically provides for equitable subordination, which it did not at the time of the *Mobile Steel* decision. *Official Comm. Of Unsecured Creditors v. Blomen* (*In re Hydrogen, LLC*), 431 B.R. 337, 360-61 (Bankr. S.D.N.Y. 2010); *Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006).

probability of fraud at BLMIS. Accordingly, this conduct is sufficient to sustain a claim for equitable subordination in the face of a summary judgment motion.

Defendants' next argument that their conduct has not injured the creditors of BLMIS was already rejected by this Court. *Merkin*, 515 B.R. at 160. The evidence shows Defendants received transfers of more than $550 million (Third Amend. Compl. ¶ 254, ECF No. 151), making those funds unavailable for distributions to net loser customers with allowed claims. Because this harm affects the whole creditor body, the Trustee need only demonstrate that creditors were harmed in a general, concrete manner and it is sufficient to show that creditors are less likely to collect on their debts. *In re 80 Nassau Assocs.*, 169 B.R. at 840 (citing Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 BUS. LAW. 417, 426 (1985)). As this Court found, "but for these transfers, this money would have been available for distribution to the other BLMIS investors who now find themselves net losers." *Merkin*, 515 B.R. at 160. The fact that Ascot Partners was a net loser does not alter this conclusion. *Ceretti*, 2015 WL 4734749, at *17 ("Although the Funds are net losers, the money they withdrew would have been available to innocent net losers who did not knowingly invest in a Ponzi scheme."); *Merkin*, 515 B.R. at 160 (same).

Defendants' assertion that the Trustee cannot simultaneously prosecute fraudulent transfer claims and seek equitable subordination is incorrect. The Trustee's equitable subordination claim is plead in the alternative to his fraudulent transfer claims. Should the Trustee avoid and recover all of the transfers he seeks, the Trustee does not disagree that equitable subordination could be moot. *See Hirsch v. Pa. Textile Corp. Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 610-11 (Bankr. S.D.N.Y. 1998). However, if the Trustee cannot recover some or all of the fraudulent transfers—because of statute of limitations or other

defenses, or any other reason—equitable subordination would be appropriate. *Merkin*, 515 B.R. at 160. Defendants' arguments in this regard are therefore, at best, premature.

Defendants' last argument, like their argument on section 502(h), relies on their failure to distinguish between settlements and litigation to a judgment. Defendants claim that because the Trustee allowed the claims of other feeder funds in settlements, the Trustee cannot seek equitable subordination of any potential claim of Ascot Partners. Not so. With this Court's approval, the Trustee can settle any of his claims in a manner that benefits the estate. *Air Line Pilots Ass'n v. Am. Nat'l Bank & Trust Co. of Chicago* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). The Trustee's settlement of claims as appropriate in no way prohibits him from pursuing similar claims against non-settling defendants. And if the parties do not reach a settlement prior to any judgment on the Trustee's claims, the Trustee is entitled to use the full force of the Bankruptcy Code to enforce that judgment, including potentially subordinating a claim against the estate where the full amount of fraudulent transfers are not repaid. Contrary to compromise, there are guarantees in litigation as to any potential claims against the estate following a judgment.

Finally, and most importantly on a summary judgment motion, determining whether equitable subordination is appropriate requires the examination of the relevant facts and circumstances of the case. *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007) ("in the context of claims for equitable subordination "[t]he nature of the underlying conduct (and, at least arguably, any resulting injury) will have to be fleshed out as a factual matter"); *see also In re Mid-Am. Waste Sys., Inc.*, 274 B.R. 111, 126 (Bankr. D. Del. 2001) ("equitable subordination is rarely amenable

to resolution on summary judgment").  Because Defendants contest evidence relied upon by the

Trustee in support of his equitable subordination claim, Defendants have failed to show that

there is no genuine issue of material fact.  Defendants are thus not entitled to judgment as a

matter of law.

<u>**CONCLUSION**</u>

The evidence overwhelmingly shows that Defendants were willfully blind to fraud at

BLMIS.  At minimum though, the evidence adduced by the parties presents genuine issues of

material fact regarding the Trustee's claims to avoid and recover fraudulent transfers to

Defendants and to subordinate the customer claim of Ascot Partners.  For the foregoing reasons,

the Trustee respectfully requests that Defendants' motions be denied.


Dated: New York, New York              Respectfully submitted,
      November 25, 2015
                                      BAKER & HOSTETLER LLP


By:  *s/ David J. Sheehan*
      Baker & Hostetler LLP
      45 Rockefeller Plaza
      New York, New York 10111
      Telephone: (212) 589-4200
      Facsimile: (212) 589-4201
      David J. Sheehan
      Email: dsheehan@bakerlaw.com
      Lan Hoang
      Email: lhoang@bakerlaw.com
      Seanna R. Brown
      Email: sbrown@bakerlaw.com
      Brian W. Song
      Email: bsong@bakerlaw.com

      *Attorneys for Irving H. Picard, Trustee for the*
      *Substantively Consolidated SIPA Liquidation of*
      *Bernard L. Madoff Investment Securities LLC*
      *and the Estate of Bernard L. Madoff*