# EXHIBIT 8

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


--------------------------------x

In Re:


BERNARD L. MADOFF INVESTMENT        Adv.Pro.No.

SECURITIES LLC,                     08-01789(BRL)

          Debtor.

--------------------------------x

IRVING H. PICARD, Trustee for the

Liquidation of Bernard L. Madoff

Investment Securities LLC,

          Plaintiff,                Adv.Pro.No.

                                    09-1182(BRL)

          v.

J. EZRA MERKIN, GABRIEL CAPITAL,

L.P., ARIEL FUND LTD., ASCOT

PARTNERS, L.P., GABRIEL CAPITAL

CORPORATION,


          Defendants.

--------------------------------x



        VIDEOTAPED DEPOSITION OF J. EZRA MERKIN,

as reported by Nancy C. Bendish, Certified Court

Reporter, RMR, CRR, and Notary Public of the

State of New York, at the offices of Baker

Hostetler, 45 Rockefeller Plaza, New York, New

York, on Tuesday, February 24, 2015, commencing

at 9:47 a.m.

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

9

1          Q.      Yes.  Would it be fair to say at

2     least ten or more times in the Madoff matter?

3               MR. STEINER:  Objection to form.

4          A.      Do you mean in depositions?

5          Q.      Yes.

6          A.      I don't really know the number,

7     doesn't sound unreasonable.

8          Q.      Okay.  So, you know the drill, if

9     you have a problem with any of my questions, I'd

10    like you to just tell me that and, as I said

11    earlier, I'll try and clean them up for you.

12         A.      Okay.

13         Q.      Why don't we start at the

14    beginning, so to speak, with the benefit of your

15    educational background, starting with college.

16         A.      I attended Columbia College in the

17    City of New York and I graduated in 1976.

18         Q.      While in college, did you take any

19    business courses?

20         A.      I really don't remember.  I don't

21    think so.

22         Q.      Okay.  And thereafter, what did

23    you do after you graduated from college?

24         A.      I attended law school.

25         Q.      And where did you go to law

**Picard v. Merkin**                                    **J. Ezra Merkin  2-24-15**

10

1  school?

2      A.    I went to Harvard Law School and I

3  graduated the class of 1979.

4      Q.    Did you take any -- and we're

5  going to explain what I mean by this --

6  business-related courses while at Harvard Law

7  School?  By way of example, accounting for

8  lawyers?

9      A.    I took accounting in law school.

10     Q.    Okay.

11     A.    I took corporations, corporate

12  finance.  Just not quite sure what is

13  responsive.

14     Q.    Yeah, that's fair.

15           How about securities laws, the

16  Securities Act of 1933, for example?

17     A.    I think I took a class that

18  covered aspects of securities regulation.

19     Q.    And would that include also the

20  Exchange Act of 1934, to your recollection?

21     A.    It certainly might have.  I just

22  don't remember precisely.

23     Q.    Okay.  Were there any other -- I

24  may have overlooked some business courses that

25  you may have included within your law school

Picard v. Merkin                          J. Ezra Merkin  2-24-15

11

1    curriculum.  Could you tell me if I have.

2         A.    I just don't want to -- I took

3    first year contracts.  I'm not sure that is what

4    you have in mind.

5         Q.    Well, it's a start, yeah.

6         A.    Okay.  I guess I took first year

7    property.  I imagine New York City trust and

8    estates.  The ones I mentioned before --

9         Q.    That's fine.

10        A.    -- corporations, corporate

11   finance, some form of securities regulation,

12   accounting, those are the ones that come to my

13   mind at the moment.  There may have been others.

14   I don't remember at this time.

15        Q.    Upon your graduation, what did you

16   do next?  From law school that is, I'm sorry.

17        A.    I took the bar exam in the summer

18   of 1979 and started in the fall of 1979 at a law

19   firm in New York City called Milbank, Tweed,

20   Hadley & McCloy.

21        Q.    How did you get to Milbank?

22        A.    Well, I had worked at Milbank the

23   prior summer, which would have been the summer

24   of 1978, so I was coming back to Milbank.  I

25   wasn't getting there for the first time.

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

15

1          A.      Which aspects?

2          Q.      The sale of stock, stock exchange.

3    Making markets.

4          A.      I couldn't say yes and I couldn't

5    say no.  I guess I could say I really don't

6    remember.  The Exchange was a regulated entity.

7    Some of the materials -- some of the assignments

8    focused on the regulatory status of the exchange

9    and the ongoing -- and it's ongoing nature.

10         Q.      Let me try a different way, which

11   may be helpful.

12                 What did you do -- did there come

13   a time when you left Milbank?

14         A.      Yes.

15         Q.      And how long were you at Milbank?

16         A.      More or less three years.

17         Q.      And what, if anything, did you do

18   after that?

19         A.      I went to work for a small money

20   management firm that had started up not very

21   long before I got there, called Halcyon

22   Investments.

23         Q.      And what do you mean by the term

24   "money management firm"?

25         A.      A firm that had been given to it

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

30

1    the bankruptcy analysis that covered or that

2    accompanied an analysis or the attractiveness of

3    the debt piece, the more likely the original

4    lender might just say the easiest way to

5    restructure this from my point of view is to

6    pick up the telephone and sell it.  And if we

7    thought we could buy it at a sufficiently steep

8    discount to what our analysis thought it would

9    be worth at the end, that made an attractive

10   investment.  Put another way, I think there was

11   an attempt to try hard to invest across the

12   board of the portfolio not only, but

13   significantly in securities that were undergoing

14   some restructuring that had an analyzable

15   conclusion.  And a lot of that analyzable

16   conclusion was driven by legal analysis and a

17   lot of the analysis was driven by legal

18   training, if not specifically legal analysis.

19        Q.    Let's move on, if we could, to did

20   there come a time when you left Halcyon?

21        A.    Yes.

22        Q.    And when was that?

23        A.    That would have been later in the

24   1980s.  So I'd say something like 1985 or maybe

25   a year, half a year earlier, half a year later,

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

31

1    something like that.

2         Q.     And what, if anything, did you do

3    next?

4         A.     I joined a firm that had been

5    started by someone who I had been an associate

6    of and he had been an associate of mine at

7    Halcyon.  The name of that firm was Gotham

8    Capital.  The name of that person was Joel,

9    J-o-e-l, Greenblatt.  And I joined him in his

10   operation more or less at the time I indicated.

11        Q.     This is a very broad question, but

12   perhaps it will work.  What did Gotham do?

13        A.     So, Gotham did a lot of things

14   that we had done at Halcyon.  The tray of

15   attractive candidates for the portfolio had

16   evolved, which is very usual in the investment

17   business, or usual enough.  So that, very

18   roughly, and from memory that is not to be

19   depended on in this particular -- in this

20   particular period of time or set of questions,

21   Halcyon might have had as much as 75 or 80

22   percent in bankruptcies and 20 or 25 percent in

23   merger arbitrage when I got there, and that

24   could have flipped over a two- or three-year

25   period.  Not deliberately.  You go where the

**Picard v. Merkin**                                    **J. Ezra Merkin  2-24-15**

58

1    next line.

2         A.      Um-hum.

3         Q.      What is your understanding of the

4    term "options arbitrage"?

5         A.      Well, substantially all of the

6    assets of Ascot at that point were managed by

7    the Madoff organization and Bernie Madoff

8    specifically and they were engaging in what I

9    would consider options arbitrage.  Meaning

10   arbitraging prices of -- the prices of options

11   and the prices of the securities to which those

12   options can be converted into or exercised into

13   or assigned to.  So that it's your arbitraging

14   price relationships between underlying

15   securities and options struck against those

16   securities.

17        Q.      Okay.  And then skip over

18   Cerberus.  It then says "managing partner" and

19   it has your name.

20        A.      Um-hum.

21        Q.      Were you the managing partner --

22   well, you've said Capital Group was just a term

23   used.  Of what organizations were you managing

24   partner?

25        A.      One that comes to mind I'm pretty

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

70

1    don't want to read it to you, Mr. Merkin.

2         A.    Um-hum.

3         Q.    Just in general terms what are you

4    describing here?  Is this a particular fund or a

5    strategy?

6         A.    Yeah, so I think this is still

7    Gabriel Capital LP.

8         Q.    Okay.

9         A.    And would have some applicability,

10   therefore, to Ariel Fund Limited.  We ran those

11   two reasonably or even more than -- ran those

12   two, you know, reasonably pari passu.  So this

13   presents what it calls the warp and the woof.

14   You're familiar with those terms?

15        Q.    I am indeed.  I'm also familiar

16   with the term the weft.

17        A.    The weft?

18        Q.    Yeah.

19        A.    Which is?

20        Q.    The weft is actually what I think

21   you call the woof.  But that's a time for

22   another day.

23        A.    Okay.  So --

24        Q.    The warp and the woof is the

25   fabric.

**Picard v. Merkin**                                    **J. Ezra Merkin  2-24-15**

110

1        Q.      Well, I'm gonna ask you that but,

2    yes, I think I understand.

3        A.      So we don't have to -- do you want

4    me to address that now?

5        Q.      Yeah, what is your understanding

6    of what the Ascot strategy was?

7                MR. STEINER:  And I'm going to

8    interrupt both of you before the court reporter

9    does, that you're getting too talking over each

10   other.  And so maybe I can't direct Mr. Sheehan,

11   but I will tell you, you've got to let him

12   finish before you start responding.

13               MR. SHEEHAN:  Did you get all

14   that?

15               THE REPORTER:  I did.

16               MR. SHEEHAN:  She did.  We're

17   good.

18       A.      Question on the table is?

19       Q.      Now you got me confused here.

20   There it is.

21       Q.      What is your understanding of what

22   the Ascot strategy was?

23       A.      So for those parts of the Ascot

24   portfolio over which Mr. Madoff had discretion,

25   which were substantially all the assets for most

111

1    of the period but not always all of them, so

2    that's now what I mean by Ascot.  Now I'm just

3    addressing the Madoff strategy.  They're not the

4    same things always.

5                Originally we were long a stock,

6    I'm gonna say IBM, long a put struck underneath

7    the stock, and short a call struck over the

8    stock.  So that if IBM traded at, take an

9    example we've tossed around on other occasions,

10   say at 92, we might be long 100 shares of the

11   stock, short the equivalent -- at 92, short the

12   equivalent in calls, the equivalent number of

13   calls struck at 95, and we collected some money

14   for being short those, right?  And we bought a

15   put at 90.  And when we were doing individual

16   stocks and options, which was only at the

17   beginning, we were never partially hedged.  In

18   other words, you may know enough about options

19   contracts to know that -- how the multipliers

20   are, they're not the same as in stocks.

21        Q.      Um-hum.

22        A.      So we were long and short the

23   correct amount of options.  We weren't open, we

24   weren't -- we didn't take an exposure anywhere.

25                So, what that meant is from --

112

1    what that meant is we had limited risk and

2    limited upside.  We were selling off the upside

3    above the strike at which the call was sold.

4    And if you want to add in the premium that's

5    collected, right, so if we sold the call at 95

6    and collected a dollar, the stock could go to a

7    thousand, we stop making money at 96.  We also

8    stop losing money beneath 90.

9              So, I would call that a hedged

10   position, in a very natural way.  I think that

11   is a hedged position.  When we're doing

12   individual stocks we might have had, to pick a

13   characteristic but not necessarily specific

14   example, 30 of those at a time.  30 different

15   stocks with puts and calls.  Long the stock,

16   long the put and short the calls.

17             So I would say it was a portfolio,

18   a basket of hedged positions, fully hedged

19   positions.  Doesn't mean riskless, means hedged.

20        Q.      Um-hum, okay.

21        A.      Those evolved over time to

22   something from which they emanated and there's a

23   resemblance, but it's a different thing.  The 35

24   grew to probably over 50 positions.  But instead

25   of having the individual puts, going back to my

113

1    example IBM, we no longer had IBM puts and were

2    no longer short IBM calls.  We had 50 stocks,

3    50-ish stocks in the S & P 100 and were long

4    puts on the S & P 100 and short calls on the

5    S & P 100.

6              So that the relationship that

7    existed is we had -- we were always long puts,

8    always short calls and for the, for the long,

9    instead of the stock we had a basket of stocks,

10   all of whom were in the S & P 100.

11             So I would consider that a fully

12   hedged position.  Not riskless; fully hedged.

13        Q.    This is a little out of the area

14   but I've got to ask it.

15        A.    Sure.

16        Q.    In your entire experience with

17   Ascot, did anybody ever exercise the call?

18        A.    Exercise the call.  Well, we were

19   short -- were we ever -- I don't remember.  I

20   just have to differentiate the answer.

21             In the individual stock days, say

22   the IBM example, it's just too long ago for me

23   to remember.

24        Q.    All right.

25        A.    That's not to say no, but I just

**Picard v. Merkin**                              **J. Ezra Merkin  2-24-15**

127

1    But that did not make me a Registered Investment

2    Advisor.

3            Q.     I understand that.  Let me ask

4    that question.

5                    Did you or any of the entities

6    that you controlled ever become a Registered

7    Investment Advisor?

8            A.     No.  I never registered.  I don't

9    know about things I controlled because they've

10   had subsequent histories, but I never

11   registered.

12           Q.     I'll ask them later.  Okay.

13                  The -- was GCC the entity that

14   you're referring to?  Do you know what I mean by

15   that?

16           A.     Yes.  If I know what you mean by

17   that, yes.

18           Q.     Okay.  Did GCC --

19           A.     I meant that to be a serious

20   answer.

21           Q.     I took it as such.  And did --

22   just so everybody else is in on it, was GCC the

23   investment advisor for Ascot, Ariel and Gabriel?

24           A.     No.  GCC -- again, GCC was the

25   investment advisor to some of those and not all

**Picard v. Merkin**                    **J. Ezra Merkin  2-24-15**

128

1   of those, because it was only the investment

2   advisor to the offshore funds.  Only the

3   offshore funds had investment advisors.  That's

4   the structure of these and many other offshore

5   funds.

6               So Gabriel Capital LP was a

7   domestic limited partnership and had a managing

8   partner, who is your humble narrator, and Ariel

9   Fund Limited had an investment advisor, GCC,

10  which was a company controlled by the managing

11  partner of Gabriel Capital LP, previously

12  identified as your humble narrator.

13          Q.     Okay, that's good.  Thank you.

14                 Does the term "prime broker" mean

15  anything to you?

16          A.     The term "prime broker" is a

17  phrase used on Wall Street that can refer to one

18  of many different functions, perhaps only one,

19  perhaps several, perhaps all.  It's -- it means

20  a lot of things to a lot of different people.

21  Means a lot of different things to different

22  people.

23          Q.     What does it mean to you?

24          A.     Prime broker?

25          Q.     Prime broker.

**Picard v. Merkin**                                    **J. Ezra Merkin  2-24-15**

141

1       Q.      No, no.  Just initial and

2   monitoring.  The difference.

3       A.      If I misunderstand you, you'll

4   tell me.

5       Q.      Take your time.

6       A.      What I take you to mean, or take

7   the phrase to mean, initial due diligence is due

8   diligence that precedes the actual inception of

9   an investment.

10      Q.      Um-hum.

11      A.      And -- meant to say a second

12  later, but as you continue to hold the

13  investment, there's monitoring due diligence.

14  But it may mean something else to somebody else

15  and it may mean something else in a different

16  context.

17      Q.      Again, just asking your

18  understanding, do you have an understanding of

19  the term "scalability"?

20      A.      Scalability?

21      Q.      Yes.

22      A.      Again, if we're not back at that

23  peer, we're talking about things --

24      Q.      No, we're not there.

25      A.      Scalability generally means, to

143

1    strategies that can't be scaled or have

2    difficulty being scaled, in which case if

3    they're left small enough, they do great.

4         Q.     Have you ever heard the expression

5    "The God of Size comes to visit everybody"?

6         A.     Yes.

7         Q.     Have you used that phrase?

8         A.     Probably.

9         Q.     When you used it, what did you

10   mean by it?

11        A.     It connects to scalability, which

12   means you can't -- if you keep growing, growing

13   and growing assets, you will see some impact on

14   performance.  Doesn't necessarily mean that

15   performance will disappear, it doesn't

16   necessarily mean that performance won't be

17   entirely satisfactory.

18              As a broad concept, it's just

19   easier to push around a smaller amount of assets

20   than a larger amount of assets.  And so if you

21   really really really get big your rates of

22   return are somewhat likely to fall.

23              If you remember the table that we

24   looked at that showed steadily decreasing

25   return, that would perhaps be a concept -- a

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

144

1    result of assets growing.  It might also be an

2    interest rate environment changing, it might be

3    changes in the strategy.  But assets under

4    management, the basic question so what are you

5    running, is an issue that relates to

6    scalability.

7              That said, there are strategies

8    that do better scaled up.  And they are, I

9    think, not as frequent as other ones, but there

10   are strategies that require a critical mass of

11   capital for sheer position in the market or else

12   they don't work, or they work a lot less well.

13        Q.    Okay.

14              THE WITNESS:  If you're going to

15   take a minute, I was going to go to the men's

16   room.

17              MR. SHEEHAN:  No, no, we'll take

18   five minutes.  I told you, any time you need

19   time.

20              THE VIDEOGRAPHER:  Off the record

21   1:44.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  Back on 2:01.

24   BY MR. SHEEHAN:

25        Q.    Mr. Merkin, while we were off the

**Picard v. Merkin**                          **J. Ezra Merkin 2-24-15**

151

1    92 when he died, and I didn't have that many

2    further discussions that I remember with him on

3    that subject.

4          Q.    Okay.  Let's go back to your

5    meeting, if I may, with Mr. Madoff.

6                So, how was it that you came to

7    meet with him in the first place?

8          A.    I don't remember the circumstances

9    of the first meeting and I don't remember when

10   the first meeting was, exactly, and I have a

11   vague memory that I met Bernie downtown, meaning

12   he -- it may have been before he moved his

13   office uptown and I don't know when he moved his

14   office uptown.  I have a vague memory that I met

15   him still when he was on Wall Street.  I mean

16   that literally, that he had an office on a

17   street called Wall Street.  I don't mean the

18   financial district.

19         Q.    I understand.

20         A.    It's in the financial district but

21   if there was there was one.  This was the

22   beginning of our due diligence process and the

23   discussions that I remember more clearly are

24   already uptown at Third Avenue in the east 50s.

25         Q.    What were you doing at that time?

152

1    Were you still with Gotham when you met with

2    Bernie?

3          A.      This would have been after

4    Gotham -- I don't remember.  I don't remember

5    specifically, as I say, the first investment

6    was -- of mine, was at -- through 61M

7    Associates.  61M was a, call it an account or

8    call it an investment vehicle that was managed

9    out of the Scheuer family office, which had

10   possibly also migrated uptown but for many years

11   was at 61 Broadway, and then at the Empire State

12   Building.

13              61M was an account that invested

14   money with the Madoff -- with Bernie Madoff, and

15   had a number of persons who had contributed to

16   61M for that purpose.  And the person who ran

17   the Scheuer family office as an entirety and a

18   61 account was a gentleman named Leon Meyers.

19         Q.      How was it that you came to make

20   that investment in 61?

21         A.      Leon and I had developed a pattern

22   of, you know, sort of talking about managers we

23   liked or managers we thought were interesting.

24   I'm not sure that he was the first person --

25   certainly among the very first, I don't know how

153

1   that dovetailed with my dad, but he was

2   certainly -- it was certainly -- that was

3   certainly the vehicle through which I first

4   invested, and that was just me.  In other words,

5   or maybe it was the kids or something, but it

6   wasn't for the fund and it wasn't for any

7   additional limited partners.

8       Q.    Okay.  I may not -- I don't think

9   I do remember this.  Did you invest in 61 before

10  the meeting with Bernie or after?

11      A.    I invested in 61 I -- you know

12  what, I don't remember precisely.  The answer is

13  about the same time.  Ask me what took place

14  first and what took place second, I don't

15  remember.

16      Q.    All right.

17      A.    I think of both the investment

18  personally only and the meeting with Madoff, the

19  meetings with Madoff as part of the initial due

20  diligence that preceded any investments on the

21  part of the funds, and was sort of just the

22  beginning of the due diligence process.

23      Q.    So, again, returning to page 3,

24  the second line in that first full paragraph

25  says:  Discuss Mr. Madoff's trading strategies

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

163

1    trying to catch, as I say, market turns.

2         Q.    Okay.

3         A.    This is my understanding as best

4    as I can remember it today -- let me just

5    finish -- at that time.  You're asking me

6    initial meetings and what did I think.  So this

7    is my memory today of what I thought then.  That

8    understanding to some extent evolved over time,

9    but I think I am honestly saying that that's

10   what I remember of then rather than what I

11   remember of things that I've even learned -- I

12   mean, obviously what I've learned since this,

13   but I'm saying this is not something that I

14   think I remember from one proceeding or another

15   that has taken place since 2009.

16        Q.    Okay.  During this --

17        A.    Which is what, I assume, what

18   you're asking.

19        Q.    I understand.  I am asking that

20   and we will get to whatever evolution that had

21   taken place.

22        A.    Okay.

23        Q.    When you were having this

24   conversation, the one we're talking about right

25   now, the initial one, and you're talking about

**Picard v. Merkin**                                      **J. Ezra Merkin  2-24-15**

164

1    his trading strategies, you used the term

2    "market timing."  Could you tell me what you

3    mean by that phrase?

4          A.     Well, what I meant by that phrase

5    is -- I'm just going to say in a typical year we

6    would be in and out of the market, I'll stick

7    with my three to six, if we can say three to six

8    to four -- to four to eight times.  So that we

9    would catch -- that's what I mean by catching a

10   turn.

11         Q.     Catch the turn.

12         A.     Among other things, it made the

13   strategy tax inefficient.  It's a good way to

14   understand what I thought was going on, because

15   realized long-term gains, which are heavily

16   taxed advantaged, do not come out of this kind

17   of strategy, or very unlikely to.  You need a

18   longer holding period.  You need a shorter

19   holding period for long term if you're gonna be

20   doing this three or four times a year.

21               His average holding period was

22   maybe, I don't know the number, so it's silly to

23   speculate, but I don't know, eight weeks,

24   something like that, maybe longer.  But nothing

25   close to get you to long term.

Picard v. Merkin                                          J. Ezra Merkin  2-24-15

165

1                   So, what I thought of the strategy

2       as a whole was that he had a knack for catching

3       market turns.  It was market turns done on a

4       hedged basis with very good executions.  That's

5       what I would have seen as the strategy.

6                   Q.    When you say he had a knack, do

7       you mean by that he could intuit the market

8       term?

9                   A.    So, I'm not sure that's entirely

10      what I mean.  I've learned over time -- now this

11      didn't all happen -- what I'm about to say

12      didn't all happen the first meeting.

13                  Q.    Of course.

14                  A.    But every now and then we would

15      have a flat period, nothing happening, dry as a

16      bone, sitting on the sidelines doing nothing.

17                  Q.    When you were doing nothing, where

18      was the money?

19                  A.    Treasuries.

20                  Q.    All right.

21                  A.    You may not think of that as

22      nothing but I'm saying that's what I meant by.

23                  Q.    Right now it's nothing, but go

24      ahead.  Well, it's turning in.

25                  A.    You know what, the Swiss will

Picard v. Merkin                                          J. Ezra Merkin  2-24-15

166

1   charge you for that.  The government still pays

2   you something.  That may change, too, but that's

3   at the moment snapshot.

4          So every now and then I would say,

5   Bernie, we're going to miss the market, you

6   know, if this market's got to catch a rally,

7   whatever, whatever.  I learned over time that

8   his near term market timing sense was much

9   better than mine and that when he thought we

10  might catch a turn he was almost all the time

11  right and when we disagreed either about getting

12  in or getting out he was very often right.

13          He emphasized, I don't remember

14  this specific to the first conversation at all,

15  what I'm about to say to you, but he emphasized

16  certainly over time and maybe even at the first

17  conversation that the elements of -- no, the

18  indicators and the algorithms that helped create

19  his trading program, what you quote in here

20  trading strategies and I mean the same by that,

21  so I'll just say trading strategies rather than

22  to introduce a new phrase.

23      Q.    Understood.

24      A.    Were very much computer assisted

25  in the sense that he spent a lot of money on

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

167

1    software that would help get a sense of market

2    movements from the order flow in the wholesale

3    business.  That's very different to my mind than

4    what you call skimming, and certainly to

5    front-running and, importantly as to your last

6    question, that his gut feeling about which way

7    the market was going to go controlled those

8    signals from his programs and rather than the

9    other way around.

10             In other words, it was a very very

11   sophisticated system that was subject to his, if

12   you want to put it somewhat, perhaps too

13   colloquially, his gut check.

14        Q.    As part of your -- this

15   interrogatory answer we're looking at, as part

16   of your due diligence, as I understand it, did

17   you as part of your due diligence ask for any

18   insight or transparency into the algorithm that

19   gave him the ability to have -- to time the

20   market?

21        A.    The ultimate expression of the

22   algorithm, ultimate expression of the algorithm,

23   is the tickets.

24        Q.    Right.

25        A.    In other words, the algorithm

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

185

1      A.      The Madoff relationship in our

2   organization was heavily managed by Mike and me.

3   I'm not saying to the absolute exclusion of

4   everybody else, but it was basically Mike and

5   me.

6      Q.      Let's just go back just to that

7   last answer, the penultimate answer, actually.

8   That is, when you say you went to Mr. Madoff

9   with other investors and you talked to other

10  investors, did that -- well, let me start first

11  with the other investors.  The other investors,

12  did they know anything more than you knew?

13     A.      From time to time, sure.

14     Q.      What did they know, they told you

15  that you didn't know from talking to Mr. Madoff?

16     A.      I think from time to time they had

17  insights into the process that I might have

18  learned of from them in the first instance.

19     Q.      Such as?

20     A.      Than from him.

21     Q.      Such as?

22     A.      I'm not sure.  There's

23  something -- if you leave that question with me

24  I'll try to come up with something more

25  concrete.

Picard v. Merkin                                    J. Ezra Merkin 2-24-15

186

1    Q.    We'll come back to it.  What I'm

2  looking at is, by talking to others and by

3  bringing people to talk to Madoff, was there

4  anything different going on there than you just

5  talking one on one with Madoff?

6         MR. SIEV:  Objection to the form.

7    A.    There might have been -- if you

8  meet somebody for the first -- I talked to

9  Bernie somewhere between 10 and 15 times a year.

10  Spoke or met with him between 10 and 15 times a

11  year for many years.

12    Q.    Right.

13    A.    I'm going to say roughly, very

14  roughly once a month.  It wasn't always every

15  month and those 10 or 15 times were not

16  separated by the same amount of time every

17  week -- every conversation.  But the importance

18  of listening to Bernie present what he did to

19  someone who met him for the first time is always

20  helpful.  Because you don't refer to things you

21  talked about five years ago or seven years ago

22  or last week, and it's not -- it's less

23  conversational and it's an introduction to a

24  fresh pair of eyes, a fresh pair of ears, a

25  thinking head and a critical acumen, and that

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

187

1    can be very, very, very additive.

2          Q.     You indicated -- I'm sorry, I'm

3    moving around.  I'm going to page 5 of this

4    document, 354.  Down in the last paragraph.

5          A.     Just one second.

6          Q.     Sure, take your time.

7          A.     Just trying to get there.  Sorry.

8          Q.     It's a paragraph that starts,

9    "Mr. Merkin also knew."  And if you travel on

10   down, you start -- you discuss the SEC.  I want

11   to be sure I don't miss something here.  Sorry,

12   I might have jumped over something.

13         A.     It's okay.

14         Q.     Boy, your memory place tricks

15   here.

16         A.     Would you say that for the record,

17   please.

18         Q.     I would readily admit it to the

19   jury.  Just ask Brian Williams.

20                Let's go back to page 5 and the

21   SEC.

22         A.     Last paragraph?

23         Q.     Yeah, last paragraph.  I'm going

24   to just read it.  "In one of their many

25   conversations, Mr. Madoff reported that the SEC

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

188

1    had visited BLMIS's offices to conduct reviews

2    eight times in 16 years, and that gave you

3    additional comfort about Mr. Madoff's bona

4    fides."  Do you see that?

5         A.    I do.

6              MR. STEINER:  It wasn't exactly a

7    correct reading, but close enough.

8              MR. SHEEHAN:  All right.  I stand

9    by the record, not by what I said, all right?

10   Just suggesting a question.

11        Q.    But can you tell me what you

12   discussed that gave you comfort?

13        A.    Unless I'm missing, it says -- the

14   specific reference to the SEC reviews?

15        Q.    Yes.  Did he tell you what they

16   did?

17        A.    Oh.  I thought you were saying

18   something about the comfort.

19        Q.    No.

20        A.    He had either scheduled or

21   surprise visits from the SEC with some

22   regularity and some frequency, perhaps more on

23   the regular than on the surprises.  He was very

24   proud of his overall compliance record and just

25   sort of a clean bill of health with occasional

Picard v. Merkin                                          J. Ezra Merkin  2-24-15

189

1    references to one or two smaller things, and it

2    certainly meant a great deal to me that the SEC,

3    with the power of subpoena, with the ability to

4    spend days at the firm, which is how he

5    presented it, came away and said, you know,

6    thank God for Bernie.  And that was very

7    significant to me.

8         Q.    My question, though, was, maybe I

9    wasn't clear so I'll restate it.

10             Did he tell you what exactly the

11   SEC did during these visits?

12        A.    Yeah.  He -- his operation was

13   reviewed by the SEC.  It is my memory on the --

14   on what I thought of as the two sort of aspects

15   of the business.

16        Q.    What I'm asking you for is

17   specifically, for example, did he tell you that

18   they asked for access to DTCC to verify the fact

19   that he had the stock he said he had?

20        A.    I don't remember that

21   conversation.

22        Q.    Did he ever represent to you that

23   that happened?

24        A.    I truly don't remember.

25        Q.    Okay.  Page 6 if you would,

Picard v. Merkin                                    J. Ezra Merkin 2-24-15

207

1    broker.  The customer doesn't execute the trade,

2    the broker does.

3          Q.    In terms of his ability to execute

4    a trade, how would you rate Mr. Merkin?  You're

5    Mr. Merkin.

6          A.    I am.

7          Q.    You like --

8                (Indiscernible crosstalk)

9          A.    Very low.

10         Q.    Mr. Madoff, how would you rate

11   him?

12         A.    I think the strategy in part was

13   implemented through very good execution.  Not

14   uniformly good execution, but very good

15   execution.

16         Q.    What do you mean by that?

17         A.    I guess several things.  One is

18   costs.  In other words, what we were paying

19   Mr. Madoff to execute.  Had he charged,

20   hypothetically, twice what he charged, the

21   strategy would have been that much less

22   profitable to us.  Same trades, different cost

23   structures would have left us with a different

24   return.

25         Q.    Right.

208

1      A.      Secondly, when we -- by and large

2  when he wanted to get in, he got in.  And by and

3  large when he wanted to get out, he got out.

4  That's called execute.

5      Q.      You say therefore, and maybe I'm

6  wrong, so correct me, is there a relationship

7  between market timing and execution?

8      A.      Well, I know you -- there's a

9  relationship between every strategy and

10  execution.

11      Q.      Right.

12      A.      So you're saying something

13  particular, not unique but something unusual

14  that's individual to market timing?

15      Q.      Meaning that you, through your

16  algorithm and your knack, you pick a time but

17  you must execute it within that time frame, do

18  the two go together?  In other words, if do you

19  think the time is now but your execution lags

20  behind and you don't get the trade done, do you

21  miss the turn?

22      A.      So that's what I was alluding to.

23  When he wanted to get in he seemed able to get

24  in.  There was not a lot of talk from Mr. Madoff

25  over the years of I saw the window, I had the

212

1      Q.      Earlier today we were talking

2  about monitoring due diligence.  My question is

3  did you ever do monitoring due diligence on

4  BLMIS, on behalf of any of your funds?

5      A.      Yes.

6      Q.      What did that monitoring due

7  diligence consist of?

8      A.      Some of these things we have

9  talked about before the break and perhaps even

10  before then, but if one is approximately 10 or

11  15 conversations a year, conversations either in

12  person or on the phone, were meant to continue

13  to monitor and continue to perform due

14  diligence.

15          I just want to make sure he's

16  okay.  Yes, he is.  Are you okay?  Okay, sorry.

17  I thought you had a problem.

18          Was a form of continuing due

19  diligence on the Madoff organization and the

20  organization of the Madoff function.  That is,

21  we didn't just get on the boat, wave farewell

22  after we started investing.  There were

23  numerous, numerous conversations.

24          Madoff's role in the affairs of

25  Yeshiva University was such that I was likely to

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

213

1    bump into him then a couple times a year for

2    that.  And there was always or almost always an

3    opportunity to ask him something that I wasn't

4    sure about in terms of where the strategy --

5    whether it had been executed properly or where

6    the strategy might be headed to next.

7              Madoff's continued and growing

8    success and prominence in the securities

9    industry was very significant.  He did end up in

10   the position he achieved at NASDAQ, as its

11   chairman, and he went to Washington for hearings

12   for testimony.

13             I remember an occasion when he and

14   the president of the stock exchange and a former

15   chairman of the SEC were basically the three

16   persons who congressional committees wanted to

17   speak to.  That all goes to various and

18   different forms of due diligence.

19             Continued to talk to investors,

20   continued to talk to investors of his not

21   through us, who I thought were thoughtful and

22   insightful investors, bringing investors to see

23   him was a big part of what we were after.

24             Various events that took place in

25   the securities industry mattered to me a great

**Picard v. Merkin**                    **J. Ezra Merkin  2-24-15**

277

1   asked me the first question.  And the third

2   question, self-clearing is a question I got from

3   time to time about Madoff.

4       Q.    Didn't you -- you were handling

5   for Ascot, let's just stick with that, current

6   version, both combined, all right?  Or the

7   version near the collapse.  And you're the

8   managing partner, right?

9       A.    Correct.

10      Q.    And GCC is doing what for Ascot at

11  that point?

12      A.    Well, Ascot Fund is then a limited

13  partner in Ascot Partners LP.  So GCC, as the

14  investment advisor to Ascot Fund Limited,

15  basically invested in Ascot Partners LP on

16  behalf of the entire fund.  It was the single

17  largest LP in our limited partnership.

18      Q.    Did you feel as though in that

19  position, just looking at Bernie's statements,

20  that is his confirmations, his customer

21  statements and his reputation, that that was

22  adequate due diligence?

23           MR. STEINER:  Objection, form.

24      A.    I'll add a fact, I'll add a

25  question and I'll answer your question.

**Picard v. Merkin**                          **J. Ezra Merkin  2-24-15**

286

1   this before, yes.

2        Q.     Okay.  Do you know where the --

3   can't think of a better way to put this, do you

4   know where the document comes from?

5        A.     Well, I have to take more time,

6   but if this document stops speaking as of '96,

7   which I'm guessing it does because the upper

8   left-hand date, right, plus I'm doing this

9   quickly and I shouldn't do it this quickly, the

10  table on 220 starts at '90 and ends in August

11  '95.

12       Q.     Yup.

13       A.     And I don't -- and ditto 221.  And

14  ditto 222.  Well, 223 is not that relevant.

15  Another quick look.  But certainly ditto 224.  5

16  and 6 is just kind of neutral, though.

17  Histogram comes back.

18            I'm guessing I got this thing 20

19  years ago.  I'm trying to remember -- I think it

20  describes the performance of a, what is referred

21  to in the street occasionally as a Madoff feeder

22  fund and I'm not sure which.  But the return

23  pattern looks a lot like one, with some

24  differences and exceptions.

25       Q.     Directing your attention to

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

289

1          Q.      Yes.

2          A.      I don't remember.

3          Q.      Did you do, at your fund at GCC,

4     for example, did you do these types of analyses

5     at GCC?  The ones that we see here?

6          A.      The comparison to the S & P 500?

7          Q.      Yes, like for Ascot and for others

8     did you do these types of analyses?

9          A.      Yeah, well we looked at certainly

10    one this morning.

11         Q.      That's right, okay.

12         A.      Okay.

13         Q.      So, do you recall looking at --

14         A.      Therefore, yes.  Just to be clear.

15         Q.      Right.  Did you -- I'm sorry.

16                 Do you recall looking at these in

17    1996 and having any reaction to them?

18                 MS. ARCHER:  Object to the form.

19         A.      I don't remember what my reaction

20    was when and if I looked at it in 1996.  It's in

21    the file, I wrote on it, I'm sure I looked at it

22    when I got it or reasonably soon thereafter, and

23    I don't remember what my reaction was in 1996.

24         Q.      Okay.  You made a statement

25    earlier when you were identifying the document

**Picard v. Merkin**                                    **J. Ezra Merkin  2-24-15**

290

1    that it looked like a Madoff feeder fund in

2    terms of the performance.  In some ways it did

3    and in some ways it didn't.  Could you tell me

4    in what ways you see the information here as

5    reflective of the performance of a Madoff fund.

6         A.    Well, clearly I must have thought

7    something because I wrote "Madoff" on it and put

8    it in the Madoff file.  So if you asked me what

9    I thought in 1996 I presume I wrote "Madoff" on

10   it in 1996 and thought it aspects of the Madoff

11   feeder fund.

12              Looking at it now, I don't

13   quite -- I might still think so.  I just -- it

14   isn't -- I'd have to look at it a little more

15   carefully, but it isn't either as correlated or

16   as uncorrelated as certain aspects I would think

17   of as a Madoff feeder fund.  I haven't studied

18   it.  I may have then but I have to study it now.

19        Q.    Do you have any recollection of

20   why you kept this document?

21        A.    No.  I mean it might have -- no.

22   I might have liked some of the comparisons, I

23   might have liked the presentation, I might have

24   thought that he was a Madoff feeder fund.  I

25   loosely was interested in the world of Madoff

Picard v. Merkin                                    J. Ezra Merkin  2-24-15

308

1   paraphrased.

2           I think -- let's put it this way,

3   to the extent that I can make some sense of

4   this -- I don't really -- if we discussed --

5   Madoff was, was, I don't think Madoff failed to

6   answer too many questions certainly that I put

7   to him.

8           Where he would say that's -- that

9   that is a subject that he considers somewhat

10  proprietary is what you called the algorithm.

11  In other words, he wasn't that interested in

12  training people -- he used to say, I'm not that

13  interested in training people in Madoff.  And by

14  that he meant to say, in the algorithm.  In

15  other words, this is the thing that we do that

16  we think is proprietary, it comes out of the

17  totality of what we spend on the computer

18  systems and the order flow and it lets us judge

19  these turns.  That was something that he would

20  answer and consider proprietary.

21          So I'm just guessing -- doesn't

22  even relate to this, so I don't know.  I've

23  spent five minutes looking at this document, I

24  wouldn't put this at the top of the list of what

25  he got wrong.  I think the top of the list is

**Picard v. Merkin**                                      **J. Ezra Merkin  2-25-15**

321

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


---------------------------------x

In Re:


BERNARD L. MADOFF INVESTMENT          Adv.Pro.No.

SECURITIES LLC,                       08-01789(BRL)

          Debtor.

---------------------------------x

IRVING H. PICARD, Trustee for the

Liquidation of Bernard L. Madoff

Investment Securities LLC,

          Plaintiff,                  Adv.Pro.No.

                                      09-1182(BRL)

          v.

J. EZRA MERKIN, GABRIEL CAPITAL,

L.P., ARIEL FUND LTD., ASCOT

PARTNERS, L.P., GABRIEL CAPITAL

CORPORATION,


          Defendants.

---------------------------------x



          CONTINUED VIDEOTAPED DEPOSITION OF

J. EZRA MERKIN, as reported by Nancy C. Bendish,

Certified Court Reporter, RMR, CRR, and Notary

Public of the State of New York, at the offices

of Baker Hostetler, 45 Rockefeller Plaza, New

York, New York, on Wednesday, February 25, 2015,

commencing at 9:42 a.m.


**BENDISH REPORTING**
**877.404.2193**

347

1    BLMIS account held by Ascot Partners?

2              MS. ARCHER:  Object to the form.

3        A.    My issue is with your use of the

4    word "other."  Which did, before you get to the

5    others?

6        Q.    Let me see if any of these names

7    mean anything to you.

8        A.    Sure.

9        Q.    Are you familiar with the Eric

10   Bruell Trust?

11       A.    Eric?

12       Q.    Eric Bruell.

13       A.    I know something about that.

14       Q.    Was there a time in which Gabriel

15   Capital Corporation was managing the Eric Bruell

16   Trust?  The Eric Bruell Trust BLMIS account?

17             MR. STEINER:  Objection to form.

18       A.    I don't -- I guess I really don't

19   parse the question.  Eric Bruell Trust, as I

20   remember it, had an account directly at Madoff.

21       Q.    Okay.

22       A.    Which the Madoff office was

23   managing, as I take your sense, your use of the

24   word "manage."  So I'm not sure what you mean by

25   was Gabriel Capital Corp. managing an account

**Picard v. Merkin**                                      **J. Ezra Merkin  2-25-15**

348

1    for Eric Bruell at Bernard Madoff.  We did not

2    manage anything at Bernard Madoff.  We played no

3    role in that office.

4            Q.    Did you administer -- well, let me

5    go through these names.

6            A.    I think we might have introduced

7    the account or might have suggested to the

8    trustees of the account that that might be an

9    attractive option for their trust.  And then did

10   our best to keep an eye on it.

11           Q.    Did you charge a fee to the Eric

12   Bruell Trust?

13           A.    We might have at some point.

14           Q.    Manny H. Weiss, are you familiar

15   with Mr. Weiss?

16           A.    Yes.

17           Q.    Did Mr. Weiss have, to your

18   knowledge did Mr. Weiss have a personal -- did

19   Mr. Weiss have a BLMIS account?

20           A.    Some entity related to him I think

21   did.

22           Q.    All right.  And did there come a

23   time in which Mr. Weiss closed that account and

24   transferred its assets to Ascot Partners?

25           A.    I believe that some family member

349

1    of his became a limited partner in Ascot

2    Partners LP.

3            Q.      Are you familiar with Richard L.

4    Hirsch?

5            A.      Yes.

6            Q.      Did Mr. Hirsch have a BLMIS

7    account, to your knowledge?

8            A.      Yes, I believe he did, yes.

9            Q.      Same question, did he --

10           A.      Yes.

11           Q.      -- close and then come to Ascot

12   Partners as a limited partner?

13           A.      I'm not sure anything -- either he

14   or his family entity became a limited partner in

15   Ascot Partners LP.

16           Q.      Are you familiar with the E-b-r-o,

17   NV, or Ebro, N.V.?

18           A.      I think I know -- I know -- I'm

19   familiar with the name.

20           Q.      What is Ebro, N.V.?

21           A.      It's an offshore account.  N.V.

22   is a -- not sure -- I can't remember.  Anyway,

23   it is in some foreign language the equivalent of

24   like Ltd or Inc. and it's, therefore, in all

25   likelihood, an offshore corporation.  And it had

Picard v. Merkin                              J. Ezra Merkin  2-25-15

353

1        Q.     And those entities were Dunraven,

2    Heaton, Langham Trading and Ebro, N.V., correct?

3        A.     Right.   There are four such

4    letters.

5        Q.     Do you know what the purpose of

6    this letter was?

7        A.     Let me just read it.

8               Yes.   I mean, the letter kind of

9    is pretty self-explanatory.   Do you want me to

10   summarize it?

11       Q.     Just tell me what you believe the

12   purpose of the letter was.

13       A.     I think the purpose of the letter

14   was to inform Mr. Ben Dror of the three

15   paragraphs of information that it tells him

16   about.   There's no purpose beyond what the

17   letter says.

18       Q.     Do you see in the first paragraph

19   it says that during 1992 you maintained, you

20   referring to Dunraven on page 6003, maintain a

21   managed account at Bernard L. Madoff & Company

22   that was administered by Ariel Management

23   Corporation?

24       A.     Um-hum.

25       Q.     What is your understanding of the

354

1    relationship between Ariel Management Company

2    and Dunraven's BLMIS account in 1992?

3         A.    I'm not sure exactly what my

4    memory of it is today in 1992, but this first

5    sentence may be an accurate way of saying it.

6    It was managed at Madoff and administration

7    relative to that was done by our management

8    company.

9         Q.    And what is meant by

10   administration?

11        A.    I'm not sure I remember what I was

12   intending in late 1992.

13        Q.    And then you see in the next

14   paragraph --

15        A.    It may be -- it may have involved

16   a number of different things, including

17   specifically oversight of the accounts and

18   compliance with the strategy.  I think that was

19   one of the important issues back then.

20        Q.    And you see in the next paragraph

21   you charged a one percent fee to Dunraven?

22        A.    Yes.

23        Q.    And by you, I mean GCC.

24        A.    Correct.

25        Q.    If you look in the third

355

1    paragraph, you see where it says, sort of in the

2    middle, your managed account with Madoff &

3    Company will be liquidated and the proceeds will

4    be used to purchase participating shares of

5    Ascot Fund Limited?

6          A.     Yes.

7          Q.     To your recollection is that what

8    occurred with these four entities?

9          A.     If these entities are all offshore

10   entities?

11         Q.     Yes.

12         A.     If they're all offshore

13   entities --

14         Q.     Yes.

15         A.     -- then instead of having four

16   different accounts managed at Madoff in their

17   account, individual account names, they would

18   have been participants in a pooled vehicle that

19   was Ascot Fund Limited.

20         Q.     Do you see in the next sentence it

21   says Ascot's sole asset will be a managed

22   account at Madoff & Company.

23         A.     Um-hum.

24         Q.     At the time, and -- at this time

25   was Ascot's investment strategy to manage a --

359

1    should actually be January 1st, 1993, given the

2    date of this letter?

3           A.     I believe that's correct.

4           Q.     Can you turn to Trustee's 366,

5    which is the next document.  And if you could

6    turn to what's -- the Bates number which is 722.

7           A.     Is that the bottom right-hand

8    corner?

9           Q.     In the bottom right-hand corner.

10          A.     Okay.  Just a moment.  Okay.

11          Q.     Do you -- can you identify -- can

12   you identify Trustee's 366 for me.  Have you

13   seen this before?

14          A.     Are you talking about 722 now?

15   You asked me to turn to a specific --

16          Q.     Specifically on page 722.  Have

17   you seen this letter before?

18          A.     Yes.

19          Q.     Can you tell me what this letter

20   is?

21          A.     This is a letter signed by me

22   dated in late December, and addressed to an

23   entity of which I am a managing and general

24   partner called Gabriel Capital LP.  So it's

25   actually written on Gabriel Capital Group's

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

360

1   letterhead and is sent to Gabriel Capital LP by

2   Ariel Management Corporation, and then signed by

3   its president.

4        Q.     And it's informing Gabriel Capital

5   LP of the same information that we saw in

6   Trustee's 365, correct?

7        A.     I would say a parallel movement to

8   a domestic pooled vehicle.  Even has the same

9   typo.

10       Q.     And if you can turn back to page

11  571.

12       A.     571?

13       Q.     I'm sorry.  721.

14       A.     Oh, the previous page.

15       Q.     The previous page.  I'm trying to

16  read it upside down, which is not helpful.

17       A.     Doesn't work for me either.

18       Q.     Do you recognize this document?

19       A.     No.  But I might if I look at it.

20              I don't recognize it, but it looks

21  like something that might have been produced by

22  our back office.

23       Q.     Does this document reflect the

24  managed accounts that Gabriel Capital

25  Corporation was managing or administrating,

Picard v. Merkin                                    J. Ezra Merkin 2-25-15

361

1    sorry, providing administration services for in

2    1992?

3                    MS. ARCHER:  Object to the form.

4          A.       Just one moment, let me have a

5    look.

6                    I don't know today anymore.  It

7    very possibly -- very likely is, but I can't

8    testify that that's the case.

9          Q.       Did you have any discussions with

10   Mr. Madoff regarding the liquidation of those --

11   of the accounts that we talked about in

12   Trustee's 365 and 366?

13         A.       I'm sorry?

14         Q.       Did you have any conversations

15   with Mr. Madoff regarding the liquidation of the

16   accounts listed in 365?

17         A.       The previous document?

18         Q.       Yes.

19         A.       Yes.  You've asked me that before.

20         Q.       What were those conversations?

21         A.       I don't remember the specifics of

22   the conversation, but we didn't -- I mean, you

23   can't open Ascot Fund and Ascot Partners without

24   asking for account documentation, and in the

25   first instance he's the person I would have

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

370

1    Jesselson's name I just mentioned.  Not sure

2    else -- not sure what you're asking me beyond

3    that.

4           Q.    We'll try to tackle this again at

5    the end of the series of questions.

6                 Let's go back to page 2.

7           A.    Okay.

8           Q.    And we've talked a little bit

9    about Mr. Meyers already.  Do you know how long

10   Mr. Meyers had known Mr. Madoff?

11          A.    No.

12          Q.    Do you recall whether he -- strike

13   that question.

14                Do you know when 61 -- I'm sorry,

15   is it 61M or is it 61 Associates?

16          A.    Well, it depends what you're

17   asking.  It's both.  What are you looking for?

18          Q.    What was the entity in which you

19   invested initially with BLMIS?

20          A.    I believe 61M.  I think it's not M

21   by coincidence.

22          Q.    And do you know when 61M made its

23   initial investments with BLMIS?

24          A.    Somewhere in the back of my head

25   is a memory that there is a -- I had a -- I have

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

371

1     in a file, and if that's right, surely produced

2     to you, 61M's record with Madoff.  And if I have

3     the entire record there, then it would go

4     back -- I mean, these are a series of ifs.  If

5     it's there, if it's been produced and if it is

6     exhaustive in the sense that it returns to the

7     first date of their first investment with

8     Madoff, then the answer would be there.

9                    If you're gonna ask me if I know

10    that, that year, sitting here I do not.  But I

11    can tell you where to find it because we whizzed

12    past it yesterday.

13         Q.      Was it in your Madoff file?

14         A.      I believe so.

15         Q.      And can you describe what the

16    document looks like?

17         A.      It's a, it's a column of figures,

18    one set of figures being years, meaning annual

19    dates, and the other one being performance.

20         Q.      And does it describe BLMIS as

21    BEMIS, B-E-M-I-S?

22         A.      Now you got me.

23         Q.      Let me see if I can find that

24    document.

25                    Do you know whether 61M

373

1    market crash, because I remember his quoting

2    something to me the day after the market

3    crashed -- I'm sorry, about the day after the

4    market crashed, which was that the -- the day

5    the market crashed was a very, very, very tough

6    day in the office.  The day after was a

7    disaster, and I think that is true.

8               So we're talking about, you know,

9    the later '80s, '86, '87, something like that,

10   but I can't place it with any greater precision.

11        Q.    Do you recall when you first --

12        A.    He was then running the Scheuer

13   family office.  Just to be clear, that is 61

14   Associates.  61 Associates is the name of the

15   Scheuer family office.

16        Q.    Thank you.

17        A.    61M is just a sub-account or a

18   function within the office.

19        Q.    Do you recall when you first spoke

20   about BLMIS with Mr. Mayer?

21             MR. STEINER:  Meyers.

22        Q.    Meyers, sorry.

23        A.    The day, the time, the weather?

24        Q.    Relative to when your initial --

25   when you first met Mr. Meyers --

Picard v. Merkin                                      J. Ezra Merkin  2-25-15

374

1        A.      Oh, how much time passed?

2        Q.      How much time had passed before

3   you started speaking about BLMIS.

4        A.      I don't remember.

5        Q.      How often would you speak about

6   BLMIS?

7        A.      With Mr. Meyers?

8        Q.      Yes.

9        A.      Over the years?

10       Q.      In the initial time frame.   In

11  this late '80s time period.

12       A.      I don't remember.

13       Q.      Did Mr. Meyers tell you that he

14  conducted due diligence on BLMIS?

15       A.      I don't remember the nature of

16  those conversations.

17       Q.      Do you have any documentation from

18  those discussions?

19       A.      Again, I suppose the answer to the

20  question is yes if the note in the file, if

21  that's what it is, that we referred to, say,

22  five or ten minutes ago, so if it's in fact his,

23  and regardless of whether it's B-E-M-I-S at the

24  top of it or not, if it's there, then that would

25  have been something that he would have sent me

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

375

1    around that time.

2              One way of determining that is

3    seeing what the last year on that is because he

4    would have sent me something that was reasonably

5    up to date.  So, therefore, I'm not testifying,

6    but speculating, those are two different

7    functions, reasonably contemporaneous with the

8    period you're talking about.

9         Q.    After your initial conversations

10   with Mr. Meyers, did you have any discussions

11   with him regarding the performance of your

12   respective BLMIS accounts?

13        A.    When you say respective, at that

14   time they weren't respective.

15        Q.    After your initial discussions,

16   after, in 1990, did you ever have conversations

17   with Mr. Meyers regarding the performance of

18   your respective BLMIS accounts?

19        A.    Yes.  Yes.

20        Q.    What do you recall from those

21   discussions?

22        A.    Well, Leon Meyers and I have had

23   conversations about the investment world going

24   back, let's just say, to '85, '86, '87 and have

25   had one as recently as last week.  So I have

376

1    spent all those years talking to Leon, I suppose

2    possibly twice a day, sometimes twice a week,

3    sometimes twice a month, sometimes twice a

4    quarter.  I think my guess would be in all

5    instances more frequently than twice a year.  So

6    I'm not going to go to twice a year.  And Madoff

7    was a theme of our conversations, surely not

8    every one, but was a constant theme of our

9    conversations.  Performance would certainly have

10   been part of it.  Most of them focused on

11   visits, telephone calls, understandings, changes

12   in the strategy, possible changes in the

13   strategy, and was he in or was he out, if that

14   was something that we were then talking about.

15        Q.     Did you ever have any

16   conversations with Mr. Meyers where you tried to

17   determine how Mr. Madoff chose to enter and exit

18   the market?

19        A.     Probably.

20        Q.     Did you ever come to any

21   conclusions with Mr. Meyers?

22        A.     About what he -- how he --

23        Q.     How Mr. Madoff chose to enter and

24   exit the markets.

25        A.     You're asking me specifically

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

382

1         A.        Nothing terribly reliable, the

2    estimate.

3         Q.        Did Ms. Manzke tell you that she

4    had conducted due diligence on BLMIS?

5         A.        I don't remember the specifics of

6    the conversation, but I remember forming an

7    impression that she had been to the office, that

8    she knew Bernie, that she'd had conversations

9    about the strategies.

10        Q.        And did Ms. Manzke send you any

11   documentation in the course of your

12   conversations -- or in the course of your due

13   diligence on BLMIS?

14        A.        She may have.  I don't remember.

15        Q.        Did you take any notes of your

16   conversations with Ms. Manzke?

17        A.        I don't remember.

18        Q.        If you had taken notes regarding

19   your conversations about BLMIS with Ms. Manzke,

20   would you have put them in your Madoff file?

21        A.        If I had them, very likely, yes.

22        Q.        The next name on the list on page

23   2 is David Gottesman.

24        A.        Gottesman, yes.

25        Q.        Gottesman.  And prior to 1990 did

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

385

1    investor or the funds became investors of

2    Mr. Madoff's.

3          Q.     And what did you discuss with

4    Mr. Gottesman?

5          A.     Mr. Madoff, his personal

6    reputation, the strategy and so forth.

7          Q.     Were you aware at that time, prior

8    to 1990, whether Mr. Gottesman had a personal

9    investment with BLMIS or whether it was in a

10   pooled vehicle or investor money?

11         A.     I don't remember.

12         Q.     And did Mr. Gottesman tell you

13   that he conducted due diligence on BLMIS?

14         A.     I don't remember his saying that

15   in those words.  I know Mr. Gottesman and he

16   doesn't -- he's a very careful and methodical

17   investor.  In his case, one of the impressions I

18   do remember, he had a very high opinion of

19   Bernie Madoff, the person.  Thought he was an

20   innovative person, that some of the things he

21   had done in terms of his challenge of on-board

22   versus off-board trading, his willingness to

23   take on the (indiscernible) of the New York

24   Stock Exchange were all things that

25   Mr. Gottesman knew about, was aware of.

386

1            It was not quite at this time, but

2    Mr. Gottesman's decision to have Mr. Madoff join

3    the university board and become the chairman of

4    their business school board, become at some

5    point the treasurer of the university, a member

6    of the executive committee, were later events,

7    some of them not that much later because that

8    takes place over a series of years, that I think

9    reflected those views.

10        Q.     Did Mr. Gottesman ever share with

11   you how much he invested in BLMIS?

12        A.     I don't remember.

13        Q.     Would the amount of money that

14   Mr. Gottesman placed with BLMIS be of any

15   significance to you?

16             MS. ARCHER:  Object to the form.

17        A.     I don't remember.  At the time

18   Mr. Gottesman had -- was a very, very, very

19   significant investor in Berkshire Hathaway.

20   It's possible that even then I was aware, or I

21   believe is the case which is he was the largest

22   single individual shareholder in Berkshire other

23   than Mr. Buffett.  They're institutional

24   investors, but I think at some point I realized

25   he had a larger -- perhaps was a larger investor

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

387

1    than anybody -- any other individual.

2              So nothing -- he was never going

3    to invest with some other person.  Just for

4    sheer size, of what he might have had with

5    Berkshire and therefore what he had someplace

6    else was not something that I necessarily asked

7    about or remember hearing about or paid that

8    much attention to.  Unless it was trivial, but I

9    don't have any memory that it was trivial.

10        Q.    What would be a trivial amount in

11   your mind?

12        A.    Then?

13              MR. STEINER:  Objection to form.

14        Q.    Yes.

15        A.    I don't know.

16        Q.    The next name on the list is

17   Mr. Gedale Horowitz.

18        A.    Um-hum.

19        Q.    Again, prior to 1990, did you have

20   a relationship with Mr. Horowitz?

21        A.    Yes.

22        Q.    How would you describe that

23   relationship?

24        A.    I knew him.  I knew him probably a

25   little bit less well than I knew Mr. Gottesman

388

1    but not that much less well.  He was a -- had

2    been a figure at the Yeshiva University board.

3    I'm not sure he was still on the board but he

4    was the chairman of their investment committee

5    at that time and I had, by then I'm pretty sure,

6    joined the investment committee.  I'm not sure I

7    necessarily was then chairing it.  Pardon me.

8    Can't quite place the time sequence today.

9              He ran Solomon Brothers' municipal

10   department, municipals department which, when he

11   ran it, until -- the department was closed, was

12   sort of a huge firm within a firm.  He was

13   probably one of the leading spokesmen for the

14   muni industry.  The nature of the muni industry

15   is such that government relations are very

16   critical because municipals are debt securities

17   issued by government entities, perhaps without

18   exception.  They don't qualify for their tax

19   advantages.

20             What I remember from a

21   conversation with him, very specifically at that

22   time, was the extent to which the regulatory

23   world and the congressional world held

24   Mr. Madoff in such high esteem.  That would have

25   been something that would have been important to

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

389

1   me and he would have been a very critical figure

2   in knowing, because he was constantly traveling

3   among states, and specifically to Congress in

4   Washington, on governmental relations, because

5   they're so important to the muni industry, and

6   because Solomon was such a dominant name in

7   municipals.  And he kept saying to me -- he was

8   the person who said to me at that time, Bernie

9   Madoff, a legend on Wall Street.  He said, but

10  you -- but possibly even more so, even more than

11  a legend in Congress.  Given Bernie's testifying

12  down there and given the extent to which they

13  had looked to him for certain issues in the

14  securities industry.

15      Q.    Did you know whether or not

16  Mr. Horowitz had a -- any kind of a personal

17  relationship with Mr. Madoff at that point in

18  time?

19      A.    I don't really remember today

20  whether that was the case or not.  I have very

21  specific memories of their knowing each other

22  subsequent to that time.  In other words, I can

23  tell you about things subsequent to that, but

24  they did very clearly know each other, but I

25  don't remember today whether I knew that then or

**Picard v. Merkin**                    **J. Ezra Merkin  2-25-15**

390

1    whether I didn't know that then.

2          Q.      And the reason I'm asking is the

3    conversation that you had with Mr. Horowitz

4    regarding Mr. Madoff's reputation, do you know

5    whether that was based on Mr. Horowitz's

6    personal knowledge or whether he also learned

7    that through -- or he was relaying to you

8    Mr. Madoff's reputation from other people?

9          A.      The short answer is I don't know.

10         Q.      Do you know whether or not

11   Mr. Horowitz had a personal account with BLMIS?

12         A.      I don't know whether he had a

13   personal account at that time.

14         Q.      Do you know if he ever had a

15   personal account?

16         A.      Oh, I thought you asked me that.

17   I don't know for sure.

18         Q.      Do you know whether or not

19   Mr. Horowitz was ever personally invested

20   through any vehicle with BLMIS?

21         A.      Yes.

22         Q.      What vehicle was that?

23         A.      Ascot Partners LP.

24         Q.      And when did --

25         A.      I'm not sure it was him

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

391

1    personally.  I think it was family trusts, but I

2    would take that to be something that you would

3    want me to answer yes to in your question.

4         Q.    Yes.  Do you know when

5    Mr. Horowitz began his investments with Ascot

6    Partners?

7         A.    Early on in Ascot history and I

8    can't place the exact date or time or year.

9         Q.    Did Mr. Horowitz ever tell you

10   that he conducted due diligence on BLMIS?

11        A.    I don't remember.

12        Q.    And if you hadn't -- if you -- do

13   you have any documentation regarding your

14   discussions and conversations with Mr. Horowitz

15   regarding BLMIS?

16        A.    None that comes to mind, but I

17   don't remember.

18        Q.    If you had such documentation, you

19   probably would have put it in your BLMIS file?

20        A.    Probably.

21              MR. STEINER:  Objection to form.

22        A.    But depends.

23        Q.    Do you recall a meeting between

24   yourself, Mr. Madoff and Mr. Horowitz in

25   February of 2003?

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

393

1      A.      And their views were important to

2   the committee.

3      Q.      Do you recall anything specific

4   regarding the conversation you had between

5   Mr. Madoff and Mr. Horowitz at this meeting?

6      A.      There were some old war stories.

7   That's what makes me think they had a personal

8   relationship because it started with, you know,

9   you son of a gun, do you remember what you did

10  to me in whatever year it was, and you son of a

11  gun, do you remember what you did to me in

12  whatever year it was, and so it didn't sound

13  like these were exactly two people meeting for

14  the first time.

15          So they were discussing figures on

16  Wall Street -- figures meaning persons, not

17  numbers.  They were both friendly with industry

18  leaders.

19     Q.      Did you --

20     A.      I'm -- I just want to make sure

21  that you -- that I'm clear.  I'm not sure that

22  this is -- I remember they were both discussing

23  their being interested in a person who either at

24  that time was, had been or was to become the

25  president of the New York Stock Exchange.  There

394

1   was a bit of discussion about SEC chairman but

2   I'm not sure I -- that that is in front of me.

3   That is what I remember their talking about.

4        Q.    Did you arrange the meeting

5   between Mr. Horowitz and Mr. Madoff?

6        A.    I think so.

7        Q.    Do you know why you needed to

8   arrange the meeting if Mr. Horowitz and

9   Mr. Madoff had a personal relationship?

10       A.    I think Mr. Horowitz, as either a

11  fiduciary for or as an investor in Ascot

12  Partners LP, thought that that was the way to

13  have the introduction, or have the request made.

14       Q.    And did you take any notes from

15  this meeting?

16       A.    Again, I'm not sure I was at the

17  meeting or this is my memory of what they told

18  me about the meeting.  They meaning mostly

19  Gedale.

20       Q.    Other than this one meeting that

21  we were discussing, do you recall any other

22  occasions in which you arranged a meeting

23  between Mr. Horowitz and Mr. Madoff?

24       A.    I don't remember if there was a

25  request for another meeting, that didn't happen

396

1    list is Daniel Hoffert.  Am I saying that right?

2          A.      Hoffert, I think.

3          Q.      Prior to -- again prior to 1990

4    did you have a relationship with Mr. Hoffert?

5          A.      Yes.

6          Q.      And how would you describe that

7    relationship?

8          A.      I knew Mr. Hoffert, he was

9    probably older than I am, and he was someone I

10   knew from our neighborhood and community in New

11   York City when I was growing up.  He no longer

12   lived in New York City, probably even then, he

13   lived in Florida.

14         Q.      Mr. Merkin, can I ask you not to

15   put your hand to your mouth.

16         A.      Okay.

17         Q.      Did there come a time in which

18   Mr. Hoffert became an investor with Gabriel?

19         A.      Yes.  Or some family entity did.

20         Q.      And do you recall when you first

21   met Mr. Hoffert to discuss BLMIS?

22         A.      I don't remember that, when we met

23   to discuss it.  I think he was already in

24   Florida, called me and asked me one or two

25   questions about Madoff.  He said he had had -- I

397

1    think I remember the conversation going

2    something like as follows, because I told him

3    that Gabriel Capital LP -- this is either around

4    the time that he became an investor, or maybe it

5    was earlier.  We had discussed the merger

6    arbitrage business and he said to me, you must

7    know somebody else who's in the merger arbitrage

8    business.  That's not such an infrequent

9    question.  And I said, who'd you have in mind

10   and he said, Bernie Madoff.  And I said, I would

11   not think of Bernie Madoff as someone who is in

12   the merger arbitrage business.  And he said, no,

13   no, no, not merger arbitrage business.

14   Arbitrage business.  He's an arbitrager.  "He"

15   meaning Madoff, not Mr. Hoffert.  And I thought

16   in some sense that made some sense.  And he sent

17   me some form of either a confirmation or perhaps

18   it was a monthly statement to give me some sense

19   of why he called him an arbitrager and what he

20   was doing with him.

21        Q.    I'm going you to go back to your

22   Madoff file.

23        A.    To the rubber bands?

24        Q.    Yes.  This will be relatively easy

25   to find.

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

398

1          A.      I see my discussion of bands has

2     inspired you to take it literally.

3          Q.      All the way to the back.  It's

4     Bates number 3600.

5          A.      3600?

6          Q.      Yes.

7          A.      Oh, it's all the way in the back.

8          Q.      Yes.

9          A.      Oh, is the back.

10         Q.      Couple more pages.

11         A.      Okay.

12         Q.      It's the last document.

13         A.      Okay.  Do I have a page number on

14    this?  3600?

15         Q.      3600.

16              MR. STEINER:  It's cut off on the

17    copy.

18              THE WITNESS:  It's there

19    somewhere, bottom right.

20              MR. STEINER:  Oh, okay.  Sorry.

21         A.      Yes, Mr. Song.

22         Q.      Do you recognize this document?

23         A.      I believe so.  Yes.

24         Q.      What is it to you?

25         A.      Well, now I have to -- it looks

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

399

1    like a monthly, actually, statement from the

2    Madoff office, Bernard L. Madoff Investment

3    Securities, to Mr. Hoffert, who is a trustee for

4    some trust that is for the benefit of Daniel

5    Hoffert.  That is Mr. Hoffert's first name.

6                 So, Daniel Hoffert is a trustee

7    for something that has to do with Daniel

8    Hoffert.  Mailed to him I presume, it was

9    certainly addressed to him on South Ocean

10   Boulevard in Palm Beach, which is where

11   Mr. Hoffert lived.  I think I mentioned he had

12   moved to Florida, although I knew him from New

13   York.

14        Q.    You see the period ending date is

15   January 31, 1993?

16        A.    Um-hum.

17        Q.    Is this the statement that

18   Mr. Hoffert sent to you that you were discussing

19   earlier?

20        A.    I don't quite remember, I don't

21   remember whether the time period I was referring

22   to is then, or earlier.  But he didn't send me

23   the statement necessarily the day after we had

24   the discussion.

25        Q.    Okay.

400

1          A.      The statement came a little bit

2     later.  It's two different accounts.  I'm just

3     looking to see where the options are.  There

4     they are, okay.  So they're here.  There's a...

5     all right.

6          Q.      So, is it your recollection, sir,

7     that you had a conversation with Mr. Hoffert

8     regarding BLMIS prior to 1990 and then

9     subsequent conversation where he sent you this

10    statement?

11         A.      I'm not sure that's my

12    recollection, but I think that is likely what

13    happened, just given the dates of all this.

14    That is, it is my recollection that I had a

15    discussion with Mr. Hoffert at the period of

16    time contemplated by this document.

17         Q.      The interrogatory response.

18         A.      I'm less clear on when this

19    document arrived.  But if you consider this

20    outside of that time, which it probably is, then

21    it came later.

22         Q.      By necessity it had to come later.

23         A.      Right.

24         Q.      And did Mr. Hoffert tell you --

25         A.      May I just clarify.  There may

401

1   have been an earlier document.  That's what I'm

2   trying to get at, that I didn't keep or that I

3   don't have that wasn't in the file, wasn't

4   there.  So I'm not sure that this is the

5   document that I was referring to when I said we

6   had the earlier conversations and the earlier

7   document.

8          Q.     Okay.  Did Mr. Hoffert tell you

9   that he conducted due diligence on BLMIS?

10         A.     I don't remember the conversation.

11         Q.     And do you know when Mr. Hoffert

12  passed?

13         A.     I am guessing around -- the answer

14  is no, I don't.  I'm guessing around 2010.

15         Q.     Do you know if Mr. Hoffert was

16  asked to testify in any matters regarding your

17  investments in BLMIS?

18         A.     I have no idea.

19         Q.     If you turn to page 3 of the

20  interrogatory response --

21         A.     Okay.  Let me put this -- may I

22  seek your advice.  Am I putting the rubber bands

23  back on or not?

24         Q.     I would not put the rubber bands

25  back on.

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

402

1        A.      I asked the right person the right

2   question.

3        Q.      If you turn to page 3, the first

4   full sentence at the top says you had

5   conversations with customers of BLMIS's market

6   making operations.

7        A.      Um-hum.

8        Q.      Do you recall who those customers

9   were?

10        A.      Well, Fidelity for sure.  And I

11   don't remember at the moment who else it might

12   have been.  There might have been somebody at

13   Charles Schwab.  I just don't remember.

14        Q.      Do you recall the particular

15   person you spoke to at Fidelity?

16        A.      No.

17        Q.      And did Fidelity send you any

18   documentation regarding BLMIS's market making

19   operations?

20        A.      I don't think so.

21        Q.      Do you know Henry Kaufman?

22        A.      I do.

23        Q.      How do you know Mr. Kaufman?

24        A.      How do I know Mr. Kaufman?  I know

25   Mr. Kaufman because he and his wife, for a

407

1   had met once or twice.

2        Q.     And did you ever speak to Mr. de

3   Picciotto regarding investments with BLMIS?

4        A.     Directly with him?

5        Q.     Yes.

6        A.     Not that I recall.

7        Q.     Do you know whether Mr. de -- did

8   you know prior to 2008 whether Mr. de Picciotto

9   had any personal investments, meaning him or his

10  family, in BLMIS?

11       A.     So, he owned, and for all I know

12  still owns, he and his family own something

13  called UBP, and I certainly knew that UBP had

14  hundreds of millions of dollars with Mr. Madoff,

15  if not more than hundreds of millions of

16  dollars.  In part because they had hundreds of

17  millions of dollars there, I suppose, with us.

18  I don't know that he had a -- that part of that

19  was his money or not his money, but I know what

20  Mr. Madoff told me Mr. de Picciotto had with him

21  personally.  At the time believed it, I'm not

22  sure that that was necessarily the case.  I'm

23  not sure today I would say that that was

24  necessarily the case.  But at the time I know

25  what that figure was.  And I know that part of

408

1    the UBP staff and senior people with whom I did

2    spend endless amounts of time due diligencing

3    Mr. Madoff occasionally made references to Mr.

4    de Picciotto being an investor, but didn't say

5    through them, independently, and it's also

6    broadly speaking supporting their investment.

7              Mr. de Picciotto by reputation I

8    think is one of the most gifted investors of his

9    generation.  So there was a person that used to

10   go interview him periodically and literally

11   print all of his predictions, kind of, I think

12   used to refer to him as the smartest man he knew

13   or the smartest man in the west or something

14   like that.

15             And over a series of years

16   reading -- he's a very, very (indiscernible)

17   investor.  And I just remember once thinking,

18   okay, this one he's really really going to get

19   wrong, and then a year or two later, he was

20   absolutely right.

21        Q.    Did you ever attempt to speak to

22   Mr. de Picciotto regarding his investments with

23   BLMIS?

24        A.    I think I might have.  It was a

25   very brief snatch and didn't really leave a

Picard v. Merkin                                          J. Ezra Merkin  2-25-15

421

1    is there isn't one.

2         Q.    Okay.

3         A.    Did we produce such a document?

4         Q.    Not that I'm aware of.

5         A.    Okay.  And would it have been

6    called for?

7         Q.    Yes, it would have.

8         A.    Okay, so then I was right.  So the

9    answer to my question is -- your question is yes

10   and the answer to my question is no.

11        Q.    Okay.  I think I've lost who's

12   asking questions.

13             MR. STEINER:  You're not the only

14   one.

15        Q.    The record will so reflect.

16        A.    Right.

17        Q.    Mr. Merkin, do you know Zev

18   Wolfson?

19        A.    I did.

20        Q.    And who is Mr. Wolfson?

21        A.    Mr. Wolfson is an immigrant to

22   this country, sometime I think in the late '40's

23   or early '50s, and made a series of fortunes in

24   different businesses, real estate -- well, the

25   real estate business, the construction business,

**Picard v. Merkin**                    **J. Ezra Merkin  2-25-15**

422

1   as a backer, very, very early backer of certain

2   funds, as a subsequent early backer heavily into

3   strategies that would broadly be described as

4   private equity strategies.

5          Q.     Did you ever have any discussions

6   with Mr. Wolfson regarding your investments with

7   BLMIS?

8          A.     With?

9          Q.     With Mr. Wolfson.

10         A.     My investments with -- just the

11  last.

12         Q.     With BLMIS.

13         A.     Oh.  I thought you said Leon

14  Meyers.  I'm sorry, I just didn't hear you.  I

15  was going to say, I don't think so.

16                Yes.

17         Q.     When did you have those

18  conversations?

19         A.     Over a series of years.  And they

20  would have been perhaps with him and also with

21  one or another of his sons.  It was a family

22  office.

23         Q.     Do you know whether or not

24  Mr. Wolfson or his family office had investments

25  with BLMIS?

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

423

1        A.        I believe they did.

2        Q.        Was that the subject of your

3   conversations?

4        A.        I'm sure it came up.

5        Q.        And do you know whether

6   Mr. Wolfson or his family office conducted due

7   diligence on BLMIS?

8        A.        I believe they did.

9        Q.        What is the basis for your belief?

10        A.        The fact they were there, that

11   they went to -- had been to the office, they'd

12   had conversations, that it was something they

13   had looked into.

14        Q.        Did Mr. Wolfson tell you that he

15   had visited BLMIS's offices?

16        A.        I don't remember specifically

17   whether it was him or a son and I just don't

18   remember.

19        Q.        Did Mr. Wolfson or his son send

20   you any documentation regarding their

21   investments with BLMIS?

22        A.        Not that I recall.

23        Q.        If you can turn to page 5.

24        A.        Still in the same document?

25        Q.        Same document.

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

427

1   top of that paragraph, the first full paragraph

2   on the page where it says, as an --

3          A.      Same paragraph, right?

4          Q.      Same paragraph.  As an initial

5   part of his due diligence in monitoring, it says

6   that you met with Mr. Madoff 10, 15 times a year

7   by phone or in person.  See that?

8          A.      Approximately, yes.

9          Q.      Was it your practice then to speak

10  to Mr. Madoff about once a month?

11         A.      I think I said yesterday that it

12  may well have averaged once a month but I didn't

13  necessarily speak to him once a month and

14  conversations could be bunched.

15         Q.      And does that 10 -- is that 10 to

16  15 times a year purely business conversations

17  that you had with Mr. Madoff?  In other words,

18  discussions about the investments, about funds?

19         A.      You mean with no other subjects

20  ever coming up?

21         Q.      Being the primary purpose of the

22  conversation.

23         A.      Yes.

24         Q.      And so would you have other

25  conversations with Mr. Madoff purely on a

428

1  personal nature?

2      A.     I had conversations with

3  Mr. Madoff about issues that were not -- or

4  subjects that were not business.  One was

5  Yeshiva University.  He knew less about Yeshiva

6  perhaps than other trustees when they first

7  joined and would ask me a lot, ask me questions

8  about Yeshiva.

9              As a member of the executive

10  committee, he was entitled to a vote on who the

11  new president would be.  There were only I think

12  nine such people who had a real vote.  And there

13  were one or two occasions in which he

14  interviewed prospective candidates for that job

15  and asked me to join the interview.  That's the

16  one or two meetings I can think of that were

17  basically not business.

18      Q.     And what year did you start

19  speaking to Mr. Madoff 10 to 15 times per year?

20      A.     Don't remember.  Fairly early on

21  but I don't remember.

22      Q.     Any recollection, starting from

23  1990?

24      A.     I can't tell you that in 1990 I

25  spoke to him 13 times, and if I spoke to him

429

1    nine times it would have been less than 10 to

2    15.  But I spoke to him regularly starting

3    fairly early on.

4         Q.    And you visited Mr. Madoff in

5    person on occasion, correct?

6         A.    Yes.

7         Q.    And were those occasions in his

8    office?

9         A.    Yes.

10        Q.    How often in a year would you go

11   to visit Mr. Madoff's offices?

12        A.    Don't remember exactly.  Several.

13        Q.    So out of the 10 to 15 times --

14        A.    A minority.

15        Q.    A minority of that 10 to 15 times?

16        A.    I would think so, although it

17   doesn't mean I didn't see him at -- later on I

18   would see him, we both attended certain

19   university meetings, so I would see him there.

20   Don't think we met socially very often at all.

21   So an extraordinarily high percentage of my

22   meetings with Bernie were in his office.

23        Q.    And where were you -- where would

24   you physically meet with Mr. Madoff in his

25   office?  When you say his office, that's kind of

431

1    how many people I was bringing in to visit, if

2    the number of people exceeded what his own

3    office could hold, let's say comfortably, we

4    would go a couple of doors down and sit in a

5    conference room.

6              So, the answer to your question I

7    guess is all of the above.

8         Q.    Yes.  Other than Mr. Madoff, did

9    you meet with anybody else during these

10   sessions?

11        A.    From his office?

12        Q.    From his office.

13        A.    No.

14        Q.    Mr. DiPascali -- do you know Frank

15   DiPascali?

16        A.    No.  To answer your question, I

17   believe I met him once.  He was passing by and

18   poked his head in the door and Madoff said Frank

19   and I said, that must be Mr. DiPascali.

20        Q.    Did you know Peter Madoff?

21        A.    I met Peter Madoff maybe once or

22   twice.  I remember in a conference room we were

23   sitting with a number of people, he poked his

24   head in the door and mostly wanted to ask Bernie

25   something and all these people here or

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

432

1   something.

2              Peter Madoff's son died, his son

3   Roger died in the spring of, I don't remember,

4   and I went with somebody who very much wanted to

5   pay a condolence call, so I joined them and saw

6   Peter then, say within a few days after his son

7   had died.  And then I think Peter came -- so I

8   came to these -- get the right name -- Gift of

9   Life Foundation meetings from time to time, and

10  Bernie was the chairman and I think Mrs. Madoff

11  was the vice-chairman of that foundation.

12             So I would see there, you know,

13  some fairly sophisticated investors who were

14  investors of Bernie who were either supporters

15  of the foundation or on the board.  Richard Joel

16  who was the president of Yeshiva University

17  would be there, I think Michael Jesselson was

18  there, a son of Ludwig's, and a brother of

19  Benjamin's.  I think Fred Wilpon was there, I

20  was there, and I think Bernie was there -- I'm

21  sorry, Peter was there.

22       Q.    And you're referring to a specific

23  meeting of the Gift of Life?

24       A.    (Witness nods.)

25       Q.    Was that meeting in December of

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

433

1    2008?

2          A.     Yes.

3          Q.     Who did you understand -- who did

4    you understand operated the computer algorithm

5    that Mr. Madoff purportedly used?

6          A.     I'm not sure I -- in the sense

7    that you mean, I'm not sure I understood that

8    anybody in particular did.  If there was such a

9    person, I'm not sure I have a name to report to

10   you.

11         Q.     Did Mr. Madoff ever show you how

12   the computer algorithm worked?

13         A.     Not that I recall.

14         Q.     And did Mr. Madoff ever express to

15   you that he had employees of BLMIS who helped

16   either create the algorithm or monitor the

17   algorithm?

18         A.     Mr. Madoff talked about how many

19   employees he had, how many people worked at the

20   organization, including the wholesale end of the

21   business and over time that number went up.  So

22   I remember stops along the way, you know,

23   perhaps 85 to 100 and then 200 and then 300.

24                Talked about the computer system,

25   didn't really tell me specifically who was

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

434

1    working on the computers and how many did.

2    Talked more about what he spent the year on

3    improving his systems.

4         Q.    Did you ever ask to speak to any

5    of the people who operated the algorithm?

6         A.    Not that I recall.

7         Q.    Did -- in your conversations with

8    Mr. Madoff, either in person or on the phone,

9    did you have any discussions regarding when he

10   planned to come in and out of the market?

11        A.    Yes.

12        Q.    And did Mr. Madoff, in these

13   conversations, did Mr. Madoff ever offer a

14   projection to you about what the market would do

15   in that month?

16             MR. STEINER:  Objection to form.

17        A.    I'm sorry, offer me a projection

18   of?

19        Q.    Of how the market would perform

20   that month.

21        A.    At the beginning of the month he

22   would say the S & P is going to be up one-and-a-

23   quarter percent this coming month, that's a

24   prediction and you can bank on it or something

25   like that?

444

1        THE VIDEOGRAPHER:  Back on 1:28.

2    BY MR. SONG:

3        Q.    Mr. Merkin, do you recall in some

4    of your earlier testimony when we were

5    discussing Mr. Madoff's strategy you discussed

6    that Mr. Madoff was trying to catch, catch

7    market turns intra-quarter?  Do you recall

8    saying that?

9            MR. STEINER:  Objection to the

10   form.

11       A.    I don't recall saying that in

12   those words.  I think I might well have said

13   that he was trying to catch a turn, but it

14   certainly didn't have to be a turn in a calendar

15   quarter.  I might have either said or trying to

16   suggest that he would catch a turn that would --

17   could often last 90 days duration.  Another way

18   of saying that is three months, just distinct

19   from a calendar quarter.

20       Q.    Do you recall in your experience

21   with Mr. Madoff, was he always able to catch a

22   turn at the beginning of a quarter of a calendar

23   year?

24       A.    I don't remember.

25       Q.    Was he ever, excuse me, did he

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

445

1    ever exit a quarter -- I'm sorry.

2              Were you ever not in treasuries at

3    the end of a quarter of a calendar year?

4         A.    Probably --

5              MR. STEINER:  End of the quarter

6    or end of the calendar year?

7              MR. SONG:  End of a quarter of

8    each calendar year.

9              MR. SIEV:  Objection to the form.

10        A.    Four quarters a year for however

11   many years, so I'm just gonna say, 50 odd

12   quarters.  Were we ever in treasuries -- were we

13   ever not in treasuries at the end of those 50

14   odd quarters.

15        Q.    Instead being in the basket

16   position, yes.

17        A.    I don't remember.

18        Q.    Did you ever check?

19        A.    I always knew whether we were

20   invested or not, on any given day, unless there

21   was activity going on, so we were partially

22   coming in and I might have thought we were -- we

23   were fully coming in, I might have thought we

24   were partially coming in.  But I checked every

25   single day the P & L and the balance sheet.  I

446

1    mean and the position sheet, were we invested,

2    were we not invested, or how much.

3        Q.      Did Mr. Madoff ever tell you that

4    it was important to his strategy to exit the

5    market before the end of a quarter?

6        A.      No.

7        Q.      It was your understanding that the

8    market turns that he was trying to catch by and

9    large lasted 90 days?

10               MR. STEINER:  Objection to form.

11       A.      My understanding from a

12   conversation with him?

13       Q.      Yes.

14       A.      Not that I specifically remember.

15       Q.      Before lunch we were discussing

16   the recordings of telephone calls that you had

17   with Mr. Madoff; do you recall that discussion?

18       A.      Yes.

19       Q.      What mechanism did you use in

20   order to record conversations with Mr. Madoff?

21       A.      Pushed the button on my telephone

22   console, whatever you -- telephone box.

23       Q.      And was it a tape or a digital

24   recorder or how exactly did it work?

25       A.      I told you the extent of what I

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

449

1   little bit because there's going to be too much.

2   33 -- this is now toward the end.

3        Q.    Yes.

4        A.    Oh, here we go, one second.  So

5   I'm going to take 3384 to 3387, right?

6        Q.    That's correct.  If you could just

7   take a minute to look at 3384 to 3387.

8        A.    One second, please.

9              You want me to actually read the

10  whole thing?

11       Q.    If you can just review it and then

12  tell me if you recognize it and then I'll ask

13  you specific questions.

14       A.    Just one moment.  Okay.

15       Q.    Do you recognize this document?

16       A.    Yes.

17       Q.    Can you tell me what it is?

18       A.    It purports to be a transcript of

19  a part of a conversation starting somewhere in

20  the middle, that I had by telephone with

21  Mr. Madoff on or around May 1st of 2000.

22       Q.    And you say on or around May 1st

23  of 2000.  The document itself is dated May 1st,

24  2000, correct?

25       A.    Yes.

Picard v. Merkin                                J. Ezra Merkin 2-25-15

450

1      Q.      Do you have any reason to believe

2   it wasn't, this recording didn't happen on this

3   date?

4      A.      I don't know whether it's the date

5   that the transcript was made or the date that

6   the recording took place.

7      Q.      Okay.  And the first speaker there

8   is listed with the letter B and a colon.  Do you

9   see that?

10     A.      Yes.

11     Q.      Does that indicate that that's

12  Mr. Madoff?

13     A.      I think so.

14     Q.      And the "E" indicates you,

15  Mr. Merkin?

16     A.      Think so.

17     Q.      Do you recall why you recorded

18  this conversation with Mr. Madoff on or about

19  May 1st, 2000?

20     A.      I -- no.

21     Q.      If you -- on page 384, if you go

22  about three-quarters of the way down --

23     A.      84?

24     Q.      Yes, first page.

25     A.      Yup, I got it.

Picard v. Merkin                                      J. Ezra Merkin  2-25-15

451

1        Q.      There is a sentence stated by you,

2    says it's one of two possibilities.  Do you see

3    that?

4        A.      Yes.

5        Q.      And you mention -- or you go on to

6    say it's the introduction of a, you have a pair

7    of accounts with us, we operate as one strategy

8    but it comes from two accounts.  We would then

9    move from one pair to two pair.  Do you see

10   that?

11       A.      I do.

12       Q.      Does that mean anything to you?

13       A.      Today?

14       Q.      Yes.

15       A.      I'm guessing that that -- I'm

16   guessing that the one pair refers to the Ascots

17   and that the second pair refers to what I'll

18   just call Gabriel.

19       Q.      Gabriel and Ariel having accounts?

20       A.      Yes.

21       Q.      Do you recall earlier we talked --

22   we agreed that Ariel and Gabriel opened BLMIS

23   accounts in August of 2000?

24       A.      Okay.

25       Q.      So, does that refresh your

452

1    recollection as to whether this conversation

2    with Mr. Madoff was in regards to opening BLMIS

3    accounts with Ariel -- for Ariel and Gabriel?

4         A.    I mean, that's why I was saying

5    what I was saying.  We had had that -- you and I

6    had that discussion earlier today.

7         Q.    Can you turn to the next page on

8    385?

9         A.    Says it's a few months away.

10        Q.    Yes.  Can you turn to 385.  The

11   first entry that's attributed to you, do you see

12   it says "we" and then there's a very long blank.

13        A.    Um-hum.

14        Q.    Before "weighted."  Do you know

15   why there is nothing transcribed between "we"

16   and "weighted"?

17        A.    That would be anything other than

18   a complete speculation?  No.

19        Q.    If you look towards the bottom of

20   the page you see the comment, the quotations or

21   the words attributed to Mr. Madoff starting with

22   "two more entities."  Do you see that?

23        A.    Yes.  Yes, I do.

24        Q.    Do you recall having Mr. Madoff

25   saying this to you, what's listed here on 385?

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

461

1        A.      Which will take not a lot of time,

2   or do you want me to read it?

3        Q.      I want you to take a look to be

4   able to identify it and then I'll ask you

5   specific questions.

6        A.      Okay.  But you don't want me to

7   read it first?  That's going to take a lot

8   longer than to identify it.

9        Q.      Yes.  Just be able to identify it,

10  first.

11       A.      I'm ready to identify it.

12       Q.      What is it?

13              MR. STEINER:  As I'm sure Mr. Song

14  will tell you, if you want to read the whole

15  thing or feel like you need to read any parts of

16  it answering his questions, you should.

17  Certainly feel free to do so.

18              MR. SONG:  That's correct.

19              MR. STEINER:  If you want to hear

20  his questions about specific parts first, that's

21  fine.

22       A.      I'm sure Mr. Song would say the

23  same thing.

24       Q.      And I do so.

25              Mr. Merkin, do you recognize the

462

1    documents listed 364 through 373?

2            A.      It purports to be a transcription

3    of a recorded telephone conversation between me

4    and Mr. Madoff.

5            Q.      And is the date on or about

6    January 14, 2002?

7            A.      Yes.

8            Q.      And do you recall having a

9    conversation with Mr. Madoff on or about this

10   date?

11           A.      If you had not handed me this

12   document first?

13           Q.      Yes.

14           A.      No.

15           Q.      Do you know whether or not Ms.

16   Ferro transcribed this conversation?

17           A.      I'm guessing that she did.  Do not

18   know for sure.

19           Q.      Would anyone other than Ms. Ferro

20   have transcribed conversations for you?

21           A.      Might have.  Depends who else was

22   in the office, depends who was around, depends

23   who was available.  She wasn't the only person

24   who could have transcribed it.

25           Q.      Again there's a listing of a "B"

Picard v. Merkin                                      J. Ezra Merkin  2-25-15

463

1    and an "E" here as to speakers.  Do you see

2    that?

3           A.      (Witness nods.)

4           Q.      Is it still your understanding

5    that the "B" is Mr. Madoff and the "E" is you?

6           A.      Yes.

7           Q.      Could you turn to page 365, it's

8    the second page.  Towards the bottom you see

9    where there's a handwritten note?

10          A.      Um-hum.

11          Q.      Do you know whose handwriting that

12   is?

13          A.      I don't.  It's not mine.  And the

14   rest is a speculation.

15          Q.      Going back to 364.

16          A.      360?

17          Q.      4.

18          A.      Got it.

19          Q.      In the first paragraph you see

20   Mr. Madoff is saying, why anybody would feel

21   that they don't have transparency as to the

22   strategy.  Do you see that?

23          A.      No.  Oh, it's the very beginning.

24          Q.      Very beginning.

25          A.      Um-hum.  Okay.

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

464

1      Q.      And you respond:  "Actually,

2   Bernie, all the better for you.  The worse for

3   me."

4      A.      Yes.  Yes, that's what that says.

5      Q.      Do you know what that means?

6      A.      I can speculate today what that

7   refers to.

8      Q.      To the best of your recollection,

9   do you know what that means?

10      A.      This statement to which this is

11   responding --

12      Q.      Yes.

13      A.      -- is the middle of the

14   conversation.  Our telephone conversation did

15   not start by Mr. Madoff getting on the phone and

16   saying why anybody would feel that they don't

17   have transparency.  I can't imagine.  That's not

18   how conversations start.

19              So I can speculate what the

20   subject of that is and why that's the response

21   and what about the fact that's alluded to above

22   makes Bernie's life easier and my life harder,

23   but I don't have an independent memory of that

24   today.  So, if you want the independent memory,

25   I don't have one.

465

1      Q.      What is your understanding today

2   of what that means?

3      A.      My guess today, my speculation

4   today is Bernie first says, how can anybody

5   think they don't have transparency.  Meaning

6   they have the transparency as to the strategy,

7   they get the confirmations.  Then he stops in

8   the middle of the sentence and says, actually,

9   no, that's not true.  Meaning he knows that

10  there are limited partners or, if that's the

11  proper structure, in the pooled vehicle who

12  don't get the tickets.  In other words, don't

13  get the confirmations.  Let's not use the word

14  tickets.  Who don't get confirmations and don't

15  have that kind of transparency, so he says, oh,

16  that's not true -- actually you -- what do you

17  need me to go back over?

18            So they don't get the

19  confirmations.  I do.  He says, actually, you

20  know that's not true, actually you have the

21  transparency, Ezra has the transparency, they

22  don't.  Now I understand.  I'm not sure what he

23  now understands.  It's a reference to something

24  that I said before that he now understands but

25  there's no recording of what I said before.  And

466

1    to save you the question, I don't have a clue

2    what I said before in terms of what I remember

3    of this conversation.

4           Q.     Okay.

5           A.     So I say to him, yes, the better

6    for you, the worse for me, meaning they're my --

7    they're now my clients, not his clients.  His

8    customer is the funds, my clients are my limited

9    partners and because I do have the transparency

10   I have to explain to them what the strategy is

11   about and what we're doing and so on and so

12   forth.  But at least I have the transparency to

13   do so.  This is significant.  That's my

14   speculation as to what those three lines mean.

15          Q.     And in the fourth entry down, the

16   second one that's attributed to you, do you see

17   where it says, if I get it wrong by more than

18   plus or minus 25 million --

19          A.     I'm not with you, sorry.

20          Q.     Oh.

21          A.     How far down the page?

22          Q.     Top quarter, top quarter of the

23   page.  And you see where -- let me go one

24   sentence down, it says if someone asks me what

25   Bernie is managing --

479

1    Goldman and Morgan does to help corporate

2    clients either raise money, raise debt, raise

3    equity, sell themselves, buy something else,

4    help them buy somebody to intake them private or

5    help themselves go private.

6              So that on his list of names he

7    had no impairments as to what he could own in

8    the basket.

9              If it's transcribed, I can

10   probably find it for you, but then you have to

11   let me read the whole thing.

12        Q.    Well, we'll see if we can find it

13   at some point today.

14        A.    Okay.

15        Q.    If you go to the next page and you

16   see the second B where Mr. Madoff says:  "What

17   would you say if I told you I don't make 1-1/2

18   percent"?

19        A.    Um-hum.

20        Q.    Do you know what he's referring to

21   there?

22        A.    In the paragraph above it?

23        Q.    I'm trying to see if you can

24   explain to me what he's referring to.

25        A.    Um-hum.

480

1           Yeah, so this is a conversation,

2     this is a link in a conversational chain that

3     we've had for a long period of time, which is

4     what is Bernie making on his money management

5     business expressed as a percentage of those

6     assets.

7           Q.     And here he's telling you it's

8     1-1/2 percent?

9           A.     I don't know if that's exactly

10    what he's telling me.

11          Q.     Or less than 1-1/2 percent?

12          A.     The suggestion is it's in the

13    1-1/2 percent or somewhat less ballpark.

14          Q.     And did you wonder why Mr. Madoff

15    didn't organize himself as a pooled vehicle?

16          A.     Yes.

17          Q.     And what was Mr. Madoff's

18    explanation for that?

19          A.     I think it's in one of these --

20    certainly one of the conversations, but I think

21    I remember it having been transcribed.  It's not

22    the way he wanted to do business.  He had very

23    decent margins in terms of what he was doing in

24    the money management business.

25           In addition to those margins or,

Picard v. Merkin                                        J. Ezra Merkin  2-25-15

493

1    sound of his voice, I don't know.

2         Q.    Other than in this conversation

3    with Mr. Elden, did you have any conversations

4    with any other BLMIS investor where you

5    discussed a Ponzi scheme?

6              MR. STEINER:  Objection to form.

7         A.    I didn't discuss Ponzi scheme.  I

8    wasn't the person who said anything about a

9    Ponzi scheme.

10        Q.    Did any other BLMIS investor other

11   than Mr. Elden ever mention Ponzi scheme to you

12   in the context of BLMIS?

13             MR. STEINER:  Objection to form.

14        A.    Not that I recall.

15        Q.    You can put that one aside and

16   we're going to turn to 368.

17        A.    368?

18        Q.    Yes.

19        A.    So this is part of this?  Yes.

20   Okay.

21             I know you're Nancy.  Are you

22   Nancy Bendish?

23             THE REPORTER:  Yes.

24        Q.    Trustee's 368 is a transcription

25   of an audio file produced to us as bd.mp3.

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

494

1        A.      Um-hum.

2        Q.      We're going to try to do the same

3    exercise.  Put on the headphones, we'll play it.

4        A.      All right.  Let me set up these

5    things here.

6            MR. STEINER:  Brian, are you going

7    to give us the -- I know you did some sort of

8    enhancement, are you going to give us copies of

9    that?

10            MR. SONG:  Yes.  That's what these

11   are.  Short answer is yes.

12            MR. STEINER:  I don't need it

13   right now.  I thought that you did something to

14   the audio to try to enhance the quality.

15            MR. SONG:  Tried to enhance the

16   quality by minimizing some of the background

17   noise, but, yes, we'll get you that.

18        Q.      Are you ready?

19        A.      Yeah.  I took them off because it

20   sounded like you guys were talking.

21            MR. SONG:  Oleg, go ahead.

22            (Audio played.)

23        A.      Wait, wait.  Can we start that

24   again?  I didn't get it from the beginning, I

25   don't think.

495

1          (Audio played.)

2          A.     Wait, I'm sorry.  I don't want to

3     be difficult.  Doesn't somebody say something

4     about Thursday, twice?

5          Q.     I don't hear that, but...

6          A.     It sounded like something about

7     Thursday and then something about Thursday.  So

8     that's why I thought I was reading the wrong

9     transcript.  "I'm here to start that" is somehow

10    Thursday?  I don't know.  I haven't heard this

11    before, I don't think.

12         Q.     We're on the right transcript.  It

13    could be you have a better ear for the voices

14    than the rest of us did.

15         A.     Okay.  But it's repeated.  Anyway,

16    doesn't matter.

17         Q.     Start from the beginning.

18         A.     Somebody agrees with me.

19                (Audio played.)

20         A.     Okay.

21         Q.     Mr. Merkin, were you able to

22    identify Male Voice number 1?

23         A.     Yes, Male Voice number 1 is

24    Mr. Madoff.

25         Q.     And is Male Voice number 2 you?

**Picard v. Merkin**                                **J. Ezra Merkin  2-25-15**

496

1     A.     I think so.  No, no, sorry.

2     Q.     Well, let me ask one question.

3     A.     No, I think this is wrongly

4  transcribed in that case.

5     Q.     I want to clarify it with you.

6  Lines 11 and 12.

7     A.     10, 11 and 12 identified here as

8  Male Voice number 1 is me.

9     Q.     Is you.

10     A.     Right.  In addition to that, after

11  the word "specific" I say the word

12  "proposition," I believe, although I'd have to

13  listen to it again.

14          So here Male Voice number 2 is

15  Mr. Madoff.  What follows from Male Voice number

16  1 is Mr. Madoff.  It's still Mr. Madoff.  I

17  think, I have to listen to this again because I

18  don't want to say this for sure without hearing

19  it a second time.

20     Q.     Sure.

21     A.     But that's what I got.  And then

22  so -- so I don't understand the beginning, that

23  I, I'm here to start that, right, exactly,

24  right, I didn't catch any of that the way it's

25  transcribed.  I'm not sure that's what it says.

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

497

1    Q.      Okay.

2    A.      I want to listen to the whole

3    thing again before I -- and you know something,

4    if it's okay, can I just borrow this for a

5    moment?

6    Q.      Sure.

7    A.      Can I write notes on this or do we

8    have to put this into evidence, the whole thing?

9             Then, you know what, thank you so

10   much for your loan of the pen.

11   Q.      I will stipulate that I will not

12   mark your notes on this document.

13   A.      I was just going to scribble in

14   "proposition" because I heard it and I didn't

15   have a pen.  So let me listen to the whole thing

16   again.

17            Can I ask another question, can

18   you play it more slowly or that doesn't work?

19   Q.      Doesn't work.  We can play it

20   multiple times and, believe me, we've played it

21   multiple times.

22   A.      Okay, I'm just asking.  It's all

23   right.

24            Makes me wonder about the quality

25   of the transcription of the ones that we did,

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

498

1   that we looked at before and how accurate they

2   really are.  Things that a transcriber thought

3   were said that may have said something else

4   entirely.

5                   (Audio played.)

6           A.      Hold that, hold that, hold that.

7   Okay.  You would make my life much easier, I

8   hear him saying, if I don't do that.  Didn't he

9   just say that?

10          Q.      Yes, that's after the um-hum.

11          A.      No, it's not.  It's before the

12  um-hum.  Am I talking too loud?

13          Q.      No.

14          A.      Because I could really, I can

15  really barely hear you.

16                  He says, I would, it would make my

17  life much easier.  Could I do this without these

18  on so we can all do this together?

19          Q.      Sure.

20          A.      If it's not important, Brian, I'm

21  happy to pass.

22          Q.      I want to get your recollection

23  and your identification of these voices.

24          A.      I now really am borrowing this.

25                  MR. STEINER:  Here, write on this

499

1    as opposed to the exhibit.

2                    THE WITNESS:  Ever see a guy that

3    devoted to a client?  Throws his stuff in front

4    of -- yes, sorry.

5                    MR. BITMAN:  Ready?

6                    THE WITNESS:  Yup.  But you've got

7    to stop it when I say stop it, okay?

8                    MR. STEINER:  It's Oleg, it's not

9    the videographer.

10                    THE WITNESS:  Oh, it's Oleg.

11    Oleg, how are you buddy?  Okay.

12                    (Audio played.)

13        A.      It's just repeated.

14                    (Audio played).

15        A.      Stop.  So what happened to "if I

16    don't do that"?  It's not here.  It says, it

17    would make my life much easier, dot dot dot.

18        Q.      And he interrupts with an um-hum.

19        A.      Oh, okay.  So let's forget the

20    um-hum.  So Male Voice 1 and Male Voice 1 there

21    is Madoff.

22        Q.      Okay.

23        A.      Okay.  We'll turn this into a skit

24    before we're done here.

25                    Okay.  Thank you.  You want to

500

1    pick it up from where we left it off or you want

2    to go back to the beginning?

3              MR. BITMAN:  Up to you.

4        A.    It's up to Brian.

5              (Audio played).

6        A.    Stop, stop.  "If I don't do that"

7    is the end of Madoff.  Okay.  "You have no idea

8    how interested I am as a general and specific

9    proposition," I believe I will add, "in making

10   your life easier."

11             Who am I, 2 or 1?

12       Q.    You are 2.

13       A.    Okay, you want to do this E and B?

14       Q.    Sure.  As long as you're

15   identifying that sentence as your voice.

16       A.    Okay.  2 starts again with you

17   have no idea, but I want to hear it again.

18             THE REPORTER:  You've got to slow

19   down.

20             THE WITNESS:  I forgot, I forgot,

21   I'm sorry.

22       A.    We're going to go back to "if I

23   don't do that."  That is Bernie for sure.

24       Q.    So line 10 is Mr. Madoff?

25       A.    Right.  Then line 11 I believe is

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

501

1   me but I'd like to hear line 11 again.

2                   (Audio played.)

3          A.       Stop.  Okay, that's me.

4          Q.       So 11 and 12 are you?

5          A.       Right.  Now we're up to 13.

6                   (Audio played.)

7          A.       Okay.  So I didn't catch line 13

8   and I would argue it doesn't matter.

9          Q.       Okay.

10         A.       If you want me to hear it again,

11  I'll listen to it again.

12         Q.       No, that's fine.

13         A.       I didn't even hear the word "okay"

14  but it doesn't matter.  It's just an

15  interruption or it's a vocal pause.

16         Q.       Is line 14 through 19 Mr. Madoff?

17         A.       Yes.

18         Q.       And is lines 21 through 23

19  Mr. Madoff?

20         A.       Yes.

21         Q.       Now that we've gotten that out of

22  the way.

23         A.       Now it makes more sense.

24         Q.       Do you recall having this

25  conversation with Mr. Madoff?

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

502

1      A.      A version of this conversation.  I

2   recall something like this, yes.

3      Q.      What is this conversation about?

4      A.      I think he's turning me down on

5   something, okay, and he's saying, very politely,

6   no.

7      Q.      Do you recall what that something

8   was?

9      A.      What's the subject of the

10  conversation?

11     Q.      Yes.

12     A.      I'm not sure.  If -- there's some

13  possibility I wanted more capacity and he's

14  saying, you know, the whole idea of doing this,

15  it doesn't matter to you, doesn't matter, I

16  don't want -- not going to change your

17  lifestyle, then I'm not gonna, I'm just gonna

18  pass.

19     Q.      If you could slow down a little

20  bit for Nancy's sake.

21             THE REPORTER:  I'm going to need a

22  vacation after this deposition.

23             THE WITNESS:  I didn't tell you we

24  have to do this for another two days?

25             MR. SONG:  That's on the record,

503

1   Neil.

2              THE WITNESS:  That was an

3   interrogatory.

4         Q.     Did you ever have --

5         A.     But it's also very possible that,

6   and perhaps even more likely, that we had had

7   ongoing conversations over the years about his

8   doing a program for us in LEAPS, and at some

9   point he definitely communicated to me that he

10  didn't want to do the LEAPS.  He had looked into

11  it, the market was too small for his overall

12  book, he might have done it for us and perhaps

13  one or two other persons because it might have

14  been large enough to accommodate a very small

15  fraction of his overall book, and then in the

16  end the decision was he was going to pass

17  entirely.

18              What I remember is the pass

19  entirely sort of rings a distant bell.

20  Lifestyle is a theme that comes in other

21  conversations.  So, I think this is -- my guess

22  is this is a decent likelihood that this is

23  where he turns me down on doing LEAPS.

24        Q.     Did you also have any discussions

25  with Mr. Madoff regarding a leveraged product?

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

504

1      A.      Yes.

2      Q.      Did Mr. Madoff ever tell you that

3   he was not interested in doing a leveraged

4   product?

5      A.      No.  Mr. Madoff gave us a lot of

6   green light on the leveraged product and we

7   thought we had identified the source of credit

8   for the leveraged product, which is what you

9   need to have a leveraged product in the identity

10  of two very large established French banks or

11  their New York offices and they ran a whole

12  program of due diligence on Madoff and got to,

13  yes, as did, obviously, he or wouldn't have

14  started.

15          In the end that idea failed to

16  happen.  We never did a leveraged product

17  because the cost of the debt I thought was too

18  high relative to, as a range, what might have

19  been the expected returns.

20      Q.      Now, if you can turn to Trustee's

21  369, which is the last of these transcripts.

22      A.      How many transcripts are there?

23      Q.      There's three.

24      A.      So this is a fourth document

25  that's not a transcript?

Picard v. Merkin                                      J. Ezra Merkin  2-25-15

505

1            MR. STEINER:  No.  You have mine

2    that you were writing notes on.

3        Q.    You have Mr. Steiner's which is

4    not a Trustee marked exhibit.

5            THE WITNESS:  Sorry about that.

6        Q.    So if you can turn to Trustee's

7    369, which is a transcript of audio file 1 --

8        A.    So we just did 368.

9        Q.    We just did 368.

10       A.    Okay, that's my confusion.  Thank

11   you.  Got it.

12       Q.    This is a transcript of an audio

13   file 1bf.mp3.  Try this one more time.

14       A.    Are we still doing this?

15       Q.    Yes.

16       A.    Oh.

17            Nancy is psyched; she doesn't have

18   to write for a while.

19            (Audio played.)

20       A.    Okay.

21       Q.    Mr. Merkin, can you identify who

22   Male Voice number 1 is?

23       A.    Yes.  That's Mr. Madoff.

24       Q.    And then on line 5, do you see

25   where it says "auto flow phonetic"?

506

1    A.    Yes.

2    Q.    Should that be order flow?

3    A.    Might be.  I mean, I was --

4    wouldn't say that it is, but certainly might be.

5    Q.    And are you able to identify Male

6    Voice number 2?

7    A.    Yes.  That's me.

8    Q.    And do you recall having this

9    conversation with Mr. Madoff?

10   A.    Not specifically, no.

11   Q.    Do you know what your -- next page

12   where you reference Bayou.

13   A.    Do you have some idea what is said

14   on line 22?

15   Q.    I do not.

16   A.    Okay.

17   Q.    That's why the dashes are there.

18   A.    Can possibly figure that one out.

19   Q.    See on page 3 you reference Bayou.

20   A.    Um-hum.

21   Q.    What is Bayou?

22   A.    Let me just say that line 3, as I

23   listened to it very quickly I thought I said I'm

24   sure you got one or two.  But I could listen

25   again and tell you if that's what I really said

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

507

1    or not.  And it doesn't make a lot of difference

2    but that's what I heard rather than "one too."

3         Q.    Okay.  Why don't we play it again

4    and you can put your headphones on or you can

5    listen.

6         A.    Okay.

7              (Audio played.)

8         A.    Could you just hold for a second?

9    Where it says we should reinstitute dash dash

10   dash dash, it's something for order flow.  You

11   see that line 12?

12        Q.    Um-hum.

13        A.    You want to play it again?  I'm

14   asking you, you don't have to.  It's up to you,

15   Brian.

16        Q.    I want to get it as accurate as

17   possible.

18        A.    If that's what you want, then do

19   you mind playing that again.

20              (Audio played.)

21        A.    Stop.  I think that's what it

22   says.

23        Q.    Okay.

24        A.    Not sure, but I think that's what

25   it says.

508

1              Okay, go ahead.  Sorry, line 14.

2              (Audio played.)

3         Q.    My original question was what is

4    Bayou?

5         A.    I'm not sure if it's one or two;

6    it could be "one too."  This transcript could be

7    correct.

8         Q.    Okay.

9         A.    Bayou is a -- was a fund, you'll

10   do a better job in supplying the date than I

11   will, that ended up in scandal, the details of

12   which I don't remember at the moment, but I

13   think monies were stolen, people went to jail,

14   so on and so forth.

15        Q.    Do you recall having conversations

16   with Mr. Madoff regarding Bayou, other than in

17   this transcript?

18        A.    I do.

19        Q.    And what were those conversations?

20        A.    I recall his -- maybe this is the

21   conversation I recall, something about when

22   there's a scandal or a scam I guess is the word

23   that's used here in the hedge fund industry

24   questions come up about other managers

25   routinely.  One of those managers -- questions

509

1    come up about a lot of funds, about a lot of

2    different strategies.  At that time I was

3    sitting on investment committees and so the

4    investment committee people would ask, well,

5    Bayou -- none of the committees that I chaired

6    had investments with Bayou.  So we weren't

7    focused on Bayou, Bayou was not a particularly

8    big issue for those committees or in my office.

9               But an issue with a fund might

10   provoke questions about other funds, and

11   questions might easily come up about Bernie

12   because so many of the persons who were

13   investors of his didn't have the transparency.

14   They just got a number, so at that point you

15   would say, you might if you were the recipient

16   of that information, here is at least something

17   that looks -- that all I have is a number.  Do I

18   have any evidence of the trades.

19               So that's why, as people reacted

20   to a scam by saying, oh, let's try to figure out

21   if all of my money is safe in all these other

22   places, you get lots of questions about other

23   places, and questions about Bernie as well.

24               I just must say, Bernie sounds

25   incredibly relaxed about the whole thing, as I

510

1    listen to it today.  Where you can sort of hear

2    him a little bit kind of working the con, in a

3    way.

4        Q.    Did you do anything as a result --

5    did you change your due diligence practices as a

6    result of Bayou?

7        A.    I don't -- I certainly spent time

8    talking to Madoff about issues that related to

9    Bayou.  I'm not sure that we announced a whole

10   new revision to our due diligence procedures.

11            MR. SONG:  Now is a good point for

12   a break.

13            THE VIDEOGRAPHER:  Off the record

14   2:52 p.m.

15            (Recess taken.)

16            THE VIDEOGRAPHER:  Back on 3:12.

17   BY MR. SONG:

18       Q.    Mr. Merkin, if you could turn to

19   Trustee's Exhibit 354 and go to page 5 of that

20   exhibit.  First full paragraph, within that

21   first full paragraph there's a discussion of the

22   meetings that you arranged and participated

23   between Mr. Madoff and certain investors in the

24   funds.  Do you see that?

25       A.    Starting with the third sentence?

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

512

1      Q.      You're not aware of a direct

2  investment with BLMIS?

3      A.      I'm not aware of one but I would

4  not necessarily be aware of one.

5      Q.      And what were the circumstances

6  related to the meeting that you set up between

7  Mr. Bravmann and Mr. Madoff?

8      A.      Don't remember.

9      Q.      Do you recall what time frame this

10  was in?

11      A.      No.

12      Q.      Did you attend that meeting?

13      A.      I don't remember.

14      Q.      Did you have -- did you take any

15  notes of that meeting?

16      A.      I don't remember.

17      Q.      And do you know if you have any

18  documentation at all evidencing this meeting?

19      A.      Did we produce any, may I ask?

20      Q.      Would you have had an email, say,

21  with Mr. Bravmann setting up the meeting?

22      A.      I might have.  I don't know.  I

23  would not testify that we didn't but I don't --

24  I don't know that that's the way it would have

25  happened.  It may have just been telephone calls

513

1    that, for all I know, my secretary did and got

2    the times that worked for both of them.

3              They were -- they meaning neither

4    Mr. Bravmann or Mr. Madoff, as best as I can

5    remember, were very big on emails.

6         Q.    The next two names on the list

7    here are Alec Hackel and Christof Reichmuth.  Do

8    you see those?

9         A.    I do.

10        Q.    Who is Alec Hackel?

11        A.    Alec Hackel is a, I think, German,

12   of German origination, possibly a spot of South

13   Africa in there as well, very senior figure in

14   the commodities industry at Philip Brothers and

15   at Marc Rich & Company, who was based, in

16   relevant times, in Zug, Switzerland or in

17   Meggen, Switzerland and was, I think, the

18   chairman of the board, but certainly the senior

19   figure from the point of view of the

20   capitalization of a money management operation,

21   later licensed Swiss bank, called Reichmuth &

22   Company that had been started by Christof

23   Reichmuth's father Carl.

24             And perhaps to save you some

25   questions, at which Patrick Erne, which is the

515

1    I would have conjectured 2000 but, you know,

2    it's not a different -- not a completely

3    different answer.

4         Q.    Do you recall attending the

5    meeting with Mr. Reichmuth and Mr. Madoff?

6         A.    I recall attending meetings at

7    Mr. Madoff's office with various members of the

8    Reichmuth staff.  I'm not sure I remember this

9    one specifically.

10        Q.    Okay.  Do you recall what the

11   purposes were of the -- do you recall what the

12   purposes of the meeting between Mr. Reichmuth

13   and Mr. Madoff were?

14        A.    Broadly speaking, Reichmuth &

15   Company had money management clients, of which

16   possibly Mr. Hackel was one and then had a whole

17   series of clients who I didn't know, and they

18   had -- over a period of time were in the process

19   of setting up at least one and probably two what

20   became fairly large fund of funds.

21             In the first one, chronologically,

22   they had a very large position relative to the

23   size of the fund in Ascot Fund Limited.

24        Q.    Did you ever tell Mr. Reichmuth

25   that BLMIS only acted as a broker for Ascot

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

529

1      A.      It looks like an email from me to

2   Mike.

3      Q.      And below that is an email between

4   you and Mr. Igolnikov on March 13th, 2004?

5      A.      Um-hum.  Yes.

6      Q.      Does this email indicate to you

7   that Mr. -- you had already had the meeting

8   between Mr. Igolnikov and Mr. Madoff at this

9   point?

10      A.      It suggests that it probably had

11   taken place.

12      Q.      You see where it says, "I

13   appreciate very much your effort in putting our

14   meeting together"?

15      A.      Right.  Not clear from that

16   sentence that the meeting was either a week

17   earlier or was coming the next week.

18      Q.      Around this time period you recall

19   having a meeting with --

20      A.      Right.  My guess is this is the

21   thank you note.

22      Q.      And do you recall what the purpose

23   of this meeting was?

24      A.      Largely the same as other

25   purposes.  Roman wanted to meet with Mr. Madoff.

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

530

1    It sounds like he may otherwise have had some

2    difficulty in doing so from the third sentence,

3    and was appreciative of the access and of the

4    meeting.

5          Q.     To your understanding was this the

6    first time Mr. Igolnikov met with Mr. Madoff?

7          A.     I don't remember, if I knew.

8          Q.     Do you recall -- did you attend

9    that meeting between Mr. Igolnikov and

10   Mr. Madoff?

11         A.     I don't remember.

12         Q.     Did Mr. Igolnikov ask to bring

13   anyone with him to the meeting?

14         A.     I don't remember.

15         Q.     Did you ever tell Mr. Igolnikov

16   that BLMIS does not take visitors?

17         A.     Did I ever tell that to Roman?

18         Q.     Yes.

19         A.     While setting up a meeting?

20         Q.     Yes.

21         A.     No.

22         Q.     Did you tell Mr. Igolnikov that it

23   was a big deal for you to take him to see

24   Mr. Madoff?

25         A.     No.  Certainly not that I

562

1        A.       That's what I think that says.

2        Q.       What are you referring to here by

3    "block box"?

4        A.       Oh, black box here means what

5    perhaps, in a word, Mr. Sheehan referred to

6    yesterday as algorithm.

7        Q.       Isn't that the proprietary trading

8    strategy that Madoff purportedly had?

9        A.       Well, it's about it, yes.  But I'm

10   saying it's the algorithm, it's the black box.

11   This has nothing to do now with transparency.

12   This has to do with, as this suggests, the years

13   of following market patterns helped the firm

14   perfect its, if you will, entry and exit cues.

15       Q.       Okay.  Other than this call on

16   November 7th, did you have another call --

17       A.       And then that's consistent with

18   constantly spend money improving that system.

19       Q.       Okay.  And the notes "and would

20   hope to visit," is that "Mr. Madoff's offices"?

21       A.       Yes.

22       Q.       "This month."

23       A.       "Later this month," yes.  Sorry.

24   That says 885 there.

25       Q.       During this call or, actually, did

635

1    here in the next 20 minutes or so.

2              Let me get tab 8, 6, 7 and I guess

3    there should be 9.

4              MR. STEINER:  But not 6, 7, 8 and

5    9?

6         A.    This goes back to yesterday,

7    right, Brian?

8              MR. STEINER:  Doesn't matter.

9              MR. SONG:  Doesn't matter.  It's

10   all one.

11        Q.    Doesn't matter.

12             (Comments off the record.)

13             (Exhibit Trustee 375 marked for

14   identification.)

15        Q.    Mr. Merkin, before we get to the

16   exhibit, you testified I believe yesterday

17   regarding personal exposure that you and your

18   family had through the defendant funds to BLMIS.

19   Do you recall that testimony?

20        A.    I think I -- if I know what you

21   are referring to, not that I'm reading your mind

22   here, yes, I do.

23        Q.    You said -- I believe you said

24   that you had somewhere 110, $120 million in

25   exposure; is that right?

Picard v. Merkin                                J. Ezra Merkin  2-25-15

636

1        A.      I don't think I said quite that,

2   no.  I think I said I don't think it was as high

3   as 120.  I think it might have been something

4   closer to 110, 112, something like that.  Across

5   the --

6        Q.      Across the defendant funds?

7        A.      Right.

8        Q.      The court reporter has handed you

9   what's been marked as Trustee's Exhibit 375.

10   What I would like to do is try to figure out

11   exactly where the exposure lies.

12              And let me say for the record

13   Trustee's 375 is Bates number GCC-P 0463582.  It

14   is a native file, which is why the Bates number

15   doesn't appear on the document.

16              Mr. Merkin, do you recognize

17   Trustee's 375?

18        A.      Does recognize mean have I seen

19   this before and therefore can recognize it?

20        Q.      Yes.

21        A.      I don't really know.  It says it's

22   a list of the Ascot Partners LP investor capital

23   accounts.

24        Q.      But you haven't seen this document

25   or another document like it before?

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

637

1      A.      I'm not sure.  I'm not sure I've

2  seen this document before.

3      Q.      Okay.  Could you turn to the last

4  page of the document.

5      A.      The very last page of the

6  document?

7      Q.      Yes.

8      A.      Sure.  Okay.

9      Q.      Do you see that there's, at the

10 bottom of the page, certain entities that are

11 broken out from the other limited partners?

12     A.      Yes.

13     Q.      Is it your understanding that

14 these entities listed here are associated with

15 either you or your family?

16     A.      You're talking about lines 234 to

17 238 or maybe I should say 240?

18     Q.      Yes.

19     A.      Yes.

20     Q.      And the first one there is listed

21 as Hobby Farm.  What is Hobby Farm?

22     A.      It's some form of a family trust,

23 I think.

24     Q.      Were you including Hobby Farm's

25 investment in Ascot Partners in the $110

638

1  million?

2         A.      Likely, yes.

3         Q.      Then the next one is Lauren

4  Merkin?

5         A.      Yes.

6         Q.      And Ms. Merkin is your wife,

7  correct?

8         A.      Yes.

9         Q.      And you're including that amount

10 as well?

11        A.      Yes.

12        Q.      And then there is -- there's your

13 name listed.  You see that?

14        A.      Yes.

15        Q.      Is that you as a limited partner

16 or as a general partner?

17        A.      I don't know.  Does it say?  I

18 don't remember preparing this document so I

19 can't really tell you.

20        Q.      Okay.

21        A.      Does this say -- I don't know.  It

22 doesn't say.  Well, I've got to go back to the

23 middle of it, I guess, to check.

24        Q.      And then below your -- and you're

25 including --

**Picard v. Merkin**                                    **J. Ezra Merkin 2-25-15**

639

1      A.      Sorry, sorry, sorry, I was

2  checking something else.  I'm with you now.

3      Q.      You're including the amount listed

4  next to your name in the $110 million?

5      A.      I don't remember doing this

6  exercise quite this way, but I would imagine I

7  did.  Seems to me very likely that I included

8  things in my own name.

9      Q.      Okay.  And then you see LKM 2000

10  Trust?

11      A.      Yes.

12      Q.      What's the LKM 2000 Trust?

13      A.      It's a trust that I think relates

14  in some form to Lauren K. Merkin.

15      Q.      And the investments in LKM Trust

16  is included in the 110 million?

17      A.      Yeah, I mean they're not -- the

18  next three investments are not terribly --

19          THE REPORTER:  I'm sorry, I can't

20  hear you.

21      A.      Yes, they are included.

22      Q.      And then below that is JEM 2000

23  Trust?

24      A.      Yes.

25      Q.      And that's a trust associated with

640

1    you?

2          A.      I think so.

3          Q.      And the investment by JEM Trust in

4    Ascot Partners is included in the 110 million?

5          A.      I would think so.

6          Q.      Go back two pages.

7          A.      One moment.

8          Q.      Can you see, if you can look at --

9          A.      Two pages?

10         Q.      Two pages.

11         A.      Sorry.  I went back one.

12         Q.      There are two entities listed by

13   154 and 155.

14         A.      One moment, sir.  Okay, I'm with

15   you.

16         Q.      Do you see 154 and 155?

17         A.      I do.

18         Q.      Merkin Trusts and Merkin Trusts 2?

19         A.      I do see both.

20         Q.      Do you know what those entities

21   are?

22         A.      Not off the top of my head.

23         Q.      Do you know whether that, the

24   investments by Merkin Trusts and Merkin Trusts

25   2, are included in the 110 million?

**Picard v. Merkin**                                   **J. Ezra Merkin  2-25-15**

641

1       A.      Might very well have been, I'm not

2   sure.

3       Q.      Are there any other investors that

4   you know of, limited partners in Ascot Partners

5   that are associated with you that you include in

6   your 110 million dollar loss?

7       A.      I don't know.  There might be.

8       Q.      Going back to the last page, 218.

9       A.      Just take the clip off,  just to

10  make it easier.

11          Yes.

12      Q.      Sylvia Korngold.

13      A.      One moment.  Okay, I'm with you.

14      Q.      Do you know who Sylvia Korngold

15  is?

16      A.      She is my mother-in-law.

17      Q.      Are you including Ms. Korngold's

18  loss?

19      A.      Might have been.

20      Q.      Under the terms of Ascot Partners'

21  offering memorandum, were you required to have

22  at least one percent of Ascot Partners assets

23  under management invested with the fund?

24          MR. STEINER:  Object to the form.

25      A.      I don't remember.

642

1      Q.      Are you familiar with a schedule

2    K-1?

3      A.      Broadly speaking, yes.

4      Q.      What's your understanding of a

5    K-1?

6      A.      A K-1 is a document I believe

7    filed with the Internal Revenue Service and sent

8    to individual limited partners as to taxes they

9    may or may not own -- may or may not owe, o-w-e,

10   to the Internal Revenue Service for their

11   participation in a partnership in a given year.

12     Q.      Are you aware whether or not a K-1

13   reflects capital contributions or capital

14   withdrawals in that given year?

15     A.      No.

16     Q.      No, you're not aware or, no, it

17   does not do that?

18     A.      No, I'm not aware.

19     Q.      Let me have 6.

20            (Exhibit Trustee 376 marked for

21   identification.)

22     Q.      Mr. Merkin, the court reporter has

23   handed you what's been marked as Trustee's 376,

24   GCC-P 0463580.  Again, this has been produced to

25   us natively, which is why the Bates numbers do

643

1    not appear on the page.

2              Mr. Merkin, do you recognize 376?

3         A.    I can tell you what it purports to

4    be.

5         Q.    What does it purport to be?

6         A.    It looks like it is the capital

7    account summary of the shareholders or the

8    registered names of the shareholders in Ariel

9    Fund Limited.

10        Q.    It's as of November 30th, 2008?

11        A.    I don't know.  If that's indicated

12   here, I haven't found it yet.

13        Q.    See up at the top --

14        A.    Yes, it is so indicated.

15        Q.    And did there come a time that you

16   decided to defer your incentive and management

17   fees in Ariel?

18             MR. STEINER:  Objection to form.

19        A.    Ask me the question again, please.

20        Q.    Did there come a time in which you

21   decided to defer payment of your incentive and

22   management fees associated with Ariel?

23        A.    I think the answer to that is yes

24   and no.

25        Q.    Okay.  Could you elaborate on the

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

644

1   yes and no.

2        A.    I think we tried to defer -- or we

3   deferred the incentive and not the management.

4        Q.    If you turn to the last page of

5   376.

6        A.    Okay.  One moment.  Yup, got it.

7        Q.    Do you see the two listings for

8   Merkin deferral and Merkin deferral - directed?

9        A.    I do.

10       Q.    Do you know what the -- do you

11   know what those accounts reflect?

12       A.    I'm not sure what your question

13   is.  What do you mean what do they reflect?

14       Q.    What is Merkin deferral and Merkin

15   deferral - directed?

16       A.    Those -- that is -- I don't know

17   what this piece of paper exactly pulls together

18   or not, but it suggests an account of some sort

19   or a, perhaps a liability of some sort from the

20   fund to Merkin deferrals.  Is this Ariel?

21       Q.    Yes.

22       A.    Of something like 285 or 286 or 7

23   million dollars.

24       Q.    And that $287 million that's

25   listed here, is that your total deferred

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

645

1    compensation?

2                     MR. STEINER:  Objection to form.

3         Q.    As of November 30th, 2008?

4         A.    I don't know.  It could be.  I'm

5    just not sure.

6         Q.    And did you include some

7    percentage of this 2 -- of your deferred

8    compensation in Ariel as part of your -- part of

9    the calculation of your 110 million dollar

10   exposure?

11        A.    Just to be precise, I'm not sure

12   or I'm -- as I sit here I don't recall that all

13   of my deferred was in Ariel.  And if this was

14   all in Ariel, I would have included a percentage

15   of this as managed -- as included in the figure

16   that you asked me about.

17        Q.    Do you know what percentage you

18   used?

19        A.    In calculating that number?

20        Q.    Yes.

21        A.    No.

22        Q.    But it would have reflected the

23   percentage in which Ariel was invested at BLMIS

24   as of 2000 --

25        A.    Presumably, yes.

646

1          Q.      -- summer 2008?

2          A.      I don't know as of what date.  It

3    would have reflected the percentage allocation

4    to the Madoff strategies, or the Madoff

5    positions.

6          Q.      Did you direct any of your

7    deferred fees to be placed in Ascot Fund?

8          A.      I don't believe so.  Ascot Fund

9    didn't charge deferred -- it didn't charge

10   incentive fees.

11         Q.      That's not my question.  My

12   question was for your deferred fees in Ariel,

13   did you direct those fees to be invested

14   directly into Ascot Fund?

15              MR. STEINER:  A portion of those

16   fees?

17              MR. SONG:  Yes.

18         A.      Oh, that wasn't the question I was

19   answering.  So let me make sure I understand.

20   You're asking, take this figure and did any

21   percentage of that figure go into Ascot?

22         Q.      Yes.

23         A.      I don't remember.  It certainly

24   might have.

25         Q.      Almost there.

647

1           (Exhibit Trustee 377 marked for

2    identification.)

3           Q.    Mr. Merkin, the court reporter has

4    handed you what's been marked as Trustee's 377.

5    It's Bates number is GCC-P 0463581.  And I'll

6    purport to you that it is a native file and it

7    is also the Gabriel Capital accounts as of

8    November 30th, 2008.

9               Do you see that?

10          A.    Yes.

11          Q.    Now if, again, you can turn to the

12   last page of the document.

13          A.    I see that.

14          Q.    And you see towards the end

15   there's a listing of GP next to the J. Ezra

16   Merkin?

17          A.    Yes.

18          Q.    And then, did you include some

19   percentage of the amount listed, the 26 plus

20   million dollars listed to the right, in your

21   calculation of your 110 million dollar exposure

22   in BLMIS?

23          A.    Likely, yes.

24          Q.    And, again, the percentage that

25   you used was Gabriel's exposure to BLMIS at the

Picard v. Merkin                                    J. Ezra Merkin  2-25-15

648

1    end of 2008?

2         A.    I'm not sure as of what date, as I

3    previously answered you, but it would have been

4    the percentage of the fund's equity that was

5    allocated to the Madoff positions.

6         Q.    Were there any other limited

7    partners in Gabriel as of November 2008 that are

8    associated with you or your family?

9         A.    I don't know.  I mean, other than

10   that one line item?

11        Q.    Yes.

12        A.    Might be.

13        Q.    Do you know whether or not any of

14   these -- any of the limited partners listed as

15   of November 30th, 2008 were included in your

16   calculation of your 110 million dollar exposure?

17        A.    I guess the answer to the question

18   is no, I don't know.  They might have been.

19   Want me to run through it and tell you?

20        Q.    If you can look through the list

21   and see if you can identify any.

22        A.    Let's have a look.  Well, the same

23   strength of something you asked me before, the

24   Korngold family is listed on line 88.  That is

25   the same name as my mother-in-law's last name,

**Picard v. Merkin**                              **J. Ezra Merkin  2-25-15**

649

1   whom you asked me about previously.

2        Q.      Yes.

3        A.      I would have to go through this

4   really line by line to check.  I don't -- I'm

5   not sure I can think of sort of material

6   omissions.  If so, it may not be big enough to

7   chase down.

8              This is Gabriel, right?  So

9   anything that's here would anyway be a

10  percentage of it.

11             Line 61, Good Partners may be a

12  family trust or a family partnership.

13       Q.      Okay.

14       A.      And after that, I really have to

15  go through it line by line.  Which if you want

16  me to, I will, but I'm not sure it's gonna make

17  that big a difference to the overall calculation

18  of the figure that you asked about.

19       Q.      To your knowledge other than the

20  accounts that we've gone over, are there any

21  other significant accounts that would -- that

22  contributed to that $110 million?

23             MR. STEINER:  And just to be

24  clear, as to some that Mr. Merkin identified as

25  to his in-laws, his testimony was he wasn't sure

**Picard v. Merkin**                                    **J. Ezra Merkin  2-25-15**

650

1   whether they were included, not that they were

2   included.

3                    MR. SONG:  Yes.  I just want to

4   make sure we covered all the big accounts that

5   would have contributed to the 110 million.

6            A.      There are none that come to mind

7   at this time.  I'm not sure that that means that

8   there weren't any.

9                    MR. SONG:  All right.  Can we just

10  take two minutes?

11                   THE VIDEOGRAPHER:  Off the record,

12  6:29.

13                   (Recess taken.)

14                   THE VIDEOGRAPHER:  Back on 6:36.

15                   MR. SONG:  Before we close, for

16  the record, we did hand out the CDs to counsel

17  with the enhanced audio files.  And with that, I

18  have no further questions of Mr. Merkin.

19                   MS. ARCHER:  No questions.

20                   MR. SIEV:  Nothing, thanks.

21                   MR. STEINER:  You're done.

22  Thanks.

23                   THE VIDEOGRAPHER:  Off the record

24  6:36.

25                   (Deposition concluded.)

**BENDISH REPORTING**
**877.404.2193**