# EXHIBIT 17

FILED: NEW YORK COUNTY CLERK 12/06/2010
NYSCEF DOC. NO. 195
INDEX NO. 450879/2009
08-01789-cgm    Doc 12134-17    Filed 11/25/15    Entered 11/25/15 14:28:47    Exhibit 17
RECEIVED NYSCEF: 12/06/2010
Pg 2 of 41

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK
By ANDREW M. CUOMO, Attorney General of
the State of New York

                              Plaintiff,

            -against-

J. EZRA MERKIN and GABRIEL CAPITAL
CORPORATION,

                           Defendants,

            and

ASCOT PARTNERS L.P, ASCOT FUND
LIMITED, GABRIEL CAPITAL L.P., ARIEL
FUND LIMITED, GABRIEL ASSETS LLC, and
GABRIEL ALTERNATIVE ASSETS LLC,

                     Relief Defendants.

Index No.: 450879/2009

**RESPONSE OF DEFENDANTS
J. EZRA MERKIN AND GABRIEL CAPITAL CORPORATION
TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS,
AND STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 19-a of the Commercial Division Rules, Defendants J. Ezra Merkin

("Merkin") and Gabriel Capital Corporation ("GCC" and collectively, "Defendants")

respectfully submit this (i) response to Plaintiff's Commercial Division Rule 19-a Statement of

Material Facts in Support of Plaintiff's Motion for Summary Judgment, dated October 18, 2010

and (ii) Statement of Additional Material Facts in Opposition to Plaintiff's Motion for Summary

Judgment and in Support of Defendants' Cross-Motion for Summary Judgment.

## GENERAL OBJECTIONS

Defendants object generally to the Statement of Undisputed Facts on the ground that it includes factual allegations that are immaterial to the motion for summary judgment of the New York Attorney General. *See* Commercial Division Rule 19-a.

Defendants object generally to the Statement of Undisputed Facts on the grounds that it includes misleading and incorrect characterizations of the record referenced therein.

Defendants object generally to the Statement of Undisputed Facts on the ground that it includes legal inferences drawn from facts asserted and legal conclusions. *See* Commercial Division Rule 19-a.

## SPECIFIC RESPONSES

1.    J. Ezra Merkin is an individual residing at 740 Park Avenue, New York, New York, and a business office at 450 Park Avenue, New York, New York. *Defendants' Answer and Affirmative Defenses to Amended Complaint ("Answer") at ¶ 16.*

**Response to 1:** Not controverted.

2.    Merkin is a graduate of Columbia College and Harvard Law School. *Answer at ¶ 25.*

**Response to 2:** Not controverted.

3.    At all relevant times, prior to the appointment of receivers for the Funds in May and July 2009, Merkin was the General Partner of Ascot Partners, L.P. and Gabriel Capital L.P., and is the sole shareholder and sole director of Gabriel Capital Corporation. *Answer at ¶ 23; Stipulation and Order Appointing Receiver [for Ariel Fund Ltd. and Gabriel Capital L.P.] at pp. 7-8 (May 29, 2009) ("Ariel Receiver Order"); Stipulation and Order Appointing Receiver for Ascot Partners, L.P. at p. 7 (July 14, 2009).*

**Response to 3:** Not controverted.

4.    Gabriel Capital Corporation ("GCC") is a Delaware corporation with its principal place of business at 450 Park Avenue, New York, New York. *Answer at ¶ 17.*

**Response to 4:** Not controverted.

5.    GCC is the investment advisor to Ariel Fund Limited. *Ariel Receiver Order at p.7 ¶ II.A.1.*

2

**Response to 5:** Not controverted.

6.     Ascot Partners L.P. is a Delaware limited partnership with its principal place of business at 450 Park Avenue, New York, N.Y. *Ex. 3 at GCC-NYAG0000224; Answer at ¶ 18.*

**Response to 6:** Not controverted.

7.     Ascot Fund Limited is an offshore fund incorporated in the Cayman Islands. *Ex. 5 at GCC-NYAG0000048; Answer at ¶ 19.*

**Response to 7:** Not controverted.

8.     Ascot was established in 1992, "largely but not entirely . . ." for the purpose of investing with Madoff. *Ex. 6 at 36:21-24.*

**Response to 8:** Not controverted.

9.     Since being founded in 1992, the Ascot funds invested their assets with Madoff. *Answer at ¶¶ 2, 28, 32.*

**Response to 9:** Not controverted to the extent that a portion of the Ascot Funds' assets were invested with Madoff, but controverted to the extent that paragraph 9 implies that the Ascot Funds invested 100% of their assets with Madoff. (Steiner Aff., Ex. 60.)

10.    At all times, over 90% of Ascot's assets were entrusted to Madoff who made all investment decisions, cleared transactions and had custody of the securities which purportedly were being held by Ascot. *Ex. 33 at 36:1-38:5.*

**Response to 10:** Controverted. Madoff had investment discretion for the Ascot assets that Merkin allocated to him, confined by the parameters of the Trading Authorization Directive. (Steiner Aff., Ex. 51.) Merkin consulted with Madoff as to Madoff's trading strategy, the markets and times to enter or exit the market, and discussed with Madoff potential changes to Madoff's investment strategy. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 95:15-97:18.) Madoff had custody over the funds allocated to him and cleared transactions involving those funds. Merkin made the decision to allocate capital to Madoff, as well as the decisions to increase or decrease the allocation to Madoff. (Steiner Aff., Ex. 15 (Jan. 30, 2009 Merkin Tr.) at 182:11-19).) The allocation to Madoff as a percentage of Ascot's assets varied over time, and is set forth in Exhibit 18 to the Attorney General's Rule 19-a statement.

11.    As of December 2008, investors' net cash investment in Ascot was about $886 million. In November 2008, the Ascot funds had about 300 investor accounts with approximately $1.8 billion under management. *Ex. 7; Ex. 8.*

**Response to 11:** Controverted as to the specific numbers.

12.    The $1.8 billion was a fictitious figure based on non-existent profits reported by Madoff.

3

**Response to 12:** Not controverted.

13.     Over $215 million of the alleged $1.8 billion represented investments by some 35 non-profit organizations. *Cmpl. ¶ 36.*

**Response to 13:** Controverted. The cited evidence does not support the proposition.

14.     Gabriel Capital L.P. ("Gabriel Fund") is a Delaware limited partnership with its principal place of business at 450 Park Avenue, New York, N.Y. *Ex. 4 at GCC-NYAG0000875; Answer at ¶ 20.*

**Response to 14:** Not controverted.

15.     The Gabriel Fund was formed in 1988. *Answer at ¶ 66.*

**Response to 15:** Not controverted.

16.     At the end of 2007, the Gabriel Fund had about 200 investors, who had net cash investments of approximately $183 million, and had a reported total of $1.4 billion under management. *Ex. 9.*

**Response to 16:** Controverted as to the specific numbers.

17.     Ariel Fund Limited is an offshore fund incorporated in the Cayman Islands. *Ex. 2 at GCC-NYAG0000650-651; Answer at ¶ 21.*

**Response to 17:** Not controverted.

18.     The Ariel Fund was formed in 1988. *Answer at ¶ 66.*

**Response to 18:** Not controverted.

19.     At the end of 2007, the Ariel Fund had some 78 investors who had net cash investments of approximately $120 million, and had a reported total of $1.0 billion under management. *Ex. 10.*

**Response to 19:** Controverted as to the specific numbers.

20.     Although Merkin described himself as the sole manager of the Funds, from 2001 to 2008 between 16% and 30% of the assets of Gabriel and Ariel in fact were managed by Madoff. *Ex. 18.*

**Response to 20:** Controverted that "Merkin described himself as the sole manager of the Funds." The first page of the 2006 offering memoranda for Ariel and Gabriel provides that "[t]he Partnership will also make indirect investments with third-party money managers, including investments through managed accounts . . . ." (Steiner Aff., Ex. 2 (Gabriel OM) at 1-2; Ex. 3 (Ariel OM) at 1-2); *see also* Ex. 2 (Gabriel OM) at 14 ("The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money

4

managers, other than the General Partner."). The fact that Merkin would allocate assets of the Funds to be invested with third-party managers is reiterated throughout the documents. (*See, e.g.* Ex. 2 (Gabriel OM) at 14, 28; Ex. 3 (Ariel OM) at 20, 40-41, 45-46.)

21.    The remaining amounts were largely managed by Cohanzick Capital LP ("Cohanzick") and Stephen Feinberg, pursuant to written agreement. *Cmpl. ¶¶ 76-78; Ex. 11.*

**Response to 21:**  Controverted. Paragraph 21 does not adequately describe the relationship between Cerberus and Ariel and Gabriel. Merkin explained "Cerberus and I and our funds co-invested in certain positions, many of which were originated there, many of which originated elsewhere, with the understanding that no position or perhaps no position of any significance would be a position that we owned and they didn't. In other words, we are co-investors with them on a variety of publics, privates, distressed, private equity." (Steiner Aff., Ex. _54 (Merkin Tr. (Mar. 3, 2010)) at 220:13-23.)

22.    Michael Autera is the Chief Financial Officer of GCC. *Ex. 40 at 72:18-21.*

**Response to 22:**  Not controverted.

23.    Bernard L. Madoff Investment Securities, LLC was an investment firm run by Bernard L. Madoff.  On December 11, 2008, Bernard Madoff was arrested for securities fraud. It was revealed that Madoff's purported investments were in reality nothing more than a massive Ponzi scheme. *Answer at ¶ 30.*

**Response to 23:**  Not controverted except that BLMIS was also a regulated broker-dealer..

24.    Merkin collected annual management fees equal to 1% of the capital invested in each of Ariel, Gabriel, and Ascot. *Answer at ¶ 34.*

**Response to 24:**  Not controverted, except that Ascot's management fee was increased to 1.5% of the capital in Ascot as of January 1, 2003.

25.    In 2003, Merkin raised the Ascot management fee to 1.5% of invested capital *(Ex. 3 at 243; Answer at ¶ 34)* by fraudulently telling investors that the fee increase was designed to offset the possible cost of (non-existent) computer enhancements. *Ex. 12 at 942.*

**Response to 25:**  Not controverted that "[i]n 2003, Merkin raised the Ascot management fee to 1.5% of invested capital." Controverted that Merkin did so "by fraudulently telling investors that the fee increase was designed to offset the possible cost of (non-existent) computer enhancements." The cited evidence, minutes of a Yeshiva University Investment Committee Meeting, state that "Mr. [redacted] asked Mr. Merkin to elaborate on the reason for the fee increase. Due to additional scheduled presentations, Mr. Merkin asked [redacted] to add Ascot Partners as an agenda item for the next meeting." Moreover, the minutes state that Mr. Merkin said that "Ascot *may* begin trading in long-term equity options (LEAPS) in 2003." *Id.* (emphasis added).  Plaintiff's characterization of Merkin's actions as "fraudulent[]" is an impermissible legal conclusion.

5

Moreover, in a letter that was sent to all Ascot investors, Merkin stated that the fee increase was due to the fact that "the expenses of running Ascot Partners over the past few years have been encroaching to a greater and greater extent into the 1% investment advisory fee. . . . I believe this [1.5%] is a fair level of compensation for the risk that we take and the results that we have achieved. Limited partners were required to consent to the changes in writing in order to remain invested in the Fund. (Ex. 59.)

26.     In addition, Merkin collected an annual incentive fee of 20% of any appreciation in the assets of Ariel and Gabriel. *Ex. 13 at 580; Ex. 14 at 117905.*

**Response to 26:** Not controverted that Merkin and/or GCC was entitled to an annual incentive fee of 20% of any appreciation in the assets of Ariel and Gabriel, but controverted that Merkin and/or GCC "collected" the incentive fee on Ariel. All incentive fees on the appreciation in the assets of Ariel were deferred by GCC. (*See* Ariel Investment Advisory Agreement.)

27.     In 1992, 1996, 2002, and 2006, Ascot issued Confidential Offering Memoranda offering participation to qualified investors in the investment partnership. *Ex 15; Ex 16; Ex 17; Ex 3.*

**Response to 27:** Not controverted.

28.     Investors received the Confidential Offering Memorandum prior to investing with the fund. *Defendants' Memorandum of Law in Support of Motion to Dismiss ("Mtd.") at pp. 3,6.*

**Response to 28:** Not controverted.

29.     These memoranda explicitly represented that Merkin would be involved in the Funds' management on a day-to-day, and transaction-by-transaction basis, and that the success of the Funds depended on *his* abilities as a money manager: "All decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin. Consequently, the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin." *Ex 17, at 176-177; Ex 3, at 245.*

**Response to 29:** Controverted that the memoranda "explicitly represented that Merkin would be involved in the Funds' management on a day-to-day, and transaction-by-transaction basis." The memoranda contain no such representation. Consistent with the Offering Memoranda's actual language, Merkin explained that the quoted language from the memoranda referred to his decisions concerning allocation of capital rather than decisions "about an individual stock at an individual time in the portfolio." (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 182:9-25.) Merkin's description is supported by a reading of the memoranda in their entirety. For example, certain provisions of the Offering Memoranda expressly stated that Merkin would not be involved in the individual investment decisions of third-party managers. (Steiner Aff., Ex. 1 (Ascot OM) at 2-3, 13, 17.)

Moreover, Adams explained in his expert report that the:

6

13966429

Offering Memoranda expressly warned prospective purchasers that the respective Fund's success may also have been dependent upon other money managers to whom Merkin or GCC delegated investment discretion, and it was. Thus, prospective investors were warned expressly that Merkin or GCC were not exclusively responsible for the success of the respective Fund if Merkin or GCC delegated investment discretion. (Steiner Aff., Ex. 11 (Adams Report) ¶ 17.4.)

30.    The first page of the 1992 Ascot offering memorandum referred to the personal attention and judgment Merkin promised to bring to bear on individual transactions:

The Managing Partner intends to the extent circumstances permit to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions *he can follow more closely*. He may often employ strategies involving derivative securities like options, futures and convertibles . . . . He expects to use hedging devices and will engage in short sales. *Ex 15 at 56 (emphasis added)*.

**Response to 30:**  Not controverted that the first page of the 1992 Ascot offering memorandum contains the language quoted by Plaintiff.  Controverted to the extent that the language "referred to the personal attention and judgment Merkin promised to bring to bear on individual transactions" means that Merkin personally would make every trade.  The 1992 Ascot Offering Memorandum explicitly provided for the use of third-party money managers and stated that the General Partner "intends to delegate investment discretion over all or a portion of the Partnership's portfolio to other independent money managers." (Steiner Aff., Ex. 65 (1992 Ascot OM) at 2; Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 182:9-25.)

31.    Merkin's personal attention to individual trades was repeatedly touted in "risk disclosures" in Ascot's offering memoranda, such as the following:

- "The Partnership also may take positions in options on stock of companies which may, *in the judgment of the General Partner*, be potential acquisition candidates . . . ." *(Ex. 3 at 246 (emphasis added))*.
- "Such purchases may include securities which *the General Partner believes* to be undervalued[.]" *(Id.) (emphasis added)*.
- "Investments in debt claims and the securities of companies that have filed for bankruptcy . . . may be made at various stages in the bankruptcy process *based on the Managing Partner's judgment that there is sufficient profit potential. (Id.; Ex. 14 at GCC-NYAG0117895*
- "The imposition of controls by governmental authorities might also limit such forward (and futures) trading to less than that which the General Partner would otherwise recommend . . ." (Ex. 3 at GCC-NYAG0000247) (emphasis added).

**Response to 31:**  Controverted that the risk disclosures support Plaintiff's self-serving conclusion that "Merkin's personal attention to individual trades was repeatedly touted in risk disclosures."  Moreover, provisions of Ascot's offering memoranda make Plaintiff's conclusion completely untenable. (*See* Steiner Aff., Ex. 1 (Ascot OM) at 2-3, 13, 17.)

7

32.    The Ascot Offering Memoranda contained boilerplate provisions stating that Merkin could delegate management duties to "independent money managers" without "prior notice to or the consent of" the investors. *Ex. 3 at GCC-NYAG0000230, GCC-NYAG000024;Ex. 5 at GCC-NYAG 0000057, GCC-NYAG 0000072.*

**Response to 32:**    Not controverted that the Ascot Offering Memoranda disclosed that Merkin could delegate investment discretion to "independent money managers" without "prior notice to or the consent of" the investors.   Controverted to the extent that the Attorney General attempts to denigrate the disclosures as "boilerplate."

33.    The Ascot documents only identify Madoff as the "prime broker." *Ex. 3 at GCCNYAG0000236; Ex. 5 GCC-NYAG 0056404.*

**Response to 33:**  Controverted. The Ascot OM identifies Madoff as the "prime broker" and "custodian." (Ex. 1  (Ascot OM) at 8-9; Ex. 4 (Ascot Fund OM) at 12-13.)

34.    Other than the description of Madoff as the "prime broker," no mention is made in the Ascot Offering Memoranda of Madoff's role in managing the Funds. *Ex 15; Ex 16; Ex 17; Ex 3; Ex. 5.*

**Response to 34:**  Controverted. The Ascot OM identifies Madoff as the "prime broker" and "custodian." (Steiner Aff., Ex. 1 (Ascot OM) at 8-9; Ex. 4 (Ascot Fund OM) at 12-13. The Ascot documents also identify the Madoff investment strategy and disclose that the Fund will invest through third-party managers. (*See* Steiner Aff., Ex. 1 (Ascot OM) at 1-2.

35.    The Ascot Offering Memoranda identification of Madoff as a "prime broker" was misleading because such brokers do not make investment management decisions like Madoff was making. *Ex. 19.*

**Response to 35:**  Controverted.  The identification of Madoff as a "prime broker" was accurate. (Steiner Aff., Ex. 54 (Merkin Tr. (Mar. 3, 2010) 185:23-186:18; *see also* Ex. 16 (Autera Tr.) at 75:21-77:22.)

36.    Merkin misrepresented the role of Morgan Stanley by referring to the firm as a "prime broker" in the Ascot prospectus and by representing that Morgan Stanley acted as the custodian of Ascot's securities. *Ex. 3 at 256.*

**Response to 36:**  Controverted.  Merkin did not misrepresent the role of Morgan Stanley.  The October 2006 Ascot OM provides Morgan Stanley was one of the prime brokers and custodians for Ascot.  That disclosure was accurate.  As Merkin explained:

> Morgan Stanley acted as what I would describe our home base.  That is where investors sent money to when they subscribed to a limited partnership interest in the fund, if it's Ascot Partners, yes.  That's where they got money back from.  That's where we occasionally held cash.  That was their role.

(Steiner Aff., Ex. 54 (Merkin Tr. (Mar. 3, 2010)) at 89:6-12.)  Morgan Stanley also cleared trades for Ascot and had custody of some of Ascot's securities.  (Steiner Aff., Ex. 54

8

13966429

(Merkin Tr. (Mar. 3, 2010)) at 89:25-90:2.) And Roy Adams explained in his expert report -- the conclusions of which have not been disputed -- that Morgan Stanley did act as a prime broker for the Funds:

> Prime brokers provide a variety of services, including among other things, custody, clearing, administration, cash management, financing, capital introductions, portfolio reporting, securities lending, information technology and consultations, and compliance and risk management. Morgan Stanley provided custody and administrative and cash management services in connection with the processing of the Funds' purchase and redemption orders.

(Steiner Aff., Ex. 11 (Report of Roy W. Adams) ¶ 17.5.)

37.    Ascot did not have multiple "money managers." The Ascot Funds were entirely dependent on Madoff, as essentially all of Ascot's money was with Madoff. Throughout the life of the fund, "substantially all" of Ascot's assets were managed by Bernard Madoff. *Ex. 6 at 36-37; Answer at ¶ 32.*

**Response to 37:**  Controverted that Ascot did not have multiple "money managers." Ascot used the services of several money managers, including McGarr Fund, Jim Chanos of Kynikos, Ron Little of Marque Millennium and Rich Pzena of R.S. Pzena & Company.  (*See* Steiner Aff., Ex. 16 (Autera Tr.) at 34:12-43:14; Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 179:13-20.)  Controverted that the Ascot Funds were "entirely dependent on Madoff." Madoff had discretion to trade for Ascot pursuant to the Trading Authorization Directive. (Steiner Aff., Ex. 51.)  Merkin consulted with Madoff as to Madoff's trading strategy, the markets and times to enter or exit the market, and discussed with Madoff potential changes to Madoff's investment strategy. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 95:15-97:18.)  Madoff had custody over the funds allocated to him and cleared transactions involving those funds.  Merkin made the decision to allocate capital to Madoff, as well as the decisions to increase or decrease the allocation to Madoff.  (Steiner Aff., Ex. *15* (Jan. 30, 2009 Merkin Tr.) at 182:11-19).)  The allocation to Madoff as a percentage of Ascot's assets varied over time, and is set forth in Exhibit 18 to the Attorney General's Rule 19-a statement.

38.    Ascot thus became virtually worthless when Madoff's Ponzi scheme was revealed in December 2008. *Mtd. at p.1.*

**Response to 38:**  Not controverted that Ascot was rendered virtually worthless upon the revelation of Madoff's Ponzi scheme.

39.    The table below reflects the percent of Ariel, and Gabriel's assets managed by Madoff in each of the noted years:

| Percent of Ariel and Gabriel Invested in Madoff, by Year | | |
|---|---|---|
| | **Ariel** | **Gabriel** |
| 1990 | 23.43% | 24.01% |
| 1991 | 17.89% | 13.17% |
| 1992 | 21.83% | 21.34% |

9

| 1993-1999 | 0% | 0% |
|---|---|---|
| 2000 | 7.96% | 7.13% |
| 2001 | 21.15% | 21.35% |
| 2002 | 29.18% | 30.32% |
| 2003 | 22.19% | 23.45% |
| 2004 | 20.86% | 19.54% |
| 2005 | 16.24% | 16.24% |
| 2006 | 23.35% | 23.76% |
| 2007 | 24.42% | 24.04% |

**Response to 39:** Not controverted.

40. The Ariel and Gabriel offering documents do not disclose Madoff's role as investment manager. The Ariel and Gabriel offering documents do not mention Madoff at all.

**Response to 40:** Not controverted that the name "Madoff" does not appear in the Ariel and Gabriel Offering Memoranda. Controverted to the extent that paragraph 40 suggests that Madoff was not covered by the disclosure that Merkin could allocate capital to "independent money managers" . . . "without prior notice to or consent of the investors." (Steiner Aff., Ex. 2 (Gabriel OM) at 14, 28; Ex. 3 (Ariel OM) at 20, 40-41, 45-46.)

41. The Ariel and Gabriel Offering Memoranda concealed Madoff's role in managing the Funds by representing that the Funds were focused on distressed debt and insolvency situations, which had nothing to do with Madoff's "split strike conversion" strategy. The Memoranda stated that Ariel was "concentrated in the purchase of securities which are subject to Reorganizations," which were defined as including "tender offers, mergers, liquidations, recapitalizations, bankruptcies, spin-offs and other similar transaction," (*Ex. 20 at GCCNYAG0000593,598)*, and that Gabriel "engages primarily in investments in private debt claims and publicly traded securities of bankrupt and distressed companies and in risk arbitrage." *Ex. 14 at GCC-NYAG0117893.*

**Response to 41:** Controverted that the Ariel and Gabriel Offering Memoranda concealed Madoff's role. The Ariel and Gabriel OMs provide that the Funds "will also make indirect investments with third-party money managers" . . . "without prior notice to, or consent of, the investors." (Steiner Aff., Ex. 2 (Gabriel OM) at 14, 28; Ex. 3 (Ariel OM) at 20, 40-41, 45-46.) The Offering Memoranda also disclosed that Gabriel and Ariel may engage in "arbitrage in options on securities" which accurately includes the Madoff strategy. (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 256:11-16; 260:7-15 ("Arbitrage of related securities is an accurate description of that part of the portfolio."); Ex. 3 (Ariel OM) at 34; Ex. 2 ( Gabriel OM) at 22.) The Ariel and Gabriel OMs also provide that Merkin "reserves the right to alter or modify some or all of the Fund's investment strategies in light of available investment opportunities." (Ex. 2 (Gabriel OM) at 15; Ex. 3 (Ariel OM) at 21.)

42. At least 16% and up to 30% of the assets of Ariel and Gabriel were handled by Madoff, whose strategy – *i.e.* purchasing large cap stocks from the S & P 100 Index and hedging the equity investments by using options – was entirely unrelated to distressed debt and risk arbitrage. *Ex. 18.*

10

**Response to 42:** From 1993 through 1999, none of the assets of Ariel and Gabriel were allocated to Madoff. From 2000 until December 2008, between approximately 7% and approximately 30% of the assets of Ariel and Gabriel were allocated to an account managed by Madoff. The percentages varied over time and are reflected in Exhibit 18. Moreover, the Ariel and Gabriel Offering Memoranda provided that the Funds could invest in "arbitrage in options on securities," which included the Madoff strategy, and further that Merkin "reserves the right to alter or modify some or all of the Fund's investment strategies in light of available investment opportunities." (Steiner Aff., Ex. 2 (Gabriel OM) at 15; Ex. 3 (Ariel OM) at 21.)

43.    Madoff's role as broker, custodian and manager was directly contrary to statements in the Offering Memoranda that brokers for the Funds who cleared trades would *not* have managerial functions. *Ex. 1 at GCC-NYAG0000638.*

**Response to 43:** Controverted. Madoff did not have "managerial functions" over the Funds. Merkin had sole authority for the management of Ascot Partners and Gabriel, and subject to the oversight of the directors, of Ariel and Ascot Fund. Merkin's managerial function included the authority to allocate capital and delegate investment discretion over such allocated capital to independent money managers. Madoff was one such independent money manager, and had investment discretion over the assets allocated to him subject to the confines of the Trading Authorization Directive and discussions with Merkin. (Steiner Aff., Ex. 51.)

44.    Morgan Stanley was identified in the Offering Memoranda as a prime broker and custodian of the Funds, but it was not disclosed that Madoff was custodian for the portion he managed. *Ex. 2 at GCC-NYAG0000701; Ex. 4 at GCC-NYAG0000911.*

**Response to 44:** Controverted. The Ascot Offering Memoranda identify Madoff as one of the principal prime brokers and custodians of Ascot, and all of the Offering Memoranda provide that "the General Partner may select other or additional brokers to act as prime brokers for the Partnership." (Steiner Aff., Ex. 2 (Gabriel OM) at 11.) In addition, the Offering Memoranda disclose that the Funds will not have custody over the assets allocated to third-party managers. (Steiner Aff., Ex. 1 (Ascot OM) at 17; *see also* Ex. 2 (Gabriel OM) at 28; Ex. 4 (Ascot Fund OM) at 25-26; Ex. 3 (Ariel OM) at 40-41.)

45.    Merkin sent quarterly letters to investors in Ariel and Gabriel which included discussion of the markets, their investments, and related matters.

**Response to 45:** Not controverted.

46.    The letters described the Funds' investment process in the following manner:

• July 20, 2005 report: "We are particularly enthusiastic about some large positions that we put on at the end of the first quarter. Thus far, they have contributed nothing to our profitability. . . . We have every reason to hope that the new positions will drive the results for a good quarter (or quarters) down the road, at which point we will take a brief bow and immediately resume searching for additional opportunities." *Ex. 21 at GCCNYAG0076338.*

13966429

- January 20, 2007 report: "Our effort has been to migrate from increasingly efficient markets to our private positions, where we enjoy both much more complete information about our investments and, thanks to our sourcing network, much less competition for our ideas. There, we have worked diligently to establish a reputation for creativity and reliability, which further enhances the access to ideas conferred by our sourcing advantage." *Ex. 22 at GCC-NYAG0077410.*

- October 20, 2008 report: "Our favorite hedge is to sell some of a position and thereby reduce risk. We prefer that to finding and selling a vaguely corresponding short that increases the aggregate broad exposure of the fund while weakening the power of an idea." *Ex. 23 at GCC-NYAG0262028.*

      **Response to 46:**  Controverted that the excerpts describe the Funds' investment process.  Not controverted that the quoted language is excerpted from the referenced quarterly letters.

      47.    In a letter discussing his investment strategy, Merkin described Ariel and Gabriel as "a tapestry of six threads of different colors, each representing one of the full ranges of debt related asset classes in our repertoire." The six "threads" were defined as (a) "high-yield bonds"; (b) "public distressed names"; (c) "asset-based lending"; (d) "'private' distressed" debt; (e) "private equity, usually with a distressed flavor"; and (f) "U.S. distressed credits sourced in Japan." *Ex. 24 at GCC-NYAG0040581-82.*

      **Response to 47:**  Not controverted that the quotations are excerpted from the referenced quarterly letter.  Controverted that the letter describes the entirety of Merkin's investment strategy.

      48.    As a GCC employee who helped draft the letters testified, none of these "threads" described the strategies allegedly employed by Madoff, who controlled a significant component of Ariel's and Gabriel's portfolios.

Q.    As of April '05, would you have been able to classify the Madoff components in one of these six threads?

A.    My understanding of what these threads were meant to represent is that these were active investment strategies in which the fund participated, which is not the case with respect to the money that was entrusted to Mr. Madoff. *Ex. 25 at 75:21-76:5.*

      **Response to 48:**  Not controverted that the question and answer are excerpted from the referenced deposition transcript.  Controverted as to the Attorney General's suggested interpretation or conclusions with respect to that testimony, and controverted that Madoff "controlled a significant component of Ariel's and Gabriel's portfolios." *See* Plaintiff's table set out at Paragraph 39.

      49.    The investment strategies described in Merkin's letters to investors in Ariel and Gabriel did not include Madoff's "split-strike conversion" strategy. The letters purported to show that 100% of Ariel and Gabriel assets were invested according to strategies

13966429

that had nothing to do with the strategy Madoff ostensibly was implementing. *GCC-NYAG0262023; GCC-NYAG0040521; GCC-NYAG0040579; GCC-NYAG0076333; GCC-NYAG0077405.*

**Response to 49:** Controverted. The investment with Madoff was properly categorized in the strategy "arbitrage of related securities." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 256:11-16; 260:7-15 ("Arbitrage of related securities is an accurate description of that part of the portfolio.").) Moreover, the quarterly reports were not required to and did not purport to provide a detailed description of all or even a majority of the Funds' holdings, and there is no evidence that any investor believed that they did. (Steiner Aff., Ex. 55, (Merkin Tr. (Mar. 4, 2010)) at 260:19-261:3.)

50.     None of the letters mentioned that approximately 20 to 30% of the assets were managed by Madoff.

**Response to 50:** Controverted. The letters properly categorize the investment with Madoff as "arbitrage of related securities." The percentage of Gabriel's and Ariel's assets allocated to Madoff over time is set forth in Paragraph 39. Not controverted that the name "Madoff" does not appear in the quarterly letters.

51.     In a meeting with the finance committee of New York Law School in November 2006, Merkin told the committee that 15% of Ascot used LEAPS, which he traded through Madoff. *Ex. 27.*

**Response to 51:** Controverted. Merkin explicitly denied that he "told the committee that 15% of Ascot used LEAPS, which he traded through Madoff." (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) 192:18-194:4). Moreover, in sworn testimony in the Wiederhorn arbitration, Ralph Sinsheimer of Solaris Group, the investment advisor to New York Law School, admitted that critical portions of the minutes here relied on by the Attorney General were obviously inaccurate. Following the meeting, Autera advised Solaris employees, including Max Sinsheimer, that Madoff had been the prime broker and custodian for Ascot "since inception." (Steiner Aff., Ex. 39.)

52.     Ascot did not engage in LEAPS trading. *Ex. 6 at 189:6-191:4.*

**Response to 52:** Controverted. Ascot engaged in LEAPS trading. Steiner Aff., Ex. 54 (Merkin Tr. (Mar. 3, 2010)) at 134:20-25.) Merkin also discussed with Madoff the possibility of doing additional LEAPS trading through Madoff. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 190: 3-10.); Ex. 54 (Merkin Tr. (Mar. 3, 2010)) at 134:20-25.)

53.     A March 30, 2006 e-mail memorialized a misleading conversation between GCC's CFO, Michael Autera, and an investor's representative regarding the Funds' investment strategies: "Per my discussion today with Mike Autera: . . . "Ariel/Gabriel" . . . ~50% of the ideas overlap with Cerberus Partners. Ezra employs 2 PMs, 4 analysts, a trader, 4 admin people, and 5 accounting/operations people in his own office. The ~50% that is non-Cerberus overlap is a mix of Cohanzick (David Sherman), and ideas generated in-house: distressed, private equity, capital structure arbitrage, and event-driven ideas." *Ex. 28.*

13

**Response to 53:** Controverted. The email purportedly summarizing the conversation was never sent to Autera, and there is no evidence that the email "memorialized" the conversation accurately and completely. Moreover, the remainder of the email (not herein quoted by the Attorney General) states that Ascot's "Assets are held at Madoff & Co., which has 'a lot' of discretion over them, although Ezra 'has discretion' too." (Steiner, Aff., Ex. 36.)

54.    In 2006, 23% of Ariel and Gabriel's funds were invested with Madoff. *Ex. 18.*

**Response to 54:** Not controverted.

55.    Merkin had a fiduciary duty to the investors in the Funds. *Ex. 6 at 101:7-:24.*

**Response to 55:** Not controverted as to investors in Ascot Partners and Gabriel. Controverted as to the Attorney General's legal conclusion with respect to investors in Ariel and Ascot Fund.

56.    Merkin knew that sophisticated money managers had raised serious issues concerning the legitimacy of Madoff's operations.

**Response to 56:** Controverted. No evidence is cited for the statement in paragraph 56.

57.    For example, in 2001, Barron's and a newsletter, MAR/Hedge, reported that hedge fund professionals and option strategists believed Madoff could not legitimately achieve the returns he was reporting using the "split strike" conversion strategy. *Ex. 35 at GCC-NYAG-0074523.*

**Response to 57:** Controverted. The cited evidence does not support the proposition. Rather, the MAR/Hedge article states that "[t]hose who question the consistency of the returns" do "not necessarily [question] the ability to generate the gross and net returns reported." (Ex. 66.) And the Barron's article described Madoff as one of the "most-respected hedge-fund managers." (Ex. 76.)

58.    Merkin read and preserved these articles. *Ex. 32 at 90:20-91:13.*

**Response to 58:** Not controverted.

59.    Three of Merkin's associates told him that the returns Madoff was reporting for the funds were simply too good to be true.

**Response to 59:** Controverted. No evidence is cited for the proposition.

60.    For example, Victor Teicher ("Teicher"), a money manager employed by Merkin to manage Ariel and Gabriel's portfolios from 1988 to 1999, warned Merkin about investing with Madoff because, he told him, the combination of low volatility and high returns Madoff was reporting was suspicious. *Ex. 29 at 44:17-19, 53:6-54:14.*

14

**Response to 60:** Controverted. The cited evidence does not support the proposition. Teicher testified that he thought "the returns were too consistent." (Steiner Aff., Ex. 56 (Teicher Tr.) at 44:17-18.) Teicher also testified that he had never spoken to Madoff and did not understand the Madoff strategy. (*Id.* at 56:20-21; 57:17-19; 130:5-10.) Teicher was never an employee of Merkin's. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 200:23-201:3.)

Moreover, Teicher acknowledged that his concerns derived in large part from the fact that Madoff's office was in the Lipstick Building (according to Teicher, lipstick is used to disguise the appearance of a woman's lips) and if you type Madoff's name in an email, Microsoft Outlook does not recognize it as a name and instead attempts to change it to the two words "made off." (Steiner Aff., Ex. 56 (Teicher Tr.) at 74:10-75:15.) Nevertheless, Teicher explained that he found the news that Madoff had been running a massive Ponzi scheme "hilarious" precisely because Madoff had enjoyed such a good reputation on Wall Street. (*Id.* at 36:24-38:2.) Teicher never claimed to have believed or suggested to Merkin prior to December 11, 2008 that Madoff was running a Ponzi scheme, and Merkin denied ever being told that. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 25:22-26:13.)

61.    Teicher raised other Madoff issues with Merkin including that Madoff self-cleared and his returns were too consistent. *Id.*

**Response to 61:** Controverted. Teicher testified that he did not understand the Madoff strategy. (Steiner Aff., Ex. 56 (Teicher Tr.) at 56:20-21; 57:17-19.) Moreover, Teicher acknowledged that his concerns derived in large part from the fact that Madoff's office was in the Lipstick Building (according to Teicher, lipstick is used to disguise the appearance of a woman's lips) and if you type Madoff's name in an email, Microsoft Outlook does not recognize it as a name and instead attempts to change it to the two words "made off." (*Id.* at 74:10-75:15.) Merkin testified that Teicher was "something of a Madoff skeptic in at least one conversation that we had, many, many, many years ago. I don't think it was anything stronger than that . . . ." (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 201:25-202:5.)

62.    Teicher told Merkin that Madoff might be running a scam or Ponzi scheme. *Ex. 30 at 52:2-54:16.*

**Response to 62:** Controverted. Teicher never claimed to have believed or suggested to Merkin prior to December 11, 2008 that Madoff was running a Ponzi scheme, and Merkin denied ever being told that. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 25:22-26:13.) A different individual, Jack Mayer testified that he had a "[v]ague general recollection" of a conversation with Teicher and Merkin in which "Victor sa[id] that he didn't believe in [Madoff] or he didn't think [Madoff] was worth investing in . . . and saying that [Madoff] could be a scam or Ponzi, that's, I have a picture of such a conversation vaguely." (Steiner Aff., Ex. 61 (Mayer Tr.) at 53:22-54:6.) Neither Teicher nor Merkin agreed with Mayer's vague testimony.

63.    Further, another sophisticated money manager, Jack Nash, told Merkin that he had become suspicious of Madoff returns. *Ex. 6 at 22:22-23:24.*

13966429

**Response to 63:** Controverted. Jack Nash never told "he had become suspicious" about Madoff; Nash had only "expressed skepticism about the Madoff return." (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 23:22-23.)

64.    Merkin knew that certain aspects of Madoff's operations raised the possibility of fraud, including:

(1)    the use of paper trade confirmations (which made it possible to manufacture fictitious trade tickets), *(Ex. 6, at 112:25-113:15; Ex. 31, at 357:17-24; Ex. 32, at 9:13-17)*;

(2)    that Madoff was self-clearing, i.e., he initiated and executed all trades and had custody of the securities he allegedly purchased, *(Ex. 33, at 80:23-81:5; Ex. 32, at 238:21-23)*;

(3)    that Madoff's operation was tightly controlled by himself and close family members, *(Ex. 33, at 59:19-21)*;

(4)    the unerring stability of Madoff's returns over a long period of time, including in bear markets, *(Ex. 34, at 52284-85; Ex. 32, at 90:20-91:13)*;

(5)    Madoff's claim to be purchasing and selling billions in S & P 100 puts and calls, trading so vast that it simply could not have been done, *(Ex. 35 at GCC-NYAG-0074523);* and,

(6)    that Madoff's auditor was a small obscure firm. *(Ex. 32 at 160:21-161:5, 164:4-165:4)*.

**Response to 64:** Controverted that "Merkin knew certain aspects of Madoff's operation raised the possibility of fraud." The evidence does not support the proposition that the six aspects listed raised the possibility of fraud. Not controverted that Merkin was aware Madoff used paper trade confirmations. Not controverted that Madoff was self-clearing. Controverted "that Madoff's operation was tightly controlled by himself and close family members." (Steiner Aff., Ex. 54 (Merkin Tr. (Mar. 3, 2010)) 59:14-25.)

Controverted that "the unerring stability of Madoff's returns" "raised a possibility of fraud." Controverted that the evidence cited supports the proposition that Madoff's returns had "unerring stability." Controverted that the evidence cited, a trade publication, is dispositive of any statement regarding Madoff's returns. Moreover, Weingarten concluded in his expert report that the returns were plausible and that there were "many fund managers' results where the returns were high and volatility was proportionately low." (Steiner Aff., Ex. 50 (Weingarten) at 3.)

Controverted that Madoff claimed to be doing "trading so vast that it simply could not have been done." The cited evidence does not support the proposition.

16

Controverted that Merkin knew "that Madoff's auditor was a small obscure firm." The cited evidence does not support the proposition. Rather, Merkin testified that "[t]here are lots of accounting firms I have never heard of." (Steiner Aff., Ex. 57 (Merkin Tr. (July 1, 2010)) at 164:23-24.) Moreover, BDO was aware that Madoff's auditor was Friehling & Horowitz, and accepted reports issued by Friehling & Horowitz in performing its audits of the Funds.

65.   In a conversation recorded by Merkin on January 14, 2002, when Merkin tried to get information about the size of assets under Madoff's management, and Madoff declined to provide such basic information, Merkin responded, "I don't really care, because I've made my peace with Bernie." *Ex. 36 at GCC-NYAG0105062.*

**Response to 65:** Controverted that "Merkin tried to get information about the size of assets under Madoff's management." The evidence cited does not support the proposition. (Ex. 67.)

66.   Merkin made no effort to verify that the paper confirmations Madoff sent him reflected actual transactions. *Ex. 6 at 101:4-102:22.*

**Response to 66:** Controverted. The cited evidence, discussing Merkin's due diligence performed on the funds, does not support the proposition.

67.   For example, Merkin did not attempt to confirm the trades with the securities industry clearinghouse, Depository Trust Company, which would have had to clear any equity trades by Madoff. *Ex. 32 at 50:23-51:22.*

**Response to 67:** Not controverted that Merkin did not attempt to confirm the trades with the Depository Trust Company. The statement that the Depository Trust Company "would have had to clear any equity trades by Madoff" is not supported by the cited evidence. Moreover, Madoff's prime henchman, Frank DiPascali, admitted to falsifying records of the Depository Trust Company. (Ex. 62.)

68.   Merkin knew by 2006 that Madoff was supposedly managing in the vicinity of $20 billion (*Ex. 33 at 159:15-160:11*) and he testified that Madoff told him at the time that 20% to 50% of the options he was trading for these accounts were through the Chicago Board of Options Exchange ("CBOE"), with the remainder traded "over-the-counter" through privately negotiated transactions with major financial banks and institutions. *Ex. 32 at 22:23-23:25.*

**Response to 68:** Controverted. Merkin's testimony concerning the estimate of 20%-50% CBOE options was that, "I'm not sure that that was correct for the entire period of time. It depends what years you're talking about when you say I previously testified to such and such. It changed. It evolved." (Steiner Aff., Ex. 57 (Merkin Tr. July 1, 2010)) at 23:6-10.)

69.   Merkin was aware of publicly available data showing the "open interest" on the CBOE, i.e., the volume of trading in such options. *Ex. 32 at 57:21-58:19.*

13966429

**Response to 69:** Controverted. Merkin stated that he was not "entirely sure" and he "would think that there might be." (Steiner Aff., Ex. 57 (Merkin Tr. July 1, 2010)) at 58:7-16.)

70.     Nevertheless, Merkin never seriously checked, or had anyone do so, whether the confirmations Madoff sent purporting to show the trading of billions in options was consistent with the actual volume of trading on the CBOE. *Id.*

**Response to 70:** Not controverted that Merkin did not check "whether the confirmations Madoff sent purporting to show the trading of billions in options was consistent with the actual volume of trading on the CBOE." Merkin explained, "I wasn't terribly interested in whether Madoff was executing listed or over-the-counter options. I was very interested in the executions, and in best price, and in other forms of execution advantages and cared much more about that." (Steiner Aff., Ex. 57 (Merkin Tr. July 1, 2010)) at 59:22-60:5.)

Moreover, Merkin discussed with Madoff how Madoff found sufficient options to hedge 10 to 20 billion dollars in investments, and Madoff told Merkin that "he was using over-the-counter options as well as listed options and, depending on when these conversations took place, over time he would give me a sense of what percentage, roughly what percentage was in listed options and what percentage was in over-the-counter options . . . ." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 353:7-19.)

71.     The volume of trading in these options on the CBOE was wholly insufficient to support Madoff's alleged options trading. *Ex. 37.*

**Response to 71:** Controverted. The cited evidence, statistics from the Chicago Board of Options Exchange, does not support the proposition because the cited evidence does not include the volume of OTC options, which is unknowable.

72.     Merkin did not attempt to verify Madoff's claim that he was trading options through over-the-counter transactions with major banking firms, some of which Madoff identified for him. *Ex. 32 at 46:4-49:18.*

**Response to 72:** Controverted to the extent that paragraph 72 implies that Merkin should have attempted to contact a major banking firm to verify Madoff's claim. Merkin explained that "You can't go to a Wall Street firm and ask them about their business with their customer who is not you. You can go and ask them about your business, but I'm not their customer in that context." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 375:24-376:4.)

73.     Madoff claimed to purchase a group of stocks traded on the S & P 100, and to hedge these equity investments by buying puts (to protect against a decline in the value of the stocks) and selling calls (which generated cash to purchase the puts but limited the ability to maximize profits from these investments). *Ex. 32 at 33:16 to 35:3.*

**Response to 73:** Not controverted.

74.     In using a strategy consisting of a long stock position hedged by options, rather than varying between long and short positions or using options to speculate on the

13966429

direction of the market, Madoff could not have generated substantial, consistently positive returns virtually every month, averaging at least 8% a year, for over a decade, even during periods when the stock market was sharply declining. *See, e.g., Ex. 38 at 4227.*

**Response to 74:** Controverted. The cited evidence, an April 2008 power point presentation by Gabriel Capital Group, does not support any statement in paragraph 74. Moreover, the MARHedge article did not question Madoff's returns, and Weingarten explained that the returns were plausible and that other successful low-volatility managers obtained similar if not better returns. (Ex. 50 (Weingarten Report) at 3-4.) Moreover, after the Madoff fraud was revealed, Credit Suisse did an analysis and concluded that a median stock picker employing the strategy could have earned returns averaging 8.6% per year. Tennille Tracy, *Madoff Strategy Put to Test—Credit Suisse Sees Gains of 8.6%; Factoring in a Collar*, WALL ST. J., Jan. 15, 2009, at C6.

75.    Merkin never analyzed "Madoff's ability . . . to achieve an 11 point gain in a year that the S & P lost 22 and a half percent." *Ex. 32 at 135:11-14.*

**Response to 75:** Controverted. Merkin reviewed and analyzed all of Madoff's positions and returns on a daily basis. (Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 17:17-23.)

76.    In 2006, when Madoff was required to register as an investment adviser, Merkin learned that Madoff was then managing about $17 billion to $21 billion. *Ex. 32 at 24:2-8.*

**Response to 76:** Controverted to the extent that paragraph 76 implies that Merkin learned the amount Madoff was managing only when Madoff was required to register as an investment adviser. Merkin and Madoff had previously discussed the amount of money Madoff was managing. Merkin stated that the range "was consistent with -- as a range, was consistent with what he had suggested in a conversation." (Steiner Aff., Ex. 57 (Merkin Tr. (July 1, 2010)) at 24:10-12.)

77.    Merkin knew that in order to effectuate his strategy, Madoff would have to purchase and sell billions of dollars of puts and calls to "collar" the long position in the stocks he claimed to acquire.

**Response to 77:** Not controverted.

78.    Merkin acknowledged that he knew that S & P 100 options, traded on the CBOE, were not available in any such volume and "there wouldn't have been sufficient puts and calls, layered, to hedge all of the securities he (Madoff) was trading" on the CBOE. *Ex. 31 at 366:4-14.*

**Response to 78:** Controverted. The quoted text is misleadingly taken from a question posed by David Ellenhorn, not from Merkin's testimony:

> Mr. Ellenhorn: Was that part of a discussion in which you indicated or it was
> acknowledged that there wouldn't have been sufficient puts or puts and calls,

19

13966429

layered puts and calls to carry all of the securities he was trading, to hedge all of the securities he was trading?

Mr. Merkin: I don't remember if it was or wasn't part of that discussion. It would fit naturally there but I don't remember the specifics of the conversation.

(Steiner Aff., Ex. 55 (Merkin Tr.(Mar. 4, 2010)) at 366:5-14.)

79.    Merkin knew there was a serious question concerning how Madoff could be acquiring such a huge volume of options, but Merkin never informed his investors about these issues.

**Response to 79:** Controverted that "Merkin knew there was a serious question concerning how Madoff could be acquiring such a huge volume of options." No evidence is cited for the proposition. Rather, Merkin discussed with Madoff how Madoff found sufficient options to hedge 10 to 20 billion dollars in investments, and Madoff told Merkin that "he was using over-the-counter options as well as listed options and, depending on when these conversations took place, over time he would give me a sense of what percentage, roughly what percentage was in listed options and what percentage was in over-the-counter options . . . ." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 353:7-19.)

80.    Merkin testified that, after discussing with Madoff, Merkin believed that somewhere between 50% and 85% of the options were being purchased "over-the-counter," rather than on the CBOE, from about twenty banks and financial institutions that Madoff purportedly named for Merkin. *Ex. 32 at 22:23-23:25, 42:3-45:12; 80:14-85:6.*

**Response to 80:** Controverted to the extent that the cited evidence does not support that "Merkin testified that, after discussing with Madoff, Merkin believed that somewhere between 50% and 85% of the options were being purchased 'over-the-counter.'" Rather, Merkin testified, "I'm not sure that that was correct for the entire period of time. It depends what years you're talking about when you say I previously testified to such and such. It changed. It evolved." (Steiner Aff., Ex. 57 (Merkin Tr. (July 1, 2010)) at 23:6-10.)

81.    Merkin thus knew that puts were still being purchased by Madoff through the CBOE to hedge a portfolio of securities valued between $3 and $10 billion. *Id.*

**Response to 81:** Controverted. The evidence cited does not support the proposition. Rather, Merkin testified, "I'm not sure that that was correct for the entire period of time. It depends what years you're talking about when you say I previously testified to such and such. It changed. It evolved." (Steiner Aff., Ex. 57 (Merkin Tr. (July 1, 2010)) at 23:6-10.)

82.    Merkin had access to public data showing that the "open interest" on the CBOE was insufficient to allow Madoff to purchase options in that volume on the CBOE. Merkin never reviewed this data. *Ex. 32 at 73:3-74:2.*

**Response to 82:** Controverted. The cited evidence has not established the "volume" of options Merkin believed Madoff was purchasing on the CBOE.

20

83.    Merkin never made – or tried to make – contact with "any of these twenty institutions to see whether they were doing index trading with Madoff." *Ex. 31 at 374:2-375:11; Ex. 32 at 42:3-46:13.*

**Response to 83:**  Controverted to the extent that paragraph 83 implies that Merkin should have "made – or tried to make – contact" with such institution.  Merkin explained that "You can't go to a Wall Street firm and ask them about their business with their customer who is not you.  You can go and ask them about your business, but I'm not their customer in that context." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 375:24-376:4.)  Merkin had, however, over the years discussed Madoff with individuals at many of the largest banks.  (Ex. 57 (Merkin Tr. (July 1, 2010)) at 19:17-20:16.)

84.    Merkin never tried to determine whether the banking institutions were, in Merkin's own words, doing "a significant volume of over-the-counter business with the Madoff firm in OEX options." *Id.*

**Response to 84:**  Controverted to the extent paragraph 84 implies that Merkin should have contacted these institutions to determine whether they were doing "a significant volume of over-the-counter business with the Madoff firm in OEX options."  Merkin explained that "You can't go to a Wall Street firm and ask them about their business with their customer who is not you.  You can go and ask them about your business, but I'm not their customer in that context." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 375:24-376:4.)

Further controverted that Merkin never tried to make such a determination.  Merkin testified that he had discussions with Madoff about Madoff's counterparties and generally discussed Madoff with various senior executives at major investment banks.  (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 353:7-354:25.)

85.    Merkin never tried to obtain from Madoff a copy of a single purported contract between Madoff and the alleged counter-parties to the over-the-counter trades. *Ex. 32 at 87:5-16.*

**Response to 85:**  Not controverted except to the extent the Attorney General is suggesting that Merkin had an obligation to obtain such a contract.

86.    Merkin never tried to verify that Madoff was acquiring the huge volume of options he needed in order to carry out the "split strike conversion" strategy, for the billions he had under management.  Merkin simply "assumed that the tickets" (confirmations) from Madoff "represented actual transactions in options trading." *Ex. 32 at 12:9-13.*

**Response to 86:**  Controverted.  Merkin believed that the confirmations he received from Madoff represented actual transactions because the confirmations were issued by a SEC-registered broker-dealer that was subject to regular inspections and examinations.  Moreover, Merkin testified to performing extensive due diligence on Madoff.  (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009) at 8:4-12:5; 17:7-18:14.)  Weingarten concluded in his expert report, the conclusions of which are undisputed, that the due diligence performed by Merkin "conformed with industry practice." (Steiner Aff., Ex. 50 (Weingarten Report) at 2.)

13966429

87.     Merkin knew there was an issue as to how Madoff was acquiring the options, and he knew there were publicly available numbers showing the "open interest" in options on the CBOE but never checked whether the "open interest" was compatible with the volume of options trades Madoff was reporting. *Ex. 32 at 57:11-60:5.*

**Response to 87:**  Controverted that "Merkin knew there was an issue as to how Madoff was acquiring the options." The cited evidence does not support the proposition. Rather, Merkin stated that "I wasn't terribly interested in whether Madoff was executing listed or over-the-counter options.  I was very interested in the executions, and in best price, and in other forms of execution advantages and cared much more about that." (Steiner Aff., Ex. 57 (Merkin Tr. (July 1, 2010)) at 59:22-60:5.)

Moreover, Merkin discussed with Madoff how Madoff found sufficient options to hedge 10 to 20 billion dollars in investments, and Madoff told Merkin that "he was using over-the-counter options as well as listed options and, depending on when these conversations took place, over time he would give me a sense of what percentage, roughly what percentage was in listed options and what percentage was in over-the-counter options . . . ." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 353:7-19.)

88.     Merkin did not inquire into the over-the-counter market for such options, or obtain any proof, in the form of contracts or otherwise, that Madoff was actually trading options over-the-counter. *Ex. 32 at 51:23-52:16.*

**Response to 88:**  Controverted to the extent paragraph 88 implies that Merkin should have "inquire[d] into the over-the-counter market for such options." Merkin explained that "You can't go to a Wall Street firm and ask them about their business with their customer who is not you.  You can go and ask them about your business, but I'm not their customer in that context." (Steiner Aff., Ex. 55 (Merkin Tr. (Mar. 4, 2010)) at 375:24-376:4.)

89.     Merkin knew Madoff's auditors had a very small, obscure firm, Madoff was sending paper confirmations, and Madoff's returns had been challenged by sophisticated money managers, some of whom had specifically suggested Madoff may be a Ponzi scheme. *Ex. 29 at 13:25-15:20.*

**Response to 89:**  Controverted that "Merkin knew Madoff's auditors had a very small, obscure firm," and that Merkin knew "Madoff's returns had been challenged by sophisticated money managers, some of whom had specifically suggested Madoff may be a Ponzi scheme." The cited evidence does not support the propositions.

90.     Merkin did not disclose to investors the information set forth in paragraphs 56 to 89.

**Response to 90:**  Controverted.  No evidence is cited to support the proposition.

91.     The table below sets forth the fees paid to Merkin on a yearly basis:

| **Defendant's Management and Incentive Fees** |
| --- |

22

13966429

| Year | Ascot Partners | Ascot Fund | Gabriel | Ariel |
|------|---------------|------------|---------|-------|
| 1990 | | | $456,146 | |
| 1991 | | | $2,151,379 | $7,287,700 |
| 1992 | | | $3,619,310 | $6,450,820 |
| 1993 | $232,085 | $516,596 | $8,283,712 | $11,676,177 |
| 1994 | $880,668 | $735,085 | $6,040,373 | $6,896,515 |
| 1995 | $1,165,331 | $850,966 | $11,162,665 | $12,409,950 |
| 1996 | $1,611,374 | $1,183,044 | $19,013,758 | $25,631,220 |
| 1997 | $2,101,263 | $1,666,394 | $27,899,176 | $35,722,094 |
| 1998 | $2,654,297 | $2,344,047 | $6,833,819 | $7,506,086 |
| 1999 | $3,316,268 | $2,756,538 | $10,947,816 | $5,923,084 |
| 2000 | $3,798,766 | $3,470,457 | $14,236,148 | $13,038,087 |
| 2001 | $4,082,427 | $4,540,279 | $11,901,158 | $9,949,603 |
| 2002 | $4,607,052 | $5,314,688 | $7,719,933 | $5,205,260 |
| 2003[1] | $18,083,968 | | $11,184,001 | $11,443,971 |
| 2004 | $21,685,693 | | $18,302,849 | $14,290,871 |
| 2005 | $26,170,949 | | $31,882,175 | $20,305,563 |
| 2006 | $26,004,162 | | $41,260,706 | $29,454,005 |
| 2007 | $28,292,833 | | $43,754,640 | $17,128,861 |
| 2008[2] | $25,957,305 | | $11,046,619 | $6,934,086 |
| Total | $170,644,441 | $23,378,095 | $287,696,383 | $247,253,950 |

**Response to 91:** Controverted to the extent the table includes fees for 2008, which were never paid, and to the extent the amounts include incentive fees for Ariel that were deferred by GCC and not received.

92.    The total fees received by Merkin for the Ascot Funds from inception through 2008 were $194,022,536.

**Response to 92:** Controverted to the extent that the amounts include fees for 2008, which were never paid.

93.    The total fees received by Merkin for Gabriel and Ariel from their inception through 2008 were $287,696,383 and $247,253,950, respectively.

**Response to 93:** Controverted to the extent that the amounts include fees for 2008, which were never paid, and to the extent the amounts include incentive fees for Ariel that were deferred by GCC and not received.

94.    The total for all three funds for all years (1990-2008) is $728,972,868.85.

---

[1] From 2003 forward the management fee for Ascot Fund was taken through Ascot Partners because Ascot Fund became a feeder for Ascot Partners in that year.

[2] Defendant did not collect a management or incentive fee for 2008, however, Defendant maintains that he has a claim against the fund for those fees

13966429

**Response to 94:** Controverted as set forth in Responses to 91, 92 and 93.

95.    Merkin testified at his pre-complaint deposition as follows regarding his practice about revealing Madoff's role:

> I certainly had a policy of answering all questions about Ascot [?] as fully as I possibly could. There were investors who came through, who breezed through in a very short period of time and may have gotten to ask questions.

> There were investors who may not have gotten to ask questions, and there were investors to whom the strategy was much more significant than where accounts were custodied. *Ex. 6 at 172:5-15.*

**Response to 95:** Not controverted.

96.    Later in a post-complaint deposition, Merkin testified that he told many investors in Ascot about Madoff's role. *Ex. 31 at 286:5-288:9.*

**Response to 96:** Not controverted.

97.    The table below shows the out of pocket losses for those Ascot investors as well as the Gabriel and Ariel investors who Merkin has not questioned had no knowledge of Madoff's role in those funds:

|  | **Out of Pocket Loss** |
|---|---|
| **Ascot** | $77,348,019.43 |
| **Gabriel** | $180,682,848.12 |
| **Ariel** | $114,554,912.79 |
|  |  |
| **Total** | $372,585,780.34 |

**Response to 97:** Controverted. No evidence is cited to support the statement that there are investors "who Merkin has not questioned had no knowledge of Madoff's role in those funds." Rather, Defendants stated in their Supplemental Answers and Objections to Plaintiff's First Set of Interrogatories to Defendants that:

> [T]hey believe (i) that all Investors in Ascot Partners, L.P. and Ascot Fund Limited as of December 11, 2008 knew or should have known that Madoff was a third-party manager who made investments on behalf of Ascot as a result of the disclosures in Ascot's offering memorandum and because it was widely known that substantially all of Ascot's assets were invested with Madoff and (ii) that all Investors in Gabriel Partners, L.P. and Ariel Fund Limited as of December 11, 2008 knew or should have known that Madoff could have been a third-party manager and/or could have made investments on behalf of Gabriel and Ariel of a portion of Gabriel's and Ariel's assets as a result of the disclosures in Gabriel's and Ariel's offering memorandum." (Ex. 58 at 2.)

24

13966429

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

### The Funds

1.      Ascot Partners and Gabriel are Delaware limited liability partnerships that were formed to operate as private investment partnerships for qualified U.S. investors.  (Steiner Aff., Ex. 1 (Ascot Partners OM) at i, 1, 12; Ex. 2 (Gabriel OM) at i, 1, 14.)

2.      Ascot Fund and Ariel are Cayman Islands corporations whose qualified investors are exclusively non-U.S. persons and certain tax-exempt U.S. persons.  (Steiner Aff., Ex. 2 (Gabriel OM) at i, 1, 16; Ex. 3 (Ariel OM) at i, 1, 20.)  Ascot Fund invested substantially all of its capital in Ascot Partners through a "master-feeder" structure, while Gabriel and Ariel typically invested together in the same investments but were operated as stand-alone entities.  (Ascot Fund OM at i, 1, 16 (Steiner Aff., Ex. 4); Ariel Fund OM at i, 1, 20 (Steiner Aff., Ex. 3); Gabriel Fund OM at ii, 1, 12, 14, 51 (Steiner Aff., Ex. 2).)

3.      At all times, the vast majority of Ascot's assets were invested through a brokerage account managed by Madoff.  From 2000 through 2008, Gabriel and Ariel also delegated a portion to their assets, ranging from zero to approximately 30%, to an account managed by Madoff.  (Ex. 60.)

### The Governing Documents

4.      All investors in the Funds invested pursuant to the Funds' applicable Offering Memorandum or Prospectus and signed Subscription Agreements and related documents in connection with their investments.  (Steiner Aff., Ex. 5 (Ascot SA); Ex. 6 (Gabriel SA); Ex. 7 (Ascot Fund SA); Ex. 8 (Ariel SA) (collectively "Subscription Agreements").)

5.      By entering into the Subscription Agreements for the Funds, investors in the Funds agreed that their investments would be subject to the terms of the applicable Offering Memorandum or Prospectus, the Subscription Agreements themselves, and, for investors in Ascot Partners or Gabriel, the Limited Partnership Agreements.  (Steiner Aff., Ex. 5 (Ascot SA) at 4; Ex. 6 (Gabriel SA) at 4)

6.      Investors acknowledged that they had "such knowledge and experience in financial and business matters that [they were] capable of evaluating the merits and risks of [their] investment[s] in the Partnership[s] and [were] able to bear such risks."  (Ascot Partners SA at 5 (Steiner Aff., Ex. 5); *see also* Gabriel, Ascot Fund and Ariel SAs at 5 (Exs. 6-8).)

7.      Investors represented and covenanted that they had "evaluated the risks of investing in the Partnership, under[stood] there [we]re substantial risks of loss incidental to the purchase of Interests and ha[d] determined that the Interests [we]re a suitable investment."  (Ascot Partners SA at 5 (Steiner Aff., Ex. 5); *see also* Gabriel, Ascot Fund and Ariel Subscription Agreements at 5 (Exs. 6-8).)

8.      All investors had to be "qualified purchasers," within the meaning of Section 2(a)(51) and 3(c)(7) of the 1940 Act and related rules thereunder.  (Ex. 11 (Adams Report) at ¶ 10.)

13966429

9.    The fact that all investors had to be qualified purchasers:

has important consequences to the Litigation, for it means that purchasing investors had a responsibility to investigate and evaluate the prospective investment aside from merely passively reading the Offering Memoranda.    Moreover, it means that each purchasing investor was deemed under federal law as capable of protecting its own interests in connection with such a purchase. (Ex. 11 (Adams Report) at ¶ 10.)

10.    Fund investors represented that, prior to determining whether to invest, they had "received, carefully read and underst[ood] the Partnership Agreement and the Offering Memorandum outlining . . . the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Partnership," "ha[d] been provided an opportunity to obtain any additional information" and had had "the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the offering and other matters pertaining to this investment." (Ascot Partners SA at 5 (Steiner Aff., Ex. 5); *see also* Gabriel, Ascot Fund and Ariel SAs at 5 (Exs. 6-8).)

11.    Each investor "made an independent decision to invest in the Partnership and . . . in making its decision to subscribe . . . [it] relied solely upon the Memorandum, the Partnership Agreement and [its] independent investigations." In the same provision, each investor specifically confirmed that it was "not relying on the Partnership, the General Partner or any other person or entity . . . other than [its] own advisers." (Ascot Partners SA at 5 (Steiner Aff., Ex. 5); *see also* Gabriel, Ascot Fund and Ariel SAs at 5 (Exs. 6-8).)

12.    It is incumbent upon the 3c7 fund investor to follow up on any issues of particular importance to the investor or his advisors. (Ex. 11 (Adams Report) at ¶ 12.2.)

13.    The Governing Documents expressly advised prospective investors of Merkin's intention to delegate management responsibility for all or a portion of each Fund's assets to third-party managers, with Merkin retaining overall responsibility to select and monitor those third-party managers. (Steiner Aff., Ex. 1 (Ascot OM) at 2, 12-13, 17; Ex. 2 (Gabriel OM) at 1-2, 14, 28; Ex. 4 (Ascot Fund OM) at i, 2, 16-17, 25-26; Ex. 3 (Ariel OM) at i, 1-2, 20, 40-41).)[3]

14.    The Limited Partnership Agreements provided that Merkin could unilaterally invest the Funds' assets with outside money managers. (Ascot Partners LPA §§ 7.01, 7.03 (Steiner Aff., Ex. 9); Gabriel LPA § 7.01 (Ex. 10).)

15.    The Offering Memoranda include a risk disclosure labeled "Independent Money Managers," which provides:

> Independent Money Managers. The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Consequently, the

---

[3] Unless otherwise noted, citations to the offering documents refer to the most current version of the document.

13966429

success of the Partnership may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the General Partner will exercise reasonable care in selecting such independent money managers or Other Investment Entities and will monitor the results of those money managers and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities. Hence, the actions or inactions on the part of other money managers or the investment advisors to Other Investment Entities may affect the profitability of the Partnership. The risk of loss of the funds invested with other money managers or with Other Investment Entities may not be insured by any insurance company, bonding company, governmental agency, or other entity and the General Partner is not liable for any such loss. Independent money managers and managers of Other Investment Entities selected by the General Partner may receive compensation based on the performance of their investments.

(Steiner Aff., Ex. 1 (Ascot OM) at 17; *see also* Ex. 2 (Gabriel OM) at 28; Ex. 4 (Ascot Fund OM) at 25-26; Ex. 3 (Ariel OM) at 40-41.)

16.    The Governing Documents disclosed that the Funds could engage such independent money managers "*without prior notice to*" or the "*consent of*" the Funds' investors. (Steiner Aff., Ex. 1 (Ascot OM) at 13; Ex. 2 (Gabriel OM) at 14; Ex. 3 (Ariel OM) at 2, 20; Ex. 4 (Ascot Fund OM) at 2, 17) (emphasis added).)

17.    A reasonable investor would have understood that Merkin could invest some or all of the Funds' assets with a third-party manager. (*See, e.g.,* Ex. 12 (Straus Tr.) at 60:4-24; Ex. 11 (Adams Report) ¶ 12.3.)

18.    The fee structure for Ascot -- a 1.5% management fee with no incentive fee -- was a fraction of the fees typically paid to a hedge fund manager that personally conducted all of the trading activity in house.

19.    The presence of an explicit disclosure stating that a 3c7 fund manager will be or may be delegating investment discretion of all or a portion of the fund's assets to independent money managers without disclosure to the investor made it incumbent on the investor, if such information was important to the investor, to ask the manger the identity or identities of any such third party manager. (Ex. 11 (Adams Report) ¶ 12.3.)

20.    The identity of the third party manager was not material. (Ex. 11 (Adams Report) ¶ 17.1.)

21.    Nor was the number of third party managers material. (*Id.*)

22.    The Ascot Offering Memoranda explicitly identified Madoff as a prime broker and custodian of the fund in two places. ((Ex. 1 (Ascot OM) at 8, 28; Ex. 4 (Ascot Fund OM) at 13, 31.)

23.    The Ascot disclosure documents described the Fund's primary strategy as purchasing a "diverse portfolio of securities" that primarily involved "index arbitrage" with a "portfolio of large-cap U.S. equities drawn from the S&P 100." (Steiner Aff., Ex. 1 (Ascot OM) at i, 1-2, 12; Ex. 4 (Ascot Fund OM) at i, 1-2, 16, 25; *see also* Ex. 11 (Adams Report) ¶ 17.8) (stating that the "2002 and 2006 Ascot Offering Memoranda and the 2003 and 2006 Ascot Limited Offering Memoranda described . . . exactly the investment strategy Madoff used").)

24.    It was widely known in the investing world that Madoff employed a strategy that involved purchasing a portfolio of large-cap equities from the S&P 100, selling S&P 100 call options and buying S&P 100 put options.

25.    The Ascot Offering Memoranda disclosed that the Fund will invest with "third-party managers using managed accounts." (Steiner Aff., Ascot Partners OM (Ex. 1) at i; *see also* Gabriel OM (Ex. 2) at i; Ascot Fund OM (Ex. 4) at i; Ariel Fund OM (Ex. 3) at i.)

## BDO's Knowledge of Madoff's Role

26.    The Funds were audited every year by BDO Seidman, LLP ("BDO").

27.    BDO is the fifth-largest accounting firm in the country and a recognized leader in the audits of hedge funds.

28.    The Attorney General took "investigative testimony" of two auditors from BDO Seidman, Irina Gershengoren and Robert Castro.

29.    Michael Andreola, a BDO partner, recommended Ascot to at least one investor. (Steiner Aff., Ex. 13.)

30.    BDO was well-aware of the Funds' investments with Madoff, including that Ascot had invested substantially all of its assets in a managed account with Madoff. (Steiner Aff., Ex. 14 (Gershengoren Tr.) at 25:4-25.)

31.    Defendants provided BDO complete access to all documentation concerning the investments with Madoff, including copies of trading confirmations and monthly statements. (Steiner Aff., Ex. 14 (Gershengoren Tr.) at 17:15:18:4.)

32.    BDO confirmed the balances in the Madoff accounts directly with the Madoff's SEC registered broker-dealer.

33.    BDO was aware that Madoff was audited by Friehling & Horowitz, and was not troubled by the size of Madoff's auditor.

13966429

34.    As part of its audits, BDO reviewed the Offering Memoranda "to make sure that the investments that the client invest in are allowed under the Offering Memorandum." (Steiner Aff., Gershengoren Tr. (Ex.14) at 13:4-11.)

35.    The auditors had specifically reviewed the provisions in the Offering Memoranda concerning trading strategy, dependence on the general partner and independent money managers. (Steiner Aff., Gershengoren Tr. (Ex. 14) 38:10-18; 38:23-39:10; 43:9-18; 110:7-18.)

36.    BDO did not believe there was anything inaccurate or misleading in the Offering Memorandum and in fact "think he [Merkin] complied with the agreement as a whole." (Steiner Aff., Gershengoren Tr. (Ex. 14) at 13:4-11; 40:4-41:5.)

**Disclosures to Individual Investors or Other Third Parties**

37.    Merkin and GCC routinely informed investors about Madoff's role in the Funds.

38.    Merkin's practice in explaining Ascot to investors and potential investors was to "mak[e] sure they understood that the strategies were executed through Madoff." (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009)) at 165:18-20.)

39.    Michael Autera, the chief financial officer of GCC, regularly and completely answered investors' and potential investors' questions about Madoff's role. (Steiner Aff., Ex. 16 (Autera Tr.) at 58:24-60:3; 63:14-64:4; 271:16-280:13.)

40.    Autera understood that it was very widely known that substantially all of Ascot was invested with Madoff. (Steiner Aff., Ex. 16 (Autera Tr.) at 58:24-60:3; 63:14-64:4; 271:16-280:13.)

41.    Autera never misled or concealed that information from an investor or potential investor and was never asked to do so by Merkin. (Steiner Aff., Ex. 16 (Autera Tr.) at 58:24-60:3; 63:14-64:4; 271:16-280:13.)

42.    As far back as Yeshiva's initial investment in Ascot in 1992, the minutes of the Investment Committee describe the Ascot investment as "Madoff & Co." (Steiner Aff., Ex. 17.)

43.    It was well-known to everyone on the Yeshiva University investment committee, throughout the time of the University's investment, that Ascot was invested with Madoff. (Steiner Aff., Ex. 18 (Horowitz Tr.) at 55:19-25.)

44.    Gedale Horowitz, who was chairman of the Investment Committee prior to Merkin, testified that "we really never called it Ascot. We always called it Bernie in the meetings [of the investment committee]." (Steiner Aff., Ex. 18 (Horowitz Tr.) at 55:19-25.)

45.    Ascot investors who were on Yeshiva's Investment Committee included Ludwig Bravmann, Robert Beren, Morris Smith, Gedale Horowitz and Jonathan Kolatch.

13966429

46.     Messrs. Beren, Horowitz and Kolatch have confirmed to the Attorney General that they were aware that Madoff was a money manager for Ascot.

47.     It was well-known throughout Yeshiva and among the Board of Trustees that Ascot invested with Madoff. (Steiner Aff., Ex. 19 (Socol Tr.) at 27:8-28:5; 31:9-33:2.)

48.     Yeshiva obtained a written opinion from Ira Millstein of Weil, Gotschal & Manges advising that it was permissible for a not-for-profit corporation to do business with members of its Board of Trustees and Investment Committee provided that disclosure was provided to the other members of the Board of Trusteees. (Steiner Aff., Ex. 77.)

49.     The annual Conflict of Interest Report circulated to the Board of Trustees of Yeshiva University, as well as its committees, explicitly disclosed the relationship between Ascot and Madoff as far back as 1999, stating that Ascot was "essentially managed by Bernard Madoff." (Steiner Aff., Ex. 20; Ex. 19 (Socol Tr.) at 31:19-23.)

50.     Ascot investors who were on Yeshiva's Board of Trustees included Alan Goldberg, Ludwig Bravmann, Moshael Straus, Vivian Glueck, Emanuel Gruss, Morry Weiss, Daniel Abraham, Robert Beren, Ira Rennert and Gedale Horowitz.

51.     Messrs. Beren, Rennert and Horowitz have confirmed to the Attorney General that they were aware that Madoff was a money manager for Ascot.

52.     In addition, Jayne Beker, the wife of Harvey Beker, was on the Board of Trustees.

53.     In September 1992, Michael Autera informed Ralph Kestenbaum in writing that "Ascot's sole investment is a managed account at Bernard L. Madoff & Co. (Steiner Aff., Ex. 21 (Sept. 1, 1992 Autera facsimile to Kestenbaum).)

54.     After Mr. Kestenbaum's death, his daughter, Deena Kestenbaum, and her mother, Jan Kestenbaum (through the Arnon Foundation) remained investors in Ascot. (Steiner Aff., Ex. 80.)

55.     In December 1992, Merkin informed Dov Ben Dror that "Ascot's sole asset will be a managed account at Madoff & Company." (Steiner Aff., Ex. 22 .) Mr. Ben Dror was a representative of Ascot investors Dunraven, N.V., Heaton, Lanham Trading Inc. and Ebro. *Id.*

56.     In December 1992, Peter Winstead, an attorney for Mary Thomajan, wrote to Merkin: "Mary and I look forward to working with you and Bernie Madoff as it relates to Ascot Partners, L.P." (Steiner Aff., Ex. 23 (Dec. 30, 1992 Winstead letter to Merkin).)

57.     In February 1994, Leonard Stern faxed Merkin a list of investment managers used by Hartz Investment Managers. Under the category, "Hedging Through Related Investments," Ascot is listed as "Madoff & Co. (Ascott) (sic)." (Steiner Aff., Ex. 24.) Leonard Stern was involved in the decisions of HM Pension, Homes for the Homeless and Andrea Stern to invest in Ascot. (Steiner Aff., Ex. 81.)

13966429

58.    In February 2001, Norman Chait of AIG Global Investment Corp., a potential investor in Ascot wrote in an email to Merkin, "following our discussion, could you please send me the prospectus for the Ascot Madoff Fund." (Steiner Aff., Ex. 25.)

59.    In March 2001, Eugene Tenenbaum sent Autera a fax in which he asked, "Are Madoff Feeder and Ascot different names for the same fund?" Tenenbaum was the beneficiary of or otherwise involved in the decision of Equitable Synergy and Genesis to invest in Ascot Fund. (Steiner Aff., Ex. 26.)

60.    In June 2001, Geraldine Fabrikant asked Merkin whether she should add money to her Ascot account, calling it "Madoff." (Steiner Aff., Ex. 27.)

61.    In March 2002, Doron Cohen, a prospective investor, asked Merkin, "Ascot: How much is in Madoff?" (Steiner Aff., Ex. 28.)

62.    In July 2002, Israel Englander told Merkin that "I got a call from someone last week . . . asking if he should add to his madoff [sic] exposure and that he could do it through ascot [sic]." (Steiner Aff., Ex. 29.)

63.    In February 2003, Merkin sent an email to his assistant, Naomi Ferro, requesting that she arrange a meeting among Merkin, Horowitz and Madoff. (Steiner Aff., Ex. 53.)

64.    In April 2003, investor Doug Rudolph wrote to GCC employee Michael Autera ("Autera") to inquire whether investigations into specialist market makers on the floor of the New York Stock Exchange would have any effect on Ascot because of potential effects on Madoff. (Steiner Aff., Ex. 30.) Rudolph was the owner of or involved in the decisions of Rudolph Partners and Bayview Rudolph to invest in Ascot.

65.    In May 2003, Keith Rosenbloom of Commonwealth Advisors called GCC asking for information on the "Madoff feeder product" at the suggestion of Michael Andreola of BDO, and Autera provided Rosenbloom with information on Ascot. (Steiner Aff., Ex. 13.)

66.    In July 2003, Autera emailed Merkin concerning the request of an employee of Michael Matlin, the advisor to Ascot investors Equitable Synergy and Genesis, to review Madoff statements. (Steiner Aff., Exs. 53, 82-83.)

67.    In March 2004, Roman Igolnikov of Union Bancaire Privee, the largest investor in Ascot, wrote to Merkin, with respect to Ascot, that he was attaching "the latest letter from the other feeder into Bernie." (Steiner Aff., Ex. 31.)

68.    In June 2004, Autera advised Seiichiro Takahashi of Aozora Bank that "[s]ubstantially all of Ascot Fund's assets are allocated and held at Bernard L. Madoff Investment Securities LLC. Ascot has no clearing, trading, or prime brokerage arrangements with other investment firms at this time." And, in response to Takahashi's question about Ariel, Autera stated that between 10% and 25% of Ariel's portfolio had also been invested with Madoff. (Steiner Aff., Ex. 32.)

13966429

69. In June 2004, Merkin forwarded to Autera and Michael Garfinkle (who acted on behalf of Ascot investor Sutcliffe) an email from Leon Meyers, which discussed recent Madoff activity. (Steiner Aff., Ex. 33.)

70. In August 2005, Merkin and Danny Dreyfuss, an investor in Ascot through an entity named League, discussed Ascot's allocation to an outside money manager. (Steiner Aff., Exs. 34, 63.)

71. In October 2005, Autera discussed with BNP Paribas the possibility of setting up a "leveraged Ascot/Madoff facility." (Steiner Aff., Ex. 35.) BNP Paribas was an investment advisor to or owner of Ascot investor Ozcar Multistrategies LLC. (Steiner Aff., Ex. 84.)

72. In March 2006, Jamie Hague informed Harvey Beker that "[t]he Assets are held at Madoff & Co., which has 'a lot' of discretion over them, although Ezra 'has discretion' too." (Steiner Aff., Ex. 36.) Beker was on the board of Ascot investors SAR Academy and Ramaz school. (Steiner Aff., Ex. 85.)

73. In June 2006, Harold Epers sent Ronna Chao an email, which she then forwarded to Autera, referring to Bexley's investment in Ascot as "Ascot/Madoff." (Steiner Aff., Ex. 37.)

74. In December 2006, Ascot investor Morris Smith, a member of the investment committee at Yeshiva and a former senior manager of Fidelity, inquired about the value of Ascot and was told that Ascot was waiting to receive the final November results from Madoff. (Steiner Aff., Ex. 38.)

75. In August 2007, Autera advised Max Sinsheimer of Solaris Group, the financial advisor to several investors, that Madoff had been the prime broker and custodian for Ascot "since inception." (Steiner Aff., Ex. 39.) The Solaris Group was the investment advisor for Ascot investors, including Angelica Berrie, New York Law School and Moshael Straus. (Steiner Aff., Ex. 86.)

76. In October 2007, Merkin and Patrick Erne of Reichmuth and Co. made arrangements for Merkin and Erne to meet with Madoff. Christof Reichmuth was copied on the email. (Steiner Aff., Ex. 40.) Reichmuth & Co. administered Dunraven, Ebro, Ebro 2, Havelet, the Insinger Trusts, Kodomo, Reichmuth SBT and Solon, which were all investors in Ascot. (Steiner Aff., Ex. 89.)

77. Michael Matlin, an advisor to Ascot investors Equitable Synergy Ltd. and Genesis Investor Corporation, also attended the October 2007 meeting with Madoff. (Steiner Aff., Exs. 53, 82-83.)

78. In October 2007, Autera told Renee Nadler of investor Tufts University that "[h]istorically, the non-Madoff strategies have represented less than 5% of Ascot's gross exposure. The exposure in 2007 has been less than 5% as well." (Steiner Aff., Ex. 41.)

13966429

79.    In January 2008, David Hirsch emailed Merkin to inquire about the spread between Ascot and Madoff. (Steiner Aff., Ex. 42.)

80.    In September 2008, Autera informed William Scalzulli of Ascot investor KPC Kraft that "Ascot's assets are held at Bernard L. Madoff & Co. and Morgan Stanley." (Steiner Aff., Ex. 43). A written consent by Scalzulli, the sole director of KPC Kraft, lists assets to be transferred, including assets in "Bernard Madoff via Ascot Partners." (Steiner Aff., Ex. 44.)

81.    In October 2008, Jason Orchard of Spring Mountain Capital described Ascot to Andrea Maurella: "Most of the trading activities occurs [sic] at Madoff securities, an independent broker dealer." (Steiner Aff., Ex. 45 (Oct. 16, 2008 Orchard email to Maurella).) Spring Mountain Capital managed various funds that invested in Ascot, including SMC Alt. Ltd., Spring Mountain Fortis, SMC Reserve II, Spring Mountain, and Spring Mountain QP I, and was the investment advisor to Ascot investors SKG Partners, L.P. and Goldenson Partners, L.P.

82.    In November 2008, Walter Link of M&H Properties wrote to Autera to confirm his understanding that Ascot "presently [is] invested 100% in Madoff and that the fee is 1.5% with no further costs or deductions on the Madoff results." (Steiner Aff., Ex. 46.)

83.    In December 2008, Vanessa Harrington of the Calibre Fund asked Autera about Ascot exposure to Madoff. She stated that "Mr. Madoff was just arrested for securities fraud, and I recall Ascot being an investor in one of his funds." (Steiner Aff., Ex. 47.)

84.    In November 2009, Leon Meyers, an investor in Gabriel, testified under oath that Merkin told him that Madoff was the primary investment of Ascot and that Merkin told him that Ariel and Gabriel both had investments with Madoff. Meyers was also the representative of Ascot Fund investor Guernroy. (Steiner Aff., Ex. 48 (Meyers Tr.) at 34:2-35:4.)

85.    Meyers recommended Ascot to several investors. Meyers testified that he informed every individual he referred to Ascot that Ascot was managed by Madoff. (Steiner Aff., Ex. 48 (Meyers Tr.) at 34:2-35:4; 35:11-18.).

86.    On May 25, 2010, Mark Kenyon, an investor in Ascot, testified that Merkin told him that substantially all of Ascot was invested with Madoff. (Steiner Aff., Ex. 49 (Kenyon Tr.) at 14:5-11.) The NYAG had previously identified Kenyon as someone who had told the NYAG he did not know about Madoff's role in Ascot, but Kenyon testified that he had told the NYAG that he knew about Madoff's role. (Steiner Aff., Ex. 49 (Kenyon Tr.) at 17:14-20.)

87.    On June 17, 2010, Gedale Horowitz, a personal investor in Ascot and a member of the Yeshiva University Investment Committee, testified that, from the time of his initial investment in Ascot in 1994, he understood that Ascot invested with Madoff. (Steiner Aff., Ex. 18 (Horowitz Tr.) at 28:6-19.)

88.    The Attorney General attempted to interview or communicate with every investor in the Funds.

13966429

89.     On August 14, 2009, the Attorney General produced a list of investors that it had purportedly interviewed and identified for each investor whether or not the Attorney General contended that the investor had knowledge of Madoff's role in the Funds. (*See* Ex. C to Plaintiff's Answers to Interrogatories.)

90.     The Attorney General's August 14, 2009 list represented that the Attorney General's office had spoken to Ascot investor Michael Hammer, and that he had advised the Attorney General's office that he did not know about Madoff. (*See id.*)

91.     Mr. Hammer in fact had passed away in September 2008.

92.     On August 9, 2010, the Attorney General produced an updated list of the investors in the Funds and a column identifying for each such investor whether or not the Attorney General contended that the investor had knowledge of Madoff's role in the Funds. (*See* Plaintiff's Supplement to Its Responses and Objections to Defendants' Interrogatories ("NYAG Supplemental Interrogatory Responses".)

93.     The Attorney General concedes that 13 investors in Ascot Fund, 43 investors in Ascot Partners, 2 investors in Ariel and 10 investors in Gabriel had knowledge of Madoff's role in the particular Fund. (*See* NYAG Supplemental Interrogatory Responses.)

94.     In addition, the Attorney General responded with the answer "Other" (with various explanations) as to whether 4 investors in Ascot Fund, 16 investors in Ascot Partners, and 1 investor in Gabriel had knowledge of Madoff's role in the particular Fund. (*See* NYAG Supplemental Interrogatory Responses.)

95.     The answer "Other" means that the investor had knowledge that Madoff played some role as an independent money manager for the particular Fund. (*See* NYAG Supplemental Interrogatory Responses.)

96.     The Attorney General admits that the following investors in Ascot Fund had knowledge of Madoff's role in that Fund: Ariel Fund, Bexley, Centigrade, Equitable Synergy, Fidulex Management, Genesis, Gonetti, Guernroy, Langham, MH Properties, Republic Nom #1751, Romsdale, SMC Alt Ltd, Spring Mountain Fortis, Redwood Ltd., UBP Lux-Dinvest and UBP Lux-Dinvest II. (*See* NYAG Supplemental Interrogatory Responses.)

97.     The Attorney General admits that the following investors in Ascot Partners had knowledge of Madoff's role in that Fund: AGL Life VA 65, AGL Life VL 75, Andrea Stern, Autera IRA, Beren Foundation, Beren Foundation 2, BHorowitz 2005 Ruth, BHorowitz 2005 Seth, BHorowitz03 GRAT, Capital Growth (Gross), Daniel Krasner, David Gordon, David Gordon IRA, David Kahn, Debbie Rapp, Ellen Levine, Ellen Levine IRA, Gedale Horowitz, Gerry Fabrikant, GHorowitz 2005 Ruth, GHorowitz 2005 Seth, GHorowitz03 GRAT, Good Partners, HM Pension, Hobby Farm LP, Homes For Homeless, Ilshar, Joan Beren Foundation, Joan Ross GRAT Isaac, Joan Ross GRAT Kathryn, Joan Ross IRA, J. Ezra Merkin, JEM 2000 Trust, Jerome Balsam, Karen Gordon, Kenyon IRA, Kolatch, Lauren Merkin, LKM 2000 Trust, Madge Miller IRA, Martin Miller IRA, Merkin Trusts, Merkin Trusts 2, Metropolitan Council on Jewish Poverty, Renco, Roman Igolnikov, Sandalwood A, Sandalwood B, Selectinvest, Selectinvest Balanced, SMC Reserve II, Spring Mountain, Spring Mountain QP

34

13966429

I, Stephen Haber, Sternberg, Tufts University, Vajda Trust, and Yeshiva University. (*See* NYAG Supplemental Interrogatory Responses.)

98.    The Attorney General admits that the following investors in Gabriel had knowledge of Madoff's role in that Fund: Cottonwood Sali, David Sherman, Debbie Rapp, Good Partners, Ilshar, J. Ezra Merkin, Joan Meyers, Mike Autera, Renco Group, and Tamerac Sali. (*See* NYAG Supplemental Interrogatory Responses.)

99.    The Attorney General admits that the following investors in Ariel had knowledge of Madoff's role in that Fund:  Merkin Deferral and Meyers IRA. (*See* NYAG Supplemental Interrogatory Responses.)

100.    The Attorney General left the "knowledge" column blank for investors who failed or refused to respond to the Attorney General's inquiries.  The Attorney General put a "?" in the "knowledge" column for some investors as to whom, despite communicating with the investor, the Attorney General was unsure whether the investor had knowledge of Madoff's role in the Funds. (*See* NYAG Supplemental Interrogatory Responses; Email dated August 23, 2010 from Harriett Rosen to Neil Steiner, David Ellenhorn and Maria Vullo.)

101.    42 investors in Ascot Fund, 20 investors in Ascot Partners, 26 investors in Ariel and 40 investors in Gabriel failed or refused to respond to the Attorney General's inquiries. An additional 10 investors in Ascot Partners and 3 investors in Gabriel were marked with a "?" by the Attorney General.[4] (*See* NYAG Supplemental Interrogatory Responses.)

102.    Of the investors identified in paragraph 99, Defendants' undisputed interrogatory answers verify that 32 of those investors in Ascot Fund and 23 of those investors in Ascot Partners indisputably had knowledge of Madoff's role in the Funds. (*See* Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Answers and Objections to Plaintiffs' First Set of Interrogatories to Defendants ("Defendants Supplemental Interrogatory Responses").)  Moreover, the documentary evidence in paragraphs 37 through 86 confirms many of these investors' knowledge of Madoff.

103.    The investors identified in paragraph 95 had net capital investments in Ascot Fund totaling approximately $93.2 million and November 30, 2008 stated investment values totaling approximately $222.7 million.[5] (*See* Letter from Neil Steiner to Laurence Borten dated March 16, 2009 enclosing, *inter alia*, Excel files containing Ascot Partners Capital Activity and Gabriel Partners Capital Activity, and Letter from Neil Steiner to Laurence Borten dated March 27, 2009 enclosing, *inter alia*, Excel files containing Ascot Fund Capital Activity and Ariel Fund Capital Activity ("Capital Activity Spreadsheets").)

---

[4]    For purposes of this motion, investors marked with a "?" are considered the same as investors who failed to respond to the Attorney General's inquiry.

[5]    For purposes of calculating aggregate net capital herein, the balances of investors who had negative net capital balances are excluded or deemed to be equal to zero.

13966429

104.    The investors identified in paragraph 96 had net capital investments in Ascot Partners (excluding the investments by Merkin and his family) totaling approximately $188.5 million and November 30, 2008 stated investment values totaling approximately $417.8 million. (*See* Capital Activity Spreadsheets.)

105.    The investors identified in paragraph 101 had net capital investments in Ascot Fund totaling approximately $485.2 million and November 30, 2008 stated investment values totaling $737.3 million. (*See* Capital Activity Spreadsheets.)

106.    The investors identified in paragraph 101 had net capital investments in Ascot Partners totaling approximately $19.6 million and November 30, 2008 stated investment values totaling $61.1 million. (*See* Capital Activity Spreadsheets.)

107.    At least 52_ investors in Ascot Fund, having net capital investments totaling approximately $962.1 million and November 30, 2008 stated investment values totaling $580.1 million, had knowledge of Madoff's role. (*See* Paragraph 37 through 105; Capital Activity Spreadsheets.)

108.    At least 103 investors in Ascot Partners, having net capital investments totaling approximately $581.6 million and November 30, 2008 stated investment values totaling $264.2 million, had knowledge of Madoff's role. (*See* Paragraph 37 through 105; Capital Activity Spreadsheets.)

109.    The following investors in Ascot Fund were "net winners":[6] Bexley, Cedarwest, Darchey Noam, Delta Overseas, Dunraven, Fidulex Management, Gonetti, Hopewell, Insinger Peta, League , Romsdale, Sleeping Beauty NV B, and Solon. (*See* Capital Activity Spreadsheets.)

110.    The following investors in Ascot Partners were "net winners":  Beren Foundation, Bravmann A, Bravmann B, Caymen, Daniel Straus, Gedale Horowitz, George Rubin, Gordian , Growth, Guedalia, Kasper, KS Family, Lynton, Mary Thomajon, Mike Weiss, Peter Hirschl, Phyllis Fromme, SAR Academy, The MCNY Fund, Wegier, Weiss, and Willner Associates. (*See* Capital Activity Spreadsheets.)

111.    The following investors in Gabriel were "net winners":  Armand Lindenbaum, Daniel Straus, Dr Kosowsky, Elaine Sargent, Max Palevsky, Moshael Straus, Noel Levine, Peter Stern Family Trust, Richard Hirsch 2, Ronald Lightstone, Saul Partners, and Vajda Family Trust. (*See* Capital Activity Spreadsheets.)

112.    The following investors in Ariel were "net winners":  Dunraven, Havelet, Inst for Advanced Study, Jerome Levy Econ Institute, Kestenbaum #2, Sleeping Beauty NV, Sleeping Beauty NV B, and Sterling Stamos SEC Select LTD. (*See* Capital Activity Spreadsheets.)

---

[6]    "Net winners" includes a few investors whose redemptions exactly equaled their subscriptions and therefore had net capital investments of zero.

13966429

113.    The investors identified in paragraph 108 had November 30, 2008 stated investment values in Ascot Fund totaling approximately $115.4 million. (*See* Capital Activity Spreadsheets.)

114.    The investors identified in paragraph 109 had November 30, 2008 stated investment values in Ascot Partners totaling approximately $51 million. (*See* Capital Activity Spreadsheets.)

115.    The following investors in Ascot Fund made their last investment prior to April 6, 2003:  Equitable Synergy, Darchey Noam, Ebro 2, Dunraven, Langham, Abner Sassoon 2, League , Sleeping Beauty NV D, Solon, Sleeping Beauty NV A, Havelet, Sleeping Beauty NV L, Bexley, Sleeping Beauty NV AA, Somers Dublin, Sleeping Beauty NV B, Delta Overseas , Hopewell, Wohl Foundation, Guernroy, Walbrook, Insinger Jill, Insinger Sasha, Ariel Fund, Romsdale, Optimum, Marsham, Insinger Peta, MH Properties, Cedarwest, Jesselsohn, Moffson, and Arnon Foundation. (*See* Capital Activity Spreadsheets.)

116.    The following investors in Ascot Partners made their last investment prior to April 6, 2003:  Weiss, Yeshiva University, Gerry Fabrikant, Mary Thomajon, Lynton, Fromme IRA, Gordian, Gordian LTD, Hammer, Acg Investment, KS Family, Kasper, Wegier, SAR Academy, Sylvia Korngold, Gedale Horowitz, Vajda Trust, George Rubin, Billig, Beren Foundation2, Beren Foundation, Sternberg, Capital Growth (Gross), The MCNY Fund, Bravmann A, Bravmann B, Leher IRA, Propp Charity, HM Pension, Growth, Peter Hirschl, Willner Associates, Kenyon IRA, Smith IRA, Bravmann Foundation, Phyllis Fromme, Joan Beren Foundation, ISBR Associates, Katz IRA, Eric Austein, Guedalia, Mollie Zweig, Daniel Krasner, Dov Schwartz, Daniel Straus, Moshael Straus, Jan Kestenbaum, Pomrenze Trust, Bacon Trust, Caymen, Yaseen IRA, Autera IRA, Charlie Haar, Michelle Schwartz, Dov Schwartz Trust, Judith Kaufthal, Carol Bravmann, Mike Weiss, Scheiner IRA, Familian, Rudolph Partners, Bayview Rudolph, Spring Mountain, Hammerman Fisch, Jeff Moskowitz, Alexander Palevsky, Jonathan Palevsky, Matthew Palevsky, Florence Cohen, Haar Foundation, David Hirsch, Karen Gordon, JJR Ruch, RHO Pension, Ellen Levine IRA, Burt Ross IRA, Joan Ross IRA, Sutcliffe, Ellen Levine, Pollack IRA, Zes-Fam Capital, Eric Bruell - Gregory, Stephen Haber, Madge Miller IRA, GHorowitz03 GRAT, and BHorowitz03 GRAT. (*See* Capital Activity Spreadsheets.)

117.    The following investors in Gabriel made their last investment prior to April 6, 2003:  Nash Family Partnership, Ronald Lightstone, Marion Lynton, Richard Hirsch 2, Vajda Family Trust, Armand Lindenbaum, Stern Properties, Bernard Spitzer, Wilner Associates, Lotte Bravmann, Peter Stern Family Trust, Burton Lustine, Jack Parker, Lady Quinton, Dr Kosowsky, Noel Levine, Abraham Family, Joan Meyers, SLRB-I Strauss, Dodge Associates, Sternberg, Hammer, Joshua Nash, Green Trust, Wolfensohn, Hoffert, BFI Billig, David Feinburg, Wruble, CNA, Roxanne Levy, Mollie Zweig, Sandor Straus, Maryles, James Stern, Billet, David Hirsch, Robert Weinberg, Eric Austein, Adelsberg, Tannenbaum, Daniel Straus, Moshael Straus, Charlie Haar, Lowenthal, Jesselson, Arthur Samberg, Judith Kaufthal, Carol Bravmann, Familian, Spring Mountain, Edward Falk, and Phyllis Rimsky. (*See* Capital Activity Spreadsheets.)

13966429

118.    The following investors in Ariel made their last investment prior to April 6, 2003: Sleeping Beauty NV A, Sleeping Beauty NV B, Sleeping Beauty NV C, Sleeping Beauty NV D, Ebro 2, Jerome Levy Econ Inst , Harvey Beker Foundation, Nephrology Associates Pension, New York University, Meyers IRA, Bard College, Shimon Katz, Wohl Foundation, H Levine Ira, Optimum Wohl, Wave Foundation, Billig Foundation, Balford, Kestenbaum #2, Golan Pension, JJR Ruch, RHO Pension, Israel Museum, Jesselsohn, Forchheimer, Sapirstein, Moffson, Texas Tech, and Hanadiv Charity. (*See* Capital Activity Spreadsheets.)

119.    The investors identified in paragraph 114 had net capital investments in Ascot Fund totaling approximately $43.2 million and November 30, 2008 stated investment values totaling $170.5 million. (*See* Capital Activity Spreadsheets.)

120.    The investors identified in paragraph 115 had net capital investments in Ascot Partners totaling approximately $60.9 million and November 30, 2008 stated investment values totaling $320.8 million. (*See* Capital Activity Spreadsheets.)

**Due Diligence**

121.    Merkin "exercise[d] reasonable care in selecting," and conducted extensive due diligence on, Madoff. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009) at 8:4-12:5; 17:7-18:14.)

122.    The due diligence performed by Merkin "conformed with industry practice." (Steiner Aff., Ex. 50 (Weingarten Report) at 2.)

123.    Prior to December 11, 2008, Madoff was a legend on Wall Street, breaking the NYSE's monopoly on big board trading, testifying before Congress and the SEC on market issues and, in 1999, entering into a joint venture with Goldman Sachs, Morgan Stanley, Salomon Smith Barney, and Merrill Lynch to establish the first electronic trading platform.

124.    Madoff served as the chairman of NASDAQ for many years and regularly did business with sophisticated market participants including Charles Schwab and Fidelity.

125.    Before making any investment with Madoff, Merkin was well aware of Madoff's reputation as a leading market maker, understood the regulatory structure governing Madoff's operations, including the fact that the SEC and other regulators regularly reviewed Madoff's business, and had several meetings and conversations with Madoff himself and with other investors and customers of Madoff concerning Madoff's strategy, including its upside potential and downside risks. (Steiner Aff., Ex. 15  Merkin Tr. (Jan. 30, 2009) at 9:5-10:14; 128:21-134:3); *see also 3 Firms Plan to Develop New System for Trading*, N.Y. TIMES, June 8, 1999  (Ex. 68); Greg Ip, *Firms Create System as Rival to Big Board*, WALL ST. J., June 8, 1999 at C1 (Ex. 69); Joseph Kahn, *4 Leading Securities Firms Join Forces to Back Primex*, N.Y. TIMES, September 14, 1999 (Ex. 70); Richard L. Stern, *Living Off the Spread*, FORBES, July 10, 1989 at 66 (Ex. 71); Gary Slutsker, *If You Can't Beat 'Em . . .*, FORBES, January 6, 1992 at 48 (Ex. 72); David A Vise, *Stock Exchanges Get a Shot at New Foe*, INT'L HERALD TRIBUNE, April

13966429

15, 1993) (Ex. 73); Jeffrey Taylor, *A Fairer Nasdaq? SEC Approves Its New Rules*, WALL ST. J.,
August 29, 1996) at C1 (Ex. 74.)

   126. According to published reports, the SEC repeatedly investigated and
inspected Madoff, including in 1992, 2006, and 2007, but did not uncover the fraud. *See*
Binyamin Appelbaum, *Madoff Case 'Failures' Put SEC In Spotlight*, WASH. POST, Dec. 19,
2008, at A1; *see also SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680, 2010 WL 363844, at *2
(S.D.N.Y. Feb. 2, 2010) ("[T]he complaint supports the reasonable inference that Madoff fooled
the defendants as he did individual investors, financial institutions, and regulators."). In fact, in
Merkin's files is an article from the Wall Street Journal from 1992 in which the head of the
SEC's New York office happily announced that an investigation of certain note offerings, which
the SEC had feared was a scam, turned out to be invested with Madoff and the money -- $440
million -- "was all there." (Randall Smith, *Wall Street Mystery Features a Big Board Rival*,
WSJ, Dec. 16, 1992, at C1 (Steiner Aff., Ex. 75.))

   127. Merkin entered into a written trading authorization that limited Madoff's
discretion to the agreed-upon split-strike strategy (Steiner Aff., Ex. 51 (Trading Authorization
Directive).)

   128. Throughout their more than 15 year relationship, Merkin had regular
meetings and telephone calls with Madoff to discuss the trading strategy and execution. (Steiner
Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009) at 8:4-12:5; 17:7-18:14; Ex. 57 (Merkin Tr. (July 1,
2010)) at 20:6-23.)

   129. GCC employees reviewed and reconciled Madoff's trading tickets,
monthly statements and daily and weekly profit and loss statements generated from the tickets.
(Steiner Aff., Ex. 15 (Merkin Tr. (Jan. 30, 2009) at 17:7-18:14.)

   130. Other low-volatility managers, including Millennium Partners, Elliott
Associates and SAC Capital, had returns at least as good as Madoff's. (Steiner Aff., Exs. 93-95.)

   131. Merkin and GCC retained BDO Seidman to perform audits of the Funds,
including review of Madoff's trading activity and his auditor's statement of controls as deemed
necessary by the auditors (Steiner Aff., Ex.52 (Feb. 3, 2004 Irene Sirota (BDO) email to
Merkin).)

   132. Merkin was well-aware of the fifteen-year history of Madoff paying
redemption requests on time and accurate to the penny. (Steiner Aff., Ex. 15 (Merkin Tr. (Jan.
30, 2009) at 21:15-21; Ex. 57 (Merkin Tr. (July 1, 2010)) at 50:10-12.)

   133. The timely and accurate payment of redemptions is an "absolutely critical
part of the due diligence process." (Steiner Aff., Ex. 50 (Weingarten Report) at 4.) "Without
question, from the evidence in the Defendants' files, redemptions were met on time and in the
amounts requested. There would not have been any reason to doubt that the performance as
depicted was real and liquid." *Id.*

   134. Merkin's due diligence "was not a one off event but was continued
through the life of the investment with Madoff." (Steiner Aff., Ex. 50 (Weingarten Report) at 4.)

13966429

135.    Merkin arranged or attempted to arrange for several investors to meet with Madoff to conduct their own due diligence, including Gedale Horowitz of the Yeshiva University investment committee, investor Michael Matlin, Roman Igolnikov and his colleagues at UBP, Patrick Erne of Reichmuth & Co and Ahron Green. (Steiner Aff., Ex. 31, 40 & 53.)

136.    As recently as the fourth quarter of 2008, Merkin arranged for a four-person team from UBP, including in-house lawyers and compliance officers, to visit Madoff's office to conduct their own due diligence on Madoff's operations. (Steiner Aff., Ex. 57 (Merkin Tr. (July 1, 2010) at 20:9-18.)

137.    Weingarten concluded in his expert report that:

> In my opinion, the Defendants performed very adequate due diligence on Mr. Madoff and his organization. They adequately understood the investment Philosophy; they understood and carefully examined the Process; had transparent knowledge of the Procedures; and knew both personally and by reputation the People, namely the then esteemed and experienced investment manager. The Performance, both in terms of the results and in terms of realizing the cash from those results were entirely consistent. (Steiner Aff., Ex. 50 (Weingarten Report) at 4.)

138.    The Attorney General has not offered any contrary expert opinion.


Dated: New York, New York
       December 6, 2010

DECHERT LLP

By: _____
       Andrew J. Levander
       Gary J. Mennitt
       Neil A. Steiner
       Michael Z. Goldman
       Sarah Mendola
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
andrew.levander@dechert.com
Attorneys for J. Ezra Merkin and
Gabriel Capital Corporation

13966429