# **EXHIBIT 25**

```
                                                                    1
 1              C O N F I D E N T I A L

 2            UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF NEW YORK
 3

 4     ---------------------------------x
       In Re:
 5
       BERNARD L. MADOFF INVESTMENT              Adv.Pro.No.
 6     SECURITIES LLC,                           08-01789(BR L)

 7              Debtor.
       ---------------------------------x
 8     IRVING H. PICARD, Trustee for the
       Liquidation of Bernard L. Madoff
 9     Investment Securities LLC,

10              Plaintiff,                       Adv.Pro.No.
                                                 09-1182(BRL)
11              v.

12     J. EZRA MERKIN, GABRIEL CAPITAL,
       L.P., ARIEL FUND LTD., ASCOT
13     PARTNERS, L.P., GABRIEL CAPITAL
       CORPORATION,
14
                Defendants.
15     ---------------------------------x

16

17              DEPOSITION of MICHAEL J. ACHILARRE as

18     taken by and before NANCY C. BENDISH, Certified

19     Court Reporter, RMR, CRR and Notary Public of the

20     States of New York and New Jersey, at the offices of

21     Baker & Hostetler, 45 Rockefeller Plaza, New York,

22     New York on Tuesday, August 9, 2011, commencing at

23     10:00 a.m.

24

25
```

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL    MICHAEL J. ACHILARRE 8/9/11

10

1  responsibilities there with that hedge fund?
2       A.    Well, it started as I -- I would
3  prepare the records and then I would give them to a
4  supervisor to review and then as I moved up I became
5  a supervisor and director where I was the contact
6  for the fund to our group and we provided all back
7  office services to them.  I had a team of, I don't
8  remember the titles, but usually two people, an
9  entry level person and a supervisor who would
10 provide the month-end reporting.  I would review it
11 and then I would send it to the funds that hired us
12 to do this.
13      Q.    Okay.  So you would take documents
14 and plug them in and produce reports?
15      A.    Yes, that's right.
16      Q.    And so you worked there until 2004?
17      A.    Correct.
18      Q.    Then how did you become employed with
19 Gabriel Capital Corporation?
20      A.    In late 2004 I began looking at
21 possible moves to the private side, to the hedge
22 fund side.  At that time I got an interview with
23 Gabriel Capital Corp.  It went well.  I was offered
24 the position and I accepted.
25      Q.    Okay.  Which position did you start?

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN   CONFIDENTIAL      MICHAEL J. ACHILARRE 8/9/11

11

1    A.    I was hired as controller.
2    Q.    You were hired as controller?
3    A.    Yes.
4    Q.    And who interviewed you there?
5    A.    Michael Autera, twice, and on the
6  second time when I went back I also met with Ezra
7  Merkin.
8    Q.    When you started, could you describe
9  what you were asked to do?
10   A.    It was similar to the role that I had
11 in my previous employer.  I was going to be
12 responsible for the accounting, the recordkeeping of
13 their various hedge funds.
14   Q.    And is that the entire scope of your
15 duties there?  I mean, could you just -- if you
16 were, let's say if you were drawing a job
17 description of your position, what would you say it
18 involved as controller?
19   A.    I would say the day-to-day
20 accounting, the month-end, more importantly the
21 month-end accounting, the creating of all portfolio
22 documents, capital summaries, calculating NEV,
23 calculating fees, some investor relations.  Pretty
24 broad question.  Standard, I think what people would
25 know to be the controller role for a hedge fund.

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN   CONFIDENTIAL   MICHAEL J. ACHILARRE 8/9/11

12

```
 1        Q.    Okay.  And have you been a controller
 2   since 2004 until present?
 3        A.    Yes.
 4        Q.    Have your responsibilities changed at
 5   all during that time?
 6        A.    I took on more work as the years went
 7   on.  When I started I probably had less to do.  But
 8   as I learned, I ended up taking on more
 9   responsibilities, but pretty much what I've
10   discussed is what I'm responsible for now.
11        Q.    Have your responsibilities changed at
12   all since Madoff's arrest?
13        A.    They've changed just in the fact that
14   there may be less reporting requirements since the
15   receiver has taken over.
16        Q.    Okay.  And that would be the receiver
17   for Ascot Fund?
18        A.    That would be the receiver for
19   Gabriel and Ariel, that's Guidepost Partners.
20        Q.    Okay.
21        A.    And my responsibilities on Ascot have
22   changed as well in that we haven't been providing
23   the monthly accounting that we did previous to
24   December of 2008.
25        Q.    All right.  Let's take a step back
```

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL    MICHAEL J. ACHILARRE 8/9/11

33

```
 1   tickets and then he would then take the tickets
 2   manually and put them into our portfolio management
 3   system.
 4        Q.    Okay.
 5        A.    And then reconcile to make sure that
 6   everything was booked correctly.
 7        Q.    So when you described Cohanzick
 8   before, you said you would upload them to JPMorgan
 9   for settlement?
10        A.    Um-hum.
11        Q.    So you would not do that for Madoff?
12        A.    No.
13        Q.    And that is because?
14        A.    They were settling -- my
15   understanding, they were settling through Madoff.
16        Q.    So they were already settled?
17        A.    They were already -- the trades were
18   settled.
19        Q.    All right.  So you said you received
20   Cohanzick trade tickets on the same day as the
21   trades were made?
22        A.    Yes.
23        Q.    What about for Madoff?
24        A.    Madoff would take a couple days in
25   that we got them by mail.  They weren't in a space
```

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL        MICHAEL J. ACHILARRE  8/9/11

34

1    where they could walk over the tickets.  They mailed
2    them to us.
3         Q.    Was it usually just a couple days or
4    did you ever have to wait for trade tickets for
5    Madoff?
6         A.    What's a couple?  It was more than
7    one or two, but it wasn't weeks.
8         Q.    What about monthly statements?  Did
9    you receive monthly statements from Cohanzick?
10        A.    No.  Cohanzick managed money for us.
11   They wouldn't provide monthly statements.  They
12   weren't a broker.
13        Q.    Is it the same for Cerberus?
14        A.    Once again, they're not the broker,
15   so they don't provide us monthly statements.  Well,
16   Cerberus provides us our books monthly, but it's not
17   statements -- I think what you're asking about is
18   broker statements.
19        Q.    Right.
20        A.    That's not a role that Cohanzick or
21   Cerberus would provide.
22        Q.    So you did receive monthly statements
23   from Madoff?
24        A.    Yes.
25        Q.    Because he was the broker and he

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL    MICHAEL J. ACHILARRE 8/9/11

37

1  would, what you call, break, so it wouldn't settle.
2       Q.    How often would trades break?
3       A.    Not very often.
4       Q.    And what would happen when the trade
5  broke?
6       A.    We'd just be notified that what you
7  reported to us is not what the other side of that
8  transaction reported to us.
9       Q.    Okay.  So when you received the trade
10 tickets from Madoff, my understanding is that the
11 trades were already settled.  Did you ever check the
12 prices on those trade tickets against the market?
13      A.    No.  Not that I'm aware of.  I
14 didn't.
15      Q.    Would anyone in the office be --
16      A.    Not that I'm aware of.  It would be a
17 very -- seems to be something that would not
18 typically be done.
19      Q.    Was there any difference in
20 monitoring Ascot compared to Gabriel and Ariel, from
21 an accounting perspective, from your department's
22 perspective?
23      A.    No.
24      Q.    You treated it the same in terms of
25 your accountings and your monthly reports?

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL    MICHAEL J. ACHILARRE 8/9/11

41

1  A. Entity. That Madoff was one of the
2  managers or one of the tranches of money that was
3  invested on our behalf.
4  Q. Did you ever in the course of your
5  employment at Gabriel Capital Corporation deal with
6  a person from BLMIS, Bernard Madoff?
7  A. No.
8  Q. Did you ever talk to anyone on the
9  phone?
10 A. No.
11 Q. Did you ever go over to his office?
12 A. No.
13 Q. Did you ever see anyone from BLMIS at
14 Gabriel Capital Corporation?
15 A. Not that I know of. I don't know
16 anybody. If I never met anybody, I wouldn't know
17 they were there.
18 Q. So you never attended a meeting with
19 Mr. Madoff present?
20 A. No.
21 Q. And you never saw him go into the
22 offices?
23 A. No.
24 Q. All right. I want to introduce
25 Exhibit Achilarre-1.

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL         MICHAEL J. ACHILARRE 8/9/11

49

```
 1              (Exhibit Achilarre-4 marked for
 2     identification.)
 3          Q.     Could you look at this email and tell
 4     me what's going on?
 5          A.     It's the same situation.
 6          Q.     "Same dividend number as last month.
 7     Might want to double-check."  Do you remember if
 8     Mr. Autera double-checked?
 9          A.     I'm sure he did.
10          Q.     Did he ever explain to you what was
11     going on?
12          A.     I can't remember exactly what
13     happened, but I know that when we got the broker
14     statement the correct number would be provided to
15     us.
16          Q.     At this point do you think you
17     received the broker statement?
18          A.     No, we would have gotten the broker
19     statement probably two or three days later.
20          Q.     But just based on your internal
21     records you thought there was discrepancy?
22          A.     Exactly.  The number was the same as
23     the previous month, so when they reported us the
24     dividends, they missed the dividends that would have
25     been in that month, is how I would have -- that
```

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL    MICHAEL J. ACHILARRE 8/9/11

74

```
 1        Q.     Do you recall the substance of those
 2   conversations?
 3        A.     My understanding was that we
 4   invested -- Gabriel and Ariel invested a portion of
 5   their capital with Madoff, just as they did with
 6   David Sherman and Cerberus, and that that portion of
 7   the portfolio was basically our liquid, most liquid
 8   portfolio.  The common stocks, things along those
 9   lines.
10        Q.     Did you ever discuss how Madoff was
11   able to produce positive returns even in the worst
12   market?
13        A.     No, but I'm also not sure that that's
14   necessarily my understanding of the returns.  I got
15   there in 2004, so 2005, 2006 and 2007 were very good
16   years in the market, and Madoff performed positively
17   in those years as well.
18        Q.     So when you were working there the
19   market was up?
20        A.     Right.
21        Q.     Did you ever hear of the split strike
22   strategy?
23        A.     Not previous to December of 2008.
24        Q.     When did you hear about it?
25        A.     Just in reading articles on the whole
```

BENDISH REPORTING, INC.
877.404.2193

IRVING H. PICARD v. J. EZRA MERKIN    CONFIDENTIAL    MICHAEL J. ACHILARRE 8/9/11

116

1  more, really, or any less work on those accounts.
2  They were confirmed by audits at year-end.
3              So, sure, when I read what people
4  call red flags, I say to myself, oh, you know,
5  that's interesting, but I to this date don't feel
6  that we did anything where we should have picked up
7  on this.
8              MS. HARTMAN:  Any other questions?
9              MS. STROKER:  Not at this time.
10             MR. LAFFEY:  No.  We'll reserve our
11 rights.
12             MS. MALASKA:  Same, no questions.
13 We'll reserve our right to ask questions later.
14             THE WITNESS:  I don't have any
15 questions.
16             MS. HARTMAN:  Thank you very much for
17 your patience and your cooperation.  We're done.
18             (Deposition concluded 1:20 p.m.)
19                       -oOo-
20
21
22
23
24
25

BENDISH REPORTING, INC.
877.404.2193