# **EXHIBIT 32**

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4   ------------------------------------)
                                         )
 5   In Re:                              ) SIPA LIQUDATION
                                         )
 6   BERNARD L. MADOFF INVESTMENT        ) No. 08-01789 (BRL)
     SECURITIES LLC,                     ) (Substantively
 7                                       )  Consolidated)
                    Debtor.              )
 8                                       )
     ------------------------------------)
 9                                       )
     IRVING H. PICARD, Trustee of the    )
10   Liquidation of Bernard L. Madoff    )
     Investment Securities LLC,          )
11                                       )
                    Plaintiff,           )
12                                       )
              vs.                        ) Adv. Pro. No.
13                                       ) 09-01182 (BRL)
     J. EZRA MERKIN, GABRIEL CAPITAL,    )
14   L.P., ARIEL FUND LTD., ASCOT        )
     PARTNERS L.P., GABRIEL CAPITAL      )
15   CORPORATION,                        )
                                         )
16                  Defendants.          )
                                         )
17   ------------------------------------)
18
19
20
      VIDEOTAPED DEPOSITION OF STEVE POMERANTZ, Ph.D.
21                  New York, New York
                     July 8, 2015
22
23
24   Reported by:  BONNIE PRUSZYNSKI, RMR, RPR, CLR
     JOB NO. 95461
25
```

1                S. Pomerantz

2  information.

3           If I am acquiring somebody, if I am

4  negotiating with an outside hedge fund and I

5  am trying to acquire them, or I may be

6  talking to a hedge fund that has no track

7  record that doesn't exist, but somebody that

8  I want to ultimately seed and start up, or

9  somebody could be a partner of my -- Weiss

10 Peck & Greer is a partnership, so a lot of

11 the people who work there are partners, and

12 they have ongoing businesses that they have

13 been managing their funds for years.

14           So there is different levels of

15 information that I am getting from all of

16 these different people.

17     Q    Would you agree that due diligence

18 is a flexible process?

19     A    I guess I don't -- there are

20 aspects -- I don't know what you mean by the

21 process.  I would like to think that the

22 process is objective and the process is well

23 defined by what Weingarten and I have said.

24 The actual implementation of it is going to

25 be constrained by the particulars of any

1                S. Pomerantz
2  given situation.
3            So, in other words, somebody --
4  somebody may be in business for five years,
5  and they may have a track record, and I may
6  be able to analyze their historical track
7  record, but somebody else may just be out of
8  the box and be a totally new hedge fund, and
9  then they have no track record.  So my
10 evaluation of their performance will mean
11 something different when I look at this
12 manager versus that manager, but the notion,
13 the concept of looking at performance is an
14 objective part of that process.
15      Q    When you performed due diligence on
16 one of your partners as compared to
17 performing due diligence on a fund that you
18 were considering acquiring, did you do
19 anything differently?
20      A    Well, again, if they are a partner,
21 if they are a part of Weiss, Peck & Greer, I
22 have access to all of their records.  I know
23 their trading.  I know what their
24 transactions are.  I know what their trades
25 are.  I can go talk directly to the head

1                  S. Pomerantz

2       trader at Weiss, Peck & Greer and get

3       information.

4                  If I am trying to acquire someone

5       and they are using Goldman Sachs as a prime

6       broker, well, I can talk to Goldman Sachs,

7       but Goldman Sachs is clearly not going to

8       tell me the same things that the head trader

9       at Weiss, Peck & Greer is going to tell me.

10                 So, again, there is differences

11      based on every situation.

12           Q     Why would the -- why would Goldman

13      Sachs not tell you the same things that the

14      head trader at Weiss, Peck & Greer would tell

15      you?

16           A     Because Goldman Sachs is a private

17      company, and there are limits to what they

18      need to communicate to the public.

19                 (Discussion held off the record.)

20      BY MR. STEINER:

21           Q     The -- so, you said when you were

22      at Weiss, Peck & Greer, when you were

23      performing due diligence on your partners,

24      you had access to basically more information,

25      and a lot more information, than on a fund

1                    S. Pomerantz

2       Q     Of some Goldman fund?

3       A     Of a Goldman account.  It's not a
4  '40 Act fund.  It's an account.  It's a
5  separately -- separate legal standing
6  account, and we own shares in that account.

7       Q     Just like an LLC or something?

8       A     It's like a hedge fund.

9       Q     And someone at Goldman manages that
10 fund?

11      A     It's an index fund, but presumably
12 somebody is managing it.

13      Q     And you don't know who that person
14 is?

15      A     It's probably a computer.

16      Q     Do you know what broker-dealer that
17 fund uses?

18      A     They probably use themselves.

19      Q     Goldman Sachs?

20      A     Yes.

21      Q     And that's not a problem for you?

22      A     That's not a problem.

23      Q     Why not?

24      A     I mean, Goldman Sachs is a large
25 entity.  There is -- the broker-dealer and

1              S. Pomerantz
2    the asset management arm are two distinct
3    entities.  They report to different people.
4    They probably share a CEO and nothing but a
5    CEO.
6              Goldman has divisions of
7    responsibilities, and they have people who
8    are there to insure the division of
9    responsibility.  I don't -- I don't see a
10   problem with that.
11       Q    And have you ever asked to see the
12   trade confirmations or monthly statements
13   from that account?
14       A    I get monthly statements.  But
15   again, I get -- I get monthly statements
16   regarding -- actually, the total plan as well
17   as the individual pieces.
18       Q    And does the monthly statement show
19   the individual securities that are owned in
20   that account, or it shows the value of --
21       A    It would show me shares of --
22   shares of Goldman Sachs' total stock alpha
23   fund, and then the number of shares that I
24   own, and the NAV of those shares.
25       Q    It doesn't show you the underlying

1                S. Pomerantz

2   holdings?

3        A    No.

4        Q    That is not a problem for you?

5        A    It's a Russell 3000 index fund.

6        Q    And so, it's okay with you to not

7   have the breakdown of individual holdings?

8        A    I don't need to see a list of 3,000

9   holdings.  If I want to look at the annual

10  report, I could do that.

11       Q    Have you ever done that?

12       A    Maybe years ago.

13       Q    How do you know that that account

14  in fact owns all 3,000 stocks that you think

15  it owns?

16       A    I think there is -- how do I know

17  it owns 3,000?  They have represented to me

18  that it owns 3,000.  It performs like it owns

19  3,000.  The returns match the returns of the

20  index.

21            I have no reason to believe that it

22  doesn't own 3,000.  It behaves exactly the

23  way I expect it to behave.

24       Q    And that's good enough for you?

25       A    Not -- that fact alone is not good

1                   S. Pomerantz
2    enough.  I mean, there is -- there is a brand
3    that is involved.  I go to their offices
4    periodically.  I meet with a lot of people --
5    as I said, I have about ten contacts in the
6    company -- on a variety of issues involving
7    IFIC.  So I meet with, sometimes meet with
8    all of them, or sometimes meet with one or
9    two or three.
10            I feel very comfortable.  I have no
11   reason to believe that something is happening
12   that is not as being represented.
13       Q    I think you used the term "trust
14   but verify" --
15       A    Yes.
16       Q    -- in your report; right?
17       A    Yes.
18       Q    So in terms -- I understand the
19   "trust," and I understand people trust
20   Goldman Sachs.  In terms of the "verify,"
21   what do you do to verify those
22   representations, other than go to their
23   offices and meet with people?
24       A    I mean, this relationship has been
25   going on for about seven years.  I do get

Page 88

1          S. Pomerantz
2  all tools that have direct application to a
3  BLMIS-type investment.
4      Q    So, now let me make sure I
5  understand.  If I understand correctly, what
6  you are saying is that the industry standard
7  was the framework, the five P's; is that
8  right?
9      A    Yes.
10     Q    In your opinion?
11     A    Yes.
12     Q    And then there are lots of
13 different ways to go about implementing,
14 developing the information you need in the
15 five different P's; is that right?
16     A    I mean the five P's are the
17 objective standard, and then it is incumbent
18 on a fiduciary to accomplish the due
19 diligence into each of those P's to the
20 extent that data and tools are available, and
21 circumstances warrant.
22     Q    What do you mean by "circumstances
23 warrant"?
24     A    Well, let's take BLMIS as an
25 example.  Perhaps what is being offered up as

1             S. Pomerantz

2     A    Well, I just gave you examples in a
3  litigation context.
4     Q    Right.  So, my question is:  In
5  your due diligence of -- in your performing
6  due diligence on an investment advisor or
7  hedge fund manager, have you ever reviewed
8  trade confirmations?
9     A    No.  I reviewed transaction-level
10 data, and I would input transaction-level
11 data into systems to perform certain
12 analyses.  But I -- I never had a need to
13 look at the confirmations.
14    Q    So, you never asked to look at
15 confirmations in any of the due diligence
16 that you have done over the last 20 years?
17    A    I was never -- I never had a need
18 to do that.
19    Q    And in your -- in due diligence --
20 by the way, when you referred to your work as
21 an expert in the tax shelter cases as due
22 diligence, that was always a review after the
23 fact after a challenge by the IRS; correct?
24    A    Yes.
25    Q    Okay.  So in your work performing

1                    S. Pomerantz
2      due diligence on investment advisors or hedge
3      funds, have you -- have you had occasion
4      to -- strike that.
5                In your work performing due
6      diligence on hedge fund managers or on
7      investment advisors, have you ever compared
8      on a transaction-by-transaction basis
9      transaction price versus the daily high-low
10     range?  Has that been something you have done
11     in your due diligence work?
12        A     I have looked at transaction prices
13     against VWAP, but I have not looked at
14     transactions versus highs and lows.  But I
15     have looked against VWAP as part of my due
16     diligence.
17        Q     Why haven't you looked at
18     transactions versus highs and lows as part of
19     your due diligence?
20        A     I never had a reason to.
21        Q     And I take it you don't believe
22     that the due diligence that you have
23     performed has been faulty for not having
24     looked at that; correct?
25        A     It depends on the circumstances.

1        S. Pomerantz

2   In the circumstances that I have worked in, I

3   never had a need to do that.  I -- as I said,

4   my objective was to understand things as best

5   as I could, and I felt that I always reached

6   that objective by using the tools that were

7   necessary.

8        Q    Looking back over the, you know,

9   30 years that you have been involved in the

10  investment industry or the, you know, 20 or

11  so years where you have had some due

12  diligence responsibilities, have you ever had

13  occasion in hindsight to think that your due

14  diligence was subpar?

15       A    You know, there was a time when I

16  actually was lied to, and I didn't discover

17  it for a few months.  I don't know -- there

18  really was no way, looking back on it, for me

19  to have known that I was being lied to, but I

20  was, and as soon as I knew, as soon as it was

21  possible for me to know, I knew.

22       Q    What were you lied to about?

23       A    Actually, it was a particular hedge

24  fund that actually said they were not going

25  to engage in market timing, and that it was

1            S. Pomerantz

2   competitor to Barra called NorthPoint, and

3   they will provide similar analysis. It's not

4   a very expensive proposition. You can -- you

5   can hire people.

6            I -- I don't -- I don't know that

7   it requires -- you know, maybe I'm -- maybe

8   I'm out of touch, but I don't think it

9   requires an enormous amount of effort. There

10  is commercially available software to do all

11  of this work.

12      Q    But it is your view that, for

13  example, asking the question how do you

14  calculate the correlation between each

15  investment means that the person performing

16  the due diligence should go and recalculate

17  that to test what information they are

18  receiving?

19      A    It depends what the results say.

20  If the results that you get from somebody,

21  right -- I mean, you don't ask these

22  questions, fill them in, and then throw this

23  in a file somewhere. You have to read it and

24  you have to interpret it and understand it.

25           I think of this as kind of when you

1                S. Pomerantz

2    go to the doctor, the nurse takes your

3    history and asks you a bunch of questions,

4    and she enters the questions into a database,

5    and there is questions and answers, and then

6    there is a doctor who basically interprets

7    that, and says, oh, you have this problem or

8    you have that problem.  That is not for the

9    nurse to do, that is for the doctor to do.

10              This is like an intake form.  These

11   are questions that need to be asked, but just

12   because they are answered, that is not

13   where -- due diligence doesn't end there.

14   This is where it starts.  It starts here by

15   asking these questions and getting answers,

16   and then somebody, a partner, a general

17   partner, somebody has to then start to read

18   it and interpret it and say, okay, is what I

19   am seeing consistent with these answers?  Do

20   these answers make sense?  Are they

21   internally consistent?  Are they internally

22   inconsistent?  Those are things that have to

23   be asked.

24        Q    And in making those judgments, is

25   it your opinion -- as to whether things are

1                    S. Pomerantz

2      consistent with what they expect, is it your

3      opinion that the manager or the person

4      responsible for the due diligence is required

5      to use the very -- the various quantitative

6      analyses that you have put forth in your

7      report?

8           A     I think that part of the due

9      diligence process is to confirm these

10     answers.  Right.  The due diligence process

11     is not fill this in so that I can put it in

12     my file.  Right?  You have to confirm the

13     information that is here, whatever tools you

14     think are necessary to do that, and it will

15     depend upon the fund, it will depend upon the

16     strategy, it will depend upon the data that

17     is available.  It's very situational.

18              But the fiduciary is ultimately

19     responsible for reconciling the information

20     on this piece of paper with the reality that

21     he sees.

22          Q     And he is supposed to do that using

23     the tools he thinks are necessary; right?

24          A     You know, he is supposed to do it.

25     How he chooses to do it is up to him.  He can

1                    S. Pomerantz

2  saying.

3            But these are all tools that were

4  available, and some subset of these tools

5  were always being brought to bear regarding

6  any due diligence project.

7       Q    So, is it your testimony that these

8  tools, the quantitative tools that you

9  describe in your report, were available, or

10 that industry standards required these tools

11 to be used?

12      A    I -- I would say both.  I would say

13 that they were available, and as far as the

14 industry standard is concerned, I would point

15 to this document which is dated 1997, and it

16 basically says you will also have to identify

17 the sources of return.  That is what is being

18 mandated to people that are in the process of

19 due diligence, that are in the process of

20 performing due diligence.  They are being

21 mandated by AIMA, you will also have to

22 identify the sources of return.

23           And that is what this report

24 attempts to do.  Now, ironically, there was

25 no source of return.  That is not evident

Page 331

1           S. Pomerantz

2        MS. ARCHER:  I think Mr. Steiner
3    has done a more than adequate job, so I
4    have no questions.
5        THE VIDEOGRAPHER:  The time is
6    6:41 p.m.  We are off the record.
7                    oOo
8        I,  STEVE POMERANTZ, Ph.D., the witness
9   herein, do hereby certify that the foregoing
10   testimony of the pages of this deposition to be a
11   true and correct transcript, subject to the
12   corrections, if any, shown on the attached page.
13                           _____
14
15   Subscribed and sworn to before me this
16   _____day of _____,_____.
17   _____
18            NOTARY PUBLIC
19
20
21
22
23
24
25