# **EXHIBIT 33**

Page 1

1                    AMY B. HIRSCH
2            UNITED STATES DISTRICT COURT
3            SOUTHERN DISTRICT OF NEW YORK
4    ----------------------------------x
     In re:                            SIPA LIQUIDATION
5
     BERNARD L. MADOFF INVESTMENT      No. 08-01789(BRL)
6    SECURITIES LLC,
7                                      (Substantively
                                        Consolidated)
8            Debtor.
     ---------------------------------x
9    IRVING H. PICARD, Trustee of the
     Liquidation of Bernard L. Madoff
10   Investment Securities LLC,
11              Plaintiff,
                                       Adv. Pro. No.
12         vs.                         09-01182(BRL)
13   J. EZRA MERKIN, GABRIEL
     CAPITAL, L.P., ARIEL FUND LTD.,
14   ASCOT PARTNERS, L.P., GABRIEL
     CAPITAL CORPORATION,
15
             Defendants.
16   ---------------------------------x
17
18      VIDEOTAPED DEPOSITION OF AMY B. HIRSCH
19             New York, New York
20             June 16, 2015
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 94520

1          AMY B. HIRSCH

2      Q.    Do you have an opinion as to whether

3  that relates to the topic of due diligence

4  performed by Mr. Merkin on Madoff or Madoff

5  securities?

6      A.    My opinion, again, is stated in the

7  report.

8      Q.    Does Opinion I relate to the topic of

9  due diligence performed by Mr. Merkin on Madoff

10 or Madoff securities?

11     A.    Opinion I speaks to bookkeeping and

12 recordkeeping and accounting and the use of fund

13 assets and investor subscriptions.

14     Q.    Does that, in your mind, relate to due

15 diligence performed by Mr. Merkin?

16     A.    Again, it relates to bookkeeping and

17 accounting functions and transfers of assets and

18 the appropriateness of those transfers of

19 assets.

20     Q.    Are you able to answer my question as

21 to whether or not it relates to the topic of due

22 diligence performed by Mr. Merkin?

23     A.    This opinion is specifically focused

24 on bookkeeping and accounting and the transfer

25 of assets.  Due diligence is a very, very broad

1            AMY B. HIRSCH

2            MS. HOANG:  I'll put on the record

3       that that was produced to you guys pursuant

4       to a subpoena, Rule 45 subpoena, to David

5       Bamberger, and then we produced whatever he

6       gave us to you guys, to the defendants.

7  BY MR. STEINER:

8       Q.    Yes or no:  Have you discussed with

9  the trustee's counsel any of the opinions that

10  you offered in the Hammerman case?

11            MS. HOANG:  Objection.  Caution the

12       witness not to disclose any privileged

13       communication.

14       Q.    You can answer yes or no.  My question

15  was yes or no, which I assume the trustee's

16  counsel agrees you can answer.

17            MS. HOANG:  Go ahead.

18  A.    No.

19       Q.    Am I right that, in that case, one of

20  the things that you were asked to look at was

21  the due diligence performed by Mr. Merkin?

22            MS. HOANG:  I just want to caution the

23       witness, I don't know the scope of the

24       privilege that you have with Mr. Bamberger

25       and your -- and his client, the Fisch and

Page 49

1              AMY B. HIRSCH

2       Hammerman Foundation, so I just caution you

3       with that, but if you can answer Mr.

4       Steiner's question without disclosing the

5       communications.

6              THE WITNESS:  Okay.  Yes, I can answer

7       that, actually, and yes, it did involve due

8       diligence.

9    BY MR. STEINER:

10      Q.    And am I correct that, in connection

11   with your work in that case, you did not observe

12   or form any opinion that Mr. Merkin or GCC knew

13   about the fraud that was perpetrated by Mr.

14   Madoff --

15             MS. HOANG:  Objection.

16      Q.    -- is that right?

17             MS. HOANG:  I'm sorry.  Objection.

18      A.    I cannot discuss my opinions in that.

19      Q.    Well, isn't it the case that when

20   asked to give an opinion about due diligence in

21   the Hammerman case, you -- you did not give an

22   opinion or your opinion was not that Mr. Merkin

23   was reckless or knew about or intentionally

24   disregarded any fraud or Ponzi scheme by Mr.

25   Madoff?

Page 63

1                    AMY B. HIRSCH

2    contain an analysis of the firm and its

3    personnel, all of the products that it has under

4    management, it would contain a review of the

5    strategy in its totality and a review of the

6    underlying investments in the strategy to the

7    best of our -- of our knowledge.

8             It would contain an analysis of risk

9    management, portfolio construction, execution,

10   risk management, operational efficiencies and

11   insufficiencies.

12            It would contain a complete

13   performance analysis and peer analysis, if

14   appropriate.  It would contain a variety of

15   different correlation analysis and market

16   analysis versus the performance.

17            Those are just some of the things that

18   a full report would contain.

19       Q.    Would it -- are you familiar with the

20   term "reverse engineering"?

21       A.    Yes, I'm familiar with it.

22       Q.    And would -- when you perform due

23   diligence, do you do reverse engineering of a

24   strategy?

25       A.    Not necessarily.

                    AMY B. HIRSCH

1

2        Q.    Why not?

3        A.    We don't necessarily need to do

4   reverse engineering because you can find out --

5   there are different ways to get factors and

6   correlation analysis done to find out what

7   footprints are.  So in rare cases do we do --

8   will we do, or have to do, reverse engineering.

9        Q.    That's -- reverse engineering is

10  something that you do rarely?

11             MS. HOANG:  Objection.

12       A.    We -- we have not found a reason to,

13  to do it.  So it's not something that is done on

14  a standard basis, no.

15       Q.    As part of your standard due

16  diligence, do you try and do a quantitative

17  breakdown of the sources of a fund's return?

18       A.    Yes.

19       Q.    How do you do that?

20       A.    Well, it's done either through a

21  correlation analysis, factor analysis.  There

22  are a number of ways to achieve it.  There's a

23  breakdown of beta and alpha analysis,

24  footprinting, et cetera.

25       Q.    What's footprinting?

Page 86

1                    AMY B. HIRSCH

2    reward in a investment.

3         Q.    And how do you -- how do you use the

4    Sharpe ratio?

5         A.    For what, specifically?

6         Q.    Do you use the Sharpe ratio in your

7    work?

8         A.    It's one of the tools we look at, yes.

9         Q.    And why do you look at it?

10        A.    We look at it because in many

11   strategies it can give you a sense of the -- the

12   type of risk and reward you're getting for your

13   investment, and the issue with the Sharpe ratio

14   is that it penalizes for upside volatility, so

15   we only use it as one of the tools.  It wouldn't

16   be appropriate, for example, for managed futures

17   because it would -- it would hurt the manager.

18   But it's a great tool for using on most of the

19   equity strategies.

20        Q.    And as a general matter, is there a

21   direction of Sharpe -- do you prefer a higher

22   Sharpe ratio or a lower Sharpe ratio?

23        A.    You're looking for a higher Sharpe

24   ratio.

25        Q.    And that's typically a good thing?

1        AMY B. HIRSCH

2     A.    It's not that it's a good thing, it's

3  just one of the tools in the toolbox of -- of

4  performance analysis.  It shouldn't be looked at

5  standalone.  We don't look at it standalone.  We

6  look at it in conjunction with a lot of other

7  performance indicators.

8     Q.    Are you aware of funds that have

9  Sharpe ratios in excess of 2 or 2 and a half?

10    A.    I am aware that there have been funds,

11 yes, with Sharpe ratios in excess of those.

12    Q.    Such as?

13    A.    Renaissance.  There are -- there were

14 a few equity managers that were in excess of 2.

15 I can't give you the --

16    Q.    Renaissance, that's the Jim Simons'

17 fund?

18    A.    Yes.

19    Q.    And Elliott, are you familiar with

20 Elliott?

21    A.    Elliott Partners?  Yes.

22    Q.    Elliott Capital Management?

23    A.    Yes.

24    Q.    And is their Sharpe ratio also

25 somewhere in excess of 2 or 2 and a half?

Page 160

1                    AMY B. HIRSCH

2       A.    Well, first, I verified it against the

3   documentation I had, but then, yes, she did have

4   it in her report, one of the examples.  I think

5   example 4, perhaps.

6             MS. VIBBERT:  I have no further

7   questions.

8             MS. HOANG:  No questions.

9             THE VIDEOGRAPHER:  The time is 5:08

10  p.m.  We're going off the record.

11                    oOo

12

13

14

15

16

17

18

19

20

21

22

23

24

25