**EXHIBIT 47**

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------x
In Re:

BERNARD L. MADOFF INVESTMENT                    Adv.Pro.No.
SECURITIES LLC,                                 08-01789(BRL)

       Debtor.
---------------------------------x
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,

       Plaintiff,                       Adv.Pro.No.
                                                09-1182(BRL)

       v.

J. EZRA MERKIN, GABRIEL CAPITAL,
L.P., ARIEL FUND LTD., ASCOT
PARTNERS, L.P., GABRIEL CAPITAL
CORPORATION,

       Defendants.
---------------------------------x


    Videotaped Deposition of TINA HYUNG SURH, as taken by and before NANCY C. BENDISH, Certified Court Reporter, RMR, CRR, RSA and Notary Public of the States of New York and New Jersey, at the offices of Scott & Scott, 405 Lexington Avenue, New York, New York on Wednesday, September 18, 2013, commencing at 10:10 a.m.

11

| | | |
|---|---|---|
| 10:17:54 1 | Q. | How long have you held that title? |
| 10:17:57 2 | A. | Since 2010. |
| 10:18:01 3 | Q. | What was your title prior to 2010? |
| 10:18:05 4 | A. | Acting chief investment officer. |
| 10:18:06 5 | Q. | Also at NYU? |
| 10:18:08 6 | A. | At NYU. |
| 10:18:09 7 | Q. | When did you begin employment at NYU? |
| 10:18:12 8 | A. | 2005. |
| 10:18:13 9 | Q. | And what was your title at that time? |
| 10:18:15 10 | A. | Director of investments. |
| 10:18:17 11 | Q. | Have you held any additional titles |
| 10:18:20 12 | during your time at NYU? | |
| 10:18:22 13 | A. | No. Well, actually deputy chief |
| 10:18:25 14 | investment officer. So there's a progression. | |
| 10:18:29 15 | Q. | Understood. |
| 10:18:29 16 | | And the approximate date range of the |
| 10:18:32 17 | time you held that title? | |
| 10:18:36 18 | A. | From March of 2005 through to |
| 10:18:40 19 | beginning '08, I was the director of investments, | |
| 10:18:43 20 | then I was promoted to deputy CIO. | |
| 10:18:48 21 | Q. | Can you describe for me the extent to |
| 10:18:54 22 | which your roles and responsibilities at NYU may | |
| 10:18:57 23 | have changed over time since you began employment. | |
| 10:19:01 24 | A. | Well, in my initial capacity I was a |
| 10:19:05 25 | member of the investment office staff responsible | |

22

```
10:33:23  1    NYU, can you describe the general circumstances
10:33:29  2    pursuant to which NYU filed this lawsuit against
10:33:33  3    Mr. Merkin and other defendants?
10:33:35  4           A.      Um-hum.  Mr. Merkin as investment
10:33:41  5    manager within the endowment portfolio failed in his
10:33:46  6    duty to NYU to manage the assets in a manner
10:33:52  7    consistent with the way he presented to his client,
10:33:56  8    NYU, as a partner -- as a member of the partnership.
10:34:01  9           Q.      So am I correct in my understanding
10:34:04 10    that prior to the filing of the lawsuit NYU had an
10:34:08 11    investment in one of Mr. Merkin's funds?
10:34:11 12           A.      Yes.
10:34:11 13           Q.      Do you know which fund?
10:34:13 14           A.      The Ariel Fund.
10:34:22 15           Q.      And you stated that the basis of the
10:34:24 16    complaint was that Mr. Merkin as a manager failed to
10:34:28 17    manage that investment consistent with
10:34:30 18    representations he had made to NYU; is that correct?
10:34:34 19                   MR. PRINC:  Object to form.
10:34:34 20                   MR. LAUGHLIN:  Objection.  She can
10:34:37 21    testify that those are the general circumstances
10:34:38 22    under which that complaint was filed.
10:34:40 23           Q.      Can you elaborate for me on the
10:34:42 24    general circumstances that you just described and
10:34:45 25    include the factual basis for the allegations you
```

10:34:49  1    just described.
10:34:52  2         A.     Mr. Merkin represented to his
10:34:54  3    investors in the Ariel Fund that he was managing a
10:35:00  4    portfolio of distressed credits and reorganized
10:35:04  5    equity situations.  And that was the primary
10:35:10  6    activity of the fund, and that was how the fund made
10:35:14  7    money and generated returns for its investors.
10:35:21  8               Unfortunately, that is not how he was
10:35:25  9    investing the entirety of the fund and a significant
10:35:29 10    portion of the fund was, instead, invested in a
10:35:33 11    completely inconsistent manner with the way he
10:35:36 12    presented his activities to his clients.
10:35:39 13         Q.     What was the investment that you just
10:35:42 14    described as inconsistent?
10:35:49 15         A.     I'm not sure I would call it an
10:35:51 16    investment, but I would say that a meaningful
10:35:56 17    proportion of the assets were conveyed or
10:36:00 18    communicated to his clients as being held in
10:36:05 19    liquidity reserve, cash, T-bills, when we looked at
10:36:11 20    the annual -- if you looked at financials or so
10:36:14 21    forth.
10:36:15 22               As it turned -- as we then
10:36:16 23    discovered, instead, those assets were being
10:36:19 24    invested in a speculative manner by an external
10:36:23 25    manager that had previously never been discussed.

```
10:36:33   1          Q.      When you say "never been discussed,"
10:36:34   2   do you mean discussed with NYU?
10:36:38   3          A.      Correct.  Or rather, I should say
10:36:47   4   disclosed.  Maybe that's a better -- a better -- you
10:36:49   5   know, a better term.
10:36:52   6          Q.      Was -- is it your understanding that
10:36:54   7   that external money manager was Bernard Madoff?
10:36:58   8          A.      It is now.
10:37:08   9          Q.      Okay.  Can you provide on behalf of
10:37:10  10   NYU the history of NYU's investment with Ariel?
10:37:15  11                  MR. LAUGHLIN:  Objection, vague,
10:37:17  12   but...
10:37:18  13          A.      NYU invested with -- in the Ariel
10:37:22  14   Fund beginning in 1994 and made two, I'd say two
10:37:30  15   investments, in terms of injections of capital,
10:37:33  16   first in 1994 and then in 1997.
10:37:38  17          Q.      What were the amounts of capital
10:37:41  18   invested in those years?
10:37:42  19          A.      I believe it was 20 million in 1994
10:37:46  20   and an additional 10 million in 1997.
10:37:51  21          Q.      Can you describe the circumstances
10:37:54  22   under which NYU came to invest with Ariel?
10:37:59  23                  MR. LAUGHLIN:  Objection, vague.
10:38:01  24          A.      My understanding is that Ariel was
10:38:07  25   considered to be an appropriate investment for the
```

10:38:10  1    endowment portfolio as a diversifier within the
10:38:17  2    portfolio.
10:38:28  3         Q.     How was Ariel identified as a
10:38:31  4    possible investment for NYU?
10:38:33  5         A.     I was not present at the time, but my
10:38:36  6    understanding is that Leon Levy introduced the
10:38:44  7    investment or the possible -- the potential
10:38:47  8    investment to -- to the university.
10:38:55  9         Q.     And you stated at the time it was
10:38:58 10    believed -- and please correct me if I'm wrong, I'm
10:39:01 11    not trying to misstate your words, but my
10:39:04 12    understanding is you stated at the time NYU believed
10:39:07 13    that Ariel was an appropriate investment for the
10:39:10 14    endowment.
10:39:12 15                MS. PRINC:  Object to form.
10:39:13 16         Q.     Is that correct?
10:39:14 17         A.     It's reasonable to conclude that it
10:39:17 18    was deemed appropriate at the time.
10:39:21 19         Q.     Can you elaborate on why an
10:39:26 20    investment may or may not be an appropriate
10:39:29 21    investment for the endowment?
10:39:31 22         A.     Um-hum.  The endowment is managed as
10:39:39 23    a -- as an entity, as whole and it -- and it relies
10:39:41 24    on diversification and active management.  So an
10:39:46 25    investment in a fund like the Ariel Fund would

38

```
11:04:30  1   investment?
11:04:31  2                 MR. LAUGHLIN:  Objection, vague.
11:04:32  3                 MS. PRINC:  Objection.
11:04:38  4        A.       Ongoing due diligence?
11:04:39  5        Q.       Yes.
11:04:40  6        A.       So the -- so the -- yes, so the
11:04:41  7   conversations that Maury, the chief investment
11:04:45  8   officer at the time, would have had and our review
11:04:49  9   of all of the documents provided to us by the
11:04:51 10   manager.
11:05:10 11        Q.       You stated that you personally met
11:05:12 12   with Mr. Merkin in October 2008; is that correct?
11:05:16 13        A.       Yes.
11:05:19 14        Q.       What were the circumstances of that
11:05:22 15   meeting?
11:05:23 16        A.       In terms of why we met or --
11:05:25 17        Q.       Correct.  I'm just -- I'm trying to
11:05:28 18   gain an understanding of why did the meeting occur.
11:05:31 19        A.       Well, it was October of 2008 and that
11:05:35 20   was a very dynamic time in the market.
11:05:38 21        Q.       I remember.
11:05:39 22        A.       Lehman Brothers had gone under.
11:05:42 23   There was a lot to -- to try to get your arms
11:05:45 24   around, and -- and so it was appropriate to meet
11:05:51 25   with Ezra as a manager in the NYU portfolio to -- to
```

40

| | | |
|---|---|---|
| 11:07:32 1 | Q. | Had Mr. Maertens had in-person |
| 11:07:35 2 | meetings with Mr. Merkin prior to this date? | |
| 11:07:38 3 | A. | Probably. |
| 11:07:41 4 | Q. | Any that you are specifically aware |
| 11:07:43 5 | of? | |
| 11:07:49 6 | A. | I'm aware of an in-person meeting |
| 11:07:52 7 | that took place in front of -- with our investment | |
| 11:07:54 8 | committee, which would have involved Mr. Maertens. | |
| 11:08:00 9 | As to other specific dates, I couldn't cite the | |
| 11:08:05 10 | specific dates. | |
| 11:08:09 11 | Q. | The meeting with the investment |
| 11:08:10 12 | committee you just referenced, were you -- did you | |
| 11:08:13 13 | participate in that meeting? | |
| 11:08:14 14 | A. | It was 2000. |
| 11:08:15 15 | Q. | So it was prior to your employment? |
| 11:08:17 16 | A. | It was prior to my joining NYU. |
| 11:08:24 17 | Q. | Do you know what the purpose of that |
| 11:08:25 18 | meeting was with the investment committee? | |
| 11:08:35 19 | A. | It would have been part of normal -- |
| 11:08:39 20 | normal practices of the investment committee, so | |
| 11:08:43 21 | nothing out of the ordinary. | |
| 11:08:46 22 | Q. | Did Mr. Merkin give a presentation to |
| 11:08:49 23 | the investment committee? | |
| 11:08:51 24 | A. | I believe so. |
| 11:09:01 25 | Q. | Can you tell me in as much detail as |

| | |
|---|---|
| 11:09:05  1 | possible everything you recall about the in-person |
| 11:09:08  2 | meeting you had with Mr. Merkin on October 23rd, |
| 11:09:11  3 | 2008. |
| 11:09:14  4 |     A.    That's a lot of detail.  Well, we met |
| 11:09:19  5 | Mr. Merkin at his offices.  He showed us into his |
| 11:09:28  6 | personal office, so we passed through the offices, |
| 11:09:31  7 | sat down with him in his personal offices. |
| 11:09:35  8 | He exchanged a number of -- or, |
| 11:09:41  9 | rather -- he was very pleasant.  Referenced a lot of |
| 11:09:47 10 | individuals in the money management business and |
| 11:09:50 11 | others who we might know, some of whom are mentioned |
| 11:09:53 12 | in my notes that you have.  For example, Seth |
| 11:09:57 13 | Klarman, who's a very well known and highly |
| 11:10:01 14 | respected manager based in Boston.  He runs the |
| 11:10:04 15 | Baupost Group.  And he had recently just published, |
| 11:10:06 16 | republished the edition, the 1940, I think it is, |
| 11:10:11 17 | edition of Graham and Dodd Security Analysis.  It is |
| 11:10:16 18 | the best version, the 1940 edition.  And so Ezra, |
| 11:10:20 19 | Mr. Merkin was very proud of the fact that he had |
| 11:10:23 20 | authored one -- you know, the -- the introductory |
| 11:10:26 21 | section to one of those chapters.  And so there was |
| 11:10:32 22 | a lot of that at the front end of the conversation. |
| 11:10:36 23 | Then we talked about the portfolio to |
| 11:10:38 24 | some degree, particularly a couple of large |
| 11:10:42 25 | investments that had gone against us -- had gone |

42

| | | |
|---|---|---|
| 11:10:45 | 1 | against him in the portfolio, GMAC and Chrysler. |
| 11:10:51 | 2 | They were -- they had been, you know, getting -- |
| 11:10:54 | 3 | getting, let's say, punished in the markets. |
| 11:10:57 | 4 | Mr. Merkin was at the time chairman of the board of |
| 11:11:01 | 5 | GMAC, so very involved, obviously, in the -- in |
| 11:11:04 | 6 | that -- that process. And so we spent a fair amount |
| 11:11:10 | 7 | of time discussing those investments, and general |
| 11:11:12 | 8 | outlook, his general outlook. |
| 11:11:16 | 9 | And then Mr. Merkin then volunteered |
| 11:11:24 | 10 | understanding for the plight that, that endowments |
| 11:11:28 | 11 | like ours are in, in terms of needing to meet a |
| 11:11:36 | 12 | level of return, or generate a level of return to |
| 11:11:39 | 13 | support spending, maintain pace with inflation, et |
| 11:11:43 | 14 | cetera, citing his own experience as the chairman of |
| 11:11:48 | 15 | investment committees for prestigious institutions |
| 11:11:51 | 16 | and, thus, again, understanding of the -- of our |
| 11:11:54 | 17 | needs, and volunteered some suggestions of managers |
| 11:11:59 | 18 | who we might consider investing the university's |
| 11:12:01 | 19 | capital with. |
| 11:12:05 | 20 | Q.    Managers in addition to himself? |
| 11:12:08 | 21 | A.    Beyond himself, right. All in -- in |
| 11:12:09 | 22 | the context of being helpful. And so two of |
| 11:12:16 | 23 | those -- the two managers that he focused on were Is |
| 11:12:25 | 24 | Englander's Millennium Group and Bernie Madoff's, I |
| 11:12:30 | 25 | guess Madoff or whatever it's called, you know, as |

```
11:12:36  1    two -- as two places we should -- we could consider
11:12:38  2    investing our capital.
11:12:39  3                   He did mention a third group near the
11:12:42  4    end of the meeting as another, but that I don't
11:12:45  5    recall if it was in the context of a place that the
11:12:48  6    university might invest or if it was in the context
11:12:51  7    of someone else that he respects, and that's Lonnie
11:12:54  8    Steffens who he had respect for as a -- I suppose as
11:13:00  9    a money manager.  Spring Mountain Capital, or
11:13:07 10    something like that.
11:13:08 11                   All three of those were groups that
11:13:09 12    we really didn't have much knowledge of.  I'd say of
11:13:11 13    the three, Millennium was the one that we had the
11:13:15 14    most familiarity with, just at least having heard
11:13:18 15    the name before.
11:13:20 16         Q.        Okay.  Prior to this meeting, had you
11:13:23 17    ever heard Bernie Madoff's name?
11:13:25 18         A.        Prior to the October 23rd meeting?
11:13:27 19         Q.        Correct.
11:13:28 20         A.        No.
11:13:29 21         Q.        Prior to that meeting, did you have
11:13:31 22    any familiarity at all with his investment advisory
11:13:35 23    business?
11:13:35 24         A.        None.
11:13:40 25         Q.        What did Mr. Merkin tell you about
```

44

```
11:13:42  1    Mr. Madoff in that meeting?
11:13:45  2           A.     Well, he said he had a family trust
11:13:53  3    that was invested with Mr. Madoff, that he knew
11:14:00  4    Mr. Madoff quite well as a fellow member of the
11:14:03  5    board at Yeshiva, I believe it was, that he's an
11:14:14  6    exceptionally consistent performer, something like
11:14:18  7    30 quarters and -- or some extraordinarily long
11:14:21  8    period of time with no down quarters.  So he was a
11:14:27  9    very stable performer.  And, again, that he had a
11:14:30 10    family -- a family trust that was invested with --
11:14:34 11    with said individual, with Bernie Madoff, and that
11:14:40 12    he thought it was something that we might consider.
11:14:46 13           Q.     Did you or Mr. Maertens respond?
11:14:51 14           A.     Yes.
11:14:53 15           Q.     Can we start with your response?
11:14:55 16           A.     Sure.  Well, I should --
11:14:57 17           Q.     Or if there was one.
11:14:59 18           A.     The prompt to the response.  So
11:15:03 19    Mr. Merkin stylistically in the -- he can talk -- he
11:15:10 20    can expound for quite a while, so we were listening,
11:15:13 21    and -- and he volunteered near the end of his -- our
11:15:18 22    interaction, near the end of that description of
11:15:22 23    this opportunity, that the only significant negative
11:15:25 24    is that he prints his own tickets.  He said, he
11:15:31 25    prints his own tickets.
```

45

11:15:33  1              And so I asked, to clarify, do you
11:15:37  2    mean he clears his own trades?  To which he said,
11:15:41  3    yes, they're on his own stationery.  And then I
11:15:44  4    clarified further, so there's no third-party
11:15:46  5    administration involved?  And he -- he confirmed
11:15:50  6    that that was true.
11:15:53  7              And so, you know, being a maybe
11:16:02  8    impolite visitor in his office, I -- I then
11:16:08  9    volunteered for his edification, I suppose, that
11:16:11 10    while we were very appreciative of the
11:16:20 11    recommendation and respected his long relationship
11:16:22 12    with this individual, what he just had described to
11:16:26 13    us from an institutional standpoint would have been
11:16:30 14    a -- would be a non-starter, meaning the lack of a
11:16:34 15    third-party administrator.  The idea that a person
11:16:39 16    clearing his own trades, right, it would just make
11:16:42 17    it -- it would make it unpalatable for us.  So we
11:16:48 18    wouldn't pursue the opportunity.
11:16:51 19         Q.    Why would clearing one's own trades
11:16:54 20    be -- make it an unpalatable opportunity?
11:16:57 21         A.    Well, as I -- as I described, as I
11:17:03 22    have described to the university's auditors as an
11:17:07 23    anecdote, that's the kind of situation in which
11:17:11 24    fraud can occur.
11:17:14 25         Q.    Can you explain why?

46

```
11:17:17   1         A.     Well, because there's no independent
11:17:21   2    verification that the assets exist and at a certain
11:17:26   3    price.
11:17:33   4         Q.     Did you personally offer any
11:17:38   5    additional response to Mr. Merkin's recommendation
11:17:40   6    of Mr. Madoff?
11:17:42   7         A.     That was -- that was pretty bold for
11:17:46   8    a relatively junior person meeting a very
11:17:49   9    prestigious money manager for the first time in the
11:17:53  10    presence of their superior.
11:17:55  11         Q.     Understood.
11:17:58  12                Do you recall if Mr. Maertens
11:18:00  13    responded to the recommendation?
11:18:02  14         A.     If -- if Maury responded?
11:18:03  15         Q.     Correct.
11:18:05  16         A.     I think he, at a minimum, made the
11:18:08  17    kinds of noises that were supportive of what I had
11:18:12  18    just said, you know, the vocal nod, right.  I don't
11:18:18  19    think there was much more to -- that needed to be
11:18:21  20    said.
11:18:22  21         Q.     Okay.  Did Mr. Merkin address the
11:18:24  22    concern that you had raised about self-clearing?
11:18:27  23                MS. PRINC:  Object to form.
11:18:30  24                THE WITNESS:  May I answer that?
11:18:31  25                MR. LAUGHLIN:  Yes.
```

                                                                              62

```
12:02:17  1        Q.     Okay.  You write -- there's an
12:02:20  2   asterisk written onto the copy?
12:02:23  3        A.     Um-hum.
12:02:23  4        Q.     And next to it a statement that says,
12:02:25  5   "Again, I'm pretty shocked this fund was in Ariel's
12:02:29  6   portfolio given how we told him that we could never
12:02:32  7   invest in a fund like that.  The guy was doing his
12:02:34  8   own marks from an institutional perspective."
12:02:38  9        A.     Um-hum.
12:02:38 10        Q.     Is this statement referring to the
12:02:40 11   October meeting with Mr. Merkin?
12:02:43 12               MS. PRINC:  Object to form.
12:02:45 13        A.     Yeah, yes.  How we told him we could
12:02:49 14   never invest, that statement refers to our
12:02:52 15   interaction in the October meeting, yes.
12:02:54 16        Q.     Right.
12:02:55 17               So just to be clear, where you say
12:02:58 18   "given how we told him," you're referring to
12:03:01 19   Mr. Merkin?
12:03:01 20        A.     Him being Mr. Merkin.
12:03:02 21        Q.     "That we could never invest in a fund
12:03:05 22   like that," the "we" being NYU?
12:03:09 23        A.     Right.
12:03:10 24        Q.     And "fund like that" referring to --
         25        A.     Madoff.
```

123

| | | |
|---|---|---|
| 02:32:13 | 1 | A. If that's what -- if that's what he |
| 02:32:14 | 2 | said, I have no reason to disagree with it. |
| 02:32:19 | 3 | MS. PRINC: I have no further |
| 02:32:20 | 4 | questions. Thank you very much. |
| 02:32:23 | 5 | THE WITNESS: Sure. |
| 02:32:23 | 6 | MR. LAFFEY: We have no questions at |
| 02:32:24 | 7 | this time, but reserve all rights. Thank you very |
| | 8 | much. |
| 02:32:28 | 9 | MS. ARCHER: None for Ascot. |
| 02:32:30 | 10 | THE VIDEOGRAPHER: The time is 2:32 |
| 02:32:33 | 11 | p.m. This ends media number 3. |
| 02:32:37 | 12 | (Deposition concluded.) |
| | 13 | -o0o- |