# **EXHIBIT 50**

Page 1

Teicher, Victor 2/9/2009 12:00:00 PM

## Page 1

** CONFIDENTIAL ** CONFIDENTIAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
INDEX NO. 08603803/2008
Justice Richard B. Lowe

----------------------------------x
NEW YORK UNIVERSITY,

  Plaintiff,

-against-

ARIEL FUND LIMITED, GABRIEL CAPITAL CORPORATION, J. EZRA MERKIN, FORTIS BANK (CAYMAN) LTD., FORTIS PRIME SOLUTIONS (CAYMAN) LTD., FORTIS BANK, BDO TORTUGA, and BDO INTERNATIONAL,

  Defendants.
----------------------------------x

425 Park Avenue
New York, New York
February 9, 2009
12:00 p.m.

Videotaped deposition of VICTOR TEICHER, held at the above time and place, before Eileen Mulvenna, CSR/RMR, a Certified Shorthand Reporter, Registered Merit Reporter and Notary Public of the State of New York.

## Page 2

** CONFIDENTIAL ** CONFIDENTIAL

APPEARANCES:

SCOTT & SCOTT, LLP
Attorneys for Plaintiff
  29 West 57th Street
  New York, New York 10019
BY: JOSEPH P. GUGLIELMO, ESQ.
    jguglielmo@scott-scott.com
    CHRISTOPHER M. BURKE, ESQ.
    cburke@scott-scott.com

SCHULTE ROTH & ZABEL, LLP
Attorneys for Defendant Ariel Fund
  919 Third Avenue
  New York, New York 10022
BY: HARRY SANDICK, ESQ.
    harry.sandick@srz.com
    TALEAH ESPERANZA JENNINGS, ESQ.
    taleah..jennings@srz.com

DECHERT, LLP
Attorneys for Defendants J. Ezra Merkin and Gabriel Capital Corporation
  1095 Avenue of the Americas
  New York, New York 10036-6797
BY: GARY J. MENNITT, ESQ.
    gary.mennitt@dechert.com
    JONATHAN D. PERRY, ESQ.
    jonathan.perry@dechert.com

STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
Attorneys for the Witness
  425 Park Avenue
  New York, New York 10022
BY: MARJORIE J. PEERCE, ESQ.
    mpeerce@stillmanfriedman.com

ALSO PRESENT:

  Christopher Martin, Videographer

## Page 3

** CONFIDENTIAL ** CONFIDENTIAL

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that all rights provided by the Civil Practice Law and Rules, including the right to object to any question, except as to form, or to move to strike any testimony of this examination are reserved, and, in addition, the failure to object to any question, shall not be a bar or waiver to make such motion at, and is reserved for the trial of this action.

IT IS FURTHER STIPULATED AND AGREED, that this examination may be signed and sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so, or to return the original of this examination by counsel, shall not be deemed a waiver of any rights.

IT IS FURTHER STIPULATED AND AGREED, that the filing of the original of this examination is waived.

## Page 4

THE VIDEOGRAPHER: We're on the record.

My name is Chris Martin. I'm the videographer for Veritext Court Reporting in New York City. Today's date is February 9, 2009, and the time is 12:01 p.m.

This deposition is being held at the office of Stillman Friedman & Shechtman, 425 Park Avenue, New York, New York.

The caption on this case is New York University versus Ariel Fund Limited, et al., case filed in the Supreme Court of the State of New York, New York County.

The witness' name is Victor Teicher.

At this time, will counsel please introduce themselves for the record.

MR. GUGLIELMO: Joseph Guglielmo with Scott & Scott for plaintiff.

MR. BURKE: Chris Burke, Scott & Scott, for plaintiff.

MS. JENNINGS: Taleah Jennings, Schulte Roth & Zabel, for defendant Ariel Fund Limited.

Teicher, Victor 2/9/2009 12:00:00 PM

**37**

1
2  A.  I meant that the Madoff news was
3  hilarious.
4  Q.  By "hilarious" obviously you're
5  being sarcastic.
6  A.  I thought it was very funny.
7  Q.  Why did you think it was funny?
8  A.  I think almost everything is funny.
9  I think that ultimately the truth is funny. And
10  when the truth is revealed, that's hilarious.
11  Q.  Did that statement have at least --
12  did that statement have anything to do with I
13  guess your opinion that Madoff was a fraud?
14  A.  No, I don't -- the way I think of it
15  is that I think Madoff was well-considered and --
16  by many people in the investment community. And
17  when it was revealed that he wasn't all that he
18  was cooked up to be, the revelation of that truth
19  made it funny.
20  I mean, if people thought poorly of
21  Madoff and then there was news that would lead
22  one to think poorly of him, that wouldn't be very
23  funny, would it?
24  Q.  He had a good reputation.
25  A.  Yes, he had a good reputation. So

**38**

1
2  when the truth is revealed, it's always funny.
3  Q.  I guess let's take the next phrase
4  in the e-mail. You said "hope you negotiate out
5  of this mess as well as possible."
6  What were you -- what was the --
7  A.  Well, I thought that problems would
8  arise from anyone directly or indirectly involved
9  in the Madoff scandal. And so I basically gave
10  him my sentiments that I hoped that it all goes
11  well for him, whatever the repercussions.
12  Q.  And so I'm clear, this e-mail on
13  December 11, was this the first time you had
14  attempted to communicate with Mr. Merkin
15  concerning the Madoff revelations?
16  A.  I believe so, but I'm not sure. I
17  believe so.
18  Q.  You didn't try to pick up the phone
19  before that?
20  A.  I don't recall.
21  Q.  And then the next phrase that you
22  have in your e-mail says, "I'm yours to help in
23  any way I can."
24  What were you referring to, or what
25  did you mean by that?

**39**

1
2  A.  Well, if he wanted to talk things
3  over about this matter -- I think at the end,
4  what I meant was that -- Ezra tends to be very
5  anxious. And by being with me, he becomes less
6  anxious. And so if he wanted me -- wanted to
7  talk to me, it would allay any anxiety that he
8  might otherwise have. A lot of people feel that
9  way about me.
10  Q.  The next I guess phrase in this
11  e-mail, you say, "unfortunately, you've paid a
12  big price for a lesson on the cost of being
13  greedy."
14  What did you mean by that?
15  A.  Well, I meant that investing with
16  Bernie Madoff was very, very easy in some sense;
17  that it was -- the consistency of returns was
18  such that it made it very appealing. And that
19  Ezra was able to raise a lot of money by virtue
20  of investing in Madoff.
21  Q.  And what's your understanding for
22  that, investing with Madoff was very easy?
23  A.  Well, it was very -- if you show
24  someone fairly consistent returns over time,
25  people really like that kind of consistency. And

**40**

1
2  so if you're going to raise money to invest and
3  you can show people those kind of returns, you'll
4  have those people -- they'll very easily invest
5  with you.
6  Q.  Did you observe -- sorry.
7  A.  Pardon?
8  Q.  I'm sorry. Go ahead.
9  Did you ever talk with Mr. Merkin
10  about the consistency, as you put it?
11  A.  Yes.
12  MS. PEERCE:  In what time period?
13  Q.  Let's start with the most recent
14  time frame.
15  A.  No.
16  Q.  In prior time frames, you had talked
17  to him about the consistency of Madoff's --
18  A.  Yes.
19  Q.  -- returns?
20  A.  Yes.
21  Q.  And in what context did you speak to
22  him about those?
23  A.  How did it come up? I mean --
24  Q.  Yes.
25  A.  He told me sometime -- perhaps it

Ariel Fund/NYU                None                Page 37 - 40

Teicher, Victor 2/9/2009 12:00:00 PM

**41**

2  was '92 or '93, that he was considering investing
3  with Bernie Madoff. And he described Madoff in
4  terms of what he was doing and the consistency of
5  the returns, and I felt that that was just not
6  possible.
7  Q. What was -- why did you feel it
8  wasn't possible?
9  A. Because I've never seen anyone -- I
10 mean, have such consistent returns. It's
11 possible to do 50 percent a year. In some years
12 you do more and some years you do less, but just
13 the nature of the business, you just can't year
14 in and year out have such low volatility in the
15 returns.
16 Q. Did you express these concerns to
17 Ezra?
18 A. I wouldn't call them concerns. I
19 would just say that's -- I told him I didn't
20 think -- it just didn't seem like it was
21 possible.
22 Q. And do you have any sort of
23 background in the types of investments that
24 Mr. Madoff was supposedly investing in?
25 A. I'm not sure I know what he was

**42**

2  doing exactly.
3  Q. I guess when you first talked to
4  Mr. Merkin in around 1992, 1993 time frame, and I
5  guess you had this discussion about Madoff, did
6  you review any materials or read up, or was it
7  just a conversation upon which you said his
8  returns are too consistent?
9     MR. MENNITT: Objection to the form.
10 A. It was just a conversation.
11 Q. Did you follow up that conversation?
12 A. Follow up?
13 Q. Follow up. Did you do anything
14 after that conversation?
15    MS. PEERCE: Do you mean any due
16 diligence?
17 Q. Did you do anything with respect
18 to -- yeah, did you do any due diligence with
19 respect to Madoff?
20 A. No.
21 Q. Did you have any subsequent
22 conversations with Mr. Merkin concerning Madoff?
23 A. Yes.
24 Q. And when did those take place?
25 A. Over the years.

**43**

2  Q. Was it the same type of conversation
3  that you had with him?
4  A. The same.
5  Q. And you reiterated to Mr. Merkin
6  that the returns were too consistent?
7  A. Yes.
8  Q. And what was his response to you? I
9  guess let's start with the first conversation in
10 and around 1992, 1993 time frame.
11 A. He didn't have a response..
12 Q. So he didn't say anything when you
13 mentioned it to him?
14 A. Nothing that I recall.
15 Q. Did he do anything that you know of?
16 Did he decide not to invest in Mr. Madoff's
17 investments or did he go ahead and do it?
18    MS. PEERCE. Object to the form.
19 Q. You can answer.
20 A. He invested in Madoff, as far as I
21 understood.
22 Q. And then you had -- you raised the
23 issue of the consistency of Mr. Madoff's returns
24 again at some point down the line; correct?
25 A. Yes.

**44**

2  Q. And approximately when did you raise
3  those -- when did you raise those issues again
4  with Mr. Merkin?
5  A. Whenever we spoke of Madoff or
6  not -- I shouldn't say whenever we spoke of
7  Madoff, but if there was a discussion of Madoff,
8  I put my views forward.
9  Q. How often do you think those
10 conversations took place?
11 A. I just don't know offhand. I mean,
12 it's -- here and there. Madoff was a name that
13 was mentioned here and there.
14 Q. And in the subsequent conversations,
15 did you continue to express your views that the
16 returns were too consistent?
17 A. That the returns were too
18 consistent. I didn't like the fact that he
19 self-cleared as well.
20 Q. What does that mean?
21 A. That is that he would represent to
22 you the securities that you held -- that were
23 held in your account, as opposed to that being
24 done by a third party.
25 Q. And you didn't like that because?

Ariel Fund/NYU       None       Page 41 - 44

CONFIDENTIAL       BS00004965

Teicher, Victor  2/9/2009  12:00:00 PM

### Page 45

2  A. Because there's room for
3  misrepresentations. There's no check that what
4  you've told -- what you've been told has been
5  done has actually been done. There have been
6  cases in the past that were frauds that the
7  people were self-clearing.
8  Q. Did you communicate these issues to
9  Mr. Merkin?
10 A. I recall the consistency of returns
11 clearly as a salient issue. The other things, I
12 just thought that I had -- I don't recall
13 specifically when or if things related to that
14 were -- I just remember generally that I had a
15 view about Madoff.
16 Q. But did you -- the things you
17 identified, I think you said self-clearing and
18 then you identified some issues with the problems
19 with self-clearing. Did you ever discuss --
20 A. I don't have any specific
21 recollection of having that discussion. I just
22 don't recall offhand.
23 Q. Was Mr. Merkin aware that Mr. Madoff
24 was self-clearing?
25 A. I don't know. I mean, I guess since

### Page 46

2  I was aware of it, I'm guessing that he was aware
3  of it, otherwise I wouldn't have been aware of
4  it.
5  Q. Let me ask you then.
6  How were you aware that Mr. Madoff
7  was self-clearing?
8  A. I think probably Michael or Ezra
9  told me that.
10 Q. Again, in the course of
11 conversations regarding Madoff generally?
12 A. Yes.
13 Q. And let's stick with the -- back in
14 the time frame '92, '93, did Mr. Merkin do
15 anything to allay your concerns about the
16 consistency of Madoff returns?
17    MR. MENNITT: Objection to the form.
18    I think previous questions you said
19    "concerns," and he rejected that
20    terminology.
21    MR. GUGLIELMO: You're not entitled
22    to a speaking objection. You can just
23    object to form. I'll restate the question.
24    MR. MENNITT: That was not a
25    speaking objection. That was a proper

### Page 47

2  objection. But you can go right ahead,
3  Joe.
4     MR. GUGLIELMO: We can continue with
5     this.
6  BY MR. GUGLIELMO:
7  Q. Mr. Teicher, what did Mr. Merkin do
8  to allay or to alleviate any of the issues that
9  you identified concerning the consistency of
10 Mr. Madoff's returns?
11    MR. MENNITT: Objection to the form.
12 Q. You can answer the question.
13 A. I don't know that he did anything
14 one way or another. I mean, I told him what
15 problems I had with the Madoff investment
16 returns, and I'm not sure what he could have
17 done.
18 Q. Did you know if he -- did he say he
19 was going to do any due diligence or speak to
20 Mr. Madoff or --
21 A. I don't recall.
22 Q. Did you suggest that he do some due
23 diligence?
24 A. I don't recall.
25 Q. Did you --

### Page 48

2  A. I don't know -- what due diligence
3  could you do, really? These are the returns. I
4  mean, that's what the guy's telling you he's
5  done. I'm not sure what you could do.
6  Q. Did you suggest that he shouldn't
7  invest with Mr. Madoff?
8  A. Yes.
9  Q. When did you make that suggestion?
10 A. When I first heard of Madoff.
11 Q. 1992, 1993?
12 A. Yes.
13 Q. Did you --
14 A. I guess it was around then. I think
15 it was around then, yes.
16 Q. Then in the subsequent conversations
17 that you had over time concerning Mr. Madoff, did
18 you continue to tell Mr. Merkin that he shouldn't
19 be investing with Mr. Madoff?
20 A. No.
21 Q. So at a certain point in time, you
22 didn't -- you didn't --
23 A. I didn't tell him what he should or
24 shouldn't be doing. I mean, it's not the way I
25 would go about these things. But I told him that

Ariel Fund/NYU                None                  Page 45 - 48

Teicher, Victor 2/9/2009 12:00:00 PM

**Page 49**

2  I was highly doubtful of -- that I was doubtful
3  of this whole Madoff thing. I was doubtful. Not
4  highly doubtful, I was just doubtful.
5      MS. PEERCE: Can I have one moment,
6  please.
7      MR. GUGLIELMO: Off the record.
8      THE VIDEOGRAPHER: We're off the
9  record. The time is 12:53.
10     (Pause from the record.)
11     THE VIDEOGRAPHER: We're back on the
12  record. The time is 12:54.
13     THE WITNESS: Another matter, I did
14  mention to Ezra that -- the issue of the
15  trade tickets coming in late, that this was
16  troublesome.
17  Q.  And when did you mention this to
18  Mr. Merkin?
19  A.  When I was first made aware of it.
20  Q.  When were you made aware of the
21  trading tickets?
22  A.  Very early on.
23  Q.  1992, 1993 time frame?
24  A.  Yes, yes.
25  Q.  And was that something you raised

**Page 50**

2  continually throughout the period that you had
3  discussions concerning Madoff, or was that
4  just --
5  A.  No.
6  Q.  So it was early on?
7  A.  (Witness nods head in the
8  affirmative.)
9  Q.  Do you know if the issues that
10  you've identified concerning the trading tickets
11  continued throughout the subsequent years?
12  A.  I have no idea.
13  Q.  Did you --
14  A.  In fact, I would say my -- now I do
15  remember -- at a certain point in time, that was
16  not an issue, that Ezra told me that the tickets
17  were not coming in regularly and that -- that
18  issue was not an issue anymore, yes.
19  Q.  And by telling you it was not an
20  issue anymore, did he provide any more detail?
21  A.  Not that I recall.
22  Q.  Did you discuss the trading ticket
23  issues subsequent to that time?
24     MS. PEERCE: With whom?
25     MR. GUGLIELMO: With Mr. Merkin.

**Page 51**

2  A.  No.
3  Q.  So he basically had a conversation
4  with you and said these trading tickets -- this
5  trading issue that you raised isn't really an
6  issue?
7  A.  Yes.
8  Q.  At any time, did Mr. Merkin ever
9  raise with you any concerns that he had with
10  respect to the Madoff investments?
11  A.  No.
12  Q.  Did he ever say to you that he
13  agreed with you that the consistency was too good
14  to be true or not believable?
15  A.  No, he never said that.
16  Q.  So this was an issue that you raised
17  throughout the years, and he never agreed with
18  your position?
19     MS. PEERCE: Objection to form.
20     MR. MENNITT: Objection to form.
21  A.  He felt that Madoff was okay.
22  Q.  Did --
23  A.  Which was -- I'm sorry.
24  Q.  Did anyone else agree with you that
25  the consistency was too good to be true, "anyone

**Page 52**

2  else" being anyone else at Gabriel Capital?
3     MS. PEERCE: Object to the form.
4  A.  I don't recall the people there
5  having any point of view that was expressed to
6  me. I don't recall anything like that.
7  Q.  Other than the conversation you had
8  after the revelations were revealed with
9  Mr. Hess, did you have anything -- any
10  conversations with any of the individuals at
11  Gabriel Capital Corporation concerning the
12  trading tickets?
13  A.  Other than talking with Hess about
14  it, did I talk to anyone else who had been at
15  Gabriel about these tickets?
16  Q.  Did you talk to them during -- did
17  you talk to them prior to the Madoff revelations?
18  A.  Prior to the Madoff revelations --
19  Q.  That there were issues with the
20  trading tickets that you had identified.
21  A.  I don't recall.
22  Q.  Do you recall having any
23  conversation with Mike Autera about the trading
24  tickets?
25  A.  Yes.

Ariel Fund/NYU            None            Page 49 - 52

CONFIDENTIAL                                        BS00004967

Teicher, Victor  2/9/2009  12:00:00 PM

**Page 213**

1
2  questions?
3      And I guess -- were -- those funds
4  that were identified by Mr. Mennitt, were those
5  providing returns that were too consistent? I
6  think you indicated earlier today that Madoff was
7  providing returns that were too consistent. I'm
8  just trying to understand if you had any
9  suspicions about those other funds.
10     MS. PEERCE: Objection to form.
11     MR. MENNITT: Objection to form.
12     MR. SANDICK: Objection to form.
13  A.  I didn't have any suspicions about
14  those other funds. Their returns, while they
15  were extremely attractive returns, they were
16  inconsistent returns. I mean, that is, sometimes
17  that were higher and sometimes they were lower.
18  I mean -- but they weren't -- they weren't more
19  or less at the same place give or take 1 percent.
20  Q.  With respect to the monies -- the
21  questions on the monies you managed, you wouldn't
22  consider the monies that you managed -- the
23  returns too consistent?
24  A.  No.
25  Q.  So you had ups and downs with

**Page 214**

1
2  respect to those investments?
3  A.  Over a year, we never had a losing
4  year, but during the year, we could be down
5  10 percent at some point from top to bottom.
6  Q.  Were you down in '08?
7  A.  No, it was flat in '08.
8  Q.  And let me ask you again,
9  Mr. Mennitt sort of elicited some testimony about
10  a conversation with Mr. Merkin.
11     And did any conversation with
12  Mr. Merkin ever alleviate your concerns about
13  Mr. Madoff?
14  A.  No.
15     MR. GUGLIELMO: I have no further
16  questions.
17     MS. PEERCE: Can I ask a clarifying
18  question, because the testimony earlier
19  where he talked about having consistent
20  returns was testimony when he was managing
21  money for other people, and then you jumped
22  to '08.
23     MR. GUGLIELMO: He also talked about
24  his own money.
25     MS. PEERCE: So I just want to -- a

**Page 215**

1
2  couple of things.
3  EXAMINATION
4  BY MS. PEERCE:
5  Q.  The money that you're currently
6  managing is for you and your immediate family;
7  correct?
8     THE WITNESS: Yes.
9     MS. PEERCE: Thank you.
10     MR. GUGLIELMO: No further
11  questions.
12     Thank you for your time.
13     THE VIDEOGRAPHER: That concludes
14  the deposition. The time is 5:06. We're
15  off the record.

**Page 216**

1
2  STATE OF NEW YORK  )
3                     ss:
4  COUNTY OF WESTCHESTER )
5
6
7  I, VICTOR TEICHER, the witness herein,
8  having read the foregoing testimony of the pages
9  of this deposition, do hereby certify it to be a
10  true and correct transcript, subject to the
11  correction, if any, shown on the attached page..
12
13              oOo
14
15
16
17  _____
18         VICTOR TEICHER
19
20
21  Subscribed and sworn before me
22  this _____ day of _____, 2009..
23  _____
24
25

Ariel Fund/NYU          None          Page 213 - 216

CONFIDENTIAL                                      BS00005008

Teicher, Victor 2/9/2009 12:00:00 PM

217

```
 1
 2  February 9, 2009
 3          INDEX
 4  WITNESS      EXAMINATION BY      PAGE
 5
    VICTOR TEICHER
 6
         MR. GUGLIELMO       5
 7       MR. MENNITT       204
         MR. SANDICK       210
 8       MR. GUGLIELMO     212
         MS. PEERCE        215
 9
10            EXHIBITS
11  TEICHER                  PAGE
12
13  Exhibit 1  E-mail dated 12/11/08, 11:38   76
14      p.m., from Teicher to Merkin
15  Exhibit 2  E-mail dated 12/13/08, 13:03   76
16      a.m., from Teicher to Merkin
17  Exhibit 3  E-mail dated 12/13/08, 9:47 a.m., 76
18      from Teicher to Merkin
19  Exhibit 4  No Bates numbers, Letter authored  78
20      by Vos and Walthour to Clients
21      and Friends
22  Exhibit 5  Bates No. GCC0020875, E-mail   151
23      dated 12/13/08 from Teicher to
24      Autera
25
```

218

```
 1
 2  (Continued)
 3          EXHIBITS
 4
 5  Exhibit 6  Initial Decision Release No. 61,  173
 6      Administrative Proceeding File
 7      No. 3-8394
 8  Exhibit 7  The opinion of the commission, In 176
 9      Re the matter of Victor Teicher;
10      Victor Teicher & Co., LP; Ross S.
11      Frankel
12  Exhibit 8  United States of America before  177
13      the Securities and Exchange
14      Commission, Administrative
15      Procedure File No. 3-8394 in the
16      matter of Victor Teicher
17      document, dated 11/5/07
18  Exhibit 9  United States Securities and    178
19      Exchange Commission in the matter
20      of Victor Teicher, Administrative
21      Procedure File 3-8394 document,
22      dated 10/15/08
23  Exhibit 10 Schedule A of itemized receipts  180
24      for the New Republican Majority
25      Fund
```

219

```
 1
 2  (Continued)
 3          EXHIBITS
 4
 5  Exhibit 11  Bates Nos. GCC0013150 through 65, 197
 6      Document entitled, TE36ELocal
```

220

```
 1
 2              ERRATA SHEET
                VERITEXT/NEW YORK REPORTING, INC.
 3              1-800-727-6396
 4  200 OLD COUNTRY ROAD      1350 BROADWAY
    MINEOLA, NEW YORK 11501  NEW YORK, NEW YORK 10018
 5
 6  NAME OF CASE:    NYU VS. ARIEL
    DATE OF DEPOSITION: FEBRUARY 9, 2009
 7  NAME OF DEPONENT:  VICTOR TEICHER
 8
 9  PAGE LINE(S)  CHANGE        REASON
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20          _____
21              VICTOR TEICHER
22  Subscribed and sworn to before me
23  this _____ day of _____, 2009.
24
25  _____    _____
```

Ariel Fund/NYU                None                Page 217 - 220