# **EXHIBIT 62**

# GABRIEL CAPITAL GROUP

450 Park Avenue
New York, NY 10022
TELEPHONE 212 838-7200
FACSIMILE 212 838-9603

## CYCLES: ASSET CLASSES AND SCAMS

**NextWave Redux or Redo?**

When last we wrote you, we awaited a decision from the Supreme Court: whether to hear the FCC's challenge to a D.C. Circuit decision in favor of NextWave and its entitlement to wireless spectrum. Senator Ernest ("Fritz") Hollings had just scotched congressional approval of a proposed settlement of NextWave's dispute with the government. If Murphy's Law teaches that everything that can go wrong will go wrong, NextWave had hit the trifecta: setbacks in the executive (the Federal Communications Commission), judicial (various courts), and legislative (Congress) branches of government.

The judicial news took a turn for the worse on March 4, when the Supreme Court announced that it would, indeed, take up the FCC's appeal. The long and winding road is to wend some more. NextWave stock, which had crested at $12.50 last November and closed the year at $8.00, promptly fell to less than $3.00. Considering that NextWave was our biggest position and that we had been long and (pending a decision on the merits from the Supreme Court) wrong, we consider ourselves fortunate that our P&L treaded water during the first quarter of 2002. In part, that is the result of good risk control and portfolio management. After the D.C. Circuit ruled in NextWave's favor and the parties agreed to settle the dispute (an agreement later to be undone by Hollings), we unloaded 40% of our position at favorable prices, so as to avoid placing too many eggs in a wireless basket. We may yet get good news from the Supreme Court in the first half of 2003, which is why we believe that NextWave's valuation may be discounted too heavily, provided that the spectrum in dispute holds its value for a longer period of time than initially required. Notwithstanding our enthusiasm for NextWave's legal arguments, we cannot disregard the non-trivial possibility that five people wearing black robes will disagree with us, thereby sending the stock to levels approaching zero.

Late in the quarter, the passing of the comedian and television pioneer Milton Berle, at age 93, merited a *New York Times* obituary that exceeded a full page. The tribute concluded with the story of Berle, on his 88th birthday, answering an inquiry about how he felt: "I feel like a 20-year-old, but unfortunately there's never one around." For the second consecutive quarter, thanks to NextWave, we understand the sentiment. As recently as the end of last November, we felt like a strong quarter, but the failure of Congress to approve the settlement assured that there was not one to be found. The same thing happened in this quarter when the Supreme Court took the case and sent NextWave plummeting again.

Confidential                                                                                               GCC-P 0183728

**The Cycles Within Alternative Investing**

It is apparent that our corner of the investment world is moving through the third of a series of cycles. The first cycle focused on merger arbitrage, the second — shorter, smaller, and much less noticed — on high-yield paper, and the third on distressed credits. The cycles are complementary: first comes the party (a huge liquidity-driven economic expansion that created a boom in deals, succeeded by a rally in high-yield paper), then the cleanup (the distressed cycle).

From the fourth quarter of 1998 through the end of 2000, the accent was on arbitrage, where the byword could have been *laissez les bon temps rouler*. The twin shocks of Long-Term Capital Management and the Russian crisis had caused a withdrawal by the Street from the market. The Fed kept on easing and easing, the stock market enjoyed a major rally, and deal-making got into full swing. There was still a shortage of capital in the field, however, leaving robust spreads for those who were ready and able to play. We saw annualized spreads of 30%, and some deals that offered similar payoffs for a quarter, a month, or even a week. The deals closed, and investors who had the capital to underwrite mergers did very well. Not surprisingly, capital rushed into the sector, with new firms raising billions of dollars for arbitrage, just as deal flow was drying up.

By late 2000, the influx of capital and dearth of deals had crushed spreads in arbitrage, and the market moved into the smaller, less heralded second cycle, as a significant rally in high-yield instruments commenced. Managers who were smart, lucky, or liquid (which generally meant brand-new funds) enough to buy performing bonds at discounted prices — i.e., putative bankruptcies that did not go bankrupt — enjoyed handsome yields *and* capital gains. The rally in high-yield, which ran through the first quarter of 2002, left the paper more fully priced; if we owned a lot of it, which we do not, we would be sorely tempted to sell it now.

This brings us to the distressed cycle. With attractive high-yield opportunities now limited, it is, more than ever, time to engage in classic bankruptcy analysis (a marriage of legal and financial scrutinies) early in the process, and be prepared to underwrite reorganizations for a year or more. Contrary to what you may read in the newspapers, the economy remains weak, and there are many troubled companies. This gives us a wealth of ideas to consider, and the prospect of a real economic rally a year hence can help those ideas metamorphose into pleasing returns. Distressed opportunities continue to pour in faster than capital and we find ourselves at a potentially fruitful juncture. The influx of capital (abetted by our non-gargantuan size) suffices to enable us to trade positions, whereas past dearths of capital have required us to either hold to maturity or accept drastic markdowns to achieve liquidity. But we are still early in the cycle: the sector has not become so flooded with capital as to compress margins, and this is why we like our area as much as we do. The only thing needed is patience.

**How Much Beta Sneaked Into the Alpha?**

Given this view of the state of alternative investing's cycles, what should our goals be? One of the preeminent money managers in the world of alternative investing, Elliott Associates, has just celebrated its silver anniversary. Management justifiably takes pride not only in

2

surviving for twenty-five years, an achievement in itself, but in posting annualized returns of 14.4% over that period. All along, Elliott had told its investors that they were minimizing their correlation with the broad market and trying to earn returns from a portfolio of lesser-correlated ideas. Is it entirely a coincidence, however, that the annualized return for the S&P 500, over the same twenty-five years, was 14.1%? Looking backwards, even recognizing that Elliott was not remotely an index fund, one gets the sense that, for this and other alpha-maximizers and beta-minimizers, the results were not totally insulated from activity in the broad market. We have experienced an era of asset inflation, which has been more than agreeable for those who have assets. For those of us who do not see stock market returns of 14.1% on the horizon, the question is what may be expected from the haven of alternative investing in the coming years of an unexciting equities market.

The Nineties and their outsized returns are over. Alternative investment strategies are not likely to yield the returns that we saw in the past decade; neither are hedge funds in general. We like distressed investing these days because, unlike other forms of alternative investing (e.g., merger arbitrage, statistical arbitrage, convertible arbitrage), this asset class currently enjoys a very large disparity between available ideas and capital chasing them. Given where we think this incongruity allows us to set up positions, we believe that it is reasonable to hope that the next two or three years will produce, net of fees, low double-digit returns: not the worst row of daisies to mow down, particularly on a risk-adjusted basis. Of course, the disparity between sellers and buyers in distressed investing will not last forever, at which point the asset class will become less attractive. We do not pretend to know whence will come Wall Street's next row of daisies. Nevertheless, Elliott's longevity and success teaches that, between protracted periods of under-performance, the daisies keep popping up.

**Captain Renault Lives**

Many investors have asked us about the momentous collapse of Enron and what it may mean to us. Apart from Enron's potential as a distressed investment, there is much to be learned from its story for business in general and money management in particular. Enron teaches a familiar but timely lesson: *An exceptional run of superior performance in virtually any business is almost impossible to perpetuate*. This is true in our world of alternative investing, as it moves through its three cycles, and it is also true for an energy/transportation/trading colossus. Competition turns almost every enterprise into a commodity business. The pioneer's advantage fritters away as transparency expands: new players figure out what the first mover is doing and decide that they want a piece of the action. Spreads contract, margins shrink, and knowledge heretofore seen as "proprietary" becomes the stuff of business school cases. Profits begin to stall, then fall, and eventually evaporate. The first movers try to protect their market share — which they have come to consider an entitlement — by taking bigger risks, leveraging up (eventually, off the books), and even giving the arithmetic a bit of a nudge. It all ends in tears, as in the cases of Drexel Burnham Lambert in the Milken era, or the great commodity traders of the Eighties, or Long-Term Capital Management, or Lipper & Company, or, most spectacularly, Enron. Every time, the investing world, à la Charlie Brown lying flat on his back after Lucy has yanked away the football, asks: "How could this happen *again*?" Everyone is Captain Renault, shocked — *shocked* — to learn that there was gambling going on at the casino. The pain is more acute

Confidential                                                                                                                                          GCC-P 0183730

because it was only yesterday that investors could have cashed in their chips and heard three of the most beautiful words in the English language: "Your winnings, sir."

And thus Kenneth Lay, late of the late, lamented Enron, found himself invoking his Fifth Amendment privilege against self-incrimination before the Senate Commerce Committee and its chairman, our old nemesis Ernest Hollings. Hollings could not resist this *cri de coeuer* on behalf of ethics and morality: "There's no better example than Kenny Boy of cash-and-carry government." When a helpful reporter reminded Hollings that he, too, had accepted money from Enron, the Senator explained the facts of life, Washington style: "I got $3,500 over ten years, but our friend, Kay Bailey Hutchison, she got $99,000. Heck, I'm the chairman of the committee. That wasn't a contribution. That was an insult." No worse insult, we would argue, than Senator Fritz's to the American taxpayer vis-à-vis NextWave, but, as we have recounted, that is another story.

The contumely heaped on Lay may have been overdone, but Enron illustrates a disease to which all too many hedge fund investors have become susceptible. An ever-rising stock price (or NAV) attracts new investors, who will be satisfied only by — you guessed it — an ever-rising stock price (or NAV). A CEO (or money manager) can try to accommodate old and new investors for a time, but eventually he must disappoint them, as proprietary advantages become commoditized. There is a path of greater responsibility, however, which was stated persuasively by Scott McNealy of Sun Microsystems in an April 1 interview in *Business Week*. In a tour de force that serves as a virtual primer for a final examination in a securities analysis course, McNealy reminisced about his stock's high-flying days:

> [T]wo years ago we were selling at 10 times revenues when we were at $64. At 10 times revenues, to give you a 10-year payback, I have to pay you 100% of revenues for 10 straight years in dividends. That assumes I can get that by my shareholders. That assumes I have zero cost of goods sold, which is very hard for a computer company. That assumes zero expenses, which is really hard with 39,000 employees. That assumes I pay no taxes, which is very hard. And that assumes you pay no taxes on your dividends, which is kind of illegal. And that assumes with zero R&D for the next 10 years, I can maintain the current revenue run rate. Now, having done that, would any of you like to buy my stock at $64? Do you realize how ridiculous those basic assumptions are? You don't need any transparency. You don't need any footnotes. What were you thinking?

A lesson of Enron's implosion is that the pressure for constant performance — weekly, monthly, quarterly, annually — can lead to short-sighted, even disastrous, decisions by management, and that bull-market investors, intoxicated by greed and dulled to fear, will go along. This tendency cannot be legislated out of existence, but that is not to say it goes unpunished. As McNealy sees it: "In general, the system is working. Enron is Darwinian toast. It's gone. The system works. You are a crook, your company is gone. Andersen is facing the Darwinian music big-time also…." We think it no coincidence that the zenith of Enron-mania coincided with the zenith of hedge fund performance mania. In both instances, a structure that was designed to align the interests of managers and investors became stunted by the excesses of a bull market and operated perversely to create a conflict rather than an alignment of interest.

Confidential                                                                                                                  GCC-P 0183731

Seventy years ago, another Berle — A.A., not Milton — defined this tension between investors and managers as the "agency problem." In the corporate world, the culprit was the culture of stock options. The theory is that managers should get rich when shareholders do. The problem is that options focus attention on short- rather than long-term performance and on the performance of the *stock* rather than the health of the *company*. The combination of ubiquitous stock options, a stock market bubble, and lavish compensation packages encouraged short-term fixes and creative, not to say fraudulent, accounting. (Leo Bloom, meet Andrew Fastow.) Managers got rich by massaging the numbers and then selling stock before the Captain Renault moment. In the world of hedge funds, incentive fees enrich managers when investors do well. The danger here is that managers will take undue risk: they get to keep their large fees regardless of the likelihood that turbo-charged investment strategies will later come to ruin.

No one is immune. Enron, together with related perpetrators/victims such as Arthur Andersen and the cream of the Texas bar, is a poster child for the damage caused by the pressure to make quarterly numbers. Bull markets engender greed and gullibility; thereafter, disillusionment and suspicion walk hand-in-hand. Our job, as we understand it, is to keep our guard up at all times. In reviewing the impressive meltdowns of the past few years, we can think of no credo more apt than Lily Tomlin's observation: "No matter how cynical you get, it's impossible to keep up."

J. Ezra Merkin
April 2002

Confidential                                                                                                    GCC-P 0183732