# **EXHIBIT 75**

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x
In Re:

BERNARD L. MADOFF INVESTMENT         Adv.Pro.No.
SECURITIES LLC,                      08-01789(BRL)

       Debtor.
-----------------------------------x
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,

       Plaintiff,              Adv.Pro.No.
                                     09-1182(BRL)
       v.

J. EZRA MERKIN, GABRIEL CAPITAL,
L.P., ARIEL FUND LTD., ASCOT
PARTNERS, L.P., GABRIEL CAPITAL
CORPORATION,

       Defendants.
-----------------------------------x

      \*   \*   \*

VIDEOTAPED DEPOSITION

OF PAUL K. MEYER

      \*   \*   \*

TRANSCRIPT of testimony as reported by NANCY C. BENDISH, Certified Court Reporter, RMR, CRR, and Notary Public of the State of New York, at the offices of Baker Hostetler, 45 Rockefeller Plaza, New York, New York, on Friday, July 10, 2015, commencing at 10:03 a.m.

 1   the two major issues.  First it was just to
 2   address the issue of initial transfers and sort
 3   of looking at how that was laid out and
 4   documented, explained by Ms. Collura.  So Ms.
 5   Knox and Mr. Lietsch worked with me very
 6   carefully on that.
 7              Then we turned to looking at her
 8   Exhibit 12 and then how she executed on the five
 9   tracing methodologies that she's used in her
10   report.  So we worked together going through a
11   lot of that detail.
12              Then once we did that, we began
13   writing our report.
14        Q.    Did you or your team find any
15   errors in Exhibit 12?
16        A.    If you're asking about the
17   allocations themselves, sort of the process of
18   the allocations, I've raised no issues with the
19   actual calculations.  I have issues about what
20   methodologies I believe are most appropriate for
21   the tracing of the subsequent transfers, but as
22   it relates to the actual calculations in Exhibit
23   12, I have no issues with that.
24        Q.    And did your team -- did you or
25   your team check to see if the amounts listed in

1   think I should be considering.
2         Q.    And to be clear, you're not
3   offering an opinion that the calculations that
4   Ms. Collura made under the LIBR or Restated LIBR
5   methodologies are incorrect in any way?
6         A.    I haven't challenged the
7   calculations per se.  I described a moment ago
8   the Restated LIBR.  It's sort of easy to
9   describe because it basically says if a
10  withdrawal goes out and there's Madoff funds at
11  Ascot Partners, then you associate that
12  withdrawal to a defendant fund with the Madoff
13  money, so it sort of like maximizes that.  And I
14  don't -- I don't believe it's an appropriate
15  methodology from the standpoint of how things
16  were managed, but I've already given opinions
17  about that.
18              The LIBR uses a tracing
19  methodology in these circumstances.  It's a
20  little nuance because it doesn't really fit per
21  se.  It's -- we're now talking about subsequent
22  transfers.  So basically when Ms. Collura does
23  that, when Madoff money comes into Ascot
24  Partners and then there's like the next
25  withdrawal, she basically says let's always pay

1    the next withdrawal out of non-Madoff monies,
2    which is sort of -- it's sort of an interesting
3    thing because if there's a lot of non-Madoff
4    monies that are available and there's lots of
5    withdrawals, that's the association.  So it sort
6    of works almost like counter-intuitively to what
7    she said out to do.
8                 So even though I don't take
9    challenge with the numbers, and I'm not going to
10   say this at a hearing or a trial, it sort of
11   doesn't really fit the circumstance for use with
12   subsequent transfers, but I've not made that
13   point in my report and I'm not gonna make that
14   point later, but if you actually follow the
15   logic of the actual calculations they're a
16   little awkward for a subsequent transfer tracing
17   methodology.
18                 With that said, you know my
19   opinions and I'm not going to venture to say
20   that at trial unless something came up where she
21   said something differently and I was asked by
22   counsel for Ascot Partners and Ascot Funds to
23   jump into that because something else came out
24   of Ms. Collura's opinion.
25        Q.    In your opinion that

```
 1    which is the lengthy document that's omitted.
 2         Q.     And did you and your team confirm
 3    the calculations under each of these five
 4    methods?
 5         A.     Yes, I believe earlier today I
 6    said that we went through her Exhibit 12 and
 7    looked at her methodology, Ms. Collura's, and
 8    did not take issue with her calculations on
 9    Exhibit 12, which basically roll into Exhibit
10    13.1 through 13.4, which then are summarized on
11    Exhibit 13 of her report.
12         Q.     In the previous paragraph,
13    paragraph 20, the last sentence there, you state
14    that, "Ms. Collura assumed the withdrawals by
15    Ariel and Gabriel from their respective BLMIS
16    accounts were used to fund negative bank account
17    balances that existed at the time of the
18    withdrawal."  Do you see that?
19         A.     Yes.
20         Q.     Do you agree with that assumption?
21         A.     Yes, I felt that made sense in
22    those circumstances.
23         Q.     And are you aware that Ms.
24    Collura's assumed, for the purposes of ordering
25    the transactions in her exhibits, that the
```

1  understand -- and I can't explain this in detail
2  and defer to Ascot Partners' management -- I
3  believe some fees are also paid potentially when
4  some investors withdraw.
5              So, I'm just sort of throwing this
6  out because that's my understanding.  And that
7  would explain why you'd have some maybe in the
8  non-year-end break periods.  That's my general
9  understanding, but I would defer to Ascot
10 Partners' management to describe that.
11     Q.     Can you turn back to your
12 attachment 4.  Other than from BLMIS, what is
13 your understanding of the sources of the funds
14 that Ascot used to pay redemptions and
15 management fees?
16     A.     I think we've had this discussion.
17 It's from the new investors and so those monies
18 would be coming in and those monies would be
19 sources and you can -- it's how you want to
20 visualize the funds.  The funds come in from the
21 new investors, they can be invested up at
22 Madoff, and then you pull down a large amount
23 from Madoff or you just take those monies when
24 they come in and use those to meet the current
25 withdrawal needs.

```
 1              It's a flow issue which we could
 2   all visualize, but to be efficient I could see
 3   why they would just take those monies and make
 4   them part of paying the current, because the
 5   money, it's fungible, it's commingled.
 6        Q.    So money would all flow into Ascot
 7   Partners' Morgan Stanley account?
 8        A.    Yes.
 9        Q.    And one of the sources of those
10   funds was from BLMIS?
11        A.    Yes.
12        Q.    Another source of those funds was
13   from investors subscribing into Ascot Partners?
14        A.    Agreed.
15        Q.    There was another source of funds
16   being transfers from Gabriel and Ariel's Morgan
17   Stanley accounts, correct?
18              MS. ARCHER:  Object to the form.
19        A.    That would happen once in a while,
20   but when that happened I understand that they
21   then adjusted at Madoff those balances so that
22   the inner fund balances were kept aligned, is my
23   understanding.
24        Q.    And you included certain of those
25   transfers in your attachment 4 from Gabriel and
```

```
 1      A.    I think that's the group.  I think
 2  I say as examples because you probably have this
 3  issue, we talked about just the residual in the
 4  operating account.  But I think ultimately those
 5  monies all come in from these sources.
 6      Q.    These are the primary sources?
 7      A.    I would agree with that.
 8            MR. SONG:  I have no further
 9  questions.
10            MS. ARCHER:  Thanks.
11            THE VIDEOGRAPHER:  This concludes
12  the deposition.  The time is now 5:03 p.m.,
13  going off the record.
14            (Deposition concluded.)
15                    -oOo-
16
17
18
19
20
21
22
23
24
25
```