**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 09-01182 (SMB) |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

## TRUSTEE'S STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL BANKRUPTCY RULE 7056-1

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*, and the estate of Bernard L. Madoff

("Madoff") (collectively, "Debtor"), respectfully submits the following Additional Statement of

Material Facts in support of the Trustee's Memorandum of Law in Opposition to Defendants'

Motions for Summary Judgment Filed by Defendants J. Ezra Merkin ("Merkin") and Gabriel

Capital Corporation ("GCC") (collectively, "Merkin Defendants"), and Ralph C. Dawson, as

Receiver for Ascot Partners, L.P. ("Ascot Partners"), and Ascot Fund Limited ("Ascot Fund,"

collectively the "Ascot Defendants" and together with the Merkin Defendants, "Defendants").

I.    **Merkin is a well-educated, sophisticated, and experienced hedge fund manager.**

1.    Merkin is a graduate of Columbia College and Harvard Law School.  Declaration

of Lan Hoang, dated November 25, 2015 ("Hoang Decl."), Ex. 8 (Merkin Dep.) at 9:13-10:3.

2.    Merkin was associated with the law firm of Milbank, Tweed, Hadley & McCloy

from 1979 to 1982.  Hoang Decl., Ex. 8 (Merkin Dep.) at 11:15-25, 15:12-16; Merkin Defs. Ans.

¶ 40, ECF No. 261.

3.    Merkin was associated with Halcyon Investments from 1982 to 1985 and served

as a Managing Partner of Gotham Capital L.P. from 1985 to 1988.  Hoang Decl. Ex. 8 (Merkin

Dep.) at 15:17-22, 30:19-31:10; Merkin Defs. Ans. ¶ 40, ECF No. 261.

4.    Merkin served as chairman of the board of General Motors Acceptance

Corporation from 2006 to 2009 and resigned as the chairman of the board of General Motors

Acceptance Corporation after the fraud at BLMIS became public.  Merkin Defs. Ans. ¶ 40, ECF

No. 261.

5.    Merkin served on the investment committee of the Ramaz School, Carnegie Hall,

and Yeshiva University.  Merkin Defs. Ans. ¶ 41; Third Amend. Compl. ¶ 41, ECF No. 151.

6.    Merkin served on the board of directors of the Beyeler Foundation and Museum,

Carnegie Hall, Columbia College, the Gruss Foundation, and the Levy Economics Institute of

Bard College. Merkin Defs. Ans. ¶ 41; Third Amend. Compl. ¶ 41, ECF No. 151.

7.    Merkin served as the chairman of the investment committees of Yeshiva University and the UJA Federation of New York. Merkin Defs. Ans. ¶ 41; Third Amend. Compl. ¶ 41, ECF No. 151.

8.    Merkin and Madoff served on the board of directors of Yeshiva University. Hoang Decl. Ex. 8 (Merkin Dep.) at 428:2-17.

## II.    There is no evidence that Merkin did any due diligence prior to his initial personal investments with BLMIS.

9.    Merkin testified that he "first invested with Mr. Madoff and BLMIS through [Leon] Meyers and the Scheuer family's account with Mr. Madoff." Steiner Decl. Ex. 80 (Supplemental Responses) at 3; Hoang Decl. Ex. 55 (Verification).

10.    The Scheuer family office, also known as 61 Associates, managed an investment vehicle known as 61M that invested with Madoff. Hoang Decl. Ex. 8 (Merkin Dep.) at 151:25-152:18, 373:11-15.

11.    Merkin claims that this personal investment occurred as "part of the initial due diligence that preceded any investments on the part of the funds, and was sort of the initial due diligence process." Hoang Decl. Ex. 8 (Merkin Dep.) at 153:8-22.

12.    Merkin has no recollection of whether Leon Meyers ("Meyers") ever told him that Meyers conducted due diligence on BLMIS. Hoang Decl. Ex. 8 (Merkin Dep.) at 374:5-16.

13.    Merkin does not have any documentation of his purported discussions with Meyers. Hoang Decl. Ex. 8 (Merkin Dep.) at 374:17-375:8.

14.    During his initial due diligence, Merkin claims that Meyers sent him a document with "a column of figures, one set of figures being years, meaning annual dates, and the other one being performance," and that he kept the document in his file. Hoang Decl. Ex. 8 (Merkin Dep.) at 370:12-371:19, 374:17-375:8.

15.     Merkin's "Madoff File" contains no documents setting forth BLMIS's purported

investment performance that could have been created prior to opening BLMIS account nos.

1FN004 in the name of Ariel Fund Ltd. and 1A0042 in the name of Ariel Capital on or about

October 1, 1990.  *See* Hoang Decl. Ex. 19 (Trustee 363).  A document identifying "BEMIS"

performance data from 1980 through 1991, and could not have been created before the end of

1991.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393127.

16.     The only document evidencing Merkin's investment with 61 Associates is a

schedule of gains and losses for the period from January 1, 1992 through December 31, 1992.

Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393168-3171.

17.     There is no evidence, other than Merkin's unsubstantiated testimony, that he

conducted any due diligence on BLMIS prior to opening BLMIS account nos. 1FN004 in the

name of Ariel Fund Ltd. and 1A0042 in the name of Ariel Capital on or about October 1, 1990.

### III.     The Merkin Funds'[1] BLMIS Investment History

18.     GCC was incorporated in December 1988 as Ariel Management Corporation

before changing its name to GCC.  Merkin Defs. Ans. ¶ 42, ECF No. 261.  GCC is an investment

advisor and investment management corporation.  *See, e.g.*, Steiner Decl. Ex. 16 (Ariel Fund

Confidential Offering Memorandum, March 2006) at GCC-P 0335720 ("J. Ezra Merkin owns

and manages Gabriel Capital Corporation which serves as the Investment Advisor of the Fund.").

19.     Merkin was GCC's sole shareholder, sole director, and sole decision-maker.

Merkin Defs. Ans. ¶ 43, ECF No. 261; Hoang Decl. Ex. 17 (Merkin Responses and Obj to

NYAG Statement of Undisputed Facts) ¶ 3.

---

[1] Ascot Partners, Ascot Fund, Ariel Fund Limited and Gabriel Capital L.P. are collectively the "Merkin Funds."

20.    Each of the Merkin Funds executed a BLMIS Customer Agreement, an Option

Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and

Options.  Merkin Defs. Ans. ¶ 70, ECF No. 261; Ascot Ans. ¶ 70, ECF No. 260.

**Ariel Fund Ltd. and Gabriel Capital, L.P.**

21.    In 1988, Merkin formed Ariel Fund Limited ("Ariel") in 1988, as a private

investment fund for foreign investors, and as the off-shore pairing to Gabriel Capital L.P.

("Gabriel").  Merkin Defs. Ans. ¶ 47, ECF No. 261; Steiner Decl. Ex. 16 (Ariel Fund

Confidential Offering Memorandum, March 2006) at GCC-P 0335720; Hoang Decl. Ex. 17

(Merkin Responses and Obj to NYAG Statement of Undisputed Facts) ¶ 18; Hoang Decl. Ex. 8

(Merkin Dep.) at 70:3-42; 127:21-128:12; Hoang Decl. Ex. 56 (Merkin testimony-Born

Arbitration) at 941:11-942:9.

22.    In 1989, Merkin formed Ariel Capital, L.P., the predecessor to Gabriel, as a

domestic fund for U.S. investors and was Gabriel's sole general partner and sole decision-maker

through December 2008.  Merkin Defs. Ans. ¶¶ 44-45, ECF No. 261; Hoang Decl. Ex. 57

(Gabriel Confidential Offering Memorandum, March 2006).

23.    Gabriel's and Ariel's offering memoranda state that Merkin, as the general partner

of Gabriel and the owner and manager of Ariel's investment advisor, "has ultimate responsibility

for the management, operations and investment decisions made on behalf of the Fund[s]."

Hoang Decl. Ex. 57 (Gabriel Confidential Offering Memorandum, March 2006) at GCC-SEC

0000875; Steiner Decl. Ex. 16 (Ariel Fund Confidential Offering Memorandum, March 2006) at

GCC-P 0335720.

24.    From at least October 1, 1990 through February 26, 1993, Ariel held BLMIS

account number 1FN004.  Merkin Defs. Ans. ¶ 56, ECF No. 261; Declaration of Matthew B.

Greenblatt, dated November 25, 2015 ("Greenblatt Decl."), Ex. 3 (Greenblatt Expert Report) ¶¶ 8, 21, Ex. 4A.

25.    Throughout its account history, Ariel BLMIS Account 1FN004 had (i) cash deposits; (ii) deductions of principal for payments made by BLMIS to the IRS on the accountholder's behalf; (iii) inter-account transfers received from BLMIS Account 1FN033, held in the name of Shalvah Fund Ltd.; and, (iv) inter-account transfers made to Shalvah Fund BLMIS Account 1FN033, Ariel Capital BLMIS Account 1A0042, and Ascot Fund BLMIS Account 1FN005.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 21, 26-34, Ex. 4A.

26.    On January 4, 1993, Ariel purported to transfer $35,041,794 from Ariel BLMIS Account 1FN004 to Ascot Fund BLMIS Account 1FN005, but only $13,633,109 of principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 33, Ex. 4A.

27.    The last activity in Ariel BLMIS Account 1FN004 occurred on February 26, 1993 when Ariel purported to transfer $13,853 to Ascot Fund BLMIS Account 1FN005, but no principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4A.

28.    From at least October 1, 1990 through February 26, 1993, Ariel Capital L.P., Gabriel's predecessor entity, held BLMIS account number 1A0042.  Merkin Defs. Ans. ¶ 60, ECF No. 261; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 35.

29.    Throughout its account history with BLMIS, Gabriel BLMIS Account 1A0042 had (i) cash deposits; (ii) inter-account transfers received from Ariel Fund 1FN004; and, (iii) inter-account transfers made to Ascot Partners Account 1A0058.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 36, 41-47, Ex. 4K.

30.    On January 4, 1993, Gabriel BLMIS Account 1A0042 purported to transfer $25,759,317 to Ascot Partners BLMIS Account 1A0058, but only $21,543,295 of principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 46, Ex. 4K.

31.    The last activity in the Gabriel BLMIS Account 1A0042 occurred on February 26, 1993 when Gabriel BLMIS Account 1A0042 purported to transfer $14,276 to Ascot Partners BLMIS Account 1A0058, but no principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 47, Ex. 4K.

32.    According to a partial transcript of a conversation purportedly held between Merkin and Madoff on May 1, 2000, Merkin asked Madoff for "two more slots" in order to open new accounts for Ariel and Gabriel.  Hoang Decl. Ex. 19 (Trustee Ex. 363) at GCC-P 0393384-387; Hoang Decl. Ex. 8 (Merkin Dep.) at 449:6-452:6.

33.    Madoff agreed to "accommodate" Merkin because Madoff "had a relationship going back with Ezra many years; he's been a good friend, he's been a very good client." Hoang Decl. Ex. 19 (Trustee Ex. 363) at GCC-P 0393385.

34.    In August 2000, Ariel opened a new BLMIS account, depositing $46 million.  It held BLMIS account number 1FR070 from August 2000 through December 2008.  Merkin Defs. Ans. ¶ 57, ECF No. 261; Third Amend. Compl. ¶ 57, ECF No. 151; Declaration of Lisa M. Collura, dated November 25, 2015 ("Collura Decl."), Ex. 1 (Collura Report) at Ex. 10; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 92, 103.

35.    In August 2000, Gabriel opened a new BLMIS account, depositing $39 million. It held BLMIS account number 1G0321 from August 2000 through December 2008.  Merkin

Defs. Ans. ¶ 61, ECF No. 261; Third Amend. Compl. ¶ 61, ECF No. 151; Collura Decl. Ex. 1

(Collura Report) Ex. 10; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 118, 124.

### Ascot Partners and Ascot Fund

36.     Ascot Fund opened BLMIS account number 1FN005 in January 1992.  Merkin

Defs. Ans. ¶ 64, ECF No. 261; Ascot Ans. ¶ 64, ECF No. 260; Third Amend. Compl. ¶ 64, ECF

No. 151; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 48, Ex. 4O.

37.     Throughout its account history, Ascot Fund BLMIS Account 1FN005 had (i) cash

deposits; (ii) cash withdrawals; (iii) deductions of principal for payments made by BLMIS to the

IRS on the accountholder's behalf; (iv) inter-account transfers received from BLMIS Accounts

1FN041 (in the name of Claude Dauphin), 1FN016 (in the name of Ebro, N.V.), 1FN042 (in the

name of Willy R. Strothotte), 1FN022 (in the name of Langham Trading Inc.), 1FN039 (in the

name of Dunraven NV), 1FN020 (in the name of Heaton Fund Limited), 1FN030 (in the name of

Sandpiper Fund Ltd II), and 1FN031 (in the name of Sandpiper Fund Limited II #2); and, (v)

inter-account transfers made to Ascot Partners Account 1A0058, Ariel Fund Account 1FR070,

and Gabriel Account 1G0321.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 49, 54-74,

Exs. 4C, 4D, 4E, 4F, 4G, 4H, 4I, 4J, 4O.

38.     During at least 1992, Ariel Management Corporation administered the BLMIS

accounts held by Dunraven, Heaton, Langham Trading Inc., Ebro, N.V., Sandpiper, Willy R.

Strothotte, and Claude Dauphin and charged a 1% investment advisory fee.  Hoang Decl. Ex. 58

(Trustee 365); Hoang Decl. Ex. 59 (Trustee 366); Hoang Decl. Ex. 8 (Merkin Dep.) at 353:18-

354:24.

39.     In December 1992, Merkin sent letters to the holders of certain BLMIS accounts

that Ariel Management Corporation administered, informing them that their respective accounts

at BLMIS would "be liquidated and the proceeds will be used to purchase participating shares of

Ascot Fund Ltd." Hoang Decl. Ex. 58 (Trustee 365); Hoang Decl. Ex. 8 (Merkin Dep.) at

354:25-355:19.

40.     Merkin informed these investors that "[Ascot Fund's] sole asset will be a

managed account at Madoff & Company." Hoang Decl. Ex. 58 (Trustee 365) at BS00306003.

41.     In January and February 1993, Ascot Fund BLMIS Account 1FN005 received

transfers from BLMIS Accounts 1FN004, 1FN039, 1FN042, 1FN022, 1FN031, 1FN030,

1FN020, 1FN041, and 1FN016. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4O.

42.     Ascot Partners opened account number 1A0058 with BLMIS in January 1993.

Merkin Defs. Ans. ¶ 65, ECF No. 261; Ascot Ans. ¶ 65, ECF No. 260; Third Amend. Compl. ¶

65, ECF No. 151; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 75, Ex. 4P.

43.     As general partner of Ascot Partners, Merkin had "ultimate responsibility for the

management, operations and investment decisions made on behalf of the Partnership." *See*

Steiner Decl. Ex. 15 at i, 1 (Confidential Offering Memorandum of Ascot Partners, L.P.).

44.     Throughout its account history, Ascot Partners BLMIS Account 1A0058 had (i)

cash deposits; (ii) cash withdrawals; (iii) inter-account transfers received from Gabriel BLMIS

Account 1A0042, BLMIS Account 1H0037 (in the name of Richard L. Hirsch), 1B0079 (in the

name of Eric Bruell Trust), 1W0041 (in the name of Manny H. Weiss); and, (iv) inter-account

transfers made to Ascot Fund Account 1FN005, Ariel Fund Account 1FR070, and Gabriel

Account 1G0321. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 76, 81-93, Exs. 4L, 4M,

4N, 4P.

45.     During at least 1992, Ariel Management Corporation administered the BLMIS

accounts held by Eric Bruell Trust, Richard L. Hirsch, and Manny Weiss and charged a 1%

investment advisory fee.  Hoang Decl. Ex. 59 (Trustee 366) at BS00305721; Hoang Decl. Ex. 8 (Merkin Dep.) at 347:9-349:15.

46.      In December 1992, Merkin sent letters to additional holders of certain BLMIS accounts that Ariel Management Corporation administered, informing them that their respective accounts at BLMIS would "be liquidated and the proceeds will be used to purchase participating shares of Ascot Fund Ltd."  Hoang Decl. Ex. 59 (Trustee 366) at BS00305722; Hoang Decl. Ex. 8 (Merkin Dep.) at 347:9-349:15, 359:16-361:8.

47.      Merkin informed these investors that "[Ascot Partners'] sole asset will be a managed account at Madoff & Company."  Hoang Decl. Ex. 59 (Trustee 366) at BS00305722.

48.      In January and February 1993, Ascot Partners received transfers from BLMIS accounts 1B0079, 1W0041, 1H0037, and 1A0042 to its BLMIS account number 1A0058.  Merkin Ans. ¶ 65; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4P.

49.      On January 8, 2003, Ascot Fund purported to transfer $551,296,800 to Ascot Partners BLMIS Account 1A0058, but only $221,487,622 of principal was available to be transferred.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 70, Ex. 4O.

50.      The Merkin Funds maintained the following percentages of their capital with BLMIS at year end:

| Year | Gabriel | Ariel | Ascot Partners | Ascot Fund |
|------|---------|-------|----------------|------------|
| 1990 | 24.01% | 23.43% | N/A | N/A |
| 1991 | 13.17% | 23.43% | N/A | N/A |
| 1992 | 21.34% | 21.83% | N/A | 101.08% |
| 1993 | N/A | N/A | 98.04% | 100.58% |
| 1994 | N/A | N/A | 99.87% | 101.01% |
| 1995 | N/A | N/A | 100.85% | 100.85% |
| 1996 | N/A | N/A | 91.62% | 94.70% |

| Year | Gabriel | Ariel | Ascot Partners | Ascot Fund |
|------|---------|-------|----------------|------------|
| 1997 | N/A | N/A | 88.03% | 74.43% |
| 1998 | N/A | N/A | 91.03% | 83.11% |
| 1999 | N/A | N/A | 97.55% | 97.85% |
| 2000 | 7.13% | 7.96% | 100.04% | 100.25% |
| 2001 | 21.35% | 21.15% | 100.94% | 101.00% |
| 2002 | 30.32% | 29.18% | 100.01% | 100.94% |
| 2003 | 23.45% | 22.19% | 100.03% | N/A |
| 2004 | 19.54% | 20.86% | 94.39% | N/A |
| 2005 | 16.24% | 16.24% | 99.22% | N/A |
| 2006 | 23.76% | 23.53% | 99.36% | N/A |
| 2007 | 24.04% | 24.42% | 91.27% | N/A |

Hoang Decl. Ex. 16 (Madoff Investment History); Hoang Decl. Ex. 17 (Merkin Responses and

Obj to NYAG Statement of Undisputed Facts) ¶¶ 37, 39.

**IV.  Merkin had a duty to perform due diligence consistent with industry customs and practices.**

51.  "Merkin was a Fund Manager, a type of investment advisor in the investment

management industry."  Declaration of Dr. Steve Pomerantz, dated November 25, 2015

("Pomerantz Decl."), Ex. 1 (Pomerantz Expert Report) ¶ 43.

52.  "Due diligence is a process whereby a Fund Manager initially investigates an

investment to assess the attractiveness of an opportunity, the quality of the management team,

the key risks associated with the opportunity, and continues to evaluate and monitor the

investment on an ongoing basis."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 49.

53.  The due diligence process (both before and after an investment is made) is

designed to identify red flags as early as possible.  A red flag is information "that raises doubt or

concern regarding an investment opportunity and can include: (i) any impossibilities where the

only reasonable explanation is fraud; (ii) any indications that the advisor is not executing the

strategy; (iii) any indicia of fraud or changes to the risk profile of the invested assets; (iv) any

inconsistencies with the stated strategy; (v) any potential changes in the advisor and/or his

organization, investment process, or philosophy; (vi) any situations that created an opportunity

for fraud; and (vii) any inconsistencies with industry customs and practices."  Pomerantz Decl.

Ex. 1 (Pomerantz Expert Report) ¶ 51; Pomerantz Decl. ¶ 6.

54.    As far back as 1997, fund managers and hedge funds performed analyses to

understand the source of returns of a particular investment as part of due diligence in accordance

with recognized customs and practices of the investment management industry.  Pomerantz Decl.

Ex. 1 (Pomerantz Expert Report) ¶¶ 34, 35; Hoang Decl. Ex. 32 (Pomerantz Dep.) at 204:7-24.

55.    Initial due diligence is performed before an investment is made.  Pomerantz Decl.

Ex. 1 (Pomerantz Expert Report) ¶ 64; Hoang Decl. Ex. 8 (Merkin Dep.) at 141:6-9.

56.    "Initial due diligence often relies on initial interviews with investment advisor

staff, historical monthly returns, a description of the strategy, and any other information that can

be collected prior to investing."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 65.

57.    Ongoing or monitoring due diligence is necessary to evaluate whether the

performance is consistent with the stated strategy and investment advisor's representations.  Due

diligence independently verifies what an investment advisor has told a Fund Manager.

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 66.

58.    When initial due diligence results in a significant red flag where the only

reasonable explanation is fraud, a fund manager would typically stop the due diligence process

and not invest.  Similarly, if a significant red flag is revealed during ongoing/monitoring due

diligence, a fund manager would typically redeem their investments and find an alternative

investment opportunity.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 72.

59.    "When a red flag is an indicia of fraud or creates an opportunity for fraud, it is industry custom and practice for the Fund Manager to perform additional due diligence." Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 73.

60.    "Additionally, it is industry custom and practice to perform additional due diligence when red flags are uncovered that indicate the advisor is not executing or is operating inconsistently with the stated strategy." "[I]f an investor finds … that their returns are different from what is expected based on a certain strategy, additional due diligence should be performed." Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 74.

61.    A comprehensive framework for conducting due diligence centers around the "Five Ps," where each P relates to a particular element of due diligence: Process, Portfolio, People, Performance, and Price. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 97.

62.    "Due diligence consistent with industry customs and practices would have revealed numerous red flags relating to the Merkin BLMIS Accounts." Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 98-374.

63.    Both qualitative and quantitative analyses are conducted to confirm the legitimacy of an investment and to eliminate fraud concerns. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 88, 236.

64.    Merkin's quarterly newsletter to his clients said that "[o]ur first objective, therefore is to control risk," and while "[i]nvestors often look up, enchanted by upside and profits, but that works only if their managers spend time and money looking down." Hoang Decl. Ex. 60 (January 1994 Newsletter from Merkin to Investors) at GCC-P 0470411; Hoang Decl. Ex. 61 (April 1995 Newsletter from Merkin to Investors) at BS00043059.

65.    Merkin also told his clients that "an exceptional run of superior performance in virtually any business is almost impossible to perpetuate . . . [and] our job, as we understand it, is to keep our guard up at all times."  Hoang Decl. Ex. 62 (April 2002 Newsletter from Merkin to Investors) at GCC-P 0183730, 32.

## V.    The returns for the Merkin BLMIS Accounts were remarkably consistent, did not correlate to the S&P, and were inconsistent with the SSC strategy.

66.    As reflected on the Merkin Funds' BLMIS customer statements through 1991, the initial version of the Madoff split-strike conversion strategy consisted of purportedly buying a stock, buying a put option on that stock, and selling a call option on that stock.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 105.

67.    Beginning in 1991, Madoff purportedly began to implement the strategy using a basket of stocks in the S&P 100 Index, selling call options on the Index, and buying put options on the S&P 100 Index ("Madoff SSC strategy").  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 110.

68.    According to the Trading Authorization Directive, the basket would be "correlated" with the S&P 100 Index by at least 95%, meaning that the value of his subset of stocks moved in a manner similar to the S&P 100 Index.  Steiner Decl. Ex. 38 (November 2002 Trading Authorization Directive for Ascot Partners, LP) at GCC-P 0366167.

69.    Merkin confirmed that this was his understanding of the strategy.  He stated: "The evolution over time was, I think, one very specific change and that is rather do individual stocks with their own options contracts, meaning the puts beneath and the calls above, the strategy evolved toward what Mr. Madoff called baskets, meaning that a larger and larger number of stocks, of components in the basket, the qualifying characteristic of each and every

one of them being they were all part of the S&P 100." Hoang Decl. Ex. 63 (Merkin Dep. dated

Jan. 30, 2009 in *In the Matter of Madoff Charities  Investigation*) at 13:5-14:10.

70.     As early as May 23, 1995, Merkin understood that Madoff's purported strategy

had moved from baskets of 15 to 21 stocks to baskets of 35.  Hoang Decl. Ex. 19 (Trustee 363)

at GCC-P 0393211.

71.     The Madoff SSC strategy should have produced returns that were correlated (*i.e.*,

related from a statistical perspective) to the returns of the underlying stock or the S&P 100

Index.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 112.

72.     Because of the collar, any gains generated by the strategy should not have been as

big as the largest gains and any losses should not have been as big as the largest loss in the

underlying stock or the S&P 100 Index.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶

113.

73.     However, by at least February 1996, Merkin knew that BLMIS's performance

was "to a large degree independent of the gyrations of the S&P 500."  Hoang Decl. Ex. 19

(Trustee 363) at GCC-P 0393226; Hoang Decl. Ex. 8 (Merkin Dep.) at 286:2-24, 289:24-290:18.

74.     A document, titled "Comparing Promeo [sic] Manager Series B and the S&P 500"

found in Merkin's files, plots the monthly returns of the S&P 500 Index against Primeo Manager

Series B's [a Madoff Feeder fund] monthly return from July 1989 through December 1995,

showing that BLMIS generated positive returns regardless of the corresponding returns in the

market.[2]  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393226 ("This summary confirms that

Manager Series B achieves consistent results, whether the S&P 100 trends up or down");

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 201-02.

---

[2] Since the S&P 100 Index is comprised of the larger, more stable companies included in the S&P 500 Index, the
performance of the S&P 100 Index should be highly correlated to the performance of the S&P 500 Index.
Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) Fig. 38.

75.     An analysis of the data in this document revealed that "4% of the change in BLMIS's returns was explained by the change in the S&P 500 Index-implying therefore that the change in the market had little to no impact on BLMIS's returns."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 204.

76.     Even though Madoff's position would have been expected to move with the overall S&P 100 Index when its value was between the put and call strike prices, the returns for the Defendants' BLMIS accounts did not move in the same direction as the S&P 100 Index. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 120.

77.     From December 1991 through November 2008, the Merkin BLMIS Accounts reflected negative return months less than 4% of the time (8 out of 204 months), while the S&P 100 Index incurred losses 40.7% of the time (83 out of 204 months).  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 120.

78.     Because of the pre-determined range defined by the strike prices, it would have been mathematically impossible for anyone implementing Madoff's split-strike conversion strategy to eliminate downside risk.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 121.

79.     As the MAR/Hedge Article pointed out in 2001, "the best known entity using a similar strategy, a publicly traded mutual fund from 1978 called Gateway, has experienced far greater volatility and lower returns [than Madoff] during the same period."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393339.

80.     The Merkin BLMIS Accounts also posted positive returns at times of market stress, including the burst of the "dot-com" bubble, the 2000-2002 bear market, the September 11, 2001 terrorist attacks, the WorldCom bankruptcy, and the 2007 recession.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 300-09.

81.    For example, during the "tech-bubble" burst of April 2000 through March 2001, Merkin's BLMIS accounts purportedly generated returns of 13.3% while the S&P 100 Index lost 27.4%. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 301.

82.    From November 2007 through November 2008, during the financial crisis, the reported returns for Merkin BLMIS accounts were up 11.4%, while the S&P 100 Index fell 40.2%. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 301.

83.    From December 1999 through the end of 2002, the S&P 100 Index fell 43.9% while the Merkin BLMIS Accounts showed returns of over 45%. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 303.

## VI.    Merkin's explanations that Madoff achieved his remarkable results through "market timing" are implausible and inconsistent with the SSC strategy.

84.    Merkin testified that part of the Madoff SSC strategy involved "market timing" or going in and out of the market three to six or four to eight times a year. Hoang Decl. Ex. 8 (Merkin Dep.) at 163:23-165:5.

85.    Merkin testified that Madoff used an "algorithm" or "black box" that "would help [him] get a sense of market movements from the order flow in the wholesale business." Hoang Decl. Ex. 8 (Merkin Dep.) at 165:23-167:13, 562:2-14.

86.    Madoff was purportedly out of the market at the end of each year for the Merkin BLMIS Accounts for fifteen straight years, from 1993 through 2007. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 145-46.

87.    Madoff was also out of the market at the end of each quarter for 25 straight calendar quarters beginning in the third quarter of 2002 and proceeding through the third quarter of 2008. The probability of this occurring is less than one in 5,000,000. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 145 n.162.

88.     There is no rational explanation for Madoff to be out of market on these dates with such consistency, and such an action is inconsistent with the opportunistic nature of the purported Madoff SSC strategy.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 146.

89.     Merkin testified that he "always knew whether we were invested or not, on any given day . . . ."  Hoang Decl. Ex. 8 (Merkin Dep.) at 444:25-446:2.

90.     Merkin also testified that Madoff never told him that it was important to the strategy to exit the market before the end of the calendar quarter.  Hoang Decl. Ex. 8 (Merkin Dep.) at 446:3-6.

91.     Merkin should have investigated the inconsistency between market timing and the execution of the purported strategy.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 146. Due diligence consistent with industry customs and practices would have revealed that the returns were not possible, inconsistent with the SSC strategy, and were significant red flags.  *Id.* §§ VI.D.4, VI.B.2 and VI.B.1.

**VII.    The Merkin BLMIS Accounts reported option trading volume in excess of the total daily volume on the options exchanges.**

92.     From October 1990 through November 2008, the volume of call options purportedly traded for the Merkin BLMIS Accounts was above the daily market volume for the relevant option and trade date 53.7% of the time. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 123.   The number of shares transacted by Madoff greatly exceeded the total share volume transacted on the exchange.   *Id.*  As early as the end of 1993, there had been 21 unique call transactions and 22 unique put transactions purportedly traded across the Merkin BLMIS Accounts that exceeded the total market volume traded for that day.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 359.  By May 2001, the unique call transactions increased to 101 and unique put transactions increased to 66.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶

366.  By September 2005, there were 292 unique call transactions and 232 unique put transactions that exceeded the total market volume traded that day.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 372. In addition, there were 15 instances where BLMIS reported buying or selling call options when no volume traded on that day.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 123.

93.    For the unique transactions of put options, 48.5% had a purported number of contracts above the daily market volume.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 124.  The number of shares transacted for the Merkin BLMIS Accounts greatly exceeded the total share volume transacted in the market.  *Id.*  Further, there were 15 instances where BLMIS reported buying or selling put options when there was no volume traded on that day.  *Id*.

94.    Defendants claim that "BLMIS sent confirmations of every trade supposedly made in the accounts, which were reviewed by GCC employees and input into GCC's portfolio management system ("PMS")."  Steiner Decl. Ex. 80 (Supplemental Responses) at 6.

95.    For the period 2000 through 2008, based on the customer statements reflected that, on average, the Merkin Funds owned more call options than those in existence on the exchange for 116 days out of each year and more put options than those in existence in the market place for 123 days out of each year.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 125.

96.    The trade confirmations for the Merkin BLMIS Accounts reflected a CUSIP number for the S&P 100 Index options, indicating the options were traded on the Chicago Board of Options Exchange as opposed to over-the-counter ("OTC").  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 122 n.134.

97.    Further, the options transactions on the Merkin Funds' BLMIS account statements

could not have traded over-the-counter for numerous reasons, including:

(a)    OTC transactions tend to be in the $5-25 million dollar range, which
would have required 280-1400 transactions to be done across multi-
billions of dollars in assets with theoretically many sophisticated global
counterparties; any larger OTC transactions would have been done only on
a negotiated basis that would require days, weeks, or months to negotiate;

(b)    counterparties to the trades would themselves have had to offset their own
risk, which likely have been done back in the exchange-traded market; if
there was insufficient volume in the exchange-traded market, there would
have been insufficient volume for BLMIS's counterparties in the OTC
market to absorb and then lay off this transferred risk;

(c)    there do not appear to be any written agreements, such as International
Swaps and Derivatives Association agreements, which would have been
necessary to execute these transactions OTC;

(d)    every trade confirmation reviewed for S&P 100 options purportedly traded
in the Merkin Defendants' BLMIS accounts listed the relevant Defendant
Fund as the counterparty, instead of the actual counterparty; it is industry
custom and practice to list the counterparty to an OTC transaction on a
trade confirmation, so that at a minimum the customer can assess the
counterparty risk associated with the trade; and

(e)    if the Merkin Funds had been counterparties to OTC trades, it would have
been typical to post margin; yet no instances were identified where margin
was posted.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 127.

98.    Merkin's notes from an October 2008 meeting with Madoff state that Madoff

"prefer[s]" OTC transactions.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393146-148.

99.    The impossible call and put option volumes were a significant red flag and the

only reasonable explanation was fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 127.

**VIII.    The Merkin Funds' BLMIS customer statements and trade confirmations included over 900 instances where Madoff reported buy and sell equity transactions at prices either above the high stock price for the day or below the low stock price for the day as reported by Bloomberg.**

100.    Between 1990 and 2008, there were 985 transactions, reflecting over 56 million shares, across the Merkin BLMIS Accounts, which reported equity prices traded outside the daily price range.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 130.

101.    Over this same time period, there were also 382 transactions, representing 545,828 options contracts (*i.e*, 54.5 million options shares), that were traded outside the daily price range across the Merkin BLMIS Accounts.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 132.

102.    These impossible transactions were significant red flags and the only reasonable explanation was fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 131, 133.

**IX.    The Merkin Funds' BLMIS customer statements reflected the use of options to speculate on the movements of the market.**

103.    Merkin understood that the Madoff SSC strategy purported to use options to create "fully hedged positions" where "we were long and short the correct amount of options. We weren't open, we weren't - - we didn't take an exposure anywhere."  Hoang Decl. Ex. 8 (Merkin Dep.) at 110:21-113:12.

104.    Yet, the Merkin Funds' BLMIS customer statements reflect that, between January 1, 1992 and November 30, 2008, option transactions on at least 200 separate occasions were used solely to generate a profit and not to hedge any equity transaction as summarized below:

| Time Period | Number of Transactions (Inclusive) | Purported Profit (Inclusive) |
|---|---|---|
| By December 1995 | 56 | $6.7 million |
| By May 2001 | 120 | $20.0 million |
| By August 2005 | 172 | $67.4 million |
| By November 2008 | 200 | $94.2 million |

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 362, 366, 372, Fig. 8.

105.    These speculative option trades generated over $94 million in gains and 6.9% of total dollar return.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 163, Fig. 8.

106.    These speculative option trades were suspicious, inconsistent with the SSC strategy and should have prompted Merkin to conduct performance attribution, reverse engineering and alpha analysis as additional due diligence.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 163.

107.    Due diligence consistent with industry custom and practices would have revealed significant red flags where the only reasonable explanation was fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 163, §§ VI.D.4, VI.B.2, and VI.B.1.

## X.    **Merkin ignored his own concerns that the SSC strategy was not scalable.**

108.    Scalability refers to the concept that as a fund increases its assets under management, it becomes increasingly difficult for that fund to find investment opportunities of a scale proportional to the growing size of the fund.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 152 n.170.

109.    As early as 1999, Merkin expressed concerns to Morris Smith ("Smith"), an Ascot investor, that Ascot was "bumping up against the limits of being able to do the trades profitably," meaning the "thinness of the market as far as being able to execute the option trades related to owning—owning or shorting the stocks underneath."  Hoang Decl. Ex. 48 (Smith Dep.) at 33:8-34:14.  Merkin told Smith that Merkin thought the limit for Ascot's trading strategy in the options market was "about a billion dollars."  *Id.* at 34:15-19.

110.    Merkin recognized that the "God of size comes to visit everybody," meaning that "if you keep growing, growing and growing assets, you will see some impact on performance."

Hoang Decl. Ex. 8 (Merkin Dep.) at 143:4-144:12; Hoang Decl. Ex. 39 (Orchard Dep.) at 118:1-14 (Merkin stating to Orchard and Aozora Bank during a November 2005 meeting that he "believes the Ascot (Partners) strategy will stop working one day" because as "more and more capital is employed to exploit that arbitrage, it eventually goes away.").

111.    By May 2001, Merkin knew that BLMIS had $6-7 billion in assets under management.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393336; Hoang Decl. Ex. 64 (Merkin testimony- Straus arbitration) at 237:16-238:21.

112.    In a conversation with Madoff in January 2002, Merkin stated that "one of the tenets of the investment business, right or wrong, is that there is some basic connection between size and profitability."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393364.

113.    Merkin acknowledged that he had "given up guessing" as to the amount of assets Madoff purportedly had under management and that he concluded that Madoff's business was scalable simply because "in Bernie's case he's been defying gravity for long enough that at some point you could stop caring that much."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393364.

114.    In its SEC Form ADV, BLMIS listed that it had approximately $11.7 billion, $13.2 billion, and $17.0 billion in assets under management in 2006, 2007, and 2008, respectively.  Hoang Decl. Ex. 2 (August 25, 2006 BLMIS Form ADV) at PUBLIC0003736; Hoang Decl. Ex. 3 (January 24, 2007 BLMIS Form ADV) at PUBLIC0003771, Hoang Decl. Ex. 65 at PUBLIC0003840.

115.    Due diligence, consistent with industry custom and practice, would have revealed that it would have been impossible for Madoff, with billions of dollars of assets under management, to implement the SSC strategy because there was simply not enough call option notional value (the number of option shares outstanding times the value of the index at the time)

23

from 2001 and thereafter to support the strategy. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 152-56.

**XI.**    **Other than purported conversations with Madoff, Merkin made no effort to determine how Madoff achieved his purported returns.**

116.    Starting in 2006, BLMIS listed in its SEC Form ADV that it had no more than five employees who performed investment advisory functions. Hoang Decl. Ex. 2 (August 25, 2006 BLMIS Form ADV) at PUBLIC0003734; Hoang Decl. Ex. 3 (January 24, 2007 BLMIS Form ADV) at PUBLIC0003769, Hoang Decl. Ex. 65 at PUBLIC0003839.

117.    BLMIS had a limited number of personnel, who were not capable of developing mathematical algorithms or other related analyses for the "black box." Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 226-27.

118.    Yet, in over 18 years, Merkin never met with anyone at BLMIS other than Madoff. Hoang Decl. Ex. 8 (Merkin Dep.) at 431:8-432:21.

119.    Merkin had never asked to speak with anyone who purportedly operated the algorithm. Hoang Decl. Ex. 8 (Merkin Dep.) at 433:3-434:6.

120.    To the extent that Merkin believed that the success of the SSC strategy was driven by market timing, there is no evidence that Merkin ever attempted to determine whether market timing contributed to the purported returns generated by BLMIS.

121.    Due diligence would have confirmed that, out of the 84 baskets that Madoff purportedly entered into between December 1991 and November 2008, the S&P 100 Index was up only 45 times, or only 54% of the time. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 330, Schedule 71.

122.    Market timing contributed very little (only 4.7%) to the purported returns for the Merkin BLMIS Accounts. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 329.

123.     Similarly, to the extent that Merkin believed that the success of the Madoff SSC strategy was driven by stock selection, there is no evidence that Merkin ever attempted to determine whether stock picking contributed to the purported returns generated by BLMIS.  *See, e.g.*, Steiner Decl. Ex. 11 (Weingarten Expert Report) at 4 ("Mr. Merkin understood that Mr. Madoff had, by virtue of his long experience, the knowledge and ability to take advantage of both market timing and stock selection to improve returns over that which would have been generated by a formulaic putting on of the trades.").

124.     In a comparison of the stocks in each basket in the Merkin BLMIS Accounts from 2000 to 2008 against the returns of the S&P 100 Index over the purported investment period of each basket, the stocks outperformed the S&P 100 Index in only 17 out of the 52 baskets (33%). Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 331, Schedule 72.

125.     Merkin testified that he believed that the "strategy in part was implemented through very good execution," meaning "by and large when he wanted to get in, he got in" and "when he wanted to get out, he got out."  Hoang Decl. Ex. 8 (Merkin Dep.) at 207:3-208:4.

126.     Yet, there is no evidence that Merkin ever attempted to determine how much Madoff's ability to "execute" generated the purported returns generated by BLMIS.

127.     In order to track trade execution effectiveness, it is common practice for portfolio managers to compare their transaction price against the Volume Weighted Average Price ("VWAP") for the respective stock.   Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 319. VWAP is a trading metric calculated by weighting each transaction price by the volume for the transaction. *Id.*

128.    VWAP data is easily obtainable from any Bloomberg terminal and was publicly accessible by fund managers like Merkin.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 319, n.332.

129.    The single largest component of the BLMIS purported returns (58.5%) comes from the purported trade execution being above or below VWAP.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 320, Fig. 42.

130.    From January 1996 to November 2008, 81.3% of the Merkin BLMIS account purported buy transactions by share volume were executed below VWAP, while 74.9% of purported sell transactions by share volume were executed above VWAP.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 320.

131.    The industry norm is to target trade execution at VWAP (meaning that one would expect 50% of shares would be above VWAP and 50% would be below VWAP).  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 321.

132.    BLMIS's ability to purportedly buy and sell at a level well below and above 50%, respectively, is virtually impossible.  The only reasonable explanation for BLMIS's ability to consistently execute at a level better than VWAP is fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 322-23.

133.    For example, on October 7, 2003, BLMIS purportedly purchased 672,450 shares of Exxon Mobil Corp. across three Merkin accounts for $37.75.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 324.

134.    During that day, there was only an 11 minute period when that price was available, and only 328,500 shares were traded in the market at that price.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 325, Fig. 44.

135.    The total shares purportedly purchased in the Merkin BLMIS Accounts alone were double the shares traded in the market at that reported price.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 325, Fig. 44.

136.    BLMIS's purported purchase and sale of equities at volumes larger than the total daily traded volume at the price reported by BLMIS was a significant red flag and the only reasonable explanation was fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 328.

## XII.    Merkin was aware of and understood other red flags, but did not investigate them.

137.    Merkin knew that BLMIS employed Friehling & Horowitz as its independent auditor.  Hoang Decl. Ex. 66 (Merkin NYU Dep.) at 165:12-14 ("I have had conversations with Mr. Madoff about Friehling & Horowitz as recently as I think November of 2008.").

138.    Friehling & Horowitz was a very small firm with one active accountant and did not have the capability to audit a firm the purported size of BLMIS.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 171; Declaration of Bruce G. Dubinsky, dated November 25, 2015 ("Dubinksy Decl."), Ex. 1 (Dubinsky Expert Report) ¶ 74.

139.    Merkin was aware that BLMIS did not charge traditional performance fees.  Hoang Decl. Ex. 56 (Merkin testimony-Born Arbitration) at 686:6-686:22; Hoang Decl. Ex. 8 (Merkin Dep.) at 479:15-480:16.

140.    Typically, a fund manager charges management fees of 1% and performance fees of 20%.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 345.

141.    BLMIS, however, charged only a $0.04 commission per share on stock transactions and a $1 commission per option contract.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 349.

142.    It is inconsistent with industry customs and practices for an investment advisor to charge only transaction fees.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 347-48.

143.    The Merkin Funds paid on average $27 million less each year under the BLMIS

fee structure than they would have under a traditional fee structure.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶¶ 343, 349-53.

144.    Merkin had a conversation with Madoff on why Madoff didn't charge a 20%

performance fee, which culminated in Merkin stating, "I know why you don't do it.  Because

you're Bernie.  Because that's not the way the good Lord made you.  If he made you a little

differently, you would."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393369; Hoang Decl. Ex.

8 (Merkin Dep.) at 461:25-463:6.

## XIII.   At most, Merkin's due diligence on BLMIS consisted of speaking to Madoff.

145.    Other than Merkin's testimony, there is no evidence that Merkin conducted any

due diligence on Madoff or BLMIS prior to the Funds' initial investments in October 1990.  *See*

Trustee's Resp. Def.'s Joint Statement of Material Facts ¶¶ 84-91, 92; *supra* ¶¶ 9-17.

146.    Merkin's purported expert does not indicate what due diligence analyses Merkin

performed as part of initial due diligence or refer to any documents suggesting that Merkin

performed any due diligence prior to the Merkin Funds' investments with BLMIS.  Steiner Decl.

Ex. 11 (Weingarten Report); Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 4.

147.    Even when Merkin did ask Madoff questions, including about which assets

Madoff managed, Merkin refused to press him, stating that he [Merkin] "didn't really care,

because [he] made his peace with Bernie."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P

0393364.

148.    In a conversation with Madoff, Merkin stated:

> I can always tell when people are going to ask me about Bernie,
> because when people come to the office, ask me what we're doing
> and I give them a little sense of it, and they look around and say I
> know I'm not supposed to talk about this, but can I ask you the
> following question? So I told one person, look, you can ask me

how Bernie does it and that's fine, but when are you going to ask
Bernie? So he said, look, if I asked him, he'd throw me out. I said,
look, *all I can tell you is don't ask so many questions. Sit tight. And
that's what I tell everybody* ….

Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393371-72 (emphasis added).

149.    Merkin maintained a file, consisting of approximately 86 documents or 500

pages, on Madoff and BLMIS purportedly accumulated over an 18 year period.  Hoang Decl. Ex.

19 (Trustee 363) (Merkin's "Madoff File").

**XIV.    Merkin misrepresented Madoff's role with the Merkin Funds to his investors.**

150.    Merkin understood that his investors did not have transparency into BLMIS and

that he had "to explain what the strategy is about and what we're doing."  Hoang Decl. Ex. 8

(Merkin Dep.) at 463:19-466:14.

151.    Neither Ariel's nor Gabriel's offering memoranda ever mentioned BLMIS or

Madoff at any point in time.  Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG

Statement of Undisputed Facts) ¶ 40 ("Not controverted that the name 'Madoff' does not appear

in the Ariel and Gabriel Offering Memoranda"); Steiner Decl. Ex. 16 (Ariel Fund Confidential

Offering Memorandum, March 2006); Hoang Decl. Ex. 57 (Gabriel Confidential Offering

Memorandum, March 2006); Hoang Decl. Ex. 30 (Nash Dep.) at 67:21-69:2.

152.    Other than the disclosure that BLMIS was the "prime broker" or "custodian" of

Ascot in 2006, none of the Merkin Funds' other communications with investors ever mentioned

BLMIS.  Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed

Facts)  ¶¶ 45-50 ("Not controverted that the name "Madoff" does not appear in the quarterly

letters"); Hoang Decl. Ex. 46 (Gottlieb Dep.) at 87:1-88:3; Hoang Decl. Ex. 30 (Nash Dep.) at

68:14-23.

153.     The offering documents for Ascot Partners and Ascot Fund represented that Merkin was involved in running the strategy of the Funds on a day-to-day and transaction-by-transaction basis.  Hoang Decl. Ex. 67 (Ascot Partners March 2006 Offering Memorandum) at HLGSAA-00000088 at 105 (stating that, "The Partnership primarily follows a strategy in which the Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100.  In order to hedge its exposure to these securities, the Partnership simultaneously purchases put option and sells a call option on the S&P 100.") (emphasis added).

154.     Merkin further represented to his investors that Ascot's success depended on his skill as a money manager, and never identified BLMIS as an investment advisor or money manager.  Hoang Decl. Ex. 67 (Ascot Partners March 2006 Offering Memorandum) at HLGSAA-00000110 (stating that, "the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin.").

**Daniel Gottlieb**

155.     Daniel Gottlieb ("Gottlieb") is the Chief Investment Officer of Glen Eagle Partners.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 11:25-12:3.

156.     Gottlieb met with Merkin twice about potentially investing in Gabriel and Ascot on/around December 2005 and February 2006.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 37:8-13, 41:6-14, 44:24-46:6.

157.     As a result of his meetings with Merkin, Gottlieb invested $500,000 in Ascot via The Anne and Howard Gottlieb Family Foundation and $1,000,000 in Gabriel via Glen Eagle Partners.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 47:21-48:6, 50:10-15, 90:22-91:2.

158.     Prior to the fraud, Merkin never disclosed Madoff to Gottlieb.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 51:12-53:8.

159.    When asked if he believes that Merkin intentionally concealed Madoff, Gottlieb

testified, "I don't see how he couldn't have.  I just – I believe that I was supposed to think that

there was trading going on at [GCC] . . . there were people there that were engaging in a whole

variety of strategies from the sort of less liquid stuff that Gabriel was doing to the more liquid

stuff that Ascot was doing.  And I thought it was going on in the offices and at the terminals that

I saw when I went there."  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 115:11-116:2.

**Morris Smith**

160.    Morris Smith ("Smith") is a sophisticated investor and was a portfolio manager

for the Magellan Fund at Fidelity Investments.  Hoang Decl. Ex. 48 (Smith Dep.) at 12:21-15:11.

161.    Prior to investing in Ascot Partners and Gabriel, Smith spoke with Merkin about

the funds and Merkin never indicated that he would be using third party managers for either

fund.  Hoang Decl. Ex. 48 (Smith Dep.) at 21:22-22:1, 24:22-25:1.

162.    As a result of conversations with Merkin, Smith invested in Ascot Partners and

Gabriel in 1992.  Hoang Decl. Ex. 48 (Smith Dep.) at 19:18-21:13, 22:5-10, 23:17-24:2.

163.    Over a fifteen year period, Smith spoke to Merkin about his investments.  Hoang

Decl. Ex. 48 (Smith Dep.) at 32:19-33:5.

164.    Merkin told Smith that Morgan Stanley was the custodian of Ascot Partners,

omitting BLMIS.  Hoang Decl. Ex. 48 (Smith Dep.) at 35:25-36:4.

165.    Merkin told Smith that Merkin was the decision-maker for Ascot Partners and that

BLMIS was acting as Ascot Partners' executing broker who carried out the trades of Merkin's

strategy.  Hoang Decl. Ex. 48 (Smith Dep.) at 36:5-19, 37:10-38:20, 40:4-14.

166.    Smith was not aware that Gabriel had any BLMIS exposure until after the fraud

was revealed.  Hoang Decl. Ex. 48 (Smith Dep.) at 67:5-69:2.

167.    In early 2008, Merkin explained to Smith that he was setting up special accounts with the United States Treasury to secure Smith's assets.  Hoang Decl. Ex. 48 (Smith Dep.) at 43:8-44:10.  As a result, Smith decided to not redeem his investments in Ascot Partners.  *Id.* at 45:12-15.

168.    During the week following Madoff's arrest, Smith spoke with Merkin twice and learned for the first time that he was actually allocating all of Ascot Partners' assets to Madoff.  Hoang Decl. Ex. 48 (Smith Dep.) at 69:6-72:17.

169.    During this post-arrest conversation with Merkin, Smith inquired about the purported treasury accounts and Merkin responded that he had since moved the money back to Madoff.  Hoang Decl. Ex. 48 (Smith Dep.) at 69:6-72:17.

170.    Smith was also a member of the Yeshiva University Investment Committee from 2000 until January 2009. Hoang Decl. Ex. 48 (Smith Dep.) at 45:20-22, 46:22-47:4.

171.    During his time on the committee, Smith recalls only one discussion related to Madoff being on the university's board.  He does not recall a time where Madoff was ever referred to in the context of Ascot Partners. Hoang Decl. Ex. 48 (Smith Dep.) at 64:24-66:8.

**Research Company A Director of Research**

172.    The Director of Research for Research Company A is responsible for conducting ongoing due diligence.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 13:12-20.

173.    Director of Research conducted due diligence on Ascot on behalf of a Research Company A client.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 13:15-20.

174.    Director of Research testified that Merkin said that "Charles Ponzi would lose out because it would be called the 'Madoff scheme'" during a phone call in June 2003. Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 53:18-23.

175.    Merkin also represented to Director of Research that Madoff "[c]onsistently buys nearer the lows of the day" and is "[n]ever more than 3/8ths outside the NYSE price range for the day." Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 66:16-21.

176.    Director of Research testified that Merkin was aware of issues with BLMIS's option volume, stating: "We [ ] were asking him about the volume of – of stock trading and we received certain answers and [Merkin] followed up to say that he's more concerned, was how I interpreted it, he was more concerned about the volume in options as opposed to the stocks." Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 45:12-16 ("The bigger question is volume in options."), 45:20-46:2; Hoang Decl. Ex. 43 (Trustee Ex. 208).

177.    Merkin also told Director of Research that "I have come to accept there are things that I don't understand" with regards to Madoff. Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 46:3-7.

178.    Director of Research testified that his notes state that, "Ezra did not have a good explanation for how Madoff executes option trades in such size." Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 46:13-16.

179.    Director of Research testified that it was his opinion that there "[s]eems to be some probability in Ezra's mind that this could be a fraud." Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 76:1-6.

**Jason Orchard**

180.     Jason Orchard ("Orchard") is the Chief Financial Officer and Managing Director in charge of the hedge fund group at Spring Mountain Capital ("SMC"), an alternative investment management firm. Hoang Decl. Ex. 39 (Orchard Dep.) at 19:12-16, 24:15-21.

181.     SMC invested in Ascot Partners, Ascot Fund, Ariel and Gabriel. Hoang Decl. Ex. 39 (Orchard Dep.) at 65:11-16.

182.     Orchard met with Merkin as part of his due diligence. Hoang Decl. Ex. 39 (Orchard Dep.) at 19:12-16, 61:22-62:23.

183.     In a meeting on November 14, 2005 between Merkin, Orchard and representatives of Aozora Bank, Merkin described three types of trading strategies that Ascot implemented in addition to the SSC strategy.   Hoang Decl. Ex. 68 (Orchard November 14, 2005 notes).

184.     One of these trades, a "bull spread trade," which was similar to the split-strike conversion strategy but options on single name stocks were used.  He also discussed a "bear spread trade," where Ascot "put on the opposite positions of the bull spread trade" and another strategy where Ascot "will short two put options, be long a call and long the stock."  Merkin noted that each of these trades would be put on depending on the market environment.  Hoang Decl. Ex. 68 (Orchard November 14, 2005 notes) at SMC-NYAG000001-02.

185.     During a meeting with Merkin in November 2005, Merkin made several misrepresentations to Orchard, including that:

- Ascot's positions are typically held for three to six months. Hoang Decl. Ex. 39 (Orchard Dep.) at 103:16-23.

- Ascot trades would sometimes be outside the S&P 100. *Id.* at 102:12-103:15.

- "It was understood or it was explained to me that when the funds were not invested, they were in cash at Morgan Stanley and the cash would be held there." *Id.* at 102:12-103:15, 105:17-20.

34

- Ascot utilizes a "12 minute rule" where "Ezra or Bernie have to establish all three legs of the typical trade within 12 minutes, otherwise the trade legs established are sold." *Id.* at 116:7-117:14.

- "Ascot is no different than flipping a coin, but trades are structured so that Ascot can be right only 25 percent of the time and still be able to break even." *Id.* at 106:20-107:6.

186.    Merkin also told Orchard that in the past "Ascot [Partners] executed these trades as well as allowed Mr. Madoff to clear some of these trades through his broker-dealer," but that "the execution ability of Madoff, especially in the option market, has proven to have done better than Ascot [Partners'] own execution and therefore, the majority of the trade execution and clearing is now done at Madoff Securities." Hoang Decl. 68 (Orchard November 14, 2005 notes) at SMC-NYAG000003.

187.    Merkin told Orchard "that he could established (*sic*) guidelines in which Mr. Madoff could then – could then invest, as long as the opportunities fell within those guidelines or parameters." Hoang Decl. Ex. 39 (Orchard Dep.) at 108:15-18, 114:13-20.

**Joshua Nash**

188.    Josh Nash ("Nash") is a sophisticated money manager who knew Merkin both socially and professionally for over twenty years. Hoang Decl. Ex. 30 (Nash Dep.) at 40:14-19, 41:2-3.

189.    Nash invested in Gabriel, both personally and through a family fund called the "Nash Family Partnership." Hoang Decl. Ex. 30 (Nash Dep.) at 56:22-57:10.

190.    Merkin was aware that Nash did not want to be invested with BLMIS and that Nash had previously redeemed from BLMIS. Hoang Decl. Ex. 30 (Nash Dep.) at 48:22-52:14.

191.    Nash's father, Jack Nash, had previously had a direct investment with BLMIS. Jack and Josh Nash had a meeting with Madoff prior to the time Jack Nash made his redemption

from BLMIS.  They discussed issues including Madoff's use of a small auditor rather than one that was large and well-known.  Hoang Decl. Ex. 30 (Nash Dep.) at 29:4-34:7, 35:23-36:6.

192.    Nash noted that he was not comfortable with Madoff's explanations at the meeting.  Hoang Decl. Ex. 30 (Nash Dep.) at 30:22-24.

193.    After a review of the account statements, Nash "didn't understand how, by buying stocks, selling calls and buying puts, one would have made money every month."  Hoang Decl. Ex. 30 (Nash Dep.) at 28:10-13.

194.    Nash told Merkin that he was skeptical of BLMIS and, as a fiduciary, was not comfortable investing in BLMIS, stating, "The lack of a major accounting firm to me was a red flag."  Hoang Decl. Ex. 30 (Nash Dep.) at 51:6-52:8.

195.    Merkin, however, never disclosed to Nash that Gabriel was invested with BLMIS. Nash only learned that Gabriel was invested with BLMIS after it collapsed.  Hoang Decl. Ex. 30 (Nash Dep.) at 47:4-48:4.

**Tina Surh**

196.    New York University ("NYU") invested $20 million with Ariel in 1994, and an additional $10 million in 1997, an investment that they maintained through December 2008.  Hoang Decl. Ex. 47 (Surh Dep.) at 24:9-20.

197.    Tina Surh ("Surh") was a director of investments at NYU from 2005 to 2008. Hoang Decl. Ex. 47 (Surh Dep.) at 11:16-20.

198.    Surh met with Merkin in October 2008 on behalf of NYU where Merkin suggested that NYU consider investing with BLMIS.  Hoang Decl. Ex. 47 (Surh Dep.) at 38:11-13, 40:25-43:20. Surh testified that Merkin suggested NYU consider investing with BLMIS, but acknowledged that the fact that BLMIS self-cleared was a "significant negative."  Surh informed Merkin that the lack of a third-party administrator "would be a non-starter" and would make an

36

opportunity to invest with BLMIS "unpalatable" for NYU.  Merkin never disclosed to NYU that

it was in fact already invested with BLMIS through its investment with Ariel.  SOF Response ¶¶

157, 173.

199.    Post-collapse of BLMIS, Surh received Merkin's investor letter and testified that

she was "pretty shocked this fund was in Ariel's portfolio given how we told him that we could

never invest in a fund like that.  The guy was doing his own marks from an institutional

perspective."  Hoang Decl. Ex. 47 (Surh Dep.) at 62:4-8.

**XV.    Merkin's knowledge and conduct should be imputed to GCC and Ascot Fund.**

200.    GCC served as investment advisor to Ascot Fund from 1992 until January 2003.

Hoang Decl. Ex 69 (Termination Agreement between GCC and Ascot Fund).

201.    Merkin told Ascot investors that the reorganization will make the investing

process "cheaper and more efficient" for both funds and justified an increase in their respective

management fees from 1% to 1.5% due to the "rising expenses" of running the funds.  Hoang

Decl. Ex. 12 (Ascot Fund November 11, 2002 Letter) at GCC-NYAG 0031103; Hoang Decl. Ex.

70 (Ascot Partners November 11, 2002 Letter) at BS00451097.

202.    However, there was no increase in expenses to Merkin for running Ascot Partners

or Ascot Fund, as each fund was nearly entirely invested with BLMIS—in fact, in the years

before the reorganization, from 2000 through 2003, both Ascot Partners and Ascot Fund had

100% of their assets invested with BLMIS.  *See supra* ¶ 50.

203.    The general operation of Ascot Fund did not change after it switched to a master

feeder relationship.  In fact, Merkin continued to meet with investors on behalf of Ascot Fund.

Hoang Decl. Ex. 71 (Seymour Dep.) at 96:18-97:4 ("I recall the investment advisory agreement

that existed before, in relation to Ascot.  So that was one of the services that they provided under

that agreement.  And after that agreement ceased, there was a limited partnership agreement and

37

they continued to provide basically the same services under a different agreement."); Hoang
Decl. Ex. 18 (Ascot Fund January 2003 Prospectus) at BS00020963 ("[t]he success of the Master
Fund depends primarily upon the Managing Partner of the Master Fund[, . . . J. Ezra Merkin]);
Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 43:15-44:4; Hoang Decl. Ex. 68 (Orchard
November 14, 2005 notes) at SMC-NYAG000001; Hoang Decl. Ex. 39 (Orchard Dep.) at 97:23-
98:9; Hoang Decl. Ex. 37 (Erne Dep.) at 43-44; Hoang Decl. Ex. 4 (Research Company A
Principal Dep.) at 135:1-10.

204.    Ascot Fund engaged Donald Seymour ("Seymour") and Aldo Ghiseletta
("Ghisletta") of DMS Offshore Investment Services Ltd., to serve as directors on December 28,
2001 and November 30, 2002, respectively.  Hoang Decl. Ex. 72 (Ascot Fund Register of
Directors and Officers) at AF00000140; Hoang Decl. Ex. 71 (Seymour Dep.) at 39:19-24; Hoang
Decl. Ex. 73 (Ghisletta Dep.) at 25:9-13.  At that time, Ascot Fund maintained a direct account
with BLMIS and was investing substantially all of its assets with BLMIS.  Hoang Decl. Ex. 71
(Seymour Dep.) at 39:19-24.

205.    Seymour and Ghisletta served as professional directors for a nominal fee of
$7,500 per year. Hoang Decl. Ex. 71 (Seymour Dep.) at 65:6-9.

206.    Seymour never met Merkin until after the fraud in 2009 and Ghiseltta testified
that he has never even spoken with Merkin.  Hoang Decl. Ex. 71 (Seymour Dep.) at 38:7-9;
Hoang Decl. Ex. 73 (Ghisletta Dep.) at 25:21-23.

207.    Ghisletta did not recall ever holding an Ascot Fund board meeting and no
documentation exists of any meetings prior to December 11, 2008.  Hoang Decl. Ex. 73
(Ghisletta Dep.) at 72:10-13.

208.    All business decisions on behalf of Ascot Fund, including those related to investments with BLMIS, were made by Merkin, even after the transition to the master-feeder structure.  Hoang Decl. Ex. 71 (Seymour Dep.) at 77:16-23; Steiner Decl. Ex. 17 (Ascot Fund October 2006 Confidential Offering Memorandum) at GCC-NYAG0000048; Hoang Decl. Ex. 8 (Merkin Dep.) at 277:4-18.

209.    Seymour testified that Merkin maintained sole authority over Ascot Fund: "The voting shares of this fund was held by the general partner and that was Merkin in this case.  And the voting shares actually controlled the fund, including the board."  Hoang Decl. Ex. 71 (Seymour Dep.) at 92:3-20.

210.    Ghisletta testified that no investment decisions could be made without Merkin's approval.  Hoang Decl. Ex. 73 (Ghisletta Dep.) at 79:17-80:2.

211.    Seymour was appointed a Director of Ascot Fund in 2001, prior to the switch to a master feeder structure.  Hoang Decl. Ex. 73 (Ghisletta Dep.) at 39:20-24.

212.    Ascot Fund's directors had no role in the investment decisions or the overall strategy of the fund.  In fact, they testified that they had never even heard of Madoff prior to his arrest in December 2008.  Hoang Decl. Ex. 71 (Seymour Dep.) at 35:23-36:8 (Mr. Seymour stated that he first heard about Madoff "In the press when the scheme was revealed."); Hoang Decl. Ex. 73 (Ghisletta Dep.) at 24:11-17.

213.    Despite being the sole Director of Ascot Fund in 2001, Seymour testified that he was not aware at the time that Ascot Fund maintained an account at BLMIS or that substantially all of Ascot Fund's assets were invested in BLMIS.   Hoang Decl. Ex. 71 (Seymour Dep.) at 101:10-101:23.

## XVI.  **Initial Transfers**

**Ascot Partners**

214.    Between October 1, 1990 and the Filing Date, the Merkin Funds invested over one billion dollars with BLMIS through at least 80 separate wire transfers directly to BLMIS's bank account.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 28, 43, 56, 90, 105, 126, Exs. 4A, 4K, 4O, 4P, 4Q, 4R.  From at least 1998 through 2008, the BLMIS bank account at JPMorgan Chase & Co. was Account # xxxxxx703 (the "BLMIS Bank Account").  Collura Decl. Ex. 1 (Collura Report) ¶¶ 24-25; Dubinksy Decl. Ex. 1 (Dubinsky Expert Report) ¶ 76.

215.    In total, Ascot Partners BLMIS account 1A0058 had cash deposits totaling $552,335,889; inter-account transfers of principal to the account of $422,027,224; cash withdrawals of $489,840,000; and inter-account transfers of principal from the account of $258,504,709.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 94, Exs. 3D, 4P.

216.    Based on the cash and principal transactions in Ascot Partners BLMIS account 1A0058, there was $226,018,404 of principal in the account as of December 11, 2008.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 96, Exs. 3D, 4P.

217.    In the two years before December 11, 2008, $280,000,000 was withdrawn from Ascot Partners BLMIS account 1A0058.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 96, Ex. 4P.  This was accomplished via four withdrawals:

- On December 29, 2006, there was a $10,000,000 withdrawal.

- On December 31, 2007, there was a $175,000,000 withdrawal.

- On July 2, 2008, there was a $50,000,000 withdrawal.

- On October 1, 2008, there was a $45,000,000 withdrawal.

Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4P.

218.    Ascot Partners received transfers from BLMIS to Morgan Stanley Account No. XX-X3021, which was held in its name.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 8, 52-53, Ex. 10.

## XVII.  Subsequent Transfers

219.    GCC and Ascot Fund both received subsequent transfers of the initial transfers of BLMIS funds to Ascot Partners in the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) Ex. 13.

220.    There was commingling in the Defendants' bank accounts.[3]  Collura Decl. Ex. 1 (Collura Report) ¶ 62.  Commingling in this context means that there was a combination of BLMIS funds (Initial and/or Subsequent Transfers) and other sources of funds in each respective bank account, such that BLMIS funds become unidentifiable and/or inseparable.  *Id.* at ¶ 57.

221.    Ascot Fund received subsequent transfers from Ascot's Morgan Stanley Account No. XX-XX021 to Morgan Stanley Account No. XX-XX020 and Fortis Bank Account No. XXX336. Collura Decl. Ex. 1 (Collura Report) Ex. 13.1.

222.    As there was commingling in the Defendants' bank accounts, Ms. Collura applied five tracing methods to chronological lists of transactions that were derived from GCC, Ascot and Ascot Fund bank records to identify Subsequent Transfers of BLMIS funds.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 81-82.

223.    These five tracing methods are "Last In, First Out ("LIFO"), "First In, First Out" ("FIFO"), "Lowest Intermediate Balance" ("LIBR"), "Restated Tracing Rules"(referred to as "Restated LIBR"), and "Proportionality."  Collura Decl. Ex. 1 (Collura Report) ¶ 81.

---

[3] Ms. Collura considered five bank accounts in her commingling analysis: four Morgan Stanley accounts held in names of Ascot Partners, Ariel Fund, Gabriel Capital, and GCC, respectively, and a fifth account held in the name of GCC at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 57-58.

224.     The LIFO method is an accounting practice used to determine the cost of inventory. LIFO assumes that the inventory sold during a certain period comes from the most recent inventory purchased. Simply, under LIFO, the last units of inventory purchased are the first units to be sold. LIFO is also a method applied to trace funds in and out of a commingled bank account. Using LIFO, the last money deposited into a commingled bank account is considered to be the first money disbursed from that account.  Collura Decl. Ex. 1 (Collura Report) ¶ 84.

225.     Applying the LIFO method, $21,081,296 was transferred to Ascot Fund and $11,406,779 was transferred to GCC of the initial transfers during the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 86, Ex. 13.

226.     The FIFO method is another accounting practice used to determine the cost of inventory.  FIFO assumes that the inventory sold during a certain period comes from the oldest inventory purchased.  Simply, under FIFO, the first units of inventory purchased are the first units to be sold.  FIFO is also a method applied to trace funds in and out of a commingled bank account.  Using FIFO, the first money deposited into a commingled bank account is considered to be the first money disbursed from that bank account.  Collura Decl. Ex. 1 (Collura Report) ¶ 90.

227.     Applying the FIFO method, $33,365,000 was transferred to Ascot Fund and $12,051,196 was transferred to GCC of the initial transfers during the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 91, Ex. 13.

228.     LIBR is a tracing principal used to determine the rights to funds remaining in a commingled bank account (e.g., the rights of a trust beneficiary or the rights of a secured party). LIBR assumes that trust or secured funds deposited into a commingled bank account are the last

42

funds disbursed from that account, and any disbursements made from the account are taken first

from funds other than the trust or secured funds until the balance in the account dips below the

amount of those trust or secured funds.  In other words, under LIBR, trust or secured funds are

assumed to fall to the bottom of the commingled bank account and subsequent disbursements

made from the commingled account are taken off the top first.  Collura Decl. Ex. 1 (Collura

Report) ¶ 95.

229.    Applying LIBR, $29,064,189 was transferred to Ascot Fund and $9,356,021 was

transferred to GCC of the initial transfers during the two years before December 11, 2008.

Collura Decl. Ex. 1 (Collura Report) ¶ 97, Ex. 13.

230.    Certain rules regarding tracing of funds through a commingled bank account were

restated in 2011.  Pursuant to these restated tracing rules, withdrawals from a commingled bank

account can be "marshaled so far as possible in favor of the claimant" (here, the Trustee), and the

claimant can "claim the entire advantage of beneficial withdrawals that can be attributable to the

claimant's funds" (i.e., BLMIS funds). Further, the claimant can trace to his benefit any

withdrawal from the commingled bank account that does not exceed the lowest balance reached

in that commingled account between 1) the point at which the Trustee's funds (i.e., BLMIS

funds) are deposited into the commingled bank account and 2) the point at which the withdrawal

is made.  Collura Decl. Ex. 1 (Collura Report) ¶ 102.

231.    Applying Restated LIBR, $33,365,000 was transferred to Ascot Fund and

$17,756,812 was transferred to GCC of the initial transfers during the two years before

December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 103, Ex. 13.

232.    Proportionality (also known as pro rata) is another tracing method used to trace

funds in and out of a commingled bank account. This method calculates the proportion of the

balance in a bank account between sources each time a deposit is made and applies that
proportion to the next disbursement from the account are taken off the top first.  Collura Decl.
Ex. 1 (Collura Report) ¶ 107.

233.    Applying Proportionality, $25,984,614 was transferred to Ascot Fund and
$11,546,306 was transferred to GCC of the initial transfers during the two years before
December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 109, Ex. 13.

234.    In summary, the Ascot Partner's subsequent transfers to Ascot Fund and GCC, respectively, are as follows:

| Method | Ascot Fund | GCC |
|---|---|---|
| FIFO | $21,081,296 | $11,406,779 |
| LIFO | $33,365,000 | $12,051,196 |
| LIBR | 29,064,189 | $9,356,021 |
| Restated LIBR | $33,365,000 | $17,756,812 |
| Proportionality | $25,984,614 | $11,546,306 |

Collura Decl. Ex. 1 (Collura Report) ¶¶ 86, 91, 97, 103, 109, Figs. 13, 13.4, 19, 22, 25.

235.    Additionally, there were transfers of the subsequent transfers that GCC made of BLMIS funds to, or for the benefit of, Merkin (the "Subsequent Subsequent transfers"). Collura Decl. Ex. 1 (Collura Report) ¶¶ 112-18. These transfers were calculated using the five tracing methods outlined above. *Id.* ¶ 112.

236.    GCC received subsequent transfers from Ascot Partners' Morgan Stanley Account No. XX-XX021 to its Morgan Stanley Account No. XX-XX007. (Collura Decl. Ex. 1 (Collura Report) Ex. 13.4.

237.    Applying the LIFO method, $224,508 of the initial transfers was transferred to Merkin and $6,126,617 of the initial transfers was transferred for the benefit of Merkin. Collura Decl. Ex. 1 (Collura Report) ¶ 112, Ex. 16.[4]

238.    Applying the FIFO method, $188,111 of the initial transfers was transferred to Merkin and $7,137,413 of the initial transfers was transferred for the benefit of Merkin. Collura Decl. Ex. 1 (Collura Report) ¶ 122, Ex. 16.[5]

---

[4] There were an additional $4,752,917 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase. Collura Decl. Ex. 1 (Collura Report) ¶ 120.

239.    Applying LIBR, no money was transferred to Merkin and $5,420,503 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 125, Ex. 16.[6]

240.    Applying Restated LIBR, $903,510 of the initial transfers was transferred to Merkin and $9,054,460 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 128, Ex. 16.[7]

241.    Applying Proportionality, $292,663 of the initial transfers was transferred to Merkin and $4,746,330 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 131, Ex. 16.[8]

242.    In summary, the Ascot subsequent transfers to, or for the benefit of, Merkin, respectively, are as follows:

| Method | Merkin | For the Benefit of Merkin | Totals |
|---|---|---|---|
| LIFO | $224,508 | $6,126,617 | $6,351,125 |
| FIFO | $188,111 | $7,137,413 | $7,325,524 |
| LIBR | - | $5,420,503 | $5,420,503 |
| Restated LIBR | $903,510 | $9,054,460 | $9,957,970 |
| Proportionality | $292,663 | $4,453,667 | $4,746,330 |

Collura Decl. Ex. 1 (Collura Report) ¶¶ 119, 122, 125, 128, 131, Figs. 28, 30, 32, 34, 36.

---

[5] There were an additional $13,599,607 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 123.

[6] There were an additional $5,155,721 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 123.

[7] There were an additional $18,057,895 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 128.

[8] There were an additional $8,097,125 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 132.

243.    Paul K. Meyer ("Meyer"), who was retained by Ascot Partners and Ascot Fund, reviewed the analysis of withdrawals by Ascot Partners from BLMIS and the subsequent disbursements.[9]  Hoang Decl. Ex. 74 (Meyer Expert Report) ¶¶ 6-7.

244.    Meyer testified that he did not find any issues with the accuracy of Ms. Collura's calculations.  Hoang Decl. Ex. 75 (Meyer Dep.) at 80:14-23; 109:2-7; 110:8-9, 123:2-11.

## XVIII. Inter-account transfers

245.    The Merkin Funds transferred millions of dollars between their respective bank accounts at Morgan Stanley to offset inter-account transfers at BLMIS.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 67-73, Ex. 11.1.

246.    From June 1998 through February 2009, the Merkin Funds transferred the following amounts between their respective Morgan Stanley accounts as reflected in their accounting and bank records:

| Transferor Bank Account | Transferee Bank Account | Amount (approximate) |
|---|---|---|
| Ascot Partners (MS xx-x3021) | Gabriel Capital (MS xx-x3003) | $148 million |
| Ascot Partners (MS xx-x3021) | Ariel Fund (MS xx-x3001) | $52 million |
| Gabriel Capital (MS xx-x3003) | Ascot Partners (MS xx-x3021) | $190 million |
| Gabriel Capital (MS xx-x3003) | Ariel Fund (MS xx-x3001) | $208 million |
| Ariel Fund (MS xx-x3001) | Ascot Partners (MS xx-x3021) | $76 million |

---

[9] As Mr. Meyer was also originally retained by Ariel Fund and Gabriel Capital, he was also tasked with reviewing Ms. Collura's analysis as to disbursements from Ascot Partners to Ariel Fund and Gabriel Capital.  Hoang Decl. Ex. 74 (Meyer Expert Report) ¶¶ 6-7.

| Transferor Bank Account | Transferee Bank Account | Amount (approximate) |
|---|---|---|
| Ariel Fund (MS xx-x3001) | Gabriel Capital (MS xx-x3003) | $366 million |

Collura Decl. Ex. 1 (Collura Report) ¶ 64, Ex. 11.1.

247.    There were numerous instances of transfers between the Merkin Funds' accounts at BLMIS that corresponded to transfers between the Merkin Funds' respective bank accounts. Collura Decl. Ex. 1 (Collura Report) ¶¶ 67-73, Ex. 11.1.

248.    In the context of the Merkin Fund's BLMIS accounts, an inter-account transfer is a non-cash transaction between BLMIS customer accounts in which no new funds entered or left BLMIS, but rather a book entry occurred at BLMIS to internally adjust the balance of those accounts.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 9. These books entries did not reflect any transfers of cash because there was no actual movements of cash.  *Id.*  Rather, these inter-account transfers changed reported values in the purported "equity" maintained in the BLMIS customer's account.  *Id.*

249.    The total transfers between the Merkin Fund's BLMIS accounts that correspond with the total transfers between the Merkin Fund's bank accounts at Morgan Stanley (*see supra* ¶ 246) can be summarized as follows:

| Transferor | Transferee | Amount Transferred to BLMIS Account (approximate) |
|---|---|---|
| Ascot Partners | Gabriel Capital | $141 million |
| Ascot Partners | Ariel Fund | $78 million |
| Gabriel Capital | Ascot Partners | $46 million |
| Gabriel Capital | Ariel Fund | $38 million |

| Transferor | Transferee | Amount Transferred to BLMIS Account (approximate) |
|---|---|---|
| Ariel Fund | Ascot Partners | $52 million |
| Ariel Fund | Gabriel Capital | $9 million |

Collura Decl. Ex. 1 (Collura Report) ¶ 69, Figure 6, Ex. 11.1.

250.    For example, the total transfers of $52M from Ariel's BLMIS account to Ascot Partners' BLMIS account is reflected as $52M from Ascot Partners' Morgan Stanley to Ariel's Morgan Stanley Account.  Collura Decl. Ex. 1 (Collura Report) ¶ 69 n.31.

251.    Ascot Partners paid investor redemptions and management fee payments from three primary sources of funds: (i) incoming investor subscriptions; (ii) redemptions from BLMIS; and (iii) inter-account transfers from Ariel and Gabriel.  Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 85:17-86:11, 162:6-17, 163:1-10, 174:24-175:7; Hoang Decl. Ex. 75 (Meyer Dep.) at 167:11-168:23.

252.    The Merkin Funds transferred hundreds of millions of dollars between their respective BLMIS accounts and their respective Morgan Stanley accounts to pay investor redemptions related to their BLMIS investments.  Collura Decl. Ex. 1 (Collura Report) at ¶¶ 64, 68-73, Ex. 11.1.

253.    Between May 1998 and November 2005, Ascot Partners and Ascot Fund made only two redemptions from BLMIS, totaling $17 million.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Exs. 4O, 4P.

254.    Ascot Partners made no redemptions from BLMIS for the year end of 1998, 1999, 2000, 2001, 2002, or 2004, yet still paid management fees and investor redemptions. Greenblatt

Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4P; Collura Decl. Ex. 1 (Collura Report) ¶¶ 68, 76-77, Ex. 10, 17.

255. Ariel Fund and Gabriel Capital did not make any redemptions from BLMIS until July 2008. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Exs. 4Q, 4R.

256. The Merkin Funds used inter-account transfers to avoid making redemptions from BLMIS. Collura Decl. Ex. 1 (Collura Report) ¶¶ 64, 69, Ex. 11.1.

257. For example, on January 4, 2007, Michael Autera instructed BLMIS to transfer $18.5 million from Ascot Partners' BLMIS account to Ariel's BLMIS account and $26.5 million from Ascot Partners' BLMIS account to Gabriel's BLMIS account. Collura Decl. Ex. 1 (Collura Report) ¶ 68; Hoang Decl. Ex. 76 (Trustee 285); Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 187:16-19.

258. Ascot Partners' BLMIS account reflects that BLMIS made the requested transfers on January 4, 2007. Hoang Decl. Ex. 77 (Trustee 287).

259. Yet, Ascot Partners' BLMIS account reflected that it did not have $45 million in available cash to transfer to Ariel and Gabriel and did not have the necessary available cash until January 9, 2007. Hoang Decl. Ex. 77 (Trustee 287); Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 206:25-208:20.

260. In exchange for the $45 million that Ascot Partners transferred from its BLMIS account to Ariel's and Gabriel's respective accounts, Ariel and Gabriel transferred $18.5 million and $26.5 million respectively from their Morgan Stanley accounts to Ascot Partners' Morgan Stanley account. Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 193:14-198:18.

261. On January 4, 2007, the Ascot Partners Morgan Stanley account had a beginning balance of approximately $2.3 million. Collura Decl. Ex. 1 (Collura Report) ¶ 68.

262.     Ascot Partners paid $33.3 million in investor distributions and would not have

had enough money to fund these redemptions without the transfers from Ariel and Gabriel.

Collura Decl. Ex. 1 (Collura Report) ¶ 68.

## XIX.  Fees

263.     Merkin received or was entitled to hundreds of millions of dollars as a result of

the Merkin Funds investments with BLMIS.  Hoang Decl. Ex. 17 (Merkin Responses and Obj. to

NYAG Statement of Undisputed Facts) ¶¶ 91-94.

264.     From its inception through the end of 2002, in accordance with its offering

memorandum, Merkin, through GCC, was entitled to a management fee equal to 1% (prorated

for periods of less than a year) of each investor's capital account balance at the end of such year,

as adjusted to take account of capital contributed or withdrawn during such year from Ascot

Fund.  Hoang Decl. Ex. 9 (Ascot Fund February 1996 Prospectus) at BS00306067-68; Hoang

Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed Facts) ¶¶ 24-25.

265.     From its inception through the end of 2002, in accordance with its offering

memorandum, Merkin, as general partner, was entitled to a management fee equal to 1%

(prorated for periods of less than a year) of each limited partner's capital account balance at the

end of such year, as adjusted to take account of capital contributed or withdrawn during such

year from Ascot Partners.  Hoang Decl. Ex. 10 (Ascot Partners February 1996 Confidential

Offering Memorandum).

266.     As of January 1, 2003, Ascot Partners and Ascot Fund increased their

management fees to 1.5%.  Merkin Defs. Ans. ¶ 235, ECF No. 261; Third Amend. Compl. ¶ 235,

ECF No. 151.

267.     Merkin, as Gabriel's general partner, was also entitled to a management fee equal

to 1% of each limited partner's capital account balance at the beginning of each year plus such

partner's contributed capital during such year for Gabriel and incentive fee equal to 20% of

Gabriel's net income.  Hoang Decl. Ex. 57 (Gabriel Confidential Offering Memorandum, March

2006); Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed

Facts) ¶¶ 24-25.

268.    Merkin, as the sole shareholder of GCC, was also entitled to a management fee

equal to 1% of the beginning net asset value attributable to each series of shares and an incentive

fee equal to 20% of the increase, if any, in the net asset value per share for Ariel.  Steiner Decl.

Ex. 16 (Ariel Fund Confidential Offering Memorandum, March 2006) at GCC-P 0335736-37;

Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed Facts) ¶¶

24-25.

269.    The Merkin Defendants admitted that from 1990 through 2008, Merkin,

individually and/or through GCC, received or claimed entitlement to fees from Ascot Partners,

Ascot Fund, Gabriel and Ariel totaling $728,972,868 as follows:

| Year | Ascot Partners Fees | Ascot Fund Fees | Gabriel Fees | Ariel Fees |
|---|---|---|---|---|
| 1990 | | | $456,146 | |
| 1991 | | | $2,151,379 | $7,287,700 |
| 1992 | | | $3,619,310 | $6,450,820 |
| 1993 | $232,085 | $516,596 | $8,283,712 | $11,676177 |
| 1994 | $880,668 | $735,085 | $6,040,373 | $6,896,515 |
| 1995 | $1,165,331 | $850,966 | $11,162,665 | $12,409,950 |
| 1996 | $1,611,374 | $1,183,044 | $19,013,758 | $25,631,220 |
| 1997 | $2,101,263 | $1,666,394 | $27,899,176 | $35,722,094 |
| 1998 | $2,654,297 | $2,344,047 | $6,833,819 | $7,506,086 |

| Year | Ascot Partners Fees | Ascot Fund Fees | Gabriel Fees | Ariel Fees |
|---|---|---|---|---|
| 1999 | $3,316,268 | $2,756,538 | $10,947,816 | $5,923,084 |
| 2000 | $3,798,766 | $3,470,457 | $14,236,148 | $13,038,087 |
| 2001 | $4,082,427 | $4,540,279 | $11,901,158 | $9,949,603 |
| 2002 | $4,607,052 | $5,314,688 | $7,719,933 | $5,205,260 |
| 2003 | $18,083,968 | | $11,184,001 | $11,443,971 |
| 2004 | $21,685,693 | | $18,302,849 | $14,290,871 |
| 2005 | $26,170,949 | | $31,882,175 | $20,305,563 |
| 2006 | $26,004,162 | | $41,260,706 | $29,454,005 |
| 2007 | $28,292,833 | | $43,754,640 | $17,128,861 |
| 2008 | $25,957,305 | | $11,046,619 | $6,934,086 |
| **Total** | **$170,644,441** | **$23,378,095** | **$287,696,383** | **$247,253,950** |
| | | **Grand Total:** | **$728,972,868**[10] | |

Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed

Facts) ¶ 94.

270.    GCC and Ascot Partners' records show that from 1998 through 2008, Ascot

Partners paid a total $146,184,547, broken down as follows:

| Year | Total Fees |
|---|---|
| 1998 | $2,637,267 |
| 1999 | $3,341,820 |
| 2000 | $3,786,520 |

---

[10] Based on the amounts set forth in the table, Merkin, individually and through GCC, received or claimed entitlement to $552,986,312 in fees, excluding management fees for Ariel and Gabriel from 1994 through 1999 when those funds had no exposure to BLMIS and fees that GCC received for administering other BLMIS accounts in the early 1990's.

| Year | Total Fees |
|------|------------|
| 2001 | $4,094,673 |
| 2002 | $4,607,053 |
| 2003 | $18,083,968 |
| 2004 | $20,872,693 |
| 2005 | $30,463,559 |
| 2006 | $26,004,162 |
| 2007 | $28,292,833 |
| 2008 | $4,000,000 |

Collura Decl. Ex. 1 (Collura Report) ¶ 135, Ex. 17.


Dated: New York, New York
   November 25, 2015

Respectfully submitted,

BAKER & HOSTETLER LLP

By: *s/ David J. Sheehan*
  Baker & Hostetler LLP
  45 Rockefeller Plaza
  New York, New York 10111
  Telephone: (212) 589-4200
  Facsimile: (212) 589-4201
  David J. Sheehan
  Email: dsheehan@bakerlaw.com
  Lan Hoang
  Email: lhoang@bakerlaw.com
  Seanna R. Brown
  Email: sbrown@bakerlaw.com
  Brian W. Song
  Email: bsong@bakerlaw.com

  *Attorneys for Irving H. Picard, Trustee for the*
  *Substantively Consolidated SIPA Liquidation*
  *of Bernard L. Madoff Investment Securities*
  *LLC and the Estate of Bernard L. Madoff*