**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04311 (SMB) |
| Plaintiff, | |
| v. | |
| ANDREW H. COHEN, | |
| Defendant. | |

### DEFENDANT ANDREW H. COHEN'S POST-TRIAL
### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's Post-Trial Scheduling Order (ECF No. 63), Defendant Andrew Cohen ("Mr. Cohen"), by and through his undersigned counsel, hereby submits the following Proposed Findings of Fact and Conclusions of Law in connection with the trial of the above-captioned adversary proceeding brought by Irving S. Picard, as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa et seq., and the substantively consolidated estate of Bernard L. Madoff, Defendant Andrew H. Cohen (the "Adversary Proceeding").

## ANDREW COHEN'S PROPOSED FINDINGS OF FACT

1.      From 1987 through its collapse in 2008, Bernard L. Madoff Investment Securities LLC ("Madoff Securities") was headquartered in the "Lipstick Building," located at 885 Third Avenue, New York, New York.  Second Revised Joint Pretrial Order, Stipulated Facts at page 6 ("JPTO at 6"); Expert Report of Bruce G. Dubinsky, attached as Exhibit 1 to the Declaration of Bruce G. Dubinsky, at pages 16-17, marked as Trial Exhibit PX20-A ("PX20-A-20:21 (¶ 35)").

2.      Madoff Securities operated three business units: (i) a market-making business; (ii) a proprietary trading business; and (iii) an investment advisory ("Investment Advisory") business. (PX20-A-20:21 (¶ 35)).

3.      During all time periods relevant in this Adversary Proceeding, Madoff Securities was registered with the Securities and Exchange Commission (the "SEC") as a broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78$o$(b).  (JPTO at 6; PX20-A-21:22 (¶ 35))

4.      Madoff Securities reported to the customers of its Investment Advisory business that their accounts were invested in one of several investment strategies.  (PX20-A-21:22 (¶¶ 40-44)).

5.      For a number of years, many Investment Advisory accounts were purportedly invested in the "convertible arbitrage" strategy, wherein Madoff Securities reported that it was achieving profits by taking advantage of price mismatches that may occur between the equity markets and the bond/preferred equity markets.  (PX20-A-22 (¶ 42)).

6.      Another strategy purportedly employed in many Investment Advisory accounts was the so-called "split-strike conversion" strategy, wherein Madoff Securities reportedly invested in a basket of common stocks within the Standard & Poor's 100 Index and reportedly sold call options and bought put options to hedge against price changes in the underlying basket of stocks.

(PX20-A-22 (¶ 43)).

7.    For all relevant periods in this Adversary Proceeding (and at least as far back as the 1970s), there is no evidence that Madoff Securities actually executed the trades in any purported strategy which were reported on the account statements of its Investment Advisory customers. (PX20-A-16 (¶ 18)).

8.    For all relevant periods in this Adversary Proceeding, the trades reported in the statements for the Investment Advisory accounts were not based on actual account value or trades.  (PX20-A-36:124 (¶¶ 82- 289)).

9.    The Investment Advisory business utilized new customer monies to fund the withdrawal of principal and fictitious profits for its older customers.  (JPTO at 8; PX20-A-18 (¶ 28); PX20-A-24 (n.39); PX20-A-115:122 (¶¶ 264- 286); PX20-B at 92; PX18-A-8:16 (¶¶ 17-42)).

10.    Further evidence of the existence of the Ponzi scheme at Madoff Securities includes, but is not limited to, the following: (i) the Investment Advisory business was not generating any legitimate profits since no trading activity was taking place; (ii) the Investment Advisory business was not receiving legitimate financial support from the other business units of Madoff Securities in amounts sufficient to satisfy the cash requirement needs of the Investment Advisory customer withdrawals; and (iii) the Investment Advisory business was not receiving any legitimate outside financial support vis-à-vis loans or otherwise.  (JPTO at 8; PX20-A-18 (¶ 28); PX20-A-115:124 (¶¶ 264-289)).

11.    Between 1991 and 2000, Defendant Andrew H. Cohen ("Mr. Cohen") was employed by Madoff Securities as a trader on its market-making desk. Mr. Cohen had no role in the operation of the Investment Advisory operation. (JPTO at 6).

12.    In early 1996, Mr. Cohen opened an Investment Advisory account at Madoff Securities

(the "Account").  (JPTO at 6; PX1-1:6; PX2-1; PX22-A-13 (¶ 41); PX18-A-17 (¶ 47)).

13.  Mr. Cohen and Madoff Securities entered i) a Trading Authorization for the Purchase and Sale of Securities; ii) a Brokerage Customer Agreement; and iii) an Options Agreement. (JTPO at 6; PX1).

14.  The Account was assigned account number 1C1219.  (JPTO at 6; PX2-2; PX18- A-4:5 (¶ 12); PX22-A-4 (¶ 10)).

15.  Mr. Cohen received monthly statements for the Account from January 1996 through November 2008.  (JPTO at 6; PX2-1:892).

16.  Before Madoff Securities's collapse on December 11, 2008, Mr. Cohen had no knowledge or notice of any wrongdoing or fraudulent intent on the part of Madoff Securities. (JPTO at 7).

17.   All of the investments or deposits made by Mr. Cohen in connection with the Account were reported in the monthly statements for the Account.  (JPTO at 7; PX2-1:892; PX22-A-15 (¶¶ 44-45); PX22-B (Expert Report of Matthew B. Greenblatt at Exhibit 4)).

18.  From 1996 to 2000 Mr. Cohen made 19 deposits totaling $1,605,000 and one withdrawal of $70,000.  (JPTO at 7; PX2-1:892; PX22-A-15; PX22-A-18).

19.  In all, Mr. Cohen made 25 separate deposits into the Account, which totaled $2,921,539 in nominal, unadjusted dollars.  (JPTO at 7; PX22-A-15).

20.  In all, Mr. Cohen received 41 separate withdrawals from the Account, which totaled $4,065,000.  (JPTO at 7; PX2-1:892; PX22-A-18:19).

21.  Mr. Cohen's withdrawals were made following receipt of and in reliance upon account balances shown in Madoff Securities Account Statements. From 1996-2008 those Account Statements represented that Mr. Cohen's account had assets in excess of $2 million dollars.

(JPTO at 7; PX2-1:892).

22.  No withdrawal made by Mr. Cohen after December of 2006 exceeded the account balance shown on the most recent Account Statement provided by Madoff Securities. (PX2-771:892; PX22-A-18:19).

23.  Each of the transfers made to Mr. Cohen and each of the Account Statements provided to Mr. Cohen were made and provided by Madoff Securities knowledge of their false and misleading nature.  (JPTO at 8; PX20-A-18 (¶ 28) & 115:124 (¶¶ 264- 289)).

24.  In 1997 Mr. Cohen incurred and paid $16,100.00 in Federal income tax, $2,901.00 in New York State income tax; and $1,186.00.00 in New York City income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 1996. (DX7 ¶¶ 10-17).

25. In 1998 Mr. Cohen incurred and paid $59,300.00 in Federal income tax, $10,258.00 in New York State income tax; and $6,679.00 in New York City income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 1997. (DX7 ¶¶ 18-25).

26.  In 1999 Mr. Cohen incurred and paid $86,600.00 in Federal income tax, $15,146.00 in New York State income tax; and $9,682.00 in New York City income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 1998. (DX7 ¶¶ 26-33).

27.  In 2000 Mr. Cohen incurred and paid $129,900.00 in Federal income tax, $22,471.00 in New York State income tax; and $12,556.00 in New York City income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 1999. (DX7 ¶¶ 34-41).

28. In 2001 Mr. Cohen incurred and paid $122,900.00 in Federal income tax, $21,258.00 in New York State income tax; and $11,728.00 in New York City income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 2000. (DX7 ¶¶ 42-49).

29.  In 2002 Mr. Cohen incurred and paid $106,243.00 in Federal income tax and $19,400.00

in Commonwealth of Virginia income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 2001. (DX7 ¶¶ 50-55).

30.  In 2003 Mr. Cohen incurred and paid $99,001.00 in Federal income tax, $19,750.00 in Commonwealth of Virginia income tax as a result of the fraudulent short-term gains reported by Madoff Securities for FY 2002. (DX7 ¶¶ 56-61).

31.  Mr. Cohen has paid a total of $773,869.00 in unrecovered income tax (excluding applicable interest) as a result of the gains reported and statements provided to Mr. Cohen.  (DX7 ¶¶ 4-9, 62; Exhibit 1).

32.  Mr. Cohen has incurred $45,760.95 in legal fees to defend the current adversary proceeding that is a result of the transfers made by Mr. Cohen based upon fraudulent statements provided Madoff Securities. (DX6).

33.  The relative value of a U.S. Dollar is set forth in the CPI Index published by the United States Department of Labor; Bureau of Labor Statistics (DX8).

34.  The value of Mr. Cohen's deposits, as adjusted by the CPI Index to December of 2008 is $3,616,043.12 (DX8; Exhibit 2).

35.  On December 11, 2008, Madoff was arrested for violating numerous federal criminal securities statutes.  (JPTO at 5; PX20-A-23 (¶ 47)).

36.  On December 11, 2008, Madoff Securities was holding approximately $1 million of Investment Advisory customer property while claims held by Investment Advisory customers for the return of their principal totaled nearly $20 billion.  (PX20-A-860 (Exhibit 27)).

37.  On  December 11, 2008 (the "Filing Date"), the SEC commenced proceedings against Madoff Securities and Madoff in the United States District Court for the Southern District of New York (the "District Court").  (JPTO at 5; Complaint, *Securities Exchange Commission v.*

6

*Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "Liquidation Proceeding") (ECF No. 1)).

38.   On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed an application, pursuant to § 78eee(a)(4)(B) of SIPA, in the District Court because Madoff Securities was not able to meet its obligations to securities customers as they became due and thus its customers needed the protections afforded by SIPA.   (JPTO at 5; Application of the Securities Investor Protection Corp., Liquidation Proceeding (ECF No. 5)).

39.   On November 26, 2010, the Trustee brought this adversary proceeding against Mr. Cohen as an innocent customer to avoid and recover 11 allegedly fraudulent transfers received in good faith totaling $1,143,46140 (as defined above, the "Avoidable Transfers") received by Mr. Cohen in connection with the Account.   (Complaint, Adversary Proceeding (ECF No. 1)).

## <u>ANDREW COHEN'S PROPOSED CONCLUSIONS OF LAW</u>

I.      PRELMINARY STATEMENT……………………………………………….… 7

II.      THE ANTECEDENT DEBT DECISION IS NOT LAW OF THE CASE………… 9

    A.      There is No Law of the Case with Respect to the Time Value Adjustment to Principal……………………………………………………………...…10

    B.      The Antecedent Debt Decision Is No Longer Controlling Law…………….11

        1.      The Second Circuit Court of Appeals Has Subsequently Rejected the Rationale Relied Upon in the District Court's Antecedent Debt Decision……………………………………………………………11

        2.      The Antecedent Debt Decision Improperly Expanded the Trustee's Avoidance Power in Contravention of SIPA and the Bankruptcy Code……………………………………………………………..12

III.      THE TRUSTEE'S CONTRACTUAL OBLIGATIONS TO MR. COHEN CONSTITUTE ANTECEDENT DEBT UNDER § 548(C)…………………………14

    A.      Mr. Cohen Properly Preserved a Defense of Value for an Obligation Pursuant to New York U.C.C. Art. 11 and Federal Securities Law………..14

B.    Madoff Securities' Obligations to Mr. Cohen as a Broker Constitute Value Where the Trustee has Failed to Avoid these Contracts………………………15

C.    Section 29 of the '34 Securities Act Does Not Void the Broker Agreements……………………………………………………………16

D.    Trustee May Not Invoke Common Law to Void the Agreements Under the Doctrine of *In Pari Delicto*……………………………………………………17

IV.    MR. COHEN'S FEDRAL AND STATE LAW CLAIM CONSTITUTE ANTECEDENT DEBT FOR PURPOSE OF § 548(c)………………………………17

A.    Mr. Cohen Held Federal Securities Fraud Claims against Madoff Securities at the Time of the Transfers, which are Valued by their Available Remedies……………………………………………………………17

B.    Mr. Cohen's State-based Fraud and Breach of Fiduciary Duty Claims against Madoff Securities Constitute "Value" for Purposes of § 548(c)…..18

C.    The Taxes Paid by Mr. Cohen on Income Fraudulently Reported by Madoff Securities Constitute Consequential Damages Recoverable Under State and Federal Law…………………………………………………………19

D.    The Legal Costs Incurred by Mr. Cohen in Defense of this Adversary Proceeding Constitute Direct and Consequential Damage of Madoff's Tortious Conduct In 2006-2008………………………………………....20

E.    Mr. Cohen's is Entitled to 9% Interest on his New York State Claims pursuant to CPLR § 5001(a)…………………………………………………20

F.    Mr. Cohen is Entitled to the Lost Investment Opportunity as a Direct and Consequential Damage……………………………………………..……21

V.    THE VALUE OF THE PRINCIPAL CONTRIBUTED BY MR. COHEN MUST BE ADJUSTED FOR INFLATION TO REFLECT ITS TRUE VALUE………...21

VI.    MR. COHEN IS ENTITLED TO A SETOFF UNDER §550(E) FOR THE TAXES PAID ON THE PROPERTY RECEIVED FROM MADOFF SECURITIES……………………………………………………………22

VII.    PRIOR "PONZI-SCHEME" PRECEDENT DOES NOT INVOLVE BROKER-CUSTOMER RELATIONSHIPS……………………………………………22

# I.    PRELIMINARY STATEMENT

Under the Safe Harbor provisions of Bankruptcy Code Section 546(e), the Trustee may only avoid a transfer made by Madoff Securities if Madoff Securities "made such transfer. . .with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made. . . . . ." pursuant to 11 U.S.C. § 548(a)(1)(A). *Picard v. Ida Fishman Rev. Trust*, 773 F.3d 411 (2d Cir. 2014), cert. denied, (June 23, 2015 14-1128) ("546(e) Decision"). Section 548(a)(1)(A) permits avoidance of transfers as fraudulent conveyances only if they occurred within two years of a filing. Moreover a customer that is acting in "good faith" has a defense to avoidance where the customer receives a transfer that is "for value." 11 U.S.C. § 548(c). Therefore, a transfer to such a customer within the two-year period cannot be avoided if it was "for value." While Mr. Cohen has stipulated that the Madoff Securities transfers received in that period were made with the intent required by § 548(a)(1)(A) those transfers were nevertheless received in "good faith"[1] and "for value" under §548(c).  In addition Mr. Cohen is additionally entitled to a time-value adjustment for his principal invested as well as a setoff under § 550(e) for taxes paid in defense to the Trustee's claims.

The proposed Conclusions of Law in this submission adopt both arguments and legal citations contained in filings submitted in the Madoff Securities liquidation and related adversary proceedings by the proposed intervenors.   Mr. Cohen supports the intervention motion, and reiterates that he has limited means and resources to properly pursue continuing litigation effort on these complex issues, including post-trial proceedings and any subsequent appeals.

---

[1] The Parties have stipulated to Mr. Cohen's "good faith" in the Joint Pretrial Order (JTPO, pg. 7).

## II.    THE ANTECEDENT DEBT DECISION IS NOT LAW OF THE CASE.

The Trustee argues that Mr. Cohen's arguments regarding the extent to which he received the transfers for value are foreclosed by the District Court's decision in *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Madoff Sec.), 499 B.R. 416, (S.D.N.Y. 2013) (the "Antecedent Debt Decision") (Trustee's Proposed Findings, pg. 18). This both overstates the Court's findings in that decision and ignores a subsequent ruling by the Second Circuit Court of Appeals that rejected the rationale expressed in that District Court decision.

### A.  There is No Law of the Case with Respect to the Time-Value Adjustment to Principal.

First, while the Antecedent Debt Decision held that only a defendant's investment of principal  may constitute "value" under § 548(c) in the context of a SIPA liquidation, it expressly declined to address the issue of time-value of that principal *as it related to the calculation of "value". Id.* at 422, n.5 (stating that the question of time-value adjustment to principal was not before the Court). The Trustee concedes this point in its Proposed Findings. (Trustee's pg. 27). However the assertion that Mr. Cohen's "time-value" contention is foreclosed by this Court's decision in 496 B.R. 744, 761 or in the Second Circuit's decision of *In re Madoff Sec.*, 779 F.3d 74, 81 (2d Cir. 2015) is without merit.

Neither decision addressed the time-value adjustment of principal for purposes of value under § 548(c).[2] Rather they only addressed the contention that a customer's affirmative "net equity claims" against SIPA was subject to a constant-dollar or time value adjustment. The issue of adjustment to principal as "value" under § 548(c) is a different issue, and was not before the

---

[2] It should additionally be noted that Mr. Cohen was not party to the "time-value" proceeding that the Trustee asserts as law of the case and therefore any decision on appeal is not binding on Mr. Cohen. *See, e.g,.United States v. Fallbrook Pub. Util. Dist.*, 193 F. Supp. 342, 344 (S.D. Cal. 1961) (a decision by an appellate court is not binding, or the law of the case, as to any of the parties except those participating in that appeal).

Court. While the Trustee takes the position that a decision on "net equity" claims necessarily implicates and governs Mr. Cohen's right to time-value for principal as "two sides of the same coin" (Trustee 28) – they are two different sides and two different statutes.  The Second Circuit previously rejected the Trustee's similar argument in its § 546(e) decision, stating that its prior decision regarding SIPA's definition of "net equity" had no bearing on its interpretation of separate and distinct bankruptcy code provisions.  Specifically the Court held:

> **Section 546(e) however, is part of the Bankruptcy Code, not SIPA, and was not in issue in [the Net Equity decision].** This is important because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality.

773 F.3d 411 at 423 (emphasis supplied).

The Net Equity decision cannot be applied to the terms of § 548(c). Mr. Cohen cannot be bound by the preclusive effect of these prior holdings where i) he was not party to those proceedings; and ii) the Court did not decide the issue that the Trustee now asserts is the purported law of the case.

### B.  The Antecedent Debt Decision Is No Longer Controlling Law.

#### 1.  The Second Circuit Court of Appeals Has Subsequently Rejected the Rationale Relied Upon in the District Court's Antecedent Debt Decision.

The precedential effect of the Antecedent Debt decision was rejected by the Second Circuit's Decision in the § 546(e) Case. The District Court's decision in the Antecedent Debt opinion was premised on a finding that the definition of "value" in § 548(c) was limited to principal in the context of a SIPA proceeding and that to allow the definition of "value" to exceed a customer's principal would conflict with the provisions of SIPA. 499 B.R. *supra*, at 423 (SDNY 2013) (the definition of "value" and the Trustee's authority "must be interpreted through the lens of SIPA's statutory scheme"). While the District Court declined to certify its decision to

the Second Circuit, the Court's rationale was subsequently rejected in the Trustee's appeal of the § 546(e) decision.

The Second Circuit rejected the Trustee's argument that the SIPA's remedial propose necessitated a differing interpretation of the Trustee's powers and of the terms "settlement payment" or "securities contract" in § 546(e). The Court held that Congress, in enacting SIPA and the Bankruptcy Code, struck a balance in "the need for an equitable result for the debtor and its creditors, and the need for finality". 773 F.3d 411, 423. It declined to redefine or give special meaning to the Code merely to achieve a better result – recognizing the equitable considerations must defer to the certainty provided by the express terms of the Code. *Id.* ("we are obliged to respect the balance Congress struck among these complex competing considerations."). Where, as here, a higher court has issued an intervening decision that changes the controlling law, the decision in the Antecedent Debt matter should and must be revisited. *See, e.g., Official Comm. of Unsec. Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP*, 322 F.3d 147, 167 (2d Cir. 2003)

## 2. The Antecedent Debt Decision Improperly Expanded of the Trustee's Avoidance Power in Contravention of SIPA and the Bankruptcy Code.

The powers of a SIPA-appointed Trustee to use the avoidance provisions of Title 11 are expressly limited by SIPA itself. The Trustee possesses "the same power and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11 of the United States Code." 15 U.S.C. § 78fff-1(a). Section 78fff–2(c)(3) of SIPA further provides that a Trustee may recover customer property transferred by the debtor "if and to the extent that such transfer is voidable or void." These are words of limitation and SIPA expressly places a SIPA Trustee in a no better position than a Trustee in a non-SIPA

12

proceeding.[3] Both the District Court and Second Circuit have recognized SIPA's limitation of the Trustee's avoidance powers, as well as the improvidence of rewriting the code to achieve a desired result.[4]

There is no conflict between § 548(c) and SIPA. SIPA requires the Trustee to take the powers of Title 11 as he finds it. There is no language in either the SIPA statute or in the Bankruptcy Code that supports a modification of § 548(c). Where SIPA required a modification of the Title 11 avoidance powers to further its remedial purpose, express statutory language was enacted.[5] No modification or expansion of the Trustee's Title 11 powers exists with respect to § 548.[6] Accordingly, there is no basis upon which SIPA can, or should, abrogate the claims and/or defenses otherwise available to Mr. Cohen.

The Antecedent Debt decision improperly limited the definition of "value" to principal. The basis for this limitation is that a defendant's § 548(c) defenses under Title 11 against the *bankruptcy estate* would otherwise be given the same priority as *customer claims* under SIPA. 499 B.R. at 422, 430. The two are distinct and independent rights. Contrary to that decision, a § 548(c) avoidance defense does not give a defendant an independent prioritized claim to the

---

[3] *See also*, *Picard v. HSBC Bank PLC*, 454 B.R. 25, 30 (S.D.N.Y. 2011) ("the powers of a SIPA trustee are still, as indicated, cabined by Title 11" (citing 15 U.S.C. § 78fff-2(c)(3))); *Greiff*, 476 B.R. 715, 722, n.7 ("SIPA expressly incorporates the limitations Title 11 places on [a] trustee's powers . . .")

[4] *Id.* (Rejecting the Trustee's argument that § 546(e) conflicted with SIPA because "applying the safe harbor provision would eliminate most avoidance powers granted to a trustee under SIPA negating its remedial purpose" and holding that the Net Equity decision does "not permit the Trustee to suspend the whole legal order in pursuit of a result he regards as equitable.")

[5] § 78fff-2(c)(3) of SIPA states that for the purposes of the Trustee's recovery of property under Title 11, property transferred by the debtor "shall be deemed to have been the property of the debtor". *Id*. This language was expressly included to resolve a conflict between SIPA and the Code – that the Trustee would lack standing to recover funds that the debtor held in trust for its customers. *See, e.g. SIPC v. BLMIS*, 513 B.R. 437, 443, 444, n.2 (S.D.N.Y. 2014) ("Section 78fff2(c)(3) merely creates a legal fiction that permits the Trustee to pursue transfers of customer property to customers under the avoidance provisions of the Bankruptcy Code").

[6] There is no merit to the contention that the generic provisions of 15 USCA § 78fff(b), that liquidation be conducted "in accordance with the Bankruptcy Code to the extent consistent with SIPA", supersedes the express limitations of the Trustee's powers of 15 USCA § 78fff–2(c)(3).

customer estate of Madoff Securities – it only acts as a defense to a prerequisite avoidance as is statutorily intended. The avoidance of the transfer must first occur as condition a precedent before any property held by a defendant can become part of the customer estate. *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207, n.7 (2d Cir. 2014).  Only then do the provisions of SIPA, as customer property, apply to the funds. *Id.* That an interplay of the two statutes may give rise to a less desired result does not amount to "conflict" and allow the customer claim provisions of SIPA to reach out and undermine the need for an avoidance consistent with the terms of Title 11.

The Court's rationale in the Antecedent Debt Decision is further inconsistent with the application of § 546(e) to the Trustee's claims. If, as contended, the faithful application of § 548(c) gives rise to an impermissible priority claim, the same must be true for the application of the § 546(e) defense – which similarly results in transfers before December, 2006 becoming "priority customer claims" under SIPA. However, as the Second Circuit has recognized, in the absence of unequivocal Congressional intent, the law is "obliged to respect the balance Congress struck among these complex competing considerations."[7]  Accordingly this Court should follow the Second Circuit's intervening opinion and apply the provisions of SIPA and the Code as plainly enacted.

## III.    THE TRUSTEE'S CONTRACTUAL OBLIGATIONS TO MR. COHEN CONSTITUTE ANTECEDENT DEBT UNDER § 548(c).

### A. Mr. Cohen Properly Preserved a Defense of Value for an Obligation Pursuant to New York U.C.C. Art. 11 and Federal Securities Law.

The Trustee erroneously asserts (Trustee's Proposed Findings, pg.30) that Mr. Cohen waived the contention that "obligations that were owed by Madoff to Mr. Cohen … provided a

---

[7] *See also*, *Picard v. Fairfield Greenwich Ltd*, 762 F.3d 199, 207

defense under Section 548(c)" because the issue was not preserved by the Second Revised Joint

Pretrial Order (ECF No. 60).  In fact, both Mr. Cohen's stated contentions and the parties'

stipulation of issues to be tried encompass and preserve the contention.  First, Mr. Cohen

specifically made the following contention:

> "The transfers made by Madoff Securities to Mr. Cohen were received in good
> faith and for value pursuant to Section 548(c).  Accordingly, Mr. Cohen has not
> been stripped of: his rights which include … *his claims for securities fraud
> pursuant to Section/Rule 10b5 of the Securities Exchange Act of 33/34; and his
> claims under New York's Article 8 of the U.C.C. for value of the account
> statements provided by Madoff Securities*."   [Second Revised Pretrial Order, §
> 4(B)(1) (italics added).]

Second, the parties stipulated that the following issues would be tried before the Court:

> 1.   The extent to which any of the Avoidable Transfers made by Madoff
> Securities to Mr. Cohen were made for value and in good faith pursuant to
> Section 548(c);

> 2. Whether Mr. Cohen is entitled to *any type of setoff with respect to the Trustee's
> fraudulent transfer claim*[.]"   [*Id.*, § V (italics added).]

### B. Madoff Securities' Obligations to Mr. Cohen as a Broker Constitute Value Where the Trustee has Failed to Avoid those Contracts.

The Second Circuit in the § 546(e) Decision concluded that Article 11 of New York's

Uniform Commercial Code constituted valid, existing obligations to Madoff Securities investors.

773 F.3d at 422. Section 28(a)(2) of the 1934 Act, of which SIPA is a part, further recognizes

that Mr. Cohen retains his rights and remedies that may arise under state law.  The Account

Statements provided by Madoff Securities established an enforceable legal obligation to Mr.

Cohen at the time they were issued and constituted "value" at the time the funds were

withdrawn. Where the Trustee has failed to avoid these obligations, Mr. Cohen is entitled to a

complete defense as his withdrawals never exceeded the funds owed pursuant to the Account

Statements.

15

The term "obligation" is broadly construed. *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005). *See also In re James River Coal Co.*, 360 BR 139, 163 (Bankr. E.D. Va. 2007). The obligations Madoff Securities owes Mr. Cohen have not been avoided – either because the Trustee failed to do so, or pursuant to the two year limitation period of § 546(e). In either circumstance, any subsequent transfer had to have been taken *for value* against those obligations. *In re Central Illinois*, 526 B.R. 786, 790 (Bankr. C.D. Ill. 2015); *In re All-Type Printing, Inc.*, 274 B.R. 316 (Bankr. D. Conn. 2002); *In re HDD Rotary Sales*, LLC, 512 B.R. 877, 886 (Bankr. S.D. Tex. 2014); *In re National Gas Distribs., LLC,* 412 B.R. 758, 766-67 (Bankr. E.D.N.C. 2009). Insofar as the Second Circuit has confirmed that the Account Statements created an obligation to transfer funds upon Mr. Cohen's request, it follows that that that transfer satisfied a then-existing obligation.

## C.  Section 29 of the '34 Securities Act Does Not Void The Broker Agreements.

The Second Circuit has established that fraud does not automatically void a fraudulent broker's obligations; it merely gives Mr. Cohen, as an innocent customer, the option to void any agreement.  *FDIC v. Giammettei*, 34 F.3d 51, 58 (2d Cir. 1984).  *See also Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970). Mr. Cohen has retained the right void a contract procured against him by fraud or to maintain an action for money damages against Madoff Securities, i.e., the value of the Account Statements provided. *Freeman v. Marine Midland Bank-New York*, 419 F. Supp. 440, 453 (EDNY 1976); *Kardon v. National Gypsum Co.,* 69 F. Supp. 512, 514 (E.D. Pa. 1946*); Cant v. AG Becker & Co., Inc.*, 384 F. Supp. 814, 816 (N.D. Ill. 1974). Conversely, the Trustee cannot invoke Section 29(b) to avoid the fraudulent contract.  *In re Bernard L. Madoff Inv. Secs. LLC*, 721 F. 3d 54, 63 (2d Cir. 2013). Where Mr. Cohen has never sought to void the contractual obligations, they remain as value under § 548(c).

### D. The Trustee May Not Invoke Common Law to Void the Agreements under the Doctrine of *In Pari Delicto*.

Because Madoff Securities' fraud is imputed to the Trustee, the doctrine of *in pari delicto* bars him from asserting common law claims for relief on behalf of the estate. *Picard v. HSBC Bank Plc*, 454 BR 25, 37 (Bankr. S.D.N.Y 2011)("[T]he Trustee cannot bring his common law claims on behalf of the estate. This is because such claims are negated by the common law doctrine of *in pari delicto*, which bars a trustee from suing to recover for a wrong that the debtor whose estate he represents, essentially took part in.") Accordingly, the Trustee's claims should be dismissed, and the Court should enter judgment in favor of Mr. Cohen.

### IV. Mr. Cohen's Federal and State Law Claims Constitute Antecedent Debt for the Purposes of § 548(c).[8]

SIPA preserves Mr. Cohen's state and federal claims and remedies through Section 28(a)(2) of the 1934 Act and through its incorporation of § 548(c). The Code broadly defines "claim" to mean "a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." § 101(5)(A). At the time Mr. Cohen withdrew each transfer in issue, he possessed numerous, valid claims against Madoff Securities for the fraud that was being perpetrated; all of which constitute value under § 548(c).

### A. Mr. Cohen held federal securities fraud claims against Madoff Securities at the time of the transfers, which are valued by their available remedies.

It is undisputed that Madoff Securities engaged in a fraudulent scheme both at the outset of Mr. Cohen's account opening and with each fictitious statement provided up and until

---

[8] The Trustee has only challenged the validity of Mr. Cohen's claims in his Proposed Findings of Fact and Conclusions of Law based upon the Antecedent Debt decision. To the extent the Trustee disputes the validity or valuation of Mr. Cohen's claims on any other ground, then Mr. Cohen reserves the right to address any defense not presented.

December, 2008. The parties have stipulated that Madoff Securities received monies from customers without the intent to invest; that the funds were not invested; and that Madoff Securities continued the fraud by issuing account statements purporting to show securities and cash positions not actually held by Mr. Cohen. The Madoff Securities scheme clearly meets the elements of securities fraud claim[9] that existed at the time the transfers were made during the two-year avoidance period.[10]

The value of Mr. Cohen's securities fraud claim includes rescission of the transaction as well as interest on, and compensation for, loss of the time value of money. 15 U.S.C. § 77l(a)(2); 15 U.S.C. § 78cc(b). In addition, Mr. Cohen is entitled to consequential damages resulting from the fraud. *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 803 (2d Cir. 1973) (consequential damages are available for federal securities law claims when they are established with certainty); *Stevens v. Abbot, Proctor & Paine*, 288 F. Supp. 836, 850-51 (E.D. Va. 1968) (finding that percentage of capital gains taxes due to defendant's fraudulent conduct were recoverable as actual damages).

**B.    Mr. Cohen's State-based fraud and breach of fiduciary duty claims against Madoff Securities constitute "value" for purposes of Section 548(c).**

A New York fraud claim requires a "representation of fact, which is … untrue and known to be untrue … and which [is] offered to deceive the other party and to induce [him] to act upon it, causing injury." *Jo Ann Homes v Dworetz,* 25 N.Y.2d 112, 119 (N.Y. 1969). The Trustee's

---

[9] These include (1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation," (5) economic loss, and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss. *See, e.g., Dura Pharms., Inc. v. Broudo*, 544 U.S. 336,341 (2005).

[10] The Trustee's arguments as to the statute of limitations ignore the principle that the value of the antecedent debt is valued at the time of the transfer. At the time of the transfers in 2006-2008, Mr. Cohen's actions for securities fraud were cognizable and well within the applicable insofar as the fraudulent behavior was present and ongoing at that time.

contentions and stipulated facts clearly establish that Mr. Cohen has a valid claim for fraud under New York law where Madoff Securities repeatedly and knowingly deceived Mr. Cohen as its intent to invest his principal as well as the gains and value as reflected in his account statements.

Mr. Cohen additionally held claims for breach of fiduciary duty against Madoff Securities, as both a broker and investment advisor. *See, e.g. Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341 (N.Y. 2011); *Scalp & Blade v. Advest Inc.*, 281 A.D.2d 882, 882–883 (N.Y. App. Div. 2001). A breach of fiduciary duty requires i) the existence of a fiduciary relationship, ii) misconduct by the defendant, and iii) damages that were directly caused by the defendant's misconduct. *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590 (N.Y. App. Div. 2007). Madoff Securities' acts in connection with Mr. Cohen's funds and account clearly rise to the level of misconduct and, as a result, Mr. Cohen has incurred significant, material damages.

New York law recognizes that actions for fraud and breach of fiduciary duty allow a party to recover its "out-of-pocket" loss. The value of the fraud claim is not only measured by rescission of the principal but by those consequential damages necessary to restore the defendant to the status quo ante. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d. Cir. 1985)). *3801 Beach Channel Inc., v. Shcvartzman*, 2010 WL 6471990 at * 10 (E.D.N.Y. Sept. 30, 2010); *Continental Casualty Co. v. PriceWaterhouse Coopers*, 15 N.Y.3d 264, 270 (N.Y. 2010); *105 E. Second St. Assocs. v. Bobrow*, 175 A.D.2d 746, 747 (N.Y. App. Div. 1991).

### C.    The Taxes Paid by Mr. Cohen on Income Fraudulently Reported by Madoff Securities Constitute Consequential Damages Recoverable under State and Federal Claims.

The taxes paid by Mr. Cohen from 1996 to 2002 on the gains reported by Madoff Securities are a direct and immediate result of Madoff's tortious conduct. Where an aggrieved

party incurs tax liability as a direct consequence of a party's fraudulent or tortious conduct, those damages are recoverable as "out-of-pocket" losses necessary to make a party whole. *See Beach Channel Inc., v. Shcvartzman,* 2010 WL 6471990 at * 10, n.10 (EDNY Sept. 30, 2010) (payment of taxes on fraudulently valued equipment was recoverable as a direct consequence to restore the status quo ante); *Magnaleasing, Inc. v. Staten Island Mall,* 428 F.Supp. 1039, 1045–46 (S.D.N.Y. 1977) (payments plaintiff made for taxes constituted direct pecuniary loss where fraud involved misrepresentation by landlord's agent about estimated tax cost); *Stevens v. Abbot, Proctor & Paine,* 288 F. Supp. 836, 850-51 (E.D. Va. 1968). Accordingly, Mr. Cohen is entitled a value defense of not less than seven hundred seventy three thousand, eight hundred sixty nine dollars ($773,869.00), plus interest thereon. (See Exhibit 1).

**D.    The Legal Costs Incurred by Mr. Cohen in Defense of this Adversary Proceeding Constitute Direct and Consequential Damage of Madoff's Tortious Conduct in 2006-2008.**

The legal fees incurred by Mr. Cohen in defending claims bought against him as a result of fraud are recoverable as consequential damages of Madoff Securities' fraud and breach of fiduciary duty. *See Mazuma Holding Corp. v. Bethke,* 21 F.Supp.3d 221, 235-236 (E.D.N.Y. 2014) (citing *The Ltd., Inc. v. McCrory Corp.*, 683 F.Supp. 387, 393 (S.D.N.Y.1988) ("consequential damages may include out-of-pocket expenses stemming from related litigation")). The Trustee's claims in the present action are a direct consequence of Madoff's Securities tortious conduct and constitute damages under state and federal law, and therefore value under § 548(c).

**E.    Mr. Cohen is Entitled to 9% Interest on his New York State Claims pursuant to CPLR § 5001(a).**

New York CPLR § 5001(a) provides that "interest shall be recovered upon a sum awarded … because of an act or omission depriving or otherwise interfering with title to, or

possession or enjoyment of, property." Interest is compulsory here where Madoff Securities has engaged in tortious conduct that denied Mr. Cohen the availability of his principal invested, as well as the funds expended as consequential damages. *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 694-95 (2d Cir. 1983).

>    F.    **Mr. Cohen is Entitled to the Lost Investment Opportunity as a Direct and Consequential Damage**.

Common law further recognizes that an award of lost opportunity is cognizable where a victim of fraud has been induced to forego alternative business or investment opportunities. *Trans World Airlines, Inc. v. 47th Street Photo, Inc. Eyeglasses*, 1990 WL 481956 at *9 (S.D.N.Y. April 16, 1990); *105 E. Second St. Assocs. v. Bobrow*, 175 A.D.2d 746, 747 (N.Y. App. Div. 1991). To the extent that Mr. Cohen is only entitled to a return of his original principal, Mr. Cohen has been damaged by the lost opportunity to invest the principal he invested with Madoff Securities and earn returns in excess of the 0% resulting from Madoff's fraud. In the event the Court denies interest on the principal invested, Mr. Cohen is additionally entitled to receive a rate of return on his principal as measured by the applicable risk-free rate of US Treasury bills during the period of his account investment.

## V.    THE VALUE OF THE PRINCIPAL CONTRIBUTED BY MR. COHEN MUST BE ADJUSTED FOR INFLATION TO REFLECT ITS TRUE VALUE.

Section 548(c) provides Mr. Cohen with a defense to the extent that the transfer was made for value. Critically implicit to this concept is that the value must be considered at the time of transfer. "Value" under Section 548(c) is measured by what the transferee relinquished on the date of the transfer. The appropriate measure of the value, therefore, must take into account the real value of the principal contributed by Mr. Cohen. A methodology that fails to account for that measure is untenable in that it compares dollars from different eras that can and should be

compared on a nominal, unadjusted basis – especially where Mr. Cohen had invested with

Madoff Securities for over 20 years and contributed most of this principal in the first 5 years of

his account.    *Proctor & Gamble Distrib. Co. v. Sherman*, 2 F.2d 165, 166 (S.D.N.Y. 1924)

(value must consider the effect of time on value between transfers). Notwithstanding the

Antecedent Debt decision, Mr. Cohen remains entitled to a revaluation of his principal pursuant

to the CPI index. (DX8, Exhibit 2).

## VI.    MR. COHEN IS ENTITLED TO SETOFF UNDER §550(E) FOR THE TAXES PAID ON THE PROPERTY RECEIVED FROM MADOFF SECURITIES.

Although the Trustee asserts recovery under § 550(a) of the Code (JTPO, pg. 11), §

550(e)(1) provides that a good faith transferee from whom the trustee may recover  under §548

has "a lien on the property recovered to secure the lesser of (A) the cost, to such transferee, of

any improvement made after the transfer…" *Id*. It further provides that "improvement" includes

"payment of any tax on such property". *Id*. at (e)(2). See, e.g., *In re Keeley & Grabanski Land

P'ship,* 531 B.R. 771, 776 (8th Cir. BAP 2015) (550(e) provides a setoff against fraudulent

conveyance claims). Insofar as the funds transferred to Mr. Cohen constitute "property" of the

Madoff Securities pursuant to § 78fff-2(c)(3), Mr. Cohen possesses a lien pursuant to taxes paid

thereon. (DX7).

## VII.    PRIOR "PONZI-SCHEME" PRECEDENT DID NOT INVOLVE BROKER-CUSTOMER RELATIONSHIPS.

The Antecedent Debt and prior decisions rely on cases that involved equity investment as

opposed to the securities/brokerage context.[11] As the Second Circuit recognized in the § 546(e)

decision, the existence of a brokerage-customer relationship is crucial in determining the rights

---

[11] *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) (receivables investments); *Hedged Invs. Assocs., Inc. v. Buchanan*
84 F.3d 1286 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) (sales of limited partnerships).

of the parties and legal interests implicated in an avoidance aciton.  More relevant precedent is found in *Visconsi v. Lehman Bros.*, 244 F. App'x 708 (6th Cir. 2007).  There the Sixth Circuit affirmed an arbitration award against a brokerage Ponzi scheme and held that the out-of-pocket rule was inadequate given the issuance of valid brokerage statements. There, as here, the Court recognized that customers in a securities/brokerage context have greater rights and expectations than other instances of fraud.

> Plaintiffs gave $21 million to [a broker] not to hide under a rock or lock in a safe, but for the express purpose of investment, with a hope-indeed a reasonable expectation-that it would grow. Thus, the out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages.

*Id*. at 713.

## CONCLUSION

Mr. Cohen has established that he is entitled to a full a complete defense of the Trustee's claims under 11 USC §548(c) and thus respectfully requests that an order be entered Dismissing the Trustee's sole remaining claim under §548(a) and/or other such relief as the Court deems proper and equitable.

LEWIS & McKENNA

By: /s/ Paul Z. Lewis

82 E. Allendale Road
Saddle River, New Jersey 07458
Telephone:  201.934.9800
Facsimile:  201.934.8681
Paul Z. Lewis
Email:  plewis@lewismckenna.com
Gregory Goett
Email: ggoett@lewismckenna.com
Attorneys for Defendant Andrew Cohen

# EXHIBIT 1

| Tax Year | Interest Accrual Date | Total Tax Paid | 9% Simple Interest Per Annum | Years Accrued as of January 3, 2007 | Total Interest as of January 3, 2007 | Tax Damages as of January 3, 2007 |
|---|---|---|---|---|---|---|
| 1996 | April 15, 1997 | $ 20,817.00 | $ 1,873.53 | 9.72 | $ 18,204.47 | |
| 1997 | April 15, 1998 | $ 76,237.00 | $ 6,861.33 | 8.72 | $ 59,807.93 | |
| 1998 | April 15, 1999 | $ 111,608.00 | $ 10,044.72 | 7.72 | $ 77,511.76 | |
| 1999 | April 15, 2000 | $ 164,927.00 | $ 14,843.43 | 6.72 | $ 99,698.37 | |
| 2000 | April 15, 2001 | $ 155,886.00 | $ 14,029.74 | 5.72 | $ 80,203.35 | |
| 2001 | April 15, 2002 | $ 125,643.00 | $ 11,307.87 | 4.72 | $ 53,335.45 | |
| 2002 | April 15, 2003 | $ 118,751.00 | $ 10,687.59 | 3.72 | $ 39,722.21 | |
| | | $ 773,869.00 | | | $ 428,483.53 | $ 1,202,352.53 |

| Date | Net Equity Balance | Unrecovered Taxes + Interest on Date of Withdrawl | Withdrawal | Balance After Withdrawal |
|---|---|---|---|---|
| 1/3/2007 | $186,539.00 | $ 1,202,352.53 | $ (90,000.00) | $ 1,298,891.53 |
| 1/23/2007 | - | $ 1,305,385.99 | $ (20,000.00) | $ 1,285,385.99 |
| 5/29/2007 | - | $ 1,325,875.65 | $ (50,000.00) | $ 1,275,875.65 |
| 7/5/2007 | - | $ 1,287,358.53 | $ (50,000.00) | $ 1,237,358.53 |
| 9/5/2007 | - | $ 1,255,918.91 | $ (50,000.00) | $ 1,205,918.91 |
| 10/1/2007 | - | $ 1,213,757.38 | $ (20,000.00) | $ 1,193,757.38 |
| 1/22/2008 | - | $ 1,226,884.15 | $ (200,000.00) | $ 1,026,884.15 |
| 1/23/2008 | - | $ 1,027,140.87 | $ (500,000.00) | $ 527,140.87 |
| 2/27/2008 | - | $ 531,621.56 | $ (170,000.00) | $ 361,621.56 |
| 6/10/2008 | - | $ 370,933.32 | $ (90,000.00) | $ 280,933.32 |
| 10/28/2008 | - | $ 290,625.52 | $ (90,000.00) | $ 200,625.52 |

# EXHIBIT 2

| Date | Deposit | CPI Adj. Per DOL /2008 |
|---|---|---|
| 1/18/1996 | $ 300,000.00 | $411,669.22 |
| 6/5/1996 | $ 140,000.00 | $192,112.30 |
| 3/10/1997 | $ 90,000.00 | $120,730.65 |
| 4/8/1997 | $ 190,000.00 | $254,875.83 |
| 5/30/1997 | $ 25,000.00 | $33,536.29 |
| 7/15/1997 | $ 15,000.00 | $20,121.78 |
| 8/19/1997 | $ 70,000.00 | $93,901.62 |
| 10/14/1997 | $ 25,000.00 | $33,536.29 |
| 11/14/1997 | $ 25,000.00 | $33,536.29 |
| 2/9/1998 | $ 20,000.00 | $26,417.55 |
| 3/19/1998 | $ 30,000.00 | $39,626.32 |
| 11/27/1998 | $ 60,000.00 | $79,252.64 |
| 12/18/1998 | $ 50,000.00 | $66,043.87 |
| 2/12/1999 | $ 30,000.00 | $38,770.05 |
| 3/9/1999 | $ 120,000.00 | $155,080.19 |
| 4/14/1999 | $ 35,000.00 | $45,231.72 |
| 6/25/1999 | $ 30,000.00 | $38,770.05 |
| 10/13/1999 | $ 120,000.00 | $155,080.19 |
| 11/19/1999 | $ 30,000.00 | $38,770.05 |
| 3/14/2000 | $ 200,000.00 | $250,061.56 |
| 3/19/2004 | $ 810,000.00 | $923,215.62 |
| 6/22/2004 | $ 75,000.00 | $85,482.93 |
| 10/25/2004 | $ 70,000.00 | $79,784.07 |
| 11/8/2004 | $ 50,000.00 | $56,988.62 |
| 9/9/2005 | $ 311,539.00 | $343,447.42 |
| **CPI Adjusted Prinicpal** | | **$3,616,043.12** |

* Calculated per  United States Bureau of Labor Stastics CPI Caluclator @ http://data.bls.gov/cgi-bin/cpicalc.pl