**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| SUSANNE STONE MARSHALL, ADELE FOX, MARSHA PESHKIN, and RUSSELL OASIS, | Adv. Pro. No. 15-01293 (SMB) |
| Plaintiffs, | |
| v. | |
| CAPITAL GROWTH COMPANY; DECISIONS, INC.; FAVORITE FUNDS; JA PRIMARY LIMITED PARTNERSHIP; JA SPECIAL LIMITED PARTNERSHIP; JAB PARTNERSHIP; JEMW PARTNERSHIP; JF PARTNERSHIP; JFM INVESTMENT COMPANIES; JLN PARTNERSHIP; JMP LIMITED PARTNERSHIP; JEFFRY M. PICOWER SPECIAL COMPANY; JEFFRY M. PICOWER, P.C.; THE PICOWER FOUNDATION; THE PICOWER INSTITUTE OF MEDICAL RESEARCH; THE TRUST F/B/O GABRIELLE H. PICOWER; BARBARA PICOWER, individually, and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabrielle H. Picower; and IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR DECLARATORY JUDGMENT** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTS .......................................................................................................................3

    I.       THE FOX PLAINTIFFS' CUSTOMER CLAIMS ................................3

    II.      THE PICOWER SETTLEMENT AND ISSUANCE OF THE
           PERMANENT INJUNCTION ................................................................4

    III.     FOX'S AND MARSHALL'S FIRST CHALLENGE TO THE
           PERMANENT INJUNCTION ................................................................5

          A.      The Bankruptcy Court's Enforcement of the Permanent
                 Injunction as Against Fox and Marshall .......................................5

          B.      The District Court Affirms the Enforcement of the
                 Permanent Injunction as Against Fox and Marshall ...................5

          C.      The Second Circuit Affirms the Enforcement of the
                 Permanent Injunction as Against Fox and Marshall ...................6

    IV.     FOX II: THE FOX PLAINTIFFS UNSUCCESSFULLY TRY
           AGAIN TO END-RUN THE PERMANENT INJUNCTION ................8

          A.      The Bankruptcy Court Again Enforces the Permanent
                 Injunction .....................................................................................8

          B.      The District Court Affirms the Bankruptcy Court's
                 Enforcement of the Permanent Injunction ..................................11

    V.      THE FOX PLAINTIFFS SEEK DISCOVERY ON THEIR
           CLAIMS IN DELAWARE.....................................................................13

    VI.     THE FOX III COMPLAINT ...............................................................14

ARGUMENT .........................................................................................................14

       THE DECLARATORY JUDGMENT MOTION MUST BE DENIED .........................14

    I.       STANDARD OF REVIEW ..................................................................14

    II.      VIRTUALLY ALL OF THE FOX III COMPLAINT HAS
           ALREADY BEEN HELD TO VIOLATE THE PERMANENT
           INJUNCTION.........................................................................................16

    III.     THE ADDITIONAL ALLEGATIONS ADD NOTHING ...................18

# TABLE OF CONTENTS
## (continued)

**Page**

A.    Madoff Did Not Testify That Picower Controlled the Fraud at BLMIS or Took Any Action Outside of His Own Accounts ................................................................................................19

B.    The Allegations That Picower Otherwise Bolstered the Fraud Duplicate the Trustee's Claims and Relate to Picower's Own BLMIS Accounts ............................................................22

C.    The Allegations That Picower Served as a Counterparty for Purported Options Trading are Derivative, Conclusory, and Unsupported by the Criminal Trial Testimony ..........................................25

D.    Fox III Continues to Assert Derivative and Generalized Claims ....................................................................................................28

        1.    The Alleged Claims Are No Different From Before ..................288

        2.    The Cases Relied Upon by the Fox Plaintiffs Are Inapposite .......29

        3.    The Fox Plaintiffs' Other Claims Fail As Well ...........................31

IV.    THE FOX PLAINTIFFS ATTEMPT TO CIRCUMVENT THE NET EQUITY DECISION ......................................................................32

V.    THE AUTOMATIC STAY BARS THE FOX III COMPLAINT ......................333

CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A & G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
No. 12 Civ. 6109 (RJS), 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013) ........................ *passim*

*Accurate Grading Quality Assurance, Inc. v. Thorpe*,
No. 12 Civ. 1343 (ALC), 2013 WL 1234836 (S.D.N.Y. Mar. 26, 2013) ............................... 15

*In re Asia Pulp & Paper Sec. Litig.*,
293 F. Supp. 2d 391 (S.D.N.Y. 2003) ...................................................................... 30

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011) ............................................................................... 1, 4

*Brass v. Am. Film Techs. Inc.*,
987 F.2d 142 (2d Cir. 1993) .................................................................................. 15

*In re Cabrini Med. Ctr.*,
No. 09-14398 (ALG), 2012 WL 2254386 (Bankr. S.D.N.Y. June 15, 2012) ........................ 33

*Dietrich v. Bauer*,
126 F. Supp. 2d 759 (S.D.N.Y. 2001) ...................................................................... 30

*Fox v. Picard (In re Bernard L. Madoff)*,
848 F. Supp. 2d 469 (S.D.N.Y. 2012) ............................................................... *passim*

*Fox v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
531 B.R. 345 (S.D.N.Y. 2015) ........................................................................ *passim*

*Freeland v. Iridium Worldwide Comms. Ltd.*,
545 F. Supp. 2d 59 (D.D.C. 2008) .......................................................................... 30

*Gant v. Wallingford*,
69 F.3d 669 (2d Cir. 1995) .................................................................................... 27

*Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum)*,
522 F.3d 575 (5th Cir. 2008) ................................................................................ 29

*Johns-Manville Corp. v. Chubb Indemn. Ins. Co. (In re Johns-Manville Corp.)*,
517 F.3d 52 (2d Cir. 2008) ................................................................................... 28

*Jones v. City of Cincinnati*,
521 F.3d 555 (6th Cir. 2008) ................................................................................ 27

*Katz v. Image Innovations Holdings, Inc.*,
542 F. Supp. 2d 269 (S.D.N.Y. 2008) ..................................................................... 30

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Lazzaro v. Manber*,
　　701 F. Supp. 353 (E.D.N.Y. 1988) .......................................................30

*Marshall v. Madoff*,
　　No. 15-mc-56 (JGK), 2015 WL 2183939 (S.D.N.Y. May 11, 2015) ....................13

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
　　740 F.3d 81 (2d Cir. 2014)............................................................ *passim*

*Medsker v. Feingold*,
　　307 F. App'x 262 (11th Cir. 2008) .................................................29, 30

*Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*,
　　96 F.3d 1151 (9th Cir. 1996) .........................................................30

*In re Parmalat Sec. Litig.*,
　　375 F. Supp. 2d 278 (S.D.N.Y. 2005).....................................................30

*Picard v. Fox (In re Bernard L. Madoff)*,
　　429 B.R. 423 (Bankr. S.D.N.Y. 2010)................................................5, 29–30, 32

*Picard v. JPMorgan Chase & Co.*,
　　721 F.3d 54 (2d Cir. 2013)..........................................................29, 30

*Picard v. Marshall (In re Bernard L. Madoff)*,
　　Adv. Pro. No. 14-01840, 2014 WL 5486279 (Bankr. S.D.N.Y. Oct. 30, 2014) ....................13

*Picard v. Marshall (In re Bernard L. Madoff)*,
　　511 B.R. 375 (Bankr. S.D.N.Y. 2014).......................................... *passim*

*Rieger v. Drabinksy (In re Livent, Inc. Noteholders Sec. Litig.)*,
　　151 F. Supp. 2d 371 (S.D.N.Y. 2001).....................................................15

*Ritchie Cap. Mgmt., LLC v. Gen. Elec. Cap. Corp.*,
　　No. 14 Civ. 8623 (PAE), 2015 WL 4635630 (S.D.N.Y. Aug. 4, 2015)............................28, 30

*In re Saint Vincents Catholic Med. Ctrs. of N.Y.*,
　　449 B.R. 209 (S.D.N.Y. 2011)............................................................15

*Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
　　477 B.R. 351 (S.D.N.Y. 2012)........................................................32

*In re SemGroup Energy Partners, L.P.*,
　　729 F. Supp. 2d 1276 (N.D. Okla. 2010) ..............................................30

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
   884 F.2d 688 (2d Cir. 1989)......................................................................6, 28, 30, 31

*In re Third Eighty-Ninth Assocs.*,
   138 B.R. 144 (S.D.N.Y. 1992)...............................................................................15

*Wight v. BankAmerica Corp.*,
   219 F.3d 79 (2d Cir. 2000).......................................................................................30

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................5, 33

11 U.S.C. § 362(a) .........................................................................................................33

15 U.S.C. § 78fff-2 ..........................................................................................................4

15 U.S.C. § 78t................................................................................................... *passim*

**Other Authorities**

Helen Davis Chaitman & Lance Gotthoffer, JP MADOFF: THE UNHOLY ALLIANCE
   BETWEEN AMERICA'S BIGGEST BANK AND AMERICA'S BIGGEST CROOK,
   *http://jpmadoff.com* ................................................................................................22

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the estate of Bernard L. Madoff

("Madoff"), by his undersigned counsel, respectfully submits this memorandum of law in

opposition to the motion filed by Susanne Stone Marshall, Adele Fox, Marsha Peshkin, and

Russell Oasis (collectively, the "Fox Plaintiffs") for a declaratory judgment concerning whether

their proposed Third Amended Complaint ("*Fox III*" or "*Fox III* Compl.") against the Picower

Parties[1] is barred by (1) the permanent injunction issued by this Court in its January 13, 2011

order (the "Permanent Injunction") in connection with the Trustee's settlement with the Picower

Parties ("Picower Settlement") and/or (2) the automatic stay provisions of the Bankruptcy Code.

## PRELIMINARY STATEMENT

Fox and Marshall have been trying to sue the Picower Parties since 2010 in order to

circumvent the Second Circuit's "Net Equity Decision," which affirmed that BLMIS customers

were not entitled to their false profits from Madoff's Ponzi scheme.  *In re Bernard L. Madoff Inv.*

*Sec. LLC*, 654 F.3d 229, 242 (2d Cir. 2011).  Knowing that they are barred from suing Madoff or

BLMIS for their false profits, the Fox Plaintiffs have instead sought to sue the Picower Parties by

attempting to allege that Jeffry Picower was somehow legally responsible for the Ponzi scheme.

To date, every court that has reviewed the Fox Plaintiffs' allegations has held that they derive

from the Trustee's fraudulent transfer claims against the Picower Parties, and therefore are

---

[1] The "Picower Parties" are: Capital Growth Company; Decisions, Inc.; Favorite Funds; JA Primary Limited
Partnership; JA Special Limited Partnership; JAB Partnership; JEMW Partnership; JF Partnership; JFM Investment
Companies; JLN Partnership; JMP Limited Partnership; Jeffry M. Picower Special Company; Jeffry M. Picower,
P.C.; the Picower Foundation; the Picower Institute of Medical Research; the Trust F/B/O Gabrielle H. Picower;
Barbara Picower, individually, and as executor of the estate of Jeffry M. Picower, and as Trustee for the Picower
Foundation and for the Trust F/B/O Gabrielle H. Picower.

barred by the Permanent Injunction entered by this Court in connection with the $7.2 billion Picower Settlement.

Relying this time around on testimony from Madoff in another case, the Fox Plaintiffs claim to have found the silver bullet that transforms their previous allegations from derivative of the Trustee's claims to independent of them. But stripping the allegations of their false gloss, Madoff's testimony says nothing about Picower's alleged control over BLMIS's operations. In fact, it says nothing more than that Madoff made the conscious decision to engage in fraud and that Picower profited from it by engaging in manipulations in his own accounts. The Trustee pled as much in 2009 and settled with the Picower Parties, as did the government, on the basis of these claims.

The Fox Plaintiffs also point to testimony from the criminal cases involving BLMIS employees to allege that Picower was complicit in the fraud. But these allegations are lifted nearly verbatim from allegations made by a competing set of class action plaintiffs—the "Goldmans"—which the Goldmans admitted were not based on responses provided by the criminal defendants, but rather, on the prosecutor's questions. (Declaration of Helen Davis Chaitman in Support of Plaintiffs' Motion for Declaratory Judgement ("Chaitman Decl.") Ex. D at 61–62; 74:1–3.) Other citations to the criminal testimony that purportedly show that Madoff and Picower allegedly "agreed," for example, to make false representations to regulators, neither say nor imply anything about any such agreement.

In response to the weaknesses in their allegations, the Fox Plaintiffs ask the Court to ignore the sources upon which they base their allegations. They argue that the issue presented is one of law, not fact. But that calculus misses the point—a court is free to ignore allegations that

are contradicted by the very documents they rely on. This plain rule of law is all the more significant here because the documents relied on are sworn testimony.

The Fox Plaintiffs know what they need to allege to bring a control person claim. They make the conclusory claim that Picower "did in fact control [] the overall decision-making at Madoff, the day to day activities at Madoff . . . including solicitation of customers, the record keeping for Picower's accounts and other customers' accounts, and the recording of securities transactions and cash transfers in and from all customer accounts, including those of the Class Members." (Chaitman Decl. Ex. A. ("*Fox III* Compl.") ¶ 127.) But just as in all of their prior complaints, the only specific factual allegations concern conduct within Picower's own accounts.

Counsel for the Fox Plaintiffs, by their own admission, have interviewed Madoff multiple times over the years. (*See, e.g.*, *Fox III* Compl. at 2.) And they have been unable to assert an independent, viable claim that is not barred by the Permanent Injunction. They have nothing more to offer than generalizations based on their skewed reading of Madoff's self-serving deposition testimony. The Fox Plaintiffs' request for declaratory relief should be denied.

## FACTS[2]

### I.    THE FOX PLAINTIFFS' CUSTOMER CLAIMS

In the BLMIS liquidation proceeding, this Court approved the Trustee's use of the net investment method to calculate net equity, meaning that BLMIS customers were not entitled to their false profits. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Mar. 8, 2010), ECF No. 2020. In its Net Equity Decision, the Second Circuit affirmed, holding that reliance on the fictitious profits

---

[2] Most of the pertinent facts have been laid out in prior briefing and court decisions. *See, e.g.*, *Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81 (2d Cir. 2014); *Fox v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 531 B.R. 345 (S.D.N.Y. 2015); *Fox v. Picard (In re Bernard L. Madoff)*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012).

shown on customer statements "would have the absurd effect of treating fictitious and arbitrarily

assigned paper profits as real and would give legal effect to Madoff's machinations." *In re*

*Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011).[3]

Each of the Fox Plaintiffs other than Russell Oasis filed customer claims, which were

resolved in the claims resolution process.[4]  (Affidavit of Vineet Seghal, sworn to on Dec. 18,

2015 ("Seghal Aff.") ¶¶ 3–6.)  The customer claims of Marshall and Peshkin were allowed and

have been satisfied in full.  (*Id.* ¶¶ 5, 7.)  And although Fox's net equity claims were denied

because she is a "net winner," like all other net winners she could still participate in the estate as

a general creditor (as could Marshall and Peshkin, for amounts above their net equity claims) if

the Trustee is able to recover more customer property than is required to satisfy net equity

claims.  *See* SIPA § 78fff-2(c)(1).

## II.    THE PICOWER SETTLEMENT AND ISSUANCE OF THE PERMANENT
         INJUNCTION

As recounted in *Fox v. Picard*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012) (Koeltl, J.), the

Trustee brought an adversary proceeding against Jeffry M. Picower (now deceased) and the other

Picower Parties, which the Trustee and the government settled for $7.2 billion.  Over Fox's and

Marshall's objections, Judge Lifland of this Court issued the following Permanent Injunction as

part of the Picower Settlement:

> [A]ny BLMIS customer or creditor of the BLMIS estate . . . is hereby
> permanently enjoined from asserting any claim against the Picower BLMIS
> Accounts or the Picower Releasees that is duplicative or derivative of the claims

---

[3] Counsel for the Fox Plaintiffs was part of the group that petitioned the United States Supreme Court for *certiorari* on the Net Equity Decision.  On June 25, 2012, the petitions were denied.  *See Velvel v. Picard*, 133 S. Ct. 25 (2012) (mem.); *Ryan v. Picard*, 133 S. Ct. 24 (2012) (mem.).

[4] Oasis was a limited partner in BLMIS Account number 1R0172 held by the RAR Entrepreneurial Fund.  (*Fox III* Compl. ¶ 22); *Picard v. RAR Entrepreneurial Fund, Ltd. et al.*, Adv. Pro. No. 10-4352 (Bankr. S.D.N.Y. Nov. 30, 2010), ECF No. 1.

brought by the Trustee, or which could have been brought by the Trustee against the Picower BLMIS Accounts or the Picower Releasees . . . .

(Declaration of Keith R. Murphy in Opposition to Fox Plaintiffs' Motion for Declaratory Judgment, dated Dec. 18, 2015 ("Murphy Decl.") Ex. A at 7.)  The Permanent Injunction does not bar actions where there is an independent basis on which to bring suit against the Picower Parties.  (*Id.* at 14–15.)

## III.   FOX'S AND MARSHALL'S FIRST CHALLENGE TO THE PERMANENT INJUNCTION

### A.   *The Bankruptcy Court's Enforcement of the Permanent Injunction as Against Fox and Marshall*

Prior to the issuance of the Permanent Injunction, Judge Lifland had held that the *Fox I* and *Marshall I* actions violated the automatic stay and at least one stay order of the District Court.  *Picard v. Fox (In re Bernard L. Madoff)*, 429 B.R. 423, 437 (Bankr. S.D.N.Y. 2010). The court declared the actions void *ab initio* and issued a preliminary injunction under § 105(a) of the Bankruptcy Code.  *Id.*  Fox and Marshall appealed that order.  *Fox*, 848 F. Supp. 2d at 472.  At the hearing on the Picower Settlement, this Court held that the Permanent Injunction barred Fox's and Marshall's putative class actions ("*Fox I*" and "*Marshall I*").  (Murphy Decl. Ex. I at 41:8–16.)

### B.   *The District Court Affirms the Enforcement of the Permanent Injunction as Against Fox and Marshall*

Fox and Marshall appealed this Court's orders declaring the *Fox I* and *Marshall I* class actions void *ab initio*, the approval of the Picower Settlement, and the entry of the preliminary injunction and Permanent Injunction.  The appeals were consolidated and heard by Judge John G. Koeltl of the District Court.  *See Fox*, 848 F. Supp. 2d at 469.  The District Court held that the *Fox I* and *Marshall I* complaints were a "transparent effort" to pursue claims that "were

5

duplicative of claims brought by the Trustee and that belonged to the Trustee on behalf of all creditors of BLMIS." *Id.* at 473.

The District Court reasoned that the wrongful acts alleged in the complaints "harmed every BLMIS investor (and BLMIS itself) in the same way: by withdrawing billions of dollars in customer funds from BLMIS and thus substantially diminishing the assets available to BLMIS. *Id.* at 480. The District Court further rejected Fox's and Marshall's attempts to "circumvent this obvious proposition by arguing that they are seeking different damages" such as the "lost time-value of their investments as well as any taxes paid on gains that never existed," because "these are all the same types of damages that could be claimed by other BLMIS customers in general." *Id.* The District Court held that such generalized claims belong to the Trustee under the Second Circuit's decision in *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 704 (2d Cir. 1989). *Id.* at 480–81. Finally, the District Court held that the "integrity of the SIPA liquidation itself" is protected by preventing customers from circumventing the Net Equity Decision and undermining the liquidation plan. *Id.* at 490.

### C.    The Second Circuit Affirms the Enforcement of the Permanent Injunction as Against Fox and Marshall

On January 13, 2014, the Second Circuit affirmed the District Court and upheld the Permanent Injunction as against Fox and Marshall. *See Marshall v. Picard (In re Bernard L. Madoff Inc. Sec. LLC)*, 740 F.3d 81 (2d Cir. 2014). The Second Circuit held that the *Fox I* and *Marshall I* actions "impermissibly attempt to 'plead around'" the Permanent Injunction because they "allege nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers." *Id.* at 84. Importantly, the Second Circuit held that "[t]he only allegations of the Picower defendants' direct involvement in the Ponzi scheme are that they prepared false

6

documentation, recorded and withdrew fictional profits, and filed false statements in connection

with their tax returns." *Id.* at 92.  Citing United States District Court Judge Richard J. Sullivan's

decision in a similar injunction case in the Madoff proceedings against Picower in the Southern

District of New York, the Second Circuit held that:

> [t]he . . . Complaints plead nothing more than that the Picower defendants traded
> on their *own* BLMIS accounts, knowing that such "trades" were fraudulent, and
> then withdrew the "proceeds" of such falsified transactions from BLMIS.  All the
> "book entries" and "fraudulent trading records" that the Complaints allege refer to
> nothing more than the fictitious records BLMIS made, *for the Picower
> defendants*, to document these fictitious transactions.   In other words, the
> Complaints plead nothing more than that the Picower defendants fraudulently
> withdrew money from BLMIS.

*Id.* (citing *A & G Goldman P'ship v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 12

Civ. 6109 (RJS), 2013 WL 5511027, at *7 (S.D.N.Y. Sept. 30, 2013)).  Accordingly, the Second

Circuit ruled that the *Fox I* and *Marshall I* Actions did not contain particularized claims because

they "do not allege that the Picower defendants made . . . misrepresentations to BLMIS

customers."  *Id.*  Rather, the "alleged injuries are inseparable from, and predicated upon, a legal

injury to the estate namely, the Picower defendants' fraudulent withdrawals from their BLMIS

accounts of what turned out to be other BLMIS customers' funds."  *Id.*

Notably, the Second Circuit held that: "[a]llegations that the Picower defendants

knowingly reaped the benefits of Madoff's scheme through fraudulent withdrawals, and effected

such withdrawals through backdating trades and recording fictional profits, does not amount to a

particularized claim that they directly participated in defrauding BLMIS customers by inducing

them to invest."  *Id.* at 93.  The Court also rejected Fox's and Marshall's argument that their

claims were non-derivative because they sought damages not available in an avoidance action,

finding that the "claimed damages, also suffered by all BLMIS customers, still remain mere

secondary harms flowing from the Picower defendants' fraudulent withdrawals and the resulting

depletion of BLMIS funds." *Id.*

## IV.    FOX II: THE FOX PLAINTIFFS UNSUCCESSFULLY TRY AGAIN TO END-RUN THE PERMANENT INJUNCTION

### A.    *The Bankruptcy Court Again Enforces the Permanent Injunction*

On February 18, 2014, Fox and Marshall, together with Peshkin and Oasis, and

purportedly representing a putative class, moved in the United States District Court for the

Southern District of Florida ("Florida District Court") to re-open the Fox Class Action, Case No.

10-80252, and for leave to file their *Fox II* complaint.  (Murphy Decl. Ex. B.)

The *Fox II* complaint was merely an amalgam of the complaints in the *Fox I* and

*Marshall I* Actions and proposed complaints asserted by another set of putative class action

plaintiffs, Pamela Goldman and A&G Goldman Partnership (the "Goldmans"), who had

attempted to plead control person securities claims against the Picower Parties under § 20(a) of

the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78t.  But the Goldmans' action also

was rejected by both this Court and Judge Sullivan of the District Court.  *See A & G Goldman*

*P'ship*, 2013 WL 5511027, at *1.  Judge Sullivan held that "a purely formalistic approach" that

looks only at the nominal title of a cause of action was improper, and determined that the

Goldmans' claims "are not bona fide securities fraud claims." *Id.* at *12.  Judge Sullivan found

instead that, aside from allegations listing the elements of a securities fraud claim, "all of the

allegations in the Complaint refer exclusively to the Picower defendants' fraudulent

withdrawals." *Id.* at *6, 11.  The District Court recognized that the Goldman Complaints pled

"nothing more than that the Picower defendants traded on their *own* BLMIS accounts," allege

fraudulently trading activity that BLMIS conducted "*for the Picower defendants*," and that, "[i]n

8

other words, the Complaints plead nothing more than that the Picower defendants fraudulently

withdrew money from BLMIS." *Id.* at *7.

Judge Sullivan further held that "the parts of the Complaints that *do* discuss aspects of the

BLMIS fraud unconnected to the Picower defendants' accounts noticeably *lack* any allegation

that the Picower defendants were involved in such fraud" and that "with respect to the clearest

examples of BLMIS's fraud to other customers, the Goldman Complaints are completely silent

about the Picower defendants' involvement." *Id.* at *7–8.  The District Court held that the:

> [Class Action Plaintiffs] do not in fact claim that the Picower defendants directed
> BLMIS to make misrepresentations above and beyond what was necessary to
> document the Picower defendants' false withdrawals.   The fraudulent
> representations Class Action Plaintiffs point to were incident to the fraudulent
> withdrawals.   Regardless of what Class Action Plaintiffs call their claims, the
> Goldman Complaints plead fraudulent conveyance claims.  Accordingly, they are
> clearly derivative of the Trustee's already-settled claims.

*Id.* at *9.  As a result, the District Court held that the Goldmans had brought "simply deceptively

labeled fraudulent conveyance claims." *Id.* at *10.  Accordingly, the Court held the claims came

"within the plain scope of the [Permanent] Injunction." *Id.*  The Goldmans did not appeal Judge

Sullivan's decision.

As with the rejected *Goldman I* and *Fox I* complaints, the *Fox II* complaint relied on the

same conclusory allegations as before: namely, that the Picower Parties knew that their actions in

their own accounts would affect other BLMIS accounts, and that such conduct is tantamount to a

misrepresentation to other BLMIS customers.  (*See, e.g.*, Murphy Decl. Ex. C ("*Goldman II*

Compl.") ¶¶ 2–3; Murphy Decl. Ex. B ("*Fox II* Compl.") ¶¶ 117, 119–20.)

On March 11, 2014, the Trustee sought to enjoin the *Fox II* action in this Court.  In the

same application, the Trustee also sought enforcement of the Permanent Injunction against the

Goldmans, who had separately sought to file a new putative class action in Florida, the *Goldman

II* action.  On June 23, 2014, this Court issued a decision enforcing the Permanent Injunction

9

against the Fox Plaintiffs and the Goldmans.  *Picard v. Marshall (In re Bernard L. Madoff)*, 511

B.R. 375 (Bankr. S.D.N.Y. 2014).  This Court held that the Fox Plaintiffs had failed to allege

non-derivative or non-duplicative claims specific to any particular customer or creditor, as

opposed to generalized to the estate: "regardless of the label the plaintiffs choose to attach to

their claims, a claim based on the Picower [Parties'] fraudulent withdrawals and fraudulent

entries in their accounts, without any particularized allegations that the Picower [Parties] directly

participated in any misrepresentation to the customers, is derivative of the Trustee's fraudulent

conveyance claims against the Picower defendants."  *Id.* at 390.

As to the Fox Plaintiffs' allegations, this Court held that "the allegations are conclusory"

and "absent particularized allegations that the Picower defendants directed BLMIS to send false

financial information or participated in its dissemination, the [Fox Plaintiffs'] claims are based

on the secondary effects of the fraudulent transfers to the Picower defendants and are inseparable

from the Trustee's claim."  *Id.*  This Court further examined the Fox Plaintiffs' allegations that

Picower purportedly solicited investors or induced Madoff to do so.  This Court found these

allegations entirely conclusory: "the [Fox Plaintiffs] do not even allege that they were solicited

directly or indirectly by Picower to invest in BLMIS."  *Id.* at 394.[5]  The Fox Plaintiffs appealed

this Court's Decision and Order.

In addition, because the *Goldman II* complaint only restated the legal standard for control

person liability under § 20(a) without alleging that Picower "was an officer of BLMIS" or

including any "particularized allegations that Picower Parties did anything besides fraudulently

withdraw money from BLMIS and cause BLMIS to make phony entries in the records *of their*

---

[5] This Court found it unnecessary to determine the application of the automatic stay in light of its ruling that the Fox Plaintiffs' claims in the *Fox II* complaint were duplicative and derivative of the Trustee's claims and thus barred by the Permanent Injunction.  *Marshall*, 511 B.R. at 395.

*accounts*," this Court found their claims derivative. *Id.* at 393 (emphasis added). The Goldmans

voluntarily dismissed their appeal of that decision.[6]

### B.    *The District Court Affirms the Bankruptcy Court's Enforcement of the Permanent Injunction*

On May 11, 2015, Judge Koeltl of the District Court affirmed this Court's Order. *Fox v.

Picard*, 531 B.R. 345 (S.D.N.Y. 2015). The District Court recognized that "[a]lthough the same

factual allegations may give rise to both derivative and independent claims, the Fox Plaintiffs

may not state independent claims merely by asserting new legal claims or seeking different

forms of relief than the Trustee," and that "[r]ather, courts should 'inquire into the factual origins

of the injury' and 'nature of the legal claims asserted.'" *Id.* at 351 (citing *Marshall*, 740 F.3d at

89, 91–93).

Applying this standard, the District Court held that the *Fox II* complaint stated derivative

claims and that the Bankruptcy Court had properly enjoined the Fox Plaintiffs from filing the

*Fox II* complaint. *Fox*, 531 B.R. at 351–54. Discussing first the Fox Plaintiffs' claim under

§ 20(a) of the Securities Exchange Act, the District Court held that the Fox Plaintiffs had not

made any particularized allegations about any misrepresentations made by the Picower Parties,

or any direct involvement of the Picower Parties in misrepresentations made to customers by

Madoff. *Id.* at 352. Analogizing to Judge Sullivan's *Goldman I* decision, the District Court held

that the *Fox II* complaint did not allege any specific misrepresentations by the Picower Parties

and, with respect to Madoff's misrepresentations in account statements sent to BLMIS

customers, the allegations regarding Picower's involvement were "entirely conclusory" and

---

[6] On August 28, 2014, the Goldmans brought a putative class action for the third time against the Picower Parties, this time in the United States District Court for the Southern District of Florida ("*Goldman III*" or "*Goldman III* Compl."). On November 17, 2014, the Trustee brought an adversary proceeding to enforce the Permanent Injunction against the *Goldman III* complaint. (*See* Complaint, *Picard v. A & G Goldman P'ship*, Adv. Pro. No. 14-02407 (Bankr. S.D.N.Y.).) This Court heard argument on February 5, 2015 and the motion is *sub judice*.

"simply 'based on the secondary effects of the fraudulent transfers to the Picower Defendants'

and thus 'inseparable from the Trustee's claim.'"  *Id.* (quoting *Marshall*, 511 B.R. at 394).

Judge Koeltl compared specific paragraphs that the Fox Plaintiffs argued stated

particularized claims to similar paragraphs in the *Goldman I* complaint and, like Judge Sullivan,

rejected them.  *Id.* at 352–53.  The court held that the Fox Plaintiffs: (1) alleged actions taken by

the Picower Parties regarding their *own* BLMIS accounts; (2) made particularized factual

allegations regarding the BLMIS fraud but "the Picower defendants are nowhere to be found;" or

(3) made "conclusory allegations of control person liability with no particularized factual

support."  *Id.*  For these reasons, the court held that "'[t]he *Fox II* Complaint does not include

any particularized allegations that Picower solicited any investor or induced Madoff to do so."

*Id.* at 353 (citing *Marshall*, 511 B.R. at 394).

The District Court likewise rejected the rest of the claims in the *Fox II* complaint,

determining that "the bankruptcy court was plainly correct in finding those claims to be

derivative" because they did not allege particularized injuries directly traceable to the Picower

Parties' conduct.  *Id.*  The court concluded that:

> the [Fox Plaintiffs] seek to bring claims based on legal theories that Judge
> Sullivan in *Goldman* and the Second Circuit Court of Appeals in *Marshall*
> explained could qualify *theoretically* as independent claims.  However, the [Fox
> Plaintiffs] have merely repackaged the same facts underlying the Trustee's claims
> *without any new particularized injuries of the [Fox Plaintiffs] that are directly*
> *traceable to the Picower defendants*.  Thus, all of the claims in the *Fox II*
> Complaint "impermissibly attempt to 'plead around' the bankruptcy court's
> injunction barring all 'derivative claims,'" *Marshall*, 740 F.3d at 96, and the
> bankruptcy court properly granted the Trustee's motion to enjoin the filing of the
> *Fox II* Complaint in the Florida district court.

*Id.* at 354 (emphasis added).  The Fox Plaintiffs appealed to the Second Circuit but subsequently

withdrew that appeal.  (Mandate, *Marshall v. Madoff*, No. 15-1886 (2d Cir. Oct. 9, 2015), ECF

No. 80.)

## V.    THE FOX PLAINTIFFS SEEK DISCOVERY ON THEIR CLAIMS IN DELAWARE

Within a few days after appealing this Court's *Fox II* decision to the District Court, the

Fox Plaintiffs simultaneously sought to short circuit that review and proceed with their litigation

by moving for discovery in this Court, including perpetuating the deposition testimony of

Madoff under Fed. R. Civ. P. 27(a).  (*See* Notice of Motion, *Picard v. Marshall*, Adv. Pro. No.

14-01840 (Bankr. S.D.N.Y. filed Aug. 18, 2014), ECF No. 63.)  This Court held that it lacked

jurisdiction to rule on the Rule 27(a) portion of the motion, and further rejected the Fox

Plaintiffs' other discovery requests.  *See Picard v. Marshall (In re Bernard L. Madoff)*, Adv. Pro.

No. 14-01840, 2014 WL 5486279, at *4 (Bankr. S.D.N.Y. Oct. 30, 2014).  Shortly thereafter,

while the District Court appeal of *Fox II* was pending, the Fox Plaintiffs petitioned the United

States District Court for the District of Delaware (the "Delaware District Court") to take

Madoff's deposition under Rule 27(a).  (*See Marshall v. Madoff*, 15-CV-1 (D. Del. filed Jan. 2,

2015.))  Following a substantive telephone conference and briefing, the Delaware District Court

granted the Trustee and Picower Parties' joint motion to transfer venue to the Southern District

of New York.  *See Marshall v. Madoff*, No. 15-mc-56 (JGK), 2015 WL 2183939, at *2

(S.D.N.Y. May 11, 2015).  The Fox Plaintiffs then filed a writ of mandamus with the Third

Circuit, which was summarily denied.  *Id.* at *2 n.1.  Judge Koeltl subsequently denied the Rule

27 petition, holding among other things that the Fox Plaintiffs appeared to be bringing their

petition for an improper purpose.  *Id.* at *4.

13

## VI.    THE FOX III COMPLAINT

Having lost in this Court, in district courts in New York and Delaware, and the Second and Third Circuits,[7] the Fox Plaintiffs nevertheless brought this declaratory judgment action on August 29, 2015 in this Court against the Picower Parties and the Trustee, seeking a declaration that neither the Permanent Injunction nor the automatic stay barred the *Fox III* complaint against the Picower Parties. (Complaint for Declaratory Judgment at 8–9.)

The *Fox III* complaint is virtually identical to the rejected *Fox II* complaint, except it adds testimony from the criminal proceedings of BLMIS employees, and allegations purportedly based on Madoff's deposition testimony in another case from years ago.  (*See Fox III* Compl. ¶¶ 6–9, 67, 69, 72–81, 83–85, 89.)  The complaint again attempts to allege, among other things, that Jeffry Picower was a control person of BLMIS under § 20(a) of the Exchange Act, and was therefore responsible for misrepresentations and omissions by BLMIS to BLMIS customers that induced customers to invest and stay invested with BLMIS.  (*Fox III* Compl. ¶ 3.)

### ARGUMENT

### THE DECLARATORY JUDGMENT MOTION MUST BE DENIED

## I.    STANDARD OF REVIEW

As the District Court recognized, "Trying to figure out what 'derivative' means and how it applies sort of feels like assessing the merits of the pleading for a securities claim under 12(b)(6).  Feels like it.  But they are distinct analyses."  (Murphy Decl. Ex. M at 38:21–25.)  As

---

[7] The Fox Plaintiffs also previously sought to prosecute their purported claims against the Picower Parties in the Florida District Court, but that court deferred to this Court.  (*See Fox v. Jeffry M. Picower Estate*, No. 10-80252 (S.D. Fla. Filed Feb. 16, 2010).)  The Eleventh Circuit dismissed the Fox Plaintiffs' appeal of that decision as moot. (*See Fox v. Jeffry M. Picower Estate et al.*, 14-11250, Order (11th Cir. Aug. 27, 2014).  To date, the Fox Plaintiffs' attempts to assert non-derivative claims have been rejected by numerous courts and judges across the country, including by Your Honor, Judge Lifland, Judge Koeltl, Judge Sullivan, Judge Kenneth Ryskamp of the Florida District Court, Chief Judge Stark of the Delaware District Court, and panels on the Second, Third, and Eleventh Circuits.

part of its review, it is proper for the Court to examine the testimony in the criminal trial of

former BLMIS employees and the Madoff deposition testimony, upon which the *Fox III*

complaint expressly relies.  This would be true even under the stricter standard for a motion to

dismiss, which generally confines judicial review to the four corners of a complaint, except with

respect to documents referred to or relied on in the complaint.  *See Brass v. Am. Film Techs. Inc.*,

987 F.2d 142, 150 (2d Cir. 1993) ("[C]onsideration is limited to . . . documents attached to the

complaint as an exhibit or incorporated in it by reference . . . or to documents either in plaintiffs'

possession or of which plaintiffs had knowledge and relied on in bringing suit.")  And it is

certainly true under the more liberal standard for the enforcement of an injunction, for which

even evidentiary hearings are permissible.  *See, e.g.*, *In re Saint Vincents Catholic Med. Ctrs. of*

*N.Y.*, 449 B.R. 209, 215–16 (S.D.N.Y. 2011) (approving of bankruptcy court's review of

documents explicitly relied upon by challenger to automatic stay); *In re Third Eighty-Ninth*

*Assocs.*, 138 B.R. 144, 146 (S.D.N.Y. 1992) (court heard evidence in connection with request for

§ 105 injunction).

Courts need not accept as true allegations that are contradicted by the very documents

upon which they rely.  *Rieger v. Drabinksy (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F.

Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("[A] court need not feel constrained to accept as

truth . . . pleadings . . . that are contradicted either by statements in the complaint itself or by

documents upon which its pleadings rely.")  And here, this is all the more true because the

"documents" relied on are sworn testimony.  *See Accurate Grading Quality Assurance, Inc. v.*

*Thorpe*, No. 12 Civ. 1343 (ALC), 2013 WL 1234836, at *8 (S.D.N.Y. Mar. 26, 2013).

## II.    VIRTUALLY ALL OF THE FOX III COMPLAINT HAS ALREADY BEEN HELD TO VIOLATE THE PERMANENT INJUNCTION

Employing this standard of review to earlier iterations of the Fox Plaintiffs' complaint, this Court and the District Court have specifically addressed and rejected almost all of the allegations made by the Fox Plaintiffs again in the *Fox III* complaint.  The essence of the *Fox III* complaint is that Picower was a control person of BLMIS under § 20(a) of the Exchange Act, and directly or indirectly controlled BLMIS in perpetrating the fraud.  The *Fox III* complaint alleges:

> 3.  Madoff, acting directly and indirectly under the control of the late Jeffry Picower, lied to the Plaintiffs or their representatives, failed to disclose information he was legally obligated to disclose, and thereby induced the Plaintiffs to entrust Madoff with their money, in the belief that Madoff was going to invest their money in various securities, and with the hope that such securities would appreciate over time.

> 53.  . . .Through his close relationship with Madoff, Picower had access to Madoff's books and records, directed the affairs of Madoff, and became Madoff's *de facto* partner.

> 62.  Picower exercised direct and indirect control over the day-to-day operations of Madoff and over his illegal trading activities.

Just as they were in *Fox II*, these allegations of control in *Fox III* are entirely general and simply state conclusions that are devoid of any particular allegations that could support them.  (*Compare Fox II* Compl. ¶ 46 ("Picower fully and knowingly participated in the fraud . . . and actively encouraged people to enter into investment advisory agreements with BLMIS"), *with Fox III* Compl. ¶ 59 ("Picower fully and knowingly participated in the fraud and actively encouraged people to enter into investment advisory agreements with Madoff."); *compare Fox II* Compl. ¶ 119 ("Picower directly or indirectly induced the material misrepresentations and omissions giving rise to the securities violations alleged herein"), *with Fox III* Compl. ¶ 128 ("The

misrepresentations and deceptive actions directed by Picower proximately induced customers to

entrust their funds to a thief.").)

These are the same types of "conclusory allegations of control person liability with no

particularized factual support" that the District Court rejected as derivative allegations. *See Fox*,

531 B.R. at 353–54; *see also A & G Goldman P'ship*, 2013 WL 5511027, at \*6, \*8–9; *Marshall*,

511 B.R. at 393. They fail here, too, for the same reasons.

The vast majority of the remaining facts are taken directly, often verbatim, from the *Fox

II* complaint already rejected by both this Court and the District Court. The *Fox III* complaint

alleges that Picower: (1) backdated trades in his BLMIS accounts (*Fox III* Compl. ¶¶ 9(a), 82–

89); (2) took out margin loans (*id.* ¶¶ 62–64, 189); (3) knew that there was false information in

BLMIS's financial disclosures (*id.* ¶¶ 90–95); and (4) referred clients to BLMIS (*id.* ¶¶ 9(c); 57–

59).

The allegations that Picower backdated trades and otherwise directed fictitious trading

relate only to Picower's conduct *in his own accounts* and are word-for-word the same allegations

the District Court specifically rejected in *Fox II* as derivative. *See Fox*, 531 B.R. at 353;

*compare Fox II* Compl. ¶ 44 ("Picower directed Madoff . . . to document fictitious gains in the

accounts of the Picower Parties . . . ), *with Fox III Compl.* ¶ 85 ("Picower also directed Madoff

employees to document fictitious gains in the Picower accounts . . . "); *compare Fox II* Compl.

¶ 47 (the Picower Parties "demanded that BLMIS manufacture fictitious losses for the Picower

Parties . . . ."), *with Fox III* Compl. ¶ 84 (the Picower Parties "demanded that Madoff

manufacture fictitious losses for Picower . . .").

The allegations about margin loans likewise solely concern Picower's direction of

activity *in his own BLMIS accounts*. (*Fox III* Compl. ¶¶ 62–64.) These allegations have been

rejected before and cannot save the *Fox III* complaint from the reach of the Permanent

Injunction. *See Fox*, 531 B.R. at 353 (rejecting margin loan allegations).

The allegations about Picower's knowledge of false information in BLMIS's financial

disclosures are similarly conclusory and were rejected in *Fox II*. *Id.* at 352–53. The *Fox III*

complaint alleges that Picower knew that his direction of false trading activity in his accounts (1)

would be reflected in the FOCUS reports BLMIS filed monthly with FINRA, and (2) would

indirectly cause other BLMIS customers' account statements to reflect fictitious trades.

(*Compare Fox III* Compl. ¶¶ 93–94, *with Fox II* Compl. ¶¶ 55–56.) But as with *Fox II*, there are

no allegations that Picower was directly involved in preparing or disseminating these false

disclosures. Again, the Fox Plaintiffs "make particularized factual allegations regarding the

BLMIS fraud, but the Picower defendants are nowhere to be found . . . ." *Fox*, 531 B.R. at 353–

54.

The allegations about Picower's soliciting investors are no different from the allegations

in *Fox II*, and have no direct connection to the Picower Parties. (*Compare Fox III* Compl. ¶ 57,

*with Fox II* Compl. ¶ 54.) As this Court found with respect to the *Fox II* complaint, the *Fox III*

complaint "does not include any particularized allegations that Picower solicited any investor or

induced Madoff to do so," and the Fox Plaintiffs "do not even allege that they were solicited

directly or indirectly by Picower to invest in BLMIS." *Marshall*, 511 B.R. at 394.

## III.    THE ADDITIONAL ALLEGATIONS ADD NOTHING

The "big news" in the *Fox III* complaint, according to the Fox Plaintiffs, is Madoff's

deposition testimony from the *Optimal* litigation.[8] Its importance, they assert, "cannot be

---

[8] *See In re Optimal Litig.*, 10-CV-4095 (SAS) (S.D.N.Y.). The *Optimal* litigation is an action by investors in the Optimal Strategic U.S. Equity Fund for losses related to the fund's investment with BLMIS. The Picower Parties were not parties to the litigation.

overstated," as it purportedly "explicitly identified Jeffry Picower as being complicit in

[Madoff's] crime" and "provided detailed information as to the control Picower wielded over

him and how that control led to the creation and expansion of Madoff's fraudulent scheme."

(Fox Br. at 8–9.)  Indeed, they ask, "how much more specific testimony of control can there be

than Madoff's testimony that he started his fraud because Picower asked him to?"  (*Id.* at 14.)

The problem with the Fox Plaintiffs' rhetoric is just that—mere rhetoric.  It is based on a

misreading of Madoff's testimony, which tells a different story.

While Madoff did say that Picower (and others) were "complicit" in his crime, when

asked to elaborate, Madoff responded they were all guilty of tax fraud—which would make

sense based on activity in their own accounts that they presumably falsely reported to tax

authorities.  (Chaitman Decl. Ex. A, Ex. A thereto ("Madoff Dep.") at 108:16, 19–24.)

Other than the Madoff testimony, the only other "new" allegations are those already

raised in *Goldman III*: that Picower extended loans to shore up the fraud during cash shortages,

agreed to be listed as an options counterparty in BLMIS's books and records, and agreed to let

Madoff know if anyone asked Picower about being a counterparty. (*Compare Fox III* Compl.

¶¶ 9(b), 71–81, 66–69, 54, 56, *with* Murphy Decl. Ex. P (*Goldman III* Compl.) ¶¶ 67–75, 77, 79–

81.)  These allegations fail to allege an independent claim for the same reasons they fail in

*Goldman III*—they are based on nothing more than the questions asked by prosecutors in a jury

trial, and allege nothing more than that Picower's transactions in his own accounts helped prop

up the fraud.

### A.    *Madoff Did Not Testify That Picower Controlled the Fraud at BLMIS or Took Any Action Outside of His Own Accounts*

The *Fox III* complaint alleges:

54. Picower started investing with Madoff in the late 1980s with his personal
funds and the funds of the other Defendants. In or about 1987, at the insistence of

19

> Picower, Stanley Chais, and Carl Shapiro, Madoff structured an investment that
> would benefit these investors if stock market prices stayed low, but which would
> expose Picower—and Madoff—to enormous risk if the market rose. . . . Madoff
> then turned his business "illegitimate" in order to cover the losses and thus did
> history's largest financial fraud begin.

(*Fox III* Compl. ¶ 54.) Putting aside that statements by Madoff, a notorious liar, are inherently

unreliable, the Fox Plaintiffs' characterization attempts to gloss over the *five years* that passed

between 1987 and the year the Fox Plaintiffs claim the Ponzi scheme supposedly began. (*See

Fox III* Compl. ¶ 7 ("Madoff further testified that he started what became history's largest

financial fraud only because, in 1992, Picower told Madoff he had suffered huge losses on

investments that Madoff had placed with foreign banks and Picower directed Madoff to cover

those losses for him . . ."); ¶ 9 ("Madoff commenced his fraud in 1992 in response to Picower's

demands  . . ."); ¶¶ 44–52, 71, 100 ("In his plea allocution, Madoff stated that he began the

Madoff Investment Program in 1992 . . ."); ¶ 105 (class is defined as customers who invested

with BLMIS starting December 1, 1992); ¶¶ 139, 161 (treating the starting point of the fraud as

1992).)[9]

But more to the point, Madoff did not say what the Fox Plaintiffs portray him as saying.

Madoff's story in his sworn testimony, although proven false by his lack of any true securities

trading, is that Picower and others agreed to enter into *actual securities transactions* with French

banks on the other side, but then decided to back out of the transactions when they thought the

market was turning. (Madoff Dep. at 39:4–40:8.) Madoff did not want to unwind the

transactions and ruin his relationship with the French bank counterparties, so he stepped into the

place of Picower and the others, assuming their risk. (*Id.* at 45:15–47:4.) Picower and the others

---

[9] It is worth noting that the testimony about when the fraud began contradicts the testimony of the Trustee's proof of
fraud and insolvency expert, Bruce Dubinsky, that, *inter alia*, BLMIS did not engage in the purported investment
transactions for investment advisory business customers at least as far back as the 1970s. (Declaration of Bruce G.
Dubinsky, Exs. 1–2, *Picard v. Merkin*, (*In re Bernard L. Madoff Inv. Sec. LLC*), 09-01182 (SMB) (Bankr. S.D.N.Y.
Nov. 25, 2015), ECF Nos. 296, 296-1, and 296-2.)

assured Madoff that he would not suffer any losses, but if he did, Picower and the others would

make them up to him, by for example, changing their trusts and their wills so that Madoff would

be held harmless.  (*Id.* at 48:3–5.)  Madoff supposedly trusted them because they were "like

family."  (*Id.* at 47:15.)  But as time went by, Picower complained to Madoff that he had lost

most of his fortune, and Madoff became concerned that Picower would not be able to cover

Madoff's losses.  (*See id.* at 49:25–53:17.)  And, according to Madoff, that is why he decided to

start the largest Ponzi scheme in history.  (*Id.* at 55:24; 111:18–20.)  Madoff's problem with

Picower is that when it turned out Picower was able to write a $7 billion check to settle with the

Trustee and the government, Madoff realized that Picower had had plenty of money all along.

(*Id.* at 111:14–23.)  Madoff thus paints Picower as a savvy investor in actual securities who

walked away from an apparently informal commitment to Madoff—and not as either the founder

of or a participant in the BLMIS Ponzi scheme.  Madoff's testimony about his relationship with

Picower, like the evidence of Picower's actions within his own accounts, does not support the

allegations that he controlled the BLMIS fraud.

As to Picower's involvement in the BLMIS scheme, the Fox Plaintiffs rely primarily on

Madoff's statement that Picower and others were "complicit in the crime."  But Madoff's

response to the next question—"Why were they complicit?"—takes the wind out of the Fox

Plaintiffs' sails: "Well, because they had violated tax laws based upon what I discussed with

them and other things that I knew that they were doing with people in my firm, bookkeepers,

who are all now under investigation. . . . And these people are all aware of the fact that I have

information that will send them to prison."  (Madoff Dep. at 108; *see also id.* at 43–52

(discussing Picower's losses in his own accounts).)

Far from being a smoking gun, the allegation that there was fraudulent activity in the

Picower accounts has been the staple of the Fox Plaintiffs' complaints (and of the Trustee's)

from the very beginning.  Even with the benefit of Madoff's deposition testimony and their own

supposed hours of interviews with Madoff,[10] the Fox Plaintiffs cannot articulate specific

allegations that would support the conclusion that Picower was a control person of BLMIS.

### B. The Allegations That Picower Otherwise Bolstered the Fraud Duplicate the Trustee's Claims and Relate to Picower's Own BLMIS Accounts

The *Fox III* complaint, like the *Goldman III* complaint before it, alleges that the Picower

Parties helped perpetuate the fraud during liquidity crises by making two "sham" loans to

Madoff in 1992 and 2006, respectively.  (*See Fox III* Compl. ¶¶ 9(b), 71–81.)  The Fox Plaintiffs

allege:

> 9(b).   Picower made sham loans to Madoff to prop up the fraud, enabling Madoff to pay redeeming customers and to misrepresent Madoff's solvency and financial condition to existing and potential customers
>
> 71.    As set forth above, to prop up the Madoff scheme, Picower engaged in "lending" transactions amounting to more than $200 million between 1992 and 2008. At Picower's direction, Madoff used the "borrowed" funds to pay off redeeming customers that Picower selected.  For example, in 1992, one of Madoff's large feeder funds, Avellino & Bienes ("A&B"), failed and was under investigation by the SEC. Madoff needed cash to pay back all of the A&B customers in order to avoid an investigation by the SEC.

(*Id.* ¶¶ 9(b), 71.)  These loans allegedly enabled Madoff to continue to make misrepresentations

about BLMIS's financial condition to BLMIS customers.  (*Id.* ¶ 9(b).)  Therefore the Fox

Plaintiffs argue that the loans demonstrated Picower's control over Madoff because if Picower

---

[10] *See* Transcript of January 22, 2015 Teleconference, *In re Marshall*, 15-MC-0001 (D. Del.) at 13:23–25 (counsel for Fox Plaintiffs representing to Delaware District Court that he has interviewed Madoff); *see also* Helen Davis Chaitman & Lance Gotthoffer, JP Madoff: The Unholy Alliance Between America's Biggest Bank and America's Biggest Crook, *http://jpmadoff.com* (last visited Dec. 18, 2015), chapter 2 (stating Fox Plaintiffs' counsel has had "numerous" telephone conversations with Madoff over the past five years).

withdrew the loans or refused to make them, the fraud could not have continued and Madoff

would have been exposed.  (*Id.* ¶ 80.)

Specifically, the Fox Plaintiffs allege that, in late 2006, Picower made a $125 million

loan to Madoff to infuse cash to the scheme during a liquidity crisis:

> 76. In April 2006, Picower made a $125 million loan to Madoff to keep Madoff
> afloat when he was short on cash. The $125 million was deposited into a new
> Decisions account (the "Decisions 6 Account"). Picower was quickly repaid a
> portion of the loan when Madoff wired $125 million from the Decisions 6
> Account to Picower in September 2006.

> 77. After Madoff wired the $125 million to Picower, $81 million in securities
> purportedly remained in the Decisions 6 account.  At Picower's direction, his
> trades on those remaining securities were all backdated four months and the
> securities were selected based on their performance during the preceding four
> months.

> 78. This $125 million "loan" was necessary to perpetuate the fraud by concealing
> Madoff's inability to pay his redeeming customers their fictitious gains.

(*Id.* ¶¶ 76–78.)  As in *Goldman III*, this allegation merely rehashes an allegation of backdated

trades in April 2006 made by the Trustee in his action.  (*Compare* Murphy Decl. Ex. D ¶ 63(i),

*with Fox III* Compl. ¶ 76.)  Moreover, this allegation concerns purported trading activity—the

deposit of $125 million, the withdrawal of $125 million and backdating trades—in the Picower

Parties' *own accounts*, which again, all courts reviewing the multiple generations of *Fox* and

*Marshall* complaints have rejected as derivative of the Trustee's claims.  *See Marshall*, 740 F.3d

at 93; *Fox*, 531 B.R. at 353; *A & G Goldman P'ship*, 2013 WL 5511027, at *1; *Marshall*, 511

B.R. at 394.

The Fox Plaintiffs further allege that Picower made another loan to BLMIS in 1992

during the SEC's investigation of BLMIS feeder fund Avellino & Bienes ("A&B"):

> 73. After conferring with Madoff, Picower sent $76 million dollars' worth of
> securities from his Goldman Sachs account to Madoff.

23

74. The Picower securities were held in a Madoff general account and they were then pledged by Madoff as security to obtain bank loans to repay the A&B clients. Madoff did not disclose to the lending banks that he was using Picower's securities as collateral for the loans.  Madoff falsely represented to the lending banks that he owned the securities he used as collateral for the loans.

75. The $76 million in securities that Picower "loaned" to Madoff allowed Madoff to continue bringing new victims into his Ponzi scheme.

(*Id.* ¶¶ 73–75.)  As an initial matter, this allegation is contradicted by the testimony of Frank DiPascali, Jr.—testimony upon which the Fox Plaintiffs rely—as he testifies that the securities were received in Picower's account.  (Transcript of Proceedings, *United States v. Bonventre*, Case No. 10 Cr. 228 (LTS) (S.D.N.Y. Apr. 3, 2014), ECF No. 856, at 4706–07 ("[Madoff] instructed Annette to receive [the securities] into Mr. Picower's account at Madoff . . . .").) [11]

Moreover, the allegations aver nothing more than that Picower propped up the Ponzi scheme, a claim that the Trustee made in his adversary proceeding against Picower.  In the Trustee's opposition to the Picower Parties' motion to dismiss, the Trustee alleged that Picower enabled the fraud to continue by accepting payment from Madoff of only a fraction of his requested redemptions:

It is significant, moreover, that as early as 2003 – even before Madoff's scheme began to unravel – BLMIS could not pay Picower the quarterly sums that he was demanding.  Instead, on several occasions starting in September 2003, BLMIS paid Picower only a fraction of the amount that he originally requested.  BLMIS' failure to pay Picower sums that purportedly were in his accounts or otherwise available to him is further evidence that Picower knew or should have known of Madoff's fraud.  This evidence becomes even more compelling given Picower's apparent lack of complaint about his inability to access billions of dollars reported on his BLMIS account statements.

---

[11] Full copies of the relevant transcripts from the criminal proceedings were provided to the Court in the *Goldman III* proceedings.  (Declaration of Marcy Ressler Harris in Support of the Picower Parties' Application for Enforcement of the Permanent Injunction, Exs. 8–32, Adv. Pro. No. 14-02408 (Bankr. S.D.N.Y. filed Nov. 17, 2014), ECF No. 4.)

(Murphy Decl. Ex. E at 4–5.)[12]  The same allegation—that investing in BLMIS propped up the

fraud—relates only to Picower's activity in his own accounts and could be made about any

BLMIS customer with alleged knowledge of the fraud and without good faith.  It likewise rests

on a harm that is common to all customers and creditors, namely, that withdrawing funds from

BLMIS depleted BLMIS's assets.  As such, it is a "secondary effect from harm done to the

debtor," which the Second Circuit, the District Court and this Court have held is the hallmark of

a derivative claim.  *Marshall*, 740 F.3d at 89; *Fox*, 531 B.R. at 351; *Marshall*, 511 B.R. at 394.

Finally, the Fox Plaintiffs also rely on the testimony of Annette Bongiorno as the factual

basis for the loan allegations.  (*Fox III* Compl. ¶ 73 n.5; ¶ 77 n.9.)  A review of her testimony,

however, shows that the conclusion that Picower provided loans to Madoff is drawn entirely

from *questions* posed by the U.S. Attorney's Office and is not supported by the testimony of Ms.

Bongiorno herself.  (Transcript of Proceedings at 112:7–9, *United States v. Bonventre*, No. 10

Cr. 228 (LTS) (S.D.N.Y. Feb. 27, 2014), ECF No. 926 ("Q. And you don't recall that during that

time period, Jeffrey [*sic*] Picower agreed to loan Mr. Madoff $125 million? A. Nope. I knew

nothing about it.").)  Indeed, in the February 5, 2015 hearing in *Goldman III*, the Goldman

Plaintiffs' counsel admitted that the allegations were based solely on the prosecutor's questions.

(Chaitman Decl. Exhibit D, 61–62.)

### C.    *The Allegations That Picower Served as a Counterparty for Purported Options Trading are Derivative, Conclusory, and Unsupported by the Criminal Trial Testimony*

The next facially new allegation in the *Fox III* complaint is that Picower "agreed" with

Madoff to be listed on BLMIS's books and records as a counterparty for purported options

---

[12] The case settled before the Trustee had the chance to amend his complaint.  Nevertheless, these claims were considered and settled by the Trustee.  (*See* Murphy Decl. Ex. H at 3; *Fox*, 848 F. Supp. 2d at 481 (affirming application of Permanent Injunction to claims in *Fox I* and *Marshall I* that were "dependent on and identical in substance to the claims that are being settled").)

trades, and that Picower would notify Madoff if any regulators or auditors approached him about

the counterparty transactions and would not speak with them:

> 67.    In order to further the fraud, Madoff and Picower agreed that Picower
> would be listed on Madoff's fabricated books and records as a counterparty for a
> large volume of options trading.

> 68.    Picower knew that there was no such options trading, but agreed to
> participate in this falsification of Madoff's trading records so that Madoff could
> continue to entice new customers to entrust him with their money.

> 69.    If regulators or auditors called Picower about his counterparty
> transactions, Picower would not to speak with them and would let Madoff know
> that he had been approached by the regulators or auditors.

(*Id.* ¶¶ 66–69.)  The *Fox III* complaint further claims that Picower controlled Madoff through his

knowledge that BLMIS's books and records concerning these purported options transactions

were fabricated.  (*Id.* ¶ 70.)  These allegations, again, are taken nearly verbatim from *Goldman*

*III*.

Significantly, the testimony upon which the Fox Plaintiffs rely never says that Picower

"agreed" to be listed as an options counterparty.  Rather, the testimony is that *Madoff* decided

that Picower and others could be used as counterparties if regulators asked:

> What [Madoff] said was that these people he would use on his stock record as the
> counter parties because if they ever got a call from any of the regulators or KPMG
> specifically, you know, he could talk to them and tell them to just not answer their
> questions, just hang up on them. More importantly, if they ever got a call they
> would let him know that.

(Transcript of Proceedings at 5825:16–21, *United States v. Bonventre*, Case No. 10 Cr. 228

(LTS) (S.D.N.Y. Dec. 16, 2013), ECF No. 870).  The Court cannot allow the Fox Plaintiffs'

sophistry to support an independent claim.  A $7.2 billion settlement deserves more than false

allegations to undermine it.  The Fox Plaintiffs contend that the Court should not look beyond

their allegations to the sworn testimony on which they explicitly rely, arguing that it is inappropriate to do so. (Fox Br. at 10 n.3.) They are incorrect.[13]

The counterparty allegations in *Fox III* complaint also suffer from a lack of particularity. No specifics are alleged as to whether misrepresentations were made, or in connection with what transactions Madoff allegedly falsely identified Picower as a counterparty. Nor are there any allegations as to whether Picower was actually questioned by regulators or anyone else about any alleged transactions. And, yet again, the testimony relating to use of customers as counterparties that was adduced at the criminal trial, upon which the Fox Plaintiffs purport to rely, relates to the deposit of fictitious treasury bills in the customers' own accounts. (*See, e.g.*, Transcript of Proceedings at 5341–46 *United States v. Bonventre*, Case No. 10 Cr. 228 (LTS) (S.D.N.Y. Apr. 3, 2014), ECF No. 862 (discussing Madoff's instruction to DiPascali to internalize option trades by placing "treasury bills" in client accounts).)

Furthermore, the *Fox III* complaint does not allege that any particular plaintiff, including the Fox Plaintiffs themselves, were affected by Madoff's alleged use of Picower's name as a bogus options counterparty. Rather, as with the "loans," the allegations here are that Picower helped prop up the fraud—a harm that affected all BLMIS customers and creditors "the same way and for the same reason." *See Fox*, 848 F. Supp. 2d at 480.

---

[13] *Gant v. Wallingford*, 69 F.3d 669 (2d Cir. 1995) and *Jones v. City of Cincinnati*, 521 F.3d 555 (6th Cir. 2008), cited by the Fox Plaintiffs, are inapposite because here, and unlike in those cases, the Fox Plaintiffs are relying on the testimony to particularize their claims. *See Gant*, 69 F.3d at 675 (plaintiffs were not using incorporated document to particularize their claims); *Jones*, 521 F.3d at 561 (attached document did not itself form the basis for the allegations).

**D.     Fox III Continues to Assert Derivative and Generalized Claims**

**1.     The Alleged Claims Are No Different From Before**

As every court that has reviewed the Fox's and Goldman's allegations over the years has

steadfastly held, a claim is barred by the Permanent Injunction if it alleges a "derivative injury

[that] is based upon a 'secondary effect from harm done to the debtor." *Fox*, 531 B.R. at 351

(quoting *Marshall*, 740 F.3d at 89 and *St. Paul Marine & Fire Ins. Co. v. PepsiCo, Inc.,* 884 F.2d

688, 704 (2d Cir. 1989)).   Derivative claims are those that "seek [] relief against third parties that

pushed the debtor into bankruptcy."   *Marshall*, 740 F.3d at 89.   By contrast, an independent

claim requires an injury that can be "directly traced to [the third party's conduct]."   *Id.*

Examples of such independent injuries would include the violation of an independent legal duty

to the plaintiffs or "'particularized' actions aimed at BLMIS customers."   *Id.* at 90, 93.   Courts

must "inquire into the factual origins of the injury" to determine whether a claim is derivative.

*See Marshall*, 740 F.3d at 89; *Johns-Manville Corp. v. Chubb Indemn. Ins. Co. (In re Johns-

Manville Corp.)*(*"Manville III"*), 517 F.3d 52, 67 (2d Cir. 2008); *Fox*, 531 B.R. at 531; *see also

Ritchie Cap. Mgmt., LLC v. Gen. Elec. Cap. Corp.*, No. 14 Civ. 8623 (PAE), 2015 WL 4635630,

at *11 (S.D.N.Y. Aug. 4, 2015) (third-party claims in Ponzi scheme against lender based on

generalized harm under *St. Paul* and hence belonged to the Trustee). The relevant inquiry

therefore is whether the Fox Plaintiffs allege facts suggesting that Picower harmed them by

directing conduct particularly toward them or by violating a legal duty he owed them.   But they

allege only that Picower harmed the estate and secondarily harmed them in the process.   *See Fox*,

740 F.2d at 94.

The fundamental difficulty faced by the Fox Plaintiffs remains, as it always has, that

Picower was a customer of BLMIS, who does not appear to have had any relationship with or

taken any action directed toward them.   There remains no evidence, contrary to the conclusory

allegations in *Fox III*, that Picower participated in the day to day operations at BLMIS outside of his own accounts; that he had access to any books and records of BLMIS outside of his own accounts; or that he took any action directed specifically toward any other customer of BLMIS. Instead of focusing on Picower's *withdrawals* from his own accounts, the Fox Plaintiffs focus now on his deposits, which they allege to have been "loans" intended to prop up the fraud. But an allegation, if true, that a customer knowingly invested money into a Ponzi scheme harms the estate by perpetuating the fraud. Similarly, instead of focusing on false statements related to Picower's withdrawals, the Fox Plaintiffs focus on their allegation that Picower agreed to be a counterparty with respect to transactions within his own accounts. Even if Plaintiffs could allege (which they have not) that Picower specifically agreed to misrepresentations to regulators not specifically related to transactions in his own accounts, this again would be an act to prop up the fraud that harmed the BLMIS estate by pushing BLMIS further into bankruptcy, and therefore would constitute a derivative claim. *See* 740 F.3d at 89.

Finally, the Fox Plaintiffs point to specific misrepresentations *by Madoff*, who they alleged that Picower "controlled." But the missing link remains any specific factual allegations that would suggest that Picower exercised such control.

### 2.     The Cases Relied Upon by the Fox Plaintiffs Are Inapposite

Because their claims are no different from before, the Fox Plaintiffs rely on precedent that is inapposite for the same reasons as with their prior complaints. *See Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum)*, 522 F.3d 575 (5th Cir. 2008); *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54 (2d Cir. 2013); *Medsker v. Feingold*, 307 F. App'x 262 (11th Cir. 2008).

First, this Court, the District Court, and the Second Circuit have all expressly rejected the application of *Seven Seas* to the earlier versions of the Fox Plaintiffs' complaint. *Fox*, 429 B.R.

at 432–33; *Fox*, 848 F. Supp. 2d at 469; *Marshall*, 740 F.3d at 92–93 (allegations of inducement

in *Seven Seas* were non-conclusory and based on specific misrepresentations made to the

bondholders on specific dates); *see Ritchie*, 2015 WL 4635630, at *9 (distinguishing *Seven Seas*

where plaintiffs made non-conclusory allegations that a secured creditor knowingly used

misleading financial information to induce them to purchase unsecured notes issued by the

debtor).

Second, the Second Circuit has distinguished the injunction context from that in the

Trustee's actions against banks.  The Second Circuit specifically noted that the Fox Plaintiffs'

claims are "'general' in the sense articulated in *St. Paul*, in that they arose from 'a single set of

actions that harmed BLMIS and all BLMIS customers in the same way.'" *JPMorgan Chase &*

*Co.*, 721 F.3d at 70 n.20.

Third, this Court and the District Court have repeatedly rejected arguments that *Medsker*

is pertinent, as that case contained specific allegations that were not conclusory and alleged

specific actions directed towards the plaintiffs.  *Fox*, 511 B.R. at 393 (rejecting application of

*Medsker*); *Fox*, 531 B.R. at 352 (same).[14]

---

[14] In any event, the cases cited by the Fox Plaintiffs to support their control person claims are inapposite because, in each of those cases, the allegations were not conclusory and were based on specific misrepresentations.  *See, e.g., Lazzaro v. Manber*, 701 F. Supp. 353, 358–59 (E.D.N.Y. 1988) (control person defendants solicited and made false representations); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003) (dismissing § 20(a) claim when there were only "conclusory allegations"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 283–84 (S.D.N.Y. 2005) (control person defendants were principals or officers of accounting firms that certified false financial statements); *Freeland v. Iridium Worldwide Comms. Ltd.*, 545 F. Supp. 2d 59, 66 (D.D.C. 2008) (defendant made false statements in publically issued press releases); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (control person defendants were officers or directors of company and signed 10-K statements containing fraudulent statements); *Dietrich v. Bauer*, 126 F. Supp. 2d 759 (S.D.N.Y. 2001) (control person defendant was sole owner and director of company that allegedly perpetrated fraud); *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151 (9th Cir. 1996) (control person defendant participated in drafting agreement with investors containing false statements); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000) (case did not involve a control person claim under federal securities law); *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276 (N.D. Okla. 2010) (control person defendants signed public documents with misrepresentations or signed memorandum authorizing conduct that harmed investors).

In lieu of alleging particularized conduct aimed at them, the Fox Plaintiffs attempt to find an independent legal duty owed to them by Picower, by asserting that Picower was a control person of BLMIS under § 20(a).  Aside from conclusory allegations of such control, the only specific acts suggesting "control" alleged in *Fox III*, just as in every prior complaint, relate to Picower's own accounts.  Here, "any allegations purporting to show an injury directly traceable to the Picower [Parties'] conduct are too conclusory to present a 'bona fide' claim independent from the Trustee's action."  *Fox*, 531 B.R. at 353 (citing *A & G Goldman P'ship*, 2013 WL 5511027, at *9).[15]

### 3.    The Fox Plaintiffs' Other Claims Fail As Well

In addition to the § 20(a) claim, the *Fox III* complaint also asserts federal and state RICO claims and common-law claims as in *Fox II*.  Yet these claims rest on the same factual basis as the § 20(a) claim and fail for all the reasons that claim fails.  This Court held that the same claims in *Fox II* failed because they rested on allegations that were "wholly conclusory . . . whether labeled as a control person claim, a RICO claim or a common law claim . . . ."  *Marshall*, 511 B.R. at 394–95.  In ruling that this Court was "plainly correct" in this decision, the District Court recognized that the federal and state law RICO claims and other Florida state law claims failed to allege any "particularized injuries directly traceable to the Picowers' conduct." *Fox*, 531 B.R. at 353; *see also St. Paul*, 884 F.2d at 704 (a claim is particularized when the injury alleged can be "directly traced to the third party's conduct.").

---

[15] The opposition brief filed by the Picower Parties further discusses the Fox Plaintiffs' failure to state meritorious claims.  The Trustee adopts these arguments as to why Picower is not properly alleged to be a control person.

## IV.    THE FOX PLAINTIFFS ATTEMPT TO CIRCUMVENT THE NET EQUITY DECISION

As they did with the previous versions of their complaints, the Fox Plaintiffs yet again

seek to represent a "shadow estate" of BLMIS customers and creditors based on generalized

harms.  The Fox Plaintiffs admit that the damages they seek in the action are the plaintiffs' losses

based on the final BLMIS customer account statements:

> 12.    The damages sought through this action are Plaintiffs' losses based on their individual final account statements from Madoff. . . .  Plaintiffs' claims are based upon the damages they suffered as a result of the fraud Madoff perpetrated against the Plaintiffs under the control of Picower and his various entities.

(*Fox III* Compl. ¶ 12.)  The Fox Plaintiffs thus allege that they should be entitled to recover for

every fraudulent transfer made by BLMIS, not just those to the Picower Parties.  The Fox

Plaintiffs clearly seek to represent essentially all customers who did not receive the amounts on

their last account statements:

> 105.    The definition of the "Class" in this action is all Customers who entrusted securities or cash to Madoff, either directly or indirectly, pursuant to the Madoff Investment Program between December 1, 1992, the approximate date that Picower first became a control person of Madoff, and December 11, 2008, the date that Madoff confessed (the "Class Period").

(*Id.* ¶ 105.)

The Fox Plaintiffs have previously endeavored to create a "shadow" estate of all

customers of BLMIS in order to circumvent the Net Equity Decision.  And each time, the ruling

court has rejected their efforts.  *See Sec. Inv. Protection Corp. v. Bernard L. Madoff Inv. Sec.*

*LLC (In re Bernard L. Madoff)*, 477 B.R. 351 (S.D.N.Y. 2012); *Marshall*, 511 B.R. 375.  The

Fox Plaintiffs' efforts to usurp the fraudulent transfer claims brought by the Trustee to recover

amounts exceeding their ratable share of customer property under the Net Equity Decision

should be rejected here too because they do not state independent claims.

## V.    THE AUTOMATIC STAY BARS THE FOX III COMPLAINT

Because the claims alleged in the *Fox III* complaint are generalized claims that are

duplicative and derivative of those of the Trustee, they violate the automatic stay. 11 U.S.C.

§ 362(a).  (*See Fox*, 848 F. Supp. 2d at 480–81; Murphy Decl. Ex. D ¶ 8 (injunction was issued

under § 105(a) and § 362(a) of the Bankruptcy Code).)[16]

The claims in the *Fox III* complaint violate the automatic stay under § 362(a)(3), which

bars any act to obtain possession of or take control over property of the estate.  11 U.S.C.

§ 362(a)(3).  *See, e.g.*, *Fox*, 848 F. Supp. 2d at 479 (Fox Plaintiffs' claims violate § 362(a)(3)).

Likewise, to the extent the claims are nothing more than disguised fraudulent transfer claims,

they violate the automatic stay under § 362(a)(1).  Section 362(a)(1) bars "the commencement or

continuation . . . of a judicial . . . or other action or proceeding against the debtor . . . or to

recover a claim against the debtor . . . ."  11 U.S.C. § 362(a)(1).  *See A & G Goldman P'ship*,

2013 WL 5511027, at *11 (the Goldman Plaintiffs' claims are "deceptively labeled fraudulent

conveyance claims that the Trustee already brought and settled").[17]

---

[16] The *Fox III* complaint also violates certain stay orders entered by the District Court.  (*See* December 15 Stay Order ¶ IV, *SEC v. Bernard L. Madoff*, No. 08-CIV-10791, ECF No. 4; *see also* December 18 Stay Order ¶ IX, ECF No. 8; February 9 Stay Order ¶ IV, ECF No. 18.)  *See Fox*, 429 B.R. at 433 (holding that the Fox Plaintiffs' derivative claims violated the automatic stay and certain of the stay orders).

[17] In addition, even claims owned by the Trustee but not brought would be encompassed both by the automatic stay and the Permanent Injunction, which reaches claims the Trustee "could" have brought.  Accordingly, claims based on alter ego liability (akin to control person claims) would belong to the Trustee.  *See e.g., In re Cabrini Med. Ctr.*, No. 09-14398 (ALG), 2012 WL 2254386, at *1 (Bankr. S.D.N.Y. June 15, 2012) (Gropper, J.).

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny the Fox

Plaintiffs' motion and enforce the Permanent Injunction and automatic stay.

Dated:    December 18, 2015                    Respectfully submitted,
          New York, New York


                                              By:  */s/ David J. Sheehan*
                                              David J. Sheehan
                                              dsheehan@bakerlaw.com
                                              Deborah H. Renner
                                              drenner@bakerlaw.com
                                              Tracy L. Cole
                                              tcole@bakerlaw.com
                                              Keith R. Murphy
                                              kmurphy@bakerlaw.com
                                              Amy Vanderwal
                                              avanderwal@bakerlaw.com
                                              Ferve Ozturk
                                              fozturk@bakerlaw.com
                                              Samuel M. Light
                                              slight@bakerlaw.com

                                              Baker & Hostetler LLP
                                              45 Rockefeller Plaza
                                              New York, New York 10111
                                              Telephone: (212) 589-4200
                                              Facsimile: (212) 589-4201

                                              *Attorneys for Irving H. Picard, Trustee for*
                                              *the Substantively Consolidated SIPA Liquidation*
                                              *of Bernard L. Madoff Investment Securities LLC*
                                              *and the Estate of Bernard L. Madoff*