# EXHIBIT H

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and Bernard L.
Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>               Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>               Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>               Plaintiff, | Adv. Pro. No. 09-1197 (BRL) |

v.

JEFFRY M. PICOWER, individually and
as trustee for the Picower Foundation, *et al*.

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING AN AGREEMENT BY AND BETWEEN THE TRUSTEE AND THE PICOWER BLMIS ACCOUNT HOLDERS AND ENJOINING CERTAIN CLAIMS

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff ("Madoff," and together with BLMIS, collectively, the "Debtors"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his motion (the "Motion") seeking entry of an order, pursuant to section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving an agreement (the "Agreement")[1] by and between the Trustee on the one hand and Barbara Picower, as the executor (the "Executor" or "Mrs. Picower") of the estate (the "Picower Estate") of Jeffry M. Picower ("Mr. Picower" and, together with Mrs. Picower, the "Picowers"), and certain other related entities that held BLMIS accounts and the accounts they maintained (together with the Picowers, the "Picower BLMIS Account Holders," identified on Attachment A to the Agreement), on the other hand, and (ii) enjoing customers

---

[1] The form of Agreement is annexed hereto as Exhibit "A."

and creditors of BLMIS, who filed or could have filed claims in the BLMIS SIPA

proceeding, from pursuing certain claims against the Picower BLMIS Account Holders or

the Picower Releasees that arise from or are related to BLMIS or the Madoff Ponzi scheme,

and, in support thereof, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

The Trustee has settled his claims against the Picower BLMIS Account Holders for

$5 billion (the "Picower Settlement"). The importance of this event cannot be overstated.

The $5 billion that the Picowers have agreed to return to the estate through the Picower

Settlement is easily the single largest recovery to date. Moreover, when the $5 billion

Picower Settlement is combined with the approximately $1.5 billion the Trustee has already

recovered on behalf of BLMIS customers,[2] the Trustee will have collected a third of the total

principal lost in the Ponzi scheme, currently calculated to be approximately $20 billion.

Finally, when the amount of the Picower Settlement is combined with the additional funds,

in excess of $2.0 billion, that the Picower Estate is forfeiting to the Government, as

described more fully herein, the Picowers will have repaid **one hundred percent** of

fictitious profits received by the Picower BLMIS Account Holders over the lifetime of the

relationship between Picower and BLMIS. Thus, the Picower Settlement not only makes

good financial sense for the BLMIS estate and the victims of Madoff's fraud, it also sets a

high bar for future settlements in this case. Therefore, the Trustee respectfully requests that

the Court approve the Picower Settlement.

---

[2] The Trustee has entered into two settlements that are pending approval by the Bankruptcy
Court that, if approved, would bring an over $1 billion into the estate for distribution to BLMIS
customers with allowed claims.

**BACKGROUND**

On December 11, 2008 (the "Filing Date"),[3] the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against the Debtors (Case No. 08 CV 10791). The complaint alleged that the Debtors engaged in fraud through investment advisor activities of BLMIS.

On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by SIPA.

On that date, the District Court entered the Protective Decree, to which BLMIS consented, which, in pertinent part:

> (i) appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;
>
> (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and
>
> (iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

At a plea hearing (the "Plea Hearing") on March 12, 2009 in the criminal action filed against him by the United States Attorney's Office for the Southern District of New York, Madoff pled guilty to an 11-count criminal information, which counts included securities

---

[3] In this case, the Filing Date is the date on which the SEC commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm. *See* section 78*lll*(7)(B) of SIPA.

fraud, money laundering, theft and embezzlement.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23:14-17).  On June 29, 2009, Madoff was sentenced to a term of imprisonment of 150 years.

On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff.  On June 9, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the BLMIS SIPA proceeding.

## THE CLAIMS AGAINST THE PICOWER BLMIS ACCOUNT HOLDERS

Mr. Picower was an attorney, accountant and businessman who invested with BLMIS over several decades through numerous accounts (identified on Attachment A to the Agreement) held in Mr. Picower's name, in the name of family members, associates, corporations or partnerships through which Mr. Picower transacted business, not-for-profit entities he founded and funded, or retirement plans for which he served as a trustee.  For purposes of this Motion and this Memorandum of Law, the Picower Estate shall be considered to be one of the Picower BLMIS Account Holders.

On May 12, 2009, the Trustee filed a Complaint (the "Complaint") commencing an adversary proceeding against certain of the Picower BLMIS Account Holders (the "Picower Defendants"), captioned *Picard v. Picower, et al.*, No. 09-1197 (BRL), in which he alleged that prior to the Filing Date, BLMIS made payments or other transfers (the "Transfers") totaling more than $6.7 billion to one or more of the Picower Defendants.  [ECF No. 1].  The details with regard to the Transfers are principally set forth in the Complaint and are incorporated herein by reference.  The Picower Defendants filed a motion seeking to dismiss the Complaint (the "Motion to Dismiss") on July 31, 2009.  [ECF No. 6].  The Trustee filed

his Opposition to the Motion to Dismiss on September 30, 2009 (the "Opposition"), in which the Trustee identified additional Transfers to the Picower Defendants, bringing the total value of Transfers received by them to more than $7.2 billion.   [ECF No. 11]. Subsequently, the Picower Defendants filed a Reply on November 25, 2009.  [ECF No. 16].

The Trustee believes that all of the Transfers are recoverable as set forth in the Complaint and the Opposition.  The Picower Defendants dispute that they are liable for the return of the Transfers.   After a review of the relevant records and discussions with Picowers' counsel concerning the factual background and certain legal arguments, as well as certain records not available to the Trustee at the time of the filing of the Complaint and the Opposition, and a consideration of the costs and uncertainty inherent in any litigation, the Trustee, in the exercise of his business judgment, has determined that it is appropriate to resolve this matter rather than litigate the allegations in the Complaint.

In the course of the Trustee's investigation into the accounts held by the Picower BLMIS Account Holders, certain margin loans owed by certain of the Picower BLMIS Account Holders to BLMIS were identified (the "Margin Loans").  The Trustee determined that certain Picower BLMIS Account Holders borrowed on margin from BLMIS and, when the Ponzi scheme collapsed in December of 2008, there was a considerable balance owed on these Margin Loans.

The Trustee's investigation disclosed that the Margin Loans were funded by the investments of other customers in connection with Madoff's Ponzi scheme, and appear to have been the primary vehicle through which Transfers were made to the Picower BLMIS Account Holders.

The Trustee, Mrs. Picower, or their respective professional advisors have analyzed the debits and credits in the relevant accounts, have identified those withdrawals that were taken from the accounts on margin, and have reached an agreement regarding the amount of the Margin Loans.

The settlement, as described below, involves the repayment of a substantial portion of the value of the Margin Loans and will return $5 billion to the BLMIS estate for distribution to defrauded customers. This represents a most significant recovery for the victims of the Ponzi scheme, while at the same time it collects a substantial debt owed to the BLMIS estate. Moreover, when combined with the monies that the Picower Estate is forfeiting to the Government, one hundred percent of the net withdrawals received by the Picower BLMIS Account Holders will have been returned for distribution to Madoff victims, whether by the Trustee or by the Government.

## SETTLEMENT DISCUSSIONS

In September 2009, the Picowers, through their counsel, approached the Trustee to discuss the resolution of the Picower Adversary Proceeding. While the Picowers vigorously disputed that the Picower Defendants had any liability to the BLMIS estate, they indicated that they nevertheless wished to engage in good faith negotiations with the Trustee, in the hope that an amicable resolution of the dispute could be achieved.[4] The Trustee had the opportunity, with the assistance of the United States Attorney's Office for the Southern District of New York (the "Government"), to investigate the circumstances surrounding the

---

[4] Following Mr. Picower's death, Mrs. Picower was appointed as the executor of his estate. In such capacity, she and her counsel continued the settlement discussions with the Trustee that had been commenced prior to the death of her husband.

Picower BLMIS Account Holders' investments with BLMIS.  Since settlement discussions began with the Picowers, the Trustee, through his investigation, has uncovered facts which the Picowers claim show that Mr. Picower did not know of or participate in the Ponzi scheme.

For example, the Complaint alleged that Mr. Picower, through a certain entity, had received at one point a 950% return on certain investments.  Informal discovery and further research has confirmed that the 950% return that BLMIS reported to Mr. Picower in certain BLMIS documents was inconsistent with the much lower rate of return that Mr. Picower purportedly received based on the entirety of BLMIS records for that account.  Further research has also confirmed that other rates of return reported by BLMIS to the Picower BLMIS Account Holders in certain documents were not consistent with lower rates of return recorded by BLMIS for the same such accounts based on the entirety of the relevant documents.

In addition, since the time that the Complaint was filed, the Trustee has been directed to evidence that the Picower Defendants believe raises questions about the allegations in the Complaint that Mr. Picower knew the accounts of the Picower Defendants were being manipulated by BLMIS to maintain artificially high account values.  For instance, whereas the account statements of certain of BLMIS's split-strike investors reflected consistent gains throughout 2008, the account statements of the primary entity through which Mr. Picower invested in BLMIS reflected a decrease in value of nearly $3 billion over the course of 2008, as the securities reflected on the entity's account statements sharply decreased with the collapse of the stock market that year.  The reported value of the Picower Foundation's

BLMIS account likewise decreased nearly 40% during 2008 according to its BLMIS account statements.

Similarly, as the Trustee's investigation went further back in time, the Trustee became aware of evidence showing that several decades ago Mr. Picower transferred real securities into certain BLMIS accounts. The Picower Defendants contend that evidence supports their claim that their BLMIS accounts contained real securities. In addition, the Trustee became aware of records showing that the Picower BLMIS Account Holders reported income tax gains or losses to the Internal Revenue Service ("IRS") in connection with the securities transactions reported on their BLMIS account statements, and paid millions of dollars in taxes to the IRS based on the information reported on their BLMIS account statements. The Picower BLMIS Account Holders assert that such conduct reflects that they were unaware that the securities transactions reflected on their BLMIS account statements were fictitious.

In addition, Mrs. Picower has advised the Trustee that she engaged accountants and a tax attorney to amend tax returns for open years so as to remove gains and losses that had been reported previously on the United States federal tax returns of the Picower BLMIS Account Holders, and filed the amended returns with the IRS. The amended returns report additional amounts of tax liabilities due and, together with interest, result in additional payments to the IRS of more than $45 million.

Finally, the Trustee was able to confirm that for decades prior to Mr. Picower's death last October, Mr. Picower had arranged to leave the vast majority of his estate to charity upon his death and thereby give away his great wealth to a number of worthy organizations and endeavors.

As the Trustee was analyzing this new information, settlement negotiations were continuing. During that period, the focus evolved from the Trustee's fraudulent transfer allegations in the Complaint to include the new information the Trustee learned from his ongoing investigation and the fact that there was a very significant debit balance in one of Mr. Picower's accounts relating to the Margin Loans. The parties met on numerous occasions to analyze the Margin Loans and to discern to the best of their abilities the number to which both Mrs. Picower and the Trustee could agree was the amount of the Margin Loan balance. After multiple meetings and the sharing of information by Mrs. Picower, including tax returns and financial information pertaining to the withdrawals on margin, Mrs. Picower and the Trustee came to an agreement as to the value of the Margin Loans.

In reconciling these facts and figures, coupled with the fact that Mrs. Picower genuinely wanted to assist the victims of Madoff's fraud, the Trustee concluded that further examination and debate with regard to the allegations in the Complaint would be counterproductive, particularly in light of the additional information that had come to the Trustee's attention, including evidence that Mr. Picower had contributed real securities to certain BLMIS accounts. The parties thereupon agreed to the amount of the Margin Loans, viewed within the context of the Complaint and the Transfers, and once it was determined, a meeting of the minds for the settlement took place. In connection with such settlement, it was also agreed that all Picower BLMIS Account Holders' customer claims would be deemed withdrawn with prejudice.

The Trustee appreciates that Mrs. Picower has made a powerful statement on behalf of the victims of the Madoff fraud by putting a substantial portion of the wealth that she and her husband accumulated over their lifetimes into the fund of customer property for

distribution to Madoff victims.  By virtue of this settlement, and that with the Government, more fully described below, Mrs. Picower has now returned **every cent** of net payments the Picower BLMIS Account Holders received from BLMIS in excess of their investments. This settlement is significant with regard to the collaborative efforts of the Trustee and the Government to assemble the largest fund possible for the benefit of customers of BLMIS. The Trustee notes that Mrs. Picower has embraced this concept and has set an appropriately high standard for going forward.

### GOVERNMENT FORFEITURE

By March 2010, the Trustee had reached an agreement with Mrs. Picower that she would resolve the Trustee's claims against the Picower BLMIS Account Holders by payment to the Trustee of between $4.8 billion and $5 billion.  Ultimately, Mrs. Picower agreed that the Picower Estate would pay to the Trustee the sum of $5 billion to resolve the Picower Adversary Proceeding.  Mrs. Picower's agreement with the Trustee, however, was contingent on Mrs. Picower reaching an agreement with the Government to resolve potential civil forfeiture liability of certain of the Picower Estate pursuant to 18 U.S.C. § 981(a)(1)(C).  As a result of subsequent negotiations with the Government, Mrs. Picower, on behalf of the Picower Estate and the Picower BLMIS Account Holders, agreed to forfeit to the Government the amount of $7,206,157,717 (the "Forfeited Funds"), of which $5 billion will be credited and paid over to the Trustee (the "Bankruptcy Settlement Amount") while the remainder represents Mrs. Picower's settlement with the Government on behalf of the Picower Estate (the "Government Settlement Funds").

To effectuate that agreement and the Picower Settlement, the Government has commenced a forfeiture action captioned *United States of America v. $7,206,157,717 On*

*Deposit at JPMorgan Chase, NA in the Account Numbers Set Forth on Schedule A*, No. 10
CV 9398, in the District Court.  The Government and Mrs. Picower have also entered into a
Stipulation and Order of Settlement (the "Forfeiture Stipulation," attached hereto as Exhibit
B), which the Government has presented to the District Court and has been "so ordered" by
the District Court.

Simultaneous upon the execution of the Forfeiture Stipulation, Mrs. Picower caused
the Forfeited Funds to be wired into one or more escrow accounts (the "Escrow Accounts")
that have been established at JPMorgan Chase Bank, N.A. (the "Escrow Agent") pursuant to
an escrow agreement (the "Escrow Agreement," attached to the Forfeiture Stipulation as
Exhibit B) executed by and among the Picower Estate, the Trustee, the Government and,
with respect to certain sections only, SIPC.  The Escrow Agent will release the funds (a) to
the Trustee upon written notice provided jointly by the Trustee and Mrs. Picower, with a
copy of a final and non-appealable 9019 Order (the "Final 9019 Order") attached; or (b) to
the Government upon written notice jointly provided by the Trustee, Mrs. Picower, and the
Government, with a copy of a final, non-appealable order of forfeiture attached.  Because
the Bankruptcy Settlement Amount was derived from the Forfeited Funds, the Bankruptcy
Settlement Amount will never revert to Mrs. Picower or the Picower BLMIS Account
Holders even if the Court denies this Application, or issues the 9019 Order but that order is
overturned on appeal.  Rather, the Bankruptcy Settlement Amount will remain available for
distribution to victims of Madoff's fraud.

The Government Settlement Funds, as well as any Forfeited Funds remaining in the
escrow account after payment to the Trustee of the Bankruptcy Settlement Amount, will be

distributed to customers of BLMIS through the process of remission, consistent with applicable Department of Justice regulations.

## THE AGREEMENT AND PERMANENT INJUNCTION

The principal terms and conditions of the Agreement are contained in the form of Agreement attached as Exhibit A and should be reviewed for a complete account of its terms).[5]  Under the Agreement, the Picower Settlement takes effect and is binding after the Bankruptcy Court approves the Agreement (the "9019 Order").

The Agreement provides:

- Upon execution of the Forfeiture Stipulation, Mrs. Picower, as Executor, will cause the Forfeited Funds, in the amount of $7,206,157,717, to be wired into the Escrow Accounts.  The Escrow Agent will release the funds up to the Bankruptcy Settlement Amount within two (2) business days (a) to the Trustee upon written notice provided jointly by the Trustee and Mrs. Picower, with a copy of the Final 9019 Order attached; or (b) to the Government upon written notice jointly provided by the Trustee, Mrs. Picower, and the Government, with a copy of a final, non-appealable order of forfeiture attached.  For purposes of the Agreement, an order will be considered "final and non-appealable" when (i) the time to appeal the order has expired, or (ii) if any appeal has been taken, any and all such appeals have been fully and finally resolved without material modification of the order.

- The Picower BLMIS Account Holders' Customer Claims will be deemed withdrawn with prejudice.

- Each of the Picower Releasees (listed on Exhibit C to the Agreement), through the execution by an authorized representative of a Release Subscription (the form of which is annexed to the Agreement), will release, acquit and absolutely discharge the Trustee and all his agents and BLMIS and its consolidated estate, from any and all actions or causes of action asserted or unasserted, known or unknown, now existing or arising in the future in any

---

[5] Terms not otherwise defined in this section shall have the meaning ascribed in the Agreement.  In the event of any inconsistency between the summary of terms provided in this section and the terms of the Agreement, the Agreement shall prevail.

way related to the affairs of BLMIS.  Subject to Section 6 of the Agreement (Bankruptcy Court Approval; Effective Date), the Release will become effective upon the Trustee's or the Government's actual receipt of funds up to the Bankruptcy Settlement Amount without further action by any of the Parties.

•   The Trustee will release the Picower Releasees from any and all past, present or future claims or causes of action that are, have been, could have been or might in the future be asserted by the Trustee or that are duplicative or derivative of a claim that could be asserted by the Trustee against any of the Picower Releasees and that are based on, arise out of or relate in any way to the affairs of BLMIS or the Picower BLMIS Accounts. Subject to Section 6 of the Agreement (Bankruptcy Court Approval; Effective Date), the Release will become effective upon the Trustee's or the Government's actual receipt of funds up to the Bankruptcy Settlement Amount without further action by any of the Parties.

•   All BLMIS account agreements between the Picower BLMIS Account Holders and BLMIS will be terminated.

•   In the event no Final 9019 Order is entered, but the final, non-appealable order of forfeiture has been entered, then funds in the amount of the Bankruptcy Settlement Amount will be released to the Government from the account of the Trustee, except to the extent the BLMIS estate lacks sufficient funds to pay such amount, for distribution to Madoff fraud victims.  In such circumstances. the releases contained in Sections 3 and 4 of the Agreement will remain in full force and effect and be fully binding on the Parties.

•   The only circumstance in which the Agreement will not become effective and binding is in the event that no final and non-appealable orders are entered approving either the Final 9019 Order or the Forfeiture Stipulation.  In such case, and only in such case, (i) the Forfeited Funds would be returned to the Picower Estate, less any amounts paid by the Trustee to Mrs. Picower for or in reimbursement of tax payments made by Mrs. Picower during the escrow of the Forfeited Funds; (ii) the Agreement, including the releases in Sections 3 and 4 of the Agreement will not take effect and will be null and void for all purposes; (iii) the stay of the Picower Adversary Proceeding would be lifted and the Trustee, on the one hand and the Picower Defendants, on the other hand, would continue to litigate their respective claims and defenses in the Picower Adversary Proceeding; (iv) the Picower Account Holders' Customer Claims would not be withdrawn; and (v) the Parties could not use or rely on any statement in the Agreement in the Picower Adversary Proceeding or in any public statement or other litigation relating to BLMIS or Madoff.

In addition, within six (6) business days of the earlier to occur of (a) the entry of the

Final 9019 Order, or (b) the Government's actual receipt of funds up to the Bankruptcy

Settlement Amount, the Trustee will file a Notice of Dismissal, dismissing the Picower Adversary Proceeding with prejudice and without costs to any Party.  From the date of the Agreement through the earlier to occur of (a) or (b) of this paragraph, the Picower Adversary Proceeding shall be stayed and not further actions may be taken by any of the Parties thereto.

As part of the Agreement, the Trustee is seeking a permanent injunction from this Court, pursuant to Section 105(a) of the Bankruptcy Code (the "Permanent Injunction"), permanently enjoining any BLMIS customer or creditor of the BLMIS estate who filed or could have filed a claim, anyone acting on their behalf or in concert or participation with them, or anyone whose claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme, from asserting any claim against the Picower BLMIS Account Holders or the Picower Releasees that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the Picower BLMIS Account Holders or the Picower Releasees, and which arises from or relates to BLMIS or the Madoff Ponzi scheme.  Moreover, the Trustee has agreed to use his reasonable best efforts to obtain the Permanent Injunction and litigate any appeals of the Permanent Injunction Order.

In connection with the Agreement, Mrs. Picower, on behalf of the Picower BLMIS Account Holders, will submit to the Bankruptcy Court's jurisdiction with respect to the SIPA Proceeding and the Picower Adversary Proceeding.  The Trustee also agrees to reasonably cooperate with Mrs. Picower, the Picower BLMIS Account Holders, and the Picower Releasees to enforce the terms of the Permanent Injunction and extinguish any claim that may be asserted against Mrs. Picower, the Picower BLMIS Account Holders, or the Picower Releasees in violation of the Permanent Injunction.

# ARGUMENT

## THE AGREEMENT IS FAIR AND EQUITABLE AND IN THE BEST INTERESTS OF THE BLMIS ESTATE

**I.     The Terms Of The Agreement Are Fair And Reasonable And Will Confer A Significant Benefit On BLMIS Customers.**

Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Courts have held that in order to approve a settlement or compromise under Bankruptcy Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and equitable, reasonable, and in the best interests of a debtor's estate.  *In re Ionosphere Clubs, Inc.*, 156 BR 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

The Second Circuit has stated that a bankruptcy court, in determining whether to approve a compromise, should not decide the numerous questions of law and fact raised by the compromise, but rather should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.), *cert. denied sub nom. Cosoff v. Rodman*, 464 U.S. 822 (1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039 (1972)); *accord Nellis v. Shugrue*, 165 B.R. 115, 121-22 (S.D.N.Y. 1994); *In re Ionosphere Clubs*, 156 B.R. at 426; *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying litigation"); *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

(i)     the probability of success in the litigation;

(ii)    the difficulties associated with collection;

(iii)   the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(iv)    the paramount interests of the creditors (or in this case, customers).

*Nellis v. Shugrue*, 165 B.R. at 122 (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992), *cert. dismissed*, 506 U.S. 1088 (1993)).

The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable.  *See In re Purofied Down Prods.*, 150 B.R. at 522; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. at 505.  The competency and experience of counsel supporting the settlement may also be considered.  *Nellis v. Shugrue*, 165 B.R. at 122.  Finally, the court should be mindful of the principle that "the law favors compromise."  *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. at 505 (quoting *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976)).

The Trustee believes that the terms of the Picower Settlement fall well above the lowest point in the range of reasonableness and, accordingly, the Agreement should be approved by this Court.  The Agreement resolves all issues regarding the Trustee's asserted and unasserted claims against the Picower BLMIS Account Holders (the "Claims") without the need for protracted, costly, and uncertain litigation.  When the Bankruptcy Settlement Amount and the Government Settlement Funds are combined, one hundred percent of the net funds withdrawn from BLMIS by the Picower BLMIS Account Holders will be available for distribution to customers.  *See* Affidavit of the Trustee in Support of the Motion (the "Picard

Affidavit"), ¶ 5.  A true and accurate copy of the Picard Affidavit is attached hereto as Exhibit <u>D</u>.  Litigating the Claims would require a significant commitment of time by the various professionals involved in the matter, and involves litigation risk.  *Id.*

Based on his investigation, the Trustee believes that the Bankruptcy Settlement Amount represents a significant percentage of the agreed upon value of the Margin Loans. *Id.* ¶ 5.  The Agreement also furthers the interests of the customers of BLMIS by adding a substantial amount of money to the fund of customer property.  *Id.* ¶ 7.  Specifically, as a result of the Agreement, when combined with the amounts already recovered by the Trustee, over 30% of the currently estimated $20 billion value of BLMIS net liabilities to customers should be available for distribution to customers, with an initial distribution forthcoming.[6] *Id.*  In addition, the Picower BLMIS Account Holders have agreed to withdraw the customer claims that they filed in the liquidation.  While most of the entities that filed claims were "net winners" in the parlance of this case, the withdrawal of those customer claims will result in a decrease of over billions of dollars in the amount for which the Trustee will have to reserve pending final determination of the net equity issue.  This will allow the Trustee to distribute significantly more funds to victims in the initial distribution.  *Id.* ¶ 8.

Given the cost and complexities involved in proceeding with litigation, the Trustee has determined that the proposed settlement with the Picower BLMIS Account Holders represents a fair compromise of the Claims.  The Trustee's analysis of the proposed

---

[6] If, as anticipated, the Trustee completes a distribution of funds, including a portion of the proceeds of the Picower Settlement, prior to the resolution of the net equity issue, the Trustee will reserve an appropriate amount as a contingency in the event the Trustee's and Bankruptcy Court's view of the issue is found to be erroneous.  Thus, should the Bankruptcy Court's net equity decision (*SIPC v. BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010)) be reversed, the Trustee will have sufficient reserves to make a *pro rata* distribution to all customers with valid claims.

settlement reveals that the BLMIS estate will recover the majority of the net monies owed to the estate by the Picower BLMIS Account Holders.  When combined with the Government Settlement Funds Payment, the Picowers will have returned one hundred percent of the monies that they received from BLMIS for distribution to BLMIS customers, an unquestionably positive result.  In light of those facts, The Trustee submits that it is in the best interests of the estate to settle the Picower Adversary Proceeding according to these terms.

The Trustee maintains that he would have prevailed at trial in recovering all transfers to the Picower Defendants. Yet there is always a litigation risk, which risk could be higher for transfers that occurred beyond the six year period.  The Agreement allows the Trustee to avoid potentially protracted litigation and resolves all of the issues raised by the Picower Defendants in the Motion to Dismiss.  The ability to avoid the time and expense associated with continuing to litigate this matter, combined with the fact that the Agreement will result in a very substantial recovery, makes the settlement embodied by the Agreement extremely beneficial to BLMIS customers.

## II.      An Injunction Under Section 105(a) Is Warranted and Necessary.

The Trustee seeks a narrowly tailored injunction, which, given the unique circumstances of the BLMIS liquidation in general and the Picower Settlement in particular, is both appropriate and necessary.

The Agreement requires the Trustee to use his best efforts to obtain approval of the Final 9019 Order as promptly as practicable, which shall contain a permanent injunction from the Bankruptcy Court, pursuant to Section 105(a) of the Bankruptcy Code "permanently enjoining any customer or creditor of the BLMIS estate, anyone acting on their behalf or in concert or participation with them, or person whose claim in any way

arises from or relates to BLMIS or the Madoff Ponzi scheme, from asserting any claim against the [Picower] Estate, the Picower BLMIS Accounts, the Picower Adversary Defendants or the Picower Releasees that is duplicative or derivative of the claims brought by the Trustee, or which could have been brought by the Trustee against the [Picower] Estate, the Picower BLMIS Accounts, the Picower Defendants or the Picower Releasees." Agreement, ¶ 7.

>    **a.      The Injunction Is Narrowly Tailored And All Claims Subject To The Injunction Are Derivative Of The Trustee's Claims.**

This Court has subject matter jurisdiction to grant the injunction because the claims that the Trustee seeks to enjoin are direct claims over which the Trustee has "exclusive standing" to assert.

Pursuant to 28 U.S.C. § 1334(b), district courts (and therefore bankruptcy courts) have original jurisdiction over civil proceedings "arising under" and "arising in" and "related to" cases under title 11.  28 U.S.C. § 1334(b).  *See also In re Adelphia Commc'ns Corp.*, 2006 WL 1529357, at *6 (Bankr. S.D.N.Y. June 5, 2006).  "Related to" jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate or the dispute would have an effect on the estate.  *In re Johns Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008), *vacated & remanded on other grounds,* --- U.S. ---, 129 S.Ct. 2195, 174 L.Ed.2d 99 (2009), *aff'g in part & rev'g in part,* 600 F.3d 135 (2d Cir. 2010); *In re Delta Airlines, Inc.*, 374 B.R. 516, 525 (S.D.N.Y. 2007).

This Court's recent decision in *In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. April 28, 2010), is instructive on the issue of subject matter jurisdiction in a situation similar to that created by Madoff's Ponzi scheme and a situation in which the settlement also involved an interlocking agreement with the Government to forfeit money.

Marc S. Dreier ("Dreier"), who was the sole equity partner of Dreier LLP ("Dreier LLP"), committed an extensive fraud against his clients by selling them sham promissory notes (the "Notes") from 2004 to 2008. *Id.* at *1. GSO, an investment manager for certain purchasers of Notes, transferred over a hundred million dollars to Dreier LLP accounts. *Id.* at *3. When the fraud was revealed, Dreier and Dreier LLP filed bankruptcy cases. In an effort to settle potential avoidance actions against GSO, the Chapter 11 Trustee and Chapter 7 Trustee, along with GSO, entered into a settlement agreement, whereby GSO would contribute approximately $10 million, plus artwork with an approximate value of $3 million, to the debtors' estates in exchange for a release and injunction against third-party claims. *Id.* at *4.

In considering subject-matter jurisdiction, the Court first found that it "plainly" had jurisdiction to bar general creditors of the estates from seeking to recover their claims from the funds at issue—the funds transferred by Dreier LLP to GSO. *Id.* at *15. The Court explained that principles stated in *Hirsch v. FDIC (In re Colonial Realty Co.)*, 980 F.2d 125 (2d Cir. 1992), which recognized that the automatic stay barred an action by the FDIC to recover property that the debtor had transferred before bankruptcy, and *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 850 (Bankr. S.D.N.Y. 1994), which held that a bankruptcy trustee alone has standing to maintain avoidance actions, supported the *Dreier* holding. *Id.* at *15-16. Based on these principles, the Court reasoned, the bankruptcy court could permanently enjoin "derivative" creditor claims on avoidance funds because "[a]bsent that power, the Trustees will be hampered in their ability to pursue and ultimately settle fraudulent transfer claims from a transferee fearful of paying twice for the same transfer— once on the Trustees' claim and a second time on the derivative claim." *Id.* at *16 (citing

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Lambert Group, Inc.),* 960 F.2d
285, 293 (2d Cir. 1992).[7]

The Agreement specifically provides that the injunction would preclude the assertion
of "any claim against the Picower Estate, the Picower BLMIS Accounts, the Picower
Adversary Defendants or the Picower Releasees that is duplicative or derivative of any claim
brought by the Trustee, or which could have been brought by the Trustee against the Estate,
the Picower BLMIS Accounts, the Picower Adversary Defendants or the Picower
Releasees." Agreement, ¶ 7.    The Trustee has "exclusive standing" to assert such causes of
action, which belong to the Debtors' estate. *Picard v. Fox*, 2010 WL 1740885, at *5 (Bankr.
S.D.N.Y. May 3, 2010); *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670,
679 (Bankr. S.D.N.Y. 2008); *Goldin v. Primavera Familienstiftung, Tag Assocs. Ltd. (In re
Granite Partners L.P.)*, 194 B.R. 318, 324-25 (Bankr. S.D.N.Y. 1996).    The Second Circuit
has stated that "[i]f a claim is a general one, with no particularized injury arising from it, and
if that claim could be brought by any creditor of the debtor, the trustee is the proper person
to assert the claim, and the creditors are bound by the outcome of the trustee's action."

---

[7] The Court in *Dreier* went on to determine that the injunction sought exceeded the Court's
jurisdiction for reasons not applicable in this case.    Specifically, the Court found that the *Dreier*
injunction did not sufficiently identify the entities being released and was not limited to claims
affecting the property of the estate or the administration of the estate.    *In re Dreier LLP*, 2010 WL
1707737, at *16-17.    Following this decision, the *Dreier* trustee filed a renewed motion for approval
of the settlement agreement with a more tailored injunction.    By order dated June 8, 2010, the Court
approved the settlement and entered the injunction sought by the *Dreier* trustee [Case No. 08-15051
(SMB) ECF No. 610].    The injunction entered enjoined all creditors and parties in interest in the case
from commencing or continuing any action against any of the released parties where the action is
based on Marc Dreier's or Dreier LLP's misconduct and for which there is no independent basis to
bring suit.    The order granting the modified injunction was recently upheld by the District Court.    *See
In re Dreier LLP*, 2010 WL 3835179, at *4-5 (S.D.N.Y. Sept. 10, 2010).

*Picard v. Fox*, 2010 WL 1740885, at \*5 (*quoting St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)).

In addition to the above authorities, the proposed injunction is consistent with the injunction recently entered by the Court in *Dreier*, which excluded from the scope of the injunction actions where there an independent basis on which to bring suit. *In re Dreier LLP*, 2010 WL 1707737, at \*16-17, *aff'd,* 2010 WL 3835179, at \*4-5 (S.D.N.Y. Sept. 10, 2010) (upholding injunction and endorsing *pro rata* distribution for similarly situated victims of a Ponzi scheme). The Trustee, in exercising his exclusive jurisdiction, has asserted claims for the benefit of all customers of BLMIS against the Picower BLMIS Account Holders and has reached an agreement regarding the settlement of those claims. An injunction is appropriate to avoid the re-litigation of claims asserted on behalf of all customers and creditors that have been resolved by the Trustee, particularly where the Trustee has resolved those claims in a manner enormously beneficial to the estate.

Further, the claims that the Trustee seeks to enjoin are those that would impact the administration of the liquidation. Courts have repeatedly enjoined suits against non-debtor third parties to protect the administration of the estate. *See, e.g.*, *In re Adelphia*, 2006 WL 1529357, at \*4 ("The Bankruptcy Court's injunctive powers . . . include 'the power to enjoin the Defendants from proceeding against non-debtor third parties . . . where, as here, the actions against such third parties have at least a conceivable effect upon the Debtors or implicate the interpretation or enforcement of this Court's orders.'") (internal citation omitted); *In re AP Indus.*, 117 B.R. at 801–02 ("The large majority of the courts which have considered the question have held that the bankruptcy courts have the power to restrain legal action by creditors of the debtor against non-debtor third parties, in certain circumstances . .

. .") (quoting *In re Monroe Well Serv., Inc.*, 67 B.R. 746, 751 (Bankr. E.D. Pa. 1986)); *In re Calpine Corp.*, 365 B.R. at 409 n.20.  Enjoining such claims is necessary to protect the proper administration of this liquidation.

If these claims were allowed to be asserted, claimants would be permitted to side-step the jurisdiction of this Court, the processes this Court has put into place, and the SIPA distribution scheme mandated by Congress.  *See generally SIPC v. BLMIS,* 424 B.R. 122 (Bankr. S.D.N.Y. 2010).[8]  In essence, those claimants would be inequitably obtaining property that should not be available to them based on the previous decisions of this Court regarding the claims administration process and the net equity calculation, to the detriment of other claimants that play by the rules.  *See SIPC v. BLMIS*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010); Order on Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 [ECF No. 12].  As this Court noted with respect to the defendants in *Picard v. Fox*, "any judgment awarded to the [*Fox* defendants] would exceed their entitlement to BLMIS distribution under SIPA and this Court's Net Equity Decision."

---

[8] The standard for a Rule 7065 injunction is inapplicable when an injunction is sought under section 105 of the Bankruptcy Code.  *See In re Lyondell Chem. Co.*, 402 B.R. 571, 588 n.37 (Bankr. S.D.N.Y. 2009).  The Court may enjoin actions against the Picower BLMIS Account Holders if (i) a third party suit would impair the court's jurisdiction with respect to a case before it or (ii) the third party suits threaten to thwart or frustrate the debtor's reorganization efforts and the injunction is necessary to preserve or protect the debtor's estate.  *See In re Keene Corp.*, 162 B.R. 935, 944 (Bankr. S.D.N.Y. 1994)*; In re Calpine Corp.*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987)*.  The Second Circuit recently upheld an anti-litigation injunction in the receivership context, finding that the injunction assisted the receiver in managing the receivership and maintaining control over receivership assets.  *SEC v. Byers*, 609 F.3d 87,92-93 (2d Cir. 2010).  Similarly, in the instant case, the injunction sought would prevent interference with the administration of the BLMIS estate.

*Picard v. Fox*, 2010 WL 1740885, at \*10. Indeed, permitting those with allowable customer claims to pursue the Picower BLMIS Account Holders outside of the liquidation would create the potential for double recovery.  Thus, in the absence of an injunction, potential claimants would be able to eviscerate the equitable distribution scheme that lies at the core of both SIPA and the Bankruptcy Code to their own individual benefit.

Finally, the injunction is narrowly tailored, protecting only the Picower BLMIS Account Holders, which are those entities related to Mr. Picower which held BLMIS accounts and which are identified on Attachment A to the Agreement, and the Picower Releasees identified on Attachment C to the Agreement, and only those claims that are derivative of Madoff, BLMIS or the Madoff Ponzi scheme.  These entities have, through the Bankruptcy Settlement Amount and the Government Settlement Funds, agreed to return all of the net profits that they received from BLMIS.  Other than claims arising from the Ponzi scheme — which derivatively injure all BLMIS customers — it is difficult to see what claims would possibly be appropriate to pursue.  Given this fact and the fact that the injunction and releases are "narrowly drawn and are necessary to prevent relitigation of precisely the claims that were negotiated and resolved by the Settlement Agreement," *In re Delta Airlines, Inc.*, 374 B.R. at 526, this Court has the authority to grant the injunction sought.

      **b.**     **The BLMIS Estate Will Receive Substantial Benefit From The Picower Settlement And The Unique Circumstances Of The Case Make The Injunction Appropriate.**

The Picower Settlement will bring $5 billion into the estate for distribution to customers under SIPA.  This amount alone represents a quarter of the currently estimated $20 billion value of BLMIS net liability to customers.  As such, the principles set forth in the controlling Second Circuit case, *Deutsche Bank AG v. Metromedia Fiber Network Inc.*

(*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005), are satisfied.   In

*Metromedia*, the Second Circuit held that nonconsensual nondebtor releases and injunctions

are proper in "in truly unusual circumstances" where, among other things, the debtor's estate

has received substantial consideration.   416 F.3d at 141-143; *see also SEC v. Drexel

Burnham Lambert Group, Inc. (In re Drexel Lambert Group, Inc.),* 960 F.2d 285, 293 (2d

Cir. 1992); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,

280 F.3d 648, 657-58 (6th Cir. 2002).[9]

The Picower Settlement represents an incredibly significant milestone in this

liquidation proceeding.   The demand amount in the adversary proceeding commenced

against Picower is among the highest of the actions commenced by the Trustee thus far and

the Picower Settlement would constitute, by far, the Trustee's largest recovery to date.   The

increase in customer property by virtue of the Picower Settlement is dramatic and would

constitute a significant increase in the amounts of the *pro rata* distribution that will be made

to BLMIS's defrauded customers.   As this Court has already recognized in the *Picard v. Fox*

proceedings, the Picower Settlement would provide a unique benefit to the estate that is

certainly worthy of the protection of a carefully tailored injunction.   As the Court observed,

an injunction pursuant to section 105(a) "is appropriate and necessary to preserve the

integrity of the SIPA proceedings and the Trustee's settlement negotiations for the benefit of

---

[9] Although certain of the cited case law addresses injunctions in the context of a plan of reorganization, it is clear that injunctions pursuant to section 105 are not limited to reorgarization proceedings. *See, e.g., Apostolou*, 155 F.3d at 882 (section 105 injunction applicable in liquidation proceeding); *In re AP Indus.*, 117 B.R. at 201 ("The court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case.").   The same principles apply to injunctions required in settlement agreements.   *See In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. April 28, 2010); *see also In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358 (Bankr. S.D.N.Y. 2002).

the BLMIS estate and all of its customer claimants." *Picard v. Fox*, 2010 WL 1740885, at *9.

     There is no doubt that the injunction is necessary and fair. Mrs. Picower has made it clear to the Trustee that the injunction is an essential part of the settlement. Given the value of the proposed settlement, it is not surprising that Mrs. Picower wishes to have finality and be certain that, on behalf of the Picower Estate, she will not be required to satisfy the same claims twice. As this Court noted in *Picard v. Fox*, without an injunction, the Picower BLMIS Account Holders would be "fearful of paying twice for the same transfer." *Picard v. Fox*, 2010 WL 1740885, at *9 (quoting *In re Dreier LLP*, 2010 WL 1707737, at *16). The Second Circuit has held that an injunction is appropriate in situation where, but for the injunction, the settlement would be less likely to occur. *See e.g., SEC v. Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 293. In such circumstances, the Court may use its powers to enjoin in order to foster the conclusion of a settlement by providing the finality sought by the Picower BLMIS Account Holders. *See, e.g.*, *In re Johns-Mansville Corp.*, 68 B.R. 618, 626 (Bankr. S.D.N.Y. 1986) (Lifland, J.) (enjoining further actions against settling defendants under § 105(a) in order to "preserve the rights of all asbestos claimants by establishing a corpus of funds from which all can collect" and to "prevent[] the inequitable, piece-meal dismemberment of the debtor's estate . . . "), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987*), aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

     Accordingly the terms of the injunction sought satisfy the *Metromedia* requirements: the opportunity offered to the estate by the Picower Settlement must be considered "unusual circumstances" and the settlement will provide a substantial benefit to the BLMIS estate and

in turn, BLMIS's customers.  As such, the narrow injunction sought by the Trustee should be granted.

## CONCLUSION

The Trustee submits that the Agreement should be approved for two overarching reasons:  (a) to avoid lengthy and burdensome litigation, and (b) and because it represents a reasonable compromise of the Claims that benefits the estate and the customers of BLMIS. Accordingly, since the Agreement is well within the "range of reasonableness" and confers a substantial benefit on the estate, the Trustee respectfully requests that the Court enter an Order (i) approving the Agreement, and (ii) issuing the permanent injunction.

## NOTICE

In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion has been given to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; and (iv) the United States Attorney for the Southern District of New York.  The Trustee shall also serve, by way of the ECF filing that will be made, each person or entity that has filed a notice of appearance in this case.  The Trustee submits that no other or further notice need be given and respectfully requests that the Court find that such notice is proper and sufficient.

WHEREFORE, the Trustee respectfully requests entry of an Order (i) approving the settlement agreement between the Trustee on the one hand and Mrs. Picower, on behalf of the Picower BLMIS Account Holders on the other and (ii) enjoining customers and creditors of BLMIS who filed or could have filed claims in the liquidation from pursuing claims against the Picower BLMIS Account Holders and the Picower Releasees, substantially in the form of Exhibit C.

Dated: New York, New York
      December 17, 2010

Respectfully submitted,

/s/ David J. Sheehan

Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and Bernard L. Madoff*