# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No: _____

PAMELA GOLDMAN and
A & G GOLDMAN PARTNERSHIP, individually
and on behalf of a class of similarly situated Plaintiffs,

vs.

CAPITAL GROWTH COMPANY;                          **COMPLAINT-CLASS ACTION**
DECISIONS, INC.;
FAVORITE FUNDS;                                  **Jury Trial Demanded**
JA PRIMARY LIMITED PARTNERSHIP;
JA SPECIAL LIMITED PARTNERSHIP;
JAB PARTNERSHIP;
JEMW PARTNERSHIP;
JF PARTNERSHIP;
JFM INVESTMENT COMPANIES;
JLN PARTNERSHIP;
JMP LIMITED PARTNERSHIP;
JEFFRY M. PICOWER SPECIAL COMPANY;
JEFFRY M. PICOWER, P.C.;
THE PICOWER FOUNDATION; JOHN DOE TRUSTEES
OF THE PICOWER FOUNDATION;
THE PICOWER INSTITUTE OF MEDICAL RESEARCH;
THE TRUST F/B/O GABRIELLE H. PICOWER;
BARBARA PICOWER, individually, and as
Executor of the Estate of Jeffry M. Picower,
and as Trustee for the Picower Foundation
and for the Trust f/b/o Gabriel H. Picower.
_____/

Plaintiffs, Pamela Goldman and A&G Goldman Partnership, through their undersigned

attorneys, on their own behalf and on behalf of a similarly situated class of plaintiffs

(collectively, "Plaintiffs"), hereby sue Defendants and allege the following based upon the

investigation of Plaintiffs' counsel, including a review of documents in the bankruptcy

proceeding concerning Bernard L. Madoff Investment Securities, LLC ("BLMIS"); documents in

the Securities Exchange Commission ("SEC") and criminal proceedings against Bernard L.

Madoff ("Madoff") and other BLMIS employees, including without limitation the sworn testimony of Enrica Cotellessa-Pitz, Frank DiPascali, Jr., and Annette Bongiorno in the criminal action, *United States v. Bonventre, et al.,* 10-cr-228(LTS) (S.D.N.Y.); and documents in the United States of America's (the "Government") civil forfeiture action (the "Civil Forfeiture Action") against Jeffry M. Picower.

### INTRODUCTION AND SUMMARY OF CLAIMS

1.      This is an action against Jeffry Picower and his affiliated Defendants ("Picower") for control person liability under Section 20(a) of the 1934 Exchange Act, 15 U.S.C § 78t(a). This claim arises out of Picower's decades of knowing direction and active funding and concealment of the notorious Madoff/BLMIS Ponzi scheme.   Picower's role included involvement in the creation and dissemination of material misrepresentations and omissions made to BLMIS customers.  The damages sought through this action are separate from, and are not predicated on, Picower's fraudulent withdrawals from the Ponzi scheme.

2.      BLMIS was a broker-dealer owned by Madoff and ostensibly engaged in the business of buying and selling securities in customer accounts.  BLMIS sent monthly statements to its nearly 7,000 customers reflecting phony investments, phony securities transactions, and phony profits.  Each such statement contained material misrepresentations and omissions that were sent to BLMIS customers, including Plaintiffs.  Each statement falsely reflected that securities had been purchased and cash proceeds credited to customer accounts when there were no such purchases or cash credited.

3.      Madoff's fraudulent scheme also involved the continuous misrepresentation of BLMIS' overall solvency and securities trading activity.  BLMIS' fraudulent documentation of its trading activity and its own financial condition was critical to the perpetuation of the scheme.

4.      Since BLMIS did not make any actual securities transactions in BLMIS accounts,
when BLMIS customers withdrew the profits or the principal reflected in their statements, they
were paid with the cash that had been invested by other BLMIS customers.  In or about
December 2008, the Ponzi scheme collapsed when customer redemptions overwhelmed the
amount of money invested in BLMIS.  Madoff has been convicted for violations of the federal
securities laws.  But Madoff did not act alone.

5.      Before his death, Picower was a highly sophisticated investor, accountant, and
attorney.  Picower was closely associated with Madoff, both in business and socially, for
decades, and Picower lived close to Madoff in Palm Beach, Florida.  Madoff served as a trustee
for the Picower Institute for Medical Research.  Picower "invested" with BLMIS since at least
the 1980s.  Through his close relationship with Madoff, Picower had uncommon access to
BLMIS' books and records, directed the affairs of BLMIS, and became Madoff's *de facto*
partner.

6.      Section 20(a) of the Exchange Act provides that:

> Every person who, *directly or indirectly,* controls any person liable
> under any provision of this title or of any rule or regulation thereunder
> shall also be liable jointly and severally with and to the same extent as
> such controlled person to any person to whom such controlled person is
> liable . . . unless the controlling person acted in good faith and did not
> directly or indirectly induce the act or acts constitution the violation or
> cause of action.  (Emphasis added.)

Consistent with the remedial purpose of Section 20(a), the SEC defines "control" broadly as:

> *The possession, direct or indirect, of the power* to direct or cause the
> directions of the management and policies of a person, whether through
> the ownership of voting securities, by contract, or *otherwise.*"

17 C.F.R. § 230.405 (2012) (emphasis added).

7.     Picower is liable under Section 20(a) because Picower knew that BLMIS was operating a fraud, and because Picower caused the dissemination of material misrepresentations and documents containing material omissions relied on by BLMIS customers that are the basis of BLMIS' securities law violations.

8.     Picower had both the motive and opportunity to control BLMIS.  He stole at least $7.2 million (40%) of the total $18 billion in cash invested in BLMIS.  This in and of itself is indicia of Picower's control over the BLMIS enterprise.  But Picower did far more, exerting control over the Ponzi scheme in ways that had nothing to do with transactions in his own BLMIS accounts or his theft of cash from BLMIS.

9.     The Ponzi scheme could only succeed if investors did not know it was a fraud, and concealment of the scheme required continuous misrepresentations as to BLMIS' solvency and securities trading activity.  Picower directed BLMIS on strategic decisions regarding the dissemination of such misrepresentations and omissions and participated directly in the scheme and its concealment.

10.    For example, Picower made approximately $200 million in sham "loans" to BLMIS in order to prop up the Ponzi scheme and enable BLMIS to pay off redeeming investors. But for the Picower "loans," BLIMS and the Ponzi scheme would have collapsed long ago.  The "loans" also resulted in direct misrepresentations to BLMIS customers about BLMIS' solvency and financial condition.

11.    Picower also acted as a "counterparty" to phony options trading transactions on BLMIS' books that were critical to the "split-strike" options trading strategy that Madoff and BLMIS purported to engage in on a day to day basis, and which Madoff touted to investors as his primary investment strategy.

12.     In short, Picower directly and indirectly controlled the viability of the Ponzi scheme.  Picower caused and directed material misrepresentations and omissions relating to BLMIS' general trading activity, balance sheet, assets, capital, and solvency, all of which gave investors and regulators the false appearance that BLMIS was engaged in profitable and legitimate trading and investment activity, and all of which induced Plaintiffs and the class members to invest or remain invested in BLMIS.

13.     The net amount of customer cash lost in the Ponzi scheme was approximately $18 billion.  Picower is responsible for *all* $18 billion of the losses suffered by BLMIS customers: not because he stole $7.2 billion of the $18 billion lost, but because he controlled BLMIS and directed the fraud in numerous ways.

14.     On December 17, 2010, the BLMIS bankruptcy Trustee settled his fraudulent conveyance claims against Picower, and the Trustee recovered the entire $7.2 billion net amount Picower withdrew from BLMIS.  There is no basis in law or fact to contend that Picower and his affiliates immunized themselves from securities fraud damages claims by defrauded investors by agreeing to return the fraudulent transfers to the Trustee.  BLMIS investors lost $11 billion that is separate and apart from any amount fraudulently transferred from BLMIS to Picower. This action seeks recovery of this distinct loss.

15.     Picower's wrongful conduct is exactly the evil that Section 20(a) was enacted to remedy.

### JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and under Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331,1337, and under § 27 of the Exchange Act, 15 U.S.C. §78aa.  At all relevant times the principal place of Defendants' business was Palm Beach, Florida.  Substantial acts, if not all of the acts, committed in the furtherance of the control relationship occurred in the state of Florida.

18.     Venue is proper in this district pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, 28 U.S.C. §1391(b), because Defendants reside or are headquartered in this judicial district, and the acts and transactions alleged herein occurred in substantial part in this judicial district.

19.     In connection with the wrongs alleged herein, Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of national securities markets.

## THE PARTIES

20.     Plaintiff Pamela Goldman is a resident of the State of New York.  Plaintiff brings this class action on behalf of herself and a putative class of persons similarly situated for damages and other relief arising from the Defendants' wrongful conduct described herein.

21.     Plaintiff A & G Goldman Partnership is a New York partnership with its principal place of business in the State of New York.  Plaintiff brings this class action on behalf of itself and a putative class of persons similarly situated for damages and other relief arising from the Defendants' wrongful conduct described herein.

22.      Picower was a resident of Palm Beach, Florida, and Fairfield, Connecticut, prior to and at the time of his death on October 25, 2009.  Picower held an individual BLMIS account

in the name of "Jeffry M. Picower," with an account address of 1410 South Ocean Boulevard,
Palm Beach, Florida.  Picower was Chairman of the Board of Defendant Decisions Incorporated.

23.    Defendant Barbara Picower is the Executor of the Estate of Jeffry M. Picower,
which is being probated in the State of New York.

24.    Defendant Barbara Picower is a person residing at 1410 South Ocean Boulevard,
Palm Beach, Florida 33480.  Barbara Picower is Picower's surviving spouse.  Barbara Picower
holds an individual account at BLMIS in the name "Barbara Picower," with the account address
of 1410 South Ocean Boulevard, Palm Beach, Florida 33480, and Barbara Picower is trustee for
Defendant Trust f/b/o Gabrielle H. Picower, an officer and/or director of Defendant Decisions
Incorporated, and trustee and Executive Director of the Picower Foundation.

25.    Defendant Decisions Incorporated is a corporation organized under the laws of
Delaware with a principal place of business at 950 Third Avenue, New York, New York 10022
and an alternate mailing address on its BLMIS account listed as 22 Saw Mill River Road,
Hawthorne, New York, 10532.  The Decisions Incorporated office in Hawthorne was merely a
store-front office through which little or no business was conducted, and Decisions Incorporated
is a general partner of Defendants Capital Growth Company, JA Primary Limited Partnership,
JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JLN
Partnership, JMP Limited Partnership and Jeffry M. Picower Special Co.

26.    Defendant Capital Growth Company purports to be a limited partnership with a
mailing address for its BLMIS account listed at 22 Saw Mill River Road, Hawthorne, New York,
10532, care of Decisions Incorporated. Defendant Decisions Incorporated and/or Picower
serve/served as General Partner or Director of Capital Growth Company, and Decisions
Incorporated and Picower transact/transacted business through this entity.

27.     Defendant JA Primary Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. Defendant Decisions Incorporated and/or Picower serves/served as General Partner or Director of JA Primary Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this entity.

28.     Defendant JA Special Limited Partnership is a limited partnership organized under the laws of Delaware with a principal place of business at 25 Virginia Lane, Thornwood, New York, New York 10594.  Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JA Special Limited Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

29.     Defendant JAB Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532. Upon information and belief, Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JAB Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

30.     Defendant JEMW Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or Director of JEMW Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

31.     Defendant JF Partnership purports to be a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Defendant Decisions Incorporated and/or Picower serve/served as General Partner or

Director of JF Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

32. Defendant JFM Investment Company is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and JFM Investment Company is a Limited Partner of Capital Growth Company, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JFM Investment Company.

33. Defendant JLN Partnership is a limited partnership with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of JLN Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

34. Defendant JMP Limited Partnership is a limited partnership organized under the laws of Delaware, with a principal place of business at 25 Virginia Lane, Thornwood, New York 10594. Decisions Incorporated and/or Picower serve/served as General Partner or Director of JMP Partnership, and Decisions Incorporated, and/or Picower transact/transacted business through this Defendant entity.

35. Defendant Jeffry M. Picower Special Co. is an entity through which Decisions Incorporated, and/or Picower transact/transacted business, with a mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532; and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower Special Co.

36.     Defendant Favorite Funds is an entity through which Picower transacted business, with a listed mailing address care of Decisions Incorporated at 22 Saw Mill River Road, Hawthorne, New York, 10532, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Favorite Funds.

37.     Defendant Jeffry M. Picower P.C. purports to be a limited partnership with a listed mailing address at 25 Virginia Lane, Thornwood, New York, New York 10594, and Decisions Incorporated and/or Picower serve/served as General Partner or Director of Jeffry M. Picower P.C., and Decisions Incorporated, and/or Picower transact/transacted business through this defendant entity.

38.     Defendant Picower Foundation is a trust organized for charitable purposes with Picower listed as donor, and Picower and Barbara Picower, among others, listed as Trustees during the relevant time period. Picower Foundation's addresses are reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480 and 9 West 57th Street, Suite 3800, New York, New York 10019.

39.     Defendants John Doe Trustees of the Picower Foundation were the Trustees of the Picower Foundation during the statute of limitations period.

40.     Defendant Picower Institute for Medical Research is a nonprofit entity organized under the laws of New York, with a principal place of business at 350 Community Drive, Manhasset, New York 11030.

41.     Defendant Trust f/b/o Gabrielle H. Picower is a trust established for beneficiary Gabrielle H. Picower, who is the daughter of Picower and Barbara Picower, with Defendant Barbara Picower listed as trustee, and the trust's BLMIS account address reported as 1410 South Ocean Boulevard, Palm Beach, Florida 33480.

42.     On information and belief, the Picower Entity Defendants were dominated, controlled and used as a mere instrumentality of Picower to advance his interests in, and to control BLMIS and the Madoff Ponzi scheme.  Thus, the Picower Entity Defendants are the alter egos of Jeffry Picower and of each other, and are jointly and severally liable for wrongful conduct committed by one or more of them, as detailed herein.

## BLMIS' PRIMARY SECURITIES LAW VIOLATION

### BLMIS Committed Securities Fraud

43.     For decades, Madoff and BLMIS engaged in the largest Ponzi scheme in history. BLMIS was a broker-dealer ostensibly engaged in the business of buying and selling securities and acting as the custodian of customer securities and cash balances.  In the course of the scheme, BLMIS sent monthly statements to its nearly 7,000 customers reflecting phony investments and phony profits.  Each such statement was a material misrepresentation since each misrepresented to customers, including Plaintiffs, that securities had been purchased and cash proceeds credited when there were no such purchases or cash credited.

44.     Madoff's fraudulent scheme also involved the continuous misrepresentation of BLMIS' solvency and securities trading activity.  It was essential to the scheme that BLMIS appear to be a solvent, profitable brokerage firm.  Indeed, throughout the class period BLMIS was actually insolvent and repeatedly needed large undisclosed "loans" to pay off investors who redeemed their BLMIS interests.  BLMIS also needed parties who would assist it in fabricating purported trading activity at BLMIS.  BLMIS did not engage in such trading, but it needed well-constructed, authentic looking, but fraudulent trading records to hide this fact from investors and regulators.  BLMIS' fraudulent documentation of its trading activity and its own financial condition was an essential part of its overall fraudulent scheme.

11

45.     BLMIS is a New York Limited Liability Company that was wholly owned by
Madoff.  BLMIS was founded in 1959, and operated from its principle place of business at 885
Third Avenue, New York, NY.  Madoff was Founder, Chairman, Chief Executive Officer, and
sole shareholder.  BLMIS was registered with the SEC as a Securities Broker Dealer under
Section 15 of the Exchange Act.

46.     BLMIS typically obtained account documentation from its customers which gave
BLMIS a power of attorney and complete discretion over trading in the relevant BLMIS
accounts.  BLMIS falsely described its trading strategy to customers as involving a complicated
option strategy ("split-strike') which generated consistent returns.  BLMIS in fact operated a
Ponzi scheme.

47.     BLMIS falsely represented to all class members that it maintained a multi-billion
dollar program of commingled options and stock trading which were securities and investment
contracts under the Exchange Act (the "BLMIS Discretionary Trading Program"). Customer
"participation" therein involved the purchase and sale of securities.

48.     BLMIS falsely represented to class members that they had purchased securities
and options through BLMIS.  Each class member received monthly statements purportedly
reflecting securities in their account, trading activity during the month, and profits earned over
the relevant time period. BLMIS also published for customers and regulators monthly and annual
financial reports.  The monthly statements for customer accounts depicted consistent profits on a
monthly basis and rarely, if ever, showed loses.  The BLMIS financials reported a profitable firm
that was solvent.

49.     The transactions reported on these monthly statements were a fabrication.  The
securities transactions described in the monthly statements never occurred, and the profits and

securities positions reported were entirely fictitious. Madoff admitted at his plea hearing that he had never purchased any of the securities in BLMIS customer accounts. Except for isolated individual transactions, there is no record of BLMIS having purchased or sold any securities in BLMIS customer accounts, or any proprietary accounts.

50.     On December 11, 2008, Madoff was arrested by federal agents and charged with criminal violation of the federal securities laws, including securities fraud, investment advisor fraud, and mail and wire fraud. On the same day, the SEC filed a complaint in the United States District Court for the Southern District of New York against Madoff and BLMIS, also alleging that Madoff and BLMIS had engaged in securities fraud.

51.     On December 15, 2008, the District Court appointed Irving H. Picard, Esq., as trustee ("Trustee") for the substantively consolidated liquidation of Madoff's estate and of BLMIS under the Securities and Investor Protection Action ("SIPA"). On March 10, 2009, the federal government filed an eleven count criminal information against Madoff in the case styled United States v. Madoff, 09-CR-213 (S.D.N.Y.). Two days later, Madoff plead guilty to all eleven counts, including Count I for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

52.     It is beyond dispute that BLMIS engaged in the largest Ponzi scheme in U.S. history. The net amount of *bona fide* net customer assets invested in the BLMIS scheme was approximately $18 billion. BLMIS violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Madoff pleaded guilty to criminal securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5. During the Ponzi scheme, Madoff and his family defalcated at least $800 million of *bona fide* customer assets.

53.     BLMIS is currently subject to a federal bankruptcy proceeding, and thus cannot be named as a defendant in this action.

### BLMIS Violated Section 10(b) of the Exchange Act and Rule 10b-5

54.     BLMIS carried out a plan, scheme and course of conduct which was intended to and, did: (i) cause brokerage customers of BLMIS and investors in the BLMIS Discretionary Trading Program to entrust securities and cash for safe-keeping with BLMIS; and (ii) misappropriate the assets of BLMIS customers who purchased securities sold by or issued by BLMIS in connection with the BLMIS Discretionary Trading Program, as alleged herein. In furtherance of this unlawful scheme, plan, and course of conduct, BLMIS and its agents, including Madoff, took the actions set forth herein. As a result, Plaintiffs and the other members of the Class suffered damages in connection with the undisclosed and unauthorized theft of their securities and cash assets, and the misappropriation of the proceeds thereof, as alleged herein.

55.     BLMIS (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of materials fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon brokerage customers who entrusted assets to BLMIS and who purchased securities issued by BLMIS in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

56.     As part of and in furtherance of this conduct, BLMIS engaged in an ongoing scheme to misappropriate funds which constituted the proceeds of sales of customers' securities.

57.     BLMIS directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misappropriate funds which constituted the proceeds of sales of securities (or the securities

14

themselves or cash) held by BLMIS as securities custodian and broker for Plaintiffs and the Class members.

58.     BLMIS made untrue statements of material fact and/or omitted to state material facts necessary to make its statements not misleading, and employed devices, schemes and artifices to defraud, and engaged in acts, practices, and a course of conduct in an effort to mislead and misappropriate the assets of BLMIS brokerage customers and participants in the BLMIS Discretionary Trading Program.  Such misconduct included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BLMIS and the BLMIS Discretionary Trading Program, its financial performance and its business operations in the light of the circumstances under which they were made, not misleading, and which included engaging in manipulative and deceptive transactions, practices and courses of business which operated as a fraud and deceit upon the customers of BLMIS and participants in the BLMIS Discretionary Trading Program, including the surreptitious and unauthorized theft of customer assets and securities.

59.     BLMIS had actual knowledge of the misrepresentations and omissions of material facts set forth herein.  BLMIS' material misrepresentations and/or omissions were done knowingly for the purpose and effect of inflating BLMIS' financial results.  At all relevant times, BLMIS was aware of the dissemination of artificially inflated financial information to the investing public which it knew was materially false and misleading.

60.     At the time of the misrepresentations, omissions and manipulative and deceptive conduct, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true, and they were ignorant of the manipulative and deceptive conduct complained of

herein. If Plaintiffs and the other members of the Class had known the truth regarding BLMIS' materially false statements and deceptive and manipulative conduct alleged above, which were not disclosed, Plaintiffs and other members of the Class would not have entrusted their assets to BLMIS or purchased what they were led to believe were BLMIS securities.

61.     As a direct and proximate result of BLMIS' wrongful, manipulative, and deceptive conduct, including the dissemination of the materially false and misleading information set forth above, Plaintiffs and the other members of the Class suffered damages by overpaying for the BLMIS securities. Plaintiffs and the Class members suffered damages as a result of this manipulative and deceptive conduct.

62.     By virtue of the foregoing, BLMIS violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## DEFENDANTS ARE CONTROL PERSONS UNDER SECTION 20(a)

### Picower controlled BLMIS and directed its fraud

63.     Picower was a highly sophisticated investor, accountant, and attorney. Picower was closely associated with Madoff, both in business and socially, for decades, and Picower lived close to Madoff in Palm Beach. Madoff served as a trustee for the Picower Institute for Medical Research. Picower "invested" with BLMIS since at least the 1980s.

64.     Through his close relationship with Madoff, Picower was heavily involved in the BLMIS fraud and became Madoff's *de facto* partner. Picower also used his extensive connections in Palm Beach and his stature on Wall Street to recruit and refer clients to the BLMIS scheme, despite his knowledge that it was a fraud.

65.     Picower had invested in BLMIS since the 1980s, and he became a control person of BLMIS for his own benefit at least by December 1, 1995, when he started to directly or indirectly cause BLMIS to make misrepresentations to other customers, and to direct and

participate in the fraudulent acts described herein. Madoff has stated that Picower was "complicit" in the scheme.

66. Picower secretly financed the Ponzi scheme and directly participated in BLMIS' fraudulent transactions that allowed the Ponzi scheme to go undetected by regulators and the class members, and he caused the dissemination of highly material misstatements and omissions in BLMIS' financials for extended periods of time.

**Picower Controlled BLMIS and Caused the Dissemination of Material Misrepresentations and Omissions Through Fraudulent "Lending" Transactions**

67. In order to prop up the Ponzi scheme, Picower engaged in a series of "lending" transactions amounting to more than $200 million. But for these "loans," BLMIS would have been unable to pay off redeeming investors and the Ponzi scheme would have collapsed. The loans gave Picower control over BLMIS as his potential to either refuse to make the illicit "loans" or to call them would have resulted in the end of the Ponzi scheme.

68. Specifically, in 1992, one of BLMIS' large feeder funds, Avellino & Bienes ("Avellino"), failed and was under SEC investigation. BLMIS needed cash to pay back Avellino investors and deflect suspicion away from the Ponzi scheme. After conferring with Madoff, Picower sent $76 million dollars' worth of securities from a non-BLMIS account to BLMIS, without consideration.

69. The Picower securities were held in a BLMIS general account, and they were then pledged as security to obtain a bank loan (or multiple loans) to repay the Avellino clients who had invested in BLMIS. BLMIS falsely represented to a lending bank that BLMIS owned the Picower securities. The securities that Picower "loaned" to BLMIS perpetuated the fraud and allowed BLMIS to continue to bringing new victims into the Ponzi scheme.

70.     Picower also made a $125 million "loan" to BLMIS in April 2006 (without consideration) in order to keep BLMIS afloat when it was short on cash to pay its redeeming customers.  Picower was quickly repaid on his "loan" when BLMIS wired him $125 million in September 2006.   Like the earlier 1993 "loan," this loan was necessary to perpetuate the Ponzi scheme by concealing BLMIS' inability to pay its redeeming customers their fictitious gains.

71.     Although Picower was a sophisticated businessman and investor, he never entered into formal loan documents for his $200 million in "loans" to BLMIS.  This lack of documentation allowed Picower to hide the loans and their fraudulent purpose.

72.     It was essential to both Picower and to BLMIS that the Picower "loans" were secret because they were improper and inconsistent with applicable laws, rules, and regulations of the SEC and the Financial Institution Regulatory Authority (FINRA).  Loans to brokers like BLMIS must be approved by FINRA following a comprehensive review of the purpose of the loan and the lender.  Also, a bona fide lender must sign a detailed subordination agreement, agreeing that the loan is subordinate to certain other liabilities to creditors of the brokerage firm. Knowing that "bailing out a Ponzi scheme" would not be an acceptable purpose for a subordinated loan, Picower hid the loans from FINRA and participated in BLMIS' fraudulent representation of the Picower loans as BLMIS capital that could be pledged as security for a bank loan or used as a cash asset to pay back redeeming BLMIS investors.

73.     Through the BLMIS bailouts, Picower had the power to coerce BLMIS to do what he wanted, as he could have pulled the loans or refused them at any time, causing BLMIS to fail. Picower's role as a provider of significant hidden financing to prolong the Ponzi scheme gave him control over BLMIS, because his refusal to participate in such hidden loan transactions would have been the demise of BLMIS.

74.     Through these secret and illegal "loans" to BLMIS, Picower directly caused the dissemination of material misrepresentations and omissions to prospective and existing BLMIS customers about the legitimacy and solvency of BLMIS, which BLMIS customers relied upon in investing with, or staying invested with, BLMIS.   Moreover, the Picower "loans" were not properly reflected in BLMIS' financial statements, which financial statements were rendered materially false by Picower's actions.  In fact, the Picower "loans" rendered BLMIS insolvent because they created a $200 million liability without any corresponding asset.

75.     These misrepresentations and omissions were not related to transactions in Picower's BLMIS trading accounts and were not incident to the fraudulent withdrawal of funds from Picower's BLMIS accounts.  The loans were not the withdrawal of capital at all, but were hidden infusions designed to deceive investors into believing that BLMIS was solvent.

### Picower Controlled BLMIS and Caused the Dissemination of Material Misrepresentations and Omissions as a Party to Fraudulent Options Trading

76.     A critical aspect of the Ponzi scheme was the creation of the appearance of legitimate trading records to induce prospective and existing BLMIS customers to invest and stay invested with BLMIS.  To that end, Madoff represented that he engaged in high volume "split strike" options trading activity.  Madoff purported to invest BLMIS customers' money in the largest S&P 100 stocks and buy and sell options against those stocks to minimize losses.

77.     However, BLMIS did not actually engage in any real stock or options transactions.  Therefore, fabrication of the trading records was essential to the Ponzi scheme, as was the cooperation of partners in the fraud who would agree to act as a "counterparty" to the phony options contracts with BLMIS.

78.     Madoff was continually concerned that those who BLMIS identified as counterparties to the phony options transactions, such as institutional broker-dealers throughout

the world, would become subject to heightened scrutiny from regulators and from large institutions that did business with BLMIS. Madoff believed BLMIS needed to frequently name new counterparties for its fake option trades to continue tricking regulators, and the public and prospective and existing customers, into believing BLMIS was actually engaged in large scale options trading necessary to implement BLMIS' purported split-strike options strategy.

79.     BLMIS and Picower agreed that Picower, who was a billionaire, would be listed on BLMIS' fabricated books and records as a counterparty for a large volume of options trading. Picower knew that there was no such options trading, but agreed to participate in this falsification of BLMIS trading records to deceive auditors, regulators, and BLMIS customers and potential investors and to preserve the Ponzi scheme. Picower expressly agreed not to disclose the counterparty fraud and that he would warn Madoff if he was questioned by regulators or anyone else about the options transactions.

80.     By agreeing to act as a party to fraudulent options transactions, Picower knowingly controlled the falsification of the books of BLMIS and participated in the preparation and dissemination of false information and material omissions about the legitimacy of the split-strike options strategy used to induce BLMIS customers to invest. This also made Picower an essential element of the Ponzi scheme.

81.     These misrepresentations and omissions were not related to cash withdrawals from Picower's BLMIS accounts and are, therefore, not incident to the fraudulent withdrawal of funds from Picower's BLMIS accounts.

**Picower Controlled BLMIS Through Direct Contact With BLMIS Employees**

82.     Picower also had extensive direct contact with BLMIS employees and had the power to direct their actions.

20

83.     Picower caused BLMIS to book phony transactions with phony profits in his own BLMIS accounts. From time to time, Picower withdrew these phony profits from his BLMIS accounts. These withdrawals were actually funded with cash from other BLMIS customers.

84.     Picower knew and intended that each phony recording of a fictitious profitable transaction in his accounts resulted directly in the recording of false transactions and false asset values in the accounts of other BLMIS customers, because these customer accounts did not reflect the resulting cash transfer from their accounts to Picower.

85.     BLMIS employees regularly carried out Picower's fraudulent trading instructions by fabricating and back dating trades in Picower's accounts to generate phony paper profits. By way of example, on or about December 29, 2005, Picower's assistant April Friehlich, acting on behalf of the Defendants, faxed BLMIS a letter signed by Picower that directed BLMIS to "realize" a gain of $50 million in the Picower accounts. Upon direction from Picower and Friehlich, BLMIS falsified records so that it would appear that BLMIS sold large amounts of stock in Agilent Technologies and Intel Corporation in various Defendant accounts on a back dated basis. Friehlich directed the fictitious sale of large amounts of these purported securities on or about December 29, 2005, requesting that the sales be "booked" to take place on an earlier date, *i.e.*, December 8 or 9.

86.     BLMIS backdated the trades at Picower's direction and on Picower's behalf for the purpose of generating phony paper profits of approximately $46.3 million, which made up most of Picower's requested $50 million distribution. Picower knew that in order to maintain and hide the Ponzi scheme, Picower's phony $46.3 million paper profit necessitated the creation of corresponding phony account records in other BLMIS customer accounts.

21

87.     Similarly, on or about April 24, 2006, Defendant Decisions Incorporated opened a new account with BLMIS known as the "Decisions, Inc. 6" account.  This account was opened with a wire transfer of $125 million. Defendants instructed BLMIS to back date trades in this account to January 2006, which was four months prior to the date the account was actually opened. BLMIS employees carried out Defendants' direct instructions and fabricated and back dated trades in the "Decisions, Inc. 6" account. This resulted in the net value of the account increasing by almost $40 million, or 30%, in less than two weeks after it opened.  Defendants also directed and orchestrated the preparation of false statements in May 2007, which reflected millions of dollars in securities transactions which reportedly took place in earlier in 2007, but which in fact did not take place at all.

88.     Picower also directed BLMIS to make a margin "loan" of approximately $6 billion to Defendant Decisions Incorporated, even though the account had no trading activity or cash or securities to support such borrowing.

89.     Borrowing in a brokerage account is regulated by margin rules established by the Federal Reserve System and by the New York Stock Exchange.  These rules limit the amount that an account holder can borrow from his or her securities account based upon the value of securities that can be used as collateral for the loan.  The Decisions Incorporated account reflects virtually no trading activity and virtually no securities positions or other collateral for loans from this account.  Picower was able to direct BLMIS to violate the margin rules and "loan" almost $6 billion in the Decisions Incorporated account without any collateral.

90.     Picower knew at all times that this $6 billion credit was actually a transfer from the accounts of other BLMIS customers that was never recorded in those accounts.

## Picower's Participation in the Ponzi Scheme Caused the
## Dissemination of Material Misrepresentations and Omissions.

91.     The fraudulent transactions directed and participated in by Picower as well his fraudulent lending activity and participation as a phony options counterparty all directly resulted in the falsification of BLMIS' financial statements provided to regulators and relied upon by BLMIS customers.

92.     Each month, BLMIS prepared and filed a Financial and Operational Combined Uniform Single ("FOCUS") report with FINRA, which is the self-regulatory organization that regulates broker-dealers.

93.     BLMIS' FOCUS reports materially misstated its financial condition by failing to account properly for Picower's phony lending and phony trades and the overstated value of other customers' accounts, and by overstating BLMIS' capital and trading profits.

94.     Picower's ability to direct the creation and dissemination of false and misleading trading and financial documentation which he knew would be incorporated in financial disclosures made by BLMIS, establishes that Picower exercised direct and indirect control over the day-to-day operations of BLMIS and specifically over the activity that constituted a violation of the securities laws.

95.     As a result of Picower's control, the account records of other BLMIS customers falsely overstated the assets therein and their investment performance and the BLMIS financials vastly overstated BLMIS' capital and fraudulently reported trading activity which never took place.  BLMIS customers consequently unknowingly overpaid for BLMIS securities.

96.     As a result of Picower's control, he caused BLMIS to present Plaintiffs with false and misleading information (i.e., inflated account values and inflated capital values for BLMIS), in order to induce those investors to remain invested in BLMIS and to continue to attract new

investments in BLMIS. If Plaintiffs had been provided with accurate information, they would have attempted to protect the value of their investments, and the Ponzi scheme would have collapsed. Picower's direction of fraud with respect to his own accounts, and the financial and trading records of BLMIS, coupled with his knowledge and intent that BLMIS would necessarily create corresponding false entries in other BLMIS customer accounts, show control of the specific fraudulent activity which constituted the underlying Ponzi scheme and the underlying violations of Section 10(b) and Rule 10b-5 engaged in by BLMIS.

### This Action Is Distinct From the Trustee's Fraudulent Conveyance Actions

97.     Picower was able to withdraw at least $7.2 billion from BLMIS, constituting approximately 40% of the net $18 million in cash from the Ponzi scheme.

98.     The Trustee has alleged in his adversary action against Defendants that the Defendants received at least $7.2 billion from BLMIS, net of their investments. Those funds have now been recovered by the Trustee and the Government through a settlement. Plaintiffs do not seek the recovery of any fraudulently transferred funds in this action.

99.     Instead, Plaintiffs seek damages against Defendants resulting from Plaintiffs' reliance upon misrepresentations made by BLMIS and fraud committed by BLMIS under the direct or indirect control of Picower. BLMIS customers lost at least $11 billion in excess of the $7.2 billion transferred to Picower. Picower is responsible for the entire $11 billion loss as a control person who participated in and caused the dissemination of material misrepresentations and omissions and directed the fraudulent scheme.

100.    The Trustee's fraudulent conveyance action did not involve allegations that Picower exercised control over BLMIS.

101.    Pursuant to Section 20(a) of the Exchange Act, Defendants are jointly and severally liable to the same extent as BLMIS itself for Plaintiffs' damages, which are sought to

be recovered from other assets of Defendants, and not the funds recovered by the Trustee through his fraudulent conveyance claims.

## CLASS ACTION ALLEGATIONS

102. Picower, as a control person, is liable for the $11 billion of customer assets lost by BLMIS above and beyond the amounts actually paid to Picower as fraudulent conveyances. His control and participation in the fraud allowed Madoff and others to defalcate or lose $11 billion of additional customer assets.

103. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). The definition of the Plaintiff Class in this action is: (1) all brokerage customers of BLMIS who entrusted securities or cash to BLMIS between December 1, 1995, the approximate date that Picower first became a control person of BLMIS, and December 15, 2008, the date that BLMIS entered into SIPA liquidation ("Class Period"), and who at such time granted to BLMIS or its employees or agents trading authority or discretion with respect to assets in such brokerage accounts for trading in the BLMIS Discretionary Trading Program; and (2) who have not received the full reported account value of their BLMIS account(s) as of the date of the BLMIS bankruptcy/SIPC liquidation (the "Class"). The Class excludes the Defendants named herein, members of the Madoff family, BLMIS employees, and any of their affiliates or controlled entities.

104. The Class meets the requirements for class certification under Rule 23(a) of the Federal Rules of Civil Procedure.

      a.    *Numerosity.* The members of the Class are so numerous that joinder of all members is impracticable. Based on disclosures made by the SIPA Trustee the Class has thousands of members. Class members may be identified from records

maintained by BLMIS and the SIPA Trustee. The members of the Class may be notified of the pendency of this action by mail or otherwise using a form of notice similar to that customarily used in securities class actions.

b.      *Commonality.*  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are whether the Federal Securities Laws (specifically §20(a) of the Exchange Act) were violated by Picower as alleged herein, whether members of the Class have sustained damages as a result thereof, and if so, the proper measure of such damages.

c.      *Typicality.*  Plaintiffs' claims are typical of the claims of members of the Class as all members of the Class were similarly affected by Picower's wrongful conduct in violation of federal law as alleged herein.

d.      *Adequacy.*  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class.  Plaintiffs have retained competent and experienced counsel in class and securities litigation.

105.    This class action also meets the requirements of Federal Rule of Civil Procedure 23(b)(3).  The common issues outlined herein predominate over any individual issues in the case. A class action is superior to all other available methods of the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually address the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

106. The allegations herein are based on the damage inflicted directly upon the Class members through the fraudulent and deceptive practices of, and materially false reporting directed or controlled by Defendants with the intention that the Class members would be deceived by such practices and/or reporting and rely upon such reporting to their detriment. The Class members did in fact rely upon these misrepresentations and/or omissions of material fact, and were defrauded.

## TOLLING THE STATUTE OF LIMITATIONS

107. Any applicable statute of limitations with respect to Plaintiffs' claims has been tolled since no later than February 16, 2010, by the filing of the class action complaint against all of the Defendants named here in the action captioned *Susanne Stone Marshall, Individually and On Behalf of a Class of Similarly Situated v. Barbara Picower, Individually, and as Executor of the Estate Of Jeffry M. Picower, et al.,* case no. 10-80252-CV-Ryskamp/Vitunac (S.D. Fla.). *See American Pipe and Construction Company v. Utah*, 414 U.S. 538, 552 (1974); *In re World Comm Securities Litigation*, 496 F.3d 245 (2d Cir. 2007).

## COUNT I

### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AS AGAINST THE PICOWER DEFENDANTS

108. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

109. BLMIS violated Section 10(b) of the Exchange Act and Rule 10b-5 by its acts and omissions and by engaging in a massive Ponzi scheme.

110.     Picower and Madoff were the masterminds of the fraudulent Ponzi scheme and each actively participated in the fraud.

111.     Picower actively controlled and prolonged the Ponzi scheme with full knowledge of its fraudulent purpose.  Picower's actions had the effect of falsifying BLMIS' trading records and financial reporting and giving BLMIS the false appearance of being a solvent, profitable brokerage entity.

112.     Picower had motive to hide BLMIS' insolvency and continue the BLMIS fraud in order to prevent his role in the fraud from being detected.

113.     Pursuant to Section 20(a), Picower is jointly and severally liable to the same extent as BLMIS itself for BLMIS' violations of Section 10(b) of the Exchange Act and Rule 10b-5.

114.     Defendants acted collectively and in concert as a control group of BLMIS within the meaning of Section 20(a) of the Exchange Act as alleged herein. Each Defendant is an entity or individual operating as part of a control group of BLMIS.  Defendants are commonly controlled or were commonly controlled by Jeffry M. Picower. At all relevant times, Defendants were dominated, controlled and used as a mere instrumentality of Jeffry M. Picower.

115.     Picower had the power to directly or indirectly control, and did in fact control, the overall decision-making at BLMIS, including the record keeping for his accounts and other customers' accounts at BLMIS, the reporting of the financial condition and capital of BLMIS, the recording of securities transactions and cash transfers in and from all customer accounts at BLMIS, including those of the Class members, and the recording of securities and options trading activity by BLMIS itself.

116.    Picower had the power to directly or indirectly control, and did in fact control, the flow of funds and securities in and out of BLMIS and customer accounts at BLMIS, even when this flow of funds and securities did not correspond to actual trading activity, resulting in the overstatement of the value of the Class members' accounts at BLMIS and the capital of BLMIS.

117.    Picower actively communicated and agreed with Madoff and other BLMIS personnel to perpetuate and hide the fraud.  Picower had a close relationship with Madoff and BLMIS, and directly ensured that Madoff and BLMIS concealed the scheme from other BLMIS customers and regulators.  Picower directly or indirectly induced and participated in BLMIS' misleading statements to others. These misrepresentations induced BLMIS customers to pay BLMIS for non-existent securities.

118.    Picower had intimate knowledge of and involvement in the operations, record keeping, and financial management of BLMIS.   Picower directly or indirectly induced the material misrepresentations, fraudulent schemes and omissions giving rise to the securities violations alleged herein.

119.    Picower knew and intended that the material misrepresentations and omissions described herein would be communicated to other investors, including Plaintiffs and knew that they would be defrauded by BLMIS' fraudulent schemes.  Picower directly or indirectly induced BLMIS to conceal the fraud from BLMIS customers and regulators.  Picower and Defendants also profited from the BLMIS scheme, and did in fact materially benefit from Picower's direct or indirect control of BLMIS.

120.    The damages sought herein are distinct from the monies paid by Defendants pursuant to fraudulent conveyance actions pressed by the Madoff Estate and U.S. Government. Here Plaintiffs seek only damages resulting from Defendants control of the BLMIS fraud which

resulted in their overpaying for BLMIS securities. The Picower Defendants are jointly and severally liable for the $18 billion out of pocket loss resulting from the BLMIS fraud, plus interest. Thus the fraudulent conveyance damages they have paid have not compensated Plaintiffs for their securities damages.

121.    The volume, pattern and practice of Picower's control over BLMIS as set forth above, including Picower's secret unauthorized funding of the scheme, his agreement to act as a fraudulent trading counterparty to throw off regulators, his direction of false reporting of BLMIS' capital and financial condition and customer assets and returns in monthly statements provided to Plaintiffs, and his direct or indirect control over the benefits of the Ponzi scheme, establishes that Picower was a "control person" with liability under Section 20(a).

122.    Picower directed and was involved in the creation and dissemination of actionable misrepresentations and omissions to prospective and existing BLMIS customers, which representations and omissions were not incident to the Picower's fraudulent withdraws from Picower's BLMIS accounts.

123.    The damages sought in this action are completely separate from, and are not predicated on, the transfer of funds from BLMIS to Picower.

124.    Pursuant to Section 20(a), Picower's control of BLMIS, and Picower's domination and control of Defendants, makes them jointly and severally liable to the same extent as BLMIS itself for Plaintiffs' damages, which are sought to be recovered from other assets of Defendants, and not the funds recovered by the Trustee through his fraudulent conveyance claims.

125.    As a direct and proximate result of BLMIS' securities violations, Plaintiffs and other members of the Class have suffered damages.

WHEREFORE, Plaintiffs pray for relief and judgment against the Defendants as follows:

A.      Determining that this action is a proper class action;

B.      designating Plaintiffs as class representatives under Rule 23 of the Federal
Rules of Civil Procedure and Plaintiffs' counsel as class counsel;

C.      awarding compensatory damages in favor of Plaintiffs and other Class
members against all of the Defendants jointly and severally, for all
securities based damages sustained as a result of Defendants' wrongdoing
in an amount to be proven at trial, including interest;

D.      awarding Plaintiffs and the Class the reasonable costs and expenses
incurred in this action, including counsel fees and expert fees; and

E.      such other and further relief as the Court may deem just and proper.

DATED: this 28 day of August, 2014, by:


By:     /s/ James W. Beasley, Jr.
        James W. Beasley, Jr.
        beasley@beasleylaw.net
        Florida Bar No. 145750
        Joseph G. Galardi
        galardi@beasleylaw.net
        Florida Bar No. 180572
        BEASLEY KRAMER & GALARDI, P.A.
        505 South Flagler Drive, Suite 1500
        West Palm Beach, Florida 33401
        Tel:  (561) 835-0900
        Fax:  (561) 835-0939

        *and*

        Lesley Blackner, Esq.
        lblackner@aol.com
        Florida Bar No. 654043
        BLACKNER, STONE & ASSOCIATES
        123 Australian Avenue
        Palm Beach, FL  33480

Tel: (561) 659-5754
Fax: (561) 659-3184

*Co-counsel for Plaintiffs and the Class*