# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



THOMAS MEDKSER
THOMAS J. BLUM
RICHARD BRINKMAN
T.H. HOLLOWAY
W. MANOR LTD.
MILTON F. LANGER
CHARLES PHELPS
WILLIAM E.N. PONSETI
CHRISTOPHER M. PONSETI
JERRY S. REDD
CRAYTON R. WALKER

       Plaintiffs,

v.

                                      Civil Action No. 3:04CV353

DAVID J. FEINGOLD
DARREN SILVERMAN
KRISTIAN BASO
PAUL SLOAN

       Defendants.

## COMPLAINT

      Plaintiffs, Thomas Medsker, Thomas J. Blum, Richard Brinkman, T.H. Holloway,

W. Manor Ltd., Milton F. Langer, Charles Phelps, William E.N. Ponseti, Christopher M.

Ponseti, Jerry S. Redd, and Crayton R. Walker (collectively referred to as, the

"Plaintiffs"), by counsel, file the following Complaint against Defendants, David J.

Feingold, Darren Silverman, Kristian Baso, and Paul Sloan, jointly and severally.

      Plaintiffs seek compensatory, statutory, and punitive damages in the total amount

of $21,094,000.00.

## Summary of the Claims and Losses

This is an action for fraud and civil conspiracy arising out of the Defendants'
misrepresentations, omissions, and conversion of Plaintiffs' funds.

The Defendants fraudulently induced the Plaintiffs to invest in the IDT Group and
Brandaid Marketing Corporation, and then conspired to convert the assets of
IDT/Brandaid and transfer the Plaintiffs' funds to unidentified, offshore accounts.
Plaintiffs suffered a total out-of-pocket loss of over $4,836,000 as a direct result of the
Defendants' fraud and misconduct.

## The Parties

1.  Plaintiffs, Thomas Medsker, Thomas J. Blum, Richard Brinkman, T.H.
Holloway, W. Manor Ltd., Milton F. Langer, Charles Phelps, William E.N. Ponseti,
Christopher M. Ponseti, Jerry S. Redd, and Crayton R. Walker reside in Virginia, Ohio,
Texas, Illinois, California, and Utah.

2.  Defendants, David J. Feingold ("Feingold"), Darren Silverman
("Silverman"), Kristian Baso ("Baso"), and Paul Sloan ("Sloan"), upon information and
belief, reside in Florida.

3.  From August 1999 through May 2002, Silverman – in concert with
Feingold, Baso, Sloan, and others – defrauded the Plaintiffs (and hundreds of other
investors from Virginia and elsewhere) out of approximately $4.8 million dollars through
the offer and sale of securities issued by five (5) individual affiliated hedge funds
(collectively referred to as the "IDT Funds") and, beginning in 2001, shares of stock in
IDT Group, Inc. ("IDT Group") and Brandaid Marketing Corporation ("Brandaid").

4.      Feingold is a businessman and practicing attorney from South Florida.
Feingold owns and/or controls numerous offshore entities and accounts.  Feingold is (or
was) a partner with Silverman in numerous ventures, including entertainment companies
headquartered in Florida.  Feingold is (or was) a major shareholder of Brandaid.
Feingold is registered agent of "IDT Funding Corporation", a Bahamian corporation,
which is (or was) general partner of the IDT Funds.  Feingold provided general business
advice to both IDT and Brandaid.  Feingold conceived of the scheme to launder
Plaintiffs' and other investors' funds through Brandaid and other entities to accounts
offshore, including accounts at Suisse Security Bank & Trust Ltd. ("SSBT") in the
Bahamas and elsewhere.  At all material times, Feingold personally advised Silverman,
Baso, and Sloan, and set up many of the shell companies in and to which Plaintiffs'
funds, upon information and belief, were illegally diverted.

5.      Silverman used deceptive offering materials and fictitious statements (at
least one of which was signed by Feingold), among other things, to entice the Plaintiffs to
invest in the IDT Funds.  Silverman and others lulled the Plaintiffs into keeping their
funds invested - and making additional investments - by sending account statements
falsely stating the IDT Funds were profitable and outperforming major market indicators.
Silverman misrepresented the safety of investments in IDT Funds, while lying to the
Plaintiffs about the compensation IDT Funds paid their day traders.  Silverman misled the
Plaintiff by paying what he claimed were "dividends" but, in truth, were new investor
funds paid to earlier investors, in a Ponzi-like fashion.  At Silverman's direction, both the
IDT Funds, and their successor, the IDT Group, employed unlicensed sales
representatives who raised millions of dollars from investors, including the Plaintiffs.

Silverman was fund manager of IDT Funds beginning in approximately October 2000. He became president, chairman, and CEO of IDT Group, managing the day-to-day operations of IDT Group and making investment decisions, after IDT Funds' merged into IDT Group during the period from April through July 2001. Silverman received a substantial salary and other benefits while managing IDT Funds and, later, the IDT Group. By reason of his positions with the IDT Funds and IDT Group, Silverman had significant decision-making authority in those entities and controlled, or had the power to control their sales representatives' conduct, and the content of the IDT Funds and IDT Group's marketing materials, private placement memoranda ("PPMs"), and website.

6.     Baso was an officer and director of both the IDT Group and Brandaid. At all material times, Baso aided and abetted Silverman and Sloan's scheme to defraud the Plaintiffs and knew about the illegal transfer of Plaintiffs' funds to offshore accounts controlled by Sloan and/or Feingold. Baso also participated in other schemes to violate the securities laws and conceal the true financial condition of both IDT and Brandaid.

7.     At all material times, Sloan was chairman and chief operating officer of Brandaid. With Silverman's knowledge and consent and as part of the concerted scheme to defraud the Plaintiffs, Sloan falsified SEC filings and delivered false and misleading letters to the Plaintiffs in order to induce Plaintiffs to purchase shares of Brandaid. In addition, and as part of the conspiracy to fraudulently convert the assets of IDT Group, millions of dollars of IDT funds were received by Brandaid and then transferred by Sloan and his agents to unidentified, offshore accounts.

8.      IDT Group and Brandaid shared other common officers and directors, including Sean Zausner ("Zausner") and Michael Solomon.  Zausner is also an officer in numerous Feingold-created entities.

### Jurisdiction and Venue

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 (federal question) and 1332 (complete diversity).  Venue is proper in the Eastern District of Virginia.  Medsker lives in Fredericksburg, Virginia.  In furtherance of their conspiracy (described below), Defendants repeatedly transmitted and delivered to Virginia numerous intentionally false documents, including SEC filings, with the sole purpose of defrauding Virginia investors, such as Medsker.

### Statement of the Facts

10.     Beginning in approximately August 1999, Silverman and IDT representatives under his control sold interests in five (5) individual, affiliated hedge funds: IDT Fund A Ltd., IDT Fund B Ltd., IDT Fund C Ltd., the Millennium IDT Fund Ltd., and IDT Venture (collectively "IDT Funds").  Beginning on or about March 2001, they also sold interests in IDT Group, Inc., the successor entity ultimately formed by the IDT Funds' merger.

11.     Four (4) of the funds, IDT Fund A Ltd., IDT Fund B Ltd., IDT Fund C Ltd., the Millennium IDT Fund Ltd., were structured as limited partnerships, and one, IDT Venture, as a corporation.  Each of these funds' near-identical PPMs stated they were "organized for the purpose of investing in, and trading all types of securities, including

but not limited to, equity, debt or convertible securities, and foreign securities," and that each fund was managed in a similar manner. PPMs were not delivered to all Plaintiffs.

12.     The IDT Funds offered and sold their investments to the public through a network of sales representatives controlled and directed by Silverman and others. Silverman, and sales representatives at his direction, pitched investments in the IDT Funds and IDT Group through "cold-calling" prospective investors, including the Plaintiffs, using high-pressure sales tactics and, unbeknownst to Plaintiffs, lies. Silverman, and sales representatives at his direction, also sold investments to individuals who heard about the IDT Funds' purported outstanding performance by word of mouth.

13.     IDT Funds offered investments in the form of units in the IDT Funds' limited partnerships at $25,000 each, or shares of common stock in IDT Venture at $3.50 to $6.00 per share. Subscription documents presented to certain Plaintiffs were, upon information and belief, prepared by Feingold and/or a mutual business advisor to IDT and Brandaid, Peter Markus. Plaintiffs were instructed to make initial capital contributions to multiple accounts, including accounts at Merrill Lynch, IDT Fund, and the "Feingold & Kam Escrow Account" – an account owned and controlled by Feingold. Upon information and belief, Silverman and his confederates raised approximately $26,284,575.00.

14.     Silverman, and the IDT Funds' agents and sales representatives at his direction, including, without limitation, Richard Reisman ("Reisman") and Robert Donski ("Donski"), made numerous material misrepresentations and omissions to convince the Plaintiffs to invest, and to continue investing, in IDT Funds and, eventually, its successor, IDT Group. They misled the Plaintiffs about the growth and rates of return

on the touted investments, the safety of the investments, the compensation structure for the IDT Funds and IDT Group traders, as well as the experience and abilities of Silverman and others involved in running the IDT Funds, and its successor, IDT Group. IDT sales brochures falsely portrayed and represented that IDT traders were being supervised by older, experienced managers.

15.  Silverman and IDT intentionally targeted older persons nearing retirement and retirees, many of whom worked in the medical profession.

16.  IDT Funds, at the direction of Silverman, sent investors account statements and other written materials and "highlights" falsely representing that IDT Funds were profitable and outperforming all major market indicators, when the funds actually were losing money. Silverman used this information to convince earlier investors to increase their investments in IDT Funds.

17.  IDT Funds, at the direction of Silverman, also sent Plaintiffs numerous other documents that falsely described IDT Funds' purported growth, profits, and return on investment. The returns Silverman claimed for IDT Funds were blatantly false. Unaudited financial statements for the life of four (4) of the hedge funds reveal that IDT Funds A, B, C, and IDT Venture reported accumulated losses of ($4,153,646), ($1,378,796), ($494,938), and ($213,850), respectively. The Millennium Fund, which was only operational for seven (7) months, may have realized a miniscule $7,787 profit.

18.  Silverman, and IDT Funds' representatives he directed, falsely represented IDT Funds as a safe and better alternative to traditional mutual funds. Silverman, and IDT Funds' sales representatives at his direction, told investors IDT Funds engaged in low-risk trading activities, even though they knew this to be false. Silverman and sales

representatives at his direction represented that an investment in IDT was an excellent way to "diversify" from simply owning stocks. In fact, IDT Funds engaged in highly risky, speculative day-trading, and lost a substantial portion of investor funds "investing" in companies, such as Brandaid, that traded on the OTC Bulletin Board, and CTI, which was (is) controlled by Baso.

19.  Silverman concealed from Plaintiffs the fact that the IDT Group's investment in Brandaid was really part of a scheme to funnel the funds of the IDT Group to offshore accounts owned and/or controlled by Feingold.

20.  Silverman, and IDT Funds' sales representatives at his direction, added to the false image of safety and security by telling investors that IDT Funds' crew of day traders would make money only if the IDT Funds were profitable, giving investors the false understanding that this was a "built-in incentive" for the traders to be successful. In reality, Silverman knew IDT Funds paid millions to its day traders - sometimes through commissions of up to 90% of profits made on individual trades - even though the funds were operating at a loss. Silverman did not include this information on account statements sent, or directed to be sent, to Plaintiffs.

21.  Silverman oversaw the creation of the marketing and offering materials of the IDT Funds, and, later, of its successor, IDT Group. These materials touted their successful operations and presented the appearance of a well-run and highly-experienced investment firm. In truth, many of the IDT Group's traders had little experience and many of IDT Funds' and IDT Group's principals and traders had adverse disciplinary, criminal, and regulatory histories. IDT Group, in its PPM and in letters to investors, touted Silverman's experience "in banking" with Credit Lyonnaise in New York City.

However, Silverman was merely employed with Credit Lyonnaise as a summer intern doing "computer input." Silverman mismanaged the company's books and records to such an extent and was so incompetent that neither Silverman nor IDT Group can determine the exact amount that company has (had) in investor assets.

22.     As a direct result of the misrepresentations and omissions of Silverman and his agents, Plaintiffs invested their money and faith in the IDT funds. Many Plaintiffs liquidated mutual funds and money in profit sharing accounts (incurring penalties and fees) because they were convinced by representations that IDT was a "very safe haven."

23.     At the direction of Silverman and others at IDT, many of the Plaintiffs' initial investments were wired to an account at Merrill Lynch ("Merrill"). From there, it is not known what IDT or Merrill did with the money.

24.     At this time, Plaintiffs do not know what Merrill's involvement was with Silverman, Feingold and IDT. Investigation continues.

25.     As part of the scheme to defraud, Silverman and his agents invited the Plaintiffs and other investors to come to IDT headquarters in Boca Raton, Florida. Silverman represented that IDT intended to enlarge the trading floor and increase the number of traders. This statement was false at the time it was made. Plaintiffs were encouraged to sell other investments and put more money in IDT as it was "safer than stocks and mutual fund families, such as Vanguard, Dreyfus, etc." One IDT broker stated, "why continue to watch your other investments erode during this current market correction. IDT has a computer program that is highly effective. Put the funds in IDT, and the fund will continue to make gains."

26.     In March 2001, Silverman, and IDT Funds or IDT Group sales representatives at his direction, began telling Plaintiffs that they were merging the IDT Funds to form another, single entity called IDT Group. Silverman told Plaintiffs, or directed IDT Fund sales representatives to tell Plaintiffs, that IDT Group was expanding its offices and staff (including hiring additional day-traders), as well as offering additional services even though Silverman knew, with one very minor exception, that the IDT Funds had been losing money.

27.     Silverman signed and directed IDT Funds or IDT Group to send investors a document entitled IDT Group, Inc. Confidential Documentation Regarding Merger Plan, ("Merger Plan"), requesting investors to sign an agreement supporting the merger. The Merger Plan ostensibly allowed each limited partner to convert his or her limited partnership interest, or shares of IDT Venture stock into shares in IDT Group stock, with the same valuation.

28.     Silverman, and sales representatives at his direction, told some of the Plaintiffs they had "no choice" regarding the Merger Plan, falsely stating that "over 50% of the investors already signed." Some Plaintiffs were not informed of the Merger until after the fact.

29.     Silverman orchestrated the merger of IDT Funds' five (5) individual hedge funds into IDT Group between April 24, 2001 and July 31, 2001. During the merger process, he failed to disclose to Plaintiffs that the IDT Funds were not profitable and had, in fact, sustained serious trading losses. The Plaintiffs executed numerous merger documents in reliance and based upon the fraudulent representations of Silverman and other agents of IDT.

30.     Once the IDT Funds merged into IDT Group, over $18,000,000 of the $26,284,575 the IDT Funds had raised transferred to IDT Group, with the difference comprising over $6 million in losses and over $1.2 million in redemptions.

31.     After the merger, Silverman had IDT Group declare false dividends to mislead Plaintiffs into believing IDT Group was profitable.  Specifically, IDT Group's general ledger for the eight-month period ending December 31, 2001 and the three-month period ending March 31, 2002, showed that it declared or paid out dividends of $847,052 and $516,543, respectively.  At Silverman's direction, IDT Group encouraged Plaintiffs to reinvest their dividends in additional IDT Group stock.

32.     In fact, Silverman knew, or was reckless in not knowing, that IDT Group had no source of income besides investor funds that could be used to make dividend payments.  Declaring a dividend under these conditions was improper, *inter alia*, because IDT Group's PPM stated that it would declare dividends only when the company showed a profit, and it had not shown a profit.

33.     Beginning in late 2000, Silverman – in association with Feingold, Sloan and others – began to illegally dissipate the assets of the IDT Group by transferring funds to Brandaid and others.  Brandaid then transferred certain funds offshore.  Plaintiffs were advised to invest in Brandaid (known then as Salient Cybertech).  Silverman and his agents represented that Brandaid was a company that "they" were going to take to the New York Stock Exchange ("NYSE") and that Brandaid "will be a $20 stock."  These statements were false when made.  No one had any intention of taking Brandaid to the NYSE and there was no good faith basis or any genuine belief that Brandaid was or would ever be a "$20 stock."  Certain Plaintiffs purchased Brandaid stock based upon

Silverman's representations and omissions. They were told that "IDT and Silverman have good connections with a number of brokerage houses that will promote Brandaid and assist in more widely distributing the stock."

34. Unbeknownst to Plaintiffs, from at least 1998 through 2002, Brandaid (Salient) was involved in a massive broker bribery scheme involving undisclosed kickbacks to boiler room brokerage houses, including LH Ross Branch, for selling the stock to the public.

35. Silverman misrepresented the IDT Group's financial health to Plaintiffs when – with knowledge and agreement of Feingold, Baso and Sloan – he directed the IDT Group to report the value of supposed stock shares IDT had received from Brandaid. Silverman and Sloan falsely and fictitiously reported that IDT Group had "purchased" and owned three (3) shares of preferred stock in Brandaid. Each of these shares of preferred stock was supposedly convertible to 1.5 million shares of Brandaid common stock. Silverman directed IDT Group to include these three (3) shares of preferred stock in reporting IDT Group's net income on its December 31, 2001 and March 31, 2002 financial statements, which reported total net income as $17,516,384 and $7,832,155 for those periods, respectively.

36. The net income reported by IDT Group, at Silverman's direction, was false and misleading because it was comprised almost exclusively of unrealized gain on the preferred Brandaid stock. Nor did IDT Group disclose to investors that unrealized gains accounted for almost IDT Group's entire income. These numbers also were misleading because one of the shares included in these calculations already had been converted to 1.5 million shares of Brandaid common stock and registered to CTI Tobacco Industries, Inc.

("CTI"), a company IDT Group jointly owns or owned with Baso. Without improperly posting the unrealized Brandaid gains, IDT Group's December 2001 and March 2002 income statements would have reflected net losses of approximately ($5,000,000.00) and ($360,000.00), respectively.

37.     To make the Brandaid investment appear legitimate, Silverman and IDT – in concert and combination with Sloan – also published certain false "income statement assumptions" about Brandaid. These "assumptions" had no basis in fact.

38.     Silverman directed IDT Group to misrepresent to Plaintiffs that IDT was actively preparing to conduct an IPO, and that investors' profits would "skyrocket." In reality, as Silverman knew, IDT Group did not have the financial capability to conduct an IPO, and never prepared the necessary audited financial statements or Commission filings for such a venture. Additionally, as discussed above, Silverman lacked the experience to conduct any IPO, much less a successful one.

39.     Throughout 2001, Silverman and IDT continued to defraud the Plaintiffs. On May 1, 2001, Silverman directed IDT Group to commence its own private placement, offering 3 million shares of its common stock at $10 per share to investors. IDT Group raised approximately $6.8 million in this offering. Maintaining the illusion of profitability and successful management of the investments and the IDT companies, Silverman sent correspondence to investors acknowledging their investments and signed all IDT Group stock certificates.

40.     Silverman directed IDT Group to mail and fax Plaintiffs and other investors in Virginia financial projections reflecting that IDT Group expected net earnings of approximately $7.5 million, $27.1 million, $55 million and $90 million for

the years 2002, 2003, 2004, and 2005, respectively. As alleged above, Silverman knew

IDT Funds had had a dismal investment record and that IDT Group had no basis for these

projections. The projections were also unreasonable because IDT Group based them

largely on IDT Group's purported plan to establish its own broker-dealer to be called

"Worldwide Trading, LLC" ("Worldwide"). This strategy was at the heart of IDT

Group's business plan, and Silverman, and IDT Group sales representatives at his

direction, touted Worldwide to Plaintiffs and others. Silverman further misrepresented

IDT Group's status in its PPM by falsely claiming that Worldwide had applied in April

2000 for NASD and Philadelphia Stock Exchange memberships. Silverman knew, or

was reckless in not knowing, that Worldwide had not applied for either membership. In

fact, Worldwide never applied for those memberships.

41.     In March 2002, Silverman knew that he could no longer continue to

manufacture lies about the IDT Group. Silverman knew he was going to be caught. In

combination with Feingold, Silverman and Sloan then devised a scheme whereby the

Plaintiffs and other investors would exchange their shares of IDT Group for shares of

Brandaid, thereby relinquishing, *inter alia*, any right as shareholders of IDT Group to

demand an accounting of the assets of IDT.

42.     Beginning in April 2002, Silverman presided over IDT Group's

distribution to Plaintiffs of a "stock purchase agreement", soliciting Plaintiffs to exchange

all their outstanding IDT Group stock for stock in Brandaid. To induce Plaintiffs to

exchange their shares, IDT representatives stated that Plaintiffs would receive two (2)

shares of Brandaid for every share of IDT Group stock sold and certain "bonus" shares

before the exchange. Silverman, in concert with Sloan, told Plaintiffs that they were

receiving an "incredible deal," getting Brandaid stock at a "huge discount." Plaintiffs were told that they would be protected by putting their money in Brandaid. When Plaintiffs balked at approving the stock exchange, Silverman, or IDT Group sales representatives at his direction, lied and told them more than 50% of IDT Group's current shareholders had already agreed to the exchange, and if they held out, they would have only "worthless" stock in a "shell company." IDT representatives under Silverman's direction advised certain Plaintiffs that they had no choice in matters regarding changes in IDT or the Brandaid deal because they had "less than $1 million invested". Silverman directed IDT Group even to avoid presenting some other investors with the opportunity to exchange their stock. Silverman, or IDT Group sales representatives at his direction, merely told those investors Brandaid was one of numerous companies in which its venture capital division was interested.

43. Silverman and IDT – in combination with Sloan and other agents of Brandaid – further lied to Plaintiffs by telling them that if they agreed to the stock exchange they could "immediately" sell their Brandaid shares at the then-current market price. However, in June 2002, after Plaintiffs signed the stock purchase agreement and agreed to exchange their shares of IDT Group for shares of Brandaid, Plaintiffs received restricted shares of Brandaid they could not sell. Silverman and Sloan concealed from Plaintiffs that these restricted, Brandaid 144, shares were (and are) illiquid and worthless.

44. In late April 2002, to induce the Plaintiffs and other IDT investors to sign the stock purchase agreement and invest in Brandaid, Sloan published a press release, announcing that Brandaid had entered into a national in-store marketing agreement with

Safeway which "will result in the installation of Brandaid Supercards displays in most of Safeway's 1,665 stores nationwide." Sloan's statements were knowingly false.

45.     As of June 30, 2002, certain internal Brandaid records (concealed from Plaintiffs) represented that Brandaid had received $4,310,534.55 from the IDT Group between 2000 and 2002. It is not known whether the money was ever deposited in any of Brandaid's many accounts. Brandaid's account statements do show, however, large wire transfers to offshore accounts.

46.     On October 17, 2002, less than six (6) months after Silverman and Sloan devised the "stock swap" scheme and after Plaintiffs agreed to accept the "incredible deal" to purchase shares of Brandaid, Sloan solicited further funds from the Plaintiffs by representing in a letter delivered to shareholders in Virginia that Brandaid was now facing a "critical cash shortage." Sloan included with the letter financial projections that had no basis in fact whatsoever, and were similar to Silverman's outrageous predictions for IDT. Sloan's letter contained numerous material omissions, including the fact that Brandaid was already in default of its contractual obligations to its "bread and butter" client, Safeway, a fact concealed by Sloan and Silverman. Sloan and Brandaid were later investigated by the SEC as a result of the letter, another fact concealed from Plaintiffs.

47.     At all times, Plaintiffs relied upon Silverman and Sloan's representations and omissions in deciding to exchange their shares of IDT for shares of Brandaid and to hold their shares of Brandaid.

48.     On April 17, 2003, the IDT Funds, IDT Group, Silverman, and Matthew Brenner (another manager of IDT) filed for bankruptcy. Silverman's bankruptcy case was dismissed by Order entered May 7, 2003.

49.     On February 27, 2004, the SEC filed a complaint against Silverman and Brenner, alleging, *inter alia*, violations of § 10(b) of the Securities Exchange Act of 1934 in connection with their actions and misconduct relating to IDT and Brandaid.

50.     Defendants refuse to account for what happened to Plaintiffs' funds and the other assets of the IDT Group and Brandaid.

## COUNT I – SECURITIES FRAUD (SILVERMAN)

51.     Plaintiffs repeat the allegations in paragraphs 1 through 50, and incorporate them herein by reference.

52.     From at least October 2000 to October 2002, Silverman, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described above in this Complaint, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which have operated as a fraud upon the Plaintiffs and other purchasers of such securities.

53.     Silverman knew his representations were false and acted with the intent to defraud the Plaintiffs and other investors. Plaintiffs reasonably relied upon Silverman's representations and omissions in deciding to purchase and sell shares of IDT and Brandaid. But for Silverman's misrepresentations and omissions, Plaintiffs never would

have invested in either IDT Group or Brandaid.  As a direct and proximate result of

Silverman's misrepresentations and omissions, Plaintiffs lost over $4,800,000.

54.　　By reason of the foregoing, Silverman, directly or indirectly, violated

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. §

240.10b-5, thereunder.

55.　　Silverman's misrepresentations and omissions also constitute common law

fraud, both actual and constructive.  Silverman made numerous false misrepresentations

of material facts, knowingly and intentionally and with the intent to mislead.  Plaintiffs

relied upon these misrepresentations and omissions and, as a direct and proximate result,

suffered massive losses.  Silverman represented as true what was really false in such a

way as to induce any reasonable person to believe it, and with the intent that the Plaintiffs

and other investors would act upon the misrepresentations and omissions.

## COUNT II – SECURITIES FRAUD (SLOAN)

56.　　Plaintiffs repeat the allegations in paragraphs 1 through 55, and

incorporate them herein by reference.

57.　　Between 2001 and October 2002, Sloan, directly and indirectly, by use of

the means and instrumentalities of interstate commerce, and of the mails in connection

with the purchase or sale of the securities, as described in this Complaint, knowingly,

willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made

untrue statements of material facts and omitted to state material facts necessary in order

to make the statements made, in the light of the circumstances under which they were

made, not misleading; and (c) engaged in acts, practices and courses of business which

have operated as a fraud upon the purchasers of such securities.

58.     Sloan knew his representations were false and acted with the intent to

defraud the Plaintiffs and other investors.  Plaintiffs reasonably relied upon Sloan's

representations and omissions in deciding to purchase and sell shares of IDT and

Brandaid.  But for Sloan's misrepresentations and omissions, Plaintiffs never would have

invested in either IDT Group or Brandaid.  As a direct and proximate result of Sloan's

misrepresentations and omissions, Plaintiffs lost over $4,800,000.

59.     By reason of the foregoing, Sloan, directly or indirectly, violated Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

thereunder.

60.     Sloan's misrepresentations and omissions constitute common law fraud,

both actual and constructive.  Sloan made numerous false misrepresentations of material

facts, knowingly and intentionally and with the intent to mislead.  Plaintiffs relied upon

these misrepresentations and omissions and, as a direct and proximate result, suffered

massive losses.  Sloan represented as true what was really false in such a way as to

induce any reasonable person to believe it, and with the intent that the Plaintiffs and other

investors would act upon the misrepresentations and omissions.

## <u>COUNT III – CONTROL PERSON LIABILITY</u>

61.     Plaintiffs repeat the allegations in paragraphs 1 through 60, and

incorporate them herein by reference.

62.     As detailed above, IDT Group and Brandaid made numerous false

statements and omissions of material fact with scienter upon which the Plaintiffs

justifiably relied that proximately caused the Plaintiffs' damages. From 1999 through

2002, IDT and Brandaid, directly or indirectly, by the use of the means or

instrumentalities of interstate commerce or of the mails, or of any facility of any national

securities exchange, in connection with the purchase or sale of securities, as described

herein, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were

made, not misleading; and (c) engaged in acts, practices or courses of business, which

operated or would operate as a fraud or deceit upon purchasers of securities and upon

other persons.

63.     During the relevant time period, Feingold, Silverman, Baso and Sloan

were, directly or indirectly, control persons of the IDT Funds, IDT Group and Brandaid

for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By reason of their

positions as officers, directors, and advisors, Feingold, Silverman, Baso and Sloan

controlled the business and activities of IDT and Brandaid. Feingold made "executive"

decisions for IDT. At all material times, Feingold, Silverman, Baso, and Sloan possessed

the power to direct or cause the direction of the management and policies of the IDT

group and Brandaid. Feingold, Silverman, Baso, and Sloan directly controlled and

influenced the specific corporate and regulatory policies and conduct, which resulted in

IDT Group and Brandaid's violations of the securities laws.

64.     By reason of the foregoing, Feingold, Silverman, Baso, and Sloan are jointly and severally liable with and to the same extent as IDT and Brandaid for their violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## COUNT IV – CIVIL CONSPIRACY

65.     Plaintiffs restate paragraphs 1 through 64 of their Complaint, and incorporate them herein by reference.

66.     Feingold, Silverman, Baso, Sloan, Brandaid combined, associated, agreed or acted in concert amongst themselves and with other third parties, including Jay Elliott and Peter Markus, for the purpose of willfully and maliciously defrauding the Plaintiffs and injuring the Plaintiffs in their businesses and investments.

67.     Acting in concert and with others, Defendants converted Plaintiffs' funds and transferred those funds to offshore accounts owned and/or controlled by Feingold and others.

68.     Defendants acted intentionally, purposefully and without lawful justification.

69.     Defendants' actions constitute a civil conspiracy in violation of § 18.2-499 and 18.2-500 of the Virginia Code and at common law.

70.     As a direct result of the conspiracy, misconduct, actions and inaction, the Plaintiffs have suffered damage and incurred loss, including, but not limited to, direct loss of funds, loss of the value of their investments, lost investment opportunities, loss of

business, loss of life savings, costs, expenses, attorney's fees and other out-of-pocket expenses.

WHEREFORE, Plaintiffs respectfully request the Court to enter Judgment against Defendants, David J. Feingold, Darren Silverman, Kristian Baso, and Paul Sloan, jointly and severally, as follows:

A.  Compensatory damages in an amount not less than $4,836,000;

B.  Treble Damages in an amount not less than $14,508,000.00;

C.  Punitive damages in the amount of $1,750,000.00;

D.  Prejudgment interest;

E.  Postjudgment interest;

F.  Attorney's fees, expert witness fees, and all other costs and expenses incurred by the Plaintiffs in this action; and

G.  Such further relief as is just and proper.

IN ACCORDANCE WITH RULE 38, TRIAL BY JURY IS HEREBY DEMANDED.

THOMAS MEDSKER
THOMAS J. BLUM
RICHARD BRINKMAN
T.H. HOLLOWAY
W. MANOR LTD.
MILTON F. LANGER
CHARLES PHELPS
WILLIAM E.N. PONSETI
CHRISTOPHER M. PONSETI
JERRY S. REDD
CRAYTON R. WALKER


By: _____
                                   Counsel


Steven S. Biss (VSB # 32972)
P.O. Box 592
Richmond, Virginia 23219
Telephone:  (804) 643-2090
Facsimile:   (202) 318-4098

        Counsel for the Plaintiffs