# EXHIBIT I

Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for all of the partners of
S&P Associates General Partnership

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        Defendant.

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S
DETERMINATION OF
CLAIM**

All of the parties listed on Exhibit A hereto (the "Partners") of S&P Associates General

Partnership (the "Investment Group") hereby object to the Notice of Trustee's Determination of

Claim dated December 8, 2009 (the "Determination Letter") and state as follows:

**Background facts**

    1.    After conferring directly with Bernard L. Madoff as to the structure of the

Investment Group in 1992-1993, the Investment Group was formed pursuant to a written

agreement.  The Investment Group opened an account with Bernard L. Madoff Investment

Securities LLC ("Madoff"), Account No. 1ZA874-3-0 (the "Account").

1102141.1

MWPTAP01079644

2.     The purpose of the Investment Group was for each of the Partners to deposit money
with Madoff for the purpose of purchasing securities and each of the Partners deposited money
with Madoff for the purpose of purchasing securities.

3.     On February 25, 2009, the Investment Group filed a SIPC claim in the amount of
$44,768,253.86 representing the Investment Group's November 30, 2008 balance in the
Account.  The Partners' respective shares of the November 30, 2008 balance are set forth on
Exh. A hereto.

4.     In the Determination Letter, Picard rejected the Partners' claims for securities on the
ground that each of them did not have an account with Madoff in his/her own name.   Picard
ignored the fact that each of the Partners is a "Customer" under the Securities Investor Protection
Act ("SIPA") and is entitled to SIPC insurance.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

5.     Picard has failed to comply with the Court order dated December 23, 2008 which
directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's
books and records."  December 23, 2008 Order at 5 (Docket No. 12).  The November 30, 2008
account statement generated by Madoff is reflective of "the Debtor's books and records" by
which Picard is bound, absent proof that the Investment Group did not have a "legitimate
expectation" that the balance on the Account statement represented its property.

6.     Picard has failed to state a legitimate basis in the Determination Letter for the
position he has taken.  Thus, he has not complied with the requirement that an "objection to a
claim should . . . meet the [pleading] standards of an answer.  It should make clear which facts
are disputed; it should allege facts necessary to affirmative defenses; and it should describe the

2

1102141.1

**MWPTAP01079645**

theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron*

*Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at * (B.S.D.N.Y. Jan. 13, 2003).

## B. Picard has violated the requirement that he honor a customer's "legitimate expectations"

7.    The legislative history of SIPA makes clear that Congress' intent was to protect a

customer's "legitimate expectations."   For example, Congressman Robert Eckhardt commented

when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be
> remedied by [the 1978 amendments] is the failure to meet legitimate customer
> expectations of receiving what was in their account at the time of their broker's
> insolvency.

> *          *          *

> A customer generally expects to receive what he believes is in his account at the
> time the stockbroker ceases business. But because securities may have been lost,
> improperly hypothecated, misappropriated, never purchased, or even stolen, this
> is not always possible. Accordingly, [when this is not possible, customers] will
> receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

8.    SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for

the classification of claims in accordance with the "legitimate expectations" of a customer based

upon the written transaction confirmations sent by the broker-dealer to the customer.

9.    Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations."

This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein

SIPC assured the appeals court that its policy was to honor the legitimate expectations of

customers, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling
> even where inconsistent with transaction reality.  Thus, for example, **where a
> claimant orders a securities purchase and receives a written confirmation
> statement reflecting that purchase, the claimant generally has a reasonable**

3

1102141.1

**MWPTAP01079646**

>    expectation that he or she holds the securities identified in the confirmation
>    and therefore generally is entitled to recover those securities (within the
>    limits imposed by SIPA), even where the purchase never actually occurred
>    and the debtor instead converted the cash deposited by the claimant to fund
>    that purchase . . . [T]his emphasis on reasonable and legitimate claimant
>    expectations frequently yields much greater 'customer' protection than would be
>    the case if transaction reality, not claimant expectations, were controlling, as this
>    Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

      10.    Picard's position in the Madoff case is contradicted, not only by SIPC's prior

treatment of customers in the *New Times* case, but also by a statement that SIPC's general

counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

>    Based on a conversation with the SIPC general counsel, Josephine Wang, if
>    clients were presented statements and had reason to believe that the securities
>    were in fact owned, the SIPC will be required to buy these securities in the open
>    market to make the customer whole up to $500K each.  So if Madoff client
>    number 1234 was given a statement showing they owned 1000 GOOG shares,
>    even if a transaction never took place, the SIPC has to buy and replace the 1000
>    GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

      11.    As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its

obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement,

inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi

scheme for a period of approximately 17 years and had never purchased the securities reflected

on the customers' monthly statements.  In fact, SIPC's president, Stephen Harbeck, assured the

*New Times* bankruptcy court that customers would receive securities up to $500,000 including

the appreciation in their accounts.

>    HARBECK: . . . if you file within sixty days, you'll get the securities, without
>    question.  Whether – if they triple in value, you'll get the securities . . . Even if
>    they're not there.

4

1102141.1

MWPTAP01079647

COURT: Even if they're not there.

HARBECK: Correct.

COURT: In other words, if the money was diverted, converted –

HARBECK: And the securities were never purchased.

COURT: Okay.

HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00)

(emphasis added).

## C. Without legal authority, Picard has invented his own definition of "net equity"

12. SIPA defines "net equity" as the value of the securities positions in the customer's

account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

13. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15

U.S.C. § 78ccc(b)(4)(A).

14. The Second Circuit has recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

5

MWPTAP01079648

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

15.     In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize customers' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff customers who have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

16.     Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

17.     Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent customers who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

18.     After 12 months of his tenure, Picard has identified only two Madoff customers who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. Picard has sued two Madoff customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7.2 billion more than they

6

1102141.1

MWPTAP01079649

invested. Picard has further alleged that these two customers received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

19.     However, the fact that a few out of more than 8,000 Madoff customers may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent customers of their statutory maximum payment of $500,000 in SIPC insurance.

20.     The Investment Group, like thousands of other customers, received monthly statements from Madoff indicating returns on their Madoff investment in the past few years in the range of 9 – 11% per year, subject to short term capital gains tax rates. The Investment Group had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Investment Group had specified, numbered accounts for the purchase and sale of securities; it received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. The Partners paid Federal and State taxes on the annual growth of the investments with Madoff. There is no basis to claim that each of the Partners did not have a "legitimate expectation" that the assets reflected on the Investment Group's statements sent by Madoff belonged to them.

21.     Thus, the Investment Group is entitled to a claim for $44,768,253.86, the November 30, 2008 balance on the Account as reflected on the Madoff statement.

## D. The Investment Group is entitled to prejudgment interest on its investment and profits.

22.     At a minimum, under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et*

7

**MWPTAP01079650**

*seq.* Moreover, since Madoff converted the Investment Group's funds, it is also entitled to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U.*S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

23.    Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Investment Group' investments.  To the extent the funds were deposited into a bank, they earned interest while on deposit.  Madoff disbursed customer funds to favored customers, to family members, and for other purposes.  Those funds may have yielded substantial profits to which the Investment Group and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

24.   In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008).  Where a Ponzi scheme is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007).  In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested.  The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow.

8

MWPTAP01079651

Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in a Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

## E. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit

25.     In derogation of his fiduciary duty to the Investment Group, Picard is, in effect, imposing upon the Investment Group a fraudulent conveyance judgment for sums that the Investment Group withdrew from the Account beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Partners of SIPC insurance and the claim to which the Investment Group is absolutely entitled.

26.     Moreover, Picard has employed the avoidance powers of the Bankruptcy Code solely for SIPC's benefit. There is no authority in SIPA or the Bankruptcy Code for Picard to utilize the avoidance powers of a trustee to enrich SIPC at the Investment Group' expense. The legislative history of Sections 544, 547 and 548 of the Bankruptcy Code makes clear that the purpose of a trustee's avoidance powers is to assure an equal distribution of a debtor's assets among its creditors. *See, e.g.,* 5 *Collier on Bankruptcy* ¶ 547.01 (15th ed. 2008); *see also In re Dorholt, Inc.,* 224 F.3d 871, 873 (8th Cir. 2000) (preferential transfer rule "is intended to

9

**MWPTAP01079652**

discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote

equality of distribution to creditors in bankruptcy"); *Pereira v. United Jersey Bank, N.A.*, 201

B.R. 644, 656 (B.S.D.N.Y. 1996) (The purpose of Section 547 is to discourage creditors from

racing to the courthouse to dismember the debtor and, "[s]econd, and more important, the

preference provisions facilitate the prime bankruptcy policy of equality of distribution among

creditors of the debtor.  Any creditor that received a greater payment than others of his class is

required to disgorge so that all may share equally") (quotations omitted).

28.    Here, however, Picard is not acting to assure equal distribution among prepetition

creditors.  On the contrary, he is simply acting as SIPC's agent in depriving the Investment

Group of the SIPC insurance to which the Partners are statutorily entitled.

**F.  Picard has violated SIPA by delaying the payment of SIPC insurance**

28.    Picard has breached his statutory obligation to "promptly" replace a customer's

securities.  15 U.S.C. § 78fff-2(b).  Picard is obligated to replace the Partners' securities up to a

value of $500,000 each, as valued on the November 30, 2008 statements and as set forth on Exh.

A hereto.

**G.  The Partners are each "customers" under
SIPA entitled to up to $500,000 in SIPC insurance.**

29.    Each of the Partners is a "customer" under the plain definition of "customer" in

SIPA.  Thus, each is entitled to receive $500,000 in SIPC insurance.  15 U.S.C. § 78lll(2)("The

term "customer" includes . . . any person who has deposited cash with the debtor for the purpose

of purchasing securities."). *Rosenman Family, LLC v. Picard,* 401 B.R. 629, 635 (B.S.D.N.Y.

2009)("the mere act of entrusting . . . cash to the debtor for the purpose of effecting securities

transactions . . . triggers customer status. . ."); *SEC v. Ambassador Church Financial Devel.*

*Group, Inc.,* 679 F. 2d 608, 614 (6th Cir. 1982); *In re Primeline Sec. Corp.,* 295 F. 3d 1100, 1107

10

**MWPTAP01079653**

(10th Cir. 2002)("SIPA does . . . protect claimants who try to attempt to invest through their brokerage firm but are defrauded by dishonest brokers . . . If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a 'customer' under SIPA even if the brokerage or its agents misappropriate the funds"); *Miller v. DeQuine (In re Stratton Oakmont, Inc.),* 2003 WL 22698876 at *3 (S.D.N.Y. Nov. 14, 2003)("Stratton Oakmont's conversion of Claimants' property makes the customers within the meaning of SIPA.").

30.     Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of "customer" is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor")(emphasis added).

31.     Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Investment Group because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

32.     Moreover, it is clear that Congress intended for "customer" to be broadly interpreted. In the first draft of the bill, there was no entitlement to SIPC insurance for any customer whose name or interest was not disclosed on the records of the broker/dealer "if such

11

MWPTAP01079654

recognition would increase the aggregate amount of the insured customer accounts or insured

liability in such closed broker or dealer." S. 2348, 91[st] Cong. Section 7(d)(June 9, 1969); H.R.

13308, 91st Cong. Section 7(d) (Aug.4, 1969). The final bill dropped this restriction.

33.    The Trustee may erroneously rely upon SIPC Rule 103. SIPA does not permit

SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute.

Hence, Rule 103 is invalid. 15 U.S.C. § 78ccc(b)(4)(A).

**Conclusion**

The Investment Group is entitled to an order compelling Picard and SIPC to immediately

replace the securities in the Account to the extent of a valuation of up to $500,000 for each of the

Partners using the values as of November 30, 2008 and $44,768,253.86 for the Investment

Group.

The Investment Group is entitled to have its claim recognized in the amount of

$44,768,253.86, the balance on the November 30, 2008 statement.

The Partners are entitled to judgment against Picard and Baker & Hostetler LLP for the

damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

January 11, 2010

PHILLIPS NIZER LLP

By  Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
Attorneys for all of the parties listed
on Exhibit A hereto as partners of
S&P Associates General Partnership

12

1102141.1

MWPTAP01079655

# EXHIBIT A

**MWPTAP01079656**

S&P list 1

| | |
|---|---|
| Katherine F. Astley<br>197 Cameron Drive<br>Weston, FL 33326-3514 | 35,674.24 |
| Martin L. & Gloria Braun<br>823 Promenade Way, Apt. #104<br>Jupiter, FL 33458 | $16,101.73 |
| James Caplinger<br>309 Blackbird Way<br>Lewisburg, WV 24901 | $57,698.38 |
| Denise A. Cram<br>91 Princeton Avenue<br>Waltham, MA 02154 | $35,924.19 |
| Diane M. DenBleyker<br>14 River Point Dr.<br>Palm Coast, FL 32137 | $17,347.48 |
| Leo L. & Mary V. Dunham, co-trustees<br>Leo L. & Mary V. Dunham revocable trust, dtd 10/11/90 amended 2/20/96, amended 1/28/00<br>10002 Gramerly Lane<br>Orlando, FL 32821 | $18,909.28 |
| Deborah Fellman Revocable Trust<br>Deborah Fellman, Trustee<br>4016 Cornwell A<br>Boca Raton, FL 33434-2948 | $55,108.53 |
| Morton Fellman, Trustee<br>Revocable Trust dated 5/20/97<br>10650 Crystal Lake Drive<br>Boca Raton, FL 33428 | $93,929.02 |
| Jesse A. & Lois A. Goss, Trustees U/A dated 11/1/1990<br>10004 Gannon Lane<br>Orlando, FL 32821 | $4,516.87 |
| Mary S. Haslam<br>213 Cameron Drive<br>Weston, FL 33326 | 63,200.27 |
| Robert H. & Dorothy D. Henley<br>4508 NE 21st Lane<br>Ft. Lauderdale, FL 33308-4713 | $12,430.15 |

MWPTAP01079657

Antonio Hidalgo. c/o Eduardo Hidalgo
525 N. Ocean Blvd., #1014
Pompano Beach, FL  33062

$127,993.41

Gayl Hinerman
831 Lyons Rd., #23101
Coconut Creek, FL  33434

$10,334.06

Phillip A. & Jolene O. Hocott
344 Fairway Drive
Waynesville, NC  28786

$1,419.26

Alicia N. Holloway Revocable Trust
6550 N. Federal Hwy., Suite 200
Ft. Lauderdale, FL  33308

26,765.92

Kristina Anne Holloway
6550 N. Federal Hwy., Ste. 200
Ft. Lauderdale, FL 33308

$9,236.26

Helen F. Holt, trustee
Helen F. Holt Revocable Trust dtd 8/8/86
St. Andrews Estates North
6152 North Verde Trail, Apt. C211
Boca Raton, Fl 33433

$153,551.24

Edward M. Jacobs
5321 Seaton Hall Lane
Orlando, FL  32821

$39,227.23

Kim D. Janicek, custodian
Cody F. Janicek, UGMA
15 Alan Court
Farmingdale, NY  11735

$14,205.05

Rosemary Leo-Sullivan
4142 NW 6th Street
Deerfield Beach, FL  33442

$65,134.60

Stanley & Emilie Leonardi
141 A Eastbourne Court
Ridge, NY  11961

$69,521.16

Dorothea V. Marema
2880 NE 14th St. Cswy.
Apt. 107
Pompano Beach, FL 33062

$65,156.33

Catharine B. McGarey

$13,214.02

MWPTAP01079658

c/o Ames C. & Robert B. McGarey
5930 E. Orange Blossom Lane
Phoenix, AZ 85018

Louise McIlvaine, trustee
Louise McIlvaine Living Trust dtd 10/18/95          $77,311.00
2121 Fox Lake Rd.
Wooster, OH 44691

Susan Michaelson Trust dated 2/8/05                 $76,670.12
Susan Michealson, Trustee
101 Bay Colony Drive
Ft. Lauderdale, FL 33308

                                                    $105,182.65
Paul & Tina Paolozzi
33 Prentiss Drive
Hopewell Junction, NY 12533

Beverly J. Payne                                    $31,356.29
1660 NW 42 Street
Oakland Park, FL 33309


2009 FINAL

                                                    $16,647.33
Jeffrey W. Posser
2555 NE 11th Street, #603
Ft. Lauderdale, FL 33304-3215

Irwin B. & Mary N. Reed, Trustees
Irwin B. Reed Trust dtd 6/7/00                      $146,631.84
9892 SE 177 Lane
Summerfield, FL 34491

Lynn Rosen
626 Woodgate Circle                                 $584.63
Sunrise, FL 33326

Saul Rosen
2420-9 Hunter Avenue                                $91,580.04
Apt. 9F
Bronx, NY 10475-5634

Lucille Rowlette
10027 Gannon Lane                                   $84,467.18
Orlando, FL 32821

Angela M. Silecchia
8971 SW 6th Ct.                                     $9,958.12

Planation, FL 33324

Kathryn and/or Angela Silecchia
8971 SW 6th Ct.                                                    $8,563.80
Plantation, FL 33324

Kathryn and/or Debra Silecchia
13121 SW 33rd Ct.                                                  $22,505.67
Davie, FL 33330

Jess L. and /or Alice B. Taylor                                    $124,199.53
2614 Golfside Ct.
Naples, FL 34110

Richard F. & Bette West
2800 SW 41st. St.                                                  $1,905.33
Bldg. 200, Apt. 1005
Ocala, FL 34474

MWPTAP01079660

0812 S&P Tracking

Barbara Aymes
10368 Sunset Bend Drive                                    $248,856.88
Boca Raton, FL  33428

Kathryn L. Babcock
3208 Colony Club Rd., Apt. 6                               $21,361.58
Pompano Beach, FL  33062-4730

Roger G. & Terry A. Bond
3111 NE 57th St.                                           2,454,397.31
Ft. Lauderdale, Fl  33308

Laurel & William Bonhage
5519 Reid Lane                                            $19,145.06
Allentown, PA  18104-9001

Ruth J. Brown Revoc. Trust
1741 NE 58th Street                                        $54,503.14
Ft. Lauderdale, FL  33334

Gary R. Chapman
5926 Bartram Street                                        $7,821.79
Boca Raton, FL  33432

Johanna Wills Clark
2544 Saint Heather way                                     $26,592.53
Orlando, FL 32806

John & Lois Combs
5145 SE Matousek St.                                       $313,106.36
Stuart, FL 34997 .

Eldridge Family Limited Partnership
607 3rd Key Dr.                                            $673,644.06
Ft. Lauderdale, FL  33304

Festus & Helen Stacy Foundation, Inc.
c/o Douglas A. Stepelton                                   12,645,053.59
5110 N. Federal Hwy., Suite 100
Ft. Lauderdale, FL  33308

Fox Family Partnership
2760 NE 52nd St.                                           $148,158.79
Ft. Lauderdale, FL  33308

**MWPTAP01079661**

Barbara B. Fox, Trustee
451 Heritage Dr.
Apt. 703                                              $287,387.48
Pompano Beach, FL 33060

Ralph C. Fox, Trustee
451 Heritage Dr.
Apt. 703                                              $997,084.58
Pompano Beach, FL 33060

Ersica P. Gianna Trustee
Ersica P. Gianna Living Trust dtd 9/25/01             $161,720.88
3101 NE 47 Court, #102
Ft. Lauderdale, FL 33308-5348

Wallace M. Goodman
4751 NW 21 St.                                        $271,081.08
Bldg. 12, Apt. 210
Lauderhill, FL 33313

Guardian Angel Trust, L.L.C.                          $6,186,696.90
PO Box 11941
Ft. Lauderdale, FL 33339

Margaret B. Gwinn, Trustee
Margaret B. Gwinn Trust                               $135,672.30
211 Lakeside Circle
Pompano Beach, FL 33060-7707

Adam S. Holloway
121 Theory
Irvine, CA 92617                                      $185,709.41

Scott W. Holloway
6550 N. Federal Hwy., Suite 200                       $173,974.43
Ft. Lauderdale, FL 33308

Howard H. & Joyce C. Horwitz, Trustees
Living Trust dtd 1/27/97                              $112,195.42
7675 Trapani Lane
Boynton Beach, FL 33437

Alice B. Iuen
Revocable Living Trust dated 3/21/1994               $348,191.27
2142 NE 15 Terrace
Ft. Lauderdale, FL 33305

Marvin F. Iuen, Trustee                               $146,274.56

2142 NE 15 Terrace
Ft. Lauderdale, FL 33305

James Judd & Valerie Bruce Judd                    $48,897.06
2421 Barcelona Drive
Ft. Lauderdale, FL 33301

Beverly B. Lewis
5555 N. Ocean Blvd., #33                           $174,939.51
Ft. Lauderdale, FL 33308

Margaret Lipworth & Donna Moss
3100 NE 47th Court                                 $197,964.75
Townhouse #3
Ft. Lauderdale, FL 33308

Richard P. & Dora F. Long
259 Sago Palm St.                                  $239,232.18
Largo, FL 33778-1306

Marguerite Marinaro                                180,537.40
34 Dixie Lane
East Islip, NY 11730

Paul H. Mueller
4061 NE 26th Avenue                                $490,291.17
Ft. Lauderdale, FL 33308

Karen Newman
7 Tee Lane                                         $30,071.96
Port Jefferson Station, NY 11776

Louis S., Jr. or Darlene A. O'Neal                 $131,617.45
1939 Anniston Road
Jacksonville, FL 32246

Michael J. Podwill
1-2 Bridle Path                                    111,136.79
Ossining, NY 10562

Robert R. & Gail Podwill
10996 Boca Woods Lane                              148,592.99
Boca Raton, FL 33428

Bette Anne Powell
Arbor lakes
4650 N. Lake Vista Trail                           $237,943.51
Hernando, FL 34442

**MWPTAP01079663**

Glen O. & Barbara J. Powell
19 Princess Rose Dr.                                    31,887.31
Palm Coast, FL 32164-7120

Phil & Mica Roughton
4503 NE 22nd Rd.                                       $60,501.88
Ft. Lauderdale, FL 33308

Joseph A. Speizio
39 Woodlot Road                                        $403,889.10
Ridge, NY 11961-1908

SPJ Investments, Ltd.
6550 N. Federal Hwy., #210                             $10,791,309.58
Ft. Lauderdale, FL 33308-1404

Ann or Michael Sullivan
4105 NE 21st Avenue, Apt. 2                             $308,256.13
Ft. Lauderdale, FL 33308

Ann M. Sullivan
4105 NE 21st Avenue, #2                                 $397,488.41
Ft. Lauderdale, FL 33308

Michael D. & L. Gail Sullivan
2590 NE 41 St.                                         $31,153.62
Ft. Lauderdale, FL 33308

Wallick Family Edcational Trust
C/O Gregg and Cindy Wallick                            $85,859.17
459 NE 15th Ave.
Ft. Lauderdale, FL 33301

Cindy Wallick
459 NE 15th Ave.                                       $1,540,545.26
Ft. Lauderdale, FL 33301

Gregg Wallick
11901 SW 3rd Street                                    $28,460.45
Plantation, FL 33325

The Robert G. Walsh Family Trust #2
James R. Walsh, Trustee                                1,190.05
37 Hawkins Ave.
Hamberg, NY 14075

James R. & Kathleen Walsh
706 Lakeside Circle                                    256,207.51
Pompano Beach, FL 33060

Kathy G. Walsh-POD David Walsh
5280 NE 28th Avenue                          561,361.45
Ft. Lauderdale, FL  33308

Evelyn L. Willis
515 East Beacon Rd.                          $47,548.02
Lakeland, FL  33803-3019

Eileen W. & Richard J. Wills, Jr.
60 Revere Park                               $1,441.55
Nashville, TN 37205

George & Sybil Wirick
440 E. Dogwood st.                           $67,303.33
Monticello, FL 32344

Jack B. & Barbara B. Wirick
3348 Washington St.                          $70,144.22
Monticello, FL  32344

James E. Yonge, Trustee
James E. Yonge Trust, u/a dtd 1/2/95         224,844.99
3948 3rd St. South
Jacksonville Beach, Fl 32250-5847

MWPTAP01079665

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for all of the partners of S&P Associates
General Partnership

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 09-01789 (BRL) |
| Plaintiff, | SIPA Liquidation |
| v. | **CERTIFICATE OF SERVICE** |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

I, Lourdes Blanco, hereby certify that on January 11, 2010 I caused a true and correct

copy of the **Objection to Trustee's Determination of Claim** on behalf of all of the partners of

S&P Associates General Partnership to be filed electronically with the Court and served upon

the parties in this action who receive electronic service through CM/ECF, and served by hand

upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

January 11, 2010

_____/s/ Lourdes Blanco_____

1102280.1

**MWPTAP01079666**