UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— X
                       :

In re:                       :

                       :   SIPA LIQUIDATION

BERNARD L. MADOFF INVESTMENT  :
SECURITIES LLC,           :
                       :   No. 08-01789 (SMB)

      Debtor.         :

———————————————————— X

IRVING H. PICARD, Trustee for the Liquidation  :
of Bernard L. Madoff Investment Securities LLC,  :
                       :

         Plaintiff,        :   Adv. Proc. No. 09-01182 (SMB)

        v.           :

J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,  :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,  :
ASCOT FUND LTD., GABRIEL CAPITAL  :
CORPORATION,            :

        Defendants.      :

———————————————————— X

## DEFENDANTS J. EZRA MERKIN AND GABRIEL CAPITAL CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
*Attorneys for Defendants J. Ezra Merkin
and Gabriel Capital Corporation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ...................................................................................................... 3

POINT I       SUMMARY JUDGMENT DISMISSING THE TRUSTEE'S
FRAUDULENT CONVEYANCE CLAIM IS APPROPRIATE
BECAUSE THERE IS NO GENUINE ISSUE AS TO THE MERKIN
DEFENDANTS' GOOD FAITH .............................................................. 3

    A.    The Trustee's Repeated Reliance on Purported   "Red Flags" Does Not
Raise a Genuine Issue of Fact ................................................................ 6

        1.    The Trustee's Specific "Red Flag" Allegations Are Meritless ................ 7

        2.    Merkin Widely Disclosed the Funds' Investments in BLMIS ................ 14

POINT II     THE TRUSTEE'S SUBSEQUENT TRANSFEREE  AND GENERAL
PARTNER LIABILITY CLAIMS FAIL ............................................... 18

    A.    If The Avoidance Claims Were Successful Ascot Would Be Entitled To
An Amount Equal To Or Greater Than Any Potential Judgment ...................... 19

    B.    The Trustee Cannot Execute A Judgment Against Merkin As The General
Partner Of Ascot Because None Of The Statutory Exceptions Apply ................ 22

POINT III    THE TRUSTEE'S EQUITABLE SUBORDINATION  CLAIM FAILS
BECAUSE THERE WAS NEITHER  GROSS AND EGREGIOUS
CONDUCT NOR INEQUITABLE CONDUCT ................................................ 23

CONCLUSION ................................................................................................. 25

i

# TABLE OF AUTHORITIES

**CASES**

*Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*,
301 F.R.D. 31 (S.D.N.Y. 2014) ...............................................................13

*Bryant v. Maffucci*,
923 F.2d 979 (2d Cir. 1991)......................................................................4

*Compare Global Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011) ............................................................................23

*Cunningham v. Safeway Trails, Inc.*,
No. 84 Civ. 3936, 1985 WL 1684 (S.D.N.Y. June 14, 1985)...................4

*DeLollis v. Friedberg, Smith & Co.*,
600 Fed. App'x 792 (2d Cir. 2015)...........................................................7

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
No. 12 Civ. 4112, 2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ................4

*Economou v. Butz*,
84 F.R.D. 678 (S.D.N.Y. 1979) ................................................................4

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund (In re Tremont Sec. Law, State*
*Law, & Ins. Litig.)*,
No. 08 Civ. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013), *aff'd sub nom.*
*Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014) ..............................10

*Gowan v. HSBC Mortg. Corp. (USA) (In re Dreier LLP)(Gowan II)*
No. 08-15051, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012) ..........................20

*Gowan v. Patriot Grp., LLC (In re Dreier LLP)(Gowan I)*
452 B.R. 391 (Bankr. S.D.N.Y. 2011).......................................................4

*Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*,
453 B.R. 499 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) ............................24

*In re Adelphia Commc'ns Corp.*,
365 B.R. 24 (Bankr. S.D.N.Y. 2007).......................................................25

*In re Audre, Inc.*,
210 B.R. 360 (Bankr. S.D. Cal. 1997) .....................................................25

*In re Auto Specialties Mfg. Co.*,
153 B.R. 457 (Bankr. W.D. Mich. 1993)..................................................24

*In re Bankvest Capital Corp.*,
375 F.3d 51 (1st Cir. 2004) .......................................................................20, 21, 22

*In re Eufaula Indus. Auth.*,
266 B.R. 483 (B.A.P. 10th Cir. 2001) .......................................................24

*In re Falcon Prods, Inc.*,
NO. 4:07-cv-1495, 2008 WL 363045 (E.D. Mo. Feb. 8, 2008) ..........................21

*In re J. Ezra Merkin & BDO Seidman Sec. Litig.*,
817 F. Supp. 2d 346 (S.D.N.Y. 2011) ......................................................18

*In re Mid-Am. Waste Sys., Inc.*,
274 B.R. 111 (Bankr. D. Del. 2001) .........................................................25

*In re Phase I Molecular Toxicology, Inc.*,
287 B.R. 571 (Bankr. D.N.M. 2002) ........................................................24

*In re QuVis, Inc.*,
446 B.R. 490 (Bankr. D. Kan. 2011), *aff'd sub nom In re QuVIS, Inc.*, 469 B.R. 353
(D. Kan. 2012), *aff'd,* 504 F. App'x 747 (10th Cir. 2012).................................24

*In re TI Acquisition, LLC*,
410 B.R. 742 (Bankr. N.D. Ga. 2009) .......................................................21

*In re Vermont Elec. Generation & Transmission Co-op., Inc.*,
240 B.R. 476 (Bankr. D. Vt. 1999) ..........................................................25

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998)......................................................................8

*LaFrenier v. Kinirey*,
550 F.3d 166 (1st Cir. 2008) ...................................................................6

*Lauren W. ex rel. Jean W. v. DeFlaminis*,
480 F.3d 259 (3d Cir. 2007).....................................................................5

*Luh v. J.M. Huber Corp.*,
211 F. App'x 143 (4th Cir. 2006) .............................................................6

*Meiri v. Dacon*,
759 F.2d 989 (2d Cir. 1985).............................................................2, 3, 6

*Meridian Horizon Fund, LP v. KPMG*,
487 F. App'x 636 (2d Cir. 2012) .............................................................7

*Nash v. Jacqueline Cochran, Inc.*,
548 F. Supp. 676 (S.D.N.Y. 1982) ...........................................................4

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
   269 F.3d 114 (2d Cir. 2001)........................................................................3

*Page v. Rogers*
   211 U.S. 575, 581 (1909)..........................................................................21

*Picard v. Ceretti,*
   Adv. No. 09-1161, ECF No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014) .......................................10

*Picard v. Merkin,*
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..........................................................3, 19, 23

*Reeves v. Sanderson Plumbing Prods Inc.*,
   530 U.S. 133 (2000)..................................................................................5

*Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,
   926 F.2d 134 (2d Cir. 1991)........................................................................4

*RW Grand Lodge of Free Masons v. Meridian Capital Partners*,
   No. 15-1064 (2d Cir. Dec. 15, 2015) .........................................................19, 20

*Salib v. P&O Ports N. Am., Inc.*,
   No. 05 CV 5313, 2008 WL 4724008 (E.D.N.Y. Oct. 28, 2008) ...........................................6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   499 B.R. 416 (S.D.N.Y. 2013).................................................................20, 21

*SEC v. Treadway*,
   430 F. Supp. 2d 293 (S.D.N.Y. 2006)...............................................................4

*Sel-Way, Inc. v. United States*,
   No. 95-4485, 1997 WL 154114 (Bankr. E.D. Mich. Jan. 22, 1997), *aff'd sub nom.*
   *Gordon Sel-Way, Inc. v. United States*, 217 B.R. 221 (E.D. Mich. 1997)..............................25

*Stratienko v. Cordis Corp.,*
   429 F.3d 592 (6th Cir. 2005) ......................................................................5

*Valentine v. Standard & Poor's*,
   50 F. Supp. 2d 262 (S.D.N.Y. 1999) (Sotomayor, J.)..................................................4

**STATUTES AND RULES**

11 U.S.C. § 550(A), (D)...............................................................................19

15 U.S.C. § 78lll(2)(B)(i)............................................................................19

FED. R. CIV. P. 26(E)(A)(2) ..........................................................................13

FED. R. CIV. P. 56(E) ...............................................................................4

Local Bankr. Rule 7056-1(d) ................................................................................................5

Local Rule 56.1(c) ...............................................................................................................5

**OTHER AUTHORITIES**

Del. Code Ann. Title 6, § 15-306 (West 2015)...................................................................20

Del. Code Ann. Title 6, § 17-403(d)(1)-(5) (West 2015) ..................................................24

Demand for Change Post-Madoff, *Markets Media* (Mar. 6, 2013),
    http://marketsmedia.com/demand-for-change-post-madoff (last accessed December
    14, 2015) ....................................................................................................................9

Deutsche Börse Group, White Paper, The Global Derivatives Market: An Introduction 38 (April
    2008), http://www.math.nyu.edu/faculty/avellane/global_derivatives_market.pdf ..........12

John Summa, "Option Price-Volatility Relationship:  Avoiding Negative Surprises,"
    Investopedia, http://www.investopedia.com/articles/optioninvestor/05/020205.asp ..............11

Pierre Clauss, Thierry Roncalli & Guillaume Weisang, Risk Management Lessons from
    Madoff Fraud (Mar. 2, 2009), available at http://mpra.ub.uni-muenchen.de/36754 ................8

## Preliminary Statement

Defendants J. Ezra Merkin and Gabriel Capital Corporation respectfully submit this reply memorandum of law in further support of their motion for summary judgment.[1]  The Merkin Defendants' opening brief demonstrated that the Trustee's four remaining claims should be dismissed because the evidence adduced through extensive discovery leaves no triable issue of material fact on any of those claims.

Specifically, the evidence demonstrates that the Trustee cannot avoid as actual fraudulent conveyances and recover from Ascot Partners the withdrawals it had made from its BLMIS account in the two years prior to Madoff's confession because, far from being willfully blind to Madoff's fraud, the Merkin Defendants conducted extensive due diligence and, like thousands of other sophisticated investors, were duped by Madoff's massive Ponzi scheme.  Indeed, the Trustee's lead counsel, David Sheehan, admitted in open court that he "d[id]n't think [Merkin] thought [BLMIS] was a Ponzi scheme." Reply Ex. 1 (Apr. 30, 2014 Hr'g Tr.) at 50:14-25.[2] That judicial admission alone is fatal to the Trustee's willful blindness claim.

The opening brief explained that dismissal of the fraudulent conveyance claim likewise requires dismissal of the subsequent transferee, general partner and equitable subordination claims because each of those claims requires the Trustee, at a minimum, to establish the Merkin Defendants' willful blindness.  Moreover, the subsequent transferee and general partner claims fail for the additional reason that, in the unlikely event the Trustee were to prevail on the fraudulent conveyance claim, Ascot Partners indisputably has sufficient assets to satisfy any

---

[1]     Unless otherwise defined, capitalized terms used herein have the same meaning as in the Defendants J. Ezra Merkin and Gabriel Capital Corporation's Memorandum of Law in Support of their Motion for Summary Judgment filed on October 8, 2015 (Dkt. No. 285) ("Opening Mem.").

[2]     Citations to "Ex." are exhibits to the October 7, 2015 Declaration of Neil A. Steiner, filed with Defendants' opening brief.  Citations to "Reply Ex." are exhibits to the December 23, 2015 Declaration of Neil A. Steiner, filed concurrently herewith.  Citations to "Hoang Ex." are exhibits to the November 25, 2015 Declaration of Lan Hoang, filed with the Trustee's opposition.

judgment.  And the equitable subordination claim fails both because Ascot Partners did not

engage in inequitable conduct and because it would not be equitable to deny any recovery to the

fund and its investors.

In opposition, the Trustee argues that, because he is required to prove Merkin's state of

mind, summary judgment is inappropriate.  But Second Circuit law is to the contrary:  The

"summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state

of mind would operate as a talisman to defeat an otherwise valid motion."  *Meiri v. Dacon*, 759

F.2d 989, 998 (2d Cir. 1985).  Nor is there merit to the Trustee's contention that the Court cannot

consider Merkin's uncontradicted testimony at the summary judgment stage.  And the evidence

showed that the generic purported "red flags" relied on by the Trustee – which were known or

available to virtually all Madoff investors – did not objectively, much less subjectively, suggest a

high probability that Madoff was operating a Ponzi scheme.  *See infra* Point I.

There is likewise no merit to the Trustee's argument that Ascot Partners may not have

sufficient assets to satisfy any judgment that could be entered against it on the fraudulent

conveyance claim.  The Trustee contends that Ascot Partners may not be able to satisfy a

potential judgment because it would have to pay any judgment before receiving any distribution

on its net equity or Section 502(h) claim.  That not only defies common sense, but also ignores

century-old Supreme Court authority that remains good law today.  And because Ascot Partners

is indisputably a significant net loser in Madoff's Ponzi scheme, the Trustee's latest suggestion

that any Section 502(h) claim might be a general creditor claim rather than a customer claim is

wrong as a matter of law.  *See infra* Point II.

Finally, the equitable subordination claim fails because there is no evidence that Ascot

Partners engaged in inequitable conduct.  Further, if the Trustee prevailed on his fraudulent

conveyance claim and Ascot Partners repaid any such amount, it cannot be disputed that it would

be inequitable to subordinate and deny distributions to Ascot Partners and the investors in that

fund. In any event, the Trustee concedes that the equitable subordination claim can be pursued

only as an alternative to monetary damages on his fraudulent conveyance claims. Hence, if the

Trustee prevailed and elected equitable subordination, he would not have any claim against the

Merkin Defendants. *See infra* Point III.

## **Argument**

### **POINT I**

### **SUMMARY JUDGMENT DISMISSING THE TRUSTEE'S FRAUDULENT CONVEYANCE CLAIM IS APPROPRIATE BECAUSE THERE IS NO GENUINE ISSUE AS TO THE MERKIN DEFENDANTS' GOOD FAITH**

The Trustee concedes that, to prevail on his fraudulent conveyance claim, he bears the

burden of proving "that Defendants 'willfully blinded [themselves] to circumstances indicating a

high probability of [Madoff's] fraud.'" (Opp. at 41 (quoting *Sec. Inv'r Prot. Corp. v. BLMIS*,

516 B.R. 18, 23 (S.D.N.Y. 2014))). The Trustee further acknowledges that proving willful

blindness requires him to show both that Defendants subjectively believed that there was a high

probability that Madoff was engaged in a fraud and that Defendants took deliberate actions to

avoid learning of that fact. *See id*. (citing *Picard v. Merkin*, 515 B.R. 117, 139 (Bankr. S.D.N.Y.

2014)).

Here, the Trustee has not identified a material factual dispute on either issue. Instead, the

Trustee erroneously argues that summary judgment is inappropriate because Merkin's state of

mind is at issue. But the Second Circuit has expressly rejected any such rule. *See Meiri*, 759

F.2d at 998; *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 125 (2d Cir. 2001)

(affirming summary judgment for defendant on plaintiff's allegation that defendant acted in bad faith).[3]

Even worse, the Trustee misleadingly quotes this Court's opinion in *Gowan v. Patriot Grp., LLC (In re Dreier LLP)* (*Gowan I*), 452 B.R. 391 (Bankr. S.D.N.Y. 2011). The Trustee argues that *Gowan* requires denial of summary judgment because "'the Defendants' good faith [under section 548(c)] is an indisputably factual inquiry,'" Opp. at 45 (quoting *Gowan I*, 452 B.R. at 426). But *Gowan* was a decision on a motion to dismiss; the Trustee omits the very next sentence, which explains that such "factual inquiry [is] to be undertaken by the Court after the close of discovery and need not be resolved at the motion to dismiss stage." *Gowan I*, 452 B.R. at 426. *Gowan I* is therefore inapposite.

The Trustee's contention that many of the undisputed facts relied on by Defendants are "immaterial," "not relevant," "incomplete," or "incomplete and misleading" is insufficient to dispute those facts. Rather, when a party fails to "properly address another party's assertion of fact," the court may consider the fact undisputed. Fed. R. Civ. P. 56(e), (e)(2); *see also SEC v. Treadway*, 430 F. Supp. 2d 293, 300 n.4 (S.D.N.Y. 2006) ("Facts are undisputed unless

---

[3]    *See also Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141-42 (2d Cir. 1991) (affirming summary judgment for defendant and lower court's finding that plaintiff failed to establish defendant's deliberate deception); *Bryant v. Maffucci*, 923 F.2d 979, 987 (2d Cir. 1991) (affirming district court's holding on summary judgment that plaintiff failed to establish that defendants acted with deliberate indifference); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 289-90 (S.D.N.Y. 1999) (Sotomayor, J.) (granting summary judgment for defendant and finding that no reasonable jury could find that the defendant was motivated by discrimination against people with disabilities); *Nash v. Jacqueline Cochran, Inc.*, 548 F. Supp. 676, 678 (S.D.N.Y. 1982) (dismissing argument that "a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element" because "[t]here must be some indication that he can produce evidence to enable him to reach the jury with his claims"); *see also Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, No. 12 Civ. 4112, 2014 WL 814532, at *23, *26 (S.D.N.Y. Mar. 3, 2014) (granting summary judgment for defendant where plaintiff failed to raise any issue of fact as to defendant's alleged bad faith); *Cunningham v. Safeway Trails, Inc.*, No. 84 Civ. 3936, 1985 WL 1684, at *4-5 (S.D.N.Y. June 14, 1985) (granting summary judgment for defendants where plaintiff failed to offer any facts that defendants intended to discriminate based on age and race); *Economou v. Butz*, 84 F.R.D. 678, 681 (S.D.N.Y. 1979) ("[A] court has a duty to grant a motion for summary judgment where there is no [g]enuine issue regarding state of mind.").

4

otherwise noted. [Defendants'] voluminous [counterstatements of undisputed materials facts]

frequently do not dispute a statement of fact but instead declare it to be incomplete and

misleading. Unless specifically disputed, each fact is deemed admitted, in accordance with

Local Rule 56.1(c)."). Facts are "deemed admitted for the purposes of the [summary judgment]

motion unless specifically controverted." Local Bankr. R. 7056-1(d). For this reason, the facts

contained in paragraphs 1-3, 11, 16-17, 19-22, 25-29, 34-36, 44, 47, 51, 54, 56-58, 61, 64, 68-70,

72-75, 77, 82-83, 98-103, 111, 117, 119, 121-122, 124, 129, 139, 142-144, 148-149, 152, 154-

158, 161, 165, 167-168, 178, 184, 187, 189-192, and 194 of Defendants' Statement of

Undisputed Facts should be deemed admitted for the purposes of this motion.

Similarly, the Trustee cannot dispute, and the Court should not disregard, Merkin's

uncontradicted testimony solely on the ground that he is an interested witness. The Trustee

argues that exclusion of such testimony is supported by the Supreme Court's reasoning in *Reeves*

*v. Sanderson Plumbing Prods Inc.*, 530 U.S. 133 (2000). While the Second Circuit has not

interpreted *Reeves*, other Circuits have uniformly rejected the Trustee's expansive interpretation.

*See e.g.*, *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 271-72 (3d Cir. 2007) ("We

cannot believe that the law precludes a party from presenting his own testimony on a summary

judgment motion. . . . The fact is that in considering a motion for summary judgment the court

should believe uncontradicted testimony unless it is inherently implausible even if the testimony

is that of an interested witness."); *Stratienko v. Cordis Corp.,* 429 F.3d 592, 598 (6th Cir. 2005)

(not being able to consider "the testimony of a moving party's interested witnesses. . . . leads to

absurd consequences because defendants will often be able to respond only through the

testimony of their employees") (internal quotation marks omitted); *LaFrenier v. Kinirey*, 550

F.3d 166, 168 (1st Cir. 2008); *Luh v. J.M. Huber Corp.,* 211 F. App'x 143, 146 (4th Cir. 2006);

*see also Meiri*, 759 F.2d at 998 (affirming summary judgment for defendant who provided

deposition testimony and affidavits to establish that plaintiff's termination was not due to

religious discrimination); *Salib v. P&O Ports N. Am., Inc.*, No. 05 CV 5313, 2008 WL 4724008,

at *1 n.1 (E.D.N.Y. Oct. 28, 2008) ("[T]hat an 'interested witness' has testified to a certain issue

does not, in and of itself, raise a genuine issue of material fact.'") (quoting *Donahue v. Windsor*

*Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir.1987)).

A.      **The Trustee's Repeated Reliance On Purported**
        **"Red Flags" Does Not Raise A Genuine Issue Of Fact**

        The opening brief demonstrated that the generic "red flags" that the Trustee contends, in

hindsight, should have alerted Defendants and other investors to Madoff's fraud are insufficient

to create a triable issue of fact as to Defendants' supposed willful blindness.  Indeed, discovery

showed that most of these purported "red flags" were not actually red flags, while other analyses

that the Trustee says should have been performed were not standard practices prior to Madoff's

confession.  At most, the Trustee's arguments are that the Merkin defendants were negligent in

their due diligence (which they were not); the Trustee's evidence is woefully inadequate to create

a triable issue of fact on the higher hurdle of willful blindness.

        Last week, in *RW Grand Lodge of Free Masons v. Meridian Capital Partners*, No. 15-

1064 (2d Cir. Dec. 15, 2015), the Second Circuit reiterated that allegations that an investment

advisor ignored these purported red flags about Madoff, even if true, are insufficient to establish

that the investment advisory acted with scienter – that is, was reckless or had the motive and

opportunity to engage in fraud.  As the Second Circuit explained, "Grand Lodge essentially

makes a 'red flag' argument – that Appellees were aware or had the duty to become aware of red

flags in the Rye Funds' operations and that Appellees were reckless in ignoring the red flags.

This court, along with many district courts in this circuit, has rejected similar claims based upon

6

a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *See id.* at 5 (collecting cases).[4] *A fortiori*, the purported red flags are legally insufficient to establish that Defendants were willfully blind or deliberately closed their eyes to Madoff's fraud.

1.    The Trustee's Specific "Red Flag" Allegations Are Meritless

The Trustee's contention that Merkin knew or should have known of the red flags concerning Madoff begins with the faulty premise that Merkin should have undertaken extensive quantitative analyses of Madoff's trading and returns. According to the Trustee's expert, Steven Pomerantz, this quantitative analysis was a standard part of due diligence in the investment industry. Aside from Ascot Partners' investment with Madoff being in a separate managed account with an SEC-registered broker dealer – and not being an investment in a hedge fund or other pooled vehicle – the undisputed evidence shows that the quantitative analysis suggested by Pomerantz was not industry standard prior to Madoff's confession.

In fact, the documents relied on by Pomerantz for his opinion do not suggest, much less require, performing quantitative analysis. Pomerantz repeatedly referred to the Due Diligence Questionnaire published by the Alternative Investment Management Association ("AIMA") as mandating quantitative analyses. But he was forced to admit in his deposition that the AIMA's pre-2008 Due Diligence Questionnaires did not refer to or describe any quantitative analysis as part of a hedge fund's due diligence. Reply Ex. 2 (Pomerantz Dep.) 184:9-10 ("They don't identify [any] specific quantitative analyses."); *see also* Reply Exs. 3-5 (1997, 2002, and 2004 AIMA Due Diligence Questionnaires, respectively).

---

[4]    The Second Circuit cited *DeLollis v. Friedberg, Smith & Co.*, 600 Fed. App'x 792, 796 (2d Cir. 2015) ("Numerous actions brought against auditors and investment advisors by victims of Madoff's fraud have been dismissed despite the presence of 'red flags,' which in hindsight arguably should have called attention to Madoff's illegal conduct."), and *Meridian Horizon Fund, LP v. KPMG*, 487 F. App'x 636, 640–41 (2d Cir. 2012) ("[T]he more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals.")

Similarly, the April 15, 2008 Report on the Principles and Best Practices for Hedge Fund

Investors by the Investors' Committee of the President's Working Group on Financial Markets

(which has four members – the Secretary of the Treasury and the chairs of the Board of

Governors of the Federal Reserve, the SEC, and the CFTC) did not include any of the detailed

quantitative analysis Pomerantz claimed was required.  For example, there is no discussion of

studying the daily price range, volume or timing of trades.  Rather, less than a year before

Madoff's confession, those recommended "Best Practices" provided only that "fiduciaries should

review the history of the investment management firm and its professionals, the firm's past and

current portfolios, its investment philosophy, its decision processes for implementing the

investment strategy, its organizational culture, and its internal economic incentives," as well as

"an evaluation of the business infrastructure, investment operations, and controls in place to

support the hedge fund's investment strategy."  Reply Ex. 6 at 12-13.  There is no dispute that

Merkin investigated and obtained an understanding of each of those issues with respect to

Madoff.[5]

Furthermore, the Madoff fraud dramatically changed industry practices for due diligence.

Indeed, the quantitative procedures that Pomerantz claimed Merkin should have undertaken on

the Madoff investments became common or recommended procedures only *after* – and as a

result of – Madoff's Ponzi scheme.  *See, e.g.*, Pierre Clauss, Thierry Roncalli & Guillaume

Weisang, Risk Management Lessons from Madoff Fraud (Mar. 2, 2009), available at

http://mpra.ub.uni-muenchen.de/36754 (last accessed December 14, 2015), at 17, 19

---

(quoting *Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 413 (S.D.N.Y. 2010)).

[5]     *See* Ex. 11 (Weingarten Expert Report).  Of course, failure to adhere strictly to supposed industry best practices would not in any event establish willful blindness.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 n.2 (2d Cir. 1998) (stating that industry custom is relevant but not dispositive in determining willful blindness).

(commenting that it is "necessary to call for a re-thinking of the due diligence process, and more specifically to stress on a call to use the tools provided by the quantitative methods . . . because these considerations have been strangely absent from any [] regulatory or standardizing framework"); Zabrina T. Barile & Wendy Toribio-Torres, Demand for Change Post-Madoff, *Markets Media* (Mar. 6, 2013), http://marketsmedia.com/demand-for-change-post-madoff (last accessed December 14, 2015) ("The Madoff Investment Securities scandal in 2008 prompted significant reforms to the rules and regulations that govern the investment management industry. . . . [T]he SEC has stressed the importance of developing standard due diligence policies and procedures that include quantitative due diligence checks.").

Moreover, Pomerantz admitted that he does not perform as part of his due diligence many of the analyses he claims Merkin should have undertaken. For example, Pomerantz has never compared stock purchases or sales to the daily high-low price range. Ex. 9 (Pomerantz Dep.) at 101:5-20. Nor does Pomerantz review individual trade confirmations. *Id.* at 100:4-13. Rather, like Merkin, Pomerantz relies on his back office and support staff to enter trade information into a spreadsheet or summary report, and reviews those reports rather than the underlying trade data. Reply Ex. 2 (Pomerantz Dep.) at 220:22-221:13.

Even if quantitative due diligence had been industry standard prior to 2008 – which it was not – the Trustee's specific "red flag" arguments fail. As an initial matter, the Trustee makes much of the argument that the Merkin Defendants should have known that Madoff's returns were too consistent and that the split-strike conversion strategy should have been closely correlated to the returns of the S&P 500. (Opp. at 46.) The Trustee is simply wrong. Merkin – like thousands of others – invested in the split-strike conversion strategy precisely because it was an uncorrelated strategy. Indeed, not only were virtually all Madoff customers aware that the

9

split-strike strategy was producing low volatility returns that were largely uncorrelated to the

market, Ascot Partners and other feeder funds including Greenwich Sentry (part of Fairfield

Greenwich Group), Tremont and Kingate all touted that fact to their own investors.  *See* Hoang

Ex. 19 at GCC-P 0393458, -66, -71-72, -482-507 (1996 Greenwich Sentry, L.P. Confidential

Offering Memorandum, describing split-strike strategy and disclosing monthly and annual

returns since inception); *Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund (In re Tremont*

*Sec. Law, State Law, & Ins. Litig.)*, No. 08 Civ. 11117, 2013 WL 5179064, at \*2 (S.D.N.Y. Sept.

16, 2013) (dismissing complaint, which alleged that "Tremont represented that the XL Fund

sought to provide 'long-term capital growth' and consistent 'positive returns irrespective of stock

market volatility or direction, while focusing on preservation of capital' . . . by investing its

assets with Madoff who supposedly employed a 'splitstrike conversion' strategy, a hedging

strategy using equities, options trading, and short selling"), *aff'd sub nom. Elendow Fund, LLC v.*

*Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014); Fourth Amended Compl., *Picard v. Ceretti*,

Adv. No. 09-1161, ECF No. 100 (Bankr. S.D.N.Y. Mar. 17, 2014), at ¶ 147 (alleging that

Defendants "touted the Kingate Funds' steady performance notwithstanding the volatility in the

markets").

The Trustee nevertheless argues that Madoff's returns should have essentially mirrored

the returns of the underlying equity securities (the S&P 100) within the options collar, and that

the upside and downside should have been limited at the option strike price.  (Opp. at 16-17.)

This simplistic view erroneously assumes that the options trades canceled one another out, and

that an investor could not make or lose money on the options other than as an offset to the

returns on the equities.  But any sophisticated options trader knows that the price of the

underlying security is but one factor in the price of an option.  Other factors include the

10

remaining time to option expiration and the volatility of the market.  And, when volatility

increases, the price of put options tends to increase both from the increase in volatility and from

the price decline in the underlying security.  *See, e.g.*, John Summa, "Option Price-Volatility

Relationship:  Avoiding Negative Surprises," Investopedia,

http://www.investopedia.com/articles/optioninvestor/05/020205.asp.

Pomerantz also contends that "Merkin knew that BLMIS was not hedging options

consistent with the Madoff SSC strategy.  Instead, BLMIS was purportedly engaging in a

speculative options strategy to generate a profit."  (Opp. at 19.)  According to Pomerantz, there

were more than 200 "speculative" options transactions that did not correspond to equity

transactions and were undertaken solely to generate profits for the portfolio.  In fact, it appears

that the 200 transactions to which Pomerantz refers are really only 37 unique trades.[6]  In *none* of

those instances did Madoff purport to engage in options transactions for the Defendant Funds'

accounts when the Funds were not invested in equities.  Rather, the profits were generated as a

result of repositioning an option with either a different strike price or different expiration date

while the Funds continued to own the underlying basket of equity securities, and therefore were

entirely consistent with Madoff's purported strategy.  For example, on January 28, 1992, Madoff

purportedly purchased a total of 691 S&P100 Index February put options with a 380 exercise

price.  Reply Ex. 7 at 5 (Appendix XIV to Pomerantz Report).  On January 31, 1992, trade

confirmations reflected that the hedge was repositioned at a lower exercise price by selling the

S&P100 Index February puts with the 380 exercise price and buying the same number of

S&P100 Index February puts with a 375 exercise price.  *Id*.  Together, these transactions were

---

[6]     Similar trades were purportedly made in each of the Defendant Funds' accounts.  In addition, the
transactions were often entered or existed over multiple days, and an options repositioning would involve a
sale and purchase or purchase and sale of options with a different strike price or different expiration date.

aligned with Madoff's purported strategy because the portfolio continued to be hedged from

significant downside risk. Pomerantz's analysis of "speculative" options includes the purchase

and sale of the put options with a 380 exercise price, but ignores the purchase of the puts with the

375 exercise price. Reply Ex. 8 (WPTDP 00000238) at "List of Speculative Transactions."

      The Trustee also argues that Merkin knew "that BLMIS was reporting option trading

volume in excess of the total volume on the CBOE," and that there were other deficiencies with

the trade confirmations BLMIS provided. (Opp. at 47.) With respect to options volume, Merkin

knew that volume often exceeded trading volume on the CBOE. That was one of many details

about the strategy he discussed with Madoff on multiple occasions, and was told that a

significant and increasing portion of the options trading was conducted over the counter. And it

is well-known that size of the over-the-counter options market is unknown but estimated to be

many multiples the size of the listed options market. Deutsche Börse Group, White Paper, The

Global Derivatives Market: An Introduction 38 (April 2008),

http://www.math.nyu.edu/faculty/avellane/global_derivatives_market.pdf ("In the derivatives

market, the over-the-counter segment is by far the largest part of the market.").

      With respect to the supposed inaccuracies on the trade confirmations, it was not Merkin's

practice or responsibility to review trade confirmations. Instead, back office employees of GCC

would input information from the trade tickets into a spreadsheet for Merkin and others to

review. Reply Ex. 9 (Autera Oct. 22, 2014 Dep.) at 180:22-181:3; Reply Ex. 10 (Balsam Dep.)

at 78:20-25; Ex. 90 (Achilarre Dep.) at 32:22-33:6. And no one in Merkin's office ever raised

any concerns about the records they received from BLMIS. Ex. 90 (Achilarre Dep.) at 98:8-10.

This practice was entirely industry norm; indeed, the Trustee's own expert, Pomerantz,

acknowledged that he does not review trade confirmations but relies on the same type of

summary reports as Merkin received, reviewed and relied on. Reply Ex. 2 (Pomerantz Dep.) at

220:22-221:13 (the receipt and reconciliation of trade confirmations are "administrative

function[s]")).[7]

Nor is there merit to the Trustee's contention that hundreds of transactions supposedly

occurred outside the daily high-low price range. Pomerantz admitted that there would be almost

no trades outside the daily ranges but for the fact that he adjusted each pre-2006 trade listed on

the BLMIS trade confirmations by four cents per share. SOF ¶¶ 130, 169; Ex. 9 (Pomerantz

Dep.) at 227:2-9, 230:6-234:17. The Trustee claims that such adjustment was appropriate

because BLMIS trade confirmations said the trade price "includes a commission equivalent of

$.04 per share," Opp. at 22, but Pomerantz admitted that he did not know whether the four cent

"commission equivalent" would have affected the price reported to an exchange. Ex. 9

(Pomerantz Dep.) at 230:24-231:3, 232:10-18, 233:15. Tellingly, the Trustee's opposition does

not address that question. Pomerantz further admitted that if the Funds paid the trade price

including the commission, then that trade would be within range even though he calculated it as

out-of-range, but testified that he did not know how many trades fell into this category. *Id.* at

233:22-234:17.[8]

---

[7]    The Trustee argues that back office personnel testified that when a discrepancy was identified during the reconciliation process, Madoff would improperly issue additional confirmations to eliminate the discrepancy, and that the correction of such discrepancies was a red flag. In fact, the accounting personnel explained that far from being a cause for concern, these isolated occurrences were an entirely normal part of any reconciliation process. Reply Ex. 9 (Autera Oct. 22, 2014 Dep.) at 180:22-181:3; Ex. 96 (Gordon Dep.) at 48:21-49:5. More fundamentally, none of the employees ever raised this as a concern to Merkin (Reply Ex. 10 (Balsam Dep.) at 78:20-25; Ex. 90 (Achilarre Dep.) at 98:8-10), and therefore it cannot form the basis of willful blindness.

[8]    In an attempt to cover up this deficiency, the Trustee argues that even without Pomerantz's price adjustments, 462 trades would have been out of the price range. Opp. at 22. The Trustee disregards the other mistakes Pomerantz admitted he made with respect to identification of those trades. *See* Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-20, 227:2-9, 230:6-234:17, 234:20-240:17. And it is too late for Pomerantz to change or supplement his opinions. *See* FED. R. CIV. P. 26(e)(a)(2); *Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 31, 35-36 (S.D.N.Y. 2014) (explaining that a party who fails to properly introduce expert testimony under Rule 26(a) cannot use that testimony on a dispositive motion "'unless the failure was substantially justified or is harmless'" (quoting Fed. R. Civ. P. 37(c)(1))).

The Trustee's other red flag arguments – that BLMIS used a small auditing firm; self-cleared its trades; charged commissions rather than management fees; may have faced scalability limits; and that the Bayou fraud should have changed due diligence procedures – also fail.  For example, Merkin discussed these issues with Madoff, including the use of a small auditing firm, scalability limits and the Bayou fraud.  Reply Ex. 11 (Merkin Dep.) at 474:20-475:9, Ex. 84 (Merkin Dep.) at 508:15-510:10; Hoang Ex. 66 at 165:9-14.  Merkin also understood that BLMIS self-cleared, and believed it would have been unusual for a major market maker not to self-clear – just as unusual as it would have been for Goldman Sachs or Merrill Lynch not to clear accounts that they managed.  Ex. 84 (Merkin Dep.) at 169:13-21, 172:5-174:17, 177:12-19, 179:11-182:7.  Similarly, it was not unusual for a broker-dealer to charge only a commission schedule and not a management or performance fee on discretionary managed accounts, and Merkin discussed the fee structure with Madoff.  Hoang Decl. Ex. 19 at GCC-P 0393369.

In short, Merkin's failure to perform quantitative analysis is not evidence of willful blindness.  Rather, the due diligence performed by the Merkin Defendants was consistent with prevailing industry standards.  *See* Ex. 11 (Weingarten Expert Report) at 2, 6.

      2.      Merkin Widely Disclosed The Funds' Investments In BLMIS

The Trustee argues that Merkin lied to investors about BLMIS and that this demonstrates that Merkin was aware of facts suggesting a high probability of fraud.  (Opp. at 50-51.)  The Trustee is wrong both factually and legally.  Far from lying to investors about the Ascot's exposure to BLMIS, the evidence adduced in this case shows that Merkin regularly discussed with investors that substantially all of Ascot's assets were invested with Madoff.

The Trustee's claims that "Merkin hid the Merkin Funds' relationship with BLMIS from his investors entirely" and misrepresented "that Morgan Stanley was the only custodian for Ascot Partners."  Opp. at 51.  Those contentions are belied by the Funds' offering documents.

14

Both Ascot Partners and Ascot Fund's Offering Memoranda disclosed that "Morgan Stanley & Co., Inc. and [BLMIS] currently serve as the principal prime brokers and custodians."  Ex. 15 at 8-9, 28; Ex. 17 at 13, 31.  Merkin also explained that his practice in explaining Ascot Partners to investors and potential investors was to "mak[e] sure they understood that the strategies were executed through Madoff."  Reply Ex. 12 (Merkin Dep. (Jan. 30, 2009)) at 165:18-20.

Indeed, dozens of specific written communications and documentary evidence show that investors and potential investors were regularly told about Madoff's role in Ascot.  A few examples are worth noting to demonstrate the breadth of the disclosures.  Japanese bank Aozora, which invested $75 million in Ascot Fund (purportedly valued at more than $107 million as of November 30, 2008) and $50 million in Ariel, was told that "[s]ubstantially all of Ascot Fund's assets are allocated and held at Bernard L. Madoff Investment Securities LLC" and that between 10% and 25% of Ariel's portfolio had also been invested with Madoff.  Ex. 72.  In response to a question from Renee Nadler of Tufts University, which invested $20 million in Ascot Partners (purportedly worth approximately $26 million as of November 30, 2008), Autera advised that historically and in 2007 more than 95% of Ascot Partners was invested with Madoff and less than 5% was devoted to other strategies.  Reply Ex. 13.  And it was widely disclosed to the entire Yeshiva University Board of Trustees – which included many individual investors in Ascot – that Ascot Partners was "essentially managed by Bernard Madoff."[9]  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU

---

[9]     Among the small handful of investors the Trustee argues did not know about Madoff's role in Ascot is Morris Smith.  Mr. Smith acknowledged that, in around the late 1990s or early 2000s, he learned that "Bernie Madoff or Madoff security . . . were, in a sense, the executing broker of the strategies," Hoang Ex. 48 (Smith Dep.) at 36:5-19, but claimed not to have a complete understanding of Madoff's role.  Mr. Smith was, however, a member of the Yeshiva University Investment Committee from 2000 to January 2009; his memory failures simply cannot be reconciled with the disclosures to the Yeshiva community.

15

0000724), at YU0000730 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners L.P.)").

In addition, as set forth in Defendants' opening brief, Merkin took other sophisticated investors to meet with Madoff, including representatives from UBP – which invested more than $487 million total and had net capital investments of $380 million in the Funds.  Opening Mem. at 11 (citing SOF ¶¶ 139-41; Ex. 87 (Merkin Dep., *State of N.Y. v. Merkin*, July 1, 2010) at 20:9-18).  Indeed, after a November 25, 2008 meeting among Madoff, Merkin, GCC's CFO Autera, and four UBP representatives, the bank continued to invest hundreds of millions of dollars in Ascot.  *See id.* (citing SOF ¶ 143).  Merkin also brought a Reichmuth & Co. employee and the founder of Research Company A to meet with Madoff in 2007, and Research Company A's clients maintained their $20 million investments in Ascot after this meeting through the time of Madoff's confession.  *See id.* at 11-12 (citing SOF ¶¶ 145-46).  Yet another meeting was held among Merkin, Madoff, and Gedale Horowitz, an Ascot investor and also a member of the Investment Committee of Yeshiva University, another investor in Ascot.  *See id.* at 12 (citing SOF ¶ 150).

Not only large investors knew about Madoff's role in the Funds.  When Mary Thomajan from Austin, Texas, who had a comparatively small investment in Ascot Partners (valued at approximately $1.5 million as of November 30, 2008), made her initial $750,000 investment in Ascot Partners, her lawyer wrote to Merkin that "Mary and I look forward to working with you and Bernie Madoff as it relates to Ascot Partners, L.P."  Reply Ex. 16.  Similarly, in September 1992, Autera confirmed to Ralph Kestenbaum that "Ascot's sole investment is a managed account at Bernard L. Madoff & Co."  Reply Ex. 17.  As late as November 2008, Walter Link of M&H Properties (which had $827,000 invested in Ascot Fund) wrote to Autera to confirm his

16

understanding that Ascot Partners "presently [is] invested 100% in Madoff and that the fee is

1.5% with no further costs or deductions on the Madoff results." Reply Ex. 18.

On top of Merkin's own testimony and undisputed documents produced to the Trustee

showing that the vast majority of investors in Ascot knew that substantially all of Ascot's assets

were invested with Madoff, witness after witness called by the Trustee candidly admitted that

Merkin openly explained Madoff's role, regardless of whether they had already invested or were

considering making an investment. *See, e.g.*, Ex. 93 (Harrington Dep.) at 164:17-25 (agreeing

that "it was 100 percent clear in [her] mind that [Merkin], in fact, was delegating some

substantial percentage of Ascot's assets to BLMIS"); Reply Ex. 19 (Founder of Research

Company A Dep.) at 35:22-36:6 (testifying that by 2003 he knew Ascot Fund was a feeder fund

for BLMIS); Reply Ex. 20 (████ Dep.) at 131:1-25 (testifying that he learned from a client

before December 11, 2008 "that Ascot certainly had a significant exposure to Madoff, and

subsequent to that understanding I became aware that Gabriel and Ariel may have had some

exposure to Madoff."); Reply Ex. 21 (████ Dep.) at 118:18-119:6 (agreeing that "Mr. Merkin

ma[d]e it clear that Ascot was entirely or almost completely invested with Madoff")); Reply Ex.

22 (████ Dep.) at 61:15-62:9; 66:11-68:3 (testifying that he understood both Ascot Partners

and Ascot Fund "to be primarily a Madoff feeder fund"); *see also* Ex. 80 at 5 (Defendants' sworn

interrogatory response specifying the numerous investors with specific knowledge of Madoff's

role); SOF ¶¶ 120-27 (BDO knew that Ascot Partners invested a significant portion of assets in a

managed account with Madoff and referred to Ascot Partners as a "Madoff feeder product").

Even if investors did not know about or were unsure of the details of BLMIS's role, the

Funds' governing documents expressly allowed Merkin to delegate investment discretion and

imposed no corresponding duty to disclose any such delegation. *See* Ex. 15 (Ascot Partners

17

Confidential OM) at 17; Ex. 16 (Ariel Confidential OM) at 40-41; Ex. 17 (Ascot Fund

Confidential OM) at 25-26; Hoang Ex. 57 (Gabriel Confidential OM) at 28; *see also In re J.*

*Ezra Merkin & BDO Seidman Sec. Litig.*, 817 F. Supp. 2d 346, 355-56 (S.D.N.Y. 2011)

(dismissing a class action against the Merkin Defendants and finding that the Funds' offering

documents expressly permitted delegation to a brokerage account managed by Madoff).

Moreover, even if the Trustee's allegation that Merkin had lied to investors was true – and it is

not – it is simply irrelevant to whether Merkin was willfully blind to the Madoff fraud.

The Trustee argues that the fees collected in connection with Funds' investments with

BLMIS gave Merkin "substantial motive to avoid confirming fraud at BLMIS." (Opp. at 55.)

This argument ignores that Merkin had invested approximately $110 million of his and his

family's money with BLMIS through the Funds.[10] SOF ¶ 159. Similarly, GCC's CFO, Michael

Autera invested a substantial portion of his own money in Ascot Partners and Gabriel, fully

aware that substantially all of Ascot Partners' and a portion of Gabriel's assets were invested

with BLMIS. *See* Ex. 91 (Autera Dep.) at 110:22-112:1, 117:12-118:22. That, too, completely

undermines any assertion that the Merkin Defendants were willfully blind to Madoff's massive

fraud. *In re Merkin*, 817 F. Supp. 2d at 357 n.8 ("Merkin's significant personal exposure to

Madoff's fraud also belies any inference of intent.").

## POINT II

## THE TRUSTEE'S SUBSEQUENT TRANSFEREE
## AND GENERAL PARTNER LIABILITY CLAIMS FAIL

---

[10] The Trustee contends that there is no evidence that Merkin had losses or that they were profits not principal, but the Trustee has extensive records documenting the investments and withdrawals of all of the Funds' investors in BLMIS, including the investments made by Merkin and his family. GCC-P 0870890–0886910, *see* Reply Decl. ¶ 4.

The Trustee can prevail on Claims Nine (subsequent transferee liability) and Ten (general partner liability) only if he prevails on his avoidance claims *and* Ascot Partners is unable to satisfy the resulting judgment. *See* 11 U.S.C. § 550(a), (d); DEL. CODE ANN. tit. 6, § 15-306 (West 2015); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 149 (Bankr. S.D.N.Y. 2014). The Merkin Defendants are entitled to summary judgment on those claims because the Trustee cannot prevail on his avoidance claims. *See supra* Point I. Moreover, even if the Trustee prevailed on the fraudulent conveyance claim, Ascot Partners would be able to satisfy any judgment. Accordingly, summary judgment dismissing the subsequent transferee and general partner liability claims is well-warranted.

**A.    If The Avoidance Claims Were Successful Ascot Would Be Entitled To An Amount Equal To Or Greater Than Any Potential Judgment**

Under the Securities Investor Protection Act of 1970 ("SIPA"), "[c]ustomer property remaining in the possession of the debtor at the time of filing for bankruptcy is allocated to this separate customer property estate for distribution according to SIPA's statutory priorities, under which customers of the debtor 'share ratably in such customer property on the basis and to the extent of their respective net equities.'" *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416, 420 (S.D.N.Y. 2013) (quoting 15 U.S.C. § 78fff–2(c)(1)). Additionally, a SIPA trustee is empowered to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property." *Id.* (quoting 15 U.S.C. § 78fff–2(c)(3)). A "customer," under SIPA, includes "any person who has deposited cash with the debtor for the purpose of purchasing securities." 15 U.S.C. § 78lll(2)(B)(i).

19

Section 502(h) "gives a pre-petition claim to a fraudulent transferee where the trustee recovers the transfer under [Bankruptcy Code Section] 550" as long as the "transferee gave consideration for the avoided transfer." *Gowan v. HSBC Mortg. Corp. (USA) (In re Dreier LLP)* (*Gowan II*), No. 08-15051, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012) (internal citations omitted). "Section 502(h) is based on the principle of fraudulent transfer law that the return of a fraudulent transfer restores the parties to the *status quo*." *Id*. Thus, in the case of a customer of a debtor in a SIPA proceeding, a pre-petition claim under Section 502(h) entitles the customer to a ratable share of the customer property estate. *See In re Bankvest Capital Corp.*, 375 F.3d 51, 67 (1st Cir. 2004) ("the 502(h) claim takes on the characteristics of the original claim, including, in this case, its secured status.").

In this case, in the unlikely event that the Trustee were to succeed on his fraudulent conveyance claim, he will recover $280 million. There is no dispute that because Ascot Partners is a significant net loser, and gave value for that $280 million, that money would be treated as a customer claim. *See Sec. Inv'r Prot. Corp.*, 499 B.R. at 420. Under Section 502(h), Ascot Partners would therefore be entitled to a pre-petition claim against the customer fund up to the amount of consideration given for the avoided transfer, in this case $280 million. *See Gowan II*, 2012 WL 4867376, at *3. In addition, the Trustee has already acknowledged that Ascot has a net equity claim for at least $226 million in the SIPA proceeding. Ex. 6 (Greenblatt Report) at Ex. 4P. Added to a $280 million claim under Section 502(h), Ascot Partners would have a claim of at least $506 million against the customer fund. It is also undisputed that the distributions to date have exceeded 55% of allowed net equity claims. Hence, the minimum initial distribution to Ascot Partners would be approximately $281 million, or at least $1 million more than the maximum amount it could owe. (Opening Mem. at 27-28.) Ascot Partners would continue to

receive additional distributions in the future.  Thus there is no doubt that Ascot will be able to

satisfy any judgment against it, rendering the Trustee's subsequent transferee claim pointless.

The Trustee does not dispute any of these facts.  Rather, the Trustee argues that under the

Bankruptcy Code, absent the Trustee's consent, Ascot Partners cannot engage in a cashless setoff

in the manner described above, and instead would have to pay the full $280 million in to the

SIPA fund and then immediately receive a distribution back of $281 million.  But more than a

century ago, in *Page v. Rogers*, the Supreme Court rejected such a formulaic approach:

> [I]t is entirely practicable to avoid the circuitous proceeding of
> compelling the defendant to pay into the bankruptcy court the full
> amount of the preference which he has received, and then to resort
> to the same court to obtain part of it back by way of dividend.  The
> defendant may be permitted, if he shall be so advised, to prove his
> claim against the estate of the bankrupt, and the bankrupt court
> then may settle the amount of the dividend coming to him, and the
> final decree may direct him to pay over the full amount of his
> preference, with interest less the amount of his dividend.

211 U.S. 575, 581 (1909).  While *Page* long precedes the Bankruptcy Code, it remains good law

today.  *See In re TI Acquisition, LLC*, 410 B.R. 742, 748 n.1 (Bankr. N.D. Ga. 2009) ("the

preference defendant could deduct his dividend from the preference amount, including interest");

*In re Falcon Prods, Inc.*, NO. 4:07-cv-1495,  2008 WL 363045, at *10 (E.D. Mo. Feb. 8, 2008)

(citing *Page* and upholding the Bankruptcy Court's grant of summary judgment in favor of the

defendant because it recognized "the futility of going through the exercise of avoiding the

Transfers and then paying them back.").

In *In re Bankvest Capital Corp.*, the First Circuit applied this principle in the Section

502(h) context.  The Court agreed that avoidance would be "for naught" where the creditor

would recover the entire avoided payment under Section 502(h).  375 F.3d at 56-57 ("Fleet, as a

secured creditor, could now recover [post-petition payments] under its so-called 502(h) claim, to

which it had become entitled following avoidance, thus rendering futile Gray's right to

avoidance."). Thus, the Court of Appeals affirmed the district court's ruling denying the

trustee's avoidance claims because they would be "pointless" given the creditor's Section 502(h)

claims. *Id.* at 71. Requiring a round-trip payment of any judgment followed by distributions of a

greater amount, rather than a cashless netting of the amounts, would be equally pointless.

### B. The Trustee Cannot Execute A Judgment Against Merkin As The General Partner Of Ascot Because None Of The Statutory Exceptions Apply

The Trustee mistakenly argues that he can recover against Merkin as general partner of

Ascot under Delaware law. (Opp. at 62 n.13.) As an initial matter, as noted in the opening brief,

a claim based on general partner liability is not one of the claims specifically enumerated in

Section 550(a) that survive the statutory safe harbor. (Opening Mem. at 27 n.7.) The general

partner liability claim should be dismissed for that reason alone.

Even if Merkin could be held liable as a general partner for Ascot Partners' debts, the

Trustee as a third party may execute a judgment against the general partner in only five limited

circumstances:

> (1) A judgment based on the same claim has been obtained against the limited partnership and a writ of execution on the judgment has been returned unsatisfied in whole or in part;

> (2) The limited partnership is a debtor in bankruptcy;

> (3) The general partner has agreed that the creditor need not exhaust the assets of the limited partnership;

> (4) A court grants permission to the judgment creditor to levy execution against the assets of the general partner based on a finding that the assets of the limited partnership that are subject to execution are clearly insufficient to satisfy the judgment, that exhaustion of the assets of the limited partnership is excessively burdensome, or that the grant of permission is an appropriate exercise of the court's equitable powers; or

> (5) Liability is imposed on the general partner by law or contract independent of the existence of the limited partnership.

DEL. CODE ANN. tit. 6, § 17-403(d)(1)-(5) (West 2015).  None of these circumstances exists here.

Ascot Partners has sufficient means to satisfy any judgment against it; Ascot is not a debtor in

bankruptcy; Merkin has not agreed that the Trustee does not need to exhaust Ascot's assets;

Merkin has no independent liability to the Trustee; and no court has granted permission for the

Trustee to execute the judgment against Merkin's assets.  *See id.*  Thus, the Trustee's general

partner liability claim cannot succeed.

**POINT III**

**THE TRUSTEE'S EQUITABLE SUBORDINATION
CLAIM FAILS BECAUSE THERE WAS NEITHER
<u>GROSS AND EGREGIOUS CONDUCT NOR INEQUITABLE CONDUCT</u>**

The Trustee concedes that his equitable subordination claim is only an alternative to his

fraudulent transfer claims and that he cannot recover on both.  *See* (Opp. at 67) ("Should the

Trustee avoid and recover all of the transfers he seeks, the Trustee does not disagree that

equitable subordination could be moot."); *Picard*, 515 B.R. at 161 ("It would seem that the

Trustee should not be able to equitably subordinate the § 502(h) claim because the return of the

avoided transfer would compensate the estate for the injury caused by the fraudulent transfer,

and the estate cannot recover damages and equitable subordination for the same wrong.").

In addition, the Trustee cannot prevail on his equitable subordination claim unless he also

prevails on his fraudulent conveyance claim and then has to elect a remedy because the standard

required for equitable subordination is more demanding – or, at the very least, no less demanding

– than the willful blindness standard.  *Compare Global Tech Appliances, Inc. v. SEB S.A.*, 131 S.

Ct. 2060, 2070-71 (2011) ("Under this formulation, a willfully blind defendant is one who takes

deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be

said to have actually known the critical facts.") *with In re 80 Nassau Assocs.*, 169 B.R. 832, 840

(Bankr. S.D.N.Y. 1994) ("In the absence of a contractual breach, the proponent must

23

demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity.").

Even if the Trustee could prevail on willful blindness, equitable subordination is still inappropriate. The Trustee must show Ascot Partners "engaged in 'gross and egregious' conduct 'tantamount to fraud, misrepresentation, overreaching or spoliation.'" *Gowan v. Wachovia Bank, N.A.* (*In re Dreier LLP),* 453 B.R. 499, 516 (Bankr. S.D.N.Y. 2011) (Bernstein, J.) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.),* 169 B.R. 832, 838-39 (Bankr. S.D.N.Y. 1994)). Where, as here, a non-insider allegedly engaged in inequitable conduct, "the level of . . . proof is significantly higher . . . [and] [a]lthough . . . equitable subordination can apply to a non-insider creditor, the circumstances are few and far between." *In re Eufaula Indus. Auth.*, 266 B.R. 483, 489 (B.A.P. 10th Cir. 2001) (internal quotations and citations omitted). No triable issue of fact exists as to whether Defendants were willfully blind to Madoff's fraud, and therefore, no triable issue of fact exists as to whether Defendants engaged in "gross and egregious [conduct] tantamount to fraud, misrepresentation, overreaching or spoliation." *Id.* (internal quotations omitted).

Contrary to the Trustee's argument, courts routinely resolve equitable subordination issues when a creditor moves for summary judgment. *See e.g.*, *In re QuVis, Inc.*, 446 B.R. 490, 504 (Bankr. D. Kan. 2011) (granting summary judgment on equitable subordination claim), *aff'd sub nom In re QuVIS, Inc.*, 469 B.R. 353 (D. Kan. 2012), *aff'd,* 504 F. App'x 747 (10th Cir. 2012); *In re Phase I Molecular Toxicology, Inc.*, 287 B.R. 571, 580 (Bankr. D.N.M. 2002) (same); *In re Auto Specialties Mfg. Co.*, 153 B.R. 457, 494 (Bankr. W.D. Mich. 1993) (same), *adopted,* 153 B.R. 503 (W.D. Mich. 1993); *Sel-Way, Inc. v. United States*, No. 95-4485, 1997 WL 154114, at *2 (Bankr. E.D. Mich. Jan. 22, 1997) (same), *aff'd sub nom. Gordon Sel-Way,*

*Inc. v. United States*, 217 B.R. 221 (E.D. Mich. 1997); *In re Vermont Elec. Generation & Transmission Co-op., Inc.*, 240 B.R. 476, 486 (Bankr. D. Vt. 1999) (same); *In re Audre, Inc.*, 210 B.R. 360, 363 (Bankr. S.D. Cal. 1997) (same).[11]

In any event, if the Trustee prevailed on his equitable subordination claim and elected that as a remedy, he would have no judgment for monetary damages against Ascot Partners or any of the other Defendants. Accordingly, the presence of the equitable subordination claim is insufficient to provide a basis for maintaining the futile general partner and subsequent transferee claims against the Merkin Defendants.

## Conclusion

For the foregoing reasons, and those in their opening brief, Defendants J. Ezra Merkin and Gabriel Capital Corporation respectfully request that the Court grant summary judgment and dismiss all of the Trustee's remaining claims.

Dated:      New York, New York
            December 23, 2015

                                DECHERT LLP

                                By:  *  /s/ Neil A. Steiner*
                                         Andrew J. Levander
                                         Neil A. Steiner
                                1095 Avenue of the Americas
                                New York, New York 10036
                                andrew.levander@dechert.com
                                neil.steiner@dechert.com
                                (212) 698-3500

                                *Attorneys for Defendants J. Ezra Merkin and*
                                *Gabriel Capital Corporation*

---

[11] By contrast, the cases relied on by the Trustee are readily distinguishable. *See In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007) (applying motion to dismiss standard); *In re Mid-Am. Waste Sys., Inc.*, 274 B.R. 111, 126 (Bankr. D. Del. 2001) (denying debtor summary judgment on equitable subordination claim where creditor "does not yet have an allowed claim").