**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 09-01182 (SMB) |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

**DEFENDANTS' JOINT RESPONSES TO THE**
**TRUSTEE'S ADDITIONAL STATEMENT OF MATERIAL FACTS**

Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC") (collectively, "Merkin Defendants"), and Ralph C. Dawson, as Receiver for Ascot Partners, L.P. ("Ascot Partners"), and Ascot Fund Limited ("Ascot Fund") (Ascot Partners and Ascot Fund, collectively "Ascot"), in further support of their respective motions for summary judgment

jointly submit this response to the Trustee's Statement of Additional Material Facts Pursuant to Local Bankruptcy Rule 7056-1 (ECF No. 298).[1]  Nothing in the Trustee's Statement creates a dispute of material fact.

1.      Merkin is a graduate of Columbia College and Harvard Law School.  Declaration of Lan Hoang, dated November 25, 2015 ("Hoang Decl."), Ex. 8 (Merkin Dep.) at 9:13-10:3.

**Defendants' Response**:  Not disputed.

2.      Merkin was associated with the law firm of Milbank, Tweed, Hadley & McCloy from 1979 to 1982.  Hoang Decl., Ex. 8 (Merkin Dep.) at 11:15-25, 15:12-16; Merkin Defs. Ans. ¶ 40, ECF No. 261.

**Defendants' Response**:  Not disputed.

3.      Merkin was associated with Halcyon Investments from 1982 to 1985 and served as a Managing Partner of Gotham Capital L.P. from 1985 to 1988.  Hoang Decl. Ex. 8 (Merkin Dep.) at 15:17-22, 30:19-31:10; Merkin Defs. Ans. ¶ 40, ECF No. 261.

**Defendants' Response**:  Not disputed.

4.      Merkin served as chairman of the board of General Motors Acceptance Corporation from 2006 to 2009 and resigned as the chairman of the board of General Motors Acceptance Corporation after the fraud at BLMIS became public.  Merkin Defs. Ans. ¶ 40, ECF No. 261.

**Defendants' Response**:  Not disputed.

5.      Merkin served on the investment committee of the Ramaz School, Carnegie Hall, and Yeshiva University.  Merkin Defs. Ans. ¶ 41; Third Amend. Compl. ¶ 41, ECF No. 151.

**Defendants' Response**:  Not disputed.

---

[1]      The Trustee's additional facts are referred to herein as "AF."

6.     Merkin served on the board of directors of the Beyeler Foundation and Museum, Carnegie Hall, Columbia College, the Gruss Foundation, and the Levy Economics Institute of Bard College.  Merkin Defs. Ans. ¶ 41; Third Amend. Compl. ¶ 41, ECF No. 151.

**Defendants' Response**:  Not disputed.

7.     Merkin served as the chairman of the investment committees of Yeshiva University and the UJA Federation of New York.  Merkin Defs. Ans. ¶ 41; Third Amend. Compl. ¶ 41, ECF No. 151.

**Defendants' Response**:  Not disputed.

8.     Merkin and Madoff served on the board of directors of Yeshiva University. Hoang Decl. Ex. 8 (Merkin Dep.) at 428:2-17.

**Defendants' Response**:  Not disputed.

9.     Merkin testified that he "first invested with Mr. Madoff and BLMIS through [Leon] Meyers and the Scheuer family's account with Mr. Madoff."  Steiner Decl. Ex. 80 (Supplemental Responses) at 3; Hoang Decl. Ex. 55 (Verification).

**Defendants' Response**:  Not disputed.

10.     The Scheuer family office, also known as 61 Associates, managed an investment vehicle known as 61M that invested with Madoff.  Hoang Decl. Ex. 8 (Merkin Dep.) at 151:25-152:18, 373:11-15.

**Defendants' Response**:  Not disputed.

11.     Merkin claims that this personal investment occurred as "part of the initial due diligence that preceded any investments on the part of the funds, and was sort of the initial due diligence process."  Hoang Decl. Ex. 8 (Merkin Dep.) at 153:8-22.

**Defendants' Response**: Not disputed.  Merkin further testified that investment through 61M and the related meetings with Madoff were "part of the initial due diligence that preceded any investments on the part of the funds, and was sort of just the beginning of the due diligence process."  Hoang Decl. Ex. 8 (Merkin Dep.) at 153:17-22.

12.    Merkin has no recollection of whether Leon Meyers ("Meyers") ever told him that Meyers conducted due diligence on BLMIS.  Hoang Decl. Ex. 8 (Merkin Dep.) at 374:5-16.

**Defendants' Response**:  AF 12 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  The United States Court of Appeals for the Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *The R.W. Grand Lodge of Free & Accepted Masons of Pa. v. Meridian Cap. Partners, Inc.*, -- Fed. App'x --, 2015 WL 8731547, at *2 (2d Cir. Dec. 15, 2015); *see also Reyes v. Krasdale Foods, Inc.*, 945 F. Supp. 2d 486, 490 (S.D.N.Y. 2013) ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).  In addition, the Trustee mischaracterizes Merkin's testimony, and thus AF 12 is misleading and raises no genuine issue of material fact.  Merkin testified that "Madoff was a theme of [Meyers and his] conversations, surely not every one, but was a constant theme of our conversations. Performance would certainly have been part of it.  Most of them focused on visits, telephone calls, understandings, changes in the strategy, possible changes in the strategy, and was he in or was he out."  Hoang Decl. Ex. 8 (Merkin Dep.) at 375:20-376:19.

13.    Merkin does not have any documentation of his purported discussions with Meyers.  Hoang Decl. Ex. 8 (Merkin Dep.) at 374:17-375:8.

**Defendants' Response**:  The Trustee mischaracterizes Merkin's testimony, and thus AF 13 is misleading and raises no genuine issue of material fact.  Merkin testified that he believed he did receive documents from Meyers and that it would likely be contained in his Madoff file.  Hoang Decl. Ex. 8 (Merkin Dep.) at 374:17-375:8; *see also id.*at 370:22-371:19.   It is also irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2; *see also Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

14.     During his initial due diligence, Merkin claims that Meyers sent him a document with "a column of figures, one set of figures being years, meaning annual dates, and the other one being performance," and that he kept the document in his file.  Hoang Decl. Ex. 8 (Merkin Dep.) at 370:12-371:19, 374:17-375:8.

**Defendants' Response**:  The Trustee mischaracterizes Merkin's testimony, and thus AF 14 is misleading and raises no genuine issue of material fact.  Merkin did not testify that Meyer sent that document to him during any due diligence or at any specific time, nor did Merkin testify that he could recall specifically receiving or placing such document anywhere.  Hoang Decl. Ex. 8 (Merkin Dep.) at 370:22-371:19.  He testified that he believed he did receive 61M's record with Madoff and that he believed it would be contained in his Madoff file.  *Id.*  In fact, Merkin's Madoff file did contain such document.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393127.  AF 14 is also irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2; *see also Reyes*, 945 F. Supp. 2d at

490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

15.     Merkin's "Madoff File" contains no documents setting forth BLMIS's purported investment performance that could have been created prior to opening BLMIS account nos. 1FN004 in the name of Ariel Fund Ltd. and 1A0042 in the name of Ariel Capital on or about October 1, 1990.  *See* Hoang Decl. Ex. 19 (Trustee 363).  A document identifying "BEMIS" performance data from 1980 through 1991, and could not have been created before the end of 1991.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393127.

**Defendants' Response**:  AF 15 is irrelevant to the claims and defenses in this case and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2; *see also Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

16.     The only document evidencing Merkin's investment with 61 Associates is a schedule of gains and losses for the period from January 1, 1992 through December 31, 1992.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393168-3171.

**Defendants' Response**:  AF 16 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2; *see also Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

17.     There is no evidence, other than Merkin's unsubstantiated testimony, that he conducted any due diligence on BLMIS prior to opening BLMIS account nos. 1FN004 in the name of Ariel Fund Ltd. and 1A0042 in the name of Ariel Capital on or about October 1, 1990.

**Defendants' Response**:  AF 17 is misleading and raises no genuine issue of material fact.  Defendants have provided significant, uncontroverted evidence of the due diligence Merkin conducted on BLMIS.  Defendants' Rebuttal to Trustee's Response to Joint Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1 ("Rebuttal JSOMF") ¶¶ 78-94. Further, the Trustee has provided no evidence that Merkin's testimony lacks credibility or any evidence that contradicts Merkin's testimony.  *See John Hancock Life Ins. Co. v. Perchikov*, 553 F. Supp. 2d 229, 238 (E.D.N.Y. 2008) (finding that speculation about a witness's credibility based on "nonexistent inconsistencies" "is unsubstantiated and insufficient to raise an issue of material fact"); *Hahn v. Breed*, 606 F. Supp. 1557, 1562 (S.D.N.Y. 1985) ("[A] litigant cannot defeat a summary judgment motion merely by challenging the credibility of the witnesses on whose testimony the movant relies.").  In addition, AF 17 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at \*2; *see also Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

18.     GCC was incorporated in December 1988 as Ariel Management Corporation before changing its name to GCC.  Merkin Defs. Ans. ¶ 42, ECF No. 261.  GCC is an investment advisor and investment management corporation.  *See, e.g.*, Steiner Decl. Ex. 16 (Ariel Fund

Confidential Offering Memorandum, March 2006) at GCC-P 0335720 ("J. Ezra Merkin owns and manages Gabriel Capital Corporation which serves as the Investment Advisor of the Fund.").

**Defendants' Response**: Not disputed. GCC was the investment advisor of the fund prior to the appointment of the receiver.

19.    Merkin was GCC's sole shareholder, sole director, and sole decision-maker. Merkin Defs. Ans. ¶ 43, ECF No. 261; Hoang Decl. Ex. 17 (Merkin Responses and Obj to NYAG Statement of Undisputed Facts) ¶ 3.

**Defendants' Response**: Not disputed.

20.    Each of the Merkin Funds[2] executed a BLMIS Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options. Merkin Defs. Ans. ¶ 70, ECF No. 261; Ascot Ans. ¶ 70, ECF No. 260.

**Defendants' Response**: Not disputed.

21.    In 1988, Merkin formed Ariel Fund Limited ("Ariel") in 1988, as a private investment fund for foreign investors, and as the off-shore pairing to Gabriel Capital L.P. ("Gabriel"). Merkin Defs. Ans. ¶ 47, ECF No. 261; Steiner Decl. Ex. 16 (Ariel Fund Confidential Offering Memorandum, March 2006) at GCC-P 0335720; Hoang Decl. Ex. 17 (Merkin Responses and Obj to NYAG Statement of Undisputed Facts) ¶ 18; Hoang Decl. Ex. 8 (Merkin Dep.) at 70:3-42; 127:21-128:12; Hoang Decl. Ex. 56 (Merkin testimony-Born Arbitration) at 941:11-942:9.

**Defendants' Response**: Not disputed.

22.    In 1989, Merkin formed Ariel Capital, L.P., the predecessor to Gabriel, as a domestic fund for U.S. investors and was Gabriel's sole general partner and sole decision-maker

---

[2]  The Trustee refers to Ascot Partners, Ascot Fund, Ariel Fund Limited, and Gabriel Capital L.P. as the "Merkin Funds." Trustee's AF at p. 4 n.1.

through December 2008. Merkin Defs. Ans. ¶¶ 44-45, ECF No. 261; Hoang Decl. Ex. 57

(Gabriel Confidential Offering Memorandum, March 2006).

**Defendants' Response**: Not disputed.

23. Gabriel's and Ariel's offering memoranda state that Merkin, as the general partner

of Gabriel and the owner and manager of Ariel's investment advisor, "has ultimate responsibility

for the management, operations and investment decisions made on behalf of the Fund[s]."

Hoang Decl. Ex. 57 (Gabriel Confidential Offering Memorandum, March 2006) at GCC-SEC

0000875; Steiner Decl. Ex. 16 (Ariel Fund Confidential Offering Memorandum, March 2006) at

GCC-P 0335720.

**Defendants' Response**: Not disputed.

24. From at least October 1, 1990 through February 26, 1993, Ariel held BLMIS

account number 1FN004. Merkin Defs. Ans. ¶ 56, ECF No. 261; Declaration of Matthew B.

Greenblatt, dated November 25, 2015 ("Greenblatt Decl."), Ex. 3 (Greenblatt Expert Report) ¶¶

8, 21, Ex. 4A.

**Defendants' Response**: AF 24 is irrelevant to the claims and defenses in this case and

raises no genuine issue of material fact because Ariel and Gabriel have settled and been

dismissed from this action. *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are

irrelevant or unnecessary' are not material and thus cannot preclude summary judgment."

(quoting *Anderson*, 477 U.S. at 248)). To the extent AF 24 is relevant to the claims and defenses

in this action, it is not disputed.

25. Throughout its account history, Ariel BLMIS Account 1FN004 had (i) cash

deposits; (ii) deductions of principal for payments made by BLMIS to the IRS on the

accountholder's behalf; (iii) inter-account transfers received from BLMIS Account 1FN033, held

in the name of Shalvah Fund Ltd.; and, (iv) inter-account transfers made to Shalvah Fund BLMIS Account 1FN033, Ariel Capital BLMIS Account 1A0042, and Ascot Fund BLMIS Account 1FN005. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 21, 26-34, Ex. 4A.

**Defendants' Response**: AF 25 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action. *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)). To the extent AF 25 is relevant to the claims and defenses in this action, Defendants dispute that the Trustee's expert properly calculated Ariel's principal balance because he refused to credit a transfer of securities from Shalvah Fund Ltd. ("Shalvah") to Ariel on March 26, 1992. Declaration of Neil Steiner, dated December 23, 2015 ("Steiner Reply Decl.") Ex. 23 (MF00469043-MF00469044). By not taking into account that transfer, Shalvah's account, which closed later that year, under the Trustee's expert's calculation, had a principal balance of $9,706,832. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4B. The Trustee's expert, Matthew B. Greenblatt ("Greenblatt"), described his methodology for crediting inter-account transfers in his expert report, stating that he calculated a BLMIS accountholder's net equity by including "all inter-account transfers . . . up to the amount of principal available in the transferor's account on the day of the inter-account transfer." *Id.* ¶ 10. His report further stated that "An inter-account transfer is a non-cash transaction between BLMIS customer accounts in which no new funds entered or left BLMIS, but rather a book entry occurred at BLMIS to internally adjust the balances of those accounts." *Id.* ¶ 9. Greenblatt admits that, as written, his methodology as outlined in the report submitted in this action, does not state that only inter-account transfers of cash and not inter-account transfers of securities would be

credited.  Steiner Reply Decl. Ex. 24 (Greenblatt Dep.) at 91:4-93:13.  Rather, Greenblatt refers

to the report he authored and submitted in all Madoff-related cases to a provision describing his

methodology:  "At the direction of Trustee's counsel, no credit is given or removed for gains or

losses resulting from trades reflected on customer statements."  *Id.* at 62:24-64:19, 92:18-93:22.

But, had the securities been "liquidated" on the books and then transferred (as opposed to having

been transferred as securities), the principal remaining in the account at the time would have

been transferred and credited to Ariel.  *Id.* at 89:2-19, 95:7-19.  Greenblatt admitted that this does

not state that inter-account transfers of securities are excluded and testified that he would not

consider the inter-account transfer of a security as a "trade".  *Id.* at 63:7-64:7.  Instead, he

testified that such was "implied" by the language of the paragraph.  *Id.*  Whether or not the inter-

account transfer of securities from Shalvah to Ariel should be recognized is a legal, not factual,

dispute, as also admitted by Greenblatt.  *Id.* at 60:17-22 ("Q.  And you're not offering any

opinion as to the appropriateness of excluding the transfer of securities between BLMIS

accounts, correct?  A.  It calls for a legal conclusion, so all I'm offering is the calculation of the

methodology . . . .").  Such legal conclusion has not been heard or decided by any court.  *See*

Rebuttal JSOMF ¶¶ 66-68.

26.    On January 4, 1993, Ariel purported to transfer $35,041,794 from Ariel BLMIS

Account 1FN004 to Ascot Fund BLMIS Account 1FN005, but only $13,633,109 of principal

existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 33, Ex.

4A.

**Defendants' Response**:  AF 26 is misleading and raises no genuine issue of material

fact.  Defendants do not dispute that the Trustee's expert shows an attempted transfer from Ariel

BLMIS Account 1FN004 to Ascot Fund BLMIS Account 1FN005 in the amount of $35,041,794

and that the Trustee only shows a principal balance transfer of $13,633,109 to Ascot Fund. Defendants dispute, however, that the Trustee's expert's calculation of Ariel's principal balance as of January 4, 1993, is correct as a matter of law as described in Defendants' Response to AF 25 and Rebuttal JSOMF ¶¶ 66-68.

27.    The last activity in Ariel BLMIS Account 1FN004 occurred on February 26, 1993 when Ariel purported to transfer $13,853 to Ascot Fund BLMIS Account 1FN005, but no principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4A.

**Defendants' Response**:  AF 27 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 27 is relevant to the claims and defenses in this action, it is not disputed.

28.    From at least October 1, 1990 through February 26, 1993, Ariel Capital L.P., Gabriel's predecessor entity, held BLMIS account number 1A0042.  Merkin Defs. Ans. ¶ 60, ECF No. 261; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 35.

**Defendants' Response**:  AF 28 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 28 is relevant to the claims and defenses in this action, it is not disputed.

29.    Throughout its account history with BLMIS, Gabriel BLMIS Account 1A0042 had (i) cash deposits; (ii) inter-account transfers received from Ariel Fund 1FN004; and, (iii) inter-account transfers made to Ascot Partners Account 1A0058.    Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 36, 41-47, Ex. 4K.

**Defendants' Response**:  AF 29 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

30.    On January 4, 1993, Gabriel BLMIS Account 1A0042 purported to transfer $25,759,317 to Ascot Partners BLMIS Account 1A0058, but only $21,543,295 of principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 46, Ex. 4K.

**Defendants' Response**:  AF 30 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 30 is relevant to the claims and defenses in this action, it is not disputed.

31.    The last activity in the Gabriel BLMIS Account 1A0042 occurred on February 26, 1993 when Gabriel BLMIS Account 1A0042 purported to transfer $14,276 to Ascot Partners BLMIS Account 1A0058, but no principal existed in the account at that time.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 47, Ex. 4K.

**Defendants' Response**:  AF 31 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 31 is relevant to the claims and defenses in this action, it is not disputed.

32.    According to a partial transcript of a conversation purportedly held between Merkin and Madoff on May 1, 2000, Merkin asked Madoff for "two more slots" in order to open new accounts for Ariel and Gabriel.  Hoang Decl. Ex. 19 (Trustee Ex. 363) at GCC-P 0393384-387; Hoang Decl. Ex. 8 (Merkin Dep.) at 449:6-452:6.

**Defendants' Response**:  AF 32 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 32 is relevant to the claims and defenses in this action, Defendants submit that the cited document speaks for itself, and the Trustee's characterization raises no genuine issue of fact.

33.    Madoff agreed to "accommodate" Merkin because Madoff "had a relationship going back with Ezra many years; he's been a good friend, he's been a very good client."  Hoang Decl. Ex. 19 (Trustee Ex. 363) at GCC-P 0393385.

**Defendants' Response**:  AF 33 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are

irrelevant or unnecessary' are not material and thus cannot preclude summary judgment."

(quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 33 is relevant to the claims and defenses

in this action, Defendants submit that the cited document speaks for itself, and the Trustee's

characterization raises no genuine issue of fact.

34.    In August 2000, Ariel opened a new BLMIS account, depositing $46 million.  It

held BLMIS account number 1FR070 from August 2000 through December 2008.  Merkin Defs.

Ans. ¶ 57, ECF No. 261; Third Amend. Compl. ¶ 57, ECF No. 151; Declaration of Lisa M.

Collura, dated November 25, 2015 ("Collura Decl."), Ex. 1 (Collura Report) at Ex. 10;

Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 92, 103.

**Defendants' Response**:  AF 34 is irrelevant to the claims and defenses in this case and

raises no genuine issue of material fact because Ariel and Gabriel have settled and been

dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are

irrelevant or unnecessary' are not material and thus cannot preclude summary judgment."

(quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 34 is relevant to the claims and defenses

in this action, it is not disputed.

35.    In August 2000, Gabriel opened a new BLMIS account, depositing $39 million.

It held BLMIS account number 1G0321 from August 2000 through December 2008.  Merkin

Defs. Ans. ¶ 61, ECF No. 261; Third Amend. Compl. ¶ 61, ECF No. 151; Collura Decl. Ex. 1

(Collura Report) Ex. 10; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 118, 124.

**Defendants' Response**:  AF 35 is irrelevant to the claims and defenses in this case and

raises no genuine issue of material fact because Ariel and Gabriel have settled and been

dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are

irrelevant or unnecessary' are not material and thus cannot preclude summary judgment."

(quoting *Anderson*, 477 U.S. at 248)).  To the extent AF 35 is relevant to the claims and defenses in this action, it is not disputed.

36.     Ascot Fund opened BLMIS account number 1FN005 in January 1992.  Merkin Defs. Ans. ¶ 64, ECF No. 261; Ascot Ans. ¶ 64, ECF No. 260; Third Amend. Compl. ¶ 64, ECF No. 151; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 48, Ex. 4O.

**Defendants' Response**:  Not disputed.

37.     Throughout its account history, Ascot Fund BLMIS Account 1FN005 had (i) cash deposits; (ii) cash withdrawals; (iii) deductions of principal for payments made by BLMIS to the IRS on the accountholder's behalf; (iv) inter-account transfers received from BLMIS Accounts 1FN041 (in the name of Claude Dauphin), 1FN016 (in the name of Ebro, N.V.), 1FN042 (in the name of Willy R. Strothotte), 1FN022 (in the name of Langham Trading Inc.), 1FN039 (in the name of Dunraven NV), 1FN020 (in the name of Heaton Fund Limited), 1FN030 (in the name of Sandpiper Fund Ltd II), and 1FN031 (in the name of Sandpiper Fund Limited II #2); and, (v) inter-account transfers made to Ascot Partners Account 1A0058, Ariel Fund Account 1FR070, and Gabriel Account 1G0321.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 49, 54-74, Exs. 4C, 4D, 4E, 4F, 4G, 4H, 4I, 4J, 4O.

**Defendants' Response**:  AF 37 is incomplete and misleading, and raises no genuine issue of material fact.  Defendants dispute that the Trustee's expert's calculation of Ascot Fund's principal balance is correct as a matter of law as described in Defendants' Response to AF 25 and Rebuttal JSOMF ¶¶ 66-68.

38.     During at least 1992, Ariel Management Corporation administered the BLMIS accounts held by Dunraven, Heaton, Langham Trading Inc., Ebro, N.V., Sandpiper, Willy R. Strothotte, and Claude Dauphin and charged a 1% investment advisory fee.  Hoang Decl. Ex. 58

(Trustee 365); Hoang Decl. Ex. 59 (Trustee 366); Hoang Decl. Ex. 8 (Merkin Dep.) at 353:18-354:24.

**Defendants' Response**:    It is not disputed that Ariel Management Corporation administered certain accounts held by the specified persons.

39.    In December 1992, Merkin sent letters to the holders of certain BLMIS accounts that Ariel Management Corporation administered, informing them that their respective accounts at BLMIS would "be liquidated and the proceeds will be used to purchase participating shares of Ascot Fund Ltd."   Hoang Decl. Ex. 58 (Trustee 365); Hoang Decl. Ex. 8 (Merkin Dep.) at 354:25-355:19.

**Defendants' Response**: Not disputed.

40.    Merkin informed these investors that "[Ascot Fund's] sole asset will be a managed account at Madoff & Company."  Hoang Decl. Ex. 58 (Trustee 365) at BS00306003.

**Defendants' Response**: Not disputed.

41.    In January and February 1993, Ascot Fund BLMIS Account 1FN005 received transfers from BLMIS Accounts 1FN004, 1FN039, 1FN042, 1FN022, 1FN031, 1FN030, 1FN020, 1FN041, and 1FN016.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4O.

**Defendants' Response**: Not disputed.

42.    Ascot Partners opened account number 1A0058 with BLMIS in January 1993. Merkin Defs. Ans. ¶ 65, ECF No. 261; Ascot Ans. ¶ 65, ECF No. 260; Third Amend. Compl. ¶ 65, ECF No. 151; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 75, Ex. 4P.

**Defendants' Response**: Not disputed.

43. As general partner of Ascot Partners, Merkin had "ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership." *See* Steiner Decl. Ex. 15 at i, 1 (Confidential Offering Memorandum of Ascot Partners, L.P.).

**Defendants' Response**: Not disputed.

44. Throughout its account history, Ascot Partners BLMIS Account 1A0058 had (i) cash deposits; (ii) cash withdrawals; (iii) inter-account transfers received from Gabriel BLMIS Account 1A0042, BLMIS Account 1H0037 (in the name of Richard L. Hirsch), 1B0079 (in the name of Eric Bruell Trust), 1W0041 (in the name of Manny H. Weiss); and, (iv) inter-account transfers made to Ascot Fund Account 1FN005, Ariel Fund Account 1FR070, and Gabriel Account 1G0321. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 76, 81-93, Exs. 4L, 4M, 4N, 4P.

**Defendants' Response**: AF 44 is incomplete and misleading, and raises no genuine issue of material fact. Defendants dispute that the Trustee's expert's calculation of Ascot Partner's principal balance is correct as a matter of law as described in Defendants' Response to AF 25 and Rebuttal JSOMF ¶¶ 66-68.

45. During at least 1992, Ariel Management Corporation administered the BLMIS accounts held by Eric Bruell Trust, Richard L. Hirsch, and Manny Weiss and charged a 1% investment advisory fee. Hoang Decl. Ex. 59 (Trustee 366) at BS00305721; Hoang Decl. Ex. 8 (Merkin Dep.) at 347:9-349:15.

**Defendants' Response**: Not disputed.

46. In December 1992, Merkin sent letters to additional holders of certain BLMIS accounts that Ariel Management Corporation administered, informing them that their respective accounts at BLMIS would "be liquidated and the proceeds will be used to purchase participating

shares of Ascot Fund Ltd." Hoang Decl. Ex. 59 (Trustee 366) at BS00305722; Hoang Decl. Ex. 8 (Merkin Dep.) at 347:9-349:15, 359:16-361:8.

**Defendants' Response**: Not disputed.

47.    Merkin informed these investors that "[Ascot Partners'] sole asset will be a managed account at Madoff & Company." Hoang Decl. Ex. 59 (Trustee 366) at BS00305722.

**Defendants' Response**: Not disputed.

48.    In January and February 1993, Ascot Partners received transfers from BLMIS accounts 1B0079, 1W0041, 1H0037, and 1A0042 to its BLMIS account number 1A0058. Merkin Ans. ¶ 65; Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4P.

**Defendants' Response**: Not disputed.

49.    On January 8, 2003, Ascot Fund purported to transfer $551,296,800 to Ascot Partners BLMIS Account 1A0058, but only $221,487,622 of principal was available to be transferred. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 70, Ex. 4O.

**Defendants' Response**: AF 49 is misleading and raises no genuine issue of material fact. Defendants do not dispute that the Trustee's expert shows an attempted transfer from Ascot Fund BLMIS Account 1FN005 to Ascot Partners BLMIS Account 1A0058 in the amount of $551,296,800 and that the Trustee only shows a principal balance transfer of $221,487,622 to Ascot Partners. Defendants dispute, however, that the Trustee's expert's calculation of Ascot Fund's principal balance as of January 8, 2003, is correct as a matter of law as described in Defendants' Response to AF 25 and Rebuttal JSOMF ¶¶ 66-68.

50.    The Merkin Funds maintained the following percentages of their capital with BLMIS at year end:

| Year | Gabriel | Ariel | Ascot Partners | Ascot Fund |
|------|---------|-------|----------------|------------|
| 1990 | 24.01%  | 23.43% | N/A           | N/A        |

| Year | Gabriel | Ariel | Ascot Partners | Ascot Fund |
|------|---------|-------|----------------|------------|
| 1991 | 13.17% | 23.43% | N/A | N/A |
| 1992 | 21.34% | 21.83% | N/A | 101.08% |
| 1993 | N/A | N/A | 98.04% | 100.58% |
| 1994 | N/A | N/A | 99.87% | 101.01% |
| 1995 | N/A | N/A | 100.85% | 100.85% |
| 1996 | N/A | N/A | 91.62% | 94.70% |
| 1997 | N/A | N/A | 88.03% | 74.43% |
| 1998 | N/A | N/A | 91.03% | 83.11% |
| 1999 | N/A | N/A | 97.55% | 97.85% |
| 2000 | 7.13% | 7.96% | 100.04% | 100.25% |
| 2001 | 21.35% | 21.15% | 100.94% | 101.00% |
| 2002 | 30.32% | 29.18% | 100.01% | 100.94% |
| 2003 | 23.45% | 22.19% | 100.03% | N/A |
| 2004 | 19.54% | 20.86% | 94.39% | N/A |
| 2005 | 16.24% | 16.24% | 99.22% | N/A |
| 2006 | 23.76% | 23.53% | 99.36% | N/A |
| 2007 | 24.04% | 24.42% | 91.27% | N/A |

Hoang Decl. Ex. 16 (Madoff Investment History); Hoang Decl. Ex. 17 (Merkin Responses and Obj to NYAG Statement of Undisputed Facts) ¶¶ 37, 39.

**Defendants' Response**:  AF 50 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In addition, Defendants submit that the cited documents speak for themselves, and the Trustee's characterization raises no genuine issue of fact.

51.    "Merkin was a Fund Manager, a type of investment advisor in the investment management industry."  Declaration of Dr. Steve Pomerantz, dated November 25, 2015 ("Pomerantz Decl."), Ex. 1 (Pomerantz Expert Report) ¶ 43.

**Defendants' Response**:  AF 51 is not relevant to any claims or defenses in this matter and raises no genuine issue of fact.

52.    "Due diligence is a process whereby a Fund Manager initially investigates an investment to assess the attractiveness of an opportunity, the quality of the management team, the key risks associated with the opportunity, and continues to evaluate and monitor the investment on an ongoing basis."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 49.

**Defendants' Response**:  AF 52 is incomplete, misleading, and raises no genuine issue of fact.  Pomerantz testified that due diligence "means different things to different funds" and "ultimately is going to be defined by the information that you have available to you."  Ex. 9 (Pomerantz Dep.) at 36:21-37:8, 38:15-39:2; *see also* Ex. 11 (Weingarten Report) at 2 (stating there is no set formula for due diligence); ████████████████████ "'[D]ue diligence' is a term of art. It doesn't have any prescribed methodologies. They differ from firm to firm, people to people . . . .").  The Trustee's statement should be disregarded because it is not supported by the evidence in this case.  *Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

53.    The due diligence process (both before and after an investment is made) is designed to identify red flags as early as possible.  A red flag is information "that raises doubt or concern regarding an investment opportunity and can include: (i) any impossibilities where the only reasonable explanation is fraud; (ii) any indications that the advisor is not executing the strategy; (iii) any indicia of fraud or changes to the risk profile of the invested assets; (iv) any inconsistencies with the stated strategy; (v) any potential changes in the advisor and/or his organization, investment process, or philosophy; (vi) any situations that created an opportunity for fraud; and (vii) any inconsistencies with industry customs and practices."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 51; Pomerantz Decl. ¶ 6.

**Defendants' Response**: AF 53 is incomplete, misleading, and raises no genuine issue of

fact. Pomerantz testified that "the five P's are the objective standard, and then it is incumbent on

a fiduciary to accomplish the due diligence into each of those P's to the extent that data and tools

are available, and circumstances warrant." Ex. 9 (Pomerantz Dep.) at 88:16-21; *see, e.g.*, *id.* at

100:4-13 (admitting he did not review trade confirmations), 101:5-20 (admitting he did not

compare transaction prices against daily highs and lows); Ex. 7 (Hirsch Dep.) at 63:22-64:14

(agreeing that reverse engineering a fund's strategy is not standard due diligence procedure).

The Trustee's statement should be disregarded because it is not supported by the evidence in this

case. *Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a

Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed

independently.").

54.     As far back as 1997, fund managers and hedge funds performed analyses to

understand the source of returns of a particular investment as part of due diligence in accordance

with recognized customs and practices of the investment management industry. Pomerantz Decl.

Ex. 1 (Pomerantz Expert Report) ¶¶ 34, 35; Hoang Decl. Ex. 32 (Pomerantz Dep.) at 204:7-24.

**Defendants' Response**: AF 54 is incomplete, misleading, and raises no genuine issue of

fact. Pomerantz testified that, while "there have always been people who maintained their own .

. . proprietary approaches to due diligence," the Alternative Investment Management Association

"provide[d] some codification of that for people who did not have the internal resources to

develop their own" due diligence approaches in 1997. Ex. 9 (Pomerantz Dep.) at 183:10-22.

The Trustee's statement should be disregarded because it is not supported by the evidence in this

case. *Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a

Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

55.    Initial due diligence is performed before an investment is made.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 64; Hoang Decl. Ex. 8 (Merkin Dep.) at 141:6-9.

**Defendants' Response**:  Not disputed.

56.    "Initial due diligence often relies on initial interviews with investment advisor staff, historical monthly returns, a description of the strategy, and any other information that can be collected prior to investing."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 65.

**Defendants' Response**:  Not disputed.

57.    Ongoing or monitoring due diligence is necessary to evaluate whether the performance is consistent with the stated strategy and investment advisor's representations.  Due diligence independently verifies what an investment advisor has told a Fund Manager. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 66.

**Defendants' Response**:  AF 57 is incomplete, misleading, and raises no genuine issue of fact.  Pomerantz testified that due diligence "means different things to different funds" and "ultimately is going to be defined by the information that you have available to you."  Ex. 9 (Pomerantz Dep.) at 36:21-37:8, 38:15-39:2; *see also* Defendants' Responses to AF 52-53; Ex. 11 (Weingarten Report) at 3-4 (discussing Merkin Defendants' processes and monitoring of Madoff)..

58.    When initial due diligence results in a significant red flag where the only reasonable explanation is fraud, a fund manager would typically stop the due diligence process and not invest.  Similarly, if a significant red flag is revealed during ongoing/monitoring due diligence, a fund manager would typically redeem their investments and find an alternative investment opportunity.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 72.

**Defendants' Response**:  AF 58 is incomplete, misleading, and raises no genuine issue of

fact.  Pomerantz testified that, although he purportedly believed in 2005 that Madoff was

engaged in a fraud, he nevertheless met with investors after 2005 without telling them that they

were invested in a fraud and therefore did not encourage them to redeem their investments and

find alternative investment opportunities.  Ex. 9 (Pomerantz Dep.) at 118:10-121:2, 126:20-

127:20; Ex. 11 (Weingarten Report) at 5 (explaining that Madoff's returns were not implausible

and discrediting "after-the-fact-logic" that suggests Madoff returns were simply "too good").

59.     "When a red flag is an indicia of fraud or creates an opportunity for fraud, it is

industry custom and practice for the Fund Manager to perform additional due diligence."

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 73.

**Defendants' Response**:  AF 59 is incomplete, misleading, and raises no genuine issue of

fact.  Pomerantz testified that, although he purportedly believed in 2005 that Madoff was

engaged in a fraud, he nevertheless met with investors after 2005 without telling them that they

were invested in a fraud and therefore did not encourage them to perform additional due

diligence on their Madoff investments.  Ex. 9 (Pomerantz Dep.) at 118:10-121:2, 126:20-127:20;

Ex. 11 (Weingarten Report) at 5 (explaining that Madoff's returns were not implausible and

discrediting "after-the-fact-logic" that suggests Madoff returns were simply "too good").

60.     "Additionally, it is industry custom and practice to perform additional due

diligence when red flags are uncovered that indicate the advisor is not executing or is operating

inconsistently with the stated strategy."  "[I]f an investor finds ... that their returns are different

from what is expected based on a certain strategy, additional due diligence should be

performed."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 74.

**Defendants' Response**:  AF 60 is incomplete, misleading, and raises no genuine issue of

fact.  Pomerantz testified that, although he purportedly knew in 2005 that Madoff was engaged in

a fraud, he nevertheless met with investors after 2005 without telling them that they were

invested in a fraud and therefore did not encourage them to perform additional due diligence on

their Madoff investments.  Ex. 9 (Pomerantz Dep.) at 118:10-121:2, 126:20-127:20.

61.    A comprehensive framework for conducting due diligence centers around the

"Five Ps," where each P relates to a particular element of due diligence:  Process, Portfolio,

People, Performance, and Price.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 97.

**Defendants' Response**:  AF 61 is incomplete, misleading, and raises no genuine issue of

fact.  Pomerantz acknowledged that defense expert Jeffrey Weingarten's framework of Five Ps

included Philosophy instead of price.  Ex. 9A (Pomerantz Rebuttal Report) at ¶ 6 ("While

Weingarten's Ps . . . are different than the Five Ps used in my Initial Report . . . they follow the

same general framework.").

62.    "Due diligence consistent with industry customs and practices would have

revealed numerous red flags relating to the Merkin BLMIS Accounts."  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶¶ 98-374.

**Defendants' Response**:  AF 62 is irrelevant and raises no genuine issue of fact.  *See*

*R.W. Grand Lodge*, 2015 WL 8731547, at *2 ("[T]he facts Grand Lodge has pled fail to give rise

to a strong inference of scienter.  Grand Lodge essentially makes a 'red flag' argument—that

Appellees were aware or had the duty to become aware of red flags in the Rye Funds' operations

and that Appellees were reckless in ignoring the red flags. This court, along with many district

courts in this circuit, has rejected similar claims based upon a failure of due diligence to uncover

Madoff's infamous Ponzi scheme.").  Defendants have provided significant, uncontroverted

evidence of the due diligence the Merkin Defendants conducted on BLMIS.  Joint Statement of

Material Facts Pursuant to Local Bankruptcy Rule 7056-1 In Support of Defendants' Motions for

Summary Judgment filed October 7, 2015 ("JSOMF") ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-

94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence

performed by [the Merkin Defendants] . . . met or exceeded industry standards").  Merkin

performed extensive due diligence consistent with industry custom and practice.  *See id.*

63.    Both qualitative and quantitative analyses are conducted to confirm the legitimacy

of an investment and to eliminate fraud concerns.  Pomerantz Decl. Ex. 1 (Pomerantz Expert

Report) ¶¶ 88, 236.

**Defendants' Response**:  AF 63 is incomplete, misleading, and raises no genuine issue of

fact.  Pomerantz testified that the Due Diligence Questionnaire published by the Alternative

Investment Management Association in 1997 neither referred to nor described any quantitative

analysis as part of a hedge fund's due diligence.  Ex. 9 (Pomerantz Dep.) at 184:9-10 ("They

don't identify specific quantitative analysis . . . but they will all address the need for quantitative

analysis when applicable.").

64.    Merkin's quarterly newsletter to his clients said that "[o]ur first objective,

therefore is to control risk," and while "[i]nvestors often look up, enchanted by upside and

profits, but that works only if their managers spend time and money looking down."  Hoang

Decl. Ex. 60 (January 1994 Newsletter from Merkin to Investors) at GCC-P 0470411; Hoang

Decl. Ex. 61 (April 1995 Newsletter from Merkin to Investors) at BS00043059.

**Defendants' Response**:  Defendants submit that the cited quarterly letters speak for

themselves, and the Trustee's characterization of them raises no genuine issue of fact.

65.     Merkin also told his clients that "an exceptional run of superior performance in virtually any business is almost impossible to perpetuate . . . [and] our job, as we understand it, is to keep our guard up at all times."  Hoang Decl. Ex. 62 (April 2002 Newsletter from Merkin to Investors) at GCC-P 0183730, 32.

**Defendants' Response**:  Defendants submit that the cited quarterly letter speaks for itself, and the Trustee's characterization of it raises no genuine issue of fact.

66.     As reflected on the Merkin Funds' BLMIS customer statements through 1991, the initial version of the Madoff split-strike conversion strategy consisted of purportedly buying a stock, buying a put option on that stock, and selling a call option on that stock.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 105.

**Defendants' Response**:  AF 66 is irrelevant to the claims and defenses in this case. Further, Defendants submit that the cited customer statements speak for themselves, and the Trustee's characterization of them raises no genuine issue of fact.    In any event, AF 66 is not disputed.

67.     Beginning in 1991, Madoff purportedly began to implement the strategy using a basket of stocks in the S&P 100 Index, selling call options on the Index, and buying put options on the S&P 100 Index ("Madoff SSC strategy").  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 110.

**Defendants' Response**:  AF 67 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  In any event, AF 67 is not disputed.

68.     According to the Trading Authorization Directive, the basket would be "correlated" with the S&P 100 Index by at least 95%, meaning that the value of his subset of

stocks moved in a manner similar to the S&P 100 Index.  Steiner Decl. Ex. 38 (November 2002

Trading Authorization Directive for Ascot Partners, LP) at GCC-P 0366167.

**Defendants' Response**:  AF 68 is irrelevant to the claims and defenses in this case.

Further, Defendants submit that the cited document speaks for itself, and the Trustee's

characterization of it raises no genuine issue of fact.

69.     Merkin confirmed that this was his understanding of the strategy.  He stated: "The

evolution over time was, I think, one very specific change and that is rather do individual stocks

with their own options contracts, meaning the puts beneath and the calls above, the strategy

evolved toward what Mr. Madoff called baskets, meaning that a larger and larger number of

stocks, of components in the basket, the qualifying characteristic of each and every one of them

being they were all part of the S&P 100."  Hoang Decl. Ex. 63 (Merkin Dep. dated Jan. 30, 2009

in *In the Matter of Madoff Charities Investigation*) at 13:5-14:10.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and

the Trustee's characterization of the testimony raises no genuine issue of fact.  The Trustee also

misquotes the testimony.  Hoang Decl. Ex. 63 (Merkin Dep. dated Jan. 30, 2009 in *In the Matter

of Madoff Charities Investigation*) at 13:5-14:10 ("The evolution over time was, I think, one

specific change and that is rather than do individual stocks with their own options contracts,

meaning the puts beneath and the calls above, the strategy evolved toward what Mr. Madoff

called baskets . . .").

70.     As early as May 23, 1995, Merkin understood that Madoff's purported strategy

had moved from baskets of 15 to 21 stocks to baskets of 35.  Hoang Decl. Ex. 19 (Trustee 363)

at GCC-P 0393211.

**Defendants' Response**:  AF 70 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Further, Defendants submit that the cited document speaks for itself, and the Trustee's characterization of it raises no genuine issue of fact.

71.    The Madoff SSC strategy should have produced returns that were correlated (*i.e.*, related from a statistical perspective) to the returns of the underlying stock or the S&P 100 Index.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 112.

**Defendants' Response**:  AF 71 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.  In any event, Pomerantz's opinion is contrary to what was expected of Madoff's strategy.

72.    Because of the collar, any gains generated by the strategy should not have been as big as the largest gains and any losses should not have been as big as the largest loss in the underlying stock or the S&P 100 Index.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 113.

**Defendants' Response**:  AF 72 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations. Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17. In any event, Pomerantz's opinion is contrary to what was expected of Madoff's strategy.

73.    However, by at least February 1996, Merkin knew that BLMIS's performance was "to a large degree independent of the gyrations of the S&P 500." Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393226; Hoang Decl. Ex. 8 (Merkin Dep.) at 286:2-24, 289:24-290:18.

**Defendants' Response**:  AF 73 is irrelevant to the claims and defenses in this case. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

74.    A document, titled "Comparing Promeo [sic] Manager Series B and the S&P 500" found in Merkin's files, plots the monthly returns of the S&P 500 Index against Primeo Manager Series B's [a Madoff Feeder fund] monthly return from July 1989 through December 1995, showing that BLMIS generated positive returns regardless of the corresponding returns in the market. Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393226 ("This summary confirms that Manager Series B achieves consistent results, whether the S&P 100 trends up or down"); Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 201-02.

**Defendants' Response**:  AF 74 is irrelevant to the claims and defenses in this case. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Further, Defendants submit that the cited document speaks for itself, and the Trustee's characterization of it raises no genuine issue of fact.

75.    An analysis of the data in this document revealed that "4% of the change in BLMIS's returns was explained by the change in the S&P 500 Index-implying therefore that the change in the market had little to no impact on BLMIS's returns."  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 204.

**Defendants' Response**:  AF 75 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Further, Defendants submit that the cited document speaks for itself, and the Trustee's characterization of it raises no genuine issue of fact.

76.    Even though Madoff's position would have been expected to move with the overall S&P 100 Index when its value was between the put and call strike prices, the returns for the Defendants' BLMIS accounts did not move in the same direction as the S&P 100 Index. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 120.

**Defendants' Response**:  AF 76 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations. Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.  In any event, Pomerantz's opinion is contrary to what was expected of Madoff's strategy.

77.    From December 1991 through November 2008, the Merkin BLMIS Accounts reflected negative return months less than 4% of the time (8 out of 204 months), while the S&P

31

100 Index incurred losses 40.7% of the time (83 out of 204 months).  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 120.

**Defendants' Response**:  AF 77 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

78.    Because of the pre-determined range defined by the strike prices, it would have

been mathematically impossible for anyone implementing Madoff's split-strike conversion

strategy to eliminate downside risk.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 121.

**Defendants' Response**:  AF 78 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

79.    As the MAR/Hedge Article pointed out in 2001, "the best known entity using a

similar strategy, a publicly traded mutual fund from 1978 called Gateway, has experienced far

greater volatility and lower returns [than Madoff] during the same period."  Hoang Decl. Ex. 19

(Trustee 363) at GCC-P 0393339.

**Defendants' Response**:  AF 79 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited document speaks for itself, and the Trustee's

characterization of it raises no genuine issue of fact.

80.    The Merkin BLMIS Accounts also posted positive returns at times of market

stress, including the burst of the "dot-com" bubble, the 2000-2002 bear market, the September

11, 2001 terrorist attacks, the WorldCom bankruptcy, and the 2007 recession.  Pomerantz Decl.

Ex. 1 (Pomerantz Expert Report) ¶¶ 300-09.

**Defendants' Response**:  AF 80 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand

Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

81.    For example, during the "tech-bubble" burst of April 2000 through March 2001,

Merkin's BLMIS accounts purportedly generated returns of 13.3% while the S&P 100 Index lost

27.4%.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 301.

**Defendants' Response**:  AF 81 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand

Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

82.     From November 2007 through November 2008, during the financial crisis, the reported returns for Merkin BLMIS accounts were up 11.4%, while the S&P 100 Index fell 40.2%.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 301.

**Defendants' Response**:  AF 81 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

83.     From December 1999 through the end of 2002, the S&P 100 Index fell 43.9% while the Merkin BLMIS Accounts showed returns of over 45%.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 303.

**Defendants' Response**:  AF 83 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

84.     Merkin testified that part of the Madoff SSC strategy involved "market timing" or going in and out of the market three to six or four to eight times a year.  Hoang Decl. Ex. 8 (Merkin Dep.) at 163:23-165:5.

**Defendants' Response**:  AF 84 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact.

85.    Merkin testified that Madoff used an "algorithm" or "black box" that "would help

[him] get a sense of market movements from the order flow in the wholesale business."  Hoang

Decl. Ex. 8 (Merkin Dep.) at 165:23-167:13, 562:2-14.

**Defendants' Response**:  AF 85 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact.

86.    Madoff was purportedly out of the market at the end of each year for the Merkin

BLMIS Accounts for fifteen straight years, from 1993 through 2007.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶¶ 145-46.

**Defendants' Response**:  AF 86 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand

Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

87.    Madoff was also out of the market at the end of each quarter for 25 straight

calendar quarters beginning in the third quarter of 2002 and proceeding through the third quarter

of 2008.  The probability of this occurring is less than one in 5,000,000.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 145 n.162.

**Defendants' Response**:  AF 87 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.  Also,

because the decision to enter or exit the market is not a chance event, the probability calculation

is not mathematically correct.

88.    There is no rational explanation for Madoff to be out of market on these dates

with such consistency, and such an action is inconsistent with the opportunistic nature of the

purported Madoff SSC strategy.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 146.

**Defendants' Response**:  AF 88 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2; *see* Ex. 11 (Weingarten Expert Report) at 5 (noting that an

"absolutely critical [] part of due diligence" was consideration of Madoff's consistent returns and

ability to meet redemption requests).

89.    Merkin testified that he "always knew whether we were invested or not, on any

given day . . . ." Hoang Decl. Ex. 8 (Merkin Dep.) at 444:25-446:2.

**Defendants' Response**:  AF 89 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact.

90.     Merkin also testified that Madoff never told him that it was important to the

strategy to exit the market before the end of the calendar quarter. Hoang Decl. Ex. 8 (Merkin

Dep.) at 446:3-6.

**Defendants' Response**: AF 90 is irrelevant to the claims and defenses in this case. The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact.

91.     Merkin should have investigated the inconsistency between market timing and the

execution of the purported strategy. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 146.

Due diligence consistent with industry customs and practices would have revealed that the

returns were not possible, inconsistent with the SSC strategy, and were significant red flags. *Id*.

§§ VI.D.4, VI.B.2 and VI.B.1.

**Defendants' Response**: AF 91 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand

Lodge*, 2015 WL 8731547, at *2. In addition, AF 91 is incomplete and misleading. Pomerantz

testified that, although he purportedly knew in 2005 that Madoff was not executing a split-strike

strategy and was engaged in a fraud, he nevertheless met with investors after 2005 without

telling them that they were invested in a fraud and therefore did not encourage them to redeem

their investments and find alternative investment opportunities.  Reply Ex. 2 (Pomerantz Dep.) at

118:10-121:2, 126:20-127:20.    Moreover, there is no inconsistency between market timing and

the execution of the purported strategy.  Defendants have provided significant, uncontroverted

evidence of the due diligence the Merkin Defendants conducted on BLMIS.  JSOMF ¶¶ 78-94,

98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2

(concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded

industry standards").

92.    From October 1990 through November 2008, the volume of call options

purportedly traded for the Merkin BLMIS Accounts was above the daily market volume for the

relevant option and trade date 53.7% of the time.  Pomerantz Decl. Ex. 1 (Pomerantz Expert

Report) ¶ 123.  The number of shares transacted by Madoff greatly exceeded the total share

volume transacted on the exchange.  *Id.*  As early as the end of 1993, there had been 21 unique

call transactions and 22 unique put transactions purportedly traded across the Merkin BLMIS

Accounts that exceeded the total market volume traded for that day.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 359.  By May 2001, the unique call transactions increased to 101

and unique put transactions increased to 66.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶

366.  By September 2005, there were 292 unique call transactions and 232 unique put

transactions that exceeded the total market volume traded that day.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 372.  In addition, there were 15 instances where BLMIS reported

buying or selling call options when no volume traded on that day.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 123.

**Defendants' Response**:  AF 92 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  In addition, AF 92 is incomplete and misleading.  Merkin discussed options volume with Madoff and was told that Madoff conducted a substantial part of the options trading in the over-the-counter market.  Ex. 84 (Merkin Dep.) at 173:14-174:2, 203:12-205:16.  And the volume of options traded over-the-counter is unknown and unreported, but believed to far exceed the volume on the exchange.  Reply Ex. 11 at 309:23-314:22. Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

93.    For the unique transactions of put options, 48.5% had a purported number of contracts above the daily market volume.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 124.  The number of shares transacted for the Merkin BLMIS Accounts greatly exceeded the total share volume transacted in the market.  *Id*.  Further, there were 15 instances where BLMIS reported buying or selling put options when there was no volume traded on that day.  *Id*.

**Defendants' Response**:  AF 93 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  In addition, AF 93 is incomplete and misleading.  Merkin discussed options volume with Madoff and was told that Madoff conducted a substantial part of the options trading in the over-the-counter market.  Ex. 84 (Merkin Dep.) at 173:14-174:2; Reply Ex. 11 at 203:12-205:16.  And the volume of options traded over-the-counter is unknown and unreported, but believed to far exceed the volume on the exchange.  *Id.* at 309:23-314:22. Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations,

including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex.
9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

94.     Defendants claim that "BLMIS sent confirmations of every trade supposedly
made in the accounts, which were reviewed by GCC employees and input into GCC's portfolio
management system ("PMS")."  Steiner Decl. Ex. 80 (Supplemental Responses) at 6.

**Defendants' Response**:  Not disputed.

95.     For the period 2000 through 2008, based on the customer statements reflected
that, on average, the Merkin Funds owned more call options than those in existence on the
exchange for 116 days out of each year and more put options than those in existence in the
market place for 123 days out of each year.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶
125.

**Defendants' Response**:  AF 95 is irrelevant to the claims and defenses in this case, and
raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based
upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand
Lodge*, 2015 WL 8731547, at *2.  In addition, AF 95 is incomplete and misleading.  Merkin
discussed options volume with Madoff and was told that Madoff conducted a substantial part of
the options trading in the over-the-counter market.  Ex. 84 (Merkin Dep.) at 173:14-174:2; Reply
Ex. 11 at 203:12-205:16.  And the volume of options traded over-the-counter is unknown and
unreported, but believed to far exceed the volume on the exchange.  *Id.* at 309:23-314:22.
Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations,
including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex.
9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

96.    The trade confirmations for the Merkin BLMIS Accounts reflected a CUSIP

number for the S&P 100 Index options, indicating the options were traded on the Chicago Board

of Options Exchange as opposed to over-the-counter ("OTC").  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 122 n.134.

**Defendants' Response**:  AF 96 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand

Lodge*, 2015 WL 8731547, at *2.  In addition, AF 96 is incomplete and misleading.  Merkin

discussed options volume with Madoff and was told that Madoff conducted a substantial part of

the options trading in the over-the-counter market.  Ex. 84 (Merkin Dep.) at 173:14-174:2; Reply

Ex. 11 at 203:12-205:16.  And the volume of options traded over-the-counter is unknown and

unreported, but believed to far exceed the volume on the exchange.  *Id.* at 309:23-314:22.

Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations,

including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex.

9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.  Nor is there any reason that over-the-counter

options could not be identified with reference to CBOE CUSIP numbers.

97.    Further, the options transactions on the Merkin Funds' BLMIS account statements

could not have traded over-the-counter for numerous reasons, including:

(a)    OTC transactions tend to be in the $5-25 million dollar range, which
would have required 280-1400 transactions to be done across multi-
billions of dollars in assets with theoretically many sophisticated global
counterparties; any larger OTC transactions would have been done only on
a negotiated basis that would require days, weeks, or months to negotiate;

(b)    counterparties to the trades would themselves have had to offset their own
risk, which likely have been done back in the exchange-traded market; if
there was insufficient volume in the exchange-traded market, there would
have been insufficient volume for BLMIS's counterparties in the OTC
market to absorb and then lay off this transferred risk;

(c)    there do not appear to be any written agreements, such as International Swaps and Derivatives Association agreements, which would have been necessary to execute these transactions OTC;

(d)    every trade confirmation reviewed for S&P 100 options purportedly traded in the Merkin Defendants' BLMIS accounts listed the relevant Defendant Fund as the counterparty, instead of the actual counterparty; it is industry custom and practice to list the counterparty to an OTC transaction on a trade confirmation, so that at a minimum the customer can assess the counterparty risk associated with the trade; and;

(e)    if the Merkin Funds had been counterparties to OTC trades, it would have been typical to post margin; yet no instances were identified where margin was posted.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 127.

**Defendants' Response**:  AF 97 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  In addition, AF 97 is incomplete and misleading.  Merkin discussed options volume with Madoff and was told that Madoff conducted a substantial part of the options trading in the over-the-counter market.  Ex. 84 (Merkin Dep.) at 173:14-174:2; Reply Ex. 11 at 203:12-205:16.  And the volume of options traded over-the-counter is unknown and unreported, but believed to far exceed the volume on the exchange.  *Id.* at 309:23-314:22.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

98.    Merkin's notes from an October 2008 meeting with Madoff state that Madoff "prefer[s]" OTC transactions.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393146-148.

**Defendants' Response**:  Defendants submit that the cited document speaks for itself, and the Trustee's characterization raises no genuine issue of fact.

99.    The impossible call and put option volumes were a significant red flag and the only reasonable explanation was fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 127.

**Defendants' Response**:  AF 99 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  In addition, AF 99 is incomplete and misleading.  Merkin

discussed options volume with Madoff and was told that Madoff conducted a substantial part of

the options trading in the over-the-counter market.  Ex. 84 (Merkin Dep.) at 173:14-174:2; Reply

Ex. 11 at 203:12-205:16.  And the volume of options traded over-the-counter is unknown and

unreported, but believed to far exceed the volume on the exchange.  *Id.* at 309:23-314:22.

Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations,

including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex.

9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

100.    Between 1990 and 2008, there were 985 transactions, reflecting over 56 million

shares, across the Merkin BLMIS Accounts, which reported equity prices traded outside the

daily price range.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 130.

**Defendants' Response**:  AF 100 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  In addition, AF 100 is incomplete and misleading.  Pomerantz

testified that, in conducting due diligence, he never looked at stock transaction prices compared

to daily highs and lows.  Ex. 9 (Pomerantz Dep.) at 101:5-20.  He also admitted that he

manufactured virtually all of the pricing discrepancies by "adjusting" every pre-2006 stock

transaction by four cents per share from the price reported on the BLMIS trade confirmation by

subtracting four cents per share from the purchase price reported on the BLMIS confirmation

sent to Ascot Partners for every stock purchase, and adding four cents per share to the sale price

reported on the BLMIS confirmation for every stock sale. *Id.* at 226:25-227:9. He used the

"adjusted" prices in his comparison to the reported daily high-low range and his VWAP analysis.

*Id.* at 230:6-23, 234:18-23.

101.    Over this same time period, there were also 382 transactions, representing

545,828 options contracts (*i.e*, 54.5 million options shares), that were traded outside the daily

price range across the Merkin BLMIS Accounts.  Pomerantz Decl. Ex. 1 (Pomerantz Expert

Report) ¶ 132.

**Defendants' Response**:  AF 101 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand

Lodge*, 2015 WL 8731547, at *2.  In addition, AF 101 is incomplete and misleading.  Pomerantz

testified that, in conducting due diligence, he never looked at transaction prices compared to

daily highs and lows.  Ex. 9 (Pomerantz Dep.) at 101:5-20.

102.    These impossible transactions were significant red flags and the only reasonable

explanation was fraud.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 131, 133.

**Defendants' Response**:  AF 102 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand

Lodge*, 2015 WL 8731547, at *2.  In addition, AF 102 is incomplete and misleading.  Pomerantz

testified that, in conducting due diligence, he never looked at stock transaction prices compared

to daily highs and lows.  Ex. 9 (Pomerantz Dep.) at 101:5-20.  He also admitted that he

manufactured virtually all of the pricing discrepancies by "adjusting" every pre-2006 stock

transaction by four cents per share from the price reported on the BLMIS trade confirmation by subtracting four cents per share from the purchase price reported on the BLMIS confirmation sent to Ascot Partners for every stock purchase, and adding four cents per share to the sale price reported on the BLMIS confirmation for every stock sale. *Id.* at 226:25-227:9. He used the "adjusted" prices in his comparison to the reported daily high-low range and his VWAP analysis. *Id.* at 230:6-23, 234:18-23.

103. Merkin understood that the Madoff SSC strategy purported to use options to create "fully hedged positions" where "we were long and short the correct amount of options. We weren't open, we weren't - - we didn't take an exposure anywhere." Hoang Decl. Ex. 8 (Merkin Dep.) at 110:21-113:12.

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

104. Yet, the Merkin Funds' BLMIS customer statements reflect that, between January 1, 1992 and November 30, 2008, option transactions on at least 200 separate occasions were used solely to generate a profit and not to hedge any equity transaction as summarized below:

| Time Period | Number of Transactions (Inclusive) | Purported Profit (Inclusive) |
|---|---|---|
| By December 1995 | 56 | $6.7 million |
| By May 2001 | 120 | $20.0 million |
| By August 2005 | 172 | $67.4 million |
| By November 2008 | 200 | $94.2 million |

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 362, 366, 372, Fig. 8. In addition, the transactions referenced by Pomerantz to support the statement in fact were used to hedge equity positions.

**Defendants' Response**:  AF 104 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

105.    These speculative option trades generated over $94 million in gains and 6.9% of total dollar return.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 163, Fig. 8.

**Defendants' Response**:  AF 105 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.  *See supra* Defendants' Response to AF 104.

106.    These speculative option trades were suspicious, inconsistent with the SSC strategy and should have prompted Merkin to conduct performance attribution, reverse engineering and alpha analysis as additional due diligence.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 163.

**Defendants' Response**:  AF 106 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations. Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17. In addition, Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS. JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards"). In addition, the quantitative analysis were not a standard part of due diligence prior to 2008. *See* Reply Ex. 2 (Pomerantz Dep.) 184:9-10 (admitting that the AIMA's pre-2008 Due Diligence Questionnaires "don't identify [any] specific quantitative analyses."); *see also* Reply Exs. 3-5 (1997, 2002, and 2004 AIMA Due Diligence Questionnaires, respectively). *See supra* Defendants' Response to AF 104.

107.    Due diligence consistent with industry custom and practices would have revealed significant red flags where the only reasonable explanation was fraud. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 163, §§ VI.D.4, VI.B.2, and VI.B.1.

**Defendants' Response**: AF 107 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, AF 107 is incomplete and misleading. Pomerantz testified that, although he purportedly believed in 2005 that Madoff was engaged in a fraud, he nevertheless met with investors after 2005 without telling them that they were invested in a fraud and therefore did not encourage them to redeem their investments and find alternative investment opportunities. Reply Ex. 2 (Pomerantz Dep.) at 118:10-121:2, 126:20-127:20. And Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants

conducted on BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also*

Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin

Defendants] . . . met or exceeded industry standards").  In addition, the quantitative analysis were

not a standard part of due diligence prior to 2008.  *See* Reply Ex. 2 (Pomerantz Dep.) 184:9-10

(admitting that the AIMA's pre-2008 Due Diligence Questionnaires "don't identify [any]

specific quantitative analyses."); *see also* Reply Exs. 3-5 (1997, 2002, and 2004 AIMA Due

Diligence Questionnaires, respectively).  *See supra* Defendants' Response to AF 104.

108.    Scalability refers to the concept that as a fund increases its assets under

management, it becomes increasingly difficult for that fund to find investment opportunities of a

scale proportional to the growing size of the fund.  Pomerantz Decl. Ex. 1 (Pomerantz Expert

Report) ¶ 152 n.170.

**Defendants' Response**:  Not disputed.

109.    As early as 1999, Merkin expressed concerns to Morris Smith ("Smith"), an Ascot

investor, that Ascot was "bumping up against the limits of being able to do the trades profitably,"

meaning the "thinness of the market as far as being able to execute the option trades related to

owning—owning or shorting the stocks underneath."  Hoang Decl. Ex. 48 (Smith Dep.) at 33:8-

34:14.  Merkin told Smith that Merkin thought the limit for Ascot's trading strategy in the

options market was "about a billion dollars."  *Id*. at 34:15-19.

**Defendants' Response**:  AF 109 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact.

110.    Merkin recognized that the "God of size comes to visit everybody," meaning that "if you keep growing, growing and growing assets, you will see some impact on performance." Hoang Decl. Ex. 8 (Merkin Dep.) at 143:4-144:12; Hoang Decl. Ex. 39 (Orchard Dep.) at 118:1-14 (Merkin stating to Orchard and Aozora Bank during a November 2005 meeting that he "believes the Ascot (Partners) strategy will stop working one day" because as "more and more capital is employed to exploit that arbitrage, it eventually goes away.").

**Defendants' Response**:  AF 110 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

111.    By May 2001, Merkin knew that BLMIS had $6-7 billion in assets under management.  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393336; Hoang Decl. Ex. 64 (Merkin testimony-Straus arbitration) at 237:16-238:21.

**Defendants' Response**:  AF 111 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Further, Defendants submit that the cited document and testimony speak for themselves, and the Trustee's characterizations of the document and testimony raise no genuine issue of fact.

112.    In a conversation with Madoff in January 2002, Merkin stated that "one of the tenets of the investment business, right or wrong, is that there is some basic connection between size and profitability."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393364.

**Defendants' Response**:  Not disputed.

113.    Merkin acknowledged that he had "given up guessing" as to the amount of assets

Madoff purportedly had under management and that he concluded that Madoff's business was

scalable simply because "in Bernie's case he's been defying gravity for long enough that at some

point you could stop caring that much."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393364.

**Defendants' Response**:  AF 113 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited document speaks for itself, and the Trustee's

characterization of it raises no genuine issue of fact.

114.    In its SEC Form ADV, BLMIS listed that it had approximately $11.7 billion,

$13.2 billion, and $17.0 billion in assets under management in 2006, 2007, and 2008,

respectively.  Hoang Decl. Ex. 2 (August 25, 2006 BLMIS Form ADV) at PUBLIC0003736;

Hoang Decl. Ex. 3 (January 24, 2007 BLMIS Form ADV) at PUBLIC0003771, Hoang Decl. Ex.

65 at PUBLIC0003840.

**Defendants' Response**:  Not disputed.

115.    Due diligence, consistent with industry custom and practice, would have revealed

that it would have been impossible for Madoff, with billions of dollars of assets under

management, to implement the SSC strategy because there was simply not enough call option

notional value (the number of option shares outstanding times the value of the index at the time)

from 2001 and thereafter to support the strategy.  Pomerantz Decl. Ex. 1 (Pomerantz Expert

Report) ¶¶ 152-56.

**Defendants' Response**:  AF 115 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS. JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards"). The volume of over-the-counter options was unknown. *See* Deutsche Börse Group, White Paper, The Global Derivatives Market: An Introduction 38 (April 2008), http://www.math.nyu.edu/faculty/avellane/global_derivatives_market.pdf.

116.    Starting in 2006, BLMIS listed in its SEC Form ADV that it had no more than five employees who performed investment advisory functions. Hoang Decl. Ex. 2 (August 25, 2006 BLMIS Form ADV) at PUBLIC0003734; Hoang Decl. Ex. 3 (January 24, 2007 BLMIS Form ADV) at PUBLIC0003769, Hoang Decl. Ex. 65 at PUBLIC0003839.

**Defendants' Response**: Not disputed.

117.    BLMIS had a limited number of personnel, who were not capable of developing mathematical algorithms or other related analyses for the "black box." Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 226-27.

**Defendants' Response**: AF 117 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

118.    Yet, in over 18 years, Merkin never met with anyone at BLMIS other than Madoff. Hoang Decl. Ex. 8 (Merkin Dep.) at 431:8-432:21.

**Defendants' Response**:  AF 118 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at \*2.  Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards").

119.    Merkin had never asked to speak with anyone who purportedly operated the algorithm.  Hoang Decl. Ex. 8 (Merkin Dep.) at 433:3-434:6.

**Defendants' Response**:  AF 119 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at \*2.  Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards").

120.    To the extent that Merkin believed that the success of the SSC strategy was driven by market timing, there is no evidence that Merkin ever attempted to determine whether market timing contributed to the purported returns generated by BLMIS.

**Defendants' Response**:  AF 120 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards").

121.    Due diligence would have confirmed that, out of the 84 baskets that Madoff purportedly entered into between December 1991 and November 2008, the S&P 100 Index was up only 45 times, or only 54% of the time.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 330, Schedule 71.

**Defendants' Response**:  AF 121 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards").  Further, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

122.    Market timing contributed very little (only 4.7%) to the purported returns for the

Merkin BLMIS Accounts.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 329.

**Defendants' Response**:  AF 122 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  Further, Pomerantz admitted at his deposition that he made

numerous errors in his calculations, including adjusting every transaction that appeared in pre-

2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.

123.    Similarly, to the extent that Merkin believed that the success of the Madoff SSC

strategy was driven by stock selection, there is no evidence that Merkin ever attempted to

determine whether stock picking contributed to the purported returns generated by BLMIS.  *See*,

*e.g.*, Steiner Decl. Ex. 11 (Weingarten Expert Report) at 4 ("Mr. Merkin understood that

Mr. Madoff had, by virtue of his long experience, the knowledge and ability to take advantage of

both market timing and stock selection to improve returns over that which would have been

generated by a formulaic putting on of the trades.").

**Defendants' Response**:  AF 123 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  In addition, AF 123 is incomplete and misleading.  The

Trustee's expert acknowledged that reverse engineering of fund's strategy is not standard due

diligence procedure. Ex. 7 (Hirsch Dep.) at 63:22-64:14.  Defendants have provided significant,

uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS.

JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten

Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards").

124.    In a comparison of the stocks in each basket in the Merkin BLMIS Accounts from 2000 to 2008 against the returns of the S&P 100 Index over the purported investment period of each basket, the stocks outperformed the S&P 100 Index in only 17 out of the 52 baskets (33%). Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 331, Schedule 72.

**Defendants' Response**:  AF 124 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  In addition, AF 124 is incomplete and misleading.  Pomerantz testified that he personally never reviewed individual trade confirmations or compared securities transactions to the reported daily high-low price range as part of any due diligence he ever conducted on another investment advisor.  Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-20. Rather, Pomerantz admitted at his deposition that he made numerous errors in his calculations, including adjusting every transaction that appeared in pre-2006 BLMIS trade confirmations.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-240:17.  The returns speak for themselves.

125.    Merkin testified that he believed that the "strategy in part was implemented through very good execution," meaning "by and large when he wanted to get in, he got in" and "when he wanted to get out, he got out."  Hoang Decl. Ex. 8 (Merkin Dep.) at 207:3-208:4.

**Defendants' Response**:  Not disputed.

126.    Yet, there is no evidence that Merkin ever attempted to determine how much Madoff's ability to "execute" generated the purported returns generated by BLMIS.

**Defendants' Response**: AF 126 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, AF 126 is incomplete and misleading. The Trustee's expert acknowledged that reverse engineering of fund's strategy is not standard due diligence procedure. Ex. 7 (Hirsch Dep.) at 63:22-64:14. Defendants have provided significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS. JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met or exceeded industry standards").

127.    In order to track trade execution effectiveness, it is common practice for portfolio managers to compare their transaction price against the Volume Weighted Average Price ("VWAP") for the respective stock. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 319. VWAP is a trading metric calculated by weighting each transaction price by the volume for the transaction. *Id.*

**Defendants' Response**: AF 127 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, the quantitative analysis were not a standard part of due diligence prior to 2008. *See* Reply Ex. 2 (Pomerantz Dep.) 184:9-10 (admitting that the AIMA's pre-2008 Due Diligence Questionnaires "don't identify [any] specific quantitative analyses."); *see also* Reply Exs. 3-5 (1997, 2002, and 2004 AIMA Due Diligence Questionnaires, respectively).

128.    VWAP data is easily obtainable from any Bloomberg terminal and was publicly

accessible by fund managers like Merkin.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶

319, n.332.

**Defendants' Response**:  AF 128 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.

129.    The single largest component of the BLMIS purported returns (58.5%) comes

from the purported trade execution being above or below VWAP.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 320, Fig. 42.

**Defendants' Response**:  AF 129 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.  In addition, AF 129 is incomplete and misleading.  Pomerantz

testified that he manipulated the BLMIS trade confirmations by adjusting every pre-2006

transaction by four cents per share, and that this manipulation impacted his analysis of VWAP.

Ex. 9 (Pomerantz Dep.) at 234:20-240:17.

130.    From January 1996 to November 2008, 81.3% of the Merkin BLMIS account

purported buy transactions by share volume were executed below VWAP, while 74.9% of

purported sell transactions by share volume were executed above VWAP.  Pomerantz Decl. Ex.

1 (Pomerantz Expert Report) ¶ 320.

**Defendants' Response**:  AF 130 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, AF 130 is incomplete and misleading. Pomerantz testified that he manipulated the BLMIS trade confirmations by adjusting every pre-2006 transaction by four cents per share, and that this manipulation impacted his analysis of VWAP. Ex. 9 (Pomerantz Dep.) at 234:20-240:17.

131. The industry norm is to target trade execution at VWAP (meaning that one would expect 50% of shares would be above VWAP and 50% would be below VWAP). Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 321.

**Defendants' Response**: AF 131 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

132. BLMIS's ability to purportedly buy and sell at a level well below and above 50%, respectively, is virtually impossible. The only reasonable explanation for BLMIS's ability to consistently execute at a level better than VWAP is fraud. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 322-23.

**Defendants' Response**: AF 132 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, AF 132 is incomplete and misleading. Pomerantz testified that he manipulated the BLMIS trade confirmations by adjusting every pre-2006 transaction by four cents per share, and that this manipulation impacted his analysis of VWAP. Ex. 9 (Pomerantz Dep.) at 234:20-240:17. Pomerantz also testified that some managers

consistently traded below VWAP, which by necessity means that others traded above VWAP.

Reply Ex. 2 (Pomerantz Dep.) at 44:18-46:3. Defendants have provided significant,

uncontroverted evidence of the due diligence the Merkin Defendants conducted on BLMIS.

JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11 (Weingarten

Report) at 2 (concluding that "the due diligence performed by [the Merkin Defendants] . . . met

or exceeded industry standards").

133.    For example, on October 7, 2003, BLMIS purportedly purchased 672,450 shares

of Exxon Mobil Corp. across three Merkin accounts for $37.75. Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 324.

**Defendants' Response**: AF 133 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand

Lodge*, 2015 WL 8731547, at *2. In addition, AF 133 is incomplete and misleading. Pomerantz

testified that, in conducting due diligence, he never looked at trade confirmations or stock

transaction prices compared to daily highs and lows. Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-

20.

134.    During that day, there was only an 11 minute period when that price was

available, and only 328,500 shares were traded in the market at that price. Pomerantz Decl. Ex.

1 (Pomerantz Expert Report) ¶ 325, Fig. 44.

**Defendants' Response**: AF 134 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand

Lodge*, 2015 WL 8731547, at *2. In addition, AF 134 is incomplete and misleading. Pomerantz

testified that, in conducting due diligence, he never looked at trade confirmations or stock transaction prices compared to daily highs and lows. Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-20.

135.    The total shares purportedly purchased in the Merkin BLMIS Accounts alone were double the shares traded in the market at that reported price. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 325, Fig. 44.

**Defendants' Response**: AF 135 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, AF 135 is incomplete and misleading. Pomerantz testified that, in conducting due diligence, he never looked at trade confirmations or stock transaction prices compared to daily highs and lows. Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-20.

136.    BLMIS's purported purchase and sale of equities at volumes larger than the total daily traded volume at the price reported by BLMIS was a significant red flag and the only reasonable explanation was fraud. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 328.

**Defendants' Response**: AF 136 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact. The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2. In addition, AF 136 is incomplete and misleading. Pomerantz testified that, in conducting due diligence, he never looked at trade confirmations or stock transaction prices compared to daily highs and lows. Ex. 9 (Pomerantz Dep.) at 100:4-13, 101:5-20. Defendants have provided significant, uncontroverted evidence of the due diligence the

Merkin Defendants conducted on BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94,

98-128; *see also* Ex. 11 (Weingarten Report) at 2 (concluding that "the due diligence performed

by [the Merkin Defendants] . . . met or exceeded industry standards").

137.    Merkin knew that BLMIS employed Friehling & Horowitz as its independent

auditor.  Hoang Decl. Ex. 66 (Merkin NYU Dep.) at 165:12-14 ("I have had conversations with

Mr. Madoff about Friehling & Horowitz as recently as I think November of 2008.").

**Defendants' Response**:  Not disputed.

138.    Friehling & Horowitz was a very small firm with one active accountant and did

not have the capability to audit a firm the purported size of BLMIS.  Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 171; Declaration of Bruce G. Dubinsky, dated November 25, 2015

("Dubinksy Decl."), Ex. 1 (Dubinsky Expert Report) ¶ 74.

**Defendants' Response**:  AF 138 is irrelevant to the claims and defenses in this case, and

raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based

upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand*

*Lodge*, 2015 WL 8731547, at *2.

139.    Merkin was aware that BLMIS did not charge traditional performance fees.

Hoang Decl. Ex. 56 (Merkin testimony-Born Arbitration) at 686:6-686:22; Hoang Decl. Ex. 8

(Merkin Dep.) at 479:15-480:16.

**Defendants' Response**:  AF 139 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact.

140.    Typically, a fund manager charges management fees of 1% and performance fees of 20%.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 345.

**Defendants' Response**:  AF 140 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  BLMIS was not a fund manager; rather, it held managed accounts, and it was not unusual for broker-dealers to charge commissions.

141.    BLMIS, however, charged only a $0.04 commission per share on stock transactions and a $1 commission per option contract.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 349.

**Defendants' Response**:  AF 141 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

142.    It is inconsistent with industry customs and practices for an investment advisor to charge only transaction fees.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 347-48.

**Defendants' Response**:  AF 142 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  BLMIS was not a fund manager; rather, it held managed accounts, and it was not unusual for broker-dealers to charge commissions.

143.    The Merkin Funds paid on average $27 million less each year under the BLMIS fee structure than they would have under a traditional fee structure.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 343, 349-53.

**Defendants' Response**:  AF 143 is irrelevant to the claims and defenses in this case, and raises no genuine issue of fact.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  BLMIS was not a fund manager; rather, it held managed accounts, and it was not unusual for broker-dealers to charge commissions.

144.    Merkin had a conversation with Madoff on why Madoff didn't charge a 20% performance fee, which culminated in Merkin stating, "I know why you don't do it.  Because you're Bernie.  Because that's not the way the good Lord made you.  If he made you a little differently, you would."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393369; Hoang Decl. Ex. 8 (Merkin Dep.) at 461:25-463:6.

**Defendants' Response**:  AF 144 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.  Further, Defendants submit that the cited document and testimony speak for themselves, and the Trustee's characterization of the document and testimony raises no genuine issue of fact.

145.    Other than Merkin's testimony, there is no evidence that Merkin conducted any due diligence on Madoff or BLMIS prior to the Funds' initial investments in October 1990.  *See* Trustee's Resp. Def.'s Joint Statement of Material Facts ¶¶ 84-91, 92; *supra* ¶¶ 9-17.

**Defendants' Response**:  AF 145 is irrelevant to the claims and defenses in this case.  The Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme." *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that Mr. Merkin's testimony speaks for itself, and the Trustee's

characterization of the testimony raises no genuine issue of fact  Merkin testified that he "first

invested with Mr. Madoff and BLMIS through [Leon] Meyers and the Scheuer family's account

with Mr. Madoff."  Ex. 80 (Supplemental Responses) at 3; Hoang Decl. Ex. 55 (Verification).

He further testified that Merkin thought of this investment and the related meetings with Madoff

"as part of the initial due diligence that preceded any investments on the part of the funds, and

was sort of just the beginning of the due diligence process."  Hoang Decl. Ex. 8 (Merkin Dep.) at

153:17-22.  Merkin testified that he believed he did receive documents from Meyers and that it

would likely be contained in his Madoff file.  Hoang Decl. Ex. 8 (Merkin Dep.) at 374:17-375:8;

*see also id.* at 370:22-371:19.  In fact, Merkin's Madoff file did contain such document.  Hoang

Decl. Ex. 19 (Trustee 363) at GCC-P 0393127.

146.    Merkin's purported expert does not indicate what due diligence analyses Merkin

performed as part of initial due diligence or refer to any documents suggesting that Merkin

performed any due diligence prior to the Merkin Funds' investments with BLMIS.  Steiner Decl.

Ex. 11 (Weingarten Report); Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 4.

**Defendants' Response**: AF 146 is irrelevant to the claims and defenses in this case.  The

Second Circuit "has rejected [red flag-based] claims based upon a failure of due diligence to

uncover Madoff's infamous Ponzi scheme."  *R.W. Grand Lodge*, 2015 WL 8731547, at *2.

Further, Defendants submit that the cited document speaks for itself, and the Trustee's

characterization of the document raises no genuine issue of fact.  Defendants have provided

significant, uncontroverted evidence of the due diligence the Merkin Defendants conducted on

BLMIS.  JSOMF ¶¶ 78-94, 98-128; Rebuttal JSOMF ¶¶ 78-94, 98-128; *see also* Ex. 11

64

(Weingarten Report) at 2 (concluding that "the due diligence performed by [the Merkin

Defendants] . . . met or exceeded industry standards").

147.    Even when Merkin did ask Madoff questions, including about which assets

Madoff managed, Merkin refused to press him, stating that he [Merkin] "didn't really care,

because [he] made his peace with Bernie."  Hoang Decl. Ex. 19 (Trustee 363) at GCC-P

0393364.

**Defendants' Response**:  Defendants submit that the cited document speaks for itself, and

the Trustee's characterization of the document raises no genuine issue of fact.

148.    In a conversation with Madoff, Merkin stated:

> I can always tell when people are going to ask me about Bernie,
> because when people come to the office, ask me what we're doing
> and I give them a little sense of it, and they look around and say I
> know I'm not supposed to talk about this, but can I ask you the
> following question?  So I told one person, look, you can ask me
> how Bernie does it and that's fine, but when are you going to ask
> Bernie?  So he said, look, if I asked him, he'd throw me out.  I
> said, look, *all I can tell you is don't ask so many questions.  Sit
> tight.  And that's what I tell everybody* ....

Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393371-72 (emphasis added).

**Defendants' Response**:  Defendants submit that the cited document speaks for itself, and

the Trustee's characterization of the document raises no genuine issue of fact.

149.    Merkin maintained a file, consisting of approximately 86 documents or 500

pages, on Madoff and BLMIS purportedly accumulated over an 18 year period.  Hoang Decl.

19 (Trustee 363) (Merkin's "Madoff File").

**Defendants' Response**:  Defendants submit that the cited document speaks for itself, and

the Trustee's characterization of the document raises no genuine issue of fact.

150.     Merkin understood that his investors did not have transparency into BLMIS and that he had "to explain what the strategy is about and what we're doing."  Hoang Decl. Ex. 8 (Merkin Dep.) at 463:19-466:14.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

151.     Neither Ariel's nor Gabriel's offering memoranda ever mentioned BLMIS or Madoff at any point in time.  Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed Facts) ¶ 40 ("Not controverted that the name 'Madoff' does not appear in the Ariel and Gabriel Offering Memoranda"); Steiner Decl. Ex. 16 (Ariel Fund Confidential Offering Memorandum, March 2006); Hoang Decl. Ex. 57 (Gabriel Confidential Offering Memorandum, March 2006); Hoang Decl. Ex. 30 (Nash Dep.) at 67:21-69:2.

**Defendants' Response:**  Not disputed.

152.     Other than the disclosure that BLMIS was the "prime broker" or "custodian" of Ascot in 2006, none of the Merkin Funds' other communications with investors ever mentioned BLMIS.  Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed Facts) ¶¶ 45-50 ("Not controverted that the name "Madoff" does not appear in the quarterly letters"); Hoang Decl. Ex. 46 (Gottlieb Dep.) at 87:1-88:3; Hoang Decl. Ex. 30 (Nash Dep.) at 68:14-23.

**Defendants' Response**:  Defendants submit that the cited documents speak for themselves, and the Trustee's characterization of the documents raises no genuine issue of fact.

153.     The offering documents for Ascot Partners and Ascot Fund represented that Merkin was involved in running the strategy of the Funds on a day-to-day and transaction-by-transaction basis.  Hoang Decl. Ex. 67 (Ascot Partners March 2006 Offering Memorandum) at

HLGSAA-00000088 at 105 (stating that, "The Partnership primarily follows a strategy in which the Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100.  In order to hedge its exposure to these securities, the Partnership simultaneously purchases put option and sells a call option on the S&P 100.") (emphasis added).

**Defendants' Response**:  Defendants submit that the cited documents speak for themselves, and the Trustee's characterization of the documents raises no genuine issue of fact. Defendants note that the documents do not say "day to day" or "transaction by transaction."

154.    Merkin further represented to his investors that Ascot's success depended on his skill as a money manager, and never identified BLMIS as an investment advisor or money manager.  Hoang Decl. Ex. 67 (Ascot Partners March 2006 Offering Memorandum) at HLGSAA-00000110 (stating that, "the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin.").

 **Defendants' Response**:  Defendants submit that the cited document speaks for itself, and the Trustee's characterization of the document raises no genuine issue of fact.  Moreover, the Ascot's governing documents expressly allowed Merkin to delegate investment discretion and imposed no corresponding duty to disclose any such delegation.  *See* Ex. 15 (Ascot Partners Confidential OM) at 17; Ex. 17 (Ascot Fund Confidential OM) at 25-26.

155.    Daniel Gottlieb ("Gottlieb") is the Chief Investment Officer of Glen Eagle Partners.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 11:25-12:3.

**Defendants' Response**:  Not disputed.

156.    Gottlieb met with Merkin twice about potentially investing in Gabriel and Ascot on/around December 2005 and February 2006.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 37:8-13, 41:6-14, 44:24-46:6.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

157.    As a result of his meetings with Merkin, Gottlieb invested $500,000 in Ascot via The Anne and Howard Gottlieb Family Foundation and $1,000,000 in Gabriel via Glen Eagle Partners.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 47:21-48:6, 50:10-15, 90:22-91:2.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

158.    Prior to the fraud, Merkin never disclosed Madoff to Gottlieb.  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 51:12-53:8.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

159.    When asked if he believes that Merkin intentionally concealed Madoff, Gottlieb testified, "I don't see how he couldn't have. I just – I believe that I was supposed to think that there was trading going on at [GCC] . . . there were people there that were engaging in a whole variety of strategies from the sort of less liquid stuff that Gabriel was doing to the more liquid stuff that Ascot was doing.  And I thought it was going on in the offices and at the terminals that I saw when I went there."  Hoang Decl. Ex. 46 (Gottlieb Dep.) at 115:11-116:2.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

160.    Morris Smith ("Smith") is a sophisticated investor and was a portfolio manager for the Magellan Fund at Fidelity Investments.  Hoang Decl. Ex. 48 (Smith Dep.) at 12:21-15:11.

**Defendants' Response**:  Not disputed.

161.    Prior to investing in Ascot Partners and Gabriel, Smith spoke with Merkin about the funds and Merkin never indicated that he would be using third party managers for either fund.  Hoang Decl. Ex. 48 (Smith Dep.) at 21:22-22:1, 24:22-25:1.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  Mr. Smith acknowledged that, in around the late 1990s or early 2000s, he learned that "Bernie Madoff or Madoff security . . . were, in a sense, the executing broker of the strategies," Hoang Ex. 48 (Smith Dep.) at 36:5-19, but claimed not to have a complete understanding of Madoff's role. Mr. Smith was, however, a member of the Yeshiva University Investment Committee from 2000 to January 2009, and it was widely disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU 0000724), at -30 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners L.P.)").  Moreover, the Funds' governing documents expressly allowed Merkin to delegate investment discretion and imposed no corresponding duty to disclose any such delegation.  *See* Ex. 15 (Ascot Partners Confidential OM) at 17; Ex. 16 (Ariel Confidential OM) at 40-41; Ex. 17 (Ascot Fund Confidential OM) at 25-26; Hoang Ex. 57 (Gabriel Confidential OM) at 28.

162.    As a result of conversations with Merkin, Smith invested in Ascot Partners and Gabriel in 1992.  Hoang Decl. Ex. 48 (Smith Dep.) at 19:18-21:13, 22:5-10, 23:17-24:2.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

163.    Over a fifteen year period, Smith spoke to Merkin about his investments.  Hoang Decl. Ex. 48 (Smith Dep.) at 32:19-33:5.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

164.    Merkin told Smith that Morgan Stanley was the custodian of Ascot Partners, omitting BLMIS.  Hoang Decl. Ex. 48 (Smith Dep.) at 35:25-36:4.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  Mr. Smith acknowledged that, in around the late 1990s or early 2000s, he learned that "Bernie Madoff or Madoff security . . . were, in a sense, the executing broker of the strategies," Hoang Ex. 48 (Smith Dep.) at 36:5-19, but claimed not to have a complete understanding of Madoff's role.  Mr. Smith was, however, a member of the Yeshiva University Investment Committee from 2000 to January 2009, and it was widely disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU 0000724), at -30 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners L.P.)").  Additionally, both Ascot Partners and Ascot Fund's Offering Memoranda disclosed that "Morgan Stanley & Co., Inc. and [BLMIS] currently serve as the principal prime brokers and custodians."  Ex. 15 at 8-9, 28; Ex. 17 at 13, 31.

165.    Merkin told Smith that Merkin was the decision-maker for Ascot Partners and that BLMIS was acting as Ascot Partners' executing broker who carried out the trades of Merkin's strategy.  Hoang Decl. Ex. 48 (Smith Dep.) at 36:5-19, 37:10-38:20, 40:4-14.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  Mr. Smith acknowledged that, in around the late 1990s or early 2000s, he learned that "Bernie Madoff or Madoff security . . . were, in a sense, the executing broker of the strategies," Hoang Ex. 48 (Smith Dep.) at 36:5-19, but claimed not to have a complete understanding of Madoff's role.  Mr. Smith was, however, a member of the Yeshiva University Investment Committee from 2000 to January 2009, and it was widely disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU 0000724), at -30 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners L.P.)").

166.    Smith was not aware that Gabriel had any BLMIS exposure until after the fraud was revealed.  Hoang Decl. Ex. 48 (Smith Dep.) at 67:5-69:2.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  Mr. Smith acknowledged that, in around the late 1990s or early 2000s, he learned that "Bernie Madoff or Madoff security . . . were, in a sense, the executing broker of the strategies," Hoang Ex. 48 (Smith Dep.) at 36:5-19, but claimed not to have a complete understanding of Madoff's role.  Mr. Smith was, however, a member of the Yeshiva University Investment Committee from 2000 to January 2009, and it was widely disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee memorandum, minutes, and conflict of interest reports) at

YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU

0000724), at -30 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff

and Company (Ascot Partners L.P.)").

167.     In early 2008, Merkin explained to Smith that he was setting up special accounts

with the United States Treasury to secure Smith's assets.  Hoang Decl. Ex. 48 (Smith Dep.) at

43:8-44:10.  As a result, Smith decided to not redeem his investments in Ascot Partners.  *Id.* at

45:12-15.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and

the Trustee's characterization of the testimony raises no genuine issue of fact.

168.     During the week following Madoff's arrest, Smith spoke with Merkin twice and

learned for the first time that he was actually allocating all of Ascot Partners' assets to Madoff.

Hoang Decl.  Ex. 48 (Smith Dep.) at 69:6-72:17.  Mr. Smith acknowledged that, in around the

late 1990s or early 2000s, he learned that "Bernie Madoff or Madoff security . . . were, in a

sense, the executing broker of the strategies," Hoang Ex. 48 (Smith Dep.) at 36:5-19, but claimed

not to have a complete understanding of Madoff's role.  Mr. Smith was, however, a member of

the Yeshiva University Investment Committee from 2000 to January 2009, and it was widely

disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially

managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee

memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also

id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU 0000724), at -30 (1992 Investment

Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners

L.P.)").

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

169.    During this post-arrest conversation with Merkin, Smith inquired about the purported treasury accounts and Merkin responded that he had since moved the money back to Madoff.  Hoang Decl. Ex. 48 (Smith Dep.) at 69:6-72:17.

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

170.    Smith was also a member of the Yeshiva University Investment Committee from 2000 until January 2009.  Hoang Decl. Ex. 48 (Smith Dep.) at 45:20-22, 46:22-47:4.

**Defendants' Response**:  the Trustee's characterizationNot disputed.

171.    During his time on the committee, Smith recalls only one discussion related to Madoff being on the university's board.  He does not recall a time where Madoff was ever referred to in the context of Ascot Partners.  Hoang Decl. Ex. 48 (Smith Dep.) at 64:24-66:8.  It was, however, widely disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU 0000724), at -30 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners L.P.)").

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  It was widely disclosed to the entire Yeshiva University Board of Trustees that Ascot Partners was "essentially managed by Bernard Madoff."  *See, e.g.*, Reply Ex. 14 (collection of Investment Committee

memorandum, minutes, and conflict of interest reports) at YU 0009587, YU 0023066; *see also id.* at YU 0001442, Reply Ex. 15 (Mnookin Dep. Ex. 1, YU 0000724), at -30 (1992 Investment Committee minutes stating that Yeshiva invested in "Madoff and Company (Ascot Partners L.P.)").

172.    The Director of Research for Research Company A is responsible for conducting ongoing due diligence.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 13:12-20.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

173.    Director of Research conducted due diligence on Ascot on behalf of a Research Company A client.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 13:15-20.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

174.    Director of Research testified that Merkin said that "Charles Ponzi would lose out because it would be called the 'Madoff scheme'" during a phone call in June 2003.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 53:18-23.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.  In addition, AF 174 is incomplete and misleading.  As part of Research Company A's due diligence, it not only spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS statements and trade confirmations in Merkin's office.  Ex. 98 (Research Company A Principal Dep.) at 19:24-20:6; Ex. 97 (Research Company A Employee Dep.) at 20:3-19.  One of the

clients advised by Research Company A invested at least $20 million in Ascot following June

2003 conversations with Merkin and maintained those investments through the time of Madoff's

confession. *Id.* at 168:14-17.

175. Merkin also represented to Director of Research that Madoff "[c]onsistently buys

nearer the lows of the day" and is "[n]ever more than 3/8ths outside the NYSE price range for

the day." Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 66:16-21.

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and

the Trustee's characterization of the testimony raises no genuine issue of fact. In addition, AF

175 is incomplete and misleading. As part of Research Company A's due diligence, it not only

spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS

statements and trade confirmations in Merkin's office. Ex. 98 (Research Company A Principal

Dep.) at 19:24-20:6. One of the clients advised by Research Company A invested at least $20

million in Ascot following June 2003 conversations with Merkin and maintained those

investments through the time of Madoff's confession. *Id.* at 168:14-17.

176. Director of Research testified that Merkin was aware of issues with BLMIS's

option volume, stating: "We [ ] were asking him about the volume of – of stock trading and we

received certain answers and [Merkin] followed up to say that he's more concerned, was how I

interpreted it, he was more concerned about the volume in options as opposed to the stocks."

Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 45:12-16 ("The bigger

question is volume in options."), 45:20-46:2; Hoang Decl. Ex. 43 (Trustee Ex. 208).

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and

the Trustee's characterization of the testimony raises no genuine issue of fact. In addition, AF

176 is incomplete and misleading. As part of Research Company A's due diligence, it not only

spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS

statements and trade confirmations in Merkin's office.  Ex. 98 (Research Company A Principal

Dep.) at 19:24-20:6.  One of the clients advised by Research Company A invested at least $20

million in Ascot following June 2003 conversations with Merkin and maintained those

investments through the time of Madoff's confession.  *Id.* at 168:14-17.

177.    Merkin also told Director of Research that "I have come to accept there are things

that I don't understand" with regards to Madoff.  Hoang Decl. Ex. 41 (Research Company A

Director of Research Dep.) at 46:3-7.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and

the Trustee's characterization of the testimony raises no genuine issue of fact.  In addition, AF

177 is incomplete and misleading.  As part of Research Company A's due diligence, it not only

spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS

statements and trade confirmations in Merkin's office.  Ex. 98 (Research Company A Principal

Dep.) at 19:24-20:6; Ex. 97 (Research Company A Employee Dep.) at 20:3-19.  One of the

clients advised by Research Company A invested at least $20 million in Ascot following June

2003 conversations with Merkin and maintained those investments through the time of Madoff's

confession.  *Id.* at 168:14-17.

178.    Director of Research testified that his notes state that, "Ezra did not have a good

explanation for how Madoff executes option trades in such size."  Hoang Decl. Ex. 41 (Research

Company A Director of Research Dep.) at 46:13-16.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and

the Trustee's characterization of the testimony raises no genuine issue of fact.  In addition, AF

178 is incomplete and misleading.  As part of Research Company A's due diligence, it not only

spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS statements and trade confirmations in Merkin's office. Ex. 98 (Research Company A Principal Dep.) at 19:24-20:6. One of the clients advised by Research Company A invested at least $20 million in Ascot following June 2003 conversations with Merkin and maintained those investments through the time of Madoff's confession. *Id.* at 168:14-17.

179.    Director of Research testified that it was his opinion that there "[s]eems to be some probability in Ezra's mind that this could be a fraud." Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 76:1-6.

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact. In addition, AF 179 is incomplete and misleading. As part of Research Company A's due diligence, it not only spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS statements and trade confirmations in Merkin's office. Ex. 98 (Research Company A Principal Dep.) at 19:24-20:6. One of the clients advised by Research Company A invested at least $20 million in Ascot following June 2003 conversations with Merkin and maintained those investments through the time of Madoff's confession. *Id.* at 168:14-17.

180.    Jason Orchard ("Orchard") is the Chief Financial Officer and Managing Director in charge of the hedge fund group at Spring Mountain Capital ("SMC"), an alternative investment management firm. Hoang Decl. Ex. 39 (Orchard Dep.) at 19:12-16, 24:15-21.

**Defendants' Response**: Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

181.    SMC invested in Ascot Partners, Ascot Fund, Ariel and Gabriel. Hoang Decl. Ex. 39 (Orchard Dep.) at 65:11-16.

**Defendants' Response**: Not disputed.

182.    Orchard met with Merkin as part of his due diligence. Hoang Decl. Ex. 39 (Orchard Dep.) at 19:12-16, 61:22-62:23.

**Defendants' Response**: Not disputed.

183.    In a meeting on November 14, 2005 between Merkin, Orchard and representatives of Aozora Bank, Merkin described three types of trading strategies that Ascot implemented in addition to the SSC strategy. Hoang Decl. Ex. 68 (Orchard November 14, 2005 notes).

**Defendants' Response**: Defendants submit that the cited document speaks for itself, and the Trustee's characterization of the document raises no genuine issue of fact.

184.    One of these trades, a "bull spread trade," which was similar to the split-strike conversion strategy but options on single name stocks were used. He also discussed a "bear spread trade," where Ascot "put on the opposite positions of the bull spread trade" and another strategy where Ascot "will short two put options, be long a call and long the stock." Merkin noted that each of these trades would be put on depending on the market environment. Hoang Decl. Ex. 68 (Orchard November 14, 2005 notes) at SMC-NYAG000001-02.

**Defendants' Response**: Defendants submit that the cited document speaks for itself, and the Trustee's characterization of the document raises no genuine issue of fact.

185.    During a meeting with Merkin in November 2005, Merkin made several misrepresentations to Orchard, including that:

- Ascot's positions are typically held for three to six months. Hoang Decl. Ex. 39 (Orchard Dep.) at 103:16-23.
- Ascot trades would sometimes be outside the S&P 100. *Id*. at 102:12- 103:15.
- "It was understood or it was explained to me that when the funds were not invested, they were in cash at Morgan Stanley and the cash would be held there." *Id*. at 102:12-103:15, 105:17-20.

- Ascot utilizes a "12 minute rule" where "Ezra or Bernie have to establish all three legs of the typical trade within 12 minutes, otherwise the trade legs established are sold."  *Id*. at 116:7-117:14.
- "Ascot is no different than flipping a coin, but trades are structured so that Ascot can be right only 25 percent of the time and still be able to break even."  *Id*. at 106:20-107:6.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

186.    Merkin also told Orchard that in the past "Ascot [Partners] executed these trades as well as allowed Mr. Madoff to clear some of these trades through his broker-dealer," but that "the execution ability of Madoff, especially in the option market, has proven to have done better than Ascot [Partners'] own execution and therefore, the majority of the trade execution and clearing is now done at Madoff Securities."  Hoang Decl. 68 (Orchard November 14, 2005 notes) at SMC-NYAG000003.

**Defendants' Response**:  Defendants submit that the cited document speaks for itself, and the Trustee's characterization of the document raises no genuine issue of fact.

187.    Merkin told Orchard "that he could established (sic) guidelines in which Mr. Madoff could then – could then invest, as long as the opportunities fell within those guidelines or parameters."  Hoang Decl. Ex. 39 (Orchard Dep.) at 108:15-18, 114:13-20.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

188.    Josh Nash ("Nash") is a sophisticated money manager who knew Merkin both socially and professionally for over twenty years.  Hoang Decl. Ex. 30 (Nash Dep.) at 40:14-19, 41:2-3.

**Defendants' Response**:  Not disputed.

189.    Nash invested in Gabriel, both personally and through a family fund called the "Nash Family Partnership."  Hoang Decl. Ex. 30 (Nash Dep.) at 56:22-57:10.

**Defendants' Response**:  Not disputed.

190.    Merkin was aware that Nash did not want to be invested with BLMIS and that Nash had previously redeemed from BLMIS.  Hoang Decl. Ex. 30 (Nash Dep.) at 48:22-52:14.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

191.    Nash's father, Jack Nash, had previously had a direct investment with BLMIS. Jack and Josh Nash had a meeting with Madoff prior to the time Jack Nash made his redemption from BLMIS.  They discussed issues including Madoff's use of a small auditor rather than one that was large and well-known.  Hoang Decl. Ex. 30 (Nash Dep.) at 29:4-34:7, 35:23-36:6.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

192.    Nash noted that he was not comfortable with Madoff's explanations at the meeting.  Hoang Decl. Ex. 30 (Nash Dep.) at 30:22-24.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

193.    After a review of the account statements, Nash "didn't understand how, by buying stocks, selling calls and buying puts, one would have made money every month."  Hoang Decl. Ex. 30 (Nash Dep.) at 28:10-13.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

194.    Nash told Merkin that he was skeptical of BLMIS and, as a fiduciary, was not comfortable investing in BLMIS, stating, "The lack of a major accounting firm to me was a red flag."  Hoang Decl. Ex. 30 (Nash Dep.) at 51:6-52:8.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

195.    Merkin, however, never disclosed to Nash that Gabriel was invested with BLMIS. Nash only learned that Gabriel was invested with BLMIS after it collapsed.  Hoang Decl. Ex. 30 (Nash Dep.) at 47:4-48:4.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

196.    New York University ("NYU") invested $20 million with Ariel in 1994, and an additional $10 million in 1997, an investment that they maintained through December 2008. Hoang Decl. Ex. 47 (Surh Dep.) at 24:9-20.

**Defendants' Response**:  Not disputed.

197.    Tina Surh ("Surh") was a director of investments at NYU from 2005 to 2008. Hoang Decl. Ex. 47 (Surh Dep.) at 11:16-20.

**Defendants' Response**:  Not disputed.

198.    Surh met with Merkin in October 2008 on behalf of NYU where Merkin suggested that NYU consider investing with BLMIS.  Hoang Decl. Ex. 47 (Surh Dep.) at 38:11-13, 40:25-43:20.  Surh testified that Merkin suggested NYU consider investing with BLMIS, but acknowledged that the fact that BLMIS self-cleared was a "significant negative."  Surh informed Merkin that the lack of a third-party administrator "would be a non-starter" and would make an opportunity to invest with BLMIS "unpalatable" for NYU.  Merkin never disclosed to NYU that

it was in fact already invested with BLMIS through its investment with Ariel.  SOF Response ¶¶ 157, 173.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

199.    Post-collapse of BLMIS, Surh received Merkin's investor letter and testified that she was "pretty shocked this fund was in Ariel's portfolio given how we told him that we could never invest in a fund like that.  The guy was doing his own marks from an institutional perspective."  Hoang Decl. Ex. 47 (Surh Dep.) at 62:4-8.

**Defendants' Response**:  Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of fact.

200.    GCC served as investment advisor to Ascot Fund from 1992 until January 2003.  Hoang Decl. Ex 69 (Termination Agreement between GCC and Ascot Fund).

**Defendants' Response**:  Defendants submit that the cited document speaks for itself, and the Trustee's characterization raises no genuine issue of fact.  Defendants further submit that the cited document terminates the Investment Advisory Agreement between Ascot Fund and GCC on December 31, 2002.  Hoang Decl. Ex. 69 (Termination Agreement between GCC and Ascot Fund).

201.    Merkin told Ascot investors that the reorganization will make the investing process "cheaper and more efficient" for both funds and justified an increase in their respective management fees from 1% to 1.5% due to the "rising expenses" of running the funds.  Hoang Decl. Ex. 12 (Ascot Fund November 11, 2002 Letter) at GCC-NYAG 0031103; Hoang Decl. Ex. 70 (Ascot Partners November 11, 2002 Letter) at BS00451097.

**Defendants' Response:**    Defendants submit that the cited documents speak for themselves, and the Trustee's characterization raises no genuine issue of fact.

202.    However, there was no increase in expenses to Merkin for running Ascot Partners or Ascot Fund, as each fund was nearly entirely invested with BLMIS—in fact, in the years before the reorganization, from 2000 through 2003, both Ascot Partners and Ascot Fund had 100% of their assets invested with BLMIS.  *See supra* ¶ 50.

**Defendants' Response:**  AF 202 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).   In addition, the Trustee cites no evidence supporting his contention, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . ."); *see Major League Baseball*, 542 F.3d at 310 ("In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles."); *see also* Response to AF 50.

203.    The general operation of Ascot Fund did not change after it switched to a master feeder relationship.  In fact, Merkin continued to meet with investors on behalf of Ascot Fund. Hoang Decl. Ex. 71 (Seymour Dep.) at 96:18-97:4 ("I recall the investment advisory agreement that existed before, in relation to Ascot.  So that was one of the services that they provided under that agreement.  And after that agreement ceased, there was a limited partnership agreement and they continued to provide basically the same services under a different agreement."); Hoang Decl. Ex. 18 (Ascot Fund January 2003 Prospectus) at BS00020963 ("[t]he success of the Master

Fund depends primarily upon the Managing Partner of the Master Fund[, . . . J. Ezra Merkin]);
Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 43:15-44:4; Hoang Decl. Ex. 68 (Orchard
November 14, 2005 notes) at SMC-NYAG000001; Hoang Decl. Ex. 39 (Orchard Dep.) at 97:23-
98:9; Hoang Decl. Ex. 37 (Erne Dep.) at 43-44; Hoang Decl. Ex. 4 (Research Company A
Principal Dep.) at 135:1-10.

**Defendants' Response**:  The Trustee mischaracterizes the testimony and documents
cited, and thus AF 203 is misleading and raises no genuine issue of material fact.  The Trustee's
cited evidence does not support his statement and should be disregarded.  *Holtz*, 258 F.3d at 74
("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those
assertions should be disregarded and the record reviewed independently.").  Instead, the cited
evidence makes clear only that GCC (not Merkin) continued to engage in back office work for
Ascot Fund. ██████████████████████████████████  But this back office work
decreased when Ascot Fund became a limited partner of Ascot Partners.  Hoang Decl. Ex. 13
(Autera 30(b)(6) Dep.) at 43:23-44:1.  The Ascot Fund director's testimony of Donald Seymour
("Seymour") cited by the Trustee does not concern Merkin at all, and, in fact, Seymour was
generally aware of Merkin, but does not recall speaking with him, had never been to his offices,
and did not meet Merkin prior to December 11, 2008. ████████████████████████
███████████████████████████████████████████████████████████████
████████████████.  Another of the Ascot Fund's directors, Aldo Ghisletta, had also never met
or spoken to Merkin.  Hoang Decl. Ex. 73 (Ghisletta Dep.) at 24:21-25:23.  The references to
Merkin in the Trustee's cited documents and testimony concerned only his knowledge of and
direction regarding Ascot's investment strategy, which, because Ascot Fund was a limited
partner of Ascot Partners, was the same strategy as Ascot Partners.

204.    Ascot Fund engaged Donald Seymour ("Seymour") and Aldo Ghiseletta

("Ghisletta") of DMS Offshore Investment Services Ltd., to serve as directors on December 28,

2001 and November 30, 2002, respectively.    Hoang Decl. Ex. 72 (Ascot Fund Register of

Directors and Officers) at AF00000140; Hoang Decl. Ex. 71 (Seymour Dep.) at 39:19-24; Hoang

Decl. Ex. 73 (Ghisletta Dep.) at 25:9-13.    At that time, Ascot Fund maintained a direct account

with BLMIS and was investing substantially all of its assets with BLMIS.    Hoang Decl. Ex. 71

(Seymour Dep.) at 39:19-24.

**Defendants' Response**:    Defendants do not dispute that Seymour and Ghiseletta of DMS

Offshore Investment Services Ltd. began to serve as directors of Ascot Fund on December 28,

2001, and November 30, 2002, respectively.    With respect to the statement that "[a]t that time,

Ascot Fund maintained a direct account with BLMIS and was investing substantially all of its

assets with BLMIS," the evidence cited by the Trustee does not support his position, and thus

such assertion should be disregarded.    *See Holtz*, 258 F.3d at 74 ("Where, as here, the record

does not support the assertions in a Local Rule 56.1 statement, those assertions should be

disregarded . . . .").

205.    Seymour and Ghisletta served as professional directors for a nominal fee of

$7,500 per year.  Hoang Decl. Ex. 71 (Seymour Dep.) at 65:6-9.

**Defendants' Response**:    The Trustee mischaracterizes Seymour's testimony, and thus

AF 205 is misleading and raises no genuine issue of material fact.    Defendants submit that the

cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no

genuine issue of material fact.

206.    Seymour never met Merkin until after the fraud in 2009 and Ghiseltta testified that he has never even spoken with Merkin.  Hoang Decl. Ex. 71 (Seymour Dep.) at 38:7-9; Hoang Decl. Ex. 73 (Ghisletta Dep.) at 25:21-23.

**Defendants' Response:**  Not disputed.

207.    Ghisletta did not recall ever holding an Ascot Fund board meeting and no documentation exists of any meetings prior to December 11, 2008.  Hoang Decl. Ex. 73 (Ghisletta Dep.) at 72:10-13.

**Defendants' Response**:    The Trustee mischaracterizes Ghisletta's testimony, and thus AF 207 is misleading and raises no genuine issue of material fact.  Ghisletta testified only that he did not recall having a board meeting prior to December 11, 2008, not that one never occurred. Hoang Decl. Ex. 73 (Ghisletta Dep.) at 72:10-13.  His testimony just prior indicates that he had been at board meetings for Ascot Fund and Ariel prior to that time.  *Id.* at 72:1-4.  The evidence cited by the Trustee does not support any remaining assertions, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").

208.    All business decisions on behalf of Ascot Fund, including those related to investments with BLMIS, were made by Merkin, even after the transition to the master-feeder structure.  Hoang Decl. Ex. 71 (Seymour Dep.) at 77:16-23; Steiner Decl. Ex. 17 (Ascot Fund October 2006 Confidential Offering Memorandum) at GCC-NYAG0000048; Hoang Decl. Ex. 8 (Merkin Dep.) at 277:4-18.

**Defendants' Response**:    The Trustee mischaracterizes the testimony and documents cited, and thus AF 208 is misleading and raises no genuine issue of material fact.  The Trustee cites no evidence supporting AF 208, and thus such assertions should be disregarded.  *See Holtz*,

258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1

statement, those assertions should be disregarded . . . ."); *see Major League Baseball*, 542 F.3d at

310 ("In order to defeat a properly supported summary judgment motion, the opposing party

must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed

factual issue that is material under the applicable legal principles.").  The Trustee's evidence

merely states that Merkin had discretion with respect to how to manage Ascot Partners as its

general partner.

209.    Seymour testified that Merkin maintained sole authority over Ascot Fund: "The

voting shares of this fund was held by the general partner and that was Merkin in this case.  And

the voting shares actually controlled the fund, including the board."  Hoang Decl. Ex. 71

(Seymour Dep.) at 92:3-20.

**<u>Defendants' Response</u>**:  The Trustee mischaracterizes Seymour's testimony, and thus

AF 209 is misleading and raises no genuine issue of material fact.  The Trustee cites no evidence

supporting that Merkin maintained sole authority over Ascot Fund, and thus such assertion

should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support

the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . ."); *see*

*Major League Baseball*, 542 F.3d at 310 ("In order to defeat a properly supported summary

judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific

facts' showing a genuinely disputed factual issue that is material under the applicable legal

principles.").  The cited testimony instead states that the holder of the voting shares could

appoint and remove directors.  Hoang Decl. Ex. 71 (Seymour Dep.) at 92:3-7.

210.    Ghisletta testified that no investment decisions could be made without Merkin's

approval.  Hoang Decl. Ex. 73 (Ghisletta Dep.) at 79:17-80:2.

**Defendants' Response**:  The Trustee mischaracterizes Ghisletta's testimony, and thus AF 210 is misleading and raises no genuine issue of material fact.  The evidence cited by the Trustee does not support his assertion, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").  Merkin, as general partner of Ascot Partners, in which Ascot Fund was a limited partner, had the discretion to oversee the investment strategy of Ascot.

211.    Seymour was appointed a Director of Ascot Fund in 2001, prior to the switch to a master feeder structure.  Hoang Decl. Ex. 73 (Ghisletta Dep.) at 39:20-24.

**Defendants' Response:**  Not disputed.

212.    Ascot Fund's directors had no role in the investment decisions or the overall strategy of the fund.  In fact, they testified that they had never even heard of Madoff prior to his arrest in December 2008.  Hoang Decl. Ex. 71 (Seymour Dep.) at 35:23-36:8 (Mr. Seymour stated that he first heard about Madoff "In the press when the scheme was revealed."); Hoang Decl. Ex. 73 (Ghisletta Dep.) at 24:11-17.

**Defendants' Response**:  The Trustee mischaracterizes the cited testimony, and thus AF 212 is misleading and raises no genuine issue of material fact.  The evidence cited by the Trustee does not support his assertions, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").  Merkin was responsible for overseeing the investment strategy of Ascot, a decision Ascot Fund's directors had made when it determined to become a limited partner of Ascot Partners. ██████████████████

213.    Despite being the sole Director of Ascot Fund in 2001, Seymour testified that he was not aware at the time that Ascot Fund maintained an account at BLMIS or that substantially all of Ascot Fund's assets were invested in BLMIS.   Hoang Decl. Ex. 71 (Seymour Dep.) at 101:10-101:23.

**Defendants' Response**:   The Trustee mischaracterizes Seymour's testimony, and thus AF 213 is misleading and raises no genuine issue of material fact.   Defendants submit that the cited testimony speaks for itself, and the Trustee's characterization of the testimony raises no genuine issue of material fact.

214.    Between October 1, 1990 and the Filing Date, the Merkin Funds invested over one billion dollars with BLMIS through at least 80 separate wire transfers directly to BLMIS's bank account.   Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 28, 43, 56, 90, 105, 126, Exs. 4A, 4K, 4O, 4P, 4Q, 4R.   From at least 1998 through 2008, the BLMIS bank account at JPMorgan Chase & Co. was Account # xxxxxx703 (the "BLMIS Bank Account").   Collura Decl. Ex. 1 (Collura Report) ¶¶ 24-25; Dubinksy Decl. Ex. 1 (Dubinsky Expert Report) ¶ 76.

**Defendants' Response**:   Not disputed.

215.    In total, Ascot Partners BLMIS account 1A0058 had cash deposits totaling $552,335,889; inter-account transfers of principal to the account of $422,027,224; cash withdrawals of $489,840,000; and inter-account transfers of principal from the account of $258,504,709.   Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 94, Exs. 3D, 4P.

**Defendants' Response**:   AF 215 is misleading, and raises no genuine issue of material fact.   Defendants do not dispute the amounts of cash deposits into and cash withdrawals and inter-account transfers of principal out of Ascot Partners' BLMIS account 1A0058.   Defendants dispute, however, that the Trustee's expert's calculation of the amount of inter-account transfers

of principal into the account is correct as a matter of law as described in Defendants' Response

to AF 25 and Rebuttal JSOMF ¶¶ 66-68.

216.    Based on the cash and principal transactions in Ascot Partners BLMIS account

1A0058, there was $226,018,404 of principal in the account as of December 11, 2008.

Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 96, Exs. 3D, 4P.

**Defendants' Response**:    AF 216 is a legal conclusion inappropriate for a Rule 56.1

Statement.    Defendants dispute the amount of principal in Ascot Partners' BLMIS account

1A0058 as a matter of law as described in Defendants' Response to AF 25 and Rebuttal JSOMF

¶¶ 66-68.    Ascot Partners principal in its BLMIS account as of December 11, 2008, using the

calculation that takes into account the transfer of securities by Shalvah is $235,734,338 million.

217.    In the two years before December 11, 2008, $280,000,000 was withdrawn from

Ascot Partners BLMIS account 1A0058.    Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 96,

Ex. 4P.    This was accomplished via four withdrawals:

- On December 29, 2006, there was a $10,000,000 withdrawal.

- On December 31, 2007, there was a $175,000,000 withdrawal.

- On July 2, 2008, there was a $50,000,000 withdrawal.

- On October 1, 2008, there was a $45,000,000 withdrawal.

Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4P.

**Defendants' Response**:  Not disputed.

218.    Ascot Partners received transfers from BLMIS to Morgan Stanley Account No.

38-23021, which was held in its name.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 8, 52-53, Ex. 10.

**Defendants' Response**:  Not disputed.

219.    GCC and Ascot Fund both received subsequent transfers of the initial transfers of BLMIS funds to Ascot Partners in the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) Ex. 13.

**Defendants' Response**:  AF 219 is a legal conclusion inappropriate for a Rule 56.1 Statement.  Defendants do not dispute that Ascot Partners transferred money to GCC and Ascot Fund in the two years prior to December 11, 2008.

220.    There was commingling in the Defendants' bank accounts.[3]  Collura Decl. Ex. 1 (Collura Report) ¶ 62.  Commingling in this context means that there was a combination of BLMIS funds (Initial and/or Subsequent Transfers) and other sources of funds in each respective bank account, such that BLMIS funds become unidentifiable and/or inseparable.  *Id.* at ¶ 57.

**Defendants' Response**:  AF 220 is a legal conclusion inappropriate for a Rule 56.1 Statement.  Defendants do not dispute that Morgan Stanley and JPMorgan Chase bank accounts considered by Ms. Collura contained both funds originating from BLMIS and funds originating from other sources, including investor contributions.  Hoang Decl. Ex. 74 (Meyer Expert Report) at 15 n.59.

221.    Ascot Fund received subsequent transfers from Ascot's Morgan Stanley Account No. XX-XX021 to Morgan Stanley Account No. XX-XX020 and Fortis Bank Account No. XXX336.  Collura Decl. Ex. 1 (Collura Report) Ex. 13.1.

**Defendants' Response**:  AF 221 is a legal conclusion inappropriate for a Rule 56.1 Statement.  Defendants do not dispute that Ascot Partners transferred money to Morgan Stanley Account No. XX-XX020 and Fortis Bank Account No. XXX336.

---

[3]    Ms. Collura considered five bank accounts in her commingling analysis:  four Morgan Stanley accounts held in names of Ascot Partners, Ariel Fund, Gabriel Capital, and GCC, respectively, and a fifth account held in the name of GCC at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 57-58.

222.    As there was commingling in the Defendants' bank accounts, Ms. Collura applied

five tracing methods to chronological lists of transactions that were derived from GCC, Ascot

and Ascot Fund bank records to identify Subsequent Transfers of BLMIS funds.  Collura Decl.

Ex. 1 (Collura Report) ¶¶ 81-82.

**Defendants' Response**:  AF 222 is a legal conclusion inappropriate for a Rule 56.1

Statement.   Defendants  do  not  dispute  that  the  Collura  applied  five  methodologies  to  the

transactions in the examined bank accounts to determine the amount of funds were transferred to

various Defendants under the five different methodologies utilized.

223.    These five tracing methods are "Last In, First Out ("LIFO"), "First In, First Out"

("FIFO"), "Lowest Intermediate Balance" ("LIBR"), "Restated Tracing Rules"(referred to as

"Restated LIBR"), and "Proportionality."  Collura Decl. Ex. 1 (Collura Report) ¶ 81.

**Defendants' Response**:  AF 223 is misleading and raises no genuine issue of material

fact.  Defendants do not dispute that Collura used five methodologies as defined by the Trustee

to trace the funds flow into and out of the examined bank accounts.  Collura Decl. Ex. 1 (Collura

Report) ¶ 82.

224.    The LIFO method is an accounting practice used to determine the cost of

inventory.  LIFO assumes that the inventory sold during a certain period comes from the most

recent inventory purchased.  Simply, under LIFO, the last units of inventory purchased are the

first units to be sold.  LIFO is also a method applied to trace funds in and out of a commingled

bank account.   Using LIFO, the last money deposited into a commingled bank account is

considered to be the first money disbursed from that account.  Collura Decl. Ex. 1 (Collura

Report) ¶ 84.

**Defendants' Response**:  AF 224 is incomplete, misleading, and raises no genuine issue of material fact.  LIFO is an appropriate methodology to apply in these circumstances, because it "is consistent with how Ascot Partners was actually managed.  As described above, Ascot Partners withdrew funds from BLMIS to satisfy a known, immediate and specific need to pay investor redemptions or management fees (including to meet the needs of Ascot Fund investor redemptions) during a specific break period. The LIFO tracing method is consistent with the nature of the transaction activity at issue."  Hoang Decl. Ex. 74 (Meyer Report) ¶ 38.

225.    Applying the LIFO method, $21,081,296 was transferred to Ascot Fund and $11,406,779 was transferred to GCC of the initial transfers during the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 86, Ex. 13.

**Defendants' Response**:  The evidence cited by the Trustee does not support AF 225, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").  The evidence shows that Collura found that, applying the LIFO method, $11,405,779 (not $11,406,779) of funds from the initial transfers to Ascot Partners were transferred from Ascot Partners to GCC.  Collura Decl. Ex. 1 (Collura Report) ¶ 86, Ex. 13. Otherwise, AF 225 is not disputed.

226.    The FIFO method is another accounting practice used to determine the cost of inventory.  FIFO assumes that the inventory sold during a certain period comes from the oldest inventory purchased.  Simply, under FIFO, the first units of inventory purchased are the first units to be sold.  FIFO is also a method applied to trace funds in and out of a commingled bank account.  Using FIFO, the first money deposited into a commingled bank account is considered

to be the first money disbursed from that bank account.  Collura Decl. Ex. 1 (Collura Report) ¶ 90.

**Defendants' Response**:  AF 226 is incomplete, misleading, and raises no genuine issue of material fact.  "As Ascot Partners withdrew funds from BLMIS, and then immediately transferred the funds out to pay investor redemptions and management fees, a FIFO tracing method is not consistent with how Ascot Partners operated."  Hoang Decl. Ex. 74 (Meyer Report) ¶ 43.  The Trustee has not provided any evidence supporting the appropriateness of FIFO, and thus his assertions regarding FIFO should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . ."); *see Major League Baseball*, 542 F.3d at 310 ("In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles.").

227.    Applying the FIFO method, $33,365,000 was transferred to Ascot Fund and $12,051,196 was transferred to GCC of the initial transfers during the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 91, Ex. 13.

**Defendants' Response**:  Not disputed.

228.    LIBR is a tracing principal used to determine the rights to funds remaining in a commingled bank account (e.g., the rights of a trust beneficiary or the rights of a secured party).  LIBR assumes that trust or secured funds deposited into a commingled bank account are the last funds disbursed from that account, and any disbursements made from the account are taken first from funds other than the trust or secured funds until the balance in the account dips below the amount of those trust or secured funds.  In other words, under LIBR, trust or secured funds are

assumed to fall to the bottom of the commingled bank account and subsequent disbursements made from the commingled account are taken off the top first.  Collura Decl. Ex. 1 (Collura Report) ¶ 95.

**Defendants' Response**:  AF 228 is a legal conclusion inappropriate for a Rule 56.1 Statement.  In addition, AF 228 is incomplete, misleading, and raises no genuine issue of material fact.  The LIBR methodology used by Collura does not comport with how Ascot Partners operated in practice.  Hoang Decl. Ex. 74 (Meyer Report) ¶ 44.  The Trustee has not provided any evidence supporting the appropriateness of LIBR, and thus his assertions regarding LIBR should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . ."); *see Major League Baseball*, 542 F.3d at 310 ("In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles.").  Defendants do not dispute that Collura applied LIBR as a tracing principal as defined in AF 228 to trace the funds flow into and out of the examined bank accounts.

229.    Applying LIBR, $29,064,189 was transferred to Ascot Fund and $9,356,021 was transferred to GCC of the initial transfers during the two years before December 11, 2008. Collura Decl. Ex. 1 (Collura Report) ¶ 97, Ex. 13.

**Defendants' Response**:  Not disputed.

230.    Certain rules regarding tracing of funds through a commingled bank account were restated in 2011.  Pursuant to these restated tracing rules, withdrawals from a commingled bank account can be "marshaled so far as possible in favor of the claimant" (here, the Trustee), and the

claimant can "claim the entire advantage of beneficial withdrawals that can be attributable to the claimant's funds" (i.e., BLMIS funds).   Further, the claimant can trace to his benefit any withdrawal from the commingled bank account that does not exceed the lowest balance reached in that commingled account between 1) the point at which the Trustee's funds (i.e., BLMIS funds) are deposited into the commingled bank account and 2) the point at which the withdrawal is made.  Collura Decl. Ex. 1 (Collura Report) ¶ 102.

**Defendants' Response**:   AF 230 is a legal conclusion inappropriate for a Rule 56.1 Statement.   In addition, AF 230 is misleading and raises no genuine issue of material fact. Defendants do not dispute that Section 59 of the Restatement of Restitution and Unjust Enrichment ("Restatement § 59") was restated in 2011.   Reply Ex. 27 (Collura Dep.) at 71:18-72:9; Collura Report Ex. 4, *see* Reply Decl. ¶ 3.  Restatement § 59, however, makes a distinction between "a recipient who is a conscious wrongdoer or a defaulting fiduciary" and one who is "an innocent recipient."  Collura reviewed Restatement § 59 and applied a methodology that assumes the recipient is a conscious wrongdoer.  Reply Ex. 27 (Collura Dep.) at 71:18-73:11.  Collura testified that, while the "restatement didn't lay out steps as to how to apply the restated rules, . . . based on my review and understanding of what was in the restatement, I applied those concepts to the activity in the bank accounts."  *Id.* at 73:7-11.  Collura assumed that Defendants were the wrongdoers as stated in Restatement § 59 and thus applied the rules for such wrongdoers (instead of the rules for innocent recipients) delineated therein, despite the fact that "it didn't matter to [her] one way or another if the defendant was in fact a wrongdoer."   *Id.* at 110:20-112:11. Moreover, the Restated LIBR methodology used by Collura does not comport with how Ascot Partners operated in practice.  Hoang Decl. Ex. 74 (Meyer Report) ¶ 44.  The Trustee has not provided any evidence supporting the appropriateness of the Restated LIBR methodology, and

thus his assertions regarding the Restated LIBR methodology should be disregarded. *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . ."); *see Major League Baseball*, 542 F.3d at 310 ("In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles.").

231.    Applying Restated LIBR, $33,365,000 was transferred to Ascot Fund and $17,756,812 was transferred to GCC of the initial transfers during the two years before December 11, 2008. Collura Decl. Ex. 1 (Collura Report) ¶ 103, Ex. 13.

**Defendants' Response**:  AF 231 is misleading and raises no genuine issue of material fact.  Defendants do not dispute that Collura applied the so-called Restated LIBR as a methodology to trace the funds flow into and out of the examined bank accounts.  Defendants do not dispute that, utilizing the "Restated LIBR" methodology defined by the  Trustee and Collura, $33,365,000 of funds from the initial transfers to Ascot Partners were transferred from Ascot Partners to Ascot Fund and $17,756,812 was transferred from Ascot Partners to GCC.

232.    Proportionality (also known as pro rata) is another tracing method used to trace funds in and out of a commingled bank account.  This method calculates the proportion of the balance in a bank account between sources each time a deposit is made and applies that proportion to the next disbursement from the account are taken off the top first.  Collura Decl. Ex. 1 (Collura Report) ¶ 107.

**Defendants' Response**:  AF 232 is incomplete, misleading, and raises no genuine issue of material fact.  The evidence cited by the Trustee does not support the statement in AF 232 that the proportion is applied "to the next disbursement from the account are taken off the top first,"

and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").  "Proportionality is a tracing method used to associate disbursements from an account with funds originating from multiple sources."  Hoang Decl. Ex. 74 (Meyer Report) ¶ 40.  Proportionality is an appropriate methodology to apply "in these circumstances, as Ascot Partners' investor redemptions requirements and management fee payments to GCC were met through a combination of the most recent investor contributions in a break period and transfers from Gabriel and Ariel, in addition to withdrawals from BLMIS."  *Id.*

233.    Applying Proportionality, $25,984,614 was transferred to Ascot Fund and $11,546,306 was transferred to GCC of the initial transfers during the two years before December 11, 2008.  Collura Decl. Ex. 1 (Collura Report) ¶ 109, Ex. 13.

**Defendants' Response**: Not disputed.

234.    In summary, the Ascot Partner's subsequent transfers to Ascot Fund and GCC, respectively, are as follows:

| **Method** | **Ascot Fund** | **GCC** |
|---|---|---|
| FIFO | $21,081,296 | $11,406,779 |
| LIFO | $33,365,000 | $12,051,196 |
| LIBR | 29,064,189 | $9,356,021 |
| Restated LIBR | $33,365,000 | $17,756,812 |
| Proportionality | $25,984,614 | $11,546,306 |

Collura Decl. Ex. 1 (Collura Report) ¶¶ 86, 91, 97, 103, 109, Figs. 13, 13.4, 19, 22, 25.

**Defendants' Response**:  AF 234 is a legal conclusion inappropriate for a Rule 56.1 Statement.  In addition, the evidence cited by the Trustee does not support the figures in the chart in AF 234, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions

should be disregarded . . . .").  Defendants do not dispute that Ascot Partners transferred money to GCC and Ascot Fund in the two years prior to December 11, 2008.  The evidence shows that Collura found that, applying the LIFO method, $11,405,779 (not $12,051,196) of funds from the initial transfers to Ascot Partners were transferred from Ascot Partners to GCC, and $21,081,096 (not $33,365,000) of funds from the initial transfers to Ascot Partners were transferred from Ascot Partners to Ascot Fund.  Otherwise, the chart in AF 234 is not disputed.

235.    Additionally, there were transfers of the subsequent transfers that GCC made of BLMIS funds to, or for the benefit of, Merkin (the "Subsequent Subsequent transfers").  Collura Decl. Ex. 1 (Collura Report) ¶¶ 112-18.  These transfers were calculated using the five tracing methods outlined above.  *Id*. ¶ 112.

**Defendants' Response**:  AF 235 is a legal conclusion inappropriate for a Rule 56.1 Statement.  Defendants do not dispute that GCC transferred money to Merkin in the two years prior to December 11, 2008.

236.    GCC received subsequent transfers from Ascot Partners' Morgan Stanley Account No. XX-XX021 to its Morgan Stanley Account No. XX-XX007.  (Collura Decl. Ex. 1 (Collura Report) Ex. 13.4.

**Defendants' Response**:  AF 236 is a legal conclusion inappropriate for a Rule 56.1 Statement.  Defendants do not dispute that Ascot Partners transferred money to GCC's Morgan Stanley Account No. XX-XX007.

237.    Applying the LIFO method, $224,508 of the initial transfers was transferred to Merkin and $6,126,617 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 112, Ex. 16.[4]

**Defendants' Response**:  Not disputed.

238.    Applying the FIFO method, $188,111 of the initial transfers was transferred to Merkin and $7,137,413 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 122, Ex. 16.[5]

**Defendants' Response**:  AF 238 is incomplete, misleading, and raises no genuine issue of material fact.  *See* Response to AF 226.

239.    Applying LIBR, no money was transferred to Merkin and $5,420,503 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 125, Ex. 16.[6]

**Defendants' Response**:  AF 239 is incomplete, misleading, and raises no genuine issue of material fact.  *See* Response to AF 228.

240.    Applying Restated LIBR, $903,510 of the initial transfers was transferred to Merkin and $9,054,460 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 128, Ex. 16.[7]

---

[4]    There were an additional $4,752,917 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 120.

[5]    There were an additional $13,599,607 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 123.

[6]    There were an additional $5,155,721 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 123.

**Defendants' Response**:  AF 240 is incomplete, misleading, and raises no genuine issue of material fact.  *See* Response to AF 230-231.

241.    Applying Proportionality, $292,663 of the initial transfers was transferred to Merkin and $4,746,330 of the initial transfers was transferred for the benefit of Merkin.  Collura Decl. Ex. 1 (Collura Report) ¶ 131, Ex. 16.[8]

**Defendants' Response**:  AF 241 is misleading and raises no genuine issue of material fact.  The evidence cited by the Trustee does not support AF 225, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").  The evidence shows that Collura found that, applying the Proportionality method, $4,453,667 (not $4,746,330) of funds from the initial transfers to Ascot Partners were transferred from Ascot Partners to GCC and then from GCC for the benefit of Merkin.

242.    In summary, the Ascot subsequent transfers to, or for the benefit of, Merkin, respectively, are as follows:

| Method | Merkin | For the Benefit of Merkin | Totals |
|---|---|---|---|
| LIFO | $224,508 | $6,126,617 | $6,351,125 |
| FIFO | $188,111 | $7,137,413 | $7,325,524 |
| LIBR | - | $5,420,503 | $5,420,503 |
| Restated LIBR | $903,510 | $9,054,460 | $9,957,970 |
| Proportionality | $292,663 | $4,453,667 | $4,746,330 |

---

[7]    There were an additional $18,057,895 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 128.

[8]    There were an additional $8,097,125 of Subsequent Subsequent Transfers of BLMIS funds from GCC's Morgan Stanley account to GCC's account at JPMorgan Chase.  Collura Decl. Ex. 1 (Collura Report) ¶ 132.

Collura Decl. Ex. 1 (Collura Report) ¶¶ 119, 122, 125, 128, 131, Figs. 28, 30, 32, 34, 36.

**Defendants' Response**:  AF 242 is a legal conclusion inappropriate for a Rule 56.1

Statement.  AF 242 is also incomplete, misleading, and raises no genuine issue of material fact.

Defendants dispute that the FIFO, LIBR, and Restated LIBR methodologies listed above are

appropriate for this case.  In addition, the Trustee has not provided any evidence supporting the

appropriateness of any of the methodologies, and thus such assertions regarding the

inappropriate methodologies should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here,

the record does not support the assertions in a Local Rule 56.1 statement, those assertions should

be disregarded . . . ."); *see Major League Baseball*, 542 F.3d at 310 ("In order to defeat a

properly supported summary judgment motion, the opposing party must proffer admissible

evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is

material under the applicable legal principles.").

243.    Paul K. Meyer ("Meyer"), who was retained by Ascot Partners and Ascot Fund,

reviewed the analysis of withdrawals by Ascot Partners from BLMIS and the subsequent

disbursements.[9]  Hoang Decl. Ex. 74 (Meyer Expert Report) ¶¶ 6-7.

**Defendants' Response**:  Not disputed.

244.    Meyer testified that he did not find any issues with the accuracy of Ms. Collura's

calculations.  Hoang Decl. Ex. 75 (Meyer Dep.) at 80:14-23; 109:2-7; 110:8-9, 123:2-11.

**Defendants' Response**:  AF 244 misleading and raises no genuine issue of material fact.

While Meyer did not dispute the veracity or accuracy of Collura's application of the

---

[9]    As Mr. Meyer was also originally retained by Ariel Fund and Gabriel Capital, he was
also tasked with reviewing Ms. Collura's analysis as to disbursements from Ascot
Partners to Ariel Fund and Gabriel Capital.  Hoang Decl. Ex. 74 (Meyer Expert Report)
¶¶ 6-7.

methodologies as defined by her to the transactions in the examined bank accounts, Meyer opined that only two of the five methodologies were appropriate in this case.  Hoang Decl. Ex. 74 (Meyer Report) ¶¶ 38, 40, 44.

245.    The Merkin Funds transferred millions of dollars between their respective bank accounts at Morgan Stanley to offset inter-account transfers at BLMIS.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 67-73, Ex. 11.1.

**Defendants' Response**:  AF 245 is incomplete, misleading, and raises no genuine issue of material fact.  As Ascot's expert opined, "[f]or certain break periods, Ascot Partners would decrease the allocation of funds it held at BLMIS at the same time that Gabriel and/or Ariel would increase the allocation of funds they held at BLMIS.  At times, this would be processed by a transfer from Ascot Partners' BLMIS account (#1-A0058-3) to Gabriel's and/or Ariel's BLMIS account(s) (#1-G0321-3 and #1-FR070-3, respectively) and a [] corresponding transfer would be made by Gabriel and/or Ariel into Ascot Partners' Morgan Stanley Account."  Hoang Decl. Ex. 74 (Meyer Report) ¶ 29.  In addition, AF 245 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

246.    From June 1998 through February 2009, the Merkin Funds transferred the following amounts between their respective Morgan Stanley accounts as reflected in their accounting and bank records:

| **Transferor Bank Account** | **Transferee Bank Account** | **Amount (approximate)** |
|---|---|---|
| Ascot Partners (MS xx-x3021) | Gabriel Capital (MS xx-x3003) | $148 million |
| Ascot Partners | Ariel Fund | $52 million |

| (MS xx-x3021) | (MS xx-x3001) | |
|---|---|---|
| Gabriel Capital (MS xx-x3003) | Ascot Partners (MS xx-x3021) | $190 million |
| Gabriel Capital (MS xx-x3003) | Ariel Fund (MS xx-x3001) | $208 million |
| Ariel Fund (MS xx-x3001) | Ascot Partners (MS xx-x3021) | $76 million |
| Ariel Fund (MS xx-x3001) | Gabriel Capital (MS xx-x3003) | $366 million |

Collura Decl. Ex. 1 (Collura Report) ¶ 64, Ex. 11.1.

**Defendants' Response**:  AF 246 is misleading and raises no genuine issue of material fact.  In addition, AF 246 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

247.    There were numerous instances of transfers between the Merkin Funds' accounts at BLMIS that corresponded to transfers between the Merkin Funds' respective bank accounts. Collura Decl. Ex. 1 (Collura Report) ¶¶ 67-73, Ex. 11.1.

**Defendants' Response**:  AF 247 is incomplete, misleading, and raises no genuine issue of material fact.  As Ascot's expert opined, "[f]or certain break periods, Ascot Partners would decrease the allocation of funds it held at BLMIS at the same time that Gabriel and/or Ariel would increase the allocation of funds they held at BLMIS.  At times, this would be processed by a transfer from Ascot Partners' BLMIS account (#1-A0058-3) to Gabriel's and/or Ariel's BLMIS account(s) (#1-G0321-3 and #1-FR070-3, respectively) and a [] corresponding transfer would be made by Gabriel and/or Ariel into Ascot Partners' Morgan Stanley Account."  Hoang Decl. Ex.

74 (Meyer Report) ¶ 29. In addition, AF 247 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact. *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

248.    In the context of the Merkin Fund's BLMIS accounts, an inter-account transfer is a non-cash transaction between BLMIS customer accounts in which no new funds entered or left BLMIS, but rather a book entry occurred at BLMIS to internally adjust the balance of those accounts. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 9. These books entries did not reflect any transfers of cash because there was no actual movements of cash. *Id.* Rather, these inter-account transfers changed reported values in the purported "equity" maintained in the BLMIS customer's account. *Id.*

**Defendants' Response**: Not disputed.

249.    The total transfers between the Merkin Fund's BLMIS accounts that correspond with the total transfers between the Merkin Fund's bank accounts at Morgan Stanley (*see supra* ¶ 246) can be summarized as follows:

| **Transferor** | **Transferee** | **Amount Transferred to BLMIS Account (approximate)** |
|---|---|---|
| Ascot Partners | Gabriel Capital | $141 million |
| Ascot Partners | Ariel Fund | $78 million |
| Gabriel Capital | Ascot Partners | $46 million |
| Gabriel Capital | Ariel Fund | $38 million |
| Ariel Fund | Ascot Partners | $52 million |
| Ariel Fund | Gabriel Capital | $9 million |

Collura Decl. Ex. 1 (Collura Report) ¶ 69, Figure 6, Ex. 11.1.

**Defendants' Response**: AF 249 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact. *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)). In addition, AF 249 is misleading and raises no genuine issue of material fact.

250.    For example, the total transfers of $52M from Ariel's BLMIS account to Ascot Partners' BLMIS account is reflected as $52M from Ascot Partners' Morgan Stanley to Ariel's Morgan Stanley Account. Collura Decl. Ex. 1 (Collura Report) ¶ 69 n.31.

**Defendants' Response**: AF 250 is misleading in its use of the phrase "reflected as" and raises no genuine issue of material fact.

251.    Ascot Partners paid investor redemptions and management fee payments from three primary sources of funds: (i) incoming investor subscriptions; (ii) redemptions from BLMIS; and (iii) inter-account transfers from Ariel and Gabriel. Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 85:17-86:11, 162:6-17, 163:1-10, 174:24-175:7; Hoang Decl. Ex. 75 (Meyer Dep.) at 167:11-168:23.

**Defendants' Response**: AF 251 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact. *See Fin. Fed. Credit*, 2007 WL 2398583, at *3 ("'Factual disputes that are irrelevant or unnecessary' cannot defeat a motion for summary judgment." (quoting *Anderson*, 477 U.S. at 248). AF 251 is also incomplete, misleading, and raises no genuine issue of material fact. As Ascot's expert opined, "[f]or certain break periods, Ascot Partners would decrease the allocation of funds it held at BLMIS at the same time that Gabriel and/or Ariel would increase the allocation of funds they held at BLMIS. At times, this

would be processed by a transfer from Ascot Partners' BLMIS account (#1-A0058-3) to Gabriel's and/or Ariel's BLMIS account(s) (#1-G0321-3 and #1-FR070-3, respectively) and a [] corresponding transfer would be made by Gabriel and/or Ariel into Ascot Partners' Morgan Stanley Account." Hoang Decl. Ex. 74 (Meyer Report) ¶ 29.

252.    The Merkin Funds transferred hundreds of millions of dollars between their respective BLMIS accounts and their respective Morgan Stanley accounts to pay investor redemptions related to their BLMIS investments. Collura Decl. Ex. 1 (Collura Report) at ¶¶ 64, 68-73, Ex. 11.1.

**Defendants' Response:** AF 252 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact. *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)). AF 252 is also incomplete, misleading, and raises no genuine issue of material fact. As Ascot's expert opined, "[f]or certain break periods, Ascot Partners would decrease the allocation of funds it held at BLMIS at the same time that Gabriel and/or Ariel would increase the allocation of funds they held at BLMIS. At times, this would be processed by a transfer from Ascot Partners' BLMIS account (#1-A0058-3) to Gabriel's and/or Ariel's BLMIS account(s) (#1-G0321-3 and #1-FR070-3, respectively) and a [] corresponding transfer would be made by Gabriel and/or Ariel into Ascot Partners' Morgan Stanley Account." Hoang Decl. Ex. 74 (Meyer Report) ¶ 29.

253.    Between May 1998 and November 2005, Ascot Partners and Ascot Fund made only two redemptions from BLMIS, totaling $17 million. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Exs. 4O, 4P.

**Defendants' Response**: Not disputed.

254.    Ascot Partners made no redemptions from BLMIS for the year end of 1998, 1999, 2000, 2001, 2002, or 2004, yet still paid management fees and investor redemptions.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4P; Collura Decl. Ex. 1 (Collura Report) ¶¶ 68, 76-77, Ex. 10, 17.

**Defendants' Response**:  Not disputed.

255.    Ariel Fund and Gabriel Capital did not make any redemptions from BLMIS until July 2008.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Exs. 4Q, 4R.

**Defendants' Response**:  Not disputed.

256.    The Merkin Funds used inter-account transfers to avoid making redemptions from BLMIS.  Collura Decl. Ex. 1 (Collura Report) ¶¶ 64, 69, Ex. 11.1.

**Defendants' Response**:  AF 256 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In addition, the evidence cited by the Trustee does not support his assertion in AF 256, and thus such assertion should be disregarded.  *See Holtz*, 258 F.3d at 74 ("Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded . . . .").  AF 256 is also incomplete, misleading, and raises no genuine issue of material fact.  Defendants used inter-account transfers to meet investor redemptions, and inter-account transfers at BLMIS had corresponding transfers in other bank accounts.  Hoang Decl. Ex. 74 (Meyer Report) ¶¶ 29, 40.

257.    For example, on January 4, 2007, Michael Autera instructed BLMIS to transfer $18.5 million from Ascot Partners' BLMIS account to Ariel's BLMIS account and $26.5 million from Ascot Partners' BLMIS account to Gabriel's BLMIS account.  Collura Decl. Ex. 1 (Collura

Report) ¶ 68; Hoang Decl. Ex. 76 (Trustee 285); Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 187:16-19.

**Defendants' Response**:  AF 257 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In any event, Defendants do not dispute AF 257.

258.    Ascot Partners' BLMIS account reflects that BLMIS made the requested transfers on January 4, 2007.  Hoang Decl. Ex. 77 (Trustee 287).

**Defendants' Response**:  AF 258 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In any event, Defendants do not dispute AF 258.

259.    Yet, Ascot Partners' BLMIS account reflected that it did not have $45 million in available cash to transfer to Ariel and Gabriel and did not have the necessary available cash until January 9, 2007.  Hoang Decl. Ex. 77 (Trustee 287); Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 206:25-208:20.

**Defendants' Response**:  AF 259 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

260.    In exchange for the $45 million that Ascot Partners transferred from its BLMIS account to Ariel's and Gabriel's respective accounts, Ariel and Gabriel transferred $18.5 million and $26.5 million respectively from their Morgan Stanley accounts to Ascot Partners' Morgan Stanley account.  Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 193:14-198:18.

**Defendants' Response**:  AF 260 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In any event, Defendants do not dispute AF 260.

261.    On January 4, 2007, the Ascot Partners Morgan Stanley account had a beginning balance of approximately $2.3 million.  Collura Decl. Ex. 1 (Collura Report) ¶ 68.

**Defendants' Response**:  AF 261 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).

262.    Ascot Partners paid $33.3 million in investor distributions and would not have had enough money to fund these redemptions without the transfers from Ariel and Gabriel. Collura Decl. Ex. 1 (Collura Report) ¶ 68.

**Defendants' Response**:  AF 262 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In addition, AF 262 is incomplete, misleading, and raises no genuine issue of material fact.  As Meyer opined, "[f]or certain break periods,

Ascot Partners would decrease the allocation of funds it held at BLMIS at the same time that

Gabriel and/or Ariel would increase the allocation of funds they held at BLMIS.  At times, this

would be processed by a transfer from Ascot Partners' BLMIS account (#1-A0058-3) to

Gabriel's and/or Ariel's BLMIS account(s) (#1-G0321-3 and #1-FR070-3, respectively) and a []

corresponding transfer would be made by Gabriel and/or Ariel into Ascot Partners' Morgan

Stanley Account."  Hoang Decl. Ex. 74 (Meyer Report) ¶ 29.

263.    Merkin received or was entitled to hundreds of millions of dollars as a result of

the Merkin Funds investments with BLMIS.  Hoang Decl. Ex. 17 (Merkin Responses and Obj. to

NYAG Statement of Undisputed Facts) ¶¶ 91-94.

**Defendants' Response**:  AF 263 is misleading and raises no genuine issue of material

fact.  Defendants submit that the cited document speaks for itself.

264.    From its inception through the end of 2002, in accordance with its offering

memorandum, Merkin, through GCC, was entitled to a management fee equal to 1% (prorated

for periods of less than a year) of each investor's capital account balance at the end of such year,

as adjusted to take account of capital contributed or withdrawn during such year from Ascot

Fund.  Hoang Decl. Ex. 9 (Ascot Fund February 1996 Prospectus) at BS00306067-68; Hoang

Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed Facts) ¶¶ 24-25.

**Defendants' Response**:  AF 264 is misleading and raises no genuine issue of material

fact.  Defendants submit that the cited documents speak for themselves.

265.    From its inception through the end of 2002, in accordance with its offering

memorandum, Merkin, as general partner, was entitled to a management fee equal to 1%

(prorated for periods of less than a year) of each limited partner's capital account balance at the

end of such year, as adjusted to take account of capital contributed or withdrawn during such

year from Ascot Partners.   Hoang Decl. Ex. 10 (Ascot Partners February 1996 Confidential

Offering Memorandum).

**Defendants' Response**:  Not disputed.

266.    As of January 1, 2003, Ascot Partners and Ascot Fund increased their

management fees to 1.5%.  Merkin Defs. Ans. ¶ 235, ECF No. 261; Third Amend. Compl. ¶ 235,

ECF No. 151.

**Defendants' Response**:  Not disputed.

267.    Merkin, as Gabriel's general partner, was also entitled to a management fee equal

to 1% of each limited partner's capital account balance at the beginning of each year plus such

partner's contributed capital during such year for Gabriel and incentive fee equal to 20% of

Gabriel's net income.  Hoang Decl. Ex. 57 (Gabriel Confidential Offering Memorandum, March

2006); Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed

Facts) ¶¶ 24-25.

**Defendants' Response**:  AF 267 is irrelevant to the claims and defenses in this case and

raises no genuine issue of material fact because Ariel and Gabriel have settled and been

dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are

irrelevant or unnecessary' are not material and thus cannot preclude summary judgment."

(quoting *Anderson*, 477 U.S. at 248)).    In addition, AF 269 is misleading.  Gabriel Capital's

Confidential Offering Memorandum provides that the General Partner's management fee would

be "an amount equal to 1% (prorated for periods of less than a year) of each Limited Partner's

capital account balance at the beginning of such year plus such Partner's contributed capital

during such year."  Hoang Decl. Ex. 57 at 18.

268.    Merkin, as the sole shareholder of GCC, was also entitled to a management fee equal to 1% of the beginning net asset value attributable to each series of shares and an incentive fee equal to 20% of the increase, if any, in the net asset value per share for Ariel.  Steiner Decl. Ex. 16 (Ariel Fund Confidential Offering Memorandum, March 2006) at GCC-P 0335736-37; Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed Facts) ¶¶ 24-25.

**Defendants' Response**:  AF 268 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact because Ariel and Gabriel have settled and been dismissed from this action.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In any event, Defendants do not dispute AF 268.

269.    The Merkin Defendants admitted that from 1990 through 2008, Merkin, individually and/or through GCC, received or claimed entitlement to fees from Ascot Partners, Ascot Fund, Gabriel and Ariel totaling $728,972,868 as follows:

| Year | Ascot Partners Fees | Ascot Fund Fees | Gabriel Fees | Ariel Fees |
|------|---------------------|-----------------|--------------|------------|
| 1990 | | | $456,146 | |
| 1991 | | | $2,151,379 | $7,287,700 |
| 1992 | | | $3,619,310 | $6,450,820 |
| 1993 | $232,085 | $516,596 | $8,283,712 | $11,676,177 |
| 1994 | $880,668 | $735,085 | $6,040,373 | $6,896,515 |
| 1995 | $1,165,331 | $850,966 | $11,162,665 | $12,409,950 |
| 1996 | $1,611,374 | $1,183,044 | $19,013,758 | $25,631,220 |
| 1997 | $2,101,263 | $1,666,394 | $27,899,176 | $35,722,094 |
| 1998 | $2,654,297 | $2,344,047 | $6,833,819 | $7,506,086 |
| 1999 | $3,316,268 | $2,756,538 | $10,947,816 | $5,923,084 |
| 2000 | $3,798,766 | $3,470,457 | $14,236,148 | $13,038,087 |

| 2001 | $4,082,427 | $4,540,279 | $11,901,158 | $9,949,603 |
| 2002 | $4,607,052 | $5,314,688 | $7,719,933 | $5,205,260 |
| 2003 | $18,083,968 | | $11,184,001 | $11,443,971 |
| 2004 | $21,685,693 | | $18,302,849 | $14,290,871 |
| 2005 | $26,170,949 | | $31,882,175 | $20,305,563 |
| 2006 | $26,004,162 | | $41,260,706 | $29,454,005 |
| 2007 | $28,292,833 | | $43,754,640 | $17,128,861 |
| 2008 | $25,957,305 | | $11,046,619 | $6,934,086 |
| **Total** | **$170,644,441** | **$23,378,095** | **$287,696,383** | **$247,253,950** |
| | | **Grand Total:** | **$728,972,868**[10] | |

Hoang Decl. Ex. 17 (Merkin Responses and Obj. to NYAG Statement of Undisputed

Facts) ¶ 94.

**Defendants' Response**:  AF 269 is irrelevant to the claims and defenses in this case and

raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes

that are irrelevant or unnecessary' are not material and thus cannot preclude summary

judgment." (quoting *Anderson*, 477 U.S. at 248)).  In addition, AF 269 is misleading and raises

no genuine issue of material fact.  AF 269 includes fees for 2008, which Merkin never received,

and fees for Ariel that were deferred by GCC and not received.  Hoang Decl. Ex. 17 (Merkin

Responses and Obj. to NYAG Statement of Undisputed Facts) ¶¶ 91-94.

270.    GCC and Ascot Partners' records show that from 1998 through 2008, Ascot

Partners paid a total $146,184,547, broken down as follows:

| Year | Total Fees |
| --- | --- |
| 1998 | $2,637,267 |

---

[10]    Based on the amounts set forth in the table, Merkin, individually and through GCC, received or claimed entitlement to $552,986,312 in fees, excluding management fees for Ariel and Gabriel from 1994 through 1999 when those funds had no exposure to BLMIS and fees that GCC received for administering other BLMIS accounts in the early 1990's.

| 1999 | $3,341,820 |
| 2000 | $3,786,520 |
| 2001 | $4,094,673 |
| 2002 | $4,607,053 |
| 2003 | $18,083,968 |
| 2004 | $20,872,693 |
| 2005 | $30,463,559 |
| 2006 | $26,004,162 |
| 2007 | $28,292,833 |
| 2008 | $4,000,000 |

Collura Decl. Ex. 1 (Collura Report) ¶ 135, Ex. 17.

**Defendants' Response**:  AF 270 is irrelevant to the claims and defenses in this case and raises no genuine issue of material fact.  *See Reyes*, 945 F. Supp. 2d at 490 ("'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." (quoting *Anderson*, 477 U.S. at 248)).  In any event, Defendants do not dispute that Exhibit 17 of the Collura Report contains the numbers listed in AF 270..

Dated:  New York, New York
December 23, 2015

DECHERT LLP

By: /s/ *Neil A. Steiner*
Andrew J. Levander
Neil A. Steiner
Daphne T. Ha
Mariel R. Bronen
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
andrew.levander@dechert.com
neil.steiner@dechert.com
daphne.ha@dechert.com
mariel.bronen@dechert.com

*Attorneys for Defendants J. Ezra Merkin
and Gabriel Capital Corporation*

NORTON ROSE FULBRIGHT US LLP

By: /s/ *Judith A. Archer*
       Judith A. Archer
       Jami Mills Vibbert
       David B. Schwartz
666 Fifth Avenue
New York, New York  10103
Tel.:  (212) 318-3000
Fax:  (212) 318-3400
judith.archer@nortonrosefulbright.com
jami.vibbert@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

*Attorneys for Ralph C. Dawson, as Receiver*
*for Defendant Ascot Partners, L.P., and*
*Ascot Fund Ltd.*