# REPLY EXHIBIT 11

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


--------------------------------x

In Re:


BERNARD L. MADOFF INVESTMENT          Adv.Pro.No.

SECURITIES LLC,                       08-01789(BRL)

         Debtor.

--------------------------------x

IRVING H. PICARD, Trustee for the

Liquidation of Bernard L. Madoff

Investment Securities LLC,

         Plaintiff,               Adv.Pro.No.

                        09-1182(BRL)

         v.

J. EZRA MERKIN, GABRIEL CAPITAL,

L.P., ARIEL FUND LTD., ASCOT

PARTNERS, L.P., GABRIEL CAPITAL

CORPORATION,


         Defendants.

--------------------------------x



     VIDEOTAPED DEPOSITION OF J. EZRA MERKIN,

as reported by Nancy C. Bendish, Certified Court

Reporter, RMR, CRR, and Notary Public of the

State of New York, at the offices of Baker

Hostetler, 45 Rockefeller Plaza, New York, New

York, on Tuesday, February 24, 2015, commencing

at 9:47 a.m.

**Page 2**

```
 1  APPEARANCES:
 2
 3    BAKER HOSTETLER, LLP
      45 Rockefeller Plaza
      New York, New York  10111
 4    BY:  DAVID J. SHEEHAN, ESQ.
          BRIAN W. SONG, ESQ.
 5    For Irving H. Picard, Trustee
 6
      DECHERT, LLP
 7    1095 Avenue of the Americas
      New York, New York  10036-6797
 8    BY:  NEIL A. STEINER, ESQ.
          DAPHNE HA, ESQ.
 9    For Gabriel Capital Corp.
      and J. Ezra Merkin
10
11    NORTON ROSE FULBRIGHT
      Fulbright & Jaworski, LLP
12    666 Fifth Avenue
      New York, New York  10103-3198
13    BY:  JUDITH A. ARCHER, ESQ.
          JAMI MILLS VIBBERT, ESQ.
14    For Ascot Partners LP
15
      REED SMITH LLP
16    599 Lexington Avenue
      New York, New York  10022
17    BY:  JORDAN W. SIEV, ESQ.
          JAMES C. McCARROLL, ESQ.
18    NICOLE LAPSATIS, ESQ.
      For Gabriel, LP and Ariel Fund, LP
19
20  ALSO PRESENT:
21    BART M. SCHWARTZ, Receiver for Hedge Funds
      RALPH DAWSON
22    OLEG BITMAN, Baker Hostetler
      JIM SOTO, Videographer
23
24
25
```

**Page 3**

```
 1           I N D E X
 2  WITNESS                    PAGE
 3
    J. EZRA MERKIN
 4
     Examination by Mr. Sheehan.................5
 5
 6
 7
 8
          E X H I B I T S
 9
    IDENT.     DESCRIPTION        PAGE
10
11  Trustee 353  Document entitled "Gabriel
                 Capital Group, April 2008,
12               BS00038458......................48
13  Trustee 354  Supplemental Responses to
                 Interrogatories and Requests
14               for Admissions..................102
15  Trustee 354A Verification....................102
16  Trustee 355  Confirmation, GCC-P 0295218.....218
17  Trustee 356  Confirmation, GCC-SEC 0052887...218
18  Trustee 357  Confirmation, GCC-P 0295238.....218
19  Trustee 358  Documents BS00536227-6354.......224
20  Trustee 359  Documents GCC-SEC 0040626-0690..239
21  Trustee 360  Documents GCC-SEC 0027370-7381..248
22  Trustee 361  Documents GCC-NYAG 0027474-7484.248
23  Trustee 362  Documents AMF00076307-76314.....248
24  Trustee 363  Merkin's Madoff File,
                 GCC-P 0393096-3607..............280
25
```

**Page 4**

```
 1           THE VIDEOGRAPHER:  Good morning,
 2  we're on the record.  The time on the monitor is
 3  9:47 a.m.  Today is the 24th day of February,
 4  2015.  We are here at 45 Rockefeller Plaza, New
 5  York, New York for the purpose of taking the
 6  videotaped deposition of Mr. Ezra Merkin in re
 7  Picard versus Merkin.
 8           Videographer is James Soto, the
 9  court reporter is Nancy Bendish, both of Bendish
10  Reporting.
11           Will all counsel please announce
12  your appearances for the record.
13           MR. STEINER:  Neil Steiner with
14  Ms. Daphne Ha from Dechert representing
15  Mr. Merkin and Gabriel Capital Corporation.
16           MS. ARCHER:  Judith Archer from
17  Norton Rose Fulbright.  With me is Jami Vibbert
18  and Ralph Dawson.  Norton Rose Fulbright
19  represents Mr. Dawson as the receiver of Ascot
20  Partners LP.
21           MR. McCARROLL:  James McCarroll of
22  Reed Smith LLP.  With me is my partner Jordan
23  Siev.  We represent Bart Schwartz, who is with
24  me to my left, who is the court appointed
25  receiver for Ariel Fund Limited and Gabriel
```

**Page 5**

```
 1  Capital LP.
 2           MR. SIEV:  And Nicole Lapsatis is
 3  also from our firm.
 4           MS. ARCHER:  Let me note for the
 5  record Norton Rose Fulbright also represents
 6  Ascot Funds Limited.
 7           MR. SHEEHAN:  David Sheehan with
 8  Baker Hostetler for the Trustee.
 9           MR. SONG:  Brian Song with Baker
10  Hostetler for the Trustee.
11           MR. SHEEHAN:  And with us is...
12           MR. BITMAN:  Oleg Bitman also for
13  the Trustee.
14
15  J. E Z R A   M E R K I N, affirmed.
16  EXAMINATION BY MR. SHEEHAN:
17       Q.   Good morning, Mr. Merkin.
18       A.   Good morning.
19       Q.   My name is David Sheehan, as I
20  just announced a moment ago, and I represent the
21  Trustee this morning in the matter that is
22  pending between the Trustee and yourself and
23  other defendants who are represented here today.
24  Are you aware of that lawsuit?
25       A.   Yes.
```

2  (Pages 2 to 5)

**Page 170**

1    A.    I was never a market making
2  customer.
3    Q.    Do you know whether it
4  self-cleared?
5    A.    So I don't know.
6    Q.    You don't know.
7    A.    Or if I knew, if I knew, I don't
8  remember.
9    Q.    Well, when he told you he
10  self-cleared at the investment advisory end, was
11  that a red flag to you?
12        MR. STEINER:  Objection to form.
13        MR. SIEV:  Objection to form.
14    Q.    They're objecting because I didn't
15  ask what a red flag is, so let's do that.
16    A.    I'm sorry?
17    Q.    They didn't like me using red
18  flag.  So let me ask you this.
19    A.    You just lost me for a second.
20    Q.    I know.  It's a lawyer thing, they
21  call it foundation, whatever.  You know what I
22  was talking about but the record doesn't.  In
23  any event --
24    A.    In the meantime you lost me, and
25  not them.  You really lost me.

**Page 171**

1    Q.    They're with me, they're having a
2  good time.
3          Anyway, the bottom line is this.
4  Do you know what a red flag is in terms of in
5  the investment advisory business, a red flag?
6        MR. SIEV:  Objection to the form.
7    A.    I'm not sure exactly what you
8  mean, but I take you to mean some sort of a
9  caution.
10    Q.    Okay.  Well, I don't want you to
11  take that from my question.  I'm asking you
12  independently of me saying that, does the term
13  "red flag" mean anything to you?
14    A.    Let me just be, perhaps, a little
15  bit clearer.  I'm not sure whether by red flag
16  you mean something that would be an absolute
17  bar --
18    Q.    No.
19    A.    -- or something that would be a
20  caution.  That's what I was getting at.
21    Q.    Let me rephrase it then.  That's a
22  very good point.
23          Something that would expose
24  something as a risk factor that needed to be
25  examined.

**Page 172**

1    A.    So you think a red flag means a
2  risk factor?
3    Q.    Yes.
4    A.    Okay, fine.
5    Q.    All right.  So, would you -- how
6  do you view self-clearing that, in terms of a
7  risk factor?
8    A.    Normally speaking?  Look, I had
9  accounts with persons who self -- with firms who
10  self-cleared for a long time.  If you go back
11  long enough, many more people self-cleared until
12  clearing was made part of the industry.
13          So clearing, which relates a
14  little bit to who has custody, presuming the
15  clearing broker has custody, is one of the
16  attributes that we didn't speak about all that
17  much in terms of prime broker, but when earlier
18  you had asked me what a prime broker is and I
19  said there's many many -- there's several
20  different attributes to them, custody is also
21  something that a prime broker has.
22    Q.    Right.
23    A.    So, one might think of somebody
24  who is a custodian as a prime broker by virtue
25  of that alone.

**Page 173**

1    Q.    Right.
2    A.    To this day, I sort of said this
3  earlier, if you have an account at Goldman
4  Sachs, the one I was referring to, this
5  hypothetical account this morning, you're gonna
6  clear at Goldman Sachs.  If you have an account
7  at Merrill Lynch, you're going to clear at
8  Merrill Lynch.  Merrill Lynch is not in the
9  business of giving the profitable clearing part
10  of their business away to Goldman Sachs, or vice
11  versa.  I don't say that with encyclopedic
12  knowledge, but that's not the way the business
13  works.
14          In Mr. Madoff's case, it was very
15  clear, he made very clear that the accounts were
16  maintained at his shop and the confirmations and
17  the monthlies that you received were on his
18  letterhead.  By letterhead I don't mean an 8-1/2
19  by 11 letter, but the tickets had his firm on
20  them.
21          That seemed to me to be a risk
22  factor to be weighed, but it was inconceivable
23  to me that somebody who had his prominence both
24  within the industry, to some extent his
25  legendary status in the industry, the sheer

**Page 174**

1 volume of business he did on the wholesale side,
2 that was always of interest to me.
3          These Fidelity and Charles Schwab
4 orders are sought after.  They are the staff of
5 life to people who handle their business.  And
6 Madoff was, I spoke to somebody at Fidelity,
7 that's what I mean as a customer at this time,
8 and got back very positive review, all part of
9 the due diligence process.
10         I spoke to investors of his,
11 clients of his as distinct from customers.
12 Clients on the market-making side at that time,
13 who I think are some of the single most able
14 people I've met in the investment business,
15 still think so.  I still think that about some
16 of these people.  And, you know, they all had
17 very positive things to say.
18   Q.    Do you know if Mr. Madoff paid for
19 order flow?
20   A.    Pay for order flow was a subject
21 of his over a number of years.  It subsided over
22 time.  The whole -- I'm moving ahead in time
23 frame, so if that's not where you want to go --
24   Q.    At the time you're doing your due
25 diligence here?

**Page 175**

1   A.    Initially.
2   Q.    Yeah, initially.  Did you know at
3 that time that perhaps one of the reasons he had
4 the clients he did is because he paid for order
5 flow?
6   A.    I don't remember whether it came
7 up in the first meeting or two or not.  I just
8 don't remember.
9   Q.    Did you subsequently learn that he
10 paid for order flow?
11   A.    I certainly know that payment for
12 flow was something that he said that he was open
13 to and did.  I was not a wholesale customer, I
14 can't -- the way you worded the question, can I
15 confirm to you independently that he paid for
16 order flow, I cannot.  I can only tell you what
17 he told me.
18   Q.    When you talked to Fidelity did
19 you talk about paying for order flow?
20   A.    Certainly not at that first
21 meeting.
22   Q.    Did you ever talk to him about it?
23   A.    Not that I recall.
24   Q.    Let's go back to clearing broker
25 again.

**Page 176**

1   A.    Um-hum.
2   Q.    Does Merrill Lynch clear trades?
3   A.    Does Merrill Lynch clear some
4 trades?
5   Q.    Yes.
6   A.    I would imagine so.
7   Q.    Do you have any knowledge that
8 they clear trades?
9   A.    I believe they do.
10   Q.    And they were cleared -- do you
11 know what the term "introducing broker" means?
12   A.    Not very precisely, no.
13   Q.    Do you know if introducing broker
14 clears trades?
15   A.    I don't know -- the answer is I'm
16 not sure.
17   Q.    When the person who clears the
18 trade -- like Merrill Lynch is clearing trades
19 for Madoff, let's assume that he was clearing
20 his trades through Merrill Lynch, right?
21   A.    I don't think he did.
22   Q.    No, no, but I'm asking you to
23 assume that he did.
24   A.    Okay.
25   Q.    You would know, would you not,

**Page 177**

1 that when you got a statement from Merrill Lynch
2 that they held a certain stock long that they
3 had that stock, would you not?
4   A.    I just don't follow.  You're
5 saying now that I got a, let's say a monthly
6 statement from Merrill Lynch that Bernard L.
7 Madoff had bought a hundred shares from me and
8 that was held at Merrill?
9   Q.    Yes.
10   A.    I just don't see the nexus to
11 Bernie. I'm missing something.
12   Q.    If Bernie is using Merrill Lynch
13 to clear his trades.  He's not clearing them
14 himself.
15   A.    I would have known -- I would have
16 known -- had Bernie cleared our account at
17 Merrill Lynch, I would have had statements from
18 Merrill Lynch that would have reported that
19 information to me, yes.
20   Q.    And would -- are there regulations
21 governing clearing brokers?
22   A.    I would think yes.
23   Q.    Are you familiar with them?
24   A.    Not terribly well, no.
25   Q.    When Bernie was clearing his own

45  (Pages 174 to 177)

**Page 202**

1   is what did you understand him to be doing? Was
2   he buying at one time during the day or several
3   times throughout the day?
4        A.    I certainly didn't think he was
5   only buying one time during the day and --
6   although he may have. I'm sort of not sure what
7   several means. But he could have been buying
8   over the course of a day in more than one trade.
9   And he didn't have to do the entire position in
10  one day and he didn't have to do the entire
11  position at all.
12       We could be -- I mean, if this is
13  important I should just mention it. We
14  sometimes caught a turn with one-third in and
15  two-thirds out or two-thirds in and one-third
16  out.
17       Q.    Right.
18       A.    So, again, I'm not sure that's
19  what you mean by time slicing, but we didn't
20  always get all in. We could be partially in and
21  we didn't get in all in on one trade and we
22  didn't necessarily get all in on one day.
23       The one trade per day, we saw
24  things at the end of the day, but the different,
25  the trading on different trade dates is

**Page 203**

1   something you might have seen pretty quickly.
2        Q.    Does the phrase the 12-minute rule
3   mean anything to you?
4        A.    The 12-minute rule?
5        Q.    Yes.
6        A.    It seems to have come up in
7   conversations. I don't place it exactly when
8   and where.
9        Q.    Okay. I think we can place it
10  later, so let's pass on that for now.
11       A.    Okay.
12       Q.    Very simple question: Do you know
13  if Mr. Madoff picked stocks?
14       A.    Well, there came a time, as
15  persons of your profession like to say, that the
16  trading director came into place and he had to
17  pick stocks in compliance with the trading
18  director. And before that in compliance with
19  the basic overall strategies he and I discussed
20  it many, many many times.
21       So for starters, he was picking
22  stocks that were in the S & P 100. He was
23  picking perhaps as many as half of them. So,
24  you know, there are -- I can't remember exactly
25  but I think well over 3,000 listed stocks, I

**Page 204**

1   think it is. There's thousands and thousands of
2   stocks. He started with a buy list that could
3   only be a hundred. Of that he did as many as
4   half of them.
5        So, he just wasn't that much of
6   a -- there's only so many choices he had. He
7   was basically doing a form of market timing that
8   was nuanced by that fifth or 50 that he picked
9   relative to trading restrictions and vis-a-vis
10  options.
11       In many ways he was -- well, do I
12  think that's true? I'll think about it.
13       Q.    Is there a reason he would pick
14  stocks as opposed to just trading the entire
15  index? If you know.
16       A.    Well, we talked about that before.
17  When you say trading the entire index, you mean
18  buying the index or buying every stock in the
19  index?
20       Q.    Let's try with buying the index.
21       A.    I'm not sure what -- this was in
22  the end an arbitrage strategy.
23       Q.    Right.
24       A.    In many ways any options arbitrage
25  strategy. If he had every single stock in the

**Page 205**

1   index pegged precisely correctly calibrated to
2   exactly its component in the index, then you're
3   long the index. Then you have a perfect hedge.
4   And then you have reduced risk to a level that,
5   you know, an informal and by no means
6   exhaustively correct but nonetheless handy
7   definition of a perfect hedge is, you're gonna
8   make whatever the risk-free money market rate of
9   return gives you. You've got to take risks to
10  make money.
11       Q.    Of course.
12       A.    So if he owned every single
13  security, unless -- unless he bought them, you
14  know, over different periods of time, different
15  days, weighted them differently against the
16  basket, I mean, you have to do something.
17       Q.    Would that have been -- well, let
18  me rephrase this. Withdrawn. I'm not going to
19  ask.
20       What impact, if any, Mr. Merkin,
21  did Mr. Madoff's ability to perform executions
22  impact his strategy?
23       A.    His ability to execute impacted
24  his strategy?
25       Q.    Yeah.

BENDISH REPORTING
877.404.2193

**Picard v. Merkin**                                              **J. Ezra Merkin  2-24-15**

Page 306

1  some of the Russian restructures, sovereign debt
2  restructures.

Page 307

Page 308

1  paraphrased.
2       I think -- let's put it this way,
3  to the extent that I can make some sense of
4  this -- I don't really -- if we discussed --
5  Madoff was, was, I don't think Madoff failed to
6  answer too many questions certainly that I put
7  to him.
8       Where he would say that's -- that
9  that is a subject that he considers somewhat
10  proprietary is what you called the algorithm.
11  In other words, he wasn't that interested in
12  training people -- he used to say, I'm not that
13  interested in training people in Madoff.  And by
14  that he meant to say, in the algorithm.  In
15  other words, this is the thing that we do that
16  we think is proprietary, it comes out of the
17  totality of what we spend on the computer
18  systems and the order flow and it lets us judge
19  these turns.  That was something that he would
20  answer and consider proprietary.
21       So I'm just guessing -- doesn't
22  even relate to this, so I don't know.  I've
23  spent five minutes looking at this document, I
24  wouldn't put this at the top of the list of what
25  he got wrong.  I think the top of the list is

Page 309

1  crowded with other things that are just
2  factually wrong.  This one I think he either --
3  just assuming that he was on the same phone
4  call.  I don't know.
5       Q.   Let me just offer that and move
6  off the document for a minute.
7       You know, did you ever have a
8  concern, from a scalability standpoint, of the
9  ability of Merkin to -- Merkin -- Mr. Madoff to
10  purchase options consistent with the strategy?
11       A.   So purchase, you mean puts?
12       Q.   Yeah, purchasing puts, or selling
13  calls.  One or the other that, since he had to
14  do both theoretically under the split-strike,
15  that the volume of those options on either side
16  of the collar, whether that volume was available
17  to him given the size of his investments?
18       MR. STEINER:  Objection to form.
19

23       A.   Mr. Madoff and I certainly
24  discussed that over time and he certainly made
25  clear that an ever evolving higher percentage of

**78  (Pages 306 to 309)**

**Page 310**

1   his options executions were unlisted rather than
2   listed. And that that number could be a very
3   large percentage and a very large number of
4   options.
5       Q.   Where would unlisted options be
6   available?
7       A.   When you say where?
8       Q.   In other words, I can go to the
9   CBOE and buy an option, right?
10      A.   Well, if you buy, if I understand
11  you, if you buy an option on the CBOE that would
12  be what I would call a listed option and it
13  would be -- it would be CBOE cleared.
14      Q.   Right. So I'm asking now, you're
15  not buying a listed option. You're buying an
16  unlisted option.
17      A.   Okay.
18      Q.   Where do you go to buy it?
19      A.   Broadly speaking, I mean, it's not
20  a physical location. It's not a floor.
21      Q.   I understand that.
22      A.   I wasn't sure what you meant about
23  the where. It is in the virtual -- maybe
24  virtual is not the right word. It's in the
25  derivative marketplace.

**Page 311**

1       Q.   Okay.
2       A.   You're buying derivatives. You're
3   buying non-exchange listed options that you are
4   bargaining for, contracting for and closing,
5   selling.
6       Q.   Who makes a market in those?
7       A.   There are -- you know, this is one
8   of the lessons of '08 and one of the great fears
9   today, which is we don't really know. The "we"
10  is a little bit too broad because there might be
11  some people, there surely are some people that
12  know about this than I do, but the size of that
13  market is, you know, starts at trillions and
14  goes bigger and bigger and bigger. This is the
15  market that, just to take an example, that, you
16  know, Buffett has -- continues less strongly
17  than he did, but has been warning about that
18  when a crisis comes it will be because of the
19  derivative marketplace. Because the world
20  brings so much of its business in the derivative
21  marketplace.
22      Q.   You're using derivative as a
23  general term here?
24      A.   Not sure what you mean by a
25  general term. I mean what you are buying is a

**Page 312**

1   derivative.
2       Q.   Are you saying there are trillions
3   of dollars in options?
4       A.   I'm saying we don't know or I
5   don't know what the total market is in options.
6   I'm saying a derivative market as a whole is
7   hundreds of trillions and whether there are --
8   and hundreds and hundreds and hundreds. There
9   was just an article not such a long time ago and
10  not in this time period. I mean --
11      Q.   Right.
12      A.   -- 2014, let's say, or maybe '13,
13  but probably not recent enough to be '15. One
14  of the European regulators, I think The Bank of
15  International Settlements, tries to guess the
16  size of some of these markets and says it's
17  guessing conservatively and it's just that much
18  bigger and there's this ongoing regulatory
19  effort to have players in that market bring
20  their derivatives at least into more reportable
21  forms so that the world knows what it's about.
22      Q.   I understand --
23      A.   This is clearly the market that I
24  think Bernie meant he was trading these options
25  in. Finding them and buying them.

**Page 313**

1       Q.   But that's a different market than
2   the one you just described?
3       A.   What is the "this"?
4       Q.   The one you described is
5   derivative is in a broad sense, credit default
6   swaps, everything that's involved --
7       A.   Swaps, derivatives, options.
8       Q.   What I'm talking about is a very
9   limited thing. I'm talking about somebody who's
10  going to be in the S & P 100 stocks.
11      A.   On the index. That's what I
12  thought you meant.
13      Q.   Exactly. And you're saying
14  there's trillions of dollars of those options
15  out there?
16      A.   I'm saying there could be and I
17  don't really know how large the size is. But I
18  think you -- there's something in your question
19  I don't totally follow, I think.
20          If you're not buying these options
21  CBOE listed, I think we agree that you're buying
22  them as a derivative.
23      Q.   You're calling it that, I did not.
24  Why are you calling it a derivative?
25      A.   Because I think that's what it is.

**Page 314**

1  You want to call it a swap, that's okay too,
2  although I think from an accounting point of
3  view I think it's actually sometimes called a
4  derivative, from a formal accounting point of
5  view.  And I'm not remotely the last word on
6  formal accounting definitions.
7      But there's an enormous
8  marketplace in derivatives.  Not only do we not
9  know how big it is, we don't know what all the
10  instruments are.
11     Q.   So a credit default swap would
12  also be a derivative?
13     A.   Certainly might be, sure.
14     Q.   Right.  But I'm not talking about
15  all derivatives, I'm talking about only one.
16  I'm not suggesting it's not a derivative in a
17  classic sense, but the marketplace derivatives
18  for -- now we're only talking S & P 100 stocks
19  and we're talking a collar here for those where
20  we're selling --
21     A.   The same options we were
22  describing earlier.
23     Q.   Right.  We've been describing.
24  Are you saying, I'll ask you one more time, that
25  that marketplace is in the trillions?

**Page 315**

1      MR. STEINER:  Object to the form.
2      A.    It depends what you're measuring
3  with the use of the word "trillions."  Are you
4  talking about -- I mean, these are complex
5  things that also have technical pieces to them.
6      Are you talking about notional,
7  are you talking about actual, are you talking
8  about total amount of capital hedged.  But could
9  they be in the trillions?  Do we know, could
10  there have been the volume available for this in
11  the derivative marketplace?  Absolutely.
12     Q.   Did you ever, yourself, on behalf
13  of yourself or any of your funds, trade in
14  unlisted options?
15     A.   I don't remember.  We certainly
16  could have.
17     Q.   Okay.  The other thing about
18  options -- well, no, I already asked that.  I
19  apologize.  One second.
20     A.   Sure.
21     Q.   I want to ask you some questions
22  with regard to -- it's page -- well, doesn't
23  seem right here, but anyway, CON 0000060.  This
24  one.  Where it says, the bold word is
25  "relationship."

**Page 316**

1      A.    Relationship, I've got the bold
2  word, okay.
3      Q.   I actually just want not even to
4  ask you whether you said these things but if any
5  of them are even true.  Can I ask you, for
6  example, the relationship that says that Bernie
7  was the executor of Ezra's father's will.  Is
8  that correct?
9      A.   No.  Nor did I say it.
10     Q.   Ezra's brother and brother-in-law
11  worked for Madoff?
12     A.   No.
13     Q.   Did you say that?
14     A.   To tell you the truth, now that I
15  see this -- I haven't seen this before.  It is
16  true that Ezra's brother and brother-in-law were
17  the executives of Ezra's father's will, as well
18  as Ezra.  But my brother and brother-in-law were
19  the executives of my father's will and my mother
20  was alive then.  When was this?  Anyway, they
21  were the executives of my mother's estate as
22  well.
23     Q.   '03.
24     A.   So how garbled -- I can't really
25  tell you why who was the executor of my father's

**Page 317**

1  will would have come up, but my brother and
2  brother-in-law were, and this is partly what I
3  mean when I suggested telephone conversations
4  don't unroll these ways and I read this for two
5  minutes and I didn't finish the whole thing, but
6  doesn't look to me like somebody took very good
7  notes and it looked to me like somebody tidied
8  up a lot of things for a neat presentation.
9      MR. SHEEHAN:  Well, I am done for
10  today.
11     THE WITNESS:  Okay.
12     MR. SHEEHAN:  Thank you.
13     THE VIDEOGRAPHER:  Off the record
14  6:16.
15     (Deposition adjourned.)
16          -oOo-
17
18
19
20
21
22
23
24
25

**Page 321**

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


--------------------------------x

In Re:


BERNARD L. MADOFF INVESTMENT            Adv.Pro.No.

SECURITIES LLC,                         08-01789(BRL)

            Debtor.

--------------------------------x

IRVING H. PICARD, Trustee for the

Liquidation of Bernard L. Madoff

Investment Securities LLC,

            Plaintiff,                  Adv.Pro.No.

                                        09-1182(BRL)

            v.

J. EZRA MERKIN, GABRIEL CAPITAL,

L.P., ARIEL FUND LTD., ASCOT

PARTNERS, L.P., GABRIEL CAPITAL

CORPORATION,


            Defendants.

--------------------------------x



            CONTINUED VIDEOTAPED DEPOSITION OF

J. EZRA MERKIN, as reported by Nancy C. Bendish,

Certified Court Reporter, RMR, CRR, and Notary

Public of the State of New York, at the offices

of Baker Hostetler, 45 Rockefeller Plaza, New

York, New York, on Wednesday, February 25, 2015,

commencing at 9:42 a.m.

**Page 322**

1    A P P E A R A N C E S :
2
3    BAKER HOSTETLER, LLP
     45 Rockefeller Plaza
     New York, New York  10111
4    BY:  BRIAN W. SONG, ESQ.
          LAN HOANG, ESQ.
5    For Irving H. Picard, Trustee
6
7    DECHERT, LLP
     1095 Avenue of the Americas
     New York, New York  10036-6797
8    BY:  NEIL A. STEINER, ESQ.
          MARIEL BRONEN, ESQ.
9    For Gabriel Capital Corp.
     and J. Ezra Merkin
10
11   NORTON ROSE FULBRIGHT
     Fulbright & Jaworski, LLP
12   666 Fifth Avenue
     New York, New York  10103-3198
13   BY:  JUDITH A. ARCHER, ESQ.
          JAMI MILLS VIBBERT, ESQ.
14   For Ascot Partners LP
15
16   REED SMITH LLP
     599 Lexington Avenue
     New York, New York  10022
17   BY:  JORDAN W. SIEV, ESQ.
          NICOLE LAPSATIS, ESQ.
18   For Gabriel, LP and Ariel Fund, LP
19
     ALSO PRESENT:
20
21   BART M. SCHWARTZ, Receiver for Hedge Funds
     RALPH DAWSON
22   OLEG BITMAN, Baker Hostetler
     JIM SOTO, Videographer
23
24
25

**Page 323**

1              I N D E X
2    WITNESS                          PAGE
3
     J. EZRA MERKIN
4
       Examination by Mr. Song....................5
5
6
7
8
9
10
11
12           E X H I B I T S
13   IDENT.     DESCRIPTION         PAGE
14
15   Trustee 364  Document entitled "Gabriel
                  Capital Group, December 2005,
                  "BS00038683-697.................326
16
17   Trustee 365  Documents BS00306002-006........351
18   Trustee 366  Documents BS00305716-723........351
19   Trustee 367  Transcription of Audio File
                  158.mp3.......................484
20   Trustee 368  Transcription of Audio File
                  bd.mp3........................484
21
22   Trustee 369  Transcription of Audio File
                  1bf.mp3.......................484
23   Trustee 370  Email, UBPAMMERKIN00000004......527
24   Trustee 371  Email, GCC-P 0152946...........527
25   Trustee 372  Email, GCC-P 0479368...........586

**Page 324**

1           E X H I B I T S (Cont'd)
2    IDENT.     DESCRIPTION         PAGE
3
     Trustee 373  Email, BS00340382...............592
4
     Trustee 374  Email, BS00337463...............603
5
6    Trustee 375  Ascot Partners Investor
                  Capital Accounts, GCC-P 0463582.635
7    Trustee 376  Ariel Fund Ltd Capital Account
                  Summary, GCC-P 0463580.........642
8
9    Trustee 377  Gabriel Capital LP Partner
                  Capital Accounts, GCC-P 0463581.647
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 325**

1         THE VIDEOGRAPHER:  Good morning,
2    we're on the record, 9:42.
3    J. E Z R A  M E R K I N, previously affirmed.
4    EXAMINATION BY MR. SONG:
5         Q.   Good morning, Mr. Merkin.
6         A.   Good morning.
7         MR. STEINER:  Brian, before we
8    start, I did want to put on the record that our
9    understanding of the rules is that you get one
10   examiner per witness and Mr. Sheehan started
11   taking this deposition yesterday and our view is
12   that he should be the one who's here completing
13   it.  We understand you disagree, we don't think
14   that that's what the rules provide, but we are
15   interested in finishing this deposition so we
16   can complete discovery and move forward with the
17   case, and so, you know, subject to just noting
18   our objection, start with your questions.
19        MR. SONG:  Okay.
20   BY MR. SONG:
21        Q.   Good morning, Mr. Merkin.  We met
22   yesterday.  I'm Brian Song, I'm an attorney for
23   the Trustee and I will be continuing your
24   examination today.  My apologies that
25   Mr. Sheehan is unavailable today as he is in

**Page 474**

1  if you remember we looked yesterday at those
2  declining returns, in one of the chart
3  presentations, those green lines that went down
4  over a decent period of years, but still
5  acceptable, so that you could begin to come to a
6  conclusion that he's learned how to scale his
7  business.
8      Q.    Did Mr. Madoff ever express to you
9  that there was a limit to the assets under
10  management that he could take for his strategy?
11     A.    He certainly expressed that at any
12  given time he was not interested in giving an
13  additional capacity.  He would turn down
14  additional capacity routinely or postpone it.
15  That certainly conveyed the notion that he was
16  capacity sensitive, capacity possibly
17  constrained.  He did not convey a single digit
18  to me and say this is what I can manage, I
19  cannot manage a penny more.
20     Q.    And did you ever develop a sense
21  of the limits of what Mr. Madoff's scalability
22  would be?
23     A.    In absolute dollars?
24     Q.    Yes.
25     A.    I didn't -- it's not the way I

**Page 475**

1  would have thought of it or not the way I would
2  have expressed it, so...
3          I was acutely aware that
4  Mr. Madoff was not interested in managing
5  additional money at many points in the
6  relationship, and explained himself to me as
7  either making exceptions, as we saw earlier, and
8  as occasionally having, in a different part of
9  his book, redemptions.
10     Q.    Okay.  The last E on this page?
11     A.    The last E?
12     Q.    The last E, where you talk about,
13  I couldn't tell you if I'm one of your top 10
14  clients, top 20, top 50, top five.  See that?
15     A.    No -- oh, yes.  Here it is.  Fine.
16     Q.    Did you have an understanding as
17  to how many clients Mr. Madoff had in the
18  investment advisory business at this point in
19  time?
20     A.    I don't remember any understanding
21  at that time.
22     Q.    Did you ever have an
23  understanding?
24     A.    Well, I'm sure I must have looked
25  at the NAV to see what it suggested.

**Page 476**

1      Q.    And again I think you --
2      A.    I meant to say ADV.  That last
3  line again is scalability issue.
4      Q.    Can you turn to page 367, which is
5  the fourth page of this document.
6      A.    Yes.
7      Q.    The top of 367 is actually a
8  continuation of comments made by Mr. Madoff,
9  starting on 366, but what I want to direct your
10  attention to --
11     A.    This is a good illustration of why
12  it's hard to take notes.
13     Q.    I want to direct your attention at
14  the top of 367 there's a reference to, says
15  Goldman Sachs, for example, does an almost
16  identical type of arbitrage strategy.  Do you
17  see that?
18     A.    Yes.
19     Q.    Do you recall Mr. Madoff talking
20  to you about an arbitrage strategy that Goldman
21  Sachs also had at that point in time?
22     A.    I'm not sure I remember that
23  exactly today, but I'm sure this is what was
24  said.  I don't think anybody is making up this
25  transcript.

**Page 477**

1      Q.    Did you ever speak to anybody at
2  Goldman Sachs regarding their arbitrage
3  strategy?
4      A.    Their arbitrage strategy?
5      Q.    Yes.
6      A.    God, I spoke to so many people at
7  Goldman Sachs over the years, so many years
8  about so many different things.  Not that I
9  remember.
10     Q.    Do you see Mr. Madoff is claiming
11  that Goldman Sachs is -- well, he says if I'm
12  making 14 or 13 percent in some quarters,
13  they're probably coming in at nine percent.  Do
14  you see that?
15     A.    I see that.  He's not saying it's
16  the same.  He's saying it's almost identical.
17     Q.    Right.  Do you have an
18  understanding as to why Goldman Sachs would be
19  less successful at the strategy than Mr. Madoff?
20     A.    Well, he says you won't hear about
21  it, you won't know about it, because they're not
22  telling you about it, which goes to what I knew
23  or didn't know about the Goldman Sachs.  But I
24  think the next big B paragraph tries to explain
25  it.  If you let me read it for a moment, I'll

# REPLY EXHIBIT 12

1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN THE MATTER OF

MADOFF CHARITIES INVESTIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

120 Broadway
New York, New York

January 30, 2009
10:02 a.m.


EXAMINATION UNDER OATH of J.

EZRA MERKIN, pursuant to Subpoena, held at

the above place, date and time, before

Alice Schulman, a Notary Public of the

State of New York.

VERITEXT REPORTING COMPANY

212-267-6868                                                    516-608-2400

CONFIDENTIAL                                                    BS00001025

```
                                                                    2

 1

 2      A P P E A R A N C E S:

 3

 4      DECHERT, LLP
        Attorneys for J. EZRA MERKIN
 5               1095 Avenue of the Americas
                 New York, New York    10036
 6
        BY:      ANDREW J. LEVANDER, ESQ.,
 7
                 NEIL STEINER, ESQ., and
 8
                 SARA MENDOLA, ESQ.
 9

10

        STATE OF NEW YORK
11      OFFICE OF THE ATTORNEY GENERAL
        ANDREW M. CUOMO
12               120 Broadway - 23rd Floor
                 New York, New York    10271-0332
13
        BY:      DAVID A. MARKOWITZ, ESQ.,
14               Bureau Chief
                 Investor Protection Bureau
15
                 ERIC CORNGOLD, ESQ.,
16               Executive Deputy AG for
                 Economic Justice
17
                 JASON R. LILIEN, ESQ.
18               Bureau Chief Charities Bureau

19               DANIEL SANGEAP, AAG

20               HARRIET ROSEN, AAG

21

22

23

24

25
```

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

CONFIDENTIAL

165

1              J. E. Merkin

2    document beyond any conversations with

3    me.

4              There were investors who came

5    into Ascot looking for Madoff and saying

6    this is what we want, and so I'm not sure

7    that it was necessarily the first leg of

8    the conversation was a disclosure for me.

9              There were investors who came in

10   looking for Ascot and ran out and got a

11   conversation perhaps about the strategy

12   and didn't necessarily get a full

13   conversation about Bernie's role, but they

14   certainly had the documents.

15             And depending upon how many

16   questions were asked and depending on how

17   long the conversation was, I pretty much

18   had a practice of making sure they

19   understood that the strategies were

20   executed through Madoff.

21        Q.    Now, with respect to Ramaz, did

22   you disclose to Ramaz that you had an

23   affiliation with Madoff?

24        A.    I did that, I think, in the

25   context that is relatively unimportant.

# REPLY EXHIBIT 13

**From:**  Autera, Michael

**Sent:**  Tue, 30 Oct 2007 11:14:15 GMT

**To:**  'Renee Nadler'

**Subject:** RE: Quick Question from Tufts

---

Historically, the non-Madoff strategies have represented less than 5% of Ascot's gross exposure.   The exposure in 2007 has been less than 5% as well.

---

**From:** Renee Nadler [mailto:rnadler@invoff.trustees.tufts.edu]
**Sent:** Monday, October 29, 2007 4:45 PM
**To:** Autera, Michael
**Subject:** RE: Quick Question from Tufts

Hi Mike,
Nice to see you when we were in NY last week.  A quick follow up question for you:

Ezra mentioned that a portion of Ascot is being managed internally with LEAPs and other option strategies.  Could you let me know what % of capital is allocated to positions beyond the capital allocated to the Madoff team.  (I don't need a precise number, just trying to get a sense of what it has been on average in 2007 and how that compares to other years.)

Thanks!

Renee

_____

Renee Nadler, CFA
Director of Investments
Tufts University
151 Merrimac Street, Suite 600
Boston, MA
02114

617-627-3491 (tel)
617-627-6754 (fax)
RNadler@invoff.trustees.tufts.edu (e-mail)

**Confidential**

GCC-P 0193623

# REPLY EXHIBIT 14

## YESHIVA UNIVERSITY

TO:    Mr. Robert Beren            DATE:    October 28, 1993
       Mr. Ludwig Bravmann
       Mr. David S. Gottesman
       Mr. Gedale Horowitz
       Mr. J. Ezra Merkin

FROM:  Sheldon E. Socol          SUBJECT:    Board of Trustees
                                             Investment Committee
                                             Meeting October 27, 1993

While I will, of course, prepare full Minutes of our meeting of October 27, I thought it advisable to summarize the decisions that were reached.    Please advise if any corrections or modifications are appropriate.

1.  On January 1, $20.0 million dollars to be invested with **Odyssey Partners** (a 10.0 million dollar increase over the previously approved 10.0 million dollar figure).

2.  As soon as possible, increase the funds invested with **Ardsley** (including current market value) to a total of 15.0 million dollars to be managed by Philip Hempelman.

3.  As soon as possible, invest 5.0 million dollars with **Ardsley Pacific** to be managed by David Gong.

4.  As soon as possible, increase the funds invested with **Ascott** (including current market value) to a total of 20.0 million dollars to be managed by Bernard Madoff.

5.  Increase, as soon as possible, the funds invested with Kingdon (including current market value) to a total of 10.0 million dollars.

6.  Decide by November 30 if the funds now invested in the **J Fund** (Jerry Jordon) should be withdrawn.

7.

    A. Interview Martin Zweig to determine if 10.0 million dollars should be invested with him for management.

    B. Interview Merriweather (John Hildebrand) to determine if an investment should be made and, if so, the amount of such investment.

    Mr. Merkin will attempt to schedule these two interviews for November 18.

1

**Confidential
Treatment Requested**

**YU 0000744**

8.   If the Board of Trustees Real Estate Committee approves of the transaction, some 7.0 million dollars can be invested in the purchase of a 7%, 20.0 million dollar mortgage note of Francis Greenburger relating to his leasehold on 55 Fifth Avenue to be sold by the FDIC on behalf of Dollar Dry Dock Savings back during a November 10 auction.  Annual return is some 1.5 million dollars or 100% of cash flow, whichever is higher.

SES:ajs
cc:  Ms. Navah Levine
     Mr. Bernard Pittinsky
     Mr. Jack Sproule

2

**Confidential
Treatment Requested**

**YU 0000745**

## 1998 CONFLICT OF INTEREST REPORT
## TO THE BOARD OF TRUSTEES
## MARCH 1999

During the 1998 calendar year, the University "did business" with the following firms and companies in which one or more members of the Board had or have a financial interest. In each instance the business relationship was based upon a proven track record, the reputation of the firm or individuals involved, demonstrated experience and competence, and/or the result of competitive bids.

When applicable, such as the selection of investment mangers, where the Board Investment Committee made and approved the decisions the appropriate Board committee was involved. In all cases, the fees charged were equal to and in many instances less than the industry standard.

**Phllip Altheim**
Vice Chairman, Board of Overseers

Forest Electric Corp. was the electrical sub-contractor selected by Knightsbridge Construction Company in connection with the renovation of the 11th floor of the Brookdale Center for the Cardozo School of Law. The Forest Electric sub-contract totaled $275,000 of the $1.5 million Knightsbridge contract for the 11th floor.

**Leon Black**
Member of the Cardozo Board

30.0 million dollar investment committed for management to the Apollo Investment Fund of which only 6.5 million was under management in 1998 resulting in a management fee of $33,000.

**Judah Feinerman**
RIETS Board Chairman
Member of Board of Trustees

Judd Associates. Insurance broker.
Total policy premiums $38,000.

**Morris Green**
Vice Chairman - RIETS Board
Member of Board of Trustees

Total payments in 1998 totaled $103,000 as rental payments for apartments used by students in a Washington Heights (480 W. 187th Street) building in which Mr. Green has a financial interest.

In prior years the University had provided capital as an investor to acquire this building which has since been repaid.

-1-

**Confidential**
**Treatment Requested**

YU 0009586

**Samuel H. Lindenbaum**
Honorary member-Board of
  Overseers

Rosenman & Colin.
Represents the institution as special land use
counsel. Total fee paid in 1998 was $14,000.

**J. Ezra Merkin**
Member RIETS Board
Chairman-Board of Trustees
  Investment Committee

General or Managing Partner or Chairman or Co-
Manager of four (4) of the 24 investments classified
by the Investment Committee as hedge funds, hedge
investments or non-readily marketable investments.

| Total University Funds Managed | |
|---|---|
| Blackacre | 11.2 Million Dollars |
| Long Horizon | 19.3 Million Dollars |
| ABLECO | 8.5 Million Dollars |
| Ascot Partners | 45.5 Million Dollars |
| | 84.5 Million Dollars |

Management fees paid in 1998 totaled $824,200
including $430,000 paid for funds in Ascot Partners
which are essentially managed by Bernard Madoff, a
member of the Board of Trustees.  Incentive fees
based upon 1998 performance totaled an additional
$601,454.

Each fund identified generated each year, to date, a
net profit for the University and the University has
never experienced a loss on these investments.

It should also be noted that one of Mr. Merkin's Co-
Managers on the ABLECO fund is the General
Manager of Cerberus which manages 15.0 million
dollars of University funds.

**Ira M. Millstein**
Vice Chairman - Board of Overseers

Partner Weil Gotshal & Manges LP
Represents the University in regard to many matters.
Ira Millstein has never charged the University for the
considerable personal time he devotes to University
issues. Total fees paid to the firm was $251,000 in
1998 primarily for real estate matters, but includes
other matters and litigation.

-2-

**Confidential**
**Treatment Requested**

YU 0009587

**Richard Parkoff**
Member Yeshiva College Board

Total rental payments of $724,000 were made in 1998 to The Parkoff Organization as rental payments for apartments used by students in seven (7) Washington Heights buildings in which The Parkoff Organization has a financial interest. In prior years mortgage financing was provided by the University to acquire these buildings under favorable terms in consideration of benefits granted to the University such as assuring access to all vacant apartments. The mortgage on several of these buildings is not at this time current, however, due to inadequate cash flow.

**Philip Rosen**
Vice Chairman - Yeshiva College Board

Partner, Weil Gotshal & Manges LP
Represents the University in regard to various real estate matters. Total fees paid to the firm in 1998 totaled $251,000 (see note above in regard to Ira Millstein).

**Howard J. Rubenstein**
Member Board of Overseers -

Howard J. Rubenstein Associates.
Firm retained annually to assist the Institution with special public relations problems and projects. Total annual payment $32,000.

**Stephen B. Siegel**
Member Cardozo Board

President and CEO Insignia/Edward S. Gordon Co. Payment of commission in 1998 of $752,000 in connection with the sale of 425 Fifth Avenue.

-3-

TOTAL P.04

Confidential
Treatment Requested

YU 0009588

Minutes of a regular meeting of the Board of Trustees of Yeshiva University held pursuant to notice at the Midtown Campus, 245 Lexington Avenue, New York, New York at 4:30 p.m. on Tuesday, March 13, 2001.

Present:        Robert M. Beren, Chairman

| | |
|---|---|
| Jack A. Belz | Dr. Ira Kukin |
| Julius Berman | Dr. Norman Lamm |
| Ludwig Bravmann | Earle I. Mack |
| J. Morton Davis | Burton P. Resnick |
| David Eshaghian | David I. Schachne |
| Judd Feinerman | Michael Scharf |
| Dr. Felix L. Glaubach | Ronald P. Stanton |
| Dr. Jacob E. Goldman | Moshael J. Straus, Esq. |
| E. Billi Ivry | Sy Syms |
| Michael Jesselson | Morry Weiss |
| Marcos Katz | Joseph Wilf |
| Mordecai D. Katz | David Yagoda |

Also present:

Martin H. Bockstein, Esq.
   General Counsel

Dr. Herbert Dobrinsky
   Vice President for University Affairs

Peter Ferrera
   Director, Department of Communications and Public Affairs

Daniel T. Forman
   Vice President for Development

Dr. Morton Lowengrub
   Vice President for Academic Affairs

Dr. Sheldon E. Socol
   Vice President for Business Affairs
   and Secretary

L/Minutes/Trustees/04 23 01

**Confidential
Treatment Requested**

YU 0001932

Mr. Beren called the meeting to order and welcomed all present. He noted that this was the first meeting of the Board to be held in the Gottesman Board Room and he called attention to the picture of the three generations of Gottesman family members on the wall of the Board Room.

The Chairman called for approval of the minutes of the Board meeting of November 14th, 2000. On motion duly made and seconded the minutes were approved.

Mr. Beren then referred to the previously distributed list of his recommendations for membership on the Committees of the Board of Trustees through the period ending September 30, 2001. A copy of the recommended nominees is attached. A motion was made to approve the recommended nominees. The motion was seconded and unanimously passed.

The Chairman then called upon Mr. Bravmann to give the report of the Nominating Committee. Mr. Bravmann said that the Nominating Committee had submitted to the Executive Committee, and the Executive Committee had unanimously approved the nominations of Dr. Jayne G. Beker, Chairman of the Ferkauf Graduate School of Psychology, and Marjorie Diener-Blenden, Chairman of the Stern College Board, for membership on the Board of Trustees for a two year term. The nominees were approved by the Board. Final action is deferred until the next meeting of the Board of Trustees in accordance with the By-laws.

The Chairman then called upon Dr. Morton Lowengrub. Dr. Lowenbrub reported that the search is continuing for Deans of the Azrieli, Sy Syms, and Cardozo Schools. Dr. Lowengrub has interviewed candidates and has made recommendations to Dr. Lamm.

Mr. Resnick then reported on the proposed amendments to the By-laws. He called on Martin Bockstein to discuss the proposed amendments, which had previously been unanimously approved by the Executive Committee and recommended by it to the Board of Trustees.

**Confidential
Treatment Requested**

YU 0001933

Following a discussion, the proposed By-laws amendments were, on motion duly made and seconded, unanimously approved. The amendments will be submitted to the next meeting of the Board of Trustees in accordance with the By-laws.

Mr. Beren, noting the large attendance at this meeting, said that it is a tribute to Dr. Lamm on his 25th year as President.

The Chairman then called upon Mr. Stanton for a report on the Capital Campaign. Mr. Stanton said that the campaign has raised $212 million through February 2001. This total includes the new Michael Price pledge of $25 million to name The Center for Genetic and Translational Medicine. Many people were involved in numerous meetings to secure this gift including Dean Purpura, Ira Millstein, Burt Resnick, Einstein faculty members, Dr. Socol, and other staff. Mr. Price also retained assistance from Philanthropic Initiatives, a philanthropic consultant group in Boston who represented his interests.

The model of trustees and current supporters identifying new friends will be critical to our Capital Campaign success in future years. Mr. Stanton urged each Board member to identify three potential new major supporters in the belief that we will achieve success with one of the three.

Our Capital Campaign launch will take place on May 23 at the New-York Historical Society.

We are on target in announcing that ten families have committed pledges of $10 million dollars and over. We are also on target in announcing that an additional ten families have committed gifts of $5-$10 million and an additional thirty families have committed gifts of between $1 and $5 million.

L/Minutes/Trustees/04 23 01

3

**Confidential
Treatment Requested**

YU 0001934

In regard to the Price gift, it was pointed out that it is a matching grant. $25 million dollars has been pledged on condition that the AECOM Board raises an additional $35 million. There are other specific conditions.

Mr. Beren then introduced Mr. Julius Berman, the Chairman of the RIETS Board of Trustees, who is attending his first meeting of the YU Board of Trustees.

Mr. Beren then called upon Mr. Bravmann for the Investment Committee report. Mr. Bravmann made reference to a performance summary sheet including asset allocations as of December 31, 2000 which he briefly updated. As at January 31, 2001, the market value of our endowment fund was $862.1 million. This compares favorably to the $777 million market value one year earlier. The $85.1 million endowment increase consists of $19.3 million in new gifts and $65.8 million in realized and unrealized appreciation.

During the calendar year 2000, despite difficult market conditions our total assets under management earned 11.6%, net of all fees. We manage most fixed income assets internally with other investments managed externally. In 2000 our external managers earned an impressive 13.6% net of fees total return and our internally managed fixed income assets earned an equally impressive 8.4% for a weighted average of 11.6% compared to a negative 9.1 % for the S&P 500 index and a negative 4.7 % for the Dow Jones Industrial Average.

These figures are subject to year-end audit adjustments and include unrealized returns.

Mr. Mack asked Dr. Socol about the University's investment portfolio. Dr. Socol said that it had very limited exposure to high tech equities. He said its allocation was 37.91% in fixed income investments and 61.50% in equities, hedge funds and alternative investments.

The Chairman then called upon Mr. Mack for the Government Relations Committee Report. Mr. Mack said that it is important to have a presence in Washington to avail ourselves of

4

Confidential
Treatment Requested

YU 0001935

Federal Grants. He said that President Lamm had convened a meeting of Messrs. Resnick, Mack and Eric Javits, who considered several representatives who could represent the University's interests in Washington. Two were decided upon, one to cover the House and the second for the Senate. They will be seeking programmatic grants. For AECOM, funding would be sought for the magnetic resonance imaging facility and for Cardozo, for its Innocence Project. The groups selected were those of Bob Livingston at the House level and Alfonse D'Amato's firm for Senate representation.

The Chairman then called upon Dr. Socol for the Conflict of Interest report. Dr. Socol distributed the annual report of all members of all University Boards who do business with the University. The names of all such Board members are annually disclosed with the nature and the amount of business done with the University. A copy of the year 2000 Conflict of Interest Report is attached to these minutes.

Mr. Stanton recommended that people on the YU payroll who consult with companies that the University does business with should also be listed in the Conflict of Interest Statement. Dr. Socol said that those names will be included in future reports.

The Chairman then called upon Dr. Norman Lamm. Dr. Lamm, speaking about the Capital Campaign, said that we need the Board's help in reaching the goals of the campaign.

The President said that when the Executive Committee had authorized the Dormitory Authority borrowing, it did so conscious of the importance of prudence in incurring debt.

Dr. Lamm said that achieving diversity in staffing and enrollment sometimes creates concerns as does providing educational opportunities for the disabled. He said there are both moral and statutory considerations that must be taken into account. In addition, both are driven by accrediting agencies and applicable law. He recommended the appointment of a committee to

**Confidential**
**Treatment Requested**

YU 0001936

establish a University-wide policy for dealing with such issues.

Dr. Lamm then presented the following recommendations for recipients of Honorary Degrees: Richard C. Holbrooke, Rabbi Ephraim Buchwald, Arthur Cohn and Eli Zborowski. A discussion followed concerning the recommendations. Thereafter a motion to approve the recommendations was seconded and unanimously adopted.

Dr. Lamm then recalled for the Board a conversation he had had with his revered predecessor, Dr. Samuel Belkin, 25 years ago, after Dr. Belkin had retired. Dr. Lamm described how Dr. Belkin had told him of the rigors of the Presidency and what Dr. Lamm could expect, including the unexpected. Dr. Lamm said that the past 25 years have been the most invigorating of his life.

With that background, Dr. Lamm said, he now officially informs the Board that he will leave the Presidency of Yeshiva University and of RIETS in August 2002, in sixteen months. He said that he hoped that a successor could be found within that time but that he would, of course, stay on until that was accomplished.

Following Dr. Lamm's remarks Mr. Beren referred to Dr. Lamm as "our distinguished President and brilliant Rosh Hayeshiva." He said that his initial reaction to Dr. Lamm's news was one of sadness but that was tempered by the contemplation of so much achievement. Dr. Lamm's career covers over 60 years. Mr. Beren said that we are grateful that Dr. Lamm has pledged his continuing involvement with the University. He said that he would, later this evening, address the President's specific, enormous accomplishments. Mr. Beren said that Dr. Lamm is the recognized world leader of modern orthodoxy who responded to the challenges of his office with dignity and intelligence. Morry Weiss took the floor on behalf of Mr. Gottesman, who was absent, and reiterated Mr. Beren's sentiments and remarks. He said that Dr. Lamm's tenure has

**Confidential**
**Treatment Requested**

YU 0001937

been a fabulous period for the University due to his presence.

In recognition of Dr. Lamm's enormous accomplishments, a motion was made that Yeshiva University establish the position of Chancellor and that it be assumed by Dr. Lamm on the final day of his presidency. The motion was unanimously carried.

The Chairman then recognized, in turn, the following Board members, each of whom expressed their appreciation to Dr. Lamm for his abilities and accomplishments: Messrs. Yagoda, Berman, Feinerman, Scharf, Belz, Davis, Ms. Ivry and Drs. Goldman and Kukin.

Following the remarks, Dr. Lamm briefly took the floor again to thank all those who spoke so warmly in tribute to him. Dr. Lamm then presented the tenure recommendations that had been approved by the Executive Committee. The proposal was to award tenure to Nancy Carrasco, M.D. Thierry LeJemtel, M.D., Steven Schwartz, M.D. and Mark Chance, Ph.D. The candidates' CV's were previously distributed to the Board members. Following a discussion, the Board unanimously voted to award tenure to the candidates conditioned upon tenure recommendations being approved for them by the Board of Overseers of the Albert Einstein College of Medicine when it next meets.

Mr. Beren then said that he will announce a search committee for Dr. Lamm's successor in the near future. The meeting was then adjourned to be followed by a dinner at the Schottenstein Residence Hall in honor of Dr. Lamm.

MARTIN H. BOCKSTEIN

Confidential
Treatment Requested

YU 0001938

# 2000 CONFLICT OF INTEREST REPORT
## TO THE BOARD OF TRUSTEES
### MARCH 2001

During the 2000 calendar year, the University "did business" with the following firms and companies in which one or more members of the Board had or have a financial interest. In each instance the business relationship was based upon a proven track record, the reputation of the firm or individuals involved, demonstrated experience and competence, and/or the result of competitive bids.

When applicable, such as the selection of investment managers, where the Board Investment Committee made and approved the decisions the appropriate Board committee was involved. In all cases, the fees charged were equal to and in many instances less than the industry standard.

**Philip Altheim**
Vice Chairman, Board of Overseers

Forest Electric Corp. installed two (2) 1500 KVA replacement transformers at 2495 Amsterdam Avenue. The total payment was $275,000.

**Leon Black**
Member, Cardozo Board

$45.0 million University investment committed for management to the Apollo Investment Funds. $24.5 million book value, $30.2 million market value as of December 31, 2000 was under management in 2000. resulting in a management fee of $400,400.

**Judah Feinerman**
Member, Board of Trustees
Member, RIETS Board

Judd Associates/ C.S.I.R. Inc. Enterprises Insurance broker. Total policy premiums $366,000.

**Elliot Feinerman**
Member, Yeshiva College Board

**Confidential**
**Treatment Requested**

YU 0023065

**Samuel H. Lindenbaum**
Honorary Member, Board of
Overseers

Rosenman & Colin.
Represents the Institution in an estate
administration proceeding.  Total fee paid in 2000
was $134,179.

**J. Ezra Merkin**
Member, RIETS Board
Chairman, Board of Trustees
  Investment Committee

General or Managing Partner or Chairman or Co-
Manager of four (4) of the 32 investments
classified by the Investment Committee as hedge
funds, hedge investments or non-readily
marketable investments.

### Total University Funds Managed
### (Market Value at December 31, 2000)

| | | |
|---|---|---|
| Blackacre | 15.7 | Million Dollars |
| Long Horizon | 26.1 | Million Dollars |
| ABLECO | 10.0 | Million Dollars |
| Ascot Partners | 61.6 | Million Dollars |
| | 113.4 | Million Dollars |

Management fees paid in 2000 totaled $1,090,000
including $593,000 paid for funds in Ascot Partners
which are essentially managed by Bernard Madoff,
a member of the Board of Trustees.  Incentive fees
based upon 2000 performance totaled an
additional $537,824.

Each fund identified generated each year, to date,
a net profit for the University and the University has
never experienced a loss on these investments.

It should also be noted that one of Mr. Merkin's Co-
Managers on the ABLECO and Blackacre funds is
the General Manager of Cerberus which manages
6.4 million dollars of University funds.

-2-

**Confidential**
**Treatment Requested**

YU 0023066

**Ira M. Millstein**
Vice Chairman, Board of Overseers

Partners Weil Gotshal & Manges LLP Represent the University in regard to many matters. Ira Millstein has never charged the University for the considerable personal time he devotes to University issues. Total fees paid to the firm was $670,905 in 2000 primarily for real estate matters, but includes other matters and litigation. In addition, The Midtown Centre LLC, a limited liability company established to purchase and operate property at 205/215 Lexington Avenue paid legal fees of $529,436 during 2000.

**Marvin E. Jacob**
Member, RIETS Board

**J. Philip Rosen**
Vice Chairman, Yeshiva College Board

**A. Richard Parkoff**
Member, Yeshiva College Board

Total rental payments of $817,748 were made in 2000 to The Parkoff Organization as rental payments for apartments used by students in seven ( 7 ) Washington Heights buildings in which The Parkoff Organization has a financial interest. In prior years mortgage financing was provided by the University to acquire these buildings under favorable terms in consideration of benefits granted to the University such as assuring access to all vacant apartments. The mortgage on several of these buildings is not at this time current, however, due to inadequate cash flow.

*90 Laurel Hill Terrace*

**Howard J. Rubenstein**
Member, Board of Overseers

Howard J. Rubenstein Associates. Firm retained annually to assist the Institution with special public relations problems and projects. Total annual payment $86,323 in 2000.

**Charles A. Krasne**
Member, Board of Overseers

Krasdale Foods, Inc. Total paid to the company was $47,874 in 2000 for University cafeteria food purchases.

-3-

Confidential
Treatment Requested

YU 0023067

**John D. Cohen**
Member, Board of Overseers

Blank Rome Tenzer Greenblatt
Total fees paid to the firm was $41,801.25 in 2000 primarily for real estate matters, but includes other matters and litigation.

**Emanuel J. Adler**
Member, Yeshiva College Board

**Dr. Michael A. Stocker**
Member, Board of Overseers

Empire Blue Cross / Blue Shield
$12,792,213

**Stephen J. Schulte**
Member, Cardozo Board

Schulte Roth & Zabel
Total fees paid to the firm was $1,433 in 2000 related to a former employee labor matter.

**Robert I. Kantowitz**
Member, Yeshiva College Board

Chase Securities, Inc.
The University utilizes this organization to sell various bonds received from gifts and estates.

**Alan M. Silberstein**
Member, Sy Syms Board

Western Union Financial Services
$1,868 was paid to this company in 2000 for various mailing services.

**Moses Marx**
Member, RIETS Board

The Berkshire Bank

In 2000 the University used Madison Merchant Services, a subsidiary of The Berkshire Bank, to process its MasterCard and VISA payment transactions. Approximately $16.0 million of transactions were processed, generating $351,000 in fees.

-4-

**Confidential
Treatment Requested**

**YU 0023068**

AGENDA

YESHIVA UNIVERSITY

BOARD OF TRUSTEES MEETING

TUESDAY - MARCH 12, 2002

MID-TOWN CAMPUS

GOTTESMAN BOARD ROOM

7TH FLOOR

4:00 P.M.

Robert M. Beren - Presiding

| | | |
|---|---|---|
| I. | Welcome | Chairman |
| | Approval of Minutes - November 27, 2001 | |
| II. | President's Report | Dr. Norman Lamm |
| | Including appointments of | |
| | Dr. David Schnall and Dr. Charles Snow | |
| III. | Committee Reports | |
| | a.   Capital Campaign Committee | Ronald P. Stanton |
| | | Daniel T. Forman |
| | b.   Gift Acceptance Committee | Chairman |
| | c.   Investment Committee | Ludwig Bravmann |
| | d.   Academic Affairs Committee | Dr. Ira Kukin |
| | e.   Presidential Search Committee | Michael Jesselson |
| | f.   Finance Committee | Burton P. Resnick |
| | g.   Nominating Committee - Board of Trustees | Ludwig Bravmann |
| | h.   By-Laws Committee | Martin Bockstein, Esq. |
| IV. | Report on Legal Affairs | Dr. Sheldon E. Socol |
| | | Martin Bockstein, Esq. |
| V. | Annual Report on Conflict of Interest | Dr. Sheldon E. Socol |
| VI. | Discussion | |
| | –   Albert Einstein College of Medicine | |
| | –   Benjamin N. Cardozo School of Law | |

## 2001 CONFLICT OF INTEREST REPORT
## TO THE BOARD OF TRUSTEES
## MARCH 2002

During the 2001 calendar year, the University "did business" with the following firms and companies in which one or more members of the Board or members of Board Committees are either employed by or had / or have a financial interest. In each instance the business relationship was based upon a proven track record, the reputation of the firm or individuals involved, demonstrated experience and competence, and/or the result of competitive bids.

Where investment managers are committee members, the Board Investment Committee approved the allocation of funds for management. In all cases, the fees charged were not more than the industry standard.

While not a condition of the business relationship often the Board member is a substantial donor to the University.

**Hyman Arbesfeld**
*Member, RIETS Board*
*Hotel Bedford*
*San Carlos Hotel*
The Hotel Bedford was paid $64,712 in 2001 and $64,666 in 2000.
In 2001 $485 was paid to the San Carlos Hotel, $4,802 was paid in 2000.


**Leon Black**
*Member, Cardozo Board*
*Apollo Investment Funds*
$35.0 million investment committed for management to the Apollo Investment Funds of which $29.2 million of book value, $32.7 million of market value was under management in 2001 resulting in a management fee of $474,900.


**John D. Cohen**                         **Emanuel J. Adler**
*Member, Board of Overseers*      *Member, Yeshiva College Board*

*Blank Rome Tenzer Greenblatt LLP*
Total fees paid to the firm was $27,060 in 2001 primarily for real estate matters, but includes other matters and litigation.

-I-

**Confidential**
**Treatment Requested**                         **YU 0001440**

**David Eshaghian**
*Member, Board of Trustees*
On June 30, 2000, Mr. Eshaghian purchased from the University a condominium unit at 215 Lexington Avenue and the entire building at 205 Lexington Avenue for $29.25 million. The University and Mr. Eshaghian share management of the common elements of the 215 Lexington Avenue condominium with a common operating budget of some $1.0 million.

**Julian Feinerman**                    **Elliot Feinerman**
*Member, Board of Trustees*              *Member, Yeshiva College Board*
*Member, RIETS Board*
*Fund Associates/ C.S.I.R. Inc. Enterprises*
Insurance broker.  Total policy premiums $234,406.

**Howard Jonas**
*Member , Yeshiva College Board*
*IDT Internet Services Inc.*
The University paid $3,388 in 2001.

**Robert I. Kantowitz**
*Member, Yeshiva College Board*
*Chase Securities, Inc.*
The University utilizes this organization to sell various securities received as gifts or from estates.  Total fees paid in 2001 was de minimus.

**Charles A. Krasne**
*Member, Board of Overseers*
*Scarsdale Foods, Inc.*
Total paid to the company was $38,276 in 2001 for University cafeteria food purchases.

**Fredda Leff**
*Member, Wurzweiler Board*
*Lincoln Electric Products Company*
Total business with this company in 2001 was almost $60,000.

-2-

**Confidential
Treatment Requested**                                    **YU 0001441**

**Moses Marx**
*Member, RIETS Board*
*The Berkshire Bank*
In 2001 the University used Madison Merchant Services, a subsidiary of The Berkshire Bank, to process its MasterCard and VISA payment transactions. Approximately $7.5 million of transactions were processed, generating $158,000 in fees to Madison Merchant Services.

**J. Ezra Merkin**
*Member, RIETS Board*
*Chairman, Board of Trustees*
*Investment Committee*
General or Managing Partner of the following four (4) investments of the thirty-nine (39) such investments classified by the Investment Committee as hedge funds, hedge investments or non-readily marketable investments.

| Market Value at December 31, 2001 | | | Management Fee | High Water Mark | Incentive Fee |
|---|---|---|---|---|---|
| Blackacre | $16.5 | Million | 1% | Yes | 20% |
| Long Horizon | $29.2 | Million | 1% | Yes | 20% (in excess of 10%) |
| ABLECO | $10.9 | Million | 1% | No | 20% |
| Ascot Partners | $69.3 | Million | 1% | No | None |
| | $125.9 | Million | | | |

The 39 investments had a market value of $634.5 million with the four (4) Merkin managed funds representing some 19.84% of this type of investment. The total funds under management as at December 31 was $1.3 billion. Each Merkin managed fund generated each year, to date, a net profit for the University.

Management and incentive fees paid in 2001 totaled $1,680,786 including $663,000 paid for funds in Ascot Partners which is managed by Bernard Madoff Investment Securities in accordance with an arrangement made directly with Ascot Partners. Mr. Bernard Madoff is a Member, Board of Trustees and Chairman, Sy Syms Board of Directors.

It should also be noted that Steve Fineberg, one of Mr. Merkin's Co-Managers on the ABLECO, Blackacre and Long Horizon funds is the General Manager of Cerberus which manages $7.2 million of University funds and received $224,949 as management and incentive fees in 2001.

-3-

**Confidential Treatment Requested**

**YU 0001442**

**Ira M. Millstein,**
*Vice Chairman,*
*Board of Overseers*

**Marvin E. Jacob**
*Member, RIETS Board*

**J. Philip Rosen**
*Vice Chairman, Yeshiva College Board*

*Weil Gotshal & Manges LLP*
A law firm representing the University in regard to many matters. Ira Millstein, who has retired from the management of the firm, has never charged the University for the considerable personal time he devotes to University issues. Total fees paid to the firm was $237,582 in 2001 primarily for real estate matters, but includes other matters and litigation.

**A. Richard Parkoff**
*Member, Yeshiva College Board*
*The Parkoff Organization*
Total rental payments of $936,299 were made in 2001 to The Parkoff Organization as rental payments for fifty-seven (57) apartments used by or held vacant for the University in seven (7) Washington Heights buildings in which The Parkoff Organization has a financial interest. In prior years, mortgage financing and investments were provided by the University to acquire ten (10) buildings under favorable terms in consideration of benefits granted to the University such as assuring access to all vacant apartments. The mortgage on several of these buildings is not at this time current, however, due to inadequate cash flow. As of June 30, 2001, there are outstanding mortgages and investments in nine (9) buildings totaling $4,415,000. The interest in arrears is $1,821,000.

**Howard J. Rubenstein**
*Member, Board of Overseers*
*Howard J. Rubenstein Associates*
Firm retained annually to assist the Institution with special public relations problems and projects. Total annual payment $82,753 in 2001.

**Stephen J. Schulte**
*Member, Cardozo Board*
*Schulte Roth & Zabel*
Total fees paid to the firm was $972 in 2001 related to a former employee labor matter.

-4-

**Confidential**
**Treatment Requested**

**YU 0001443**

**Stephen Siegel**
*Member, Cardozo Board*
*Insignia/E.S.G. Real Estate*
In 2001, $16,959 was paid for real estate related services for 205/215 Lexington Avenue
and for year 2000, $730,000 was paid for real estate commissions in connection with real
estate transactions.

**Dr. Michael A. Stocker**
*Member, Board of Overseers*
CEO of Empire Blue Cross / Blue Shield which provides basic health insurance for members
of the University, faculty, staff and student body.  Total premium remitted was $11,694,060.

**Confidential
Treatment Requested**

**YU 0001444**

Minutes of a regular meeting of the Board of Trustees of Yeshiva University held pursuant to notice at the Midtown Campus, Gottesman Board Room, 245 Lexington Avenue, New York, New York at 4:00 p.m. on Tuesday, March 12, 2002.

Present:    Robert M. Beren, Chairman

| | |
|---|---|
| Jack Belz* | Dr. Ira Kukin |
| Julius Berman | Dr. Norman Lamm |
| Marvin S. Bienenfeld | Earle I. Mack |
| Marjorie Diener Blenden | Burton P. Resnick |
| Ludwig Bravmann | David I. Schachne |
| David Eshaghian | Irwin Shapiro |
| Judd Feinerman | Ronald P. Stanton |
| Dr. Felix L. Glaubach | Moshael Straus, Esq. |
| Alan E. Goldberg | Sy Syms |
| David S. Gottesman | Morry Weiss |
| Michael Jesselson | Joseph Wilf |
| Mordecai D. Katz | David Yagoda |

* *By telephone*

Also present:

    Martin H. Bockstein, Esq.
      General Counsel

    Dr. Herbert Dobrinsky
      Vice President for University Affairs

    Daniel T. Forman
      Vice President for Development

    Dr. Morton Lowengrub
      Vice President for Academic Affairs

    Dr. Sheldon E. Socol
      Vice President for Business Affairs
      and Secretary

The Chairman called the meeting to order and called for approval of the minutes of the meeting of November 27, 2001, which on motion duly made and seconded were approved.

**Confidential
Treatment Requested**

YU 0001944

The Chairman then called upon Dr. Norman Lamm for the President's Report. Dr. Lamm thanked Joseph Wilf for his extremely generous gift naming the uptown campus. His report was greeted with applause.

The President said that the Rabbinate in Israel has asked for a day of prayer and fasting in the United States. It would be known as a "little Yom Kippur." Dr. Lamm said that the Israel situation is causing an institutional problem for YU. We do not know how many students will be returning to Israel after the break. It may create a residence hall problem.

The President said that the Jerusalem College of Technology may not be able to continue as our tenant in Israel. In that event, a new tenant or other source of income would have to be identified.

The President said that there have been three acceptances of the offer of honorary degrees: Dr. Bernadine Healy, Michael Jesselson and Mrs. Limor Livnat. They will be honored at the YU graduation.

Dr. Lamm proposed for additional honorary degrees Malcolm Hoenlein and Richard Joel. The nominees for honorary degrees were unanimously approved.

The Chairman then called upon Michael Jesselson for a report of the Presidential Search Committee. Mr. Jesselson said that the Committee has been operating for a few months with a very short list of candidates. Dr. Zakheim recently met with several Board members and indicated that he does not want to be considered for the Presidency. Mr. Jesselson noted that no offer had been made to him.

2

**Confidential
Treatment Requested**

YU 0001945

Dr. Lamm asked the Board to approve the appointment of 2 new Deans: J. Charles Snow of the Sy Syms School of Business and David J. Schnall as the Dean of the Azrieli Graduate School of Jewish Education and Administration.

Thereafter the Board unanimously approved the appointment of the 2 Deans.

The Chair then called upon Mr. Resnick for a report of the Finance Committee. A copy of the report is attached to these minutes.

The Chair then called upon Earle Mack. Mr. Mack said that he would like to re-open discussions regarding Cardozo Law School finances in relation to the renovation project and would like to meet with the Finance Committee to insure that we can complete the renovations of the Law School building in a timely manner. He asked that construction continue until the meeting takes place.

Mr. Mack noted that the Law School would produce a "profit" after certain expenses are satisfied including debt service on the $30 million bond issue. Mr. Resnick said that as soon as Mr. Mack was ready the Finance Committee would meet with him and other representatives of the Law School. Mr. Beren said that in view of that, action should be deferred on Mr. Mack's request that the construction at the Law School be continued until the meeting with the Finance Committee.

The Chair then called upon Mr. Stanton, who together with Dan Forman gave the Capital Campaign Report. The Report is summarized in the material included in the booklet distributed to all Board members. Mr. Forman, utilizing slides, expanded on those remarks, showing among other things, the source of the funds received so far and of the pledges.

3

Confidential
Treatment Requested

YU 0001946

The Chair then called on Mr. Bravmann for the report of the Investment Committee. A copy of that report is attached to these minutes.

Mr. Bravmann's report was supplemented by Dr. Socol who distributed additional charts and spoke with the aid of slides. He said that the closing market value of the endowment fund at December 31, 2001 was $920.8 million. For the year ending on that day there was a net of fees total return of 3.7% which compares favorably with the applicable benchmarks.

Reference was made to an Executive Summary of Cambridge Associates which indicated that YU's endowment fund has performed the third best of 134 surveyed institutions for the fiscal year ended June 30, 2001. Dr. Socol thanked the Investment Committee for its diligent service.

Mr. Beren said that we are pleased with the performance on a comparative basis.

Mr. Bravmann then moved the membership on the Board of Fanya Gottesfeld-Heller whose nomination had been considered at the previous meeting of the Board and deferred to this meeting in accordance with the By-Laws. The Board unanimously approved her membership on the Board.

Mr. Bravmann also nominated J. Ezra Merkin for membership on the Board. Mr. Merkin had previously been recommended by vote of the Executive Committee. His nomination was unanimously approved and will be deferred for final action until the next succeeding meeting of the Board.

The Board then considered 2 proposed amendments to the By-Laws which had been approved at the previous meeting. The amendments relate to the creation of an Investment Committee as a Standing Committee of the Board of Trustees and the creation of the Office of

4

**Confidential
Treatment Requested**

YU 0001947

Chancellor. On motion duly made and seconded both amendments were unanimously approved and will now become part of the By-Laws.

Mr. Bravmann then proposed an amendment to the By-Laws which would eliminate deferral to a succeeding meeting of final approval of candidates for Board membership. A discussion followed. Mr. Syms asked why we are fixing something that isn't broken and pointed out that all the current members had successfully been through the existing process. Following further discussion a motion to adopt the amendment was made, seconded and approved. It will be considered at the next meeting of the Board in accordance with the By-Laws.

The Chair then called upon Dr. Kukin for the Report of the Academic Affairs Committee. Dr. Kukin said that Dr. Lowengrub had reported on academic initiatives, external departmental reviews, new faculty hires and the mentoring program being conducted by Dr. Margaret Gibelman.

Dean Gelman provided an update on the upcoming Middle States Association visit. Dr. Rosovsky reported on his review of the undergraduate colleges that had been done in 1999 at the request of Dr. Lamm and Mr. Gottesman.

A suggestion was made that the Academic Affairs Committee meet with the Middle States evaluators during their visit on March 17 - 20, 2002.

Mr. Beren then gave a report on the Gift Acceptance Committee and called attention to the guidelines of the Committee contained in the booklet distributed to members. He said that the Committee had recently acted on 3 bequests. Included are funds already received and to be received as follows: $7 million from the Estate of Peter Benenfeld, $10 million from the Estate of Joseph Emanuel and the magnificent bequest from the Estate of Anne Scheiber that has now

5

Confidential
Treatment Requested

YU 0001948

grown to approximately $40 million. Mr. Beren said that the Committee carried out the intent of the benefactors.

Mr. Bockstein and Dr. Socol then reported to the Board on pending litigation, describing the status of the Estates of Herling and Gabriel Levine. Mr. Beren reported on the pending litigation involving the Harry Beren Trust D in which Yeshiva University is one of 9 charities named as preferred beneficiaries.

Dr. Socol then gave the Annual Conflict of Interest Report with supporting data previously distributed to the Board. He noted that the Board's policy requires full disclosure of the nature and extent of any business done between members of the various Boards of the University and the University. A list with details of such transactions had been distributed. Dr. Socol noted that most of such business is done on a competitive bidding basis and that the University usually receives preferential treatment, to its benefit. Mr. Beren questioned the Board on whether it had any objections to any of the transactions. No member expressed any opposition.

Dr. Socol then reported on the Prudential demutualization. He said that YU pension participants have approximately $800 million invested with Prudential constituting the assets of its basic pension plan. The University has engaged Buck Associates to consult and advise on the most equitable way to distribute the approximately $307 million that Prudential will distribute to the University for the benefit of the 6000 possible distributees. The report is expected to be received shortly.

The meeting was then adjourned.

*[signature]*

MARTIN H. BOCKSTEIN

6

Confidential
Treatment Requested

YU 0001949

# REPLY EXHIBIT 15

YESHIVA UNIVERSITY
BOARD OF TRUSTEES
INVESTMENT COMMITTEE

MR. GEDALE HOROWITZ, CHAIRMAN

December 21, 1992

MINUTES

A meeting of the Board of Trustees Investment Committee was held
in the offices of Mr. David Gottesman at 4:00 p.m. on Monday
afternoon, December 21, 1992.

Present:  Mr. Robert Beren, Mr. Ludwig Bravmann, Mr. David
Gottesman, Mr. Gedale Horowitz, Ms. Billi Ivry, Mr. J. Ezra
Merkin, Dr. Sheldon E. Socol and  Ms. Abigail Mason of Cambridge
Associates.

1.  The investment performance as at November 30 was reviewed for
each of the fund managers:

● OPPENHEIMER

The Committee expressed the opinion that Oppenheimer's 1992
performance was "very good".  Questions were raised, however,
concerning their reporting format and Dr. Socol was asked to
reconcile with University records their data concerning
opening fund balances and the amount of withdrawals.  Dr.
Socol was also asked to report at the next meeting concerning
the policies and procedures applicable to "income" received
by the University each year from the various fund managers.

● NEUBERGER AND BERMAN

The Committee expressed its satisfaction of the
performance of Neuberger and Berman.  To assure

1

Confidential
Treatment Requested



YU 0000724

performance reporting consistency of all the fund managers, Dr. Socol said that he would undertake, with the help of Cambridge Associates, to develop a more meaningful reporting format.

### ● EUROPACIFIC GROWTH FUND

While it is somewhat premature to evaluate the performance of the funds invested in the EuroPacific Growth Fund, the value of the fund did decline by approximately 2% over the previous 30 days, which today is, in view of the relatively depressed condition of the foreign markets, to be expected with global investment funds. It was decided to invite a representative of EuroPacific to attend the next meeting of the Committee.

### ● MILLER, ANDERSON & SHERRERD

The management by Miller, Anderson & Sherrerd of 30 million dollars was undertaken only within the last 30 days, no comments could, therefore, be made concerning their performance. On balance, it was noted that, to date, they appear to be investing the funds aggressively. It was pointed out, however, that while some of the investments held by MAS appear to be high coupon, high quality, others are very clearly not investment grade. It also appears that they had purchased a substantial amount of what could be called "junk" bonds and that they, at least, as of the November 30 reporting date appear to have a high cash position. Many questions were raised,

2

Confidential
Treatment Requested

YU 0000725

however, concerning their reporting format and the definitions they use to refer to "yield to maturity" and "current yield". The reporting format also did not provide crucial information such as the average life of the portfolio, the duration of maturities, and the yield to maturity based upon purchase cost.

The investment guidelines with Miller, Anderson & Sherrerd were reviewed by the Committee and it was suggested that the guidelines be modified to provide that investments should not be made in less than double "BB" obligations. These issues will be discussed with MAS by Cambridge Associates and a complete report will be prepared for the next meeting.

2.  Dr. Socol presented a schedule identifying the assets managed by the various fund managers, which indicated that in the aggregate some 36% is now invested in equities under the assumption that the 100% equity managers have indeed invested all the assets that they manage in equities.

The non-supervised assets were identified and briefly described.

It is the objective of the Committee that ultimately all the endowed assets of the Institution should be managed under the oversight and guidelines set by of the Investment Committee and that over time those that today are being managed consistent with certain donor preferences, should be consolidated as part of the investment pool to the degree it

3

Confidential
Treatment Requested

YU 0000726

is practical to do so.

3. Dr. Socol referred to the Minutes of the December 1st meeting and said that the Committee had previously decided that after the national presidential election, subject to market conditions, an additional 30 million dollars is to be deposited for management with Miller, Anderson & Sherrerd. In view of economic conditions and the questions raised concerning their reporting format and the "quality" of the investments being made, it was decided to defer the implementation until the questions raised can be satisfactorily answered.

4. Dr. Socol pointed out to the Committee that they had indicated a desire to move toward an equity asset allocation of approximately 50% and that since some 36% was now invested in equities 14% additional percent of the market value of the endowment fund can now be invested in the equity market. The Committee expressed its view that it should proceed toward a 50% equity position on a long term basis but should do so with great caution.

The Committee agreed that on a long term basis the equity market consistently outperforms the fixed income market, yet the time horizon to measure equity performance should be five years or greater.

A lengthy discussion followed concerning various investment strategies. Ms. Mason reviewed her report concerning prospective "hedge fund" managers for the Committee and

4

Confidential
Treatment Requested

YU 0000727

pointed out the various definitions and structures under the
general category of hedge funds which include varying
investment styles and strategies, as well as the concerns
inherent in the use of such strategies.

The Committee confirmed its prior decision not to invest
funds with any individual or firm which is under any
investigation "cloud", which eliminated certain possible
managers.  Many names, as possible investment mangers,  were
suggested by members of the Committee and varying investment
styles and approaches were discussed in considerable detail.

Ms. Ivry raised, once again, for consideration, the possible
investment in mutual funds such as the Putnam Fund.
Discussion followed, and it was decided to review this matter
again in the future, pointing out the advantages and
disadvantages of mutual funds as compared to the other
investment opportunities under consideration.

5.  Mr. Ezra Merkin, in response to the request made of him to do so
during the December 1 meeting of the Committees, presented
his report and analysis concerning various investment
strategies and potential managers for each strategy.
Consistent with the Committee's earlier decision, a plan was
discussed for 25 million dollars to be so invested to be
divided among six or seven managers in amounts ranging from
2.5 million dollars to 5.0 million dollars.

Mr. Merkin pointed out that the objective is to increase

5

Confidential
Treatment Requested

YU 0000728

return at the lowest possible risk and that on a risk
adjusted basis, especially in a downward or meandering
market, the type of management suggested should do better
than the more traditional investment opportunities.  The
Committee expressed its awareness of the fact that the
investment approach being considered requires the recognition
of certain realities.  Rather than the receipt of trade
notices, the University will, in their place, receive
quarterly letters and reports that are often unaudited.  In
certain instances the University may from time to time,
therefore engage an independent audit of its investment.
Liquidity varies with the investment opportunity, and prior
notice is required and the timing of that notice is important
to assure a prompt return of principal.  While communication
with the fund managers of the type under discussion is
certainly possible, it is not as easily achieved as with
typical fund managers and the information obtained may to the
unsophisticated be a source of some discomfort.  The members
of the Committee understood full well the characteristics of
the type of investments under discussion and the names of
those suggested were well known to them as was their business
and professional reputation.  Ms. Mason and Dr. Socol pointed
out that investment in certain types of Limited Partnerships
may give rise to Unrelated Business Taxable Income (UBTI).

Mr. Gottesman pointed out that it was important to select
managers and investment opportunities that have proven in the
past that they could stay the course since in today's highly

6

Confidential
Treatment Requested

YU 0000729

valued market, "When you fill the bathtub, all the toys float
and  the problem begins when you pull the plug.".

There was unanimous agreement, after considerable discussion
and analysis, that it is in the best interest of the
University to invest 25 million dollars, consistent with the
plan being discussed, one that the University has sufficient
endowment funds to now make it prudent to do so.  It was
further decided that to the degree possible, the investments
should be made by December 31st since the opportunities to
invest in the way proposed is limited and that the
representatives of several of the desirable investment
opportunities have  indicated in prior conversations that
only as an accommodation to the University would they be
prepared to accept new "accounts" and that this offer should
be accepted without delay especially since December 31 is an
opportune time for such investments.  It was then decided
unanimously to proceed with the following investments:

| | | |
|---|---|---|
| A. | Madoff and Company (Ascot Partners L.P.) | $5.0 million |
| B. | Ardsley Partners | $5.0 million |
| C. | J Fund | $2.5 million |
| D. | Kingdon Capital | $2.5 million |
| E. | Pequot Partner | $2.5 million |
| F. | Bentley Capital | $2.5 million |
| G. | Wellington Partners | $2.5 million |
| H. | Siegler-Collery | $2.5 million |
| | Total | $25.0 million |

7

Confidential
Treatment Requested

YU 0000730

If it proves, for whatever reason, to be impractical to place any one or more of these investments at this time, the Committee agreed that the funds are to remain uninvested until the Committee meets again and makes an alternative decision.

The Committee authorized Dr. Socol with the help of Mr. Merkin to proceed to place these investments. Mr. Merkin was thanked for his valuable assistance.

The Committee decided to meet again on Monday afternoon, January 25, 1993 at 3:30 p.m. in Mr. Gottesman's office to continue its deliberations and to receive status reports concerning the implementation of prior decisions. A representative of The Euro Pacific Growth Fund will be invited to that meeting.

.Meeting was adjourned at 7:25 p.m.

Minutes prepared

Sheldon E. Socol

8

Confidential
Treatment Requested

YU 0000731

YESHIVA UNIVERSITY ENDOWMENT FUND                                    JANUARY 1, 1993
IN $000S

| MANAGER | AVERAGE CAPITAL | MONTHLY CHANGE $ | % | Y-T-D CHANGE $ | % | CURRENT VALUE | PREVIOUS VALUE | % |
|---|---|---|---|---|---|---|---|---|
| **I - OPPORTUNISTIC TRADERS** | | | | | | | | |
| | $0 | | | | | $0 | $0 | 0% |
| SUBTOTAL | $0 | | | | | $0 | $0 | 0% |
| | | | | | | | | |
| **II - RELATIVE VALUE** | | | | | | | | |
| MADOFF & CO | $5,000 | | | | | $5,000 | $5,000 | 20% |
| SUBTOTAL | $5,000 | | | | | $5,000 | $5,000 | 20% |
| | | | | | | | | |
| **III - HEDGED EQUITIES** | | | | | | | | |
| ARDSLEY PARTNERS | $5,000 | | | | | $5,000 | $5,000 | 20% |
| PEQUOT PARTNERS | $2,500 | | | | | $2,500 | $2,500 | 10% |
| J FUND | $2,500 | | | | | $2,500 | $2,500 | 10% |
| BENTLEY CAPITAL | $2,500 | | | | | $2,500 | $2,500 | 10% |
| SUBTOTAL | $12,500 | | | | | $12,500 | $12,500 | 50% |
| | | | | | | | | |
| **IV - LONG EQUITIES** | | | | | | | | |
| SIEGLER-COLLERY | $2,500 | | | | | $2,500 | $2,500 | 10% |
| SUBTOTAL | $2,500 | | | | | $2,500 | $2,500 | 10% |
| | | | | | | | | |
| **V - SPECIAL SITUATIONS** | | | | | | | | |
| KINGDON PARTNERS | $2,500 | | | | | $2,500 | $2,500 | 10% |
| WELLINGTON PARTNERS | $2,500 | | | | | $2,500 | $2,500 | 10% |
| SUBTOTAL | $5,000 | | | | | $5,000 | $5,000 | 20% |
| | | | | | | | | |
| **VI - SHORT SELLING** | | | | | | | | |
| | $0 | | | | | $0 | $0 | 0% |
| SUBTOTAL | $0 | | | | | $0 | $0 | 0% |
| | | | | | | | | |
| CASH INVESTMENTS | $0 | | | | | $0 | $0 | 0% |
| | | | | | | | | |
| **TOTAL PERFORMANCE** | $25,000 | | | | | $25,000 | $25,000 | 100% |

**Confidential**
**Treatment Requested**

YU 0000732

### YESHIVA UNIVERSITY

**TO:**   Mr. Jack Sproule        **DATE:**      December 21, 1992
           Deputy Controller

**FROM:** Dr. Sheldon E. Socol     **SUBJECT:**   Board of Trustees
           Vice President                         Investment Committee
           Business Affairs

Today the Board of Trustees made, among other decisions, the following investment decisions which you should act upon today:

Call:

    Pequot Partners Fund L.P.                $2.5 million
      Mr. Arthur Sanburg
     (203) 254-0091

    J. Fund                                  $2.5 million
      Mr. David Driscoll or his
      secretary, Ms. Susan Lynch
      (617) 261-9800

    Bentley Capital                          $2.5 million
      Mr. Jerry Levine
      (212) 272-9440

Advise each of them of the decision of the Investment Committee and that we want to open the account and wire the funds by December 31.  Let them send the forms and information to do so right away.

You can advise that the Board Committee decision was based upon the recommendation of Mr. J. Ezra Merkin, a member of the Board. (He probably contacted them already.)

Let me know the status this afternoon.

The Minutes of the December 21 meeting will provide data concerning other investment decisions, such as the decision to invest with:

    Madoff & Co.              $5.0 million
    Ardsley Partners          $5.0 million

Do not contact them, however, until Mr. Merkin first speaks to them.

SES:ajs
cc: Mr. Bernard Pittinsky

**Confidential**
**Treatment Requested**

YU 0000733

# REPLY EXHIBIT
# 16

**WINSTEAD
SECHREST
& MINICK**

A Professional Corporation
Attorneys & Counselors

Suite 800
100 Congress Avenue
Austin, Texas 78701

DALLAS HOUSTON AUSTIN
LONDON WASHINGTON, D.C.

(512) 474-4330
Telecopier (512) 370-2850

Direct Dial 512/370-2866

December 30, 1992

Mr. J. Ezra Merkin                     VIA FAX 212-838-9603
c/o Ascot Partners, L.P.               ORIGINAL BY FEDERAL EXPRESS
450 Park Avenue
32nd Floor
New York, New York 10022

　　　　Re:  Mary Thomajan Investment of $750,000
　　　　　　 Ascot Partners, L.P.

Dear Ezra:

　　　　By way of follow up to our conversation of yesterday and my
telephone call this date to Michael in your office, I am faxing
to you the following documents relevant to Mary Thomajan's
investment of $750,000 in Ascot Partners, L.P., with the origi-
nals being sent by Federal Express to your office tonight:

　　　　(1) Purchaser's Statement of Suitability executed by Mary
Thomajan, and wherein she has indicated that you acted as her
purchaser representative.  If you deem that inappropriate in
light of your role as the General Partner, please advise me; oth-
erwise, you may wish to place in her file a Purchaser Representa-
tive Statement signed by you.

　　　　(2) Executed originals of Pages 7 and 8 of the Subscription
Agreement and Power of Attorney for Ascot Partners, L.P.  I would
appreciate your returning to me a copy of page 8, the acknowledg-
ment page, signed by yourself as the Managing Partner, so as to
reflect the acceptance of Mary as a limited partner.

　　　　Please be advised that I have this date instructed Nations
Bank in Austin, Texas to wire transfer the amount of $750,000 to
Citibank N.Y., ABA #021000089 to the account of Morgan Stanley &
Company, Account #38890774, for further credit to Ascot Partners,
L.P., Account #03823002.  I would appreciate your office confirm-
ing receipt of these funds as soon as possible.

　　　　Mary and I look forward to working with you and Bernie
Madoff as it relates to Ascot Partners, L.P.  I also very much
appreciate your assistance to Mary in evaluating the various
investments we have been considering.  I am forwarding to you
copies of the letters confirming our investments of $1,000,000 in

CONFIDENTIAL

GCC-P 0351780

Mr. J. Ezra Merkin
December 30, 1992
Page Two

Tremont Investors and $750,000 in The SC Fundamental Value Fund.
I am sure we will be talking during the year, and I know you are
particularly busy at this time of year, and Mary really needed
the help.  Thanks again for your assistance and your patience.

Sincerely,

Peter Winstead

PW

cc: Ms. Mary Thomajan

Enclosures

101:A921230X.30
1230921h1
GENL T3165-00100

CONFIDENTIAL

GCC-P 0351781

# REPLY EXHIBIT
# 17

# GABRIEL CAPITAL GROUP

1992 SEP -1 PM 12: 22

450 Park Avenue
New York, New York 10022

TELEPHONE 212 838-7200
FACSIMILE 212 838-9603

TO:      Mr. Ralph Kestenbaum
         011-4121-395-914

FROM:    Michael E. Autera, Jr.

DATE:    September 1, 1992

RE.:     Investment in Ascot Fund Ltd/Madoff & Co.

Per your request, the wiring instructions for
Ascot Fund Ltd. are as follows:

         Chemical Bank
         New York, New York

         ABA      021-000128
         CHIPS    012

         A/C:     Pierson Heldring & Pierson
                  544-7-07901

         CR.:     Ascot Fund Ltd
                  238336

As I mention on the phone, your investment of
$500,000 (USD) will be used to purchase
participating shares of Ascot Fund Ltd.  Ascot
is a Cayman Island corporation whose Investment
Advisor is Ezra Merkin.  Ascot's sole investment
is a managed account at Bernard L. Madoff & Co.

Please do not hesitate to call either Ezra or
me if additional information is needed or if
questions arise.

Regards,

GCC-P 0393132

# REPLY EXHIBIT 18

**From:**   Walter Link on behalf of wlink@bluewin.ch

**Sent:**   Thu, 06 Nov 2008 08:21:27 GMT

**To:**   Autera; Michael

**CC:**   wlink@bluewin.ch

**Subject:** M&H Propeties LLC

---

Dear Mr. Autera,
Just in case you didn't get my e-mail address down correctly, here it is. In the future if I have questions, shall I
direct myself to you or who else should I call.

For now I understand that you send me
- Month by month performance overview for 2008 and prior years
- Each month when the numbers come out an e-mail about the return for the prior month
- The redemption info. My understanding is that I need to cancel with 30 days notice for the end of the
  quarter
- My understanding is also that presently you are invested 100% in Madoff and that the fee is 1,5% with
  no further costs or deductions on the Madoff results

Thank you, Walter Link (President M&H)

**Confidential**                                              **GCC-P 0219384**

# REPLY EXHIBIT
# 19
# (FILED UNDER SEAL)

# REPLY EXHIBIT 20
# (FILED UNDER SEAL)