# REPLY EXHIBIT 21
# (FILED UNDER SEAL)

# REPLY EXHIBIT 22
# (FILED UNDER SEAL)

# REPLY EXHIBIT 23

```
3/31/92  SHALVAH FUND LTD C/O PIERSON                          1-05121-3-0           1
         HELDRING & PIERSON CAYSIDE
         GALRS CAYMAN LTD HARBOUR DR
         BOX 2003 GRAND CAYMAN CI BWI

         ************

T/DT  S/DT      LONG    SHORT                                          DEBIT        CREDIT
                              BALANCE FORWARD                                      727,035.83
2/26  3/04      37080  636  DIGITAL EQUIPMENT CORP    64  3/8                     2387,025.00
3/16  3/16                  W/H TAX DIV DD                 CW          3,651.48
3/16  3/16                  EXXON CORP                     DIV                      17,942.60
                            DIV  2/11/92  3/10/92
3/16  3/16                  GENERAL MOTORS CORP            DIV                      13,184.00
                            DIV  2/13/92  3/10/92
3/16  3/16                  W/H TAX DIV GM                 CW          3,955.20
3/16  3/16                  W/H TAX DIV XON                CW          5,382.78
3/16  3/16                  DU PONT E I DE NEMOURS & CO    DIV                      12,171.60
                            DIV  2/14/92  3/14/92
3/16  3/16                  W/H TAX DIV DA                 CW            545.18
3/16  3/16                  BOEING CO                      DIV                       1,817.25
                            DIV  2/14/92  3/06/92
3/16  3/16                  W/H TAX DIV MOB                CW          3,974.40
3/16  3/16                  MOBIL CORP                     DIV                      13,248.00
                            DIV  2/10/92  3/10/92
3/16  3/16                  INTERNATIONAL BUSINESS MACHS   DIV                      29,911.20
                            DIV  2/12/92  3/10/92
3/16  3/16                  W/H TAX DIV IBM                CW          8,973.36
3/18  3/18                  FIDELITY CASH RESERVES SBI     CW            172.88
                            W/H TAX DIV FCRXX
3/18  3/18                  FIDELITY CASH RESERVES SBI     DIV                         576.27
                            DIV  3/18/92
3/18  3/18     108725   12  FIDELITY CASH RESERVES SBI     1                       108,725.00
3/26  3/26      32960       GENERAL MOTORS CORP            DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26      16560       MOBIL CORP                     DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26      28160       WAL-MART STORES INC            DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26       8280       AMERICAN INTL GROUP INC        DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26      45540       AMERICAN TEL & TELEG CO        DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26      28980       DU PONT E I DE NEMOURS & CO    DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26       7269       BOEING CO                      DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26      26780       EASTMAN KODAK CO               DELV
                            DEL TO ARIEL FUND A/O 3/25/92
3/26  3/26      14420       COCA COLA CO                   DELV
                            DEL TO ARIEL FUND A/O 3/25/92
```

CONTINUED ON PAGE    2

MF00469044

```
3/31/92   SHALVAH FUND LTD C/O PIERSON                                    1-05121-3-0            3
          HELDRING & PIERSON CAYSIDE
          GALRS CAYMAN LTD HARBOUR DR
          BOX 2003 GRAND CAYMAN CI BWI

          ************

 3/26  3/26            26780    EXXON CORP                         DELV
                                DEL TO ARIEL FUND A/O 3/25/92
 3/26  3/26             5500    DISNEY WALT PRODTNS                DELV
                                DEL TO ARIEL FUND A/O 3/25/92
 3/26  3/26            18540    GENERAL ELECTRIC CO                DELV
                                DEL TO ARIEL FUND A/O 3/25/92
 3/31  3/31                     W/H TAX DIV AIG                    CW            310.50
 3/31  3/31                     TRANS TO 10512430                  CW       2,726,799.72
 3/31  3/31                     AMERICAN INTL GROUP INC            DIV                          1,035.00
                                DIV  3/06/92  3/20/92
 3/31  3/31      724       252  FIDELITY CASH RESERVES SBI           1           724.00

                                NEW BALANCE                                                  558,182.25


                                SECURITY POSITIONS                   LONG         SHORT       DIFFERENCE

 FIDELITY CASH RESERVES SBI     724                                  724.00                      724.00
                                END OF POSITIONS                     724.00                   558,182.25CR
```

# REPLY EXHIBIT 24

Page 1

```
 1              MATTHEW GREENBLATT
 2         UNITED STATES DISTRICT COURT
 3         SOUTHERN DISTRICT OF NEW YORK
 4    ------------------------------------x
      In re:                                SIPA LIQUIDATION
 5
      BERNARD L. MADOFF INVESTMENT          No. 08-01789(BRL)
 6    SECURITIES LLC,
 7                                          (Substantively
                                            Consolidated)
 8              Debtor.
      ------------------------------------x
 9    IRVING H. PICARD, Trustee of the
      Liquidation of Bernard L. Madoff
10    Investment Securities LLC,
11              Plaintiff,
                                            Adv. Pro. No.
12         vs.                              09-01182(BRL)
13    J. EZRA MERKIN, GABRIEL
      CAPITAL, L.P., ARIEL FUND LTD.,
14    ASCOT PARTNERS, L.P., GABRIEL
      CAPITAL CORPORATION,
15
                Defendants.
16    ------------------------------------x
17
18     VIDEOTAPED DEPOSITION OF MATTHEW GREENBLATT
19              New York, New York
20              August 17, 2015
21
22
23    Reported by:
24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25    JOB NO. 96625
```

Page 58

1                MATTHEW GREENBLATT
2       A.   Yes.
3       Q.   What are some of the additional
4  transactions that you factored into the
5  principal balance calculation?
6       A.   The inter-account transfers to and
7  from one BLMIS customer account to another and
8  the cash withdrawals in the form of payments
9  made by BLMIS on behalf of the account holders.
10      Q.   Can you describe some of the
11 inter-account transfers that you factored into
12 your principal balance calculation?
13      A.   Sure.  In many instances, within the
14 BLMIS customer accounts, there are transfers of
15 funds from one account to another, and the
16 analysis requires that we identify the amount of
17 principal available in the account at the time
18 those funds are attempted to be transferred from
19 Account A to Account B, and so it'll show up on
20 a line item on a customer statement that says
21 transfer to Account XXX, and then on the other
22 account, it'll show a transfer from Account ZZZ,
23 and it'll have a dollar amount of an attempted
24 amount of funds to be transferred.  It'll show
25 up that way on a customer statement.

Page 59

1                MATTHEW GREENBLATT
2  We have identified all of those line
3  items where funds were attempted to be
4  transferred from one to the other, and then we
5  look at how much principal was available in the
6  account at the time of that transfer and move
7  over only those funds up to the balance of
8  principal available in the transferor's account
9  at the time.
10      Q.   What about the transfer of securities
11 between BLMIS accounts, did you factor that into
12 the principal balance calculation?
13      A.   Those have all been reviewed and
14 considered, but as the fictitious trading has
15 been identified within Madoff, the securities
16 were not actually purchased, no securities
17 actually existed, so the securities could not be
18 moved from one account to another because they
19 didn't exist.  So those have all been considered
20 and excluded from the calculation.
21      Q.   And did you make the determination to
22 exclude the transfer of securities between BLMIS
23 accounts?
24      A.   It was not my decision to be made.  It
25 was part of the methodology that the trustee and

Page 60

1                MATTHEW GREENBLATT
2  his team had determined was the appropriate
3  method with which to calculate the net equity
4  balances.
5           So I identified all of those instances
6  of inter-account transfers of funds and
7  identified principal available in everybody's
8  account, and I identified all the instances of
9  transfers of reportedly held but fictitious
10 securities; and the decision was made that the
11 fictitious trading activity and the fictitious
12 securities, any fictitious gains generated, all
13 of the fictitious activity couldn't be moved
14 from one account to another, and only funds in
15 the form of principal could be moved in the
16 inter-account transfers.
17      Q.   And you're not offering any opinion as
18 to the appropriateness of excluding the transfer
19 of securities between BLMIS accounts, correct?
20      A.   It calls for a legal conclusion, so
21 all I'm offering is the calculation of the
22 methodology that accounts only for principal.
23      Q.   Did you ever discuss factoring in the
24 transfer of securities between BLMIS accounts
25 into your principal balance calculation?

Page 61

1                MATTHEW GREENBLATT
2           MR. SONG:  Object to the form.
3       A.   It was part of the overall discussions
4  that took place during the reconstruction of the
5  books and records and the calculation of
6  principal balance, yes.
7       Q.   And you discussed that with counsel?
8           MR. SONG:  I caution the witness not
9       to divulge anything that's privileged, but
10      you can that question yes or no.
11      A.   Yes.
12      Q.   Did you discuss that decision -- the
13 decision to exclude the transfer of securities
14 between BLMIS accounts with anyone at FTI?
15          MR. SONG:  Same caution.
16      A.   Yes.
17      Q.   And as a result of your discussions
18 with counsel, you decided to exclude the
19 transfer of securities between BLMIS accounts
20 from your calculations, correct?
21          MR. SONG:  Object to the form.
22      A.   So you say -- the question said I
23 decided?
24      Q.   As a result of your discussions with
25 counsel, yes.

16

Page 62

MATTHEW GREENBLATT

A. I performed the calculation where it was determined that the appropriate method to calculate net equity or determine net equity was to account for all actual cash and principal transactions on the face of the BLMIS documents on the books and records that we were reconstructing in an effort to calculate the reality of the Madoff situation and to disallow any of the fictitious trading activity.

Q. You're the expert who signed these reports, correct?

A. Yes.

Q. And as the expert, you made the determination to exclude those transactions from the principal balance calculation, correct?

MR. SONG: Object to the form. Asked and answered.

A. I don't agree with that, no.

Q. Where in your report do you say that you're excluding the transfer of securities between BLMIS accounts from your principal balance calculation?

A. It's captured in paragraph 18, where it says, "The principal balance calculation does

Page 63

MATTHEW GREENBLATT

not include trading activity reflected on customer statements. At the direction of Trustee's counsel, no credit is given or removed for gains or losses resulting from trades reflected on customer statements."

Q. Is the transfer of securities from one BLMIS account to another a trade?

MR. SONG: Object to the form.

A. No, I wouldn't call it a trade.

Q. So where in your report do you say that you're excluding the transfers of securities between BLMIS accounts from your principal balance calculation?

A. It's implied in that sentence. It doesn't use the words, but the principal balance calculation doesn't include the trading activity. The direction I was provided was to prepare a calculation based on the inflows and the outflows that are in paragraph 17 and to not give any credit to any of the fictitiously purchased securities or any of the fictitious gains from fictitious sales of securities or any of that related trading activity.

So, in situations where securities

Page 64

MATTHEW GREENBLATT

that don't exist are attempted to be moved from Account A to Account B, the principal that exists in an account is not ignored; it's left in the transfer -- the principal is left in the transferor's account because the securities can't be moved.

Q. Paragraph 17 says you considered non-cash deposits, correct?

A. It says that, yes.

Q. Is a security that's being transferred from one BLMIS to another a non-cash deposit of principal?

A. In certain cases, yes. There are instances where BLMIS customers deposited real bonds or real securities from other brokerage accounts, and those were granted as principal to those account holders because they represented real non-cash deposits.

The fictitiously reported purchases of securities are treated differently because the fictitious trading never took place, so the securities listed on the vast majority of customer statements that were falsely reported as purchased, those securities never existed,

Page 65

MATTHEW GREENBLATT

BLMIS never had custody of those shares, and therefore, those shares couldn't be moved from Account A to Account B.

Q. When cash was transferred from one BLMIS account to another, was there actual cash being transferred?

A. And I never used the word "cash" being transferred because, no, cash was not transferred in inter-account transfers. It was a book entry, where liquid -- liquidly-available-looking funds were moved, but no cash ever changed hands.

Q. So it was just a book entry that you included in your principal balance calculation?

A. For the inter-account transfers? Question mark.

Q. Yes, for the inter-account transfers, it was just a book entry that you included in your principal balance calculation, correct?

A. Those inter-account transfers that are reflected in the principal balance calculation are book entries made to move funds from one account to another, and then the analysis that I described earlier was put on each one of those.

Page 90

1  MATTHEW GREENBLATT
2  p.m.  We are back on the record.
3      MS. BRONEN:  We have a few document
4  issues that we will follow up with Brian on,
5  but otherwise, I have no further questions.
6  Thank you, Mr. Greenblatt.
7      MS. VIBBERT:  We have a couple.
8  EXAMINATION BY
9  MS. VIBBERT:
10     Q.  Good afternoon, Mr. Greenblatt.  I'm
11 Jami Vibbert from Norton Rose Fulbright, and we
12 represent the receiver of Ascot Partners and
13 Ascot Fund Limited, and I just have a couple of
14 followup questions for you.
15     You testified earlier today that you
16 spoke with counsel about the methodology for the
17 inter-account transfers; is that correct?
18     A.  Yes.
19     Q.  And you also said that you discussed
20 with him not counting the transfers of -- the
21 inter-account transfers of securities that
22 represented the fictitious securities with your
23 counsel, correct?
24     A.  Yes.
25     Q.  And did that conversation happen prior

Page 91

1  MATTHEW GREENBLATT
2  to March 20 of 2015?
3      A.  Yes.
4      Q.  I would like to direct your attention
5  to what has been marked -- your March 15 -- or,
6  your March 20 report which has been marked as
7  Greenblatt Exhibit 1, to paragraph 9.  The
8  second sentence of that paragraph says, and I'll
9  just read it, "An inter-account transfer is a
10 non-cash transaction between BLMIS customer
11 accounts in which no new funds entered or left
12 BLMIS, but rather a book entry occurred at BLMIS
13 to internally adjust the balances of those
14 accounts."
15     Do you see that?
16     A.  I do.
17     Q.  And did I read that correctly?
18     A.  You did.
19     Q.  Is there any indication in that
20 sentence that an inter-account transfer reflects
21 book entries of funds but not of securities?
22     A.  Not in that sentence, no.
23     Q.  If you read the next sentence, it
24 says, "These books entries did not reflect any
25 transfers of cash because there were no actual

Page 92

1  MATTHEW GREENBLATT
2  movement of cash"; is that correct?
3      A.  That's what it says, yes.
4      Q.  And the last sentence, "Rather, these
5  inter-account transfers merely changed reported
6  value in the purported 'equity' maintained in
7  the BLMIS customers' accounts"; is that correct?
8      A.  You read it correctly, yes.
9      Q.  Did the inter-account transfer of
10 securities change the reported value and the
11 purported equity maintained in the BLMIS
12 customer account?
13     MR. SONG:  Object to the form.
14     A.  Yes, they did.
15     Q.  So what about this paragraph describes
16 the methodology as you have described it here
17 today?
18     A.  So this paragraph is, and if it's --
19 if I haven't properly defined the inter-account
20 transfers to be those of funds, then it needs to
21 link with what was paragraph 18 in the Global
22 Report, because the inter-account transfers that
23 we talk about in the Global Report separately --
24 separate from those that transferred funds to
25 those that attempted to deliver and/or receive

Page 93

1  MATTHEW GREENBLATT
2  fictitiously held securities which are
3  considered part of the -- part of the fraud and
4  part of the Ponzi scheme.
5      So earlier, prior to paragraph 9, I
6  know I incorporate the other footnote 1 on page
7  4, incorporate the other report by reference.
8      Q.  Did -- the end of paragraph 9 has a
9  footnote; is that correct?
10     A.  Yes.
11     Q.  Did you footnote paragraph 18 of your
12 report in that paragraph?
13     A.  No, I did not.
14     Q.  Okay.  And as we discuss -- as you
15 testified earlier, paragraph 18, that you are
16 relying on now of your original Global Report,
17 does not say that you are not going to count
18 inter-account transfers of securities, correct?
19     A.  It does not say securities, no.
20     Q.  You testified earlier that it's
21 implied?
22     A.  Yes.
23     Q.  I would like to direct your attention
24 to Exhibit 4B of your March 20 report, which is
25 Exhibit -- Greenblatt Exhibit 1.

24

Page 94

1    MATTHEW GREENBLATT
2    A.  Yes.
3    Q.  On page 1 of that exhibit, on the very
4    first and the fourth lines, there are two
5    transfers in on May 1 of 1990 and July 9 of
6    1990, correct?
7    A.  I wouldn't consider those transfers
8    in.  Those are --
9    Q.  Deposits?
10   A.  -- deposits.
11   Q.  And are those deposits equaling $10
12   million?
13   A.  Yes.
14   Q.  And that's $10 million of principal,
15   what you would consider principal, correct?
16   A.  Yes.
17   Q.  And if you turn to the last page of
18   that exhibit, which is page 3, and you testified
19   earlier that there is a remaining principal
20   balance in that account when the account no
21   longer has any activity of $9,706,832, correct?
22   A.  The -- when you said when that account
23   has no -- I mean, that's the ending balance as
24   of October 30, 1992, yes.  This had --
25   Q.  Was there any activity after October

Page 95

1    MATTHEW GREENBLATT
2    30, 1992?
3    A.  No.
4    Q.  So that's the ending balance of the
5    account?
6    A.  Yes.
7    Q.  Now, if the transfer of securities
8    that you testified about earlier had been
9    liquidated, if the securities had been
10   liquidated in another book entry and then
11   transferred to Ariel Fund, you would have
12   included that transfer in your calculation of
13   Ariel Fund's principal balance; is that correct?
14   A.  To the extent principal existed in
15   that -- on the face of the customer statements,
16   if that's how it was reflected, yes.  If they
17   had shown a -- the fictitious sale of those
18   fictitious securities and then a transfer of
19   funds, yes, it would have been recognized.
20   Q.  And then the balance reflected here of
21   the $9 million -- assuming that the liquidation
22   of the securities and the transfer of the
23   securities was more than the principal balance
24   that you see here as of October 30, 1992, that
25   would have been transferred to Ascot Fund -- I

Page 96

1    MATTHEW GREENBLATT
2    mean to Ariel Fund?
3    A.  The math may not be that simple
4    because there were subsequent inter-account
5    transfers that did have principal available, so
6    it's likely that some or all of that amount
7    would have gotten transferred, but there's a
8    calculation required to get to an exact number.
9    Q.  As of the date of the transfer of
10   securities, which is March 26 of 1992 --
11   A.  Right.
12   Q.  -- the principal balance that you have
13   listed there, which is $12 million --
14   $12,463,831, that would have been transferred as
15   principal if there had been on the face date
16   Shalvah account statement a book entry that
17   liquidated these securities and transferred them
18   over in a different type of line item?
19   A.  And for this, we're assuming that the
20   value was greater than $12.4 million?
21   Q.  Assume that the value was greater as
22   of March 26, 1992; assume that the value was
23   greater than $12 million -- $12.5 million.
24   A.  Yes, then $12,463,520 would have been
25   transferred, but the additional accounts below

Page 97

1    MATTHEW GREENBLATT
2    it may be affected.
3        MS. VIBBERT:  No further questions.
4        MR. SONG:  Thank you.
5        THE VIDEOGRAPHER:  We're going off the
6    record.  The time is 1:41 p.m.  This is the
7    end of tape 2.
8            oOo

15   I,         , do hereby certify under
16   penalty of perjury that I have read the foregoing
17   transcript of my deposition taken on        ;
18   that I have made such corrections as appear noted
19   herein in ink, initialed by me; that my testimony as
20   contained herein, as corrected, is true and correct.

23   Signature: _____

25   Dated: _____

25

# REPLY EXHIBIT 25
# (FILED UNDER SEAL)

# REPLY EXHIBIT 26
# (FILED UNDER SEAL)

# REPLY EXHIBIT 27

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF NEW YORK
 4     ----------------------------------x
       In re:                             SIPA LIQUIDATION
 5
       BERNARD L. MADOFF INVESTMENT       No. 08-01789(BRL)
 6     SECURITIES LLC,
 7                                        (Substantively
                                          Consolidated)
 8                  Debtor.
       ----------------------------------x
 9     IRVING H. PICARD, Trustee of the
       Liquidation of Bernard L. Madoff
10     Investment Securities LLC,
11                  Plaintiff,
                                          Adv. Pro. No.
12           vs.                          09-01182(BRL)
13     J. EZRA MERKIN, GABRIEL
       CAPITAL, L.P., ARIEL FUND LTD.,
14     ASCOT PARTNERS, L.P., GABRIEL
       CAPITAL CORPORATION,
15
                    Defendants.
16     ----------------------------------x
17
18       VIDEOTAPED DEPOSITION OF LISA M. COLLURA
19                 New York, New York
20                   June 18, 2015
21
22
23     Reported by:
24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25     JOB NO. 94537
```

Page 2

2     June 18, 2015

4           Videotaped deposition of
5     LISA M. COLLURA, held at the offices of
6     NORTON ROSE FULBRIGHT, 666 Fifth Avenue,
7     New York, New York, before Kathy S. Klepfer,
8     a Registered Professional Reporter, Registered
9     Merit Reporter, Certified Realtime Reporter,
10    Certified Livenote Reporter, and Notary
11    Public of the State of New York.

Page 3

3                  A P P E A R A N C E S:

5     DECHERT
6     Attorneys for J. Ezra Merkin and Gabriel Capital
7     Corporation
8          1095 Avenue of the Americas
9          New York, New York  10036
10    BY:  DAPHNE HA, ESQ.
11         MARIEL BRONEN, ESQ.

13    BAKER & HOSTETLER
14    Attorneys for Defendants Irving Picard, trustee for
15    the Substantively Consolidated SIPA Liquidation of
16    Bernard L. Madoff Investment Securities, LLC, Bernard
17    L. Madoff and the Witness
18         45 Rockefeller Plaza
19         New York, New York  10111
20    BY:  BRIAN SONG, ESQ.
21         ROBYN FELDSTEIN, ESQ.

Page 4

3           A P P E A R A N C E S:  (Cont'd.)

5     REED SMITH
6     Counsel for Bart M. Schwartz, as Receiver of Ariel
7     Fund Limited and Gabriel Capital L.P.
8          599 Lexington Avenue
9          New York, New York  10022
10    BY:  CASEY LAFFEY, ESQ.

12    NORTON ROSE FULBRIGHT
13    Counsel for Receiver for Ascot Partners, L.P.
14         666 Fifth Avenue
15         New York, New York  10103
16    BY:  JUDITH ARCHER, ESQ.
17         JAMI VIBBERT, ESQ.

19    ALSO PRESENT:
20         CARLOS LOPEZ, Legal Video Specialist

Page 5

3          IT IS HEREBY STIPULATED AND
4     AGREED, by and between the attorneys for
5     the respective parties herein, that the
6     filing and sealing be and the same are
7     hereby waived.
8          IT IS FURTHER STIPULATED AND
9     AGREED that all objections, except as to
10    the form of the question, shall be
11    reserved to the time of the trial.
12         IT IS FURTHER STIPULATED AND
13    AGREED that the within deposition may be
14    sworn to and signed before any officer
15    authorized to administer an oath, with
16    the same force and effect as if signed
17    and sworn to before the Court.

Page 70

1        LISA M. COLLURA
2    A.   Correct.
3    Q.   What about restated LIBR, when was --
4  were you familiar with that term and methodology
5  before your work on this matter?
6    A.   No, I was not.
7    Q.   Had you ever heard the term "restated
8  LIBR"?
9    A.   No.
10   Q.   I'm going to direct your attention to
11 paragraph 96 in your report.  It starts on page
12 34.
13       In the second sentence of that
14 paragraph, you state, "I have assumed that the
15 BLMIS funds are equivalent to the trust or
16 secured funds referred to in my explanation of
17 LIBR above."
18       Can you tell me why you made that
19 assumption?
20   A.   My understanding is that LIBR is a
21 method that's used to determine who has rights
22 to the balance in an account, or in my -- an
23 example of that is to -- for a trust fund, for
24 example, or if there's secured parties that have
25 certain rights to funds, and my understanding of

Page 71

1        LISA M. COLLURA
2  LIBR is that's one method that can be applied to
3  the activity in a bank account to really come to
4  the conclusion as to who has rights to the
5  balance in an account.  And in that example,
6  trust funds, for example, those are the funds
7  that -- that one might be tracing using LIBR to
8  come to that conclusion.
9        So, in this case, even though we're
10 applying -- I was applying LIBR for a slightly
11 different purpose than to figure out who has
12 rights to the ending balance in the account, the
13 BLMIS funds are the ones -- are the funds that
14 were the focus of the tracing, and therefore,
15 they were equivalent to my description of LIBR
16 using the trust funds or the secured funds in
17 paragraph 95 above.
18   Q.   Turning over to page 36 in your
19 report, under Restated Tracing Rules, you state
20 at the beginning of paragraph 101, "Counsel to
21 the trustee has advised me that certain rules
22 regarding tracing of funds through a commingled
23 bank account were restated in 2011."
24       Where were they restated or by whom?
25   A.   It was -- in Exhibit 2, I have

Page 72

1        LISA M. COLLURA
2  referenced restatement of restitution and unjust
3  enrichment.  It's a section -- I believe that's
4  a section of the Bankruptcy Code, although I'm
5  not sure.  It's section 59, and that restatement
6  was provided to me from counsel, and, you know,
7  based on my review of that restatement, that's
8  how I determined how to apply the restated rules
9  to the bank account activity in this case.
10   Q.   Is it referred to in the restatement
11 as restated LIBR, or it's just a different
12 concept from what you had previously understood
13 as LIBR?
14   A.   It's the latter.  It was not called
15 restated.  Just for purposes of my report and to
16 try to make it as clear as possible that it was
17 not the traditional LIBR, that it was this
18 restated tracing rules, I refer to it as
19 restated LIBR.
20   Q.   In paragraph 102, you have some quotes
21 there, "marshaled so far as possible in favor of
22 the claimant," and then again later you say, in
23 quotes, "claim the entire advantage of
24 beneficial withdrawals."
25       Were those quotes from the

Page 73

1        LISA M. COLLURA
2  restatement?
3    A.   Yes, they were.
4    Q.   Did the restatement provide the basis
5  for your application of the restated LIBR
6  methodology in this matter?
7    A.   The restatement didn't lay out steps
8  as to how to apply the restated rules, but based
9  on my review and understanding of what was in
10 that restatement, I applied those concepts to
11 the activity in the bank accounts.
12   Q.   Was your application also based on
13 conversations that you had with the trustee's
14 counsel as to how to apply the restated LIBR?
15   A.   Yes, we had discussions about the
16 application of the restated tracing rules.
17   Q.   And what did -- what did they tell you
18 about the restated tracing rules?
19   A.   It really was more the other way
20 around, where I was explaining to them how I
21 interpreted the rules and how, based on what I
22 read, how I would apply that to the bank account
23 analysis, the bank account activity.
24   Q.   Did you do any research into how the
25 restatement came about?

Page 110

1  LISA M. COLLURA
2  direct you to Comment (A), the fourth full
3  paragraph.
4    A.  What page? I'm sorry. Does it have a
5  page?
6    Q.  Page 2.
7    A.  Okay.
8    Q.  Yes. So if you look at the last
9  sentence just above (B), it says, "The present
10 Restatement adheres instead to the traditional
11 rule on this point, permitting the claimant (as
12 against a wrongdoer) to claim the entire
13 advantage of beneficial withdrawals that can be
14 attributed to the claimant's funds"?
15   A.  Yes.
16   Q.  Do you see that?
17   A.  Yes.
18   Q.  Is that where the quote came from?
19   A.  Yes, it is. Thank you for finding it.
20   Q.  When you were deciding to apply the
21 restated LIBR, as you have called it, and
22 applying it, did you assume that there was
23 conscious wrongdoing or a defaulting fiduciary
24 in this case?
25   A.  I didn't really think about it, but I

Page 111

1  LISA M. COLLURA
2  see those sections that refer to a wrongdoer. I
3  assume that the wrongdoer in this case was the
4  defendant.
5    Q.  So you assumed that who was the
6  wrongdoer? Mr. Merkin? Any of the funds?
7    A.  The defendants in this case.
8    Q.  So you assumed that all of the
9  defendants were wrongdoers?
10   A.  Well, a wrongdoer as it's stated in --
11 the wrongdoer that's reflected in the
12 restatement was, in this scenario, the
13 defendants.
14   Q.  Did the counsel for the trustee
15 instruct you to assume that the defendants were
16 wrongdoers?
17   A.  I don't remember ever discussing that
18 with counsel, no.
19   Q.  But you did make that assumption?
20   A.  Yes.
21   Q.  And is that assumption applicable to
22 any of the other methodologies that you used, or
23 only to the restated LIBR?
24   A.  Yes, I mean, it's only relevant here
25 because of the word that's included in the

Page 112

1  LISA M. COLLURA
2  restatement. It wasn't a deciding factor in
3  this -- in applying the restatement from my
4  standpoint.
5    In other words, because it says a
6  wrongdoer there, it didn't matter to me one way
7  or another if the defendant was in fact a
8  wrongdoer. I was going off of the restatement
9  in terms of how would I apply -- how would I
10 apply this tracing method to the bank account
11 activity that I was analyzing.
12   Q.  Would the tracing method vary if you
13 assumed that the defendants were not wrongdoers
14 but were innocent?
15   A.  No, I think I would still take the
16 application as it's laid out in the restatement
17 and apply it to the bank account analysis.
18   Q.  Just directing you to paragraph 2 of
19 the restatement -- right, the body itself, not
20 the comment.
21   A.  Yes.
22   Q.  It says, "If property of the claimant
23 has been commingled by a recipient who is a
24 conscious wrongdoer or a defaulting fiduciary or
25 equally at fault in dealing with the claimant's

Page 113

1  LISA M. COLLURA
2  property," you see that?
3    A.  Yes.
4    Q.  Okay. And then it gives you three
5  steps?
6    A.  Right.
7    Q.  Would it be appropriate to apply those
8  three steps if the defendants were not deemed
9  wrongdoers?
10     MR. SONG: Object to the form.
11   A.  I don't know. I would -- to me that's
12 a legal question. So, honestly, I -- I didn't
13 even consider that first -- that -- I looked at
14 the commingling and then how the method would be
15 applied. So the fact of a wrongdoer versus a
16 not wrongdoer did not come into play in my -- in
17 my mind when I read the restatement.
18   Q.  Am I correct that you're not intending
19 to offer any opinion in this case that the
20 defendants were in fact wrongdoers?
21   A.  That's correct.
22   Q.  So if the application under the
23 restatement of the restated LIBR rule is
24 dependent on a finding of wrongdoing, then
25 depending on what the -- how the case turns out