**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Jonathan B. New
Robertson D. Beckerlegge

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-04283 (SMB) |
| v. | |
| STEVEN B. MENDELOW, NANCY MENDELOW, CARA MENDELOW, PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., and C&P ASSOCIATES, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND DISMISS WITHOUT PREJUDICE THE TRUSTEE'S SUBSEQUENT TRANSFEREE CAUSES OF ACTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

PROCEDURAL BACKGROUND.............................................................3

STATEMENT OF FACTS ......................................................................8

ARGUMENT ...................................................................................13

    I.      STANDARDS GOVERNING MOTIONS TO AMEND A
            PLEADING.................................................................13

    II.     THE COURT SHOULD GRANT THE TRUSTEE'S MOTION TO
            AMEND IN LIGHT OF THE INTERVENING CHANGE IN LAW
            AND THE ADDITIONAL FACTS ALLEGED ....................................15

            A.      The Intervening Change in the Pleading Standard is Grounds to
                   Amend..................................................................15

            B.      New Facts Supporting Mendelow's Coordination with Madoff
                   and DiPascali to Directly Benefit From the Fraud are Grounds
                   to Amend.................................................................16

            C.      Defendants' Belated Motion to Dismiss Provides an Additional
                   Equitable Ground to Grant Trustee Leave to Amend ...............................17

    III.    THERE HAS BEEN NO UNDUE DELAY OR BAD FAITH BY THE
            TRUSTEE ..................................................................18

    IV.    THE DEFENDANTS WILL NOT BE PREJUDICED BY THE
            AMENDMENT.............................................................20

            A.      The Potential Unavailability and Weak Recollection of
                   Witnesses Does Not Constitute Grounds to Deny Amendment ................20

            B.      Because Defendants Have Effectively Stalled Discovery and
                   Claim to Have Few Additional Documents, They Will Not Be
                   Prejudiced by Amendment at This Time .....................................21

            C.      Defendants Cannot Claim Prejudice as to Lack of Notice of the
                   Actual Knowledge Allegations .................................................24

    V.     AMENDMENT OF THE COMPLAINT WOULD NOT BE FUTILE ................25

            A.      Legal Standard .........................................................25

**TABLE OF CONTENTS**
**(continued)**

                                                                      <u>Page</u>

B.     The Additional Facts in the Proposed Amended Complaint
       Confirm that Mendelow had Actual Knowledge of Fraud at
       BLMIS and Cannot Claim Protection Under Section 546(e) ...................27

       1.     The Section 546(e) Safe Harbor Only Protects Innocent
              Investors Who Did Not Have Actual Knowledge of
              Madoff's Fraud ............................................................................28

       2.     Mendelow's Actual Knowledge Should Be Inferred
              From His Refusal to Answer Questions, Invoking the
              Fifth Amendment ..........................................................................32

C.     Mendelow's Knowledge is Imputed to the Other Defendants ...................34

VI.    THE SUBSEQUENT TRANSFEREE COUNTS SHOULD BE
       DISMISSED WITHOUT PREJUDICE.................................................................37

CONCLUSION.............................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010)...............................................................................21

*In re Alstom SA Sec. Litig.*,
454 F. Supp. 2d 187 (S.D.N.Y. 2006)................................................................32

*Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*,
760 F.2d 442 (2d Cir. 1985)...............................................................................22

*Art Fin. Partners, LLC v. Christie's Inc.*,
58 A.D. 3d 469, 870 N.Y.S.2d 331 (2009) .........................................................34

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009).....................................26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)....................................26

*In re BLMIS*,
12 MC 0115 (S.D.N.Y. Apr. 13, 2012).................................................................5

*In re BLMIS*,
No. 08-99000 (SMB), 2015 WL 7568376 (Bankr. S.D.N.Y. Nov. 25, 2015)................ *passim*

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993)...............................................................................21

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
866 F. Supp. 2d 257 (S.D.N.Y. 2012)................................................................14

*Burgee v. Patrick*,
No. 91-CIV-3023 (MJL), 1996 WL 227819 (S.D.N.Y. May 3, 1996)...................22

*Center v. Hampton Affiliates, Inc.*,
488 N.E.2d 828 (N.Y. 1985)...............................................................................34

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*,
439 B.R. 284 (S.D.N.Y. 2010).............................................................................4

*In re Colonial Chesire I Ltd. P'ship*,
167 B.R. 748 (Bankr. D. Conn. 1994) ................................................................22

*Commander Oil Corp. v. Barlo Equip. Corp.*,
215 F.3d 321 (2d Cir. 2000)...............................................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Donnelly Garment Co. v. Int'l Ladies Garment Workers' Union*,
  47 F. Supp. 61 (W.D. Mo. 1941) ............................................................14

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
  282 F.3d 83 (2d Cir. 2002)................................................................25

*E.E.O.C. v. Staten Island Bank*,
  207 F.2d 144 (2d Cir. 2000)..............................................................26

*In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011)..............................................................29

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013)..........................................14, 16

*Fed. Nat. Mortg. Ass'n v. I.R.S.*,
  No. CV-98-5174 (JM), 2001 WL 260076 (E.D.N.Y. Jan. 17, 2001) ....................20

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
  726 F.3d 62 (2d Cir. 2013)................................................................26

*Fjord v. AMR Corp. (In re AMR Corp.)*,
  506 B.R. 368 (Bankr. S.D.N.Y. 2014)..........................................13, 14

*Foman v. Davis*,
  371 U.S. 178 (1962)........................................................................13, 14

*Grace v. Rosenstock*,
  228 F.3d 40 (2d Cir. 2000)..............................................................14

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
  No. 02 Civ. 5068 (JFK), 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008) ...............16

*Hamilton v. City of New York*,
  No. 06-cv-15405 (DC), 2011 WL 1842990 (S.D.N.Y. May 20, 2011)..................15

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
  665 F. Supp. 2d 239 (S.D.N.Y. 2009)..........................................14, 25

*Hood v. P. Ballantine & Sons*,
  38 F.R.D. 502 (S.D.N.Y. 1965) ..........................................................15

*Kirschner v. Bennett (In re Refco Secs. Litig.)*,
  759 F. Supp. 2d 301 (S.D.N.Y. 2010)..................................................27

*Kirschner v. KPMG LLP*,
  938 N.E.2d 941 (N.Y. 2010)..............................................................34

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Krumme v. WestPoint Stevens Inc.*,
   143 F.3d 71 (2d Cir. 1998)..................................................................................14, 22

*Local 802, Associated Musicians v. Parker Meridien Hotel*,
   145 F.3d 85 (2d Cir. 1998)...........................................................................................14

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
   No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27,
   2014) ...........................................................................................................................25

*Margel v. E.G.L. Gem Lab Ltd.*,
   No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010) .........25

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
   740 F.3d 81 (2d Cir. 2014).............................................................................................4

*McBeth v. Gabrielli Truck Sales, Ltd.*,
   731 F. Supp. 2d 316 (E.D.N.Y. 2010) ..................................................................15

*Monahan v. N.Y.C. Dep't of Corr.*,
   214 F.3d 275 (2d Cir. 2000)........................................................................................21

*Morin v. Trupin*,
   835 F. Supp. 126 (S.D.N.Y. 1993)..............................................................................16

*Ohio Cas. Ins. Co. v. Transcontinental Ins. Co.*,
   No 05-6432 BSJ RLE, 2006 WL 1540540 (S.D.N.Y. May 31, 2006) ....................14

*Oscar v. BMW of N. Am., LLC*,
   No. 09-cv-11 (PAE), 2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011).......................22

*Panzella v. Skou*,
   471 F. Supp. 303 (S.D.N.Y. 1979)..............................................................................20

*In re Parmalat Sec. Litig.*,
   659 F. Supp. 2d 504 (S.D.N.Y. 2009).........................................................................36

*Phillips v. Kidder, Peabody & Co.*,
   No. 87 Civ. 4936 (DLC), 1994 WL 570072 (S.D.N.Y. Oct. 13, 1994)...................16

*Picard v. ABN AMRO Bank (Ireland) Ltd. (Secs. Investor Prot. Corp. v. Bernard
L. Madoff Inv. Secs. LLC)*,
   505 B.R. 135 (S.D.N.Y. 2013)....................................................................................29

*Picard v. Chais (In re BLMIS)*,
   445 B.R. 206 (Bankr. S.D.N.Y. 2011)........................................................................36

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Greiff,*
   476 B.R. 715 (S.D.N.Y. 2012)...............................................................5, 16, 17, 29

*Picard v. Ida Fishman Revocable Tr.,*
   135 S. Ct. 2859 (Mem) (2015).............................................................16, 17, 18, 19

*Picard v. Ida Fishman Revocable Trust (In re BLMIS),*
   773 F.3d 411 (2d Cir. 2014)...............................................................................16

*Picard v. Katz,*
   462 B.R. 447 (S.D.N.Y. 2011)................................................................... *passim*

*Picard v. Merkin (In re BLMIS),*
   440 B.R. 243 (Bankr. S.D.N.Y. 2011)............................................................26, 34

*Picard v. Merkin (In re BLMIS),*
   515 B.R. 117 (Bankr. S.D.N.Y. 2014)..............................................4, 26, 28, 34

*Rachman Bag Co. v. Liberty Mut. Ins. Co.,*
   46 F.3d 230 (2d Cir. 1995)................................................................................18

*Ricciuti v. N.Y.C. Transit Auth.,*
   941 F.2d 119 (2d Cir. 1991)..............................................................................25

*Ruotolo v. City of New York,*
   514 F.3d 184 (2d Cir. 2008)..............................................................................22

*S.E.C. v. Ballesteros Franco,*
   253 F. Supp. 2d 720 (S.D.N.Y. 2003).................................................................36

*S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co., Inc.,*
   608 F.2d 28 (2d Cir. 1979)................................................................................14

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
   516 B.R. 18 (S.D.N.Y. 2014)...............................................................................5

*SEC v. Berry,*
   No. C-07-04431 RMW, 2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ................................33

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.),*
   No. 04-8369-ESS, 2012 WL 6012149 (Bankr. E.D.N.Y. Dec 3, 2012)................................27

*Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs,
Inc.),*
   446 B.R. 32 (Bankr. E.D.N.Y. 2011)..................................................................27

*SIPC v. BLMIS,*
   490 B.R. 46 (S.D.N.Y. 2013)...............................................................................5

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*SIPC v. BLMIS,*
   531 B.R. 439 (Bankr. S.D.N.Y. 2015) ................................................................................37

*SIPC v. BLMIS,*
   No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. 2013) ......................................... *passim*

*Sokolski v. Trans Union Corp.,*
   178 F.R.D. 393 (E.D.N.Y. 1998) .........................................................................................14

*Soley v. Wasserman,*
   No. 08 Civ. 9262 (KMW)(FM), 2013 WL 6244146 (S.D.N.Y. Dec. 3, 2013) ......................14

*State Teachers Ret. Bd. v. Fluor Corp.,*
   654 F.2d 843 (2d Cir. 1981)...........................................................................................18, 21

*Stern v. Marshall,*
   131 S. Ct. 2594 (2011) ..........................................................................................................5

*Sys. Fed'n No. 152 v. Pa. R.R. Co.,*
   272 F. Supp. 971 (S.D.N.Y. 1967).......................................................................................15

*Town of New Windsor v. Tesa Tuck, Inc.,*
   919 F. Supp. 662 (S.D.N.Y. 1996).......................................................................................18

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),*
   503 B.R. 239 (Bankr. S.D.N.Y. 2013) .................................................................................22

*Tuosto v. Philip Morris USA Inc.,*
   672 F. Supp. 2d 350 (S.D.N.Y. 2009)..................................................................................15

*United States v. Cont'l Ill. Nat'l Bank & Tr. Co.,*
   889 F.2d 1248 (2d Cir. 1989)...............................................................................................23

*United States v. Hudson,*
   152 F.R.D. 6 (D. Conn. 1993)..............................................................................................21

**Statutes**

11 U.S.C. § 544.................................................................................................................................3

11 U.S.C. § 546(e) ...................................................................................................................... *passim*

11 U.S.C. § 548.................................................................................................................................3

11 U.S.C. § 548(a)(1)(A) ...........................................................................................................27, 28

11 U.S.C. § 548(c) ...........................................................................................................................5

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

11 U.S.C. § 550(a) ...................................................................................................3

11 U.S.C. § 550(f) ..................................................................................................37

11 U.S.C. § 551 .......................................................................................................3

15 U.S.C. §§ 78aaa, *et seq.* ....................................................................................1

15 U.S.C. § 78*lll*(7)(B) ...........................................................................................4

N.Y. Debt & Cred. Law §§ 273-279 .......................................................................3

N.Y. P'SHIP LAW § 23 ............................................................................................36

N.Y. P'SHIP LAW § 26 ............................................................................................36

**Rules**

Fed. R. Bankr. P. 2004.................................................................................6, 23, 33

Fed. R. Bankr. P. 7015............................................................................................13

Fed. R. Civ. P. 12(b)(6)................................................................................17, 25, 26

Fed. R. Civ. P. 15(a)(1)(B) .....................................................................................17

Fed. R. Civ. P. 15(a)(2)...................................................................................8, 13, 14

Fed. R. Civ. P. 33(b)(4)............................................................................................6

Fed. R. Civ. P. 34(b)(2)(B) ......................................................................................6

Fed. R. Civ. P. 41(a)(2)...........................................................................................37

**Other Authorities**

U.S. Const. amend. V...................................................................................20, 23, 32, 33

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1473 (3d ed.) ..............................14

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.) ..............................20

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) ..............................25

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation

of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of

Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C.

§§ 78aaa, *et seq*., by and through his undersigned counsel, respectfully submits this

Memorandum Of Law In Support Of Trustee's Motion For Leave To File An Amended

Complaint And Dismiss Without Prejudice the Trustee's Subsequent Transferee Causes Of

Action (the "Motion to Amend").

## PRELIMINARY STATEMENT

The Trustee's Proposed Amended Complaint ("PAC"), before the Court on this Motion

to Amend, provides additional, non-conclusory factual allegations confirming that Defendant

Steven B. Mendelow ("Mendelow"), was a knowing participant in Madoff's fraud who

communicated directly with Madoff himself and his first lieutenant Frank DiPascali

("DiPascali"), to ensure he benefitted from the scheme.  Mendelow, a sophisticated and

experienced accountant, financial advisor, and investor, played an instrumental role in the

growth, maintenance, and concealment of Madoff's now infamous Ponzi scheme.  For the better

part of 30 years, Mendelow steered investors to BLMIS creating feeder funds that fueled the

growth of Madoff's scheme. Mendelow profited directly from Madoff's fraud all the while

knowing that those profits were not the result of actual securities trading.

Mendelow exploited his position as a trusted financial advisor to his clients and his close

relationship with Madoff to reap tremendous financial rewards.  In the early years of his

involvement with BLMIS, Mendelow set up a feeder fund, Telfran Associates Ltd. ("Telfran")

that funneled money to BLMIS through the accounting firm Avellino & Bienes ("A&B").

Mendelow's Telfran operation was significant, consisting of over 800 investors and almost $90

million funneled into A&B.  Mendelow profited from this feeder fund relationship until 1992

when Telfran was shut down by the Securities and Exchange Commission ("SEC").

Not content to lose his Madoff driven cash flow, Mendelow agreed to a new financial

arrangement with Madoff.  Mendelow worked to corral former Telfran investors into BLMIS.

As detailed in the PAC, in return for steering former Telfran investors to directly open accounts

with BLMIS, Madoff personally assured Mendelow that he would continue to receive the same

financial benefits provided for steering investors to A&B.  Madoff promised Mendelow a double

benefit in multiple accounts—a guaranteed return on his IRA BLMIS accounts, Nancy

Mendelow's IRA BLMIS account and C&P Associates' BLMIS account, and annual increases to

the value of certain designated accounts through fictitious, speculative options transactions

("Extra P&L").  This Extra P&L took the place of the profits Mendelow and Telfran had

previously earned by placing investor money into BLMIS through A&B.  Mendelow

successfully steered over $60 million of Telfran money directly back into Madoff's scheme.

As now made clear in the PAC, for years, Mendelow worked directly with DiPascali to

boost the balances on Mendelow's designated account statements by recording fictitious options

transactions that yielded the predetermined amount of Extra P&L.  Mendelow knew that no

actual securities were being traded in his specified BLMIS accounts by virtue of the fact that he

personally directed increases in the stated values in those accounts to meet the pre-determined

amount agreed to with Madoff.   The ability to allocate the Extra P&L among certain BLMIS

accounts under Mendelow's control was impossible in a real securities trading operation and

Mendelow knew it.

In order to further exploit Madoff's fraud, Mendelow created additional investment

vehicles to funnel money into BLMIS.  He operated C&P Associates, Ltd. as a mini-Telfran,

accepting "loans" from "investors" and guaranteeing them a set return, even though he told investors their money was in investment advisory accounts at BLMIS.  Mendelow later transferred many of the C&P investors to a new feeder entity only invested in BLMIS, FGLS Equity, LLC ("FGLS").  As the managing member of FGLS he assumed fiduciary duties towards the investors and told at least one FGLS investor that he performed due diligence on and audits of BLMIS.

Given the intervening change in the pleading standards since the Trustee filed the original complaint in this action and the additional allegations in the PAC that satisfy those standards, the Court should grant the Trustee leave to amend the complaint.  The Trustee's amendment would not be futile as the facts alleged in the PAC, and the reasonable inferences to be drawn therefrom in favor of the Trustee, demonstrate Mendelow's actual knowledge of and participation in the fraud.   The Defendants would suffer no prejudice from the proposed amendment as, among other reasons, there would be no significant delay and they would not be forced to expend significant additional resources.  In the absence of any other countervailing factors, the Court should follow the mandate of Federal Rule of Civil Procedure ("FRCP") 15(a)(2) and freely grant the Trustee's motion.

## PROCEDURAL BACKGROUND

The Trustee filed the complaint (the "Complaint") initiating this action on November 23, 2010.  (ECF No. 1).  In the Complaint, the Trustee seeks to avoid and recover $20,250,720 in fraudulent transfers made since 1993 to or for the benefit of the Defendants under sections 544, 548, 550(a), and 551 of title 11 of the Bankruptcy Code and sections 273-279 of the New York Debtor and Creditor Law ("NYDCL").  (Compl. ¶¶ 8, 12, Ex. B).  Of this total, more than $11,435,809 constitutes transfers of fictitious profits from the Ponzi scheme.  (Compl. ¶¶ 8, 106, Ex. B) (AC ¶ 10, Ex. B).  The transfers that were made in the two-year period before the Filing

Date (the "Two-Year Transfers"), which under section 78*lll*(7)(B) of SIPA is December 11, 2008

(the "Filing Date"), consisted solely of fictitious profits; the remaining transfers that were made

in the six-year period before the Filing Date (the "Six-Year Transfers") and beyond (the "Full

History Transfers") consist of both fictitious profits and principal.  (Compl. Ex. B).

At the time the Complaint was filed, there was no case law holding that the Section

546(e) safe harbor would apply to, among other things, the Trustee's claims to avoid transfers

made more than two years before the Filing Date based on the NYDCL.  *Picard v. Katz*, 462

B.R. 447, 455 (S.D.N.Y. 2011).[1]  Additionally, the good faith defense against the avoidance of

two-year transfers was an affirmative defense that required only allegations of "inquiry notice"

to demonstrate bad faith.  *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 138 (Bankr. S.D.N.Y.

2014); *Katz*, 462 B.R. at 455.  Thus, the Trustee drafted the Complaint with language keyed to

the inquiry notice standard.  In addition, the Trustee also alleged on an alternative basis that the

Defendants "knew…that Madoff's IA Business was predicated on fraud."  (Compl. ¶¶ 54, 96,

106).

Since the Trustee filed the Complaint, several decisions changed the relevant legal

standards requiring the Trustee to plead sufficient facts proving actual knowledge of the fraud in

order to avoid and recover transfers that were made more than two years after the Filing Date

---

[1] *See also, e.g., Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 91 n.11 (2d Cir. 2014) (A
transferee "is entitled to a 'good faith' defense upon a showing that it took the transfer 'for value' and 'in good
faith'" and that the presence of good faith depends upon "whether the transferee had information that put it on
inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose") (citing
*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284,
310 (S.D.N.Y. 2010)).

4

and willful blindness to avoid and recover two-year transfers of principal.[2]  Relying in part on

one of those decisions—*Picard v. Katz*—the Defendants filed a Motion to Withdraw the

Reference (the "Withdrawal Motion") on October 27, 2011.  (ECF Nos. 31-33).[3]  On May 15,

2012, the District Court withdrew the reference in this and numerous other adversary

proceedings and ordered consolidated briefing as to five issues related to the application of

Section 546(e) in adversary proceedings brought in connection with the BLMIS SIPA

Proceeding.  (Order District Court ECF No. 14; Order District Court ECF No. 16).  On April 15,

2013, Judge Rakoff entered the *Cohmad* decision elaborating on the actual knowledge of fraud

exception to Section 546(e)'s safe harbor for post-two-year transfers and returned this case,

among others, to the Bankruptcy Court for proceedings consistent with that opinion.  *Cohmad*,

2013 WL 1609154, at *10.

        After the Trustee filed the Complaint, he granted the Defendants twenty-two extensions

of time to respond.  (ECF Nos. 3, 10, 18, 22, 25, 26, 28, 35, 41, 42, 45, 46, 47, 48, 49, 50, 51, 52,

54, 57, 58, 59).  Each Defendant filed a separate answer on November 14, 2014.  (ECF Nos. 60-

65).

---

[2] *See, e.g., Picard v. Katz*, 462 B.R. 447, 451-455 (S.D.N.Y. 2011) (imposing heightened "willful blindness" standard to proving lack of good faith); *Picard v. Greiff*, 476 B.R. 715, 719-722 (S.D.N.Y. 2012) ("*Greiff*") (addressing the meaning of "value" under section 548(c) of the Bankruptcy Code); *SIPC v. BLMIS*, No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. 2013) ("*Cohmad*") (applying section 546(e) of Bankruptcy Code); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. 18 (S.D.N.Y. 2014) (imposing an initial burden of pleading the defendant's lack of good faith on the Trustee).

[3] The Defendants also moved to withdraw the reference in connection with issues arising from the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and on April 13, 2012, the District Court withdrew the reference in this and numerous other actions to consider these issues.  Order at 1 (District Court Docket ECF No. 16 at 1); Order at 3, *In re BLMIS*, 12 MC 0115 (S.D.N.Y. Apr. 13, 2012).  On January 4, 2013, the District Court issued its opinion on the *Stern v. Marshall* issues.  *SIPC v. BLMIS*, 490 B.R. 46 (S.D.N.Y. 2013).

On January 23, 2015, the parties entered into a Case Management Plan.  (ECF No. 69).[4]

Under the Case Management Plan, it was agreed that "[t]he parties contemplate that discovery

will be needed on *all* liability and damages issues, and that fact and expert discovery will be

needed."  (Case Management Plan at 3) (emphasis added).  Fact discovery was to proceed,

consistent with the Federal Rules of Civil Procedure and this Court's Local Rules, until January

29, 2016 and the parties exchanged initial disclosures on January 30, 2015.  (Case Management

Plan at 2-5).

Essentially no discovery has been exchanged to date in this action.  The Defendants did

not serve any discovery requests on the Trustee.  The Trustee served document requests and

interrogatories on the Defendants on May 15, 2015.  On July 11, 2015, the Defendants produced

eleven pages of documents in response to the document requests, which they noted relate solely

to the Two-Year Transfers, and provided general, but not specific,[5] objections to all of the

discovery requests.  The Defendants took the position that the Trustee has no legal basis to seek

documents related to anything other than the Two-Year Transfers.  (Defendants' Letter ECF No.

82). The Defendants also relied on the fact that they previously produced documents to the

Trustee in response to a Rule 2004 subpoena prior to the filing of the Complaint.  However, that

---

[4] Although the Case Management Plan states, "At this time, the Parties do not contemplate any amendments to the pleadings or joinder of additional parties," the Trustee's position, as described above, was that the allegations in the Complaint would satisfy the "actual knowledge" standard.  Additionally, as described below, at the time the Case Management Order was entered the Defendants did not indicate that they would be moving to dismiss the Complaint.

[5] FRCP 34(b)(2)(B) states, "For each item or category, the response must…state with specificity the grounds for objecting to the [document] request, including the reasons."  Fed. R. Civ. P. 34(b)(2)(B).  FRCP 33(b)(4) states, "The grounds for objecting to an interrogatory must be stated with specificity.  Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure."  Fed. R. Civ. P. 33(b)(4).

document production consisted of nothing more than a copy of the document productions that

Mendelow and C&P Associates made to the SEC and Department of Justice, and did not

specifically respond to any of the Trustee's requests.  Also, the Defendants have refused to

stipulate that these documents can be treated as though they were produced in this action.

On May 14, 2015, the Defendants filed a Motion for Judgment on the Pleadings (the

"Dismissal Motion") to dismiss all counts of this action except Count I.  (ECF Nos. 73-74).  The

Trustee filed his opposition brief to the Dismissal Motion on August 6, 2015.  (ECF No. 79).  In

the Trustee's opposition brief, the Trustee argued that the allegations in the Complaint were

sufficient to establish Mendelow's actual knowledge of Madoff's fraud and that, to the extent the

Court finds the Complaint fails to state a claim for relief with respect to transfers beyond the

two-year period, the Trustee should be granted the opportunity to amend the Complaint.  (ECF

No. 79 at 25-29).  The Defendants filed a reply brief on September 4, 2015.  (ECF No. 84).  Oral

argument on the Dismissal Motion took place before this Court on October 28, 2015.  (ECF No.

85).

At oral argument, this Court considered the Complaint's allegations that the Trustee

contended established Mendelow's actual knowledge that no securities were being traded and

indicated that it was inclined to rule that the Complaint, as pled, was not sufficient to satisfy the

actual knowledge standard.  (ECF No. 85, Transcript Regarding Hearing Held on 10/28/2015

10:02AM, ("Transcript") at 95:16-23, 96:4-18).  The Court proposed, in the interests of

advancing the Action without delay and of judicial economy, that the Trustee move to amend the

complaint to update it to the current pleading standards.  (Transcript at 95:16-23, 96:4-97:10).

Counsel for the Trustee agreed to file a motion for leave to amend the Complaint.  (Transcript at

96:2-3).  The Court agreed to hold a decision on the Dismissal Motion in abeyance pending the

Trustee's motion for leave to amend. With regard to the related discovery dispute, the Court

recognized that the action would, at a minimum, proceed with regard to Count I of the

Complaint, which seeks the Two-Year Transfers. (Transcript at 95:21-23, 104:11).

Nevertheless, the Court held discovery in abeyance pending the motion to amend. (Transcript at

104:18-22).

On November 17, 2015, the parties stipulated to a briefing schedule in connection with

the Trustee's anticipated motion to amend the Complaint. (ECF No. 86). On December 22,

2015, the Trustee, pursuant to FRCP 15(a)(2), sought the Defendants' written consent to amend

and provided the Defendants' counsel with the Trustee's PAC. On December 29, 2015, the

Defendants notified the Trustee that they would not consent to the Trustee filing the PAC,

necessitating this Motion.

## STATEMENT OF FACTS

As described in the Trustee's PAC, attached to the December 30, 2015 declaration of

Jonathan B. New, for over 20 years, Mendelow was a sophisticated investor, who exploited

Madoff's fraud for his own gain. While many of the allegations in the PAC were included in the

Complaint, several new factual allegations, more fully explained in the PAC, highlight

Mendelow's knowledge that no legitimate securities trading was occurring in his BLMIS

accounts.

Mendelow was involved with BLMIS for over 20 years, starting with A&B and Telfran

and later through direct BLMIS accounts for himself, his wife, and his two daughters. In

addition to Telfran, he formed two funds, FGLS and C&P Associates, for investment with

BLMIS. (PAC ¶ 54). Mendelow also facilitated the opening of BLMIS accounts for numerous

other clients, friends, and family. (PAC ¶ 59). Throughout his relationship with Madoff, he was

close enough to know when Madoff would not accept new "investors" and was able to obtain

8

exceptions from Madoff for his family, friends, and colleagues on multiple occasions by personally reaching out to Madoff. (PAC ¶¶ 60-64).

As A&B and Telfran were being shut down by the SEC, Madoff personally contacted Mendelow to ensure his continued participation with BLMIS. (PAC ¶¶ 3, 91). In return for Mendelow encouraging former Telfran investors to invest directly with BLMIS, Madoff promised Mendelow financial bonuses similar to the profits he had received through his arrangement with A&B. (PAC ¶¶ 3, 91).

Avellino met with Madoff on behalf of Mendelow to negotiate a new payment structure. (PAC ¶ 92). Madoff agreed that BLMIS would provide Mendelow with financial rewards that mimicked the profit structure of A&B and Telfran. (PAC ¶¶ 3, 92). Similar to the interest received on Mendelow's personal accounts at A&B, Madoff guaranteed Mendelow a return of at least 17% in Mendelow's new BLMIS accounts. (PAC ¶¶ 3, 92). In addition, Madoff gave Mendelow an Extra P&L boost in certain accounts he opened at BLMIS, which was based on the amount of money former Telfran clients reinvested directly with BLMIS. (PAC ¶¶ 3, 93). By March 31, 1993, approximately $372 million of the $441 million returned to the original A&B investors by Madoff (including those who invested through Telfran) had been reinvested directly with BLMIS. (PAC ¶ 101). Of this $372 million, $62 million was attributable to Mendelow and his Telfran investors. (PAC ¶ 101).

Mendelow directed that the Extra P&L he received from BLMIS in exchange for his help be credited, at various times, to his IRA accounts (Account Nos. 1ZR179 and 1ZR208), Nancy Mendelow's IRA account (Account No. 1ZR180), and C&P Associates' account (Account No. 1ZA542). (PAC ¶ 111). From 1994 to 1997, Mendelow directed BLMIS to add the Extra P&L to the C&P Associates account. (PAC ¶ 111). Starting in 1998 and until 2007, Mendelow

directed BLMIS to split the Extra P&L between his IRA account and Nancy Mendelow's IRA

account. (PAC ¶ 111).

BLMIS did not compensate Mendelow through legitimate means such as checks, cash

transfers, or even actual securities. (PAC ¶ 116). Rather, BLMIS provided Mendelow's

designated accounts with the Extra P&L boost by reporting blatantly fictitious and highly

profitable speculative S&P 100 index put and call options transactions on their account

statements. (PAC ¶ 116). DiPascali typically worked on these fictitious options transactions in

the end of December every year. (PAC ¶¶ 104-05, 120). He waited until the end of the year so

that he could determine the returns that the accounts had received over the course of the year.

(PAC ¶¶ 104-05, 120). If the account had not purportedly achieved the guaranteed return agreed

to by Madoff, DiPascali would manufacture sufficient fictitious options transactions to reach that

return and then add additional fictitious options transactions for the Extra P&L on top of the

returns.

The BLMIS accounts for Mendelow, Nancy Mendelow, and C&P Associates received

Extra P&L totaling $5,116,748, which was entirely generated through this fictitious options

trading. (PAC ¶ 127). The account statements for each of these accounts do not indicate any

cash deposits, wires, inter-account transfers, or contributions of securities to the accounts to

produce these increases in account balances. (PAC ¶ 127).

Mendelow closely monitored his accounts and worked with Madoff and DiPascali to

ensure that BLMIS gave him the full, promised amount of his Extra P&L and guaranteed returns

each year. (PAC ¶¶ 7, 133). Mendelow received quarterly and annual Portfolio Management

Reports, BLMIS generated documents, which listed each accounts' annualized return for the

current year, in addition to account statements and trade confirmations, allowing him to more

10

easily track his rates of return. (PAC ¶ 133). In various handwritten notes and worksheets, Mendelow calculated his expected account balances based on the guaranteed return and Extra P&L and compared them with his actual account balances. (PAC ¶ 6).

Mendelow regularly called BLMIS and sent letters and notes with instructions concerning the accounts he controlled. (PAC ¶¶ 7, 134). In particular, Mendelow called DiPascali every December to tell DiPascali how he wanted his Extra P&L to be divided among his accounts. (PAC ¶ 134). Referring to the yearly boost in his account balances generated through fictitious options transactions, Mendelow would cryptically say to DiPascali something to the effect of, "on that thing you do, I want 115 for me, 115 for my wife." (PAC ¶¶ 7, 134).

Mendelow sent his calculations of any shortfall in the guaranteed rate of return and Extra P&L "due" to him, along with supporting Portfolio Management Reports, to BLMIS. (PAC ¶ 142). DiPascali performed his own similar calculations in which he tabulated the returns for each account at 17%, weighting all cash flows, and added "fees." (PAC ¶ 142). Thereafter, Mendelow's accounts received the requisite amounts via fictitious, speculative options transactions. (PAC ¶ 142).

Nowhere in Mendelow's yearly calculations did he consider any actual securities transactions to have occurred in his accounts. (PAC ¶ 149). As detailed in the PAC, in his own handwritten notes and schedules he analyzed the accounts as if they were some form of fixed income investment in which the year-end balances could be determined based solely upon the cash flow and fixed return. (PAC ¶¶ 2, 149). He even used terminology commonly associated with bonds or other debt instruments, such as "interest" and "yield." (PAC ¶¶ 2, 149).

The purported speculative option transactions, by which the Extra P&L was reported, were not only consistently, hugely, and impossibly profitable, but also almost exactly matched

the predetermined amounts of the Extra P&L to be credited to Mendelow.  (PAC ¶¶ 4, 152).

Mendelow knew that this arrangement with Madoff was impossible to execute in a securities

trading account subject to market fluctuations.  (PAC ¶ 4).

 Every December from 1999 through 2007, Mendelow instructed BLMIS to split the Extra

P&L between his and Nancy Mendelow's IRA accounts.  (PAC ¶ 162).  By using IRA accounts,

they were able to defer taxes on the purported gains and save tens of thousands of dollars each

year by deferring taxes in this manner.  (PAC ¶ 162).  Mendelow knew this tax avoidance

strategy was only possible if the Extra P&L he received from BLMIS was in the form of gains

from purported securities transactions in his accounts.  (PAC ¶ 163).  BLMIS could not have

transferred securities into these accounts because IRA contributions are required to be in cash.

(PAC ¶ 163).  Further, for the majority of the years in which Mendelow received Extra P&L in

his and Nancy Mendelow's IRAs, the accounts did not have sufficient cash to fund the purchase

of the speculative options listed on his account statements.  (PAC ¶ 164).

 In addition to the above, in 1998 Mendelow returned to his old ways by recruiting

additional investors to feeder funds he created to funnel money into BLMIS.  (PAC ¶¶ 8, 124).

Mendelow operated C&P Associates as he had Telfran, issuing letters to people offering them a

specified return, even though he told investors their money was in investment accounts at

BLMIS.  (PAC ¶¶ 8, 125).  As with Telfran, Mendelow structured the "investment" with C&P as

a loan.  (PAC ¶ 125).  Mendelow sent at least one "investor" a letter agreement promising "an

interest rate of 15% per annum unless otherwise notified."  (PAC ¶ 126).  The letter agreements

regarding the "arrangements" with C&P Associates served the same purpose as the loans issued

to Telfran customers, and some of C&P's investors referred to their investments as "loans" when

12

corresponding with Mendelow. (PAC ¶ 127). In Mendelow's letter to C&P's investors, C&P

disclaimed any liability in the event of "default by Bernard L. Madoff." (PAC ¶ 129).

In 2002, Mendelow created another entity, FGLS, for the sole purpose of funneling

investor money into BLMIS. (PAC ¶ 130). Mendelow was the managing member of FGLS.

(PAC ¶ 8). As part of his solicitation of investors into FGLS, Mendelow represented to at least

one investor that he had performed and continued to perform due diligence and audits of BLMIS

and its operations. (PAC ¶¶ 8, 131). Once FGLS was created Mendelow transferred many of

his clients' "investments" from C&P into FGLS. (PAC ¶¶ 8, 130). To effectuate the transfer

from C&P to FGLS, Mendelow provided these clients with a form letter allowing the transfer of

"funds that I have loaned to C&P Associates, along with accrued interest, to a newly formed

entity, FGLS, LLC, in a new account to be managed by Bernard L. Madoff Investment Securities

LLC." (PAC ¶ 132). FGLS did not issue loans to investors promising a 15% return, but instead

provided investors with the return purportedly provided by BLMIS. (PAC ¶ 132).

## ARGUMENT

## I.    STANDARDS GOVERNING MOTIONS TO AMEND A PLEADING

FRCP 15(a)(2), made applicable here by Federal Rule of Bankruptcy Procedure 7015,

provides that when a party cannot amend its pleading as matter of course, the party "may amend

its pleading only with the opposing party's written consent or the court's leave. The court should

freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court, in its

landmark case *Foman v. Davis*, stated that absent undue delay, bad faith, undue prejudice, or

futility, the "mandate" under FRCP 15(a)(2) to freely grant leave to amend "is to be heeded."

371 U.S. 178, 182 (1962); *see also, e.g.*, *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368,

382 (Bankr. S.D.N.Y. 2014) (citations omitted).

The Second Circuit Court of Appeals has repeatedly noted that the trial court has "broad" discretion in ruling on a motion to amend. *Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009) (citing *Local 802, Associated Musicians v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998); *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000)).  The standard to amend under FRCP 15(a)(2) is "generally lenient."  *In re AMR Corp.*, 506 B.R. at 382 (citing *Foman*, 371 U.S. at 182).   In general, courts favor amendments because they "'tend to facilitate a proper decision on merits.'" *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 472 (S.D.N.Y. 2013) (quoting *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 396 (E.D.N.Y. 1998);

Amendments are generally and liberally permitted by the courts.  S*ee e.g.*, *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 272 (S.D.N.Y. 2012).  FRCP 15(a)(2) is "interpreted liberally and an amendment is normally permitted." (quoting *Ohio Cas. Ins. Co. v. Transcontinental Ins. Co.*, No 05-6432 BSJ RLE, 2006 WL 1540540, at *1 (S.D.N.Y. May 31, 2006))).  "[W]hen any defendant appears generally in an action, he is deemed to have made an appearance with the knowledge that amendments are granted liberally and will be allowed and freely given when justice requires it."  Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1473 (3d ed.) (quoting *Donnelly Garment Co. v. Int'l Ladies Garment Workers' Union*, 47 F. Supp. 61, 63 (W.D. Mo. 1941).  As long as the moving party can demonstrate "colorable grounds for relief, justice does [] require" the court to permit the amendment.  *Soley v. Wasserman*, No. 08 Civ. 9262 (KMW)(FM), 2013 WL 6244146, at *1 (S.D.N.Y. Dec. 3, 2013) (quoting *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co., Inc.*, 608 F.2d 28, 42 (2d Cir. 1979).

II.    **THE COURT SHOULD GRANT THE TRUSTEE'S MOTION TO AMEND IN
LIGHT OF THE INTERVENING CHANGE IN LAW AND THE ADDITIONAL
FACTS ALLEGED**

The Trustee seeks to amend on multiple, well-accepted grounds, and leave to amend

should be granted.  As an initial matter, the Complaint was filed well prior to District Court's

decision on the applicable standards in this SIPA case.  Therefore, the Trustee seeks to amend to

conform the Complaint to the new standards.  In addition, the Trustee seeks to amend the

Complaint in accordance with this Court's suggestion that additional factual allegations

supporting Mendelow's actual knowledge of fraud should be added.  These are both appropriate

grounds for granting leave under the law.  In fact, in dozens of other actions in the BLMIS SIPC

proceedings, complaints have been amended to meet the newly articulated pleading standards

and to present allegations based on new evidence.  This Court has found there was good cause in

granting motions that were brought on similar grounds to the instant motion.  *See, e.g.*, *Kingate*,

Order Granting Motion For Leave To File A Fourth Amended Complaint (ECF No. 99) (granting

a motion for leave to amend based on, in part, the change in law and new facts).  Moreover, this

would be the Trustee's first amendment of the Complaint in this action.

A.    <u>The Intervening Change in the Pleading Standard is Grounds to Amend</u>

Courts in this Circuit routinely grant leave to amend when there are intervening changes

in the law.  *See, e.g.*, *Hamilton v. City of New York*, No. 06-cv-15405 (DC), 2011 WL 1842990,

at *3 (S.D.N.Y. May 20, 2011); *McBeth v. Gabrielli Truck Sales, Ltd.*, 731 F. Supp. 2d 316,

320–21 (E.D.N.Y. 2010); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 366 (S.D.N.Y.

2009); *Sys. Fed'n No. 152 v. Pa. R.R. Co.*, 272 F. Supp. 971, 974 (S.D.N.Y. 1967); *Hood v. P.

Ballantine & Sons*, 38 F.R.D. 502, 503 (S.D.N.Y. 1965).  Within the last five years many

decisions have been issued that affect this action.  Many of the issues addressed in those

decisions had been withdrawn to the District Court and later appealed through the Supreme

15

Court.  The District Court ruled that the safe harbor provided in Section 546(e) limited the

Trustee's ability to seek transfers made more than two years before the Filing Date.  *Greiff*, 476

B.R. at 719-20; *Katz*, 462 B.R. at 451.  The Trustee appealed the *Greiff* decision, which the

Second Circuit affirmed December 8, 2014 in the decision *Picard v. Ida Fishman Revocable*

*Trust (In re BLMIS)* ("*Ida Fishman*"), 773 F.3d 411 (2d Cir. 2014).  The issue of the

applicability of Section 546(e) was not finalized until June 22, 2015, when the Supreme Court

declined the Trustee's petitions for *certiorari* in *Ida Fishman*.  *Picard v. Ida Fishman Revocable*

*Tr.*, 135 S. Ct. 2859 (Mem) (2015).

> **B.      New Facts Supporting Mendelow's Coordination with Madoff and DiPascali
> to Directly Benefit From the Fraud are Grounds to Amend.**

In instances where plaintiffs discover new facts relating to and supporting claims asserted

in an earlier pleading, "courts routinely permit amendment on the basis of this new information."

*In re Facebook, Inc.*,  986 F. Supp. 2d at 472 (citing *Phillips v. Kidder, Peabody & Co.*, No. 87

Civ. 4936 (DLC), 1994 WL 570072, at *4 (S.D.N.Y. Oct. 13, 1994) (stating "courts consistently

grant motions to amend where it appears that the new facts and allegations are developed during

discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings"));

*Morin v. Trupin*, 835 F. Supp. 126, 129 (S.D.N.Y. 1993) ("The plaintiffs…are granted leave to

amend their pleadings to incorporate factual matters obtained through discovery….").  As

discussed throughout, the Trustee has obtained additional evidence to support his allegations

against the Defendants that was not available when he filed the Complaint in 2010.  Moreover,

the Trustee may now add allegations that are based on evidence that was in the Trustee's

possession when the Complaint was drafted but were not necessary to satisfy the pleading

standard at the time.  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068

(JFK), 2008 WL 9359652, at *3 (S.D.N.Y. Mar. 17, 2008) ("Given that the original Complaint

has grown somewhat stale due to the unusually drawn out procedural history of this case,…[the

plaintiff] may amend and supplement the Complaint with new facts and allegations….").

### C.    Defendants' Belated Motion to Dismiss Provides an Additional Equitable Ground to Grant Trustee Leave to Amend

Granting the Trustee leave to amend the Complaint is also both fair and equitable,

including because of the Defendants' gamesmanship which induced the Trustee to forego his

opportunity to amend the Complaint as a matter of course.  Fed. R. Civ. P. 15(a)(1)(B).  As

discussed above, the Trustee filed his Complaint in November 2010, and through multiple agreed

extensions, the Defendants answered approximately four years later.  The Defendants filed their

Answers with full awareness of the series of District Court decisions that had applied the Section

546(e) safe harbor to limit the Trustee's ability to avoid and recover transfers past the two-year

period—*e.g., Katz*, *Greiff*, *Cohmad*—and this Court's decision in *Merkin II*.

At any point prior to answering, the Defendants could have filed a Rule 12(b)(6) motion

to dismiss on Section 546(e) grounds consistent with their motion to withdraw the reference.

They chose not to.  Instead, they not only answered the Complaint, but then shortly thereafter

agreed to a Case Management Plan in January 2015.  (ECF No. 69).  While the Defendants

represented to the Court they did not move to dismiss the case until the Second Circuit Court of

Appeals' decision in *Ida Fishman*, (Transcript at 80:2-8); Reply Motion (ECF No. 84 at 19,

n.10), they have provided no explanation for why they entered into a Case Management Plan

where it was agreed that "discovery will be needed on all liability and damages issues, and that

fact and expert discovery will be needed" and that they were not "aware of any other matter that

may add to the just and expeditious disposition of this matter." (*See* Case Management Plan at

1).    It was not until six months after they answered, and after the exchange of initial

disclosures, that Defendants filed the Dismissal Motion based on Section 546(e).  The

Defendants' lengthy and unexplained delay in filing their motion effectively caused the Trustee

to forego his right to amend the Complaint, and appears to have been pure gamesmanship.

Further, this exercise further delayed the resolution of this action and caused the Trustee to

expend significant resources by having the Trustee pursue agreed-upon areas of discovery that

the Defendants knew they were not prepared to produce.  Under these circumstances, it would be

inequitable and unfair to deny the Trustee leave to amend the Complaint.

## III.    THERE HAS BEEN NO UNDUE DELAY OR BAD FAITH BY THE TRUSTEE

The mere passage of time, in the absence of bad faith, does not warrant a denial of leave

to amend. *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 676 (S.D.N.Y. 1996)

(granting leave to amend after plaintiff waited two years to file amendments, noting that "[t]he

federal rules of pleading are not intended unreasonably to lock counsel into a litigation

strategy"); *Commander Oil Corp. v. Barlo Equip. Corp*., 215 F.3d 321, 333 (2d Cir. 2000)

(upholding District Court grant of leave to amend even in the face of a seven-year delay).  Only

where a court finds that a party delayed in bad faith will it deny leave to amend.  *See Town of*

*New Windsor*, 919 F. Supp. at 676-77; *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856

(2d Cir. 1981) ("Mere delay…absent a showing of bad faith or undue prejudice, does not provide

a basis for a district court to deny the right to amend."); *Rachman Bag Co. v. Liberty Mut. Ins.*

*Co.*, 46 F.3d 230, 235 (2d Cir. 1995) (upholding District Court grant of leave to amend more

than four years after the complaint was filed where the amending party lacked bad faith).

The Trustee did not unduly delay or act in bad faith in bringing this Motion to Amend.

The Supreme Court did not deny certiorari in *Ida Fishman*, thus removing any doubt as to the

application of the safe harbor, until June 2015.  In the intervening period, the Defendants had

sought and received twenty-two extensions of time to respond to the Complaint, filed Answers,

and agreed to proceed with discovery on the allegations in the Complaint.  Thus, the Trustee

18

reasonably deferred seeking any amendment of the Complaint until after the Defendants sought judgment on the pleadings.

During the hearing on October 28, 2015, the Defendants stated that they did not move to dismiss the Complaint earlier because they "didn't want to waste the resources" in the event *Katz* or *Ida Fishman* were overturned on appeal. (Transcript at 80:2-7). At oral argument, the Court noted that the Trustee could rely on the same argument for not seeking to amend the Complaint earlier. (Transcript at 80:9-14) ("Well, can't you make the same argument as to why they didn't amend the complaint? If you're waiting before you make the motion to dismiss, why isn't it fair for them to wait in order to make a decision to amend the complaint?"); (Transcript at 97:13-18) ("[Y]ou can argue…that…there's been an undue delay, although for the reasons I've discussed, you've already told me you wanted to wait. So, you know, I suppose they're entitled to wait."). The Defendants failed to articulate any response as to why their position was distinguishable from the Trustee's. (Transcript at 80:15-23).

Further, as detailed above, the Trustee contended that the allegations in the Complaint met the actual knowledge standard. However, after the Court indicated at oral argument that the Trustee should pursue amending the Complaint so it may meet the current pleading standard, the Trustee pursued this course of action without delay.

To the extent the Defendants have argued in their Dismissal Motion (Motion at 19-22) or at oral argument (Transcript at 78:9-10, 79:16-20) that the Trustee has unduly delayed or acted in bad faith by not previously amending the complaint, this argument turns the relevant procedural history of this case on its head. It was, in fact, the Defendants who repeatedly asked for and received twenty-two extensions of time over the course of nearly four years to respond to the Complaint. Thus, the purported five-year delay was solely due to the Defendants' actions, not

the Trustee's.  The Defendants only answered the Complaint on November 14, 2014, and even

then, they caused more delay by entering into a Case Management Order to set discovery

deadlines and waiting six additional months before filing the Dismissal Motion, despite the fact

that there had been no intervening changes to the legal standards affecting this case.  Accordingly

there has been no undue delay by the Trustee in this action, and relatedly, no basis to suggest that

he delayed in bad faith.

## IV.    THE DEFENDANTS WILL NOT BE PREJUDICED BY THE AMENDMENT

The party opposing an amendment has the burden of proving that leave to amend would

be prejudicial.  *Fed. Nat. Mortg. Ass'n v. I.R.S.*, No. CV-98-5174 (JM), 2001 WL 260076, at *2

(E.D.N.Y. Jan. 17, 2001) (citing *Panzella v. Skou*, 471 F. Supp. 303, 305 (S.D.N.Y. 1979)).  "If

no prejudice is found, then leave normally will be granted."  Wright & Miller, 6 Fed. Prac. &

Proc. Civ. § 1484 (3d ed.) (citations omitted).  Here, the Defendants cannot meet that burden.

### A.    The Potential Unavailability and Weak Recollection of Witnesses Does Not Constitute Grounds to Deny Amendment

At Oral Argument, the Defendants suggested that they could be prejudiced because of

Mendelow's memory "fad[ing]" or their inability to question certain witnesses, such as Frank

DiPascali,[6] who are no longer available.  (Transcript at 81:22-82:7).  In considering the

Defendant's claims of potential prejudice, the Court questioned how the Defendants would, in

fact, be prejudiced in defending this action because of this purported lack of evidence, but the

---

[6] The Defendants argue that they would be prejudiced because they cannot question Frank DiPascali about any conversations with Mendelow (Transcript at 82:5-7), but by that reasoning the Trustee would likewise be prejudiced in the Court's evaluation of the PAC's allegations, as it is alleged that Mendelow invoked the Fifth Amendment when questioned on whether he spoke with Frank DiPascali.  (PAC ¶ 165).

Defendants could not articulate a reason in response. (Transcript at 81:22-82:17). In addition to constituting pure speculation, the Defendants represented to this Court that they "[did not] believe" Mendelow had any conversations with DiPascali, while the Trustee concretely alleges in the PAC that they spoke every December. (Transcript at 82:8-12; PAC ¶¶ 7, 134).

In any event, the potential unavailability and dim recollections of potential witnesses is not an accepted basis for establishing prejudice and should be rejected by this Court. *See United States v. Hudson*, 152 F.R.D. 6, 8 (D. Conn. 1993) ("In any event, the potential of unavailable witnesses and dim recollections would be present in this case even if leave to amend is denied. The events underlying this action occurred some time ago … The so-called prejudice of which the defendants complain appears to reflect no more than the general difficulties facing all parties in the course of protracted litigation.").

**B.**     **Because Defendants Have Effectively Stalled Discovery and Claim to Have Few Additional Documents, They Will Not Be Prejudiced by Amendment at This Time**

Courts also consider whether amendment "would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725-26 (2d Cir. 2010) (internal quotation marks omitted) (quoting *State Teachers Ret. Bd.*, 654 F.2d at 856; *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000); *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Neither of those factors is present here.

First, Courts only consider potential additional discovery to be prejudicial when a party seeks to amend its pleadings in the later stages of a case. S*ee, e.g.*, *State Teachers Ret. Bd.*, 654 F.2d at 856 (reversing denial of leave to amend where "no trial date had been set by the court," no party had moved for summary judgment, the amended claim was "obviously one of the

objects of discovery and related closely to the original claim," and "the amendment will not involve a great deal of additional discovery"); *Krumme*, 143 F.3d at 88 (affirming denial of motion to amend where "case was near resolution and discovery had been completed"); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) (affirming denial of motion to amend as "especially prejudicial given the fact that discovery had already been completed and [the defendant] had already filed a motion for summary judgment"); *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (finding undue prejudice where the plaintiff sought leave to amend after judgment had already been entered against him); *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 240 (Bankr. S.D.N.Y. 2013) (amendment deemed prejudicial where the parties had already expended millions of dollars preparing for trial, had conducted a 34-day trial already, and had not conducted any discovery on the proposed claim); *Oscar v. BMW of N. Am., LLC*, No. 09-cv-11 (PAE), 2011 WL 6399505, at *5–6 (S.D.N.Y. Dec. 20, 2011) (finding that defendants would be prejudiced by plaintiff's amendments that increased scope of litigation, because parties had already conducted extensive discovery and the amendments would require additional expert testimony as well as additional fact discovery).

The Defendants filed their Dismissal Motion on May 14, 2015, less than three months into fact discovery. Defendants have yet to serve any discovery demands on the Trustee. As discovery has barely commenced, Defendants will not suffer any prejudice from the amendment of the allegations in the Complaint. Furthermore, "[t]he Second Circuit has held that 'the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.'" *Burgee v. Patrick*, No. 91-CIV-3023 (MJL), 1996 WL 227819, at *4 (S.D.N.Y. May 3, 1996) (citations omitted); *In re Colonial Chesire I Ltd. P'ship*,

167 B.R. 748, 751 (Bankr. D. Conn. 1994) ("[D]efendant's assertion that the elements of the

[amended claim] will require it to investigate and defend against some additional details or

circumstances does not rise to the level of undue prejudice."); *United States v. Cont'l Ill. Nat'l*

*Bank & Tr. Co.*, 889 F.2d 1248, 1255 (2d Cir. 1989) (adverse party's burden of investigating

new allegations in amended pleading, including undertaking discovery, does not by itself

"suffice to warrant denial of a motion to amend").

Second, an amendment to the Complaint will not require the Defendants to expend

significant additional resources.  In responding to the Trustee's document requests and

interrogatories, the Defendants failed to provide specific objections and responses.  Surprisingly,

Defendants' counsel represented to the Court this was not done because "[w]e just think that

would be extra work."  (Transcript at 101:22-102:7).  Additionally, other than eleven pages of

material produced last summer, the Defendants claim they are essentially finished with their

production, representing  to the Court that "we've given [the Trustee] essentially everything five

years ago" and that the Trustee has "had all of our documents for five years" in connection with

discovery pursuant Rule 2004.[7]  (Transcript at 78:12-14, 103:18-20).  As the Defendants have

---

[7] While the Defendants represented to the Court that the Trustee "[has] the [Defendants'] documents," which the
Defendants' counsel characterized as "tons of discovery," "so much evidence" and "discovery that no plaintiff has
ever dreamed of," (Transcript at 78:12-14, 79:2-3, 82:17-19), the Trustee notes that the Defendants produced only
2,710 documents in connection with Federal Rule of Bankruptcy Procedure 2004.  At his deposition pursuant to
Rule 2004, Mendelow invoked the Fifth Amendment over 390 times.  (PAC ¶ 165).  Further, the Defendants
production that was made pursuant to Rule 2004 consisted of the Defendants production to the SEC and Department
of Justice, and the Trustee does not know the particular documents that these agencies sought.

themselves represented that they already compiled "essentially everything," there is no

additional, burdensome discovery for them. [8]

### C. Defendants Cannot Claim Prejudice as to Lack of Notice of the Actual Knowledge Allegations

The Defendants claimed at Oral Argument and in the Dismissal Motion that they will be

prejudiced by any amendment that satisfies the new pleading standards because the Complaint

suggested that this was an "objective notice" case, which they contend would require a "totally

different set of evidence" to defend. (Transcript at 79:6-80:1, 81:1-21).  They additionally

questioned how they are "going to prove subjective state of mind."  (Transcript at 79:24-25).

However, it is fundamental that the Trustee bears the burden to establish his allegations and meet

the applicable legal standard.  Moreover, as detailed above, these assertions are not true: the

Defendants were well aware that the Trustee would be pursuing a theory that the Defendants had

actual knowledge of fraud at BLMIS. [9]  Indeed, at oral argument the Court noted that the

Defendants knew that the standard would be actual knowledge and that they should have been

---

[8] In fact, the Defendants already represented to this Court, in their motion to enjoin the *Warshaw* action from proceeding, that there should be "no concern" that "Mr. Mendelow will…destroy evidence" because the Trustee "issued a document preservation letter to Mr. Mendelow."  Reply to Motion (ECF No. 15 at 10).  The preservation letter, which the Defendants attached in support of their motion, calls for, among other things, preservation of "all communications with Bernard L. Madoff Investment Securities LLC and any employees or principals of BLMIS" and "documents regarding any referrals or introductions to BLMIS."  Affidavit (ECF No. 16, Ex. C, at 2-3).

[9] Although the Defendants argued that "there's not even a conclusory statement of anything like actual knowledge" (Transcript at 81:18-21), as noted above the Complaint contains numerous allegations on an alternative basis of the Defendants' knowledge of Madoff's fraud.  Complaint ¶¶ 54 ("Defendants…knew…that Madoff's IA Business was predicated on fraud, that Defendants…were benefitting from fraudulent transactions in their accounts, and that their purported activity was inconsistent with legitimate trading activity and credible returns"); 96 ("The fact that Mendelow was able to direct the value of his accounts at BLMIS based upon his own calculations, and to ensure he received specific amounts through fictitious options transactions is indicative of his knowledge of fraudulent trading activity; Mendelow…knew…that BLMIS was not a legitimate securities operation"); 106 ("The Defendants…knew…[of] irregularities and problems concerning the trades reported by BLMIS…).

compiling this evidence. (Transcript at 80:24-81:21) ("But you knew that was the standard…Didn't you start to gather that evidence?").  Finally, the Trustee's additional allegations in the PAC are premised on areas that were detailed in the original Complaint, such as illegitimate financial benefits Mendelow received from BLMIS.

The Defendants' generic assertions of prejudice are not proper bases to deny leave to amend, and thus should not be entertained by the Court.  *M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y. June 27, 2014) (The Plaintiff's "Second Amended Complaint mostly elaborates upon [the plaintiff's] First Amended Complaint …[The Defendant] cannot claim to be surprised by these new claims and unprepared to swiftly formulate a defense."); Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) (Courts have allowed amendments when "the opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue.").

## V.    AMENDMENT OF THE COMPLAINT WOULD NOT BE FUTILE

Although motions to amend are typically liberally granted, a motion to amend should be denied in the event that the amendment would be futile.  The Trustee's PAC would not be futile.

### A.    Legal Standard

The party opposing an amendment has the burden of proving that leave to amend would be futile.  *Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445192, at *3 (S.D.N.Y. Feb. 8, 2010) (citations omitted); *Ho Myung Moolsan Co. Ltd.*, 665 F. Supp. 2d at 250 (citations omitted).  "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

When considering a motion to dismiss under FRCP 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 253 (Bankr. S.D.N.Y. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007); *E.E.O.C. v. Staten Island Bank*, 207 F.2d 144, 148 (2d Cir. 2000). To survive a motion to dismiss, a complaint must plead "'enough facts to state a claim to relief that is plausible on its face.'" *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570. Courts do not decide plausibility in a vacuum. *In re BLMIS*, No. 08-99000 (SMB), 2015 WL 7568376, at *7 (Bankr. S.D.N.Y. Nov. 25, 2015) ("*Shapiro*"). "Determining whether a claim is plausible is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Whereas legal conclusions "are not entitled to the assumption of truth," the "court should give all 'well-pleaded factual allegations' an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief." *Merkin II*, 515 B.R. at 137 (quoting *Iqbal*, 556 U.S. at 679).

It is particularly important for the Court to draw reasonable inferences from well-pleaded facts in favor of the plaintiff with respect to a defendant's knowledge or state of mind, as such elements are rarely proven by direct evidence:

> To be sure a defendant's admission of actual knowledge of the underlying fraud is likely to be rare. But such direct evidence of actual knowledge is not necessary to establish this element of the claim. Rather, actual knowledge may be inferred from circumstantial evidence, provided that the central inquiry remains whether the evidence permits a reasonable finder of fact to infer that the defendant *actually* knew of the underlying fraud.

*Silverman v. A-Z Rx, LLC (In re Allou Distribs., Inc.)*, No. 04-8369-ESS, 2012 WL 6012149, at *16 (Bankr. E.D.N.Y. Dec 3, 2012) (quoting *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs, Inc.)*, 446 B.R. 32, 51-52 (Bankr. E.D.N.Y. 2011)); *see also Kirschner v. Bennett (In re Refco Secs. Litig.)*, 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010) ("*Refco*") ("Actual knowledge may also be implied from a strong inference of fraudulent intent" and a "motive can provide part of that inference." (internal quotation marks omitted)). Furthermore, at the pleading stage it is particularly appropriate to infer actual knowledge of fraud from circumstantial evidence. *See Refco*, 759 F. Supp. 2d at 335.

## B.    The Additional Facts in the Proposed Amended Complaint Confirm that Mendelow had Actual Knowledge of Fraud at BLMIS and Cannot Claim Protection Under Section 546(e)

It is undisputed that Count I of the PAC, which seeks to avoid and recover the Two Year Transfers under section 548(a)(1)(A) of the Bankruptcy Code, will proceed. (Transcript at 95:21-23, 104:11). Counts II through VII of the PAC seek to avoid and recover actual and constructive fraudulent transfers to the Defendants that occurred as early as 1993 under New York and federal bankruptcy law. In light of the safe harbor under Section 546(e) and several decisions issued by the Second Circuit Court of Appeals and District Court, the Trustee may only

27

pursue these counts if the Defendants had, inter alia, "actual knowledge that there were no actual securities transactions being conducted." *Cohmad*, 2013 WL 1609154, at *4.

The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor had actual knowledge of Madoff's fraud, or Madoff's scheme, or Madoff's Ponzi, or that no actual securities were being traded, he had no reasonable expectation that he was signing a securities contract with BLMIS for purposes of trading securities in his account. *Id.* In that event, the Trustee may avoid and recover actual and constructive fraudulent transfers to the full extent permitted under state and federal bankruptcy law, and Section 546(e) would not provide a "safe harbor" to such a transferee. *Id.* at *6.

As explained in depth in the PAC, Mendelow had actual knowledge that BLMIS was not executing actual securities trades in his accounts and worked to further Madoff's fraud. As such, he is exactly the type of defendant the Section 546(e) safe harbor does *not* protect. The Section 546(e) defense only protects those who had a reasonable expectation that BLMIS was engaging in legitimate securities transactions on his behalf. Further, since Mendelow acted as the agent for all of the other Defendants and dominated and controlled C&P Associates, Mendelow's actual knowledge is imputed to these defendants. Therefore, none of the Defendants can claim the protection of Section 546(e).

### 1.    The Section 546(e) Safe Harbor Only Protects Innocent Investors Who Did Not Have Actual Knowledge of Madoff's Fraud

The Section 546(e) safe harbor prevents a trustee from avoiding "a transfer that is…[a] settlement payment" or "a transfer made by…[a] stockbroker…in connection with a securities contract," except in cases of actual fraud under 11 U.S.C. § 548(a)(1)(A). *See Cohmad,* 2013 WL 1609154, at *1*; see also Merkin II,* 515 B.R. at 138.The safe harbor is intended to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a

major bankruptcy affecting those industries." *In re Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (citations omitted).  The District Court has held that "[i]n the context of Madoff Securities' fraud, that goal is best achieved by protecting the *reasonable expectations of investors who believed they were signing a securities contract*." *Cohmad*, 2013 WL 1609154, at *4 (emphasis added).

Applying the safe harbor in a trilogy of cases, the District Court held that investors who understood BLMIS to be acting as their stockbroker had agreements with BLMIS that were securities contracts. *Katz*, 462 B.R. at 451-52; *Grieff*, 476 B.R. at 720; *Cohmad*, 2013 WL 1609154, at *2-3.  The District Court further held that transfers from BLMIS to those customers were settlement payments in connection with those securities contracts and thus fell within the safe harbor of section 546(e). *Grieff*, 476 B.R. at 720-21; *Katz*, 462 B.R. at 452; *Cohmad*, 2013 WL 1609154 at *3.  Under the District Court's reasoning, the safe harbor protects legitimate investors who reasonably believed that BLMIS was trading securities on their behalf.  *Katz*, 462 B.R. at 452 n.3; *Grieff*, 476 B.R. at 720; *Cohmad*, 2013 WL 1609154 at *4.  But an investor with no such belief, like the Defendants, who "had actual knowledge of Madoff's scheme[,]…stands in a different posture from an innocent transferee, even as concerns the application of Section 546(e)." *Cohmad*, 2013 WL 1609154 at *4.  As the District Court explained:

> [A] transferee who had actual knowledge of the Madoff "Ponzi" scheme did not have any such expectations, but was simply obtaining moneys while he could.  Neither law nor equity permits such a person to profit from a safe harbor intended to promote the legitimate workings of the securities markets and the reasonable expectations of legitimate investors.

*Id.*

The section 546(e) safe harbor inquiry, therefore, "turn[s] on the investors' understanding of what they had contracted for." *Picard v. ABN AMRO Bank (Ireland) Ltd. (Secs. Investor Prot.*

*Corp. v. Bernard L. Madoff Inv. Secs. LLC)*, 505 B.R. 135, 142 n.6 (S.D.N.Y. 2013). The safe

harbor does not protect "actual participants in the fraud" or those "who had actual knowledge of

its workings (and thereby effectively participated in it by taking advantage of its workings)"

because "unlike innocent customers, they would not have believed that the settlement payments

were entirely bona fide." *Cohmad*, 2013 WL 1609154 at *4 (quoting *Katz*, 462 B.R. at 452 n.3).

Further, an investor with "actual knowledge that there were no actual securities

transactions being conducted" at BLMIS could also not have expected that his securities

contracts with BLMIS were "entirely bona fide." *Id.* A transferee may have lacked insight into

the exact nature of Madoff's fraud, but may have known that there were no actual securities

being traded in his or her account. In this scenario, the investor cannot avail himself of section

546(e) because he had no legitimate expectations that the transfers received from BLMIS were

"settlement payments" or "transfers" made "in connection with a securities contract." 11 U.S.C.

§ 546(e); *Cohmad*, 2013 WL 1609154 at *4. Indeed, it would be an absurd and inequitable result

to allow an investor who actually knew his "securities contracts" with, and "settlement

payments" from, BLMIS were premised on fraud to be granted refuge in a safe harbor reserved

for innocent customers.

Under this standard, as established by the three District Court cases summarized above,

the Trustee can defeat the safe harbor by establishing the Defendants' actual knowledge of

Madoff's fraud, or Madoff's scheme, or Madoff's Ponzi, or that no actual securities were being

traded. If the Defendants had knowledge of any one of these, they had no reasonable expectation

their securities contracts or transfers were bona fide, and they cannot invoke the safe harbor

defense.

The Trustee has sufficiently alleged in the PAC that Mendelow knew that BLMIS was not conducting securities transactions in his account.  Indeed, as discussed above, the PAC includes allegations that:

- Mendelow and Madoff personally agreed to an arrangement by which Mendelow received financial benefits from BLMIS that Mendelow knew were  not possible in a securities trading account (PAC ¶¶ 3, 91);

- Mendelow knowingly received Extra P&L in the form of fictitious transactions as a reward from Madoff for ensuring that Telfran investors returned their money to BLMIS after the SEC action (PAC ¶¶ 91, 105);

- Mendelow knowingly received an impossible guaranteed rate of return on BLMIS accounts that were purportedly invested in volatile securities markets (PAC ¶¶ 102-103);

- Mendelow tracked his expected returns based on his promised Extra P & L and guaranteed rates of return (PAC ¶ 133);

- Mendelow calculated his expected annual returns without regard to any securities trading reported on his BLMIS account statements and treated his accounts as if they were fixed income investments rather than securities trading accounts (PAC ¶ 149);

- Mendelow's own notes and letters include terms such as "interest," "yield," "loans," and "vig" in reference to his BLMIS accounts, which demonstrate that he did not consider the gains in his accounts to be the result of legitimate market based securities trading (PAC ¶¶ 2, 8, 68, 139, 140);

- Mendelow worked with DiPascali to perfect the mechanics of the annual Extra P&L and guaranteed returns (PAC ¶ 112);

- Mendelow sent DiPascali his calculations when he believed his year-end BLMIS account balances failed to equal the values he had been promised by Madoff (PAC ¶¶ 142–47);

- Mendelow coordinated with DiPascali every December to ensure his accounts received the Extra P&L and the guaranteed returns Mendelow demanded (PAC ¶¶ 7, 134-35);

- When Mendelow called DiPascali in December he would say something to the effect of, "on that thing you do, I want 115 for me, 115 for my wife" (PAC ¶¶ 7, 134);

- Mendelow instructed DiPascali as to the accounts in which he wanted to receive the Extra P&L (PAC ¶¶ 5, 134); and

- Mendelow specifically directed that DiPascali split the Extra P&L between his and Nancy Mendelow's IRA accounts in order to defer taxes on the purported gains, thus demonstrating his knowledge that the Extra P&L was being generated through the reporting of fictitious options transactions in those accounts (PAC ¶¶ 111, 162).

### 2. Mendelow's Actual Knowledge Should Be Inferred From His Refusal to Answer Questions, Invoking the Fifth Amendment

It is well-accepted that when the Court is evaluating whether a defendant has actual knowledge, it may draw an adverse inference in favor of the Trustee where a Defendant invokes his Fifth Amendment right against self-incrimination when questioned on events that the Trustee alleges evidence actual knowledge. *Cohmad*, 2013 WL 1609154, at *6, n.4; *Shapiro*, 2015 WL 7568376, at *9; *see also In re Alstom SA Sec. Litig*., 454 F. Supp. 2d 187, 208 n.17 (S.D.N.Y.

2006) (noting that the court is permitted to draw adverse inference from defendants' invocation

of Fifth Amendment in considering and ultimately denying motion to dismiss fraud claims); *SEC*

*v. Berry*, No. C-07-04431 RMW, 2008 WL 4065865, at *5 (N.D. Cal. Aug. 27, 2008) (holding

that defendant's invocation of the Fifth Amendment permitted the court to draw an unfavorable

inference and required denial of her motion to dismiss fraud claim).  At a deposition pursuant to

Rule 2004, Mendelow invoked the Fifth Amendment over 390 times and refused to answer when

questioned on the following-topics that the Trustee alleges as the basis of his actual knowledge

that BLMIS was not trading securities:

- whether he reviewed the Defendants' BLMIS statements;

- whether he spoke with DiPascali about the balances in his BLMIS account;

- whether he sent written correspondence to BLMIS regarding the amount of money he thought should be available in his account;

- whether he received a guaranteed return for his investments with  BLMIS; and

- whether he was paid a finder's fee for referring investors to BLMIS. (PAC ¶ 165).

While the Defendants now argue that the Court does not "even need…to draw the

inference" and that "if [the Court does], it's weak" (Transcript at 77:4-6), the Defendants prior

arguments betray them.  The Defendants took a contrary position before this Court when arguing

its motion to prevent the *Warshaw* action from proceeding, stating that if the Court did not enjoin

the *Warshaw* action, the adverse inference that could be drawn against Mendelow if he invoked

the Fifth Amendment was so strong that he risked losing the *Warshaw* action.  Motion at 14

(ECF No. 6) (emphasis added) ("Without a stay, Mr. Mendelow could be forced to choose

between forgoing the exercise of his Fifth Amendment right not to testify and *potentially losing*

the *Warshaw Action as a result of the imposition of a negative inference*.").  In addition to all of

33

the factual allegations in the PAC that establish Mendelow's actual knowledge of fraud, the

Court should also draw an adverse inference based on his refusal to answer any questions about

those allegations.

### C.    Mendelow's Knowledge is Imputed to the Other Defendants

The Trustee has alleged more than enough facts, taken as true, to establish that

Mendelow's knowledge may be imputed to the other Defendants.  "Under well-established

principles of agency law, 'the acts of agents, and the knowledge they acquire while acting within

the scope of their authority are presumptively imputed to their principals.'"  *Merkin II*, 515 B.R.

at 146 (quoting *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010)). "The general rule

is that knowledge acquired by an agent acting within the scope of his agency is imputed to his

principal and the latter is bound by such knowledge although the information is never actually

communicated to it."  *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985); *see

also Shapiro* 2015 WL 7568376 at *11 ("A principal-agent relationship may be established by

evidence of the consent of one person to allow another to act on his or her behalf and subject to

his or control, and consent by the other so to act, even where the agent is acting as a volunteer."

(quoting *Art Fin. Partners, LLC v. Christie's Inc.*, 58 A.D. 3d 469, 870 N.Y.S.2d 331, 331

(2009)); *Kirschner*, 938 N.E.2d at 951 ("Agency law presumes imputation even where the agent

acts less than admirably, exhibits poor business judgment, or commits fraud").  "At the motion to

dismiss stage, where the Trustee has not had the opportunity to conduct discovery concerning the

relationships between the Moving Defendants, the question is not whether the Trustee has proved

the existence of an agency relationship, merely whether he should have the chance to do so."  *In

re BLMIS,* 440 B.R. at 260  (citation and internal quotation marks omitted).

Mendelow acted as an agent for C&P Associates, Inc. and C&P Associates, as well as

Nancy Mendelow, Cara Mendelow, and Pamela Christian in connection with their respective

BLMIS investments. (PAC ¶¶ 174, 175). *See Shapiro,* 2015 WL 7568376 at *11 (finding an agency relationship where defendant acted as an agent for certain BLMIS account holders where the defendant "created the [a]ccounts for the benefit of himself and his family," the account statements were "sent to the [defendant's] at [his] home address," the defendant "reviewed those statements, and the defendant "directed BLMIS to execute fabricated trades in the [accounts]"). Specifically:

- Mendelow closely tracked the value of Nancy Mendelow's BLMIS account, directed that BLMIS place Mendelow's Extra P&L into Nancy Mendelow's BLMIS IRA account, and ensured that Nancy Mendelow's BLMIS account received the guaranteed return he was promised by Madoff (PAC ¶ 174);

- Mendelow dominated, influenced, and controlled Cara Mendelow's and Pamela Christian's BLMIS accounts, by directing contributions and withdrawals and communicating with BLMIS on their behalf (PAC ¶ 175);

- Mendelow further opened Cara Mendelow's BLMIS account for her, with a check drawn on C&P Associates' bank account, which he signed (PAC ¶ 19);

- Mendelow opened C&P Associates' BLMIS account, the account statements were addressed to his home and principal place of business, he directed all contributions and withdrawals into and out of the BLMIS account and corresponded with BLMIS on C&P Associates' behalf. Mendelow requested that withdrawal checks be sent to him at his home address. (PAC ¶ 169);

- Mendelow also directed that BLMIS manufacture the Extra P&L reflected on C&P Associates' BLMIS account statements (PAC ¶ 169); and

- Mendelow was the president and a director of C&P Associates, Inc. (PAC ¶ 167).

As an officer of C&P Associates, Inc., all knowledge gained by Mendelow within the scope of his agency is imputed to it.  (PAC ¶ 167).  *See, e.g.*, *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 517-18 (S.D.N.Y. 2009) ("Corporations can act only through their agents, including their employees and officers.  Acts performed and knowledge acquired by a corporate officer or agent…are imputed to the corporation.").  Thus, all knowledge gained by Mendelow within the scope of this agency, including his actual knowledge of fraud at BLMIS, is imputed to all of these Defendants.

In addition as C&P Associates Inc. is the general partner of C&P Associates, its knowledge is imputed to it.  (PAC ¶ 167).  *See Shapiro*, 2015 WL 7568376 at *10 (citing N.Y. P'SHIP LAW § 23; *Picard v. Chais (In re BLMIS)*, 445 B.R. 206, 224 (Bankr. S.D.N.Y. 2011) ("[T]he knowledge of a general partner can be imputed to the limited partnership") (citations omitted)).  In addition, as general partner C&P Associates Inc. is liable for the fraudulent transfers C&P Associates received.  *See Shapiro*, 2015 WL 7568376, at *10 (citing N.Y. P'SHIP LAW § 26) (citations omitted).

Moreover, Mendelow dominated, influenced, and controlled C&P Associates such that no corporate veil can be maintained between them and making Mendelow liable for its debts and obligations, including the fraudulent transfers they received from BLMIS.  (PAC ¶¶ 170, 173).  "[W]here an individual so dominates or controls the activities of some entity…the entity may also be held responsible for the same acts committed by the individual."  *S.E.C. v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003).  Mendelow was the sole decision maker for C&P Associates.  Mendelow ignored all corporate formalities and treated C&P Associates' BLMIS  as a bank account for his family.  (PAC ¶ 170).  On more than one occasion, Mendelow deposited checks from C&P Associates into the Defendants' BLMIS account.  (PAC ¶ 170).

36

Mendelow and Nancy Mendelow used C&P Associates to fund their living expenses, such as

paying fees to their apartment building and making monthly car payments. (PAC ¶ 172).

Mendelow and his family also used C&P Associates to hold assets for their benefit. (PAC

¶ 171). For instance, in a series of transactions Mendelow transferred his interest in a residence

in Pound Ridge, NY and transferred the title to Nancy Mendelow, who then transferred 50% title

to Pamela Christian. (PAC ¶ 171). Nancy Mendelow and Pamela Christian then sold their

stakes in the property to C&P Associates. (PAC ¶ 172).

## VI.  THE SUBSEQUENT TRANSFEREE COUNTS SHOULD BE DISMISSED WITHOUT PREJUDICE

In its June 2, 2015 decision, this Court held that "[t]o plead the subsequent transfer prong,

the complaint must allege facts that support the inference that the funds at issue originated with

the debtor, and contain the necessary vital statistics—the who, when, and how much of the

purported transfers to establish an entity as a subsequent transferee of the funds." *SIPC v.

BLMIS*, 531 B.R. 439, 473 (Bankr. S.D.N.Y. 2015) (citations and internal quotation marks

omitted)). Because, at this time, the Trustee lacks this information with respect to the subsequent

transferee defendants as pleaded in the Complaint, the Trustee respectfully requests that these

causes of action be dismissed without prejudice.

The Trustee sought Defendants' agreement to stipulate to the voluntary dismissal of

Counts Eight through Ten of the Complaint without prejudice and they refused, demanding

instead, that the dismissal be with prejudice.[10]  Therefore, pursuant to FRCP 41(a)(2), the

---

[10] Moreover, pursuant to Section 550(f) of the Bankruptcy Code, the Trustee has until one year after the initial transfer is avoided to bring an action against subsequent transferees. 11 U.S.C. § 550(f).

Trustee respectfully requests that the Court enter an order dismissing those counts without prejudice.  The rule contemplates that such dismissal, in the ordinary course, should be without prejudice.  The Court has previously dismissed without prejudice subsequent transfer counts in other avoidance actions brought by the Trustee, and there exist no extraordinary circumstances to warrant a different result in this action.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave to Amend the Complaint and to

Dismiss the Subsequent Transferee Causes of Action Without Prejudice should be granted in its

entirety.


Date:    December 30, 2015
         New York, New York

                                        By:  /s/ Jonathan B. New
                                        **BAKER & HOSTETLER LLP**
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: (212) 589-4200
                                        Facsimile: (212) 589-4201
                                        David J. Sheehan
                                        Email:dsheehan@bakerlaw.com
                                        Jonathan B. New
                                        Email:jnew@bakerlaw.com
                                        Robertson D. Beckerlegge
                                        Email:rbeckerlegge@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee for the*
                                        *Substantively Consolidated SIPA Liquidation*
                                        *of Bernard L. Madoff Investment Securities*
                                        *LLC and Bernard L. Madoff*