**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | SIPA LIQUIDATION |
|  | : |  |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | Index No. 08-01789 (SMB) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | : | Adv. Pro. No. 10-04283 (SMB) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| - against - | : |  |
|  | : |  |
| STEVEN B. MENDELOW, NANCY MENDELOW, CARA MENDELOW, PAMELA CHRISTIAN, C&P ASSOCIATES, LTD., and C&P ASSOCIATES, INC., | : |  |
|  | : |  |
| Defendants. | : |  |

------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION**
**FOR LEAVE TO FILE AN AMENDED COMPLAINT**

Stanley S. Arkin (SA-1373)
ARKIN SOLBAKKEN LLP
750 Lexington Avenue, 25th Floor
New York, New York 10022
*Attorneys for Defendants Steven B.*
*Mendelow, Nancy Mendelow, Cara*
*Mendelow, Pamela Christian, C&P*
*Associates, Ltd., and C&P Associates, Inc.*

## TABLE OF AUTHORITIES

TABLE OF AUTHORITIES ................................................................. (iii)

PRELIMINARY STATEMENT ............................................................. 1

RELEVANT BACKGROUND ............................................................... 3

    A.    The Defendants ................................................................. 3

    B.    Allegations as to Mendelow's Purported "Relationship"
        with Madoff .................................................................... 3

    C.    Allegations as to Avellino & Bienes and Telfran ................... 4

    D.    Referral Fees ("Extra P&L") for Reinvestments Attributable
        to Mendelow .................................................................. 5

    E.    BLMIS's "Schupt Schedules" ......................................... 6

    F.    Allegations that Mendelow Recruited Investors for His
        Investment Entities ......................................................... 8

    G.    Allegations that Mendelow "Closely Monitored" His Accounts and
        "Worked with" BLMIS to Ensure Receipt of Promised Sums ............ 8

    H.    Allegations that Mendelow "Knew" BLMIS Traded No Securities ..... 10

        1.    Mendelow's "Yearly Calculations" and Use of
            Terms Such as "Vig" ............................................... 10

        2.    Allegations that Fake Trades Were "Apparent"
            on BLMIS Statements ............................................. 11

        3.    Allegations as to Tax Deferral ................................. 12

    I.    Invocation of Fifth Amendment Right ............................... 12

ARGUMENT ............................................................................... 12

I.    LEGAL STANDARD ON A MOTION TO AMEND ................... 14

II.    BECAUSE THE PROPOSED AMENDMENTS FAIL TO CURE PRIOR
    DEFICIENCIES, DEFENDANTS' MOTION SHOULD BE DENIED AS
    FUTILE ................................................................................. 15

    A.    The Trustee Identifies Nothing About the Referral Fees
        (the So-Called "Extra P&L") Evidencing Mendelow's
        Knowledge of the Madoff Fraud ...................................... 17

|   |   | 1. | The Receipt of Referral Fees Does Not Suggest Knowledge of Fraud | 17 |
|   |   | 2. | The Term "Fee" or "Vig" Does Not Suggest Knowledge of Fraud | 18 |
|   | B. |   | Mendelow's Alleged "Relationship" with Madoff | 19 |
|   | C. |   | An Alleged "Guaranteed Rate of Return" Is Insufficient to Establish "Actual Knowledge" that BLMIS Never Engaged in Securities Transactions | 20 |
|   | D. |   | Mendelow's Invocation of the Fifth Amendment Does Not Raise an Inference of "Actual Knowledge" | 21 |
|   | E. |   | Allegations that Mendelow "Monitored" His Accounts or Specified the Allocation of His Referral Fee Do Not Raise an Inference that He Actually Knew of (Much Less "Directly Participated in") BLMIS's Fraud | 23 |
|   |   | 1. | Allegations That Mendelow Calculated Amounts Due or Identified the Accounts Into Which His Referral Fees Should Be Paid | 24 |
|   |   | 2. | Allegations That Mendelow Knew His Referral Fees Were Generated by Fake "Backdated" Transactions | 25 |
|   |   | 3. | Allegations That Mendelow "Directed" BLMIS to Use "Fake Trades" to Make up Shortfalls in His Account | 25 |
|   |   | 4. | Allegations that the Fraud Was Apparent on BLMIS Account Statements | 26 |
|   | F. |   | The Trustee's Case Law Does Not Compel a Different Conclusion | 33 |
| III. |   |   | THE TRUSTEE'S MOTION SHOULD SEPARATELY BE DENIED ON GROUNDS OF DELAY AND PREJUDICE. | 34 |
|   | A. |   | The Trustee's Undue Delay in Seeking to Amend Its Complaint | 35 |
|   | B. |   | Lack of Satisfactory Explanation and False Accusations of Gamesmanship | 36 |
|   | C. |   | Prejudice to Defendants from the Trustee's Delay | 38 |
|   | D. |   | The Trustee's Arguments as to Discovery | 40 |
| CONCLUSION |   |   |   | 40 |

# TABLE OF AUTHORITIES

## Cases

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)...................................................................................... 19, 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 14, 15

*Aurora Loan Servs. v. Posner, Posner & Assocs., P.C.*,
   513 F. Supp. 2d 18 (S.D.N.Y. 2007)......................................................................... 36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................. 15

*Berman v. Parco*,
   986 F. Supp. 195 (S.D.N.Y. 1997) ........................................................................... 35

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.*,
   447 B.R. 170 (Bankr. S.D.N.Y. 2011), *aff'd,* 480 B.R. 480 (S.D.N.Y. 2012) ........ 14

*Clark v. Kitt*,
   2014 U.S. Dist. LEXIS 113494 (S.D.N.Y. Aug. 15, 2014) ...................................... 17

*DiPirro v. United States*,
   181 F.R.D. 221 (W.D.N.Y. 1998)............................................................................. 39

*Fahs Constr. Group, Inc. v. Gray*,
   2012 U.S. Dist. LEXIS 96519 (N.D.N.Y. July 12, 2012),
   *aff'd*, 725 F.3d 289 (2d Cir. 2013) ..................................................................... 39, 40

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp.*,
   783 F.3d 383 (2d Cir. 2015)..................................................................................... 14

*In re Alstrom SA Sec. Litig.*,
   454 F. Supp. 2d 187 (S.D.N.Y. 2006)...................................................................... 23

*In re Crude Oil Commodity Litig.*,
   2007 U.S. Dist. LEXIS 66208 (S.D.N.Y. Sept. 7, 2007)............................... 34, 35, 37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013)...................................................................... 14

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006)...................................................................... 15

*Jones v. N.Y.S. Div. of Military & Nav. Affairs*,
   166 F.3d 45 (2d Cir 1998)........................................................................................ 14

*JP Morgan Chase Bank, N.A.*,
   447 B.R. 170 (Bankr. S.D.N.Y. 2011) .................................................................. 14

*Kirschner v. Bennett*,
   759 F. Supp. 2d 301 (S.D.N.Y. 2010) ................................................................ 14

*Leber v. Citigroup, Inc.*,
   2011 U.S. Dist. LEXIS 129444 (S.D.N.Y. Nov. 8, 2011) .............................. 35, 36

*LSSi Data Corp. v. Time Warner Cable, Inc.*,
   2012 U.S. Dist. LEXIS 37914 (S.D.N.Y. Mar. 20, 2012) ............................... 35, 36

*MacDraw, Inc. v. CIT Group Equip.Fin.*,
   157 F.3d 956 (2d Cir. 1998) .............................................................................. 35

*MPD Access., B.V. v Urban Outfitters, Inc.*,
   2013 US Dist LEXIS 153035 (S.D.N.Y. Oct. 23, 2013) ....................................... 36

*Picard v. Ceretti*,
   2015 Bankr. LEXIS 2674 (Bankr. S.D.N.Y. Aug. 11, 2015) ........................... *passim*

*Picard v. Ida Fishman Revocable Trust*,
   773 F.3d 411 (2d Cir. 2014) *cert. denied*, 135 S. Ct. 2859 (2015) ................... 12, 38

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011) .................................................................. 12, 13, 35

*Picard v. Merkin*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................... *passim*

*Picard v. Shapiro*,
   542 B.R. 100 (Bankr. S.D.N.Y. 2015) .................................................................. 13

*Prickett v. N.Y. Life Ins. Co.*,
   896 F. Supp. 2d 236 (S.D.N.Y. 2012) .................................................................. 21

*Pungitore v. Barbera*,
   506 F App'x 40 (2d Cir. 2012) ............................................................................ 14

*Ruotolo v. City of N.Y.*,
   2006 U.S. Dist. LEXIS 57346 (S.D.N.Y. Aug. 15, 2006),
   *aff'd*, 514 F.3d 184 (2d Cir. 2008) ................................................................ 35, 36

*Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*,
   346 B.R. 73 (Bankr. S.D.N.Y. 2006) ........................................................ 35, 36, 38

*SEC v. Barry*,
   2008 U.S. Dist. LEXIS 65914 (N.D. Cal. Aug. 27, 2008) ...................................... 23

*SEC v. Cohmad Sec. Corp. ("Cohmad I")*,
  2010 U.S. Dist. LEXIS 8597 (S.D.N.Y. Feb. 1, 2010) ...................................................... 17, 22

*Silverman v. A-Z Rx LLC (In re Allou Distribs.)*,
  2012 Bankr. LEXIS 5607 (Bankr. E.D.N.Y. Dec. 3, 2012) ............................................... 14, 22

*Silverman v United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs.)*,
  446 B.R. 32 (Bankr. E.D.N.Y. 2011) ...................................................................................... 14

*SIPC v. BLMIS*,
  516 B.R. 18 (S.D.N.Y. 2014) ......................................................................................... *passim*

*SIPC v. BLMIS*, 2012 US Dist LEXIS 70109 (S.D.N.Y. Apr. 30, 2012) .................................... 13

*SIPC v. BLMIS ("Cohmad II")*,
  2013 U.S. Dist. LEXIS 56042 (S.D.N.Y. Apr. 15, 2013) ................................................. *passim*

*Starter Corp. v. Converse, Inc.*,
  1996 U.S. Dist. LEXIS 17502 (S.D.N.Y. Nov. 25, 1996) ...................................................... 35

*State Farm Ins. Cos. v. Kop-Coat, Inc.*,
  183 F. App'x 36 (2d Cir. 2006) .............................................................................................. 38

*Triangle Indus., Inc. v. Kennecott Copper Corp.*,
  1981 US Dist LEXIS 16160 (S.D.N.Y. Nov. 25, 1981) ......................................................... 39

## Statutes & Other Authorities

11 U.S.C. § 546 ............................................................................................................... *passim*

15 U.S.C. §§ 78aaa ................................................................................................................ 12

Fed. R. Bankr. P. 7009 .......................................................................................................... 15

Fed. R. Civ. P. 9(b) ............................................................................................................... 15

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 14

Fed. R. Civ. P. 12(c) ............................................................................................................. 15

Fed. R. Civ. P. 15(a) ............................................................................................................. 14

Black's Law Dictionary 950 (9th ed. 2009) ............................................................................ 14

Preet Bharara Letter to the Court, 10-cr-228, Dkt #1389 ............................................................ 17

David Bank, *Microsoft Moves to Rule On-Line Sales*, Wall St. J., June 5, 1997 ......................... 18

Erik Larson, *Frank DiPascali, Madoff Deputy Who Aided U.S., Dies at 58*,
    Bloomberg News, May 10, 2015 ........................................................................................... 39

Christopher Matthews, *Bernard Madoff's Former Accountant Pleads Guilty*,
    Wall St. J., June 24, 2014.................................................................................................... 31

Steven B. Mendelow, Nancy Mendelow, Cara Mendelow, Pamela Christian, C&P

Associates, Ltd., and C&P Associates, Inc. (collectively, "Defendants") respectfully submit this

memorandum of law in opposition to the Trustee's Motion for Leave to File an Amended

Complaint.

## PRELIMINARY STATEMENT

The Trustee's motion to amend should be denied on grounds of futility, as its proposed

amendments fail to cure the deficiencies in its Original Complaint:  the absence of any facts

indicating that Mendelow actually knew of Madoff's fraud.  It should also be denied for undue

delay and prejudice – as the purportedly "new" details have been available to the Trustee for

years and rely heavily on innuendo supplied by a cooperating witness who has recently died.

For months, the Trustee has claimed to have new information showing that Mendelow

*actually knew* that BLMIS engaged in no real securities transactions – and now goes so far as to

assert that Mendelow and Madoff "personally agreed" on a scheme wherein Mendelow would

receive funds generated by fake transactions.  But the Proposed Amended Complaint ("PAC")

provides ***literally not one fact*** to support this defamatory statement.  To the contrary:  the PAC

makes clear that Mendelow and Madoff never "personally agreed" to anything (and in fact may

have never even met) and that Mendelow had ***no knowledge*** of Madoff's secret fraud.

Indeed, despite the Trustee's efforts to repackage its allegations (using new labels and

buzzwords, and adding image scans to create the illusion of factual sufficiency), the PAC asserts

exactly the same allegations that this Court has already rejected – allegations that are framed (at

best) as a matter of ***inquiry notice*** or ***constructive knowledge***.  That is, while the PAC replaces

phrases such as "should have known" with the word "knew," it still alleges only that Mendelow

had access to information that could have alerted him to possible irregularities:  in short, that

Mendelow could have discovered BLMIS's fraud if only he had (i) examined individual

securities transactions and (ii) compared them against market data, account cash balances, and prior year transactions. But the PAC does not allege that Mendelow ever undertook such examination – much less that he recognized red flags and somehow transformed such recognition into actual knowledge that BLMIS was a Ponzi scheme involving no actual securities trades. For this reason, the PAC – like the Original Complaint – is wholly insufficient.

The motion should also be denied on grounds of delay and prejudice – as, among other things, the Trustee does not satisfy its burden of explaining its years-long delay. While the Trustee generally suggests its amendments arise from previously unavailable information, ***it does not show that any relevant addition is based on evidence unavailable to it when this action was filed (or by the time it learned of the need to allege actual knowledge)***. Nor does the Trustee dispute that its "new" allegations as to Mendelow's purported "knowledge" could have been included in its original pleading. (Indeed, the Trustee alternatively suggests it was aware of such information when it filed this action – but that it simply chose not to include it earlier.)[1]

This fact confirms the Trustee's inability to cure the deficiencies in its prior pleading – and confirms as well the absence of any satisfactory explanation for the Trustee's delay. Indeed, the Trustee seems to recognize as much: seeking, instead, to deflect blame for its inaction on Defendants. Thus, the Trustee falsely accuses Defendants of "gamesmanship" – insisting that they "induced the Trustee to forego his opportunity to amend as [of right]," by opting to Answer rather than to file a motion to dismiss. ***But this is – as the Trustee is aware – absolutely false***. It was at the Trustee's insistence that Defendants filed their Answer; and it was because of

---

[1]    At times the Trustee suggests it has intended ***for years*** to assert "actual knowledge" allegations against Mendelow. (Mot. at 4, 24 n.9.)

Irrespective of what it believed to be the applicable legal standard, the notion that the Trustee would opt to *withhold* facts showing Mendelow in the most damning light possible makes little legal or logical sense – as the Trustee was charged with seeking the greatest recovery possible from each clawback defendant. *Indeed, as the Trustee's complaints against other clawback defendants have made clear, the Trustee has aggressively included allegations of knowledge, participation, and complicity when its investigation revealed a basis to do so.*

settlement talks with the Trustee that they then waited six months to file their Rule 12(c) motion.

Finally, the Trustee's years-long delay in amending indisputably prejudices Mendelow. Among other things, the PAC relies heavily on information supplied by a witness who died in May 2015 – such that Mendelow cannot question a key source of the allegations against him.

For all these reasons, the Trustee's motion to file an amended pleading should be denied.

## RELEVANT BACKGROUND

The following facts are set forth as alleged in the PAC.

### A.    The Defendants

Defendant Steven B. Mendelow ("Mendelow") is a principal at Konigsberg Wolf & Co., P.C.("Konigsberg Wolf").  (PAC ¶ 16.)  The PAC refers to Mendelow, Nancy Mendelow, Cara Mendelow, Pamela Christian, and C&P Associates, collectively, as "Defendants."  (*Id.* ¶ 9.)

### B.    Allegations as to Mendelow's Purported "Relationship" with Madoff

Mendelow is alleged to have been a "sophisticated investor and financial advisor" during the events of the PAC.  (PAC ¶¶ 49-56.)  The Trustee alleges that, from 1972 to 1983, Mendelow was a principal at Glantz & Levey, an accounting firm operated by Edward Glantz and Aaron Levey.  (*Id.* ¶ 50 (noting the firm merged with Konigsberg Wolf in 1983).)  The PAC alleges that Glantz & Levey shared an office suite with Avellino & Bienes ("A&B").  (*Id.* ¶¶ 51, 67.)

The PAC alleges that Mendelow had a relationship with Madoff spanning "decades" (*id.* ¶ 57) – and claims, on the basis of the following allegations, that it was a "close" relationship:

- Mendelow's name appears in Madoff's address book;

- there were "numerous calls between Mendelow and [the firm] BLMIS";

- Mendelow successfully referred investors to BLMIS, and sent checks to Madoff on behalf of investors seeking to open an account; *and*

- Mendelow received emails from clients or associates asking his opinion about Madoff (of which two examples are provided).

3

(*Id.* ¶¶ 57-64.) The PAC does not allege that Mendelow ever met with Madoff or visited BLMIS – or even that Mendelow and Madoff ever spoke (in person or by phone). (*Id.*)

### C. <u>Allegations as to Avellino & Bienes and Telfran</u>

The PAC alleges that A&B and its predecessor firms operated as "significant feeder funds for BLMIS from the early 1960s through November 1992 when A&B's operations were shut down pursuant to an [SEC] enforcement action." (*Id.* ¶ 67.) A&B would guarantee investors a certain rate of return, would label the investments "loans" in order to avoid scrutiny from regulators, and would provide investors letters with their specified rates of return. (*Id.* ¶ 68.) Madoff would guarantee certain returns to A&B, which would then retain the "difference between [those returns] and the returns promised to the underlying A&B investors." (*Id.* ¶ 69.)

In the 1980s, the PAC alleges, Mendelow, Glantz, and Levey created Telfran Associates Ltd. ("Telfran") and Telfran Corp. (*Id.* ¶¶ 2, 65.) They allegedly "modeled" Telfran on the structure of A&B and operated it as a "subfeeder to A&B's feeder fund." (*Id.* ¶¶ 66, 71.) Telfran is alleged to have "accepted loans from clients and in turn loaned that money to A&B." (*Id.*)

The PAC alleges that, until 1992, Telfran "operated as an unregistered investment company, selling unregistered securities to the public" – promising a guaranteed return to clients, who invested $89 million in total. (*Id.* ¶ 72.) Telfran allegedly "[fed] money into BLMIS by giving that money to A&B to 'invest' with BLMIS." (*Id.*) Telfran allegedly termed these investments "loans" and issued letters specifying the return on each. (*Id.* ¶ 73.) Mendelow allegedly dealt with investor inquiries and made deposits with A&B. (*Id.* ¶ 78.)

In 1992, the SEC commenced an investigation of A&B, which in turn led to an investigation of Telfran. (*Id.* ¶¶ 80-83.) The SEC sued Telfran and Mendelow for sales of unregistered securities by an unregistered investment advisor, and an auditor reviewing Telfran's finances found Telfran's books and records to be deficient. (*Id.*) Ultimately, Telfran and

4

Mendelow entered into a consent decree which enjoined them from selling unregistered securities or operating an unregistered investment advisory company. (*Id.* ¶ 84.)

As a result of these investigations, Madoff agreed to "return" money to be distributed to its investors, including those invested through Telfran. (*Id.* ¶ 85.) The PAC alleges that Madoff "recorded fraudulent trading activity in customer statements to create the appearance of sufficient value in their accounts to cover [these] investors." (*Id.*) BLMIS employees are alleged to have created a fictitious account, reflecting backdated transactions. (*Id.* ¶¶ 86-87.)

Mendelow is not alleged to have actually known of any of this activity at BLMIS. (*Id.*) Rather, as to Telfran, the PAC alleges only that Mendelow had *constructive knowledge* or *inquiry notice* of some impropriety. (*Id.* ¶ 76 (alleging he knew "BLMIS's transactions were fraudulent because no legitimate securities trading operation could guarantee a specific return."); *id.* ¶ 89 ("Mendelow knew as early as the 1980s that BLMIS was not actually trading securities because he knew of, and relied on, the guaranteed return promised by Madoff to A&B, and, in turn, Telfran. As an accountant and sophisticated financial advisor, Mendelow knew that it was impossible for BLMIS to guarantee a return if it was engaged in actual securities trades.")[2]

## D.    Referral Fees ("Extra P&L") for Reinvestments Attributable to Mendelow

The PAC alleges that, as A&B and Telfran were shutting down, Madoff promised that Mendelow would receive "financial bonuses" in return for encouraging former Telfran investors to invest in BLMIS. (*Id.* ¶¶ 91-92.) Avellino is alleged to have "met with Madoff on behalf of Mendelow" to negotiate a new payment structure. (*Id.*) Madoff allegedly promised Avellino that Mendelow's new BLMIS accounts would receive a return of at least 17% (allegedly from 1993

---

[2]    Although the PAC makes repeated reference to Mendelow's purported "knowledge" of BLMIS's fraud, it alleges no facts in support of these conclusory statements. ***Rather, as in the Original Complaint, these allegations are framed as a matter of inquiry notice***. *See, e.g.*, PAC 151-53, 156, 158-60 ("[F]rom the face of the BLMIS statements Mendelow knew that only the speculative options transactions could have generated the Extra P&L.").

to 1996), and that certain Mendelow accounts would receive "predetermined" annual increases to replace funds previously earned through Telfran investments.  (*Id.* ¶¶ 92-93, 96, 102.)

Although the Trustee originally referred to these increases as "fraudulent side payments" (Orig. Compl. ¶¶ 75-77), it now labels them "***Extra P&L***."  (PAC ¶ 3.)  However, the PAC still describes them (consistent with the Original Complaint) merely as ***referral fees*** for former Telfran clients referred by Mendelow to BLMIS.  (*Id.* ¶¶ 93, 96, 106-14.)  Specifically, the PAC alleges the so-called "Extra P&L" was a "set amount" that was calculated "based on the $62 million returned to BLMIS by former Telfran investors."  (PAC ¶¶ 106-14.)  ***(Notably, Mendelow is not alleged to have ever used the term "Extra P&L.")***

According to the PAC, the amount of these referral fees was constant from 1994 to 2001, and then continued at a lower rate until 2007. (*Id.*) Specifically, from 1994 to 2001, Telfran's former owners would collectively receive a fee of 1% of the total reinvested in BLMIS by former Telfran investors.  (*Id.* ¶ 108.)  Mendelow received 37.5% of that 1% fee, as well as an additional $200,000 per year, such that his referral fee (the so-called "Extra P&L") totaled approximately $432,000 per year through 2001, and half that amount thereafter.  (*Id.* ¶¶ 108-10, 114.)

While the PAC alleges Mendelow "knew" this fee was from "fictitious trading activity," its allegations are pled as mere constructive knowledge or inquiry notice.  (*Id.* ¶ 110; *id.* ¶ 103 ("As an accountant, sophisticated investor and financial advisor, who touted that he conducted due diligence on Madoff, Mendelow knew that it was impossible for Madoff to guarantee and consistently deliver a pre-determined return if he was actually trading securities.").)

E.    **BLMIS's "Schupt Schedules"**

The PAC next details the internal processes by which BLMIS employees boosted the value of customer accounts.  (*Id.* ¶¶ 116-23.)  According to the PAC, BLMIS employees created handwritten schedules ("Schupt schedules") to "identify, track, and reconcile accounts to ensure

the guaranteed rates of returns and/or [referral fee]" to numerous BLMIS customers. (*Id.* ¶ 118.)
These schedules "showed the amount of fictitious gains needed to bring the account to the
promised return and the calculation of the [referral fee]." (*Id.*)  BLMIS employees noted "the
type of option and the amount of options contracts that would be 'purchased or sold' to create the
predetermined gain," and "an account statement was generated to reflect these purported
transactions and the associated gains generated." (*Id.* ¶ 119; *id.* ¶¶ 117, 120 (citing examples).)

       The PAC alleges that Frank DiPascali (whom it describes as "Madoff's chief lieutenant"
(*id.* ¶ 5)) usually worked on these "fictitious options transactions in the end of December." (*Id.* ¶
120.)  If a particular account had not achieved the guaranteed return, DiPascali would allegedly
"manufacture sufficient fictitious options transactions to reach that return and then add additional
fictitious options transactions for the Extra P&L on top of the returns." (*Id.*)

       The PAC does not allege Mendelow ever saw any Schupt schedules or even knew they
existed. (*Id.* ¶¶ 116-23.)  Rather, it alleges he was on ***inquiry notice*** that BLMIS's transactions
were fraudulent: "Mendelow knew that it was impossible to generate a specific gain through
actual securities trading, and therefore that the speculative options transactions purportedly made
to give him the guaranteed return were fraudulent." (*Id.* ¶ 121; *see id.* ¶ 123 ("BLMIS's delivery
of the Extra P&L through purported speculative options transactions resulting in specific, on-
demand gains is impossible under any circumstance, and Mendelow knew the specific gains
could not have been achieved without the benefit of hindsight and backdating.").)

       Although the PAC repeatedly asserts that Mendelow *must have known* that the "Extra
P&L" was the result of fake transactions, it also alleges that such "Extra P&L" is in the nature of
a fixed commission or referral fee, which was paid each year by allocation of transactions to
selected accounts. (*Id.* ¶¶ 93, 106-14, 134-35.) *Because this fee was constant year-to-year, it is*

7

*unclear why it would place Mendelow on notice that BLMIS's trading results were fraudulent.*

## F. Allegations that Mendelow Recruited Investors for His Investment Entities

The Trustee alleges that, in 1998, Mendelow began "recruiting additional investors to feeder funds he created to help prop up BLMIS." (*Id.* ¶ 124.) (The PAC provides no facts to support or explain the assertion that Mendelow acted so as to "help prop up" BLMIS. (*Id.*)) It also alleges that, as part of such solicitation, Mendelow "represented to at least one investor that he had performed and continued to perform due diligence regarding Madoff's operation." (*Id.* ¶ 131.) The PAC does ***not*** allege that Mendelow actually conducted any due diligence or other review of BLMIS, or that he uncovered evidence of fraud by doing so. (*Id.*)

Mendelow is alleged to have issued letters to investors offering them a "specific return" and (as with Telfran) to have structured such investments as loans. (*Id.* ¶¶ 125-26.) The letters "disclaimed any liability in the event of 'default by Bernard L. Madoff.'" (*Id.* ¶ 129.) The PAC alleges that "default" ordinarily relates to a "note, loan or other obligation," and that Mendelow's use of such terms demonstrates that he "considered the C&P Associates account at BLMIS to perform as a fixed-interest investment, not an account trading actual securities." (*Id.*)

The PAC alleges that Mendelow chose his terminology so as to not "to appear to be recreating Telfran, and thus violating the SEC injunction against him." (*Id.* ¶ 127.)

## G. Allegations that Mendelow "Closely Monitored" His Accounts and "Worked with" BLMIS to Ensure Receipt of Promised Sums

The Trustee alleges that Mendelow "closely monitored his accounts and worked with Madoff and DiPascali to ensure that BLMIS gave him the full, promised amount of his Extra P&L [the referral fee] and guaranteed returns each year." (*Id.* ¶ 133.) However, the PAC does not allege any facts suggesting that Mendelow "worked with Madoff" to ensure such receipt. (*Id.* ¶¶ 133-48 (no mention of any discussions with Madoff).) Rather, it states that BLMIS staff

*internally* generated fake returns, with no facts indicating Mendelow knew of this activity. (*Id.*)

In support of the claim that Mendelow "closely monitored his accounts," the PAC alleges only that he received BLMIS statements and, twice in the 1990s, calculated his expected fees:

- Mendelow received quarterly and annual Portfolio Management Reports from BLMIS, which "listed each accounts' [sic] annualized return for the current year, in addition to account statements and trade confirmations, allowing him to more easily track his rates of return" (*id.* ¶ 133); and

- in two instances (in 1995 and 1996), Mendelow made written notations calculating the guaranteed returns and referral fee that he believed he was owed, and sent such calculations to BLMIS (*id.* ¶ 138-42, 144-46).

The PAC does not allege Mendelow reviewed (or even needed to review) any transactions or trade confirmations in making these calculations. (*Id.* ¶ 133-48.) Indeed, according to the PAC, these calculations do not contemplate the review of any BLMIS securities transactions. (*Id.* ¶¶ 93, 96, 106-14 (referral fee, or "Extra P&L," was a *fixed percentage* of the $62 million reinvested by former Telfran investors and thus remained virtually constant year-to-year); *id.* ¶¶ 92, 102 (guaranteed rate of return was a percentage of the *total value* of BLMIS account).)

The PAC alleges that, between 1994 and 1996, Mendelow "worked closely with BLMIS, particularly with DiPascali, to systematize the mechanics of the guaranteed returns and Extra P&L and to ensure that his designated accounts received the full value Madoff had promised." (*Id.* ¶ 136.) In support of this assertion, the PAC alleges only that

- on two occasions in the mid-1990s, Mendelow calculated the amounts he believed he was due using a 17% return rate (and adding his fixed referral fees) and forwarded his calculations to BLMIS (*id.* ¶¶ 138-42, 144-46);

- each year, Mendelow called or wrote DiPascali to identify the accounts into which his referral fee should be paid (*id.* ¶¶ 134-35 (alleging, as an example, that Mendelow directed DiPascali to pay the "Extra P&L" equally into BLMIS accounts for himself and his wife).)

None of these details (whether new or from the Original Complaint) suggests that Mendelow ever knew how BLMIS would satisfy the return rate or referral fee. (*Id.* ¶¶ 133-48.)

The PAC also alleges that Mendelow must have known certain transactions to be fake because they "pre-dated his instructions to DiPascali" to deposit his referral fee equally into accounts belonging to himself and his wife. (*Id.* ¶¶ 134-35.) Again, however, the PAC does not allege that Mendelow ever reviewed specific trades or dates. (*Id.*) Indeed, because the referral fee is alleged to have been *constant* year-to-year (approximately $432,000 from 1994 to 2002, and half that thereafter), the PAC indicates that BLMIS did not need to await Mendelow's "instructions" to know how much was needed to satisfy it. (*Id.* ¶¶ 93, 96, 106-14.)

Finally, while the Trustee conclusorily asserts that Mendelow "directed" BLMIS to create fake options transactions, the PAC does not reconcile such claims with the allegations already described – which indicate that BLMIS employees independently created schedules to identify deficiencies and calculate amounts needed to cover them for BLMIS customers. (*Id.* ¶¶ 118-20.)

## H.    Allegations that Mendelow "Knew" BLMIS Traded No Securities

In a section entitled "Mendelow Knew That the Extra P&L and Guaranteed Returns He Was Promised Were Not the Result of Actual Securities Trading," the PAC divides its allegations as to Mendelow's purported "knowledge" into the following three subsections.

### 1.    Mendelow's "Yearly Calculations" and Use of Terms Such as "Vig"

As in the Original Complaint, the PAC alleges that Mendelow's handwritten notations and use of the term "vig" or "fee" reflect his "awareness" of Madoff's fraud. (PAC ¶¶ 149-50.)

First, the PAC alleges that "[n]owhere in his yearly calculations did Mendelow consider any actual securities transactions to have occurred in his accounts." (*Id.* ¶ 149.) However, the PAC separately alleges that these calculations did not require consideration of any individual securities transactions, as they were based on either (i) an account's total value or (ii) a referral fee set as a fixed percentage of an amount that remained constant year-to-year. (*Supra* at 5-6.)

Second, as in its Original Complaint, the PAC alleges that Mendelow's use of the word

"vig" as shorthand for his referral fees shows his "awareness of BLMIS's fraudulent practices."

(*Id.* ¶ 150.)  The PAC similarly alleges that Mendelow's use of the terms "interest" and "yield,"

reflect his knowledge that BLMIS engaged in fake transactions.  (*Id.* ¶ 149.)

2.    Allegations that Fake Trades Were "Apparent" on BLMIS Statements

The PAC alleges that Mendelow had *constructive knowledge* (or was on inquiry notice)

of BLMIS's fraud because "implausible options activity" was "evident" on his BLMIS customer

statements.  (*Id.* ¶ 151.)  The PAC alleges that BLMIS's account statements reflected:

(i)    a "difference between the accounts where he received Extra P&L and guaranteed
returns, and other accounts that did not receive preferential treatment"[3];

(ii)    "impossibly profitable" transactions that "almost exactly matched the
predetermined amounts of the Extra P&L to be credited to Mendelow";

(iii)    that BLMIS "always recorded these transactions in the month of December"; and

(iv)    the fact that accounts that received the "Extra P&L" showed higher gains than
Mendelow's other accounts.

(*Id.* ¶¶ 151-54.)  As a "trained accountant and financial advisor," the PAC alleges, Mendelow

must therefore have known that "actual securities trading was not occurring at BLMIS."  (*Id.*)

The PAC does not reconcile these assertions with its allegations that the so-called "Extra

P&L" was simply a referral fee that was allocated near year-end into certain Mendelow accounts.

(*Id.* ¶¶ 93, 96, 106-14, 134-35; *see supra* at 6, 9.)  The PAC also does not allege that Mendelow

actually reviewed any specific transactions or trading activity, or that he cross-checked specific

transactions against other accounts or against market data generally.  (*Id.* ¶¶ 151-61.)

Finally, while the PAC includes a chart "depicting the unusually consistently high rates

of returns" in certain Mendelow accounts, it does not allege that Mendelow ever saw this chart or

noticed any regular "spike" in returns in his accounts.  (*Id.* ¶ 156.)

---

[3]    As the so-called "Extra P&L" is alleged to have been merely a ***referral fee***, it is unclear what the Trustee
means by the phrase "preferential treatment."  (*Supra* at 6.)

11

### 3. Allegations as to Tax Deferral

Finally, the Trustee alleges that Mendelow must have known that the referral fees allocated into IRA accounts for himself and his wife "could not have" been the result of actual securities transactions. (*Id.* ¶¶ 162-64.) Specifically, the PAC alleges that, "as a sophisticated investor, account and financial advisor," Mendelow must have known that (i) allocating such fees into these IRA accounts could defer taxes only if they were "in the form of gains from purported securities transactions in his accounts"; (ii) in the "majority" of the years in which those IRA accounts received the referral fee, those accounts did not have enough cash to fund the reported trades at the times they occurred; (iii) such transactions were therefore possible only in an account trading on margin; and (iv) trading on margin is not allowed in an IRA account. (*Id.*)

Again, the PAC does not allege that Mendelow ever reviewed specific transactions in his BLMIS accounts (or cross-checked them against cash balances on the relevant dates). (*Id.*)

## I. Invocation of Fifth Amendment Right

The PAC again alleges that, at a Rule 2004 examination in 2010, Mendelow repeatedly invoked the Fifth Amendment and "refus[ed] to answer virtually any question." (*Id.* ¶ 165.)

## ARGUMENT

Section 546(e) of the Bankruptcy Code creates a "safe harbor" that limits the trustee's clawback powers under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq. See* 11 U.S.C. § 546(e). "Section 546(e) provides generally that certain securities-related payments, such as transfers made by a stockbroker 'in connection with a securities contract,' or 'settlement payment[s]' cannot be avoided in bankruptcy." *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 414 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015). Although this safe harbor does not apply to "claims of actual fraud brought under [Section] 548(a)(1)(A)," it otherwise covers a "very broad range of securities-related transfers." *Id.* at 416, 423; *see Picard v. Katz*,

462 B.R. 447, 451-52 (S.D.N.Y. 2011).

The Trustee may avoid the Section 546(e) safe harbor only if it can demonstrate that the transferee had "actual knowledge of Madoff's Ponzi scheme." *Picard v. Ceretti*, 2015 Bankr. LEXIS 2674, at *37 (Bankr. S.D.N.Y. Aug. 11, 2015). Critically, and contrary to the Trustee's repeated effort to miscast the applicable legal standard, "actual knowledge" is not pled by allegations that a transferee knew "that no *legitimate* securities trading was occurring." (*See* Mot. at 8, 28-30 (emphasis added).) Rather, to escape the Section 546(e) safe harbor, the Trustee must "show, *at a minimum*, that the transferee had actual knowledge that there were *no actual securities transactions being conducted" at all*.[4] *SIPC v. BLMIS ("Cohmad II")*, 2013 U.S. Dist. LEXIS 56042, at *31-32 (S.D.N.Y. Apr. 15, 2013) (emphasis added); *Picard v. Shapiro*, 542 B.R. 100, 112 (Bankr. S.D.N.Y. 2015). Thus, Section 546(e) would not protect "full-fledged participants" in BLMIS's Ponzi scheme, or defendants with "actual knowledge" of the precise mechanics of the underlying fraud. *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *30-33.

In determining whether "actual knowledge" has been pled, allegations suggesting a "strong suspicion" are not enough. *Picard v. Merkin*, 515 B.R. 117, 140-41 (Bankr. S.D.N.Y. 2014). Nor is "actual knowledge" pled by allegations of constructive knowledge, or allegations that "red flags" exist, *id.* – much less by vague suggestions that defendant lacked the "reasonable expectations" of ordinary investors. *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *32; *Merkin*, 515 B.R. at 137. Rather, the Trustee must allege particularized facts showing defendant's "*direct and clear knowledge, as distinguished from constructive knowledge," of Madoff's fraud*. *Merkin*, 515 B.R. at 139-40; *SIPC v. BLMIS*, 516 B.R. 18, 24 (S.D.N.Y. 2014) ("*Good Faith*

---

[4]    In other words, Section 546(e) would protect investors who suspected their stockbroker of engaging in some kind of *illegitimate* conduct (such as misstatements or breaches of fiduciary duty), but believed it to be engaging in actual securities transactions. *See, e.g.*, *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *31-32; *see also, e.g.*, *SIPC v. BLMIS*, 2012 US Dist LEXIS 70109, at *13-22 (S.D.N.Y. Apr. 30, 2012) (explaining broad reach of Section 546(e) and rejecting notion that it does not apply where stockbroker engaged in illegal conduct).

*Decision*") (particularity requirement applies to transferee's state of mind).  "Actual knowledge"

implies a "high level of certainty and absence of any substantial doubt regarding the existence of

a fact." *Merkin*, 515 B.R. at 139 (citing Black's Law Dictionary 950 (9th ed. 2009)).[5]

## I.    LEGAL STANDARD ON A MOTION TO AMEND

Under Federal Rule of Civil Procedure 15(a), the district court has discretion to "deny

leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to

the opposing party." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606,

624-28 (S.D.N.Y. 2013); *Jones v. N.Y.S. Div. of Military & Nav. Affairs*, 166 F.3d 45, 50 (2d Cir

1998) (court "may properly deny leave when amendment would be futile").  "In addition, a

Court may deny leave to replead where it has *previously identified the deficiencies* in a pleading,

but the deficiencies persist in subsequent pleadings." *Buchwald Capital Advisors LLC v. JP

Morgan Chase Bank, N.A.*, 447 B.R. 170, 197 (Bankr. S.D.N.Y. 2011) (emphasis added), *aff'd,*

480 B.R. 480 (S.D.N.Y. 2012).

"Proposed amendments are futile if they 'would *fail to cure prior deficiencies* or to state

a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'" *IBEW Local Union No.

58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 389 (2d Cir.

2015) (emphasis added).  Leave to amend should thus be denied unless the proposed additions

contain "sufficient factual matter . . . to state a claim to relief that is plausible on its face."

*Pungitore v. Barbera*, 506 F App'x 40, 42-43 (2d Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S.

---

[5]    Not one of the Trustee's cases is to the contrary – as (i) none of these cases involved the rigorous standards set forth in the BLMIS matter for alleging actual knowledge under Section 546(e); (ii) the cases all emphasize that, even where state of mind is established by circumstantial evidence, such evidence must show *actual knowledge* as opposed to *constructive knowledge*; and (iii) one case relies on a "motive" theory that has not been held to apply in this context. *Silverman v. A-Z Rx LLC (In re Allou Distribs.)*, 2012 Bankr. LEXIS 5607, at *43-46 (Bankr. E.D.N.Y. Dec. 3, 2012) (in summary judgment decision on "aiding and abetting fraud" claim, emphasizing that, although circumstantial evidence may be used to show knowledge, it must show "*actual knowledge* …, not simply that the defendant *should have known*"); *Silverman v United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs.)*, 446 B.R. 32, 51-52 (Bankr. E.D.N.Y. 2011) (same; emphasizing distinction between "actual knowledge" and "recklessness or conscious disregard"); *Kirschner v. Bennett*, 759 F. Supp. 2d 301, 335 (S.D.N.Y. 2010) (same).

662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  It is not enough that the

claim is "conceivable," or that the facts pled "are merely consistent with a defendant's liability."

*Id*.  Nor will "conclusory statements" cure prior pleading deficiencies – ***as such assertions are***

***not entitled to the presumption of truth and must be disregarded***.  *Id.*; *see In re Nokia Oyj*

*(Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 409-10 (S.D.N.Y. 2006).  Rather, the complaint

must plead sufficient ***facts*** to allow the court to "draw the reasonable inference that the defendant

is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

Finally, the complaint must satisfy the particularity requirements of Rule 9(b), made

applicable to adversary proceedings by Bankruptcy Rule 7009.  Fed. R. Civ. P. 9(b); Fed. R.

Bankr. P. 7009; *supra* at 13-14 (particularity requirement applies to transferee's state of mind).

## II.   BECAUSE THE PROPOSED AMENDMENTS FAIL TO CURE PRIOR DEFICIENCIES, DEFENDANTS' MOTION SHOULD BE DENIED AS FUTILE.

This Court found that the Original Complaint failed to allege facts showing that

Mendelow *actually knew* of Madoff's fraud, or *actually knew* that BLMIS engaged in no real

securities transactions.  (Dkt. No. 85, at 95-96.)  In particular (and as set forth in Defendants'

Rule 12(c) motion), "actual knowledge" was not pled by allegations that Mendelow *(i)* received

referral fees from BLMIS; *(ii)* received a guaranteed rate of return from 1993 to 1996; *(iii)*

invoked the Fifth Amendment; and *(iv)* checked his BLMIS statements and reminded BLMIS of

his expected fees and returns.  (Dkt. No. 74, at 13-16; Dkt. No. 84, at 4-16.)  The Court also

rejected the Trustee's improper effort to allege, in its papers opposing the Rule 12(c) motion, an

*entirely new set of facts* – the proposition (without basis in the Original Complaint) that

Mendelow actually "directed" BLMIS to engage in fake transactions and therefore actively

participated in the workings of Madoff's fraud.  (Dkt. No. 79, at 22-24.)  However, the Court

offered the Trustee an opportunity to demonstrate that it could allege facts establishing the

requisite "actual knowledge" on Mendelow's part.

The newly drafted PAC still fails to allege *a single fact* showing that Mendelow "knew" of Madoff's fraud – despite the Trustee's claims to have obtained substantial new information in the years since this action was filed.  (Mot. at 16.)  Instead, the PAC merely repackages the ***same allegations that this Court has already rejected***, adding cosmetic alterations that utterly fail to cure the deficiencies of the Original Complaint.  (*Compare* Mot. at 31-32 (listing PAC's "actual knowledge" allegations), *with* Dkt. No. 79 at 19-23 (same allegations from Orig. Compl.).)  For example, the Trustee re-uses its prior allegations of inquiry notice, but replaces phrases such as "should have known" with conclusory words meant to signify *actual knowledge* ("knew" and "was aware").[6]  The PAC also adds extraneous details, complete with image scans, in an effort to create the illusion of newly substantiated, or previously unavailable, allegations.  (PAC ¶¶ 138-48.)  Finally, the PAC combines buzzwords from other BLMIS cases with misleading sentence structures, to suggest that Mendelow actually participated in Madoff's fraud.[7]  (*Id.* ¶ 5 (implying that the "mechanics" of how Mendelow's referral fees were allocated had something to do with the "mechanics" of the Ponzi scheme); *id.* ¶¶ 3-4 (implying Mendelow actually "direct[ed]" BLMIS's fraud).)  ***But the PAC still supplies no facts suggesting Mendelow actually knew of***

---

[6]     To take a few examples:  The Original Complaint alleged that consistently high December returns "should have been apparent" on BLMIS statements and placed Mendelow "on notice" of the fraud (Orig. Compl. ¶ 91); while the PAC conclusorily alleges that Mendelow "knew that [these December returns] were the result of purported speculative options transactions," with no facts supporting claim of actual knowledge.  (PAC ¶¶ 156-58.)

        Similarly, the Original Complaint alleged that the guaranteed return rate "*should have been apparent*" from Mendelow's BLMIS statements and thus placed him "*on inquiry notice*" that they "were not the result of legitimate trading activity."  (Orig. Compl. ¶¶ 83, 89.)  The PAC, in turn, conclusorily alleges that Mendelow "was aware [of BLMIS's fraud] because no legitimate securities trading operation could guarantee a specific return" (PAC ¶ 76).  *Compare also, e.g.*, Orig. Compl. ¶¶ 8, 10, 83, 96 (alleging Mendelow "should have known" or "should have [been] on notice" of some underlying fraud"), *with* PAC ¶¶ 4, 89, 103, 121 (same allegations, but with conclusory assertions that Mendelow "knew … that BLMIS was not engaged in actual securities trading").

[7]     For example, the PAC claims, *without any factual support*, that Mendelow actually "directed" BLMIS to create fake options transactions in order to boost his account balances (PAC ¶ 4), and that Madoff "promised" Mendelow that fake transactions would be used to generate guaranteed returns and referral fees (*id.* ¶ 3).

*Madoff's fraud – and, at times, contradicts its own claims of knowledge.*

Not one of the proposed amendments goes to the crucial deficiency in the Original

Complaint – as none establishes (or even raises an inference) that Mendelow knew of BLMIS's

secret fraud.  Rather, they merely repeat allegations that this Court has already rejected.

## A.    The Trustee Identifies Nothing About the Referral Fees (the So-Called "Extra P&L") Evidencing Mendelow's Knowledge of the Madoff Fraud

The Original Complaint alleged that Mendelow received fees for former Telfran clients

that he referred to BLMIS – and, by using the term "fraudulent side payments," unsuccessfully

sought to suggest that such fees somehow reflected Mendelow's knowledge of Madoff's fraud.

(Orig. Compl. ¶¶ 75-77.)  Having failed in this effort, the Trustee now inexplicably re-labels

these fees as "Extra P&L."  (PAC ¶¶ 3, 93, 107-09.)  Irrespective of how the Trustee labels them,

however, such fees do not raise an inference of the requisite "actual knowledge."

### 1.    The Receipt of Referral Fees Does Not Suggest Knowledge of Fraud

This Court has already held that the receipt of referral fees does not raise an inference

that Mendelow knew of Madoff's fraud.  (*Supra* at 15.)  Indeed, as this District has stated in the

BLMIS context, "[t]here is nothing inherently fraudulent about referring customers to an

investment adviser for fees."  *SEC v. Cohmad Sec. Corp. ("Cohmad I")*, 2010 U.S. Dist. LEXIS

8597, at *3 (S.D.N.Y. Feb. 1, 2010).  Nor do such fees prove a defendant's knowledge of the

underlying Ponzi scheme.  *See id.*; *see also* Preet Bharara Letter to the Court, 10-cr-228, Dkt

#1389, at ¶ 2 ("Bharara Letter") (U.S. Attorney stating Paul Konigsberg was unaware of Ponzi

scheme despite his "annual commission payments for recruiting other investors to [BLMIS]").[8]

Nothing in the proposed amendments changes this conclusion, or otherwise suggests that

---

[8]    The Court may take judicial notice of the Bharara Letter for the purpose of showing the government took
this position. *See Clark v. Kitt*, 2014 U.S. Dist. LEXIS 113494, at *20-24 (S.D.N.Y. Aug. 15, 2014) (judicial notice
of documents in other cases "for the fact that the statements were made"), *aff'd*, 619 F. App'x 34 (2d Cir. 2015).

referral fees (the so-called "Extra P&L") received by Mendelow reflect his knowledge of

BLMIS's Ponzi scheme.  Indeed, the PAC, like the Original Complaint, alleges that these fees

were calculated as a *pre-set percentage* of a reinvestment amount *fixed in 1993*, and thus did not

fluctuate based on BLMIS's trading results.  (PAC ¶¶ 3, 93, 107-09.)  Accordingly, Mendelow's

expectation of payment in no way suggests that he knew that fake trades were generated to

satisfy these fees – much less that he "directed" BLMIS to engage in such activities.  (*Id.*)

In short, while the Trustee now claims that Mendelow "knowingly received [referral fees]

in the form of fictitious transactions" (Mot. at 31), the PAC alleges **literally not one fact**

suggesting that Mendelow knew of the fake transactions manufactured by BLMIS.

2.    The Term "Fee" or "Vig" Does Not Suggest Knowledge of Fraud

So, too, with the alleged use of the term "fee" or "vig" to refer to these payments. (PAC ¶

150.)  As the PAC defines it, "vig" is a term used to "describe the interest, 'take,' or 'juice' on a

usurious loan." (*Id.*)  As other sources describe it, it is a "slang term used by bookmakers that

means, roughly, the profit made for bringing bettors together."  David Bank, *Microsoft Moves to

Rule On-Line Sales*, Wall St. J., June 5, 1997.  *In other words, even giving the term its most

unsavory connotations, it appears to be shorthand for a referral fee – which is exactly what the

"Extra P&L" is alleged to be.*  (*Supra*  at 6.)  Further, under either definition, the term plainly

implies an underlying transaction (albeit one possibly subject to inflated fees or overhead).

Accordingly – **and as this Court has already held** – Mendelow's purported use of this

term does not raise an inference that he "actually knew" BLMIS conducted "no actual securities

transactions."[9] (Mot. at 30.) To the contrary:  the notion that this terminology shows Mendelow's

---

[9]    Mendelow's alleged use of the words "interest" and "yield" also raises no inference of actual knowledge, as
they are consistent with the guaranteed return rates that he allegedly received from 1993 to 1996. (*Supra* at 5-6.)

Further, the PAC itself alleges an explanation for Mendelow's purported use of these terms:  according to
the Trustee, Mendelow was circumspect in the terminology he used regarding BLMIS because as he did not wish to

*actual knowledge* of Madoff's Ponzi scheme requires speculative and conclusory leaps in logic that cannot sustain the Trustee's claims. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations'"); *see Merkin*, 515 B.R. at 139-41 (even recognition that Madoff's results were "impossible" and that BLMIS was likely a Ponzi scheme did not raise inference of "actual knowledge"); *Good Faith Decision*, 516 B.R. at 24 ("Without particularized allegations that [transferees] either knew of [BLMIS] fraud or willfully blinded themselves to it, the Trustee's complaints here cannot make out a plausible claim [under Section 548(a)(1)(A) or 550(a)].").

## B.    Mendelow's Alleged "Relationship" with Madoff

The Trustee is aware of cases suggesting that (i) a defendant's close friendship with Madoff, combined with (ii) the intermingling of their business operations, *and* (iii) defendant's open access to information as to BLMIS's secret operations, may (together) constitute *one factor* supporting an inference that defendant had "actual knowledge" of the fraud. *See, e.g.*, *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *34-40; *Ceretti*, 2015 Bankr. LEXIS 2674, at *6-8.

In hopes of suggesting a similarly intimate personal and business relationship in this case, the Trustee conclusorily alleges that Mendelow too had a "close, longstanding relationship with Madoff." (PAC ¶¶ 57-60.) But the facts alleged in purported support of this statement raise no such inference. Instead, the PAC alleges only the most superficial of interactions:

- Mendelow's name appears in Madoff's address book;

- over the course of some unspecified period, there were "numerous calls between Mendelow and BLMIS" (though none is alleged to have involved Madoff);

---

be perceived as improperly selling unregistered securities in violation of the SEC consent decree relating to Telfran. (PAC ¶ 127; *see also id.* ¶ 84.) Such concerns (while perhaps subject to criticism in other respects) do not suggest knowledge of any facts that might suggest BLMIS was a Ponzi scheme.

- Mendelow referred investors to BLMIS, and occasionally forwarded checks to Madoff on behalf of investors seeking to open an account; *and*

- Mendelow was twice asked by acquaintances for his opinion about Madoff.

(*Id.* ¶¶ 57-64.)  The PAC does *not* allege that Mendelow ever met with Madoff socially or professionally, that he ever visited BLMIS, or that he ever spoke with Madoff (or anyone else at BLMIS) about the inner workings of BLMIS.  (*Id.*)  ***Indeed, it is unclear from the PAC whether Mendelow ever spoke to Madoff at all.***  (*Id.*).

In short, the PAC alleges no facts suggesting that Mendelow had any special insight into BLMIS's operations, or that he was privy to non-public "red flags" by virtue of some close relationship with Madoff.  (*Id.*)  For this reason too, the PAC fails to raise an inference that Mendelow even suspected (much less actually knew) of Madoff's fraud.  *See, e.g.*, *Merkin*, 515 B.R. at 129-31, 141; *Ceretti*, 2015 Bankr. LEXIS 2674, at *46-47.

### C.    An Alleged "Guaranteed Rate of Return" Is Insufficient to Establish "Actual Knowledge" that BLMIS Never Engaged in Securities Transactions

This Court has already found that an alleged guaranteed rate of return does not raise an inference that Mendelow actually knew of Madoff's fraud.  (*Supra* at 15.)  Despite this, the PAC continues to rely heavily on the allegation that, from 1989 to 1992, Telfran received a guaranteed return rate from A&B; and that, from 1993 to 1996, Mendelow's BLMIS accounts also received a guaranteed rate of return.  (Mot. at 31.)  The PAC alleges that, "as an accountant, sophisticated investor and financial advisor," Mendelow must have known that it was "impossible for Madoff to guarantee and consistently deliver a pre-determined return."  (PAC ¶ 103.)

Once again, these allegations fail.  As an initial matter, they are still expressly framed as a matter of *inquiry notice*.  (PAC ¶¶ 89, 103, 121 (alleging that, as a sophisticated investor, Mendelow must have known that a specific rate of return could not be guaranteed and must therefore have known that BLMIS engaged in no securities transactions at all)).)  This is, as a

20

matter of law, insufficient to establish "actual knowledge" of the fraud. *See Merkin*, 515 B.R. at

139-40 (inquiry notice does not amount to willful blindness, and willful blindness does not

amount to actual knowledge); *Good Faith Decision*, 516 B.R. at 21-22 (same).

Further – and as this Court has already found – Mendelow's allegedly "guaranteed

specific rates of investment returns" in the 1990s does not raise an inference that he actually

knew of BLMIS's fraud. *Supra* at 15; *see* Bharara Letter, at ¶ 2 (stating that Mendelow's

colleague, Konigsberg, was unaware of BLMIS's fraud despite, among other things, *guaranteed

return rates*). Courts have similarly declined to find "actual knowledge" pled by allegations of

impossibly consistent returns. *See, e.g., Merkin*, 515 B.R. at 129-31, 141 (knowledge not

"plausibly allege[d]" even where defendant recognized returns as impossibly consistent); *Ceretti*,

2015 Bankr. LEXIS 2674, at *46-47 (discussing *Merkin*); *Prickett v. N.Y. Life Ins. Co.*, 896 F.

Supp. 2d 236, 243, 246-47 (S.D.N.Y. 2012) ("abnormally high and consistent returns" did not

suggest defendants "willfully or recklessly ignored" signs of fraud at BLMIS absent facts

showing they "*translated those red flags into a suspicion of fraud*" (emphasis added)).

Finally, the Trustee *deliberately mischaracterizes* its own allegations on this topic:

claiming, in its brief, that "Mendelow and Madoff personally agreed to an arrangement by which

Mendelow received financial benefits from BLMIS that Mendelow know were not possible in a

securities trading account." (Mot. at 31.) *But the PAC alleges literally not one fact in support of

this claim*. In fact, the PAC undermines almost every aspect of this statement – alleging, among

other things, that it was *Avellino* who reached this purported agreement with Madoff (PAC ¶¶

91-92), and alleging no facts suggesting Mendelow actually knew of any fraud.

### D.    Mendelow's Invocation of the Fifth Amendment Does Not Raise an Inference of "Actual Knowledge"

Once again, the Trustee notes that Mendelow invoked the Fifth Amendment during a

Rule 2004 examination in 2010, and asks this Court to infer therefrom that he had "actual knowledge" of BLMIS's fraud. (Mot. at 32-34.) ***This Court has already declined to do so.*** The Trustee adds no facts requiring a different result, and still cites no authority for the notion that such a substantial inference – ***one that can be satisfied only by particularized allegations of "direct and clear knowledge"*** – may be drawn from such invocation.

It has already been held in the BLMIS context – by this Court and others – that a defendant's invocation of the Fifth Amendment does not raise a "plausible inference" that he knew of Madoff's fraud. *Cohmad I*, 2010 U.S. Dist. LEXIS 8597, at *5-6, 15-16 & n.2. In *Cohmad I*, as in this case, the court rejected the argument that defendant's "assertion of his Fifth Amendment privilege" gave rise to an inference that he knew of the fraud at BLMIS:

> The adverse inference that may be drawn from Jaffe's invocation of his Fifth Amendment privilege is weak. Given the numerous criminal investigations arising from Madoff's fraud, there is a justifiable concern for anyone who did business with BMIS's investment advisory unit, as did Jaffe, that he or she will be hauled into the criminal probe.

*Id.* As the SEC "failed to allege facts giving rise to a plausible inference" that Jaffe "knew of, or recklessly disregarded, Madoff's fraud," the court dismissed the complaint. *Id.* at 5-6, 15.

The same result follows here. Indeed, any "adverse inference" to be drawn here would carry even *less* weight than in *Cohmad I*, as the standards for pleading "actual knowledge" under Section 546(e) are more rigorous than the standards for pleading recklessness in the securities context. *See Merkin*, 515 B.R. at 139-44. Thus, even if an adverse inference were drawn here, it would be "weak" – and insufficient to satisfy the pleading standards already articulated by this Court. *Id.* at 140-41; *Ceretti*, 2015 Bankr. LEXIS 2674, at *39-40, 46-47; *see Silverman*, 2012 Bankr. LEXIS 5607, at *36-42, *43-49 (any adverse inference from invocation of Fifth Amendment "may not be the sole basis for a finding of liability," and such "testimonial silence does not close the gap" as to defendants' "actual knowledge" of the underlying fraud).

22

None of the Trustee's cases is to the contrary. Two of them note only that an adverse inference *may* be drawn from invocation of the Fifth – but do not suggest it is alone sufficient to raise an inference of "actual knowledge." *In re Alstrom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 n.17 (S.D.N.Y. 2006) (an adverse inference is "not forbid[den]," but is just one of several factors to consider); *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *38 n.4 (same). *SEC v. Barry*, in turn, involved only the most limited inference – using defendant's silence to a specific question to fill in a specific gap in otherwise well-pled allegations. 2008 U.S. Dist. LEXIS 65914, at *14 n.5 (N.D. Cal. Aug. 27, 2008) (where SEC pled false statement with particularity and sole question was whether defendant participated in making that statement, her refusal to answer permitted inference that she had done so). Here, in contrast, the Trustee seeks to use Mendelow's invocation of the Fifth to satisfy the considerable burden of alleging "actual knowledge" – *the crux of the entire PAC*. As this Court has already held, this is insufficient. *Supra* at 15.

Finally, speculation by Defendants' counsel about the possibility of an adverse inference in the *Warshaw* state court action has literally no persuasive value here. (Mot. at 32-33.) First, the state court action was subject to a *different legal standard* that was neither as rigorous nor specific as the "actual knowledge" requirement at issue here. (*Id.*) Second, Defendants' counsel did not suggest or concede that an adverse inference *should* be drawn (much less one so strong as to compel a finding that Mendelow knew of Madoff's fraud). (Dkt. No. 6, at 14 (speculating that Warshaw might seek an adverse inference).) As attorney hypotheticals do not carry the force of law, they have no bearing here.

### E.   Allegations that Mendelow "Monitored" His Accounts or Specified the Allocation of His Referral Fee Do Not Raise an Inference that He Actually Knew of (Much Less "Directly Participated in") BLMIS's Fraud

As in its Original Complaint, the Trustee persists in its efforts to transform Mendelow's purported year-end "monitoring" of his BLMIS accounts into proof that he knew of Madoff's

secret fraud.  But this Court has already found such allegations insufficient to raise an inference

of the requisite knowledge – and nothing in the proposed amendments alters this conclusion.

Instead (and despite the Trustee's efforts at embellishment), the PAC alleges only that:

- Mendelow received quarterly and annual Portfolio Management Reports from BLMIS, as well as account statements and trade confirmations (PAC ¶ 133);

- in two instances (in 1995 and 1996), Mendelow made written notations showing his calculations of his referral fee and guaranteed returns, and sent such calculations to BLMIS (*id.* ¶¶ 138-42, 144-46); *and*

- each year, Mendelow contacted Frank DiPascali to specify the accounts into which his referral fee should be deposited (*id.* ¶¶ 134-35).

Once again, these allegations do not raise an inference that Mendelow knew BLMIS to be a

Ponzi scheme – much less that he knew of or participated in its underlying "mechanics."

1.    Allegations That Mendelow Calculated Amounts Due or
 Identified the Accounts Into Which His Referral Fees Should Be Paid

Although the PAC alleges that Mendelow twice calculated his expected fees and returns,

it does *not* allege that he reviewed any BLMIS transactions or trade confirmations in doing so.

(*Id.* ¶ 133-48.)  ***Indeed, according to the PAC, these calculations do not require (or even***

***contemplate) such review.***  The referral fee is described as a fixed percentage of a fixed sum,

which thus required no review of any BLMIS trades – or of any BLMIS statements for that

matter.  (*Id.* ¶¶ 93, 96, 106-14 ("Extra P&L" was a *fixed percentage* of the $62 million reinvested

by former Telfran investors and remained virtually constant year-to-year).)  Similarly, calculation

of a guaranteed return rate would require no review of underlying transactions, as it would be

based on the *total value* of the relevant BLMIS accounts.  (*Id.* ¶¶ 92, 102.)

These calculations thus raise no inference that Mendelow actually reviewed BLMIS's

individual transactions – much less that he cross-checked them against other data so as to

discover possible indicia of some underlying fraud.  *Compare id.*, *with Ceretti*, 2015 Bankr.

LEXIS 2674, at *13-22, 41-47 (actual knowledge sufficiently pled by allegations that defendants

actually reviewed and verified "facially impossible transactions," recognized that Madoff was

reporting fake transactions, and took steps to block others from discovering them).

> 2.  Allegations That Mendelow Knew His Referral
>     Fees Were Generated by Fake "Backdated" Transactions

Equally futile are the amendments suggesting that Mendelow must have known certain

options transactions to be fake because they "pre-dated his instructions to DiPascali" to deposit

his referral fee equally into BLMIS accounts belonging himself and his wife.  (*Id.* ¶¶ 134-35.)

Specifically, even assuming Mendelow ever reviewed specific trades (*which is not*

*alleged*), the PAC itself undermines the notion that he would have understood them to reflect

"backdating" – as there is no suggestion that these transactions had to be generated *after* his

"instructions to DiPascali."  That is, the PAC alleges that the referral fee was **constant** year-to-

year – **such that BLMIS did not need to await communications from Mendelow (i) to know**

**what amount would be required to satisfy it, or (ii) to engage in (or fake) the necessary options**

**transactions to fulfill that requirement**.  (*Compare id.* ¶¶ 134-35, *with id.* ¶¶ 93, 96, 106-14.)

Indeed, on its face, the PAC alleges only that the *allocation* of the referral fee took place after

Mendelow's communications.  (*Id.* ¶¶ 135-36.)

As there would be no reason for Mendelow (or anyone else) to assume that such trades

must have occurred *after* his communications to DiPascali, the PAC makes clear there would be

no reason to suspect "backdating."  (*Id.*)  Accordingly, even if Mendelow *were* alleged to have

scrutinized these transactions, their dates would raise no red flags as to whether they had actually

occurred.  (And, even then, such allegations would still suggest only *inquiry notice*.)

> 3.  Allegations That Mendelow "Directed" BLMIS to Use
>     "Fake Trades" to Make up Shortfalls in His Account

In the introduction to its PAC, the Trustee misleadingly suggests that Mendelow actually

"direct[ed]" BLMIS to use fake trades to make up shortfalls in his accounts. (PAC ¶ 4.) While this theory was the centerpiece of the Trustee's brief in opposition to Defendants' motion for judgment on the pleadings (and although the Trustee insisted that it could supply facts in support of such theory), the PAC provides ***not a single fact*** to support this false and conclusory assertion.

Rather, like the Original Complaint, the PAC alleges only that Mendelow (i) calculated his expected referral fee (an easy task, as it was a pre-set percentage of a fixed amount); (ii) twice forwarded such calculations to Frank DiPascali; and (iii) contacted DiPascali each year-end to specify the accounts into which such fee should be deposited. (PAC ¶¶ 133-46.) ***The PAC alleges no facts indicating Mendelow knew that BLMIS manufactured "fictitious options transactions" in order to make such payments – much less that he directed BLMIS to do so.*** (*Compare* PAC ¶ 4, *with id.* ¶¶ 133-46) (alleging Mendelow reminded DiPascali of his expected referral fees, but providing no facts suggesting he knew this was achieved via fake trades).)

To the contrary, the PAC makes clear that BLMIS manufactured these "fictitious transactions" *independently and covertly* – using internal "handwritten schedules" to track and create the gains needed to ensure expected returns and side payments for "dozens of different customers." (PAC ¶¶ 116-20.) The PAC never alleges that Mendelow knew of these schedules or of any fictitious trades; and certainly never alleges that he "directed" any such activities. (*Id.*)

4.  Allegations that the Fraud Was Apparent on BLMIS Account Statements

Finally, this Court has already held that Mendelow's receipt of account statements and other documents from BLMIS does not raise an inference that he ever recognized any indicia of fraud therein – much less that he translated such recognition into "actual knowledge" that BLMIS was a massive Ponzi scheme that involved no actual securities transactions.

Specifically, although the PAC alleges Mendelow received statements and "monitored" his accounts, it never alleges that he reviewed any individual transactions, cross-checked them

26

against other available information, or otherwise noticed any suspicious activity.  Rather, the

PAC continues to frame its allegations as (at best) matter of *inquiry notice* or *constructive notice*

– alleging only that "implausible options activity" was "evident" on Mendelow's BLMIS

customer statements, and that an "accountant, sophisticated investor and financial advisor"

would have identified such activity as evidence of some underlying impropriety.  (PAC ¶ 151.)

For example, the PAC alleges that BLMIS's account statements and reports reflected:

(i)    a "difference between the accounts where he received [his referral fees] and
       guaranteed returns, and other accounts that did not receive preferential treatment";[10]

(ii)   "impossibly profitable" transactions that "almost exactly matched the
       predetermined amounts of the [referral fees] to be credited to Mendelow";

(iii)  the fact that BLMIS "always recorded these transactions in the month of
       December"; *and*

(iv)   the fact that accounts that received the referral fees showed higher gains than
       Mendelow's other accounts.

(*Id.* ¶¶ 151-54.)  As a "trained accountant and financial advisor," the PAC alleges, Mendelow

must therefore have known that "actual securities trading was not occurring at BLMIS."  (*Id.*)

Similarly, the Trustee alleges that, "as a sophisticated investor, account and financial

advisor," Mendelow was *on notice* that payment of his referral fees into his IRA account meant

that BLMIS did not engage in any actual securities trades.  (*Id.* ¶¶ 162-64.)  Specifically, the

PAC alleges, Mendelow (i) must have known that allocating the referral fee into these accounts

could defer taxes only if it "was in the form of gains from purported securities transactions in his

accounts"; and (ii) possessed documents showing that, in the "majority" of the years in which

those accounts received such fee, they had insufficient cash to fund the transactions on those

dates.  (*Id.*)  The PAC alleges that Mendelow must therefore have (iii) realized such transactions

---

[10]    As the so-called "Extra P&L" is alleged to have been merely a referral fee, it is unclear what the Trustee
means by the phrase "preferential treatment."  (*Supra* at 6.)

were possible only in an account trading on margin; and (iv) understood that margin trading is

not permitted in IRA accounts.  (*Id.*)  Based on this speculative chain of allegations, the PAC

concludes, Mendelow must have known "that the purported speculative option transactions used

to generate the [referral fee] could not have actually occurred in his IRA account."

  ***Each of these allegations fails on its face*** – as they are all framed, at best, as a matter

of ***inquiry notice***.  That is, despite the PAC's conclusory use of words like "knew" and "aware,"

it does not allege that Mendelow actually saw or recognized any of these alleged anomalies.

(PAC ¶¶ 151-54, 162-64.)  The PAC alleges ***not a single fact*** indicating that Mendelow reviewed

specific transactions or compared them to specific cash balances on those dates – much less that

he recognized any evidenced therein of some possible underlying fraud.  (*Id.*)

  To take one example: the Trustee again offers the Court a chart showing a "consistent

spike in returns every December" in those accounts into which Mendelow's referral fee was

paid.  (*Id.* ¶ 156, Ex. C.)  While the PAC claims this pattern was "evident on the face of the

Defendants' BLMIS account documents," it nowhere alleges that Mendelow ever saw this chart,

engaged in this type of year-to-year comparison, or noticed any implausible activity.  (*Id.*)  (For

that matter, the PAC alleges that *allocation* of the referral fee always occurred near year-end – an

allegation that, on its face, would explain this purportedly implausible pattern.  (*Id.* ¶¶ 134-35.))

  Finally, even if Mendelow *were* alleged to have actually noticed any of these purported

discrepancies, the PAC provides no facts suggesting he somehow translated such recognition

into a suspicion of impropriety – ***much less into "actual knowledge" of Madoff's fraudulent

scheme***.  That is, even drawing all reasonable inferences in the Trustee's favor, nothing in the

PAC suggests that the alleged "implausible options activity" in Mendelow's BLMIS accounts

would (or actually did) lead to the realization that Madoff was running Ponzi scheme of

unprecedented proportions, in which not a single actual securities transaction occurred.

Indeed, this Court's recent decision in *Picard v. Ceretti* clearly illustrates the distinction between *constructive* and *actual knowledge* of fraud. *Ceretti* involved certain feeder funds (the "Kingate Funds") that received transfers aggregating $825 million from BLMIS within six years of the BLMIS filing date. 2015 Bankr. LEXIS 2674, at *1-2. The funds were formed by Frederico Ceretti and Carlo Grosso, who were part of Madoff's inner circle – enjoying social outings with their respective spouses and engaging in hundreds of conversations with Madoff personally in the four years preceding Madoff's arrest. *Id.* at *6-8. Madoff even invited Ceretti and Grosso to visit the 17th floor of BLMIS (off-limits to nearly everyone else), which contained "antiquated computers that were not connected to the BLMIS network and were used by BLMIS employees to execute billions of dollars of trades on a monthly or even daily basis." *Id.*

As in this case, the Trustee's complaint in *Ceretti* included numerous allegations as to certain indicia of fraud that should have been apparent to the Ceretti defendants, including impossibly consistent returns and impossible options trades. *Id.* at *25-31. *But, as this Court was careful to point out, the existence of these red flags (and even defendants' awareness thereof) was not enough to plead "actual knowledge" of BLMIS's fraud so as to defeat the Section 546(e) safe harbor. Id.* at *46-47. Rather, the *Ceretti* complaint set forth specific facts (including documents authored by defendants) establishing that defendants actually *discovered and acknowledged* that Madoff was reporting fake transactions and *actively took steps to prevent any inquiry* into such fraud. *Id.* at *13-22, 41-47. Among other things, the Ceretti defendants

- received specific "warnings of fraudulent activity at BLMIS raised by third parties";

- specifically "reviewed and verified" at least five facially impossible transactions;

- knowingly exempted their BLMIS-invested funds (alone out of 31 holdings) from their rigorous due diligence policies;

- acknowledged to each other the likelihood that BLMIS was a "scam," and their concern that Kingate's auditor would discover as much;

- repeatedly "fabricated stories" to placate the Funds' shareholders regarding concerns raised about BLMIS; *and*

- used threats and "*ad hominem* attacks" to discredit and silence outside analysts who raised concerns over BLMIS;

*Id.*  It was *this* set of allegations that established defendants' "actual knowledge" of the fraud – as distinguished from allegations that they were merely aware of "red flags."  As this Court stated:

> The allegations regarding the *actual knowledge* of the [Ceretti] Defendants stand in sharp contrast to those in *Merkin* where the Court concluded the complaint failed to plead actual knowledge.  The *Merkin* complaint referred to Merkin's speculations that BLMIS might be a Ponzi scheme, and the warnings by . . . a money manager[] that BLMIS'[s] returns were not possible.  In addition, the complaint alleged that Merkin was aware of several of the red flags, including the lack of correlation between the performance of BLMIS and the S&P 500 and the excessive volume of option trading.
>
> *Still, the complaint did not imply that Merkin actually believed that BLMIS was a Ponzi scheme ....* [or] that he conducted an analysis other than maintaining a single folder containing documents and analyses relating to the lack of correlation between BLMIS'[s] performance and the … S&P 500.  *Instead, the complaint painted a picture of someone who saw the red flags and ignored them.  In contrast, the [Ceretti] Defendants actively reviewed the impossible transactions reported by Madoff in the Funds' accounts, deflected any inquiry into Madoff and feared what PwC might uncover.*

*Id.* at *46-47 (emphasis added).

Mendelow, in contrast, is not alleged to have reviewed or recognized any of these "red flags."  The PAC alleges no facts suggesting that he reviewed specific BLMIS transactions, compared BLMIS results against independent pricing data for those days, or otherwise *actually recognized* any impossible trades or badges of fraud.  To the contrary:  as in the Original Complaint, the PAC alleges only that Mendelow checked his total account balances – and asks the Court to infer, on this basis, that Mendelow (i) *must* have noticed discrepancies between BLMIS's reported trades and other data, (ii) *must* have identified the implausible patterns in

BLMIS's trading history, and (iii) *must* have realized that such discrepancies meant that BLMIS

engaged in no actual securities trading.  *In short, the Trustee asks this Court to find – contrary to*

*all applicable case law – that "inquiry notice" may replace "actual knowledge" for purposes of*

*Section 546(e)*.  But this is not the law.  *Ceretti*, 2015 Bankr. LEXIS 2674, at *13-22, 41-47;

*Good Faith Decision*, 516 B.R. at 21-22; *Merkin*, 515 B.R. at 139-40.[11]

The federal government's recent filing in the Paul Konigsberg matter compels a similar

conclusion – underscoring the critical distinction between *the existence of "red flags"* and *actual*

*knowledge.  See* Bharara Letter, at ¶ 2.  Konigsberg is a founder of the accounting firm where

Mendelow worked, and has since pled guilty to conspiracy and falsification of records.  *Id*.  In

July 2015, the government filed a letter to the court in favor of leniency for Konigsberg, stating

unequivocally that he "was unaware of [Madoff's] Ponzi scheme."  *Id*.  The letter stated that

Konigsberg had no subjective awareness of the Ponzi scheme *notwithstanding red flags identical*

*to (and in some instances greater than) those alleged against Mendelow*:

- "glaringly fraudulent transactions";

- "guaranteed specific rates of investment returns";

- "annual commission payments for recruiting other investors to [BLMIS]"; *and*

- "backdated transactions they referred to as 'schtup' trades, in most cases
  purportedly executed in the last month of the year, to generate promised returns."

*Id*.  In fact, Konigsberg was deemed "unaware" of BMLIS's fraud despite his ***actual knowledge***

***of the fraudulently backdated trades*** – knowledge that Mendelow is not alleged to have had.

Christopher Matthews, *Bernard Madoff's Former Accountant Pleads Guilty*, Wall St. J., June 24,

2014.  As the PAC comes nowhere close to alleging Mendelow knew more than Konigsberg, it is

beyond dispute that the heightened "actual knowledge" standard is not met here.

---

[11]    As the allegations against Mendelow are considerably weaker than those against Merkin, the PAC plainly
fails to raise a plausible inference that Mendelow actually knew of Madoff's fraud.

Indeed, this Court has found "actual knowledge" insufficiently pled even on allegations far more specific and direct than these – including where the defendant *repeatedly and openly admitted* that he suspected Madoff was operating a massive Ponzi scheme. *Merkin*, 515 B.R. at 139-40. In *Merkin,* defendant was alleged to have expressly stated that BLMIS appeared to be a fraud, and to have specifically recognized numerous "red flags" suggesting fraud. *Id.* at 129-30, 139-41. Among other things, third-party evidence indicated that Merkin

- *"openly admitted* that Madoff appeared to be operating a Ponzi scheme";

- stated "that Madoff's scheme was bigger than Ponzi, and 'Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme'";

- received warnings that BLMIS's performance was "impossible" and "could be a Ponzi scheme";

- *admitted* that he knew "the options markets lacked the volume necessary to sustain BLMIS' option trading";

- maintained a folder of documents "noting the lack of correlation between the performances of BLMIS' investments and the S&P 500";

- warned others "of the dangers of investing significant amounts for the long term with BLMIS and to '[n]ever go long in a big way'";

- "articulated concerns about fraud to Madoff"; *and*

- *"specifically acknowledged* a list of his concerns with BLMIS," including numerous red flags that BLMIS's purported trades were impossible.

*Id.* (emphasis added). In short, the Trustee's allegations against Merkin (*unlike the allegations against Mendelow*) set forth facts suggesting *actual notice* of numerous indicia of fraud. *Id.*

As specific and substantiated as the Merkin allegations were, however, this Court nonetheless held that they *did "not imply the level of certainty or absence of substantial doubt associated with actual knowledge"* – and thus that the Merkin complaint "fail[ed] to plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme." *Id.* at 141.

The same result follows here. Like the Original Complaint, the PAC fails to set forth

facts suggesting Mendelow actually knew of the Madoff Ponzi scheme.  Rather, the Trustee sets

forth speculation, conclusory statements, and unsupported leaps in logic – none of which raises

an inference that Mendelow had "direct and clear knowledge" of Madoff's fraud.  *See id.* at 139-

41; *Good Faith Decision*, 516 B.R. at 24 (no plausible claim absent "particularized allegations

that [defendants] either knew of [Madoff's fraud] or blinded themselves to it"); *Acito*, 47 F.3d at

52 (claims cannot rest on "speculation and conclusory allegations").

### F.    The Trustee's Case Law Does Not Compel a Different Conclusion

The Trustee continues argue that, as in the *Cohmad Securities* matter, its PAC sets forth

Mendelow's "actual knowledge" of BLMIS's fraud and the fact that "no actual securities

transactions were taking place in Defendants' accounts."  (Mot. at 29-30.)

This is simply incorrect – as the PAC nowhere alleges any such facts.  *See supra* at 15-

29.  It is thus a far cry from the Trustee's allegations against the Cohmad defendants – who were

alleged (i) not only to have been inextricably "intertwined" with BLMIS and its most secret

operations; (ii) *but also to have maintained specific information showing the magnitude of*

*fraud in each client account*.  *Cohmad II*, 2013 U.S. Dist. LEXIS 56042, at *34-38.

To begin with, the *Cohmad II* complaint painted a picture of a company with no

meaningful professional, personal, or financial separation from BLMIS:

- Madoff co-founded Cohmad with his friend "Sonny" Cohn; members of both families
  served as Cohmad's officers and directors; and the two companies and families were
  "closely intertwined both personally and professionally" for over 20 years;[12]

- Cohmad shared BLMIS's office space and computer network;

- Cohmad and BLMIS were "understood to be the same entity" by many investors, and
  Cohmad representatives often presented themselves as BLMIS representatives; *and*

---

[12]    By contrast, as to Mendelow's purported "special access" to BLMIS, the Trustee alleges only that
Mendelow could sometimes refer new investors to Madoff.   (PAC ¶¶ 57-64.)

- Over the course of about 10 years, BLMIS paid nearly $100 million to Cohmad upon request – sometimes for "no reason at all."

*Id.* Further, as in *Ceretti*, Cohmad officers ("unlike most [BLMIS] employees") had regular access to the closely guarded seventeenth floor where BLMIS's fraud took place. *Id.*

Even more damningly, the complaint alleged facts establishing that Cohmad ***actively monitored the degree of fraud reflected in its customer accounts***. Among other things, Cohmad maintained a database showing the *"actual cash value* of each referred account without considering the fictitious profits." *Id.* at \*37-38 (emphasis added). As the complaint alleged:

> "Importantly, in situations where [BLMIS] customer statements showed a positive balance due to fictitious profits, but the account was actually in a negative position . . . , the Cohmad Cash Database showed the negative account balance of the [BLMIS] customer account." [Complaint] ¶ 74.

*Id.* Commissions for Cohmad representatives were calculated using the *true balances* in these accounts, irrespective of fake profits. *Id.* (noting they never objected to this method).

In short, the Trustee's allegations in *Cohmad II* not only paints a picture of a company with complete access to the inner workings of BLMIS, but also set forth specific facts showing defendants' *actual knowledge* that their client accounts contained fictitious profits resulting from a massive fraud. *Id.* The PAC against Mendelow, by contrast, asserts no such facts.

## III. THE TRUSTEE'S MOTION SHOULD SEPARATELY BE DENIED ON GROUNDS OF DELAY AND PREJUDICE.

The Trustee has wholly failed to satisfy its burden of explaining its years-long delay in seeking to amend – as, among other things, it does not even attempt to show that its amendments are predicated on facts not previously available to it. Its motion should therefore be denied.

Denial of leave to amend is appropriate where a party has been given "full notice of the deficiencies in [its complaint]" but has declined prior opportunities to amend. *In re Crude Oil Commodity Litig.*, 2007 U.S. Dist. LEXIS 66208, at \*10-15 (S.D.N.Y. Sept. 7, 2007). "While

delay alone is insufficient, a court may deny leave to amend where 'after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant.'" *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 346 B.R. 73, 76 (Bankr. S.D.N.Y. 2006) (Bernstein, J.) (citation omitted). "The burden to explain a delay is on the party that seeks leave to amend." *MacDraw, Inc. v. CIT Group Equip. Fin.*, 157 F.3d 956, 962 (2d Cir. 1998). An explanation will rarely be deemed "satisfactory" where movant knew of the underlying facts but declined earlier opportunities to include them. *See, e.g.*, *Savage*, 346 B.R. at 76

Indeed, a delay will be deemed "inexcusable" when (as in this case) movant fails to show that its proposed amendments are "***predicated on facts learned after the pleading stage***." *Leber v. Citigroup, Inc.*, 2011 U.S. Dist. LEXIS 129444, at *19 (S.D.N.Y. Nov. 8, 2011). ***Such failure, by itself, "provides an independent basis to deny [a] Rule 15 motion."*** *LSSi Data Corp. v. Time Warner Cable, Inc.*, 2012 U.S. Dist. LEXIS 37914, at *11-12 (S.D.N.Y. Mar. 20, 2012); *Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997); *see Savage*, 346 B.R. at 76-77 (no leave to amend where plaintiff had "known the facts on which she now relies for over two years" and could have amended earlier); *Ruotolo v. City of N.Y.*, 2006 U.S. Dist. LEXIS 57346, at *7-9 (S.D.N.Y. Aug. 15, 2006) (denying leave five years after start of action, as facts were "available to [movant] from the beginning"), *aff'd*, 514 F.3d 184 (2d Cir. 2008); *Starter Corp. v. Converse, Inc.*, 1996 U.S. Dist. LEXIS 17502, at *5-8 (S.D.N.Y. Nov. 25, 1996) (denying leave; noting that cases granting leave after delays of "two or three years" involved discovery of "*previously unknown*" facts).

## A.   The Trustee's Undue Delay in Seeking to Amend Its Complaint

Here, there can be no dispute that the delay is substantial, as this action was filed in 2010 and the Trustee has known since at least 2011 of key deficiencies in its pleading. *See  Katz*, 462 B.R. at 452, 455.  In other words, there is no dispute that the Trustee knew, no later than 2011, that the bulk of its claims in this action would fail ***as a matter of law*** unless it alleged that

35

Mendelow "actually knew" of Madoff's fraud. But the Trustee nonetheless declined to amend

its pleading against Mendelow to address these issues. Indeed, in January 2015 – well after the

Second Circuit decision in *Ida Fishman* – the Trustee stated that it "[did] not contemplate any

amendments to the pleadings." (Dkt. No. 69 (Proposed Case Management Plan), at 2.)

### B.    Lack of Satisfactory Explanation and False Accusations of Gamesmanship

Although it is the Trustee's burden to show its delay to be excusable, the Trustee

identifies no relevant proposed amendment that is based on information unavailable to it when

Katz was decided – or, for that matter, when it filed its Original Complaint. (*Supra* at 34-35.)

Nor is this surprising – as, by all appearances, the so-called additions to the pleading consist of

facts that were "available to [the Trustee] from the beginning of the litigation," *Ruotolo*, 2006

U.S. Dist. LEXIS 57346, at *7-9; or (at minimum) facts that it has known for years.

***As the Trustee has failed to prove the prior unavailability of these facts (and cannot***

***attempt to do so on reply)[13] – leave to amend should be denied on this basis alone.*** *See, e.g.*,

*Leber,* 2011 U.S. Dist. LEXIS 129444, at *18-19 (delay inexcusable absent proof that

amendments are based on new facts); *LSSi Data,* 2012 U.S. Dist. LEXIS 37914, at *11-12

(same); *Savage*, 346 B.R. at 76 (denying leave where plaintiff knew relevant facts "for over two

years" before seeking to amend); *Ruotolo*, 2006 U.S. Dist. LEXIS 57346, at *7-9 (denying leave

after five-year delay, where facts were available to plaintiff at start of action).

The Trustee, however, insists it is *Defendants* who are to blame. Specifically, while the

Trustee concedes that it has long known that Section 546(e) barred most of its clawback claims,

---

[13]    Where the moving party fails to meet its burden of proof in its opening papers, it may not submit new
materials on reply in hopes of remedying such failure. *See, e.g.*, *MPD Access., B.V. v Urban Outfitters, Inc.*, 2013
US Dist LEXIS 153035, at *17 (S.D.N.Y. Oct. 23, 2013) (court declining to consider parts of reply declarations
"attempt[ing] to correct evidentiary deficiencies in their initial submissions"); *Aurora Loan Servs. v. Posner, Posner
& Assocs., P.C.*, 513 F. Supp. 2d 18, 20 (S.D.N.Y. 2007) (striking portions of plaintiff's reply evidence that added
new material; and rejecting argument that such materials were "in response" to defendants' opposition papers, which
had simply "pointed out that [plaintiff] had not met its burden" on motion).

it insists that the burden was on *Defendants* to remind it to take action.  "At any point prior to

answering," the Trustee insists, "Defendants could have filed a Rule 12(b)(6) motion to dismiss

on section 546(e) grounds." (Mot. at 17-18.)  By failing to do so, the Trustee complains,

Defendants "effectively caused the Trustee to forego his right to amend the Complaint."  (*Id.*)

This is, respectfully, both absurd and deliberately misleading.  *First*, it is not Defendants'

burden to move to dismiss or otherwise to notify the Trustee of the need to act. It is the Trustee's

burden to plead its case, and to amend without undue or prejudicial delay.  *Second*, it was ***the***

***Trustee*** who (i) intended to add "actual knowledge" allegations to its complaint, and (ii) claimed

to possess new facts supporting such allegations.  Defendants did not know of either of these

facts until August 2015, when it received the Trustee's opposition to their Rule 12(c) motion.

(Declaration of Alex Reisen, dated Feb. 1, 2016 ("Reisen") ¶ 17.)  *Third*, while the Trustee

complains that Defendants filed their Answers with "full awareness" of decisions such as *Katz*

and *Merkin*, clearly the Trustee – ***as the Plaintiff in those cases*** – was also aware of those

decisions and their implications for its other clawback actions.  (Mot. at 17.)  Indeed, through

these cases, the Trustee had "full notice of the deficiencies in [its pleading against Mendelow]"–

but failed to amend accordingly.  *In re Crude Oil*, 2007 U.S. Dist. LEXIS 66208, at *13-14.

Leave to amend should therefore be denied.  *See id.* at 10-15.

Finally, the Trustee deliberately misstates the facts in accusing Defendants of

"gamesmanship" – claiming Defendants strategically filed an Answer (rather than a Rule

12(b)(6) motion to dismiss) so as to bar Trustee from amending as of right.  (Mot. at 17-18.)

***This is false – as it was the Trustee's counsel who called for Defendants to file their responsive***

***pleading rather than wait for resolution of the Katz appeal.***  (Reisen ¶¶ 5-6.)  Accordingly,

Defendants filed their Answer on November 14, 2014; and *Katz* was affirmed on December 8,

2014.  *Ida Fishman*, 773 F.3d 411.  Believing that this ruling obviated much of the Trustee's

case, Defendants engaged in settlement discussions with the Trustee.  (Reisen ¶¶ 13, 16.)  Only

*after* such discussions failed did Defendants move for judgment on the pleadings.  (*Id.*)

### C.    Prejudice to Defendants from the Trustee's Delay

As this Court has stated, "[t]he longer the period of unexplained delay, the less will be

required of the non-moving party to show prejudice."  *Savage*, 346 B.R. at 76; *State Farm Ins.*

*Cos. v. Kop-Coat, Inc.,* 183 F. App'x 36, 38 (2d Cir. 2006).  Here, the Trustee has offered no

satisfactory explanation for its years-long delay in seeking to amend – and, accordingly, the

prejudice that Defendants must show should be correspondingly reduced.

In light of the PAC's heavy reliance on information and innuendo procured from the

recently deceased Frank DiPascali,[14] Mendelow would plainly suffer prejudice should the

proposed amendments be permitted.  While none of these new allegations speak to Mendelow's

knowledge (or, more accurately, lack of knowledge) of Madoff's fraud, the Trustee nonetheless

attempts to cast DiPascali's purported recollections as proof positive of Mendelow's complicity.

In particular, the Trustee repeatedly alleges that, each December, Mendelow would call

DiPascali and "say something to the effect of, 'on that thing you do, I want 115 for me, 115 for

my wife.'"  (PAC ¶¶ 7, 134.)  The Trustee insists that this language (***which is, again, not alleged***

***to be an actual quotation of anything***) must be understood to evidence Mendelow's knowledge

that BLMIS consisted of fake options transactions.  (*Id.*; *see* Mot. at 11, 32.)

Of course, the PAC supplies no facts to support this tenuous conclusion.  To the contrary,

it affirmatively alleges that, by this language, Mendelow sought "to tell DiPascali how he wanted

---

[14]    It bears mention that DiPascali was highly motivated to implicate as many people as possible.  (*See infra* at
39.)  Certainly, if he had *any basis* to claim that Mendelow knew of Madoff's fraud, it would have been in his
interest to do so.  The fact that he did not (and that the worst the Trustee can come up with is "something to the
effect of 'that thing you do'") speaks volumes as to the inferences that may reasonably be drawn from the PAC.

his [referral fees] to be divided among his accounts."  (PAC ¶ 134.)  Thus, the Trustee's own

allegations supply a more obvious interpretation of this language:  that it refers to "*that thing you*

*do where you pay me a referral fee for those reinvestments by former Telfran investors*."

If Mendelow could question DiPascali, he would confirm as much.[15]  But DiPascali died

in May 2015 – years after he agreed to cooperate with the government and the Trustee learned of

the need to plead "actual knowledge."  If Mendelow had earlier known of the Trustee's proposed

amendments, he could have questioned DiPascali – to ask what he understood "that thing you

do" to mean, and whether he had any reason to believe Mendelow knew of BLMIS's fraud.  But

as the Trustee waited until *after* DiPascali's death to offer its amendments, Mendelow will have

no such opportunity.  Rather, the factfinder will be presented with third-hand information from

DiPascali – complete with the Trustee's baseless and inflammatory interpretations thereof.[16]

For this reason too, the Trustee's undue delay has directly prejudiced Mendelow.  *See*

*Triangle Indus., Inc. v. Kennecott Copper Corp.*, 1981 US Dist LEXIS 16160, at \*5-8 (S.D.N.Y.

Nov. 25, 1981) (citing prejudice where evidence necessary to defend against plaintiff's new

allegations was "*no longer available*," and amendments were based on evidence available to

plaintiffs three years before motion).  The motion should be denied for this reason as well.  *See*

*id.*; *DiPirro v. United States*, 181 F.R.D. 221, 224 (W.D.N.Y. 1998) (prejudice where defendant

sought to add defense based on evidence *no longer available to plaintiff*); *Fahs Constr. Group.,*

*Inc. v. Gray*, 2012 U.S. Dist. LEXIS 96519, at \*22-23 (N.D.N.Y. July 12, 2012 (no leave where

---

[15]    DiPascali testified to his success in hiding the fraud from investors, regulators, and even BLMIS staff.  Erik Larson, *Frank DiPascali, Madoff Deputy Who Aided U.S., Dies at 58*, Bloomberg News, May 10, 2015.

[16]    It is – respectfully – nonsense for the Trustee to claim that it, too, suffers prejudice from DiPascali's death because Mendelow "invoked the Fifth Amendment when questioned on whether he spoke with Frank DiPascali." (Mot. at 20 n.6.)  Among many other absurdities in this argument, (i) it was the Trustee who created this situation by waiting more than 5 years to raise claims of actual knowledge (and then waiting until after DiPascali died to seek leave to amend); and (ii) to the extent that applicable statutes of limitation have run, the Trustee can now compel Mendelow to testify as to any communications with DiPascali, irrespective of the Fifth Amendment.

– as in this case – plaintiff could have amended earlier, defendants had expended resources moving to dismiss and would be unduly prejudiced, and eight years had passed since some of the events), *aff'd*, 725 F.3d 289 (2d Cir. 2013).

### D.    The Trustee's Arguments as to Discovery

Finally, it is simply misleading for the Trustee to claim that Defendants will suffer no prejudice from amendment because "[e]ssentially no discovery has been exchanged." (Mot. at 6, 21-24.) The Trustee has, for years, been in possession of many thousands of pages of material relating to Mendelow, including Defendants' productions to the Department of Justice and SEC. (Mot. at 23 n.7.) The Trustee also has the benefit of its own intensive investigation into BLMIS, and investigations by other government agencies. Further, if the Trustee's current assertions are to be believed, it has intended *for years* to assert "actual knowledge" allegations against Mendelow[17] – and has, presumably, pursued its investigation with this standard in mind.

Mendelow, by contrast, now finds himself in the position of having to defend against claims that he *actually knew of (and perhaps even "directed")* the fraud at BLMIS, after years of dealing with a complaint that expressly alleged only *inquiry notice*. Certainly, if Defendants' counsel had known of the Trustee's purported intentions (and of its heavy reliance on statements made by DiPascali), Mendelow would have chosen to seek interviews.

### CONCLUSION

For all the reasons set forth above, Defendants respectfully request that the Trustee's motion to amend its complaint be denied in its entirety.

---

[17]    *See, e.g.*, Mot. at 4, 24 n.9 (insisting that the Original Complaint alternatively alleges actual knowledge).

40

Dated:  New York, New York
        February 1, 2016

                                        ARKIN SOLBAKKEN LLP

                                        By: /s/ *Stanley S. Arkin*
                                        Stanley S. Arkin (SA-1373)
                                        Lisa C. Solbakken (LS-8910)
                                        Alex Reisen (AR-5432)
                                        Arkin Solbakken LLP
                                        750 Lexington Avenue – 25th Floor
                                        New York, New York 10022
                                        (212) 333-0200
                                        *Attorneys for Defendants*