# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>            Plaintiff-Applicant, <br><br>      v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>            Defendant. | No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>            Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>            Plaintiff, <br><br>      v. <br><br> FEDERICO CERETTI, et al., <br><br>            Defendants. | Adv. Pro. No. 09-1161 (SMB) |

**TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT KINGATE GLOBAL FUND, LTD.**

**PLEASE TAKE NOTICE** that in accordance with Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this adversary proceeding under the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the applicable local rules of the United States District Court for the Southern District of New York and this Court (the "Local Rules"), Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff, hereby demands that defendant Kingate Global Fund, Ltd., through the joint liquidators acting on its behalf, produce Documents responsive to the requests set forth herein and deliver the same to the office of Baker & Hostetler LLP, c/o Anthony M. Gruppuso, Esq., 45 Rockefeller Plaza, New York, New York 10111, within thirty (30) days of service.

## DEFINITIONS

1.       The rules of construction and definitions set forth in Local Rule 26.3, as adopted by Rule 7026-1 of the Bankruptcy Rules, are incorporated in their entirety.

2.       "Action" means the civil action captioned *Picard v. Ceretti, et al.,* Adv. Pro. No. 09-01161, pending in the United States Bankruptcy Court for the Southern District of New York.

3.       "Alpine Trustees" means Alpine Trustees Limited and anyone acting on behalf of or at the direction of Alpine Trustees Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

4.       "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope, as defined in Local Rule 26.3.

5.       "Applicable Period" means the period beginning January 1, 1993 through December 31, 2009.

6.       "Ashby Holdings" means Ashby Holdings Services Limited and anyone acting on behalf of or at the direction of Ashby Holdings Services Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

2

7.     "Ashby Investment" means Ashby Investment Services Limited and anyone acting on behalf of or at the direction of Ashby Investment Services Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

8.     "Bank Bermuda" means HSBC Bank Bermuda Limited and anyone acting on behalf of or at the direction of HSBC Bank Bermuda Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

9.     "Bermuda Action" means that civil action commenced by Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. against Kingate Management Limited and others in the Supreme Court of Bermuda, Civil Jurisdiction, Commercial List, bearing the caption *Kingate Global Fund Limited (in liquidation), et al. v. Kingate Management Limited, et al*., No. 2010:454.

10.     "BLMIS" means Bernard L. Madoff Investment Securities LLC and anyone acting on behalf of or at the direction of Bernard L. Madoff Investment Securities LLC, including, but not limited to, current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers of the above specifically identified Persons, and any and all related entities, including without limitation:  Abel Automatics, Inc.; Abel Holdings, LLC; Abtech Industries Inc.; BLM Air Charter LLC; Blumenfeld Development Group; BREA Associates LLC; Cohmad, Cohn, Delaire & Madoff, Inc.; Delta Fund I, L.P.; Madoff Brokerage & Trading Technologies LLC; Madoff Energy Holdings LLC; Madoff Energy III LLC; Madoff Energy IV LLC; Madoff Energy LLC; Madoff Family LLC (a/k/a Madoff Family Fund LLC); Madoff Realty LLC/Madoff Realty Associates/Madoff Realty Trust; Madoff Securities International Ltd.; Madoff Securities International LLC; Madoff Technologies LLC; Primex Holdings LLC; Realty Associates Madoff II; The Madoff Family Foundation (f/k/a Bernard L. and Ruth Madoff Foundation); Yacht Bull Corp (registered by Campbell Corporate Services LTD); Bernard Madoff; Ruth Madoff; Andrew Madoff; Deborah Madoff; Jennifer Madoff; Stephanie Madoff; Mark Madoff; Peter Madoff; Marion Madoff; Ruth Madoff; Shana Madoff; Sondra Madoff-Weiner; Roger Madoff; Marvin Wiener; Charles Wiener; Annette Bongiorno; Jo Ann "Jodi" Crupi; Eric Lipkin; Irwin Lipkin; Frank DiPascali; Erin Reardon; David Kugel; Belle Jones; and Darlene Concepcion.

11.     "BLMIS Employee" means any Person employed by BLMIS, including but not limited to the following Persons:  Semone Anderson; Annette Bongiorno; Daniel Bonventre; John Bonventre; Elizabeth Buchmueller; Robert Cardile; Darlene Concepcion; Enrica Cotellessa-Pitz; Joann Crupi; Frank DiPascali; Jeffrey Ferraro; Marc Ferraro; Enrique Flores; Diana Guzman; Scott Hendell; Winifer Jackson; Dorothy Khan; David Kugel; Eric Lipkin; Bernard L. Madoff; Ruth Madoff; Andrew Madoff; Mark Madoff; Peter Madoff; Shana Madoff; Dumarsais Magnus; Alethea Mui; William Nasi; Jerome O'Hara; Magdalena Ortiz; Rafael Pagan; Daniel Pennachio; George Perez; Sharda Persaud; Erin Reardon; Lee Sibley; Richard Sobel; Brett Sondike; Eleanor Squillari; Anthony Tiletnick; Robert Weber; Sean-Louis Wharton; Charlene White; Walter Tiletnick; or Charles Wiener.

12.     "Board of Directors" means the Board of Directors or individual Directors of KGF (as defined herein).

13.     "BVI Proceedings" means those proceedings commenced in The Eastern Caribbean Supreme Court, In The High Court of Justice, British Virgin Islands, captioned *First Peninsula Trustees Limited (as Trustee of the Ashby Trust) v. Irving H. Picard, et al*., BVIHCV 2011/0154 and *Port of Hercules Trustees Limited (as Trustee of the El Prela Trust) v. Irving H. Picard, et al.*, BVIHCV 2011/0155.

14.     "Ceretti" means Federico Ceretti.

15.     "CITCO" means Citco Fund Services (Europe) B.V. and anyone acting on behalf of or at the direction of Citco Fund Services (Europe) B.V., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

16.     "Citi Hedge" means Citi Hedge Fund Services Limited and anyone acting on behalf of or at the direction of Citi Hedge Fund Services Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

17.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), as defined in Local Rule 26.3.

18.     "Company" means any sole proprietorship, corporation, association, joint venture, firm, partnership, limited liability company, limited liability partnership, limited partnership, and business or legal entity in whatever form and wherever formed or located.

19.     "Complaint" means the Fourth Amended Complaint filed by the Trustee in the Action on March 17, 2014.

20.     "Concerning" means relating to, referring to, describing, evidencing, or constituting, as defined in Local Rule 26.3.

21.     "Defendants" means all of the following:  KGF, KEF, KML, FIM Limited, FIM Advisers, Ceretti, Grosso, El Prela Trust, El Prela Holding, El Prela Investments, Alpine Trustees, Port of Hercules, Ashby Trust, Ashby Holdings, Ashby Investment, First Peninsula, or Citi Hedge, as each is defined in these Definitions.

22.     "DiPascali" means Frank DiPascali.

23.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "Documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A), as defined in Local Rule 26.3.  A draft or non-identical copy is a separate Document within the meaning of this term.  For purposes of these Requests, the meaning and scope of Document captures the meaning and scope of Communication.  Accordingly, a Request that demands the production of "all Documents" by definition demands the production of "all Communications" responsive to the Request.  That a Request may specifically seek "all Communications" does not in any way limit or alter the definitions given to Document and Communication, respectively.

24.     "El Prela Holding" means El Prela Group Holding Services and anyone acting on behalf of or at the direction of El Prela Group Holding Services, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

4

25.    "El Prela Investments" means El Prela Trading Investments Limited and anyone acting on behalf of or at the direction of El Prela Trading Investments Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

26.    "Feeder Funds" means all Companies, and all current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers of such Companies, through which investments were made, directly or indirectly, with BLMIS, including, but not limited to, Aurelia Asset Management Partners, Aurelia Fund Management Ltd., Fairfield Sentry Ltd., Fairfield Sigma Limited., Herald Fund SPC, Hermes Asset Management Ltd., Lagoon Investment Ltd., Rafael Partners, Inc., Rye Select Broad Market Fund, LP, Rye Select Broad Market Insurance Fund, L.P., Rye Select Broad Market Insurance Portfolio LDC, Rye Select Broad Market Portfolio Ltd., Rye Select Broad Market Prime Fund, L.P., Rye Select Broad Market XL Fund, LP, Rye Select Broad Market XL Portfolio Ltd., Rye Select Equities Fund, Thema Asset Management Ltd., Thema Fund Ltd., Thema International Fund plc, and Thema Wise Investments Ltd.

27.    "FIM" means FIM Limited, FIM Advisers, and FIM (USA).

28.    "FIM Advisers" means FIM Advisers LLP and anyone acting on behalf of or at the direction of FIM Advisers LLP, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

29.    "FIM Limited" means FIM Limited and anyone acting on behalf of or at the direction of FIM Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

30.    "FIM (USA) means FIM (USA), Inc. and anyone acting on behalf of or at the direction of FIM (USA), Inc., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

31.    "First Peninsula" means First Peninsula Trustees Limited and anyone acting on behalf of or at the direction of First Peninsula Trustees Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

32.    "Grosso" means Carlo Grosso.

33.    "Identify," when referring to a Document, means to give, to the extent known, the (i) type of Document, (ii) general subject matter, (iii) date of the Document, and (iv) author(s), addressee(s) and recipient(s), as defined in Local Rule 26.3. In the alternative, KGF may produce the Document, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

34.    "Identify," when referring to a Person, means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural Person, additionally, the present or last known place of employment, as defined in Local Rule 26.3. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

5

35.    "Initial Transfer" means any and all Transfers (as defined herein) made by BLMIS or any Person acting on behalf of BLMIS to KGF or to any Person acting on KGF's behalf.

36.    "KEF" means Kingate Euro Fund, Ltd. and anyone acting on behalf of or at the direction of Kingate Euro Fund, Ltd., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and the court-appointed liquidators representing KEF's estate in liquidation proceedings commenced in the British Virgin Islands and Bermuda.

37.    "KGF," "You," and "Your" mean Kingate Global Fund, Ltd. and anyone acting on behalf of or at the direction of Kingate Global Fund, Ltd., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and the court-appointed liquidators representing KGF's estate in liquidation proceedings commenced in the British Virgin Islands and Bermuda and the liquidators' agents and representatives.

38.    "KGF Account" means that certain account with BLMIS designated 1FN061.

39.    "KEF Account" means that certain account with BLMIS designated 1FN086.

40.    "KML" means Kingate Management Limited and anyone acting on behalf of or at the direction of Kingate Management Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and the court-appointed receiver(s) representing KML's estate in receivership proceedings commenced in Bermuda and the receiver's agents and representatives.

41.    "Loan(s)" means loans, broker loans, letters of credit, lines of credit, broker lines, or other credit facilities.

42.    "Madoff" means Bernard L. Madoff.

43.    "Manzke" means Sandra Manzke.

44.    "Net Asset Value" or "NAV" means gross assets less gross liabilities attributable to a class or series of shares of any of KGF or KEF as of a particular date of determination.

45.    "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association, as defined in Local Rule 26.3.

46.    "Port of Hercules" means Port of Hercules Trustees Limited and anyone acting on behalf of or at the direction of Port of Hercules Trustees Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

47.    "Regulators" means, and "Regulatory" refers to, all external oversight entities, whether governmental, law enforcement, quasi-governmental, or private, in any jurisdiction in which KGF operated with any power or ability to regulate, censure, fine, or penalize.  This includes, but is not limited to, the United States Securities & Exchange Commission, Office of the Comptroller of the Currency, Financial Industry Regulatory Authority and its predecessor the National Association of Securities Dealers, and the United Kingdom's Financial Services Authority, Financial Conduct Authority, and Serious Fraud Office.

6

48.    "Risk Management" means your policies, procedures, or efforts to provide controls and management of the risks inherent to KGF's business activities.

49.    "Transfer" shall conform to the meaning set forth under the Bankruptcy Code, 11 U.S.C. § 101(54):  (a) the creation of a lien; (b) the retention of title as a security interest; (c) the foreclosure of a debtor's equity redemption; or (d) each mode, direct and indirect, absolute or conditional, voluntary or involuntary, of disposing of or departing with—(i) property; or (ii) an interest in property.  For purposes of these Requests, the term "Transfer(s)" shall only apply to amounts in excess of $10,000.

50.    "Tremont" means Tremont (Bermuda) Limited and anyone acting on behalf of or at the direction of Tremont (Bermuda) Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and directly or indirectly related entities.

51.    Reference to any Person that is not a natural Person and is not otherwise defined herein refers to and includes any parent, subsidiary, affiliate, division, branch, representative office, predecessor, successor, principal, member, director, officer, shareholder, manager, employee, attorney-in-fact, attorney, nominee, agent, or representative of such Person.

52.    The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

Federal Rules 26 through 37, made applicable to this proceeding by the Bankruptcy Rules, are incorporated by reference and apply to each of the following instructions:

1.    Unless otherwise specified, each of these Requests seeks Documents created, modified, or existing during the Applicable Period.

2.    All Documents shall be identified by the request(s) to which they are primarily responsive and produced as they are maintained in the usual course of business.

3.    Produce all Documents and all other materials described below in KGF's actual or constructive possession, custody, or control, including in the possession, custody, or control of a current or former employee or third-party service provider, wherever those Documents and materials are maintained, including on personal computers, PDAs, wireless devices, or web-based email systems (such as Gmail, Yahoo, etc.).

4.    Produce all Documents in KGF's custody or control, whether maintained in electronic or paper form and whether located on hardware owned and maintained by KGF or hardware owned and/or maintained by a third party that stores data on KGF's behalf.  KGF must produce all such Documents even if they were deleted or in draft form.  Without limitation, hardware where such data may be stored includes:  servers; desktop, laptop, or tablet computers; cell and smart phones; PDA devices; scanners, fax machines, and copying machines; and mobile storage devices, such as thumb or external hard drives.  Electronically stored Documents include any computerized data or content stored on electromagnetic media.  Without limitation, types of electronically stored Documents include email, voicemail, and instant messages, intranet and internet system data, telephone and cellular telephone calling records, data compilations, spreadsheets, word processing Documents, images, databases, digital photocopier memory, and any other information stored in memory storage devices.

5.    Produce the original or duplicate, as such terms are defined by Rule 1001 of the Federal Rules of Evidence, of each Document requested together with all non-identical copies and drafts of that Document.  If a duplicate is produced, it should be legible and bound or stapled in the same manner as the original.

6.    Documents not otherwise responsive to these Requests should be produced: (i) if such Documents mention, discuss, refer to, explain, or concern one or more Documents that are called for by these Requests; (ii) if such Documents are attached to, enclosed with, or accompany Documents called for by these Requests; or (iii) if such Documents constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar materials.

7.    Documents attached to each other should not be separated; separate Documents should not be attached to each other.

8.    Documents should include all exhibits, appendices, linked Documents, or otherwise appended Documents that are referenced in, attached to, included with, or are a part of the requested Documents.

9.    If a request calls for information concerning a Transfer, Initial Transfer, redemption, or withdrawal from an account, such request includes, but is not limited to, Documents that reflect the account name and number for the account the funds were transferred from and to, method of transfer (*i.e.*, wire, check, etc.), date of, amount and the reason for the Transfer, Initial Transfer, redemption, or withdrawal.

10.    If any Document, or any part thereof, is not produced based on a claim of attorney-client privilege, work-product protection, or any other privilege or immunity from disclosure, then in answer to such request or part thereof, for each such Document:

      a.    Identify the type, title, and subject matter of the Document;

      b.    State the place, date, and manner of preparation of the Document;

      c.    Identify all authors, addressees, and recipients of the Document, including information about such Persons to assess the privilege asserted; and

      d.    Identify the privilege(s) asserted and the factual basis for same.

11.    Documents should not contain redactions unless such redactions are made to protect information subject to the attorney-client privilege and/or work-product protection.  If Documents are produced with redactions, a log setting forth the information requested in Instruction #10 above must be provided.

12.    If a Document sought herein was at one time, but is no longer, in KGF's actual or constructive possession, custody, or control, state whether it: (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred to others; and/or (iv) has been otherwise disposed of.  In each instance, Identify the Document, state the time period during which it was maintained, state the circumstance surrounding authorization for such disposition thereof and the date thereof, Identify each Person having knowledge of the circumstances of the disposition thereof, and Identify each Person who had possession, custody, or control of the Document, to whom it was available or who had knowledge of the Document and/or the contents thereof.

13.    The Bankruptcy Court entered Orders on September 17, 2013:  (I) Establishing Procedures for Third-Party Data Rooms; and (II) Modifying the June 6, 2011 Litigation

Protective Order.  Pursuant to those Orders, upon production, Producing Parties shall provide the following information in a production cover letter, to the extent any of the following information is applicable:  (i) the Documents (listed in an Excel file Document-by-Document by Beginning Bates and Ending Bates for each Document) that are designated as confidential pursuant to the Litigation Protective Order; (ii) the Documents (listed in an Excel file Document-by-Document by Beginning Bates and Ending Bates for each Document) that are designated confidential pursuant to an Individual Confidentiality Standard, if applicable, pursuant to Paragraph 10 of the Order Establishing Procedures for Third-Party Data Rooms and Paragraph I of the Order Modifying the June 6, 2001 Litigation Protective Order; (iii) the Documents (listed in an Excel file Document-by-Document by Beginning Bates and Ending Bates for each Document) that should be excluded from the Third-Party Data Rooms pursuant to Paragraph 4 of the Order Establishing Procedures for Third-Party Data Rooms and Paragraph C of the Order Modifying the June 6, 2001 Litigation Protective Order; and (iv) the designated representative authorized for that production to provide consent to the disclosure of confidential Documents requested or to object to the disclosure of confidential Documents.[1]  Failure to provide such information in a production cover letter shall result in a waiver by the Producing Parties of:  (i) any confidential designations; (ii) any objections to inclusion of the Documents in the Third-Party Data Rooms; and/or (iii) notification that Documents have been requested for disclosure.  For the avoidance of doubt, notwithstanding Paragraph 13 of the Order Establishing Procedures for Third-Party Data Rooms and Paragraph L of the Order Modifying the June 6, 2011 Litigation Protective Order, Paragraphs 7 and 14 of the Litigation Protective Order will still apply with respect to:  (i) inadvertent failure to designate confidential material as confidential or incorrect designations of confidential material (Paragraph 7 of the Litigation Protective Order); and (ii) inadvertent production or disclosure of any Document or other material otherwise protected by the attorney-client privilege, work-product protection or a joint defense/common interest privilege (Paragraph 14 of the Litigation Protective Order).

## MANNER OF PRODUCTION

     1.    All Documents produced to the Trustee shall be provided in either native file ("native") or single-page 300 dpi-resolution group IV TIF format ("tiff") format as specified below, along with appropriately formatted industry-standard database load files, and accompanied by true and correct copies or representations of unaltered attendant metadata. Where Documents are produced in tiff format, each Document shall be produced along with a multi-page, Document-level searchable text file ("searchable text") as rendered by an industry-standard text extraction program in the case of electronic originals, or by an industry-standard Optical Character Recognition ("ocr") program in the case of scanned paper Documents. Searchable text of Documents shall not be produced as fielded data within the ".dat file" as described below.

     2.    Database load files and production media structure:  Database load files shall consist of: (i) a comma-delimited values (".dat") file containing: production Document identifier information, data designed to preserve "parent and child" relationships within Document "families," reasonably accessible and properly preserved metadata (or bibliographic coding in the case of paper Documents), custodian or Document source information; and (ii) an Opticon

---

[1] Electronic productions containing Documents designated as confidential shall also be accompanied by a database load file containing a field identifying if a Document has been designated confidential.

("opt") file to facilitate the loading of tiff images. Load files should be provided in a root-level folder named "Data," images shall be provided within a root level "Images" folder containing reasonably structured subfolders, and searchable text files shall be provided in a single root-level "Text" folder. If any of the Documents produced in response to these requests are designated as confidential pursuant to the Litigation Protective Order, in addition to marking the Documents with the brand "CONFIDENTIAL" or branding the media with the word "CONFIDENTIAL," also include a confidential field within the load file, with a "yes" or "no" indicating whether the Document has been designated as confidential, as well as native file loading/linking information (where applicable).

3.    <u>Electronic Documents and data, generally</u>:  Documents and other responsive data or materials created, stored, or displayed on electronic or electro-magnetic media shall be produced in the order in which the Documents are or were stored in the ordinary course of business, including all reasonably accessible metadata, custodian or Document source information, and searchable text as to allow the Trustee, through a reasonable and modest effort, to fairly, accurately, and completely access, search, display, comprehend, and assess the Document's true and original content.

4.    <u>Emails and attachments, and other email account-related Documents</u>:  All Documents and accompanying metadata created and/or stored in the ordinary course of business within commercial, off-the-shelf email systems including but not limited to Microsoft Exchange™, Lotus Notes™, or Novell Groupwise™ shall be produced in tiff format, accompanying metadata, and searchable text files or, alternately, in a format that fairly, accurately, and completely represents each Document in such a manner as to make the Document(s) reasonably useable, manageable, and comprehendible by the Trustee.

5.    <u>Documents and data created or stored in or by structured electronic databases</u>: With the exclusion of email and email account-related Documents and data, all Documents and accompanying metadata created and/or stored in structured electronic databases or files shall be produced in a format that enables the Trustee to reasonably manage and import those Documents into a useable, coherent database. Documents must be accompanied with reasonably detailed documentation explaining each Document's content and format, including but not limited to data dictionaries and diagrams. Some acceptable formats, if and only if provided with definitive file(s), table(s), and field level schemas include:

    a.    XML format file(s);

    b.    Microsoft SQL database(s);

    c.    Access database(s); and/or

    d.    fixed or variable length ASCII delimited files.

6.    <u>Spreadsheets, multimedia, and non-standard file types</u>:  All Documents generated or stored in software such as Microsoft Excel or other commercially available spreadsheet programs, as well as any multimedia files such as audio or video, shall be produced in their native format, along with an accompanying placeholder image in tiff format indicating a native file has been produced. A "Nativelink" entry shall be included in the .dat load file indicating the relative file path to each native file on the production media. To the extent the party has other file types that do not readily or easily and accurately convert to tiff and searchable text, the party may elect to produce those files in native format subject to the other requirements listed herein.

Native files may be produced within a separate root-level folder structure on deliverable media entitled "Natives."

7.      "Other" electronic Documents:  All other Documents and accompanying metadata and embedded data created or stored in unstructured files generated by commercially available software systems (excluding emails, structured electronic databases, spreadsheets, or multimedia) such as, but not limited to, word processing files (such as Microsoft Word), image files (such as Adobe .pdf files and other formats), and text files shall be produced in tiff and searchable text format in the order the files are or were stored in the ordinary course of business.

8.      Paper Documents:  Documents originally created or stored on paper shall be produced in tiff format.  Relationships between Documents shall be identified within the Relativity .dat file utilizing Document identifier numbers to express parent Document/child attachment boundaries, folder boundaries, and other groupings.  In addition, the searchable text of each Document shall be provided as a multi-page text file as provided for by these requests.

## REQUESTS FOR PRODUCTION

1.      All Documents relevant to any claim or defense asserted in the Action.

## I.    FORMATION AND STRUCTURE

2.      All Documents concerning the formation of KGF, including but not limited to articles of incorporation, memoranda of association, articles of association, by-laws, limited or general partnership agreements, limited liability company agreements, trust agreements, and organizational charts, and any other Documents reflecting formation and governance of KGF, as originally constituted and as amended or otherwise modified.

3.      All Documents sufficient to identify KGF's principal place(s) of business, business address(es), and the name(s) and address(es) of KGF's registered agent(s).

4.      All Documents sufficient to identify all members of KGF's Board of Directors, by year, including but not limited to Documents reflecting their titles, responsibilities, membership on any subcommittees or working groups, tenures, and any changes thereto.

5.      All Documents concerning the formation, authority, and acts of KGF's Board of Directors, including but not limited to all Documents concerning:  (i) the authority possessed by KGF's Board of Directors; (ii) KGF's Board of Directors' exercise of its authority, including but not limited to any such exercise of authority concerning KGF's investments, KGF's investments with BLMIS, and KGF's selection and engagement of BLMIS and all other service providers; (iii) any and all resolutions, orders, directives, or instructions issued by KGF's Board of Directors; (iv) any and all meetings of KGF's Board of Directors, including but not limited to agendas, notes, minutes, Documents considered by, distributed to, or created by KGF's Board of Directors  before, during, or after any and all such meetings, and all drafts of such Documents; (v) all Communications to, from, or among KGF's Board of Directors or any individual Director(s); (vi) the manner in which the Directors were chosen, elected, or appointed to the Board; and (vii) the compensation of Directors.

6.      All Documents sufficient to identify all of KGF's personnel, executives, officers, directors, employees, agents, and/or representatives, including but not limited to their position, title, responsibilities, dates of service, and supervisors.

7.      All Documents sufficient to show the telephone numbers and email addresses assigned to all KGF's directors, officers, and employees, including but not limited to all employer-issued cell phone numbers.

## II.    CONTRACTUAL RELATIONSHIPS

8.      All Documents concerning any agreement or contract, whether oral or written, to which KGF is a party or a beneficiary, including but not limited to all Documents concerning: (i) Co-Manager Agreement between Tremont (Bermuda) Limited and Kingate Global Fund, Ltd.; (ii) Letter agreement dated January 16, 2006 between Kingate Global Fund, Ltd. and Tremont (Bermuda) Limited terminating Co-Manager Agreement as of December 31, 2005; (iii) First Amendment to the Kingate Global Fund, Ltd. Management Agreement dated as of March 1, 1995 between Kingate Global Fund, Ltd. and Kingate Management Limited; (iv) Kingate Global Fund, Ltd. and Kingate Management Limited and Tremont (Bermuda) Limited Co-Management Agreement; (v) Co-Manager Agreement dated as of July 1, 2004 between Kingate Management Limited and Kingate Global Fund, Ltd.; (vi) Management Agreement dated as of January 1, 2006 between Kingate Management Limited and Kingate Global Fund, Ltd.; (vii) Tremont (Bermuda) Limited and Kingate Management Limited and Kingate Global Fund, Ltd. Consulting Services Agreement made as of February 24, 1994; (viii) Kingate Management Limited and Kingate Global Fund, Ltd. and FIM Limited Consulting Services Agreement made as of December 1, 1995; (ix) Amendment to Consulting Services Agreement between Kingate Management Limited and Kingate Global Fund, Ltd. and FIM Limited effective December 1, 1995; (x) Kingate Management Limited and FIM Limited Consulting Services Agreement relating to Kingate Global Fund, Ltd. dated April 23, 2001; (xi) Kingate Management Limited and FIM Limited Consulting Services Agreement relating to Kingate Global Fund, Ltd. dated April 29, 2001; (xii) Deed of Novation between Kingate Management Limited, FIM Limited, and FIM Advisers LLP relating to Kingate Global Fund, Ltd. dated July 29, 2005; (xiii) Kingate Management Limited and FIM Limited Distribution Agreement relating to Kingate Global Fund, Ltd. dated April 24, 2001; (xiv) Administration Agreement between Kingate Global Fund, Ltd., Kingate Management Limited, and Hemisphere Management Limited; (xv) First Amendment to the Kingate Global Fund, Ltd. Administration Agreement dated as of March 1, 1995; (xvi) Kingate Global Fund, Ltd. and Kingate Management Limited and Hemisphere Management Limited Restated and Amended Administration Agreement dated May 1, 2000; (xvii) Amended and Restated Administration Agreement between Kingate Global Fund, Ltd. and Kingate Management Limited and Bisys Hedge Fund Services Limited dated June 1, 2007; (xviii) Custodian Agreement between Kingate Global Fund, Ltd., The Bank of Bermuda Limited, and Kingate Management Limited; (xix) Custodian Agreement between Kingate Global Fund, Ltd. and The Bank of Bermuda Limited and Kingate Management Limited made as of March 1, 1994; and (xx) Registrar Agreement between Kingate Global Fund, Ltd., Kingate Management Limited and Hemisphere Management Limited made as of May 1, 2000.

9.      All Documents concerning any agreement or contract, whether oral or written, by, between, or among any of the Defendants.

## III.   DUE DILIGENCE AND INVESTMENT ACTIVITY

10.     All Documents concerning KGF's operations, requirements, policies, and procedures concerning Risk Management, due diligence, know-your-customer, suspicious activity investigation and reporting, and any other Regulatory compliance policies and

procedures. This Request includes all manuals or guidelines for such operations, requirements, policies, and procedures, as well as all Documents sufficient to determine the date and substance of any changes.

11.    All Documents concerning KGF's due diligence processes, including but not limited to the standards and practices employed to investigate, monitor, and oversee the activities and investments of sub-advisers, unaffiliated managers, or third-party funds.

12.    All Documents concerning KGF's methods, protocols, practices and procedures for conducting due diligence on any existing investment or any prospective investment opportunity.

13.    All Documents concerning any inquiry, investigation, or due diligence conducted by KGF on any existing investment or potential investment, including but not limited to all Documents reviewed or created as part of that inquiry, investigation, or due diligence, due diligence reports or questionnaires, prospectuses, offering memoranda, private placement memoranda, advertisements, brochures, website postings, website addresses, presentations, pamphlets, pitch books, performance records, term sheets, and marketing or executive summaries.

14.    All Documents concerning any potential or actual investment with, or related to, BLMIS, including but not limited to all Documents concerning:  (i) due diligence conducted on BLMIS; (ii) any opinions, research, or advice concerning any actual or potential investment with BLMIS; (iii) any marketing materials of BLMIS, including but not limited to any private placement memoranda, offering memoranda, tear sheets, or prospectuses; (iv) any monthly, quarterly, or annual performance reports or summaries of BLMIS; (v) any monthly, quarterly, or annual risk or risk management reports of BLMIS; (vi) any portfolio management reports of BLMIS; (vii) any monthly, quarterly, or annual strategy reviews of BLMIS; (viii) SEC Form(s) ADV or 13F, or any amendments thereto, filed or submitted by BLMIS and any other Regulatory filings for BLMIS; (ix) any analysis, discussion, review, simulation, or replication of the split-strike conversion investment strategy purportedly executed by BLMIS or any trade purportedly executed under that strategy, including the volumes of and prices at which BLMIS purportedly purchased or sold securities, the identity of counterparties to trades purportedly executed by BLMIS, and trading activity inconsistent with the split-strike conversion strategy; (x) the management team or management structure of BLMIS; (xi) any investigation, background check, or similar review of the professional experience, education, or other credentials of any BLMIS employee; (xii) the identity or nature of BLMIS's clients or investors; (xiii)  the assets under management of BLMIS, including but not limited to the amount of such assets, the growth of such assets, and the percentage of such assets attributable to particular, or groups of, clients or investors; (xiv) any of BLMIS's accountants, auditors, accounting firms, or auditing firms, including but not limited, to David G. Friehling or Friehling & Horowitz, CPAs, P.C.; (xv) fees or commissions charged by BLMIS; (xvi) risk models; (xvii) pricing models; (xviii) qualitative or quantitative analyses; (xix) periodic portfolio analyses; (xx) benchmarking analyses; (xxi) performance attribution analyses; (xxii) peer analyses; (xxiii) systematic v. non-systematic return analyses; (xxiv) regression analyses; (xxv) reverse-engineering analyses; (xxvi) risk-adjusted analyses; (xxvii) style-adjusted analyses; (xxviii) scenario analyses; (xxix) drawdown analyses; (xxx) correlation analyses; (xxxi) alpha analyses; (xxxii) comparisons, reviews, or analyses of performance during periods of market stress or market downturn; (xxxiii) the volatility or expected volatility of BLMIS's performance; (xxxiv) any "scatter diagrams" or histograms

13

created or used to analyze the performance of BLMIS; (xxxv) the Sharpe ratio for BLMIS; and
(xxxvi) the Sortino ratio for BLMIS.

15.    All Documents concerning any assessment of, or due diligence conducted on,
KGF, KEF, BLMIS, or any Feeder Fund, by any Person, including but not limited to all
Documents concerning: (i) due diligence questionnaires; (ii) any opinions, research, or advice
concerning any actual or potential investment with KGF; (iii) any KGF marketing materials,
including but not limited to any private placement memoranda, offering memoranda, tear sheets,
or prospectuses; (iv) any KGF monthly, quarterly, or annual performance reports or summaries;
(v) any KGF monthly, quarterly, or annual risk or risk management reports; (vi) any KGF
portfolio management reports; (vii) any KGF monthly, quarterly, or annual strategy reviews;
(viii) KGF's Regulatory filings; (ix) risk models; (x) pricing models; (xi) qualitative or
quantitative analyses; (xii) periodic portfolio analyses; (xiii) benchmarking analyses; (xiv)
performance attribution analyses; (xv) peer analyses; (xvi) systematic v. non-systematic return
analyses; (xvii) regression analyses; (xviii) reverse-engineering analyses; (xix) risk-adjusted
analyses; (xx) style-adjusted analyses; (xxi) scenario analyses; (xxii) drawdown analyses; (xxiii)
correlation analyses; (xxiv) alpha analyses; (xxv) comparisons, reviews, or analyses of
performance during periods of market stress or market downturn; (xxvi) the volatility or
expected volatility of KGF's performance; (xxvii) any "scatter diagrams" or histograms created
or used to analyze KGF's performance; (xxviii) KGF's assets under management, including but
not limited to the amount of such assets, the growth of such assets, and the percentage of such
assets attributable to particular, or groups of, clients or investors; (xxix) the Sharpe ratio for
KGF; and (xxx) the Sortino ratio for KGF.

16.    All Documents concerning the investment activity of KGF, KEF, BLMIS, or any
Feeder Fund that relate to the following subjects: (i) the performance of KGF's investment with
BLMIS; (ii) the NAV of KGF, including its calculation; (iii) KGF's assets under management;
(iv) KGF's investment strategies, including the development, marketing, or execution of any
investment strategy; (v) all account statements issued by KGF to any Person; (vi) trade
confirmations or other memorialization of purported trades made by, or on behalf of, KGF; (vii)
the identification (or lack thereof) of any counterparty to any trades purportedly executed by, or
on behalf of, KGF and any attempts to ascertain any such counterparty's identity; (viii) any
review, discussion, or analysis of any options purportedly purchased or sold by, or on behalf of,
KGF; (ix) any review, analysis, or statement of prices at which KGF, or any Person acting on
behalf of KGF, purportedly purchased or sold securities; and (x) any efforts to verify the
securities positions purportedly held by BLMIS for the KGF Account.

## IV.    FINANCIAL AND ACCOUNTING RECORDS

17.    All Documents concerning the accounting or recordation of KGF's financial
performance and activity, including but not limited to all general ledgers, journals, trial balances,
reconciliations, statements of cash flow, balance sheets, and profit-and-loss statements, and
KGF's financial statements, whether audited or unaudited, including but not limited to audited
annual statements, unaudited quarterly and other interim statements, and draft statements,
including all related work papers, notes, schedules, and exhibits.

18.    KGF's foreign and domestic tax returns or other tax reporting Documentation,
whether filed, unfiled, or in draft form, and all supporting schedules, work papers, journal
entries, and trial balances.

19.    All Documents concerning services provided to KGF by PricewaterhouseCoopers, including but not limited to all Documents sent to or received from PricewaterhouseCoopers.

## V.    SUBSCRIPTIONS & REDEMPTIONS

20.    All Documents provided to, received from, or concerning any and all actual or potential investors, subscribers, or shareholders in KGF, including but not limited to information memoranda, offering memoranda, private placement memoranda, and all other Documents of a similar type concerning the solicitation of investment or subscription in KGF; account opening Documents, investment advisory or management contracts, consent forms, trading authorizations, authorizations to purchase and sell securities, investment contracts, option agreements, and subscription agreements; and all Documents concerning that certain (i) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated October 6, 2008, (ii) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated September 22, 2008, (iii) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated August 1, 2007, (iv) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated May 1, 2007, (v) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated May 1, 2006, (vi) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated May 1, 2004, (vii) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated January 15, 2003, (viii) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum dated January 1, 2002, (ix) Kingate Global Fund, Ltd. Information Memorandum dated May 1, 2000, (x) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum as of January 1, 1999, (xi) Kingate Global Fund, Ltd. Amended and Restated Information Memorandum as of September 20, 1998, (xii) Kingate Global Fund, Ltd. Information Memorandum dated December 1, 1995, (xiii) Kingate Global Fund, Ltd. Restated Information Memorandum as of March 1, 1995, and (xiv) Kingate Global Fund, Ltd. Restated Information Memorandum as of March 1, 1995.

21.    All Documents concerning your receipt of funds from any Person for purposes of investment or subscription in KGF.

22.    All Documents concerning (i) any and all actual or proposed withdrawals of funds from KGF and (ii) any and all actual or proposed redemption of shares or partnerships interests in KGF.

## VI.    BANK ACCOUNTS

23.    All Documents concerning any and all accounts, whether for deposit, credit, investment or any other purpose, maintained by KGF, in KGF's name, or by any Person on KGF's behalf, with any bank, financial institution, or depository trust corporation during the Applicable Period, including but not limited to all statements of account, signature cards, account-opening Documents, periodic reconciliations, deposit slips, withdrawal slips, check registers, canceled checks, wire transfer requests, and wire transfer confirmations.  This Request includes all such Documents concerning account number 010-424174-561 and account number 010-427174-564 maintained with Bank Bermuda.

24.    All Documents concerning any and all accounts, whether for deposit, credit, investment or any other purpose, maintained by any Defendant in its own name, or by another on such Defendant's behalf, with any bank, financial institution, or depository trust corporation

during the Applicable Period, including but not limited to:  (i) Bank Bermuda; (ii) HSBC-Monaco Bank; (iii) Fortis Bank- Guernsey; (iv) Fortis Bank-Channel Islands; (v) Lombard Odier Darier Hentsch, Geneva; (vi) Bank of NT Butterfield & Sons; (vii) Clariden Leu AG-Zurich; and JPMorgan Chase Bank, N.A.  Documents responsive to this Request include, but are not limited to, all statements of account, signature cards, periodic reconciliations, deposit slips, withdrawal slips, check registers, canceled checks, wire transfer requests, wire transfer confirmations, and all other records reflecting cash activity.  This Request includes all such Documents concerning (i) account number 010-503324-512 and account number 010-503324-511 maintained in KEF's name, or on its behalf, with Bank Bermuda and (ii) a certain demand deposit account maintained in KML's name, or on its behalf, with Bank Bermuda.

## VII.   CUSTOMER ACCOUNTS AND TRANSFERS

25.    All Documents concerning any and all accounts, including but not limited to the KGF Account or the KEF Account, whether for deposit, credit, investment or any other purpose, maintained by KGF, in KGF's name, or by any Person on KGF's behalf, with BLMIS, including but not limited to all sub-advisory agreements, solicitation agreements, trading authorizations, trading directives, margin agreements, authorizations to purchase and sell securities, investment contracts, option agreements, subscription agreements, and limited partnership agreements, customer account statements, statements of NAV, calculations of NAV, trade confirmations, portfolio statements, deposit records, withdrawal records, and all other records of investment or cash activity.

26.    All Documents concerning any and all Initial Transfers, including but not limited to all Documents concerning any of the following:  (i) the date of each such Initial Transfer, (ii) the amount of each such Initial Transfer, (iii) the account name and account number for the account from which the funds were transferred, (iv) the account name and account number for the account to which the funds were transferred, (v) the method of transfer, (vi) the reason for each such Initial Transfer, and (vii) the disposition of each such Initial Transfer.

27.    All Documents concerning any and all Transfers from, between, or among any and all of the accounts referred to in Requests ##23 through 26.

28.    All Documents concerning each and every request made to BLMIS to withdraw moneys from the KGF Account or the KEF Account, including but not limited to consideration of the timing and amount of such request, the decision to make such request, and all Communications concerning such request.

29.    All Documents concerning each and every deposit made into the KGF Account or the KEF Account, including but not limited consideration of the timing and amount of such deposit, the decision to make such deposit, and all Communications concerning such deposit.

30.    All Documents concerning any review or analysis undertaken to trace monies transferred from any of the accounts referred to in Requests ##23 through 26.

31.    All Documents reviewed or relied upon in connection with the analyses attached at Exhibits J & K of the Declaration of Robert S. Loigman in Support of Opposition of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. to Trustee's Application for Enforcement of Automatic Stay and Injunction, filed on or about February 8, 2014 in *Picard v. Kingate Global Fund, Ltd.*, Adv. Proc. No. 12-01920 (SMB).

32.    All Documents concerning management fees, administrative fees, performance fees, or any other fees or commissions charged by, or paid to, KML, BLMIS, FIM Advisers, FIM Limited, Citi Hedge, and any other Defendant.

## VIII.    BLMIS

33.    All Documents concerning BLMIS, including but not limited to all Documents concerning any of the following:  (i) Documents received from or sent to BLMIS; (ii) Documents received from or sent to any Defendant concerning BLMIS or KGF's investments with BLMIS; (iii) any contact, meeting, or attempt to contact or meet with BLMIS or with any BLMIS employee; (iv) all Communications between KGF and BLMIS including but not limited to transcripts or audio recordings of any such telephone calls; (v) all Communications between KGF and any Person concerning BLMIS, including but not limited to transcripts or audio recordings of any such telephone calls; (vi) any agreement or contract, whether oral or written, to which BLMIS is a party; (vii) all Communications with any BLMIS Employee; and (viii) all Documents received from or sent to any Feeder Fund, the Depository Trust & Clearing Corporation, and the Options Clearing Corporation concerning BLMIS.

34.    All Documents created on or after December 11, 2008, concerning:  (i) the public disclosure that a Ponzi scheme operated out of BLMIS; (ii) the arrest, confession, plea, conviction, or sentencing of either Bernard L. Madoff or of any employee of BLMIS; and (iii) all meetings held by KGF's Board of Directors or KGF's committees, sub-committees or working groups in which BLMIS's Ponzi scheme was a subject or topic or was mentioned or referenced.

35.    All Documents created on or after December 11, 2008, concerning:  (i) any review or modification of KGF's due diligence process; (ii) any self-critical analysis; (iii) any investigation or review that KGF conducted of itself; and (iv) any Communications with any shareholder or prospective shareholder of KGF concerning (a) subscriptions or redemptions in KGF, (b) the NAV of KGF, (c) the effect on KGF of the arrest of Bernard L. Madoff or the commencement of liquidation proceedings against BLMIS, or (d) KGF's actions subsequent to the arrest of Bernard L. Madoff or the commencement of liquidation proceedings against BLMIS.

36.    All Documents concerning: (i) any analysis or discussion of execution prices, performance, or returns of BLMIS; (ii) any analysis or discussion of the feasibility or impossibility of the purported returns and trades of, BLMIS; (iii) Cambridge Associates LLC; (iv) Robert Rosenkranz or Acorn Partners; (v) Oswald Gruebel; (vi) Jim Vos or Aksia, LLC; (vii) David Giampaolo or Pi Capital; (viii) Neil Chelo or Benchmark Plus Partners; (ix) Albourne Partners; (x) Bayou Group, LLC, Bayou Fund, Bayou Hedge Fund Group, Bayou Management, LLC, Samuel Israel III, or any of their respective affiliates; (xi) Michael Ocrant; (xii) Erin Arvedlund; (xiii) Noreen Harrington; (xiv) Michael Markov, (xv) Gil Berman; (xvi) Edward Thorp; (xvii) Harry Markopolos; (xviii) Chris Cutler; (xix) Eric Lazear; (xx) the article in the May 7, 2001 issue of Barron's entitled "Don't Ask, Don't Tell:  Bernie Madoff is so secretive, he even asks his investors to keep mum"; (xxi) the article in the December 16, 1992 issue of the Wall Street Journal entitled "Wall Street Mystery Features a Big Board Rival"; (xxii) the May 2001 MAR/Hedge newsletter entitled "Madoff Tops Charts; Skeptics Ask How"; and (xxiii) any actual, potential, or suspected fraud, Ponzi scheme, or illegal activity (including front running), at BLMIS.

## IX.    SPECIFIC INDIVIDUALS AND ENTITIES

37.    All Documents concerning any of the following:  (i) Manzke; (ii) Fairfield Greenwich (Bermuda), Ltd.; (iii) Fairfield Sentry Ltd.; (iv) Amit Vijayvergia; (v) Andres Piedrahita; (vi) Shazieh Salahuddin; (vii) Eric Lazear; (viii) Tremont (Bermuda) Limited; (ix) Tremont Advisers; (x) Tremont Group Holdings, Inc.; (xi) Tremont Partners, Inc.; (xii) Hemisphere Management Limited; (xiii) Christopher Wetherhill; (xiv) Island Storm, Ltd.; (xv) Phillip A. Evans; (xvi) Frank Walters; (xvii) Michael Tannenbaum; (xviii) the law firm of Tannenbaum Helpern Syracuse & Hirschtritt LLP; (xix) MN Services; (xx) UBP; (xxi) M Invest; (xxii) Robert Johnson; (xxiii) BNP Paribas; (xxiv) Barry E. Breen; (xxv) Moore Stephens International Services (BVI) Limited; (xxvi) Moore Stephens Services SAM; (xxvii) Hamilton Trust Co. Ltd.; (xxviii) Hamilton Nominees Ltd.; (xxix) Fenton Trust; (xxx) FIM Long-Invest Fund EUR & USD; (xxxi) Dancrest Global Equity Fund; (xxxii) Levco Debt Opportunity Fund & Levco Alternative Fund; (xxxiii) FIM Relative Value Fund; (xxxiv) Five Balanced Fund (Bermuda); (xxxv) Five Balanced Fund (Cayman Islands); (xxxvi) Victoria Global Fund; (xxxvii) FDVG Low Volatility Investments & FDVG Equity Investments; (xxxviii) Silver Shield Fund (Bermuda); or (xxxix) Silver Shield Fund (Cayman Islands).

## X.    INVESTIGATIONS & LITIGATION

38.    All Documents concerning any civil, criminal, or other legal proceedings, such as arbitration, including but not limited to the Bermuda Action and the BVI Proceedings, and any criminal investigation, commenced by or against KGF or any other Defendant, in any jurisdiction, whether foreign or domestic, whether threatened or filed, including but not limited to, any pleadings, motions, correspondence, Documents and discovery produced, deposition transcripts (including exhibits), hearing transcripts, witness statements taken or given by any party/witness or produced in discovery, and orders, rulings, and judgments.

39.    All Documents concerning any Communications between KGF and any governmental, Regulatory, or law enforcement entity or official in any jurisdiction, whether foreign or domestic, concerning BLMIS, including but not limited to all Documents received from or sent to any such entity or official.

40.    All Documents concerning any Communications between KGF and any governmental, Regulatory, or law enforcement entity or official in any jurisdiction, whether foreign or domestic, concerning any Defendant, including but not limited to all Documents received from or sent to any such entity or official.

41.    All Documents concerning any and all payments or consideration made by or received by KGF after December 11, 2008, in connection with KGF's investment with BLMIS.

42.    All Documents concerning any claims filed or actions taken (whether legal, equitable, or otherwise) to recoup or recover any damages or losses KGF alleges to have sustained as a result of KGF's investment with BLMIS.

43.    All Communications with, and all Documents submitted by or on behalf of any investor, subscriber, or shareholder in KGF to, Richard C. Breeden, his attorneys, his accountants, or any other representative of Mr. Breeden or the Madoff Victim Fund created under the Department of Justice Asset Forfeiture Distribution Program.

Date:  New York, NY
         October 7, 2015

/s/ David J. Sheehan_____
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorney for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served this 7th day of

October, 2015 by electronic mail upon the following:

Counsel for the Joint Liquidators for Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd.

Robert S. Loigman
Rex Lee
Lindsay M. Weber
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

/s/ William W. Hellmuth
*An Attorney for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>FEDERICO CERETTI, et al.,<br><br>                    Defendants. | Adv. Pro. No. 09-1161 (SMB) |

## TRUSTEE'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT KINGATE EURO FUND, LTD.

**PLEASE TAKE NOTICE** that in accordance with Rules 26 and 34 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this adversary proceeding under the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the applicable local rules of the United States District Court for the Southern District of New York and this Court (the "Local Rules"), Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff, hereby demands that defendant Kingate Euro Fund, Ltd., through the joint liquidators acting on its behalf, produce Documents responsive to the requests set forth herein and deliver the same to the office of Baker & Hostetler LLP, c/o Anthony M. Gruppuso, Esq., 45 Rockefeller Plaza, New York, New York 10111, within thirty (30) days of service.

### DEFINITIONS

1.      The rules of construction and definitions set forth in Local Rule 26.3, as adopted by Rule 7026-1 of the Bankruptcy Rules, are incorporated in their entirety.

2.      "Action" means the civil action captioned *Picard v. Ceretti, et al.,* Adv. Pro. No. 09-01161, pending in the United States Bankruptcy Court for the Southern District of New York.

3.      "Alpine Trustees" means Alpine Trustees Limited and anyone acting on behalf of or at the direction of Alpine Trustees Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

4.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope, as defined in Local Rule 26.3.

5.      "Applicable Period" means the period beginning January 1, 1993 through December 31, 2009.

6.      "Ashby Holdings" means Ashby Holdings Services Limited and anyone acting on behalf of or at the direction of Ashby Holdings Services Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

2

7.      "Ashby Investment" means Ashby Investment Services Limited and anyone acting on behalf of or at the direction of Ashby Investment Services Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

8.      "Bank Bermuda" means HSBC Bank Bermuda Limited and anyone acting on behalf of or at the direction of HSBC Bank Bermuda Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

9.      "Bermuda Action" means that civil action commenced by Kingate Global Fund Ltd. and Kingate Euro Fund Ltd. against Kingate Management Limited and others in the Supreme Court of Bermuda, Civil Jurisdiction, Commercial List, bearing the caption *Kingate Global Fund Limited (in liquidation), et al. v. Kingate Management Limited, et al.*, No. 2010:454.

10.      "BLMIS" means Bernard L. Madoff Investment Securities LLC and anyone acting on behalf of or at the direction of Bernard L. Madoff Investment Securities LLC, including, but not limited to, current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers of the above specifically identified Persons, and any and all related entities, including without limitation:  Abel Automatics, Inc.; Abel Holdings, LLC; Abtech Industries Inc.; BLM Air Charter LLC; Blumenfeld Development Group; BREA Associates LLC; Cohmad, Cohn, Delaire & Madoff, Inc.; Delta Fund I, L.P.; Madoff Brokerage & Trading Technologies LLC; Madoff Energy Holdings LLC; Madoff Energy III LLC; Madoff Energy IV LLC; Madoff Energy LLC; Madoff Family LLC (a/k/a Madoff Family Fund LLC); Madoff Realty LLC/Madoff Realty Associates/Madoff Realty Trust; Madoff Securities International Ltd.; Madoff Securities International LLC; Madoff Technologies LLC; Primex Holdings LLC; Realty Associates Madoff II; The Madoff Family Foundation (f/k/a Bernard L. and Ruth Madoff Foundation); Yacht Bull Corp (registered by Campbell Corporate Services LTD); Bernard Madoff; Ruth Madoff; Andrew Madoff; Deborah Madoff; Jennifer Madoff; Stephanie Madoff; Mark Madoff; Peter Madoff; Marion Madoff; Ruth Madoff; Shana Madoff; Sondra Madoff-Weiner; Roger Madoff; Marvin Wiener; Charles Wiener; Annette Bongiorno; Jo Ann "Jodi" Crupi; Eric Lipkin; Irwin Lipkin; Frank DiPascali; Erin Reardon; David Kugel; Belle Jones; and Darlene Concepcion.

11.      "BLMIS Employee" means any Person employed by BLMIS, including but not limited to the following Persons:  Semone Anderson; Annette Bongiorno; Daniel Bonventre; John Bonventre; Elizabeth Buchmueller; Robert Cardile; Darlene Concepcion; Enrica Cotellessa-Pitz; Joann Crupi; Frank DiPascali; Jeffrey Ferraro; Marc Ferraro; Enrique Flores; Diana Guzman; Scott Hendell; Winifer Jackson; Dorothy Khan; David Kugel; Eric Lipkin; Bernard L. Madoff; Ruth Madoff; Andrew Madoff; Mark Madoff; Peter Madoff; Shana Madoff; Dumarsais Magnus; Alethea Mui; William Nasi; Jerome O'Hara; Magdalena Ortiz; Rafael Pagan; Daniel Pennachio; George Perez; Sharda Persaud; Erin Reardon; Lee Sibley; Richard Sobel; Brett Sondike; Eleanor Squillari; Anthony Tiletnick; Robert Weber; Sean-Louis Wharton; Charlene White; Walter Tiletnick; or Charles Wiener.

12.      "Board of Directors" means the Board of Directors or individual Directors of KEF (as defined herein).

13.     "BVI Proceedings" means those proceedings commenced in The Eastern Caribbean Supreme Court, In The High Court of Justice, British Virgin Islands, captioned *First Peninsula Trustees Limited (as Trustee of the Ashby Trust) v. Irving H. Picard, et al.*, BVIHCV 2011/0154 and *Port of Hercules Trustees Limited (as Trustee of the El Prela Trust) v. Irving H. Picard, et al.*, BVIHCV 2011/0155.

14.     "Ceretti" means Federico Ceretti.

15.     "CITCO" means Citco Fund Services (Europe) B.V. and anyone acting on behalf of or at the direction of Citco Fund Services (Europe) B.V., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

16.     "Citi Hedge" means Citi Hedge Fund Services Limited and anyone acting on behalf of or at the direction of Citi Hedge Fund Services Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

17.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), as defined in Local Rule 26.3.

18.     "Company" means any sole proprietorship, corporation, association, joint venture, firm, partnership, limited liability company, limited liability partnership, limited partnership, and business or legal entity in whatever form and wherever formed or located.

19.     "Complaint" means the Fourth Amended Complaint filed by the Trustee in the Action on March 17, 2014.

20.     "Concerning" means relating to, referring to, describing, evidencing, or constituting, as defined in Local Rule 26.3.

21.     "Defendants" means all of the following:  KGF, KEF, KML, FIM Limited, FIM Advisers, Ceretti, Grosso, El Prela Trust, El Prela Holding, El Prela Investments, Alpine Trustees, Port of Hercules, Ashby Trust, Ashby Holdings, Ashby Investment, First Peninsula, or Citi Hedge, as each is defined in these Definitions.

22.     "DiPascali" means Frank DiPascali.

23.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "Documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A), as defined in Local Rule 26.3.  A draft or non-identical copy is a separate Document within the meaning of this term.  For purposes of these Requests, the meaning and scope of Document captures the meaning and scope of Communication.  Accordingly, a Request that demands the production of "all Documents" by definition demands the production of "all Communications" responsive to the Request.  That a Request may specifically seek "all Communications" does not in any way limit or alter the definitions given to Document and Communication, respectively.

24.     "El Prela Holding" means El Prela Group Holding Services and anyone acting on behalf of or at the direction of El Prela Group Holding Services, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

25.    "El Prela Investments" means El Prela Trading Investments Limited and anyone acting on behalf of or at the direction of El Prela Trading Investments Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

26.    "Feeder Funds" means all Companies, and all current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers of such Companies, through which investments were made, directly or indirectly, with BLMIS, including, but not limited to, Aurelia Asset Management Partners, Aurelia Fund Management Ltd., Fairfield Sentry Ltd., Fairfield Sigma Limited., Herald Fund SPC, Hermes Asset Management Ltd., Lagoon Investment Ltd., Rafael Partners, Inc., Rye Select Broad Market Fund, LP, Rye Select Broad Market Insurance Fund, L.P., Rye Select Broad Market Insurance Portfolio LDC, Rye Select Broad Market Portfolio Ltd., Rye Select Broad Market Prime Fund, L.P., Rye Select Broad Market XL Fund, LP, Rye Select Broad Market XL Portfolio Ltd., Rye Select Equities Fund, Thema Asset Management Ltd., Thema Fund Ltd., Thema International Fund plc, and Thema Wise Investments Ltd.

27.    "FIM" means FIM Limited, FIM Advisers, and FIM (USA).

28.    "FIM Advisers" means FIM Advisers LLP and anyone acting on behalf of or at the direction of FIM Advisers LLP, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

29.    "FIM Limited" means FIM Limited and anyone acting on behalf of or at the direction of FIM Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

30.    "FIM (USA) means FIM (USA), Inc. and anyone acting on behalf of or at the direction of FIM (USA), Inc., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

31.    "First Peninsula" means First Peninsula Trustees Limited and anyone acting on behalf of or at the direction of First Peninsula Trustees Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

32.    "Grosso" means Carlo Grosso.

33.    "Identify," when referring to a Document, means to give, to the extent known, the (i) type of Document, (ii) general subject matter, (iii) date of the Document, and (iv) author(s), addressee(s) and recipient(s), as defined in Local Rule 26.3.  In the alternative, KEF may produce the Document, together with identifying information sufficient to satisfy Fed. R. Civ. P. 33(d).

34.    "Identify," when referring to a Person, means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural Person, additionally, the present or last known place of employment, as defined in Local Rule 26.3. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

35.    "Initial Transfer" means any and all Transfers (as defined herein) made by BLMIS or any Person acting on behalf of BLMIS to KEF or to any Person acting on KEF's behalf.

36.    "KEF," "You" and "Your" mean Kingate Euro Fund, Ltd. and anyone acting on behalf of or at the direction of Kingate Euro Fund, Ltd., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and the court-appointed liquidators representing KEF's estate in liquidation proceedings commenced in the British Virgin Islands and Bermuda.

37.    "KGF" means Kingate Global Fund, Ltd. and anyone acting on behalf of or at the direction of Kingate Global Fund, Ltd., including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and the court-appointed liquidators representing KGF's estate in liquidation proceedings commenced in the British Virgin Islands and Bermuda and the liquidators' agents and representatives.

38.    "KGF Account" means that certain account with BLMIS designated 1FN061.

39.    "KEF Account" means that certain account with BLMIS designated 1FN086.

40.    "KML" means Kingate Management Limited and anyone acting on behalf of or at the direction of Kingate Management Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and the court-appointed receiver(s) representing KML's estate in receivership proceedings commenced in Bermuda and the receiver's agents and representatives.

41.    "Loan(s)" means loans, broker loans, letters of credit, lines of credit, broker lines, or other credit facilities.

42.    "Madoff" means Bernard L. Madoff.

43.    "Manzke" means Sandra Manzke.

44.    "Net Asset Value" or "NAV" means gross assets less gross liabilities attributable to a class or series of shares of any of KGF or KEF as of a particular date of determination.

45.    "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association, as defined in Local Rule 26.3.

46.    "Port of Hercules" means Port of Hercules Trustees Limited and anyone acting on behalf of or at the direction of Port of Hercules Trustees Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, and third-party service providers.

47.    "Regulators" means, and "Regulatory" refers to, all external oversight entities, whether governmental, law enforcement, quasi-governmental, or private, in any jurisdiction in which KEF operated with any power or ability to regulate, censure, fine, or penalize.  This includes, but is not limited to, the United States Securities & Exchange Commission, Office of the Comptroller of the Currency, Financial Industry Regulatory Authority and its predecessor the National Association of Securities Dealers, and the United Kingdom's Financial Services Authority, Financial Conduct Authority, and Serious Fraud Office.

48.    "Risk Management" means your policies, procedures, or efforts to provide controls and management of the risks inherent to KEF's business activities.

49.    "Transfer" shall conform to the meaning set forth under the Bankruptcy Code, 11 U.S.C. § 101(54):  (a) the creation of a lien; (b) the retention of title as a security interest; (c) the foreclosure of a debtor's equity redemption; or (d) each mode, direct and indirect, absolute or conditional, voluntary or involuntary, of disposing of or departing with—(i) property; or (ii) an interest in property.  For purposes of these Requests, the term "Transfer(s)" shall only apply to amounts in excess of $10,000.

50.    "Tremont" means Tremont (Bermuda) Limited and anyone acting on behalf of or at the direction of Tremont (Bermuda) Limited, including, but not limited to, its current and former agents, representatives, employees, servants, predecessors, successors, third-party service providers, and directly or indirectly related entities.

51.    Reference to any Person that is not a natural Person and is not otherwise defined herein refers to and includes any parent, subsidiary, affiliate, division, branch, representative office, predecessor, successor, principal, member, director, officer, shareholder, manager, employee, attorney-in-fact, attorney, nominee, agent, or representative of such Person.

52.    The use of the singular form of any word includes the plural and vice versa.

## INSTRUCTIONS

Federal Rules 26 through 37, made applicable to this proceeding by the Bankruptcy Rules, are incorporated by reference and apply to each of the following instructions:

1.    Unless otherwise specified, each of these Requests seeks Documents created, modified, or existing during the Applicable Period.

2.    All Documents shall be identified by the request(s) to which they are primarily responsive and produced as they are maintained in the usual course of business.

3.    Produce all Documents and all other materials described below in KEF's actual or constructive possession, custody, or control, including in the possession, custody, or control of a current or former employee or third-party service provider, wherever those Documents and materials are maintained, including on personal computers, PDAs, wireless devices, or web-based email systems (such as Gmail, Yahoo, etc.).

4.    Produce all Documents in KEF's custody or control, whether maintained in electronic or paper form and whether located on hardware owned and maintained by KEF or hardware owned and/or maintained by a third party that stores data on KEF's behalf.  KEF must produce all such Documents even if they were deleted or in draft form.  Without limitation, hardware where such data may be stored includes:  servers; desktop, laptop, or tablet computers; cell and smart phones; PDA devices; scanners, fax machines, and copying machines; and mobile storage devices, such as thumb or external hard drives.  Electronically stored Documents include any computerized data or content stored on electromagnetic media.  Without limitation, types of electronically stored Documents include email, voicemail, and instant messages, intranet and internet system data, telephone and cellular telephone calling records, data compilations, spreadsheets, word processing Documents, images, databases, digital photocopier memory, and any other information stored in memory storage devices.

7

5.      Produce the original or duplicate, as such terms are defined by Rule 1001 of the Federal Rules of Evidence, of each Document requested together with all non-identical copies and drafts of that Document. If a duplicate is produced, it should be legible and bound or stapled in the same manner as the original.

6.      Documents not otherwise responsive to these Requests should be produced: (i) if such Documents mention, discuss, refer to, explain, or concern one or more Documents that are called for by these Requests; (ii) if such Documents are attached to, enclosed with, or accompany Documents called for by these Requests; or (iii) if such Documents constitute routing slips, transmittal memoranda or letters, comments, evaluations, or similar materials.

7.      Documents attached to each other should not be separated; separate Documents should not be attached to each other.

8.      Documents should include all exhibits, appendices, linked Documents, or otherwise appended Documents that are referenced in, attached to, included with, or are a part of the requested Documents.

9.      If a request calls for information concerning a Transfer, Initial Transfer, redemption, or withdrawal from an account, such request includes, but is not limited to, Documents that reflect the account name and number for the account the funds were transferred from and to, method of transfer (*i.e.*, wire, check, etc.), date of, amount and the reason for the Transfer, Initial Transfer, redemption, or withdrawal.

10.     If any Document, or any part thereof, is not produced based on a claim of attorney-client privilege, work-product protection, or any other privilege or immunity from disclosure, then in answer to such request or part thereof, for each such Document:

        a.      Identify the type, title, and subject matter of the Document;

        b.      State the place, date, and manner of preparation of the Document;

        c.      Identify all authors, addressees, and recipients of the Document, including information about such Persons to assess the privilege asserted; and

        d.      Identify the privilege(s) asserted and the factual basis for same.

11.     Documents should not contain redactions unless such redactions are made to protect information subject to the attorney-client privilege and/or work-product protection. If Documents are produced with redactions, a log setting forth the information requested in Instruction #10 above must be provided.

12.     If a Document sought herein was at one time, but is no longer, in KEF's actual or constructive possession, custody, or control, state whether it: (i) is missing or lost; (ii) has been destroyed; (iii) has been transferred to others; and/or (iv) has been otherwise disposed of. In each instance, Identify the Document, state the time period during which it was maintained, state the circumstance surrounding authorization for such disposition thereof and the date thereof, Identify each Person having knowledge of the circumstances of the disposition thereof, and Identify each Person who had possession, custody, or control of the Document, to whom it was available or who had knowledge of the Document and/or the contents thereof.

13.     The Bankruptcy Court entered Orders on September 17, 2013: (I) Establishing Procedures for Third-Party Data Rooms; and (II) Modifying the June 6, 2011 Litigation

Protective Order.  Pursuant to those Orders, upon production, Producing Parties shall provide the following information in a production cover letter, to the extent any of the following information is applicable:  (i) the Documents (listed in an Excel file Document-by-Document by Beginning Bates and Ending Bates for each Document) that are designated as confidential pursuant to the Litigation Protective Order; (ii) the Documents (listed in an Excel file Document-by-Document by Beginning Bates and Ending Bates for each Document) that are designated confidential pursuant to an Individual Confidentiality Standard, if applicable, pursuant to Paragraph 10 of the Order Establishing Procedures for Third-Party Data Rooms and Paragraph I of the Order Modifying the June 6, 2001 Litigation Protective Order; (iii) the Documents (listed in an Excel file Document-by-Document by Beginning Bates and Ending Bates for each Document) that should be excluded from the Third-Party Data Rooms pursuant to Paragraph 4 of the Order Establishing Procedures for Third-Party Data Rooms and Paragraph C of the Order Modifying the June 6, 2001 Litigation Protective Order; and (iv) the designated representative authorized for that production to provide consent to the disclosure of confidential Documents requested or to object to the disclosure of confidential Documents.[1]  Failure to provide such information in a production cover letter shall result in a waiver by the Producing Parties of:  (i) any confidential designations; (ii) any objections to inclusion of the Documents in the Third-Party Data Rooms; and/or (iii) notification that Documents have been requested for disclosure.  For the avoidance of doubt, notwithstanding Paragraph 13 of the Order Establishing Procedures for Third-Party Data Rooms and Paragraph L of the Order Modifying the June 6, 2011 Litigation Protective Order, Paragraphs 7 and 14 of the Litigation Protective Order will still apply with respect to:  (i) inadvertent failure to designate confidential material as confidential or incorrect designations of confidential material (Paragraph 7 of the Litigation Protective Order); and (ii) inadvertent production or disclosure of any Document or other material otherwise protected by the attorney-client privilege, work-product protection or a joint defense/common interest privilege (Paragraph 14 of the Litigation Protective Order).

## MANNER OF PRODUCTION

1.      All Documents produced to the Trustee shall be provided in either native file ("native") or single-page 300 dpi-resolution group IV TIF format ("tiff") format as specified below, along with appropriately formatted industry-standard database load files, and accompanied by true and correct copies or representations of unaltered attendant metadata. Where Documents are produced in tiff format, each Document shall be produced along with a multi-page, Document-level searchable text file ("searchable text") as rendered by an industry-standard text extraction program in the case of electronic originals, or by an industry-standard Optical Character Recognition ("ocr") program in the case of scanned paper Documents. Searchable text of Documents shall not be produced as fielded data within the ".dat file" as described below.

2.      Database load files and production media structure:  Database load files shall consist of: (i) a comma-delimited values (".dat") file containing: production Document identifier information, data designed to preserve "parent and child" relationships within Document "families," reasonably accessible and properly preserved metadata (or bibliographic coding in the case of paper Documents), custodian or Document source information; and (ii) an Opticon

---

[1] Electronic productions containing Documents designated as confidential shall also be accompanied by a database load file containing a field identifying if a Document has been designated confidential.

("opt") file to facilitate the loading of tiff images. Load files should be provided in a root-level folder named "Data," images shall be provided within a root level "Images" folder containing reasonably structured subfolders, and searchable text files shall be provided in a single root-level "Text" folder. If any of the Documents produced in response to these requests are designated as confidential pursuant to the Litigation Protective Order, in addition to marking the Documents with the brand "CONFIDENTIAL" or branding the media with the word "CONFIDENTIAL," also include a confidential field within the load file, with a "yes" or "no" indicating whether the Document has been designated as confidential, as well as native file loading/linking information (where applicable).

3.    <u>Electronic Documents and data, generally</u>:  Documents and other responsive data or materials created, stored, or displayed on electronic or electro-magnetic media shall be produced in the order in which the Documents are or were stored in the ordinary course of business, including all reasonably accessible metadata, custodian or Document source information, and searchable text as to allow the Trustee, through a reasonable and modest effort, to fairly, accurately, and completely access, search, display, comprehend, and assess the Document's true and original content.

4.    <u>Emails and attachments, and other email account-related Documents</u>:  All Documents and accompanying metadata created and/or stored in the ordinary course of business within commercial, off-the-shelf email systems including but not limited to Microsoft Exchange™, Lotus Notes™, or Novell Groupwise™ shall be produced in tiff format, accompanying metadata, and searchable text files or, alternately, in a format that fairly, accurately, and completely represents each Document in such a manner as to make the Document(s) reasonably useable, manageable, and comprehendible by the Trustee.

5.    <u>Documents and data created or stored in or by structured electronic databases</u>:  With the exclusion of email and email account-related Documents and data, all Documents and accompanying metadata created and/or stored in structured electronic databases or files shall be produced in a format that enables the Trustee to reasonably manage and import those Documents into a useable, coherent database.  Documents must be accompanied with reasonably detailed documentation explaining each Document's content and format, including but not limited to data dictionaries and diagrams.  Some acceptable formats, if and only if provided with definitive file(s), table(s), and field level schemas include:

a.    XML format file(s);

b.    Microsoft SQL database(s);

c.    Access database(s); and/or

d.    fixed or variable length ASCII delimited files.

6.    <u>Spreadsheets, multimedia, and non-standard file types</u>:  All Documents generated or stored in software such as Microsoft Excel or other commercially available spreadsheet programs, as well as any multimedia files such as audio or video, shall be produced in their native format, along with an accompanying placeholder image in tiff format indicating a native file has been produced.  A "Nativelink" entry shall be included in the .dat load file indicating the relative file path to each native file on the production media.  To the extent the party has other file types that do not readily or easily and accurately convert to tiff and searchable text, the party may elect to produce those files in native format subject to the other requirements listed herein.

Native files may be produced within a separate root-level folder structure on deliverable media entitled "Natives."

7.    "Other" electronic Documents:  All other Documents and accompanying metadata and embedded data created or stored in unstructured files generated by commercially available software systems (excluding emails, structured electronic databases, spreadsheets, or multimedia) such as, but not limited to, word processing files (such as Microsoft Word), image files (such as Adobe .pdf files and other formats), and text files shall be produced in tiff and searchable text format in the order the files are or were stored in the ordinary course of business.

8.    Paper Documents:  Documents originally created or stored on paper shall be produced in tiff format.  Relationships between Documents shall be identified within the Relativity .dat file utilizing Document identifier numbers to express parent Document/child attachment boundaries, folder boundaries, and other groupings.  In addition, the searchable text of each Document shall be provided as a multi-page text file as provided for by these requests.

## REQUESTS FOR PRODUCTION

1.    All Documents relevant to any claim or defense asserted in the Action.

## I.    FORMATION AND STRUCTURE

2.    All Documents concerning the formation of KEF, including but not limited to articles of incorporation, memoranda of association, articles of association, by-laws, limited or general partnership agreements, limited liability company agreements, trust agreements, and organizational charts, and any other Documents reflecting formation and governance of KEF, as originally constituted and as amended or otherwise modified.

3.    All Documents sufficient to identify KEF's principal place(s) of business, business address(es), and the name(s) and address(es) of KEF's registered agent(s).

4.    All Documents sufficient to identify all members of KEF's Board of Directors, by year, including but not limited to Documents reflecting their titles, responsibilities, membership on any subcommittees or working groups, tenures, and any changes thereto.

5.    All Documents concerning the formation, authority, and acts of KEF's Board of Directors, including but not limited to all Documents concerning: (i) the authority possessed by KEF's Board of Directors; (ii) KEF's Board of Directors' exercise of its authority, including but not limited to any such exercise of authority concerning KEF's investments, KEF's investments with BLMIS, and KEF's selection and engagement of BLMIS and all other service providers; (iii) any and all resolutions, orders, directives, or instructions issued by KEF's Board of Directors; (iv) any and all meetings of KEF's Board of Directors, including but not limited to agendas, notes, minutes, Documents considered by, distributed to, or created by KEF's Board of Directors  before, during, or after any and all such meetings, and all drafts of such Documents; (v) all Communications to, from, or among KEF's Board of Directors or any individual Director(s); (vi) the manner in which the Directors were chosen, elected, or appointed to the Board; and (vii) the compensation of Directors.

6.    All Documents sufficient to identify all of KEF's personnel, executives, officers, directors, employees, agents, and/or representatives, including but not limited to their position, title, responsibilities, dates of service, and supervisors.

7.      All Documents sufficient to show the telephone numbers and email addresses assigned to all KEF's directors, officers, and employees, including but not limited to all employer-issued cell phone numbers.

## II.    CONTRACTUAL RELATIONSHIPS

8.      All Documents concerning any agreement or contract, whether oral or written, to which KEF is a party or a beneficiary, including but not limited to all Documents concerning:  (i) Manager Agreement dated as of May 1, 2000 between Kingate Management Limited and Kingate Euro Fund, Ltd.; (ii) Kingate Management Limited and FIM Limited Consulting Services Agreement relating to Kingate Euro Fund, Ltd. dated April 23, 2001; (iii) Deed of Novation between Kingate Management Limited, FIM Limited, and FIM Advisers LLP relating to Kingate Euro, Ltd. dated July 29, 2005; (iv) Kingate Management Limited and FIM Limited Distribution Agreement relating to Kingate Euro Fund, Ltd. dated April 23, 2001; (v) Kingate Euro Fund, Ltd. and Kingate Management Limited and Hemisphere Management Limited Administration Agreement dated May 1, 2000; (vi) Amended and Restated Administration Agreement between Kingate Euro Fund, Ltd. and Kingate Management Limited and Bisys Hedge Fund Services Limited dated June 1, 2007; (vii) Custodian Agreement made on May 1, 2000 between Kingate Euro Fund, Ltd. and The Bank of Bermuda Limited; and (viii) Registrar Agreement between Kingate Euro Fund, Ltd., Kingate Management Limited and Hemisphere Management Limited made as of May 1, 2000.

9.      All Documents concerning any agreement or contract, whether oral or written, by, between, or among any of the Defendants.

## III.    DUE DILIGENCE AND INVESTMENT ACTIVITY

10.      All Documents concerning KEF's operations, requirements, policies, and procedures concerning Risk Management, due diligence, know-your-customer, suspicious activity investigation and reporting, and any other Regulatory compliance policies and procedures.  This Request includes all manuals or guidelines for such operations, requirements, policies, and procedures, as well as all Documents sufficient to determine the date and substance of any changes.

11.      All Documents concerning KEF's due diligence processes, including but not limited to the standards and practices employed to investigate, monitor, and oversee the activities and investments of sub-advisers, unaffiliated managers, or third-party funds.

12.      All Documents concerning KEF's methods, protocols, practices and procedures for conducting due diligence on any existing investment or any prospective investment opportunity.

13.      All Documents concerning any inquiry, investigation, or due diligence conducted by KEF on any existing investment or potential investment, including but not limited to all Documents reviewed or created as part of that inquiry, investigation, or due diligence, due diligence reports or questionnaires, prospectuses, offering memoranda, private placement memoranda, advertisements, brochures, website postings, website addresses, presentations, pamphlets, pitch books, performance records, term sheets, and marketing or executive summaries.

12

14.    All Documents concerning any potential or actual investment with, or related to, BLMIS, including but not limited to all Documents concerning: (i) due diligence conducted on BLMIS; (ii) any opinions, research, or advice concerning any actual or potential investment with BLMIS; (iii) any marketing materials of BLMIS, including but not limited to any private placement memoranda, offering memoranda, tear sheets, or prospectuses; (iv) any monthly, quarterly, or annual performance reports or summaries of BLMIS; (v) any monthly, quarterly, or annual risk or risk management reports of BLMIS; (vi) any portfolio management reports of BLMIS; (vii) any monthly, quarterly, or annual strategy reviews of BLMIS; (viii) SEC Form(s) ADV or 13F, or any amendments thereto, filed or submitted by BLMIS and any other Regulatory filings for BLMIS; (ix) any analysis, discussion, review, simulation, or replication of the split-strike conversion investment strategy purportedly executed by BLMIS or any trade purportedly executed under that strategy, including the volumes of and prices at which BLMIS purportedly purchased or sold securities, the identity of counterparties to trades purportedly executed by BLMIS, and trading activity inconsistent with the split-strike conversion strategy; (x) the management team or management structure of BLMIS; (xi) any investigation, background check, or similar review of the professional experience, education, or other credentials of any BLMIS employee; (xii) the identity or nature of BLMIS's clients or investors; (xiii) the assets under management of BLMIS, including but not limited to the amount of such assets, the growth of such assets, and the percentage of such assets attributable to particular, or groups of, clients or investors; (xiv) any of BLMIS's accountants, auditors, accounting firms, or auditing firms, including but not limited, to David G. Friehling or Friehling & Horowitz, CPAs, P.C.; (xv) fees or commissions charged by BLMIS; (xvi) risk models; (xvii) pricing models; (xviii) qualitative or quantitative analyses; (xix) periodic portfolio analyses; (xx) benchmarking analyses; (xxi) performance attribution analyses; (xxii) peer analyses; (xxiii) systematic v. non-systematic return analyses; (xxiv) regression analyses; (xxv) reverse-engineering analyses; (xxvi) risk-adjusted analyses; (xxvii) style-adjusted analyses; (xxviii) scenario analyses; (xxix) drawdown analyses; (xxx) correlation analyses; (xxxi) alpha analyses; (xxxii) comparisons, reviews, or analyses of performance during periods of market stress or market downturn; (xxxiii) the volatility or expected volatility of BLMIS's performance; (xxxiv) any "scatter diagrams" or histograms created or used to analyze the performance of BLMIS; (xxxv) the Sharpe ratio for BLMIS; and (xxxvi) the Sortino ratio for BLMIS.

15.    All Documents concerning any assessment of, or due diligence conducted on, KGF, KEF, BLMIS, or any Feeder Fund, by any Person, including but not limited to all Documents concerning: (i) due diligence questionnaires; (ii) any opinions, research, or advice concerning any actual or potential investment with KEF; (iii) any KEF marketing materials, including but not limited to any private placement memoranda, offering memoranda, tear sheets, or prospectuses; (iv) any KEF monthly, quarterly, or annual performance reports or summaries; (v) any KEF monthly, quarterly, or annual risk or risk management reports; (vi) any KEF portfolio management reports; (vii) any KEF monthly, quarterly, or annual strategy reviews; (viii) KEF's Regulatory filings; (ix) risk models; (x) pricing models; (xi) qualitative or quantitative analyses; (xii) periodic portfolio analyses; (xiii) benchmarking analyses; (xiv) performance attribution analyses; (xv) peer analyses; (xvi) systematic v. non-systematic return analyses; (xvii) regression analyses; (xviii) reverse-engineering analyses; (xix) risk-adjusted analyses; (xx) style-adjusted analyses; (xxi) scenario analyses; (xxii) drawdown analyses; (xxiii) correlation analyses; (xxiv) alpha analyses; (xxv) comparisons, reviews, or analyses of performance during periods of market stress or market downturn; (xxvi) the volatility or

13

08-01789-cgm    Doc 12768-1    Filed 03/04/16    Entered 03/04/16 10:49:19    Exhibit A
Pg 35 of 40


expected volatility of KEF's performance; (xxvii) any "scatter diagrams" or histograms created or used to analyze KEF's performance; (xxviii) KEF's assets under management, including but not limited to the amount of such assets, the growth of such assets, and the percentage of such assets attributable to particular, or groups of, clients or investors; (xxix) the Sharpe ratio for KEF; and (xxx) the Sortino ratio for KEF.

16.    All Documents concerning the investment activity of KGF, KEF, BLMIS, or any Feeder Fund that relate to the following subjects:  (i) the performance of KEF's investment with BLMIS; (ii) the NAV of KEF, including its calculation; (iii) KEF's assets under management; (iv) KEF's investment strategies, including the development, marketing, or execution of any investment strategy; (v) all account statements issued by KEF to any Person; (vi) trade confirmations or other memorialization of purported trades made by, or on behalf of, KEF; (vii) the identification (or lack thereof) of any counterparty to any trades purportedly executed by, or on behalf of, KEF and any attempts to ascertain any such counterparty's identity; (viii) any review, discussion, or analysis of any options purportedly purchased or sold by, or on behalf of, KEF; (ix) any review, analysis, or statement of prices at which KEF, or any Person acting on behalf of KEF, purportedly purchased or sold securities; and (x) any efforts to verify the securities positions purportedly held by BLMIS for the KEF Account.

## IV.    FINANCIAL AND ACCOUNTING RECORDS

17.    All Documents concerning the accounting or recordation of KEF's financial performance and activity, including but not limited to all general ledgers, journals, trial balances, reconciliations, statements of cash flow, balance sheets, and profit-and-loss statements, and KEF's financial statements, whether audited or unaudited, including but not limited to audited annual statements, unaudited quarterly and other interim statements, and draft statements, including all related work papers, notes, schedules, and exhibits.

18.    KEF's foreign and domestic tax returns or other tax reporting Documentation, whether filed, unfiled, or in draft form, and all supporting schedules, work papers, journal entries, and trial balances.

19.    All Documents concerning services provided to KEF by PricewaterhouseCoopers, including but not limited to all Documents sent to or received from PricewaterhouseCoopers.

## V.    SUBSCRIPTIONS & REDEMPTIONS

20.    All Documents provided to, received from, or concerning any and all actual or potential investors, subscribers, or shareholders in KEF, including but not limited to information memoranda, offering memoranda, private placement memoranda, and all other Documents of a similar type concerning the solicitation of investment or subscription in KEF; account opening Documents, investment advisory or management contracts, consent forms, trading authorizations, authorizations to purchase and sell securities, investment contracts, option agreements, and subscription agreements; and all Documents concerning that certain (i) Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum dated October 6, 2008, (ii) Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum dated September 22, 2008, (iii) Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum dated August 1, 2007, (iv) Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum dated May 1, 2006, (v)  Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum dated May 1, 2004, (vi) Kingate Euro Fund, Ltd. Amended and Restated

14

Information Memorandum dated January 15, 2003, (vii) Kingate Euro Fund, Ltd. Amended and Restated Information Memorandum dated January 1, 2002, and (viii) Kingate Euro Fund, Ltd. Information Memorandum dated May 1, 2000.

21.     All Documents concerning your receipt of funds from any Person for purposes of investment or subscription in KEF.

22.     All Documents concerning (i) any and all actual or proposed withdrawals of funds from KEF and (ii) any and all actual or proposed redemption of shares or partnerships interests in KEF.

## VI.    BANK ACCOUNTS

23.     All Documents concerning any and all accounts, whether for deposit, credit, investment or any other purpose, maintained by KEF, in KEF's name, or by any Person on KEF's behalf, with any bank, financial institution, or depository trust corporation during the Applicable Period, including but not limited to all statements of account, signature cards, account-opening Documents, periodic reconciliations, deposit slips, withdrawal slips, check registers, canceled checks, wire transfer requests, and wire transfer confirmations. This Request includes all such Documents concerning account number 010-503324-512 and account number 010-503324-511 maintained in KEF's name, or on its behalf, with Bank Bermuda.

24.     All Documents concerning any and all accounts, whether for deposit, credit, investment or any other purpose, maintained by any Defendant in its own name, or by another on such Defendant's behalf, with any bank, financial institution, or depository trust corporation during the Applicable Period, including but not limited to:  (i) Bank Bermuda; (ii) HSBC-Monaco Bank; (iii) Fortis Bank- Guernsey; (iv) Fortis Bank-Channel Islands; (v) Lombard Odier Darier Hentsch, Geneva; (vi) Bank of NT Butterfield & Sons; (vii) Clariden Leu AG-Zurich; and JPMorgan Chase Bank, N.A.  Documents responsive to this Request include, but are not limited to, all statements of account, signature cards, periodic reconciliations, deposit slips, withdrawal slips, check registers, canceled checks, wire transfer requests, wire transfer confirmations, and all other records reflecting cash activity. This Request includes all such Documents concerning (i) account number 010-424174-561 and account number 010-427174-564 maintained in KGF's name, or on its behalf, with Bank Bermuda and (ii) a certain demand deposit account maintained in KML's name, or on its behalf, with Bank Bermuda.

## VII.   CUSTOMER ACCOUNTS AND TRANSFERS

25.     All Documents concerning any and all accounts, including but not limited to the KGF Account or the KEF Account, whether for deposit, credit, investment or any other purpose, maintained by KEF, in KEF's name, or by any Person on KEF's behalf, with BLMIS, including but not limited to all sub-advisory agreements, solicitation agreements, trading authorizations, trading directives, margin agreements, authorizations to purchase and sell securities, investment contracts, option agreements, subscription agreements, and limited partnership agreements, customer account statements, statements of NAV, calculations of NAV, trade confirmations, portfolio statements, deposit records, withdrawal records, and all other records of investment or cash activity.

26.     All Documents concerning any and all Initial Transfers, including but not limited to all Documents concerning any of the following:  (i) the date of each such Initial Transfer, (ii) the amount of each such Initial Transfer, (iii) the account name and account number for the

15

account from which the funds were transferred, (iv) the account name and account number for the account to which the funds were transferred, (v) the method of transfer, (vi) the reason for each such Initial Transfer, and (vii) the disposition of each such Initial Transfer.

27.    All Documents concerning any and all Transfers from, between, or among any and all of the accounts referred to in Requests ##23 through 26.

28.    All Documents concerning each and every request made to BLMIS to withdraw moneys from the KGF Account or the KEF Account, including but not limited to consideration of the timing and amount of such request, the decision to make such request, and all Communications concerning such request.

29.    All Documents concerning each and every deposit made into the KGF Account or the KEF Account, including but not limited consideration of the timing and amount of such deposit, the decision to make such deposit, and all Communications concerning such deposit.

30.    All Documents concerning any review or analysis undertaken to trace monies transferred from any of the accounts referred to in Requests ##23 through 26.

31.    All Documents reviewed or relied upon in connection with the analyses attached at Exhibits J & K of the Declaration of Robert S. Loigman in Support of Opposition of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. to Trustee's Application for Enforcement of Automatic Stay and Injunction, filed on or about February 8, 2014 in *Picard v. Kingate Global Fund, Ltd.*, Adv. Proc. No. 12-01920 (SMB).

32.    All Documents concerning management fees, administrative fees, performance fees, or any other fees or commissions charged by, or paid to, KML, BLMIS, FIM Advisers, FIM Limited, Citi Hedge, and any other Defendant.

## VIII.    BLMIS

33.    All Documents concerning BLMIS, including but not limited to all Documents concerning any of the following:  (i) Documents received from or sent to BLMIS; (ii) Documents received from or sent to any Defendant concerning BLMIS or KEF's investments with BLMIS; (iii) any contact, meeting, or attempt to contact or meet with BLMIS or with any BLMIS employee; (iv) all Communications between KEF and BLMIS including but not limited to transcripts or audio recordings of any such telephone calls; (v) all Communications between KEF and any Person concerning BLMIS, including but not limited to transcripts or audio recordings of any such telephone calls; (vi) any agreement or contract, whether oral or written, to which BLMIS is a party; (vii) all Communications with any BLMIS Employee; and (viii) all Documents received from or sent to any Feeder Fund, the Depository Trust & Clearing Corporation, and the Options Clearing Corporation concerning BLMIS.

34.    All Documents created on or after December 11, 2008, concerning:  (i) the public disclosure that a Ponzi scheme operated out of BLMIS; (ii) the arrest, confession, plea, conviction, or sentencing of either Bernard L. Madoff or of any employee of BLMIS; and (iii) all meetings held by KEF's Board of Directors or KEF's committees, sub-committees or working groups in which BLMIS's Ponzi scheme was a subject or topic or was mentioned or referenced.

35.    All Documents created on or after December 11, 2008, concerning:  (i) any review or modification of KGF's due diligence process; (ii) any self-critical analysis; (iii) any investigation or review that KGF conducted of itself; and (iv) any Communications with any

16

shareholder or prospective shareholder of KGF concerning (a) subscriptions or redemptions in KGF, (b) the NAV of KGF, (c) the effect on KGF of the arrest of Bernard L. Madoff or the commencement of liquidation proceedings against BLMIS, or (d) KGF's actions subsequent to the arrest of Bernard L. Madoff or the commencement of liquidation proceedings against BLMIS.

36.    All Documents concerning: (i) any analysis or discussion of execution prices, performance, or returns of BLMIS; (ii) any analysis or discussion of the feasibility or impossibility of the purported returns and trades of, BLMIS; (iii) Cambridge Associates LLC; (iv) Robert Rosenkranz or Acorn Partners; (v) Oswald Gruebel; (vi) Jim Vos or Aksia, LLC; (vii) David Giampaolo or Pi Capital; (viii) Neil Chelo or Benchmark Plus Partners; (ix) Albourne Partners; (x) Bayou Group, LLC, Bayou Fund, Bayou Hedge Fund Group, Bayou Management, LLC, Samuel Israel III, or any of their respective affiliates; (xi) Michael Ocrant; (xii) Erin Arvedlund; (xiii) Noreen Harrington; (xiv) Michael Markov, (xv) Gil Berman; (xvi) Edward Thorp; (xvii) Harry Markopolos; (xviii) Chris Cutler; (xix) Eric Lazear; (xx) the article in the May 7, 2001 issue of Barron's entitled "Don't Ask, Don't Tell:  Bernie Madoff is so secretive, he even asks his investors to keep mum"; (xxi) the article in the December 16, 1992 issue of the Wall Street Journal entitled "Wall Street Mystery Features a Big Board Rival"; (xxii) the May 2001 MAR/Hedge newsletter entitled "Madoff Tops Charts; Skeptics Ask How"; and (xxiii) any actual, potential, or suspected fraud, Ponzi scheme, or illegal activity (including front running), at BLMIS.

## IX.    SPECIFIC INDIVIDUALS AND ENTITIES

37.    All Documents concerning any of the following:  (i) Manzke; (ii) Fairfield Greenwich (Bermuda), Ltd.; (iii) Fairfield Sentry Ltd.; (iv) Amit Vijayvergia; (v) Andres Piedrahita; (vi) Shazieh Salahuddin; (vii) Eric Lazear; (viii) Tremont (Bermuda) Limited; (ix) Tremont Advisers; (x) Tremont Group Holdings, Inc.; (xi) Tremont Partners, Inc.; (xii) Hemisphere Management Limited; (xiii) Christopher Wetherhill; (xiv) Island Storm, Ltd.; (xv) Phillip A. Evans; (xvi) Frank Walters; (xvii) Michael Tannenbaum; (xviii) the law firm of Tannenbaum Helpern Syracuse & Hirschtritt LLP; (xix) MN Services; (xx) UBP; (xxi) M Invest; (xxii) Robert Johnson; (xxiii) BNP Paribas; (xxiv) Barry E. Breen; (xxv) Moore Stephens International Services (BVI) Limited; (xxvi) Moore Stephens Services SAM; (xxvii) Hamilton Trust Co. Ltd.; (xxviii) Hamilton Nominees Ltd.; (xxix) Fenton Trust; (xxx) FIM Long-Invest Fund EUR & USD; (xxxi) Dancrest Global Equity Fund; (xxxii) Levco Debt Opportunity Fund & Levco Alternative Fund; (xxxiii) FIM Relative Value Fund; (xxxiv) Five Balanced Fund (Bermuda); (xxxv) Five Balanced Fund (Cayman Islands); (xxxvi) Victoria Global Fund; (xxxvii) FDVG Low Volatility Investments & FDVG Equity Investments; (xxxviii) Silver Shield Fund (Bermuda); or (xxxix) Silver Shield Fund (Cayman Islands).

## X.    INVESTIGATIONS & LITIGATION

38.    All Documents concerning any civil, criminal, or other legal proceedings, such as arbitration, including but not limited to the Bermuda Action and the BVI Proceedings, and any criminal investigation, commenced by or against KEF or any other Defendant, in any jurisdiction, whether foreign or domestic, whether threatened or filed, including but not limited to, any pleadings, motions, correspondence, Documents and discovery produced, deposition transcripts (including exhibits), hearing transcripts, witness statements taken or given by any party/witness or produced in discovery, and orders, rulings, and judgments.

39.    All Documents concerning any Communications between KEF and any governmental, Regulatory, or law enforcement entity or official in any jurisdiction, whether foreign or domestic, concerning BLMIS, including but not limited to all Documents received from or sent to any such entity or official.

40.    All Documents concerning any Communications between KEF and any governmental, Regulatory, or law enforcement entity or official in any jurisdiction, whether foreign or domestic, concerning any Defendant, including but not limited to all Documents received from or sent to any such entity or official.

41.    All Documents concerning any and all payments or consideration made by or received by KEF after December 11, 2008, in connection with KEF's investment with BLMIS.

42.    All Documents concerning any claims filed or actions taken (whether legal, equitable, or otherwise) to recoup or recover any damages or losses KEF alleges to have sustained as a result of KEF's investment with BLMIS.

43.    All Communications with, and all Documents submitted by or on behalf of any investor, subscriber, or shareholder in KEF to, Richard C. Breeden, his attorneys, his accountants, or any other representative of Mr. Breeden or the Madoff Victim Fund created under the Department of Justice Asset Forfeiture Distribution Program.


Date:  New York, NY
       October 7, 2015


                                   /s/ David J. Sheehan_____
                                   Baker & Hostetler LLP
                                   45 Rockefeller Plaza
                                   New York, NY 10111
                                   Telephone: (212) 589-4200
                                   Facsimile: (212) 589-4201
                                   David J. Sheehan
                                   Email: dsheehan@bakerlaw.com


                                   *Attorney for Irving H. Picard, Trustee for the*
                                   *substantively consolidated SIPA Liquidation of*
                                   *Bernard L. Madoff Investment Securities LLC*
                                   *and the estate of Bernard L. Madoff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was served this 7th day of

October, 2015 by electronic mail upon the following:

<u>Counsel for the Joint Liquidators for Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd.</u>

Robert S. Loigman
Rex Lee
Lindsay M. Weber
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000


/s/ William W. Hellmuth
*An Attorney for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*