# EXHIBIT C

# BakerHostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

Karin Scholz Jenson
direct dial: 212.589.4266
kjenson@bakerlaw.com

Robert S. Loigman, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Ave 22nd Floor
New York, NY 10010
Attn: Robert S. Loigman, Esq.

Re: *Picard v. Ceretti et al.*

Dear Bob:

Thank you for participating in the Rule 26(f) conference on October 1, 2015 at BakerHostetler. Our goals were to provide you with a better understanding of the Trustee's various collections of documents that may be relevant, to gain a better understanding of the Kingate Funds' prior productions pursuant to the Rule 2004 subpoenas of less than 450 documents ("the 2010 Production"), and to set the stage for future meet-and-confers. This letter memorializes that meeting, which we trust you will agree was productive.

The Kingate Funds ("the Funds") opened the discussion stating that discovery should not proceed until the Funds' motion for leave to appeal from the Bankruptcy Court's August 21, 2015 order on the Funds' motion to dismiss is decided, and further because discovery from the service provider defendants ("the Service Providers") is necessary, and they are subject to the Extraterritoriality Proceedings. You recognize that those proceedings may not be resolved for some time, and we can proceed to obtain discovery from the Service Providers as third parties. The Funds asked the Trustee to consider voluntarily postponing discovery until these matters are resolved, and to advise the Funds' counsel of the Trustee's response to this request as soon as practicable. We agreed to confirm the Trustee's intention to move this proceeding forward, including discovery, promptly.

You advised that, aside from the 2010 Production, documents relevant to this proceeding are in the hands of the Service Providers. We stated that documents that should have been in the Funds' possession, custody or control at the time of the 2010 Production were missing. Such key documents include:

1. Complete bank records from 1995 to 2009. You confirmed that only records from 2008 and perhaps 2007 were produced.

October 5, 2015
Page 2

2. Complete board minutes. We only have minutes from certain meetings in 2008. Minutes from the formation of the Funds are missing. Agendas for board meetings would go hand in hand with the minutes. In that regard, agreements, whether formal or informal, with board members regarding their tenure, responsibilities and duties, bylaws, if any, compensation and the like, were missing.

3. Communications on behalf of the Funds, including but not limited to board member communications or other agents with the Service Providers. None were produced.

4. A complete set of service provider agreements. Many agreements were missing.

5. A complete set of financial statements for the Funds. None were produced.

You acknowledged that the Funds do have many of these documents today, but you may not have had them at the time of the 2010 Production.

You advised that the Liquidators for the Funds have two document collections in their possession, custody or control today. First, you advised that the Liquidators have voluminous documents – hundreds of thousands of pages – obtained from numerous third parties. The Liquidators have not reviewed many of these documents, which are in both electronic and hard copy. We will refer to this collection as the "Voluntary Productions." Second, you advised that many documents were produced by various parties in the Bermuda action, but that the Liquidators may be barred from producing these documents to the Trustee by Bermudian court order or law. We will refer to this collection as the "Bermuda Productions." You advised that you believe there may be overlap between the Voluntary Productions and the Bermuda Productions. You also advised that you would confer with Bermuda counsel to determine what, if any, steps need to be taken for the Funds to make the Bermuda Productions available to the Trustee.

You also asked whether the Trustee would share the cost of making the Voluntary Productions and the Bermuda Productions to the Trustee. We advised that the Trustee would consider this request.

The Funds advised that they intend to file a motion to stay discovery to be heard on October 28. In the alternative, the Funds proposed that, in an effort to keep discovery costs down, the Funds and the Trustee exchange "limited" discovery, perhaps for a period of three months, and then proceed to mediation.

The Trustee also wishes to conserve costs in discovery. We indicated that the Trustee might consider a "quick peek" agreement whereby the Trustee would be permitted unfettered access to the Voluntary Productions and the Bermuda Productions, with the Funds reserving all rights. We advised that a "quick peek" agreement would make the cost-sharing proposal more palatable to the Trustee. A "quick peek" agreement would allow the Funds to avoid the fees

October 5, 2015
Page 3

associated with reviewing both collections for responsiveness to the Trustee's forthcoming Requests for Production of Documents.

The Funds' requests have been presented for further consideration. To assist us in evaluating your proposal for a period of limited discovery in lieu of the Funds' moving for a stay of discovery, we ask that you provide the following information:

1. Indices of the Voluntary Productions and the Bermuda Productions, including the name of each producing party, the number of documents and/or pages produced by each, whether the production is electronic or in hard copy, where the hard copies are currently located, any available information regarding the types of documents produced, and, particularly, whether the key documents identified above missing from the 2010 Production are included;

2. Confirmation that the Funds will be able to legally make both the Voluntary Productions and the Bermuda Productions to the Trustee if we agree to your proposal, without the Trustee having to incur any litigation expense in Bermuda other than potentially for the cost-sharing of production that you proposed; and

3. Alternatively, whether the Funds are amenable to a "quick peek" agreement as to the Voluntary Productions and the Bermuda Productions, if we agree to your proposal, again without the Trustee having to incur any litigation expense in Bermuda other than potentially for the cost-sharing of production that you proposed.

We also discussed the sources of documents in the Trustee's collection. That discussion is memorialized below.

### I. BLMIS

#### A. Generally

The Trustee's database of BLMIS documents from which he produces contains nearly twenty-nine million documents (the "BLMIS Collection"). These are documents that were in BLMIS's possession as of December 11, 2008. The BLMIS Collection includes:

- Core Account Documents ("CADs") for all BLMIS IA customers, which comprise account opening documents, correspondence to and from BLMIS, requests for transfers and/or redemptions, and other documents that were specific to each account;

- Other documents that do not appear in the CADs that may relate to a defendant or account, such as reports, lists, notes, correspondence, and other types of documents;

- Emails and other electronic documents from key custodians at BLMIS;

October 5, 2015
Page 4

- Documents about the business of BLMIS in general;

- Documents that also appear in the Trustee's E-Data Room 1, which contains the documents supporting that BLMIS was a fraudulent enterprise and insolvent; and

- Hard-copy documents.

### B. Production of BLMIS Documents

1. The Trustee will segregate and directly produce all CADs for:

- The BLMIS accounts held by the Kingate Defendants; and

- The "related" accounts (i.e. those BLMIS accounts that transferred funds into the BLMIS accounts held by the Kingate Defendants).

2. There are certain documents from the BLMIS Collection placed into E-Data Room 1, which is discussed more fully below.

3. As to the remainder of the documents in the BLMIS Collection, the parties will meet-and-confer and negotiate search terms and other potential ways to focus the production of those remaining documents, such as removing voluminous customer lists.

### II. E-Data Room 1

### A. Generally

E-Data Room 1 contains BLMIS and third-party documents that relate to the fraud and insolvency of BLMIS. The Trustee's expert considered certain of these documents in connection with his expert report on fraud and insolvency. E-Data Room 1 contains approximately four million BLMIS and third-party documents that relate to BLMIS' fraud and insolvency, including:

- Documents related to the financial condition of BLMIS;

- Documents related to the operations of BLMIS, including the Ponzi scheme;

- BLMIS customer monthly account statements;

- Other internal records of BLMIS;

- Transfers of money to, from and within BLMIS; and

- Regulatory disclosures made by BLMIS.

October 5, 2015
Page 5

The documents and data in E-Data Room 1 are organized generally by source, then document type. Some included categories are:

- BLMIS customer monthly account statements and ledgers;

- Data and reports from various electronic sources;

- BLMIS documents and work papers;

- Operational documents;

- FINRA documents;

- Certain documents received from the SEC;

- Some public documents like relevant plea allocations; and

- Certain hard-copy documents collected from the three floors in the Lipstick Building and BLMIS's off-site storage locations.

### B. Production of Documents from E-Data Room 1

1.  In accordance with the orders on E-Data Room 1, any defendant represented by counsel may access E-data Room 1. The first step is executing a Non-Disclosure Agreement ("NDA"), which we provided to you at our October 1, 2015 meeting. Upon receipt of the signed NDA, we will provide a user login and password to enable access to Data Room Information Portal, which contains a manual and other information explaining how to use E-Data Room 1.

2.  The manual explains how to search E-Data Room 1. There is a mechanism in E-Data Room 1 that allows attorneys to tag documents of interest. No other users can access or view documents that an attorney has tagged.

3.  The manual also explains how to request specific documents for physical production from E-Data Room 1. E-Data Room 1 users do not have the ability to print or download files from E-Data Room 1.

4.  To obtain a production of tagged documents, the user selects a "to produce" tab, then logs on to the Data Room Information Portal and submits a production request.

5.  The Trustee and the Trustee's counsel does not monitor or track counsel's activities within E-Data Room 1. The Trustee's counsel receives a copy of whatever documents are selected for production.

### C. The SQL Database

Information contained in certain sources of information in E-Data Room 1 were processed and input into multiple Microsoft SQL Server tables and databases ("SQL

October 5, 2015
Page 6

Databases.") To the extent feasible, the underlying documents used to build the SQL Databases are contained in E-Data Room 1. As we advised, the SQL Databases are used by the Trustees' experts and are available for production to any defendant upon request.

The sources of data loaded into the SQL Databases include, without limitation:

- StorQM Optical Storage Device: BLMIS used the StorQM application to store historical customer records from December 1995 through November 2008, which include, but are not limited to, Customer Statements and Portfolio Management Reports ("PMRs").

- Microfilm reels: BLMIS used this storage medium for historical customer records, which include, but are not limited to Customer Ledgers and PMRs as well as Portfolio Management Transaction Reports ("PMTs").

- Spiral notebooks: BLMIS personnel recorded cash deposits and withdrawals in handwritten stenographic (spiral-bound) notebooks relating to certain customer accounts. Spiral notebooks were identified for the periods from April 1985 through September 1990, and August 1991 through November 1994.

- BLMIS's bank records, from various banks, including monthly bank statements, check images, wire transfer records, and deposit slips.

- House 17 AS/400 System: This is the computer system that the BLMIS's Investment Advisory Business used to manage customer accounts and generate Customer Statements.

- House 5 AS/400 System: This is the computer system that the BLMIS Market Making and Proprietary Trading businesses used to track and report trading and position information.

- House 17 Backup Tapes: These tapes were created in the normal course of business at BLMIS and contain historical and contemporaneous purported customer activity and customer records from the House 17 AS/400 System.

- House 5 Backup Tapes: These tapes were created in the normal course of business at BLMIS and contain historical and contemporaneous backups of the trading and position records from the House 5 AS/400 System.

- Madoff Securities International Ltd. historical trading and position records.

- Electronic files recovered from BLMIS employee computers and network folders.

- Electronic files recovered from BLMIS's Network Accessed Shares (NAS).

October 5, 2015
Page 7

- Cohmad Cash Database.

- Bloomberg Instant Messaging: Instant messages passed between House 5 traders.

- BLMIS phone logs from Avaya and BlackBerry.

- Security swipe data of employees and visitors from the Lipstick Building.

- Reporting data from the Depository Trust & Clearing Corporation ("DTCC").

- Reporting data from the Options Clearing Corporation ("OCC").

- Bloomberg Market Data.

- Data from the Center for Research in Security Prices ("CRSP").

- Data from the Chicago Board Options Exchange ("CBOE").

### III. Third-Party Documents

#### A. Generally

The Trustee is in possession of millions of documents from hundreds of producing parties from his Bankruptcy Rule 2004 investigation, and from the various litigations. With a few exceptions outlined below, pursuant to the Court's October 17, 2013 Orders on the Third-Party Data Rooms, which we distributed at the October 1, 2015 meeting, the Trustee makes available all third-party documents in the Third-Party Data Rooms.

As set forth in the Orders, the documents included in the Third-Party Data Rooms are:

- Documents produced to the Trustee in response to Rule 2004 subpoenas;

- Documents produced to the Trustee voluntarily;

- Documents produced to the Trustee in non-Avoidance Actions where discovery has commenced;

    o "Avoidance Actions" is defined in the Order; they are the "good-faith" or "innocent investor" cases.

- Transcripts of parties examined pursuant to Bankruptcy Rule 2004; and

- Transcripts of parties and non-parties deposed in litigation.

As set forth in the Orders, the documents excluded from the Third-Party Data Rooms are:

- Documents provided to the Trustee in connection with hardship applications;

October 5, 2015
Page 8

- Documents provided to the Trustee with restrictions on use and/or disclosure for possible settlement and/or mediation;

- Documents subject to or controlled by a domestic or foreign court order;

- Those documents that, due to contractual obligations, are no longer under the care, custody or control of the Trustee;

- Documents produced to the Trustee in discovery in the Avoidance Actions;

- Exhibits to Rule 2004 Examinations and Litigation Depositions, which will be in the Third-Party Data Rooms as they were originally produced to the Trustee in accordance with the Order Establishing Procedures for Third-Party Data Rooms; and

- Documents or data identified as being a record of Cohmad, and/or where the original custodian identified was a Cohmad employee.

    o This category excludes from the Third-Party Data Rooms any documents or data that remained at the offices of BLMIS in 2009 identified as being a record of Cohmad and/or where the original custodian identified was a Cohmad employee; and

    o It also excludes from the Third-Party Data Rooms any document production by any Cohmad Defendant to the Trustee in this action.

### B. Production of Third-Party Documents

### Documents Included in the Third-Party Data Rooms

1. The Orders describe how the Third-Party Data Rooms operate. In general, if a defendant serves a Request for Production of Documents that implicates documents that are in the Third-Party Data Rooms, following counsel's execution of an NDA similar to that for E-Data Room 1, the Trustee and the defendant will meet and confer about "appropriate access" to the Data Rooms. Once access is granted, counsel will receive a manual describing the contents of and exclusions from the Third-Party Data Rooms and how the Third-Party Data Rooms can be searched.

2. The documents in the Third-Party Data Rooms are segregated into two separate spaces: one contains documents designated confidential; the other contains non-confidential documents.

3. The basic difference between the two is that in the Non-Confidential Data Room, counsel can run searches and view documents immediately that hit on those searches. In the Confidential Data Room, counsel can run searches, but cannot view the documents that hit on those terms until the producing party releases them for viewing. There is a mechanism in place

October 5, 2015
Page 9

in the Data Rooms for the producing party to authorize the viewing of confidential documents, and to authorize the production of both non-confidential and confidential documents.

### Documents Excluded from the Third-Party Data Rooms

Documents responsive to non-objectionable Requests for Production by a defendant that are *excluded* from the Data Room (including documents produced in the Avoidance Actions) will be produced in accordance with the Trustee's search-term protocol, i.e., the development of search terms, document type or producing party limitations, and other parameters that may be helpful as discussed in individual meet and confers.

IV.    The Trustee's Approach to Discovery Generally/Miscellaneous Points

   1. **What the Trustee will produce without search terms:**

The Trustee will produce the following documents regardless of a specific request for production of the documents:

- The Core Account Documents previously described;

- Bank Transfer Documents: account statements and cancelled checks that establish proof of the transfers from BLMIS to Cohmad Defendants; and

- Any other case-specific documents that he may use to support his claims.

   2. **The need for cooperation and search terms:**

The parties' cooperative approach to developing narrowly tailored search terms is critical to the Trustee's cases for the following reasons:

- To avoid a "data dump" of documents if a defendant demands "all" documents relating to an account, defendant, or subject, given the sheer volume of documents that are in the Trustee's collections;

- The fact that many of these "responsive" documents may be redundant, cumulative, duplicative or marginally relevant;

- To reduce the costs in discovery, both on the Trustee in having to conduct a responsiveness review, and on defendants for having to review a large production from the Trustee.

We generally agree to provide hit-count reports on agreed-upon search terms, so defendants can further limit the production by narrowing the terms, requesting only certain document types, or other parameters.

   3. **Productions within the matter**

October 5, 2015
Page 10

- Any defendant who produces documents to the Trustee in response to the Trustee's Requests for Production of Documents must provide a duplicate copy to every other defendant in *Picard v. Ceretti*;

- The Trustee will provide a courtesy copy of any documents he produces to one defendant *Picard v. Ceretti* to all other defendants in *Picard v. Ceretti*, except for any productions a defendant takes out of either E-Data Room 1 or the Third-Party Data Rooms; and

- The party who issues a subpoena is responsible for producing to all other parties a copy of a production received pursuant to a Rule 45 subpoena.

As we discussed, we are prepared to begin the production of the Core Account Documents and Bank Transfer documents upon receipt of the Undertaking and Consent to be Bound attached to the June 6, 2011 Litigation Protective Order, which we provided to you at the October 1, 2015 meeting. Please submit the signed undertaking, as well as the other non-disclosure agreements discussed above and that we provided to you at the October 1, 2015 meeting, to Madoffdatarooms@bakerlaw.com.

Thank you.

Sincerely,

Karin Jenson

cc:
Rex Lee
Lindsay Weber
David Sheehan
Geraldine E. Ponto
John Burke
Gonzalo Zeballos
James Sherer
Michelle R. Usitalo