# EXHIBIT D

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL: (212) 849-7000 FAX: (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7277**

WRITER'S INTERNET ADDRESS
**lindsayweber@quinnemanuel.com**

October 13, 2015

**BY E-MAIL**

Karin Jenson, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111

Re:   *Picard v. Ceretti et al.*
      Adv. Pro No. 09-01161 (SMB)

Dear Karin:

We write in furtherance of our October 1, 2015 meet and confer, and in response to your October 5, 2015 letter.

*The Funds' Request for Stay of Discovery*

During our October 1 meet and confer, we asked whether the Trustee would be willing to agree to a voluntary stay of discovery. We explained first that we thought it made little sense for the parties to engage in discovery while the Funds' motion for leave to appeal is pending. Separately, we noted that until the Extraterritoriality Proceedings are resolved, there can be no party discovery with respect to the Non-Fund Defendants. While we recognized at the meet and confer that the parties may attempt to obtain discovery from the Non-Fund Defendants as foreign third parties, we also specifically discussed the heavy burdens associated with making such requests. In your October 5 letter, you appear to indicate that the Trustee nonetheless intends to "move this proceeding forward, including discovery, promptly." We ask that you confirm the Trustee's position immediately so that we can prepare for motion practice, if necessary.

*The Funds' Mediation Proposal*

At the meet and confer, we also discussed the Funds' proposal to have a short period of targeted discovery, followed by a mediation. We explained that the Funds—like BLMIS—are currently in liquidation proceedings, and that as such, they have a strong desire to minimize costs. We are encouraged to hear that the Trustee "also wishes to conserve costs in discovery." In that regard, you indicate that the Trustee is willing to consider a "quick peek" agreement

Karin Jenson, Esq.
Page 2

whereby the Trustee would be permitted unfettered access to documents in the Funds' possession, with the Funds reserving all rights. The Funds are also willing to consider such an arrangement, but first require some clarification.

As an initial matter, we are puzzled by your use of the term "quick peek" as we do not recall that term having been used during the parties' discussions. We assume that by "quick peek" you are referring to the Funds' proposal to produce to the Trustee documents in the same form and manner in which the Trustee is producing documents to the Funds. More specifically, the Funds are determining whether it is possible to make available to the Trustee an electronic data room of documents without first conducting a review for responsiveness. The Trustee would then have the ability to run searches in the data room and tag documents for production. The Funds would not be able to view the searches run by the Trustee, but would receive a copy of those documents that the Trustee tags for production out of the data room. The Trustee would bear the costs of hosting the data room, as well as the costs of production. All of these aspects of discovery would mirror the Trustee's use of data rooms available to the Funds. Please confirm that this is the "quick peek" proposal to which the Trustee is referring.

As your letter acknowledges, we also discussed conducting this type of open access discovery for a period of 3-4 months, followed by a mediation. We ask that you clarify whether the Trustee is amenable to entering a mediation following the "quick peek" period. Relatedly, please let us know if the Trustee is agreeable to conducting discovery in the form and manner described above, even in the event this case moves past mediation and into a more extensive discovery period.

***Documents in the Funds' Possession or Control***

Your October 5 letter asks that the Funds answer a series of questions related to the sources of documents that they have in their possession. In order to facilitate discussions regarding the Trustee's proposed "quick peek" arrangement, we have sought to be as specific as possible with respect to the types of documents the Funds have available. By listing the documents below, we do not concede that they are relevant to the Trustee's claims, and fully reserve our rights with respect to this issue.

As your letter correctly notes, the Funds have two general categories of document collections: (1) documents produced voluntarily by third parties; and (2) documents provided pursuant to court orders. You ask that the Funds provide indices of those productions, including the name of each producing party, the number of documents and/or pages produced, and any available information regarding the types of documents included in each production. You also ask whether the productions are electronically stored or maintained in hard copy form.

With respect to voluntary productions, the Funds are in possession of the following categories of documents. Except where noted, these documents are all stored electronically on the Funds' Ringtail system. The voluntary productions generally include the bank records, board minutes, communications, service provider agreements, and financial statements that your letter notes are missing from the Funds' Rule 2004 productions, but only to the extent the Funds have received such documents in the productions set forth below.

Karin Jenson, Esq.
Page 3

- <u>Directors of the Funds</u>: When BLMIS collapsed in December 2008 there were three directors of the Funds: Graham Cook, John Epps and Christopher Wetherhill. At the outset of the Funds' liquidations, Cook and Epps collectively produced approximately 1,820 documents. As to Wetherhill, it is our understanding that his documents were captured in productions made by KML.

- <u>Bison</u>: Bison produced approximately 15 documents to the Funds, consisting of quarterly reports, resolutions, and versions of the Funds' Offering Memoranda and Articles of Association.

- <u>Citi Hedge</u>: Early on in the liquidations, the Funds received approximately 857 electronic documents from Citi Hedge. In addition, Citi Hedge produced approximately 350 bankers boxes of documents in hard copy form. Citi Hedge included in that production indices of the boxed documents. Approximately 83,000 of those hard copy documents have been scanned and uploaded to the Funds' Ringtail platform. The remaining bankers boxes are held in storage in Bermuda at Bermuda Forwarders Ltd. Earlier this year, Citi Hedge also produced to the Funds approximately 17,100 documents in electronic form. Many of the newly produced documents are duplicative of those documents the Funds received in hard copy form.

- <u>Bank of Bermuda</u>: Bank of Bermuda produced approximately 65 documents to the Funds. We note that some of those documents are hundreds of pages long, as they consist of years of the Funds' bank statements. As a result, the number of documents does not reflect the scope of production from Bank of Bermuda.

- <u>Tremont</u>: Tremont produced approximately 218 documents to the Funds, consisting of a mix of correspondence, shareholder information, fee information, financial statements, fact sheets and various agreements.

- <u>KML</u>: The Funds received approximately 128,000 documents from KML, mostly in electronic form. The production primarily consists of documents retrieved from KML's server. Since our meet and confer, we have confirmed that the Funds did not maintain a standalone server of their own. Instead, they used KML's server to communicate with investors. Those communications were meant to be captured in this voluntary production. As you are aware, KML is itself in a liquidation proceeding. At the outset of that proceeding, the KML server was imaged, and that image is now held in a safe deposit box in Bermuda. Pursuant to an agreement, the server can only be accessed in the joint presence of legal representatives of the Joint Liquidators and KML's Official Receiver.

- <u>FIM</u>: FIM produced approximately 53,000 documents to the Funds, mostly in electronic form. FIM represented that these are the same documents that the Trustee received in connection with his application to the English court for production under the UK Cross Border Insolvency Regulations.

Karin Jenson, Esq.
Page 4

- **Privileged Communications**: The Funds are in possession of privileged documents obtained by the Joint Liquidators from counsel to the Funds. The Funds do not intend to include these documents in the proposed data room.

The Funds are also in possession of documents provided to them pursuant to the rules of the Supreme Court of Bermuda, supplemented by orders of that court in the Bermuda action. However, as explained during the meet and confer, English common law imposes on the Funds an implied undertaking which prevents them from turning these documents over to the Trustee. In our October 1 meeting, we agreed to explore ways to enable production of these documents, notwithstanding this undertaking, including by obtaining consent from the producing third parties and/or by seeking an order from the Bermuda court. Each of the producing third parties is being asked for their permission to turn the documents over to the Trustee. In the event those parties do not consent, the Funds are also willing to apply to Bermuda court for an order allowing them to produce the documents in the New York proceedings. We outline the categories of documents currently subject to the implied undertaking, below.

- **KML**: The Funds' received approximately 66,000 documents in electronic form, with approximately 23,000 of those documents duplicative of what was previously provided to the Funds voluntarily.

- **FIM**: The Funds received approximately 47,000 documents in electronic form from FIM. 22,800 of those documents are duplicative of what FIM provided to the Trustee by order of the English court.

- **The Trust Defendants**: The Funds' received approximately 26,800 documents in electronic form from the Trust Defendants. We understand that the discovery was compiled by undertaking searches of key personnel's emails and certain servers of Moore Stephens entities.

The Funds are also in possession of three sets of documents received from PricewaterhouseCoopers ("PwC"). The first set was received by the Funds in 2009 at the outset of the Funds' liquidation proceedings and consists primarily of engagement letters, audited financial statements, and representation letters. These documents have been loaded onto the Funds' Ringtail system and would be made available to the Trustee in the data room. The second set of documents was received from PwC under compulsion of a 2012 order issued by the Bermuda court. By and large, these documents are PwC work papers that are not relevant to the Trustee's claims; they will not be included in the data room. Of this production, however, approximately 266 document have been uploaded to the Funds' Ringtail system for electronic production in the Bermuda action, and can be made available to the Trustee in the data room. The Funds received the third set of documents from PwC's US affiliate, PricewaterhouseCoopers LLP, pursuant to a section 1782 action initiated in the Southern District of New York. Those documents are similarly unrelated to the Trustee's claims, and subject to confidentiality restrictions, and therefore would not be included in the data room.

Karin Jenson, Esq.
Page 5

*Shareholder Identities*

As we explained at the meet and confer, the Funds' subscription agreements with the individual shareholders preclude the sharing of personal data—such as subscriber names and addresses—with "non-affiliated third parties." Moreover, the redaction of such information from the hundreds of thousands of documents now in the Funds' possession could prove unduly burdensome. That said, the Joint Liquidators would like to structure disclosure by providing the Trustee with broad access to the Funds' documents (much like the Trustee's approach with the data rooms). To that end, while we reserve all rights with respect to the document requests recently served by the Trustee, it would help if the Trustee could provide a complete explanation why the following are relevant to the Trustee's claims against the Funds: (a) information regarding individual shareholders in the Funds, and (b) information contained in documents that include shareholder information—such as bank records, communications with managers, etc.—apart from the shareholder information itself. An assessment of relevance is essential to determining the Funds' ability to disclose documents that contain confidential shareholder data.

*The Trustee's Data Rooms*

We appreciate that you have already agreed, in advance of our specific document requests, to grant us access to the Trustee's data rooms. We intend to submit our non-disclosure agreements shortly (subject to a reservation of rights with respect to our position regarding the commencement of discovery). We understand from the meet and confer that some documents from the BLMIS Collection are not included in E-Data Room 1 and/or the SQL Database; from your letter, it is not clear which documents are included in that group. Please provide us with a description of those BLMIS documents so that we can determine whether they are relevant to the matters at issue in these proceedings and so, when appropriate, we can frame document requests.

\*   \*   \*

We appreciate and agree that the October 1 meeting was both helpful and productive. We look forward to your responses to the questions set forth above—whether in writing or by telephone—so that the parties can continue to move things forward in advance of the conference scheduled for October 28.

Best regards,

Lindsay M. Weber

cc:   David Sheehan
      Geraldine E. Ponto
      John Burke
      Gonzalo Zeballos
      James Sherer
      Michelle R. Usitalo
      Robert S. Loigman
      Rex Lee