# EXHIBIT X

AN AGREEMENT made the          day of
One thousand nine hundred and ninety-four BETWEEN:-

**KINGATE GLOBAL FUND, LTD.** a company incorporated under the laws of the British Virgin Islands whose registered office is at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, BVI (the "Company"); and

**KINGATE MANAGEMENT LIMITED,** a company incorporated under the laws of Bermuda whose office is at Hemisphere House, 9 Church Street, Hamilton HM 11, Bermuda (the "Manager").

WHEREBY IT IS AGREED AND DECLARED as follows:-

1      INTERPRETATION

1.1    In this Agreement the following words and expressions shall, where not inconsistent with the context, have the following meanings respectively:-

"Administrator" means Hemisphere Management Limited or any other Administrator appointed as such by the Directors;

"Articles" means the Memorandum and Articles of Association for the time being of the Company and any reference herein to an Article shall be taken to refer to the Articles unless otherwise specified;

"Auditors" means Coopers & Lybrand or any other auditor appointed as such by the Directors;

"Business Day" means any day when the central banking systems of the U.S. and Bermuda are open and operating;

"Connected Person" of a company means and includes (a) any person or company beneficially owning, directly or indirectly, 20 per cent or more of the issued ordinary share capital of that company or able to exercise, directly or indirectly 20 per cent or more of the total votes in that company; (b) any person or company controlled by a person who or company which meets one or both of the descriptions given in (a); (c) any company 20 per cent or more of whose issued ordinary share capital is beneficially owned, directly or indirectly by that company and any Connected Person of that company (as defined in (a), (b) or (d) of this definition) taken together or any company 20 per cent or more of the total votes in which can be exercised, directly or indirectly, by that company and any such Connected Person thereof (as defined in (a), (b) or (d) of this definition taken together; (d) any employee, director or officer of that company or of any Connected Person of that company (as defined in (a), (b) or (c) of this definition); (e) any spouse, minor child or step-child of the persons referred to in (a), (b) and (d); and (f) any trustee of a trust, the beneficiaries of which are persons falling into (a), (b), (d) and (e);

"Custodian" means the body corporate acting in the capacity of custodian of the Investments for the time being;

"Directors" means the Directors of the Company from time to time;

"Dollars ($) and Cents" means U.S. dollars and cents;

"Eligible Investor" means a person who is entitled to own Shares under the Articles;

"Investments" means all the assets and rights from time to time of the company held in accordance with the Articles;

"Laws" means the laws of Bermuda and any other applicable laws and regulations for the time being in force;

"Management Fees" means the fees payable to the Manager calculated in accordance with Clause 6.1 of this agreement;

"Net Asset Value" means the net asset value of all the Shares calculated in accordance with Clause 4 as of the close of business on the last Business Day of each calendar month;

"Redemption Date" means the last Business Day of each calendar month.

"Shares" means the Common Shares with an initial net price of $100 per share;

KING_000000410

"Subscription Date" means the first Business Day subsequent to the prior month-end;

1.2 Any reference to the Company, the Manager or the Custodian includes a reference to its or their duly authorised agents or delegates.

1.3 Reference to Clauses are to Clauses of this Agreement.

1.4 The headings to the Clauses of this Agreement are for convenience only and shall not affect the construction or interpretation thereof.

1.5 Unless the context otherwise requires words and expressions contained in this Agreement shall bear the same meaning as in the Articles PROVIDED THAT any alteration or amendment of the Articles shall not be effective for the purposes of this Agreement unless the party hereto affected (to the extent that its rights or duties hereunder are affected by such alteration or amendment) shall, by endorsement hereon or otherwise, have consented thereto.

2  APPOINTMENT OF THE MANAGER

The Company HEREBY APPOINTS the Manager and the Manager shall act with effect from the date hereof as Manager of the Company upon the terms hereinafter contained and in accordance with the Laws, the Articles and the investment policy for the Company for the time being as determined by the Directors until its appointment shall be terminated as hereinafter provided and the Manager hereby accepts such appointment and agrees to assume the obligations set forth herein.

3  FUNCTIONS, POWERS AND OBLIGATIONS OF THE MANAGER

3.1  During the continuance of its appointment the Manager shall (subject to the overall policy and supervision of the Directors and subject to Clause 3.4) have full power, authority and right to exercise the functions, duties, powers and discretions exercisable by the Directors under the Articles either itself or wholly or in part through its authorised agents or delegates to (i) manage all aspects of the investment advisory services provided to the Fund, including the selection and evaluation of Investment Advisors and the allocation of the Fund's assets among the Investment Advisors and (ii) to arrange for the performance of all accounting and administrative services which may be required by the Fund's operations.

3.2 Without limiting the generality of the foregoing clause 3.1, the Manager shall have and is hereby granted the authority, power and right in the name of the Company but subject to the supervision of the Directors:-

> 3.2.1  to issue orders and instructions by telex or telefax to the Custodian as to payments in respect of the sale or acquisition of the Investments;
>
> 3.2.2  to purchase (or otherwise acquire), sell (or otherwise dispose of) and invest in the Investments for the account of the Company and effect foreign exchange transactions on behalf of the Company and for the account of the Company in connection with any such purchase, other acquisition, sale or other disposal or the protection of the value of Investments;
>
> 3.2.3  to enter into, make and perform all contracts, agreements and other undertakings as may in the opinion of the Manager be necessary or advisable or incidental to the carrying out of the objectives of this Agreement;
>
> 3.2.4  to apply to the relevant authorities for, and to obtain from such authorities, all confirmations or consents relating to the taxation status of the Company and all tax rebates and other payments which may be due to the Company from time to time in respect of the Investments and in connection therewith the Manager shall have and is hereby granted the authority to disclose to any such relevant authorities such information in its possession regarding the Company or its affairs as may be necessary or required; and
>
> 3.2.5  to supervise the distribution of the shares.

3.3 The Manager shall observe and comply with the Articles and with the applicable provisions of any prospectus, explanatory memorandum or other such document relating to the Company distributed from time to time by or on behalf of the Company and all resolutions of the Directors of which it has notice and other lawful orders and directions given to it from time to time by the Directors and all activities engaged in by the Manager hereunder shall at all times by subject to the control of and review by the Directors and without limiting the generality of the foregoing the Directors may from time to time:-

> 3.3.1 prohibit the Manager from investing in any Investment or in any currency or country or with any institution;

    3.3.2 require the Manager to sell any Investment or (subject to the availability of funds) to purchase any Investment;

    3.3.3 amend the investment objectives of the Company and specify the manner in which they wish the Manager to give effect to such objectives;

    3.3.4 instruct the Manager as to the exercise of the rights attached to the Investments managed by the Manager;

and the Manager shall and shall procure that any person firm or company to whom it delegates any of its functions hereunder shall give effect to all such decisions.

3.4 Subject to the terms of this Agreement, to such orders and directions as may from time to time be given by the Directors and to the overall policy and supervision of the Directors, in exercising its rights and carrying out its duties hereunder the Manager is authorised to act for the Company and on the Company's behalf within the scope of this Agreement either itself or wholly or in part through its authorised agents or delegates in the same manner and with the same force and effect as the Company might or could do.

3.5 All rights of voting conferred by Investments shall be exercised in such manner as the Manager may determine (subject to the right of the Directors to give instructions) and subject as aforesaid the Manager may in its discretion refrain from the exercise of such voting rights. The Manager (subject as aforesaid) may instruct the Custodian as to how it should exercise the voting rights conferred by a particular Investment.

4    NET ASSET VALUE

4.1    Net Asset Valuations are determined by the Administrator, in large part based upon information regarding the value of the Fund's portfolio assets provided by the Investment Advisors, as of the close of business on the last Business Day of each calendar month. The Fund generally seeks to have portfolio securities valued in accordance with the following guidelines.

4.2    Portfolio securities are valued at the last sale price reported on the principal securities exchange or market on which the securities are traded. In the absence of reported sales prices on the valuation date, portfolio positions generally are valued at the last reported bid quotation in the case of securities held long and at the last reported offer quotation in the case of securities sold short. In special circumstances in which the Administrator determines that market prices or quotations do not fairly represent the value of particular assets based on information provided by the applicable Investment Advisor, the Administrator is authorized to assign a value to such assets which differs from the market prices or quotations based on information provided by the applicable Investment Advisor.

4.3    Securities or other assets which are not readily marketable, including, illiquid direct investments of the Fund, generally are valued at the lesser of cost or market price, and may be subject to an additional discount upon the recommendation of the Administrator. If appraisals are available, references can be made to such appraisals. Shares of other investment funds will generally be valued at the Net Asset Value supplied by such funds, less any applicable redemption charges customarily imposed by such funds and less any provision for non-accrued management and performance fees. The value of assets are recorded at their fair value as determined in good faith by the Administrator in the absence of current quotations or if the Administrator concludes that such quotations are not indicative of fair value by reason of illiquidity of a particular security or other factors.

4.4    In addition to special valuation calculations relating to illiquid securities, other special situations affecting the measurement of Net Asset Values may arise from time to time. Prospective investors should be aware that situations involving uncertainties as to the valuation of portfolio positions could have an adverse effect on the Fund's net assets if judgments regarding appropriate valuations made by the Administrator should prove incorrect. In the absence of bad faith or manifest error, the Net Asset Value calculations made by the Administrator are conclusive and binding on all shareholders.

4.5    There will be deducted from the total value of the Fund's assets all accrued debts and liabilities, including (i) fees of the Investment Advisors, the Manager, the Consultant and the Administrator earned or accrued but not yet paid, (ii) a provision for the annual performance fees of the Manager and the Investment Advisors measured as of the valuation date, (iii) monthly amortization of organization costs, (iv) an allowance for the Fund's estimated annual audit and legal fees, and (v) any contingencies for which reserves are determined to be required. Net Asset Valuations will be expressed in U.S. Dollars, and any items denominated in other currencies will be translated at prevailing exchange rates as determined by the Administrator.

5   CONTINUATION AND EXERCISE OF MANAGER'S POWERS

5.1   The authorities herein contained are continuing ones and shall remain in full force and effect until revoked by termination of this Agreement as hereinafter provided, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

6   FEES OF THE MANAGER

6.1   In consideration of the services to be undertaken by the Manager hereunder the Manager shall be entitled to receive from the Company a fee or fees consisting of:-

   6.1.1   Management Fee - The Manager receives a monthly fee from the Fund calculated at an annual rate equal to one and one-half percent (1.5%) of the month-end Net Asset Value of the Fund (the "Management Fee") before any current accrual for a Performance Fee. The Management Fee is generally payable as of the last Business Day of each month.

   6.1.2   Annual Performance Fee - The Fund also pays the Manager a performance fee, payable annually, equal to ten percent (10%) of the Fund's cumulative net profit, including net realized and unrealized gains and losses and net investment income (the "Performance Fee"), but such payment is due only if:

   o   the Fund's annual performance is in excess of ten percent (10%) prorated for a partial year, and

   o   such payment (if due) does not cause the Fund's performance to fall below ten percent (10%).

   The cumulative net profit of the Fund is generally determined as the amount, if any, by which the sum of the Fund's Net Asset Value as of the last Business Day of each year, before deduction or accrual of the Performance Fee, but after deduction or accrual of all other expenses and liabilities including basic monthly fees, exceeds the sum of the Fund's Net Asset Value as of the last Business day of the preceding year, in each case adjusted for capital changes since such date. Because the Fund's assets are recorded in the Fund's annual financial accounts at their market value, the Performance Fee will reflect any net changes in unrealised appreciation or depreciation in the value of the Fund's portfolio as of the last Business Day of each year as well as gains and losses realised during the year and net investment income or loss.

   The Performance Fee will be payable on a cumulative, or "peak to peak", basis and will not be payable after a period during which the Fund experiences a net loss unless and until such net loss is recouped and net gains in excess of ten percent (10%) are achieved. If in a given year the Fund's annual performance, although positive, is less than ten percent (10%), no Performance Fee shall be payable to the Manager, but any such shortfall will not be taken into account in the calculation of the Performance Fee in the following year.

   The Performance Fee is payable to the Manager as of the end of each calendar year. The Manager has no obligation to restore to the Fund Performance Fees previously earned and paid, notwithstanding a loss in a subsequent period.

   Appropriate adjustments will be made in the calculation of the net profit and in the calculation of the net loss carried forward from one period to the next to account for capital contributions and withdrawals.

6.2   If this Agreement shall terminate otherwise than on any Redemption Date, the Manager, in respect of the Management Fee set out in Clause 5.1.1, shall be entitled to receive on the Redemption Date following termination in respect of the part of the relevant month preceding termination ("the partial month") only the amount which bears the same proportion to the amount calculated pursuant to Clause 5.1.1 above as the number of days in the partial month bears to the number of days in the relevant month.

6.3   If this Agreement shall terminate otherwise than on the last Redemption Date of the calendar year the Manager, in respect of the Performance Fee set out in Clause 5.1.2, shall be entitled to receive on the Redemption Date following termination the fee which had accrued as of the Redemption Date prior to termination.

6.4   In the event of any dispute arising as to the amount of the Management and/or Performance Fee, the same shall be referred to the Auditors for settlement, who shall be entitled to make such further or other adjustments as may in the circumstances appear to them to be appropriate and whose decision shall be regarded as the decision of an expert and not of an arbitrator and shall be binding and final upon the parties hereto.

7    EXPENSES

7.1    The Manager shall pay the expenses incurred by it in connection with the performance of its services hereunder unless the Company otherwise agrees in any particular case.

7.2    All remuneration and other sums payable to any person firm or company to whom the whole or any part of the Manager's functions hereunder shall be delegated under Clause 8 shall be paid by the Manager.

8    SERVICES OF THE MANAGER NOT TO BE EXCLUSIVE

The services of the Manager to the Company hereunder are not to be deemed exclusive and the Manager shall be free to render similar services to others so long as its services hereunder are not impaired thereby and to retain for its own use and benefit all fees or other monies payable thereby and the Manager shall not be deemed to be affected with notice of or to be under any duty to disclose to the Company any fact or thing which comes to the notice of the Manager or any servant or agent of the Manager in the course of the Manager rendering similar services to others or in the course of its business in any other capacity or in any manner whatsoever otherwise than in the course of carrying out its duties hereunder.

9    POWER OF DELEGATION

9.1 The Manager shall have full power to delegate the whole or any part of its functions hereunder to any person firm or company with the approval of the Board of Directors. The Manager shall (unless the Directors shall otherwise agree in any particular case) exercise its power of delegation only on terms which include a provision binding on the Appointee in terms similar in all respects to this Agreement.

9.2    Neither the responsibilities nor liabilities under this Agreement can be assigned by the Manager without the approval of the Board of Directors.

9.3 The Manager shall be entitled to obtain investment and other advice from such source or sources and on such terms as it thinks fit (including, without prejudice to the generality of the foregoing, full power to appoint information and consulting services, to advise as to and to effect on behalf of the Manager the investment and re-investment of the Investments with the proviso that no additional costs are incurred by the Company).

10    INTERESTS IN THE MANAGER OR THE COMPANY

10.1 It is understood that directors, officers, agents and shareholders of the Company are or may be interested in the Manager as directors, officers, or shareholders or otherwise, that directors, officers, shareholders, agents and any client of the Manager are or may be interested in the Company as directors, officers, shareholders of otherwise and that the Manager is or may be interested in the Company as shareholder or otherwise and it is hereby acknowledged that no person so interested shall be liable to account for any benefit to any other party by reason solely of such interest.

10.2 The Manager or any client of the Manager or any Connected Person of the Manager or any holding company of the Manager or any subsidiary of such holding company ("the interested party") may hold, acquire or dispose of any investments upon its own account notwithstanding that the same or similar Investments may be held by or for the account of or otherwise connected with the Company and it is hereby acknowledged that no such interested party shall be liable to account for any benefit to any other party by reason solely of such interest.

10.3 Nothing herein contained shall prevent an interested party from selling Investments to or purchasing Investments from or vesting Investments in the Company or from contracting or entering into any financial, banking, currency or other transaction with the Company or the holders of Shares of the shareholder(s) of any company or body any of whose securities are held by or for the account of or otherwise connected with the Company or from being interested in any such sale, vesting, contract or transaction and the interested party shall not be called upon to account in respect of any such contract or transaction or benefit derived therefrom provided that nothing herein contained shall permit any such sale or vesting or the entering into of any such contract or transaction as aforesaid with the Company unless such transaction is on the best terms reasonably obtainable.

10.4 Nothing herein contained shall prevent an interested party from receiving any commissions which it may negotiate in relation to any sale or purchase of Investments effected by it for the account of the Company and the interested party shall be entitled to retain for its own benefit any profit or benefit derived therefrom provided that the amount of such commission is not in excess of rates commonly receivable by security dealers in transactions of the kind contemplated and that in effecting any such sales or purchases the interested party shall do so on the best terms reasonably obtainable having regard to the interests of the Company and provided further that such commission does not

arise in circumstances in which the Company could itself have acquired such Investments without payment of commission.

## 11   LIABILITY AND INDEMNITY

11.1 The Manager shall not be liable to the Company or any holder of Shares or otherwise for any error of judgment or for any loss suffered by the Company or any such holder of Shares in connection with the subject matter of this Agreement howsoever any such loss may have occurred unless such loss arises from negligence, willful default, fraud or dishonesty in the performance or non-performance by the Manager or persons designated by it of its obligations or duties.

11.2 The Company hereby undertakes to hold harmless and indemnify the Manager against all actions proceedings claims costs demands and expenses which may be brought against suffered or incurred by the Manager by reason of its performance or non-performance of its duties under the terms of this Agreement (other than due to negligence, willful default, fraud or dishonesty on the part of the Manager or persons designated by it) including all legal professional and other expenses incurred by the Manager or persons designated by it in the performance of its obligations or duties and including indemnity obligations owed by the Manager to persons designated by it (except such as shall arise from negligence, willful default, fraud or dishonesty in the performance of such obligations or duties) and in particular (but without limitation) this protection and indemnity shall extend to or any loss delay misdelivery or error in transmission of any telexed or telefaxed communication or as a result of acting upon any forged document or signature, but not tax on the overall income or profits of the Manager.

11.3 The Manager hereby undertakes to hold harmless and indemnify the Company against all actions proceedings claims costs demands and expenses which may be brought against suffered or incurred by the Company by reason of its performance or non-performance of its duties under the terms of this Agreement (other than due to negligence, willful default, fraud or dishonesty on the part of the Company or persons designated by it) including all legal professional and other expenses incurred by the Company or persons designated by it in the performance of its obligations or duties and including indemnity obligations owed by the Company to persons designated by it (except such as shall arise from negligence, willful default, fraud or dishonesty in the performance of such obligations or duties) and in particular (but without limitation) this protection and indemnity shall extend to or any loss delay misdelivery or error in transmission of any telexed or telefaxed communication or as a result of acting upon any forged document or signature, but not tax on the overall income or profits of the Company.

11.4 Notwithstanding any other provision of this Agreement, the Manager shall not be liable to the Company or any holder of Shares or otherwise for any taxation assessed upon or payable by the Company wheresoever the same may be assessed or imposed and whether directly or indirectly except for such taxation as shall be attributable to negligence, willful default, fraud or dishonesty   in the performance or non-performance by the Manager or persons designated by it of its obligations or duties. The Company shall indemnify and keep indemnified the Manager from and against all taxes not attributable to negligence, willful default, fraud or dishonesty as aforesaid (wheresoever and by whomsoever imposed) on profits or gains of the Company which may be assessed upon or become payable by the Manager and against all costs claims demands actions and proceedings in connection therewith.

11.5 For the avoidance of doubt it is hereby agreed and declared that references to the Manager in this Clause shall be deemed to include references to the officers, servants, agents and delegates of the Manager.

11.6 Any indemnity expressly given to the Manager in this agreement is in addition to and without prejudice to any indemnity provided by the Laws.

## 12    LEGAL ACTION BY THE MANAGER

The Manager shall not be required to take any legal action on behalf of the Company unless fully indemnified to its reasonable satisfaction for all costs and liabilities that may be incurred or suffered by the Manager in connection therewith and if the Company requires the Manager to take any action of whatsoever nature which in the reasonable opinion of the Manager might make the Manager liable for the payment of money or liable in any other way the Manager shall be and be kept indemnified in any reasonable amount and form satisfactory to the Manager as a prerequisite to taking action.

## 13    RESIGNATION AND TERMINATION

13.1 The Manager shall be entitled to resign its appointment hereunder:-

    13.1.1   by giving not less than one years' notice in writing to the Company to expire at the end of a calendar month;

13.1.2    at any time if the Company shall go into liquidation (except a voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the Manager) or be unable to pay its debts or commit any act of bankruptcy under the laws of Bermuda or if a receiver is appointed of any of the assets of the Company or if some event having an equivalent effect under the laws of Bermuda or elsewhere occurs;

13.1.3    at any time if the Company shall commit any material breach of its obligations under this Agreement and (if such breach shall be capable of remedy) shall fail within thirty days of receipt of notice served by the Manager requiring it so to do to make good such breach;

13.2 The Company may terminate the appointment of the Manager as follows:

13.2.1    by giving no less than one years' notice in writing to the Manager to expire at the end of a calendar month;

13.2.2    if the Manager goes into liquidation (except a voluntary liquidation for the purpose of reconstruction or amalgamation upon terms previously approved in writing by the company) or is unable to pay its debts or commits any act of bankruptcy under the laws of Bermuda or if a receiver is appointed of any of the assets of the Manager or if some event having an equivalent effect occurs;

13.2.3    if the Manager shall commit any material breach of its obligations under this Agreement and (if such breach shall be capable of remedy) shall fail within thirty days of receipt of notice served by the Company requiring it so to do to make good such breach;

13.3    This agreement shall have an initial term expiring on December 31, 1995 and will be automatically renewed for successive one-year periods, subject to termination by either party in accordance with this Clause 13.

13.4 On termination of the appointment of the Manager under the provisions of this Clause the Manager shall be entitled to receive the fees referred to in Clauses 6.2 and 6.3 but shall not be entitled to compensation in respect of such termination; and the Manager shall deliver or procure to be delivered to the Company, or as it shall direct, all books of account, records, other registers, correspondence, documents and assets relating to the affairs of or belonging to the Company in the possession of or under the control of the Manager and shall take all necessary steps to vest in the Company or any new Manager any assets previously held in the name of or to the order of the Manager on behalf of the Company and shall not be entitled to any lien in respect of any of the foregoing.

14    CONFIDENTIALITY

Neither of the parties hereto shall (except under compulsion of law) either before or after the termination of this Agreement disclose to any person not authorised by the relevant party to receive the same any confidential information relating to such party or to the affairs of such party of which the party disclosing the same shall have become possessed during the period of this Agreement and each party shall use all reasonable endeavours to prevent any such disclosure as aforesaid.

15    MISCELLANEOUS PROVISIONS

15.1 No failure on the part of either party to exercise, and no delay on its part in exercising, any right or remedy under this Agreement will operate as a waiver thereof nor will any single or partial exercise of any right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies proved by the Laws.

15.2 Any provision of this Agreement may be amended only if the parties so agree in writing.

15.3 The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

15.4 Except to the extent that the Laws admit variations by contract and are so varied by the terms of this Agreement, the powers, duties, rights and obligations of the parties under this Agreement shall be overridden by, and to the extent that they may conflict, be subject to, the Laws and the Manager shall have all the powers and perform its functions in accordance with the Laws.

16    NOTICES

Any notice given hereunder shall be in writing and shall be served by hand at or by being sent by

prepaid airmail post to the registered office for the time being of the addressee and any such notice shall if so posted be deemed to be served seven days after posting. Evidence that the notice was properly addressed stamped and put into the post shall be conclusive evidence of posting.

17    LAW OF THE CONTRACT

17.1 This agreement shall be governed by and construed in accordance with the laws of Bermuda.

17.2 The Company and the Manager hereby irrevocably submit to the non-exclusive jurisdiction of the courts of Bermuda for the settlement of any dispute or difference arising between the parties hereto.

IN WITNESS whereof this Agreement has been entered into the day and year first above written.

SIGNED BY KEITH R. BISH         )
for and on behalf of            )
KINGATE GLOBAL FUND, LTD.       )
                                )
in the presence of:-            )


SIGNED BY                       )
for and on behalf of            )
KINGATE MANAGEMENT LIMITED      )
                                )
in the  presence of:-           )

# FIRST AMENDMENT TO THE KINGATE GLOBAL FUND, LTD. MANAGEMENT AGREEMENT

FIRST AMENDMENT (the "First Amendment"), dated as of March 1, 1995, to the Management Agreement of Kingate Global Fund, Ltd. (the "Fund") dated as of November 1994 (the "Management Agreement") by and between the Fund and Kingate Management Limited (the "Manager").

## W I T N E S S E T H :

WHEREAS, the Fund, pursuant to an Information Memorandum dated as of November 1994, offered common shares of the Fund (the "Common Shares") and simultaneously executed the Management Agreement; and

WHEREAS, as of March 1, 1995, the directors and members of the Fund approved a recapitalization of the Fund (the "Recapitalization") which involved a redesignation of the Common Shares as Class A Shares ("Class A Shares") and an issuance of a new class of common shares, Class B Shares ("Class B Shares"); and

WHEREAS, in order to effect the Recapitalization, the Fund, pursuant to a Restated Information Memorandum dated as of March 1, 1995, redesignated the Common Shares as Class A Shares (the "Restated Information Memorandum"); and

WHEREAS, in order to further effect the Recapitalization, the Fund, pursuant to an Information Memorandum dated as of March 1, 1995, offered the new Class B Shares (the "Class B Shares Information Memorandum"); and

WHEREAS, in order to effect the provisions of the Restated Information Memorandum and the Class B Shares Information Memorandum, the Fund wishes to amend the Management Agreement by executing this First Amendment.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties hereby agree as follows:

1. Definitions

Unless otherwise defined herein, terms defined in the Management Agreement hereby shall have such defined meanings when used herein.

2. Amendment

(i) Section 1.1 of the Management Agreement is hereby amended by deleting the definition of "Shares" and adding the following new definition, of "Class A Common Shares," to appear as the fifth definition:

VLC-117553

Attorney Eyes Only

KING_DIL_000765
KGFSAC0000765

"Class A Common Shares" means the Class A Common Shares which were initially offered as Common Shares pursuant to the Fund's Information Memorandum dated as of November 1994 (the "Information Memorandum") and redesignated as Class A Shares pursuant to the Fund's Restated Information Memorandum dated as of March 1, 1995. (Simultaneously, the Fund issued a new class of shares, Class B Shares, pursuant to a separate Information Memorandum dated as of March 1, 1995. All references in this Agreement refer to Class A Shares only.)

3. Effective Date

This First Amendment shall be effective as of the date first written above. Except as expressly set forth herein, all of the terms and conditions of the Management Agreement shall remain unchanged and shall continue in full force and effect and are hereby ratified and confirmed.

4. Counterparts

This First Amendment may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.



5. Governing Law

This First Amendment and the underlying Agreement shall hereafter be governed by and construed in accordance with the substantive laws of the Bermuda applicable to contracts made and entirely performed therein, without regard to principles of conflicts of law.

IN WITNESS WHEREOF, the parties hereto have signed this First Amendment to be duly executed and delivered as of the date and year first written above.

KINGATE GLOBAL FUND, LTD.

By: _____
Name: Christopher Wetherhill
Title: Director

KINGATE MANAGEMENT LIMITED
(the "Manager")

By: _____
Name: Margaret Every
Title: Director

VLC-117553

2

"Class A Common Shares" means the Class A Common Shares which were initially offered as Common Shares pursuant to the Fund's Information Memorandum dated as of November 1994 (the "Information Memorandum") and redesignated as Class A Shares pursuant to the Fund's Restated Information Memorandum dated as of March 1, 1995. (Simultaneously, the Fund issued a new class of shares, Class B Shares, pursuant to a separate Information Memorandum dated as of March 1, 1995. All references in this Agreement refer to Class A Shares only.)

3. Effective Date

This First Amendment shall be effective as of the date first written above. Except as expressly set forth herein, all of the terms and conditions of the Management Agreement shall remain unchanged and shall continue in full force and effect and are hereby ratified and confirmed.

4. Counterparts

This First Amendment may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

5. Governing Law

This First Amendment and the underlying Agreement shall hereafter be governed by and construed in accordance with the substantive laws of the Bermuda applicable to contracts made and entirely performed therein, without regard to principles of conflicts of law.

IN WITNESS WHEREOF, the parties hereto have signed this First Amendment to be duly executed and delivered as of the date and year first written above.

KINGATE GLOBAL FUND, LTD.

By: _____
   Name: Christopher Wetherhill
   Title: Director

KINGATE MANAGEMENT LIMITED
(the "Manager")

By: _____
   Name:
   Title:

VLC-117353                                2

14/02 '00 19:58   TX/RX NO.2555   P.007

Attorney Eyes Only                                          KING_DIL_000767
                                                            KGFSAC0000767