# EXHIBIT KK

Dated     APRIL 29     2001

# KINGATE MANAGEMENT LIMITED

-and-

# FIM LIMITED

**Distribution Agreement**

-relating to-

Kingate Global Fund, Ltd.

FADSAC0059679

**THIS DISTRIBUTION AGREEMENT** is made this 25 day of April 2001

**BETWEEN:**

1.  **KINGATE MANAGEMENT LIMITED**, a limited company registered in Bermuda (under number EC-19184) and whose registered office is at 99 Front Street, Hamilton HM11, Bermuda (the "Co-Manager");

2.  **FIM LIMITED**, a limited company registered in England and Wales (under number 1536755) and whose registered office is at 62 Wilson Street, London EC2A 2BU ("FIM").

**WHEREAS:**

(A)  Kingate Global Fund, Ltd. (the "Company") is open-end investment company organized as an international business company in the British Virgin Islands ("B.V.I.").

(B)  By a Co-Manager Agreement dated November 1, 1994 between the Company and the Co-Manager, the Co-Manager has been appointed by the Company to provide the Company with Management and other services in relation to the Company's assets and operations, including the placement of Shares and the appointment of authorised dealers to solicit applications for the purchase of Shares, in accordance with the provisions of the Co-Manager Agreement.

(C)  By a Consulting Services Agreement as amended and restated effective May 1, 2000 between the Co-Manager and FIM, FIM has been appointed Consultant to the Co-Manager to provide the Co-Manager with consultancy and other services to assist in the day to day management of the Company's assets and operations undertaken by the Co-Manager under the terms of the Co-Manager Agreement.

(D)  FIM is a member of the Investment Management Regulatory Organisation Limited ("IMRO") in the United Kingdom. As part of its permitted business, it is allowed to market in England to certain persons certain types of investment fund.

(E)  It is intended to sell the shares in the Company in England and elsewhere as permitted by applicable laws, rules, and regulation.

(F) FIM wishes to act as a distributor of the Shares in England and elsewhere where it may lawfully do so. It is authorised to do so in England within the parameters of its IMRO authorized business.

(G) In connection therewith, FIM has been providing distribution services to the Co-Manager since 1 June 2000, based on a verbal agreement.

(H) The Co-Manager now wishes to appoint FIM as a non-exclusive distributor of the Shares pursuant to and subject to the terms and provisions of this Agreement. FIM is prepared to so act.

**NOW IT IS HEREBY AGREED as follows:**

1. **Definitions and Construction**

    (a) Save where the context otherwise requires, terms and expressions defined for the purposes of the Information Memorandum and the rules of IMRO shall have the same meaning when used in this Agreement.

    (b) "FSA" means the Financial Services Act 1986 of the United Kingdom.

    (c) "IMRO" means the Management Regulatory Organisation Limited or its successor(s) or replacement(s).

    (d) "Information Memorandum" means the Information Memorandum of the Company dated May 1, 2000 or the most recent Information Memorandum, as appropriate.

    (e) "Operative Documents" means any and all documents which may be issued by the Company in relation to the issue of securities (other than Shares) of the Company.

    (f) "Shares" means the Participating Common Shares of the Company.

    (g) "Unregulated Collective Investment Scheme" means an unregulated collective investment scheme as that term is defined in the FSA

    (h) References to any statute, statutory enactment, rules and regulations shall be references to such statutes, statutory investments, rules or regulations as from time to time amended, re-enacted, replaced or substituted.

2.  **Appointment as Distributor**

    2.1 This Agreement shall be deemed to have taken effect on and from the 1 June 2000 (the "Effective date").

    2.2 The Co-Manager hereby appoints FIM as distributor for the sale of the Shares subject to the terms and conditions of this Agreement as from the effective date of this Agreement.

    2.3 This appointment is of a non-exclusive nature. FIM shall be free to render its services elsewhere as if FIM were not acting as a distributor of the Shares under the terms hereof for so long as its services hereunder shall not be impaired thereby. The Co-Manager shall be entitled to appoint distributors other than FIM in England and elsewhere.

    2.4 The Information Memorandum, the Operative Documents and any amendments thereto, any published annual and/or interim reports and any sales material shall be sent to FIM by the Co-Manager promptly upon any such publications or amendments to them and as FIM shall from time to time reasonably request free of charge and in sufficient number.

3.  **Distribution Services**

    Without prejudice to the generality of the provisions of clause 2 above, the distribution services to be provided by FIM to the Co-Manager under the terms of this Agreement shall include, without limitation:-

    (a) the identification and solicitation of prospective investors to purchase the Shares;

    (b) the introduction of such prospective investors to the Co-Manager;

    (c) the maintenance of regular contact with investors introduced to the Co-Manager to keep them informed of investment results and other information with regard to the Company;

    (d) the preparation of marketing and other material for use in the performance of its duties under the terms of this Agreement, subject to approval by the Co-Manager;

(e) the supervision of distribution lists used by the Co-Manager to keep prospective and existing investors informed of developments with regard to the Company;

(f) generally, the provision of such services as may be required by the Co-Manager to enable it fulfil its duties with regard to the placement of the Shares in accordance with the provisions of the Co-Manager Agreement.

4. **Potential Conflicts of Interest and Disclosures**

FIM may be involved in other distribution activities which may be similar to, or in competition with, its activities for the Co-Manager with respect to the Company. FIM may effect transactions in which FIM, or its partners, officers, employees and directors, has, directly or indirectly, a material interest, which may involve a potential conflict with FIM's duty to the Co-Manager and the Company. FIM shall disclose such conflicts, but shall not be under any obligation to account to the Co-Manager or the Company for any profit, commission or remuneration earned or received in connection therewith. However, FIM shall at all times:-

(a) Have due regard to its duties to the Co-Manager and the Company and, where a conflict arises, use all reasonable endeavours to ensure it is resolved fairly; and

(b) Where FIM is acting as distributor of securities other than the Shares, act fairly with respect to the Co-Manager and the Company.

5. **Undertakings**

5.1 FIM undertakes with the Co-Manager that the sale of the Shares shall be conducted in accordance with the rules of IMRO and any other applicable regulation in England and, to the extent that FIM sells the Shares elsewhere in accordance with applicable local laws, rules and regulations.

5.2 The Company is an Unregulated Collective Investment Scheme. The Co-Manager shall inform FIM forthwith if the status of the Company changes.

5.3 The Co-Manager acknowledges that FIM may only sell the Shares in accordance with its own IMRO permitted business category and as permitted by local laws, rules and regulations in other countries.

 5.4 The Co-Manager undertakes to FIM that the Information Memorandum and any sales material shall be drafted in accordance with the laws of England and any applicable rules and regulations of England and, to the extent that it requires FIM to market the Shares elsewhere, in accordance with any applicable local laws, rules and regulations.

 5.5 FIM shall effect the sale of Shares in accordance with the provisions set forth in the Information Memorandum and Operative Documents and in accordance with any additional instructions which may be issued by or on behalf of the Co-Manager from time to time.

6. **Fees and Expenses**

Fees and expenses shall be as detailed in Schedule 1 to this Agreement, or as agreed from time to time between the parties.

7. **Indemnity**

The Co-Manager agrees that it will indemnify FIM from and against all claims, costs, charges, liabilities and expenses incurred by FIM directly or indirectly in connection with the performance of FIM's duties hereunder, in particular in respect of such claims, costs, charges, liabilities and expenses suffered or alleged to be suffered by any investor or former investor in the Company as a result of the acts or omissions of the Co-Manager, its delegates or agents, or the contravention by any of them of the applicable laws of The Territory of the British Virgin Islands, Bermuda, England, the Information Memorandum, the Operative Documents, the Memorandum and Articles of Association or this Agreement provided that such indemnify shall not apply to the extent that any such claim, cost, charge, liability or expense is due to the fraud, wilful default or negligence of FIM, its partners, offices, employees, directors or agents. This clause shall survive the termination of this Agreement.

8. **Termination**

 8.1 This Agreement and the appointment of FIM shall continue until December 31, 2002. Thereafter, this Agreement shall be automatically renewed for successive one year periods, subject to termination as of the close of each calendar month by either the Co-Manager or FIM giving to the other party not less than six months' written notice (or such shorter notice as the parties may agree to accept).

FADSAC0059684

8.2 Without prejudice to the accrued rights and provisions intended to survive termination, this Agreement may be terminated forthwith by written notice given by the Co-Manager or FIM to the other party if:-

(a) the other party shall commit any material breach of its obligations under this Agreement and shall fail to make good such breach within thirty days after receipt of notice from the other party requiring it so to do;

(b) the other party becomes insolvent or goes into liquidation (except a voluntary liquidation for the purposes of a reconstruction, amalgamation or merger upon terms previously approved in writing by the other party, such consent not to be unreasonably withheld or delayed) or if a receiver or administrator is appointed over all or any of its assets;

(c) the Co-Manager shall cease to be the co-manager of the Company; and

(d) FIM shall cease to be authorised by IMRO to provide its services under the terms of this Agreement.

8.3 Upon termination of this Agreement, FIM shall deliver to the Co-Manager or to such other person or corporation as the Co-Manager shall in writing direct, all books of account, correspondence and records or other documents which are in its power and/or possession, belonging to or relating to the Company.

8.4 On termination of the appointment FIM shall be entitled to payment of its fees and expenses as referred to in clause 6 and any additional expenses necessarily realised in settling or concluding outstanding obligations.

8.5 Termination of the appointment shall operate without prejudice to any rights which either party may have against the other in relation to any antecedent breach by the other of any provision of this Agreement.

8.6 In the event of termination of this Agreement, all pending trades and transactions shall be settled in the ordinary course and consistent with existing trade practices.

9. **Limitation on Authority**

9.1 In carrying out its duties hereunder, FIM shall comply with all instructions of the Co-Manager in connection therewith. Such instructions may be given by letter, by fax, by e-mail or by telephone (and the Co-Manager undertakes to confirm telephone instructions by fax, e-mail or in writing) by any director of the Co-Manager or by any other person authorised by resolution of the directors of the Co-Manager (of which a copy, certified by any two such directors, shall have been supplied to FIM).

9.2 For the purposes of clause 9.1 and unless and until FIM shall receive written notice that any such person's authority has been revoked FIM may rely or act upon any instructions or communications which FIM believes on reasonable grounds and in good faith, to have been given by or on behalf of any persons notified by the Company or the Co-Manager from time to time in accordance with clause 9.1 as being authorised to instruct FIM.

10. **Confidentiality**

Each of the parties at all times shall keep confidential information required in consequence of its services under this Agreement except information which it is bound to disclose under compulsion of law or compulsion of regulatory agencies to whose jurisdiction it is subject.

11. **Notices**

Any instructions, notices, demands, acknowledgements or requests to be given by any of the parties hereunder shall, subject to any express provision of this Agreement, be given in writing in the English language (and may be delivered in person or sent by facsimile or recorded delivery post) to the other party at the following address or any address subsequently notified by the relevant party to the other:-

**To FIM:**    FIM Limited
25-28 Old Burlington Street
London W1S 3AN
Attention: Carlo Grosso
Fax: (+ 44 20) 7494 1981

|  |  |
|---|---|
| **To the Co-Manager:** | Kingate Management Limited<br>99 Front Street<br>Hamilton HM11<br>Bermuda<br>Fax: (+ 1 441) 296 6775 |

Notice given in person shall be effective when delivered. Notice given by facsimile or e-mail shall be deemed to have been given contemporaneously unless delivered outside normal business hours in which case it shall be deemed to have been received at the next time after delivery when normal business hours commence. Notice given by recorded delivery shall be deemed to have been given seventy-two hours after posting. Evidence that the notice was properly addressed and sent by recorded delivery shall be conclusive evidence of posting.

12. **Assignment**

Neither the benefit nor the burden of this Agreement shall be assigned by any party without the written consent of the others.

13. **Independent Contractor**

In the performance of its duties hereunder, FIM shall be an independent contractor and not an employee or agent of the Co-Manager.

14. **Entire Agreement**

This Agreement sets forth the entire agreement of the parties relating to the subject matter hereof.

15. **Waiver**

The failure by any party to enforce at any time or for any period any one or more of the provisions of this Agreement shall not be a waiver of any one or more of them or of the right at any time thereafter to enforce all or any of them.

16. **Invalidity**

If any provision of this Agreement is or becomes invalid or contravenes any applicable law, the remaining provisions shall remain in full force and effect.

17. **Amendments**

This Agreement may only be amended in writing by the parties.

18. **Counterparts**

This Agreement may be executed in one or more counterparts all of which taken together shall be deemed to constitute one and the same agreement.

19. **Governing Law**

This Agreement will be governed by and construed in accordance with Bermuda law. Bermuda courts are to have non-exclusive jurisdiction to settle any disputes or claims which may arise out of or in connection with this Agreement for which purposes all parties agree to submit to the jurisdiction of Bermuda courts. Nothing contained in this clause shall limit the right of any party to take court proceedings against any other party or parties in any other court of competent jurisdiction, nor shall the taking of court proceedings in one or more jurisdictions preclude the taking of court proceedings in any other jurisdiction, whether concurrently or not, to the extent permitted by the law of that other jurisdiction.

\* \* \* \* \* \* \* \* \* \*

## SCHEDULE 1

## Fees and Expenses

**Distribution Fees.**

In consideration for its services, from the Effective Date of this Agreement, FIM shall be due a fixed monthly asset based fee (the "Distribution Fee") equal to 1/12th of 0.50% (one-twelfth of one-half of one percent) of the Net Asset Value at the end of each calendar month of the Shares that have been placed as a result of FIM's efforts.

**Payment of Fees.**

The Distribution Fee shall be payable quarterly in arrears within thirty (30) days of the end of each calendar quarter to FIM.

The Co-Manager may arrange to have the Company make payments directly to FIM for administrative convenience.

In the event that this Agreement is terminated, for a period of six (6) years following the effective date of termination the Distribution Fee shall be due to FIM for as long as the Shares continue to be held and until such time as the Shares are redeemed. No additional remuneration shall be due to FIM.

The Distribution Fee payable under this Agreement is payable exclusive of any Value Added Tax (if applicable).

**Other Costs and Expenses**

Unless otherwise agreed to by the Co-Manager and FIM, FIM shall bear all of its own costs and expenses incurred in the performance of the services provided pursuant to this Agreement, including those attributable to such office personnel, office space, office equipment and office services as may be required by FIM.

\* \* \* \* \* \* \* \* \* \*

IN WITNESS whereof the parties hereto have caused this Agreement to be executed as of the day and year first above written.

SIGNED by                              )
                                       )
   CWETHERHILL                         )    *[signature]*
                                       )
for and on behalf of                   )
**KINGATE**                            )
**MANAGEMENT LIMITED**                 )


SIGNED by                              )
                                       )
   C. G Rosso                          )
                                       )    *[signature]*
for and on behalf of                   )
**FIM LIMITED**                        )

FADSAC0059690