# EXHIBIT RR



**\*177 Taylor and Another Appellants v. Director of the Serious Fraud Officeand Others Respondents**

Image 1 within document in PDF format.

House of Lords
29 October 1998

**[1998] 3 W.L.R. 1040**

**[1999] 2 A.C. 177**

Lord Lloyd of Berwick, Lord Goff of Chieveley, Lord Hoffmann, Lord Hope of Craighead and Lord Hutton

Kennedy and Millett L.JJ. and Sir Brian Neil
1998 July 6, 7; Oct. 29
1997 June 23; July 22

**Analysis**

Practice—Discovery—Use of documents—Documents prepared by prosecution in course of investigation disclosed to accused in criminal proceedings—Documents shown to plaintiff by accused's solicitor—Plaintiff bringing libel action based on documents—Whether abuse of process—Whether implied undertaking not to use documents for purposes other than defence in criminal trial—Whether absolute immunity from suit

The first defendant was investigating the activities of D. and F. in connection with a fraud where moneys obtained from the victim had passed through the hands of the first plaintiff, a solicitor practising in the Isle of Man, or the second plaintiff, a company controlled by him. The second defendant, an employee of the S.F.O., wrote a letter to the Attorney-General of the Isle of Man, requesting assistance in the investigation and setting out the facts as they appeared to the S.F.O., which suggested that the first plaintiff had been a party to the fraud. The second defendant also spoke to the fourth defendant, an employee of the third defendant, the Law Society, and made a file note which recorded their views that the first plaintiff was a co-conspirator and should be struck off as a solicitor. The plaintiffs

were not charged with any offence. When criminal proceedings were begun against D. and F., the first defendant disclosed to their solicitors the unused material which had come into existence during the investigation, including the letter and the file note. The first plaintiff was shown the unused material when he was asked by F.'s solicitors to give evidence for F. The plaintiffs began an action for defamation against the defendants based on the contents of the letter and the file note. The judge granted the defendants' application to strike out the action as an abuse of process, holding that the disclosure to F.'s solicitors had been subject to an implied undertaking that the documents would not be used for any purpose other than F.'s defence. The Court of Appeal held that there was no such implied undertaking but dismissed the plaintiffs' appeal on the ground that the documents were immune from suit because they were brought into existence for the purposes of a criminal investigation.

On the plaintiffs' appeal:-

Held, dismissing the appeal,
(1) that in order to ensure that the privacy and confidentiality of those who made, and those who were mentioned in, statements contained in unused material which had come into existence as a result of a criminal investigation were not invaded more than was absolutely necessary for the purposes of justice, compliance by the prosecution with its **\*178** obligation to disclose all such material to the defence generated an implied undertaking not to use the material for any purpose other than the conduct of the defence; and that, accordingly, the documents disclosed to F.'s solicitors could not be used for the purposes of the action for defamation (post, pp. 203C-D, 204G-H, 210E-H, 211A-F, 212D-E, 220C-D).
Mahon v. Rahn [1998] Q.B. 424, C.A. disapproved.
(2) (Per Lord Goff of Chieveley, Lord Hoffmann, Lord Hope of Craighead and Lord Hutton) that the absolute immunity from suit which applied to judges, advocates and witnesses in respect of statements made in court extended also to out of court statements which could fairly be said to be part of the process of investigating a crime or a possible crime with a view to a prosecution; and that, accordingly, the statements made in the letter and the file note were subject to absolute immunity from suit in respect of an action for defamation (post, pp. 204G-H, 214D-215B, 219D-F, 220C-D, 221B-G, 222B).
Dictum of Drake J. in Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184, 192 approved.

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

Decision of the Court of Appeal [1997] 4 All E.R. 887 affirmed.

The following cases are referred to in their Lordships' opinions in the House of Lords:

Bennett v. Commissioner of Police for the Metropolis (1997) 10 Admin.L.R. 245
• Coventry Newspapers Ltd., Ex parte [1993] Q.B. 278; [1992] 3 W.L.R. 916; [1993] 1 All E.R. 86, C.A..
• D. v. National Society for the Prevention of Cruelty to Children [1978] A.C. 171; [1977] 2 W.L.R. 201; [1977] 1 All E.R. 589, H.L.(E.).
• Docker v. Chief Constable of West Midlands Police, The Times, 29 April 1998; Court of Appeal (Civil Division) Transcript No. 472 of 1998, C.A..
• Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184; [1981] 1 All E.R. 715
• Hill v. Chief Constable of West Yorkshire [1989] A.C. 53; [1988] 2 W.L.R. 1049; [1988] 2 All E.R. 238, H.L.(E.).
• Home Office v. Harman [1983] 1 A.C. 280; [1982] 2 W.L.R. 338; [1982] 1 All E.R. 532, H.L.(E.).
• Mahon v. Rahn (unreported), 19 June 1996; [1998] Q.B. 424; [1997] 3 W.L.R. 1230; [1997] 3 All E.R. 687, C.A..
•Mann v. O'Neill (1997) 71 A.L.J.R. 903
• Marrinan v. Vibart [1963] 1 Q.B. 528; [1962] 3 W.L.R. 912; [1962] 3 All E.R. 380, C.A..
• Munster v. Lamb (1883) 11 Q.B.D. 588, C.A..
•Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734
•Prudential Assurance Co. Ltd. v. Fountain Page Ltd. [1991] 1 W.L.R. 756; [1991] 3 All E.R. 878
•Rees v. Sinclair [1974] 1 N.Z.L.R. 180
• Reg. v. Brown (Winston) [1994] 1 W.L.R. 1599; C.A.; [1998] A.C. 367; [1997] 3 W.L.R. 447; [1997] 3 All E.R. 769, H.L.(E.).
• Reg. v. Davis [1993] 1 W.L.R. 613; [1993] 2 All E.R. 643, C.A..
• Reg. v. Keane [1994] 1 W.L.R. 746; [1994] 2 All E.R. 478, C.A..
• Reg. v. Maguire [1992] Q.B. 936; [1992] 2 W.L.R. 767; [1992] 2 All E.R. 433, C.A..
• Reg. v. Ward (Judith) [1993] 1 W.L.R. 619; [1993] 2 All E.R. 577, C.A..
• Roy v. Prior [1971] A.C. 470; [1970] 3 W.L.R. 202; [1970] 2 All E.R. 729, H.L.(E.).
• Silcott v. Commissioner of Police of the Metropolis (1996) 8 Admin.L.R. 633, C.A..
• Watson v. M'Ewan [1905] A.C. 480, H.L.(Sc.).

• X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633; [1995] 3 W.L.R. 152; [1995] 3 All E.R. 353, H.L.(E.).

The following additional cases were cited in argument in the House of Lords:

•Canada v. Lukasik (1985) 18 D.L.R. (4th) 245
• Connelly v. Director of Public Prosecutions [1964] A.C. 1254; [1964] 2 W.L.R. 1145; [1964] 2 All E.R. 401, H.L.(E.).
•Dooley v. C. N. Weber Ltd. (1994) 118 D.L.R. (4th) 750
• Marcel v. Commissioner of Police of the Metropolis [1992] Ch. 225; [1992] 2 W.L.R. 50; [1992] 1 All E.R. 72, C.A..
• Trapp v. Mackie [1979] 1 W.L.R. 377; [1979] 1 All E.R. 489, H.L.(Sc.).

The following cases are referred to in the judgment of the Court of Appeal:

• Arrows Ltd. (No. 4), In re [1995] 2 A.C. 75; [1994] 3 W.L.R. 656; [1994] 3 All E.R. 814, H.L.(E.).
• Coventry Newspapers Ltd., Ex parte [1993] Q.B. 278; [1992] 3 W.L.R. 916; [1993] 1 All E.R. 86, C.A..
•Distillers Co. (Biochemicals) Ltd. v. Times Newspapers Ltd. [1975] Q.B. 613; [1974] 3 W.L.R. 728; [1975] 1 All E.R. 41
•Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184; [1981] 1 All E.R. 715
• Hasselblad (G.B.) Ltd. v. Orbinson [1985] Q.B. 475; [1985] 2 W.L.R. 1; [1985] 1 All E.R. 173, C.A..
• Home Office v. Harman [1983] 1 A.C. 280; [1982] 2 W.L.R. 338; [1982] 1 All E.R. 532, H.L.(E.).
• Lincoln v. Daniels [1962] 1 Q.B. 237; [1961] 3 W.L.R. 866; [1961] 3 All E.R. 740, C.A..
• Mahon v. Rahn (unreported), 19 June 1996, Brooke J.; [1998] Q.B. 424; [1997] 3 W.L.R. 1230; [1997] 3 All E.R. 687, C.A..
• Marcel v. Commissioner of Police of the Metropolis [1992] Ch. 225; [1991] 2 W.L.R. 1118; [1991] 1 All E.R. 845; [1992] Ch. 225; [1992] 2 W.L.R. 50; [1992] 1 All E.R. 72, C.A..
• Marrinan v. Vibart [1963] 1 Q.B. 528; [1962] 3 W.L.R. 912; [1962] 3 All E.R. 380, C.A..
• Morris v. Director of the Serious Fraud Office [1993] Ch. 372; [1993] 3 W.L.R. 1; [1993] 1 All E.R. 788
• Munster v. Lamb (1883) 11 Q.B.D. 588, C.A..
•Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734; 74 Cr.App.R. 302

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

• Prudential Assurance Co. Ltd. v. Fountain Page Ltd. [1991] 1 W.L.R. 756; [1991] 3 All E.R. 878
• Reg. v. Keane [1994] 1 W.L.R. 746; [1994] 2 All E.R. 478, C.A..
• Reg. v. Ward (Judith) [1993] 1 W.L.R. 619; [1993] 2 All E.R. 577; 96 Cr.App.R. 1, C.A..
• Richards v. Naum [1967] 1 Q.B. 620; [1966] 3 W.L.R. 1113; [1966] 3 All E.R. 812, C.A..
• Saif Ali v. Sydney Mitchell & Co. [1980] A.C. 198; [1978] 3 W.L.R. 849; [1978] 3 All E.R. 1033, H.L.(E.).
• Silcott v. Commissioner of Police of the Metropolis (1996) 8 Admin.L.R. 633, C.A..
• Watson v. M'Ewan [1905] A.C. 80, H.L.(Sc.).
• X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633; [1995] 3 W.L.R. 152; [1995] 3 All E.R. 353, H.L.(E.).

The following additional cases were cited in argument in the Court of Appeal:

• British Coal Corporation v. Dennis Rye Ltd. (No. 2) [1988] 1 W.L.R. 1113; [1988] 3 All E.R. 816, C.A..
• Davis v. Johnson [1979] A.C. 264; [1978] 2 W.L.R. 553; [1978] 1 All E.R. 1132, H.L.(E.).
• Gold v. Essex County Council [1942] 2 K.B. 293, C.A..
• Johnson v. Agnew [1978] Ch. 176; [1978] 2 W.L.R. 806; [1978] 3 All E.R. 314, C.A..; [1980] A.C. 367; [1979] 2 W.L.R. 487; [1979] 1 All E.R. 883, H.L.(E.).
• Miller v. Scorey [1996] 1 W.L.R 1122; [1996] 3 All E.R. 18
• Morelle Ltd. v. Wakeling [1955] 2 Q.B. 379; [1955] 2 W.L.R. 672; [1955] 1 All E.R. 708, C.A..
• Young v. Bristol Aeroplane Co. Ltd. [1946] A.C. 163; [1946] 1 All E.R. 98, H.L.(E.).

Appeal from Sir Michael Davies sitting as a judge of the Queen's Bench Division.

By a writ endorsed with a statement of claim issued on 24 March 1996 as subsequently amended the plaintiffs, Thomas Denton Taylor and Monarch Assurance Plc., of which he was managing director, brought an action for defamation against the defendants, the Serious Fraud Office, Katherine McKenzie, the Law Society and Neil Rogerson. By summonses dated 1 May 1996 and 29 May 1996 the first and second defendants, and the third and fourth defendants respectively sought orders that the writ

and statement of claim be struck out pursuant to R.S.C., Ord. 18, r. 19 or under the inherent jurisdiction of the court. On 26 July 1996 Sir Michael Davies made the orders sought.

By a notice of appeal dated 20 August 1996 the plaintiffs appealed with leave, on the grounds, inter alia, that the judge had (1) erred in law in holding that the prosecution in the criminal proceedings against D. and F. were under a duty to disclose to them the documents on which the plaintiffs based their action; (2) erred in law in holding that an implied undertaking not to use documents disclosed by one party to another for purposes collateral to the proceedings in which they were disclosed arose by operation of law in criminal proceedings; (3) erred in law in holding that the implied undertaking was binding as against the plaintiffs, who were not defendants to the criminal proceedings and to whom the documents were properly disclosed by F.; and (4) wrongly exercised his discretion in striking out the plaintiffs' statement of claim.

The facts are stated in the judgment of Kennedy L.J.

*Leolin Price Q.C.* and *Julian Knowles* for the plaintiffs. Mahon v. Rahn [1998] Q.B. 424 was determinative as to whether the documents were "used" or "unused" since criteria in Young v. Bristol Aeroplane Co. Ltd. [1946] A.C. 163 were not applicable.

If there was an undertaking not to use documents disclosed in the criminal proceedings for any collateral or ulterior purpose that undertaking was not binding on the plaintiffs, who obtained the documents properly **\*181** from F.'s solicitors. However, the disclosure by F. to the first plaintiff was not in breach of such an undertaking because F. made the disclosure for the purposes of his criminal proceedings. There was no reason of public policy to prevent the first plaintiff from seeking by action protection of his reputation. Documents obtained from public bodies in criminal proceedings, if not covered by public interest immunity, do not fall within the scope of an undertaking given by third parties.

The court should decline to rule on absolute privilege and qualified privilege because they were not pleaded by the defendants as defences.

*Andrew Caldecott Q.C.* and *Catrin Evans* for the

defendants. Mahon v. Rahn is not decisive on the issue whether unused material is subject to an implied undertaking. [Reference was made to Gold v. Essex County Council [1942] 2 K.B. 293; Morelle Ltd. v. Wakeling [1955] 2 Q.B. 379; Davis v. Johnson [1979] A.C. 264; Johnson v. Agnew [1978] Ch. 176 and Young v. Bristol Aeroplane Co. Ltd. [1946] A.C. 163.]


Prior to the Criminal Procedure and Investigations Act 1996, pre-trial disclosure in criminal proceedings was governed by Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734 and Reg. v. Keane [1994] 1 W.L.R. 746. Generally, material disclosed pursuant to an obligation to disclose for a particular purpose should only be used for that purpose: see British Coal Corporation v. Dennis Rye Ltd. (No. 2) [1988] 1 W.L.R. 1113 and Marcel v. Commissioner of Police of the Metropolis [1992] Ch. 225. There are policy reasons why a person should be able to speak freely when giving proofs of evidence, reporting to the Director of Public Prosecutions or otherwise making statements with a view to a criminal prosecution: see Watson v. M'Ewan [1905] A.C. 480; Marrinan v. Vibart [1963] 1 Q.B. 528; Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184 and X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633. There is a presumption against any collateral use of such material. The concept of an implied undertaking is a convenient mechanism: see Prudential Assurance Co. Ltd. v. Fountain Page Ltd. [1991] 1 W.L.R. 756. [Reference was also made to Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278.] If policy imposes an implied undertaking, it is absurd if third parties receiving the material with notice of the undertaking are free to ignore it: see Distillers Co. (Biochemicals) Ltd. v. Times Newspapers Ltd. [1975] Q.B. 613. [Reference was also made to Munster v. Lamb (1883) 11 Q.B.D. 588 and Lincoln v. Daniels [1962] 1 Q.B. 237.] Striking out the action as an abuse of process in the circumstances was a proper exercise of the judge's discretion: see Miller v. Scorey [1996] 1 W.L.R. 1122.


In any event, the action should be struck out, under R.S.C., Ord. 18, r. 19, on the ground that the relevant publications were immune from suit because they were protected by absolute privilege: see Silcott v. Commissioner of Police of the Metropolis (1996) 8 Admin.L.R. 633


*Price Q.C.* replied.

*Cur. adv. vult.*

22 July. The following judgments were handed down


**Kennedy L.J.**

This is the plaintiffs' appeal from a decision of Sir Michael Davies, sitting as a judge of the Queen's Bench Division, who on **\*182** 27 June 1996 ordered that the plaintiffs' action be struck out against all four defendants.


**Facts**

For the purposes of this appeal the facts can be briefly stated. In 1994 the Serious Fraud Office ("S.F.O.") was investigating the activities of Charles Deacon, James Fuller and John Patrick Savage, who were alleged to have committed a serious and complex fraud. The investigations resulted in January 1996 in Deacon and Fuller being convicted of conspiracy to defraud, by which time Savage had died. But on 4 May 1994, during the course of the investigations, Katherine McKenzie, an investigating lawyer employed by the S.F.O., wrote to seek the assistance of the Attorney-General for the Isle of Man in relation to the investigation. It had apparently emerged that Mr. Taylor, a solicitor in the Isle of Man, (and in England) had, on behalf of clients, invested money with Deacon and Savage, and the letter proposed that Mr. Taylor be interviewed, and that Ms McKenzie and Detective Constable Walker of Staffordshire Police be given authority to undertake their inquiries in the Isle of Man.


On 17 May 1994, as part of the investigation, Ms McKenzie and Detective Inspector Hulse of Staffordshire Police went to the Solicitors Complaints Bureau at Leamington Spa to see Neil Rogerson, a Law Society employee, who explained how the compensation fund worked and its application to the instant fraud inquiry. A file note was made. By that date the criminal proceedings against Deacon and Fuller had already been transferred to the Crown Court and on 24 October 1994 the S.F.O. disclosed to the defendant's solicitors in the criminal case "unused material" which included the letter of 4 May 1994 and the file note of 17 May 1994.


In May 1995 Mr. Taylor was asked by counsel representing Fuller if he would be prepared to assist, and

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

a meeting was arranged. To enable him to prepare for that meeting he was shown amongst other documents the letter of 4 May 1994 and the file note of 17 May 1994 and he was, he says, concerned because in those documents he was being portrayed by Ms McKenzie as a conspirator.

**The defamation action**

By a specially endorsed writ issued on 24 March 1996 Mr. Taylor and Monarch Assurance Plc., of which he is managing director, commenced this action against the Director of the S.F.O., Ms McKenzie, the Law Society and Neil Rogerson. The plaintiffs were subsequently given leave to amend the writ and all subsequent proceedings to show the S.F.O. as the title of the first defendant, and nothing now turns on that. The statement of claim sets out in full the letter of 4 May 1994, and asserts that the words used, in their natural and ordinary meaning, were defamatory of the plaintiffs. In paragraph four of the statement of claim the word defendant is persistently used in place of the word plaintiff, but the meaning is clear. Similar allegations are made in relation to the meeting of 17 May 1994, based on the file note, although here again the misdescription of the parties makes it difficult to disentangle what precisely is being alleged. In **\*183** paragraph 11 of the statement of claim criticism is made of disclosure of the file note to Fuller's legal advisers.

On 1 May 1996 the Treasury Solicitor, acting for the first and second defendants, took out a summons which sought an order that the writ and statement of claim be struck out pursuant to R.S.C., Ord. 18, r. 19 or under the inherent jurisdiction of the court, on the grounds that: "(a) as against the first defendant they disclosed no reasonable cause of action and/or are embarrassing: (b) as against each of the first and second defendants they are scandalous and/or an abuse of the process of the court."

On 29 May 1996 solicitors acting for the third and fourth defendants also took out a summons seeking an order that the action against those defendants be struck out pursuant to Ord. 18, r. 19 or under the inherent jurisdiction of the court. Thus the matter came before Sir Michael Davies on 26 July 1996, when he made the order to which I have already referred.

**The decision under appeal**

As the judge pointed out:

> "All the causes of action derived from the letter, the file note, and any oral statements which led to them and the plaintiffs only acquired access to them because they were disclosed as unused material by the crown to Fuller's legal advisers. These were documents which were prima facie confidential and private, and this, I think, may be important, neither of the documents nor the oral conversations were read out or referred to at the criminal trial."

The judge found:

> "(1) that it was the duty of the prosecution to disclose the two documents without formal order; (2) that in civil proceedings there is an implied undertaking that documents disclosed on discovery must not be used for any purpose other than the purposes of the case in which they are disclosed [in this court it has been common ground that such an undertaking extends to a third party who sees documents as a result of discovery and knows that they have been available in that way - as the first plaintiff saw them in the present case]; (3) that it is not in the interests of the public that there should be opened up the possibility of countless defamation cases arising from situations like those in the present case; (4) that when shown the documents the first plaintiff was subject to an implied undertaking to the court, which was entitled to control the documents, and that it was a breach of that undertaking for him to use them for the purposes of this action; (5) that if such documents are to be used for any purpose other than that for which they are disclosed an application should be made to the Crown Court to release the undertaking."

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

In arriving at his conclusion the judge referred to various authorities including, in particular, the decision at first instance of Brooke J. in Mahon v. Rahn (unreported), 19 June 1996. That decision was reversed by another division of the Court of Appeal [1998] Q.B. 424, and Mr. Leolin Price, who has appeared for the plaintiffs before us, contends that because of the **184** way in which Mahon's case was decided by this court we must now allow this appeal. Before I turn to consider what was decided by this Court in Mahon v. Rahn, and the extent to which this court is bound by that decision, it is in my judgment appropriate to consider how Mr. Caldecott, for the defendants, puts his case in relation to the main issue, namely whether, in the absence of recent binding authority, this court should say that these plaintiffs were entitled to start proceedings on the basis of documents disclosed to the first plaintiff in the way that I have described.

**Why maintain confidentiality?**

Unfortunately no prosecuting authority was a party to Mahon's case, so this court did not have the advantage of the submissions which we have heard.

As Mr. Caldecott pointed out, although it can be valuable to see what, if anything, is done in civil litigation to restrict collateral use of documents disclosed on discovery, the approach if carried too far can lead to error, because if the reasons for restriction which apply in relation to civil litigation are not present in the criminal field it does not necessarily follow that in relation to criminal litigation there should be no restrictions. There may be, and he submits that there are, quite separate and powerful reasons for imposing and maintaining restrictions in the criminal field. The first and most obvious of those reasons is the need to sustain and encourage the free flow of information from informants both to initiate and to achieve progress with criminal inquiries. By informants I do not mean only those who operate close to criminals and give information for reward. I mean anyone in a position to give useful information, such as a neighbour who may have made a potentially significant observation, or an employer who may have suspected an employee of dishonesty. If informants are to be encouraged to be forthcoming and frank it is obviously essential for them to know that so far

as possible the information which they give will remain confidential. In order to ensure that no injustice is done to a defendant in a criminal trial the information may have to be made available to that defendant, or to those acting for him, for the purposes of conducting his defence in that case, but the needs of justice require no wider disclosure. So long as the information does not actually become public as a result of it being used at a criminal trial it seems to me that, save in highly exceptional cases, no significant damage can be done to anyone's reputation as a result of the very limited disclosure to which I have just referred, and so the common good clearly requires that the documents disclosed should go no further. Otherwise not only will there be a real danger of informants being stifled by the threat, if not the reality, of civil litigation, but there will also be a risk of their being ostracised or subjected to violence and intimidation from those sympathetic to the criminal's cause. To say that informants have nothing to fear because a prosecutor can always seek a special order to safeguard particularly sensitive information and that if the action against them should happen to take the form of a claim for damages for defamation they can, if not malicious, sustain a defence of qualified privilege or even absolute privilege is, in my judgment, a wholly inadequate response. No one, least of all a bona fide potential informer, wishes to be dependent upon the prosecutor's **185** view of what is sensitive, or to be sued (especially if the cause of action is one for which legal aid is not available), and if he can avoid those risks by withholding information he will do so.

A second compelling reason in favour of maintaining confidentiality as far as possible is that the material gathered in during the course of a criminal investigation and properly disclosed on discovery will often affect others who may never even have given a statement to anyone, and who may not even be aware of the disclosure. For example, disclosed material may show that someone other than the defendant was originally suspected of the crime, or a letter properly written in confidence by A to B may exist which is disparaging to C. Long after the letter was written a prosecution of B may lead to the disclosure of that letter as unused material. If C obtains access to it and sues A it is, in my judgment, plain that justice is not being done if A is simply left to avail himself if he can of such defence as he can raise to an action in defamation. Similarly, if it is not C who obtains access to the letter but a newspaper, which refuses to reveal its source, C's reputation may be seriously damaged before he can do anything to stop it. It may be information affecting his private life, it may even affect vulnerable children.

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

A third reason for maintaining confidentiality, demonstrated by the facts of this case, is the need to enable those investigating crime to operate freely, to follow leads, to consider suspects, and to record their thoughts without the fear of parasitic litigation.

I have therefore no hesitation in concluding that the interests of justice are best served if material which is disclosed to a defendant by the prosecution as part of the criminal process is subject to the restriction that it can only be used for the purposes of conducting the defence in those proceedings, at least until it enters the public domain by being referred to in open court. I accept, as will become apparent, that at present, even since the implementation of the Criminal Procedure and Investigations Act 1996, the restriction is not precisely as I have suggested that it should be, but it is Mr. Caldecott's submission that long prior to the Act the law had demonstrated in many fields, including in particular in the field of defamation, a policy against allowing, without the leave of the court, collateral use of information which it required to be disclosed for the purposes of particular proceedings where such information had not been referred to in open court. Mr. Caldecott submits that it was because it was not alerted to the existence of that well established policy that this court in Mahon's case fell into error.

**Relevant authorities**

It is said that only limited assistance can be gained from cases concerning the alleged misuse of material disclosed in criminal proceedings because there are few such cases. No doubt that is because extensive disclosure by the prosecution of material other than that relied on in open court is a recent development: see Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734, Reg. v. Ward [1993] 1 W.L.R. 619, and Reg. v. Keane [1994] 1 W.L.R. 746. Bearing that in mind Mr. Caldecott submits that the policy of the law can be seen in many cases in other fields of law to which we were referred. Those cases show, he submits, a **\*186** recognition that private law remedies, such as seeking an injunction, or raising a defence of privilege, are inadequate. As I have already indicated the injured party may not know of the collateral publication until serious damage has been done. He may not know who to proceed against because he may not know how the information became public, he may not have the necessary means, his opponent may be impecunious, or if he takes proceedings in defamation he may be met by a defence of justification, in which event no interlocutory injunction will normally be granted.

Mr. Caldecott submits, and I accept, that by granting the defence of absolute privilege to every advocate and every witness in a trial in respect of what is said in court, and in respect of fair and accurate reports thereof, the courts have long recognised the need to protect the trial process from extraneous influences and, he submits, that privilege, which arises from public policy, is more widely available than was recognised by this court in Mahon v. Rahn [1998] Q.B. 424. In Munster v. Lamb (1883) 11 Q.B.D. 588 the defendant to the action in defamation was a solicitor who had used the words complained of when conducting a defence at petty sessions. The Court of Appeal held that he was entitled to the protection of absolute privilege and explained why. Brett M.R. said, at p. 604:

> "To my mind it is illogical to argue that the protection of privilege ought not to exist for a counsel, who deliberately and maliciously slanders another person. The reason of the rule is, that a counsel, who is not malicious and who is acting bona fide, may not be in danger of having actions brought against him. If the rule of law were otherwise, the most innocent of counsel might be unrighteously harassed with suits, and therefore it is better to make the rule of law so large that an innocent counsel shall never be troubled, although by making it so large counsel are included who have been guilty of malice and misconduct."

In other words qualified privilege was not a sufficient safeguard because of the dangers of being "harassed with suits," one of Mr. Caldecott's arguments in the present case. Fry L.J. made the same point, at p. 607:

> "The rule of law exists, not because the conduct of those parties ought not of itself to be actionable, but because if their conduct was actionable, actions would be brought against judges and witnesses in cases in which they have not spoken with malice, in which they have not spoken

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

with falsehood. It is not a desire to prevent actions from being brought in cases where they ought to be maintained that has led to the adoption of the present rule of law; but it is the fear that if the rule were otherwise, numerous actions would be brought against persons who were merely discharging their duty."

In Watson v. M'Ewan [1905] A.C. 480 the House of Lords held that the privilege which protects the witness from an action in slander in respect of his evidence in the witness box also protects him against the consequences of statements made to the client and his solicitor when preparing the case for trial. The Earl of Halsbury L.C. said, at p. 487:

"It is very obvious that the public policy which renders the protection of witnesses necessary for the administration of justice must as a **187** necessary consequence involve that which is a step towards and is part of the administration of justice namely, the preliminary examination of witnesses to find out what they can prove."

Mr. Caldecott invites us to note the thinking which is there articulated. In Lincoln v. Daniels [1962] 1 Q.B. 237 this court made it clear that the decision in Watson's case [1905] A.C. 480 must not be read too widely, but Devlin L.J. reiterated the reasons for the rule of absolute privilege saying [1962] 1 Q.B. 237, 256:

"The rule of absolute privilege, as has so often been pointed out, has not been devised so as to protect malicious persons but to ensure that judges and others engaged in the administration of justice should be free from the fear of proceedings and 'the vexation of defending actions.'"

In Marrinan v. Vibart [1963] 1 Q.B. 528 the cause of action was conspiracy, the plaintiff alleging that two police constables had conspired to defame him in a report to the Director of Public Prosecutions, in evidence given at a trial, and in testimony to an inquiry ordered by the benchers of an Inn of Court. On a preliminary issue Salmon J. held that each publication was absolutely privileged, and that decision was upheld by this court. Sellers L.J. said, at p. 535:

"Whatever form of action is sought to be derived from what was said or done in the course of judicial proceedings must suffer the same fate of being barred by the rule which protects witnesses in their evidence before the court and in the preparation of the evidence which is to be so given."

Mr. Caldecott submits that there is an obvious parallel between that case and the position of the second and fourth defendants in the present case. Of course we are not concerned with the defence of absolute privilege - no defence has yet been served. The problem is that even if such a defence is available it does not prevent proceedings being started, and if there is any doubt as to the availability of the defence of absolute privilege it will not be considered as a preliminary issue: see Richards v. Naum [1967] 1 Q.B. 620.

The present case also raises the question of the extent to which confidentiality or privilege attaches to material disclosed so as to restrain someone other than the defendant. In Distillers Co. (Biochemicals) Ltd. v. Times Newspapers Ltd. [1975] Q.B. 613, in the context of civil litigation, that problem was addressed. An expert who was advising some claimants in their action against Distillers was given access to material disclosed by the defendants in that action. He agreed to sell the material to a newspaper, and refused to return it after the claimants' action had been settled. The court ordered that it be returned, Talbot J. saying, at p. 621:

"Those who disclose documents on discovery are entitled to the

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

protection of the court against any use of the documents otherwise than in the action in which they are disclosed. I also consider that this protection can be extended to prevent the use of the documents by any person into whose hands they come unless it be directly **\*188** connected with the action in which they are produced. I am further of the opinion that it is a matter of importance to the public, and therefore of public interest, that documents disclosed on discovery should not be permitted to be put to improper use and the court should give its protection in the right case."

Mr. Caldecott of course submits that the same line of reasoning should be adopted in relation to material disclosed to the defence as unused material in the course of a criminal prosecution.

In Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184 the plaintiff had been arrested and charged with the murder of her five-month-old son by morphine poisoning, on the basis of post mortem investigation results provided by the defendants. Further investigations led to no evidence being offered, and she was acquitted. She then commenced civil proceedings against the defendants alleging negligence, thus illustrating, as Mr. Caldecott has pointed out, that a person who starts civil proceedings on the basis of material disclosed during the course of a criminal prosecution will not always seek damages for defamation. He or she may select a different cause of action. The defendants successfully moved to set aside the statement of claim on the basis that they were at all times acting in the course of preparing evidence for a possible criminal prosecution, and for that reason were *immune from any civil proceedings* arising from their acts. Drake J. reviewed the line of authority to which I have already referred, and, having referred to a test used by the House of Lords in Saif Ali v. Sydney Mitchell & Co. [1980] A.C. 198, said [1981] 1 W.L.R. 184, 192:

"I would alter it to apply it to the immunity attaching to a witness or possible witness in a criminal investigation, thus: the protection exists only where the statement or conduct is such that it can fairly be

said to be part of the process of investigating a crime or a possible crime with a view to a prosecution or possible prosecution in respect of the matter being investigated."

If that is right then it would appear to have direct application to the facts of the present case. The importance of the decision in Evans's case is twofold - (1) the immunity from suit is not the same as absolute privilege because the cause of action was one for which absolute privilege would not have afforded any defence; (2) the immunity did not arise out of the way in which the plaintiff obtained the information which enabled her to sue. It arose out of the nature of the activity being undertaken by the defendants at the time of the acts complained of.

In Mahon v. Rahn [1998] Q.B. 424 Otton L.J. did refer briefly at the end of his judgment to Evans's case and to two other decisions namely Hasselblad (G.B.) Ltd. v. Orbinson Ltd. [1985] Q.B. 475 and X v. Bedfordshire County Council [1995] 2 A.C. 633, saying that it was "at least arguable" that the respondents in Mahon's case [1998] Q.B. 424 could raise the defence of absolute immunity. But it had not been pleaded or argued, either in the Court of Appeal or in the court below, so Otton L.J. considered that it would not be appropriate to maintain the first instance decision on that ground. That, is not our position. We have had the benefit of argument, in particular at an adjourned hearing, in relation to that **\*189** defence and the relevant cases have been cited to us. The decision in the Hasselblad case [1985] Q.B. 475 is sufficiently far away from the facts of the present case for me not to need to pause to consider it, but X v. Bedfordshire County Council [1995] 2 A.C. 633 is a decision to which I will later refer.

The Criminal Justice Act 1987 established the S.F.O. and gave to the director certain investigative powers, but only for the purposes of an investigation (see section 2(1)), and the Act in section 3(5) sets out the purposes for which information obtained may be used. In Morris v. Director of the Serious Fraud Office [1993] Ch. 372 the court considered a liquidator's application under section 236 of the Insolvency Act 1986 for an order that the S.F.O. produce certain documents in its possession, and Sir Donald Nicholls V.-C. said, at p. 380:

"I can see no justification for implying a general power for the S.F.O. to disclose information, obtained in the exercise of compulsory powers conferred by the Act, to persons not named in section 3. . . . When information is obtained in exercise of those powers the S.F.O. may use the information for those purposes and purposes reasonably incidental thereto and such other purposes as may be authorised by statute, but not otherwise."

Mr. Caldecott submits first that the Act of 1987 gives some useful indication how Parliament expects confidence to be respected so far as practicable when documents are brought to light during the course of criminal investigations, and, secondly, that it would be curious, to say the least, if a responsible investigating authority such as the S.F.O. were unable to make or permit collateral use of any documents revealed in the course of an investigation, but if criminal proceedings were commenced and those documents were then disclosed to the defendant, he and those to whom he revealed the documents would be free to use the documents as they chose.

In Prudential Assurance Co. Ltd. v. Fountain Page Ltd. [1991] 1 W.L.R. 756 Hobhouse J. considered the extent to which a party to whom documents had been disclosed during exchanges before trial of a civil action could make use of those documents after the action had been settled. Having reviewed some of the authorities he said, at p. 764h, that an undertaking to the court not to use material supplied in the course of discovery, or allow it to be used, for any purpose other than the proper conduct of the instant action will be implied. The judge continued, at p. 765:

"The rational basis for the rule is that where one party compels another, either by the enforcement of a rule of court or a specific order of the court, to disclose documents or information whether that other wishes to or not, the party obtaining the disclosure is given this power because the invasion

of the other party's rights has to give way to the need to do justice between those parties in the pending litigation between them: it follows from this that the results of such compulsion should likewise be limited to the purpose for which the order was made, namely, the purposes for that litigation then before the court between those parties and not for any other litigation or matter or any collateral purpose."

*190

Obviously it involves some straining of language to apply that reasoning to disclosure by the prosecution in the course of criminal proceedings. There is no relevant rule of the court, and normally the prosecution does not disclose because the defence obtains an order. Prior to the implementation of the Criminal Procedure and Investigations Act 1996 disclosure was made because, in the light of the authorities, that was known to be what was required, and if the court did make an order it could not be said to invade the prosecutor's rights.

In Marcel v. Commissioner of Police of the Metropolis [1992] Ch. 225 the court had to consider how to deal with documents which came into the hands of the prosecution during the course of a criminal investigation. The solicitor for the defendant in a civil action was allowed to inspect and copy some documents seized by the police from those who were to be witnesses in that action. A subpoena duces tecum was then taken out requiring the police to produce the documents at court, but a witness from whom documents had been seized asked the court to order, inter alia, that the copies of the documents be returned to the police and that the subpoena be set aside. At first instance Sir Nicholas Browne-Wilkinson V.-C. held that section 22 of the Police and Criminal Evidence Act 1984 does not expressly state the only purposes for which documents seized can be used, and he continued, at pp. 234c, 235c:

"However, there manifestly must be some limitation on the purposes for which seized documents can be used. Search and seizure under statutory powers constitute fundamental infringements of the individual's immunity from interference by the state with his property and privacy

fundamental human rights. Where there is a public interest which requires some impairment of those rights, Parliament legislates to permit such impairment. But, in the absence of clear words, in my judgment Parliament cannot be assumed to have legislated so as to interfere with the basic rights of the individual to a greater extent than is necessary to secure the protection of that public interest . . . In my judgment, subject to any express statutory provision in other Acts, the police are authorised to seize, retain and use documents only for public purposes related to the investigation and prosecution of crime and the return of stolen property to the true owner. Those investigations and prosecutions will normally be by the police themselves and involve no communication of documents or information to others. However, if communication to others is necessary for the purpose of the police investigation and prosecution, it is authorised."

Those passages, in so far as they relate to voluntary disclosure by the police, were expressly approved by Dillon L.J. in this court. The Court of Appeal declined to set aside the subpoena, but stressed also the need to recognise the private law rights of the owner of the documents seized. Nolan L.J. said, at p. 261b:

"In the context of the seizure and retention of documents, I would hold that the public law duty is combined with a private law duty of confidentiality towards the owner of the documents. The private law duty . . . arises from the relationship between the parties. It matters **191 not, to my mind, that in this instance, so far as the owners of the documents are concerned, the confidence is unwillingly imparted."

Sir Christopher Slade said, at pp. 262d, 263f:

"In my judgment, documents seized by a public authority from a private citizen in exercise of a statutory power can properly be used only for those purposes for which the relevant legislation contemplated they mig ht be used. The user for any other purpose of documents seized in exercise of a draconian power of this nature, without the consent of the person from whom they were seized, would be an improper exercise of the power. Any such person would be entitled to expect that the authority would treat the documents and their contents as confidential, save to the extent that it might use them for purposes contemplated by the relevant legislation. . . . I agree with the Vice-Chancellor that these documents and information were disclosed in breach of confidence."

So I come to Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278, a decision of the Court of Appeal (Criminal Division) on unusual facts. B. was convicted of unlawful wounding. The evidence against him included that of two police officers who were alleged to have behaved improperly. A complaint was made about their conduct which was investigated by the Police Complaints Authority ("P.C.A."). A newspaper then published an article which was said to be defamatory of the two officers, and they took civil proceedings against the newspaper. At that stage the conviction of B. was referred to the Court of Appeal (Criminal Division) by the Home Secretary, and for the purposes of that hearing the court ordered disclosure to B. of all witness statements and documents in the possession of the P.C.A. The appeal succeeded, and the newspaper then asked the Court of Appeal (Criminal Division) to release B. from his implied undertaking pursuant to which discovery of the P.C.A. documents to him was given. It was, said Lord Taylor of Gosforth C.J., at p. 285f: "an implied undertaking, analogous to that arising on discovery in civil proceedings, not to use the disclosed documents otherwise than for the purposes for which discovery was given, here the pursuance of the criminal appeal."

It was accepted, both by experienced counsel and by the

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

court, that an implied undertaking had been given to the Court of Appeal (Criminal Division) which alone had power to vary it, but it was significantly different from such an undertaking arising as a result of discovery in civil proceedings. Counsel for the P.C.A. argued against any variation of the undertaking, and the court said, at p. 291e that his argument "would, we accept, be formidable indeed had the implied undertaking with which we are concerned been one given in the usual way in civil proceedings." The court went on to recognise that in civil proceedings the concept of the implied undertaking is a necessary way of underpinning the integrity of the discovery process, but whereas in private litigation discovery is "a very serious invasion of the privacy and confidentiality of the litigant's affairs" (per Lord Keith of Kinkel in Home Office v. Harman [1983] 1 A.C. 280, 308) that is less obviously apt in relation to an order made by the Court of Appeal (Criminal Division). The court held that the implied undertaking added little to the public interest immunity attaching to the P.C.A. **\*192** documents, and that both should yield to the countervailing public interest which required that the newspaper be able to mount a proper defence.

In X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633 one of the actions considered by the House of Lords was M (A Minor) v. Newham London Borough Council in which an infant and her mother claimed damages for negligence and breach of statutory duty against the local authority and others. It was said that a psychiatrist and a social worker employed by the local authority had erred in diagnosing sex-abuse and in concluding that the child's mother's cohabitee was the abuser. The master granted an application to strike out the claim as disclosing no cause of action on the basis that the psychiatric injury complained of could not found a claim for damages in negligence, and that the psychiatrist was protected from suit by a witness's immunity from actions in negligence. The Court of Appeal disagreed, but in the House of Lords Lord Browne-Wilkinson, with whom the other members of the House agreed, said, at p. 754g, that the Court of Appeal "placed too narrow a limit on the principle of witness immunity." He referred to the decision of the House of Lords in Watson v. M'Ewan [1905] A.C. 405, to which I have already referred, and [1995] 2 A.C. 633, 755 cited this passage from the decision of Drake J. in Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184, 191:

"The immunity given to a witness or potential witness is because the administration of justice would be

greatly impeded if witnesses were to be in fear that . . . persons against whom they gave evidence might subsequently involve them in costly litigation: see Marrinan v. Vibart [1963] 1 Q.B. 234, 237. If this object is to be achieved I think it essential that the immunity given to a witness should also extend to cover statements he makes prior to the issue of a writ or commencement of a prosecution, provided that the statement is made for the purpose of a possible action or prosecution and at a time when the possible action or prosecution is being considered. In a large number of criminal cases the police have collected statements from witnesses before anyone is charged with an offence; indeed sometimes before it is known whether or not any criminal offence has been committed. If immunity did not extend to such statements it would mean that the immunity attaching to the giving of evidence in court or the formal statements made in preparation for the court hearing could easily be outflanked and rendered of little use. For the same reason I think that the immunity must extend also to the acts of the witness in collecting or considering material on which he may later be called to give evidence."

Lord Browne-Wilkinson then continued [1995] 2 A.C. 633, 755:

"My Lords, I find the reasoning of Drake J. compelling at least in relation to the investigation and preparation of evidence in criminal proceedings. In my judgment exactly similar considerations apply where, in the performance of a public duty, the local authority is investigating whether or not there is evidence on which to bring proceedings for the protection of the child from abuse, such abuse **\*193** frequently being a

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

criminal offence. I express no view as to the position in relation to ordinary civil proceedings."

In my judgment the last sentence quoted by Lord Browne-Wilkinson from the decision of Drake J. plainly applies to the letter and to the file note which are at the heart of this case, and to the discussion which the file note was intended to summarise. It is also important to note that it was precisely because it was potentially a criminal and not a civil investigation that the witness was granted immunity in the Newham case.

In In re Arrows Ltd. (No. 4) [1995] 2 A.C. 75 the liquidators of a company applied to a judge for directions, having received a request from the S.F.O. for transcripts of the examination of the chairman and managing director under section 236 of the Insolvency Act 1986. The judge ordered that the transcripts be released on certain undertakings being given, but the Court of Appeal released the S.F.O. from undertakings, and the appeal to the House of Lords was dismissed. The case is really concerned with the extent of the powers of the S.F.O., and although cited to us in my judgment it is not really of assistance in the present case.

In Silcott v. Commissioner of Police of the Metropolis (1996) 8 Admin.L.R. 633, this court considered a plaintiff's appeal against an order that his action for conspiracy to pervert administration of justice and misfeasance in public office be struck out. The third cause of action for malicious prosecution was not affected by the order. The factual basis of the case was that, according to the plaintiff, two police officers had conspired together to produce false notes of interview which indicated that the plaintiff was the murderer of Police Constable Blakelock, with the result that he was wrongly convicted of that offence. The issue on appeal was identified by Simon Brown L.J. as being: "whether the alleged actions of the police officers are protected from any civil action for conspiracy to pervert the course of justice or misfeasance in a public office by reason of a cloak of absolute immunity conferred as a matter of public policy."

Simon Brown L.J. set out the immunity rule which protects parties and witnesses from any action arising out of anything said or done in the ordinary course of any proceedings in a court of justice. He referred to Munster v. Lamb, 11 Q.B.D. 588, Marrinan v. Vibart [1963] 1 Q.B. 234 and Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184 as indicating the width of the rule and its limitations, and he said that "protection must extend to the preparation of evidence equally as to its presentation." He said:

> "In my judgment, Drake J. was correct in Evans's case to have held that the immunity covers all conduct that can fairly be said to be part of the investigatory and, I would add, preparatory process. To Lord Williams' submission that there is no public interest in protecting those who create false evidence or, for that matter, those who destroy sound evidence, I would answer that that misses the essential point: the public interest is in the protection of those who might otherwise be falsely accused of such conduct."

That answer, as it seems to me, must be the same if the cause of action happens to be in defamation.
*194

### Conclusions from authorities
In my judgment five propositions can be extracted from that rather lengthy examination of authorities.

(1) Whatever the form of action it will be barred if it is founded upon what a witness has said in the witness box, or upon what has been said or done in preparing the evidence for a trial: see Watson v. M'Ewan [1905] A.C. 405; Marrinan v. Vibart [1963] 1 Q.B. 234.

(2) This immunity is not, like absolute privilege, limited to actions alleging defamation. In criminal cases it applies to prevent any form of parasitic litigation (other than an action like malicious prosecution which relates directly to criminal proceedings) where the statement or conduct relied upon is such that it can fairly be said to be part of the process of investigating a crime or a possible crime with a view to a prosecution or possible prosecution: see

Marrinan's case, Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184, X v. Bedfordshire County Council [1995] 2 A.C. 633 and Silcott's case (1996) 8 Admin.L.R. 633,

(3) Documents seized by the police or other prosecuting authority during a criminal investigation must be treated as confidential. The owners of the documents are entitled to expect that they will only be used for the specific purpose for which they have been seized (i.e. to further the criminal investigation) and the courts will if necessary act to support that expectation: see Marcel's case [1992] Ch. 225.

(4) In civil proceedings a party who obtains discovery is required in return to give an implied undertaking to the court not to use material supplied in the course of discovery or allow it to be used for any purpose other than the proper conduct of the action in which discovery is obtained. That is to encourage full discovery, and to ensure that the invasion of the rights of the party giving discovery is restricted to what is necessary to do justice in the instant case: Prudential Assurance Co. Ltd. v. Fountain Page Ltd. [1991] 1 W.L.R. 756.

(5) When the prosecution discloses material to the defence in the course of a criminal prosecution, whether it be used material or unused material, the authorities prior to Mahon v. Rahn [1998] Q.B. 224 are silent as to whether that gives rise to an implied undertaking of the kind to which I have just referred. Some such undertaking may well be implied if the Court of Appeal (Criminal Division) orders specific disclosure of documents normally protected by public interest immunity (see Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278) but the reasons for the undertaking will not be the same as in relation to a civil action.

Those propositions are not quite the policy for which Mr. Caldecott contended, but unless there is anything in the Criminal Procedure and Investigations Act 1996 or Mahon's case which compels me to take a different view I regard the first and second propositions as determinative of this appeal.

## Criminal Procedure and Investigations Act 1996

Part I of the Act creates for the first time a statutory scheme for prosecution and defence disclosure in criminal proceedings. As part of that scheme section 17 makes provision for protecting unused material that is **195 disclosed by a prosecutor to an accused or to his or her legal adviser. It has to be treated as confidential, and cannot be used, except with the permission of the court other than for the purposes of the criminal proceedings to which it relates. As we discovered during the course of argument, it is by no means easy to see how Part I of the Act will apply to persons in the position of the plaintiffs in the present case, but fortunately that is not something we have to decide, because the material parts of the Act did not come into force until April 1997, and so they have no direct application to this case. We were really invited to consider the Act because it was thought it might assist us as to the state of the law before it came into force. I confess that I have not been able to find any such assistance in the Act. Much of the procedure which it lays down is new, and section 17(8) provides:

> "Nothing in this section affects any other restriction or prohibition on the use or disclosure of an object or information, whether the restriction or prohibition arises under an enactment (whenever passed) or otherwise."

Mahon v. Rahn [1998] Q.B. 424

I return now to the case which Mr. Price has submitted that we must follow in deciding this appeal. The plaintiffs were London stockbrokers, and the defendants were partners in a Swiss bank. The defendants instructed the plaintiffs to purchase certain shares for $5m., but provided only $3m. They were pressed for the balance before the S.F.O. and the Securities Association ("S.A.") began to investigate the plaintiffs. As part of that investigation the defendants were approached, and they wrote a letter to the S.A. Criminal proceedings were commenced, and the letter was read out in court. The criminal proceedings were dismissed and the plaintiffs claimed damages for libel on the basis of the letter. The defence served a defence in which they claimed qualified (but not absolute) privilege. They then issued a summons to strike out on the grounds that the letter had been obtained by the plaintiffs by way of disclosure in criminal proceedings against them. Brooke J. held that when the prosecution discloses material in criminal proceedings that gives rise to an implied undertaking by a defendant similar to that which arises in civil proceedings. The undertaking is to be implied whether the disclosure is voluntary or pursuant of an order of the court. It continues

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

to apply even if the document is read or referred to in court and if a libel action is commenced in breach of the undertaking the court may strike it out. On appeal Otton L.J. examined the scope of the implied undertaking as it exists in civil proceedings, and concluded, at p. 447, that "in the absence of a public interest immunity ruling to the contrary there never has been a fetter on the subsequent use of documents which have been "used" in the criminal process." He was not satisfied that it was appropriate to imply an undertaking in criminal proceedings by analogy with the implied undertaking which exists in civil procedure and found that to be decisive of the appeal, but then added the postscript to which I have already referred, but which it is now appropriate to quote verbatim. He said, at p. 453, that on the basis of the decisions in the Hasselblad case [1985] Q.B.475, Evans's case [1981] 1 W.L.R. 184 and X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633:

> "it would appear at least arguable that the respondents in this case could raise the defence of absolute immunity. However, this has not been pleaded, nor was the point argued below or before this court. Thus it would not be appropriate for this court to maintain Brooke J.'s decision to strike out on this ground."

As I hope I have made clear, it is the plea of absolute immunity which I regard as being entitled to succeed in the present case. It follows that the judgment of Otton L.J. in Mahon's case is in no way decisive because it does not address the issue. Schiemann L.J. simply agreed, and Staughton L.J., at p. 456, emphasised that in that case the court was dealing with a document which was disclosed to the plaintiffs "because it formed part of the material which the prosecution wished to put before the court." That, of course, is not the position in this case. He did not consider that the defendant in a criminal trial is under any implied undertaking as to material "disclosed to him as part of the prosecution case whether or not it is read out or referred to in open court:" p. 457. So Mr. Caldecott submitted to us that Staughton L.J. having made no finding in relation to unused material, and Schiemann L.J. not having made it clear with whom he agreed, we are free to decide that an implied undertaking does arise in relation to unused material. That is not a decision which I have to make in order to reach a conclusion in relation to this appeal. More significant from my point of view, is

what Staughton L.J. said at the end of his judgment, at pp. 458-459:

> "Otton L.J. in his penultimate paragraph has referred to cases which elucidate the privilege that is available to witnesses. We heard no argument on that topic, but clearly it may be relevant if this action proceeds further. I agree that we should not rule upon it at the present stage. It is not pleaded, the full facts may not be known, and we would have to recall the parties for further argument. It must be considered, if at all, on some other occasion."

Contrary to the submissions made by Mr. Price I do not regard the decision in Mahon's case as being determinative of this appeal, which I would dismiss.

**Does Mahon v. Rahn apply to unused material?**

Were it not for the decision in Mahon v. Rahn I would have had a second reason for dismissing this appeal, namely that Sir Michael Davies was right for the reasons which he gave. It seems to me that:

(1) Where the needs of criminal justice involve, as they do, invasions of privacy and confidentiality - as, for example, by the seizure of documents during the course of an inquiry, and the disclosure of documents to the court and to the defence (both used and unused material) - the extent of the invasion should be no greater than the needs of criminal justice in the instant case require. That is necessary not only to encourage and protect informants and investigators, but also because those whose privacy and confidentiality have been invaded have a right to expect the law to protect **197** them from any unnecessary exposure. (2) It follows that save in two exceptional cases the court should be prepared to act so as to ensure that documents created or collected during the course of a criminal inquiry are used only for the purposes of that inquiry, and of any prosecution which arises out of it. (3) The first exceptional case is where a document is used in a criminal court in such a way that the contents of the document become public knowledge. It then becomes no longer practicable for the court to protect the privacy or confidentiality so far as that document is concerned. (4)

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

The second exceptional case is where the court is persuaded that the overall interests of justice require that the document or documents in question be available for use in other proceedings (e.g. where someone released soon after being charged seeks damages for wrongful arrest and false imprisonment, or a problem arises of the kind considered in *Ex parte Coventry Newspapers Ltd.* [1993] Q.B. 278). (5) In circumstances where there is no protection to be derived from the immunity which in my judgment applies in this case the reasons for restricting the use of documents which come to light in the course of criminal investigations and criminal trials are therefore different from those which underpin the well-established implied undertaking which arises on discovery in civil proceedings, but they are no less powerful, and it can be persuasively argued that they should lead to the same result, namely confirmation of the existence of an implied undertaking in all cases other than those where the document has come fully into the public domain during the criminal trial. (6) However this court in *Mahon's case* [1998] Q.B. 424 decided not to follow that route so far as used material was concerned. The way in which the matter was dealt with by Otton and Staughton L.JJ. (even allowing for the latter's more restricted approach) seems to me to leave no room for a meaningful distinction to be drawn between used material and unused material, nor would such a distinction constitute an adequate response to the reasoning in favour of an implied undertaking which I have attempted to summarise. Although, as I have said, the court in Mahon's case did not have the benefit of submissions from a prosecuting authority I cannot accept Mr. Caldecott's submission that an established policy was overlooked, and even if I could accept it I am not persuaded that this court could decline to follow Mahon v. Rahn on that ground.

In conformity with the decision in Mahon's case I must therefore accept that in this court Sir Michael Davies's finding as to the existence of and breach of an implied undertaking cannot now be sustained, but for the reasons I have given that, in my judgment, has no effect on the outcome of the appeal.

**Millett L.J.**

I would be very concerned if private and confidential material, such as bank statements, medical records and tax returns, belonging to private individuals and seized by the police or provided to them voluntarily and in confidence, and which was then served on an accused as part of the prosecution case or supplied to him by the prosecution as unused material in order to assist him with his defence,

but which was not then used or referred to in open court, could be used by the accused for his own purposes free from restriction. In my opinion this would be contrary to basic legal policy derived from principles which **\*198** I regard as fundamental in a free society. In my view: (1) The seizure or compulsory disclosure of material is an interference with the owner's privacy. The invasion of his privacy can only be justified by the public interest in ensuring that all relevant material should be available to a court of justice and that an accused person should have made available to him all material which may assist him to meet the case against him. It follows that the use to which the material may lawfully be put should be limited by the purpose for which its compulsory production is justified. (2) Persons who voluntarily supply material in confidence are entitled to have their confidence respected save only in so far as they must be taken to have consented to the use of the material. Members of the public who volunteer information to the police are entitled to expect that it will be used only for the purpose of the investigation and subsequent criminal proceedings. Their expectations should be respected. (3) Nothing should be done to discourage members of the public from voluntarily assisting the police or prosecuting authorities. This applies with particular force to informers, but it is not confined to them. The risk that material which they provide will come into the public domain by being used or referred to in open court may discourage co-operation but is unavoidable. But there would be a further and unnecessary disincentive to co-operation if material of only peripheral relevance to the proceedings but disclosed by the prosecution to the accused in conformity with its duty should thereafter be freely available for use for any purpose. (4) A person who is supplied with material for a limited purpose is not entitled without the consent of the person who supplied it to use it for any other purpose.

To a large extent these principles are given effect by the doctrines of public interest immunity and immunity from suit. But these doctrines do not give complete protection. The prosecution may not claim public interest immunity, and even if it does its claim may be refused. Immunity from suit does not extend to pre-existing documents, that is to say documents which are not brought into existence in the course of the criminal investigation, and does not prevent the use of material otherwise than for the purpose of civil proceedings.

In my view, those who volunteer information to and those whose documents are seized by the police are entitled to protection from improper use of their material. So, too, are those who are responsible for creating documents in

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

the course of a criminal investigation. If, therefore the matter were res integra, I would agree with Kennedy L.J. that the accused ought to be subjected to a legal obligation similar to that which arises under the implied undertaking in civil proceedings in relation to documents obtained on discovery. We are, however, bound by the recent decision of this court in Mahon v. Rahn [1998] Q.B. 424 to hold that material supplied to the accused as part of the prosecution case is not subject to any restriction on its subsequent use, even though it has not become public knowledge, and even though it may have been seized under compulsory powers or obtained in confidence.

I have not found the reasoning in that case persuasive. In the first place, I cannot accept the proposition that persons who take part in the administration of justice are sufficiently protected by qualified privilege. This would be contrary to a long line of authority. It is the policy of the *199 law to protect such persons against baseless allegations of malice, and this requires nothing less than absolute immunity from suit. In the second place, a very narrow view was taken of the scope of privacy, and no regard appears to have been paid to the fact that it is the privacy of the individual witness or investigator, not the prosecution, which is invaded when his material is supplied to the accused. Thirdly, in my view no support can be derived from the terms of section 17 of the Criminal Procedure and Investigations Act 1996. The section is limited to unused material, but the reason for this is self-evident: other material was beyond the scope of the Act. It is not possible to deduce what Parliament considered to be the position in relation to material served on the accused as part of the prosecution case. It is possible though unlikely that Parliament thought that such material should be at the free disposition of the accused. But it is at least possible that Parliament assumed that the existing law prevented this.

The position in relation to unused material was expressly left open in Mahon's case. I agree with Kennedy L.J., however, that it is not open to us to distinguish the case on that ground. To do so would be to introduce an indefensible distinction between used and unused material. It would mean that a member of the public whose information undermined the prosecution case would be protected, whereas one whose information advanced it would not. Such a policy would have no rational basis.

Accordingly, I reluctantly agree that it was not open to the judge to strike out the proceedings on the ground that they

were brought in breach of an implied undertaking to the court. But I am also relieved to find that the proceedings should be struck out on the ground that they infringe the defendants' immunity from suit and that to continue them would be an abuse of the process of the court.

I agree that the appeal should be dismissed.

**Sir Brian Neill.**

In these proceedings for defamation the plaintiffs rely on: (a) a letter dated 4 May 1994 from Ms McKenzie of the S.F.O. to the Attorney-General for the Isle of Man; (b) a discussion which took place on 17 May 1994 in Leamington Spa at a meeting attended by Ms McKenzie, Detective Inspector Hulse of the Staffordshire Police and Mr. Rogerson of the Law Society; (c) a file note dated 17 May 1994 in which Ms McKenzie made a record of the discussion referred to in (b).

The claims in respect of (a) and (c) are for damages for libel. The claims in respect of (b) are for damages for slander.

In the course of the hearing in this court Mr. Caldecott advanced two arguments as to why these claims should be struck out: (1) because the documents and the terms of the discussion on 17 May only came to the knowledge of the plaintiffs by reason of the fact that the letter and the file note had been disclosed by the prosecution in accordance with the modern practice in criminal proceedings to a defendant in such proceedings for the purpose of the preparation by him of his defence; (2) because the documents came into existence and the discussion took place in the course of and for the purpose of a criminal investigation.

These two arguments raise quite separate considerations. Thus the first argument, if correct, would mean that the documents which were disclosed *200 by the prosecution to the defence in criminal proceedings could not be used as the basis of a subsequent civil action irrespective of the circumstances in which the documents first came into existence.

If the matter were free from authority I would be disposed, for the reasons explained by Kennedy and Millett L.JJ., to uphold this argument. The law of

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

confidence recognises that there are circumstances in which the protection of the court can be invoked to prevent the use of documents for purposes other than those for which they first came into the possession of a defendant. The limited use that can be made of "without prejudice" documents provides a similar example. It seems to me that on grounds of public policy the court should be able to intervene to prevent the misuse of what are in effect its own processes. But I have come to the conclusion that there is no satisfactory way in which the recent decision of this court in Mahon v. Rahn [1998] Q.B. 424 can be distinguished. Accordingly, had the first argument been the only material available to Mr. Caldecott, I would have felt obliged to allow the appeal.

On the facts of the present case, however, I am satisfied that neither the documents nor the words used in the course of the discussion of 17 May 1994 can found an action for defamation at the suit of the plaintiffs. The documents came into existence and the discussion took place in the context of the investigation of suspected crime. Public policy requires, for the reasons explained by Kennedy L.J., that such documents and such discussions should be immune from suit. In this context I say nothing of course about the exceptional remedies of malicious prosecution and malicious arrest.

A decision on this second ground does not meet the concerns voiced by Mr. Caldecott. In my judgment, however, in the light of the decision in Mahon's case this is the only ground on which this appeal can be dismissed. I therefore concur in the order proposed by Kennedy L.J.

*Petition: 29 January 1998. The Appeal Committee of the House of Lords (Lord Goff of Chieveley, Lord Hoffmann and Lord Saville) allowed a petition by the plaintiffs for leave to appeal. ([Reported by Alison Sylvester, Barrister] )*

The plaintiffs appealed by leave of the House of Lords (Lord Goff of Chieveley, Lord Hoffmann and Lord Saville) granted on 29 January 1998.

*Leolin Price Q.C.* and *Julian Knowles* for the plaintiffs. The rival public interests involved in the case are the public interest in granting absolute privilege and immunity from defamation proceedings in respect of

communications made in the course of a criminal investigation and the public interest in not denying justice in respect of damage to reputation.

*201

The defence of absolute privilege should be strictly confined. It is for the defendant to allege and prove all the facts necessary to bring the words complained of within that defence. [Reference was made to Trapp v. Mackie [1979] 1 W.L.R. 377; Mann v. O'Neill (1997) 71 A.L.J.R. 903; Roy v. Prior [1971] A.C. 470; Bennett v. Commissioner of Police of the Metropolis (1997) 10 Admin.L.R. 245 and Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278.] In defamation proceedings there is no defence of absolute immunity distinct from absolute privilege, which extends to everything said or done in the course of preparing for a potential prosecution. Absolute immunity is simply the name given to absolute privilege in actions other than defamation actions: Marrinan v. Vibart [1963] 1 Q.B. 528, 535.

Absolute privilege attaches to the character or identity of the person writing or speaking the defamatory matter: see Munster v. Lamb (1883) 11 Q.B.D. 588. The defence of qualified privilege attaches more to the occasion on which the words were spoken. A claimed immunity arising from things done in the course of criminal investigations therefore has the character of a qualified rather than absolute privilege. The immunity that covers proceedings in a court of justice should not be extended to matters outside those proceedings except where such immunity is necessary for the protection of those participating in the proceedings: see Marrinan v. Vibart [1963] 1 Q.B. 528; Watson v. M'Ewan [1905] A.C. 480; Silcott v. Commissioner of Police of the Metropolis (1996) 8 Admin.L.R. 633; Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184 and X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633. The Court of Appeal erred in holding that absolute immunity extended to what could fairly be said to be part of the process of investigating a crime or possible crime with a view to prosecution.

Considerations of public policy do not require all those involved in criminal investigations to be given immunity from suit. The two public policy reasons underpinning absolute privilege are the need to encourage witnesses to assist the course of justice without fear of exposing themselves to litigation, and the need to avoid relitigation by subsequent collateral challenges. Those policy concerns are sufficiently addressed by the absolute privilege accorded to witnesses and potential witnesses

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

and the doctrine of public interest immunity. It is absurd to suggest that police officers and court officials will be inhibited in the prosecution of crime unless they have immunity from suit. The right of a plaintiff to go to court to protect his reputation must be given its due weight. [Reference was made to D. v. National Society for the Prevention of Cruelty to Children [1978] A.C. 171; Docker v. Chief Constable of West Midlands Police, The Times, 29 April 1998; Court of Appeal (Civil Division) Transcript No. 472 of 1998; Hill v. Chief Constable of West Yorkshire [1989] A.C. 53; Dooley v. C. N. Weber Ltd. (1994) 118 D.L.R. (4th) 750; Canada v. Lukasik (1985) 18 D.L.R. (4th) 245 and Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734.]

There is no implied undertaking as to use attaching to documents disclosed in criminal proceedings. A person receiving documents is free to use them as he wishes unless there is some principle which prevents him from doing so. Under English law that which is not expressly prohibited is lawful. If a person is defamed he ought not to be prevented from seeking *202 redress in the courts, save where that would clearly not be in the public interest.

Unlike a litigant in civil proceedings, the Crown has an interest in the information contained in a document but not in the document. Those who sign witness statements fully expect to give evidence in public and the police cannot know at that stage whether that evidence will be used at the trial. Notions of confidence do not apply to information supplied for use in the criminal justice process. Where there is a genuine public interest in information being kept confidential public interest immunity will apply. [Reference was made to Home Office v. Harman [1983] 1 A.C. 280.]

Mahon v. Rhan [1998] Q.B. 424 was correctly decided. At common law there is no implied undertaking as to the use of documents disclosed by the Crown in the course of criminal proceedings, whether as part of its case or as unused material.

*Andrew Caldecott Q.C.* and *Catrin Evans* for the defendants. The restrictions on the application of immunity to actual or potential witnesses and evidence in court, as proposed by the plaintiffs, are impractical. Those restrictions have to be judged at the time when the relevant communication is made since the whole purpose of immunity is that at that point the person concerned knows he can speak freely without fear of proceedings

being brought against him. Defamatory statements are a necessary part of any police investigation and a prospective witness's account will often include a mixture of his own observations and hearsay.

The prosecution's obligation to disclose unused material is not confined to material which is admissible in evidence but extends to material which may set in train a line of inquiry and which is not prima facie admissible in court. [Reference was made to Reg. v. Brown (Winston) [1994] 1 W.L.R. 1599; Reg. v. Keane [1994] 1 W.L.R. 746 and Reg. v. Ward (Judith) [1993] 1 W.L.R. 619.]

Statements made in the course of an investigation into a possible crime are immune from suit on grounds of public policy developed from the absolute immunity afforded to witnesses in court proceedings. The public interest in protecting the free flow of information to and from those investigating crime outweighs the need for private remedies for those damaged in the course of criminal investigations. Qualified privilege affords insufficient protection for persons wishing to assist in the investigation of crime [Reference was made to Munster v. Lamb, 11 Q.B.D. 588.]

For the purposes of the law of defamation there is no meaningful distinction between absolute privilege and absolute immunity. The former is but an application of the latter in defamation proceedings.

Investigators are obliged by law to use information and documents obtained or generated by them only for the purposes of the investigation. Collateral use without the leave of the court of such information is contrary to the public interest in that such use tends to deter the free flow of information to, and free communication between, investigators. [Reference was made to Marcel v. Commissioner of Police of the Metropolis [1992] Ch. 225.]

An implied undertaking or obligation to the court is a convenient mechanism protecting the administration of justice against the harmful consequences of collateral use, while allowing persons to apply to the court *203 for release from the obligation or undertaking where the particular use is in the public interest. In contrast, private law remedies afford wholly inadequate protection. [Reference was made to Connelly v. Director of Public Prosecutions [1964] A.C. 1254.] The person harmed may

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

know of the prosecution or the identity of the person responsible for the improper use. There is no legal aid for defamation and there is uncertainty as to the effectiveness of financial remedies in breach of confidence in such a context. An obligation or undertaking is effective against third parties to whom such information is disclosed since collateral use by them would be an interference with the administration of justice and, prima facie, a contempt of court.

Mahon v. Rahn [1998] Q.B. 424 should be overruled, save in so far as it indicates that material communicated to the public in open court is not protected.

*Price Q.C.* relied.

Their Lordships took time for consideration.

29 October. Lord Lloyd of Berwick.

I would decide this appeal on the first of the two principles discussed by my noble and learned friend, Lord Hoffmann. This was the ground on which Sir Michael Davies decided the case, correctly in my view. He was following the closely reasoned judgment of Brooke J. in Mahon v. Rhan (unreported), 19 June 1996. Unfortunately Brooke J.'s judgment was reversed on appeal [1998] Q.B. 424. This provided Mr Leolin Price with the ammunition which he needed.

The Court of Appeal [1997] 4 All E.R. 887 in the present case held that it was bound by its previous decision in Mahon v. Rahn. So they could not decide against the plaintiff on the preferred ground of an implied undertaking. Instead they turned with relief (see *per* Millett L.J., ante, p. 199d) to an alternative ground not argued before them. They held that the absolute immunity which attaches to witnesses and potential witnesses should be extended to all those taking part in a criminal investigation with a view to a prosecution or possible prosecution. Since the point was not argued, it may be that if it had not been for Mahon v. Rahn it would never have been decided.

Whereas the implied undertaking is a clear cut and relatively straightforward point, the absolute immunity raises issues of far reaching importance on which I would

for my part have wished to hear fuller argument. In Watson v. M'Ewan [1905] A.C. 480 the House extended the original absolute privilege attaching to a witness's statement in court to his statements in preparation for court proceedings. This was a natural, necessary and indeed obvious extension of the principle. But I am not persuaded that it is obvious or necessary to extend the principle to those who are not witnesses or potential witnesses at all, but whose only function is to investigate and prosecute crime, such as the Serious Fraud Office, the Crown Prosecution Service and the police.

The new rules on disclosure of unused material, to which my noble and learned friend, Lord Hope, attaches importance, do not seem to me to justify the extension of absolute privilege to a different class of beneficiary. **\*204** Nor can I see any logical reason for doing so. Indeed logic would seem to point in the other direction. If the immunity is absolute, how is it to be reconciled with proceedings against the police for malicious prosecution? If there is to be an exception for malice, is this not more consistent with qualified privilege rather than absolute privilege? It is said that qualified privilege is insufficient protection for the reasons stated by Fry L.J. in Munster v. Lamb (1883) 11 Q.B.D. 588, 607. But the same could be said of every case in which the law allows qualified but not absolute privilege.

It is said that the absolute privilege or immunity will not apply unless what is said or done is "fairly part" of the investigation process. But the absolute privilege of the judge and advocate are not subject to that qualification. The privilege applies even though what is said is gratuitous and irrelevant to every issue in the trial: Munster v. Lamb. Does this mean that there is now to be an intermediate level of privilege lying somewhere between absolute privilege on the one hand and qualified privilege on the other?

Reliance was placed on a dictum of Drake J. in Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184. But I do not see how that case helps. The third and fourth defendants in that case were clearly potential witnesses. This is how Drake J. approached the case, at pp. 191-192. This is how Lord Brown-Wilkinson understood the case in X (Minors) v. Bedfordshire County Council [1995] 2 A.C. 633, 755. In that case, too, the psychiatrist was clearly a potential witness. This is confirmed by Mr. Caldecott's own treatment of the decision in paragraph 3.3 of his written case. The passage in Drake J.'s judgment, at p. 192, on

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

which particular reliance is placed begins with the words "the protection exists only where the statement or conduct is such that it can fairly be said to be part of the process of investigating a crime . . ." But this passage is prefaced by the words "I would alter [the test suggested in Rees v. Sinclair 1 N.Z.L.R. 180, 187] to apply it to the immunity attaching to a witness or possible witness in a criminal investigation." There is nothing in these decisions which would extend absolute immunity to the Crown Prosecution Service, the Serious Fraud Office or the police.

The merit of deciding the case on the first ground is that it allows a degree of flexibility. It enables the court to keep control of the material in question. This was regarded by Brooke J. and Sir Michael Davies as a factor of importance. I agree with them. There will be little if any flexibility, and little if any control by the courts, if the police are to enjoy absolute immunity in the course of their investigations. Instead of investigating complaints by members of the public whose rights have been infringed, the courts will presumably be met in every case with an application to strike out. I am bound to say that I regard this development with some alarm. But, as your Lordships take a different view, I say no more about it.

On the first ground I am in complete agreement with the speech of my noble and learned friend, Lord Hoffmann. I would dismiss the appeal on that ground, but leave the second ground undecided.

Lord Goff of Chieveley.

My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend, Lord Hoffmann. For the reasons which he gives I would dismiss the appeal.
    *205

Lord Hoffmann.

My Lords,

### 1. The facts

In 1994 the Serious Fraud Office ("S.F.O.") was investigating a fraud involving U.S.$8m. alleged to have been committed by James Fuller, John Savage and a

London solicitor named Charles Deacon. The money which they obtained from the victim had passed through the hands of the first appellant, Mr. Taylor, who was a solicitor practising in the Isle of Man, or the second appellant, a company with which he was connected called Monarch Assurance Plc. By a letter dated 4 May 1994, Katherine McKenzie, a lawyer employed by the S.F.O., made a formal request to the Attorney-General of the Isle of Man, asking for his assistance in the investigation of the fraud. She requested the Attorney-General to exercise his powers under section 24 of the Criminal Justice Act 1990 (Isle of Man) by summoning Mr. Taylor for an interview about the transactions. This section, so far as material, provides:

"(1)    The    powers    of    the Attorney-General under this section shall be exercisable in any case in which it appears to him - (a) on reasonable grounds that there is a suspected offence involving serious or complex fraud, wherever committed; and (b) that there is good reason to do so for the purpose of investigating the affairs, or any aspect of the affairs, of any person. (2) The Attorney-General may by notice in writing require the person whose affairs are to be investigated ('the person under investigation') or any other person whom he has reason to believe has relevant information to attend before the Attorney-General at a specified time and place to answer questions or otherwise furnish information with respect to any matter relevant to the investigation . . . (10) The Attorney-General may authorise any person to exercise on his behalf all or any of the powers conferred by this section but no such authority shall be granted except for the purpose of investigating the affairs, or any aspect of the affairs, of a person specified in the authority."

Ms McKenzie's letter presented the facts as they appeared to the S.F.O. They depicted Mr. Taylor's part in the transaction in such a way as to suggest that the S.F.O. suspected him to have been a party to the fraud. The letter

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

concluded with a statement that by reason of the facts stated, the S.F.O. had reason to believe that the use of the powers contained in section 24 was justified and desirable. It invited the Attorney-General to authorise Ms McKenzie and a police officer to exercise those powers on his behalf by interviewing Mr. Taylor.

On 3 June 1994 the Attorney-General sent Mr. Taylor a formal notice requiring him to attend for an interview but owing to illness he was unable to do so. Meanwhile Ms McKenzie had been pursuing her inquiries and on 17 May 1994 she and a colleague called upon a Mr. Rogerson, who worked for the Law Society in the administration of the solicitors' compensation fund, to talk about the transaction, which had given rise to a claim by the victim against the fund. She made a file note of the interview, recording among other things Mr. Rogerson's view that *206 Mr. Taylor should be struck off as a solicitor and her own contention that Mr. Taylor was a co-conspirator.

Mr. Fuller and Mr. Deacon were indicted on charges of conspiracy to defraud and eventually convicted. Mr. Savage was in the United States and died before an application for extradition had run its course. Mr. Taylor, despite the suspicions I have recorded, was not charged. Mr. Fuller's solicitors asked him to give evidence on his behalf. Before meeting him to discuss the case, they gave him a file of documents which had been disclosed to them by the S.F.O. as unused material in accordance with the principles stated by the Court of Appeal (Criminal Division) in Reg. v. Ward (Judith) [1993] 1 W.L.R. 619, 679-681 and Reg. v. Keane [1994] 1 W.L.R. 746. It included a copy of the letter of 4 May 1994 to the Attorney-General of the Isle of Man and the file note of the meeting with Mr. Rogerson on 17 May 1994.

## 2. The litigation

Mr. Taylor commenced an action for libel. He alleged that the letter contained a libel published by the S.F.O. and Ms McKenzie to the Attorney-General and that the file note contained a libel published by the S.F.O. and Ms McKenzie to Mr. Rogerson as well as a libel published by Mr. Rogerson to Ms McKenzie. He also relied upon a publication by Ms McKenzie of both documents by their disclosure to Mr. Fuller's solicitors.

All four defendants took out summonses to strike out the action as an abuse of process. On 26 July 1996 they were heard by Sir Michael Davies, sitting as a High Court

judge. He struck out the action on the ground that the disclosure of the two documents to Mr. Fuller's solicitors had been subject to an implied undertaking, similar to that which applies to documents produced on discovery in civil proceedings, that they would not be used for any purpose other than Mr. Fuller's defence. It followed that they could not be used as the basis of a libel action by Mr. Taylor without the leave of the court.

Mr. Taylor appealed. Shortly before the appeal was heard in June 1997 by a Court of Appeal consisting of Kennedy and Millett L.JJ. and Sir Brian Neill, Mahon v. Rahn [1998] Q.B. 424 had been decided by a differently constituted Court of Appeal. The holding, according to the headnote, was that:

> "material disclosed by the prosecution to a defendant in criminal proceedings, whether obtained by compulsion or voluntarily . . . was not subject to any implied undertaking, analogous to that which existed in relation to material discovered in civil proceedings . . ."

I shall examine this case in more detail later, but the Court of Appeal regarded it as a binding authority which obliged it to hold that the ground upon which Sir Michael Davies had struck out the action could not be sustained. But the court invited argument on whether the striking out could be affirmed for a different reason, namely that the documents were immune from suit because they were brought into existence for the purposes of a criminal investigation. The court accepted this alternative submission and dismissed the appeal. Mr. Taylor appeals to your *207 Lordships' House on the ground that the Court of Appeal extended the principle of immunity from suit beyond its proper sphere. The respondents, on the other hand, say that Mahon v. Rahn [1998] Q.B. 424 was wrongly decided and that the judgment ought also to be upheld on the ground upon which they succeeded before Sir Michael Davies.

## 3. The two principles

The two principles in debate are each well established and the question before your Lordships is the extent of their reach. The concept of an implied undertaking originated in the law of discovery in civil proceedings. A solicitor or

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

litigant who receives documents by way of discovery is treated as if he had given an undertaking not to use them for any purpose other than the conduct of the litigation. As Hobhouse J. pointed out in Prudential Assurance Co. Ltd. v. Fountain Page Ltd. [1991] 1 W.L.R. 756, 764 the undertaking is in reality an obligation imposed by operation of law by virtue of the circumstances in which the document or information is obtained. The reasons for imposing such an obligation were explained by Lord Keith of Kinkel in Home Office v. Harman [1983] 1 A.C. 280, 308:

> "Discovery constitutes a very serious invasion of the privacy and confidentiality of a litigant's affairs. It forms part of English legal procedure because the public interest in securing that justice is done between parties is considered to outweigh the private and public interest in the maintenance of confidentiality. But the process should not be allowed to place upon the litigant any harsher or more oppressive burden than is strictly required for the purpose of securing that justice is done."

The question in this appeal is whether the public interest in the administration of justice requires the application of an analogous principle to documents disclosed by the prosecution to the defence in criminal proceedings.

Likewise, the core of the principle of immunity from suit is not in doubt. By the end of the 19th century it was settled that persons taking part in a trial - the judge, the advocates, the witnesses - could not be sued for anything written or spoken in the course of the proceedings. The immunity was absolute and could not be defeated even by proof of malice. The reason for the immunity was explained by Fry L.J. in a well known passage in Munster v. Lamb, 11 Q.B.D. 588, 607:

> "Why should a witness be able to avail himself of his position in the box and to make without fear of civil consequences a false statement, which in many cases is perjured, and which is malicious and affects the character of another? The rule of law exists, not

because the conduct of those persons ought not of itself to be actionable, but because if their conduct was actionable, actions would be brought against judges and witnesses in cases in which they had not spoken with malice, in which they had not spoken with falsehood. It is not a desire to prevent actions from being brought in cases where they ought to be maintained that has led to the adoption of the present rule of law; but it is the fear that if the rule were otherwise, numerous actions would be brought against persons who were merely discharging *208 their duty. It must always be borne in mind that it is not intended to protect malicious and untruthful persons, but that it is intended to protect persons acting bona fide, who under a different rule would be liable, not perhaps to verdicts and judgments against them, but to the vexation of defending actions."

In Watson v. M'Ewan [1905] A.C. 480 the House of Lords extended the immunity to statements made by the witness to a party and his legal advisers with a view to giving evidence. The question in this case is whether the immunity extends more generally to statements made to or by investigators for the purposes of a criminal investigation.

It will be noticed that although both principles are concerned with public policy in securing the proper administration of justice, the interests which they are intended to protect are somewhat different and this is reflected in differences in their scope. The implied undertaking in civil proceedings is designed to limit the invasion of privacy and confidentiality caused by compulsory disclosure of documents in litigation. It is generated by the circumstances in which the documents have been disclosed, irrespective of their contents. It excludes all collateral use, whether in other litigation or by way of publication to others. On the other hand, the undertaking may be varied or released by the courts if the interests of justice so require and, unless the court otherwise orders, ceases to apply when the documents

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

have been read to or by the court, or referred to, in proceedings in open court: R.S.C., Ord. 24, r. 14A.

The immunity from suit, on the other hand is designed to encourage freedom of speech and communication in judicial proceedings by relieving persons who take part in the judicial process from the fear of being sued for something they say. It is generated by the circumstances in which the statement was made and it is not concerned with its use for any purpose other than as a cause of action. In this respect, however, the immunity is absolute and cannot be removed by the court or affected by subsequent publication of the statement.

While therefore the effect of the two principles may occasionally overlap, it is easy to think of cases in which one would apply but not the other. For example, a statement protected by the immunity may be disclosed on discovery and subsequently read out in court. The implied undertaking would cease to apply and anyone would be free to publish the statement but it still could not form the basis of a cause of action.

Nevertheless, there is some degree of interaction between the two principles. The implied undertaking prevents, so far as possible, the publication or dissemination of disclosed documents and therefore restricts the extent to which damage can be caused by defamatory statements which they may contain. In this sense, the injustice which may be caused by the fact that such defamatory statements are protected by the immunity is reduced.

It is now time to make a separate examination of the scope of the two principles. I shall begin with the implied undertaking.

## 4. The implied undertaking

We are concerned in this appeal with whether an implied undertaking is created by the disclosure of documents pursuant to the prosecution's **\*209** duty at common law, in accordance with the principles most recently discussed by Lord Hope of Craighead in Reg. v. Brown (Winston) [1998] A.C. 367, 374-377. Since the trial of Fuller and Deacon took place, the law of disclosure has been put on a statutory basis by the Criminal Procedure and Investigations Act 1996. Section 17 imposes obligations of confidentiality in relation to disclosed material, but I do not think that the statute is of any assistance in deciding whether such obligations existed at common law.

Until recently there was no authority on the subject. The reason, I suspect, is that the perception by prosecuting authorities of their disclosure obligations was substantially widened by the decisions of the Court of Appeal in Reg. v. Ward (Judith) [1993] 1 W.L.R. 619 and Reg. v. Keane [1994] 1 W.L.R. 746. Under the earlier Attorney-General's guidelines (Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734), the documents disclosed would almost invariably have fallen within the immunity principle as extended in Watson v. M'Ewan [1905] A.C. 480. We were told that the disclosure of internal memoranda made by investigators or letters passing between investigators is a relatively new practice.

The matter was however discussed by the Court of Appeal in Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278. The case was unusual in a number of respects and did not involve normal disclosure by the prosecution in advance of the trial. The documents in question were in fact disclosed by the Police Complaints Authority pursuant to an order of the Court of Appeal for the purposes of an appeal against conviction. They related to an investigation of the conduct of police officers who had given evidence against the appellant. As a result of the information contained in the documents, his appeal was allowed. A newspaper which was being sued for libel by the same police officers applied to the court for the accused to be given leave to allow it to use the documents in its defence. Both sides proceeded on the assumption that there had been an implied undertaking which it was necessary to vary. Lord Taylor of Gosforth C.J. endorsed this assumption. He said, at p. 285:

> "But for such proposed order the appellant would clearly be unable to hand over the documents: he would be subject to an implied undertaking, analogous to that arising on discovery in civil proceedings, not to use the disclosed documents otherwise than for the purposes for which discovery was given, here the pursuance of the criminal appeal, which is now, of course, successfully concluded."

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

The court went on to hold that the interests of justice required the undertaking to be varied so as to allow the appellant in the criminal proceedings to hand over the documents to the newspaper upon its undertaking to use them only for the purposes of its defence.

At first instance in Mahon v. Rahn (unreported), 19 June 1996, Brooke J. held that counsel in Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278 had been right to concede the existence of an implied undertaking. The case concerned a libel action brought by two directors of a London firm of stockbrokers against two Swiss bankers. The alleged libel was contained in a document provided by the bankers to the Securities *210 Association and the Serious Fraud Office in connection with an investigation which led to a prosecution of the plaintiffs on charges of conspiracy to defraud. The document was disclosed to the plaintiffs as an exhibit to a witness statement before the trial and subsequently read in open court. At the end of the prosecution case the plaintiffs successfully submitted that there was no case to answer and were acquitted.

Brooke J. said that in his view the general principle was that the use of documents disclosed for the purpose of legal proceedings should remain under the control of the court. The undertaking could always be varied in an appropriate case but the court should retain control. It was a necessary tool for preventing its process from being abused. He also held that the undertaking applied to material disclosed by the prosecution as intended to be used at the trial as well as to unused material and that it survived the use of the document in open court.

In the Court of Appeal [1998] Q.B. 424 his decision was reversed. Otton L.J. said, at p. 448, that he could find "no basis for an implied undertaking in criminal proceedings on the grounds of privacy and confidentiality." The reason, as I understand it, was that it was foreseeable that the information, if acted upon, would be made public. It is true that in Mahon v. Rahn the letter had actually been made public by use in open court. But that raised the separate and subsequent question of whether the undertaking, if it exists, should survive publication in open court. In the case of information which has not been made public, like the letter and file note in this case, the fact that publication may have been foreseeable as a possibility at the time when the documents were written does not mean that privacy and confidentiality should not be preserved so far as it is possible to do so. It is equally foreseeable that documents disclosed in civil discovery will be published in open court but that does not mean

that there is no point in the court retaining control over the use of documents which have not been published or even, for some purposes, over those which have.

Otton L.J. went on to say that he saw no analogy between the position of the Crown in a criminal case and that of a party in civil proceedings. It could not be said that the Crown would be deterred from complying with its obligations of disclosure, whether at common law or now under statute, by concern that the accused might use the documents for some ulterior purpose.

I am not sure that it is right to treat the implied undertaking in civil proceedings merely as an inducement to a litigant to disclose documents which he might otherwise have been inclined to conceal. I think that it is more a matter of justice and fairness, to ensure that his privacy and confidentiality are not invaded more than is absolutely necessary for the purposes of justice. But I readily accept that these considerations do not apply to the Crown as prosecutor with the same force as they apply to an individual litigant. In the case of material disclosed by the prosecution, the main interest in privacy and confidentiality lies at one or sometimes two removes: in the persons who provided the information and in the persons to whom the information refers.

Otton L.J. said that the most impressive argument in favour of an implied undertaking was the need to protect informers close to criminals. *211 But in his view sufficient protection was already provided by public interest immunity, which entitled the prosecution to apply for leave to withhold documents which would disclose the identity of a police informer, and by the immunity from suit accorded to statements made for the purpose of litigation, which I shall consider in more detail later.

In my view, this takes too narrow a view of the interests which require protection and too broad a view of the other rules which may be available for that purpose. Many people give assistance to the police and other investigatory agencies, either voluntarily or under compulsion, without coming within the category of informers whose identity can be concealed on grounds of public interest. They will be moved or obliged to give the information because they or the law consider that the interests of justice so require. They must naturally accept that the interests of justice may in the end require the publication of the information or at any rate its disclosure to the accused for the purposes of enabling him to conduct

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

his defence. But there seems to me no reason why the law should not encourage their assistance by offering them the assurance that, subject to these overriding requirements, their privacy and confidentiality will be respected.

One must also consider the interests of persons who are mentioned in the statements. Information given to the police or investigatory authorities will frequently contain defamatory or at least hurtful allegations about other people. That is to be expected in a criminal investigation. Such people may never be charged or know that they were under suspicion or that anything untoward was said about them. If such allegations are given publicity during the course of the proceedings, they will have to suffer the consequences because of the public interest in open justice. Even then, the judge will often be able to prevent the introduction of allegations about third parties which are not relevant to the issues in the case. But there seems to me no reason why the accused should be free, outside court, to publish such statements to the world at large. The possibility of a defamation action is for most people too expensive and impractical to amount to an adequate remedy.

Otton L.J. thought that the rules of public interest immunity, immunity from suit and qualified privilege should be sufficient protection for people who might be adversely affected by collateral use of disclosed documents. But the first two of these rules are not designed to protect the same interests as those protected by the implied undertaking and can therefore offer only accidental protection. Public interest immunity, in a criminal trial, involves weighing the public interest in confidentiality against the interests of justice - usually, the interests of the accused in being able to establish his defence. But the interests at stake when a question of collateral use arises are quite different. One is, by definition, no longer concerned with the use of the information for the purposes of establishing a defence at the trial. The interests to be weighed are, on the one hand, the public interest in allowing the collateral use (as in Ex parte Coventry Newspapers Ltd. [1993] Q.B. 278) and, on the other hand, the public interest in avoiding unnecessary invasion of the privacy and confidentiality of the maker of the statement and anyone to whom it refers. There may be **212** occasions on which the answers produced by these two exercises will coincide but that will be accidental.

Likewise, as I mentioned earlier, the interests protected by the immunity rule are different. The immunity rule, for example, offers no protection of the privacy or reputations

of people mentioned in the statement. On the contrary, it makes their position worse, since they cannot even clear their names by bringing a libel action against the maker. In the present case, the plaintiff might have taken some comfort from the fact that the documents which showed that he had been under suspicion could go no further than the files of the S.F.O. and Mr. Fuller's solicitors. They could not have damaged his reputation in the outside world. Instead, he chose to bring libel proceedings and (apparently due to the thoughtlessness of his solicitors) put the statements into the public domain by quoting them in extenso on a specially indorsed writ.

In addition, the immunity rule, at its widest, protects only statements made for the purposes of the investigation. It offers no protection for documents in existence at the time when the investigation commences and which are given to the police or investigators for the purposes of the prosecution. But these documents too would have been disclosed only because the interests of justice so required and there seems no reason why that should justify their collateral use.

Finally, qualified privilege also seems to me an inadequate answer, both for the reasons given by Fry L.J. in Munster v. Lamb, 11 Q.B.D. 588, 607 and because it does nothing to protect the privacy of persons mentioned in the statements.

In my opinion, therefore, the disclosure of documents by the prosecution as unused material under its common law obligations did generate an implied undertaking not to use them for any collateral purpose. I agree with the reasoning of Brooke J. on this point in Mahon v. Rahn and I think that Sir Michael Davies was right to strike out the action for the reasons which he gave.

I do not propose to express a view on the further points which arose in Mahon v. Rahn [1998] Q.B. 424, namely whether the undertaking applies also to used materials and whether it survives the publication of the statement in open court. I do not do so because these questions may well have been overtaken by the express provisions of the Criminal Procedures and Investigations Act 1996. But I would draw attention to the comments of Brooke J. in Mahon v. Rahn on the question of whether the provisions of Ord. 24, r. 14A (which was introduced in response to a decision of the European Court of Human Rights holding that the previous law unduly limited freedom of expression) and, by parity of reasoning, section 17(3)(b)

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

of the Act of 1996, are not too widely drawn. There seems to me much force in his view that the court should nevertheless retain control over certain collateral uses of the documents, including the bringing of libel proceedings.

**5. Immunity from suit**

In view of the opinion I have expressed on the implied undertaking, it is not strictly necessary for me to consider the ground upon which the Court of Appeal dismissed the appeal, namely immunity from suit. **\*213** Nevertheless, the question was fully argued before your Lordships and I think it is right to deal with it. It could easily have happened that, as in Mahon v. Rahn [1998] Q.B. 424, the documents were read in open court. I think it would be right for your Lordships to decide whether in that case the plaintiff would have been entitled to rely upon them for the purposes of an action in libel.

I have already described the evolution of the principle of immunity from suit in respect of statements made in the course of litigation and its extension in Watson v. M'Ewan [1905] A.C. 480 to statements made before the proceedings. In that case, a wife who had brought matrimonial proceedings in Scotland claimed that a doctor (who had examined her) had made defamatory statements in the course of giving evidence for her husband. This was held to be subject to absolute immunity, but she relied also upon the publication of the same statements before trial to her husband and his lawyers. In the House of Lords, Lord Halsbury L.C. said that the earlier statements were subject to the same immunity. He said, at p. 487:

> "It is very obvious that the public policy which renders the protection of witnesses necessary for the administration of justice must as a necessary consequence involve that which is a step towards and is part of the administration of justice - namely, the preliminary examination of witnesses to find out what they can prove. It may be that to some extent it seems to impose a hardship, but after all the hardship is not to be compared with that which would arise if it were impossible to administer justice, because people would be afraid to give their testimony."

In later cases there has been some discussion of the general principle upon which this extension was based. Judges have rightly cautioned against further extension merely by analogy. In Mann v. O'Neill (1997) 71 A.L.J.R. 903, 912 McHugh J. identified two dangers in judicial reasoning - a Scylla and Charybdis through which it was necessary to navigate. The first was:

> "the temptation to recognise the availability of the defence for new factual circumstances simply because they are closely analogous to an existing category (or cases within an existing category) without examining the case for recognition in light of the underlying rationale for the defence."

On the other hand, there was an opposite peril in:

> "the temptation too readily to dismiss the defence as applicable in novel circumstances because the case is not within or analogous to an existing category but without determining the matter by reference to the defence's underlying rationale."

There is no doubt that the claim for absolute immunity in respect of statements made by one investigator to another (as in the case of the letter from the S.F.O. to the Attorney-General of the Isle of Man) or by an investigator to a person helping with the inquiry (as in the statements of Ms McKenzie recorded in the file note) or to an investigator by a person helping the inquiry who is not intended to be called as a witness (as in the **\*214** remarks of Mr. Rogerson included in the file note) is a novel one. So far as I know, it is not a category of absolute immunity which has been considered before. But it should not for that reason be rejected. Again, I would imagine that the reason why this question now arises for the first time is that before the broadening of the prosecution's disclosure obligation, such letters and memoranda, internal to the

investigation, would never have seen the light of day. At any rate, the question is now whether they fall within the underlying rationale for the existence of immunity from suit.

In Mann v. O'Neill, 71 A.L.J.R. 903, 907 the judgment of Brennan C.J., Dawson, Toohey and Gaudron JJ. describes the rationale as one of necessity:

> "It may be that the various categories of absolute privilege are all properly to be seen as grounded in necessity, and not on broader grounds of public policy. Whether or not that is so, the general rule is that the extension of absolute privilege is 'viewed with the most jealous suspicion, and resisted, unless its necessity is demonstrated.' Certainly, absolute privilege should not be extended to statements which are said to be analogous to statements in judicial proceedings unless there is demonstrated some necessity of the kind that dictates that judicial proceedings are absolutely privileged."

Thus the test is a strict one; necessity must be shown, but the decision on whether immunity is necessary for the administration of justice must have regard to the cases in which immunity has been held necessary in the past, so as to form part of a coherent principle.

Approaching the matter on this basis, I find it impossible to identify any rational principle which would confine the immunity for out of court statements to persons who are subsequently called as witnesses. The policy of the immunity is to enable people to speak freely without fear of being sued, whether successfully or not. If this object is to be achieved, the person in question must know at the time he speaks whether or not the immunity will attach. If it depends upon the contingencies of whether he will be called as a witness, the value of the immunity is destroyed. At the time of the investigation it is often unclear whether any crime has been committed at all. Persons assisting the police with their inquiries may not be able to give any admissible evidence; for example, their information may be hearsay, but none the less valuable for the purposes of the investigation. But the proper administration of justice requires that such people

should have the same inducement to speak freely as those whose information subsequently forms the basis of evidence at a trial.

When one turns to the position of investigators, it seems to me that the same degree of necessity applies. It would be an incoherent rule which gave a potential witness immunity in respect of the statements which he made to an investigator but offered no similar immunity to the investigator if he passed that information to a colleague engaged in the investigation or put it to another potential witness. In my view it is necessary for the administration of justice that investigators should be able to exchange information, theories and hypotheses among themselves and to put them to other persons assisting in the inquiry without fear of being sued if such *215 statements are disclosed in the course of the proceedings. I therefore agree with the test proposed by Drake J. in Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184, 192:

> "the protection exists only where the statement or conduct is such that it can fairly be said to be part of the process of investigating a crime or a possible crime with a view to a prosecution or a possible prosecution in respect of the matter being investigated."

This formulation excludes statements which are wholly extraneous to the investigation - irrelevant and gratuitous libels - but applies equally to statements made by persons assisting the inquiry to investigators and by investigators to those persons or to each other.

As the policy of the immunity is to encourage freedom of expression, it is limited to actions in which the alleged statement constitutes the cause of action. In Marrinan v. Vibart [1963] 1 Q.B. 528 the Court of Appeal held that the immunity in respect of statements made in court or with a view to a prosecution could not be circumvented by alleging that it formed part of a conspiracy with other witnesses to give false evidence. That seems to me to be right. On the other hand, the immunity does not apply to actions for malicious prosecution where the cause of action consists in abusing legal process by maliciously and without reasonable cause setting the law in motion against the plaintiff. It does not matter that an essential step in setting the law in motion was a statement made by

the defendant to a prosecuting authority or even the court: see Roy v. Prior [1971] A.C. 470.

Actions for defamation and for conspiracy to give false evidence plainly fall within the policy of the immunity and actions for malicious prosecution fall outside it. In between, there is some disputed ground. In Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184 Drake J. held that it precluded reliance on the statement in an action for negligence in which it was alleged that a carelessly prepared post mortem report had led to the plaintiff being unjustifiably arrested and charged with murder. I express no view on this case, which I think might nowadays have been decided on the ground that the defendants owed the plaintiff no duty of care. There is also some dispute over whether it applies to the emergent tort of abuse of public office. In Silcott v. Commissioner of Police of the Metropolis (1996) 8 Admin.L.R. 633 and again in Docker v. Chief Constable of West Midlands Police, The Times, 29 April 1998; Court of Appeal (Civil Division) Transcript No. 472 of 1998, the Court of Appeal decided that it did while in Bennett v. Commissioner of Police for the Metropolis (1997) 10 Admin.L.R. 245 Sir Richard Scott V.-C. decided that it did not. The point has not been argued before your Lordships and I therefore likewise express no view. But I am satisfied that the Court of Appeal was right in holding that the statements relied upon in this case were protected by absolute immunity and for that reason also I would dismiss the appeal.

Lord Hope of Craighead.

My Lords, the plaintiffs in this case are Mr. Taylor, who is an English solicitor practising in the Isle of Man, and Monarch Assurance Plc., an Isle of Man company of which **\*216** Mr. Taylor is the managing director. Their action is one of damages for defamation. It is based entirely upon the contents of two documents.

The first document is a letter dated 4 May 1994 which was sent by the second defendant Katherine McKenzie, an investigating lawyer employed by the first defendant, the Serious Fraud Office, to the Attorney-General of the Isle of Man. It was a letter of request which was written in connection with an investigation which was being carried out by the S.F.O. into an allegation of fraud committed within the United Kingdom by Charles Deacon and James Fuller and by another man named John Patrick Savage who later died. The request was for assistance to enable

inquiries to be undertaken in the Isle of Man under the Criminal Justice Act 1990 (Isle of Man). The second document is a file note which was prepared on 14 May 1994 by the second defendant following a meeting which took place on that date as part of the same investigation at the Solicitors' Complaints Bureau. At that meeting the second defendant was accompanied by Detective Inspector Hulse of the Staffordshire Police. They had gone to see the fourth defendant, an employee of the third defendant, the Law Society, to obtain information from him about how the compensation fund could be expected to work in the circumstances of the alleged fraud. The plaintiffs maintain in their statement of claim that the letter and the file note contain words which, in their natural and ordinary meaning, are defamatory of them because they allege that they were involved in the fraudulent activity which was being investigated.

A copy of the letter was retained within the office of the S.F.O. together with the file note as part of the papers relating to the investigation. Some months later the criminal proceedings which had been commenced against Deacon and Fuller were transferred to the Crown Court. On 24 October 1994 the solicitors for Deacon and Fuller received from the S.F.O. under the common law disclosure rules material falling within the category of "unused material" which included these two documents. In May 1995 Mr. Taylor was asked by counsel representing Fuller whether he would be willing to assist him with his defence. A meeting with him was then arranged, and in order to enable him to prepare for it he was shown a number of documents. These included the copy letter and the file note which had been disclosed to the solicitors by the S.F.O. In January 1996 Deacon and Fuller were convicted of conspiracy to defraud after a trial in which Mr. Taylor did not, in the event, give evidence. Neither of the two documents were produced or referred to at the trial. The second and fourth defendants were not called upon either by the Crown or by the defence to attend the trial as witnesses.

Two points emerge clearly from this brief narrative. The first is that, had it not been for the obligation which rested on the S.F.O. under the common law disclosure rules, these two documents would never have been seen by Mr. Taylor or by anyone else who was not involved in the investigation by the S.F.O. into the alleged fraud. The copy letter and the file note would have remained on the S.F.O.'s files. There would have been no dissemination to anybody outside its office of any defamatory material which was contained in them. The second is that, as none of the defendants were witnesses or potential witnesses at

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

the trial, they do not have the protection of the absolute privilege which is available in respect of what is **217** said in court by witnesses and in statements which are taken when the case is being prepared for trial by potential witnesses: Watson v. M'Ewan [1905] A.C. 480.

Two further points need to be made about the common law disclosure rules in order to set these issues into their proper context. The first point relates to the scope of these rules. They have provided the basis for the rules which have now been introduced by statute: see sections 1–21 of the Criminal Procedure and Investigations Act 1996. By October 1994, when the material which is relevant to this case was disclosed by the S.F.O., it was no longer enough to disclose details of the evidence which the prosecution proposed to use at the trial. The duty extended to "unused" material as well, namely to material which the prosecution had decided not to use but which might be useful to the defence. It extended to statements taken from witnesses whom the prosecution had decided not to call at the trial, to items which the prosecution had decided not to exhibit but which the defence might wish to use in support of the defence case and to all manner of other material, irrespective of whether it would be admissible in evidence, which might possibly be helpful to the defence or damaging to the prosecution case. In the interests of ensuring a fair trial the duty had been extended far beyond the original concept of giving fair notice to the defendant of the case which he had to meet. and the consequences of non-disclosure had become so serious for the administration of justice - the setting aside of a conviction, with the prospect of much adverse publicity - that in practice the duty extended to everything on the prosecutor's files which could not be made the subject of a specific request for non-disclosure. Thus the correspondence, file notes and working papers of investigators, which in the past would have been regarded as purely internal to the prosecutor and not available at all for defence scrutiny, had now become disclosable.

The second point is the recent origin of this development. It first found expression in the Attorney-General's guidelines (Practice Note (Criminal Evidence: Unused Material) [1982] 1 All E.R. 734). But the extent of the modern common law rules was not clearly established until a series of cases in which the Court of Appeal held that a failure to disclose what ought to have been disclosed was an irregularity in the course of the trial. This enabled the court to hold that the conviction was unsafe: Reg. v. Maguire [1992] Q.B. 936; Reg. v. Ward (Judith) [1993] 1 W.L.R. 619 and Reg. v. Davis [1993] 1 W.L.R. 613. The history of the matter was described in

Reg. v. Brown (Winston) [1994] 1 W.L.R. 1599; [1998] A.C. 367. The fact that the development is so recent is important, as one compares the modern law rules about disclosure with the absolute immunity which is given to witnesses for things said in court and in statements taken from potential witnesses. Central to the present case is the question whether the law about the immunity of witnesses and potential witnesses, which was settled by authority long before the evolution of the modern disclosure rules, is in need of some adaptation or adjustment in order to keep pace with the widening of the disclosure rules.

In my opinion it is necessary here, as in so many matters affecting the criminal law, to balance the public interest in the administration of justice against the interests of the individual. The history of the evolution of the **218** disclosure rules shows that the balance has swung a long way towards the interests of the individual who is being prosecuted. This is in recognition of the fact that the defendant in criminal proceedings has the right to insist on a fair trial. Fairness to the defendant demands the widest possible disclosure. In practice, to avoid the risk of unfairness and because the prosecutor does not have the time or the resources to edit out every item which need not be disclosed, disclosure under the modern rules tends to provide the defence with more material than is strictly necessary.

But the administration of justice is not all about fairness to the defendant. It is also about the interests of those individuals who may be affected by dissemination of the material. There is a public interest also, in the detection and punishment of crime. If that interest is put at risk because of the consequences of the disclosure rules, the balance between the public interest and the interests of the individual is disturbed. It needs to be adjusted in favour of the public interest. This cannot be done by reducing the scope of the disclosure rules. That would prejudice the right of the defendant to a fair trial, which is always paramount. What can be done is to increase the protection to those who may be affected by the disclosure rules against the collateral use of such material - that is to say, against its use for purposes other than to ensure that the defendant has a fair trial.

I consider that Mr. Caldecott for the respondents took your Lordships to the heart of the matter when he submitted that the public interest required that all those involved in a criminal investigation should be able to communicate freely without being inhibited by the threat of proceedings for defamation such as those which have

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

been brought in the present case. Those who give or may give evidence at the trial are protected by the traditional witness immunity when they are in the course of preparing their evidence. But the traditional protection has until now been applied only to persons who fall within that category. Yet the typical criminal investigation involves many other people who are not witnesses or potential witnesses. They include those who simply provide information to the investigators. The information which they give may be useful as background but not worth investigating further for use at the trial. It may not even be admissible as evidence. But it may nevertheless be worth putting on record, perhaps to close one line of inquiry or to open up one which has not yet been investigated. As soon as it has been recorded, perhaps in a file note to ensure that it is not lost sight of should further reference to it become necessary, it is at risk now of being disclosed to the defence. Then there are the investigators themselves and the prosecuting officials with whom they are required to communicate. They are likely to be members of a team, perhaps working from various offices. The memberships of the team may change from time to time. The efficiency of the investigation may be dependent upon the completeness and accuracy of the information which has been committed to paper by the investigators. Yet anything which is committed to paper, whether by the official or the investigator, is now at risk of being disclosed under the disclosure rules.

The risk to the administration of justice lies in the inhibiting effect of collateral use of this material. A criminal investigation may travel in various directions before it settles down and concentrates on the activities **\*219** of those against whom the prosecutor believes there is sufficient evidence. Those who provide information to investigators usually do so in the belief, which may or may not be expressed by them, that the information is being given out of a sense of public duty and in confidence. That information may, if it is to be useful to the investigator, contain material which is defamatory. So long as the information goes no further, no harm is done to anybody. But disclosure releases the defamatory material from the control of the prosecutor. Unless protected, it may be disseminated further and become actionable.

It requires little imagination to appreciate the damaging effects on the supply of information if those who supply it are to be subjected to claims for damages for defamation arising from what they have said. The process of investigation is likely to be inhibited if the investigator is at risk of such a claim because of something which he has

recorded for his own use, or for use by others in his team, in a file note. As Lord Keith of Kinkel remarked in Hill v. Chief Constable of West Yorkshire [1989] A.C. 53, 63d, in a different but analogous context, the imposition of liability in such circumstances may lead to the exercise of the investigatory function being carried on in a detrimentally defensive frame of mind. This may prejudice the defendant, because other possible lines of inquiry which might assist his defence will not appear anywhere in writing lest they should be thought, following disclosure, to be defamatory. I do not think that it is possible to overstate the importance, in the public interest, of ensuring that material which is disclosed in criminal proceedings is not used for collateral purposes.

Under the existing rules all those who participate in a criminal investigation in good faith are entitled to claim the protection of qualified privilege. But that is an imperfect protection, because qualified privilege requires to be pleaded and established as a defence. No action can be struck out on the ground of qualified privilege. The requirement therefore is to extend to informants, investigators and prosecutors whose statements are revealed by the operation of the disclosure rules the benefit of the absolute privilege in respect of the statements made which is already accorded to witnesses and potential witnesses. and it is necessary to extend to them the same absolute immunity against actions for conspiracy or for negligence based upon disclosed material as has already been recognised in the case of the police: see Marrinan v. Vibart [1963] 1 Q.B. 528 and Hill v. Chief Constable of West Yorkshire [1989] A.C. 53. Such material may however still be actionable on other grounds where malice and lack of reasonable and probable cause can be established. Just as proceedings for perjury are available to deal with the witness who would otherwise be protected against statements made in the witness box, so also the public interest requires that a remedy for malicious prosecution should remain available against those who would be entitled to the benefit of the absolute privilege but who have acted maliciously and without reasonable and probable cause during the investigation process. But that is a quite separate matter as it is the malicious abuse of process, not the making of the statement, which provides the cause of action. The public policy argument for extending the absolute privilege, consistently with established principles, seems to me to be unanswerable.

**\*220**

I see the two solutions as complementary to each other. If the absolute privilege and the consequent immunity are to be kept within the limits which are necessary for the

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

administration of justice, they must be accompanied by a rule which restricts the use and dissemination of disclosed material. The purpose of the immunity is to ensure the integrity of the investigation process. The disclosure should extend no wider than is necessary to serve the public interest in the administration of justice. It should not be accompanied by risks to the good name of those who are not on trial from whom the protection of defamation proceedings has been removed by the immunity. So a restriction on the release and collateral use of the disclosed material by means of the implied undertaking can be seen as a necessary balance against the possible harm which might flow from the absolute nature of the immunity.

For these reasons as well as those given in the speech of my noble and learned friend, Lord Hoffmann, which I have had the benefit of seeing in draft and with which I agree, I would dismiss the appeal.

Lord Hutton.

My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead, with which I am in agreement, and will only add a few observations of my own in relation to the principle of immunity from suit. Under this principle it is settled that no action can be brought against the judge, counsel, witnesses, jurors and parties for words spoken or written in the course of a trial, and this immunity is absolute and cannot be defeated by proof of malice. In Munster v. Lamb, 11 Q.B.D. 588, 604 Brett M.R. stated:

> "The rule of law is that what is said in the course of the administration of the law, is privileged; and the reason of that rule covers a counsel even more than a judge or a witness. To my mind it is ill ogical to argue that the protection of privilege ought not to exist for a counsel, who deliberately and maliciously slanders another person. The reason of the rule is, that a counsel, who is not malicious and who is acting bona fide, may not be in danger of having actions brought against him. If the rule of law were otherwise, the most innocent of counsel might be unrighteously harassed with suits, and therefore it is

better to make the rule of law so large that an innocent counsel shall never be troubled, although by making it so large counsel are included who have been guilty of malice and misconduct."

The immunity was extended by this House in Watson v. M'Ewan [1905] A.C. 480 to statements made by a witness to a party and his solicitor in preparing for a trial, Lord Halsbury L.C. stating, at p. 487:

> "It is very obvious that the public policy which renders the protection of witnesses necessary for the administration of justice must as a necessary consequence involve that which is a step towards and is part of the administration of justice - namely, the preliminary examination of witnesses to find out what they can prove. It may be that to some extent it seems to impose a hardship, but after all the hardship is not to be compared with that which would arise if it were impossible to *221 administer justice, because people would be afraid to give their testimony."

In recent years the procedure has developed whereby very full disclosure is given to the defendant in a criminal case, so that he will become aware, and others may become aware, of what has been said by investigators and those who speak to them in the course of the investigation which preceded the prosecution. Therefore, just as the preliminary examination of a witness by a party's solicitor out of court is a step towards the administration of justice which requires to be protected, I consider that the investigation of a suspected crime is a step towards the administration of justice so that the protection of absolute privilege should be given to those who, in the course of their public duty in investigating a suspected crime, speak or write to persons who may be able to provide relevant information, and to such persons in respect of what they say or write to the investigators, and to the giving of information by investigators to their colleagues who are

Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)

also concerned with the investigation. If this protection were not given police officers and investigators, such as officers of the Serious Fraud Office, who had conducted investigations into suspected crimes and persons who gave information to them "might be unrighteously harassed with suits" and, as Fry L.J. stated in Munster v. Lamb, 11 Q.B.D. 588, 607, there would be the risk that "numerous actions would be brought against persons who were merely discharging their duty."

In my opinion the argument should not prevail that the defence of qualified privilege would give adequate protection to investigators and those who spoke to them because I consider that there would be a real risk that an unfounded allegation of malice made by a plaintiff bringing an action for defamation would subject an investigator or informant to harassment to which he should not be subjected.

I am in agreement with the statement of Drake J. in Evans v. London Hospital Medical College (University of London) [1981] 1 W.L.R. 184, 192c in respect of witnesses and possible witnesses that

> "the protection exists only where the statement or conduct is such that it can fairly be said to be part of the process of investigating a crime or a possible crime with a view to a prosecution or possible prosecution in respect of the matter being investigated."

I would also apply this requirement to an investigator or a person who gives him information so that the protection will not apply to a gratuitous defamatory remark made by an investigator to a third party or by a third party to an investigator.

In D. v. National Society for the Prevention of Cruelty to Children [1978] A.C. 171 this House held that a similar immunity from disclosure of their identity should be given to those who gave information about neglect or ill treatment of children to a local authority or the N.S.P.C.C to that which the law allowed to police informers. In rejecting an argument that such an immunity could give

protection to a malicious informant Lord Simon of Glaisdale said, at p. 233:

> "I cannot leave this particular class of relevant evidence withheld from the court without noting, in view of an argument for the **222** respondent, that the rule can operate to the advantage of the untruthful or malicious or revengeful or self-interested or even demented police informant as much as of one who brings information from a high-minded sense of civic duty. Experience seems to have shown that though the resulting immunity from disclosure can be abused the balance of public advantage lies in generally respecting it."

In this case, whilst the immunity may on occasions benefit a malicious investigator or informant, I consider that the balance of public advantage lies in allowing it to the defendants.

I would dismiss the appeal.

**Representation**

Solicitors: Jeffrey Green Russell; Treasury Solicitor; Crockers Oswald Hickson.

Petition: 29 January 1998. The Appeal Committee of the House of Lords (Lord Goff of Chieveley, Lord Hoffmann and Lord Saville) allowed a petition by the plaintiffs for leave to appeal. ([Reported by Shiranikha Herbert, Barrister] )

(c) Incorporated Council of Law Reporting for England & Wales

© 2016 Sweet & Maxwell
[1999] 2 A.C. 177

    © 2016 Thomson Reuters.

**Taylor v Director of the Serious Fraud Office, [1999] 2 A.C. 177 (1998)**

