UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : | Adv. Proc. No. 08-01789(SMB) |
| | : | |
| Plaintiff, | : | SIPA Liquidation |
| | : | |
| – against – | : | (Substantively Consolidated) |
| | : | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------X

| | | |
|---|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | : | |
| | : | |
| Plaintiff, | : | Adv. Proc. No. 10-04311(SMB) |
| | : | |
| – against – | : | |
| | : | |
| ANDREW H. COHEN, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------X

## POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff*
45 Rockefeller Plaza
New York, New York 10111

    David J. Sheehan, Esq.
    Nicholas J. Cremona, Esq.
    James H. Rollinson, Esq.
        Of Counsel

LEWIS & McKENNA
*Attorneys for Defendant*
82 E. Allendale Road
Saddle River, New Jersey 07458

> Paul Z. Lewis, Esq.
> Gregory S. Goett, Esq.
> > Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*, commenced this

adversary proceeding against Andrew H. Cohen to recover fictitious profits in

the sum of $1,143,461.  The case was tried on stipulated facts on October 14,

2015, but Cohen did not consent to the entry of a final order by this Court.

Accordingly, this Court respectfully recommends that the District Court adopt

the following proposed findings of fact and conclusions of law, and enter a final

judgment in favor of the Trustee against Cohen in the sum of $1,143,461.[1]

## PROPOSED FINDINGS OF FACT

Section III of the *Second Revised Joint Pretrial Order*, dated Oct. 8, 2015

("*JPTO*") (ECF Doc. # 60)[2] contains the following seventeen paragraphs of

stipulated facts:[3]

---

[1]    The Trustee is not seeking prejudgment interest.

[2]    "ECF" refers to the electronic docket in this adversary proceeding.

[3]    The *JPTO* did not include paragraph numbers, but the Court has included them for ease of reference.

1.      On December 11, 2008 (the "Filing Date"), Madoff was arrested for
violating numerous federal criminal securities statutes.  Contemporaneously,
the Securities and Exchange Commission (the "SEC") commenced proceedings
against BLMIS and Madoff in the United States District Court for the Southern
District of New York (the "District Court") in a case captioned *Securities
Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No.
08 CV 10791 (the "Liquidation Proceeding").

2.      On December 15, 2008, the SEC consented to a combination of its own
action with an application of the Securities Investor Protection Corporation
("SIPC") pursuant to Section 78eee(a)(4)(A) of SIPA.  Pursuant to section
78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court because
BLMIS was not able to meet its obligations to securities customers as they
became due and thus its customers needed the protections afforded by SIPA.

3.      On December 15, 2008, the District Court granted the SIPC application
and entered an order pursuant to SIPA which, in relevant part: (i) appointed
the Trustee the trustee for the liquidation of BLMIS pursuant to section
78eee(b)(3) of SIPA; (ii) appointed Baker & Hostetler LLP as counsel to the
Trustee pursuant to section 78eee(b)(3) of SIPA; and (iii) removed the case to
this Court pursuant to section 78eee(b)(4) of SIPA.  (*Order, Liquidation
Proceeding* (Dec. 15, 2008) (ECF Main Case No. 1).)[4]  The Trustee has been

---

[4]      "ECF Main Case" refers to the electronic docket in Adv. Proc. No. 08-01789.

found to be a disinterested party in these proceedings, and has been found to

be duly qualified to serve and act on behalf of the estate of BLMIS.  *Id.*; (*Order

of Disinterestedness of Trustee and Counsel to Trustee, Liquidation Proceeding*

(Feb. 4, 2009) (ECF Main Case No. 69).)

4.     During the relevant period in this Adversary Proceeding, BLMIS was

headquartered in the Lipstick Building, located at 885 Third Avenue, New York,

New York, and operated its Investment Advisory business ("IA Business") in

that location.  Over this same period, BLMIS was registered with the SEC as a

broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78o(b).

5.     Between 1991 and 2000, Mr. Cohen was employed by BLMIS as a trader

on its market-making desk.  In early 1996, Mr. Cohen opened an Investment

Advisory account at BLMIS (the "Account").  The Account was assigned account

number 1C1219.  Marked as trial exhibit PX1 are true and accurate copies of

the Customer Agreement, Trading Authorization forms, and the Option

Agreement executed by Mr. Cohen in connection with the Account.

6.     Mr. Cohen received monthly account statements for the Account.

Marked as trial exhibit PX2 are true and accurate copies of all monthly

customer statements for the Account.  Marked as trial exhibit PX3 are true and

accurate copies of monthly customer statements for the Account produced by

Mr. Cohen in the Adversary Proceeding.

7.     Over the years, Mr. Cohen provided money to BLMIS to invest in the

Account and also withdrew funds from the Account.  Marked as trial exhibit

PX6 are all of the written requests that Mr. Cohen made to BLMIS requesting

withdrawals from the Account.  Mr. Cohen continued to hold the Account

through the time BLMIS ceased operations on or about December 11, 2008.

8.     Prior to BLMIS's collapse, Mr. Cohen did not have any knowledge or

notice of any wrongdoing or fraudulent intent on the part of BLMIS.

9.     As set forth in the Declaration of Matthew B. Greenblatt, which has been

marked as trial exhibit PX22-A, between January 18, 1996 and December 11,

2008, Mr. Cohen deposited a total of $2,921,539 into the Account and

withdrew a total of $4,065,000 from the Account.

10.     Of the withdrawals from the Account, a total of $1,143,461 was

withdrawn by Mr. Cohen in excess of the principal, representing fictitious

profits[5] (the "Avoidable Transfers"), and all of these withdrawals took place

within the two-year period prior to December 11, 2008 (the "Two-Year Period").

All of these transactions, reported as either cash deposits or cash withdrawals,

are accurately reflected on the monthly account statements for the Account,

marked as trial exhibit PX2.

---

[5]     In describing the withdrawals received by Mr. Cohen in excess of the principal that he
deposited as "fictitious profits," Mr. Cohen does not waive or otherwise compromise his
contention that he is entitled to a value defense for those withdrawals under Section 548(c).
[Numbered footnote 5 in the *JPTO*].

11.    As set forth in the Declaration of Lisa M. Collura, which has been marked as trial exhibit PX18-A, all of the deposit and withdrawal transactions reflected in the monthly account statements actually took place as evidenced by, and reconciled through a review of, BLMIS bank records as well as the opinion reached by Ms. Collura therefrom.

12.    Mr. Cohen received during the Two-Year Period eleven cash withdrawals from the Account totaling $1,330,000, with $1,143,461 of this total representing fictitious profits, as evidenced by BLMIS bank records and records relating to the bank account that Mr. Cohen held at Bank of America (the "BOA Account").  Marked as trial exhibits PX8, PX9, PX18-C and PX18-D are true and accurate copies of BLMIS bank records.  Marked as trial exhibit PX11 are true and accurate copies of the monthly bank statements and other records relating to the BOA Account.

13.    As established by the analysis and findings set forth in the Collura Declaration, BLMIS used monies deposited by its newer customers to fund withdrawals taken by its older customers.  Each of the Avoidable Transfers constituted a transfer of an interest of BLMIS in property within the meaning of Section 101(54) of the Bankruptcy Code and pursuant to Section 78fff-2(c)(3) of SIPA.

14.    As set forth in the Declaration of Bruce G. Dubinsky, which incorporates and includes the Expert Report of Bruce G. Dubinsky and which has been marked as trial exhibit PX20-A:

    a. fraud permeated BLMIS;

    b. BLMIS was operating a Ponzi scheme through its IA Business; and

    c. BLMIS was insolvent from at least December 11, 2002 and all points after.

15.    The evidence which establishes that the IA Business was a Ponzi scheme includes, but is not limited to, the following:

    a. BLMIS utilized new customer monies to fund its operations, as well as to fund the withdrawal of fictitious profits and principal for its older customers;

    b. the IA Business was not generating any legitimate profits since no trading activity was taking place;

    c. the IA Business was not receiving legitimate financial support from the other business units of BLMIS in amounts sufficient to satisfy the cash requirement needs of the IA Business customer withdrawals; and

    d. the IA Business was not receiving any legitimate outside financial support vis-à-vis loans or otherwise.

16.    As a result, BLMIS made each of the Avoidable Transfers to Mr. Cohen during the Two-Year Period with the actual intent to hinder, delay, or defraud some or all of its then existing and/or future creditors within the meaning of Section 548(a)(1)(A) of the Bankruptcy Code.

17.    The Parties stipulate that the testimony set forth in the Greenblatt Declaration, the Collura Declaration, and the Dubinsky Declaration is deemed admitted and is incorporated by reference in these Stipulated Facts. The Parties further stipulate that Matthew B. Greenblatt, Lisa M. Collura, and Bruce G. Dubinsky qualify as expert witnesses under Federal Rule of Evidence 702 and other applicable law.

In short, Cohen admits that he was a net winner who withdrew

$1,143,461 more than he deposited into his BLMIS account, and all of the

fictitious profits were withdrawn during the two years preceding the Filing

Date.

## PROPOSED CONCLUSIONS OF LAW

### A.    Jurisdiction, Standing and Venue

This Court has jurisdiction over this adversary proceeding pursuant to

28 U.S.C. §§ 1334(b) and 157(a) and the District Court's Standing Order of

Reference, dated July 10, 1984, and the Amended Standing Order of Reference,

dated Jan. 31, 2012.  In addition, the District Court removed the SIPA

liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see Order,* Civ. 08–

01789 (S.D.N.Y. Dec. 15, 2008), at ¶ IX (ECF Main Case Doc. # 1)), and this

Court has jurisdiction under the latter provision.[6]  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(H).  Cohen has dismissed his counterclaim

and the parties agree that the Court cannot enter a final judgment under *Stern*

---

[6]    SIPA § 78eee(b)(4) provides:

> Upon the issuance of a protective decree and appointment of a trustee, or a trustee and counsel, under this section, the court shall forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under Title 11. The latter court shall thereupon have all of the jurisdiction, powers, and duties conferred by this chapter upon the court to which application for the issuance of the protective decree was made.

The reference to the "court of the United States in the same judicial district having jurisdiction over cases under Title 11" means the bankruptcy court.  Otherwise, the statute would lead to the absurd result of commanding the district court to refer the SIPA case to itself. *Turner v. Davis, Gillenwater & Lynch* (*In re Inv. Bankers, Inc.*), 4 F.3d 1556, 1564 (10th Cir.1993), *cert. denied,* 510 U.S. 1114 (1994); *Barton v. SIPC,* 185 B.R. 701, 703 (D.N.J.1994). Furthermore, this interpretation is consistent with Congress' intent that SIPA proceedings should be conducted like ordinary bankruptcy cases in the bankruptcy court. *Turner,* 4 F.3d at 1564–65; *Barton,* 185 B.R. at 703.

*v. Marshall*, 131 S. Ct. 2594, 2611 (2011) absent the consent of all parties.

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944-46, 1949 (2015).

Cohen does not consent to the entry of a final judgment by this Court, (*JPTO* at

5), but the Court may recommend proposed findings of fact and conclusions of

law to the District Court. *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct.

2165, 2172-74 (2014); (*see JPTO* at 5.)

The Trustee has demonstrated Article III standing. He brings this

adversary proceeding as representative of an insolvent estate, (*see Proposed*

*Finding of Fact* ("*PFF*") ¶ 14(c)), to avoid and recover transfers for the benefit of

the estate of customer property that was injured by the fraudulent transfers of

that property, and the Trustee's action will redress that injury by replenishing

the funds available to satisfy the customers' net equity claims in the SIPA

proceeding. *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 449 (Bankr. S.D.N.Y.

2015) ("*Omnibus Good Faith Decision*").

The Trustee has also demonstrated that he has statutory and prudential

standing pursuant to SIPA § 78fff–2(c)(3).[7] The BLMIS estate has been

---

[7]     SIPA § 78fff–2(c)(3) provides:

Whenever customer property is not sufficient to pay in full the claims set forth in
subparagraphs (A) through (D) of paragraph (1), the trustee may recover any
property transferred by the debtor which, except for such transfer, would have
been customer property if and to the extent that such transfer is voidable or void
under the provisions of Title 11. Such recovered property shall be treated as
customer property. For purposes of such recovery, the property so transferred
shall be deemed to have been the property of the debtor and, if such transfer
was made to a customer or for his benefit, such customer shall be deemed to
have been a creditor, the laws of any State to the contrary notwithstanding.

insolvent at least since December 11, 2002, (*PFF* at ¶ 14(c)), and therefore, the

customer property was "insufficient" within the meaning of SIPA § 78fff–2(c)(3)

on the Filing Date, on the date this adversary proceeding was commenced and

at all times thereafter.

    Cohen's invocation of *in pari delicto* lacks merit and does not deprive the

Trustee of standing under *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d

114 (2d Cir. 1991). According to Cohen, the doctrine bars the Trustee from

asserting common law claims for relief on behalf of the estate. (*See Defendant

Andrew H. Cohen's Post-Trial Proposed Findings of Fact and Conclusions of Law,*

filed Dec. 9, 2015 ("*Cohen Post-Trial Submission*"), at 17 (ECF Doc. # 74).) The

Trustee is not asserting common law claims; he is asserting statutory

fraudulent transfer claims that did not belong to BLMIS, never became

property of the BLMIS estate, *see* 11 U.S.C. § 541(a), and are not subject to any

limitations on the debtor's ability to bring the claim under state law. For these

reasons, *in pari delicto* does not apply. *Omnibus Good Faith Decision*, 531 B.R.

at 449-50.[8]

    Finally, venue of this adversary proceeding in this Court is proper under

---

[8]    Although not mentioned in the text of his post-trial submission, Cohen's table of
contents ties this argument to the notion that the Trustee is invoking the common law to void
the Broker Agreements Cohen signed with BLMIS. (*Cohen Post-Trial Submission*, at 8.) The
Trustee is not seeking to void these agreements, and Cohen may very well have claims against
the general estate for any damages arising from the breach of those agreements. Instead, the
Trustee contends that the "satisfaction" of those obligations does not provide value within the
meaning of 11 U.S.C. § 548(c) regardless of whether they imposed enforceable obligations on
BLMIS, and permitting Cohen to offset the Trustee's claim with non-SIPA, net equity claims
violates the priority of customers with net equity claims in customer property granted under
SIPA.

28 U.S.C. § 1409(a).

## B.    The Trustee's *Prima Facie* Case

The Trustee concedes that Cohen received the transfers at issue without knowledge of Madoff's Ponzi scheme, (*PFF* at ¶ 8), and accordingly, the Trustee may only recover fraudulent transfers made with actual intent under 11 U.S.C. § 548(a)(1)(A).[9]  *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), Adv. Proc. No. 10-05286 (SMB), 2016 WL 943773, at *9 (Bankr. S.D.N.Y. Mar. 14, 2016). Furthermore, Cohen is a good faith transferee (he did not willfully blind himself to Madoff's fraud) and his liability is limited to the fictitious profits he received within two years of the Filing Date.  *Id.* at *10.

The Trustee satisfied his burden of proof on his affirmative claim.  First, BLMIS transferred customer property to Cohen, and under SIPA § 78fff–2(c)(3) such property is "deemed to have been the property of the debtor."  Second, the transfers were made within two years of the Filing Date.  (*PFF* at ¶ 10.)  Third, the parties stipulated that "BLMIS made each of the Avoidable Transfers to Mr. Cohen during the Two-Year Period with the actual intent to hinder, delay, or defraud some or all of its then existing and/or future creditors within the

---

[9]    Bankruptcy Code § 548(a)(1)(A) provides, in relevant part:

The trustee may avoid any transfer . . . of an interest of the debtor in property . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . indebted.

meaning of Section 548(a)(1)(A) of the Bankruptcy Code." (*PFF* at ¶ 16.)  Even

without that specific stipulation, the parties have stipulated that BLMIS' IA

Business was a Ponzi scheme.  (*PFF* at ¶¶ 14(b), 15.)  Accordingly, the Trustee

is entitled to rely on the Ponzi scheme presumption pursuant to which all

transfers are deemed to have been made with actual fraudulent intent.  *See*

*Omnibus Good Faith Decision*, 531 B. R. at 471 (collecting cases).

In fact, Cohen conceded at trial that the stipulated facts satisfied the

Trustee's *prima facie* case, and the dispute came down to his defenses.

(Transcript of October 14, 2015 Trial ("Tr.") at 10:24-12:18 (ECF Doc. # 64).)

Accordingly, the burden shifted to Cohen to establish one or more of his

defenses.

## C.  Cohen's Defenses

Most if not all of Cohen's defenses amount to a challenge to prior rulings

by the District Court and this Court regarding the scope of the value defense

under Bankruptcy Code § 548(c).[10]  Bankruptcy Code § 548(c) provides a

defense in a fraudulent transfer action to the extent a transferee takes "for

value and in good faith."  11 U.S.C. § 548(c).  The Trustee does not challenge

Cohen's good faith, and consequently, Cohen can assert a defense under

Bankruptcy Code § 548(c) to the extent he gave value to BLMIS.  "Value"

includes the "*satisfaction* or securing of a present or *antecedent debt* of the

---

[10]     Parties in fifty-seven adversary proceedings have moved to intervene on this issue.  That
motion is denied for the reasons stated in a separate decision.

debtor. . . ."  11 U.S.C. § 548(d)(2)(A) (emphasis added).  Cohen's principal

defense is that BLMIS owed antecedent debts that were satisfied by the

payment of fictitious profits, and therefore, the fictitious profits were received

for value.

This issue has been litigated and expressly or impliedly rejected in four

previous opinions, and Cohen was a party to one of those decisions.  To give

context to the fifth rejection of the antecedent debt/value defense raised by

Cohen, the Court recounts the history of those decisions.

### 1.    The Prior Decisions

#### a.    *Greiff*

In *Picard v. Greiff,* (*In re BLMIS*), 476 B.R. 715 (S.D.N.Y.2012) ("*Greiff* "),

*aff'd on other grounds,* 773 F.3d 411 (2d Cir.2014), *cert. denied*, 135 S. Ct.

2859 (2015), defendants in four adversary proceedings moved to dismiss the

complaints alleging, among other things, that they had state law claims

entitling them to the securities listed on their customer statements, *e.g.,*

N.Y.U.C.C. § 8-501(b)(1), even though BLMIS failed to purchase those

securities.  476 B.R. at 724.  Hence, each time a customer withdrew fictitious

profits, he was receiving money in satisfaction of that entitlement.  Defendants

in eighty other adversary proceedings, not including Cohen, eventually joined

in the motions.  *Id.*, Appendix A.  According to these defendants, BLMIS'

"transfers discharged its liability on [their] claims," and consequently, they

"took 'for value' under § 548(d)(2)(A)."  *Id.* at 725.

13

The defendants cited *Visconsi v. Lehman Bros., Inc.*, 244 F. App'x 708 (6th Cir. 2007) to support their contention that they were entitled to the amounts reflected in their fictitious account statements and to the benefit of their bargains with BLMIS. In *Visconsi*, the fraudster worked for several brokers, including Lehman. He stole money from his clients' accounts, and covered up the thefts by issuing phony account statements. *Id.* at 709. The plaintiffs invested approximately $21 million over the life of the account and withdrew over $31 million. Their fictitious account statements showed a balance of $37.9 million, although as a result of the fraudster's thefts, the actual balance was only a few thousand dollars. *Id.* at 710.

The plaintiffs received an arbitration award of $10.4 million, but the arbitrator did not issue an opinion that explained his reasoning. Noting the "nearly impossible burden" that Lehman faced trying to vacate an arbitration award issued without opinion, *id.* at 712, the Sixth Circuit affirmed the district court order denying the motion to vacate the award. It ruled that the plaintiffs were entitled to "benefit of the bargain" rather than "out of pocket" damages under a breach of contract theory. The plaintiffs gave money to the fraudster for investment in the stock market, and the "funds would have grown immensely" especially since the plaintiffs had invested "during one of the strongest bull markets in recent history." *Id.* at 713.

The *Greiff* Court rejected the argument that the defendants were entitled to retain their fictitious profits and distinguished *Visconsi*. It initially observed

14

that "every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme are not 'for value.'" *Greiff*, 476 B.R. at 725 (citing *Donell v. Kowell*, 533 F.3d 762, 771-72 (9th Cir.), *cert. denied*, 555 U.S. 1047 (2008); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.) (Posner, J.), *cert. denied,* 516 U.S. 1028 (1995) and *Sender v. Buchanan* (*In re Hedged-Invs. Assocs., Inc.*), 84 F.3d 1286, 1290 (10th Cir. 1996)).  Consequently, even if the defendants had claims against BLMIS under state or federal law, the transfers from BLMIS exceeding the return of defendants' principal were not made "for value." *Id.*

The District Court then distinguished *Visconsi* on three grounds.  First, unlike *Visconsi*, the District Court had no reliable basis to determine how the defendants benefitted from their bargains with BLMIS.  In *Visconsi*, the statements were designed to track the plaintiffs' funds as if they had been properly invested, but the BLMIS statements "constituted an integral part of the fraud, . . . consistently representing favorable returns based on trading that could not have occurred." *Greiff*, 476 B.R. at 725.  Second, *Visconsi* considered the plaintiffs' claims against a defendant who was not quite as innocent as they were, but in *Greiff*, all of the defendants were equally innocent.  Awarding benefit of the bargain damages to the defendants would impose the cost on equally innocent investors. *Id.* at 725-26.  Third, the *Greiff* defendants failed to show that the harm they suffered corresponded to the amounts reflected in their customer statements. *Id.* at B.R. at 726.

15

In addition, the District Court rejected the argument that defendants were entitled to interest as creditors rather than equity investors. The BLMIS investors did not contract for "reasonable" interest, and faced the same risks as equity investors. *Id.* at 726.

Finally, treating the satisfaction of the state and federal claims as value would conflict with SIPA:

> To allow defendants, who have no net equity claims, to retain profits paid out of customer property on the ground that their withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims.

*Id.* at 727.

### b.    *Antecedent Debt Decision*

Judge Rakoff revisited the antecedent debt/value issue in an omnibus decision that disposed of motions to dismiss in 299 adversary proceedings, including Cohen's case.[11] Citing *Greiff*, Judge Rakoff rejected the defendants' arguments that they had valid state law claims based on their account statements reiterating that the fictitious account statements were invalid and

---

[11]    On March 14, 2012, Cohen moved to withdraw the reference on three issues, including "whether the Trustee improperly seeks to avoid transfers that BLMIS made in satisfaction of antecedent debt owed by BLMIS to Mr. Cohen." (*JPTO* at 3-4; *see Defendant's Memorandum of Law in Support of Motion for Mandatory Withdrawal of the Reference*, dated Mar. 14, 2012, at 8-12 (ECF Doc. # 15-1).) On May 12, 2012, the District Court granted Cohen's motion, along with similar motions in 298 other adversary proceedings, to withdraw the reference on the antecedent debt issue. (*Order*, dated May 12, 2012 (ECF (DC) Doc # 107).)

unenforceable. *SIPC v. BLMIS* (*In re BLMIS*), 499 B.R. 416, 421 n. 4 (S.D.N.Y.

2013) ("*Antecedent Debt Decision*"). In addition, assuming the BLMIS investors

held claims for restitution to recover their principal investments, they had

recovered their principal investments prior to the bankruptcy and were not

entitled to interest under New York's CPLR. *Id.* at 422.

Moreover, even if the defendants held valid claims under the federal

securities laws or state law, the claims did not provide value as against the

BLMIS customer property estate under SIPA. *Id.* at 422 n. 6. A SIPA

liquidation consists of two estates, and the assets of the customer property

estate must be used to satisfy the customers' net equity claims on a priority

basis. *Id.* at 419-21; *accord SIPC v. 2427 Parent Corp.* (*In re BLMIS*), 779 F.3d

74, 77 (2d Cir.) ("*Time-Value Decision*") ("In a SIPA liquidation, a fund of

customer property, separate from the broker-dealer's general estate, is

established for priority distribution exclusively among customers."), *cert.

denied*, 136 S. Ct. 218 (2015); *In re BLMIS*, 654 F.3d 229, 233 (2d Cir.

2011)("*Net Equity Decision*") ("In a SIPA liquidation, a fund of 'customer

property,' separate from the general estate of the failed broker-dealer, is

established for priority distribution exclusively among customers."), *cert.

denied*, 133 S. Ct. 24 (2012); *Rosenman Family, LLC v. Picard*, 395 F. App'x

766, 768 (2d Cir. 2010) (summary order) ("Generally, SIPA liquidations involve

two kinds of claimants: customers and general unsecured creditors. To protect

customers of failed brokerages, their claims are satisfied from a customer

property estate, which is separate from the general estate used to satisfy the

17

claims of general unsecured creditors. . . . To effectuate its purposes, SIPA
accords 'those claimants in a SIPA liquidation proceeding who qualify as
'customers' of the debtor priority over the distribution of 'customer property.'")
(footnote and citations omitted); *see CarVal UK Ltd. v. Giddens* (*In re Lehman
Bros., Inc.*), 791 F.3d 277, 281 (2d Cir. 2015) ("SIPA trustees administer what is
in effect a 'bankruptcy within a bankruptcy' for investors who had property on
account with the broker-dealer.  15 U.S.C. § 78fff–2.  The trustee amasses
'customer property' and '[e]ach customer shares ratably in this fund of assets
to the extent of the customer's net equity at the time of filing.'") (quoting
*Stafford v. Giddens* (*In re New Times Sec. Servs., Inc.*)*,* 463 F.3d 125, 127 (2d
Cir.2006) (internal quotations marks and citation omitted)), *cert. denied,* 136 S.
Ct. 1158 (2016).  SIPA prioritizes net equity claims and incorporates its priority
system into the fraudulent transfer rules by allowing the trustee to recover
fraudulent transfers if the customer property is insufficient, and deeming the
recoveries to be part of the customer property estate rather than the general
estate.  *Antecedent Debt Decision,* 499 B.R. at 423.

Judge Rakoff also rejected the defendants' argument that a SIPA
trustee's rights in fraudulent transfer litigation are no greater than those of an
ordinary bankruptcy trustee.  SIPA expressly provides that the Bankruptcy
Code applies only to the extent that it is consistent with SIPA.  *Id.* (citing SIPA §
78fff(b)).  While the SIPA trustee can avoid transfers to the extent that the
transfer is avoidable under the Bankruptcy Code, *id.* (citing SIPA 78fff–2(c)(3)),
Bankruptcy Code § 548(c) is not an element of the Trustee's avoiding powers;

18

instead, it is an affirmative defense to an otherwise avoidable transfer.  SIPA

does not necessarily imply that the section 548(c) defense must apply in the

same way to the customer property estate as it would to the general estate.  *Id.*

at 423-24.

"More fundamentally, the definition of net equity and the definition of

claims that can provide 'value' to the customer property estate are inherently

intertwined where the customer property estate is created as a priority estate

intended to compensate customers only for their net-equity claims."  *Id.* at 424.

The assertion of a general damage claim as an offset against the recovery of

customer property has the same effect as the assertion of that claim against

the customer property estate.[12]  The satisfaction of non-net equity claims from

the customer property estate would defeat the priority that SIPA intended

customers to have against the separate and distinct customer property estate.

*Id.* at 424-25.

Following a discussion of other issues not germane to the instant

proceeding, the District Court concluded:

> Accordingly, defendants' motion to dismiss on all of the above
> grounds is denied.  Except to the extent provided in other orders,
> the Court directs that the following adversary proceedings be
> returned to the Bankruptcy Court for further proceedings
> consistent with this Opinion and Order: (1) those cases listed in
> Exhibit A of item number 107 on the docket of 12 Misc. 115. . . ."

---

[12]     In fact, it has a greater effect where the customer property estate is insufficient as here.
The setoff grants the defendant a dollar for dollar benefit for his "claim," while the net losers
that hold net equity claims and are not fully compensated by SIPC insurance will receive less
than a dollar for dollar recovery on their net equity claims.

19

*Id.* at 430.  This adversary proceeding was case number 200 on Exhibit A.

### c.    Motion to Certify an Interlocutory Appeal

Following the issuance of the *Antecedent Debt Decision*, several of the

defendants moved before Judge Rakoff to certify an interlocutory appeal.[13]

(*Antecedent Debt Defendants' Memorandum of Law in Support of Motion to*

*Amend October 15, 2013 Opinion and Order Regarding Antecedent Debt Issues*

*to Add 28 U.S.C. § 1292(b) Certification for Interlocutory Appeal*, dated Oct. 29,

2013 (ECF (DC) Doc. # 491).)[14]  The movants identified seven issues as to

which, among other things, they argued there was a substantial ground for a

difference of opinion.  (*Id.* at 4-11.)  Six of the issues centered on Judge

Rakoff's conclusions relating to the antecedent debt/value issue.[15]  The issues

included whether the satisfaction of the defendants' state and federal claims

constituted value under Bankruptcy Code § 548(c), and hence, could be

asserted as a defense to a claim by a SIPA trustee to recover customer

property, whether the Trustee had to first avoid a BLMIS obligation before

disregarding its value under § 548(c), and whether SIPA authorized a departure

from the usual rules, specifically those relating to the value defense under §

548(c), that govern fraudulent transfer litigation under the Bankruptcy Code.

---

[13]    It does not appear that Cohen joined in the motion.

[14]    "ECF (DC)" refers to the electronic docket in *SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR) (S.D.N.Y.).

[15]    The seventh concerned inter-account transfers.

The Trustee's response methodically addressed each of the movants' issues and explained why there was no substantial ground for a difference of opinion from the one the District Court had expressed. (*Trustee's Memorandum of Law in Opposition to the Antecedent Debt Defendants' Motion to Amend October 15, 2013 Opinion and Order Regarding Antecedent Debt Issues to Add 28 U.S.C. § 1292(b) Certification for Interlocutory Appeal*, dated Nov. 19, 2013, at 9-23 (ECF (DC) Doc. # 504).)  In the main, the Trustee argued that the District Court's reading of value in a SIPA case was consistent with the Second Circuit's *Net Equity Decision*.  In the latter case, the Trustee had advocated that a customer's net equity claim should be computed by deducting withdrawals from deposits without regard to the monthly statements generated by BLMIS that contained fictitious entries.  The Second Circuit agreed that this approach "better measures" net equity because it relies on unmanipulated deposits and withdrawals and ignores Madoff's arbitrary assignment of fictitious gains.  *Net Equity Decision*, 654 F.3d at 238.  The determination of net equity was "inherently intertwined" with the definition of value under § 548(c) in fraudulent transfer litigation because allowing the defendants to offset non-SIPA, non-net equity claims, would, in effect, draw money out of the customer estate to pay those claims in violation of SIPA.

The District Court denied the certification motion.  Among other reasons, it was "not of the opinion that there is a substantial ground for difference of opinion as to the holding of the Opinion and Order, substantially for the reasons stated in the Trustee's memorandum of law in opposition to the

21

motion." *SIPC v. BLMIS* (*In re BLMIS*), 987 F. Supp.2d 309, 311 (S.D.N.Y.

2013).

### d.    *Omnibus Good Faith Decision*

The antecedent debt/value issue was considered a fourth time in this

Court's *Omnibus Good Faith Decision*.  The defendants in 233 adversary

proceedings had moved to dismiss the complaints in their cases on various

grounds, and virtually every movant asserted that the transfer of fictitious

profits satisfied a federal or state law claim or obligation, and was, therefore,

made for value under Bankruptcy Code § 548(c).  Cohen was not one of the

movants.

After recounting Judge Rakoff's treatment of the issue in *Greiff* and the

*Antecedent Debt Decision, see Omnibus Good Faith Decision*, 531 B.R. at 462,

the Court concluded that his rulings were consistent with "the well-settled rule

in [non-SIPA] Ponzi scheme cases that net winners must disgorge their

winnings."  *Id.*; *accord id.* at 462-63 (citing cases).  Allowing investors in a

Ponzi scheme to retain fictitious profits in satisfaction of their claims for

contractual interest in excess of their deposits "would further the fraudulent

scheme at the expense of innocent investors.  Since they had no claim for

interest, the payment of interest could not satisfy an antecedent debt." *Id.* at

463.  Furthermore,

> the few decisions that have considered fictitious profits arising out
> of investments in BLMIS under New York law have concluded that
> they were not 'lost' to the extent they were not paid, and are not
> recoverable as an element of damages under the UCC or in any

22

> other context in which the proposition was advanced.  Thus, there
> is no support for the defendants' argument that they could recover
> fictitious profits as a matter of New York contract law or their
> related argument that the payment of fictitious profits satisfied an
> antecedent debt.

*Id.* at 465.

The Court next considered the second prong of Judge Rakoff's analysis:

the payment of fictitious profits in satisfaction of state or federal claims or

obligations did not provide value in a SIPA fraudulent transfer action within the

meaning of Bankruptcy Code § 548(c).  SIPA created two estates, and granted

customers priority in the customer property to the extent of their net equity

claims.  *Id.* at 466.  "Allowing net winners to retain fictitious profits in

satisfaction of state law claims would conflict with SIPA's priority system and

frustrate the Trustee's efforts to satisfy priority claims."  *Id.*  Lastly, the SIPA

trustee's avoidance powers under Bankruptcy Code § 548(a)(1)(A) had to be

interpreted through the lens of SIPA's statutory scheme, and moreover, § 548(c)

is not an avoiding power but a defense to an avoidance claim under §

548(a)(1)(A).  *Id.*

The Court observed that Judge Rakoff's extensive consideration of the

antecedent debt/value issue "would normally foreclose further argument in

this Court" because the "moving defendants that participated in the withdrawal

of the reference of the antecedent debt/value issue have had their day in court

and Judge Rakoff's decisions are law of the case."  *Id.*  In fact, Judge Rakoff

returned the proceedings to this Court "for further proceedings consistent with

23

this Opinion and Order," *Antecedent Debt Decision*, 499 B.R. at 430, and "[t]his

sounds like a mandate." *Omnibus Good Faith Decision*, 531 B.R. at 466.

However, the Second Circuit had decided several Madoff matters after the

*Antecedent Debt Decision*, and many defendants argued that these decisions

required a different result.

One of those decisions was *Picard v. Ida Fishman Revocable Trust* (*In re

BLMIS*), 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015).

There, the Second Circuit held that the safe harbor in Bankruptcy Code §

546(e) shielded the payments to BLMIS investors.[16]  The Court concluded that

this result was not inconsistent with the *Net Equity Decision*.  The *Net Equity

Decision* determined net equity under SIPA, but the safe harbor was part of the

Bankruptcy Code, and "in enacting the Bankruptcy Code, Congress struck

careful balances between the need for an equitable result for the debtor and its

creditors, and the need for finality."  *Ida Fishman*, 773 F.3d at 423.  "[B]y

enacting § 546(e), Congress provided that, for a very broad range of securities-

related transfers, the interest in finality is sufficiently important that they

cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent

transfers under § 548(a)(1)(A)."  *Id.*

Attorneys representing numerous defendants wrote to the Court, (*see*

---

[16]     The Court did not address the exception to the safe harbor regarding those investors
who had actual knowledge that BLMIS was not trading securities. *See SIPC v. BLMIS* (*In re
BLMIS*), No. 12 Misc. 115, 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013).

*Letter from Richard Levy, Jr., Esq., Carole Neville, Esq. and Matthew A. Kupillas, Esq. to the Court*, dated Dec. 10, 2014 (ECF Main Case Doc. # 8703)), arguing that *Ida Fishman* confirmed that SIPA and the Bankruptcy Code were distinct. Hence, SIPA priorities could not impair an otherwise valid defense under Bankruptcy Code § 548(c) that transfers in satisfaction of state and federal claims constituted value. *See Omnibus Good Faith Decision*, 531 B.R. at 469.

The Court considered and rejected the argument. First, none of the decisions brought to the Court's attention, including *Ida Fishman*, addressed the question of value under Bankruptcy Code § 548(c), or upset the settled rule in non-SIPA cases that the transferees of fictitious profits do not give value under Bankruptcy Code § 548(c) beyond their investments of principal. *Id.* at 469-70. Second, *Ida Fishman* discussed the distinction between the SIPA and the Bankruptcy Code in the context of the express statute of limitations incorporated into Bankruptcy Code § 546(e). The two statutory regimes were not so easily separated with respect to other aspects of fraudulent transfer litigation. "Unlike § 546(e), there is no clear statutory direction that the satisfaction of claims against the general estate provides value for the fraudulent transfer of fictitious profits from the deposits made by other customers." *Id.* at 470.

## 2.    The Two Rules Applicable to the BLMIS Ponzi Scheme

Two rules emerge from the case law that govern fraudulent transfer litigation in Ponzi scheme cases. The first applies in SIPA cases and non-SIPA

cases alike, and can summarized in one sentence:  A transferee does not give

value beyond his deposits of principal.  This principle was recently reinforced

in *Silverman v. Cullin* (*In re Agape World, Inc.*), No. 15-1341, 2016 WL 423800

(2d Cir. Feb. 4, 2016) (summary order).  There, Cullin had invested $75,000 in

Agape. *Silverman v. Cullin*, No. 14-CV-4248 (JMA), 2015 WL 1509583, at *1

(E.D.N.Y. Mar. 31, 2015).  Pursuant to her investment agreement with Agape,

she was permitted to receive payments from her purported investment in the

form of interest payments, or roll over the investments to a future bridge loan.

*Id.*  Cullin received back $86,744.76, leaving her with a net gain of $11,744.76.

*Id.*  Agape turned out to be a Ponzi scheme, and following Agape's bankruptcy,

the trustee sued Cullin in Bankruptcy Court and recovered the amount of the

net gain under New York's constructive fraudulent conveyance law.  *See id.*

The District Court affirmed.  Although the Second Circuit had not ruled

on the question, the District Court acknowledged that in Ponzi scheme cases

"many courts have concluded that such statutes allow those investors to retain

their principal, but not any profits or interest."  *Id.* at *2 (collecting cases).

Noting the split of authority on whether Ponzi scheme investors can

nonetheless retain *contractual interest* on loans to Ponzi scheme operators, *id.*

at *2-3 (*compare Daly v. Deptula* (*In re Carrozzella & Richardson*)*, 286 B.R. 480

(D.Conn.2002) (permitting recovery of interest) and *Lustig v. Weisz & Assocs.,

Inc.* (*In re Unified Commercial Capital, Inc.*)*, 260 B.R. 343 (Bankr. W.D.N.Y.

2001) (same), *aff'd*, No. 01–CV–6004, 2002 WL 32500567 (W.D.N.Y. June 21,

2002) *with Merrill v. Abbott* (*In re Indep. Clearing House Co.*)*, 77 B.R. 843 (D.

Utah 1987) (denying recovery of interest) and *In re Taubman,* 160 B.R. 964

(Bankr. S.D. Ohio 1993) (same)), the District Court concluded that it did not

have to resolve the split.  Even under *Carrozzella* and similar decisions, the

contractual interest rate must be reasonable, and Cullin's annual rate of return

was 48%.  *Silverman v. Cullin*, 2015 WL 1509583, at *5.  Furthermore, unlike

the contracts in *Carrozzella* and *Unified Commercial*, Agape's contract with

Cullin did not guarantee a specific rate of return or any interest.  *Id.*

The Second Circuit affirmed the District Court in a summary order.

*Silverman v. Cullin* (*In re Agape World, Inc.*), No. 15-1341, 2016 WL 423800 (2d

Cir. Feb. 4, 2016).  It observed that "other courts of appeals have held that

payments of 'interest' to Ponzi scheme investors should be treated as

fraudulent transfers, because 'fair consideration' is not present in the context

of such schemes."  *Id.* at *1 (citing cases).  Although the Second Circuit had not

addressed the issue, "the prevailing view in the district and bankruptcy courts

in this Circuit has agreed with this consensus. *See Sec. Inv'r Prot. Corp. v.

Bernard L. Madoff Inv. Sec. LLC,* 531 B.R. 439, 462–64 (Bankr.S.D.N.Y.2015)

(collecting cases)."  *Id.*  Finally, the Court did not have to decide if *Carrozzella*

and *Unified Commercial,* which it described as "two outlier cases," were

correctly decided.  Even if they were, Cullin could not rely on their holdings

because her interest was not guaranteed and the interest rate was

commercially unreasonable.  *Id.* at *2.

The second rule applies strictly in SIPA Ponzi scheme cases involving

27

fraudulent transfer litigation. Net winners cannot argue that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of Bankruptcy Code § 548(c). SIPA creates two estates and grants net losers – those with net equity claims – a priority in the customer property estate. Permitting a net winner to offset a non-net equity claim against the trustee's claim for the return of customer property effectively allows the net winner to recover his non-SIPA claim from customer property at the expense of the net losers in violation of SIPA's priority rules.

### 3.    Cohen's Arguments

Cohen's arguments focus primarily on the antecedent debt/value issue. They fall into three categories: (i) the *Antecedent Debt Decision* was wrongly decided, (ii) the rationale of the *Antecedent Debt Decision* was rejected by subsequent Second Circuit Decisions, and (ii) the *Antecedent Debt Decision* did not decide certain issues relating to the time-value of money, such as interest, inflation adjustments and lost opportunity costs.

### a.    The *Antecedent Debt Decision* Was Wrongly Decided

This category includes the argument that the *Antecedent Debt Decision* misinterpreted SIPA to expand the Trustee's avoidance powers by limiting value under Bankruptcy Code § 548(c) to the amount of principal invested. (*Cohen Post-Trial Submission* at 12-14.) In a related argument, Cohen contends that the monthly BLMIS statements, the federal securities laws and the common law relating to breach of fiduciary duty and fraud created obligations owing by

28

BLMIS to Cohen, and the satisfaction of those obligations through the withdrawal of fictitious profits constituted value for purposes of Bankruptcy Code § 548(c).  (*Id.* at 14-19.)  For support, he relies on *Visconsi v. Lehman Bros.*, 244 F. App'x 708 (6th Cir. 2007).  (*Id.* at 23.)  Finally, Cohen contends that he is entitled to 9% annual interest on his New York state law claims pursuant to N.Y.C.P.L.R. § 5001(a).  (*Id.* at 20-21.)

Judge Rakoff thoroughly considered and rejected these arguments and distinguished *Visconsi* in the *Antecedent Debt Decision*.  Cohen was a party to that decision and the District Court returned his and the other cases to this Court for proceedings consistent with the *Antecedent Debt Decision*.  *Greiff* and the *Omnibus Good Faith Decision* expressly rejected these antecedent debt/value arguments as well.  Cohen had his day in court, he preserved these arguments for appeal, and I cannot and will not permit Cohen to reargue expressly or impliedly before me that the *Antecedent Debt Decision* was wrongly decided at the time Judge Rakoff rendered the decision.  *See Picard v. Shapiro* (*In re BLMIS*), 542 B.R. 100, 117 (Bankr. S.D.N.Y. 2015) (Defendants were parties to the *Antecedent Debt Decision* "and they cannot collaterally attack Judge Rakoff's reference order in this Court.").

### b.    The Rationale of the *Antecedent Debt Decision* Was Rejected by Subsequent Second Circuit Decisions

Referring to the distinction drawn by the Second Circuit between SIPA and the Bankruptcy Code regarding the statute of limitations contained in 11 U.S.C. § 546(e), Cohen argues that *Ida Fishman* changed controlling law, and

"the decision in the Antecedent Debt matter should and must be revisited."

(*Cohen Post-Trial Submission* at 12.)[17]

As noted, the Court discussed *Ida Fishman* at length in the *Omnibus Good Faith Decision.* Like the defendants who argued in a post-argument letter to the Court, Cohen implies that the Second Circuit's decision erects an impenetrable barrier between SIPA and the Bankruptcy Code such that the former is irrelevant in considering the avoidance provisions under the Bankruptcy Code. This is not so, and the Court rejects Cohen's argument for the reasons discussed in the *Omnibus Good Faith Decision.* Since, however, Cohen has devoted a substantial portion of his proposed conclusions of law to this issue, the Court takes this opportunity to amplify its earlier reasoning.

The provisions of the Bankruptcy Code apply to a SIPA liquidation "[t]o the extent consistent with the provisions of this chapter." SIPA § 78fff(b). Thus, a SIPA liquidation court must always consider whether the application of provisions of the Bankruptcy Code are consistent with SIPA. SIPA, in this

---

[17]    According to Cohen, *Ida Fishman* also ruled that account statements created an enforceable legal obligation, the Trustee never avoided the obligation and its satisfaction constituted value for the withdrawal of fictitious profits. (*Cohen Post-Trial Submission* at 15 – 16.) *Ida Fishman* did cite N.Y.U.C.C. § 8-501(b)(1) and cmt. 2, *Ida Fishman*, 773 F.3d at 422, which gives the customer a "security entitlement" where the person maintaining the account "indicates by book entry that a financial asset has been credited to the person's securities account." N.Y.U.C.C. § 8-501(b)(1). However, *Ida Fishman* did not hold that BLMIS' fictitious statements created enforceable obligations. Even if they did, the Second Circuit did not rule that the satisfaction of a claim under N.Y.U.C.C. § 8-501(b)(1) constituted value for the payment of fictitious profits, and such a conclusion would be inconsistent with its holding in *Silverman v. Cullin.* Finally, the argument that payment in satisfaction of an unavoided obligation provides value misses the point. An obligation may be valid, but payments in excess of principal are avoidable and recoverable (in all Ponzi scheme cases) and violate the priority rules of SIPA (in SIPA Ponzi scheme cases).

regard, confers superior avoiding powers on the trustee. An ordinary trustee could not recover the transfers in this case because the customer property that BLMIS transferred was not property of BLMIS at the time of the transfer. *Picard v. Greenwich Ltd.* (*In re BLMIS*), 762 F.3d 199, 213 (2d Cir. 2014) ("[B]ecause money held by a broker on behalf of its customers is not the broker's property under state law, it would not be recoverable by a trustee in an ordinary bankruptcy."). SIPA § 78fff-2(c)(3) creates a legal fiction, *id.*, that empowers the SIPA trustee to recover customer property as if it had been BLMIS property transferred prior to the Filing Date. This enhanced power allows the Trustee to fulfill SIPA's goal "to return customer property to customers," *Time-Value Decision*, 779 F.3d at 77, and serve SIPA's dual purposes of protecting investors and protecting the security markets as a whole. *Net Equity Decision*, 654 F.3d at 235. The corollary of this rule is that BLMIS' transfer of fictitious profits discharged its antecedent debts, if at all, with other people's money and not its own.

In *Ida Fishman*, the Court acknowledged that the payments at issue were fraudulent transfers. *Ida Fishman*, 773 F.3d at 422 ("Certainly SIPC and the Trustee are correct that these transfers were also made 'in connection with' a Ponzi scheme and, as a result, were fraudulent."). However, a conflict existed between SIPA's goal of maximizing the recovery of customer property and the express language of Bankruptcy Code § 546(e). Where Congress has made a clear choice, a court must enforce Congress' will. Cohen has not pointed to a similar conflict between the goals of SIPA and the express language of

31

Bankruptcy Code § 548(c).  Moreover, as Judge Rakoff stated, even if the Trustee has the same avoiding powers as a bankruptcy trustee, it does not follow that a defendant in a SIPA fraudulent transfer action can assert the same defenses.

Finally, *Ida Fishman* did not deal with the rule applied in all Ponzi scheme cases that the transferee – even the innocent transferee – does not pay value for his fictitious profits.  The rule is based on the lack of any benefit to the debtor and the adverse impact that recognition of a different rule would have on other defrauded investors.  *Scholes,* 56 F.3d at 757.

The rationale for the rule is even greater in SIPA cases.  The SIPA trustee seeks to recover customer property to satisfy net equity claims which enjoy a priority in that property.  Every offset against the trustee's avoidance claim based on a non-SIPA claim under state or federal law diminishes the SIPA trustee's recovery.  In effect, treating the satisfaction of general, non-SIPA claims as value under Bankruptcy Code § 548(c) permits the transferee to recover his non-SIPA claim from the customer property estate.

Cohen also argues that the decision in *Picard v. Fairfield Greenwich Ltd*, 762 F.3d 199 (2d Cir. 2014) represents an intervening opinion that undercuts the rationale of the *Antecedent Debt Decision.*  (*Cohen Post-Trial Submission* at 14 & n. 7.)  He does not explain why.  The Court considered this decision in the *Omnibus Good Faith Decision*, 531 B.R. at 468-69.  *Fairfield Greenwich*, which did not address the value defense, supports the general proposition that "SIPA

§ 78fff–2(c)(3) is limited to granting a SIPA trustee the additional power to recover the transfers of customer property, but otherwise, the Trustee's fraudulent transfer claims proceed as they would in an ordinary bankruptcy." *Id.* at 469.  A defendant in a non-SIPA fraudulent transfer action arising from a Ponzi scheme cannot assert the defense of value beyond his deposits.  It follows, therefore, that Cohen cannot do so either.

### c.   The *Antecedent Debt Decision* Did Not Decide Certain Issues

Cohen argues that the *Antecedent Debt Decision* did not address his right to recover interest, loss opportunity costs or similar adjustment for the time-value of money.  (*Cohen Post-Trial Submission* at 10-11), and he is entitled to an inflation adjustment to its principal to reflect its true value.  (*Id.* at 21-22.) He is wrong.  Imputed interest represents a time-value adjustment.  Judge Rakoff withdrew the reference to decide the antecedent debt issue, and ruled that net winners were not entitled to the payment of interest (or any other claim) in excess of their principal deposits.  *Antecedent Debt Decision*, 499 B.R. at 422.  He declined to reach the distinct issue of whether the defendants were entitled to adjust their *net equity* claims *under SIPA* by a time-value factor.  *Id.* at 422 n. 5 ("To the extent that defendants' argument for interest on their state and federal claims can be construed as an argument that their net-equity claims should be adjusted based on the time value of money, the Court will not address it, as it did not withdraw the reference with respect to that question.").

The Second Circuit decided that issue in the *Time-Value Decision*.  It

ruled that BLMIS customers were not entitled to an inflation or interest

adjustment to their net equity claims because SIPA did not permit it.  *Time-*

*Value Decision*, 779 F.3d at 79-80.  Furthermore, an unadjusted distribution

was fair especially where the customer property estate was insufficient because

any such adjustment would allocate value to the earlier investors and reduce

the amount recoverable by later investors.  *Id.* at 81.

> An inflation adjustment to net equity claims could allow some
> customers to obtain, in effect, a protection from inflation for which
> they never bargained, in contravention of the text and purpose of
> SIPA, and at the expense of customers who have not yet recovered
> the property they placed in Madoff's hands.

*Id.* (footnote omitted).

The precise question raised by Cohen – in essence, whether a net winner

can offset the Trustee's damage claim by adding imputed interest to his

principal deposits – was decided in *Antecedent Debt Decision* and in many Ponzi

scheme decisions that preceded it and came after it.  *E.g.*, *Silverman v. Cullin*,

2016 WL 423800.  The *Time-Value Decision* addressed a different but related

question involving net equity under SIPA rather than value under Bankruptcy

Code § 548(c), but the decision supports Judge Rakoff's conclusion.  Net equity

and fictitious profits are two sides of the same coin.  *Antecedent Debt Decision*,

499 B.R. at 420.  In both cases, the Trustee nets deposits against withdrawals;

net losers have net equity claims against the customer property estate and net

winners are subject to liability in connection with fraudulent transfer claims.

*Id.* at 420-21.  The ultimate goal is to restore each customer's net equity with

no winners or losers.  For this reason, the computation of net equity under

SIPA and value under Bankruptcy Code § 548(c) are "inherently intertwined."
*Id.* at 424.

Consequently, the same rules should govern the computation of net
equity claims and fraudulent transfer exposure.  Denying a time-value
adjustment in the former case but permitting it in the latter would undermine
the balance that SIPA seeks to strike, and lead to a result inconsistent with
SIPA's two estate/priority scheme.  The net winner could increase his principal
deposits (and reduce his exposure) by the amount of the time-value adjustment
but the net loser could not increase his net equity claim based on unpaid
principal deposits through a similar adjustment.

Furthermore, permitting a defendant like Cohen to adjust his principal
deposits by an inflation, interest or some other time-value factor would
disregard the well-settled rules that govern Ponzi scheme litigation.  In all Ponzi
scheme fraudulent transfer litigation, a transferee must return transfers in
excess of his principal deposits.  Even under the "outlier decisions" discussed
in the Second Circuit's decision in *Silverman*, a transferee is not entitled to
retain interest unless the interest was guaranteed and the rate was reasonable.
Cohen never bargained for interest or an inflation or time-value adjustment,
and he is not entitled to one.  *See Greiff*, 476 B.R. at 726.  He thought he was
investing in the stock market and receiving an equity owner's profits.

In a SIPA case, any definition of value that allows such an adjustment
would impose the burden of the adjustment on the holders of net equity claims

35

who lost money and would violate SIPA's priority rules. *Id.* Thus, even if

Cohen were legally entitled to a time-value adjustment, increasing his deposits

by an inflation or interest factor and reducing the fictitious profits he received

would, like the assertion of the antecedent debt/value defense, allow Cohen to

recover a general claim from the customer property estate that would come at

the expense of the claimants who have not yet recovered their principal.

### d.    Other Defenses

Cohen argues that he is entitled to recover as direct and consequential

damages the amount of $773,869.00 he paid in taxes on account of fictitious

profits for the tax years 1996 through 2002, inclusive, (DX 7), and $45,760.95

in legal fees and expenses he incurred defending this adversary proceeding.

(DX 6.)  (*Cohen Post-Trial Submission*, at 19-20, 21-22.)  Cohen cannot offset

the taxes he paid on fictitious profits for the reasons explained in *Donell v.

Kowell,* 533 F.3d 762 (9th Cir.), *cert. denied,* 555 U.S. 1047 (2008); (i) there is

no principled basis to limit the offsets to taxes and not permit offsets for other

expenses relating to, or the uses of, the fictitious profits, (ii) the offset would

introduce complex problems of proof and tracing and reduce the plaintiff's

ability to recover assets and (iii) the amount of the offset would differ depending

on the defendant's financial situation and come at the expense of the other

victims.  *Id.* at 779; *accord Wing v. Dockstader*, No. 2:08 cv 776, 2010 WL

5020959, at *7 (D. Utah Dec. 3, 2010), *aff'd*, 482 F. App'x 361 (10th Cir. 2012);

*see Picard v. The Estate (Succession) of Doris Igoin* (*In re BLMIS*), 525 B.R. 871,

36

893 (Bankr. S.D.N.Y. 2015).[18]

Cohen also argues that he is entitled to offset the legal fees he incurred defending claims brought against him as a result of Madoff's fraud.  (*Cohen Post-Trial Submission*, at 20) (citing *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 235-236 (E.D.N.Y. 2014) and *The Ltd., Inc. v. McCrory Corp.*, 683 F. Supp. 387, 393 (S.D.N.Y.1988)).)  Under the American Rule, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015) (quoting *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242, 252–253 (2010) (internal quotation marks omitted)).  The cases cited by Cohen reflect the general rule in New York that allows "plaintiffs to recover 'the reasonable value of attorneys' fees and other expenses' when, 'through the wrongful act of his present adversary, [the plaintiff was] involved in *earlier* litigation with a third person in bringing or defending an action to protect his interests.'"  *World Trade Ctr. Props., LLC v. Am. Airlines, Inc.* (*In re Sept. 11 Litig.*), 802 F.3d 314, 334 (2d Cir. 2015) (emphasis added) (quoting *Coopers & Lybrand v. Levitt,* 384 N.Y.S.2d 804, 807 (N.Y. App. Div. 1976)).  "Such expenses, however, must be

---

[18]     Cohen asserts that he acquired a lien under 11 U.S.C. § 550(e)(1) to the extent he paid taxes on fictitious profits but does not explain why.  (*Cohen Post-Trial Submission*, at 22.) Bankruptcy Code § 550(e)(1) grants a good faith transferee a lien to the extent he has improved the property after the transfer, and an improvement can include "the payment of any tax on such property."  11 U.S.C. § 550(e)(2)(C).  The section is intended to prevent the estate from achieving a windfall at the transferee's expense.  5 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶550.06, at 550-34 (16th ed. 2015).  Cohen's payment of taxes on his fictitious profits did not increase the value of those fictitious profits and their recovery would not confer a windfall on the customer property estate.

the natural and necessary consequences of the defendant's acts, such as when an attorney's malpractice exposes the client to liability." *Id.* (internal quotation marks and citations omitted).

This exception to the American Rule is inapplicable. Cohen may have been defrauded into investing with BLMIS, but he does not contend that he was forced to defend an earlier action as a result of Madoff's fraud or that he incurred any legal fees or expenses except for the costs of defending this adversary proceeding. The rule Cohen advocates would have the perverse effect of reducing the Trustee's recovery by the amount of legal fees and expenses Cohen incurred unsuccessfully defending the Trustee's claim for the return of money he was never entitled to receive in the first place.

Finally, assuming that Cohen had federal or state claims based on the payment of income taxes on fictitious profits or the legal fees relating to their receipt, these claims suffer from the same defect as all of his other value defenses: they are general claims that cannot be offset against claims to recover customer property.

Based on the foregoing, this Court respectfully recommends that the District Court adopt these proposed findings of fact and conclusions of law, and enter a judgment in favor of the plaintiff and against the defendant in the sum of $1,143,461. The Clerk of the Court is directed to mail a copy of these

proposed findings of fact and conclusions of law to all parties and note the date

of mailing on the docket.  FED. R. BANKR. P. 9033(a).


Dated:        New York, New York
              April 25, 2016


                                  /s/ *Stuart M. Bernstein*
                                  STUART M. BERNSTEIN
                            United States Bankruptcy Judge