**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Irving H. Picard
Email: ipicard@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**TRUSTEE'S FIFTEENTH INTERIM REPORT**
**FOR THE PERIOD OCTOBER 1, 2015 THROUGH MARCH 31, 2016**

# TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY ......................................................................................1

II.   BACKGROUND ...................................................................................................3

III.  FINANCIAL CONDITION OF THE ESTATE ...................................................3

IV.   ADMINISTRATION OF THE ESTATE ..............................................................4

    A.    Marshaling And Liquidating The Estate Assets .......................................4

V.    CLAIMS ADMINISTRATION..............................................................................5

    A.    Claims Processing .......................................................................................5

        i.    Customer Claims...............................................................................5

        ii.   General Creditor Claims ..................................................................6

        iii.  The Trustee Has Kept Customers Informed Of The Status
            Of The Claims Process......................................................................6

        iv.   The Hardship Program .....................................................................7

    B.    Objections To Claims Determinations.........................................................9

    C.    Settlements Of Customer Claims Disputes................................................10

VI.   PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA ...........10

    A.    Net Equity Dispute....................................................................................10

    B.    Time-Based Damages ................................................................................13

    C.    "Customer" Definition ..............................................................................15

    D.    Fact-Based Objections ..............................................................................22

    E.    Inter-Account Transfers ............................................................................22

    F.    Profit-Withdrawal Issue ............................................................................25

VII.  RECOVERIES AND CONTINGENCIES ...........................................................28

    A.    Recoveries Accomplished During Prior Report Periods ...........................28

    B.    Recoveries Accomplished During This Report Period..............................28

    C.    Earlier Settlements ....................................................................................29

VIII. THE TRUSTEE'S ALLOCATION OF FUNDS AND  DISTRIBUTIONS
      TO CUSTOMERS ...............................................................................................29

    A.    The Customer Fund....................................................................................29

    B.    The Trustee's Initial Allocation of Property to the Fund of Customer
        Property and Authorizing the First Interim Distribution to Customers ................30

    C.    The Trustee's Second Allocation of Property to the Fund of Customer
        Property and Authorizing the Second Interim Distribution to Customers............31

# TABLE OF CONTENTS
(continued)

**Page**

D.    The Trustee's Third Allocation of Property to the Fund of Customer
Property and Authorizing the Third Interim Distribution to Customers ...............32

E.    The Trustee's Fourth Allocation of Property to the Fund of Customer
Property and Authorizing the Fourth Interim Distribution to Customers .............33

F.    The Trustee's Fifth Allocation of Property to the Fund of Customer
Property and Authorizing the Fifth Interim Distribution to Customers ................34

G.    The Trustee's Sixth Allocation of Property to the Fund of Customer
Property and Authorizing the Sixth Interim Distribution to Customers ...............35

H.    The General Estate ................................................................................................38

IX.    LITIGATION ................................................................................................................38

A.    The District Court—Motions to Withdraw the Reference, Motions to
Dismiss and Related Appeals ...............................................................................39

    i.    Proceedings Relating to Motions to Withdraw .........................................39

        (a)    The Administrative Order ................................................................39

        (b)    Consolidated Briefing Orders .........................................................40

        (c)    The 546(e) Appeal ..........................................................................44

B.    Litigation in the Bankruptcy Court and Related Appeals .....................................45

        (a)    Resolution of Good Faith Avoidance Actions ...............................45

        (b)    Picard v. Andrew H. Cohen, Adv. Pro. No. 10-04311 ..................45

        (c)    Interlocutory Appeal of The Omnibus Decision ............................47

        (d)    Interlocutory Appeal of The Trustee's Protective Order ..............48

        (e)    Extraterritoriality ............................................................................49

    ii.    Subsequent Transferee Actions .................................................................51

    iii.    Bad Faith/Feeder Fund Actions ................................................................52

        (a)    The HSBC Action ...........................................................................52

        (b)    The Luxalpha Action ......................................................................55

        (c)    The Kohn Action .............................................................................57

        (d)    Picard v. Avellino ...........................................................................58

        (e)    Picard v. Cohmad Sec. Corp. .........................................................60

        (f)    Picard v. Irwin Lipkin, et al. ..........................................................61

        (g)    Picard v. J. Ezra Merkin .................................................................63

        (h)    Picard v. Kingate ............................................................................67

# TABLE OF CONTENTS
(continued)

**Page**

      (i)     Picard v. Legacy Capital Limited ...................................................72

      (j)     Picard v. Magnify Inc. .................................................................73

      (k)    Picard v. Mendelow ....................................................................75

      (l)     Picard v. Andrew H. Madoff........................................................76

      (m)   Picard v. Vizcaya .......................................................................78

      (n)    Picard v Rye/Tremont .................................................................79

      (o)    Picard v. Stanley Shapiro............................................................81

      (p)    Picard v. Silver Creek .................................................................82

  C.     Injunction Proceedings..........................................................................82

      i.     Picard v. Marshall ......................................................................83

      ii.    Picard v. A&G Goldman Partnership ...........................................85

X.     INTERNATIONAL INVESTIGATION AND LITIGATION...........................................87

  A.     Austria ...................................................................................................87

  B.     Bermuda ................................................................................................87

  C.     BVI........................................................................................................88

  D.     England .................................................................................................88

  E.     Ireland ..................................................................................................88

  F.     Israel.....................................................................................................88

  G.     Switzerland and Luxembourg .................................................................88

XI.    FEE APPLICATIONS AND RELATED APPEALS ....................................................89

  A.     Objections to Prior Fee Applications.......................................................89

  B.     Nineteenth Fee Application ....................................................................89

  C.     Twentieth Fee Application......................................................................90

XII.   CONCLUSION......................................................................................................91

TO THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, Esq. (the "Trustee"), as Trustee for the substantively consolidated

liquidation proceeding of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the

Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of

Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the

"Debtors"), respectfully submits his Fifteenth Interim Report (this "Report") pursuant to SIPA

§ 78fff-1(c) and this Court's Order on Application for an Entry of an Order Approving Form and

Manner of Publication and Mailing of Notices, Specifying Procedures For Filing, Determination,

and Adjudication of Claims; and Providing Other Relief entered on December 23, 2008 (the

"Claims Procedures Order") (ECF No. 12).[2]  Pursuant to the Claims Procedures Order, the

Trustee shall file additional interim reports every six (6) months.  This Report covers the period

between October 1, 2015 and March 31, 2016 (the "Report Period").

## I.    EXECUTIVE SUMMARY

1.    The Trustee has worked relentlessly for over seven years to recover customer

property and distribute it to BLMIS customers.  Through pre-litigation and other settlements, the

Trustee has successfully recovered or reached agreements to recover, more than $11.1 billion

through the Report Period—more than 63% of the currently estimated principal lost in the Ponzi

scheme by those who filed claims—for the benefit of all BLMIS customers with allowed

claims. [3]

---

[1] For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] All ECF references refer to pleadings filed in the main adversary proceeding pending before this Court, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (BRL) (Bankr. S.D.N.Y.), unless otherwise noted.

[3] Almost $20 billion of principal was lost in the Ponzi scheme in total.  Of the $20 billion, approximately $17.5 billion of principal was lost by those who filed claims.

2.    On November 18, 2015, this Court entered an Order Approving the Trustee's Sixth Allocation of Property to the Fund of Customer Property and Authorizing a Sixth Interim Distribution to Customers, in which the Trustee allocated approximately $1.449 billion to the Customer Fund.  On December 4, 2015, the Trustee distributed approximately $1.193 billion on allowed claims relating to 1,071 accounts, or 8.262% of each customer's allowed claim, unless the claim was fully satisfied.  Subsequent to December 4, 2015 and through the end of the Report Period, an additional $15.477 million was distributed as catch-up payments, bringing the total Sixth Interim Distribution amount to $1.209 billion.  When combined with the approximately $685.279 million First Interim Distribution, the $4.978 billion Second Interim Distribution, the $696.277 million Third Interim Distribution, the $468.223 million Fourth Interim Distribution, the $403.409 million Fifth Interim Distribution and $836.522 million in advances paid or committed to be paid by the Securities Investor Protection Corporation ("SIPC"),[4] the Trustee has distributed approximately $9.277 billion to BLMIS customers, with 1,275 BLMIS accounts fully satisfied.  The 1,275 fully satisfied accounts represent over 56% of accounts with allowed claims, demonstrating that the Trustee has made significant progress in returning customer property to BLMIS customers.  See discussion *infra* in Section VIII.

3.    The Trustee and his counsel (including, but not limited to, Baker & Hostetler LLP ("B&H"), Windels Marx Lane & Mittendorf, LLP ("Windels Marx"), and various special counsel retained by the Trustee ("Special Counsel") (collectively, "Counsel"), continued to litigate hundreds of individual cases before this Court, the United States District Court for the

---

[4] SIPC has advanced over $834.4 million to date to the Trustee to pay allowed claims.  The difference between the amount committed to pay by SIPC and the amount actually advanced to customers depends on whether the Trustee has received an executed assignment and release from the customer. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims is less than the amount of SIPC advances committed by the Trustee.

Southern District of New York (the "District Court"), the United States Court of Appeals for the

Second Circuit (the "Second Circuit"), the Supreme Court, and dozens of international courts.

4.      This Report is meant to provide an overview of the efforts of the Trustee and his

team of professionals in unwinding the largest Ponzi scheme in history.  Billions of dollars and

thousands of people and entities located across the world were involved in this fraud.  The

Trustee continues to work diligently to coordinate the administration, investigation, and litigation

to maximize efficiencies and reduce costs.

5.      All Interim Reports, along with a complete docket and substantial information

about this liquidation proceeding, are located on the Trustee's website, www.madofftrustee.com

(the "Trustee Website").

## II.      BACKGROUND

6.      The Trustee's prior interim reports, each of which is fully incorporated herein,[5]

have detailed the circumstances surrounding the filing of this case and the events that have taken

place during prior phases of this proceeding.

## III.      FINANCIAL CONDITION OF THE ESTATE

7.      No administration costs, including the compensation of the Trustee and his

counsel, are being paid out of recoveries obtained by the Trustee for the benefit of BLMIS

customers.  Rather, the fees and expenses of the Trustee, his counsel and consultants, and

---

[5] Prior reports cover the periods from December 11, 2008 to June 30, 2009 (the "First Interim Report") (ECF No. 314); July 1, 2009 to October 31, 2009 (the "Second Interim Report") (ECF No. 1011); November 1, 2009 to March 31, 2010 (the "Amended Third Interim Report") (ECF No. 2207); April 1, 2010 to September 30, 2010 (the "Fourth Interim Report") (ECF No. 3038); October 1, 2010 to March 31, 2011 (the "Fifth Interim Report") (ECF No. 4072); April 1, 2011 to September 30, 2011 (the "Sixth Interim Report") (ECF No. 4529); October 1, 2011 to March 31, 2012 (the "Seventh Interim Report") (ECF No. 4793); April 1, 2012 to September 30, 2012 (the "Eighth Interim Report") (ECF No. 5066); October 1, 2012 to March 31, 2013 (the "Ninth Interim Report") (ECF No. 5351); April 1, 2013 to September 30, 2013 (the "Tenth Interim Report") (ECF No. 5554); October 1, 2013 to March 31, 2014 (the "Eleventh Interim Report") (ECF No. 6466); April 1, 2014 to September 30, 2014 (the "Twelfth Interim Report") (ECF No. 8276); October 1, 2014 through March 31, 2015 (the "Thirteenth Interim Report") (ECF No. 9895); and April 1, 2015 through September 30, 2015 (the "Fourteenth Interim Report") (ECF No. 11912).

administrative costs incurred by the Trustee are paid from administrative advances from SIPC. These costs are chargeable to the general estate and have no impact on recoveries that the Trustee has obtained or will obtain. Thus, recoveries from litigation, settlements, and other means will be available in their entirety for the satisfaction of customer claims.

8.    A summary of the financial condition of the estate as of March 31, 2016 is provided in Exhibit A attached hereto.

9.    This summary reflects cash of $30,855,544.46, short term investments, money market deposit accounts, certificates of deposit and other minor investments of $333,824,395 and short-term United States Treasuries in the amount of $2,154,038,409. *See* Exhibit A, page 3, note (3) and page 5, notes (4) and (5).

10.    As detailed in Exhibit A, as of March 31, 2016, the Trustee requested and SIPC advanced $2,158,291,582.28, of which $834,417,302.24 was used to pay allowed customer claims up to the maximum SIPA statutory limit of $500,000 per account,[6] and $1,323,874,280.04 was used for administrative expenses. *See* Exhibit A, page 1.

## IV.    ADMINISTRATION OF THE ESTATE

### A.    <u>Marshaling And Liquidating The Estate Assets</u>

11.    The Trustee and his Counsel have worked diligently to investigate, examine, and evaluate the Debtor's activities, assets, rights, liabilities, customers, and other creditors. Thus far, the Trustee has been successful in recovering or entering into agreements to recover a significant amount of assets for the benefit of customers, totaling over $11.1 billion through March 31, 2016. For a more detailed discussion of prior recoveries, *see* Section V.B. of the First

---

[6] The Trustee must receive an executed assignment and release from each customer before releasing an advance of funds from SIPC. Thus, the amount of SIPC advances requested by the Trustee and paid for allowed customer claims that have been determined is less than the amount of SIPC advances committed by the Trustee. *See supra* note 4.

Interim Report; Section IV of the Second, Amended Third, and Fourth Interim Reports; Section VII of the Fifth Interim Report; Section IV of the Sixth Interim Report; and Section VII of the Seventh through Fourteenth Interim Reports.

12.     The Trustee has identified claims in at least eight shareholder class action suits that BLMIS filed before the Trustee's appointment arising out of its proprietary and market making desk's ownership of securities.  As of the Fifteenth Interim Report, the Trustee had received distributions from seven of these class action settlements totaling over $91,000.  The Trustee has not and will not receive any distributions from the eighth class action settlement.  In addition, the Trustee has identified claims that BLMIS may have in 189 other class action suits also arising out of its proprietary and market making activities.  The Trustee has filed proofs of claim in 123 of these cases and, based on a review of relevant records, has declined to pursue claims in 55 additional cases.  Subject to the completion of a review of relevant records, the Trustee intends to file claims in the remaining 11 cases.  As of March 31, 2016, the Trustee has recovered $1,727,318.04 from settlements relating to 59 of the 123 claims filed directly by the Trustee, of which $85,772.41 was recovered during the Report Period.

## V.     CLAIMS ADMINISTRATION

### A.     <u>Claims Processing</u>

#### i.     <u>Customer Claims</u>

13.     During the Report Period, the Trustee allowed $221,470,842.09 in customer claims.  This brings the total amount of allowed claims as of March 31, 2016 to $15,079,891,831.79.  The Trustee has paid or committed to pay $836,522,226.02 in cash advances from SIPC.  This is the largest commitment of SIPC funds of any SIPA liquidation proceeding and greatly exceeds the total aggregate payments made in all SIPA liquidations to date.

14.     As of March 31, 2016, there were 74 claims relating to 50 accounts that were "deemed determined," meaning the Trustee has instituted litigation against those accountholders and related parties.  The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under § 502(d) of the Bankruptcy Code.  Accordingly, such claims will not be allowed until the avoidance actions are resolved by settlement or otherwise and the judgments rendered against the claimants in the avoidance actions are satisfied.

### ii.      General Creditor Claims

15.     As of March 31, 2016, the Trustee had received 427 timely and 22 untimely filed secured and unsecured priority and non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 427 claims and $1.7 billion, the Trustee has received 94 general creditor claims and 49 broker-dealer claims totaling approximately $264.9 million.  At this time, the BLMIS estate has no funds from which to make distributions to priority/non-priority general creditors and/or broker dealers.

### iii.     The Trustee Has Kept Customers Informed Of The Status Of The Claims Process

16.     Throughout the liquidation proceeding, the Trustee has kept customers, interested parties, and the public informed of his efforts by maintaining the Trustee Website, a toll-free customer hotline, conducting a Bankruptcy Code § 341(a) meeting of creditors on February 20, 2009, and responding to the multitude of phone calls, e-mails, and letters received on a daily basis, from both claimants and their representatives.

17.     The Trustee Website allows the Trustee to share information with claimants, their representatives, and the general public regarding the ongoing recovery efforts and the overall

liquidation.  In addition to court filings, media statements, and weekly information on claims determinations, the Trustee Website includes up-to-date information on the status of Customer Fund recoveries, an "Ask the Trustee" page where questions of interest are answered and updated, a letter from the Chief Counsel to the Trustee on litigation matters, a detailed distribution page, an FAQs page, and a timeline of important events.  The Trustee Website is monitored and updated on a daily basis.

18.    In addition, the Trustee Website allows claimants to e-mail their questions directly to the Trustee's professionals, who follow up with a return e-mail or telephone call to the claimants.  As of March 31, 2016, the Trustee and his professionals had received and responded to more than 7,100 e-mails via the Trustee Website from BLMIS customers and their representatives.

19.    The toll-free customer hotline provides status updates on claims and responses to claimants' questions and concerns.  As of March 31, 2016, the Trustee, B&H, and the Trustee's professionals had fielded more than 8,200 calls from claimants and their representatives.

20.    In sum, the Trustee and his team have endeavored to respond in a timely manner to every customer inquiry and ensure that customers are as informed as possible about various aspects of the BLMIS proceeding

**iv.    The Hardship Program**

21.    At the commencement of claims administration, the Trustee established the Hardship Program to accelerate the determination of claims and the receipt of SIPC protection up to $500,000 for individual account holders who were dealing with hardship.  An individual could qualify for the Hardship Program if he or she filed a claim and was unable to pay for necessary living or medical expenses, over 65 years old and forced to reenter the work force after

retirement, declaring personal bankruptcy, unable to pay for the care of dependents, or suffering from extreme financial hardship beyond the identified circumstances.

22.    As of December 11, 2010, the Trustee had received 394 Hardship Program applications.    The Trustee obtained advances from SIPC and issued 122 checks to hardship applicants with allowed claims.    The Trustee also worked in good faith with approved applicants to reconcile any disputed portions of their claims.    Of the 394 Hardship Program applications received prior to December 11, 2010, the Trustee assessed the information provided and, in the exercise of his discretion, decided not to commence avoidance actions against 249 hardship applicants.

23.    The Trustee expanded the Hardship Program into a second phase as he instituted avoidance actions.    While the law requires the Trustee to pursue avoidance actions to recover customer property, the Trustee has stated that he will not pursue avoidance actions against BLMIS accountholders suffering proven hardship.    In order to forego an avoidance action, the Trustee needed financial information about the accountholder.    Thus, the Trustee announced in November 2010 that the Hardship Program would focus on avoidance action defendants and requested that accountholders come forward to share information regarding their hardships. Through this program, the Trustee has worked with a substantial number of hardship applicants who were subject to avoidance actions to confirm their hardship status and forego the pursuit of an avoidance action.

24.    As of March 31, 2016, the Trustee had received 529 applications from avoidance action defendants relating to 339 adversary proceedings.    After reviewing the facts and circumstances presented in each application and, in many cases, requesting additional verifying information, the Trustee dismissed 217 Hardship Program applicants-defendants from avoidance

actions.  As of March 31, 2016, there were 34 applications still under review and 278 that were resolved because they were either withdrawn by the applicant, deemed withdrawn for failure of the applicant to pursue the application, denied for lack of hardship or referred for consideration of settlement.  The Trustee has also extended the time for applicants to answer or otherwise respond to avoidance action complaints while their Hardship Program applications are pending.

25.      The Trustee established a Hardship Program Hotline with a telephone number and electronic mail address.  A large number of potential applicants have been assisted by the Trustee through the use of the Hotline, and the Trustee urges customers to continue using this resource and the Hardship Program if they believe they qualify.  Further information and applications are available on the Trustee Website.

**B.      Objections To Claims Determinations**

26.      As required by the Claims Procedures Order and described in each determination letter sent by the Trustee ("Determination Letter"), BLMIS claimants have thirty days from the date of a Determination Letter to object to the Trustee's determination of their claim.  Claimants who disagree with the Trustee's determination of their claim must file with the Court a written opposition setting forth the grounds of disagreement and provide the Trustee with the same.  A hearing date will be obtained by the Trustee, and claimants will be notified of that date.  As of March 31, 2016, 2,085 objections (which exclude withdrawn objections and include duplicates, amendments, and supplements) have been filed with the Court.  These objections relate to 3,674 unique claims and 1,012 accounts.

27.      The following objections, among others, have been asserted: Congress intended a broad interpretation of the term "customer" and the statute does not limit the definition to those who had a direct account with BLMIS, the Trustee should determine claims based upon the BLMIS November 30, 2008 statement as opposed to the court-approved cash in-cash out or "Net

Investment Method," claimants should receive interest on deposited amounts, the Trustee must commence an adversary proceeding against each claimant in order to avoid paying gains on claimants' investments, claimants paid income taxes on distributions and their claims should be adjusted by adding all amounts they paid as income taxes on fictitious profits, each person with an interest in an account should be entitled to the SIPC advance despite sharing a single BLMIS account, and there is no legal basis for requiring the execution of a Assignment and Release prior to prompt payment of a SIPC advance.

28.    The Trustee has departed from past practice in SIPA proceedings and paid or committed to pay the undisputed portion of any disputed claim in order to expedite payment of SIPC protection to customers, while preserving their right to dispute the total amount of their claim.

C.    **Settlements Of Customer Claims Disputes**

29.    As of March 31, 2016, the Trustee had reached agreements relating to 827 accounts and with the IRS (which did not have a BLMIS account).  These litigation, pre-litigation, and avoidance action settlements allowed the Trustee to avoid the litigation costs that would have been necessary to obtain and collect judgments from these customers.

VI.    **PROCEEDINGS RELATED TO THE INTERPRETATION OF SIPA**

A.    **Net Equity Dispute**

30.    For purposes of determining each customer's Net Equity, as that term is defined under SIPA, the Trustee credited the amount of cash deposited by the customer into his BLMIS account, less any amounts already withdrawn from that BLMIS customer account, also known as the Net Investment Method.  Some claimants argued that the Trustee was required to allow customer claims in the amounts shown on the November 30, 2008 customer statements (the "Net Equity Dispute").

10

31.     This Court issued a decision on March 1, 2010 upholding the Trustee's Net

Investment Method as the only interpretation consistent with the plain meaning and legislative

history of the statute, controlling Second Circuit precedent, and considerations of equity and

practicality.  (ECF No. 2020); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 424

B.R. 122 (Bankr. S.D.N.Y. 2010).   This Court certified an immediate appeal to the Second

Circuit (ECF No. 2467), which heard oral argument on March 3, 2011.

32.     On August 16, 2011, the Second Circuit affirmed this Court's decision and the

Trustee's Net Investment Method, holding that it would have been "legal error" for the Trustee

to discharge claims for securities under SIPA "upon the false premise that customers' securities

positions are what the account statements purport them to be."   *Sec. Investor Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 241 (2d Cir. 2011).  Any calculation other than

the Net Investment Method would "aggravate the injuries caused by Madoff's fraud."  *Id*. at 235.

Instead, the Net Investment Method prevents the "whim of the defrauder" from controlling the

process of unwinding the fraud.  *Id*.

33.     Under the Second Circuit's decision, the relative position of each BLMIS

customer account must be calculated based on "unmanipulated withdrawals and deposits" from

its opening date through December 2008.  *Id*. at 238.  If an account has a positive cash balance,

that accountholder is owed money from the estate.  As a corollary, if an account has a negative

cash balance, the accountholder owes money to the estate.  Both the recovery and distribution of

customer property in this case are centered on the principle that the Trustee cannot credit

"impossible transactions."  *Id*. at 241.  If he did, then "those who had already withdrawn cash

deriving from imaginary profits in excess of their initial investment would derive additional

benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id*. at 238.

34.     First, the Second Circuit found, "in the context of this Ponzi scheme—the Net Investment Method is . . . more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud . . . and 'avoid[s] placing some claims unfairly ahead of others.'" *Id*. at 242 n.10 (quoting *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 463 (S.D.N.Y. 2001)).  Thus, the Trustee is obligated to use the avoidance powers granted by SIPA and the Bankruptcy Code to prevent one class of customers—the "net winners" or those with avoidance liability—from having the benefit of Madoff's fictitious trades at the expense of the other class of customers—the "net losers," or those who have yet to recover their initial investment.

35.     Next, the Second Circuit explained that "notwithstanding the BLMIS customer statements, there were no securities purchased and there were no proceeds from the money entrusted to Madoff for the purpose of making investments." *Id*. at 240.  Therefore any "[c]alculations based on made-up values of fictional securities would be 'unworkable' and would create 'potential absurdities.'" *Id*. at 241 (quoting *In re New Times Sec. Serv., Inc.*, 371 F.3d 68, 88 (2d Cir. 2004)).  Thus, the Second Circuit rejected reliance upon the BLMIS account statements, finding that, to do otherwise, "would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *Id*. at 235.

36.     On September 6, 2011, certain claimants filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc*.  *Sterling Equities Assoc. v. Picard*, Adv. No. 10-2378 (2d Cir.) (ECF Nos. 505, 537).  The panel that determined the appeal considered the request for

panel rehearing, the active members of the Court considered the request for rehearing *en banc*,

and on November 8, 2011, both denied the petition.  (ECF No. 551).

37.    Three petitions for certiorari were filed with the Supreme Court.  On June 25,

2012, the Supreme Court denied certiorari in two of the petitions.  *Ryan v. Picard*, 133 S. Ct. 24

(2012); *Velvel v. Picard*, 133 S. Ct. 25 (2012).  Certiorari was also dismissed with respect to one

appeal.  *Sterling Equities Assoc. v. Picard*, 132 S. Ct. 2712 (2012).

**B.    Time-Based Damages**

38.    Following the Supreme Court decision denying certiorari regarding the Net

Investment Method, the Trustee filed a motion seeking the affirmance of his calculations of net

equity, and denying certain claimants' request for "time-based damages."  (ECF Nos. 5038,

5039).  The Trustee took the position that customers were not entitled to an inflation-based

adjustment to their allowed customer claims.

39.    Over the objections of hundreds of parties, the Court granted the Trustee's

motion, finding that claimants were not entitled to time-based damages as part of their net equity

claims against the fund of customer property (the "Time-Based Damages Decision").  (ECF No.

5463).

40.    Thereafter, the parties submitted a letter requesting that the Court certify a direct

appeal of the Time-Based Damages Decision to the Second Circuit under 28 U.S.C. § 158(d)(2).

(ECF No. 5488).  On September 24, 2013, the Court certified the Time-Based Damages Decision

for a direct appeal to the Second Circuit, (ECF No. 5514), which was accepted on January 22,

2014.  *In re Bernard L. Madoff Inv. Sec. LLC*, No. 14-97(L) (2d Cir. Jan. 22, 2014).  Oral

argument took place on October 14, 2014.

41.    On February 20, 2015, the Second Circuit affirmed the Bankruptcy Court's

decision, holding that "SIPA's scheme disallows an inflation adjustment as a matter of law" and

that the SEC was not owed *Skidmore* or *Chevron* deference.  *See In re Bernard L. Madoff Inv.*

*Sec. LLC*, 779 F.3d 74, 80, 82 (2d Cir. 2015) ("*Net Equity Decision*").  The Court also held that

"an interest adjustment to customer net equity claims is impermissible under SIPA's scheme."

*Id.* at 83.

42.      Under the Second Circuit's decision, a customer's net equity claim, calculated in

accordance with the *Net Equity Decision*, will not be adjusted for inflation or interest.  The

Second Circuit explained that "an inflation adjustment goes beyond the scope of SIPA's intended

protections and is inconsistent with SIPA's statutory framework."  *Id.* at 79.  Nor does SIPA

provide for compensation related to any opportunity cost of the use of such money during the

pendency of the liquidation proceedings.  *Id.* at 80.  While SIPA operates to "facilitate the

proportional distribution of customer property actually held by the broker," *Id*. at 81, "the Act . .

. restores investors to what their position would have been in the absence of liquidation."  *Id.* at

79.  For similar reasons, the Second Circuit rejected the request of one claimant who sought an

adjustment for interest, in addition to inflation.  *Id.* at 83.

43.      Certain claimants urged the Court to apply deference to the SEC's view, which

supported their position that customer claims were deserving of an inflation-based adjustment.

While the SEC clarified that it did not seek deference at all, but if it were, it would have been

*Skidmore*, a more fluid level of deference than the kind sought by the claimants. Nevertheless,

the Second Circuit held that no deference was owed to the SEC's views in this case.  *Id.* at 82.

44.      The claimants did not file a petition for rehearing in the Second Circuit.  A

petition for a writ of certiorari in the Supreme Court was filed on July 20, 2015.  On July 23,

2015 and July 24, 2015, the Trustee and SIPC waived their rights to respond to the petition.  On

August 21, 2015, a brief was filed in support of the petition by other BLMIS customers.  On

September 9, 2015, the petition was distributed to the Justices for a conference on September 28,

2015.  On October 5, 2015, the Supreme Court declined to review the petition.

C.    **"Customer" Definition**

45.    The Trustee's position consistently has been that only those claimants who

maintained an account at BLMIS constitute "customers" of BLMIS, as defined in § 78*lll*(2) of

SIPA.  Where it appeared that claimants did not have an account in their names at BLMIS

("Claimants Without An Account"), the Trustee denied their claims for securities and/or a credit

balance on the ground that they were not customers of BLMIS under SIPA.

46.    On June 11, 2010, the Trustee filed a Motion For An Order To Affirm Trustee's

Determinations Denying Claims of Claimants Without BLMIS Accounts in Their Names,

Namely, Investors in Feeder Funds.  (ECF Nos. 2410–2413, 2416).  The motion addressed only

those claimants whose claims emanated from their direct or indirect investments in sixteen so-

called feeder funds that, in turn, had accounts with and invested directly with BLMIS.

47.    This Court held a hearing on October 19, 2010.  On June 28, 2011, this Court

issued a Memorandum Decision and Order affirming the Trustee's denial of these claims.  (ECF

Nos. 3018, 4193, 4209); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R.

285 (Bankr. S.D.N.Y. 2011).

48.    This Court found that, in light of the plain language of SIPA and relevant case

law, the investor-claimants did not qualify as "customers" under SIPA.  This Court found that

the objecting claimants invested in, not through, the feeder funds, and had no individual accounts

at BLMIS.  It was the feeder funds who entrusted their monies with BLMIS for the purpose of

trading or investing in securities—the touchstone of "customer" status—whereas the objecting

claimants purchased ownership interests in the feeder funds.  This Court held that, absent a direct

15

broker-dealer relationship with BLMIS, the objecting claimants sought a definition of "customer" that stretched the term beyond its limits.

49.     Judge Lifland put it succinctly: the objecting-claimants who invested in sixteen feeder funds did not qualify as "customers" because they "had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interests in any Feeder Fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment discretion over Feeder Fund assets invested with BLMIS, received no account statements or other communications from BLMIS and had no transactions reflected on the books and records of BLMIS . . . ." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. at 290.

50.     Twenty-seven notices of appeal were filed and assigned to United States District Judge Denise L. Cote.  *See Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, No. 11-cv-05683 (DLC) (S.D.N.Y.).  On January 4, 2012, Judge Cote affirmed the June 28, 2011 order of this Court.  *See Aozora Bank Ltd. v. Sec. Investor Prot. Corp.*, 480 B.R. 117 (S.D.N.Y. 2012).  In that decision, Judge Cote determined in light of SIPA, the "most natural reading of the 'customer' definition excludes persons like the appellants who invest in separate third-party corporate entities like their feeder funds that in turn invest their assets with the debtor." *Id*. at 123.  Thus, the District Court held that the feeder funds were the BLMIS customers and the appellants were precluded from seeking separate recoveries as additional SIPA claimants. *Id*. at 129–30.

51.     On January 6, 2012, four appeals were taken from Judge Cote's order to the Second Circuit.  *See Bricklayers and Allied Craftsman Local 2 Annuity Fund v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-410 (2d Cir. Jan. 31, 2012); *Rosamilia v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-437 (2d Cir. Feb. 2, 2012); *Kruse v. Sec. Investor Prot.*

*Corp., Irving H. Picard*, No. 12-483 (2d Cir. Feb. 6, 2012); *Upstate N.Y. Bakery Drivers and*

*Indus. Pension Fund v. Sec. Investor Prot. Corp., Irving H. Picard*, No. 12-529 (2d Cir. Feb. 3,

2012). On February 22, 2013, the Second Circuit affirmed the decisions of the District Court

and the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court"). *See Kruse v. Sec. Investor Prot. Corp., Irving H. Picard,* 708 F.3d 422 (2d Cir. 2013).

52.     On another matter involving the interpretation of the "customer" definition, on

October 5, 2011, the Trustee moved before this Court for an order establishing a briefing

schedule and hearing to affirm his determination that ERISA did not alter his denial of

"customer" status to certain claimants. (ECF No. 4432). This Court entered a scheduling order

on November 8, 2011. (ECF No. 4507).

53.     On November 14, 2011, the Trustee filed his Motion For An Order Affirming

Trustee's Determinations Denying Claims Over ERISA-Related Objections. (ECF No. 4521)

(the "ERISA Motion"). On or around January 17, 2012, approximately eighteen opposition

briefs to the ERISA Motion were filed on behalf of various ERISA claimants. (ECF Nos. 4625–

4628, 4631–4633, 4635, 4637–4643, 4652–4654). On March 2, 2012, the Trustee filed his

Memorandum in Support of the Trustee's Motion For An Order Affirming Trustee's

Determinations Denying Claims Over ERISA-Related Objections. (ECF No. 4703). On April 2,

2012, five replies to the ERISA Motion were filed on behalf of various ERISA claimants. (ECF

Nos. 4746, 4748, 4750, 4755, 4756). The Trustee's sur-reply was filed on April 20, 2012. (ECF

No. 4781).

54.     During the pendency of the above briefing, certain ERISA claimants also filed

motions to withdraw the reference on the ERISA Motion from this Court to the District Court.

*See Sec. Investor Prot. Corp. v. Jacqueline Green Rollover Account*, No. 12-cv-01039-DLC

(S.D.N.Y. Aug. 6, 2012) (filed on behalf of J. X. Reynolds & Co. Deferred Profit Sharing Plan, Jacqueline Green Rollover Account and Wayne D. Green Rollover Account); *Sec. Investor Prot. Corp. v. I.B.E.W. Local 241 Pension Fund*, No. 12-cv-01139-DLC (S.D.N.Y. Aug. 6, 2012) (filed on behalf of thirty-seven ERISA plan claimants). On February 28, 2012 and March 1, 2012, these motions were accepted as related to the appeals decided by Judge Cote in *Aozora Bank*, 480 B.R. 117 (S.D.N.Y. 2012), discussed above, and were re-assigned to Her Honor. Judge Cote withdrew the reference on April 20, 2012. *Jacqueline Green Rollover Account*, No. 12-cv-01039-DLC (S.D.N.Y.), ECF No. 7.

55.    On July 25, 2012, the District Court granted the Trustee's ERISA Motion. *See Id.* (ECF No. 29). The District Court found that the ERISA claimants were not "customers" under SIPA because they did not deposit money with BLMIS for the purchase of securities and did not own the assets of the ERISA plans that were deposited with BLMIS. *Id.* No appeal was taken from this opinion and order.

56.    On June 27, 2013, the Trustee filed the Trustee's Second Motion to Affirm Trustee's Determinations Denying Claims of Claimants Who Invested in Certain Feeder Funds and Did Not Have BLMIS Accounts in Their Names. (ECF Nos. 5396, 5397, 5398, 5399, 5438, 5439, collectively, the "Second Feeder Fund Motion"). On August 21, 2013, the Court issued the Second Feeder Fund Decision. (ECF No. 5450). That decision reaffirmed that "the burden is on the claimant to establish he is a 'customer' entitled to SIPA protection, and such a showing is not easily met." *Id.* at 4 (quoting 454 BR at 294). Also, the Court determined that the claimants "failed to [meet their burden] because they lack any indicia of a 'customer' relationship with BLMIS." In particular, "they had no securities accounts at BLMIS, were not known to BLMIS, lacked privity and any financial relationship with BLMIS, lacked property interest in any feeder

fund account assets at BLMIS, entrusted no cash or securities to BLMIS, had no investment

discretion over feeder fund assets invested with BLMIS, received no account statements or other

communications from BLMIS and had no transactions reflected on the books and records at

BLMIS." *Id*. at p. 4.  The Second Feeder Fund Decision was not appealed.

57.    On April 30, 2014, the Trustee filed a motion to affirm his determinations

denying claims of claimants who invested in certain ERISA plans.  (ECF Nos. 6489, 6491,

6492).  In an opinion rendered on August 22, 2014, the Court determined that the claimants were

not "customers" of BLMIS within the meaning of SIPA.  (ECF No. 7761).

58.    On December 12, 2014, the Trustee filed his Motion and Memorandum To Affirm

His Determinations Denying Claims of Claimants Holding Interests in S&P or P&S Associates,

General Partnerships (the "S&P Motion").  (ECF No. 8734).  The S&P Motion was filed to

resolve objections to the Trustee's denial of 158 claims that were filed by parties who were either

partners in, or investors in those partners in, P&S or S&P Associates.[7]  The Trustee allowed the

claims of S&P and P&S to the extent of their respective net equity, because each held a BLMIS

account in its name.  S&P and P&S have been receiving interim distributions on their claims.

59.    The P&S/S&P Claimants objected to the Trustee's S&P Motion on January 26,

2015 (ECF No. 9185).  They argued that SIPA should be construed broadly to include the S&P

and P&S partners/investors.  *Id.* at 3-4.  The Claimants also argued that under Florida partnership

law, "a partner is an owner of the partnership. . . . [and] a partner owns a specific interest in all

partnership assets."  *Id.* at 6.

60.    On February 25, 2015, the Bankruptcy Court issued an oral ruling granting the

Trustee's S&P Motion.  *See* Hr'g Tr. 27:19 – 35:25 (ECF No. 9506).  The Court explained that

---

[7] *See* S&P Motion at 2, n. 3 (citing Declaration of Vineet Sehgal, ECF No. 8734), identifying and describing the objections to the Trustee's determinations of claims at issue in the S&P / P&S Proceeding).

"the objecting partners have failed to sustain their burden of proof" because "[t]hey did not entrust any cash or securities with BLMIS." Rather, "[t]hey invested with partnerships who, in turn, invested with BLMIS." As a result, "even if BLMIS knew or surmised that the partnerships' BLMIS accounts were funded with partners' contributions, there is no evidence that BLMIS maintained records identifying the partners or even knew who they were, and the fact remains that the partners did not entrust anything to BLMIS . . . ." *Id.* at 30:16-31:6. On March 10, 2015 the Bankruptcy Court entered an Order approving the Trustee's Motion to Affirm His Determinations Denying Claims of Claimants Holding Interests in S & P or P & S Associates, General Partnerships. (ECF No. 9450). No appeal was taken from the order.

61.    Since the S&P Decision, the Trustee has filed eight similar motions to affirm his customer claim determinations with respect to indirect investors, seven of which have been granted by this Court. *See* Order Approving Trustee's Motion To Affirm His Determinations Denying Claims of Claimants Holding Interests In Peerstate Equity Fund, L.P. (ECF No. 9883) (Apr. 27, 2015); Order Approving Trustee's Motion And To Affirm His Determinations Denying Claims Of Claimants Holding Interests In The Lazarus-Schy Family Partnership, The Schy Family Partnership, Or The Lazarus Investment Group, (ECF No. 10010) (May 18, 2015); Order Approving Trustee's Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests In Epic Ventures, LLC (ECF No. 10267) (June 25, 2015); Order Approving Trustee's Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests in Partners Investment Co., Northeast Investment Club, And Martin R. Harnick & Steven P. Norton, Partners (ECF No. 10894) (July 29, 2015); Order Approving Trustee's Motion To Affirm His Determinations Denying Claims Of Claimants Holding Interests In The Whitman Partnership, The Lucky Company, The Petito Investment Group, And The Harwood Family

Partnership (ECF No. 11145) (August 26, 2015); Order Approving Trustee's Motion To Affirm

His Determinations Denying Claims Of Claimants Holding Interests In 1973 Masters Vacation

Fund, Bull Market Fund, And Strattham Partners (ECF No. 11920) (Oct. 29, 2015); Order

Approving Trustee's Motion To Affirm His Determinations Denying Claims Of Claimants

Holding Interests In Black River Associates LP, MOT Family Investors, LP, Rothschild Family

Partnership, and Ostrin Family Partnership (ECF No. 12757) (Mar. 3, 2016).  The eighth motion

for an Order Approving Trustee's Motion to Affirm His Determinations Denying Claims of

Claimants Holding Interests In The Article Third Trust, Palmer Family Trust, Maggie Faustin,

Estate of Theodore Schwartz, And Miller Trust Partnership was filed on March 21, 2016 with a

hearing date of April 27, 2016. (ECF No. 12947).  No timely objections were received.

62.    Only two claimants since the P&S/S&P Claimants have objected to the Trustee's

motion to affirm his treatment of their claim.  On September 29, 2015, George G. and Linda G.

Pallis filed a timely objection to the Trustee's Motion to Affirm His Determinations Denying

Claims Of Claimants Holding Interests In 1973 Masters Vacation Fund, Bull Market Fund, And

Strattham Partners. (ECF No. 11920).

63.    The Pallises relied upon three checks made payable to Bernard L. Madoff for

investment in the 1973 Masters Vacation Fund BLMIS account as evidence of their customer

status.  This Court found that despite the existence of those checks, the Pallises were situated no

differently than any of the other indirect claimants because despite being made payable to

Madoff, they were sent to the "agent of the fund" and were ultimately credited to the fund's

BLMIS account.  *See* Transcript of Hearing regarding Trustee's Motion and Memorandum to

Affirm His Determinations Denying Claims of Claimants' Holding Interests in 1973 Masters

Vacation Fund, Bull Market Fund, and Strattham Partners, 12:18-25 (Oct. 28, 2015).  This Court

overruled the Pallises' objection and granted the Trustee's Motion because the evidence showed that the Pallises "didn't have an account with . . . BLMIS, had no connection, received no correspondence or direct communications" from BLMIS and thus "fail[ed] to demonstrate that they were customers" of BLMIS.  *Id.* at 13:1-8.

## D.    **Fact-Based Objections**

64.    During the period covered by the Trustee's Fifteenth Interim Report, counsel for the Trustee has been investigating and analyzing objections of claimants to the Trustee's determination of their claims.  During this extensive review of the facts unique to each claimant, the Trustee has identified circumstances that may require resolution by the Bankruptcy Court. As the Trustee works through these issues with the claimants, individual disputes will be scheduled for hearing and resolution by the Bankruptcy Court in due course.

## E.    **Inter-Account Transfers**

65.    The Trustee has maintained, and the Second Circuit affirmed, that the "cash-in, cash-out" methodology is appropriate for calculating a customer's net equity in this case.  The *Net Equity Decision*, however, did not expressly address the treatment of transfers between BLMIS accounts, which the Trustee refers to as "Inter-Account Transfers."  Many customers maintained more than one BLMIS account, and transferred funds between such accounts.  Other customers transferred funds to the accounts of other BLMIS customers.

66.    On March 27, 2014, the Bankruptcy Court entered an order setting a schedule to file briefs and argue the merits of the Trustee's Motion For An Order To Affirm the Trustee's Determination of Customer Claims Regarding Transfers between BLMIS Accounts (the "IAT Motion").  *See* ECF No. 6049.  On March 31, 2014, the Trustee filed the IAT Motion, which explained that, for Inter-Account Transfers, in which no new funds entered BLMIS, the Trustee reduced the balance of the transferor account to the extent actual principal was available, and

then credited the transferee account in the corresponding amount of actual principal transferred. (ECF No. 6084). If the transferor account did not have any principal available at the time of the transfer, then $0 was credited to the transferee account. *Id.* at 3. SIPC filed a brief in support of the Trustee's motion on March 31, 2014. (ECF No. 6079).

67.     Fifteen objections were filed in response to the IAT Motion. These objecting parties argued that the inter-account method violates the statute of limitations for pursuing fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code; generates arbitrary results; improperly combines accounts and violates federal securities laws; violates public policy; and violates ERISA. They also argued that the Bankruptcy Court lacks constitutional authority to render final judgments and that a transferee's net equity claim should not be affected by withdrawals made by other beneficiaries in a shared account.

68.     On December 8, 2014, the Bankruptcy Court entered its Memorandum Decision Affirming Application of the Trustee's Inter-Account Method to the Determination of Transfers Between BLMIS Accounts. ECF No. 8680; *see Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 522 B.R. 41 (Bankr. S.D.N.Y. 2014). The Bankruptcy Court affirmed the Trustee's method for calculating a customer's net equity when inter-account transfers were made to or from that account. Judge Bernstein explained that if he adopted the objecting parties' arguments, "computing the balance in the transferor's account bloated by fictitious profits increases the transferee's claim to the customer property pool allocable to all Madoff victims by artificially increasing the transferee's net equity. This result aggravates the injury to those net losers who did not receive transfers of fictitious profits by diminishing the amount available for distribution from the limited pool of customer property." *Id.* at 53. The

order memorializing Judge Bernstein's written decision was entered on December 22, 2014. (ECF No. 8857).

69.     Five notices of appeal were filed by: (i) Diana Melton Trust, Dated 12/05/05 (ECF No. 8843); (ii) Edward Zraick Jr., Nancy Zraick, Patricia DeLuca and Karen M. Rich (ECF No. 8911); (iii) Michael Most (ECF No. 8913); (iv) claimants represented by Becker & Poliakoff (ECF No. 8916); and (v) Elliot G. Sagor (ECF No. 8917).    These appeals are currently pending in the District Court before Judge Paul A. Engelmayer.  (Case Nos. 15-cv-1151; 15-cv-1195; 15-cv-1223; 15-cv-1236; 15-cv-1263).    The appellants filed two briefs on April 27, 2015.    The Trustee's opposition was filed on May 27, 2015.  An amicus brief was filed on May 4, 2015, and replies were filed on June 25, 2015.  On September 17, 2015, oral argument was held before Judge Engelmayer.

70.     On January 14, 2016, Judge Engelmayer issued his opinion and order affirming this Court's Order approving the use of the Inter-Account Transfer Method.  Judge Engelmayer held that the Inter-Account Transfer Method "properly applies the Second Circuit's *Net Equity Decision* and is not otherwise prohibited by law;" in fact, he found that "the method is superior as a matter of law, and not 'clearly inferior,'" to the alternatives proposed by the appellants.  *In re BLMIS*, 15 Civ. 1151(PAE), 2016 WL 183492 *1, at *26 (S.D.N.Y. Jan. 14, 2016) (citing *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 238 n.7).

71.     On February 11 and 12, 2016, three appeals were taken from Judge Engelmayer's order to the Second Circuit by (i) Elliot G. Sagor (Docket 16-413, ECF No. 1); (ii) Edward A. Zraick, Jr., Nancy Zraick, Patricia DeLuca, and Karen M. Rich (Docket 16-420, ECF No. 1); and (iii) claimants represented by Chaitman LLP (Docket 16-423, ECF No. 1).    The Trustee subsequently moved to consolidate the three appeals and set a common briefing schedule on

March 18, 2016; that motion was granted on March 23, 2016. *See Sagor v. Picard*, 16-413, ECF No. 34; *Zraick et al. v. Picard*, 16-420, ECF No. 34; *Blecker et al. v. Picard*, 16-423, ECF No. 39. Appellants' opening briefs are due on May 23, 2016, the Trustee's and SIPC's briefs are due on August 22, 2016, and the appellants' reply briefs are due on September 30, 2016.

F.    **Profit-Withdrawal Issue**

72.    In a declaration related to the Inter-Account Transfer matter, one customer raised an issue with respect to certain withdrawals that were reflected on his BLMIS customer account statements. *See* Declaration of Aaron Blecker, In Opposition to the Trustee's Motion to Affirm The Application of The Net Investment Method to the Determination of Customer Transfers Between BLMIS Accounts (ECF No. 6761). Several other customers objected to the Trustee's denial of their net equity claims for similar reasons. These customers dispute whether they actually received funds that appear to be identified on BLMIS customer account statements as "PW", or "Profit Withdrawals."

73.    Upon further review and analysis, the Trustee discovered that several hundred accounts contained "PW" Transactions. In light of the number of potentially impacted accounts, the Trustee sought to institute an omnibus proceeding to resolve the question of whether the Trustee's treatment of "PW" transactions as cash withdrawals for the purposes of a customer's net equity calculation is proper. *See* Motion for Order Establishing Schedule For Limited Discovery & Briefing On Profit Withdrawal Issue (ECF No. 9357). Following discussions with various counsel, the Trustee withdrew his Motion and filed an Amended Motion for Order Establishing Schedule for Limited Discovery and Briefing on Profit Withdrawal Issue (ECF No. 10017) ("Profit Withdrawal Scheduling Order"). The Court granted the Amended Motion on June 25, 2015 (ECF No. 10266).

74.    On July 14, 2015, the Trustee filed his motion and memorandum of law on the Profit Withdrawal Issue, along with the supporting declarations.  (ECF Nos. 10660-10664).  The Trustee and Participating Claimants exchanged written discovery in accordance with the Profit Withdrawal Scheduling Order, including service of supplemental expert reports.

75.    On December 28, 2015, counsel for Aaron Blecker filed a Motion for an Order Compelling the Trustee to Allow Aaron Blecker's SIPC Claim ("Motion to Compel") despite his involvement in the Profit Withdrawal litigation. (ECF No. 12319).  The Trustee opposed the Motion to Compel on the grounds that Mr. Blecker's claims were at the center of both the Profit Withdrawal litigation and the Inter-Account Transfer appeal before the District Court.  (ECF No. 12432, Jan. 13, 2016).  Mr. Blecker filed his reply on February 10, 2016, ECF No. 12628, and a hearing was held before this Court on February 24, 2016 at which time Mr. Blecker's Motion to Compel was denied.  This Court denied the motion because (1) Mr. Blecker agreed to participate in the omnibus Profit Withdrawal Litigation proceedings and he could not now litigate around those procedures; (2) any decision on the issues raised in his Motion to Compel would impact the omnibus profit withdrawal litigation; and (3) issues of facts remain that would only be resolved through an evidentiary hearing.  *See* Hearing Transcript Regarding Motion to Allow Customer Claim of Aaron Blecker, 28:22 -30:4 (Feb. 24, 2016).

76.    During the February 24, 2016 hearing, this Court also granted counsel for Mr. Blecker leave to file a Motion for an Order Authorizing the Deposition of Bernard L. Madoff ("Motion to Depose Madoff") and raised the possibility that the Trustee may also want to depose former BLMIS employees with knowledge of the Profit Withdrawal Transactions.  As a result, on March 9, 2016, counsel for Mr. Blecker filed the Motion to Depose Madoff.  (ECF Nos. 12799, 12800).  The Trustee opposed the Motion to Depose Madoff on the grounds that his

26

testimony would be unreliable and that counsel for the customers was likely to use the deposition as an opportunity to seek information related to other pending litigation. The Trustee requested that the motion be denied or in the alternative, that all questions be limited to the Profit Withdrawal Issue.[8] (ECF No. 12892). A hearing was held on the Motion to Depose Madoff on March 23, 2016, and this Court granted the Motion to Depose Madoff with the requested limitations including that the deposition transcript remain sealed pending review by all interested parties and redaction if necessary. Transcript of Hearing Regarding Motion to take Deposition of Bernard L. Madoff, 85:14-22 (Mar. 23, 2016); *see also* Order Authorizing the Deposition of Bernard L. Madoff With Certain Limitations, ECF No. 13060.

77.    To allow time for the depositions of Mr. Madoff and former BLMIS employees before the end of discovery, the Trustee filed a Motion for an Order Amending Schedule of Litigation of Profit Withdrawal Issue on March 14, 2016. Through that motion, the Trustee requested a 90-day extension of all remaining deadlines, including the close of discovery. (ECF No. 12865). Arguments were heard by this Court on April 5, 2016, at which time the Motion to Amend the Scheduling Order was approved. *See* Hearing Transcript Regarding Trustee's Motion to Extend Discovery Deadline in Profit Withdrawal Proceeding, 14:25-15:1 (Apr. 5, 2016).

---

[8] The Trustee was joined by the Capital Growth Company, Decisions Incorporated, Favorite Funds, JA Primary Limited Partnership, JA Special Limited Partnership, JAB Partnership, JEMW Partnership, JF Partnership, JFM Investment Companies, JLN Partnership, JMP Limited Partnership, Jeffry M. Picower Special Company, Jeffry M. Picower, P.C., The Picower Foundation, The Picower Institute of Medical Research, The Trust f/b/o Gabrielle H. Picower, Barbara Picower, individually, and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for the Trust f/b/o Gabrielle H. Picower (the "Picower Parties") in opposing the Motion for an Order Authorizing the Deposition of Bernard L. Madoff on the grounds that Ms. Chaitman planned to use the deposition to question Mr. Madoff on information related to the late Jeffry Picower. *See* ECF No. 12893.

## VII.    RECOVERIES AND CONTINGENCIES

### A.    Recoveries Accomplished During Prior Report Periods

78.    In the Sixth through Fourteenth Interim Reports, the Trustee reviewed the significant settlements entered into during those periods and prior report periods.  Prior to this Report Period, the Trustee had recovered or reached agreements to recover approximately $10.9 billion for the benefit of BLMIS customers.  *See* Trustee's Sixth Interim Report ¶¶ 52–63 (ECF No. 4529); Trustee's Seventh Interim Report ¶¶ 56–62 (ECF No. 4793); Trustee's Eighth Interim Report ¶¶ 57–61 (ECF No. 5066); Trustee's Ninth Interim Report ¶¶ 59 – 61 (ECF No. 5351); Trustee's Tenth Interim Report ¶¶ 61-62 (ECF No. 5554); Trustee's Eleventh Interim Report ¶¶ 61-62 (ECF No. 6466); Trustee's Twelfth Interim Report ¶¶ 63-64 (ECF No. 8276); Trustee's Thirteenth Interim Report ¶¶ 72-76 (ECF No. 9895) and Trustee's Fourteenth Interim Report ¶¶ 73-76 (ECF No. 11912).

### B.    Recoveries Accomplished During This Report Period

79.    During the Report Period, the Trustee settled 109 cases.  Additionally, the Trustee received settlement recoveries of $228,686,025.16, bringing the amount the Trustee has successfully recovered to over $11.1 billion.

80.    On January 16, 2016, this Court approved a settlement between the Trustee and Vizcaya Partners Limited, Bank J. Safra Sarasin (Gibraltar) Ltd., Bank J. Safra (Gibraltar) Ltd., Asphalia Fund, Ltd., Zeus Partners Limited, Banque J. Safra Sarasin (Suisse) SA, Banque Jacob Safra (Suisse) SA, and Pictet et Cie. *Picard v. Vizcaya Partners Limited, et al.,* Adv. Pro. No. 09-01154. *Picard v. Banque J. Safra (Suisse) SA,* Adv. Pro. No. 11-01725. *Picard v. Pictet et Cie,* Adv. Pro. No. 11-01724. Under the settlement, $24,950,000 was paid to the Trustee from funds Zeus Partners had deposited with the Clerk of this Court.

C.    **Earlier Settlements**

81.    In the Twelfth Interim Report, the Trustee reported on the Fairfield, JPMorgan Chase and Tremont settlements.  *See* Trustee's Twelfth Interim Report ¶¶ 173-182, 202-214, 311-319 (ECF No. 8276). In the Thirteenth Interim Report, the Trustee reported on the Blumenfeld, Herald Fund, Senator Fund and Herald (Lux) SICAV settlements.  *See* Trustee's Thirteenth Interim Report ¶¶ 73-76 (ECF No. 9895).   In the Fourteenth Interim Report, the Trustee reported on the Gabriel Capital, Plaza Investments and Defender settlements.  *See* Trustee's Fourteenth Interim Report ¶¶ 74-76 (ECF No. 11912)

82.    Through the end of the Report Period, the Trustee recovered $536,052,384.27 as a result of other settlements that were made pursuant to agreements subject to the Net Equity Dispute.

## VIII.   THE TRUSTEE'S ALLOCATION OF FUNDS AND DISTRIBUTIONS TO CUSTOMERS

A.    **The Customer Fund**

83.    In order to protect customers of an insolvent broker-dealer such as BLMIS, Congress established a statutory framework pursuant to which customers of a debtor in a SIPA liquidation are entitled to preferential treatment in the distribution of assets from the debtor's estate.  The mechanism by which customers receive preferred treatment is through the creation of a Customer Fund, as defined in SIPA § 78*lll*(4), which is distinct from a debtor's general estate.  Customers holding allowable claims are entitled to share in the Customer Fund based on each customer's net equity as of the filing date, to the exclusion of general creditors.  SIPA § 78fff-2(c).

84.    In order to make interim distributions from the Customer Fund, the Trustee must determine or be able to sufficiently estimate: (a) the total value of customer property available

for distribution (including reserves for disputed recoveries), and (b) the total net equity of all allowed claims (including reserves for disputed claims). Each element of the equation—the customer property numerator and the net equity claims denominator—is inherently complex in a liquidation of this magnitude.

85. There are many unresolved issues in this liquidation proceeding that require the maintenance of substantial reserves. Nonetheless, the liquidation proceeding progressed to a stage at which it was possible for the Trustee, on an interim basis, to determine: (a) the allocation of property to the Customer Fund, or the "numerator" (taking reserves into account), (b) the amount of allowable net equity claims, or the "denominator" (also taking reserves into account), and (c) the calculation of each customer's minimum ratable share of the Customer Fund

**B.    The Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing the First Interim Distribution to Customers**

86. On May 4, 2011, the Trustee moved for an initial allocation and pro rata interim distribution of the Customer Fund to customers whose claims had not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "First Allocation" and "First Interim Distribution"). (ECF No. 4048). This motion was unopposed, and the Court entered the Order Approving the Trustee's Initial Allocation of Property to the Fund of Customer Property and Authorizing An Interim Distribution to Customers on July 12, 2011. (ECF No. 4217).

87. On October 5, 2011, the Trustee distributed $311.854 million, or 4.602% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied. Subsequent to October 5, 2011, an additional $373.426 million was distributed as catch-up payments, bringing the total First Interim Distribution amount to $685.279 million through the end of the Report Period. The First Interim Distribution was made to 1,352 BLMIS accounts, of which 39

payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

88.     The First Allocation and First Interim Distribution were initial and interim in nature because the Trustee anticipated recovering additional assets through litigation and settlements, and resolving the issues on appeal that require reserves.

**C.     The Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing the Second Interim Distribution to Customers**

89.     During the year after the Trustee made the First Interim Distribution, the Trustee recovered significant additional assets through litigation and settlements, as well as the resolution of issues on appeal that required reserves.

90.     In particular, the Supreme Court resolved the Net Equity Dispute on June 25, 2012, and the Trustee received the Picower settlement funds after the final order of forfeiture became final and non-appealable on July 16, 2012.

91.     Thus, the Trustee was prepared to make a second significant distribution to BLMIS customers in an amount as great as $3.019 billion, or 41.826% of each customer's allowed claim, unless the claim had been fully satisfied.  However, in order to maintain adequate reserves for the Time-Based Damages Issue, the Trustee was unable to distribute the entire $3.019 billion.

92.     On July 26, 2012, the Trustee filed a motion seeking entry of an order approving the second allocation of property to the Customer Fund and authorizing the second interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Second Allocation" and "Second Interim Distribution").  (ECF No. 4930).

93.    In connection with the Second Interim Distribution, the Trustee proposed holding in reserve an amount sufficient for the Trustee to pay Time-Based Damages assuming an interest rate of three percent (the "3% Reserve") or, in the alternative, nine percent (the "9% Reserve"). Four objections were made to the Trustee's motion, seeking the imposition of the 9% Reserve. (ECF Nos. 4965, 4966, 4971, 4976).

94.    On August 22, 2012, this Court held a hearing and entered an Order Approving the Trustee's Second Allocation of Property to the Fund of Customer Property and Authorizing a Second Interim Distribution to Customers, with a 3% Reserve.  (ECF No. 4997).

95.    Thus, on September 19, 2012, the Trustee distributed $2.479 billion, or 33.556% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to September 19, 2012, an additional $2.499 billion was distributed as catch-up payments, bringing the total Second Interim Distribution amount to $4.978 billion through the end of the Report Period.  The Second Interim Distribution was made to 1,338 BLMIS accounts, of which 39 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

**D.     The Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing the Third Interim Distribution to Customers**

96.    During the months after the Second Interim Distribution, the Trustee recovered significant additional assets thorough litigation and settlements, particularly the Tremont settlement.  See discussion *infra* Section IX(B)(iii)(n).

97.    On February 13, 2013, the Trustee filed a motion seeking entry of an order approving the third allocation of property to the Customer Fund and authorizing the third interim distribution to customers whose claims have not been fully satisfied because their net equity

claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000
(respectively, the "Third Allocation" and "Third Interim Distribution").  (ECF No. 5230).

98.     In connection with the Third Interim Distribution, the Trustee proposed holding
reserves in connection with the Levy settlement appeal, the Internal Revenue Service (the "IRS")
settlement and net loser accounts currently in litigation.  *Id.*

99.     On March 13, 2013, this Court held a hearing and entered an Order Approving the
Trustee's Third Allocation of Property to the Fund of Customer Property and Authorizing a
Third Interim Distribution to Customers.  (ECF No. 5271).

100.     Thus, on March 29, 2013, the Trustee distributed $506.227 million, or 4.721% of
each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to
March 29, 2013, an additional $190.05 million was distributed as catch-up payments, bringing
the total Third Interim Distribution amount to $696.277 million through the end of the Report
Period.  The Third Interim Distribution was made to 1,149 BLMIS accounts, of which 26
payments went to claimants who qualified for hardship status under the Trustee's Hardship
Program whose claims had not been fully satisfied previously.

**E.     The Trustee's Fourth Allocation of Property to the Fund of Customer Property and
Authorizing the Fourth Interim Distribution to Customers**

101.     During the year after the Trustee made the Third Interim Distribution, the Trustee
recovered significant additional assets through litigation and settlements, particularly the
JPMorgan settlement.

102.     On March 25, 2014, the Trustee filed a motion seeking entry of an order
approving the fourth allocation of property to the Customer Fund and authorizing the fourth
interim distribution to customers whose claims have not been fully satisfied because their net

equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Fourth Allocation" and "Fourth Interim Distribution").  (ECF No. 6024).

103.    In connection with the Fourth Interim Distribution, the Trustee proposed holding reserves in connection with non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements.  *Id.*

104.    On April 18, 2014, this Court entered an Order Approving the Trustee's Fourth Allocation of Property to the Fund of Customer Property and Authorizing a Fourth Interim Distribution to Customers.  (ECF No. 6340).

105.    Thus, on May 5, 2014, the Trustee distributed $351.632 million, or 3.180% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Subsequent to May 5, 2014, an additional $116.591 million was distributed as catch-up payments, bringing the total Fourth Interim Distribution amount to $468.223 million through the end of the Report Period.  The Fourth Interim Distribution was made to 1,117 BLMIS accounts, of which 25 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

F.    **The Trustee's Fifth Allocation of Property to the Fund of Customer Property and Authorizing the Fifth Interim Distribution to Customers**

106.    During the months after the Trustee made the Fourth Interim Distribution, the Trustee recovered significant additional assets through litigation and settlements, particularly with the Blumenfeld defendants (*Picard v. Edward Blumenfeld, et al.,* Adv. Pro. No. 10-04730 (Bankr. S.D.N.Y.) (SMB) (ECF No. 45)), Herald Fund SPC and Primeo Fund (*Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 349)), and Senator Fund SPC (*Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y.) (SMB) (ECF No. 350)).

34

107.   On December 22, 2014, the Trustee filed a motion seeking entry of an order approving the fifth allocation of property to the Customer Fund and authorizing the fifth interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Fifth Allocation" and "Fifth Interim Distribution").  (ECF No. 8860).

108.   In connection with the Fifth Interim Distribution, the Trustee proposed holding reserves in connection with non-preference related settlement payments for accounts with net equity clauses, as well as certain other settlements.  *Id.*

109.   On January 15, 2015, this Court entered an Order Approving the Trustee's Fifth Allocation of Property to the Fund of Customer Property and Authorizing a Fifth Interim Distribution to Customers.  (ECF No. 9014).

110.   On February 6, 2015, the Trustee distributed $355.761 million, or 2.743% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Upon completion of the Fifth Interim Distribution, approximately 52% of the allowed customer claims were satisfied.  Subsequent to February 6, 2015, an additional $47.647 million was distributed as catch-up payments, bringing the total Fifth Interim Distribution amount to $403.409 million through the end of the Report Period.  The Fifth Interim Distribution was made to 1,096 BLMIS accounts, of which 23 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

**G.**   **The Trustee's Sixth Allocation of Property to the Fund of Customer Property and Authorizing the Sixth Interim Distribution to Customers**

111.   In its order approving the Second Allocation Motion (ECF No. 4997), the Court required the Trustee to maintain the 3% Reserve for the Time-Based Damages Dispute.  Under the terms of Judge Lifland's order requiring the 3% Reserve, the Trustee set a Time-Based

Damages reserve and allocated such reserve to the Customer Fund as part of the total amount allocated to the Customer Fund in the Second through Fifth Allocations and Interim Distributions.

112.    On April 15, 2015, the Trustee filed a motion seeking entry of an order approving the sixth allocation of property to the Customer Fund and authorizing the sixth interim distribution to customers whose claims have not been fully satisfied because their net equity claims as of the Filing Date exceeded the statutory SIPA protection limit of $500,000 (respectively, the "Sixth Allocation" and "Sixth Interim Distribution").  (ECF No. 9807).  In the Sixth Allocation and Sixth Interim Distribution Motion, the Trustee sought approval to release the bulk of the Time-Based Damages reserve and distribute such funds under the terms set forth therein.  These funds became available for distribution following the decision of the Second Circuit on the "time-based damages" issue.  *In Re Bernard L. Madoff Inv. Sec. LLC,* 779 F.3d 74 (2d Cir. Feb. 20, 2015) (the "Time-Based Damages Decision").

113.    The Trustee could not distribute these funds until the time limit to file a petition for certiorari with the Supreme Court expired with no petition being filed or a final, non-appealable order was entered on the Time-Based Damages Decision.

114.    At the time the Trustee filed the Sixth Allocation Motion, no petitions for certiorari had been filed on the Time-Based Damages Decision.  The time period to file a petition for certiorari was due to expire on May 21, 2015.  The hearing date on the Sixth Allocation Motion was set for May 29, 2015, which would permit the hearing to go forward if no petitions for certiorari were filed by that date.  The Trustee indicated in the Sixth Allocation Motion that the hearing may not be able to go forward if a petition for certiorari was filed.

115.    A group of claimants represented by Helen Davis Chaitman, Esq. moved for an extension of time within which to file a petition for certiorari with the Supreme Court.  The Supreme Court granted that request on April 28, 2015, extending the time to file a petition for certiorari to July 20, 2015.  *Marsha Peshkin v. Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,* No. 14A1099 (2015).

116.    Following the extension of time to file the petition for a writ of certiorari, the Trustee filed a notice of adjournment of the hearing on the Sixth Allocation Motion, adjourning the hearing from May 28, 2015 to July 29, 2015.  The purpose of the adjournment was to allow the extended time period within which to file a petition for certiorari to expire.  If no petition was filed, the Trustee would seek the Court's approval to allocate and distribute funds from the fund of customer property, as outlined in the Trustee's Sixth Allocation Motion.

117.    On July 20, 2015, the group of claimants represented by Helen Davis Chaitman filed a petition for a writ of certiorari with the Supreme Court.  Accordingly, the hearing on the Trustee's Sixth Allocation Motion was adjourned *sine die*, pending the determination of the petition for a writ of certiorari by the Supreme Court.

118.    On October 5, 2015, the Supreme Court denied the petition for certiorari, paving the way for the Trustee to request authorization from the Court to make a sixth distribution to customers of more than $1.18 billion—up to 8.186% of each customer's allowed claim amount. On October 20, 2015, the Trustee filed a Notice of Hearing and Supplemental Filing in Further Support of the Trustee's Motion for an Order Approving Sixth Allocation of Property to the Fund of Customer Property and Authorizing Sixth Interim Distribution to Customers (ECF No. 11834) and an Affidavit of Vineet Sehgal in support.  (ECF No. 11835).  On November 18, 2015, this Court entered an Order Approving the Trustee's Sixth Allocation of Property to the

Fund of Customer Property and Authorizing a Sixth Interim Distribution to Customers.  (ECF No. 12066).

119.    On December 4, 2015, the Trustee distributed $1.193 billion, or 8.262% of each BLMIS customer's allowed claim, unless the claim had been fully satisfied.  Upon completion of the Sixth Interim Distribution, approximately 56% of the allowed customer claims were satisfied.  Subsequent to December 4, 2015, an additional $15.477 million was distributed as catch-up payments, bringing the total Sixth Interim Distribution amount to $1.209 billion through the end of the Report Period.  The Sixth Interim Distribution was made to 1,075 BLMIS accounts, of which 20 payments went to claimants who qualified for hardship status under the Trustee's Hardship Program whose claims had not been fully satisfied previously.

## H.    **The General Estate**

120.    If the Trustee is able to fully satisfy the net equity claims of the BLMIS customers, any funds remaining will be allocated to the general estate and distributed in the order of priority established in Bankruptcy Code § 726 and SIPA § 78fff(e).

121.    All BLMIS customers who filed claims—whether their net equity customer claims were allowed or denied—are deemed to be general creditors of the BLMIS estate.  The Trustee is working diligently on behalf of all creditors and will seek to satisfy all creditor claims.

## IX.    LITIGATION

122.    Other major developments have occurred during the Report Period in the Trustee's avoidance actions and bank/feeder fund litigations.  This Report does not discuss each of them in detail but instead summarizes those matters with the most activity during the Report Period.

A.    **The District Court—Motions to Withdraw the Reference, Motions to Dismiss and Related Appeals**

123.    Upon the motions of hundreds of defendants, the District Court withdrew the reference in numerous cases and heard numerous motions to dismiss. A total of 485 motions to withdraw and 424 joinders were filed, altogether implicating a total of 807 adversary proceedings. The District Court returned all proceedings to the Bankruptcy Court.

i.    **Proceedings Relating to Motions to Withdraw**

(a)    **The Administrative Order**

124.    On March 5, 2012, this Court entered the Administrative Order which stated: "[i]n the interest of administrative efficiency, this Court has been informed by Judge Rakoff, and hereby notifies all parties to the Adversary Proceedings, that the District Court will automatically regard untimely any motion to withdraw . . . if such motion is not filed on or before April 2, 2012." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. No. 08-01789 (ECF No. 4707).

125.    On July 10, 2014, the District Court issued an order directing counsel to parties with individual issues not addressed by the Court's decisions in the consolidated withdrawals to inform the Court by letter by July 18, 2014. *See In re Madoff Sec.*, No. 12 MC 00115 (JSR) (S.D.N.Y. July 10, 2014), ECF No. 552. The District Court received several such letters and addressed the issues they raised in separate orders. On August 4, 2014, the District Court deemed any remaining motions to withdraw the reference to be denied, referred all the adversary proceedings to be returned to the Bankruptcy Court, and directed the closure of all civil cases seeking to withdraw the reference related to the Madoff matter. *See In re Madoff Sec.*, No. 12 MC 00115 (JSR) (S.D.N.Y. Aug. 4, 2014), ECF No. 557.

(b)    **Consolidated Briefing Orders**

126.    In April 2012, the District Court instituted a protocol for then-pending motions to

withdraw, which consolidated briefing on common issues raised in the motions to withdraw (the

"Common Briefing").  The common issues included:

- whether the Supreme Court's decision in *Stern v. Marshall* (the "Stern Issue") precluded the Bankruptcy Court from entering final judgment on the Trustee's claims and therefore mandated withdrawal of the reference to Bankruptcy Court. 131 S. Ct. 2594 (2011); *see* Order, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 0115 (JSR) (S.D.N.Y. Apr. 13, 2012), ECF No. 4;

- whether the Trustee's claims against certain defendants should be dismissed in light of the defendants' affirmative defense of antecedent debt (the "Antecedent Debt Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 107;

- whether standing issues (the "Standing Issue") bar the Trustee's common law claims against certain defendants by virtue of the doctrine of *in pari delicto* and/or the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), as well as whether the Trustee is entitled to accept assignments or assert the "insider exception" to *in pari delicto*.  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 114;

- whether § 546(e) of the Bankruptcy Code precludes the Trustee's claims against certain defendants against whom the Trustee has alleged knew or should have known that Madoff was running a Ponzi scheme (the "Bad Faith § 546(e) Issue"). *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. May 15, 2012), ECF No. 119;

- whether the Trustee is entitled to employ § 502(d) of the Bankruptcy Code against defendants accused of receiving avoidable transfers (the "§ 502(d) Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 1, 2012), ECF No. 155;

- whether the Supreme Court's ruling in *Morrison v. National Australia Bank Ltd.*, as applied to SIPA or the Bankruptcy Code, bars the Trustee's claims against certain defendants (the "Extraterritoriality Issue").  130 S. Ct. 2869 (2010); *see* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 6, 2012), ECF No. 167; and

- whether SIPA or the securities laws alter the standards for determining good faith under either §§ 548(c) or 550(b) of the Bankruptcy Code (the "Good Faith Standard Issue").  *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. June 23, 2012), ECF No. 197.

127.    The Stern Issue was raised by hundreds of defendants.  Judge Rakoff heard oral

argument on June 18, 2012 and issued a decision on January 4, 2013 (the "Stern Opinion and

Order"), ruling that the Bankruptcy Court could not issue a final decision on certain of the Trustee's fraudulent transfer claims. Opinion and Order (ECF No. 427), 460 B.R. 46 (Bankr. S.D.N.Y. 2013). The Stern Opinion and Order indicates that the Bankruptcy Court may be able to render rulings where a defendant filed a claim. *Id.* at 19. In the Stern Opinion and Order, Judge Rakoff found that even in those cases where no claim was filed, the Bankruptcy Court could issue a report and recommendation, and referred the Trustee's cases back to the Bankruptcy Court subject to the other pending rulings. *Id.*

128.    The Antecedent Debt Issue was also raised by hundreds of defendants, who filed their motion on June 25, 2012. (ECF No. 196). Oral argument was held by Judge Rakoff on August 25, 2012. Judge Rakoff issued a decision on October 15, 2013 (the "Antecedent Debt Opinion and Order"), ruling that the Trustee's avoidance claims against certain defendants should not be dismissed and stating that "[the] pre-reach-back-period inter-account transfers of amounts exceeding principal in the account of the sender continue to be fictitious profits, not principal, in the account of the recipient, and therefore do not constitute antecedent debt for the recipient of the funds." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115 (JSR), 2013 WL 5651285, at *11 (S.D.N.Y. Oct. 15, 2013).

129.    The Standing Issue was raised by various defendants, who filed two sets of moving papers on August 3, 2012. (ECF Nos. 269, 270, 271). Judge Rakoff heard oral argument on October 15, 2012 and issued a decision on December 5, 2013 (the "Standing Opinion and Order"), finding that the Trustee "has standing to bring claims on behalf of Madoff Securities' customers to the extent, but only to the extent, that the customers validly assigned their claims to the Trustee. However, the Court also finds that the Trustee's pursuit of these assigned claims, to the extent that he brings the claims of more than fifty assignors, constitutes a

covered class action for purposes of SLUSA."  Opinion and Order (ECF No. 509), 987 F.

Supp.2d 309 (S.D.N.Y. 2013).

130.    The Bad Faith § 546(e) Issue was raised by various defendants, who filed two sets

of moving papers on July 27, 2012.  (ECF Nos. 259–261).  Judge Rakoff heard oral argument on

November 26, 2012 and issued a "bottom line" ruling on February 12, 2013, indicating that

under certain circumstances, the Trustee's complaints should not be dismissed at the pleading

stage solely on the basis of defendants' invocation of § 546(e) of the Bankruptcy Code.  (ECF

No. 439).  On April 15, 2013, Judge Rakoff issued a decision (the "Bad Faith § 546(e) Opinion

and Order"), setting forth the basis for his ruling, and indicated that the Trustee's claims are not

precluded under § 546(e) of the Bankruptcy Code in cases where the Trustee "sufficiently alleges

that the transferee from whom [the Trustee] seeks to recover a fraudulent transfer knew of

[BLMIS's] fraud, that transferee cannot claim the protection of Section 546(e)'s safe harbor."

Opinion and Order (ECF No. 460), 491 B.R. 27 (S.D.N.Y. 2013).

131.    Various defendants raised the § 502(d) Issue and joined in moving papers filed on

July 13, 2012.  (ECF Nos. 231–33).  Judge Rakoff heard oral argument on October 9, 2012 and

issued a "bottom line" ruling on February 12, 2013, indicating that the Trustee may invoke

section 502(d) of the Bankruptcy Code.  (ECF No. 439).  Judge Rakoff issued a decision on June

30, 2014 (the " § 502(d) Opinion and Order"), explaining the reasons for that decision and

directing further proceedings related thereto to be returned to the Bankruptcy Court.  Opinion

and Order (ECF No. 549), 513 B.R. 437 (S.D.N.Y. 2014).

132.    The Extraterritoriality Issue was joined by various defendants, who filed moving

papers on July 3, 2012.  (ECF Nos. 234-36).  Judge Rakoff held oral argument on September 21,

2012.  On July 6, 2014, Judge Rakoff issued a decision (the "Extraterritoriality Opinion and

Order") indicating that certain of the Trustee's claims were barred under *Morrison*, and stated

that "section 550(a) does not apply extraterritorially to allow for the recovery of subsequent

transfers received abroad by a foreign transferee from a foreign transferor," and directing further

proceedings related thereto to be returned to the Bankruptcy Court.  Opinion and Order (ECF

No. 551), 513 B.R. 222 (S.D.N.Y. 2014).

133.    The Good Faith Standard Issue was raised by various defendants, who filed two

main sets of moving papers on July 20, 2012.  (ECF Nos. 242, 243).  Judge Rakoff heard oral

argument on October 12, 2012 and issued a decision on April 27, 2014 (the "Good Faith

Standard Opinion and Order"), ruling that "in the context of this litigation and with respect to

both section 548(c) and section 550(b)(1), "good faith" means that the transferee neither had

actual knowledge of the Madoff Securities fraud nor willfully blinded himself to circumstances

indicating a high probability of such fraud."  With respect to the issue of which party bears the

burden of pleading a defendant's good faith or lack thereof, Judge Rakoff further ruled that "a

defendant may succeed on a motion to dismiss by showing that the complaint does not plausibly

allege that that defendant did not act in good faith."  Opinion and Order (ECF No. 524), 516 B.R.

18 (S.D.N.Y. 2014).

134.    Following the entry of the Good Faith Standard Opinion and Order and the

Extraterritoriality Opinion and Order, the Trustee filed an omnibus motion for expedited

discovery related to the good faith issue and for leave to replead regarding the issues of good

faith and extraterritoriality, which affected over 86 adversary proceedings (the "Omnibus

Motion").  (ECF No. 7827).  On September 17, 2014, the Bankruptcy Court held a conference to

discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order

and the Omnibus Motion.  The Bankruptcy Court directed the parties to confer and devise an

43

efficient procedure and briefing schedule. The Omnibus Motion is being held in abeyance pending the Bankruptcy Court's resolution of issues relating to extraterritoriality.

(c) **The 546(e) Appeal**

135. On April 27, 2012 the District Court entered an order dismissing certain claims in 78 adversary proceedings. *See Picard v. Greiff*, Adv. No. 11-03775 (BRL) (Bankr. S.D.N.Y.); *Picard v. Blumenthal*, Adv. No. 11-04293 (BRL) (Bankr. S.D.N.Y.); *Picard v. Goldman*, Adv. No. 11-04959 (BRL) (Bankr. S.D.N.Y.); and *Picard v. Hein*, Adv. No. 11-04936 (BRL) (Bankr. S.D.N.Y.). *See* Order, No. 12 MC 0115 (JSR) (S.D.N.Y. April 30, 2012), ECF No. 57. These claims included preferences under § 547 of the Bankruptcy Code, constructive fraudulent transfers under § 548(a)(l)(B) of the Bankruptcy Code, and actual and constructive fraudulent transfers or fraudulent conveyances under provisions of the New York Debtor & Creditor Law incorporated by § 544(b) of the Bankruptcy Code (the "Dismissed Claims"). The Dismissed Claims did not include those claims proceeding under § 548(a)(l)(A) and § 550(a) of the Bankruptcy Code.

136. On April 30, 2012, the District Court entered an Opinion and Order explaining the reasons for its decision. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715 (S.D.N.Y. 2012). On May 15, 2012, the District Court entered a Supplemental Opinion and Order to make explicit that § 546(e) of the Bankruptcy Code applies to the Trustee's claims for avoidance and recovery of preferential transfers under § 547 of the Bankruptcy Code. *See* Supplemental Opinion and Order, No. 12 MC 0115 (JSR) (ECF No. 101).

137. On June 21, 2012, the Trustee and SIPC each filed notices of appeal in the Second Circuit from these orders.

138.    The Second Circuit held argument on March 5, 2014.  On December 8, 2014, the Second Circuit affirmed the District Court's decision finding that section 546(e) of the Bankruptcy Code bars the Dismissed Claims.

139.    On March 17, 2015, the Trustee and SIPC filed separate petitions for a writ of certiorari with the Supreme Court seeking to reverse the Second Circuit's December 8, 2014 opinion.

140.    On June 22, 2015, the U.S. Supreme Court denied the two petitions for certiorari filed by the Trustee and SIPC.

## B.    Litigation in the Bankruptcy Court and Related Appeals

### (a)    Resolution of Good Faith Avoidance Actions

141.    At the beginning of the Report Period, there were 593 active good faith avoidance actions.  146 were closed during the Report Period, leaving a total of 447 open good faith avoidance actions by the end of the Report Period.  In certain avoidance actions, the Trustee entered into several mediations and considered hardship applications and where appropriate, agreed to dismiss certain defendants from the actions.  During the Report Period, three actions were dismissed pursuant to approved hardship applications and two were dismissed due to findings of no liability.  In addition, the Trustee's professionals engaged in settlement negotiations, which led to 133 cases entering into documented settlements during the Report Period.

### (b)    Picard v. Andrew H. Cohen, Adv. Pro. No. 10-04311

142.    On August 27, 2015, the Trustee and Defendant Andrew H. Cohen in *Picard v. Andrew H. Cohen,* Adv. Pro. No. 10-04311 (SMB) submitted a proposed Revised Joint Pretrial Order which the Bankruptcy Court so ordered the following day.  (ECF No. 55).  Pursuant to the Order, the Court scheduled a trial to be held on October 14, 2015 to determine whether the

Trustee may avoid and recover from Mr. Cohen $1,143,461 (the "Avoidable Transfers") in fraudulent transfers, or the value thereof, pursuant to, *inter alia*, §§ 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and various provisions of SIPA, including § 78fff-2(c)(3).

143.    On October 8, 2015, the Trustee and Mr. Cohen submitted a Second Revised Joint Pretrial Order, which the Court so ordered the same day, and which stated that Trustee had established: (a) all of the required elements, under Section 548(a)(1)(A) of the Bankruptcy Code, to avoid the Avoidable Transfers; and (b) all of the required elements, under Section 550(a) of the Bankruptcy Code, entitling the Trustee to recover the Avoidable Transfers, or the value thereof, from Mr. Cohen.  (ECF No. 60).

144.    On September 24, 2015, the Court was served with a letter from Loeb & Loeb LLP, Baker & McKenzie LLP, Milberg LLP, Dentons US LLP, and Pryor Cashman LLP (the "Intervenor-Customers") on behalf of certain defendants in adversary proceedings, seeking leave under the Litigation Procedures Order (Adv. Pro. No. 08-01789, ECF No. 3141), to move to intervene as defendants in the *Cohen* adversary proceeding ("Request to Intervene") on two legal issues: (1) the scope of the "value defense" under Section 548(c) of the Bankruptcy Code, and (2) the availability, rate and computation of prejudgment interest if a money judgment is entered against a defendant.  (ECF No. 56).  The Trustee submitted a letter dated September 25, 2015 opposing the Request to Intervene.  (ECF No. 57).

145.    On September 30, 2015, a court conference was held and the Court granted the Intervenor-Customers' request for leave to file their motion to intervene. *See* Transcript, Conference Regarding Certain Parties' Request to Intervene at 44:25-45:3, *Picard v. Cohen*, No. 10-04311 (SMB) (Bank. S.D.N.Y. Sept. 30, 2015).  Subsequently, on October 9, 2015, the Intervenor-Customers filed their Memorandum of Law in Support of Intervening in the *Cohen*

matter.  (ECF No. 61).  On October 29, 2015, the Trustee filed his opposition brief (ECF No. 65), and on November 11, 2015, the Intervenor-Customers filed their reply brief.  (ECF No. 69).

146.    On October 14, 2015, the trial was held for the *Cohen* matter before the Court. On that same day, the Court issued its Post-Trial Scheduling Order.  (ECF No. 63).   On November 12, 2015, the Trustee submitted his Proposed Findings of Fact and Conclusions of Law.  (ECF No. 71).  On December 9, 2015, Mr. Cohen submitted his Proposed Findings of Fact and Conclusions of Law.  (ECF No. 74).   On December 30, 2015, the Trustee submitted his response to Mr. Cohen's Proposed Findings of Fact and Conclusions of Law.  (ECF No. 79).  To date, the Court has not issued its adopted Findings of Fact and Conclusions of Law.

147.    Although the Court had not yet ruled on the Motion to Intervene, on December 9, 2015, the Intervenor-Customers filed a "Memorandum of Law (Provisional) of Intervenor-Customers on Value Defense Issues."  (ECF No. 73).  On December 10, 2015, the Trustee filed a letter response to the Court opposing the filing of the Memorandum of Law.  (ECF No. 77).  On that same day, the Intervenor-Customers filed a letter response in support of the Memorandum of Law.  (ECF No. 78).  On April 26, 2016, the Court denied the Motion to Intervene in its entirety. (ECF No. 89).

### (c)    Interlocutory Appeal of The Omnibus Decision

148.    On June 2, 2015, the Court granted in part and denied in part over 200 Motions to Dismiss for reasons set forth in its Memorandum Decision Regarding Omnibus Motions to Dismiss (the "Omnibus Decision").  *See SIPC v. BLMIS,* 531 B.R. 439 (Bankr. S.D.N.Y. 2015).

149.    On July 30, 2015, on behalf of defendants in *Picard v. RAR Entrepreneurial Fund, Ltd., et al*, Adv. Pro. No. 10-04352 (SMB), Helen Davis Chaitman, Esq., ("Chaitman") then of Becker & Poliakoff LLP, and now of Chaitman LLP, filed a notice of motion for leave to

appeal the Omnibus Decision. *See* No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 30, 2015), ECF Nos. 10905, 10906, 10907.

150.    On August 17, 2015, the Trustee filed his memorandum of law in opposition to the motion for leave to appeal the Omnibus Decision. *See* No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 30, 2015), ECF Nos. 11090, 11091.

151.    On February 11, 2016, District Court Judge George B. Daniels denied the motion for leave to appeal the Omnibus Decision. *See* No. 15 Civ. 06564 (GBD), 2016 WL 690834 (S.D.N.Y. Feb. 11, 2016).

### (d)     Interlocutory Appeal of The Trustee's Protective Order

152.    On February 29, 2016, the Trustee sought a protective order prohibiting defendants in three adversary proceedings from pursuing any discovery that implicated the compensation or fees of the Trustee and his counsel. *See e.g., Picard v. Dusek,* Adv. Pro. No. 10-4644 (SMB), ECF No. 44, *Picard v. Carol Nelson,* Adv. Pro. No. 10-04658 (SMB), ECF No. 50, and *Picard v. Carol Nelson, et al.,* Adv. Pro. No. 10-04377 (SMB), ECF No. 48.

153.    On March 17, 2016, the Court entered an order stating that the defendants in the three adversary proceedings were "prohibited from serving or pursuing any discovery that relating to the compensation, fees, or payments that the Trustee receives from his law firm, or any agreements or arrangements relating thereto." *See* Order Implementing Court's March 17, 2016 Bench Ruling Granting Protective Order, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. March 18, 2016), ECF No. 12912.

154.    On March 31, 2016, on behalf of defendants RAR Entrepreneurial Fund, Ltd., Russell Oasis, Carol Nelson, individually and as joint tenant, Stanley Nelson, individually and as joint tenant, and Russell L. Dusek, Chaitman filed a notice of motion for leave to appeal the Order Implementing Court's March 17, 2016 Bench Ruling Granting Protective Order. *See* No.

08-01789 (SMB) (Bankr. S.D.N.Y. March 30, 2016), ECF No. 13010.  On April 14, 2016, after

the close of the Report Period, the Trustee filed his opposition to the motion for leave to appeal

the Order Implementing Court's March 17, 2016 Bench Ruling Granting Protective Order.  *See*

No. 08-01789 (SMB) (Bankr. S.D.N.Y. April 14, 2016), ECF No. 13084.

(e)   <u>**Extraterritoriality**</u>

155.   On July 6, 2014, the District Court issued the Extraterritoriality Opinion and

Order.  *Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 513 B.R. 222 (S.D.N.Y.

2014).  *See* discussion *supra* Section IX(A)(i)(b).

156.   On August 22, 2014, a number of subsequent transferee defendants, as well as

other defendants, requested a conference with this Court to discuss procedures for motions to

dismiss based on the Extraterritoriality Opinion and Order.  (ECF No. 7766).

157.   On August 28, 2014, the Trustee filed the Omnibus Motion for Leave to Replead

Pursuant to Federal Rule of Civil Procedure 15(a) and Court Order Authorizing Limited

Discovery Pursuant to Federal Rule of Civil Procedure 26(d)(1) (the "Omnibus Motion") (ECF

No. 7826).

158.   On September 17, 2014, this Court held a conference to discuss the

extraterritoriality motion to dismiss procedures, which included discussions regarding the

Omnibus Motion.  During the conference, this Court ordered the parties to confer and submit a

report or recommendation prior to the next omnibus hearing scheduled for October 22, 2014.

The parties submitted an order to the Court for procedures governing defendants' motions to

dismiss and the Trustee's motion for expedited discovery.

159.   On November 19, 2014, this Court held a hearing regarding two objections that

were filed in response to the order the parties had submitted to the Court.  Following the hearing,

the parties submitted a modified order, which was entered by this Court on December 18, 2014.

160.    On December 10, 2014, this Court issued the Order Concerning Further Proceedings on Extraterritoriality Motion and Trustee's Omnibus Motion for Leave to Replead and for Limited Discovery (the "ET Scheduling Order").

161.    On December 31, 2014, the defendants filed a supplemental memorandum of law in support of their extraterritoriality motion to dismiss (the "Consolidated Motion to Dismiss"). Beginning on June 25, 2015 through June 29, 2015, the Trustee filed his responses to the defendants' supplemental memorandum of law in support of their extraterritoriality motion to dismiss, as well as addenda in all applicable adversary proceedings.

162.    On September 30, 2015, the defendants filed their supplemental reply memorandum in support of their extraterritoriality motion to dismiss and addenda in most applicable adversary actions.  This Court held a hearing on the motions to dismiss based on extraterritoriality on December 16, 2015.  The motion is *sub judice*.

163.    The Omnibus Motion is currently in abeyance under the ET Scheduling Order pending this Court's ruling on the extraterritoriality issues.

164.    Numerous defendants are involved in the extraterritoriality proceedings, including but not limited to defendants in the following actions: *Picard v. ABN AMRO Bank N.A.*, Adv. Pro. No. 10-05354 (SMB) (Bankr. S.D.N.Y.); *Picard v. ABN AMRO (Ireland) Ltd. (In re Bernard L. Madoff)*, Adv. Pro. No. 10-05355 (Bankr. S.D.N.Y. filed Dec. 8, 2010) (SMB); *Picard v. BNP Paribas Arbitrage, SNC*, Adv. No. 11-02796 (SMB) (Bankr. S.D.N.Y. 2011); *Picard v. BNP Paribas S.A.*, Adv. No. 12-01576 (SMB) (Bankr. S.D.N.Y. 2011); *Picard v. Legacy Capital Ltd.*, Adv. No. 10-05286 (SMB) (Bankr. S.D.N.Y. 2010); *Picard v. Oreades SICAV*, Adv. No. 10-05120 (SMB) (Bank. S.D.N.Y. 2010); *Picard v. Equity Trading Portfolio Ltd.*, Adv. No. 10-04457 (SMB) (Bank. S.D.N.Y. 2010); *Picard v. Citibank*, Adv. No. 10-05345

(SMB) (Bankr. S.D.N.Y.); *Picard v. Fairfield Sentry Ltd. (In Liquidation)*, Adv. No. 09-01239

(SMB) (Bankr. S.D.N.Y. May 18, 2009); *Picard v. RD Trust*, Adv. No. 12-01701 (SMB) (Bankr.

S.D.N.Y.); *Picard v. Barrenche Inc.*, Adv. No. 12-01702 (SMB) (Bankr. S.D.N.Y.); and *Picard

v. Natixis*, Adv. No. 10-05353 (SMB) (Bankr. S.D.N.Y.).

### ii.   Subsequent Transferee Actions

165.   To date, the Trustee has brought a total of 82 adversary proceedings seeking

recovery of just over $7.2 billion in subsequent transfers from 150 defendants who redeemed

money from Fairfield Sentry Limited, Fairfield Sigma Limited, Fairfield Lambda Limited,

Harley International (Cayman) Ltd., Kingate Global Fund Ltd., and Kingate Euro Fund Ltd.  The

Trustee has completed service of process in all but one adversary proceeding, for which the

Trustee is currently in the process of effectuating international service of process on the

remaining two defendants.

166.   The subsequent transferee defendants filed motions to withdraw the reference,

which were granted by Judge Rakoff and resulted in Common Briefing by the Trustee and the

defendants.  Among the issues affecting the subsequent transfer cases are the Extraterritoriality

Issue, the Bad Faith § 546(e) Issue, the avoidance of initial transfers through the settlement with

Fairfield Sentry, Greenwich Sentry, Greenwich Sentry Partners, and various Tremont funds

under Bankruptcy Code § 550, application of SLUSA, and the Trustee's standing to assert claims

assigned to him.  The District Court issued its rulings on all of the issues affecting subsequent

transferee cases and remanded the cases to this Court for further findings based on the legal

standards set forth in the District Court's decisions.

167.   Two subsequent transferee defendants filed motions to dismiss in the Bankruptcy

Court.  Briefing on one motion has not yet been completed.  In the second motion, *Picard v.

Bureau of Labor Insurance*, the defendant sought to dismiss based on the Foreign Sovereign

Immunities Act, lack of personal jurisdiction, improper extraterritorial application of SIPA and the Bankruptcy Code, the failure to avoid the initial transfers to Fairfield Sentry through the Fairfield Sentry settlement, and the statute of limitations under Bankruptcy Code § 550.  Adv. No. 11-02732 (BRL) (Bankr. S.D.N.Y.), ECF No. 8–10.  On October 11, 2012, the Bankruptcy Court denied the motion to dismiss on all grounds.  (ECF No. 51).  On April 9, 2015, the Bureau of Labor Insurance filled a motion for judgment on the pleadings.  On June 9, 2015, the Trustee filed his memorandum in opposition to the motion for judgment on the pleadings.  On July 22, 2015, the Bureau of Labor Insurance filed its reply memorandum in support of its motion for judgment on the pleadings.  On July 29, 2015, this Court held a hearing on the Bureau of Labor Insurance's motion for judgment on the pleadings.  The matter is *sub judice.*

168.    Currently, the response dates to the Trustee's subsequent transfer adversary proceedings have been extended while the parties await this Court's rulings on the defendants' extraterritoriality motions to dismiss and the Omnibus Motion.  *See* discussion *supra* Section IX(B)(e).

### iii.    **Bad Faith/Feeder Fund Actions**

169.    The Trustee has approximately 45 bad faith and feeder fund actions still pending as of the end of the Report Period.  A few will be highlighted below.

### (a)    **The HSBC Action**

170.    On July 15, 2009, the Trustee commenced an adversary proceeding against a handful of HSBC entities and international feeder funds in the financial services industry that transferred funds to and from BLMIS.  *Picard v. HSBC Bank plc*, Adv. No. 09-01364 (BRL) (Bankr. S.D.N.Y.) (the "HSBC Action").  After further investigation, the Trustee filed an amended complaint on December 5, 2010, expanding the pool of defendants to thirteen HSBC entities and forty-eight individuals and entities, and alleging that over 33% of all monies invested

in Madoff's Ponzi scheme were funneled by and through these defendants into BLMIS.  (ECF No. 35).

171.    The thirteen HSBC-related defendants and, separately, UniCredit S.p.A. and Pioneer Alternative Investment Management Limited, moved to withdraw the reference.  On April 14, 2011, United States District Judge Jed S. Rakoff ("Judge Rakoff") withdrew the reference to consider the Trustee's standing to assert common law claims.  *Picard v. HSBC Bank plc*, No. 11 Civ. 00836 (JSR) (S.D.N.Y.), ECF Nos. 20, 23.

172.    On May 3, 2011, the same defendants filed motions to dismiss.  *Picard v. HSBC Bank plc*, No. 11 Civ. 00836 (ECF Nos. 24–27).  The Trustee and SIPC opposed the motions.  (ECF Nos. 32–36).  On July 28, 2011, the District Court dismissed the Trustee's common law claims, holding that the Trustee lacked standing, under any theory, to assert them.  *Picard v. HSBC Bank plc*, 454 B.R. 25, 37–38 (S.D.N.Y. 2011).  The District Court returned the remainder of the HSBC Action to this Court for further proceedings.  *Id.* at 38.

173.    On December 15, 2011, the Trustee appealed the District Court's decision to the Second Circuit.  *See Picard v. HSBC Bank PLC*, No. 11-5175 (2d Cir. 2011); *Picard v. HSBC Bank PLC*, No. 11-5207 (2d Cir. 2011).  Oral argument was held on November 21, 2012.  On June 20, 2013, the Second Circuit affirmed the decision of the District Court.  (ECF No. 163).

174.    On October 9, 2013, the Trustee filed a petition for a writ of certiorari with the Supreme Court.  *See Picard v. J.P. Morgan Chase & Co.*, *pet. for cert. filed*, (U.S. Oct. 9, 2013) No. 13-448.  The Supreme Court denied the petition.

175.    The District Court returned several of the Trustee's bankruptcy claims to this Court; however, various defendants in the HSBC Action moved to withdraw the reference from this Court and those motions have been granted, at least in part, by the District Court.  These

defendants participated in a variety of motions before the District Court on Common Briefing, including the Bad Faith § 546(e) Issue, the § 502(d) Issue, the Extraterritoriality Issue, and the Good Faith Standard Issue. The District Court's disposition of these Common Briefing issues is discussed *supra* in Section IX(A)(i)(b). The HSBC Action has been returned to the Bankruptcy Court.

176. Following the entry of the Extraterritoriality Opinion and Order, the Trustee filed the Omnibus Motion. ECF No. 7827. *See* discussion *supra* Section IX(B)(e). Following a request by certain defendants, on September 17, 2014, the Bankruptcy Court held a conference to discuss further proceedings to be conducted pursuant to the Extraterritoriality Opinion and Order and the Omnibus Motion. The Court directed the parties to confer and devise an efficient procedure and briefing schedule. The Omnibus Motion is being held in abeyance pending the Bankruptcy Court's ruling on the extraterritoriality issues.

177. The Trustee had been engaged in mediation with Primeo Fund (In Official Liquidation) and Herald Fund SPC (In Official Liquidation). The mediation commenced in April 2014. The mediation resulted in a settlement whereby Herald and Primeo paid the Trustee $496,844,288, and Herald received an allowed claim of $1,639,896,943.

178. The Trustee had been engaged in mediation with Senator Fund. The mediation commenced in March 2014, which resulted in a $95 million settlement between the Trustee and Senator Fund. Under the settlement, Senator Fund received an allowed claim in the amount of $238,753,482 and a catch-up distribution in the amount of $116,516,474.29. Senator Fund paid $95 million by assigning to the Trustee: (i) the funds to be advanced by SIPC in the amount of $500,000 under Senator Fund's allowed customer claim, and (ii) $94.5 million of the $116,516,474.29 catch-up distribution owed to Senator Fund under its allowed customer claim.

(b)      **The Luxalpha Action**

179.     On December 10, 2014, the Court entered the ET Scheduling Order.  *See*

discussion *supra* Section IX(B)(e).  The ET Scheduling Order provided certain deadlines for the

parties to file their respective submissions in connection with the Extraterritoriality Issue and the

Omnibus Motion.

180.     On December 31, 2014, the transferee defendants listed in Exhibits A and B to the

ET Scheduling Order (the "Defendants Group")—including the moving Access Defendants[9] in

the Luxalpha Proceeding (defined below), M&B Capital Advisors Sociedad de Valores, S.A. in

the LIF Proceeding, Reliance Management (Gibraltar) Ltd. in the LIF Proceeding (defined

below), and the UBS Defendants[10] in the Luxalpha and LIF Proceedings—filed their

Consolidated Motion to Dismiss in connection with their Omnibus Motion regarding the

Extraterritoriality Issue.  *Picard v. UBS AG*, Adv. Pro. No. 10-4285 (SMB) (Bankr. S.D.N.Y.)

(the "Luxalpha Proceeding"); *Picard v. UBS AG*, Adv. Pro. No. 10-05311 (SMB) (Bankr.

S.D.N.Y.) (the "LIF Proceeding").  *See* discussion *supra* Section IX(B)(e).

181.     On June 26, 2015, the Trustee filed submissions opposing moving defendants'

Consolidated Motion to Dismiss regarding the Extraterritoriality Issue in the Luxalpha and LIF

Proceedings.   These submissions included a proffered Second Amended Complaint in the

Luxalpha Proceeding, and a proffered Amended Complaint in the LIF Proceeding.

182.     On September 30, 2015, the moving Access Defendants in the Luxalpha

Proceeding, M&B Capital Advisors Sociedad de Valores, S.A. in the LIF Proceeding, and the

---

[9] The moving Access Defendants consist of Access International Advisors Ltd., Access Management Luxembourg SA (f/k/a Access International Advisors (Luxembourg) SA), Access Partners SA, Patrick Littaye, and Pierre Delandmeter.

[10] The UBS Defendants consist of UBS AG, UBS (Luxembourg) SA, UBS Fund Services Luxembourg SA, and UBS Third Party Management SA.

UBS Defendants in the Luxalpha and LIF Proceedings filed reply papers in further support of their Consolidated Motion to Dismiss regarding the Extraterritoriality Issue.

183.   In preparing the amended complaints and submissions on the Extraterritoriality Issue across numerous cases—including the Luxalpha and LIF Proceedings—the Trustee relied upon and references many documents that were designated confidential by the various parties who produced such documents (the "Producing Parties").

184.   The Trustee completed meet-and-confer discussions regarding confidentiality issues with counsel for relevant Producing Parties, including the UBS Defendants and Reliance International Research LLC.  Such meet and confers resulted in the de-designation of several documents, but outstanding issues remained with several Producing Parties.

185.   As a result, the Trustee had entered into arbitration proceedings with the UBS Defendants and Reliance International Research LLC.  On June 12, 2015, an arbitrator issued a decision resolving the confidentiality status of certain documents produced by Reliance International LLC and relied upon by the Trustee in preparation of the amended complaints and submissions on the Extraterritoriality Issue.  On June 23, 2015, another arbitrator issued a decision resolving the confidentiality status of certain documents prepared by the UBS Defendants and relied upon by the Trustee in preparation of the amended complaints and submissions on the Extraterritoriality Issue.

186.   During the Report Period, the Trustee continued to identify additional documents improperly designated as confidential by certain producing parties for purposes of seeking de-designation from confidential treatment of these documents, and engaged in additional meet and confers for further resolution of confidentiality issues.

187.    The Trustee also continued to research and investigate the law and facts at issue in the Luxalpha and LIF proceedings, including further analyses of the transfers and assessment of related legal proceedings in both domestic and foreign jurisdictions.   In addition, the Trustee prepared generally for anticipated discovery in the proceedings, which involved preparation of discovery requests and proposed case management plans, the scheduling and parameters of which were discussed with all defendants at a Fed. R. Civ. P. 26(f) conference held on April 4, 2016.

### (c)      The Kohn Action

188.    On December 10, 2010, the Trustee commenced an adversary proceeding (the "Kohn Action") against Sonja Kohn ("Kohn"), Bank Medici, UniCredit Bank Austria AG ("Bank Austria"), UniCredit S.p.A. ("UniCredit), Pioneer Asset Management ("Pioneer"), Alessandro Profumo ("Profumo"), and dozens of individuals, trusts, and nominee companies (collectively, the "Kohn Defendants").   *Picard v. Kohn*, Adv. No. 10-5411 (BRL) (Bankr. S.D.N.Y.).

189.    On November 26, 2014, the Trustee filed his Notice of Voluntary Dismissal Without Prejudice of seventy-three defendants.  (ECF No. 281).  The Trustee then filed a Motion for Leave to File a Third Amended Complaint, which reflects the dismissal of the parties dismissed pursuant to the Notice of Dismissal filed on November 26, 2014.  (ECF No. 283).  The remaining defendants are Ms. Sonja Kohn, Infovaleur, Inc. and Tecno Development & Research Ltd. (the "Remaining Defendants").  *See* ECF No. 282, Ex. 1.

190.    On December 11, 2014 (ECF No. 287), February 3, 2015 (ECF No. 289), and March 16, 2015 (ECF No. 290), the Trustee and the Remaining Defendants stipulated to extend the time for the Remaining Defendants to file a response to the Trustee's Motion for Leave to File a Third Amended Complaint.  The return date for the Motion was June 24, 2015.

191.     The Trustee and the Remaining Defendants have since continued to extend the time for the Remaining Defendants to file a response to the Trustee's Motion for Leave to File a Third Amended Complaint.  The Remaining Defendants currently have until July 7, 2016 to respond to this Motion, and the return date for the Motion is August 31, 2016. (ECF No. 302).

### (d)     Picard v. Avellino

192.     On December 10, 2010, the Trustee commenced an avoidance action against Avellino & Bienes, Frank J. Avellino, Michael S. Bienes, Nancy C. Avellino, Dianne K. Bienes, Thomas G. Avellino, and numerous other trusts and entities (collectively, the "A&B Defendants") seeking the return of over $904 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of the A&B Defendants.  *Picard v. Frank J. Avellino*, Adv. No. 10-05421 (SMB) (Bankr. S.D.N.Y.) (the "A&B Action").

193.     On June 6, 2011, certain A&B Defendants moved to dismiss the complaint in the Bankruptcy Court.  *A&B Action* (ECF Nos. 23-27).  In addition, on June 7, 2011, certain A&B Defendants moved to withdraw the reference to the Bankruptcy Court.  *Id.* (ECF Nos. 28–30); *see also Picard v. Avellino*, No. 11-cv-03882 (JSR) (S.D.N.Y.) (the "A&B Withdrawal Action").

194.     The motion to withdraw the reference was fully briefed in the District Court, and oral argument was held on October 18, 2011.  On February 29, 2012, the District Court issued a Memorandum Order withdrawing the reference on certain issues of law raised by the A&B Defendants and other defendants named in separate adversary proceedings commenced by the Trustee.  *A&B Withdrawal Action* (ECF No. 20).  As a result of the District Court's order, during the period of May 2012 through October 2012, the Trustee and the A&B Defendants joined in

consolidated briefing and oral arguments on the withdrawn issues of law.  *See A&B Withdrawal Action* (ECF Nos. 21–23).

195.     Following the disposition of the Common Briefing issues, the Trustee and the A&B Defendants filed a coordinated briefing schedule on August 7, 2014.  *A&B Action* (ECF No. 81).  Per the schedule, on September 24, 2014, certain A&B Defendants filed a Renewed Motion to Dismiss, incorporating their previous June 6, 2011 pleading.  *A&B Action* (ECF Nos. 82-84).  On November 24, 2014, the Trustee filed an amendment to the original complaint (the "A&B Amended Complaint") in response to the Renewed Motion to Dismiss.  *A&B Action* (ECF No. 86).  The Trustee and A&B Defendants conferred and filed an amended coordinated briefing schedule on January 14, 2015.  *A&B Action* (ECF No. 87).  Under the schedule, certain A&B Defendants filed a Motion to Dismiss the A&B Amended Complaint on January 28, 2015.  *A&B Action* (ECF Nos. 88-89).  The Trustee and A&B Defendants again conferred and filed an amended coordinated briefing schedule on April 7, 2015.  *A&B Action* (ECF No. 91).  Under the schedule, the Trustee's time to respond to the Motion to Dismiss the Amended Complaint was up to and including May 21, 2015.  Consequently, the A&B Defendants had up to and including June 22, 2015 to file a reply, and oral argument was scheduled for and held on July 29, 2015.  At oral argument, Judge Bernstein requested supplemental briefs by the Trustee and the A&B Defendants on issues raised in the Motion to Dismiss briefing, which were filed on August 12, 2015.  *A&B Action* (ECF Nos. 102, 104).

196.     During the Report Period, the Trustee continued to prepare for discovery, conduct document review and perform overall case management while awaiting determination on the motion to dismiss.

(e)    **Picard v. Cohmad Sec. Corp.**

197.    On June 22, 2009, the Trustee commenced an adversary proceeding against Madoff insiders Cohmad Securities Corporation ("Cohmad"), Maurice ("Sonny") J. Cohn ("Sonny Cohn"), Marcia B. Cohn, and several other defendants (collectively, the "Cohmad Defendants") seeking the return of over $245 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances, disallowance of any claims filed against the estate by the Cohmad Defendants, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Cohmad Defendants. *Picard v. Cohmad Sec. Corp.*, Adv. No. 09-01305 (BRL) (Bankr. S.D.N.Y.).

198.    The complaint seeks to avoid and recover the fictitious profits withdrawn by the Cohmad Defendants and the return of commissions and fees transferred directly from BLMIS to Sonny Cohn and Cohmad.  On October 8, 2009, the Trustee filed an amended complaint.  (ECF No. 82).  The Cohmad Defendants filed numerous motions to dismiss, which the Trustee opposed.  (ECF No. 135).

199.    On August 1, 2011, this Court issued its Memorandum Decision and Order Denying Defendants' Motions to Dismiss Trustee's Complaint.  (ECF No. 209).  This Court found that the Trustee had adequately pleaded that the transfers received by the Cohmad Defendants in excess of their principal were not transferred for reasonably equivalent value, and Cohmad and Sonny Cohn lacked good faith in receiving commissions from Madoff. *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 332–34 (Bankr. S.D.N.Y. 2011).

200.    Certain of the Cohmad Defendants filed a motion for leave to appeal. *See Picard v. Cohmad Sec. Corp.*, No. 11 MC 00337 (TPG) (S.D.N.Y.), ECF Nos. 212–13.  The Cohmad Defendants' appeal was denied by Judge Griesa on November 14, 2012.

201.    In March and April 2012, the Cohmad Defendants moved to withdraw the reference from this Court.  *Picard v. Cohmad*, 12-cv-02676 (JSR) (S.D.N.Y.), ECF No. 1.  The Cohmad Defendants have also participated in Common Briefing as to the Bad Faith § 546(e) Issue and the Good Faith Standard Issue.  *See* discussion *supra* Section (IX)(A)(i)(b).  The District Court rendered a decision on the Bad Faith § 546(e) Issue, which indicated that the Trustee adequately pleaded a case against the Cohmad Defendants so that the Cohmad Defendants are not entitled to dismiss the Trustee's complaint at the pleading stage on the basis of Bankruptcy Code Section 546(e).

202.    Meanwhile, the parties have engaged in discovery.  The Trustee has served discovery on all parties and third-parties, and discovery is ongoing.  Under the Amended Case Management Plan, discovery closes June 30, 2016.  In September 2015, Mr. Jonathan Greenberg moved for leave to appeal the denial of his motion to quash and for a protective order concerning subpoenas the Trustee issued to two financial institutions seeking bank records relating to Mr. Greenberg.  The Trustee filed his opposition to that motion on September 30, 2015.  The parties entered into a stipulation concerning certain transfers and the appeal was discontinued in March 2016.

203.    In January and February 2016, defendants the Estate of Cyril D. Jalon, the Estate of Elena Jalon, the Joint Tenancy of the Estate of Phyllis Guenzburger and Fabian Guenzburger, and the Joint Tenancy of Robert Pinchou and Fabian Guenzburger were voluntarily dismissed from the adversary proceeding.

### (f)    Picard v. Irwin Lipkin, et al.

204.    On November 12, 2010, the Trustee and B&H commenced an adversary proceeding against defendants and former BLMIS employees Irwin Lipkin and Eric Lipkin, and their family members.  *Picard v. Irwin Lipkin, et al.*, Adv. Pro. No. 10-4218 (Bankr. S.D.N.Y.)

(SMB).    Irwin Lipkin is the father of Eric Lipkin.    The Complaint seeks $9,175,967.00 in damages.

205.    Eric Lipkin was subsequently charged with a six count indictment by the United States Attorney's Office, asserting that he manufactured customer statements to reflect false holdings of customer accounts and falsified the books and records of BLMIS.  *USA v. O'Hara, et al.*, Case No. 10-cr-00228 (LTS).    Eric Lipkin entered into a cooperation agreement and, on June 6, 2011, pleaded guilty to all six counts.  On May 20, 2015, Eric Lipkin was sentenced to home detention for a period of nine months as part of a larger two year supervised release sentence.

206.    Irwin Lipkin was also subsequently indicted for, among other things, conspiracy to commit securities fraud and falsifying statements.  Irwin Lipkin pleaded guilty on November 8, 2012, and was sentenced to six months imprisonment plus three years of supervised release pursuant to the Judgment in a Criminal Case entered on August 7, 2015.

207.    On August 5, 2015, the District Court entered the Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment (Case No. 10-cr-00228 (LTS), ECF No. 1413), pursuant to which Irwin Lipkin, his wife Carole Lipkin, the United States Attorney's Office and the Trustee entered into a universal settlement.  Under the terms of the agreement, the Trustee will recover approximately $518,000 from Irwin and Carole Lipkin, and Irwin and Carole Lipkin's claims against the BLMIS estate are withdrawn.

208.    During the Report Period, the Trustee entered into a settlement agreement with Eric and Erika Lipkin and their children. Mr. and Mrs. Lipkin and their children were dismissed from this matter on January 7, 2016.  The Trustee also engaged in mediation with the remaining defendants, which was unsuccessful.  As a result, the Trustee is engaging in litigation with the

62

remaining defendants.  A case management plan is in effect, and the parties are engaging in discovery.

### (g)    Picard v. J. Ezra Merkin

209.    On May 7, 2009, the Trustee commenced an adversary proceeding against sophisticated money manager and Madoff associate J. Ezra Merkin ("Merkin"); the investment management company he solely owned, Gabriel Capital Corporation ("GCC"); and his funds, Gabriel Capital, L.P. ("Gabriel Capital"), Ariel Fund Ltd. ("Ariel Fund"), and Ascot Partners, L.P. ("Ascot Partners") (collectively, the "Merkin Defendants"[11]).  (ECF. No. 1).  The Trustee alleged that Merkin knew or should have known that Madoff's investment advisory business ("IA Business") was predicated on fraud.  Among other things, the Trustee sought the return of nearly $560 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law, for preferential and fraudulent transfers that were made by BLMIS to or for the benefit of the Merkin Defendants.  *Picard v. J. Ezra Merkin*, Adv. No. 09-01182 (BRL) (Bankr. S.D.N.Y.) (ECF No. 1-2).  On August 6, 2009, the Trustee filed an amended complaint.  (ECF No. 10).

210.    On August 30, 2013, the Trustee filed the third amended complaint (the "Third Amended Complaint"), which alleges that the Merkin Defendants had knowledge of, or were willfully blind to, the fraud at BLMIS consistent with the District Court's recent decisions.  (ECF No. 212).  The Third Amended Complaint also asserted subsequent transfer claims against Ascot Fund Ltd. ("Ascot Fund"), a Cayman fund controlled by Merkin.

211.    On October 11, 2013, the Receivers, Merkin and GCC filed motions to dismiss the Third Amended Complaint.  (ECF Nos. 160, 166, 168).  On November 15, 2013, the Trustee

---

[11] Ascot Fund Ltd. was added as a defendant on August 30, 2014 and will be included in the definition of "Merkin Defendants" for all events after this date.

filed a consolidated opposition brief in response to these motions to dismiss. (ECF No. 173). On December 20, 2013, the Receivers and Merkin and GCC filed briefs in further support of their motions to dismiss. (ECF Nos. 185-188).

212.    The Trustee entered into a stipulation with Ascot Fund extending its time to move, answer, or otherwise respond to the Third Amended Complaint. (ECF Nos. 159, 171). Ascot Fund ultimately filed a motion to dismiss the Third Amended Complaint on December 20, 2013. (ECF Nos. 182-183). On December 23, 2013, the Trustee and Ascot Fund entered into a stipulation which clarified the subsequent transfer counts of the Third Amended Complaint against Ascot Fund. (ECF No. 189). The Trustee filed his opposition to the Ascot Fund motion to dismiss on January 31, 2014. (ECF Nos. 198-199).

213.    On April 30, 2014, this Court heard oral arguments on the motions to dismiss. (ECF No. 210). Thereafter, on August 12, 2014, this Court entered its Decision Granting in Part and Denying in Part Defendants' Motion to Dismiss. (ECF No. 212). The Court found that the Third Amended Complaint "adequately pleads willful blindness" and that the Trustee may thus still pursue avoiding and recovering all of the intentional fraudulent transfers that he brought under section 548(a)(1)(A) of the Bankruptcy Code. The Court also found that the Trustee did not sufficiently plead that the Merkin Defendants had "actual knowledge" of Madoff's fraud. As a result, the Court held that section 546(e) of the Bankruptcy Code limits the Trustee's avoidance counts to those asserted under section 548(a)(1)(A), and dismissed the Trustee's counts for preferential transfers, constructive fraudulent transfers, and fraudulent transfers under New York Debtor & Creditor Law. The Court also dismissed the Third Amended Complaint's counts of disallowance and equitable disallowance on bases unrelated to actual knowledge.

214.    On January 30, 2015, fact discovery concluded, except for limited matters agreed upon by the parties.  (ECF No. 264).

215.    On February 5, 2015, Ariel Fund and Gabriel Capital, Ascot Partners and Ascot Fund, and Merkin and GCC filed their respective answers to the Third Amended Complaint. (ECF Nos. 259-261).

216.    On March 20, 2015, the Trustee, Merkin, and GCC served expert reports pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.  (ECF No. 264).  On May 15, 2015, the Trustee and the Merkin Defendants served rebuttal expert reports.  (ECF No. 264).  Expert discovery concluded on July 17, 2015.  (ECF No. 264).

217.    On May 29, 2015, the Trustee filed a Motion For Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving A Settlement Agreement Between the Trustee, Gabriel Capital, L.P. Ariel Fund LTD., and Bart M. Schwartz as the Appointed Receiver of Gabriel Capital, L.P. and Ariel Fund Ltd (the "Settlement Motion").  (ECF Nos. 266-267).  On June 22, 2015, the Trustee filed a Certificate of No Objection as to the Settlement Motion, representing that there had been no objection, responsive pleading, or request for a hearing with respect to the Settlement Motion by the deadline for filing objections and requesting that the order be entered without a hearing.  (ECF No. 268).  On June 23, 2015, this Court entered an Order granting the Settlement Motion and approving the settlement agreement between the Trustee, Gabriel Capital, Ariel Fund, and the Ariel/Gabriel Receiver.  (ECF No. 270).  On September 8, 2015, the Trustee, Gabriel Capital, and Ariel Fund entered into a stipulation dismissing Gabriel Capital and Ariel Fund from the action with prejudice.  (ECF No. 282).

218.     On August 10, 2015, the Trustee filed a motion to withdraw the reference to the Bankruptcy Court.   (ECF Nos. 271-273); *see also Picard v. Merkin*, No. 15-cv-06269 (the "Trustee's Withdrawal Motion").

219.     On August 11, 2015, Merkin, GCC, Ascot Partners and Ascot Fund filed respective letters to this Court requesting a pre-motion conference regarding the defendants' intention to file a motion for summary judgment of all the Trustee's remaining claims.  (ECF Nos. 275-276).   On August 21, 2015, this Court permitted the remaining defendants to file motions for summary judgment.  (ECF No. 281).

220.     On August 24, 2015, the remaining defendants filed an opposition to the Trustee's Withdrawal Motion.  *Trustee Withdrawal Motion* (ECF Nos. 5-6).

221.     On September 3, 2015, the Trustee withdrew his Withdrawal Motion, as all parties to the action stipulated and consented to: (a) entry of final orders and judgments by the Bankruptcy Court on all claims in this adversary proceeding; (b) waiver of their right to a jury trial; and (c) a bench trial before the Bankruptcy Court on all claims in this proceeding.  *Trustee Withdrawal Motion* (ECF No. 10).   On September 17, 2015, the parties had a conference before the District Court where it confirmed the parties' consent to try the case to final judgment before the Bankruptcy Court.  (ECF Nos. 278-280); *Trustee Withdrawal Motion* (ECF Nos. 11-12).

222.     On October 7, 2015, the remaining defendants filed their respective motions for summary judgment.  (ECF Nos. 283-287).   The Trustee filed his opposition on November 25, 2015.  (ECF Nos. 289-302).   The remaining defendants filed their respective replies in support of their motions on December 23, 2015.  (ECF Nos. 306-310).

223.     On March 21, 2016, the Trustee and the remaining defendants entered into a Thirteenth Amended Case Management Plan.  (ECF No. 313).   Under the plan, oral argument on

the respective motions for summary judgment is to be held on a date scheduled by the Court. The plan also provided a schedule for pre-trial briefing and the exchange of pre-trial disclosures beginning on May 17, 2016. The final pre-trial conference and the commencement of trial will be held on a date and time scheduled by the Court.

224.    During the Report Period, the Trustee prepared for and filed his opposition to the remaining defendants' respective motions for summary judgment (ECF Nos. 289-302), reviewed and analyzed the arguments made by the remaining defendants in their respective moving papers and reply briefs (ECF Nos. 306-310) in preparation for oral argument, and prepared for trial before the Bankruptcy Court.

(h)    <u>**Picard v. Kingate**</u>

225.    On March 17, 2014, the Trustee filed and served a fourth amended complaint under SIPA, the Bankruptcy Code, New York Debtor and Creditor Law and other applicable law against Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. and numerous other defendants in the adversary proceeding captioned as *Picard v. Federico Ceretti*, Adv. No. 09-01161 (SMB) (Bankr. S.D.N.Y.), ECF No. 100 (the "Fourth Amended Complaint").

226.    The Kingate Funds answered the Fourth Amended Complaint (ECF No. 211) on September 30, 2015, paving the way for formal discovery in the Kingate proceeding to begin. During the Report Period, the Trustee and his counsel have devoted significant time to discovery-related matters.

227.    The Trustee promptly sought to meet and confer with the Kingate Funds' counsel under Federal Rule of Bankruptcy Procedure 7026(f). The first conference occurred on October 1, 2015, during which the Trustee's counsel summarized the Trustee's data rooms and the procedures for access to them, and provided a detailed explanation in writing of the data rooms through which the Trustee's documents are produced.

228.    Following that initial conference, on or about October 7, 2015, the Trustee timely

served initial disclosures to the Kingate Funds in accordance with Rule 7026(a) and his first

requests for the production of documents.  On October 14, 2015, the Kingate Funds served the

Trustee with their initial disclosures, and on November 6, 2015, the Kingate Funds served the

Trustee with the Kingate Funds' respective first requests for the production of documents.

229.    An initial pretrial conference had been noticed and scheduled for October 28,

2015 (ECF No. 197).  Prior to the conference, the Trustee and the Kingate Funds conferred

throughout October 2015, ultimately submitting a joint Case Management Plan (which, among

other things, established pre-trial deadlines for fact and expert discovery and summary judgment

briefing) in accordance with the timelines set by the Rules and the Local Bankruptcy Rules.  The

non-Fund defendants in this proceeding did not participate in those conferences. The Court "so

ordered" and entered the Case Management Plan (the "CMO") in late October 2015 (ECF 227),

and the CMO remains in effect to date.

230.    During the meet and confer process between the Trustee and the Kingate Funds,

the Trustee learned that the Kingate Funds had in their possession the following documents:

(a)    approximately 139,000 documents in the aggregate produced by Kingate

Management Limited ("KML"), FIM Advisers LLP and FIM Limited (together the "FIM

Entities"), and First Peninsula Trustees Limited, Port of Hercules Trustees Limited,

Alpine Trustees Limited, The Ashby Trust, Ashby Holding Services Limited, Ashby

Investment Services Limited, El Prela Trust, El Prela Group Holding Services Limited,

and El Prela Trading Investments Limited (together, the "Trust Defendants") in litigation

commenced by the Kingate Funds in Bermuda against those entities and other defendants

asserting claims arising from the Kingate Funds' investment business with BLMIS ("Bermuda Production"); and

(b)     no fewer than 259,730 documents collected by the Kingate Funds voluntarily from their service providers and other agents, including KML, Citi Hedge, the Funds' directors, HSBC Bank, and Tremont, a co-manager of the Funds for a decade ("Voluntary Production").

231.    The Kingate Funds refused to produce to the Trustee substantially all of the documents in their possession, asserting they had a duty under BVI law to maintain shareholder information as confidential, and an "implied undertaking" under Bermuda law that documents produced in a Bermuda civil action cannot thereafter be separately collected and produced in another jurisdiction.

232.    On or about November 3, 2015, the Kingate Funds informed the Trustee that the Kingate Funds were applying to the Bermuda court to be relieved of their implied undertaking and to obtain permission to produce the Bermuda Production to the Trustee.

233.    On November 6, 2015, the Kingate Funds served the Trustee with their responses and objections to the Trustee's document requests.

234.    On November 12, 2015, the Trustee produced to the Kingate Funds the case-specific core account documents and the bank transfer documents, which was followed by a second production on or about January 15, 2016, and a third production on March 25, 2016 of documents responsive to supplemental search terms provided by the Kingate Funds necessitating the review of approximately 10,000 documents by the Trustee.

235.    On November 24, 2015, the Trustee's counsel provided the Kingate Funds' counsel with access to the Madoff Trustee Data Room Portal.  Also on that date, the Trustee's

counsel attended a hearing in Bermuda concerning the Kingate Funds' contested application to the Bermuda court for leave to disclose to the Trustee all documents the Kingate Funds obtained through discovery from substantially the same defendants as in the Trustee's avoidance and recovery action, which were sued by the Kingate Funds in Bermuda on grounds other than fraudulent conveyance. No relief was granted by the Bermuda court that date, but it ordered briefing on the issues raised in objections to the Kingate Funds' application, and set a further hearing date.

236.    On December 1, 2015, the Kingate Funds informed the Trustee that on November 30, 2015, the Kingate Funds also applied to the BVI court, seeking leave of that court to produce the Voluntary Production to the Trustee. The Kingate Funds' application was contested, but the Kingate Funds refused to provide a copy of any pleadings, evidence, or briefs filed in the BVI court, and refused to consent to the Trustee attending any hearing on the Kingate Funds' application.

237.    By Order dated December 4, 2015 (U.S.D.C. Doc. #11), District Judge J. Paul Oetken, sitting on the United States District Court for the Southern District of New York, entered an order denying the Kingate Funds' motion for leave to appeal from the interlocutory August 11, 2015 order of the Bankruptcy Court substantially denying the Kingate Funds' motion to dismiss the Fourth Amended Complaint.

238.    On December 7, 2015, the Kingate Funds submitted responses and objections to the Trustee's document requests. On January 7, 2016, the Kingate Funds made a limited production to the Trustee representing approximately 6% of the documents in the Kingate Funds' possession, custody, or control, which was followed by a second limited production on January 29, 2016. On February 18, 2016, the Kingate Funds produced certain documents in their

possession relating to their auditor, PricewaterhouseCoopers, obtained by the Kingate Funds under 28 U.S.C. § 1782.

239.    The Trustee's counsel has exchanged extensive correspondence with the Kingate Funds' counsel since the first discovery-related conference on October 1, 2015, to obtain specific information about the Kingate Funds' documents and the reasons cited by the Kingate Funds for withholding production of the bulk of the documents they possessed.

240.    Unable to obtain a date certain for the Kingate Funds' document production or to identify the complete volume and nature responsive to the Trustee's document requests, the Trustee requested the first discovery-related conference before the Bankruptcy Court, which occurred on December 17, 2016.

241.    On January 26, 2016, the BVI court entered an order scheduling a further hearing on the Kingate Funds' application to make the Voluntary Production to the Trustee in early February, 2016.  In light of no ruling forthcoming from the BVI court, the Trustee requested that time set aside on the Bankruptcy Court's calendar on January 27, 2016 for a pretrial conference instead be used for a second discovery-related status conference, which request was granted.

242.    By letter dated February 10, 2016, the Trustee's counsel requested the non-Fund defendants to participate in discovery and forwarded a proposed stipulation setting a date for a Rule 26(f) conference.  The non-Fund defendants replied by letter dated February 19, 2016, refusing to participate in discovery on various grounds, including that discovery was effectively stayed by the procedures order entered by the Bankruptcy Court in a separate matter, to which all of the non-Fund defendants are parties, upon remand to the Bankruptcy Court following the District Court's Opinion and Order on the extraterritorial application of 11 U.S.C. § 550.

243.    On March 7, 2016, the Trustee's and the Kingate Funds' counsel appeared at a discovery-related conference before the Bankruptcy Court.  At the conference, the Kingate Funds reported to the Court that on February 26, 2016, the BVI court had entered an order absolving the joint liquidators for the Kingate Funds of any personal liability if they followed the advice of their New York counsel and produced the Voluntary Production to the Trustee, provided the Funds advised the Bankruptcy Court of the confidentiality issue.  The BVI court also entered a Note of Judgment, a copy of which, together with the BVI court order, was submitted to the Bankruptcy Court.  On March 7, 2016, the Bankruptcy Court also heard argument by counsel purportedly representing anonymous shareholders of the Kingate Funds seeking to obstruct their production of  documents to the Trustee they contended were confidential.  No motion being pending for any affirmative relief, the Bankruptcy Court declined to grant any relief.  Subsequently, the anonymous shareholders, through their counsel, informed the Bankruptcy Court they would not be seeking to intervene or for any other relief at present.

244.    On March 21, 2016, the Kingate Funds made a partial production to the Trustee of documents available electronically that constitute part of the Voluntary Production.  Certain issues remain disputed between the parties regarding the Voluntary Production.

245.    Throughout the Report Period, the Trustee and his counsel have continued to prepare for discovery with the non-Fund defendants as well, and, ultimately, for trial.

### (i)    Picard v. Legacy Capital Limited

246.    On December 6, 2010, the Trustee commenced an action against Legacy Capital Ltd., Isaac Jimmy Mayer, Rafael Mayer, Khronos LLC, Khronos Capital Research LLC,  HCH Management Co., Montpellier Resources Ltd., BNP Paribas Securities Corp., Inversiones Coque S.A., Aurora Resources Ltd., and Olympus Assets LDC (collectively, the "Legacy Capital Defendants") seeking the return of over $218 million under SIPA, the Bankruptcy

Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Legacy Capital Defendants. *Picard v. Legacy Capital Ltd.*, Adv. No. 10-05286 (BRL) (Bankr. S.D.N.Y. 2010).

247.    On July 2, 2015, B&H attorneys, on behalf of the Trustee, filed and served a First Amended Complaint ("Amended Complaint") in connection with this adversary proceeding. The Trustee's Amended Complaint named Khronos LLC and Legacy Capital Ltd. as the remaining defendants.  On July 30, 2015, Defendants Khronos LLC and Legacy Capital Ltd. filed motions to dismiss the Amended Complaint under Federal Rule of Bankruptcy Procedure 7012(b) and Federal Rule of Civil Procedure 12(b)(6).  The Trustee responded to the motions to dismiss, and on October 28, 2015, the Trustee participated in oral argument before Judge Bernstein concerning Khronos LLC's and Legacy Capital Ltd.'s motions to dismiss the Trustee's complaint.

248.    On March 14, 2016, Judge Bernstein ruled on the defendants' pending motions to dismiss the Trustee's Amended Complaint, dismissing all of the Trustee's claims excluding his claim to recover fictitious profits transferred from BLMIS to or for the benefit of Legacy Capital Ltd.  During the Report Period, the Trustee worked with Legacy Capital Ltd. and Khronos LLC on a proposed joint order entering Judge Bernstein's decision. The parties met and conferred concerning the defendant's disputed contention that Judge Bernstein's dismissals were granted with prejudice.

### (j)    Picard v. Magnify Inc.

249.    On December 6, 2010, the Trustee commenced an action against Magnify, Inc. and several related companies holding BLMIS accounts, individuals acting on behalf of these accounts, and several other recipients of transfers from these accounts (collectively, the

"Magnify Defendants") seeking the return of more than $154 million under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 542, 544, 547, 548(a), and 551 of the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable laws for preferences, fraudulent conveyances, and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Magnify Defendants. *Picard v. Magnify Inc.*, Adv. No. 10-05279 (BRL) (Bankr. S.D.N.Y.). On September 21, 2011, the Trustee filed an amended complaint in the action. (ECF No. 39).

250.    On April 2, 2012, defendants Robert H. Book and R.H. Book LLC moved to withdraw the reference to the District Court on several grounds. *See Picard v. Magnify, Inc.*, No. 12-cv-02482 (JSR) (S.D.N.Y.). These defendants have since resolved the Trustee's claims and have been dismissed from the action.

251.    Defendant Kurt Brunner moved to dismiss the Trustee's complaint for lack of personal jurisdiction on September 1, 2011, and supplemented this motion with regard to allegations in the amended complaint on November 3, 2011. *Picard v. Magnify*, Adv. No. 10-05279 (BRL) (ECF Nos. 32, 48). On June 14, 2012, this Court held a hearing on Mr. Brunner's motion to dismiss for lack of personal jurisdiction. This Court denied the motion and ordered jurisdictional discovery over Mr. Brunner related to "the degree to which Brunner controlled and profited from [defendants] Magnify, Premero and Strand" and entered an order to this effect on June 15, 2012. (ECF No. 97). Determination of personal jurisdiction over Mr. Brunner was stayed pending resolution of a motion to dismiss for lack of personal jurisdiction and *forum non conveniens* filed in *Picard v. Estate (Succession) of Doris Igoin*, Adv. No. 10-04336 (BRL) (Bankr. S.D.N.Y.), a pending avoidance action against defendants who have ties to the late founder of several of the Magnify Defendants.

252.    Mr. Brunner subsequently resolved the Trustee's claims and was dismissed from the *Magnify* action without prejudice on February 5, 2015.  The *Igoin* defendants' motion was denied on February 13, 2015.

253.    On September 21, 2015, the Trustee voluntarily dismissed Defendant Special Situations Cayman Fund, L.P., from the action with prejudice.

254.    On December 10, 2015, the parties entered into an amended case management plan.  Pursuant to this plan, the Trustee received and reviewed documents served in response to written discovery requests to several of the Magnify Defendants, corresponded with counsel for the Magnify Defendants regarding deficiencies in discovery responses and the production of additional documents, conferred with counsel for the Magnify Defendants regarding contemplated depositions in the United States and Israel, and continued to seek documents through letters of request pursuant to the Hague Convention to certain third parties who may possess relevant information.

### (k)    Picard v. Mendelow

255.    On November 23, 2010, the Trustee commenced an action against Steven B. Mendelow ("Mendelow"), Nancy Mendelow, Cara Mendelow, Pamela (Mendelow) Christian, C&P Associates, Ltd., and C&P Associates, Inc. (collectively, the "Mendelow Defendants") seeking the return of just over $20 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Mendelow Defendants.  *Picard v. Steven B. Mendelow*, Adv. No. 10-04283 (BRL) (Bankr. S.D.N.Y.).

256.    On November 14, 2015, the Mendelow Defendants answered the Complaint.  On January 23, 2015, the Trustee entered into a Case Management Order with the Mendelow Defendants.

257.    The Mendelow Defendants filed a Motion for Judgment on the Pleadings on May 14, 2015.  On August 6, 2015, B&H attorneys filed the Trustee's Opposition to the Mendelow Defendants' Motion for Judgment on the Pleadings.  The Mendelow Defendants filed a reply to the Trustee's Opposition on September 4, 2015.

258.    On October 28, 2015, the Trustee participated in an argument before Judge Bernstein on the Mendelow Defendants' Motion for Judgment on the Pleadings.  At that time, Judge Bernstein suggested that the Trustee file an amended complaint.

259.    On December 30, 2015, the Trustee filed a Motion for Leave to file an Amended Complaint, along with a Proposed Amended Complaint.  On February 1, 2016, the Mendelow Defendants filed their Opposition to the Motion for Leave to File an Amended Complaint.  On February 15, 2016, the Trustee filed his Reply Memorandum of Law in Further Support of the Trustee's Motion to File an Amended Complaint.

260.    On February 24, 2016, the Trustee participated in an argument before Judge Bernstein on the Mendelow Defendants' Motion for Leave to File an Amended Complaint.

### (l)        **Picard v. Andrew H. Madoff**

261.    On October 2, 2009, the Trustee commenced an adversary proceeding against Peter Madoff, Andrew Madoff, Shana Madoff, and the late Mark Madoff (the "Family Defendants") seeking the return of approximately $198 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent transfers, fraudulent conveyances and damages for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting in connection with certain transfers of property by BLMIS to or for the benefit of the Family Defendants.  *Picard v. Andrew H. Madoff*, Adv. No.

09-01503 (BRL) (Bankr. S.D.N.Y.).[12]   On March 15, 2010, the Family Defendants filed a motion to dismiss the complaint.  (ECF Nos. 13–19).  The Trustee opposed the motion.  (ECF No. 25).

262.   The Trustee filed a Motion for Leave to File a Third Amended Complaint on July 15, 2014.  (ECF No. 184).  In his proposed Third Amended Complaint, the Trustee sought to remove all dismissed defendants and the factual allegations and claims asserted against them in the Second Amended Complaint.  (ECF No. 185).  The Trustee also sought to address altered legal standards and pleading burdens in light of District Court decisions rendered after the Second Amended Complaint was filed.  (*Id.*).

263.   Andrew Madoff, individually and as Executor of the Estate of Mark Madoff, opposed the motion (the "Opposition").  (ECF No. 191, 192).  The parties stipulated to an extension of the deadline for the Trustee to file a reply to the Opposition to April 8, 2016.  (ECF No. 228).  A hearing on the Trustee's Motion for Leave to Amend is scheduled for June 15, 2016.  (*Id.*).  Following the death of Andrew Madoff on September 3, 2014, the parties stipulated to an extension of the deadline to substitute the Estate of Andrew Madoff and Martin Flumenbaum as Executor of the Estate of Andrew Madoff, to May 6, 2016.  (ECF No. 242).  The Trustee filed a motion to substitute David Blumenfeld as the Successor Executor of the Estate of Mark Madoff to be heard on June 15, 2016.  (ECF No. 239).  In addition, the Trustee filed a motion to extend the notice of pendency placed on certain real property located in New York and owned by Andrew Madoff.  (ECF No. 232).

---

[12] The case formerly was styled as *Picard v. Peter B. Madoff*, Adv. No. 09-01503.  The caption was revised following the Trustee's consent judgment against Peter Madoff and dismissal with prejudice of Shana Madoff, as discussed herein.

(m)    **Picard v. Vizcaya**

264.    After extensive investigation, the Trustee brought both domestic and Gibraltar-based actions against Vizcaya Partners Ltd. ("Vizcaya"), Banque Jacob Safra (Gibraltar) Ltd. ("Bank Safra"), Asphalia Fund Ltd. ("Asphalia"), Zeus Partners Ltd. ("Zeus"), and Siam Capital Management ("Siam").  *Picard v. Vizcaya*, Adv. No. 09-01154 (BRL) (Bankr. S.D.N.Y.).

265.    Vizcaya, Siam, Asphalia, and Zeus failed to appear or answer the Trustee's amended complaint in this Court. Accordingly, this Court granted the Trustee's motion for default judgment on August 3, 2010.  (ECF No. 49).  Thereafter, Zeus and the Trustee entered into a stipulation pursuant to which the Trustee agreed to vacate the default judgment against Zeus.  Zeus agreed not to oppose the Trustee's application to the Supreme Court of Gibraltar for the transfer of over $60 million that had been held in Zeus's account at Bank Safra and was placed in the custody of the Gibraltar Supreme Court.  This Court approved the stipulation on November 23, 2010.  (ECF No. 56).  The Trustee and Siam reached a settlement, and Siam was dismissed from the domestic and Gibraltar actions.

266.    The Trustee filed an application in the Gibraltar Supreme Court for the repatriation of those funds to the United States, which was granted.  Those funds were deposited in the Court's registry on August 8, 2011.

267.    The Trustee also served a protective action in Gibraltar to preserve his right to sue Vizcaya, Bank Safra, Asphalia, Zeus, Siam, Banque J. Safra (Suisse) SA, and Pictet et Cie for $180 million in transfers received from BLMIS.

268.    In addition, in September 2012, the Trustee filed an action in the Gibraltar courts opposing and seeking to join to the Trustee's existing proceedings in Gibraltar a petition filed by Mr. Robert Faissal against Vizcaya (the "Faissal Action").  The Faissal Action seeks to adjourn the enforcement of a default judgment entered in the BVI against Vizcaya.

269. In May 2015 the parties entered into mediation and on December 17, 2015 the parties executed a settlement agreement. The Trustee prepared and filed a Motion for an Order Approving a Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 on December 31, 2015. No objections were filed in response to this motion. Judge Bernstein issued the Order Approving the Settlement Agreement on January 26, 2016.

270. The Trustee received a settlement payment in the amount of $24,950,000 on February 12, 2016.

271. The Trustee dismissed Adversary Proceeding 09-1154 on February 16, 2016.

272. The Supreme Court of Gibraltar approved Orders dismissing the Gibraltar actions on March 10, 2016.

### (n)    **Picard v Rye/Tremont**

273. On December 7, 2010, the Trustee commenced an action against Tremont Group Holdings, Inc., Tremont Partners, Inc., Tremont (Bermuda) Ltd., Rye Select Broad Market Fund, and numerous other entities and individuals (collectively, the "Tremont Funds") in which the Trustee sought the return of approximately $2.1 billion under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for preferences and fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of the Tremont Funds (the "Tremont Litigation"). *Picard v. Tremont Group Holdings, Inc.*, Adv. No. 10-05310 (SMB) (Bankr. S.D.N.Y.).

274. After the court filing, the parties entered into substantive settlement negotiations. On September 22, 2011, this Court approved a settlement between the Trustee and more than a dozen domestic and foreign investment funds, their affiliates, and a former chief executive associated with Tremont Group Holdings, Inc. (collectively, "Tremont") in the amount of $1.025 billion. *Picard v. Tremont Group Holdings, Inc.*, Adv. No. 10-05310 (SMB) (Bankr. S.D.N.Y.),

79

(ECF No. 38).  (There were two non-settling defendants at the time, Sandra Manzke ("Manzke")

and Rye Select Broad Market XL Portfolio Limited ("XL Portfolio")).

275.    Pursuant to the settlement, Tremont delivered $1.025 billion into an escrow

account, which was placed into the Customer Fund, and the Trustee allowed certain customer

claims related to Tremont in the approximate amount of $2.9 billion.  Two objections to the

settlement agreement were filed by non-BLMIS customers, both of which were overruled by this

Court.  This Court entered an Order Granting Trustee's Motion for Entry of Order Approving

Agreement.  (ECF No. 38).

276.    Pursuant to the Tremont settlement, Tremont delivered $1.025 billion into an

escrow account on November 6, 2012.  The settlement payment was released from the escrow

account to the Trustee on February 8, 2013.  Accordingly, the Trustee allowed certain customer

claims related to Tremont.

277.    On February 10, 2012, XL Portfolio settled with the Trustee in connection with

the Tremont Litigation, as well as two other actions commenced on December 8, 2010 by the

Trustee against XL Portfolio and other defendants.  These other actions are captioned *Picard v.*

*ABN AMRO Bank, N.V. et al.,* Adv. No. 10-05354 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010) and

*Picard v. ABN AMRO (Ireland) Ltd., et al,* Adv. No. 10-05355 (SMB) (Bankr. S.D.N.Y. Dec. 8,

2010).

278.    On September 17, 2013, the remaining defendant in the Tremont Litigation,

Manzke, who was also a defendant in the captioned action, *Picard v. Maxam Absolute Return*

*Fund Ltd., et al.,* Adv. No. 10-05342 (Bankr. S.D.N.Y. Dec. 8, 2010), settled and had approved

the latter action.  Upon the Maxam settlement, Manzke was dismissed from the Tremont

Litigation, and that case closed.

279.   Subsequent to the dismissal of the Maxam and Tremont cases, strategy and investigation for proposed actions and amended proceedings against subsequent transferees has continued.   This includes work related to issues concerning extraterritoriality of some of the proposed defendants, and analysis consistent with various recent court rulings.

(o)   **Picard v. Stanley Shapiro**

280.   On December 9, 2010, the Trustee commenced an action against Stanley Shapiro, Renee Shapiro, David Shapiro, Rachel Shapiro, Leslie Shapiro Citron, Kenneth Citron, and numerous trusts (collectively, the "Shapiro Defendants") seeking the return of over $54 million under SIPA, the Bankruptcy Code, the New York Fraudulent Conveyance Act, and other applicable law for fraudulent conveyances and damages in connection with certain transfers of property by BLMIS to or for the benefit of the Shapiro Defendants. *See Picard v. Shapiro*, Adv. No. 10-05383 (BRL) (Bankr. S.D.N.Y.).   In early 2014, the Trustee filed a second amended complaint against the Shapiro Defendants.

281.   On August 28, 2014, the Shapiro Defendants moved to dismiss the second amended complaint on several grounds including, but not limited to, that they could avail themselves of the safe harbor protection under Section 546(e) of the Bankruptcy Code.   During the Report Period, the Bankruptcy Code issued a written decision in which it granted in part and denied in part the Shapiro Defendants' motion.   Thereafter, the Trustee and counsel for the Shapiro Defendants prepared a proposed order settling the Bankruptcy Court's decision on the motion, which the Bankruptcy Code entered on February 8, 2016.

282.   During the Report Period, the Trustee and counsel for the Shapiro Defendants held a Rule 26(f) conference, and prepared and submitted a proposed Case Management Order for the Court's consideration, which the Bankruptcy Code entered on March 31, 2016.   Also

during the Report Period, the Trustee continued to prepare for discovery with the Shapiro Family

and develop his case against the same.

### (p)   Picard v. Silver Creek

283.   During the Report Period, the Trustee and B&H attorneys investigated facts and

legal theories in connection with a potential recovery action against Silver Creek Long/Short

Holdings, L.L.C. ("L/S Holdings").  In addition, the Trustee engaged in pre-litigation settlement

discussions with L/S Holdings.

284.   After several months of arms-length and extensive negotiations concerning

potential claims and defenses, in March 2016, the Trustee entered into a settlement agreement

with L/S Holdings to settle all claims the Trustee may have asserted against L/S Holdings and

affiliated entities and individuals with respect to the funds L/S Holdings received.  The Trustee

subsequently filed a motion for approval of the settlement on March 25, 2016, which this Court

granted on April 26, 2016.  (ECF No. 13171).

### C.   Injunction Proceedings

285.   The Trustee commenced numerous injunction actions seeking to enjoin third party

lawsuits brought against defendants who also have been named as defendants in the Trustee's

avoidance actions.  Through these proceedings, the Trustee has sought to enforce the automatic

stay established by § 362 of the Bankruptcy Code and related District Court stays, and/or to

enjoin third party actions under § 105 of the Bankruptcy Code in order to facilitate the orderly

administration of the BLMIS liquidation, and to preserve assets from which the Trustee may

recover for the benefit of all BLMIS customers.  During the Report Period, there have been

developments in the Bankruptcy Court and the District Court with respect to these proceedings.

### i.   **Picard v. Marshall**

286.   The Trustee was previously successful in enjoining Adele Fox and other plaintiffs (the "Fox Plaintiffs") from pursuing putative class actions they had brought in 2010 against the Picower estate and related entities (the "Picower Parties") in view of the Trustee's settlement with the Picower Parties and the permanent injunction ("Permanent Injunction") issued as part of the settlement, precluding claims that duplicate or derive from claims the Trustee brought or could have brought against the Picower Parties.  This Court's decision barring the Fox Plaintiffs' suits was affirmed by the District Court and Second Circuit.  *Picard v. Fox*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010), *aff'd, Fox v. Picard*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd, In re Marshall*, 740 F.3d 81 (2d Cir. 2014).

287.   On February 5, 2014, shortly after the Second Circuit's affirmance, the Fox Plaintiffs brought a motion in Florida District Court to bring a second amended complaint against the Picower Parties as "control persons" of BLMIS under the federal securities laws.  The Trustee successfully enjoined the Fox Plaintiffs from proceeding with their new proposed class action in violation of the automatic stay and Permanent Injunction.  *See Picard v. Marshall*, 511 B.R. 375 (Bankr. S.D.N.Y. 2014).  In the same action, the Trustee also successfully enjoined another set of plaintiffs (the "Goldman Plaintiffs") from bringing a putative class action against the Picower Parties, as discussed further below.  On May 11, 2015, the Court's decision and order was affirmed by the District Court.  *Picard v. Marshall*, 531 B.R. 345, 350 (S.D.N.Y. 2015) (Koeltl, J.).

288.   Meanwhile, shortly after appealing this Court's decision in *Fox II* to the District Court, the Fox Plaintiffs moved in this Court for a deposition of Bernard Madoff and others under Federal Rule of Bankruptcy Procedure 2004 and, with respect to Bernard Madoff's deposition, under Federal Rule of Civil Procedure 27(a) and (b).  On October 30, 2014, this

Court denied the motion in full except it found that it lacked jurisdiction to rule on the request for

Bernard Madoff's deposition under Rule 27(a). *Picard v. Marshall*, No. 14-01840, 2014 WL

5486279 (Bankr. S.D.N.Y. Oct. 30, 2014).

289.   The Fox Plaintiffs subsequently brought a Rule 27(a) petition for a deposition of

Bernard Madoff in Delaware District Court, which declined to rule on the petition and

transferred the case to the District Court. *In re Marshall*, No. 15-MC-01, 2014 WL 849302 (D.

Del. Feb. 25, 2015).   The Fox Plaintiffs unsuccessfully petitioned the Third Circuit to vacate the

transfer order. *In re Marshall*, No. 15-1590 (3d Cir. 2015).

290.   On May 11, 2015, the District Court denied the Rule 27 petition after hearing oral

argument jointly with argument on the *Fox II* appeal. *Marshall v. Madoff*, 15-MC-56, 2015 WL

2183939 (S.D.N.Y. May 11, 2015).   The District Court held that the Fox Plaintiffs appeared to

be bringing the petition for the improper purpose of crafting a third amended complaint and

failed to show any urgent need for the deposition. *Id.* at 3.

291.   The Fox Plaintiffs appealed this decision to the Second Circuit, which

consolidated the appeal with the appeal of the District Court's decision on the *Fox II* injunction.

The Second Circuit dismissed the appeals on September 25, 2015 after the Fox Plaintiffs

abandoned the appeals.   (Order, *Marshall v. Capital Growth Co. et al.*, 15-1869 (lead), ECF No.

70 (2d Cir. Sept. 25, 2015).)

292.   On August 29, 2015, while the appeals to the Second Circuit were still pending,

the Fox Plaintiffs brought a declaratory judgment action and motion seeking to file a third

amended complaint against the Picower Parties ("*Fox III*").   The Fox Plaintiffs again alleged that

the Picower Parties were control persons of BLMIS and incorporated testimony from a recently

disclosed deposition of Bernard Madoff.   In support of their claim, the Fox Plaintiffs also

introduced on reply a declaration from Bernard Madoff in an unrelated case, which made references to Mr. Picower. The Fox Plaintiffs also stated in their papers that they intended to seek Bernard Madoff's deposition. The Trustee and Picower Parties objected to the Fox Plaintiffs' motion on the ground that the *Fox III* complaint was, like the predecessor complaints, duplicative and derivative of the Trustee's complaint, and further objected to the inclusion of Bernard Madoff's declaration in this action. On February 11, 2016, this Court heard oral argument and the parties are awaiting a decision.

293.   Counsel for the Fox Plaintiffs then moved in this Court on March 9, 2016 in an unrelated matter for the deposition of Bernard Madoff. The Trustee and Picower Parties objected to the motion in part on the ground that counsel would improperly seek testimony concerning Mr. Picower, which was irrelevant to the matter. On March 23, 2016, this Court issued a bench ruling allowing counsel to depose Mr. Madoff, but prohibiting any reference to Mr. Picower during the deposition.

### ii.   Picard v. A&G Goldman Partnership

294.   In December 2011, A & G Goldman Partnership and Pamela Goldman (the "Goldman Plaintiffs") moved before this Court to lift the automatic stay so that they could file putative securities class actions against the Picower Parties. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* No. 08-01789 (SMB) (S.D.N.Y. Dec. 13, 2011), ECF No. 4581. On June 20, 2012, this Court issued an order denying the Goldman Plaintiffs' motion as duplicative and derivative of the Trustee's settled claims and thus in violation of the Permanent Injunction as well as the automatic stay. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 477 B.R. 351, 352–53 (Bankr. S.D.N.Y. 2012).

295.   The Goldman Plaintiffs appealed to the District Court. *See A & G Goldman P'ship v. Picard*, No. 12-cv-06109 (RJS) (S.D.N.Y. Aug. 10, 2012). On September 30, 2013,

after oral argument, the District Court issued a decision affirming the Bankruptcy Court's decision and order. *A & G Goldman P'ship v. Picard*, No. 12 Civ. 6109 (RJS), 2013 WL 5511027 (S.D.N.Y. Sept. 30, 2013). The Goldman Plaintiffs did not further appeal the District Court's decision.

296.    On January 6, 2014, the Goldman Plaintiffs filed a new action in the District Court for the Southern District of Florida, seeking to file a new complaint against the Picower Parties. On March 11, 2014, the Trustee successfully sought injunctive relief against both the Goldman Plaintiffs and the Fox Plaintiffs, as discussed above. The Goldman Plaintiffs appealed the decision and order, but subsequently withdrew their appeal.

297.    On August 28, 2014, the Goldman Plaintiffs brought a new action against the Picower Parties in the United States District Court for the Southern District of Florida, again seeking to allege securities law claims against the Picower Parties. On November 17, 2014, the Trustee brought an adversary proceeding in this Court to enforce the Permanent Injunction against the Goldman Plaintiffs. The Picower Parties also brought a motion to enforce the Permanent Injunction against the Goldman Plaintiffs and the two actions were consolidated.

298.    On February 17, 2016, this Court granted the Trustee's and Picower Parties' motions. *See Picard v. A&G Goldman P'ship,* 14-02407, 2016 WL 625076 (Bankr. S.D.N.Y. Feb. 17, 2016). The Court held that the Goldman Plaintiffs sought to recover for conduct that was incidental to withdrawals that formed the basis of the Trustee's claims and for injuries that were identical to those suffered by customers generally. *Id.* at *11. The Court thus held that the Goldman Plaintiffs' claims were, like the earlier iterations of the claims, derivative of the claims the Trustee had settled, and were thus enjoined by the Permanent Injunction. *Id.* The Goldman Plaintiffs appealed the decision to the District Court. The appeal is pending.

## X.     INTERNATIONAL INVESTIGATION AND LITIGATION

299.    The Trustee's international investigation and recovery of BLMIS estate assets involves, among other things: (i) identifying the location and movement of estate assets abroad, (ii) becoming involved in litigation brought by third parties in foreign courts, by appearance or otherwise, to prevent the dissipation of funds properly belonging to the estate, (iii) bringing actions before United States and foreign courts and government agencies to recover customer property for the benefit of the customers and creditors of the BLMIS estate, and (iv) retaining international counsel to assist the Trustee in these efforts, when necessary.  More than seventy of the actions filed in this Court involve international defendants, and the Trustee is involved in actions and investigations in several jurisdictions, including Austria, Bermuda, Israel, and the United Kingdom, among others.

300.    The following summarizes key litigation involving foreign defendants in the Bankruptcy Court and in foreign courts.

### A.     Austria

301.    The Trustee has actively investigated certain banks, institutions, and individuals located in this jurisdiction.  The HSBC Action, discussed *supra*, names several Austrian and Italian defendants, including Sonja Kohn, Bank Austria, and UniCredit S.p.A.

### B.     Bermuda

302.    The Trustee is actively investigating various BLMIS-related entities, their officers and directors, and transfers of funds to and through Bermuda.  In addition, in December 2010, the Trustee filed protective actions in Bermuda against several HSBC-related entities in order to preserve the Trustee's ability to bring causes of action in that jurisdiction.  The Trustee also continues to actively monitor third party legal proceedings taking place in Bermuda that involve several BLMIS-related entities.

C.    **BVI**

303.    The Trustee has discovered and is actively investigating the involvement of no fewer than twenty BVI-based feeder funds that funneled money into the Ponzi scheme. In particular, the Trustee has investigated and filed active complaints in the Bankruptcy Court against several BVI-based defendants, including Kingate Global Fund, Ltd., Kingate Euro Fund, Ltd., Hermes International Fund Limited, Lagoon Investment Limited, Thema Fund Ltd, Thema Wise Investments Ltd., Lagoon Investment Trust, and Equity Trading Portfolio.

D.    **England**

304.    The Trustee currently has protective claims pending in England against Kingate-related individuals and entities and against HSBC and related entities.

E.    **Ireland**

305.    Ireland-based Thema International Fund plc and Landmark Fund are defendants in two separate avoidance actions. The Trustee has continued to investigate these and other Ireland-based funds, related third-party litigation and related entities.

F.    **Israel**

306.    The Trustee is pursuing an avoidance and recovery claim against certain Israeli defendants who received fictitious profits from BLMIS. In addition, in December 2015, the Trustee, acting through Israeli counsel, instituted two actions in Israel to avoid and recover transfers of customer property from certain Israeli defendants.

G.    **Switzerland and Luxembourg**

307.    In 2010, the Trustee filed two lawsuits in this Court against Switzerland-based UBS AG and other UBS-and HSBC related entities based in Luxembourg and various feeder funds, management companies, and individuals, discussed above. The Trustee also continues to monitor certain BLMIS-related third party actions currently pending in these jurisdictions.

## XI.    FEE APPLICATIONS AND RELATED APPEALS

### A.    Objections to Prior Fee Applications

308.    Objections were filed to six of the seventeen fee applications submitted by the Trustee and B&H.  Discussions of the objections to the first through sixth fee applications, and related motions for leave to appeal the Court's orders granting the Trustee's and B&H's fee applications and overruling those objections, are discussed more fully in the Trustee's Amended Third Interim Report ¶¶ 186–90 (ECF No. 2207); the Trustee's Fourth Interim Report ¶¶ 163–66 (ECF No. 3083); the Trustee's Fifth Interim Report ¶¶ 134–43 (ECF No. 4072); and the Trustee's Sixth Interim Report ¶¶ 131–42 (ECF No. 4529).  No decision has been entered on the motion for leave to appeal the Second Interim Fee Order, No. M47-b (DAB) (S.D.N.Y.).  The motion for leave to appeal the Sixth Interim Fee Order was withdrawn on September 10, 2014. *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Case No. 11 MC 00265(PGG) (S.D.N.Y.), ECF No. 9.

### B.    Nineteenth Fee Application

309.    On November 23, 2015, the Trustee and his counsel filed the Nineteenth Application for Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses incurred from April 1, 2015 through and including July 31, 2015 with the Bankruptcy Court.  (ECF No. 12089).  Special counsel and international special counsel also filed applications for Interim Professional Compensation.  (ECF Nos. 12090-12112).

310.    At the hearing on December 17, 2015, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Nineteenth Interim Fee Application was reasonable.  This Court subsequently entered the Nineteenth Interim Fee Order approving the Nineteenth Interim Fee

Applications.  (ECF No. 12292).  No motion for leave to appeal the Nineteenth Interim Fee Order was filed.

**C.    Twentieth Fee Application**

311.    On March 23, 2016, the Trustee and his counsel filed the Twentieth Application for Interim Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses incurred from August 1, 2015 through and including November 30, 2015 with the Bankruptcy Court.  (ECF No. 12958).  Special counsel and international special counsel also filed applications for Interim Professional Compensation.  (ECF Nos. 12959-12975).  At the hearing on April 27, 2016, the Trustee, his counsel, and SIPC were heard and provided a description of the services rendered and the reasons for which the compensation sought in the Twentieth Interim Fee Application was reasonable.  This Court subsequently entered the Twentieth Interim Fee Order approving the Twentieth Interim Fee Applications.  (ECF No. 13180).

## XII.   CONCLUSION

The foregoing report represents a summary of the status of this proceeding and the

material events that have occurred through March 31, 2016, unless otherwise indicated.  This

Report will be supplemented and updated with further interim reports.


Dated:  New York, New York
       April 28, 2016

Respectfully submitted,

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Heather R. Wlodek
Email: hwlodek@bakerlaw.com

*/s/ Irving H. Picard*
Irving H. Picard
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: ipicard@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the Estate of Bernard L. Madoff*

*Trustee for the Substantively Consolidated
SIPA Liquidation of Bernard L. Madoff
Investment Securities LLC and the Estate of
Bernard L. Madoff*