**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04311 (SMB) |
| Plaintiff, | |
| v. | |
| ANDREW H. COHEN, | |
| Defendant. | |

**PLAINTIFF IRVING H. PICARD'S RESPONSE TO**
**DEFENDANT ANDREW H. COHEN'S AMENDED OBJECTIONS TO**
**POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

RELEVANT BACKGROUND ..............................................................3

    A.    The Madoff Ponzi Scheme..........................................3

    B.    The SIPA Statutory Framework....................................3

    C.    *The Net Equity Decision* ..........................................4

    D.    *Picard v. Greiff* ......................................................5

    E.    *The Antecedent Debt Decision*....................................7

    F.    *The Omnibus Good Faith Decision* ..............................9

    G.    *The Time-Based Damages Decision* ............................11

ARGUMENT ....................................................................................13

  I.    THE TRUSTEE HAS ESTABLISHED HIS *PRIMA FACIE* CASE TO AVOID AND RECOVER THE FICTITIOUS PROFITS RECEIVED BY MR. COHEN......................................................................13

  II.    DEFENDANT'S OBJECTIONS RELATING TO PURPORTED LEGAL DEFENSES FAIL AS A MATTER OF LAW ......................................14

    A.    Mr. Cohen Did Not Give Value For Any Amount Above His Principal Deposits With BLMIS.................................15

        1.    The Second Circuit's *Silverman* Decision Is Persuasive Authority....................................................16

        2.    There Is No Basis To Treat Equity Investors and Retail Customers Differently..........................................18

    B.    Mr. Cohen's Receipt Of Fictitious Profits Did Not Satisfy An Antecedent Debt Or Obligation Or Provide Value Under Section 548(c) Of The Bankruptcy Code..............................18

        1.    Section 548(c) Of The Bankruptcy Code Does Not Limit The SIPA Trustee's Avoidance Powers.................................19

        2.    The *Antecedent Debt Decision* Remains Law Of The Case. .........21

        3.    Mr. Cohen's Purported Federal And State Law Claims Or Obligations Do Not Constitute Value Under Section 548(c)........22

# TABLE OF CONTENTS
## (continued)

**Page**

4.    Mr. Cohen's Purported Remedies, Adjustments, And Setoffs Under State Or Federal Law Do Not Constitute Value Under Section 548(c). ..............................................................................26

    a.    Taxes May Not Be Considered As Part Of Value Calculation Or Setoff Under 550(e)..................................27

    b.    Mr. Cohen's Legal Fees and Lost Opportunities Do Not Constitute Consequential Damages That Create Value. ..............................................................................28

    c.    Mr. Cohen Is Not Entitled to Time-Value Adjustments. ....29

CONCLUSION....................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re All-Type Printing, Inc.*,
  274 B.R. 316 (Bankr. D. Conn. 2002) ...................................................................25

*Amer. Sur. Co. of N.Y. v. Sampsell*,
  327 U.S. 269 (1946).........................................................................................24

*Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
  256 B.R. 664 (Bankr. S.D.N.Y. 2000) .............................................................15, 17

*Bash v. Lepelley (In re Lepelley)*,
  233 B.R. 802 (Bankr. N.D. Ohio 1999) ...............................................................28

*In re Bayou Group, LLC*,
  362 B.R. 624 (Bankr. S.D.N.Y. 2007) ..................................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011)........................................................................3, 6, 26

*In re Central Illinois*,
  526 B.R. 786 (Bankr. C.D. Ill. 2015)....................................................................25

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re
  Bayou Group, LLC)*,
  439 B.R. 284 (S.D.N.Y. 2010)............................................................................29

*In re Consol. Yacht Corp.*,
  337 B.R. 711 (Bankr. S.D. Fla. 2006)..................................................................28

*Donell v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) ...................................................................16, 27, 28

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
  452 B.R. 391 (Bankr. S.D.N.Y. 2011)...................................................................16

*In re HDD Rotary Sales, LLC*,
  512 B.R. 877 (Bankr. S.D. Tex. 2014) .................................................................25

*In re Hedged–Invs. Assocs., Inc.*,
  84 F.3d 1286 (10th Cir. 1996) ......................................................................16, 28

*Janvey v. Brown*,
  767 F.3d 430 (5th Cir. 2014) .....................................................................16, 26, 28

*In re National Gas Distribs., LLC*,
  412 B.R. 758 (Bankr. E.D.N.C. 2009)..................................................................25

## TABLE OF AUTHORITIES
### (continued)

*In re Nirvana Rest.*,
   337 B.R. 495 (Bankr. S.D.N.Y. 2006) ................................................................25

*Picard v. Cohmad Sec. Corp.* (*In re BLMIS*),
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..........................................................15, 17

*Picard v. The Estate (Succession) of Doris Igoin* (*In re Madoff Sec.*),
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) ..........................................................27, 28

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014) ............................................................................19

*Picard v. Ida Fishman Revocable Trust* (*In re Madoff Sec.*),
   773 F.3d 411 (2d Cir. 2014) ....................................................................... *passim*

*S.E.C. v. Aragon Capital Mgmt., LLC*,
   672 F. Supp. 2d 421 (S.D.N.Y. 2009) *and aff'd in part sub nom. S.E.C. v.
   Rosenthal,* 426 F. App'x 1 (2d Cir. 2011) .................................................28

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) ......................................................................10, 16

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*),
   476 B.R. 715 (S.D.N.Y. 2012) ................................................................... *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*),
   499 B.R. 416 (S.D.N.Y. 2013) ................................................................... *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*),
   531 B.R. 439 (Bankr. S.D.N.Y. 2015) ....................................................... *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*),
   779 F.3d 74 (2d Cir. 2015) ...........................................................11, 12, 29, 30

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*),
   987 F. Supp. 2d 309 (S.D.N.Y. 2013) .................................................................9

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, (Picard v. Andrew
   H. Cohen),*
   Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. April
   25, 2016) ..................................................................................................... *passim*

*Silverman v. Cullin* (*In re Agape World, Inc.*),
   633 Fed. Appx. 16 (2d Cir. Feb. 4, 2016) ................................................14, 16, 17

**TABLE OF AUTHORITIES**
(continued)

*Silverman v. Cullin*,
No. 14 Civ. 4248 (JMA), 2015 WL 1509583 (E.D.N.Y. Mar. 31, 2015)................................17

*Wing v. Dockstader*,
No. 2:08 Civ. 776 (BVD), 2010 WL 5020959 (D. Utah 2010) ............................................28

*World Trade Ctr. Props., LLC v. Am. Airlines, Inc.* (*In re Sept. 11 Litig.*),
802 F.3d 314 (2d Cir. 2015)................................................................................................29

**Statutes**

11 U.S.C. § 546(e) ....................................................................................................11, 21, 22, 24

11 U.S.C. § 548(a)(1)(A) .................................................................................................... *passim*

11 U.S.C. § 548(a)(1)(B) ..............................................................................................................17

11 U.S.C. § 548(c) .............................................................................................................. *passim*

11 U.S.C. § 550 ............................................................................................................................28

11 U.S.C. § 550(e) .......................................................................................................................28

15 U.S.C. § 78aaa ..........................................................................................................................1

15 U.S.C. § 78cc(b) .....................................................................................................................23

15 U.S.C. § 78fff–1(a) ............................................................................................................3, 19

15 U.S.C. § 78fff–2(c)(1) ..............................................................................................................4

15 U.S.C. § 78fff–2(c)(3).................................................................................................4, 19, 20

15 U.S.C. § 78fff(b) .....................................................................................................................19

15 U.S.C. § 78*lll*(4).................................................................................................................3, 20

15 U.S.C. § 771(a)(2) ...................................................................................................................23

N.Y. Debt. & Cred. Law § 272 ....................................................................................................17

N.Y. Debt. & Cred. Law § 273 ....................................................................................................17

N.Y. U.C.C. § 8–501(b)(1) ............................................................................................................5

N.Y. U.C.C. § 8–503 cmt.1 (2009)..............................................................................................24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**Rules**

N.Y. C.P.L.R. § 5001 .................................................................................................................29

**Other Authorities**

U.S. Const., art. VI, cl. 2 ..........................................................................................................24

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act

("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L.

Madoff under Chapter 7 of the United States Bankruptcy Code, by and through his undersigned

counsel, hereby submits the following response to Defendant Andrew H. Cohen's Amended

Post-Trial Objections to Proposed Findings of Fact and Conclusions of Law ("Objections") (ECF

No. 117) to the Post-Trial Proposed Findings of Fact and Conclusions of Law ("*Proposed

Findings and Conclusions*") (ECF No. 90)[1] entered on April 26, 2016, by the Hon. Stuart M.

Bernstein of the United States Bankruptcy Court for the Southern District of New York in the

above-captioned adversary proceeding against Mr. Cohen.

## PRELIMINARY STATEMENT

This case was tried on stipulated facts in which Mr. Cohen admitted that he invested in a

Ponzi scheme operated by BLMIS and that he received $1,143,461 in fictitious profits from the

Ponzi scheme within the two years preceding December 11, 2008 (the "Filing Date").  Through

his Objections, Mr. Cohen seeks to keep all the fictitious profits he received by challenging well-

settled rules of law defining "value" in the context of a Ponzi scheme.  No amount of creativity,

however, can rebut the rules of law set forth by the Bankruptcy Court and the District Court in

this SIPA liquidation.  These rules require the conclusion that Mr. Cohen did not give value

beyond his deposits of principal with BLMIS, and as a net winner Mr. Cohen cannot argue that

the payment of fictitious profits he received from BLMIS satisfied an antecedent debt or

provided value under section 548(c) of the Bankruptcy Code.

---

[1] Post-Trial Proposed Findings of Fact and Conclusions of Law, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, (*Picard v. Andrew H. Cohen*), Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. April 25, 2016).

In challenging the Bankruptcy Court's *Proposed Findings and Conclusions*, Mr. Cohen relies heavily on arguments raised by third parties who were denied intervention in this adversary proceeding.[2]  These are arguments of which Mr. Cohen was aware, but chose not to raise during the trial in the Bankruptcy Court or in his post-trial submissions.  And for good reason: none of the arguments succeed at redefining value in the context of a Ponzi scheme or permit Mr. Cohen to keep the fictitious profits he received from BLMIS.

For example, Mr. Cohen argues that the fictitious profits he received satisfied "obligations" owed by BLMIS and thus provided value under section 548(c).  This is just the "antecedent debt" argument under a different name, and it fails for the same reasons.  In short, the profits Mr. Cohen received were not offset by any further investments with BLMIS, and only reduced BLMIS's funds to the detriment of other BLMIS investors.  This is especially true in a SIPA liquidation, where SIPA establishes a separate customer property fund for priority distribution to customers according to their "net equities."  Thus, any amount that Mr. Cohen retains above his principal investment depletes, dollar-for-dollar, the fund of customer property available to satisfy net equity claims of less fortunate customers who never fully withdrew their deposits of principal from BLMIS.

With no viable legal defenses, Mr. Cohen is liable for the full amount of the fictitious profits he received from BLMIS.  The Trustee respectfully requests that the District Court adopt

---

[2] In his Objections, Mr. Cohen acknowledges that he incorporated "many of the arguments and authorities" from a memorandum of law filed on behalf of defendants in 57 other avoidance actions commenced by the Trustee in the Bankruptcy Court.  (Objections at 3.)  *See* Memorandum of Law (Provisional) of Intervenor-Customers on Value Defense Issues, *Picard v. Cohen,* Adv. Pro. No. 10-04311 (SMB) (Bankr. S.D.N.Y. Dec. 9, 2015), ECF No. 73.  However, at no point in time did the Bankruptcy Court permit the intervenors to file the memorandum of law, and as Mr. Cohen noted, on April 28, 2016, the Bankruptcy Court denied the intervenors' motion to intervene as parties or *amicus curiae* in this proceeding.  *See* Order Denying Motion To Intervene Or To Participate As Amicus Curiae, *Picard v. Cohen,* Adv. Pro. No. 10-04311 (SMB) (Bankr. S.D.N.Y. April 28, 2016), ECF No. 94.  Despite the fact that Mr. Cohen attempts to evade the Bankruptcy Court's denial by copying wholesale in many instances the intervenors' arguments in his Objections, the Trustee nonetheless has responded to each of the arguments grafted by Mr. Cohen, and they all fail for the reasons set forth herein.

the Bankruptcy Court's *Proposed Findings and Conclusions*, which are founded upon extensive

precedent in this SIPA proceeding as well as other Ponzi scheme cases, and enter a final

judgment in favor of the Trustee in the sum of $1,143,461.

## RELEVANT BACKGROUND

Most if not all of the legal defenses raised by Mr. Cohen in his Objections have been

previously litigated and rejected in several prior decisions by the Bankruptcy Court, the District

Court, and the Second Circuit Court of Appeals, as explained below.

### A.    The Madoff Ponzi Scheme

Prior to filing for bankruptcy, BLMIS purported to invest in securities on behalf of its

investment advisory customers. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231

(2d Cir. 2011) ("*Net Equity Decision*"). In reality, BLMIS's investment advisory business never

executed any trades. *Id.* Instead, BLMIS operated as a Ponzi scheme. *Id.* at 232. Madoff used

deposits from new and existing customers to fund withdrawals of principal and supposed profit

made by other customers. *Id.* Thus, when customers withdrew money from their BLMIS

investment accounts, they did not receive returns on their purported investments, but only the

money that they and others had deposited with BLMIS for investment. *Id.*

### B.    The SIPA Statutory Framework

SIPA establishes procedures for liquidating failed broker-dealers. As a general matter, a

SIPA trustee is "vested with the same powers and title with respect to the debtor and the property

of the debtor … as a trustee in a case under Title 11." 15 U.S.C. § 78fff–1(a). However, a SIPA

bankruptcy is different from an ordinary bankruptcy in that SIPA empowers a SIPA trustee to

recover and distribute "customer property" to the debtor's customers. *See* 15 U.S.C. § 78*lll*(4)

(defining customer property as "cash and securities … at any time received, acquired, or held by

or for the account of a debtor from or for the securities accounts of a customer, and the proceeds

3

of any such property transferred by the debtor, including property unlawfully converted"). Correspondingly, SIPA superimposes on the Bankruptcy Code a separate customer property estate that takes priority over the debtor's general estate.  Customer property remaining in the possession of the debtor as of the filing date is allocated to this separate customer property estate for distribution to the debtor's customers, who "share ratably in such customer property on the basis and to the extent of their respective net equities."  15 U.S.C. § 78fff–2(c)(1).

To the extent that existing "customer property is not sufficient to pay in full" those customers' "net equity" claims, the trustee is empowered by SIPA to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11."  15 U.S.C. § 78fff–2(c)(3).  If any customer property remains "after allocation in accordance with" SIPA's statutory priorities, those assets "become part of the general estate of the debtor."  *Id.*

## C.    *The Net Equity Decision*

In 2011, the Second Circuit affirmed the Bankruptcy Court's decision upholding the Trustee's use of the "Net Investment Method" for calculating a BLMIS customer's "net equity" under SIPA.  *See Net Equity Decision*, 654 F.3d at 231.  Under the Net Investment Method, net equity is determined by calculating the total amount of principal that was invested in a customer's account (cash in) minus the total amount of money withdrawn from that account (cash out).  *Id*. at 233.  Thus, if a customer, during the life of an account, had withdrawn more money than he had invested, the account would have no or negative net equity, even if the BLMIS statements for the account reported a positive balance reflecting "profit" that BLMIS falsely claimed to have made for the account.  *Id*.  The use of the Net Investment Method limits the class of customers who have allowable claims against the BLMIS customer property fund to

4

those who deposited more cash than they withdrew from their investment accounts, because only those customers have positive net equity. *Id.*

The Second Circuit held that the Net Investment Method was consistent with SIPA. *Id.* at 235. According to the Circuit, the Trustee's use of the Net Investment Method preserved the separate customer fund for priority distribution to customers who—having withdrawn less money than they deposited—had not yet recovered their principal investments. *Id.* Otherwise, "those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed." *Id.* at 238; *see also id.* at 240 ("[I]f customers receive SIPC advances based on property that is a fiction, those advances will necessarily diminish the amount of customer property available to other investors, including those who have not recouped even their initial investment.").

    **D.**     ***Picard v. Greiff***

In *Greiff*, defendants in four adversary proceedings—who had withdrawn more money than they deposited with BLMIS—moved the District Court to dismiss the Trustee's claims to avoid transfers of fictitious profits under section 548(a)(1)(A).[3] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, (*In re Madoff Sec.*), 476 B.R. 715 (S.D.N.Y. 2012) ("*Greiff*"). Defendants argued that they had state law claims against BLMIS that entitled them to the purported securities listed on their monthly account statements, *e.g.*, N.Y. U.C.C. § 8–501(b)(1), even though BLMIS failed to purchase those securities. *Id.* at 724. Defendants maintained that each time they withdrew profits from BLMIS, they received money in satisfaction of that entitlement. *Id.* at 725. Accordingly, defendants argued that they received the transfers of

---

[3] Defendants in eighty other adversary proceedings, not including Mr. Cohen, eventually joined in the motions to dismiss. *See Greiff*, 476 B.R. at 729-30.

fictitious profits "for value" under 11 U.S.C. § 548(c), because the transfers discharged BLMIS's liabilities and/or obligations on defendants' state law claims.  *Id.*

The District Court rejected defendants' arguments, holding that transfers from BLMIS to defendants that "exceeded the return of defendants' principal, *i.e.*, that constituted profits, were not 'for value.'"  *Id.*  According to the District Court, "the transfers must be assessed on the basis of what they really were; and they really were artificial transfers designed to further the fraud, rather than any true return on investments."  *Id.*  Therefore, it was not surprising to the District Court that "every circuit court to address this issue [of value] has concluded that an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not 'for value."  *Id.* (collecting cases).

The District Court further held, "even if the defendants had enforceable claims for the amounts reported on their brokerage statements, a conclusion that satisfaction of those claims gave 'value' to [BLMIS] would conflict with SIPA."  *Id.* at 727.  Here, the District Court noted that SIPA establishes a separate customer property fund for priority distribution to customers with net equity claims.  *Id.*  And whenever the customer fund is insufficient to pay priority claims, SIPA permits the Trustee to invoke the avoidance provisions of the Bankruptcy Code, such as section 548(a)(1)(A), to recover "customer property" for distribution according to SIPA's priorities.  *Id.* (citing *Net Equity Decision*, 654 F.3d at 233).  The District Court found that "allow[ing] defendants, who have no net equity claims, to retain profits paid out of customer property on the ground that their withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims."  *Id.* at 727.  Thus, in order to preserve the customer fund for distribution

according to customers' net equities, the District Court concluded that defendants did not receive

transfers of fictitious profits "for value." *Id*. at 728.

### E.   *The Antecedent Debt Decision*

The District Court revisited the value issue in an omnibus decision that disposed, in part,

of motions to dismiss in approximately 300 adversary proceedings.  *Sec. Investor Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC*, (*In re Madoff Sec.*), 499 B.R. 416 (S.D.N.Y. 2013)

("*Antecedent Debt Decision*").  Defendants, including Mr. Cohen,[4] moved to dismiss the

Trustee's complaints, arguing they were entitled to retain transfers of profits from BLMIS under

section 548(c) because they held federal and state law claims against BLMIS, which constituted

antecedent debts under the Bankruptcy Code.  *Id*. at 422.  Sounding a familiar refrain, defendants

argued that the transfers of profits from BLMIS satisfied the antecedent debts and thus provided

"value" for the profits received from BLMIS.  *Id*. at 423.  Citing *Greiff*, the District Court

rejected defendants' arguments, holding that even if defendants held valid claims under federal

or state law, those claims did not provide value under SIPA against the separate BLMIS

customer property estate.  *Id.* at 423 (citing *Greiff,* 476 B.R. at 727-28); *see also id.* 422 n. 6.

In response to the District Court's clear holding in *Greiff*, defendants argued that the

Trustee was seeking greater avoidance power than provided under the Bankruptcy Code, which

was impermissible because SIPA does not redefine "value" under the Code.  *Id*.  The District

Court rejected defendants' argument that a SIPA trustee's rights are no greater than those of an

ordinary bankruptcy trustee.  *Id.*  "[W]hile SIPA provides that a SIPA trustee is 'vested with the

---

[4] On March 14, 2012, Cohen moved to withdraw the reference on three issues, including "whether the Trustee improperly seeks to avoid transfers that BLMIS made in satisfaction of antecedent debt owed by BLMIS to Mr. Cohen."  *See* Defendant's Memorandum of Law in Support of Motion for Mandatory Withdrawal of the Reference, *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB) (Bankr. S.D.N.Y. Mar. 14, 2012), ECF No. 15–1.  On May 12, 2012, the District Court granted Mr. Cohen's motion to withdraw the reference on the antecedent debt issue.  *See* Order, *Picard v. Cohen*, No. 12 Civ. 02583 (JSR) (S.D.N.Y. May 12, 2012), ECF No. 5.

same powers and title with respect to the debtor and the property of the debtor … as a trustee in a case under Title 11,'" the District Court noted that under SIPA "the provisions of the Bankruptcy Code apply only '[t]o the extent consistent with the provisions of this chapter.'" *Id*. Accordingly, the District Court found that the Trustee's powers to avoid transfers under the Code "must be interpreted through the lens of SIPA's statutory scheme." *Id*.

"More fundamentally," the District Court found that "the definition of net equity and the definition of claims that can provide 'value' to the customer property estate are inherently intertwined where the customer property estate is created as a priority estate intended to compensate customers only for their net-equity claims." *Id*. at 424. According to the District Court:

> To the extent that defendants' state and federal law claims allow them to withhold funds beyond their net-equity share of customer property, those defendants are, in effect, making those damages claims against the customer property estate. Because their damages claims are not net-equity claims (or any other payments that are permitted to be made in SIPA's priority scheme), allowing such claims to be drawn out of the customer property estate would violate SIPA. It is for this reason that only a defendant's investment of principal may count as "value" with respect to the customer property estate for purposes of section 548(c).

*Id*. To the extent that defendants may have any state and federal law claims, those claims run against BLMIS's general estate, not the customer property estate. *Id*.

The District Court also rejected defendants' arguments that BLMIS's account statements constituted binding, enforceable obligations of BLMIS to its customers, as the amounts reported thereon were not "antecedent debts" that BLMIS owed to its customers. *Id*. at 421 n. 4. The District Court "reject[ed] defendants' contention that [BLMIS's] pre-reach-back-period account statements constitute[d] binding obligations of [BLMIS] to its customers that the Trustee must avoid." *Id*. The District Court found that the amounts reported on account statements were

invalid and entirely unenforceable.  *Id.* (citing *Greiff*, 476 B.R. at 726).  Such amounts therefore

could not create valid obligations used to offset liabilities.  *Id.*

The District Court concluded that "it would significantly undo the SIPA scheme to allow

customers to recast amounts received as something other than what they were—fictitious

profits—and treat them as a claim for antecedent debts beyond the customer's net equity."  *Id*. at

425.  Therefore, under SIPA, "a customer may only seek the protections of section 548(c) to the

extent of investments of principal, and federal and state law claims cannot be used to increase the

amount to which a customer is entitled from the customer property estate."  *Id*. at 426.

Following the *Antecedent Debt Decision*, the District Court denied a motion made by

certain defendants for interlocutory appeal.  The District Court was "not of the opinion that there

is a substantial ground for difference of opinion as to the holding of the [*Antecedent Debt

Decision*], substantially for the reasons stated in the Trustee's memorandum of law in opposition

to the motion."  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff

Sec.*), 987 F. Supp. 2d 309, 311 (S.D.N.Y. 2013).

## F.     *The Omnibus Good Faith Decision*

After the District Court returned the adversary proceedings to the Bankruptcy Court for

further proceedings consistent with the *Antecedent Debt Decision*, the Bankruptcy Court

revisited the antecedent debt/value issue in deciding omnibus motions to dismiss brought by

defendants in nearly 250 adversary proceedings.[5]  *Sec. Investor Prot. Corp. v. Bernard L. Madoff

Inv. Sec. LLC,* (*In re Madoff Sec.*), 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith

Decision*").  Notwithstanding the District Court's holdings in *Greiff* and the *Antecedent Debt

Decision*, these defendants yet again argued that "the fictitious profits they received from BLMIS

---

[5] Mr. Cohen was not one of the movants.

9

satisfied their claims against BLMIS including those arising from violations of federal securities

law and state law (*e.g.*, fraud, breach of contract, breach of fiduciary duty, rescission)," and

consequently they "provided 'value' to BLMIS in exchange for the fictitious profits."  *Id*. at 461.

The Bankruptcy Court denied defendants' motion, concluding that the District Court's

prior rulings in *Greiff* and the *Antecedent Debt Decision* were "consistent with the well-settled

rule in Ponzi scheme cases that net winners must disgorge their winnings.*"  Id*. at 462-63

(collecting cases).  The Bankruptcy Court explained that "the rationale for the rule is that the

Ponzi scheme participant does not provide any value to the debtor in exchange for the fictitious

profits it receives."  *Id.* at 463 (citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995)

("The paying out of profits to [the Ponzi scheme investor] not offset by further investments by

him conferred no benefit on the [entities involved in the Ponzi scheme] but merely depleted their

resources faster.") (modifications in original)).  Citing to *Greiff* and the *Antecedent Debt*

*Decision*, the Bankruptcy Court also rejected defendants' purported "value" defense as being in

conflict with SIPA's statutory scheme.  *Id*. at 466 ("Allowing net winners to retain fictitious

profits in satisfaction of state law claims would conflict with SIPA's priority system and frustrate

the Trustee's efforts to satisfy priority claims.").

The Bankruptcy Court noted that the extensive consideration of the antecedent debt/value

issue by the District Court (Rakoff, J.) "would normally foreclose further argument in this

Court," because "those moving defendants that participated in the withdrawal of the reference of

the antecedent debt/value issue have had their day in court and Judge Rakoff's decisions are law

of the case."  *Id*.  However, defendants also argued that subsequent Second Circuit cases,

decided after the *Antecedent Debt Decision*, required a different conclusion.  *Id*.  For example,

relying on *Picard v. Ida Fishman Revocable Trust* (*In re Madoff Sec.*), 773 F.3d 411 (2d Cir.

2014) (*"Section 546(e) Decision"*), defendants argued that the *Antecedent Debt Decision* was wrongly decided because the *Section 546(e) Decision* confirmed that "SIPA priorities cannot impair an otherwise valid defense under Bankruptcy Code § 548(c)." *Id.* at 469.[6]

In rejecting defendants' argument that the *Antecedent Debt Decision* was no longer good law, the Bankruptcy Court first noted that none of the recent Second Circuit cases cited by defendants addressed the question of value or the settled rule that "transferees in a Ponzi scheme do not give 'value' within the meaning of the Bankruptcy Code beyond what they pay into the scheme." *Id.* at 469-70. Second, the Bankruptcy Court noted that, unlike the prohibitions to avoidance embedded in the section 546(e) "safe harbor," there was "no clear statutory direction that the satisfaction of claims against the general estate provides value for the fraudulent transfer of fictitious profits from the deposits made by other customers." *Id.* at 470. Accordingly, after distinguishing defendants' cases, the Bankruptcy Court concluded that "the payment of fictitious profits did not satisfy an antecedent debt or provide value within the meaning of the Bankruptcy Code." *Id.*[7]

### G.    *The Time-Based Damages Decision*

In 2013, the Second Circuit affirmed the Bankruptcy Court's decision that BLMIS customers were not entitled under SIPA to adjustments to their claims to account for any form of time-based damages, including those relating to lost opportunity costs or the consumer price index ("CPI"). *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* (*In re Madoff Sec.*), 779 F.3d 74 (2d Cir. 2015) (*"Time-Based Damages Decision"*). The Court noted that

---

[6] In the *Section 546(e) Decision*, the Second Circuit affirmed the District Court's ruling that payments to customers were subject to the safe harbor under section 546(e) of the Bankruptcy Code, which limited the Trustee to avoiding intentional fraudulent transfers made within two years of the filing date under section 548(a)(1)(A) in cases where the Trustee did not allege that the customer knew the fraud. 773 F.3d at 417.

[7] This argument is further addressed in Section II(B)(2) herein.

"[b]ecause it is doubtful that the full amount of customer property will be recovered in this case, each dollar allocated to earlier investors in recognition of inflation reduces the amount of principal recovered by later investors." *Id.* at 81.  Thus, the Court found that adjusting net equity claims to account for inflation would only favor customers who already have recovered their principal investments, "at the expense of customers who have not yet recovered the property they placed in Madoff's hands." *Id.*

While Mr. Cohen did not participate in the time-based damages proceedings, he did participate in the briefing relating to the *Antecedent Debt Decision*, in which he, along with others, argued that they should be compensated for the time value of money and were entitled to a purported "revaluation of his principal pursuant to the CPI index."[8]  While the District Court declined to address defendants' arguments because it did not withdraw the reference on this issue, *Antecedent Debt Decision*, 499 B.R. at 422 n. 5, the District Court made clear that the calculation of net equity is the same in the context of determining the amount of a customer's net equity claim and in determining avoidance liability: "a customer's net equity and the amounts sought in avoidance and recovery proceedings (assuming the customer's good faith) are two sides of the same coin." *Id.* at 420.  As a result, the District Court concluded that to deny a time-value adjustment in calculating net equity but to permit such an adjustment in calculating avoidance liability would undermine SIPA's priorities and lead to inconsistent results.

---

[8] *See* Consolidated Memorandum of Law in Support of Motion to Dismiss Regarding Antecedent Debt Issues on Behalf of Withdrawal Defendants As Ordered By The Court on May 12, 2012, at 6-10, *In re Madoff Sec.,* No. 12 Misc. 00115 (JSR) (S.D.N.Y. June 25, 2012), ECF No. 199.

12

## ARGUMENT

**I.    THE TRUSTEE HAS ESTABLISHED HIS *PRIMA FACIE* CASE TO AVOID AND RECOVER THE FICTITIOUS PROFITS RECEIVED BY MR. COHEN**

The Bankruptcy Court correctly found that the Trustee had satisfied his burden of proof on his affirmative claim to avoid and recover the fictitious profits received by Mr. Cohen. *Proposed Findings and Conclusions,* 2016 WL 1695296 at *5. As stipulated by the parties, Mr. Cohen held an investment account with BLMIS. *Id.* at *2. Between January 18, 1996 and the Filing Date, Mr. Cohen deposited a total of $2,921,539 into the account and withdrew, and received, a total of $4,065,000 from the account. *Id.* Thus, of the withdrawals from the account, a total of $1,143,461 was received by Mr. Cohen in excess of principal, representing fictitious profits from the Ponzi scheme. *Id.* All of the withdrawals of fictitious profits took place within two years of the Filing Date. *Id.*

The parties further stipulated that fraud permeated BLMIS, that BLMIS was operating a Ponzi scheme, and that BLMIS was insolvent. *Id.* at *3. The parties also stipulated that BLMIS made each of the transfers to Mr. Cohen with actual intent to hinder, delay, or defraud some or all of BLMIS's creditors within the meaning of section 548(a)(1)(A) of the Bankruptcy Code. *Id.* Given the parties' stipulations, the Bankruptcy Court correctly found that the transfers from BLMIS to Mr. Cohen are deemed to have been made with actual fraudulent intent. *Id.* at *5.

In short, Mr. Cohen admitted he received $1,143,431 in fictitious profits from his BLMIS account during the two years preceding the Filing Date. Therefore, Mr. Cohen can only avoid liability if he can establish one or more of his purported defenses under Bankruptcy Code section 548(c). He cannot.

## II.  DEFENDANT'S OBJECTIONS RELATING TO PURPORTED LEGAL DEFENSES FAIL AS A MATTER OF LAW

Mr. Cohen's principal defense is that BLMIS owed antecedent debts or "obligations" to him that were satisfied by the payment of fictitious profits, and therefore, the fictitious profits were received for "value" under the Bankruptcy Code.  (*See* Objections at 9-12.)  After a review of the relevant case law, the Bankruptcy Court set forth two simple rules of law that govern fraudulent transfer litigation in Ponzi scheme cases—each of which squarely rejects the antecedent debt/value defenses raised by Mr. Cohen.  *Proposed Findings and Conclusions*, 2016 WL 1695296 at *10-11.

The first rule of law applies in SIPA and non-SIPA Ponzi scheme cases alike and can be summarized in one sentence: "A transferee does not give value beyond his deposits of principal." *Id.* at *10.  For support, the Bankruptcy Court cited to a recent summary order from the Second Circuit in *Silverman v. Cullin* (*In re Agape World, Inc.*), 633 Fed. Appx. 16 (2d Cir. Feb. 4, 2016).  In *Silverman*, the Second Circuit observed that "other courts of appeals have held that payments of 'interest' to Ponzi scheme investors should be treated as fraudulent transfers, because 'fair consideration' is not present in the context of such schemes." *Id.* at *17 (citing cases).  Although the Second Circuit had not previously addressed this issue, it found that "the prevailing view in the district and bankruptcy courts in this Circuit has agreed with this consensus." *Id.* (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64 (collecting cases)).

The second rule of law applies in a SIPA case involving fraudulent transfers made in connection with a Ponzi scheme.  *Proposed Findings and Conclusions*, 2016 WL 1695296 at *11.  The Bankruptcy Court found that in such schemes, "[n]et winners cannot argue that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of Bankruptcy Code § 548(c)," because "SIPA creates two estates and grants net

14

losers—those with net equity claims—priority in the customer property estate." *Id.* And

"[p]ermitting a net winner to offset a non-net equity claim against the trustee's claim for the

return of customer property effectively allows the net winner to recover his non-SIPA claim from

customer property at the expense of the net losers in violation of SIPA's priority rules." *Id.*

Based on these two simple rules, all of Mr. Cohen's purported defenses fail as a matter of

law.

A. **Mr. Cohen Did Not Give Value For Any Amount Above His Principal
Deposits With BLMIS.**

Mr. Cohen first objects to the rule of law that a transferee does not give value beyond his

deposits of principal. (Objections at 4-5.) Without citing any authority, Mr. Cohen argues the

fact that BLMIS was a Ponzi scheme is irrelevant, because it does not alter the law governing the

avoidance of transfers or his purported value defense under section 548. (*Id.*)

Mr. Cohen is wrong. As the Bankruptcy Court found in the *Omnibus Good Faith*

*Decision*, it is a "well-settled rule in Ponzi scheme cases that net winners must disgorge their

winnings." 531 B.R. at 462. "[I]nvestors may retain distributions from an entity engaged in a

Ponzi scheme to the extent of their investments, while distributions exceeding their investments

constitute fraudulent conveyances which may be recovered by the Trustee." *Balaber–Strauss v.*

*Sixty–Five Brokers* (*In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 682 (Bankr. S.D.N.Y.

2000); *accord In re Bayou Group, LLC*, 362 B.R. 624, 635-36 (Bankr. S.D.N.Y. 2007)

("[V]irtually every court to address the question has held unflinchingly that to the extent that

investors have received payments in excess of the amounts they have invested, those payments

are voidable as fraudulent transfers.") (internal quotations and citations omitted); *Picard v.*

*Cohmad Sec. Corp.* (*In re BLMIS*), 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011) ("[W]hen

investors invest in a Ponzi scheme, any payments that they receive in excess of their principal

15

investments can be avoided by the Trustee as fraudulent transfers."); *Gowan v. The Patriot Grp.,*
*LLC* (*In re Dreier LLP*), 452 B.R. 391, 440 n. 44 (Bankr. S.D.N.Y. 2011) ("The Court's
conclusion that the Defendants did not provide 'reasonably equivalent value' for the payments in
excess of principal is consistent with those courts that have held that investors in a Ponzi scheme
are not entitled to retain the fictitious profits they received.").

The rule that a transferee does not give value beyond his deposits of principal and
therefore must disgorge net winnings is also a well-settled rule among other Circuits. *See Janvey*
*v. Brown*, 767 F.3d 430, 441-42 (5th Cir. 2014) ("To allow an [investor] to enforce his contract
to recover promised returns in excess of his undertaking would be to further the debtors'
fraudulent scheme as the expense of other [investors] . . .[because] any award of damages would
have to be paid out of money rightfully belonging to other victims of the Ponzi scheme.");
*Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *In re Hedged–Invs. Assocs., Inc.*, 84 F.3d 1286
(10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).

The rationale for applying this rule to Mr. Cohen is simple: he did not provide any value
to BLMIS in exchange for the fictitious profits he received from the Ponzi scheme. *See Omnibus*
*Good Faith Decision*, 531 B.R. at 463.  This is because the receipt of fictitious profits by Mr.
Cohen was not offset by any further investments of principal with BLMIS and only depleted
BLMIS's fund of customer property further. *See Scholes*, 56 F.3d at 757.  Accordingly, Mr.
Cohen did not give value beyond his deposits of principal with BLMIS.

### 1.    The Second Circuit's *Silverman* Decision Is Persuasive Authority.

In his Objections, Mr. Cohen mischaracterizes the Bankruptcy Court's reliance on
*Silverman* as "dictat[ing] the proposed outcome of this Adversary Proceeding." (Objections at
25.)  This is an exaggeration.  The Bankruptcy Court thoroughly analyzed the relevant case law
to adopt the simple rule that, "A transferee does not give value beyond his deposits of principal."

16

*Proposed Findings and Conclusions*, 2016 WL 1695296 at \*10.  The Bankruptcy Court stated

that this rule was "recently reinforced" in *Silverman*, in which a trustee sued a transferee in

Bankruptcy Court under New York's constructive fraudulent conveyance law, and successfully

recovered the amount of the net gain the transferee had received from a Ponzi scheme.  *See id*.

(citing *Silverman v. Cullin*, No. 14 Civ. 4248 (JMA), 2015 WL 1509583, at \*1 (E.D.N.Y. Mar.

31, 2015)).

On appeal in *Silverman*, the District Court agreed, noting that in Ponzi scheme cases

"many courts have concluded that such statutes allow those investors to retain their principal, but

not any profits or interest."  *Silverman*, 2015 WL 1509583 at \*2 (collecting cases).  The Second

Circuit similarly affirmed, stating that "other courts of appeals have held that payments of

'interest' to Ponzi scheme investors should be treated as fraudulent transfers, because 'fair

consideration' is not present in the context of such schemes."[9]  *Silverman*, 633 Fed.Appx. at \*17

(collecting cases)).  The Second Circuit acknowledged that it had not yet addressed this issue,

but made clear that "the prevailing view in the district and bankruptcy courts in this Circuit has

agreed with this consensus."  *Id.* (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64

(collecting cases)).  Thus, the *Silverman* case supports the Bankruptcy Court's conclusion of law

that Mr. Cohen did not give value beyond his principal investments with BLMIS.

---

[9] Section 273 of the New York Debtor and Creditor Law ("NYDCL") provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NYDCL § 273.  "Fair consideration is given for property, or obligation, . . .[w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied...."  *Id.* § 272.  Fair consideration in the NYDCL has "the same fundamental meaning" as "reasonably equivalent value" in Section 548(a)(1)(B) of the Bankruptcy Code.  *Cohmad*, 454 B.R. at 333 (citing *In re Churchill Mortg. Inv. Corp.,* 256 B.R. 664, 677 (Bankr. S.D.N.Y 2000)).

### 2. There Is No Basis To Treat Equity Investors and Retail Customers Differently.

Mr. Cohen asserts the Bankruptcy Court improperly relied upon Ponzi scheme cases involving equity investors rather than "innocent retail customers of a regulated broker-dealer." (Objections at 26.)  Mr. Cohen asserts that unlike equity investors in other types of Ponzi schemes, BLMIS investors are "customers of a retail broker who are protected by statutes and rules that give them legal rights and entitlements as brokerage customers that are not available to equity holders of an entity that perpetrates commits a Ponzi scheme."  (Objections at 27.)

Mr. Cohen cites no authority for treating equity investors and retail customers differently. (Objections at 26-28).  There is none.  As the District Court noted, the distinction "is a distinction without a difference" because defendants "faced the same risks as equity investors." *Greiff*, 476 B.R. at 726.  Specifically, the District Court stated:

> Any entitlement defendants had to a return on their investment, then, depended on a representation that Madoff Securities had in fact generated a profit.  The complaints allege that Madoff Securities' representations in this regard were wholly fraudulent.  Thus, defendants, in effect, ask the Court to enforce the fraud on the ground that the vehicle of this particular Ponzi scheme, in contrast to others, styled itself as a stockbroker.  Such a distinction pays only lip service to the underlying realities of the Ponzi scheme, and the Court rejects it.

*Id.*  Therefore, whether Mr. Cohen was an "equity investor" or "retail customer" is immaterial—he is not entitled to retain the fictitious profits he received from BLMIS.

### B. Mr. Cohen's Receipt Of Fictitious Profits Did Not Satisfy An Antecedent Debt Or Obligation Or Provide Value Under Section 548(c) Of The Bankruptcy Code.

Mr. Cohen's remaining objections challenge the Bankruptcy Court's second rule of law that applies in SIPA cases involving fraudulent transfers from a Ponzi scheme—that net winners cannot argue that the payment of fictitious profits satisfies an antecedent debt or obligation or provide value within the meaning of section 548(c).  (*See* Objections at 5-8, 11-12, 15-16, 21-

25.)  Although stated and restated in different ways, Mr. Cohen's arguments fail as a matter of

law.

### 1.    Section 548(c) Of The Bankruptcy Code Does Not Limit The SIPA Trustee's Avoidance Powers.

Mr. Cohen argues that SIPA neither expands the Trustee's avoidance powers beyond

those of an ordinary bankruptcy trustee, nor modifies the value defense under section 548(c).

(Objections at 5-8.)  The District Court and the Bankruptcy Court each considered and rejected

this argument.  In the *Antecedent Debt Decision*, the District Court explained while SIPA

provides that a SIPA trustee is "vested with the same powers and title with respect to the debtor

and the property of the debtor, including the same rights to avoid preferences, as a trustee in a

case under Title 11," citing 15 U.S.C. § 78fff−1(a), it also provides that the provisions of the

Bankruptcy Code apply only "[t]o the extent consistent with the provisions of this chapter."  499

B.R. at 423 (citing 15 U.S.C. § 78fff(b)).  Consequently, the Trustee's authority to avoid

transfers as a bankruptcy trustee "must be interpreted through the lens of SIPA's statutory

scheme."  *Id.*

For example, under the Bankruptcy Code, a trustee may avoid and recover transfers of a

debtor/broker's property, but not property held by the debtor but owned by the debtor's

customers, because "[m]oney held by the broker on behalf of its customers is not property of the

broker under state law, and in an ordinary bankruptcy, a trustee cannot avoid and recover a

transfer of non-debtor property."  *Omnibus Good Faith Decision*, 531 B.R. at 448 (citing *Picard

v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014)).  However, SIPA circumvents this

problem by treating customer property as though it were "property of the debtor in an ordinary

liquidation."  *Id.* at 449 (citing SIPA § 78fff−2(c)(3) (internal quotations omitted)).  SIPA

expressly empowers a trustee to avoid and recover customer property held by the customers of

the debtor broker-dealer. *Id.* at 448-49. This includes not only "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted, SIPA § 78*lll*(4)," but also "property recovered by the Trustee pursuant to SIPA § 78fff–2(c)(3)." *Id.* at 448.

Mr. Cohen acknowledges that SIPA modifies the definition of "customer property" to "resolve what would have been a conflict between SIPA and the Bankruptcy Code," but he nevertheless argues that because SIPA does not expressly modify "the value defense included in Section 548(c) of the Bankruptcy Code," it must follow that section 548(c) is a limitation on the Trustee's avoidance powers. (Objections at 7.) Mr. Cohen is wrong because this "characterization conflates two separate concepts." *Antecedent Debt Decision*, 499 B.R. at 423.

As the District Court stated, "Section 548(a)(1) empowers a trustee to avoid the entirety of a fraudulent transfer, while section 548(c) provides an affirmative defense that allows a defendant to retain portions of that otherwise entirely avoidable transfer." *Id.* However, SIPA "does not necessarily imply that section 548(c)'s affirmative defense must apply in the same way to the customer property estate as it would to the general estate." *Id.* at 424. More importantly, "the definition of net equity and the definition of claims that can provide 'value' to the customer property estate are inherently intertwined where the customer property estate is created as a priority estate intended to compensate customers only for their net-equity claims." *Id.* To the extent Mr. Cohen's purported value defenses could permit him "to withhold funds beyond [his] net-equity share of customer property," Mr. Cohen is effectively "making those damages claims against the customer property estate" and allowing such claims "to be drawn out of the customer property estate would violate SIPA." *Id.* (citing *Greiff*, 476 B.R. at 728 ("[W]hen determining

20

whether a[] transferee provides value, SIPA requires consideration not only of whether the

transfer diminishes the resources available for creditors generally, but also whether it depletes

the resources available for the satisfaction of customers' net equity claims and other priority

claims.")).  Thus, under SIPA, Mr. Cohen may only seek the protections of section 548(c) to the

extent of investments of principal.[10]

### 2.    The *Antecedent Debt Decision* Remains Law Of The Case.

In an effort to rebut the rule of law that fictitious profits do not satisfy an antecedent debt

or obligation, or provide value under section 548(c), Mr. Cohen argues throughout his Objections

that the Second Circuit's *Section 546(e) Decision* effectively overruled the District Court's

holding in the *Antecedent Debt Decision*.  (Objections at 23-24.)  In rejecting this very argument,

the Bankruptcy Court held that the *Section 546(e) Decision* did not overrule the *Antecedent Debt

Decision*, because the Second Circuit neither addressed "the question of value" nor disturbed the

general rule that a "trustee can recover fictitious profits because transferees in a Ponzi scheme do

not give 'value' within the meaning of the Bankruptcy Code beyond what they pay into the

scheme."  *Omnibus Good Faith Decision*, 531 B.R. at 469-70.  As the Bankruptcy Court

explained, "Fictitious profits are not profits at all but distributions of other people's money based

on an arbitrary allocation of fraudulent bookkeeping entries.  The [*Section 546(e) Decision*] did

not address this rule and it remains the majority view."  *Id.* at 470.

The Bankruptcy Court noted there was a conflict between SIPA's goal of maximizing the

recovery of customer property and the express language of section 546(e) of the Bankruptcy

Code.  *Proposed Findings and Conclusions*, 2016 WL 1695296 at *13.  This "conflict" was

---

[10] Mr. Cohen also argues that courts cannot override the express language of section 548(c) based on notions of equity (Objection at 8), but the rule that "a Ponzi scheme investor does not provide value beyond his principal investment" is based on the statutory provisions of SIPA, not equity, "as well as the case law that has interpreted the meaning of 'value' under the Bankruptcy Code and similar avoidance statutes."  *Omnibus Good Faith Decision,* 531 B.R. at 468.

resolved in the *Section 546(e) Decision*, which limited the Trustee to recovering intentional fraudulent transfers made within two years of the Filing Date under section 548(a)(1)(A) in cases where the Trustee has not alleged that the customer knew of the fraud. *Id.* However, the Bankruptcy Court stated that SIPA and the Bankruptcy Code were "not so easily separated with respect to other aspects of fraudulent transfer litigation" and found no "similar conflict" between the goals of SIPA and section 548(c) of the Bankruptcy Code. *Id.* at *10, 13. This is because, unlike the statute of limitations embedded in the section 546(e) safe harbor, there was "no clear statutory direction that the satisfaction of claims against the general estate provides value" for the receipt of fictitious profits from a Ponzi scheme. *Id.* (citing *Omnibus Good Faith Decision*, 531 B.R. at 470); *see also Greiff*, 476 B.R. at 725 (concluding that the fraudulent transfers from BLMIS were not "for value," because "[u]nlike the situation under § 546(e), Congress has here created no 'safe harbor' to shelter receipts that might otherwise be subject to avoidance."). Accordingly, the Bankruptcy Court found that the proviso—"to the extent consistent" with SIPA—tempered otherwise valid defenses under section 548(c). *Proposed Findings and Conclusions*, 2016 WL 1695296 at *10, 12-13. Thus, the *Section 546(e) Decision* did not change the rule of law that Mr. Cohen may only seek the protections of section 548(c) to the extent of his principal investment with BLMIS. *Id.*

### 3.    Mr. Cohen's Purported Federal And State Law Claims Or Obligations Do Not Constitute Value Under Section 548(c).

Throughout his Objections, Mr. Cohen argues that the fictitious profits he received from the BLMIS Ponzi scheme satisfied an antecedent debt or obligation owed by BLMIS because of his purported federal or state law claims against BLMIS, and consequently the fictitious profits he received were "for value" under section 548(c). (*e.g.*, Objections at 9-16, 21-22.) For example, Mr. Cohen objects to the Bankruptcy Court's proposed conclusion of law that his

claims for federal securities violations under 15 U.S.C. §§ 78cc(b) and 771(a)(2), and his claims

for fraud and breach of fiduciary duty under New York state law, do not provide value under

section 548(c).  (Objections at 12-13, 15-16.)  Since the District Court decided *Greiff* on April

30, 2012, net winners like Mr. Cohen have continued to press this same line of argument, but it is

even less persuasive now than it was when the District Court first rejected it.

As the District Court held in *Greiff*, "even if the defendants had enforceable claims,"

under federal or state law, "a conclusion that satisfaction of those claims gave 'value' to

[BLMIS] would conflict with SIPA."  476 B.R. at 727*; see also Antecedent Debt Decision*, 499

B.R. at 422 n. 6 (holding federal and state law claims "cannot provide value as against the

[BLMIS] customer property estate under SIPA").  This is because SIPA "prioritizes net equity

claims over general creditor claims."  *Greiff*, 476 B.R. at 727.  And to allow customers like Mr.

Cohen, who have no net equity claims, to retain fictitious profits of customer property on the

ground that these profits satisfied their purported claims would deplete the customer fund

available for distribution according to customers' "net equities."  *Id*. at 728.  "Neither bankruptcy

law nor state law require the Court to disregard SIPA in this fashion."  *Id.*  Thus, to the extent

that Mr. Cohen has valid federal or state law claims and payment on those claims theoretically

could discharge an antecedent debt, "that debt runs against [the BLMIS] general estate, not the

customer property estate, and therefore cannot be the basis of the retention of customer property

under section 548(c)."  *Antecedent Debt Decision*, 499 B.R. at 424; *see also Omnibus Good
Faith Decision*, 531 B.R. at 466.

Notwithstanding the prior rulings of the District Court and the Bankruptcy Court, Mr.

Cohen continues to press this same argument, albeit now repackaged as "obligations" owed by

BLMIS under state law.  (Objections at 9.)  According to Mr. Cohen, the Second Circuit in its

*Section 546(e) Decision* determined that Article 8 of New York's Uniform Commercial Code

gave rise to valid obligations owed by BLMIS to its customers. (Objections at 9-10.) Mr. Cohen

is wrong. Such an obligation is neither stated nor implied in the *Section 546(e) Decision*. The

Second Circuit only references the U.C.C. in the context of the definition of "settlement

payment[s]" under section 546(e), which the Second Circuit construed to apply to "the transfer

of cash or securities made to complete [a] securities transaction." *Section 546(e) Decision,* 773

F.3d. at 422 (citing N.Y. U.C.C. § 8–501(b)(1) & cmt. 2). However, it does not follow that in a

SIPA liquidation, any purported obligations owed by BLMIS under the U.C.C. provide a defense

to Mr. Cohen for the receipt of fictitious profits. *See Proposed Findings and Conclusions*, 2016

WL 1695296, at *12 n. 17.

In fact, the U.C.C. is state law and, to the extent it is inconsistent with SIPA, is

preempted under the Supremacy Clause of the United States Constitution. *See* U.S. Const., art.

VI, cl. 2; *Amer. Sur. Co. of N.Y. v. Sampsell*, 327 U.S. 269, 272 (1946) ("[F]ederal bankruptcy

law, not state law, governs the distribution of a bankrupt's assets to his creditors."). Further, the

Bankruptcy Code and SIPA both override the U.C.C. if the debtor's affairs are being

administered in an insolvency proceeding. *See* N.Y. U.C.C. § 8–503 cmt.1 (2009) (noting

"applicable insolvency law governs how the various parties having claims against the firm are

treated"); *see also Omnibus Good Faith Decision*, 531 B.R. at 467 (finding "while claims and

debts are usually based on state law rights, a federal interest may require a different result").

Mr. Cohen also argues that because the Second Circuit determined in the *Section 546(e)*

*Decision* that the transfers made by BLMIS to its customers were made in connection with a

securities contract or were settlement payments within the meaning of section 546(e) of the

Bankruptcy Code, then it "necessarily mean[t] that the customer-transferee received value that

satisfied or reduced a contract or legal obligation owed by the broker to the customer."
(Objections at 10). However, the Second Circuit did not rule that the transfers underlying the
securities contract or settlement payments were made for "value" at the time of the transfer,
pursuant to section 548(c) of the Code. It did not even consider the question of value.

Mr. Cohen alternatively argues that his BLMIS account statements "evidence enforceable
obligations" (Objections at 10), and because the Trustee did not avoid these obligations, any
transfer by BLMIS was "for value against those existing contractual and brokerage obligations
arising under applicable non-bankruptcy law."[11]  (Objections at 11.)  Again, Mr. Cohen is wrong.
The District Court ruled in both *Greiff* and the *Antecedent Debt Decision* that BLMIS's account
statements do not create enforceable obligations owed by BLMIS.  In the *Antecedent Debt
Decision*, the District Court rejected "defendants' contention that [BLMIS's] pre-reach-back-
period account statements constitute binding obligations of Madoff Securities to its customers
that the Trustee must avoid."  499 B.R. at 421 n. 4; *see also Omnibus Good Faith Decision*, 531
B.R. at 476 n. 26.  Likewise in *Greiff*, the District Court found that the amounts reported on
account statements were wholly fraudulent and therefore unenforceable.  476 B.R. at 726-27.
Although Mr. Cohen argues otherwise, the *Section 546(e) Decision* only reinforces the District
Court's holdings, as the Second Circuit made clear it "would be 'absurd' to calculate customers'
net equity using BLMIS's fictitious account statements, because that would 'have the . . . effect

---

[11] Mr. Cohen cites five cases in support of his argument that the satisfaction of such "unavoided or unavoidable
obligations of Madoff Securities to its customer" constituted "value" for fraudulent transfer purposes, "even with the
broker's perpetration of a fraudulent scheme."  (Objections at 11-12).  However, all five cases involve enforceable
agreements related to the exchange of actual goods and services, as opposed to fraudulent statements generated as
part of a Ponzi scheme.  *See e.g., In re Central Illinois*, 526 B.R. 786 (Bankr. C.D. Ill. 2015) (obligations relating to
agreement to pay for construction work to make grain handling facility operational); *In re All-Type Printing, Inc.*,
274 B.R. 316 (Bankr. D. Conn. 2002) (obligations relating to retirement agreement with shareholder); *In re HDD
Rotary Sales, LLC*, 512 B.R. 877 (Bankr. S.D. Tex. 2014) (obligations relating to loan transaction, promises of
annual bonus to shareholder/employee); *In re National Gas Distribs., LLC*, 412 B.R. 758 (Bankr. E.D.N.C. 2009)
(obligations relating to contractual agreement to deliver gas to former customer); *In re Nirvana Rest.*, 337 B.R. 495
(Bankr. S.D.N.Y. 2006) (obligations relating to a guaranty for rent payments).

of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to

Madoff's machinations.'"  773 F.3d at 423 (citing *Net Equity Decision*, 654 F.3d at 235).

Mr. Cohen next argues that courts have interpreted Section 29(b) of the Securities

Exchange Act of 1934 as establishing a "rule of voidability" such that "fraud does not render the

fraudster's obligation unenforceable," but rather gives Mr. Cohen, as "an innocent party," the

option to void any agreement including that with BLMIS.[12]  (Objections at 13-14.)  The

Bankruptcy Court previously examined this issue and concluded that "courts often permit

innocent plaintiffs to enforce contracts that are against public policy, but here, such enforcement

would further none of the policies generally favoring enforcement by an innocent party to an

illegal bargain," because "any award of damages would have to be paid out of money rightfully

belonging to other victims of the Ponzi scheme."  *Omnibus Good Faith Decision*, 531 B.R. at

463 (citing *Janvey*, 767 F.3d at 442 (internal quotations omitted)).

Thus, Mr. Cohen's purported federal and state law claims against BLMIS—whether

phrased as an "obligation" owed by BLMIS or otherwise—simply do not satisfy antecedent

debts or provide value under section 548(c) for the fictitious profits retained by Mr. Cohen.

### 4. Mr. Cohen's Purported Remedies, Adjustments, And Setoffs Under State Or Federal Law Do Not Constitute Value Under Section 548(c).

The remainder of Mr. Cohen's Objections concern remedies, adjustments, and setoffs he

claims he is entitled to under federal or state law.  Specifically, Mr. Cohen argues that he is

entitled to retain the amount of taxes he paid on transfers received from BLMIS, the amount of

legal fees paid in defending this action, and adjustments for the time-value of money invested

---

[12] The cases Mr. Cohen cites in support are irrelevant in that none of them concern the receipt of fictitious profits from a Ponzi scheme.

with BLMIS.  (Objections at 21-25.)  For the reasons previously stated by the Bankruptcy Court,

the District Court, and the Second Circuit, Mr. Cohen is entitled to none of the above.

> a.     **Taxes May Not Be Considered As Part Of Value Calculation Or Setoff Under 550(e).**

Mr. Cohen argues that taxes he paid on fictitious profits are consequential damages or

"out of pocket" losses that constitute value under section 548(c).  (Objections at 21.)  The

Bankruptcy Court already has rejected this argument, holding that a defense for taxes paid on

profits would be inconsistent with the approved manner for calculating net equity.  *See Picard v.*

*The Estate (Succession) of Doris Igoin* (*In re Madoff Sec.*), 525 B.R. 871, 893 (Bankr. S.D.N.Y.

2015) ("[T]he withdrawal of the money to pay taxes … is not a defense to the fraudulent transfer

claims.").

Courts routinely have denied investors like Mr. Cohen the ability to offset their avoidance

liability for taxes paid on income from a Ponzi scheme.  In *Donell v. Kowell*, a receiver brought

an action against an investor to avoid and recover fraudulent transfers from a Ponzi scheme.  533

F.3d at 779.  The investor argued that he should be permitted to offset his avoidance liability by

amounts paid as income taxes on those gains.  *Id.* at 778.  The Ninth Circuit rejected this

argument, finding, not only did the investor fail to cite any supporting authority, but to offset tax

payments would create a slippery slope for other expenses the investor paid, such as bank

transfer or fund management fees.  *Id.*  The Ninth Circuit explained, "There is simply no

principle by which to limit such offsets; one could argue that every purchase made with the gains

from the scheme would not have been made 'but for' receipt of that money.  If each net winner

could shield his gains in their entirety in this manner . . . the multitude of victims who lost their

27

entire investment would receive no recovery." *Id.* at 779.[13]  As a result, Mr. Cohen is "in the

same position as many other Madoff victims who paid taxes on fictitious profits, and then were

sued by the Trustee as net winners," and he is not entitled, as a matter of law, to any offsets for

any taxes paid on transfers from BLMIS.  *Igoin*, 525 B.R. at 885 n. 16.

In a related argument, Mr. Cohen argues that the Bankruptcy Court wrongly concluded

he is not entitled to setoff under section 550(e) of the Bankruptcy Code for taxes paid on

transfers from BLMIS.  (Objections at 22.)  Section 550(e) creates a lien in favor of a transferee

up to the value of certain improvements made to property after its transfer by the debtor, which

"makes sense from an equitable perspective because § 550 is intended to return the debtor to the

position it would have been had the transfer not occurred—not to return it to a better position."

*In re Consol. Yacht Corp.*, 337 B.R. 711, 714 (Bankr. S.D. Fla. 2006).  To establish an

improvement to the property transferred, the party seeking the lien must show that he increased

the value of the property transferred from the point of view of the trustee and the bankruptcy

estate.  *Bash v. Lepelley* (*In re Lepelley*), 233 B.R. 802, 808 (Bankr. N.D. Ohio 1999).  Here, the

taxes paid by Mr. Cohen on the fictitious profits from BLMIS did nothing to improve the value

of the transfers from the estate's perspective.  Accordingly, Mr. Cohen is not entitled to a setoff

under section 550(e).

### b. Mr. Cohen's Legal Fees and Lost Opportunities Do Not Constitute Consequential Damages That Create Value.

Mr. Cohen next argues that he is entitled to the reimbursement of legal fees incurred in

defending this action and interest adjustments to account for foregone investment opportunities

---

[13] *See also Janvey*, 647 F.3d at 602 (affirming that taxes could not offset fraudulent transfer liability); *In re Hedged-Invs. Assocs., Inc.*, 84 F.3d at 1290 (declining to allow investor to recover tax and interest payments paid out of Ponzi scheme investment); *Wing v. Dockstader*, No. 2:08 Civ. 776 (BVD), 2010 WL 5020959, at *7 (D. Utah 2010) (rejecting defendants' request to offset income taxes paid on fraudulent transfers); *S.E.C. v. Aragon Capital Mgmt., LLC*, 672 F. Supp. 2d 421, 438-39 (S.D.N.Y. 2009) *and aff'd in part sub nom. S.E.C. v. Rosenthal,* 426 F. App'x 1 (2d Cir. 2011) (same).

as consequential damages arising out of his federal and state law claims against BLMIS. (Objections at 21-22.)  Mr. Cohen's claims for consequential damages fail completely.  The cases relied upon by Mr. Cohen do not establish he is entitled to offset the legal fees he incurred in defending this action, in which he has alleged no wrongful acts by the Trustee.  *See World Trade Ctr. Props., LLC v. Am. Airlines, Inc.* (*In re Sept. 11 Litig.*), 802 F.3d 314, 334 (2d Cir. 2015).  Additionally, the New York statute that Mr. Cohen cited in support of prejudgment interest has no application here.  Section 5001 of the New York Civil Practice Law and Rules authorizes interest only "upon a sum awarded," which requires a judgment in favor of Mr. Cohen.  *See Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Group, LLC*), 439 B.R. 284, 337-38 (S.D.N.Y. 2010).  Because there is no judgment in favor of Mr. Cohen, and there never could be because he no longer has a counterclaim, he is simply not entitled to prejudgment interest.

### c.   Mr. Cohen Is Not Entitled to Time-Value Adjustments.

Mr. Cohen's argument that he is entitled to recover interest or other similar adjustments for the time-value of money has already been rejected by the District Court and the Second Circuit.  (Objections at 21-22, 24-25.)  In the *Antecedent Debt Decision*, the District Court ruled that net winner defendants were not entitled to the payment of interest.  499 B.R. at 422.  The District Court did not rule on the issue of whether defendants were entitled to time-based damages as an adjustment to their net equity claims, because it had not withdrawn the reference with respect to this issue.  However, the Second Circuit decided this issue in the *Time-Based Damages Decision*.  There, the Second Circuit held that "BLMIS customers were not entitled to an inflation or interest adjustment to their net equity claims because SIPA did not permit it."  *Proposed Findings and Conclusions,* 2016 WL 1695296 (citing *Time-Based Damages Decision,* 779 F.3d at 79-80).  The Second Circuit determined that "an inflation adjustment to net equity

claims" would allocate value to the earlier investors "at the expense of customers who have not yet recovered the property they placed in Madoff's hands." *Time-Based Damages Decision,* 779 F.3d at 81. Thus, an inflation or other time-based damages adjustment violated SIPA's statutory structure. *Id.* The Second Circuit further determined that such an adjustment also violated the purpose of SIPA, which was to distribute customer property to customers, not to provide full protection to all victims of a brokerage's collapse. *See Id.* ("The purpose of determining net equity under SIPA is to facilitate the proportional distribution of customer property actually held by the broker, not to restore to customers the value of the property that they originally invested.").

Although the Second Circuit's *Time-Based Damages Decision* answered a different but related question involving net equity under SIPA rather than value under section 548(c), the logic and rationale of the decision all but resolves the question as to value under section 548(c). As the District Court stated, "a customer's net equity and the amounts sought in avoidance and recovery proceedings (assuming the customer's good faith) are two sides of the same coin." *Antecedent Debt Decision*, 499 B.R. at 420. In both cases, the Trustee nets deposits against withdrawals: "[a] customer who withdrew less than she deposited over the course of her investment with Madoff Securities has a net-equity claim and may be entitled to disbursements from the customer property estate for the amount of that net equity," and customers "who withdraw more money from their accounts than they deposited" are subject to "avoidance actions for the amount in excess of their deposits." *Id.* at 420-21.

The Bankruptcy Court therefore correctly concluded that "the computation of net equity under SIPA and value under Bankruptcy Code § 548(c) are 'inherently intertwined'" and that

30

there can be no time-value adjustment to Mr. Cohen's principal. *Proposed Findings and Conclusions*, 2016 WL 1695296, at *14 (citing *Antecedent Debt Decision*, 499 B.R. at 424).

## <u>CONCLUSION</u>

For the reasons discussed above, the Trustee respectfully requests that the District Court adopt the Bankruptcy Court's *Proposed Findings and Conclusions* in its entirety, and enter a final judgment in favor of the Trustee and against Mr. Cohen in the sum of $1,143,461.

Dated: June 30, 2016
      New York, New York

**BAKER & HOSTETLER LLP**

By: */s/ Nicholas J. Cremona*
45 Rockefeller Plaza
New York, New York 10111
Telephone:  212.589.4200
Facsimile:  212.589.4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Nicholas J. Cremona
Email:  ncremona@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com

and

1900 East Ninth Street
Cleveland, Ohio 44114
Telephone:  216.621.0200
Facsimile:  216.696.0740
James H. Rollinson
Email:  jrollinson@bakerlaw.com

*Attorneys for Plaintiff Irving H. Picard, Trustee for the consolidated liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff*