SECURITIES INVESTOR PROTECTION
 CORPORATION
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006
Telephone: (202) 371-8300
JOSEPHINE WANG
General Counsel
Email: jwang@sipc.org
KEVIN H. BELL
Senior Associate General Counsel for Dispute Resolution
Email: kbell@sipc.org

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
                                                              )
SECURITIES INVESTOR PROTECTION    )
 CORPORATION,                                       )         Adv. Proc. No. 08-1789 (BRL)
                                                              )         SIPA Liquidation
                      Plaintiff-Applicant,        )
                                                              )         (Substantively Consolidated)
            v.                                            )
                                                              )
BERNARD L. MADOFF INVESTMENT   )
 SECURITIES LLC,                                   )
                                                              )
                      Defendant.                      )
———————————————————————— )
                                                              )
IN RE:                                                   )
                                                              )
BERNARD L. MADOFF,                           )
                                                              )
                      Debtor.                            )
————————————————————————)


**SUPPLEMENTAL MEMORANDUM OF THE**
**SECURITIES INVESTOR PROTECTION CORPORATION**
**IN SUPPORT OF THE TRUSTEE'S MOTION TO AFFIRM**
**HIS TREATMENT OF PROFIT WITHDRAWALS**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ...........................................................................................................3

    I.      THE BLMIS BOOKS AND RECORDS ACCURATELY
           SHOW PROFIT WITHDRAWAL PAYMENTS ...................................................3

        A.     The Debtor's Books and Records and Office Practice ................................5

              (i)      The Account Maintenance Form ......................................................5

              (ii)     The Check Out Book ......................................................................6

              (iii)    The Ledger Sheets...........................................................................7

              (iv)    The Arbitrage Portfolio Management Report .................................8

               (v)     The House 17 Manual....................................................................8

               (vi)    Customer Account Statements........................................................9

         B.     The Books and Records and the Blecker Accounts ..................................10

              (i)      Mr. Blecker elected to have profits sent to him............................11

               (ii)     Mr. Blecker's account  statements showed "profits" as
                      credits in his account, and then, as debits, once the
                      profits were withdrawn ................................................................11

              (iii)    BLMIS records that tracked the Blecker account
                      activity were consistent with the payment of "profits"................. 12

              (iv)    Entries in the check out book correspond to profit
                      checks to Mr. Blecker ..................................................................13

               (v)     The data entry operators regularly recorded their work in
                      logs which included issuance and printing of the profit
                      withdrawal checks.........................................................................13

**TABLE OF CONTENTS (cont.)**

**PAGE**

       (vi)     Elections made in other Blecker accounts were consistent with one another.................................................................................14

   C.     The Books and Records and the Blum Accounts......................................15

II.   DENIAL OF RECEIPT AND SPECULATION AS TO NON-RECEIPT ARE INSUFFICIENT TO REBUT THE PRESUMPTION OF MAILING AND RECEIPT ................................17

   A.     The Regular Office Procedures Followed at BLMIS Created a Presumption of Mailing and Delivery of the Profit Withdrawal Checks...........................................................17

   B.     Denial of Receipt by Mr. Blecker is Insufficient to Rebut the Presumption ........................................................................19

   C.     The Denial by the Blums of Receipt Does Not Overcome the Presumption; The Blums Had No First-Hand Knowledge .................20

       (i)     Norman Blum.................................................................20

       (ii)    Joel Blum ...................................................................23

III.   "TO THE SATISFACTION OF THE TRUSTEE" IS NOT AT ISSUE...............25

   A.     The Nature of "To the Satisfaction of" .....................................27

   B.     Discretionary Action Under SIPA ...........................................28

CONCLUSION......................................................................32

## TABLE OF AUTHORITIES

**CASES:**                                                                                                      **PAGE**

*Augienello v. F.D.I.C.*, 310 F. Supp. 2d 582 (S.D.N.Y. 2004) ......................................................28

*In re Adler Coleman Clearing Corp.*, 204 B.R. 99
    (Bankr. S.D.N.Y. 1997) ........................................................................................18

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002)..................................................................29

*In re Bernard L. Madoff Inv. Securities LLC*,
    654 F.3d 229 (2d Cir. 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012),
    *and cert. den.*, 2012 WL 396489 and 2012 WL 425188 (2012).......................................32

*Bronia, Inc. v. Ho*, 873 F. Supp. 854 (S.D.N.Y. 1995)..................................................................18

*Concrete Pipe and Products of California, Inc. v. Construction
    Laborers Pension Trust for Southern California*,
    508 U.S. 602 (1993).................................................................................................26, 29, 30

*Godfrey v. U.S.*, 997 F.2d 335 (7th Cir. 1993)..............................................................................18

*Jahn v. F.D.I.C.*, 828 F. Supp. 2d 305 (D.D.C. 2011) ..................................................................28

*Koznarek v. F.D.I.C.*, 116 F. Supp. 3d 894 (N.D. Ill. 2015).........................................................28

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    597 F.3d 84 (2d Cir. 2010)....................................................................................................18

*Meckel v. Continental Resources Co.*, 758 F.2d 811 (2d Cir. 1985) ............................................18

*Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*,
    277 B.R. 520 (Bankr. S.D.N.Y. 2002) ...................................................................................2

*Mount Vernon Fire Ins. v. East Side Renaissance*,
    893 F. Supp. 242 (S.D.N.Y. 1995)   .......................................................................................18

*In re MV Securities, Inc.*, 48 B.R. 156 (Bankr. S.D.N.Y. 1985).....................................................26

*Nants v. F.D.I.C.*, 864 F. Supp. 1211 (S.D. Fla. 1994).................................................................28

*Nethagani v. Mukasey*, 532 F.3d 150 (2d Cir. 2008).....................................................................27

*Nissho-Iwai Co. v. M/T Stolt Lion*, 719 F.2d 34 (2d Cir. 1983) ...................................................26

## TABLE OF AUTHORITIES (cont.)

**PAGE**

*Offenberg v. Unum Life Ins. Co. of America*, 986 F. Supp. 351
(S.D. W. Va. 1997) ............................................................................30

*SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 515 B.R. 161
(Bankr. S.D.N.Y. 2014) ................................................................. 25-26

*U.S. Nat'l Bank of Or. v. Independent Ins. Agents*, 508 U.S. 439 (1993)......................................27

*U.S. v. Gigante*, 94 F.3d 53 (2d Cir. 1996)
*cert. den. sub nom., Aloi v. U.S.*, 522 U.S. 868 (1997) ......................................26

*Vasile v. Gonzales*, 417 F.3d 766 (7th Cir. 2005)..........................................................27

## STATUTES AND RULES:

Securities Investor Protection Act, as amended, 15 U.S.C. §

78eee(b)(3) ...............................................................................................29
78eee(b)(6)(B)...........................................................................................28
78fff-1(d)(1) .............................................................................................26
78fff-2(a)(2) .............................................................................................26
78fff-2(b)...............................................................................1, 2, 26, 29, 31
78fff-4(a) .................................................................................................28
78fff-4(f) .................................................................................................29
78fff(a)(4) ...............................................................................................26

8 U.S.C. §

1158(a)(2)(D)...........................................................................................27
1252(a)(2)(B)(ii) .......................................................................................27

12 U.S.C. §

1821(d)(5)(D)...........................................................................................28
1821(d)(5)(D)(i)........................................................................................27
1821(d)(5)(E)............................................................................................28
1821(d)(6)(A)...........................................................................................28

## PRELIMINARY STATEMENT

Under section 8(b) of the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78fff-2(b), a trustee in a SIPA liquidation proceeding must satisfy the broker-dealer's obligations to its customers to the extent "such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee."[1]    In including the "otherwise established to the satisfaction of the trustee" clause in section 78fff-2(b), Congress recognized that there may be instances when a brokerage's books and records are unreliable or non-existent.    In those instances, under section 78fff-2(b), the claimant is allowed to prove his claim, and the trustee is empowered to evaluate the sufficiency of the claim and to decide it, without being tied to what the books and records, if they exist, inaccurately show.    Thus, section 78fff-2(b) posits two different and distinct scenarios:  one where the obligation of the brokerage to the claimant, or the non-existence of an obligation, can be determined from the brokerage's books and records; and two, where the books and records are deficient and the trustee must exercise his informed judgment in deciding a claim.

At the hearing in this matter on May 18, 2016, the Court posed a question regarding the role of the Court in the claims determination process.  Is the Court to review the reasonableness of the determination by the trustee made under the facts known to the trustee at the time, or is it to review the correctness of the determination?[2]    SIPC respectfully submits that the question must be answered with reference to SIPA section 78fff-2(b).

---

[1]    References hereinafter to provisions of SIPA shall be to the United States Code, and, for convenience, shall omit "15 U.S.C."

[2]    *See* Transcript of May 18, 2016, hearing (Doc. No. 13395) at 27-28, 36-39.  Unless otherwise noted, all filed documents referenced herein are in docket No. 08-01789.

As noted above, the trustee satisfies an obligation to a customer if the obligation is ascertainable from the debtor's books and records. Congress has not limited the review of the trustee's determination and the Court, *de novo,* must evaluate whether the claimant has proven that an obligation is or is not ascertainable from the books and records of the debtor. The decision of the Court carries the day, subject to any further judicial review. *See Mishkin v. Siclari (In re Adler, Coleman Clearing Corp.)*, 277 B.R. 520, 524 n.7 (Bankr. S.D.N.Y. 2002) ("Despite this formulation, which reflects the procedural posture here, no deference has been given to the Trustee's determination, as it might be after an administrative proceeding or appeal.")

Unlike in the foregoing situation, a more limited review may apply if, under section 78fff-2(b), the books and records are unreliable or non-existent and the claim must be established "to the satisfaction of the trustee." Under this clause, Congress has conferred discretion on the trustee, but whether Congress thereby has limited the scope of review by the Court is unclear. Before that issue is examined, however, the initial inquiry should be whether the question is presented.

Whether Bernard L. Madoff Investment Securities LLC ("BLMIS" or "Debtor") paid the claimants profits on "trades" in their accounts (referred to herein as "profit withdrawals"), *is* ascertainable from the Debtor's books and records. The determination of claims challenging those payments required the exercise of no discretion by the Trustee. Although BLMIS perpetrated a massive fraud on investors and "trades" shown on customer account statements were fictitious, some information on the statements needed to be accurate or BLMIS would arouse suspicion. Thus, customers knew how much they deposited with the brokerage. Inaccurate reporting of those amounts on account statements would lead to customer complaints

and possible scrutiny of the firm. Likewise, the payments to customers of profits on "trades," shown in customer account statements as debits in, or reductions in value of, an account, would cause customers to complain if payments were not received and the reductions in value were unexplained.[3]

As previously discussed by SIPC, the claimants bear the burden of proving the validity of their "customer" claims.[4] By a preponderance of the evidence, they must establish that the books and records which show the profit withdrawal payments made to them are inaccurate. That burden is not met by mere denial of receipt of payment or speculation by third parties of non-payment.

In this memorandum, SIPC first discusses the burden on the claimants to prove that the BLMIS books and records are inaccurate with respect to profit withdrawal payments. The evidence will show that the claimants are unable to do so and if the Court agrees, it need look no further. In the event the Court disagrees and finds the books and records unreliable and concludes that determination of the claims turns on their being established to the satisfaction of the trustee, SIPC addresses in the latter part of this memorandum the applicable standard of review.

## **ARGUMENT**

### I.    **THE BLMIS BOOKS AND RECORDS ACCURATELY SHOW PROFIT WITHDRAWAL PAYMENTS**

---

[3]    *See* Transcript of July 8, 2016 Deposition of Annette Bongiorno ("Bongiorno Tr.") at 143 [PW-4].

    Copies of excerpts from deposition transcripts and Trustee exhibits referenced herein are attached to the Declaration of Seanna R. Brown In Support of Supplemental Memorandum of Law In Support of the Trustee's Motion Affirming the Treatment of Profit Withdrawal Transactions, and are referred to herein as "[PW-___]."

[4]    Memorandum of the Securities Investor Protection Corporation In Support of the Trustee's Motion to Affirm his Treatment of Profit Withdrawals, filed on July 14, 2015, at 8-10 ("SIPC 7/14/15 Memo") (Doc. No. 10650).

The BLMIS claimants in this matter assert that profit withdrawal payments were never made.  Among others, the claimants include Mr. Aaron Blecker, and the Blum brothers who received transfers of funds from their deceased parents' BLMIS accounts from which profit withdrawals were made.

"Profit withdrawal" refers to the profit realized on the "sale" or close-out of a security. The trades were fictitious, as was the existence of "profit," but the payments were real.  The "profits" resulted from BLMIS's alleged use of a convertible arbitrage trading strategy that lasted until approximately 1998 when customers were moved out of arbitrage and into options. Payments of arbitrage "profits" were sent by check to the customer.  In contrast to options customers who received their checks quarterly, arbitrage customers received their checks every time a "profit" was realized.[5]

Deposition testimony in this matter shows a consistent practice at BLMIS of 1) the arbitrage customer electing upon the opening of his account to have profits sent to him or reinvested; 2) "profit" being calculated by BLMIS for customers upon the fake sale or close-out of non-existent securities in customer accounts; 3) account statements being issued to customers that showed the name of the security "sold," the amount of "profit" realized upon the sale, the issuance of a check in the amount of the profit, and the profit amount being debited from the customer account; 4) records being kept of profit withdrawal checks issued and to whom issued; and 5) complaints being made to the firm if profit withdrawal checks were not received.

BLMIS maintained a variety of books and records in the ordinary course of its business that are relevant to the issue at hand.  These are discussed below.

---

[5]    *See* Transcript of May 19, 2016 Deposition of Jo Ann Sala ("Sala Tr.") at 21, 26, 29-30 [PW-9];  Transcript of June 13, 2016 Deposition of Jo Ann Sala ("Sala 6/13 Tr.") at 223-224 [PW-9]; Bongiorno Tr. at 60-61, 90, 119, 156, 161, 227-228 [PW-4].

A.      **The Debtor's Books and Records and Office Practice**

    (i)      **The Account Maintenance Form**

Annette Bongiorno who joined BLMIS in 1968[6] and whose job by the 1970s until 2008 was to assist Bernard Madoff ("Madoff") with customer accounts, testified that one of the first questions Madoff asked of customers upon an account opening was whether the customer wanted account profits to be reinvested or to be sent to the customer. (Bongiorno Tr. at 30-31, 65 [PW-4]). The information would be recorded on a new account form for the customer, the Name/Addr File Maintenance form, which was kept in a folder for the customer's account. (*Id.* at 62-64). Ms. Bongiorno would have the customer file, including the new account form, given to the data entry operator who would enter the customer's information into the BLMIS computer system. (Leung Tr. at 87-88, 97 [PW-7].[7] *See* Bongiorno Tr. at 33, 35-36 [PW-4]; Ttee Ex. 23 at bates 2330 [PW-21]).[8] The notation of "R" on the customer's Name/Addr File Maintenance account form meant "reinvest" while "S" stood for "send." (Bongiorno Tr. at 36 [PW-4]). If an account was marked "S," profit checks would be sent automatically and it would be unnecessary for the customer to write to request the profits. (Bongiorno Tr. at 36 [PW-4]). Only if the customer wished to change his election from "send" to "reinvest" would written confirmation by the customer be needed. In that event, upon receipt of the confirmation letter, Ms. Bongiorno would have the information entered in the computer and the "S" changed to "R." While profit withdrawals were automatic upon close-out of a trade, the customer would have to request a

---

[6]  Bongiorno Tr. at 11, 15, 17, 21, 145 [PW-4].

[7]  Transcript of June 2, 2016 Deposition of Alethea Leung ("Leung Tr.") [PW-7].

[8]  A single set of exhibits was relied upon by the Trustee in the various depositions. Deposition exhibits introduced by the Trustee are referred to herein as "Ttee Ex. ___." For ease of reference, bates numbered pages are referred to as "bates," followed by the last four digits of the number.

capital withdrawal, that is, a reduction in capital, in writing.  (*Id.* at 38-40).    Initially, memos identifying the "trades" that led to the profit either were not sent or were sent to the customer a couple of days after the check.  Later, however, the memos were attached to the checks, and produced by the same computer system that generated account statements and checks.  (*Id.* at 45-46, 77, 81, 86).

### (ii)    The Check Out Book

BLMIS maintained a "check out book" which listed customers' names and account numbers, the nature of payments ("PW" for Profit Withdrawal and "CW" for Capital Withdrawal) and the amount of the checks that needed to be sent to customers.  (*Id.* at 43-44, 52; Ttee Ex. 61 at bates 1472 *et seq*. [PW-53]).  Before BLMIS became automated, the check out book was used to record profit withdrawal checks.  After BLMIS became automated, it was used to record one-off check issuances, such as the re-issuance of a check where the customer complained that the check had not been received. (Bongiorno Tr. at 136 [PW-4]; Sala 6/13 Tr. at 195 [PW-9]).  The check out book would be given to the data entry operators who would punch up and print the checks and mailing labels.  After automation, profit withdrawals were reflected in computerized format, and for the most part, were no longer noted in the check out book. (Bongiorno Tr. at 26 [PW-4]).

Winifier Jackson was one of the BLMIS employees responsible for processing profit withdrawal checks.  From 1986 until BLMIS closed, she worked as an administrative assistant to Ms. Bongiorno, assisting with paperwork in setting up customer accounts, logging incoming checks into the checkbook, recording checks to be issued, and reviewing for accuracy against a computer printout the customer's account number, the amount, and the name of the payee, on ongoing checks, including ones for profit withdrawal.  Ms. Jackson also would double-check the

6

form of delivery of those checks, namely, whether they were to go by mail or by other means. (Jackson Tr. at 9, 13, 21-23, 45 [PW-5]). [9]

Jo Ann Sala, who worked at BLMIS from 1984 until 1998, also was an assistant to Ms. Bongiorno who made entries in the check out book.  (Sala Tr. at 12-13, 31 [PW-9]).  Like Ms. Jackson, she stated that if an account was marked "send," the check would be made payable to, and sent to, the customer whose name was on the account.  Most profit withdrawal payments were made by check, and occasionally by wire.  (Sala Tr. at 31, 39-45, 53-54, 82-83 [PW-9]; Jackson Tr. at 44, 107-108 [PW-5]; Ttee Ex. 22 at bates 1479 *et seq.* [PW-20]).

Once checks were printed, they would be handed to Ms. Bongiorno or others, for signature by Madoff.  The signed checks then would be taken to the mailroom where they would be sorted, folded, placed in envelopes, and mailed.  (Bongiorno Tr. at 44-45 [PW-4]; Jackson Tr. at 110 [PW-5]).

At the end of each month, Ms. Jackson would reconcile copies of checks issued against the check log and bank statements.  The reconciliation was done a second time by others at BLMIS.  After reconciliation, the check reconciliation documents were bound and stored. (Jackson Tr. at 63-65, 117-118 [PW-5]).

**(iii)  The Ledger Sheets**

BLMIS ledger sheets replicated customer account statements but contained some additional information, and were used internally by BLMIS.   (Bongiorno Tr. at 97-98 [PW-4]; Ttee Exs. 69, 71 [PW-58, PW-60]).  Among other information, the ledger sheet showed the customer's account balance for the month before and the new balance.  In relevant part, if profit

---

[9]  Transcript of May 23, 2016 Deposition of Winifier Jackson ("Jackson Tr.") [PW-5].

withdrawal transactions occurred, the ledger sheet showed the "new balance" reduced by the amount of the withdrawals.  (Bongiorno Tr. at 99 [PW-4]).

    **(iv)**    **The Arbitrage Portfolio Management Report**

Arbitrage portfolio management reports were a way for Madoff to monitor whether accounts were realizing the profit that he projected for the accounts.  (Bongiorno Tr. at 111 [PW-4]; Ttee Ex. 39 [PW-35]).

    **(v)**    **The House 17 Manual**

Processes described in a BLMIS Manual entitled the House 17 Manual and dated August 1995 were familiar to BLMIS employees and accurately reflected the work that they performed.  (Leung Tr. at 155-158 [PW-7]).  The Manual (Ttee Ex. 49 at bates 6545 [PW-45]) referenced three books from which checks were to be "punched."  These included the check in book which was a notebook in which checks would be posted when they came in.  The second was the check out book described above.  The third book was a binder which contained ledger sheets that would be printed off of the computer upon "trade" completion and would list all profits and the dates on which profits were due.  (*See* Bongiorno Tr. at 135 [PW-4]; Ttee. Ex. 38 [PW-34].  *See also* Sala Tr. at 161-162 [PW-9]).

When profits were due was tracked by reference to the computer data.  Customers would be placed in a "stock" for weeks at a time at the end of which the transaction would be deemed completed and a profit check would be due.  From the "due date reports," Ms. Sala would be able to monitor when profits were due and when it was time to place customers in another "stock."  (Sala Tr. at 157-160 [PW-9]).

The due date reports took the place of the check out book once the firm became fully computerized and contained the same information as in the check out book.  The reports were

printed by BLMIS computer operators and given to Ms. Sala.  These reports identified which customers would receive profit checks.  Because the reports showed different transaction completion dates, Ms. Sala would cut the due date report, taking  the information relating to customers to be placed in new stocks from the reports and taping it on to a sheet of paper.  The sheet of paper would be delivered to the data entry operator for entry into the computer and issuance of a new report.  (Sala Tr. at 156-160, 163-164 [PW-9]; Sala 6/13 Tr. at 183 -194 [PW-9]).

Dorothy Khan and Alethea Leung were data entry operators at BLMIS.  Both were employed by BLMIS until the firm closed.  Ms. Khan worked the night shift beginning in 1993, and Ms. Leung, the day shift, beginning in 1995.  Their job entailed inputting customer information, updating customer files and transactions, as well as inputting into the computer or "punching" the information for checks to be issued, and printing them.  The information that they input into the computer would be received from Ms. Bongiorno and other account managers.  Typically, the checks that they printed were made out to BLMIS customers. Printed with the checks were mailing labels that matched the name of the customer on the check, as well as memo sheets.  At the end of their shifts, the printed checks and other documentation would be left for Winifier Jackson or another BLMIS employee for the processing described above. (Khan Tr. at 10-13, 18-24, 33, 60-61, 73, 95, 101, 111 [PW-6];[10] Leung Tr. at 9-11, 13, 16, 18-23 [PW-7]).

**(vi)  <u>Customer Account Statements</u>**

Last but not least, BLMIS sent monthly statements to its customers which reflected all transactions in the customer's account.  The BLMIS clerical staff, including Ms. Jackson, was

---

[10]    Transcript of May 25, 2016 deposition of Dorothy Khan ("Khan Tr.") [PW-6].

responsible for physically assembling and mailing the statements to customers.  (Jackson Tr. at 48-49 [PW-5]).  If cash transactions in the statements were inaccurate, customers called or complained in writing.  If a call related to a missing check, Ms. Bongiorno would call the bank, confirm that the check had not cleared, have a stop payment placed on it, and a check re-issued. (Bongiorno Tr. at 142-144, 212-213 [PW-4]).  Ms. Sala received written or telephone inquiries from customers asking, among other things, when they could expect their profit checks.  (Sala Tr. at 3 [PW-9]1; Sala 6/13 Tr. at 271-272 [PW-9]).

## B.    The Books and Records and the Blecker Accounts

As described by him, in 1986, Mr. Blecker opened an account with BLMIS, under the name of Aaron Blecker, and which was assigned number 100254.  When BLMIS adopted a new numbering system, the account number was changed to 1B0022.   In 1997, the account, in which Mr. Blecker had deposited a total of $200,000, was closed and funds allegedly in the account were transferred to two new accounts – one, account no. 1B0156-3-0 that was in his name, and a second account, no. 1B0157, that was in his name as "Arthur Blecker" and the name of his wife, Sofie.  "Arthur" and "Aaron" were the same person.  *See* Affidavit of Aaron Blecker (Doc. No. 961), at 3, ¶ 2.  In 2007, any funds in those accounts allegedly were transferred to a trust account, no. 1B0156, established in the name of the Aaron Blecker Revocable Trust.  *See* Affidavit of Aaron Blecker (Doc. No. 961), at p. 3; Sala Tr. at 104-106 [PW-9].[11]

---

[11]   In fact, Mr. Blecker or his family members had four accounts at BLMIS that were opened as follows:  BLMIS Account nos. 1B0022 (in the name of Aaron Blecker and opened in 1986), 1B0023 (in the names of Arthur and Sofie Blecker and opened before 1981), 1B0156 (in the name of Aaron Blecker and opened in 1997), and 1B0157 (in the names of Arthur and Sofie Blecker and opened in 1997).  In 2007, the Aaron Blecker Revocable Trust account was opened, bearing account no. 1B0156.   *See* Declaration of Vineet Sehgal In Support of the Trustee's Objection to Motion of Aaron Blecker to Compel the Trustee to Allow his SIPC Claim, filed herein on January 13, 2016 (Doc. No. 12433) at 2, ¶ 6.

The BLMIS Trustee ("Trustee") denied the claim of Mr. Blecker relating to Account No. 1B0022 on the basis that the $261,634 paid by BLMIS to him in profit withdrawals between November 24, 1986 and November 13, 1991, exceeded his total deposit of $200,000 in the account.  Thus, by the time funds were transferred out of the original Blecker account, the funds consisted only of fictitious profit, all of Mr. Blecker's principal having been returned to him in profit withdrawals.[12]

The Trustee's determination that the profit withdrawal payments were made was grounded in the books and records of BLMIS.  Thus, they showed that:

(i)    **Mr. Blecker elected to have profits sent to him.**

The completed Name/Addr File Maintenance form in the folder for account no. 1B0022 contained an election of "S" which denoted a request that profits, dividends and interest in the account be sent to Mr. Blecker.  (Sala Tr. at 106-107 [PW-9]; Ttee Ex. 36 at bates 8419 [PW-32]).  As discussed above, this meant that Mr. Blecker would have received his profits automatically, without having to make a separate request whenever "profits" became due.  (Sala Tr. at 107 [PW-9]; Jackson Tr. at 90-91 [PW-5]).

(ii)    **Mr. Blecker's account statements showed "profits" as credits in his account, and then, as debits, once the profits were withdrawn.**

---

[12]    On May 10, 2010, the Trustee issued a determination notice of his denial of the claim of the Aaron Blecker Revocable Trust on the basis that the adjusted amount transferred to that account was "0."  On September 29, 2010, the Trustee issued a determination notice with regard to the claim of the Arthur and Sophie Blecker joint account and denied it on the basis that the adjusted amount transferred to that account also was "0."  Copies of the three determination notices are exhibits to the Declaration of Vineet Sehgal In Support of the Trustee's Objection to Motion of Aaron Blecker to Compel the Trustee to Allow his SIPC Claim, filed herein on January 13, 2016 (Doc. Nos. 12433-2, 12433-10, and 12433-14).

The account statements issued to Mr. Blecker showed checks issued as profit withdrawal. For example, the following "trades" in Pep Boys stock appeared on his April 30, 1992 statement:

| T/DT [Trade Date] | Long | Short | Debit | Credit |
|---|---|---|---|---|
| 4/13 | 80000 | | $99,466.66 | |
| 4/13 | | 1600 | | $36,800.00 |
| 4/13 | | 2854 | | $65,285.25 |

Together with a journal entry resulting in a $9.15 credit to the account, the "sale" of the Pep Boys stock resulted in a profit of $2,627.74 ($36,800+$65,285.25+$9.15 less $99,466.66=$2,627.74). The profit amounted to a "credit" in the account. (Sala Tr. at 111-114 [PW-9]; Ttee Ex. 37 [PW-33]). On June 16, 1992, per the account statement for the period ending on June 30, 1992, a check representing a withdrawal of the profit from the account was issued. The amount of $2,627.74 now appeared as a "debit" in the account and under the description of "PW," signifying a profit withdrawal and issuance of a check to Mr. Blecker in that amount. (Sala Tr. at 114-117 [PW-9]; Jackson Tr. at 92-94 [PW-5]; Ttee Ex. 38 [PW-34]).

### (iii)   BLMIS records that tracked the Blecker account activity were consistent with the payment of "profits."

For the period as of December 31, 1992, the Arbitrage Portfolio Management Report, which allowed Madoff to monitor returns in accounts, showed total profits of $16,858.40 withdrawn from the Blecker account number 1B0022, and no withdrawals of capital. (Sala Tr. at 118-120 [PW-9]; Ttee Ex. 39 [PW-35]). An Arbitrage Portfolio Management Transactions report, which listed the cash transactions in account no. 1B0022 showed the individual components making up the $16,858.40. These included the profit withdrawal of $2,627.74 on June 16, 1992. (Jackson Tr. at 93-97 [PW-5]; Ttee Ex. 40 [PW-36]). Arbitrage Portfolio

Management Transaction reports were run by the data entry operators periodically and were given to Ms. Bongiorno. (Leung Tr. at 119 [PW-7]).

Likewise, the ledger sheets that replicated the customer account statements but were used internally at BLMIS showed the balance in the Blecker account reduced by the amount of profit withdrawals. (*See* Bongiorno Tr. at 97-100 [PW-4]; Ttee Exs. 69 and 36 [PW-58 and 32]).

The Blecker account statements further showed that notwithstanding profits credited to the account, the balance in the Blecker account remained relatively constant because of the withdrawal of the profits. (Bongiorno Tr. at 101-103 [PW-4]; Ttee Ex. 70 [PW-59]).

**(iv)   Entries in the check out book corresponded to profit checks to Mr. Blecker.**

The issuance of profit withdrawal checks to Mr. Blecker also was corroborated by entries made in the check out book. For example, the profit withdrawal of $3,230.02 on July 11, 1991, shown on the July 31, 1991, Blecker account statement and relating to a purported transaction in Health South, corresponded to the following handwritten entry in the check out book:

| 7/17 | Aaron Blecker | 25410 | PW | 3,230.02 | Health South |
|------|---------------|-------|-----|----------|--------------|

The "25410" referred to the previous number for account no. 1B0022. The entry in the check out book meant that a check for $3,230.02 representing the "profit" on the Health South "transaction" would be issued to Mr. Blecker. (Sala Tr. at 122-126 [PW-9]; Ttee Ex. 22 at bates 1651 [PW-20]; Ttee Ex. 41 [PW-37]). According to Ms. Bongiorno, the entry in the check out book combined with the corresponding activity on the customer statement signified that "the check went out for that amount." Bongiorno Tr. at 94-95 [PW-4]. *See also* Bongiorno Tr. at 95-96 [PW-4]; Ttee Ex. 61 at bates 1655 [PW-53]; Ttee Ex. 41 [PW-37].

**(v)   The data entry operators regularly recorded their work in logs which included issuance and printing of the profit withdrawal checks.**

13

The work logs kept by the data entry operators confirmed the inputting and printing of checks. For example, a $3,838.25 profit withdrawal on September 5, 1996, shown in the September 30, 1996 statement for the Aaron Blecker account correlated to a description in the work log of the printing of a profit withdrawal check on September 5, 1996. (Leung Tr. at 114-115 [PW-7]; Ttee Ex. 59 [PW-51]; Ttee Ex. 56 at bates 7565 [PW-49].) As a further example, the September 30, 1996 statement for the account of Arthur and Sofie Blecker showing a profit withdrawal of $7,231.50 on September 5, 1996 correlated to the log indicating work on a profit withdrawal check for September 5, 1996. (Leung Tr. at 117-118 [PW-7]; Ttee Ex. 60 [PW-52]; Ttee 56 at bates 7565 [PW-49]).

### (vi) Elections made in other Blecker accounts were consistent with one another.

The same election made by Mr. Blecker in opening his account in 1986 was made by him with respect to the joint account with his spouse. Account No. 100215 was the prior number for the convertible arbitrage account of Arthur and Sofie Blecker and became account no. 1B0023. In this account as well, the election was to "send" profits, dividends, and interest. (Sala Tr. at 126-131 [PW-9]; Ttee Ex. 42 at bates 8421 and 8423 [PW-38]; Jackson Tr. at 97-98 [PW-5]). Likewise, checks to be issued for profit withdrawals in this account were entered in the check out book. For example, the entry in the joint account statement of a $12,364.06 Health South profit withdrawal on July 11, 1991 (Ttee Ex. 43 [PW-39]), correlated to the handwritten entry evidencing the same in the check out book (Ttee Ex. 22 at 1651 [PW-20]). Similarly, the notation in the joint account statement of a $1,375.28 Liberty Natl profit withdrawal on July 22, 1991 (Ttee Ex. 43 [PW-39]) corresponded to the handwritten entry of the same in the check out book (Ttee Ex. 22 at bates 1655 [PW-20]). *See* Sala Tr. at 131-138 [PW-9]. The ledger sheet for this account which mirrored the customer's account statement for the same date also showed the

issuance of profit withdrawal checks and the balance of the account reduced by the amount of the profit withdrawals.  (Bongiorno Tr. at 107-108 [PW-4]; Ttee Ex. 71 [PW-60]).

## C.    THE BOOKS AND RECORDS AND THE BLUM ACCOUNTS

The Blum brothers contend that amounts transferred to them from their parents' accounts, upon the passing of their parents, should not have been reduced by profit withdrawals because their parents allegedly never received any.

Morris Blum, the father of Norman and Joel Blum, established a BLMIS account in or about 1981 that was numbered 1B0033.  In 1984, he opened an account for Roslyn L. Blum, his spouse.  That account was numbered 1B0036, and was funded with monies transferred from Morris Blum's account no. 1B0033.  Upon Mrs. Blum's death in 1993, the funds in her account were transferred to an Estate account numbered 1B0115 and titled the Roslyn L. Blum Remainder Trust account.  In 1997, the funds in that account were transferred to another BLMIS account numbered 1B0191, of the same name, with Norman and Joel Blum as co-trustees on the account.  The latter trust account was dissolved, and in December 2002, the proceeds were distributed to the two sons.  Joel Blum's share was transferred to BLMIS account no. 1B0251 which was a joint account in his name and the name of his spouse, Kerry Blum.  The share of Norman Blum was transferred to his BLMIS account no. 1B0201 in the name of the Norman J. Blum Living Trust.

In July 1997, Norman Blum had the contents of his father's account no. 1B0033 transferred to a new BLMIS account no. 1B0189, which was the Dr. Morris Blum Living Trust account, with Joel Blum and himself as co-trustees.  After Morris Blum passed away in 2002, that account was closed and in October 2003, the proceeds were distributed to the two sons.

15

Norman's share was transferred to his account no. 1B0201 (the Norman J. Blum Living Trust),

and Joel's share was transferred to his joint account no. 1B0251.[13]

The objection filed by Norman and Joel Blum is as to account no. 1B0251 (Joel and

Kerry Blum account), and account no. 1B0201 (the Norman J. Blum Living Trust account).  *See*

Objection to Trustee's Determinations of Claims, filed herein on May 13, 2016 (Doc. No. 13323)

("Blum Objection").  With respect to both accounts, in determining the claims, the Trustee

adjusted the amounts transferred to those accounts from the parents' trust accounts (nos. 1B0191

and 1B0189), in order to reflect the actual remaining principal, after profit and other

withdrawals.[14]  *See* Exhibits A and B to Blum Objection.

As with Mr. Blecker, in the case of the Blums as well, profit withdrawals were evidenced

by BLMIS records including

- the customer statements issued for the accounts;

- the election of "send" in, for example, the  Name/Address File Maintenance form

  for account no.  1B0036 (Estate of Roslyn Blum) (Ttee Ex. 9 at bates 6725 and 6727

  [PW-13]);

- a letter dated December 8, 1997, contained in the folder for account no. 1B0191

  (the Roslyn L. Blum Remainder Trust account), and sent by Morris Blum to Bernard L.

---

[13]    *See* Declaration of Joel A. Blum, M.D., filed herein on March 30, 2016 (Doc. No. 13003-6) at ¶¶4-6; and Declaration of Norman J. Blum, M.D., filed herein on March 30, 2016 (Doc. No. 13003-7) at ¶¶6-7.  *See also* Transcript of May 13, 2016 deposition of Norman Blum ("N. Blum Tr.") at 12 and 47-50 [PW-3]; and Transcript of May 16, 2016 deposition of Joel A. Blum ("J. Blum Tr.") at 54 [PW-2].
    To avoid confusion, the Blums intermittently are referred to herein by their first names.

[14]    In valuing account no. 1B0201 (the Norman J. Blum Living Trust account), the Trustee also adjusted the value of funds transferred to that account from account no. 1B0034.  Account no. 1B0034 was opened in 1986, in the name of Norman J. Blum.  *See* Exhibit B to Blum Objection, and N. Blum Tr. at 12 [PW-3].

Madoff. In the letter, Morris, as trustee for the trust, instructs Madoff not to "send any future income due above account [no. 1B0191] until further notice." The letter contains the notation "Remove 'S'" which is in a different handwriting from that of Morris. *See* Ttee Ex. 10 at bates 6524 [PW-14]. Noted on the folder for the account are "10/17/97 Make 'S'" and "12/11/97 Remove 'S.'" Ttee Ex. 10 at bates 6513 [PW-14].

• an undated letter, contained in the 1B0191 account folder and sent by Morris Blum to BLMIS in which he instructs BLMIS to remit distribution for his and his wife's trust accounts (nos. 1B0189 and 1B0191) as soon as possible. A handwritten notation of "Then make both 'S,'" in writing other than that of Morris, appears in the letter. *See* Ttee Ex. 10 at bates 6525 [PW-14].

• entry in the check out book of a profit withdrawal payment in the amount of $2,013.24 to M. Blum related to Liberty National Bancorp. The check out book log entry corresponds to a profit withdrawal of the same from Morris's account no. 1B0033 on July 22, 1991.[15]

## II.    DENIAL OF RECEIPT AND SPECULATION AS TO NON-RECEIPT ARE INSUFFICIENT TO REBUT THE PRESUMPTION OF MAILING AND RECEIPT

### A.    The Regular Office Procedures Followed At BLMIS Created a Presumption of Mailing and Delivery of the Profit Withdrawal Checks

The BLMIS books and records discussed above, supported by the deposition testimony of the former BLMIS employees who routinely generated them and worked with them in the ordinary course, is proof that office procedures were established at BLMIS that were regularly followed with respect to the preparation, issuance, and mailing, of profit withdrawal checks. The

---

[15]    *Cf.* Ttee Ex. 61 at bates 1655 [PW-53] and Declaration of Richard A. Kirby In Support of Blums' Objection to Trustee's Proposed Scheduling Order Changes for Profit Withdrawal Motion (Doc. No. 13003), Ex. E at p. 2 of 5.

fact that such procedures existed and were adhered to gives rise to a rebuttable presumption that

the checks not only were prepared and mailed, but delivered.  Thus, a presumption of delivery is

established in one of two ways: *one*, by presenting proof of actual mailing by the person who

mailed the check, or, *two*, by "proof of procedures followed in the regular course of operations

which give rise to a strong inference that the check was properly addressed and mailed."

*Godfrey v. U.S.*, 997 F.2d 335, 338 (7th Cir. 1993).   The Second Circuit has agreed with this

approach.  As the Circuit observed in *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817

(2d Cir. 1985):

> [U]nder New York law personal knowledge is required only to
> establish regular office procedure, not the particular mailing.  Here,
> the presence of such proof establishes prima facie evidence of the
> mailing and creates a rebuttable presumption as to receipt.

> \* \* \* \* \*

> New York law holds that when, as here, there is proof of the office
> procedure followed in a regular course of business, and these
> procedures establish that the required notice has been properly
> addressed and mailed, a presumption arises that notice was
> received. The mere denial of receipt does not rebut that
> presumption.  There must be – in addition to denial of receipt –
> some proof that the regular office practice was not followed or was
> carelessly executed so the presumption that notice was mailed
> becomes unreasonable.

*Accord, Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010)

(denial of receipt insufficient to rebut the presumption); *Mount Vernon Fire Ins. v. East Side*

*Renaissance*, 893 F. Supp. 242, 245-246 (S.D.N.Y. 1995) (regular office practice shown by

testimony of employees with personal knowledge of office practice); *Bronia, Inc. v. Ho*, 873 F.

Supp. 854, 859-860 (S.D.N.Y. 1995) (proof of regular office procedures sufficient to establish

mailing and receipt despite lack of first-hand knowledge); *In re Adler Coleman Clearing Corp.*,

204 B.R. 99, 110 (Bankr. S.D.N.Y. 1997) (in SIPA case, holding that personal knowledge of

18

office procedures only and not of actual mailing is needed to create presumption).  In the matter

at hand, the denial of receipt by Mr. Blecker and the Blum brothers, compounded in the case of

the Blums by their lack of actual knowledge as to receipt, is insufficient to rebut the presumption

that the profit withdrawal checks were mailed and received.

### B.   Denial of Receipt by Mr. Blecker Is Insufficient to Rebut the Presumption

The objection of Mr. Blecker rests on two basic grounds: *one*, an outright denial that he

received the profit withdrawal checks issued between 1986 and 1997; and *two*, he believed the

entries of "PW" meant that the checks were payable not to him, but to the security issuer for

purchase of additional shares of the issue.  As to the first ground, the mere denial of receipt is

insufficient to overcome the presumption discussed above.  Moreover, in any event, Mr. Blecker

acknowledges that he received monthly account statements from BLMIS, including ones that

showed profit withdrawal payments.  *See* Blecker Tr.[16] at 11 ("I just got a statement showing

what transactions had occurred"); 12, 13 [PW-1].  He stated that "I could only check from their

statements, so I was really going over their work, which I had no way to prove whether it was

correct or not, but I assumed what they put on my statement must have been in my account.  And

that's how I confirmed it." *Id.* at 14.   At the time of receipt, he accepted the information in the

statements without protest.  His contention now, more than twenty years after the fact, is too late.

*See*  SIPC 7/14/15 Memo at 6-7.

As to Mr. Blecker's assertion that the checks were to pay for the purchase of more shares

of the issue and were payable to the issuer, that contention is contrary to the facts.  The

statements for his account simply do not reflect the purchase of such shares in the amounts in

question.

---

[16]   Transcript of July 1, 2014 deposition of Aaron Blecker ("Blecker Tr.").  A copy of the
transcript was filed herein on December 30, 2015, and is Doc. No. 12324-1.

**C.      The Denial By the Blums of Receipt Does Not Overcome the Presumption; The
Blums Had No First-Hand Knowledge**

**(i)      Norman Blum**

Although the Blums maintain that their parents received no profit withdrawal checks,

their deposition testimony reveals that they had no first-hand knowledge of whether checks were

received.  As Dr. Norman Blum conceded during his deposition:

> Q [by counsel for the Trustee].  …  Is there a distinction for you
> between profits and disbursements?
>
> A.  No.  They're the same thing to me.  That's – that what I think it
> is.
>
> * * * *
>
> Q. …  So your testimony earlier was that your father absolutely
> never received profit withdrawals or disbursements?
>
> A.  That's what – that's what I said.  I would strongly doubt that.
>
> Q.  Do you know for a fact that he never received disbursements?
>
> A.  I can – no, I do not know it for a fact.

N. Blum Tr. at 67-68 [PW-3].

There is no reason why the Blum brothers would have known of the payment of profit

withdrawals.  Their father, Morris Blum, remained in control of the disposition of assets in his

account and the assets in the trust accounts virtually until the time of his passing.  Under the

Roslyn Blum Living Trust Agreement, a copy of which was in the customer folder for Mrs.

Blum's arbitrage account no. 1B0036, income under the trust was to be paid to Roslyn Blum

during her lifetime, and then to Morris Blum for his lifetime.  (Ttee Ex. 9 at bates 6733 and bates

6737 [PW-13]; N. Blum Tr. at 54, 56-58 [PW-3].) Morris received the statements for the Roslyn

Blum Trust accounts (nos. 1B0115 and 1B0191), and only when he passed away in 2002 did

20

Norman, and possibly also his brother, receive the statements.[17]    By then, the sons promptly closed the mother's trust account and profit withdrawal checks were no longer being sent in either trust account.    (N. Blum Tr. at 70-71, 73 [PW-3]).    Although Morris was "totally independent" until 2000, after 2000, Norman began to assist his father.    (N. Blum Tr. at 82 [PW-3].)  But, according to Norman, "[w]hatever [his father] wanted to do, he did it."  His father "had his mind together till the day he died."  (N. Blum at 52 [PW-3].)  Norman would help his father with his banking, but he did so only by looking at his father's checkbook of deposits.  Morris made his own deposits and balanced his own checking account, and at times, grouped multiple dividend payments into one deposit.  (N. Blum Tr. at 68-69, 74-76, 80 [PW-3].)  Although Norman maintained that before the year 2000, his father would have told him "everything," N. Blum Tr. at 82 [PW-3], he was unaware that his father had written to Bernard Madoff on December 8, 1997, and instructed him not to send any future income due on the Roslyn Blum remainder trust account no. 1B0191, until further notice.  (Ttee Ex. 10 at bates 6524 [PW-14]; N. Blum Tr. at 85-86 [PW-3].)  Norman also was unaware of the undated letter from Morris to BLMIS in which Morris requested remittance of distributions from both Roslyn's remainder trust account (no. 1B0191) and the trust account into which his monies had been transferred and as to which his sons were co-trustees (no. 1B0189).  (Ttee Ex. 10 at bates 6525 [PW-14]; N. Blum Tr. at 87-89 [PW-3].)    Although Norman initially did not recall whether he reviewed the account statements that his father received from BLMIS, he later recalled seeing the monthly statements but not examining them closely.  (N. Blum Tr. at 53, 78 [PW-3].)

From 1986 until 1997, Norman maintained his own account at BLMIS which was numbered 1B0034, and as to which profit withdrawal payments were made.  While Norman

---

[17]    Joel Blum did not recall receiving any statements for his parents' accounts.  (J. Blum Tr. at 57 [PW-2].)

denied receiving such payments, N. Blum Tr. at 29, 94-95 [PW-3], his answers at the deposition clearly revealed an incomplete, and often, faulty, memory. For example, he acknowledged receiving monthly statements from BLMIS from 1986 until 2008, but could not recall seeing his early customer statements from the 1980s. (N. Blum Tr. at 13, 18-19, 26 [PW-3].) Although he arguably confirmed deposits and withdrawals on the statements, he reviewed the statements mainly for the closing balance which was "all I would care about." (N. Blum Tr. at 19 [PW-3]. See *id*. at 15-16, 20-21.) He could not recall whether he had an account at BLMIS for the Bradley Blum Pension Plan, stating that "[t]his is 1987. There's no way I would remember that, nor do I think I did." (N. Blum at 30 [PW-3].) In fact, the Bradley Blum Pension Plan was part of Norman's medical practice. In a letter dated October 16, 1990, Norman advised BLMIS that he was the trustee for the Bradley Blum Pension Plan and that the plan had been terminated. He instructed that his share of the proceeds of the plan be transferred to his individual IRA account at BLMIS. (*See* Ttee Ex. 6 at bates 3412 [PW-12]; N. Blum Tr. at 32-36 [PW-3].) Norman could not recall discussing profits with BLMIS, yet, on December 24, 1997, he wrote to BLMIS with respect to the Norman J. Blum Living Trust account (no. 1B0201) requesting BLMIS to "please send me all of the profits when it is time for a distribution." (Ttee Ex. 3 at bates 7068 [PW-11]; N. Blum at 42-43 [PW-3].) And, again, on June 27, 2003, in writing, Norman instructed BLMIS to "[p]lease invest all of my profits in the above acct." [no. 1B0201.] (Ttee Ex. 3 at bates 7037 [PW-11]; N. Blum at 45-46 [PW-3].) Norman claimed to have no involvement in the setup of the living trust for his parents even though the trust agreement bore his signature as a trustee. (Ttee Ex. 9 at bates 6750 [PW-13]; N. Blum at 56, 58-59 [PW-3].) While eventually acknowledging that he had signed the document, he maintained that he had "no idea what it said." (N. Blum Tr. at 59 [PW-3].)

(ii)    **Joel Blum**

Joel Blum also professed a belief that profit withdrawal payments were not made, but when asked whether he knew if his father had received checks in connection with his BLMIS investments, Joel answered: "I don't know." (J. Blum Tr. at 51, 53 [PW-2]). Similarly, when asked whether he played a role in the management of his father's investments, he replied: "Not really." J. Blum Tr. at 52 [PW-2].

Joel's own involvement with BLMIS began in 1984 when he opened a trust account called the "CAB," an acronym derived from the initials of the names of two of his children. (J. Blum Tr. at 17, 36 [PW-2]). He received monthly statements for this and the account that he held at BLMIS with his wife, but he would review them only "a little bit." (J. Blum at 24 [PW-2].) Like his brother, his memory fell short in a number of respects. For example, he was surprised to learn that he had opened the joint account with his wife as early as 1990. He also did not recall serving as the trustee of the CAB trust, created in May 1984. (J. Blum at 42 [PW-2]; *see* Ttee Ex. 17 at bates 6365 [PW-18]). He did not remember a letter dated July 10, 1990, in which he asked to have an account at BLMIS that was in his name only changed to the joint account with his spouse. Notably, in the letter, he also asked BLMIS to "send a check covering the profits from each transaction" in the CAB account to the CAB Trust, in his care. (Ttee Ex. 15 at bates 6948 [PW-16]; J. Blum Tr. at 31-36 [PW-2]). Joel also did not recall a letter dated April 18, 1996, that he wrote to "Joanne" at BLMIS in which he asked to have the CAB account closed, stated that the account had financed the college education for his two older children and that the time had come to distribute the remaining funds to them. He ended the letter by asking that BLMIS "[p]lease send a check for the remaining balance along with the check for the

current transaction, as you have been doing over the past several years." (Ttee Ex. 17 at bates 6358 [PW-18]).

While he did not recall receiving checks during the life of the CAB account, he acknowledged that "I know that that must have happened," and conceded that at least some of the money would have consisted of profits. (J. Blum Tr. at 45 [PW-2].). That the payments included "profits" was consistent with a letter that he wrote to "Joanne" on July 10, 1990, in which he stated with regard to the CAB Trust account:

> until now the profits have all been reinvested.  Starting with the
> next transaction, could you please send a check covering the
> profits from each transaction to:
>
> The CAB Trust
> c/o Joel A. Blum
>
> * * * *

Ttee Ex. 15 at bates 6948 [PW-16].  The testimony comported with the Name/Addr Maintenance forms contained in the CAB trust account folder.  As Joanne Sala testified at her deposition, the notations on the forms showed a change in election – from "send" to "reinvest," and back to "send."  (Sala Tr. at 144-147 [PW-9]; Tr. Ex. 46 at bates 6356 and 6357 [PW-42].  *See* Bongiorno Tr. at 122-128 [PW-4].)  It also comported with statements issued in the CAB Trust account that showed "PW" entries, and with the check out book that showed a PW check entry for the CAB Trust.  *See* Sala Tr. at 149-155 [PW-9]; Ttee Exs. 47, 48 at bates 3416, 22 at bates 1655 [PW-43, 44, 20].

Joel recalled or knew even less about his parents' investments.  He did not know why his father opened an account at BLMIS (J. Blum Tr. at 50 [PW-2]).  He did not become fully aware of the account of his mother at BLMIS until his father passed away in 2002.  (J. Blum Tr. at 52 [PW-2]).  He served as successor co-Trustee under the Dr. Morris Blum Living Trust (Ttee Ex.

18 at 6416-6417 [PW-19]) from November 2002 until July 2003 and as successor co-Trustee on his mother's trust account for two months, in November 2002 and December 2002. He "guessed" that his role as successor trustee was to "oversee the settlement" of the BLMIS accounts, but while serving, he received no statements for the accounts, corresponded with no one at BLMIS relative to the accounts, and did not recall being actively involved in account maintenance. He did not know that his father had requested distribution from the trust accounts, and believed that any checks from BLMIS for the trust accounts went to his brother, following his father's death. (J. Blum Tr. at 55-63 [PW-2]). He received no bank statements for his father, never reviewed any for him, and never deposited and never wrote checks for him. (J. Blum Tr. at 66-67, 80 [PW-2].) He did not recall ever discussing with his father whether his father had received checks from BLMIS. (J. Blum Tr. at 80 [PW-2]).

In sum, far from casting doubt on the Trustee's determinations of the claims at issue, the testimony of Mr. Blecker and of the Blums reinforces the correctness of the determinations, both under the law and on the facts. No claimant has shown any grounds for overcoming the presumption against them or for satisfying the burden incumbent upon them. As evidenced in the careful and complete analysis of the claims by the Trustee's professionals, reinforced by the testimony of the BLMIS employees, the BLMIS books and records amply support and identify the obligation of BLMIS to the claimants and the absence thereof.

### III.    "TO THE SATISFACTION OF THE TRUSTEE" IS NOT AT ISSUE

If there were no debtor books and records or the relevant information in the ones that existed was unreliable, which is not the case at hand, an obligation would have to be established by the claimant "to the satisfaction of the trustee." The claimant bears the burden of proof and that burden is substantial. *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 515 B.R. 161, 166 (Bankr.

S.D.N.Y. 2014) ("showing 'is not easily met.'") (citations omitted).  The claimant must prove his

claim by a preponderance of the evidence, meaning that he must show that "the existence of a

fact is more probable than its nonexistence."  *Concrete Pipe and Products of California, Inc. v.*

*Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 622 (1993).  *See*

*U.S. v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("preponderance standard is no more than a tie-

breaker dictating that when the evidence on an issue is evenly balanced, the party with the

burden of proof loses."), *cert. den. sub nom., Aloi v. U.S*., 522 U.S. 868 (1997); *Nissho-Iwai Co.*

*v. M/T Stolt Lion*, 719 F.2d 34, 38 (2d Cir. 1983).

SIPA section 78fff-2(b) requires that obligations to customers be "ascertainable from the

books and records of the debtor or … otherwise established to the satisfaction of the trustee."

The rationale behind the "satisfaction" clause is plain.  As this Court stated in *In re MV*

*Securities, Inc*., 48 B.R. 156 (Bankr. S.D.N.Y. 1985):

> Given that historically SIPA evolved at a time of severe back
> office problems in the securities industry resulting in substantial
> inaccuracies in account records, it is clear from 15 U.S.C. § 78fff-
> 2(b) that Congress did not intend to base SIPC coverage solely on
> what the debtor's books stated.

48 B.R. at 159 n.5.  That Congress gave the trustee the authority to decide claims in the absence

of reliable books and records is consistent with SIPA.  In a SIPA proceeding, claims are filed

with the SIPA trustee; the trustee is charged with the duty to investigate all aspects of the

business of the debtor and to report thereon to the court; and the trustee administers the

liquidation.  SIPA §§ 78fff(a)(4), 78fff-1(d)(1), and 78fff-2(a)(2).  Thus, the trustee is best

positioned to decide, in an informed way, all claims against a debtor.

Apparently because of the "satisfaction" clause of section 78fff-2(b), this Court has

questioned whether its review of an objection is *de novo*, that is, may it disregard the

determination of the trustee and decide whether the claimant has met its burden by a preponderance of the evidence, or is its review limited to deciding whether the claim has been established "to the satisfaction of the trustee?" For the reasons discussed above, the issue is not presented here and SIPC submits that the Court need not reach it. *See U.S. Nat'l Bank of Or. v. Independent Ins. Agents*, 508 U.S. 439, 446 (1993) (federal court lacks power to render advisory opinion). Nevertheless, because the Court has posed the question, SIPC offers its preliminary views below.

### A. The Nature of "To the Satisfaction of"

In other contexts, "to the satisfaction of" has been held to be discretionary language. For example, in an immigration case, the Seventh Circuit stated: "Permissive language that refers to demonstrating something to the agency's 'satisfaction' is inherently discretionary." *Vasile v. Gonzales*, 417 F.3d 766, 768 (7th Cir. 2005). *See Nethagani v. Mukasey*, 532 F.3d 150, 154-155 (2d Cir. 2008) ("in the discretion of" and "to the satisfaction of" deemed to be language rendering a determination discretionary).

At issue in *Vasile* was an immigration law provision (8 U.S.C. § 1158(a)(2)(D)) that allowed an application for asylum to be considered if the applicant demonstrated changed circumstances "to the satisfaction of the Attorney General." The Court held discretionary determinations to be outside of its jurisdiction and dismissed the petition for review for lack of jurisdiction. In reaching its decision, the Court was guided by another provision of the immigration laws (8 U.S.C. § 1252(a)(2)(B)(ii)) that expressly made such discretionary decisions unreviewable.

In another context - the failed bank situation, - the FDIC, as receiver, may disallow any claim not proven "to the satisfaction of the receiver." 12 U.S.C. § 1821(d)(5)(D)(i). Here too,

27

Congress has provided guidance regarding the extent of review. Under 12 U.S.C. section 1821(d)(5)(E), no court may review the decision of the FDIC made pursuant to section 1821(d)(5)(D). But if the receiver fails to determine a claim within the statutorily-allotted time or denies a claim, the claimant may seek administrative review before the FDIC of a denial, or file suit in federal district court. 12 U.S.C. § 1821(d)(6)(A). If the claimant sues, because the Court may not review the decision of the receiver, judicial review is *de novo* of the merits of the claim. *Koznarek v. F.D.I.C.*, 116 F. Supp. 3d 894, 896 (N.D. Ill. 2015). *See Augienello v. F.D.I.C.*, 310 F. Supp. 2d 582, 588-589 (S.D.N.Y. 2004). As one court commented in considering an argument by the FDIC that a document not submitted to the FDIC with a proof of claim should be excluded, *de novo* review means:

> "a fresh, independent determination of 'the matter' at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion." …
>
> * * * *
>
> Were the Court to adopt the posture suggested by the FDIC, the Court would be limiting itself to the record before the FDIC, thereby depriving [the claimant] of his right to have an Article III court "adjudicate" his claim.

*Nants v. F.D.I.C.*, 864 F. Supp. 1211, 1217 (S.D. Fla. 1994) (citations omitted).[18]

## B.    Discretionary Action Under SIPA

A number of provisions of SIPA confer discretionary authority. For example, the Court has discretion with regard to the method by which notice of a disinterestedness hearing is given. §78eee(b)(6)(B) ("The court may, in its discretion, also require…"). SIPC has discretion in deciding whether to use a direct payment procedure. § 78fff-4(a) ("SIPC may, in its discretion,

---

[18]    But the claimant cannot assert claims or theories in the court proceeding that were not reflected in the proof of claim because the court has jurisdiction only over claims first submitted to the receiver. *See Jahn v. F.D.I.C.*, 828 F. Supp. 2d 305, 317 (D.D.C. 2011).

use the direct payment procedure….").  In its discretion, SIPC may discontinue the use of the direct payment procedure.  § 78fff-4(f) ("… SIPC determines, in its discretion, that continuation of such direct payment procedure is not appropriate …").  Where Congress has sought to confer sole discretion under SIPA, it has done so explicitly.  Thus, under SIPA section 78eee(b)(3), the court is to appoint as trustee and counsel in a SIPA proceeding, persons designated by SIPC, "in its sole discretion."  Similarly, SIPC, "in its sole discretion," may specify itself or a SIPC employee as trustee under specified conditions.  *Id*.

While the "satisfaction" clause in section 78fff-2(b) is discretionary language, Congress has provided no direct guidance in SIPA as to its implications.  Clearly, Congress has not committed the determination of claims to the sole discretion of the trustee.  Unlike the above provisions that specify "sole discretion," section 78fff-2(b) contains no such limiting language. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 453 (2002) (Congress acts intentionally and purposely when it includes language in one section of statute but omits it in other).  But SIPA also does not contain a provision, as under the banking laws, that makes a trustee's determinations judicially unreviewable or subject to *de novo* review.

Lacking clarity, it may be useful to consider the nature of the trustee's role in order to determine the extent of the role of the Court.  In this regard, the analysis in the case of *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993), offers some insight.  *Concrete Pipe* involved a challenge to a labor law that provided for the assessment of a "withdrawal liability" as to any employer withdrawing from a multiemployer pension plan.  Upon the failure of an employer to pay a withdrawal liability, the Plan sued the employer in federal district court which referred the matter to arbitration.  Following a decision by the arbitrator, the employer sued to set aside or modify

the decision, and the matter proceeded through the courts.  Upon review by the Supreme Court, the employer challenged the constitutionality of the labor law on the asserted ground that the trustees of the plan were acting as adjudicators in assessing the withdrawal amount.  The employer contended that the trustees were biased toward assessing the largest possible liability, and therefore, the law failed to afford the employer due process.

The Court found that the trustees were not acting as adjudicators, and dismissed the argument.  In describing their functions, the Court compared the case to a previously decided analogous case and made the following observations:

> Of the administrator there we said, "He is not a judge.  He performs no judicial or quasi-judicial functions.  He hears no witnesses and rules on no disputed factual or legal questions.  The function of assessing a violation is akin to that of a prosecutor or civil plaintiff."

> This analysis applies with equal force to the trustees, who, we find, act only in an enforcement capacity.  The statute requires the plan sponsor, here the trustees, to notify the employer of the amount of withdrawal liability and to demand payment, actions that bear the hallmarks of an assessment, not an adjudication.  The trustees are not required to hold a hearing, to examine witnesses, or to adjudicate the disputes of contending parties on matters of fact or law.  In *Marshall*, we observed that an employer "except[ing] to a penalty … is entitled to a *de novo* hearing before an administrative law judge," * * *, and we concluded that this latter proceeding was the "initial adjudication,"…  Likewise here, we conclude that the first adjudication is the proceeding that occurs before the arbitrator, not the trustee's initial determination of liability. [citations omitted]

508 U.S. at 619-620.  But *cf., e.g., Offenberg v. Unum Life Ins. Co. of America*, 986 F. Supp. 351, 353 (S.D. W. Va. 1997) (standard of review of decision by trustees of a benefit plan generally *de novo,* but where the plan gives the trustees discretion, the standard is whether the trustees abused their discretion.  Under this standard, if the decision is supported by substantial evidence and in accordance with the law, it must be sustained even if a contrary result could be

30

reached.  The rationale for the narrow standard of review is that it "'ensures that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional.'")

It is plain that significant considerations exist both for interpreting section 78fff-2(b) to require deference to the judgment of the trustee or *de novo* review by the court where the debtor's books and records are deficient.  On the one hand, "to the satisfaction of the trustee" implies an exercise of discretion.  The trustee is most knowledgeable of the affairs of a debtor and therefore, best positioned to decide claims.  A lesser standard than *de novo* review minimizes the unnecessary use of judicial and estate resources and allows the liquidation to move forward in a more streamlined way.  On the other hand, while duty-bound to adhere to the highest standards of a fiduciary, the SIPA trustee is not an adjudicator and does not perform the functions of a court.  In the absence of books and records to support a trustee's determination, *de novo* review by the court assures the claimant of the fullest hearing on his claim.

At the May 18 hearing, the Court framed the issue thusly: 'Do I decide that the trustee … made a reasonable determination, depending on what he knew at the time, which I guess is the expert report, or that the trustee made a correct determination?"[19]  Specifically, the Court asked what its role should be if it concluded that the Trustee's determination was reasonable "based on what the trustee knew, at the time," but that ultimately, the determination was not correct.[20] When stated in those terms, the choice is clear: the Court must decide whether the determination is correct.  The objective of SIPA is customer protection, and section 78fff-2(b) should not be interpreted as a limitation upon that objective.

---

[19]  Transcript of May 18, 2016, hearing herein (Doc. No. 13395) at 27.

[20]  *Id*. at 38.

It is noteworthy that the Second Circuit has held that in certain circumstances, "a degree of deference" should be accorded the Trustee's exercise of discretion. *In re Bernard L. Madoff Inv. Securities LLC*, 654 F.3d 229, 238 n.7 (2d Cir. 2011), *cert. dismissed*, 132 S. Ct. 2712 (2012), *and cert. den.*, 2012 WL 396489 and 2012 WL 425188 (2012). While a Court is not bound by it, because a SIPA trustee's claim determination carries with it the trustee's intimate familiarity and knowledge of the case, a Court should not lightly overturn it. Regardless of the level of discretion accorded to a trustee, if a claimant has met his burden and proven his claim against the estate, the trustee cannot rest on his determination to deny it. But that is not the case here where the burden is not met.

## CONCLUSION

For the foregoing additional reasons, the Trustee's motion to affirm his treatment of profit withdrawal transactions should be granted.

Respectfully submitted,


/s/ Josephine Wang
JOSEPHINE WANG
General Counsel

KEVIN H. BELL
Senior Associate General Counsel
  For Dispute Resolution

SECURITIES INVESTOR
  PROTECTION CORPORATION
1667 K Street N.W., Suite 1000
Washington, D.C.  20006
Telephone: (202) 371-8300
Facsimile: (202) 371-6728
E-mail: jwang@sipc.org
E-mail: kbell@sipc.org

Date:  August 12, 2016
Washington, D. C.