Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Amanda E. Fein
Email: afein@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION
<u>AFFIRMING TREATMENT OF PROFIT WITHDRAWAL TRANSACTIONS</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND ...................................................................................... 4

I.    The Trustee's Net Investment Method Determines BLMIS Customers' Net Equity by Calculating Customers' Net Investment ............................... 4

II.    The Trustee's Method for Calculating BLMIS Customers' Net Investment......... 6

    A.    The Trustee Determined That the Customer Statements Were Reliable for Calculating Customers' Net Investment ............................... 6

    B.    Other BLMIS Books and Records Confirmed the Accuracy of the Cash and Principal Transactions ............................................. 9

    C.    The Trustee Determines the Inflows and Outflows in the Net Equity Calculation ...................................................... 10

III.    The Trustee's Treatment of PW Transactions ..................................... 11

    A.    The Trustee's Review of PW Transactions in the BLMIS Accounts ...... 11

    B.    Procedural History of Litigation on Profit Withdrawals......................... 15

    C.    The Trustee Deposed Former BLMIS Employees With Significant Knowledge of PW Transactions ............................................ 17

    D.    BLMIS Employees Testified That the PW Transactions Were Tied to the Arbitrage Accounts ................................................ 18

    E.    BLMIS Employees Corroborated the Trustee's Interpretation of BLMIS Records, Including Specific Records Relating to Participating Claimants .......................................................... 23

        1.    The AS/400 ................................................................ 23

        2.    Customer Statements ................................................. 24

        3.    Spiral Notebooks....................................................... 25

        4.    PW Checks............................................................... 26

        5.    Debit Memos............................................................. 30

        6.    PMRs and PMTs ...................................................... 31

    F.    BLMIS Employees Corroborated the Documentation for a Sample Profit Withdrawal Transaction................................................. 32

    G.    The Trustee's Determination Was Corroborated by a Former Customer ...................................................................... 35

    H.    BLMIS Books and Records and Employee Testimony Confirm That the Participating Claimants Received Profit Withdrawal Checks........................................................................... 36

        1.    Aaron Blecker ........................................................... 36

**TABLE OF CONTENTS**
**(continued)**

(a)     Mr. Blecker's BLMIS Accounts ...................................... 36

(b)     Blecker Received Profit Withdrawal Checks ................. 38

(c)     Blecker's Accounts Did Not See Any Gains From Purported Trading ........................................................... 41

2.     The Blums ................................................................................. 43

(a)     The Blums Concededly Have No Specific Knowledge of Their Father's Investments with BLMIS ............................................................................. 44

(b)     The Blums' Memories of Their Own Accounts Are Tenuous ................................................................. 45

(c)     Purported Equity Analysis of Blum Accounts ................ 47

ARGUMENT ................................................................................................... 49

I.     The Trustee's Methodology for Determining that PW Transactions are Cash Outflows is Unchallenged, Correct as a Matter of Law, and Entitled to Deference ...................................................................................... 49

A.     The Trustee's Determination as to the Treatment of PW Transactions is Based on the Debtor's Books and Records in Accordance with SIPA and Correct as a Matter of Law ......................... 51

B.     The Trustee's Chosen Methodology is Owed Deference As There Is No Superior Method ................................................................. 54

1.     SIPA Requires Deference to the Trustee's Methodology ........... 54

2.     The Deference Accorded the Trustee is Consistent with the Business Judgment Rule Afforded to Other Fiduciaries ............. 56

II.     Under Any Standard of Review, Discovery Has Confirmed that the Trustee's Treatment of PW Transactions Is Correct ............................. 58

III.     Participating Claimants Have No Basis to Challenge the Treatment of PW Transactions as Applied to Them ........................................................ 60

A.     Participating Claimants Ratified PW Transactions by not Objecting to Them ................................................................................... 60

B.     Participating Claimants Have Offered no Basis to Challenge the Trustee's Determination of their Net Equity in the BLMIS Estate ........ 62

1.     Participating Claimaints Bear the Burden of Proof to Establish Their Net Equity Claims Against the BLMIS Estate ................................................................................ 62

2.     Participating Claimants Have Not Raised Any Legally Sufficient Challenge to their Individual Claims Determinations .......................................................................... 65

**TABLE OF CONTENTS**
**(continued)**

**Page**

IV.    Specific Issues Relating to Witnesses ................................................................. 66

    A.    Blecker's Self-Serving Testimony is an Insufficient Basis to Challenge the Trustee's Determination, Particularly Without Meaningful Opportunity to Cross-Examine .............................................. 66

    B.    The Blums' Speculation About Their Parents' Mindset Is Inadmissible ............................................................................... 69

    C.    Madoff's Testimony Provides No Basis to Challenge the Trustee's Determination ........................................................................... 71

    D.    Bongiorno's Testimony Poses No Credibility Issues .............................. 76

CONCLUSION ............................................................................................................ 79

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.R. Baron Co., Inc.*,
226 B.R. 790 (Bankr. S.D.N.Y. 1998)........................................................49

*Ackerman v. Ventimiglia (In re Ventimiglia)*,
362 B.R. 71 (Bankr. E.D.N.Y. 2007)........................................................66

*In re Adelphia Commc'ns Corp.*,
No. 02-41729(REG), 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ......................64, 65

*In re Adilace Holdings, Inc.*,
548 B.R. 458 (Bankr. W.D. Tex. 2016)........................................................57

*In re Adler Coleman Clearing Corp.*,
195 B.R. 266 (Bankr. S.D.N.Y. 1996)........................................................49

*In re Adler Coleman Clearing Corp.*,
211 B.R. 486 (Bankr. S.D.N.Y. 1997)........................................................56

*In re Aiolova*,
No. 11-10503 (BRL), 2013 WL 5818893 (S.D.N.Y. Oct. 29, 2013) ....................................64

*In re Bakalis*,
220 B.R. 525 (Bankr. E.D.N.Y. 1998)........................................................56

*BanxCorp v. Costco Wholesale Corp.*,
978 F. Supp. 2d 280 (S.D.N.Y. 2013)........................................................66

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011), *reh'g and reh'g en banc denied* (2d Cir. Nov. 08,
2011) ............................................................................................ *passim*

*Best Payphones, Inc. v. Verizon N.Y., Inc.* (*In re Best Payphones, Inc.*),
No. 01-B-15472(SMB), 2006 WL 647618 (S.D.N.Y. Mar. 14, 2006)..................................66

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
No. 13 Civ. 7574 (KPF), 2016 WL 3951182 (S.D.N.Y. July 20, 2016) ................................59

*Camp v. Morey (In re Gov't Sec. Corp.)*,
107 B.R. 1012 (S.D. Fla. 1989) ........................................................63

*In re Chain*,
255 B.R. 278 (Bankr. D. Conn. 2000) ........................................................63

*Commerce Ltd. P'Ship v. Dyevoich (In re Dyevoich)*,
Bankr. No. 10-33007(RTL), 2012 WL 194677 (D.N.J. Jan. 23, 2012)..........................57, 58

**TABLE OF AUTHORITIES**
(continued)

*Commodity Futures Trading Comm'n v. Eustace*,
   Civ. No. 05-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008) ..............................................56

*Diana Melton Trust et al. v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
   Nos. 15 Civ. 1151 (PAE), 15 Civ. 1195 (PAE), 15 Civ. 1223 (PAE), 15 Civ.
   1236 (PAE), 15 Civ. 1263 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016) .....6, 11, 50, 52

*Dzanoucakis v. Chase Manhattan Bank, USA*,
   No. 06-CV-5673(JFB)(ARL), 2009 WL 910691 (E.D.N.Y. Mar. 31, 2009) ..........................66

*E. Air Lines, Inc. v. Ins. Co. of the State of Pa. (In re Ionosphere Clubs, Inc.)*,
   85 F.3d 992 (2d Cir. 1996).....................................................................................................58

*ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*,
   No. 96 Civ. 6033(BSJ), 1999 WL 595450 (S.D.N.Y. Aug. 6, 1999) .....................................60

*Fed. Kemper Life Assurance Co. v. Ellis*,
   28 F.3d 1033 (10th Cir. 1994) ...............................................................................................59

*Fed. Trade Comm'n v. Whole Foods Mkt., Inc.*,
   502 F. Supp. 2d 1 (D.D.C. 2007), *rev'd on other grounds*, 548 F.3d 1028
   (D.C. Cir. 2008) ....................................................................................................................69

*Francolino v. Kuhlman*,
   224 F. Supp. 2d 615 (S.D.N.Y. 2002).....................................................................................64

*Frostbaum v. Ochs*,
   277 B.R. 470 (E.D.N.Y. 2002) ...............................................................................................58

*Gen. Ins. Co. v. Mezzacappa Bros., Inc.*,
   No. 01-CV-7394 (FB), 2003 WL 22244964 (E.D.N.Y. Oct. 1, 2003), *aff'd*, F.
   App'x 183 (2d Cir. 2004)........................................................................................................14

*Hester v. BIC Corp.*,
   225 F.3d 178 (2d Cir. 2000).............................................................................................70, 71

*High Five Ventures, Inc. v. Sportsmansliquidations.com LLC*,
   Civ. No. 1:13-CV-2334, 2015 WL 1932221 (M.D. Pa. Apr. 28, 2015) .................................56

*In re John Dawson & Assocs., Inc.*,
   289 B.R. 654 (Bankr. N.D. Ill. 2003) ....................................................................................61

*In re Klein, Maus & Shire, Inc.*,
   301 B.R. 408 (Bankr. S.D.N.Y. 2003).....................................................................................61

*Lawsky v. Condor Capital Corp.*,
   No. 14 CIV. 2863(CM), 2015 WL 4470332 (S.D.N.Y. July 21, 2015) ..................................57

# TABLE OF AUTHORITIES
## (continued)

*In re Lehman Bros. Holdings Inc.*,
No. 08-13555 JMP, 2010 WL 4818173 (Bankr. S.D.N.Y. Nov. 10, 2010).............................63

*Lopez v. Zaremba*,
No. 3:08CV01132, 2009 WL 36617 (N.D. Ohio Jan. 5, 2005).........................................62, 63

*Magnoni v. Smith & Laquercia, LLP*,
701 F. Supp. 2d 497 (S.D.N.Y. 2010)......................................................................................66

*In re Mailman Steam Carpet Cleaning Corp.*,
212 F.3d 632 (1st Cir. 2000)....................................................................................................58

*In re Mason Hill & Co., Inc.*,
No. 02-8030A (SMB), 2004 WL 2659579 (Bankr. S.D.N.Y. Oct. 18, 2004)........................61

*Mejia v. City of N.Y.*,
119 F. Supp. 2d 232 (E.D.N.Y. 2000) ....................................................................................76

*In re MF Glob. Inc.*,
467 B.R. 726 (Bankr. S.D.N.Y. 2012)......................................................................................58

*In re MF Glob. Inc.*,
535 B.R. 596 (Bankr. S.D.N.Y. 2015)......................................................................................57

*In re MF Glob. Inc.*,
No. 11-2790 (MG) SIPA, 2016 WL 270180 (Bankr. S.D.N.Y. Jan. 15, 2016)......................61

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*,
936 F.2d 640 (2d Cir. 1991)......................................................................................................61

*Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV
Corp. (In re Chateaugay Corp.)*,
973 F.2d 141 (2d Cir. 1992)......................................................................................................57

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
No. 10-05421 (SMB), 2016 WL 4040799 (Bankr. S.D.N.Y. July 21, 2016).........................14

*Pitheckoff v. SIPC (In re Great E. Sec., Inc.)*,
No. 10 Civ. 8647(CM), 2011 WL 1345152 (S.D.N.Y. Apr. 5, 2011)....................................61

*Raleigh v. Ill. Dep't of Revenue*,
530 U.S. 15 (2000)....................................................................................................................64

*In re Rockefeller Ctr. Props.*,
272 B.R. 524 (Bankr. S.D.N.Y. 2000)......................................................................................65

# TABLE OF AUTHORITIES
## (continued)

*Rosenman Family, LLC v. Picard,*
  395 F. App'x 766 (2d Cir. 2010) ...........................................................61

*Ryan v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),*
  133 S. Ct. 24 (2012)...........................................................................5

*SEC v. Byers,*
  637 F. Supp. 2d 166 (S.D.N.Y. 2009).....................................................56

*SEC v. Goren,*
  206 F. Supp. 2d 344 (E.D.N.Y. 2002), *aff'd in part, vacated in part, remanded
  sub nom. In re New Times Sec. Servs., Inc.,* 371 F.3d 68 (2d Cir. 2004) ...............63

*SEC v. Illarramendi,*
  Civ. No. 3:11cv78 (JBA), 2013 WL 6385036 (D. Conn. Dec. 6, 2013) ...............56

*SEC v. Milligan,*
  No. 99-CV-7357 (NG)(VVP), 2009 WL 1162633 (E.D.N.Y. Apr. 29, 2009),
  *aff'd,* 436 F. App'x 1 (2d Cir. 2011).......................................................76

*SEC v. Scott,*
  565 F. Supp. 1513 (S.D.N.Y. 1983).........................................................76

*Estate of Sheppard ex rel. Sheppard v. Sec'y of Dep't of Health & Human Servs.,*
  No. 04-112V, 2007 WL 5160383 (Ct.. Cl. Aug. 7, 2007) .....................................66

*Sherman v. Novak (In re Reilly),*
  245 B.R. 768 (B.A.P. 2d Cir. 2000).........................................................64

*SIPC v. 2427 Parent Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC),*
  779 F.3d 74 (2d Cir. 2015).............................................................. *passim*

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
  496 B.R. 713 (Bankr. S.D.N.Y. 2013)..................................................65, 75

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
  522 B.R. 41 (Bankr. S.D.N.Y. 2014)...................................................50, 54

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.
  LLC),*
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) .....................................................5

*SIPC v. Cont'l Capital Inv. Servs., Inc. (In re Cont'l Capital Inv. Servs., Inc.),*
  No. 03-3370, 2008 WL 4533665 (Bankr. N.D. Ohio Oct. 1, 2008) .......................65

*SIPC v. Glob. Arena Capital Corp.,*
  No. 16 Civ. 620 (RWS), 2016 WL 590470 (S.D.N.Y. Feb. 11, 2016)....................61

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*SIPC v. I.E.S. Mgmt. Grp., Inc.*,
    612 F. Supp. 1172 (D.N.J. 1985) ............................................................62

*SIPC v Lehman Bros. Inc.*,
    433 B.R. 127 (Bankr. S.D.N.Y. 2010) ....................................................49

*SIPC v. Stratton Oakmont, Inc.*,
    229 B.R. 273 (Bankr. S.D.N.Y. 1999) ....................................................63

*In re St. Johnsbury Trucking Co.*,
    206 B.R. 318 (Bankr. S.D.N.Y. 1997) ....................................................64

*In re St. Mary's Hosp.*,
    155 B.R. 345 (Bankr. E.D. Pa. 1993) ......................................................56

*United States v. Al-Moayad*,
    545 F.3d 139 (2d Cir. 2008)....................................................................67

*United States v. Certified Envtl. Servs., Inc.*,
    753 F.3d 72 (2d Cir. 2014)......................................................................79

*United States v. Edwards*,
    631 F.2d 1049 (2d Cir. 1980)..................................................................79

*United States v. Estrada*,
    430 F.3d 606 (2d Cir. 2005)..............................................................77, 78

*United States v. Feng Ling Liu*,
    No. 12-CR-934-01 (RA), 2015 WL 4460898 (S.D.N.Y. July 20, 2015)................................77

*United States v. Frank*,
    520 F. 2d 1287 (2d Cir. 1975)................................................................68

*United States v. Hamilton*,
    334 F.3d 170 (2d Cir. 2003)....................................................................76

*United States v. Memoli*,
    No. 3:13-CR-214 (VLB), 2014 WL 5313707 (D. Conn. Oct. 16, 2014)................................76

*United States v. Milken*,
    759 F. Supp. 109 (S.D.N.Y. 1990) ..........................................................79

*United States v. Petters*,
    Civ. No. 08-5348 ADM/JSM, 2011 WL 281031 (D. Minn. Jan. 25, 2011)............................56

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992)..................................................................71

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Subeh,*
No. 04-CR-6077T, 2006 WL 1875407 (W.D.N.Y. July 5, 2006) ....................................70, 71

*United States v. U.S. Gypsum Co.,*
333 U.S. 364 (1948)...............................................................................................................66, 69

*United States v. Weinstein,*
452 F.2d 704 (2d Cir. 1971)...........................................................................................................76

*Velvel v. Picard (In re Bernard L. Madoff Inv. Sec. LLC),*
133 S. Ct. 25 (2012)....................................................................................................................5

*In re Williams,*
No. 92–50546, 1994 WL 329328 (Bankr. S.D. Ga. Mar. 30, 1994)........................................64

**Statutes**

11 U.S.C. § 502(a) ....................................................................................................................62

15 U.S.C. § 78aaa *et seq.* ...........................................................................................................1

15 U.S.C. § 78fff-1(a) ...............................................................................................................56

15 U.S.C. § 78fff-2(a)(2) ...........................................................................................................63

15 U.S.C. § 78fff-2(b)...........................................................................................................4, 52

15 U.S.C. § 78fff-2(b)(2)...........................................................................................................49

15 U.S.C. § 78*lll*(11)...................................................................................................................4

**Rules**

Fed. R. Bankr. P. 3001...............................................................................................................62

Fed. R. Bankr. P. 3001(f)...........................................................................................................66

Fed. R. Evid. 609(a)(2) ..............................................................................................................75

Fed. R. Evid. 701 ......................................................................................................................71

**Other Authorities**

Victor James Gold, 27 Fed. Prac. & Proc. Evid. § 6022 (2d ed. 2016) ..................................70

*Burden of Proof*, Black's Law Dictionary (10th ed. 2014)....................................................64

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE § 6.31 (2d ed.
     1999) ...................................................................................................................78

COLLIER ON BANKRUPTCY ¶ 502.02 (16th ed. 2016) ..............................................64, 65

5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE
     § 802.02[3] (Joseph M. McLaughlin ed., 2d ed. 2008) ...............................67, 68, 70

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this supplemental memorandum of law and the declarations of Seanna R. Brown ("Brown Decl."), Lisa M. Collura ("Second Collura Decl."), Matthew B. Greenblatt ("Second Greenblatt Decl."), and Vineet Sehgal ("Second Sehgal Decl."), and the exhibits thereto, in further support of the Trustee's motion (the "Motion") seeking entry of an order affirming the treatment of profit withdrawal transactions ("PW Transactions") and overruling the objections thereto.[2]

## PRELIMINARY STATEMENT

As required by SIPA, the Trustee has reviewed the books and records of BLMIS to determine the net equity of each customer account. His "cash in, cash out" methodology has been the subject of litigation since 2009, and has been upheld against repeated challenges. Now, a few dozen customers challenge the Trustee's determination as to one line item within that analysis. Specifically, one customer argues that although he received customer statements reflecting "profit withdrawals" that contemporaneously debited his account, he did not receive corresponding checks from BLMIS for those amounts. The remaining customers argue that other customers, from whom they received inter-account transfers, did not receive profit withdrawals prior to making the inter-account transfers to them. Collectively, these claimants (the "Participating Claimants") argue that their individual net equity calculations should not include any reduction for PW Transactions.

---

[1] Subsequent references to sections of the act shall be denoted as "SIPA § __."

[2] The Trustee expressly incorporates herein the facts and legal arguments made in his opening brief on the Trustee's treatment PW Transactions ("Trustee's Opening Br.") July 14, 2015, ECF No. 10661.

The Trustee's statutory obligation is to discharge net equity claims ascertainable from the debtor's books and records or that are otherwise established to the Trustee's satisfaction. The Court has questioned what level of deference is due to the Trustee's determination of claims. In its Net Equity Decision, the Second Circuit noted that it need not reach the question of this SIPA Trustee's discretion because his Net Investment Method was a superior methodology as a matter of law. Nonetheless, it explicitly noted the Trustee's determination as to how to measure net equity should be accorded "a degree of deference" as long as it is not "clearly inferior to other methods under consideration."[3]

As before, there is no need to determine the precise degree of deference to be accorded to the Trustee because his treatment of PW Transactions is correct as a matter of law. In order to determine whether the BLMIS customer statements were reliable, the Trustee and his professionals examined those records. The Trustee learned that the deposit and withdrawal transactions—including PW Transactions—reported on the BLMIS customer statements tied out with 99% accuracy to BLMIS's bank records, which stretched back over ten years. He further learned that the deposit and withdrawal entries were equally supported by other available BLMIS documentation. Based on this investigation, the Trustee determined that the books and records of BLMIS reliably showed the cash deposits and withdrawals between BLMIS and its customers. Accordingly, the Trustee determined net equity claims, including those with PW Transactions, from the books and records of the debtor consistent with SIPA

If not upheld as a matter of law, the Trustee's treatment of PW Transactions should be accorded a level of deference as there is no competing methodology superior to his. The Trustee's methodology treats similar transactions on BLMIS's books and records in a similar

---

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 242 (2d Cir. 2011), *reh'g and reh'g en banc denied*, (2d Cir. Nov. 08, 2011) (the "*Net Equity Decision*").

fashion, including PW Transactions, to ensure that all BLMIS customers are treated equally. Participating Claimants, on the other hand, have no "methodology;" they merely want to reverse certain transactions to enhance their own net equity claims. In fact, they are more than willing to rely upon the Trustee's methodology when it is to their benefit—specifically, his determination to credit them for the deposits reflected on the same customer statements as the PW Transactions they challenge. Particularly where the books and records support the Trustee's determination to calculate net equity, a methodology where individual customers are permitted to cherry pick the components of the net equity calculation that serve them at the expense of other customers is clearly inferior.

In addition to being correct as matter of law and an appropriate exercise of the Trustee's discretion, the correctness of the Trustee's methodology and its application to Participating Claimants has been borne out in fact. The Trustee obtained testimony from former BLMIS employees and a BLMIS customer, all of whom confirmed the Trustee's determination that PW Transactions represent payments to customers and are appropriately treated as debits in the net equity calculation. Other than their self-serving denials, there has been no evidence contradicting the Trustee's treatment of cash inflows and outflows, including that PW Transactions represent cash outflows from customer accounts.

Because the Trustee's methodology for determining net equity is correct (whether upheld as a matter of law or discretion), the burden shifts to the Participating Claimants to show that the Trustee's net equity determination is nonetheless wrong. To do so, they must offer sufficient evidence contradicting the debtor's books and records such that the Trustee's reliance on those records is, as to them, improper and unreasonable. They have not made any such showing. Faced with the Trustee's unconverted evidence, Participating Claimants cannot and do not

dispute that PW Transactions are properly treated as debits. Instead, they put forth a series of arguments in an attempt to demonstrate that they did not receive these amounts. They have variously argued that profit withdrawal checks were diverted to Madoff's family and friends, the checks were paid to public companies to purchase stock and, most recently, that a written request was needed before a profit withdrawal check would be mailed to a customer. The only "evidence" they have put forward is their own self-serving representations, decades after the fact, that they did not (or they believe the accountholder did not) receive funds corresponding to PW Transactions. But their speculation is contradicted by both the books and records and by the testimony obtained from BLMIS employees. Where the books and records support the Trustee's methodology, the net equity calculation cannot be re-litigated on a transaction-by-transaction basis without specific countervailing evidence which contradicts those books and records.

## BACKGROUND

I. **The Trustee's Net Investment Method Determines BLMIS Customers' Net Equity by Calculating Customers' Net Investment[4]**

Under SIPA, the Trustee is charged with recovering and distributing customer property to BLMIS's customers that hold allowed customer claims. The Trustee has an obligation to discharge net equity claims only to the extent that they are supported by the debtor's books and records or otherwise established to the Trustee's satisfaction.[5]

After Madoff's confession to a decades-long fraud, the Trustee began the process of reviewing and reconstructing the BLMIS books and records to calculate each customer's net equity.[6] Based on his investigation, the Trustee determined that BLMIS did not trade securities

---

[4] The procedural background regarding the commencement of the SIPA proceeding and the appointment of the Trustee are recounted in the Trustee's Opening Brief. *Id.* at 3.

[5] SIPA § 78fff-2(b).

[6] SIPA § 78*lll*(11).

on behalf of its customers. The securities positions reflected on customer statements were not only uncorroborated by but were irreconcilable with any trading records; they instead reflected fictitious "trades" that could never have actually happened because they were based on historical trading data.[7] By contrast, the cash deposits and withdrawals identified on the customer statements were corroborated by, among other items, BLMIS bank records reflecting withdrawals and deposits, customer correspondence, and other BLMIS internal documents. The Trustee's investigation revealed that instead of trading securities, Madoff deposited customer money into BLMIS checking accounts, which he then used to pay customer withdrawals.

Accordingly, the Trustee determined that each customer's net equity was the amount of cash deposited less amounts withdrawn (the "Net Investment Method"). The Trustee rejected a method that calculated net equity based on amounts shown on the last BLMIS account statement (the "Last Statement Method"), concluding that the Last Statement Method would give undue credence to fictitious amounts engineered by Madoff. This Court and the Second Circuit upheld the Net Investment Method.[8] The United States Supreme Court denied *certiorari*.[9]

Because the Second Circuit found that the Trustee's Net Investment Method was superior to the challengers' method as a matter of law, it declined to rule on the level of deference to be accorded to a Trustee's discretion in determining net equity. However, it noted that it saw "no

---

[7] *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 129 (Bankr. S.D.N.Y. 2010) (the "*Bankr. Net Equity Decision*") (describing Trustee's investigation, which revealed "that with the exception of isolated individual trades, there is no record of BLMIS having cleared any purchase or sale of securities in the Depository Trust & Clearing Corporation (the 'DTCC'), a custodian for most stock and government debt securities issued in the United States.")

[8] *Bankr. Net Equity Decision*, 424 B.R. at 140; *Net Equity Decision*, 654 F.3d at 242.

[9] *Ryan v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 133 S. Ct. 24 (Mem.) (2012); *Velvel v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 133 S. Ct. 25 (Mem.) (2012).

reason to doubt" that some level of deference should be accorded if a Trustee's method is not

"clearly inferior" to other methods of allocating net equity among competing claimants.[10]

The Trustee's Net Investment Method has survived two further challenges. One group of

customers argued that they should have received credit for time-based damages. Another group

challenged the Trustee's determination that inter-account transfers shall be valued based on the

principal value of the transferor account at the time of the inter-account transfer. In both cases,

the reviewing courts determined that the Trustee's position was the necessary corollary to the

Net Investment Method: a customer's net equity is determined by his cash in minus his cash

out.[11]

## II.    The Trustee's Method for Calculating BLMIS Customers' Net Investment

Having determined that customers' net equity must be calculated based on their net

investment into BLMIS, the Trustee's task was to calculate that net investment for each

customer. As discussed below, he performed these calculations by examining the books and

records of BLMIS and reconciling data among various internal and external sources. While the

securities transactions reflected on BLMIS books and records were fictitious, BLMIS kept

thorough records of customers' cash deposits and withdrawals—as is necessary in any successful

Ponzi scheme—that are corroborated by numerous documentary and testimonial sources.

### A.    The Trustee Determined That the Customer Statements Were Reliable for Calculating Customers' Net Investment

The most complete set of records for purposes of determining net equity—i.e., records

that identify cash transactions—are BLMIS customer ledgers and statements (together,

---

[10] *Net Equity Decision*, 654 F.3d at 238 n.7.

[11] *SIPC v. 2427 Parent Corp. et. al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74, 78 (2d Cir. 2015) (the "*Time-Based Damages Decision*"); *Diana Melton Trust et al. v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, Nos. 15 Civ. 1151 (PAE), 15 Civ. 1195 (PAE), 15 Civ. 1223 (PAE), 15 Civ. 1236 (PAE), 15 Civ. 1263 (PAE), 2016 WL 183492, at *1, *4 (S.D.N.Y. Jan. 14, 2016) (the "*Engelmayer Inter-Account Transfer Decision*").

"customer statements"), which are available from April 1981 to December 2008.[12]  In addition to reflecting reported trading, they contain line-by-line transaction detail of each deposit and withdrawal from each BLMIS account.

The BLMIS customer statements show, *inter alia*, a date, a transaction description, a transaction code, and an amount for each deposit and withdrawal transaction.  BLMIS's "Madoff Investment Securities House 17 Manual" (the "House 17 Manual") identified the transaction codes that appeared on the customer statements and other BLMIS documentation primarily as: (1) "CA" for capital addition; (2) "CW" for capital withdrawal; and (3) "PW" for profit withdrawal.[13]  The Trustee's professionals compiled the transactions recorded on the customer statements into a chronological list, which showed that there were approximately 427,000 such transactions between 1981 and 2008.

To determine whether these transactions constituted deposits and withdrawals between BLMIS and its customers, the Trustee compared this data to available third-party bank records. BLMIS maintained three bank accounts for customer deposits and withdrawals, two accounts with JPMorgan Chase (the "703 account" and the "509 account") and one account held with Bankers Trust (the "Bankers Trust account").[14]  Certain of these records were located in BLMIS's files dating back to December 1998.  In addition, bank records for the 703 account were obtained from JPMorgan Chase & Co. for the period of December 2001 to December 2008.

---

[12] Greenblatt Decl. Ex. 1, ECF No. 10633 ("Greenblatt Principal Balance Rpt.") Section V.A. For the time period of December 1, 2008 through December 11, 2008, a file called the "Checkbook File" is the only BLMIS record available to identify cash transactions during that period.  *Id.*at Section V.E.

[13] Brown Decl. Ex. PW-45 ("Trustee Ex. 49"), at MADTSS00336545; Greenblatt Second Decl. Ex. 2 ("Greenblatt PW Rpt.") Section IV.C.1. The House 17 Manual, dated 1995, sets out the procedures for the operation of BLMIS's investment advisory business relating to the AS/400 computer system and memorializes the investment advisory processes.  *Id.*; Brown Decl. Ex. PW-4 ("Bongiorno Tr.") 128:6-129:25; Ex. PW-7 ("Leung Tr.") 9:21-10:2, 11:14-12:24.

[14] *See* Collura Decl. ¶¶ 2-3, Ex. 1, ECF No. 10664 ("Collura PW Rpt.") ¶¶ 19-21.

Thus, bank records are available for the period of December 1998 to December 2008 (the "Ten-Year Period") and contain hundreds of thousands of pages of BLMIS bank records, including bank statements, wire transfer data, cancelled checks, and deposit slips.[15]

During the Ten Year Period, there were approximately 225,000 deposit and withdrawal transactions for all BLMIS accounts. Of these 225,000 transactions, approximately 5,500 are denoted on the customer statements as PW Transactions. The Trustee's professionals "reconciled" these transactions by confirming that for the deposit and withdrawal transactions identified on the BLMIS customer statement, the third-party bank records showed a corresponding transaction (*i.e.*, in the same amount, on or around the same date, for the same customer). This reconciliation showed that approximately 99% of the 225,000 transactions were consistent between the BLMIS customer statements and the third-party bank records for the Ten-Year Period.[16] The Trustee also reviewed the customer statements to determine that BLMIS treated these transactions contemporaneously as credits and debits to the purported equity of the accounts.[17]

The combination of the Trustee's extensive investigation into BLMIS and the conclusive results of his professionals' reconciliation processes gave the Trustee confidence that all 427,000 deposit and withdrawal transactions listed on the BLMIS customer statements and Checkbook File from April 1981 to December 2008 were accurate and reliable for purposes of determining net equity and calculating avoidance liability to the estate.

---

[15] *Id.* ¶¶ 12, 20.

[16] *Id.* ¶¶ 17, 33 ("The remaining 1%, or approximately 2,200 transactions, consist primarily of withdrawal transactions for which copies of the related cancelled checks were not available.").

[17] *See generally* Greenblatt Principal Balance Rpt.

**B.**    **Other BLMIS Books and Records Confirmed the Accuracy of the Cash and Principal Transactions**

In addition to the customer statements and third-party bank records, the Trustee reviewed other BLMIS books and records for the purpose of confirming that the deposit and withdrawal information on the BLMIS customer statements were accurate and could be used to calculate net equity in accordance with the Net Investment Method. Specifically, the Trustee reviewed Portfolio Management Reports ("PMRs"), Portfolio Management Transaction Reports ("PMTs"), and certain handwritten spiral notebooks maintained by BLMIS (the "Spiral Notebooks").

PMRs were generated by the BLMIS computer system and provided year-to-date information on a summary level about principal additions to, and withdrawals from, customer accounts.[18] PMRs listed an account's initial investment, capital additions, capital withdrawals, profits withdrawn, current and annualized rates of return, and purported equity.[19] PMTs were also generated by the BLMIS computer system and reflected the dates on which specific deposit and withdrawal transactions occurred within a particular month.[20] BLMIS also maintained the Spiral Notebooks, consisting of handwritten notebooks with incoming and outgoing check information, called the "Check In" and "Check Out" books.[21]

The Trustee and his professionals further confirmed their analysis using these internal BLMIS documents. Notably, the documents are consistent and do not demonstrate any material differences in the reporting of cash additions to or withdrawals from customer accounts at any

---

[18] Greenblatt Principal Balance Rpt. ¶¶ 44-45; Greenblatt PW Rpt. ¶ 30, Ex. 10.

[19] Greenblatt Principal Balance Rpt. ¶¶ 44-48; Greenblatt PW Rpt. ¶ 30, Ex. 10; *see also* Bongiorno Tr. 110:24-113:17; Brown Decl. Ex. PW-9 ("Sala Tr.") 117:23-120:18.

[20] Greenblatt Principal Balance Rpt. ¶¶ 48-49; Greenblatt PW Rpt. ¶ 31, Ex. 11.

[21] Greenblatt Principal Balance Rpt. ¶ 51; Bongiorno Tr. 47:11-48:13; 131:1-13; *see, e.g.,* Brown Decl. Ex. PW-53 ("Trustee Ex. 61").

relevant time.  Review of these documents uniformly supported the Trustee's determination that the BLMIS deposit and withdrawal transactions listed on the customer statements were reliable for purposes of determining net equity.

### C.    The Trustee Determines the Inflows and Outflows in the Net Equity Calculation

Based on his review of the BLMIS books and records and combined with his overall forensic investigation of BLMIS, the Trustee determined that the information needed to determine net equity was the 427,000 deposit and withdrawal transactions from the BLMIS customer statements.[22]

Relevant to this Motion, inflows, or increases to the Net Investment Method, include account balances reported on customer statements as of April 1, 1981[23] and cash deposits.[24]  The cash deposits were denoted primarily with the CA transaction code on BLMIS customer statements.  "Outflows," or reductions in the Net Investment Method are capital withdrawals (denoted as CW), and profit withdrawals (denoted as PW).[25]  To determine net equity for BLMIS accounts opened after April 1981, the Trustee netted any inflows to the account against

---

[22] Also relevant to determining net equity are inter-account transfers. *See* Greenblatt Principal Balance Rpt. ¶ 17, 27-31 ("An inter-account transfer is defined as a transaction between BLMIS customer account in which no new funds entered or left BLMIS, but rather a book entry occurred at BLMIS to internally adjust the balances of those accounts.").

[23] For BLMIS accounts opened prior to April 1981, the Trustee's professionals calculated a principal credit comprised of the account's ending cash balance and historical cost of the securities reported as held in the account as of March 31, 1981. Greenblatt Principal Balance Rpt. ¶¶ 20-22.

[24] Other inflows to the Net Investment Method include inter-account transfers of principal into the account and limited non-cash deposits. *Id.* ¶ 17 nn. 5, 6.

[25] *Id.* ¶¶ 17, 29-36. Other outflows to the Net Investment Method include inter-account transfers of principal out of the account, and certain payments made by BLMIS to the Internal Revenue Service on behalf of foreign accountholders.  *Id.* ¶ 17 n.7.

any outflows from the account.[26]   The Trustee's Net Investment Method has been consistently upheld despite numerous challenges.[27]

## III.    The Trustee's Treatment of PW Transactions

As described above, the PW Transactions are a subset of transactions that are considered "outflows" under the Net Investment Method, meaning they reflect a withdrawal and reduce an account's net equity balance.[28]   Of the 427,000 deposit and withdrawal transactions between April 1981 and December 2008, 91,132 are PW Transactions.[29]   Generally, PW entries on customer statements reflect that checks were sent to customers relating to reported "profits" in their account generated by reported trading through BLMIS's purported arbitrage strategy.

### A.    The Trustee's Review of PW Transactions in the BLMIS Accounts

PW Transactions occurred in 761 accounts (the "Direct Accounts").[30]   1,190 accounts received inter-account transfers from an account with a PW transaction (the "Related Direct Accounts").[31]   The net equity calculations of accounts connected via inter-account transfers are generally impacted by any changes to the net equity calculation in the chain.   Thus, even those accounts that do not have PW Transactions could nonetheless be impacted if the treatment of PW Transactions were to change.[32]

---

[26] *Id.* ¶¶ 17-18.

[27] *Net Equity Decision*, 654 F.3d at 240-42; *Time-Based Damages Decision*, 779 F.3d at 78; *Engelmayer Inter-Account Transfer Decision*, 2016 WL 183492, at *1, *4.

[28] Greenblatt PW Rpt. ¶ 19.

[29] Second Collura Decl. ¶¶ 3-4 Ex. 1 ("Collura Supplemental PW Rpt.") ¶ 11 n.4 (explaining update to the PW Transaction population from 91,138 to 91,132); Collura PW Rpt. ¶34 *see also* Greenblatt PW Rpt. ¶¶ 21-22; Second Greenblatt Decl. Ex. 1 ("Greenblatt Supplemental PW Rpt.") ¶¶ 16-18.

[30] Greenblatt Supplemental PW Rpt. ¶ 18 (explaining update to the PW Transaction population from 763 to 761).

[31] *Id.* ¶ 18.

[32] *See id.* ¶ 5 n.2; *Bankr. Net Equity Decision*, 424 B.R. 122, 141 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011).

As described above, the Trustee's reconciliation of the Ten-Year Period transactions showed that 99% of the deposits and withdrawals reflected on the BLMIS customer statements in that period corresponded to the third-party bank records in terms of the date and amount of the transaction, and the accountholder. This level of accuracy over a period of ten years and across approximately 225,000 transactions gave the Trustee confidence that the deposit and withdrawal transactions from the customer statements that preceded the Ten-Year Period were similarly reliable. Nonetheless he tested, and continues to test, the reliability of these records against other available sources.

Specifically as to the 5,527 PW Transactions in the Ten-Year Period, the Trustee's professionals were able to reconcile 5,507, or 99.6% to available BLMIS bank records, including monthly bank statements and copies of cancelled checks.[33] This means that third-party BLMIS bank records showed corresponding transactions to those transactions on the BLMIS customer statements for 99.6% of the Ten-Year Period PW Transactions. In addition, the Trustee confirmed that 5,430 of the Ten-Year Period PW Transactions showed a match between the check payee or wire beneficiary and the accountholder on the BLMIS customer statements.[34]

The Trustee's professionals also conducted a tracing analysis of the Ten-Year Period PW Transactions.[35] In total, 99.997% of the amount of the Ten Year Period PW Transactions were traced to bank accounts held by, or for the benefit of, the respective BLMIS accountholder

---

[33] Collura PW Rpt. ¶¶ 35-36.

[34] Collura PW Rpt. ¶¶ 35-36, 45.

[35] Collura PW Rpt. Section VIII.

identified on the customer statement,[36] meaning that profit withdrawal checks were sent from BLMIS, received by customers, and deposited in their respective bank accounts.

In addition to bank records, the Trustee's professionals tested the deposit and withdrawal transaction against available documentation, meaning that many transactions were confirmed through multiple sources.[37] The Trustee's professionals were able to reconcile 51,769 of the 91,132 PW Transactions—or more than 50%—to available BLMIS bank records, correspondence between BLMIS and customers, other documentation in the customer files, and documents received by the Trustee through litigation or the claims process.[38] Of these 51,769 transactions, more than 6,000 transactions reconciled to correspondence between the customer and BLMIS regarding PW Transactions.[39] Specifically, letters and other correspondence in the customer files were identified in which accountholders requested that the purported profits be sent to the accountholder instead of being "reinvested" or conversely, that BLMIS began reinvesting profits instead of sending to customers.[40]

The Trustee and his professionals also reviewed the Spiral Notebooks, PMRs, PMTs, debit memoranda, and the House 17 Manual, as detailed in his experts' reports.[41] As discussed below in connection with testimony by BLMIS employees, all of these documents supported, rather than contradicted, treating the PW Transactions as outflows in the Net Investment Method.

---

[36] *Id.* ¶¶ 51-52. The remaining .003% could not be traced because the bank records were not available or the information on the back of the cancelled check was not legible or sufficient to identify the owner of the bank account.

[37] For example, a single transaction may be reconciled to BLMIS bank records and to correspondence within the customer file.

[38] Collura Supplemental PW Rpt. ¶ 11; *see also* Errata Sheet at ¶ 2 for Expert Reports of Lisa M. Collura, CPA, CFE, CFF entitled Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" and Supplemental Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" served Aug. 12, 2016.

[39] *See* Collura PW Rpt. ¶ 38; Collura Supplemental PW Rpt. Attachments D.1-D.84.

[40] Collura PW Rpt. ¶¶ 38-39, Exs. 8.1, 8.2.

[41] Second Greenblatt Decl. ¶¶ 6-7 Ex. 2 ("Greenblatt Second Supplemental PW Rpt.") Sections IV & V; *see also* Greenblatt PW Rpt. ¶¶ 25-31; Greenblatt Supplemental PW Rpt. Section V.

Finally, as discussed above, the Trustee analyzed the customer statements for internal consistency. His review confirmed that purported arbitrage trading reflected on a statement resulted in a "profit" that equaled the amount of the corresponding PW Transaction. [42] Similarly, he confirmed that, contemporaneously with the PW Transactions, BLMIS reduced the account's purported equity value by the amount of the PW Transactions. [43]

The fact that the PW Transactions contemporaneously debited the accounts—something Participating Claimants have conceded[44]—resulted in the purported equity for Participating Claimants' accounts either staying flat or increasing by only *de minimus* amounts.[45] These debits appeared on BLMIS customer statements sent to customers contemporaneously with the PW Transactions.[46] The only reason that an account balance at BLMIS would remain essentially flat while the purported trading resulted in reported gains over any length of time is that the PW Transactions were, in fact, withdrawals sent to the customers.[47] Otherwise, the purported equity balance of each account would have grown as "profits" were reinvested and would therefore be considerably higher than the amount of its original investment. The Trustee's professionals analyzed the purported equity value of the BLMIS accounts related to Participating Claimants, set forth below in Section III(H).

---

[42] Greenblatt PW Rpt. Section V; Greenblatt Supplemental PW Rpt. Section V.A; Greenblatt Second Supplemental PW Rpt. n.13.

[43] Greenblatt Supplemental PW Rpt. ¶¶ 27-28, 34.

[44] Blecker acknowledged that the profit withdrawal amounts were debits to his accounts. Hr'g Tr. *SIPC v. BLMIS*, 08-1789 (SMB) (Bankr. S.D.N.Y. Feb. 24, 2016), ECF No. 12885, at 26:16-21 ("We don't dispute that it's a debit to the account but it's a debit to the account because there was money purportedly paid to the company that issued the stock. It was a purchase of securities for the account"). Statements made by an attorney during oral argument constitute binding judicial admissions. *Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10-05421 (SMB), 2016 WL 4040799, at *15 (Bankr. S.D.N.Y. July 21, 2016) (quoting *Gen. Ins. Co. v. Mezzacappa Bros., Inc.*, No. 01-CV-7394 (FB), 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003), *aff'd*, F. App'x 183 (2d Cir. 2004)).

[45] Greenblatt Second Supplemental PW Rpt. Section VI.

[46] Brown Decl. Ex. PW-60 ("Trustee Ex. 71"); Bongiorno Tr. 107:9-108:21.

[47] The purported equity balance also should have risen if the PW Transactions were checks sent to Fortune 500 companies to purchase securities for the customer's account, as Participating Claimants allege.

14

In sum, the Trustee's determination to treat PW Transactions as outflows in the Net Investment Method is supported by the available books and records of BLMIS. There is not a shred of contrary evidence within BLMIS's books and records that PW Transactions were anything but checks sent to customers.

### B.    Procedural History of Litigation on Profit Withdrawals

During the inter-account transfer litigation in 2014, claimant Aaron Blecker argued that his net equity should not have been reduced by the PW Transactions on his customer statements. He did not raise any other challenges to the Trustee's determination of cash deposits and withdrawals in his account.[48]

Thereafter, this Court approved an omnibus proceeding to address the Trustee's treatment of PW Transactions.[49] The Trustee served notice of the omnibus proceeding to all BLMIS accountholders who had PW Transactions in their account ("Direct Accounts") or received inter-account transfers from an account with PW Transactions ("Indirect Accounts").[50] Only 54 accountholders elected to participate, of which only one is a Direct Account and 53 are Indirect Accounts.[51] Other than one *pro se* party, the Participating Claimants are represented by only two law firms.

---

[48] *See* Decl. in Opp. to the Trustee's Mot. to Affirm App. of the Net Investment Method to the Determination of Customer Transfers Between BLMIS Accounts ¶¶ 8-10, No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 20, 2014), ECF No. 6719 ("Blecker Decl."); *see also* Customers' Mem. of Law in Opp. to the Trustee's Method for Valuing Inter-Account Transfers at 4-6, No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 16, 2014), ECF No. 6708 ("Customers' Mem. Of Law").

[49] *See* Order Establishing Schedule for Limited Discovery and Briefing on Profit Withdrawal Issue, No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 25, 2015), ECF No. 10266 ("June 25, 2015 Order").

[50] *See* Affidavit of Mailing, May 20, 2015, ECF No. 10024; *see* Affidavit of Service, May 19, 2015, ECF No. 10018.

[51] Greenblatt Supplemental PW Rpt. ¶ 5 n.2. The 53 Indirect Participating Accounts received inter-account transfers from 84 Accounts that contained PW Transactions (the "84 Related Direct Accounts," which includes the one Direct Account participating in the Motion). *Id.* Ben Heller (Account 1H0022) and Barbara Engel (Account 1E0111) withdrew as Participating Claimants after their Counsel reviewed specific correspondence in their files wherein those parties requested PW Transactions.

The Trustee filed his Motion and supporting expert declarations in July 2015. Since that time, the parties have engaged in discovery. The Trustee served an affidavit from Mr. Barry Schwartz, a former BLMIS customer. The Trustee also served two supplemental reports from Matthew B. Greenblatt and a supplemental report from Lisa M. Collura. Mr. Greenblatt's supplemental report addressed in greater detail the PW Transactions, particularly as it applied to the Participating Claimants' 54 BLMIS accounts. Mr. Greenblatt's second supplemental report further addressed certain documents that supported treatment of the PW Transactions as debits, as well as conducting an analysis of the purported equity balances of certain Participating Claimants' accounts. Ms. Collura's supplemental report addressed the specific reconciliation results of the accounts of Participating Claimants. Participating Claimants did not disclose any experts during discovery.

The Court authorized the Trustee to depose five former BLMIS employees: Annette Bongiorno, Winifier Jackson, Dorothy Khan, Alethea Leung, and Joann Sala. These witnesses confirmed the Trustee's conclusion that PW Transactions properly are treated as cash outflows in the Net Investment Method. The witnesses provided greater detail as to how and why PW Transactions were entered onto customer statements, and confirmed the reliability of these entries as a basis for reducing a customer's net equity. More specifically, the BLMIS employees' testimony rebuts Blecker's suggestion that the Trustee misapprehended BLMIS procedures. For example, regarding the Participating Claimants' allegation that profit checks were sent only upon written request, BLMIS employees testified, consistent with the Trustee's conclusion based on BLMIS books and records, that BLMIS customers were sent profit checks automatically without prior written requests based on how the account was set up.

C.   **The Trustee Deposed Former BLMIS Employees With Significant**
**Knowledge of PW Transactions**

The BLMIS employees deposed by the Trustee included those who were directly responsible for the PW Transactions and their accounting.   Bongiorno had responsibility for BLMIS's arbitrage accounts, in which nearly all of the PW Transactions occurred, and a thorough understanding of PW Transactions.   In her role overseeing customer accounts, Bongiorno was responsible for, among other tasks, allocating purported trades to customer accounts using BLMIS's imaginary arbitrage strategy.[52]   Through her employment at BLMIS, beginning in 1968, Bongiorno was intimately familiar with the BLMIS books and records.[53]

Sala worked under Bongiorno as an account manager at BLMIS for the arbitrage accounts from 1984 until her retirement in 1998.[54]   Like Bongiorno, Sala had a thorough understanding of PW Transactions.   Sala was responsible for arbitrage accounts, including tracking the arbitrage "trades" that resulted in profit withdrawal checks sent to customers.[55] Bongiorno and Sala spoke to customers on the phone, maintained customer files, and received instructions from customers by letter concerning changes to their accounts.[56]

Jackson worked at BLMIS from 1986 until it closed.[57]   Jackson primarily assisted JoAnn (Jodi) Crupi in managing and organizing incoming and outgoing checks, including profit withdrawal and capital withdrawal checks.[58]   Through her work, Jackson was familiar with

---

[52] Bongiorno Tr. 21:8-22:4.

[53] *See, e.g.,* Bongiorno Tr. 47:17-48:10 (use of Spiral Notebooks), 10:21-22, 12:24-25; *see also* Brown Decl. Ex. PW-5 ("Jackson Tr.") 23:15-24:4 (testifying that Bongiorno was responsible for instructing the staff to print checks due to BLMIS customers).

[54] Sala Tr. 12:20-13:12, 18:18-20, 20:16-22:14; *see also* Bongiorno Tr. 24:3-18; Jackson Tr. 87:10-13.

[55] Sala Tr. 12:20-13:12, 18:18-20, 20:16-22:14, 27:9-28:4; Bongiorno Tr. 27:4-14, 54:22-55:16.

[56] Bongiorno Tr. 21:8-12; Sala Tr. 31:1-17.

[57] Jackson Tr. 9:18-10:6, 20:14-18.

[58] Jackson Tr. 10:7-15, 13:1-14, 21:18-23:14.

BLMIS's process for sending checks to customers.[59]  Alethea Leung, employed from 1995 until

it closed, and Dorothy Khan, employed from the early 1990s to 2008,[60] were "keypunch

operators."[61]  They were responsible for data entry, including inputting into the AS/400 trade

data, customer information, and check information on a daily basis.[62]  The testimony of Jackson,

Leung, or Khan was consistent with the testimony of Bongiorno and Sala.  Collectively, they

describes a uniform, coherent accounting of PW Transactions that is consistent with the results

of the Trustee's investigation.

    The Court also authorized Participating Claimants' to depose Bernard Madoff.  Madoff's

deposition revealed that, for the most part, he delegated work related to the investment advisory

business to his account managers on the 17th floor, including Bongiorno, Crupi, and Frank

DiPascali.  Madoff was not involved in the day-to-day running of the investment advisory

business, although he did meet with customers when they opened their BLMIS accounts,

particularly in the early days.[63]  Madoff was also occasionally consulted by the account

managers, including Sala and Bongiorno, with questions regarding how to handle certain matters

or customer requests.[64]

### D.    BLMIS Employees Testified That the PW Transactions Were Tied to the Arbitrage Accounts

    BLMIS employees testified that prior to the late 1990s, BLMIS offered a purported

convertible arbitrage strategy in a subset of customer accounts with account numbers ending in

---

[59] *Id.* at 23:15-24:4.

[60] Leung Tr. 9:21-10:3, 18:9-18; Brown Decl. Ex. PW-6 ("Khan Tr.") 10:11-20.

[61] Bongiorno Tr. 26:4-14; Brown Decl. Ex. PW-8 ("Madoff Tr.") 83:16-84:5.

[62] Leung Tr. 13:12-24; Khan 11:9-14, 12:7-14:8; Bongiorno Tr. 26:4-22; 27:1-3.

[63] Madoff Tr. 81:2-84:20; Bongiorno Tr. 30:12-32:20.

[64] *See, e.g.,* Bongiorno Tr. 38:13-18; Sala Tr. 33:21-34:5.

"-1" known as arbitrage accounts.[65]    Bongiorno was initially responsible for managing the

arbitrage accounts, and she maintained supervisory authority over those accounts through her

tenure.    Sala was responsible for arbitrage accounts from roughly 1984 to 1998 under

Bongiorno's supervision.[66]

Bongiorno and Sala testified that the purported arbitrage strategy reported profits that

resulted in the PW Transactions.    According to their testimony, BLMIS set up various arbitrage

"deals" to run over a period of time, usually between four and eight weeks.[67]    At the beginning

of the "deal" period, the customer would be set up in a particular stock (the "deal" stock), which

would be listed on the accountholder's customer statement as a stock purchase with purchase

amount appearing in the debit column.[68]    At the end of the deal period, the customer statement

would reflect a sale of the deal stock[69] with the sale price appearing in the credit column.[70]    The

difference between the "buy" and the "sell" prices for the deal stock would result in a "profit" for

the BLMIS account.[71]    The purported stock purchase and sale, and the PW Transaction

representing the profit from the arbitrage transaction, were all listed on the BLMIS

accountholder's customer statement.[72]    At the conclusion of the deal, a check would be

---

[65] Sala Tr. 24:4-26:2, 27:9-28:10; Bongiorno Tr. 56:21-22.  For example, Mr. Blecker's account numbers were 1B0022-1 and 1B0023-1.  *See, e.g.,* Brown Decl. Ex. PW-35 ("Trustee Ex. 39"). These accounts were also referred to as "10 accounts."  *See* Bongiorno Tr. 135:6-11, 54:9-21.

[66] Sala Tr. 12:20-13:12; 18:18-20, 20:16-22:14; *see also* Bongiorno Tr. 24:3-18; Jackson Tr. 87:10-13.

[67] Sala Tr. 27:9-28:10, 60:9-20; *see* Bongiorno Tr. 74:2-10.

[68] Sala Tr. 183:1-14, 203:13-204:10; Bongiorno Tr. 72:13-24; *see* Brown Decl. Ex. PW-27 ("Trustee Ex. 29").

[69] Bongiorno Tr. 73:6-21 (describing stock split at the time of sale); Sala Tr. 204:11-205:18 (same), Sala Tr. 80:8-81:17.

[70] *Id.*; Bongiorno Tr. 99:1-6; *see, e.g.,* Brown Decl. Ex. PW-25 ("Trustee Ex. 27").

[71] Bongiorno Tr. 73:4-74:10, 74:16-76:4; Sala Tr. 80:0-82:5, 204:11-206:11; Brown Decl. Ex. PW-23 ("Trustee Ex. 25"), Brown Decl. Ex. PW-24 ("Trustee Ex. 26"), Trustee Ex. 27.

[72] *See* Section III.E.4, *infra*; *see, e.g.*, Trustee Exs. 27, 29; Brown Decl. Ex. PW-33 ("Trustee Ex. 37"), Brown Decl. Ex. PW-34 ("Trustee Ex. 38").

automatically sent to the customer for the amount of the profit if the account was set up to receive its profits.[73]

Bongiorno and Sala further testified that, at the time an account was opened, it was set up to either automatically send customer the profits at the conclusion of each deal or automatically reinvest those profits. This decision was made verbally between the customer and Madoff; there was no form for the customer to fill out or any writing from the customer required.[74] In the early days, the customer would either meet with Madoff in person or by telephone to discuss this question as well as how the account would be funded.[75] Following this meeting or telephone call, Madoff would instruct Bongiorno to open the account consistent with their discussions.[76]

When an account was opened, BLMIS created manila folders for each account with the accountholder name and account number on the label.[77] These customer files have been reviewed by the Trustee and are among the documents relied on to determine customers' net investments with BLMIS. BLMIS employees would fill out a Name/Address Form,[78] which was maintained in the customer files along with correspondence between the customer and BLMIS

---

[73] Sala Tr. 83:12-84:3, 105:13-107:13, 130:14-131:18, 196:21-199:6; Bongiorno Tr. 99:1:100:23; Trustee Exs. 26, 27, 29; Brown Decl. Ex. PW-21 ("Trustee Ex. 23"), Brown Decl. Ex. PW-26 ("Trustee Ex. 28"), Brown Decl. Ex. PW-28 ("Trustee Ex. 30"); Brown Decl. Ex. PW-32 ("Trustee Ex. 36"), Brown Decl. Ex. PW-38 ("Trustee Ex. 42"), Brown Decl. Ex. PW-42 ("Trustee Ex. 46"); Brown Decl. Ex. PW-58 ("Trustee Ex. 69").

[74] Bongiorno Tr. 33:16-34:22 ("[T]he customer wouldn't have a form to fill out that said send it or not. I don't remember there ever being a form like that. It was all, you know, just by communication, by – verbally"), 63:3-65:17, 193:2-7 ("Q. Okay. And you testified that, to your knowledge, Mr. Madoff did not require a writing from the customer requesting the profit withdrawals at the opening of the account? A. To my knowledge, no one put that in writing. It was a verbal agreement."), ("It did not have to be in writing. They could have put it in writing, but it didn't have to be put in writing"); Trustee Ex. 23.

[75] Bongiorno Tr. 30:22-32:20; see also Sala Tr. 31:25-32:13. Generally, the customer had the choice of whether the profits in their account would be reinvested or sent to them, although at times Madoff would make that determination for the account. Bongiorno Tr. 32:3-7.

[76] Bongiorno Tr. 33:2-15 ("[Madoff] would give me the instructions, and I would make a note of it on an account page that I had. Once we were automated, it would be on a page that went to the keypunch operators, and it would be punched and put into the computer"), 35:18-36:19, 105:23-106:24.

[77] See, e.g., Trustee Exs. 36, 42, 46; see also Bongiorno Tr. 62:1-71:1; Jackson Tr. 66:5-69:1; Sala Tr. 61:4-63:5.

[78] Id.

20

referencing incoming deposits and/or requests for withdrawals, customer contact information, and customer, trust, and other agreements.[79]

The top half of Name/Address Form contains basic identifying information for the accountholder, including the BLMIS account number it was assigned and the accountholder name, address, and tax identification or social security number.[80] The bottom half of the form has three headings "Profits," "Dividends," and "Interest" directly next to the text "(Note: S=Send, R=Reinvest)."[81] These forms generally have an "S" or an "R" written on them.[82] BLMIS employees testified that these "S" and "R" notations determined whether accountholders were sent their profits by check or whether those amounts were reinvested into their accounts.[83]

Bongiorno, Sala, and Jackson testified that if customer elected to have their profits sent at the time the account was set up, the profits were sent automatically—without any further communication between BLMIS and the customer—at the end of each "deal."[84] The customer was not required to write a letter to BLMIS requesting that its profits be sent to it for each individual deal.[85] Specifically, Bongiorno testified that once the customer elected to have profits

---

[79] Sala Tr. 36:9-37:8; Bongiorno Tr. 61:1-63:2; *see also* Collura PW Rpt. ¶¶ 37-39.

[80] Bongiorno Tr. 67:20-68:1, 86:19-88:17, Sala Tr. 61:4-64:9; Jackson Tr. 66:5-67:9; *see, e.g.,* Trustee Ex. 36.

[81] Bongiorno Tr. 61:1-63:2, 68:2-24; Sala Tr. 64:10-66:24; *see, e.g.,* Trustee Ex. 36.

[82] Trustee Exs. 23, 30, 36, 42, 46; *see also* Bongiorno Tr. 35:18-36:13 (describing the customer form, "We would either circle the S or we would make an S if it was a send. And same thing with the R if it was a reinvest"), 123:24-125:1 (identifying her handwriting on name/address form for "S" and "R" notations); Sala Tr. 91:13-93:2 (same); *see generally* Second Sehgal Decl.

[83] Sala Tr. 64:10-66:24 (regarding the "S" and "R" notations, "It means send being they were going to take their profits out, and "R" means they were going to roll it over, reinvest their money"); Jackson Tr. 68:2-69:4 ("[W]hatever the profits are on the account, the "S" would indicate to send the profits to the customer. Reinvest, the "R" for reinvestment meant to reinvest whatever the profit[] was back into the account"); Bongiorno Tr. 68:2-69:3; *see also* Leung Tr. 90:3-91:6; Khan Tr. 72:6-74:20; Sala Tr. 53:14-20; Brown Decl. Ex. PW-50 ("Trustee Ex. 57").

[84] Sala Tr. 65:4-66:24, 82:6-83:5; Jackson Tr. 23:20-26:17, 72:4-73:5; Bongiorno Tr. 35:18-36:22, 100:7-23, 121:19-122:12; *see also* Sala Tr. 53:11-56:13; Brown Decl. Ex. PW-22 ("Trustee Ex. 24"); Trustee Exs. 23, 25, 36, 46.

[85] Sala Tr. 54:16-56:13 ("Q. And the profit[s] in a send account are sent without any written request from the customer? A. Yes."), 53:11-54:15, 59:18-60:8, 129:7-131:13; 237:5-12; Bongiorno Tr. 70:20-22 (Q. And would

sent when the account was set up, that customer would be sent regular profit checks and no letter from the customer was required.[86]   Sala confirmed that for those BLMIS accounts that were set up to have profits sent, the BLMIS accountholder would automatically receive a profit check after every PW Transaction for the amount of "profit" on the arbitrage transaction.[87]

However, the employees testified, if customers wanted to change their account from a "Send" to a "Reinvest" (or vice versa), the customer would need to submit a written request to BLMIS.[88]   After receiving this instruction, BLMIS would change an "S" on the Name/Address Form to an "R" to indicate the customer would be reinvesting profits from that point on.[89]

BLMIS employees were unwavering in their testimony that no letter from the customer was necessary for PW Transactions if the account was set up as a "Send" account.[90]   By contrast, when a customer wanted to make a one-time withdrawal of a specific dollar amount, the customer needed to make such a request to BLMIS in writing.[91]   Similarly, if a customer wanted standing monthly or quarterly withdrawals of a certain amount, the customer needed to make

---

this customer need to have a letter in the file in order to receive his profits?  A.  No.  Huh-uh."), 106:16-107:2, 107:9-108:21; Jackson Tr. 26:8-17, 43:19-44:7.

[86]  Bongiorno Tr. 36:20-25 ("Q. If an account was marked as a send account, would it receive its profits automatically?  A. Yes. Q. Would the customer need to write a letter to BLMIS in order to receive its profits?  A. No."), 38:19-22 ("Q. [A]t the time an account was set up, did a customer have to write a letter to have its account be marked as a send or reinvest?  A. No.").

[87]  Sala Tr. 53:21-54:8, 58:9-14.

[88]  Bongiorno Tr. 37:23-38:18 ("[I]f the decided verbally to change it, once we were on computer they had to send me a letter.  And when I got the letter in, I would have the girls go into the computer and change it from an S to an R"), 125:23-126:6; Sala Tr. 57:8-16; Jackson Tr. 26:8-17; *see* Trustee Ex. 46.

[89]  Sala Tr. 84:18-91:3; 57:17-21; Bongiorno Tr. 123:24-125:12; *see, e.g.*, Trustee Exs. 30, 46.

[90]  Bongiorno Tr. 36:20-25, 70:20-22, 106:16-107:2, 107:9-108:21; Sala Tr. 54:16-56:13 ("Q.  And the profit[s] in a send account are sent without any written request from the customer?  A.  Yes."), 53:11-54:15, 59:18-60:8, 129:7-131:13, 237:5-12 ("Q.  To your knowledge, nobody sent a check to a customer unless the customer asked for the check in writing, is that correct?  A.  Yes.  If it was a capital withdrawal.  That's the only time a check would be sent with a request, unless it was a profit.  That went out automatically") (objection omitted); Jackson 26:8-17, 43:19-44:7.

[91]  Sala Tr. 46:21-47:15, 53:11-54:15, 54:16-56:13; Bongiorno Tr. 38:23-40:4 (explaining difference between capital withdrawals and profit withdrawals, "profit withdrawals automatically go out every time a trade is closed out, every time something the bought was sold.  So – but a capital withdrawal was at the request of the customer, when they wanted it.").

such a request to BLMIS in writing.[92]  One-time capital withdrawal requests, or standing monthly or quarterly capital withdrawals for a certain amount, were indicated on BLMIS customer statements with the transaction code "CW."[93]

Bongiorno and Sala testified that the arbitrage strategy and, consequently, the PW Transactions, began to be phased out around 1998 when Sala retired.[94]  Those customers whose BLMIS accounts purportedly traded in the arbitrage strategy were transferred into new accounts for which BLMIS represented it was engaged in options trading.[95]  These accounts ended in "-3" and "-4."[96]

### E.    BLMIS Employees Corroborated the Trustee's Interpretation of BLMIS Records, Including Specific Records Relating to Participating Claimants

The employees' testimony about certain relevant records corroborates the Trustee's determination that PW Transactions reflected checks sent to customers by BLMIS.  Notably, the BLMIS employees confirmed the Trustee's conclusion that the PW Transactions were treated consistently by BLMIS, both over time and across customer accounts.

### 1.    The AS/400

During the 1980s, BLMIS had automated its investment advisory activities in a centralized computer system.[97]  The AS/400 (and its predecessor systems) was used to carry out BLMIS's investment advisory business, including creating and tracking "every [trade] ticket,

---

[92] Sala Tr. 58:21-59:5; Jackson Tr. 25:6-26:7.

[93] Bongiorno Tr. 38:23-39:25.

[94] Sala Tr. 29:6-23; Bongiorno Tr. 60:6-61:10.

[95] Bongiorno Tr. 60:10-60:22; Sala Tr. 29:24-30:19; see Sala Tr. 142:8-19; Brown Decl. Ex. PW-40 ("Trustee Ex. 44"), Brown Decl. Ex. PW-41 ("Trustee Ex. 45").

[96] Bongiorno Tr. 60:23-61:2; Sala Tr. 26:3-13. For example, once Mr. Blecker's accounts were transitioned to the options strategy, the account numbers changed to 1B0156-3-4 and 1B0157-3-4. See Trustee Exs. 44, 45; Brown Decl. Ex. PW-63 ("Schwartz Aff.") ¶ 5, Ex. A.

[97] Bongiorno Tr. 26:4-25, 40:5-41:14; Sala Tr. 19:13-20:15 (same); see also Madoff Tr. 82:23-25; Leung Tr. 13:12-14:10.

every statement, every check, every blotter, everything."[98]  The AS/400 stored data that appeared on various BLMIS documents and was used to generate and print customer statements, trade confirmations, PMRs, PMTs, debit memoranda, and customer checks.[99]

In addition to being recorded on the Name/Address Form, whether the account was set up as a "Send" or "Reinvest" account was also recorded in the AS/400.[100]  The AS/400 would track the customer's initial election as well as any subsequent changes to that status requested by the customer.  When customers wrote to request changes to the "Send" or "Reinvest" election, the keypunch operators would make the corresponding change in the AS/400.  The date such a request was received or processed in the AS/400 was then indicated on the back of the customer file folder with the text "Change to R" or "Change to S," depending on the request from the customer.[101]

## 2.    Customer Statements

BLMIS customer statements show that PW Transactions are debits (*i.e.*, reductions) from customer accounts and correlate to reported trading that resulted in "profit."[102]  On BLMIS customer statements, Sala and Bongiorno identified "buy" transactions in a specific security, which was followed by a "sell" transaction in the same security,[103]  which was followed by a separate line item with the phrase "Check [Security Name]."  They testified that the last

---

[98] Bongiorno Tr. 41:7-10.

[99] Bongiorno Tr. 41:25-42:3; 72:25-73:3, 115:22-116:4; *see also* Jackson Tr. 103:4-18, Sala Tr. 97:25-98:17; *see* Trustee Exs. 39, 40.

[100] Bongiorno Tr. 70:23-71:11; Leung Tr. 94:18-97:17; Khan Tr. 72:6-75:17; *see* Trustee Exs. 23, 49.

[101] Bongiorno Tr. 37:23-38:18; Sala Tr. 215:20-218:12; Leung  Tr. 101:6-108:3; *see also* Khan Tr. 75:7-17; Trustee Ex. 57; Brown Decl. Ex. PW-56 ("Trustee Ex. 64").

[102] *See* Greenblatt Principal Balance Rpt. ¶ 40; Greenblatt PW Rpt. Section IV.D.

[103] Sala Tr. 110:25-113:24 (Pep Boys transaction); Bongiorno Tr. 71:12-73:21 (Cardinal Health transaction); *see also* Sala Tr. 80:8-82:5, 204:11-206:11; Bongiorno Tr. 71:12-73:21. 74:16-76:4; Trustee Exs. 25, 26, 27, 36; Brown Decl. Ex. PW-33 ("Trustee Ex. 37"); Brown Decl. Ex. PW-34 ("Trustee Ex. 38"); Brown Decl. Ex. PW-35 ("Trustee Ex. 39").

transaction represented the difference or "profit" between the previously identified buy and sell

transactions in that same security and a profit withdrawal check sent to customers.[104]

### 3.    Spiral Notebooks

BLMIS employees and the House 17 Manual referred to the Spiral Notebooks as "Check

In" and "Check Out" books.[105]    Bongiorno testified that the "check out book" "list[ed] the

checks that had to go out to the customers."[106]    The Spiral Notebooks refer to Profit Withdrawals

as "Profit Cks."[107]

Prior to the automation of profit withdrawals, Bongiorno and Sala testified that BLMIS

used the "Check Out" spiral notebook maintained by BLMIS to record information related to PW

Transactions.[108]    Bongiorno and Sala confirmed that entries in the Spiral Notebooks

corresponded to the PW Transactions on the customer statements, matching BLMIS

accountholder, BLMIS account number, security name, check amounts, and dates.    They

unequivocally stated that an entry in the Check Out Spiral Notebook reflects a check sent to a

customer.[109]

After trading was automated, BLMIS employees typically used the Spiral Notebooks to

process incoming checks and outgoing capital withdrawal checks, as those checks were

processed manually.    In contrast, the profit withdrawal checks were automated early on and the

generation of those checks was based on the "S" or "R" instructions in the customer files and the

---

[104] *See* nn. 71-73, *supra*; *see also* Sala Tr. 114:9-115:17 (Pep Boys transaction); Bongiorno Tr. 73:22-75:17 (Cardinal Health transaction).

[105] Bongiorno Tr. 43:9-22; Sala Tr. 181:13-183:19; Jackson Tr. 51:21-53:2; Trustee Exs. 49, 61; *see also* Greenblatt Second Supplemental PW Rpt. ¶¶ 24-25.

[106] Bongiorno Tr. 43:20-22.

[107] Greenblatt Second Supplemental PW Rpt. ¶ 24.

[108] Bongiorno Tr. 130:24-136:18; Sala Tr. 163:13-164:9; *see also* Trustee Ex. 49; Trustee Ex. 61 at HWN00001537, HWN00001651, HWN00001655.

[109] Bongiorno Tr. 53:24-56:5; Sala Tr. 121:24-126:11, 179:7-181:9; *see also* Khan Tr. 52:25-53:12.

AS/400.[110]  After the profit withdrawals were automated, the Spiral Notebook was used for profit

withdrawal checks when a check relating to an arbitrage trade was manually entered into the

AS/400.[111]  BLMIS employees testified that this was done if a check was lost in the mail and

needed to be re-issued, which was usually brought to their attention by a phone call from the

customer.[112]

Participating Claimant Blecker's name appears at least four times in the Check Out Spiral

Notebooks and accounts related to Participating Claimants Norman and Joel Blum appear at least

six times in the Check Out Spiral Notebooks.[113]  Those entries for Blecker and the Blums

correspond to the customer statements showing entries for PW transactions (*i.e.*, "Check Liberty

Natl") for the same amounts listed in the Spiral Notebooks.[114]  The Spiral Notebooks show that

even though the transaction description on the BLMIS customer statement refers to "Check

Liberty Natl," PW Transactions were checks made out to BLMIS customers, not checks made

payable or sent to companies.[115]

### 4.    PW Checks

BLMIS employees testified that entries of "PW" on the customer statements reflected

checks sent to customers and contemporaneous debits (*i.e.*, reductions) to customer accounts.[116]

The keypunch operators testified that they would input data for outgoing checks into the AS/400,

---

[110] Sala Tr. 163:13-164:9.

[111] Bongiorno Tr. 42:4-43:8.

[112] *See also* Bongiorno Tr. 91:16-93:22; Trustee Ex. 49.

[113] Trustee Ex. 61 at HWN00001651, HWN00001655.

[114] Sala Tr. 122:1-126:11 (Health South example), 131:24-138:23 (Liberty National example), 151:23-155:8; Bongiorno Tr. 90:22-100:23; Greenblatt Second Supplemental PW Rpt. ¶ 27; Trustee Ex. 22 at HWN00001651, Trustee Ex. 61 at HWN00001655; Brown Decl. Ex. PW-37 ("Trustee Ex. 41"), Brown Decl. Ex. PW-39 ("Trustee Ex. 43"), Brown Decl. Ex. PW-44 ("Trustee Ex. 48").

[115] *Id.*; Trustee Ex. 49; *see also* Sala Tr. 83:12-84:3.

[116] *See* nn. 71-73, *supra*.  The House 17 Manual instructs that PW and CW checks must be punched or entered as debits.  Trustee Ex. 49 at MADTSS00336545; *see also* Leung Tr. 84:19-85:21.

also known as "punching." Then, they would use the AS/400 to print checks onto the check

stock that BLMIS kept for mailing the next day.[117] The House 17 Manual noted, "Jodi will give

you checks on a daily basis. She will give you an instruction sheet which will tell you what out

going [sic] checks should be punched and the check date."[118] As Bongiorno describes the

process for punching checks:

> So we would give [the keypunch operators] a list and they would –
> with the name of the account, the number, the amount of the check,
> and the code, whether it was a PW or a CW. And we would hand
> that to the girls in the computer room. Dorothy Khan, Alethea
> [Leung], they would punch it in.[119]

In order to generate a check, the keypunch operators would open the menu screen of the

AS/400 and enter the specific command for punching checks.[120] Then, Leung testified, they

typed in the BLMIS account number into a search window and the AS/400 would pull up the

customer's information. The check fields, including payee, would auto-populate with the

customer's information.[121] In the section entitled "Entering and Running Checks," the House 17

Manual bears a note stating that "Check name is a function of name/address." Bongiorno [and

Sala] confirmed "check name" (*i.e.*, the payee) was automatically populated from the

---

[117] Leung Tr. 68:1-22, 77:20-79:15, 84:7-18; Khan Tr. 45:13-48:13; Brown Decl. Ex. PW-46 ("Trustee Ex. 53").

[118] *See* Trustee Ex. 49 at MADTSS00336545; Greenblatt PW Rpt., Ex. 9.

[119] Bongiorno Tr. 42:4-20.

[120] Leung Tr. 46:22-47:9, 49:20-50:14; *see also* Khan 18:16-19:23, 48:19-53:12; *see* Trustee Ex. 53, Brown Decl. Ex. PW-47 ("Trustee Ex. 54"), Brown Decl. Ex. PW-48 ("Trustee Ex. 55"); Brown Decl. Ex. PW-49 ("Trustee Ex. 56").

[121] Leung Tr. 49:4-51:22; Khan Tr. 54:11-55:4, 65:22-66:9; *see also* Bongiorno Tr. 139:5-140:1; Trustee Exs. 49, 24, Trustee Ex. 53 at MDPTFF00000697.

name/address list stored in the AS/400 computer system.[122]  The name/address list in the AS/400

corresponded to the information recorded on the Name/Address Form in the customer files.[123]

Once the purported arbitrage trading became automated,[124] the employees testified that

AS/400 was used to keep track of the "deals" associated with the arbitrage accounts and generate

the corresponding checks to customers for the profits.[125]  Sala testified that the deals would be

entered into the AS/400 with their "due dates."[126]  Once a "deal" was done, the AS/400 computer

system would track the amount of profits related to each deal and which accounts were set up to

have their profits sent.[127]  The AS/400 would generate a list called a Due Date Report[128] listing

checks that were to be sent to the accountholders that participated in that specific "deal."[129]

BLMIS employees, including Bongiorno and Sala, would organize the Due Date Reports in date

order and provide that information to either Crupi or directly to the keypunch operators.[130]

---

[122]  Bongiorno Tr. 139:5-140:11; *see* Leung Tr. 72:22-73:18; Khan Tr. 54:11-55:4; Trustee Ex. 49 at MADTSS00336547.

[123]  Bongiorno Tr. 70:23-71:11; Leung Tr. 87:4-89:8, 94:18-97:17; Khan Tr. 72:6-75:17; *see* Trustee Exs. 23, 44, 45, 49.

[124]  Sala Tr. 182:18-185:5; Bongiorno Tr. 42:4-43:1, 128:6-140:22; *see also* Sala Tr. 156:20-158:18, 189:3-190:16. The House 17 Manual directs the keypunch operators: "[o]n description, type 'check & stock name.'" Bongiorno testified this was only necessary during the timeframe when PW checks were entered manually.  Bongiorno Tr. 136:23-137:10.

[125]  Bongiorno Tr. 42:4-43:22, 131:1-132:3, 136:8-22; Sala Tr. 82:6-83:5, 162:4-163:7; *see also* Trustee Ex. 49 at MADTSS00336545.

[126]  Sala Tr. 156:20-158:18, 182:18-185:5, 189:3-190:16.

[127]  Bongiorno Tr. 36:16-19, 42:4-43:1, 128:6-140:22.

[128]  Sala Tr. 156:15-160:3, 188:2-22; *see also* Bongiorno Tr. 42:21-43:8; *see also* Trustee Ex. 49 at MADTSS00336528.

[129]  *Id.*; Bongiorno Tr. 36:16-19 ("Well, once it was programmed, it would automatically track every trade and give us lists of these checks that were to be going out and approximately when they were going to be going out."), 135:6-136:22; *see also* Sala Tr. 157:15-158:18, 182:18-185:5.

[130]  Bongiorno Tr. 136:2-7 ("Q. And when you got that document that showed you all the profits that were due, what would you do with that document? A. Put it in date order and then wait until the trade was completed done and then give it to the girls to do the checks on it."); Sala Tr. 184:1-185:5.

Then, on the date each arbitrage trade was "completed," the keypunch operators would print the

profit withdrawal checks due for each arbitrage account participating in that trade.[131]

As Bongiorno explains the process, beginning with a customer's election to receive

profits:

> Q: So there's an S on the bottom part of the page under profits. And tell me again what that means to you.
>
> A: the S means that we are sending profits out to him, or her.
>
> ***
>
> Q. Other than this form that we're looking at on the page ending in 330, where else was the information about to send or reinvest recorded at BLMIS?
>
> A. Where else was it recorded?
>
> Q. Was it stored in the computer system?
>
> A. Oh, yes. This page [referring to Ex. 23] was written up to go into the computer system.
>
> Q. So the send or reinvest notation would also be maintained in the computer system.
>
> A. Yes. And that's--remember we talked about it being automated, the arbitrage being automated. When it was automated, the computer would look at the account number, see the S and know to print the check out.[132]

The keypunch operators used a different screen of the AS/400 to physically print

checks.[133]  The checks were printed with accompanying documents—either with a copy of the

check for BLMIS's files or, at other points in time, with a debit memorandum pertaining to the

PW Transaction.[134]  Once printed, the keypunch operators would leave the checks to be reviewed

---

[131] Bongiorno Tr. 136:2-7; Sala Tr. 162:23-163:7, 182:18-185:5, 196:21-199:1; Leung Tr. 38:12-39:5; Jackson Tr. 54:19-57:12; Trustee Exs. 22, 49 at MADTSS00336545.

[132] *See* Bongiorno Tr. 70:15-71:11; Trustee Ex. 23.

[133] Leung Tr. 49:4-51:24.

[134] Leung Tr. 50:21-51:22; Khan Tr. 65:22-66:22; Sala Tr. 196:21-199:1 Bongiorno Tr. 76:16-82:17, 44:15-45:25, 46:1-22 ("Q: Would these memos have been sent on or around the time the check was mailed?  A: Should have been sent on that exact date, yes."); *see also* Trustee Exs. 24, 28, 62.

by Jackson or another BLMIS employee.[135]  After review, Bongiorno, DiPascali or Crupi would bring the checks to Madoff or another individual with signing authority to be signed.[136]  The checks were then separated from the check copies maintained by BLMIS, folded, put into envelopes and mailed from the mail room.[137]  While Bongiorno testified that was common practice to maintain copies of checks and debit memoranda sent to customers, there was also a period of time when copies were destroyed.[138]

### 5.  Debit Memos

The AS/400 generated debit memoranda for BLMIS customers ("Debit Memos").[139] Attached to the Debit Memos would either be a copy of the associated profit withdrawal check for BLMIS's files or the physical check that was sent to customers relating to the PW Transaction reflected in the Debit Memo.[140]  The Debit Memo included the words "PW CHECK + [security name]" (which matched the entry on the customer statement), the accountholder name and address, account number, and the amount and date of the PW Transaction.[141]  Attached to the Debit Memo was either a copy of the check for BLMIS's files or the check corresponding to that transaction.[142]

---

[135] Jackson Tr. 21:18-23:14; *see* Khan Tr. 23:20-25:1.

[136] Bongiorno Tr. 45:2-16.

[137] *Id.*; Bongiorno Tr. 42:4-20.

[138] Bongiorno Tr. 218:3-16 ("at one point – and I don't remember when – they decided that we didn't need to hold everything from the very beginning and they did start shredding some of that stuff.").

[139] BLMIS books and records contained a limited number of Debit Memos for transactions prior to 1998, which is the year in which third-party bank records begin.

[140] *See* Trustee Ex. 62; Sala Tr. 196:21-199:1; Bongiorno Tr. 45:17-46:22; Jackson Tr. 69:24-72:3 ("[O]n the memo part of it would tell you if it was a PW…There's two parts to the check.  There's like a top part, that's the memo that the customer would keep. This [Trustee Ex. 24] is the part that you would deposit to the bank.").

[141] *Id.*

[142] Trustee Ex. 62; *see also* Greenblatt Second Supplemental Rpt. ¶¶ 31-33, Ex. 9.

Bongiorno testified that as part of its routine business practice, BLMIS employees mailed Debit Memos to customers[143] when a "deal" was over.[144] Bongiorno explained that BLMIS maintained copies of Debit Memos with the copy of the check image, as identified by the "Non-Negotiable" stamp in the signature line on the check image. However, the Debit Memos mailed to customers would attach the actual profit withdrawal check on the bottom, which would contain a signature rather than "Non-Negotiable."[145]

For Debit Memos and the corresponding check copies/checks, Sala and Bongiorno noted that these documents contained the same customer information and trade information shown on the customer statements.[146] Sala testified that the transaction information, including the amount of purported "profit" listed on the Debit Memos matched the "profit" listed on BLMIS customer statements.[147] Likewise, the Debit Memo contained the same exact transaction description as the transaction that appeared on the customer statement—i.e., "PW CHECK CARDINAL HEALTH." And the Debit Memos also show the corresponding check sent to the customers.

### 6. PMRs and PMTs

PMRs and PMTs were generated from the AS/400.[148] The Trustee's investigation showed that PMRs and PMTs uniformly treated PW Transactions as reductions to the BLMIS

---

[143] *See* Bongiorno Tr. 76:16-78:15; Leung Tr. 50:21-51:22; Khan Tr. 65:22-66:22; Sala Tr. 196:21-199:1.

[144] Sala Tr. 198:24-199:6; *see* Trustee Ex. 62. Bongiorno testified that, in later years, debit memos were mailed together with the Profit Withdrawal checks. Bongiorno Tr. 45:17-46:22 ("In the early days, the check went out, the memo might have gone out a couple of days later. But later on, in the later days, they were – the memos were attached to the checks.").

[145] *Id.*; Bongiorno Tr. 76:16-82:17.

[146] Bongiorno Tr. 46:1-22, 76:16-82:17; Sala Tr. 196:21-200:19; Trustee Exs. 27, 28, 62.

[147] Sala Tr. 199:13-211:21; *see* Section III.F, *infra.*

[148] Bongiorno Tr. 110:25-116:1; Leung Tr. 118:21-120:1.

customer's account balance and corroborated the PW Transaction information provided on customer statements.[149]

PMRs showed the total amounts of capital additions, total amounts of capital withdrawals and total amounts of profit withdrawals that occurred in the account over a specific period of time, either monthly or annually.[150]  Bongiorno testified that PMRs were used by BLMIS employees, including Sala and Crupi, to track whether BLMIS accounts were meeting their targeted rates of return listed on the PMRs as "expected rate of return" by comparing them to the "projected annualized rate of return."[151]  BLMIS employees testified that the PMRs showed profit withdrawals received by the accountholder on an annual basis.[152]

PMTs were another part of what Bongiorno testified was a "portfolio report" along with the PMRs.[153]  PMTs included information on each account's capital additions, capital withdrawals and profit withdrawals on a per-transaction basis.[154]  Bongiorno also confirmed that the transactions listed on PMTs in a given month matched the dates and amounts provided on the customer statement.[155]

### F.  BLMIS Employees Corroborated the Documentation for a Sample Profit Withdrawal Transaction

As an exemplar, Bongiorno and Sala walked through a specific arbitrage deal in Cardinal Health securities in Account 1C1047 between October and November 1998.  Bongiorno and Sala

---

[149] Greenblatt PW Rpt. ¶¶ 30, 54-55, 62, 66, 70.

[150] Sala Tr. 117:23-120:18; Bongiorno Tr. 110:25-113:17; *see* Trustee Ex. 39; Brown Decl. Ex. PW-31 ("Trustee Ex. 35").

[151] *Id.*

[152] *Id.*; Trustee Ex. 44.

[153] Bongiorno Tr. 115:10-116:16; Jackson Tr. 86:19-87:5; Brown Decl. Ex. PW-30 ("Trustee Ex. 34"); Brown Decl. Ex. PW-36 ("Trustee Ex. 40").

[154] *See* Leung Tr. 118:21-120:20; Bongiorno Tr. 115:10-21; Trustee Exs. 34, 40.

[155] Bongiorno Tr. 116:20-118:4.

identified an October 20, 1998 "buy" transaction in Cardinal Health on a BLMIS customer statement[156] that debited Account 1C1047 for $213,850.[157]

On the following month's customer statement, Bongiorno and Sala identified a 3-for-2 stock split on November 5, 1998, at which point the stock was "sold" and listed as two separate credits on that date for $123,375.00 and $91,806.75, respectively.[158]  These amounts total $215,181.75.  The difference between the sale price and the purchase price of these securities is $1,331.75, which Bongiorno and Sala testified reflected the profit to this account resulting from the stock split.

On November 25, 1998, Account 1C1047 is debited by $1,331.75, with the transaction description "Check Cardinal Health PW."[159]  BLMIS employees confirmed that the amount of the profit matched the PW Transaction on the November 25, 1998 customer statement.  They further confirmed that the entry "Check Cardinal Health PW" represented the profit withdrawal check sent to the accountholder for Account 1C1047 on the arbitrage "deal" that took place between October 20 and November 5 in Cardinal Health securities.  As Bongiorno described:

> It was a simple buy and sell.  The sale – the shares that [1C1047] was long, was split in November.  And everything was sold in November.  And the account – the transaction was completed and a check went out on the 25th.[160]

Bongiorno and Sala reviewed a Debit Memo relating to this transaction.  The top portion of the Debit Memo contains a description of "PW Check Cardinal Health" that matches the transaction description on the customer statement, and a November 25, 1998 transaction date in

---

[156] Bongiorno explained that a ledger was the BLMIS copy or "mirror image" of BLMIS customer statements issued to customers.  Bongiorno Tr. 97:13-98:25; *see* Trustee Ex. 69.

[157] Sala Tr. 80:16-81:1; Bongiorno Tr. 71:22-72:24, 97:13-98:25; *see* Trustee Ex. 29.

[158] Sala Tr. 81:13-17; Bongiorno Tr. 73:4-21; Trustee Ex. 27.

[159] Trustee Ex. 27; *see* Sala Tr. 81:18-83:5; Bongiorno Tr. 73:22-74:1; 74:13-75:1.

[160] Bongiorno Tr. 74:2-10, 73:22-75:24; *see also* Sala Tr. 81:22-82:1.

the amount of $1,331.75 for Account 1C1047.  The bottom half of the Debit Memo shows a

check image that is identical in every respect to the cancelled check from JPMorgan Chase.[161]





BLMIS employees testified that BLMIS treated PW Transactions consistently over

time.[162]  Thus, even if the BLMIS books and records do not contain every document relating to

every PW Transaction, this example, where all such books and records are available, shows that

the entries on customer statements with the transaction code PW reflect checks to customers.

---

[161] *See* Bongiorno Tr. 75:2-24, 76:16-77:8.
[162] *See generally* Bongiorno Tr., Sala Tr.

## G.    The Trustee's Determination Was Corroborated by a Former Customer

During discovery, the Trustee served an affidavit from Mr. Barry Schwartz, a former BLMIS customer and certified public accountant.[163]  Mr. Schwartz held a BLMIS account that showed PW Transactions similar to those in the accounts of the Participating Claimants.  Unlike Participating Claimants, Mr. Schwartz affirmed that he received profit withdrawal checks.

At the inception of his account, Mr. Schwartz chose to participate in the convertible arbitrage strategy and understood that BLMIS would distribute his profits to him by check.[164] As a result, he received checks from 1990 until 1997, which he understood to be the profits derived from the convertible arbitrage investment.[165]  Accompanying his checks from BLMIS were receipts noting the involved securities, generated profit, date, and check number (*i.e.*, a Debit Memo).[166]

In September 1997, Mr. Schwartz was informed by BLMIS personnel that BLMIS was pursuing a new investment strategy and that he had to determine whether he wanted to continue to receive his profits.[167]  A letter from Mr. Schwartz in the BLMIS books and records shows that on September 10, 1997, in response to a conversation with BLMIS personnel, he requested that his future profits be sent to him on a quarterly basis.[168]  Mr. Schwartz attested that he filed his tax returns indicating the amount that he received in profits, dividends, or interest from 1990-1997.[169]  BLMIS books and records of PW Transactions received by Mr. Schwartz generally

---

[163] *See* Schwartz Aff.

[164] *Id.* ¶ 2.

[165] *Id.*

[166] *Id.* ¶ 3.

[167] *Id.* ¶ 4.

[168] *Id.* ¶ 5, Ex. A.

[169] *Id.* ¶¶ 7-14.

track the amounts that Mr. Schwartz declared on his taxes for each of those individual years.[170]

Unlike the Participating Claimants, Mr. Schwartz's testimony is consistent with the BLMIS

books and records and the testimony provided by the BLMIS employees.

### H.    BLMIS Books and Records and Employee Testimony Confirm That the Participating Claimants Received Profit Withdrawal Checks

Despite their self-serving testimony to the contrary, Participating Claimants, like Mr.

Schwartz, received profit withdrawal checks as shown by the BLMIS books and records and

confirmed by BLMIS employee testimony.

### 1.    Aaron Blecker

#### (a)    Mr. Blecker's BLMIS Accounts

Mr. Aaron Blecker ("Blecker") had four BLMIS accounts.  Account 1B0022, held in the

name of Blecker and his wife, Sophie, and Account 1B0023, held in Blecker's name,[171]

participated in the purported arbitrage strategy until 1997.[172] In April 1997, as arbitrage accounts

were being phased out, Accounts 1B0022 and 1B0023 were closed and the reported account

balances were transferred to two new accounts, Accounts 1B0156 and 1B0157.[173]   The new

accounts participated in the purported options strategy.[174]

The books and records of BLMIS show that the Bleckers were sent 180 profit withdrawal

checks totaling $1,087,029 from 1981 until BLMIS accounts 1B0022 and 1B0023 were closed in

1997.[175]   These PW Transactions are reported on the customer statements—which Blecker

---

[170] *Id.* ¶¶ 6-14.

[171] Trustee Exs. 36, 42, 44, 45.

[172] Sala Tr. 114:14-115:3.

[173] Greenblatt Supplemental PW Rpt. Ex. 14 Accounts 1B0022, 1B0023; Bongiorno Tr. 118:9-120:9, 120:24-121:18; Trustee Exs. 44-45.

[174] *Id.*

[175] *See* Greenblatt Supplemental PW Rpt. Ex. 14 Account 1B0023.

acknowledged he received and reviewed—as debits, reducing the account value by the corresponding amount.[176]   On February 27, 2009, Blecker filed three customer claims for Accounts 1B0022, 1B0156, and 1B0157, which were denied by the Trustee[177] because Blecker withdrew more money than he deposited with BLMIS.[178]   Blecker timely objected to the Trustee's determinations.[179]

Account 1B0022 is a Direct Participating Account.  Accounts 1B0156 and 1B0157 are Indirect Participating Accounts.  Although PW Transactions occurred in 1B0023, no claim was filed on behalf of that account and, accordingly, it cannot participate in this Motion.  1B0023 is a Related Direct Account, which means it had PW Transactions and is connected to the Participating Accounts via inter-account transfers.

Blecker claims that, although he reviewed his customer statements showing PW Transactions being debited from his accounts, he never received any withdrawals from his BLMIS accounts.[180]  Blecker has advanced conflicting theories in an attempt to explain how this was so.  When he filed his claims objection in 2009, Blecker posited that the profit withdrawal checks must have been for Madoff's family or his friends[181] or, alternatively, that the profit withdrawal checks could have been paid to public companies as a "party of the larger fraud and cover-up."[182]  By 2014, with newfound certainty, Blecker claimed that when he reviewed PW

---

[176] Brown Decl. Ex. PW-1 ("Blecker Tr.") 13:9-14:12; Blecker Decl. ¶ 10; Affidavit of Aaron Blecker, No. 08-01789 (SMB) (Bankr. S.D.N.Y. Nov. 18, 2009), ECF No. 691 ("Blecker Claim Objection").

[177] See Blecker Claim Objection.

[178] Greenblatt Supplemental PW Rpt. Ex. 14 for 1B0023, 1B0156, and 1B0157; Greenblatt Second Supplemental PW Rpt. Ex. 21 for 1B0022.  Blecker received $466,527 in excess of his deposits in Account 1B0023, an account for which he did not file a claim.  He received $59,634 in excess of his deposits in Account 1B0022.

[179] Blecker Decl. ¶ 7.

[180] Blecker Tr. 8:25-9:8.

[181] Blecker Claim Objection at 8 ("these checks must have been for members of the Madoff family or friends.").

[182] Blecker Claim Objection at 4.

Transactions on his customer statements, he understood that these amounts were sent on his behalf to purchase securities in the Fortune 500 companies listed.[183]  Blecker has now advanced another theory: that any withdrawal from a BLMIS account would necessarily be preceded by a letter from the customer requesting the specific withdrawal.[184]

(b)    Blecker Received Profit Withdrawal Checks

BLMIS books and records show that BLMIS sent Blecker profit withdrawal checks on a regular basis from 1981 to 1997, and this conclusion is supported by BLMIS employee testimony.  Notably, BLMIS employees confirmed that the BLMIS books and records showed Blecker's Accounts 1B0022 and 1B0023 were designated as "Send" accounts, denoted by the handwritten "S" on the Name/Address Forms in his customer files.[185]  Because his accounts were "Send" accounts, BLMIS employees confirmed that Blecker would have been sent profit withdrawal checks automatically and would not have needed to make individual, written requests to receive those checks.[186]

The dates and amounts of each profit withdrawal check sent from BLMIS are reflected in Blecker's monthly customer statements.  For example, the customer statement for Account 1B0022 showed an arbitrage transaction in "PEP BOYS" securities in April and June 1992. Sala and Bongiorno identified the purported "buy" and "sell" transactions in PEP BOYS and confirmed that the entry "PW CHECK PEP BOYS" dated June 16, 1992 was the purported profit

---

[183] Blecker Decl. ¶¶ 8, 10 ("Of course, these checks appeared on my BLMIS statements and I understood that the checks written to numerous Fortune 500 companies represented the purchase of securities in my account because, in fact, my statements showed that I owned the securities of these various companies.").

[184] Blecker's Mem. of Law in Support of Mot. to Compel the Trustee to Allow his SIPC Claim at 2-3, Dec. 28, 2015, ECF No. 12319 ("Blecker Mem. of Law").

[185] Bongiorno Tr. 86:19-88:22; Sala Tr. 129:7-131:18; Trustee Exs. 36, 42.

[186] Bongiorno Tr. 86:19-88:17, 66:6-68:24.

due to Blecker resulting from this transaction.[187]   Sala and Bongiorno further confirmed that the

entry "PW CHECK PEP BOYS" on Blecker's statement represented the profit check sent to Mr.

Blecker in April 1992.[188]

Additionally, Bongiorno and Sala confirmed that the December 1992 PMR for Account

1B0022 reported $16,858.40 as the amount of profit withdrawals received by Blecker from

January to December 1992.[189]   Bongiorno and Jackson also identified the PEP BOYS arbitrage

profit transaction on the 1992 PMT for Account 1B0022, confirmed that it matched the

transaction on the customer statement, and confirmed that the transactions on both documents

reflected a profit withdrawal check to Blecker on June 16, 1992 for $2,627.74.[190]

That BLMIS sent Blecker profit withdrawal checks is further supported by the "Check

Out" Spiral Notebooks, containing entries with his name, the amount of profit withdrawal checks

sent and the security transactions that purportedly resulted in profit, each of which ties back to

his customer statements for those transactions.[191]   BLMIS employees confirmed that entries in

the "Check Out" Spiral Notebooks identified profit withdrawal checks sent to Blecker.

Bongiorno reviewed Blecker's July 1991 statement for Account 100254,[192] which listed

two PW transactions with the description "CHECK HEALTH SOUTH," one on July 11 and one

on July 17, each in the amount of $3,230.02.[193]   Also on July 17, there was an entry for "CXL

---

[187] Sala Tr. 111:4-117:21; Bongiorno Tr. 110:25-118:4.

[188] *Id.*

[189] Sala Tr. 117:23-120:18; Bongiorno Tr. 110:24-112:20 (referring to "Profits Withdrawn" column on Trustee Ex. 39, "Q.  And profits withdrawn? A. Those would be the profits that were made in the account for that period.  Q. What would happen when those profits were made? A. The profits withdrawn?  We would have sent them to him"); Trustee Ex. 39.

[190] Bongiorno Tr. 117:12-118:4; Jackson 92:17-94:12; Trustee Exs. 38, 40.

[191] Greenblatt Second Supplemental PW Rpt. ¶¶ 26-28; Exhibit 61, at HWN00001651, HWN00001655-1658.

[192] Later changed to Account 1B0022.

[193] Trustee Ex. 41; Bongiorno Tr. 90:22-95:13.

CHECK 7/11/91" in the amount of $3230.02.  Bongiorno testified that this series of transactions

likely resulted from Blecker calling BLMIS to say that he had not received his profit withdrawal

check.[194]  She explained that a cancelled check entry indicates that a stop payment had been

placed on the earlier check and that a new check would have been reissued.  She testified that

this series of events was "typical if somebody ever called and said, you know, we didn't get that

check.  It's on my statement.  I didn't get it.  We would call the bank and see if it was cashed.  If

it wasn't, we'd stop payment and issue a new check.  That was the system."[195]  While Bongiorno

did not specifically remember speaking to Blecker twenty-five years ago, Bongiorno explained,

based upon her review of the customer statement, that the series of transactions that occurred

there was what would typically happen "when somebody called in and said we didn't get a

check."[196]

Bongiorno's explanation regarding the cancelled check is consistent with other testimony

about the Spiral Notebook.  BLMIS employees testified that after PW Transactions were

automated, the Spiral Notebook was used for PW Transactions only when checks needed to be

manually entered into the AS/400.  When checks had to be reissued after a cancellation,

Bongiorno explained, the Spiral Notebook would be used because reissuing a check outside the

automated process for profit withdrawal checks required manual entry into the AS/400

system.[197]  Indeed, corresponding to the second PW Transaction in that exact amount reflected

---

[194] Bongiorno Tr. 91:16-93:22 ("This is telling me that someone called and said they didn't get this check").

[195] Bongiorno Tr. 93:2-7, 93:10-15 ("Well, if they didn't receive – it didn't happen often,  But when it did happen, they would call up and say they didn't receive [the check].  Sure.  If you see a check on your statement or if you know a check is coming because you've requested profit checks and you don't get it, you call up and say 'What's going on?'").

[196] Bongiorno Tr. 232:8-17 ("That's exactly what we would do, and that's what I was saying.  We call the bank and check it out.  Then cancel the check and send a new one right away . . . So when I saw that, that's the first scenario that came to mind.").

[197] Bongiorno Tr. 136:8-18.

the July 1991 customer statement (after a "CXL"), the Spiral Notebook has an entry for the amount of $3,230.02 for Account 100254 for HEALTH SOUTH on a page dated July 17.[198]

Regarding Blecker's contention that the PW Transactions were merely securities purchased on his behalf from Fortune 500 companies, Sala noted that Blecker's customer statements show that the PW Transactions always appear after the securities were sold in his accounts, rather than purchases of any new securities.[199]  Additionally, at the end of that month and subsequent months, no new shares in those particular securities were reported as held in the account.[200]  Moreover, BLMIS employees confirmed that no checks were sent to companies to purchase securities, contrary to Blecker's speculation on this point.[201]  They further testified that, based on the process for printing checks from the AS/400 in which customer names were autopopulated, checks relating to customer accounts could not be printed with a name other than the customer name in the payee line.[202]

      (c)    Blecker's Accounts Did Not See Any Gains From Purported Trading

Blecker testified that his investments with BLMIS increased over time and showed a profit:

> As a matter of fact, if I had withdrawn money, why would Madoff keep crediting my account and adding to my investment?  If I had no money there, he wouldn't have bothered with me.  He would have discarded me.  In the meantime after all the years he kept increasing my investment, showed a profit return on my investment and that's why it kept accumulating.[203]

---

[198] Trustee Ex. 61 at HWN00001651.

[199] *Id.*; Sala Tr. 111:4-117:21; Greenblatt PW Rpt. ¶¶ 67-70.

[200] Greenblatt Supplemental PW Rpt. ¶¶ 23-39.

[201] Sala Tr. 154:15-155:8; Jackson Tr. 59:15-19.  Moreover, as set forth in the Trustee's Opening Brief, this is not how securities are purchased from Fortune 500 companies.

[202] Bongiorno Tr. 139:5-140:11; *see also* Leung Tr. 68:23-71:6, 72:22-73:18; Khan Tr. 54:11-55:4.

[203] Blecker Tr. 7:12-21.

Blecker's version of his account trajectory is not borne out by BLMIS records.  The monthly statements received by Blecker from 1981 to 1997 for Account 1B0022 showed that no gains were accumulating in his account,[204] even though there were dozens of fictitious arbitrage trades and 100% of them generated "profit."[205]   Other than the $200,000 Blecker deposited into Account 1B0022, the purported equity balance went up only $6,528 after eleven years of investment with BLMIS.  This is because the transactions that had resulted in reported gains were then deducted from the account and sent to Blecker as profit withdrawals.[206]

Bongiorno confirmed that customer statements for Account 1B0022 showed no appreciable gain in the first five years of investing, from 1986 to 1991.[207]   When asked why Blecker's account balance remained flat, Bongiorno stated, "Because the [initial] investment was the same and because he's been getting his profits all along."[208]  Madoff agreed.[209]

If BLMIS had purported to reinvest the funds withdrawn as PW Transactions instead of debiting them from the account from 1986 until 1997, the account would have had a purported equity of $861,467 by the time the account was closed.[210]   This would have quadrupled Blecker's initial investment.[211]  Instead, Account 1B0022 showed a gain of a mere $6,000 over the course of Blecker's eleven-year investment.[212]

---

[204] *See* Section III.H.2, *supra;* Greenblatt Second Supplemental Rpt. Section VI.

[205] *Id.*

[206] Greenblatt Second Supplemental PW Rpt. ¶ 38.

[207] Bongiorno Tr. 100:24-103:24.

[208] Bongiorno Tr. 103:18-24.

[209] Madoff Tr. 34:13-14.

[210] Greenblatt Second Supplemental Rpt. Section VI Exs. 11, 11A.

[211] *Id.*

[212] Greenblatt Second Supplemental PW Rpt. Ex. 11.

### 2.    The Blums

Participating Claimants Drs. Joel and Norman Blum (the "Blums") are associated with more than ten BLMIS Accounts held in their own names and in the names of their late parents, Dr. Morris Blum and Mrs. Roslyn Blum.[213]    The accounts through which the Blums are participating in this Motion did not have any PW Transactions.[214]    Instead, the PW Transactions at issue occurred in four other accounts held in their names or the names of their parents that are Related Direct Accounts.

The Blums contend, based on their alleged understanding of their father's financial affairs, that the notion that their father cashed any checks related to PW Transactions "makes no sense given the way [their] family managed their accounts"[215]    and that their father would have never "cashed checks in such small denominations."[216]    They also claim to have never personally received any PW Transactions checks in their own accounts.    The Blums, however, provide no documentary support for their assertions, which are directly contradicted by the BLMIS books and records, including their own correspondence with BLMIS, and the testimony of BLMIS employees.

---

[213] *See* Collura Supplemental PW Rpt. Attachment B (identifying participating and related direct Blum Accounts). Also relevant to the claims asserted by the Blums are Accounts 1C1001, 1B0189 and 1B0191.

[214] The three participating accounts are Accounts 1B0190, 1B0201 and 1B0251.    Certain of the Blums' own accounts, 1C1001 and 1B0034, did have PW Transactions but they did not file claims for those accounts.  These accounts are still relevant to the Motion, however, insofar as they involve PW Transactions and the Blums' knowledge about such transactions.

[215] Brown Decl. Ex. PW-15 ("Trustee Ex. 14") (J. Blum Decl.) ¶ 8. On February 20, 2016, the Declaration of Norman J. Blum, M.D. and the Declaration of Joel A. Blum, M.D. were executed and provided to the Trustee.

[216] Brown Decl. Ex. PW-10 ("Trustee Ex. 1") (N. Blum Decl.) ¶ 11.

(a)    The Blums Concededly Have No Specific Knowledge of Their
Father's Investments with BLMIS

The sole basis for the Blums' assertion that their father did not receive PW checks is the sweeping claim that they are "fully familiar" with their father's investment strategy.[217]  But the Blums concede that they have no knowledge of the specific transactions at issue, either directly or even indirectly through interactions with their father.  Neither of the Blums ever discussed with their father how many distributions he took over the years from his BLMIS accounts.[218]  They did not review their father's BLMIS customer statements, nor did they discuss specific transactions in his accounts with him.[219]  They were unfamiliar with correspondence between Morris and BLMIS and neither was involved in the details of Morris's banking, instead conceding that their father managed his own affairs nearly until his passing.[220]

Instead, the Blums base their claims that their father did not receive PW Transactions on their assumptions of how they each "imagine" their father managed his accounts.[221]  Joel believed his father would have wanted to receive funds from BLMIS "in an orderly fashion."[222]  Norman conceded that he is unable to "prove" his father didn't take profit withdrawals, rather relying on the fact that he "just knows [his] father" and this is not something he would have done.[223]

---

[217] Trustee Ex. 1 (N. Blum Decl.) ¶¶ 5, 10-11; Trustee Ex. 14 (J. Blum Decl.) ¶¶ 4, 8-9.

[218] Brown Decl. Ex. PW-2 ("J. Blum Tr.") 51:13-16, 53:18-21; Brown Decl. Ex. PW-3 ("N. Blum Tr.") 87:14-89:10; Brown Decl. Ex. PW-14 ("Trustee Ex. 10").

[219] J. Blum Tr. 74:22-75:11; N. Blum Tr. 55:19-23, 82:16-25.

[220] J. Blum Tr. 57:21-59:5; N. Blum Tr. 85:16-86:14.

[221] N. Blum Tr. 51:5-11, 51:16-52:5, 74:7-19; J. Blum Tr. 67:11-16.  Dr. Joel Blum's only evidence that his father did not request or received PW checks was that he believed his father would have wanted to receive funds from BLMIS "in an orderly fashion." J. Blum Tr. 78:1-2.  Similarly, Dr. Norman Blum confirmed that he is unable to "prove" his father didn't take profit withdrawals, rather relying on the fact that he "just knows [his] father" and this is not something he would have done. N. Blum Tr. 83:6-25, 89:3-10.

[222] J. Blum Tr. 77:8-78:10.

[223] N. Blum Tr. 83:6-25, 89:3-10.

On the other hand, the BLMIS books and records clearly show that Morris and Roslyn received PW Transactions. Like Blecker's, the customers statements for Accounts 1B0033 and 1B0036 reflect PW Transactions as debits, reducing the value of the account. The information on the customer statements is confirmed by other records. The Name/Address Forms for Accounts 1B0033, 1B0036, and 1B0115 plainly show a single "S" on each page, making them "Send" accounts.[224]

Similarly, the Spiral Notebook shows that Morris and Roslyn's accounts received PW checks. The July 1991 customer statements for Accounts 100220 (Morris J. Blum)[225] and 100242 (Roslyn Blum)[226] show entries for July 22, 1991 identified as "CHECK LIBERTY NATL" with the transaction code of "PW" for the amounts of $2013.24 and $1,087.67, respectively. The 1991 Spiral Notebook identifies checks for those same accounts in the amounts of $2,013.24 and $1,087.67 on the page titled "PW Liberty National Bancorp."[227]

As Bongiorno testified, every customer listed on the above page of the Spiral Notebook received a check for the amount noted next to their name for the profits purportedly earned on Liberty National Bancorp, including "M. Blum" and "R. Blum."[228]

       (b)    The Blums' Memories of Their Own Accounts Are Tenuous

The Blums' memories about their own BLMIS accounts were also directly contradicted by the BLMIS books and records. Norman claimed that he never received a profit withdrawal check.[229] Yet BLMIS books and records show that Norman's account received profit

---

[224] Trustee Ex. 9; Brown Decl. Ex. PW-68 at MADTBB01988462; Brown Decl. Ex. PW-69 at MADTBB01988479.

[225] *See* Brown Decl. Ex. PW-66 MF00483417.

[226] *See* Brown Decl. Ex. PW-65 MF00483458.

[227] Trustee Ex. 61 at HWN00001655.

[228] *Id.*; Bongiorno Tr. 55:20-56:5.

[229] Trustee Ex. 1 (N. Blum Decl.) ¶9.

withdrawals between 1986 and 1997, except for July 1987 to April 1988.[230]  The customer file

for Account 1B0034 indicates both an "S" and an "R."[231]  Customer statements for Account

1B0034 reflect PW Transactions as debits, reducing the value of the account.  Norman's account

appears in the Spiral Notebook for a PW Transaction in the amount of $360.82 on July 22, 1991

that matches the corresponding customer statement exactly.[232] As explained by Bongiorno, the

checks identified on this page in the Spiral Notebook were for "profit withdrawn for Liberty

National Bancorp" and were "sent to the customer listed."[233]

Joel was likewise unable to recall details of his interactions with BLMIS.  When

presented with a letter he wrote to Sala that stated that "until now the profits have all been

reinvested" and asking that "[s]tarting with the next transaction, could you please send a check

covering the profits from each transaction," Joel could not explain "why he worded it that way"

or his purpose for requesting the change.[234]  BLMIS books and records confirm that Joel did not

receive PW Transactions prior to the date of the letter.[235]  Following the date of the letter,

however, PW Transactions occurred in his account, reducing the purported account balance and

reflecting that checks were being sent to him.[236]

Other BLMIS books and records show that Joel's account received profit withdrawals,

which was confirmed by BLMIS employee testimony.  The Name/Address Form for Joel's

account identified it as a "Send" account.  Sala confirmed that this meant that he "received [the]

---

[230] *See* Greenblatt Supplemental PW Rpt. Ex. 14 Account 1B0034.

[231] Brown Decl. Ex. PW-70 at MADTBB1988469.

[232] Trustee Ex. 61 at HWN00001655; Brown Decl. Ex. PW-71 MF00483467; *see also* Sala Tr. 153:9-154:19.

[233] Bongiorno Tr. 55:20-56:5.

[234] Trustee Ex. 15 at MADTBB03076968; J. Blum Tr. 49:1-8.

[235] *See* Greenblatt PW Rpt. Ex. 2 at 266-268; *see* Brown Decl. Ex. PW-72 at MDPTPP00391364.

[236] *See, e.g.*, Brown Decl. Ex. PW-17 ("Trustee Ex. 16"); *see also* Brown Decl. Ex. PW-44 ("Trustee Ex. 48").

profits earned in the account."[237]   Joel's account also appears in the Spiral Notebook for a PW Transaction in the amount of $355.59,[238] which matches the July 1991 BLMIS customer statement.[239] Sala**,** who was responsible for managing the Blum accounts at that time**,** confirmed "transaction of $355.59 [to be] a payment made" to Joel for "his profits relating to Liberty National Bancorp."[240]

(c)    <u>Purported Equity Analysis of Blum Accounts</u>

An analysis of the reported monthly gains and the purported equity balance for Accounts 1B0033, 1B0034, 1B0036 and 1B0115 held by the Blums and their parents show that profits were withdrawn from, and reduced the purported balance of, the accounts.[241]

In each instance, the analysis shows that the account's purported equity did not increase over time.   Thus, because the reported "profits" were withdrawn from the account when "earned," the purported equity in the account remained flat and consistent over the life of the account.[242] If the profits had been reinvested, the purported equity would have been expected to increase.   For all accounts analyzed, the result is the same: if the funds withdrawn as PW Transactions were reinvested, as claimed, instead of debited against the account balances, the account balances would have been markedly higher.

 If BLMIS had purported to reinvest the funds withdrawn as PW Transactions, instead of debiting them from the account from 1981 to 1997, Account 1B0033 (Morris Blum) would have

---

[237] Sala Tr. 143:19-145:15; *see also* Bongiorno Tr. 121:19-126:1; Trustee Ex. 46.

[238] Trustee Ex. 61 at HWN00001655; *see* Sala Tr. 153:9-154:19.

[239] Trustee Ex. 48.

[240] Sala Tr. 154:15-19.

[241] *See* Greenblatt Second Supplemental PW Rpt. Section VI, Exs. 1-18A.

[242] *Id.*

grown from $650,000 to an ending purported equity of $12,137,031.[243]  Instead, after 16 years of

investing with BLMIS, 1B0033's closing balance was reported as $583,443.  Similarly, if

BLMIS had purported to reinvest the funds withdrawn as PW Transactions from 1984 and 1994,

for Account 1B0036 would have grown from an initial investment of $298,236 to a purported

equity of $1,824,347.[244]  Instead, after 16 years of investing with BLMIS, 1B0036's closing

balance was reported as $300,425.  Finally, if BLMIS had purported to reinvest the funds

withdrawn as PW Transactions between 1994 and 1997, Account 1B0115 (Roslyn Blum

Remainder Trust) would have grown from an initial investment of $319,579 to a purported

equity of $465,482.[245]  Instead, after 3 years of investing with BLMIS, 1B0115's closing balance

was reported as $331,371, representing an increase in the purported equity of less than $12,000.

As for his own account, 1B0034, Norman Blum testified that he "categorically . . . never

received or cashed any such checks."[246]  He further testified that he reviewed his customer

statements every month, including checking his ending balance.[247]  But if this were true, Norman

would have seen that his account balance was not increasing, but rather stayed flat.  If BLMIS

had purported to reinvest the funds withdrawn as PW Transactions, his investment of $100,000

would have increased more than seven times the original principal invested between 1986 and

1997 to a purported ending balance of $709,837.  Instead, after an initial deposit of $100,000, the

purported equity balance in 1997 was $102,725, representing a gain of only $2,725.[248]

---

[243] *Id.* at Exs. 15, 15A.

[244] *Id.* at Exs. 17, 17A.

[245] *Id.* at Exs. 18, 18A.

[246] Trustee Ex. 1 (N. Blum Decl.) ¶ 9.

[247] N. Blum Tr. 15:4-12.

[248] Greenblatt Supplemental PW Rpt. Ex. 14 Account 1B0034.

## **ARGUMENT**

Participating Claimants challenge the Trustee's treatment of PW Transactions as cash outflows in the Net Investment Method.  The basis for their challenge is their assertion that they did not receive certain checks that correspond to the withdrawals of profit identified on their customer statements.  The threshold question is whether the Trustee's methodology for determining cash inflows and outflows, insofar as it relates to PW Transactions, was reasonable and based on the books and records of BLMIS.  Assuming that it was, the next question is whether the Participating Claimants have offered sufficient evidence contradicting the books to render the Trustee's reliance on those records unreasonable.  For the reasons discussed below, the Trustee's treatment of PW Transactions is demonstrably correct as a matter of law, and Participating Claimants have offered no evidence sufficient to challenge its application as to their accounts.

**I.      The Trustee's Methodology for Determining that PW Transactions are Cash Outflows is Unchallenged, Correct as a Matter of Law, and Entitled to Deference**

SIPA is designed to return customer property to customers with net equity claims.[249]  A SIPA trustee's duty is to make payments to customers based on net equity "insofar as *the amount owed* to the customer is 'ascertainable from the books and records of the debtor or [is] otherwise established to the satisfaction of the trustee.'"[250]  "To perform this duty, [the Trustee] must be

---

[249] *See Bankr. Net Equity Decision*, 424 B.R. at 132-33; *Net Equity Decision*, 654 F.3d at 233.

[250] *Time Based Damages Decision*, 779 F.3d at 77 (quoting SIPA § 78fff-2(b)(2)) (emphasis added); *Net Equity Decision*, 654 F.3d at 237; *see also SIPC v Lehman Bros. Inc.*, 433 B.R. 127, 133 (Bankr. S.D.N.Y. 2010); *In re Adler Coleman Clearing Corp.*, 195 B.R. 266, 270 (Bankr. S.D.N.Y. 1996) ("A SIPA trustee discharges a debtor's obligations to customers to the extent that they may be determined to the trustee's satisfaction from the debtor's books and records. . . . The value of a customer's account, or it's 'net equity', is the measure of the preferred SIPA customer claim."); *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 794 (Bankr. S.D.N.Y. 1998).

satisfied that the method he selects will enable him to deduce the amounts he must pay to the claimants . . . ."[251]

In the BLMIS liquidation, a customer's net equity is based upon his net investment into BLMIS: cash inflows minus cash outflows. The Trustee's obligation to ascertain this net investment includes determining how to analyze and calculate these amounts. As to the Court's review of the Trustee's determination, two principles have emerged from the body of case law developed in the BLMIS liquidation. First, the Court may uphold as a matter of law the Trustee's selected method to determine net equity.[252] Second, if not upheld as a matter of law, the method selected by the Trustee is entitled to deference if it is 'not clearly inferior' to other possible methods under consideration."[253] When presented with challenges to the Net Investment Method in various contexts, courts have generally upheld the Trustee's selected method as a matter of law.[254]

Here, the Trustee's chosen methodology was based upon his review and reconciliation of the books and records of the debtor with multiple sources. Participating Claimants, on the other hand, have no "methodology" as to the treatment of PW Transactions, much less one that would be clearly superior to the Trustee's method. Instead, they merely suggest—through self-serving denials uncorroborated by any other evidence—that they did not receive particular funds. They fail to offer even a viable explanation as to what PW Transactions were and why they had no

---

[251] *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 522 B.R. 41, 50 (Bankr. S.D.N.Y. 2014) (the "*Inter-Account Transfer Decision*").

[252] *Net Equity Decision*, 654 F.3d at 241(holding that it would have been "legal error" for the Trustee to rely on alternate method proposed by claimants); *Time-Based Damages Decision*, 779 F.3d at 78; *Engelmayer Inter-Account Transfer Decision*, 2016 WL 183492, at *4.

[253] *Inter-Account Transfer Decision*, 522 B.R. at 50; *Net Equity Decision*, 654 F.3d at 238 n.7.

[254] *Net Equity Decision*, 654 F.3d at 238 n.7; *Time-Based Damages Decision*, 779 F.3d at 78; *Engelmayer Inter-Account Transfer Decision*, 2016 WL 183492, at *4; *c.f. Inter-Account Transfer Decision*, 522 B.R. at 53 (upholding Inter-Account method after determining that Trustee's method is entitled to deference).

complaints when BLMIS debited their accounts by those amounts.  The Court should therefore uphold the Trustee's method for determining the treatment of PW Transactions as a matter of law or, alternatively, defer to the Trustee's determination.

### A.   The Trustee's Determination as to the Treatment of PW Transactions is Based on the Debtor's Books and Records in Accordance with SIPA and Correct as a Matter of Law

Unlike the previous disputes related to the determination of net equity, this issue does not raise a challenge to the fundamental "cash in minus cash out" determination of net equity. Instead, the issue is whether the Trustee's determination that PW Transactions belong in the "cash out" column is a proper exercise of his obligation under SIPA to ascertain net equity based on the books and records of the Trustee.  There is no serious dispute that the Trustee was correct to examine the books and records of BLMIS to ascertain cash inflows and outflows, and no challenge to the overall reliability of these records as to deposits and withdrawals.  In fact, Participating Claimants rely on the same records to support their claims.

Each of the prior cases upheld the Trustee's Net Investment Method as a matter of law because it is based on the deposits and withdrawals that were ascertainable from the books and records of the debtor.  In the Net Equity Decision, the Second Circuit determined that the Trustee's selection of the Net Investment Method was superior to the Last Statement Method as a matter of law because it relied upon "unmanipulated withdrawals and deposits."[255]  In the Time-Based Damages Decision, the Second Circuit likewise determined that SIPA disallows an inflation adjustment as a matter of law because BLMIS books and records "reflected only funds

---

[255] *Net Equity Decision*, 654 F.3d at 238 (citing *Bankr. Net Equity Decision*, 424 B.R. at 140); *see Bankr. Net Equity Decision*, 424 B.R. at 135 ("[T]he only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals.").

deposited and withdrawn, without any time-based adjustment."[256]  In the Inter-Account Transfer

Decision, the Southern District of New York found that the Trustee's inter-account transfer

methodology, which applied the Net Investment Method to inter-account transfers, was the

"superior method as a matter of law" because it accorded with "SIPA"s statutory definition of

net equity and its requirement that net equity be determined to the extent it is ascertainable from

the books and records of the debtor or [is] otherwise established to the satisfaction of the

Trustee."[257]  Accordingly, it would be legal error for the Trustee to rely on anything *other* than

the customers' deposits and withdrawals to the extent he can determine them from BLMIS's

books and records.

The Trustee starts, as he must under SIPA, with those books and records.  He found that

the most complete information regarding deposits and withdrawals from BLMIS accounts were

the customer statements, dating back to 1981.  Given the fraudulent nature of BLMIS's business,

the Trustee did not simply accept the records as he found them but engaged forensic accounting

professionals to reconstruct reconcile them both internally and with external sources.  When the

deposits and withdrawals (including the PW Transactions) on the customer statements in the

Ten-Year Period were compared to third-party bank records, including cancelled checks, 99% of

those transactions tied out in terms of the date, dollar amount, and recipient.  There were no

records contradicting these transactions.  This evidenced beyond any doubt that the deposit and

withdrawal information for the years 1998-2008 actually reflected real cash deposits by and

withdrawals to BLMIS customers, unmanipulated by BLMIS's fraud.

---

[256] *Time-Based Damages Decision*, 779 F.3d at 80.

[257] *Engelmayer Inter-Account Transfer Decision*, 2016 WL 183492, at *9, *10 (alteration and emphasis in original)
(quoting *Net Equity Decision*, 654 F.3d at 237 (quoting SIPA § 78fff-2(b))).

Having confirmed the accuracy of virtually every deposit and withdrawal transaction reflected on every customer statement over a ten-year period, the Trustee determined that the customer statements are a reliable record of cash deposits and withdrawals.[258]   The Trustee further tested their reliability by reconciling those entries with the other books and records of BLMIS that related to deposits and withdrawals—PMRs, PMTs, and Spiral Notebooks, among others—and found that these records supported and confirmed his determination.   Similarly, as the Trustee has received discovery from defendants in avoidance actions and third parties, that additional information continues to support his calculation of net inflows and outflows, and the reliability of the customer statements as to deposits and withdrawals.   The Trustee has relied on his examination of these records to determine every customer's net equity from 1981 forward.

The PW Transactions are merely a subset of transactions within this overall methodology for determining all deposits and withdrawals, for which the same support exists in the books and records of the debtor.   There were approximately 5,500 PW Transactions during the Ten-Year Period that, like the other approximately 220,000 deposit and withdrawal transactions during that period, reconciled to third-party bank records for 99% of the transactions.[259]   The bank records showed in each instance that when a PW Transaction appeared on a customer statement, a check was sent to a customer and cashed by that customer.   And when the Trustee reviewed all of the other books and records of BLMIS that related to PWs—PMRs, PMTs, Spiral Notebooks, the customer statements themselves—the Trustee found nothing but additional support for his determination to include PW Transactions as part of the Net Investment Methodology.

---

[258] Likewise, these are the only records that the customers have to rely on to establish their deposits with BLMIS.

[259] This means that of the 225,000 in the Ten-Year Period, 1% of the transactions that could not be reconciled.   The primary reason that these transactions could not be reconciled is because the particular cancelled check was missing, not because the information was found to be inaccurate.

The Participating Claimants seize on the lack of bank records prior to 1998 to challenge the Trustee's treatment of PW Transactions—though they are happy to accept his treatment of deposits reflected on the same account statements. Nothing in SIPA, however, requires the Trustee to obtain third-party confirmation for obligations that can be ascertained to his satisfaction by the debtor's records. In fact, ignoring demonstrably reliable records of the debtor would result in a breach of the Trustee's duties to determine net equity based on those same records. And PW Transactions, just like the other deposits and withdrawals listed on the customer statements, are plainly ascertainable from BLMIS books and records. The length of Madoff's fraud does not absolve the Trustee of his duty to calculate net equity that is ascertainable from the debtor's books and records.

### B.    The Trustee's Chosen Methodology is Owed Deference As There Is No Superior Method

#### 1.    SIPA Requires Deference to the Trustee's Methodology

If the Court does not uphold the Trustee's treatment of PW transactions as a matter of law, then the Trustee's determination on net equity is entitled to deference as long as it is not "clearly inferior" to other possible methods.[260]  The Trustee's methodology is simple. He reviewed the books and records of the debtor. He ignored the fictitious trading. He confirmed to a veritable certainty that the deposit and withdrawal records were accurate, including the PW Transactions. And then he determined net equity based upon those records, in accordance with his duties under SIPA.

When evaluating the Trustee's methodology, courts look to the other proposed alternatives. But Participating Claimants cannot propose a competing methodology that would

---

[260] *See Net Equity Decision*, 654 F.3d at 238 n.7; *Inter-Account Transfer Decision*, 522 B.R. at 50, 53 (holding Trustee's methodology, which was based on the cash deposits and withdrawals, was "not 'clearly inferior,' and indeed, is superior to the alternative . . . . For these reasons, his chosen method is entitled to deference").

be consistent with the debtor's books and records (or meet the Trustee's satisfaction) because every piece of evidence adduced in this proceeding supports the Trustee's determination. Certainly they would not argue that the Trustee can only determine net equity from the third-party bank records.  Doing so would result in negative net equity for Blecker regardless of how the Court ruled on the PW Transactions as all of his deposits predated 1998 and he has come forward with no bank records to support those deposits.  Likewise, such a position would collectively deprive the Blums of $196,355 in cash deposits.[261]  Participating Claimants merely want to cherry pick the component parts of the net equity calculation that serve to increase their claims against the estate or reduce the amounts owed to the estate.  It should go without saying that if everyone were permitted to do that, the "net losers" in this case would not have received any return of their lost principal in this proceeding.

Participating Claimants appear to be proposing a methodology whereby the unsupported oral allegations of every customer claimant trump SIPA's statutory provisions that require that net equity claims be ascertained from the debtor's books and records or otherwise established to the satisfaction of the trustee.[262]  As the Second Circuit recognized, however, "customer property consists of a limited amount of funds that are available for distribution."[263]  If the books and records show that a claimant received certain amounts, and the claimant is unable to prove to the contrary, the customer should not be permitted to receive a larger share of customer property than that to which he is entitled.[264]

---

[261] Greenblatt Supplemental PW Rpt. Ex. 14 Accounts 1B0190, 1B0201, 1B0251.

[262] *See* Blecker Mem. of Law, ECF No. 12319; Customers' Mem. Of Law at 4-6.

[263] *Bankr. Net Equity Decision*, 424 B.R. at 141.

[264] *Id.*

The Trustee must conduct his duties to benefit the entire estate, not just a particular set of customers.[265] Other than testimony by interested parties seeking to enhance their individual net equity calculation, there has not been a shred of evidence to suggest that the Trustee's determination to include PW Transactions in the Net Investment methodology is wrong or an abuse of his discretion. Rather, the books and records show that BLMIS treated PW Transactions consistently across accounts, and likewise, the Trustee does as well. Under these circumstances, the Trustee's determination should be upheld by the Court.

### 2. The Deference Accorded the Trustee is Consistent with the Business Judgment Rule Afforded to Other Fiduciaries

The exercise of discretion proposed here is consistent with the discretion typically afforded to trustees in other proceedings under the Bankruptcy Code as well as other similar fiduciaries.[266] In bankruptcy, a "trustee has ample discretion to administer the estate."[267] A trustee should be accorded deference when a trustee is acting within the scope of his discretionary powers.[268] Courts regularly afford deference to fiduciaries regarding concerning calculations, such as a fiduciary's determination with respect to plans of distribution.[269]

---

[265] *See In re Adler Coleman Clearing Corp.*, 211 B.R. 486, 496 (Bankr. S.D.N.Y. 1997) (affirming trustee's discretion in protecting all customers in lieu of favoring specific customers).

[266] A SIPA trustee has all the powers under SIPA plus the powers of a regular bankruptcy trustee. SIPA § 78fff-1(a).

[267] *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998).

[268] *In re St. Mary's Hosp.*, 155 B.R. 345, 351 (Bankr. E.D. Pa. 1993).

[269] *See SEC v. Byers*, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) (Chin, J.) (giving weight to receiver's judgment and approving distribution plan); *Commodity Futures Trading Comm'n v. Eustace*, Civ. No. 05-2973, 2008 WL 471574, at *5 (E.D. Pa. Feb. 19, 2008); *United States v. Petters*, Civ. No. 08-5348 ADM/JSM, 2011 WL 281031, at *10 (D. Minn. Jan. 25, 2011) ("When approving a distribution in an equity receivership, it is proper for a district court to afford deference to the agency charged with enforcing the laws, and to give weight to the receiver's judgment"); *see also SEC v. Illarramendi*, Civ. No. 3:11cv78 (JBA), 2013 WL 6385036, at *2 (D. Conn. Dec. 6, 2013) (citing *Byers*, 637 F. Supp. 2d at 175); *High Five Ventures, Inc. v. Sportsmansliquidations.com LLC*, Civ. No. 1:13-CV-2334, 2015 WL 1932221, at *2 (M.D. Pa. Apr. 28, 2015).

Challenges to a bankruptcy trustee or receiver's discretion are analyzed under the "highly deferential" business judgment test.[270] This means that when a decision is committed to a trustee or receiver's discretion per the business judgment rule, a reviewing court may overturn the trustee's decision only if it is unreasonable, in bad faith or not a sound business decision.[271] "A trustee generally satisfies the business judgment standard if he acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the debtor. Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross negligence."[272]

The "business judgment" rule as applied to bankruptcy trustees is commonly invoked when a trustee makes strategic decisions with regard to assets of the estate and other issues that affect distributions to creditors. For example, with regard to sale of a debtor's assets, if a trustee has a good business reason to support the sale, then the court will approve the sale.[273] The Bankruptcy Code also gives trustees wide latitude to decide whether they should settle cases on behalf of the debtor.[274] If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate;

---

[270] *Lawsky v. Condor Capital Corp.*, No. 14 CIV. 2863(CM), 2015 WL 4470332, at *6 (S.D.N.Y. July 21, 2015) (according weight to SEC receiver's judgment under business judgment test); *see also Commerce Ltd. P'Ship v. Dyevoich (In re Dyevoich)*, Bankr. No. 10-33007(RTL), 2012 WL 194677, at *4 (D.N.J. Jan. 23, 2012) (courts "defer[] to the business judgment of the Trustee").

[271] *Lawsky*,, 2015 WL 4470332, at *6 ("Here, the task of this Court is not to decide whether it agrees with the Receiver's decision but, rather, whether the Receiver exercised his discretion in a reasonable manner, in good faith, and for sound business reasons.").

[272] *In re MF Glob. Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) (internal citations omitted).

[273] *Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 145 (2d Cir. 1992).

[274] *In re Adilace Holdings, Inc.*, 548 B.R. 458, 463 (Bankr. W.D. Tex. 2016).

the burden of rebutting that presumption falls to parties opposing the transaction.[275]    Finally,

courts invoke the business judgment rule when reviewing a trustee's decision to reject or accept

an executory contract in order to provide greatest profit to creditors.[276]

The Trustee's business judgment here is based on a thorough investigation and the

reliable information in the books and records of the debtor.  Where the only contrary assertions

are the uncorroborated allegations of interested parties, the Participating Claimants have not

shown that they are entitled to any revisions to their net equity claims against the BLMIS estate.

## II.    Under Any Standard of Review, Discovery Has Confirmed that the Trustee's Treatment of PW Transactions Is Correct

The record as developed through the litigation of this matter shows that the Trustee's

determination to treat PW Transactions as debits in the Net Investment methodology is not only

supported by his review of the books and records of the debtor.  It is also supported by the

BLMIS employees who created and maintained those books and records and dealt with the

transactions at issue directly, as well as by the testimony of one of the thousands of customers

who did not join Participating Claimants.  As such, there is an independent basis for this Court to

affirm the Trustee's determination based on the entire record before it.

BLMIS employees were questioned about BLMIS books and records relied upon by the

Trustee and confirmed that the Trustee's interpretation of such records is accurate.  The BLMIS

employees confirmed that BLMIS records identified PW Transactions the same way before 1998

as they did after 1998, where bank records exist sufficient to confirm that 99.9% of PW

Transactions identified by the Trustee as a debit were in fact withdrawn from BLMIS bank

---

[275] *In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012); *see also Dyevoich*, 2012 WL 194677, at *4 (trustee may settle "on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors") (quoting *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 635 (1st Cir. 2000))).

[276] *E. Air Lines, Inc. v. Ins. Co. of the State of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 998-99 (2d Cir. 1996) (executory contracts); *Frostbaum v. Ochs*, 277 B.R. 470, 475 (E.D.N.Y. 2002) (same).

accounts. The BLMIS employees uniformly testified that the notation "PW" on BLMIS customer statements referred to profit checks sent to customers. They confirmed that such amounts were debited from the customer accounts. They confirmed that when an entry appeared in a Spiral Notebook with a PW notation, it referred to a PW Transaction that was sent to the customers. They confirmed that the Debit Memos show copies of the PW checks that were sent to customers, with the memo portion correlating to the PW transaction. They confirmed that PMRs and PMTs reflect PW transactions, and that each of those transactions reflect checks sent to customers.[277]

BLMIS employees articulated their business practices concerning the PW Transactions evident from customer statements, including how purported arbitrage transactions resulted in profit withdrawal checks and the routine practices used by BLMIS to track which the customers should receive those checks. The evidence of BLMIS's routine business practices, including the practice of sending profit withdrawal checks in connection with each PW Transaction on the BLMIS customer statements, is corroborated by the BLMIS books and records, including customer statements, Debit Memos, endorsed checks, PMRs, PMTs and customer files, as explained by the BLMIS employee witnesses. Thus, even if Participating Claimants were somehow correct that the Trustee needs direct proof of checks sent by BLMIS to determine net equity, the testimony of BLMIS employees confirms the routine practice of BLMIS to send checks to customers for PW Transactions, where a PW transaction appears on BLMIS customer statement.[278]

---

[277] *See* Section III.E.6.

[278] *See Fed. Kemper Life Assurance Co. v. Ellis*, 28 F.3d 1033, 1040 (10th Cir. 1994) ("Proof of customary and usual computer procedures is sufficient to show adherence to usual and customary procedures of proper mailing."); *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, No. 13 Civ. 7574 (KPF), 2016 WL 3951182, at *5 (S.D.N.Y. July 20, 2016) (admitting routine handling of copyright applications to prove images at issue were those for which

That BLMIS followed its routine practice is not only demonstrated by the specific books and records relating to Participating Claimants, but also those of Mr. Schwartz.  Mr. Schwartz's testimony as to how received statements showing PW Transactions, and received his profits up through 1997 is consistent with BLMIS employee testimony as well as the debtor's books and records relied on by the Trustee.

### III.    Participating Claimants Have No Basis to Challenge the Treatment of PW Transactions as Applied to Them

The Trustee's treatment of PW Transactions as reductions against BLMIS customers' net equity is correct either as a matter of law or as a matter of discretion.  Their challenge to the Trustee's methodology in determining net equity having failed, the next question is whether Participating Claimants may successfully challenge the application of that determination as to them.  As discussed below, to the extent Participating Claimants are objecting to BLMIS's contemporaneous reporting of these transactions as PW Transactions, they long ago ratified that conduct and may not challenge it now.  To the extent that they raise specific challenges to the Trustee's determination of their individual claim, as opposed to some challenge to the Trustee's methodology in calculating inflows and outflows, it is their burden to demonstrate that they have any net equity claim against the estate.

### A.    Participating Claimants Ratified PW Transactions by not Objecting to Them

Participating Claimants now claim—in some instances, twenty or thirty years after the fact—that they did not receive or cash checks corresponding to the PW Transactions listed on their customer statements.  To the extent that their argument is that BLMIS erred in reflecting

---

plaintiffs received certificates of copyright registration); *ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*, No. 96 Civ. 6033(BSJ), 1999 WL 595450, at *12 n.19 (S.D.N.Y. Aug. 6, 1999) (testimony that it was organization's consistent and routine practice to pay any invoice within 30 days after its entry into accounting system admitted to prove date of invoice payment).

PW Transactions in their accounts, it is untimely by decades.  Participating Claimants have not
produced any documentary evidence indicating that they objected contemporaneously to any of
the allegedly unauthorized transactions in their accounts, even though they concede that they
regularly received and reviewed their account statements.  Their failure to object within ten days
of the contested transaction precludes them from raising such arguments now.

An investor ratifies an unauthorized transaction by acquiescing to it.[279]  Courts regularly
enforce broker-customer agreements requiring written notice of objection to transactions within a
limited amount of time after a customer receives confirmation of the transaction.[280]  In SIPA
proceedings, where customers do not promptly object to certain transactions in their account,
courts hold them to have ratified such transactions.[281]  Recently, a SIPA trustee's objection to a
claim alleging an unauthorized transfer was sustained where a customer ratified the transfer by
not seeking to alter the method used when offered the opportunity to do so.[282]

BLMIS customer agreements clearly provided that customers had a finite window of ten
days to provide written objections to an unauthorized transaction noted in a transaction
confirmation or customer account statement otherwise, the transactions included therein became

---

[279] *Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 646 (2d Cir. 1991).

[280] *Id.*; *In re Mason Hill & Co., Inc.*, No. 02-8030A (SMB), 2004 WL 2659579, at *6 (Bankr. S.D.N.Y. Oct. 18, 2004) (Bernstein, J.) (noting that courts generally respect objections clauses in customer agreements).

[281] *Pitheckoff v. SIPC (In re Great E. Sec., Inc.)*, No. 10 Civ. 8647(CM), 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011) (affirming bankruptcy court finding that customer ratified transactions by failing to repudiate them); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 419-20 (Bankr. S.D.N.Y. 2003) (denying investors' claim of unauthorized trading as ground for customer claim under SIPA based on investors' failure to timely complain of trading); *In re John Dawson & Assocs., Inc.*, 289 B.R. 654, 665 (Bankr. N.D. Ill. 2003) (holding trustee adequately established that claimant ratified the transactions in claimant's account); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 770 (2d Cir. 2010) (noting absence of objection to a securities trade in BLMIS account confirmed that funds were voluntarily transferred to debtor); *c.f. SIPC v. Glob. Arena Capital Corp.*, No. 16 Civ. 620 (RWS), 2016 WL 590470, at *4 (S.D.N.Y. Feb. 11, 2016) (finding accountholders did not ratify transactions where they made complaints to broker).

[282] *In re MF Glob. Inc.*, No. 11-2790 (MG) SIPA, 2016 WL 270180, at *8-9 (Bankr. S.D.N.Y. Jan. 15, 2016).

binding upon the customer.[283]    This language was standard in all BLMIS customer agreements.[284]  The account statements at issue here indicate *on their face* that PW Transactions occurred and resulted in deductions to the account balances.[285]  Thus, if Participating Claimants did not in fact receive the profit withdrawal checks, the binding language in their customer agreements made it incumbent upon them to object upon receipt of their customer statements, which they failed to do.

### B.    Participating Claimants Have Offered no Basis to Challenge the Trustee's Determination of their Net Equity in the BLMIS Estate

#### 1.    Participating Claimaints Bear the Burden of Proof to Establish Their Net Equity Claims Against the BLMIS Estate

As the Trustee noted in his opening brief, it is the customer's burden to establish a net equity claim.[286]  Section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001 do not apply in SIPA proceedings with regard to customer claims because SIPA has its own unique claims objections and allowance process that supplants the traditional structure in the Bankruptcy Code and Rules.

Instead, in a SIPA proceeding, a claimant seeking a customer claim must establish his customer status and that he is owed a customer claim.[287]  While the Trustee must review the

---

[283] *See* Trustee Ex. 44 at AMF00154153; Brown Decl. Ex. PW-18 ("Trustee Ex. 17") at MADTBB02386394.

[284] *See generally* Madoff Tr. 103:4-104:5; Madoff Tr.104:24-105:5 ("Q. Mr. Madoff, is that paragraph form language in the customer agreement that was used by BLMIS? A. Uh-huh. Yes. Q. Okay, And does that paragraph require a customer to object to a transaction in their account? A. Yes.").

[285] *See, e.g.,* Trustee Exs. 69, 71.

[286] See Opening Br. at 22-26.

[287] *See SIPC v. I.E.S. Mgmt. Grp., Inc.*, 612 F. Supp. 1172, 1177 (D.N.J. 1985); *Lopez v. Zaremba*, No. 3:08CV01132, 2009 WL 36617, at *4 (N.D. Ohio Jan. 5, 2005) ("If a claimant can establish status as a customer *and the amount owed by the debtor*, the SIPA trustee discharges the debtor broker-dealer's obligations to such customer") (emphasis added)).

debtor's books and records or otherwise ascertain customer claims,[288] the burden of proving

entitlement to net equity claims falls to the customers themselves.  SIPA is consistent with the

Bankruptcy Code in that a claimant seeking preferred status—like customer status under SIPA—

bears the burden of showing that he is within the class of eligible persons and that his

transactions are protected by SIPA.[289]  Further, the Participating Claimants filed SIPA customer

claims asserting their rights to the amounts shown on their customer statement.[290]  SIPA

customer claims are not formal "proofs of claim" filed with the bankruptcy court, but instead are

simple "written statements of claim."[291] These written statements are not *prima facie* evidence of

anything.[292]  Even under typical bankruptcy rules, if a claim is not *prima facie* valid, the

claimant must establish validity of the claim.[293]

Even if this Court were to disregard, however, the burdens of proof applicable in SIPA

proceedings and the general rules on claimants seeking preferred status in bankruptcies, the

---

[288] *SEC v. Goren*, 206 F. Supp. 2d 344, 349 (E.D.N.Y. 2002), *aff'd in part, vacated in part, remanded sub nom. In re New Times Sec. Servs., Inc.*, 371 F.3d 68 (2d Cir. 2004).

[289] *See SIPC v. Stratton Oakmont, Inc.*, 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999) ("Just as all creditors in a bankruptcy case who claim priority status have the burden of showing that they are entitled to the asserted priority under the Bankruptcy Code, the Claimants bear the burden of proving that they are the type of priority creditors known as 'customers . . . .'"); *Zaremba*, 2009 WL 36617, at *4.

[290] The Second Circuit has held that the last BLMIS customer statement is not a sufficient basis to establish a claim on the part of the Participating Claimants Claimants.  *Net Equity Decision*, 654 F.3d at 238, 240.

[291] *See* SIPA § 78fff-2(a)(2); *Goren*, 206 F. Supp. 2d at 349  ("Customers of failed broker-dealers placed in liquidation proceedings must file written claim statements in order to receive compensation for amounts lost due to broker-dealer failure, but need not file formal proofs of claim.").

[292] The Second Circuit has held that the last BLMIS customer statement is not a sufficient basis to establish a net equity claim in those amounts.  *Net Equity Decision*, 654 F.3d at 238, 240.  *See also Camp v. Morey (In re Gov't Sec. Corp.)*, 107 B.R. 1012, 1023 (S.D. Fla. 1989) ("In a SIPA liquidation, a claim is filed with the trustee and not, as in ordinary bankruptcy, with the clerk of the court.  Unlike the procedures in straight bankruptcy, a SIPA trustee reviews the claim and makes a determination.  If the claim is denied, the claimant may object, and the trustee will obtain a hearing before the bankruptcy court on the objection.  The court then considers the correctness of the trustee's determination of the claim.  However, at no point prior to that time will the court have the opportunity to consider the claim.").

[293] *In re Lehman Bros. Holdings Inc.*, No. 08-13555 JMP, 2010 WL 4818173, at *3 (Bankr. S.D.N.Y. Nov. 10, 2010) ("Here, because the claim is not *prima facie* valid, Mr. Kuntz as claimant must establish the validity of the claim."); *In re Chain*, 255 B.R. 278, 281 (Bankr. D. Conn. 2000) ("Because RSW's proof of claim did not set forth sufficient factual allegations to support its claim, it is not entitled to the presumption of prima facie validity, and RSW bears the burdens of going forward, as well as that of proving its claim by a preponderance of the evidence.").

outcome remains the same: in an ordinary bankruptcy dispute, a claimant bears the burden of proving his or her claim.[294] "[T]he burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it."[295]

Should this Court, applying the Bankruptcy Code, find that the *prima facie* burden has shifted to the Trustee, he need only show facts sufficient to demonstrate that an actual dispute exists regarding the validity or amount of the claim.[296]   The Trustee provided claims determinations to the Participating Claimants setting forth his net equity determination for each respective BLMIS account.[297]   He has supported this determination with his extensive reconciliation analysis and a review of the BLMIS books and records, all of which point to treating PW Transactions as debits in the Net Investment Method.   His treatment of PW Transactions was also affirmed by the testimony of BLMIS employees.[298]   The Trustee has more than met his *prima facie* burden to refute the claims of Participating Claimants.

---

[294] The burden of proof includes both the burden of persuasion and burden of production.  *Burden of Proof*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Francolino v. Kuhlman*, 224 F. Supp. 2d 615, 627 (S.D.N.Y. 2002) (quoting same).  The party bearing the burden of production has the burden of going forward with the evidence while the party bearing the burden of persuasion "stands to lose if his evidence fails to convince the jury – or the judge in a nonjury trial." *Burden of Proof*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[295] *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21 (2000) (considering burden of proof of claimants in a bankruptcy proceeding); *see* COLLIER ON BANKRUPTCY ¶ 502.02 (16th ed. 2016) ("COLLIER ON BANKRUPTCY") (quoting same).

[296] *In re Aiolova*, No. 11-10503 (BRL), 2013 WL 5818893, at *2 (S.D.N.Y. Oct. 29, 2013) ("[T]he objecting party must come forward with evidence of equal or greater value than that provided by the creditor in conjunction with the proof of claim."); *In re Adelphia Commc'ns Corp.*, No. 02-41729(REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Williams*, No. 92–50546, 1994 WL 329328, at *2 (Bankr. S.D. Ga. Mar. 30, 1994).

[297] *See, e.g.,* Blecker Claim Objection at Attachment B (Notice of the Trustee's Determination of Claim No. 3907 (Oct. 19, 2009)).

[298] *In re St. Johnsbury Trucking Co.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997) ("Any party objecting to the claim has the burden of putting forth evidence sufficient to negate the prima facie validity of the claim by refuting one or more of the facts in the filed claim.  Once this occurs, however, the ultimate burden of persuasion undoubtedly remains upon the claimant.  The claimant must prove the claim, not sit back while the objector attempts to disprove it." (internal citations omitted)); *In re Aiolova*, 2013 WL 5818893, at *2 ("The ultimate burden of persuasion rests with the claimant."); *see Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000) ("Once the presumption is overcome, the ultimate burden to establish the validity of a claim is placed on the creditor.").

As soon as the objector has met his *prima facie* burden with evidence in opposition to the claim, the ultimate burden rests with the claimant, as "[t]he holder of the claim bears the risk of nonpersuasion and the ultimate burden of proof respecting the allowance of claim."[299] Thus, the Participating Claimants bear the ultimate burden of proving they are entitled to their claims by a preponderance of the evidence.[300]

### 2.    Participating Claimants Have Not Raised Any Legally Sufficient Challenge to their Individual Claims Determinations

Whether the Participating Claimants' burden is to establish their net equity claim or rebut the Trustee's determination of their individual net equity claims, they have not met it. Participating Claimants cannot carry any burden by merely pointing to their own self-serving testimony. Although Blecker claims that he did not receive profit withdrawal checks and the Blums claim that they understand that their mother and father did not receive profit withdrawal checks, they have produced no bank records, no tax returns, or any other documents to support these claims. Self-serving testimony that has not been corroborated cannot substantiate a SIPA claim.[301]

Moreover, their testimony conflicts with all of the other evidence collected in this matter, including contemporaneous documentary records and testimony from former BLMIS employees. Given the fact that their testimony is entirely uncorroborated by any other evidence, the

---

[299] COLLIER ON BANKRUPTCY ¶ 501.02.

[300] *Adelphia Commc'ns Corp.*, 2007 WL 601452, at *5  ("Once an objectant offers sufficient evidence to overcome the prima facie validity of the claim, the claimant is required to meet the usual burden of proof to establish the validity of the claim." (quoting *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000))); *see also* COLLIER ON BANKRUPTCY ¶ 502.02.

[301] *SIPC v. Cont'l Capital Inv. Servs., Inc. (In re Cont'l Capital Inv. Servs., Inc.)*, No. 03-3370, 2008 WL 4533665, at *4 (Bankr. N.D. Ohio Oct. 1, 2008) (holding no issue of fact existed on customer status where claimant contended that the debtor made representations that account was maintained in claimant's name but failed to provide any corroborating evidence); *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 496 B.R. 713, 721 (Bankr. S.D.N.Y. 2013), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, No. 13 Civ. 4332(ALC), 2014 WL 1302660 (S.D.N.Y. Mar. 31, 2014) (rejecting "self-serving" affidavits and noting that claimants failed to produce tax returns, dividend statements, or any other documents that evidence their investment).

Participating Claimants' self-interest must be evaluated by this Court. A recent case in the Southern District of New York doubted the candor a self-interested witness could provide, noting that "self-interest creates such a powerful incentive to shade the truth that it is unusual for an interested witness to be totally candid."[302] Where a party's own self-serving oral testimony conflicts with ample documentary evidence, it should be afforded even less weight.[303]

Whether this Court applies SIPA or elects to apply the burden shifting rules outlined in the Bankruptcy Code, the ultimate burden rests with Participating Claimants to prove by a preponderance of the evidence that they are in fact entitled to their claims.[304] The burden is not on the Trustee to negate the claims of the Participating Claimants.

## IV.    Specific Issues Relating to Witnesses

### A.    <u>Blecker's Self-Serving Testimony is an Insufficient Basis to Challenge the Trustee's Determination, Particularly Without Meaningful Opportunity to Cross-Examine</u>

For the reasons discussed above, a claimant's uncorroborated self-serving testimony cannot be sufficient to challenge the application to him of the Trustee's net equity calculation.

---

[302] *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d 497, 499 (S.D.N.Y. 2010) (internal quotation marks omitted).

[303] *Estate of Sheppard ex rel. Sheppard v. Sec'y of Dep't of Health & Human Servs.*, No. 04-112V, 2007 WL 5160383, at *10 (Ct. Cl. Aug. 7, 2007); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948) ("Where such testimony is in conflict with contemporaneous documents we can give it little weight . . . ."); *see also BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013) ("[W]here the uncontroverted record clearly supports a [particular] finding, then plaintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact" (internal quotation marks omitted) (quoting *Dzanoucakis v. Chase Manhattan Bank, USA*, No. 06-CV-5673(JFB)(ARL), 2009 WL 910691, at *8 (E.D.N.Y. Mar. 31, 2009))); *see also Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 82 (Bankr. E.D.N.Y. 2007) ("Where purported loans are not supported [by] valid writings to confirm the existence of such debt, and the record as a whole does not support the existence of such debt, oral testimony alone can be insufficient to support a finding that such loans were made.").

[304] *Best Payphones, Inc. v. Verizon N.Y., Inc.* (*In re Best Payphones, Inc.*), No. 01-B-15472(SMB), 2006 WL 647618, at *4 (S.D.N.Y. Mar. 14, 2006) ("[I]t is clearly established law that the Rule 3001(f) presumption governs only the burden of production, and that the ultimate burden of proving the claim by a preponderance of the evidence remains with the claimant.").

Moreover, Mr. Blecker's testimony here is inadequate for the additional reason that his deposition did not permit the Trustee the opportunity to cross-examine him.

Blecker testified in a deposition, taken by his own counsel, that he did not receive PW Transactions. This deposition was taken in July 2014 immediately following a hearing before this Court on a separate litigation, at which this Court suggested Blecker's testimony be preserved. The deposition occurred almost a year prior to the commencement of the profit withdrawal litigation[305] and well before the time period for disclosure of any documents or expert opinions on PW Transactions. Because the deposition was taken on short notice to preserve his testimony and no documents had yet been produced, the Trustee's counsel explicitly reserved the right to cross-examine Blecker at a later date.[306] The Trustee's later request to depose Blecker was denied.

Cross-examination is one of the fundamental "devices for ensuring the accuracy" of witness testimony.[307] "Cross-examination clarifies the witness's perception, memory, and narration. It can expose gaps, contradictions, and inaccuracies in his or her testimony, as well as flaws in observation or comprehension."[308] Determining the strength of a witness's memory is a classic subject for cross-examination, and particular latitude is afforded to cross-examining witnesses advanced in age "since extremes of age are known to affect the accuracy of a person's

---

[305] *See* Amended Motion for Order Establishing a Schedule for Limited Discovery and Briefing on Profit Withdrawal Issue, May 19, 2015 (ECF No. 10017).

[306] Blecker Tr. 13:8-12.

[307] *United States v. Al-Moayad*, 545 F.3d 139, 169 (2d Cir. 2008) (alterations omitted) (quoting 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 802.02[3] (Joseph M. McLaughlin ed., 2d ed. 2008) ("WEINSTEIN'S FEDERAL EVIDENCE")).

[308] WEINSTEIN'S FEDERAL EVIDENCE § 802.02[2][c] (16th ed. 2013).

recollections."[309]    The Trustee was unable to ascertain the strength of Blecker's memory regarding PW Transactions that appeared on his customer statements between twenty and thirty-five years ago.   The Trustee was also unable to ascertain why Blecker did not object to the transactions at the time even though such transactions appeared on his customer statements.

Blecker's testimony is also internally inconsistent, which would have been tested on cross-examination.   Blecker's statement that he saw his BLMIS account balances going up over time[310] would have been challenged with his statements showing that no profits accrued in Blecker's accounts for over fifteen years.[311]    Blecker claimed to have statements from 1995 showing PW Transactions in his possession,[312] yet in discovery, he produced nothing. Likewise, at his deposition, he claimed that had a schedule of his BLMIS transactions showing stocks bought and sold, profits, and dividends reported.[313]    When the Trustee asked for these schedules in discovery, Blecker said he did not have them.   Without the opportunity to cross-examine Mr. Blecker on his contradictory statements or his memory, his deposition testimony is akin to hearsay and should be disregarded.[314]    At the very least, Blecker's unexamined testimony should

---

[309] *Id.* § 607.05[2].   Courts permit wide latitude to cross-examine a witness regarding capacity even in a non-jury trial, particularly concerning memory.  *Id.* ("Courts should allow counsel particular latitude in cross-examining very young or very old witnesses since extremes of age are known to affect the accuracy of a person's recollections.").

[310] Blecker Tr. 7:3-21, 13:15-14:12 (referring to his contemporaneous review of BLMIS account statements); Blecker Claim Objection at 4..

[311] Greenblatt Second Supplemental Rpt. Section VI; *see also* Trustee Ex. 70-72; Bongiorno Tr. 107-118 (describing evidence of PW Transactions being sent to Mr. Blecker).

[312]*See* Blecker Claim Objection at 4 ("Recently I did find statements from 1995…These statements did note entries for the checks in question."); Mr. Blecker also failed to produce tax schedules regarding his BLMIS statements after referring to these schedules in his 2014 deposition.

[313] *See* Blecker Tr. 7:22-8:9 ("All the profits that Madoff earned for me I reported it in my tax return showing I – I made up a schedule of transactions, stocks bought and sold and showing profit from the stocks plus the reporting dividend income that I received on those securities and that was reported each year.").

[314] *See, e.g.*, *United States v. Frank*, 520 F. 2d 1287, 1292 (2d Cir. 1975) ("[B]y virtue of Allen's refusing to answer (for whatever reason) proper, relevant questions on cross-examination going directly to the heart of his testimony on direct examination, the direct testimony became hearsay, since not subject to cross-examination, and was therefore properly struck.").

carry even less weight because it conflicts with contemporaneous documents from BLMIS books and records.[315]

### B.   The Blums' Speculation About Their Parents' Mindset Is Inadmissible

The Blums' testimony offered in support of their claim that their late parents did not receive PW Transactions should be disregarded by this Court.   The Blums have no personal knowledge regarding the PW Transactions that occurred in the accounts of their parents and therefore consists of inadmissible speculation and lay opinion.

In their declarations, the Blums claimed to be "personally familiar" with their mother's and father's BLMIS accounts and "fully familiar" with how their father Morris "administered his Madoff Securities Accounts."[316]  They testified differently at their depositions.[317]  Joel Blum did not know whether his father received any checks from BLMIS in connection with his parents' investments and Norman Blum admitted to only very limited knowledge.[318]  For example, when shown a letter written by his father requesting "distributions" from his BLMIS accounts, Joel Blum testified that he did not know his father requested distributions from his accounts.[319]

The Blums claim that they acted as co-trustees on the accounts in receipt of PW Transactions.  But Joel admitted at his deposition that he did so for "a couple of months" after his father passed away in 2002—well after the PW Transactions last occurred in 1997.[320]  The

---

[315] See, e.g., Trustee Exs. 36-45; Fed. Trade Comm'n v. Whole Foods Mkt., Inc., 502 F. Supp. 2d 1, 4 n.4 (D.D.C. 2007), rev'd on other grounds, 548 F.3d 1028 (D.C. Cir. 2008) ("The Court agrees with plaintiff that these declarations, prepared for the purpose of litigation by defendants, should be viewed with caution and should be given less probative force than depositions taken of the same persons who were then subject to cross-examination. Such declarations are entitled to little weight to the extent they are 'in conflict with contemporaneous documents.'" (quoting U.S. Gypsum Co., 333 U.S. at 396)).

[316] Trustee Ex. 1 (N. Blum Decl.) ¶5; Trustee Ex. 14 (J. Blum Decl.) ¶¶ 3-4.

[317] See Section III.H.2, supra.

[318] J. Blum Tr. 51:13-16, 53:18-21, 53:11-17; N. Blum Tr. 55:19-23.

[319] J. Blum Tr. 58:2-59:5; see Trustee Ex. 18 at AMF00156427.

[320] J. Blum Tr. 54:15-57:10, 59:9-61:4.

Blums professed no familiarity with Morris Blum's banking practices, nor did they receive or review his father's bank statements.[321]

Testimony should at all times be based on the personal knowledge of the witness.[322]  In lieu of personal knowledge, the Blums offer up their opinions as to why their father would not have received profit checks.  For example, Joel Blum testified:

> *To me*, having these huge amount of profit withdrawal checks, it was just not – it was chaotic to do something like that.  It's just – I can't imagine that my father would ever have chosen that as a course of action to just have checks coming in all the time.  *So it didn't make any sense to me.*[323]

Similarly, at Norman Blum's deposition, he admitted that he is unable to "prove" his father did not receive profit withdrawals, rather relying on the fact that he "just knows [his] father" and this is not something he would have done.[324]

The opinions offered by the Blums are mere speculation about what they "imagine" their father would want to do with his finances.[325]  Lay witnesses are not competent to testify as to what someone else's state of mind was.[326]  Lay opinion testimony is permitted only when it is "rationally based on the witnesses perception" and is "helpful to . . . determining a fact in

---

[321] J. Blum Tr. 65:20-66:10; 67:11-19; N. Blum Tr. 51:5-9; 51:16-52:5; 74:7-19.

[322] "A witness should normally limit testimony to observed facts, refraining from giving opinions or drawing inferences to the extent possible."  VICTOR JAMES GOLD, 27 FED. PRAC. & PROC. EVID. § 6022 (2d ed. 2016).

[323] J. Blum Tr. 74:4-75:11, 77:22-78:2 ("I just can't imagine that [my father] would have done it that way….*He would have wanted to know that it* [BLMIS withdrawals] *was coming in an orderly fashion*.")

[324] N. Blum Tr. 83:6-25, 89:3-10.

[325] *See, e.g.*, *Hester v. BIC Corp*., 225 F.3d 178, 184-85 (2d Cir. 2000) (ruling testimony inadmissible where it was no more than "naked speculation"); *see also* WEINSTEIN'S FEDERAL EVIDENCE § 701.03.

[326] *See United States v. Subeh*, No. 04-CR-6077T, 2006 WL 1875407, at *4-5 (W.D.N.Y. July 5, 2006) ("[B]ecause Subeh could only speculate as to his brother's intentions, if the question had been asked of him as a witness during a trial in a court of law, Subeh would not have been allowed to answer because he is not competent to testify as to what someone else's state of mind was.").

issue."[327]   The Blums' testimony is based on speculation and lacks a factual basis for their understanding, years later, that their father would not have wanted to receive profit withdrawals.

Even if the Blums could establish a reasonable basis for their understanding of Morris Blum's intentions for his BLMIS accounts, "the likely benefits of lay opinion testimony must outweigh its costs" and "the costs of lay opinion testimony increase and the benefits diminish the closer the opinion approaches the crucial issues in the case."[328]   The Blums offer their opinion testimony on the central issue of whether their parents received profit withdrawal checks without any basis for their opinions.  The Blums' testimony should not be considered by this Court.

## C.   Madoff's Testimony Provides No Basis to Challenge the Trustee's Determination

Adducing no other support for their claims other than their own self-serving testimony, Participating Claimants turn to Bernard Madoff—the mastermind of the Ponzi scheme—to bolster their evolving theories about PW Transactions.  However, Madoff testified that he was not involved in day-to-day account-related activities and could not testify knowledgably about BLMIS's books and records; to the extent he demonstrated knowledge of the PW Transactions at all, he confirmed that they were checks sent to customers.  In any event, to the extent Madoff's testimony is not corroborated by other witnesses or documentary evidence, it cannot be credited given his criminal history.

Although Madoff testified that he was in charge of BLMIS,[329] he admitted he did not create or maintain any of the books and records at issue in this Motion.[330]   To the contrary,

---

[327] Fed. R. Evid. 701.

[328] *Hester*, 225 F.3d at 182 (alterations and internal quotation marks omitted); *see also Subeh*, 2006 WL 1875407, at *6; *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) (offering lay opinion testimony on ultimate issue "will often not be 'helpful' within the meaning of Rule 701 because the [fact-finder] will be in as good a position as the witness to draw the inference").

[329] Madoff Tr. 69:3-23.

Madoff testified that DiPascali was in charge of the 17th Floor and was responsible for "pretty much everything relating to customers"[331] and that Bongiorno was responsible for the convertible arbitrage accounts.[332] Madoff's role with respect to the daily operation of the investment advisory business was limited to answering DiPascali's questions.[333] Madoff was not responsible for opening customer accounts and could not recall which BLMIS employees would have performed that function.[334] Madoff did not regularly review customer correspondence or customer files and indicated that DiPascali and Bongiorno had the authority to speak with customers on the telephone and address customer inquiries that arose.[335] Further, Madoff was unfamiliar with account-opening paperwork and in fact testified that he had never seen the Name/Address Forms used when customer accounts were opened.[336] Madoff's distance from the routine aspects of the investment advisory business—particularly as it relates to the BLMIS books and records—renders his testimony virtually worthless from an evidentiary standpoint. In fact, Madoff admitted that Bongiorno would be more knowledgeable with respect to the issues implicated by this Motion.[337]

Even with this distance from quotidian customer issues, Madoff's testimony supported the Trustee's determination to treat PW Transactions as debits. He stated that, contrary to assertions made by the Participating Claimants, BLMIS would take instructions from customers

---

[330] *Id.* at 11:10-25.

[331] *Id.* at 72:3-5, 71: 12-19.

[332] *Id.* at 75:7-12.

[333] *Id.* at 84:24-85:5.

[334] *Id.* at 78:25-79:18.

[335] *Id.* at 80:20-82:15.

[336] *Id.* at 101:21-103:1.

[337] *Id.* at 101:8-11, 107:7-22 (testifying that operations department would have changed Mr. Blecker's account from a reinvest to send account or vice versa).

over the phone.[338]  Madoff further deduced that the "S" or "R" notations on the Name/Address

Form represented the customer's choice on whether they wished to receive the profits generated

in the account.[339]  And, in reviewing the July 1986 customer statement for Blecker's Account

100215,[340] Madoff identified a PW Transaction for $7,000 and confirmed that the transaction

reduced the balance of the account.  When asked by counsel for Participating Claimants, Madoff

confirmed that the "PW" code on a customer statement indicated that a check was issued to the

Bleckers:

> Q.     So   that   check   was   --   was   sent   to   whom?
> A.     It would have been sent to the Bleckers.[341]

Faced with this testimony, Participating Claimants are forced to abandon several of their

theories regarding PW Transactions—for example, they could not find support, even from a

world-class liar, for their position that PW Transactions were checks sent to companies to

purchase securities.   Madoff made a single statement in favor of Participating Claimants'

position:  he stated, in response to his counsel's question about a specific withdrawal (that she

erroneously identified as the first PW Transaction in the relevant account), that Blecker would

have to have sent a letter to BLMIS to receive those profit withdrawals.[342]  This statement, as it

relates to profit withdrawals, is inconsistent with the books and records of BLMIS and is

contradicted by the testimony of both Bongiorno and Sala.[343]  Sala and Bongiorno confirmed

that if a customer elected at the time an account was opened to have profits sent, no written

---

[338] *Id.* at 35:9-15.

[339] *Id.* at 102:19-24.

[340] Account was later renumbered 1B0023 by BLMIS.  Madoff Tr. 34:2-10; Brown Decl. Ex. PW-62 ("Madoff Ex. 6").

[341] Madoff Tr. 34:13-14.

[342] *Id.* at 34:15-20. To the contrary, PW Transactions occurred in this account for years prior to the statement Ms. Chaitman provided to Madoff.

[343] *Id.*; *see* Greenblatt Supplemental PW Rpt. Ex. 14 Account 1B0023.

request was needed to receive profits at the conclusion of each transaction.[344] However, Madoff's testimony is consistent with BLMIS's treatment of capital withdrawals as confirmed by both Bongiorno and Sala.[345] When a customer wanted to make a one-time withdrawal of capital, a written request was required.[346]

Assuming for the moment that Madoff were an otherwise truthful witness, his lack of familiarity with the day to day account management strips this statement of any force. Madoff could have been confusing profit withdrawals with capital withdrawals, which required a written request. (Although, as Madoff testified, if the customer wished to receive capital withdrawals on a quarterly basis, they would not need to send a specific request each quarter, it would be sufficient to make the request once).[347] Because he testified to no involvement in setting up the accounts he may not have been aware of the practice of indicating whether an account was to be a "Send" account or a "Reinvest" account. Or perhaps he may have been thinking about the last 10 years of BLMIS's operations after the phasing out of the arbitrage accounts, when the employees in charge of these issues testified that requests did need to be made in the manner he described. After all, as he testified, "my mind is not as clear as it should be."[348]

By contrast, those responsible for the PW Transactions independently testified to specific and credible answers that directly contradict that one particular statement of Madoff's, and Participating Claimants' position. Bongiorno and Sala testified in detail to relevant processes, and their testimony was consistent with the BLMIS documents and the testimony of the other BLMIS employees and of Mr. Schwartz.

---

[344] Bongiorno Tr. 193:2-7.

[345] Sala Tr. 55:4-56:9.

[346] *Id.*

[347] Madoff Tr. 36:1-15.

[348] *Id* at 107:3-5.

At best, the totality of Madoff's testimony is equivocal for the Participating Claimants: the vast majority of Madoff's testimony supports the Trustee's position regarding PW Transactions and the limited inconsistency is directly contrary to testimony of other BLMIS employees who had more direct dealings with PW Transactions.

In any case, a single statement by Madoff that is contradicted by other BLMIS employees and by all available documentary evidence, cannot satisfy even the most minimal evidentiary burden. This Court has already recognized that "given that he is a convicted fraudster, Madoff's testimony likely lacks credibility."[349]   In rejecting efforts by other claimants to rely upon Madoff's testimony, this Court found that Madoff's testimony could not possibly satisfy either the Trustee or the Court because the testimony was "not otherwise substantiated by documentary evidence of any kind." *Id.* The same is true here.

Madoff's own description of his crimes in his guilty plea shed great doubt on his ability to testify truthfully, even under oath. Madoff stated that he was aware at all times that his conduct was wrong—indeed, that it was criminal.[350]   Nonetheless, he repeatedly lied to clients.[351] He filed false and misleading audit reports and financial statements with the SEC.[352] He risked penalty of perjury by intentionally and falsely certifying that BLMIS had custody of his clients' securities when he did not.[353]   He knowingly created and sent customer account statements reflecting bogus transactions.[354]

---

[349] *SIPC v. BLMIS*, 496 B.R. at 723 (citing FED. R. EVID. 609(a)(2)) (denying request to compel Madoff to testify because there would be "little, if any, probative value" to his testimony).

[350] Brown Decl. Ex. PW-73 ("Madoff Allocution Tr.") 23:20-21.

[351] *Id.* at 32:18- 22.

[352] *Id.* at 27:23-28:5.

[353] *Id.* at 28: 14-17.

[354] *Id.* at 27:9-16.

Testifying under oath does not stop Madoff from dissembling. In his allocution, Madoff admitted that:

> [W]hen the United States Securities and Exchange Commission asked me to testify as part of an investigation they were conducting about my investment advisory business, I knowingly gave false testimony under oath to the staff of the SEC.[355]

Because Madoff's ability to testify truthfully is in serious doubt, his uncorroborated (and indeed, contradicted) statement should be given little or no weight by this Court.[356] It certainly does not constitute evidence sufficient to suggest that the Trustee improperly relied on the books and records of BLMIS to determine the net equity claims of Participating Claimants.

### D.    Bongiorno's Testimony Poses No Credibility Issues

Recognizing how harmful Bongiorno's testimony is to their efforts to prove their claims that they did not receive profit withdrawal checks, Participating Claimants will likely seek to tarnish Bongiorno's credibility in two ways: pointing to her criminal conviction and to her settlement. But neither fact diminishes the testimony provided by Bongiorno, in light of her detailed and corroborated testimony.[357]

---

[355] *Id.* at 26:21-25.

[356] *SEC v. Milligan*, No. 99-CV-7357 (NG)(VVP), 2009 WL 1162633, at *2 (E.D.N.Y. Apr. 29, 2009), *aff'd*, 436 F. App'x 1 (2d Cir. 2011) (concluding that convicted fraudster who lied under oath "has no difficulty testifying in a manner consistent with his own self-interest, as he perceives it, regardless of what the truth might be, and that his testimony therefore cannot be believed absent substantial corroboration"); *see also SEC v. Scott*, 565 F. Supp. 1513, 1531 (S.D.N.Y. 1983) (refusing to credit statements of "inveterate liar and convicted con artist"); *Mejia v. City of N.Y.*, 119 F. Supp. 2d 232, 260 (E.D.N.Y. 2000) ("[A] witness's disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion . . . ." (internal quotation marks omitted) (quoting *United States v. Weinstein*, 452 F.2d 704, 713 (2d Cir. 1971) (Friendly, J.))).

[357] *United States v. Hamilton*, 334 F.3d 170, 186-87 (2d Cir. 2003) ("[A]ny question as to the veracity of the recorded statements and the credibility of the [witness] goes to the evidence's weight rather than to its admissibility."); *see also United States v. Memoli*, No. 3:13-CR-214 (VLB), 2014 WL 5313707, at *10 (D. Conn. Oct. 16, 2014) ("[T]he reliability of a witness goes to the weight of evidence, not its admissibility, and the determination of [the witness]'s credibility is the proper realm of the [fact-finder].").

Unlike Madoff's testimony, Bongiorno's description of PW Transactions is completely consistent with BLMIS's books and records and was corroborated by Sala and the other BLMIS employees. It is telling that the two people who worked most closely with the arbitrage accounts generally and PW Transactions specifically—Bongiorno and Sala—independently provided identical testimony. Sala was not charged with or convicted of any crime in connection with her role at BLMIS. Likewise, Bongiorno's testimony was consistent with the other BLMIS employees, Khan, Leung, and Jackson, none of whom were charged criminally in connection with Madoff's scheme.

Indeed, in all but one area, Bongiorno's testimony is even consistent with that of Madoff's. Their one area of dispute concerns whether written requests to receive profits were necessary. Bongiorno testified that a written request for profits was not required; Madoff stated it was.[358] On cross-examination, when informed of Madoff's testimony on this point, Bongiorno stated "I'd say he made a mistake."[359] As discussed above, it is more likely that Madoff was conflating profit withdrawals than capital withdrawals, a point that Bongiorno and the other witnesses were more than clear on.[360]

Bongiorno's conviction of securities fraud should not diminish her credibility.[361] After presiding over her five-month trial,[362] Judge Laura Taylor Swain noted that Bongiorno was "not fundamentally corrupt."[363] Judge Swain found at her sentencing that:

---

[358] Bongiorno Tr. 193:2-7; Madoff Tr. 34:13-20.

[359] Bongiorno Tr. 195:10-13.

[360] *See* n. 91, *supra.*

[361] *See United States v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005) (Sotomayor, J.) ("[I]t is the [fact-finder]'s function to assess the probative value of a witness's specific conviction or convictions as part of its overall evaluation of the witness's credibility.").

[362] Significantly, Bongiorno's testimony was also corroborated by other former BLMIS employee witnesses and contemporaneous documents. *See United States v. Feng Ling Liu*, No. 12-CR-934-01 (RA), 2015 WL 4460898, at *5, *10 (S.D.N.Y. July 20, 2015) (upholding conviction of criminal enterprise "leader," finding her lower-level

> Ms. Bongiorno was not a mastermind or architect of the Ponzi scheme, the fraudulent IA structure, or the Avellino & Bienes rewrite. She followed instructions and implemented formulae and chose to work hard to please Madoff, whom she admired.[364]

As such, Bongiorno can hardly be compared to Madoff himself, the mastermind of the Ponzi scheme. In fact, Judge Swain explicitly noted that Bongiorno "is not the corrupt institution Madoff Securities, nor clearly is she Bernard Madoff."[365] Courts have found that the "gravity of an offense may bear on truthfulness, to the extent that more serious offenses indicate a stronger willingness to ignore the law.[366] As compared to the 150-year sentence imposed upon Madoff, Bongiorno was sentenced to only six years in prison.[367]

Nor should the fact of the global settlement among the United States, the Trustee, Bongiorno and her husband, Rudy Bongiorno, diminish the credible nature of Bongiorno's testimony on profit withdrawals. The settlement was the result of long and complex negotiations between the Trustee, the United States, counsel for Bongiorno, and counsel for Bongiorno's husband that resulted in substantial forfeitures to the United States, payments to the Trustee on his avoidance claims, and a cooperation agreement.[368] Cooperation provisions are common in settlement agreements and, on balance, may have a positive effect on witness credibility because

---

employees' testimony against her credible and corroborated by record evidence, notwithstanding accusations during trial that witnesses were "liars" and committed fraud for years while working for kingpin).

[363] Brown Decl. Ex. PW-74 ("Bongiorno Sentencing Tr.") 58:13-14. Judge Swain found credible certain testimony provided by Bongiorno in her self-defense and decided that Bongiorno had not perjured herself at trial, despite the Government's argument to the contrary. Bongiorno Sentencing Tr. 48:17-23, 16:13-18:4.

[364] *Id.* at 60:8-12.

[365] *Id.* at 57:20-22.

[366] *See Estrada*, 430 F.3d at 618 (citing CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE § 6.31 (2d ed. 1999)).

[367] The six year sentence imposed upon Bongiorno was a downward departure from the sentence suggested by Bongiorno's own counsel. Bongiorno Sentencing Tr. 65:1-3.

[368] In that global settlement, and Bongiorno agreed to cooperate with the Trustee by provide "truthful and complete testimony by declaration, at deposition, or at trial. Brown Decl. PW-75 ("Forfeiture Order") ¶ 24. Bongiorno testified during cross examination that she agreed to cooperate on the profit withdrawal matter in order "[t]o give my honest answer to both of you, all of you." Bongiorno Tr. 192:5-13.

the witness promises to testify truthfully.[369]    On these facts, there is no principled basis to suggest that the Trustee "paid" for Bongiorno's testimony.   Ms. Bongiorno's vast personal knowledge on PW Transactions, as corroborated by other employee testimony and the books and records of BLMIS, outweigh any credibility concerns regarding her conviction and settlement.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests the Court affirm the Trustee's treatment of PW Transactions and overrule the objections thereto.

Dated:  New York, New York
       August 12, 2016

Respectfully submitted,

*/s/ Seanna R. Brown*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Amanda E. Fein
Email: afein@bakerlaw.com

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Estate of Bernard L.*
*Madoff*

---

[369] *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 85-86 (2d Cir. 2014) (quoting *United States v. Edwards*, 631 F.2d 1049, 1052 (2d Cir. 1980)); *United States v. Milken*, 759 F. Supp. 109, 112 (S.D.N.Y. 1990) ("Although the existence of [cooperation] agreements is relevant to assessing Mr. Peizer's credibility, it is only one fact the court must weigh along with others.").