# EXHIBIT H

*** CONFIDENTIAL ***

Page 1

1        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK

2

    ----------------------------------X
3                                     :

    SECURITIES INVESTOR PROTECTION     :
4    CORPORATION,                       :
                                       :
5                Plaintiff-Applicant,   :
                                       :
6        -vs-                          :  08-01789 (SMB)
                                       :
7    BERNARD L. MADOFF INVESTMENT       :
     SECURITIES, LLC,                   :
8                                      :
                 Defendant.            :
9                                      :
    ----------------------------------X
10                                     :

    In re:                             :
11                                     :

    BERNARD L. MADOFF,                 :
12                                     :
                 Debtor.               :
13                                     :
    ----------------------------------X
14

15                *** CONFIDENTIAL ***
16          DEPOSITION OF BERNARD L. MADOFF
17

                  (Taken by the Customers)
18

                  Butner, North Carolina
19

                    June 15, 2016
20

21

22

23

24   Reported by:  Lisa A. DeGroat, RPR
                   Notary Public

25

*** CONFIDENTIAL ***

Page 2

1                    A P P E A R A N C E S
2

    For the Customers:
3

    HELEN DAVIS CHAITMAN, Esq.
4    GREGORY M. DEXTER, Esq.
    Chaitman, L.L.P.
5    465 Park Avenue
    New York, New York  10022
6    (908) 303-4568
    hchaitman@chaitmanllp.com
7

8    For the Trustee:
9    SEANNA R. BROWN, Esq.
    AMY VANDERWAL, Esq.
10    Baker & Hostetler, L.L.P.
    45 Rockefeller Plaza
11    New York, New York  10111
    (212) 589-4230
12    sbrown@bakerlaw.com
13

    The Videographer:
14

    Robert Collier
15

16

17

18

19          CONFIDENTIAL DEPOSITION OF BERNARD L. MADOFF,
20    taken by the Customers, at the Federal Correctional
21    Institution, Butner Medium I, Old NC Highway 75,
22    Butner, North Carolina, on the 15th day of June,
23    2016, at 8:50 a.m., before Lisa A. DeGroat,
24    Registered Professional Reporter and Notary Public.
25

*** CONFIDENTIAL ***

Page 3

1                    C O N T E N T S
2     The Witness:  Bernard L. Madoff          Examination
3     By Ms. Chaitman  . . . . . . . . . . . . . .    6
4     By Ms. Brown   . . . . . . . . . . . . . . .   68
5     By Ms. Chaitman  . . . . . . . . . . . . . .  105
6
7

8         I N D E X   O F   T H E   E X H I B I T S
9     Madoff                             For Identification
10    Exhibit 1    Order Authorizing the Deposition  .    4
11    Exhibit 2    Declaration Opposing Trustee's
              Treatment of Profit Withdrawals   .    9
12
      Exhibit 3    8/31/84 statement    . . . . . . .   14
13
      Exhibit 4    12/31/85 statement   . . . . . . .   28
14
      Exhibit 5    6/30/86 statement    . . . . . . .   30
15
      Exhibit 6    7/31/86 statement    . . . . . . .   33
16
      Exhibit 7    2/28/89 statement    . . . . . . .   34
17
      Exhibit 8    10/31/89 statement   . . . . . . .   35
18
      Exhibit 9    4/30/90 statement    . . . . . . .   37
19
      Exhibit 10   12/31/90 statement   . . . . . . .   61
20
      Exhibit 11   5/31/95 statement    . . . . . . .   61
21
      Exhibit 12   Declaration of Bernard L. Madoff  .   92
22
      Exhibit 13   Aaron Blecker file,
23             MADTBB01988418-MADTBB01988420   . .  101
24    Exhibit 14   Aaron Blecker file,
              AMF00154125-AMF00154157   . . . . .  103
25

*** CONFIDENTIAL ***

Page 4

1                 (MADOFF EXHIBIT 1 WAS MARKED FOR

2         IDENTIFICATION.)

3                          * * * * *

4                 THE VIDEOGRAPHER:  We are now on the

5         record.

6                 Please note that the microphones are

7         sensitive, and they pick up whispering and

8         private conversations.  Please turn off all

9         cellphones or place them away from the

10        microphones, as they can interfere with the

11        deposition audio.  The recording will continue

12        until all parties agree to go off the record.

13                My name is Bob Collier, representing

14        Veritext Legal Solutions.  Today's date is

15        June 15th, 2016, and the time is approximately

16        8:50 a.m.

17                This deposition is being held at the

18        Federal Correctional Institute, Butner,

19        Medium I, located at Old Highway 75, Butner,

20        North Carolina.

21                The caption of this case is In re:

22        Securities Investor Protection Corporation,

23        Plaintiff-Applicant -v- Bernard L. Madoff

24        Investment Securities, L.L.C., Defendant; in re:

25        Bernard L. Madoff, Debtor.

*** CONFIDENTIAL ***

Page 5

1              This case is being held in the

2      United States Bankruptcy Court, Southern

3      District of New York.  Case number 08-017889

4      (SIC) (SMB).  The name of the witness is

5      Bernard L. Madoff.

6              At this time the attorneys present in

7      the room and everyone attending remotely will

8      identify themselves and the parties they

9      represent.

10             MS. CHAITMAN:  Helen Davis Chaitman, of

11     Chaitman, L.L.P., on behalf of a large number of

12     Madoff customers.

13             MR. DEXTER:  Greg Dexter, Chaitman,

14     L.L.P.  I'm here with Helen Chaitman,

15     representing a large number of Madoff customers.

16             MS. BROWN:  Seanna Brown, on behalf of

17     Irving Picard, trustee.

18             MS. VANDERWAL:  Amy Vanderwal, on

19     behalf of the trustee.

20             THE VIDEOGRAPHER:  Our court reporter,

21     Lisa DeGroat, representing Veritext Legal

22     Solutions, will swear in the witness.  Then we

23     can proceed.

24

25                      * * * * *

*** CONFIDENTIAL ***

Page 6

1               P R O C E E D I N G S

2                      Whereupon,

3                 BERNARD L. MADOFF,

4               having been duly sworn,

5          was examined and testified as follows:

6        DIRECT EXAMINATION BY COUNSEL FOR CUSTOMERS

7   BY MS. CHAITMAN:

8        Q.    Good morning, Mr. Madoff.

9        A.    Good morning.

10       Q.    I'm going to be asking questions initially.

11  This deposition has been ordered by Judge Bernstein

12  to be limited to the issue of profit withdrawals

13  that were generated by the trading strategy that you

14  had in the 1980s and into the 1990s, where you were

15  investing in subordinated convertible debentures.

16       A.    Uh-huh.

17       Q.    And the judge has ordered that your

18  testimony be limited to that subject, and I would

19  appreciate if you would do so.

20       A.    Uh-huh.

21       Q.    Thank you.

22               MS. BROWN:  Helen, before you begin,

23       can I put the other orders on the record?

24               MS. CHAITMAN:  I'm sorry.  I --

25               MS. BROWN:  That's okay.

*** CONFIDENTIAL ***

Page 7

1              MS. CHAITMAN:  Yeah, I forgot.

2              MS. BROWN:  That's okay.

3              Mr. Madoff, before we go any further, I

4      do want to tell you today about several

5      protective orders that govern the overall

6      bankruptcy case and the specific deposition.

7              The first is the litigation protective

8      order, which governs the entire bankruptcy.

9      And, Mr. Madoff, I have provided you a copy of

10     that order before we began here today.

11             Could you confirm that you have signed

12     the litigation protective order?

13             THE WITNESS:  Yes, I did.

14             MS. BROWN:  Thank you.

15             And, as Ms. Chaitman just mentioned,

16     there is a second protective order that governs

17     this specific deposition.  The order has been

18     marked as Madoff Exhibit 1, and, as Ms. Chaitman

19     indicated, the bankruptcy court gave permission

20     for this deposition to go forward with certain

21     limitations.  That order bears the docket number

22     13060.

23             The deposition must be limited to

24     profit withdrawal transactions and the issues

25     related to that -- to those transactions, and

*** CONFIDENTIAL ***

Page 8

1         none of the counsel here today are permitted to

2         go outside the scope of the profit withdrawal

3         issue.

4                    And, specifically, counsel is not

5         allowed to ask you any questions about

6         Mr. Jeffry Picower or any of his accounts.

7                    I am also required to instruct you,

8         Mr. Madoff, that your testimony must be limited

9         to BLMIS's profit withdrawal transactions, and

10        you're not permitted to testify about any other

11        issues.

12                   Do you understand those limitations?

13                   THE WITNESS:  Uh-huh, yes.

14                   MS. BROWN:  And before we go any

15        further, I'd also like to note for the record

16        that the order permitting this deposition to go

17        forward states that the entire transcript of

18        Mr. Madoff's deposition is confidential and

19        shall remain under seal for 60 days or the day

20        after a final non-appealable order is entered

21        concerning any alleged or actual violations of

22        the order limiting this deposition.

23                   And the order further states that the

24        court may impose sanctions upon any person or

25        entity that violates the protective order that's

*** CONFIDENTIAL ***

```
                                                    Page 9

1        marked as Madoff Exhibit 1.

2                    Thank you.

3                    (MADOFF EXHIBIT 2 WAS MARKED FOR

4        IDENTIFICATION.)

5    BY MS. CHAITMAN:

6        Q.    Okay.  Mr. Madoff, I'd like to show you

7    what I've marked as Madoff Exhibit 2.  Is that your

8    signature on page three?

9        A.    Yes.

10       Q.    And do you recall signing this Declaration?

11       A.    Yes.

12       Q.    Now, if you'd just look at paragraph two.

13   I just want to read this into the record.

14              It says, "In the investment advisory

15   business stockbrokers do not send checks to

16   customers unless they specifically request a

17   withdrawal.  In fact, I cannot recall a single

18   instance in my career where I sent a check to a

19   customer that did not request it."

20              "Sometimes the requests would be for a

21   quarterly payment of a fixed amount, like $25,000.

22   Sometimes I would receive a request for a large

23   withdrawal, such as $250,000, but I cannot ever

24   recall sending a check to a customer who did not ask

25   for a withdrawal."
```

*** CONFIDENTIAL ***

Page 10

1           Is that still your testimony?

2      A.    That is.  I assume when you're stating,

3    "I," you're referring to the firm.

4      Q.    Yes.

5      A.    Okay.

6      Q.    Yes.  But that -- that is accurate today?

7      A.    Yes, it is.

8      Q.    Okay.  And paragraph three reads,

9    "Moreover, there were no recorded phone lines in the

10   1990s.  Hence, we did not accept verbal instructions

11   from customers.  If they wanted withdrawals, they

12   had to specifically request them in writing, and we

13   retained copies of all such requests in our customer

14   files."

15           "If there are no such requests in our

16   files, that indicates that the customer did not

17   request any withdrawals and would not have received

18   any checks."

19           Is that still true in your --

20      A.    Yes.

21      Q.    Okay.  Now, do you recall any instance when

22   there was a loss of customer files within your

23   office?

24      A.    A loss of customer files?  I really didn't

25   keep the files themselves.  I mean, I was not

*** CONFIDENTIAL ***

Page 11

1    responsible for that.  So, you know, it's possible,

2    but, you know, I doubt it.

3        Q.    Were your instructions to your staff to put

4    letters from customers requesting withdrawals in the

5    customers' files?

6        A.    Yes.  That's what --

7        Q.    Do you recall ever being told that any of

8    those letters had been misplaced or lost?

9        A.    No, I do not.

10       Q.    And at the time that the trustee was

11   appointed, do you have any reason to believe that

12   those files were not intact?

13       A.    No.

14       Q.    Now --

15       A.    Well, let me correct something.

16       Q.    Sure.

17       A.    I mean, there is -- there's a six year

18   record required -- record-retention requirement in

19   the securities industry.  So there was a -- a period

20   of time when the records might have been destroyed

21   once they went past that period of time, you know.

22            You know, that's something that, you know,

23   I -- I was not in charge of.  So, you know, I paid

24   no attention to that.  That was under the -- usually

25   the supervisor's jurisdiction.

*** CONFIDENTIAL ***

Page 12

1      Q.    Okay.  But if, for example, there were

2   letters from customers dating from the 1980s in some

3   of the files, would you agree that there was no

4   policy to destroy letters from a certain period of

5   time?

6      A.    Well --

7               MS. BROWN:  Objection.

8               THE WITNESS:  You know, as I said, I --

9          I don't know -- to my -- to my -- my

10         recollection was that there were routine

11         destruction of records after -- you know, after

12         a certain number of years, because, you know,

13         we -- we would have filled up, you know, an

14         impossible amount of space retaining all the

15         records.

16               So I -- you know, I -- as a general

17         rule, we kept customer records going back longer

18         than the six year period, because customers

19         typically needed to refer to records or their

20         accountants needed to refer to records to get

21         cost basis and things of that sort.

22               So customer records were kept longer

23         than counterparty records, like other

24         broker-dealers.  As a matter of fact, the

25         industry had a practice of not requiring any

*** CONFIDENTIAL ***

Page 13

1      hard copy to be -- to be kept of any records as

2      long as the records could be reduced -- could be

3      produced within 40 -- 48 hours for an

4      examination, because it was an -- it was an

5      impossible task for firms to maintain all -- all

6      their records.

7   BY MS. CHAITMAN:

8      Q.    So is it fair to say that either the

9   records were maintained on computer or they were

10  maintained in paper files?

11     A.    Yes.

12     Q.    Okay.  So when you say that the records

13  would be destroyed, they would actually just be

14  digitized for computer storage; is that right?

15     A.    I believe that's the case.  Yes.

16     Q.    Okay.  Now, when new customers came to you

17  at the inception of the relationship, did you -- did

18  you similarly require that any requests for

19  withdrawals be put in writing?

20     A.    Yes.

21     Q.    And they would have to be signed by the

22  customer?

23     A.    Yes.

24     Q.    Do you recall a customer named Aaron

25  Blecker, B-l-e-c-k-e-r?

*** CONFIDENTIAL ***

Page 14

1      A.    The name sounds familiar, but, you know, I

2  can't -- I can't tell you exactly.

3      Q.    Right.  I understand.  You had a lot of

4  customers.

5            He -- he was married to a woman named Sofie

6  Blecker, and he first opened an account in 1981, and

7  he had accounts through December of 2008.  And do

8  you recall -- you don't recall him?

9      A.    Not particularly.

10                 (MADOFF EXHIBIT 3 WAS MARKED FOR

11         IDENTIFICATION.)

12  BY MS. CHAITMAN:

13     Q.    Okay.  Let me show you what I've marked as

14  Exhibit 3.  I apologize for the copy, but this is

15  one of those records that was stored on computer,

16  and this is the best we have.

17     A.    Uh-huh.

18     Q.    So this is a statement, dated August 31,

19  1984 for Arthur and Sofie Blecker, and it -- it

20  appears to be New York -- oh, no.  Let's see where

21  the account number is.  Can you tell me, do you see

22  the account number on this?

23     A.    Yeah.

24     Q.    Where is it?

25     A.    Where is the account?

*** CONFIDENTIAL ***

Page 15

1      Q.    The account number.  Where --

2      A.    Oh, 0 -- 1002151-0.

3      Q.    Okay.  And do you recall what the 1-0

4  indicated?

5      A.    No.

6      Q.    Okay.  This is as of August 31, 1984.

7      A.    Okay.

8      Q.    Okay.  Can you -- are you able to -- to --

9  I'd like to go through line by line on this

10  statement, and I'd like you to explain to me what

11  the statement reflects as to the transactions in the

12  account.

13           If we start with the first line, it looks

14  like the balance forward is $183,004.83.  Can you

15  make that out?

16     A.    Yes.

17     Q.    Okay.  And then on August 23rd, it's -- it

18  looks like under the column, "Long" --

19     A.    Uh-huh.

20     Q.    -- there are 4,700 shares of Household

21  International, Inc.; is that right?

22     A.    Correct.

23     Q.    And those were received; is that right?

24     A.    Correct.

25     Q.    And do you recall why that wouldn't have a

*** CONFIDENTIAL ***

Page 16

1    dollar amount as a credit to the account?

2        A.    It -- received has a -- wait.  There is no

3    dollar amount next to received.  That's just a -- an

4    entry of receiving the securities into the account.

5        Q.    What does that mean, though?

6        A.    The securities were delivered and received

7    either from conversion or from -- it had to be from

8    conversion for this type of an account.

9            So the -- these are arbitrage accounts,

10   where the client buys a security, sells a related

11   security to that.  In fact, they buy a convertible

12   bond.  Then they sell the stock or they provide

13   convertible preferred and sell the stock short

14   against the box.

15           Then when that transaction is closed out,

16   the security would be received.  It would either be

17   received from the conversion agent or the bank or

18   whoever.  That's why there's no dollar amount on the

19   received.  That just means the account was credited

20   with the physical securities.

21       Q.    But isn't that an asset that belongs to the

22   account --

23       A.    Yes.

24       Q.    -- holder?

25       A.    Yeah.

*** CONFIDENTIAL ***

Page 17

1     Q.    And so then why wouldn't the value of the

2   asset be reflected in the credit column?

3     A.    It just isn't.  It's not the common

4   practice to receive that.  You know, at least not in

5   our booking procedure.  Remember, this is movement

6   of -- of the securities.

7           Dollar amounts only, you know, hit the

8   account when there's actually money movement, not

9   physical securities movement.  The valuation of

10  the -- of this -- the securities that are in the

11  account would be at the end of the month.  Usually

12  there's a valuation.

13    Q.    I see.  But this statement is 8/31/84.  So

14  it was the end of August 1984?

15    A.    Well, 8/23 would not be --

16    Q.    Oh, I see.  Yeah.

17           (DISCUSSION HELD OFF THE RECORD.)

18           THE WITNESS:  8/23 would not be the end

19      of the month.

20  BY MS. CHAITMAN:

21    Q.    Okay.  But if the statement is as of 8/31,

22  wouldn't there then be another line, which would be

23  8/31, and it would have the value of those shares?

24           MS. BROWN:  Objection.

25           THE WITNESS:  Only if the account was

*** CONFIDENTIAL ***

Page 18

1      long those securities at the end of the month.

2    BY MS. CHAITMAN:

3      Q.    Okay.  Okay.  So let's take the next line.

4    August 23rd.  2,056 shares were received.  So that's

5    the same thing we just talked about; right?

6      A.    Correct.

7      Q.    And then the next line says, "August 23rd,

8    Household International, Inc., preferred

9    convertible;" is that -- what is that --

10      A.    Convertible preferreds.  A convertible

11    preferred -- preferred security.  Where it says,

12    "delivered."

13      Q.    Right.

14      A.    Okay.  That was the -- if you add them up,

15    you're going to get the same amount of -- I can't

16    read this thing.

17      Q.    It says, "4,504."  You're short 4,504?

18      A.    Right.

19      Q.    So you're long 4,700 and 2,056, and you're

20    short 4,504?

21      A.    Uh-huh, because they're -- they're two

22    different securities.  The Household --

23      Q.    Okay.

24      A.    One is the common, which is the first

25    lines, which must have been short.  And the -- the

*** CONFIDENTIAL ***

```
                                             Page 19

 1   4,500, it says -- if you look at the next line,

 2   "Convertible preferred."

 3        Q.    Okay.

 4        A.    Those -- those were -- you know, those were

 5   the securities that were convertible.

 6        Q.    Okay.  But isn't the 4,504 in the short

 7   column, so weren't -- weren't -- wasn't the account

 8   long, the first two lines?

 9        A.    Yeah.  It -- it was received into the

10   account.  At that moment, 8/23, the account would

11   have been long.  That -- and it would have been --

12   would have been short the second line.

13             If there's no money movement -- if there's

14   no money stated there, those are just the security

15   movements in the account.

16        Q.    Okay.  So the first two lines, just to be

17   clear, 4,700 and 2,056, you're long for Household

18   International, Inc.?

19        A.    Right.

20        Q.    And the third line, you're short for the

21   convertible preferred?

22        A.    That's correct.

23        Q.    Okay.

24        A.    Or it -- that's right.

25        Q.    And then underneath, in the next column, on
```

*** CONFIDENTIAL ***

```
                                                    Page 20
```

1    the first two lines it says, "Received;" right?

2    R-e-c-d --

3        A.    Right.

4        Q.    -- is received?

5              And the third line, which is where you're

6    short, it says, D-e-l-v?

7        A.    Delivered.  Correct.

8        Q.    Delivered.  What is the difference between

9    received and delivered?

10       A.    One is you're -- you're crediting the

11   account.  One is you're debiting the account.  In

12   other words, if you're -- when you're doing a

13   convertible -- when you're doing an arbitrage

14   security, you -- the account originally -- you'd

15   have to look at what happened the previous --

16   previous period.

17             You would -- one would have been long --

18   long, and one would have been short.  Then once the

19   conversion is made or the -- or the transaction is

20   closed out, then the accounts get debited and

21   credited by the -- by the movement of the securities

22   in the account.

23       Q.    Okay.  So the next line, 8/20 -- okay.  So

24   I -- I apologize, this is so hard to read, but

25   the -- if you look at the top column, it says, T,

*** CONFIDENTIAL ***

                                                    Page 21

1    dash, D.  Is that time-date or -- do you see -- can

2    you see that?

3         A.    Yeah.

4         Q.    What is -- do you know what that is?

5         A.    Trade date, settlement date, it looks like.

6         Q.    Oh, perfect.  Okay.  So trade date,

7    settlement date.  I got it.  That's helpful.  Okay.

8    So now if we go to the trade date, 8/20, and then

9    the settlement date, 8/27, it looks like there's

10   3,159 shares of Katy --

11        A.    -- Industries.

12        Q.    -- Industries?

13        A.    Right.

14        Q.    Okay.  And so that's an asset that's in the

15   account, right, because there's a --

16        A.    It was bought.

17        Q.    Oh, it --

18        A.    It was purchased on that date.

19        Q.    It was purchased.  So there's a debit,

20   because you have to pay for the shares?

21        A.    Correct.

22        Q.    Got it.  Okay.  So the next line is 8/21.

23   It's -- the account is short 2,100 shares of Katy

24   Industries; right?

25        A.    Correct.  It's -- it's the common being

*** CONFIDENTIAL ***

```
                                                    Page 22
```

1   sold.  The first purchase that you're referring to

2   was convertible preferred of the Katy Industries.

3            So you understand that?

4       Q.    No.

5       A.    In other words --

6       Q.    Sorry.  If you just took those -- the first

7   two lines on the Katy Industries, just --

8       A.    Okay.  That's --

9       Q.    Explain what's happening.

10      A.    On 8/27, you know, there were -- they

11  bought the Katy Industries preferred, convertible

12  preferred.  And then on 8/21, the next day, they

13  sold common shares that the convertible would have

14  been -- that the convertible preferred would have

15  been convertible into.

16      Q.    Okay.

17      A.    That was sold short --

18      Q.    Right.

19      A.    -- against the convertible preferred.

20      Q.    Okay.

21      A.    And then the next typical practice would be

22  either the securities would be reversed, which would

23  mean they would be -- you'd buy one and sell the

24  other to cover the long or the short, or you would

25  physically convert it, you know, through the

*** CONFIDENTIAL ***

Page 23

1    conversion agent.  And you would get -- eventually

2    get -- the common would deliver out against the

3    short.

4        Q.    Okay.  So where it says there's -- if we

5    look, it says 8/23 and then 8/28, and that's the

6    line that says, "Katy Industries, Inc.," and it

7    seems to say, "Journal," on that line.

8        A.    8/23 is Household Finance.

9        Q.    The -- yeah, but if you go down further --

10       A.    You're talking about 8/21?

11       Q.    8/21, and then the one beneath it with --

12       A.    Is also 8/21.

13       Q.    Okay.

14       A.    I don't see any 8/23 --

15       Q.    Okay.

16       A.    -- for Katy Industries.

17       Q.    Okay.

18       A.    You're confusing the two --

19       Q.    Okay.

20       A.    -- transactions.

21       Q.    All right.  So where it says, J-r-n-l, do

22    you see that entry?

23       A.    Journal.

24       Q.    Journal.  So that's a long -- that's --

25    that goes on the line where it says, "Katy

*** CONFIDENTIAL ***

Page 24

1    Industries, Inc."  What -- and then it's $4.92

2    credit.  What does that mean?

3        A.    Fractional shares.  In other words, there's

4    a -- there -- there's a leftover portion of shares

5    of the transaction that journaled over.  In this

6    situation it was credited to the account.

7        Q.    Okay.

8        A.    It's showing it was a credit.

9        Q.    Okay.

10       A.    It's like the odd lot amount of the shares

11   of the transaction.

12       Q.    Okay.  So if we look at the credit column,

13   we started out with $183.04 for a -- $183,004.83; do

14   you see that?

15       A.    Right.

16       Q.    And then we ended up with $186, I think.

17              MS. BROWN:  I think it's eight.

18              THE WITNESS:  183,000.

19              MS. CHAITMAN:  188,823.37; right?

20        188,823.37; can you see that?

21              THE WITNESS:  End of -- well, one of

22        them you're looking at is -- is the value of the

23        positions.  That's the value of the positions

24        after it's market to market.  So don't confuse

25        that one.

*** CONFIDENTIAL ***

Page 25

1              When you say -- I'm not sure I

2        understand what you're saying.

3     BY MS. CHAITMAN:

4        Q.    Okay.  If you take the line -- you -- the

5     balance forward is 183,004.83; you see that under

6     the credit line at the top?

7        A.    Right.

8        Q.    And then the new balance is 188,823.37;

9     right?

10       A.    183?

11       Q.    188 --

12       A.    It -- I --

13       Q.    It looks like 188 --

14       A.    I show the position -- I show a value of

15    183,117.42 on the credit side.

16       Q.    Oh, I see.  All of the way down?

17       A.    Right.

18       Q.    Okay.  See this line here, where it says,

19    "New balance"?

20       A.    Uh-huh.

21       Q.    What -- what -- what does that represent?

22       A.    That's the money balance in the account

23    from the transactions above that line.

24       Q.    Okay.

25       A.    The balance that you're referring to at the

*** CONFIDENTIAL ***

Page 26

1   end is the securities -- it says, "Security

2   positions."

3        Q.    Right.

4        A.    Okay.  That's the value of the account that

5   was long, which was only long to Katy Industries,

6   preferred and common.

7        Q.    Okay.  So does this show that in this month

8   this account appreciated in value?

9        A.    Well, if you look at the opening balance --

10  it would be easier if you -- if you had a better

11  copy.

12       Q.    I know.  I'm so sorry.  It's going to get

13  better.  I do have better ones after this.

14             To me it looks like 183,004.83 is the

15  opening balance.

16       A.    Right.  Okay.  That's the opening balance.

17  It's the balance forward.

18       Q.    Right.

19       A.    That's the opening balance always.  The new

20  balance at the end is 188,823.37.  That's the cash

21  balance in the account.  It went up from 183 to 188.

22       Q.    Okay.

23       A.    Which would have been the profit made in

24  those transactions.

25       Q.    Okay.

*** CONFIDENTIAL ***

Page 27

1      A.      Then when you go down to the security

2  positions, you know, at the bottom, you're getting a

3  market value of those -- of that what's long in the

4  account, which is only referring to the Katy

5  Industries, which is only your long and short.

6           So I think the question you're asking was,

7  how did the account -- cash balance appreciated from

8  183 to 188.  All right.  Roughly 5,000 --

9      Q.      Right.

10     A.      -- dollars.

11     Q.      Right.

12     A.      That's the cash balance in the account.

13  And then you would have to take the -- the

14  difference between the long and short positions in

15  the account after the market to market, which would

16  be basically 5,000 -- 5,705, it looks like.

17     Q.      Okay.

18     A.      The account would have appreciated by those

19  amounts.

20     Q.      By the 5,705?

21     A.      Yeah, but one is -- one is actual cash

22  balance in the account.  The other one is the value

23  of the --

24     Q.      Securities?

25     A.      -- securities.

*** CONFIDENTIAL ***

                                                          Page 28

1              MS. CHAITMAN:  Okay.  Great.  Thank you

2        so much.

3              Okay.  We're doing the same exercise,

4        but this document is a slight improvement, and I

5        think we gradually get better.

6                    (MADOFF EXHIBIT 4 WAS MARKED FOR

7        IDENTIFICATION.)

8   BY MS. CHAITMAN:

9        Q.    I've just handed you what's been marked as

10   Madoff Exhibit 4.

11        A.    This is better.

12        Q.    A little bit better, isn't it?

13        A.    Oh, okay.  Sorry.  Okay.  All right.

14              MS. BROWN:  Do you have one more copy

15        for Amy?

16              MS. CHAITMAN:  Oh, I'm sorry.

17   BY MS. CHAITMAN:

18        Q.    Okay.  So we're looking at a statement,

19   which is, again, Arthur and Sofie Blecker.  It's

20   dated December 31, 1985.

21        A.    Uh-huh.

22        Q.    And it's for the same account, 215-1-0.  So

23   just, if you could, do -- do the same thing for me.

24   Just take me through this, so that I can understand

25   exactly what happened in this period of time, which

*** CONFIDENTIAL ***

Page 29

1    is December of '85.

2        A.    All right.  It's showing that an opening

3    balance -- well, it's not an opening balance.  Let's

4    see where the opening balance is.  Balance forward

5    is -- here it is.

6            It's $288,445 -- or 446.44.  That's the

7    balance forward from the prior month, but you skip

8    from -- this one is eight, and then you went from

9    eight to twelve.  So --

10        Q.    Right.  We didn't have the interim ones.

11        A.    Okay.

12            MS. BROWN:  You skipped years as well.

13            MS. CHAITMAN:  Wait.  Hold on.  '84 to

14        '80 -- yes.  You're right.  '84 to '85.  These

15        were the only statements that were produced to

16        us.

17    BY MS. CHAITMAN:

18        Q.    So, if you could, just go through --

19        A.    It would be the same thing.  You --

20    you're -- you're selling -- you're selling, it looks

21    like, Woolworth.  I can't read it, but it looks like

22    you're -- the account opened with a balance of

23    288,000 some odd dollars.

24        Q.    Right.

25        A.    Then certain securities, number of shares,

*** CONFIDENTIAL ***

Page 30

1    3,892 shares were delivered into the account of the

2    convertible preferred.  Then you had -- it was the

3    same thing.

4              Received of -- of the common shares after

5    the conversion.  And there's no money -- no money

6    entries in that, because it was just physical

7    movement of securities.

8              And you had the same thing with this

9    Wetterau, same types of transactions.  And you have

10   a -- there you have on 12/20, trade day 12/30.

11   Settlement, you have actual money balances moving

12   from the sale of the -- of the common and the

13   journal for another fractional shares of 21 some odd

14   dollars, and a new balance of 298,838.

15             And then when you go down to, "Security

16   positions," you're seeing the -- the market value of

17   the -- of the long and short positions in there.

18                  MS. CHAITMAN:  Okay.  Thank you.

19                  (MADOFF EXHIBIT 5 WAS MARKED FOR

20       IDENTIFICATION.)

21                  MS. CHAITMAN:  I'm going to show you

22       now what we've marked as Exhibit 5.

23   BY MS. CHAITMAN:

24       Q.   So this -- the last one we looked at was

25   12/31/85, and this is 6/30/86.

*** CONFIDENTIAL ***

```
                                                      Page 31
1        A.    Okay.
2        Q.    So you bought the --
3        A.     Interco.
4        Q.    Yeah.
5        A.    Uh-huh.  Same type of transaction.
6    Convertible preferred.
7        Q.    Right.  So you have a debit of 277 --
8        A.    Uh-huh.
9        Q.    -- 309?
10            And then you were short the securities?
11       A.    Right.  Sold the securities short.  Right.
12   For 283,000 some odd dollars.
13       Q.    Right.
14       A.     Then there's a receive and deliver of GTE,
15   which must have been -- the account must have been
16   long and short the previous month coming in.  It's
17   physical movement of securities.
18            Then later on there's a -- a journal of
19   fractional share of $14.
20       Q.    Uh-huh.
21       A.    I'm assuming that there was -- that the GTE
22   was related to the Interco.  That must have been
23   a -- a merger or something that they exchanged those
24   securities.  It's hard to tell until I look at --
25   unless you had the --
```

*** CONFIDENTIAL ***

Page 32

1    Q.    The previous one?

2    A.    -- the previous position.

3    Q.    Right, right.

4    A.    No.  Actually, it wouldn't have anything to

5    do with it.  It would -- yeah, you must be long and

6    short the GTE in the previous month.  The Interco --

7    because here is -- the Interco is -- you have both

8    sides.  You have the sale of the common of -- and

9    you have the -- the purchase of the preferred.

10   Q.    So -- so basically -- forgive me if I sound

11   dumb about this, but you were buying a subordinated

12   convertible --

13   A.    That's convertible into -- when you -- you

14   have a convertible bond or a convertible preferred.

15   Those securities are convertible into common shares

16   of the company.

17         You know, you're obviously buying -- the

18   idea is to buy the convertible security, which

19   either is a preferred or a convertible bond that is

20   convertible into a related number of common shares.

21         You buy the -- the purchase price of the --

22   either the preferred or the -- or the bond would be

23   lower than the sale price of the common, and that's

24   the profit.

25         That's the whole concept of doing any

*** CONFIDENTIAL ***

                                                    Page 33

1    arbitrage, but then you have to physically convert

2    one into the other, you know, to close out the

3    transaction.

4         Q.    And these convertible preferred securities

5    were generally convertible within like a 30 day

6    period?

7         A.    Yes.  If, in fact, they were -- well, it

8    depends upon -- there's -- there's various forms of

9    arbitrage.  I don't want to complicate your

10   situation, but there's -- you can actually

11   physically convert one into the other, putting it

12   into the conversion agent, or you can, what's

13   called, unwind the transaction, would be to go out

14   and purchase -- repurchase the stock that you sold

15   short and resale the one that you're long.  It's

16   commonly referred to as a Chinese arbitrage.  Having

17   nothing to do with China.

18        Q.    Okay.

19        A.    It's just because it's sort of --

20        Q.    It's backwards.

21        A.    -- backwards.

22             MS. CHAITMAN:  It's backwards.  Right.

23             (MADOFF EXHIBIT 6 WAS MARKED FOR

24        IDENTIFICATION.)

25   BY MS. CHAITMAN:

*** CONFIDENTIAL ***

Page 34

1    Q.    Okay.  All right.  Let me show you what

2    I've marked as Exhibit 6.  So this is July 31, 1986.

3    Same account.  So what's happening in this page?

4    A.    Well, you're -- I see you -- you have a

5    check coming into the -- going out of the account

6    with PW for $7,000.  It's normally referred like a

7    profit withdrawal of some sort, which lowered the --

8    which lowered the balance by that amount to 284,000.

9          Balance forward was 292.  It was reduced by

10   the -- the balance of the withdrawal of $7,000.  And

11   then the carrying forward positions are Interco.

12   You're long and short.

13   Q.    So that check was -- was sent to whom?

14   A.    It would have been sent to the Bleckers.

15   Q.    Okay.  And this is the first time we've

16   seen an entry like that, with a PW, for the

17   Bleckers.  Does that mean that at this point in time

18   your office would have received a written request

19   from the Bleckers?

20   A.    Correct.

21          (MADOFF EXHIBIT 7 WAS MARKED FOR

22      IDENTIFICATION.)

23   BY MS. CHAITMAN:

24   Q.    All right.  I'm handing you what I've

25   marked as Madoff 7, which is a similar statement.

*** CONFIDENTIAL ***

Page 35

1    This is for February 28th, 1989.  So, again, the

2    last statement was dated July 31, 1986.  This one is

3    dated February 20th, 1989.  And this one indicates a

4    profit withdrawal.  So that, again, would have been

5    a check --

6         A.    Uh-huh.

7         Q.    -- sent to the customer?

8         A.    Correct.

9         Q.    Okay.  And if the customer -- what was the

10   procedure with -- with profit withdrawal requests?

11   Would -- would there --

12        A.    Typically the customer would call up on the

13   phone to request a check and was instructed that --

14   that we needed written instructions.  They would

15   send in a -- usually a letter requesting the check.

16                  (MADOFF EXHIBIT 8 WAS MARKED FOR

17        IDENTIFICATION.)

18                  MS. CHAITMAN:  Okay.  Actually, I'm not

19        going to -- let the record reflect, I'm not

20        going to use Exhibit 8, because it's -- it's

21        illegible.

22                  MS. BROWN:  Can I have a copy, just --

23                  MS. CHAITMAN:  Yeah, if you want to

24        just have it.

25                  MS. BROWN:  Sure.  Thank you.

*** CONFIDENTIAL ***

Page 36

1              THE WITNESS:  Let me just -- I want

2        to -- I forgot what I said about the -- the

3        request for checks.  If a customer -- I think

4        you covered that in -- in your opening, that if

5        a customer requested checks to be sent out

6        quarterly, I don't know that they sent every

7        quarter, you know, a specific written request.

8              We would have had on file quarterly

9        profit distribution instructions.  They wouldn't

10       necessarily, you know, call us every quarter for

11       the check, I don't think, because as long as we

12       had instructions to send whatever the profit was

13       in the account as of a certain quarter.  Usually

14       it would be a certain amount.  They would say,

15       send me a certain amount every quarter.

16  BY MS. CHAITMAN:

17       Q.    Okay.  And we've seen letters with respect

18  to some customers, where they would write in and

19  say, please don't send me the profit withdrawals

20  anymore, or, please send me the profit withdrawals.

21       A.    Correct.

22       Q.    And it appears from the records that we've

23  seen that if someone wrote in and said, please send

24  me the profit withdrawals, the profit withdrawals

25  would be sent until they sent in a letter saying,

\*\*\* CONFIDENTIAL \*\*\*

Page 37

1   don't send me the profit withdrawals?

2       A.    That's correct.

3                   (MADOFF EXHIBIT 9 WAS MARKED FOR

4       IDENTIFICATION.)

5   BY MS. CHAITMAN:

6       Q.    Let me show you what's been marked as

7   Exhibit 9, which is a little bit more legible.  So

8   this is April 30th, 1990.  And without going through

9   the same detail, this is essentially the same --

10      A.    Yes.

11      Q.    -- trading strategy; right?

12              So do you remember the time period when you

13  were executing this particular trading strategy?

14              MS. BROWN:  Objection.

15              THE WITNESS:  Do I remember the time

16      when it was --

17  BY MS. CHAITMAN:

18      Q.    The -- the time period when you were using

19  that strategy?

20      A.    Convertibles?

21      Q.    Yeah.

22      A.    Depending upon the account, but would have

23  been executing them certainly into the '90s.

24      Q.    Okay.  Now, with respect to the

25  transactions that -- what do you -- what do you

*** CONFIDENTIAL ***

Page 38

1   describe this strategy?

2       A.     Convertible arbitrage.

3       Q.     Convertible arbitrage.  Okay.  The -- were

4   the convertible arbitrage trades actually carried

5   out?

6       A.     Yes.

7       Q.     And were they carried out through Bear

8   Stearns?

9       A.     No.

10      Q.     How were --

11      A.     We were -- we were a self-clearing firm

12  always.  We never cleared through anyone in the

13  United States.  We only cleared through a firm,

14  through Barclays Bank, in London, but that wouldn't

15  have been doing this kind of trading.

16      Q.     Okay.  Was -- was there a time period in

17  the '80s that you were doing business with Bear

18  Stearns?

19      A.     Yes.

20      Q.     Would you -- do you remember when that was?

21      A.     We were doing business with everyone all

22  through -- through 2008.

23      Q.     Okay.

24      A.     And --

25      Q.     Can you -- were you doing -- were you

*** CONFIDENTIAL ***

                                                      Page 39

1   having Bear Stearns execute the purchase of

2   convertible --

3        A.    No.

4        Q.    -- debentures?

5        A.    We were probably the largest market-maker

6   and trader in convertible securities in the country,

7   you know, through the -- the -- the entire period.

8   You know, I would say -- let's say from the --

9   certainly from the '80s right through 2008.

10            The -- the business we did with Bear

11  Stearns, as we did with Merrill Lynch and with

12  everybody else, was usually as a market-maker or

13  part of our proprietary trading department, would

14  have, you know -- might have been in convertibles.

15            It could have been in -- you know, we were

16  doing hundreds of thousands of transactions every

17  day.  In spite of the fact that we never got caught,

18  like we weren't doing anything, because they

19  couldn't find confirmations.

20            We had -- we explained to them that the

21  industry stopped issuing confirmations, you know,

22  years ago.  They seemed to have been dumbfounded by

23  that remark.

24       Q.    The business that you did with Bear

25  Stearns, was it structured so that Bear Stearns

*** CONFIDENTIAL ***

Page 40

1   would buy the securities in its own name and would

2   lend you the -- the money to buy the securities, and

3   then when the transactions closed, there would be

4   a -- an accounting for the profits?

5              MS. BROWN:  Objection.

6              THE WITNESS:  I'm not sure I understand

7       the question.

8   BY MS. CHAITMAN:

9       Q.   Okay.  Did you instruct Bear Stearns to buy

10  securities positions for -- for you?

11      A.   No.

12      Q.   So can you just describe what those

13  transactions were that you did with Bear Stearns?

14      A.   I -- we were a market-maker in 500

15  securities.  Some of them were convertible.  Some of

16  them were -- were common.  They came to our -- our

17  market-making department.

18              And based upon what we were quoted in

19  NASDAQ, if it was a NASDAQ security, they would, you

20  know, ask for a bid or an offer on whatever they

21  were selling.

22              That was -- would have been referred to as

23  a wholesale transaction.  Would not involve a

24  customer of ours.  It might have been a customer of

25  Bear Stearns probably.

*** CONFIDENTIAL ***

Page 41

1       Q.    So -- forgive me for being simplistic.

2   Bear Stearns would -- might have a customer, or it

3   might be for their own account?

4       A.    Correct.

5       Q.    They would have a block of stock?  They

6   would ask you to purchase it?

7       A.    Correct.

8               MS. BROWN:  Objection.

9   BY MS. CHAITMAN:

10      Q.    And -- and you -- and you would purchase

11  it?

12              MS. BROWN:  Objection.

13              THE WITNESS:  Depending upon which

14      department it came -- if it was a market-making

15      transaction, it would go into the firm's

16      market-making account.

17              You know, if it was -- you know, and

18      that's the only way that Bear Stearns would come

19      to us.

20  BY MS. CHAITMAN:

21      Q.    Okay.

22      A.    I'm not sure I understand where you're

23  going.  So --

24      Q.    No.  I just want to get an understanding of

25  what the structure was of your dealings with Bear

*** CONFIDENTIAL ***

Page 42

1    Stearns.

2         A.    The same as it was with everybody else, you

3    know, in the industry.  Every other broker-dealer.

4    If it was coming through -- if it was, you know, a

5    security that we were a market-maker in, which was

6    500 different securities.

7         Q.    And would -- who -- if you were purchasing

8    a large block of stock from Bear Stearns --

9         A.    Uh-huh.

10        Q.    -- where would the financing come from for

11   that?

12                  MS. BROWN:  Objection.

13                  Helen, I think we're starting to go a

14        little outside the scope of the order.  He's

15        saying that he didn't purchase it for customers.

16                  MS. CHAITMAN:  Well --

17                  MS. BROWN:  It was a wholesale

18        business.

19                  MS. CHAITMAN:  I'm not -- I'm not sure.

20                  MS. BROWN:  So I'm going to let you

21        permit it.  Keep going forward.

22                  MS. CHAITMAN:  Yeah.

23                  MS. BROWN:  But I think we're treading

24        very close to getting outside of the scope of

25        the order.

*** CONFIDENTIAL ***

                                                    Page 43

1   BY MS. CHAITMAN:

2       Q.    I -- with respect to the transactions we've

3   seen --

4       A.    In convertible securities?

5       Q.    On the customer statements.

6       A.    Right.

7       Q.    Your testimony is that these were positions

8   that you actually executed?

9       A.    Correct.

10              MS. BROWN:  Objection.

11  BY MS. CHAITMAN:

12      Q.    Okay.  And how did you execute the

13  transactions that -- that we've been reviewing on

14  these statements?

15              MS. BROWN:  Objection.

16              THE WITNESS:  Either we would go out

17      into the open market to buy them, you know, from

18      another dealer.  It could have been Bear

19      Stearns, if, in fact, they made a market in that

20      security, or it could have been someone --

21      someone else, or it could have been somebody

22      coming in to us unsolicited, another dealer to

23      sell a security.  I mean, that's what we did all

24      day long.

25  BY MS. CHAITMAN:

*** CONFIDENTIAL ***

Page 44

1    Q.    And who were the people, if you recall,
2    during the 1980s who were executing these
3    transactions that we've just reviewed?
4                MS. BROWN:  Objection.
5                THE WITNESS:  Who would we call?
6    BY MS. CHAITMAN:
7    Q.    Who were the people, if you recall, within
8    your organization who were doing this?
9    A.    It would have been -- depending upon which
10   trader was making a market in that stock, it could
11   have been someone like, you know, a David Kugel.  It
12   could have been someone like a Martin Joel.  It
13   could have been any number of, you know, a hundred
14   traders that we had.
15   Q.    So did -- how did it work?  Did you assign
16   to traders the transactions with respect to certain
17   securities?  How was that allocated among your --
18   A.    Certain traders made a market in certain --
19   in various securities.  Other -- there also were
20   times that we didn't make a market in that security.
21   That we just went out into the open market to buy.
22   It could have been any number of traders that --
23   that did that for us over the years.
24   Q.    Okay.  So --
25   A.    Including myself.

*** CONFIDENTIAL ***

Page 45

1      Q.    Okay.  So I just want to be clear on

2   something.  There's a -- there's been a public

3   perception --

4      A.    Uh-huh.

5      Q.    -- that there was a stone wall between the

6   17th floor, which handled the investment advisory

7   accounts, and the 18th and 19th floor.

8      A.    The Chinese wall.

9             MS. BROWN:  Objection.

10  BY MS. CHAITMAN:

11     Q.    The Chinese wall.  Okay.

12     A.    It's referred to.

13     Q.    Okay.  But are you saying that the

14  investment advisory transactions that we've just

15  reviewed were executed by people on the 18th or 19th

16  floors?

17            MS. BROWN:  Objection.

18            THE WITNESS:  It depends.  It depends

19      upon, again, whether we were a market-maker and

20      also the period of time.  The -- the Chinese

21      wall went into existence in the '80s, and the --

22      the Chinese wall varied based upon what the SEC

23      requirements were with -- with the Chinese wall.

24            In other words, it became more specific

25      the later the period went.  For example, once

*** CONFIDENTIAL ***

Page 46

1        you went into the '90s the Chinese wall was --

2        was, you know, in place.

3                When you're talking about doing

4        transactions in the '80s, it was -- that was

5        done, you know, by one -- you have to understand

6        we were one firm.  There was no -- there was no

7        separation between the investment advisory, you

8        know, and the -- and the market-making side in

9        the beginning.

10               It was only -- it was all down under

11       Bernard L. Madoff Investment Securities.  Even

12       the investment advisory form was filed -- the

13       ADD form was filed under Bernard L. Madoff

14       Investment Securities.

15               We structured the Chinese wall, as

16       required, to have different managers supervise

17       different departments.  And then physically we

18       moved the whole advisory side down to the 17th

19       floor.  That was in the '90s.

20               But it could have been any number of

21       people making -- you know, executing the

22       transaction, including myself, in these types of

23       convertibles.  But it could have been any number

24       of traders that did it, or it could just be me

25       going out and buying the security.

*** CONFIDENTIAL ***

Page 47

1   BY MS. CHAITMAN:

2       Q.    Okay.

3       A.    To answer your question, which I think I

4   know where you're going, the convertible securities

5   transactions were all bought and sold.  They were

6   not paper transactions, as opposed -- as opposed to

7   the split-strike transactions, which in the '90s

8   became just paper transactions, where we were

9   actually short.

10          You also have to understand one thing.

11  This is beyond the depth, for some reason, of Irving

12  Picard, his whole legal thing.  No -- no remarks,

13  but -- but it's -- I was astounded of the lack of

14  understanding of -- of this, but the -- oh, I went

15  off track.  The -- what was -- what --

16              MS. CHAITMAN:  Can you read back where

17      he was?  Just -- just read back his answer.

18              MS. BROWN:  I just want to make sure

19      we're -- we're -- the testimony has to be

20      limited to profit withdrawals.  So --

21              MS. CHAITMAN:  Yeah, I want you --

22      we're focusing on these transactions that we've

23      just reviewed.

24              THE WITNESS:  Okay.

25              (THE PREVIOUS ANSWER WAS THEN READ.)

*** CONFIDENTIAL ***

Page 48

1                THE WITNESS:  Okay.  Okay.  I

2        understand.  All right.  All of our trading was

3        done as principal.  You know, I had to explain

4        this, for some reason, to the SEC and to the

5        other people, the 20 some odd people who were

6        there at my proffer agreement, of what -- of

7        what that is.

8                When brokerage firms either buy or sell

9        as an agent, which means they go out into the

10       market, and they buy it from another broker, as

11       an agent, and then charge a commission or a

12       markup, or they trade as principal, which means

13       they go out into the market the same way and buy

14       it and sell it and mark it up or they short it.

15       They go short, the stock.

16                As -- as a market-maker -- which means

17       that we're selling stock to another

18       broker-dealer, like a Merrill Lynch or we're

19       selling it to John Q Public.  We're making the

20       same transaction.

21                We're selling that stock as principal,

22       meaning that I either bought it in the

23       marketplace or I shorted it.  Now, as a

24       registered market-maker, you're required by

25       regulation to at times short stock to a client

*** CONFIDENTIAL ***

Page 49

1     in order to be competitive in order to make a

2     two-sided market.

3            So I'm under an obligation, even though

4     I don't want to sell the security, to make my

5     market good, because I have a quoted market in

6     NASDAQ or on the pink sheets, depending upon the

7     time period.

8            And somebody comes in to buy stock or I

9     have a client that wants to buy stock, I have to

10    short the stock, which means that the client

11    still owns the stock.

12            The same way as if I had went out into

13    the market to bought it or I -- except that --

14    that it's my obligation to deliver that stock,

15    you know, in the future to that client if he

16    requires it or he wants to sell it and so on.

17    It's the same transaction.

18            Now, our practice, as most dealers,

19    like myself, in the industry, was to always

20    trade as principal.  Particularly in stocks we

21    were a market-maker in.  And the fact that we go

22    short a stock does not mean that the transaction

23    was not completed.

24            The reason I'm stressing that was

25    during the proffer agreament, the first thing

*** CONFIDENTIAL ***

Page 50

1          that the prosecutor jumped on was when I said

2          that -- going back even into the '70s I sold

3          stock short to a customer.

4                  And he said, well, you mean you sold

5          stock that you didn't own to the customer?  And

6          both myself and my attorneys were dumbfounded

7          with the question.

8                  I don't know whether it was theater,

9          but from that remark was deduced that Madoff

10         never sold -- bought stock for -- actually

11         bought the stock that he sold to a customer.

12                 When -- when other people, like other

13         attorneys in the industry, and I must have had

14         30 of them come down here in the past seven

15         years, were stunned at that kind of dialogue.

16                 And they said that he couldn't have not

17         been -- he couldn't have not known that.  This

18         must have been a theater to just build a case,

19         which I didn't know why anyone had built.  I had

20         admitted what I did.  All right.

21    BY MS. CHAITMAN:

22         Q.    Okay.  So the --

23         A.    All of the arbitrage transactions that

24    you're talking about, the Bleckers or for anybody

25    else, were actual purchases and sales of the

*** CONFIDENTIAL ***

Page 51

1    securities, either as agent or as principal, but

2    that doesn't matter which way it was done.  It was

3    an actual transaction, where money changed hands.

4        Q.    Okay.

5        A.    As opposed to the split-strike, where it

6    was done -- it was done the same way, but I never

7    reflected those short positions on the books.  And

8    there was my problem.

9            There was nothing wrong with me shorting

10   stock to clients, and -- even if it was 65 billion

11   dollars worth of shorting them.  Where I went wrong

12   and violated the law was not reflecting those

13   liabilities on my books and records.  That's it in a

14   nutshell.

15       Q.    Okay.  Just sticking with the profit

16   withdrawals, which is all I'm permitted to ask you

17   about --

18       A.    Okay.

19       Q.    -- with respect to the convertible

20   debentures.  Were there -- are there any documentary

21   records that you can recall that would establish

22   what you're saying, that these were actual

23   transactions?

24           In other words, for the period from, say,

25   1981 through, say, 1990?

*** CONFIDENTIAL ***

Page 52

1      A.     Yes.  You -- you --

2      Q.     Let me just finish.  1995, say.

3      A.     Right.

4      Q.     Are there any documentary records which

5    would prove what you're saying?

6      A.     They should all have been available, unless

7    they were, you know, destroyed or in part of the

8    record-retention process.  There would be blotters.

9    There would be cash receipts.

10           Depending upon whether the transaction went

11   through the clearing corporation or whether it was

12   just an over the -- over-the-window transaction, but

13   there would be debits and credits in the firm's bank

14   account.

15           Now, the convertible securities all went

16   through the Bank of New York.  They did not go

17   through, to my recollection, JPMorgan.  Those were

18   all -- all the investment advisory transactions,

19   which these would not be considered, going back to

20   the '80s, went through either Bank of New York,

21   Banker's Trust.

22           Man, we had -- we had a lot of banks, you

23   know.  There would -- there should be -- just as

24   there were, you know, transactions that went through

25   the clearing corp, which would have been NSCC or DTC

*** CONFIDENTIAL ***

Page 53

1    in the later years.

2         Q.    Okay.  Now, the -- this strategy with the

3    convertible debentures continued into the 1990s?

4         A.    Uh-huh.

5         Q.    And, as I understand it, it existed at the

6    same time as the split-strike conversion strategy?

7    There were some customers --

8         A.    Right.

9         Q.    -- who were in split-strike, and some were

10   in the --

11        A.    Correct.

12        Q.    -- subordinated debentures?

13             MS. BROWN:  Objection.

14   BY MS. CHAITMAN:

15        Q.    Are you saying that at the same time that

16   you were not executing the transactions in the

17   split-strike accounts, you were executing the

18   transactions in the subordinated debenture accounts?

19        A.    Yes.

20             MS. BROWN:  Objection.

21             Go ahead.

22             THE WITNESS:  Yes, but you -- you --

23        you have to understand that these transactions

24        could have been done as, you know, actually in

25        the marketplace or from the firm's trading or

*** CONFIDENTIAL ***

Page 54

1          investment accounts.

2                    In other words, it's -- it's not just a

3          matter of there were two -- as I said before,

4          there were ways that we could go out, and if we

5          decided we wanted to buy and sell a security for

6          a client doing a convertible arbitrage or for an

7          equity transaction, we would go out into the

8          marketplace and buy that securities, or the

9          marketplace would come to us and sell us that

10         security.

11                   All right.  Or we would go short the

12         stock from the firm's trading or investment

13         account to the client.  It's still the same

14         transaction.

15                   All right.  There's still an entry on

16         the books.  It would look the same.  It would

17         just be carried over into a long and short

18         position.  From the customer's standpoint it's

19         totally the same.

20       BY MS. CHAITMAN:

21         Q.    Okay.  So forgive me for going over this

22       again, but I just want to be clear on it.  If -- if

23       we wanted to find the documentary evidence of

24       this -- I mean, just let's -- let's be concrete.

25                   If I look at -- let me just take one of

*** CONFIDENTIAL ***

Page 55

1   these that's legible.  If -- if you'd be good enough

2   to look at Exhibit 4 for a second.

3       A.    Uh-huh.

4       Q.    Okay.  So this is 12/31/85.

5       A.    Right.

6       Q.    If I wanted to find the documentary

7   evidence of the --

8       A.    You would have a very -- this -- this

9   record would probably not be retained.  It's an '85

10  transaction.

11      Q.    Okay.  So there wouldn't be any place I

12  could find it?

13      A.    No.

14      Q.    And of the people who were working for you

15  at the time who were the people that I would have to

16  talk to who would possibly have executed these

17  transactions?

18      A.    It might have been myself.  It might have

19  been -- in '85 it could have been David Kugel.  It

20  could have been Martin -- well, Martin Joel was

21  dead.  I don't remember the name -- the names of

22  some of the other trade -- traders.

23      Q.    Okay.  And if we go a little bit further

24  along, like in, let's say, 1990.

25      A.    As a general rule, you would -- the firm

*** CONFIDENTIAL ***

Page 56

1    would not -- and I would -- you know, you'd have to

2    ask the trustee.  As a general rule, all records

3    were the past six years, which is their requirement

4    or -- or destroyed, with the exception of customer

5    transactions.

6             As I said, we kept those longer, because

7    the clients, particularly the individual clients

8    that we had, for some reason, could never find their

9    monthly statements for their tax returns and so on.

10             So we would constantly get -- as all

11   brokers did, we'd get phone calls from an account,

12   like the Bleckers, saying, I have a tax audit, and I

13   need to, you know, find my cost basis on a

14   particular security.  So we typically kept those --

15   those records longer.

16             But as far as Wall Street's records, nobody

17   kept records past -- as the same reason the banks

18   don't keep the records.  Six years is the record

19   retention period.

20             After that, they're automatically supposed

21   to be destroyed.  And that includes the -- by the

22   way, to correct that, that would include microfiche,

23   unless it was for clients.  But the counter signs of

24   broker-dealers don't.

25             As I said before, the -- the industry

*** CONFIDENTIAL ***

Page 57

1    requested the SEC to change their requirements,

2    which they, in fact, did from pressure in the

3    industry to not produce hard copy records with each

4    other, with brokerage firms trading amongst

5    themselves.

6            The requirement that you had -- you had to

7    be able to produce them upon an examination request

8    within 48 hours, but nobody kept records past six

9    years.  It would be impossible to do it.

10       Q.    But you would scan the records and keep

11   them on computer?

12               MS. BROWN:  Objection.

13               THE WITNESS:  Every -- to my knowledge,

14       everything would have been -- after six years,

15       we had no records.

16   BY MS. CHAITMAN:

17       Q.    Okay.

18       A.    Except you would find client confirmation

19   in the statement records, but not, you know, what's

20   called street records.  Meaning other brokerage

21   firms trading with each other, even in

22   clearinghouses.

23       Q.    Okay.  These -- these records --

24       A.    Those are customer statements.

25       Q.    These -- these were produced by the

*** CONFIDENTIAL ***

Page 58

1    trustee.

2       A.    Okay.

3              MS. BROWN:   Objection.

4    BY MS. CHAITMAN:

5       Q.    Going back to '85?

6       A.    Right.

7       Q.    So --

8       A.    Yeah.  Those -- as I said, those

9    statements, you would have some, because they

10   were -- they were customer activity.  I doubt

11   whether you would be able to find counter signed

12   with other brokerage firms that -- dating back that

13   long.

14      Q.    Okay.  Can you just --

15      A.    I -- I want to read --

16      Q.    Go ahead.

17      A.    -- something into the record, which may be

18   beneficial to you or not.  I don't know.  But the --

19   what was amazing to me and to a whole host of other

20   attorneys that came here and went through the same

21   process that we're going through, the -- the fact

22   that you can't produce going back whatever the

23   period of time is records that will research

24   transactions that -- you know, that would verify

25   that a transaction was done.

*** CONFIDENTIAL ***

Page 59

1        According to the trustee and the prosecutor

2    at the time, meant that the transaction never

3    occurred.  But other attorneys pointed out and said,

4    well, wasn't those transactions, you know -- you

5    know, gone -- didn't they go through the clearing

6    corporation?  Weren't there debit and entries in

7    checking accounts and so on?

8        Those transactions were reported to -- to

9    the regulators, to FINRA, or we reported those

10   transactions on a daily basis.  Weren't those debits

11   and credits -- you know, weren't they reflected

12   anywhere?  Wasn't there money changing hands?

13       You know, wasn't there a continuous net

14   settlement with the banks for the clearing

15   organizations wanted to get paid for securities back

16   and forth?

17       And they said, of course.

18       Well, doesn't that demonstrate the fact

19   that the transactions did take place?  And I had to

20   explain what a continuous net settlement was.  Now,

21   a continuous net settlement was when you buy stock

22   in a marketplace.

23       I may go out and buy the stock for Blecker,

24   let's assume, if it was a regular equity from a

25   Merrill Lynch.  All right.  I may buy it from five

Page 60

1   other brokerage firms.

2           The clearing corporation nets all of those

3   transactions overnight in a -- in what's called a

4   continuous net settlement, and -- and I get -- my

5   contract winds up being with a broker that has

6   nothing to do with Bear Stearns and Merrill Lynch.

7   It might be Credit Suisse or something of that sort.

8       Q.    Uh-huh.

9       A.    It's called a continuous net settlement.

10  They net all of the buys and sells, and they just

11  ask the broker for a money difference.  So I could

12  do literally a billion dollars worth of purchases

13  and sales and wind up with literally $100,000 net

14  credit or a debit, depending upon the transactions.

15  That's the way the industry runs.

16      Q.    And would -- were there different clearing

17  firms that you used for various kinds of --

18      A.    It wasn't --

19      Q.    -- transactions?

20      A.    They were not clearing firms.  They were

21  other counterparties of the brokerage firm.  We

22  cleared the transaction ourself, but we bought, as

23  did everybody else.

24          When you say a clearing firm, it means that

25  you had no back office capability to generate

*** CONFIDENTIAL ***

Page 61

1   confirmations or -- or no operations departments --

2       Q.      Uh-huh.

3       A.      -- and so on.  We had -- from the day we

4   opened up our doors in 1960 we self-cleared all of

5   our transactions and continued that through 2008.

6               MS. CHAITMAN:  Okay.  All right.  If I

7       can just take a five-minute break.

8               THE WITNESS:  I'll tell you what, I --

9               THE VIDEOGRAPHER:  Going off the

10      record.  The time is 10:03.

11              (RECESS FROM 10:03 A.M. TO 10:15 A.M.)

12              (MADOFF EXHIBITS 10 AND 11 WERE MARKED

13      FOR IDENTIFICATION.)

14              THE VIDEOGRAPHER:  Back on the record.

15      The time is 10:15.

16              MS. CHAITMAN:  I want to show you what

17      I've marked as Exhibit 11.

18              MS. VANDERWAL:  Are you sure it's not

19      10?

20              MS. CHAITMAN:  What did I do with 10?

21      Let's see.

22              MS. BROWN:  I think the last one you

23      marked -- you didn't use Exhibit 8, and then you

24      marked Exhibit 9.

25              MS. CHAITMAN:  Thank you.  Okay.  So

*** CONFIDENTIAL ***

Page 62

1        10 -- yeah.  Well, thank you for correcting me.

2        This is Exhibit 10.

3   BY MS. CHAITMAN:

4        Q.    So, Mr. Madoff, is it fair to say that

5   these are the same kinds of transactions that we've

6   already reviewed this morning?

7        A.    Yes.

8        Q.    So this is that same trading strategy?

9        A.    Correct.

10       Q.    And this is 12/31/90?

11       A.    Uh-huh.

12       Q.    And is it your testimony that as of

13  12/31/90 these transactions were actually executed?

14       A.    Correct.

15       Q.    Okay.  And these were executed by the

16  traders on the 18th and 19th floors?

17                 MS. BROWN:  Objection.

18                 THE WITNESS:  Yes.

19  BY MS. CHAITMAN:

20       Q.    Now, if I can show you what I've marked as

21  Exhibit 11, and we're just going to -- so this is --

22  the Madoff 11 is dated 5/31/95.  So we've skipped --

23       A.    Right.

24       Q.    -- several years.  Is this basically the

25  same strategy, the same trading strategy?

*** CONFIDENTIAL ***

Page 63

1          MS. BROWN:  Objection.

2          THE WITNESS:  Yes.

3    BY MS. CHAITMAN:

4      Q.    And as of May 31, 1995 were these

5    transactions actually executed by the people on the

6    18th and 19th floors?

7          MS. BROWN:  Objection.

8          THE WITNESS:  There's also the 17th

9      floor.  So during that period, in '95, the

10      seventh -- the 17th floor went into existence in

11      '92, I believe, or '93, something like that.

12    BY MS. CHAITMAN:

13      Q.    So were these -- were these transactions --

14    transactions that are reflected here actually done?

15          MS. BROWN:  Objection.

16          THE WITNESS:  After '90 -- after '92,

17      things got discombobulated.  So I can't -- I

18      can't say yes or no on that after '92.

19    BY MS. CHAITMAN:

20      Q.    Okay.  So do you have a -- when you say,

21    "after '92," do you have some way that you can peg

22    it to '92?  I just -- I just want to have your

23    testimony as to what the cutoff was.

24          When was -- when were the trades actually

25    executed on the convertible debenture strategy?

*** CONFIDENTIAL ***

Page 64

1       A.     I can't say specifically.  Certainly prior

2   to '92 they were.  Before it began in '92 --

3       Q.     So --

4       A.     -- partially.

5       Q.     If we said -- if we said January 1st, 1992,

6   everything before that was --

7       A.     Should have been --

8       Q.     -- was executed?

9       A.     -- executed.  Correct.

10      Q.     Okay.  Are you comfortable with that as --

11      A.     As comfortable as I can be, you know, now.

12      Q.     Okay.  Why -- why do you peg it to 1992?

13      A.     Because post '92 was when I started doing

14   the business in the split-strike, you know, or not

15   doing business in the split-strike.

16      Q.     Okay.  Now, have you ever discussed with

17   Irving Picard the profit withdrawal trades?

18      A.     No.

19      Q.     Did you -- did you ever meet with Irving

20   Picard?

21      A.     Once.  There -- during the proffer

22   agreement, which is the first day after I was

23   arrested.  To my knowledge, that was the last time I

24   spoke to him or saw him.

25      Q.     Okay.  Did you meet with anyone who either

*** CONFIDENTIAL ***

Page 65

1    represented him as a lawyer --

2         A.    Yes.

3         Q.    Who?

4         A.    David Sheehan and a whole group of lawyers

5    came down here, interviewed me for two days.  I

6    don't remember the time period.  Probably within a

7    few -- maybe two years after I came here, I guess it

8    was, or the year after I came here.

9         Q.    Okay.

10        A.    Which was, you know, in 2009.

11        Q.    2009, when you came here?

12        A.    Yeah.

13        Q.    So it would have been in 2010?

14        A.    Probably.  Something like that.

15        Q.    Okay.  And did they ask you whether the

16   profit withdrawal transactions were actually

17   executed?

18        A.    Not to my knowledge.  There was actually --

19   wait a minute.  There was one -- there was one

20   question-and-answer exchange that happened relating

21   to a scrap of paper that they produced that had some

22   scribbling on it from one of my traders.  I think it

23   was David Kugel, I think they said.

24             It was a conversion instruction.  And I

25   remember this, because it was, what they thought,

*** CONFIDENTIAL ***

Page 66

1   was some sort of smoking gun.  What they did was

2   they showed me a piece of paper and my attorneys who

3   were here at the time, Ike Sorkin.

4          And it gave the formula a particular

5   convertible bond or preferred.  I don't remember

6   which it was.  What that convertible bond was

7   convertible into the number of shares.  It was --

8          And they asked me what that was, and I

9   said, that is instructions of what -- how to convert

10  what -- what a convertible bond equal the number of

11  shares.

12         And they asked me if I knew who wrote this.

13  And I said, it looks like David Kugel's handwriting.

14  And they asked me what it was.  And I said, that

15  would be instructions to one of the operations

16  people to -- what -- how to convert a particular

17  security.

18         And from that he tried to, you know, say

19  that that was instructions to create a transaction.

20  And I said that you would probably find a hundred of

21  those types of instructions in the records if you

22  looked at them.

23         And that was instructions that the trader,

24  David Kugel at that time, would have to have been a

25  trader in that particular bond or preferred, is

*** CONFIDENTIAL ***

Page 67

1   instructing probably Jodi Crupi or one of the other

2   people, you know, in the operations department how

3   to allocate, you know, a particular security,

4   convert it.

5           I said, you know, if you went to any back

6   office, you would see instructions like that, you

7   know.  I didn't understand why he felt that that was

8   important one way or the other, but he -- he was --

9   I guess he -- where he was going was this was his

10  evidence that the -- that the transaction was just a

11  fictitious transaction, made up.

12          That was the end of that.  I started

13  laughing.  My attorney started to laugh.  And there

14  was, you know, a lot of confused looks from the

15  lawyers, the other six attorneys that were present

16  at that meeting.

17          That was the only thing -- that was the

18  only -- that was the only conversation we had,

19  period, about anything relating to any of this.

20      Q.   Did anyone on behalf of the trustee ask you

21  what your policy was with respect to requiring

22  letters from clients asking for withdrawals?

23      A.   I don't recall anything coming up about

24  that.  No.

25               MS. CHAITMAN:  Okay.  All right.  I

*** CONFIDENTIAL ***

Page 68

1          have no further questions, subject to redirect.

2                    MS. BROWN:  Okay.  I have some

3          questions, but we need --

4                    THE WITNESS:  Sure.

5                    MS. BROWN:  -- to take a short break.

6                    THE WITNESS:  Okay.

7                    MS. BROWN:  Just a couple of minutes --

8                    THE VIDEOGRAPHER:  Going --

9                    MS. BROWN:  -- if that's okay.

10                   THE VIDEOGRAPHER:  Going off the

11         record.  The time is 10:25.

12                   (RECESS FROM 10:25 A.M. TO 10:40 A.M.)

13                   THE VIDEOGRAPHER:  Back on the record.

14         The time is 10:40.

15            CROSS-EXAMINATION BY COUNSEL FOR TRUSTEE

16    BY MS. BROWN:

17         Q.    Good morning, Mr. Madoff.

18               Mr. Madoff, your former business was called

19    Bernard L. Madoff Investment Securities, L.L.C.;

20    correct?

21         A.    Yes.

22         Q.    Okay.  And is it okay if we refer to it as

23    BLMIS today?

24         A.    Perfect.

25         Q.    Great.  Mr. Madoff, who was in charge of

*** CONFIDENTIAL ***

Page 69

1   BLMIS?

2       A.    Me.

3       Q.    Okay.  And what were your day-to-day

4   responsibilities for BLMIS?

5       A.    Primarily just supervising the firm, but

6   based upon our compliance procedures as part of the

7   Chinese wall, the firm had to be divided in -- in

8   different divisions.

9           So we had a market-making division, which

10  was supervised by my son, Mark.  We had a

11  proprietary trading division, which was supervised

12  by my son, Andy.

13          The investment advisory side, or the 17th

14  floor, as it's referred to, was basically supervised

15  by Frank DiPascali.  And my brother, Peter, was the

16  compliance director of the -- everything, other than

17  the investment advisory side.  I was the compliance

18  manager of the investment advisory side.

19          And each -- the requirements had that the

20  divisions could not speak to each other.  So my

21  sons, Mark and Andy, could not have contact with

22  what the profits or loss of each department was.

23  They had to be run like separate divisions.

24          That was a procedure that was put into

25  place.  Well, it started in the '80s, but what --

*** CONFIDENTIAL ***

Page 70

1    it -- the SEC kept on adjusting what the industry

2    had to do through the 2000's.

3        Q.    Okay.  So those supervisors that you've

4    just described in the organizational chart, you were

5    above them?

6        A.    Yes.  I was in charge of everything.

7        Q.    Okay.  Did you report to anybody?

8        A.    No.

9        Q.    And those supervisors that you've just

10   described, they reported to you?

11       A.    Yes.

12       Q.    How many employees did you have in total at

13   BLMIS?

14       A.    I would guess offhand, maybe 100, 150.

15       Q.    And how did those employees break down

16   between the three divisions that you've described?

17       A.    There were -- I would say there were 75

18   traders.  There were probably 30 operations, back

19   office type people.  A similar amount of IT people.

20   I don't know.  What are we -- what are we up to now?

21       Q.    Sixty -- 135.

22       A.    And the rest were, you know, a combination

23   of bookkeepers, operate -- you know, messengers,

24   people of that sort.

25       Q.    Approximately how many people worked on the

*** CONFIDENTIAL ***

Page 71

1    17th floor in the investment advisory department?

2         A.    There was Frank DiPascali, Jodi Crupi,

3    Erin, Eric Lipkin.  There was another fellow.  I

4    don't remember his name.  Frank's cousin.  I think

5    his name was -- and there was Annette, and she had

6    about four different women working for her.

7              Then there was a whole mailroom that had

8    about four or five people in it.  And then there

9    were a number of other programmers, George and

10   Jerry.  George -- I think pretty much that covers

11   them.

12        Q.    Okay.  And, so just going through the

13   employees that you've listed, what were Frank

14   DiPascali's day-to-day responsibilities?

15        A.    Pretty much everything relating to the

16   customers.

17        Q.    Those are the customers in the investment

18   advisory business?

19        A.    Right.

20        Q.    Can you give me some detail about -- when

21   you say everything related to customers in the

22   investment advisory, what does that mean?

23        A.    He was in charge of the split-strike

24   conversion trades.  He was in charge of the

25   programming.  The -- the actual execution of the

*** CONFIDENTIAL ***

Page 72

1    model for the split-strike trades, and he just ran

2    pretty much everything down that floor.

3        Q.    Is it fair to say that Frank was in charge

4    of the 17th floor?

5        A.    Yes.

6        Q.    And Jodi Crupi, what did she do on a daily

7    basis on the --

8        A.    She --

9        Q.    -- 17th floor?

10       A.    -- basically worked with Frank.  She kept

11   the checkbook for the JPMorgan account, which is

12   where all the investment advisory clients

13   transactions took place.  She was his -- his number

14   one assistant.

15       Q.    When you say she handled the checkbook, did

16   she sign checks?

17       A.    No.

18       Q.    Okay.

19       A.    No.

20       Q.    Who signed the checks for the JPMorgan

21   account?

22       A.    I did mostly.  Sometimes -- I don't even

23   know who else would sign them.  I guess my brother

24   had signatory possibly.  I -- I was trying to think

25   of that the other day.  I couldn't remember whether

*** CONFIDENTIAL ***

Page 73

1    he ever did or not.  I don't know who else.  I don't

2    remember who else.

3         Q.    Did you physically sign the checks, or your

4    signature was printed --

5         A.    No.

6         Q.    -- from the computer?

7         A.    Physically.  Physically.

8         Q.    And you physically signed the checks

9    through 2008?

10        A.    Yes.

11        Q.    And, other than Peter and yourself, you

12   can't -- do you -- did anyone else have signing

13   authority for the JPMorgan account?

14        A.    I don't recall.

15        Q.    Okay.  You mentioned Erin.  Is Erin -- is

16   that Erin Reardon?

17        A.    Yes.

18        Q.    Okay.  And what were Erin's day-to-day

19   responsibilities on the 17th floor?

20        A.    She -- she was also -- same as Jodi, except

21   she -- I don't think she kept anything to do with

22   the checkbook.  She just, you know, helped process

23   all of the -- the transactions with Frank.

24        Q.    Okay.  And, Eric Lipkin, what were his

25   day-to-day responsibilities?

*** CONFIDENTIAL ***

Page 74

1        A.    Same as -- same as Jodi, except also he

2   didn't -- he wasn't involved with the checkbook

3   really.  He was -- worked with Frank with --

4   remodeled the allocations of the trades and so on.

5        Q.    Okay.  Let's turn to Annette.  That's

6   Annette Bongiorno?

7        A.    Yes.

8        Q.    And what were Annette's day-to-day

9   responsibilities?

10       A.    Primarily handling the -- the customer

11  statements dealing with mostly related to Levy,

12  Picower, Stanley Chais and a number of other

13  clients.

14       Q.    And how long did Ms. Bongiorno work for

15  you?

16       A.    Probably 30 some odd years.

17       Q.    Did she always work on the investment

18  advisory side of the business?

19       A.    No.  She worked on the arbitrage side for

20  the customers.  Also as -- she was basically a

21  bookkeeper.

22       Q.    When you say, "the arbitrage side for the

23  customers," are you referring to customers in the

24  investment advisory business?

25       A.    Well, the investment advisory didn't really

*** CONFIDENTIAL ***

Page 75

1    go into existence officially until, you know, in the

2    '90s while she -- until we filed the form, which was

3    in 2006, but she was on -- wasn't on the 17th floor

4    until the '90s, when we moved everybody down to the

5    17th floor.  That didn't have anything to do with

6    market-maker or the proprietary side.

7        Q.    And the customer accounts that she handled,

8    were those investment advisory accounts?

9        A.    Well, it's hard to -- to classify

10   whether -- she primarily handled a group of the

11   large accounts and the convertible arbitrage-type

12   accounts.

13       Q.    Okay.  And you mentioned that Ms. Bongiorno

14   had several different people working for her.  Do

15   you know what those individuals did on a daily

16   basis?

17       A.    They were bookkeepers.

18       Q.    Do you remember any of their names?

19       A.    She had one, Evelyn -- I don't remember

20   their names.

21       Q.    Yeah.

22       A.    I used to.

23       Q.    Okay.  But those bookkeepers worked for

24   Annette?

25       A.    They were clerks.  Yeah.

*** CONFIDENTIAL ***

Page 76

1      Q.    Clerks.  And they reported to Annette?

2      A.    Yes.

3      Q.    Okay.  You mentioned the mailroom.  What

4   was the mailroom's responsibility at BLMIS?

5      A.    Mail out the customer confirmations

6   basically and customer statements.

7      Q.    Would they mail customer checks?

8      A.    Yes.

9      Q.    Did the mailroom stuff the envelopes for

10   the statements and the checks?

11      A.    Yes.

12      Q.    And you mentioned the programmers, George

13   Perez and Jerry O'Hara.  What were their daily

14   responsibilities?

15      A.    They wrote code for the computer, dealing

16   with primarily the investment advisory clients,

17   trades.

18      Q.    I'm going to read some names to you, and if

19   you -- if they refresh your recollection, maybe you

20   could tell me what they did.  Is the name Winifier

21   Jackson familiar to you?

22      A.    Yeah.  She was one of Annette's clerks.

23      Q.    Okay.  And do you have any specifics on

24   what her role was?

25      A.    Just following Annette's instructions

*** CONFIDENTIAL ***

```
                                        Page 77
 1    primarily.
 2        Q.    Okay.  And Alethea Mui?  I don't know if
 3    I'm saying that right.
 4        A.    Alethea.  Yeah.
 5        Q.    Yeah.
 6        A.    Same.
 7        Q.    Same.  So she had a similar role --
 8        A.    Yeah.
 9        Q.    -- as Ms. Jackson?
10        A.    Uh-huh.
11        Q.    Dorothy Khan?
12        A.    I think the same.
13        Q.    When you say, "the same," you mean the same
14    as Alethea --
15        A.    Right.
16        Q.    -- and Ms. Jackson?
17        A.    Uh-huh.
18        Q.    Okay.  Fran Barbato?
19        A.    Probably the same.
20        Q.    Okay.  So all the people that we've just
21    described, Frank, Jodi, Erin, Eric, Annette,
22    Ms. Jackson, Ms. Mui, Ms. Khan, those employees all
23    worked on the 17th floor?
24        A.    Right.
25        Q.    And is it fair to say that they ran the
```

*** CONFIDENTIAL ***

Page 78

1   investment advisory business for you?

2        A.    Well, they didn't -- they were basically

3   bookkeepers.

4        Q.    Okay.  Did they handle -- sorry.  Strike

5   that.  I want to go back just one step.

6              Is the name Joanne Sala familiar to you?

7        A.    Excuse me?

8        Q.    Joanne Sala?

9        A.    What did Joanne do?  She -- I don't

10   remember.  She worked -- she worked with Annette

11   also.  I don't know how long.  I guess she worked

12   with Annette for -- during that same period.

13        Q.    What period is that?

14        A.    I think she -- I don't remember whether she

15   stayed -- whether she was at the firm at the very

16   end or not, but certainly, you know, through the

17   '90s and 2000, I guess.

18        Q.    And she worked for Annette?

19        A.    Yeah, I believe so.

20        Q.    Okay.  So Annette would be her supervisor?

21        A.    Yeah.

22        Q.    Are you familiar with what Ms. Sala's

23   specific job duties were?

24        A.    No.

25        Q.    Okay.  Okay.  So the -- including Ms. Sala

*** CONFIDENTIAL ***

Page 79

1    into the list of people that you've described that

2    worked on the 17th floor, did those employees open

3    investment advisory accounts for customers?

4         A.    I don't -- when you mean open them, I don't

5    know.  I mean, I don't remember who -- who

6    physically opened the account, meaning filing the

7    papers and so on.

8         Q.    Uh-huh.

9         A.    It could have been any number of them.

10        Q.    Okay.  Would it have been someone that

11   worked on the 17th floor?

12        A.    Huh?

13        Q.    Would it have been someone that worked on

14   the --

15        A.    Yes.

16        Q.    -- 17th floor?

17        A.    Yes.  Somebody had to on the 17th floor do

18   it.

19        Q.    Okay.  And when questions from customers

20   relating to their customer accounts came in, were

21   those phone calls taken by employees on the 17th

22   floor?

23        A.    Yes.

24        Q.    Did Annette have her own phone line?

25        A.    I mean, everybody had an extension.

*** CONFIDENTIAL ***

Page 80

1      Q.    Okay.  And did customers call Ms. Bongiorno
2   directly?
3      A.    Some, yes.
4      Q.    Okay.  And did customers call Frank
5   DiPascali directly?
6      A.    Yes.
7      Q.    And were customers able to contact other
8   individuals that worked on the 17th floor directly?
9      A.    Including them, yes.
10     Q.    To your knowledge, did Frank DiPascali and
11  Annette Bongiorno take customer calls?
12     A.    Yes.
13     Q.    And did they respond to customer inquiries?
14     A.    Uh-huh.
15     Q.    Yes?
16     A.    Yes.
17     Q.    Did they confer with you every time a
18  customer called?
19     A.    No.
20     Q.    And did Ms. Bongiorno, Mr. DiPascali and
21  the individuals working for them have the authority
22  to speak with customers?
23     A.    Yes.
24     Q.    And did they have the authority to respond
25  to their inquiries?

*** CONFIDENTIAL ***

Page 81

1      A.    If they -- if they knew the answer.

2      Q.    When customers sent correspondence to

3   BLMIS, where would the correspondence go?

4      A.    It would go basically to the 17th floor.

5      Q.    And did you personally review any of the

6   correspondence?

7      A.    Some, over the years, yes.

8      Q.    Would you review correspondence from

9   customers on a daily basis?

10     A.    No.

11     Q.    On a weekly basis?

12     A.    I -- maybe.

13     Q.    Okay.  Is it fair to say that the employees

14  on the 17th floor were the first point of contact

15  for the letters that were received from customers?

16     A.    Yes.

17     Q.    After BLMIS received customers from

18  letters, where did BLMIS put the letters?

19           MS. CHAITMAN:  I think you said -- you

20      said, "customers from letters."

21           MS. BROWN:  Sorry.  Do you want to read

22      it back?  I got --

23           (THE PREVIOUS QUESTION WAS THEN READ.)

24           MS. BROWN:  Oh, I'm sorry.

25  BY MS. BROWN:

*** CONFIDENTIAL ***

Page 82

1      Q.    Once BLMIS received the letters, what did
2   it do with them after that?
3      A.    It would go into a customer file.
4      Q.    Okay.  And where were those customer files
5   maintained?
6      A.    On the 17th floor.
7      Q.    And did the employees on the 17th floor
8   have access to those files?
9      A.    Yes.
10     Q.    And were they responsible for maintaining
11  those files?
12     A.    Yes.
13     Q.    How often did you review the individual
14  customer files?
15     A.    Rarely.
16     Q.    BLMIS sent monthly customer statements to
17  its customers; yes?
18     A.    Yes.
19     Q.    Okay.  And how were the monthly statements
20  created?
21     A.    They were created on the 17th floor through
22  the -- one of the IBM computers.
23     Q.    Is the IBM computer also referred to as an
24  AS/400?
25     A.    Yes.

*** CONFIDENTIAL ***

Page 83

1        Q.    Who printed the statements each month?

2        A.    Who printed them?  You mean who ran them

3    through -- ran the computer?

4        Q.    Yes.

5        A.    I'm not sure -- I'm not sure of the name of

6    the person that sat in the room anymore.

7        Q.    Okay.  Was it an employee on the 17th

8    floor?

9        A.    Yes.

10       Q.    You didn't personally print the statements?

11       A.    No.

12       Q.    Okay.  So you mentioned that BLMIS used an

13   AS/400 computer system relating to the customer

14   accounts?

15       A.    Right.

16       Q.    And who put the -- who input data into the

17   AS/400?

18       A.    Who input the data?  It must have come

19   from, I would assume, either Frank or Annette.

20       Q.    So the -- the data came from Frank or

21   Annette?

22       A.    Uh-huh.

23       Q.    Yes?

24       A.    Yeah.

25       Q.    Okay.  And then who would physically put it

*** CONFIDENTIAL ***

Page 84

1    into the computer?

2        A.    We had a number of keypunch operators.

3        Q.    Okay.  And those keypunch operators worked

4    on the 17th floor?

5        A.    Yes.

6        Q.    Was the AS/400 used to print the checks to

7    customers?

8        A.    I don't know.  It must have been, I would

9    assume.

10       Q.    Okay.  So we've discussed the customer

11   statements, checks to customers, speaking with

12   customers.  Are those all duties that were handled

13   by the employees on the 17th floor?

14       A.    Yes.

15       Q.    And we might have skipped over at the

16   beginning, but could you tell me what your personal

17   responsibilities were with respect to the investment

18   advisory business?

19       A.    Just supervising in general and working

20   with Frank.

21       Q.    How often did you go down to the 17th

22   floor?

23       A.    Daily.

24       Q.    And what did you do when you were down

25   there?

*** CONFIDENTIAL ***

Page 85

1     A.     Answer questions or make decisions as to

2   when we were going to put trades through on the

3   split-strike trades.

4     Q.     Who were those conversations with?

5     A.     Frank.

6     Q.     Is there anything else that you can think

7   of that the employees on the 17th floor did for you?

8     A.     No.  Pretty much what we've covered.

9     Q.     Mr. Madoff, have you met Ms. Chaitman

10   before today?

11     A.     No.

12     Q.     You haven't met her in person?

13     A.     Uh-uh.

14     Q.     Have you communicated with her before

15   today?

16     A.     Yes.

17     Q.     And how -- what was the first time you

18   communicated with her?  What did you do?

19     A.     Spoke to her over the telephone.

20     Q.     Did she call you, or did you call her?

21     A.     Well, nobody can call me in prison.  So I

22   must have called her.

23     Q.     Okay.  And when was that?

24     A.     I guess a couple of years ago, I believe.

25     Q.     And how often have you spoken to

*** CONFIDENTIAL ***

Page 86

1    Ms. Chaitman since --

2         A.    Well, I think I spoke to her twice.

3         Q.    Twice in the last couple of years?

4         A.    Uh-huh.  Relatively short phone calls.

5         Q.    Can you estimate the length?

6         A.    Well, the maximum could be 15 minutes.  So

7    it was certainly less than that.  It basically had

8    to do with her trying to come in to see me.

9         Q.    Okay.  So -- but until today she's never

10   come to see you?

11        A.    No.

12        Q.    So you discussed twice her coming to see

13   you, but she didn't come?

14        A.    She -- the prison wasn't allowing her to

15   come down.  I said I also had a conversation with

16   one of her attorneys, Lance -- something or other, I

17   think his name was.

18        Q.    Okay.  And can you tell me the approximate

19   date of those two conversations?

20        A.    No.  She would be able to tell you more

21   than I would.

22        Q.    Okay.  But it was in the last couple of

23   years?

24        A.    Yeah.

25        Q.    And, other than those two conversations,

*** CONFIDENTIAL ***

```
                                              Page 87
 1    those are the only two conversations you have had
 2    with Ms. Chaitman by telephone?
 3        A.    That's correct.
 4        Q.    And, other than Lance, have you spoken to
 5    anyone else at Ms. Chaitman's firm?
 6        A.    I might have spoken to an Italian fellow,
 7    named Joe -- something or other.  I don't know.
 8    Also a very brief conversation.  All related to
 9    basically, you know, coming to see me.
10        Q.    And did Joe or Lance come -- come to see
11    you?
12        A.    No.
13        Q.    Have you communicated with Ms. Chaitman or
14    anyone at her firm by e-mail?
15        A.    No.
16        Q.    Never?
17        A.    I might have sent an e-mail again to -- to
18    one of her employees relating to coming to see me,
19    but, you know, then they took her off the -- I
20    wasn't allowed any communications with her based
21    upon the Bureau of Prisons for some reason.
22        Q.    Okay.  And that -- that e-mail was a couple
23    of years ago or more recently?
24        A.    Probably certainly within well over a year
25    ago.
```

*** CONFIDENTIAL ***

Page 88

1        Q.    And, other than that one e-mail, have you

2    had any other e-mail communications with

3    Ms. Chaitman or her firm?

4        A.    No.

5        Q.    Did you communicate with her prior to

6    setting up today's visit?

7        A.    Nothing, other than what I said that I gave

8    you.  I don't recall.  No.

9        Q.    I thought that you testified that you spoke

10   to her a year ago by e-mail.  Did you speak -- have

11   any conversations by e-mail or over the phone about

12   today's visit?

13       A.    About today's visit?

14       Q.    Yes.

15       A.    No.

16       Q.    And, other than that one e-mail that you've

17   just described, you've had no other e-mail

18   communications with Ms. Chaitman or anyone at her

19   firm?

20       A.    No.

21       Q.    When was the first time that you heard

22   about a dispute regarding profit withdrawals?

23       A.    I guess about -- I received a letter

24   regarding the -- oh, actually, I received some

25   communications with -- from -- I don't know if it

*** CONFIDENTIAL ***

Page 89

1    was from her or from my brother-in-law, who is one

2    of their -- one of her clients, relating to a book

3    that she was writing, something of that sort.

4        Q.    Okay.  And when you say, "her," and, "she,"

5    in that sentence, are you referring to Ms. Chaitman?

6        A.    Uh-huh.  What?

7        Q.    I said -- you said, "her," and, "she."  So

8    are you referring to Ms. Chaitman --

9        A.    Ms. Chaitman.  Right.

10       Q.    -- when you were just discussing the --

11       A.    Yeah.

12       Q.    -- book?

13             Okay.  And who is your brother-in-law?

14       A.    Bob Roman.  Robert Roman.

15       Q.    And how did Mr. Roman raise the profit

16   withdrawal issue to you?

17       A.    I received some copies of -- I think it was

18   in one of the exhibits that you -- that you first

19   showed me, about -- I'm trying to think of what it

20   was.

21             It had to do with one of the customer --

22   the question was basically whether or not -- I

23   signed something, some document that she sent to me

24   relating to profit withdrawals, whether or not we

25   sent out checks without a -- whether a check would

*** CONFIDENTIAL ***

Page 90

1    be issued without instructions from a client,

2    something of that sort.

3        Q.    Okay.  We'll get to the Declaration in a

4    second, but just sticking with the first time that

5    you heard about the dispute regarding profit

6    withdrawals, who did you hear about it from?

7        A.    It came in from -- I received it in the

8    mail.  It must have come from either Robert Roman,

9    who is one of her clients, or it came from -- I

10   don't think it came from New York.  It must have

11   come from Rob Roman.

12       Q.    Okay.  What did you do after you received

13   that mailing?

14       A.    I -- I signed something, basically similar

15   to what she outlined in that letter here about

16   profit withdrawal.

17       Q.    Okay.  And who was the letter from?

18       A.    I don't remember.  Like I said, I assumed

19   it must have come from -- from the office of

20   Chaitman.

21       Q.    Do you have a copy of the letter?

22       A.    No.

23       Q.    Do you know around what date you received

24   that letter?

25       A.    Within a year ago.

*** CONFIDENTIAL ***

Page 91

1      Q.     Do you recall who the letter was signed by?

2      A.     Excuse me?

3      Q.     Who the letter was signed by?

4      A.     No.

5      Q.     You mentioned the letter was accompanied by

6   some documents.  Do you recall what those documents

7   were?

8      A.     I thought it -- it might have been a

9   reprint of one of the accounts.

10     Q.     Okay.  Other than the document you've just

11  described, have you reviewed any other documents

12  before today's deposition relating to the profit

13  withdrawal dispute?

14     A.     No.

15            MS. BROWN:  I'd like to mark for the

16         record the Declaration of Bernard L. Madoff as

17         Madoff 12.

18            Can I have a sticker, please?

19            MS. CHAITMAN:  It's actually already

20         marked.  Do you want to use the one we just

21         marked?

22            MS. BROWN:  I don't.  I want to use

23         this one.

24            MS. CHAITMAN:  Okay.

25            MS. BROWN:  Can I have a sticker,

*** CONFIDENTIAL ***

Page 92

1          please?

2                    MS. CHAITMAN:  Oh, sure.

3                    MS. BROWN:  Are you going to use the

4          rest, because --

5                    MS. CHAITMAN:  No.  You can take them.

6                    MS. BROWN:  Okay.

7                    (MADOFF EXHIBIT 12 WAS MARKED FOR

8          IDENTIFICATION.)

9                    MS. BROWN:  And I do want to note for

10         the record the -- a similar Declaration was

11         marked as Madoff Exhibit 2.  The differences

12         that I can tell between these two Declarations

13         is the Declaration in Exhibit 2 is missing the

14         line, "Attorneys for the customers listed on

15         Exhibit A hereto."  I'm sorry.  Exhibit 12 is

16         missing that line.

17                   The next difference is the caption.  It

18         has a different format, and the document has a

19         different name.  The name on Madoff Exhibit 2

20         is, "Declaration Opposing Trustee's Treatment of

21         Profit Withdrawals."  The name on Madoff

22         Exhibit 12 is the, "Declaration of Bernard L.

23         Madoff."

24                   The other differences that I can see at

25         this point are Madoff Exhibit 2 has a page --

*** CONFIDENTIAL ***

Page 93

1        page numbers on pages one, two and three.

2        Madoff Exhibit 12 does not have a page number on

3        page one or two, and it has it on page three.

4                    And we reserve our rights to further

5        examine the exhibits to determine whether there

6        are any other differences between them.

7    BY MS. BROWN:

8        Q.    Mr. Madoff, I'm placing before you what's

9    been marked as Madoff Exhibit 12.

10                   MS. CHAITMAN:  Do you have extra

11       copies?

12                   MS. BROWN:  Oh, I'm sorry.  I do.

13                   MS. CHAITMAN:  Thank you.

14                   MS. BROWN:  You're welcome.

15                   THE WITNESS:  Okay.

16   BY MS. BROWN:

17       Q.    Mr. Madoff, who prepared this Declaration?

18       A.    I believe this is the first I've seen it.

19       Q.    This is the first time you've seen the

20   Declaration?

21       A.    Uh-huh.

22       Q.    Do you want to turn to page three?  Is that

23   your signature on the back?

24       A.    Yes.

25       Q.    Okay.  But looking at the first two pages,

*** CONFIDENTIAL ***

Page 94

1    that's the first time you've seen this Declaration?

2        A.    You know, this looks -- this -- well, the

3    information in it looks similar to what I just said

4    before that -- that I received from her.

5        Q.    Okay.  Did you personally type up this

6    Declaration?

7        A.    Me?  I?

8        Q.    Yes.

9        A.    No.

10       Q.    How did you first receive the Declaration?

11       A.    I would have had to have received it in the

12   mail.

13       Q.    In the mail.  And do you know who you

14   received it from?

15       A.    Either the Chaitman office or Robert Roman.

16       Q.    Do you recall the time period around when

17   you received the Declaration?

18       A.    Within a year.

19       Q.    Within a year of today's date?

20       A.    Uh-huh.

21       Q.    Did you make any changes to the

22   Declaration?

23       A.    Not that I recall.  Oh, wait a minute.

24   I -- I crossed something out, I think.  I don't

25   remember what it was that I crossed out.

*** CONFIDENTIAL ***

Page 95

1      Q.    Okay.  After you crossed it out, what did

2  you do with the document then?

3      A.    I -- I must have mailed it back.

4      Q.    Did you sign the document before you mailed

5  it back?

6      A.    Yes.

7      Q.    Other than the -- let me back up.

8          Do you recall what it was that you crossed

9  out?

10      A.    It was some language.  I don't remember

11  what it was, though.

12      Q.    Do you remember what the language was about

13  or the topic?

14      A.    Let me see.  I'll read this through.  I

15  don't remember seeing anything about Picower in

16  this.  No.  I don't remember seeing number four or

17  number three.  I don't remember seeing this.  I

18  don't remember seeing that language in -- in what I

19  signed.

20          MS. BROWN:  Okay.  Thank you,

21      Mr. Madoff.  I think we have to go off the

22      record to change the tape.  So --

23          THE VIDEOGRAPHER:  This ends media

24      number one in the deposition of Bernard L.

25      Madoff.  Going off the record.  The time is

*** CONFIDENTIAL ***

Page 96

1        11:15.

2                    (RECESS FROM 11:15 A.M. TO 11:17 A.M.)

3                    THE VIDEOGRAPHER:  This begins media

4        number two in the deposition of Bernard L.

5        Madoff.  The time is 11:17.  We are on the

6        record.

7    BY MS. BROWN:

8        Q.    Mr. Madoff, if we could just go through the

9    Declaration paragraph by paragraph.  Do you

10   recall -- before you signed the Declaration

11   approximately a year ago, do you recall seeing

12   paragraph one?

13       A.    Yes.

14       Q.    Okay.  And what were you informed about the

15   dispute that's described in paragraph one?

16       A.    Basically that I -- I guess that the --

17   there was some claims that the customer did not

18   receive the checks that matched the -- the profit

19   withdrawals.

20       Q.    Okay.  And you -- who were you informed

21   about that by?

22       A.    What -- by this document.

23       Q.    Okay.  When you received the Declaration?

24       A.    Yeah.

25       Q.    Okay.  Okay.  And, Mr. Madoff, you

*** CONFIDENTIAL ***

Page 97

1    indicated that you sent -- I'm sorry.  You struck

2    out a paragraph before you sent it back; correct?

3        A.    Uh-huh.

4        Q.    Okay.  And did you make any other edits

5    that you can recall to the Declaration?

6        A.    No.

7        Q.    Okay.  And, other than mailing it back, did

8    you have any discussions with Ms. Chaitman --

9        A.    No.

10       Q.    -- about the Declaration?

11       A.    No, because I couldn't reach her, if I

12   wanted to.

13       Q.    Did you have any discussions with anyone

14   else --

15       A.    Uh-uh.

16       Q.    -- about the Declaration?

17       A.    No.

18       Q.    After you sent the Declaration back with

19   the changes that you've indicated, did you receive

20   any other drafts of the Declaration?

21       A.    No.

22       Q.    Did you see any other --

23       A.    Actually -- wait a minute.  I'm not -- I'm

24   not sure whether I received something -- you know,

25   if I signed -- this is clearly my signature.  All

*** CONFIDENTIAL ***

Page 98

1   right?

2        Q.    Okay.

3        A.    Now, I wouldn't have -- either I -- in

4   other words, I wouldn't have signed something if --

5   if I crossed something out, and it wasn't here, you

6   know.

7        Q.    Uh-huh.

8        A.    So I must have received something with the

9   same information -- information.  I'm sort of

10  confused --

11       Q.    Okay.

12       A.    -- about this.  It wasn't -- it was nothing

13  relevant or nothing major that I crossed out.  It

14  was just something that -- I crossed it out for some

15  reason.  I don't remember what it was.

16            I remember, as far as I knew, the only

17  thing that was important was the question of whether

18  or not we issued checks --

19       Q.    Uh-huh.

20       A.    -- without having instructions from the

21  client.

22       Q.    Okay.  Okay.  So in paragraph one it

23  states, "I have been informed that the trustee,

24  Irving Picard, has claimed that my customers

25  received payments that the customers dispute they

*** CONFIDENTIAL ***

Page 99

1   received."

2       A.    Right.

3       Q.    And did you have any information about what

4   Ms. Chaitman's position was in this dispute?

5       A.    I -- I would assume that -- that that was

6   the case involved -- the dispute involved whether or

7   not, you know, checks were sent out to a client

8   without having instructions.

9       Q.    Okay.

10      A.    That's it.

11      Q.    Okay.  Did you have any specific

12   communications about Ms. Chaitman's position?

13      A.    No, other than what was -- what was in the

14   document.

15      Q.    And the document you're referring to is the

16   Declaration --

17      A.    Right.

18      Q.    -- Madoff Exhibit 12?

19           And, just to confirm, Madoff Exhibit 12 was

20   not created by you?

21      A.    No.

22      Q.    And it was not prepared by you?

23      A.    No.

24      Q.    Were you told why your testimony was being

25   sought in this dispute?

*** CONFIDENTIAL ***

Page 100

1      A.    Because I was the one -- I would know

2   whether or not this was a true fact --

3      Q.    Uh-huh.

4      A.    -- true statement or not.

5      Q.    Were you offered anything in exchange for

6   your Declaration?

7      A.    No.

8      Q.    Okay.  Any payments?

9      A.    No.

10     Q.    Anything of value?

11     A.    No.

12     Q.    Prior to reviewing the Declaration that you

13  received in the mail did you review any other

14  documents related to the profit withdrawal dispute?

15     A.    Not that I recall.

16     Q.    And before today's deposition, putting

17  aside the documents that we've looked at here today,

18  have you reviewed any documents relating to the

19  profit withdrawal dispute?

20     A.    No.

21            MS. BROWN:  Okay.  I'd like to -- I'll

22       mark it as Madoff Exhibit 13, but I'll also note

23       for the record this exhibit bears the Bates --

24       I'm sorry -- the Exhibit Number Trustee 36, and

25       it has a Bates number of MADTBB01988418.

*** CONFIDENTIAL ***

Page 101

1           (MADOFF EXHIBIT 13 WAS MARKED FOR

2       IDENTIFICATION.)

3   BY MS. BROWN:

4       Q.    Mr. Madoff, I'm placing before you what's

5   been marked as Madoff Exhibit 13.

6       A.    Okay.

7       Q.    Do you recognize this document?

8       A.    I can't read a thing that's on it.  Oh,

9   yeah.  All right.  This looks like something from

10  Annette's department basically.  You know, how they

11  opened up an account folder.

12      Q.    Okay.  Just so the record is clear, can you

13  tell me what page you were looking at when you were

14  just talking?  You can just tell me which page of

15  the document.

16      A.    Page -- oh.

17      Q.    You can tell me the --

18      A.    Two.

19      Q.    Two?

20      A.    The second page.

21           MS. BROWN:  Okay.  Let the record

22      reflect the witness is referring to page

23      MADTBB01988419.

24  BY MS. BROWN:

25      Q.    Just sticking with this page for a second,

*** CONFIDENTIAL ***

Page 102

1    Mr. Madoff, do you -- are you familiar with this

2    document, type of document?

3        A.    I'm -- yeah.

4        Q.    Okay.  And what is it?

5        A.    It looks like it's various codes as to how

6    an account would be handled.

7        Q.    Okay.  And is this a document that you

8    worked with on a daily --

9        A.    No.

10       Q.    -- basis?

11       A.    No.

12       Q.    Okay.  And who worked with these -- this

13   type of document?

14       A.    Annette and her department.

15       Q.    And directing your attention down to the

16   bottom portion of the page, where it says, "Profits,

17   dividends, interest."

18       A.    Uh-huh.

19       Q.    "Note:  Send" -- "S equals send.  R equals

20   reinvest."  What does that mean to you?

21       A.    It means what the customer had instructed

22   they wanted to receive, whether they wanted to

23   receive the dividends in the account.

24       Q.    Okay.

25       A.    Like I said, I've never really seen this

*** CONFIDENTIAL ***

Page 103

1   before, but --

2                   MS. BROWN:  Okay.  Thank you.  You can

3        put that down.

4                   I'd also like to mark Madoff

5        Exhibit 14, and, note for the record, this

6        document also bears the Trustee Exhibit 44, and

7        it has a Bates number of AMF00154125.

8                   (MADOFF EXHIBIT 14 WAS MARKED FOR

9        IDENTIFICATION.)

10  BY MS. BROWN:

11       Q.    And, Mr. Madoff, when you're ready, I have

12  a question --

13       A.    Okay.

14       Q.    -- on a specific page.

15       A.    Uh-huh.

16       Q.    But you're free to look through the

17  document.

18       A.    No.  Go ahead.

19       Q.    Okay.  The page that I want to ask you

20  about ends in -- I'm sorry.  I had it.  153 is the

21  last three digits of the page.

22       A.    Okay.

23       Q.    Okay.  Mr. Madoff, do you recognize this

24  document?

25       A.    Uh-huh.

*** CONFIDENTIAL ***

Page 104

1     Q.    And can you tell us what it is?

2     A.    Yeah.  What --

3     Q.    What is it?

4     A.    Oh, it's a customer agreement.

5     Q.    Okay.  And is this a form that was used at

6     BLMIS?

7     A.    Yes.

8     Q.    Okay.  And if I could turn your -- direct

9     your attention to paragraph 16, could you read that

10    paragraph for me into the record?

11    A.    "Confirmations and statements.

12    Confirmations of transactions and statements for the

13    customer's account shall be binding upon the

14    customer if the customer does not object, in

15    writing, within ten days after receipt by the

16    customer."

17          "Notice or other communications including

18    margin and maintenance calls delivered or mailed to

19    the address given below shall, until the broker has

20    received notice in writing of a different address,

21    be deemed to have been personally delivered to the

22    customer whether actually received or not."

23    Q.    Okay.  Thank you.

24          And, Mr. Madoff, is that paragraph form

25    language in the customer agreement that was used by

*** CONFIDENTIAL ***

Page 105

1    BLMIS?

2        A.    Uh-huh.  Yes.

3        Q.    Okay.  And does that paragraph require a

4    customer to object to transactions in their account?

5        A.    Yes.

6              MS. BROWN:  I have no further

7        questions.

8              MS. CHAITMAN:  Okay.  I'm just going to

9        take a five-minute break.

10             THE WITNESS:  Going --

11             MS. CHAITMAN:  Do you --

12             THE VIDEOGRAPHER:  Going --

13             MS. CHAITMAN:  Do you need anything to

14        eat?

15             THE VIDEOGRAPHER:  Going off the

16        record.  The time is 11:28.

17             (RECESS FROM 11:28 A.M. TO 11:47 A.M.)

18             THE VIDEOGRAPHER:  Back on the record.

19        The time is 11:47.

20        REDIRECT EXAMINATION BY COUNSEL FOR CUSTOMERS

21    BY MS. CHAITMAN:

22        Q.    Mr. Madoff, do you -- do you recall, now

23    that you've been questioned about it, that I sent

24    you a form of Declaration, and you crossed out

25    something in it, and then sent it back to me?

\*\*\* CONFIDENTIAL \*\*\*

Page 106

1      A.    Yes.

2      Q.    And then do you remember I sent you a clean

3  copy with the crossed-out material deleted?

4      A.    Okay.

5            MS. BROWN:  Objection.

6  BY MS. CHAITMAN:

7      Q.    You remember that?

8      A.    I must have, because I wouldn't have signed

9  something that wasn't in its complete form.

10     Q.    Okay.  And, in fact, you had signed the

11 Declaration, but crossed out a paragraph --

12     A.    Yes.

13     Q.    -- and sent it to me?

14     A.    Yes.

15     Q.    And then didn't I resend it to you,

16 unsigned, with that crossed-out paragraph

17 eliminated?

18            MS. BROWN:  Objection.

19            THE WITNESS:  I would assume so.

20 BY MS. CHAITMAN:

21     Q.    Okay.  Because you -- there's no question

22 that you signed the document --

23     A.    Yes.

24     Q.    -- we've marked as Exhibit 2?

25            And it was in this form when you signed it;

*** CONFIDENTIAL ***

Page 107

1    right?

2                MS. BROWN:  Objection.

3                THE WITNESS:  Excuse me.  I must have,

4        but I -- I tell you, I don't remember.  My mind

5        is not as clear as it should be.

6    BY MS. CHAITMAN:

7        Q.    Okay.  Looking at Exhibit 14, and if you

8    want, I can just hold it up to you.  I'm looking at

9    the second page, which ends in Bates number 54126.

10               Do you see on this form -- this is for

11   Aaron Blecker.  Do you see on this form, it has S's

12   for profits and dividends and interest, and then

13   it's crossed out?

14       A.    Okay.  Yes.

15       Q.    Do you know who would have crossed this

16   out?

17       A.    No.  I would assume it had to be someone in

18   the operations department.

19       Q.    Okay.  And was there anyone who would check

20   the work of someone in the operations department to

21   make sure they didn't make a mistake?

22       A.    Yes.  Probably Annette Bongiorno.

23       Q.    Okay.  So she would do it?

24       A.    Uh-huh.

25       Q.    Okay.  And if you wanted to know what the

Page 108

1    customer's instructions were, is it fair to say

2    you'd have to look at the customer file to see what

3    the letter from the customer said?

4              MS. BROWN:  Objection.

5              THE WITNESS:  I would assume so.

6    BY MS. CHAITMAN:

7        Q.    Because this document, the second page of

8    Exhibit 14, this is not signed by the customer;

9    right?

10       A.    No, no.

11       Q.    Okay.  And, looking at Exhibit 13, on the

12   third page, this is also a document, which is not

13   signed by the customer; right?

14       A.    I -- I don't -- I don't believe so.  This

15   looks all like internal documents.

16       Q.    Okay.  And, again, if you wanted to know

17   what the customer's request was, you'd have to look

18   in the customer file for a letter from the customer;

19   isn't that true?

20       A.    Correct.

21              MS. BROWN:  Objection.

22              MS. CHAITMAN:  Okay.  I have nothing

23       further.

24              MS. BROWN:  I'm sorry.  I have nothing

25       further.  We can go off the record.  I forgot

*** CONFIDENTIAL ***

Page 109

1          you were there.

2                    THE VIDEOGRAPHER:  We're off the record

3          in the deposition of Bernard L. Madoff.  The

4          number of media used is two.  The time is 11:50.

5                    (SIGNATURE WAIVED.)

6                    (DEPOSITION CONCLUDED AT 11:50 A.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*** CONFIDENTIAL ***

Page 110

1    STATE OF NORTH CAROLINA

2    COUNTY OF PERSON

3

4                CERTIFICATE OF TRANSCRIPT

5

6         I, Lisa A. DeGroat, a Court Reporter and

7    Notary Public in and for the aforesaid county and

8    state, do hereby certify that the foregoing

9    deposition of BERNARD L. MADOFF, was taken by me and

10   reduced to typewriting under my direction; and the

11   transcript is a true record of the testimony given

12   by the witness.

13        I further certify that I am neither attorney

14   or counsel for, nor related to or employed by any

15   attorney or counsel employed by the parties hereto

16   or financially interested in the action.

17        This the 16th day of June, 2016.

18

19

20

21

22   _____

23   LISA A. DeGROAT

     Registered Professional Reporter

24   Notary Public #19952760001

     Expiration Date:  December 8, 2020

25

**[& - 60]**                                                                                    Page 1

| & |
| --- |

**&**   2:10

| 0 |
| --- |

**0**   15:2
**08-017889**   5:3
**08-01789**   1:6

| 1 |
| --- |

**1**   3:10 4:1 7:18 9:1
**1-0**   15:3
**10**   3:19 61:12,19,20
  62:1,2
**10/31/89**   3:17
**100**   70:14
**100,000**   60:13
**1002151-0**   15:2
**10022**   2:5
**101**   3:23
**10111**   2:11
**103**   3:24
**105**   3:5
**10:03**   61:10,11
**10:15**   61:11,15
**10:25**   68:11,12
**10:40**   68:12,14
**11**   3:20 61:12,17
  62:21,22
**11:15**   96:1,2
**11:17**   96:2,5
**11:28**   105:16,17
**11:47**   105:17,19
**11:50**   109:4,6
**12**   3:21 91:17 92:7
  92:15,22 93:2,9
  99:18,19
**12/20**   30:10
**12/30**   30:10
**12/31/85**   3:13 30:25
  55:4
**12/31/90**   3:19 62:10
  62:13
**13**   3:22 100:22
  101:1,5 108:11

**13060**   7:22
**135**   70:21
**14**   3:12,24 31:19
  103:5,8 107:7 108:8
**15**   1:19 86:6
**150**   70:14
**153**   103:20
**15th**   2:22 4:15
**16**   104:9
**16th**   110:17
**17th**   45:6 46:18 63:8
  63:10 69:13 71:1
  72:4,9 73:19 75:3,5
  77:23 79:2,11,16,17
  79:21 80:8 81:4,14
  82:6,7,21 83:7 84:4
  84:13,21 85:7
**183**   25:10 26:21
  27:8
**183,000**   24:18
**183,004.83**   24:13
  25:5 26:14
**183,004.83.**   15:14
**183,117.42**   25:15
**183.04**   24:13
**186**   24:16
**188**   25:11,13 26:21
  27:8
**188,823.37**   24:19,20
  25:8
**188,823.37.**   26:20
**18th**   45:7,15 62:16
  63:6
**1960**   61:4
**1980s**   6:14 12:2 44:2
**1981**   14:6 51:25
**1984**   14:19 15:6
  17:14
**1985**   28:20
**1986**   34:2 35:2
**1989**   35:1,3
**1990**   37:8 51:25
  55:24
**1990s**   6:14 10:10
  53:3

**1992**   64:5,12
**1995**   52:2 63:4
**19952760001**   110:24
**19th**   45:7,15 62:16
  63:6
**1st**   64:5

| 2 |
| --- |

**2**   3:11 9:3,7 92:11
  92:13,19,25 106:24
**2,056**   18:4,19 19:17
**2,100**   21:23
**2/28/89**   3:16
**20**   48:5
**2000**   78:17
**2000's**   70:2
**2006**   75:3
**2008**   14:7 38:22
  39:9 61:5 73:9
**2009**   65:10,11
**2010**   65:13
**2016**   1:19 2:23 4:15
  110:17
**2020**   110:24
**20th**   35:3
**21**   30:13
**212**   2:11
**215-1-0**   28:22
**23rd**   15:17 18:4,7
**25,000**   9:21
**250,000**   9:23
**277**   31:7
**28**   3:13
**283,000**   31:12
**284,000**   34:8
**288,000**   29:23
**288,445**   29:6
**28th**   35:1
**292**   34:9
**298,838**   30:14

| 3 |
| --- |

**3**   3:12 14:10,14
**3,159**   21:10
**3,892**   30:1

**30**   3:14 33:5 50:14
  70:18 74:16
**303-4568**   2:6
**309**   31:9
**30th**   37:8
**31**   14:18 15:6 28:20
  34:2 35:2 63:4
**33**   3:15
**34**   3:16
**35**   3:17
**36**   100:24
**37**   3:18

| 4 |
| --- |

**4**   3:10,13 28:6,10
  55:2
**4,500**   19:1
**4,504**   18:17,17,20
  19:6
**4,700**   15:20 18:19
  19:17
**4.92**   24:1
**4/30/90**   3:18
**40**   13:3
**400**   82:24 83:13,17
  84:6
**44**   103:6
**446.44.**   29:6
**45**   2:10
**465**   2:5
**48**   13:3 57:8

| 5 |
| --- |

**5**   3:14 30:19,22
**5,000**   27:8,16
**5,705**   27:16,20
**5/31/95**   3:20 62:22
**500**   40:14 42:6
**54126**   107:9
**589-4230**   2:11

| 6 |
| --- |

**6**   3:3,15 33:23 34:2
**6/30/86**   3:14 30:25
**60**   8:19

**[61 - audio]**                                                                                        Page 2

**61**  3:19,20
**65**  51:10
**68**  3:4

**7**

**7**  3:16 34:21,25
**7,000**  34:6,10
**7/31/86**  3:15
**70s**  50:2
**75**  2:21 4:19 70:17

**8**

**8**  3:17 35:16,20
  61:23 110:24
**8/20**  20:23 21:8
**8/21**  21:22 22:12
  23:10,11,12
**8/23**  17:15,18 19:10
  23:5,8,14
**8/27**  21:9 22:10
**8/28**  23:5
**8/31**  17:21,23
**8/31/84**  3:12 17:13
**80**  29:14
**80s**  38:17 39:9 45:21
  46:4 52:20 69:25
**84**  29:13,14
**85**  29:1,14 55:9,19
  58:5
**8:50**  2:23 4:16

**9**

**9**  3:11,18 37:3,7
  61:24
**90**  63:16
**908**  2:6
**90s**  37:23 46:1,19
  47:7 75:2,4 78:17
**92**  3:21 63:11,16,18
  63:21,22 64:2,2,13
**93**  63:11
**95**  63:9

**a**

**a.m.**  2:23 4:16 61:11
  61:11 68:12,12 96:2
  96:2 105:17,17

109:6
**aaron**  3:22,24 13:24
  107:11
**able**  15:8 57:7 58:11
  80:7 86:20
**accept**  10:10
**access**  82:8
**accompanied**  91:5
**account**  14:6,21,22
  14:25 15:1,12 16:1
  16:4,8,19,22 17:8
  17:11,25 19:7,10,10
  19:15 20:11,11,14
  20:22 21:15,23 24:6
  25:22 26:4,8,21
  27:4,7,12,15,18,22
  28:22 29:22 30:1
  31:15 34:3,5 36:13
  37:22 41:3,16 52:14
  54:13 56:11 72:11
  72:21 73:13 79:6
  101:11 102:6,23
  104:13 105:4
**accountants**  12:20
**accounting**  40:4
**accounts**  8:6 14:7
  16:9 20:20 45:7
  53:17,18 54:1 59:7
  75:7,8,11,12 79:3
  79:20 83:14 91:9
**accurate**  10:6
**action**  110:16
**activity**  58:10
**actual**  8:21 27:21
  30:11 50:25 51:3,22
  71:25
**add**  18:14 46:13
**address**  104:19,20
**adjusting**  70:1
**admitted**  50:20
**advisory**  9:14 45:6
  45:14 46:7,12,18
  52:18 69:13,17,18
  71:1,18,22 72:12
  74:18,24,25 75:8

76:16 78:1 79:3
  84:18
**aforesaid**  110:7
**agent**  16:17 23:1
  33:12 48:9,11 51:1
**ago**  39:22 85:24
  87:23,25 88:10
  90:25 96:11
**agree**  4:12 12:3
**agreement**  48:6
  49:25 64:22 104:4
  104:25
**ahead**  53:21 58:16
  103:18
**alethea**  77:2,4,14
**alleged**  8:21
**allocate**  67:3
**allocated**  44:17
**allocations**  74:4
**allowed**  8:5 87:20
**allowing**  86:14
**amazing**  58:19
**amf00154125**  3:24
  103:7
**amf00154157**  3:24
**amount**  9:21 12:14
  16:1,3,18 18:15
  24:10 34:8 36:14,15
  70:19
**amounts**  17:7 27:19
**amy**  2:9 5:18 28:15
**andy**  69:12,21
**annette**  71:5 74:5,6
  75:24 76:1 77:21
  78:10,12,18,20
  79:24 80:11 83:19
  83:21 102:14
  107:22
**annette's**  74:8 76:22
  76:25 101:10
**answer**  47:3,17,25
  65:20 81:1 85:1
**anybody**  50:24 70:7
**anymore**  36:20 83:6

**apologize**  14:14
  20:24
**appealable**  8:20
**appears**  14:20 36:22
**applicant**  1:5 4:23
**appointed**  11:11
**appreciate**  6:19
**appreciated**  26:8
  27:7,18
**approximate**  86:18
**approximately**  4:15
  70:25 96:11
**april**  37:8
**arbitrage**  16:9
  20:13 33:1,9,16
  38:2,3,4 50:23 54:6
  74:19,22 75:11
**arrested**  64:23
**arthur**  14:19 28:19
**aside**  100:17
**asked**  66:8,12,14
**asking**  6:10 27:6
  67:22
**asset**  16:21 17:2
  21:14
**assign**  44:15
**assistant**  72:14
**assume**  10:2 59:24
  83:19 84:9 99:5
  106:19 107:17
  108:5
**assumed**  90:18
**assuming**  31:21
**astounded**  47:13
**attending**  5:7
**attention**  11:24
  102:15 104:9
**attorney**  67:13
  110:13,15
**attorneys**  5:6 50:6
  50:13 58:20 59:3
  66:2 67:15 86:16
  92:14
**audio**  4:11

[audit - carolina]                                                                 Page 3

**audit** 56:12
**august** 14:18 15:6
15:17 17:14 18:4,7
**authority** 73:13
80:21,24
**authorizing** 3:10
**automatically** 56:20
**available** 52:6
**avenue** 2:5

**b**

**b** 3:8 13:25
**back** 12:17 47:16,17
50:2 52:19 58:5,12
58:22 59:15 60:25
61:14 67:5 68:13
70:18 78:5 81:22
93:23 95:3,5,7 97:2
97:7,18 105:18,25
**backwards** 33:20,21
33:22
**baker** 2:10
**bakerlaw.com** 2:12
**balance** 15:14 25:5
25:8,19,22,25 26:9
26:15,16,17,19,20
26:21 27:7,12,22
29:3,3,4,4,7,22
30:14 34:8,9,10
**balances** 30:11
**bank** 16:17 38:14
52:13,16,20
**banker's** 52:21
**bankruptcy** 1:1 5:2
7:6,8,19
**banks** 52:22 56:17
59:14
**barbato** 77:18
**barclays** 38:14
**based** 40:18 45:22
69:6 87:20
**basically** 27:16
32:10 62:24 69:14
72:10 74:20 76:6
78:2 81:4 86:7 87:9

89:22 90:14 96:16
101:10
**basis** 12:21 56:13
59:10 72:7 75:16
81:9,11 102:10
**bates** 100:23,25
103:7 107:9
**bear** 38:7,17 39:1,10
39:24,25 40:9,13,25
41:2,18,25 42:8
43:18 60:6
**bears** 7:21 100:23
103:6
**began** 7:10 64:2
**beginning** 46:9
84:16
**begins** 96:3
**behalf** 5:11,16,19
67:20
**believe** 11:11 13:15
63:11 78:19 85:24
93:18 108:14
**belongs** 16:21
**beneath** 23:11
**beneficial** 58:18
**bernard** 1:7,11,16
2:19 3:2,21 4:23,25
5:5 6:3 46:11,13
68:19 91:16 92:22
95:24 96:4 109:3
110:9
**bernstein** 6:11
**best** 14:16
**better** 26:10,13,13
28:5,11,12
**beyond** 47:11
**bid** 40:20
**billion** 51:10 60:12
**binding** 104:13
**bit** 28:12 37:7 55:23
**blecker** 3:22,24
13:25 14:6,19 28:19
59:23 107:11
**bleckers** 34:14,17
34:19 50:24 56:12

**blmis** 68:23 69:1,4
70:13 76:4 81:3,17
81:18 82:1,16 83:12
104:6 105:1
**blmis's** 8:9
**block** 41:5 42:8
**blotters** 52:8
**bob** 4:13 89:14
**bond** 16:12 32:14,19
32:22 66:5,6,10,25
**bongiorno** 74:6,14
75:13 80:1,11,20
107:22
**book** 89:2,12
**booking** 17:5
**bookkeeper** 74:21
**bookkeepers** 70:23
75:17,23 78:3
**books** 51:7,13 54:16
**bottom** 27:2 102:16
**bought** 21:16 22:11
31:2 47:5 48:22
49:13 50:10,11
60:22
**box** 16:14
**break** 61:7 68:5
70:15 105:9
**brief** 87:8
**broker** 12:24 42:3
48:10,18 56:24 60:5
60:11 104:19
**brokerage** 48:8 57:4
57:20 58:12 60:1,21
**brokers** 56:11
**brother** 69:15 72:23
89:1,13
**brown** 2:9 3:4 5:16
5:16 6:22,25 7:2,14
8:14 12:7 17:24
24:17 28:14 29:12
35:22,25 37:14 40:5
41:8,12 42:12,17,20
42:23 43:10,15 44:4
45:9,17 47:18 53:13
53:20 57:12 58:3

61:22 62:17 63:1,7
63:15 68:2,5,7,9,16
81:21,24,25 91:15
91:22,25 92:3,6,9
93:7,12,14,16 95:20
96:7 100:21 101:3
101:21,24 103:2,10
105:6 106:5,18
107:2 108:4,21,24
**build** 50:18
**built** 50:19
**bureau** 87:21
**business** 9:15 38:17
38:21 39:10,24
42:18 64:14,15
68:18 71:18 74:18
74:24 78:1 84:18
**butner** 1:18 2:21,22
4:18,19
**buy** 16:11 22:23
32:18,21 40:1,2,9
43:17 44:21 48:8,10
48:13 49:8,9 54:5,8
59:21,23,25
**buying** 32:11,17
46:25
**buys** 16:10 60:10

**c**

**c** 2:1 3:1 6:1 13:25
20:2
**call** 35:12 36:10
44:5 80:1,4 85:20
85:20,21
**called** 33:13 57:20
60:3,9 68:18 80:18
85:22
**calls** 56:11 79:21
80:11 86:4 104:18
**capability** 60:25
**caption** 4:21 92:17
**career** 9:18
**carolina** 1:18 2:22
4:20 110:1

**carried** 38:4,7 54:17
**carrying** 34:11
**case** 4:21 5:1,3 7:6
 13:15 50:18 99:6
**cash** 26:20 27:7,12
 27:21 52:9
**caught** 39:17
**cellphones** 4:9
**certain** 7:20 12:4,12
 29:25 36:13,14,15
 44:16,18,18
**certainly** 37:23 39:9
 64:1 78:16 86:7
 87:24
**certificate** 110:4
**certify** 110:8,13
**chais** 74:12
**chaitman** 2:3,4 3:3
 3:5 5:10,10,11,13
 5:14 6:7,24 7:1,15
 7:18 9:5 13:7 14:12
 17:20 18:2 24:19
 25:3 28:1,8,16,17
 29:13,17 30:18,21
 30:23 33:22,25
 34:23 35:18,23
 36:16 37:5,17 40:8
 41:9,20 42:16,19,22
 43:1,11,25 44:6
 45:10 47:1,16,21
 50:21 53:14 54:20
 57:16 58:4 61:6,16
 61:20,25 62:3,19
 63:3,12,19 67:25
 81:19 85:9 86:1
 87:2,13 88:3,18
 89:5,8,9 90:20
 91:19,24 92:2,5
 93:10,13 94:15 97:8
 105:8,11,13,21
 106:6,20 107:6
 108:6,22
**chaitman's** 87:5
 99:4,12

**chaitmanllp.com**
 2:6
**change** 57:1 95:22
**changed** 51:3
**changes** 94:21 97:19
**changing** 59:12
**charge** 11:23 48:11
 68:25 70:6 71:23,24
 72:3
**chart** 70:4
**check** 9:18,24 34:5
 34:13 35:5,13,15
 36:11 89:25 107:19
**checkbook** 72:11,15
 73:22 74:2
**checking** 59:7
**checks** 9:15 10:18
 36:3,5 72:16,20
 73:3,8 76:7,10 84:6
 84:11 89:25 96:18
 98:18 99:7
**china** 33:17
**chinese** 33:16 45:8
 45:11,20,22,23 46:1
 46:15 69:7
**claimed** 98:24
**claims** 96:17
**classify** 75:9
**clean** 106:2
**clear** 19:17 45:1
 54:22 101:12 107:5
**cleared** 38:12,13
 60:22 61:4
**clearing** 38:11 52:11
 52:25 59:5,14 60:2
 60:16,20,24
**clearinghouses**
 57:22
**clearly** 97:25
**clerks** 75:25 76:1,22
**client** 16:10 48:25
 49:9,10,15 54:6,13
 57:18 90:1 98:21
 99:7

**clients** 51:10 56:7,7
 56:23 67:22 72:12
 74:13 76:16 89:2
 90:9
**close** 33:2 42:24
**closed** 16:15 20:20
 40:3
**code** 76:15
**codes** 102:5
**collier** 2:14 4:13
**column** 15:18 17:2
 19:7,25 20:25 24:12
**combination** 70:22
**come** 41:18 42:10
 50:14 54:9 83:18
 86:8,10,13,15 87:10
 87:10 90:8,11,19
**comes** 49:8
**comfortable** 64:10
 64:11
**coming** 31:16 34:5
 42:4 43:22 67:23
 86:12 87:9,18
**commission** 48:11
**common** 17:3 18:24
 21:25 22:13 23:2
 26:6 30:4,12 32:8
 32:15,20,23 40:16
**commonly** 33:16
**communicate** 88:5
**communicated**
 85:14,18 87:13
**communications**
 87:20 88:2,18,25
 99:12 104:17
**company** 32:16
**competitive** 49:1
**complete** 106:9
**completed** 49:23
**compliance** 69:6,16
 69:17
**complicate** 33:9
**computer** 13:9,14
 14:15 57:11 73:6
 76:15 82:23 83:3,13

 84:1
**computers** 82:22
**concept** 32:25
**concerning** 8:21
**concluded** 109:6
**concrete** 54:24
**confer** 80:17
**confidential** 1:15
 2:19 8:18
**confirm** 7:11 99:19
**confirmation** 57:18
**confirmations** 39:19
 39:21 61:1 76:5
 104:11,12
**confuse** 24:24
**confused** 67:14
 98:10
**confusing** 23:18
**considered** 52:19
**constantly** 56:10
**contact** 69:21 80:7
 81:14
**continue** 4:11
**continued** 53:3 61:5
**continuous** 59:13,20
 59:21 60:4,9
**contract** 60:5
**conversation** 67:18
 86:15 87:8
**conversations** 4:8
 85:4 86:19,25 87:1
 88:11
**conversion** 16:7,8
 16:17 20:19 23:1
 30:5 33:12 53:6
 65:24 71:24
**convert** 22:25 33:1
 33:11 66:9,16 67:4
**convertible** 6:15
 16:11,13 18:9,10,10
 19:2,5,21 20:13
 22:2,11,13,14,15,19
 30:2 31:6 32:12,13
 32:14,14,15,18,19
 32:20 33:4,5 38:2,3

**[convertible - depth]**                                                Page 5

38:4 39:2,6 40:15
43:4 47:4 51:19
52:15 53:3 54:6
63:25 66:5,6,7,10
75:11
**convertibles** 37:20
39:14 46:23
**copies** 10:13 89:17
93:11
**copy** 7:9 13:1 14:14
26:11 28:14 35:22
57:3 90:21 106:3
**corp** 52:25
**corporation** 1:4
4:22 52:11 59:6
60:2
**correct** 11:15 15:22
15:24 18:6 19:22
20:7 21:21,25 34:20
35:8 36:21 37:2
41:4,7 43:9 53:11
56:22 62:9,14 64:9
68:20 87:3 97:2
108:20
**correcting** 62:1
**correctional** 2:20
4:18
**correspondence**
81:2,3,6,8
**cost** 12:21 56:13
**counsel** 6:6 8:1,4
68:15 105:20
110:14,15
**counter** 56:23 58:11
**counterparties**
60:21
**counterparty** 12:23
**country** 39:6
**county** 110:2,7
**couple** 68:7 85:24
86:3,22 87:22
**course** 59:17
**court** 1:1 5:2,20
7:19 8:24 110:6

**cousin** 71:4
**cover** 22:24
**covered** 36:4 85:8
**covers** 71:10
**create** 66:19
**created** 82:20,21
99:20
**credit** 16:1 17:2
24:2,8,12 25:6,15
60:7,14
**credited** 16:19
20:21 24:6
**crediting** 20:10
**credits** 52:13 59:11
**cross** 68:15
**crossed** 94:24,25
95:1,8 98:5,13,14
105:24 106:3,11,16
107:13,15
**crupi** 67:1 71:2 72:6
**customer** 9:19,24
10:13,16,22,24
12:17,22 13:22,24
35:7,9,12 36:3,5
40:24,24 41:2 43:5
50:3,5,11 56:4
57:24 58:10 74:10
75:7 76:5,6,7 79:20
80:11,13,18 82:3,4
82:14,16 83:13
84:10 89:21 96:17
102:21 104:4,14,14
104:16,22,25 105:4
108:2,3,8,13,18,18
**customer's** 54:18
104:13 108:1,17
**customers** 1:17 2:2
2:20 5:12,15 6:6
9:16 10:11 11:4,5
12:2,18 13:16 14:4
36:18 42:15 53:7
71:16,17,21 74:20
74:23,23 79:3,19
80:1,4,7,22 81:2,9
81:15,17,20 82:17

84:7,11,12 92:14
98:24,25 105:20
**cutoff** 63:23

**d**

**d** 3:8 6:1 20:2,6 21:1
**daily** 59:10 72:6
75:15 76:13 81:9
84:23 102:8
**dash** 21:1
**data** 83:16,18,20
**date** 4:14 21:1,5,5,6
21:7,8,9,18 86:19
90:23 94:19 110:24
**dated** 14:18 28:20
35:2,3 62:22
**dating** 12:2 58:12
**david** 44:11 55:19
65:4,23 66:13,24
**davis** 2:3 5:10
**day** 2:22 8:19 22:12
30:10 33:5 39:17
43:24 61:3 64:22
69:3,3 71:14,14
72:25 73:18,18,25
73:25 74:8,8 110:17
**days** 8:19 65:5
104:15
**dead** 55:21
**dealer** 42:3 43:18,22
48:18
**dealers** 12:24 49:18
56:24
**dealing** 74:11 76:15
**dealings** 41:25
**debenture** 53:18
63:25
**debentures** 6:15
39:4 51:20 53:3,12
**debit** 21:19 31:7
59:6 60:14
**debited** 20:20
**debiting** 20:11
**debits** 52:13 59:10

**debtor** 1:12 4:25
**december** 14:7
28:20 29:1 110:24
**decided** 54:5
**decisions** 85:1
**declaration** 3:11,21
9:10 90:3 91:16
92:10,13,20,22
93:17,20 94:1,6,10
94:17,22 96:9,10,23
97:5,10,16,18,20
99:16 100:6,12
105:24 106:11
**declarations** 92:12
**deduced** 50:9
**deemed** 104:21
**defendant** 1:8 4:24
**degroat** 1:24 2:23
5:21 110:6,23
**deleted** 106:3
**deliver** 23:2 31:14
49:14
**delivered** 16:6 18:12
20:7,8,9 30:1
104:18,21
**demonstrate** 59:18
**department** 39:13
40:17 41:14 67:2
69:22 71:1 101:10
102:14 107:18,20
**departments** 46:17
61:1
**depending** 37:22
41:13 44:9 49:6
52:10 60:14
**depends** 33:8 45:18
45:18
**deposition** 1:16 2:19
3:10 4:11,17 6:11
7:6,17,20,23 8:16
8:18,22 91:12 95:24
96:4 100:16 109:3,6
110:9
**depth** 47:11

[describe - extra]                                                                          Page 6

**describe** 38:1 40:12
**described** 70:4,10
  70:16 77:21 79:1
  88:17 91:11 96:15
**destroy** 12:4
**destroyed** 11:20
  13:13 52:7 56:4,21
**destruction** 12:11
**detail** 37:9 71:20
**determine** 93:5
**dexter** 2:4 5:13,13
**dialogue** 50:15
**difference** 20:8
  27:14 60:11 92:17
**differences** 92:11,24
  93:6
**different** 18:22 42:6
  46:16,17 60:16 69:8
  71:6 75:14 92:18,19
  104:20
**digitized** 13:14
**digits** 103:21
**dipascali** 69:15 71:2
  80:5,10,20
**dipascali's** 71:14
**direct** 6:6 104:8
**directing** 102:15
**direction** 110:10
**directly** 80:2,5,8
**director** 69:16
**discombobulated**
  63:17
**discussed** 64:16
  84:10 86:12
**discussing** 89:10
**discussion** 17:17
**discussions** 97:8,13
**dispute** 88:22 90:5
  91:13 96:15 98:25
  99:4,6,25 100:14,19
**distribution** 36:9
**district** 1:1 5:3
**divided** 69:7
**dividends** 102:17,23
  107:12

**division** 69:9,11
**divisions** 69:8,20,23
  70:16
**docket** 7:21
**document** 28:4
  89:23 91:10 92:18
  95:2,4 96:22 99:14
  99:15 101:7,15
  102:2,2,7,13 103:6
  103:17,24 106:22
  108:7,12
**documentary** 51:20
  52:4 54:23 55:6
**documents** 91:6,6
  91:11 100:14,17,18
  108:15
**doing** 20:12,13 28:3
  32:25 38:15,17,21
  38:25 39:16,18 44:8
  46:3 54:6 64:13,15
**dollar** 16:1,3,18
  17:7
**dollars** 27:10 29:23
  30:14 31:12 51:11
  60:12
**doors** 61:4
**dorothy** 77:11
**doubt** 11:2 58:10
**drafts** 97:20
**dtc** 52:25
**duly** 6:4
**dumb** 32:11
**dumbfounded**
  39:22 50:6
**duties** 78:23 84:12

**e**

**e** 2:1,1 3:1,8,8,8 6:1
  6:1 13:25,25 20:2,6
  87:14,17,22 88:1,2
  88:10,11,16,17
**easier** 26:10
**eat** 105:14
**edits** 97:4

**eight** 24:17 29:8,9
**either** 13:8 16:7,16
  22:22 32:19,22
  43:16 48:8,22 51:1
  52:20 64:25 83:19
  90:8 94:15 98:3
**eliminated** 106:17
**employed** 110:14,15
**employee** 83:7
**employees** 70:12,15
  71:13 77:22 79:2,21
  81:13 82:7 84:13
  85:7 87:18
**ended** 24:16
**ends** 95:23 103:20
  107:9
**entered** 8:20
**entire** 7:8 8:17 39:7
**entity** 8:25
**entries** 30:6 59:6
**entry** 16:4 23:22
  34:16 54:15
**envelopes** 76:9
**equal** 66:10
**equals** 102:19,19
**equity** 54:7 59:24
**eric** 71:3 73:24
  77:21
**erin** 71:3 73:15,15
  73:16 77:21
**erin's** 73:18
**esq** 2:3,4,9,9
**essentially** 37:9
**establish** 51:21
**estimate** 86:5
**evelyn** 75:19
**eventually** 23:1
**everybody** 39:12
  42:2 60:23 75:4
  79:25
**evidence** 54:23 55:7
  67:10
**exactly** 14:2 28:25
**examination** 3:2 6:6
  13:4 57:7 68:15

  105:20
**examine** 93:5
**examined** 6:5
**example** 12:1 45:25
**exception** 56:4
**exchange** 65:20
  100:5
**exchanged** 31:23
**excuse** 78:7 91:2
  107:3
**execute** 39:1 43:12
**executed** 43:8 45:15
  55:16 62:13,15 63:5
  63:25 64:8,9 65:17
**executing** 37:13,23
  44:2 46:21 53:16,17
**execution** 71:25
**exercise** 28:3
**exhibit** 3:10,11,12
  3:13,14,15,16,17,18
  3:19,20,21,22,24
  4:1 7:18 9:1,3,7
  14:10,14 28:6,10
  30:19,22 33:23 34:2
  34:21 35:16,20 37:3
  37:7 55:2 61:17,23
  61:24 62:2,21 92:7
  92:11,13,15,15,19
  92:22,25 93:2,9
  99:18,19 100:22,23
  100:24 101:1,5
  103:5,6,8 106:24
  107:7 108:8,11
**exhibits** 61:12 89:18
  93:5
**existed** 53:5
**existence** 45:21
  63:10 75:1
**expiration** 110:24
**explain** 15:10 22:9
  48:3 59:20
**explained** 39:20
**extension** 79:25
**extra** 93:10

## f

f  3:8
fact  9:17 12:24
  16:11 33:7 39:17
  43:19 49:21 57:2
  58:21 59:18 100:2
  106:10
fair  13:8 62:4 72:3
  77:25 81:13 108:1
familiar  14:1 76:21
  78:6,22 102:1
far  56:16 98:16
february  35:1,3
federal  2:20 4:18
fellow  71:3 87:6
felt  67:7
fictitious  67:11
file  3:22,24 36:8
  82:3 108:2,18
filed  46:12,13 75:2
files  10:14,16,22,24
  10:25 11:5,12 12:3
  13:10 82:4,8,11,14
filing  79:6
filled  12:13
final  8:20
finance  23:8
financially  110:16
financing  42:10
find  39:19 54:23
  55:6,12 56:8,13
  57:18 58:11 66:20
finish  52:2
finra  59:9
firm  10:3 38:11,13
  46:6 55:25 60:21,24
  69:5,7 78:15 87:5
  87:14 88:3,19
firm's  41:15 52:13
  53:25 54:12
firms  13:5 48:8 57:4
  57:21 58:12 60:1,17
  60:20

first  7:7 14:6 15:13
  18:24 19:8,16 20:1
  22:1,6 34:15 49:25
  64:22 81:14 85:17
  88:21 89:18 90:4
  93:18,19,25 94:1,10
five  59:25 61:7 71:8
  105:9
fixed  9:21
floor  45:6,7 46:19
  63:9,10 69:14 71:1
  72:2,4,9 73:19 75:3
  75:5 77:23 79:2,11
  79:16,17,22 80:8
  81:4,14 82:6,7,21
  83:8 84:4,13,22
  85:7
floors  45:16 62:16
  63:6
focusing  47:22
folder  101:11
following  76:25
follows  6:5
foregoing  110:8
forgive  32:10 41:1
  54:21
forgot  7:1 36:2
  108:25
form  46:12,13 75:2
  104:5,24 105:24
  106:9,25 107:10,11
format  92:18
former  68:18
forms  33:8
formula  66:4
forth  59:16
forward  7:20 8:17
  15:14 25:5 26:17
  29:4,7 34:9,11
  42:21
four  71:6,8 95:16
fractional  24:3
  30:13 31:19
fran  77:18

frank  69:15 71:2,13
  72:3,10 73:23 74:3
  77:21 80:4,10 83:19
  83:20 84:20 85:5
frank's  71:4
free  103:16
further  7:3 8:15,23
  23:9 55:23 68:1
  93:4 105:6 108:23
  108:25 110:13
future  49:15

## g

g  6:1
general  12:16 55:25
  56:2 84:19
generally  33:5
generate  60:25
generated  6:13
george  71:9,10
  76:12
getting  27:2 42:24
give  71:20
given  104:19 110:11
go  4:12 7:3,20 8:2
  8:14,16 15:9 21:8
  23:9 27:1 29:18
  30:15 33:13 41:15
  42:13 43:16 48:9,13
  48:15 49:21 52:16
  53:21 54:4,7,11
  55:23 58:16 59:5,25
  75:1 78:5 81:3,4
  82:3 84:21 95:21
  96:8 103:18 108:25
goes  23:25
going  6:10 12:17
  18:15 26:12 30:21
  34:5 35:19,20 37:8
  41:23 42:20,21
  46:25 47:4 50:2
  52:19 54:21 58:5,21
  58:22 61:9 62:21
  67:9 68:8,10 71:12
  76:18 85:2 92:3

95:25 105:8,10,12
  105:15
good  6:8,9 49:5 55:1
  68:17
govern  7:5
governs  7:8,16
gradually  28:5
great  28:1 68:25
greg  5:13
gregory  2:4
group  65:4 75:10
gte  31:14,21 32:6
guess  65:7 67:9
  70:14 72:23 78:11
  78:17 85:24 88:23
  96:16
gun  66:1

## h

h  3:8,8
handed  28:9
handing  34:24
handle  78:4
handled  45:6 72:15
  75:7,10 84:12 102:6
handling  74:10
hands  51:3 59:12
handwriting  66:13
happened  20:15
  28:25 65:20
happening  22:9
  34:3
hard  13:1 20:24
  31:24 57:3 75:9
hchaitman  2:6
hear  90:6
heard  88:21 90:5
held  4:17 5:1 17:17
helen  2:3 5:10,14
  6:22 42:13
helped  73:22
helpful  21:7
hereto  92:15 110:15
highway  2:21 4:19

**hit**  17:7
**hold**  29:13 107:8
**holder**  16:24
**host**  58:19
**hostetler**  2:10
**hours**  13:3 57:8
**household**  15:20
  18:8,22 19:17 23:8
**huh**  6:16,20 8:13
  14:17 15:19 18:21
  25:20 28:21 31:5,8
  31:20 35:6 42:9
  45:4 53:4 55:3 60:8
  61:2 62:11 77:10,17
  79:8,12 80:14 83:22
  86:4 89:6 93:21
  94:20 97:3 98:7,19
  100:3 102:18
  103:15,25 105:2
  107:24
**hundred**  44:13
  66:20
**hundreds**  39:16

**i**

**ibm**  82:22,23
**idea**  32:18
**identification**  3:9
  4:2 9:4 14:11 28:7
  30:20 33:24 34:22
  35:17 37:4 61:13
  92:8 101:2 103:9
**identify**  5:8
**ike**  66:3
**illegible**  35:21
**important**  67:8
  98:17
**impose**  8:24
**impossible**  12:14
  13:5 57:9
**improvement**  28:4
**inception**  13:17
**include**  56:22
**includes**  56:21

**including**  44:25
  46:22 78:25 80:9
  104:17
**indicated**  7:19 15:4
  97:1,19
**indicates**  10:16 35:3
**individual**  56:7
  82:13
**individuals**  75:15
  80:8,21
**industries**  21:11,12
  21:24 22:2,7,11
  23:6,16 24:1 26:5
  27:5
**industry**  11:19
  12:25 39:21 42:3
  49:19 50:13 56:25
  57:3 60:15 70:1
**information**  94:3
  98:9,9 99:3
**informed**  96:14,20
  98:23
**initially**  6:10
**input**  83:16,18
**inquiries**  80:13,25
**instance**  9:18 10:21
**institute**  4:18
**institution**  2:21
**instruct**  8:7 40:9
**instructed**  35:13
  102:21
**instructing**  67:1
**instruction**  65:24
**instructions**  10:10
  11:3 35:14 36:9,12
  66:9,15,19,21,23
  67:6 76:25 90:1
  98:20 99:8 108:1
**intact**  11:12
**interco**  31:3,22 32:6
  32:7 34:11
**interest**  102:17
  107:12
**interested**  110:16

**interfere**  4:10
**interim**  29:10
**internal**  108:15
**international**  15:21
  18:8 19:18
**interviewed**  65:5
**investing**  6:15
**investment**  1:7 4:24
  9:14 45:6,14 46:7
  46:11,12,14 52:18
  54:1,12 68:19 69:13
  69:17,18 71:1,17,22
  72:12 74:17,24,25
  75:8 76:16 78:1
  79:3 84:17
**investor**  1:3 4:22
**involve**  40:23
**involved**  74:2 99:6,6
**irving**  5:17 47:11
  64:17,19 98:24
**issue**  6:12 8:3 89:16
**issued**  90:1 98:18
**issues**  7:24 8:11
**issuing**  39:21
**italian**  87:6

**j**

**j**  23:21
**jackson**  76:21 77:9
  77:16,22
**january**  64:5
**jeffry**  8:6
**jerry**  71:10 76:13
**joanne**  78:6,8,9
**job**  78:23
**jodi**  67:1 71:2 72:6
  73:20 74:1 77:21
**joe**  87:7,10
**joel**  44:12 55:20
**john**  48:19
**journal**  23:7,23,24
  30:13 31:18
**journaled**  24:5
**jpmorgan**  52:17
  72:11,20 73:13

**judge**  6:11,17
**july**  34:2 35:2
**jumped**  50:1
**june**  1:19 2:22 4:15
  110:17
**jurisdiction**  11:25

**k**

**k**  13:25
**katy**  21:10,23 22:2,7
  22:11 23:6,16,25
  26:5 27:4
**keep**  10:25 42:21
  56:18 57:10
**kept**  12:17,22 13:1
  56:6,14,17 57:8
  70:1 72:10 73:21
**keypunch**  84:2,3
**khan**  77:11,22
**kind**  38:15 50:15
**kinds**  60:17 62:5
**knew**  66:12 81:1
  98:16
**know**  11:1,2,21,22
  11:22,23 12:8,9,11
  12:12,13,16 14:1
  17:4,7 19:4 21:4
  22:10,25 26:12 27:2
  32:17 33:2 36:6,7
  36:10 39:7,8,14,15
  39:21 40:20 41:17
  41:17 42:3,4 43:17
  44:11,13 46:2,5,8
  46:21 47:4 48:3
  49:15 50:8,19 52:7
  52:23,24 53:24 56:1
  56:13 57:19 58:18
  58:24 59:4,5,11,13
  64:11,14 65:10
  66:18 67:2,3,5,7,14
  70:20,22,23 72:23
  73:1,22 75:1,15
  77:2 78:11,16 79:5
  84:8 87:7,9,19
  88:25 90:23 94:2,13

97:24 98:6 99:7
100:1 101:10
107:15,25 108:16
**knowledge** 57:13
64:23 65:18 80:10
**known** 50:17
**kugel** 44:11 55:19
65:23 66:24
**kugel's** 66:13

**l**

**l** 1:7,11,16 2:19 3:2
3:21 4:23,25 5:5 6:3
13:25 20:6 23:21
46:11,13 68:19
91:16 92:22 95:24
96:4 109:3 110:9
**l.l.c.** 4:24 68:19
**l.l.p.** 2:4,10 5:11,14
**lack** 47:13
**lance** 86:16 87:4,10
**language** 95:10,12
95:18 104:25
**large** 5:11,15 9:22
42:8 75:11
**largest** 39:5
**laugh** 67:13
**laughing** 67:13
**law** 51:12 89:1,13
**lawyer** 65:1
**lawyers** 65:4 67:15
**leftover** 24:4
**legal** 4:14 5:21
47:12
**legible** 37:7 55:1
**lend** 40:2
**length** 86:5
**letter** 35:15 36:25
88:23 90:15,17,21
90:24 91:1,3,5
108:3,18
**letters** 11:4,8 12:2,4
36:17 67:22 81:15
81:18,20 82:1

**levy** 74:11
**liabilities** 51:13
**limitations** 7:21
8:12
**limited** 6:12,18 7:23
8:8 47:20
**limiting** 8:22
**line** 15:9,9,13 17:22
18:3,7 19:1,12,20
20:5,23 21:22 23:6
23:7,25 25:4,6,18
25:23 79:24 92:14
92:16
**lines** 10:9 18:25
19:8,16 20:1 22:7
**lipkin** 71:3 73:24
**lisa** 1:24 2:23 5:21
110:6,23
**list** 79:1
**listed** 71:13 92:14
**literally** 60:12,13
**litigation** 7:7,12
**little** 28:12 37:7
42:14 55:23
**llc** 1:7
**located** 4:19
**london** 38:14
**long** 13:2 15:18 18:1
18:19 19:8,11,17
20:17,18 22:24
23:24 26:5,5 27:3,5
27:14 30:17 31:16
32:5 33:15 34:12
36:11 43:24 54:17
58:13 74:14 78:11
**longer** 12:17,22 56:6
56:15
**look** 9:12 19:1 20:15
20:25 23:5 24:12
26:9 31:24 54:16,25
55:2 103:16 108:2
108:17
**looked** 30:24 66:22
100:17

**looking** 24:22 28:18
93:25 101:13 107:7
107:8 108:11
**looks** 15:13,18 21:5
21:9 25:13 26:14
27:16 29:20,21
66:13 67:14 94:2,3
101:9 102:5 108:15
**loss** 10:22,24 69:22
**lost** 11:8
**lot** 14:3 24:10 52:22
67:14
**lower** 32:23
**lowered** 34:7,8
**lynch** 39:11 48:18
59:25 60:6

**m**

**m** 2:4
**madoff** 1:7,11,16
2:19 3:2,9,21 4:1,23
4:25 5:5,12,15 6:3,8
7:3,9,18 8:8 9:1,3,6
9:7 14:10 28:6,10
30:19 33:23 34:21
34:25 35:16 37:3
46:11,13 50:9 61:12
62:4,22 68:17,18,19
68:25 85:9 91:16,17
92:7,11,19,21,23,25
93:2,8,9,17 95:21
95:25 96:5,8,25
99:18,19 100:22
101:1,4,5 102:1
103:4,8,11,23
104:24 105:22
109:3 110:9
**madoff's** 8:18
**madtbb01988418**
3:23 100:25
**madtbb01988419**
101:23
**madtbb01988420**
3:23

**mail** 76:5,7 87:14,17
87:22 88:1,2,10,11
88:16,17 90:8 94:12
94:13 100:13
**mailed** 95:3,4
104:18
**mailing** 90:13 97:7
**mailroom** 71:7 76:3
76:9
**mailroom's** 76:4
**maintain** 13:5
**maintained** 13:9,10
82:5
**maintaining** 82:10
**maintenance** 104:18
**major** 98:13
**maker** 39:5,12
40:14 42:5 45:19
48:16,24 49:21 75:6
**making** 40:17 41:14
41:16 44:10 46:8,21
48:19 69:9
**man** 52:22
**manager** 69:18
**managers** 46:16
**margin** 104:18
**mark** 48:14 69:10
69:21 91:15 100:22
103:4
**marked** 4:1 7:18 9:1
9:3,7 14:10,13 28:6
28:9 30:19,22 33:23
34:2,21,25 35:16
37:3,6 61:12,17,23
61:24 62:20 91:20
91:21 92:7,11 93:9
101:1,5 103:8
106:24
**market** 24:24,24
27:3,15,15 30:16
39:5,12 40:14,17
41:14,16 42:5 43:17
43:19 44:10,18,20
44:21 45:19 46:8
48:10,13,16,24 49:2

49:5,5,13,21 69:9
75:6
**marketplace** 48:23
53:25 54:8,9 59:22
**markup** 48:12
**married** 14:5
**martin** 44:12 55:20
55:20
**matched** 96:18
**material** 106:3
**matter** 12:24 51:2
54:3
**maximum** 86:6
**mean** 10:25 11:17
16:5 22:23 24:2
34:17 43:23 49:22
50:4 54:24 71:22
77:13 79:4,5,25
83:2 102:20
**meaning** 48:22
57:20 79:6
**means** 16:19 48:9,12
48:16 49:10 60:24
102:21
**meant** 59:2
**media** 95:23 96:3
109:4
**medium** 2:21 4:19
**meet** 64:19,25
**meeting** 67:16
**mentioned** 7:15
73:15 75:13 76:3,12
83:12 91:5
**merger** 31:23
**merrill** 39:11 48:18
59:25 60:6
**messengers** 70:23
**met** 85:9,12
**microfiche** 56:22
**microphones** 4:6,10
**mind** 107:4
**minute** 61:7 65:19
94:23 97:23 105:9
**minutes** 68:7 86:6

**misplaced** 11:8
**missing** 92:13,16
**mistake** 107:21
**model** 72:1
**moment** 19:10
**money** 17:8 19:13
19:14 25:22 30:5,5
30:11 40:2 51:3
59:12 60:11
**month** 17:11,19
18:1 26:7 29:7
31:16 32:6 83:1
**monthly** 56:9 82:16
82:19
**morning** 6:8,9 62:6
68:17
**moved** 46:18 75:4
**movement** 17:5,8,9
19:13 20:21 30:7
31:17
**movements** 19:15
**moving** 30:11
**mui** 77:2,22

**n**

**n** 2:1 3:1,1,8 6:1
23:21
**name** 4:13 5:4 14:1
40:1 55:21 71:4,5
76:20 78:6 83:5
86:17 92:19,19,21
**named** 13:24 14:5
87:7
**names** 55:21 75:18
75:20 76:18
**nasdaq** 40:19,19
49:6
**nc** 2:21
**necessarily** 36:10
**need** 56:13 68:3
105:13
**needed** 12:19,20
35:14
**neither** 110:13

**net** 59:13,20,21 60:4
60:9,10,13
**nets** 60:2
**never** 38:12 39:17
50:10 51:6 56:8
59:2 86:9 87:16
102:25
**new** 1:1 2:5,5,11,11
5:3 13:16 14:20
25:8,19 26:19 30:14
52:16,20 90:10
**non** 8:20
**normally** 34:6
**north** 1:18 2:22 4:20
110:1
**notary** 1:24 2:24
110:7,24
**note** 4:6 8:15 92:9
100:22 102:19
103:5
**notice** 104:17,20
**nscc** 52:25
**number** 5:3,11,15
7:21 12:12 14:21,22
15:1 29:25 32:20
44:13,22 46:20,23
66:7,10 71:9 72:13
74:12 79:9 84:2
93:2 95:16,17,24
96:4 100:24,25
103:7 107:9 109:4
**numbers** 93:1
**nutshell** 51:14

**o**

**o** 3:1,8 6:1
**o'hara** 76:13
**object** 104:14 105:4
**objection** 12:7 17:24
37:14 40:5 41:8,12
42:12 43:10,15 44:4
45:9,17 53:13,20
57:12 58:3 62:17
63:1,7,15 106:5,18
107:2 108:4,21

**obligation** 49:3,14
**obviously** 32:17
**occurred** 59:3
**odd** 24:10 29:23
30:13 31:12 48:5
74:16
**offer** 40:20
**offered** 100:5
**offhand** 70:14
**office** 10:23 34:18
60:25 67:6 70:19
90:19 94:15
**officially** 75:1
**oh** 14:20 15:2 17:16
21:6,17 25:16 28:13
28:16 47:14 81:24
88:24 92:2 93:12
94:23 101:8,16
104:4
**okay** 6:25 7:2 9:6
10:5,8,21 12:1
13:12,16 14:13 15:3
15:6,7,8,17 17:21
18:3,3,14,23 19:3,6
19:16,23 20:23,23
21:6,7,14,22 22:8
22:16,20 23:4,13,15
23:17,19 24:7,9,12
25:4,18,24 26:4,7
26:16,22,25 27:17
28:1,3,13,13,18
29:11 30:18 31:1
33:18 34:1,15 35:9
35:18 36:17 37:24
38:3,16,23 40:9
41:21 43:12 44:24
45:1,11,13 47:2,24
48:1,1 50:22 51:4
51:15,18 53:2 54:21
55:4,11,23 57:17,23
58:2,14 61:6,25
62:15 63:20 64:10
64:12,16,25 65:9,15
67:25 68:2,6,9,22
68:22 69:3 70:3,7

71:12 72:18 73:15
73:18,24 74:5 75:13
75:23 76:3,23 77:2
77:18,20 78:4,20,25
78:25 79:10,19 80:1
80:4 81:13 82:4,19
83:7,12,25 84:3,10
85:23 86:9,18,22
87:22 89:4,13 90:3
90:12,17 91:10,24
92:6 93:15,25 94:5
95:1,20 96:14,20,23
96:25,25 97:4,7
98:2,11,22,22 99:9
99:11 100:8,21
101:6,12,21 102:4,7
102:12,24 103:2,13
103:19,22,23 104:5
104:8,23 105:3,8
106:4,10,21 107:7
107:14,19,23,25
108:11,16,22

**old**  2:21 4:19

**once**  11:21 20:18
45:25 64:21 82:1

**ones**  26:13 29:10

**open**  43:17 44:21
79:2,4

**opened**  14:6 29:22
61:4 79:6 101:11

**opening**  26:9,15,16
26:19 29:2,3,4 36:4

**operate**  70:23

**operations**  61:1
66:15 67:2 70:18
107:18,20

**operators**  84:2,3

**opposed**  47:6,6 51:5

**opposing**  3:11 92:20

**order**  3:10 7:8,10,12
7:16,17,21 8:16,20
8:22,23,25 42:14,25
49:1,1

**ordered**  6:11,17

**orders**  6:23 7:5

**organization**  44:8

**organizational**  70:4

**organizations**  59:15

**originally**  20:14

**ourself**  60:22

**outlined**  90:15

**outside**  8:2 42:14,24

**overall**  7:5

**overnight**  60:3

**owns**  49:11

### p

**p**  2:1,1 6:1

**page**  9:8 34:3 92:25
93:1,2,3,3,22
101:13,14,16,20,22
101:25 102:16
103:14,19,21 107:9
108:7,12

**pages**  93:1,25

**paid**  11:23 59:15

**paper**  13:10 47:6,8
65:21 66:2

**papers**  79:7

**paragraph**  9:12
10:8 96:9,9,12,15
97:2 98:22 104:9,10
104:24 105:3
106:11,16

**park**  2:5

**part**  39:13 52:7 69:6

**partially**  64:4

**particular**  37:13
56:14 66:4,16,25
67:3

**particularly**  14:9
49:20 56:7

**parties**  4:12 5:8
110:15

**pay**  21:20

**payment**  9:21

**payments**  98:25
100:8

**peg**  63:21 64:12

**people**  44:1,7 45:15
46:21 48:5,5 50:12
55:14,15 63:5 66:16
67:2 70:19,19,24,25
71:8 75:14 77:20
79:1

**perception**  45:3

**perez**  76:13

**perfect**  21:6 68:24

**period**  11:19,21
12:4,18 20:16 28:25
33:6 37:12,18 38:16
39:7 45:20,25 49:7
51:24 56:19 58:23
63:9 65:6 67:19
78:12,13 94:16

**permission**  7:19

**permit**  42:21

**permitted**  8:1,10
51:16

**permitting**  8:16

**person**  8:24 83:6
85:12 110:2

**personal**  84:16

**personally**  81:5
83:10 94:5 104:21

**peter**  69:15 73:11

**phone**  10:9 35:13
56:11 79:21,24 86:4
88:11

**physical**  16:20 17:9
30:6 31:17

**physically**  22:25
33:1,11 46:17 73:3
73:7,7,8 79:6 83:25

**picard**  5:17 47:12
64:17,20 98:24

**pick**  4:7

**picower**  8:6 74:12
95:15

**piece**  66:2

**pink**  49:6

**place**  4:9 46:2 55:11
59:19 69:25 72:13

**placing**  93:8 101:4

**plaintiff**  1:5 4:23

**plaza**  2:10

**please**  4:6,8 36:19
36:20,23 91:18 92:1

**point**  34:17 81:14
92:25

**pointed**  59:3

**policy**  12:4 67:21

**portion**  24:4 102:16

**position**  25:14 32:2
54:18 99:4,12

**positions**  24:23,23
26:2 27:2,14 30:16
30:17 34:11 40:10
43:7 51:7

**possible**  11:1

**possibly**  55:16 72:24

**post**  64:13

**practice**  12:25 17:4
22:21 49:18

**preferred**  16:13
18:8,11,11 19:2,21
22:2,11,12,14,19
26:6 30:2 31:6 32:9
32:14,19,22 33:4
66:5,25

**preferreds**  18:10

**prepared**  93:17
99:22

**present**  5:6 67:15

**pressure**  57:2

**pretty**  71:10,15 72:2
85:8

**previous**  20:15,16
31:16 32:1,2,6
47:25 81:23

**price**  32:21,23

**primarily**  69:5
74:10 75:10 76:16
77:1

**principal**  48:3,12,21
49:20 51:1

**print**  83:10 84:6

printed  73:4 83:1,2
prior  29:7 64:1 88:5
   100:12
prison  85:21 86:14
prisons  87:21
private  4:8
probably  39:5 40:25
   55:9 65:6,14 66:20
   67:1 70:18 74:16
   77:19 87:24 107:22
problem  51:8
procedure  17:5
   35:10 69:24
procedures  69:6
proceed  5:23
process  52:8 58:21
   73:22
produce  57:3,7
   58:22
produced  13:3
   29:15 57:25 65:21
professional  2:24
   110:23
proffer  48:6 49:25
   64:21
profit  3:11 6:12
   7:24 8:2,9 26:23
   32:24 34:7 35:4,10
   36:9,12,19,20,24,24
   37:1 47:20 51:15
   64:17 65:16 88:22
   89:15,24 90:5,16
   91:12 92:21 96:18
   100:14,19
profits  40:4 69:22
   102:16 107:12
programmers  71:9
   76:12
programming  71:25
proprietary  39:13
   69:11 75:6
prosecutor  50:1
   59:1
protection  1:3 4:22

protective  7:5,7,12
   7:16 8:25
prove  52:5
provide  16:12
provided  7:9
public  1:24 2:24
   45:2 48:19 110:7,24
purchase  22:1 32:9
   32:21 33:14 39:1
   41:6,10 42:15
purchased  21:18,19
purchases  50:25
   60:12
purchasing  42:7
put  6:23 11:3 13:19
   69:24 81:18 83:16
   83:25 85:2 103:3
putting  33:11
   100:16
pw  34:6,16

**q**

quarter  36:7,10,13
   36:15
quarterly  9:21 36:6
   36:8
question  27:6 40:7
   47:3 50:7 65:20
   81:23 89:22 98:17
   103:12 106:21
questioned  105:23
questions  6:10 8:5
   68:1,3 79:19 85:1
   105:7
quoted  40:18 49:5

**r**

r  2:1,9 6:1 13:25
   20:2 23:21 102:19
raise  89:15
ran  72:1 77:25 83:2
   83:3
rarely  82:15
reach  97:11
read  9:13 18:16
   20:24 29:21 47:16

47:17,25 58:15
   76:18 81:21,23
   95:14 101:8 104:9
reads  10:8
ready  103:11
really  10:24 74:3,25
   102:25
reardon  73:16
reason  11:11 47:11
   48:4 49:24 56:8,17
   87:21 98:15
recall  9:10,17,24
   10:21 11:7 13:24
   14:8,8 15:3,25 44:1
   44:7 51:21 67:23
   73:14 88:8 91:1,6
   94:16,23 95:8 96:10
   96:11 97:5 100:15
   105:22
receipt  104:15
receipts  52:9
receive  9:22 17:4
   31:14 94:10 96:18
   97:19 102:22,23
received  10:17
   15:23 16:2,3,6,16
   16:17,19 18:4 19:9
   20:1,4,9 30:4 34:18
   81:15,17 82:1 88:23
   88:24 89:17 90:7,12
   90:23 94:4,11,14,17
   96:23 97:24 98:8,25
   99:1 100:13 104:20
   104:22
receiving  16:4
recess  61:11 68:12
   96:2 105:17
recognize  101:7
   103:23
recollection  12:10
   52:17 76:19
record  4:5,12 6:23
   8:15 9:13 11:18,18
   17:17 35:19 52:8
   55:9 56:18 58:17

61:10,14 68:11,13
   91:16 92:10 95:22
   95:25 96:6 100:23
   101:12,21 103:5
   104:10 105:16,18
   108:25 109:2
   110:11
recorded  10:9
recording  4:11
records  11:20 12:11
   12:15,17,19,20,22
   12:23 13:1,2,6,9,12
   14:15 36:22 51:13
   51:21 52:4 56:2,15
   56:16,17,18 57:3,8
   57:10,15,19,20,23
   58:23 66:21
redirect  68:1 105:20
reduced  13:2 34:9
   110:10
refer  12:19,20 68:22
referred  33:16 34:6
   40:22 45:12 69:14
   82:23
referring  10:3 22:1
   25:25 27:4 74:23
   89:5,8 99:15 101:22
reflect  35:19 101:22
reflected  17:2 51:7
   59:11 63:14
reflecting  51:12
reflects  15:11
refresh  76:19
regarding  88:22,24
   90:5
registered  2:24
   48:24 110:23
regular  59:24
regulation  48:25
regulators  59:9
reinvest  102:20
related  7:25 16:10
   31:22 32:20 71:21
   74:11 87:8 100:14
   110:14

**relating** 65:20 67:19 71:15 79:20 83:13 87:18 89:2,24 91:12 100:18
**relationship** 13:17
**relatively** 86:4
**relevant** 98:13
**remain** 8:19
**remark** 39:23 50:9
**remarks** 47:12
**remember** 17:5 37:12,15 38:20 55:21 65:6,25 66:5 71:4 72:25 73:2 75:18,19 78:10,14 79:5 90:18 94:25 95:10,12,15,16,17 95:18 98:15,16 106:2,7 107:4
**remodeled** 74:4
**remotely** 5:7
**report** 70:7
**reported** 1:24 59:8,9 70:10 76:1
**reporter** 2:24 5:20 110:6,23
**represent** 5:9 25:21
**represented** 65:1
**representing** 4:13 5:15,21
**reprint** 91:9
**repurchase** 33:14
**request** 9:16,19,22 10:12,17 34:18 35:13 36:3,7 57:7 108:17
**requested** 36:5 57:1
**requesting** 11:4 35:15
**requests** 9:20 10:13 10:15 13:18 35:10
**require** 13:18 105:3
**required** 8:7 11:18 46:16 48:24

**requirement** 11:18 56:3 57:6
**requirements** 45:23 57:1 69:19
**requires** 49:16
**requiring** 12:25 67:21
**resale** 33:15
**research** 58:23
**resend** 106:15
**reserve** 93:4
**respect** 36:17 37:24 43:2 44:16 51:19 67:21 84:17
**respond** 80:13,24
**responsibilities** 69:4 71:14 73:19,25 74:9 76:14 84:17
**responsibility** 76:4
**responsible** 11:1 82:10
**rest** 70:22 92:4
**retained** 10:13 55:9
**retaining** 12:14
**retention** 11:18 52:8 56:19
**returns** 56:9
**reversed** 22:22
**review** 81:5,8 82:13 100:13
**reviewed** 44:3 45:15 47:23 62:6 91:11 100:18
**reviewing** 43:13 100:12
**right** 13:14 14:3 15:21,23 18:5,13,18 19:19,24 20:1,3 21:13,15,24 22:18 23:21 24:15,19 25:7 25:9,17 26:3,16,18 27:8,9,11 28:13 29:2,10,14,24 31:7 31:11,11,13 32:3,3 33:22 34:1,24 37:11

39:9 43:6 48:2 50:20 52:3 53:8 54:11,15 55:5 58:6 59:25 61:6 62:23 67:25 71:19 77:3,15 77:24 83:15 89:9 98:1 99:2,17 101:9 107:1 108:9,13
**rights** 93:4
**rob** 90:11
**robert** 2:14 89:14 90:8 94:15
**rockefeller** 2:10
**role** 76:24 77:7
**roman** 89:14,14,15 90:8,11 94:15
**room** 5:7 83:6
**roughly** 27:8
**routine** 12:10
**rpr** 1:24
**rule** 12:17 55:25 56:2
**run** 69:23
**runs** 60:15

**s**

**s** 2:1 3:1,8 6:1 102:19
**s's** 107:11
**sala** 78:6,8,25
**sala's** 78:22
**sale** 30:12 32:8,23
**sales** 50:25 60:13
**sanctions** 8:24
**sat** 83:6
**saw** 64:24
**saying** 25:2 36:25 42:15 45:13 51:22 52:5 53:15 56:12 77:3
**says** 9:14 18:7,11,17 19:1 20:1,6,25 23:4 23:5,6,21,25 25:18 26:1 102:16

**sbrown** 2:12
**scan** 57:10
**scope** 8:2 42:14,24
**scrap** 65:21
**scribbling** 65:22
**seal** 8:19
**seanna** 2:9 5:16
**sec** 45:22 48:4 57:1 70:1
**second** 7:16 19:12 55:2 90:4 101:20,25 107:9 108:7
**securities** 1:3,7 4:22 4:24 11:19 16:4,6 16:20 17:6,9,10 18:1,22 19:5 20:21 22:22 26:1 27:24,25 29:25 30:7 31:10,11 31:17,24 32:15 33:4 39:6 40:1,2,10,15 42:6 43:4 44:17,19 46:11,14 47:4 51:1 52:15 54:8 59:15 68:19
**security** 16:10,11,16 18:11 19:14 20:14 26:1 27:1 30:15 32:18 40:19 42:5 43:20,23 44:20 46:25 49:4 54:5,10 56:14 66:17 67:3
**see** 14:20,21 17:13 17:16 21:1,2 23:14 23:22 24:14,20 25:5 25:16,18 29:4 34:4 61:21 67:6 86:8,10 86:12 87:9,10,18 92:24 95:14 97:22 107:10,11 108:2
**seeing** 30:16 95:15 95:16,17,18 96:11
**seen** 34:16 36:17,23 43:3 93:18,19 94:1 102:25

**[self - strategy]**                                                                                                    Page 14

**self**  38:11 61:4
**sell**  16:12,13 22:23
  43:23 48:8,14 49:4
  49:16 54:5,9
**selling**  29:20,20
  40:21 48:17,19,21
**sells**  16:10 60:10
**send**  9:15 35:15
  36:12,15,19,20,23
  37:1 102:19,19
**sending**  9:24
**sensitive**  4:7
**sent**  9:18 34:13,14
  35:7 36:5,6,25,25
  81:2 82:16 87:17
  89:23,25 97:1,2,18
  99:7 105:23,25
  106:2,13
**sentence**  89:5
**separate**  69:23
**separation**  46:7
**setting**  88:6
**settlement**  21:5,7,9
  30:11 59:14,20,21
  60:4,9
**seven**  50:14
**seventh**  63:10
**share**  31:19
**shares**  15:20 17:23
  18:4 21:10,20,23
  22:13 24:3,4,10
  29:25 30:1,4,13
  32:15,20 66:7,11
**sheehan**  65:4
**sheets**  49:6
**short**  16:13 18:17,20
  18:25 19:6,12,20
  20:6,18 21:23 22:17
  22:24 23:3 27:5,14
  30:17 31:10,11,16
  32:6 33:15 34:12
  47:9 48:14,15,25
  49:10,22 50:3 51:7
  54:11,17 68:5 86:4

**shorted**  48:23
**shorting**  51:9,11
**show**  9:6 14:13
  25:14,14 26:7 30:21
  34:1 37:6 61:16
  62:20
**showed**  66:2 89:19
**showing**  24:8 29:2
**sic**  5:4
**side**  25:15 46:8,18
  69:13,17,18 74:18
  74:19,22 75:6
**sided**  49:2
**sides**  32:8
**sign**  72:16,23 73:3
  95:4
**signatory**  72:24
**signature**  9:8 73:4
  93:23 97:25 109:5
  110:21
**signed**  7:11 13:21
  58:11 72:20 73:8
  89:23 90:14 91:1,3
  95:19 96:10 97:25
  98:4 106:8,10,22,25
  108:8,13
**signing**  9:10 73:12
**signs**  56:23
**similar**  34:25 70:19
  77:7 90:14 92:10
  94:3
**similarly**  13:18
**simplistic**  41:1
**single**  9:17
**situation**  24:6 33:10
**six**  11:17 12:18 56:3
  56:18 57:8,14 67:15
**sixty**  70:21
**skip**  29:7
**skipped**  29:12 62:22
  84:15
**slight**  28:4
**smb**  1:6 5:4
**smoking**  66:1

**sofie**  14:5,19 28:19
**sold**  22:1,13,17
  31:11 33:14 47:5
  50:2,4,10,11
**solutions**  4:14 5:22
**somebody**  43:21
  49:8 79:17
**son**  69:10,12
**sons**  69:21
**sorkin**  66:3
**sorry**  6:24 22:6
  26:12 28:13,16 78:4
  81:21,24 92:15
  93:12 97:1 100:24
  103:20 108:24
**sort**  12:21 33:19
  34:7 60:7 66:1
  70:24 89:3 90:2
  98:9
**sought**  99:25
**sound**  32:10
**sounds**  14:1
**southern**  1:1 5:2
**space**  12:14
**speak**  69:20 80:22
  88:10
**speaking**  84:11
**specific**  7:6,17 36:7
  45:24 78:23 99:11
  103:14
**specifically**  8:4 9:16
  10:12 64:1
**specifics**  76:23
**spite**  39:17
**split**  47:7 51:5 53:6
  53:9,17 64:14,15
  71:23 72:1 85:3
**spoke**  64:24 85:19
  86:2 88:9
**spoken**  85:25 87:4,6
**staff**  11:3
**standpoint**  54:18
**stanley**  74:12
**start**  15:13

**started**  24:13 64:13
  67:12,13 69:25
**starting**  42:13
**state**  110:1,8
**stated**  19:14
**statement**  3:12,13
  3:14,15,16,17,18,19
  3:20 14:18 15:10,11
  17:13,21 28:18
  34:25 35:2 57:19
  100:4
**statements**  29:15
  43:5,14 56:9 57:24
  58:9 74:11 76:6,10
  82:16,19 83:1,10
  84:11 104:11,12
**states**  1:1 5:2 8:17
  8:23 38:13 98:23
**stating**  10:2
**stayed**  78:1
**stearns**  38:8,18 39:1
  39:11,25,25 40:9,13
  40:25 41:2,18 42:1
  42:8 43:19 60:6
**step**  78:5
**sticker**  91:18,25
**sticking**  51:15 90:4
  101:25
**stock**  16:12,13 33:14
  41:5 42:8 44:10
  48:15,17,21,25 49:8
  49:9,10,11,14,22
  50:3,5,10,11 51:10
  54:12 59:21,23
**stockbrokers**  9:15
**stocks**  49:20
**stone**  45:5
**stopped**  39:21
**storage**  13:14
**stored**  14:15
**strategy**  6:13 37:11
  37:13,19 38:1 53:2
  53:6 62:8,25,25
  63:25

**street** 57:20
**street's** 56:16
**stressing** 49:24
**strike** 47:7 51:5 53:6
  53:9,17 64:14,15
  71:23 72:1 78:4
  85:3
**struck** 97:1
**structure** 41:25
**structured** 39:25
  46:15
**stuff** 76:9
**stunned** 50:15
**subject** 6:18 68:1
**subordinated** 6:15
  32:11 53:12,18
**suisse** 60:7
**supervise** 46:16
**supervised** 69:10,11
  69:14
**supervising** 69:5
  84:19
**supervisor** 78:20
**supervisor's** 11:25
**supervisors** 70:3,9
**supposed** 56:20
**sure** 11:16 25:1
  35:25 40:6 41:22
  42:19 47:18 61:18
  68:4 83:5,5 92:2
  97:24 107:21
**swear** 5:22
**sworn** 6:4
**system** 83:13

**t**

**t** 3:1,1,8,8 20:25
**take** 18:3 25:4 27:13
  28:24 54:25 59:19
  61:7 68:5 80:11
  92:5 105:9
**taken** 1:17 2:20
  79:21 110:9
**talk** 55:16

**talked** 18:5
**talking** 23:10 46:3
  50:24 101:14
**tape** 95:22
**task** 13:5
**tax** 56:9,12
**telephone** 85:19
  87:2
**tell** 7:4 14:2,21
  31:24 61:8 76:20
  84:16 86:18,20
  92:12 101:13,14,17
  104:1 107:4
**ten** 104:15
**testified** 6:5 88:9
**testify** 8:10
**testimony** 6:18 8:8
  10:1 43:7 47:19
  62:12 63:23 99:24
  110:11
**thank** 6:21 7:14 9:2
  28:1 30:18 35:25
  61:25 62:1 93:13
  95:20 103:2 104:23
**theater** 50:8,18
**thing** 18:5,16 28:23
  29:19 30:3,8 47:10
  47:12 49:25 67:17
  98:17 101:8
**things** 12:21 63:17
**think** 24:16,17 27:6
  28:5 36:3,11 42:13
  42:23 47:3 61:22
  65:22,23 71:4,10
  72:24 73:21 77:12
  78:14 81:19 85:6
  86:2,17 89:17,19
  90:10 94:24 95:21
**third** 19:20 20:5
  108:12
**thought** 65:25 88:9
  91:8
**thousands** 39:16
**three** 9:8 10:8 70:16
  93:1,3,22 95:17

103:21
**time** 4:15 5:6 11:10
  11:20,21 12:5 21:1
  28:25 34:15,17
  37:12,15,18 38:16
  45:20 49:7 53:6,15
  55:15 58:23 59:2
  61:10,15 64:23 65:6
  66:3,24 68:11,14
  80:17 85:17 88:21
  90:4 93:19 94:1,16
  95:25 96:5 105:16
  105:19 109:4
**times** 44:20 48:25
**today** 7:4,10 8:1
  10:6 68:23 85:10,15
  86:9 100:17
**today's** 4:14 88:6,12
  88:13 91:12 94:19
  100:16
**told** 11:7 99:24
**top** 20:25 25:6
**topic** 95:13
**total** 70:12
**totally** 54:19
**track** 47:15
**trade** 21:5,6,8 30:10
  48:12 49:20 55:22
**trader** 39:6 44:10
  66:23,25
**traders** 44:14,16,18
  44:22 46:24 55:22
  62:16 65:22 70:18
**trades** 38:4 63:24
  64:17 71:24 72:1
  74:4 76:17 85:2,3
**trading** 6:13 37:11
  37:13 38:15 39:13
  48:2 53:25 54:12
  57:4,21 62:8,25
  69:11
**transaction** 16:15
  20:19 24:5,11 31:5
  33:3,13 40:23 41:15
  46:22 48:20 49:17

49:22 51:3 52:10,12
  54:7,14 55:10 58:25
  59:2 60:22 66:19
  67:10,11
**transactions** 7:24,25
  8:9 15:11 23:20
  25:23 26:24 30:9
  37:25 39:16 40:3,13
  43:2,13 44:3,16
  45:14 46:4 47:5,6,7
  47:8,22 50:23 51:23
  52:18,24 53:16,18
  53:23 55:17 56:5
  58:24 59:4,8,10,19
  60:3,14,19 61:5
  62:5,13 63:5,13,14
  65:16 72:13 73:23
  104:12 105:4
**transcript** 8:17
  110:4,11
**treading** 42:23
**treatment** 3:11
  92:20
**tried** 66:18
**true** 10:19 100:2,4
  108:19 110:11
**trust** 52:21
**trustee** 2:8 5:17,19
  11:10 56:2 58:1
  59:1 67:20 68:15
  98:23 100:24 103:6
**trustee's** 3:11 92:20
**trying** 72:24 86:8
  89:19
**turn** 4:8 74:5 93:22
  104:8
**twelve** 29:9
**twice** 86:2,3,12
**two** 9:12 18:21 19:8
  19:16 20:1 22:7
  23:18 49:2 54:3
  65:5,7 86:19,25
  87:1 92:12 93:1,3
  93:25 96:4 101:18
  101:19 109:4

**type**  16:8 31:5 70:19
  75:11 94:5 102:2,13
**types**  30:9 46:22
  66:21
**typewriting**  110:10
**typical**  22:21
**typically**  12:19
  35:12 56:14

**u**

**uh**  6:16,20 8:13
  14:17 15:19 18:21
  25:20 28:21 31:5,8
  31:20 35:6 42:9
  45:4 53:4 55:3 60:8
  61:2 62:11 77:10,17
  79:8 80:14 83:22
  85:13,13 86:4 89:6
  93:21 94:20 97:3,15
  97:15 98:7,19 100:3
  102:18 103:15,25
  105:2 107:24
**underneath**  19:25
**understand**  8:12
  14:3 22:3 25:2
  28:24 40:6 41:22
  46:5 47:10 48:2
  53:5,23 67:7
**understanding**
  41:24 47:14
**united**  1:1 5:2 38:13
**unsigned**  106:16
**unsolicited**  43:22
**unwind**  33:13
**use**  35:20 61:23
  91:20,22 92:3
**usually**  11:24 17:11
  35:15 36:13 39:12

**v**

**v**  4:23 20:6
**valuation**  17:9,12
**value**  17:1,23 24:22
  24:23 25:14 26:4,8
  27:3,22 30:16
  100:10

**vanderwal**  2:9 5:18
  5:18 61:18
**varied**  45:22
**various**  33:8 44:19
  60:17 102:5
**verbal**  10:10
**verify**  58:24
**veritext**  4:14 5:21
**videographer**  2:13
  4:4 5:20 61:9,14
  68:8,10,13 95:23
  96:3 105:12,15,18
  109:2
**violated**  51:12
**violates**  8:25
**violations**  8:21
**visit**  88:6,12,13
**vs**  1:6

**w**

**wait**  16:2 29:13
  65:19 94:23 97:23
**waived**  109:5
**wall**  45:5,8,11,21,22
  45:23 46:1,15 56:16
  69:7
**want**  7:4 9:13 33:9
  35:23 36:1 41:24
  45:1 47:18,21 49:4
  54:22 58:15 61:16
  63:22 78:5 81:21
  91:20,22 92:9 93:22
  103:19 107:8
**wanted**  10:11 54:5
  54:23 55:6 59:15
  97:12 102:22,22
  107:25 108:16
**wants**  49:9,16
**way**  25:16 41:18
  48:13 49:12 51:2,6
  56:22 60:15 63:21
  67:8
**ways**  54:4
**we've**  30:22 34:15
  36:17,22 43:2,13

44:3 45:14 47:22
  62:5,22 77:20 84:10
  85:8 100:17 106:24
**weekly**  81:11
**welcome**  93:14
**went**  11:21 26:21
  29:8 44:21 45:21,25
  46:1 47:14 49:12
  51:11 52:10,15,20
  52:24 58:20 63:10
  67:5
**wetterau**  30:9
**whispering**  4:7
**wholesale**  40:23
  42:17
**wind**  60:13
**window**  52:12
**winds**  60:5
**winifier**  76:20
**withdrawal**  7:24 8:2
  8:9 9:17,23,25 34:7
  34:10 35:4,10 64:17
  65:16 89:16 90:16
  91:13 100:14,19
**withdrawals**  3:11
  6:12 10:11,17 11:4
  13:19 36:19,20,24
  36:24 37:1 47:20
  51:16 67:22 88:22
  89:24 90:6 92:21
  96:19
**witness**  3:2 5:4,22
  7:13 8:13 12:8
  17:18,25 24:18,21
  36:1 37:15 40:6
  41:13 43:16 44:5
  45:18 47:24 48:1
  53:22 57:13 61:8
  62:18 63:2,8,16
  68:4,6 93:15 101:22
  105:10 106:19
  107:3 108:5 110:12
**woman**  14:5
**women**  71:6

**woolworth**  29:21
**words**  20:12 22:5
  24:3 45:24 51:24
  54:2 98:4
**work**  44:15 74:14
  74:17 107:20
**worked**  70:25 72:10
  74:3,19 75:23 77:23
  78:10,10,11,18 79:2
  79:11,13 80:8 84:3
  102:8,12
**working**  55:14 71:6
  75:14 80:21 84:19
**worth**  51:11 60:12
**write**  36:18
**writing**  10:12 13:19
  89:3 104:15,20
**written**  34:18 35:14
  36:7
**wrong**  51:9,11
**wrote**  36:23 66:12
  76:15

**x**

**x**  1:2,9,13 3:8,8

**y**

**yeah**  7:1 14:23
  16:25 17:16 19:9
  21:3 23:9 27:21
  31:4 32:5 35:23
  37:21 42:22 47:21
  58:8 62:1 65:12
  75:21,25 76:22 77:4
  77:5,8 78:19,21
  83:24 86:24 89:11
  96:24 101:9 102:3
  104:2
**year**  11:17 12:18
  65:8 87:24 88:10
  90:25 94:18,19
  96:11
**years**  12:12 29:12
  39:22 44:23 50:15
  53:1 56:3,18 57:9
  57:14 62:24 65:7

74:16 81:7 85:24
86:3,23 87:23
**york**   1:1 2:5,5,11,11
5:3 14:20 52:16,20
90:10