Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    SECURITIES INVESTOR

5    PROTECTION CORPORATION,

6                      Plaintiff,

7    v.                              Adv. Case No. 08-01789(SMB)

8    BERNARD L. MADOFF

9    INVESTMENT SECURITIES

10   LLC,

11                     Defendant.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    August 24, 2016

18                    10:10 AM

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25

1   Hearing re:  Motion for Order Authorizing Deposition of

2   Bernard Madoff by Chaitman LLP and Conference Regarding

3   Madoff Deposition

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER

 3         Attorney for the Trustee

 4         45 Rockefeller Plaza

 5         New York, NY 10111

 6

 7    BY:  KEITH R. MURPHY, ESQ.

 8

 9    DENTONS US LLP

10         Attorney for Madoff Defendants

11         1221 Avenue of the Americas

12         New York, NY 10020-1089

13

14    BY:  CAROLE NEVILLE, ESQ.

15

16    SCHULTE ROTH & ZABEL LLP

17         Attorneys for Picauer Parties

18         919 Third Avenue

19         New York, NY 10022

20

21    BY:  MARK D. RICHARDSON, ESQ.

22         JENNIFER M. OPHEIM, ESQ.

23

24

25
```

1    MCDERMOTT WILL & EMERY LLP

2         Attorney for the Sage Parties

3         340 Madison Avenue

4         New York, NY 10173-1922

5

6    BY:  ANDREW B. KRATENSTEIN, ESQ.

7

8    KELLEY DRYE & WARREN LLP

9         Attorney for the Igan Defendants

10        101 Park Avenue

11        New York, NY 10178

12

13   KRISTINA M. ALLEN, ESQ.

14

15   HUNTON & WILLIAMS LLP

16        200 Park Avenue

17        New York, NY 10166-0091

18

19   BY:  ROBERT A. RICH, ESQ.

20

21

22

23

24

25

1   MILBERG LLP

2          Attorney for Defendants

3          One Pennsylvania Plaza

4          New York, NY 10119

5

6   BY:  JOSHUA E. KELLER, ESQ.

7

8   CHAITMAN LLP

9          Attorney for Acton Blackheir

10         465 Park Avenue

11         New York, NY 10022

12

13   BY:  HELEN DAVIS CHAITMAN, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2           THE COURT:  Madoff?

3      (Pause)

4           THE COURT:  Go ahead.

5           MS. CHAITMAN:  Good morning, Your Honor.  Helen

6     Davis Chaitman on behalf of --

7           THE COURT:  Just keep your voice up.

8           MS. CHAITMAN:  Sure.  Helen Davis Chaitman on

9     behalf of a large number of customers.

10          We've moved to take Mr. Madoff's depositions on

11    some of the issues that we enumerated in our papers, and the

12    defense counsel have all coordinated, we're all working

13    together.  The trustee asked that someone be lead counsel.

14    Everyone has agreed that I could serve as lead counsel.

15    We've worked out what we think will be an efficient way of

16    handling the deposition so that we don't repeat questions.

17          And as to the objection to Your Honor I wanted to

18    briefly focus on the Picauer's objection.  I think we're at

19    a point in the clawback litigations where it's terribly

20    important that the defendants have a full opportunity to

21    explore the facts supporting some of their defenses.  And

22    while I appreciate that we're not entitled to take discovery

23    in order to supplement a complaint against the Picauers, I

24    think that their issue can be dealt with simply by an order

25    which says precisely that.

1           If Mr. Madoff, and I won't ask questions, nobody I

2    think is going to ask questions about Mr. Picauer --

3           THE COURT:  But if -- well, I'm not saying that

4    you can't ask the questions, he's obviously going say based

5    upon the declaration put in that Picauer created the Ponzi

6    scheme, so.

7           MS. CHAITMAN:  But the Picauers anticipate that

8    his -- the numerated areas will result in his mentioning

9    Picauer.

10          THE COURT:  Well it could.

11          MS. CHAITMAN:  The simple way to deal with that is

12   to simply enter an order saying anything that he testifies

13   to in his deposition cannot be used to frame a complaint

14   against the Picauers.

15          THE COURT:  Can I ask you a question?

16   Mechanically how is the deposition going to work?  Are all

17   -- how many people are going to go down to the prison?

18          MS. CHAITMAN:  Well I think -- it hasn't been

19   finalized, but I think what we're working on is that only

20   one or two firms would come to the deposition, we would -- I

21   don't think the prison would allow consecutive days -- so

22   what we're thinking is we would take a day, we would

23   circulate the transcript to all defense counsel, we could

24   then filter the questions based on that day, and then we

25   would go down, just one or two attorneys, and then we'll

Page 8

1   complete that process, and it may very well be that

2   individual defense counsel will have questions base solely

3   on their situations, and then we'll sort that out.  But I

4   think we've developed an efficient way of handling --

5           THE COURT:  Are you proposing two people --

6   whatever -- two people go down, have a preliminary

7   deposition, and after review of the transcript have follow-

8   up questions?

9           MS. CHAITMAN:  Yes.  And that would all be handled

10  by one attorney, unless people had specific issues that they

11  wanted to cover, and it would only be one person obviously

12  asking questions at a time.

13          THE COURT:  Okay.  One of the issues raised by the

14  defense, which may narrow the deposition, is in most of the

15  cases, I think all but three it doesn't really matter if the

16  Ponzi scheme started in 1981 or on January 1st, 1992, and I

17  guess my question for the defendants is, are you prepared to

18  concede for the purposes of these 80 whatever number of

19  cases that the Ponzi scheme started January 1st, 1992?  I

20  should say the plaintiffs.  Sorry.  Is Mr. Picard prepared

21  to concede that so that you don't have to take discovery

22  about what occurred before 1992?

23          MR. MURPHY:  Your Honor, Keith Murphy, Baker

24  Hostetler for the trustee.

25          Just for purposes of the record and clarity, we're

Page 9

1    certainly not prepared to concede that the Ponzi scheme or

2    the fraud did not start prior to 1992.

3                    THE COURT:  Even in these cases?

4                    MR. MURPHY:  Even if these cases.

5                    THE COURT:  Okay.

6                    MR. MURPHY:  I think it's not relevant.

7                    MS. NEVILLE:  Your Honor, may I be heard for a

8    minute?

9                    THE COURT:  Well let me just hear --

10                   MS. NEVILLE:  It's on that particular issue on the

11   date.

12                   THE COURT:  All right.  Go ahead.  Ms. Neville, go

13   ahead, I'll hear you.

14                   MS. NEVILLE:  Carole Neville from Dentons.

15                   Your Honor, last night we looked again at the

16   Madoff allocution, and actually what he says is that the

17   fraud began in the early '90s.  So I don't know that in fact

18   the fraud began in 1992 and I --

19                   THE COURT:  He testified in another deposition

20   though --

21                   MS. NEVILLE:  I understand that he said that --

22                   THE COURT:  -- that it was 1992.

23                   MS. NEVILLE:  -- but I don't know that there were

24   follow-up questions on that.  And I went back last night and

25   checked on some of my cases, and the difference between one

1   year in Madoff could actually move the needle.

2           THE COURT:  Well it doesn't matter because he's

3   not -- the trustee is not prepared to concede --

4           MS. NEVILLE:  Right.

5           THE COURT:  -- for the purposes of the case --

6           MS. NEVILLE:  I know, but this --

7           THE COURT:  -- that it began then.  All right.

8           MS. NEVILLE:  For the record it is clear 1992 is

9   the --

10          THE COURT:  So tell me about the areas that you

11  propose to inquire into on the first day.

12          MS. CHAITMAN:  Well I think there are two areas on

13  the first day that I'd like to cover, Your Honor, although I

14  want to cover all the areas that we listed in our papers,

15  but --

16          THE COURT:  Some of them are a little amorphous.

17          MS. CHAITMAN:  You know, I think in fairness to

18  the defendants, Your Honor, since we've never had the

19  opportunity to question Mr. Madoff, except for the very

20  limited proffer withdrawal deposition --

21          THE COURT:  That's because nobody sought his

22  deposition before July.

23          MS. CHAITMAN:  I'm sorry?

24          THE COURT:  No one sought his deposition before

25  July other than the profit withdrawal orders.

Page 11

1          MS. CHAITMAN:  Yeah.  Actually when we had the

2   profit withdrawal motion I did suggest that we'd be opened

3   up for all the clawback defendants at that time, and Your

4   Honor deferred on that.

5          THE COURT:  Right.

6          MS. CHAITMAN:  But in any event, the two threshold

7   areas are when did the Ponzi scheme actually begin, and then

8   to what extent did the Ponzi scheme, if at all, overpower

9   the legitimate trading operations?

10         I've discussed this with you in the past, Your

11  Honor, and as Your Honor noted, there are cases which say if

12  the Ponzi scheme is a small percentage of an otherwise

13  legitimate operation it might not justify the Ponzi scheme

14  presumption.

15         THE COURT:  Did I say that?  I don't know.

16         MS. CHAITMAN:  Yeah, you did.

17         THE COURT:  Okay.

18         MS. CHAITMAN:  Well you acknowledged that --

19         THE COURT:  I say a lot of thing, so.

20         MS. CHAITMAN:  -- you acknowledged the cases --

21         THE COURT:  Yes.

22         MS. CHAITMAN:  -- existed.

23         THE COURT:  Okay.  And what else do you want to --

24  so what you're really -- I mean we've kind of been assuming

25  this is an on/off switch, but what you really want to ask is

Page 12

1    when he started to manufacture fictitious trading and when

2    he stopped making actual trades, assuming he ever stopped to

3    make actual trades.

4             MS. CHAITMAN:  With respect to the defendants.

5             THE COURT:  Right.

6             MS. CHAITMAN:  Yeah.  I mean he may have done

7    something else with the unmentionable person, but -- and a

8    few others, but clearly with respect to the defendants who

9    are innocent, non-co-conspirator defendants we want to focus

10   on that.

11            THE COURT:  All right.

12            MS. CHAITMAN:  And --

13            THE COURT:  And what else?

14            MS. CHAITMAN:  -- then we want to focus on the

15   recordkeeping.  We want to focus --

16            THE COURT:  Why do you want to ask about the

17   recordkeeping?  You know, what's he going to know?

18            MS. CHAITMAN:  Well I think, you know, based on my

19   limited deposition of him he has a complete picture of the

20   recordkeeping.

21            THE COURT:  But what are you going to ask him

22   about the recordkeeping?

23            MS. CHAITMAN:  Well, for example, Your Honor, his

24   testimony on the profit withdrawal issue was that up until

25   -- the cutoff date that he gave me was -- he said it started

Page 13

1     some time in 1992, and I said, well can we safely say that

2     as of December 31, 1991 the trades were all legitimate?  He

3     said, yes, definitely.

4              So if we use that as the cutoff date what I want

5     to do, and I disagree with the trustee's calculation that it

6     only impacts three cases, I haven't had time to go through

7     all of my cases, but I don't believe that's accurate,

8     because you have to take into consideration the interaccount

9     transfers and --

10             THE COURT:  Well I thought the trustee did that or

11    at least --

12             MS. CHAITMAN:  Well --

13             THE COURT:  -- the experts, Mr. Greenblatt (ph) I

14    think said he had done that.

15             MS. CHAITMAN:  Okay.  I haven't had -- I don't

16    believe that's accurate, but I haven't had a chance to go

17    through all my cases.

18             But what we're hoping to get out of Mr. Madoff is

19    not simply when the fraud began, but how Madoff's records

20    will prove that there were actual trades prior to that time.

21    And it wasn't specifically relevant to the profit withdrawal

22    issue, and I didn't go into it at that deposition, but he

23    did mention some of the traders who handled the trades that

24    were done for the investment advisory customers, and I want

25    to explore with him what records Madoff had and perhaps some

Page 14

1    of those records still exist, there may be some way that we

2    can actually prove this.

3                THE COURT:  So you want to ask him about records

4    of actual trading?

5                MS. CHAITMAN:  Yes.

6                THE COURT:  Okay.  What else do you want to ask?

7    What other areas?

8                MS. CHAITMAN:  Obviously there may be questions

9    specific to some of my clients.

10                THE COURT:  But I thought that wasn't going to be

11    the first day though.

12                MS. CHAITMAN:  No, it wouldn't be the -- oh, the

13    first day?

14                THE COURT:  Just about the first day, yeah.

15                MS. CHAITMAN:  Yeah.  I think that that would be

16    the first day, Your Honor.

17                THE COURT:  All right.

18                MS. CHAITMAN:  And subject to whatever he would

19    say that would lead to something else.  So basically --

20                THE COURT:  Does anybody else disagree that on the

21    defendants' side that that's the scope of the first day?

22                MR. RICH:  Your Honor, for the for the record,

23    Robert Rich, Hunton & Williams on behalf of the

24    (indiscernible) defendants.

25                I would just add to the scope of the first day

Page 15

1    that we would want to ask about the interpretation of some

2    of the account records generally, the monthly statements.

3    You know, we've heard that the trustee's experts are going

4    to testify on this issue, we've requested to take deposition

5    and learn more about that.

6              THE COURT:  But in what sense?

7              MR. RICH:  Well, you know, I've looked through the

8    records and I've had a hard time figuring out how those

9    monthly statements show what deposits were made into an

10   account, and I've yet to be able to figure it out, and I'd

11   like to ask about just how to interpret these records

12   generally.

13             THE COURT:  You really think he's going to know?

14             MR. RICH:  I mean he's the head of the company --

15             THE COURT:  No.

16             MS. CHAITMAN:  He will know, Your Honor, because

17   we did that with the profit withdrawal statements, he knew

18   exactly --

19             THE COURT:  But that sounds like particular

20   defendant questions.  In other words, you'll show him an

21   account statement from your client I assume -- the clients

22   and you'll say what does this mean?

23             MR. RICH:  Yeah, Your Honor, I think this is more

24   of how to interpret the account statements generally.  I

25   mean I do have some questions specific to ours, but I think

Page 16

1    there's a more general question.

2              THE COURT:  So what general question do you want

3    to ask him about the accounts statements?

4              MR. RICH:  So like, you know, here's a set of

5    monthly statements, what the trustee is using to say this is

6    the amount deposited, this amount withdrawn.  I don't see

7    how like these statements show all that information, and

8    maybe he can say why.

9              THE COURT:  Are you going to show him a statement

10   that shows -- I guess I don't understand.  I thought that

11   the monthly statements would reflect cash deposits and

12   withdrawals, don't they?

13             UNIDENTIFIED SPEAKER:  They do.

14             THE COURT:  So beyond that what would you ask him?

15             MR. RICH:  You know, I don't --

16             THE COURT:  When did they actually occur I guess.

17   How's he's going to --

18             MR. RICH:  I'm looking at the statement and I'm

19   looking at the trustee's summary, you know, attached to the

20   complaint of what those statements say and I'm having

21   trouble reconciling them.

22             THE COURT:  But the -- he didn't prepare the

23   trustee's summary.  You have to figure that out from either

24   the trustee's records or the trustee will at some point have

25   to explain it.

Page 17

1           MR. RICH:  But I need to --

2           THE COURT:  That's filed.  Did you take the --

3   first of all the trustee didn't do anything, he had experts

4   -- did you take the expert depositions?

5           MS. CHAITMAN:  If I may just say something, Your

6   Honor.  When I questioned Mr. Madoff about the profit

7   withdrawal statements I believe his testimony was that where

8   it says buy it actually meant sell, and where it says sell

9   it actually meant buy.  A little counterintuitive, but his

10  explanation, which I never would have anticipated, was that

11  he -- the -- from the customer's perspective it was being

12  bought and sold from and to Madoff.

13          In other words, what he began to testify was that

14  Madoff had the inventory because he had such massive

15  positions, he explained it, he was doing trades equal to 10

16  percent of the daily volume on the stock exchange so that

17  when he says in the statement and someone with my limited

18  intelligence looks at it if it says buy I would have thought

19  that meant that the customer bought it.  It's not what it

20  meant.  It meant that it was bought by Madoff from the

21  customer and it was put back into Madoff's inventory.

22          So all I'm saying is these are very complicated

23  issues and they're not apparent on the face of the

24  statements, so I think what Mr. Drake is saying is that we

25  just need to question him.  He knows all this stuff.

Page 18

1                THE COURT:  Right.

2                MS. CHAITMAN:  He had a very, very clear ability

3      to testify as to what the (indiscernible) entries meant.

4                THE COURT:  Anything else?

5                MR. KRATENSTEIN:  Your Honor, Andrew Kratenstein,

6      I represent the Sage defendants.

7                And Ms. Chaitman may have covered this when she

8      said that one of the topics was the extent to which the

9      Ponzi scheme overcomes the legitimate trading.  Just to put

10     a fine --

11               THE COURT:  No, I understand.  That's why I said

12     it's not an on/off switch.

13               MR. KRATENSTEIN:  Right.  Just to put a finer

14     point on that, because I want to be clear since you're

15     asking about scope.

16               One of the questions about scope is whether the

17     Ponzi scheme extended beyond the so-called split strike

18     strategy or went to the so-called directed trading and

19     (indiscernible) bond arbitrage that Mr. Madoff did with a

20     number of accounts, including my clients' accounts.

21               THE COURT:  These are not investment advisory

22     accounts?

23               MR. KRATENSTEIN:  They were investment advisory

24     accounts, but they were different.  They were not in split

25     strike for the entirety of the period, which is relevant

1    because if he's admitted to a "split strike Ponzi scheme"

2    that's one thing, but if he's saying that that's the scope

3    of the Ponzi scheme, it didn't go beyond "split strike" --

4              THE COURT:  Okay.

5              MR. KRATENSTEIN:  -- then that's relevant.

6              MS. NEVILLE:  Your Honor, Carole Neville.

7              To add to that, in 1997 apparently a large number

8    of these so-called arbitrage accounts were switched over to

9    split strike conversion and it happened in six of my

10   accounts, and I'd like to find out what actually occurred

11   that the point.  That was --

12             THE COURT:  It sounds like this --

13             MS. NEVILLE:  -- the summer of 1997.

14             THE COURT:  It sounds like that's a specific

15   question about specific --

16             MS. NEVILLE:  It covers --

17             THE COURT:  -- accounts, and I thought that the

18   first day was more of a general type of thing, otherwise

19   just do it in one day.

20             MS. NEVILLE:  But this is -- covers a large number

21   of clients, so it may play into this idea that there was

22   some separate activity in the Madoff operations that held

23   those arbitrage accounts and others -- accounts from the

24   same period as split strike conversion.

25             THE COURT:  All right.  Anything else?

Page 20

1           MS. CHAITMAN:  I think that's it for the first

2    day, Your Honor.

3           THE COURT:  Let me hear from the trustee.

4           MR. MURPHY:  Good morning, Your Honor.  Keith

5    Murphy, Baker Hostetler, counsel for the trustee.

6           Your Honor, just to begin, there are 83 adversary

7    proceedings impacted by these folks --

8           THE COURT:  Right.

9           MR. MURPHY:  -- including Ms. Chaitman and the 6

10   people who have filed.  That relates to 136 BLMIS accounts

11   in those 83 adversary proceedings.

12          We raised several issues in our response.  The

13   first is with respect to those cases where fact discovery

14   was already closed --

15          THE COURT:  Right, and I said that I wouldn't

16   extend it for those, and I'm not going to.

17          MR. MURPHY:  Okay, great, then I don't think there

18   was any objection to that.  So that would be fine.

19          The second category, Your Honor, are those cases

20   where fact discovery was still open as of July 7th but is

21   closing, was about to close, or will close during this

22   process.

23          So we would request, Your Honor, that the -- that

24   just because of this process that the case management order

25   deadlines that are previously set in all of these cases not

Page 21

1    be modified.  They shouldn't be extended as a result of this

2    process.

3             THE COURT:  Well I said that I would -- if I'm

4    going to allow the deposition of Madoff I'm obviously going

5    extend it for that purpose.

6             MR. MURPHY:  Agreed, and that's what we discussed

7    at the July 20 hearing.  I did clarify at the time, Your

8    Honor, that I would just -- we were asking that it just be

9    extended for purposes of taking Mr. Madoff's deposition and

10   then to allow the trustee to rebut anything that he might

11   say.

12            THE COURT:  Well, I don't know if I would do that,

13   but why don't we just leave it that they can take the

14   deposition and then we'll see what happens after that.

15            MR. MURPHY:  That's fine, Your Honor.

16            I would just add during that July 20 hearing, I

17   don't know that you had a chance to look at the transcript,

18   but the point I made at that time was that this process

19   shouldn't be used to hit restart on all of discovery for the

20   defendants now that it's coming towards the end or near the

21   end of their fact discovery deadline.  I think the Court

22   understood that point and said it agreed.

23            With respect to the start date of the fraud, Your

24   Honor, the 1992 date was not something that we picked, it

25   was something that occurred in the notices and

Page 22

1    Ms. Chaitman's motion.  They have based their questions --

2              THE COURT:  Yeah, but --

3              MR. MURPHY:  -- around 1992.

4              THE COURT:  I understand that -- well they're

5    asking for information prior to 1992 and that's why I asked

6    if you're prepared to concede for the purposes of the --

7    these adversary proceedings that the start date was

8    January 1st, 1992.  If you were a lot of those requests for

9    pre-1992 information go away, but since you're not it

10   doesn't matter.

11             In other words, if you're going to contend that,

12   for example, the Ponzi scheme started in the late '80s

13   they're entitled to information about what was going on in

14   BLMIS in the late '80s and in particular whether BLMIS was

15   involved for instance in 100 percent legitimate trading.

16             MR. MURPHY:  Well with respect to those people,

17   Your Honor, who believe that the fraud started in January of

18   1991 -- 1992, excuse me, or some time thereafter, this is a

19   strict that liability case, I think at that point the

20   activity that took place prior the that point is irrelevant.

21             THE COURT:  I don't know.  I don't know.  If they

22   were relevant you'd just concede it.

23             MR. MURPHY:  Well, Your Honor, maybe because, for

24   example, Ms. Neville has not consented to the 1992 date me

25   conceding even the 1992 date wouldn't necessarily have that

Page 23

1    effect.

2           THE COURT:  All right.  I'm not saying you have to

3    do it --

4           MR. MURPHY:  Okay.

5           THE COURT:  -- I was just asking.  I thought it

6    might streamline things.  But go ahead.

7           MR. MURPHY:  Why don't we just -- we have put the

8    details in our response, I don't think I need to go through

9    it here with respect to why the adversary proceedings were

10   or were not affected by 1992 given the discussion here

11   today.

12          For example, 80 of the adversary proceedings, 61

13   of those accounts that were involved in that -- in those

14   adversary proceedings were opened after 1992 and had no

15   affect from anything prior to 1992.

16          The second prong it relates to 61 of the accounts.

17   And with respect to those accounts, while they may have been

18   opened after 1992 and they may have -- or been affected by

19   something prior to 1992 such as from an interaccount

20   transfer, after all the calculations are made and taken into

21   account those people still had withdrawn more funds prior to

22   the two-year period such that there was no principal left.

23   It would not change their fictitious profit calculation.

24          Your Honor, I would just ask if a deposition is

25   authorized that we would limit the areas approved by the

1    Court, any deposition not be used for purposes of getting

2    testimony for use in other proceedings for the profit

3    withdrawal or Picauer.

4            THE COURT:  I don't know how I'd do that though.

5            MR. MURPHY:  I think maybe it would be --

6            THE COURT:  For example --

7            MR. MURPHY:  -- the questions would be --

8            THE COURT:  -- assume Ms. Chaitman has some

9    clients or maybe not where the discovery cutoff has run.  Do

10   you have any of those?

11           MS. CHAITMAN:  I have some clients where the

12   discovery cutoff has run.

13           THE COURT:  All right.  So but if we're litigating

14   in those particular cases and Mr. Madoff has said, you know,

15   the scheme began on January 1st, 1992 how do I not use that

16   information?

17           MR. MURPHY:  Right, Your Honor --

18           THE COURT:  Or anybody else for that matter.

19           MR. MURPHY:  I think maybe Your Honor would have

20   to be perhaps after the deposition when counsel goes through

21   it to see if there are any areas which either the trustee or

22   for example counsel for the Picauer find were beyond the

23   scope or would want to have --

24           THE COURT:  Well that's different.

25           MR. MURPHY:  That's a request we would make also,

Page 25

1   Your Honor, to have a procedure by which there would be

2   sufficient time to do that.

3              THE COURT:  The same procedure we had in the

4   profit withdrawal order.

5              MR. MURPHY:  Right, Your Honor.

6              With respect to the deposition, Your Honor, I

7   would ask -- Ms. Chaitman I think suggested a two-day

8   process.  I would request a one-day process or at least that

9   people be prepared in the event that it happened over one

10  day such that if the deposition were relatively short and we

11  were all there and waiting for all afternoon people would be

12  able to review what --

13             THE COURT:  Well the idea of this is I think so a

14  lot of people don't have to traipse down to the prison,

15  which I understand is a problem any way with the prison

16  authorities.

17             MS. CHAITMAN:  It is.  They have -- the deposition

18  room is a very small room --

19             THE COURT:  Right.

20             MS. CHAITMAN:  -- it doesn't comfortably hold more

21  than six people.

22             THE COURT:  And, you know, maybe you can convince

23  people between the first day and the second day that as to

24  their particular cases -- Ms. Chaitman has a lot of cases so

25  this may not be true of her -- but to those who only have

Page 26

1    one or two cases it's just not worth the effort to go down

2    and ask him any questions.  Maybe you can enter into a

3    factual stipulation with them.  If you can satisfy them then

4    it doesn't make a difference as long as he testifies clearly

5    that -- I'm not saying he will --

6              MR. MURPHY:  Right.

7              THE COURT:  -- that on January 1st, 1992 I no

8    longer -- after that date I no longer made a legitimate

9    trade and basically, you know, the switch was turned onto

10   the Ponzi scheme.

11             But I think the two days, if nothing else, to

12   accommodate the prisons and to limit, you know, the amount

13   of time, because what I'm hearing you can't do more than one

14   day in a row any way if that's (indiscernible).  But that

15   makes sense.  Then the only question is the scope.  Do you

16   have any problems with the scope?

17             MR. MURPHY:  Just what I've said before, Your

18   Honor, and contained in our response.  So --

19             THE COURT:  All right.

20             MR. MURPHY:  -- I would adopt our response to the

21   extent not discussed here, Your Honor.

22             THE COURT:  Subject to seeing exactly what

23   procedure you're adopting or how you're going to go about

24   doing this, how many people are going to go, you can ask him

25   any questions -- the scope -- the appropriate scope is when

Page 27

1    the Ponzi scheme began, which includes whether he continued

2    to make legitimate trades --

3              MS. CHAITMAN:  Right.

4              THE COURT:  -- and you didn't mention it, but

5    whether there are records that show allocations to

6    particular accounts of those trades.  I don't know how you

7    figure it out if he says yes, I made a legitimate trade of X

8    and I didn't allocate it and then you go through everybody's

9    statement to figure out how it should be allocated, but to

10   the extent he continued to make legitimate trades after

11   whatever the start date is that might be reflected in the

12   statements.

13             You can ask him that recordkeeping question.  I

14   don't quite understand about how buy is sell and sell is

15   buy, but I guess there's a lot I don't understand.

16             And you can ask him general questions about random

17   account statements they conduct particular entries mean if

18   you have an account statement that has a lot of these

19   entries as an example in terms of whether, you know, a buy

20   is a sell and a sell is a buy and when it says there's as

21   withdrawal if it's actually a withdrawal of cash, and

22   whether there -- when there's a deposit whether it's an

23   actual deposit of cash, although I think the trustee's

24   experts have gone through the bank records and confirmed

25   that those deposits and withdrawals are accurate, and I

Page 28

1    think the second circuit is satisfied that they are

2    accurate.

3              MS. CHAITMAN:  But the trustee's bank records

4    start in December 1998, Your Honor.

5              THE COURT:  All right.  Okay.

6              MS. CHAITMAN:  And then the other area that I had

7    raised was the extent to which the Ponzi scheme overwhelmed

8    the legitimate trading, which continued until --

9              THE COURT:  Well that's kind of the more general

10   question of did he continue to engage in legitimate trading.

11             MS. CHAITMAN:  Okay.  As long as we understand

12   that that's the area that I wanted to cover.

13             THE COURT:  Yeah.  No, I recognize the issue and

14   I've used the analogy several times of an on/off switch.

15   That may not be an accurate way to describe --

16             MS. CHAITMAN:  Right.

17             THE COURT:  -- what happened, so you can certainly

18   can him whether he engaged or whether BLMIS engaged in

19   legitimate trading --

20             MS. CHAITMAN:  Right.

21             THE COURT:  -- afterwards, and was there a point

22   which it stopped?

23             MS. CHAITMAN:  Right.

24             THE COURT:  That he was no longer engaged, at

25   least in the IA business in legitimate trading.

1          MS. CHAITMAN:  Well but that's the issue.  The IA

2     business, just to use a very simplistic measure, the -- of

3     approximately 200 employees even in 2008 only 12 were

4     involved in the IA business.

5          THE COURT:  Well, you know -- and I know what

6     you're saying and I've heard the argument, but if your

7     clients invest -- were in the IA business and the IA

8     business was run as a Ponzi scheme the fact that it wasn't

9     separately incorporated and it was run as a division of

10    BLMIS it's probably not going convince me that it wasn't a

11    Ponzi scheme.

12         MS. CHAITMAN:  Well --

13         THE COURT:  I've had other cases where the debtor

14    may have a legitimate operation but he's also running a

15    Ponzi scheme, and if you invested in the Ponzi scheme rather

16    than the legitimate operation you've invested in a Ponzi

17    scheme.  That's all I'm saying.

18         MS. CHAITMAN:  Okay.  Obviously we'll argue the

19    merits --

20         THE COURT:  I don't know how he's going to know

21    that, I think you'd have to determine from the records the

22    trustee has what percentage of income -- although if it's a

23    Ponzi scheme I guess the income is really ephemeral -- but

24    what percentage of income was earned from the IA side and

25    what percentage was earned from the other side.  I

Page 30

1    understand it was the IA side that supported the other

2    businesses, but you know, you've raised this issue and I've

3    said in the past you can question him about that.

4            MS. CHAITMAN:  Okay.

5            THE COURT:  I don't know what he's going to know

6    -- you know, he's going to have that information on his

7    fingertips if you're talking about strict numbers or ratios.

8            MR. MURPHY:  Your Honor, I think a lot of that

9    will be elucidated by the trustee's experts at the proper

10   time.

11           THE COURT:  I know.

12           MR. MURPHY:  Two questions.

13           THE COURT:  Yeah.

14           MR. MURPHY:  One, we would ask that the deposition

15   be scheduled without delay.  Obviously there is --

16           THE COURT:  Subject to the prison obviously.

17           MR. MURPHY:  Fine.

18           And then the second question, Your Honor, is

19   really a question relating to discovery.  Going back to that

20   there are certain deadlines that are going on, or passing

21   with fact discovery --

22           THE COURT:  I haven't --

23           MR. MURPHY:  -- are you going to address --

24           THE COURT:  I haven't extended any deadlines other

25   than to take Mr. Madoff's deposition.  Whether someone can

Page 31

1    come in and make a compelling case, one that they didn't

2    take the deposition earlier and they should have more time

3    to do follow-up depositions, as you seem to be saying, we'll

4    deal with it at that time.

5            MR. MURPHY:  Thank you, Your Honor.

6            THE COURT:  So I'm not extending your time to take

7    any discovery either in any of these cases.

8            MR. MURPHY:  Thank you, Your Honor.

9            THE COURT:  Why don't you circulate a proposed

10   order.

11           Oh, let me add one other thing since it was

12   raised --

13           MR. MURPHY:  Oh, sorry.

14           THE COURT:  -- about Picauer when I got an

15   objection.

16           Obviously -- I say obviously -- but it seems like

17   Madoff is going to testify that Picauer created the Ponzi

18   scheme, and that's -- you know, but that's -- if that's

19   relevant to when the Ponzi scheme began he can certainly

20   testify to it.  What you can't do is ask questions about and

21   what did he do -- and what did Picauer do in 1993 and what

22   did he do in 1994 and things like that, because that's well

23   beyond the scope of it and I think the Picauer parties have

24   a legitimate objection on that basis.

25           MR. RICHARDSON:  Yes, Your Honor.  Mark

Page 32

1    Richardson, Schulte Roth & Zabel on behalf of Picauer.

2              THE COURT:  See I just made your argument for you.

3              MR. RICHARDSON:  Sorry?

4              THE COURT:  I just made your argument for you,

5    right?

6              MR. RICHARDSON:  You did.  And I'll be brief in

7    that regard.

8              THE COURT:  Okay.

9              MR. RICHARDSON:  We're here, you know, for the

10   limited purpose of trying to get -- or ask the Court for the

11   same type of --

12             THE COURT:  Oh, but he had one other thing.  Since

13   you've offered it I'll include the proviso that the

14   information can't be used to draft something against the

15   Picauers (indiscernible) parties.

16             MR. RICHARDSON:  And respectfully, Your Honor, I

17   don't think it stops there.  I mean Ms. Chaitman has been

18   forthright in saying that she's not going to ask questions

19   about Picauer and she's not going use his deposition

20   testimony to draft a new complaint, but it goes beyond that.

21   I mean this could be a spring board for other things and

22   that's really our concern is that if there isn't a

23   limitation on the scope and a broad limitation on use that

24   Ms. Chaitman could, for example, use day one of Madoff's

25   deposition to make a further motion to ask more questions

Page 33

1    about Picauer during day two.

2              THE COURT:  But she can always make a motion then

3    you could oppose it.  All right.  I meant to ask, and maybe

4    I didn't understand the procedure, are you then going to

5    come back before day two and get a further order defining

6    the scope of the second day?

7              MS. CHAITMAN:  If that's what Your Honor wants.

8              THE COURT:  Yeah, I think that probably makes

9    sense just to --

10             MS. CHAITMAN:  Okay.

11             THE COURT:  -- give the -- keep a --

12             MS. CHAITMAN:  Okay.

13             THE COURT:  -- control on this and maybe some of

14   these issues can be resolved.  It doesn't sound like it, but

15   maybe they can.

16             MS. CHAITMAN:  Okay.

17             THE COURT:  So let's just say this is one day

18   only, these are the issues subject to the right to come back

19   to ask further questions.  Okay?

20             MR. RICHARDSON:  And just for the record, Your

21   Honor, I don't think there's any reason to suspect that

22   Madoff will testify that Picauer created the fraud based on

23   these --

24             THE COURT:  But he put it in an affidavit.

25             MR. RICHARDSON:  Right, but based on these topics.

Page 34

1    Nothing I heard from these topics that are being sought

2    would require factual discovery about Picauer.

3            THE COURT:  I disagree.  I think they can ask him

4    how did it come about.  Or when did it come about and how

5    did it come about.

6            MR. RICHARDSON:  Well when did it come about is a

7    very different question from how did it come about.

8            THE COURT:  I'm not going to limit the deposition

9    in that sense.  As long as he's not asked questions about

10   what did Picauer do --

11           MR. RICHARDSON:  I understand.

12           THE COURT:  -- you know, things like that,

13   although then, you know, why he -- or how he -- you know,

14   almost the basis of the statement he created it since it's

15   out there any way, but he can't ask how did Picauer aid and

16   abet it.

17           MR. RICHARDSON:  Right, and that's helpful, but I

18   do think there is still a concern that if the door is open a

19   crack it will be used to create a back door later.

20           THE COURT:  Why don't you deal with that in terms

21   of limiting the use of it in this order with a right to go

22   through the questions.  It's the same order --

23           MR. RICHARDSON:  Right.

24           THE COURT:  -- we had in the PW which

25   (indiscernible) and raise objections that it exceeded the

Page 35

```
1    scope.

2              MR. RICHARDSON:  Yes, sir.

3              THE COURT:  Okay?

4              MR. RICHARDSON:  Thank you.

5              THE COURT:  Circulate a proposed order.

6              MS. CHAITMAN:  Right.  You know, I assume that

7    it's -- you know, we had a sealing order last time, but I

8    assume that all defense counsel can -- obviously they need

9    to review the transcript.

10             THE COURT:  Well only the defense counsel that

11   participated --

12             MS. CHAITMAN:  That participated.

13             THE COURT:  -- in these proceedings.

14             MS. CHAITMAN:  Right.

15             THE COURT:  And not with respect to the cases

16   where the discovery has not been extended.

17             MS. CHAITMAN:  No.

18             THE COURT:  It may be the same defense counsel, it

19   may not matter, but --

20             MS. CHAITMAN:  Right.  But --

21             THE COURT:  -- if there are any --

22             MS. CHAITMAN:  -- I'll give defense counsel that

23   have filed something saying we want to participate.

24             THE COURT:  Right.

25             MS. CHAITMAN:  Okay.  I'll put together a proposed
```

Page 36

1    order.

2              THE COURT:  Although, Ms. Neville, I looked at the

3    cases you cited in the declaration, I looked at a couple of

4    the adversary proceedings, you said all the accounts were

5    open before 1992 and I didn't see that.

6              MS. NEVILLE:  Some of them were transfers.  I only

7    listed the accounts that I had that were opened before 1992.

8              THE COURT:  Well go back and look at the

9    complaints.

10             MS. NEVILLE:  I will go back and look.

11             THE COURT:  They may be transfers but that's not

12   what it said in your declaration.

13             MS. NEVILLE:  Well but the transfers came from

14   earlier accounts that started -- oh, that's --

15             THE COURT:  With your accounts --

16             MS. NEVILLE:  -- here -- no, no, no, Your Honor,

17   this is the 1997 issue.  Barbara Beardan (ph), for example,

18   opened her account in 1986, the trustee's complaint begins

19   in 1997.  That was when her account was switched from an

20   arbitrage to some other account, but it's the exact same

21   person and her account statement --

22             THE COURT:  Well it wasn't clear.  If that's the

23   case it certainly wasn't clear from your declaration.

24             MS. NEVILLE:  Well you can't tell it from the

25   complaint, because the calculation that the trustee uses

Page 37

1    begins in 1997, but the account by Ms. --

2              THE COURT:  With an interaccount transfer.

3              MS. NEVILLE:  Exactly.

4              THE COURT:  Right, I know.  All right.

5              MR. RICHARDSON:  So, Your Honor, just to clarify,

6    the limiting order with respect to the confidentiality

7    period and the use restrictions should be the same as the

8    previous limiting orders that have been entered with respect

9    to profit withdrawals?

10             THE COURT:  Why is there a confidentiality order?

11   Oh, I guess you want to review the transcript --

12             MR. RICHARDSON:  Just a period for counsel to look

13   at.

14             THE COURT:  -- for the period -- same

15   confidentiality we have when we say there's a transcript on

16   the ECF?

17             MR. RICHARDSON:  Correct.

18             THE COURT:  All right.

19             MR. RICHARDSON:  Thank you.

20             MR. MURPHY:  Thank you, Your Honor.

21             THE COURT:  All right.  Thank you.

22        (Whereupon these proceedings were concluded at 10:42

23   AM)

24

25

Page 38

1                              **I N D E X**

2

3                              RULINGS

4                                                                PAGE

5     Motion for Order Authorizing Deposition of

6     Bernard Madoff by Chaitman LLP                              33

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 39

1                    C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o=Veritext, ou,
                   email=digital@veritext.com, c=US
6    _____    Date: 2016.08.25 13:32:14 -04'00'

7    Dawn South

8    AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12    Date:  August 25, 2016

13

14

15

16

17

18

19

20

21

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501