**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-1789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

**PARTICIPATING CLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION
TO TRUSTEE'S MOTION SEEKING AFFIRMANCE OF HIS
TREATMENT OF PROFIT WITHDRAWALS**

**CHAITMAN LLP**

465 Park Avenue
New York, New York 10022
Phone and Fax: (888) 759-1114
Helen Davis Chaitman
Gregory M. Dexter
hchaitman@chaitmanllp.com
gdexter@chaitmanllp.com

*Attorneys for Participating Claimants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

THE EVIDENCE WITH RESPECT TO PROFIT WITHDRAWALS ........................................... 5

THE BLECKERS' ACCOUNTS .............................................................................. 14

    The Aaron Blecker Account .................................................................... 14

    The Arthur and Sofie Blecker Account ...................................................... 17

ARGUMENT ...................................................................................................... 18

    INCORPORATION OF ARUGMENTS MADE BY THE BLUMS ................................... 18

    THE TRUSTEE HAD EVERY OPPORTUNITY TO DEPOSE AARON
    BLECKER ................................................................................................ 19

    THE TRUSTEE'S RELIANCE ON BONGIORNO'S  TESTIMONY IS
    UNSUSTAINABLE .................................................................................... 20

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)...................................................................................................3

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)...........................................................................................................19

**Statutes**

15 U.S.C. §§ 78aaa to -78lll...............................................................................................1, 3, 13

15 U.S.C. § 78fff-2(b)..............................................................................................................1

Participating Claimants, as set forth on Exhibit A to the accompanying declaration of

Helen Davis Chaitman ("Chaitman Decl."), by their attorneys, Chaitman LLP, respectfully

submit this memorandum of law in opposition to the Trustee's motion seeking to affirm his

treatment of profit withdrawals.

## PRELIMINARY STATEMENT

The factual issue before the Court, with respect to Aaron & Sofie Blecker, as illustrative

of the numerous customers who have joined on this issue, is the following:  During the entire

course of their investments through Madoff, did the Bleckers ever receive checks made payable

to them representing profit withdrawals?  While the Trustee argues that the evidence proves that

the Bleckers received 180 profit withdrawal checks, the Trustee has failed to produce a shred of

credible, admissible evidence to support this contention.

The Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa to -78lll, ("SIPA"),

requires the Trustee to determine claims based upon the debtor's "books and records."  15 U.S.C.

§ 78fff-2(b).  But, of course, here, the Trustee has represented to every court before which he has

appeared that Madoff's records are "permeated with fraud."  How then can he, as a fiduciary,

rely upon those records to deny customers the SIPC insurance to which they are statutorily

entitled?  The Trustee will argue that the records are permeated with fraud only as to the issues

which he disputes but as to deposits and withdrawals, the records are accurate.

Yet, we know that is not the case.  While the Trustee has refused to produce evidence of

mistakes he has found in the records, *see generally* Tr. May 17, 2016 discovery hearing in

*Picard v. Wilenitz et al.*, Adv. Pro. No. 10-04995, he undoubtedly knows of mistakes as to

deposits and withdrawals.  We know of at least one:  The December 1991 statement for Margaret

and Gunther Unflat shows a profit withdrawal of $4,226.20 on December 17, 1991.  Chaitman

Exh. 38.[1]  In fact, however, the Unflats never cashed this check.  Chaitman Exh. 37.  And yet,

Madoff debited the Unflats' account as if the check had been cashed.  Chaitman Exh. 38.  This

proves that Madoff had no procedure in place to verify that customers received and deposited

checks that were allegedly sent to them.  This also proves that the Trustee's records of deposits

and withdrawals are not accurate and they cannot serve as a basis to deny customers the SIPC

insurance to which they are statutorily entitled.

And, indeed, the Trustee's own experts have admitted that Madoff's records are

"permeated with fraud" and mistakes.  *See, e.g.,* August 20, 2013 Report of Bruce G. Dubinsky

at 156 ("[F]raud permeated BLMIS to the extent that the company's books and records could not

be relied upon by a hypothetical buyer."); *id.* at 12, 32, 155 ("Fraud permeated BLMIS."); *see

also* December 17, 2015 Report of Matthew B. Greenblatt ("Greenblatt II") Exh. 7 (collecting

data entry errors on Madoff accounts); *id.* at 10, n.12 ("For the remaining 23 instances of PW

Transactions with the Check + Stock Name description where FTI was unable to identify the

corresponding fictitious trading activity related to the amount of the PW Transactions, additional

analysis revealed several reasons for such variances, including but not limited to **situations

where it appears the transactions were coded by BLMIS employees as 'PW' in error or

reflect other data entry errors made by BLMIS.").** (Emphasis added); *id.* ¶ 43 ("For the

remaining 78 PW Transactions with the Check Only description, there was no fictitious trading

which generated a profit, interest, or dividend in the exact amount of the PW Transaction.  As a

result, FTI performed additional analyses to identify potential reasons for such variances.  Based

on the review performed, **it is likely that these transactions were coded by BLMIS employees

as 'PW' in error.").**  (Emphasis added).

---

[1] All exhibit references are to the Chaitman Decl.

The Trustee's default position, throughout this proceeding, has been to determine every issue so as to minimize the amount of SIPC insurance that has to be paid to customers. However, nowhere in SIPA did Congress authorize a SIPA trustee to resolve every doubt against the customers. As its name implies, SIPA was intended to protect customers, not to enrich SIPC's members at the expense of customers. Hence, any doubts should be resolved in favor of the customers, rather than against them.

The Second Circuit's "Net Equity Decision" was rendered in a factual vacuum, based upon the Trustee's representation that Madoff's books and records were riddled with fraud. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision"). Hence, the Trustee argued, the only credible evidence was deposits and withdrawals. However, in litigating that issue, the Trustee did not inform either the bankruptcy court or the Second Circuit that he had no third party bank records predating December 1998. Thus, he had no credible evidence of the deposits and withdrawals prior to December 1998. We do not doubt that, if the courts had been informed of this extraordinary fact, the courts would have required the Trustee to accept the balances on each customer statement as of November 30, 1998.

In all of 2009, 2010, 2011, 2012, or 2013, the Trustee did not disclose to the courts or to the customers that he had no bank records prior to December 1998. This fact was finally elicited by Mr. Blecker's counsel on July 14, 2014 – in response to a direct question from Ms. Chaitman, after the issue of Mr. Blecker's claim had been the subject of motion practice before this Court. *See* ECF Nos. 6084-86, 6761, 7249.

Mr. Blecker assumed that, since the statements indicate "CHECK [Corporation]" and the simultaneous acquisition of shares of that corporation, checks were paid to corporations for the purchase of shares. When the Trustee claimed that Blecker received these checks, Blecker

explained to the Trustee that he could not possibly deposit into his personal account a check

made payable to a corporation and he asked that the Trustee produce the front and back of the

checks that Blecker allegedly received.  It was only then that the Trustee admitted – for the first

time in this proceeding – that he had no checks predating December 1998.

On July 16, 2014, Ms. Chaitman wrote to the Trustee's counsel:

> I just would like an answer to my question:  Does the Trustee have
> the cancelled checks reflected on Mr. Blecker's statements?

In response, the Trustee's counsel finally admitted the truth:

> As we have previously indicated, we produced all documents in the
> Trustee's possession, custody, and control that relate to Mr.
> Blecker's accounts and were responsive to the subpoena.
>
> We did not produce any cancelled checks for Mr. Blecker because
> there are no such documents in the Trustee's possession, custody, or
> control that have been identified to date.

Chaitman Exh. 40.

Having won in the Second Circuit by concealing from the courts the unreliability of

Madoff's books and records, the Trustee brandishes his ill-gotten victory to disallow claims

where he has no basis – from the debtor's books and records – to deny them.  The Trustee argues

that "the books and records of BLMIS reliably showed the cash deposits and withdrawals

between BLMIS and its customers."  Trustee's Supplemental Memorandum of Law in Support

of Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions, dated August 12,

2016 ("Trustee's Mem.") at 2.  Nothing could be further from the truth.  In fact, the Trustee's

own expert, Lisa M. Collura, admitted that there is not a single internal BLMIS document which

establishes that the Bleckers received a single profit withdrawal:  not a BLMIS bank record; not

a document in a BLMIS customer file; not a document the Trustee obtained from a third party.

*See* Chaitman Exh. 8, December 17, 2015 expert report of Lisa M. Collura ("Collura II"),

Attachments D-17 and D-18 (admitting that there is no documentary evidence that the Bleckers received profit withdrawals (a) in Madoff's bank records, (b) in Madoff's customer files, or (c) in any documents received by the Trustee from third parties).

Since the Trustee himself acknowledges that his calculations must be supported by the debtor's "books and records" (Trustee's Mem. at 4), the Trustee must allow the Bleckers' claims. Here, the Trustee's determinations are supported solely by his desire to minimize the amount of money that SIPC has to pay to aggrieved customers.  Such a standard is insupportable.

## THE EVIDENCE WITH RESPECT TO PROFIT WITHDRAWALS

The evidence proving that the Trustee has absolutely no basis to conclude that the Bleckers received profit withdrawals includes the following:

- The Trustee does not have a single cancelled check, covering the period from 1981 – 2008, indicating that the Bleckers ever received a withdrawal from Madoff.

- The Trustee does not have a single check stub, covering the period from 1981 – 2008, indicating that a check was made payable to Blecker, even though Annette Bongiorno testified that Madoff's checks contained a bottom half, separated by a serrated edge, which half was kept in the customers' files, along with a copy of each check ever sent to a customer.  *See* Chaitman Exh. 2, Bongiorno Tr. at 42:4-20, 76:24-79:3, 214:20-217:6.

- The Trustee relies upon Joann Sala's testimony that she entered into the Spiral Notebooks each check that had to be written to each customer representing a profit withdrawal. Trustee's Mem. at 25.  Yet, of the 180 profit withdrawal checks that the Trustee claims the Bleckers received, only four are listed in the Spiral Notebooks upon which the Trustee relies. Trustee's Mem. at 36; Greenblatt II Exh. 14 Account 1B0023.  If, indeed, the Spiral Notebooks were used to list the checks to be paid to Madoff customers, why is it that the Bleckers' name

appears only four times in the Spiral Notebooks when the Trustee claims the Bleckers received 180 profit withdrawal checks?

- All of the former Madoff employees testified that customers had to make written requests for profit withdrawal checks and that such written requests were kept in the customers' files.  Yet the Trustee has not produced a single such written request from the Bleckers and they deny they ever requested a withdrawal in the 27 years they had funds invested through Madoff.

- Bongiorno testified that, in 1997 when Madoff switched from arbitrage trading to split strike conversion trading, customers who had requested profit withdrawals were automatically switched to quarterly profit distributions.  Chaitman Exh. 2, Bongiorno Tr. at 227:21-229:4.  Yet, the Bleckers never received a quarterly profit distribution and there is nothing in the Bleckers' files proving they ever received a withdrawal.

- As Bongiorno admitted, Madoff alone interviewed new customers and gave instructions to Bongiorno to set up the accounts; and Madoff testified that he required written requests from customers at the inception of the account if they wanted profit withdrawals.  Chaitman Exh. 2, Bongiorno Tr. at 195:14-18; Chaitman Exh. 6, Madoff Tr. at 9:12-10:5, 10:8-20, 11:3-9, 13:16-23, 34:15-20, 35:9-15, 108:16-20.  Yet, the Bleckers' customer file contains not a single written request for profit withdrawals or any other withdrawals in the entire period from 1981 - 1998.  While the Trustee has written requests from other customers, at the inception of their accounts, requesting profit withdrawals, he has none from the Bleckers.  *See, e.g.*, the letters included in Chaitman Exh. 39; Trustee's Mem. at 38-41.

- Each of the former Madoff employees admitted she had no personal knowledge as to whether the Bleckers ever received a profit withdrawal check:

- Joann Sala testified that, even though she was familiar with the name Aaron Blecker, she had no basis for believing that Blecker would have received profit withdrawals other than the fact that some unidentified person had inserted "S" on a form in Blecker's file, indicating that at least one of his accounts was marked a "Send" account. *See* Chaitman Exh. 7, Sala Tr. at 249:19-21, 250:22-251:24 ("I just assume that because it was a send account" but Sala had no idea who put the "S" on that form and, in fact, she did not even recognize the initials of the person, written next to the "S."). Sala admitted that she never confirmed with customers whether they received profit withdrawal checks and that she really had no idea at all whether customers ever received profit withdrawal checks. *Id.* at 239:16-24, 242:25-243:4, 261:4-12. Sala testified that, if Madoff had a policy requiring requests for profit withdrawals to be in writing, as Madoff asserts he did, then no employee would dare violate it. *Id.* at 248:12-25. Sala knew that customers were required to request profit withdrawals in writing. *Id.* at 235:23-236:10, 237:20-238:1

- As explained *infra,* Annette Bongiorno was paid over $4 million for her testimony and released, by the Trustee, of a $23 million claim. *See infra.* She admitted that neither she, nor anyone she knew, ever confirmed with customers if they received their profit withdrawal checks. *Id.* at 197:12-201:3. Bongiorno testified that a customer would have to send a written request to change a "reinvest" account to a "send" account. *Id.* at 256:9-257:15; *see also id.* at 40:1-4 (indicating that requests for capital withdrawals "absolutely" had to be in writing). She testified that a letter requesting profit withdrawals was required except at the time of the account opening. However, she testified that all account openings were handled solely by Madoff, who spoke personally to each new customer. *Id.* at 195:14-18. Bongiorno admitted that only Madoff could open an account and she was not privy to Madoff's communications with new account

holders.  *Id.* at 195:14-18.  Hence, Madoff's unambiguous testimony is the only testimony which is based on personal knowledge on the issue of what was required at the time of an account opening.  And, in fact, the Trustee has letters from customers at the inception of their accounts requesting profit withdrawal.  *See, e.g.,* Chaitman Exh. 48.

- Winnifer Jackson had no idea whether any customer ever received a profit withdrawal check.  *See* Chaitman Exh. 3, Jackson Tr. at 109:25-112:23,  114:2-14, 117:5-8, 119:8-14.  She testified that the only reliable information in Madoff's files were letters from customers, and this would be the only way to determine whether a customer received a profit withdrawal.  *Id.* at 107:21-7, 109:9-13, 112:24-114:1.  Jackson testified unequivocally that all requests for profit withdrawals had to be in writing.  *Id.* at 112:24-114:1.

- Alethea Leung and Dorothy Kahn had no knowledge as to whether any customer ever received a profit withdrawal check.  Chaitman Exh. 5, Leung Tr. at 134:13-16, 136:16-137:2, 143:5-15, 151:18-152:17;  Chaitman Exh. 4, Kahn Tr. at 98:25-99:4.  ("There's no way for me to know anything.  Nobody ever explained to me what we do.  All we know, we got work and we did the work.  I don't know the detail of the work . . . ."); *see also id.* at 100:1-5("I didn't understand anything.  All I know, I just entered and printed.  I don't know the details of anything.").  In fact, Leung, whose testimony the Trustee submits to establish that Blecker received profit withdrawals, testified that she did not even know what a "profit withdrawal" was or that an "S" meant an account was a "Send" account.  Chaitman Exh. 5, Leung Tr. at 135:2-8, 142:18-143:4.

Lacking any employee with personal knowledge that any Madoff customer ever received a profit withdrawal check, the Trustee tries to prove that Blecker received profit withdrawal checks through Madoff's "books and records," such as the incomprehensible statements sent to

customers.  But the Madoff employees who were deposed overwhelmingly testified that they had

no idea whether Madoff's books and records could be trusted at all.  For example, Sala was so

unsure of the veracity of Madoff's records that she began to question whether she had any basis

at all for believing that any of Madoff's records were not entirely fraudulent:

> Q. But at this point, isn't it true that the only documents that are reliable are the ones that were sent from customers?
>
>  MS. BROWN: Objection.
>
> A. I don't know.  It seems that way now.  I don't know.  I don't know when it started.  I have no idea.
>
> Q. And these documents that were created by Madoff Securities were all created by an entity that turned out to be engaged in fraud.
>
> A. Yes.
>
> Q. So at this point, isn't it true that the only reliable documents are the customers -- are the letters from customers?
>
> MS. BROWN: Objection.
>
> A. It seems like that, but I don't know when this started, so I'm not sure – I'm not sure if these were real or not real.
>
> Q. Do you have any way of knowing which documents were real and which were not real?
>
> MS. BROWN: Objection.
>
> A. No.
>
> Q. For the record –
>
> A. No.

Chaitman Exh. 7, Sala Tr. at 252:22-254:6.

> Q. . . .  all of these could be made up as well, right?
>
> MS. BROWN: Objection.

A. Yes.

Q. So it's hard to say really what you do know is accurate and what isn't accurate, correct?

MS. BROWN: Objection.

A. Well, according to the job that I had and what I was told, this was all accurate to me at the time.

Q. But now do you still think that these documents are accurate?

A. I don't know.  I don't know.

*Id.* at 243:20-244:16.

Winnifer Jackson's testimony was similar:

Q. So again, I come back to the same question, isn't it true that the only reliable evidence of what the customers wanted would be a letter in the file, whether it was mailed or faxed, it would be a letter in the file from the customer, right?

A.  Yes.

Q. Saying, I want my profit withdrawals or now I don't want them, right?

A. Yes.

Q. And, in fact, even Mr. Madoff would tell you that any request had to be in writing from a customer seeking a check; isn't that true?

A. Yes.

Chaitman Exh. 3, Jackson Tr. at 112:24-113:8.

Leung also had no confidence in the accuracy of any of Madoff's records:

They gave me information I guess that's false.  I don't know, you know, what they did with it.  But I guess now that I know it was a whole Ponzi scheme, everything was false, yeah.

Chaitman Exh. 5, Leung Tr. at 132:19-24.

Thus, there is nothing in the books and records which supports the Trustee's self-serving conclusion that the Bleckers received profit withdrawal checks. Certainly, if Madoff had intended to communicate to customers that profit withdrawal checks were being sent to them, he would not have used the convention "CHECK CORPORATION" when he could just as easily have used "CHECK TO CUSTOMER."

In the absence of a shred of documentary or testimonial evidence that, in the entire period from 1981 – 2008, the Bleckers ever withdrew even one dollar from their Madoff accounts, the Trustee speculates that, if the Bleckers did not receive profit withdrawals, it would be difficult to explain why there would appear to be virtually no appreciation in the Bleckers' accounts over the period from 1981 – 1997. According to the Trustee, Mr. Blecker deposited only $200,000 in his account and the Bleckers, together, deposited $377,350.33 in the joint account. *See* the Trustee's two determination letters for the Aaron Blecker account, annexed to the Chaitman Decl. as Exhs. 23 and 26; and the Trustee's two determination letters for the Arthur and Sofie Blecker account, annexed to the Chaitman Decl. as Exhs. 27 and 29.

As a matter of speculation, we agree that the Bleckers would not have retained accounts with Madoff if they had no appreciation over a lengthy period of time. And, of course, we are dealing with the fact that Mr. Blecker is 105 years old and, naturally, does not have his records from 1981 – 1997. Nor would the law expect him to: this is precisely why the statute of limitations on a breach of contract claim is six years under New York law. However, if we try to reconstruct the account information, we can reasonably speculate as to the following: If no withdrawals had been taken by Mr. Blecker from his account, it would have appreciated over the period from 1986 – 1997 at an average rate of 18%/year according to the portfolio management reports produced by the Trustee. This would have yielded a total appreciation in Mr. Blecker's

account of approximately $560,297.01 to a total account balance of $760,297.01 on April 30,

1997.  Instead, according to the Trustee, the total account balance appreciated to only

$674,690.75 (as evidenced by the sum of the alleged profit withdrawals of $468,162.00 and the

account balance on April 30, 1997 of $206,528.75).  This is a differential of $85,606.26 (or close

to 20%) from what could be expected using an 18% annual benchmark.  *See* Chaitman Exh. 35.

The Trustee has offered no explanation for this discrepancy.

        The differential is far greater with respect to the Bleckers' joint account.  There,

according to the Trustee, the total deposits were $377,350.33.  Assuming no withdrawals and an

appreciation of 18% per year since the initial deposit in 1981, the account would have

appreciated by April 30, 1997 to approximately $2,899,288.47.  Yet, according to the Trustee,

the account appreciated to only $1,629,367 (again, as evidenced by the sum of alleged profit

withdrawals, in this account of $1,233,723.00, and the total deposits as of April 30, 1997 of

$395,644).  This is a differential of $1,269,921.47 (over 100%) from what could be expected

using an 18% annual benchmark.  *See* Chaitman Exh. 36.  The total differential when the

accounts are combined is approximately $1.36 million **more** in appreciation than the Trustee

claims occurred.

        We do not know why the Trustee's calculations do not reconcile with, and indeed

significantly underperform, returns derived from the percentage appreciation set forth in

Madoff's portfolio management reports.  But the Trustee has omitted evidence which may shed

light on this mystery:  The Trustee represents to this Court that the Bleckers had only two

accounts with Madoff (which, in 1997, were assigned new numbers by Madoff).  This is not

correct.  In fact, the Bleckers had four other accounts for which the Trustee apparently has

incomplete records.  *See* Chaitman Exhs. 30 – 34, 43 – 46.  And, with incomplete records, it is

impossible to establish in what accounts the Bleckers' profits were deposited and over what period of time.  What we do know, however, is that, according to the Trustee, the Bleckers invested a total of $577, 350.33 through Madoff and, as of November 30, 2008, their investment had appreciated to $2,213,889.50 – a return of almost 400%.  Chaitman Exh. 21; Tr. Mem. at 41-42.

Thus, what this lengthy and massively expensive exercise has established is that (a) the Trustee has no evidence that the Bleckers ever withdrew a dime from any of their accounts; and (b) in view of the incomplete evidence before the Court, the most probable explanation is that the profit withdrawals were transferred by Madoff to one of the other Blecker accounts.  Obviously, neither the Bleckers nor the Trustee has records establishing precisely how the funds were transferred or when.  But that is the Trustee's problem –  not the Bleckers'; the Trustee is obligated to determine customer claims based on the debtor's books and records which contain no evidence that the Bleckers ever received a single withdrawal check.  There is no provision of SIPA which allows a trustee to disallow a customer's claim when the debtor's books and records support it.

According to the Trustee's own expert, Mr. Blecker's claim is $558,868, if the profit withdrawals are not charged against him.  Chaitman Exh. 9, Greenblatt II at 24.  Based on the debtor's books and records, Arthur Blecker is entitled to be paid his full $500,000 in SIPC insurance.  In order to avoid any claim that he is depleting the fund of customer property, he will waive any payment from the Trustee above the amount that SIPC is obligated to pay.  Thus, the Trustee should have no objection to allowing his claim for $500,000.  This does not take a penny from any other customer.

{00023563 4 }                                          13

## THE BLECKERS' ACCOUNTS

According to the Trustee, Blecker had four accounts which were actually two accounts on which Madoff changed the numbers in 1997:

> Account 1B0022, held in the name of Blecker and his wife, Sofie, and Account 1B0023, held in Blecker's name . . . . In April 1997 . . . . Accounts 1B0022 and 1B0023 were closed and the reported account balances were transferred to two new accounts, Accounts 1B0156 and 10157.

Trustee's Mem. at 36.

In fact, there were more. Aaron (a/k/a Arthur) Blecker opened an account with Madoff in 1981 in his own name and in the same year he opened a joint account with his wife, Sofie. The documents produced by the Trustee show that Blecker and his wife had eight different account numbers assigned to their accounts. In addition, according to the Trustee's expert, the Bleckers had two additional accounts that were "related": these are 100124 and 1R0030. Greenblatt II, Exh. 5 at 1. We have no idea what it means that these two accounts are "related." However, so far as we have been able to determine, the Bleckers' funds were in the following accounts:

| Account Number | Account Holder | *See, e.g.,* Chaitman Exhs. |
|---|---|---|
| 1B0022/1B0156 | Aaron Blecker | Chaitman Exhs. 34, 43 and 44 |
| 1B0023/1B0157 | Arthur & Sofie Blecker | Chaitman Exhs. 45 and 46 |
| 1-00254-1-0 | Aaron Blecker | Chaitman Exh. 30 |
| 1-00254-9-0 | Aaron Blecker | Chaitman Exh. 31 |
| 1-00214-1-8 | Arthur & Sofie Blecker | Chaitman Exh. 32 |
| 1-00215-9-0 | Arthur & Sofie Blecker | Chaitman Exh. 33 |
| 1R0030 | "related account" | Greenblatt II, Exh. 5 at 1 |
| 100124 | "related account" | Greenblatt II, Exh. 5 at 1 |

### The Aaron Blecker Account

The earliest account opening form the Trustee has produced for the Aaron Blecker Account indicates that it was prepared on September 22, 1986 and refers to two account numbers: 100254-10, which is crossed off; and 1B0022-10. *See* Chaitman Exh. 11. The

account opening form indicates that the account number was changed on April 17, 1997 to

1B0156-30/40.  *See* Chaitman Exh. 13.  While it indicates that the account is an "S," indicating,

according to some of the former Madoff employees, that it is a "Send" account, there is no

evidence as to who wrote "S" on the form or when it was written.  It appears that, on April 17,

1997 the name on this account was changed to Aaron Blecker Rev. Trust u/a/d 3/15/07.  *See*

Chaitman Exh. 15.  And the "S" was crossed out although, again, there is no testimony about

who crossed out the "S" or when it was done.  At the same time, on April 24, 1997, $206,528.75

was transferred from Mr. Blecker's account No. 1B0022 to his account No. 1B015630.  *See*

Chaitman Exh. 23, Trustee's October 19, 2009 determination letter, at 5; *see also* Chaitman

Exhs. 17 and 18, (April 2,4 1997 transfer from the Blecker Joint Account in the amount of

$389,846.73).

In July 2007, after Sofie Blecker's death, the balance in the Joint Account of

$1,459,343.06 was transferred into the Aaron Blecker Account, 1B0156-30.  At that point,

Madoff showed that Blecker had a total equity of $2,223,338.50 in the Aaron Blecker account.

*See* Chaitman Exh. 19.

On July 22, 2009 Mr. Blecker filed a SIPC claim for $2,213,889.50.  By letter dated

October 19, 2009, the Trustee denied Mr. Blecker's claim on Account No. 1B0022/1B015630.

*See* Chaitman Exhs. 22 and 23.  Although the Trustee's records indicate that the account was

opened in 1981, the Trustee gave Mr. Blecker no credits for deposits made prior to September

22, 1986 and informed Mr. Blecker that the Aaron Blecker Account was opened in 1986 (when,

in fact, it was opened in 1981) and, during the period from September 22, 1986 on, Mr. Blecker

deposited only $200,000 and withdrew $261,633.94.  The Trustee claims that the $261,633.94

represented profit withdrawals that were sent to Mr. Blecker during the period from November 24, 1986 through April 29, 1997. *Id.* at 4-6.

The Trustee notified Mr. Blecker that, if he disagrees with the claim determination, he must file a written request for a hearing within 30 days. Mr. Blecker filed a timely request for a hearing. *See* Chaitman Exh. 25. On October 19, 2010, Mr. Blecker wrote a letter to Judge Lifland objecting to the Trustee's denial of his claim in which he explained:

> I never withdrew a penny or received anything of value from anyone. . . . When Madoff's fraud was exposed, I had over $2.5 million in the account. I filed for SIPC protection with all supporting documents in a timely fashion. I have repeatedly requested the trustee to supply evidence (which they cannot because it can't exist) that I ever instructed Madoff to buy anything, or endorsed a check or received stock or anything of value for my original investment from my accounts.

*See* Chaitman Exh. 28.

Mr. Blecker wrote a letter to Judge Lifland dated November 2, 2009 in opposition to the Trustee's determination. Chaitman Exh. 24. In that letter he explained that, in all the years he and his wife had accounts with Madoff, they never took out any money or requested any withdrawals. He asked that the original checks that the Trustee claimed were sent to Mr. Blecker be produced by the Trustee so that he could look at the backs of the checks to see where they were deposited.

By letter dated May 10, 2010, Chaitman Exh. 26, the Trustee wrote to Mr. Blecker rejecting his claim for Account No. 1B0156 claiming that there was a zero balance in the account because of the following transfers:

| Date | Transferor Account | Amount | Value in the Trustee's view |
|------|--------------------|--------|-----------------------------|
| 4/24/97 | 1B002210 | 206,528.75 | 0 |
| 6/5/07 | 1B015730 | 1,459,343.06 | 0 |
| 9/19/07 | 1B015730 | 1,666,664.08 | 0 |

| Date | Transferor Account | Amount | Value in the Trustee's view |
|------|--------------------|--------|-----------------------------|
| Total |  | 3,332,535.89 | 0 |

According to the Trustee's expert, if the withdrawals from Mr. Blecker's account are not recognized, Mr. Blecker would have a net loser claim of $558,868. Chaitman Exh. 9, Greenblatt II at 24. It is this claim that Mr. Blecker is willing to resolve in exchange for a SIPC payment of $500,000.

**The Arthur and Sofie Blecker Account**

Arthur and Sofie Blecker had a joint account (the "Blecker Joint Account") from April 1, 1981 on. Over time, Madoff changed the number on the Account for his own purposes, but the Blecker Joint Account had, at various times, the following numbers:

| Account No. | Time Period | Source |
|-------------|-------------|--------|
| 1-00214-1-B | 4/1/81 – 12/31/82 | Chaitman Exh. 10. |
| 1-00215-1-0 | 7/29/83 – 4/30/92 | Chaitman Exh. 47 |
| 1-00215-9-0 | 8/31/90 – 12/31/91 | Chaitman Exh. 33 |
| 1B0023-10 | 5/31/92 – 4/17/97 | Chaitman Exhs. 14 and 34 |
| 1B0157-30/40 | 4/17/97 – 11/30/08 | Chaitman Exhs. 12 and 16. |

On April 24, 1997, the Account was renumbered by Madoff Account 1B0157-3-0, showing a balance of $389,846.73. *See* Chaitman Exh. 18. The Blecker Joint Account retained the number 1B0157-30/40 through November 30, 2008. *See* Chaitman Exh.29. However, in July 2007, following Sofie Blecker's death, Mr. Blecker transferred the balance of $1,459,343.06 in the joint account to his own account. *See* Chaitman Exhs. 19 and 20.

The Trustee claims that Blecker has no right to assert a claim with respect to the Joint Account because no SIPC claim was filed for Account No. 1-B0023. Trustee's Mem. at 37. That is untrue. In fact, Blecker filed a SIPC claim for Account No. 1-B0157, the successor to No. 1-B0023 (s*ee* Chaitman Exh. 49), even though all of the funds from the joint account had been transferred into 1-B0156-3 in June 2007. *See* Chaitman Exh. 22. The Trustee obviously

knew this because, by letter dated November 11, 2010, the Trustee denied the claim on the

Blecker Joint Account and explained that Blecker's request for a hearing on the denial of his

claim relating to 1-B0157-3 "will occur in due course" and "will be handled under the same

procedures as other objections filed in this case." *See* Chaitman Exh. 27, Trustee's September

29, 2010 determination letter and Exh. 29, Trustee's November 11, 2010 letter to Blecker, at 2.

The schedule annexed to the Trustee's letter shows the following deposits into the

Blecker Joint Account:

| Date | Amount |
|------|--------|
| 3/31/81 | $42,350.33 |
| 2/18/83 | $35,000 |
| 9/16/83 | $70,000 |
| 9/16/83 | $30,000 |
| 10/12/84 | $100,000 |
| 10/9/90 | $100,000 |
|  | $377,350.33 |

We do not know the source of these deposits and it is certainly possible that some of

these deposits came from the profits generated in the two Blecker accounts that the Trustee

acknowledges. However, for all we know, there could have been profits in other accounts as

well because the Trustee's records are incomplete. In any event, to the extent that the Trustee

wrongfully charged the joint account with profit withdrawals, the credit should follow the

balance in the account from the joint account to Mr. Blecker's account.

## ARGUMENT

## INCORPORATION OF ARUGMENTS MADE BY THE BLUMS

Mr. Blecker respectfully refers the Court to the legal and factual arguments contained in

the memorandum of law submitted by counsel for Drs. Joel and Norman Blum, which arguments

are expressly incorporated herein.

## THE TRUSTEE HAD EVERY OPPORTUNITY TO
## DEPOSE AARON BLECKER

In view of his age, this Court suggested that Aaron Blecker be deposed on the profit

withdrawal issues (ECF No. 7249) and he was deposed on July 1, 2014, following the Court's

denial of Blecker's motion to compel the Trustee to allow his claim.  At the time of his

deposition, Blecker was 103 years old.  The Trustee, of course, attended the deposition by

counsel, who questioned Mr. Blecker.  *See* Chaitman Exh. 1 at 13-17. Thereafter, the Trustee

indicated he wanted to continue his questioning of Mr. Blecker.  While counsel for Mr. Blecker

could easily have told the Trustee he already had his opportunity to question Mr. Blecker, she did

not do so.  Even though Mr. Blecker was 103 years old, Ms. Chaitman agreed to give the Trustee

another opportunity to cross-examine him.  A date was set in August 2014 for that continued

deposition.  The deposition did not go forward because it was cancelled by the Trustee whose

counsel wrote to Ms. Chaitman on August 1, 2014:

> Thanks for your email.  Please be advised that we have decided not
> to proceed at this time with the deposition of Aaron Blecker that was
> scheduled for August 7, 2014 at 10:00 a.m.

*See* Chaitman Exh. 41.

At no time thereafter, until the summer of 2016, did the Trustee decide that he wanted to

continue Mr. Blecker's deposition, at which point Mr. Blecker was 105 years old; the court-

ordered discovery period for the profit withdrawal litigation had long since expired; and the

Court had extended discovery in the profit withdrawal litigation solely to permit the Trustee to

question former Madoff employees about the profit withdrawal entries (since the Trustee

admitted that he had never done so).

Due process simply requires that the Trustee be given a reasonable opportunity to take

Mr. Blecker's deposition.  *See, e.g., Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.

306 (1950).  The Trustee had that opportunity when Mr. Blecker was deposed on July 1, 2014

and he had that opportunity again on August 7, 2014.  He made the deliberate decision not to

proceed with Mr. Blecker's deposition and his failure to do so can fairly be construed as the

Trustee's acknowledgment that he had no basis to challenge Mr. Blecker's credibility.

Moreover, the Trustee's complaint that Mr. Blecker did not have documents going back to 1981,

and could not recall certain events going back to 1981, is not a reason to discredit his testimony.

On the contrary, it is a reason – as we will argue in the *in limine* motions – that the Trustee

should be required to accept the statement balance on all customer statements as of November

30, 1998.

## THE TRUSTEE'S RELIANCE ON BONGIORNO'S
## TESTIMONY IS UNSUSTAINABLE

It is a remarkable reflection on the Trustee that he finds Annette Bongiorno more credible

than Madoff when, in essence, he paid over $27 million for Bongiorno's testimony.  Madoff is

serving a 150 year sentence and has not been paid by the Trustee, or anyone else, for his testimony.

Bongiorno was convicted of conspiracy to defraud Madoff's investment advisory clients,

securities fraud, falsifying records of a broker dealer, falsifying records of an investment advisor,

and tax evasion.  *See United States v. Daniel Bonventre et al.*, No. 10-cr-00228, ECF No. 1095.

After her conviction, a forfeiture order was entered against her in the amount of nearly $155.2

**billion**.  *See id.*, ECF No. 1216.  She is currently serving a six-year prison sentence in a Florida

federal penitentiary.  But these are actually the least of Bongiorno's credibility problems.

At the time Madoff confessed, Bongiorno's loyalty to Madoff had earned her a $50 million

Madoff account plus millions of dollars of assets that she had acquired with "earnings" on her

Madoff investments.  *See id.*, ECF No. 926 at 10511:11-22, 10515:8-25.  In 2010, the Trustee sued

Bongiorno and her husband to recover nearly $23 million in avoidable transfers.  *See* ECF No. 13926.  The Trustee never recovered a dime from her.

On June 6, 2016, during Bongiorno's originally noticed deposition, she asserted her Fifth Amendment right against self-incrimination and refused to answer any questions at all.  The deposition concluded in minutes.  Days later, however, Bongiorno and her husband entered into a settlement agreement with the Trustee and the government (the "Settlement Agreement") that released Bongiorno of liability to the Trustee for the $23 million in avoidable transfers and required Bongiorno to "cooperate with [the] Trustee and SIPC . . . [and] make[] herself reasonably available to assist in the Trustee's ongoing investigation of the BLMIS fraud . . . ."  *See* ECF No. 13926-2.  In the event Bongiorno "fails to cooperate as required" at any point during the Madoff liquidation, the Settlement Agreement operates as a tolling agreement permitting the Trustee to reassert avoidance claims against her and her husband.  ECF No. 13926-2 at 10.

Once the Settlement Agreement was signed, Bongiorno was no longer concerned that her testimony might incriminate her and she testified in consideration of the $27 million she had been paid for her testimony.  And Bongiorno was paid – like a bandit – for her testimony.  Her husband got to keep approximately $3.5 million worth of securities Bongiorno had acquired with money stolen from Madoff's customers![2]  And, as if that wasn't enough of a bribe, the Trustee released his claim for $23 million in avoidable transfers and relinquished any claim to her residence in Cape Coral, Florida.  So, in return for her testimony, Bongiorno gets to retire to her Florida residence at

---

[2] Obviously, the Trustee did not want anyone who read the settlement agreement to realize how much he had agreed to pay Bongiorno for her testimony.  Hence, he did not insert into the Settlement Agreement the market value of the released securities.  However, that information is readily available and has been calculated.  See Chaitman Exh. 42.

the end of her six-year prison term with enough money to support her and her husband in luxury for the rest of their lives.

To give the Court some measure of Bongiorno's credibility, when questioned at her deposition as to the Trustee's generosity towards her, as evidenced by the settlement agreement, she said:

> Honestly, I didn't read this. I don't even care about this. . . . I just didn't read it. They told me – between my husband and my lawyer said I can go ahead and sign it, I signed it.

Chaitman Exh. 2, Bongiorno Tr. at 190:24-191:3.

To give the Court a measure of the testimony the Trustee purchased for $27 million:

- Bongiorno admitted to backdating BLMIS customer accounts. *Id.* at 153:7-21; 155:5-16; 166:15-167:1. Yet she testified that she always thought her activities at BLMIS were legitimate. *Id* 170:10-21. ("I believed him at all times . . . . Until I had my lawyer explain to me why this doesn't work like that in the real world, I believed that I was in the real world."); *see also id.* at 205:7-206:2 (denying any knowledge of fraud at BLMIS while she worked there).

- When questioned as to whether she instructed Fidelity to invest her IRA funds so that she had a guaranteed return (as she did at BLMIS), Bongiorno said she did not tell Fidelity to guarantee her a specific return.

> Q: Did you ever sit down with the person at Fidelity and say I want to earn 20 percent or 30 percent or 40 percent?
>
> A: No.
>
> Q: Why not?
>
> A: Well, I don't know. Is that what you do? You tell them what you earn? Or they tell you what they give you, like a bank, like a regular bank.

*Id.* at 174:13-175:23.

Bongiorno claimed that she "thought Fidelity was more like a bank, you know, and not like a brokerage firm," *id*. at 175:11-23,   even though Bongiorno acknowledged that the Fidelity account was a brokerage account opened with securities transferred from her BLMIS accounts. *Id.*.

Bongiorno's testimony was just as incredible with respect to profit withdrawals.  She testified that she "understood that it would be important to have a change [between a "reinvest account" to a "send account" or vice versa] . . . in writing . . . . as a paper trail." *Id.* at 257:9-15, 126:2-6.  She also testified that customers' verbal requests to Madoff to change accounts between a "reinvest account" or a "send account" had to be followed up with a written request by the customer. *Id.*  ("They first have to first call and speak to Mr. Madoff and ask to be able to do it, and then they'd have to follow up with the letter for me . . . .").  Bongiorno further testified that requests for capital withdrawals "absolutely" had to be in writing. *Id.* at 40:1-4.  Yet Bongiorno continued to maintain that no writing was required for a customer to request to receive profit withdrawals – when, and only when, an account was opened. *Id.* at 193:2-7.  However, Bongiorno never met with customers to open their accounts.  She admitted that only Madoff met with new customers. *Id.* at 195:14-18.

Bongiorno is not only a crook; she is a nasty human being who refuses to acknowledge her crimes or to express remorse.  When speaking of the victims of her crimes, she said:  "They're nobody to me." *Id.* at 159:1-2.  And one could fairly ask why she should acknowledge remorse when she has been paid $27 million by the Trustee for her patently unreliable testimony.

**CONCLUSION**

Based on the foregoing arguments, we respectfully ask that the Court disallow the Trustee's treatment of profit withdrawals in all instances where the debtor's books and records do not establish that the Participating Claimants actually received checks from Madoff.

September 23, 2016                                    **CHAITMAN LLP**

                                              By:    */s/ Helen Davis Chaitman*
                                                     Helen Davis Chaitman
                                                     Gregory M. Dexter
                                                     465 Park Avenue
                                                     New York, New York 10022
                                                     (888) 759-1114
                                                     hchaitman@chaitmanllp.com
                                                     gdexter@chaitmanllp.com

                                                     *Attorneys for the Participating Claimants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2016, I caused a true and correct copy of the

foregoing document to be served upon the parties in this action who receive electronic service

through CM/ECF and by electronic mail upon:

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan
Email: dsheehan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*

**CHAITMAN LLP**
By: /s/ Helen Davis Chaitman
465 Park Avenue
New York, NY 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Participating Claimants*