# EXHIBIT 7

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

Page 174

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
SECURITIES INVESTOR PROTECTION
CORPORATION,

                    Plaintiff,

                              Adv. Pro. No.
          -against-          08-01789(SMB)

BERNARD L. MADOFF INVESTMENT    SIPA Liquidation
SECURITIES, LLC,                (Substantially
                                 Consolidated)
                    Defendant.
----------------------------------x
In Re:

BERNARD L. MADOFF,

                    Defendant.
----------------------------------x
                    June 13, 2016
                    9:58 a.m.


          - CONFIDENTIAL -


     Videotaped Continued Deposition of JOANN
SALA, taken by attorneys for the Trustee, at the
home of JoAnn Sala, 23 Shady Court, Bay Shore,
New York, before SUZANNE PASTOR, a Shorthand
Reporter and Notary Public within and for the
State of New York.

SIPC v BLMIS                                                    Sala 6/13/2016

CONFIDENTIAL

| Page 175 |
| --- |

1  A P P E A R A N C E S :
2  BAKER & HOSTETLER, LLP
   Attorneys for Irving H. Picard, Trustee for
3  the Substantively Consolidated SIPA
   Liquidation of BLMIS and the Estate of
4  Bernard L. Madoff
      45 Rockefeller Plaza
5     New York, New York 10111
6  BY:   SEANNA R. BROWN, ESQ.
      sbrown@bakerlaw.com
7     212.589.4200
8  AND:  AMY E. VANDERWAL, ESQ.
      avanderwal@bakerlaw.com
9
10
11 CHAITMAN, LLP
   Attorneys for a number of Madoff Victims
12    465 Park Avenue
      New York, New York 10022
13 BY:   GREGORY M. DEXTER, ESQ.
      888.759.1114
14
15
16
17 ALSO PRESENT:
18    JOHN EDMUNDS, Videographer
19
20
21
22
23
24
25

| Page 176 |
| --- |

1                    INDEX
2  WITNESS     EXAMINATION BY         PAGE
3
   Joann Sala    Ms. Brown       178
4              Mr. Dexter      227
               Ms. Brown       270
5              Mr. Dexter      279
6
7                 EXHIBITS
8  TRUSTEE     DESCRIPTION        PAGE
9  Exhibit 61 HWN 1472 through 1824    179
10 Exhibit 62 MADTBB 1800094 through    196
      1800109
11
12 Exhibit 63 MADTBB 1991239        212
13 Exhibit 64 AMF 142426 through    212
      142480
14 Exhibit 65 MF 177098             218
15 Exhibit 66 MADTBB 1764427 through  219
      1764466
16
17
18    (Exhibits accompany the transcript.)
19
20
21
22
23
24
25

| Page 177 |
| --- |

1          THE VIDEOGRAPHER:  Good morning.
2  We are now on the record.
3          The date today is June 13th, 2016
4  and the time is approximately 9:58 a.m.  My name
5  is John Edmunds, the video technician, in
6  association with Bendish Reporting.  This
7  deposition is being held at JoAnn Sala residence
8  at 23 Shady Court, Bay Shore, New York 11706.
9          The caption of this case is SIPC
10 versus BLMIS.  This case is filed in the United
11 States Bankruptcy Court, Southern District of
12 New York, adversary proceeding number 08-01789
13 SMB.  The name of the witness is JoAnn Sala.
14         At this time the attorneys present
15 will identify themselves and the parties they
16 represent.
17         MS. BROWN:  Seanna Brown on behalf
18 of Irving Picard.
19         MS. VANDERWAL:  Amy Vanderwal on
20 behalf of Irving Picard.
21         MR. DEXTER:  Greg Dexter on behalf
22 of Madoff customers.
23         THE VIDEOGRAPHER:  Will the court
24 reporter, Sue Pastor, please swear in the
25 witness.

| Page 178 |
| --- |

1          JOANN SALA,
2  residing at 23 Shady Court, Bay Shore, New York
3  11706, having been first duly sworn by the
4  Notary Public (Suzanne Pastor), was examined and
5  testified as follows:
6  EXAMINATION BY
7  MS. BROWN:
8      Q.   Good morning, Ms. Sala.
9      A.   Good morning.
10     Q.   Thanks for appearing again as a
11 witness today.
12         Before we get started, I'd like to
13 remind you of a couple of the preliminary
14 instructions I gave you on May 19th when we
15 initially began your deposition.  And the most
16 important one I want to remind you of is that
17 the judge has entered a protective order in this
18 case that limits this deposition to the subject
19 matter of profit withdrawal transactions only.
20 So the attorneys present here today can ask you
21 questions about profit withdrawal transactions,
22 but they can't go beyond the scope of that
23 subject matter.
24         Do you understand that?
25     A.   Yes.

SIPC v BLMIS                                          Sala 6/13/2016

CONFIDENTIAL

3 (Pages 179 to 182)

Page 179

1      Q.   And you understand that you're
2  under oath here today?
3      A.   Yes.
4      Q.   And you would testify the same as
5  you would at trial?
6      A.   Yes.
7          MS. BROWN:  I'd like to mark this
8  as Exhibit -- Trustee Exhibit 61, which is a
9  document bearing the Bates number HWN 00001472
10  through HWN 00001824.
11         (Trustee Exhibit 61 for
12  identification, HWN 1472 through 1824)
13     Q.   Ms. Sala, if you could just take a
14  look at that document and let me know when
15  you're ready, I can ask you a few questions.
16     A.   What page is it on?  This?
17     Q.   I want to ask you a couple of
18  questions about the entire document rather than
19  a specific page at this point.
20     A.   Mm-hmm.
21     Q.   Do you need a couple more minutes
22  to look through this?
23     A.   Yes.
24     Q.   Ms. Sala, do you recognize this
25  document?

Page 180

1      A.   Yes.
2      Q.   And what is it?
3      A.   It's a list of the checks going
4  out, the check-out book.
5      Q.   And how do you recognize this book?
6      A.   By the symbol that is -- the CW is
7  the capital withdrawal.  It's the customer's
8  name, account number and amount of the check.
9          MS. BROWN:  Let the record reflect
10  that the witness is examining the page ending in
11  HWN 00001475.
12     Q.   Ms. Sala, what was this check-out
13  book used for?
14     A.   Checks that went out to the
15  customers, either capital withdrawals that they
16  asked for the money or profit withdrawals.  When
17  the deal was done, they took the profits.
18     Q.   Ms. Sala, when you say that checks
19  went out to the customers, who sent the checks
20  out to the customers?
21     A.   Madoff -- well, you mean the person
22  that --
23     Q.   The entity.  What entity sent out
24  the checks to the customers?
25     A.   Jodi handled the checkbook, so

Page 181

1  she -- we would put -- anybody that knew if they
2  were getting a check put -- entered it into that
3  book.
4      Q.   And when you say "that book," is
5  the document in front of you --
6      A.   The check-out book.
7      Q.   -- the book that reflects that
8  amount you're referring to?
9      A.   Yes.
10     Q.   I just want to remind you,
11  Ms. Sala, we have to wait to finish your
12  questions and answers.
13         Let me start at the beginning.  If
14  you could walk me through the process of when
15  someone would write in the check-out book, when
16  would that happen?
17     A.   If they were -- if they asked for a
18  check, they would have to send us a letter.
19     Q.   And when you say "they," you're
20  referring to the customer?
21     A.   The customer.  And when I got the
22  letter I would enter it into the check-out book
23  and file the letter.
24     Q.   Where would you file the letter?
25     A.   In their folder, the customer's

Page 182

1  folder.
2      Q.   And you would make entries into the
3  check-out book?
4      A.   Yes.
5      Q.   Do you know who else would make
6  entries into the check-out book?
7      A.   Jodi, Annette, Fran, Winnie.  I
8  think that's it.
9      Q.   Just so the record is clear, when
10  you say Jodi, you refer to Jodi Crupi?
11     A.   Yes.
12     Q.   And Annette is Annette Bongiorno?
13     A.   Yes.
14     Q.   Winnie is Winifier Jackson?
15     A.   Yes.
16     Q.   And Fran is Francis Barbato?
17     A.   Yes.
18     Q.   You testified that customers would
19  write a letter in and then you would note that
20  check request in the check-out book.
21         Were there times when you would
22  make entries into the check-out book when there
23  was no letter from the customer?
24     A.   If they were profit withdrawals,
25  yes.

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

Page 183

1    Q.    And how did you know it was time to
2  make an entry in the check-out book for a profit
3  withdrawal?
4    A.    When the due date of the deal was
5  done, they would get their check.  Checks would
6  be cut.
7    Q.    If we could just break that down a
8  little bit.  So you said when the due date was
9  done.  How would you know when the due date
10  would be coming due?
11    A.    When you set them up into the
12  stock, it was either four, five, six, seven or
13  eight weeks and the deal would be done.  When it
14  was finished we sent out the profit check.
15    Q.    And before you sent out the profit
16  check, did you make an entry into the check-out
17  book?
18    A.    The profits?
19    Q.    Before you sent a check to the
20  customer --
21    A.    Yes.
22    Q.    -- did you make an entry into the
23  check-out book?
24    A.    Not physically, no.  No, they came
25  out on a computer sheet of the profits.

Page 184

1    Q.    Okay, I think maybe my question is
2  not so clear.  I was trying to understand the
3  order.  So when the deal ended, what was the
4  next thing that you did?
5    A.    We got a printout -- it wasn't
6  really a printout.  It was a printout but
7  different people would do it different times.
8  And so we would cut those out and put them on
9  the sheet and give it to her to write the checks
10  out.
11    Q.    When you say "give it to her," who
12  are you referring to?
13    A.    Jodi Crupi.
14    Q.    And these sheets that you're
15  referring to, where were they maintained?
16    A.    Where did they come from?  Or who
17  handled them once they were out?
18    Q.    If you could address both, that
19  would be great.
20    A.    Well, they came out of the computer
21  room.  I don't know who did them or what.  But
22  then I would take them and separate them
23  according to due dates.
24    Q.    And how did you separate them
25  according to due dates?  Was that a manual

Page 185

1  process?
2    A.    No.  That was computerized.  But
3  some people were due on a certain date and
4  others weren't.  So I separated them and put
5  them in the date order that they had to go out.
6    Q.    Ms. Sala, if you could turn to the
7  page ending in 1561.  Ms. Sala, do you recognize
8  the handwriting on this page?
9    A.    Yes.
10    Q.    Whose handwriting is it?
11    A.    Mine.
12    Q.    Ms. Sala, what is the date and
13  month of this page?
14    A.    April 9th.
15    Q.    And can you tell me what the
16  entries are that are on this page?
17    A.    They're the account number, the
18  amount of the profit, and the date that they are
19  due -- no, it's probably the date that they're
20  going out.  I don't remember.  Why it's
21  different from 4/9 and 5/2, I don't remember.
22  And the Policy Management was the stock that
23  they were in.
24    Q.    Does the page reflect other stocks?
25    A.    Yes.

Page 186

1    Q.    And what are those stocks?
2    A.    Those are different stocks that
3  were due on the same date in different accounts.
4    Q.    So let's stick with the date of
5  May 2nd, which do you see that on this page?
6    A.    Uh-huh, yes.
7    Q.    So on May 2nd, can you walk me
8  through what you would have done?
9    A.    Punched in the account number, the
10  amount and that's all I think.  The date would
11  be on the check.  And I don't think that we put
12  the name of the stock on the check.  I don't
13  think.
14    Q.    And when you say "punched in,"
15  where did you punch that in?
16    A.    In the computer room.  I forget her
17  name.  Jodi had this book and she used to -- I
18  believe it went into the computer room, and I
19  can't remember her name, she would punch them
20  in.  I think that's how it worked.
21    Q.    Okay, so you didn't personally
22  punch the checks into the computer system.
23    A.    No.
24    Q.    But you did make entries into the
25  check-out book that we're looking at now.

SIPC v BLMIS                                                    Sala 6/13/2016

CONFIDENTIAL

Page 187

1      A.    Yes, mm-hmm.
2      Q.    When you were describing earlier
3  that a deal would end, is one of those deals
4  like the one we see here for Policy Management?
5      A.    Yes.
6      Q.    And when the deal would end, would
7  you make an entry in the check-out book?
8      A.    Yes.
9      Q.    And are the entries that are
10 reflected on the page ending 1561 examples of
11 the type of entries you would make when a deal
12 ended for a particular customer?
13     A.    Yes.
14     Q.    And the entries that are reflected
15 on this page are made in what you refer to as
16 the check-out book?
17     A.    Yes.
18     Q.    What's your understanding of what
19 happened after you put the entries into the
20 check-out book?  What happened next?
21     A.    Then the checks would be sent to
22 the customers.  I don't know if it was on that
23 date or about on that date.
24     Q.    And would you go through a similar
25 process for each time a deal ended?

Page 188

1      A.    Yes.
2      Q.    I want to go back to what you were
3  discussing in terms of when the deals ended.  Is
4  the term "due date report" familiar to you?
5      A.    Yes.
6      Q.    And is that the document that you
7  were referring to earlier when you said that's
8  how you tracked when deals were becoming due?
9      A.    Mm-hmm, yes.
10     Q.    Can you describe to me what the due
11 date report looked like?
12     A.    It had the account number, the
13 customer's name, the stock that they were in.
14 And the profit that they made.
15     Q.    Did it also -- did it include their
16 account number?
17     A.    Yes.  I think that was listed
18 first.
19     Q.    Who printed the due date report for
20 you?
21     A.    The computer room girl.  I can't
22 think of her name.
23     Q.    You can't remember her name?
24     A.    No, I can't.  It's on the tip of my
25 tongue.  Not a common name.

Page 189

1      Q.    Did the due date report include --
2  strike that.
3          You stated before that the due date
4  report would include information about the
5  profits that were due a customer.
6      A.    Yes.
7      Q.    Would the due date report also
8  include information about capital withdrawals?
9      A.    No.
10     Q.    Did you rely on any other types of
11 documents to determine when a deal was ending?
12     A.    Do you mean when it was set up into
13 it?
14     Q.    I'm referring to the time period
15 when a deal comes due.  Did you look at anything
16 other than the due date report?
17     A.    No.  No.
18     Q.    What documents did you rely upon
19 when you were setting up a deal?
20     A.    The due date report, we used those
21 customers to put them into a new one.
22     Q.    Into a new deal?
23     A.    Deal, mm-hmm.
24     Q.    So what happens when one deal ends?
25 What happens next?

Page 190

1      A.    Then they're set up into something
2  else.
3      Q.    Would that be a new stock entirely
4  or just a new deal in the same stock?
5      A.    It was usually a new stock.
6      Q.    And when you say that they were set
7  up, can you tell me what that entailed?
8      A.    The amount of capital that they had
9  in their account, if it was within range of the
10 ticket that David gave me, if it was more than
11 that, then I couldn't put him all in the one
12 stock, I would have to get a second one to set
13 him up in.
14     Q.    And when you say "him," are you
15 referring to the customer?
16     A.    Yes.
17     Q.    So David Kugel assisted you with
18 setting up customers in deals?
19     A.    Yes.
20     Q.    Did anyone else assist you with
21 that process?
22     A.    No.
23     Q.    Once you were done with the due
24 date report, what did you do with them?
25     A.    Well, after we put them in the

SIPC v BLMIS                                          Sala 6/13/2016

CONFIDENTIAL

Page 191

1    checkbook, the check-out book, then they were
2    set up again into -- on sheets of paper into a
3    new stock.  I believe that came from the --
4    yeah, the old -- the due date report.  That's
5    how I set them up again.
6         Q.    Okay, and when you finished setting
7    up the customers, what did you do with the
8    actual due date report?
9         A.    We cut them and put them -- when
10   they put a new stock, when they printed that
11   out, we would put them on there, Scotch tape
12   them on there if they were going into that
13   stock.
14        Q.    Okay, so you would Scotch tape the
15   due date report in pieces onto a page.
16        A.    Uh-huh.  Because not all of them
17   were due on the same date.
18        Q.    And the pages that you created with
19   the due date reports Scotch taped to them, where
20   were those pages kept?
21        A.    I don't know.  Once they left me,
22   they went into the computer room and she punched
23   them.  I don't remember what happened after
24   that.
25        Q.    After a new deal was set up, would

Page 192

1    you get a due date report sometime after that?
2         A.    Yes.
3         Q.    And then you would -- once you got
4    the due date report, can you tell me one more
5    time what kind of process you would go through?
6         A.    We'd post it in our loose-leaf
7    book.
8         Q.    Which book are you referring to?
9         A.    The ledger, where we had all
10   customers' names.  And we would post it in there
11   with the stock, the due date, the amount of
12   weeks and the profit that they made.
13        Q.    And then what happened next?
14        A.    Then when it came due they were set
15   up again.  And the checks went out on the due
16   date.
17        Q.    What's the function of the
18   check-out book in that process?
19        A.    The check-out book?  That's to send
20   them profits.  Only people that received profits
21   went in that book.  Not anybody else.  If they
22   didn't take profits, they weren't in this book,
23   unless they requested money.  If they requested
24   money, then they went in the book.
25        Q.    And "the book," you're referring to

Page 193

1    the check-out book?
2         A.    Check-out book, mm-hmm.
3         Q.    So you would make entries in the
4    check-out book after reviewing the due date
5    report.
6         A.    Yes.
7         Q.    And then once you made your entries
8    in the check-out book, what did you do with the
9    check-out book next?
10        A.    We just always left it in the same
11   place.  And anybody could go -- everybody knew
12   where it was to go and put a check in there.
13        Q.    What place was the check-out book
14   maintained?
15        A.    I believe it was in Jodi's office.
16   Jodi Crupi.
17        Q.    After the information was entered
18   into the check-out book, what happened after
19   that?
20        A.    I guess they were punched in on the
21   date that -- whatever date was on the page,
22   that's when they would go out.
23        Q.    And there were employees at BLMIS
24   that were responsible for punching information
25   into the computer system?

Page 194

1         A.    Mm-hmm.
2         Q.    Yes?
3         A.    Yes.
4         Q.    And when you say the checks were
5    punched in, are you referring to those employees
6    as who was doing the punching?
7         A.    Yes.
8         Q.    If I could direct your attention to
9    the page with the Bates label of HWN 00001528,
10   Ms. Sala, do you see a date on that document?
11        A.    Uh-huh.
12        Q.    What is that date?
13        A.    March 28, 1991.
14        Q.    And is March 28th, 1991 consistent
15   with your understanding of the time period in
16   which Exhibit 61 was created?
17        A.    Please repeat it.
18        Q.    Sure.  Was March 28th, 1991 around
19   the time when Exhibit 61 was created, that
20   entire document?
21        A.    What is -- oh, this whole thing?
22        Q.    Mm-hmm.
23        A.    I'm not sure that I understand.
24        Q.    You testified earlier that this is
25   the check-out book.

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                          Sala 6/13/2016

CONFIDENTIAL

Page 195

1      A.    Yes.
2      Q.    And we see within that book that
3  there are several dates.
4      A.    Yes.
5      Q.    Where has the date generally been
6  reflected on the pages in this document?
7      A.    On the top.
8      Q.    What's the date that you see on the
9  top?
10      A.    March 28th, '91.
11      Q.    And do you have any reason to
12  believe -- strike that.
13          Based on your review of the
14  document, is that date consistent with your
15  understanding of when this document was created?
16      A.    Mm-hmm.
17      Q.    Yes?
18      A.    Yes.
19      Q.    And did you see the document that's
20  been marked as Exhibit 61 while you were
21  employed at BLMIS?
22      A.    Yes.
23      Q.    And did you make entries into that
24  book while you were employed at BLMIS?
25      A.    Yes.

Page 196

1      Q.    And were those entries made
2  contemporaneously with your duties?
3      A.    Yes.
4      Q.    Did BLMIS use other notebooks with
5  similar information to what's reflected in
6  Exhibit 61?
7      A.    Not that I know of.
8      Q.    Were there more than one check-out
9  book during the time period at which you were
10  employed at BLMIS?
11      A.    Not that I know of, no.
12      Q.    You are familiar with the check-out
13  book that we're reviewing.
14      A.    Yes.
15      Q.    Are you aware of a time at which
16  BLMIS stopped using spiral notebooks to record
17  check-out information?
18      A.    Not while I was there, no.
19      Q.    Ms. Sala, we're done with that
20  exhibit so you can put that to the side.
21          MS. BROWN:  I'd like to mark a
22  document bearing Bates number MADTBB 01800094
23  through MADTBB 01800109 as Trustee Exhibit 62.
24          (Trustee Exhibit 62 for
25  identification, MADTBB 1800094 through 1800109)

Page 197

1      Q.    Ms. Sala, if you could tell me, do
2  you recognize this document?
3      A.    Yes.
4      Q.    And what is it?
5      A.    It's a check -- profit check that
6  went out to a customer.  It was the check and
7  the memo that went with it.
8      Q.    How do you know it was a profit
9  check that went to the customer?
10      A.    Well, there's a PW on it.
11      Q.    Where do you see the PW notation
12  reflected?  On what part of the document?
13      A.    On the memo.
14      Q.    Is the memo on the top portion of
15  the document that you're looking at?
16      A.    Yes.
17      Q.    So if you could just walk me
18  through the memo portion of the document and
19  tell me about it, what information does the memo
20  portion contain?
21      A.    It was a profit withdrawal check
22  for Cardinal Health, that was the name of the
23  stock that she was in, and the profit was
24  $1,331.75 to Hanoh Charat, her address, and her
25  account number.

Page 198

1      Q.    When you say that's the stock that
2  she was in, you also used the term "deal."
3  Would the deal of this particular that we're
4  looking at be Cardinal Health?
5      A.    Yes.
6      Q.    Turning to the bottom portion of
7  the document ending in Bates number 094, can you
8  describe what you see there?
9      A.    It's paid to the order of Hanoh
10  Charat on November 25th, 1998.  And that was
11  1,331.75.  And her account number is on there.
12      Q.    Is the account number in the memo
13  field of the check?
14      A.    Yes.  Where it says 4.
15      Q.    Does amount of the check on the
16  bottom portion of this document match the memo
17  portion on the top of the document?
18      A.    Yes, it does.
19      Q.    Do you know how this document that
20  we're looking at in Trustee Exhibit 62 was
21  generated?
22      A.    It was -- yeah, it was punched in
23  in the computer room.  That's all I know, yeah.
24      Q.    Do you know when this type of
25  document would be generated for a customer?

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                          Sala 6/13/2016

## CONFIDENTIAL

Page 199

1    A.    When the due date -- when the deal
2  was over, they had a due date, and then the
3  check would go out about that time.
4    Q.    And would a memo and copy of a
5  check be sent to a customer after the due date?
6    A.    Yes.
7    Q.    Would the type of document we're
8  looking at in Trustee Exhibit 62, would that be
9  sent with the check?
10   A.    The memo?
11   Q.    Mm-hmm.
12   A.    Yes.
13   Q.    Do you know whether BLMIS
14 maintained copies of the type of document we're
15 looking at in Trustee Exhibit 62?
16   A.    I don't think so.
17   Q.    You don't --
18   A.    I don't know.  I don't know.  I
19 don't think there were duplicates of it.  I'm
20 not sure.
21   Q.    Was the document that we are
22 looking at in Trustee Exhibit 2 created in the
23 ordinary course of BLMIS's business?
24   A.    Yes.
25   Q.    And to your knowledge, these

Page 200

1  documents were sent to customers?
2    A.    These were, yes.
3    Q.    When you say "these," are you
4  referring to the page we're looking at in
5  Trustee Exhibit 62 ending in 094?
6    A.    Yes.
7    Q.    Ms. Sala, I want to turn through
8  the rest of the pages that are in this document.
9  If you can take a look at the remainder of the
10 pages.
11       Ms. Sala, looking at the pages of
12 the document going from 095 to 108, can you tell
13 me what those pages reflect?
14   A.    Those are the confirmations that
15 were sent to the customers to show them what
16 stock they were in.
17   Q.    And are these confirmations related
18 to the arbitrage deals that you worked in?
19   A.    Yes.
20   Q.    Do you know how these confirmations
21 were generated?
22   A.    No.  Once I put them in there, we
23 gave to the computer room and they punched it.
24   Q.    When you say "in there," what are
25 you referring to?

Page 201

1    A.    Into the computer room.
2    Q.    You testified a moment ago, you
3  said once you put them in there, then you give
4  them to the computer room.
5    A.    Into the stock.  Once I put them
6  into the stock, I gave that paper to, and she
7  punched them in.
8    Q.    And to your knowledge, the types of
9  documents we're looking at in Trustee Exhibit 62
10 would be generated after that?
11   A.    Yes.
12   Q.    And would these documents be sent
13 to the customer, to your knowledge?
14   A.    Yes.
15   Q.    Ms. Sala, I'm going to put before
16 you several exhibits that were previously marked
17 in your deposition on May 19th.  So if you could
18 just close that document, unless you wanted
19 to --
20   A.    I don't know what this is.
21       MS. BROWN:  Let the record reflect
22 that the witness is referring to page number
23 MADTBB 01800096.
24   Q.    Did you want to tell me something
25 about that page?

Page 202

1    A.    I don't -- I never saw it before.
2    Q.    You've not seen this page before,
3  okay, thank you for clarifying.
4    A.    Okay.
5    Q.    Turning to the page directly
6  before, Ms. Sala, I think you just testified
7  that you had not seen the page number ending in
8  096, is that correct?
9    A.    Right, mm-hmm.
10   Q.    If you could turn to the page
11 directly before that, the Bates range is MADTBB
12 01800095.
13   A.    Right.
14   Q.    Have you seen that page?
15   A.    Yes.
16   Q.    And turning back to the page before
17 that which ends in 094, can you tell me whether
18 you have seen this page?
19   A.    Yes.
20   Q.    Okay, I'd like to turn to several
21 exhibits that were marked at your prior
22 deposition, and we're going to compare it to
23 Trustee Exhibit 62.  So you can keep that for
24 now.
25       MR. DEXTER:  I do if you need it.

SIPC v BLMIS                                          Sala 6/13/2016

CONFIDENTIAL

---

Page 203

1       MS. BROWN:  I have one for you.  Do
2   you need it?
3       Q.   Ms. Sala, I'm going to place before
4   you what's been previously marked as Trustee
5   Exhibit 27, Trustee Exhibit 28, and Trustee
6   Exhibit 29.  If you can take a look at those
7   three documents while I give copies to my
8   opposing counsel.
9       A.   (The witness reviews the document.)
10      MR. DEXTER:  Are we short a copy?
11      MS. BROWN:  It's somewhere in here.
12  I just can't find it.
13      Q.   If we could look first at Trustee
14  Exhibit 29, Ms. Sala, can you tell me what
15  transactions you see on Trustee Exhibit 29
16  relating to Cardinal Health?
17      A.   There is the amount of money in
18  Cardinal Health, that was the price, 87 and a
19  half I believe was the price, 213,850 is what
20  went into it.  And the profit -- no, that's a
21  different number.
22      Q.   Could you tell me what customer
23  that securities transaction was for in Exhibit
24  29?
25      A.   Hanoh Charat.

---

Page 204

1       Q.   And what was the -- what is the
2   date of this document?
3       A.   October 31st, 1998.
4       Q.   And the transaction you just
5   identified in Cardinal Health, was that to your
6   knowledge a buy transaction in Cardinal Health?
7   Is that a purchase of securities?
8       A.   Yes, uh-huh.
9       Q.   Yes?
10      A.   Yes.
11      Q.   Turning to Trustee Exhibit 27, can
12  you tell me what customer this document is for?
13      A.   Hanoh Charat.
14      Q.   And what is the date of this
15  document?
16      A.   November 30th, 1998.
17      Q.   Ms. Sala, could you identify
18  transactions in Cardinal Health that occurred in
19  November 1998?
20      A.   Two sales, 58 and three quarters
21  was the price.  And the amount of shares -- the
22  amount of shares was 2,100.  And the second one
23  was 1,566 at 58-5/8.
24      Q.   What date did those transactions
25  you just described occur on?

---

Page 205

1       A.   On November 5th.
2       Q.   And were those -- was that a sell
3   transaction?
4       A.   Yes.
5       Q.   Can you identify any other
6   transactions that occurred in November 1998
7   relating to Cardinal Health?
8       A.   The stock split, 3 for 2 stock
9   split on November 5th, 1998.
10      Q.   What does that stock split relate
11  to?
12      A.   I really don't know.  To the stock,
13  but I don't know.
14      Q.   Was it related to the sell
15  transactions that you identified?
16      A.   Yes.
17      Q.   Also on November 5th?
18      A.   Yes.
19      Q.   Looking at the statement, Trustee
20  Exhibit 27, do you see any other transactions on
21  the statement that relate to Cardinal Health?
22      A.   No.  Oh, the check that went out.
23  The profit withdrawal of $41,331.75 went out on
24  November 20th.  No, 25th.
25      Q.   So November 25th, there's a checks

---

Page 206

1   transaction.
2       A.   Yes.
3       Q.   And the description on the
4   statement, what does that read?
5       A.   Profit withdrawal.
6       Q.   In the field before where it says
7   PW, what does that read?
8       A.   Check for Cardinal Health.
9       Q.   And the amount of that transaction,
10  can you tell me what that was?
11      A.   $1,331.75.
12      Q.   And if we could turn to Trustee
13  Exhibit 28, can you tell me what that document
14  is?
15      A.   That is a check that went out for
16  $1,331.75 on November 25th, 1998 to Hanoh
17  Charat.
18      Q.   And does the check image
19  information that's in Trustee Exhibit 28, does
20  that match the check transaction in Exhibit --
21  Trustee Exhibit 27?
22      A.   Yes, it does.
23      Q.   Does the amount match?
24      A.   Yes.
25      Q.   Does the date match?

---

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                              Sala 6/13/2016

CONFIDENTIAL

Page 207

1    A.    Yes.
2    Q.    And is the check made payable to
3  the customer whose account statement is
4  reflected in Trustee Exhibit 27?
5    A.    Yes.
6    Q.    And the check is made payable to
7  Hanoh Charat, yes?
8    A.    Yes.
9    Q.    And the statement in Exhibit 27,
10  the description reads "check Cardinal Health,"
11  correct?
12    A.    Yes.
13    Q.    Ms. Sala, I'd like if you could
14  explain to me the timing that we see in these
15  transactions.  So you testified earlier that
16  you've identified a transaction on November 5th
17  relating to a sell transaction in Cardinal
18  Health, correct?
19    A.    Yes.
20    Q.    And the profit withdrawal
21  transaction occurs on November 25th, correct?
22    A.    Yes.
23    Q.    And November 25th is after the
24  securities in Cardinal Health were purportedly
25  sold, correct?

Page 208

1    A.    Yes.
2    Q.    And Ms. Sala, just so I have the
3  terminology correct, when we're looking at this
4  November 30th, 1998 statement in Trustee Exhibit
5  27, would Cardinal Health be the deal for that
6  particular customer?
7    A.    Yes.
8    Q.    I'd like to turn to Trustee Exhibit
9  62.  We're just going to look at that first page
10  which ends in 094.
11        Ms. Sala, I'd like to compare
12  Trustee Exhibit 22 with Trustee Exhibit 28.  So
13  I'm just going to place them next to each other
14  for you.  Looking at Trustee Exhibit 62, the
15  bottom portion of 62, do you see a check image?
16    A.    Yes.
17    Q.    And on that image do you see a
18  check number?
19    A.    Yes.
20    Q.    What is that number?
21    A.    0008790603880026763014281515 09.
22    Q.    The numbers that you just read,
23  where do they appear on the check image of
24  Trustee Exhibit 62?
25    A.    At the bottom of the check.

Page 209

1    Q.    And do you know what those numbers
2  represent?
3    A.    A checking account number or
4  routing number.
5    Q.    Turning to the top right corner of
6  the check image in Trustee Exhibit 62, do you
7  see a check number on that image?
8    A.    Yes.
9    Q.    And what is that number?
10    A.    87906.
11    Q.    Turning to Trustee Exhibit 28, do
12  you see a check number on that document?
13    A.    87906.
14    Q.    Do the check numbers in Trustee
15  Exhibit 28 and Trustee Exhibit 62 match?
16    A.    They do.
17    Q.    Turning to the date of the check
18  image in Trustee Exhibit 62, can you tell me
19  what date that is?
20    A.    November 25th, 1998.
21    Q.    And turning to Trustee Exhibit 28,
22  can you tell me what date is reflected on this
23  document?
24    A.    November 28 -- November 25th, 1998.
25    Q.    And turning back to Trustee Exhibit

Page 210

1  62, can you tell me what the amount is that's
2  reflected on the bottom portion of Trustee
3  Exhibit 62?
4    A.    $1,331.75.
5    Q.    And turning to Trustee Exhibit 28,
6  can you tell me what amount is reflected on that
7  document?
8    A.    $1,331.75.
9    Q.    And turning back to Trustee Exhibit
10  62, who is the recipient of the check image?
11  Who is it made payable to?
12    A.    Hanoh Charat.
13    Q.    And turning to Trustee Exhibit 28,
14  who is that check made payable to?
15    A.    Hanoh Charat.
16    Q.    I'd like to turn to Trustee Exhibit
17  27.  You can leave those other ones out.
18  Trustee Exhibit 27, can you identify for me the
19  transaction that occurs on November 25th?
20    A.    A check for Cardinal Health is sent
21  to Hanoh Charat in the amount of $1,331.75.
22    Q.    And what code is reflected on that
23  statement for that transaction?
24    A.    PW, which means profit withdrawal.
25    Q.    Turning to Trustee Exhibit 62,

SIPC v BLMIS                                                    Sala 6/13/2016

## CONFIDENTIAL

Page 211

1   looking at the top portion of the document, can
2   you read for me the top line of the document?
3        A.    "Profit withdrawal check for
4   Cardinal Health."
5        Q.    In what amount?
6        A.    $1,331.75.
7        Q.    And the portion of the memo that
8   you just read from Trustee Exhibit 62, does that
9   match the transaction description in the
10  customer statement?
11       A.    Yes.
12       Q.    In Trustee Exhibit 27?
13       A.    Yes, it does.
14       Q.    And the check image on the bottom
15  of Trustee Exhibit 62 matches the check in
16  Trustee Exhibit 28, correct?
17       A.    Yes.
18       Q.    And the check image and the check
19  in Trustee Exhibits 62 and 28 are made payable
20  to Hanoh Charat.
21       A.    Yes.
22       Q.    We're done with those exhibits.
23  You can put those to the side.
24            MS. BROWN:  I'd like to mark a
25  document with the Bates number MADTBB 01991236

Page 212

1   through MADTBB 01991239 as Trustee Exhibit 63.
2            (Trustee Exhibit 63 for
3   identification, MADTBB 1991239)
4            MS. BROWN:  I'd also like to mark
5   document bearing the Bates number AMF 00142426
6   through AMF 00142480 as Trustee Exhibit 64.
7            (Trustee Exhibit 64 for
8   identification, AMF 142426 through 142480)
9        Q.    Turning to Trustee Exhibit 63,
10  Ms. Sala, do you recognize this document?
11       A.    Yes.
12       Q.    What is it?
13       A.    It's a folder for Teresa R. Ryan
14  and Lawrence J. Ryan, Trustee, that we kept
15  their information in.  Any papers, any requests
16  for money, whatever, into the folder.
17       Q.    Turning to the document ending
18  in -- sorry, the document ending MADTBB
19  01991238, can you look at that page for me.
20  Ms. Sala, what is that page?
21       A.    That's a maintenance file that we
22  kept with the name of the account, the type of
23  account that they had and whether they were
24  going to receive profits or not, and the group
25  name and their Social Security number.  That's

Page 213

1   it.
2        Q.    Can you tell from looking at this
3   page whether this was a send or reinvest
4   account?
5        A.    It ended up as a send.
6        Q.    How do you know that?
7        A.    The S on here.  It started out with
8   it, and then it was a reinvest, and then a send,
9   a reinvest and a send.
10       Q.    If we could turn to the last page
11  of that document which ends in 239, what does
12  this document reflect?
13       A.    The changes that they made to the
14  account.
15       Q.    And what kind of changes are
16  reflected on that a page?
17       A.    If they were going to take a profit
18  or reinvest the money.
19       Q.    And how -- sorry, go ahead.
20       A.    And they did that four times --
21  five times, whatever.
22       Q.    And you see that reflected on the
23  page ending 239?
24       A.    Yes.
25       Q.    Do you recognize any of the

Page 214

1   handwriting on this page?
2        A.    I think the changes I did.  And I
3   think that's Annette.
4            MS. BROWN:  Let the record reflect
5   that the witness is pointing to the top entry on
6   the page ending in 239 as the handwriting of
7   Annette Bongiorno.
8        Q.    Correct?
9        A.    Yes.
10       Q.    The entry reads October 15, 1991,
11  CONF-SS, pound sign.
12            You testified that your handwriting
13  appears on this page.  Could you tell me the
14  dates of the entries that appear to be your
15  handwriting?
16       A.    5/3/93, 12/28/93, 10/10/95, and
17  1/5/96.  And then I don't know whose -- it
18  changed to a new account in '97.
19       Q.    So the entry you're not familiar
20  with is the last entry on that page?
21       A.    Right, yes.
22       Q.    Turning to Trustee Exhibit 64,
23  we're going to keep looking at that back page,
24  you might want to keep that handy.  If you turn
25  to the page with the Bates number AMF -- sorry,

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 215

1  let me back up for a second.
2       Ms. Sala, do you recognize Trustee
3  Exhibit 64?
4       A.   Yes.
5       Q.   And what is it?
6       A.   It's the account of Teresa and
7  Lawrence Ryan.  And this tells you the type of
8  account -- the name, the address, the group name
9  and whether they're going to take profits or
10 not, and the type of account that it is.
11      MS. BROWN:  Let the record reflect
12 the witness is reviewing the page with the Bates
13 number AMF 00142427.
14      Q.   Ms. Sala, what does this document
15 appear to be, the entirety of the document?
16      A.   That they opened an account and all
17 the information that they gave us is in here.
18 That's it.  And their account number, the group
19 that they were in.  That's all.
20      Q.   If I could have you turn to the
21 page ending in 441 of Trustee Exhibit 64,
22 Ms. Sala, do you recognize this document?
23      A.   Yes.
24      Q.   What is that document?
25      A.   It's a letter from a customer

Page 216

1  making a change to his account.
2       Q.   And what type of change did the
3  customer make?
4       A.   He wanted to change it to a
5  reinvest account.
6       Q.   And how do you know that?
7       A.   Because he said "please hold the
8  distribution for account number 1R00731," which
9  is Lawrence and Teresa Ryan.
10      Q.   Ms. Sala, directly under the date
11 there's some initials.  Do you recognize those
12 initials?
13      A.   Yes.  Mine.
14      Q.   Those are your initials?
15      A.   Yes.
16      Q.   To your knowledge, is this letter
17 addressed to you?
18      A.   No -- well, it's addressed to
19 Madoff.  They might have had on the envelope
20 attention JoAnn.  I don't know.
21      Q.   The top line of the letter, what
22 does the type line of the letter read?
23      A.   "Dear JoAnn."
24      Q.   Do you believe that's you?
25      A.   Yes.

Page 217

1       Q.   After receiving the type of letter
2  that we see in the page ending 441, what would
3  you do?
4       A.   I would change it in the ledger
5  book and change it from a profit withdrawal to a
6  reinvest, initial it and put it in their file.
7       Q.   And we do see your initials on this
8  document, correct?
9       A.   Yes.
10      Q.   And do your initials there reflect
11 that you made a change to the account?
12      A.   Yes.
13      Q.   Turning back to Trustee Exhibit 63,
14 do you see a notation on the folder cover of
15 Trustee Exhibit 63 that corresponds to the
16 letter we just reviewed in Trustee Exhibit 64?
17      A.   October 10th, yes.
18      Q.   And what happened on October 10th,
19 1995?
20      A.   It was changed.  The letter
21 obviously was written and then sent, and it
22 probably took a week before we actually made the
23 change.
24      Q.   What change did you make?
25      A.   We changed it to a reinvest from a

Page 218

1  send.
2       Q.   And that's what was reflected in
3  the letter that we looked at in Trustee Exhibit
4  64?
5       A.   Yes.
6       Q.   Ms. Sala, you testified that you
7  made changes to this account, correct?
8       A.   Yes.
9       Q.   And did you make them
10 contemporaneously with receiving the letter from
11 the customer?
12      A.   Yes.
13      Q.   We're done with those exhibits for
14 now.
15      I'd like to mark the document
16 bearing the Bates number MF 00177098 as Trustee
17 Exhibit 65.
18      (Trustee Exhibit 65 for
19 identification, MF 177098)
20      Q.   Ms. Sala, do you recognize this
21 document?
22      A.   Yes.  It's a statement for Teresa
23 Ryan and Lawrence Ryan, July 31st, 1995.
24      Q.   And what account number is
25 associated with the document in Trustee Exhibit

SIPC v BLMIS                                             Sala 6/13/2016

CONFIDENTIAL

---

Page 219

1  65?
2       A.    1R007310.
3       Q.    What does a dash 1-0 account
4  reflect?
5       A.    That's an arbitrage account.
6       Q.    And those are the types of accounts
7  that you dealt with at BLMIS?
8       A.    Yes.
9       Q.    Ms. Sala, can you identify any
10 profit withdrawal transactions in the month of
11 July 1995 for this account?
12      A.    Yes.
13      Q.    What do you see?
14      A.    I see on July 5th a check for
15 General Mills went out for $11,793. It was a
16 profit withdrawal.
17          MS. BROWN:  I'd like to mark a
18 document bearing the Bates number MADTBB
19 01764412 through MADTBB 01764427 as Trustee
20 Exhibit 66.
21          (Trustee Exhibit 66 for
22 identification, MADTBB 1764427 through 1764466)
23 .
24      Q.    Ms. Sala, do you recognize the
25 document that's been marked as Trustee Exhibit

---

Page 220

1  66?
2       A.    Yes.
3       Q.    What is that document?
4       A.    It's a check and a memo.
5       Q.    And just sticking with the top part
6  of Trustee Exhibit 66, what does that portion
7  reflect?
8       A.    A profit withdrawal, a check for
9  General Mills on July 5th, 1998 for $12,7 -- no,
10 $11,793.
11      Q.    And does that memo portion that you
12 just looked at match the profit withdrawal
13 transaction you identified in Trustee Exhibit
14 65?
15      A.    Yes, it does.
16      Q.    How does it match?
17      A.    It's the same amount, $11,793 for
18 profit for General Mills.
19      Q.    What date did the transaction occur
20 in?
21      A.    7/5.
22      Q.    Sorry, my question wasn't clear.
23 On the statement that you looked at, what is the
24 date that appears on the payment for that
25 transaction?

---

Page 221

1       A.    7/5.
2       Q.    Looking at the memo in Trustee
3  Exhibit 66, what is the date reflected in the
4  memo?
5       A.    7/5/95.
6       Q.    And the customer that's identified
7  in the memo portion, who is that?
8       A.    Teresa R. Ryan, Lawrence J. Ryan,
9  Trustees, UDT, 11/20/91.  217 Shearwater Isle,
10 Foster City, California 94404.
11      Q.    If I could turn back to Trustee
12 Exhibit 63 and have you take a look at the page
13 ending in 1238.  And if I could direct your
14 attention to lines 1 through 4, what does that
15 page reflect?
16      A.    The name of the account, Teresa R.
17 Ryan, Lawrence J. Ryan, Trustees, UDT 11/20/91,
18 217 Shearwater Isle, Foster City, California
19 94404.
20      Q.    And does the address information
21 that you just read from Trustee Exhibit 63 match
22 the memo field on Trustee Exhibit 66?
23      A.    Yes.
24      Q.    Does --
25      A.    Yes, it does.

---

Page 222

1       Q.    Turning back to Trustee Exhibit 66,
2  what is reflected on the bottom portion of
3  Trustee Exhibit 66?
4       A.    It's a check made out to Teresa R.
5  Ryan, Lawrence J. Ryan, Trustees, UDT, 11/20/91
6  on July 5th, 1995 in the amount of $11,793.
7       Q.    And does the information that's
8  reflected in the check image of Trustee 66, does
9  that correspond to Trustee Exhibit 65?
10      A.    Yes.
11      Q.    And how does it correspond?
12      A.    The check amount of $11,793 on
13 July 5th, the check went out for General Mills
14 profit withdrawal.
15      Q.    So looking at Trustee Exhibit 65
16 and Trustee Exhibit 66, what can you tell us
17 about these transactions?
18      A.    Well, a check went out on July 5th
19 and it was -- it's reflected in her statement,
20 her monthly statement.
21      Q.    And who is the check made payable
22 to?
23      A.    Both Teresa Ryan and Lawrence Ryan.
24      Q.    And are those the customer names
25 that we saw reflected in Trustee Exhibit 63 on

---

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 223

1   the name and address file maintenance sheet?
2       A.   Yes.
3       Q.   We're done with those exhibits, you
4   can put those -- we can put these exhibits away.
5           Ms. Sala, you testified before that
6   you left BLMIS in 1998, is that right?
7       A.   I think it was '98.
8       Q.   Around 1998.
9       A.   Yes.
10      Q.   Yes?
11      A.   Yes.
12      Q.   To your knowledge, when did BLMIS
13  start phasing out the arbitrage strategy?
14      A.   When I left.
15      Q.   So around 1998?
16      A.   Yes.
17      Q.   Did you assist with phasing out the
18  arbitrage strategy?
19      A.   Yes.
20      Q.   How did you assist?
21      A.   I took their -- I transferred their
22  money from the arbitrage account into an option
23  account.
24      Q.   And did BLMIS use a numbering
25  system to denote whether an account was an

Page 224

1   arbitrage account or an options account?
2       A.   Yes.
3       Q.   And what was that numbering system?
4       A.   10 was an arbitrage, a 30 and 40
5   were option accounts, and 50 was a hedge
6   account.
7       Q.   To your knowledge, did customers
8   still have profit withdrawal transactions after
9   arbitrage was phased out?
10      A.   I don't know if they did.
11      Q.   When you transferred accounts over
12  to the dash 3 accounts, to your knowledge, did
13  any of the dash 3 accounts receive profit
14  withdrawal transactions?
15      A.   I don't know.
16      Q.   Ms. Sala, did you ever receive
17  phone calls from customers?
18      A.   Yes.
19      Q.   About how often?
20      A.   Oh, every day.
21      Q.   And what was the nature of those
22  phone calls, in a general way?
23      A.   If they didn't understand something
24  that was mailed to them or if they wanted to
25  change their account in any way, the name of it,

Page 225

1   or profits or capital withdrawals, whatever
2   they -- if they needed money.
3       Q.   When you took phone calls from
4   customers at BLMIS, what would you do after the
5   phone call?
6       A.   Well, it depends on what they
7   wanted.  But most of the time -- whatever they
8   wanted, they had to do it in writing.
9       Q.   And with regard to -- so if a
10  customer wanted a particular amount from their
11  account, what would they have to do?
12      A.   They would have to send us a
13  letter.
14      Q.   And that was true even if they
15  spoke to you over the phone?
16      A.   Yes, mm-hmm.
17      Q.   Would you do anything with the
18  request over the phone about a particular
19  withdrawal until you got the letter?
20      A.   No.  I might make a note of it but
21  he always wanted a letter and have it initialed
22  once it was in.
23      Q.   And what types of things --
24          MR. DEXTER:  I'm sorry, when you
25  say "he," just clarify.

Page 226

1           THE WITNESS:  Bernie Madoff.
2           MR. DEXTER:  For the record.  Thank
3   you.
4       Q.   What types of things were required
5   to be in writing?  Could you tell us what you
6   remember?
7       A.   Change the name of the account, if
8   they wanted a check made out just to one of them
9   if there were two names on the account, if they
10  needed money, if they were going to change from
11  a send or a reinvest, one way or the other.
12  That's basically it.
13      Q.   Were letters required for customers
14  to take out -- I'm sorry, strike that.  Were
15  letters required for customers to receive
16  profits relating to the arbitrage strategy?
17      A.   No.  Those went out automatically.
18          THE VIDEOGRAPHER:  Five minutes
19  remaining on tape, counsel.
20      Q.   Those are all the questions I have,
21  Ms. Sala.  Thank you for your time.
22      A.   Okay.
23          MS. BROWN:  We can go off the
24  record.
25          THE VIDEOGRAPHER:  The time is

SIPC v BLMIS                                              Sala 6/13/2016

CONFIDENTIAL

Page 227

1    11:16 a.m.  Off the record.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  The time is
4    11:27 a.m.  This beginnings DVD number 2.  Back
5    on the record.
6    EXAMINATION
7    BY MR. DEXTER:
8        Q.    Ms. Sala, my name is Greg Dexter
9    with the law firm of Chaitman LLP.  We represent
10   Madoff customers.
11       I'm going to ask you a series of
12   questions, hopefully this isn't going to take
13   more than an hour and a half, relating to the
14   profit withdrawal issue.
15       To the extent possible, to have a
16   clear record, if you could answer my questions
17   in a yes or no fashion, we would appreciate
18   that.
19       A.    Okay.
20       Q.    If you can't answer a question
21   because you don't know the answer, just state
22   that you don't know.  But try to answer every
23   question either yes, no or I don't know, and to
24   the extent a question needs more elaboration,
25   you can elaborate on it.

Page 228

1        I understand that there were
2    members of your family who may have had accounts
3    with Bernard Madoff, is that true?
4        A.    Yes.
5        Q.    How many members of your family had
6    accounts with Madoff?
7        THE VIDEOGRAPHER:  The time is
8    11:28 a.m.  Off the record.
9        (Recess taken.)
10       THE VIDEOGRAPHER:  The time is
11   11:29 a.m.  Back on the record.
12       MR. DEXTER:  Can you read back my
13   last question, please.
14       (The pending question was read.)
15       A.    I think six.
16       Q.    And which family members were those
17   six?
18       A.    Two of my children, my parents, my
19   two brothers, my sister-in-law, and my cousin.
20   Seven.
21       Q.    And did you?
22       A.    Yes.
23       Q.    Do you recall the balance of any of
24   those accounts as of December 11th, 2008?
25       A.    My own, I had two accounts, about a

Page 229

1    million dollars.
2        Q.    In total?
3        A.    Mm-hmm.
4        Q.    Or in each one?
5        A.    No, in total.
6        Q.    And do you recall the balance of
7    the other accounts at that time?
8        A.    I think one of my brothers had
9    maybe 200,000, and one had about 500.  I'm
10   guessing.
11       My sister-in-law, about 5 -- no,
12   she had more, maybe 750.  My daughter, maybe --
13   under 200.  And my son, millions.  He lost
14   millions.
15       Q.    And how about your cousin?
16       A.    Maybe 300,000.
17       Q.    And were there claims allowed for
18   SIPC insurance?
19       A.    No.  My one brother -- I'm sorry,
20   did I say my mother and father, too?
21       Q.    No, I don't think you did.  What
22   were the figures in those accounts?
23       A.    I think his was about 500.
24       THE VIDEOGRAPHER:  Counsel, we need
25   to go off the record.  The time is 11:32 a.m.

Page 230

1    Off the record.
2        (Discussion off the record.)
3        THE VIDEOGRAPHER:  The time is
4    11:33 a.m.  Back on the record.
5        MR. DEXTER:  Can you just read back
6    the last few lines of what you have.
7        (The record was read as requested.)
8        Q.    Your parents had a joint account?
9        A.    Yes.
10       Q.    And that account had about 500,000?
11       A.    I think so.
12       Q.    And were the claims for SIPC
13   insurance on these accounts accepted or denied?
14       A.    Most of them were denied.  I think
15   that -- I think my cousin got money back, and I
16   think that one of my brothers did.  My
17   sister-in-law didn't.
18       Now, my son got some money back.
19   He still lost a lot of money.  I don't know, I
20   think he -- I don't really know how they settled
21   it.
22       Q.    And okay, so specifically with
23   respect to your account, what happened with
24   that?
25       A.    My personal account?

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 231

1    Q.    Yes.
2    A.    They said that I took out more than
3  my initial investment so I didn't get it back.
4  I had an IRA with them that they gave me back
5  principal on that.
6    Q.    What was the principal on that
7  account?
8    A.    It was about 100,000.
9    Q.    Earlier you said you had two
10 accounts. Was one about 900,000 and the IRA was
11 100,000? Was the IRA a third account?
12   A.    Okay, I'm giving you the figures
13 that I thought we had.
14   Q.    Right.
15   A.    It would have been a million. That
16 I think was 350, the IRA, but I really only had
17 a hundred.
18   Q.    And has anyone in your family been
19 sued by the trustee, Irving Picard, for
20 claw-backs?
21   A.    No.
22   Q.    Are you sure that no one's been
23 sued, or you're not sure with respect to some
24 family members? Or can you affirmatively say
25 that no one has been sued?

Page 232

1    A.    I don't think anyone was. Oh, I'm
2  sorry, my son.
3    Q.    He was?
4    A.    Yeah, I think -- yeah. Yeah.
5  Yeah, because there was something with -- he had
6  sold his dealership and there was something in
7  there that he opened an account -- I don't know.
8  But he ended up having to pay money back on that
9  one account. Yeah.
10   Q.    Do you know how much he had to pay
11 back?
12   A.    600,000.
13   Q.    When was the last time you spoke to
14 Mr. Madoff?
15   A.    1998, when I worked there.
16   Q.    And when was the last time you
17 spoke to any employee of Madoff Securities?
18   A.    After it all happened, I spoke with
19 Annette and Jodi.
20   Q.    And what was the substance of those
21 discussions?
22   A.    It was just social.
23   Q.    And that was only immediately after
24 the collapse of Madoff Securities?
25   A.    Well, I always spoke to them, you

Page 233

1  know what I mean? I always spoke to them.
2  Yeah, then I eventually -- we didn't talk
3  anymore.
4    Q.    But did you speak with other
5  employees of Madoff after the collapse of Madoff
6  Securities?
7    A.    No, not really. Not that I recall.
8    Q.    Do you know how customers,
9  specifically customer accounts, were allocated
10 amongst employees of Madoff Securities?
11   A.    No.
12   Q.    You don't know or you don't
13 understand?
14   A.    No, please repeat it then.
15   Q.    So would you agree that there were
16 certain higher-ups at Madoff Securities such as
17 Annette Bongiorno and JoAnn Crupi and Frank
18 DiPascali who handled certain Madoff accounts?
19   A.    Yes, different from what I did,
20 yes. They did handle different leads.
21   Q.    And do you know how those accounts
22 were allocated between those people?
23   A.    I think that Frank did the options,
24 Annette did the hedges. I'm really not sure
25 about it.

Page 234

1    Q.    Was there any overlap between those
2  people? Would those people work on multiple --
3    A.    Yes.
4    Q.    Excuse me. Would multiple people
5  be working on the same account, or were they all
6  divided up so that they had different accounts?
7    A.    It depended on the type of accounts
8  that they had. Some people had -- some people
9  had arbitrage, option and hedge accounts. So
10 then all of us were involved with that person.
11   Q.    But on one specific account, if it
12 was arbitrage or if it was option, would there
13 be multiple employees working on it or just one?
14   A.    No. Most of the time just the one
15 person, but I don't know about the options and
16 hedges, that I really don't know.
17   Q.    Okay. And before you had your
18 deposition taken today, did you discuss your
19 testimony with anyone?
20   A.    No.
21   Q.    So you don't have an attorney in
22 these proceedings?
23   A.    No.
24   Q.    Did you discuss it with Ms. Brown
25 or Ms. Vanderwal?

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

Page 235

1    A.    Discuss what?
2    Q.    The content of your deposition or
3  what might be discussed today.
4    A.    No.  Just that I knew it was about
5  the profit withdrawals.
6    Q.    Mm-hmm.  You testified in your
7  direct examination that everything had to be in
8  writing.  And earlier you had given the example
9  of a capital withdrawal.
10    A.    Mm-hmm.
11    Q.    Did profit withdrawals also have to
12  be in writing?  Requests for profit withdrawals?
13    A.    No.
14    Q.    It had to be in writing though to
15  set up an account as a profit withdrawal
16  account, didn't it?
17    A.    Yes.
18    Q.    And wasn't it a policy of
19  Mr. Madoff that all requests for profit
20  withdrawals had to be in writing?
21    MS. BROWN:  Objection.
22    A.    No.  No.  Just capital withdrawals.
23    Q.    Isn't it a policy that to establish
24  an account as a send account, that had to be in
25  writing?

Page 236

1    MS. BROWN:  Objection.
2    A.    That's when they first set up the
3  account.  If they changed it they had to send a
4  letter.  If they changed their minds on profits
5  and reinvestments.
6    Q.    But originally when the account was
7  established, it had to be in writing that it
8  would be a send account, right?
9    MS. BROWN:  Objection.
10    A.    When you fill out the form, yes.
11    Q.    Right.
12    MR. DEXTER:  Now, let's just take a
13  five-minute break if that's okay.
14    THE VIDEOGRAPHER:  The time is
15  11:43 a.m.  Off the record.
16    (Recess taken.)
17    THE VIDEOGRAPHER:  The time is
18  11:48 a.m.  Back on the record.
19    MR. DEXTER:  Can you read back the
20  last few lines, if you don't mind.
21    (The preceding testimony was read.)
22  BY MR. DEXTER:
23    Q.    When who would fill out the form?
24  When the customer would fill out the form?
25    A.    We actually filled it out for them.

Page 237

1    Q.    So if an account was a reinvest
2  account, then profit withdrawals would never be
3  sent, correct?
4    A.    Correct.
5    Q.    To your knowledge, nobody sent a
6  check to a customer unless the customer asked
7  for that check in writing, is that correct?
8    MS. BROWN:  Objection.
9    A.    Yes.  If it was a capital
10  withdrawal.  That's the only time a check would
11  be sent with a request, unless it was a profit.
12  That went out automatically.
13    Q.    Well, when you say automatically,
14  you mean in sent accounts profit would go out
15  automatically because the account was
16  established --
17    A.    Yes.
18    Q.    -- to do that.
19    A.    Yes.
20    Q.    But to your knowledge, there would
21  never be an instance where someone would be sent
22  a profit withdrawal check without requesting it
23  in writing, correct?
24    MS. BROWN:  Objection.
25    A.    Yes.  They would have to do it in

Page 238

1  writing, yes.
2    Q.    And when a customer would send you
3  a request for a check in writing, that would be
4  put in their files, correct?
5    A.    Mm-hmm, yes.
6    Q.    And those requests, they wouldn't
7  be destroyed, those writings wouldn't be
8  destroyed, right?  Those files --
9    A.    Not that I know of, no.
10    Q.    So the requests would be in
11  writing, correct?  Requests for profit
12  withdrawals would be in writing.
13    MS. BROWN:  Objection.  That's not
14  what she said.
15    A.    No, that would be a capital
16  withdrawal.  If they sent a request, that would
17  be a capital withdrawal.
18    Q.    If they sent any request for a
19  withdrawal, it would have to be in writing.
20    A.    Yes.
21    MS. BROWN:  Objection.
22    Q.    And those writings would be placed
23  in customer files, correct?
24    A.    Yes.
25    Q.    And those files would be retained

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                                          Sala 6/13/2016

CONFIDENTIAL

Page 239

by Madoff Investments, correct?
   A.   Yes.
   Q.   You testified on direct that you
would write down in a ledger the checks that
should be written to customers for their profit
withdrawals, correct?
   A.   Yes.
   Q.   And Annette Bongiorno kept that
ledger in her office, correct?
      MS. BROWN:  Objection.
   A.   No, that was in Jodi's office.  The
spiral check-out book?
   Q.   Where would that be kept?
   A.   I remember it being in Jodi's room.
Jodi Crupi.
   Q.   Now, did you ever contact a
customer whose name was written in that ledger
to receive a check to confirm that they had in
fact received a check?
   A.   No.
   Q.   It wasn't your job to speak with
customers to confirm that they had received
profit withdrawal checks, correct?
   A.   Correct.
   Q.   Let's look at Exhibit 22.  Let's

Page 240

turn to the page with Bates number 1538.
      You testified on direct that a
check in the indicated amount was sent to a G.
Alpern as a profit withdrawal, is that correct?
   A.   Yes.
   Q.   Now, you didn't write that check
out to a G. Alpern, did you?
   A.   Personally?
   Q.   Personally.
   A.   No.
   Q.   Right.  And you didn't mail that
check.
   A.   I might have mailed it.
   Q.   But you don't know if you had
personally mailed it.
   A.   I don't know.
   Q.   And you testified earlier that you
never spoke with a customer to confirm that they
had received a profit withdrawal check, so of
course you never confirmed with Ms. Alpern, or
with G. Alpern that that purported check was
ever received, correct?
      MS. BROWN:  Objection.
   A.   Right.
   Q.   Let me rephrase that question.  You

Page 241

never called G. Alpern to confirm that G. Alpern
had received this purported check, correct?
   A.   Correct.
   Q.   So when you testified earlier that
a check was sent to G. Alpern, you were really
sort of saying that you thought a check was sent
to G. Alpern.
      MS. BROWN:  Objection.
   Q.   Correct?
   A.   Yes.
   Q.   Now let's look at the next page.
You testified earlier that this document
indicates that customers received PW checks in
the stock of Selma and Policy Management,
correct?
   A.   Yes.
   Q.   But you don't have personal
knowledge that customers had ever received
checks in these stocks, do you?
   A.   No.
      MS. BROWN:  Objection.
   Q.   And you had never given these
checks to the customers.
   A.   No.
   Q.   And you never confirmed that they

Page 242

had received the checks.
   A.   No.
   Q.   And you never at any time looked at
the backs of the checks to confirm that they
were deposited in customers' accounts.
   A.   No.
   Q.   Okay, let's look at some other
exhibits.  I'm going to show you Exhibits 24,
25, 26 and 27.  And you've already seen these.
   A.   Mm-hmm.
   Q.   Ms. Sala, do you recognize these
documents that I'm showing you right now?
   A.   Yes.
   Q.   And these documents are Trustee
Exhibits 24, 25, 26 and 27.
      You had testified earlier that to
your knowledge, Hanoh Charat received the checks
indicated on this document here where there's a
copy of the check, correct?
   A.   Yes.
   Q.   But you never spoke with Hanoh
Charat to confirm that she received that check,
did you?
   A.   No.
   Q.   So you were just testifying based

SIPC v BLMIS                                    Sala 6/13/2016

**CONFIDENTIAL**

Page 243

1 on an assumption that she had received that
2 check, correct?
3          MS. BROWN: Objection.
4          A.    Yes.
5          Q.    Are you aware that Annette
6 Bongiorno had testified at her criminal trial
7 that she would regularly backdate customers'
8 statements?
9          MS. BROWN: Objection.
10         A.    I didn't know that, no.
11         Q.    Are you aware that at Madoff
12 Securities one of Annette Bongiorno's job
13 functions was to create backdated statements to
14 send to customers?
15         MS. BROWN: Objection.
16         A.    No, I didn't know that.
17         Q.    If I had told you that these
18 account statements were backdated, would that
19 cast doubts on -- strike that. Strike all that.
20         Back to these documents. If Madoff
21 Investments was a Ponzi scheme, then how would
22 you know that any of these statements were
23 accurate?
24         MS. BROWN: Objection.
25         A.    Well, I don't. I thought they were

Page 244

1 real.
2          Q.    And if there are other things
3 Madoff made up at Madoff Investments, then all
4 of these could be made up as well, right?
5          MS. BROWN: Objection.
6          A.    Yes.
7          Q.    So it's hard to say really what you
8 do know is accurate and what isn't accurate,
9 correct?
10         MS. BROWN: Objection.
11         A.    Well, according to the job that I
12 had and what I was told, this was all accurate
13 to me at the time.
14         Q.    But now do you still think that
15 these documents are accurate?
16         A.    I don't know. I don't know.
17         Q.    Let's look at another exhibit.
18 This is Trustee Exhibit 30. Ms. Sala, are you
19 familiar with this document?
20         A.    No.
21         Q.    You're not familiar with this
22 document?
23         A.    No, I didn't handle these accounts.
24         Q.    All right, let's look at within
25 this document, even if you're not familiar with

Page 245

1 it --
2          A.    Mm-hmm.
3          Q.    -- the page ending Bates number
4 1952.
5          A.    Yes.
6          Q.    Are you familiar with this page?
7          A.    Yes.
8          Q.    You are familiar with this page?
9          A.    Mm-hmm.
10         Q.    And what do you recognize it to be?
11         A.    Well, it's an arbitrage number.
12         Q.    Is it fair to say that this is a
13 letter from one Harry Harman purporting to
14 request that his account should be transferred
15 from a reinvest to a send account?
16         A.    Yes.
17         Q.    And do you know the date of this
18 letter?
19         A.    No.
20         Q.    Let's assume that this letter
21 actually is from Harry Harman.
22         A.    Mm-hmm.
23         Q.    Making that assumption, would you
24 have reason to believe that this request was
25 from Harry Harman to Bernard Madoff?

Page 246

1          A.    Well, it's to me at Madoff, yeah.
2          Q.    Right. And assuming that this
3 letter was actually from Harry Harman, you would
4 have relied on this letter, correct?
5          A.    Yes.
6          Q.    To change his account from a
7 reinvest to a send account, right?
8          A.    Yes.
9          Q.    Because Harry Harman wasn't
10 involved in the fraud at Madoff, correct?
11         MS. BROWN: Objection.
12         A.    Not that I know of.
13         Q.    Right, because he was just a
14 customer, correct?
15         A.    Yes.
16         Q.    Let's move to another exhibit,
17 Trustee Exhibit 31. Let's look at the page with
18 Bates number ending in 3566. Do you recognize
19 this letter?
20         A.    Yes.
21         Q.    And when you received this letter,
22 you received it from a customer, correct?
23         MS. BROWN: Objection.
24         A.    Yes.
25         Q.    And you had the customer's

**BENDISH REPORTING**
**877.404.2193**

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

Page 247

1  instructions, wouldn't you?
2      A.   Yes.
3      Q.    And you would make sure that this
4  letter was placed in the customer's file,
5  correct?
6      A.   Yes.
7      Q.    Because Mr. Madoff requested that
8  letters from customers be placed in their file,
9  correct?
10         MS. BROWN:  Objection.
11     A.   Yes.
12     Q.    Did you ever find mistakes on
13 customer documents?
14         MS. BROWN:  Objection.
15     A.   I'm sure there's been a mistake
16 along the way.  I don't -- I can't think of one
17 in particular right now.
18     Q.    So you don't really have a specific
19 example of recognizing a mistake on a customer
20 document.
21         MS. BROWN:  Objection.
22     A.   No.  No.  The only thing -- the
23 initial would mean that you made the change in
24 the book.
25     Q.    We don't have to focus on this

Page 248

1  exhibit now.  I'm just speaking generally.  Did
2  a customer ever call you to tell you that there
3  was a mistake on a customer's statement, or on
4  any document really?
5          MS. BROWN:  Objection.
6      A.   I just can't recall anything in
7  particular.
8      Q.    Did you ever think at any time that
9  Bernard Madoff might be doing something illegal?
10     A.   Sometimes, but I never said
11 anything to him.
12     Q.    Well, what did you think that he
13 might be doing that was illegal?
14     A.   No, I didn't think it was illegal.
15 It just seemed odd, that's all.  Just like maybe
16 a profit he wanted bigger or something.  I
17 didn't really understand how it could be done.
18 But if he said to do it, I did it.  I didn't
19 question him on it.  He wasn't the kind of
20 person you could question about.
21     Q.    Right.  So if he were to have a
22 policy that everything had to be in writing,
23 then the people who worked for him would follow
24 that policy?
25     A.   Yes.

Page 249

1      Q.    Looking back at it now, I mean, is
2  there anything specific that would sort of tip
3  you off most about the fact that he was a
4  criminal?
5      A.   I never thought of him as a
6  criminal until this happened.  But I did have
7  questions on certain things that he asked me to
8  do.
9      Q.    So what would you do when you had a
10 question if you weren't sure something was --
11     A.   I did what he said.  I never
12 thought he was involved like he was.  I mean,
13 not at all.  It never, never crossed my mind
14 that he would have been doing something wrong.
15 He was just in business for so long, an
16 outstanding person, well respected.  I just
17 never expected it, so.
18     Q.    Let's look at another exhibit.
19 Let's look at Exhibit 36.  Now, let's turn to
20 the page with Bates number ending in 8419, which
21 I think is the page that you're on.
22     A.   Yes.
23     Q.    Do you have any recollection of
24 seeing this document in 1986?
25     A.   This particular one?

Page 250

1      Q.    Yes.
2      A.   No, I don't know.  I don't know.
3  We saw these every day.  I don't know whose I
4  saw.
5      Q.    Can you or can you not recall
6  seeing this document in 1986?
7      A.   No.
8      Q.    You can't recall?
9      A.   I don't recall.
10     Q.    You don't recall.  Are you familiar
11 with this name, Aaron Blecker?
12     A.   Yes.
13     Q.    Because he was a customer of Madoff
14 Securities?
15     A.   Yes.
16     Q.    And do you recall ever sending him
17 a profit withdrawal check?
18         MS. BROWN:  Objection.
19     A.   I don't -- no.  I don't remember a
20 particular check, no.  I just would assume that
21 because it was a send account.
22     Q.    Do you recognize this writing where
23 there's an S?
24     A.   I don't know whose initials they
25 are.  I know these initials, all of these, but

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 251

1  that I don't know.
2      Q.   So you don't know who put this S
3  here on Aaron Blecker's --
4      A.   No.
5      Q.   On this statement opening Aaron
6  Blecker's account.
7      A.   No.
8          MS. BROWN:  Objection.  The
9  document is a name/address file maintenance
10 form, not a statement.
11     Q.   It's correct that on this
12 name/address file maintenance form, you don't
13 know -- on this name/address file maintenance
14 form for Aaron Blecker, you don't know who put
15 this S?
16     A.   No, I don't.
17     Q.   You don't know if it was put by
18 Mr. Madoff?
19         MS. BROWN:  Objection.  She said
20 she doesn't know.
21     A.   No, I don't recognize the initial
22 either.
23     Q.   So you have no idea who put that S?
24     A.   No.
25     Q.   A few other exhibits that we should

Page 252

1  look at.  36, 37, 38, 39 and 40.
2          This is 37.  I'm still looking for
3  36.
4      A.   I have 36 here.
5      Q.   Very good.  36, 37, 38, 39, 40.
6          Let's turn to Exhibit 37.  You had
7  testified earlier that Pep Boys was one of the
8  stocks used in the convertible arbitrage
9  strategy.
10     A.   Uh-huh.  Yes.
11     Q.   But you have no personal knowledge
12 of that, do you?
13         MS. BROWN:  Objection.
14     A.   No.  I saw -- no.
15     Q.   It's just what you assumed,
16 correct?
17     A.   Yes.
18     Q.   Because you thought that
19 Mr. Madoff's operation was legitimate, correct?
20         MS. BROWN:  Objection.
21     A.   Yes.
22     Q.   But at this point, isn't it true
23 that the only documents that are reliable are
24 the ones that were sent from customers?
25         MS. BROWN:  Objection.

Page 253

1      A.   I don't know.  It seems that way
2  now.  I don't know.  I don't know when it
3  started.  I have no idea.
4      Q.   You would agree that the customer
5  letters that we've seen --
6      A.   Are legitimate.
7      Q.   -- are legitimate.
8      A.   Yes.
9      Q.   And they were signed by people who
10 were not engaged in fraud.
11         MS. BROWN:  Objection.
12     A.   As far as I know.
13     Q.   As far as you know.  And these
14 documents that were created by Madoff Securities
15 were all created by an entity that turned out to
16 be engaged in fraud.
17     A.   Yes.
18     Q.   So at this point, isn't it true
19 that the only reliable documents are the
20 customers -- are the letters from customers?
21         MS. BROWN:  Objection.
22     A.   It seems like that, but I don't
23 know when this started, so I'm not sure -- I'm
24 not sure if these were real or not real.
25     Q.   Do you have any way of knowing

Page 254

1  which documents were real and which were not
2  real?
3          MS. BROWN:  Objection.
4      A.   No.
5      Q.   For the record --
6      A.   No.
7      Q.   All right, let's look at another
8  set of exhibits, 22, 48 and 26.  I'm putting
9  before you the BLMIS account statement for Joel
10 Blum, CAB Trust account dated July 31st, 1991.
11 And this is Trustee Exhibit 48.
12         Do you recall seeing this document
13 during your May 19th deposition?
14     A.   I may have.  I don't know.  I don't
15 know if that was his or not.
16     Q.   Do you recall seeing a -- strike
17 that.
18         Do you recall seeing any documents
19 relating to the CAB Trust for Joel A. Blum?
20         MS. BROWN:  Objection.
21     A.   I don't know if I did or not.  It's
22 not one that I -- I can't remember the name that
23 was on it, no.
24     Q.   All right, well, I'm trying to
25 refresh your recollection.  Let's look at

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                           Sala 6/13/2016

CONFIDENTIAL

Page 255

1   Exhibit 22.  Let's look at the page ending 1655.
2   This is a handwritten page that was presented to
3   you during your May 19th deposition as an
4   excerpt from a check-out book.  Ending in 16 --
5       A.   55?
6       Q.   Yes.  Do you recall seeing this
7   document during your May 19th deposition?
8       A.   I just don't know if it's the same
9   one.  I really -- I'm not sure.  It might have
10  been -- I remember an Aaron Blecker.  I don't
11  know.
12      Q.   All right, let's go off the record.
13  Let's take a short break.
14           THE VIDEOGRAPHER:  The time is
15  12:23 p.m.  Off the record.
16           (Recess taken.)
17           THE VIDEOGRAPHER:  The time is
18  12:29 p.m.  This begins DVD number 3.  Back on
19  the record.
20  BY MR. DEXTER:
21      Q.   Let's turn back to Exhibit 48.
22  What does this look like to you, Ms. Sala?
23      A.   A statement.
24      Q.   A statement of who?
25      A.   CAB Trust.

Page 256

1       Q.   And what's the date on it?
2       A.   July 31st, 1991.
3       Q.   And what does this debit in the
4   amount of $355.59 in the middle of the page look
5   to you?
6       A.   It looks like a profit withdrawal,
7   PW, on July 22nd for -- a check for Liberty
8   National.
9       Q.   And what's your basis for stating
10  that?
11      A.   Well, the symbol PW meant profit
12  withdrawal.  They took all the profits.
13      Q.   Okay, let's turn back to Exhibit
14  22, and let's turn to the page with Bates number
15  ending 1655.  And if you look about 10 to 15
16  lines down from the top, you'll see with the
17  column marked PW, you'll see an entry for the
18  amount of $355.59.  Do you see that, Ms. Sala?
19      A.   Yes.
20      Q.   Do you recall testifying during
21  your May 19th deposition that this reflects the
22  same payment to the CAB Trust as indicated on
23  the statement that was Exhibit 48?
24      A.   Yes.
25      Q.   You do recall --

Page 257

1       A.   Yes.
2       Q.   -- testifying to that now?
3            Now, BLMIS didn't make payments to
4   customers unless they were requested in writing,
5   correct?
6            MS. BROWN:  Objection.  That's not
7   her testimony.
8       A.   If it was a capital withdrawal they
9   would request it.  See, the profit --
10      Q.   That's okay.  Let's turn to Exhibit
11  46, the page ending in 358.  Have you seen this
12  letter before, Ms. Sala?
13           MR. DEXTER:  For the record, this
14  is a letter related to the CAB Trust account
15  dated April 18th, 1996.
16      Q.   Have you seen this?
17      A.   I believe I did because my initials
18  are on it.
19      Q.   But you don't remember seeing it in
20  1996, do you?
21      A.   I can't -- I don't remember that,
22  no.
23      Q.   When do you first remember seeing
24  this letter?
25      A.   Just now.  I can't remember things

Page 258

1   that I saw 20 years ago.
2       Q.   And this letter -- have you read
3   this letter?
4       A.   Mm-hmm.
5       Q.   This letter doesn't request the
6   payment of $355.59 that was made five years
7   earlier, does it?
8       A.   Right.
9       Q.   And the letter doesn't refer to an
10  earlier request for that payment, does it?
11      A.   No.
12      Q.   And this letter doesn't show a
13  standing request for profits to be distributed
14  from the CAB Trust account.
15      A.   No.
16      Q.   And it doesn't indicate that
17  there's a standing request for profits to be
18  distributed from the CAB Trust account as of
19  July 1991, does it?
20      A.   No.
21           MS. BROWN:  The letter is dated
22  April 1996.
23           MR. DEXTER:  Exactly.
24      Q.   In fact, the letter doesn't show
25  that a standing request for profits to be

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 259

1  distributed from the CAB Trust account was ever
2  made, does it?
3      A.    No.
4      Q.    And other than the documents you've
5  seen in connection with your deposition, you
6  don't recall seeing anything else about the July
7  1991 payment in the amount of $355.59, do you?
8      MS. BROWN:  Objection.
9      A.    No.
10     Q.    So you're not aware of any written
11 request for the July 1991 payment, are you?
12     MS. BROWN:  Objection.
13     A.    No.  Well, he's asking to close the
14 account.
15     Q.    I'm not focussing on this exhibit
16 right now.
17     A.    Oh, okay.
18     Q.    On the $355.59 recorded profit
19 withdrawal payment, you're not aware of any
20 written requests for that payment, correct?
21     A.    No.
22     Q.    No, you're not aware of any written
23 requests for that payment.
24     A.    No.
25     Q.    And Joel Blum never contacted you

Page 260

1  to request the July 22nd, 1991 payment, did he?
2      A.    I don't remember.
3      Q.    So you never -- so you don't recall
4  Joel Blum contacting you to request the
5  July 22nd, 1991 payment, do you?
6      MS. BROWN:  Objection.
7      A.    No.
8      Q.    And he didn't contact you before
9  July 22nd, 1991 to request automatic
10 distribution of all profits from the CAB
11 account, did he?
12     MS. BROWN:  Objection.
13     A.    No.
14     Q.    And in fact, you never spoke
15 directly with Joel Blum, did you?
16     A.    Oh, I might have.  Probably did.
17     Q.    But you don't remember if you
18 ever --
19     A.    No.
20     Q.    -- spoke directly with Joel Blum.
21     A.    No.
22     Q.    And you never in fact spoke
23 directly with any BLMIS customers about payments
24 out of their accounts, did you?
25     MS. BROWN:  Objection.

Page 261

1      A.    Yes.
2      Q.    You did?
3      A.    Mm-hmm.
4      Q.    But you never confirmed with any
5  BLMIS customer that they had received a
6  purported profit withdrawal check.
7      A.    No.
8      Q.    So you have no idea whether Joel
9  Blum requested the July 22nd, 1991 payment, do
10 you?
11     MS. BROWN:  Objection.
12     A.    No.
13     Q.    Now, you didn't prepare -- assuming
14 that there was a check in the amount of $355.59
15 sent out on or around July 22nd, 1991, you
16 didn't prepare that check, did you?
17     A.    No.
18     Q.    And you don't recall ever seeing
19 that check yourself, do you?
20     A.    No.
21     Q.    And it wasn't part of your job to
22 send out checks, was it?
23     A.    Not in the end.
24     Q.    What do you mean "not in the end"?
25     A.    I used to do it when I first worked

Page 262

1  there.  When we used to hand-write checks.
2      Q.    What years?
3      A.    '83, '84.
4      Q.    Did you ever hand-write a profit
5  withdrawal check in 1983 or '84?
6      A.    Yes.
7      Q.    And did you ever mail any of those
8  profit withdrawal checks?
9      A.    Yes.
10     Q.    You personally mailed those profit
11 withdrawal checks?
12     A.    Probably.
13     Q.    But you don't know.
14     A.    I don't know for sure.
15     Q.    You really don't know.
16     A.    No.
17     Q.    After 1984 it wasn't part of your
18 job to write checks, correct?
19     A.    No, I only did that for a short
20 time.
21     Q.    So after 1994 you don't know
22 whether -- strike that.  Not only was it not
23 part of your job to write checks, but it also
24 wasn't part of your job post 1984 to send
25 checks.

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                    Sala 6/13/2016

**CONFIDENTIAL**

Page 263

1      MS. BROWN:  Objection.
2      A.    Sometimes we did send checks.  When
3  they're backed up in mailing, we did it.  We'd
4  help them with it.  That goes for statements or
5  anything.  If someone might have needed help in
6  another department, we helped them.
7      Q.    But of course you don't know if any
8  check -- if this check was sent out on July
9  22nd, 1991.
10     A.    No.
11     Q.    And it wasn't part of your job to
12 reconcile the BLMIS checkbook, right?
13     A.    In the early '80s, but not when I
14 left, no.
15     Q.    It was not part of your job to
16 reconcile the BLMIS checkbook in 1991, was it?
17     A.    No.
18     MR. DEXTER:  We can go off the
19 record.
20     THE VIDEOGRAPHER:  The time is
21 12:41 p.m.  Off the record.
22     (Recess taken.)
23     THE VIDEOGRAPHER:  The time is
24 12:49 p.m.  Back on the record.
25 BY MR. DEXTER:

Page 264

1      Q.    Circling back to something we
2  touched on a little bit earlier, you indicated
3  that a ledger -- the handwritten ledger that we
4  were discussing was kept in Jodi Crupi's office,
5  correct?
6      A.    No.  That was the spiral check-out
7  book.
8      Q.    The spiral check-out book was
9  kept --
10     A.    Was in Jodi's, yeah.
11     Q.    And you wrote down in that spiral
12 check-out book the checks that should be written
13 out to customers for their profit withdrawals,
14 correct?
15     A.    And capital withdrawals, yes.
16     Q.    And you don't know what Jodi did
17 with that spiral check-out book after you would
18 write in it and it would be placed in her
19 office, correct?
20     MS. BROWN:  Objection.
21     A.    It went into the computer room.
22     Q.    The book went into the computer
23 room?
24     A.    Yes.
25     Q.    Was it in Jodi's office or was the

Page 265

1  book in the computer room?
2      A.    It was always in Jodi's room.  I
3  don't know, I don't know.  What I remembered was
4  that it went into the computer room to be
5  punched in.
6      Q.    How could it be kept both in Jodi's
7  office --
8      A.    It wasn't kept in the computer
9  room.  It was kept in Jodi's office.  But when
10 the checks had to be punched, it went into the
11 computer room to be punched.  Maybe I'm wrong.
12 Maybe they didn't go in there.  I don't know who
13 would have punched them.
14     Q.    So you don't know what happened to
15 the book after you would write in it.
16     A.    No.  It was in Jodi's office.
17     Q.    And you wouldn't know if some of
18 the entries in that ledger were altered after
19 you had written in them --
20     MS. BROWN:  Objection.
21     Q.    -- would you?
22     A.    You mean in the spiral check-out
23 book?
24     Q.    Yes.
25     A.    No.  No, I wouldn't know that.

Page 266

1      Q.    Let's just shift gears a little
2  bit.  Are you aware that Annette Bongiorno was
3  found to have a Madoff account in the amount of
4  approximately $50 million at the time the fraud
5  was uncovered?
6      MS. BROWN:  Objection.
7      A.    I didn't know that, no.
8      Q.    You testified earlier that you
9  weren't aware that Annette Bongiorno regularly
10 backdated customer statements.
11     A.    No --
12     MS. BROWN:  Objection.
13     Q.    You weren't aware?
14     A.    No, I wasn't aware of that.
15     Q.    But you had testified that certain
16 things Mr. Madoff said to you, looking back at
17 it now, suggests to you that maybe there was
18 back-dating occurring at Madoff --
19     MS. BROWN:  Objection.
20     A.    No.  Not backdating.  Other
21 things -- you know, other things that when I
22 look back it would -- not back-dating.
23     Q.    Well, what other things looked
24 suspicious to you?
25     A.    Profits.  Profits.

**BENDISH REPORTING**
**877.404.2193**

SIPC v BLMIS                                              Sala 6/13/2016

CONFIDENTIAL

---

Page 267

1    Q.    The profits looked suspicious to
2  you?
3    A.    Some of them.
4    Q.    And did some of the profit
5  withdrawal checks that were sent to customers
6  look suspicious to you?
7    A.    No. No.
8    Q.    But how could it be that the
9  profits were suspicious but certain -- profit
10 withdrawal checks weren't?
11   A.    No, it's if -- that's not what I
12 meant. I meant, like, if a customer didn't
13 make -- wasn't making what he was expected or
14 promised or whatever, we would change that.
15 Bernie would ask me to change that.
16   Q.    So in other words, the profits on
17 an account could be changed?
18   A.    If he told me to do that, yes.
19   Q.    So a lot of the transactions and a
20 lot of the records indicating purported
21 transactions were just made up?
22      MS. BROWN: Objection.
23   A.    Well, looking back, something might
24 have been wrong but just if I wasn't -- if I
25 wasn't making enough money --

---

Page 268

1    Q.    Well, can you answer that yes or
2  no?
3      MR. DEXTER: Can you repeat my
4  question, please.
5      (The pending question was read.)
6    A.    No.
7    Q.    No, the records and transactions of
8  Madoff Investments were not made up?
9    A.    At the time I didn't think so.
10   Q.    No, I'm not asking you what you
11 thought at the time. I'm asking you now.
12      MS. BROWN: Objection. What's the
13 question?
14   Q.    The question now is, isn't it true
15 that a lot of the records indicating purported
16 transactions at Madoff Securities were
17 completely false?
18      MS. BROWN: Objection.
19   A.    No. No.
20   Q.    It's not true that records of
21 transactions at Madoff Securities were not
22 false?
23      MS. BROWN: Objection.
24   A.    When I worked there --
25   Q.    I understand --

---

Page 269

1    A.    After.
2    Q.    I understand you didn't think so at
3  the time. But I'm saying looking back now with
4  the benefit of hindsight, isn't it true that a
5  lot of the records evidencing purported
6  transactions at Madoff Investments were false?
7      MS. BROWN: Objection.
8    A.    Yes. Yes.
9    Q.    Yes. So if a lot of the records
10 evidencing those transactions were false, then
11 why wouldn't records evidencing profit
12 withdrawal transactions be false?
13      MS. BROWN: Objection.
14   A.    Because that's what the customer
15 requested. If they wanted to take a profit. Do
16 you mean the profit itself? The profit itself
17 wasn't real?
18   Q.    Going back -- you said that the
19 profit withdrawals -- those are what the
20 customers requested.
21   A.    Yes.
22   Q.    Do you know a single instance where
23 a customer received a profit withdrawal check
24 without requesting it?
25

---

Page 270

1      MS. BROWN: Objection.
2    A.    No.
3    Q.    All right, I don't have anything
4  further.
5      MS. BROWN: I need to switch seats,
6  so let's take a short break. Let's go off the
7  record.
8      THE VIDEOGRAPHER: The time is
9  12:58 p.m. Off the record.
10      (Recess taken.)
11      THE VIDEOGRAPHER: The time is 1:07
12 p.m. Back on the record.
13 EXAMINATION CONTINUED
14 BY MS. BROWN:
15   Q.    Ms. Sala, I just have a few
16 follow-up questions for you.
17   A.    Okay.
18   Q.    Ms. Sala, since December 2008, have
19 you become aware that BLMIS was operating a
20 Ponzi scheme?
21   A.    Yes.
22   Q.    During the time that you were
23 employed at Madoff, did customers deposit money
24 with Madoff?
25   A.    Yes.

---

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                          Sala 6/13/2016

CONFIDENTIAL

Page 271

1     Q.    During the time that you were
2  employed at Madoff, did customers withdraw money
3  from Madoff?
4     A.    Yes.
5     Q.    Were those transactions reflected
6  on customer statements?
7     A.    Yes.
8     Q.    You testified earlier that you
9  didn't call to confirm that profit withdrawal
10 checks were received by customers, correct?
11    A.    Yes.
12    Q.    Did anyone at BLMIS call to confirm
13 whether profit withdrawal checks were received
14 by the customers?
15    A.    No.
16    Q.    Would a customer call BLMIS if they
17 did not receive a check?
18    A.    Yes.
19    Q.    Did that happen while you were
20 employed there?
21    A.    Yes.
22    Q.    To your knowledge, did other BLMIS
23 employees receive similar phone calls from
24 customers when they did not receive checks?
25    A.    I imagine so.  I don't know.

Page 272

1     Q.    But you personally did receive
2  phone calls from customers when they did not
3  receive checks.
4     A.    Yes.
5     Q.    And what would you do when you
6  received that phone call?
7     A.    See if the checks went out.
8     Q.    And who would you check with?
9     A.    The -- well, in their ledger it
10 would show.  And the check-out, the spiral
11 check-out book.
12    Q.    Thank you.
13          I'd like to turn to Trustee Exhibit
14 46.  If you could turn to the page ending in
15 356, which is the second page of that document.
16 Ms. Sala, you testified that you're familiar
17 with this type of form, correct?
18    A.    Yes.
19    Q.    And this was a form used by BLMIS
20 employees?
21    A.    Yes.
22    Q.    And was this form filled out by
23 BLMIS employees?
24    A.    Yes.
25    Q.    Does this form reflect the

Page 273

1  customer's account number?
2     A.    Yes.
3     Q.    And does this form reflect the
4  customer's name?
5     A.    Yes.
6     Q.    Does this form reflect the
7  customer's address?
8     A.    Yes.
9     Q.    Does this form reflect the
10 customer's Social Security number?
11    A.    Yes.
12    Q.    When you worked at BLMIS, did you
13 fill out this form for any customer accounts?
14    A.    I must have.  I imagine I have.
15    Q.    And when you worked at BLMIS, did
16 you complete this form accurately?
17    A.    Yes.
18    Q.    Was this form filled out as part of
19 your duties at BLMIS?
20    A.    If I was opening the account, yes.
21    Q.    So if you were opening the account,
22 you would fill out the name and address file
23 maintenance form that's reflected in the page
24 ending 356?
25    A.    Yes.

Page 274

1     Q.    Ms. Sala, looking at Exhibit 46
2  which you have before you, can you tell me
3  whether or not this account is a send or a
4  reinvest account?
5     A.    A send.
6     Q.    And how can you tell that?
7     A.    The S.
8          MS. BROWN:  Let the record reflect
9  that the witness is pointing to the page ending
10 in 356.
11    Q.    And if an account is marked as an S
12 account, does the customer need to provide a
13 written request to receive its profits related
14 to that account?
15    A.    No.
16    Q.    And when each deal ends, would they
17 need to send a letter in at the end of each deal
18 to request the profits related to that deal?
19    A.    No.
20    Q.    Would their profits be sent to them
21 automatically?
22    A.    Yes.
23    Q.    And without any written request
24 relating to the profit withdrawal transaction?
25    A.    Yes.

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 275

1    Q.    If we could turn to Trustee Exhibit
2    22, if we could look at the page ending in 1655.
3    Ms. Sala, what is contained on this page?
4    A.    The profit withdrawals for Liberty
5    National Bank Corp.
6    Q.    And are there a number of customers
7    that are listed on this page?
8    A.    Yes.
9    Q.    Do you see the transaction about
10   halfway down the page for CAB First?
11   A.    Yes.
12   Q.    What is the amount of that
13   transaction?
14   A.    $355.59.
15   Q.    This account was marked as a send
16   account.
17   A.    Yes.
18   Q.    Would you -- would this customer
19   have had to make a written request to BLMIS in
20   order to receive the check of $355.59?
21   A.    No.
22   Q.    You testified before that when
23   customers wanted to make a change to the send or
24   reinvest status of their account, that that had
25   to be in writing, correct?

Page 276

1    A.    Yes.
2    Q.    Can you tell me what the
3    requirements were when an account was set up?
4    A.    They had to let us know if they
5    wanted the profits or if they were going to roll
6    the money over.
7    Q.    How could they let you know?
8    A.    Well, whoever was opening the
9    account, either through Bernie or Annette or a
10   letter.
11   Q.    When the account was being opened,
12   was the customer required to write a letter to
13   BLMIS to indicate whether it wanted a send or
14   reinvest? Only when the account was being
15   opened.
16   A.    No, they could just tell us. As
17   long as we knew at that time. Anything after
18   that, they had to request it by mail.
19   Q.    I'm going to show you what's been
20   marked as Trustee Exhibit 36. Ms. Sala, are you
21   familiar with that document?
22   A.    Mm-hmm, yes.
23   Q.    Yes? Turning to the page ending in
24   419, can you tell me whether this account is a
25   send or reinvest account?

Page 277

1    A.    Send.
2    Q.    And did this account have any
3    changes to the send or reinvest status according
4    to the name and address file maintenance page?
5    A.    No, doesn't look like it did.
6    Q.    Can you tell me whether you believe
7    this account was set up as a send account?
8    A.    I think it was.
9    Q.    And why do you think that?
10   A.    Because there would have been Rs
11   and Ss down here, and there's only the one.
12   Q.    And if it was set up as a send
13   account, would the customer have needed to write
14   letter requests to Madoff in order to receive
15   its profits relating to the profit withdrawal
16   strategy?
17   A.    No.
18   Q.    You can put those documents away.
19        Ms. Sala, you testified that you
20   had some suspicions or concerns regarding
21   Madoff, and you referred to profits. I just
22   want to clarify something. You were not
23   suspicious of profit withdrawal transactions,
24   were you?
25   A.    No.

Page 278

1    Q.    And you weren't suspicious of the
2    profit withdrawal transactions that we've been
3    discussing in these two depositions, were you?
4    A.    No.
5    Q.    When you were referring to your
6    suspicions that you had, did they have anything
7    to do with the rates of returns that BLMIS
8    customers were able to obtain?
9    A.    Yes.
10   Q.    What do you understand rates of
11   return to mean?
12   A.    What they were expecting to get.
13   Q.    And was that on an annual basis?
14   A.    Yes.
15   Q.    And so when you testified earlier
16   that you had concerns, could you describe for me
17   what those concerns were?
18   A.    Well, if a customer thought he
19   wasn't -- that he didn't make enough money that
20   year, that he was promised more or whatever, he
21   was expecting more money, and Bernie would tell
22   me to do an extra trade for him or something. I
23   didn't know how that could be.
24   Q.    But those concerns didn't relate to
25   the profit withdrawal transactions that we've

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

Page 279

1  been discussing here today.
2      A.   No.
3      Q.   I have no further questions.
4          THE VIDEOGRAPHER:  The time is 1:16
5  p.m.  Off the record.
6          (Discussion off the record.)
7          THE VIDEOGRAPHER:  The time is 1:30
8  p.m.  Back on the record.
9  EXAMINATION CONTINUED
10 BY MR. DEXTER:
11     Q.   Ms. Sala, could you turn to Exhibit
12 36, please, and look at the page ending Bates
13 number 8419.
14     A.   Yes.
15     Q.   Are you there?
16     A.   Yes.
17     Q.   We discussed this a little bit
18 earlier, but that S with the checkmark next to
19 it, what does that indicate?
20     A.   It's a send account.
21     Q.   But you don't know who wrote that
22 S?
23     A.   No, I don't recognize those
24 initials.
25     Q.   So do you have any idea how this

Page 280

1  would become a send account in the first place?
2      A.   Aaron Blecker would have had to
3  have requested that when he opened the account.
4      Q.   But you don't recognize that to be
5  his handwriting?
6      A.   No.
7      Q.   And it's probable that a customer
8  like Aaron Blecker never would have written on
9  an internal document like this, right?
10     A.   No, he wouldn't.
11     Q.   So how would Aaron Blecker have
12 made that request for this to be a send account?
13     A.   Whoever spoke to him to open the
14 account would have asked him that.  They would
15 have said do you want to receive your profits or
16 do you want to reinvest it.
17     Q.   But do you know who spoke with him
18 to open the account?
19     A.   No, I don't know.
20     Q.   Do you know who typically would
21 speak with new customers to open an account?
22     A.   Mostly Annette.
23     Q.   Was there a firmwide policy for
24 establishing whether an account would be a send
25 account or a reinvest account?

Page 281

1          MS. BROWN:  Objection.
2      Q.   That you know of?
3      A.   What was the question?
4          MR. DEXTER:  Can you read that
5  back, please.
6          (The pending question was read.)
7      A.   No.
8      Q.   There wasn't a firmwide policy, or
9  you don't know --
10     A.   No, there wasn't.
11     Q.   There wasn't a policy?
12     A.   There was not.
13     Q.   So in other words, you have no idea
14 really how this was established as a purported
15 send account.
16         MS. BROWN:  Objection.
17     A.   Well, I know if I was opening an
18 account, I would ask them do you want to roll
19 over your profits or do you want to take your
20 profits.
21     Q.   And then after you receive a
22 response, what would you do?
23     A.   I'd put an S or an R on there.
24     Q.   So you would open up sheets like
25 this.

Page 282

1      A.   Mm-hmm.
2      Q.   But you never opened up one for
3  Mr. Blecker.
4      A.   No, I don't think so.
5      Q.   And you never opened up one for the
6  CAB Trust.
7      A.   No, that wasn't my writing.
8      Q.   So just for the record, your
9  position today is that to establish an account
10 as a send account, the customer would not need
11 to make that request in writing.
12     A.   No.  No.
13     Q.   And that could be done in a
14 conversation with a Madoff employee.
15     A.   Yes.  As long as he was opening an
16 account at that time, that's when it's done.
17 But if he was going to change it or they didn't
18 get the answer, then he had to do it in writing.
19     Q.   But you don't know of -- strike
20 that.  When a customer would create an account,
21 do they have to fill out a form?
22     A.   I believe they did.  I can't
23 remember now.  It was just so long ago, I can't
24 remember.  But I know that we would -- they
25 probably -- from what I recall, it was a letter.

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                                    Sala 6/13/2016

CONFIDENTIAL

29 (Pages 283 to 286)

Page 283

1  Either Bernie told me to open the account or
2  Annette told me to open the account, or a letter
3  came and then I would get it approved from them
4  to see if I could open the account, and then
5  open it.  And usually in that letter it said
6  what they wanted to do with the profits.  And if
7  they didn't, I had to find out what they wanted.
8      Q.    So in the letter where an account
9  was opened, ordinarily it would state whether
10 the customer wanted to receive the profits or
11 reinvest the profits, correct?
12     A.    Yes.
13     Q.    And you would keep those records --
14 those records in the customer's file.
15     A.    Yes.
16     Q.    And here, with respect to Exhibit
17 36, Mr. Blecker's account, there is no such
18 letter -- you're not aware of any such letter?
19     A.    No.
20     Q.    And you're not aware of how this
21 became an S, a send account.
22     A.    No.
23     Q.    All right, nothing further, thank
24 you.
25           THE VIDEOGRAPHER:  The time is 1:36

Page 284

1  p.m.  Off the record.
2           (TIME NOTED:   1:36 p.m.)
3
4      JOANN SALA
5
6  Subscribed and sworn to before me
7  this        day of        , 2016.
8
9  _____
10 Notary Public
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 285

1  WITNESS: _____
2  DATE(S): _____
3  CASE: _____
   I wish to make the following changes, for the
   following reasons:
4  PAGE LINE _____
5  _____ _____ CHANGE FROM:_____
   _____ _____ CHANGE TO:_____
6
7  REASON:_____
   _____ _____ CHANGE FROM:_____
8  _____ _____ CHANGE TO:_____
9  REASON:_____
   _____ _____ CHANGE FROM:_____
10 _____ _____ CHANGE TO:_____
11 REASON:_____
   _____ _____ CHANGE FROM:_____
12 _____ _____ CHANGE TO:_____
13 REASON:_____
   _____ _____ CHANGE FROM:_____
14 _____ _____ CHANGE TO:_____
15 REASON:_____
   _____ _____ CHANGE FROM:_____
16 _____ _____ CHANGE TO:_____
17 REASON:_____
   _____ _____ CHANGE FROM:_____
18 _____ _____ CHANGE TO:_____
19 REASON:_____
   _____ _____ CHANGE FROM:_____
20 _____ _____ CHANGE TO:_____
21 REASON:_____
   _____ _____ CHANGE FROM:_____
22 _____ _____ CHANGE TO:_____
23 Subscribed and sworn to before me this _____ day
24 of _____, 2016.
25 _____

Page 286

1           C E R T I F I C A T E
2
3  STATE OF NEW YORK  )
4                     : SS.
5  COUNTY OF NEW YORK )
6
7      I, SUZANNE PASTOR, a Shorthand
8  Reporter and Notary Public within and for the
9  State of New York, do hereby certify:
10     That the witness whose deposition is
11 hereinbefore set forth, was duly sworn by me and
12 that such deposition is a true record of the
13 testimony given by the witness.
14     I further certify that I am not
15 related to any of the parties to this action by
16 blood or marriage, and that I am in no way
17 interested in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto
19 set my hand this_____, 2016.
20
21 _____
22      SUZANNE PASTOR
23
24
25

SIPC v BLMIS                                           Sala 6/13/2016

CONFIDENTIAL

**A**

**a.m**
174:12 177:4 227:1,4
228:8,11 229:25
230:4 236:15,18
**Aaron**
250:11 251:3,5,14
255:10 280:2,8,11
**able**
278:8
**accepted**
230:13
**accompany**
176:18
**account**
180:8 185:17 186:9
188:12,16 190:9
197:25 198:11,12
207:3 209:3 212:22
212:23 213:4,14
214:18 215:6,8,10,16
215:18 216:1,5,8
217:11 218:7,24
219:3,5,11 221:16
223:22,23,25 224:1,1
224:6,25 225:11
226:7,9 230:8,10,23
230:25 231:7,11
232:7,9 234:5,11
235:15,16,24,24
236:3,6,8 237:1,2,15
243:18 245:14,15
246:6,7 250:21 251:6
254:9,10 257:14
258:14,18 259:1,14
260:11 266:3 267:17
273:1,20,21 274:3,4
274:11,12,14 275:15
275:16,24 276:3,9,11
276:14,24,25 277:2,7
277:7,13 279:20
280:1,3,12,14,18,21
280:24,25,25 281:15

**accounts**
186:3 219:6 224:5,11
224:12,13 228:2,6,24
228:25 229:7,22
230:13 231:10 233:9
233:18,21 234:6,7,9
237:14 242:5 244:23
260:24 273:13
**accurate**
243:23 244:8,8,12,15
**accurately**
273:16
**action**
286:15
**actual**
191:8
**address**
184:18 197:24 215:8
221:20 223:1 273:7
273:22 277:4
**addressed**
216:17,18
**Adv**
174:4
**adversary**
177:12
**affirmatively**
231:24
**against-**
174:5
**ago**
201:2 258:1 282:23
**agree**
233:15 253:4
**ahead**
213:19
**allocated**
233:9,22
**allowed**
229:17

**Alpern**
240:4,7,20,21 241:1,1
241:5,7
**altered**
265:18
**AMF**
176:12 212:5,6,8
214:25 215:13
**amount**
180:8 181:8 185:18
186:10 190:8 192:11
198:15 203:17 204:21
204:22 206:9,23
210:1,6,21 211:5
220:17 222:6,12
225:10 240:3 256:4
256:18 259:7 261:14
266:3 275:12
**Amy**
175:8 177:19
**Annette**
182:7,12,12 214:3,7
232:19 233:17,24
239:8 243:5,12 266:2
266:9 276:9 280:22
283:2
**annual**
278:13
**answer**
227:16,20,21,22 268:1
282:18
**answers**
181:12
**anybody**
181:1 192:21 193:11
**anymore**
233:3
**appear**
208:23 214:14 215:15
**appearing**
178:10
**appears**
214:13 220:24

**appreciate**
227:17
**approved**
283:3
**approximately**
177:4 266:4
**April**
185:14 257:15 258:22
**arbitrage**
200:18 219:5 223:13
223:18,22 224:1,4,9
226:16 234:9,12
245:11 252:8
**asked**
180:16 181:17 237:6
249:7 280:14
**asking**
259:13 268:10,11
**assist**
190:20 223:17,20
**assisted**
190:17
**associated**
218:25
**association**
177:6
**assume**
245:20 250:20
**assumed**
252:15
**assuming**
246:2 261:13
**assumption**
243:1 245:23
**attention**
194:8 216:20 221:14
**attorney**
234:21
**attorneys**
174:16 175:2,11
177:14 178:20
**automatic**
260:9

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

**automatically**
226:17 237:12,13,15
    274:21
**avanderwal@bakerl...**
175:8
**Avenue**
175:11
**aware**
196:15 243:5,11
    259:10,19,22 266:2,9
    266:13,14 270:19
    283:18,20

**B**

**back**
188:2 202:16 209:25
    210:9 214:23 215:1
    217:13 221:11 222:1
    227:4 228:11,12
    230:4,5,15,18 231:3,4
    232:8,11 236:18,19
    243:20 249:1 255:18
    255:21 256:13 263:24
    264:1 266:16,22
    267:23 269:3,19
    270:12 279:8 281:5
**back-dating**
266:18,22
**backdate**
243:7
**backdated**
243:13,18 266:10
**backdating**
266:20
**backed**
263:3
**backs**
242:4
**BAKER**
175:2
**balance**
228:23 229:6
**Bank**
275:5

**Bankruptcy**
174:1 177:11
**Barbato**
182:16
**based**
195:13 242:25
**basically**
226:12
**basis**
256:9 278:13
**Bates**
179:9 194:9 196:22
    198:7 202:11 211:25
    212:5,18 214:25
    215:12 218:16 219:18
    240:1 245:3 246:18
    249:20 256:14 279:12
**Bay**
174:17 177:8 178:2
**bearing**
179:9 196:22 212:5
    218:16 219:18
**becoming**
188:8
**began**
178:15
**beginning**
181:13
**beginnings**
227:4
**begins**
255:18
**behalf**
177:17,20,21
**believe**
186:18 191:3 193:15
    195:12 203:19 216:24
    245:24 257:17 277:6
    282:22
**Bendish**
177:6
**benefit**
269:4

**Bernard**
174:6,9 175:4 228:3
    245:25 248:9
**Bernie**
226:1 267:15 276:9
    278:21 283:1
**beyond**
178:22
**bigger**
248:16
**bit**
183:8 264:2 266:2
    279:17
**Blecker**
250:11 251:14 255:10
    280:2,8,11 282:3
**Blecker's**
251:3,6 283:17
**BLMIS**
175:3 177:10 193:23
    195:21,24 196:4,10
    196:16 199:13 219:7
    223:6,12,24 225:4
    254:9 257:3 260:23
    261:5 263:12,16
    270:19 271:12,16,22
    272:19,23 273:12,15
    273:19 275:19 276:13
    278:7
**BLMIS's**
199:23
**blood**
286:16
**Blum**
254:10,19 259:25
    260:4,15,20 261:9
**Bongiorno**
182:12 214:7 233:17
    239:8 243:6 266:2,9
**Bongiorno's**
243:12
**book**
180:4,5,13 181:3,4,6,7

181:15,22 182:3,6,20
182:22 183:2,17,23
186:17,25 187:7,16
187:20 191:1 192:7,8
192:18,19,21,22,24
192:25 193:1,2,4,8,9
193:13,18 194:25
195:2,24 196:9,13
217:5 239:12 247:24
255:4 264:7,8,12,17
264:22 265:1,15,23
272:11
**bottom**
198:6,16 208:15,25
    210:2 211:14 222:2
**Boys**
252:7
**break**
183:7 236:13 255:13
    270:6
**brother**
229:19
**brothers**
228:19 229:8 230:16
**Brown**
175:6 176:3,4 177:17
    177:17 178:7 179:7
    180:9 196:21 201:21
    203:1,11 211:24
    212:4 214:4 215:11
    219:17 226:23 234:24
    235:21 236:1,9 237:8
    237:24 238:13,21
    239:10 240:23 241:8
    241:21 243:3,9,15,24
    244:5,10 246:11,23
    247:10,14,21 248:5
    250:18 251:8,19
    252:13,20,25 253:11
    253:21 254:3,20
    257:6 258:21 259:8
    259:12 260:6,12,25
    261:11 263:1 264:20

SIPC v BLMIS                                          Sala 6/13/2016

CONFIDENTIAL

265:20 266:6,12,19
267:22 268:12,18,23
269:7,14 270:1,5,14
274:8 281:1,16
**business**
199:23 249:15
**buy**
204:6

**C**

**C**
175:1 286:1,1
**CAB**
254:10,19 255:25
256:22 257:14 258:14
258:18 259:1 260:10
275:10 282:6
**California**
221:10,18
**call**
225:5 248:2 271:9,12
271:16 272:6
**called**
241:1
**calls**
224:17,22 225:3
271:23 272:2
**capital**
180:7,15 189:8 190:8
225:1 235:9,22 237:9
238:15,17 257:8
264:15
**caption**
177:9
**Cardinal**
197:22 198:4 203:16
203:18 204:5,6,18
205:7,21 206:8
207:10,17,24 208:5
210:20 211:4
**case**
177:9,10 178:18 285:2
**cast**
243:19

**certain**
185:3 233:16,18 249:7
266:15 267:9
**certify**
286:9,14
**Chaitman**
175:10 227:9
**change**
216:1,2,4 217:4,5,11
217:23,24 224:25
226:7,10 246:6
247:23 267:14,15
275:23 282:17 285:5
285:5,7,7,9,9,11,11
285:13,13,15,15,17
285:17,19,19,21,21
**changed**
214:18 217:20,25
236:3,4 267:17
**changes**
213:13,15 214:2 218:7
277:3 285:3
**Charat**
197:24 198:10 203:25
204:13 206:17 207:7
210:12,15,21 211:20
242:17,22
**check**
180:8 181:2,18 182:20
183:5,14,16,19
186:11,12 193:12
197:5,5,6,9,21 198:13
198:15 199:3,5,9
205:22 206:8,15,18
206:20 207:2,6,10
208:15,18,23,25
209:6,7,12,14,17
210:10,14,20 211:3
211:14,15,18,18
219:14 220:4,8 222:4
222:8,12,13,18,21
226:8 237:6,7,10,22
238:3 239:18,19

240:3,6,12,19,21
241:2,5,6 242:19,22
243:2 250:17,20
256:7 261:6,14,16,19
262:5 263:8,8 269:24
271:17 272:8 275:20
**check-out**
180:4,12 181:6,15,22
182:3,6,20,22 183:2
183:16,23 186:25
187:7,16,20 191:1
192:18,19 193:1,2,4,8
193:9,13,18 194:25
196:8,12,17 239:12
255:4 264:6,8,12,17
265:22 272:10,11
**checkbook**
180:25 191:1 263:12
263:16
**checking**
209:3
**checkmark**
279:18
**checks**
180:3,14,18,19,24
183:5 184:9 186:22
187:21 192:15 194:4
205:25 239:4,23
241:13,19,23 242:1,4
242:17 261:22 262:1
262:8,11,18,23,25
263:2 264:12 265:10
267:5,10 271:10,13
271:24 272:3,7
**children**
228:18
**Circling**
264:1
**City**
221:10,18
**claims**
229:17 230:12
**clarify**

225:25 277:22
**clarifying**
202:3
**claw-backs**
231:20
**clear**
182:9 184:2 220:22
227:16
**close**
201:18 259:13
**code**
210:22
**collapse**
232:24 233:5
**column**
256:17
**come**
184:16
**comes**
189:15
**coming**
183:10
**common**
188:25
**compare**
202:22 208:11
**complete**
273:16
**completely**
268:17
**computer**
183:25 184:20 186:16
186:18,22 188:21
191:22 193:25 198:23
200:23 201:1,4
264:21,22 265:1,4,8
265:11
**computerized**
185:2
**concerns**
277:20 278:16,17,24
**CONF-SS**
214:11

SIPC v BLMIS                                      Sala 6/13/2016
CONFIDENTIAL

**CONFIDENTIAL**
174:13
**confirm**
239:18,22 240:18
241:1 242:4,22 271:9
271:12
**confirmations**
200:14,17,20
**confirmed**
240:20 241:25 261:4
**connection**
259:5
**consistent**
194:14 195:14
**Consolidated**
174:7 175:3
**contact**
239:16 260:8
**contacted**
259:25
**contacting**
260:4
**contain**
197:20
**contained**
275:3
**contemporaneously**
196:2 218:10
**content**
235:2
**Continued**
174:15 270:13 279:9
**conversation**
282:14
**convertible**
252:8
**copies**
199:14 203:7
**copy**
199:4 203:10 242:19
**corner**
209:5
**Corp**

275:5
**CORPORATION**
174:3
**correct**
202:8 207:11,18,21,25
208:3 211:16 214:8
217:8 218:7 237:3,4,7
237:23 238:4,11,23
239:1,6,9,23,24 240:4
240:22 241:2,3,9,15
242:19 243:2 244:9
246:4,10,14,22 247:5
247:9 251:11 252:16
252:19 257:5 259:20
262:18 264:5,14,19
271:10 272:17 275:25
283:11
**correspond**
222:9,11
**corresponds**
217:15
**counsel**
203:8 226:19 229:24
**COUNTY**
286:5
**couple**
178:13 179:17,21
**course**
199:23 240:20 263:7
**court**
174:1,17 177:8,11,23
178:2
**cousin**
228:19 229:15 230:15
**cover**
217:14
**create**
243:13 282:20
**created**
191:18 194:16,19
195:15 199:22 253:14
253:15
**criminal**

243:6 249:4,6
**crossed**
249:13
**Crupi**
182:10 184:13 193:16
233:17 239:15
**Crupi's**
264:4
**customer**
181:20,21 182:23
183:20 187:12 189:5
190:15 197:6,9
198:25 199:5 201:13
203:22 204:12 207:3
208:6 211:10 215:25
216:3 218:11 221:6
222:24 225:10 233:9
236:24 237:6,6 238:2
238:23 239:17 240:18
246:14,22 247:13,19
248:2 250:13 253:4
261:5 266:10 267:12
269:15,24 271:6,16
273:13 274:12 275:18
276:12 277:13 278:18
280:7 282:10,20
283:10
**customer's**
180:7 181:25 188:13
246:25 247:4 248:3
273:1,4,7,10 283:14
**customers**
177:22 180:15,19,20
180:24 182:18 187:22
189:21 190:18 191:7
200:1,15 224:7,17
225:4 226:13,15
227:10 233:8 239:5
239:22 241:13,18,23
243:14 247:8 252:24
253:20,20 257:4
260:23 264:13 267:5
269:21 270:23 271:2

271:10,14,24 272:2
275:6,23 278:8
280:21
**customers'**
192:10 242:5 243:7
**cut**
183:6 184:8 191:9
**CW**
180:6

**D**

**dash**
219:3 224:12,13
**date**
177:3 183:4,8,9 185:3
185:5,12,18,19 186:3
186:4,10 187:23,23
188:4,11,19 189:1,3,7
189:16,20 190:24
191:4,8,15,17,19
192:1,4,11,16 193:4
193:21,21 194:10,12
195:5,8,14 199:1,2,5
204:2,14,24 206:25
209:17,19,22 216:10
220:19,24 221:3
245:17 256:1
**DATE(S)**
285:1
**dated**
254:10 257:15 258:21
**dates**
184:23,25 195:3
214:14
**daughter**
229:12
**David**
190:10,17
**day**
224:20 250:3 284:7
285:23
**deal**
180:17 183:4,13 184:3
187:3,6,11,25 189:11

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

189:15,19,22,23,24
190:4 191:25 198:2,3
199:1 208:5 274:16
274:17,18
**dealership**
232:6
**deals**
187:3 188:3,8 190:18
200:18
**dealt**
219:7
**Dear**
216:23
**debit**
256:3
**December**
228:24 270:18
**Defendant**
174:7,10
**denied**
230:13,14
**denote**
223:25
**department**
263:6
**depended**
234:7
**depends**
225:6
**deposit**
270:23
**deposited**
242:5
**deposition**
174:15 177:7 178:15
178:18 201:17 202:22
234:18 235:2 254:13
255:3,7 256:21 259:5
286:10,12
**depositions**
278:3
**describe**
188:10 198:8 278:16

**described**
204:25
**describing**
187:2
**description**
176:8 206:3 207:10
211:9
**destroyed**
238:7,8
**determine**
189:11
**Dexter**
175:13 176:4,5 177:21
177:21 202:25 203:10
225:24 226:2 227:7,8
228:12 230:5 236:12
236:19,22 255:20
257:13 258:23 263:18
263:25 268:3 279:10
281:4
**different**
184:7,7 185:21 186:2,3
203:21 233:19,20
234:6
**DiPascali**
233:18
**direct**
194:8 221:13 235:7
239:3 240:2
**directly**
202:5,11 216:10
260:15,20,23
**discuss**
234:18,24 235:1
**discussed**
235:3 279:17
**discussing**
188:3 264:4 278:3
279:1
**Discussion**
230:2 279:6
**discussions**
232:21

**distributed**
258:13,18 259:1
**distribution**
216:8 260:10
**District**
174:1 177:11
**divided**
234:6
**document**
179:9,14,18,25 181:5
188:6 194:10,20
195:6,14,15,19
196:22 197:2,12,15
197:18 198:7,16,17
198:19,25 199:7,14
199:21 200:8,12
201:18 203:9 204:2
204:12,15 206:13
209:12,23 210:7
211:1,2,25 212:5,10
212:17 213:11,12
215:14,15,22,24
217:8 218:15,21,25
219:18,25 220:3
241:12 242:18 244:19
244:22,25 247:20
248:4 249:24 250:6
251:9 254:12 255:7
272:15 276:21 280:9
**documents**
189:11,18 200:1 201:9
201:12 203:7 242:12
242:14 243:20 244:15
247:13 252:23 253:14
253:19 254:1,18
259:4 277:18
**doing**
194:6 248:9,13 249:14
**dollars**
229:1
**doubts**
243:19
**due**

183:4,8,9,10 184:23,25
185:3,19 186:3 188:4
188:8,10,19 189:1,3,5
189:7,15,16,20
190:23 191:4,8,15,17
191:19 192:1,4,11,14
192:15 193:4 199:1,2
199:5
**duly**
178:3 286:11
**duplicates**
199:19
**duties**
196:2 273:19
**DVD**
227:4 255:18

**E**

**E**
175:1,1,8 286:1,1
**earlier**
187:2 188:7 194:24
207:15 231:9 235:8
240:17 241:4,12
242:16 252:7 258:7
258:10 264:2 266:8
271:8 278:15 279:18
**early**
263:13
**Edmunds**
175:18 177:5
**eight**
183:13
**either**
180:15 183:12 227:23
251:22 276:9 283:1
**elaborate**
227:25
**elaboration**
227:24
**employed**
195:21,24 196:10
270:23 271:2,20
**employee**

SIPC v BLMIS                                                Sala 6/13/2016

CONFIDENTIAL

232:17 282:14
**employees**
193:23 194:5 233:5,10
234:13 271:23 272:20
272:23
**ended**
184:3 187:12,25 188:3
213:5 232:8
**ends**
189:24 202:17 208:10
213:11 274:16
**engaged**
253:10,16
**entailed**
190:7
**enter**
181:22
**entered**
178:17 181:2 193:17
**entire**
179:18 194:20
**entirely**
190:3
**entirety**
215:15
**entity**
180:23,23 253:15
**entries**
182:2,6,22 185:16
186:24 187:9,11,14
187:19 193:3,7
195:23 196:1 214:14
265:18
**entry**
183:2,16,22 187:7
214:5,10,19,20
256:17
**envelope**
216:19
**ESQ**
175:6,8,13
**establish**
235:23 282:9

**established**
236:7 237:16 281:14
**establishing**
280:24
**Estate**
175:3
**eventually**
233:2
**everybody**
193:11
**evidencing**
269:5,11,12
**Exactly**
258:23
**examination**
176:2 178:6 227:6
235:7 270:13 279:9
**examined**
178:4
**examining**
180:10
**example**
235:8 247:19
**examples**
187:10
**excerpt**
255:4
**Excuse**
234:4
**exhibit**
176:9,10,11,12,14,15
179:8,8,11 194:16,19
195:20 196:6,20,23
196:24 198:20 199:8
199:15,22 200:5
201:9 202:23 203:5,5
203:6,14,15,23
204:11 205:20 206:13
206:19,20,21 207:4,9
208:4,8,12,12,14,24
209:6,11,15,15,18,21
209:25 210:3,5,9,13
210:16,18,25 211:8

211:12,15,16 212:1,2
212:6,7,9 214:22
215:3,21 217:13,15
217:16 218:3,17,18
218:25 219:20,21,25
220:6,13 221:3,12,21
221:22 222:1,3,9,15
222:16,25 239:25
244:17,18 246:16,17
248:1 249:18,19
252:6 254:11 255:1
255:21 256:13,23
257:10 259:15 272:13
274:1 275:1 276:20
279:11 283:16
**exhibits**
176:7,18 201:16
202:21 211:19,22
218:13 223:3,4 242:8
242:8,15 251:25
254:8
**expected**
249:17 267:13
**expecting**
278:12,21
**explain**
207:14
**extent**
227:15,24
**extra**
278:22

_____
**F**
_____
**F**
286:1
**fact**
239:19 249:3 258:24
260:14,22
**fair**
245:12
**false**
268:17,22 269:6,10,11
269:13
**familiar**

188:4 196:12 214:19
244:19,21,25 245:6,8
250:10 272:16 276:21
**family**
228:2,5,16 231:18,24
**far**
253:12,13
**fashion**
227:17
**father**
229:20
**field**
198:13 206:6 221:22
**figures**
229:22 231:12
**file**
181:23,24 212:21
217:6 223:1 247:4,8
251:9,12,13 273:22
277:4 283:14
**filed**
177:10
**files**
238:4,8,23,25
**fill**
236:10,23,24 273:13
273:22 282:21
**filled**
236:25 272:22 273:18
**find**
203:12 247:12 283:7
**finish**
181:11
**finished**
183:14 191:6
**firm**
227:9
**firmwide**
280:23 281:8
**first**
178:3 188:18 203:13
208:9 236:2 257:23
261:25 275:10 280:1

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

Page 293

five
 183:12 213:21 226:18
  258:6
five-minute
 236:13
focus
 247:25
focussing
 259:15
folder
 181:25 182:1 212:13
  212:16 217:14
follow
 248:23
follow-up
 270:16
following
 285:3,3
follows
 178:5
forget
 186:16
form
 236:10,23,24 251:10
  251:12,14 272:17,19
  272:22,25 273:3,6,9
  273:13,16,18,23
  282:21
forth
 286:11
Foster
 221:10,18
found
 266:3
four
 183:12 213:20
Fran
 182:7,16
Francis
 182:16
Frank
 233:17,23
fraud

246:10 253:10,16
 266:4
front
 181:5
function
 192:17
functions
 243:13
further
 270:4 279:3 283:23
  286:14

**G**

G
 240:3,7,21 241:1,1,5,7
gears
 266:1
general
 219:15 220:9,18
  222:13 224:22
generally
 195:5 248:1
generated
 198:21,25 200:21
  201:10
getting
 181:2
girl
 188:21
give
 184:9,11 201:3 203:7
given
 235:8 241:22 286:13
giving
 231:12
go
 178:22 185:5 187:24
  188:2 192:5 193:11
  193:12,22 199:3
  213:19 226:23 229:25
  237:14 255:12 263:18
  265:12 270:6
goes
 263:4

going
 180:3 185:20 191:12
  200:12 201:15 202:22
  203:3 208:9,13
  212:24 213:17 214:23
  215:9 226:10 227:11
  227:12 242:8 269:19
  276:5,19 282:17
good
 177:1 178:8,9 252:5
great
 184:19
Greg
 177:21 227:8
GREGORY
 175:13
group
 212:24 215:8,18
guess
 193:20
guessing
 229:10

**H**

H
 175:2
half
 203:19 227:13
halfway
 275:10
hand
 286:19
hand-write
 262:1,4
handle
 233:20 244:23
handled
 180:25 184:17 233:18
handwriting
 185:8,10 214:1,6,12,15
  280:5
handwritten
 255:2 264:3
handy

214:24
Hanoh
 197:24 198:9 203:25
  204:13 206:16 207:7
  210:12,15,21 211:20
  242:17,21
happen
 181:16 271:19
happened
 187:19,20 191:23
  192:13 193:18 217:18
  230:23 232:18 249:6
  265:14
happens
 189:24,25
hard
 244:7
Harman
 245:13,21,25 246:3,9
Harry
 245:13,21,25 246:3,9
Health
 197:22 198:4 203:16
  203:18 204:5,6,18
  205:7,21 206:8
  207:10,18,24 208:5
  210:20 211:4
hedge
 224:5 234:9
hedges
 233:24 234:16
held
 177:7
help
 263:4,5
helped
 263:6
hereinbefore
 286:11
hereunto
 286:18
higher-ups
 233:16

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

hindsight
269:4
hold
216:7
home
174:17
hopefully
227:12
HOSTETLER
175:2
hour
227:13
hundred
231:17
HWN
176:9 179:9,10,12
180:11 194:9

I

idea
251:23 253:3 261:8
279:25 281:13
identification
179:12 196:25 212:3,8
218:19 219:22
identified
204:5 205:15 207:16
220:13 221:6
identify
177:15 204:17 205:5
210:18 219:9
illegal
248:9,13,14
image
206:18 208:15,17,23
209:6,7,18 210:10
211:14,18 222:8
imagine
271:25 273:14
immediately
232:23
important
178:16
include

188:15 189:1,4,8
INDEX
176:1
indicate
258:16 276:13 279:19
indicated
240:3 242:18 256:22
264:2
indicates
241:13
indicating
267:20 268:15
information
189:4,8 193:17,24
196:5,17 197:19
206:19 212:15 215:17
221:20 222:7
initial
217:6 231:3 247:23
251:21
initialed
225:21
initially
178:15
initials
216:11,12,14 217:7,10
250:24,25 257:17
279:24
instance
237:21 269:23
instructions
178:14 247:1
insurance
229:18 230:13
interested
286:17
internal
280:9
investment
174:6 231:3
Investments
239:1 243:21 244:3
268:8 269:6

INVESTOR
174:2
involved
234:10 246:10 249:12
IRA
231:4,10,11,16
Irving
175:2 177:18,20
231:19
Isle
221:9,18
issue
227:14

J

J
212:14 221:8,17 222:5
Jackson
182:14
JoAnn
174:15,17 176:3 177:7
177:13 178:1 216:20
216:23 233:17 284:4
job
239:21 243:12 244:11
261:21 262:18,23,24
263:11,15
Jodi
180:25 182:7,10,10
184:13 186:17 193:16
232:19 239:15 264:4
264:16
Jodi's
193:15 239:11,14
264:10,25 265:2,6,9
265:16
Joel
254:9,19 259:25 260:4
260:15,20 261:8
John
175:18 177:5
joint
230:8
judge

178:17
July
218:23 219:11,14
220:9 222:6,13,18
254:10 256:2,7
258:19 259:6,11
260:1,5,9 261:9,15
263:8
June
174:11 177:3

K

keep
202:23 214:23,24
283:13
kept
191:20 212:14,22
239:8,13 264:4,9
265:6,8,9
kind
192:5 213:15 248:19
knew
181:1 193:11 235:4
276:17
know
179:14 182:5 183:1,9
184:21 187:22 191:21
196:7,11 197:8
198:19,23,24 199:13
199:18,18 200:20
201:20 205:12,13
209:1 213:6 214:17
216:6,20 224:10,15
227:21,22,23 230:19
230:20 232:7,10
233:1,8,12,21 234:15
234:16 238:9 240:14
240:16 243:10,16,22
244:8,16,16 245:17
246:12 250:2,2,3,24
250:25 251:1,2,13,14
251:17,20 253:1,2,2
253:12,13,23 254:14
254:15,21 255:8,11

SIPC v BLMIS                                         Sala 6/13/2016

CONFIDENTIAL

262:13,14,15,21
263:7 264:16 265:3,3
265:12,14,17,25
266:7,21 269:23
271:25 276:4,7
278:23 279:21 280:17
280:19,20 281:2,9,17
282:19,24
**knowing**
253:25
**knowledge**
199:25 201:8,13 204:6
216:16 223:12 224:7
224:12 237:5,20
241:18 242:17 252:11
271:22
**Kugel**
190:17

---

**L**

**L**
174:6,9 175:4
**label**
194:9
**law**
227:9
**Lawrence**
212:14 215:7 216:9
218:23 221:8,17
222:5,23
**leads**
233:20
**leave**
210:17
**ledger**
192:9 217:4 239:4,9,17
264:3,3 265:18 272:9
**left**
191:21 193:10 223:6
223:14 263:14
**legitimate**
252:19 253:6,7
**let's**
186:4 236:12 239:25

239:25 241:11 242:7
244:17,24 245:20
246:16,17 249:18,19
249:19 252:6 254:7
254:25 255:1,12,13
255:21 256:13,14
257:10 266:1 270:6,6
**letter**
181:18,22,23,24
182:19,23 215:25
216:16,21,22 217:1
217:16,20 218:3,10
225:13,19,21 236:4
245:13,18,20 246:3,4
246:19,21 247:4
257:12,14,24 258:2,3
258:5,9,12,21,24
274:17 276:10,12
277:14 282:25 283:2
283:5,8,18,18
**letters**
226:13,15 247:8 253:5
253:20
**Liberty**
256:7 275:4
**limits**
178:18
**line**
211:2 216:21,22 285:4
**lines**
221:14 230:6 236:20
256:16
**Liquidation**
174:6 175:3
**list**
180:3
**listed**
188:17 275:7
**little**
183:8 264:2 266:1
279:17
**LLC**
174:6

**LLP**
175:2,10 227:9
**long**
249:15 276:17 282:15
282:23
**look**
179:14,22 189:15
200:9 203:6,13 208:9
212:19 221:12 239:25
241:11 242:7 244:17
244:24 246:17 249:18
249:19 252:1 254:7
254:25 255:1,22
256:4,15 266:22
267:6 275:2 277:5
279:12
**looked**
188:11 218:3 220:12
220:23 242:3 266:23
267:1
**looking**
186:25 197:15 198:4
198:20 199:8,15,22
200:4,11 201:9
205:19 208:3,14
211:1 213:2 214:23
221:2 222:15 249:1
252:2 266:16 267:23
269:3 274:1
**looks**
256:6
**loose-leaf**
192:6
**lost**
229:13 230:19
**lot**
230:19 267:19,20
268:15 269:5,9,10

---

**M**

**M**
175:13
**Madoff**
174:6,9 175:4,11

177:22 180:21 216:19
226:1 227:10 228:3,6
232:14,17,24 233:5,5
233:10,16,18 235:19
239:1 243:11,20
244:3,3 245:25 246:1
246:10 247:7 248:9
250:13 251:18 253:14
266:3,16,18 268:8,16
268:21 269:6 270:23
270:24 271:2,3
277:14,21 282:14
**Madoff's**
252:19
**MADTBB**
176:10,11,15 196:22
196:23,25 201:23
202:11 211:25 212:1
212:3,18 219:18,19
219:22
**mail**
240:11 262:7 276:18
**mailed**
224:24 240:13,15
262:10
**mailing**
263:3
**maintained**
184:15 193:14 199:14
**maintenance**
212:21 223:1 251:9,12
251:13 273:23 277:4
**making**
216:1 245:23 267:13
267:25
**Management**
185:22 187:4 241:14
**manual**
184:25
**March**
194:13,14,18 195:10
**mark**
179:7 196:21 211:24

SIPC v BLMIS                                      Sala 6/13/2016

CONFIDENTIAL

212:4 218:15 219:17

**marked**
195:20 201:16 202:21
203:4 219:25 256:17
274:11 275:15 276:20

**marriage**
286:16

**match**
198:16 206:20,23,25
209:15 211:9 220:12
220:16 221:21

**matches**
211:15

**matter**
178:19,23 286:17

**mean**
180:21 189:12 233:1
237:14 247:23 249:1
249:12 261:24 265:22
269:17 278:11

**means**
210:24

**meant**
256:11 267:12,12

**members**
228:2,5,16 231:24

**memo**
197:7,13,14,18,19
198:12,16 199:4,10
211:7 220:4,11 221:2
221:4,7,22

**MF**
176:14 218:16,19

**middle**
256:4

**million**
229:1 231:15 266:4

**millions**
229:13,14

**Mills**
219:15 220:9,18
222:13

**mind**

236:20 249:13

**minds**
236:4

**Mine**
185:11 216:13

**minutes**
179:21 226:18

**mistake**
247:15,19 248:3

**mistakes**
247:12

**mm-hmm**
179:20 187:1 188:9
189:23 193:2 194:1
194:22 195:16 199:11
202:9 225:16 229:3
235:6,10 238:5
242:10 245:2,9,22
258:4 261:3 276:22
282:1

**moment**
201:2

**money**
180:16 192:23,24
203:17 212:16 213:18
223:22 225:2 226:10
230:15,18,19 232:8
267:25 270:23 271:2
276:6 278:19,21

**month**
185:13 219:10

**monthly**
222:20

**morning**
177:1 178:8,9

**mother**
229:20

**move**
246:16

**multiple**
234:2,4,13

_____
N
_____
**N**

175:1

**name**
177:4,13 180:8 186:12
186:17,19 188:13,22
188:23,25 197:22
212:22,25 215:8,8
221:16 223:1 224:25
226:7 227:8 239:17
250:11 254:22 273:4
273:22 277:4

**name/address**
251:9,12,13

**names**
192:10 222:24 226:9

**National**
256:8 275:5

**nature**
224:21

**need**
179:21 202:25 203:2
229:24 270:5 274:12
274:17 282:10

**needed**
225:2 226:10 263:5
277:13

**needs**
227:24

**never**
202:1 237:2,21 240:18
240:20 241:1,22,25
242:3,21 248:10
249:5,11,13,13,17
259:25 260:3,14,22
261:4 280:8 282:2,5

**new**
174:1,18,20 175:5,5,12
175:12 177:8,12
178:2 189:21,22
190:3,4,5 191:3,10,25
214:18 280:21 286:3
286:5,9

**Notary**
174:19 178:4 284:10

286:8

**notation**
197:11 217:14

**note**
182:19 225:20

**notebooks**
196:4,16

**NOTED**
284:2

**November**
198:10 204:16,19
205:1,6,9,17,24,25
206:16 207:16,21,23
208:4 209:20,24,24
210:19

**number**
175:11 177:12 179:9
180:8 185:17 186:9
188:12,16 196:22
197:25 198:7,11,12
201:22 202:7 203:21
208:18,20 209:3,4,7,9
209:12 211:25 212:5
212:18,25 214:25
215:13,18 216:8
218:16,24 219:18
227:4 240:1 245:3,11
246:18 249:20 255:18
256:14 273:1,10
275:6 279:13

**numbering**
223:24 224:3

**numbers**
208:22 209:1,14

_____
O
_____

**oath**
179:2

**Objection**
235:21 236:1,9 237:8
237:24 238:13,21
239:10 240:23 241:8
241:21 243:3,9,15,24
244:5,10 246:11,23

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

247:10,14,21 248:5
250:18 251:8,19
252:13,20,25 253:11
253:21 254:3,20
257:6 259:8,12 260:6
260:12,25 261:11
263:1 264:20 265:20
266:6,12,19 267:22
268:12,18,23 269:7
269:14 270:1 281:1
281:16
**obtain**
278:8
**obviously**
217:21
**occur**
204:25 220:19
**occurred**
204:18 205:6
**occurring**
266:18
**occurs**
207:21 210:19
**October**
204:3 214:10 217:17
217:18
**odd**
248:15
**office**
193:15 239:9,11 264:4
264:19,25 265:7,9,16
**oh**
194:21 205:22 224:20
232:1 259:17 260:16
**okay**
184:1 186:21 191:6,14
202:3,4,20 226:22
227:19 230:22 231:12
234:17 236:13 242:7
256:13 257:10 259:17
270:17
**old**
191:4

**once**
184:17 190:23 191:21
192:3 193:7 200:22
201:3,5 225:22
**one's**
231:22
**ones**
210:17 252:24
**open**
280:13,18,21 281:24
283:1,2,4,5
**opened**
215:16 232:7 276:11
276:15 280:3 282:2,5
283:9
**opening**
251:5 273:20,21 276:8
281:17 282:15
**operating**
270:19
**operation**
252:19
**opposing**
203:8
**option**
223:22 224:5 234:9,12
**options**
224:1 233:23 234:15
**order**
178:17 184:3 185:5
198:9 275:20 277:14
**ordinarily**
283:9
**ordinary**
199:23
**originally**
236:6
**outcome**
286:17
**outstanding**
249:16
**overlap**
234:1

**P**

**P**
175:1,1
**p.m**
255:15,18 263:21,24
270:9,12 279:5,8
284:1,2
**page**
176:2,8 179:16,19
180:10 185:7,8,13,16
185:24 186:5 187:10
187:15 191:15 193:21
194:9 200:4 201:22
201:25 202:2,5,7,10
202:14,16,18 208:9
212:19,20 213:3,10
213:16,23 214:1,6,13
214:20,23,25 215:12
215:21 217:2 221:12
221:15 240:1 241:11
245:3,6,8 246:17
249:20,21 255:1,2
256:4,14 257:11
272:14,15 273:23
274:9 275:2,3,7,10
276:23 277:4 279:12
285:4
**pages**
191:18,20 195:6 200:8
200:10,11,13
**paid**
198:9
**paper**
191:2 201:6
**papers**
212:15
**parents**
228:18 230:8
**Park**
175:11
**part**
197:12 220:5 261:21
262:17,23,24 263:11

263:15 273:18
**particular**
187:12 198:3 208:6
225:10,18 247:17
248:7 249:25 250:20
**parties**
177:15 286:15
**Pastor**
174:18 177:24 178:4
286:7,22
**pay**
232:8,10
**payable**
207:2,6 210:11,14
211:19 222:21
**payment**
220:24 256:22 258:6
258:10 259:7,11,19
259:20,23 260:1,5
261:9
**payments**
257:3 260:23
**pending**
228:14 268:5 281:6
**people**
184:7 185:3 192:20
233:22 234:2,2,4,8,8
248:23 253:9
**Pep**
252:7
**period**
189:14 194:15 196:9
**person**
180:21 234:10,15
248:20 249:16
**personal**
230:25 241:17 252:11
**personally**
186:21 240:8,9,15
262:10 272:1
**phased**
224:9
**phasing**

223:13,17
**phone**
224:17,22 225:3,5,15
225:18 271:23 272:2
272:6
**physically**
183:24
**Picard**
175:2 177:18,20
231:19
**pieces**
191:15
**place**
193:11,13 203:3
208:13 280:1
**placed**
238:24 247:4,8 264:18
**Plaintiff**
174:4
**Plaza**
175:4
**please**
177:24 194:17 216:7
228:13 233:14 268:4
279:12 281:5
**point**
179:19 252:22 253:18
**pointing**
214:5 274:9
**policy**
185:22 187:4 235:18
235:23 241:14 248:22
248:24 280:23 281:8
281:11
**Ponzi**
243:21 270:20
**portion**
197:14,18,20 198:6,16
198:17 208:15 210:2
211:1,7 220:6,11
221:7 222:2
**position**
282:9

**possible**
227:15
**post**
192:6,10 262:24
**pound**
214:11
**preceding**
236:21
**preliminary**
178:13
**prepare**
261:13,16
**present**
175:17 177:14 178:20
**presented**
255:2
**previously**
201:16 203:4
**price**
203:18,19 204:21
**principal**
231:5,6
**printed**
188:19 191:10
**printout**
184:5,6,6
**prior**
202:21
**Pro**
174:4
**probable**
280:7
**probably**
185:19 217:22 260:16
262:12 282:25
**proceeding**
177:12
**proceedings**
234:22
**process**
181:14 185:1 187:25
190:21 192:5,18
**profit**

178:19,21 180:16
182:24 183:2,14,15
185:18 188:14 192:12
197:5,8,21,23 203:20
205:23 206:5 207:20
210:24 211:3 213:17
217:5 219:10,16
220:8,12,18 222:14
224:8,13 227:14
235:5,11,12,15,19
237:2,11,14,22
238:11 239:5,23
240:4,19 248:16
250:17 256:6,11
257:9 259:18 261:6
262:4,8,10 264:13
267:4,9 269:12,16,17
269:17,20,24 271:9
271:13 274:24 275:4
277:15,23 278:2,25
**profits**
180:17 183:18,25
189:5 192:20,20,22
212:24 215:9 225:1
226:16 236:4 256:12
258:13,17,25 260:10
266:25,25 267:1,9,16
274:13,18,20 276:5
277:15,21 280:15
281:19,20 283:6,10
283:11
**promised**
267:14 278:20
**PROTECTION**
174:2
**protective**
178:17
**provide**
274:12
**Public**
174:19 178:4 284:10
286:8
**punch**

186:15,19,22
**punched**
186:9,14 191:22
193:20 194:5 198:22
200:23 201:7 265:5
265:10,11,13
**punching**
193:24 194:6
**purchase**
204:7
**purported**
240:21 241:2 261:6
267:20 268:15 269:5
281:14
**purportedly**
207:24
**purporting**
245:13
**put**
181:1,2 184:8 185:4
186:11 187:19 189:21
190:11,25 191:9,10
191:11 193:12 196:20
200:22 201:3,5,15
211:23 217:6 223:4,4
238:4 251:2,14,17,23
277:18 281:23
**putting**
254:8
**PW**
197:10,11 206:7
210:24 241:13 256:7
256:11,17

**Q**

**quarters**
204:20
**question**
184:1 220:22 227:20
227:23,24 228:13,14
240:25 248:19,20
249:10 268:4,5,13,14
281:3,6
**questions**

SIPC v BLMIS                                                    Sala 6/13/2016

CONFIDENTIAL

178:21 179:15,18
181:12 226:20 227:12
227:16 249:7 270:16
279:3

**R**

**R**
175:1,6 212:13 221:8
221:16 222:4 281:23
286:1
**range**
190:9 202:11
**rates**
278:7,10
**read**
206:4,7 208:22 211:2,8
216:22 221:21 228:12
228:14 230:5,7
236:19,21 258:2
268:5 281:4,6
**reads**
207:10 214:10
**ready**
179:15
**real**
244:1 253:24,24 254:1
254:2 269:18
**really**
184:6 205:12 230:20
231:16 233:7,24
234:16 241:5 244:7
247:18 248:4,17
255:9 262:15 281:14
**reason**
195:11 245:24 285:6,8
285:10,12,14,16,18
285:20
**reasons**
285:3
**recall**
228:23 229:6 233:7
248:6 250:5,8,9,10,16
254:12,16,18 255:6
256:20,25 259:6

260:3 261:18 282:25
**receive**
212:24 224:13,16
226:15 239:18 271:17
271:23,24 272:1,3
274:13 275:20 277:14
280:15 281:21 283:10
**received**
192:20 239:19,22
240:19,22 241:2,13
241:18 242:1,17,22
243:1 246:21,22
261:5 269:24 271:10
271:13 272:6
**receiving**
217:1 218:10
**Recess**
227:2 228:9 236:16
255:16 263:22 270:10
**recipient**
210:10
**recognize**
179:24 180:5 185:7
197:2 212:10 213:25
215:2,22 216:11
218:20 219:24 242:11
245:10 246:18 250:22
251:21 279:23 280:4
**recognizing**
247:19
**recollection**
249:23 254:25
**reconcile**
263:12,16
**record**
177:2 180:9 182:9
196:16 201:21 214:4
215:11 226:2,24
227:1,5,16 228:8,11
229:25 230:1,2,4,7
236:15,18 254:5
255:12,15,19 257:13
263:19,21,24 270:7,9

270:12 274:8 279:5,6
279:8 282:8 284:1
286:12
**recorded**
259:18
**records**
267:20 268:7,15,20
269:5,10,12 283:13
283:14
**refer**
182:10 187:15 258:9
**referred**
277:21
**referring**
181:8,20 184:12,15
188:7 189:14 190:15
192:8,25 194:5 200:4
200:25 201:22 278:5
**reflect**
180:9 185:24 200:13
201:21 213:12 214:4
215:11 217:10 219:4
220:7 221:15 272:25
273:3,6,9 274:8
**reflected**
187:10,14 195:6 196:5
197:12 207:4 209:22
210:2,6,22 213:16,22
218:2 221:3 222:2,8
222:19,25 271:5
273:23
**reflects**
181:7 256:21
**refresh**
254:25
**regard**
225:9
**regarding**
277:20
**regularly**
243:7 266:9
**reinvest**
213:3,8,9,18 216:5

217:6,25 226:11
237:1 245:15 246:7
274:4 275:24 276:14
276:25 277:3 280:16
280:25 283:11
**reinvestments**
236:5
**relate**
205:10,21 278:24
**related**
200:17 205:14 257:14
274:13,18 286:15
**relating**
203:16 205:7 207:17
226:16 227:13 254:19
274:24 277:15
**reliable**
252:23 253:19
**relied**
246:4
**rely**
189:10,18
**remainder**
200:9
**remaining**
226:19
**remember**
185:20,21 186:19
188:23 191:23 226:6
239:14 250:19 254:22
255:10 257:19,21,23
257:25 260:2,17
282:23,24
**remembered**
265:3
**remind**
178:13,16 181:10
**repeat**
194:17 233:14 268:3
**rephrase**
240:25
**report**
188:4,11,19 189:1,4,7

189:16,20 190:24
191:4,8,15 192:1,4
193:5
**reporter**
174:19 177:24 286:8
**Reporting**
177:6
**reports**
191:19
**represent**
177:16 209:2 227:9
**request**
182:20 225:18 237:11
238:3,16,18 245:14
245:24 257:9 258:5
258:10,13,17,25
259:11 260:1,4,9
274:13,18,23 275:19
276:18 280:12 282:11
**requested**
192:23,23 230:7 247:7
257:4 261:9 269:16
269:21 280:3
**requesting**
237:22 269:25
**requests**
212:15 235:12,19
238:6,10,11 259:20
259:23 277:14
**required**
226:4,13,15 276:12
**requirements**
276:3
**residence**
177:7
**residing**
178:2
**respect**
230:23 231:23 283:16
**respected**
249:16
**response**
281:22

**responsible**
193:24
**rest**
200:8
**retained**
238:25
**return**
278:11
**returns**
278:7
**review**
195:13
**reviewed**
217:16
**reviewing**
193:4 196:13 215:12
**reviews**
203:9
**right**
202:9,13 209:5 214:21
223:6 231:14 236:8
236:11 238:8 240:11
240:24 242:12 244:4
244:24 246:2,7,13
247:17 248:21 254:7
254:24 255:12 258:8
259:16 263:12 270:3
280:9 283:23
**Rockefeller**
175:4
**roll**
276:5 281:18
**room**
184:21 186:16,18
188:21 191:22 198:23
200:23 201:1,4
239:14 264:21,23
265:1,2,4,9,11
**routing**
209:4
**Rs**
277:10
**Ryan**

212:13,14 215:7 216:9
218:23,23 221:8,8,17
221:17 222:5,5,23,23

――――――――――
S
――――――――――
**S**
175:1 213:7 250:23
251:2,15,23 274:7,11
279:18,22 281:23
283:21
**Sala**
174:16,17 176:3 177:7
177:13 178:1,8
179:13,24 180:12,18
181:11 185:6,7,12
194:10 196:19 197:1
200:7,11 201:15
202:6 203:3,14
204:17 207:13 208:2
208:11 212:10,20
215:2,14,22 216:10
218:6,20 219:9,24
223:5 224:16 226:21
227:8 242:11 244:18
255:22 256:18 257:12
270:15,18 272:16
274:1 275:3 276:20
277:19 279:11 284:4
**sales**
204:20
**saw**
202:1 222:25 250:3,4
252:14 258:1
**saying**
241:6 269:3
**says**
198:14 206:6
**sbrown@bakerlaw.c...**
175:6
**scheme**
243:21 270:20
**scope**
178:22
**Scotch**

191:11,14,19
**Seanna**
175:6 177:17
**seats**
270:5
**second**
190:12 204:22 215:1
272:15
**securities**
174:2,6 203:23 204:7
207:24 232:17,24
233:6,10,16 243:12
250:14 253:14 268:16
268:21
**Security**
212:25 273:10
**see**
186:5 187:4 194:10
195:2,8,19 197:11
198:8 203:15 205:20
207:14 208:15,17
209:7,12 213:22
217:2,7,14 219:13,14
256:16,17,18 257:9
272:7 275:9 283:4
**seeing**
249:24 250:6 254:12
254:16,18 255:6
257:19,23 259:6
261:18
**seen**
202:2,7,14,18 242:9
253:5 257:11,16
259:5
**sell**
205:2,14 207:17
**Selma**
241:14
**send**
181:18 192:19 213:3,5
213:8,9 218:1 225:12
226:11 235:24 236:3
236:8 238:2 243:14

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 245:15 246:7 250:21 | **sheet** | 229:13 230:18 232:2 | 205:19,21 206:4 207:3 |
| 261:22 262:24 263:2 | 183:25 184:9 223:1 | **sorry** | 207:9 208:4 210:23 |
| 274:3,5,17 275:15,23 | **sheets** | 212:18 213:19 214:25 | 211:10 218:22 220:23 |
| 276:13,25 277:1,3,7 | 184:14 191:2 281:24 | 220:22 225:24 226:14 | 222:19,20 248:3 |
| 277:12 279:20 280:1 | **shift** | 229:19 232:2 | 251:5,10 254:9 |
| 280:12,24 281:15 | 266:1 | **sort** | 255:23,24 256:23 |
| 282:10 283:21 | **Shore** | 241:6 249:2 | **statements** |
| **sending** | 174:17 177:8 178:2 | **Southern** | 243:8,13,18,22 263:4 |
| 250:16 | **short** | 174:1 177:11 | 266:10 271:6 |
| **sent** | 203:10 255:13 262:19 | **speak** | **States** |
| 180:19,23 183:14,15 | 270:6 | 233:4 239:21 280:21 | 174:1 177:11 |
| 183:19 187:21 199:5 | **Shorthand** | **speaking** | **stating** |
| 199:9 200:1,15 | 174:18 286:7 | 248:1 | 256:9 |
| 201:12 210:20 217:21 | **show** | **specific** | **status** |
| 237:3,5,11,14,21 | 200:15 242:8 258:12 | 179:19 234:11 247:18 | 275:24 277:3 |
| 238:16,18 240:3 | 258:24 272:10 276:19 | 249:2 | **stick** |
| 241:5,6 252:24 | **showing** | **specifically** | 186:4 |
| 261:15 263:8 267:5 | 242:12 | 230:22 233:9 | **sticking** |
| 274:20 | **side** | **spiral** | 220:5 |
| **separate** | 196:20 211:23 | 196:16 239:12 264:6,8 | **stock** |
| 184:22,24 | **sign** | 264:11,17 265:22 | 183:12 185:22 186:12 |
| **separated** | 214:11 | 272:10 | 188:13 190:3,4,5,12 |
| 185:4 | **signed** | **split** | 191:3,10,13 192:11 |
| **series** | 253:9 | 205:8,9,10 | 197:23 198:1 200:16 |
| 227:11 | **similar** | **spoke** | 201:5,6 205:8,8,10,12 |
| **set** | 187:24 196:5 271:23 | 225:15 232:13,17,18 | 241:14 |
| 183:11 189:12 190:1,6 | **single** | 232:25 233:1 240:18 | **stocks** |
| 190:12 191:2,5,25 | 269:23 | 242:21 260:14,20,22 | 185:24 186:1,2 241:19 |
| 192:14 235:15 236:2 | **SIPA** | 280:13,17 | 252:8 |
| 254:8 276:3 277:7,12 | 174:6 175:3 | **Ss** | **stopped** |
| 286:11,19 | **SIPC** | 277:11 286:4 | 196:16 |
| **setting** | 177:9 229:18 230:12 | **standing** | **strategy** |
| 189:19 190:18 191:6 | **sister-in-law** | 258:13,17,25 | 223:13,18 226:16 |
| **settled** | 228:19 229:11 230:17 | **start** | 252:9 277:16 |
| 230:20 | **six** | 181:13 223:13 | **strike** |
| **seven** | 183:12 228:15,17 | **started** | 189:2 195:12 226:14 |
| 183:12 228:20 | **SMB** | 178:12 213:7 253:3,23 | 243:19,19 254:16 |
| **Shady** | 177:13 | **state** | 262:22 282:19 |
| 174:17 177:8 178:2 | **social** | 174:20 227:21 283:9 | **subject** |
| **shares** | 212:25 232:22 273:10 | 286:3,9 | 178:18,23 |
| 204:21,22 | **sold** | **stated** | **Subscribed** |
| **Shearwater** | 207:25 232:6 | 189:3 | 284:6 285:23 |
| 221:9,18 | **son** | **statement** | **substance** |

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

232:20
**Substantially**
174:6
**Substantively**
175:3
**Sue**
177:24
**sued**
231:19,23,25
**suggests**
266:17
**sure**
194:18,23 199:20
231:22,23 233:24
247:3,15 249:10
253:23,24 255:9
262:14
**suspicions**
277:20 278:6
**suspicious**
266:24 267:1,6,9
277:23 278:1
**Suzanne**
174:18 178:4 286:7,22
**swear**
177:24
**switch**
270:5
**sworn**
178:3 284:6 285:23
286:11
**symbol**
180:6 256:11
**system**
186:22 193:25 223:25
224:3

**T**

**T**
286:1,1
**take**
179:13 184:22 192:22
200:9 203:6 213:17
215:9 221:12 226:14

227:12 236:12 255:13
269:16 270:6 281:19
**taken**
174:16 227:2 228:9
234:18 236:16 255:16
263:22 270:10
**talk**
233:2
**tape**
191:11,14 226:19
**taped**
191:19
**technician**
177:5
**tell**
185:15 190:7 192:4
197:1,19 200:12
201:24 202:17 203:14
203:22 204:12 206:10
206:13 209:18,22
210:1,6 213:2 214:13
222:16 226:5 248:2
274:2,6 276:2,16,24
277:6 278:21
**tells**
215:7
**Teresa**
212:13 215:6 216:9
218:22 221:8,16
222:4,23
**term**
188:4 198:2
**terminology**
208:3
**terms**
188:3
**testified**
178:5 182:18 194:24
201:2 202:6 207:15
214:12 218:6 223:5
235:6 239:3 240:2,17
241:4,12 242:16
243:6 252:7 266:8,15

271:8 272:16 275:22
277:19 278:15
**testify**
179:4
**testifying**
242:25 256:20 257:2
**testimony**
234:19 236:21 257:7
286:13
**thank**
202:3 226:2,21 272:12
283:23
**Thanks**
178:10
**thing**
184:4 194:21 247:22
**things**
225:23 226:4 244:2
249:7 257:25 266:16
266:21,21,23
**think**
182:8 184:1 186:10,11
186:13,20 188:17,22
199:16,19 202:6
214:2,3 223:7 228:15
229:8,21,23 230:11
230:14,15,16,20
231:16 232:1,4
233:23 244:14 247:16
248:8,12,14 249:21
268:9 269:2 277:8,9
282:4
**third**
231:11
**thought**
231:13 241:6 243:25
249:5,12 252:18
268:11 278:18
**three**
203:7 204:20
**ticket**
190:10
**time**

177:4,14 183:1 187:25
189:14 192:5 194:15
194:19 196:9,15
199:3 225:7 226:21
226:25 227:3 228:7
228:10 229:7,25
230:3 232:13,16
234:14 236:14,17
237:10 242:3 244:13
248:8 255:14,17
262:20 263:20,23
266:4 268:9,11 269:3
270:8,11,22 271:1
276:17 279:4,7
282:16 283:25 284:2
**times**
182:21 184:7 213:20
213:21
**timing**
207:14
**tip**
188:24 249:2
**today**
177:3 178:11,20 179:2
234:18 235:3 279:1
282:9
**told**
243:17 244:12 267:18
283:1,2
**tongue**
188:25
**top**
195:7,9 197:14 198:17
209:5 211:1,2 214:5
216:21 220:5 256:16
**total**
229:2,5
**touched**
264:2
**tracked**
188:8
**trade**
278:22

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

transaction
203:23 204:4,6 205:3
  206:1,9,20 207:16,17
  207:21 210:19,23
  211:9 220:13,19,25
  274:24 275:9,13
transactions
178:19,21 203:15
  204:18,24 205:6,15
  205:20 207:15 219:10
  222:17 224:8,14
  267:19,21 268:7,16
  268:21 269:6,10,11
  269:13 271:5 277:23
  278:2,25
transcript
176:18
transferred
223:21 224:11 245:14
trial
179:5 243:6
true
225:14 228:3 252:22
  253:18 268:14,20
  269:4 286:12
Trust
254:10,19 255:25
  256:22 257:14 258:14
  258:18 259:1 282:6
trustee
174:16 175:2 176:8
  179:8,11 196:23,24
  198:20 199:8,15,22
  200:5 201:9 202:23
  203:4,5,5,13,15
  204:11 205:19 206:12
  206:19,21 207:4
  208:4,8,12,12,14,24
  209:6,11,14,15,18,21
  209:25 210:2,5,9,13
  210:16,18,25 211:8
  211:12,15,16,19
  212:1,2,6,7,9,14

214:22 215:2,21
  217:13,15,16 218:3
  218:16,18,25 219:19
  219:21,25 220:6,13
  221:2,11,21,22 222:1
  222:3,8,9,15,16,25
  231:19 242:14 244:18
  246:17 254:11 272:13
  275:1 276:20
Trustees
221:9,17 222:5
try
227:22
trying
184:2 254:24
turn
185:6 200:7 202:10,20
  206:12 208:8 210:16
  213:10 214:24 215:20
  221:11 240:1 249:19
  252:6 255:21 256:13
  256:14 257:10 272:13
  272:14 275:1 279:11
turned
253:15
turning
198:6 202:5,16 204:11
  209:5,11,17,21,25
  210:5,9,13,25 212:9
  212:17 214:22 217:13
  222:1 276:23
two
204:20 226:9 228:18
  228:19,25 231:9
  278:3
type
187:11 198:24 199:7
  199:14 212:22 215:7
  215:10 216:2,22
  217:1 234:7 272:17
types
189:10 201:8 219:6
  225:23 226:4

typically
280:20

_____

U

UDT
221:9,17 222:5
uh-huh
186:6 191:16 194:11
  204:8 252:10
uncovered
266:5
understand
178:24 179:1 184:2
  194:23 224:23 228:1
  233:13 248:17 268:25
  269:2 278:10
understanding
187:18 194:15 195:15
United
174:1 177:10
use
196:4 223:24
usually
190:5 283:5

_____

V

Vanderwal
175:8 177:19,19
  234:25
versus
177:10
Victims
175:11
video
177:5
Videographer
175:18 177:1,23
  226:18,25 227:3
  228:7,10 229:24
  230:3 236:14,17
  255:14,17 263:20,23
  270:8,11 279:4,7
  283:25
Videotaped

174:15

_____

W

wait
181:11
walk
181:14 186:7 197:17
want
178:16 179:17 181:10
  188:2 200:7 201:24
  214:24 277:22 280:15
  280:16 281:18,19
wanted
201:18 216:4 224:24
  225:7,8,10,21 226:8
  248:16 269:16 275:23
  276:5,13 283:6,7,10
wasn't
184:5 220:22 235:18
  239:21 246:9 248:19
  261:21 262:17,24
  263:11 265:8 266:14
  267:13,24,25 269:18
  278:19 281:8,10,11
  282:7
way
224:22,25 226:11
  247:16 253:1,25
  286:16
we're
186:25 196:13,19
  198:3,20 199:7,14
  200:4 201:9 202:22
  208:3,9 211:22
  214:23 218:13 223:3
we've
253:5 278:2,25
week
217:22
weeks
183:13 192:12
went
180:14,19 186:18
  191:22 192:15,21,24

BENDISH REPORTING
877.404.2193

SIPC v BLMIS                                    Sala 6/13/2016
CONFIDENTIAL

197:6,7,9 203:20
205:22,23 206:15
219:15 222:13,18
226:17 237:12 264:21
264:22 265:4,10
272:7
**weren't**
185:4 192:22 249:10
266:9,13 267:10
278:1
**WHEREOF**
286:18
**Winifier**
182:14
**Winnie**
182:7,14
**wish**
285:3
**withdraw**
271:2
**withdrawal**
178:19,21 180:7 183:3
197:21 205:23 206:5
207:20 210:24 211:3
217:5 219:10,16
220:8,12 222:14
224:8,14 225:19
227:14 235:9,15
237:10,22 238:16,17
238:19 239:23 240:4
240:19 250:17 256:6
256:12 257:8 259:19
261:6 262:5,8,11
267:5,10 269:13,24
271:9,13 274:24
277:15,23 278:2,25
**withdrawals**
180:15,16 182:24
189:8 225:1 235:5,11
235:12,20,22 237:2
238:12 239:6 264:13
264:15 269:20 275:4
**witness**

176:2 177:13,25
178:11 180:10 201:22
203:9 214:5 215:12
226:1 274:9 285:1
286:10,13,18
**words**
267:16 281:13
**work**
234:2
**worked**
186:20 200:18 232:15
248:23 261:25 268:24
273:12,15
**working**
234:5,13
**wouldn't**
238:6,7 247:1 265:17
265:25 269:12 280:10
**write**
181:15 182:19 184:9
239:4 240:6 262:18
262:23 264:18 265:15
276:12 277:13
**writing**
225:8 226:5 235:8,12
235:14,20,25 236:7
237:7,23 238:1,3,11
238:12,19 248:22
250:22 257:4 275:25
282:7,11,18
**writings**
238:7,22
**written**
217:21 239:5,17
259:10,20,22 264:12
265:19 274:13,23
275:19 280:8
**wrong**
249:14 265:11 267:24
**wrote**
264:11 279:21

---
**X**
---
x

174:2,8,11

---
**Y**
---
**yeah**
191:4 198:22,23 232:4
232:4,4,5,9 233:2
246:1 264:10
**year**
278:20
**years**
258:1,6 262:2
**York**
174:1,18,20 175:5,5,12
175:12 177:8,12
178:2 286:3,5,9

---
**Z**
---

---
**0**
---
**00001472**
179:9
**00001475**
180:11
**00001528**
194:9
**00001824**
179:10
**00087906038800267…**
208:21
**00142426**
212:5
**00142427**
215:13
**00142480**
212:6
**00177098**
218:16
**01764412**
219:19
**01764427**
219:19
**01800094**
196:22
**01800095**

202:12
**01800096**
201:23
**01800109**
196:23
**01991236**
211:25
**01991238**
212:19
**01991239**
212:1
**08-01789**
177:12
**08-01789(SMB)**
174:5
**094**
198:7 200:5 202:17
208:10
**095**
200:12
**096**
202:8

---
**1**
---
**1**
221:14
**1-0**
219:3
**1,331.75**
197:24 198:11 206:11
206:16 210:4,8,21
211:6
**1,566**
204:23
**1/5/96**
214:17
**1:07**
270:11
**1:16**
279:4
**1:30**
279:7
**1:36**
283:25 284:2

SIPC v BLMIS                                        Sala 6/13/2016

CONFIDENTIAL

**10**
224:4 256:15
**10/10/95**
214:16
**100,000**
231:8,11
**10022**
175:12
**10111**
175:5
**108**
200:12
**10th**
217:17,18
**11,793**
219:15 220:10,17
  222:6,12
**11/20/91**
221:9,17 222:5
**11:16**
227:1
**11:27**
227:4
**11:28**
228:8
**11:29**
228:11
**11:32**
229:25
**11:33**
230:4
**11:43**
236:15
**11:48**
236:18
**11706**
177:8 178:3
**11th**
228:24
**12,7**
220:9
**12/28/93**
214:16

**12:23**
255:15
**12:29**
255:18
**12:41**
263:21
**12:49**
263:24
**12:58**
270:9
**1238**
221:13
**13**
174:11
**13th**
177:3
**142426**
176:12 212:8
**142480**
176:13 212:8
**1472**
176:9 179:12
**15**
214:10 256:15
**1538**
240:1
**1561**
185:7 187:10
**16**
255:4
**1655**
255:1 256:15 275:2
**1764427**
176:15 219:22
**1764466**
176:15 219:22
**177098**
176:14 218:19
**178**
176:3
**179**
176:9
**1800094**

176:10 196:25
**1800109**
176:10 196:25
**1824**
176:9 179:12
**18th**
257:15
**1952**
245:4
**196**
176:10
**1983**
262:5
**1984**
262:17,24
**1986**
249:24 250:6
**1991**
194:13,14,18 214:10
  254:10 256:2 258:19
  259:7,11 260:1,5,9
  261:9,15 263:9,16
**1991239**
176:11 212:3
**1994**
262:21
**1995**
217:19 218:23 219:11
  222:6
**1996**
257:15,20 258:22
**1998**
198:10 204:3,16,19
  205:6,9 206:16 208:4
  209:20,24 220:9
  223:6,8,15 232:15
**19th**
178:14 201:17 254:13
  255:3,7 256:21
**1R00731**
216:8
**1R007310**
219:2

---

                        **2**

**2**
199:22 205:8 227:4
**2,100**
204:22
**20**
258:1
**200**
229:13
**200,000**
229:9
**2008**
228:24 270:18
**2016**
174:11 177:3 284:7
  285:23 286:19
**20th**
205:24
**212**
176:11,12
**212.589.4200**
175:7
**213,850**
203:19
**217**
221:9,18
**218**
176:14
**219**
176:15
**22**
208:12 239:25 254:8
  255:1 256:14 275:2
**227**
176:4
**22nd**
256:7 260:1,5,9 261:9
  261:15 263:9
**23**
174:17 177:8 178:2
**239**
213:11,23 214:6
**24**

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

242:8,15
**25**
242:9,15
**25th**
198:10 205:24,25
206:16 207:21,23
209:20,24 210:19
**26**
242:9,15 254:8
**27**
203:5 204:11 205:20
206:21 207:4,9 208:5
210:17,18 211:12
242:9,15
**270**
176:4
**279**
176:5
**28**
194:13 203:5 206:13
206:19 208:12 209:11
209:15,21,24 210:5
210:13 211:16,19
**28th**
194:14,18 195:10
**29**
203:6,14,15,24
**2nd**
186:5,7

**3**

**3**
205:8 224:12,13
255:18
**30**
224:4 244:18
**300,000**
229:16
**30th**
204:16 208:4
**31**
246:17
**31st**
204:3 218:23 254:10

256:2
**350**
231:16
**355.59**
256:4,18 258:6 259:7
259:18 261:14 275:14
275:20
**356**
272:15 273:24 274:10
**3566**
246:18
**358**
257:11
**36**
249:19 252:1,3,4,5
276:20 279:12 283:17
**37**
252:1,2,5,6
**38**
252:1,5
**39**
252:1,5

**4**

**4**
198:14 221:14
**4/9**
185:21
**40**
224:4 252:1,5
**41,331.75**
205:23
**419**
276:24
**441**
215:21 217:2
**45**
175:4
**46**
257:11 272:14 274:1
**465**
175:11
**48**
254:8,11 255:21

256:23

**5**

**5**
229:11
**5/2**
185:21
**5/3/93**
214:16
**50**
224:5 266:4
**500**
229:9,23
**500,000**
230:10
**55**
255:5
**58**
204:20
**58-5/8**
204:23
**5th**
205:1,9,17 207:16
219:14 220:9 222:6
222:13,18

**6**

**600,000**
232:12
**61**
176:9 179:8,11 194:16
194:19 195:20 196:6
**62**
176:10 196:23,24
198:20 199:8,15
200:5 201:9 202:23
208:9,14,15,24 209:6
209:15,18 210:1,3,10
210:25 211:8,15,19
**63**
176:11 212:1,2,9
217:13,15 221:12,21
222:25
**64**

176:12 212:6,7 214:22
215:3,21 217:16
218:4
**65**
176:14 218:17,18
219:1 220:14 222:9
222:15
**66**
176:15 219:20,21
220:1,6 221:3,22
222:1,3,8,16

**7**

**7/5**
220:21 221:1
**7/5/95**
221:5
**750**
229:12

**8**

**80s**
263:13
**83**
262:3
**84**
262:3,5
**8419**
249:20 279:13
**87**
203:18
**87906**
209:10,13
**888.759.1114**
175:13

**9**

**9:58**
174:12 177:4
**900,000**
231:10
**91**
195:10
**94404**

SIPC v BLMIS                                    Sala 6/13/2016

CONFIDENTIAL

Page 307

| | | | |
|---|---|---|---|
| 221:10,19 | | | |
| **97** | | | |
| 214:18 | | | |
| **98** | | | |
| 223:7 | | | |
| **9th** | | | |
| 185:14 | | | |