**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES INVESTOR PROTECTION CORPORATION,**<br><br>v.<br><br>**BERNARD L. MADOFF INVESTMENT SECURITIES LLC,**<br><br>                       **Defendant.** | **Adv. Pro. No. 08-01789 (SMB)**<br><br>**SIPA LIQUIDATION**<br><br>**(Substantively Consolidated)** |
| **In re:**<br>**BERNARD L. MADOFF,**<br><br>                       **Debtor.** | |
| **IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,**<br><br>                       **Plaintiff,**<br><br>v.<br><br>**NORMAN J. BLUM**<br><br>                       **Defendant.** | **Adv. Pro. No. 10-04846 (SMB)** |

**THE BLUMS' PRE-HEARING BRIEF IN OPPOSITION TO TRUSTEE'S PROFIT
<u>WITHDRAWAL MOTION</u>**

**BAKER & MCKENZIE LLP**
Richard A. Kirby
Laura K. Clinton
Graham R. Cronogue
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7020
Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com
Email: graham.cronogue@bakermckenzie.com

# Table of Contents

Introduction ............................................................................................................... 1

Statement of Facts ..................................................................................................... 3

    I.    The Blums properly challenged the Trustee's calculation of their claims .................. 3

    II.    The Blums testified that they did not receive profit withdrawal checks ..................... 5

          A.    Morris Blum's Retirement Account ................................................. 6

          B.    Roslyn Blum's Account ................................................................. 8

          C.    Norman Blum's Retirement Account ............................................... 9

    III.    The Trustee's conclusion that all Madoff Securities customers received cash payments corresponding to every PW notation is based on circumstantial evidence and inference. ......................................................................................... 11

          A.    The Trustee originally relied on five bases to draw a factual conclusion that the PW notations in the admittedly fraudulent Madoff Securities customer statements accurately recorded cash withdrawals. .......................................... 11

                1.    The vast majority of Ten Year Profit Withdrawal Transactions, none of which are at issue here, reconciled with third party bank records .........12

                2.    Including the Ten Year Profit Withdrawal Transactions, just over 50% of all PW notations are reflected in some other document. ......................14

                3.    Almost all PW notations after December 1995 with the description "Check + Stock Name" have values corresponding to fictitious trades, a time period and format that is largely irrelevant to the Blums' accounts ................................................................................16

                4.    Madoff Securities reduced account balances by amounts corresponding to the value of PW notations. ........................................17

                5.    The House 17 Manual, which employees did not read, describes PW notations as profit withdrawals and as outgoing checks. ..........................18

           B.    Recognizing that he had an insufficient basis for his factual inference concerning the Blums, the Trustee offered new analysis in a post-hoc effort to justify his claim determinations ................................................................. 19

                1.    Greenblatt's Second Supplemental Report ................................................19

                2.    Greenblatt's Principal Balance Calculation as Applied to Norman J. Blum ..................................................................................................20

                3.    Collura's Proof of Transfers to the Defendant ...........................................20

Argument .............................................................................................................. 20

    I.    It is for the Court to determine, by a preponderance of the evidence, whether the Blums received cash withdrawals corresponding to entries recorded as PW transactions on the admittedly fraudulent Madoff Securities account records. ......... 20

A.    Fact disputes over the calculation of a SIPA claim are to be resolved by the Court de novo. .................................................................................... 20

B.    The Trustee's factual assumptions are not entitled to deference under SIPA, the Bankruptcy Code, or case law. ................................................. 23

II.    The Blums' first-hand testimony showing that they did not receive cash corresponding to the PW notations is unrebutted. ..................................... 24

A.    The Blums' testimony is consistent with the purpose of the four accounts. .... 25

B.    The Blums' testimony is corroborated by the lack of any record of PW transfers. ..................................................................................... 31

C.    The Blums' testimony is credible. ................................................. 33

D.    Documentary evidence is not more reliable than oral testimony. .................... 34

III.    There is no direct evidence for the Trustee's proffered inference that the Blums received cash corresponding to the PW notations, and the Trustee's "routine practice" arguments do not satisfy the Rules of Evidence for habit evidence. .......... 35

A.    Even if admissible, the expert reports confirm that it is not appropriate to infer that any particular PW notation accurately reflects a cash withdrawal received by the customer. ............................................................... 36

1.    Collura's Ten Year Reconciliation is irrelevant because it examines a time period after the PW notations at issue, uses a miniscule sample size, and cannot account for significant intervening changes at Madoff Securities ...................................................................... 38

2.    The Second Collura Report cannot be read to establish that earlier PW notations are accurate, as it liberally construed evidence in favor of finding a pattern and even so only found 57% corroboration. .............. 41

3.    Greenblatt's trading analysis is largely irrelevant. ..................................... 42

4.    The Customer account statements showed increasing balances ................ 43

B.    Neither the House 17 Manual – which was not followed by employees – nor employee testimony about inconsistent PW procedures gives rise to a presumption of pattern or practice. ................................................... 45

1.    Employees largely ignored the House 17 Manual ..................................... 45

2.    Madoff Securities employees lacked knowledge about the PW process overall, and the process was inconsistent ..................................... 46

C.    The creation of fraudulent and misleading documents is not part of a normal business practice and should not be afforded the same respect as a reliable business habit or routine. ............................................................... 49

IV.    The Blums have not waived their claims because Trustee is barred by *in pari delicto* from enforcing any term in the Madoff Securities contract against innocent customers. .................................................................................... 50

V.    Because the Trustee cannot show by a preponderance of the evidence that the Blums received cash corresponding to the PW notations, the Trustee erred in calculating their claims and the Court should compute their SIPA claims without regard to the PW notations. ...................................................................................... 52

Conclusion .................................................................................................................................... 53

# Table of Authorities

**Page(s)**

**Cases**

*Bernardo v. Johnson,*
814 F.3d 481 (1st Cir. 2016) ........................................................................................... 23

*Bucalo v. Shelter Island Union Free Sch. Dist.,*
778 F. Supp. 2d 271 (E.D.N.Y. 2011) ............................................................................. 33

*Buffalo Forge Co. v. Ogden Corp.,*
717 F.2d 758 (2d Cir. 1983) ............................................................................................ 51

*Cappuccio v. Prime Capital Funding LLC,*
649 F.3d 180 (3d Cir. 2011) ...................................................................................... 22, 25

*Cary Oil Co. v. MG Ref'g. & Mktg., Inc.,*
230 F. Supp. 2d 439 (S.D.N.Y. 2002) ............................................................................. 51

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,*
508 U.S. 602 (1993) ......................................................................................................... 22

*Cotto v. Fischer,*
09 CV. 9813, 2012 U.S. Dist. LEXIS 162945 (S.D.N.Y. Aug. 23, 2012) ....................... 33

*Curtis v. Perkins,*
2015 U.S. App. LEXIS 4444 (11th Cir. 2015) ................................................................. 34

*In re Edwards,*
50 B.R. 933 (Bankr. S.D.N.Y. 1985) ............................................................................... 22

*Found. Ventures, LLC v. F2G, Ltd.,*
Case No. 08 Civ 10066 (PKL), 2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11,
2010) .................................................................................................................................. 51

*Freeman v. Marine Midland Bank-New York,*
419 F. Supp. 440 (E.D.N.Y. 1976) .................................................................................. 50

*G.M. Brod. & Co. v. U.S. Home Corp.,*
759 F.2d 1526 (11th Cir. 1985) ....................................................................................... 39

*Galvin v. Eli Lilly & Co.,*
488 F.3d 1026 (D.C. Cir. 2007) .................................................................................. 38, 39

*ITC Ltd. v. Punchgini Inc.,*
482 F.3d 135 (2d Cir. 2007) ...................................................................................... 24, 25

*Keene Corp. v. United States*,
 508 U.S. 200 (1993) ................................................................................................. 21

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
 560 F.3d 156 (3d Cir. 2009) .................................................................................... 25

*Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
 No. 95-08203(JLG), 1998 Bankr. LEXIS 1076 (Bankr. S.D.N.Y. Aug. 24, 1998) ............................ 23

*Levin v. United States*,
 338 F.2d 265 (D.C. Cir. 1964)................................................................................... 35

*Liebert v. Nisselson (In re Levine)*,
 No. 94-44257 (PCB), 2008 Bankr. LEXIS 2639 (Bankr. S.D.N.Y. Sept. 5, 2008) ............................ 22

*Ligon v. City of New York*,
 925 F. Supp. 2d 478 (S.D.N.Y. 2013) ....................................................................... 33

*Meyer v. United States*,
 464 F. Supp. 317 (D. Colo. 1979) ............................................................................. 36

*Mills v. Elec. Auto-Lite Co.*,
 396 U.S. 375 (1970) ................................................................................................. 51

*Mobil Exploration v. Cajun Const. Services*,
 45 F.3d 96 (5th Cir. 1995)........................................................................................ 49

*In re MV Secs., Inc.*,
 48 B.R. 156 (Bankr. S.D.N.Y. 1985) ......................................................................... 21

*Norwalk CORE v. Norwalk Redev. Agency*,
 395 F.2d 920 (2d Cir. 1968) ..................................................................................... 23

*Palmer v. Hoffman*,
 318 U.S. 109 (1943) ................................................................................................. 34

*Picard v. HSBC Bank*,
 454 B.R. 25 (S.D.N.Y. 2011) .................................................................................... 52

*Picard v. JPMorgan Chase & Co.*,
 721 F.3d 54 (2d Cir. 2013)................................................................................. 51, 52

*Sagor et al. v. Picard*,
 No. 16-0431bk(L) (2d. Cir) ............................................................................. 6, 44, 53

*SEC v. F.O. Baroff Co.*,
 497 F.2d 280 (2d Cir. 1974) ..................................................................................... 21

*Simplex, Inc. v. Diversified Energy Sys., Inc.*,
 847 F.2d 1290 (7th Cir. 1988) ................................................................. 35, 36, 41, 46

*SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*,
654 F.3d 229 (2d Cir. 2011) ............................................................................................... 22, 23

*Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*,
726 F. Supp. 2d 339 (S.D.N.Y. 2010) ....................................................................................... 33

*United States v. Angwin*,
271 F.3d 786 (9th Cir. 2001) ....................................................................................... 35, 41, 46

*United States v. Int'l Bus. Mach. Corp*,
66 F.R.D. 154 (S.D.N.Y. 1974) ................................................................................................. 34

*United States v. United States Gypsum Co.*,
333 U.S. 364 (1948) .................................................................................................................. 34

**Statutes**

15 U.S.C. § 78cc(b) .................................................................................................................... 50

15 U.S.C. § 78eee(b)(6)(B) ........................................................................................................ 21

15 U.S.C. § 78fff-1(a)(4) ............................................................................................................ 21

15 U.S.C. § 78fff-2 ..................................................................................................................... 21

15 U.S.C. § 78fff-2(a)(4) ............................................................................................................ 22

15 U.S.C. § 78fff-2(b) ................................................................................................................ 21

15 U.S.C. § 78fff-2(c)(1)(B) ....................................................................................................... 21

15 U.S.C. §§ 78fff-4(a) *and* (f) .................................................................................................. 21

Section 501 *et seq.* of the Bankruptcy Code ........................................................................... 22

Section 29(b) of the Securities Exchange Act of 1934 ........................................................ 50, 51

**Other Authorities**

Fed. R. Bankr. Proc. 3001(f) ...................................................................................................... 22

Federal Rule of Evidence 801, 802, 803 ...................................................................................... 7

Federal Rule of Evidence 301 ......................................................................................... 22, 24, 25

Federal Rule of Evidence 406 ......................................................................................... 35, 36, 39

Joseph M. McLaughlin, Jack B. Weinstein, Margaret A. Berger, 2 *Weinstein's Fed. Evid.*
Section 406.03 (2d ed. 2014) .................................................................................................. 49

## INTRODUCTION

Doctors Norman and Joel Blum offer this pre-hearing memorandum in anticipation of some of the factual and legal issues likely to be raised during the hearing on the Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions ("Motion"). In his Motion, the Trustee asks the Court to endorse a factual proposition: that every "PW" notation in Madoff Securities account statements reflects an actual cash withdrawal of profits by the customer that the Trustee can uniformly treat as "cash out" for the purposes of computing a customer's net equity claim. Where a PW notation in the Madoff records corresponds with a check actually received by a customer, the Blums do not dispute that the Trustee may treat the amount of the check as a cash withdrawal in the net equity calculation for that claimant. On the other hand, where a customer disputes the claim calculation on the grounds that a set of PW notations do not reflect actual customer account withdrawals, this presents a question of fact for the Court to determine, by a preponderance of the evidence.

There is no direct evidence that the Blums received or cashed any profit withdrawal checks associated with the PW notations on the accounts that are at issue in this proceeding. They testified that neither they nor their parents received any such checks. Specifically, both Blums aver that neither they nor their father received or cashed profit withdrawal checks and also that taking profit withdrawal checks would have frustrated the specific purpose of the accounts at issue—saving for retirement or providing financial support for family members. There is no direct evidence that contradicts their testimony.

In response, the Trustee relies on his professionals, who analyzed a mountain of paper from which they confirmed that the majority of PW notations corresponded to checks received by customers during a ten year period that is irrelevant to the Blums' claims and during which

the Madoff Securities PW practices were dramatically different from those at issue.  The Trustee

also relies on the general testimony of those former Madoff employees who assisted in the day-

to-day operations of implementing Madoff's fraud.  Putting aside the serious questions as to their

credibility, none of them were able to verify that any PW check was sent to or received by the

Blums.  Instead, they confirmed that *other* customers sometimes requested and received such

profit withdrawals, and that Madoff Securities had some general policies and practices that

employees sometimes followed when a customer requested profits.  Almost all of the Trustee's

evidence is circumstantial and much of it is clearly inadmissible; his professionals' analysis is

outside of recognized norms for expert testimony.  All of those evidentiary issues will be the

subject of separate motions *in limine*.

Putting aside the evidentiary problems with the Trustee's proffer, he provides only very

general evidence regarding the PW notations and what some other customers experienced.  His

professionals rely on largely irrelevant materials—bank records from different time periods

regarding different customer accounts—and were only able to reconcile just over 50% of the PW

notations.  Unlike the transactions upon which the Trustee focuses, the PW notations purportedly

affecting the Blums' accounts are not reflected in any verifiable bank records nor can they be

confirmed with reference to any other reliable evidence.

The Trustee asks the Court to endorse a presumption – under the guise of "routine

practice" or habit evidence – that older PW notations in customer accounts (those prior to the late

1990s) followed the same process and have the same meaning as those that his professionals

were able to verify.  But the Trustee's own witnesses *confirm* that this is totally inappropriate:

the Trustee's professionals repeatedly found that Madoff Securities did not observe the same

practices over time with respect to the PW notation.  The evidence shows that Madoff Securities

changed its accounting policies, did not follow internal guidelines for reporting, and—perhaps most importantly—recorded each PW notation as part of an overall scheme to defraud customers, not to create accurate or reliable records.  The evidence the Trustee has developed on this issue confirms that the PW notations do not accurately reflect whether a specific customer received a corresponding check.

The Trustee's calculations of the Blums' net equity claims were based on the unsupported assumption that these notations were completely accurate. The Blums ask the Court to credit their testimony that the PW notations in the four accounts at issue—like the purported profits that the PW transactions allegedly represent—are not reliable, and to recalculate their respective net equity claims without deduction for such transactions.

STATEMENT OF FACTS

**I.    <u>The Blums properly challenged the Trustee's calculation of their claims</u>**

After this proceeding was initiated under the Securities Investor Protection Act ("SIPA"), Norman and Joel Blum filed three timely customer claims in 2009, seeking reimbursement of the millions of dollars in losses that they sustained from Madoff's fraud.[1]  The Trustee denied one claim in its entirety, and initiated a clawback suit against Norman in 2010, which action remains pending.[2]  ***Almost seven years after they were submitted***, the Trustee issued a determination on the remaining two claims as this Motion was pending.[3]  For all three claims, the Trustee

---

[1] Blum Ex. A  (N. Blum Statement of Claim for Account 1B0201 - $100,000 in cash and $1,027,795.20 in securities); Blum Ex. B (J. Blum Statement of Claim for Account 1B0251 - $95,709 cash and $876,496 in securities); Blum Ex. C (N. Blum Statement of Claim for 1B0190- $2.5 million in securities).   All Blum Exhibits referenced herein are filed with the Declaration of Richard A. Kirby in Support of Blums Prehearing Brief.

[2] *Picard v. Norman Blum*, 10-adv-04846 (concerning Account 1B0190).

[3] Blum Ex. 4 (Notice of Trustee's Determination of Claim for J. Blum); Blum Ex. 5 (Notice of Trustee's Determination of Claim for N. Blum); Trustee Supp. Mem. of Law in Supp. of

calculated the net equity in the three accounts on which the claims were made, and wrote down the value of all three claims on the basis of PW notations in four older accounts.[4]

The Trustee acknowledges that none of the accounts for which Norman and Joel filed claims had any profit withdrawals.[5] Rather, the Trustee asserts that their claims are subject to reduction on the basis of alleged PW notations in four older (long closed) family accounts.[6] In calculating the amount of Joel and Norman's SIPA claims, the Trustee deducted the amounts of over 320 "PW" notations in these four closed accounts from 1981 to 1997.[7] In so doing, the Trustee relied almost exclusively on stray notations of unknown authorship in Madoff Securities documents that he acknowledges were created to defraud innocent victims like the Blum family.[8] Most relevant here, the Trustee contends that marginalia on internal customer account files – handwritten "S" and "R" notations of unknown date or authorship – suggest that any profits were to be "Sent" to the customer rather than "Reinvested."[9]

The Trustee asserts that, where the amount of SIPA claim is disputed, the Court must defer to his specific calculations and inferences, a legal proposition with which the Blums (and SIPC) disagree. As detailed below, it is not the Trustee's cash-in, cash-out methodology that the

---

Trustee's Mot. Affirming Treatment of Profit Withdrawal Transactions ("Trustee Supp. Mem.") at 43.

[4] *Id.*

[5] *Id.*

[6] *Id.*; Blum Ex. E (Notice of Trustee's Determination of Claim for J. Blum); Blum Ex. F (Notice of Trustee's Determination of Clam for N. Blum). A graph of the Blum accounts at issue and their interrelationships is attached to the Respess Declaration.

[7] *See* Blum Ex. D (Matthew B. Greenblatt, Principal Balance Calculation as Applied to Norman Blum) ("Greenblatt Principal Calculation").

[8] Trustee Supp. Mem. at 4.

[9] *Id* .at 21; Bongiorno Tr. 61:1-63:2, Trustee's PW Ex. 4.

Blums challenge here, but rather the treatment of PW notations as withdrawals where there is no

evidence to indicate that such a transaction occurred, and affirmative testimony that it did not.

## II.    The Blums testified that they did not receive profit withdrawal checks

Morris Blum and his wife Roslyn Blum,[10] now deceased, maintained several brokerage

accounts at Madoff Securities during their lifetimes.[11]   After Roslyn's death, their sons, Doctors

Joel and Norman Blum, assisted their aging father in the management of his financial affairs.[12]

As a result of this close interaction, Joel and Norman became "fully familiar" with their father's

estate and retirement planning, especially how he managed his Madoff Securities retirement

accounts.[13]   Eventually, Joel and Norman became the trustees and beneficiaries of those accounts

after their parents' deaths.[14]   Norman and Joel also invested their own funds in various Madoff

Securities accounts over time.

Norman and Joel have repeatedly testified under oath that none of the Blum accounts

were set up to receive automatic withdrawals of "profits" and that the Blums did not cash any

profit withdrawal checks issued from these accounts.[15]   In fact, withdrawing profits from the

accounts would have run counter to the very reasons for their existence, as the accounts were

---

[10] Because the various Blum family members share a common surname, they are referred to by their first names.  No disrespect is intended.

[11] Decl. of J. Blum, Trustee's PW Ex. 15, at ¶ 4.

[12] Decl. of J. Blum at ¶ 4; Transcript of N. Blum Deposition ("N. Blum Tr.") 51:1-51:25; 68:6-68:14.

[13] Decl. of J. Blum at ¶ 4; Decl. of N. Blum, Trustee's PW Ex. 10, at ¶¶ 5, 10.  Joel and Norman credited his statements regarding the financial situation because Morris Blum's mental health was still very strong.  N. Blum Tr. 51:18-20 ("He made his own decisions.  He got his regular distribution from Madoff and his regular investments, as well.  He did that himself. I would help him - - help him see. Sometime I'd help him write out the check."); N. Blum Tr. 52:4-5 ("My father . . . had his mind together till the day he died.").  There is no evidence to the contrary.

[14] Decl. of J. Blum at ¶ 4; Decl. of N. Blum at ¶ 5.

[15] N. Blum Tr. 29:23 ("I never took any profit withdrawal").

largely vehicles for retirement savings and estate planning.[16]  This testimony is the only specific, direct evidence in the record on these points.  There is no direct documentary evidence that any of the PW notations at issue actually resulted in the transmission of PW checks to any member of the Blum family, nor is there any evidence that any of the Blums cashed any corresponding PW checks.  There are no independently verifiable records of these transactions ever having occurred.

### A.  Morris Blum's Retirement Account

Prior to 1981, Morris opened a retirement account at Madoff Securities numbered 1B0033.[17]  Employee testimony established that, generally, when a customer opened an account with Madoff Securities, the customer spoke personally with Madoff regarding whether an account would be treated as a "Send" account, where profits were routinely sent to the customer, or a "Reinvest" account, where the profits would be automatically reinvested.[18]  Madoff would then orally relay this information to other Madoff Securities employees to implement.[19]  Once the account was opened, any change had to be requested by the customer in writing.[20]

Morris retired from his job as a physician in 1986 at the age of 87.[21]  Prior to his retirement, his account records reflect 42 PW notations.  Between April 1, 1981 and July 8, 1997,

---

[16] N. Blum Tr. 29:16-29:19 ("This is through my retirement fund, my pension fund.  They're very strict in doing things like that.  You're not allowed to play around with things like that.  I never touched that.").

[17] N. Blum Decl. at ¶ 5.  The remaining account assets were eventually transferred from 1B0033 to 1B0189.  N. Blum Tr. at 50:13-17.  In October 2003, this Account 1B0189 was closed and the proceeds sent to Norman and Joel Blum in equal shares.  These transfers are affected by litigation in the inter-account transfer proceeding.  *See Sagor et al. v. Picard*, No. 16-0431bk(L) (2d. Cir) (cases consolidated on appeal).

[18] A. Bongiorno Tr., Trustee's PW Ex. 4, at 33:16-34:22; 69:4-69:16; Transcript of Joann Sala Deposition, Trustee's PW Ex. 9, 54:24-58:14.

[19] A. Bongiorno Tr. 69:4-69:16; J. Sala Tr. 54:24-58:14.

[20] J. Sala Tr. 54:24-58:14. Employees testified that these documents were kept in the customer file.

[21] J. Blum. Tr. 51:8-51:13.

Madoff account documents reflect a total of 138 PW notations in this retirement account.[22]  The Trustee alleges that these transactions resulted in withdrawals totaling roughly $1.4 million from 1B0033.[23]  There is no documentary evidence that any of these checks were actually written, received by Morris, or cashed by him.  The Name/Address sheet for Morris's account indicates in handwritten marginalia that an unknown employee[24] made the account an "S" on December 29, 1992 – after more than 98 PW notations had already been made.[25]  The Trustee's witnesses testified that  each customer would have had to request such a change in writing.[26]  No such written request from Morris has been produced.

Norman and Joel testified unequivocally regarding their father's use of this account as a savings vehicle -- any withdrawal would have frustrated the entire purpose of the account.[27]  The PW notations purport to show that, at the same time Morris was receiving small monthly checks, he was also making very large infrequent deposits.[28]  For example, the PW notations suggest that Morris Blum received a PW check of $12,583 on October 31, 1986, and *deposited* $100,000 into

---

[22] Greenblatt Principal Calculation at ¶¶ 55, 58.

[23] Of these, only the PW notations prior to September 1984 actually affect the claims, as unknowingly, Morris later depleted any remaining equity in account 1B0033 through cash withdrawals.  Ex. B.7 to Respess Declaration.

[24] The evidentiary prohibitions against admitting such hearsay statements for their truth will be the subject of a motion *in limine*.  *See* Fed. R. Evid. 801, 802, 803.

[25] Ex. B.7 to Respess Declaration; Morris Blum Customer Account File, Trustee's PW Ex. 68, at MADTBB01988462.

[26] In any event, the "S," if admissible, would apply only to transactions that occurred *after* the date it was purportedly made.

[27] *See* J. Blum Tr. 65:17-65:19 ("my father was trying to grow his estate").

[28] Ex. B.7 to Respess Declaration; Greenblatt Principal Calculation at Ex. 4D p. 4.

the same account *just two weeks later*.[29]  Similarly, Morris allegedly received a PW check for

$3,742.70, and, within one month, deposited $200,000 back into the account.[30]

## B.    Roslyn Blum's Account

On September 14, 1984, Morris opened an account to provide financial support for his

wife, in the event he passed away before her.[31]  Though these funds were set aside for her benefit,

Roslyn did not manage them.[32]  Morris maintained the account to ensure that his wife would

have a sufficient nest egg after his death.[33]  The Trustee contends that, between October 10, 1984

and September 19, 1994, 83 PW checks were written from 1B0036 and cashed for a total of

$524,000.  Of these 83 PW notations, 68 are recorded in the account prior to Roslyn's death in

1993.[34]  After her death, funds in Roslyn's account were transferred to a successor account

(1B0115).[35]  The Trustee asserts that another 28 PW checks issued from the successor account

in the amount of $123,000 between October 27, 1994 and July 8, 1997.[36]  There is no evidence

that any of these checks were actually written, received, or cashed.

---

[29] *Id.*

[30] *Id.*

[31] Decl. of J. Blum at ¶ 6; N. Blum Tr. at 84:14 ("My mom was much younger than he was. He made a presumption he'd. . .die before she did, and therefore he would have a retirement for her. But, unfortunately, she died before he did").

[32] Decl. of J. Blum at ¶ 8.

[33] *Id.* at ¶ 6; J. Blum Tr. 65:14-65:16 ("my mother would not be involved in the management" of her account).

[34] Decl. of J. Blum at ¶ 4.  The original support account—1B0036—was in the name of Roslyn L. Blum.  These funds were later transferred to 1B0115—Roslyn L. Blum Remainder Trust—then to 1B0191, for which  Joel and Norman Blum were trustees.  Eventually, that account was dissolved and the funds divided between Norman and Joel Blum.

[35] Ex. B to Respess Declaration; R. Blum Account Folder, Trustee PW Ex. 69 at MADTBB01988479.

[36] Ex. B.5 to Respess Decl.; Greenblatt Principal Calculation, Ex. 4F.

The Trustee points to an S notation in the 1B0115 account folder: the Name & Address File Maintenance Form contains a handwritten S notation under the profits column. [37] Immediately next to that notation is a handwritten "Done 8/23/94" and illegible initialing. [38] Thus, in the light most favorable to the Trustee, an unknown employee asserted that he or she changed the account to an "S" on 8/23/94 – three weeks before the account was funded. [39] Employees testified that such a change to an account required a written request from the customer. [40]  There are no such letters in the account folder.

### C.    Norman Blum's Retirement Account

Norman Blum opened Account 1B0034 in September 1986 as a retirement savings account.  The customer file for the Account 1B0034, which Norman never saw prior to this proceeding, [41] contains a typewritten document on which an unknown author handwrote an "S." [42] The back of the folder contains another handwritten note:  "change to reinvest" with illegible initials and a date that appears to be "7/01/87."  Another notation reads "change to send," with a largely illegible day and month but an indicated year of "88." [43]  The Trustee asserts that between September 18, 1986 and August 3, 1997 Account 1B0034 experienced a total of 73 separate PW withdrawals totaling $180,000 – of which only 17 affect the claims in this proceeding. [44]  All of

---

[37] R. Blum Account Folder at MADTBB01988479.

[38] *Id*.

[39] Again, the evidentiary prohibitions against admitting such hearsay statements for their truth will be the subject of a motion *in limine*.

[40] Sala Tr. 54:24-58:14.

[41] *See, e.g.*, Norman Dep. Tr. at 21:7-21:12.

[42] Norman Blum Customer Account, Trustee's PW Ex. 70, MADTBB01988467.

[43] *Id.* at MADTBB01988469.

[44] Greenblatt Principal Calculation at ¶ 28; Ex. B to Respess Decl.

these 73 purported transactions are dated prior to Norman's 65th birthday.  42 occurred prior to April 1994, when Norman retired.[45]

Four years after he opened Account 1B0034, Norman rolled funds into this account from a pension plan in which he and an associate held equal shares (Account 100249).  There is no dispute that Account 100249 was explicitly a "Reinvest" account,[46] or that it was dissolved in 1990 and funds rolled over into two retirement accounts, one of which was 1B0034.[47]  Norman's written communications to Madoff Securities – and those of his partner's widow – are explicit about how 100249 be distributed:  "The proceeds in this acct need to split up equally and transferred into individual IRA accounts …";[48] "Of course, we want these two equal shares rolled over into 2 IRA's …"[49]; referring to "setting up the IRA."[50]  Handwritten notations of unknown origin confirm "IRA – yes" and the need for written confirmation for "splitting acct 50-50 into IRA."[51]  Shortly after rolling over the funds from 100249 into 1B0034, Norman transferred those funds and additional monies from 1B0034 into a new IRA, Account 1B0035.[52]

---

[45] N. Blum Tr. 55:8-55:9.

[46] Dr. Bradley and Blum Joint Account, Trustee's PW Ex. 12 at MADTBB01953409 (showing large circled handwritten "R" of unknown authorship).

[47] *Id.* at MADTBB01953410-15.

[48] *Id.* at MADTBB01953412.

[49] *Id.* at MADTBB01953413.

[50] *Id.* at MADTBB01953410; Norman Dep. Tr. at 38:8-38:25.

[51] Dr. Bradley and Blum Joint Account, MADTBB01953415.

[52] The Trustee wrote this transfer down from $239,439 face value to $112,035.00.  If the PW notations in Account 1B0034 that precede the transfer are not valid, that amount should reflect $100,000 of principal from Account 100249 and another $100,000 in principal from 1B0034, minus one cash withdrawal.  Ex. B to Respess Decl.; Greenblatt Principal Calculation, Ex. 4B.

Norman testified that he "never received or cashed any [PW] checks" for either of these accounts.[53]  Account 1B0034 was a retirement savings account, and all of the PW notations that affect the SIPA claim were made prior to 1990 – during a period when Norman had a lucrative medical practice and no need for such funds.[54]  There is no evidence that such checks were sent or cashed.  Indeed, the Trustee's experts excluded two of the PW notations because they found conclusive evidence that these notations did not result in Norman receiving and cashing a check.[55]

III.    **The Trustee's conclusion that all Madoff Securities customers received cash payments corresponding to every PW notation is based on circumstantial evidence and inference.**

   A.  **The Trustee originally relied on five bases to draw a factual conclusion that the PW notations in the admittedly fraudulent Madoff Securities customer statements accurately recorded cash withdrawals.**

The Trustee originally claimed five grounds for treating every noted "PW" transaction as a cash withdrawal by customers.[56]  As Madoff Securities' records are neither consistent nor complete, the Trustee relies on shifting theories and justifications for the specific treatment of each account.[57]  The five bases for the Trustee's original conclusion are the following: 1) Lisa Collura reconciled PW notations in statements from an irrelevant ten-year period (December 1998 to December 2008) to third party records; 2) of all PW notations in Madoff Securities customer accounts, Collura found that slightly more than half (none of which are at issue here) were corroborated by some other written record; 3) Matthew Greenblatt determined that post-

---

[53] Decl. of N. Blum at ¶ 9.

[54] N. Blum Tr. 37:10-37:13; 51:13-51:15.

[55] Greenblatt Principal Calculation at n. 8 (one was later canceled and another was returned)

[56] Trustee's Mem. of Law, Doc. No. 10661 at 12.

[57] *Id*. ("the support for a particular Profit Withdrawal Transaction may vary from transaction to transaction").

1995 PW notations (none of which are at issue here) almost always correspond to the dollar amount of a reported trade found in Madoff Securities' records; 4) customer account statements reflect PW notations as debits; and 5) an internal Madoff Securities manual – that employees did not review or follow – describes PW notations as outgoing checks. These five grounds, and the evidence supporting them, are discussed in turn.

        *1.   The vast majority of Ten Year Profit Withdrawal Transactions, none of which are at issue here, reconciled with third party bank records.*

The Trustee repeatedly emphasizes Collura's reconciliation analysis for the "Ten Year Profit Withdrawal Transactions."[58]  For December 1998 to December 2008, the Trustee was able to obtain third-party bank records related to the Madoff Securities accounts. Collura then compared the transactions in these accounts to the PW notations contained in Madoff Securities records.[59]  She concluded that the majority of the PW notations in this period were corroborated by the third party records.[60]  None of the alleged PW transactions affecting the Blum accounts occurred during this ten-year period.[61]

The relative sample size that Collura reviewed for the Ten Year Profit Withdrawal Transactions is miniscule.  Madoff Securities records contain a total of 92,000[62] PW notations

---

[58] *See, e.g.*, Trustee Supp. Mem. of Law at 12 (discussing Collura report's reconciliation analysis).

[59] *See* Lisa Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals," ¶¶ 1-15.

[60] *Id.* at ¶ 33.

[61] *See* Exs. B-B.9 to Respess Decl.

[62] The number of purported PW transactions has apparently changed from time to time.  *See, e.g.*, Greenblatt Supp. Analysis of the Profit Withdrawal Transactions at n. 4 (noting that 6 notations were erroneously included as PW transactions and that 96 PW notations had to be updated).  The present figure above includes the roughly 800 PW notations that the experts excluded; it also includes the 591 transactions that were not marked as PW but the experts chose to treat as PW transactions.  Greenblatt Supp. Analysis of the Profit Withdrawal Transactions ¶ 16, n.5.

between 1981 and 2008. However, barely 6% of these notations were recorded during the period of the Ten Year Profit Withdrawal Transactions.[63] Through her investigation, Collura was able to reconcile nearly all of the PW notations for this small subset of transactions to available bank records related to the Madoff Securities bank accounts.[64] Collura, however, was unable to reconcile roughly 94% of the PW transactions through this method.

The Trustee's reliance on Collura's reconciliation of the Ten Year Profit Withdrawal Transactions to establish that older notations followed the same pattern is based on the assumption that Madoff Securities practices regarding PW notations during the relevant time period were identical to those in the later ten-year period.[65] However, Collura did not make any claim that her analysis supports any inferences regarding transactions before the ten-year period.[66] Collura's reticence is supported by employee testimony that, far from utilizing a uniform and reliable process through time, "every decade [at Madoff Securities] was a different story. Every five years things changed there."[67]

Further, in 1998 (the beginning of the Ten-Year Period) Madoff Securities underwent considerable changes related to the PW notations, most notably the switch from an arbitrage system to an options system.[68] Whereas arbitrage checks would theoretically be sent every time a profit was realized, options checks went out far less frequently.[69] Thus, the practice of mailing and recording profits changed from an extremely high volume of small checks to a low volume

---

[63] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶ 35.

[64] *Id.* at ¶ 33.

[65] *See* Trustee Mem. of Law, Doc. No. 10661 at n. 44 ("it is reasonable to assume that if earlier records were available, they would reveal the same pattern").

[66] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶¶ 33-36.

[67] A. Bongiorno Tr. 15:7-15:20.

[68] Sala Tr. 29:6-23; A. Bongiorno Tr. 60:6-61:10

[69] Sala Tr. 27: 19-28:7; 200:17-200:23.

of larger ones.   JoAnn Sala, the Madoff Securities employee responsible for the arbitrage accounts from 1984 on,[70] retired in 1998.[71]   From 1984-1998, Sala tracked the purported arbitrage trades that created the non-existent profits.[72]   Sala controlled and monitored the purported PW notations that are at issue for the Blums' claims; she also spoke to customers on the phone, maintained the relevant customer files, and received and reviewed customer instructions.[73]   Sala was heavily involved and largely responsible for any of the purported PW transactions affecting the Blums. She testified that she did not know whether any of her practices were carried forward as the accounts were moved from the arbitrage to the options model after her retirement.[74]

> ### 2.  *Including the Ten Year Profit Withdrawal Transactions, just over 50% of all PW notations are reflected in some other document.*

In an attempt to reconcile older PW notations for which bank records were not available, Collura reviewed Madoff Securities customer files and other documents provided by the Trustee for any information related to any of the remaining 91,000 PW transactions.[75]   In conducting this broader analysis, Collura counted a PW notation as "reconciled" if it was referred to in any other document, including materials that did not identify the date or amount of any particular profit withdrawal.[76]   Likewise, where Collura found some evidence that PW transactions occurred in

---

[70] Sala Tr. 12:20-13:12; 20:16-20:21.

[71] Sala Tr. 29:6-23; Bongiorno Tr. 60:6-61:10.

[72] Sala Tr. 188:6-188:9.

[73] *Id.* 31:1-31:17.

[74] *See* Sala Tr. 224:7-224:15 (Q: To your knowledge, did customers still have profit withdrawal transactions after arbitrage was phased out? A: I don't know if they did.  Q: When you transferred accounts over to the dash 3 accounts, did any of the dash 3 accounts receive profit withdrawal transactions? A: I don't know.").

[75] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶¶ 37-42.

[76] *See id.* ¶ 38.

an account during one period, she inferred that PW transactions likely occurred for the entire undocumented history of the account.[77]

For example, where a file contained a customer letter directing that all future profits be sent to the customer rather than reinvested, Collura treated this occurrence as proof that all subsequent PW transactions noted on the account were checks sent to the customer.[78] Collura did not account for the possibility that a customer could change his or her election at any point and that many such customer communications were lost or destroyed. Rather, she assumed that where she was able to find one communication on the issue, the Madoff Securities account records completely reflected *all* relevant communications.[79]

Similarly, Collura treated letters directing that accounts be changed from "send" accounts to "reinvest" accounts as proof that each prior PW notation represented cash received by Madoff Securities customers.[80] Her reports do not suggest that she accounted for the possibility of prior elections, even where the absence of the original "Send" request itself would suggest that the account file was incomplete. Instead, she implicitly assumes that a customer who changed his election once did not change it again.[81] Even with this extremely liberal approach to reconciliation, only 5,998 transactions directly corresponded to any customer communication regarding profit withdrawals.[82]

Overall, and *including* the Ten Year Period for which third party bank records existed, Collura only found corroborating support for 51,769 PW notations—just over 50% of the total

---

[77] *See id.*

[78] *Id.*

[79] *Id.* ¶¶ 37-39.

[80] *Id.* ¶ 39.

[81] *Id.* ¶ 39.

[82] *Id.* ¶ 38.

alleged PW transactions.[83]  In other words, Collura could not account for nearly **40,000** PW

notations.  She was unable to locate any support for the PW notations in the four Blum accounts

at issue.[84]

> 3. *Almost all PW notations after December 1995 with the description "Check + Stock Name" have values corresponding to fictitious trades, a time period and format that is largely irrelevant to the Blums' accounts.*

Greenblatt, another professional working for the Trustee, conducted a trading analysis in

an effort to verify PW notations.  Greenblatt found that nearly all of the PW notations after 1995

set out values corresponding to the proceeds of fictitious trading recorded by Madoff Securities

in the relevant customer account.[85]  Specifically, Greenblatt found that of the 6,148 PW

Transactions with descriptions in the form "Check + Stock Name" recorded between December

1995 and November 2008, the dollar amount of all but three corresponded to the putative value

of the proceeds from fictitious trades recorded in the account statements.[86]

Every PW notation in the Blum accounts that impacts the calculation of the three SIPA

claims pre-dates December 1995 with the exception of 16.  All of the PW notations in Morris'

account (1B0033) that affect the Blums' claims occurred prior to the September 1984 transfer to

Roslyn's account (1B0036).  Likewise, all of the relevant PW notations in that account (1B0036)

predate 1995.  Of the 28 PW notations in Roslyn's successor account (1B0115), only 16 post-

date December 1995.  Finally, among the 73 PW notations in Norman's IRA (1B0034), only 16

---

[83] *Id.* ¶ 42.

[84] Collura Supp. Analysis of Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals," Attachments D.1-D.84 (listing all PW transactions for 84 related direct accounts).

[85] Greenblatt Supp. Analysis of the Profit Withdrawal Transactions, ¶ 27.

[86] Greenblatt Analysis of the Profit Withdrawal Transactions at ¶ 42 ("[We] were able to identify the corresponding fictitiously reported trading of the securities in the stock name identified . . . This fictitious trading generated a profit in an amount equal to the withdrawal from the BLMIS customer account").

impact the claims (because they precede the 1990 transfer of funds to account 1B0035) and all of those predate 1995. (Of the remaining 57 notations in this account, 16 are dated after December, 1995).

Likewise, the Blum account PW notations did not follow the format Greenblatt examined. For instance, in Account 1B0033, there are over 40 PW notations for the period from April 15, 1981 to April 24, 1984, none of which utilize the "Check + Stock Name" format.[87]

### 4. Madoff Securities reduced account balances by amounts corresponding to the value of PW notations.

Greenblatt also observed that the Madoff Securities records generally reduced the purported equity in the customer accounts by the fictitious amount shown in the PW notations.[88] Thus, where Madoff Securities records indicated a sale of stock that never occurred, they recorded a withdrawal of the non-existent profits from that sale and then used that fictional value to reduce the amount of a client's purported equity.[89]

By their own account, however, the Trustee's experts excluded approximately 800 PW transactions from their analysis at the outset on the ground that they represented checks to customers that were canceled rather than cashed.[90] Greenblatt later excluded six additional PW transactions after finding that four of them were actually related to tax obligations and were not sent to customers and that two of them were cancelled.[91] Greenblatt and Collura eventually

---

[87] Greenblatt Principal Calculation, Ex. 4D

[88] Greenblatt Second Supp. Analysis of the Profit Withdrawal Transactions at ¶ 37.

[89] Even this irrelevant proposition was proven incorrect. Greenblatt found 23 instances where the check and stock name did not correspond to a purported withdrawal of non-existent funds, leading him to conclude that "the transactions were coded by BLMIS employees as 'PW' in error or reflect other data entry errors." Greenblatt Supp. Analysis of Profit Withdrawal Transactions at n. 12.

[90] *Id.* at n.5.

[91] *Id.* at n.4.

determined that additional PW notations represented checks that were canceled rather than cashed and that still other PW notations represented taxes withheld by Madoff Securities.[92] Rather than reporting these as PW notations that did not represent customer withdrawals, they simply removed these transactions from the universe of PW transactions under consideration.[93]

> 5. *The House 17 Manual, which employees did not read, describes PW notations as profit withdrawals and as outgoing checks.*

The fifth basis for the Trustee's original determination is the Madoff Securities House 17 Manual (the "Manual"). The Manual contains detailed instructions for how Madoff Securities employees should enter various transactions on customer accounts.[94] As relevant here, it directed employees to include the following notations next to the following transactions: "CA" for capital addition; "CW" for capital withdrawal; and "PW" for profit withdrawal.[95]

With respect to the PW notations, the Manual states that "PW" should be used for profit withdrawals and states that PW checks are among the "checks going out."[96] The instructions for PW notations are specific: the Manual directs the employee to write PW "[o]n description type 'check & stock name'" with a notation at the bottom of that page indicating to punch PW and CW checks as debits.[97]

The Trustee relied on the Manual as evidence that PW notations were the result of a specific mandatory process and, therefore, that each such notation establishes that a check was

---

[92] *Id.* at n.4.

[93] *Id.*

[94] House 17 Manual, Trustee PW Ex. 9, at MADTSS00336514-MADTSS00336578.

[95] *Id.* at MADTSS00336545.

[96] Greenblatt Second Supp. Analysis of the Profit Withdrawal Transactions, ¶ 25; House 17 Manual at MADTSS00336545-MADTSS00336546.

[97] House 17 Manual at MADTSS00336547.

mailed to a customer.[98]  However, his professionals reported that of the 91,138 PW notations,

only 34,574 follow the Manual's instructions.[99]  Over 52,000 PW notations appear completely

divorced from any specific stock trade, merely stating "check." [100]  Further, 597 of the

transactions do not state PW at all; they contain either "CW" or "JRNL" notations.[101]  Greenblatt

unearthed another inconsistency when analyzing another account, which reflected at least three

PW transactions that were miscoded "CHECK TO BE REINVESTED."[102]

> **B.    Recognizing that he had an insufficient basis for his factual inference concerning the Blums, the Trustee offered new analysis in a post-hoc effort to justify his claim determinations.**

After filing his Motion, the Trustee commissioned three additional reports to support his

claim determinations.[103]  None of these reports provide any specific information regarding the

Blums' accounts.

### 1.  *Greenblatt's Second Supplemental Report*

Greenblatt's supplemental report purports to show that account balances in 1B0022 (an

account not at issue here),[104] 1B0033,[105] 1B0034,[106] 1B0036,[107] and 1B0115[108] were fairly stable

---

[98] Trustee's Mem. of Law in Supp. of Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions at 15.

[99] Greenblatt Analysis of Profit Withdrawal Transactions at ¶ 24.

[100] *Id.*

[101] *Id.*

[102] Collura Supp. Analysis of Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals," Attachments D.15 (listing all PW transactions for 84 related direct accounts).

[103] The Trustee also deposed several former Madoff Securities employees: Annette Bongiorno; Joann Sala; Winnifer Jackson; Dorothy Khan; and Alethea Leung.  These employees testified regarding their respective roles at Madoff Securities.  *See infra*, pp. 42-45.

[104] Greenblatt Second Supp. Analysis of the Profit Withdrawal Transactions at ¶¶ 37-42.

[105] *Id.* Ex. 15, 15A.

[106] *Id.* Ex. 16, 16A.

[107] *Id.* Ex. 17, 17A.

during certain time periods when they would have substantially increased if the reported trading profits had been reinvested.[109]  In making this observation, the report merely restates at length the premise that Madoff Securities treated PW transactions as money leaving customer accounts.

### 2. Greenblatt's Principal Balance Calculation as Applied to Norman J. Blum

In the adversary proceeding against Norman Blum, Greenblatt offered a report assessing the principal balance in the Blum accounts on the assumption that PW transactions accurately reflect cash withdrawals.  Because it simply assumes the issue, the report provides no evidence relevant to the proper treatment of the transactions.

### 3. Collura's Proof of Transfers to the Defendant

The third additional expert report provides Collura's reconciliation analysis on four cash withdrawals not at issue here.[110]  These cash withdrawals occurred during the later ten-year period in which none of the Blum PW notations at issue were made, and were withdrawals from an account that had no alleged PW transactions.[111]

### ARGUMENT

**I.  It is for the Court to determine, by a preponderance of the evidence, whether the Blums received cash withdrawals corresponding to entries recorded as PW transactions on the admittedly fraudulent Madoff Securities account records.**

**A.  Fact disputes over the calculation of a SIPA claim are to be resolved by the Court de novo.**

SIPA establishes procedures for liquidating failed broker-dealers, which grant priority to claims of the broker's customers for their account balances, computed as the customer's "net equity."  SIPA establishes a fund of customer property separate from the general estate of the

---

[108] *Id.* Ex. 18, 18A.

[109] Greenblatt Second Supp. Analysis of Profit Withdrawal Transactions at ¶ 39.

[110] *See* Collura Proof of Transfers to the Defendant at ¶ 34.

[111] *See id.*

failed broker-dealer, for distribution exclusively to the broker-dealer's customers. Each customer shares ratably in this special fund to the extent of the net equity in each account. 15 U.S.C. § 78fff–2(c)(1)(B). The SIPA trustee is charged with determining the net equity claims of customers who make claims against the separate pool of customer property. 15 U.S.C. § 78fff-2(b).

A claimant bears the initial burden of establishing that he is a customer and has a claim against the customer property pool for the amount of his net equity. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974). A SIPA trustee's primary duty is to promptly discharge the debtor's obligations to customers by paying these claims where *either* the obligations "are ascertainable from the books and records of the debtor *or* are otherwise established to the satisfaction of the trustee." 15 USC § 78fff-2 (emphasis added). Recognizing that books and records may not always be available, Congress gave a SIPA trustee the authority to pay claims in the absence of complete debtor records. As SIPC points out, SIPA was created when "severe back office problems in the securities industry result[ed] in substantial inaccuracies in account records . . . ." *See In re MV Secs., Inc.*, 48 B.R. 156, 159 n.5 (Bankr. S.D.N.Y. 1985). In the absence of records, Congress allowed the trustee charged with the duty of investigating the estate the discretion to satisfy obligations that are established to his satisfaction. *See* 15 U.S.C. § 78fff-1(a)(4).[112]

---

[112] On the other hand, where the obligations are ascertainable from the books and records, Congress deliberately refrained from adding any deferential language. Thus, even if a trustee has some discretion to honor a debtor obligation in the absence of records, where debtor obligations are ascertainable from the documents, they should be discharged. *Compare* 15 U.S.C. §§ 78fff-4(a) *and* (f) (providing for SIPC discretion)*, with* 15 U.S.C. § 78eee(b)(6)(B) (explicitly giving trustee discretion); *see also Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")).

However, much like the Bankruptcy Code's procedure, whereby a formal proof of claim constitutes *prima facie* evidence of the claim's validity and amount, the Trustee's determination stands only until it is sufficiently challenged. Once a customer objects with evidence to rebut the Trustee's determination,[113] the customer is entitled to the Court's *de novo* review without deference to the Trustee to determine the validity and amount of the claim. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 619 (1993) (noting that a trustee "is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions."). *See* Fed. R. Bankr. Proc. 3001(f). Importantly, SIPA Section 8(a)(4) specifically refers to the formal proof of claim language from Section 501 *et seq.* of the Bankruptcy Code, noting that SIPA does not limit this process. *See* 15 U.S.C. § 78fff-2(a)(4).

In this case, the Trustee has court approval to calculate a customer's net equity by netting all cash deposits against all cash withdrawals over the life of each account pursuant to the Net Investment Method. *See SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*, 654 F.3d 229, 242 (2d Cir. 2011) (affirming this Court's approval of the Net Investment Method). That methodology is not challenged here. Rather, the Blums factually dispute that they received any cash withdrawals corresponding to the PW notations in four old accounts. This is an issue on which no deference is owed to the Trustee. SIPC concedes this point.[114] By contrast, the Trustee cites *Kusch v. Mishkin (In re Adler, Coleman Clearing Corp.)*, No. 95-08203(JLG), 1998

_____

[113] *See Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 190 (3d Cir. 2011) (discussing rebuttable presumption applicable under Federal Rule of Evidence 301 in civil cases); *Liebert v. Nisselson (In re Levine)*, No. 94-44257 (PCB), 2008 Bankr. LEXIS 2639, at *14 (Bankr. S.D.N.Y. Sept. 5, 2008) (applying Rule 301 to find rebuttable presumption of insolvency under bankruptcy code); *In re Edwards*, 50 B.R. 933, 942 (Bankr. S.D.N.Y. 1985) (citing Rule 301 in finding rebuttable presumption in bankruptcy proceedings).

[114] *See* SIPC Supp. Br. at 29, 31 ("Clearly, Congress has not committed the determination of claims to the sole discretion of the trustee.").

Bankr. LEXIS 1076 (Bankr. S.D.N.Y. Aug. 24, 1998), in support of the proposition that this

Court should defer to his factual inferences and assumptions.[115]  *Kusch* does not support the

proposition that a trustee's duty to a SIPA estate as a whole empowers him to reduce a customer

claim by incorrect sums or amounts that are not supported by reliable evidence.

Had Congress sought to vest the Trustee with robust equitable powers and the prerogative

to ignore statutory obligations, it would have done so explicitly.  *See Norwalk CORE v. Norwalk

Redev. Agency*, 395 F.2d 920, 932 (2d Cir. 1968) ("The proposition is now firmly established

that judicial review of a final agency action by an aggrieved person will not be cut off unless

there is persuasive reason to believe that such was the purpose of Congress.") (internal quotation

marks omitted) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967)); *see also Bernardo

v. Johnson*, 814 F.3d 481, 502 (1st Cir. 2016) ("To overcome the presumption of judicial review,

the [statutory] language has to be explicit, unencumbered by any ambiguity over Congress's

intent.") (citing *Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010)).  Because SIPA fails to

explicitly afford deference to the Trustee under these circumstances, *de novo* review is proper in

light of the evidence contradicting the Trustee's claims determination.

**B.     The Trustee's factual assumptions are not entitled to deference under SIPA,
the Bankruptcy Code, or case law.**

This matter does not concern any area for which a trustee is afforded deference.  With

respect to claim determinations, the Trustee has some discretion to determine the best method to

calculate net equity.  *SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*, 654 F.3d 229, 238

n.7 (2d Cir. 2011).  The net equity methodology is not in dispute here – rather, it is the Trustee's

unsupported factual assertion that the Blums received profit withdrawals that is at issue.  The

---

[115] *See* Trustee Mem. at 19.

evidence sufficiently refutes the Trustee's determination as to the Blums' claims, such that the
Court should determine the validity and amount of the claims *de novo*.

The Trustee mischaracterizes PW notations as *uniformly* representing "cash out"
withdrawals from client accounts and, pursuant to that misunderstanding, reduces each customer
claim by the purported amount of the PW transactions.  Where a PW notation in the Madoff
Securities books corresponds with a check actually received by a customer, the Blums do not
dispute that the amount of the check should be included as a withdrawal in the net equity
calculation for that claimant.  On the other hand, as the Trustee admits, whether a customer
actually received such PW funds is a question of fact.[116]  Thus, where there is a dispute over
whether such a check was sent or received, it is for the Court to determine, by a preponderance
of the evidence, whether a PW notation may be treated as a customer withdrawal.

## II.    The Blums' first-hand testimony showing that they did not receive cash corresponding to the PW notations is unrebutted.

Federal Rule of Evidence 301 provides the default rule for rebutting a presumption of fact
arising from applicable law.  *See ITC Ltd. v. Punchgini Inc.*, 482 F.3d 135, 148 (2d Cir. 2007).
Where sufficient evidence is introduced to rebut a presumption, the presumption "ceases to
operate" and the issue is treated as an ordinary question of fact.  *See id.*  Here, the Blums have
met their burden to rebut any presumption in favor of the Trustee's claim determination through
the evidence in this case.  Specifically, the Blums' testimony, made under oath and submitted
into evidence before this Court, shows that they did not receive checks corresponding to the PW

---

[116] *See* Trustee Mem. at 9 (arguing that "factual issues related to the Profit Withdrawal
Transactions . . . should be determined in [this] proceeding").

notations at issue.  *See Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 190 (3d Cir. 2011) (holding that testimony alone is sufficient to overcome a presumption of receipt).[117]

As a result, to be entitled to a favorable ruling from the Court, the Trustee must produce sufficient contrary evidence supporting his specific claim determinations.  In this proceeding, the Trustee has offered no direct evidence that the PW notations at issue accurately record withdrawals, only inferences and speculation.  Because there is no evidence that the Blums received checks corresponding to any of the PW transactions at issue and they have sworn to the contrary, the Trustee's inference runs counter to the available evidence and should not be permitted to stand.

### A.    The Blums' testimony is consistent with the purpose of the four accounts.

Not only is the Blums' testimony unequivocal on this point, it aligns with common sense. All four Blum accounts at issue were retirement or maintenance accounts for which the entire purpose was to save for future need.  For example, Morris' original retirement account (1B0033) was established in 1981, five years before his retirement.[118]  The Trustee asserts that between April 1, 1981 and July 8, 1997, Morris received 138 PW withdrawal checks from his retirement account, 42 of them while he was still earning income as a physician. [119]  The Name/Address

---

[117] The majority position when applying Federal Rule of Evidence 301 is that "the quantum of evidence needed to 'burst' the presumption's 'bubble' . . . [is] minimal, given that the presumption's only effect is to require the party [contesting it] to produce enough evidence substantiating [the presumed fact's absence] to withstand a motion for summary judgment or judgment as a matter of law on the issue." *Id*. at 189 (internal quotation marks omitted); *see also ITC*, 482 F.3d at 148 (demonstrating that the Second Circuit adopts the majority view in interpreting Rule 301); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161-63 (3d Cir. 2009)(holding that a single, non-conclusory affidavit or witness's testimony is sufficient to defeat summary judgment).

[118] J. Blum. Tr. 51:8-51:13.

[119] Greenblatt Principal Calculation at ¶¶ 55, 58.

sheet for Morris's account indicates in handwritten marginalia that an unknown employee[120] changed the account to an "S" on December 29, 1992 – after more than 98 PW notations had already been made.[121]  There is no record of a written request from Morris regarding such a change.  Collura was unable to reconcile any of these PW notations with any other document supporting their validity – indeed, under Collura's assumptions for these older PW reconciliations, a change to "S" in 1992 should be presumptive proof that all prior PW notations are wrong.[122]

Rosyln's account (1B0036) was opened in 1984 by Morris to provide for her after his death.[123]  The Trustee contends that, between October 10, 1984 and September 19, 1994, 83 PW checks were written from the account for a total of $524,000.  Of these, 69 PW notations are dated during Roslyn's lifetime.[124]  Since the entire purpose of the account was to provide her with resources in the event Morris predeceased her, the Trustee's presumption that the PW notations accurately reflect withdrawals by Morris is unsupportable.  After her death, funds in Roslyn's account were transferred to a successor account (1B0115).[125]  The Trustee asserts that, between October 27, 1994 and July 8, 1997, another 28 PW checks issued from the successor account in

---

[120] The evidentiary prohibitions against admitting such hearsay statements for their truth will be the subject of a motion *in limine*.

[121] Morris Blum Customer Account File at MADTBB01988462.

[122] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals", ¶ 38.

[123] Decl. of J. Blum at ¶ 6; N. Blum Tr. at 84:14 ("my mom was much younger than he was. he made a presumption he'd . . .die before she did, and therefore he would have a retirement for her. But, unfortunately, she died before he did").

[124] Decl. of J. Blum at ¶ 4.  The original support account—1B0036—was in the name of Roslyn L. Blum.  These funds were later sent to 1B0115—Roslyn L. Blum Remainder Trust—then to 1B0191, for which Joel and Norman Blum were trustees.  Eventually, these accounts were dissolved and the funds divided between Norman and Joel Blum.

[125] Roslyn Blum Account, 1B0115, MADTBB01988479.

the amount of $123,000.  Collura found no documentary evidence that any of these checks were actually written, received, or cashed.[126]

The Trustee points to a notation in the 1B0115 account folder as the sole support for his determination as to this account.  Specifically, the Name & Address File Maintenance Form contains a handwritten S notation under the profits column.[127]  Immediately next to that notation is a handwritten "Done 8/23/94" and illegible initialing.[128]  Thus, in the light most favorable to the Trustee, an unknown employee asserted that he or she changed the account to an "S" on 8/23/94 – three weeks before the account was funded.[129]  Employees testified that such a change to an account required a written request from the customer.[130]  There are no such letters in the account folder.

The PW notations for these three accounts make "no sense given the way [Morris] managed the accounts."[131]  Norman and Joel testified unequivocally regarding their father's use of 1B0033: Morris created and maintained the account in order to grow his wealth and to maximize the size of his estate.[132]  Any withdrawal from that account would have limited the ultimate size of the estate and, therefore, frustrated its entire purpose.[133]  Both sons also testified

---

[126] Collura Supp. Analysis of Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" Attachs. D.1-D.84 (listing all PW transactions for 84 related direct accounts).

[127] Roslyn Blum Account, 1B0115, MADTBB01988479.

[128] Roslyn Blum Account, 1B0115,MADTBB01988479,

[129] Again, the evidentiary prohibitions against admitting such hearsay statements for their truth will be the subject of a motion *in limine*.

[130] E.g., Tr. Sala 54:24-58:14.

[131] Decl. of J. Blum at ¶ 4

[132] N. Blum Tr. 53:3-53:8 ("once he had retired, his strategy was to maintain his money and use whatever money he had appropriately.  He was very, very careful what he did.  . . . His investments got progressively more conservative as he got older").

[133] *See* J. Blum Tr. 65:17-65:19 ("my father was trying to grow his estate").

that Morris would not have arranged for such frequent checks and withdrawals. Morris'
financial planning strategy focused on the orderly maintenance of records.[134] Receiving checks
in great frequency and volume would be anything but orderly. Instead, it would have increased
the likelihood of mistakes and chances for errors.[135]

In light of this, neither Joel nor Norman could "imagine that [Morris] would ever have
chosen . . . as a course of action to just have checks coming in all the time."[136] Instead of
requesting smaller, more frequent checks, Morris requested withdrawals of large denominations,
as he did when he withdrew $98,236 in 1984 from 1B0033 to fund Roslyn's account.[137]
Relatedly, when Morris deposited money into his Madoff Securities accounts, he deposited in
large denominations -- quantities of one or two hundred thousand dollars.[138] Morris did not deal
with small odd dollar amounts from his accounts. As Norman testified, "the only distributions
he would take is even - - smooth, even money."[139]

The sheer volume of purported PW checks is also inconsistent with Morris's physical
circumstances. Morris could easily handle a low volume of checks, and infrequent withdrawals
would not be particularly noteworthy. Handling 140 checks over a relatively short period of time,
on the other hand, would have been a significant undertaking, especially for someone with

---

[134] J. Blum Tr. 78:1-2 (he would have "wanted to know that [the money] was coming in an
orderly fashion").

[135] *See* J. Blum Tr. 74:24-75:11 (stating that it would have been "chaotic" for Morris Blum to
receive so many checks").

[136] J. Blum Tr. 75:2-75:4; Decl. of J. Blum ("I am aware of no such situation where he would
have cashed some 140 checks over time almost on a monthly basis. Such a scenario is entirely
implausible given how he managed his financial affairs.").

[137] *See* Greenblatt Principal Calculation, Ex. 4D at 2; MF00150572.

[138] *Id.*, Ex. 4D at 4.

[139] N. Blum Tr. 83:21-83-25.

Morris' eye sight.[140]   The extra burden of managing (and reading) the checks is something Morris likely would have mentioned to his two sons – the family members who assisted him with the management of his finances, discussed financial planning with him, and helped him read and review filings.[141]   Joel and Norman both testified that they saw no evidence that these alleged transactions ever occurred.[142]   In light of the family's closeness and the assistance they provided him with his financial affairs as he grew older, it is notable that Morris never once discussed receiving more than 100 PW checks from this account.[143]

The withdrawals also make no sense when compared to other activities in the account. The notations purport to show that, at the same time Morris was receiving small monthly checks, he was also making very large infrequent deposits.[144]   For example, the PW notations suggest that Morris Blum received a PW check of $12,583 on October 31, 1986, and *deposited* $100,000 into the same account *just two weeks later*.[145]   Similarly, Morris Blum allegedly received a PW check for $3,743, and, within one month, deposited $200,000 back into the account.[146]   Under the Trustee's interpretation of the records, Morris Blum was receiving small and frequent checks and simultaneously depositing large and infrequent checks into the same account; he was simultaneously growing his estate and spending its funds.

---

[140] N. Blum Tr. 51:7-51:10 ("His problem was his vision.  He couldn't see so well.").

[141] *See* J. Blum Tr. 65:17-65:19 (Morris "was trying to grow his estate, and . . . he would do it in a way that was orderly and within his capacities").

[142] N. Blum Tr. 82:23-82  ("He never talked to me about withdrawals, nor did my brother.  None of us were aware of the significance of profit withdrawals. And if [Morris Blum] had taken profit withdrawals, there would have been innumerable checks month after month to the tune of about a million and a half [dollars]. My father didn't have that kind of money available to him at that point.  He just didn't do it.").

[143] *See id.*

[144] Greenblatt Principal Calculation, Ex. 4D at 4.

[145] *Id.*

[146] *Id.*

29

As with Morris' retirement account, the alleged PW withdrawals from Roslyn's accounts would have directly conflicted with the account's *raison d'etre*—to provide for her welfare in the event that Morris predeceased her.[147]  Every alleged withdrawal from Roslyn's account would reduce the funds available to her upon Morris Blum's death, and the automatic withdrawal of account profits is inconsistent with that purpose.  As Norman pointed out, "the whole purpose of [Roslyn's] account was for retirement, not to take money out . . . Otherwise, [Morris] would have kept it all in his own Madoff account."[148]  It would, therefore, be entirely illogical for Morris to have withdrawn funds from this account.[149]  Likewise, the purported frequency of PW checks in this account would have raised similar organizational and logistical concerns, compounding the organizational burden that the other alleged 140 PW checks would have inflicted on Morris Blum.[150]

Likewise, Norman opened Account 1B0034 in 1986 as a retirement savings account.  The Trustee asserts that between September 18, 1986 and December 11, 2008 Account 1B0034 experienced a total of 74 cash withdrawals totaling $202,204.[151]  The Trustee contends that 73

---

[147] Decl. of J. Blum at ¶ 7 (Morris "set up account in 1984 to provide for mother in event of his death").

[148] N. Blum Tr. 84:3-84:24.

[149] N. Blum Tr. 84:14 ("It was never [Morris Blum's] intention to take a penny out [of Roslyn Blum's account.).

[150] SIPC points to several pieces of irrelevant information related to the account when it was managed by the Blum brothers as 1B0191.  Specifically, he points to two letters contained in the folder.  The folder contains two notations relevant to Send and Receive.  One notations states "Make S" this notation was made on 10/17/97; the other notation states "Remove S" this notation is made on 12/11/97.  The first letter is undated.  The undated letter from Morris Blum states that Madoff Securities should remit distribution from accounts 1B0189 and 1B0191 as soon as possible.  This letter contains a handwritten "then make both 'S.'"  The second letter states that Madoff Securities should send no further income.  This letter is dated 12/8/97 and contains the notation "then remove S."  These accounts are not at issue in this proceeding.

[151] Greenblatt Principal Calculation at ¶ 28.

separate PW transactions, totaling roughly $180,000, occurred between November 20, 1986 and July 3, 1997. 42 occurred prior to April 1994, when Norman retired.[152] Norman testified that he "never received or cashed any [PW] checks" for this account.[153] As with Morris and Roslyn's accounts, Collura found no evidence that such checks were sent or cashed.[154]

###### B.    The Blums' testimony is corroborated by the lack of any record of PW transfers.

The Blums have consistently maintained that they did not receive the PW checks at issue, and the Trustee has provided no direct evidence that they did. The Trustee's presentation of the anecdotal testimony of Barry Schwartz, a former Madoff Securities customer, highlights the significance of this absence of records.

Schwartz testified that he requested that profit withdrawal checks be sent to him and that, pursuant to this request, he received and cashed the several profit withdrawal checks. While Schwartz does not remember every individual check, he has no trouble recalling that he cashed a large number of checks from Madoff Securities.[155] Schwartz's testimony is corroborated by *reliable* documentary evidence, i.e. his tax records reflect a corresponding increase in income during the periods he took withdrawals.[156] Additionally, Schwartz's Madoff Securities file contains a September 10, 1997 letter confirming that he would like to continue receiving profits from his account, rather than reinvest them.

---

[152] N. Blum Tr. 55:8-55:9.

[153] Decl. of N. Blum at ¶ 9.

[154] Collura Supp. Analysis of Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" D.1-D.84 (listing all PW transactions for 84 related direct accounts).

[155] Aff. of Barry Schwartz, Trustee's PW Ex. 63.

[156] *Id.* ¶¶ .6-13.

Likewise, the Trustee's discussion and submission of a host of exhibits concerning the "exemplar" account records of H. Charat[157] contrasts dramatically with the Blums' accounts at issue.  Charat's file has a handwritten "S" of unknown authorship on the name and address page.[158]  The Trustee need not rely on this marginalia, however, since he has copies of checks made out to Hanoh Charat that were signed by Bernard Madoff and ***endorsed by the customer*** on the reverse side.[159]  These transactions, which are presumably within the group of post-1995 trades that Greenblatt examined,[160] have no probative value whatsoever regarding what happened in the Blums' accounts in prior years.  To the contrary, they highlight the glaring lack of documentary evidence for the Trustee's allegations about the Blum PW notations.

Evidence concerning the experience of individual (unrelated) customers has no bearing on the actual issues here.  At best, it confirms that some PW notations do in fact correspond to customer withdrawals – a proposition the Blums have never contested.  The only relevance of this material is the dramatic extent to which it underscores the problems with the Trustee's allegations about the Blums:  where are the cancelled checks, the bank statements, the debit memos, the customer requests, wire transfer data, the 1099s, and deposit slips regarding the PW notations at issue?  Collura, despite a grueling examination of the materials provided to her, did not locate them, and the Trustee has not come forward with any as to the actual PW notations at issue.

---

[157] Trustee Supp. Mem. Exs. 23-27.

[158] Hanoh Charat Account Folder, Trustee's PW Ex. 21, AMF00162330.

[159] Hanoh Charat Checks, Trustee's PW Ex. 22, MADWAA0377119-MADWAA00377120; Hanoh Charat Checks, PW Ex. 26 MADWAA00379120- MADWAA00379121.

[160]  Charat Customer Statements, Trustee's PW Ex. 23-25 (customer statements from 1998 and 1999).

### C.    The Blums' testimony is credible.

The Trustee and SIPC focus their discussion of the Blums' testimony on the times in their deposition when Joel and Norman were unaware of a specific transaction or did not recall writing a specific letter.  As a threshold matter, credibility is always a question for the trier of fact, not the adversary.  *Cotto v. Fischer*, 09 CV. 9813 (SAS) (MHD), 2012 U.S. Dist. LEXIS 162945, at 66 (S.D.N.Y. Aug. 23, 2012) (citing *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("Credibility determinations and assessments regarding the weight of the evidence are made by the trier of fact . . . .")); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 778 F. Supp. 2d 271, 277 (E.D.N.Y. 2011) (stating that the trier of fact is in the position to make credibility determinations to determine whether a rebuttable presumption is triggered).  Moreover, it is irrelevant to their credibility that the Blums were not in a position to see every one of their father's withdrawals or that they did not exercise control of his finances.  Likewise, the fact that a witness may not remember one specific instance does not demonstrate that he would have forgotten or not noticed a continued, repeated, and years-long practice.  *See, e.g., Ligon v. City of New York*, 925 F. Supp. 2d 478, 510 (S.D.N.Y. 2013) (finding witness testimony credible despite failure during deposition to remember one instance of conduct among many repeated instances).  The relevant question is whether the Blums had sufficient knowledge of their father's investment practices to know if he was receiving nearly 200 withdrawal checks from those two accounts totaling roughly 2 million dollars.  *See Underpinning & Found. Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 353 (S.D.N.Y. 2010) (citing *Aniero Concrete Co. v. NYC Constr. Auth.*, No. 94. Civ. 9111 (CSH), 2003 U.S. Dist. LEXIS 7536, at *3-4 (S.D.N.Y. May 5, 2003)) (credibility determination is for trier of fact; concluding that oral testimony based on personal knowledge is sufficient to meet party's burden even absent documentary support).

### D.    Documentary evidence is not more reliable than oral testimony.

The Trustee's reliance on admittedly fraudulent documents over the sworn testimony of two innocent customers with first-hand knowledge of the events appears to stem from his view that documentary evidence is inherently more reliable than oral testimony.[161] This notion is unfounded. *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948), upon which the Trustee relies, does not hold that documentary evidence is *per se* more reliable than oral testimony. Rather, *Gypsum* and its progeny hold only that documentary evidence *bearing indicia of reliability* generally may be afforded more weight than conflicting oral testimony offered at trial. For instance, the documents in *Gypsum* were prepared contemporaneously with the events at issue and the authors of the documents did not have a motive to misrepresent, whereas the oral testimony in that case was offered significantly after the events and during litigation. *See id.* at 396-97.[162]

*Gypsum* does not suggest that courts should credit unreliable—much less fraudulent—documents. To the contrary, courts do not even admit documents created under circumstances which would make them less reliable, such as when they are created in anticipation of litigation. *See Palmer v. Hoffman*, 318 U.S. 109, 114 (1943). Tellingly, the Trustee does not cite instances in which courts have credited assertions in fraudulent documents prepared as part of a criminal scheme merely because they were written down. In fact, before documents associated with a fraudulent scheme are even *admitted* to the record, the proponent must demonstrate that the contents are authenticated by untainted evidence. *See Curtis v. Perkins*, 2015 U.S. App. LEXIS

---

[161] Trustee's Mem. of Law in Supp. of Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions at 24.

[162] In another case cited by the Trustee, *United States v. Int'l Bus. Mach. Corp.*, the court credited documentary statements over oral testimony not because of the nature of the evidence but because the oral testimony at issue was "vague." 66 F.R.D. 154, 160 (S.D.N.Y. 1974).

4444 (11th Cir. 2015) (courts may admit documents sent to other financial institutions prepared

by broker in a fraudulent *only* where trustee has reconciled the information in those documents to

reliable third party records). To credit their purported statements over those of innocent

customers, the Court should require specifically corroborating evidence.

III.   **There is no direct evidence for the Trustee's proffered inference that the Blums received cash corresponding to the PW notations, and the Trustee's "routine practice" arguments do not satisfy the Rules of Evidence for habit evidence.**

Because he has no direct evidence that the disputed PW withdrawals actually occurred,

the Trustee asks the Court to find that Madoff Securities employed consistent practices with

regard to the PW notations, such that accuracy of all PW notations on customer statements may

be presumed. Under Federal Rule of Evidence 406, "[e]vidence of . . . an organization's routine

practice may be admitted to prove that on a particular occasion the . . . organization acted in

accordance with the habit or routine practice." The requirements for showing a practice that

rises to the level of habit are high, and even if they are met, proof of habit is dispositive. *Levin v.*

*United States*, 338 F.2d 265, 271-72 (D.C. Cir. 1964) (noting that habits ordinarily should be

conducted with "invariable regularity" to support inference that it was carried out in every

instance). The proffered routine must be "reflexive or semi-automatic as opposed to volitional,"

specific or particular to the conduct at issue, and must be supported by regular or numerous

examples of the conduct. *United States v. Angwin*, 271 F.3d 786, 799 (9th Cir. 2001); *Simplex,*

*Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988) ("[B]efore a court may

admit evidence of habit, the offering party must establish the degree of specificity and frequency

of uniform response that ensures more than a mere 'tendency' to act in a given manner, but

rather, conduct that is 'semi-automatic' in nature.").

It is axiomatic that a custom or pattern is relevant only if it tends to suggest that the

organization acted in conformance with that policy in the specific instance at issue. Therefore,

the party seeking to admit evidence of a routine practice must not only demonstrate a consistent pattern; it must also demonstrate that the pattern was applied to the specific conduct. *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988) (evidence that a company failed to perform under unrelated contracts does not establish a relevant pattern of non-performance). To this end, the proponent of the routine evidence must establish that the conduct occurred under the same or similar circumstances as the relevant pattern or practice. *Meyer v. United States*, 464 F. Supp. 317, 321 (D. Colo. 1979) (evidence that dentist had been in service of a company for considerable time and habitually gave the same warning supported allowable inference that acted in conformance with that practice); 2-406 Weinstein's Federal Evidence § 406.03 (2015).

The Trustee argues that Madoff Securities followed a general practice from which the Court may infer that every PW notation resulted in a customer receiving a check. However, the Trustee's own evidence does not come close to satisfying the core requirements of FRE 406. The Trustee's arguments do not support any such inference.

**A.     Even if admissible, the expert reports confirm that it is not appropriate to infer that any particular PW notation accurately reflects a cash withdrawal received by the customer.**

The reports by the Trustee's professionals summarize most of the available documents as they pertain to the PW notations. The conclusions and identified patterns in the reports are limited to general observations regarding PW notations; they do not demonstrate whether any particular PW notation is accurate. To the contrary, the expert reports confirmed that ***hundreds*** of PW notations were not accurate; the professionals repeatedly found errors, misreported transactions, and miscoded entries.[163] While the Trustee dismisses many of these discrepancies

---

[163] Greenblatt Supp. Analysis of Profit Withdrawal Transactions, n.5 (discussing 800 transactions which were coded as PW transactions but were not included in the experts' analyses).

as "[no]thing more than the vagaries of BLIMS recordkeeping,"[164] they are material.  They

establish that – even considering the evidence in the light most favorable to the Trustee – any

particular PW notation may easily be wrong.  When available records show that some PW

notations represent cash received and others do not, the Trustee's presumption that missing

records would establish that all remaining PW notations are accurate is unsupportable.

Approximately 92,000 PW transactions are recorded in fraudulent Madoff Securities

records from April 1981 through December 2008.[165]  The Trustee's experts simply excluded PW

notations from their analysis in virtually every case where they encountered affirmative evidence

that those transactions did not represent cash received by Madoff Securities customers.[166]  This is

not a handful of scrivener's errors -- the experts found that *at least 800* PW notations were

simply wrong.[167]  Further, Greenblatt found an additional 78 instances in which "transactions

were coded by Madoff Securities employees as 'PW' in error."[168]  He also found another six

instances in which the PW notation corresponded not with a check to the customer but to funds

that were sent to the IRS on the customer's behalf or were cancelled.  These errors were

confirmed by employee testimony.  For example, Bongiorno[169] testified that customers contacted

---

[164] Trustee Mem. of Law, Doc. No. 10661 at n. 44.

[165] *See* Greenblatt Supplemental Analysis of Profit Withdrawal Transactions, nn. 4–5 (number recorded but not evaluated).

[166] *See id.* (eliminating PW transactions from consideration after finding evidence confirming that these transactions did not occur as reported).

[167] Collura Proof of Transfers to the Defendant ¶ 20; Greenblatt Supp. Analysis of Profit Withdrawal Transactions, n.5 (discussing 800 transactions which were coded as PW transactions but were not included in the experts' analyses).

[168] Greenblatt Supp. Analysis of Profit Withdrawal Transactions at ¶ 43.

[169] The Blums expressly preserve for presentation at hearing all arguments as to the credibility of the Trustee's witnesses, the appropriate weight to be given their testimony, and the inferences arising from failures to appear or testify.

her to complain that transactions in their statements were inaccurate.[170]  Bongiorno called the

bank about missing checks on several occasions and had them cancelled.[171]

By completely excluding hundreds of notations from their analysis, the professionals

made clear that they were searching for a general proposition that would work for a large number

of PW transactions, not a specific formula that could be applied to every notation regardless of

contrary evidence.[172]  The experts did not purport to articulate a rule that was accurate for every

PW notation; rather, their analyses sought to provide the Trustee with *general* guidance as to

how PW notations should be treated.  By taking a general and liberal approach to the notations,

the experts implicitly recognized that their approach would be inaccurate in many instances.

> 1. *Collura's Ten Year Reconciliation is irrelevant because it examines a time*
>    *period after the PW notations at issue, uses a miniscule sample size, and*
>    *cannot account for significant intervening changes at Madoff Securities*

SIPC implies that the Court should consider the reconciliation rate for the Ten Year

Period when considering whether Madoff Securities had a custom or habit regarding PW

notations and checks.[173]  SIPC is incorrect.  Evidence from a different time period has no

relevance to proving the specific fact  at issue *unless* the proponent demonstrates that the

circumstances in the both periods are functionally identical.  *See Galvin v. Eli Lilly & Co.*, 488

F.3d 1026, 1036 (D.C. Cir. 2007).  In *Galvin*, the plaintiff sought to demonstrate that the

defendant sold her a certain brand of drug in 1965 with evidence that the defendant *exclusively*

sold that brand of drug in 1967.  The court rejected the proffered evidence, holding that evidence

that the organization always acted in a certain way during one time period is irrelevant unless the

---

[170] A. Bongiorno Tr. at 143:8-144:4.

[171] *Id.* at  212:1-214:13.

[172] Greenblatt Supplemental Analysis of Profit Withdrawals, n. 5.

[173] SIPC Supp. Mem. at 17.

proponent proves that the same practice occurred at the time of the conduct.  *Id*. ("a reasonable juror must have some reason to believe that the practice followed in 1967 was the same as the practice followed in 1965").

The vast majority of the PW notations (94%) are not addressed in the Ten Year reconciliation, which alone should rule out a habit presumption.  See FRE 406 (the proffered pattern evidence must set forth "numerous" repeated examples of that specific conduct).  Collura focused on a tiny fraction of the most recent PW notations (6%) in an attempt to make sense of the Madoff Securities records. [174]  This limited and selective Ten Year Period analysis revealed a high degree of reconciliation for transactions that occurred during that time. [175]  Collura concentrated on this period because there was reliable documentary evidence of withdrawal activity.  She offers no firm conclusions regarding PW notations during the earlier period in which the Blums' notations were made ***because she did not have adequate records to support any such claims***.[176]

In addition to being much earlier than the Ten Year Period, the PW notations affecting the Blum family were the product of a different fictitious investment program overseen by a different employee.  The uniformity and regularity that are the essential elements of a routine practice are noticeably absent.  *G.M. Brod. & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1532-33 (11th Cir. 1985) (excluding evidence of defendant's performance under other contracts due to "significant differences between the types of contracts involved").  While the Trustee relies

---

[174] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶ 35.

[175] There are significant flaws with the methodology she employs; these arguments are set out in detail in the accompanying motion *in limine*.

[176] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶ 17 ("I was unable to complete my reconciliation for the remaining PW Transactions primarily due to the unavailability of records related to transactions that were dated before December 1998").

heavily on the testimony of JoAnn Sala and emphasizes her role, she retired in 1998 and was not involved in *any* of the Ten Year Period transactions.[177] That is, any pattern that existed during the Ten Year Period involved different relevant actors and likely considerable change. In fact, the record suggests that Madoff Securities' practices fluctuated even when there was no employee turnover. As Bongiorno testified, Madoff Securities had a "different story" every five to ten years.[178] For instance, during one unidentified period Madoff decided to make all new accounts "Send" accounts. [179]

As discussed, the Ten Year period involves purported options trading, not the arbitrage model affecting the Blum accounts. These transactions occurred in very different frequencies and at different dollar amounts. This change in frequency undoubtedly changed the volume of reporting, hours worked and staff devoted to the task of recording, and levels of transparency. Small transactions listed among many other transactions on each monthly statement are more likely to escape a customer's detection than the large transactions that occurred intermittently.[180]

Any value of that Ten Year Period analysis is necessarily limited to the transactions occurring in that period, as these transactions were entered and mailed by the then-current Madoff Securities employees operating under the then-existing policies. Recognizing that her analysis did not concern a majority of the transactions and focused on a different period, which involved numerous differences, Collura did not opine that *all* PW notations yielded PW

---

[177] *See, e.g.*, Trustee Supplemental Memo at 17-20.

[178] Bongiorno Tr. 15: 7-15:20.

[179] Bongiorno Tr. 35:1-35:9.

[180] As set forth above, the House 17 Manual's existence does not establish that the same pattern was followed in the relevant period as the evidence confirms that it was not followed or even read in certain instances.

checks.[181]  She restricted her conclusions only to those in the period studied.[182]  Collura's Ten

Year statistic does not support any inference that Madoff Securities engaged in a consistent

practice with respect to transactions occurring in the earlier period.

> ### 2. The Second Collura Report cannot be read to establish that earlier PW notations are accurate, as it liberally construed evidence in favor of finding a pattern and even so only found 57% corroboration.

Nor does Collura's expanded analysis come close to the kind of pattern evidence

necessary to establish a habit under FRE 406.  Overall, and *including* the Ten Year Period for

which third party bank records existed, Collura only found corroborating support for 51,769 PW

notations—just over 50% of the total alleged PW transactions.[183]  This a far cry from the "degree

of specificity and frequency of uniform response" required to show "reflexive or semi-

automatic" conduct.  *Simplex, Inc.*, 847 F.2d at 1293; *Angwin*, 271 F.3d at 799.

In expanding her analysis, Collura was admittedly forced to rely on more attenuated

documentation and to make greater logical leaps.[184]  Collura's Report on the period in which the

Blum PW notations were made treated any indication that a PW transaction had been requested,

such as a letter requesting that future PW transactions stop, as proof that a large group of PW

---

[181] Collura Report Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶ 17 ("I was unable to complete my reconciliation for the remaining PW Transactions primarily due to the unavailability of records related to transactions that were dated before December 1998").

[182] *Id.* at ¶ 17 (discussing reconciliation inferences for the Ten Year Period).

[183] *Id.* at ¶ 42; Collura Supplemental Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶ 11.

[184] *Id.* at ¶ 9 ("For the purposes of this report, I use the term 'reconciled' to indicate when I have matched, agreed and/or determined consistency between cash deposits and withdrawals reflected on Madoff Securities customer statements to information or data per another source (e.g., amounts on Madoff Securities bank records, correspondence, between the customer and Madoff Securities regarding deposits and/or requests for withdrawals or documents received by the Trustee related to the Blum Account)."

transactions had both been requested and did occur.[185]  Specifically, she assumed that any letter requesting that Madoff Securities stop PW transactions conclusively proved that *all* prior PW transactions were approved or that any letter requesting that profits be sent to the customer was the final communication from the client on the issue (assuming no other letter was found in the file).  [186]  Her analysis could not account for the unknown content of lost records. [187]

In any event, Collura's Reports confirm that there is no documentary evidence supporting the Trustee's assertions about the Blum's contested PW notations.   Attachment D.19 through D.23 to her report lists each PW notation, together with all available documentary support.  The blank cells next to each of the PW notations in the Blum accounts shows that, after her thorough review of all available documents, Collura was unable to find any support for a single Blum account PW notation.[188]  This lack of documentary evidence is especially telling in light of the significant and reliable corroborating evidence for other PW notations.

### 3. *Greenblatt's trading analysis is largely irrelevant.*

As discussed, Greenblatt's observation that certain post-1995 PW notations in Madoff Securities records match up to purported trades in the customer accounts is not relevant to the Blums.[189]  As a threshold matter, Greenblatt depends entirely on Collura's analysis and findings to support his conclusions about transactions that occurred in the relevant period.  In tying his analysis to Collura's findings, Greenblatt takes on the same limitations that she implicitly

---

[185] *Id.* at ¶ 38.

[186] *Id.* at ¶¶ 37-39.

[187] *See* Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" ¶¶ 37-39.

[188] Collura Supp. Analysis of Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals," Attachs. D.1-D.84 (listing all PW transactions for 84 related direct accounts).

[189] Collura Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" at ¶ 42.

recognized.  Further, Greenblatt's analysis finds only an internal consistency among different Madoff Securities records.[190]

### 4.  The Customer account statements showed increasing balances

The Trustee argues that the PW notations are treated as account debits in the fraudulent Madoff Securities records and that this fact is practically dispositive:  Had the Blums not been receiving PW checks, he argues, the level of purported equity would have risen at a considerably higher rate because Madoff had been pretending to achieve a high rate of profits.[191]  The Blums must have noticed that their account balances were not growing at a rapid clip, he asserts, and would have protested had they not been receiving the PW withdrawals.

The Trustee's assertions are incorrect.  They assume that the average Madoff Securities customer was able to decipher their account statements – an extremely questionable proposition. The Trustee asserts that the Madoff Securities trades *never* occurred, that profit *never* existed, and that these statements were generated as part of a fraudulent scheme.[192]  The account statements were intended to mislead customers; it is no wonder that they were largely incomprehensible.  The Trustee's assumption that all debits are cash withdrawals received by customers is equally suspect:  the fact that the PW notations were treated by Madoff Securities as debits does not suggest that they were actually mailed to or received by the customer.

In many ways, the record demands the opposite conclusion, i.e. that Madoff Securities would not consistently convert non-existent profits into real withdrawal checks unless such actions were absolutely necessary.  This conclusion is also more consistent with the testimony

---

[190] *Id.* at ¶ 39.

[191] *See* Trustee Supp. Brief at 47-48.

[192] Greenblatt Analysis of Profit Withdrawals at ¶ 14 ("BLMIS falsely reported to its customers that it was trading on their behalf . . . This fictitious trading typically generated falsely reported distributions and/or gains . . .").

from employees, such as Bongiorno's description of the calls she received from people complaining about not receiving the PW checks they requested.  It is consistent with Sala's description of calls she received about profits and capital withdrawals.[193]  It is consistent with Winnifer Jackson's description of the complaints customers would be filed when their PW checks were not mailed.[194]  It is consistent with Jackson's statement that "Jodi or Frank" would handle any concerns or questions about a PW transaction.[195]  It is also consistent with the findings of the Trustee's experts, who have identified numerous specific instances in which PW transactions are known to represent funds that were not received by customers.[196]

More broadly, the contention that the Blums understood and accepted that their accounts were not showing increasing returns is manifestly false:  Norman and Joel filed three SIPA claims in this proceeding in the good faith belief that Madoff Securities held millions of dollars worth of cash and securities in their accounts.[197]  Recognizing, and accepting for the purposes of this proceeding,[198] that the Trustee's net equity methodology limits their claims to their net investment, the Blums simply seek to have that net investment calculated accurately.  They have consistently stated that they did not request profits and that their father did not receive and cash the hundreds of checks attributed to his accounts.  The Trustee and SIPC's *ad hominem* attacks on their credibility and motives are unwarranted and should be given no weight by the Court.

---

[193] Sala Tr. 224:23-225:2.

[194] Jackson Tr. 118:10-118:18.

[195] Jackson Tr. 119:1-119:6.

[196] Greenblatt Supplemental Analysis of the Profit Withdrawal Transactions at n.4.

[197] Blum Exs. A-C (statements of claim showing millions owed).

[198] The Blums note that the accounts are affected by the Court's prior ruling on inter-account transfers, and nothing in their participation here should be understood to waive their arguments on the issues now pending before the Second Circuit.  *See Sagor et al. v. Picard*, No. 16-0431bk(L) (2d. Cir).

**B.    Neither the House 17 Manual – which was not followed by employees – nor employee testimony about inconsistent PW procedures gives rise to a presumption of pattern or practice.**

*1. Employees largely ignored the House 17 Manual*

The Trustee's reliance on the Manual to show that all PW transactions represent funds received by customers is indefensible.  Regardless of whether the Manual itself could be read to describe a consistent business practice, all the evidence the Trustee has adduced demonstrates that Madoff Securities employees did not follow its instructions.   The employees who purportedly prepared the PW checks testified that they had never seen it,[199] and Greenblatt confirmed that nearly two thirds of the PW notations were recorded in a manner that violated the Manual's instructions.[200]  Not only did *most* of the PW notations deviate from the Manual's instructions,[201] but the deviations were themselves *inconsistent*:  some PW notations contained the correct elements, others showed the check names only, and still others used completely different notations, such as JRNL.[202]  Greenblatt glosses over these inconsistencies, stating that the PW notations followed a "general pattern."[203]  This is insufficient to establish a pattern under anything but wishful thinking.

The  House 17 Manual sheds little light on the PW notations and certainly cannot be admitted as evidence of a "uniform response" or "semi-automatic" conduct by Madoff Securities employees.  *Simplex, Inc.*, 847 F.2d at 1293; *Angwin*, 271 F.3d at 799

---

[199] Jackson Tr. 51:17-51:23.

[200] *Compare* House 17 Manual MADTSS00336545 (directing that "Check + Stock Name" be entered in the transaction description category for PW transactions), *with* Greenblatt Supp. Analysis of Profit Withdrawal Transactions ¶¶ 20, 24 (listing PW transactions that had a transaction description category other than "Check + Stock Name").

[201] Greenblatt Analysis of the Profit Withdrawal Transactions ¶ 24

[202] *Id.*

[203] *Id.*

## 2. *Madoff Securities employees lacked knowledge about the PW process overall, and the process was inconsistent*

Likewise, the depositions did not reveal a consistent, reliable and uniform process with regard to PW notations. Instead, the testimony confirmed that there were several steps between the entry of a PW notation and the actual receipt of a check by a customer. Both the Trustee and SIPC avoid addressing the actual process by citing to the generally accepted mailing principle.[204] However, the process at Madoff Securities was far more ad hoc and appreciably less reliable than cases allowing an inference of mailing on proof of a regular business practice.

Each participant in the PW process was largely unaware of what the other participants were doing, employees and did not follow consistent practices, and they ultimately relied on Bernie Madoff and other felons for information and quality control.[205] The employees the Trustee deposed knew very little about the PW notations outside of their own specific and narrow job responsibilities. Presumably, this compartmentalized approach was designed to conceal the overall scheme; an employee with a limited scope of responsibilities would not notice any discrepancies. For instance, Alethea Mui-Leung admitted that her knowledge of the actual checks and their content was minimal,[206] had a similarly difficult time recalling the specific procedures,[207] and admitted she was not aware of who, if anyone, reviewed the checks

---

[204] Trustee Supplemental Brief at n. 278.

[205] *See e.g.*, Bongiorno Tr. 219:12-219:25.

[206] Mui-Leung Tr. 20:22-21:8 (Q: What information were you given in order to print the checks? A: I guess the check - - I don't remember what it was. It was either the check, a check-out book or a list of checks that - - I don't know if its on the C&S. . . I know the process but I don't remember exactly what was given to me to enter them into as checks.").

[207] *Id.* at 38:6-38:11 (For profit withdrawal: "Q: So this would be a list of checks that would have been printed out and sent to the customer? A: Yes. I would assume so. I don't recall, I don't recall this, but, yeah, it would look like it.").

she created. [208]    Yet, she was the employee charged with producing the actual checks. [209]

Similarly, Dorothy Khan entered much of the computer data upon which the Trustee relies. [210]

However, this information was relayed to her by other Madoff Securities employees; she did not

have any actual contact with customers, had little understanding of the overall process, and

believed that each trade represented actually occurred. [211]    Winnifer Jackson's role was equally

limited. [212]    She double-checked the PW notations and checks for proper labelling and did not

check to see if any of the inputs actually corresponded to real transactions, profits, or checks. [213]

Instead, she relied on the inputs being correct and believed each notation represented a real

securities transactions. [214]

   The Trustee also relies heavily on Sala's testimony.    However, in describing her

understanding of the PW transaction process, Sala admitted that she did not know when or how

checks were sent out. [215]    Sala also had little knowledge as to how confirmations were actually

---

[208] *Id.* at 20:1-20:22 ("did Winnie review [the checks] after you left them? A: I would assume so.
I think she would check to make sure that what we entered was there, I guess.  Q: Okay. Were
you part of the - - do you know who mailed the checks out? A: I would assume the mailroom.  Q:
Did you help with that at all? A: No.").

[209] *Id.*

[210] Khan Tr. 12:1-12:25.

[211] Khan Tr. 11:9-11:25; 111:10-111:12.

[212] Jackson Tr. 64:3-64:15; 87:6-87:9 (Do you understand how the arbitrage transactions worked?
A: Not really. I didn't really deal with them too much.").

[213] *Id.*

[214] Jackson Tr. 106:3-106:12.

[215] Sala Tr. 191:21-191:24 ("Once they left me, they went into the computer room and she
punched them.  I don't remember what happened after that."); *id.* at 198:19-198:23 ("Q: Do you
know how this document that we're looking at . . . was generated? A: It was . . . punched in the
computer room.  That's all I know.").

generated.[216]  Like other Madoff Securities employees, she simply performed the discrete tasks assigned to her and never checked the veracity of the data or statements being entered.

The little direct knowledge that these witnesses possessed did not support the Trustee's theory of a consistent and uniform practice of mailing checks to customers.  Further, Madoff Securities employees testified that they did not know whether the checks prepared were actually sent to customers.  On the contrary, Bongiorno testified that on several occasions customers contacted her to complain that transactions in their statements were inaccurate,[217] and that she called the bank about missing checks on several occasions to have them cancelled.[218]  Relatedly, the check-out book was exceptionally vulnerable to manipulation.  As Sala testified, anyone could alter the contents of the book as it was available to any Madoff Securities employee.[219] The Trustee's own experts have found that not all PW checks were cashed.[220]

Even if the employees had a general practice of mailing out checks, Madoff would often unilaterally alter the PW process.  Bongiorno recalled "a certain time where every account he wanted the profits to go out on."[221]

Further, Winnifer Jackson testified that employees gave Madoff profit withdrawal checks directly on occasion, trusting Madoff to give the checks to the client personally.[222]  Jackson never received any confirmation that the client was actually coming in to get the check, nor did

---

[216] Sala Tr. 200:20-200-23 ("Q: Do you know how these confirmations were generated? A: No. Once I put them in there, we gave [it] to the computer room and they punched it.")

[217] Bongiorno Tr. 143:8-144:4.

[218] Bongiorno Tr. at 212:1-214:11.

[219] Sala Tr. 193:10-193:12 ("anybody could go – everybody knew where it was to go and put  a check in there").

[220] Greenblatt Supp. Analysis of Profit Withdrawal Transactions at n.4.

[221] Bongiorno Tr. 35:1-35:9.

[222] Jackson Tr. at 110:19-110:25

she confirm that he had in fact requested the check.[223]  Jackson admitted that, in hindsight, she should not have taken Madoff's word or entrusted him with these checks.[224]  However, the Trustee asks the Court to do just that: accept that the check mailing process overseen by Madoff was consistent and accurate.

### C.    The creation of fraudulent and misleading documents is not part of a normal business practice and should not be afforded the same respect as a reliable business habit or routine.

Courts accept evidence of routine practice only because of their recognition that there is a legitimate "profit-driven need for regularity."  *See* Joseph M. McLaughlin, Jack B. Weinstein, Margaret A. Berger, 2 *Weinstein's Fed. Evid.* Section 406.03 (2d ed. 2014).    That is, "organizational sanctions that may result when employees deviate from the established procedures give extra guaranties that any activity followed the usual custom."  *Id.*; *Mobil Exploration v. Cajun Const. Services*, 45 F.3d 96, 99 (5th Cir. 1995).  A company, therefore, would likely follow the same pattern in response to similar issues because it would need to comply with accounting requirements but also by keeping track of its sales, profits, and losses. Since a legitimate company's sales, profits, and loss numbers correspond to real money and real activity, it is imperative that the reporting of these amounts is consistent and correct.

The only documentary evidence directly pertinent to the Blums consists of fraudulent Madoff Securities records that offset admittedly fictitious credit entries with debit entries that do not correspond to cash payments received by the Blums.  Madoff Securities had no incentive to maintain regularity and consistency in its practices; to the contrary, it had every incentive to continually alter its recording practices to hide the true nature of the scheme.  Where, as here, a

---

[223] *Id.* at 111:5-111:11.

[224] *Id.*

business is designed solely to defraud its customers, any proffer of a regular business practice in

support of that business's claim should be viewed with extreme skepticism.

IV.    **The Blums have not waived their claims because Trustee is barred by _in pari delicto_ from enforcing any term in the Madoff Securities contract against innocent customers.**

The Trustee and SIPC argue that the Blums cannot contest the PW notations because

neither Norman nor Morris objected to the purported PW debits shown on various account

statements within the ten-day period provided in the Madoff Securities customer agreement.  As

a matter of law, the Trustee cannot assert waiver under these circumstances.  While Section 29(b)

of the Securities Exchange Act of 1934 permits an innocent party to enforce or rescind

fraudulently induced contractual obligations, as legal successor of the debtor, the Trustee is

barred by the doctrine of _in pari delicto_ from enforcing any term in a contract induced by the

debtor's fraud.[225]

Section 29(b) controls the enforcement of a fraudulent securities contract, and it leaves the

decision to enforce or rescind solely to the innocent party:

> Every contract made in violation of any provision of this chapter or of any rule or
> regulation thereunder, and every contract . . . the performance of which involves
> the violation of … any provision of this chapter or any rule or regulation
> thereunder, shall be void (1) _as regards the rights of any person who, in violation
> of any such provision, rule, or regulation, shall have made or engaged in the
> performance of any such contract_ ....

15 U.S.C. § 78cc(b) (emphasis added). Under Section 29(b), the innocent party may choose

whether to void a contract procured by fraud or to maintain an action for money damages against

the wrongdoing counterparty.  _E.g._, _Freeman v. Marine Midland Bank-New York_, 419 F. Supp.

440, 453 (E.D.N.Y. 1976) ("the investor, at his option, [may choose] to void the contract as a

---

[225] SIPA is part of the 1934 Act.  _See_ SIPA Section 2.  Thus, other provisions of the 1934 Act apply to SIPA proceedings.

defense to a lender's suit, to sue on the contract for damages, to enforce the contract, or to seek rescission") (citations omitted).

Section 29(b) does not allow the Trustee to enforce any term in the contract against the innocent party because he stands in the same position as Madoff Securities under the doctrine of *in pari delecto*. *See Picard v. JPMorgan Chase & Co.*, 721 F.3d 54, 63 (2d Cir. 2013) ("The debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative.") (dismissing common law claims). Section 29(b) permits an innocent counterparty to enforce a fraudster's securities contract obligations, but *it does not permit the fraudster to do the same* against the innocent party. *See Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 387-88 (1970) (collecting cases); *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 758, 759 (2d Cir. 1983) (providing that fraudulently induced contractual provisions are enforceable unless challenged by an unwilling innocent party seeking rescission); *Cary Oil Co. v. MG Ref'g. & Mktg., Inc*., 230 F. Supp. 2d 439, 452-53 (S.D.N.Y. 2002) ("[C]ontracts made in violation of the securities laws, and thus subject to Section 29(b) . . . are merely voidable at the option of the innocent party."); *Found. Ventures, LLC v. F2G, Ltd*., Case No. 08 Civ. 10066 (PKL), 2010 U.S. Dist. LEXIS 81293, *18–20 (S.D.N.Y. Aug. 11, 2010) ("Contracts made in violation of section 29(b) are … 'voidable at the option of the innocent party.'") (quoting *Mills v. Elec. Auto-Life Co.*, 396, 375, 387-88 (1970).

The Second Circuit has already rejected the Trustee's arguments that *in pari delicto* should not apply:

> [The Trustee] argues that in a typical bankruptcy *in pari delicto* is designed to bar corporate malefactors, including shareholders, from recovering, whereas in a SIPA liquidation the trustee marshals assets for the benefit of the customer property estate…. But, in *Kirschner v. KPMG LLP*, the New York Court of Appeals declined to make an exception to the *in pari delicto* doctrine despite the

trustee's urging that proceeds would "benefit blameless unsecured creditors ... and shareholders."

*Picard*, 721 F.3d at 63 n.12; *Picard v. HSBC Bank plc*, 454 B.R. 25, 37 (S.D.N.Y. 2011) (applying "the common law doctrine of *in pari delicto*, which 'bars a trustee from suing to recover for a wrong that the debtor whose the estate he represents essentially took part in.'") (citation omitted). The Trustee may not invoke the securities contract waiver provision against the Blums.

**V.    Because the Trustee cannot show by a preponderance of the evidence that the Blums received cash corresponding to the PW notations, the Trustee erred in calculating their claims and the Court should compute their SIPA claims without regard to the PW notations.**

The Blums accept the cash-in cash-out methodology used by the Trustee to calculate net equity, with one exception not relevant here.[226]  With regard to the specific PW notations at issue, the Trustee has no corroborating evidence to support his assertion that these notations accurately reflect cash withdrawals.  The Blums deny that they are accurate, a denial that comports with the bulk of the evidence regarding PW errors, the lack of any evidence of such checks, and the testimony of concerning the PW process at Madoff Securities.  Therefore, the Blums request that the Court find that there is insufficient basis to treat the PW notations as withdrawals from their accounts and adopt the Blums' recalculation of their claims without regard to such notations, as set out in the Declaration of Thomas S. Respess, filed herewith.  Those recalculations confirm the calculations prepared for the Trustee[227] on the affect of the PW notations on the three SIPA claims:

---

[226] *See supra*, n. 198 concerning the pending inter-account transfer appeal.

[227] Greenblatt Supp. Analysis of Profit Withdrawals at 24.

| Account with SIPA Claim | Trustee Determination of Claim (treating PW notations as cash withdrawals) | Recalculated Claim Amount (disregarding PW notations) |
|---|---|---|
| Norman Blum Acct 1B0190 | ($182,196) | ($ 115,570.69) |
| Norman Blum Acct 1B0201 | $ 27,053.02 | $ 180,344.11 |
| Joel Blum Acct 1B0251 | $ 83,794.59 | $ 250,082.34 |

### CONCLUSION

For the foregoing reasons and after hearing the evidence summarized herein, the Blums respectfully request that the Court deny in part the Trustee's motion to affirm his treatment of the profit withdrawal notations and recalculate the Blums' claims without regard to the profit withdrawal notations that cannot be verified. The Blums further reserve their right to revisit the claim calculations insofar as they are based on inter-account transfers, pending the outcome of the appeal in *Sagor et al. v. Picard*, No. 16-0431bk(L) (2d. Cir).

Dated: September 23, 2016                    Respectfully submitted,

*/s/ Richard A. Kirby*
Richard A. Kirby, *pro hac vice*
Laura K. Clinton, *pro hac application forthcoming*
Graham R. Cronogue, *admission forthcoming*
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7020
Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com
Email: graham.cronogue@bakermckenzie.com