UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
In re:                                                    :
                                                          :
BERNARD L. MADOFF INVESTMENT            :        Case No. 08-99000 (SMB)
SECURITIES LLC,                                     :        Adv. Proc. No. 08-01789 (SMB)
                                                          :        SIPA LIQUIDATION
                                  Debtor.           :
-------------------------------------------------------------X
IRVING H. PICARD, Trustee for the Liquidation    :
of Bernard L. Madoff Investment Securities LLC,  :
                                                          :
                                  Plaintiff,        :
                                                          :
             – against –                            :
                                                          :        Adv. Proc. No. 10-04283 (SMB)
THE ESTATE OF STEVEN MENDELOW;         :
NANCY MENDELOW, in her capacity as the    :
Executrix of the Estate of Steven Mendelow;       :
NANCY MENDELOW; CARA MENDELOW;        :
PAMELA CHRISTIAN; C&P ASSOCIATES,        :
LTD.; and C&P ASSOCIATES, INC.                :
                                                          :
                                  Defendants.       :
-------------------------------------------------------------X

**MEMORANDUM DECISION GRANTING IN PART AND DENYING IN
PART TRUSTEE'S MOTION FOR LEAVE TO AMEND COMPLAINT**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

    David J. Sheehan, Esq.
    Jonathan B. New, Esq.
    Robertson D. Beckerlegge, Esq.
      Of Counsel

*Attorneys for Irving H. Picard, Trustee for
the Liquidation of Bernard L. Madoff
Investment Securities LLC and the Estate
of Bernard L. Madoff*

ARKIN SOLBAKKEN LLP
750 Lexington Avenue, 25th Floor
New York, NY 10022

      Stanley S. Arkin, Esq.
      Lisa C. Solbakken, Esq.
      Alex Reisen, Esq.
         Of Counsel

*Attorneys for Defendants*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*, and the estate of Bernard L. Madoff,

commenced this adversary proceeding on November 23, 2010 to avoid and recover prepetition

transfers made to Steven B. Mendelow ("Mendelow") and related defendants as fraudulent

transfers, and to recover subsequent transfers made among the defendants. The Trustee now

seeks to amend his complaint over the defendants' objections. For the reasons that follow, the

Trustee's motion is granted except to the extent that the amended complaint seeks to avoid and

recover transfers that occurred prior to January 1, 2001.

## BACKGROUND

The facts are taken from the Trustee's Proposed *Amended Complaint* ("PAC")[1] which are

accepted as true for the purpose of determining whether the Trustee alleges legally sufficient,

non-futile, claims. Some of the pertinent facts in this case overlap with those described by the

---

[1]     *See* ECF Doc. # 89, Ex. 1.

Court in *Picard v. Avellino* (*In re BLMIS*), No. 10-05421 (SMB), 2016 WL 4040799 (Bankr. S.D.N.Y. July 21, 2016) ("*Avellino*").

## A.    The BLMIS Ponzi Scheme

Madoff founded his financial advisory business in 1960 as a sole proprietorship, and organized BLMIS in January 1, 2001 as a New York limited liability company with Madoff serving as its sole member.[2]   (PAC ¶ 36.)  BLMIS, among other things, operated an investment advisory ("IA") business through which it purported to manage customer investments. Beginning in the 1990s, Madoff outwardly ascribed the consistent investment success of BLMIS' IA business to the "split-strike conversion" investment strategy.   Under this strategy, Madoff told investors that he would invest their funds in a basket of common stocks within the S&P 100 Index and sell call options and buy put options on the S&P 100 Index to control the downside risk of price changes in the basket of stocks.  (PAC ¶ 38.)  In fact, BLMIS did not engage in any trading and sent monthly statements listing false trades that made it appear that customers' IA accounts were realizing substantial gains.  The money invested by IA customers was used primarily to fund the withdrawals by other IA customers.  (PAC ¶¶ 41-42.)

On December 11, 2008 (the "Filing Date") Madoff was arrested by federal agents for criminal violations of federal securities laws, and the Securities Exchange Commission ("SEC") commenced a fraud action against Madoff in the United States District Court for the Southern District of New York.  (PAC ¶ 24.)  Upon the application of the Securities Investor Protection Corporation ("SIPC"), the District Court entered an order appointing Irving Picard as Trustee for

---

[2]      Although BLMIS did not exist as an operating entity prior to January 1, 2001, this decision generally refers to Madoff's business as "BLMIS" regardless of when the transactions described herein occurred and makes the distinction between his sole proprietorship and BLMIS, the SIPA debtor, when necessary.

the liquidation of BLMIS and removing the liquidation to this Court.  (PAC ¶¶ 25-26.)  At his

March 12, 2009 plea hearing, Madoff admitted that he "operated a Ponzi scheme through

[BLMIS' IA division]."  (PAC ¶ 29.)  On April 13, 2009, an involuntary bankruptcy petition was

filed against Madoff, and on June 9, 2009, the Court entered a consent order substantively

consolidating Madoff's chapter 7 estate with the BLMIS SIPA liquidation.  (PAC ¶ 28; Case No.

09-11893 ECF Doc. # 28.)

**B.    The Defendants**

Mendelow was an accountant, financial advisor and New York resident.  (PAC ¶ 16.)  He

died on June 7, 2016, and his estate and Nancy Mendelow (Mendelow's wife), in her capacity as

executrix of the estate, have been substituted for Mendelow as defendant.[3]  Nancy Mendelow is

also a defendant in her individual capacity.  (PAC ¶ 18.)  In addition, Cara Mendelow and

Pamela Christian, Mendelow's daughters, are defendants.  (PAC ¶¶ 19, 20.)

C&P Associates, Inc. is a Florida corporation.  Mendelow was the president and a

director until his death, and Nancy Mendelow is the secretary and a director.  (PAC ¶ 21.)

C&P Associates, Ltd. ("C&P Associates") is a Florida limited liability partnership.  C&P

Associates, Inc. is the general partner of C&P Associates, and Cara Mendelow and Pamela

Christian are limited partners.  (PAC ¶ 22.)

---

[3]    *See Stipulation and Order for Substitution of Defendant*, dated Aug. 3, 2016 (ECF Doc. # 100).

C.    **Mendelow**

1.    **Mendelow was a Trained Accountant and Sophisticated Investor[4]**

Mendelow had been a principal at Glantz & Levey, P.C. ("G&L"), an accounting firm operated by Edward Glantz ("Glantz") and Aaron Levey ("Levey"), from 1972 to 1983, at which time it merged with Konigsberg Wolf & Co. P.C. ("Konigsberg Wolf").  (PAC ¶ 50.)  For over 20 years, G&L shared an office and expenses with Avellino & Bienes ("A&B"), whose predecessor operated BLMIS' first "feeder fund." (PAC ¶¶ 51, 52.)  Konigsberg Wolf's website described Mendelow as an accountant who "specializes in unique transactions, family wealth building, and generational matters and financial restructuring."  (PAC ¶ 53.)

Mendelow opened accounts at BLMIS for himself, his wife, his two daughters, and two funds that he formed, but received the account statements for all of the accounts.  (PAC ¶ 54.) Mendelow also received BLMIS account statements for several of his accounting clients that invested with BLMIS.  (PAC ¶ 55.)

2.    **Mendelow Took Advantage of His Longstanding Relationship with Madoff**

Mendelow's name and phone number were in Madoff's address book, and there were records of numerous calls between Mendelow and BLMIS.  (PAC ¶ 57.)  BLMIS did not provide its customers with the customary year-end reporting necessary for tax preparation, and as a result, many accountants had difficulty completing tax returns for BLMIS customers. Konigsberg Wolf promoted its expertise in preparing tax returns for BLMIS customers.  (PAC ¶ 58.)

---

[4]    Certain headings are derived from the PAC.  They are descriptive only and do not imply the Court's views of the allegations.

Mendelow's relationship with Madoff allowed him to help friends, colleagues, and co-workers open BLMIS accounts when they otherwise would have been unable to do so, (PAC ¶ 59), and Mendelow fielded questions from and gave assistance to business associates and clients regarding their BLMIS investments.  (PAC ¶¶ 56, 58, 63, 64.)  According to the Trustee, Mendelow was close enough to Madoff to know when Madoff would not accept new "investors" and was able to obtain exceptions from Madoff for his family, friends, and colleagues.  (PAC ¶ 60.)

### 3.    Mendelow Owned and Operated Telfran, One of the Earliest Feeder Funds

Mendelow's relationship with A&B went back to the 1970s or 1980s when he opened accounts at A&B in his name, his wife's name, and/or in the name of C&P Associates.  (PAC ¶ 66.)  A&B raised hundreds of millions to invest in BLMIS by issuing debt instruments to investors promising a guaranteed return in the range of 13% to 18%. (PAC ¶¶ 67-68.)  BLMIS, in turn, promised a return to A&B that exceeded the return A&B had promised to its investors. A&B retained the difference between the returns as profit.  (PAC ¶ 69.)

Mendelow, along with Glantz, Levey, and Joel Levey, operated Telfran Associates Ltd. ("Telfran") as a sub-feeder to A&B's feeder fund, (PAC ¶ 71), and Telfran operated in a manner similar to A&B.  Telfran solicited approximately 800 clients, who "invested" approximately $89 million, promising them a guaranteed return.  Through Telfran, Mendelow and his partners invested that money in A&B.  (PAC ¶ 72.)  Like A&B, Telfran termed these investments "loans" and issued letters to investors that specified the rate of return.  (PAC ¶ 73.)  Telfran profited by retaining the difference between the return Telfran received from A&B and the return Telfran

6

paid to its investors.  (PAC ¶ 74.)  Mendelow profited in amounts between $200,000 and

$400,000 per year through this scheme.  (PAC ¶ 79.)

### 4.      The SEC Shut Down Telfran for Violating Securities Laws

The SEC began investigating A&B, Frank Avellino and Michael Bienes in 1992.  On

November 18, 1992, the District Court issued a preliminary injunction against Avellino, Bienes

and A&B, appointing a trustee[5] to oversee the liquidation of A&B and directing that funds be

returned to the A&B investors.  On September 7, 1993, the District Court issued a permanent

injunction against Avellino, Bienes and A&B ordering, among other things, that they be enjoined

from violating §§ 5(a) and (c) of the Securities Act of 1933 [§§ 77e(a) and (c)] by selling

unregistered securities and § 7of the Investment Company Act of 1940 [§ 80a-7], by operating an

unregistered investment advisory company.  (PAC ¶ 81.)

The SEC investigation of A&B led to an investigation of Telfran for selling unregistered

securities and operating an unregistered investment advisory company.  On November 25, 1992,

the District Court issued a preliminary injunction against Telfran, Mendelow and Glantz that,

among other things, appointed a trustee to oversee the liquidation of Telfran and directed the

return of all funds to investors.  (PAC ¶ 82.)  Ultimately, Telfran and Mendelow entered into a

consent decree with the SEC which enjoined them to the same extent as A&B.  Telfran also paid

a civil penalty in the amount of $250,000, and Mendelow paid a civil penalty in the amount of

$50,000.  (PAC ¶ 84.)

---

[5]        In *Avellino*, the Trustee described the Court-appointed official as a receiver.

As a result of the SEC investigations, and in an effort to avoid possible exposure of his own fraudulent operation to regulators, Madoff agreed to "return" money to A&B and/or the Court-appointed trustee for A&B. (PAC ¶ 85.) Telfran received approximately $89 million from A&B, a sum that corresponded to the approximate amount of money Telfran had invested with A&B for investment in BLMIS. In turn, Telfran distributed the funds to its investors. (PAC ¶ 88.)

### 5. Mendelow Continued to Exploit the BLMIS Fraud Post-SEC Investigation

As A&B and Telfran were shutting down, Frank Avellino met with Madoff on Mendelow's behalf to negotiate the details of a new payment structure. Madoff agreed that BLMIS would provide Mendelow with financial rewards that mimicked the profit structure of A&B and Telfran. Specifically, Madoff (i) guaranteed Mendelow a return of at least 17% in Mendelow's new BLMIS accounts, and (ii) added value to certain designated Mendelow accounts through the allocation of fictitious options transactions ("Extra P&L") based on the amount of money former Telfran clients reinvested directly with BLMIS. (PAC ¶¶ 91-93.) Mendelow opened an account at BLMIS in the name of C&P Associates in December 1992, and Mendelow and Nancy Mendelow rolled over their IRAs from A&B to new IRA accounts at BLMIS in February 1993. (PAC ¶ 94.)

### a. Mendelow Encouraged Telfran Investors to Reinvest with BLMIS

Mendelow helped funnel Telfran investors' money back into BLMIS. (PAC ¶ 97.) For certain former Telfran investors, Mendelow contacted Madoff directly. (*See* PAC ¶ 98.) In other cases, the investors contacted BLMIS directly at Mendelow's instruction. (*See* PAC ¶¶ 99, 100.)

8

Of the $89 million returned to original Telfran investors, $62 million was reinvested directly with BLMIS by those investors.  (PAC ¶¶ 88, 101.)

### b.    Madoff Provided Mendelow a Guaranteed Return and Extra P&L

#### (i)    Guaranteed Return

From 1993 to 1999, Mendelow received a guaranteed return of at least 17% in certain of the BLMIS accounts he opened on his own behalf and on behalf of his family members. According to the Trustee, Mendelow knew that it was impossible for Madoff to guarantee and consistently deliver a pre-determined return if he was actually trading securities.  (PAC ¶¶ 102-03.)  Near the end of every year, BLMIS officer Frank DiPascali examined the accounts in which Madoff had promised a guaranteed return, including Mendelow's accounts, to see if they had hit their mark.  (PAC ¶ 104.)

#### (ii)    Extra P&L

Madoff rewarded Mendelow and his Telfran partners with Extra P&L in an amount approximating 1% of the $62 million reinvested in BLMIS by former Telfran investors.  As part owner of Telfran, Mendelow received 37.5% of Telfran's share, or $232,500 per year.  (PAC ¶ 108.)  Mendelow also received an additional $200,000 per year on top of his share, which he referred to as the "FA+MB contrib."  The Trustee alleges upon information and belief that "FA" refers to Frank Avellino and "MB" refers to Michael Bienes, the partners in A&B.  (PAC ¶ 109.) In total, Mendelow received Extra P&L in the amount of approximately $432,000 per year from 1994 through 2001, (PAC ¶ 110), and directed the Extra P&L to be credited, at various times, to his IRA account, Nancy Mendelow's IRA account, and C&P Associates' account.  (PAC ¶ 111.) The Extra P&L calculation was cut in half for the years 2002-2007 resulting in Mendelow

receiving approximately $216,000 per year. (PAC ¶ 114.) The total amount of paper income generated by the Extra P&L for the period from 1994 through 2007 was $5,116,478. (PAC ¶ 115.)

### (iii)    "Schupt" Calculation

BLMIS did not compensate Mendelow with cash or actual securities. Instead, BLMIS paid Mendelow by assigning fictitious S&P 100 Index put and call option transactions to his designated BLMIS accounts that achieved predetermined levels of "profit." These false trades increased the balance in the accounts and the amount that Mendelow or his family could withdraw. (PAC ¶ 116.) For example, in December 1999, Mendelow's BLMIS IRA account statement showed a cash balance of $0.31. In order to create the Extra P&L Mendelow expected in his IRA account, BLMIS purported to purchase S&P 100 Index call options costing $510,600 which it purported to sell on December 28, 1999, generating proceeds of $1,169,400. In a separate December 18, 1999 transaction, BLMIS purported to sell S&P 100 Index call options generating proceeds of $509,400, and on December 28, 1999, purported to buy back the options at a cost of $870,600. The net reported gain on those four transactions was $297,600. The same transactions were listed on Nancy Mendelow's IRA account at a lower volume, and reported a gain of $128,960. In total, the purported options transactions in these accounts generated the Extra P&L of $426,560. (PAC ¶ 117.)

To identify, track, and reconcile accounts to ensure the guaranteed rates of return and/or Extra P&L to dozens of different customers, BLMIS employees created handwritten schedules that showed the amount of fictitious gains needed to bring the accounts up to their promised returns. The schedule used to determine the amounts owed was referred to internally at BLMIS

10

as either the "Shupt," "Schupt" or "Bingo" number (hereinafter "Schupt"). (PAC ¶ 118.)

DiPascali typically worked on these fictitious options transactions at the end of December every

year. If the account had not achieved the guaranteed, albeit fictitious, return, DiPascali would

manufacture sufficient fictitious options transactions to meet the number. For example, in

December 1996, Mendelow's and Nancy Mendelow's BLMIS IRA accounts reported

speculative options transactions generating $210,672 in fictitious profits bringing their respective

annual returns to 17%. (PAC ¶ 120.) The Trustee alleges that Mendelow knew that it was

impossible to generate a specific gain through actual securities trading. (PAC ¶¶ 121, 123.) All

Extra P&L was generated through fictitious options transactions. (PAC ¶ 122.)

### 6.    Mendelow Worked with DiPascali to Ensure Receipt of Promised Amounts

Mendelow closely monitored his accounts to ensure that BLMIS provided the Extra P&L

and guaranteed returns each year. (PAC ¶ 133.) In particular, Mendelow called DiPascali every

December to tell DiPascali how to divide his Extra P&L among his accounts. Referring to the

Extra P&L in his account balances generated through fictitious options transactions, Mendelow

would cryptically say something like, "on that thing you do, I want 115 for me, 115 for my

wife." (PAC ¶ 134.)

For example, BLMIS manufactured several fictitious options transactions between 1993

and 1995—the first few years in which Mendelow received the guaranteed return and Extra

P&L. In early 1995, Mendelow calculated the amount he was owed for 1993 and 1994 in his

BLMIS accounts and compared it to the actual balances as of December 31, 1994. Specifically,

Mendelow calculated the promised returns for his and his wife's IRA accounts and C&P

Associates' account based on a 17% annual return which he called "Int at 17%" or "Yield at

17%." Mendelow also separately calculated the expected Extra P&L for 1993 and 1994 based

on the "vig" and the "FA+MB contrib" totaling $462,500 per year. Mendelow determined that,

based on his calculation, BLMIS owed him $730,830. Upon receipt of Mendelow's calculations,

BLMIS started to "catch up" Mendelow's accounts, and in March and December 1995, reported

options transactions in C&P Associates' account reflecting gains of $704,294. (PAC ¶¶ 137-43.)

In early 1996, Mendelow performed a similar reconciliation for amounts owed in 1995.

This time, Mendelow's calculation showed that BLMIS was short by $197,000 as of December

31, 1995. BLMIS purported to engage in another series of speculative options transactions in

December 1996 to make-up the shortfall yielding fictitious profits of $210,672. (PAC ¶¶ 144-

147.)

Mendelow also sent a note to DiPascali on December 14, 2007, following up on a

December 11 telephone conversation, simply listing the BLMIS account numbers for his and his

wife's IRA accounts with an arrow pointing to "215m" and concluding with "Thanks Merry

Christmas Steve." Options transactions were then reported on the accounts' statements for

December 2007 generating profits in the requested amount. Moreover, these fictitious options

transactions had a purported settlement date of December 7, 2007 – four days prior to

Mendelow's phone call. (PAC ¶ 135.)

The impossibility of purported option transactions was especially apparent from 1996

through 2007 because they were always recorded in the month of December, and no matter the

market conditions, BLMIS was able to reach the predetermined amount on demand. (PAC ¶

153.) Moreover, in 1999, 2001, 2002 and 2003, the speculative options transactions were the

only December transactions reported on Mendelow's designated accounts. (PAC ¶ 159.)

12

### 7.    Mendelow Recruited More Investors into BLMIS through C&P Associates

Beginning in 1998, Mendelow used C&P Associates as he had used Telfran, soliciting investors with offers of specified returns.  As with Telfran, Mendelow structured these "investments" as loans.  Mendelow's willingness to offer a guaranteed return to C&P Associates' investors was based on his knowledge that he would receive a higher return from BLMIS.  (PAC ¶¶ 124-25.)  The Trustee alleges upon information and belief that Mendelow did not use the term "loan" in his letters to investors so as to appear that he was not in violation of the SEC injunction against him.  However, the letter he sent to investors regarding their "arrangements" with C&P Associates served the same purpose as the loans issued to Telfran's customers.  (PAC ¶¶ 126-27.)  From at least 1999 through 2006, C&P Associates paid Mendelow and Nancy Mendelow a salary as high as $159,100 and $144,000, respectively, for their management of C&P Associates.  (PAC ¶ 128.)  In 2002, Mendelow created another entity, FGLS Equity, LLC ("FGLS"), to funnel investor funds into BLMIS.  Once FGLS was created, Mendelow transferred many of his clients' "investments" from C&P Associates into FGLS.  (PAC ¶¶ 130-32.)

### 8.    Mendelow's Knowledge that BLMIS was not Engaged in Securities Trading

#### (a)    Treatment of BLMIS Accounts

Mendelow analyzed the accounts as if they were a form of fixed income investment in which the year-end balances could be determined based solely upon the cash flow and the fixed returns.  He used terminology associated with bonds and other debt instruments such as "interest" and "yield."  (PAC ¶ 149.)  In tracking the Extra P&L and guaranteed return, Mendelow referred to it as either a "vig" or "fee."  (PAC ¶ 150.)

13

**(b)      Fictitious Option Transactions were Apparent on Account Statements**

Mendelow received and reviewed BLMIS account statements of (i) the defendants and (ii) his numerous BLMIS clients.  By reviewing both, Mendelow saw the difference between his accounts which received guaranteed returns, and accounts not receiving such preferential treatment.  (PAC ¶ 151.)  The purported options transactions were not only consistently profitable, but also approximated the predetermined amount for the Extra P&L, (PAC ¶ 152), and allowed Mendelow to achieve greater percentage gains than the BLMIS accounts he managed for others.  (PAC ¶¶ 154-56, Ex. C.)  As a result, certain accounts that Mendelow controlled received returns as high as 43%, 34.7% and 28.7%, while others purportedly using the same investment strategy received returns no greater than 10.4% to 14.5%.  (PAC ¶ 157.)

**(c)      Mendelow's BLMIS IRA Accounts**

Every December from 1999 to 2007, Mendelow instructed BLMIS to split the Extra P&L between his and Nancy Mendelow's IRA accounts.  By using IRA accounts, they were able to defer taxes on purported gains.  (PAC ¶ 162.)  As a sophisticated investor, accountant and financial adviser with expertise in "family wealth building and generational matters," Mendelow knew that this tax avoidance strategy was only possible if the Extra P&L he received was in the form of gains from securities transactions.  BLMIS could not have transferred securities into these accounts because IRA contributions are required to be in cash.  However, BLMIS could not have paid Mendelow in cash because the amount of the Extra P&L far exceeded the allowable cash contribution limits, which ranged from $2,000 to $5,000 in the years 1999 through 2007.  (PAC ¶ 163.)

For the majority of the years in which Mendelow received Extra P&L in his and Nancy Mendelow's IRAs, the accounts did not have sufficient cash to fund the purchase of the speculative options listed on his account statements. For example, in December 1999 the cash balance in Mendelow's IRA was reported to be only $0.31. Yet, as mentioned above, his IRA BLMIS statement showed a purchase of S&P 100 Index call options with a cost of $510,600. Such a negative cash position would only be possible in an investment account trading on margin. However, margin trading is not permitted in an IRA account. According to the Trustee, Mendelow—a sophisticated investor, accountant and financial advisor—knew that the purported options transactions used to generate Extra P&L could not have actually occurred in his IRA account. (PAC ¶ 164.)

### 9. Mendelow Invoked His Fifth Amendment Right When Asked About BLMIS

At a Federal Bankruptcy Rule 2004 examination by the Trustee on September 23, 2010, Mendelow invoked his Fifth Amendment right over 390 times, refusing to answer virtually every question. (PAC ¶ 165.) Several of the questions he refused to answer focused on his knowledge of Madoff's Ponzi scheme and are discussed below.

### D. The Transfers

The PAC alleges that defendants maintained six BLMIS accounts which received pre-Filing Date transfers from BLMIS as follows:

| Account Name | Account # | Made w/in 2-years | Made w/in 6-years | All Transfers |
|---|---|---|---|---|
| C&P Associates c/o Steve Mendelow | 1ZA542 | $700,000 | $4,250,000 | $11,165,000 |
| Cara Mendelow | 1ZB336 | $125,000 | $935,000 | $1,125,000 |
| Pamela Mendelow | 1ZB337 | 0 | $500,000 | $550,000 |

| Account Name | Account # | Made w/in 2-years | Made w/in 6-years | All Transfers |
|---|---|---|---|---|
| NTC & Co. fbo Steven Mendelow | 1ZR179 | 0 | $1,750,000 | $5,548,990 |
| NTC & Co. fbo Nancy Mendelow | 1ZR180 | 0 | $1,750,000 | $1,750,000 |
| NTC & Co. fbo Steven Mendelow | 1ZR208 | 0 | 0 | $111,730 |
| **TOTALS** | | $825,000[6] | $9,185,000[7] | $20,250,720[8] |

(*See* PAC, Ex. B.)

The PAC asserts seven claims to avoid and recover the transfers as fraudulent transfers

under the Bankruptcy Code and New York state law as follows:

| Count | PAC ¶¶ | Description |
|---|---|---|
| 1 | 185-90 | Avoid and recover the Two-Year Transfers as actual fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A), 550, and 551. |
| 2 | 191-99 | Avoid and recover the Two-Year Transfers as constructive fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551. |
| 3 | 200-05 | Avoid and recover the Six-Year Transfers as actual fraudulent transfers under New York Debtor & Creditor Law ("NYDCL") §§ 276, 276-a, 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), and 551. |
| 4 | 206-11 | Avoid and recover the Six-Year Transfers as constructive fraudulent transfers under NYDCL §§ 273 and 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), and 551. |
| 5 | 212-17 | Avoid and recover the Six-Year Transfers as constructive fraudulent transfers under NYDCL §§ 274, 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), and 551. |
| 6 | 218-23 | Avoid and recover the Six-Year Transfers as constructive fraudulent transfers under NYDCL §§ 275, 278 and/or 279, and 11 U.S.C. §§ 544(b), 550(a), and 551. |

---

[6]    Collectively, the "Two-Year Transfers."

[7]    Collectively, the "Six-Year Transfers."

[8]    Collectively, "All Transfers."

| Count | PAC ¶¶ | Description |
|-------|--------|-------------|
| 7 | 224-30 | Avoid and recover All Transfers as undiscovered fraudulent transfers under N.Y. C.P.L.R. §§ 203(g) and 213(8), NYDCL §§ 276, 276-a, 278 and/or 279, and 11 U.S.C. §§ 544, 550(a), and 551. |

## E.     Procedural History

The Trustee commenced this adversary proceeding against Mendelow and others by filing his initial complaint on November 23, 2010 (the "Initial Complaint") (ECF Doc. #1).  The Initial Complaint made the same claims against the same parties as the PAC primarily on the theory that defendants knew *or should have known* that Madoff was engaged in fraudulent activity.  (*E.g.,* Initial Complaint at ¶¶ 10, 11, 25, 49, 54, 96.)  It also included three counts alleging subsequent transfer claims.

The parties stipulated to multiple extensions of the defendants' deadline to move, answer or otherwise respond to the Initial Complaint for reasons discussed shortly.  The final stipulated deadline expired on November 14, 2014, and the defendants foiled their answers to the Initial Complaint (the "Answers") ECF Doc. Nos. 60-65)) on that date.  On January 23, 2015, the parties stipulated to a Case Management Plan ("CMP") (ECF Doc. # 69), which, among other things, set January 29, 2016 as the deadline to complete fact discovery.  (CMP at ¶ 2(e).)

Approximately four months after entering into the CMP, the defendants moved for judgment on the pleadings to dismiss the Initial Complaint ("Dismissal Motion") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (ECF Doc. # 74.)[9]  The Court heard argument on the Dismissal Motion on October 28, 2015.  During the five years that had passed

---

[9]     The defendants sought to dismiss the count based on 11 U.S.C. § 548(a)(1)(A) only to the extent they gave value for the transfers.

between the filing of the Initial Complaint and the Dismissal Motion, this Court, the District

Court and the Second Circuit had imposed heightened pleading requirements on the Trustee, a

circumstance emphasized by the defendants in the Dismissal Motion.  The Trustee opposed the

Dismissal Motion, and in the alternative, sought leave to amend the Initial Complaint.  The Court

directed the Trustee to file an amended complaint and seek leave to amend, and held the

Dismissal Motion and discovery in abeyance.  (*Tr. of Oct. 28, 2015 Hr'g*, at 95:16-104:24.)

The Trustee moved for leave to file the PAC on December 30, 2015 (the "Motion").

(ECF Doc. # 88.)  In the main, the Trustee argues that leave is appropriate due to the intervening

change in the pleading standards for BLMIS fraudulent transfer claims that has developed since

November 2010 when the Trustee filed his Initial Complaint.  (Motion at 15-16.)   The

defendants opposed the Motion on February 1, 2016 (the "Opposition") (ECF Doc. # 93) arguing

that the proposed amendment was futile and the defendants were prejudiced by the Trustee's

delay in seeking the amendment.  (Opposition at 15-40.)  After oral argument on the Motion,

defense counsel notified the Court that Mendelow died on June 7, 2016.  (*See Letter*, dated June

7, 2016 (ECF Doc. # 99).)

## DISCUSSION

### A.    Federal Civil Rule 15(a)(2)

Rule 15(a)(2) of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by Rule 7015 of the Federal Rules of Bankruptcy Procedure, states that "a party may

amend its pleading only with the opposing party's written consent[10] or the court's leave.  The

---

[10]    Defendants refused to consent to the filing of the PAC.  (*Declaration of Jonathan B. New*, dated Dec. 30, 2015 at ¶ 2 (ECF Doc. # 89).)

court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2).  The mandate

that leave to amend be freely given when justice requires "is to be heeded" in the absence of a

substantial reason "such as undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the

opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v.

Davis*, 371 U.S. 178, 182 (1962); *accord AEP Energy Servs. Gas Holding Co. v. Bank of Am.,

N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) ("The rule in this Circuit has been to allow a party to

amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.")

(quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  "Generally,

amendments are favored because they 'tend to facilitate a proper decision on the merits.'" *In re

Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 472 (S.D.N.Y. 2013)

(quoting *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 396 (E.D.N.Y. 1998)), *appeal

docketed*, No. 14-457 (2d Cir. Feb. 18, 2014).

        An intervening change in pleading standards may justify leave to amend.  *Absolute

Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012) (granting leave to

amend claim under § 10(b) of the Securities Exchange Act of 1934 where an intervening

Supreme Court decision clarified the pleading standards for alleging a domestic securities

transaction); *Tuosto v. Phillip Morris USA Inc.*, 672 F. Supp. 2d 350, 366 (S.D.N.Y. 2009)

("Because of the intervening clarification of New York products liability law, and because of the

liberal precepts of Fed. R. Civ. P. 15(a)(2), the Court grants Plaintiff leave to replead this

claim.").  Since November 2010, various decisions of this Court, the United States District Court

and the Second Circuit have impacted the requirements the Trustee must satisfy to allege a

legally sufficient fraudulent transfer claim.  Two are relevant to consideration of the Motion.

The first concerns the Trustee's ability to recover constructive fraudulent transfers or invoke New York fraudulent conveyance law through 11 U.S.C. § 544(b). Bankruptcy Code § 546(e) limits the ability of a bankruptcy trustee to avoid and recover a securities-related transfer made by or to certain enumerated entities, including stockbrokers, that is either a "settlement payment" or made "in connection with a securities contract." 11 U.S.C. § 546(e). A trustee cannot avoid a transfer that falls within the section 546(e) safe harbor unless it is an intentional fraudulent transfer avoidable under section 548(a)(1)(A) of the Bankruptcy Code. *Id.*

The issue of whether the transfers made by BLMIS to its IA customers were protected by the safe harbor was hotly contested for several years. The District Court first addressed the issue in *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011) ("*Katz*"). There, District Judge Rakoff held that the safe harbor applied and dismissed the Trustee's fraudulent transfer claims under New York law and preference and constructive fraudulent transfer claims under the Bankruptcy Code. *Katz*, 462 B.R. at 452, 453.[11] Judge Rakoff addressed the issue again in a consolidated proceeding involving eighty-four adversary proceedings in *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012) ("*Greiff*"). As in *Katz*, the District Court again concluded "that § 546(e) bars the Trustee from pursuing the claims here made under § 548(a)(1)(B) [*i.e.* constructive fraudulent transfer claims] and § 544 [*i.e.* state law fraudulent transfer claims]." *Greiff*, 476 B.R. at 722. The Trustee appealed the *Greiff* order, the Second Circuit affirmed in *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 417-23 (2d Cir. 2014) ("*Ida Fishman*"),

---

[11]    After the District Court refused to certify the case for interlocutory appeal, *Picard v. Katz*, 466 B.R. 208 (S.D.N.Y. 2012), the parties settled, and the District Court approved the settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure by order dated May 31, 2012. (Case No. 11-Civ.-03605 (JSR) ECF Doc. # 192.)

and the United States Supreme Court denied the petition for a *writ of certiorari* on June 22, 2015. *SIPC v. Ida Fishman Revocable Trust*, 135 S. Ct. 2858 (2015).

The second change affected the Trustee's burden of pleading knowledge. The Trustee argued that BLMIS customers who knew that BLMIS was not actually trading securities should not be shielded by the safe harbor. The District Court agreed, *SIPC v. BLMIS* (*In re BLMIS*), No. 12 mc 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"), but placed "the burden . . . on the Trustee to prove that a transferee does not meet what the language and purpose of section 546(e) require." *Cohmad*, 2013 WL 1609154, at *4. Furthermore, the Trustee must plead the transferee's subjective knowledge, *id.* ("[T]he Trustee must show, at a minimum, that the transferee had actual knowledge that there were no actual securities transactions being conducted."); it was not sufficient to allege, as the Trustee had done in the Initial Complaint, that the defendant *should have known* that Madoff was not trading securities.

## B. Delay, Prejudice, and Futility

### 1. Delay

A court has discretion to deny leave "where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). The burden of providing a "satisfactory explanation" for an inordinate delay is on the party seeking to amend. *Id.* "[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Block*, 988 F.2d at 350 (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983)).

The defendants argue that the Trustee fails to provide a satisfactory explanation for the approximately five-year delay in seeking leave to amend. According to the defendants, the Trustee knew based on the District Court's *Katz* decision in September 2011 "that the bulk of its claims in this action would fail ***as a matter of law*** unless it alleged that Mendelow 'actually knew' of Madoff's fraud." (Opposition at 36 (emphasis in original).) However, it was not until the Second Circuit issued *Ida Fishman* in December 2014 and a *writ of certiorari* was denied by the United States Supreme Court in June 2015, that the application of the safe harbor first expressed in *Katz* and reiterated in *Greiff* was finally resolved. Moreover, although *Katz* briefly alluded to the exception to the safe harbor for "actual participants in the fraud," *Katz*, 462 B.R. at 452 n. 3, the District Court did not flesh out the "actual knowledge" exception (and the Trustee's pleading burden) until it issued *Cohmad* in April 2013.

Given this background, it was not unreasonable for the Trustee to have waited to move for leave to amend. Indeed, when the Court asked defense counsel why — if *Katz* established the applicability of the section 546(e) safe harbor in September 2011 — defendants waited until May 2015 to file their Dismissal Motion, counsel admitted that they too were awaiting the final resolution of the 546(e) issue:

> THE COURT: Why didn't you move to dismiss the complaint four years ago?
>
> MR. REISEN: Well, because – that's a great question. Because we didn't want to waste the resources. What if *Katz* and *Ida Fishman* goes the other way? It's useless.

(*Tr. of Oct. 28, 2015 Hr'g*, at 80:2-7.)[12]

---

[12]    Perhaps recognizing the unsettled nature of the law, the parties entered into twenty-two stipulations extending the time period for defendants to respond to the Initial Complaint. (*See* ECF Nos. 3, 10, 18, 22, 25, 26, 28, 35, 41, 42, 45, 46, 47, 48, 49, 50, 51, 52, 54, 57, 58, 59.) The defendants finally answered in November 2014,

As the defendants acknowledged in an August 13, 2015 letter to the Court, "the legal landscape relevant to the Plaintiff's claims changed dramatically since this case was commenced." (*Letter from Alex Reisen, Esq. to the Court*, dated Aug. 13, 2015, at 2 (ECF Doc. # 82).) This dramatic change, which took place over several years and was closely monitored by the parties, explains the delay in moving for leave to amend the Initial Complaint. Both sides decided to await the final resolution of the safe harbor issue. The Trustee should not be penalized and the defendants should not be rewarded for a delay to which everyone acquiesced. Accordingly, there was no unexplained delay in making the Motion now before the Court.

## 2.    Prejudice

In the absence of an "unexplained delay," the non-moving party must demonstrate that the proposed amendment would result in substantial prejudice. "In determining what constitutes 'prejudice,' [the court] consider[s] whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block,* 988 F.2d at 350; *accord Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir.), *cert. denied,* 531 U.S. 1035 (2000); *Agerbrink v. Model Serv. LLC,* 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016). In the main, the defendants argue that they will be prejudiced because Frank DiPascali, who the Trustee alleges calculated the Schupt payments that Mendelow received, died on May 7, 2015. (Opposition at 38-39.) In addition, Mendelow passed away in June 2016 after the argument of this Motion.

---

and after unsuccessful settlement negotiations, filed their Dismissal Motion in May 14, 2015, months after the Second Circuit rendered its decision in *Ida Fishman*.

The assertion of a *new* claim following the death of a material witness, including a party, may result in undue prejudice to the non-moving party. *E.g., Data Digest, Inc. v. Standard & Poor's Corp.*, 57 F.R.D. 42, 45 (S.D.N.Y. 1972); *accord Williams v. Cost-U-Less, Inc.*, Civil Action No. 2011-025 (WAL), 2014 WL 2993667, at *6 (D.V.I. July 3, 2014); *cf. Tiska v. United States*, CIV. A. No. 86–5814 (RSG), 1989 WL 2378, at *2 (E.D. Pa. Jan. 11, 1989) (denying motion to implead third-party following the original plaintiff's death).  However, the PAC does not add new claims; it withdraws old claims and abandons old theories.  The Trustee no longer asserts that Mendelow "should have known" that Madoff was a fraud and omits the subsequent fraudulent transfer counts in the Initial Complaint.  Otherwise, the claims remain the same.  The PAC simply adds more detail to the Initial Complaint, which alleged, among other things, that Mendelow closely monitored his accounts to ensure that he received the guaranteed rate of return and "fraudulent side payments," instructed BLMIS to make up the shortfall in particular amounts, and BLMIS made up any shortfall through fictitious option trades.  (Initial Complaint ¶¶ 93-96.)

In addition, the defendants must show actual prejudice, not the possibility of prejudice. *United States v. Marsten Apts., Inc.*, 175 F.R.D. 257, 264 (E.D. Mich. 1997) (mere speculation that the defendants will not be able to locate crucial witnesses does not show undue prejudice); *United States v. Hudson*, 152 F.R.D. 6, 8 (D. Conn. 1993) (Cabranes D.J.) ("The mere possibility of prejudice, however, is not tantamount to an affirmative showing of actual prejudice.")  The defendants' implicit argument that DiPascali's testimony would have helped them is entirely speculative.  To the contrary, both the Initial Complaint and the PAC refer to DiPascali's guilty plea and his admission that Madoff engaged in a fictitious trading scheme.  (Initial Complaint ¶ 32; PAC ¶ 30.)

24

While it is true that Mendelow can no longer tell his side of the story, Mendelow had the chance to provide testimony but declined to do so.  According to the PAC, the Trustee attempted to conduct a Rule 2004 examination of Mendelow on September 23, 2010, but Mendelow invoked his Fifth Amendment privilege against self-incrimination over 390 times.  (PAC ¶ 165.) At the Court's request, the Trustee provided the Court with a copy of the transcript and the exhibits marked at the examination.  Mendelow had the opportunity to testify under oath regarding the facts that give rise to the Trustee's claims in this adversary proceeding, and declined to do so.  That he can no longer testify is unfortunate, but the Trustee is not to blame. Mendelow's invocation of his Fifth Amendment privilege, whether or not wise or justified, contributed to the prejudice the defendants now claim they will suffer as a result of his passing.

### 3.    Futility

Even absent unexplained delay or undue prejudice, a Court may still deny a motion for leave to amend a complaint if the amendment would be futile.  "Proposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (quotation omitted).  The party opposing leave has the burden to demonstrate that the amendment would be futile.  *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009).

To state a legally sufficient claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 570. Courts do not decide plausibility in a vacuum. Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### (a)    Count I

Count I of the PAC seeks to avoid and recover the Two-Year Transfers as intentional fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code. As such, the claim is not barred by 11 U.S.C. § 546(e). Only two accounts received Two-Year Transfers – account 1ZA542 held in the name of "C&P Associates c/o Steven Mendelow" in the aggregate sum of $700,000, (*see* PAC, Ex. B, at ECF p. 59 of 65), and account 1ZB336 held in the name of "Cara Mendelow" in the aggregate amount of $125,000. (*Id.*, Ex. B, at ECF p. 60 of 65.) According to the referenced PAC exhibit, the Two-Year Transfers consisted entirely of fictitious profits, and consequently, the transferees cannot claim the defense set forth in 11 U.S.C. § 548(c) for transferees who take for value and in good faith. *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 461-70 (Bankr. S.D.N.Y. 2015) ("[T]he payment of fictitious profits did not satisfy an antecedent debt or provide value within the meaning of Bankruptcy Code § 548(c) and (d)(2)(A).").

26

Furthermore, as discussed in the next section, the defendants had actual knowledge of the Ponzi scheme and lacked good faith.  Accordingly, Count I is not futile.

### (b)    Counts II – VII

The survival of Counts II through VII (Bankruptcy Code-based constructive fraudulent transfer claim and New York law-based fraudulent conveyance claims) depend on the inapplicability of the section 546(e) safe harbor.  As noted, the Trustee must initially plead a plausible claim that Mendelow "actually knew" that BLMIS was not engaged in genuine securities transactions to avoid dismissal.

The Court recently addressed analogous allegations in the Trustee's adversary proceeding brought against Frank Avellino and others.  Avellino allegedly received a guaranteed rate of return and extra side payments for steering former A&B investors to invest directly with BLMIS. These payments were made through the same Schupt process described in the PAC; BLMIS employees, with Avellino's participation, determined the amount of the payments required to meet predetermined targets.  Once calculated, the Schupt payments were not paid in cash, and instead, were credited to accounts designated by Avellino through the assignment of fictitious options that purported to show a profit keyed to the targets.  Avellino, *et al.* were then free to withdraw and, in fact, did withdraw funds that were invested by other BLMIS customers.  The Court held that "there is no plausible explanation for this method of paying commissions other than the one that the Trustee suggests. . . . Given Avellino's degree of involvement in directing BLMIS employees regarding the execution of the Schupt process . . . it is plausible to infer that he was an active and knowing participant in the allocation of fictitious profits from imaginary options trades . . . ."  *Avellino*, 2016 WL 4040799, at *17.

27

Like Avellino, Mendelow was also an active participant in calculating the Schupt

payments necessary to hit his 17% guaranteed rate of return and Extra P&L.  The Schupt

payments were manufactured by BLMIS through fictitious options trades allocated to C&P

Associates and Mendelow's and his wife's IRA accounts as directed by Mendelow.  The PAC

describes how Mendelow sent his handwritten calculations of shortfalls for each of his and

Nancy Mendelow's IRA accounts and the C&P Associates account for years 1993, 1994, and

1995 to DiPascali, and how, to achieve targeted returns, BLMIS reported fictitious, profitable

options transactions.

The PAC's allegations about Mendelow's December 2007 Schupt calculation are

particularly noteworthy.  After a December 11, 2007 telephone conversation with DiPascali,

Mendelow sent a follow-up note a few days later listing his and his wife's BLMIS IRA accounts

with an arrow pointing to "$215m."  Profitable options transactions then appeared on the two

account statements in the requested amount with settlement dates of December 7, 2007 – 4 days

prior to Mendelow's phone conversation with DiPascali.  (PAC ¶ 135.)

These allegations viewed in the light most favorable to the Trustee, plausibly show that

Mendelow had actual knowledge that BLMIS was not engaged in securities trading and that

Madoff was rewarding him with fictitious profits as part of the Schupt process.  No matter how

skilled, it is improbable that an investment manager could enter into options transactions to

achieve a predetermined target on a consistent basis.

There is an additional factor that bolsters the Court's conclusion that Counts II through

VII are not futile.  Mendelow's refusal to answer any substantive question based on his

invocation of his Fifth Amendment privilege (over 390 times) permits the Court to draw an

28

adverse inference.  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Louis Vuitton Malletier S.A.
v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012).  The privilege must be invoked on a "question-
by-question basis," and an adverse inference can only be drawn as to questions that are actually
asked.  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265-66 (9th Cir. 2000) (adverse
inference cannot be drawn as to questions that were never asked); *U.S. v. $62,552.00 in U.S.
Currency*, No. 03-10153 (RBC), 2015 WL 251242, at *8 (D. Mass. Jan. 20, 2015) ("The way the
adverse inference works is that if a witness refuses to answer a question by invoking the Fifth
Amendment, the Court can draw an inference that the answer *to that question* would be adverse
to the claimant.") (emphasis in original); *Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.*, No. 00 Civ.
7352 (GEL), 2004 WL 1418201, at *2 (S.D.N.Y. June 23, 2004) (appropriateness of assertions
of privilege are determined on question-by-question basis).  Furthermore, the Court may draw
the adverse inference on a motion to dismiss.  *See Cohmad*, 2013 WL 1609154, at *6 n.4; *In re
Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 208 n. 17 (S.D.N.Y. 2006).

The Trustee's counsel asked Mendelow a series of "isn't it true" questions that went to
the heart of his knowledge of Madoff's fictitious trading.  They included Mendelow's
understanding and/or knowledge, based on his education, training and experience, that it was
impossible for any individual to guarantee a consistent rate of return on an investment in stocks,
that it was impossible to invest in equity transactions and never suffer a loss and that it was
impossible to achieve consistently high rates of return in his BLMIS accounts through legitimate
securities trading.  (*Transcript of 9/23/2010 Rule 2004 Examination* at 80:22-82:2.)[13]  Mendelow
also refused to answer (*i.e.*, admit) on Fifth Amendment grounds that he knew or understood that

---

[13]      Mendelow's counsel objected to these questions, but did not state the basis of her objection.  The objections
are overruled.

his BLMIS account statements contained false securities transactions that were designed to

provide him with undisclosed side payments for referring investors and investments to BLMIS,

that the trading reflected in his BLMIS account statements was fictitious and the product of

fraud, that Madoff was operating a Ponzi scheme, that he ignored all of the red flags and

irregularities associated with his BLMIS account statements because he personally profited from

those accounts for more than a decade, and that fictitious option trades were added to his BLMIS

accounts to meet the guaranteed rate of return promised by Madoff and his finder's fee.  (*Id.* at

82:3-83:4; 85:21-25.)[14]   The Court will draw an adverse inference regarding Mendelow's

knowledge of Madoff's fictitious trading activities from Mendelow's refusal to answer these

questions as a factor in its determination that the PAC is not futile.

Accordingly, the Court concludes that Counts II through VII are not futile with one

*caveat*.  Count VII seeks to avoid and recover All Transfers, including withdrawals pre-dating

the formation of BLMIS in January 1, 2001 ("Pre-2001 Transfers").  Prior to January 1, 2001,

Madoff operated his business as a sole proprietorship.  Although the argument was not made by

the defendants, an amendment which includes a claim seeking to avoid and recover Pre-2001

Transfers is futile for the reasons stated in *Avellino*.  *Avellino*, 2016 WL 4040799, at *11-12

(explaining that SIPA § 78fff-2(c)(3) creates a legal fiction that confers standing on a SIPA

trustee but not the bankruptcy trustee of an individual debtor).

As a result, Count VII is futile to the extent it seeks to avoid Pre-2001 Transfers.

Moreover, Account 1ZR208 held in the name of "NTC & Co. FBO Steven Mendelow" did not

---

[14]    Mendelow's counsel raised similar general objections to these questions, and they are overruled.

receive any transfers after January 1, 2001, (*see* PAC, Ex. B, ECF p. 64 of 65), and any claims relating to that account are dismissed.

### (c)    Imputation

While the PAC adequately pleads Mendelow's knowledge of the BLMIS Ponzi scheme, it is does not allege the knowledge of the other defendants.  Instead, the Trustee seeks to impute Mendelow's knowledge to the other defendants on the theory that he acted as their agent with respect to their accounts.   The defendants have contested the allegations relating to Mendelow's knowledge but have not addressed or contested the sufficiency of the Trustee's allegations that Mendelow's knowledge, whatever it may be, is imputed to the other defendants under principles of agency.  In any event, the allegations plausibly imply an agency relationship.

"A principal-agent relationship may be established by evidence of the 'consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act,' even where the agent is acting as a volunteer." *Art Fin. Partners, LLC v. Christie's Inc.*, 870 N.Y.S.2d 331, 333 (N.Y. App. Div. 2009) (quoting *Fils-Aime v. Ryder TRS, Inc.*, 837 N.Y.S.2d 199, 200 (N.Y. App. Div. 2007)); *accord Villazon v. Prudential Health Care Plan, Inc.*, 843 So.2d 842, 853 n. 10 (Fla. 2003).  Once an agency relationship is established, the "general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated." *Center v. Hampton Affiliates, Inc.*, 66 N.Y.S.2d 782, 784 (1985); *accord Computel, Inc. v. Emery Air Freight Corp.*, 919 F.2d 678, 685 (11th Cir. 1990) ("Florida case law acknowledges the general principle of agency law that knowledge of, or notice to an agency or employee is imputed to the principal when it is received by the employee within the

31

scope of her employment, and when it is in reference to matters over which the employee's authority extends."). Similarly, the knowledge of a corporate officer will be imputed to the corporation. *Weisfelner v. Hoffman* (*In re Lyondell Chemical Co.*), 16 cv 518 (DLC), 2016 WL 4030973, at *10 (S.D.N.Y. July 27, 2016).

Mendelow was the president of C&P Associates, Inc., a Florida corporation, and the knowledge he gained acting within the scope of his agency is imputed to C&P Associates, Inc. C&P Associates is a Florida limited liability partnership and owner of account 1ZA542 held in the name of "C&P Associates c/o Steve Mendelow." Under Florida partnership law, C&P Associates, Inc.'s knowledge gained through Mendelow is, therefore, imputed to C&P Associates. *Aetna Cas. Sur. Co. v. Buck*, 594 So. 2d 280, 282 n.2 (Fla. 1992) ("In Florida . . . under partnership law, the knowledge of any partner regarding a matter concerning partnership affairs operates as knowledge on the part of the partnership.").; *see* FLA. STAT. §§ 620.8102(6), 620.1103(8) (2015).[15]

The three remaining accounts that received initial transfers were account 1ZR180 held in the name of "NTC & Co. FBO Nancy Mendelow," account 1ZB336 held the name of "Cara Mendelow," Mendelow's daughter, and account 1ZB337 held in the name of "Pamela Mendelow," Mendelow's other daughter.[16] The PAC alleges that Mendelow acted as an agent for these three defendants, including, opening their accounts,[17] depositing funds into and

---

[15]    Mendelow's knowledge is obviously imputed to his own account 1ZR179 was held in the name of "NTC & Co. FBO Steven Mendelow."

[16]    The PAC alleges that Pamela Christian held this account. (PAC ¶ 20.) I infer that Pamela's last name changed to "Christian" at some point after her BLMIS account was opened.

[17]    With respect to Cara Mendelow's account, the Trustee alleges that Mendelow opened the account with a check drawn from C&P Associates' bank account signed by Mendelow. (PAC ¶ 19.)

withdrawing funds out of the accounts, and receiving and reviewing the corresponding BLMIS account documents. (PAC ¶¶ 18, 19, 20, 23, 54, 174, 175.) With respect to Nancy Mendelow's BLMIS account, the Trustee alleges that Mendelow also closely tracked the account to ensure receipt of the guaranteed rate of return and Extra P&L, and directed BLMIS to allocate Schupt payments to her account. (PAC ¶¶ 18, 174.)

These allegations support the plausible inference that Mendelow acted as agent for his family's BLMIS investments with their knowledge and consent, and his knowledge is imputed to them.

### (d)     Dismissal of Subsequent Transfer Claims Without Prejudice

Lastly, the Trustee seeks dismissal, without prejudice, of Counts Eight through Ten of the Initial Complaint—claims to recover avoidable transfers from subsequent transferees. He excluded these claims from the PAC. "When a party seeks to voluntarily dismiss some rather than all of the claims in the multi-count complaint . . . a court should consider the motion to be a request for leave to amend under Rule 15" rather than a motion pursuant to Rule 41(a) of the Federal Rules of Civil Procedure. 3 COQUILLETTE, ET AL., MOORE'S FEDERAL PRACTICE § 15.16[6] at 15-75 to 76 (3d ed. 2016). The Trustee states that he currently lacks the information to adequately bring subsequent transfer claims—*i.e.* the "necessary vital statistics—the who, when, and how much of the purported transfers to establish an entity as a subsequent transferee of the funds." *SIPC v. BLMIS*, 531 B.R. at 473 (citation and internal quotation marks omitted). The defendants did not oppose this relief. Accordingly, the request to dismiss these claims, without prejudice, is granted.

33

**CONCLUSION**

For the reasons stated, the Motion is denied except that it is granted to the extent that

Count VII of the PAC seeks to avoid and recover the Pre-2001 Transfers.[18]


Settle order on notice.


Dated: New York, New York
      September 28, 2016


                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge

---

[18]     In light of this decision, the defendants' Dismissal Motion is denied as moot.