

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5

6    SECURITIES INVESTOR PROTECTION CORP, Adv. No. 08-01789 (SMB)

7              Plaintiff,

8         v.

9    BERNARD L. MADOFF INVESTMENT SEC.,

10             Defendant.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION

13   OF B,                          Adv. No. 10-04215 (SMB)

14             Plaintiff,

15        v.

16   BONGIORNO, ET AL.,

17             Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION

20   OF B,                          Adv. No. 10-04538 (SMB)

21             Plaintiff,

22        v.

23   JAMES B. PINTO REVOCABLE TRUST,

24             Defendant.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

1

2                    U.S. Bankruptcy Court

3                    One Bowling Green

4                    New York, NY 10004

5

6                    September 28, 2016

7                    10:02 AM

8

9    B E F O R E :

10   HON STUART M. BERNSTEIN

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    Hearing re:  Discover conference re motions to compel of

2    defendants represented by Chaitman LLP

3

4    Hearing re:  Motion to affirm trustee's determination

5    denying claims of claimants holding interests in Chalek

6    Associates LLC, Chaitman/Schwebel LLC, FGLS Equity LLC,

7    Larsco Investments LLC and Kuntzman Family LLC

8

9    Hearing re:  Motion to approve settlement among trustee,

10   Annette Bongiorno, and Rudy Bongiorno pursuant to Federal

11   Bankruptcy Rule 9019

12

13   Hearing re: conference re discovery

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Jamie Gallagher

Page 4

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER LLP

 3         Attorney for the Trustee

 4         45 Rockefeller Plaza

 5         New York, NY 10111

 6

 7    BY:  EDWARD J. JACOBS, ESQ.

 8         FERNANDO A. BOHORQUEZ, JR., ESQ.

 9         STEPHANIE A. ACKERMAN, ESQ.

10

11    BAKER HOSTETLER LLP

12         Attorney for the Trustee

13         811 Main Street

14         Suite 1100

15         Houston, TX 77002

16

17    BY:  MARIE L. CARLISLE, ESQ.

18         DEAN D. HUNT, ESQ.

19

20    CHAITMAN LLP

21         Attorney for the Moving Parties

22         465 Park Avenue

23         New York, NY 10022

24

25    BY:  HELEN DAVIS CHAITMAN, ESQ.
```

1    MARVIN C. INGBER, ATTORNEY AT LAW

2         Attorney for Pinto

3         6705 Apache Road

4         Edina, MN 55439

5

6    BY:   MARVIN C. INGBER, ESQ. (TELEPHONIC)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2             THE COURT:  Madoff, why don't we do the conference

3     with Ms. Chaitman first.

4             MS. CHAITMAN:  Good morning.

5             THE COURT:  Good morning.

6             MS. CHAITMAN:  Helen Davis Chaitman of Chaitman

7     LLP on behalf of the moving parties (indiscernible).

8             THE COURT:  Won't you keep your voice up, please.

9     Speak into the microphone.  Go ahead.

10             MR. JACOBS:  Your Honor, it's Edward Jacobs on

11     behalf of the trustee.

12             MS. CARLISLE:  And Marie Carlisle, also on behalf

13     of the trustee.

14             THE COURT:  Thank you.  Go ahead, Ms. Chaitman.

15             MS. CHAITMAN:  Your Honor, we filed voluminous

16     papers in two cases.  One in Willenitz (ph), where the Court

17     had given us permission to file a motion.  And we filed the

18     motion in one other case, but we didn't have permission from

19     Your Honor to file.  What we had hoped to do was file

20     motions in all of the cases that we're handling because the

21     same discovery demands have been served in all cases and

22     we'd like to establish a mechanism where if you enter an

23     order, it would be applicable in all cases rather than

24     burdening the Court with, you know, 90 different motions.

25     They're all the same issues.  I simply would like whatever

Page 7

1    the Court's ruling is to apply to all of the cases and I can

2    provide that exhibit with a list.

3            MR. JACOBS:  Your Honor, there's quite a few

4    considerations here if you'll be patient with me this

5    morning and I'll apologize in advance.  It's a little bit

6    tedious, but I think it's important for the Court to be

7    reminded of the background and context here.

8            Back in April, we originally asked the Court for a

9    protective order on this discovery as it was served in the

10   Willenitz matter on the basis that is completely frivolous

11   and objectionable pursuant to all of the well-established

12   Rules of Civil Procedure and case law.  We had a hearing on

13   May 17th.  We had nearly two hours of argument where the

14   Court examined, with both parties present, each and every

15   single request.  There were 19 of them.  And the Court found

16   without exception that every single one of our objections to

17   those requests were substantiated.

18           THE COURT:  Well, that's not quite what happened,

19   but go ahead.

20           MR. JACOBS:  Forgive me if I've misstated any --

21   it was not my intention to misstate anything that the Court

22   had --

23           THE COURT:  Okay.  Because I read the transcript

24   again yesterday.  Go ahead.

25           MR. JACOBS:  And I agree with Ms. Chaitman that,

Page 8

1    Your Honor, you did say repeatedly throughout that hearing

2    that she could file a motion to compel.  And we had a

3    colloquy at the end about how we had preferred to move for a

4    protective order, and you had something to the effect that

5    you would hope that Ms. Chaitman would reconsider.

6              The reason why I'm raising this background is

7    because I think we've seen a pattern here where Ms. Chaitman

8    brings a frivolous discovery dispute in a case.  We have a

9    hearing.  The Court's guidance is unfavorable to her.  So

10   she then turns around and litigates those same issues in

11   other cases.  And that, Your Honor, respectfully, is

12   prejudicial to the trustee.  So --

13             THE COURT:  Let me ask you a practical question.

14             MR. JACOBS:  Yes.

15             THE COURT:  I told her she could go ahead and make

16   a motion to compel.

17             MR. JACOBS:  Right.

18             THE COURT:  And all the discovery issue -- all the

19   interrogatories, at least, are the same.

20             MR. JACOBS:  Right.

21             THE COURT:  Does it make sense for her to file --

22   have a conference which would be a waste of time because

23   we've had that conference already.

24             MR. JACOBS:  Right.

25             THE COURT:  Does it make sense to file a motion in

Page 9

1    every single case, or should we just deal with the one

2    motion and make it applicable for all the cases?

3            MR. JACOBS:  Your Honor, first just one fact

4    that's important that they're -- the discovery requests are

5    not identical.  There were two different requests that were

6    served --

7            THE COURT:  Okay.  Fair enough.

8            MR. JACOBS:  Substantially they are identical,

9    you're right.  And I agree that as a practical matter,

10   there's this discovery that Ms. Chaitman has served on the

11   trustee.  Our answers are likely going to be the same in all

12   of her cases across all of our cases beyond Ms. Chaitman's.

13   And for practical reasons, as I've said to her and to the

14   Court, we would be happy on a dispute by dispute basis to

15   enter into a stipulation as to the applicability of Your

16   Honor's ruling and willingness, for example, to all other

17   cases.

18           The problem with doing that as a blanket rule is

19   that with respect to discovery, and Your Honor, you have

20   some letters pending from us about Ms. Chaitman's discovery

21   responses, all of the discovery issues with respect to the

22   defendants' discovery is not the same.  And it is very

23   different.  And some defendants pay taxes and some --

24           THE COURT:  Well, let's get back to this, okay?

25           MR. JACOBS:  Okay.

1            THE COURT:  This is her discovery.  So how do you

2    propose it be dealt with?

3            MR. JACOBS:  I'd propose, Your Honor, that --

4    well, in the first instance, our view is that additional

5    briefing is a waste of our time and the Court's time because

6    the discovery is frivolous and doesn't warrant any further

7    attention.

8            THE COURT:  I disagree and I'll tell you why.  A

9    lot of your objections are premised on the argument that

10   this information has been made available or produced.  And I

11   told you at least three times at the last hearing that

12   you're going to have to convince me of that.  Your just

13   telling me that --

14           MR. JACOBS:  Right.

15           THE COURT:  -- doesn't do it.  So you're going to

16   have to submit affidavits or whatever which explain how your

17   data room works and how this information has been produced.

18           MR. JACOBS:  We will be happy to do that.

19           THE COURT:  All right.

20           MR. JACOBS:  So knowing your position, Your

21   Honor --

22           THE COURT:  I've said it several times the last

23   time.

24           MR. JACOBS:  I understand, Your Honor, and until

25   now we haven't had an opportunity to do that, but we've been

Page 11

1    preparing those materials for your consideration.

2            THE COURT:  In terms of the best way to do it, my

3    own view is it's easier to deal with one motion than to deal

4    with 89 motions when they're all the same.  Now, the only

5    thing I would say is I'd look back over the interrogatories,

6    and some of them may be case specific.  For example, you

7    have questions in there about PW.  And some defendants might

8    not have any PW entries or the transfer account might not

9    have any PW entries.  And as to those cases, it's

10   irrelevant.  But there's only one or two interrogatories

11   like that.  Most of them are just the same in every case.

12           MS. CHAITMAN:  And if I may, Your Honor, even with

13   respect to that.  One of the central issues that the Court

14   will have to face in all of these cases is whether the

15   Madoff business records are admissible under the exception

16   to the hearsay rule.  They have to --

17           THE COURT:  I'm not going to decide that in the

18   context of this Court.

19           MS. CHAITMAN:  No, no, no.  But what I'm saying is

20   for the purposes of discovery, we would like to have every

21   defendant, even if the defendant was not charged with profit

22   withdrawals.  To the extent that Madoff's records show

23   profit withdrawals that the Court ultimately finds did not

24   occur, that goes to the reliability of the records.  So I --

25           THE COURT:  Look.  Okay, but I said to you the

Page 12

1    last time that the issue is whether the records in the

2    particular adversary proceeding accurately reflects the

3    transactions as to that defendant or defendants.  If the

4    records -- I'm not going to try kind of a pattern and

5    practice case of inaccurate or mistaken records.  You have

6    to -- the issue is whether they correctly depict the

7    transactions of the case I'm trying.

8              So if there were mistakes in other cases, and I

9    saw those interrogatories, and I'm probably going to grant a

10   protective order or not grant the motion to compel as to

11   those types of interrogatories, I just don't see that as

12   relevant.

13             MS. CHAITMAN:  You know, I don't want to take your

14   time up talking.  The merits have it.

15             THE COURT:  Why don't we do this?  Let's deal with

16   the Willenitz motion.  Whether or not you stipulate, I'm

17   going to reach the same conclusion in every single case.  So

18   if you want to make the determination applicable by

19   stipulation, which I've heard discovery in those cases,

20   that's fine.  But I just think that makes more sense than

21   having to read through 89 -- what, did you file one master

22   brief?

23             MS. CHAITMAN:  The interrogatories are -- in --

24             THE COURT:  I know, but how many briefs -- how

25   many briefs do we have to read?  How many motions do we have

1    to read?

2            MS. CHAITMAN:  I'd like it to be one motion and

3    one brief because it's the identical issue for everybody.

4            THE COURT:  Did you file 89 motions?  That's all

5    I'm asking.

6            MS. CHAITMAN:  I did not --

7            THE COURT:  All right.  That doesn't seem to make

8    a lot of sense.

9            MR. JACOBS:  I agree, Your Honor.

10            THE COURT:  It's a waste of time and paper.  Why

11    don't we deal with the Willenitz motion?  I know you made

12    the motion in Gordon also, but let's deal with the Willenitz

13    motion.  I'm probably going to reach the same conclusion in

14    every single matter and just think that, you know, even if

15    you don't stipulate, that's going to be the result.

16            MR. JACOBS:  I understand, Your Honor.  I thank

17    you.

18            THE COURT:  All right.  But as I said, and I

19    admonished you last time, you're going to have to convince

20    me that this material was either made available to her

21    already or that she can figure out the answers -- go to the

22    same trouble that you would have to go through to figure

23    out --

24            MR. JACOBS:  Right.

25            THE COURT:  -- the answers with the material in

Page 14

1    there.  And, you know, if that's the case, you'll have to go

2    to our data room and figure it out.

3              MR. JACOBS:  Your Honor --

4              THE COURT:  I don't want to do it, but if it's

5    just as difficult for them as for you.

6              MR. JACOBS:  We're happy, Your Honor, to provide

7    you with that information.  And also, just for the Court's

8    reference, we did produce Bruce Davinski's (ph) report in

9    this case just this week.  So and Ms. Chaitman has that, as

10   well, which we will discuss in our brief.

11             THE COURT:  Is it the same report in every case or

12   is it case specific or adversary proceeding specific --

13             MR. JACOBS:  This is the proof of prog report that

14   is at this point, I guess, the same in every case, Your

15   Honor.

16             THE COURT:  And maybe this is a good time, even

17   though it's not really an omnibus procedure, to deal with

18   that insolvency issue that I raised the last time.  I just

19   don't think it's relevant --

20             MR. JACOBS:  Okay.

21             THE COURT:  -- at all.

22             MR. JACOBS:  Okay, but we will talk internally

23   about that and get back to the report if that's okay.

24             THE COURT:  Okay.  If you want to interject it in

25   the case, I mean, I guess you can, but I just don't see how

Page 15

1    it's relevant in an intentional fraudulent transfer case.

2                MR. JACOBS:  Okay.

3                MS. CHAITMAN:  May I just ask you, Judge, on that

4    issue, I know you said that the last time we were here on

5    this.  Are you saying that because the fraudulent transfer

6    actions are under 548(a)(1)(A) and that's not -- there's no

7    insolvency requirements?

8                THE COURT:  Well, it's an intentional fraudulent

9    transfer.  There's no insolvency requirement.

10               MS. CHAITMAN:  And that's the basis on which

11   you're --

12               THE COURT:  Yes.

13               MS. CHAITMAN:  Okay.  And what I'm --

14               THE COURT:  That's my understanding of the law.

15               MS. CHAITMAN:  No, I completely understand that,

16   but what I had said last time and I'd just like to clarify

17   so I understand your view on it, I had said that we still

18   had the issue of whether Madoff's operation as a whole was a

19   Ponzi scheme, if this was only a small percentage of it --

20   of the activity and --

21               THE COURT:  I thought that we were setting up some

22   sort of omnibus procedure to decide that because that's --

23   although you may have the majority of the cases, that's an

24   issue that's in every case.  I would just separate out the

25   issue of when Madoff Ponzi schemed again or whether he was

Page 16

1    operating a Ponzi scheme, and whether it's an -- you know,

2    they're insolvent in a particular adversary proceeding

3    because of that particular adversary proceeding I don't see

4    how it's relevant.

5            Have you done anything about this omnibus

6    procedure for, you know, whether this is a Ponzi scheme?

7            MR. JACOBS:  Well, we've discussed it, Your Honor.

8    We -- obviously, we haven't made any formal presentation to

9    the Court or to our defendants.

10           THE COURT:  All right.  It's the same issue in

11   every plain determination and in every adversary proceeding.

12           MR. JACOBS:  Okay.

13           THE COURT:  All right?

14           MR. JACOBS:  Thank you.

15           THE COURT:  I mean, I guess the same is true with

16   PW in this specific case.  It's being dealt with separately.

17   And there's no point -- the whole point of these omnibus

18   procedures is not to interject it separately in every case.

19           MS. CHAITMAN:  Right.  So you're suggesting that

20   we figure out what the issues are that are common to each of

21   the cases and then we discuss --

22           THE COURT:  Well, we've dealt with a lot of them

23   already.

24           MS. CHAITMAN:  Right.

25           THE COURT:  Obviously when the Ponzi scheme began

1     or if there was a Ponzi scheme is an issue that's common to

2     every case and every claim determination too.

3             MS. CHAITMAN:  And another one is, as I mentioned,

4     Your Honor, the last time I was here, Mr. Madoff's testimony

5     that purchase meant sale and sale meant purchase because it

6     was -- what he was reflecting on the statements was that

7     Madoff's operation was selling to the customer.  So on the

8     customer statement it says sell 100 shares of IBM, but

9     that's actually -- what Madoff says is that's actually the

10    entity selling to the customer.

11            THE COURT:  So what?

12            MS. CHAITMAN:  So it's backwards of what it

13    appears to be.

14            THE COURT:  But it -- all right.

15            MS. CHAITMAN:  I mean that goes to, for example --

16            THE COURT:  But dealing with actual cash

17    withdrawals and when a statement says cash withdrawal, it's

18    not really a deposit, is it?

19            MS. CHAITMAN:  Okay, it actually goes to when the

20    fraud began because Mr. Davinski's expert report didn't take

21    into consideration Madoff's testimony as to what those

22    meant.  So in other words --

23            THE COURT:  Maybe it's not confirmed by the books

24    and records that --

25            MS. CHAITMAN:  No, what Mr. Davinski's expert

Page 18

1      report says, for example, is that certain transactions

2      couldn't have happened because the total transactions which

3      were shown, like the total sales of a certain stock exceeded

4      what was sold on that day in the market.  But if, in fact,

5      they were sold from inventory that Madoff had, then that

6      would have been an incorrect criteria.  So --

7                 THE COURT:  Did Madoff actually buy and sell

8      stocks in any of his businesses?

9                 MS. CHAITMAN:  Huge.  He was the biggest trader --

10                THE COURT:  Well, let me -- okay.  I know what --

11     he was the biggest trader up until 2008, but he wasn't

12     buying and selling stocks.

13                MR. JACOBS:  Your Honor, that's a complicated

14     answer that -- to which I don't want to make a

15     representation on the record outside of a formal proceeding

16     where we have our --

17                THE COURT:  All right, I didn't realize that --

18     okay, so it sounds like he was buying and selling stocks,

19     but --

20                MS. CHAITMAN:  Judge, the evidence will show that

21     for the last 25 years of his operation, even up until the

22     end, he was a legitimate trader doing business with Bear

23     Stearn, Schwab, Fidelity, all of the major financial firms.

24     And he did trades equal to 10 percent of the daily volume on

25     the New York Stock Exchange.  This was bigger than Goldman

Page 19

1    Sachs, bigger than Merrill Lynch, bigger than Schwab, bigger

2    than Fidelity.  This was real trading.  He had 140 people

3    who were legitimately trading.

4            So what he was testifying was that he was selling

5    his own inventory to the IA customers and then buying it

6    back from them.  So what I'm saying is that --

7            THE COURT:  Well, those are actual transactions

8    that -- or they would be actual transactions if that's what

9    occurred.

10           MS. CHAITMAN:  Right, but the point is --

11           MR. JACOBS:  Your Honor, that's not supported

12   either by his testimony or the evidence and I don't see the

13   point of having this discussion today.

14           THE COURT:  Okay.  I really -- look, we've dealt

15   with the discovery conference.  It's a very interesting

16   issue, when it began, whether he had a Ponzi scheme.  All

17   I'm saying is it's an omnibus issue.  It affects every case

18   and claim determination.  So let's deal with it as an

19   omnibus issue.

20           MS. CHAITMAN:  I think that makes a lot of sense.

21           THE COURT:  All right.

22           MS. CHAITMAN:  Okay, thank you.

23           MR. JACOBS:  Thank you, Your Honor.

24           THE COURT:  All right, so you'll just deal with

25   Willenitz.

```
1              MS. CHAITMAN:  Why don't -- if you don't mind, I'd
2     like to deal with the other case because I -- you prohibited
3     me from asking certain interrogatories about --
4              THE COURT:  Right.
5              MS. CHAITMAN:  So the other case doesn't have
6     those interrogatories.  It's the same as --
7              THE COURT:  Those two extra interrogatories?
8              MS. CHAITMAN:  The ones about the trustee's
9     compensation.  So those are not --
10             THE COURT:  Well, I'm not -- that's been
11    addressed, right.
12             MS. CHAITMAN:  That's been addressed, exactly.
13    But -- well, we can use either one.  I mean --
14             MR. JACOBS:  Can we please proceed in Willenitz,
15    the other two cases don't -- weren't authorized.
16             THE COURT:  Let's just do the one unless you're
17    telling me that --
18             MS. CHAITMAN:  Fine.  No, that -- it --
19             THE COURT:  You're telling me they're all the
20    same, so let's --
21             MS. CHAITMAN:  Except that they have those
22    additional ones that you broke on.  The ones relating to the
23    question --
24             THE COURT:  All right, fine.  Let's just -- okay,
25    I told you you could make the motion.  So the fact that I
```

Page 21

1    told you where I'd go ahead and come out doesn't affect --

2                 MS. CHAITMAN:  Yeah.

3                 THE COURT:  -- anything in the motion.  We'll deal

4    with Willenitz.  Whatever is decided in Willenitz, unless

5    there is something I'm missing, will apply in every case

6    anyway, whether or not you agree to it.  Okay?

7                 MS. CHAITMAN:  Great.

8                 THE COURT:  Great.

9                 MS. CHAITMAN:  Thank you, Judge.

10                THE COURT:  So do you have a schedule for dealing

11   with Willenitz if we file the responses?

12                MR. JACOBS:  Thank you, Your Honor, for reminding

13   me of that.  Could we have -- Ms. Chaitman has filed her

14   motion.  It's pending, so could we have two weeks to file

15   our response?

16                THE COURT:  Two weeks from today?

17                MR. JACOBS:  That would be more than sufficient,

18   yes.

19                THE COURT:  So what's two weeks from today?  There

20   are holidays coming up the next couple of weeks.

21                MR. JACOBS:  That's correct.  It probably would be

22   prudent to look at a calendar.

23                THE COURT:  Well, two weeks from Friday is October

24   7th, but that -- I'm sorry, it's October 14th.  There are a

25   lot of Jewish holidays in that --

```
1              MS. CHAITMAN:  And then I would like a reply.

2              THE COURT:  Okay.  Let's fix the answering date

3       first.  When can you file the answer?

4              MR. JACOBS:  I respectfully request a minimum of

5       two weeks.  So if the Court would prefer --

6              THE COURT:  How about Friday, October 14th?

7       That's 16 days.  That's --

8              MR. JACOBS:  That would --

9              THE COURT:  -- more than two weeks.

10             MR. JACOBS:  That's more than sufficient.  Thank

11      you, Your Honor.

12             THE COURT:  Okay.  And how long do you need for a

13      reply, Ms. Chaitman?

14             MS. CHAITMAN:  Until the 21st, is that all right?

15             THE COURT:  Okay.  Reply the 21st.  When I read

16      the papers, I'll decide if I need any more argument on it.

17             MR. JACOBS:  Okay.

18             THE COURT:  We've been through it once before.

19             MS. CHAITMAN:  Okay.

20             THE COURT:  All right?

21             MS. CHAITMAN:  Thank you, Judge.

22             THE COURT:  So just pick a submission date after

23      October 21st so it will be deemed -- or I guess it can be

24      deemed submitted when the reply was filed.

25             MR. JACOBS:  Okay.
```

Page 23

1              THE COURT:  And then I'll fix an argument date if

2     I need one.

3              Next I have the claim -- the trustee's --

4     affirming the trustee's determination.

5              MS. ACKERMAN:  Good morning, Your Honor.

6     Stephanie Ackerman of Baker & Hostetler on behalf of Irving

7     Picard, the trustee, for the Madoff matter.

8              We're here today on the trustee's motion to affirm

9     the determination of 22 claims which were filed by claimants

10    who invested in one of five limited liability companies:

11    Chalek Associates LLC, Chaitman/Schwebel LLC, FGLS Equity

12    LLC, Larsco Investments LLC, and Kuntzman Family LLC.

13             The objecting claimants invested money in one of

14    the limited liability companies, which in turn invested with

15    BLMIS.  The objecting claimants had no financial

16    relationship with BLMIS and did not own the assets entrusted

17    to BLMIS for the purposes of trading securities.

18             Thus, denial of these claims is consistent with

19    the 14 prior decisions in this liquidation and the Second

20    Circuit's decisions in Cruz (ph) and Morgan Kennedy.  The

21    claimants like those in the prior motions before this Court

22    are no customers because in addition to not owning the

23    assets invested with BLMIS, they had no control over the

24    funds invested and were unknown to BLMIS.

25             No objections to the relief requested by the

Page 24

1    trustee have been filed.  And so subject to any questions,

2    we respectfully request that the motion be granted.

3            THE COURT:  Does anyone want to be heard in

4    connection with this motion?  The record should reflect

5    there's no response.  The motion is granted.  The claimants

6    were investors and customers of BLMIS.  They weren't

7    customers of BLMIS and they have no customer claims.  You

8    can submit an order.

9            MS. ACKERMAN:  Thank you, Your Honor.

10           THE COURT:  Next I have the settlement with

11   Bongiorno.

12           MR. BOHORQUEZ:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. BOHORQUEZ:  Fernando Bohorquez, Baker

15   Hostetler, counsel for the trustee.  We're here this morning

16   on the trustee's application under Bankruptcy Rule 9019,

17   seeking approval of the settlement agreement between the

18   trustee, Rudy, and Annette Bongiorno.  This settlement is

19   part of a global settlement between the trustee, the

20   Bongiornos, and the United States Attorney's Office in an

21   effort to resolve the Government's remaining claims against

22   Bongiornos' assets and are what is actions against the

23   Bongiornos.

24           As I'll discuss in detail the two principal terms

25   of the settlement by way of the trustee are: one, a transfer

1    of approximately $3.9 million from Rudy Bongiorno's E-trade

2    accounts to the trustee; and two, Annette Bongiorno's

3    unfettered cooperation with the trustee in SIPC's continued

4    investigation of the Madoff fraud.

5            As Your Honor is aware, Mr. Bongiorno was one of

6    the so-called Madoff Five that were tried and convicted in

7    the criminal trial in June of 2014.  Part of that sentence,

8    Judge Swain not only sentenced her to jail time but also

9    entered a money judgment forfeiture order of approximately

10   $155 million.

11           THE COURT:  Did the defendants have any assets

12   that weren't forfeited?

13           MR. BOHORQUEZ:  Pardon?

14           THE COURT:  Do the defendants have any assets that

15   weren't forfeited?

16           MR. BOHORQUEZ:  All of Annette Bongiorno's assets

17   were forfeited.  Rudy Bongiorno still holds onto certain

18   accounts in his E-trade account and other bank accounts.

19           Part of the deal with the U.S. Attorney's Office

20   was the U.S. Attorney was able to trace significant amounts

21   of money from BLMIS to Rudy Bongiorno.  And through several

22   months of negotiation between ourselves, the U.S. Attorney,

23   and the two counsel for the Bongiornos, we were able to

24   reach this settlement of taking some portion of the E-trade

25   account that was being forfeited from Rudy Bongiorno and

Page 26

1    handing that to the trustee.

2            THE COURT:  What I'm asking is, it really goes to

3    collectability of any judgment because without this deal,

4    all of the assets are forfeited and whatever property of

5    these particular defendants, do they have anything --

6    Ms. Bongiorno, has no unforfeited assets at this point?

7            MR. BOHORQUEZ:  Pardon?

8            THE COURT:  Ms. Bongiorno has no unforfeited

9    assets.

10           MR. BOHORQUEZ:  Zero.

11           THE COURT:  There was not language to acquire it.

12           MR. BOHORQUEZ:  Correct.

13           THE COURT:  What about Mr. Bongiorno?

14           MR. BOHORQUEZ:  He still has assets in the form of

15   certain bank accounts and recoverable retained stocks in E-

16   trade and I believe his SunTrust account.  But the majority

17   of those assets were forfeited to the U.S. Attorney's

18   assets.

19           THE COURT:  But he has assets that were never

20   forfeited, right?

21           MR. BOHORQUEZ:  Yes.

22           THE COURT:  So you could get a judgment against

23   him and enforce it, right?

24           MR. BOHORQUEZ:  We could.  We could.  But part of

25   the calculation, Your Honor, is we have -- we are -- our

Page 27

1    rights are secondary to the U.S. Attorney's Office.  We saw

2    the opportunity here to work with the U.S. Attorney's

3    Office, secure close to $4 million, avoid the cost of

4    litigation, and in the meanwhile have Annette Bongiorno's

5    cooperation in our various pending litigations.

6         As Your Honor has seen, she's already provided

7    helpful information in profit withdrawal action and we

8    anticipate --

9         THE COURT:  I'm told.

10        MR. BOHORQUEZ:  Well, you'll see -- you will see

11   when the motion -- when the matter is properly briefed.  But

12   we anticipate that given her experience and longevity at

13   BLMIS, she's going to provide very valuable, informative

14   information to our other matters.

15        THE COURT:  Okay.  Great.  Does anyone else want

16   to be heard in connection with the application?

17        I'll approve the application.  To the extent --

18   without this agreement with the U.S. Government, to the

19   extent there's forfeited property, it never became property

20   of the defendants and would not be available even if the

21   trustee got a judgment.  It's always worth it for somebody

22   to write a check and not have to litigate.  The state will

23   get over $4 million or maybe more than $4 million and get

24   Ms. Bongiorno's cooperation.  So it certainly is a

25   reasonable settlement.  You can submit an order.

Page 28

1          MR. BOHORQUEZ:  Thank you, Your Honor.

2          THE COURT:  Next is Pinto.

3          MR. HUNT:  Good morning, Your Honor.  Dean Hunt

4    for the trustee.  I believe defense counsel was going to be

5    appearing by phone today.

6          THE COURT:  Okay.  Is Mr. Ingber on the phone?

7          MR. INGBER:  Yes, Your Honor.  I'm appearing on

8    behalf of defendants James Pinto and (indiscernible).

9          THE COURT:  Mr. Ingber, if you're on a speaker,

10   would you take it off because it's very hard to hear you and

11   just speak into the receiver.

12         MR. INGBER:  No, I'm not on a speaker phone, I'm

13   on a handheld phone.

14         THE COURT:  All right.  We'll do the best we can.

15   Go ahead.

16         MR. HUNT:  Your Honor, this is the third time

17   we've come to the Court on this issue.  This is a Rule

18   7071(b) request to file a motion to compel and set that for

19   the October 26th, omnibus proceeding.  We'd also like to get

20   the Court's instruction and guidance on the discovery that

21   the defendants need to answer.

22         There are really three issues which have been laid

23   out in great detail in our three separate letters.  The

24   first being an issue that has been litigated now for over

25   seven months involving the defendants' unwillingness to

1   answer discovery for the life of the account.  They actually

2   -- one of the first times in my career I've actually seen a

3   footnote in a request for admission saying that they're

4   limiting their answers to the last two years of the account

5   and they will not respond --

6          THE COURT:  I guess it's an implied relevancy.

7          MR. HUNT:  Apparently.  But of course, under the

8   net equity calculation, we have a right to discovery on all

9   of those issues.  And second is an issue that's been ongoing

10  now for at least three months involving a purported forensic

11  analysis that the defendants have engaged accountants to do.

12  They reported that to us for the first time on June 24th

13  after they had already told us they were going to answer all

14  of the discovery.  The accountants have now been working on

15  that for at least three months.

16         In June, they told us that they'd worked nearly

17  all day on these things and they were going to get it to us

18  as quickly as they could.  Last week Mr. Ingber advised that

19  they needed another 30 to 45 days for their forensic

20  accountant to do whatever he was or she was doing.

21         THE COURT:  Have you asked for any forensic

22  accounting materials?

23         MR. HUNT:  No, we just asked for simple

24  interrogatories and for documents.  And the documents that

25  apparently the forensic accountants are looking at have not

Page 30

1     been produced.

2            The third issue is an issue that's been ongoing

3     now for at least five months where we have been advised that

4     there are documents available to be produced, but they have

5     not been produced.

6            In particular, there are documents that are held

7     by the trustee for these trusts of Mr. Sidney Kaplan (ph),

8     who has confirmed that he has fairly voluminous records that

9     are right on point.  Most recently we were advised that

10    those could not be produced because there wasn't enough

11    money in opposing counsel's trust account to justify him

12    spending the time to review the documents because he wasn't

13    sure he was going to get paid.

14           Those documents are clearly relevant and we'd ask

15    the Court's guidance to defense counsel to go ahead and get

16    those produced to us.

17           THE COURT:  Mr. Ingber?

18           MR. INGBER:  Yes, Your Honor.

19           THE COURT:  Let's start with the refusal to

20    answer, I guess, say the request for admissions --

21           MR. HUNT:  And interrogatories.

22           THE COURT:  Or the -- or as to the life of the

23    account.

24           MR. INGBER:  By way of background if I could, Your

25    Honor.  I am an estate planner not a litigator.  Mr. Hunt

Page 31

1     has been dealing directly with the litigator in this case

2     who has been terminated, Robert McClay (ph).

3               THE COURT:  Well, it's still -- he's still counsel

4     of record, isn't he?

5               MR. INGBER:  We have terminated him.

6               THE COURT:  Well, he's still counsel of record.

7     You didn't terminate -- whether or not you think you

8     terminated him, unless there's a Court order allowing him to

9     withdraw, he's still counsel of record.

10              MR. INGBER:  Yes.  I understand that, Your Honor.

11              THE COURT:  Let's get back to the objection -- the

12    implied objection, I guess, that transactions that occurred

13    more than two years before the filing date are irrelevant.

14    I assume that's the basis for the refusal to answer?

15              MR. INGBER:  I really have no idea, Your Honor.

16              THE COURT:  All right.  Well, let's -- and so the

17    objection is overruled.  You have to answer that because

18    it's relevant to a determination of fictitious profits.  So

19    even though deposits and withdrawals occurred 50 years

20    before the filing date, they're relevant.

21              MR. INGBER:  I understand, Your Honor.  I have no

22    idea why Mr. McClay put that answer in that way.  He's been

23    dealing with Mr. Hunt and two of his partners in the Houston

24    office.  It was Mr. Hunt's letter of September 7th that made

25    the clients and myself aware of the extent of the

Page 32

1    delinquency of the response to the trustee's discovery

2    request.  And we have retained other counsel to replace

3    Mr. McClay.  The issue becomes, and I can address the other

4    two issues, the forensic accounting and the Sidney Kaplan

5    issue.

6            Their forensic accounting was a proposal by

7    Mr. McClay that hopefully had shown, as I understand it,

8    that the withdrawals during the last two years, 2006 to

9    2008, were spent on expenses and costs and were not

10   transferred to third parties for lack of full and adequate

11   consideration.  The --

12           THE COURT:  There are subsequent transfer claims

13   in these cases?

14           MR. HUNT:  No, sir.

15           THE COURT:  Well, that may be.  I understand that

16   but -- and that's an issue maybe for trial, but you still

17   have to produce the materials.  The trustee doesn't have to

18   wait until you complete your forensic accounting and prepare

19   your defense.  He's got his own case to --

20           MR. INGBER:  No, that I understand now.  What we

21   have received -- I talked -- when we terminated Mr. McClay,

22   even though I know officially not relieved of Court, I

23   started talking with the accountants.  And they told me they

24   had gotten some materials from the defendants, but going

25   back 6 to 8 years, 8 to 10 years, they have gotten very

Page 33

1    little from them.  So they are unable -- they need actual

2    cancelled checks.  What they did receive were bank

3    statements, savings account statements, checking account

4    statements, but no indication of the underlying cancelled

5    checks or the credit card (indiscernible).

6            So they're not going to be able to render an

7    opinion or render any kind of forensic accounting report as

8    I understand it, that there are no -- or there were no

9    subsequent transfers.  So they're not going to -- they can't

10   do anything.

11           THE COURT:  That's not an issue for discovery.

12   You have the information and documents that were requested.

13   You haven't explained to me why they're not being produced.

14   So isn't it appropriate simply to enter an order that they

15   have to be produced by a specific deadline?

16           MR. INGBER:  That's fine, Your Honor.

17           THE COURT:  Okay.  When are you going to produce

18   them?

19           MR. INGBER:  I need to retain the replacement

20   counsel.

21           THE COURT:  I'm not -- no, they're still.  No, no,

22   no.  This has been going on a long time and the trustee

23   doesn't have to be (indiscernible) in a dispute between the

24   client and former counsel or counsel of record.  So what I'm

25   going to do is I'll give you 30 days, until the end of

1   October, to produce all the documents and answer the

2   interrogatories to the extent you haven't done so --

3        MR. HUNT:  And request for admissions.

4        THE COURT:  And request for admissions.  That's

5   (indiscernible), the request for admissions.  Failing which,

6   the trustee is going to move to strike your answer and enter

7   a judgment and that may be how this -- you know, this ends

8   unless you do what you're required to do.  Do you understand

9   that?

10        MR. INGBER:  It will put an undue time imposition

11  upon whoever replacement counsel is.  I do have replacement

12  counsel.  He's got to become familiar with the case.

13  Ultimately, I believe, Your Honor, where defendants are

14  unable to make any payments.  So the question is do we use

15  fees that would be paid to retain counsel to put in answers

16  or use that money to end up making a settlement with the

17  defendant -- with the trustee.

18        THE COURT:  You know, he's talked about settlement

19  with the trustee.  I know the trustee -- if you can convince

20  the trustee that they have no money and no judgment would be

21  collectable, it's more likely than not that it might be

22  settled if you could find the appropriate price.  But this

23  is a discovery dispute.  I'm going to direct you to turn

24  over the documents and answer the request for admissions by,

25  let's say, October 30 -- October 28th, which is a Friday and

Page 35

1    you can submit an order.

2              MR. HUNT:  So just to be clear on the order, it

3    would be for both the interrogatories and request for

4    admissions would deal with that.  Yes, sir.

5              THE COURT:  All discovery.  This has been

6    outstanding for months.  And as far as I'm concerned, if you

7    don't have the information to give to your forensic

8    accountant, that's immaterial to the trustee's requests.

9              MR. HUNT:  Thank you, Your Honor.  Appreciate your

10   time.

11             MR. INGBER:  Understood, Your Honor.

12             THE COURT:  All right.  And you might tell

13   Mr. McClay that he's still in the case.

14             MR. INGBER:  I will remind him of the case, of the

15   fact.

16             THE COURT:  All right.

17             MR. INGBER:  It's not going to do me much good

18   reminding him, though.  Thank you, Your Honor.

19             THE COURT:  Okay.

20             MR. INGBER:  Mr. Hunt, I'll talk to you when you

21   get back to Houston.

22             MR. HUNT:  Thank you.

23             THE COURT:  Okay, thank you.

24             MR. INGBER:  Okay, thanks.  Bye bye.

25             THE COURT:  I have nothing else.  Is that right?

Page 36

1        UNIDENTIFIED SPEAKER:  I think that's correct,

2    Your Honor.

3        THE COURT:  Okay, thank you.

4        (Chorus of thank you)

5        (Whereupon these proceedings were concluded at 10:37

6    AM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **I N D E X**

2

3                                        RULINGS

4                                                                              PAGE

5      Motion to affirm trustee's determination denying          24

6      claims of claimants holding interests in Chalek

7      Associates LLC, Chaitman/Schwebel LLC, FGLS Equity

8      LLC, Larsco Investments LLC and Kuntzman Family LLC

9

10     Motion to approve settlement among trustee,               27

11     Annette Bongiorno, and Rudy Bongiorno pursuant to

12     Federal Bankruptcy Rule 9019

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 38

1                C E R T I F I C A T I O N

2

3    I, Jamie Gallagher, certify that the foregoing transcript is

4    a true and accurate record of the proceedings.

5    Jamie Gallagher    Digitally signed by Jamie Gallagher
                        DN: cn=Jamie Gallagher, o=Veritext,
                        ou, email=digital@veritext.com, c=US
6    _____    Date: 2016.09.29 14:39:42 -04'00'

7    Jamie Gallagher

8

9

10   Date:  September 29, 2016

11

12

13

14

15   Veritext Legal Solutions

16   330 Old Country Road

17   Suite 300

18   Mineola, NY 11501

19

20

21

22

23

24

25