**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Nicholas J. Cremona
Edward J. Jacobs

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and for the Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>      Plaintiff, <br><br>   v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>      Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>      Plaintiff, <br><br>   v. <br><br> TRUST U/ART FOURTH O/W/O ISRAEL WILENITZ, EVELYN BEREZIN WILENITZ, individually, and as Trustee and Beneficiary of the Trust U/ART Fourth O/W/O Israel Wilenitz, and SARA SEIMS, as Trustee of the Trust U/ART Fourth O/W/O Israel Wilenitz, <br><br>      Defendants. | Adv. Pro. No. 10-04995 (SMB) |

**OPPOSITION TO DEFENDANTS' MOTION TO**
**COMPEL DISCOVERY AND MEMORANDUM IN SUPPORT OF**
**CROSS-MOTION FOR PROTECTIVE ORDER PROHIBITING DISCOVERY**
**IN ALL OTHER CASES WHERE CHAITMAN LLP IS COUNSEL OF RECORD**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

THE TRUSTEE'S PRODUCTIONS IN THIS MATTER ........................................................4

    A.    Case-Specific Documents ...........................................................................6

    B.    E-Data Room 1 ............................................................................................7

           1.    Data ................................................................................................9

           2.    Documents ....................................................................................11

           3.    Financials .....................................................................................14

    C.    Defendants' Failure to Access E-Data Room 1 in This Case ...................15

PROCEDURAL HISTORY.....................................................................................................16

ARGUMENT ..........................................................................................................................19

    I.    THE DISCOVERY SERVED IS BURDENSOME AND NOT
        PROPORTIONATE TO THE NEEDS OF THE CASE ......................................19

        A.    Defendants Should Not Be Permitted to Ignore the Millions of
            Documents the Trustee Has Made Available in Pursuit of
            Speculative Theories and Unsubstantiated Defenses.................................19

        B.    The Trustee is Not Required to Conduct Defendants'
            Investigation For Them..............................................................................22

        C.    Rule 26 Does Not Permit Fishing Expeditions .........................................25

    II.    THE TRUSTEE'S WORK PRODUCT IS NOT DISCOVERABLE ..................28

    III.    THE REQUESTS SEEK DISCOVERY THAT IS NOT RELEVANT
         TO THIS CASE .................................................................................................30

    IV.    THE TRUSTEE'S MOTION FOR A PROTECTIVE ORDER
         SHOULD BE GRANTED ..................................................................................33

CONCLUSION........................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)...................................................................................................31

*In re Candor Diamond Corp.*,
    26 B.R. 847 (Bankr. S.D.N.Y. 1983)......................................................................................32

*Capitol Records, Inc. v. MP3tunes, LLC*,
    261 F.R.D. 44 (S.D.N.Y. 2009) ..............................................................................................30

*Chiperas v. Rubin*,
    No. 96 Civ. 00130 (TPJ) (JMF), 1998 WL 531845 (D.D.C. Aug. 24, 1998).........................23

*In re Fontaine*,
    402 F. Supp. 1219 (E.D.N.Y. 1975) .......................................................................................32

*Grider v. Keystone Health Plan Cent., Inc.*,
    580 F.3d 119 (3d Cir. 2009)....................................................................................................30

*In re J.T. Moran Fin. Corp.*,
    145 B.R. 182 (Bankr. S.D.N.Y. 1992).....................................................................................33

*In re John Doe Corp.*,
    675 F. 2d 482 (2d Cir. 1982)...................................................................................................28

*KFC Corp. v. Kazi*,
    No. 12-Civ-564 (JGH), 2014 WL 4914427 (W.D. Ky. Sept. 30, 2014)..................................33

*Mackey v. IBP, Inc.*,
    167 F.R.D. 186 (D. Kan. 1996)...............................................................................................24

*Quality Edge, Inc. v. Rollex Corp.*,
    No. 10 Civ. 00278 (JTN), 2015 WL 4392980 (W.D. Mich. July 15, 2015)...........................32

*Rosanna Mayo-Coleman v. Am. Sugar Holding, Inc.*,
    2016 WL 4533564, No. 14-CV-0079 (S.D.N.Y. Aug. 9, 2016)..............................................27

*S.E.C. v. Mgmt. Sols., Inc.*,
    No. 11 Civ. 01165 (BSJ), 2013 WL 4501088 (D. Utah Aug. 22, 2013) ................................21

*Santiago v. Rivka, Inc.*,
    No. 15CV9184, 2016 WL 4530898 (S.D.N.Y. May 26, 2016).........................................21,22

*In re Suprema Specialties, Inc.*,
    No. 02-10823 (JMP), 2007 WL 1964852 (Bankr. S.D.N.Y. July 2, 2007) ............................28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Surety Ass'n of Am.*,
   388 F.2d 412 (2d Cir. 1967).............................................................................32, 33

*United States v. Kellogg Brown & Root Servs., Inc.*,
   284 F.R.D. 22 (D. D.C. 2012)..........................................................................23, 24

*United States v. Rashed*,
   83 F. Supp. 2d 96 (D.D.C. 1999), *aff'd*, 234 F.3d 1280 (D.C. Cir. 2000).........32, 33

*Velvel v. Picard*,
   133 S. Ct. 25 (2012)...............................................................................................31

*Williams v. Dow Chem. Co.*,
   No. 01 Civ. 4307 (PKC), 2004 WL 1348932 (S.D.N.Y. June 16, 2004) ...........24, 25

*Wilson v. City of New York*,
   No. 06-Civ.-229 ARR VVP, 2008 WL 824284 (E.D.N.Y. Mar. 26, 2008) ............30

**Statutes**

15 U.S.C. 78fff-2(c) ....................................................................................................16

15 U.S.C. 78fff-2(c)(3) ...............................................................................................32

15 U.S.C. §§ 78aaa .......................................................................................................1

**Rules**

Fed. R. Civ. P. 26(b)(1).........................................................................................19, 27

Fed. R. Civ. P. 26(b)(2)(C) ........................................................................................19

Fed. R. Civ. P. 26(c) ...................................................................................................33

Fed. R. Civ. P. 33(d) .............................................................................................20, 23

Fed. R. Civ. P. 37(a)(5)(B) .........................................................................................33

Fed. R. Civ. Pro. 26(b)(5) ..........................................................................................29

Southern District of New York, Local Rule 26.2 .......................................................29

**Other Authorities**

James W. Quinn, Mindy J. Spector & John P. Mastando III, Responding to
   Document Requests, 2 Bus. & Com. Litig. Fed. Cts. § 21:41 (Robert L. Haig,
   ed., 2d ed. 2006)..................................................................................................30

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa ("SIPA"), and the estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, hereby submits this memorandum in opposition to defendants' ("Defendants") motion to compel discovery (the "Motion")[1] and in support of the Trustee's cross-motion (the "Cross-Motion") for a protective order prohibiting discovery in all other cases where Chaitman LLP is counsel of record.[2]

## PRELIMINARY STATEMENT

Much of Defendants' memorandum of law in support of the Motion consists of unprofessional personal attacks on the Trustee, allegations of discovery conduct that have no basis in fact, and argument that does not reflect a good faith effort to investigate factual matters as required by Federal Rule of Civil Procedure 26(g).  The Trustee respectfully asserts that the Motion is frivolous and—much like Chaitman LLP's service of the instant 18 objectionable requests in more than 80 cases after the Court confirmed they were objectionable—violative of Rule 26(g).  In the hopes of ending this long-running dispute, the Trustee will focus this response on the request from the Court to explain in detail the steps taken to produce and make available relevant discovery to the Defendants in this case.

The Trustee has undertaken an enormous and unprecedented effort to transparently make available all of the underlying materials supporting the determination that BLMIS operated the largest and longest running financial fraud in modern history.  These materials—which are

---

[1] The Motion seeks to compel the Trustee with respect to every Request served by Defendants except for Request Nos. 10 and 13.

[2] The Trustee's memorandum is accompanied and further supported by the Declaration of Edward J. Jacobs, Esq. (the "Jacobs Decl.").

massive in both volume and scope—are largely made available to all Defendants in a carefully

organized, highly efficient, and user-friendly online searchable data room containing nearly four

million documents ("E-Data Room 1").  With just a few key strokes, litigants such as the

Defendants can quickly identify, sort, and review documents by both subject and content.  E-

Data Room 1 was established by a Court Order upon motion by the Trustee specifically designed

to address the challenge of making available large quantities of relevant materials in an efficient,

organized, searchable, and highly-useable fashion.

 As the Court is aware, the other primary factual inquiry in this strict liability avoidance

action is whether the Defendants received certain transfers representing fictitious profits from

BLMIS.  In furtherance of the Trustee's objective of transparency, and before receiving a single

discovery request, the Trustee produces to all defendants certain defendant-specific documents

that typically include:  (i) the customer file, including all correspondence, for each sued-upon

and any related BLMIS account; (ii) all relevant BLMIS customer account statements reflecting

all account activity, as well as Portfolio Management Reports ("PMRs") and/or Portfolio

Management Transaction Reports ("PMTs"), which contain transaction history for the relevant

account; and (iii) all available BLMIS bank records showing corresponding cash transactions for

the subject account(s).  The Defendants received all of the above-referenced productions, in

addition to an early disclosure of the Expert Report of Bruce G. Dubinsky, the Trustee's fraud

and insolvency expert, which sets forth in detail BLMIS's fraud.  The vast majority of the

documents considered by Mr. Dubinsky in forming his opinions are in E-Data Room 1, and all

others not included are available upon request.[3]  Given the enormous effort that has already gone

into furnishing substantially all relevant materials to the Defendants in this case as described

---

[3] Mr. Dubinsky considered certain unstructured data that is not capable of being stored in E-Data Room 1.  This data, however, is available upon request.

above, no further discovery can possibly be proportional to the needs of the case pursuant to the Federal Rules of Civil Procedure absent a good faith showing that additional discovery is necessary.

Defendants in this case have essentially ignored all of this evidence. Instead, counsel for Defendants served in this, and over 80 additional cases, 18 discovery requests that seek the Trustee's work product, demand burdensome interrogatory responses concerning irrelevant subjects, and purport to require the Trustee to complete complex investigations into the evidence previously furnished designed to further unsubstantiated theories that don't comport with the evidence. The Federal Rules of Civil Procedure, however, do not require the trustee to conduct the Defendants' investigation for them. Nor do they permit a litigant to ignore overwhelming evidence made available to it in advancing speculative theories and suppositions that have no basis in evidence or fact. Yet, that is precisely what the Defendants wish to accomplish through service of the disputed discovery.

First, request Nos. 2-5, 11, and 14-18 in Defendants' First Set of Document Demands and Interrogatories on the Trustee ("the Requests") seek to compel the Trustee to scour the millions of documents in E-Data Room 1 and repackage the information contained therein in a manner more favorable to the Defendants' theories of BLMIS's history and activities. The Trustee is not required to conduct this type of investigation on behalf of Defendants, as Fed. R. Civ. P. 33(d) expressly authorizes a responding party to provide the records through which the answers to a specific interrogatory may be determined. This is precisely what the Trustee has done here.

Second, Request Nos. 6-9 seek information that is completely irrelevant to the claims or defenses in this adversary proceeding. Defendants seek discovery concerning the Trustee's "net equity" methodology, which is an admitted attempt to re-litigate the courts' repeated approval of

that methodology.  Discovery related to any purported defense that conflicts with this long-settled law of the case is both irrelevant and improper.

Third, Request Nos. 1 and 12 on their face seek the Trustee's protected work product by requesting the substance of the Trustee's investigatory interviews.  It is plain that such information constitutes the Trustee's work product and is therefore protected from disclosure.

Finally, Request Nos. 11 and 14-16 seek premature expert discovery concerning the Trustee's determination of Defendants' net equity.  As this Court is aware, the Trustee intends to offer expert reports in support of the transfers and net equity calculations alleged in the Complaint.  The Trustee is not obligated to prematurely disclose this information at this stage of the litigation, particularly in light of the Trustee's affirmative production of the account-specific records the Trustee's experts considered in connection with their forthcoming reports.

The Trustee therefore requests that the Court (i) deny the Motion and (ii) grant the Cross-Motion in their entirety.

## THE TRUSTEE'S PRODUCTIONS IN THIS MATTER

Defendants refer to the Trustee's productions as both a "data dump" and "micro-discovery."  In fact, it is neither.  The universe of documents that the Trustee has produced and/or made available to all defendants in these good-faith adversary proceedings reflect a court-approved approach by the Trustee to affirmatively produce those account-specific and defendant-specific records that are relevant to the Trustee's specific claims, while making the much larger volume of case-wide evidence available to all parties in an electronic data room, E-Data Room 1.  This approach is designed to aid defendants in their processing of the massive volume of discoverable information, streamline their access to it, and minimize the Trustee's production burdens given the hundreds of adversary proceedings in which the Trustee is a plaintiff.

Defendants' trivialization of the Trustee's significant efforts in his collection, processing, and management of the nearly 30 million BLMIS and third-party documents in the Trustee's collection from which productions are made is unwarranted. To clarify the record and at the Court's request, the Trustee hereby provides a general outline of how he conducts discovery in these matters. The Trustee invites the Court to further inquire of the BakerHostetler partners dedicated to managing this process at any hearing set on this Motion.[4]

During the course of the Trustee's investigation following the discovery of the BLMIS fraud, the Trustee took custody of thousands of boxes of paper—enough paper to stretch from New York to Los Angeles and back—and unquantified amounts of electronically stored data. Jacobs Decl. at ¶ 4. Ultimately the Trustee and his consultants processed approximately 4.7 million hard-copy BLMIS documents and 25 million BLMIS electronic documents, which were then incorporated into the common E-Discovery document review platform, Relativity, referred to by the Trustee as the "BLMIS Searchable Database." *Id.* The Trustee does not provide direct access to the BLMIS Searchable Database to every defendant, given that it contains significant amounts of irrelevant personally identifiable information ("PII"). *Id.*

From this database, however, and consistent with the Court's Order Establishing Litigation Case Management Procedures for Avoidance Actions, which permits parties to "produce discovery, including initial disclosures, . . . in an electronic data room," *see Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Nov. 10, 2010), ECF No. 3141 (the "Procedures Order"), the Trustee created E-Data Room 1—a separate document review database in Relativity containing approximately four million documents (all of which the Trustee's team reviewed and

---

[4] Upon request by the Court, counsel for the Trustee will provide a virtual demonstration of E-Data Room 1, including its user interface and search functionality.

redacted for PII) relevant to the fraud at and insolvency of BLMIS, including certain additional

documents from third parties. *Id.* In addition to segregating this massive collection of

documents of significance across all cases, the Trustee also isolated account-specific and

defendant-specific records and began affirmatively producing these records in connection with

the Trustee's initial disclosures in the respective adversary proceedings. *Id.* Both efforts are

described in more detail below.

A.    **Case-Specific Documents**

At the outset of the Liquidation, the Trustee identified and segregated BLMIS core

account documents for all customers ("Core Account Documents"). Jacobs Decl. at ¶ 5. These

Core Account Documents typically include a customer account file which is comprised of

account opening agreements, correspondence to and from BLMIS, transfer and/or redemption

requests, customer statements, Portfolio Management Reports ("PMRs") and/or Portfolio

Management Transaction Reports ("PMTs"), which contain transaction history, and other

documents that are specific to each account and/or relevant to the Trustee's calculation of net

equity of a particular BLMIS account. *Id.*

The Trustee produces the Core Account Documents for both the subject account and any

related account. Jacobs Decl. at ¶ 6. An account is considered a related account if it is relevant

to the net-equity calculation of the subject account. *Id.* Specifically, as will be further explained

by the Trustee's testifying experts in their respective reports, if the subject account received any

direct or indirect "transfers" from another account, the net equity of that "transferor" account is

implicated, and thus the Trustee also produces the Core Account Documents for that related

account. *Id.* In addition to the Core Account Documents, the Trustee also identified and

segregated BLMIS bank account records that reflect transfers from BLMIS to the specific

6

customers for the subject account ("Bank Transfer Documents," and together with the Core

Account Documents, the "Initial Disclosure Documents" ).  *Id.*

For both the Core Account Documents and Bank Transfer Documents, the Trustee

produces detailed appendices that provide document-by-document descriptions of each

document in the Initial Disclosure Documents.  Jacobs Decl. at ¶ 7; Jacobs Decl. Ex. B.  These

are provided purely as a courtesy to defendants in an effort to aid them in their review of the

case-specific materials produced by the Trustee.  *Id.*  The appendices enable defendants to know

precisely what types of documents they have received and are reviewing, and identify with

specificity the documents supporting the Trustee's transfer and net equity allegations for each

defendant as detailed in Exhibit B to the Trustee's complaint.  *Id.*

In the *Wilenitz* case, consistent with the Trustee's protocols across all adversary

proceedings, the Trustee affirmatively produced the Core Account Documents and the Bank

Transfer Documents to the Defendants with his initial disclosures on April 1, 2016.  Jacobs Decl.

at ¶ 8; Jacobs Decl. Ex. C.  The Trustee produced the Core Account Documents for the subject

accounts (BLMIS account nos. 1CM806 and 1CM837) and related accounts (BLMIS account

nos. 1C0000, 1C0007, 1CM188, and 1CM807)—*i.e.*, accounts that affect the principal balance

calculation of the subject account.  *Id.* The appendices for the *Wilenitz* Initial Disclosure

Documents were included with the production.  *Id.* Ex. B.

## B.    E-Data Room 1[5]

As noted above, pursuant to the Procedures Order, the Trustee provides defendants with

direct access to approximately four million documents through E-Data Room 1.[6]  Jacobs Decl. at

---

[5] Per order of the Court, the Trustee has built separate electronic data rooms to provide certain defendants with direct access to the vast majority of confidential and non-confidential third-party documents that the Trustee received in the Bankruptcy Rule 2004 investigation and through Civil Rules 34 and 45 in certain adversary proceedings.  These data rooms are not available to good-faith defendants per the Court's order, given that the third-party documents are not relevant to most, if not all, good-faith proceedings.

¶ 10.  Though referred to as a "data room," E-Data Room 1 is the equivalent of a full-scale document production that the litigants access through the commonly used document review platform, Relativity.  *Id.*

The Trustee discloses the existence and availability of E-Data Room 1 in his initial disclosures for every adversary proceeding, and defense counsel are provided with credentials necessary to access E-Data Room 1 upon execution of the Undertaking and Consent to be Bound by the Litigation Protective Order ("LPO Undertaking") and the E-Data Room 1 Non-Disclosure Agreement ("E-Data Room 1 NDA").  Jacobs Decl. at ¶ 12; Jacobs Decl. Ex. D.  As such, immediately after discovery opens, the Trustee makes available roughly four million documents in E-Data Room 1 for defendants to access once they submit the executed LPO Undertaking and E-Data Room 1 NDA.  Jacobs Decl. at ¶ 12.

The Trustee adds documents to E-Data Room 1 when it is determined that they might be relevant to all actions.  Jacobs Decl. at ¶ 13.  For example, when Ms. Chaitman requested production of all records received in the Bankruptcy Rule 2004 investigation from the Depository Trust Clearing Corporation, the Trustee added those documents to E-Data Room 1 after production to Ms. Chaitman.  *Id.*  Documents loaded into E-Data Room 1 within the last 90 days can be found in four folders: (i) Released within the last 30 Days; (ii) Released within the last 60 Days; (iii) Released within the last 90 Days; and (iv) Released within post 90 Days to assist counsel in identifying new documents.  *Id.*

Once the credentials are issued, the Trustee provides defense counsel with an E-Data Room 1 manual (the "Manual"), which is a roadmap of the structure, organization, and contents

---

[6] The Procedures Order further provides that, given the volume of documentation, the parties "may produce a summary report, such as an expert report, and provide access to the underlying documentation on which the summary report relies in an electronic data room[.]"  *See* Procedures Order 4.C.

of E-Data Room 1 to aid defendants in their navigation of it.  Jacobs Decl. at ¶ 14; *see* Jacobs

Decl. Ex. E.  In addition to the Manual, the Trustee provides defense counsel with a tailored E-

Data Room 1 Relativity manual ("E-Data Room 1 Relativity Quick Guide") to offer a step-by-

step guide of navigating, searching, and tagging documents for review and/or production.  *See*

Jacobs Decl. Ex. F.  When the defendants request documents that are housed in E-Data Room 1,

the Trustee notes in his responses and objections to the requests that the documents are located

therein.  The Trustee also provides an additional appendix with his responses and objections to

discovery requests which further details the high-level contents of E-Data Room 1 and includes

screen shots of the interface.  *Id.*; *see id.* Ex. G.

Moreover, given the discovery disputes raised by Defendants in these specific adversary

proceedings, the Trustee recently made an early production of the Dubinsky Report, including a

"documents considered list" that provides Bates-labeled documents that are available in E-Data

Room 1, and provided another detailed description of E-Data Room 1 in the accompanying cover

letter.  Jacobs Decl. at ¶ 15; Jacobs Decl. Ex. H.  As the above demonstrates, the Trustee has

made significant efforts to not only make this massive trove of evidence available to all litigants,

but also to ensure that the litigants understand what is in E-Data Room 1, where specific

information in E-Data Room 1 is located, and how that information can most efficiently be

accessed.  *Id.*

As to its specific contents, E-Data Room 1 is organized in folders and subfolders under

three main primary folders: **DATA**, **DOCUMENTS**, and **FINANCIALS**.  Jacobs Decl. at ¶ 16.

### 1.    <u>Data</u>

The documents contained in the DATA folders contain data extracted from the data

sources that BLMIS maintained over the decades.  Jacobs Decl. at ¶ 17.  The DATA folder is

further divided into two sub-folders—**Account Statements and Ledgers** and **StorQM 1099**

**Forms**—and contains copies of reports and some "near-native" data obtained from the data sources. *Id.*

The **Account Statements and Ledgers** sub-folder contains customer statements, ledgers, and reports for BLMIS accounts, which are organized into further sub-folders based on the data source from which the documents were uploaded to E-Data Room 1—microfilm, SETCHS17, STMTPro, or StorQM. Jacobs Decl. at ¶ 18. To the extent defendants' Requests seek information contained in the customer statements of accountholders other than the defendant in this adversary proceeding, that information is contained in this sub-folder. *Id.*

The **Microfilm** sub-folder contains customer statements and ledgers from 1978 through November 1995. Jacobs Decl. at ¶ 19. Before implementing the AS400 computer system in the 1990s, BLMIS used predecessor systems (*e.g.*, IBM System 36) to generate account statements, and thus the statements in this sub-folder were sourced from the microfilm reels of these predecessor systems. *Id.* Generally, each microfilm reel contained labeling that gave an indication of what types of reports were contained on the reel. *Id.* Using the label information, a subset of the microfilm reels and the reports contained therein were identified for processing and Bates numbering. *Id.* Customer account statements and other reports related to customer accounts identified on the microfilm reels are available in this folder. *Id.*

The **SETCSH17** sub-folder contains SETCSH17 reports generated from BLMIS monthly backup tapes containing the SETCSH17 table. Jacobs Decl. at ¶ 20. SETCSH17 (also referred to as "Settled Cash" for House 17) is a data table maintained in the investment advisory business unit's ("Investment Advisory" or "House 17") AS400 computer that contains transactional customer activity used to generate customer account statements. *Id.* BLMIS archived this table on a monthly basis, purging the transactional data from the AS400 computer system after the

archiving was completed, to preserve storage space. *Id.* The SETCSH17 tables maintained on

backup tapes were identified and restored. *Id.* The SETCSH17 reports in this sub-folder are

presented in PDF format and contain all transactions for the applicable account number,

organized by month. Microsoft Excel files that were prepared from the extracted SETCSH17 are

also available in this folder. *Id.*

The **STMTPro** sub-folder contains customer statements created using the StatementPro

system from 1996 onward. Jacobs Decl. at ¶ 21. The STMTPro is a proprietary AS400 add-on

application developed by BLMIS programmers to create BLMIS customer statements outside the

normal monthly processing of customer statements. *Id.* Restored customer statements using the

custom STMTPro program are available in this sub-folder to the extent the STMTPro tapes have

been restored and processed. *Id.* Many of the STMTPro tapes were stored with paper indices

("tape wrappers") that provide selected information such as dates and account numbers. *Id.* To

the extent available, copies of the scanned tape wrappers are located in this folder. *Id.*

The **StorQM** sub-folder contains customer statements created using the StorQM

application on the AS400, which is a report-writing application used to generate various reports.

Jacobs Decl. at ¶ 22. The customer statements available in this folder are from December 1995

through November 2008. *Id.*

The separate **StorQM 1099 Forms** sub-folder contains IRS 1099 forms that were

generated by the StorQM application on the AS400 from December 1995 onward. Jacobs Decl.

at ¶ 23.

## 2. <u>Documents</u>

The DOCUMENTS folders contain electronic copies of hard copy documents collected

from BLMIS facilities or obtained from third parties. Jacobs Decl. at ¶ 24. These documents are

organized by source, then by type of document/data. *Id.* The bulk of the information responsive

to Defendants' requests for information related to BLMIS's purported trading activities and its insolvency are contained in this section. *Id.* The sub-folders and specific documents contained therein include:

- **BLMIS Documents and Work Papers**: This sub-folder includes various documents, notes, and papers created and maintained by BLMIS throughout its existence, including all pages from 21 spiral notebooks maintained by employee Jodi Crupi tracking cash-in and cash-out transactions. This sub-folder further includes documents related to BLMIS's liquidity timeline, including letters from employees Dan Bonventre and Enrica Cotellessa-Pitz regarding loans to BLMIS using its JPMorgan & Chase account as collateral.

- **BLMIS Operational Documents**: This sub-folder includes documents related to BLMIS's corporate structure and related organizational activities.

- **FINRA**: This sub-folder includes various documents related to FINRA, including BLMIS's quarterly FOCUS Reports from 1983 through 2007, as well as accompanying data for the reports and audit materials provided by FINRA from the late 1990s onward, which further include FINRA questionnaires and document requests completed by BLMIS.

- **MSIL Documents and Work Papers**: This sub-folder includes various records from Madoff Securities International Limited ("MSIL"), including corporate structure and organizational documents, shareholder resolutions, financial statements, and tax returns.

- **Other Public Documents**: This sub-folder folder contains certain publicly available documents, including pleas from the criminal trials of certain BLMIS employees.

- **Other Third Party Documents**: This sub-folder folder contains additional third-party documents, most of which were produced in the Trustee's Bankruptcy Rule 2004 investigation that relate to BLMIS's purported legitimate and illegitimate trading activities, including information on specific transactions.  The third-party documents include the following:

    o **DTCC**: contains various records related to the Depository Trust and Clearing Corporation, including BLMIS's records from an account maintained with the DTCC, reports, statements, notices, confirmations, and other documents related to BLMIS trading activity through BLMIS's proprietary Trading and Market Making business units; also includes documents obtained from the leased DTCC terminal at BLMIS.

    o **Daily Stock Records (DSR)**: contains various historical stock records, including pages from the New York Stock Exchange Daily Stock Price Record.

    o **Friehling & Horowitz**: contains various records related to purported accounting services provided by Friehling & Horowitz for BLMIS.

    o **OCC**: contains documents produced by Options Clearing Corporation, including various documents related to trading transactions and activity and Madoff Position Summary Reports.

o **SEC**: contains U.S. Securities and Exchange Commission-related materials, including publicly available documents and certain documents received from the SEC. The documents received from the SEC include certain filings made by BLMIS, including ADV forms, FOCUS reports, and year-end reports.

o Documents from various trading exchanges.

*Id.*

### 3. <u>Financials</u>

The FINANCIALS folders contain documents obtained from various third-party institutions related to the financial condition of BLMIS and Madoff Securities International London. Jacobs Decl. at ¶ 25. As with the DATA and DOCUMENTS folders described above, there are numerous sub-folders labeled according to document source. *Id.* Generally, the documents in these sub-folders are statements and related documents for accounts BLMIS or MSIL held with the specific entity reflected in the sub-folder label. *Id.*

In addition to folder trees, users can locate documents by type, as explained in the Manual, or through key word searches powered by the most up-to-date technology available from the makers of Relativity. Jacobs Decl. at ¶ 26. A user can also search in the data stored in fields, such as Bank Account Number, BLMIS Account Number, and Bank Account Holder Name. Other usable fields and related descriptions can be found at the end of the Manual.

As a user is reviewing documents in E-Data Room 1, the user can request documents for traditional production by clicking on the "Edit" box that appears next to each document and then clicking on the tag that marks it for production. Jacobs Decl. at ¶ 27. The documents in E-Data Room 1 are not "downloadable" (which is one of Defendants' complaints) because of security and privacy concerns, given the large number of users. *Id.* Rather, the list of documents tagged

14

by a defendant for production is sent to the Trustee's vendor, which prepares the production for

the defendant. This way, the Trustee's vendor can keep track of where these documents go and

the parties can track which specific documents have been produced in any particular case. *Id.*

As the above demonstrates, the Trustee has made significant efforts to not only make this

massive trove of evidence available to all litigants, as contemplated by the Court's order, but also

to ensure that the litigants understand what is in E-Data Room 1, where specific information in

E-Data Room 1 is located, and how that information can most efficiently be accessed.

### C.    Defendants' Failure to Access E-Data Room 1 in This Case

The Trustee's records show that defense counsel has not executed the required LPO

Undertaking and the E-Data Room 1 NDA  for the *Wilenitz* adversary proceeding, and therefore

she has not received credentials to search E-Data Room 1 in this case. Jacobs Decl. at ¶ 28. As

noted above, the Court Order establishing E-Data Room 1 contemplates access on a case-by-case

basis so that productions can be tracked in each case. *Id.* The vast majority of documents

relevant to the fraud, including documents concerning BLMIS' operations, are in E-Data Room

1. *Id.* For example, in Request No. 13, Defendants requested a list of BLMIS Proprietary

Trading employees, which is in E-Data Room 1. However, counsel for the Defendant refused to

access E-Data Room 1 to review and request production of the document. As a courtesy and

without waiving any objections, the Trustee produced an additional copy of the document, in

addition to others also in E-Data Room 1. *Id.*; *see* Jacobs Decl. Ex. A. Defendants did not move

to compel a response to Request No. 13. Jacobs Decl. at ¶ 28. Had defense counsel executed the

E-Data Room 1 NDA, accessed E-Data Room 1, and reviewed those documents, significant time

and expense incurred by the Trustee duplicating efforts could have been avoided. *Id.*

## PROCEDURAL HISTORY

The Trustee filed a complaint (the "Complaint") in 2010 against Trust U/Art Fourt O/W/O Israel Wilenitz, Sara Seims, and Evelyn Berezin Wilenitz (collectively, "Defendants") to recover avoidable transfers made by BLMIS to Defendants. (ECF No. 1.) Prior to the filing of the Complaint on June 24, 2009, Ms. Wilenitz submitted two separate customer claims to the Trustee, one for her personal BLMIS account and one for the BLMIS account held for the Trust of Israel Wilenitz, of which Ms. Wilenitz was the beneficiary and trustee. *See* Jacobs Decl. Ex. I. In each of her customer claims, Ms. Wilenitz stated that her personal bank records reflecting the withdrawals "agree with the Madoff accounts." *Id.*

On November 1, 2013, Defendants joined in the filing of an omnibus motion to dismiss, which pertained to multiple avoidance actions, including the instant action. On June 2, 2015, this Court issued its Memorandum Decision Regarding Omnibus Motions to Dismiss (the "Omnibus Decision"), and on July 16, 2015, entered an order dismissing the subsequent transfer claims and denying the motion to dismiss in all other respects. (ECF No. 39.) The Court also dismissed Defendants' affirmative defense (the "Dismissed Defense"), as follows: "Accordingly, the motions to dismiss based on the Trustee's lack of authority under SIPA § 78fff-2(c) to avoid and/or recover fraudulently transferred customer property are denied." Omnibus Decision, at 17.

On September 16, 2015, Defendants filed their answer to the complaint. (ECF No. 40.) On December 21, 2015, the Trustee served his written initial disclosures (the "Initial Disclosures"). The Trustee served the Initial Disclosure Production consisting of 4,835 pages of account-specific documents, including customer account statements and reports, correspondence between Defendants and BLMIS, and BLMIS bank records supporting the transfers alleged in the Complaint. The Trustee also provided the appendices referenced above. *See* Jacobs Decl.

16

Ex. B.  In addition, the Trustee offered Defendants access to E-Data Room 1 upon execution of the E-Data Room 1 NDA.

In February 2016, Chaitman LLP served interrogatories on the Trustee in three other similar adversary proceedings that included requests regarding the Trustee's compensation.  On March 18, 2016, this Court entered a protective order in those three cases stating that "Defendants are prohibited from serving or pursuing any discovery relating to the compensation, fees, or payments that the Trustee receives from his law firm, or any agreements or arrangement relating thereto" (the "March 18, 2016 Order").[7]  Chaitman LLP filed a motion to appeal to the District Court, which was denied on July 14, 2016 after a full briefing and oral argument.

On March 8, 2016, Defendants served the Requests.[8]  In separate correspondence with the Trustee's counsel, defense counsel advised that she intended to serve the same discovery in approximately 80 additional cases.  The Trustee, by letter dated March 22, 2016, requested that Defendants withdraw the objectionable discovery, but the parties were unable to reach a resolution.  On April 8, 2016, the Trustee served his responses and objections to the Requests. *Id.* Ex. A.

The Trustee wrote to this Court on April 6, 2016 regarding Defendants' objectionable discovery and a possible motion for a protective order.  (ECF No. 63.)  Defense counsel wrote to this Court on May 2, 2016 and requested a discovery conference and permission to file a motion

---

[7] Order Implementing Court's March 17, 2016 Bench Ruling Granting Protective Order, *Picard v. Dusek*, 10-04644 (SMB), ECF No. 50; *Picard v. Carol Nelson*, 10-04658 (SMB), ECF No. 51; and *Picard v. Carol Nelson, et al.*, 10-04377 (SMB), ECF No. 49.

[8] The Requests are numbered 1-18 but one request (listed between Request No. 7 and No. 8) was unnumbered in an apparent oversight.  Therefore, the Requests include 19 distinct requests. The Trustee seeks a protective order from all the individual requests in the Requests, even though he previously responded to Request Nos. 13 and 17, which asks for the identification of BLMIS employees who worked in the market-making and proprietary trading businesses as of January 1, 2008, by identifying the underlying documents that answer this question and were previously made available in E-Data Room 1.  *See* Jacobs Decl. Ex. A.

to compel the Trustee to compel discovery responses.  (ECF No. 64.)  The Trustee responded on

May 4, 2016 and asked to move forward with his motion for a protective order.  (ECF No. 65.)

On May 9, 2016, this Court scheduled a hearing for May 17, 2016.  During that hearing, the

Court reviewed each and every Request, but noted that Defendants were permitted to file a

motion to compel, which was filed several months later on August 28, 2016.

More than a month prior to filing the Motion, Defendants attempted to serve the Trustee

with discovery requests that purportedly related to 84 cases.  By defense counsel's own

admission, the discovery requests included 17 out of the 19 requests that were originally served

in *Wilenitz* and were the subject of the May 17, 2016 hearing.  The new set of Requests omitted

the two specific requests that related to the Trustee's compensation (and were prohibited by the

March 18, 2016 Order), but substituted in their place two new Requests (Nos. 11 and 12) related

to BLMIS's purported purchase of real securities on behalf of his Investment Advisory

customers, including a request for all underlying documents and a list of individuals with whom

the Trustee spoke on this issue and the substance of those discussions.

At a hearing on September 28, 2016 (the "September 28 Hearing"), the Court permitted a

single motion to proceed on the new set of Requests in the *Wilenitz* case only.  The Trustee's

opposition to the Motion is therefore tailored to the specific facts and procedural history of the

*Wilenitz* case only.  Notwithstanding that Request Nos. 11 and 12 were not served in *Wilenitz*,

the Trustee addresses these Requests below for purposes of efficiently obtaining an order

confirming his objections to these Requests.

## ARGUMENT

**I.**    **THE DISCOVERY SERVED IS BURDENSOME AND NOT PROPORTIONATE TO THE NEEDS OF THE CASE**

Given the enormous volume of well-organized data the Trustee has already produced in this adversary proceeding, and the complete absence of good cause for additional discovery, the Motion should be denied in its entirety.  Rule 26(b)(1) limits the scope of discovery to what is "relevant to any party's claims or defenses and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  In assessing relevance, the proportionality analysis as set forth in the Rule as amended in December 2015, specifically requires the Court to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id.*

In instances where, as here, a litigant abuses their right to discovery, Rule 26(b)(2)(C) further states that:  "the court <u>must</u> limit the frequency or extent of discovery . . . if . . . (i) the discovery sought is unreasonably cumulative or duplicative . . . (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."  Fed. R. Civ. P. 26(b)(2)(C) (emphasis added).

**A.**    **Defendants Should Not Be Permitted to Ignore the Millions of Documents the Trustee Has Made Available in Pursuit of Speculative Theories and Unsubstantiated Defenses**

Appearing to ignore the discovery already produced to them, Defendants served a number of Requests demanding that the Trustee manipulate certain information in a manner that would support their speculative defenses or theories of the case.  However, the vast majority of materials relevant to this topic have already been made available in E-Data Room 1, and thus the

Defendants can conduct their own inquiry pursuant to Fed. R. Civ. P. 33(d). Specifically,

Request Nos. 11 and 15-18 read as follows:

> 11. For each year of Madoff's operation, state all facts on which you base your position that Madoff did not purchase securities for his investment advisory customers and produce the documents on which you base your position.

> 15. Explain how you intend to establish that Madoff was insolvent in each year from 1960 – 2000 and produce all documents on which you will rely to establish insolvency for each of those years.

> 16. Provide the gross trading volume by both number of shares traded and total dollar volume for each year of Madoff's operation, broken down by (a) investment advisory business (b) proprietary trading business; and (c) market making business. Produce the documents on which you base your responses.

> 17. Provide the number of employees who worked in each of the trading areas set forth in interrogatory # 17 [sic] for each year of Madoff's operations and produce the documents on which you base your responses.

> 18. For each security listed on the Defendants' account statements for each year from 1982 on, set forth the number of shares of the listed companies' stock that BLMIS held at that time; and, if the stock was specified as belonging to a particular customer, specify the customer and the number of shares shown on BLMIS' records as being owned by that customer. Produce the documents on which you base your responses.

These requests are part of defense counsel's repeated speculation—apparently fueled by

nothing more than the bald assertions of the fraudster himself—that the Trustee should not be

entitled to the Ponzi presumption. Rather than examining or testing the Trustee's position on

fraud and insolvency by reviewing the documents in E-Data Room 1 or challenging any portions

of Mr. Dubinsky's analysis, defense counsel simply asserts and repeats her rote and

unsubstantiated talking points in conclusory fashion—without a shred of any evidence

whatsoever—that the Proprietary Trading Business traded for the benefit of the Investment

Advisory customers. As described in greater detail above, the answers Defendants seek can be

found in E-Data Room 1—the contents of which have been explained and re-explained to

defense counsel numerous times.

If Defendants intend to challenge BLMIS's fraud, then they alone bear the responsibility

for raising a challenge in good faith and basing it on something more than conjecture. *See S.E.C.*

*v. Mgmt. Sols., Inc.*, No. 11 Civ. 01165 (BSJ), 2013 WL 4501088, at *21 (D. Utah Aug. 22,

2013) (parties properly contested that debtor was a Ponzi scheme with detailed analyses of

business operations). And because the Trustee has already made the underlying documentation

available in an organized and searchable electronic data room, Defendants have access to the

documents necessary to undertake their own investigation to support their own defenses and

formulate their own litigation strategy, and should be required to do so. *See* Hr'g Tr. 69:6-8

("**THE COURT:** . . . [Y]ou [Ms. Chaitman] want the Trustee to do this for you, but you're

going to have to do this yourself if this stuff is available.").

"Reasonably calculated to lead to the discovery of admissible evidence" is not (and never

has been) the standard governing discovery in federal litigation. Fed. R. Civ. P. 26(b)(1). To be

viable, discovery must be relevant *and* "proportionate" to the needs of the case. *Id.* (emphasis

added). The Trustee and his experts have undertaken an enormous effort to analyze evidence in

determining the nature and scope of BLMIS's fraud. The Trustee has produced or made

available over four million documents, which constitutes the foundation of that analysis. Given

proportionality considerations that drove the December 1, 2015 amendments to Fed. R. Civ. P.

26, Defendants should—at a minimum—be required to make a good faith showing that more

discovery is necessary prior to being allowed to pursue even a single additional request. *See*

*Santiago v. Rivka, Inc.*, No. 15CV9184, 2016 WL 4530898, at *1 (S.D.N.Y. May 26, 2016)

(adversary "need not respond" to discovery requests until party seeking the discovery "can show

that such discovery is proportionate to the needs of this action.") (citing Fed. R. Civ. P. 26(b)(1)).

### B.    The Trustee is Not Required to Conduct Defendants' Investigation For Them

Like Request Nos. 11 and 15-18 recited above, Request Nos. 4 and 14 similarly demand

narratives on topics in which Defendants already have all of the materials necessary to conduct

their own investigation.  The Requests read as follows:

> 4.  List every single "PW" entry on a customer statement where
> there is no documentary evidence that the customer requested to
> receive profit withdrawals and produce all documents relating
> thereto.
>
> 14.    Explain the basis on which you determined that the
> Defendants have no net equity and produce the front and back of
> each [check] deposited into and withdrawal from the Account and
> from any account which transferred funds into the Defendants'
> account.

With respect to Request No. 14, the basis for the Trustee's net equity calculation is

already set forth in detail in Exhibit B to the Complaint, which includes a table listing every

alleged transaction relevant to the account, including any inter-account transfers.  *See* ECF. No.

1.  In addition, Defendants have in their possession the Trustee's Initial Disclosure Production,

which includes all of the relevant core account documents and bank transfer documents

necessary for them to conduct their own calculation.  In addition, in both of her customer claim

submissions, Ms. Wilenitz stated that her personal bank records reflecting the withdrawals

"agree with the Madoff accounts."

The answer to Request No. 4 can similarly be determined by analyzing the Initial

Disclosure Documents the Trustee has already produced to Defendants.[9]  As this Court stated at

---

[9] As the Court is aware, profit withdrawal transactions are the subject of a separate proceeding initiated by one of
defense counsel's other clients, and the parties have engaged in extensive discovery and briefing in that matter.  In
fact, defense counsel has served and received voluminous discovery, participated in several depositions, received
expert reports, and the parties are currently preparing for trial.  *See* Order Amending Schedule of Litigation of Profit

the May 17 Hearing, the Trustee cannot be compelled to do Defendants' work for them.  *See* Hr'g Tr. 23:19-22 ("**THE COURT:** [T]he Trustee's not going to do your work."  **MS. CHAITMAN:** I'm not asking the Trustee --.  **THE COURT:** Well, but you are.").  The four million documents in E-Data Room 1 are the same documents that the Trustee would use to respond to these objectionable discovery requests.  This Court entered an order establishing E-Data Room 1 for the express purpose of making large volumes of potentially relevant material readily available to all parties in an organized fashion, while at the same time easing the Trustee's production burden of such a large volume of potentially relevant data.  *See* Procedures Order, Section 4.C.

Both the Federal Rules and applicable cases are clear that a party is not required to do investigatory work for a counterparty.  *See, e.g., Chiperas v. Rubin*, No. 96 Civ. 00130 (TPJ) (JMF), 1998 WL 531845, at *1 (D.D.C. Aug. 24, 1998) ("[Plaintiff] is not required to do all the investigatory work for defendant").  Fed. R. Civ. P. 33(d)(2) provides, "if the burden of deriving or ascertaining the answer [to an interrogatory] will be substantially the same for either party, the responding party may answer by . . . giving the interrogating party a reasonable opportunity to examine and audit the records."  By creating and maintaining E-Data Room 1—which involved an enormous amount of time and effort on the part of the Trustee, his counsel, and his consultants—the Trustee has provided all defendants in these adversary proceedings with this opportunity.  As such, Defendants "should realize that the answer to [their] interrogatory can be determined by examining the parties' business records."  *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 29 (D. D.C. 2012) (finding defendant would have to conduct its own

---

Withdrawal Issue, Case No. 08-01789, ECF. No. 13038.  As the Court has noted, that trial will resolve any dispute to how the Trustee treats PW transactions for the entirety of the liquidation.  *See* Tr. of Sept. 28, 2016 Hr'g at 16:16-18 ("It's being dealt with separately.  And there's no point – the whole point of these omnibus procedures is not to interject it separately in every case.")

investigation of the records to identify the disputed charges at issue—even where plaintiff

already had the information readily available—because both parties had the same opportunity to

review the records); *see also Mackey v. IBP, Inc.*, 167 F.R.D. 186, 203 (D. Kan. 1996)

(defendant not required to answer interrogatory because doing so "would entail manual analysis

of thousands of employee personnel files" and create an "undue burden," but was required to

produce the personnel files upon which plaintiff may "undertake the analysis herself").

As described in detail above, the Trustee agrees with Defendants' statement that "[t]he

purpose of discovery is to exchange relevant information as inexpensively and openly as

possible." Motion at 13. This is precisely why the Trustee sought and obtained permission to

make nearly four million records—the primary foundation for all of his experts' analysis—

available in an electronic data room. The Trustee should not be penalized for Defendants'

ongoing refusal to review and analyze the materials that have been made available to them.

Accordingly, because Defendants and their counsel already have in their possession all of the

materials necessary to facilitate their own investigation into the subject matters of the Requests,

the Court should deny the Motion with respect to Request Nos. 4, 11 and 14-18 in their entirety.

Moreover, while Request Nos. 11 and 14-15 improperly seek to compel the Trustee to

conduct an investigation on behalf of Defendants, they also seek expert analysis that is premature

under the operative case management order. Though the Trustee has already produced

documents that his experts have considered in connection with their opinions (and will

supplement those productions should other documents become relevant), the Trustee intends to

support the foundations of his claims, including the net-equity calculations and the transfers,

through his experts. The Trustee is not obligated to prematurely provide his testifying experts'

analyses, which is precisely what these Requests seek. *See Williams v. Dow Chem. Co.*, No. 01

Civ. 4307 (PKC), 2004 WL 1348932, at *19 (S.D.N.Y. June 16, 2004) ("[It is] premature to

expect an interrogatory response to reflect expert views . . . when expert discovery is not yet

under way."); *see also* Hr'g Tr. 53:18-19 ("THE COURT: [S]ome of this may be relevant but

premature.").

### C.    Rule 26 Does Not Permit Fishing Expeditions

Without limiting their inquiry to the accounts and issues relevant to this case, Defendants

are on a fishing expedition for typos or inconsistencies across all of BLMIS's books and records

by serving the following Requests:

> 2. With respect to Madoff's and BLMIS' books and records, list every single factual error you found in those books and records including, without limitation, inconsistencies between the deposits and withdrawals shown on the customer statements and the cancelled checks and copies of cancelled checks in the Trustee's possession.

> 3.  List every single factual error asserted by any Madoff or BLMIS customer in their statements and produce all documents relating to such error.

> 5. If you contend that Madoff's and BLMIS' customer statements were not "riddled with fraud" with respect to the deposits and withdrawals, produce all reports and documents on which you base that conclusion.

As the Trustee has stated in his responses, no "factual errors" have been identified with

respect to the Defendants' BLMIS deposits and withdrawals. There is no evidence that

Defendants ever raised any errors with BLMIS, and indeed, Ms. Wilenitz stated that her personal

bank records reflecting the withdrawals "agree with the Madoff accounts." *See* Jacobs Decl. Ex.

I. Any potential errors in the BLMIS records of <u>other</u> customers—to the extent that they exist—

are completely irrelevant.

Defendants state, "While we are certain that the evidence proving errors in Madoff's

records are not in the E-Data Room 1, even if such evidence is there, the Trustee has an

obligation to produce that evidence." (Motion at 18.) It is unclear how Defendants can be so

"certain" without having done their own investigation. In any event, the Trustee cannot be

compelled to conduct Defendants' investigation based on Defendants' speculation and hope.

The Court has already noted that Requests Nos. 2 and 3 assume the existence of such errors and

such assumptions are merely "speculative." *See* Hr'g Tr. 34:12-14 ("**MS. CHAITMAN:**

[T]here may be a whole body of evidence which disproves the expert's conclusions. **THE**

**COURT:** That's speculative."). Moreover, even if such errors do exist, Defendants are free to

ascertain them from the documents already produced to them, including those located in E-Data

Room 1 per the Court's authorization. The Trustee cannot be compelled to create evidence. As

this Court stated, the Trustee cannot do the Defendants' work for them and "he can only produce

what he has." Hr'g Tr. 54:9-10.

This Court has previously agreed with the Trustee's position with respect to information

regarding other customers. The Court stated that Requests Nos. 2 and 3 are irrelevant,

disproportionate to the needs of the case, and seek information that Defendants may themselves

identify through their own investigation of the documents that the Trustee has already spent

significant time and money to produce to them in an organized, searchable fashion. *See* Hr'g Tr.

32:12-14 ("**THE COURT:** …I think Number 2 is irrelevant and goes beyond the proportionality

standards."); Hr'g Tr. 33:20-23 ("**THE COURT:** Three, again, it's the same thing -- it's errors

in other persons' accounts. And it sounds to me that at the end of the day, the Trustee has

produced all this information anyway. So you can do the same analysis, can't you?"); Hr'g Tr.

27:21-25 ("**THE COURT:** Ms. Chaitman, I hear what you're saying but I'm saying that unless

the mistakes are in the account of the particular adversary proceeding at issue, the fact that there

are mistakes in other accounts or other records doesn't matter.").

Even though purported factual "errors" are not at issue here and the Requests are overbroad, Defendants are nonetheless free to expend her own resources to conduct this analysis because they have all of the materials necessary to do so. As described above, the DATA folder in E-Data Room 1 has customer statements and ledgers across BLMIS accounts, and the FINANCIALS folder contains BLMIS bank records.

Defendants' Request No. 5 is similarly not restricted to the BLMIS records relevant to this action, and in any event, neither the Trustee nor the Court can even reasonably determine what is meant by "not riddled with fraud." *See* Hr'g Tr. 39:14-16 ("**MR. JACOBS:** [Request Number 5] is just nonsensical…how do I even respond to this? **THE COURT:** I agree.") In any event, the request itself is unintelligible and the Trustee cannot follow Defendants' argument on how any of these requests even relate to the issue of admissibility of BLMIS's books and records, which is not presently an issue before the Court. *See* Motion at 10, 16-17.

As noted above, Rule 26 was recently amended to further highlight the driving principle of proportionality. *See* Fed. R. Civ. P. 26(b)(1); Advisory Committee notes to the 1983 amendments of Rule 26(b)(1) ("The objective [of Rule 26(b)(1)] is to guard against redundant or disproportionate discovery . . . . [It] is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse."); *see, e.g., Rosanna Mayo-Coleman v. Am. Sugar Holding, Inc.*, 2016 WL 4533564, at *5, No. 14-CV-0079 (S.D.N.Y. Aug. 9, 2016) ("record does not establish that all this information is relevant to the parties claims or defenses and proportional to the needs of the case").

Request Nos. 2, 3, and 5 reflect precisely the sort of discovery abuse that Rule 26's proportionality standards are designed to prevent, and thus the Motion should be denied.

## II.    THE TRUSTEE'S WORK PRODUCT IS NOT DISCOVERABLE

The Motion seeks discovery into the Trustee's investigation of BLMIS that is both

irrelevant and protected by the work product doctrine.  Request Nos. 1 and 12 read as follows:

> 1.    List the name and address of every former BLMIS
> employee with whom you spoke about the meaning of entries on
> the customer statements and state the substance of what you
> questioned each person about and what that person told you.
> Produce all documents you reviewed with each such employee and
> all documents indicating what each person said.
>
> 12.    With respect to your answer to Interrogatory No. 11, list all
> individuals with whom you spoke concerning this issue, explaining
> the specific facts each such person provided and produce all
> documents obtained from each such person.

As this Court noted during the May 17 Hearing, Request No. 1 seeks information

protected by the work product doctrine, as it implicates discovery on the Trustee's post-filing

strategy, analysis, and processes in connection with the BLMIS liquidation.  *See* Hr'g Tr. 32:4-5

("**THE COURT:** I agree that Number 1 sounds like it's work product[.]").  Similarly, Request

No. 11 purports to demand a narrative of all information obtained through interviews of anyone

the Trustee spoke to concerning his determination that no securities were traded in connection

with BLMIS's IA business segment.  Discovery on such matters is prohibited in this jurisdiction.

*See, e.g., In re John Doe Corp.*, 675 F. 2d 482, 493 (2d Cir. 1982) (mental processes and legal

theories of the interviewing attorney are entitled to the "greatest protection available under the

work product immunity"); *In re Suprema Specialties, Inc.*, No. 02-10823 (JMP), 2007 WL

1964852, at *1 (Bankr. S.D.N.Y. July 2, 2007) (Trustee could not be compelled to produce

report prepared in investigating debtor's fraud because it includes notes of employee interviews

that is protected by work product privilege).

Defendants' argument that the Trustee has somehow waived his privilege and work

product objections by not producing a privilege log, even where he clearly made such objections,

is misplaced.  As an initial matter, the Trustee has been clear in his discovery responses for several years that he does not assert work product or privilege over BLMIS records and therefore does not withhold any on that basis.  Accordingly, there is no log to be produced regarding any discovery of BLMIS's books and records predating the revelation of the fraud on December 11, 2008.  More importantly, the discovery sought must be "<u>otherwise discoverable</u>" before any privilege log is even required.  *See* Fed. R. Civ. Pro. 26(b)(5).  Here, the Requests specifically target the Trustee's post-December 2008 investigation and are therefore not seeking any information that is "otherwise discoverable."  Indeed, it would be grossly improper to force the Trustee to log materials that are responsive to a Request that the Court has found on its face to be objectionable by virtue of the fact it specifically seeks materials that are irrelevant or otherwise shielded from discovery.  *Id.*

Moreover, ordering the Trustee to prepare a traditional privilege log under the circumstances of this case defies the common sense approach encouraged under the Committee Note to S.D.N.Y. Local Rule 26.2.[10]  Given the nature of this case, where the Trustee has no personal knowledge of BLMIS's fraud, virtually every document prepared by the Trustee and/or his counsel after December 11, 2008 is protected by the work product doctrine.  Under Defendants' logic, the Trustee would be compelled to generate a privilege log listing every document created by the Trustee and/or his counsel in response to a general request regarding anything related to BLMIS.  That is untenable, impractical and unduly burdensome.  *See Capitol Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 51 (S.D.N.Y. 2009) (in considering burden,

---

[10] "With the advent of electronic discovery and the proliferation of e-mails and e-mail chains, traditional document-by-document privilege logs may be extremely expensive to prepare, and not really informative to opposing counsel and the Court. There is a growing literature in decisions, law reviews, and other publications about the need to handle privilege claims in new and more efficient ways.  The Committee wishes to encourage parties to cooperate with each other in developing efficient ways to communicate the information required by Local Civil Rule 26.2 without the need for a traditional privilege log."

party was not required to record work product documents on privilege log because "by the time th[e] action was filed" the focus "shift[ed] from the acts giving rise to the claims to the prosecution or defense of the lawsuit"); *Wilson v. City of New York*, No. 06-Civ.-229 ARR VVP, 2008 WL 824284, at *1 (E.D.N.Y. Mar. 26, 2008) (noting that there is "legitimate uncertainty about whether such documents [prepared by counsel after litigation commenced] must be identified on a privilege log."); *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 139 n.22 (3d Cir. 2009) ("We underscore that a privilege log may not be required for communications with counsel that take place after the filing of a law suit.") (citing James W. Quinn, Mindy J. Spector & John P. Mastando III, Responding to Document Requests, 2 Bus. & Com. Litig. Fed. Cts. § 21:41 (Robert L. Haig, ed., 2d ed. 2006)).

For these reasons, the Motion should be denied with respect to Request Nos. 1 and 11.

## III.    THE REQUESTS SEEK DISCOVERY THAT IS NOT RELEVANT TO THIS CASE

Apart from being unduly burdensome, the following Requests, all of which relate to the status of other customers' claims, have no bearing on any legitimate defense in the case:

> 6.    As of the date you respond to these interrogatories, list every customer whose allowed claim has not been paid in full and state the amount of that customer's allowed claim and the amount that customer has received to date. Produce all documents from which you derived your answer. If you take the position that you cannot reveal the names of the account holders, list the accounts by account number and indicate whether the account is (a) an individual; (b) a hedge fund; (c) a family investment fund; (d) an IRA account; or some other category.

> 7.    With respect to your most recent distribution to allowed claimants, how much did you distribute in total and how much did you distribute to each allowed claimant. Produce all documents evidencing the distribution schedule including a list of the amount paid to each claimant, showing the name of each claimant. If you take the position that you cannot reveal the names of the account holders, list the accounts by account number and indicate whether

the account is (a) an individual; (b) a hedge fund; (c) a family investment fund; (d) an IRA account; or some other category.

8.      List the name of every customer who sold an allowed claim to a claims purchaser, the amount paid to the customer by the claims purchaser, the allowed amount of the claim, and the date of the purchase. Produce all documents from which you derived your answer.

9.      List every claims purchaser to whom you have made payment and state the amount, to date, that you have paid each claims purchaser.

Not only are these requests irrelevant on their face, Defendants also admit that they are primarily serving them in an attempt to re-litigate the Trustee's methodology of calculating "net equity."  Motion at 21.  The Trustee's "net equity" methodology has been unequivocally affirmed by the Second Circuit and has been settled law since the Supreme Court's denial of *certiorari* in 2011.  *Velvel v. Picard*, 133 S. Ct. 25 (2012); *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "*Net Equity Decision*").  Accordingly, defense counsel's assertion that she intends to re-open that litigation is nothing short of preposterous.  *See* Hr'g Tr. 40:21-24 ("**THE COURT:** Well, you're not going to use this adversary proceeding to create a record to go back and seek . . . [] some sort of reconsideration --.").

Defendants misleadingly quote the Net Equity Decision to argue that net equity could be calculated differently in each BLMIS adversary proceeding because they involve "differing fact patterns."  Motion at 21-22.  In fact, the "differing fact pattern" language used in the Net Equity Decision referred to an entirely separate case involving a separate brokerage firm.  Net Equity Decision at 242.  The Second Circuit clearly affirmed the Trustee's consistent application of his net equity methodology to all BLMIS-related avoidance actions.  *Id.* at 242 ("[T]he BLMIS customer statements reflect impossible transactions and the Trustee is not obligated to step into the shoes of the defrauder or treat the customer statements as reflections of reality.").

31

As this Court has observed,[11] Defendants also appear to seek the claims-related

information above solely in furtherance of the following Dismissed Defense asserted in their

Answer:  "The claims are not ripe because they do not meet the conditions of section 78fff-

2(c)(3) of SIPA.  The Trustee has not established that there is a shortfall in customer property."

*See* Answer, at 21 (ECF No. 40).  Defendants seek this information to support a Dismissed

Defense that this Court has stated is premised upon an argument that is "patently wrong."

Omnibus Decision at 15.[12]

Given the Court's Omnibus Decision, "[a]ny discovery intended to prove this invalid

defense is not relevant to the pending [fraudulent transfer] action against [transferees]."  *In re*

*Candor Diamond Corp.*, 26 B.R. 847, 849 (Bankr. S.D.N.Y. 1983) (granting protective order

prohibiting transferee from seeking discovery on matters the transferee sought to support its

affirmative defense because such information was irrelevant to the preferential transfers at issue);

*see also Quality Edge, Inc. v. Rollex Corp.*, No. 10 Civ. 00278 (JTN), 2015 WL 4392980, at *4

(W.D. Mich. July 15, 2015) (defendant's motion to "engage in discovery to advance its defenses

[was] properly denied" because the court had deemed such affirmative defenses invalid); *In re*

*Fontaine*, 402 F. Supp. 1219, 1221 (E.D.N.Y. 1975) (debtor not allowed to seek documents to

support an asserted defense where doing so would have constituted "permi[ssion] to roam in

shadow zones of relevancy and to explore a matter which does not presently appear germane on

the theory that it might conceivably become so") (quoting *In re Surety Ass'n of Am.*, 388 F.2d

---

[11] Hr'g Tr. 44:2 ("**MR. JACOBS:** I do believe that these are seeking discovery and furtherance of the standing issue that this court rejected in omnibus decisions on the motions to dismiss.  **THE COURT:** Well, that's what I thought.")

[12] As this Court noted at the May 17, 2016 Hearing, "even the Second Circuit agreed that it looked like the estate was insolvent."  Hr'g Tr. 44:25 to 45:1.  Moreover, this Court had already determined in another similar BLMIS proceeding that "the customer property was 'insufficient' within the meaning of SIPA § 78fff-2(c)(3)."  Post-Trial Proposed Findings of Fact and Conclusions of Law at 10, *Picard v. Andrew H. Cohen*, Adv. Pro. No. 10-04311 (SMB) (Bankr. S.D.N.Y. Apr. 25, 2016) (ECF No. 90).

412, 414 (2d Cir. 1967)); *United States v. Rashed*, 83 F. Supp. 2d 96, 97 (D.D.C. 1999), *aff'd*,

234 F.3d 1280 (D.C. Cir. 2000) (defendant not entitled to discovery to support his "invalid

defense"); *KFC Corp. v. Kazi*, No. 12-Civ-564 (JGH), 2014 WL 4914427, at *4 (W.D. Ky. Sept.

30, 2014) (denying discovery on issues related to defendant's affirmative defenses because "[t]he

bankruptcy court has already considered these affirmative defenses and found them wanting").

       As such, the Motion should be denied with respect to Request Nos. 6-9.

## IV.     THE TRUSTEE'S MOTION FOR A PROTECTIVE ORDER SHOULD BE GRANTED

       To the extent the Court denies Defendants' Motion, the Court should also grant the

Trustee's Motion for a Protective Order prohibiting the service of identical discovery in any

other adversary proceeding in which Chaitman LLP is counsel of record.  Under Rule

37(a)(5)(B), "[i]f the motion [to compel] is denied, the court may issue any protective order

authorized under Rule 26(c)[.]"  Under Rule 26(c), a protective order is appropriate "to protect a

party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]"

For the reasons stated above, all eighteen requests at issue are disproportionate to the needs of

the case and responding to them would cause undue burden and expense.  Thus, to the extent the

motion to compel is denied with respect to any request in the instant case, the Trustee moves for

a protective order prohibiting service of such requests or further motion practice relating to such

requests in any other case in which Chaitman LLP serves as defense counsel.  *See In re J.T.*

*Moran Fin. Corp.*, 145 B.R. 182, 184 (Bankr. S.D.N.Y. 1992) (granting protective order under

Fed R. Bankr. P. 7026(c) to prevent "undue burden and expense").  This Motion should be

granted in full.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny

Defendants' Motion in its entirety and grant the Trustee's Motion in its entirety.


Dated: October 14, 2016
     New York, NY

**BAKER & HOSTETLER LLP**

By:    */s/ Edward J. Jacobs*
       David J. Sheehan, Esq.
       Email:  dsheehan@bakerlaw.com
       Keith R. Murphy, Esq.
       Email: kmurphy@bakerlaw.com
       Nicholas J. Cremona, Esq.
       Email: ncremona@bakerlaw.com
       Edward J. Jacobs, Esq.
       Email: ejacobs@bakerlaw.com
       45 Rockefeller Plaza
       New York, NY 10111
       Telephone: (212) 589-4200
       Facsimile: (212) 589-4201

       *Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the Estate
of Bernard L. Madoff*