# EXHIBIT B

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT, dated as of October 19, 2016 (together with the Exhibits attached hereto, this "Settlement Agreement"), is made by and among Irving H. Picard, in his capacity as trustee (the "Trustee") under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa *et seq.*,[1] as amended ("SIPA"), for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated Chapter 7 estate of Bernard L. Madoff ("Madoff") on one hand, and (a) The Estate of Stanley Chais; Pamela Chais; Appleby Productions Ltd.; the now-defunct defined contribution plan formerly known as Appleby Productions Ltd. Defined Contribution Plan; the now-defunct money purchase plan formerly known as Appleby Productions Ltd. Money Purchase Plan; the now-defunct profit sharing plan formerly known as Appleby Productions Ltd. Profit Sharing Plan; Chais Investments, Ltd.; Chais 1991 Family Trust (now consisting of the Survivor's Trust under Chais 1991 Family Trust dated September 4, 1991 and the Marital Trust under Chais 1991 Family Trust dated September 4, 1991); and Chais Family Foundation (collectively, the "Stanley Chais Defendants"); and (b) Emily Chasalow; Mark Chais; William Chais; Michael Chasalow; Miri Chais, referred to in the Trustee's Complaint in the below-defined Adversary Proceeding as Mirie Chais; Wrenn Chais; 1994 Trust for the Children of Stanley and Pamela Chais; 1996 Trust for the Children of Stanley and Pamela Chais, referred to in the Trustee's Complaint as The 1996 Trust for the Children of Pamela Chais And Stanley Chais; BLMIS Account 1C1286, sued in the Trustee's Complaint as The 1999 Trust for the Children of Stanley and Pamela Chais; 1999 Trust for the Grandchildren of Stanley and Pamela Chais; Emily Chais 1983 Trust; Emily Chais Trust No. 1, Emily Chais Trust No. 2, and Emily Chais Trust No. 3, referred to collectively in the Trustee's Complaint as The Emily Chais Trust; Emily Chais Issue Trust No. 1 and Emily Chais Issue Trust No. 2, referred to collectively in the Trustee's Complaint as The Emily Chais Issue Trust; Mark Hugh Chais Trust No. 1, Mark Hugh Chais Trust No. 2, and Mark Hugh Chais Trust No. 3, referred to collectively in the Trustee's Complaint as The Mark Hugh Chais Trust; Mark Hugh Chais Issue Trust No. 1 and Mark Hugh Chais Issue Trust No. 2, referred to collectively in the Trustee's Complaint as The Mark Hugh Chais Issue Trust; Mark Hugh Chais 1983 Trust; William Frederick Chais Trust No. 1, William Frederick Chais Trust No. 2, and William Frederick Chais Trust No. 3, referred to collectively in the Trustee's Complaint as The William Frederick Chais Trust; William Frederick Chais Issue Trust No. 1 and William Frederick Chais Issue Trust No. 2, referred to collectively in the Trustee's Complaint as The William F. Chais Issue Trust; William Frederick Chais 1983 Trust; The William and Wrenn Chais 1994 Family Trust; Ari Chais 1999 Trust; Ari Chais Transferee Trust No. 1, referred to in the Trustee's Complaint as The Ari Chais Transferee #1 Trust; Benjamin Paul Chasalow 1999 Trust; Benjamin Paul Chasalow Transferee Trust No. 1, referred to in the Trustee's Complaint as The Benjamin Paul Chasalow Transferee #1 Trust; Chloe Frances Chais 1994 Trust, referred to in the Trustee's Complaint as The Chloe Francis Chais 1994 Trust; Chloe Frances Chais Transferee Trust No. 1, referred to in the Trustee's Complaint as The Chloe Francis Chais Transferee #1 Trust; Jonathan Wolf Chais 1996 Trust, referred to in the Trustee's Complaint as The Jonathan Wolf Chais Trust; Jonathan Chais Transferee Trust No. 1, referred to in the Trustee's Complaint as The Jonathan Chais Transferee #1 Trust; Justin Robert Chasalow 1999 Trust; Justin Robert Chasalow Transferee Trust No. 1, referred to in the Trustee's Complaint as The Justin Robert Chasalow Transferee #1 Trust; Madeline Celia Chais 1992 Trust; Madeline Chais Transferee

---

[1] Citations to sections of SIPA shall hereinafter omit reference to title 15.

Trust No. 1, referred to in the Trustee's Complaint as The Madeline Chais Transferee #1 Trust; Rachel Allison Chasalow 1999 Trust; Rachel Allison Chasalow Transferee Trust No. 1, referred to in the Trustee's Complaint as The Rachel Allison Chasalow Transferee #1 Trust; Tali Chais 1997 Trust; Tali Chais Transferee Trust No. 1, referred to in the Trustee's Complaint as The Tali Chais Transferee #1 Trust; Unicycle Trading Company; Unicycle Corp., individually and as the General Partner of Unicycle Trading Company; the now-defunct money purchase plan formerly known as Unicycle Corporation Money Purchase Plan; Onondaga, Inc., individually and as General Partner of Chais Investments, Ltd.; the now-defunct money purchase plan formerly known as The Onondaga, Inc. Money Purchase Plan; the now-defunct defined benefit pension plan formerly known as The Onondaga, Inc. Defined Benefit Pension Plan; Chais Management, Inc., individually and as General Partner of Chais Management Ltd.; Chais Management Ltd.; and Chais Venture Holdings (collectively, the "Chais Related Defendants" and together with the Stanley Chais Defendants, the "Settling Defendants"), on the other hand (each of the Trustee and the Settling Defendants, a "Party" and collectively the "Parties").

<u>RECITALS</u>

A.    BLMIS and its predecessor were registered broker-dealers and members of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Madoff.  On December 12, 2008, the District Court entered an order that, among other things, appointed a receiver for the assets of BLMIS (No. 08-CV-10791 (LLS)).

C.    On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud.  At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the Office of the United States Attorney for the Southern District of New York and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]" and engaged in fraud in the operation of BLMIS ("Madoff Ponzi Scheme").

D.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application by SIPC.  Thereafter, SIPC filed an application in the District Court under section 78eee(a)(3) of SIPA alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On December 15, 2008, the District Court granted SIPC's application and entered an order, which, in pertinent part, removed the receiver, appointed the Trustee under section 78eee(b)(3) of SIPA, and removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under section 78eee(b)(4) of SIPA, where it is currently pending (No. 08-01789 (SMB)) (the "SIPA Proceeding").  The Trustee is duly qualified to serve and act on behalf of the estate of BLMIS and the Chapter 7 estate of Madoff (collectively, the "Estate") pursuant to the substantive consolidation order of the Bankruptcy Court entered on June 9, 2009.

E.        Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in a case under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") as well as the powers granted pursuant to SIPA. Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code apply to this SIPA proceeding to the extent consistent with SIPA.

F.        Under SIPA, the Trustee is charged with the responsibility to marshal and liquidate the assets of BLMIS for distribution to BLMIS customers and others in accordance with SIPA in satisfaction of allowed claims, including through the recovery of avoidable transfers such as preference payments and fraudulent transfers made by BLMIS.

G.        Some or all of the Settling Defendants were customers of BLMIS and maintained customer accounts, as identified by account number in Exhibit A attached hereto and made a part hereof (collectively the "Chais Accounts").

H.        Between the opening of the Chais Accounts and the Filing Date, the total amounts deposited into the Chais Accounts less the amount of withdrawals that some or all of the Settling Defendants made from the Chais Accounts, as such amounts were calculated by the Trustee, are identified in Exhibit A to this Settlement Agreement.  The amounts withdrawn by some or all of the Settling Defendants from the Chais Accounts within ninety days before the Filing Date, as such amounts were calculated by the Trustee, are identified in Exhibit A to this Settlement Agreement ("90 Day Withdrawals").  The amounts withdrawn by some or all of the Settling Defendants from the Chais Accounts within the two-year period before the Filing Date, as such amounts were calculated by the Trustee, are identified in Exhibit A to this Settlement Agreement ("Two Year Withdrawals").  The amounts withdrawn by some or all of the Settling Defendants from the Chais Accounts within the six-year period before the Filing Date, as such amounts were calculated by the Trustee, are identified in Exhibit A to this Settlement Agreement (the "Six Year Withdrawals"); and the additional amounts withdrawn by some or all of the Settling Defendants from the Chais accounts prior to the six-year period before the Filing Date, as such amounts were calculated by the Trustee, are identified in Exhibit A to this Settlement Agreement (the "Lifetime Withdrawals" and, together with the 90 Day Withdrawals, the Two Year Withdrawals, and the Six Year Withdrawals, collectively, the "Withdrawals").  For the avoidance of doubt, Withdrawals include any transfers between and/or among the Chais Accounts.

I.        Some of the Settling Defendants filed customer claims in the SIPA Proceeding alleging aggregate losses from their respective Chais Accounts (the "SIPA Claims").  The SIPA Claims, including the relevant BLMIS Account Numbers and the Trustee's determination of each claim are identified in Exhibit B attached hereto and made a part hereof.  The SIPA Claims, as filed, assert each of those respective Settling Defendants is entitled to the allowance and distribution of a customer claim in the SIPA Proceeding in an amount reflected on the corresponding Settling Defendants' BLMIS account statements for the period ending November 30, 2008 (the "Last Statement Amounts").  The Trustee has disputed that the Settling Defendants are entitled to allowance of the SIPA Claims.

J.        On March 1, 2010, the Bankruptcy Court, per the late Honorable Burton R. Lifland, United States Bankruptcy Judge, issued an opinion affirming the Trustee's "net equity" calculation of customer claims as the difference between investment into BLMIS and amounts

withdrawn (the "Net Investment Method").  On March 8, 2010, the Bankruptcy Court entered an order implementing the decision and certifying it for immediate appeal to the United States Court of Appeals for the Second Circuit, which on August 16, 2011, upheld the Trustee's use of the Net Investment Method.  On June 25, 2012, the United States Supreme Court upheld the Trustee's methodology denying two petitions for writ of certiorari, and dismissing a third pursuant to a written agreement between the parties and Supreme Court Rule 46.1.

K.     The Trustee commenced an adversary proceeding against the Settling Defendants and other parties in the Bankruptcy Court under the caption *Picard v. Stanley Chais, et al.*, Adv. Pro. No. 09-1172 (SMB) ("Adversary Proceeding").  In the Adversary Proceeding, the Trustee asserts the Settling Defendants are liable to the Estate under 11 U.S.C. §§ 544, 547, 548, 550, and 551, the New York Uniform Fraudulent Conveyance Act (New York Debtor and Creditor Law §§ 270-281), the New York Civil Procedure Law, and section 78fff-2(c)(3) of SIPA, as applicable, for the Withdrawals made by the Settling Defendants from BLMIS (the "Avoidance Power Claims").  Through the Adversary Proceeding, the Trustee alleges that all monies and assets of the Stanley Chais Defendants represent, directly or indirectly, Withdrawals and are recoverable by the Trustee as Avoidance Power Claims.

L.     In addition to the Avoidance Power Claims, the Adversary Proceeding seeks to disallow and/or equitably subordinate SIPA Claims filed by certain Settling Defendants in the SIPA Proceeding.

M.     Following the filing of the Adversary Proceeding, on September 26, 2010, Stanley Chais passed away.

N.     While the Trustee believes that he would prevail at trial in avoiding and recovering all initial transfers from BLMIS to the initial transferees, and recovering all subsequent transfers to other Settling Defendants, he also recognizes that there is, as in any adversary proceeding, litigation risk, risk of collection, and delay in payment associated with his Avoidance Power Claims.

O.     While the Settling Defendants believe they would prevail at trial on defenses they have as to the claims asserted by the Trustee, the Settling Defendants recognize that there is litigation cost and risk associated with the Avoidance Power Claims and have decided to settle with the Trustee prior to engaging in expensive and time-consuming litigation in the Adversary Proceeding.

P.     At the direction of the Bankruptcy Court, the Trustee and the Settling Defendants engaged in multiple mediation conferences with the Honorable James L. Garrity, Jr., at the time retired from the Bankruptcy Court.

Q.     In addition to the Adversary Proceeding, there currently are five actions pending in the Superior Court of the State of California against some or all of the Settling Defendants that seek recovery of funds related to the Madoff Ponzi Scheme: *Bottlebrush Investments, LP v. The Lambeth Company, et al.*, Case No. BC407967; *Leghorn Investments, Ltd. v. Brighton Investments, et al.*, Case No. BC408661; *Heimoff v. Chais, et al., Case No. BC413821; Hall v. Chais, et al.*, Case No. BC413820 (collectively, and including any action that arises out of or is a

successor action to the preceding actions, the "<u>California Private Actions</u>"); and *The People of the State of California v. Chais, et al.*, Case No. BC422257 (the "<u>CAAG Action</u>" and, together with the California Private Actions, the "<u>California Actions</u>").  None of the Chais Related Defendants is a defendant in the CAAG Action.

      R.      On January 4, 2012, the Trustee commenced in the Bankruptcy Court an adversary proceeding captioned *Picard v. Hall, et al.*, Adv. Pro. No. 12-01001 (SMB) (the "<u>Injunction Adversary Proceeding</u>") against the plaintiffs in the California Actions, seeking to enjoin the plaintiffs from prosecuting the California Actions.

      S.      Based on the foregoing, the Trustee and the Settling Defendants wish to settle their disputes about the matters described above without the expense, delay and uncertainty of litigation.  The Settling Defendants are entering into this Settlement Agreement to fully resolve these matters and without any concession of any wrongdoing, fault or liability on the part of any Settling Defendant, any other defendant in the Adversary Proceeding, or Stanley Chais.

      T.      In determining to settle his disputes with the Settling Defendants, which settlement includes releasing claims against the Settling Defendants, the Trustee conducted a comprehensive investigation.  The investigation included the review of all BLMIS-related transaction histories for the Settling Defendants, interviews of witnesses, account statements, correspondence, financial records, other records, Bankruptcy Rule 2004 examinations, and substantial review and analysis of records and documents produced by the Settling Defendants and third parties.  Such diligence has also included a review of the Settling Defendants' abilities to satisfy any judgment that the Trustee may obtain in continued litigation and in settlement thereof.

      U.      The Trustee and the Settling Defendants have engaged in extensive settlement negotiations as well as multiple mediation conferences to attempt to resolve their disputes without the expense, delay and uncertainty of continuing the litigation about the matters described above.

      V.      Through this settlement and consistent with his fiduciary duties to the Estate, the Trustee intends to fully and finally resolve, address, extinguish and otherwise administer the Adversary Proceeding and all of the Avoidance Power Claims, and any and all claims relating to the Settling Defendants' Withdrawals from BLMIS accounts, in exchange for the consideration to be remitted by the Settling Defendants, in full satisfaction of such Avoidance Power Claims and all other Trustee Released Claims (as defined in Section 8, below).

      W.      Simultaneous with the execution of this Settlement Agreement, the Settling Defendants plan to enter into a separate settlement with the Attorney General of the State of California (the "<u>Attorney General</u>") and the Trustee to settle the CAAG Action (the "<u>AG Settlement</u>") upon terms more fully set forth in a separate settlement agreement by and among the Settling Defendants, the Attorney General and, in limited part, the Trustee (the "<u>AG Settlement Agreement</u>").

      X.      Simultaneous with the execution of this Settlement Agreement, the Settling Defendants plan to enter into a separate settlement (the "<u>CP Settlement</u>") with the plaintiffs in

the California Private Actions (the "California Plaintiffs"), upon terms more fully set forth in a separate settlement agreement by and among the Settling Defendants, the California Plaintiffs, and, in limited part, the Trustee (the "CP Settlement Agreement").

**NOW, THEREFORE**, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for other good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, and in full satisfaction of the Adversary Proceeding and Avoidance Power Claims, the Parties agree:

1.      Approval of this Settlement Agreement.  The date of the issuance of an order by the Bankruptcy Court approving (a) this Settlement Agreement, and (b) the Trustee's limited entry into each of the AG Settlement Agreement and the CP Settlement Agreement, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "TSA Approval Order") shall be referred to herein as the "Bankruptcy Court Approval Date."

2.      Payments by the Stanley Chais Defendants; Certain Taxes, Fees and Expenses.

(a)      Within ten (10) Business Days (as defined in Section 17, below) after the Bankruptcy Court Approval Date, the Stanley Chais Defendants shall cause the liquidation into cash of all assets in the following accounts (collectively, the "SCD Controlled Accounts"): (1) Account Nos. XXX-XX714, XXX-XX424, and XXX-XX512 held in the name "Survivor's Trust under Chais 1991 Family Trust UTD 9/4/91" at Sanford C. Bernstein & Co., LLC, a subsidiary of AllianceBernstein L.P.; (2) Account Nos. XXX-XX713, XXX-XX664, XXX-XX423, XXX-XX406, and XXX-XX511 held in the name "Marital Trust under Chais 1991 Family Trust UTD 9/4/91" at Sanford C. Bernstein & Co., LLC, a subsidiary of AllianceBernstein L.P.; (3) checking account no. XXXXXX382 at JP Morgan Chase, in the name of "Chais 1991 Family Trust"; and (4) Portfolio Nos. XXX-XX949-2, XXX-XX706-4, XXX-XX221-6, XXX-XX223-2, XXX-XX225-7, XXX-XX226-5, XXX-XX234-9, and XXX-XX184-4, held in the name "Chais 1991 Family Tr UAD 9/4/91, as amended, Pamela Chais Ttee" at Goldman Sachs & Co. ("Goldman Investment Accounts"), with the exception of those assets in the Goldman Investment Accounts identified in Exhibit C to this Settlement Agreement as Alternative Investments (the "Goldman Alternative Investment Assets").  At Closing (as defined in Section 14(a), below), the Stanley Chais Defendants shall pay by wire transfer to the Trustee the amount equal to the liquidated cash assets described above in this Section 2(a), less any amounts permitted to be paid or reserved pursuant to this Section 2 for taxes, fees and expenses, and provided that the amounts designated in Sections 2(d) and 2(e) herein shall be paid in the manner specified by and as directed by the Trustee for payment under, and consistent with, those Sections in connection with the AG Settlement and CP Settlement. The Trustee hereby consents to the liquidation into cash, at any time following the Execution Date (as defined in Section 13(a) below), of any or all of the assets in the Goldman Investment Accounts, other than the Goldman Alternative Investment Assets.

(b)      Within ten (10) Business Days after the Bankruptcy Court Approval Date, Chais Investments, Ltd. shall commence using reasonable efforts to liquidate, in a manner intended to maximize value, all of its non-liquid assets.  At the Closing, Chais Investments, Ltd. shall transfer to the Trustee all of its liquid assets, with the exception of any liquid assets necessary to meet future capital calls on non-liquid investments.  After the Closing, Chais Investments, Ltd. shall either: (i) turn over to the Trustee any and all distributions and/or proceeds received by Chais Investments, Ltd. from time to time with respect to its non-liquid assets that would otherwise be distributed to any Settling Defendant, less any taxes payable with respect to any such distributions or proceeds (or related allocations) and less any reasonable costs associated with the administration of any such assets; or (ii) sell or otherwise liquidate its interest in any or all of its non-liquid assets and turn over to the Trustee all proceeds received by Chais Investments, Ltd. that would otherwise be distributed to any Settling Defendant, less any taxes payable with respect to any such sale or other liquidation and less any reasonable direct costs incurred in implementing the sale or other liquidation.  It is further agreed that (x) the "reasonable costs associated with the administration" as contemplated by the immediately preceding clause "(i)" shall include (but not be limited to) a fee of up to One Hundred Thousand Dollars ($100,000), and (y) the "reasonable direct costs incurred in implementing the sale or other liquidation" as contemplated by the immediately preceding clause "(ii)" shall include (but not be limited to) a fee of up to One Hundred Thousand Dollars ($100,000).  Any sale or other liquidation of any non-liquid assets of Chais Investments, Ltd. shall be for fair market value by means of arms-length transactions; for the avoidance of doubt, Chais Investments, Ltd. may not sell or otherwise liquidate any of the entity's non-liquid assets to or for the benefit of any other Settling Defendant.  It is further agreed that, on a semi-annual basis if requested by the Trustee, the parties shall discuss and determine whether the assets of Chais Investments, Ltd. should be liquidated or otherwise disposed of.

(c)      At the Closing, one or more of the Stanley Chais Defendants shall cause counsel for the Stanley Chais Defendants to turn over to the Trustee the balance of any retainer or client trust accounts held by said counsel on behalf of any of the Stanley Chais Defendants remaining as of the Closing (the "SCD Retainer Balance"), *provided, however,* that if the Closing occurs before the CPAS Effective Date (as defined in the CP Settlement Agreement), counsel for the Stanley Chais Defendants and any successor counsel shall be entitled to retain a portion of such SCD Retainer Balance equal to the lesser of (i) Five Hundred Thousand Dollars ($500,000) and (ii) the full amount of such SCD Retainer Balance, which shall be applied by the Stanley Chais Defendants solely to pay the legal fees and expenses subsequently incurred by them in defending the California Private Actions and/or enforcing the Permanent Injunction (as defined in Section 6(a), below), and *provided, further,* that any portion of the SCD Retainer Balance remaining upon the final conclusion of the California Private Actions, whether by judicial decision, settlement or otherwise, to the extent not required to pay any outstanding invoices or incurred but as yet unbilled amounts for such legal fees and expenses, shall be thereupon paid to the Trustee.  The SCD Retainer Balance

7

may be applied without limitation to pay the legal fees and expenses incurred prior to the Closing by the Stanley Chais Defendants. However, the SCD Retainer Balance may not be used to make settlement payments required under the AG Settlement Agreement or the CP Settlement Agreement.

(d)     At the Closing, of the amount payable from the cash assets in the SCD Controlled Accounts by the Stanley Chais Defendants under this Settlement Agreement, as directed by the Trustee and consistent with the terms of the AG Settlement Agreement, the amount of Twelve Million Five Hundred Thousand Dollars ($12,500,000) shall be distributed as specified in clause (ii) of Section 14(a) hereof in connection with the AG Settlement Agreement.

(e)     At the Closing, of the amount payable from the cash assets in the SCD Controlled Accounts by the Stanley Chais Defendants under this Settlement Agreement, the amount of Two Million Six Hundred Thousand Dollars ($2,600,000) shall be paid into the CPAS Escrow Account (as defined in the CP Settlement Agreement), which amount shall be further distributed as specified in Section 14(b) hereof.

(f)     The Stanley Chais Defendants expressly represent to the Trustee that they hold no assets other than those referenced in this Settlement Agreement, and receive no income from assets other than those referenced in this Settlement Agreement.

(g)     The provisions of this Section 2 shall survive the Closing.

3.     <u>Transfer of Goldman Alternative Investment Assets by the Stanley Chais Defendants</u>.  Prior to the Closing, the Stanley Chais Defendants shall have taken all steps reasonably necessary to transfer control of the Goldman Alternative Investment Assets to the Trustee at the Closing.

4.     <u>Additional Payments and Transfers by the Settling Defendants to the Trustee</u>.

(a)     At the Closing, each Chais Related Defendant shall cause a wire transfer, by or on behalf of such Chais Related Defendant, to be made to the Trustee in the amount of such Chais Related Defendant's Two Year Withdrawals.  The aggregate of the Two Year Withdrawals referred to in this Section 4(a) is Thirty-Eight Million Six Hundred Seventy-One Thousand Nine Hundred Thirty Dollars ($38,671,930).

(b)     <u>Transfer of Real and Personal Property by the Stanley Chais Defendants</u>. On the Bankruptcy Court Approval Date, the Stanley Chais Defendants shall grant to the Trustee a conditional equitable lien upon all real property and tangible and, to the extent not encompassed by Sections 2 and 3 above, intangible personal property of the Stanley Chais Defendants, *provided, however*, that such lien shall not extend to rights to social security, pension or retirement payments to which Pamela Chais may be entitled.  At the Closing, the Stanley Chais Defendants shall, through, and subject to, the Grant Deed (as defined below in this Section

4(b)) and the Bill Of Sale And General Assignment (as defined below in this Section 4(b)), transfer to the Trustee all title and rights to their real and personal property, excluding any rights to social security, pension or retirement payments to which Pamela Chais may be entitled and excluding any rights in such real and personal property reserved under the Grant Deed or under the Bill Of Sale And General Assignment.  Without limiting the generality of the foregoing, at the Closing, Pamela Chais (in her capacity as the owner of the Real Property, as defined below in this Section 4(b)) shall transfer to the Trustee via a grant deed (with reserved life estate) (the "Grant Deed") all of her right, title and interest in the real property located at ████████████████████ (the "Real Property"), reserving to Pamela Chais (an individual) a life estate in the Real Property.  The Grant Deed will be in the form of Exhibit D attached hereto and made a part of this Settlement Agreement.  At the Closing, Pamela Chais (in her capacity as the owner of the Personal Property, as defined below in this Section 4(b)) shall also execute a bill of sale and general assignment in favor of the Trustee (the "Bill Of Sale And General Assignment"), in the form of Exhibit E attached hereto and made a part of this Settlement Agreement, covering all tangible and intangible personal property that she owns at the time of Closing or which she might own at the time of her death (the "Personal Property"), excluding only (i) current and future rights, and any survivors' or beneficiaries' rights, under any pension or retirement plans, social security payments or other wages or salaries, and (ii) upon the death of Pamela Chais, items of the Personal Property with an aggregate tangible value of up to Seventy Five Thousand Dollars ($75,000) (valued in accordance with the estate tax return filed upon the death of Pamela Chais or in accordance with the items' fair market value, whichever is higher) as may be selected by her lineal descendants.  To the extent that there is any conflict between the preceding summary and the terms of the Grant Deed or of the Bill Of Sale And General Assignment, the terms of the Grant Deed or the Bill of Sale and General Assignment as applicable, shall prevail and shall be binding on the Stanley Chais Defendants who are signatories thereto and the Trustee.

5.    Treatment of SIPA Claims; Claims Against BLMIS General Estate. Notwithstanding anything herein to the contrary, the following customer claims (collectively, the "Customer Claims") shall be allowed pursuant to the TSA Approval Order, as of the Closing, against the Estate pursuant to section 78*lll*(11) of SIPA, equal in priority to other allowed customer claims against the Estate, and shall be treated in a manner set forth in this Section 5:

The Emily Chais 1983 Trust, BLMIS Account 1C1026, Claim Number 005284 and 013848, in the amount of One Million Sixty-Two Thousand Four Hundred Eleven Dollars ($1,062,411);

The Mark Hugh Chais 1983 Trust, BLMIS Account 1C1033, Claim Numbers 005287 and 013850, in the amount of One Million Two Hundred Fifteen Thousand Three Hundred Twenty-Four Dollars ($1,215,324);

The William Frederick Chais 1983 Trust, BLMIS Account 1C1040, Claim Numbers 005289 and 013849, in the amount of One Million Thirty-Six Thousand Four Hundred Forty-Six Dollars ($1,036,446);

The Onondaga, Inc. Defined Benefit Pension Plan, BLMIS Account 1O0020, Claim Numbers 005713 and 013857, in the amount of Four Hundred Ninety-Seven Thousand Six Hundred Twenty-Nine Dollars ($497,629); and

The Unicycle Trading Company, BLMIS Account 1U0021, Claim Numbers 005288 and 013856, in the amount of One Million Sixty-Six Thousand Dollars ($1,066,000).

(a)    The Customer Claims shall total Four Million Eight Hundred Seventy-Seven Thousand Eight Hundred Ten Dollars ($4,877,810). Under no circumstance will the amount of the Customer Claims be increased, decreased or in any manner subordinated to any other allowed customer claim. For the avoidance of doubt, if a court rules that the Trustee's methodology for determining the amount of customer claims is to be modified, there shall not be any increase or decrease in the amount of the Customer Claims. At the Closing, each of the Customer Claims shall be eligible to receive an advance payment pursuant to section 78fff-3 of SIPA.

(b)    At the Closing, the Emily Chais 1983 Trust, The Mark Hugh Chais 1983 Trust, The William Frederick Chais 1983 Trust, The Onondaga, Inc. Defined Benefit Pension Plan, and The Unicycle Trading Company shall assign all rights and title to their respective Customer Claims to the Trustee.

(c)    Settling Defendants reserve their right to assert one or more general estate claims in the event that there is a BLMIS general estate, and Trustee reserves all rights with respect to any such asserted claims.

6.    <u>California Private Actions and Permanent Injunction</u>. As to the California Actions, the Parties agree as follows:

(a)    In conjunction with seeking approval of this Settlement Agreement by the Bankruptcy Court, the Trustee will use his reasonable best efforts to obtain, a final, non-appealable permanent injunction in favor of the Settling Defendants, both collectively and individually (the "<u>Permanent Injunction</u>"), enjoining the continued prosecution of any Trustee Released Claims (as defined in Section 8, below) and any claim that is duplicative or derivative of any such claim. The Trustee will request the court to provide that the Permanent Injunction is enforceable by the Settling Defendants, individually and collectively, and, accordingly, any future issue as to, and any determination limiting in any way, either the scope or the enforceability of the Permanent Injunction in favor of any particular Settling Defendant shall not automatically affect the scope or the enforceability of the Permanent Injunction as to any other Settling Defendant.

(b)    If within the period commencing thirty (30) days after the Bankruptcy Court Approval Date and ending one (1) year after the Restitution Claim Bar Date

(as defined in the AG Settlement Agreement), or during any extension of this period of time as may be agreed upon by the Settling Defendants and the Trustee, the Settling Defendants make a written request in conformity with the supplemental conditions for implementing the provisions of this Section 6(b) separately executed by the Trustee and the Chais Related Defendants, made a part hereof and incorporated herein by this reference, the Trustee shall, within sixty (60) days after receiving such request, seek leave to move for summary judgment, in whole or in part, against The Lambeth Company, The Popham Company, and/or The Brighton Company (the "023 California Limited Partnerships") with respect to avoidance of two year transfers pursuant to sections 547 and 548 of the Bankruptcy Code, 11 U.S.C. §§ 547, 548. To the extent the Bankruptcy Court grants, in whole or in part, such motion for leave to move for summary judgment, the Trustee shall file a motion for summary judgment against the California Limited Partnerships within sixty (60) days after leave is granted. If the Trustee obtains summary judgment, in whole or in part, against the California Limited Partnerships (the "LP Judgment"), then at the Closing, or promptly upon obtaining the LP Judgment if the LP Judgment is obtained after the Closing, the Trustee will assign the LP Judgment to the Chais Related Defendants. The Trustee shall neither enforce the LP Judgment nor assign the LP Judgment to any person other than the Chais Related Defendants. If, despite the Trustee's reasonable best efforts, the LP Judgment cannot be assigned to the Chais Related Defendants, upon the prior written election of the Chais Related Defendants, the Trustee shall take the necessary steps to cause such non-assignable LP Judgment to be null and void.

(c)     The Parties agree that the Trustee obtaining the Permanent Injunction pursuant to Section 6(a) of this Settlement Agreement and the Trustee obtaining leave to move for summary judgment, in whole or in part, pursuant to Section 6(b) of this Settlement Agreement are neither conditions precedent to: (i) the consummation of the Closing; nor (ii) the performance of the other duties and obligations of the Parties provided for in this Settlement Agreement.

(d)     Any Settling Defendant may seek enforcement of the Permanent Injunction.

(e)     Upon the Execution Date (as defined in Section 13(a) below), the effectiveness of the Consent Order Freezing Assets in place in the Adversary Proceeding (ECF No. 33) (the "Consent Order") shall be stayed temporarily to the extent necessary to complete the transfers, transactions and other actions contemplated by this agreement, pending the occurrence of either (i) the Closing, in which event the Consent Order shall terminate and be without further force and effect, or (ii) the Rejection Date or Optional Rejection Date (as each is defined, respectively, in section 7(a) and 7(b) below), in which event the Consent Order shall once again be fully effective.

For the avoidance of doubt, the obligations in this Section 6 shall survive the Closing.

7.      <u>Termination; Failure to Obtain a Final Non-Appealable Order; Failure to Receive
Payment at Closing</u>.

(a)      If for any reason the Bankruptcy Court, the District Court or an appellate
court of competent jurisdiction rejects this Settlement Agreement pursuant to a
final and non-appealable order (the date on which such order becomes final and
non-appealable is herein referred to as the "<u>Rejection Date</u>"), then this Settlement
Agreement (other than this Paragraph 7) shall automatically terminate and be void
as of the Rejection Date and except as otherwise provided herein the parties will
be restored to their respective positions as though this Settlement Agreement had
not been executed.

(b)      In addition, if the Trustee does not receive payment of all transfers
initiated at the Closing in accordance with the terms of this Settlement
Agreement, then the Trustee may terminate this Settlement Agreement after
written notice to the other Parties hereto and after reasonable opportunity to cure
by such Parties, as long as such notice is given within five (5) Business Days after
such payment is due and further provided that the Trustee first returns any and all
payments that he has received pursuant to this Settlement Agreement (the date on
which such notice is received and the Trustee has returned all payments received
pursuant to this Settlement Agreement is herein referred to as the "<u>Optional
Rejection Date</u>").

(c)      If this Settlement Agreement is terminated, upon the Rejection Date or
Optional Rejection Date (as the case may be) the Trustee's ability to continue to
prosecute the Chais Adversary Proceeding and to seek to recover from the
Settling Defendants in accordance with and to the extent of any judgment of a
court of competent jurisdiction, and the Settling Defendants' defenses thereto, as
well as any rights, claims or remedies the Parties might have had prior to the
Settlement Agreement, shall not in any way be prejudiced or in any other way
adversely affected by their having entered into this Settlement Agreement,
including by reason of agreeing to an amount for the Customer Claims or the
passage of time.

(d)      For the avoidance of doubt, if this Settlement Agreement is terminated, the
allowance of Settling Defendants' Customer Claims under Section 5 of this
Settlement Agreement shall have no force or effect, and the Trustee reserves all
his rights to contest any and all customer property claims the Settling Defendants
may assert, and his ability to do so shall not in any way be prejudiced or in any
other way adversely affected by his having entered into this Settlement
Agreement, including by reason of agreeing to an amount for the Customer
Claims or by the passage of time.

(e)      If this Settlement Agreement is so terminated, upon the Rejection Date or
the Optional Rejection Date (as the case may be) the Settling Defendants may
pursue any and all customer property and any other claims that would have been
available to them absent their entry into this Agreement, and their ability to do so

shall not in any way be prejudiced or in any other way adversely affected by their
having entered into this Settlement Agreement, including by reason of agreeing to
an amount for the Customer Claims or by the passage of time.

(f)      The provisions of this Section 7, and the other provisions of this
Settlement Agreement, shall be fully enforceable, including by injunctive relief,
specific performance and other equitable relief and no Party shall be required to
post any bond or other consideration or to prove irreparable injury or damages as
a condition to obtaining any enforcement remedy.

8.      Releases by Trustee.  Upon the occurrence of the Effective Date (as defined in
Section 13(b), below), without any further writing or other action of any kind or nature, in
consideration of the covenants and agreements in this Settlement Agreement and for other good
and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the
Trustee, on behalf of himself, BLMIS and the estates of BLMIS and Madoff, hereby, fully,
finally and forever, unconditionally and irrevocably, releases, acquits and discharges each
Settling Defendant, and each other Chais Releasee (as defined below), and their officers,
managers, directors, members, beneficiaries, agents, and representatives, solely in their capacity
as such, from any and all actions, causes of action, suits, debts, dues, sums of money, accounts,
reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments,
and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the
future (including, without limitation, the claims asserted or that could have been asserted against
the Settling Defendants in the Adversary Proceeding, the Avoidance Power Claims, claims based
on withdrawals from BLMIS and any and all other claims that are property of or assertable by or
on behalf of the Estate (collectively, the "Trustee Released Claims"), except for any and all
claims and rights (and the enforcement thereof) of the Trustee and obligations of the Settling
Defendants arising under this Settlement Agreement.  For the avoidance of doubt, the Trustee is
authorized to and does release any claims that could have been brought by the Securities Investor
Protection Corporation ("SIPC") in connection with BLMIS and its liquidation to the extent such
claims have been subrogated to the Trustee.  The term "Chais Releasee" shall mean each Settling
Defendant, solely in their capacity as such, each attorney or accountant for any Settling
Defendant, each child or grandchild of any Settling Defendant that is an individual and, solely in
their capacity as such, each trustee, officer, manager, director, member, beneficiary, or other
direct or indirect owner of any Settling Defendant that is an entity.  The Trustee and the Settling
Defendants expressly agree this release shall not affect or encompass (i) any claims by the
Trustee against any third party (other than the Chais Releasees), (ii) any rights to enforce the LP
Judgment, or (iii) future claims, if any, against the Chais Releasees by the Trustee under section
550(a)(2) of the Bankruptcy Code, 11 U.S.C. § 550(a)(2), to recover from the Chais Releasees
any BLMIS property that is transferred to the Chais Releasees after the Effective Date from an
initial transferee of such BLMIS property, who is not also a Chais Releasee, and for which the
transfer of the said BLMIS property to the initial transferee was avoided under sections 544, 545,
547, 548, 549, 553(b) or 724(a) of the Bankruptcy Code, 11 U.S.C. §§ 544, 545, 547, 548, 549,
553(b), 724(a) (a "Future Subsequent Transferee Claim").  Each Chais Releasee that is not a
party to this Settlement Agreement is a third party beneficiary of this Settlement Agreement and
has the full right to enforce the release and covenant not to sue provided in this Settlement
Agreement to such Chais Releasee by the Trustee as fully as if they were a party to this
Settlement Agreement.

9.      <u>Release by the Settling Defendants</u>.  Upon the occurrence of the Effective Date, without any further writing or other action of any kind or nature, in consideration of the covenants and agreements in this Settlement Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Settling Defendant hereby, fully, finally and forever, unconditionally and irrevocably, releases, acquits and discharges SIPC, the Trustee (personally and in his capacity as Trustee), the Trustee's agents and representatives, solely in their capacity as such, BLMIS and the estates of BLMIS and Madoff, from any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, now existing or arising in the future, except for (i) the Customer Claims defined in Section 5, (ii) any and all other claims and rights (and the enforcement thereof) of the Settling Defendants and any obligations of the Trustee, on behalf of himself, BLMIS, and the estates of BLMIS and Madoff  provided for in this Settlement Agreement, and (iii) any and all future claims, defenses or counter-claims that the Settling Defendants could assert in any action asserting a Future Subsequent Transferee Claim (after giving effect to such exceptions, the "<u>Defendants Released Claims</u>").  The term "<u>Released Claims</u>" shall mean, collectively, the Trustee Released Claims and the Defendants Released Claims.

10.      <u>Unknown Claims</u>.  Unknown claims shall mean any Released Claim that the Trustee or the Settling Defendants does not know or suspect to exist in its, his or her favor at the time of giving the release in this Settlement Agreement that if known by it, him or her, might have affected its, his or her settlement and release in this Settlement Agreement.  With respect to any and all Released Claims in Sections 8 and 9 of this Settlement Agreement, the Trustee and the Settling Defendants expressly waive, or are deemed to have waived, the provisions, rights and benefits of California Civil Code section 1542 (to the extent it applies herein), which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Trustee and the Settling Defendants expressly waive, and shall be deemed to have waived, any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar, comparable or equivalent in effect to California Civil Code section 1542.  The Trustee and the Settling Defendants may hereafter discover facts in addition to or different from those that they, or any of them, now know or believe to be true with respect to the subject matter of the Released Claims, but the Trustee and the Settling Defendants shall expressly have and shall be deemed to have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or noncontingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence or such different or additional facts.  The Trustee and the Settling Defendants

acknowledge and shall be deemed to have acknowledged that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part. Each Party agrees not to directly or indirectly assert any claim, or commence, continue, institute or cause to be commenced any claim or proceeding based upon any matter purported to be released hereby.

11.    <u>Release of Derivative Claims; Basis for Injunctions</u>.  The Trustee Released Claims include any and all claims that are property of or assertable by or on behalf of the Estate, including claims that are derivative or duplicative of claims that were or could have been brought by the Trustee.  This Settlement Agreement and any order approving same may be pleaded as a full and complete defense against, and may be used as an independent basis for an injunction against, any claim or proceeding instituted or maintained against any person or entity released hereunder to the extent such claim or proceeding conflicts with any release provided in this Settlement Agreement.

12.    <u>Settling Defendants' Non-Waiver of Claims Against the Madoff Victim Fund</u>.  Notwithstanding anything to the contrary in this Settlement Agreement, the Settling Defendants preserve all, and do not release, discharge or otherwise relinquish any of their rights and remedies against the Madoff Victim Fund that is currently expected to be directly or indirectly administered by the U.S. Department of Justice or any other source of recovery for claims arising from the BLMIS scheme, except for any recovery from SIPC or the Estate.  Nothing in this Settlement Agreement shall be read to confer any additional duties or restrictions upon the Settling Defendants or the Trustee, whose rights and obligations with respect to the Madoff Victim Fund or any other source of recovery for claims arising from the BLMIS scheme, except for any recovery from SIPC or the Estate, are unchanged by the terms of this Settlement Agreement.  It is the intent of the Parties that nothing in this Settlement Agreement shall constitute or shall be admissible into evidence or otherwise used, as an admission of any fact that could diminish or negate the right of any Party with respect to the proceeds of the of the Madoff Victim Fund or any other source of recovery for claims arising from the BLMIS scheme, except for any recovery from SIPC or the Estate.

13.    <u>Effective Date</u>.

(a)    Upon the execution hereof (the "<u>Execution Date</u>"), this Settlement Agreement shall be binding on the Parties to the maximum extent permitted under applicable law.  To the extent (if any) that any provision hereof is not binding upon execution of this Settlement Agreement, each such provision shall be binding on the Bankruptcy Court Approval Date to the maximum extent permitted under applicable law.  The Parties shall use their reasonable best efforts to (i) have this Settlement Agreement and the Permanent Injunction promptly approved by the Bankruptcy Court and (ii) have the TSA Approval Order become a final non-appealable order.

(b)    The date on which the TSA Approval Order becomes final and non-appealable, the Closing has occurred, and the Trustee has received all payments due to him at the Closing pursuant to the terms of this Settlement Agreement, is referred herein as "<u>Effective Date</u>."  The form of the pleadings in support of the

Trustee's request seeking approval of this Settlement Agreement and the Permanent Injunctions in the SIPA Proceeding (the "9019 Motion") pursuant to section 105(a) of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure, including the proposed approval order, shall be subject to the Settling Defendants' reasonable approval, which will have occurred prior to the Execution Date. For clarity, as provided below in Section 14, the releases provided for in Sections 8 and 9 shall become effective upon the Closing.

(c)    The Trustee shall use reasonable best efforts to file the 9019 Motion within ten (10) Business Days after the Execution Date and shall use his reasonable efforts to obtain approval of the Settlement Agreement in the SIPA Proceeding as promptly as practicable after the Execution Date. The Trustee shall request that the TSA Approval Order contain, *inter alia*, findings that the Trustee Released Claims have been and shall be deemed to be fully and finally administered by the Trustee in the SIPA Proceeding, and that all such claims have been irrevocably and unconditionally extinguished.

14.    Closing.

(a)    There shall be a closing under this Settlement Agreement ("Closing") within five (5) Business Days after the TSA Approval Order becomes final and non-appealable on a date agreed by the Parties, at the offices of the Trustee's counsel in New York, New York (provided that the Closing shall only occur if it occurs simultaneously with the CAAG Closing under Sections 1(a) and 2(a) of the AG Settlement Agreement). At the Closing: (i) the Settling Defendants shall wire to the Trustee all funds and otherwise transfer any other assets due and payable to the Trustee at the Closing under Sections 2, 3, and 4 of this Settlement Agreement, with the exception of those funds provided in Sections 2(b) and 2(c) (notwithstanding anything to the contrary that might be provided in Section 4(a) of this Agreement, the Chais Related Defendants shall have the right to determine and alter the actual apportionment and sources of payments referred to in Section 4(a) of this Agreement among the Chais Related Defendants, provided that any such apportionment does not reduce the aggregate amount of Thirty-Eight Million Six Hundred Seventy-One Thousand Nine Hundred Thirty Dollars ($38,671,930)); (ii) the Restitution Fund (as defined under the AG Settlement Agreement) shall be fully funded pursuant to Section 2(a) of the AG Settlement Agreement and the Trustee's releases, acquittals, discharges and covenants under Sections 10(a) and 10(b) of the AG Settlement Agreement shall then be in full force and effect; and (iii) the releases provided for in Sections 8 and 9 of this Settlement Agreement shall automatically become fully effective in all respects without any further writing or other act of any kind or nature by any Party; (iv) the Customer Claims will be allowed; and (v) a stipulation of dismissal, with prejudice, will be filed by the Trustee in the Adversary Proceeding as to the Settling Defendants only, and not as to as to the California Limited Partnerships. The Adversary Proceeding shall continue in full force and effect as to the California Limited Partnerships and the dismissal of the Settling Defendants shall

have no adverse effect on the Trustee's continued prosecution of the Adversary Proceeding against the California Limited Partnerships, it being understood and agreed that the continued prosecution of the Adversary Proceeding against the California Limited Partnerships shall not impair, affect or otherwise limit the release by the Trustee set forth in Section 8 hereof.

(b)      Upon the Closing, the funds paid pursuant to Section 2(e) herein into the CPAS Escrow Account shall be held in escrow and be available to the Settling Defendants for the following purposes: (i) payments to the Attorney General and/or the attorneys for the California Plaintiffs pursuant to Sections 4 and 5 of the CP Settlement Agreement to the extent the closing occurs under such agreement; (ii) payment by the Settling Defendants on account of any judgment or settlement and compromise in connection with the California Private Actions in the event the closing under the CP Settlement Agreement does not occur; or (iii) payment of attorney's fees and other costs of the Settling Defendants in connection with the California Private Actions in the event the closing under the CP Settlement Agreement does not occur.

15.     No Set-off or Recoupment.  The Trustee will not, at any time, directly or indirectly attempt to set-off or recoup against any asset for which title was transferred, or with respect to which the Trustee was granted a conditional equitable lien, pursuant to this Settlement Agreement.

16.     The Settling Defendants' and Trustee's Authority.  The Settling Defendants, in their personal and/or representative capacities, represent and warrant to the Trustee that, as of the date hereof, they have the full power, authority and legal right to execute and deliver, and to perform their respective obligations under, this Settlement Agreement and have taken all necessary actions to authorize the execution, delivery, and performance of their obligations under this Settlement Agreement.  Subject to Bankruptcy Court approval, as set forth in Section 13, the Trustee represents and warrants to the Settling Defendants that he has the full power, authority and legal right to execute and deliver, and to perform his obligations under this Settlement Agreement, and further, has taken all necessary action to authorize the execution, delivery, and performance of his obligations under this Settlement Agreement.

17.     Business Days; Dollars.  For purposes of this Settlement Agreement, the term "Business Days" shall mean any day other than Saturday, Sunday, or a day that is a legal holiday in New York City.  For purposes of this Settlement Agreement, the term "Dollars" shall mean U.S. Dollars.

18.     Confidentiality Obligations.  The Parties' confidentiality obligations under the existing agreements between and among the Parties shall remain in full force and effect.

19.     Non-Disparagement and No Admission.  Each Party agrees not to disparage or otherwise impugn the character of any other Party or Stanley Chais.  The Settling Defendants do not admit any liability and further expressly deny any participation or complicity of Stanley Chais, any Settling Defendant or any other defendant in the Adversary Proceeding in, or knowledge of Stanley Chais, any Settling Defendant or any other defendant in the Adversary

Proceeding of, the Madoff Ponzi Scheme. Nothing in this Section 19 shall preclude any Party from making truthful factual statements (as opposed to opinions and characterizations) or from complying with the requirements of judicial process in connection with the Trustee's duties and obligations with respect to the Estate.

20.    <u>Further Assurances</u>.  The Trustee, SIPC and the Settling Defendants shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Settlement Agreement to effectuate the intent of this Settlement Agreement.

21.    <u>Entire Agreement</u>.  This Settlement Agreement, including all exhibits hereto, and supplemental implementing terms executed contemporaneously herewith, together with the AG Settlement Agreement and the CP Settlement Agreement, constitute the entire agreement and understanding between and among the Parties and supersede all prior agreements, representations and understandings concerning the subject matter hereof (other than the AG Settlement Agreement and the CP Settlement Agreement).

22.    <u>Amendments, Waiver</u>.  This Settlement Agreement may not be waived, amended or modified in any way except in a writing signed by all the Parties or their authorized representatives.  No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

23.    <u>Assignability</u>.  No Party hereto may assign their rights under this Settlement Agreement to a third party without the prior written consent of each of the other Parties hereto, or their authorized representatives, *provided, however*, that the Trustee may assign his rights and delegate his duties under this Settlement Agreement to any successor Trustee appointed by the Bankruptcy Court or to SIPC.

24.    <u>Successors Bound</u>.  This Settlement Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

25.    <u>Applicable Law</u>.  This Settlement Agreement shall be construed and enforced in accordance with the laws of the State of New York, without regard to the principle of conflict of laws.  Each Party hereby waives on behalf of itself and its successors and assigns any and all rights to argue that the choice of New York law provisions is or has become unreasonable in any legal proceeding.

26.    <u>Exclusive Jurisdiction</u>.  Except to the extent the Bankruptcy Court cannot or declines to retain jurisdiction, the Parties agree and shall request that all orders entered in connection with this Settlement Agreement provide that the Bankruptcy Court shall retain and have exclusive jurisdiction over any action to enforce this Settlement Agreement, or any provision thereof, and the Parties hereby consent to and submit to the jurisdiction of the Bankruptcy Court for any such action.  The Parties agree that no Party shall bring, institute, prosecute or maintain any action to enforce, modify, terminate, void, or interpret this Settlement Agreement, or any provision thereof, in any court other than the Bankruptcy Court.  In any action commenced in another court by a third-party to enforce, modify, terminate, void or interpret this Settlement Agreement, the Parties agree to seek to transfer the action to the Bankruptcy Court or to stay or terminate the action in favor of Bankruptcy Court jurisdiction.

27.     <u>Captions and Rules of Construction</u>.  The captions in this Settlement Agreement are inserted only as a matter of convenience and for reference and do not define, limit or describe the scope of this Settlement Agreement or the scope or content of any of its provisions.  Any reference in this Settlement Agreement to a Paragraph or Section is to a paragraph or section of this Settlement Agreement, unless otherwise noted.  The words "hereby," "herein," "hereto," "hereof," "hereunder," and similar words refer to this Settlement Agreement in its entirety and not merely to the section where any such words appear.  "Includes," "including" and similar words are not limiting.  The Parties acknowledge that this Settlement Agreement was jointly drafted after negotiations by counsel and the Parties therefore agree that no provision of this Settlement Agreement may be construed against any Party as having been drafted by that Party.

28.     <u>Counterparts; Electronic Copy of Signatures</u>.  This Settlement Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document. The Parties may evidence their execution of this Settlement Agreement by delivery to the other Parties of scanned or faxed copies of their signatures, with the same effect as the delivery of an original signature.

29.     <u>Severability</u>.  In the event that any term or provision of this Agreement or any application thereof is deemed to be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

30.     <u>Survival</u>.  The provisions of this Settlement Agreement shall survive the Closing.

31.     <u>Notices</u>.  Any notices under this Settlement Agreement shall be in writing, shall be effective when received and may be delivered only by hand, or by overnight delivery service or by electronic transmission if such overnight delivery or electronic transmission is confirmed via email, to:

| | |
|---|---|
| If to the Trustee, c/o: | If to the Stanley Chais Defendants, c/o: |
| David J. Sheehan, Esq. | Dennis F. Dunne, Esq. |
| Tracy Cole, Esq. | Michael L. Hirschfeld, Esq. |
| 45 Rockefeller Plaza, 14th Floor | Milbank, Tweed, Hadley & McCloy LLP |
| New York, NY 10111 | 28 Liberty Street |
| F:  (212) 589-4201 | New York, NY 10005 |
| dsheehan@bakerlaw.com | F:  (212) 530-5219 |
| tcole@bakerlaw.com | ddunne@milbank.com |
| | mhirschfeld@milbank.com |
| | |
| If to the Chais Related Defendants, c/o: | Steven J. Katzman, Esq. |
| Andrew H. Sherman, Esq. | Biernert, Miller & Katzman |
| Boris M. Mankovetskiy, Esq. | 903 Calle Amancer, Suite 350 |
| Sills Cummis & Gross P.C. | San Clemente, CA 92673 |
| One Riverfront Plaza | F:  (949) 369-3700 |
| Newark, NJ 07102 | skatzman@bmkattorneys.com |
| F:  (973) 643-7000 | |
| asherman@sillscummis.com | |
| bmankovetskiy@sillscummis.com | |

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee for the
liquidation proceedings of Bernard L.
Madoff Investment Securities LLC and the
substantively consolidated Chapter 7 estate
of Bernard L. Madoff


THE ESTATE OF STANLEY CHAIS
By: Pamela Chais, Executrix


PAMELA CHAIS


APPLEBY PRODUCTIONS LTD.
By: Pamela Chais, President


APPLEBY PRODUCTIONS LTD.
DEFINED CONTRIBUTION PLAN
By: Michael L. Hirschfeld, Esq., counsel of
record in the Adversary Proceeding


APPLEBY PRODUCTIONS LTD.
MONEY PURCHASE PLAN
By: Michael L. Hirschfeld, Esq., counsel of
record in the Adversary Proceeding


APPLEBY PRODUCTIONS LTD. PROFIT
SHARING PLAN
By: Michael L. Hirschfeld, Esq., counsel of
record in the Adversary Proceeding

21

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee for the liquidation proceedings of Bernard L. Madoff Investment Securities LLC and the substantively consolidated Chapter 7 estate of Bernard L. Madoff

THE ESTATE OF STANLEY CHAIS
By: Pamela Chais, Executrix

PAMELA CHAIS

APPLEBY PRODUCTIONS LTD.
By: Pamela Chais, President

APPLEBY PRODUCTIONS LTD. DEFINED CONTRIBUTION PLAN
By: Michael L. Hirschfeld, Esq., counsel of record in the Adversary Proceeding

APPLEBY PRODUCTIONS LTD. MONEY PURCHASE PLAN
By: Michael L. Hirschfeld, Esq., counsel of record in the Adversary Proceeding

APPLEBY PRODUCTIONS LTD. PROFIT SHARING PLAN
By: Michael L. Hirschfeld, Esq., counsel of record in the Adversary Proceeding

21

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

_____
IRVING H. PICARD, Trustee for the liquidation proceedings of Bernard L. Madoff Investment Securities LLC and the substantively consolidated Chapter 7 estate of Bernard L. Madoff

_____
THE ESTATE OF STANLEY CHAIS
By: Pamela Chais, Executrix

_____
PAMELA CHAIS

_____
APPLEBY PRODUCTIONS LTD.
By: Pamela Chais, President

_____
APPLEBY PRODUCTIONS LTD.
DEFINED CONTRIBUTION PLAN
By: Michael L. Hirschfeld, Esq., counsel of record in the Adversary Proceeding

_____
APPLEBY PRODUCTIONS LTD.
MONEY PURCHASE PLAN
By: Michael L. Hirschfeld, Esq., counsel of record in the Adversary Proceeding

_____
APPLEBY PRODUCTIONS LTD. PROFIT SHARING PLAN
By: Michael L. Hirschfeld, Esq., counsel of record in the Adversary Proceeding

21

_____
CHAIS INVESTMENTS, LTD.
By: William Chais, President, Onondaga,
Inc., its General Partner


_____
CHAIS 1991 FAMILY TRUST (NOW
CONSISTING OF THE SURVIVOR'S
TRUST UNDER CHAIS 1991 FAMILY
TRUST DATED SEPTEMBER 4, 1991
AND THE MARITAL TRUST UNDER
CHAIS 1991 FAMILY TRUST DATED
SEPTEMBER 4, 1991)
By: Pamela Chais, Trustee


_____
CHAIS FAMILY FOUNDATION
By: Pamela Chais, President


_____
EMILY CHASALOW


_____
MARK CHAIS


_____
WILLIAM CHAIS


_____
MICHAEL CHASALOW


_____
MIRI CHAIS


22

CHAIS INVESTMENTS, LTD.
By: William Chais, President: Onondaga,
Inc., its General Partner

CHAIS 1991 FAMILY TRUST (NOW
CONSISTING OF THE SURVIVOR'S
TRUST UNDER CHAIS 1991 FAMILY
TRUST DATED SEPTEMBER 4, 1991
AND THE MARITAL TRUST UNDER
CHAIS 1991 FAMILY TRUST DATED
SEPTEMBER 4, 1991)
By: Pamela Chais, Trustee

CHAIS FAMILY FOUNDATION
By: Pamela Chais, President

EMILY CHASALOW

MARK CHAIS

WILLIAM CHAIS

MICHAEL CHASALOW

MIRI CHAIS

CHAIS INVESTMENTS, LTD.
By: William Chais, President, Onondaga,
Inc., its General Partner


CHAIS 1991 FAMILY TRUST (NOW
CONSISTING OF THE SURVIVOR'S
TRUST UNDER CHAIS 1991 FAMILY
TRUST DATED SEPTEMBER 4, 1991
AND THE MARITAL TRUST UNDER
CHAIS 1991 FAMILY TRUST DATED
SEPTEMBER 4, 1991)
By: Pamela Chais, Trustee


CHAIS FAMILY FOUNDATION
By: Pamela Chais, President


EMILY CHASALOW


MARK CHAIS


WILLIAM CHAIS


MICHAEL CHASALOW


MIRI CHAIS

22

_____

WRENN CHAIS

_____

1994 TRUST FOR THE CHILDREN OF
STANLEY AND PAMELA CHAIS
By: William Chais, Trustee

_____

1996 TRUST FOR THE CHILDREN OF
STANLEY AND PAMELA CHAIS
By: William Chais, Trustee

_____

BMIS ACCOUNT 1C1286, SUED HEREIN
AS 1999 TRUST FOR THE CHILDREN
OF STANLEY AND PAMELA CHAIS
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

_____

1999 TRUST FOR THE
GRANDCHILDREN OF STANLEY AND
PAMELA CHAIS
By: William Chais, Trustee

_____

EMILY CHAIS 1983 TRUST
By: Emily Chasalow, Trustee

_____

EMILY CHAIS TRUST NO. 1
By: Emily Chasalow, Trustee

_____

EMILY CHAIS TRUST NO. 2
By: Emily Chasalow, Trustee

_____

WRENN CHAIS


_____

1994 TRUST FOR THE CHILDREN OF
STANLEY AND PAMELA CHAIS
By: William Chais, Trustee


_____

1996 TRUST FOR THE CHILDREN OF
STANLEY AND PAMELA CHAIS
By: William Chais, Trustee

_____

BMIS ACCOUNT 1C1286, SUED HEREIN
AS 1999 TRUST FOR THE CHILDREN
OF STANLEY AND PAMELA CHAIS
By:  Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding


_____

1999 TRUST FOR THE
GRANDCHILDREN OF STANLEY AND
PAMELA CHAIS
By: William Chais, Trustee


_____

EMILY CHAIS 1983 TRUST
By: Emily Chasalow, Trustee


_____

EMILY CHAIS TRUST NO. 1
By: Emily Chasalow, Trustee


_____

EMILY CHAIS TRUST NO. 2
By: Emily Chasalow, Trustee


23

WRENN CHAIS

_____

1994 TRUST FOR THE CHILDREN OF
STANLEY AND PAMELA CHAIS
By: William Chais, Trustee

_____

1996 TRUST FOR THE CHILDREN OF
STANLEY AND PAMELA CHAIS
By: William Chais, Trustee

_____

BMIS ACCOUNT 1C1286, SUED HEREIN
AS 1999 TRUST FOR THE CHILDREN
OF STANLEY AND PAMELA CHAIS
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

_____

1999 TRUST FOR THE
GRANDCHILDREN OF STANLEY AND
PAMELA CHAIS
By: William Chais, Trustee

_____

EMILY CHAIS 1983 TRUST
By: Emily Chasalow, Trustee

_____

EMILY CHAIS TRUST NO. 1
By: Emily Chasalow, Trustee

_____

EMILY CHAIS TRUST NO. 2
By: Emily Chasalow, Trustee

23

_____
EMILY CHAIS TRUST NO. 3
By: Emily Chasalow, Trustee

_____
EMILY CHAIS ISSUE TRUST NO. 1
By: Emily Chasalow, Trustee

_____
EMILY CHAIS ISSUE TRUST NO. 2
By: Emily Chasalow, Trustee


_____
MARK HUGH CHAIS TRUST NO. 1
By: Mark Chais, Trustee


_____
MARK HUGH CHAIS TRUST NO. 2
By: Mark Chais, Trustee


_____
MARK HUGH CHAIS TRUST NO. 3
By: Mark Chais, Trustee


_____
MARK HUGH CHAIS ISSUE TRUST
NO. 1
By: Mark Chais, Trustee


_____
MARC HUGH CHAIS ISSUE TRUST
NO. 2
By: Mark Chais, Trustee


_____
MARK HUGH CHAIS 1983 TRUST
By: Mark Chais, Trustee

24

EMILY CHAIS TRUST NO. 3
By: Emily Chasalow, Trustee

EMILY CHAIS ISSUE TRUST NO. 1
By: Emily Chasalow, Trustee

EMILY CHAIS ISSUE TRUST NO. 2
By: Emily Chasalow, Trustee

MARK HUGH CHAIS TRUST NO. 1
By: Mark Chais, Trustee

MARK HUGH CHAIS TRUST NO. 2
By: Mark Chais, Trustee

MARK HUGH CHAIS TRUST NO. 3
By: Mark Chais, Trustee

MARK HUGH CHAIS ISSUE TRUST
NO. 1
By: Mark Chais, Trustee

MARC HUGH CHAIS ISSUE TRUST
NO. 2
By: Mark Chais, Trustee

MARK HUGH CHAIS 1983 TRUST
By: Mark Chais, Trustee

24

WILLIAM FREDERICK CHAIS TRUST
NO. 1
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS TRUST
NO. 2
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS TRUST
NO. 3
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS ISSUE
TRUST NO. 1
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS ISSUE
TRUST NO. 2
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS 1983
TRUST
By: William Chais, Trustee

THE WILLIAM AND WRENN CHAIS
1994 FAMILY TRUST
By: William Chais, Trustee

ARI CHAIS 1999 TRUST
By: Mark Chais, Trustee

25

WILLIAM FREDERICK CHAIS TRUST
NO. 1
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS TRUST
NO. 2
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS TRUST
NO. 3
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS ISSUE
TRUST NO. 1
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS ISSUE
TRUST NO. 2
By: William Chais, Trustee

WILLIAM FREDERICK CHAIS 1983
TRUST
By: William Chais, Trustee

THE WILLIAM AND WRENN CHAIS
1994 FAMILY TRUST
By: William Chais, Trustee

ARI CHAIS 1999 TRUST
By: Mark Chais, Trustee

25

_____
ARI CHAIS TRANSFEREE TRUST NO. 1
By: Mark Chais, Trustee


_____
BENJAMIN PAUL CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee


_____
BENJAMIN PAUL CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee


_____
CHLOE FRANCES CHAIS 1994 TRUST
By: William Chais, Trustee


_____
CHLOE FRANCES CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee


_____
JONATHAN WOLF CHAIS 1996 TRUST
By: William Chais, Trustee


_____
JONATHAN CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee


_____
JUSTIN ROBERT CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee


26

ARI CHAIS TRANSFEREE TRUST NO. 1
By: Mark Chais, Trustee

_____

BENJAMIN PAUL CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee

_____

BENJAMIN PAUL CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

_____

CHLOE FRANCES CHAIS 1994 TRUST
By: William Chais, Trustee

_____

CHLOE FRANCES CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee

_____

JONATHAN WOLF CHAIS 1996 TRUST
By: William Chais, Trustee

_____

JONATHAN CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee

_____

JUSTIN ROBERT CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee

26

_____
ARI CHAIS TRANSFEREE TRUST NO. 1
By: Mark Chais, Trustee


_____
BENJAMIN PAUL CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee


_____
BENJAMIN PAUL CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

_____
CHLOE FRANCES CHAIS 1994 TRUST
By: William Chais, Trustee

_____
CHLOE FRANCES CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee

_____
JONATHAN WOLF CHAIS 1996 TRUST
By: William Chais, Trustee

_____
JONATHAN CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee


_____
JUSTIN ROBERT CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee


26

_____

JUSTIN ROBERT CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

_____

MADELINE CELIA CHAIS 1992 TRUST
By: William Chais, Trustee

_____

MADELINE CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee

_____

RACHEL ALLISON CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee

_____

RACHEL ALLISON CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

_____

TALI CHAIS 1997 TRUST
By: Mark Chais, Trustee

_____

TALI CHAIS TRANSFEREE TRUST NO.
1
By: Mark Chais, Trustee

_____

UNICYCLE TRADING COMPANY
By: Mark Chais, President of Unicycle
Corp., its General Partner

27

JUSTIN ROBERT CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

MADELINE CELIA CHAIS 1992 TRUST
By: William Chais, Trustee

MADELINE CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee

RACHEL ALLISON CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee

RACHEL ALLISON CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

TALI CHAIS 1997 TRUST
By: Mark Chais, Trustee

TALI CHAIS TRANSFEREE TRUST NO.
1
By: Mark Chais, Trustee

UNICYCLE TRADING COMPANY
By: Mark Chais, President of Unicycle
Corp., its General Partner

27

JUSTIN ROBERT CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

MADELINE CELIA CHAIS 1992 TRUST
By: William Chais, Trustee

MADELINE CHAIS TRANSFEREE
TRUST NO. 1
By: William Chais, Trustee

RACHEL ALLISON CHASALOW 1999
TRUST
By: Emily Chasalow, Trustee

RACHEL ALLISON CHASALOW
TRANSFEREE TRUST NO. 1
By: Emily Chasalow, Trustee

TALI CHAIS 1997 TRUST
By: Mark Chais, Trustee

TALI CHAIS TRANSFEREE TRUST NO.
1
By: Mark Chais, Trustee

UNICYCLE TRADING COMPANY
By: Mark Chais, President of Unicycle
Corp., its General Partner

UNICYCLE CORP.
By: Mark Chais, President


UNICYCLE CORPORATION MONEY
PURCHASE PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding


ONONDAGA, INC.
By: William Chais, President


THE ONONDAGA, INC. MONEY
PURCHASE PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding


THE ONONDAGA, INC. DEFINED
BENEFIT PENSION PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding


CHAIS MANAGEMENT, INC.
By: William Chais, President


CHAIS MANAGEMENT LTD.
By: William Chais, President, Chais
Management, Inc., its General Partner


CHAIS VENTURE HOLDINGS
By: William Chais, President

28

UNICYCLE CORP.
By: Mark Chais, President

UNICYCLE CORPORATION MONEY
PURCHASE PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

ONONDAGA, INC.
By: William Chais, President

THE ONONDAGA, INC. MONEY
PURCHASE PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

THE ONONDAGA, INC. DEFINED
BENEFIT PENSION PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

CHAIS MANAGEMENT, INC.
By: William Chais, President

CHAIS MANAGEMENT LTD.
By: William Chais, President, Chais
Management, Inc., its General Partner

CHAIS VENTURE HOLDINGS
By: William Chais, President

28

UNICYCLE CORP.
By: Mark Chais, President

UNICYCLE CORPORATION MONEY
PURCHASE PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

ONONDAGA, INC.
By: William Chais, President

THE ONONDAGA, INC. MONEY
PURCHASE PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

THE ONONDAGA, INC. DEFINED
BENEFIT PENSION PLAN
By: Andrew Sherman, Esq., counsel of
record in the Adversary Proceeding

CHAIS MANAGEMENT, INC.
By: William Chais, President

CHAIS MANAGEMENT LTD.
By: William Chais, President, Chais
Management, Inc., its General Partner

CHAIS VENTURE HOLDINGS
By: William Chais, President

# EXHIBIT A
## SUMMARY OF TRANSFERS

| Column 1 Account Number | Column 2 Account Name | Column 3 90-Day Preferential Transfers | Column 4 Two Year Fictitious Profit Transfers | Column 5 Two Year Principal Transfers | Column 6 Two Year Total Transfers | Column 7 Six Year Fictitious Profit Transfers | Column 8 Six Year Principal Transfers | Column 9 Six Year Total Transfers | Column 10 Full History Fictitious Profit Transfers | Column 11 Full History Principal Transfers | Column 12 Full History Total Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1A0035 | APPLEBY PRODUCTIONS LTD DEFINED CONTRIBUTION PLAN | - | - | - | - | 96,804 | - | 96,804 | 192,559 | 176,644 | 369,204 |
| 1A0036 | APPLEBY PRODUCTIONS LTD MONEY PURCHASE PLAN | - | 1,094,566 | - | 1,094,566 | 11,943,024 | - | 11,943,024 | 13,770,875 | 345,867 | 14,116,741 |
| 1A0037 | APPLEBY PRODUCTIONS LTD PROFIT SHARING PLAN | - | - | - | - | 1,053,338 | - | 1,053,338 | 2,273,486 | 401,009 | 2,674,495 |
| 1A0122 | APPLEBY PRODUCTIONS LTD DEFINED CONTRIBUTION PLAN | - | - | - | - | - | - | - | - | - | - |
| 1A0123 | APPLEBY PRODUCTIONS LTD MONEY PURCHASE PLAN | - | - | - | - | - | - | - | - | - | - |
| 1A0124 | APPLEBY PRODUCTIONS LTD PROFIT SHARING PLAN | - | - | - | - | - | - | - | - | - | - |
| 1B0061 | THE BRIGHTON COMPANY | - | 76,325,000 | - | 76,325,000 | 161,746,954 | - | 161,746,954 | 232,751,786 | 62,722,212 | 295,473,998 |
| 1C1016 | CHAIS FAMILY FOUNDATION | - | 21,100,000 | - | 21,100,000 | 42,800,000 | - | 42,800,000 | 57,521,648 | 100,000 | 57,621,648 |
| 1C1017 | CHAIS 1991 FAMILY TRUST 1 STANLEY & PAMELA CHAIS TSTEES | - | 4,000,000 | - | 4,000,000 | 30,900,000 | - | 30,900,000 | 30,900,000 | 1,133,125 | 32,033,125 |
| 1C1018 | CHAIS 1991 FAMILY TRUST 2 STANLEY & PAMELA CHAIS TSTEES | - | - | - | - | - | 2,000,000 | 2,000,000 | - | 4,337,163 | 4,337,163 |
| 1C1019 | CHAIS 1991 FAMILY TRUST 3 STANLEY & PAMELA CHAIS TST | - | 4,601,000 | 399,000 | 5,000,000 | 4,601,000 | 399,000 | 5,000,000 | 4,601,000 | 399,000 | 5,000,000 |
| 1C1020 | EMILY CHAIS | - | 2,275,000 | - | 2,275,000 | 5,310,000 | - | 5,310,000 | 8,891,955 | 269,284 | 9,161,239 |
| 1C1021 | EMILY CHAIS TRUST 1 AL ANGEL TRUSTEE 4 ROCKY WAY | - | - | - | - | - | - | - | 1,564,092 | 188,303 | 1,752,395 |
| 1C1022 | EMILY CHAIS TRUST 2 EMILY & WILLIAM CHAIS TRUSTEE 4 ROCKY WAY | - | 396,838 | - | 396,838 | 3,288,700 | - | 3,288,700 | 4,625,121 | 151,299 | 4,776,420 |
| 1C1023 | EMILY CHAIS TRUST #3 EMILY & WILLIAM CHAIS TRUSTEE 4 ROCKY WAY | - | 59,711 | - | 59,711 | 4,326,619 | - | 4,326,619 | 6,186,793 | 191,638 | 6,378,431 |
| 1C1024 | EMILY CHAIS ISSUE TRUST 1 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 207,500 | - | 207,500 | 1,881,636 | - | 1,881,636 | 2,845,094 | 1,519 | 2,846,613 |
| 1C1025 | EMILY CHAIS ISSUE TRUST 2 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 331,548 | - | 331,548 | 2,117,267 | - | 2,117,267 | 3,070,086 | 1,179 | 3,071,265 |
| 1C1026 | EMILY CHAIS 1983 TRUST AL ANGEL & MARK CHAIS TRUSTEE 4 ROCKY WAY | - | - | - | - | - | 201,467 | 201,467 | - | 777,169 | 777,169 |
| 1C1027 | MARK HUGH CHAIS & MIRIE CHAIS JT WROS | - | 2,970,000 | - | 2,970,000 | 8,830,000 | - | 8,830,000 | 13,630,253 | 309,778 | 13,940,031 |
| 1C1028 | MARK CHAIS TRUST 1 AL ANGEL TRUSTEE 4 ROCKY WAY | - | - | - | - | - | - | - | 1,479,805 | 184,940 | 1,664,745 |
| 1C1029 | MARK HUGH CHAIS TRUST 2 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 397,487 | - | 397,487 | 3,127,544 | - | 3,127,544 | 4,353,398 | 157,692 | 4,511,089 |

# EXHIBIT A
## SUMMARY OF TRANSFERS

| ID | Name | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1C1030 | MARK HUGH CHAIS TRUST 3 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 59,715 | - | 59,715 | 4,306,142 | - | 4,306,142 | 6,152,667 | 191,282 | 6,343,949 |
| 1C1031 | MARK HUGH CHAIS ISSUE TST 1 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 209,886 | - | 209,886 | 1,905,956 | - | 1,905,956 | 2,851,111 | 2,498 | 2,853,609 |
| 1C1032 | MARK HUGH CHAIS ISSUE TST 2 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 347,304 | - | 347,304 | 2,009,400 | - | 2,009,400 | 3,284,791 | 2,508 | 3,287,299 |
| 1C1033 | MARK HUGH CHAIS 1983 TRUST AL ANGEL & MARK CHAIS TRUSTEE 4 ROCKY WAY | - | - | - | - | - | 201,467 | 201,467 | - | 640,473 | 640,473 |
| 1C1034 | WILLIAM CHAIS | - | - | - | - | 735,000 | - | 735,000 | 4,531,200 | 273,915 | 4,805,115 |
| 1C1035 | WILLIAM FREDERICK CHAIS TST 1 AL ANGEL TRUSTEE 4 ROCKY WAY | - | - | - | - | - | - | - | 1,829,891 | 199,882 | 2,029,772 |
| 1C1036 | WILLIAM FREDERICK CHAIS TST 2 WILLIAM AND MARK CHAIS TRUSTEE 4 ROCKY WAY | - | 395,443 | - | 395,443 | 3,109,056 | - | 3,109,056 | 4,408,723 | 161,777 | 4,570,500 |
| 1C1037 | WILLIAM FREDERICK CHAIS TST 3 WILLIAM & MARK CHAIS TRUSTEE 4 ROCKY WAY | - | 62,686 | - | 62,686 | 4,206,202 | - | 4,206,202 | 5,856,327 | 182,750 | 6,039,076 |
| 1C1038 | WILLIAM F CHAIS ISSUE TST 1 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 207,708 | - | 207,708 | 1,882,927 | - | 1,882,927 | 2,825,065 | 2,455 | 2,827,520 |
| 1C1039 | WILLIAM F CHAIS ISSUE TST 2 AL ANGEL TRUSTEE 4 ROCKY WAY | - | 326,442 | - | 326,442 | 2,094,220 | - | 2,094,220 | 2,982,022 | 1,558 | 2,983,580 |
| 1C1040 | WM FREDERICK CHAIS 1983 TST WILLIAM & MARK CHAIS TRUSTEE 4 ROCKY WAY | - | - | - | - | - | 201,467 | 201,467 | - | 813,081 | 813,081 |
| 1C1204 | MADELINE CELIA CHAIS 1992 TRUST | - | 531,765 | - | 531,765 | 1,276,270 | - | 1,276,270 | 1,334,850 | 205,214 | 1,540,064 |
| 1C1212 | CHLOE FRANCIS CHAIS 1994 TRUST | - | 431,871 | - | 431,871 | 916,927 | 144,653 | 1,061,580 | 916,927 | 160,469 | 1,077,396 |
| 1C1215 | 1994 TRUST FOR THE CHILDREN OF STANLEY AND PAMELA CHAIS AL ANGEL & MARK CHAIS TRUSTEE | - | 929,265 | - | 929,265 | 2,868,587 | 799,932 | 3,668,519 | 2,868,587 | 1,062,465 | 3,931,052 |
| 1C1225 | THE 1996 TRUST FOR THE CHILDREN OF PAMELA CHAIS AND STANLEY CHAIS | - | - | - | - | - | - | - | - | 35,841 | 35,841 |
| 1C1227 | JONATHAN WOLF CHAIS TRUST WILLIAM CHAIS, MARK CHAIS & EMILY CHAIS LOW TRUSTEES | - | 426,029 | - | 426,029 | 1,038,414 | 111,437 | 1,149,851 | 1,038,414 | 140,469 | 1,178,883 |
| 1C1270 | THE 1996 TST FOR THE CHILDREN OF PAMELA & STANLEY CHAIS AL ANGEL & MARK CHAIS TRUSTEE | - | 1,855,000 | 925,000 | 2,780,000 | 1,855,000 | 1,014,326 | 2,869,326 | 1,855,000 | 18,723,301 | 20,578,301 |
| 1C1271 | TALI CHAIS 1997 TRUST | - | 202,724 | - | 202,724 | 457,021 | 98,447 | 555,467 | 457,021 | 121,594 | 578,614 |
| 1C1275 | WILLIAM CHAIS AND WRENN CHAIS J/T WROS | - | - | - | - | - | - | - | - | - | - |
| 1C1284 | ARI CHAIS, 1999 TRUST | - | 115,855 | - | 115,855 | 246,984 | 55,112 | 302,096 | 246,984 | 81,293 | 328,277 |
| 1C1285 | CHAIS INVESTMENTS | - | 4,700,000 | - | 4,700,000 | 8,400,000 | - | 8,400,000 | 10,000,000 | 400,000 | 10,400,000 |

# EXHIBIT A
## SUMMARY OF TRANSFERS

| ID | Name | | | | | | | | | |
|----|------|---|---|---|---|---|---|---|---|---|
| 1C1286 | THE 1999 TST FOR THE CHILDREN OF STANLEY AND PAMELA CHAIS AL ANGEL TRUSTEE | - | - | - | - | - | - | - | - | - |
| 1C1289 | JUSTIN ROBERT CHASALOW 1999 TRUST C/O STANLEY CHAIS | - | 103,732 | - | 103,732 | 256,681 | 32,470 | 289,150 | 256,681 | 80,269 | 336,949 |
| 1C1290 | RACHEL ALLISON CHASALOW 1999 TRUST C/O STALEY CHAIS | - | 103,535 | - | 103,535 | 256,441 | 32,470 | 288,911 | 256,441 | 80,269 | 336,710 |
| 1C1291 | BENJAMIN PAUL CHASALOW 1999 TRUST C/O STANLEY CHAIS | - | 103,690 | - | 103,690 | 255,836 | 32,470 | 288,306 | 255,836 | 80,269 | 336,105 |
| 1C1292 | AL ANGEL TRUSTEE OF THE 1999 TRUST FOR THE GRANDCHILDREN OF STANLEY AND PAMELA CHAIS | - | 1,437,816 | - | 1,437,816 | 4,067,680 | 2,348 | 4,070,028 | 4,067,680 | 2,497 | 4,070,177 |
| 1C1293 | MIRIE CHAIS TEENA 12 | - | - | - | - | 269,731 | 80,269 | 350,000 | 269,731 | 80,269 | 350,000 |
| 1C1294 | WILLIAM CHAIS & WRENN CHAIS 1994 FAMILY TST DTD 4/25/95 | - | 2,325,000 | - | 2,325,000 | 5,664,990 | 85,010 | 5,750,000 | 5,664,990 | 85,010 | 5,750,000 |
| 1C1302 | ARI CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE 4 ROCKY WAY | - | 3,238,767 | - | 3,238,767 | 7,492,494 | - | 7,492,494 | 7,492,494 | - | 7,492,494 |
| 1C1303 | TALI CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE 4 ROCKY WAY | - | 3,239,025 | - | 3,239,025 | 7,490,647 | - | 7,490,647 | 7,490,647 | - | 7,490,647 |
| 1C1304 | MADELINE CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE 4 ROCKY WAY | - | 2,485,932 | - | 2,485,932 | 5,832,056 | - | 5,832,056 | 5,832,056 | - | 5,832,056 |
| 1C1305 | CHLOE CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE 4 ROCKY WAY | - | 2,487,379 | - | 2,487,379 | 5,751,489 | - | 5,751,489 | 5,751,489 | - | 5,751,489 |
| 1C1306 | JONATHAN CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE 4 ROCKY WAY | - | 2,485,445 | - | 2,485,445 | 5,752,047 | - | 5,752,047 | 5,752,047 | - | 5,752,047 |
| 1C1307 | BENJAMIN PAUL CHASALOW TRANSFEREE #1 ALBERT ANGEL TRUSTEE | - | 2,643,534 | - | 2,643,534 | 5,925,998 | - | 5,925,998 | 5,925,998 | - | 5,925,998 |
| 1C1308 | JUSTIN ROBERT CHASALOW TRANSFEREE #1 ALBERT ANGEL TRUSTEE | - | 2,639,193 | - | 2,639,193 | 5,923,037 | - | 5,923,037 | 5,923,037 | - | 5,923,037 |
| 1C1309 | RACHEL ALLISON CHASALOW TRANSFEREE #1 ALBERT ANGEL TRUSTEE | - | 2,639,105 | - | 2,639,105 | 5,923,908 | - | 5,923,908 | 5,923,908 | - | 5,923,908 |
| 1C1317 | CHAIS FAMILY FOUNDATION | - | - | - | - | - | - | - | 3,000,000 | - | 3,000,000 |
| 1L0002 | THE LAMBETH CO C/O STANLEY CHAIS | - | 187,157,324 | - | 187,157,324 | 329,910,714 | - | 329,910,714 | 378,241,772 | 131,195,380 | 509,437,152 |
| 1O0014 | ONONDAGA INC MONEY PURCHASE PLAN | - | - | 6,816 | 6,816 | - | 21,812 | 21,812 | - | 23,404 | 23,404 |
| 1O0020 | ONONDAGA INC DEFINED BENEFIT PENSION PLAN C/O STANLEY CHAIS | - | - | 6,911 | 6,911 | - | 6,911 | 6,911 | - | 6,911 | 6,911 |
| 1P0031 | THE POPHAM COMPANY | - | 38,004,368 | - | 38,004,368 | 82,929,368 | - | 82,929,368 | 164,144,859 | 25,841,395 | 189,986,254 |
| 1U0012 | THE UNICYCLE TRADING COMPANY C/O STANLEY CHAIS | - | - | - | - | - | - | - | 41,483 | 500,000 | 541,483 |

# EXHIBIT A
## SUMMARY OF TRANSFERS

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1U0021 | THE UNICYCLE TRADING COMPANY C/O WILLIAM CHAIS | - | - | 475,000 | 475,000 | - | 5,290,000 | 5,290,000 | - | 16,796,000 | 16,796,000 |
| 1U0022 | UNICYCLE CORP MONEY PURCHASE PLAN | - | - | - | - | 334,189 | 95,000 | 429,189 | 334,189 | 95,000 | 429,189 |
| | | $ - | $ 375,654,189 | $ 1,812,727 | $ 377,466,916 | $ 793,368,299 | $ 10,906,064 | $ 804,274,364 | $ 1,048,722,869 | $ 270,117,316 | $ 1,318,840,184 |

# Defendants' SIPA Claims

| BLMIS Account No. | BLMIS Account Name | Claim(s) |
|---|---|---|
| 1A0035 | APPLEBY PRODUCTIONS LTD DEFINED CONTRIBUTION PLAN | No claim filed. |
| 1A0036 | APPLEBY PRODUCTIONS LTD MONEY PURCHASE PLAN | No claim filed. |
| 1A0037 | APPLEBY PRODUCTIONS LTD PROFIT SHARING PLAN | No claim filed. |
| 1A0122 | APPLEBY PRODUCTIONS LTD DEFINED CONTRIBUTION PLAN | No claim filed. |
| 1A0123 | APPLEBY PRODUCTIONS LTD MONEY PURCHASE PLAN | No claim filed. |
| 1A0124 | APPLEBY PRODUCTIONS LTD PROFIT SHARING PLAN | No claim filed. |
| 1C1016 | CHAIS FAMILY FOUNDATION | No claim filed. |
| 1C1017 | CHAIS 1991 FAMILY TRUST 1 STANLEY & PAMELA CHAIS TSTEES | No claim filed. |
| 1C1018 | CHAIS 1991 FAMILY TRUST 2 STANLEY & PAMELA CHAIS TSTEES | No claim filed. |
| 1C1019 | CHAIS 1991 FAMILY TRUST 3 STANLEY & PAMELA CHAIS TST | No claim filed. |
| 1C1020 | EMILY CHAIS | No claim filed. |
| 1C1021 | EMILY CHAIS TRUST 1 AL ANGEL TRUSTEE | No claim filed. |
| 1C1022 | EMILY CHAIS TRUST 2 EMILY & WILLIAM CHAIS TRUSTEE | 013775 - Claim denied. |
| 1C1023 | EMILY CHAIS TRUST #3 EMILY & WILLIAM CHAIS TRUSTEE | 013776 - Claim denied. |
| 1C1024 | EMILY CHAIS ISSUE TRUST 1  AL ANGEL TRUSTEE | 013777 - Claim denied. |
| 1C1025 | EMILY CHAIS ISSUE TRUST 2  AL ANGEL TRUSTEE | 013778 - Claim denied. |
| 1C1026 | EMILY CHAIS 1983 TRUST AL ANGEL & MARK CHAIS TRUSTEE | 005284 - Allowed in the amount of $1,062,411.23.<br>013848 - Allowed Duplicate. |
| 1C1027 | MARK HUGH CHAIS & MIRIE CHAIS JT WROS | No claim filed. |
| 1C1028 | MARK CHAIS TRUST 1  AL ANGEL TRUSTEE | No claim filed. |
| 1C1029 | MARK HUGH CHAIS TRUST 2 AL ANGEL TRUSTEE | 013783 - Claim denied. |
| 1C1030 | MARK HUGH CHAIS TRUST 3 AL ANGEL TRUSTEE | 013784 - Claim denied. |
| 1C1031 | MARK HUGH CHAIS ISSUE TST 1 AL ANGEL TRUSTEE | 013785 - Claim denied. |
| 1C1032 | MARK HUGH CHAIS ISSUE TST 2 AL ANGEL TRUSTEE | 013786 - Claim denied. |
| 1C1033 | MARK HUGH CHAIS 1983 TRUST AL ANGEL & MARK CHAIS TRUSTEE | 005287 - Allowed in the amount of $1,215,324.44.<br>013850 - Allowed Duplicate. |
| 1C1034 | WILLIAM CHAIS | No claim filed. |
| 1C1035 | WILLIAM FREDERICK CHAIS TST 1 AL ANGEL TRUSTEE | No claim filed. |
| 1C1036 | WILLIAM FREDERICK CHAIS TST 2 WILLIAM AND MARK CHAIS TRUSTEE | 013779 - Claim denied. |
| 1C1037 | WILLIAM FREDERICK CHAIS TST 3 WILLIAM & MARK CHAIS TRUSTEE | 013780 - Claim denied. |
| 1C1038 | WILLIAM F CHAIS ISSUE TST 1 AL ANGEL TRUSTEE | 013781 - Claim denied. |
| 1C1039 | WILLIAM F CHAIS ISSUE TST 2 AL ANGEL TRUSTEE | 013782 - Claim denied. |
| 1C1040 | WM FREDERICK CHAIS 1983 TST WILLIAM & MARK CHAIS TRUSTEE | 005289 - Allowed in the amount of $1,036,446.03.<br>013849 - Allowed Duplicate. |
| 1C1204 | MADELINE CELIA CHAIS 1992 TRUST | 013787 - Claim denied. |
| 1C1212 | CHLOE FRANCIS CHAIS 1994 TRUST | 006138 - Claim denied.<br>013789 - Claim denied. |
| 1C1215 | 1994 TRUST FOR THE CHILDREN OF STANLEY AND PAMELA CHAIS AL ANGEL & MARK CHAIS TRUSTEE | 013845 - Claim denied. |
| 1C1225 | THE 1996 TRUST FOR THE CHILDREN OF PAMELA CHAIS AND STANLEY CHAIS | No claim filed. |
| 1C1227 | JONATHAN WOLF CHAIS TRUST WILLIAM CHAIS, MARK CHAIS & EMILY CHAIS LOW TRUSTEES | 013792 - Claim denied. |
| 1C1270 | THE 1996 TST FOR THE CHILDREN OF PAMELA & STANLEY CHAIS AL ANGEL & MARK CHAIS TRUSTEE | 013846 - Claim denied. |
| 1C1271 | TALI CHAIS 1997 TRUST | 005808 - Claim denied.<br>013854 - Claim denied. |
| 1C1275 | WILLIAM CHAIS AND WRENN CHAIS J/T WROS | No claim filed. |
| 1C1284 | ARI CHAIS, 1999 TRUST | 005286 - Claim denied.<br>013855 - Claim denied. |
| 1C1285 | CHAIS INVESTMENTS | No claim filed. |
| 1C1286 | THE 1999 TST FOR THE CHILDREN OF STANLEY AND PAMELA CHAIS AL ANGEL TRUSTEE | No claim filed. |
| 1C1289 | JUSTIN ROBERT CHASALOW 1999 TRUST C/O STANLEY CHAIS | 005285 - Claim denied.<br>013853 - Claim denied. |
| 1C1290 | RACHEL ALLISON CHASALOW 1999 TRUST C/O STALEY CHAIS | 005291 - Claim denied.<br>013852 - Claim denied. |
| 1C1291 | BENJAMIN PAUL CHASALOW 1999 TRUST C/O STANLEY CHAIS | 005290 - Claim denied.<br>013851 - Claim denied. |
| 1C1292 | AL ANGEL TRUSTEE OF THE 1999 TRUST FOR THE GRANDCHILDREN OF STANLEY AND PAMELA CHAIS | 013847 - Claim denied. |
| 1C1293 | MIRIE CHAIS | No claim filed. |
| 1C1294 | WILLIAM CHAIS & WRENN CHAIS 1994 FAMILY TST DTD 4/25/95 | No claim filed. |
| 1C1302 | ARI CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE | No claim filed. |
| 1C1303 | TALI CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE | No claim filed. |
| 1C1304 | MADELINE CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE | 013788 - Claim denied. |
| 1C1305 | CHLOE CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE | 013790 - Claim denied. |
| 1C1306 | JONATHAN CHAIS TRANSFEREE #1 ALBERT ANGEL TRUSTEE | 013791 - Claim denied. |
| 1C1307 | BENJAMIN PAUL CHASALOW TRANSFEREE #1 | 013842 - Claim denied. |
| 1C1308 | JUSTIN ROBERT CHASALOW TRANSFEREE #1 | 013844 - Claim denied. |
| 1C1309 | RACHEL ALLISON CHASALOW TRANSFEREE #1 | 013843 - Claim denied. |
| 1C1317 | CHAIS FAMILY FOUNDATION | No claim filed. |
| 1O0014 | ONONDAGA INC MONEY PURCHASE PLAN | No claim filed. |
| 1O0020 | ONONDAGA INC DEFINED BENEFIT PENSION PLAN | 005713 - Allowed in the amount of $497,629.40.<br>013857 - Allowed Duplicate. |
| 1U0012 | THE UNICYCLE TRADING COMPANY | No claim filed. |
| 1U0021 | THE UNICYCLE TRADING COMPANY | 005288 - Allowed in the amount of $1,066,000.00.<br>013856 - Allowed Duplicate. |
| 1U0022 | UNICYCLE CORP MONEY PURCHASE PLAN | No claim filed. |

# EXHIBIT C



---

Private Wealth Management

CHAIS 1991 FAM. TRUST

September 20, 2016

Private
Wealth
Management



# Table of Contents

Important Information                                                    3
Portfolio Review                                                        4
    Investment Strategies - Holdings                     5
Client Information                                                      8
Additional Important Information                              9

At Goldman Sachs, we are committed to identifying, creating and providing access to innovative investment ideas and opportunities. Our investment approach begins by working closely with you to identify your particular short-term and long-term goals and to understand the nature of your existing asset base.

Asset allocation plays a pivotal role in effective wealth management. This material is based on your current financial situation, your investment time horizon and your attitude toward investment risk.

Once you select an appropriate asset allocation, we will work with you to implement a strategy designed to help meet your objectives. The Investment Strategy Group ("ISG") of Goldman Sachs provides strategic asset allocation and generates tactical investment ideas.

# Important Information



Please note the following important information below.  Additional important information is included at the end of this presentation.

**U.S. Registered ETF / Mutual Fund Performance:**
*If shown, the performance data quoted for U.S. registered exchange traded funds (ETFs) and mutual funds represents past performance and is not a guarantee of future results.  Current performance may be lower or higher than the performance data quoted.  For the most current performance data, please contact your Private Wealth Management team at the number provided on your monthly statement or toll-free in the U.S. at 1-800-323-5678.  A fund's investment return and the principal value of your investment will fluctuate.  As a result, your shares when redeemed may be worth more or less than their original cost.*

*The performance data for ETFs does not reflect a deduction for commissions that would reduce the displayed performance.  You are not subject to a sales charge for mutual funds purchased through PWM.  If a sales charge were applicable, the sales charge would reduce the mutual fund's performance.*



Private
Wealth
Management

Portfolio Review

# Investment Strategies - Holdings

As of: Sep 19, 2016

**Goldman Sachs**

**ALTERNATIVE INVESTMENTS**

| | Quantity | Price Date | Market Value | Contributions | Distributions | Unrealized Gain / Loss[1] | Equalization Credit |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| | Total Capital Commitment | Total Contributions / Distributions | Remaining Capital Commitment | Net Contributions / Distributions Since Inception | Latest Capital Statement Value / Statement Date | Net Contributions / Distributions Since Last Capital Statement | Computed Market Value | Economic Gain / Loss[1] |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

*continued on next page*

# Investment Strategies - Holdings

As of: Sep 19, 2016



| | Total Capital | Total Contributions / | Remaining Capital | Net Contributions / Distributions | Latest Capital Statement Value | Net Contributions / Distributions Since Last Capital | Computed | Economic |
|---|---|---|---|---|---|---|---|---|



*continued on next page*

6

# Investment Strategies - Holdings

As of: Sep 19, 2016



Unrealized

| | Total Capital Commitment | Total Contributions / Distributions | Remaining Capital Commitment | Market Value | | Economic Gain / Loss¹ |
|---|---|---|---|---|---|---|
| | | Total Contributions / Distributions | | Market Value | | |
| **ALTERNATIVE INVESTMENTS** | | – | | **$25,230,237** | | |

| | | | | Market Value | Market Percent | |
|---|---|---|---|---|---|---|
| **Total Investment Strategies** | | | | **$143,821,645** | **100.0%** | |

¹ Information in this section should not be used for tax reporting purposes.  Please refer to Tax Information under Additional Important Information for more information.
² Distributions of this investment may be subject to recall.
³ Contributions and distributions may be net of fees.

# Client Information

 



# Additional Important Information

Thank you for reviewing this presentation. Please review the important information below.

**Our Relationship with Clients.** We may act as an advisor or as a broker-dealer depending on our relationship with you, and may act as both for some clients. Our role and obligations will vary depending on the capacity in which we act. Where we act as an advisor, our primary role is to give you advice, help you manage your investments or, where applicable, help you hire another advisor to do so. Where we act as a broker, our primary role is to execute trades for you based on your instructions and any advice we give you is incidental to our brokerage services. How we are compensated by you (and sometimes by issuers or managers of investments who compensate us based on what you buy) and how your Private Wealth Management team is compensated will vary depending on whether you are classified as a professional or retail client, have an advisory or brokerage account and on the investments we or you make in your account, and may change over time. Please ask us questions to make sure you understand your rights and our obligations to you, the difference between advisory and brokerage accounts and / or how we are compensated based on the capacity in which we act.

We are part of a full-service, integrated investment banking, investment management, and brokerage firm. Other firm businesses may implement investment strategies that are different from the strategies used or recommended for your portfolio.

**Not a Municipal Advisor.** Except in circumstances where Goldman Sachs expressly agrees otherwise, Goldman Sachs is not acting as a municipal advisor and the opinions or views contained in this presentation are not intended to be, and do not constitute, advice, including within the meaning of Section 15B of the Securities Exchange Act of 1934.

**Entities Providing Services.** Strategic wealth advisory and brokerage services are provided by Goldman, Sachs & Co., member Financial Industry Regulatory Authority ("FINRA") / Securities Investor Protection Corporation ("SIPC"). Investment advisory services may be provided by Goldman, Sachs & Co., a Goldman, Sachs & Co. affiliate or an external manager offered through Goldman Sachs. Financial counseling services are provided by The Ayco Company, L.P., a Goldman Sachs Company. Margin loans are offered by Goldman, Sachs & Co. or Goldman Sachs International. Trust services are provided by The Goldman Sachs Trust Company, N.A. or The Goldman Sachs Trust Company of Delaware. All of these affiliated entities are subsidiaries of The Goldman Sachs Group, Inc. ("Firm" or "Goldman Sachs"). Deposit products and bank loans are offered by Goldman Sachs Bank USA, member FDIC and an Equal Housing Lender.

**Investment Strategy Group.** The Investment Strategy Group ("ISG") is focused on asset allocation strategy formation and market analysis for Private Wealth Management. Any information that references ISG, including their model portfolios, represents the views of ISG, is not research and is not a product of Global Investment Research. If shown, ISG Model Portfolios are provided for illustrative purposes only. Your actual asset allocation may look significantly different based on your particular circumstances and risk tolerance.

**Pricing and Valuations.** Prices, some of which are provided by third-party pricing services, are not guaranteed for accuracy, currency, or as realizable values. Certain positions may appear without a price if Goldman Sachs is unable to obtain a price and/or the security is not actively traded. Pricing sources and methods are available upon request and are subject to change.

**Fees and Charges.** We have two pricing models for advisory relationships, a comprehensive fee model and a product based model. You should take into consideration factors, including, but not limited to, your financial needs and circumstances, investment objectives, services provided under the model, your preference and the size of your account. Certain account fees and expenses may be more or less expensive depending on the model chosen. Actual fees may differ from estimated fees due to differences in strategies and amounts invested in particular strategies or overall. Charges applied to your accounts and transactions may include execution charges (including commissions, commission equivalents, mark-ups, mark-downs and dealer spreads), investment advisory fees and custody fees. When we act as broker, we are generally compensated by an execution charge on a trade by trade basis. When we act as advisor, we generally earn a fee based on assets under management and may also be earning execution charges. More information about fees and charges is included in our account agreements, fee schedules and trade confirmations. If estimated fees are shown, we have included a description of our fee calculation methodology.

9

# Additional Important Information



**Performance / Estimated Income / Estimated Cash Flow.** Investments in securities involve risk and the value of investments and income derived from such investments may fluctuate. Past performance is not a guide of future results. If performance is shown, it may include investments no longer owned in current or closed accounts. If requested, investment results may show internal rate of return calculations. Aggregate performance may not equal the sum of returns at an investment level. Performance for advisory accounts is currently calculated net of management fees, if any, and might include investments for which actual market prices are not available at the time this presentation was produced. Private equity positions are not included in performance calculations. Over time, we have adjusted how we calculate performance for certain asset classes or strategies. Information on historical performance calculations is available upon request. Performance of net cash (i.e., cash less margin debit) is generally included in the total performance calculation but not displayed separately. Option performance is included in the performance of the asset class of the underlier. Information on our asset classification schema is available upon request.

References to market or composite indices, benchmarks or other measures of relative market performance over a specified period of time ("benchmarks") are provided for informational purposes only. In addition to the strategy for the benchmark, other benchmarks may be displayed, including benchmarks displayed at your request. The manager may not review the performance of your account against the performance of those additional benchmarks. There is no guarantee that performance will equal or exceed any benchmark displayed.

If displayed, estimated income figures and estimated private equity future cash flows are estimates of future activity, and actual results may vary substantially.

**Tax Information.** The information included in this presentation, including, if shown, in the Tax Summary section, has not been audited, should not be used for tax reporting and is not a substitute for the applicable tax documents, including your Form 1099, Schedule K-1 for private investments, which we will provide to you annually, or your monthly Goldman Sachs account statement(s). The cost basis included in this presentation may differ from your cost basis for tax purposes. Information regarding your alternative investments and transactions for retirement accounts are not included in the Tax Summary section.

Goldman Sachs does not provide legal, tax or accounting advice. You should obtain your own independent tax advice based on your particular circumstances.

**Investment Risks.** Risks vary by the type of investment. For example, investments that involve futures, equity swaps, and other derivatives, as well as non-investment grade securities, give rise to substantial risk and are not available to or suitable for all investors. We have described some of the risks associated with certain investments below. Additional information regarding risks may be available in the materials provided in connection with specific investments. You should not enter into a transaction or make an investment unless you understand the terms of the transaction or investment and the nature and extent of the associated risks. You should also be satisfied that the investment is appropriate for you in light of your circumstances and financial condition.

- *Money Market Funds.* **Investments in money market funds are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency. Although money market funds seek to preserve the value of your investment at $1.00 per share, it is possible to lose money by investing in money market funds.**

- *U.S. Registered Mutual Funds / ETFs or Exchange Traded Notes (ETNs).* **A Prospectus and, if available, a summary prospectus for the applicable mutual fund, ETF or ETN containing more information may be obtained from your Private Wealth Management team. Please consider a fund's investment objectives, risks, charges and expenses, and read the summary prospectus or the Prospectus carefully before investing, as they contain this and other information about the mutual fund.**

  You may obtain documents for ETFs or ETNs for free by 1) visiting EDGAR on the SEC website at http://www.sec.gov/; 2) contacting your Private Wealth Management team; or 3) calling toll-free at 1-866-471-2526. Unlike traditional mutual funds, ETFs can trade at a discount or premium to the net asset value and are not directly redeemable by the fund.

Private
Wealth
Management

Goldman
Sachs

# Additional Important Information

You should understand the risks associated with leveraged or inverse ETFs, ETNs or commodities futures-linked ETFs before investing. These types of securities may experience greater price movements than traditional ETFs and may not be appropriate for all investors. Most leveraged and inverse ETFs or ETNs seek to deliver multiples of the performance (or the inverse of the performance) of the underlying index or benchmark on a daily basis. Their performance over a longer period of time can vary significantly from the stated daily performance objectives or the underlying benchmark or index due to the effects of compounding. Performance differences may be magnified in a volatile market. Commodities futures-linked ETFs may perform differently than the spot price for the commodity itself, including due to the entering into and liquidating of futures or swap contracts on a continuous basis to maintain exposure (i.e., "rolling") and disparities between near term future prices and long term future prices for the underlying commodity. You should not assume that a commodity-futures linked ETF will provide an effective hedge against other risks in your portfolio.

- **Alternative Investments.** Alternative investments may involve a substantial degree of risk, including the risk of total loss of an investor's capital and the use of leverage, and therefore may not be appropriate for all investors. Private equity, private real estate, hedge funds and other alternative investments structured as private investment funds are subject to less regulation than other types of pooled vehicles and liquidity may be limited. Investors in private investment funds should review the Offering Memorandum, the Subscription Agreement and any other applicable disclosures for risks and potential conflicts of interest. Terms and conditions governing private investments are contained in the applicable offering documents, which also include information regarding the liquidity of such investments, which may be limited.

- **Emerging Markets and Growth Markets.** Investing in the securities of issuers in emerging markets and growth markets involves certain considerations, including: political and economic conditions, the potential difficulty of repatriating funds or enforcing contractual or other legal rights, and the small size of the securities markets in such countries coupled with a low volume of trading, resulting in potential lack of liquidity and in price volatility.

- **Equity Investments.** Equity investments are subject to market risk, which means that the value of the securities may go up or down in respect to the prospects of individual companies, particular industry sectors and/or general economic conditions. The securities of small and mid-capitalization companies involve greater risks than those associated with larger, more established companies and may be subject to more abrupt or erratic price movements.

- **Fixed Income.** Investments in fixed income securities are subject to the risks associated with debt securities generally, including credit/default, liquidity and interest rate risk. Any guarantee on an investment grade bond of a given country applies only if held to maturity.

- **Non-US Securities.** Investing in non-US securities involve the risk of loss as a result of more or less non-US government regulation, less public information, less liquidity and greater volatility in the countries of domicile of the issuers of the securities and/or the jurisdiction in which these securities are traded. In addition, investors in securities such as ADRs/GDRs, whose values are influenced by foreign currencies, effectively assume currency risk.

- **Real Estate.** Investments in real estate involve additional risks not typically associated with other asset classes, such as sensitivities to temporary or permanent reductions in property values for the geographic region(s) represented. Real estate investments (both through public and private markets) are also subject to changes in broader macroeconomic conditions, such as interest rates.

- **Structured Investments.** Structured investments are complex, involve risk and are not suitable for all investors. Investors in structured investments assume the credit risk of the issuer or guarantor. If the issuer or guarantor defaults, you may lose your entire investment, even if you hold the product to maturity. Structured investments often perform differently from the asset(s) they reference. Credit ratings may pertain to the credit rating of the issuer and are not indicative of the market risk associated with the structured investment or the reference asset. Each structured investment is different, and for each investment you should consider 1) the possibility that at expiration you may be forced to own the reference asset at a depressed price; 2) limits on the ability to share in upside appreciation; 3) the potential for increased losses if the reference asset declines; and 4) potential inability to sell given the lack of a public trading market.

11

# Additional Important Information



**Client Specific Markets.** Investments held in your name with a subcustodian in the local market where traded in order to comply with local law will be indicated on your statements.

**Assets Not Held at Goldman Sachs.** Information (including valuation) regarding holdings in accounts held by third party custodians may be included in this presentation for your convenience and has been supplied by third parties or by you. Goldman Sachs assumes no responsibility for the accuracy of such information.  Information may vary from that reflected by your custodian and is as of the date of the materials provided to us.  In addition, in certain instances as an accommodation to you, we may reflect certain investments unrelated to services provided by Goldman Sachs.  In those situations, Goldman Sachs does not perform any due diligence on, verify the accuracy of information regarding, or provide advice on those investments.  Unless otherwise agreed in writing, we have not assessed whether those investment fit within your investment objective and the asset classification shown for such investments may not be accurate.

These assets are displayed in italics in this presentation and are excluded from performance and investment results.

**No Distribution; No Offer or Solicitation.** This material may not, without Goldman Sachs' prior written consent, be (i) copied, photocopied or duplicated in any form, by any means, or (ii) distributed to any person that is not an employee, officer, director, or authorized agent of the recipient.  This material is not an offer or solicitation with respect to the purchase or sale of any security in any jurisdiction in which such offer or solicitation is not authorized or to any person to whom it would be unlawful to make such offer or solicitation.

© 2016 Goldman Sachs.  All rights reserved.

## EXHIBIT D – FORM OF GRANT DEED (WITH RESERVED LIFE ESTATE)

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL THIS DEED TO:
Irving H. Picard, Trustee
c/o Baker Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111-0100

MAIL TAX STATEMENT TO:
Pamela Chais, Trustee
█████████████████████

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

APN:  4319-017-038

## GRANT DEED
## (WITH RESERVED LIFE ESTATE)

The undersigned grantor(s) declare(s):

DOCUMENTARY TRANSFER TAX $

☐ Computed on full value of property conveyed, or

☐ Computed on full value less liens and encumbrances remaining at time of sale.

☐ Unincorporated Area  ☐ City of _____

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Pamela Chais, Trustee of Survivor's Trust under Chais 1991 Family Trust dated September 4, 1991 ("**Grantor**") hereby GRANTS to Irving H. Picard, in his capacity as trustee under the Securities Investor Protection Act of 1970, 15 U.S.C. §§78 aaa *et seq.*, as amended, for the liquidation of the business of Bernard L. Madoff Investment Securities, LLC and the substantially consolidated estate of Bernard L. Madoff ("**Grantee**") the following described real property in the County of Los Angeles, State of California (the "**Property**"):

SEE EXHIBIT "A" ATTACHED HERETO AND

MADE A PART HEREOF BY REFERENCE

Commonly known as █████████████████████████████

The within grant is made subject to:  (i) the life estate described in Exhibit B which is attached hereto and incorporated herein by this reference; (ii) all matters of record including but not limited to those rights and restrictions referenced in or created under that certain Grant Deed and Power of Attorney executed by █████████████ ████████████ in favor of Grantor herein, recorded on December 7, 2010 as Instrument No. ███████████ in the office of the Los Angeles County, California, Recorder; and (iii) any and all condominium covenants, conditions and restrictions that may apply to the Property.

SEE EXHIBIT "B" ATTACHED HERETO AND

MADE A PART HEREOF BY REFERENCE

REGARDING RESERVED LIFE ESTATE PROVISIONS

Dated: _____, 2016          **GRANTOR**

_____
Pamela Chais, Trustee of Survivor's Trust
Under Chais 1991 Family Trust dated
September 4, 1991

2

*A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.*

STATE OF _____ )
                                                                              )                                ss.
COUNTY OF _____ )


On _____, 2016    before    me,

_____, personally appeared

_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
NOTARY PUBLIC

[SEAL]

1

**EXHIBIT "A"**

**LEGAL DESCRIPTION**

(see attached)





*First American Title*

4



*First American Title*



# EXHIBIT "B"

## LIFE ESTATE PROVISIONS

A. Grantor expressly reserves herein a life estate in the Property for the lifetime of Pamela Chais ("Chais"). Grantor shall have full ownership, possession and use of the Property during the lifetime of Chais, but subject to the terms, conditions and restrictions herein. Upon the death of Chais, all ownership, possession rights and use of the Property shall automatically revert to Grantee.

B. The life estate reserved hereby is subject to the following terms, conditions and restrictions:

   1. Chais, at her sole and exclusive option, may elect at any time to terminate the life estate by giving ten days' written notice of termination to Grantee, which notice (and any other notice to Grantee contemplated in this Grant Deed Life Estate) may be sent by overnight delivery service or by certified mail, return receipt requested, c/o Baker Hostetler LLP, 45 Rockefeller Plaza, New York, NY 10111-0100, Attn: David Sheehan, Esq. and Tracy Cole, Esq., and by email to dsheehan@bakerlaw.com and tcole@bakerlaw.com. At the expiration of the aforesaid ten days' notice period, all ownership, possession rights, obligations and use of the Property by Grantor shall terminate. In the event of such termination, Grantor shall, upon demand by Grantee, promptly execute and deliver to Grantee a quitclaim deed to the Property, but if Grantor fails to do so, Grantee is hereby appointed as Grantor's attorney-in-fact to execute such quitclaim deed in the name of and on behalf of Grantor, which power of attorney is coupled with an interest and is irrevocable.

   2. The life estate is not transferrable or assignable, in whole or in part, by Grantor or by Chais, and no person or entity other than Grantor or Chais (or Chais's spouse or legal guardian, if any, who may have possession or use rights but no ownership rights) shall have any of the ownership, possession or use rights, afforded hereby to Chais. Chais may not rent or lease the Property, nor may Chais encumber or mortgage her interest in the Property.

   3. During the term of the life estate, Chais shall be responsible for the payment and performance of the following: all real property taxes and assessments imposed against the Property; all homeowner's association dues and assessments (general and special) assessed against the Property; all costs of maintenance, upkeep and repair of the Property, including any structural repairs or capital improvements which are not the responsibility of the homeowner's association (and Chais agrees that she will not take any action that would intentionally destroy, damage or deplete the Property), *provided, however,* that Chais will not be required to effect repairs necessitated by earthquake, other Act of God, or the actions of any third party; all costs of insurance covering the Property (and Chais agrees to maintain during the term of the life estate proper and sufficient (a) liability insurance and (b)

property insurance covering her interest in the condominium unit, with at least the same amounts of coverage that existed on the date of this Grant Deed, and to cause Grantee to be named as an additional insured or loss payee (as the case may be) on all such insurance policies, and to provide Grantee promptly after the execution of this Grant Deed, with certificates of insurance (in ACORD format) confirming coverage, confirming that Grantee is named an additional insured or loss payee, and confirming that Grantee will receive at least thirty (30) days' notice of any cancellation or material change in coverage).

4.  If Grantor or Chais should breach any of the conditions, restrictions or covenants set forth in Paragraphs B2 and B3 above, and should such breach not be cured within thirty (30) days after receipt of written notice of breach from Grantee, which notice (and any other notice to Grantor contemplated in this Grant Deed Life Estate) may be sent to Grantor at the Property by overnight delivery service or by certified mail, return receipt requested, with copies by overnight delivery service or by certified mail, return receipt requested, to Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, attn. Dennis F. Dunne, Esq. and Michael L. Hirschfeld, Esq., and by email to ddunne@milbank.com and mhirschfeld@milbank.com, then Grantee may, at its option, undertake to cure any condition constituting the breach, and, should Grantee elect to undertake to cure, Grantee may charge Grantor or Chais for the reasonable costs and expenses incurred in effecting the cure.  In addition:

    a.   in the event that (i) homeowner's association dues and assessments (general and special) assessed against the Property remain unpaid for more than one year, other than as a result of a good faith dispute between Chais and the homeowner's association ("Qualifying Unpaid Charges"); and (ii) the Grantee, having been provided a Dues Foreclosure Notice, or having received knowledge of a Dues Default (as such terms are defined in Paragraph 5 below), provides written notice ("Dues Notice") to Pamela Chais and to the Chais Related Defendants[1] stating (*a*) the existence of the Qualifying Unpaid Charges and (*b*) the Grantee's intention, not later than thirty (30) days following the date of the Dues Notice, to pay the Qualifying Unpaid Charges; and (iii) within thirty (30) days following delivery of the Dues Notice, no Chais Related Defendant or group of Chais Related Defendants either (*x*) pays the Qualifying Unpaid Charges to the homeowner's association, or (*y*) reimburses the Grantee for sums actually and reasonably paid by the Grantee to the homeowner's association in satisfaction of the Qualifying Unpaid Charges, or (*z*) informs the Grantee in writing of their reasonable belief that such charges were not Qualifying Unpaid Charges based on a good faith dispute between Grantor and the homeowner's association and the reasons they should

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the settlement agreement to which this Exhibit D is attached (the "Settlement Agreement").

not be paid (or in the event paid by the Grantee, should not have been paid); or

b. in the event that (i) property taxes assessed against the Property remain unpaid for more than one year, other than as a result of a good faith dispute between Chais and the relevant taxing authority ("Qualifying Unpaid Taxes"); and (ii) the Grantee, having been provided a Tax Sale Notice or having received knowledge of a Tax Default (as such terms are defined in Paragraph 5 below), provides written notice ("Tax Notice") to Pamela Chais and to the Chais Related Defendants stating (*a*) the existence of the Qualifying Unpaid Taxes and (*b*) the Grantee's intention, not later than thirty (30) days following the date of the Notice, to pay the Qualifying Unpaid Taxes; and (iii) within thirty (30) days following delivery of the Tax Notice, no Chais Related Defendant or group of Chais Related Defendants either (*x*) pays the Qualifying Unpaid Taxes to the relevant taxing authority, or (*y*) reimburses the Grantee for sums actually and reasonably paid by the Grantee to the relevant taxing authority in satisfaction of the Qualifying Unpaid Taxes, or (*z*) informs the Grantee in writing of their reasonable belief that such taxes were not Qualifying Unpaid Taxes based on a good faith dispute between Grantor and the relevant taxing authority and the reasons they should not be paid (or in the event paid by the Grantee, should not have been paid),

then, and only then, the Grantee may commence action to terminate the Life Estate provided for in this Grant Deed, subject to Grantor's right to cure. The failure of Grantee to seek to enforce its rights upon obtaining knowledge of any breach hereunder by Grantor or Chais shall not be deemed a waiver of any of Grantee's rights.

5. Grantor and Chais agree to provide notice to Grantee of (i) any non-payment of homeowner's association dues and assessments (general and special) assessed against the Property that continues for more than one year ("Dues Default"), (ii) any notice of initiation or threatened initiation of foreclosure proceedings for a failure to pay homeowners association dues and assessments (general and special) assessed against the Property, whether or not a default has occurred ("Dues Foreclosure Notice"), (iii) any non-payment of property taxes assessed against the Property that continues for more than one year ("Tax Default"), and (iv) any notice of initiation or threatened initiation of a tax sale proceeding for a failure to pay property taxes assessed against the Property, whether or not a tax default has occurred ("Tax Sale Notice"). Such notice of a Dues Default or Tax Default shall be transmitted to Grantee within five (5) days of the occurrence thereof. Any Dues Foreclosure Notice or Tax Sale Notice shall be transmitted within five (5) days of the earlier of receipt thereof by Grantor or Chais. If Grantor defaults in any of her notice obligations under this Paragraph 5, upon Grantee obtaining knowledge of the existence of a Dues Default or a Tax Default or that a Dues Foreclosure Notice or a Tax Sale Notice has been received by Grantor,

Grantee may, at his option, cure the Dues Default or the Tax Default without further notice to Grantor, and Grantor shall be responsible to reimburse Grantee for all costs expended by Grantee to effectuate such cure.

6. Nothing in this Grant Deed is intended to or shall be deemed to create a joint venture, partnership, or similar arrangement as between Grantor and Grantee, or a lease between Grantor and Grantee, and the only interest in Grantor which has been created by the reservation hereunder is that of a life estate.

7. In the event that Grantee relinquishes his capacity as trustee under the Securities Investor Protection Act of 1970, 15 U.S.C. §§78 aaa *et seq.* ("SIPA"), as amended, for the liquidation of the business of Bernard L. Madoff Investment Securities, LLC and the substantially consolidated estate of Bernard L. Madoff, or, in the event of incapacity of the Grantee, the powers of the Grantee are temporarily vested in a duly empowered designee ("Designee"), Grantee or Designee shall have the right to assign or transfer its rights and interest in the property to any successor trustee appointed to that capacity under SIPA (a "Successor Trustee") or to the Securities Investor Protection Corporation ("SIPC"), but such assignment or transfer shall be subject always to the terms and conditions of this Grant Deed and Life Estate Provisions, including but not limited to the life estate reserved herein, and subject to the restrictions that a Successor Trustee, or, in the event of incapacity of the Successor Trustee, the powers of the Successor Trustee are temporarily vested in a duly empowered designee (a "Successor Designee"), shall have no right to make a subsequent sale, transfer or assignment of such rights or interest in the Property during the lifetime of Chais other than to another Successor Trustee or SIPC, and SIPC shall have no right whatsoever to make any subsequent sale, transfer or assignment of such rights or interest in the Property during the lifetime of Chais.  Grantor will cooperate with Grantee by executing and delivering a customary form of "estoppel certificate" promptly upon request from Grantee in connection with any such assignment or transfer of Grantee's rights and interest in the Property to the extent that such estoppel certificate is reasonable or necessary to accomplish such sale or assignment.  Grantee shall provide written notice to Chais and Grantor, in the manner specified in Paragraph B4 above, of any plan or intention to assign or transfer Grantee's rights and interest in the Property not less than thirty (30) days prior to the contemplated closing thereof, such notice to specify the identity, address and contact information of the proposed representative at SIPC responsible for administering Grantee's rights and interest in the Property following such assignment or transfer.

8. This Grant Deed and Life Estate Provisions shall be governed in all respects, whether as to validity, construction, interpretation, capacity, performance or otherwise, by the laws of the State of California without reference to its principles of conflicts of laws.  Any court action or proceeding brought under this Grant Deed and Life Estate Provisions shall be brought in the federal or state courts in or for Los Angeles County, California and each party to this

Grant Deed and Life Estate Provisions hereby consents to the exclusive jurisdiction of such courts and venue, which each party hereby agrees is convenient.  If any action or suit at law or in equity is necessary to enforce, interpret or implement the terms of this Grant Deed and Life Estate Provisions, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which it may be entitled.

9.    Grantor and Grantee expressly waive any right to partition the Property.

The Grantor, by signing below, specifically acknowledges and agrees to the provisions in this Exhibit "B" relating to the life estate reserved in this Grant Deed.

_____
Pamela Chais, Trustee of Survivor's Trust under Chais 1991 Family Trust dated September 4, 1991

_____
Irving H. Picard, Trustee For the Liquidation Proceedings of Bernard L. Madoff Investment Securities LLC and the Substantively Consolidated Chapter 7 Estate of Bernard L. Madoff

Exhibit "B"

## EXHIBIT E – FORM OF BILL OF SALE AND GENERAL ASSIGNMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged, The Estate of Stanley Chais, Pamela Chais, Pamela Chais, Trustee of the Chais 1991 Family Trust (now consisting of the Survivor's Trust under Chais 1991 Family Trust dated September 4, 1991 and the Marital Trust under Chais 1991 Family Trust dated September 4, 1991), and Chais Family Foundation (each an "**Assignor**" and, collectively, "**Assignors**") hereby sell, assign and transfer to Irving H. Picard, in his capacity as trustee under the Securities Investor Protection Act of 1970, 15 U.S.C. §§78 aaa *et seq.*, as amended, for the liquidation of the business of Bernard L. Madoff Investment Securities, LLC and the substantially consolidated estate of Bernard L. Madoff ("**Assignee**"), all their right, title and interest in and to the following-described property:

All furniture, furnishings, fixtures, equipment, other tangible and intangible personal property (including intellectual property) of every kind and character now owned by Pamela Chais ("**Chais**") wherever located and all furniture, furnishings, fixtures, equipment, other tangible and intangible personal property (including intellectual property) of every kind and character owned by Chais at her death (the "**Personal Property**"), excluding only (i) current and future rights, and any survivors' or beneficiaries' rights, under any pension or retirement plans, social security payments or other wages or salaries, and (ii) upon the death of Chais, items of the Personal Property with an aggregate tangible value of up to $75,000 (valued in accordance with the estate tax return filed upon the death of Chais) as may be selected by her lineal descendants.

1.  Assignors represent that they are not aware of any lien or encumbrance upon, security interest in or adverse claim to the Personal Property other than (a) as asserted by the Assignee under the Consent Order Freezing Assets in place in the Adversary Proceeding[1] (ECF No. 33), the effectiveness of which has been terminated under the Settlement Agreement, (b) as asserted by the Attorney General of the State of California in litigation pending in the Superior Court of California, (c) as asserted by plaintiffs Bottlebrush Investments, LP, Leghorn Investments, Ltd., Steven Heimoff and Douglas Hall in the lawsuits pending in the Superior Court of California enumerated in Recital Q of the Settlement Agreement and (iv) any lien, encumbrance, security interest or adverse claim that applies by operation of law or of which the Assignee has been provided notice prior to the execution of this Bill of Sale and General Assignment.

2.  Each Assignor expressly reserves herein a life estate in the Personal Property of such Assignor for the lifetime of Chais. Chais shall have full ownership, possession and use of such Personal Property during her lifetime, but subject to the terms, conditions and restrictions herein. Upon the death of Chais, all ownership, possession rights and use of such Personal Property shall automatically revert to Assignee. To the extent Assignee seeks to perfect any liens, encumbrances, security interest in or claim against the Personal Property (so long as they do not interfere with any valid life estate), the Assignors agree to reasonably cooperate with such efforts, including providing appropriate signatures, *provided* that any such efforts are reasonably necessary to protect Assignee's interest in the Personal Property and are not unduly burdensome or

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the settlement agreement between the Trustee and The Estate of Stanley Chais, Pamela Chais, the Chais 1999 Family Trust and Chais Family Foundation, among others, dated October 19, 2016 (the "Settlement Agreement").

excessive to any Assignor and *further provided* that the Assignee shall pay any and all costs, including but not limited to reasonable legal costs incurred by Assignors for the review and, if necessary, negotiation and revision of any requested documents in connection with the any such efforts by Assignee.

3.  Within sixty (60) days of the execution of this Bill of Sale and General Assignment, the Assignors shall provide an inventory of the Personal Property, provided that such inventory may list property by category, with the exception of any item of Personal Property with an estimated value of more than $25,000.  The Assignors represent that they have accurately disclosed to the Trustee their reasonable best estimate of the value of the Personal Property as of the date of execution of this Bill of Sale and General Assignment.

4.  The life estate reserved hereby is subject to the following terms, conditions and restrictions:

    (a)  The life estate is not transferrable or assignable, in whole or in part, by any Assignor, and no person or entity other than an Assignor or Chais's spouse or legal guardian, if any (who may have possession or use rights but no ownership rights) shall have any of the ownership, possession or use rights afforded hereby to Assignors.  No Assignor may rent or lease the Personal Property, nor may any Assignor encumber or mortgage its interest in the Personal Property.  Notwithstanding the foregoing, Assignee acknowledges and agrees that certain items of Personal Property may be consumed, depleted, converted or disposed of by Assignors during the life estate, in a reasonable manner, provided that Personal Property that is converted into other furniture, furnishings, fixtures, equipment, other tangible and intangible personal property (including intellectual property) during the life estate shall then be included in the definition of Personal Property for purposes of this Bill of Sale and General Assignment.

    (b)  During the term of the life estate, Assignors shall be responsible for the payment and performance of the following:  all personal property taxes and assessments imposed against the Personal Property; all costs of maintenance, upkeep and repair of the Personal Property; and all costs of insurance covering the Personal Property (and Assignors agree to (i) maintain during the term of the life estate proper and sufficient property insurance covering the Personal Property with at least the same amounts of coverage which exist on the date of this Bill of Sale and General Assignment, (ii) to cause Assignee to be named as a loss payee on all such insurance policies, and (iii) to provide Assignee promptly after the execution of this Bill of Sale and General Assignment, confirmation of such coverage, confirming that Assignee is named a loss payee, and confirming that Assignee will receive at least thirty (30) days' notice of any cancellation or material change in coverage).

    (c)  If Assignors should breach any of the conditions, restrictions or covenants set forth in Pars 3(a) and (b) above, and should such breach not be cured within thirty (30) days after receipt of written notice of breach from Assignee, which notice shall be sent to Chais at ████████████████████████████ ██████ by overnight delivery service or by certified mail, return receipt requested, with copies, also by overnight delivery service or by certified mail, return receipt requested, to Milbank, Tweed, Hadley & McCloy LLP, 28

Liberty Street, New York, NY 10005, attn. Dennis F. Dunne, Esq. and Michael L. Hirschfeld, Esq., and by email to ddunne@milbank.com and mhirschfeld@milbank.com, then Assignee may, at its option, undertake to cure any condition constituting the breach, and, should Assignee elect to undertake to cure, Assignee may charge Assignors for the reasonable costs and expenses incurred in effecting the cure.  The failure of Assignee to seek to enforce its rights upon obtaining knowledge of any breach hereunder by Assignors shall not be deemed a waiver of any of Assignee's rights.

5.  Nothing in this Bill of Sale and General Assignment is intended to or shall be deemed to create a joint venture, partnership, or similar arrangement as between any Assignor and Assignee, or a lease between any Assignor and Assignee, and the only interest in Assignors which has been created by the reservation hereunder is that of a life estate.

6.  In the event that Grantee relinquishes his capacity as trustee under the Securities Investor Protection Act of 1970, 15 U.S.C. §§78 aaa *et seq.* ("SIPA"), as amended, for the liquidation of the business of Bernard L. Madoff Investment Securities, LLC and the substantially consolidated estate of Bernard L. Madoff, or, in the event of incapacity of the Grantee, the powers of the Grantee are temporarily vested in a duly empowered designee ("Designee"), Grantee or Designee shall have the right to assign or transfer its rights and interest in the Personal Property to any successor trustee appointed to that capacity under SIPA (a "Successor Trustee") or to the Securities Investor Protection Corporation ("SIPC"), but such assignment or transfer shall be subject always to the terms and conditions of this Bill of Sale and General Assignment, including but not limited to the life estate reserved herein, and subject to the restrictions that a Successor Trustee, or, in the event of incapacity of the Successor Trustee, the powers of the Successor Trustee are temporarily vested in a duly empowered designee (a "Successor Designee"), shall have no right to make a subsequent sale, transfer or assignment of such rights or interest in the Personal Property during the lifetime of Chais other than to another Successor Trustee or SIPC, and SIPC shall have no right whatsoever to make any subsequent sale, transfer or assignment of such rights or interest in the Personal Property during the lifetime of Chais.

7.  Except as otherwise provided herein, the obligations of the persons and entities which comprise Assignor are joint and several.

8.  This Bill of Sale and General Assignment shall be governed in all respects, whether as to validity, construction, interpretation, capacity, performance or otherwise, by the laws of the State of California without reference to its principles of conflicts of laws.  Any court action or proceeding brought under this Bill of Sale and General Assignment shall be brought in the federal or state courts in or for Los Angeles County, California and each party to this Bill of Sale and General Assignment hereby consents to the exclusive jurisdiction of such courts and venue, which each party hereby agrees is convenient.  If any action or suit at law or in equity is necessary to enforce, interpret or implement the terms of this Bill of Sale and General Assignment, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which it may be entitled.

"ASSIGNORS"

THE ESTATE OF STANLEY CHAIS

_____

By:  Pamela Chais, Executrix

PAMELA CHAIS

_____

PAMELA CHAIS, TRUSTEE OF THE
CHAIS 1991 FAMILY TRUST (NOW CONSISTING
OF THE SURVIVOR'S TRUST UNDER CHAIS
1991 FAMILY TRUST DATED SEPTEMBER 4,
1991 AND THE MARITAL TRUST UNDER CHAIS
1991 FAMILY TRUST DATED SEPTEMBER 4,
1991)

_____

By: Pamela Chais, Trustee

CHAIS FAMILY FOUNDATION

_____

By: Pamela Chais, President