```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE:
     BERNARD L. MADOFF INVESTMENT
 4   SECURITIES LLC

 5   IRVING H. PICARD,

 6                 Plaintiff,

 7            v.                            11 CV 3775 (JSR)

 8   JAMES GREIFF,

 9                 Defendant.

10   ------------------------------x
                                         New York, N.Y.
11                                       July 28, 2011
                                         6:10 p.m.
12
     Before:
13
                     HON. JED S. RAKOFF,
14
                                         District Judge
15
                          APPEARANCES
16
     BAKER & HOSTETLER
17        Attorneys for Plaintiff
     BY:  DAVID J. SHEEHAN
18
     BECKER & POLIAKOFF
19        Attorneys for Defendant
     BY:  HELEN DAVIS CHAITMAN
20
     SECURITIES INVESTOR PROTECTION CORPORATION, Intervenor
21   BY:  KEVIN H. BELL

22

23

24

25
```

1          (In open court)

2          DEPUTY CLERK:  July 28, 2011, Irving Picard versus

3     James Greiff.  Please be seated, and will the parties please

4     identify themselves for the record.

5          MR. SHEEHAN:  David Sheehan from Baker & Hostetler for

6     the trustee, Irving Picard.

7          MR. BELL:  Kevin Bell for the Securities Investor

8     Protection Corporation.

9          MS. CHAITMAN:  Good afternoon, your Honor, Helen Davis

10    Chaitman from Becker & Poliakoff on behalf of James Greiff and

11    64 other defendants in similar actions.

12          THE COURT:  Good afternoon, please be seated.

13          So before we hear argument on this motion to withdraw

14    the bankruptcy reference, let me sort of clear the air a little

15    bit of some things that are not before the Court.

16          First, earlier today I issued an opinion dismissing

17    the common law claims against HSBC Bank and certain other

18    defendants, but there are no common law claims involved in the

19    instant motion, so that's not before me in this argument.

20          Secondly, in withdrawing the reference in the

21    Wilpon/Katz matter, I was particularly concerned -- that was

22    not the only issue -- with the very interesting issue of

23    whether the bankruptcy law or conversely non-bankruptcy law

24    should govern the standard of what constitutes willful

25    blindness or recklessness or things of that sort.  That's not

1  before the Court in this motion because no such claim is being

2  made as against the defendant that we're concerned with this

3  afternoon.  So this is, I think, a withdrawal motion of a

4  rather more narrow compass than those I considered previously.

5        I'm also at the threshold a little perplexed by the

6  fact that Ms. Chaitman only filed a motion to withdraw the

7  reference on behalf of James Greiff, and she seeks in a

8  footnote in a brief to say that well, this is also a motion to

9  withdraw the reference of 313 other defendants.

10        I don't think that a footnote in a brief can serve

11  that purpose.  Now if trustee counsel and SIPC counsel want to

12  agree to that, that's one thing, but if they don't,

13  Ms. Chaitman, you have got to tell me where in the entire

14  history of the law in the United States there is authority for

15  saying that a footnote in a brief is the equivalent of a

16  motion.

17        MS. CHAITMAN:  With respect to that issue, your Honor

18  is absolutely right.  The complaints are identical with respect

19  to each of our clients, and if the Court rules in the Greiff

20  case, I believe that that ruling would be applicable to

21  everyone else.

22        THE COURT:  That may or may not be, but the only

23  motion before me right now involves Mr. Greiff.

24        MS. CHAITMAN:  I appreciate that, your Honor.

25        THE COURT:  All right.  Now of the issues that are

```
 1    presented, the one that seems to me to be new is the one

 2    related to the nature of Mr. Picard's compensation and whether

 3    this creates some sort of conflict.  And of course, I'm not

 4    dealing with the merits of any issue here today, I'm dealing

 5    with the question of whether there's a basis for withdrawal

 6    from reference.

 7              But I was curious to see in the argument by SIPC that

 8    they don't regard themselves as a quasi-governmental

 9    institution.  Does that mean that you don't and have never

10    asserted governmental immunity in any case?

11              MR. BELL:  Not that I know of, your Honor.

12              THE COURT:  I'm glad to hear that.  It seems to me

13    it's been fairly commonplace for similarly situated entities to

14    assert that they are quasi-governmental, therefore, that

15    they're entitled to -- usually they claim absolute immunity.

16    The Second Circuit in a number of cases has granted that view,

17    as has this Court, but if you're not asserting that --

18              MR. BELL:  I think we're constrained by the words of

19    Congress in the statute, which are very plain, that we're a DC

20    nonprofit corporation and not an agency or establishment of the

21    United States government, which is found in 3A.

22              THE COURT:  What do you think the New York Stock

23    Exchange is?

24              MR. BELL:  Excuse me?

25              THE COURT:  What do you think the New York Stock
```

1   Exchange is?

2              MR. BELL:  We're not the New York Stock Exchange.

3              THE COURT:  I know you're not, but is it not in the

4   same sense that you're talking about; it wasn't created by the

5   government, but under the Securities Act, because it served

6   nevertheless certain quasi-governmental functions when it does

7   regulatory activities --

8              MR. BELL:  We have no --

9              THE COURT:  I understand that.

10             MR. BELL:  We have no rule-making power.

11             THE COURT:  Excuse me, I really would like to finish

12  my sentence, if you don't mind.

13             MR. BELL:  Sure.

14             THE COURT:  But when it has exercised government-like

15  activities, then the Second Circuit has said its

16  representatives get absolute immunity.  So here, as I

17  understand it, you in some sense are appointed by the court on

18  the recommendation of the Department of Justice and report in

19  some sense to the Department of Justice.  No?

20             MR. BELL:  No, there is no link between SIPC and the

21  Department of Justice.

22             THE COURT:  None whatsoever?

23             MR. BELL:  None that I can recall, and I have been

24  there 37 years.

25             THE COURT:  So it's different from a bankruptcy

```
 1   trustee.

 2              MR. BELL:  It is totally different.  In fact, the

 3   bankruptcy rules say that in a SIPA proceeding there needs to

 4   be nothing served upon the Office of the U.S. Trustee.  So

 5   clearly there is an understanding in the bankruptcy rules that

 6   the U.S. Trustee has nothing to do whatsoever with the SIPA

 7   trustee or anything of that nature.

 8              THE COURT:  So taking then you to be a purely private

 9   entity --

10              MR. BELL:  We're a creature of the statute that

11   Congress has created us by.

12              THE COURT:  Well, I don't know what that means.  Are

13   you private or public or something in between?

14              MR. BELL:  Excuse me, we are at Section 3A, as set

15   forth, it says:  There is hereby established the body corporate

16   to be known as the Securities Investor Protection Corporation,

17   and SIPC shall be a nonprofit corporation and shall have

18   succession until dissolved by the Act of Congress.  SIPC shall,

19   A, not be an agency or establishment of the United States

20   government; and B, except as otherwise provided in this

21   chapter, be subject to and have all of the powers conferred

22   upon a nonprofit corporation by the District of Colombia

23   Nonprofit Corporation Act.

24              THE COURT:  So you think you are purely private.

25              MR. BELL:  We have elements of responsibility that are
```

08-01789-smb  Doc 14359-JSR  Filed 10/28/16  Entered 10/28/16 17:24:56  Exhibit 7
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR)   Pg 7 of 32
Case 1:11-cv-03775-JSR  Document 16  Filed 10/31/16  Page 7 of 32
17STPTCA

```
 1   given us by the statute to work with the United States

 2   Securities & Exchange Commission.  SIPC is set up as a

 3   membership corporation of all broker/dealers registered under

 4   15B of the Securities Exchange Act of 1934.  We're required to

 5   collect assessments, to create a fund, to maintain that fund,

 6   and when we have notice from the -- referral from the

 7   commission, we are charged with making the decision whether the

 8   customers of the SIPC member, which are registrants of the

 9   commission, need the protections afforded by this

10   Congressionally-mandated protection plan.

11           THE COURT:  So that sounds like you have some

12   quasi-governmental responsibilities.

13           MR. BELL:  We do have responsibilities.  We are

14   overseen by the commission, and we are overseen by

15   congressional committees both in the House and in the Senate.

16           THE COURT:  So would it be lawful for a prosecutor,

17   for example, to have his salary be a percentage of all fines he

18   collected when he brought various similar criminal actions as

19   U.S. Attorney?

20           MR. BELL:  I don't know, your Honor, that is not an

21   issue that arises under the Securities Investor Protection Act.

22           THE COURT:  The compensation of Mr. Picard, according

23   to Ms. Chaitman, is on a percentage basis.

24           MR. BELL:  That is incorrect.

25           THE COURT:  Well, I don't know that, all I know is
```

1    what she is alleging.

2            MR. BELL:  Your Honor, if I might direct you to

3    Section 5B5, there is set forth in the statute compensation for

4    services and reimbursement of expenses.  In no SIPA liquidation

5    proceeding in its 40 and a half years has any compensation to a

6    trustee or counsel been on a percentage basis.

7            THE COURT:  So what are the terms of compensation?

8            MR. BELL:  Compensation is set forth on a reasonable

9    basis usually on the number of hours times the hourly rate,

10   which is usually at a discount, that is given by the trustee

11   and counsel at the time of their appointment or right before.

12   And those requests for compensation are presented to the

13   bankruptcy court and are subject to notice of hearing, and

14   after consideration by the bankruptcy court with the required

15   recommendation of SIPC, there is an order issued by the

16   bankruptcy court.

17           Now in a case where there is no reasonable expectation

18   of recoupment of those administrative expenses, the fees, there

19   is a requirement by the court to grant the amounts recommended

20   by the Securities Investor Protection Corporation, if those

21   amounts recommended by SIPC are the same amounts requested by

22   the trustee and counsel.

23           THE COURT:  So if I understand what you're saying, in

24   this case, as far as you're aware, the trustee and his counsel

25   are compensated on an hourly basis.

1         MR. BELL:  On a discounted hourly rate.

2         THE COURT:  Discounted hourly rate.  And I guess the

3    one other question I have is do you know of any arrangement

4    between the trustee and his firm as to whether he receives a

5    special compensation with regard to how much the firm receives?

6         MR. BELL:  Let me put it in context and I will answer

7    your question.  I have been the SIPC attorney assigned to this

8    case since December 11, 2008 when SIPC got the referral call

9    from the Securities & Exchange Commission.  I have reviewed

10   every page of every invoice for the 960 days -- and today 960th

11   day of this case -- submitted by trustees.

12        THE COURT:  But who's counting?

13        MR. BELL:  No, I don't count, your Honor, nor does my

14   wife.

15        The 960 days that this case has been going on, there

16   is a compensation procedure order that was signed by Judge

17   Lifland in February, I think February 23rd, 2009, that sets

18   forth that the trustee and counsel shall submit their invoices

19   monthly to SIPC, SIPC shall review them, and if they pass

20   SIPC's muster -- which they never do because there is always

21   adjustments that we request -- then SIPC can advance the funds

22   to the trustee to pay them.  And then within a period of 120 to

23   150 days an application for those months shall be made to the

24   Court.

25        There have been six such applications to the Court

08-01789-smb    Doc 14359-18    Filed 10/28/16    Entered 10/28/16 17:24:56    Exhibit 10
Case 1:11-cv-03775-JSR    Document 46    Filed 08/10/12    Page 10 of 32
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR)    Pg 10 of 32
17STPICA

```
 1   running through the period of January of this year, and we are

 2   in the seventh application period, which hasn't been submitted.

 3   But SIPC gets those invoices shortly after the 20th of every

 4   month and thoroughly reviews them.  Not only do I review them,

 5   but then I make my recommendation and my extensive detailed

 6   memo to the general counsel of the corporation who almost

 7   always does a de novo through every page again to make sure

 8   we've looked at everything and understand everything.  In that

 9   review, we also have a full and complete understanding of what

10   is engaged in the case, what the issues are --

11           THE COURT:  I mean this is all very helpful, but I

12   think you missed my question.  I understand --

13           MR. BELL:  There is no knowledge, your Honor, by SIPC

14   of whatever arrangement -- nor has there ever been, of what the

15   arrangement is between the trustee and counsel.

16           THE COURT:  And given the allegations -- and I want to

17   find out whether there are any bases for the allegations from

18   your adversary -- but given her allegations, why shouldn't you

19   inquire into what the arrangements are within the firm?

20           If for example -- and this is not the case, this is to

21   take an extreme hypothetical -- if the arrangement of a lawyer

22   with a firm was that you will be paid a very high percentage of

23   what the fees are in this case, that might arguably place the

24   trustee in a position where he would have a motive that could

25   factor into his determination whether to sue people and for how
```

1    much.

2         I am not suggesting at all that that is necessarily a

3    fair inference, I just wanted to find out what reason there

4    would be for not inquiring about that.

5         MR. BELL:  Your Honor, we never have, and in fact all

6    of the litigation decisions that are engaged in, if we have a

7    question, we ask why.  We review the papers.  We are very aware

8    of the aspects of all actions commenced and intended to be

9    commenced by the trustee.  After seeing what I consider the

10   rank speculation by opposing counsel, which has been

11   articulated on the sixth application and was argued before

12   Bankruptcy Judge Lifland and was dismissed by Judge Lifland in

13   the sixth application hearing on June 1st of this year, it

14   is --

15        THE COURT:  Well, the only reason I'm raising it is

16   because it struck me as something that we hadn't discussed

17   before, and number two, more importantly, because it is at

18   least arguably a non-bankruptcy issue.

19        MR. BELL:  Well, if you look at what we've cited, you

20   will see Judge Scheindlin -- similar issues were raised before

21   her regarding constitutional issues by Ms. Chaitman back on one

22   of the earlier applications, and we have given you the citation

23   at page 23 of our opening memorandum.  There have been a lot of

24   press reports.  If you follow what was said, the source of it,

25   I think it's all smoke, no fire.

08-01789-cgm   Doc 14359-18   Filed 10/28/16   Entered 10/28/16 17:24:56   Exhibit 12
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR)   Pg 12 of 32
Case 1:11-cv-03775-JSR   Document 46   Filed 08/10/12   Page 12 of 32
17STPICA

```
 1              THE COURT:  That may be.  Let me let you off the hook

 2    for the moment, and I want to inquire of Ms. Chaitman:  What is

 3    the basis for these allegations?

 4              MS. CHAITMAN:  Your Honor, the basis is that I have

 5    been informed by a personal friend of Mr. Picard that he was

 6    compensated --

 7              THE COURT:  Who?

 8              MS. CHAITMAN:  A lawyer in New Jersey.

 9              THE COURT:  Who?

10              MS. CHAITMAN:  You know, unfortunately I can't

11    remember his name, but let me finish.  What happened was he

12    told me Mr. Picard was compensated on the basis of 33 to

13    50 percent of the billing Baker & Hostetler collected.

14              THE COURT:  Did you have any other basis?

15              MS. CHAITMAN:  No.  When we argued --

16              THE COURT:  So wait a minute, let me just -- forgive

17    me for interrupting, but on the basis of some hearsay comment

18    from someone who may or may not have had personal knowledge,

19    and who must be so little known to you that you can't even

20    remember his name, you made an allegation of unethical or

21    biased approach by Mr. Picard?  That seems an awfully weak read

22    to make such an allegation.

23              MS. CHAITMAN:  What I stated in the objection to the

24    fees is I have been told this was the case, and if it was the

25    case, I felt it raised due process issues.
```

1          At the argument, Mr. Picard stood up and said that the

2     percentage he gets is nowhere near what Ms. Chaitman said it

3     was.  So we now have Mr. Picard on the record in the transcript

4     that we provided to your Honor admitting that he is paid a

5     percentage of the fees paid to Baker & Hostetler, which is

6     directly contrary to the affidavit which he submitted to the

7     Court which gave the very, very strong impression that he

8     doesn't even receive his compensation, the fees that are

9     allocated to his time.  For example, in a typical period, a

10    four-month period or three-month period, Baker & Hostetler may

11    receive $40 million, and Mr. Picard's proportion of that is 4

12    million, or in addition it's 4 million for Mr. Picard's time.

13    What Mr. Picard said on the record -- and your Honor has the

14    transcript -- is my percentage is nowhere near what

15    Ms. Chaitman says it was.

16         THE COURT:  So assuming arguendo that he was paid on a

17    modest percentage basis of what the firm gets, because it seems

18    crystal clear from what your adversary just said that as far as

19    SIPC is concerned, they only get time charges, discounted time

20    charges, which they knock down still further, although one

21    suspects that the hourly rate will be still considerably higher

22    than is paid to federal judges.

23         So this is an arrangement on -- let us assume

24    hypothetically that he made with his firm that involves a

25    modest percentage, not unlike in some ways arrangements made by

```
1    most of the major firms in the United States to pay their

2    so-called rain makers a higher percentage of the firm's intake

3    or a higher percentage based on what they bring in than other

4    partners.  This is more or less in that sense standard practice

5    among most of the private major firms in the United States.  So

6    where is the problem?

7         MS. CHAITMAN:  Well, I agree with you that it is

8    common, your Honor, for rain makers to be compensated on the

9    basis of what they originate, and there is no problem unless

10   someone is performing a quasi-governmental function, and then

11   we learned from several United States Supreme Court cases that

12   there is a major problem, just as your Honor indicated in the

13   question to Mr. Bell.

14        THE COURT:  My first question about the U.S. Attorney

15   wasn't actually a hypothetical.  In the 19th century, U.S.

16   Attorneys throughout the United States were paid a percentage

17   of the fines they brought in, which made them much better paid

18   than they are today.  But it was determined, as you correctly

19   note, that that was not an appropriate way for them to exercise

20   their quasi-governmental function.

21        Why do you think there is any quasi-governmental

22   function being exercised?

23        MS. CHAITMAN:  Because I think that SIPC -- if you

24   review the legislative history of the Securities Investor

25   Protection Act, you will see that there are numerous statements
```

1    by people in Congress that SIPC is to function like the FDIC,

2    to provide insurance to investors, to promote confidence in the

3    capital markets, because investors were giving up the

4    protection of certificated securities, and in lieu they were

5    getting SIPC insurance.

6         THE COURT:  Well, the question, of course, isn't the

7    legislative history.  If we learned anything from Justice

8    Scalia it's that we go from the plain language of the statute

9    which was just read to me.

10        MS. CHAITMAN:  That's right.  And the statute provides

11   that SIPC operates under the direction of the Securities &

12   Exchange Commission.  It reports to the Securities & Exchange

13   Commission.  It reports to Congress.  And I believe that there

14   are numerous decisions in which courts have referred to SIPC as

15   functioning in a quasi-governmental capacity.

16        And it is a hybrid, I don't dispute it is a hybrid,

17   but the problem here, your Honor, is SIPC and Mr. Picard have

18   taken positions that are unprecedented in the 40-odd years of

19   SIPC's existence.  This is the first time in SIPC's history

20   that it has filed practically a thousand lawsuits against

21   innocent customers of an SEC regulated broker/dealer on the

22   theory that they're not allowed to rely on upon the statements

23   they receive from their brokers which is the only evidence that

24   they have of the ownership of their investments.

25        And I believe that the problem here is that if

Case 1:11-cv-03775-JSR Document 16 Filed 08/10/11 Page 16 of 32

17STPICA

```
 1    Mr. Picard is compensated on a percentage of the fees paid to

 2    Baker & Hostetler, whatever that percentage is -- and he hasn't

 3    yet disclosed it, but whatever that percentage is, it brings

 4    into question the integrity of his decisions in this case.

 5    Your Honor today dismissed the aiding and abetting claims -- I

 6    gather from what you're saying, I hadn't been aware of it until

 7    you mentioned it -- that were brought against HSBC.

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          THE COURT:  Well, if you have trouble falling asleep

 2   tonight, just read my opinion.

 3          MS. CHAITMAN:  Here we have a situation where 988

 4   clawback actions were filed against 5,000 customers at Bernard

 5   L. Madoff Securities whose only crime is that they took, for

 6   mandatory, mandatory withdrawals from their IRA account.

 7          THE COURT:  The point though, and now maybe we should

 8   turn back to the main issues, to the extent that the issues you

 9   are raising are being raised in the context of pure bankruptcy

10   law claims, then it is hard to see what the nonbankruptcy law

11   aspect is that would bar the withdrawal of the reference.  If

12   someone takes an unusual position under bankruptcy, pure

13   bankruptcy -- let's make it a hypothetical -- that is not a

14   basis for seeking mandatory withdrawal.  It could conceivably

15   in an unusual case with a lot of other factors might warrant

16   discretionary withdrawal, but we're just concerned here with

17   mandatory withdrawal, so we're talking about mandatory

18   withdrawal and we're talking about substantial and unusual

19   issues of nonbankruptcy law.

20          MS. CHAITMAN:  And your Honor has said that SIPA is

21   not a bankruptcy law and that if there is a substantial issue

22   with SIPA the mandatory --

23          THE COURT:  Well, that part of the argument I am

24   familiar with.  Maybe I guess the way I should put the issue to

25   you is this:  Is there any other nonbankruptcy law issue other
```

1  than the SIPA issue that you of course are raising and the due

2  process issue that you say is raised by the state that you are

3  contending warrants withdrawal?

4      MS. CHAITMAN:  The issues that I briefed that warrant

5  withdraw are the entity and debt issue which your Honor is

6  familiar, the 546(e) issue with which your Honor is familiar,

7  the issue we've been discussing which arises under the due

8  process clause of the United States Constitution, and a seminal

9  issue which is an issue which I think requires mandatory

10  withdrawal and that is whether under 15 U.S. 78 FFF-2C3 the

11  trustee has the power to file these actions because that

12  provision doesn't give a trustee under a SIPA liquidation

13  blanket power to file fraudulent transfer action.  A SIPA

14  trustee only has the power to file a fraudulent transfer action

15  in a case where the fund of customer property is insufficient

16  to pay the allowed customer claims.

17      THE COURT:  I want to go back and at least modify to

18  the extent you said I found SIPA is a nonbankruptcy state.

19  What I found is that there are important aspects of SIPA that

20  in some of these cases that were raised that are nonbankruptcy

21  issues.  There are parts of SIPA that on their face just adopt

22  Title 11.

23      MS. CHAITMAN:  That's right.  To the extent it is not

24  inconsistent with SIPA.

25      THE COURT:  So I think you fairly summarize what you

1    are raising here and you have correctly said that the first two

2    issues, and I am happy to hear anything else you want to say on

3    it but I have been there and heard that, so for oral argument

4    purposes I think the last issue you just raised is now what we

5    should now focus on.

6            MS. CHAITMAN:  Well, I think it is important, your

7    Honor, to look at the history of the Securities Investment

8    Protection Act.  As I indicated it was enacted in 1970 at a

9    period of time, not unlike today, when there was a significant

10   loss of confidence in the capital markets.  The purpose of SIPA

11   was to instill confidence in the capital markets by providing

12   SIPC insurance and at the same time the purpose was to induce

13   investors to relinquish the protection of certificated

14   securities.

15           I am sure your Honor remembers in the old days when

16   you buy IBM stock, we would get a certificate with a beautiful

17   gold certificate on it and if we lost the certificate --

18           THE COURT:  It is quite unfair for you to remind me

19   how old I am.

20           MS. CHAITMAN:  I was actually just speaking of us

21   generally, your Honor.

22           In any event, if you lost a certificate, you simply

23   wrote to the issuer and submitted an affidavit and got a second

24   one.  I think that in 1970 the securities firms were anxious to

25   get away from certificated securities and the reason was:

1    Number one, certificated securities were a back-office

2    nightmare for the brokerage firm.  It was not a profitable

3    activity to be transferring securities from Helen Chaitman to

4    Jed Rakoff.  The firms were behind in doing that paperwork.

5    The other thing is that the firms undoubtedly had the foresight

6    to understand that if they could persuade the investing public

7    to allow them to hold securities in book-entry form, in

8    street-name form, they would be able as the SEC has allowed

9    them to to pledge those securities for their own purposes, to

10   buy and sell them when it was advantageous for them to do so.

11        So what happened as a result of the enactment of SIPA

12   was that the customer statement became the only evidence that a

13   customer had of what he owned.  Today of course we could never

14   turn the clock back because the financial products that are

15   offered to investors cannot be certificated.  If you buy an ETF

16   or index fund or mutual fund, you cannot possibly get

17   certificates to represent your ownership interest and there is

18   no way to turn that clock back.

19        The problem in this case is that for the first time in

20   SIPC history is turning to people who received monthly

21   statements and trade confirmations showing the purchase of real

22   securities, Fortune 100 company stocks, the only evidence that

23   these people could possibly rely upon was the documents they

24   received on a regular basis from their SEC regulator broker

25   dealer.  Yet in this case we have a trustee in a simple

1    liquidation who is saying, That statement doesn't mean what it

2    says.  This trustee has gone back to the 1960s.  I have

3    clients, your Honor, who opened up Madoff accounts in the 1960s

4    and what Mr. Picard has done to the extent he has the records

5    is netted out deposits and withdrawals going back to the 1960s

6    so that people got no credit for any appreciation from the day

7    they opened their account and he was self-effectuating

8    fraudulent transfer judgments going back decades beyond the

9    statute of limitations.

10            He has only sued for the withdrawals in the last six

11    years, but he has determined whether someone was subject to a

12    clawback suit by netting out deposits and withdrawals going

13    back for decades.  Of course these people have all paid taxes

14    to the federal and state governments that they were liable to

15    pay based on the statements they received from the broker

16    showing that they had earned these profits.  So there is a

17    fundamental issue, which I don't believe has ever been

18    determined.  And interestingly enough, your Honor, in the New

19    Times case of 2004, both SIPC and the SEC took the position in

20    the briefs they submitted in the Second Circuit that someone in

21    the position of all of these people was entitled to a claim in

22    the amount of their last statement.

23            THE COURT:  Let me hear now from counsel for the

24    trustee who has been unusually off the hook so far but now is

25    your opportunity.

08-01789-smb Doc 14359-18 Filed 10/28/16 Entered 10/28/16 17:24:56 Exhibit 22
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR) Pg 22 of 32
17STPICA
Case 1:11-cv-03775-JSR Document 46 Filed 08/10/11 Page 22 of 32

 1          MR. SHEEHAN:  Your Honor, just a couple things.  The

 2    argument just made by Ms. Chaitman is identical to an argument

 3    that was made to Judge Lifland in the Bankruptcy Court.

 4          THE COURT:  And decided.

 5          MR. SHEEHAN:  And decided by him.

 6          THE COURT:  And therefore subject to appeal to the

 7    District Court from that decision.

 8          MR. SHEEHAN:  Right.  And Ms. Chaitman and other

 9    defendants request we agreed to expedite that decision to the

10    Second Circuit where all the arguments just made were also

11    presented.

12          THE COURT:  Remind me, because I have forgotten about

13    that, where that presently stands.

14          MR. SHEEHAN:  It has been argued on March 3.  We're

15    awaiting decision from the Circuit, your Honor.

16          So to a very large extent I go back to what your Honor

17    was suggesting.  I don't think what you have before you is an

18    issues you in this context with regard to the last statement

19    that represents a material or substantial issue in nonfederal

20    or nonbankruptcy federal law.  I think we're right in the

21    wheelhouse.

22          THE COURT:  Even if it did, if you will, your

23    alternative argument is what practical purpose would be served

24    by withdrawing the reference if the very issue is already

25    before the Second Circuit.

08-01789-smb Doc 14359-18 Filed 10/28/16 Entered 10/28/16 17:24:56 Exhibit 23
Case 1:11-cv-03775-JSR Document 16 Filed 08/10/11 Page 23 of 32
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR) Pg 23 of 32
17STPICA

1      MR. SHEEHAN:  Correct.  That is exactly right.  I need

2 not go any further.

3      THE COURT:  So let me go back to Ms. Chaitman.  What

4 about the, and I am ashamed I forgot about that appeal, but

5 what about that?

6      MS. CHAITMAN:  Well, your Honor, the appeal is of

7 Judge Lifland's holding that net equity as defined in SIPA

8 permits the netting out for purposes of allowance of a claim.

9 In the decision Judge Lifland expressly held that he was not

10 dealing with any defenses to a clawback action because the

11 clawback actions hadn't been filed and they were not before

12 him.

13      THE COURT:  What is the nonbankruptcy issue in the

14 defense to the clawback?

15      MS. CHAITMAN:  The nonbankruptcy issue is, your Honor,

16 that under all of the securities laws -- the federal securities

17 law, the Securities and Exchange Act -- customers are entitled

18 to the statement balance shown on the statement they receive

19 from their broker.  This is a fundamental issue of

20 nonbankruptcy federal securities law.

21      THE COURT:  Why is that not embraced by the issuance

22 of appeal?

23      MS. CHAITMAN:  Because there were no clawback actions

24 filed.  The issue for purposes of the appeal is whether a

25 customer claim can be based on the net investment over a

```
 1      50-year period, or whether the customer claim must be the last

 2      statement.  There was no issue of whether the trustee could sue

 3      on a fraudulent transfer theory.  People who took withdrawals

 4      from their accounts from their SEC regulated broker dealer

 5      thereby reducing the debt of the broker to the customer.  That

 6      issue was specifically not addressed by Judge Lifland and he

 7      expressly stated, I am not addressing any of those issues

 8      because no clawback complaints have been filed.  That issue

 9      only arises, your Honor, in this case because the trustee has

10      sued on a clawback theory, a customer who simply took

11      withdrawals from his SEC regulated broker dealer account, which

12      reduced the debt from the broker to the customer.

13              THE COURT:  What, if anything, is going on in

14      Bankruptcy Court while that appear is pending?

15              MS. CHAITMAN:  Well, there are all kinds of issue in

16      the Bankruptcy Court to which certainly I can speak to.

17              THE COURT:  In terms of your specific --

18              MS. CHAITMAN:  Nothing.

19              THE COURT:  You want to wait until and I presume they

20      want to wait until that issue is decided on appeal, yes?

21              MS. CHAITMAN:  Well, no, your Honor.  We have until

22      October 3rd to answer the complaint and I intend to make a

23      motion to dismiss and one of the grounds on which I intend to

24      move to dismiss is that the federal securities laws bar these

25      actions.  That is an issue on which there has to be withdrawal
```

 1    because the Bankruptcy Court as an Article I court does not

 2    have the competence to determine that issue.

 3              THE COURT:  I am thinking now just practicalities.  If

 4    nothing is going on while the appeal is pending but a time has

 5    been set in October when if appeal is not decide you will have

 6    to go forward and make your motion and it is then that the

 7    nonbankruptcy issue, putting aside the other issues we talked

 8    about, but this nonbankruptcy issue will become real so to

 9    speak.  Why isn't that the time, if any, to withdraw the

10    reference?

11              MS. CHAITMAN:  I don't think that one has anything to

12    do with the other, your Honor.  I don't think that Mr. Sheehan,

13    for example, would say that if Judge Lifland is reversed on

14    appeal by the Second Circuit that he would automatically

15    dismiss all the clawback actions.  I don't think there is the

16    connection that Mr. Sheehan is leading you to believe there is.

17    These are separate complaints that are not dependent upon the

18    Second Circuit decision.

19              THE COURT:  Let me hear from Mr. Sheehan.

20              MR. SHEEHAN:  Your Honor, certainly I wasn't trying to

21    mislead the Court in what my position is.  The final last

22    statement issue which is the bread and butter of Ms. Chaitman's

23    argument was argued and is now pending before the Second

24    Circuit.

25              Indeed, to suggest that Judge Lifland was not aware of

08-01789-smb    Doc 14359-18    Filed 10/28/16    Entered 10/28/16 17:24:56    Exhibit 26
Case 1:11-cv-03775-JSR    Document 16    Filed 08/19/11    Page 26 of 32
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR)    Pg 26 of 32
17STPICA

1    the fact that the trustee may engage in avoidance actions,

2    because we did have statute of limitations September of 11th

3    and we filed, would not be accurate.  If I may be so bold to

4    read from decision of Judge Lifland at page 137 at 424  B.R. he

5    states, "The net investment method allows the definition of net

6    equity and the trustee's powers to avoid and recover property

7    contained in the same statutory framework to be interpreted

8    with preferred continence."  In other words, he was fully aware

9    of what we were going to do, which we had already done in other

10    cases that have initiated prior this opinion and he was fully

11    aware of the fact that we would utilize those avoidance

12    powers -- to what? -- recover the moneys.

13         That, as your Honor knows, in your Dryer opinion, we

14    didn't have an earthquake here.  We had a tsunami.  What we

15    have here is very, very unfortunately, and Ms. Chaitman is

16    right, innocent investors.  If you want to add up all 900 of

17    them, they $4.6 billion of other people's money.  I don't have

18    the trustee to turn a blind eye to that and not try to get it

19    back.  Because if he didn't, those people, those other people,

20    those net losers whose $4.6 billion was there, would never get

21    it back.  So that is what is going on in terms of avoidance

22    statute.

23         I would agree with Ms. Chaitman if in fact the Court

24    were to decide, the Second Circuit, that the final statement

25    method, it is a net equity calculation, is to be utilized in

08-01789-smb   Doc 14359-18   Filed 10/28/16   Entered 10/28/16 17:24:56   Exhibit 27
Case 1:11-cv-03775-JSR   Document 16   Filed 08/10/15   Page 27 of 32
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR)   Pg 27 of 32
17STPICA

1    terms of measuring net equity and what we then would end up

2    with would be the $20 billion of the cash that is missing, 4.6

3    of it is in the hands of 900 some odd people.  We're trying to

4    get all 20 back.  So we're doing that, utilizing the bankruptcy

5    and to fill the fund, work together, agreed, disagree, 2(c)(3)

6    work perfectly together.  The idea is to build the funds that

7    reduces the avoidance powers.  That is why Judge Lifland called

8    it preferred continence.

9          So at the end of the day we would then say, No, the

10   fund isn't 20.  It is $65 billion because then we would be

11   honoring the fictitious profits, which is what the 65 billion

12   represents, which is why that last statement was rejected in

13   the first place.

14         So in any event, your Honor, I cannot emphasize

15   enough --

16         THE COURT:  What you are saying in the very broadest

17   sense is that dealing with the question of transfers back

18   between or really the division of property between innocent

19   people on both sides is standard fair in Bankruptcy Court.

20         MR. SHEEHAN:  I couldn't agree more.  It is something

21   the Bankruptcy Court, as your Honor well knows from the Dryer

22   opinion and we worked with the bankruptcy judge there as well,

23   it goes on every day.  It is exactly what we do.  It is not a

24   pleasant talk.  I am not suggesting that it is, but it is the

25   only crude way that the law affords to us try to rateably --

1  rateably -- distribute the funds.

2        MS. CHAITMAN:  May I briefly?

3        THE COURT:  Please, of course.

4        MS. CHAITMAN:  We heard a great deal of garden variety

5  bankruptcy cases.  This is in no way a garden variety

6  bankruptcy issue.  Yes, the Bankruptcy Code incorporates the

7  fraudulent transfer laws, but this is the first time in SIPA's

8  history that a SIPC trustee has sought to hold a SEC regulated

9  customer liable for taking money out of his account when his

10  statement showed that he owned real securities.  That is a SIPC

11  issue, your Honor.  It is a threshold SIPC issue that is

12  dependent upon the Court's interpretation of the securities

13  laws.  The federal security laws mandate that customers are

14  entitled to rely upon their statements and that the broker owes

15  them the balance on their statements.  So if I as a customer

16  withdraw money from my SEC regulated broker dealer, whatever

17  that sum is, the broker has reduced its debt to me, that is not

18  a fraudulent transfer.  That is an issue that your Honor has to

19  determine.

20        To say this is a garden variety bankruptcy issue is

21  overlooking who the parties are and what the withdrawal was.

22  Fraudulent transfers are incorporated into the Bankruptcy Code,

23  but there has never been a fraudulent conveyance action with a

24  reported decision where someone in this situation was held

25  liable for taking money out of his account where he had

```
 1    existing securities traded on the New York Stock Exchange.

 2    This is an issue which has vast impact for this country.

 3    Because if customers of an SEC regulated broker dealer who do

 4    nothing than take mandatory IRA withdrawals and pay taxes on

 5    them can be sued on a fraudulent transfer, the securities

 6    markets will collapse.  This is not a bankruptcy issue, your

 7    Honor.

 8             MR. BELL:  Your Honor, if I might?

 9             THE COURT:  Sure.  I was struck by the analogy both

10    sides to whether this is or is not a garden variety issue.  My

11    suspicion is that the familiarity of any New York lawyer with

12    garden varieties is quite limited.  But in any event --

13             MR. BELL:  I live in Virginia, your Honor, so we have

14    green down there.  I used to live in New York when I grew up.

15             Judge Marrero of this bench in the Adler Coleman case

16    on the appeal Jackson v. Mishkin, which we cite in our papers,

17    discussed at length in an 80-page opinion the appeal from Judge

18    Garrity similarly lengthy opinion an action by a trustee.

19             THE COURT:  I think judges should be paid by the page.

20             MR. BELL:  Well, your Honor, I don't know in the light

21    of what is going on in Congress down in Washington there is

22    going to be much paying anybody.

23             THE COURT:  So let's get back to the issues.

24             MR. BELL:  There clearly are fraudulent transfer

25    actions that are cited to you in SIPC's brief.  The Tenth
```

```
 1   Circuit in the Davis v. Gillenwater case addressed 547, 548
 2   actions and the viability of bringing them in a super
 3   proceeding in the Bankruptcy Court.  And within the SIPC
 4   proceedings Old Naples, which is cited also to you, had Ponzi
 5   fraud and there were fraudulent transfer actions there.  So I
 6   think Ms. Chaitman is not correct in that statement and I just
 7   want to refer you to our brief.  Thank you.
 8            THE COURT:  You've all given me some very good issues
 9   to think about.
10            Ms. Chaitman, you want to say something more?
11            MS. CHAITMAN:  I see how hard and long you have worked
12   today, but your Honor --
13            THE COURT:  I am happy to hear you but I do have
14   another matter after this one.
15            MS. CHAITMAN:  Oh, my goodness.
16            I wanted to make the point Stern v. Marshal, which
17   came down after we had filed our motion, and I think that Stern
18   v. Marshal stands for the proposition that the Bankruptcy Court
19   does not have jurisdiction to hear any of these fraudulent
20   transfer cases because they were not filed in connection with
21   the determination of a claim.  These were not counterclaims to
22   approve a claim.  I think that these are state law fraudulent
23   transfer claims which are beyond the jurisdiction of the
24   Bankruptcy Court under the Stern v. Marshal express holding.
25            MR. BELL:  Your Honor, if I might again.  Stern v.
```

```
 1      Marshal does not effect the trustee's avoidance action against
 2      Mr. Greiff.  Mr. Greiff filed a claim in the proceedings.  The
 3      trustee's complaint against him is part of the resolution of
 4      the debtor-creditor relationship.  Clearly the holding in Stern
 5      v. Marshal and the conclusion that Chief Justice Roberts wrote
 6      says this is a -- there is one limit respect we're dealing with
 7      157(b)(2) and that was the tortious interference state law
 8      cause of action as a counterclaim.  And the Court says that the
 9      Bankruptcy Court lacked the constitutional authority to enter a
10      final judgment at that time.  But the Court also discussed
11      Langencamp, which we have in our papers, and clearly Mr. Greiff
12      filed a claim, submitted himself to the equitable jurisdiction
13      of the court.  He received $2.8 million of other people's money
14      and the trustee is obligated to pursue that in unraveling the
15      debtor-creditor relationship as to that particular defendant,
16      Mr. Greiff.
17               THE COURT:  The wonderful thing about the adversary
18      system is that the competing sides can read the same case and
19      say that it clearly and unequivocally stands for two opposite
20      things.  I will read it.
21               MR. BELL:  Thank you, your Honor.
22               THE COURT:  What I was starting to say was I do think
23      it is important for the litigants so I will give you an idea
24      when I will decide this.  The first of these withdrawal
25      substantive issues under the withdrawal motion that I have to
```

08-01789-smb    Doc 14359-18    Filed 10/28/16    Entered 10/28/16 17:24:56    Exhibit 32
Ex. 18 Hearing Transcript Case No. 11-cv-3775 (JSR)    Pg 32 of 32

17STPICA

```
 1   decide and there is another substantive motion that I am going

 2   to be deciding in the Katz matter in August.  There are other

 3   motions of withdrawal that are pending, one of which I am

 4   committed to decide by August 15th, and there are some that

 5   need to be argued.  So I think to be consistent with my own

 6   calendar and to give you some fair idea, I will decide this

 7   motion by September 15th.  I doubt that I will decide it before

 8   then.  September 15th will be the time.

 9            I thank counsel for all the parties.  This matter is

10   adjourned.

11            MR. BELL:  Thank you, your Honor.

12            MR. SHEEHAN:  Thank you, your Honor.

13                        o0o

14

15

16

17

18

19

20

21

22

23

24

25
```