# Exhibit B3

## Relevant Deposition Excerpts for Bernard L. Madoff

*** CONFIDENTIAL ***

Page 1

1        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK
2

         ----------------------------------X
3                                          :

    SECURITIES INVESTOR PROTECTION    :
4   CORPORATION,                           :
                                           :
5             Plaintiff-Applicant,    :
                                           :
6       -vs-                           :   08-01789 (SMB)
                                           :
7   BERNARD L. MADOFF INVESTMENT      :
    SECURITIES, LLC,                       :
8                                          :
              Defendant.               :
9                                          :
         ----------------------------------X
10                                         :
    In re:                                 :
11                                         :
    BERNARD L. MADOFF,                     :
12                                         :
              Debtor.                      :
13                                         :
         ----------------------------------X
14

15               *** CONFIDENTIAL ***
16          DEPOSITION OF BERNARD L. MADOFF
17

                 (Taken by the Customers)
18

                 Butner, North Carolina
19

                 June 15, 2016
20
21
22
23
24   Reported by:  Lisa A. DeGroat, RPR
                    Notary Public
25

*** CONFIDENTIAL ***

Page 10

1      Is that still your testimony?
2    A.   That is.  I assume when you're stating,
3  "I," you're referring to the firm.
4    Q.   Yes.
5    A.   Okay.
6    Q.   Yes.  But that -- that is accurate today?
7    A.   Yes, it is.
8    Q.   Okay.  And paragraph three reads,
9  "Moreover, there were no recorded phone lines in the
10  1990s.  Hence, we did not accept verbal instructions
11  from customers.  If they wanted withdrawals, they
12  had to specifically request them in writing, and we
13  retained copies of all such requests in our customer
14  files."
15      "If there are no such requests in our
16  files, that indicates that the customer did not
17  request any withdrawals and would not have received
18  any checks."
19      Is that still true in your --
20    A.   Yes.
21    Q.   Okay.  Now, do you recall any instance when
22  there was a loss of customer files within your
23  office?
24    A.   A loss of customer files?  I really didn't
25  keep the files themselves.  I mean, I was not

Page 11

1  responsible for that.  So, you know, it's possible,
2  but, you know, I doubt it.
3    Q.   Were your instructions to your staff to put
4  letters from customers requesting withdrawals in the
5  customers' files?
6    A.   Yes.  That's what --
7    Q.   Do you recall ever being told that any of
8  those letters had been misplaced or lost?
9    A.   No, I do not.
10    Q.   And at the time that the trustee was
11  appointed, do you have any reason to believe that
12  those files were not intact?
13    A.   No.
14    Q.   Now --
15    A.   Well, let me correct something.
16    Q.   Sure.
17    A.   I mean, there is -- there's a six year
18  record required -- record-retention requirement in
19  the securities industry.  So there was a -- a period
20  of time when the records might have been destroyed
21  once they went past that period of time, you know.
22      You know, that's something that, you know,
23  I -- I was not in charge of.  So, you know, I paid
24  no attention to that.  That was under the -- usually
25  the supervisor's jurisdiction.

Page 12

1    Q.   Okay.  But if, for example, there were
2  letters from customers dating from the 1980s in some
3  of the files, would you agree that there was no
4  policy to destroy letters from a certain period of
5  time?
6    A.   Well --
7      MS. BROWN:  Objection.
8      THE WITNESS:  You know, as I said, I --
9  I don't know -- to my -- to my -- my
10  recollection was that there were routine
11  destruction of records after -- you know, after
12  a certain number of years, because, you know,
13  we -- we would have filled up, you know, an
14  impossible amount of space retaining all the
15  records.
16      So I -- you know, I -- as a general
17  rule, we kept customer records going back longer
18  than the six year period, because customers
19  typically needed to refer to records or their
20  accountants needed to refer to records to get
21  cost basis and things of that sort.
22      So customer records were kept longer
23  than counterparty records, like other
24  broker-dealers.  As a matter of fact, the
25  industry had a practice of not requiring any

Page 13

1  hard copy to be -- to be kept of any records as
2  long as the records could be reduced -- could be
3  produced within 40 -- 48 hours for an
4  examination, because it was an -- it was an
5  impossible task for firms to maintain all -- all
6  their records.
7 BY MS. CHAITMAN:
8    Q.   So is it fair to say that either the
9  records were maintained on computer or they were
10  maintained in paper files?
11    A.   Yes.
12    Q.   Okay.  So when you say that the records
13  would be destroyed, they would actually just be
14  digitized for computer storage; is that right?
15    A.   I believe that's the case.  Yes.
16    Q.   Okay.  Now, when new customers came to you
17  at the inception of the relationship, did you -- did
18  you similarly require that any requests for
19  withdrawals be put in writing?
20    A.   Yes.
21    Q.   And they would have to be signed by the
22  customer?
23    A.   Yes.
24    Q.   Do you recall a customer named Aaron
25  Blecker, B-l-e-c-k-e-r?

4 (Pages 10 - 13)

*** CONFIDENTIAL ***

Page 106

1   A.   Yes.

2   Q.   And then do you remember I sent you a clean

3 copy with the crossed-out material deleted?

4   A.   Okay.

5       MS. BROWN:  Objection.

6 BY MS. CHAITMAN:

7   Q.   You remember that?

8   A.   I must have, because I wouldn't have signed

9 something that wasn't in its complete form.

10   Q.   Okay.  And, in fact, you had signed the

11 Declaration, but crossed out a paragraph --

12   A.   Yes.

13   Q.   -- and sent it to me?

14   A.   Yes.

15   Q.   And then didn't I resend it to you,

16 unsigned, with that crossed-out paragraph

17 eliminated?

18       MS. BROWN:  Objection.

19       THE WITNESS:  I would assume so.

20 BY MS. CHAITMAN:

21   Q.   Okay.  Because you -- there's no question

22 that you signed the document --

23   A.   Yes.

24   Q.   -- we've marked as Exhibit 2?

25       And it was in this form when you signed it;

Page 107

1 right?

2       MS. BROWN:  Objection.

3       THE WITNESS:  Excuse me.  I must have,

4   but I -- I tell you, I don't remember.  My mind

5   is not as clear as it should be.

6 BY MS. CHAITMAN:

7   Q.   Okay.  Looking at Exhibit 14, and if you

8 want, I can just hold it up to you.  I'm looking at

9 the second page, which ends in Bates number 54126.

10       Do you see on this form -- this is for

11 Aaron Blecker.  Do you see on this form, it has S's

12 for profits and dividends and interest, and then

13 it's crossed out?

14   A.   Okay.  Yes.

15   Q.   Do you know who would have crossed this

16 out?

17   A.   No.  I would assume it had to be someone in

18 the operations department.

19   Q.   Okay.  And was there anyone who would check

20 the work of someone in the operations department to

21 make sure they didn't make a mistake?

22   A.   Yes.  Probably Annette Bongiorno.

23   Q.   Okay.  So she would do it?

24   A.   Uh-huh.

25   Q.   Okay.  And if you wanted to know what the

Page 108

1 customer's instructions were, is it fair to say

2 you'd have to look at the customer file to see what

3 the letter from the customer said?

4       MS. BROWN:  Objection.

5       THE WITNESS:  I would assume so.

6 BY MS. CHAITMAN:

7   Q.   Because this document, the second page of

8 Exhibit 14, this is not signed by the customer;

9 right?

10   A.   No, no.

11   Q.   Okay.  And, looking at Exhibit 13, on the

12 third page, this is also a document, which is not

13 signed by the customer; right?

14   A.   I -- I don't -- I don't believe so.  This

15 looks all like internal documents.

16   Q.   Okay.  And, again, if you wanted to know

17 what the customer's request was, you'd have to look

18 in the customer file for a letter from the customer;

19 isn't that true?

20   A.   Correct.

21       MS. BROWN:  Objection.

22       MS. CHAITMAN:  Okay.  I have nothing

23   further.

24       MS. BROWN:  I'm sorry.  I have nothing

25   further.  We can go off the record.  I forgot

Page 109

1   you were there.

2       THE VIDEOGRAPHER:  We're off the record

3 in the deposition of Bernard L. Madoff.  The

4 number of media used is two.  The time is 11:50.

5       (SIGNATURE WAIVED.)

6       (DEPOSITION CONCLUDED AT 11:50 A.M.)

28 (Pages 106 - 109)

*** CONFIDENTIAL ***

Page 110

1  STATE OF NORTH CAROLINA

2  COUNTY OF PERSON

3

4        CERTIFICATE OF TRANSCRIPT

5

6      I, Lisa A. DeGroat, a Court Reporter and

7  Notary Public in and for the aforesaid county and

8  state, do hereby certify that the foregoing

9  deposition of BERNARD L. MADOFF, was taken by me and

10  reduced to typewriting under my direction; and the

11  transcript is a true record of the testimony given

12  by the witness.

13      I further certify that I am neither attorney

14  or counsel for, nor related to or employed by any

15  attorney or counsel employed by the parties hereto

16  or financially interested in the action.

17      This the 16th day of June, 2016.

18

19

20

21  *Lisa A. DeGroat*

22  _____

23  LISA A. DeGROAT

    Registered Professional Reporter

24  Notary Public #19952760001

    Expiration Date:  December 8, 2020

25

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400