**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
|                         Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
|         v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | SIPA LIQUIDATION |
|                         Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
|                         Debtor. | |

**Memorandum of Law in Support of the Blums' Motion *in Limine* to Exclude Unrelated Customer Account Materials, to Exclude Hearsay Statements Regarding Profit Withdrawals, and to Limit the Proposed Testimony of <u>Lisa M. Collura and Matthew B. Greenblatt</u>**

**BAKER & MCKENZIE LLP**
Richard A. Kirby
Laura K. Clinton
Graham R. Cronogue
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7020
Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com
Email: graham.cronogue@bakermckenzie.com

# Table of Contents

INTRODUCTION ........................................................................................... 1

FACTS .......................................................................................................... 3

ARGUMENT ................................................................................................. 8

    I.    Documents from Unrelated Customer Accounts Are Not Relevant to the Blums'
        Accounts and Should Be Excluded. ............................................................ 8

    II.   Notations on Madoff Securities Customer Account Documents May Not Be
        Admitted for the Truth of Their Assertions Because of the Prohibition Against
        Hearsay. ..................................................................................................... 10

        A.    "PW" and Other Notations on Madoff Securities Records Are Hearsay. ........ 10

        B.    No Hearsay Exceptions Apply to the Notations Regarding Profit
              Withdrawals. ..................................................................................... 13

           1.   The business records exception does not apply. ............................................. 14

              a.    There is no evidence that the notations were made at or near the time by
                  someone with knowledge acting in the ordinary course of business. ................. 15

              b.    Inconsistencies in Madoff Securities records establish that they are not the
                  result of a regularly conducted business activity sufficient for Rule 803(6). ..... 18

              c.    The notations are untrustworthy because the authors were acting at the
                  direction of people whom the Trustee admits had fraudulent motives. ............. 20

           2.   The residual exception in Fed. R. Evid. 807 does not apply. ......................... 22

    III.  The Trustee Cannot Evade Evidentiary Prohibitions By Asking His Professionals
        to Summarize Hearsay or Speculate as to the Contents of Missing Records. ........... 24

        A.    Fed. R. Evid. 1006 Does Not Permit Admission of Summaries of Hearsay. .... 25

        B.    Speculation Regarding the Content of Missing Records is Improper Under
              Fed. R. Evid. 1004. ............................................................................. 27

    IV.  Alternatively, If Evaluated as Expert Opinion, the Professionals' Testimony Is
        Inadmissible under Fed. R. Evid. 702 and 703. ....................................................... 30

        A.    Fed. R. Evid. 702 Demands that an Expert Be Qualified, that His Opinion
              Be Based on Reliable Data and Methodologies, and that His Testimony on a
              Particular Issue Will Help the Trier of Fact; Greenblatt's Speculation Fails
              All Three Criteria. ............................................................................. 31

           1.   Greenblatt is not qualified to draw inferences regarding the probability that
              missing records would confirm that Madoff Securities' practices prior to 1995
              were the same as those in the ten-year period examined by Collura because he
              lacks the relevant statistical expertise. ............................................ 31

  2. The challenged inference is not based on reliable data and methodology...... 33

   a. Greenblatt's conclusion lacks sufficient supporting facts and data that the PW notations represent funds received. ................................................................ 33

   b. Greenblatt's inferences are not the product of reliable principles and methods.  Instead, the inferences are statistical conclusions that lack any foundation, explanation or metric by which they could be tested. ..................... 35

   c. Greenblatt bases his inference on an analysis that simply ignored contradictory data. ................................................................................................... 37

  3. Greenblatt's speculation is not helpful to the trier of fact because no technical or specialized knowledge is required to understand the facts. .............................. 39

 B. While FED. R. EVID. 703 Allows an Expert to Base His Opinions on Hearsay Where Such Evidence is the Type Reasonably Relied on By Experts in the Particular Field, the Fraudulent Documents Here Were Prepared in a Manner that Conflicts with Standard Accounting Practices and May Not Be Reasonably Relied Upon. ............................................................................. 40

V. The Evidentiary Deficiencies in the Trustee's Submissions Are Particularly Blatant When Applied to the Blum Accounts. ........................................................... 42

CONCLUSION .................................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.Com*,
    48 F. Supp. 3d 600 (S.D.N.Y. 2014) ................................................................. 31

*ADT Sec. Servs. v. Sec. One Int'l, Inc.*,
    2013 U.S. Dist. LEXIS 126994 (N.D. Cal. Sept. 5, 2013) .................................. 18

*Amorgianos v. Amtrak*,
    303 F.3d 256 (2d Cir. 2002) .................................................................. 33, 35, 37

*Arista Records LLC v. Lime Grp. LLC*,
    715 F. Supp. 2d 481 (S.D.N.Y. 2011) ............................................................... 11

*Bandler v. v. BPCM NYC Ltd.*,
    2014 U.S. Dist. LEXIS 137381 (S.D.N.Y. Sept. 28, 2014) ............................... 28

*Batoh v. McNeil-PPC, Inc.*,
    2016 U.S. Dist. LEXIS 31126 (Conn. Mar. 10, 2016) ....................................... 23

*Carrasco v. N.M. Dep't of Workforce Sol.*,
    2013 U.S. Dist. LEXIS 83420 (D.N.M. 2013) .................................................. 11

*Curtis v. Perkins*,
    781 F.3d 1262 (11th Cir. 2015) ......................................................................... 22

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ................................................................................. *passim*

*Davis v. Caroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013) ............................................................... 32

*Delehanty v. KLI, Inc.*,
    663 F. Supp. 2d 127 (E.D.N.Y. 2009) .......................................................... 33, 34

*Doucet v. Drydock Coal Co. (In re Oakley)*,
    397 B.R. 36 (Bankr. S.D. Ohio 2008) ............................................................... 28

*Fowler v. State Farm Fire & Cas. Co.*,
    2008 U.S. Dist. LEXIS 63312 (S.D. Miss. July 25, 2008) .............................. 9, 10

*Galvin v. Eli Lilly & Co.*,
    488 F.3d 1026 (D.C. Cir. 2007) ........................................................................ 33

*GE v. Joiner*,
    522 U.S. 136 (1997) .......................................................................................... 36

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech Grp., Inc.)*,
916 F.2d 528 (9th Cir. 1990) ......................................................................................... 21

*Hoffman v. Palmer*,
129 F.2d 976 (2d Cir. 1942) .......................................................................................... 22

*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*,
84 F.3d 1330 (10th Cir. 1996) ....................................................................................... 21

*Kleenit, Inc. v. Sentry Ins. Co.*,
486 F. Supp. 2d 121 (D. Mass. 2007) ...................................................................... 28, 29

*Lewis v. Baker*,
526 F.2d 470 (2d Cir. 1975) .......................................................................................... 21

*LNC Invs. Inc. v. First Fid. Bank N.A.*,
2000 U.S. Dist. LEXIS 10787 (S.D.N.Y. Aug. 3, 2000) ................................................. 9

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................. 32, 33, 36

*Marvel Characters, Inc. v. Kirby*,
726 F.3d 119 (2d Cir. 2013) .......................................................................................... 40

*Maxwell MacMillan Realization Liquidating Trust v. Aboff (In re Macmillan Inc.,)*,
186 B.R. 35 (Bankr. S.D.N.Y. 1995) ............................................................................. 28

*McCormick v. United States*,
34 F. Supp. 2d 1071 (W.D. Tenn. 1998) ........................................................................ 13

*Paddack v. Dave Christensen, Inc.*,
745 F.2d 1254 (9th Cir. 1984) ................................................................................. 25, 26

*Palmer v. Hoffman*,
318 U.S. 109 (1943) ................................................................................................. 21, 22

*Parsons v. Honeywell, Inc.*,
929 F.2d 901 (2d Cir. 1991) ..................................................................................... 23, 24

*Paul v. Postgraduate Ctr. for Mental Health*,
97 F. Supp. 3d 141 (E.D.N.Y. 2015) .............................................................................. 10

*Ret. Plan of the Unite Here Nat'l Ret. Fund v. Kombassan Holdings A.S.*,
629 F.3d 282 (2d Cir. 2010) .......................................................................................... 14

*Robinson v. Shapiro*,
646 F.2d 734 (2d Cir. 1981) .......................................................................................... 24

*Sanders v. New York*,
2001 U.S. Dist. LEXIS 20242 (S.D.N.Y. Dec. 5, 2001) ................................................. 9

*Triboro Quilt Mfg. Corp. v. Luve LLC*,
  2014 U.S. Dist. LEXIS 57186 (S.D.N.Y. Mar. 18, 2014) .................................................... 30

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
  112 F. Supp. 3d 122 (S.D.N.Y. 2015) ............................................................................... 8

*United States v. Castillo*,
  924 F.2d 1227 (2d Cir. 1991) ............................................................................................ 39

*United States v. Dreer*,
  740 F.2d 18 (11th Cir. 1984) ............................................................................................. 22

*United States v. Irvin*,
  682 F.3d 1254 (10th Cir. 2012) .................................................................................... 25, 26

*United States v. Keplinger*,
  776 F.2d 678 (7th Cir. 1985) ............................................................................................. 21

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) .............................................................................................. 30

*United States v. N.Y. Foreign Trade Zone Operators*,
  304 F.2d 792 (2d Cir. 1962) .............................................................................................. 21

*United States v. Oates*,
  560 F.2d 45 (2d Cir. 1977) ..................................................................................... 11, 12, 24

*United States v. Rowinsky*,
  2013 U.S. Dist. LEXIS 147784 (S.D. Fla. 2013) .............................................................. 12

*United States v. Ruffin*,
  575 F.2d 346 (2d Cir. 1978) ................................................................................. 11, 12, 27

*United States v. Samaniego*,
  187 F.3d 1222 (10th Cir. 1999) ........................................................................................ 25

*United States v. Snyder*,
  787 F.2d 1429 (10th Cir. 1986) .................................................................................... 14, 16

*United States v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004) ................................................................................................ 32

*United States v. Washington*,
  106 F. 3d 983 (D.C. Cir. 1997) ......................................................................................... 23

*United States v. Wells*,
  262 F.3d 455 (5th Cir. 2001) ............................................................................................. 29

*Wantanabe Realty Corp. v. New York*,
  2004 U.S. Dist. LEXIS 1225 (S.D.N.Y. Feb. 2, 2004) ................................... 20, 30, 34, 42

*Washington v. Kellwood Co.*,
    105 F. Supp. 3d 293 (S.D.N.Y. 2015) ............................................................................................. 31

*White Indus. v. Cessna Aircraft Co.*,
    611 F. Supp. 1049 (W.D. Mo. 1985) ......................................................................................... 15, 16

*Wiand v. Lee*,
    753 F.3d 1194 (11th Cir. 2014) ........................................................................................................ 21

**Other Authorities**

FED. R. EVID. 401 ................................................................................................................................ 9, 42

FED. R. EVID. 402 ................................................................................................................................ 9, 42

FED. R. EVID. 403 ..................................................................................................................................... 42

FED. R. EVID. 702 ................................................................................................................................ *passim*

FED. R. EVID. 703 ................................................................................................................................ 2, 30

FED. R. EVID. 801 ..................................................................................................................................... 10

FED. R. EVID. 802 ..................................................................................................................................... 13

FED. R. EVID. 803 ................................................................................................................................ *passim*

FED. R. EVID. 804 ..................................................................................................................................... 14

FED. R. EVID. 807 ................................................................................................................................ 23, 24

FED. R. EVID. 1002 .............................................................................................................................. 2, 27

FED. R. EVID. 1004 ............................................................................................................................. 27, 28

FED. R. EVID. 1006 ........................................................................................................................ 2, 25, 26

## INTRODUCTION

The Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions ("Motion") asks the Court to find that every "PW" notation in Madoff Securities customer account statements reflects an actual cash withdrawal of profits by the customer that the Trustee can uniformly treat as "cash out" for the purposes of computing a customer's net equity claim. While this may be accurate for a number of Madoff Securities accounts, the Claimants before the Court did not request or receive such withdrawals, and the Trustee's computation of their respective SIPA customer claims is inaccurate.[1]

The Trustee asserts that PW notations in customer statements from the 1980s and 1990s prove that the Blum family requested and received from Madoff Securities over 300 checks totaling more than 2 million dollars. Yet, the Trustee has not offered a single document demonstrating that the Blums requested, received, or cashed "PW" checks corresponding with the notations in dispute. Instead, despite the modest amount at issue on the Blums' claims and the limited number of PW notations that affect their calculation, the Trustee has disclosed nearly 800 exhibits he intends to offer at hearing, most of which are documents from unrelated customer accounts.

In the absence of relevant admissible evidence, the Trustee's prehearing disclosures confirm that he intends primarily to rely on two types of hearsay assertions in Madoff Securities account files. Specifically, he offers the PW notations themselves as proof that profits were withdrawn from the account and sent to the customer. He also asks the Court to accept the handwritten marginalia ("S" and "R") on various internal records that customers never saw –

---

[1] The Trustee and his professionals acknowledge that PW notations were inaccurate in nearly 900 instances. *See* Blums' Pre-Hearing Brief in Opposition to Trustee's Profit Withdrawal Motion ("Pre-Hearing Brief") at 17 (discussing the PW notations that were deliberately excluded from the analysis as inaccurate).

1

notes authored by unknown Madoff Securities employees at unknown times – as proof that customers requested that profits be "Sent" or "Reinvested" and that Madoff Securities acted accordingly. Both sets of assertions are out of court statements offered for their truth, and are classic hearsay as to which no exception applies.

The Trustee also intends to offer testimony and summary exhibits from two accounting professionals, who are anticipated to testify consistently with their prior reports. Their testimony and conclusions largely summarize the inadmissible hearsay, which is prohibited by Federal Rule of Evidence 1006. In addition to summarizing the hearsay content of existing records, at various points each professional speculates about the prior existence and contents of *missing* records, particularly third party bank records that were destroyed years ago. Such speculation is not competent evidence under Federal Rule of Evidence 1002 or 1004 and should be excluded. Furthermore, to the extent the Trustee seeks to have the professionals testify as experts, such testimony runs afoul of Federal Rules of Evidence 702 and 703, as the conclusions drawn are not helpful to the trier of fact, are premised on insufficient and unreliable data, and are not the product of a reliable methodology.

Doctors Norman and Joel Blum bring this motion *in limine* to exclude such irrelevant and inadmissible material, to narrow the issues and exhibits for hearing, and to clarify the evidentiary problems with the Trustee's prehearing submissions. Specifically, they ask the Court to rule 1) that proposed exhibits comprising documents concerning Madoff Securities customers who are not Participating Claimants and customer accounts that are not at issue here be excluded from presentation at hearing; 2) to preclude presentation of PW notations, as well as the S/R and related marginalia, as hearsay; 3) to preclude any testimony or exhibit that summarizes such

2

hearsay; and 4) to exclude any opinion or testimony regarding the contents of missing documents, including "inferences" about such records.

## FACTS

Former Madoff Securities employees testified that generally, when a customer opened an account with the broker dealer, the customer spoke personally with Bernard Madoff.[2]  Madoff would then orally relay information to other Madoff Securities employees regarding the new account,[3] including whether it should be set up as a "Send" account, where profits were routinely sent to the customer, or a "Reinvest" account, where the profits were automatically reinvested.[4] The customer had to request any subsequent change in writing. It was Madoff Securities' standard practice to retain all customer letters requesting such changes.[5]

Morris Blum and Roslyn Blum, now deceased, were innocent customers who maintained several accounts with Madoff Securities.[6]  After Roslyn's death, their children—Norman and Joel—assisted their father in managing the accounts.[7]  Eventually, Joel and Norman became trustees and beneficiaries of these accounts, and the remaining funds were transferred into their own Madoff Securities accounts.[8]  The four Blum accounts relevant to this motion are all retirement and savings accounts:  Morris' retirement account (1B0033); Roslyn's trust account

---

[2] A. Bongiorno Tr., Clinton Ex. B1, 33:16-34:22, 69:4-69:16; J. Sala Tr., Clinton Ex. B2, 54:24-58:14.  All "Clinton" Exhibits referenced herein are filed with the Declaration of Laura K. Clinton in Support of Blums' Motion *in Limine.*

[3] A. Bongiorno Tr. 69:4-69:16; J. Sala Tr. 54:24-58:14.

[4] A. Bongiorno Tr. 33:16-34:22, 69:4-69:16; J. Sala Tr. 54:24-58:14.

[5] J. Sala Tr. 54:24-58:14. Employees and Madoff testified that these documents were kept in the customer file.  B. Madoff Tr., Clinton Ex. B3, 10:8-10:20 ("If they wanted withdrawals, they had to specifically request them in writing, and we retained copies of all such requests in our customer files.").

[6] Decl. of J. Blum, Trustee's PW Ex. 15, ¶ 4.

[7] Decl. of J. Blum ¶ 4; Decl. of N. Blum, Trustee's PW Ex. 10, ¶¶ 5, 10.

[8] Decl. of J. Blum ¶ 4; Decl. of N. Blum ¶ 5.

3

(1B0036); Roslyn's remainder trust account (1B0115); and Norman's retirement savings account (1B0034). As detailed in the Blums' Pre-Hearing Brief,[9] each of these accounts was a savings vehicle. The Blums never requested or received PW withdrawals from them.[10]

In 2009, Joel and Norman filed three SIPA claims with the Trustee, seeking the return of the remaining balance in their accounts.[11] The Trustee reduced all three claims on the grounds that customer statements in the predecessor Blum accounts contained "PW" notations that should be treated as cash withdrawals, thereby reducing the net equity of the claims.[12] In total, the amount at issue for the Blums is less than $390,000: $166,288 for Joel on claim # 001507 for account 1B0251; $153,291 for Norman on account 1B0201, claim # 005863; and a reduction in Norman's clawback exposure of $66,625 on account 1B0190.[13]

There is no documentary evidence that the Blums requested any of the disputed PW withdrawals. Morris opened his retirement savings account (1B0033) prior to 1981. There are 138 PW notations in the customer account statements for 1B0033, of which only 48 affect the claim calculations.[14] To support his contention that these notations accurately record

---

[9] To avoid repeating the facts and background discussed at length in their Pre-Hearing Brief, the Blums respectfully incorporate that memorandum herein by reference.

[10] N. Blum Tr., Clinton Ex. B4, 29:23 (stating that he took only quarterly distributions after 1994 and "never took any profit withdrawal").

[11] Blum Pre-Hearing Brief Ex. A (N. Blum Statement of Claim for Account 1B0201); Blum Pre-Hearing Ex. B (J. Blum Statement of Claim for Account 1B0251); Blum Pre-Hearing Ex. C (N. Blum Statement of Claim for 1B0190).

[12] Blum Pre-Hearing Brief Ex. E (Notice of Trustee's Determination of Claim for J. Blum); Blum Pre-Hearing Ex. F (Notice of Trustee's Determination of Claim for N. Blum); Trustee Supp. Mem. of Law in Supp. of Trustee's Mot. Affirming Treatment of Profit Withdrawal Transactions ("Trustee Supp. Mem.") at 43.

[13] *See* Blum Pre-Hearing Brief at 52-53, setting out Trustee's claim calculation with and without consideration of PW notations.

[14] Principal Balance Calculation Rep. of Matthew B. Greenblatt ¶¶ 55, 58; Exhibit B.7 to Respess Declaration.

withdrawals that Morris requested and received, the Trustee relies on a single piece of handwritten marginalia in the internal Madoff Securities account file.[15] This notation, authored by an unidentified employee, purports to show that the account was changed to an "S" account on December 29, 1992, more than ten years after the account was opened, and after roughly 100 PW withdrawals allegedly occurred.[16] There is no evidence that Morris asked for the account to be converted to a "Send" account in 1992 (or any other time).

For Roslyn's trust account (1B0036), opened by her husband as a savings account for her support should he predecease her, there are 83 PW notations in customer account statements, of which 68 affect the claims at issue. Again, the Trustee contends that these notations record customer-requested profit withdrawals, and he relies solely on a handwritten "S" to support his argument that this was a "Send" account.[17] Likewise, the customer account statements for Roslyn's Remainder Trust account (1B0115) contain 28 PW notations at issue here. To support his claim that these reflect withdrawals requested and received by the customer, the Trustee relies on a handwritten "S" notation in the internal Madoff Securities account file dated "8/23/94"—roughly three weeks before the account was even funded.[18]

Norman's retirement account (1B0034) customer account statements have 74 PW notations, of which only 17 affect his net equity claim. Again, the Trustee relies on a handwritten "S" in the internal Madoff Securities account file to argue that these PW notations

---

[15] Trustee Supp. Mem. at 45.

[16] Morris Blum Customer Account File, Trustee PW Ex. 68, MADTBB01988462.

[17] Estate of Roslyn Blum Customer Account File, Trustee Ex. 72, MADTBB03076727.

[18] Roslyn Blum Remainder Trust Customer Account File, Trustee PW Ex. 69, MADTBB01988479.

reflect customer requested withdrawals.[19]  The back of the internal account folder has additional marginalia of unknown authorship: a handwritten note "change to reinvest" with illegible initials and a date that appears to be "7/01/87"; a notation "change to send," with a largely illegible day and month but an indicated year of "88."[20]

The Trustee asserts that every PW notation on a customer statement indicates that the customer requested a profit withdrawal and that—each time a PW is written next to a purported transaction—the customer received a check in the amount represented on the statement.[21]  As relevant to the Blums, there are no bank statements, customer correspondence, tax records, deposit slips, wire transfer records, cancelled checks, or other documents supporting the contention that the relevant four accounts experienced a total of 300 profit withdrawals totaling over 2 million dollars.  Rather, the Trustee relies solely on the PW notations themselves and the marginalia discussed above.[22]

In the absence of third-party documentary evidence that checks were received and cashed by customers before 1998, the time period for most of the Blum PW notations, the Trustee asked his professionals to conduct a reconciliation analysis on Madoff Securities records.  Lisa Collura reviewed all PW notations for 1998-2008, the ten year period for which third party bank records were available.[23]  Collura found that, of the 91,000 PW notations in customer statements,

---

[19] Norman Blum Customer Account File, Trustee PW Ex. 70, MADTBB01988466-MADTBB01988469.

[20] *Id.* at MADTBB01988467.

[21] Trustee Supp. Mem. at 11 ("Generally, PW entries on customer statements reflect that checks were sent to customers relating to reported 'profits' in their account generated by reported trading through BLMIS's purported arbitrage strategy.").

[22] E.g., *Id.* at 21.

[23] Collura Proof of Transfers to Certain BLMIS Customers With "Profit Withdrawals," ("Collura PW Rep."), Clinton Ex. C, at 5.

approximately 5,500 occurred in the later period for which bank records could be located.[24] Her analysis indicates that the majority of these 5,500 PW notations from December 1998 to December 2008 (the "Ten-Year Period") could be reconciled to third-party bank records.[25] Where Collura could not find bank records to support a specific transaction, she "inferred" that if the missing documents were available, they would confirm the withdrawal.[26] None of Collura's reconciliation analysis is relevant to the Blum accounts, in which the PW notations predate the ten-year period she examined.

Relying largely on Collura's reconciliation as well as his review of trading data from December 1995 to November 2008, the Trustee's professional Matthew Greenblatt opined that *all* 91,138 PW notations "reflect payments made by BLMIS to the account holder equal to the reported profits generated from the fictitious trades."[27] While he was only able to conduct a detailed analysis of the 6,148 PW notations made in 1995-2008 for which trading data could be found, i.e., "the subset of PW Transactions that contained sufficient data," Greenblatt nevertheless opined "that it is reasonable to infer that the same results would occur over the full population [of 91,138 PW notations], yielding the same conclusion, had complete documentation been available for review for all relevant time periods."[28]

---

[24] Collura PW Rep. at 3.

[25] Trustee Supp. Mem. at 8.

[26] Collura PW Rep. at 7, 8, 12, 14, 18 (asserting that she can "reasonably infer" that missing documents would support reconciliation).

[27] Greenblatt Analysis of the Profit Withdrawal Transactions, ("Greenblatt PW Report"), Clinton Ex. E, at 6.

[28] *Id*. at 20.

Despite the limited number of PW notations at issue for the Blums and the modest amount at issue, the Trustee has proposed *almost 800 hearing exhibits*.[29]  Among his proposed exhibits, the Trustee disclosed hundreds of summaries prepared by his professionals.  These exhibits purport to relay selected contents of Madoff Securities records, including the PW and S/R notations.[30]  The Trustee also proposes to use at hearing documents from other, unrelated customer accounts, and affidavits from customers who are not involved in this proceeding.[31]

The Blums respectfully move *in limine* to exclude on proposed exhibits that relate to customer accounts other than the Blum accounts at issue.  They move to preclude the presentation of hearsay to the Court, including the PW notations and the S/R marginalia as well as related marginalia, as such notations are offered for their truth.  They move *in limine* to preclude any testimony that summarizes such hearsay, and any opinion or testimony regarding the contents of missing documents.

## ARGUMENT

**I.    Documents from Unrelated Customer Accounts Are Not Relevant to the Blums' Accounts and Should Be Excluded.**

The issue presented for hearing is whether the Trustee accurately calculated the net equity balance in two Blum accounts when he deducted amounts corresponding to PW notations in older predecessor Blum accounts.  Documents related to *other* Madoff Securities accounts and/or *other* customers are irrelevant to that fact-specific inquiry.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 140 (S.D.N.Y. 2015) ("It is of no assistance to a jury to know that Fortress chooses to invest in other distressed assets . . . . This

---

[29] Trustee Pre-Hearing Exhibit List, Clinton Ex. A.

[30] *See, e.g.*, Greenblatt Supp. PW Report, Clinton Ex. F, at 5; Collura Supp. PW Report, Clinton Ex. D, Attachments D.1-D.84 (listing PW notations).

[31] E.g., Exs. 57-69, 75-243, 552.

evidence is therefore excluded under Rule 401."); *LNC Invs. Inc. v. First Fid. Bank N.A.*, 2000 U.S. Dist. LEXIS 10787, at *10-18  (S.D.N.Y. Aug. 3, 2000) (holding that evidence of bank's conduct in prior credit setting was distinct from the circumstances at issue such that evidence of prior conduct was not relevant under Rule 401); *Fowler v. State Farm Fire & Cas. Co.*, 2008 U.S. Dist. LEXIS 63312, at *13-14 (S.D. Miss. July 25, 2008) ("[A]ny claim outside the immediate vicinity of Plaintiffs' property would not be relevant to the issues in this case.  *See* FED. R. EVID. 401, 402.  Likewise, . . . adjustments made by State Farm employees or representatives who were not involved in the adjustment of Plaintiffs' claim would not be relevant.").

Notwithstanding their lack of any probative value, the Trustee proposes to offer hundreds of exhibits concerning other customer account files.[32]  The Blums move to exclude all these proposed exhibits, which do not directly relate to the four Blum accounts at issue.[33]  *See*, *e.g.*, *Sanders v. New York*, 2001 U.S. Dist. LEXIS 20242, at *6-7 (S.D.N.Y. Dec. 5, 2001) (granting motion *in limine* under Rule 402, as "[p]roposed evidence bearing no relation to facts that are of consequence to the action is inadmissible[. . . .] Sanders's own explanations fail to establish how the proposed testimony of Giuliani, Turner and Saunders is in any way connected to the specific facts and circumstances surrounding her claims."); *see also Fowler*, 2008 U.S. Dist. LEXIS at *13-14.  Alternatively, the Blums seek exclusion of the same materials on the grounds that any probative value they offer is substantially outweighed by the prejudice, confusion, and waste of time that the presentation of such exhibits will cause in this proceeding.  *See*, *e.g.*, *LNC Invs. Inc.*, 2000 U.S. Dist. LEXIS 10787, at *10-18 (granting motion *in limine* under Rules 402 and 403, noting that even "[i]f . . . the letter of credit setting is in some way relevant to the present issue, the probative value of the proffered evidence is more than substantially outweighed by the

---

[32] *See* Trustee Exs. 24.1-13, 24.16, 24.18, 24.20-24.208, 31-69, 73, 76-243, 272-514.

[33] Trustee Exs. 70-72, 74.

dangers of admitting it"); *Fowler*, 2008 U.S. Dist. LEXIS at *16 (holding that the exclusion of evidence "regarding its claims-handling of property losses other than Plaintiffs' [property]," even if relevant, "is substantially outweighed by the danger it presents of unfair prejudice, confusion of issues, or misleading the jury").

## II.    Notations on Madoff Securities Customer Account Documents May Not Be Admitted for the Truth of Their Assertions Because of the Prohibition Against Hearsay.

The Trustee seeks to admit notations from various Madoff Securities records as evidence that profit withdrawals were requested by and actually paid to customers.[34]  Specifically, the Trustee asserts that "PW" notations on customer statements and various handwritten "S" marginalia on customer files demonstrate that 1) customers requested that profits be periodically withdrawn from their accounts and sent to them; 2) Madoff Securities sent out checks in the amount and at the time indicated by a PW notation on the customer statements; and 3) customers received and cashed such checks.[35]  All of these notations are out of court statements offered for the truth of the matters asserted, and they constitute inadmissible hearsay for which no exception applies.

### A.    "PW" and Other Notations on Madoff Securities Records Are Hearsay.

Federal Rule of Evidence 801 defines hearsay as a "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  FED. R. EVID. 801(c); *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 189 n.40 (E.D.N.Y. 2015) (plaintiff's testimony that other employees told him that they received larger performance bonuses was "inadmissible hearsay introduced for the truth of the matter asserted").  "Statement" includes any written assertion.  FED. R. EVID. 801(a).  A

---

[34] Trustee Supp. Mem. at 4.

[35] *Id.*

statement is offered for the truth of the matter asserted when it is offered to prove the assertion contain therein. *See United States v. Ruffin*, 575 F.2d 346, 355-56 (2d Cir. 1978) (IRS computer printout with coded notation was "unquestionably hearsay"); *United States v. Oates*, 560 F.2d 45, 65 (2d Cir. 1977) ("eminently clear" that lab report and worksheet identifying tested substance as heroin were "written assertions" offered for their truth, and thus hearsay).

Here, the Trustee posits that a "PW" notation indicates a "Profit Withdrawal" an assertion that reported trading profits were withdrawn from the account and sent to the customer.[36] As support, the Trustee seeks to admit handwritten notations, particularly the "S" and "R" notes made by unverified authors on internal customer File Maintenance forms, arguing that an S notation indicates that a customer requested that profits be "Sent" to the customer rather than "Reinvested." He offers these various Madoff Securities notations as evidence that customers such as the Blums requested to have profits sent from the accounts at issue and that PW checks were in fact sent.[37] As a threshold matter, the Trustee cannot hope to authenticate these notations, as the authors are largely unknown. *See, e.g., Carrasco v. N.M. Dep't of Workforce Sol.*, 2013 U.S. Dist. LEXIS 83420, at *54 (D.N.M. 2013) (granting motion to strike documentary exhibits on grounds that no author of the documents was identified, "and thus the documents have not been authenticated"); *Arista Records LLC v. Lime Grp. LLC*, 715 F. Supp. 2d 481, 503 (S.D.N.Y. 2011) (authentication requires the proponent to provide competent testimony from a witness with knowledge of document's authenticity or circumstantial evidence establishing a "reasonable likelihood" that it is authentic); *see also infra*, at II(B)(1) (discussing testimony establishing that notations cannot be authenticated and reasons that business record exception does not apply).

---

[36] Trustee Mem. at 12.

[37] *Id.*

11

For instance, the "S" associated with 1B0033 is a standalone handwritten notation on the Name/Address File Maintenance form, without date or initialing.[38] There is no evidence at all of who wrote the letter S, when they wrote it, or why. Other notations are similarly unverifiable. For instance, the Trustee has argued that entries in the "Spiral Notebook" confirm that PW notations correspond to customer checks. During JoAnn Sala's deposition, the Trustee asked her to identify the handwriting in the Spiral Notebook; she could not. Sala Tr. at 49:13-49:23 (Q: … Do you recognize the handwriting on this page, Ms. Sala?  A: It might be Fran's. I'm not sure. . . . Could be anybody's. It could be Winnie's. You know, I don't know handwriting. It's pretty neat."); *id.* at 48:17-24 ("I don't know this could be anyone's. I don't know. . . . I don't really know the handwriting, no.").[39] Any Madoff Securities employee could access and manipulate these notebooks and the PW notations contained therein at any time.[40]

Even more importantly, these out-of-court statements are offered for their truth. The PW notations, the "S" and "R" marginalia, and other similar notations in Madoff Securities records are classic hearsay and should be excluded. *See Ruffin*, 575 F.2d at 355-56 (coded notation suggesting that taxpayer had at some indefinite time contacted the IRS and stated to some unidentified IRS official that he was not required to file return was "unquestionably hearsay," but finding that objection was waived and admission was harmless error); *Oates*, 560 F.2d at 65 (lab report and chemist worksheet were "written assertions" that tested substance was heroin and were offered for their truth, and thus inadmissible hearsay) (reversing and remanding for new trial); *United States v. Rowinsky*, 2013 U.S. Dist. LEXIS 147784, *21-23 (S.D. Fla. 2013)

---

[38] Morris Blum Customer Account File, MADTBB01988461- MADTBB01988463.

[39] Discussing HWN00001651, HWN00001655.

[40] Sala Tr. 193:10-193:12 ("anybody could go – everybody knew where it was to go and put a check in there").

12

(markings and notations on surveillance images such as circles, arrows, and names of pictured individuals were inadmissible hearsay, regardless of author's availability to testify and be subject to cross examination); *McCormick v. United States*, 34 F. Supp. 2d 1071, 1076 (W.D. Tenn. 1998) (handwritten marginalia on sale agreement of unknown authorship was inadmissible hearsay; witness speculation about what marginalia meant was also inadmissible) (while testimony that accountant had habit of requiring documentary support for refund claims and that documentation existed at some point may be admissible, testimony regarding the content of the missing documentation would violate the hearsay rule where "the contents of the documents were intended as an assertion (e.g., you owe me money, as in an invoice; X's check to X's creditor was cashed by the bank as the bank's stamp indicated on the back of the check)").

The PW notations, the S and R marginalia, and other similar assertions are inadmissible unless they fall under an exception to the hearsay rule.  *See* FED. R. EVID. 802.  They do not. Accordingly, the Blums move to exclude all PW notations within Trustee Exhibits 57-119-474, 513-523, 535, and 536.  More specifically, they move to exclude the PW notations in the four accounts at issue, the handwritten "S" notations that are found in customer files 1B0033,[41] 1B0115,[42] 1B0036,[43] and 1B0034,[44] and the related marginalia.  These materials are included in Trustee Exhibits 70-72, 74 and no hearsay exception applies.

## B.    No Hearsay Exceptions Apply to the Notations Regarding Profit Withdrawals.

The Federal Rules of Evidence carve out narrow exceptions to the prohibition on hearsay for situations where statements were made in a specific manner or circumstances that indicate

---

[41] Morris Blum Customer Account File at MADTBB01988462.

[42] Roslyn Blum Customer Account File at MADTBB01988479.

[43] Estate of Roslyn Blum Customer Account File at MADTBB03076725, MADTBB03076727.

[44] Norman Blum Customer Account File at MADTBB01988467.

trustworthiness.  FED. R. EVID. 803-04 (providing hearsay exceptions).  The purpose of the

hearsay exceptions is to allow some trustworthy out-of-court statements to be admitted into court.

*See* FED. R. EVID. 803, advisory committee's note.

To date, the Trustee has not even acknowledged the hearsay problem he faces.

Presumably, he will argue that exceptions to the hearsay rule permit him to offer the PW

notations and "S" marginalia to the Court for the truth of their respective assertions.  None do.

Of all the hearsay exceptions, the Trustee may argue that two are relevant here.[45]  But neither the

exception for Records of a Regularly Conducted Activity (Rule 803(6)) nor the Residual

Exception (Rule 807) apply to the notations.

### 1.  The business records exception does not apply.

"The business records exception is based on a presumption of accuracy, accorded because

the information is part of a regularly conducted activity, kept by those trained in the habits of

precision, and customarily checked for correctness, and because of the accuracy demanded in the

conduct of the nation's business."  *United States v. Snyder*, 787 F.2d 1429, 1433-34 (10th Cir.

1986).  Federal Rule of Evidence 803(6) provides that business records reflecting an act or event

may be admitted, despite containing hearsay, only if they satisfy the following requirements:

> (A) the record was made at or near the time by–or from information transmitted
> by–someone with knowledge; (B) the record was kept in the course of a regularly
> conducted activity of a business, organization, occupation, or calling, whether or
> not for profit; (C) making the record was a regular practice of that activity; (D) all
> these conditions are shown by the testimony of the custodian or another qualified
> witness, or by a certification that complies with Rule 902(11) or (12) or with a
> statute permitting certification;[46] and (E) the opponent does not show that the

---

[45] The Blums reserve the right to address any additional exceptions that the Trustee asserts.

[46] As an initial matter, there is no custodial witness available to establish a proper foundation for
these materials.  *See* FED. R. EVID. 803(6).  "To establish a proper foundation for a document
offered into evidence as a business record, the custodian or other qualified witness must testify
that the document was kept in the course of a regularly conducted business activity and also that
it was the regular practice of that business activity to make the record."  *Ret. Plan of the Unite
Here Nat'l Ret. Fund v. Kombassan Holdings A.S.*, 629 F.3d 282, 289 (2d Cir. 2010) (internal

> source of information or the method or circumstances of preparation indicate a
> lack of trustworthiness.

FED. R. EVID. 803(6); *see also* FED. R. EVID. 803, advisory committee's note ("The element of

unusual reliability of business records is said variously to be supplied by systematic checking, by

regularity and continuity which produce habits of precision, by actual experience of business in

relying upon them, or by a duty to make an accurate record as part of a continuing job or

occupation.").

The proffered records do not meet the criteria of Rule 803(6) because a) the Trustee

cannot establish when or by whom the records were made; b) the Trustee cannot show that

Madoff Securities' practices were sufficiently regular to qualify for the exception; and c) the

Trustee's own allegations establish that the source of the information, as well as the methods and

circumstances of the preparation of the records, demonstrate a lack of trustworthiness.

> **a.** **There is no evidence that the notations were made at or near**
> **the time by someone with knowledge acting in the ordinary**
> **course of business.**

In order to qualify under the business records exception, the recorded notations must have

been made at or near the time information was transmitted by someone with knowledge acting

within the ordinary course of business. *White Indus. v. Cessna Aircraft Co.*, 611 F. Supp. 1049,

1059 (W.D. Mo. 1985) ("The 'with knowledge' language of . . . [Rule 803(6)] must be read as

incorporating the 'first-hand knowledge' requirement of Rule 602."). There is no evidence that

any of the Madoff Securities employees responsible for entering PW notations had first-hand

knowledge of the specific transactions or customer instructions. Rather, former Madoff

Securities employees confirmed that the majority of the notations were entered in reliance on

---

quotations omitted). The Trustee and his professionals cannot testify as to the circumstances
under which PW notations were made, as the timing, authorship, and underlying basis or
instruction is unknown.

statements from others.  Where a declarant's statement is based on information provided to her

by another, the proponent of the statement must demonstrate *that the author and the informant*

were acting in the ordinary course of business.

> Each person involved in transmitting the information, including the original
> source, must have been acting under a 'business duty' to the business activity in
> question in connection with that transmittal.  If there is break in that series of links,
> the gap can be bridged only if the transmitting person's statement is admissible
> under some other hearsay exception.

*White Indus.*, 611 F. Supp. at 1060; *see also* FED. R. EVID. 803, advisory committee's note ("If,

however, the supplier of the information does not act in the regular course, an essential link is

broken; the assurance of accuracy does not extend to the information itself, and the fact that it

may be recorded with scrupulous accuracy is of no avail"); *Snyder*, 787 F.2d at 1434 ("The

reason underlying the business records exception fails, however, if any of the participants is

outside the pattern of regularity of activity.") (internal quotation marks omitted).

Thus, under Rule 803(6), the Trustee has a duty to demonstrate that the information

supplied was given by an informant with knowledge acting in the course of a regularly

conducted business activity.  Because employees at Madoff Securities made the PW-related

notations in the records based on third-hand information they received from Madoff or others

directly involved with the fraud, the notations do not fit within the Business Records exception.

For instance, Jackson stated she handled only internal paper work generated by other Madoff

Securities employees.[47]  She did not deal directly with customers; rather, she relied on the

information supplied by Crupi and Bongiorno.[48]  She admitted that "once [she] did the

paperwork, [she didn't] know what was bought or sold."[49]  Dorothy Khan's job was purely data

---

[47] Jackson Tr., Clinton Ex. B5, 12:14-12:25.

[48] Jackson Tr. 11:21-11:24.

[49] Jackson Tr. 17:12-17:16.

entry.[50]  Alethea Mui-Leung wrote out checks based on information supplied to her by others. Mui-Leung Tr. 20:22-21:8 (Q: What information were you given in order to print the checks? A: I guess the check - - I don't remember what it was. It was either the check, a check-out book or a list of checks that - - I don't know if its on the C&S. . . I know the process but I don't remember exactly what was given to me to enter them into as checks.").

Here, the person(s) providing information to Madoff Securities employees were not acting in the regular course of business; rather, as the Trustee admits, Madoff, Crupi, and Bongiorno were acting to perpetuate a fraudulent scheme.[51]  Even if the employees responsible for entering the PW notations in Madoff Securities records were acting in the course of a regularly conducted activity, because they did not receive information about the transaction from an informant with knowledge acting in the ordinary course of business, the annotations do not fall within the business exception.

With regard to the specific handwritten "S" and "R" notations on Blum account records, the Trustee has been unable to identify the author(s) of this marginalia -- much less when and under what circumstances they were made.  Sala, for example, had almost no knowledge regarding the initial account formation, when the majority of these "S" notations were purportedly made.  Sala Tr. at 36:3-36:8 ("Q: Do you know who did fill out forms when an account was opened? A: No. Q: Are you aware that forms were filled out when an account was opened. A: No.").  What little testimony the Trustee obtained merely confirms that the account notations—to the extent they can be authenticated at all—were not made by anyone with first-hand knowledge of customer requests.  Even the Trustee's witness who was convicted for her

---

[50] Khan Tr., Clinton Ex. B6, 12:1-12:25.

[51] E.g., Trustee Supp. Mem. at 63 (discussing "the fraudulent nature of BLMIS's business . . . "); *id*.at 65 (discussing "the length of Madoff's fraud"); *id*. at 77 (discussing Bongiorno's prison sentence).

17

role in the conspiracy lacked such first-hand knowledge: Bongiorno testified that the "Send" or "Reinvest" discussion took place between Madoff and the customer; Madoff would later relay the results of this conversation to her orally.[52] Madoff himself said otherwise.[53] During his deposition, he confirmed that that customers only received checks if they made a specific request for them in writing.[54] Like the PW notations, this marginalia is hearsay that does not fall within the business record exception.

>    **b.    *Inconsistencies in Madoff Securities records establish that they are not the result of a regularly conducted business activity sufficient for Rule 803(6).***

The multiple inconsistencies in the way PW and other notations were made demonstrates that Madoff Securities' practices were not sufficiently regular or uniform to fall within the Business Records exception. The Trustee's own professionals confirmed that the documents at issue were not prepared with an eye to consistency and reliability. *See ADT Sec. Servs. v. Sec. One Int'l, Inc.*, 2013 U.S. Dist. LEXIS 126994, at *10-11 (N.D. Cal. Sept. 5, 2013) (excluding evidence under FED. R. EVID. 803(6)(E) where, among other things, defendants demonstrated a disparity between some of the telephone call summaries contained in the business records and the sworn deposition testimony given by the customers).

Madoff Securities did not strictly observe the same practices with respect to each purported PW transaction or S notation. On the contrary, the evidence reveals that Madoff Securities changed its accounting policies and did not follow internal guidelines for reporting. Indeed, the Trustee's professionals confirmed as much, finding hundreds of errors in their review.

---

[52] Bongiorno Tr. 31:7-32:20.

[53] Madoff Tr. 10:8-10:20 ("we did not accept verbal instructions from customers. If they wanted withdrawals, they had to specifically request them in writing, and we retained copies of all such requests in our customer files").

[54] *Id.* ("If there are no such requests in our files, that indicates that the customer did not request any withdrawals and would not have received any checks.").

For example, with respect to the PW notations, the House 17 manual states that "PW" should be used for profit withdrawals and states that PW checks are among the "checks going out."[55] The guidance on the PW notations is specific. It directs the employee to write PW "[o]n description type 'check & stock name" with a notation at the bottom of that page indicating to punch PW and CW checks as debits.[56] The Trustee asserts that this manual is evidence that the PW notations followed a specific process and, therefore, that each such notation indicates a check mailed to a customer.[57] However, of the 91,138 notations that the Trustee contends are PW transactions, only 34,574 follow these instructions. Over 52,000 PW notations appear completely divorced from any specific stock trade, merely stating "check." Further, 597 of the notations do not state PW at all; they contain either "CW" or "JRNL" notations.[58]

The Madoff Securities records are, as one would expect of a fraud, riddled with inaccuracies. The Trustee's professionals found conclusive evidence that 800 PW notations represented checks to customers that were not cashed.[59] They also found 591 transactions that were not marked as PW but, according to the Trustee's professionals, should be treated as profit withdrawals.[60] The Trustee's professionals continue to uncover errors. In a recent report, Greenblatt decided to exclude six additional notations on the grounds that they were erroneously

---

[55] Greenblatt Second Supp. PW Rep. ¶ 25; MADTSS00336545; MADTSS00336546; MADTSS01019221.

[56] House 17 Manual at MADTSS00336547.

[57] Trustee Supp. Mem. at 15.

[58] *See* Blums' Pre-Hearing Brief in Opposition to Trustee's Profit Withdrawal Motion at 19, 37. (discussing record discrepancies).

[59] Greenblatt Supp. PW Rep. ¶ 16, n.5.

[60] *Id.*

entered as PW notations and added 96 notations which he had previously determined were not PW notations.[61]

Because the "PW" and "S" notations on Madoff Securities records (and other similar statements contained therein) are not the product of a regular and consistent practice, they do not fall with the business records exception to the hearsay rule.

> **c.      The notations are untrustworthy because the authors were acting at the direction of people whom the Trustee admits had fraudulent motives.**

Finally, any hearsay statement admitted under the rules must bear the hallmark of trustworthiness. *See Wantanabe Realty Corp. v. New York*, 2004 U.S. Dist. LEXIS 1225, at *10, (S.D.N.Y. Feb. 2, 2004) (finding Rule 807 unavailable where there was "nothing particularly trustworthy" about a record upon which an expert sought to rely); FED. R. EVID. 803, advisory committee's note ("Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of truthfulness, statements to a physician consulted only for the purpose of enabling him to testify."). Thus, the proponent offering business records under the hearsay exception must show that the source of information and the method or circumstances of preparation indicates trustworthiness. Documents prepared in order to deceive are inherently unreliable, and the Trustee alleges[62] that the same Madoff Securities records on which he relies were meant to deceive customers and were made with actual intent to hinder, delay, or defraud

---

[61] *See, e.g.*, Greenblatt Supp. PW Rep. at n. 4 (noting that 6 notations were erroneously included as PW notations and that 96 PW notations had to be updated).

[62] E.g., Trustee Supp. Mem. at 5 (discussing fraudulent and "fictitious" notations in the customer statements);    *id* at 5 (warning against giving "undue credence to the fictitious amounts engineered by Madoff); *id.* at 6 ("the securities transactions reflected on BLMIS books and records were fictitious"); *id.* at 63 (discussing "the fraudulent nature of BLMIS's business . . . "); *id.*at 65 (discussing "the length of Madoff's fraud"). *See also* August 20, 2013 Rep. of Bruce G. Dubinsky at 156 ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer."); *id.* at 12, 32, 155 ("Fraud permeated BLMIS.").

creditors.  *See Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014); *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996), *rev'd on other grounds*, *Jubber v. SMC Elec. Prods. (In re C.W. Mining Co.,)*, 798 F.3d 983, 986 (10th Cir. 2015)); *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech Grp., Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990).  This alone takes them outside the purview of Rule 803.

"The determinations whether a proper foundation has been laid for application of the business records exception to a particular document and whether the circumstances of the document's preparation indicate untrustworthiness are within the discretion of the trial court." *United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir. 1985), *cert. denied*, 476 U.S. 1183 (1986). When considering whether a document was prepared by an untrustworthy source, courts examine whether the party providing the information had an incentive to misrepresent.  *Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943) (excluding accident report on the grounds that it was prepared in anticipation of litigation).  Like all hearsay exceptions, the business records exception rests on a fundamental premise that the information contained therein is reliable. Where, however, the records were created with an incentive to misrepresent, that fundamental premise is violated and courts will not admit the evidence.

To this end, courts discuss the lack of any incentive to misrepresent in the business records as a condition of admissibility.  *See e.g.*, *United States v. N.Y. Foreign Trade Zone Operators*, 304 F.2d 792, 796 (2d Cir. 1962) (admitting record on the grounds that it was prepared pursuant to a statutory duty); *Lewis v. Baker*, 526 F.2d 470 (2d Cir. 1975) (reporter of a business record's protection from job censure or personal liability in connection with the matters reported was supported determination of trustworthiness).  Further, courts consistently reject documents where the author may have had an incentive to lie.  For example, the Second Circuit

21

has held that a business record was properly excluded because the author's statement was "dripping with motivations to misrepresent." *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942), *affirmed Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943).

In *United States v. Dreer*, the Eleventh Circuit rejected a set of business records on the grounds that other records in the business were falsified. 740 F.2d 18 (11th Cir. 1984). The court held that "[a]lthough the proponent of the records did not admit that the records were falsified, there was an extremely strong inference arising from evidence of numerous other forged financial documents that the proffered evidence was not genuine." *Id*. at 20. Here, unlike legitimate businesses that rely on accurate records to maintain profitability and avoid regulatory issues, the *inaccuracy* of Madoff Securities' records was pivotal to its survival. As the Trustee admits, Madoff relied on misleading innocent customers to hide the fact that no trades were occurring and the customer was not actually making any return.[63] This incentive to misrepresent should completely disqualify Madoff Securities records from admission under Rule 803(6).

### 2. The residual exception in FED. R. EVID. 807 does not apply.

Federal Rule of Evidence 807 provides a "residual exception" to the prohibition against hearsay. FED. R. EVID. 807. As a threshold matter, the Court should not entertain any argument under this provision, as a statement is admissible under Rule 807(b) "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." The Trustee has not provided any notice of his intent to offer

---

[63] In this regard, *Curtis v. Perkins*, 781 F.3d 1262 (11th Cir. 2015), is distinguishable. In *Curtis*, the court found that records maintained by a company engaged in a Ponzi scheme were admissible under the business records exception where the Trustee had presented "enough circumstantial evidence to establish the trustworthiness of the underlying documents." *Id*. at 1268. Here, the testimony of employees responsible for the PW notations as well as the many inconsistencies in the business records identified by the Trustee's own professionals show that there are no indicia of trustworthiness.

evidence under this exception, nor can he even identify the declarants.  In any event, he cannot meet the standards of Rule 807.

Evidence not specifically covered by Rule 803 or 804 may be admitted under Rule 807 if: (1) "the statement has equivalent circumstantial guarantees of trustworthiness"; (2) the statement is "offered as evidence of a material fact"; (3) the statement is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"; (4) "admitting [the statement] will best serve . . . the interests of justice"; and (5) the opposing party was offered reasonable notice.  FED. R. EVID. 807(a)(b); *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991).[64]

"The most important requirement of Rule 807 is that the hearsay evidence have 'circumstantial guarantees of trustworthiness' that are 'equivalent' to those reflected in the other hearsay exceptions."  *Batoh v. McNeil-PPC, Inc.*, 2016 U.S. Dist. LEXIS 31126, at *29 (Conn. Mar. 10, 2016) (citing *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 512 (D.N.J. 2002)); FED. R. EVID. 803, advisory committee's note ("The committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of pro[b]ativeness and necessity could properly be admissible.").  "The proponent of the statement bears the burden of establishing that the statement is especially trustworthy."  *Batoh*, 2016 U.S. Dist. LEXIS 31126, at *29 (citing *Jacboson v. Deutsche Bank, A.G.,* 206 F. Supp. 2d 590, 595 (S.D.N.Y. 2002)); *United States v. Washington*, 106 F. 3d 983, 1001-02 (D.C. Cir.), *cert. denied*, 522 U.S. 984 (1997)).  The Second

---

[64] While the Second Circuit in *Parsons* was referencing the prior residual exception in Rule 803(24), "[t]he contents of Rule 803(24) and Rule 804(b)(5) have [since] been combined and transferred to a new Rule 807. . . . No change in meaning is intended."  FED. R. EVID. 807, advisory committee's note.

Circuit holds that "the residual exception to the hearsay rule should be applied sparingly." *Robinson v. Shapiro*, 646 F.2d 734, 742 (2d Cir. 1981); *see also Parsons*, 929 F.2d at 907 (stating that Rule 807 should "be used very rarely, and only in exceptional circumstances") (internal citations and quotation marks omitted).

The Trustee has failed to establish that the proffered hearsay has any indicia of trustworthiness, much less the hallmarks of "especially trustworthy" statements and "exceptional circumstances" required by the rule. In fact, the Trustee not only admits—but affirmatively argues—that the same Madoff securities records on which he relies were *meant to deceive* customers and made with actual intent to hinder, delay, or defraud creditors.[65] The Trustee can not have it both ways. To the extent that the Trustee argues that this is the only evidence available to prove his assertions, "necessity *alone* will not render hearsay admissible under the residual exception", as "[s]uch a rule would eviscerate the hearsay rule." *Jacobson*, 206 F. Supp. at 596 (emphasis added); *Oates*, 560 F.2d at 65 (lab report and chemist worksheet were "crucial" evidence on an element of the claim, but inadmissible) (reversing conviction). Indeed, allowing evidence to be admitted on such a factually contradictory basis is far from "serv[ing] . . . the best interests of justice." FED. R. EVID. 807(a)(b); *Parsons*, 929 F.2d at 907.

This is not an "exceptional circumstance[]" in which the rarely-used residual hearsay exception applies. Furthermore, because these records are inadmissible hearsay for which no exception applies, the Trustee's professionals cannot testify to their contents.

## III.    The Trustee Cannot Evade Evidentiary Prohibitions By Asking His Professionals to Summarize Hearsay or Speculate as to the Contents of Missing Records.

Faced with these evidentiary problems, the Trustee appears to be proposing that his professionals Lisa Collura and Matthew Greenblatt testify at hearing as conduit for relaying

---

[65] *See supra* Section I.B.1.c.

24

inadmissible hearsay to the Court.  The Trustee offers their testimony (and related exhibits) both to summarize the existing documents and to prove the probable contents of missing records.  The Trustee cannot evade the evidence rules in this manner.  Whether considered under the standards for summary evidence or as secondary evidence of the contents of missing records, the anticipated testimony of the Trustee's professionals does not comport with the evidence rules.

### A.    FED. R. EVID. 1006 Does Not Permit Admission of Summaries of Hearsay.

The Trustee's exhibit disclosures suggest that he will use his professionals to present more than 200 summaries of the existing documents.[66]  This is impermissible under Federal Rule of Evidence 1006.   Summary exhibits are allowed where voluminous evidence "cannot conveniently be examined in court."  FED. R. EVID.1006.  A party may not use the rule to evade evidentiary issues with the underlying materials, however:  "Summary evidence is inadmissible if the original materials on which it is based contains hearsay that does not qualify as admissible evidence under one of the exceptions to the hearsay rule."  6-1006 Weinstein's Federal Evidence § 1006.07 (2015).  "*The materials summarized by FED. R. EVID. 1006 evidence must themselves be admissible* because a contrary rule would inappropriately provide litigants with a means of avoiding rules governing the admission of evidence such as hearsay."  *See e.g.*, *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012) (emphasis added); *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (Rule 1006 "clearly permits the use of a summary of business records provided 'all of the records from which it is drawn are otherwise admissible.'") (citations omitted).

It is not enough that some of the evidence summarized would be admissible; *all* of the underlying evidence supporting the summary must be admissible.  *Paddack v. Dave Christensen,*

---

[66] *See* Trustee Exs. 1 through 24-208.

*Inc.*, 745 F.2d 1254, 1256 (9th Cir. 1984) ("[I]t is clear that a summary of both inadmissible and admissible hearsay should not be admitted under FED. R. EVID. 1006.").[67]  Accordingly, just as the proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception, so too must the proponent of a Rule 1006 summary based on hearsay evidence establish that the materials summarized are admissible."  *Irvin*, 682 F.3d at 1259.  The summary exhibits prepared by the Trustee's professionals are inadmissible because they are not exclusively based on admissible documents.  For example, Exhibit 2—"BLMIS Direct PW Accounts"—purports to list all accounts that requested "PW" notations; however, this list is largely a compilation of handwritten "S" notations.  Similarly, the 208 Principal Balance calculations rely on the "PW" notations contained in the spiral notebook, customer statements, and other BLMIS-generated documents.  Accordingly, the Blums move to exclude the Trustee's proposed exhibits 1 through 24-208 as improper summaries.

Likewise, the Trustee may not use professionals to improperly transmit hearsay to the Court.  Collura's anticipated testimony is largely a summary of the PW notations in documents from a ten-year period that post-dates the Blum PW notations.  Likewise, Greenblatt purports to summarize Madoff Securities materials related to the 6,148 PW notations from 1995-2008 for which he could find trading data.[68]  Whatever their relevance, these materials are hearsay.[69]  Greenblatt admits that he relies on the following written out of court assertions:  PW notations,[70]

---

[67] If part of the evidence offered is admissible and a part is not, it is incumbent on the offeror, not the judge, to select the admissible part.  If counsel offers both good and bad together and the judge rejects the entire offer, the offeror may not complain on appeal.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1256 (9th Cir. 1984).

[68] Greenblatt, PW Rep. ¶ 16.

[69] *See infra* at 11-15 for hearsay discussion.

[70] Greenblatt PW Rep. ¶¶ 24, 39, 42.

BLMIS customer statements,[71] and BLMIS records of purported profits resulting from non-existent trades.  Because both professionals purport to be merely summarizing records, and the underlying records contain inadmissible hearsay, their proffered testimony should be excluded.  *See Ruffin*, 575 F.2d 346, 357 (2d Cir. 1978) (reversible error to allow witness to testify to contents of records where contents were offered for truth) ("Inasmuch as it was offered to prove the truth of the matters asserted in the missing documents, Hamill's testimony as to the contents of those documents was clearly hearsay.  Moreover, the subject matter of his testimony, the documents themselves, if they were to have been introduced at trial for the purpose of proving the matters  asserted in them, would also have been hearsay.")

**B.     Speculation Regarding the Content of Missing Records is Improper Under FED. R. EVID. 1004.**

In addition to summarizing the hearsay content of existing records, at various points each professional speculates about the prior existence and contents of other records that the Trustee has not been able to locate – specifically third party bank records that were destroyed years ago.[72]  Such speculation is not competent evidence of the contents of missing records and should be excluded.  Federal Rule of Evidence 1002, also known as the "best evidence" rule, instructs that "to prove the content of a writing . . . the original writing . . . is required."  FED. R. EVID. 1002.  Federal Rule of Evidence 1004 provides, in relevant part, that "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible" when the original is unavailable through no fault of the offering party.  FED. R. EVID. 1004.

---

[71] *Id.* at ¶¶ 32-34.

[72] *See, e.g.*, Principal Balance Calculation Rep. of Matthew B. Greenblatt, at 12 n.13 ("[Based on analysis of notations after December 1998] I can reasonably infer that the cash transactions on Customer Statements prior to December 1998 would reconcile to third-party bank records had such records been available.").

Parties commonly use Rule 1004 to admit, for instance, a photocopy in the event of a lost original business record.

The secondary evidence of the contents of a lost or missing record offered under Rule 1004 must itself be competent, admissible evidence. "The secondary evidence, . . . must give the court or other finder of fact more to go on than 'sheer speculation.'" *Doucet v. Drydock Coal Co. (In re Oakley)*, 397 B.R. 36, 49 (Bankr. S.D. Ohio 2008) (citing *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1021 (6th Cir. 1995) ("[W]e cannot state that a party can never prove the terms of [an insurance] policy without a copy of the policy or a reasonable facsimile thereof.  But the party trying to do so certainly faces a formidable burden.")).  While "Rule 1004 recognizes no degrees of secondary evidence"—*Maxwell MacMillan Realization Liquidating Trust v. Aboff (In re Macmillan Inc.,)*, 186 B.R. 35, 47 (Bankr. S.D.N.Y. 1995); *see In re Oakley*, 397 B.R. at 48-49 ("Courts place no limitations on what kind of secondary evidence the proponent may use . . . .") —the evidence offered must still meet the basic standards of the Rules of Evidence.  In other words, the Trustee may only prove the contents of missing documents with "competent secondary evidence."  *See, e.g., Bandler v. v. BPCM NYC Ltd.*, 2014 U.S. Dist. LEXIS 137381, at *28 (S.D.N.Y. Sept. 28, 2014) (noting the defendant failed to offer "reliable and competent secondary evidence") (citing *Glew v. Cigna Grp. Ins.*, 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008) (referencing the same).

Mere speculation for the purpose of advancing one's litigation position is not "competent" evidence.  *See, e.g., Kleenit, Inc. v. Sentry Ins. Co.*, 486 F. Supp. 2d 121, 136 (D. Mass. 2007) (holding that a party seeking to admit secondary evidence of a missing policy "has come forth with no competent evidence (such as the testimony of a witness with knowledge of the contents of the missing policy) that would permit the inference that the existing policy was a renewal of

28

the missing policy"). For example, in *United States v. Wells*, the Fifth Circuit held that it "simply cannot conclude that [oral] testimony of . . . a cooperating witness . . . with respect to his memories of notations of drug sales apparently drafted by someone else several years earlier and destroyed soon thereafter had sufficient indicia of trustworthiness." 262 F.3d 455, 462 (5th Cir. 2001). The court reasoned, "If we allowed this testimony, we would, in effect, be allowing an end run around the rule against hearsay and the requirements of the business records exception. This we are unwilling to do." *Id.*

To the extent that the Trustee intends to offer Collura's testimony as to her "inferences" that missing bank records would confirm PW withdrawals in the ten-year period,[73] that testimony is improper. Collura has no first hand knowledge of what the missing bank records contained – she is merely speculating. Greenblatt's more aggressive speculation that "transactions on Customer Statements prior to December 1998 would [have] reconcile[d] to third-party bank records had such records been available"[74] is more egregious but equally inadmissible. Greenblatt cannot offer testimonial evidence to prove the *content* of missing bank records, as he admittedly has no actual knowledge of the original documents.

Here, the Trustee's professionals can only speculate as to the existence, let alone the contents, of the missing bank records. Their testimony on these points is improper and would allow the Trustee to evade both the hearsay rules and the best evidence rule simply by speculating that a hypothetical original document once existed that supports his position. Accordingly, the Blums request that the Court exclude all witness testimony speculating as to the

---

[73] Collura PW Rep. at 7, 8, 12, 14, 18 (asserting that she can "reasonably infer" that missing documents would support reconciliation).

[74] Principal Balance Calculation Rep. of Matthew B. Greenblatt, at 12 n.13

existence or content of any missing record, including all testimony about "inferences" regarding the prior existence or content of missing records.

## IV.    Alternatively, If Evaluated as Expert Opinion, the Professionals' Testimony Is Inadmissible under FED. R. EVID. 702 and 703.

While the Trustee appears to be merely using his professionals as a conduit for hearsay and speculation about missing documents, in the event that he alternatively offers their testimony as expert opinion, such opinions are not admissible.  "Although 'experts can testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions,' they may not simply transmit that hearsay to the jury." *Triboro Quilt Mfg. Corp. v. Luve LLC*, 2014 U.S. Dist. LEXIS 57186, at *19 (S.D.N.Y. Mar. 18, 2014) (*quoting United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2002)).  "Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citations omitted).

Courts routinely exclude proposed testimony where the expert is simply acting as a "'mere conduit for the hearsay of another."  *Wantanabe Realty Corp. v. New York*, 2004 U.S. Dist. LEXIS 1225, at *11.  In *Wantanabe*, for example, plaintiff was the owner of a roller coaster that was destroyed by the City of New York.  The owner brought an action for damages and proposed expert testimony on replacement costs for the roller coaster.  The expert relied on a cost quotation provided by a manufacturer.  The court granted a motion *in limine* to exclude the expert's testimony, because the expert relied on an cost estimate created by a third party, which the court found to be hearsay, and on nonexistent measures and documentation.

Considered as expert opinion, the proposed testimony is not within the professionals' area

of expertise, and cannot be shown to be the product of reliable data and methodologies, as

required by Rule 702.  Further, the professionals' speculation on the ultimate issues before the

Court is not appropriate assistance to the trier of fact.  Likewise, the proposed testimony is

improper under Rule 703, because the Trustee's professionals do not rely on the type of records

generally used by experts in their respective fields, as detailed below.

> **A.**    **FED. R. EVID. 702 Demands that an Expert Be Qualified, that His Opinion Be Based on Reliable Data and Methodologies, and that His Testimony on a Particular Issue Will Help the Trier of Fact; Greenblatt's Speculation Fails All Three Criteria.**

An inquiry into the admissibility of expert testimony under Rule 702 "focuses on three

issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon

reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will

assist the trier of fact."  *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014)

(citing *Nimely v. City of New York*, 414 F.3d 381, 296-97 (2d Cir. 2005)); *see also Washington v.*

*Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015).  The party proffering expert testimony

bears the burden of establishing by a preponderance of the evidence that the testimony satisfies

the requirements of Rule 702.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593 n.10 (1993);

*see also* FED. R. EVID. 702, Advisory Committee Notes: 2000 Amendments.  Greenblatt's

assertions that PW notations prior to 1995 would be verifiable if records existed fail all three of

these criteria.

> **1.    Greenblatt is not qualified to draw inferences regarding the probability that missing records would confirm that Madoff Securities' practices prior to 1995 were the same as those in the ten-year period examined by Collura because he lacks the relevant statistical expertise.**

"To determine whether a witness qualifies as an expert, courts compare the area in which

the witness has superior knowledge, education, experience, or skill with the subject matter of the

proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). It is not enough that an individual possess expertise; the expertise must also be specifically relevant to the testimony offered. *Id.*; *Davis v. Caroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) (court's "admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case"). "[A]n expert qualified in one subject matter does not thereby become an expert for all purposes." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).

In *Louis Vuitton*, an expert in colorimetry was admitted to compare the colors used in the Louis Vuitton monogram with the colors used in the monogram of the defendant in a trademark infringement case. *Id.* at 639-43. In addition to testifying about the relative similarities in color, the plaintiff sought to have the expert opine on the likelihood that the similar colors were the probable result of copying. The court rejected this testimony, noting that the witness's "expertise in colorimetry does not establish his expertise as a statistician." *Id.* at 642. While the expert was qualified to discuss the similarities, nothing in his expertise or background qualified him to draw probabilistic inferences that the similarities in color that he identified were the result of imitation or even that the similarities were unlikely to be the result of chance.

Similarly, Greenblatt may be qualified as a forensic accountant to compare the transactions noted in Madoff Securities records with the transactions noted in the records of third parties. However, the Trustee has not made any showing that he possesses the statistical expertise that would qualify him to evaluate the probability that missing records from an earlier period would support the notation for which there is no corresponding third-party record. Nor has the Trustee provided any evidence that Greenblatt can accurately determine whether Madoff Securities followed the same practices in the relevant period that Collura observed in the ten-year

period that she examined.  Greenblatt is in the same position as the colorimetrist in *Louis Vuitton,* who could not claim to have accumulated knowledge through experience concerning the frequency with which different companies unintentionally chose branding with similar colors.

For this reason, Greenblatt is not qualified to offer expert testimony regarding any "inference" as to the meaning of PW notations that pre-date the period Collura examined.

### 2.  The challenged inference is not based on reliable data and methodology.

Expert testimony is inadmissible unless it is based on reliable data and methodology.  *See* FED. R. EVID. 702.  To meet this standard, the proponent must demonstrate the following: (1) the expert's testimony is based on sufficient facts or data; (2) the expert testimony is the product of reliable principles and methods; and (3) the expert consistently applied these reliable principles and methods to the facts of the case.  *See Amorgianos v. Amtrak*, 303 F.3d 256, 265-68 (2d Cir. 2002) (grouping these three requirements under the reliability analysis).  Greenblatt's inferences do not satisfy any of these requirements, which are three independently adequate bases for exclusion.

#### a.  *Greenblatt's conclusion lacks sufficient supporting facts and data that the PW notations represent funds received.*

Expert testimony must be based on sufficient facts or data.  FED. R. EVID. 702(b).  "[W]hen an expert opinion is based on data . . . or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos*, 303 F.3d at 265-66.  Missing information cannot be supplied by an ungrounded assumption that what is true at one point in time was also true at an earlier point in time.  *See, e.g., Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1036 (D.C. Cir. 2007) (absent evidence establishing that a practice had not changed, evidence of store's practices in 1967 inadmissible to establish practices occurring 1965).  For example, in *Delehanty v. KLI, Inc.*, 663 F. Supp. 2d 127,

133 (E.D.N.Y. 2009), an expert's opinion that a man fell from a ladder because moving parts were rusted was unreliable when it was based on the fact that the expert found rust on the ladder three months later.  Because there was no evidence that the ladder's condition was the same at the time of the accident as at the time of the expert's inspection, the court held that expert "offers nothing at all to establish the basis of his opinion."  *Id.* (excluding testimony); *see also Wantanabe*, 2004 U.S. Dist. LEXIS 1225, *11 (excluding expert whose cost estimate was hearsay, and where remainder of expert opinions were based on no evidence whatsoever).

Similarly, Greenblatt's speculation that Madoff Securities consistently recorded PW notations where profit checks were requested by customers and sent to them is unreliable. Greenblatt attempts to generalize about all PW notations based on Collura's observations about a later period.  This is exactly the sort of testimony prohibited by Rule 702 and cases such as *Delehanty*.  Notably, Collura's most successful reconciliation concerned a very narrow dataset. Of a reported 92,000 PW notations, Collura's primary analysis addressed only six percent of the total PW notations and nearly all of these transactions occurred in a later period than those at issue here.  In recognition of this limitation, Collura did not claim to reconcile all PW notations. Indeed, Collura's analysis of all PW notations had a very low success rate.  She was only able to correlate 57% of the PW notations to any supporting record.[75]  This reconciliation rate is especially unpersuasive in light of Collura's liberal inclusion of data.  For instance, Collura treated any indication that a PW withdrawal had been requested, such as a letter requesting that future PW withdrawals stop, as proof that a large group of prior PW transactions had both been

---

[75] Collura PW Rep. at ¶ 42.

requested and did occur.[76]  Even with such a broad strategy, she was only able to find support for

a little over half of the PW notations – none of which involve the Blum accounts at issue.

Greenblatt uses Collura's analysis as a basis to "infer" that all PW notations are the

product of the same process and have the same meaning.  Yet, there is no evidence that Madoff

Securities bookkeeping practices were the same at the time of the PW notations in question as at

the time of the PW notations that Collura examined.  There is no evidence that the accuracy with

which notations were made remained consistent through time.  There is no evidence that the PW

notations in the accounts at issue accurately represent cash withdrawals.  Expert testimony to the

effect that all PW notations represent funds received by customers lacks a sufficient factual basis

and should be excluded.

> **b.    *Greenblatt's inferences are not the product of reliable principles and methods.  Instead, the inferences are statistical conclusions that lack any foundation, explanation or metric by which they could be tested.***

Expert testimony must be the product of reliable principles and methods.  FED. R. EVID.

702(c).  The *Daubert* inquiry into the reliability of principles and methods is a flexible one

conducted without regard to the court's belief as to the correctness of the expert conclusions.

Instead, courts focus on four factors:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos v. Amtrak*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-95) (internal quotes

and citations omitted).  Opinion evidence should be excluded if, rather than being based on

reliable principles and methods, it "is connected to existing data only by the *ipse dixit* of the

---

[76] Collura Supp. PW Rep. ¶ 38.

expert.  A court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered."  *GE v. Joiner*, 522 U.S. 136, 146 (1997); *see also Louis Vuitton*, 525

F. Supp. 2d at 643 ("The court does not fulfill its gatekeeper function if it simply accepts the *ipse*

*dixit* of an expert.").

Greenblatt's inference that all of the PW notations correspond to PW checks is classic

*ipse dixit*.  Indeed, Greenblatt does not even explain his reasoning.  Rather, he itemizes the

documents he considered and the relative reconciliation rate; he then states that, from these facts,

he can conclude that all PW notations represent PW checks received and cashed.[77]  Greenblatt,

like the expert in *Louis Vuitton*, attempts to infer allegedly probable facts without setting out the

statistical significance of the findings, explaining the methods or principles that support the

inference, or quantifying the degree of certainty with which the inference can be drawn.  The

only reasoning that the Trustee's experts provide to connect their finding that some PW notations

represent cash withdrawals with their conclusion that all PW notations must represent cash

withdrawals is conclusory *ipse dixit* that implicitly relies on the fallacy of composition.[78]

Greenblatt's reliance on *ipse dixit* highlights the lack of demonstrable principles and

methods to draw the challenged inference.  *Daubert* points to testability, peer review, and

publication as indicators of reliability.  *Daubert*, 509 U.S. at 584-87.  Greenblatt's inferences are

impossible to test for accuracy, although he implicitly acknowledges that his approach is

---

[77] In *Louis Vuitton*, the Southern District of New York rejected what it called "the classic *ipse dixit*."  *Id.*  The court held that a colorimetrist could not infer from his finding of similarity in colors that the defendant deliberately copied the colors of a Louis Vuitton monogram because he "provided no explanation for why he found that the common use of colors was statistically significant, gave no indication that he employed reliable statistical methods to his findings, and even failed to place a figure on the degree of probability that he determined."  *Id.*

[78] *See, e.g.*, Principal Balance Calculation Rep. of Matthew B. Greenblatt, 12 n.13 ("[Based on analysis of notations after December 1998] I can reasonably infer that the cash transactions on Customer Statements prior to December 1998 would reconcile to third-party bank records had such records been available.").

inaccurate with respect to at least the 800 PW notations that he determined were not cash withdrawals. [79] Likewise, the principles and methods he applied have not been articulated – much less subjected to peer review and publication. *Daubert* also suggests that the known or potential rate of error and the existence of standards for employing a technique are also potential indicators of reliability. *Id.* at 590. Here too, Greenblatt's testimony fails: it is impossible to ascertain the error rate of his technique because it is untestable and has no standards for application. Presumably, Greenblatt would not extrapolate an inference from a single established PW transaction, but he fails to explain how many verified withdrawals or proven errors would be significant to the analysis. Finally, *Daubert* points to general acceptance in the relevant community as an indicator of reliability. The Trustee's experts provide no indication that their approach is generally accepted or even known among any community of experts.

None of the *Daubert* factors have even the slightest tendency to establish the reliability of the principles and methods underlying Greenblatt's inference. Instead, he offers a classic *ipse dixit* that cannot be accepted as a basis for expert testimony.

<strong>c.    Greenblatt bases his inference on an analysis that simply ignored contradictory data.</strong>

Expert testimony is only admissible if the expert has reliably applied reliable principles and methods to the facts of the case. FED. R. EVID. 702(d). Selective consideration of the facts of the case renders the application of any methodology unreliable. *See, e.g.*, *Amorgianos*, 303 F.3d at 268-69 (excluding testimony of expert who endorsed multi-factor methodology for assessing the concentration of solvent vapor in an enclosed space but did not include all variables in his assessment). Although much about Greenblatt and Collura's methodology is unclear, one thing about it is certain: Collura's analysis began by assessing what percentage of PW notations

---

[79] *See* Greenblatt Supp. PW Rep. at 6 nn.4-5.

could be correlated with third-party bank records that reflected cash received by Madoff Securities customers during the ten-year period.[80]  But the success of Collura's analysis depended upon the *exclusion* of approximately 800 PW notations at the outset.[81]  Throughout the course of this litigation, additional PW notations were excluded from consideration on the grounds that they did not represent PW checks sent to customers, but actually represented cancelled checks or tax payments.[82]  Rather than addressing these as PW notations as part of a risk of error analysis, Collura and Greenblatt simply removed them from the universe of PW notations under consideration.[83]  The record also suggests that, when they found other notations that were not coded as PW in Madoff Securities records but that could be reconciled to actual PW transactions, Collura and Greenblatt did not count these as erroneous entries but rather added them to the universe of PW notations under consideration to raise their reconciliation rate.[84]

Even assuming that Greenblatt or Collura had an unarticulated but reliable methodology for inferring the nature of all PW notations from the percentage of PW notations that could be verified through third party records, that methodology was selectively applied.  Whatever the methodology, it was applied to a data set that excluded any PW notation that directly contradicted the desired conclusion (i.e., the 800 errors as well as those discovered later).  Ultimately, the only reasonable statement[85] that the Trustee's professionals can make is that 57%

---

[80] Collura Proof of Transfers to the Defendant ¶ 20.

[81] Greenblatt Supp. PW Rep. at 6 n.5.

[82] *Id.*, at 6 n.4.

[83] *Id.*

[84] *See id.* at Ex. 14.

[85] For reasons discussed at length in the Blum's Pre-Hearing Brief at page 41, such as Collura's overly liberal interpretation of the evidence, her inferences are unpersuasive.

of the PW notations they examined were evidenced by some other record.  Any further inference

should be excluded.

### 3.    Greenblatt's speculation is not helpful to the trier of fact because no technical or specialized knowledge is required to understand the facts.

Expert testimony is only admissible if "the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue."  FED. R. EVID. 702(a).  Expert testimony will help the trier of fact only if "the subject

matter of the testimony is beyond the ken of the average juror."  *United States v. Castillo*, 924

F.2d 1227, 1232 (2d Cir. 1991).  Expert testimony that relies on common sense or other matters

in which the trier of fact is equally qualified should be excluded.  FED. R. EVID. 702, Advisory

Committee Notes ("There is no more certain test for determining when experts may be used than

the common sense inquiry whether the untrained layman would be qualified to determine

intelligently and to the best possible degree the particular issue without enlightenment from those

having a specialized understanding of the subject involved in the dispute.").

In this case, the Court is fully capable of evaluating the lack of evidence supporting the

Trustee's assumption regarding unreconciled PW notations and his unsupported assertions that

the notations prove that cash withdrawals were sent to and received by the customer.  No

specialized expertise is necessary to evaluate the facts discovered in Collura and Greenblatt's

review, such as the hundreds of PW notations that did not represent cash withdrawals and the

JRNL and CW entries that were reconciled as miscoded PW entries; or the lack of any

supporting documentation that PW notations in the Blum accounts represent cash withdrawals.

The Trustee's professionals have not offered a particularly complicated or technical discussion of

the evidence.  Rather, the experts merely "regurgitate the evidence" in an attempt to invade the

province of the factfinder. *See In re Lyondell Chem. Co.*, Adv. Pro. No. 09-1375-GCM, Doc. No.

849, 7 (S.D.N.Y. Bankr. Oct. 11, 2016) (quoting *In re Foxamax*, 645 F. Supp. 2d at 192).

**B.      While FED. R. EVID. 703 Allows an Expert to Base His Opinions on Hearsay Where Such Evidence is the Type Reasonably Relied on By Experts in the Particular Field, the Fraudulent Documents Here Were Prepared in a Manner that Conflicts with Standard Accounting Practices and May Not Be Reasonably Relied Upon.**

"Although the Rules permit experts some leeway with respect to hearsay evidence, a

party cannot call an expert simply as a conduit for introducing hearsay under the guise that the

testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v.

Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citing *Louis Vuitton Malletier v. Dooney & Bourke,

Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)).  Further, pursuant to Rule 703, an expert may

base his opinion on hearsay only if it is of the type reasonably relied on by experts in the

particular field in forming opinions.  "This part of the rule is designed to prevent enlarging the

category of permissible data to break down the rules of exclusion unduly.  It is especially

important when the facts or data on which the expert seeks to rely have obvious characteristics of

unreliability." *Ricciardi*, 811 F.2d at 25 (*citing Almonte v. Nat'l Union Fire Ins. Co.*, 787 F.2d

763, 770 (1st Cir. 1986)).  In this context, "the guarantee of trustworthiness of the hearsay is that

it be the kind normally employed by experts in the field." *Valentin*, 1997 U.S. Dist. LEXIS, at

*1 (internal quotation marks omitted).

Here, not only are the PW notations unusual because they were created as part of a

fraudulent scheme, the employees who made them had no personal knowledge about whether

they accurately reflected that funds were requested or received by customers, and there is a

dearth of documentation connecting the PW notations to funds that customers actually received.

These statements are thus not the type of inadmissible hearsay upon which an expert can rely.

An expert may not base her opinion on inadmissible hearsay where there is no evidence that experts in the field rely on similar kinds of statements. In *Ricciardi*, the First Circuit found that an expert in a medical malpractice case could not rely on an unusual note entered by a physician in a neurological consultation report because the note was not the type of hearsay that experts would rely on in forming an opinion. The note was written in the medical records two days after the surgery at issue by a physician who lacked personal knowledge of the events and who did not recall where he got the information recorded in the note. 811 F.2d at 24-25. The court found that "although neurological consultation reports may well be the 'type' of records upon which an expert would reasonably rely, there has been absolutely no showing here that unattributed material usually comprises a part of such consultative reports, or that experts in the field would rely such a note." *Id.* at 25. Exactly the same concerns are presented by Collura and Greenblatt's reliance on hearsay in the Madoff Securities records.

Even assuming arguendo that Greenblatt and Collura's opinions are generally within the realm of expertise of forensic accountants *and* that forensic accountants can rely on the hearsay in account records in forming their own opinions, the PW notations and related marginalia cannot form the basis of expert opinion. As explained in detail above (*supra*, Section II (A)), the PW notations were entered by unknown employees at unknown times in response to unknown direction from others with fraudulent intentions. The notations do not conform to the requirements of the House 17 manual and the practices surrounding PW notations varied widely throughout different time periods. The PW notations are not the "kind of a statement" on which an expert can reasonably rely on to form an opinion. *Ricciardi*, 811 F.2d at 25.

Moreover, as detailed in the Blums' Pre-Hearing Brief, the methodological problems with the experts' analyses make any putative reliance on the PW notations highly suspect.[86]  For example, instead of addressing the inconsistencies in the PW notations, Greenblatt and Collura simply excluded those PW notations that did not support their analysis – at least 800 PW notations were removed from the sample.  Likewise, Greenblatt and Collura included as PW notations a large number of entries that were coded "CW" or "JRNL" and did not purport to be PW notations at all.  While these issues go more directly to the merits of the analysis, they illustrate the myriad of issues that preclude any reasonable expert opinion based on the PW notations.

**V.      The Evidentiary Deficiencies in the Trustee's Submissions Are Particularly Blatant When Applied to the Blum Accounts.**

The Trustee relies on the PW notations and a handful of anonymous handwritten marks to assert that the Blums requested and received profit withdrawals from four family accounts. Because the Trustee has not identified a single third-party record corresponding to the relevant PW notations in these accounts, his experts can do nothing but repeat hearsay and speculate about the content of missing records.  There is no data to analyze and no basis to form an opinion. This is improper.  *See Wantanabe,* 2004 U.S. Dist. LEXIS 1225, *11 (granting motion *in limine* on similar grounds).

For all the reasons discussed herein, the Trustee's evidentiary submission is inadequate, and the Blums request that the Court order the following relief prior to hearing:

- Exclusion of all testimony or exhibits regarding unrelated customers or accounts not at issue under FED. R. EVID. 401-403, including Trustee Exs. 14.1-13, 24.16, 24.18, 24.20-24.208, 31-69, 73, 76-243, 272-514;

---

[86] Many of the substantive issues affecting Collura and Greenblatt's work are detailed in the Blums' Pre-Hearing Brief, which is incorporated herein by reference.

- Exclusion of all "PW" notations on customer records for lack of proper authentication, and as hearsay to the extent they are offered to prove that the customer requested or received a profit withdrawal, including Trustee Exs. 120-474, 524-532;

- Exclusion of all marginalia (e.g., "S" notations) in relevant customer files for lack of proper authentication, and as hearsay to the extent it is offered to prove that a customer requested the account profits be sent, including Trustee Exs. 70-72,74;

- Exclusion of all speculation as to the contents of missing records (e.g., cancelled checks);

- Exclusion of all testimony that incorporates or repeats hearsay;

- If offered as expert opinion, exclusion of Collura and Greenblatt's speculation under Rule 702 as not within the professionals' area of expertise, not the product of reliable data and methodologies, and/or not appropriate assistance to the trier of fact; and

- If offered as expert opinion, exclusion of Collura and Greenblatt's speculation under Rule 703 because the Trustee's professionals do not rely on the type of records generally used by experts in their respective field.

## CONCLUSION

For the reasons set forth above, the Blums request that the Court exclude the exhibits and testimony proffered by the Trustee as summarized in Section V.

Dated:  October 28, 2016                    Respectfully submitted,

                                        /s/ Laura K. Clinton
                                        Richard A. Kirby, *pro hac vice*
                                        Laura K. Clinton, *pro hac vice*
                                        Graham R. Cronogue, *admission forthcoming*
                                        BAKER & McKENZIE LLP
                                        815 Connecticut Avenue, N.W.
                                        Washington, D.C.  20006
                                        Tel: (202) 452-7020
                                        Email: richard.kirby@bakermckenzie.com
                                        Email: laura.clinton@bakermckenzie.com
                                        Email: graham.crongue@bakermckenzie.com