**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-1789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**PARTICIPATING CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE PROPOSED EXPERT TESTIMONY OF LISA M. COLLURA AND MATTHEW B. GREENBLATT**

**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone and Fax: (888) 759-1114
Helen Davis Chaitman
Gregory M. Dexter
hchaitman@chaitmanllp.com
gdexter@chaitmanllp.com

*Attorneys for Participating Claimants*

{00024807 2}

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

    I.    The Expert Reports are inadmissible to establish ultimate issues of fact .......................... 3

    II.    The experts are not qualified to serve as experts for anything more than counting numbers to reach paid-for conclusions ............................................................. 5

    III.    The Expert Reports are inadmissible because they are grossly unreliable and intentionally distorted ............................................................................................... 6

        A.    The Expert Reports intentionally include irrelevant transactions in their analysis ........................................................................................................................ 7

        B.    The Expert Reports intentionally obfuscate by lumping together "CW" and "JRNL" entries with PW Transactions ................................................................. 8

        C.    The Expert Reports intentionally obfuscate by including the Norman Levy Transactions .................................................................................................... 8

        D.    The Expert Reports grossly mislead by including in their analysis transactions post July 2000 – even though they acknowledge that no profit withdrawal transactions occurred in that time ............................................ 10

        E.    The Experts distort the evidence in their conclusions ................................................ 12

CONCLUSION ................................................................................................................... 13

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Campbell v. Bd. of Ed.*,
   310 F. Supp. 94 (E.D.N.Y. 1970) .................................................................................................5

*Daubert v. Merrell Dow Pharm.*,
   509 U.S. 579 (1993) ....................................................................................................................6, 7

*Davis v. Caroll*,
   937 F. Supp.2d 390 (S.D.N.Y. 2013) ..........................................................................................6

*Ege v. Yukins*,
   380 F. Supp.2d 852 (E.D. Mich. 2005) ......................................................................................5

*General Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .....................................................................................................................6

*Hollander v. American Cyanamid Co.*,
   172 F.3d 192 (2d Cir. 1999) ........................................................................................................4

*LinkCo, Inc. v. Fujitsu, Ltd.*,
   2002 WL 1585551 (S.D.N.Y. July 16, 2002) ............................................................................5, 6

*People v. Collins*,
   438 P.2d 33 (Cal. 1968) ..............................................................................................................4

*People v. Risley*,
   214 N.Y. 75 (1915) ......................................................................................................................4

*Presser v. Key Food Stores Co-op, Inc.*,
   24 IER Cases 1596, 2006 WL 2086346 (E.D.N.Y. July 25, 2006) ............................................5

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*,
   313 F.Supp.2d 213 (S.D.N.Y. 2004) ..........................................................................................8

*United States v. Shonubi*,
   103 F.3d 1085 (2d Cir. 1997) .....................................................................................................5

*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004) .........................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 702 .............................................................................................................................5

U.S. Department of Justice, JPMorgan Chase Bank, N.A. Deferred Prosecution
Agreement, (Jan. 6 2014) ....................................................................................................................9

Participating Claimants, as set forth on Exhibit A to the accompanying notice of motion, through their attorneys, Chaitman LLP, respectfully submit this memorandum of law in support of their motion to strike the expert reports of Lisa M. Collura and Matthew B. Greenblatt (the "Expert Reports"), upon which the Trustee relies to establish, as a matter of fact, that the Participating Claimants received profit withdrawal checks from Madoff in the 1980s and 1990s when there is no documentary evidence that such checks were ever sent by Madoff or received by the Participating Claimants.

## PRELIMINARY STATEMENT

The Participating Claimants seek a Court order barring the Expert Reports on the ground that the Experts have intentionally distorted their conclusions, making their Reports inherently unreliable.

## STATEMENT OF FACTS

The Participating Claimants incorporate by reference the facts and legal arguments set forth in their memorandum of law (ECF No. 14161) in opposition to the Trustee's motion seeking affirmance of his treatment of profit withdrawals. (ECF No. 10660). The Participating Claimants, using the Bleckers as illustrative of their position, recite only the following pertinent facts from that opposition:

- The Trustee does not have a single cancelled check, covering the period from 1981–2008, indicating that the Bleckers ever received a withdrawal from Madoff. (ECF No. 14161 at 4-5, 8).

- The Trustee does not have a single check stub, covering the period from 1981–2008, indicating that a check was ever made payable to the Bleckers, even though Annette Bongiorno testified that Madoff's checks contained a bottom half, separated by a serrated edge, which half was kept in the customers' files, along with a copy of each check ever sent to a customer. (ECF No. 14161 at 5).

{00024807 2}                                    1

- The Bleckers deny ever requesting a single profit withdrawal check and the Trustee has not produced a single written request for a profit withdrawal check from the Bleckers in the 27 years that they invested with Madoff. (ECF No. 14161 at 6).

- The Trustee relies upon Joann Sala's testimony that she entered into the Spiral Notebooks each check that had to be written to each customer representing a profit withdrawal. (ECF No. 10660 at 25). Yet, of the 180 profit withdrawal checks that the Trustee claims the Bleckers received, only four are listed in the Spiral Notebooks upon which the Trustee relies. (ECF No. 10660 at 36); Greenblatt II Exh. 14 Account 1B0023.

- All of the former Madoff employees who were deposed in this litigation admitted that they had no personal knowledge as to whether the Bleckers ever received a profit withdrawal check. (ECF No. 14161 at 6-10).

- No employee who was deposed in this litigation has any knowledge of whose handwriting was on the form allegedly used to designate Blecker's account as a "Send" account. (ECF No. 14161 at 7, 14).

The Experts' conclusion that Blecker received 180 Profit Withdrawal checks is pure speculation. In order to reach that conclusion, the Experts had to deliberately fashion their reports in such a way as to obscure, rather than elucidate, the facts.

So that there is no confusion about the factual issue before the Court, we have attached as an exhibit one page of a Madoff statement to Aaron Blecker dated June 30, 1990. (*See* October 28, 2016 Declaration of Helen Davis Chaitman, Ex. A). This statement appears to show that Madoff bought for Blecker's account 4,444 shares of Sun Microsystems Inc. It also appears to show a CHECK SUN MICROSYSTEMS in the amount of $4,228.00 with the entry "PW." The issue on which the Trustee seeks to have his Experts opine is what these entries mean: this is a purely factual issue about which the Experts have no expertise and their testimony is inadmissible.

{00024807 2}                                    2

**ARGUMENT**

The Participating Claimants join in the motion in limine filed by Doctors Norman and Joel Blum, through their attorneys, Baker & McKenzie LLP, and incorporate by reference the legal arguments submitted by the Blums in support of their motion. Beyond the legal arguments made by the Blums, there are factual arguments compelling the exclusion of the Experts' Reports and testimony because: (a) the Expert Reports are inappropriately being used to establish ultimate issues of fact; (b) they are written by "experts" in counting who have no expertise whatsoever in interpreting customer statements reflecting securities transactions; and (c) they are so grossly unreliable and distorted that they demonstrate a high degree of bias and intentional obfuscation. Thus, the Expert Reports are inadmissible under the Federal Rules of Evidence.

**I.     The Expert Reports are inadmissible to establish ultimate issues of fact**

The Trustee is attempting to establish, through expert testimony, that the Participating Claimants received checks in the amounts indicated on the line on their statements which contained the notation "PW" during the period from the 1980s to December 1998. He is attempting to prove this, not based upon cancelled checks deposited in the Claimants' accounts or on letters from the Claimants requesting withdrawals – *i.e.*, the documentary evidence necessary to prove facts – but solely based on a statistical calculation of various kinds of entries covering a period of 28 years, during which Madoff purported to employ entirely different trading strategies.

But the Trustee cannot establish an historical fact through expert testimony – and certainly not when the Trustee has admitted that the documents upon which the experts are opining are "permeated with fraud." See, for example:

- August 20, 2013 Report of Bruce G. Dubinsky at 156 ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer.").

- *Id*. at 12, 32, 155 ("Fraud permeated BLMIS.").

- December 17, 2015 Report of Matthew B. Greenblatt ("Greenblatt II") Exh. 7 (collecting data entry errors on Madoff accounts).

- *Id.* at 10, n.12 ("For the remaining 23 instances of PW Transactions with the Check + Stock Name description where FTI was unable to identify the corresponding fictitious trading activity related to the amount of the PW Transactions, additional analysis revealed several reasons for such variances, including but not limited to **situations where it appears the transactions were coded by BLMIS employees as 'PW' in error or reflect other data entry errors made by BLMIS.").** (Emphasis added);

- *Id.* ¶ 43 ("For the remaining 78 PW Transactions with the Check Only description, there was no fictitious trading which generated a profit, interest, or dividend in the exact amount of the PW Transaction. As a result, FTI performed additional analyses to identify potential reasons for such variances. Based on the review performed, **it is likely that these transactions were coded by BLMIS employees as 'PW' in error.").** (Emphasis added).

It is well established that statistical evidence cannot be used to prove a fact. For example, in the seminal case of *People v. Risley*, 214 N.Y. 75 (1915), the New York Court of Appeals held that expert testimony based on mathematical probabilities could not be used to establish an historical fact. In *Risley*, the expert testimony that the Court of Appeals found unacceptable involved the mathematical probability that the defendant's typewriter was used to create a particular document, even though the expert opined that the chances were one in four thousand million. *Id*. at 84-87; *see also Hollander v. American Cyanamid Co.*, 172 F.3d 192 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000).

In *People v. Collins*, 438 P.2d 33 (Cal. 1968), the California Supreme Court reversed a conviction where the prosecutor relied upon evidence that there was, according to mathematical probability, only one chance in 12 million that the defendants were innocent. The court wrote that the "'trial by mathematics' so distorted the role of the jury and so disadvantaged counsel for the defense as to constitute in itself a miscarriage of justice." *Id.* at 41. *Collins* has been referred to as a "classic for law students in basic evidence classes[]" and has been cited with approval by

{00024807 2}                                                        4

numerous courts. *See, e.g.*, *Ege v. Yukins*, 380 F. Supp.2d 852, 876-77 (E.D. Mich. 2005) (listing numerous cases and granting writ of habeas corpus where conviction was based upon statistical evidence), *aff'd in part, rev'd in part*, 485 F. 3d 364 (6th Cir. 2007).

In *United States v. Shonubi,* 103 F.3d 1085 (2d Cir. 1997), the Second Circuit vacated a criminal sentence for drug trafficking where the district court relied upon statistical evidence to estimate the total quantity of drugs trafficked by the defendant. The Second Circuit held that statistical evidence of general drug smuggling did not equate to "specific evidence" with respect to that particular defendant. *Id.*; *see also Presser v. Key Food Stores Co-op, Inc.*, 24 IER Cases 1596, 2006 WL 2086346, at *19 (E.D.N.Y. July 25, 2006) (plaintiff's use of statistical evidence to prove age discrimination was "demonstrably unsound"), *aff'd* 316 Fed. Appx. 9 (2d Cir. 2009); *Campbell v. Bd. of Ed.*, 310 F. Supp. 94, 105 (E.D.N.Y. 1970) (motion to enjoin elections for local school boards denied because the "computations offered at the trial were . . . not based upon any model demonstrably reflective of a real situation"); *LinkCo, Inc. v. Fujitsu, Ltd.*, 2002 WL 1585551, at * 2 (S.D.N.Y. July 16, 2002) (Scheindlin, J.) (expert report must be excluded where it does "no more than counsel . . . will do in argument, i.e., propound a particular interpretation" based on a review of documents over which the expert has only secondhand knowledge) (citation omitted).

Based on these authorities, the Expert Reports are inadmissible to prove that a specific Claimant received a specific profit withdrawal on a specific date.

## II. The experts are not qualified to serve as experts for anything more than counting numbers to reach paid-for conclusions

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). Rule 702

{00024807 2 }                                                  5

requires that "experts 'stay within the reasonable confines of [their] subject area, and cannot render expert opinion on an entirely different field or discipline.'" *Davis v. Caroll*, 937 F. Supp.2d 390, 413 (S.D.N.Y. 2013) (alteration in original) (citation omitted). A court's "admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case." *See id.*

Neither Collura nor Greenblatt worked for Madoff; neither has personal knowledge of how Madoff accounted for entries on customer statements; neither is an expert on Madoff's journal entries; and neither has expertise in brokerage data entries. Apparently, they wanted to preserve their ignorance because, remarkably, neither of them ever spoke to a single Madoff employee with personal knowledge of the meaning of the profit withdrawal entries on the customer statements. Neither can explain how their purported qualifications as certified public accountants would allow them to reach the sweeping conclusions that they do. Neither can justify their use of unreliable and intentionally distorted methods of analysis. Thus, their purported expertise is simply in adding up numbers and reaching paid-for conclusions that are utterly self-serving and inadmissible.

### III. The Expert Reports are inadmissible because they are grossly unreliable and intentionally distorted

The Supreme Court has explained that the relaxation of the common law requirement of firsthand knowledge for expert witnesses is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592 (1993) (citations omitted). Thus, lacking firsthand knowledge, the admissibility of the Expert Reports turns on the reliability of their methods and analysis. *See, e.g.*, *LinkCo, Inc.*, 2002 WL 1585551, at *4. Here, the Experts employed not only an unreliable analysis, but an analysis that is grossly – and intentionally – distorted. Thus, the conclusions reached in the Expert Reports are inadmissible. *See, e.g.*, *General Elec. Co. v. Joiner,* 522 U.S.

{00024807 2}                                                6

136, 146, 118 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.").

The following examples demonstrate the Experts' unconscionable bias:

A. <u>The Expert Reports intentionally include irrelevant transactions in their analysis</u>

Despite the fact that the only issue here is whether an entry like "CHECK AT&T" with a designation "PW" represents a check sent to the customer, the Experts define "PW Transactions" to include, not only entries on customer statements which reflect "PW," but also irrelevant entries such as "CW" (cash withdrawal) and "JRNL" (journal entry) even though there is no issue in this proceeding about the CW and JRNL entries.

> The subset of withdrawal transactions, collectively referred to herein as "PW Transactions," is comprised of: 1) transactions referred to as "Profit Withdrawals" for which the transaction code according to the Customer Statement is "PW" and 2) transactions reflected on the Customer Statements with a transaction code other than PW ("CW" or "JRNL").

*See* Greenblatt July 14, 2015 Report ("Greenblatt I") at 4, ¶ 6.

By their inclusion of irrelevant data beyond the PW period (ending in 1998), and by inclusion of irrelevant entries "Cash Withdrawals" and "Journal Entries" (as to which there is no dispute here), the Experts are able to misrepresent the relevant facts in an attempt to mislead the Court.

Moreover, even as to the PW period, the Experts are dishonest. They opine that the entries on the PW Transactions at issue here – that is, where the customer statement indicated something like "CHECK WALT DISNEY CORP    (PW)" – appeared only on customer statements from September 1983 through July 2000 (the "PW Period"). Greenblatt I, at 13, ¶ 39. In fact, the PW transactions did not occur after 1998. *See* Greenblatt II, Exh. 3. Thus, the only reason to include

post-1998 transactions is to obfuscate the issues and manipulate the facts. And that is precisely what the Experts have done. This is obviously grounds for rejecting their testimony. *See, e.g.*, *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp.2d 213, 234 (S.D.N.Y. 2004) (impermissible to admit expert analysis based on unrepresentative data).

B. The Expert Reports intentionally obfuscate by lumping together "CW" and "JRNL" entries with PW Transactions

In their obvious effort to obfuscate, neither Greenblatt nor Collura discloses the breakdown of the numbers of the PW transactions, the CWs and the JRNLs, all of which they include within their definition of PW Transactions. Aside from the fact that they have extended the period of the profit withdrawal transactions at issue to include 1999 and 2000 (without any indication of the number and type of transactions within that two year period), they include transactions beyond the PW Period, even though they admit that there were no PW Transactions after July 2000. Both experts include "CW" transactions and "JRNL" transactions, without disclosing the dates and numbers of these transactions.

C. The Expert Reports intentionally obfuscate by including the Norman Levy Transactions

Further clouding the issue, the experts include in their statistics the profit withdrawal transactions in the account owned and controlled by Norman Levy, 1L0027. Collura admits that, of the total PW Transactions, more than half, or "approximately 47,000, relate to one BLMIS customer account under the name of Norman Levy." Collura July 14, 2015 Report ("Collura I") at 13 n.10. Norman Levy had the distinction, second only to Jeffry Picower, of being the biggest

beneficiary of the Madoff fraud and the person who, as admitted by JPMorgan Chase, operated a $105 billion check kiting scheme with Madoff at JPMorgan Chase for almost ten years.[1]

Collura I Exh. 7 lists all of the PW transactions. It is a 2,727-page document of which the profit withdrawal transactions of Norman Levy's Account No. 1L0027 constitute 1,677 pages or 61%. However, Collura has not included other accounts owned or controlled by Norman Levy, including, at least, the following accounts.

| Account Name | Account Number | Pages of PW transactions in Collura II Exh. 7 | Total pages |
|---|---|---|---|
| Norman Levy | 1L0027 | 631 - 2308 | 1,677 |
| Jeanne Levy-Church | 1L0026 | 614-631 | 17 |
| Francis M. Levy Trust | 1L0025 | 549 - 614 | 65 |
| Francis N. Levy | 1L0024 | 516 - 549 | 33 |
| Betty & Norman Levy Foundation | 1L0023 | 505-516 | 11 |
| Levy Fashion Center | 101253 | 35 – 36 | 1 |
| Francis N. Levy & Jean Levy Joint Venture | 101243 | 30 – 35 | 5 |
| Betty Levy Estate | 101211 | 25 – 26 | 1 |
| Levy Cross & Brown | 100637 | 14 - 15 | 1 |
|  |  |  | 1,811 |

Thus, of the total PW transactions, approximately 66.4% represent Madoff transactions with one of his primary co-conspirators. Surely, this is information the Trustee's experts should have provided to the Court. Despite the vast volume of paper generated by the Experts, it is impossible to determine how many legitimate customer PW transactions there were during the PW Period and it is impossible to rely upon any of the Experts' conclusions because the data they rely on is so obviously distorted.

---

[1] *See* U.S. Department of Justice, JPMorgan Chase Bank, N.A. Deferred Prosecution Agreement, (Jan. 6 2014), Statement of Facts ¶25, *available at* http://www.justice.gov/usao/nys/pressreleases/January14/JPMCDPASupportingDocs/JPMC%20DPA%20Packet%20(Fully%20Executed%20w%20Exhibits).pdf (last accessed October 26, 2016).

{00024807 2 }                              9

    D. <u>The Expert Reports grossly mislead by including in their analysis transactions post July 2000 – even though they acknowledge that no profit withdrawal transactions occurred in that time</u>

Again, despite admitting that there were no profit withdrawal transactions after July 2000, both Greenblatt and Collura choose a time period of analysis from April 1, 1981 through December 11, 2008. Greenblatt states that there were 91,138 PW Transactions during the period from April 1, 1981 through December 11, 2008 – the period for which Greenblatt opined as to the "Principal Balance Calculations." *Id.* at 4, ¶ 5. Greenblatt opines that the 91,138 PW Transactions "reflect payments made by BLMIS to the account holder equal to the reported profits generated from the fictitious trades." *Id.* at 6, ¶ 17. Greenblatt bases his conclusion on "(a) BLMIS records that were contemporaneously prepared and maintained by BLMIS; and (b) various detailed forensic analyses performed by FTI Consulting." *Id.* at 7 ¶ 17.

However, the Experts do not distinguish between reliable and unreliable sources of information. By lumping together the period from April 1, 1981 through December 11, 2008, Greenblatt is including (a) the period after December 1998 for which the Trustee has Madoff's bank records with (b) the period prior to December 1998 for which the Trustee does not have Madoff's bank records. Similarly, he is including (a) the period after December 1995 for which the Trustee has Madoff's electronic customer statements with (b) the period prior to December 1995 for which the Trustee does not have Madoff's electronic customer statements; and he is including the period from November 1978 through November 1995, for which the Trustee has some customer statements on microfilm. Greenblatt I, at 13, ¶ 40. And, of course, as previously noted, he is including cash withdrawals and JRNL transactions which have nothing whatsoever to do with profit withdrawals.

Obviously, since the only issue before the Court is whether the Customers received checks on the profit withdrawal transactions, the experts should have based their opinions only on PW entries on customer statements for the PW Period (which we believe should have been defined to end in December 1998). And they should have excluded the profit withdrawal transactions involving Madoff's co-conspirator, Norman Levy, which constitute 66.4% of all profit withdrawals. The Trustee has no evidence whatsoever that the PW entries indicated a check sent to the customer, except in those instances where the Trustee has contemporaneous letters from the customers requesting the profit withdrawals and check vouchers in the customers' files indicating that the checks were sent to the customers. Of course, with respect to the disputed PW transactions, the Trustee has none of this evidence.

This is not simply argument; this is proven by the supplemental report of Collura which lists each PW Transaction and indicates in three columns labelled "Reconciliation Results" the instances where there are **no documents** supporting the theory that Madoff sent checks to the customers listed. While indisputably the Trustee has letters from some customers requesting profit withdrawals, the customers who received profit withdrawal checks are not disputing that they received them. However, in the cases at issue here, the Trustee has no documentary evidence that the customers requested or received the profit withdrawals. *See* Collura supplemental report dated December 17, 2015 (hereafter "Collura II"), Attachment D.1.

Collura analyzed the 91,138 PW Transactions described by Greenblatt and was able to reconcile only 5,527 of these transactions to Madoff's bank records. Collura July 14, 2015 Report ("Collura I") at 13, ¶ 35. These transactions all post-dated the profit withdrawal period because they were executed between December 1998 and December 2008 (the "Ten Year Period"). In total, using the irrelevant period from 1998 – 2008, she claims she was able to reconcile 51,758 of

{00024807 2}                                                11

the PW Transactions ("more than 50%") to other documentary evidence in the Trustee's possession. *Id.* at 15, ¶ 42. She does not reveal what the reconciliation would have been had she limited her analysis only to PW transactions (of which we are aware of none after 1998).

And, of the true PW transactions, Norman Levy's transactions constituted more than 66%. Collura does not disclose how many customers' transactions, other than Norman Levy's, could be reconciled for the period prior to December 1998. *Id.* Surely the Court would want to have this information since it is the only information relevant to whether the Participating Customers received profit withdrawal checks. For the period prior to December 1998, which is the only period relevant to the PW transactions, Collura had no bank records to confirm receipts of checks by the Customers. In some cases, she had letters from customers asking for profit withdrawals but, with the vast majority of non-insider customers, she had no evidence whatsoever that the customers received the profit withdrawals. *Id.* at 7.

E.  The Experts distort the evidence in their conclusions

Greenblatt uses as an example a PW Transaction showing a debit to an account shown as "CHECK STAPLES" and noting that "none of the customer statements for the three months following this transaction show any holdings of STAPLES INC." Greenblatt I at 18, ¶ 60. Greenblatt says nothing about what holdings are evidenced on the statement he describes. With respect to Aaron Blecker's accounts, for example, PW entries appear on the same page as notations of the purchase of additional shares of the stock of the company to whom the check appears to have been payable. (*See* Chaitman Decl. Exh. A). Obviously, then, Blecker reasonably believed that the notation "CHECK SUN MICROSYSTEMS" evidenced a check to Sun Microsystems for the additional shares which were credited to his account on the same statement. (*See* Chaitman Decl. Exh. A).

Finally, the Experts admitted that Madoff's records are filled with errors. They found that 800 PW notations represented checks to customers that were not cashed. Greenblatt Supp. Analysis of the Profit Withdrawal Transactions ¶ 16, n.5. They also claimed that 591 transactions that were not marked as PW should have been so marked. Greenblatt Supp. Analysis of the Profit Withdrawal Transactions ¶ 16, n.5. In a recent report, Greenblatt decided to exclude six additional notations on the grounds that they were erroneously entered as PW notations and added 96 notations which he had previously determined were not PW notations. *See, e.g.*, Greenblatt Supp. Analysis of the Profit Withdrawal Transactions at n. 4.

This is not the stuff on which factual determinations can be based.

## CONCLUSION

The Trustee's Experts are partisans with no expertise relevant to the issue before the Court and their Reports and testimony should be barred.

October 28, 2016                                    **CHAITMAN LLP**

                                                              By:   */s/ Helen Davis Chaitman*
                                                                       Helen Davis Chaitman
                                                                       Gregory M. Dexter
                                                                       465 Park Avenue
                                                                       New York, New York 10022
                                                                       Phone and Fax: (888) 759-1114
                                                                       hchaitman@chaitmanllp.com
                                                                       gdexter@chaitmanllp.com

                                                                       *Attorneys for Participating Claimants*