# EXHIBIT B

**(Madoff Profit Withdrawal Deposition Testimony Excerpts)**

*** CONFIDENTIAL ***

Page 1

1       UNITED STATES BANKRUPTCY COURT
        SOUTHERN DISTRICT OF NEW YORK

2

---------------------------------X

3                                       :

SECURITIES INVESTOR PROTECTION          :

4   CORPORATION,                        :
                                        :
5           Plaintiff-Applicant,        :
                                        :
6       -vs-                            :   08-01789 (SMB)
                                        :
7   BERNARD L. MADOFF INVESTMENT        :
    SECURITIES, LLC,                    :
8                                       :
            Defendant.                  :
9                                       :

---------------------------------X

10                                      :

    In re:                              :

11                                      :

    BERNARD L. MADOFF,                  :

12                                      :

            Debtor.                     :

13

---------------------------------X

14

15              *** CONFIDENTIAL ***

16      DEPOSITION OF BERNARD L. MADOFF

17

18          (Taken by the Customers)

            Butner, North Carolina

19

            June 15, 2016

20

21

22

23

24  Reported by:  Lisa A. DeGroat, RPR
                  Notary Public

25

*** CONFIDENTIAL ***

Page 37

1   don't send me the profit withdrawals?

2        A.     That's correct.

3                    (MADOFF EXHIBIT 9 WAS MARKED FOR

4        IDENTIFICATION.)

5   BY MS. CHAITMAN:

6        Q.     Let me show you what's been marked as

7   Exhibit 9, which is a little bit more legible.  So

8   this is April 30th, 1990.  And without going through

9   the same detail, this is essentially the same --

10       A.     Yes.

11       Q.     -- trading strategy; right?

12              So do you remember the time period when you

13  were executing this particular trading strategy?

14                    MS. BROWN:  Objection.

15                    THE WITNESS:  Do I remember the time

16       when it was --

17  BY MS. CHAITMAN:

18       Q.     The -- the time period when you were using

19  that strategy?

20       A.     Convertibles?

21       Q.     Yeah.

22       A.     Depending upon the account, but would have

23  been executing them certainly into the '90s.

24       Q.     Okay.  Now, with respect to the

25  transactions that -- what do you -- what do you

*** CONFIDENTIAL ***

Page 38

```
 1    describe this strategy?
 2         A.    Convertible arbitrage.
 3         Q.    Convertible arbitrage.  Okay.  The -- were
 4    the convertible arbitrage trades actually carried
 5    out?
 6         A.    Yes.
 7         Q.    And were they carried out through Bear
 8    Stearns?
 9         A.    No.
10         Q.    How were --
11         A.    We were -- we were a self-clearing firm
12    always.  We never cleared through anyone in the
13    United States.  We only cleared through a firm,
14    through Barclays Bank, in London, but that wouldn't
15    have been doing this kind of trading.
16         Q.    Okay.  Was -- was there a time period in
17    the '80s that you were doing business with Bear
18    Stearns?
19         A.    Yes.
20         Q.    Would you -- do you remember when that was?
21         A.    We were doing business with everyone all
22    through -- through 2008.
23         Q.    Okay.
24         A.    And --
25         Q.    Can you -- were you doing -- were you
```

*** CONFIDENTIAL ***

Page 39

1  having Bear Stearns execute the purchase of

2  convertible --

3      A.    No.

4      Q.    -- debentures?

5      A.    We were probably the largest market-maker

6  and trader in convertible securities in the country,

7  you know, through the -- the -- the entire period.

8  You know, I would say -- let's say from the --

9  certainly from the '80s right through 2008.

10          The -- the business we did with Bear

11  Stearns, as we did with Merrill Lynch and with

12  everybody else, was usually as a market-maker or

13  part of our proprietary trading department, would

14  have, you know -- might have been in convertibles.

15          It could have been in -- you know, we were

16  doing hundreds of thousands of transactions every

17  day.  In spite of the fact that we never got caught,

18  like we weren't doing anything, because they

19  couldn't find confirmations.

20          We had -- we explained to them that the

21  industry stopped issuing confirmations, you know,

22  years ago.  They seemed to have been dumbfounded by

23  that remark.

24      Q.    The business that you did with Bear

25  Stearns, was it structured so that Bear Stearns

*** CONFIDENTIAL ***

Page 40

1    would buy the securities in its own name and would

2    lend you the -- the money to buy the securities, and

3    then when the transactions closed, there would be

4    a -- an accounting for the profits?

5                    MS. BROWN:  Objection.

6                    THE WITNESS:  I'm not sure I understand

7         the question.

8    BY MS. CHAITMAN:

9         Q.    Okay.  Did you instruct Bear Stearns to buy

10   securities positions for -- for you?

11        A.    No.

12        Q.    So can you just describe what those

13   transactions were that you did with Bear Stearns?

14        A.    I -- we were a market-maker in 500

15   securities.  Some of them were convertible.  Some of

16   them were -- were common.  They came to our -- our

17   market-making department.

18                    And based upon what we were quoted in

19   NASDAQ, if it was a NASDAQ security, they would, you

20   know, ask for a bid or an offer on whatever they

21   were selling.

22                    That was -- would have been referred to as

23   a wholesale transaction.  Would not involve a

24   customer of ours.  It might have been a customer of

25   Bear Stearns probably.

*** CONFIDENTIAL ***

**Page 41**

1    Q.    So -- forgive me for being simplistic.

2  Bear Stearns would -- might have a customer, or it

3  might be for their own account?

4    A.    Correct.

5    Q.    They would have a block of stock?  They

6  would ask you to purchase it?

7    A.    Correct.

8             MS. BROWN:  Objection.

9  BY MS. CHAITMAN:

10    Q.    And -- and you -- and you would purchase

11  it?

12             MS. BROWN:  Objection.

13             THE WITNESS:  Depending upon which

14      department it came -- if it was a market-making

15      transaction, it would go into the firm's

16      market-making account.

17             You know, if it was -- you know, and

18      that's the only way that Bear Stearns would come

19      to us.

20  BY MS. CHAITMAN:

21    Q.    Okay.

22    A.    I'm not sure I understand where you're

23  going.  So --

24    Q.    No.  I just want to get an understanding of

25  what the structure was of your dealings with Bear

*** CONFIDENTIAL ***

Page 42

1   Stearns.

2       A.    The same as it was with everybody else, you

3   know, in the industry.  Every other broker-dealer.

4   If it was coming through -- if it was, you know, a

5   security that we were a market-maker in, which was

6   500 different securities.

7       Q.    And would -- who -- if you were purchasing

8   a large block of stock from Bear Stearns --

9       A.    Uh-huh.

10      Q.    -- where would the financing come from for

11  that?

12              MS. BROWN:  Objection.

13              Helen, I think we're starting to go a

14      little outside the scope of the order.  He's

15      saying that he didn't purchase it for customers.

16              MS. CHAITMAN:  Well --

17              MS. BROWN:  It was a wholesale

18      business.

19              MS. CHAITMAN:  I'm not -- I'm not sure.

20              MS. BROWN:  So I'm going to let you

21      permit it.  Keep going forward.

22              MS. CHAITMAN:  Yeah.

23              MS. BROWN:  But I think we're treading

24      very close to getting outside of the scope of

25      the order.

*** CONFIDENTIAL ***

Page 43

1    BY MS. CHAITMAN:

2        Q.    I -- with respect to the transactions we've

3    seen --

4        A.    In convertible securities?

5        Q.    On the customer statements.

6        A.    Right.

7        Q.    Your testimony is that these were positions

8    that you actually executed?

9        A.    Correct.

10              MS. BROWN:  Objection.

11   BY MS. CHAITMAN:

12       Q.    Okay.  And how did you execute the

13   transactions that -- that we've been reviewing on

14   these statements?

15              MS. BROWN:  Objection.

16              THE WITNESS:  Either we would go out

17       into the open market to buy them, you know, from

18       another dealer.  It could have been Bear

19       Stearns, if, in fact, they made a market in that

20       security, or it could have been someone --

21       someone else, or it could have been somebody

22       coming in to us unsolicited, another dealer to

23       sell a security.  I mean, that's what we did all

24       day long.

25   BY MS. CHAITMAN:

*** CONFIDENTIAL ***

**Page 44**

1    Q.    And who were the people, if you recall,

2    during the 1980s who were executing these

3    transactions that we've just reviewed?

4                MS. BROWN:  Objection.

5                THE WITNESS:  Who would we call?

6    BY MS. CHAITMAN:

7    Q.    Who were the people, if you recall, within

8    your organization who were doing this?

9    A.    It would have been -- depending upon which

10   trader was making a market in that stock, it could

11   have been someone like, you know, a David Kugel.  It

12   could have been someone like a Martin Joel.  It

13   could have been any number of, you know, a hundred

14   traders that we had.

15   Q.    So did -- how did it work?  Did you assign

16   to traders the transactions with respect to certain

17   securities?  How was that allocated among your --

18   A.    Certain traders made a market in certain --

19   in various securities.  Other -- there also were

20   times that we didn't make a market in that security.

21   That we just went out into the open market to buy.

22   It could have been any number of traders that --

23   that did that for us over the years.

24   Q.    Okay.  So --

25   A.    Including myself.

*** CONFIDENTIAL ***

Page 45

1      Q.    Okay.  So I just want to be clear on

2   something.  There's a -- there's been a public

3   perception --

4      A.    Uh-huh.

5      Q.    -- that there was a stone wall between the

6   17th floor, which handled the investment advisory

7   accounts, and the 18th and 19th floor.

8      A.    The Chinese wall.

9            MS. BROWN:  Objection.

10  BY MS. CHAITMAN:

11     Q.    The Chinese wall.  Okay.

12     A.    It's referred to.

13     Q.    Okay.  But are you saying that the

14  investment advisory transactions that we've just

15  reviewed were executed by people on the 18th or 19th

16  floors?

17           MS. BROWN:  Objection.

18           THE WITNESS:  It depends.  It depends

19      upon, again, whether we were a market-maker and

20      also the period of time.  The -- the Chinese

21      wall went into existence in the '80s, and the --

22      the Chinese wall varied based upon what the SEC

23      requirements were with -- with the Chinese wall.

24           In other words, it became more specific

25      the later the period went.  For example, once

*** CONFIDENTIAL ***

Page 46

1   you went into the '90s the Chinese wall was --

2   was, you know, in place.

3        When you're talking about doing

4   transactions in the '80s, it was -- that was

5   done, you know, by one -- you have to understand

6   we were one firm.  There was no -- there was no

7   separation between the investment advisory, you

8   know, and the -- and the market-making side in

9   the beginning.

10       It was only -- it was all down under

11  Bernard L. Madoff Investment Securities.  Even

12  the investment advisory form was filed -- the

13  ADD form was filed under Bernard L. Madoff

14  Investment Securities.

15       We structured the Chinese wall, as

16  required, to have different managers supervise

17  different departments.  And then physically we

18  moved the whole advisory side down to the 17th

19  floor.  That was in the '90s.

20       But it could have been any number of

21  people making -- you know, executing the

22  transaction, including myself, in these types of

23  convertibles.  But it could have been any number

24  of traders that did it, or it could just be me

25  going out and buying the security.

*** CONFIDENTIAL ***

Page 47

1    BY MS. CHAITMAN:

2        Q.    Okay.

3        A.    To answer your question, which I think I

4    know where you're going, the convertible securities

5    transactions were all bought and sold.  They were

6    not paper transactions, as opposed -- as opposed to

7    the split-strike transactions, which in the '90s

8    became just paper transactions, where we were

9    actually short.

10             You also have to understand one thing.

11   This is beyond the depth, for some reason, of Irving

12   Picard, his whole legal thing.  No -- no remarks,

13   but -- but it's -- I was astounded of the lack of

14   understanding of -- of this, but the -- oh, I went

15   off track.  The -- what was -- what --

16             MS. CHAITMAN:  Can you read back where

17        he was?  Just -- just read back his answer.

18             MS. BROWN:  I just want to make sure

19        we're -- we're -- the testimony has to be

20        limited to profit withdrawals.  So --

21             MS. CHAITMAN:  Yeah, I want you --

22        we're focusing on these transactions that we've

23        just reviewed.

24             THE WITNESS:  Okay.

25             (THE PREVIOUS ANSWER WAS THEN READ.)

*** CONFIDENTIAL ***

**Page 48**

1           THE WITNESS:  Okay.  Okay.  I

2      understand.  All right.  All of our trading was

3      done as principal.  You know, I had to explain

4      this, for some reason, to the SEC and to the

5      other people, the 20 some odd people who were

6      there at my proffer agreement, of what -- of

7      what that is.

8                When brokerage firms either buy or sell

9      as an agent, which means they go out into the

10     market, and they buy it from another broker, as

11     an agent, and then charge a commission or a

12     markup, or they trade as principal, which means

13     they go out into the market the same way and buy

14     it and sell it and mark it up or they short it.

15     They go short, the stock.

16                As -- as a market-maker -- which means

17     that we're selling stock to another

18     broker-dealer, like a Merrill Lynch or we're

19     selling it to John Q Public.  We're making the

20     same transaction.

21                We're selling that stock as principal,

22     meaning that I either bought it in the

23     marketplace or I shorted it.  Now, as a

24     registered market-maker, you're required by

25     regulation to at times short stock to a client

\*\*\* CONFIDENTIAL \*\*\*

Page 49

1    in order to be competitive in order to make a

2    two-sided market.

3              So I'm under an obligation, even though

4    I don't want to sell the security, to make my

5    market good, because I have a quoted market in

6    NASDAQ or on the pink sheets, depending upon the

7    time period.

8              And somebody comes in to buy stock or I

9    have a client that wants to buy stock, I have to

10   short the stock, which means that the client

11   still owns the stock.

12             The same way as if I had went out into

13   the market to bought it or I -- except that --

14   that it's my obligation to deliver that stock,

15   you know, in the future to that client if he

16   requires it or he wants to sell it and so on.

17   It's the same transaction.

18             Now, our practice, as most dealers,

19   like myself, in the industry, was to always

20   trade as principal.  Particularly in stocks we

21   were a market-maker in.  And the fact that we go

22   short a stock does not mean that the transaction

23   was not completed.

24             The reason I'm stressing that was

25   during the proffer agreement, the first thing

*** CONFIDENTIAL ***

Page 50

1    that the prosecutor jumped on was when I said

2    that -- going back even into the '70s I sold

3    stock short to a customer.

4              And he said, well, you mean you sold

5    stock that you didn't own to the customer?  And

6    both myself and my attorneys were dumbfounded

7    with the question.

8              I don't know whether it was theater,

9    but from that remark was deduced that Madoff

10   never sold -- bought stock for -- actually

11   bought the stock that he sold to a customer.

12             When -- when other people, like other

13   attorneys in the industry, and I must have had

14   30 of them come down here in the past seven

15   years, were stunned at that kind of dialogue.

16             And they said that he couldn't have not

17   been -- he couldn't have not known that.  This

18   must have been a theater to just build a case,

19   which I didn't know why anyone had built.  I had

20   admitted what I did.  All right.

21   BY MS. CHAITMAN:

22   Q.    Okay.  So the --

23   A.    All of the arbitrage transactions that

24   you're talking about, the Bleckers or for anybody

25   else, were actual purchases and sales of the

*** CONFIDENTIAL ***

**Page 51**

1    securities, either as agent or as principal, but

2    that doesn't matter which way it was done.  It was

3    an actual transaction, where money changed hands.

4        Q.    Okay.

5        A.    As opposed to the split-strike, where it

6    was done -- it was done the same way, but I never

7    reflected those short positions on the books.  And

8    there was my problem.

9              There was nothing wrong with me shorting

10   stock to clients, and -- even if it was 65 billion

11   dollars worth of shorting them.  Where I went wrong

12   and violated the law was not reflecting those

13   liabilities on my books and records.  That's it in a

14   nutshell.

15       Q.    Okay.  Just sticking with the profit

16   withdrawals, which is all I'm permitted to ask you

17   about --

18       A.    Okay.

19       Q.    -- with respect to the convertible

20   debentures.  Were there -- are there any documentary

21   records that you can recall that would establish

22   what you're saying, that these were actual

23   transactions?

24             In other words, for the period from, say,

25   1981 through, say, 1990?

*** CONFIDENTIAL ***

Page 52

1    A.    Yes.  You -- you --

2    Q.    Let me just finish.  1995, say.

3    A.    Right.

4    Q.    Are there any documentary records which

5    would prove what you're saying?

6    A.    They should all have been available, unless

7    they were, you know, destroyed or in part of the

8    record-retention process.  There would be blotters.

9    There would be cash receipts.

10         Depending upon whether the transaction went

11   through the clearing corporation or whether it was

12   just an over the -- over-the-window transaction, but

13   there would be debits and credits in the firm's bank

14   account.

15         Now, the convertible securities all went

16   through the Bank of New York.  They did not go

17   through, to my recollection, JPMorgan.  Those were

18   all -- all the investment advisory transactions,

19   which these would not be considered, going back to

20   the '80s, went through either Bank of New York,

21   Banker's Trust.

22         Man, we had -- we had a lot of banks, you

23   know.  There would -- there should be -- just as

24   there were, you know, transactions that went through

25   the clearing corp, which would have been NSCC or DTC

*** CONFIDENTIAL ***

**Page 53**

1    in the later years.

2         Q.    Okay.  Now, the -- this strategy with the

3    convertible debentures continued into the 1990s?

4         A.    Uh-huh.

5         Q.    And, as I understand it, it existed at the

6    same time as the split-strike conversion strategy?

7    There were some customers --

8         A.    Right.

9         Q.    -- who were in split-strike, and some were

10   in the --

11        A.    Correct.

12        Q.    -- subordinated debentures?

13              MS. BROWN:  Objection.

14   BY MS. CHAITMAN:

15        Q.    Are you saying that at the same time that

16   you were not executing the transactions in the

17   split-strike accounts, you were executing the

18   transactions in the subordinated debenture accounts?

19        A.    Yes.

20              MS. BROWN:  Objection.

21              Go ahead.

22              THE WITNESS:  Yes, but you -- you --

23         you have to understand that these transactions

24         could have been done as, you know, actually in

25         the marketplace or from the firm's trading or

*** CONFIDENTIAL ***

Page 54

```
 1        investment accounts.
 2                In other words, it's -- it's not just a
 3        matter of there were two -- as I said before,
 4        there were ways that we could go out, and if we
 5        decided we wanted to buy and sell a security for
 6        a client doing a convertible arbitrage or for an
 7        equity transaction, we would go out into the
 8        marketplace and buy that securities, or the
 9        marketplace would come to us and sell us that
10        security.
11                All right.  Or we would go short the
12        stock from the firm's trading or investment
13        account to the client.  It's still the same
14        transaction.
15                All right.  There's still an entry on
16        the books.  It would look the same.  It would
17        just be carried over into a long and short
18        position.  From the customer's standpoint it's
19        totally the same.
20    BY MS. CHAITMAN:
21        Q.    Okay.  So forgive me for going over this
22    again, but I just want to be clear on it.  If -- if
23    we wanted to find the documentary evidence of
24    this -- I mean, just let's -- let's be concrete.
25                If I look at -- let me just take one of
```

\*\*\* CONFIDENTIAL \*\*\*

**Page 55**

1   these that's legible.  If -- if you'd be good enough

2   to look at Exhibit 4 for a second.

3       A.    Uh-huh.

4       Q.    Okay.  So this is 12/31/85.

5       A.    Right.

6       Q.    If I wanted to find the documentary

7   evidence of the --

8       A.    You would have a very -- this -- this

9   record would probably not be retained.  It's an '85

10  transaction.

11      Q.    Okay.  So there wouldn't be any place I

12  could find it?

13      A.    No.

14      Q.    And of the people who were working for you

15  at the time who were the people that I would have to

16  talk to who would possibly have executed these

17  transactions?

18      A.    It might have been myself.  It might have

19  been -- in '85 it could have been David Kugel.  It

20  could have been Martin -- well, Martin Joel was

21  dead.  I don't remember the name -- the names of

22  some of the other trade -- traders.

23      Q.    Okay.  And if we go a little bit further

24  along, like in, let's say, 1990.

25      A.    As a general rule, you would -- the firm

*** CONFIDENTIAL ***

Page 56

1   would not -- and I would -- you know, you'd have to

2   ask the trustee.  As a general rule, all records

3   were the past six years, which is their requirement

4   or -- or destroyed, with the exception of customer

5   transactions.

6           As I said, we kept those longer, because

7   the clients, particularly the individual clients

8   that we had, for some reason, could never find their

9   monthly statements for their tax returns and so on.

10          So we would constantly get -- as all

11  brokers did, we'd get phone calls from an account,

12  like the Bleckers, saying, I have a tax audit, and I

13  need to, you know, find my cost basis on a

14  particular security.  So we typically kept those --

15  those records longer.

16          But as far as Wall Street's records, nobody

17  kept records past -- as the same reason the banks

18  don't keep the records.  Six years is the record

19  retention period.

20          After that, they're automatically supposed

21  to be destroyed.  And that includes the -- by the

22  way, to correct that, that would include microfiche,

23  unless it was for clients.  But the counter signs of

24  broker-dealers don't.

25          As I said before, the -- the industry

*** CONFIDENTIAL ***

**Page 57**

1    requested the SEC to change their requirements,

2    which they, in fact, did from pressure in the

3    industry to not produce hard copy records with each

4    other, with brokerage firms trading amongst

5    themselves.

6            The requirement that you had -- you had to

7    be able to produce them upon an examination request

8    within 48 hours, but nobody kept records past six

9    years.  It would be impossible to do it.

10       Q.    But you would scan the records and keep

11   them on computer?

12               MS. BROWN:  Objection.

13               THE WITNESS:  Every -- to my knowledge,

14       everything would have been -- after six years,

15       we had no records.

16   BY MS. CHAITMAN:

17       Q.    Okay.

18       A.    Except you would find client confirmation

19   in the statement records, but not, you know, what's

20   called street records.  Meaning other brokerage

21   firms trading with each other, even in

22   clearinghouses.

23       Q.    Okay.  These -- these records --

24       A.    Those are customer statements.

25       Q.    These -- these were produced by the

*** CONFIDENTIAL ***

Page 58

1    trustee.

2       A.    Okay.

3             MS. BROWN:  Objection.

4    BY MS. CHAITMAN:

5       Q.    Going back to '85?

6       A.    Right.

7       Q.    So --

8       A.    Yeah.  Those -- as I said, those

9    statements, you would have some, because they

10   were -- they were customer activity.  I doubt

11   whether you would be able to find counter signed

12   with other brokerage firms that -- dating back that

13   long.

14      Q.    Okay.  Can you just --

15      A.    I -- I want to read --

16      Q.    Go ahead.

17      A.    -- something into the record, which may be

18   beneficial to you or not.  I don't know.  But the --

19   what was amazing to me and to a whole host of other

20   attorneys that came here and went through the same

21   process that we're going through, the -- the fact

22   that you can't produce going back whatever the

23   period of time is records that will research

24   transactions that -- you know, that would verify

25   that a transaction was done.

*** CONFIDENTIAL ***

Page 59

1          According to the trustee and the prosecutor

2     at the time, meant that the transaction never

3     occurred.  But other attorneys pointed out and said,

4     well, wasn't those transactions, you know -- you

5     know, gone -- didn't they go through the clearing

6     corporation?  Weren't there debit and entries in

7     checking accounts and so on?

8          Those transactions were reported to -- to

9     the regulators, to FINRA, or we reported those

10    transactions on a daily basis.  Weren't those debits

11    and credits -- you know, weren't they reflected

12    anywhere?  Wasn't there money changing hands?

13          You know, wasn't there a continuous net

14    settlement with the banks for the clearing

15    organizations wanted to get paid for securities back

16    and forth?

17          And they said, of course.

18          Well, doesn't that demonstrate the fact

19    that the transactions did take place?  And I had to

20    explain what a continuous net settlement was.  Now,

21    a continuous net settlement was when you buy stock

22    in a marketplace.

23          I may go out and buy the stock for Blecker,

24    let's assume, if it was a regular equity from a

25    Merrill Lynch.  All right.  I may buy it from five

*** CONFIDENTIAL ***

Page 60

1    other brokerage firms.

2            The clearing corporation nets all of those

3    transactions overnight in a -- in what's called a

4    continuous net settlement, and -- and I get -- my

5    contract winds up being with a broker that has

6    nothing to do with Bear Stearns and Merrill Lynch.

7    It might be Credit Suisse or something of that sort.

8        Q.    Uh-huh.

9        A.    It's called a continuous net settlement.

10   They net all of the buys and sells, and they just

11   ask the broker for a money difference.  So I could

12   do literally a billion dollars worth of purchases

13   and sales and wind up with literally $100,000 net

14   credit or a debit, depending upon the transactions.

15   That's the way the industry runs.

16       Q.    And would -- were there different clearing

17   firms that you used for various kinds of --

18       A.    It wasn't --

19       Q.    -- transactions?

20       A.    They were not clearing firms.  They were

21   other counterparties of the brokerage firm.  We

22   cleared the transaction ourself, but we bought, as

23   did everybody else.

24            When you say a clearing firm, it means that

25   you had no back office capability to generate

*** CONFIDENTIAL ***

Page 61

1   confirmations or -- or no operations departments --

2       Q.     Uh-huh.

3       A.     -- and so on.  We had -- from the day we

4   opened up our doors in 1960 we self-cleared all of

5   our transactions and continued that through 2008.

6               MS. CHAITMAN:  Okay.  All right.  If I

7       can just take a five-minute break.

8               THE WITNESS:  I'll tell you what, I --

9               THE VIDEOGRAPHER:  Going off the

10      record.  The time is 10:03.

11              (RECESS FROM 10:03 A.M. TO 10:15 A.M.)

12              (MADOFF EXHIBITS 10 AND 11 WERE MARKED

13      FOR IDENTIFICATION.)

14              THE VIDEOGRAPHER:  Back on the record.

15      The time is 10:15.

16              MS. CHAITMAN:  I want to show you what

17      I've marked as Exhibit 11.

18              MS. VANDERWAL:  Are you sure it's not

19      10?

20              MS. CHAITMAN:  What did I do with 10?

21      Let's see.

22              MS. BROWN:  I think the last one you

23      marked -- you didn't use Exhibit 8, and then you

24      marked Exhibit 9.

25              MS. CHAITMAN:  Thank you.  Okay.  So

*** CONFIDENTIAL ***

**Page 62**

1       10 -- yeah.  Well, thank you for correcting me.

2       This is Exhibit 10.

3   BY MS. CHAITMAN:

4       Q.    So, Mr. Madoff, is it fair to say that

5   these are the same kinds of transactions that we've

6   already reviewed this morning?

7       A.    Yes.

8       Q.    So this is that same trading strategy?

9       A.    Correct.

10      Q.    And this is 12/31/90?

11      A.    Uh-huh.

12      Q.    And is it your testimony that as of

13  12/31/90 these transactions were actually executed?

14      A.    Correct.

15      Q.    Okay.  And these were executed by the

16  traders on the 18th and 19th floors?

17              MS. BROWN:  Objection.

18              THE WITNESS:  Yes.

19  BY MS. CHAITMAN:

20      Q.    Now, if I can show you what I've marked as

21  Exhibit 11, and we're just going to -- so this is --

22  the Madoff 11 is dated 5/31/95.  So we've skipped --

23      A.    Right.

24      Q.    -- several years.  Is this basically the

25  same strategy, the same trading strategy?

*** CONFIDENTIAL ***

Page 63

1              MS. BROWN:  Objection.

2              THE WITNESS:  Yes.

3    BY MS. CHAITMAN:

4         Q.    And as of May 31, 1995 were these

5    transactions actually executed by the people on the

6    18th and 19th floors?

7              MS. BROWN:  Objection.

8              THE WITNESS:  There's also the 17th

9         floor.  So during that period, in '95, the

10        seventh -- the 17th floor went into existence in

11        '92, I believe, or '93, something like that.

12   BY MS. CHAITMAN:

13        Q.    So were these -- were these transactions --

14   transactions that are reflected here actually done?

15             MS. BROWN:  Objection.

16             THE WITNESS:  After '90 -- after '92,

17        things got discombobulated.  So I can't -- I

18        can't say yes or no on that after '92.

19   BY MS. CHAITMAN:

20        Q.    Okay.  So do you have a -- when you say,

21   "after '92," do you have some way that you can peg

22   it to '92?  I just -- I just want to have your

23   testimony as to what the cutoff was.

24             When was -- when were the trades actually

25   executed on the convertible debenture strategy?

*** CONFIDENTIAL ***

Page 64

1      A.    I can't say specifically.  Certainly prior
2  to '92 they were.  Before it began in '92 --
3      Q.    So --
4      A.    -- partially.
5      Q.    If we said -- if we said January 1st, 1992,
6  everything before that was --
7      A.    Should have been --
8      Q.    -- was executed?
9      A.    -- executed.  Correct.
10     Q.    Okay.  Are you comfortable with that as --
11     A.    As comfortable as I can be, you know, now.
12     Q.    Okay.  Why -- why do you peg it to 1992?
13     A.    Because post '92 was when I started doing
14  the business in the split-strike, you know, or not
15  doing business in the split-strike.
16     Q.    Okay.  Now, have you ever discussed with
17  Irving Picard the profit withdrawal trades?
18     A.    No.
19     Q.    Did you -- did you ever meet with Irving
20  Picard?
21     A.    Once.  There -- during the proffer
22  agreement, which is the first day after I was
23  arrested.  To my knowledge, that was the last time I
24  spoke to him or saw him.
25     Q.    Okay.  Did you meet with anyone who either

*** CONFIDENTIAL ***

Page 65

1  represented him as a lawyer --

2      A.      Yes.

3      Q.      Who?

4      A.      David Sheehan and a whole group of lawyers

5  came down here, interviewed me for two days.  I

6  don't remember the time period.  Probably within a

7  few -- maybe two years after I came here, I guess it

8  was, or the year after I came here.

9      Q.      Okay.

10     A.      Which was, you know, in 2009.

11     Q.      2009, when you came here?

12     A.      Yeah.

13     Q.      So it would have been in 2010?

14     A.      Probably.  Something like that.

15     Q.      Okay.  And did they ask you whether the

16  profit withdrawal transactions were actually

17  executed?

18     A.      Not to my knowledge.  There was actually --

19  wait a minute.  There was one -- there was one

20  question-and-answer exchange that happened relating

21  to a scrap of paper that they produced that had some

22  scribbling on it from one of my traders.  I think it

23  was David Kugel, I think they said.

24          It was a conversion instruction.  And I

25  remember this, because it was, what they thought,

*** CONFIDENTIAL ***

Page 66

1   was some sort of smoking gun.  What they did was

2   they showed me a piece of paper and my attorneys who

3   were here at the time, Ike Sorkin.

4           And it gave the formula a particular

5   convertible bond or preferred.  I don't remember

6   which it was.  What that convertible bond was

7   convertible into the number of shares.  It was --

8           And they asked me what that was, and I

9   said, that is instructions of what -- how to convert

10  what -- what a convertible bond equal the number of

11  shares.

12          And they asked me if I knew who wrote this.

13  And I said, it looks like David Kugel's handwriting.

14  And they asked me what it was.  And I said, that

15  would be instructions to one of the operations

16  people to -- what -- how to convert a particular

17  security.

18          And from that he tried to, you know, say

19  that that was instructions to create a transaction.

20  And I said that you would probably find a hundred of

21  those types of instructions in the records if you

22  looked at them.

23          And that was instructions that the trader,

24  David Kugel at that time, would have to have been a

25  trader in that particular bond or preferred, is

*** CONFIDENTIAL ***

Page 67

1    instructing probably Jodi Crupi or one of the other

2    people, you know, in the operations department how

3    to allocate, you know, a particular security,

4    convert it.

5           I said, you know, if you went to any back

6    office, you would see instructions like that, you

7    know.  I didn't understand why he felt that that was

8    important one way or the other, but he -- he was --

9    I guess he -- where he was going was this was his

10   evidence that the -- that the transaction was just a

11   fictitious transaction, made up.

12          That was the end of that.  I started

13   laughing.  My attorney started to laugh.  And there

14   was, you know, a lot of confused looks from the

15   lawyers, the other six attorneys that were present

16   at that meeting.

17          That was the only thing -- that was the

18   only -- that was the only conversation we had,

19   period, about anything relating to any of this.

20   Q.     Did anyone on behalf of the trustee ask you

21   what your policy was with respect to requiring

22   letters from clients asking for withdrawals?

23   A.     I don't recall anything coming up about

24   that.  No.

25          MS. CHAITMAN:  Okay.  All right.  I