**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

## THE BLUMS' MEMORANDUM OF LAW IN OPPOSITION TO THE TRUSTEE'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN OF THEIR TESTIMONY

**BAKER & MCKENZIE LLP**
Richard A. Kirby
Laura K. Clinton
Graham R. Cronogue
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7020
Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com
Email: graham.cronogue@bakermckenzie.com

# **TABLE OF CONTENTS**

I.   Introduction..................................................................................................................1

II.  Background..................................................................................................................2

   A.   The Blums' Involvement in Morris' Financial Affairs..........................................2

   B.   The Blums' Knowledge of Morris' Financial Plans and Strategies .........................4

   C.   The Blums' Testimony Regarding their Inferences................................................5

III. Discussion....................................................................................................................7

   A.   The Blums' Testimony That the PW Notations Listed in the Madoff Securities Customer
      Account Statements Conflict with Their Understanding of Morris' Financial Planning
      Strategies Is Based on Personal Observation and Therefore Proper Lay Witness
      Testimony. ..........................................................................................................7

   B.   The Trustee's Argument That the Blums May Not Testify as to Their Understanding and
      Perception of Morris' Financial Strategies Because This Knowledge Is Based in Part on
      Conversations with Morris Are Meritless................................................................11

      1.   A lay witness may testify as to his perceptions where the perception is based in
         whole or part on prior conversations..........................................................11

      2.   To the extent any part of the Blums' testimony presents out-of-court statements,
         such evidence is admissible under well-established exceptions to the hearsay rule—
         Federal Rules of Evidence 803(3) and 807. ...............................................13

   C.   The Blums' Statements That the Alleged PW Notations Conflict with Their Father's
      Financial Strategies Are Admissible Inferences Rationally Based on Their Personal
      Knowledge...........................................................................................................16

      1.   The Blums' testimony is rationally based on their perceptions of Morris' financial
         plan............................................................................................................17

      2.   The Blums' opinions are helpful to the trier of fact as the Blums have the best
         understanding of Morris' financial plans and intentions..............................18

      3.   The Blums' opinions are not based on specialized knowledge, but are based on
         logical inferences based on their understanding of their father's financial plan..........19

   D.   The Blums' Testimony Is Not Offered as Character Evidence Because They Do Not
      Argue That Morris Blum Acted in Conformity with Any Character Trait But Rather That
      the Purported Withdrawals Are Antithetical to Morris Blum's Financial Strategy.............19

   E.   The Blums' Testimony That Morris Blum Consistently Saved and Invested Is Evidence of
      His Routine Financial Practice and Admissible to Prove That He Acted in Conformity
      with That Practice By Having His Purported Profits Reinvested.........................................21

IV.  Conclusion..................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agfa-Gevaert, A.G. v. A.B. Dick Co.,*
  879 F.2d 1518 (7th Cir. 1989) ...................................................................................... 11

*Altvater v. Battocletti,*
  300 F.2d 156 (4th Cir. 1962) ......................................................................................... 9

*Batoh v. McNeil-PPC, Inc.,*
  167 F. Supp.3d 296 (D. Conn. 2016) ........................................................................... 15

*Clayton v. Eli Lilly & Co.,*
  421 F. Supp. 2d 77 (D.D.C. 2006) ............................................................................. 8, 9

*Gravely v. Providence Partnership,*
  549 F.2d 958 (4th Cir. 1977) ........................................................................................ 16

*Hartford Fire Ins. v. Taylor,*
  903 F. Supp. 2d 623 (N.D. Ill 2012) .............................................................................. 9

*Howe v. Hull,*
  873 F. Supp. 70 (N.D. Ohio 1994) ................................................................................ 12

*John Hancock Mut. Life Ins. v. Dutton,*
  585 F.2d 1289 (5th Cir. 1978) ....................................................................................... 17

*Johnson v. Cook Inc.,*
  327 F. Appx 661 (7th Cir. 2009) ..................................................................................... 9

*M.B.A.F.B. Fed. Credit Union v. Cumis Ins. Soc.*
  681 F.2d 930 (4th Cir. 1982) .......................................................................................... 7

*Mutual Life Ins. Co. v. Hillmon,*
  145 U.S. 285 (1892) ...................................................................................................... 13

*Robinson v. Watts Detective Agency, Inc.,*
  685 F.2d 729 (1st Cir. 1982) ......................................................................................... 11

*Saltzman v. Comm'r,*
  131 F.3d 87 (2d Cir. 1997) ........................................................................................... 13

*Simplex, Inc. v. Diversified Energy Sys., Inc.,*
  847 F.2d 1290 (7th Cir. 1988) ....................................................................................... 21

*Teed-Ed, Inc. v. Kimball International Inc.,*
  620 F.2d 399 (3d Cir. 1980) .......................................................................................... 18

*U.S. Info. Sys. v. IBEW Local Union No. 3*,
    2006 U.S. Dist. LEXIS 52938 (S.D.N.Y. Aug. 1, 2006) ...................................................................... 17

*United States v. Barsoum*,
    763 F.3d 1321 (11th Cir. 2014) ................................................................................................. 11

*United States v. Beck*,
    418 F.3d 1008 (9th Cir. 2005) ............................................................................................ 8, 17

*United States v. Calhoun*,
    544 F.2d 291 (6th Cir. 1976) ..................................................................................................... 18

*United States v. Cuti*,
    720 F.3d 453 (2d Cir. 2013) ......................................................................................................... 7

*United States v. Franklin*,
    415 F.3d 537 (6th Cir. 2005) ................................................................................................. 7, 9

*United States v. Garcia*,
    413 F.3d 201 (2d Cir. 2005) ....................................................................................................... 19

*United States v. Gotti*,
    457 F. Supp. 2d 395 (S.D.N.Y. 2006) ....................................................................................... 12

*United States v. Johnson*,
    443 Fed. Appx. 85 (6th Cir. 2011) ........................................................................................... 11

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007) ....................................................................................................... 19

*United States v. McGrath*,
    613 F.2d 361 (2d. Cir. 1979) ....................................................................................................... 8

*United States v. Miller*,
    248 Fed. Appx. 426 (3d Cir. 2007) ........................................................................................... 18

*United States v. Munoz-Franco*,
    487 F.3d 25 (1st Cir 2009) ........................................................................................................... 8

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ..................................................................................................... 17

*United States v. Thunder Horse*,
    370 F.3d 745 (8th Cir. 2004) ..................................................................................................... 15

*United States v. Tsekhanovich*,
    507 F.3d 127 (2d Cir. 2007) ....................................................................................................... 17

*United States v. West*,
    670 F.2d 675 (7th Cir. Ill. 1982) .............................................................................................. 20

*Weil v. Seltzer*,
873 F.2d 1453 (D.C. Cir. 1989)...........................................................................................................22

**Other Authorities**

Fed. R. Evid. 404 .................................................................................................................................... 20

Fed. R. Evid. 406 ............................................................................................................................ 2, 21, 22

Fed. R. Evid. 602 .......................................................................................................................... 1, 7, 11, 17

Fed. R. Evid. 701 ................................................................................................................................ *passim*

Fed. R. Evid. 801 ............................................................................................................................ 11, 12, 13

Fed. R. Evid. 803 .......................................................................................................................... 2, 13, 14, 15

Fed. R. Evid. 804 .................................................................................................................................... 14

Fed. R. Evid. 807 .......................................................................................................................... 2, 13, 14, 15

## I.    Introduction

The Trustee's tactics in this proceeding are clear:  he asks the Court to focus on, and draw inappropriate inferences from, the records of those Madoff Securities customers who actually requested and received profit withdrawals, rather than address the reality that customers like the Blums and other Participating Claimants did not do so.  *See*, *e.g.*, Blums Mot. *in Limine*, at 9 (discussing the hundreds of proffered Trustee exhibits that have no bearing on their claims).  In his Motion *in Limine* No. 2, the Trustee goes one step further, asking the Court to preclude the Blums from testifying about their personal knowledge of their father's management of his Madoff accounts—accounts for which the Trustee lacks any records or third-party documents.  The Trustee's Motion is an overreach.  The Blums' testimony is clearly admissible, and any complaint about their testimony goes to its weight.

The Trustee complains that the Blums lack personal knowledge of their father's Madoff Securities accounts, but this is simply untrue.  Their personal observations and understanding of his financial planning were explained in their declarations and reaffirmed in their deposition testimony.  Their testimony demonstrates ample foundation, as required by Federal Rule of Evidence 602, for their statements that systematic profit withdrawals were inconsistent with their father's estate planning, lifestyle, and preferences.  This same foundation renders their testimony admissible as lay opinion testimony under Rule 701, as it is based on personal observation, will aid the trier of fact, and is not the subject of specialized knowledge.  Instead, it is drawn from the regular interactions between parent and child, part of any witness's common experience.  The Trustee's related assertion that the Blums' knowledge, gained from regular and ongoing conversations and interactions with their father over a period of years, is somehow barred by the hearsay rule is misguided.  A witness may testify as to his understanding gained through

interaction with others; this is not the presentation of an out-of-court statement for the truth of its assertion, rather it is in-court testimony regarding the witness' *own* perceptions. Moreover, the exceptions to the hearsay rule permit such testimony: the Blums may offer statements of their father's state of mind under Rule 803(3). Likewise, testimony regarding the Blums' perceptions of their father's financial plans is appropriate under Rule 807, as it was necessitated by this tardy litigation commenced many years after their father's death, and in the absence of any fault of theirs. *See* Fed. R. Evid. 807. Their testimony is also admissible under Rule 406 as evidence of routine practice. The Motion *in Limine* should be denied in its entirety.

## II.   Background

The Blums testified that, during the roughly 20 years that their father invested with Madoff Securities, Joel and Norman Blum had many opportunities to personally observe Morris Blum's financial practices, discuss with their father his financial goals and estate planning strategies, and administer his estate. In the course of these close dealings, the Blums learned what Morris did and intended to do with his accounts at Madoff Securities. The Blums testified as to their knowledge and how the PW notations found in the Madoff Securities records conflict with their observations of their father's finances. Based on their perceptions and rational inferences, they assert that Morris did not request or receive the PW withdrawals reflected in the Madoff Securities customer account statements for three of their parent's accounts.

### A.   The Blums' Involvement in Morris' Financial Affairs

Morris opened his Madoff Securities account as a savings vehicle before 1981.[1] Shortly thereafter, he discussed this decision with his children and ultimately advised them that they

---

[1] Norman Blum Dep. 12:14–15.

should also open brokerage accounts at Madoff Securities.[2]  Norman and Joel followed their

father's advice, opening their own Madoff Securities accounts a few years later.[3]

Throughout this period, Morris not only advised his children with regard to their own

finances; he also ensured that they were closely involved in his own financial planning.  Morris

set up Joel and Norman to be his trustees, personal representatives, and heirs of his estate,

ultimately leaving them all of his accounts.[4]  They observed his actions regarding his financial

position and the goals he had for his family's financial future.[5]  Joel "was in regular contact"

with Morris and was "actively involved" in Morris' finances.[6]  Three or four times a year, Joel

would make a trip to visit his father in Florida and they would discuss his financial plans in

considerable detail.[7]  From these conversations, Joel learned that Morris intended to grow his

estate for his children's benefit and to maintain a neat and orderly estate that would be easy to

administer when he passed.[8]  Norman's exchanges with his father were equally robust; the two

lived near each other in Florida, saw each other regularly, and discussed finances routinely.[9]

---

[2] *Id.* at 10:14–21.

[3] Joel Blum Dep. 16:11-19; *id.* 19:12-17 (Morris "was the one who advised me that this was something that would be a good thing for me to do").

[4] Norman Decl. at 5.

[5] *Id*. at 7; Joel Decl. at 6

[6] Joel  Dep. 77:12-78:2.

[7] *Id.* at 73:10-23 ("I would go down there three or four times a year, and it was a regular thing for him just to say, 'This is where all the material is.  This is what the accounts are and this is what you will do'").

[8] *Id.* at 73:22-74:3 ("So during these communications we had that he would just explain things to me.  It was very important to him that there not be a mess after he died. . . that things be done in an orderly fashion."); Joel Decl. at 6.

[9] Norman Dep. 81:4-22 ("I knew where his money was.  I knew what his investments were.  I knew what the stocks were.  I knew all of these things . . . because he was very open about those things"); *id*. ("He tells me everything,  as he does Joel as well."); Norman Decl. at 5.

In addition to the discussions each son had with his father, Joel and Norman directly observed and reviewed their father's records and financial statements. As Morris became older, his vision began to deteriorate and he found managing finances more difficult.[10] Morris called upon Joel and Norman to help him read and write his financial documents.[11] Part of this process required Norman to review Morris' checkbook and deposit history. During that review, he noted that Morris received regular quarterly withdrawals from Madoff Securities.[12] Norman never saw any profit withdrawals in Morris' deposit history, nor did Morris ever mention them.[13]

Norman also had reason to know Morris' day-to-day actions because he witnessed them first hand. In 1994, Norman suffered a stroke.[14] At that time, Morris (a medical doctor, like both his sons) moved in with Norman and nursed him back to health. During that five-month period, Norman reviewed Morris' statements from Madoff Securities and discussed Morris' financial plans, including the quarterly withdrawals.[15] When they lived together, Norman never saw a profit withdrawal check, and Morris never mentioned any "profit withdrawals."[16]

### B.    The Blums' Knowledge of Morris' Financial Plans and Strategies

Due to the intimate relationship they had with their father and their observations of his financial strategy, the Blums concluded that Morris used his Madoff Securities accounts not as

---

[10] *Id.* at 50:22-51:11.

[11] *Id.* at 51:10-22.

[12] *Id.* at 68:8-68:14 (Norman "always looked at the check, the checkbook of deposits . . . exclusively, pretty much, the money he took in was the money from the distributions from Madoff."); *see also id.* at 80:3-20 ("I looked at his check, I saw the dividends . . . And I saw the Madoff stuff . . .").

[13] *Id.* at 53:23-25; Norman Decl. at 9-11.

[14] Norman Dep. 55:3-15.

[15] *Id.* at 55:15-23.

[16] *Id.* at 56:1-16.

an income source, but as a savings vehicles for the benefit of his wife and children.[17]  They know

that, to achieve these goals, he focused on investments and savings[18] and "never received any

disbursements" from Roslyn Blum's account.[19]  Rather, Morris' then-existing financial plan and

goal was to grow the account so the Blums could receive the proceeds when Morris passed.[20]

The Blums knew that Morris administered 1B0033 in the same way, *i.e.*, Morris' strategy was to

maintain his investments and use whatever he had appropriately.[21]

    The Blums also knew that Morris' financial plan focused on a neat and orderly treatment

of assets.  Morris struggled with the physical act of reviewing and organizing financial

documents.  In discussing their future roles as the trustees of his estate, they learned that he

wanted the management of his savings to be as simple a task as possible.

### C.    The Blums' Testimony Regarding their Inferences

    The Blums testified about their observations of their father's financial planning and the

complete lack of any evidence that the PW notations in his accounts resulted in actual

withdrawals.  They testified that the PW notations in the Madoff Securities records are

inconsistent with Morris' financial strategies.[22]  For instance, the notations purporting to show

---

[17] *Id.* at 61:3-8 ("The idea of [Morris'] money was to be left"); Norman Decl. at 7.

[18] Norman Dep. 61:14-61:19 ("He had no need for it.  There would be no reason to pull it out."); Joel Dep. 65:12-19 (Morris was "trying to grow his estate and would do it in a way that was orderly and within his capacities").

[19] Norman Dep. 58:11-16.

[20] *Id.* at 60:2-60:6; *id.* 84:4-24 ("the whole purpose of my mom's [account] was for retirement, not to take money out. . . No other reason that [the account existed]."); *id.* (My mom was much younger than he was, he made a presumption . . . he would die before she did, and therefore he would have a retirement for her."); *id.* ("It was never his intention to take a penny out.").  Neither Blum ever witnessed Morris act in a manner contrary to this plan.

[21] *Id.* at 53:3-13 (stating that "he had money—multiple investments outside of the Madoff account, and his investments got progressively more conservative as he got older").

[22] Norman Decl. at 11.

frequent transactions from the Roslyn Blum accounts conflict with Morris' intention to provide a nest egg for his wife, who he believed would outlive him, as well as his later desire to make sure that his children received all of the proceeds from his late wife's account.[23] The numerous, low-value PW withdrawals that purportedly occurred in 1B0033 conflict with these goals as well; they also contradict the Blums' understanding that Morris had difficulty with his eyesight and, therefore, would not have chosen to review high volumes of financial documents. The notations also conflict with their understanding that he wanted to create an orderly estate that could be easily administered upon his passing.[24]

These withdrawals also conflict with their understanding of Morris' finances and day-to-day life. Had Morris withdrawn profits, as alleged by the Trustee, he would have had large amounts of cash readily available to him; he did not.[25] Had Morris received such a high volume of checks, Norman (who Morris nursed back to health after his stroke and continued to live close by thereafter) or Joel (who spoke regularly with Morris and visited him frequently) would have observed some evidence of these checks or the inconvenience it would have required of Morris to cash them.[26] Had Morris deposited these checks, the Blums would have noticed some record of them in their review of his deposits.[27]

---

[23] *Id*. at 10.

[24] Norman Dep. 82:23-83:5 ("If he had taken profit withdrawals, there would have been innumerable checks month after month to the turn of about a million and half. My father didn't have that kind of money available to him at that point.").

[25] *Id.* at 83:3-4 ("My father didn't have that kind of money available to him at that point.").

[26] *See* Norman Decl. at 11 ("Such a scenario is entirely implausible to me given how he managed his financial affairs.").

[27] *See id.* at 9-11 ("I am aware of no records of these checks being cashed or received by my family.").

### III.    Discussion

#### A.    The Blums' Testimony That the PW Notations Listed in the Madoff Securities Customer Account Statements Conflict with Their Understanding of Morris' Financial Planning Strategies Is Based on Personal Observation and Therefore Proper Lay Witness Testimony

The gravamen of the Trustee's motion *in limine* is that the Blums are not competent witnesses under Federal Rule of Evidence 602 because they lack first hand knowledge of every aspect of their father's interactions with Madoff Securities.[28]  The Trustee misinterprets the rule. Rule 602 simply requires a proponent of a witness's testimony to show "that the witness has personal knowledge of that matter."  Fed. Rule Evid. 602.  The threshold for admitting testimony under this Rule is "low."  *See United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005) (internal marks omitted).  The witness's knowledge need not be "positive or rise[] to the level of absolute certainty."  *M.B.A.F.B. Fed. Credit Union v. Cumis Ins. Soc.* 681 F.2d 930, 932 (4th Cir. 1982) (allowing testimony regarding purchase price even though witness "did not state definitely that he personally discussed the purchase price").  Rather, Rule 602 is satisfied so long as evidence suggests that the witness thinks he actually perceived or observed that to which he testifies.  *United States v. Cuti*, 720 F.3d 453, 458-59 (2d Cir. 2013) (a witness's testimony "may consist of what the witness thinks he knows from personal perception"); *M.B.A.F.B.I,* 681 F.2d at 932 (holding that testimony is admissible unless the court "finds that that witness could not have actually perceived or observed that which he testifies to").  The Blums testified about their personal knowledge of Morris' financial and estate planning; this is ample foundation for admissibility.

---

[28] Trustee's Mot. *in Limine*  4, 5, 8 (arguing Blums do not satisfy Rule 602's personal knowledge requirement and were merely speculating).

7

Where there is evidence that the witness engaged in repeated interactions and discussions on the transactions at issue, the low standard for admissibility is met. *United States v. McGrath*, 613 F.2d 361, 368 (2d. Cir. 1979) (holding that the witness's role in the drug organization itself afforded a basis "for inferring" that his testimony was based upon first-hand knowledge); *United States v. Munoz-Franco*, 487 F.3d 25, 36 (1st Cir 2009) (witness's "position as senior vice president of [bank's] mortgage department and her regular attendance at Board meetings established her familiarity with [the bank's] business operations"). Morris planned on leaving all of his assets to Norman and Joel. He discussed forthrightly with his children and heirs how he managed his finances, including the steps he had taken to save money and grow the estate.[29] He discussed his sources of income, but did not mention the receipt of numerous checks ostensibly received from Madoff Securities.[30] The Blums' frequent interactions and discussions with Morris in their roles as his heirs, future personal representatives, and trustees provided them with ample opportunity to directly observe Morris' financial planning. Such repeated interactions are more than enough to establish their independent personal knowledge of financial strategy and estate planning goals.

Lay-witness testimony is admissible where it is based upon personal observation and recollection of facts. The Trustee's arguments go to the weight the Court should afford this evidence: The extent to which the witness had the opportunity to properly observe and perceive the events "goes to weight of testimony, not to its admissibility." *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005); *Clayton v. Eli Lilly & Co.*, 421 F. Supp. 2d 77, 81 (D.D.C. 2006)

---

[29] Joel Dep. 73:10-73:23 ("I would go down there three or four times a year, and it was a regular thing for him just to say, 'This is where all the material is. This is what the accounts are and this is what you will do").

[30] Norman Dep. 81:4-81:22 ("I knew where his money was. I knew what his investments were. I knew what the stocks were. I knew all of these things . . . because he was very open about those things"); *id*. ("He tells me everything, as he does Joel as well."); Norman Decl. at 5.

("[T]he reliability of [witness's] memory goes to the weight of the evidence. Memory gaps and doubts caused by the lapse of time go to the weight to be given the testimony, and accordingly constitute a matter for the jury.")  (quoting 27 Fed. Prac. & Proc. § 6023).  Each testifying witness need not have a complete understanding of the events; witnesses routinely testify even where the evidence demonstrates that they are unaware of certain facts.  *Hartford Fire Ins. v. Taylor*, 903 F. Supp. 2d 623, 643-45 (N.D. Ill 2012) (allowing witness to testify regarding accident in which he was involved even though he had been on drugs during the incident and could not even remember if he had been driving or hit the pedestrian); *United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005) ("[Defendant's] first contention—that the district court should have excluded [the witness's] testimony on the ground that [the witness] claimed he was intoxicated at trial and before the grand jury—is clearly without merit"); *Johnson v. Cook Inc.*, 327 F. Appx 661, 664 (7th Cir. 2009) (lack of memory is not to be confused with lack of involvement); *Altvater v. Battocletti*, 300 F.2d 156 (4th Cir. 1962) (the fact that a witness did not observe some surrounding condition goes to weight, not admissibility); *Clayton*, 421 F. Supp. 2d at 77 ("[T]he reliability of [witness's] memory goes to the weight of the evidence. Memory gaps and doubts caused by the lapse of time go to the weight to be given the testimony, and accordingly constitute a matter for the jury.") (internal marks omitted).

Here, the fact that Norman and Joel did not testify that they knew every financial transaction their father may have conducted is wholly irrelevant to their competence as witnesses. There is no dispute that they witnessed and discussed a large number of financial issues with him, nor is there any evidence that Morris' overall financial plan changed at any point.  They are competent to discuss their knowledge of his financial plans and perceptions based on that knowledge.  Contrary to the Trustee's implications, the Blums' testimony speaks to their

observations and the inferences they drew from them.  For instance, when asked how he knew that Morris was taking distributions Norman replied "because I looked at the checks and saw . . . what he deposited for, and they were all invariably Madoff.  They'd come maybe three times— three, four times a year."[31]  Similarly, when asked if he knew how much Morris received each month, Norman replied that he witnessed the entire process from the dividends Morris received—to the deposit forms that he filled out—to the actual deposits.[32]  Joel likewise had the opportunity to review Morris' records three or four times a year when he visited Morris to discuss and reviewed his estate.[33]  The Trustee's arguments about what weight should be afforded to this evidence are not grounds for a motion *in limine.*[34]

---

[31] Norman Dep. 75:1-25; *see also id.* at 55:21-23 ("He would show me the monthly statements.").

[32] *Id.* at  80:3-80:20 ("I looked at his check, I saw the dividends . . . He would write it down as the dividends . . . for what it's from, and deposit.  He deposited everything that he got.  And I saw the dividends, and I saw him deposit. . . And I saw the Madoff stuff, and I saw the deposits.  So I could see.").

[33] Joel Dep. 73:10-23 ("I would go down there three or four times a year, and it was a regular thing for him just to say, 'This is where all the material is.  This is what the accounts are and this is what you will do").

[34] While the case law makes clear that the Trustee's arguments are meritless, two additional points bear mentioning.  First, the Trustee asserts that Norman's testimony is somehow less credible because Morris never mentioned that he received profit withdrawals.  Such an argument defies logic.  The fact that Morris *never* mentioned a transaction to a person with whom he discussed all of his finances permits a reasonable inference that Morris *did not* engage in that transaction.  Second, the Trustee argues that the Blums cannot testify that they were unaware of what the PW notation meant until after Madoff's arrest, asserting that Joel and Norman each *requested* profit distributions from accounts that are not at issue here.  Yet, there is nothing inconsistent with their request to be paid profits from an account, and their testimony that they had no understanding of the internal coding of these transactions at Madoff Securities and the use of the notation "PW" until this litigation.

**B.**    **The Trustee's Argument That the Blums May Not Testify as to Their Understanding and Perception of Morris' Financial Strategies Because This Knowledge Is Based in Part on Conversations with Morris Are Meritless**

*1.    A lay witness may testify as to his perceptions where the perception is based in whole or part on prior conversations*

The Trustee seeks to strike portions of the Blums' testimony on the grounds that they obtained their knowledge, in part, through their conversations with Morris.  This argument is meritless.  In *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989), Judge Posner, in holding that business executive could testify as to his perception of various products his company sold even though his knowledge came from engineers instead of from first-hand inspection, explained:

> All perception is inferential, and most knowledge social; since Kant we have known that there is no unmediated contact between nature and thought.  Knowledge acquired through others may still be personal knowledge within the meaning of Fed. R. Evid. 602, rather than hearsay, which is repetition of a statement made by someone else—a statement offered on the authority of the out-of-court declarant and not vouched for as to truth by the actual witness.  Such a statement is different from a statement of personal knowledge merely based, as most knowledge is based, on information obtained from other people.

*Id.*; *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 739 (1st Cir. 1982) ("Most knowledge has its roots in hearsay").

In recognition of this fact, Federal Rule of Evidence 801 defines as hearsay only the admission of *the out-of-court statements* for their truth.  It does not prohibit a witness from testifying as to his perceptions regarding a factual circumstance where that perception is informed by conversation.  On the contrary, courts have held that a witness's perception is not prohibited by Rule 801 even if it is based *exclusively* on conversations.  *United States v. Barsoum*, 763 F.3d 1321 (11th Cir. 2014) (holding that witness testimony referencing conversations did not convey out-of-court statement; rather, it demonstrated the basis for his personal knowledge); *United States v. Johnson*, 443 Fed. Appx. 85, 95 (6th Cir. 2011) (testimony

regarding conversation was not hearsay as it was introduced "not to prove the truth of the matter

asserted, but instead, to indicate a breakdown in the relationship").  Here, the Blums have not

testified about or sought to admit Morris' out-of-court statements for their truth.[35]  Rather, they

have testified only as to their *understanding* of Morris' financial strategy and tactics.  The fact

that their personal understanding was based in part on conversations does not transform this

understanding into inadmissible hearsay.

In any event, the discussions are not the sole basis for their understanding.  Rather, these

discussions serve only to bolster the weight that the trier of fact should afford their observations

and conclusions.  For instance, Norman's testimony that Morris received quarterly distributions

is grounded in Norman's personal review of Morris' records.[36]  The fact that this perception was

confirmed by later discussions in which Morris explained his quarterly distributions does not

somehow deprive Norman of his personal knowledge.[37]  Similarly, the testimony that Morris did

not take profit withdrawals is supported by the fact that Morris never mentioned such

transactions; however, this conclusion is *further bolstered* by Norman's personal observation that

Morris did not receive or deposit the hundreds of checks that were purportedly issued.[38]

Moreover, any testimony regarding Morris' silence on the PW issue cannot be construed as

hearsay.  *See, e.g.*, *Howe v. Hull*, 873 F. Supp. 70 (N.D. Ohio 1994)  ("While silence can be

---

[35] Even if the Blums had sought to introduce Morris' statements regarding finances, such testimony would not be hearsay as it would be admitted to show its effect on the Blums' understanding of the financial plan.  *United States v. Gotti*, 457 F. Supp. 2d 395, 396 (S.D.N.Y. 2006) (statements offered to show its effect on the witness's subjective understanding of a factual circumstance are not hearsay);  Fed. R. Evid. 801(c) (statements are admissible to show effect on the listener).

[36]  Norman Decl. at 5.

[37] Norman Dep. 55:24-56:16.

[38] *Id.* at 82:15-83:5; Norman Decl. at 9-11.

assertive conduct in limited situations, the failure to say something is simply not a statement for the purposes of Rule 801.").

> 2. *To the extent any part of the Blums' testimony presents out-of-court statements, such evidence is admissible under well-established exceptions to the hearsay rule—Federal Rules of Evidence 803(3) and 807.*

In arguing that these statements are inadmissible hearsay, the Trustee also completely ignores the hearsay exceptions set out in Rules 803(3) and 807. The Blums' testimony is admissible under either exception.

> a. Statements regarding Morris' intention or desire to invest and save are admissible under Rule 803(3) as statements of then-existing financial motives.

To the extent the Court finds that any portion of the Blums' testimony constitutes hearsay, Morris' statements regarding his then-existing financial motives, plans, or intentions all fall within Federal Rule of Evidence 803(3)'s exception for statements of then-existing mental, emotional, or physical condition. As the Supreme Court made clear in *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295-300 (1892), statements regarding a declarant's then-existing mental condition or plans are admissible to prove conduct. *See also* McCormick, Evidence § 295, p. 697 (2d ed. 1972) ("It is now clear that out-of-court statements which tend to prove a plan, design, or intention of the declarant are admissible, subject to the usual limitations as to remoteness in time and apparent sincerity common to all declarations of mental state, to prove that the plan, design, or intention of the declarant was carried out by the declarant.").

The Second Circuit makes clear that Federal Rule of Evidence 803(3) "is predicated in substance upon the *Hillmon* holding. Read together, the case and the Rule stand for the proposition that '[a] declarant's out-of-court statement of intent may be introduced to prove that the declarant acted in accordance with that intent.'" *Saltzman v. Comm'r*, 131 F.3d 87, 94 (2d

Cir. 1997) (quoting *United States v. Delvecchio*, 816 F.2d 859, 863 (2d Cir. 1987))(citations omitted).   Were the Court to find that the Blums are testifying not as to their perception of Morris' financial plan, but as to his statements regarding his plan, such evidence would be admissible to show that he acted in accordance with that plan.   The Blums may testify as to Morris' statements regarding the financial plan because these statements reveal that Morris *intended* to save and *planned* to grow his estate, making it more likely that Morris did not make numerous withdrawals.

> **b.   Morris Blum's statements to Norman and Joel are also permissible under Federal Rule of Evidence 807's residual exception.**

The residual exception to the hearsay rule applies only to hearsay statements that are not otherwise admissible under Rule 803 or 804.   As demonstrated above, the Blums' statements are non-hearsay that, in any event, contain sufficient elements to satisfy Rule 803.   However, to the extent the Court is inclined toward making a contrary finding, the testimony at issue is still admissible under Rule 807.

Rule 807 allows admission of an otherwise inadmissible statement where:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness as statements admitted under Rule 803 and 804; (2) the statement is offered as evidence of a material fact; (3) the statement is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a).[39]   It was designed to be used in those exceptional circumstances where the evidence is necessary, highly probative, and carries guarantees of trustworthiness equivalent to

---

[39] A party seeking to admit evidence under Rule 807 must provide the opposing party with adequate notice.  This is the first opportunity the Blums have had to provide such notice, as the Trustee's Motion is the first instance in which he asserted that the Blums' testimony is hearsay. The Trustee availed himself of the opportunity to depose the Blums and even elicited many of the statements he now seeks to exclude.  However, at no point during these depositions did the Trustee object to these statements.

that which underlie the recognized exceptions. *United States v. Thunder Horse*, 370 F.3d 745 (8th Cir. 2004).

"The most important requirement of Rule 807 is that the hearsay evidence have 'circumstantial guarantees of trustworthiness' that are 'equivalent' to those reflected in the other hearsay exceptions." *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp.3d 296, 311 (D. Conn. 2016) (quoting *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 512 (D.N.J. 2002)); Fed. R. Evid. 803, advisory committee's note ("The committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of pro[b]ativeness and necessity could properly be admissible."). "The proponent of the statement bears the burden of establishing that the statement is especially trustworthy." *Batoh*, 167 F. Supp. 3d at 311 (citing *Jacboson v. Deutsche Bank, A.G.,* 206 F. Supp. 2d 590, 595 (S.D.N.Y. 2002)). Morris' statements bear the hallmarks of trustworthiness. Morris was preparing his children, to whom he left everything he had, to be the trustees, administrators, and personal representatives of his estate. Unlike the participants in Madoff's fraudulent scheme, he had every incentive to be truthful.[40]

Statements regarding a witness's perception pose none of the problems associated with hearsay. Statements that are offered for their truth are concerning because the declarant is not available to testify and the opposing party does not have the opportunity to question the bases for his statements; therefore, the trier of fact has no basis to question the statements truth or falsity. Where the witness provides his perception of events, however, the opponent is free to question the witness during the hearing as to the basis for and extent of his knowledge on the subject.

---

[40] For a discussion of the untrustworthy nature of Madoff Securities records, *see, e.g.,* Blums' Mot. *in Limine* at 20-22.

Evidence tending to suggest that he had a specific financial plan and that such withdrawals would have conflicted with the aims and tactics of that plan are clearly material. There are no other sources of reliable and admissible evidence concerning Morris' finances. Morris passed away over a decade ago. His tax returns and bank records from the 1980s and 1990s are no longer available. The only documents regarding his account that remain were created and maintained by Madoff Securities and were specifically intended to defraud him.[41]

The Blums are innocent victims of Madoff's fraud who saw no reason to retain bank and other records regarding decades-old transactions. The Trustee, who has stepped into the debtor's shoes, seeks to capitalize on this issue by trying to prevent the Blums from providing any evidence regarding their father's financial planning. Such tactics are barred not only by traditional notions of fairness but also by the doctrine of *in pari delicto*.

### C.    The Blums' Statements That the Alleged PW Notations Conflict with Their Father's Financial Strategies Are Admissible Inferences Rationally Based on Their Personal Knowledge

The Trustee argues that the Blums' opinions that Morris did not engage in the purported financial transactions are inadmissible speculation. This argument is meritless; the Blums' statements are firmly grounded in first hand knowledge and satisfy the requirements of Rule 701.

It is well established that a lay witness may testify in the form of an opinion based on his or her perception of the facts. *Gravely v. Providence Partnership*, 549 F.2d 958, 961 (4th Cir. 1977) (allowing the president of a manufacturing company to testify, based on his years of experience, regarding his opinion of a manufacturing safety issue). Such opinions are admissible provided they meet all of the requirements for Rule 701 governing lay-witness testimony: they are rationally based on the perception of the witness; helpful to a clear understanding of the

---

[41] The evidentiary issues associated with the Madoff Securities records are discussed at length in the Blums' motion *in limine*.

witness' testimony or the determination of a fact at issue; and not based on specialized knowledge.  Fed. R. Evid. 701.

> 1.    *The Blums' testimony is rationally based on their perceptions of Morris' financial plan*

The rational-basis requirement stems from Rule 602's "familiar requirement" of personal knowledge, which is discussed above.  *See United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701 advisory committee's note on 1972 Proposed Rules).  To satisfy this requirement, an opinion must be based on the witness's first-hand knowledge *and* be rationally derived from those perceptions.  *See id.* at 1216; *see John Hancock Mut. Life Ins. v. Dutton*, 585 F.2d 1289 (5th Cir. 1978) (witness's testimony as to another person's mental state was rationally based on first hand knowledge and rational perceptions because the witness had the opportunity to observe that person's actions).

The Second Circuit has held that an opinion based on a foundation of several discussions and relates to the discrete subject of those discussions is proper.  For instance, in *United States v. Tsekhanovich*, 507 F.3d 127, 129-30 (2d Cir. 2007), the court held that a witness could properly testify as to why his co-conspirator may have engaged in certain acts in furtherance of the conspiracy.  The court noted that the witness's opinion was supported by a proper foundation of personal knowledge because the witness participated in several conversations regarding the general issue in dispute. *See also U.S. Info. Sys. v. IBEW Local Union No. 3*, 2006 U.S. Dist. LEXIS 52938, *31 (S.D.N.Y. Aug. 1, 2006) (personal knowledge "is not so narrowly defined" as to exclude testimony based on conversations)(providing report and recommendation that was adopted by the district court); *Beck*, 418 F.3d at 1015 ("lay witness testimony is permissible where the witness had 'sufficient contact with the defendant to achieve a level of familiarity that renders that lay opinion helpful"); 3-602 Weinstein's Evidence Section 602.03[1][a] ("Although

first-hand knowledge is obviously the most common form of personal knowledge that is not the only basis for it.").

As demonstrated above, the Blums have a sufficient foundation.  Their testimony is closely tied to this foundation.  The Blums testified that their perception of Morris' plan is one in which there were infrequent, if any, withdrawals.  Based on this knowledge, they infer that the frequent, small and uneven amounts noted as PW on the customer statements, are wholly inconsistent with that strategy and, therefore, Morris likely did not request these purported withdrawals.

2.    *The Blums' opinions are helpful to the trier of fact as the Blums have the best understanding of Morris' financial plans and intentions*

Opinion offered under Rule 701 must be helpful to the trier of fact's understanding the witness's testimony or any fact in issue.  *See United States v. Calhoun*, 544 F.2d 291 (6th Cir. 1976).  This Rule was not designed to impose a high hurdle.  *Teed-Ed, Inc. v. Kimball International Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) (recognizing that the modern trend favors admission of opinion testimony provided it is based on personal knowledge and susceptible to cross-examination).  "The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, . . . [as] cross-examination and argument will point up the weakness" of any conclusory assertions.  *See* Mason Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 415–417 (1952).  Therefore, opinion testimony is generally admitted so long as it is supported by a factual basis that is capable of being cross-examined; only opinion that amounts to little more than "choosing up sides in the litigation" should be excluded.

Here, the Blums' opinions as to whether the transactions at issue comported with their understanding of Morris' financial transactions will assist the trier of fact in deciding whether or not Morris requested these transactions.  *United States v. Miller*, 248 Fed. Appx. 426, 428 (3d

Cir. 2007) (opinion based on "day-to-day knowledge" admissible under Rule 701).  They are not merely telling the trier of fact what side to choose; they are offering their opinion that these transactions would have completely undermined and contradicted Morris' financial plan.

> 3.     *The Blums' opinions are not based on specialized knowledge, but are based on logical inferences based on their understanding of their father's financial plan*

The requirement that a statement not be "based on specialized knowledge" mandates that "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." *United States v. Garci*a, 413 F.3d 201, 215 (2d Cir. 2005); *see also* Fed. R. Evid. 701  advisory committee's note on 2000 amendments (lay witness may not present opinion that is the "process of reasoning which can be mastered only by specialists in the field); *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007)(discussing Rule 701).   The rule was designed to exclude expert opinion masquerading as lay opinion.

There can be no doubt that the Blums are offering lay testimony.  The Blums have not proposed a complex theory as to the nature of the PW notations, nor do they purport to conduct any sort of forensic analysis of Madoff Securities records.  On the contrary, the logic behind the Blums' testimony is simple.  Morris wanted to support his family after he passed.  To that end, he implemented a conservative financial plan, consistently saving and taking only quarterly distributions.  Therefore, he would not shrink his estate by making numerous withdrawals.

**D.     The Blums' Testimony Is Not Offered as Character Evidence Because They Do Not Argue That Morris Blum Acted in Conformity with Any Character Trait But Rather That the Purported Withdrawals Are Antithetical to Morris Blum's Financial Strategy**

The Trustee seeks to bar the portions of the Blums' testimony stating that Morris would not have asked for PW checks on the grounds that such testimony is inadmissible character evidence.  This argument is meritless.

Rule 404 prohibits the admission of "character evidence" to prove that on a particular occasion the person acted in conformance therewith. Character evidence refers to disposition, such as his "honesty, temperance, or peacefulness." *United States v. West*, 670 F.2d 675, 682 (7th Cir. Ill. 1982) (quoting McCormick on Evidence § 195) (holding that evidence of intelligence is not character evidence). The Blums do not offer character evidence regarding their father. Rather, their belief that Morris would not have requested profit withdrawals is based on their understanding of his financial planning and how those transactions would have no place in such a plan.

For instance, that the Trustee seeks to bar Norman's statement that Morris did not take numerous profit withdrawals because such action "[was] entirely implausible given how he managed his financial affairs." Clearly, this statement does not speak to a *character* trait, it speaks to a financial plan, *i.e.*, "how he managed his financial affairs." Similarly, the Blums do not seek to admit the statements that Morris was "very open" about his financial affairs to show that Morris was generally a very open person; they seek to admit these statements to explain the foundation for their testimony. To the extent that certain statements regarding Morris' plan could be misinterpreted as character evidence, such as "I know my father . . . [h]e would never . . . have done things like that," the Blums are confident that the Court will be able to properly evaluate the evidence at the time of hearing.[42]

---

[42] It appears that, where a statement includes a phrase that the Trustee believes is character evidence, he has sought to exclude the entire passage. This is an overreach.

### E. The Blums' Testimony That Morris Blum Consistently Saved and Invested Is Evidence of His Routine Financial Practice and Admissible to Prove That He Acted in Conformity with That Practice By Having His Purported Profits Reinvested

Alternatively, the Blums' testimony is admissible pursuant to Rule 406 as evidence of Morris' habit or routine practice. Under Rule 406, "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." A person's habit is his regular response to a specific situation. 2-406 Weinstein's Fed. Evid. § 406.02[2]. To meet this standard, the proponent must provide evidence of a consistent, uniform pattern that was applied to the specific conduct. *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988).

The Trustee argues that the Blums have not met the requirement of showing a habitual practice because they have testified only "generally that [Morris] managed his finances in an 'orderly fashion'" and Morris was "not like that."[43] This argument grossly mischaracterizes the Blums' testimony. The Blums have provided specific and reliable evidence that Morris routinely saved. As discussed above, they testified that they observed Morris' financial practices, discussed his financial goals and estate planning strategies, and administered his estate.[44] In all of these interactions, Morris took a conservative investment strategy, saving rather than investing.[45] Since the Blums have provided evidence that Morris uniformly engaged in savings strategies over time, they have met their burden of showing that it is more likely than not that

---

[43] Trustee's Mot. *in Limine* at 11.

[44] *Supra* pages 3-6.

[45] Norman Decl. at 9-11.

Morris saved in these particular instances.  *See Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C. Cir.

1989) (discussing habit under Rule 406).

## IV.     Conclusion

For the foregoing reasons, the Trustee's *in limine* motion as to certain portions of the

Blum's testimony should be denied.

Dated:  November 18, 2016                           Respectfully submitted,


                                        */s/ Laura K. Clinton*
                                        Richard A. Kirby, *pro hac vice*
                                        Laura K. Clinton, *pro hac vice*
                                        Graham R. Cronogue, *admission forthcoming*
                                        BAKER & McKENZIE LLP
                                        815 Connecticut Avenue, N.W.
                                        Washington, D.C.  20006
                                        Tel: (202) 452-7020
                                        Email: richard.kirby@bakermckenzie.com
                                        Email: laura.clinton@bakermckenzie.com
                                        Email: graham.crongue@bakermckenzie.com