Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
PARTICIPATING CLAIMANTS' MOTIONS *IN LIMINE***

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

RELEVANT FACTUAL BACKGROUND..............................................................3

I.      THE TRUSTEE'S EXPERTS ...................................................................3

        A.     Mr. Greenblatt's Background ...................................................4

        B.     Mr. Greenblatt's Scope of Assignment....................................4

        C.     Ms. Collura's Background .........................................................6

        D.     Ms. Collura's Scope of Assignment .........................................7

II.     BLMIS BOOKS AND RECORDS..............................................................8

        A.     Categories of BLMIS Books and Records...................................8

              1.     Customer Statements .................................................9

              2.     Portfolio Management Reports and Portfolio Management Transaction Reports ...............................................10

              3.     Spiral Notebooks......................................................11

               4.     BLMIS House 17 Manual............................................12

               5.     BLMIS Bank Records ...............................................13

               6.     Customer Files .........................................................13

               7.     Customer Produced Records.......................................14

        B.     Specific Books and Records Relied on By the Trustee and his Experts ................................................................14

        C.     S and R Instructions Were Not Relied on by the Experts..........15

III.    INCORRECT ASSERTIONS REGARDING EXPERTS' METHODOLOGY ...................................................................16

        A.     PW Transaction Population ...................................................16

        B.     Cancelled of PW Transactions................................................18

        C.     PW Time Period.....................................................................20

        D.     PW Transactions in Norman Levy's Account .........................21

# TABLE OF CONTENTS
## (continued)

**Page**

ARGUMENT ........................................................................................................22

IV.    PARTICIPATING CLAIMANTS MISUNDERSTAND THE SCOPE OF
THESE PROCEEDINGS ........................................................................22

V.    THE EXPERTS' TESTIMONY IS ADMISSIBLE ................................24

    A.    The Trustee is Entitled to Rely on Experts to Analyze BLMIS
Books and Records ........................................................................24

    B.    Admissibility of Expert Testimony...............................................26

    C.    As Forensic Accountants and Certified Fraud Examiners, the
Trustee's Experts Are Qualified to Offer Expert Testimony in this
Proceeding.....................................................................................28

    D.    Experts' Methodology Satisfies Rule 702 and *Daubert* ............30

    E.    The Experts Rely on Sufficient Facts and Data .........................34

    F.    The Purported Errors in the Experts' Testimony Raised by the
Claimants are Not the Basis for Admissibility Challenges........37

VI.    THE ADMISSIBILITY OF THE BLMIS BOOKS AND RECORDS ................38

    A.    The BLMIS Books and Records are Relevant ...........................39

    B.    Cash Transactions Reported in the BLMIS Books and Records Are
Reliable .........................................................................................41

    C.    The Trustee Can Authenticate the BLMIS Books and Records ...............43

VII.    THE BLMIS BOOKS AND RECORDS SHOULD NOT BE EXCLUDED
AS HEARSAY...................................................................................47

    A.    The BLMIS Books and Records are Business Records............................47

        1.    The BLMIS Books and Records Satisfy Fed. R. Evid. 803(6)'s
Requirements .........................................................................48

        2.    The Disputed Notations in the BLMIS Books and Records
Were Made and Kept in the Ordinary Course of BLMIS's
Business .................................................................................50

    B.    Most of the BLMIS Books and Records are Authenticated under
Fed. R. Evid. 901(b)(8), Making the Records Admissible as
Ancient Documents Under Fed. R. Evid. 803(16)....................54

# TABLE OF CONTENTS
## (continued)

**Page**

1.    There is No Suspicion About the Authenticity of the BLMIS
Books and Records ........................................................................55

2.    The BLMIS Books and Records Were Recovered from
BLMIS's Office: the Most Likely Place They Would Be
Found ............................................................................................55

3.    Most of the BLMIS Books and Records Have Existed for
Over Twenty Years Before Being Admitted ................................56

C.    The BLMIS Books and Records are Admissible Under the
Residual Exception ..................................................................................57

1.    The BLMIS Books and Records, Notations, and Instructions
Have Equivalent Circumstantial Guarantees of
Trustworthiness ............................................................................58

2.    The Challenged BLMIS Books and Records are Material to
the Evidentiary Hearing ...............................................................59

3.    BLMIS Books and Records are More Probative Than Any
Other Evidence .............................................................................60

4.    Admitting BLMIS Books and Records Will Best Serve the
Purposes of the Federal Rules of Evidence and the Interests of
Justice ...........................................................................................61

5.    The Trustee Has Provided Sufficient Notice of Reliance on
Residual Hearsay Exception ........................................................61

VIII.    THE TRUSTEE'S SUMMARY EXHIBITS ARE ADMISSIBLE......................62

CONCLUSION...............................................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.Com,*
   48 F. Supp. 3d 600 (S.D.N.Y. 2014)..................................................................28, 29

*In re Adelphia Commc'ns Corp.,*
   No. 02-41729, 2006 WL 346418 (Bankr. S.D.N.Y. Feb. 6, 2006).........................50

*In re Adler Coleman Clearing Corp.,*
   204 B.R. 111 (Bankr. S.D.N.Y. 1997)..............................................................24, 26

*ADT Sec. Svcs. v. Sec. One Int'l, Inc.,*
   No. 11-cv-5149, 2013 WL 4766401 (N.D. Cal. Sept. 5, 2013).........................52, 53

*Am. Equities Grp., Inc. v. Ahava Dairy Prod. Corp.,*
   No. 01-cv-5207, 2004 WL 870260 (S.D.N.Y. Apr. 23, 2004) ...................50, 53, 54

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
   303 F.3d 256 (2d Cir. 2002)..................................................................................37

*Arasimowicz v. Bestfoods, Inc.,*
   81 F. Supp. 2d 526 (S.D.N.Y. 2000).....................................................................56

*Arista Records LLC v. Lime Grp. LLC,*
   715 F. Supp. 2d 481 (S.D.N.Y. 2010)....................................................................46

*Ark-Mo Farms, Inc. v. United States,*
   530 F.2d 1384 (Ct. Cl. 1976) ................................................................................57

*Astra Aktiebolag v. Andrx Pharms., Inc.,*
   222 F. Supp. 2d 423 (S.D.N.Y. 2002)...............................................................55, 56

*Auto. Ins. Co. of Hartford, Connecticut v. Electrolux Home Prods., Inc.,*
   No. 10-cv-0011, 2012 WL 6629238 (S.D.N.Y. Dec. 20, 2012)............................35

*BL Devel. Corp. v. Masella (In re Masella),*
   No. 05-24302, Adv. No. 06-2010, 2007 WL 2302312 (Bankr. D. Conn. Aug.
   7, 2007) ................................................................................................................32

*In re Blech Secs. Litig.,*
   94-cv-7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003)...............................48, 49

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.,*
   247 F.3d 79 (3d Cir. 2001)....................................................................................61

*In re Bonham,*
   251 B.R. 113 (Bankr. D. Alaska 2000).........................................................25, 26, 29

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Boykin v. Western Exp., Inc.*,
    No. 12-cv-7428, 2015 WL 539423 (S.D.N.Y. Feb. 6, 2015) .................................................28

*Buchwald v. Renco Grp.*,
    539 B.R. 31 (S.D.N.Y. 2015)...........................................................................................32, 37

*Carrasco v. New Mexico Dep't of Workforce Sols.*,
    No. 10-0999, 2013 WL 12092509 (D. N.M. March 19, 2013)..............................................46

*Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*,
    No. 14-cv-8467, 2016 WL 5416498 (S.D.N.Y. Sept. 28, 2016) ...........................................37

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110 (S.D.N.Y. 2015)...................................................................................27

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014)........................................................................58, 59, 62

*In re Colonial Realty Co.*,
    209 B.R. 819 (Bankr. D. Conn. 1997) ...................................................................................36

*In re Comm'l Fin. Svcs., Inc.*,
    350 B.R. 520 (Bankr. N.D. Okla. 2005) ................................................................................32

*In re Cornfield*,
    365 F. Supp. 2d 271 (E.D.N.Y. 2004) ...................................................................................61

*Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*,
    781 F.3d 1262 (11th Cir. 2015) ...........................................................................42, 44, 49

*Cynergy, LLC v. First Am. Title Ins. Co.*,
    706 F.3d 1321 (11th Cir. 2013) ............................................................................................60

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993).................................................................................................. *passim*

*Delehanty v. KLI, Inc.*,
    663 F. Supp. 2d 127 (E.D.N.Y. 2009) ...................................................................................36

*Emig v. Electrolux Home Prods. Inc.*,
    No. 06-cv-4791, 2008 WL 4200988 (S.D.N.Y. Sept. 11, 2008) ...........................................28

*In re Envirosolutions of N.Y.*,
    LLC, 476 B.R. 88 (Bankr. S.D.N.Y. 2012) ............................................................................39

# TABLE OF AUTHORITIES
## (continued)

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
  No. 11-cv-6188, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ................................................38

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  74 F. Supp. 3d 639 (S.D.N.Y. 2015)......................................................................................40

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  No. 11-cv-6201, 2015 WL 1137572 (S.D.N.Y. Mar. 13, 2015)......................................49, 53

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  No. 11-cv-6201, 2015 WL 353929 (S.D.N.Y. Jan. 28, 2015) .........................................37, 53

*In re Fosamax Prod. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)...............................................................................33, 34

*Galvin v. Eli Lilly & Co.*,
  488 F.3d 1026 (D.C. Cir. 2007) .........................................................................................35, 36

*Gen. Refractories Co. v. First State Ins. Co.*,
  No. 04–3509, 2015 WL 3450391 (E.D. Pa. May 29, 2015) ....................................................63

*George v. Celotex Corp.*,
  914 F.2d 26 (2d Cir. 1990)......................................................................................................54

*Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*,
  803 F.2d 250 (6th Cir. 1986) ..................................................................................................63

*Hollman v. Taser Int'l Inc.*,
  928 F. Supp. 2d 657 (E.D.N.Y. 2013) .....................................................................................27

*John Paul Mitchell Sys. v. Quality King Distributors, Inc.*,
  106 F. Supp. 2d 462 (S.D.N.Y. 2000)......................................................................................45

*JPMorgan Chase Bank, N.A. v. Yuen*,
  No. 11-cv-9192, 2013 WL 2473013 (S.D.N.Y. June 3, 2013) ..........................................48, 49

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)............................................................................................................27, 32

*Linde v. Arab Bank, PLC*,
  922 F. Supp. 2d 316 (E.D.N.Y. 2013) .....................................................................................63

*Lopez v. Miller*,
  915 F. Supp. 2d 373 (E.D.N.Y. 2013) ...............................................................................60, 61

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Louis Vuitton Malletier v. Dooney & Burke*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007).......................................................29, 30, 34

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
   Contemporary Dance, Inc.*,
   380 F.3d 624 (2d Cir. 2004).................................................................54, 55

*Martorelli v. C.I.R.*,
   40 T.C.M. (CCH) 848, 1980 WL 4420 (U.S. Tax Ct. 1980).................................41

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995)..............................................................30

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   643 F. Supp. 2d 482 (S.D.N.Y. 2009).....................................................35

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
   No. 95-08203, 1998 WL 160039 (Bankr. S.D.N.Y. Apr. 3, 1998)..............25, 26, 29

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005).............................................................27

*Official Comm. of Unsecured Creditors v. Israel Discount Bank of N.Y. (In re Oak
   Rock Fin., LLC)*,
   No. 13-72251, Adv. No. 14-08231, 2016 WL 5794717 (Bankr. E.D.N.Y. Oct.
   4, 2016) .........................................................................39, 58

*Official Comm. of Unsecured Creditors v. Martin (In re Enron Creditors
   Recovery Corp.)*,
   376 B.R. 442 (Bankr. S.D.N.Y. 2007) ..................................................41, 42, 50

*Olin Corp. v. Certain Underwriters at Lloyd's London*,
   468 F.3d 120 (2d Cir. 2006)............................................................37

*In re Ollag Constr. Equip. Corp.*,
   665 F.2d 43 (2d Cir. 1981).............................................................52

*Parker v. Reda*,
   327 F.3d 211 (2d Cir. 2003)............................................................49

*People v. Collins*,
   438 P.2d 33 (Cal. 1968) ...............................................................38

*People v. Risley*,
   214 N.Y. 75 (1915) ....................................................................38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Petters Co., Inc.,*
   506 B.R. 784 (Bankr. D. Minn. 2013) ....................................................25, 26, 29

*Phillips v. Mortg. Elec. Registration Sys., Inc.,*
   No. 09-cv-2507, 2013 WL 1498956 (N.D. Ala. April 5, 2013) ...........................45

*Phoenix Assocs. III v. Stone,*
   60 F.3d 95 (2d Cir. 1995)......................................................................................49

*ProtoComm Corp. v. Novell Adv. Servs. Inc.,*
   171 F. Supp. 2d 473 (E.D. Pa. 2001) ........................................................34, 37, 38

*In re Randall's Island Family Golf Centers, Inc.,*
   290 B.R. 55 (Bankr. S.D.N.Y. 2003) ...................................................................25

*The Ret. Plan of the Unite Here Nat'l Ret. Fund v. Kombassan Holding, A.S.,*
   629 F.3d 282 (2d Cir. 2010)...........................................................................48, 52

*Ricciardi v. Children's Hosp. Med. Ctr.,*
   811 F.2d 18 (1st Cir. 1987)...................................................................................36

*Robinson v. Shapiro,*
   646 F.2d 734 (2d Cir. 1981).................................................................................59

*Schering Corp v. Pfizer, Inc.,*
   189 F.3d 218 (2d Cir. 1999)........................................................................57, 58, 61

*Schulz v. Akzo Nobel Paints, LLC,*
   721 F.3d 426 (7th Cir. 2013) ...............................................................................34

*Secs. Inv'r Prot. Corp. v. Pepperdine Univ. (In re Brentwood Secs., Inc.),*
   925 F.2d 325 (9th Cir. 1991) ...............................................................................23

*Secs. Inv'r Prot. Corp. v. Wise (In re Stalvey & Associates, Inc.),*
   750 F.2d 464 (5th Cir. 1985) ...............................................................................24

*Silverstein v. Smith Barney, Inc.,*
   No. 96-cv-8892, 2002 WL 1343748 (S.D.N.Y. June 18, 2002) .....................60, 61

*In re Soundview Elite Ltd.,*
   543 B.R. 78 (Bankr. S.D.N.Y. 2016).............................................................44, 45

*Stafford v. Giddens (In re New Times Secs. Svcs., Inc.),*
   463 F.3d 125 (2d Cir. 2006).................................................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*State Office Sys., Inc. v. Olivetti Corp. of Am.*,
  762 F.2d 843 (10th Cir. 1985) ...................................................................................63

*Steinberg v. Obstetrics-Gynecological & Infertility Grp., P.C.*,
  260 F. Supp. 2d 492 (D. Conn. 2003) .......................................................................62

*Stenger v. World Harvest Church, Inc.*,
  No. 04-cv-00151, 2006 WL 870310 (N.D. Ga. Mar. 31, 2006) ................................37

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  576 F. Supp. 2d 457 (S.D.N.Y. 2007) .......................................................................27

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
  112 F. Supp. 3d 122 (S.D.N.Y. 2015) .......................................................................49

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*,
  No. 00-cv-4763, 2006 WL 2136249 (S.D.N.Y. Aug. 1, 2006) .......................... 44, 45

*Ulico Cas. Co. v. Clove Capital Mgmt.*,
  217 F. Supp. 2d 311 (N.D.N.Y. 2002) .......................................................................30

*United States v. Bagaric*,
  706 F.2d 42 (2d Cir. 1983) ........................................................................................45

*United States v. Blackwood*,
  366 F. App'x 207 (2d Cir. 2010) ...............................................................................63

*United States v. Caldwell*,
  776 F.2d 989 (11th Cir. 1985) ...................................................................................45

*United States v. Dhinsa*,
  243 F.3d 635 (2d Cir. 2001) ................................................................................ 44, 45

*United States v. Dupree*,
  706 F.3d 131 (2d Cir. 2013) ......................................................................................44

*United States v. Elkins*,
  885 F.2d 775 (11th Cir. 1989) ...................................................................................60

*United States v. Ford*,
  435 F.3d 204 (2d Cir. 2006) ......................................................................................48

*United States v. Freidin*,
  849 F.2d 716 (2d Cir. 1988) ................................................................................ 48, 53

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Gambardella*,
    10-cr-674, 2012 WL 279469 (S.D.N.Y. Jan. 27, 2012)...........................................................60

*United States v. Iaconetti*,
    406 F. Supp. 554 (E.D.N.Y. 1976), *aff'd*, 540 F.2d 574 (2d Cir. 1976)................................59

*United States v. Jakobetz*,
    955 F.2d 786 (2d Cir. 1992)...............................................................................................49

*United States v. Johnson*,
    594 F.2d 1253 (9th Cir. 1979) .............................................................................................62

*United States v. Kaiser*,
    609 F.3d 556 (2d Cir. 2010)................................................................................... *passim*

*United States v. Kelley*,
    551 F.3d 171 (2d Cir. 2009)...............................................................................................39

*United States v. Manshul Constr. Corp.*,
    No. 93-cv-0308, 1996 WL 267945 (S.D.N.Y. May 20, 1996) ...............................................48

*United States v. Nivica*,
    887 F.2d 1110 (1st Cir. 1989) .......................................................................................41, 60

*United States v. Paulino*,
    445 F.3d 211 (2d Cir. 2006)...............................................................................................61

*United States v. Perez*,
    387 F.3d 201 (2d Cir. 2004)...............................................................................................39

*United States v. Portrait of Wally*,
    663 F. Supp. 2d 232 (S.D.N.Y. 2009)..............................................................................54, 55

*United States v. Rubin*,
    37 F.3d 49 (2d Cir. 1994)..................................................................................................39

*United States v. Scholl*,
    166 F.3d 964 (9th Cir. 1999) .............................................................................................54

*United States v. Swanquist*,
    161 F.3d 1064 (7th Cir. 1998) ...........................................................................................65

*United States v. Tafoya*,
    757 F.2d 1522 (5th Cir. 1985) ...........................................................................................41

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004)...................................................................29

*United States v. White*,
737 F.3d 1121 (7th Cir. 2013) ............................................................65

*United States v. Williams*,
205 F.3d 23 (2d Cir. 2000)..................................................................49

*Wantanabe Realty Corp. v. City of N.Y.*,
No. 01-cv-10137, 2004 WL 188088 (S.D.N.Y. Feb. 2, 2004), *aff'd*, 159 F.
App'x 235 (2d Cir. 2005)....................................................................59

*Wechsler v. Hunt Health Sys., Ltd.*,
381 F. Supp. 2d 135 (S.D.N.Y. 2003)..................................................29

*White Indus. v. Cessna Aircraft Co.*,
611 F. Supp. 1049 (W.D. Mo. 1985) .......................................49, 52, 53

*Wright v. Stern*,
450 F. Supp. 2d 335 (S.D.N.Y. 2006)..................................................35

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*,
628 F.3d 1032 (8th Cir. 2011) ............................................................26

**Statutes**

15 U.S.C. § 78fff-2(b)...................................................................3, 25

**Rules**

Fed. R. Evid. 401 ...............................................................................39

Fed. R. Evid. 702 ......................................................................... *passim*

Fed. R. Evid. 703 ...............................................................................36

Fed. R. Evid. 803 .................................................................36, 50, 57

Fed. R. Evid. 803(6).................................................................... *passim*

Fed. R. Evid. 803(7)...........................................................................50

Fed. R. Evid. 803(16)...................................................................54, 56

Fed. R. Evid. 807 .................................................................36, 59, 61, 62

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Fed. R. Evid. 807(a) .................................................................................................................57, 64

Fed R. Evid. 807(a)(1) ...................................................................................................................58

Fed. R. Evid. 807(a)(3) ...................................................................................................................60

Fed. R. Evid. 807(b) .................................................................................................................57, 62

Fed. R. Evid. 901 ...........................................................................................................................46

Fed. R. Evid. 901(a) .................................................................................................................44, 45

Fed. R. Evid. 901(b)(4) ...................................................................................................................45

Fed. R. Evid. 901(b)(8) .....................................................................................................54, 55, 56, 64

Fed. R. Evid. 901(b)(8)(C) ..............................................................................................................56

Fed. R. Evid. 1006 .................................................................................................................. *passim*

**Other Authorities**

6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence
§ 1006.04[1] (Joseph M. McLaughlin, ed., (2d ed.2015)) .....................................................63

4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence
§ 702.03[1] (2d ed. 2015) .......................................................................................................26

5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence,
§ 901.11[2] (2d ed. 2015) .......................................................................................................55

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff ("Madoff"),

respectfully submits this memorandum of law in opposition to: (1) the Blums' Motion *in Limine*

to Exclude Unrelated Customer Account Materials, to Exclude Hearsay Statements Regarding

Profit Withdrawals, and to Limit the Proposed Testimony of Lisa M. Collura and Matthew B.

Greenblatt ("Blum Br."); and (2) Participating Claimants' Motion to Strike the Proposed Expert

Testimony of Lisa M. Collura and Matthew B. Greenblatt ("Blecker Br.," together with the Blum

Br., the "Motions").

## PRELIMINARY STATEMENT

The Participating Claimants[2] fail to articulate any legal basis to exclude the testimony of

the proposed expert witnesses and exhibits the Trustee seeks to introduce at the evidentiary

hearing on the Profit Withdrawal issue.

The Motions seek to exclude expert testimony by Ms. Lisa M. Collura and Mr. Matthew

Greenblatt (the "Experts"), raising baseless challenges to their qualifications, including an

outlandish suggestion that the Experts are unqualified because they did not work at BLMIS. The

Motions also question the Experts' methodologies, seizing on so-called "errors" and

"inconsistencies" which, far from weakening the Experts' analyses, actually support the

reliability of their conclusions that BLMIS books and records accurately reflect cash deposits

and withdrawals. These challenges do not create grounds for excluding their testimony.

---

[1] Subsequent references to sections of the Securities Investor Protection Act shall be denoted as "SIPA § __."

[2] All capitalized terms retain the meaning ascribed to them in the Trustee's Supplemental Memorandum of Law in Support of Trustee's Motion Affirming Treatment of Profit Withdrawal Transactions, ECF No. 13876 ("Tr. Suppl. Br."), dated August 12, 2016.

The Experts are qualified through both their education and experience to analyze millions of BLMIS documents, synthesize the BLMIS books and records, and conclude that the PW Transactions are properly categorized as debits for purposes of calculating net equity. Their analyses are based on well-accepted, reliable accounting principles, and the Participating Claimants fail to identify a single shortcoming that undermines the reliability of their methodology. The Experts' testimony will assist the Court in resolving the issue at hand and should not be excluded. To the extent the Participating Claimants wish to challenge the perceived errors in the methodology, analyses and conclusions of the Experts, they will have the opportunity to do so when it is appropriate, on cross-examination.

The Participating Claimants' attempts to exclude all but a handful of the Trustee's exhibits are similarly unpersuasive. As a preliminary matter, their attempt to exclude all exhibits relating to BLMIS accounts other than their own evinces their misunderstanding of the nature and scope of these proceedings, as well as the evidence at issue. This omnibus proceeding was not established to determine the Participating Claimants' individual customer claims—though doing so may be expedient—but rather to establish whether the Trustee properly treated PW Transactions as debits when calculating a customer's net equity. Such a determination requires a broad range of exhibits beyond those relating to the Blums, including those utilized to calculate net equity.[3]

The Participating Claimants' attempts to exclude virtually all of the BLMIS books and records as inadmissible on hearsay grounds are equally unavailing. These documents are quintessential business records—created and maintained by BLMIS employees in the ordinary course of business. There is no authority supporting the Participating Claimants' argument that

---

[3] *See* Decl. of David J. Sheehan in Support of the Trustee's Motions *in Limine* Numbers 1–4 at Ex. 1, ECF No. 14359.

BLMIS's Ponzi scheme somehow renders the business records exception unavailable.  In any event, many, if not all, of the BLMIS books and records are also admissible as ancient documents or pursuant to the residual hearsay exception.

The Motions merely outline issues the Participating Claimants should more appropriately address in their cross examinations of the Trustee's witnesses at the evidentiary hearing.   There is no reason to exclude the Experts' testimony, nor the Trustee's exhibits, and as such the Motions should be denied.

## RELEVANT FACTUAL BACKGROUND

The Motions contain numerous factual errors, particularly with respect to the analyses completed by the Experts. To correct these errors, the Trustee briefly summarizes below the Experts' qualifications, the relevant BLMIS books and records, the methodologies employed by the Experts, and the results of their analyses.

## I.    THE TRUSTEE'S EXPERTS

The Trustee's statutory obligation is to discharge net equity claims ascertainable from the debtor's books and records. SIPA § 78fff-2(b). When, as here, the debtor committed massive fraud, the Trustee faces a particularly acute problem when meeting this obligation. In this case, the fraud spanned decades and the Trustee must reconcile thousands of accounts. The sheer size of the fraud required the Trustee to hire professionals to assist him in analyzing and assessing the books and records of the debtor.[4]

FTI Consulting, Inc. ("FTI") was retained on behalf of the Trustee to analyze, among other things, the financial affairs of BLMIS and to assist the Trustee with the liquidation of BLMIS. As part of its engagement, FTI was tasked with analyzing the books and records of BLMIS, including all records of the "cash in/cash out" transactions related to the BLMIS

---

[4] *Cf.* Hr'g Tr. re Mot. to Allow Customer Claim of Aaron Blecker at 32, Feb. 24, 2016, ECF No. 12885.

customer accounts as far back as the records allowed.  Relying on their experience and training

as Certified Fraud Examiners ("CFE") and Certified Public Accountants ("CPA"), Matthew B.

Greenblatt and Lisa M. Collura lead the FTI teams primarily tasked with this engagement.

### A.    Mr. Greenblatt's Background

Mr. Greenblatt, a Senior Managing Director at FTI, is a CPA, CFE and is a Certified

Financial Forensics credential holder ("CFF") with over 20 years of experience in accounting,

auditing, and litigation consulting services, including forensic accounting and fraud

investigations.[5] He is a member of the American Institute of Certified Public Accountants

("AICPA"), the New York State Society of Certified Public Accountants and the Association of

Certified Fraud Examiners. Mr. Greenblatt is currently an adjunct professor for the forensic

accounting program certificate at New York University. He has also served on multiple panels

and authored numerous articles relating to forensic accounting and investigations. As a

CPA/CFF, CFE, and forensic accountant, Mr. Greenblatt has the training, experience, and

expertise required to analyze BLMIS books and records, including the PW Transactions.

### B.    Mr. Greenblatt's Scope of Assignment

As part of FTI's retention, Mr. Greenblatt was tasked with creating a chronological

listing of all cash and principal transactions for every BLMIS customer account as far back as

possible for the purpose of determining each BLMIS account's Principal Balance Calculation.[6]

These chronological listings consist of cash and principal transactions derived from BLMIS

books and records and the data maintained within BLMIS's computer systems, as discussed in

more detailed below. Mr. Greenblatt, along with a team of professionals under his direct

---

[5] *See* Second Supplemental Analysis of the Profit Withdrawal Transactions dated June 3, 2016, Ex. 1, ECF No. 13869-8 ("Greenblatt Second Supp. PW Rpt.").

[6] *See* Principal Balance Calculation Report dated Nov. 15, 2012, Decl. of Matthew B. Greenblatt Ex. 1, ECF No. 10663-1 ("Greenblatt Principal Balance Rpt.").

supervision, identified all deposits and withdrawals, including the PW Transactions, for each

BLMIS account based on available BLMIS books and records.

In connection with these proceedings, Mr. Greenblatt was asked to analyze Customer

Statements (as defined below) reflecting PW Transactions, a subset of cash "outflow" under the

Principal Balance Calculation's Net Investment Method that reduced an account's net equity

balance. Mr. Greenblatt was tasked with analyzing, quantifying, and synthesizing: (1) all PW

Transactions identified in BLMIS books and records; (2) the subset of PW Transactions

occurring in the Participating Claimants' accounts; (3) the documents supporting the treatment of

the PW Transactions as debits; and (4) the impact of the PW Transactions on the purported

equity balances of certain Participating Claimants' accounts. Of the 427,000 deposit and

withdrawal transactions reported on Customer Statements between April 1981 and December

2008, 91,132 transactions are PW Transactions.[7]

In connection with his Principal Balance Calculations, Mr. Greenblatt confirmed that the

transaction-level detail on the Customer Statements is consistent with information on the PMTs

and PMRs (each as defined below).[8] The Profit Withdrawal Transactions at issue in these

Motions are a type of "outflow" under the Net Investment Method, which reduce an account's

net equity balance.[9]

For his initial PW Report, Mr. Greenblatt identified 6,148 PW Transactions with the

transaction description "CHECK + [Stock Name]" between December 1995 and November

---

[7] Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" dated Dec. 17, 2015, Decl. of Lisa M. Collura Ex. 1 at ¶ 11 n.4, ECF No. 13868-2 ("Collura Suppl. PW Rpt.") (explaining update to the PW Transaction population from 91,138 to 91,132); Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" dated July 14, 2015, Decl. of Lisa M. Collura Ex. 1, ECF No. 10664-1 ("Collura PW Rpt.") ¶ 34; *see also* Greenblatt PW Rpt. ¶¶ 21–22; Supplemental Analysis of the Profit Withdrawal Transactions dated Dec. 17, 2015, Second Decl. of Matthew B. Greenblatt Ex. 1, ECF No. 13869-1 ("Greenblatt Suppl. PW Rpt.") ¶¶ 16–18.

[8] Greenblatt Principal Balance Rpt. ¶ 17 n.7; Greenblatt PW Rpt. ¶¶ 30, 54-55, 62, 66, 70.

[9] Greenblatt PW Rpt. ¶¶ 15-18; see also Greenblatt Principal Balance Rpt. ¶ 17.

2008.[10]  He then confirmed that the amount of each Profit Withdrawal Transaction equaled the

amount of profit purportedly generated by a fictitious trade of a particular security as identified

on the Customer Statements for all but three of the 6,148 PW Transactions (99.95%).[11]  For his

Supplemental PW Report, Mr. Greenblatt reconciled the amount of all identified PW

Transactions and the purported trading in the reported securities between November 1978 and

November 1995 for each of the PW Transactions related to the Participating Accounts.[12]  Based

on these analyses, Mr. Greenblatt reconciled 97.8% of the PW Transactions for the Participating

Accounts to the reported trading.  Mr. Greenblatt also found that contemporaneously with the

Profit Withdrawal Transactions, BLMIS reduced the account's purported equity value by the

amount of the Profit Withdrawal Transactions.[13]  Mr. Greenblatt further confirmed that PW and

CW notations mean Profit Withdrawal and Capital Withdrawal, respectively.[14]

Ultimately, Mr. Greenblatt concludes that "the BLMIS records demonstrate that: (a) the

PW Transactions result in a reduction to the BLMIS account holders' purported equity; and (b)

the account holders received payments from BLMIS in the amount of the PW Transactions" and

"all PW Transactions constitute cash withdrawals in the Principal Balance Calculation, as

detailed in the Principal Balance Calculation Report and the PW Report."[15]

C.    **Ms. Collura's Background**

Ms. Collura is a Senior Managing Director in FTI's Forensic and Litigation Consulting

practice.  She possesses more than 20 years of experience in accounting, auditing, and litigation

---

[10] Greenblatt PW Rpt. ¶ 42.

[11] *Id.*

[12] Greenblatt Supp. Rpt. ¶ 24.

[13] *Id.* at ¶¶ 27-28, 34.

[14] *Id.* at ¶¶ 27-28.

[15] Greenblatt PW Supp. Rpt. ¶ 13.

consulting services.[16]    She specializes in providing forensic accounting and financial fraud investigative services in connection with internal investigations on behalf of trustees, boards of directors and audit committees of companies.    Ms. Collura is a CPA, CFE, member of the AICPA, and is certified in financial forensics by the AICPA.    She is also a member of the New York State Society of Certified Public Accountants and the Association of Certified Fraud Examiners.

Ms. Collura has conducted numerous large-scale, fact-finding investigations into fraudulent financial transactions, including tracing significant flows of funds between accounts and entities.    She has provided fraud investigation, and forensic accounting services in connection with several of the largest fraud cases in the United States. Ms. Collura developed and instructs continuing professional education courses for FTI, and frequently presents on forensic accounting at Fordham University and Baruch College.

### D.    Ms. Collura's Scope of Assignment

Ms. Collura was tasked with reconciling the chronological listing of transactions to the third party bank records which were available for the period from December 1998 through December 2008 ("Ten Year Period").    Ms. Collura reconciled 99% of the approximately 225,000 deposit and withdrawal transactions for all BLMIS accounts that occurred during the Ten Year Period by confirming that for each of the deposit and withdrawal transactions identified on the Customer Statements, the third-party bank records showed a corresponding transaction for the same amount, on or around the same date, and for the same BLMIS customer.[17]

---

[16] Proof of Transfers to Certain BLMIS Customers with "Profit Withdrawals" dated July 14, 2015, Decl. of Lisa M. Collura Ex. 1, ECF No. 10664-1.

[17] Collura PW Rpt. ¶¶ 17, 33.    The remaining one percent that Ms. Collura was unable to reconcile consists primarily of withdrawal transactions for which copies of the related cancelled checks were not available.

For her PW Transaction-specific analysis, Ms. Collura, along with a team of professionals working under her supervision, was responsible for analyzing whether: (1) the PW Transactions reflected on BLMIS customer statements reconciled to available documentation; (2) the check payee or wire beneficiary information related to Ten Year Period PW Transactions reconciled to the respective BLMIS account holder; and (3) whether the Ten Year Period PW Transactions reflected on Customer Statements could be traced to bank accounts held by, or for the benefit of, the respective BLMIS account holder. She was also tasked with reviewing additional documents, including the BLMIS customer files and, where available, third-party documents related to the 54 Participating Accounts and 81 Related Direct Accounts, and incorporating the results of that review into her overall reconciliation analysis.

Of the 225,000 transactions in the Ten Year Period, 5,527 transactions were PW Transactions and Ms. Collura was able to reconcile 99.6% of these PW Transactions to the third-party bank records.[18] Virtually all of these reconciled PW Transactions in the Ten-Year Period were traced to accounts belonging to the BLMIS account holder or beneficiary.[19]

## II.  BLMIS BOOKS AND RECORDS

### A.  <u>Categories of BLMIS Books and Records</u>

The Experts rely on eight sources of information in rendering their conclusions in this proceeding: (1) monthly BLMIS customer statements; (2) Portfolio Management Reports; (3) Portfolio Management Transaction Reports; (4) handwritten stenographic (spiral-bound) notebooks; (5) House 17 manuals; (6) BLMIS Bank Records from JPMorgan Chase and Bankers

---

[18] *Id.* at ¶¶ 35–36.

[19] *Id.* at ¶¶ 35–36, 45.

Trust; (7) correspondence between customers and BLMIS, as maintained in BLMIS's customer files; and (8) customer-produced documents, where available. [20]

### 1.    Customer Statements

Monthly customer statements and ledgers are available in three formats:  (i) microfilm reels covering the period November 1978 through November 1995;[21] (ii) electronic files from BLMIS's StorQM computer server for the period December 1995 through November 2008[22] stored on BLMIS's AS/400 computer system and predecessor computer systems (collectively, the "AS/400 Computer System")[23] (together, the "Customer Statements").  Purported customer trading data is therefore available electronically for the period December 1995 through November 2008 and available on microfilm for the period November 1978 through November 1995.

Customer Statements are the primary document type relied upon by Mr. Greenblatt in preparing the chronological listings of the cash and principal transactions used to perform the Principal Balance Calculation because:  (i) the cash and principal transactions recorded on the

---

[20] As an additional source document, the Checkbook File is a data table, within BLMIS's AS/400 computer system, containing transaction level detail of daily cash receipts and disbursements for BLMIS accounts from January 2000 through December 11, 2008.  The Checkbook File is the only BLMIS record available to identify cash transactions from December 1, 2008 through December 11, 2008 and was only relied on for that eleven-day period for purposes of the Principal Balance Calculations, during which no PW Transactions occurred. Further, the transactions within this eleven-day period were successfully reconciled to third-party bank records. *See* Greenblatt Principal Balance Rpt. Section V.E.

[21] Greenblatt Principal Balance Rpt. ¶¶ 40–42. Mr. Greenblatt was tasked with determining the Principal Balance Calculation for each BLMIS account by crediting the account for the amount of principal deposited and by deducting the amount of principal withdrawn over the life of the account. The first monthly BLMIS Customer Statement which reported dollar amounts for any securities allegedly held at month end was March of 1981. Therefore, the full period in which the Principal Balance Calculation could be performed covered the time period from April 1, 1981 through December 11, 2008. Accounts that were opened at BLMIS before April 1, 1981 were granted initial principal credit equal to the cash balance reported on the March 1981 Customer Statement plus the cost basis of positions reported as held.

[22] *Id.*

[23] *See* Tr. Suppl. Br. at 23 (The AS/400 Computer System "stored data that appeared on various BLMIS documents and was used to generate and print Customer Statements, trade confirmations, Portfolio Management Reports, Portfolio Management Transaction Reports, debit memoranda,  and customer checks"); *id.* at 30 (discussion of debit memoranda).

Customer Statements are supported by third-party bank records for all periods for which such records are available; (ii) they provide the most comprehensive source of account history as they contain line item-by-line item cash and principal transactions; and (iii) they were printed and provided to customers.[24]

### 2. Portfolio Management Reports and Portfolio Management Transaction Reports

Portfolio Management Reports ("PMRs") and Portfolio Management Transaction Reports ("PMTs") are other internal, BLMIS reports generated by the AS/400 Computer System. PMRs provided, among other things, calendar year-to-date information on a summary level about principal additions to, and withdrawals from, BLMIS customer accounts,[25] and are generally available for all customer accounts from January 1982 through November 2008.[26] Similarly, PMTs provide transaction-level detail related to each customer account on a monthly basis, and are available for the time periods from January 1985 through December 1986 and from January 1990 through December 1995.[27] The PMRs and PMTs provide alternate sources of information to supplement the chronological listings of cash and principal transactions used to perform the Principal Balance Calculation in the absence of a particular Customer Statement.[28]

At the evidentiary hearing, the Trustee will introduce testimony from former BLMIS employees[29] indicating that PMRs were used by BLMIS employees to track whether BLMIS

---

[24] Greenblatt Principal Balance Rpt. ¶ 40

[25] *Id.* ¶ 44.

[26] *Id.* ¶ 45.

[27] *Id.* ¶ 48.

[28] *Id*. ¶¶ 46, 49.

[29] As detailed in the Tr. Suppl. Br., the Trustee deposed five former BLMIS employees including those who were directly responsible for the PW Transactions and their accounting: Annette Bongiorno, Winifier Jackson, Dorothy Khan, Alethea Leung, and Joann Sala. *See* Tr. Suppl. Br. at 17–18. The Trustee's Prehearing Disclosures identified each of these former BLMIS employees witnesses whose testimony he intends to rely on at the evidentiary hearing on profit withdrawal.  *See* Decl. of David J. Sheehan in Support of the Trustee's Motions *in Limine* Numbers 1–4 at Ex. 1, ECF No. 14359.

accounts were meeting their targeted rates of return listed on the PMRs as expected rate of return by comparing them to the projected annualized rate of return.[30] BLMIS employees will testify that the PMRs showed profit withdrawals received by the accountholder on an annual basis.[31] Similarly, the Trustee will offer testimony indicating that along with the PMRs, PMTs were internal BLMIS "portfolio reports."[32] This testimony will confirm that PMTs included information on each account's capital additions, capital withdrawals and PW Transactions on a per-transaction basis,[33] and that the transactions listed on PMTs in a given month matched the dates and amounts of those transactions provided on the Customer Statements.[34]

### 3.    Spiral Notebooks

BLMIS maintained handwritten stenographic (spiral-bound) notebooks (the "Spiral Notebooks"), referred to as "Check In" and "Check Out" notebooks. BLMIS employees will testify the Spiral Notebooks were used in the ordinary course of BLMIS's business to track transaction information related almost exclusively to check receipts and check disbursements. Each line item and/or group of transactions identified in these notebooks corresponds with a customer account number and/or a customer name and the checks to be sent to customers including PW Transactions.[35]

---

[30] *See* Decl. of David J. Sheehan in Support of the Trustee's Memorandum of Law in Opposition to Participating Claimants' Motions *in Limine* dated Nov. 18, 2016 ("Sheehan Decl.") at Ex. 1 ("Bongiorno Tr.") 110:25–113:17; *see also* Sheehan Decl., Ex. 2 ("Sala Tr.") 117:23–120:18; Brown Decl. Ex. PW-35 (Trustee Ex. 39), ECF No. 13875-32; Brown Decl. Ex. PW-31 (Trustee Ex. 35), ECF No. 13875-28.

[31] Bongiorno Tr. 115:10–116:14; Sheehan Decl., Ex. 3 ("Jackson Tr.") 86:19–87:5; Brown Decl. Ex. PW-30 (Trustee Ex. 34), ECF No. 13875-27; Brown Decl. Ex. PW-36 (Trustee Ex. 40), ECF No. 13875-33. Brown Decl. Ex. PW-40 (Trustee Ex. 44), ECF No. 13875-37.

[32] Bongiorno Tr. 115:10–116:14; Sheehan Decl., Ex. 3 ("Jackson Tr.") 86:19–87:5; Brown Decl. Ex. PW-30 (Trustee Ex. 34), ECF No. 13875-27; Brown Decl. Ex. PW-36 (Trustee Ex. 40), ECF No. 13875-33.

[33] *See* Sheehan Decl., Ex. 4 ("Leung Tr.") 118:21–120:20; Bongiorno Tr. 115:10–21; Brown Decl. Ex. PW-30 (Trustee Ex. 34), ECF No. 13875-27; Brown Decl. Ex. PW-36 (Trustee Ex. 40), ECF No. 13875-33.

[34] Bongiorno Tr. 116:20–118:4.

[35] Greenblatt Principal Balance Rpt. ¶ 51; Bongiorno Tr. 43:20–22, 47:11–48:13; 131:1–13; Second Supplemental Analysis of the Profit Withdrawal Transactions dated June 2, 2016, Second Decl. of Matthew B. Greenblatt Ex. 2, ECF No. 13869-7 ("Greenblatt Second Suppl. PW Rpt.") ¶ 21–24.

The Trustee will offer testimony from former employees that BLMIS used the "Check Out" Spiral Notebook to record information related to the issuance of PW Transaction checks being sent to customers, prior to the automation of PW Transactions within the AS/400 Computer System.[36] The employees will also testify that after the PWs were automated, the Spiral Notebook was used for PW checks only when a check was manually entered into the AS/400 Computer System.[37] *See infra* Section VII.A. This manual entry was done if, for example, a check was lost in the mail and needed to be re-issued.[38]

As detailed in the Trustee's Supplemental PW Brief, Mr. Blecker's name appears at least four times in the Check Out Spiral Notebooks and accounts related to the Blums appear at least six times in the Check Out Spiral Notebooks.[39] Those entries for Mr. Blecker and the Blums correspond to the Customer Statements showing entries for PW transactions (*i.e.*, "Check Liberty Natl") for the same amounts listed in the Spiral Notebooks.[40]

### 4. BLMIS House 17 Manual

The Madoff Investment Securities House 17 Manual (the "House 17 Manual") described day-to-day operations of the BLMIS Investment Advisory business ("IA Business").[41] It contained detailed protocols, instructions, processes and procedures related to the AS/400

---

[36] *See* Bongiorno Tr. 130:24–136:18; Sala Tr. 163:13–164:9; *see also* Brown Decl. Ex. PW-45 (Trustee Ex. 49), ECF No. 13875-42; Brown Decl. Ex. PW-53 (Trustee Ex. 61), ECF No. 13875-49, at HWN00001538, HWN00001651, HWN00001655.

[37] Bongiorno Tr. 42:4–43:8.

[38] *See also* Bongiorno Tr. 91:16–93:22; Brown Decl. Ex. PW-45 (Trustee Ex. 49), ECF No. 13875-42.

[39] *See* Brown Decl. Ex. PW-53 (Trustee Ex. 61), ECF No. 13875-49, at HWN00001651, HWN00001655.

[40] Sala Tr. 122:1–126:11, 131:24–138:23, 151:23–155:8; Bongiorno Tr. 90:22–100:23; Greenblatt Second Suppl. PW Rpt. ¶ 27; Brown Decl. Ex. PW-20 (Trustee Ex. 22), ECF No. 13875-17, at HWN00001651, Brown Decl. Ex. PW-53 (Trustee Ex. 61), ECF No. 13875-49, at HWN00001655; Brown Decl. Ex. PW-37 (Trustee Ex. 41), ECF No. 13875-34; Brown Decl. Ex. PW-39 (Trustee Ex. 43), ECF No. 13875-36; Brown Decl. Ex. PW-44 (Trustee Ex. 48), ECF No. 13875-41.

[41] Greenblatt PW Rpt. ¶ 26.

Computer System, including PW Transactions.[42]    The House 17 Manual contained the

"Cash/Securities" transaction codes that identified the category assigned to the transactions that

were entered into the AS/400 Computer System, including the following "Check Codes:" (1)

"CA" for capital addition; (2) "CW" for capital withdrawal; and (3) "PW" for profit

withdrawal.[43] Of these transaction codes, the House 17 Manual instructs that PW and CW checks

must be punched as debits.[44]

### 5.    BLMIS Bank Records

Ms. Collura also reviewed and analyzed BLMIS bank records  for the Ten Year Period

preceding Madoff's arrest.    These records included cancelled checks, monthly statements,

deposit slips and deposited checks for two JPMorgan Chase accounts (the "703 account" and the

"509 account") and one Bankers Trust account (the "Bankers Trust account") (collectively,

"BLMIS Bank Records").[45]    During the Ten Year Period, 99% of the cash deposit and

withdrawal transactions appearing on BLMIS Customer Statements were reconciled to BLMIS

Bank Records.[46]

### 6.    Customer Files

BLMIS maintained customer files related to each IA Business customer account,

organized by account number.[47]    The Trustee will offer testimony from former BLMIS

employees that when a customer account was opened, BLMIS created folders for each account

---

[42] *Id.*

[43] *See* Greenblatt Principal Balance Rpt. ¶ 44; *see also* Brown Decl. Ex. PW-45 (Trustee Ex. 49), ECF No. 13875-42; Leung Tr. 84:19–85:21.

[44] *See supra*, note 40.

[45] Collura PW Rpt. ¶¶ 19–21. Certain of these bank records were located in BLMIS's files dating back to December 1998. In addition, the Trustee obtained records for the 703 JPMorgan Chase Accounts for the period December 2001 to December 2008. *Id.*

[46] *Id.* ¶ 33.

[47] *See, e.g.,* Brown Decl. Ex. PW-32 (Trustee Ex. 36), ECF No. 13875-29; Brown Decl. Ex. PW-38 (Trustee Ex. 42), ECF No. 13875-35; Brown Decl. Ex. PW-42 (Trustee Ex. 46), ECF No. 13875-39; *see also* Bongiorno Tr. 62:1–71:11; Jackson Tr. 66:5–68:1; Sala Tr. 61:4–63:5.

with the accountholder name and account number on the label.[48] BLMIS employees would then complete a "Name/Address Form" listing customer contact information and basic account information, including whether the account was a "send" or "reinvest" account ("Name/Address Forms").[49] The Name/Address Form was maintained in the customer files along with correspondence between the customer and BLMIS referencing incoming deposits and/or requests for withdrawals, customer contact information, and customer, trust, and other agreements.[50]

### 7. Customer Produced Records

And finally, certain BLMIS account holders and related third parties produced documents to the Trustee relevant to the profit withdrawal proceeding ("Customer Produced Records"). These Customer Produced Records consist of, among other things, bank records, accounting records and correspondence related to the PW Transactions. Ms. Collura used the Customer Produced Records to reconcile 46,127 PW Transactions reflected on BLMIS Customer Statements.[51]

### B. Specific Books and Records Relied on By the Trustee and his Experts

The Motions seek the wholesale exclusion of the Trustee's proposed summary exhibits 1 through 24-208 under Federal Rule of Evidence 1006, claiming the underlying documents contain inadmissible hearsay.[52] They do not, however, provide any specificity regarding which of the underlying documents contain the purportedly contain hearsay (and thus which of the summary exhibits they claim are inadmissible). For the Court's convenience, the Trustee has

---

[48] *Id.*

[49] *See supra* note 45.

[50] Sala Tr. 36:9–37:8; Bongiorno Tr. 62:1–63:2; *see also* Collura PW Rpt. ¶¶ 37–39.

[51] Collura PW Rpt. ¶ 41.

[52] Blum Br. at 26 ("Likewise, Greenblatt purports to summarize Madoff Securities materials related to the 6,148 PW notations from 1995-2008 for which he could find trading data. Whatever their relevance, these materials are hearsay.").

attached a chart summarizing the Trustee's proposed summary exhibits, the documents types used to create each exhibit, and the dates on which the Trustee produced the underlying source documents to the Participating Claimants.[53]

### C.    S and R Instructions Were Not Relied on by the Experts

The Participating Claimants devote substantial argument to the "S and R marginalia"—identified by the Participating Claimants as handwritten notations contained within "various internal records."[54]  However, while relevant to this proceeding, the Experts did not rely on these S and R instructions in reaching their opinions.[55]

S and R instructions appeared only on Name/Address Forms contained in most customer files, and, in some instances, on the front or back of the file folder comprising the customer files.[56] The meaning of S and R instructions on the Name/Address forms is unambiguous. The form itself specifically define "S" as "Send" and "R" as "Reinvest" as it relates to profits, interest, and dividends, as shown below.[57]



---

[53] *See* Sheehan Decl. Ex. 15.

[54] *See* Blum Br. at 1–2.

[55] The S and R instructions appear on the name and address forms contained in the customer files.

[56] When customers wrote to request changes to the "Send" or "Reinvest" election, the keypunch operators would make the corresponding change in the AS/400 Computer System. The date such a request was received or processed in the AS/400 Computer System was then indicated on the back of the customer file folder with the text "Change to R" or "Change to S," depending on the request from the customer. Bongiorno Tr. 37:23–38:18; Sala Tr. 215:20–218:12; Leung Tr. 101:6–108:3; *see also* Sheehan Decl., Ex. 5 ("Khan Tr.") Khan Tr. 75:7–17; Brown Decl. Ex. PW-50 (Trustee Ex. 57), ECF No. 13875-46; Brown Decl. Ex. PW-56 (Trustee Ex. 64), ECF No. 13875-78 and 13875-79.

[57] Brown Decl. Ex. PW-13 (Trustee Ex. 9), ECF No. 13875-74, at MADTBB03076725 (highlighting added).

Ms. Collura reviewed customer files for each BLMIS account where a PW Transaction was reported on the Customer Statement to identify correspondence where the BLMIS account holder was requesting that purported profits on the trading activity reflected on their BLMIS Customer Statements be sent directly to them. In total, she identified customer correspondence supporting more than 6000 of the 91,132 PW Transactions.[58] Ms. Collura did not rely on S and R instructions contained in customer files.

Mr. Greenblatt did not review customer files in connection with the Profit Withdrawal Proceeding.

## III.    INCORRECT ASSERTIONS REGARDING EXPERTS' METHODOLOGY

### A.    PW Transaction Population

The Participating Claimants mischaracterize both the Experts' analyses and updates thereto, including the removal or reclassification of certain transactions from the population of PW Transactions.[59] To be clear, a total of six transactions out of more than 91,000 were, upon further analysis, removed from the population of PW Transactions.[60]

Mr. Greenblatt and his team of professionals compiled a chronological listing of all cash and principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer account.[61]

In his July 14, 2015 PW Report, Mr. Greenblatt and his team identified a subset of cash transactions including (1) transactions referred to as "Profit Withdrawals" for which the

---

[58] Collura PW Rpt. ¶ 38.

[59] *See* Blum Br. at 38 (arguing that "[t]hroughout the course of this litigation, additional PW notations were excluded from consideration on the grounds that they did not represent PW checks sent to customers, but actually represented cancelled checks or tax payments. Rather than addressing these as PW notations as part of a risk of error analysis, Collura and Greenblatt simply removed them from the universe of PW notations under consideration.").

[60] Collura Suppl. PW Rpt. ¶ 11 n.4 (explaining update to the PW Transaction population from 91,138 to 91,132).

[61] *See* Greenblatt Principal Balance Rpt.

transaction is reflected on BLMIS Customer Statements as "PW," and (2) transactions reflected

on BLMIS Customer Statements as a transaction other than "PW" ("CW" or "JRNL" codes,

which referred to "capital withdrawal" and "journal," respectively) where the transaction

description includes a reference to a third party, interest and/or dividends.[62] This subset of cash

transactions then comprised the full population of "PW Transactions." [63]

Following submission of Mr. Greenblatt's July 14, 2015 PW report, FTI conducted

additional analyses of BLMIS books and records and determined that six transactions should be

removed from the PW Transaction population—four were actually tax withholdings transactions

rather than profit withdrawals, and two transactions were subsequently cancelled by BLMIS on a

later customer statement.[64]

The below chart, included in Mr. Greenblatt's Supplemental PW Report,[65] identifies the

complete and corrected population of PW Transactions, including the number of transactions in

each of six subcategories, delineated by how they were coded and described on the Customer

Statements.[66]

*Table 1: PW Transactions by Transaction Code & Description Category*

| Transaction Code | Transaction Description Category | # of Transactions | % of Total |
|---|---|---|---|
| PW | Check + Stock Name | 34,573 | 37.9% |
| PW | Check Only | 52,041 | 57.1% |
| PW | Check + Interest/Dividend | 3,868 | 4.2% |
| PW | Other Distributions | 59 | 0.1% |
| CW | Check + Stock Name | 484 | 0.5% |
| CW | Check + Interest/Dividend | 107 | 0.1% |
| | **Total:** | **91,132** | **100.0%** |

---

[62] *See* Greenblatt PW Rpt. ¶ 6.

[63] *Id*. ¶ 20.

[64] Greenblatt Suppl. PW Rpt. ¶ 16 and n.4; *see also infra* Part III.B.

[65] Greenblatt Suppl. PW Rpt.; Table 1, p.8.

[66] Greenblatt PW Rpt., Table 1, p. 9; Greenblatt Suppl. PW Rpt., Table 1, p. 8.

The Participating Claimants also erroneously claim that the Trustee recently discovered 96 "new" PW Transactions.[67] This is incorrect. Rather, Mr. Greenblatt's Supplemental PW Report merely updated the details for these 96 PW Transactions, as it relates to date, amount, type, and description.[68] These 96 transactions were neither added to, nor removed from, the population of 91,132 PW Transactions. Further, the Participating Claimants' assertions that the transactions indicated in the final two rows of the above table should be excluded because they bear the transaction code "CW" is incorrect. The Experts' analyses revealed that though these transactions were coded CW instead of PW, they possessed the characteristics of PW Transactions.

### B.      Cancelled of PW Transactions

The Participating Claimants make numerous references in their Motions to the inappropriate or unexplained "*exclusion* of approximately 800 PW notations at the outset" as a means for the Trustee's Experts to reach a "desired conclusion."[69] These arguments, however, ignore how the Experts defined the population of PW Transactions and the implications thereof.

From his chronological listing of all cash and principal transactions for all BLMIS customer accounts from April 1, 1981 to December 11, 2008, Mr. Greenblatt identified from the Customer Statements 743 instances where a PW Transaction was reported, and then was subsequently cancelled.[70] The reason for these cancellations vary, but include requests from customers to cancel a withdrawal, checks returned to BLMIS because the customer chose to reinvest his or her profits, stop payments, or reissuance of a lost or damaged check.[71]

---

[67] Blum Br. at 19–20.

[68] Greenblatt Suppl. PW Rpt. ¶ 16 and n.4.

[69] Blum Br. at 38 (emphasis in original).

[70] Greenblatt Suppl. PW Rpt. ¶ 16 and n. 5.

[71] Bongiorno Tr. 92:22–93:21; *see also* Sheehan Decl. Ex. 7 ("Albert Trust Customer File") at MADTBB01988111.

In instances where a PW Transaction was cancelled but a PW Transaction check was later reissued, this subsequent PW Transaction was captured in the population.[72] The exclusion of the initial and cancelled transaction is necessary to avoid misrepresenting the actual population of PW Transactions or double counting cancelled PW Transactions that later appear.

The following example from Participating Account 1A0011 evidences one such cancellation. The July 1996 Customer Statement for Henrietta Albert Trust shows BLMIS issued a PW check on July 5, 1996 for $10,718.63 with the description of "Check Monsanto."[73] On July 22, 1996, the statement shows the July 5, 1996 check was cancelled and the balance was not reduced.

```
      HENRIETTA ALBERT TRUST
                                                            7/31/96       1
      Redacted
                                           1-A0011-1-0   Redacted 6828


                             BALANCE FORWARD                      630,501.53
      7/05                   CHECK MONSANTO              PW   10,718.63
      7/05        10,746 8051 FIDELITY CASH RESERVES SBI  1               10,746.00
      7/22                   FIDELITY CASH RESERVES SBI     DIV                 10.43
                             DIV 7/05/96
      7/22                   CANCEL CHECK 7/5             PW               10,718.63
      7/31        10,757  71791 FIDELITY CASH RESERVES SBI  1   10,757.00
                             NEW BALANCE                          630,500.96

                             SECURITY POSITIONS
                   9,998     7,603  DELTA AIRLINES INC
                             DELTA AIRLINES
                             PFD SERIES C DEPOSITORY SHARES
                   10,757           FIDELITY CASH RESERVES SBI
```

Correspondence in the customer file further confirms the July 1996 Customer Statement accurately reflects the issuance of the July 5, 1996 PW check described as "Check Monsanto," which was made payable to the account holder and sent to the account holder, as well as its

---

[72] *Id.*

[73] *See* Sheehan Decl. Ex. 6 ("Albert Trust July 1996 Statement") at MDPTPP00002775.

subsequent cancellation.[74] The customer decided not to cash the check, instead returning it to

BLMIS. Once the check was returned, the related PW Transaction was cancelled.

```
                              Henrietta Albert Trust
                       Redacted

Bernard L. Madoff                    RE: Account #1-A0011-1-0
885 Third Ave.
New York, NY 10022

ATTN: Annette Bongiorno

Dear Annette:

Enclosed you will find check #57909, payable to Henrietta Albert
Trust, in the amount of $10,718.63.  I would like this check to be
re-deposited in my account and all future profits to be re-invested.

Thank you in advance.

Sincerely yours,

Gloria Sandler

Gloria Sandler, Trustee
```

As this example illustrates, the BLMIS books and records accurately reflect cancellations

to ensure that cash transactions were being properly tracked.

### C.    PW Time Period

Mr. Blecker's motion claims the Trustee's Experts identified a defined "PW Period," but

provide inconsistent start and end dates for that period.[75]  Regardless of the exact start or end

dates referenced in Mr. Blecker's motion, neither Mr. Greenblatt nor Ms. Collura identify a "PW

Period."

---

[74] See Albert Trust Customer File at MADTBB01988111.

[75] See Blecker Br. at 7, 10 (inconsistently claiming the "PW Period" began in April 1981 or September 1983 and ended in either 1998 or July 2000).

20

Mr. Blecker also inconsistently claims no PW Transactions occurred after 1998 ("In fact, the PW transactions did not occur after 1998"), but at other times indicates there were no PW Transactions after July 2000 ("[the Trustee's Experts] admit that there were no PW Transactions after July 2000.").[76]   Again, regardless of whether the date is 1998 or July 2000, this is simply incorrect.  Mr. Greenblatt's PW Report indicates that there were no transactions after July 2000 with a transaction code of "PW" *and* a corresponding transaction description that includes "Check + Company Name,"[77] it further makes clear there were other PW Transactions reported on Customer Statements through October 14, 2008.  The Participating Claimants thus arbitrarily define their own "PW Period" so as to ignore the PW Transactions occurring between July 2000 and October 14, 2008.[78]

Mr. Blecker also provides no argument or support for their assertion that the "PW Period" did not begin until November 1995 beyond a simple sentence explaining that Mr. Greenblatt should not have included "the period from November 1978 through November 1995, for which the Trustee has some Customer Statements on microfilm."[79]   First, they are incorrect as to the available sources of data during that time period.  Customer Statements were generated by the AS/400 Computer System for at least part of this time period.  Regardless of the data source for the Customer Statements, they are all Customer Statements reporting PW Transactions.  There is no basis in law or fact to support this arbitrary delineation.

### D.    PW Transactions in Norman Levy's Account

The Experts analyzed all of the PW Transactions on a transaction-by-transaction basis for purposes of calculating net equity.  In fact, Exhibit 7 to Ms. Collura's July 14, 2015 Report lists

---

[76] Blecker Br. at 7, 8.

[77] Greenblatt Suppl. PW Rpt. ¶ 39.

[78] Greenblatt Suppl. PW Rpt., Ex. 3; Collura PW Rpt., Ex. 7.

[79] Blecker Br. at 10.

every PW Transaction with columns identifying to which documents, if any, she was able to

reconcile each transaction.[80] As Ms. Collura's report clearly notes, PW Transactions were found

in Norman F. Levy's BLMIS customer account 1L0027. The July 14, 2015 Report indicates that

slightly more than 50%, or approximately 47,000, of the total PW Transaction population relate

to Mr. Levy's account.[81] There is no basis to exclude PW Transactions based simply on the

identity of a particular accountholder. Mr. Blecker, who objects to the inclusions of Mr. Levy's

PW Transactions, has offered no valid explanation for his position.

## **ARGUMENT**

## IV.    **PARTICIPATING CLAIMANTS MISUNDERSTAND THE SCOPE OF THESE PROCEEDINGS**

The Participating Claimants are incorrect about the nature of these proceedings and

disagree between and amongst themselves about the scope of the issues to be decided by this

Court. The Blums argue that this Court should solely determine their claims, completely

disregarding the omnibus nature of these proceedings. Thereby, the Blums essentially concede

that PW Transactions are withdrawals, stating that while the Trustee's treatment of PWs as

debits "may be accurate for a number of Madoff Securities accounts, the Claimants before the

Court did not request or receive such withdrawals, and the Trustee's computation of their

respective SIPA customer claims is inaccurate."[82]   Mr. Blecker implicitly disagrees, engaging in

argument regarding the larger meaning of PW.[83]

---

[80] Collura PW Rpt. Ex. 7.

[81] Collura PW Rpt. n.10.

[82] Blum. Br. at 1.  The Blums argue that the Trustee's evidence is irrelevant and inadmissible, and the Court should exclude any evidence regarding any other claimant. *See* Blum Br. at 2-3. It is not clear whether Mr. Blecker shares this view. He has adopted the arguments made in the Blum Brief, but he also argues that the Trustee's experts cannot establish what PW means, suggesting a broader view of the proceedings. *See generally*, Blecker Br.

[83] Blecker Br. at 12-13.

From the beginning, the purpose of this proceeding has been to determine whether the Trustee properly treated PW Transactions as debits when calculating customers' net equity. During the litigation of the inter-account transfer issue, Mr. Blecker objected to the Trustee's characterization of the PW Transactions, and thereafter the Trustee asked the Court to authorize an omnibus proceeding to resolve all objections relating to the Trustee's treatment of the PW Transactions.[84] In authorizing an omnibus proceeding, the Court limited participation to those claimants with PW Transactions in their account, or in a transferor account, so it could resolve the specific issue as it pertained to claimants.[85]

Given the nature of this omnibus proceeding, it is entirely appropriate for the Trustee to introduce evidence regarding his treatment of PW Transactions, which necessarily involves evidence beyond that related to the Participating Claimants. Further, because PW Transactions were treated by the Trustee as simply another type of cash withdrawal, evidence regarding the Trustee's calculation of net equity as a whole is also relevant.

Nevertheless, the Trustee agrees that it would be expedient to concurrently resolve the claims of the Blums and Mr. Blecker as part of this proceeding. All parties may therefore present or challenge evidence on the omnibus issue of the Trustee's treatment of PW Transactions to lay the groundwork for resolution of their individual customer claims objections. As outlined in the Trustee's Supplemental Brief, the Participating Claimants bear the burden of proof with regard to each transaction for which he claims customer status. *See, e.g.*, *Secs. Inv'r Prot. Corp. v. Pepperdine Univ. (In re Brentwood Secs., Inc.)*, 925 F.2d 325, 327 (9th Cir. 1991) ("[W]e must determine whether, on this record, any of [the customers] has established that they entrusted cash

---

[84] *See* Motion for Order Establishing Schedule for Limited Discovery and Briefing on Profit Withdrawal Issue at 3, Feb. 25, 2015, ECF No. 9357; *see also* Hearing Transcript July 6, 2016 at 8-9, ECF No. 13621 ("There is this kind of larger issue of what PW means, without regard, necessarily, to any particular claimant . . . .").

[85] *See* Order Establishing Schedule For Limited Discovery and Briefing on Profit Withdrawal Issue, June 25, 2015, ECF No. 10266.

or securities to Brentwood."); *Secs. Inv'r Prot. Corp. v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 471 (5th Cir. 1985) ("Customer status 'in the air' is insufficient to confer the SIPA's protection on a given transaction."); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997) ("[T]he Claimants must prove that they are 'customers' and that the equity in the Deposit Accounts is 'customer property' under SIPA.").[86] After a claimant proffers evidence to support his customer claim, a trustee then has the opportunity to rebut the claimant's evidence.[87]   The Trustee's evidence from the BLMIS books and records is also part of the evidence he will offer as rebuttal evidence to counter any of the claimants assertions that they did not receive PW Transactions.   The Trustee and his Experts have determined that the cash transactions are reliable; the Trustee is not required to prove that the Claimants received a check for each PW Transaction.

Finally, resolving both the omnibus issue and the Participating Claimants' claims objections would require a consideration of the same evidence. A chart summarizing the Trustee's proposed exhibits is attached to the Sheehan Declaration.[88]

For these reasons, the Trustee respectfully submits that the proceeding should determine whether the Trustee properly treated PW Transactions as debits when calculating customer's net equity, as well as resolve the claims of the Blums and Mr. Blecker.

## V.    THE EXPERTS' TESTIMONY IS ADMISSIBLE

### A.    The Trustee is Entitled to Rely on Experts to Analyze BLMIS Books and Records

When a trustee liquidates a debtor, the trustee must piece together the books and records based on the information to which he has access in order to determine the amount owed, if any,

---

[86] Trustee Suppl. Br. at 62-65.

[87] *See* Trustee Suppl. Br. at 49–58.

[88] Sheehan Decl. Ex. 14.

to each customer.[89] *In re Randall's Island Family Golf Centers, Inc.*, 290 B.R. 55, 65 (Bankr. S.D.N.Y. 2003). In this case, the Trustee was tasked with investigating the fraud at BLMIS—a fraud spanning decades—reconstructing the books and records and reconciling thousands of accounts in order to return monies owed to customers of BLMIS. As this Court has recognized, the size and length of the BLMIS fraud required the Trustee to hire professionals to assist him.[90]

It is these professionals—the Experts—who will provide the court with testimony regarding the BLMIS books and records and the determination of PW Transactions. Bankruptcy courts regularly permit expert witnesses to testify as to the debtor's books and records. *In re Bonham*, 251 B.R. 113, 132 (Bankr. D. Alaska 2000) (holding that the Trustee's witness was qualified to testify and that the Trustee had proved the existence of a Ponzi scheme); *see also Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, No. 95-08203, 1998 WL 160039, at *1-2, 5, 8 (Bankr. S.D.N.Y. Apr. 3, 1998) (holding that the trustee's expert, whom the trustee retained to assist him in reconstructing a SIPA debtor's books and records, was a proper expert witness; *In re Petters Co., Inc.*, 506 B.R. 784, 804 (Bankr. D. Minn. 2013) (finding CPA with certification in financial forensics and experience with reconstructing books and records qualified to opine on extent of commingling of debtors' funds).

---

[89] SIPA requires the Trustee to determine claims "insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b). As stated in Section IV, when a claimant objects to a trustee's determination in a SIPA case, the claimant must prove that he is a customer as to each transaction. *Stafford v. Giddens (In re New Times Secs. Svcs., Inc.)*, 463 F.3d 125, 129 (2d Cir. 2006). Nonetheless, absent convincing evidence from the Participating Claimants, the Trustee's experts have produced sufficient evidence to show that the Trustee correctly determined Participating Claimants' claims regarding the PW Transactions.

[90] *Cf.* Hr'g Tr. on Motion to Allow Customer Claim of Aaron Blecker at 32, Feb. 24, 2016, ECF No. 2885 (THE COURT: "Can't the trustee in a SIPA case hire an expert to help them understand the books and records. You know, he's a trustee. He inherits all this stuff. And he doesn't know what it means. How does he find out what it means?").

The Participating Claimants assert that the reconstruction and interpretation of BLMIS books and records is somehow not an appropriate subject for expert testimony.[91]  However, "[f]orensic accountants routinely rely, 'surely to no one's surprise, on the books and records and financial information.'"  *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1039-40 (8th Cir. 2011).  "[E]xpert testimony is admissible if it will simply help the trier of fact to understand the facts already in the record, even if all it does is put those facts in context."  4 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE § 702.03[1] (2d ed. 2015).

Here, the Experts analyzed the BLMIS records to determine, among other things, that the cash and principal transactions in the books and records were reliable. When the Trustee must present evidence on these books and records to the Court, he can rely on appropriate expert witnesses to present the evidence. *Adler, Coleman Clearing Corp.*, 1998 WL 160039, at *1-2 (denying a motion *in limine* and holding that the trustee's expert, whom the trustee retained to assist him in reconstructing a SIPA debtor's books and records, was a proper expert witness). The Trustee's retention of the Experts is analogous to the retentions in *Adler, Coleman Clearing Corp.*, *Bonham*, and *Petters*, all of which found that the forensic accountants hired to analyze a debtor's books and records were qualified and that this analysis constituted admissible expert testimony.

**B.    Admissibility of Expert Testimony**

Federal Rule of Evidence 702 governs the admission of expert testimony.  A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[91] Blum Br. at 39.

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The standard for expert admissibility is "generally lenient" in the Second Circuit, and the rejection of expert testimony is the "exception rather than the rule." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702 advisory committee's notes). This leniency is manifest when the court is the trier of fact. "There is not a concern for juror confusion or potential prejudice, [so] the court has considerable discretion in admitting the proffered testimony at trial" and determining the appropriate weight of the testimony at that time. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 n.1 (S.D.N.Y. 2007).

In determining whether expert testimony should be admitted, the court looks to ensure that "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert  v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  This requires a court to determine: "(1) whether the witness is qualified to be an expert; (2) whether the [expert's] opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 667 (E.D.N.Y. 2013) (citing *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005)). The purpose of the inquiry is to "make certain that an expert, whether basing testimony upon professional studies or professional experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*

27

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's failure to satisfy "any or all of

the Daubert factors" does not necessarily preclude the testimony, but instead the opposing party

would be "free to explore any such shortcomings on cross-examination . . . keeping in mind the

presumption in favor of the admissibility of evidence." *Emig v. Electrolux Home Prods. Inc.*,

No. 06-cv-4791, 2008 WL 4200988, at *7 (S.D.N.Y. Sept. 11, 2008).

      The Experts and their proposed testimony meet the *Daubert* and Rule 702 requirements.

### C.    As Forensic Accountants and Certified Fraud Examiners, the Trustee's Experts Are Qualified to Offer Expert Testimony in this Proceeding

      Contrary to challenges from the Participating Claimants, Mr. Greenblatt and Ms. Collura

are more than qualified to serve as experts in this matter. Mr. Blecker contests the qualifications

of both Mr. Greenblatt and Ms. Collura on the basis that neither "worked for Madoff; neither has

personal knowledge of how Madoff accounted for entries on customer statements; neither is an

expert on Madoff's journal entries; and neither has expertise in brokerage data entries."[92] On

more limited grounds, the Participating Claimants challenge only Mr. Greenblatt's qualifications

to "offer expert testimony regarding any 'inference' as to the meaning of PW notations that pre-

date the period Collura examined."[93] But these complaints are not valid challenges to Mr.

Greenblatt's or Ms. Collura's qualifications.

      The threshold inquiry of expert admissibility is whether the expert is qualified. *Boykin v.*

*Western Exp., Inc.*, No. 12-cv-7428, 2015 WL 539423, at *3 (S.D.N.Y. Feb. 6, 2015). The

analysis of an expert's qualifications typically comprises two prongs. *523 IP LLC v.*

*CureMD.Com*, 48 F. Supp. 3d 600, 641-42 (S.D.N.Y. 2014). First, courts assess the witness's

background and qualifications with respect to the relevant discipline. *Id.* Second, the court

---

[92] Blecker Br. at 6.

[93] Blum Br. at 33.

"compare[s] the area in which the witness has superior knowledge, education, experience or skill with the subject matter of the proffered testimony." *Id.* at 642 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

The Trustee will provide evidence and testimony at trial to establish the qualifications of his Experts to offer opinions on the BLMIS books and records and the determination of PW Transactions. As set forth in Section I, Ms. Collura and Mr. Greenblatt are forensic accountants and certified fraud examiners with extensive experience in the relevant discipline—the forensic analysis of the BLMIS financial records. Their practical experience in forensic accounting is frequently considered "specialized knowledge" sufficient to form a basis to qualify expert testimony, particularly in cases involving the reconstruction of a defunct company's books and records. *See, e.g., Adler, Coleman Clearing Corp.*, 1998 WL 160039, at *5–6 (denying motion *in limine* to exclude expert testimony of a SIPA trustee's forensic accountant because witness was qualified based on his overall education); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003); *In re Petters Co., Inc.*, 506 B.R. 784, 804-05 (Bankr. D. Minn. 2013) ("[g]iven the sprawling mess the Trustee inherited on the failure of PCI, he had to ascertain whether, and how, the estate(s) could be administered and allocated to claimants on a basis structured from available documentation for transactions and liabilities"); *see also In re Bonham*, 251 B.R. 113, 132 (D. Alaska 2000) (admitting expert to testify to the books and records of a business that ran a Ponzi scheme, "[t]he type of expertise truly needed in this case is someone who can take poorly kept, incomplete records, involving commingled funds, and reconstruct the business out of them.").

Notwithstanding the Experts' qualifications and the issues relevant to the PW Transactions, the Participating Claimants rely on *Louis Vuitton Malletier v. Dooney & Burke* to

29

argue that Mr. Greenblatt is not qualified to offer testimony on the "inference" regarding PW

Transactions.[94]    *Louis Vuitton Malletier* is unpersuasive in this regard.    There, the court

determined that the expert in a trademark infringement action was qualified in colorimetry but

that qualification did not provide a basis for him to render an opinion on probability theory

because he was not a statistician.    *Louis Vuitton Malletier v. Dooney & Burke*, 525 F. Supp. 2d

558, 643-44 (S.D.N.Y. 2007) (explaining that a qualified expert in one subject area is not

qualified as an expert for all purposes).    There is no such dichotomy here.    Neither Ms. Collura

nor Mr. Greenblatt is being offered to testify on a subject outside of their qualifications.    The

Experts' analyses and opinions, including Mr. Greenblatt's opinion that PW Transactions are

properly treated as debits, fall squarely within the areas of the Experts' expertise as forensic

accountants and certified fraud examiners—reconstructing and analyzing the books and records

and determining how much is owed, if any, to a BLMIS customer.    If the Participating Claimants

dispute the Experts' opinions, those challenges go to the weight of the evidence, not the

qualification of the Experts to provide testimony in areas directly within their expertise.    *See*

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995); *Ulico Cas. Co. v. Clove*

*Capital Mgmt.*, 217 F. Supp. 2d 311, 318 (N.D.N.Y. 2002).

### D.    Experts' Methodology Satisfies Rule 702 and *Daubert*

In *Daubert*, the Supreme Court set forth the following factors that the courts may

consider in determining the reliability of the methodology used by a proffered expert: (1)

whether the theory or technique can be tested; (2) whether the theory or technique has been

subjected to peer review and publication; (3) whether the technique has a known or potential rate

---

[94] Blum Br. at 32-33.

of error; and (4) whether the theory or technique has been met with widespread acceptance. *See Daubert*, 509 U.S. at 593-94.

In an attempt to discredit the Experts, the Participating Claimants claim that the Experts' testimony falls short of the scientific methodology standard under *Daubert*. Specifically, they argue Mr. Greenblatt's analysis is *ipse dixit*, and not the product of reliable principles and methods because his testimony amounts to "statistical conclusions that lack any foundation, explanation or metric by which they could be tested." And, absent any offer of evidence, they speculate that bank records, if available, would show the PW Transactions were not debits.[95] This argument fails.

Prior to the close of discovery, the Experts submitted reports detailing their analysis and opinions and the Trustee produced the documents they considered. The Participating Claimants chose not to depose either Ms. Collura or Mr. Greenblatt. At the evidentiary hearing, the Experts will offer testimony on their respective methodologies, that their methodology is consistent with the methodology used by forensic accountants and fraud examiners, and that they have previously and consistently employed their methodologies. Mr. Greenblatt and Ms. Collura will further testify as to their analysis of the books and records of BLMIS, the application of their methodologies, and the basis for their conclusions. *See* Section I.B, I.D, *supra.* And finally, Mr. Greenblatt and Ms. Collura will demonstrate that based on the data they reviewed and relied upon, which has been produced to the Participating Claimants, their methodologies and conclusions are replicable and reliable, and should therefore be admissible.

---

[95] Blum Br. at 36 ("Greenblatt's inference that all of the PW notations correspond to PW checks is classic *ipse dixit*. . . . Greenblatt . . . attempts to infer allegedly probable facts without setting out the statistical significance of the findings, explaining the methods or principles that support the inference, or quantifying the degree of certainty with which the inference can be drawn.").

Contrary to the Participating Claimants' arguments, Mr. Greenblatt's methodology need not be subject to peer review and publication or set out a rate of error to be reliable.[96] The Supreme Court has emphasized that the Rule 702 inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and that "a trial court may consider one or more of the more specific factors that Daubert mentioned [but that] Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141.    As he will testify, the methodology employed by Mr. Greenblatt is one of the methodologies employed by forensic accountants and fraud examiners.    To the extent that application of the methodology requires him to use his professional judgment, including drawing reasonable conclusions, that judgment does not render his opinions unreliable or inadmissible.  *See Buchwald v. Renco Grp.*, 539 B.R. 31, 41, 44 (S.D.N.Y. 2015) (permitting expert to render opinions based, in part, on exercise of professional judgment), *BL Devel. Corp. v. Masella (In re Masella)*, No. 05-24302, Adv. No. 06-2010, 2007 WL 2302312, at *3 (Bankr. D. Conn. Aug. 7, 2007) (expert employing his professional judgment is not a basis for exclusion) (citing *In re Comm'l Fin. Svcs., Inc.*, 350 B.R. 520, 528-29 (Bankr. N.D. Okla. 2005)).

Likewise, the Participating Claimants' arguments as to their perceived errors in the Experts' analysis and opinions are not valid grounds to exclude their testimony. Mr. Blecker devotes significant attention to alleged distortions of the Experts' analyses, arguing that the Experts are biased because they are paid and that their analyses obfuscate the facts.[97]   Mr. Blecker believes that the analyses should have excluded certain non-PW transaction codes, including "CW" and "JRNL," as well as all of the PW Transactions involving Mr. Norman Levy.

---

[96] Blum Br. at 36-37.

[97] *See* Blecker Br. 8-13.

The pejorative accusation of bias is unsupported and unfounded. As any expert witness, the Experts are paid for their testimony, but those rates are fully disclosed in their reports and are in no way contingent upon the conclusions reached.[98] In any event, bias is a common subject for cross-examination of an expert; it does not provide a basis for excluding expert testimony. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 207-08 (S.D.N.Y. 2009) (holding that arguments about the factual foundation of an expert's opinions and her financial ties are a proper subject for cross-examination but do not warrant exclusion at trial).

The charge of obfuscation is similarly unsupported and unfounded. As discussed in Section I, in order to understand what PW Transactions are, the Experts analyzed transaction codes other than PW and identified transactions that, though they had different transaction codes, were properly included in the PW population. For example, the Experts reviewed transactions coded as CW that had the exact same characteristics as those coded as PW. The Experts will testify that they considered the BLMIS books and records in order to reach the conclusions set forth in their respective reports, that included "CW" and "JRNL" entries when appropriate in their professional judgment, and when appropriate included them in their analysis. And the Experts will further testify that there was no reason to exclude the transactions in the Levy account. Incredulously, on this latter point, Mr. Blecker offers no reason other than his beliefs of Mr. Levy's personal character.

Nor is the Experts' testimony speculative as to the existence and content of missing bank records. Rather, the Experts are drawing permissible, reasonable conclusions based upon their experience and forensic analysis. This testimony is well within the scope of Federal Rule of Evidence 702. Expert testimony is designed to permit experts to base inferences on a variety of

---

[98] Greenblatt Second Suppl. PW Rpt. ¶ 11.

data sources, and the Experts here make assumptions and inferences well within their expertise as both forensic accountants and fraud examiners. *See* Section I.A, 0, *supra*; *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 190 ("An expert is permitted to draw a conclusion from a set of observations based on extensive and specialized experience"); *see also* Ass'n of Certified Fraud Examiners' Code of Prof'l Standards, Section III(c)(2) (2014) ("Conclusions shall be supported with evidence that is relevant, reliable, and sufficient"). The fact that the Participating Claimants may disagree with an inference Mr. Greenblatt made based on his evaluation of the data does not render his methodology unreliable, nor render it inadmissible. *See Schulz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) ("[W]hether [expert's] theories are correct provided the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based."); *ProtoComm Corp. v. Novell Adv. Servs. Inc.*, 171 F. Supp. 2d 473, 480-81 (E.D. Pa. 2001) (finding reliable method where forensic accountant and certified fraud examiner "based his opinions on personal knowledge and experience as well as a seemingly copious review of a multitude of relevant business documents").[99]

### E. The Experts Rely on Sufficient Facts and Data

The Participating Claimants challenge to the sufficiency of the data reviewed by the Experts is likewise unavailing. To bolster this point, the Participating Claimants argue that the Experts speculate based on generalizations and observations concerning a "very narrow dataset"

---

[99] Unlike the case cited by the Blums to argue that Mr. Greenblatt must be a statistician before he can make a reasonable inference about records, Mr. Greenblatt in no way relies on probability theory to support his assumptions. *Cf. Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 525 F. Supp. 2d at 642.

and that the Experts base their reports, in part, on "missing information."[100] The Participating

Claimants also argue that PW Transactions in BLMIS records cannot form the basis of expert

opinion because they constitute inadmissible hearsay.[101]

To the contrary, the Experts reviewed and analyzed extensive data contained in BLMIS

books and records, and further narrowed this data based on their professional judgment to those

relevant to the PW Transactions. This narrowing is permissible and does not render the

testimony inadmissible. *See Auto. Ins. Co. of Hartford, Connecticut v. Electrolux Home Prods.,*

*Inc.*, No. 10-cv-0011, 2012 WL 6629238, at *1 (S.D.N.Y. Dec. 20, 2012) (denying motion to

exclude expert, finding that data set was significantly narrowed but final data set used by expert

was relevant and sufficient); *see also Wright v. Stern*, 450 F. Supp. 2d 335, 361-62 (S.D.N.Y.

2006) (denying motion to exclude expert's testimony where opposing party claimed data set had

"so many errors that the ultimate analyses are rendered meaningless," where expert explained his

reasons for attributing weight to the data and what certain consistently coded errors indicated).

Any questions regarding whether data bears sufficient indicia of reliability is a matter of the

weight to be given to the evidence not its admissibility. *In re Methyl Tertiary Butyl Ether*

*("MTBE") Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 499 (S.D.N.Y. 2009) ("As the Second

Circuit has repeatedly counseled, concerns about the adequacy of data underpinning an expert

opinion are best addressed via cross-examination.").

The cases the Participating Claimants rely upon to support their assertion that the

Experts' data was insufficient are fully distinguishable. *Galvin v. Eli Lilly & Co.* rejected a fact

witness's affidavit about ex-post purchase-order practices as insufficient evidence that those

---

[100] Blum Br. at 33-34 ("missing information cannot be supplied by an ungrounded assumption that what is true at one point in time was also true at an earlier point in time.").

[101] The Blums also argue that "S" and "R" instructions in customer files cannot be relied upon.  It should be noted that neither Mr. Greenblatt nor Ms. Collura relied on the "S" or "R" instructions to render their opinions. *See supra* Section II.C.

same business practices were previously employed. 488 F.3d 1026, 1036 (D.C. Cir. 2007). In *Delehanty v. KLI, Inc.*, the court rejected an expert's attestation that a rusty ladder caused plaintiff's injuries because the ladder was inspected three months after the accident in question. 663 F. Supp. 2d 127, 133 (E.D.N.Y. 2009). Instead, the Experts' opinions on the PW Transactions in customer accounts over the course of decades was the result of an extensive forensic investigation and consistent with BLMIS's books and records, not one-time ad hoc inspections. The Participating Claimants' reliance on *Ricciardi* in support of their argument is equally misplaced.[102] The notation impermissibly relied upon in *Ricciardi* was a single note on a medical record used to prove that negligent acts during plaintiffs surgery caused plaintiff's injuries. The expert testified that the note was "bizarre" and that "never before had he seen such a statement in a hospital chart." *Ricciardi v. Children's Hosp. Med. Ctr.,* 811 F.2d 18, 25 (1st Cir. 1987). Inapposite here, the PW notation appeared in over 91,000 transactions over a more than twenty five-year period.

Finally, the Participating Claimants argue that the Experts should be excluded because they relied upon hearsay in their analysis of the PW Transactions. As discussed in Section VII below, the BLMIS books and records are admissible because they fall into the exceptions to the hearsay rule under Federal Rules of Evidence 803 and 807. Even if certain of the documents relied upon by the Experts were determined to contain hearsay, expert witnesses are routinely permitted to rely on hearsay, provided that the hearsay reviewed is ordinarily a source of information for an expert in the field. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted"); *In re Colonial Realty Co.*, 209 B.R. 819,

---

[102] Blum Br. at 41.

822 (Bankr. D. Conn. 1997); *Stenger v. World Harvest Church, Inc.*, No. 04-cv-00151, 2006 WL 870310, at *12 (N.D. Ga. Mar. 31, 2006) (finding that the fact that forensic accountant's analysis in Ponzi case was predicated in part on hearsay "pose[d] no obstacle to the Court's consideration of his conclusion").

### F.    The Purported Errors in the Experts' Testimony Raised by the Claimants are Not the Basis for Admissibility Challenges

The Participating Claimants challenges to alleged errors in the methodology, analyses and conclusions of the Experts, are not grounds for exclusion of the Experts under Rule 702. The Trustee's Experts will offer the requisite testimony at trial as to the reliability of their methodologies, analyses, and opinions. If the Participating Claimants wish to challenge what they perceive to be errors in the data or the methodology or the analysis considered and employed by Ms. Collura and Mr. Greenblatt, they are free to do so on cross-examination. *See Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, No. 14-cv-8467, 2016 WL 5416498, at *10 (S.D.N.Y. Sept. 28, 2016) (courts prefer to allow weaknesses in expert opinion to be pointed out on cross-examination instead of completely excluding the testimony) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)); *Buchwald v. Renco Grp.*, 539 B.R. 31, 43 (S.D.N.Y. 2015) (finding expert's testimony admissible where defendant had ample opportunity to attack expert's conclusions on cross-examination) (citing *Olin Corp. v. Certain Underwriters at Lloyd's London,* 468 F.3d 120, 134 (2d Cir. 2006)). Indeed, any contention that assumptions are unfounded go to the weight, not the admissibility of the testimony. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-cv-6201, 2015 WL 353929, at *4 (S.D.N.Y. Jan. 28, 2015); *see also ProtoComm Corp.*, 171 F. Supp. 2d at 481 ("[defendants] focus not on whether the reasoning is valid and the methodology reliable, but rather on whether the conclusions themselves are *correct.* That is not the proper inquiry in a test for admissibility").

The cases cited by Mr. Blecker are inapposite or have no relevance to these proceedings. *People v. Risley*, 214 N.Y. 75 (1915) is a pre-*Daubert* state-law criminal case that dealt with whether an expert improperly speculated whether the defendant's typewriter could have generated the print in question. *Id.* at 75-76. Similarly, *People v. Collins*, 438 P.2d 33 (Cal. 1968) is a state-law, pre-*Daubert* criminal case where the court erred in admitting a mathematical theory of probability of a suspect's characteristics. Here, the Experts are not offering opinions on the statistical probability that a particular claimant received a PW check or offering conclusions of law.

In sum, the challenges to the Experts' qualifications and methodology are not valid. *See Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11-cv-6188, 2012 WL 6000885, at *10 (S.D.N.Y. Dec. 3, 2012); *ProtoComm Corp.*, 171 F. Supp. 2d at 481 ("It appears to this Court that defendants are really arguing that [expert's] opinions are inaccurate in light of the facts. In other words, they focus not on whether the reasoning is valid and the methodology reliable, but rather on whether the conclusions themselves are *correct.* That is not the proper inquiry in a test for admissibility") (emphasis in original).

## VI.    THE ADMISSIBILITY OF THE BLMIS BOOKS AND RECORDS

The Participating Claimants move *in limine* to exclude certain BLMIS documents at the evidentiary hearing. Specifically, they argue that: (i) BLMIS documents other than those associated with their own customer accounts are not relevant to these proceedings;[103] (ii) the books and records of BLMIS are not reliable; and (iii) such records cannot be authenticated.[104] Each of these challenges fails for the reasons identified below.

---

[103] The Trustee assumes for purposes of his Opposition that by joining in the Blum's motion, Mr. Blecker did not intend to agree that his account documents are irrelevant to these proceedings. Blecker Br. at 3.

[104] Blum Br. at 8.

### A.      <u>The BLMIS Books and Records are Relevant</u>

Due to the omnibus nature of this proceeding and the issues for determination at the evidentiary hearing, the totality of BLMIS books and records are relevant to the Trustee's determination that PW Transactions are debits for purposes of calculating net equity.

The court has broad discretion to determine admissibility of evidence on relevance grounds. *See United States v. Rubin*, 37 F.3d 49, 52 (2d Cir. 1994) (citations omitted). Federal Rule of Evidence 401 defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Indeed, courts "start[] with the presumption that all evidence is presumed relevant and all relevant evidence is admissible, unless the opposing party can prove that it is precluded by the rules or its prejudice outweighs the probative value." *Official Comm. of Unsecured Creditors v. Israel Discount Bank of N.Y. (In re Oak Rock Fin., LLC)*, No. 13-72251, Adv. No. 14-08231, 2016 WL 5794717, at \*3 (Bankr. E.D.N.Y. Oct. 4, 2016); *see also United States v. Kelley*, 551 F.3d 171, 175 (2d Cir. 2009) (per curiam) ("all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded") (quoting *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004)).

The relevance of particular evidence cannot be determined without evaluating the context in which it will be used. As such, courts routinely refuse to exclude evidence *in limine* on relevance grounds, reserving decision for trial when the record is more fully developed. *See, e.g., Oak Rock Fin., LLC*, 2016 WL 5794717, at \*3 (refusing to make pre-trial determinations *in limine* regarding admissibility of evidence because its context could not be determined and directing parties to raise objections during trial); *In re Envirosolutions of N.Y., LLC*, 476 B.R. 88, 105, 107 (Bankr. S.D.N.Y. 2012) (declining to exclude evidence based on relevance grounds without a fully developed record).

The Blums' argue that BLMIS books and records are only relevant if they related to their own BLMIS accounts. This argument misses the mark. As described above, the PW proceeding is not solely an individual claims determination, but rather an omnibus proceeding determining the meaning of PW Transactions and whether the Trustee properly treated them as debits.

Even in an individual claims determination setting, the Trustee's evidence concerning the totality of BLMIS books and records, including other customer accounts, is still relevant to his methodologies and reasons for making an individual determination. The evidence in the BLMIS books and records consistently shows that over time PW Transactions are withdrawals, which is relevant to how PW Transactions are treated for individual claims.[105] The fact that Blum PW Transactions occurred at times different than PW Transactions in other accounts does not render such evidence irrelevant. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 651-53 (S.D.N.Y. 2015) (declining to exclude expert testimony as irrelevant, notwithstanding that the testimony addressed time periods <u>after</u> the date of the alleged misrepresentation). "[A] party may rely on evidence gleaned from any point in time to prove the truth or falsity of a representation of fact about a past event." *Id.* The Trustee does not determine individual customer claims in a vacuum and the Court should receive evidence that establishes how the Trustee has consistently applied the cash-in, cash-out methodology across all accounts. An analysis of all the available books and records supports only the conclusion that PW Transactions were withdrawals from all customer accounts for which they appeared on Customer Statements.[106]

---

[105] *See* Factual Background Sections I.B, I.D, *supra.*

[106] *Id.*

B.    **Cash Transactions Reported in the BLMIS Books and Records Are Reliable**

The Blums argue that the BLMIS books and records are untrustworthy because they were created to perpetuate a fraudulent scheme.[107] The Trustee does not dispute that BLMIS was a Ponzi scheme. That, however, does not render BLMIS books and records inherently unreliable. The Trustee is entitled to rely on the cash transactions in the BLMIS books and records.

Indeed, business records of an entity engaged in fraud are routinely relied upon admitted into evidence. *United States v. Kaiser*, 609 F.3d 556, 575 and n.6 (2d Cir. 2010) (admitting hand-written notes and finding fraudulent activity did not preclude admissibility under the business records exception: "It is of no consequence that the fraud was not a regular business activity. All that matters is that Redgate's note-taking was a regular business activity."); *Official Comm. of Unsecured Creditors v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 454–458 (Bankr. S.D.N.Y. 2007) (holding that while Enron was engaged in fraudulent financial transactions involving its affiliates, the general ledger reflected inter-company receipts and disbursements); *Martorelli v. C.I.R.*, 40 T.C.M. (CCH) 848, 1980 WL 4420 (U.S. Tax Ct. 1980) (admitting a financial ledger recording bets and profits or losses, even though its preparer operated a Ponzi scheme and sent fabricated monthly newsletters claiming false winnings); *United States v. Tafoya*, 757 F.2d 1522, 1528-29 (5th Cir. 1985) (upholding admissibility of billing memoranda, even though other evidence showed the billing memoranda were sometimes falsified); *United States v. Nivica*, 887 F.2d 1110, 1127 (1st Cir. 1989) (admitting business records used in allegedly fraudulent scheme where there was nothing to indicate that the business records were other than what they purported to be).

---

[107] *See, e.g.,* Blum Br. at 24.

41

A general statement about fraudulent activity is insufficient to warrant a blanket preclusion of all business records; rather, the opposing party must show that a specific document is not trustworthy and what it purports to be. *See Kaiser*, 609 F.3d at 575, n.6; *In re Enron Creditors Recovery Corp.*, 376 B.R. at 454-58 (admitting accounting records where there was no challenge to the trustworthiness of the general ledger in its reflection of inter-company receipts and disbursements).

In this regard, in *Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*, 781 F.3d 1262, 1267-69 (11th Cir. 2015), a case the Participating Claimants attempt to distinguish, the court admitted records under the business records exception even though the bankruptcy court found that the business was a Ponzi scheme that "was not set up to, and did not, conduct any legitimate business at all." On the issue of trustworthiness:

> The trustee testified in the bankruptcy court about how the underlying documents satisfied the requirements of the business records exception. As IMA's court-appointed receiver, the trustee was the "custodian" of the underlying documents. He testified about his investigation into the provenance and reliability of the documents he seized at IMA's office. He testified about his interview with one of IMA's principals, during which he learned that the office routinely created those documents based on its interactions with financial institutions and IMA's clients. And he testified about his reconciliation of the documents with corresponding files held by those financial institutions and clients. His testimony evidences that someone with personal knowledge created the documents . . . . Based on his investigation, he knew firsthand about the reliability of those records. That is enough.

*Id.* at 1267-68.

The Trustee's professionals have conducted an extensive review of the BLMIS books and records, specifically to determine which portions of the books and records are reliable and which portions are not. A holistic examination of BLMIS books and records reveals that the cash transactions reported on Customer Statements were accurate.[108] This is further supported by the

---

[108] *See* Sections I.B, I.D, *supra*; *see also* Tr. Suppl. Br. at Section II,A.

consistency across various BLMIS records, the testimony of former BLMIS employees, BLMIS

Bank Records, Customer Produced Records, and the affidavit of a BLMIS customer

corroborating the accuracy of the cash transactions reported on his Customer Statements and his

receipt of PW checks.[109]

Importantly, the Customer Statements that served as the primary source for the cash

transactions reviewed by the Experts, had an additional third party check:  the Customer

Statements were contemporaneously sent to customers, and the cash transactions indicated on

them were reviewed and presumably checked against these customers' own records at the time

they were mailed. Further, the 46,127 PW Transactions reflected in the BLMIS books and

records were identically listed in Customer Produced Records.[110]  The accuracy of the cash

transactions reported on customer statements is not surprising.   Customers of a business

operating as a Ponzi scheme are certainly aware of the cash that they deposited and withdrew.  It

was this accurate tracking and reporting of the cash transactions by BLMIS that enabled the

scheme to continue for as long as it did.  For these reason, the Trustee is entitled to rely upon the

cash and principal transactions in the books and records of BLMIS.

### C.    The Trustee Can Authenticate the BLMIS Books and Records

The Participating Claimants do not argue the authenticity of the BLMIS books and

records, nor that BLMIS employees created them. They do not challenge that the books and

records were found at BLMIS, and in the instance of electronically stored data, retrieved from

BLMIS's AS/400 Computer System. And, they do not argue that the records are not the books

and records of BLMIS, properly under the Trustee's custody and control. Rather, the

Participating Claimants move *in limine* to strike only certain notations on certain documents—

---

[109] *See* Sections I.B, I.D, II, *supra.*

[110] *See* Section II.A.7.

the "S" and "R" instructions in customer files and PW Transactions reported on Customer

Statements—arguing that the Trustee cannot authenticate the "notations" because the authors of

the notations are "largely unknown."[111] The Participating Claimants thus take a frequently

contradictory and selective position that S and R instructions and PW Transactions are not

admissible but that other information, notations, and values set forth in the same documents are

admissible because without these books and records, the Participating Claimants have no other

evidence that sustains their customer claims. This position is untenable under the Federal Rules

of Evidence.

Federal Rule of Evidence 901(a) "does not erect a particularly high hurdle." *U.S. Info.*

*Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00-cv-4763, 2006 WL 2136249,

at *5 (S.D.N.Y. Aug. 1, 2006) (quoting *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.

2001)). A trustee's burden on authentication—where he inherits the books and records of the

debtor—is a light one. *See In re Soundview Elite Ltd.*, 543 B.R. 78, 101 (Bankr. S.D.N.Y. 2016)

(explaining that the trustee could authenticate documents through the trustee's counsel's affidavit

that he had received documents from the adversary); *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d at

1267 (citations omitted). A trustee need to establish only a *prima facie* case that the documents

are what he claims them to be and can meet this burden with circumstantial evidence of

authenticity of the underlying documents through the testimony of a witness with knowledge of

the documents. *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d at 1267 (citing Fed. R. Evid. 901(a),

noting that where trustee established where records were found and that records substantially

matched third party records, the bankruptcy court could reasonably conclude that the business

---

[111] *See* Blum Br. at 18. The Trustee reserves the right to offer any of their proposed exhibits not for their truth, but
for the fact that they exist. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("[I]f the significance of
an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and
the statement is not hearsay").

records were authentic); *United States v. Caldwell*, 776 F.2d 989, 1001-03 (11th Cir. 1985). "If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury." *U.S. Info. Sys.*, 2006 WL 2136249, at *5 (internal quotation marks omitted) (quoting *Dhinsa*, 243 F.3d at 658); *see also Phillips v. Mortg. Elec. Registration Sys., Inc.*, No. 09-cv-2507, 2013 WL 1498956, at *4 (N.D. Ala. April 5, 2013) (employee of successor bank may authenticate records received in receivership from predecessor bank); *In re Soundview Elite Ltd.*, 543 B.R. at 101 (permitting trustee to authenticate documents through counsel affidavit, holding that the definition of "true and correct" is "unaltered").

The admissibility of BLMIS customer statements, PMRs, PMTs, Spiral Notebooks, customer files, and bank records does not require the testimony of the document's author to demonstrate its authenticity. Under Federal Rule of Evidence 901(a), the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is— here, evidence of the books and records of BLMIS as received by the Trustee. The Rule lists several examples that satisfy the requirement, but notes it is not meant to be an exhaustive list. "Testimony is not the *sine qua non* of authentication; circumstantial evidence may serve to demonstrate a document's authenticity. Such circumstantial evidence can include a document's appearance and content." *John Paul Mitchell Sys. v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) (internal citations omitted) (citing *United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir. 1983)). For example, Rule 901(b)(4) states that an item of evidence can be authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4).

The cases cited by the Participating Claimants are unpersuasive to their point. In *Carrasco*, in the absence of an objection by the opposing party, the court granted defendants' motion to strike a phone schedule and agenda because the author had not been identified. *Carrasco v. New Mexico Dep't of Workforce Sols.*, No. 10-0999, 2013 WL 12092509, *14-15 (D. N.M. March 19, 2013). The Participating Claimants' recitation of *Arista Records LLC v. Lime Grp.* likewise does not determine authentication based solely on the identity of the author of the document. As the *Arista* court made clear, authentication could also be established based upon testimony from a competent witness as to the knowledge of document's authenticity *or* the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *Arista Records LLC v. Lime Grp. LLC*, 715 F. Supp. 2d 481, 503 (S.D.N.Y. 2010).

The mandates of Rule 901 will be satisfied here. At the evidentiary hearing, the Trustee intends to produce a custodian of record who will testify about the significant measures taken by the Trustee's agents to secure BLMIS after Madoff's arrest.  The custodian will testify about the extraordinary efforts taken by the Trustee's agents to identify, locate and preserve all of BLMIS's electronically stored information, paper documents, and physical materials. The custodian will further testify as to the specific location of data and information at BLMIS and its offsite storage and backup facilities, how the data and information was retrieved, and how the data and information has been preserved since Madoff's arrest. As it pertains to the PW Transactions, the custodian will testify as to the retrieval and preservation of the AS/400 Computer System, as well as the locations, retrieval and preservation of the Spiral Notebooks, customer files, and microfilm.

Moreover, at the evidentiary hearing, the Trustee will present the testimony of former BLMIS employees who were responsible for creating and maintaining, overseeing, or otherwise working with the books at and records considered by the Trustee's Experts. *See* Section II, *supra.* These employees identified, utilized and/or are otherwise familiar with BLMIS books and records, as well as the data and information on the AS/400 Computer System.[112]  Conclusively, the testimony of the Trustee's custodian and the former BLMIS employees will establish that the evidence the Trustee seeks to admit is exactly what they are—the books and records as they were maintained by and at BLMIS.

## VII.    THE BLMIS BOOKS AND RECORDS SHOULD NOT BE EXCLUDED AS HEARSAY

The Participating Claimants selectively challenge only the S, R, and PW notations contained in certain portions of the books and records as hearsay but not other portions of the books and records that sustain their net equity calculation. The evidentiary rules do not permit such selective advocacy. BLMIS books and records—in their entirety and inclusive of notations—are admissible for one or more of the following reasons:  (i) they are business records; (ii) they are ancient documents; or (iii) they fall within the residual exception.

### A.      The BLMIS Books and Records are Business Records

The Trustee inherited the BLMIS books and records from the debtor, BLMIS. Based upon his investigation, as set forth above, he will present testimony at the evidentiary hearing as to the location, retrieval, and preservation of those books and records from BLMIS within days of Madoff's arrest. The Trustee will also present testimony as to the nature of the documents and the reconciliation of those records. The Trustee will present evidence that the BLMIS books and records were recorded at or near the time of the purported transaction, made by or from

---

[112] *See* Section II, *supra.*

information communicated by an individual with personal knowledge, and made in the regular practice of business activity—the very definition of business records that fall within the hearsay exception.

### 1.    The BLMIS Books and Records Satisfy Fed. R. Evid. 803(6)'s Requirements

Records made and kept in the ordinary course of a business are admissible pursuant to Fed. R. Evid. 803(6) if: "(1) the statements were recorded at or near the time of the purported transaction; (2) the record was made by or from information communicated by an individual with personal knowledge; and (3) the record was made in the regular practice of business activity." *United States v. Manshul Constr. Corp.*, No. 93-cv-0308, 1996 WL 267945, at \*5 (S.D.N.Y. May 20, 1996). Business records can include internal company memoranda, corporate documents such as demands for withdrawal liabilities, and handwritten notes. *In re Blech Secs. Litig.*, 94-cv-7696, 2003 WL 1610775, at \*5 (S.D.N.Y. Mar. 26, 2003); *The Ret. Plan of the Unite Here Nat'l Ret. Fund v. Kombassan Holding, A.S.*, 629 F.3d 282, 289-90 (2d Cir. 2010); *Kaiser*, 609 F.3d at 574-76. The requirements of Rule 803(6) "ensure that documents were not created for 'personal purpose[s] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'" *Kaiser*, 609 F.3d at 574 (citing *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988)).

Undated documents or an inability to identify exactly when each document was created will not preclude admissibility if the party seeking to introduce the business record can show that such statements were made in the regular course of business. *United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006) (citation omitted). Similarly, the lack of personal knowledge by the testifying witness or the inability to identify the author of the records will not preclude admissibility under business record exception. *JPMorgan Chase Bank, N.A. v. Yuen*, No. 11-cv-

9192, 2013 WL 2473013, at *6 (S.D.N.Y. June 3, 2013) (citing *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)); *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995); *White Indus.*, 611 F. Supp. at 1059 ("[T]he identity of the original informant need not even necessarily be known"); *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 144 (S.D.N.Y. 2015) ("As for authorship, it is irrelevant for purposes of Rule 803(6) that the face of the [document] does not identify the document's author"). Nor does the business records exception preclude the admission of records that were handwritten, rather than typed. *See Kaiser*, 609 F.3d at 575 ("A business record need not be mechanically generated to be part of a 'regular practice.'"); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-cv-6201, 2015 WL 1137572, at *1 (S.D.N.Y. Mar. 13, 2015); *In re Blech Secs. Litig.*, 2003 WL 1610775, at *6 ("The fact that these notes are handwritten and contained in a written notebook does not defeat the applicability of the business record exception in Rule 803(6)").

To the contrary, documents are admissible under the business records exception if they are "'integrated' into the testifying entity's records 'and relied upon in its day to day operations.'" *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013, at *6 (citing *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992)). That is, the documents are admissible so long as a custodian or other qualified witness testifies that the document was kept in the course of a regularly conducted business activity and it was the regular practice of that business activity to make the record. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003). Where, as here, a trustee inherits the books and records of a debtor, the business records exception can be satisfied by the trustee's diligent investigation of the provenance and reliability of the books and records, his reconciliation of those records with third party documents, and his interviews with persons with knowledge of those documents. *See In re Int'l Mgmt. Associates,* 781 F.3d at 1267-68 (trustee's

49

summaries of debtor's records were admissible under Rule 1006 because the underlying documents were admissible under the business records exception, based on Trustee's testimony as custodian); *In re Enron Creditors Recovery Corp.*, 376 B.R. at 454 (admitting debtor's records under the business records exception; "Pursuant to Fed. R. Evid. 803(6), and 803(7), a debtor's financial statements, ledgers, journal entries and other accounting records . . . are not inadmissible hearsay. Rather, they are admissible business records that can be used to prove or disprove whether there are intercompany obligations") (internal quotations omitted); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2006 WL 346418, at *1 (Bankr. S.D.N.Y. Feb. 6, 2006) (permitting debtors' books and records as business records under Rule 803).

Once a prima facie case has been made that the records were made and kept in the ordinary course of a business, Rule 803(6) favors the admission of evidence rather than its exclusion if it has any probative value at all. *Kaiser*, 609 F.3d at 574. Thus, any objections as to a business record's accuracy or completeness go to the weight and not the admissibility of the evidence. *See Am. Equities Grp., Inc. v. Ahava Dairy Prod. Corp.*, No. 01-cv-5207, 2004 WL 870260, at *10–11 (S.D.N.Y. Apr. 23, 2004).

### 2.    The Disputed Notations in the BLMIS Books and Records Were Made and Kept in the Ordinary Course of BLMIS's Business

A review of the BLMIS books and records makes evident that the PW Transactions and S and R instructions were contemporaneously captured business information that satisfies the requirements of Rule 803(6). The Trustee will present evidence and the testimony of his agents and/or former BLMIS employees who will attest that the BLMIS records—inclusive of the S and R instructions, and PW Transactions—were generated contemporaneously as part of BLMIS's regular business activities.

Annette Bongiorno, Madoff's longtime assistant, will testify that BLMIS employees typically received instructions from Madoff and customers regarding account information.[113] For instance, when creating a new account, Madoff provided Ms. Bongiorno with instructions, and she would then make notations on the relevant account pages.[114]    Specifically, beginning with the creation of an account at BLMIS, it was standard practice to create a Name/Address Form.[115] A BLMIS employee would fill out the form and create a file maintained in a filing cabinet on the 17th floor.[116]    From there, the information, including client name, address, and whether the client wanted BLMIS to "send" or "reinvest" the profits were input into the AS/400 Computer System by a keypunch operator.[117] If the account was labeled with an "S," the system would routinely generate PW checks.[118]

When customers requested account modifications—whether by mail or telephone—BLMIS employees routinely noted the on the customer's file.[119]    Both Name/Address Forms and updated customer files were then passed to the keypunch operators who input the information into the AS/400 Computer System.[120]

---

[113] *See* Bongiorno Tr. 30:22-32:20, 33:16–34:22, 63:3-65:17, 193:2-7 ("Q. Okay. And you testified that, to your knowledge, Mr. Madoff did not require a writing from the customer requesting the profit withdrawals at the opening of the account? A. To my knowledge, no one put that in writing. It was a verbal agreement."); Sala Tr. 31:3–17, 31:25–32:13.

[114] *See* Bongiorno Tr. 33:2–15 ("[Madoff] would give me the instructions, and I would make a note of it on an account page that I had. Once we were automated, it would be on a page that went to the keypunch operators, and it would be punched and put into the computer"), 35:18–36:19, 105:23–106:24; *see also* Jackson Tr. 67:3–23; Sala Tr. 272:13–273:25.

[115] *See* Bongiorno Tr. 63:3–19, 64:16–66:5; Jackson Tr. 66:5–67:23; Sala Tr. 61:4–63:5.

[116] *See* Bongiorno Tr. 61:25–62:24; Sala Tr. 272:13–273:25.

[117] *See* Bongiorno Tr. 70:23–71:11; Leung Tr. 94:18–97:17; Khan Tr. 73:2–75:17.

[118] *See* Bongiorno Tr. 70:12–71:11; Jackson Tr. 43:19–44:7.

[119] *See* Sala Tr. 36:22–37:5;  Bongiorno Tr. 131:1–132:13.

[120] *See* Khan Tr. 71:6–72:5; Leung Tr. 104:23–108:3.

The Trustee will offer testimony that documents generated by the AS/400 Computer System included Customer Statements, trade confirmations, PMTs, and PMRs.[121]   This testimony will confirm these records were generated on a regular basis and, depending on the nature of the document, either reviewed by BLMIS employees or sent directly to the customer.[122] In addition, these employees will also testify that the AS/400 Computer System would automatically generate a list of PW checks for accounts marked as "send."[123]

The testimony of the BLMIS employees is not disputed by the Participating Claimants and, thus, firmly establishes the business records exception to hearsay. *See In re Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (finding that "business records are admissible if witnesses testify that records are integrated into a company's records and relied upon in its day-to-day operations"). The fact that some notations were allegedly based on "third-hand" information, as the Participating Claimants argue, does not preclude their admissibility where, as here, the notations were made in the regular course of business. *The Ret. Plan of Unite Here Nat'l Ret. Fund,* 629 F.3d at 289 (noting that "[t]here is no requirement that the person whose first-hand knowledge was the basis of the entry be identified, so long as it was the business entity's regular practice to get information from such a person").

In this regard, the Participating Claimants' reliance on *White Indus. v. Cessna Aircraft Co.*, 611 F. Supp. 1049 (W.D. Mo. 1985) and *ADT Sec. Svcs. v. Sec. One Int'l, Inc.*, No. 11-cv-5149, 2013 WL 4766401 (N.D. Cal. Sept. 5, 2013) is misplaced. In *White Industries*, the court ruled that the "information recorded must have originated with someone who had first-hand

---

[121] *See* Bongiorno Tr. 41:25–42:3; 72:25–73:3, 115:22–116:4; *see also* Jackson Tr. 103:4–18, Sala Tr. 97:25–98:17.

[122] *See* Khan Tr. 17:25–26:10; Leung Tr. 19:4–25:2.

[123] *See* Jackson Tr. 22:19–23:2 ("Q. When you say computer printout [of checks], what do you mean by that? A. The computer printout, based on however – based on the checks that are being sent out, there was a printout that was generated that would give you that exact same information. It would give you their account number, the amount of the check and the name that's on the check.").

knowledge thereof," not that the testifying witness have first-hand knowledge. 611 F. Supp. at

1059.

> This does not mean, of course, that the proponent must produce the original
> informant as a witness; in fact the identity of the original informant need not even
> necessarily be known, since the element of 'first-hand knowledge' may be shown
> by the statement itself or 'be inferable from the circumstances.'

*Id.* (internal citations omitted). As the Participating Claimants admit, the recorded information

emanated from people with first-hand knowledge—*Madoff or others directly involved with the*

*fraud.*[124]

Similarly unpersuasive, in *ADT Security Services*, the court excluded phone summaries

because they were prepared based on information compiled by ADT representatives after the

commencement of litigation to advance ADT's position in litigation and were somewhat

inconsistent with sworn deposition testimony. 2013 WL 4766401, at *10 (document lacks

trustworthiness as it was not prepared for the systematic conduct and operations of the

enterprises but for the primary purpose of advancing litigation) (citations omitted). It will be

plain from the testimony of BLMIS employees that the BLMIS books and records were

contemporaneously recorded in the ordinary course of business, not made in anticipation of

litigation. *See Kaiser*, 609 F.3d at 574 (citing *Freidin*, 849 F.2d at 719); *see Fed. Hous. Fin.*

*Agency v. Nomura Holding Am.*, Inc., 2015 WL 1137572, at *1.

Purported errors and inconsistencies alleged by the Participating Claimants in the books

and records do not disqualify them from admissibility under the business records exception. As

an initial matter, as detailed in Section I, much of what they have identified as errors are not. In

any event, any objections to a business record's accuracy or completeness go to the weight and

not the admissibility of the evidence. *See Am. Equities Grp.*, 2004 WL 870260, at *10-11. "[A]

---

[124] Blum Br. at 16.

party need not prove that business records are accurate before they are admitted." *Id.* (quoting *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999)). "[T]he admissibility of a document, as distinguished from its weight, normally does not depend upon either completeness or freedom from ambiguity." *Id.* (citation and internals quotation omitted).

Similarly, the business records are admissible even when the business was involved in fraudulent activity. *See* Section VI.B, *supra.* Where, as here, the Trustee will present evidence and testimony that the BLMIS books and records meet the mandates of Rule 803(6), such records are admissible and the Participating Claimants are free to argue the evidentiary weight that should be accorded to them at the hearing.

**B.    Most of the BLMIS Books and Records are Authenticated under Fed. R. Evid. 901(b)(8), Making the Records Admissible as Ancient Documents Under Fed. R. Evid. 803(16)**

Many of the records the Trustee relies on were created more than 20 years ago and therefore fall within the exception to the rule against hearsay as ancient documents under Fed. R. Evid. 901(b)(8) and 803(16). A document is admissible as an ancient documents where it: "(A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." Fed. R. Evid. 901(b)(8); *see also United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 254 (S.D.N.Y. 2009). Ancient documents authenticated under Fed. R. Evid. 901(b)(8) are presumptively excluded from the rule against hearsay pursuant to Fed. R. Evid. 803(16). *See e.g.*, *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 643 (2d Cir. 2004); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990).

### 1. There is No Suspicion About the Authenticity of the BLMIS Books and Records

Rule 901(b)(8) requires that the document's condition creates no suspicion about its authenticity. *See* Fed. R. Evid. 901(b)(8).  The issue of suspicion assesses whether the document is what it purports to be, not whether the contents of the document are suspect.  *See Portrait of Wally*, 663 F. Supp. 2d at 254-55; *see also* 5 Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 901.11[2] (2d ed. 2015). Suspicion as to the content of a document "go[es] to the weight of the evidence rather than its admissibility.  *Portrait of Wally*, 663 F. Supp. 2d at 255.

As discussed above in Section VI.C, the Trustee will offer evidence and testimony to establish the authenticity of the BLMIS books and records and therefore meet this threshold. *See Martha Graham Sch.*, 380 F.3d at 643 (two letters pertaining to copyright royalties in existence for over 20 years were admissible as ancient documents based upon testimony that the letters were what they purported to be).

### 2. The BLMIS Books and Records Were Recovered from BLMIS's Office: the Most Likely Place They Would Be Found

Further, evidence must be admitted regarding the location where the document was found in order to be authenticated under Rule 901(b)(8). Sufficient evidence includes witness testimony regarding the document's chain of custody or the document's location amongst other similar documents of that nature. *See Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 574–75 (S.D.N.Y. 2002) (finding that original documents found by counsel in the principal place of business were where they would most likely be).

As discussed above in Section II, the Trustee will offer evidence and testimony to establish the location and preservation of the BLMIS books and records retrieved from BLMIS's offices, storage facilities, backup location and records depository. This evidence and testimony

sufficiently establishes the chain of custody of the books and records, and meets this requirement of Fed. R. Evid. 901(b)(8). *See Arasimowicz v. Bestfoods, Inc.*, 81 F. Supp. 2d 526, 529-30 (S.D.N.Y. 2000) (affidavit indicating that document was found in business files was sufficient).

### 3. Most of the BLMIS Books and Records Have Existed for Over Twenty Years Before Being Admitted

Finally, the document must have been in existence for at least 20 years before its proposed admission at trial—here prior to 1996. Fed. R. Evid. 901(b)(8)(C). The justification for authenticating ancient documents is that "age affords assurance that the writing antedates the present controversy." Fed. R. Evid. 803(16) advisory committee note. Dates on documents alone are not necessary to establish their age. Rather, the document's appearance and witness testimony can fulfill the age requirement. *See Astra Aktiebolag*, 222 F. Supp. 2d at 575 (the dates on the documents, the tattered and yellow appearance of the documents, and testimony establish that they are more than 20 years old).

As set forth above in Sections II, the Trustee will offer evidence and testimony that the BLMIS books and records relevant to the PW Transactions were often created over twenty years ago. Due to the timing of the PW Transactions in the Participating Claimants' accounts, effectively all of the PW Transactions occurred in or before 1996. As a result, nearly all of the customer files, PW Checks, and excerpts from the Spiral Notebooks, as well as documents created by the AS/400 system relevant to the profit withdrawal issue contain dates verifying that the documents were created before November 18, 1996.[125]   For example, the 322 PW Transactions disputed by the Blums occurred between July 27, 1982 and July 8, 1997, only 18 of

---

[125] The Rule requires that the document be created twenty years prior to its proposed admission at trial.  Because a date for this evidentiary hearing has not yet been set, the Trustee is using the date of this filing.

which occurred after November 18, 1996.[126] The remaining documents, specifically the

Name/Address Forms, can be supported by additional evidence to show that these forms were

created at or near the same type new accounts were opened, well before 1996. Additionally,

former BLMIS employees further confirm this timing.

C.    **The BLMIS Books and Records are Admissible Under the Residual
Exception**

A hearsay statement not specifically covered by an exception in Rules 803 or 804 is

nevertheless admissible if:

1)    the statement has equivalent circumstantial guarantees of trustworthiness;

2)    it is offered as evidence of a material fact;

3)    it is more probative on the point for which it is offered than any other evidence
that the proponent can obtain through reasonable efforts; and

4)    admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). The party offering the statement must also give notice of its intent to offer

the statement. Fed. R. Evid. 807(b); *see Schering Corp v. Pfizer, Inc.*, 189 F.3d 218, 231 (2d Cir.

1999) ("To be admissible under this exception, the evidence must, in other words, fulfill five

requirements: trustworthiness, materiality, probative importance, the interests of justice and

notice") (internal quotations omitted).

While the residual exception applies only in rare cases, courts are more willing to admit

hearsay in non-jury cases than in jury trials. *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384,

1386-87 (Ct. Cl. 1976) (studies admitted "pursuant to the residual exception at the discretion of a

trial court in a non-jury case to admit into evidence hearsay found to be the best evidence

---

[126] Memorandum of Law in Support of Trustee's Motion *in Limine* Number 2 to Exclude Certain Testimony of Joel
and Norman Blum at n.6, filed Oct. 28, 2016, ECF No. 14355; Greenblatt Second Suppl. Rpt. Exs. 17, 18, 21 ECF
Nos. 13869-11, 13869-12.

reasonably available and to have assurances of accuracy and reliability."); *cf. In re Oak Rock Fin., LLC*, 2016 WL 5794717, at *3.

As detailed below, the requirements of the residual hearsay exception have been met. The challenged notations of the BLMIS books and records are trustworthy, material, and more probative than any other evidence. The interests of justice will be best served by admitting BLMIS books and records, as a whole, as the information contained therein will assist the Court in its final determination regarding PW issues. And, the Trustee has also provided sufficient notice of his intent to rely on the residual hearsay exception.

### 1.    The BLMIS Books and Records, Notations, and Instructions Have Equivalent Circumstantial Guarantees of Trustworthiness

Evidence must have "circumstantial guarantees of trustworthiness" comparable to those of the enumerated exceptions. Fed R. Evid. 807(a)(1); *see also Schering*, 189 F.3d at 231. The Second Circuit has outlined the "criterion of trustworthiness" that a district court should employ:

> The hearsay rule is generally said to exclude out-of-court statements offered for the truth of the matter asserted because there are four classes of risk peculiar to this kind of evidence:  those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration, each of which decreases the reliability of the inference from the statement made to the conclusion for which it is offered . . . . The traditional exceptions to the hearsay rule, in turn, provide the benchmark against which the trustworthiness of evidence must be compared in a residual hearsay analysis . . . . It is thus important to recognize that the trustworthiness of these exceptions is a function of their ability to minimize some of the four classic hearsay dangers.

*Id.* at 232–233. While "a hearsay statement need not be free from all four categories of risk to be admitted[,]" it must minimize at least some of them. *See id.*

The records here are admissible because the Participating Claimants have not provided any evidence to show that they are not what they purport to be. *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 692 (S.D.N.Y. 2014) ("[G]iven the circumstantial guarantees of trustworthiness which were present here . . . and the lack of any evidence in the record to suggest

58

that the bank records are anything other than what they purport to be, the bank statements are admissible under the residual hearsay exception"). The mere fact that the records were generated to perpetuate a fraudulent scheme is immaterial. The records have been and will be corroborated by witnesses and other evidence, and the Trustee has no incentive to lie or make misrepresentations about the records. *Id.* at 691-92 (finding "no reason to doubt [bank statements'] trustworthiness" where "[t]hey appear in the exact manner that one would expect, and [a witness] testified as to how he obtained them directly from the bank, testimony that the Court credits"); *Robinson v. Shapiro*, 646 F.2d 734, 743 (2d Cir. 1981) (declarant had little motive to lie, and other evidence corroborated his statement) (citations omitted).

Moreover, as described above, the records were made in regular course of business. *Chevron*, 974 F. Supp. 2d at 691–92 ("[T]he bank statements are admissible under the residual hearsay exception as an alternative to the business records exception."). In this regard, the Participating Claimants mistakenly rely upon *Wantanabe Realty Corp. v. City of N.Y.*, No. 01-cv-10137, 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004), *aff'd*, 159 F. App'x 235 (2d Cir. 2005), a case commenting on the trustworthiness of documents prepared for litigation. Here, the BLMIS books and records—some of which were generated over 20 years ago—were surely not made in anticipation of litigation. Instead, the Trustee will present evidence and testimony that the books and records, inclusive of the notations, were made in the ordinary course of business and thus are reliable.

## 2. The Challenged BLMIS Books and Records are Material to the Evidentiary Hearing

In the context of Rule 807, "[w]hat is probably meant is that the exception should not be used for trivial or collateral matters." *United States v. Iaconetti*, 406 F. Supp. 554, 559 (E.D.N.Y. 1976), *aff'd*, 540 F.2d 574 (2d Cir. 1976). The records here are material as they fully bear on the

understanding of PW transactions—the primary issue to be decided at this hearing. *See United States v. Gambardella*, 10-cr-674, 2012 WL 279469, at *4 (S.D.N.Y. Jan. 27, 2012) (permitting statement to "be offered as evidence of a material fact"); *Lopez v. Miller*, 915 F. Supp. 2d 373, 424 (E.D.N.Y. 2013) ("The affidavits are material because they support [defendant's] alibi.").

### 3. BLMIS Books and Records are More Probative Than Any Other Evidence

Indeed, it is hard to imagine any evidence that would be more probative as to the meaning of the PW transactions than BLMIS books and records themselves; nor have the Participating Claimants identified any. *See* Fed. R. Evid. 807(a)(3) (evidence must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts."). The books and records reflect, among other things, the accounts of the Participating Claimants, deposits, withdrawals, transfers, and directions for management of the account, all of which bear on the meaning of the PW transactions. *See Silverstein v. Smith Barney, Inc.*, No. 96-cv-8892, 2002 WL 1343748, at *4 (S.D.N.Y. June 18, 2002) (finding statement "highly probative" because it was "the best evidence available as to how and what agreement was reached with respect to the repayment of expenses incurred"); *United States v. Elkins*, 885 F.2d 775, 785 (11th Cir. 1989) (letter written on official stationery "was more probative than any other information reasonably available"); *Cynergy, LLC v. First Am. Title Ins. Co.*, 706 F.3d 1321, 1329-30 (11th Cir. 2013) (affidavit admitted because it "directly and comprehensively" addressed contracting parties' knowledge and intent, "a key issue for which very little alternative evidence [otherwise] exist[ed]."); *Nivica*, 887 F.2d at 1127 (records of a Mexican bank that constituted the only available proof of criminal financial activity in Mexico).

### 4.    Admitting BLMIS Books and Records Will Best Serve the Purposes of the Federal Rules of Evidence and the Interests of Justice

Generally collapsed together, the inquiries of the interests of justice and trustworthiness are guided by the "four classes of risk peculiar to [hearsay] evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." *Lopez v. Miller*, 915 F. Supp. 2d at 424 (citing *Schering Corp. v. Pfizer Inc.*, 189 F.3d at 231-32); *In re Cornfield*, 365 F. Supp. 2d 271, 278 (E.D.N.Y. 2004). "To carry this burden, he must point to evidence that corroborates both the declarant's trustworthiness and the truth of the statement." *United States v. Paulino*, 445 F.3d 211, 220 (2d Cir. 2006) (internal quotation marks omitted).

As discussed in Sections VI.C and VII.A, the Trustee will offer evidence and testimony that the BLMIS books and records are authentic, were contemporaneously recorded business records free of faulty perception, memory or narration, and trustworthy.  Upon carrying this burden, the court and the parties here would best be served by admitting the books and records because they speak directly to the key issue of this hearing—the PW Transactions—and will assist in the resolution of the case on the merits. *See Silverstein*, 2002 WL 1343748, at *3 (concluding that interests of justice favor allowing statement because "two of the three contracting parties are unavailable" and statement "is the most reliable piece of evidence before the Court"); *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 113 (3d Cir. 2001) ("[T]he administration of justice, would be served by admitting the affidavit, because it would assist the jury in determining the truth").

### 5.    The Trustee Has Provided Sufficient Notice of Reliance on Residual Hearsay Exception

Contrary to the assertions of the Participating Claimants, the Trustee has provided the sufficient notice of his intent to rely upon the residual hearsay exception, if necessary.  Fed. R. Evid. 807. Well before trial and even well before the conclusion of discovery, the Trustee

identified the BLMIS books and records, provided notice of his intent to rely thereon to sustain his determination of the PW Transactions, and produced copies of those BLMIS books and records to the Participating Claimants. The reports of the Experts further identify, with specificity, the exact books and records that the Trustee intends to rely upon. And, following the completion of discovery, the Trustee again reiterated his intent to rely upon the BLMIS books and records in his prehearing disclosures. This satisfies the notice requirement of Rule 807(b). *See Chevron* 974 F. Supp. 2d at 692 (notice requirement of Rule 807(b) satisfied where bank statements were produced months before trial began and disclosed in trial exhibits approximately six weeks before trial); *Steinberg v. Obstetrics-Gynecological & Infertility Grp., P.C.*, 260 F. Supp. 2d 492, 497 (D. Conn. 2003) (notice requirement was satisfied and letter was admissible because it had been included in and was basis for opposition to summary judgment motion).

The testimony and evidence that the Trustee intends to proffer at the evidentiary hearing satisfies all five requirements of Rule 807. As such, the interests of justice would be served by admitting the BLMIS books and records under the residual exception to the hearsay rule.

## VIII.  THE TRUSTEE'S SUMMARY EXHIBITS ARE ADMISSIBLE

The Blums' Motion seeks to exclude the Trustee from introducing any summary exhibits on the grounds the underlying documents contain inadmissible hearsay.[127]  However, their objection is unfounded under the evidentiary rules.

Federal Rule of Evidence 1006 allows the use of summaries when the volume of documents being summarized is so large as to make their use impractical or impossible, and whereas, the summaries may prove more meaningful to the judge or jury. *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir. 1979). The rule states:

---

[127] Blum Br. at 25–26.

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006. Contents of charts or summaries are admissible under Rule 1006 where they fairly represent data which is too voluminous for convenient in-court examination, and are accurate and non-prejudicial. *See* Fed. R. Evid. 1006; *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 333 (E.D.N.Y. 2013); *see also United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010).

Summary evidence is an evidentiary substitute for the voluminous documents themselves. *See Gen. Refractories Co. v. First State Ins. Co.*, No. 04–3509, 2015 WL 3450391, at *9 (E.D. Pa. May 29, 2015); (admitting summary of business records subject to authentication by records custodians); *State Office Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 845-46 (10th Cir. 1985) (admitting summary of voluminous business records proving actual loss and damages); *see also Gomez v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986) (such summaries are admitted as evidence); 6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1006.04[1] (Joseph M. McLaughlin, ed., (2d ed.2015)) ("summary itself is the evidence to be considered by the jury").

The Trustee's pretrial disclosures included 24 summary exhibits (comprised of 240 individual charts) as proposed exhibits for use at the evidentiary hearing on the PW issue.[128] Of these, 208 are Principal Balance Calculations for the PW impacted BLMIS accounts at issue in this proceeding, identified as Trustee's Proposed Exhibits 24-1 through 24-208.[129]

---

[128] For the convenience of the Court, the Trustee has included an index of the scope and contents of these exhibits. *See* Sheehan Decl. Ex. 14.

[129] *Id.*

The Trustee's proposed summary exhibits fulfill every requirement of Rule 1006, namely that (1) the summarized writings are so voluminous so as to make it impracticable to conveniently examine them in court, (2) the underlying evidence is admissible for the reasons in this Opposition, (3) copies of the summarized documents were available to the Claimants during discovery, and (4) the proposed summary charts and calculations accurately summarize (or reflect) the underlying document.

First, the underlying BLMIS books, records, and transaction documents on which they are based are undoubtedly voluminous—the Experts each considered more than 4 million in connection with their opinions in this proceeding.[130]

Second, the documents and source material on which Trustee's exhibits 1 through 24 are based are admissible as business records under Rule 803(6), pursuant to Rule 807(a)'s residual exception, and as ancient documents under Rule 901(b)(8).

Third, the documents were produced to the Participating Claimants during discovery and the Participating Claimants have the opportunity to check the summary's accuracy and prepare for cross-examination at the evidentiary hearing. Many of the exhibits also identify Bates references for the pertinent documents underlying the exhibit, and the Trustee disclosed exemplar documents of each type used to create the charts as individual hearing exhibits.[131] The Claimants themselves seek to introduce selected documents underlying the Trustee's summary exhibit into evidence.[132]

---

[130] *See, e.g.,* Sheehan Decl. Exs. 8-13.

[131] To the extent the Claimants require or request additional information as to the underlying source documents used to create Trustee's exhibits 1 through 24, the Trustee will work with counsel to provide such information.

[132] Participating Claimants' Prehearing Disc., Ex. 10–20, 30–34, 38–39, 43–48; Blums' Prehearing Disc., Ex. 4, 8-1, 8-2 (relying on underlying BLMIS records to summarize incoming and outgoing checks).

And fourth, the summary charts themselves are "representative"—they catalogued facts from the BLMIS books and records and, on certain of the proposed summary exhibits, they add amounts to create totals. *United States v. White*, 737 F.3d 1121 (7th Cir. 2013).

In sum, the Trustee's summary exhibits squarely meet the requirements under Rule 1006 and are therefore admissible. To the extent that the Claimants wish to argue that the proposed summary exhibits do not contain certain types of information, the summary exhibits are nonetheless admissible and the Participating Claimants are free to cross-examine the spreadsheets' creators to bring out such information. *See United States v. Swanquist*, 161 F.3d 1064, 1072–73 (7th Cir. 1998) (finding no abuse of discretion where the defendant "had ample opportunity during his cross-examination of [the document's preparer] to elicit any facts that might have suggested that the government's charts incorrectly captured the nature of [the underlying documents]").

65

## CONCLUSION

For all the foregoing reasons, the Trustee respectfully requests the following relief:

1.    The Participating Claimants' motions *in limine* to exclude or limit the expert testimonies of Mr. Matthew B. Greenblatt and Ms. Lisa M. Collura are denied in their entirety;

2.    The Participating Claimants' motion *in limine* to exclude all testimony or exhibits regarding non-participating BLMIS customers or BLMIS accounts is denied in its entirety;

3.    The Participating Claimants' motion *in limine* to exclude all PW notations in BLMIS books and records based on objections to authenticity or hearsay are denied in its entirety;

4.    The Participating Claimants' motion *in limine* to exclude the S and R notations in BLMIS books and records based on objections to authenticity and hearsay are denied in its entirety;

5.    The Participating Claimants' motion *in limine* to exclude any of BLMIS books and records as hearsay is denied in its entirety; and

6.    The Participating Claimants' motion *in limine* to exclude testimony concerning missing BLMIS books and records is denied in its entirety.

Dated:  November 18, 2016                Respectfully submitted,
        New York, New York

                                         BAKER & HOSTETLER LLP

                                         By:  */s/ David J. Sheehan*
                                             Baker & Hostetler LLP
                                             45 Rockefeller Plaza
                                             New York, New York 10111
                                             Telephone:  (212) 589-4200
                                             Facsimile:  (212) 589-4201
                                             David J. Sheehan
                                             Email:  dsheehan@bakerlaw.com
                                             Seanna R. Brown
                                             Email:  sbrown@bakerlaw.com
                                             Amy E. Vanderwal
                                             Email:  avanderwal@bakerlaw.com

                                         *Attorneys for Irving H. Picard, Trustee for the*
                                         *Substantively Consolidated SIPA Liquidation*
                                         *of Bernard L. Madoff Investment Securities*
                                         *LLC and the Estate of Bernard L. Madoff*