**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

**Reply Memorandum of Law in Support of the Blums' Motion in Limine
to Exclude Unrelated Customer Account Materials, to Exclude Hearsay
Statements Regarding Profit Withdrawals, and to Limit the Proposed
Testimony of Lisa M. Collura and Matthew B. Greenblatt**

BAKER & MCKENZIE LLP
Richard A. Kirby
Laura K. Clinton
Graham R. Cronogue
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7020
Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com
Email: graham.cronogue@bakermckenzie.com

# Table of Contents

INTRODUCTION ..................................................................................................................... 1

REPLY ...................................................................................................................................... 3

A.  Documents from Unrelated Customer Accounts Are Irrelevant and Should Be
Excluded..................................................................................................................... 3

B.  Notations in Madoff Securities Records Are Hearsay and Cannot Be Admitted for
their Truth................................................................................................................... 4

1.  The Business Records Exception Does Not Apply. ......................................... 6
a.  There is no evidence that PW notations are reliable because they were
made at or near the time by someone with knowledge. .............................. 6
b.  There is no evidence that the PW notations at issue are the product of a
regular business practice. ........................................................................... 9
c.  The Trustee's contention that records of fraudulent enterprises are
routinely admitted under the hearsay exception for business activity is
misplaced, and he cannot vouch for the reliability of Madoff Securities
documents. ............................................................................................... 10

2.  The PW Notations Are Not Admissible as Ancient Documents Under Fed. R.
Evid. 803(16). ................................................................................................ 12
a.  The Ancient Documents twenty-year period is fixed in this SIPA case as
of the filing date, which SIPA establishes as the date for fixing the
debtor's obligations to its customers......................................................... 13
b.  The Trustee cannot meet his burden to authenticate the Madoff Securities
books and records under Rule 901 because they are not what they purport
to be and there are substantial questions as to their authenticity. ............. 14
i.  The records are not what they purport to be: records of securities
trades that the Trustee contends did not occur and profits from which
are wholly imaginary. ....................................................................... 15
ii.  The Trustee has offered nothing to overcome the suspicion as to the
documents' authenticity. ................................................................... 17
c.  The PW notations do not satisfy the requirements of Rule 803(16) because
they present all of the problems the prohibition on hearsay sought to
avoid........................................................................................................ 17

3.  The Madoff Securities Books and Records are Not Admissible Under the
Residual Exception of Rule 807. .................................................................... 19
a.  The Trustee's own professionals determined that the Madoff Securities
account statements lack circumstantial guarantees of trustworthiness. ..... 19
b.  The Trustee's concession that the Madoff Securities account statements
are the "Most Probative" evidence he has does not establish the
applicability of a hearsay exception......................................................... 21

   c. Allowing hearsay to be admitted does not serve the "interests of
    justice." .................................................................................................... 21

   d. The Trustee did not provide sufficient notice of his reliance on
    Rule 807. .................................................................................................. 22

 C. The Trustee's Summary Exhibits Rely on Inadmissible Material and are
  Prohibited by Federal Rule of Evidence 1006. ........................................................ 23

 D. The Professionals' Testimony Is Inadmissible Under Fed. R. Evid. 702 and 703. ... 24

  1. The Professionals' Proposed Testimony Is Based on Irrelevant Ten-Year
   Data and Unverifiable Assumption that the Relevant Practices Were the
   Same in Earlier Times. .................................................................................. 25

  2. The Professionals' Testimony Is Misleading and Unreliable Because of the
   Rampant Bias in Data Collection. ................................................................. 27

  3. Both Professionals Fail to Satisfy the Requirements of Rule 703 Because
   their Opinions Are Based on Inadmissible Hearsay Not Usually Relied upon
   by Experts in the Field. ................................................................................. 31

  4. Greenblatt and Collura's Speculation Regarding the Content of Missing
   Records Is Improper Under Federal Rule of Evidence 1004............................ 32

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arista Records LLC v. Lime Grp. LLC*,
  715 F. Supp. 2d 481 (S.D.N.Y. 2011) ................................................................. 16

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
  222 F. Supp. 2d 423 (S.D.N.Y. 2002) ................................................................. 33

*Batoh v. McNeil-PCC, Inc.*,
  2016 U.S. Dist. LEXIS 31126 (D. Conn. Mar. 20, 2016) ................................... 19

*Beach Mar, Inc. v. L&L Wings, Inc.*,
  2016 U.S. Dist. LEXIS 9566 (E.D.N.C. Jan. 27, 2016) ...................................... 12

*In re Bernard Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011) ............................................................................... 30

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
  247 F.3d 79 (3d Cir. 2001) ................................................................................. 21

*Carrasco v. N.M. Dep't of Workforce Sol.*,
  2013 U.S. Dist. LEXIS 83420 (D.N.M. 2013) ..................................................... 6

*Chevron Corp. v. Donziger*,
  974 F. Supp. 2d 362 (S.D.N.Y. 2014) ................................................................. 20

*In re Cirrus Logic Secs. Litig.*,
  946 F. Supp. 1446 (N.D. Cal. 1996) ..................................................................... 6

*Curtis v. Perkins*,
  781 F.3d 1262 (11th Cir. 2015) ..................................................................... 11, 16

*Davis v. Caroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ................................................................. 32

*Doucet v. Drydock Coal Co. (In re Oakley)*,
  397 B.R. 36 (Bankr. S.D. Ohio 2008) ................................................................. 31

*In re Exec. Telecard Sec. Litig.*,
  979 F. Supp. 1021 (S.D.N.Y. 1997) ............................................................... 26, 28

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  74 F. Supp. 3d 639 (S.D.N.Y. 2015) ................................................................... 25

*GE v. Joiner*,
  522 U.S. 136 (1997) ............................................................................................ 25

*Giles v. Rhodes*,
  2000 U.S. Dist. LEXIS 13980 (S.D.N.Y. Sept. 26, 2000) ................................................... 5

*Hicks v. Charles Pfizer & Co.*,
  466 F. Supp. 2d 799 (E.D. Tex. 2005) ............................................................................ 17

*Jacobson v. Deutsche Bank, A.g.*,
  206 F. Supp. 2d 590 (S.D.N.Y. 2002) ............................................................................ 21

*John Paul Mitchell Sys. v. Quality King Distribs., Inc.*,
  106 F. Supp. 2d 462 (S.D.N.Y. 2000) ............................................................................ 14

*Jordan v. Binns*,
  712 F.3d 1123 (7th Cir. 2013) ....................................................................................... 6

*JPMorgan Chase Bank, N.A. v. Yuen*,
  2013 U.S. Dist. LEXIS 81055 (S.D.N.Y. June 3, 2013) ............................................... 7, 8

*LNC Invs. Inc. v. First Fid. Bank N.A.*,
  2000 U.S. Dist. LEXIS 10787 (S.D.N.Y. Aug. 3, 2000) ................................................... 4

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....................................................................... 32, 33

*Martorelli v. C.I.R.*,
  40 T.C.M. (CCH) 848 (U.S. Tax Ct. 1980) ................................................................... 10

*Ninety Six v. S. R. Co.*,
  267 F.2d 579 (4th Cir. 1959) .................................................................................... 17, 26

*Official Committee of Unsecured Creditors v. Martin (In re Enron Creditors Recovery
  Corporation)*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007) ................................................... 10

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008) ........................................................................... 26

*In re Oracle Sec. Litig.*,
  829 F. Supp. 1176 (N.D. Cal. 1993) ............................................................................. 26

*Parker v. Reda*,
  327 F.3d 211 (2d Cir. 2003) .......................................................................................... 7

*Raskin v. Wyatt Co.*,
  125 F.3d 55 (2d Cir. 1997) ........................................................................................... 25

*Romano v. Howarth*,
  998 F.2d 101 (2d Cir. 1993) ........................................................................................... 9

*Samsung Electronics, Co. v. Apple, Inc.*,
  No. 15-777 (Sup. Ct. Dec. 6, 2016) ............................................................................... 14

*Sanders v. New York,*
   2001 U.S. Dist. LEXIS 20242 (S.D.N.Y. Dec. 5, 2001) ................................................. 4

*Securities and Exchange Commission v. Bernard Madoff, et al.,*
   08-cv-10791 ................................................................................................................ 16

*Silverstein v. Smith Barney, Inc.,*
   2002 U.S. Dist. LEXIS 10898 (S.D.N.Y. June 18, 2002) ............................................. 21

*Stenger v. World Harvest Church, Inc.,*
   2006 U.S. Dist. LEXIS 15108 (N.D. Ga. Mar. 31, 2006) ............................................. 31

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.,*
   112 F. Supp. 3d 122, 140 (S.D.N.Y. 2015) ........................................................... 4, 7, 8

*United States v. Ford,*
   435 F.3d 204 (2d Cir. 2006) ........................................................................................... 7

*United States v. Kaiser,*
   609 F.3d 556 (2d Cir. 2010) .................................................................................. 10, 17

*United States v. Manfredi,*
   2009 U.S. Dist. LEXIS 106115 (W.D. Pa. Nov. 13, 2009) ........................................... 18

*United States v. Portrait of Wally,*
   663 F. Supp. 2d 232 (S.D.N.Y. 2009) .......................................................................... 12

*United States v. Samaniego,*
   187 F.3d 1222 (10th Cir. 1999) .................................................................................... 23

*United States v. Strother,*
   49 F.3d 869 (2d Cir. 1995) ............................................................................................. 7

*United States v. Tafoya,*
   757 F.2d 1522 (5th Cir. 1985) ...................................................................................... 11

*United States v. Tin Yat Chin,*
   371 F.3d 31 (2d Cir. 2004) ........................................................................................... 32

*United States v. Washington,*
   106 F.3d 983 (D.C. Cir.,), *cert. denied,* 522 U.S. 984 (1997) ..................................... 19

*United States v. Wells,*
   262 F.3d 455 (5th Cir. 2001) ........................................................................................ 32

*In re Xcelera.com Sec. Litig.,*
   NO. 00-11649-RWZ, 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008) ................ 27

**Statutes**

15 U.S.C. §§ 78fff(a)(4) ................................................................................................. 13

15 U.S.C. § 78jjj(b) ............................................................................................................... 13

15 U.S.C. §78lll(11) .............................................................................................................. 13

**Other Authorities**

*Authentic*, WEBSTER'S DICTIONARY (3d. 1961) ..................................................................... 14

*Authenticity*, WEBSTER'S DICTIONARY (3d. 1961) ................................................................. 14

BALLANTINE'S LAW ................................................................................................................. 14

Fed. R. Evid. 102 .................................................................................................................... 22

Fed. R. Evid. 401 ...................................................................................................................... 4

Fed. R. Evid. 402 ...................................................................................................................... 4

Fed. R. Evid. 403 ...................................................................................................................... 4

Fed. R. Evid. 702 ....................................................................................................... 24, 29, 33

Fed. R. Evid. 703 ....................................................................................................... 23, 24, 30

Fed. R. Evid. 803 ........................................................................................................ 7, 9, 18, 20

Fed. R. Evid. 803(6) .......................................................................................................... 5, 6, 7

Fed. R. Evid. 803(16) ........................................................................................... 11, 12, 17, 18

Fed. R. Evid. 807 ....................................................................................................... 19, 20, 21, 22

Fed. R. Evid. 807(b) ................................................................................................................ 22

Fed. R. Evid. 901(a) ................................................................................................................ 12

Fed. R. Evid. 901(b) ......................................................................................................... *passim*

Fed. R. Evid.  1004 .............................................................................................................. 31, 32

Fed. R. Evid.  1006 .................................................................................................................. 23

## INTRODUCTION

The Trustee would obviously prefer to litigate the Profit Withdrawal issue against those claimants who have already acceded to his claim calculations, rather than the actual parties to this proceeding.  His proffer of "a broad range of [almost 800] exhibits beyond those relating to the Blums," (Tr. Resp. at 2), is a disingenuous attempt to hide his lack of evidence that pre-1998 PW notations represent actual customer profit withdrawals and to conflate contested claims with those for which no objection was lodged.  The Blums filed their Motions in Limine to narrow the evidentiary and testimonial issues presented by the Trustee's proffer of irrelevant exhibits, hearsay statements, and improper expert testimony.  Rather than address those clear evidentiary issues, the Trustee's Response repeats largely irrelevant argument about his professionals and their work, and claims that the Blums "misunderstand[]" the "nature and scope" of his motion. *Id*.

To the contrary, the Blums are quite confident of the appropriate scope of these proceedings.  In calculating customer SIPA claims, the Trustee assumed that all "PW" notations in customer statements (as well as a host of non-PW notations) accurately recorded customer cash withdrawals of arbitrage trade profits.  He took the debit book entries at face value for their truth—and inferred from the notations that customers requested these cash withdrawals and actually received them.  His assumptions are binding on those claimants who did not object to his claim determinations, and there is no need for an omnibus determination of whether they were accurate.  *See* Blum Motion at 1.  For those customers who did object, such as Participating Claimants, the dispute is not an abstract methodological one, but rather a fact-specific inquiry into whether the Trustee's general presumption that PW notations record actual cash withdrawals is supported by any admissible evidence specific to the objecting customer's account.  As to the

Blums, it is not. The Trustee cannot backfill his lack of evidence with admissions from unrelated customers or records of other accounts, and his irrelevant exhibits should be excluded.

The Madoff Securities records on which the Trustee relies are replete with hearsay, and no exception applies. Conceding his hearsay problem, the Trustee advances the fanciful arguments that he might produce a competent (unidentified) custodial witness at trial to establish the elements of the business records exception[1] and that he has unilaterally enlarged the ancient documents exception by delaying litigation for over eight years. None of this is availing; the business record, ancient document, and residual hearsay exceptions all rely on the fundamental premise that the creator of the document did not have a motive to fabricate—an assurance that the Trustee cannot possibly offer here and one that the Trustee himself has repeatedly debunked.

Similarly, the Trustee's attempt to evade his evidentiary problems by funnelling hearsay through his expert witnesses is prohibited. He cannot offer "summary" exhibits prepared by his professionals where the underlying documents contain inadmissible hearsay, and his assertions that all supporting documents were produced at some point in the litigation is wholly irrelevant to that issue. Nor is it proper for his experts—no matter how qualified to analyze existing financial records—to speculate about the contents of non-existent documents or to invade the province of the trier of fact with opinions that are not based on specialized expertise. Their testimony should be excluded.

For all the reasons in their opening brief and those set out below, the Blums respectfully request an order in limine excluding the materials and testimony specified in their moving papers.

---

[1] The Court's procedure order required all witnesses to be identified on or before September 30, 216. Order on Schedule for Litigation of and Evidentiary Hearing on Profit Withdrawal Issue, dated July 12, 2016, Doc. No. 13619, at ¶ 3.

**REPLY**

A.    **Documents from Unrelated Customer Accounts Are Irrelevant and Should Be Excluded.**

The Trustee proffered hundreds of potential exhibits regarding PW notations in unrelated customer accounts.  In support of his submission, he argues that the hearing will address the omnibus issue of the Trustee's treatment of PW notations and will "resolve all objections relating to the Trustee's treatment of the PW Transactions."  Tr. Resp. at 23.  Putting aside the huge waste of time and resources involved in identifying, authenticating, and admitting hundreds of unrelated customer account records at hearing, the Trustee's argument completely ignores the posture of this proceeding.  The Trustee does not need a court order approving his general treatment of PW notations as cash withdrawals; he employed that methodology and honored claims up to that amount.  For those claimants who failed to object to his treatment of PW notations in their accounts, the issue is settled.  *See* Blums Motion at 1.  There is no purpose to litigating in the abstract whether the treatment was factually correct as to customers who are not before the Court.

The Trustee's proffer of exhibits that have no bearing on the Participating Claimants' accounts is a transparent attempt to backfill his lack of evidence as to the accounts at issue.  As set out in the motion,[2] the contested issue is whether the Trustee properly treated the PW notations of *Participating Claimants* as "cash out."[3]  Where, as here, claimants object to his determination and provide sworn testimony in support of their objection, the Trustee must do more than provide general evidence that many other customer accounts reflect PW as a debit that can be verified as a cash withdrawal through third party records, or that one customer is willing

---

[2] Blum Motion at 8.

[3] The Blums have met their burden by testifying under oath that they did not receive checks corresponding to the PW notations. *See* Blums' Pre-Hearing Br. at 24.

to testify that he got PW checks.  Rather, the Trustee must demonstrate that the PW notations *in the accounts at issue* can be shown to correspond to actual profit withdrawal checks received and cashed by Participating Claimants.

Other customers' decisions and account activities are not relevant to this fact-specific inquiry.  *See*, *e.g.*, *Sanders v. New York*, 2001 U.S. Dist. LEXIS 20242, at *6 (S.D.N.Y. Dec. 5, 2001) (granting motion *in limine* under Rule 402, as "[p]roposed evidence bearing no relation to facts that are of consequence to the action is inadmissible"); *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 140 (S.D.N.Y. 2015) ("It is of no assistance to a jury to know that Fortress chooses to invest in other distressed assets . . . . This evidence is therefore excluded …"); *LNC Invs. Inc. v. First Fid. Bank N.A.*, 2000 U.S. Dist. LEXIS 10787, at *10-18 (S.D.N.Y. Aug. 3, 2000) (excluding evidence of bank's conduct in prior credit setting as irrelevant under Rule 401 and unduly prejudicial under Rule 403); *see also* Blum Motion at 9 (discussing cases).  The Trustee offers only vague assurances that he will establish relevance at trial, Resp. at 39-40, but this is an inadequate response to the Blums' specific objections.  For these reasons—and because of the enormous time and resources that would be expended in admitting this extraneous material—the Blums request an order excluding any exhibits concerning accounts that are not at issue in these proceedings.

## B.    Notations in Madoff Securities Records Are Hearsay and Cannot Be Admitted for their Truth.

The "PW" notations on Madoff Securities customer statements and the handwritten "S" marginalia on customer files are hearsay and cannot be admitted for the truth of their assertions, *i.e.*, to demonstrate that 1) customers requested that profits be periodically withdrawn from their accounts and sent to them; 2) Madoff Securities sent out checks in the amount and at the time indicated by a PW notation on the customer statements; or 3) customers received and cashed

such checks.  *See* Blum Motion at 10.[4]  The Trustee concedes that the notations and marginalia

are hearsay, and *he states that neither he nor his professionals considered the S/R notations.  See*

Tr. Resp. at 15 ("the Experts did not rely on these S and R instruction in reaching their

opinions").   In light of the Trustee's concession that his professionals did not rely on the S/R

notations in computing customer claims, they should be excluded as irrelevant.[5]  The Trustee

bears the burden of demonstrating that the Madoff Securities customer statements and the PW

notations they contain fall within a recognized hearsay exception.  He cannot.

The Trustee asserts three hearsay exceptions for the customer statements and their

contents: the business records exception; the ancient records exception; and the residual hearsay

exception.  *See id.* at 38-57.  None apply.  Each of them is grounded in the bedrock assumption

that documents admitted under their auspices were created under circumstances providing such

significant guarantees of trustworthiness that their admission would not deprive the opposing

party of a fair hearing.  *See* Blum Motion at 13-14; *infra* at 6, 11, 17.  Any document admitted

under these exceptions must, as a threshold matter, contain the  indicia of reliability that the rules

were designed to ensure.  *See* Blum Motion at 13-14.   Notations of unknown authorship

contained in documents that were specifically created to deceive customers do not demonstrate

any guarantee of trustworthiness, and the Trustee has not cited a single case in which a court has

admitted similar documents for their truth.  Instead, he can only point to cases that are readily

distinguishable, as discussed below.

---

[4] Contrary to the Trustee's repeated suggestions, the Blums do not selectively challenge as
hearsay only those portions of the records that conflict with their testimony.  Rather, the Blums
limited their Motion to the only evidence that the Trustee has offered that has any bearing on
their claims:  the PW notations in customer statements and the S/R notations.  Because that is the
only evidence that is relevant to the Trustee's allegations about their accounts, it is the focus of
their Motion.  For the sake of clarity the Blums affirm that they object to the admission of any
hearsay in this proceeding, whether it is relevant to them or not.

[5] Neither can the Trustee adequately authenticate the notations.  Blum Motion at 11.

### 1. The Business Records Exception Does Not Apply.

Rule 803(6) assumes that in certain instances the business need to produce and maintain accurate records will provide sufficient guarantees of reliability so as to allow admission of those records for the truth of their contents. *See Giles v. Rhodes*, 2000 U.S. Dist. LEXIS 13980, at \*25 (S.D.N.Y. Sept. 26, 2000) ("The touchstone of admissibility under Rule 803(6) is reliability."). Therefore, this exception allows admission of business records *only* where they can be shown to have been created by a consistent and reliable procedure upon whose accuracy the business relies. The exception does not encompass documents produced under circumstances that suggest a lack of reliability, truthfulness, or accuracy. *See*, *e.g.*, *Carrasco v. N.M. Dep't of Workforce Sol.*, 2013 U.S. Dist. LEXIS 83420, at \*54 (D.N.M. 2013) (granting motion to strike "on the ground that the author of the documents is not identified, and thus the documents have not been authenticated"); *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013) ("[D]ocuments prepared with an eye toward litigation raise serious trustworthiness concerns because there is a strong incentive to deceive."); *In re Cirrus Logic Secs. Litig.*, 946 F. Supp. 1446, 1469 (N.D. Cal. 1996) ("It is plainly unfair to hold defendants liable for the reporting of their statements by third parties without independent corroboration of the accuracy of the reported statements"). The Trustee cannot show that the PW notations in customer statements meet any of these standards.

   a.   <u>There is no evidence that PW notations are reliable because they were made at or near the time by someone with knowledge.</u>

The proponent of a business record's admission must—as a threshold matter—demonstrate that the information therein was recorded by a reliable source. To be reliable, the source must have made the notations 1) "at or near the time" of the event; and 2) must have first-hand knowledge of the event or made the record based on information supplied by someone with knowledge acting in the ordinary course of business. Fed. R. Evid. 803(6).

Here, the Trustee cannot identify the author of any particular PW notation or the date upon which the notation was made; therefore, he cannot hope to demonstrate that the authors themselves made the PW notations at or near the relevant time. For the same reasons, he cannot establish that the authors had first hand knowledge of the information they were entering. The Trustee ignores these requirements, arguing that he does not need to know who authored the notations because the records in which they are found were "integrated" into Madoff Securities' records. *See* Tr. Resp. at 49-50. This is not sufficient to invoke the business records exception to the hearsay rule.

Courts applying Rule 803(6) have consistently stressed that the "trustworthiness" of the information is the "principal precondition to admissibility." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal quotation marks omitted); *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 U.S. Dist. LEXIS 81055, at *20, (S.D.N.Y. June 3, 2013). While various courts have found that particular documents satisfy this trustworthiness requirement even though the proponent could not identify the author or date of the entry, they have always required other indicia of reliability and trustworthiness for admission. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (citing Fed. R. Evid. 803(6) advisory committee's note) (explaining that the purpose of Rule 803 is to "'relax[] the requirement of producing as witnesses, or accounting for the nonproduction of, all participants' in the gathering and 'recording of ordinary business records'" because "business records are made reliable by 'systematic checking, by regularity and continuity which produce habits of precision' . . .") (internal citation omitted)). In every case cited by the Trustee, the admitted documents had substantial independent indicators of trustworthiness upon which the court could rely; no such indicia is present here.

For example, in *United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006), the *author* of undated annotations testified that it was his business practice "to keep a calendar in which he documented events of which he had personal knowledge at or near the time they occurred." Contrary to the Trustee's suggestion, the case does not stand for the broad proposition that notations of unknown authorship fall within the business records exception merely because they are found in a company's records. *See* Tr. Resp. at 48. The Trustee's citation to *United States Bank Nat'l Ass'n.. v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 144 (S.D.N.Y. 2015), is equally unpersuasive. *See* Tr. Resp. at 49. In that case, the court found that authorship was irrelevant *because* the opponent "pointed to nothing in any of the[] emails or actuarial memoranda indicating lack of reliability." *U.S. Bank Nat'l Ass'n*, 112 F. Supp. 3d at 144. Neither case supports admission here.

The Trustee also tries to liken his records to those at issue in *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013, at \*6, 2013 U.S. Dist. LEXIS 81055 (S.D.N.Y. 2013), in which the court allowed admission of a document where the records custodian was unable to specifically identify the author. *See* Tr. Resp. at 49. In *Yuen*, the plaintiff challenged the admission of a spreadsheet that Chase used to identify a descendant's beneficiary on the grounds that the document had been originally created by J.P. Morgan before the companies merged. *Yuen*, 2013 WL 2473013, at \*6. The court found that the document could be admitted even though Chase could not identify the specific author:

> As the Estate itself concedes, J.P. Morgan and Chase had **absolutely no incentive to falsify or alter the decedent's beneficiary elections.** . . . The entities did not generate the Spreadsheet for "personal purposes" or "in anticipation of any litigation." *Kaiser*, 609 F.3d at 574 (internal quotation marks and alteration omitted). To the contrary, they created and kept the document for the sole purpose of distributing the decedent's Accounts, a process in which they were entirely disinterested.

8

*Id.* at *23 (emphasis added).    Unlike Chase, Madoff Securities had a significant incentive to falsify customer account records, which were an essential part of a fraud on which the company was wholly dependent.    Indeed it is central to the Trustee's position that Madoff Securities used these customer statements to deceive customers.

Likewise, the Trustee's contention that Madoff himself was frequently the underlying source of the instruction to enter "S" or "PW" and that such instructions were supplied third hand to the author eviscerates the notion that the entries were made from first hand knowledge in the ordinary course of business.    Tr. Resp. at 53 ("the recorded information emanated from people with first-hand knowledge—*Madoff or others directly involved with the fraud.*")    (emphasis added).    To satisfy the "essential link" between the informant and the author, the Trustee must also show that the sources of the information (Madoff and his co-conspirators) were complying with a business obligation to convey true and accurate statements.    *See, e.g.*, *Romano v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993) (citing *In re Leon R.R.*, 397 N.E. 2d 374, 377 (N.Y. 1979)). Where the Trustee claims that the recorded trades that ostensibly produced the "profits" were entirely fictitious and intended to perpetuate a fraud, he is not entitled to the conflicting presumption that Madoff and his co-conspirators supplied accurate information concerning those trading profits to those who entered the notations in order to discharge a legitimate business duty. Fed. R. Evid. 803, advisory committee's note ("If . . . the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail").

      b.   There is no evidence that the PW notations at issue are the product of a regular business practice.

The "PW" notations on Madoff Securities records (and other similar statements contained therein) are not the product of a regular and consistent practice.    Blum Motion at 20.    In fact, the

record shows that there was no "routine" method for entering such notations. As detailed in the Motion, the evidence reveals that Madoff Securities periodically changed its accounting practices and its employees did not follow internal guidelines for reporting. *Id*. at 18. The Trustee argues that the rampant errors and other inconsistences go to the weight, not the admissibility of the evidence. Tr. Resp. at 53. The Trustee is mistaken; the inconsistences preclude application of the business records exception because they demonstrate the absence of the required routine and reliable process.

      c. <u>The Trustee's contention that records of fraudulent enterprises are routinely admitted under the hearsay exception for business activity is misplaced, and he cannot vouch for the reliability of Madoff Securities documents.</u>

The Trustee attempts to equate the records at issue here with records that were admitted in other fraud cases. However, the nature of the documents in those cases cited by the Trustee are not analogous. For instance, *United States v. Kaiser*, 609 F.3d 556, 575 (2d Cir. 2010), involved the admissibility of notes taken by a fraudster during meetings. In *Kaiser*, there was no allegation that these notes, taken for his personal use, were made for the express purpose of deceiving anyone. On the contrary, they needed to be correct so that the fraudster could use the information to further his scheme. In *Official Committee of Unsecured Creditors v. Martin (In re Enron Creditors Recovery Corporation)*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007), the court allowed the admission of certain financial statements, ledgers, journal entries, and other accounting records of Enron to determine whether Enron had received reimbursement regarding an employment separation agreement. There, the "challenge at the Hearing was directed to the identity of the person who provided the certification because the declarant had been Enron's in-house counsel. There [was] no indication that [the plaintiff] challenge[d] the accuracy or authenticity of the general ledger detail, the wage reimbursement detail, or the Separation Payment detail." *Id*. at 457. In another case cited by the Trustee, *Martorelli v. C.I.R.*, 40 T.C.M.

(CCH) 848 (U.S. Tax Ct. 1980), "the record indicate[d] that the day-to-day transactions between [a customer] and petitioner were recorded in the redbook, that these entries were verified on a daily basis with petitioner in order to disclose any errors, and that these entries were relied upon by [the customer] in the settlement of its account with petitioner." Here, the Trustee has taken the opposite position—the customer claims cannot by settled by relying on the very records he proffers.[6]

The Trustee asserts that his investigation has resolved all of the authorship concerns with the PW notations such that they may be admitted for their truth. His cases do not support such a blanket approach. For instance, the investigation by the trustee in *Curtis v. Perkins*, 781 F.3d 1262, 1267 (11th Cir. 2015), allowed a trustee to testify under oath that someone with personal knowledge created the documents and, more importantly, "that the information in those documents substantially matched the records kept by the financial institutions and clients with which IMA had transacted." *Id.* The Trustee does not pretend to make such a showing here, nor could he.

Unlike *Curtis*, the Trustee has not been able to verify the PW notations at issue through third party records from unrelated financial institutions. In addition, the testimony of employees responsible for the PW notations as well as the many inconsistencies in the business records identified by the Trustee's own professionals show that there are no indicia of trustworthiness. *See* Blum Motion at 18.

---

[6] *United States v. Tafoya*, 757 F.2d 1522, 1528-29 (5th Cir. 1985), is not analogous, either. There, the author of the specific records in dispute was known to both parties, despite the fact that he was alleged to have "sometimes falsified billing memoranda."

## 2. The PW Notations Are Not Admissible as Ancient Documents Under Fed. R. Evid. 803(16).

"A statement in a document that is at least 20 years old and whose authenticity is established" may be admitted for its truth under the hearsay exception in Federal Rule of Evidence 803(16). Such documents must be authenticated under Federal Rule of Evidence 901(b)(8), which requires the proponent to show that the record is in a condition that creates *no suspicion about its authenticity*. Examples of the types of ancient documents that are commonly admitted under Rule 803(16) include benign letters or other correspondence, old maps, or miscellaneous news articles. *See, e.g., United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 253-56 (S.D.N.Y. 2009) (personal letter); *Beach Mar, Inc. v. L&L Wings, Inc.*, 2016 U.S. Dist. LEXIS 9566 (E.D.N.C. Jan. 27, 2016); Rule 803(16), advisory committee's note (listing "letters, records, contracts, maps, and certificate, in addition to title documents") as the intended types of ancient documents that may be admitted). The Blums have been unable to locate any court that has allowed the admission of admittedly falsified business records under this exception.

In any event, even assuming that the records were located in a place where, if authentic, they would be likely to be found, the majority of them are not within the relevant time period and the Trustee cannot properly authenticate them. The Trustee glosses over his burden under Rule 803 and 901 to prove the records are "authentic" for the exception to apply. Instead, the Trustee vaguely promises that he "will offer evidence" on authenticity later, baldly asserting that the documents "were created more than 20 years ago and therefore fall within the exception." Tr. Resp. at 55-56. This is insufficient.

The Rules do not allow admission of all documents over 20 years old for the truth of their assertions simply by virtue age or the fact that the documents likely have not been altered for

several years.  Rather, it is the proponent's *burden* to demonstrate[7] that there is "*no* suspicion as to the authenticity of the document."  Fed. R. Evid. 901(b)(8)(A).  In this context, "authenticity" refers to the reliability of the document, not merely whether it has been altered.  There must be at least *some* suspicion as to the reliability of any specific entry on a record that the Trustee contends was specifically created to deceive customers about the trading activity done on their behalf.  The Trustee cannot overcome his burden of proving "no suspicion" by simply asserting that some entries on customer statements can be reconciled to third party documents.

      a.   The Ancient Documents twenty-year period is fixed in this SIPA case as of the filing date, which SIPA establishes as the date for fixing the debtor's obligations to its customers.

As a preliminary matter, the Trustee appears to contend that the temporal scope of this exception is not set until the date of hearing, such that he has managed to single-handedly enlarge its potential application from records predating 1988 (twenty years before the filing date) to records predating 1996 (twenty years before his response brief),[8] simply by delaying the litigation of this issue.  Presumably, the Trustee believes the clock will continue running – such that, if the PW hearing is not set until 2017 he will be entitled to admit any document dated before 1997, and so forth.[9]  This approach is absurd.

The ancient documents exception applies to materials created 20 years prior to the development of *the controversy*, not the ultimate hearing.  See Resp. at 56 (quoting advisory committee note).  SIPA itself fixes the date for claim determination as of the filing date, in this

---

[7] "The proponent must produce evidence to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).

[8] See e.g. Resp,. at 56 (announcing relevant date as November 18, 2016 – the date of the response brief.

[9] While misguided, this position may shed light on the Trustee's long delays throughout this litigation.  Further delays would further alter the evidence admissible.  This cannot be the intent of Rule 803(16).

case December 2008.  15 U.S.C. §78lll(11).  Further, on the granting of a petition for a protective

decree, the business of the broker is required to be liquidated, and it is unlawful for the trustee

(except as authorized by the Commission) to operate the business.  *See* 15 U.S.C. §§ 78fff(a)(4)

and 78jjj(b).  These provisions necessarily fix the date from which the debtor's obligations to the

customer are evaluated, and the date from which the 20-year rule should be calculated if it had

any applicability.  Thus, if the hearsay exception for ancient documents applies at all to this

proceeding, it can only apply to records that were created prior to 1988.  Since the Trustee lacks

any records prior to 1981, the potential scope of this hearsay exception is limited – at best – to

Madoff Securities records between 1981-1988.

      b.   <u>The Trustee cannot meet his burden to authenticate the Madoff Securities books
and records under Rule 901 because they are not what they purport to be and there
are substantial questions as to their authenticity.</u>

In order for a document to be admitted under Rule 901, the proponent must carry his

burden of demonstrating that the 20-year-old document is what it purports to be.  Rule

901(b)(8)(A) expressly states that this burden is met only where there proponent proves there is

"no suspicion" as to an ancient record's authenticity.  The Trustee argues that the records at issue

are "authentic" because they were found within the actual records of Madoff Securities.[10]  But he

looks in this regard only to Rule 901(b)(8)(B), ignoring that he bears the burden of showing that

*each* of the subdivisions of Rule 901(b)(8) must be satisfied.  The authenticity issue is not a

chain of custody inquiry – presumably the Trustee can show that the records are those he found

in Madoff Securities' files – rather, the question is whether the customer account statements are

what they purport to be:  accurate, contemporaneous recordings of actual brokerage account

activity.  They assuredly are not.

---

[10] Trustee Resp. at 44.

> i.  *The records are not what they purport to be: records of securities trades that the Trustee contends did not occur and profits from which are wholly imaginary.*

The Court should begin its analysis with the plain meaning of "authentic" as used in Rule 901.  The Supreme Court routinely looks to the common meaning of terms used to define their meaning.  *See*, *e.g.*, *Samsung Electronics, Co. v. Apple, Inc.,* No. 15-777 (Sup. Ct. Dec. 6, 2016) Slip. Op. 6.  Webster's Dictionary defines "authenticity" as "the quality of being authentic; reliability; genuineness."  *Authenticity*, WEBSTER'S DICTIONARY (3d. 1961).  It defines the term "authentic" as "can be believed or accepted, trustworthy."  *Authentic*, WEBSTER'S DICTIONARY (3d. 1961).  Similarly, the Ballantine's Law Dictionary defines "authentic" as "properly attested; e*xecuted according to law; genuine*."  *Authentic*, BALLANTINE'S LAW DICTIONARY (3d ed. 1969). (emphasis added).

Consistent with that definition, the examples in Rule 901(b) are designed to ensure the *reliability* of the documents.  *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) (stating that the authentication requirements in 901(b)(4) are designed to ensure that the documents presented to the court are reliable).  In fact, the very reason that the original 30-year age requirement for ancient records was reduced to 20 was based on the Advisory Committee's view of the "unlikeliness of a still viable fraud after the lapse of [a 20-year period]." Fed. R. Evid. 901(b)(8), advisory committee's note (emphasis added); *see also* 1-24 Federal Courtroom Evidence § 901 (2015).  Accordingly, in order to "authenticate" the notations, the Trustee must demonstrate that the Court can rely on these documents because there is *no suspicion* as to their "trustworthiness."

Any argument that the Madoff Securities records are reliable or trustworthy is fanciful at best.  The Madoff Securities records, on their face, purport to be records of trades and the distribution of profits from those trades.  However, the Trustee has contended for years that

Madoff Securities account statements are not accurate records of account activity and are anything *but* trustworthy. *See*, *e.g.*, Tr. Resp. at 1. Rather, according to the Trustee, these documents were the centerpiece of Madoff's deception – created with the specific intention of obfuscating and perpetuating a fraud. As such, the Madoff Securities customer account statements cannot "be believed or accepted" or be deemed "trustworthy." *See id.*

Having himself admitted the suspicious nature of the Madoff records, the Trustee cannot offer specific entries in those records as above suspicion – especially those entries that center on trades that the Trustee asserts never took place. The Trustee's assertion that the Madoff Securities account statements "accurately reflect cash deposits and withdrawals," and should be deemed reliable as to those select entries, does not withstand scrutiny. It is the Trustee who has insisted that the account statements are not accurate and reliable indicators of a customer's account activity, fighting for. He fought and won the battle over his alternative cash-in/cash-out methodology for determining a customer's claim. The entire point of these current proceedings is to determine whether, as to Participating Claimants, the PW notations in the otherwise unreliable and fraudulent account statements accurately reflect cash paid to customers. The Trustee cannot prove the cash payment simply by pointing to debit entries from the otherwise fictitious account statements themselves. He is estopped by his fervent positon about the inaccuracy of the credit and debit entries related to fictional trades that are recorded on these account statements.[11]

---

[11] *See, e.g.,* August 20, 2013 Report of Bruce G. Dubinsky at 156 ("[F]raud permeated BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical buyer."); Trustee First Interim Report for the Period December 11, 2008 through June 20, 2009, ¶7 Adv. Pro. No. 08-1789; *Securities and Exchange Commission v. Bernard Madoff, et al.*, 08-cv-10791, Complaint at para. 3.

> ii. *The Trustee has offered nothing to overcome the suspicion as to the*
> *documents' authenticity.*

In light of these considerable questions regarding authenticity, the burden falls on the

Trustee to cure this suspicion by demonstrating that the statements are otherwise reliable. *Arista*

*Records LLC v. Lime Grp. LLC*, 715 F. Supp. 2d 481, 503 (S.D.N.Y. 2011) (authentication

requires the proponent to provide competent testimony from a witness with knowledge of

document's authenticity or circumstantial evidence establishing a "reasonable likelihood" that it

is authentic). The Trustee has not found a single analogous case to support his position that

unreconciled documents of unknown authorship that were specifically used to defraud

individuals can be relied upon. For instance, the Trustee cites to *Curtis v. Perkins*, 781 F.3d at

1267-69. As discussed *supra*, in *Curtis*, the trustee found multiple sources of reliability not

available here: he found that the records were sent to third party institutions, not just the victims;

and he was able to confirm the accuracy of these records with those institutions. Unlike in *Curtis*,

the Trustee cannot reconcile *any* of the disputed notations to third-party records. In fact, he

cannot even identify the author of the notations.[12]

> c. The PW notations do not satisfy the requirements of Rule 803(16) because they
> present all of the problems the prohibition on hearsay sought to avoid.

In any event, the admission of these statements would clearly run afoul of Rule 803(16).

As the Advisory Committee makes clear, the exceptions to the hearsay rule "proceed[] upon the

theory that under appropriate circumstances a hearsay statement may possess circumstantial

guarantees of trustworthiness sufficient to justify nonproduction of the declarant in person at the

trial even though he may be available."

---

[12] The remaining cases are also inapposite. For instance, while *United States v. Kaiser*, 609 F.3d
556, 575 (2d Cir. 2010), involved the admissibility of documents belonging to a fraudster, the
documents admitted were notes he had taken during meetings. There was no allegation that
these notes were inaccurate or made for the purpose of deceiving others.

Indeed, the very premise for admitting "ancient records" was the Advisory Committee's presumption the "danger of mistake is minimized by authentication requirements, and age affords *assurance that the writing antedates the present controversy*." Fed. R. Evid. 803(16), advisory committee's note (emphasis added). That is, "[a]n assertive statement found in an ancient document" assuages the hearsay concerns because it such statements are "more likely to be *truthful* because 'age affords assurance that the writing antedates the present controversy,' as such a document must have been written before the current motive to fabricate arose." *Hicks v. Charles Pfizer & Co.*, 466 F. Supp. 2d 799, 805-07 (E.D. Tex. 2005) (citing *United States v. Stelmokas*, 1995 U.S. Dist. LEXIS 11240, at *6 (E.D. Pa. Aug. 2, 1995), *aff'd*, 100 F.3d 302 (3d Cir. 1996), *cert. denied*, 520 U.S. 1241 (1997) (emphasis added)); *see also Ninety Six v. S. R. Co.*, 267 F.2d 579, 583-84 (4th Cir. 1959) ("The doctrine of admitting ancient documents in evidence, without proof of their genuineness, is based on the ground that they prove themselves, the witness being presumed to be dead.") (internal citation omitted).

Here, on the other hand, there are no grounds for the Trustee to assert that the PW notations antedate the present controversy, were written before the current motive to fabricate arose, or that the lapse of time has rendered Madoff Securities account statements more likely to be truthful. And he has shown nothing to overcome the suspicious nature of the Madoff book entries.

For the reasons set forth above, admitting the Madoff Securities books and records on the grounds that the fraud was so difficult to detect that it lasted for decades would produce an absurd result. It is because of such misinterpretations offered by the Trustee that the Judicial Conference Rules Committee recently voted to abrogate Rule 803(16) in its entirety, effective December 1, 2017. *Preliminary Draft of Proposed Amendments to the Federal Rules of*

*Bankruptcy Procedure and the Federal Rules of Evidence 18*, Committee On Rules of Practice

and Procedure of the Judicial Conference of the United States, U.S. COURTS (Aug. 2015) ("[A]

document does not become reliable just because it is old; and a document does not magically

become reliable enough to escape the rule against hearsay on the day it turns 20."); *see, e.g.*,

*United States v. Manfredi*,  2009 U.S. Dist. LEXIS 106115, at *10 (W.D. Pa. Nov. 13, 2009)

(rejecting document in a tax evasion case related to bank deposits on the grounds that "the lack

of circumstantial guarantees of trustworthiness and probativeness of the proffered hearsay

statement, the 'general purposes' of the Federal Rules of Evidence and the 'interests of justice'

would not be served by admitting the statement into evidence at trial.").  Accordingly, the Blums

urge the Court *not* to admit the pre-1988 Madoff Securities records simply based on their age.

### 3.  The Madoff Securities Books and Records are Not Admissible Under the Residual Exception of Rule 807.

Alternatively, the Trustee asks the Court to admit the Madoff Securities account

statements and other hearsay materials under the residual hearsay exception.  Rule 807 dispenses

with the formal requirements set out in Rules 803 and 804 for those rare statements that bear

such significant hallmarks of trustworthiness that justice dictates their admission.  Clearly, this

exception was not created to enable the Trustee to admit unreconciled notations of unknown

authorship created to defraud.  The Trustee can satisfy neither the spirit of this exception nor its

specific elements.

### a.  <u>The Trustee's own professionals determined that the Madoff Securities account statements lack circumstantial guarantees of trustworthiness.</u>

A party seeking to admit statements under Rule 807 "bears the burden of establishing that

the statement is especially trustworthy."  *Batoh v. McNeil-PCC, Inc.*, 2016 U.S. Dist. LEXIS

31126, at *29 (D. Conn. Mar. 20, 2016) (citing *Jacobson v. Deutsche Bank, A.g.*, 206 F. Supp.

2d 590, 595 (S.D.N.Y. 2002)); *United States v. Washington,* 106 F.3d 983, 1001-02 (D.C. Cir.,),

*cert. denied*, 522 U.S. 984 (1997)). At a minimum, "the hearsay evidence [must] have 'circumstantial guarantees of trustworthiness' that are 'equivalent' to those reflected in the other hearsay exceptions." *Batoh*, 2016 U.S. Dist. LEXIS 31126, at *29  (citing *Brown ex rel. Estate of Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 512 (D.N.J. 2002)); Fed. R. Evid. 803, advisory committee's note ("The committee believes that there are certain exceptional circumstances where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of pro[b]ativeness and necessity could properly be admissible.").

As detailed *supra*, Rule 803 does not allow for admission of these notations precisely because they are untrustworthy, *e.g.*, the authors and dates are unknown; the informant (to the extent we know his or her identify) is likely to be a convicted felon; the specific documents were used to deceive and defraud customers; and the notations were not recorded in a reliable or consistent manner.  The Trustee attempts to dismiss these considerations by providing a vague assurance the documents are what they purport to be.  However, Rule 807 is not so easily satisfied.  It is not enough that a document is what it purports to be if what it purports to be is an unauthored book entry that was prepared at the behest of a convicted fraudster *in order to* deceive a customer and perpetuate the fraud.

The Trustee fails to identify any analogous cases.  He cites to *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), which is inapposite.  *See* Tr. Resp. at 58 .  In *Chevron*, the court admitted bank records that were not challenged for their trustworthiness, noting "the lack of any evidence in the record" that they were not accurate records on which the court could rely.  Here, in contrast, the Trustee affirmatively argues that the same Madoff Securities account statements on which he relies were meant to deceive customers and made with actual intent to

hinder, delay, or defraud creditors.   The Trustee cannot have it both ways.   These are not

"exceptional circumstances" in which this Court could find the documents have "guarantees of

trustworthiness equivalent to or exceeding the guarantees" of all other hearsay exceptions.

Accordingly, on this most important basis alone, the Court should end its Rule 807 analysis and

not allow the Madoff Securities account statements to be admitted for the truth of their assertions.

> b.  <u>The Trustee's concession that the Madoff Securities account statements are the
> "Most Probative" evidence he has does not establish the applicability of a hearsay
> exception.</u>

"[N]ecessity alone will not render hearsay admissible under the residual exception"

because "[s]uch a rule would eviscerate the hearsay rule."   *Jacobson*, 206 F. Supp. at 596

(emphasis added).   The Trustee laments that "it is hard to imagine any evidence that would be

more probative as to the meaning of the PW transactions than Madoff Securities books and

records themselves."   Tr. Resp. at 60.   But third-party records are routinely used to verify

questionable records.   What is hard to imagine is a worse case to invoke the Rule 807 exception;

here, the Trustee has no objective evidence to verify the accuracy of otherwise fraudulent records

but seeks to introduce the documents for their truth to rebut the Blums' more probative first hand

testimony that they did not request or receive the alleged profit withdrawal checks, their

statements that Morris Blum planned to (and did) habitually save, and that they never saw or

heard of Morris Blum receiving any of the hundreds of alleged profit withdrawal checks noted in

his account statement.   The Court should reject the Trustee's attempt to eviscerate the hearsay

rules simply because he cannot find any admissible evidence to support his contentions.

> c.  <u>Allowing hearsay to be admitted does not serve the "interests of justice."</u>

The Trustee "generally collaps[es] together 'the inquires of justice' and 'trustworthiness,'"

and admits he "must point to evidence that corroborates both the declarant's trustworthiness and

the truth of the statement."   Tr. Resp. at 61 (quoting *United States v. Paulino*, 445 F.3d 211, 220

(2d Cir. 2006) (internal quotation marks omitted)).   As detailed above, the Trustee offers no

evidence corroborating trustworthiness, instead vaguely promising he "will offer evidence" that

the Madoff Securities books and records are authentic.   *Id.*   Further, to the extent he cites

*Silverstein v. Smith Barney, Inc.*, 2002 U.S. Dist. LEXIS 10898, at *4 (S.D.N.Y. June 18, 2002),

and *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 113 (3d Cir. 2001), as

admitting evidence since it is "the most reliable" and would "assist the jury in determining the

truth," these cases do not apply to the present facts, where the Trustee's professional has

admitted that the foundational documents were falsified and made for the purpose of defrauding

creditors and others.   *See* Tr. Resp. at 60-61.  Thus, admitting these known fraudulent,

purposefully misleading documents for the *truth* of the matter they assert is, at best, a useless and

time-wasting endeavor, and at worst, perverts the purpose of the Federal Rules of "ascertaining

the truth and securing a just determination."  *See* Fed. R. Evid. 102.

d.   <u>The Trustee did not provide sufficient notice of his reliance on Rule 807.</u>

In his opposition to the Blums' motion, the Trustee invokes Federal Rule of Evidence 807

for the first time.  The Trustee justifies this late warning on the grounds that the Blums had time

to review the underlying documents he seeks to admit, but this is not the appropriate inquiry.

Rule 807(b)'s notice requirement mandates that the proponent give the opponent a fair

opportunity to address the offered statement and its particulars.   A party satisfies this notice

requirement by identifying the particular evidence *and* giving the opponent a "fair opportunity to

meet it."  While a party can satisfy the notice requirement set out in Rule 807(b) by showing that

the opposing party had the "declarant's name and address," he cannot satisfy this requirement by

merely showing that the information was available.  Here, regardless of whether the Blums have

had the previous opportunity to preview the documents, nothing in the Trustee's prior

submissions suggested that he would attempt to admit these fraudulent documents under Rule

807—an exception specifically reserved for documents that are so trustworthy that the "interests of justice" require their admission.

The Trustee has not met any of the five requirements of Rule 807 and the Court should decline to admit Madoff Securities records on this exceptional basis.

## C.    The Trustee's Summary Exhibits Rely on Inadmissible Material and are Prohibited by Federal Rule of Evidence 1006.

The Blums moved to exclude the Trustee's summary exhibits,[13] which purport to summarize the PW notations and other statements within Madoff Securities records on the grounds that the exhibits were improperly based on inadmissible hearsay.[14]  The Trustee argues that these summaries may be admitted because he produced the documents they purport to summarize, but this is irrelevant.  *See* Tr. Resp. at 64.  The Trustee fails to address the black letter rule that the underlying documents on which the summary is based must themselves be admissible.[15]  *See, e.g.*, 6-1006 Weinstein's Federal Evidence § 1006.07 (2015) ("Summary evidence is inadmissible if the original materials on which it is based contains hearsay that does not qualify as admissible evidence under one of the exceptions to the hearsay rule."); *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (Rule 1006 "clearly permits the use of a summary of business records provided 'all of the records from which it is drawn are

---

[13] *See* Trustee Exs. 1 through 24-208.

[14] The Fed. R. Evid. 703 discussion is located *infra* at 24.

[15] The Trustee also complains that the Blums did not specify which portions of which underlying documents contain hearsay.  But the Trustee has conceded that the PW notations and other affirmative statements in the Madoff Securities records are hearsay, and the Blums gave specific examples of this problem in their motion.  *See, e.g.*,  Blum Motion at 26 ("For example, Exhibit 2—"BLMIS Direct PW Accounts"—purports to list all accounts that requested "PW" notations; however, this list is largely a compilation of handwritten "S" notations.  Similarly, the 208 Principal Balance calculations rely on the "PW" notations contained in the spiral notebook, customer statements, and other BLMIS-generated documents.").  The Blums do not bear the burden of annotating the Trustee's proposed summary exhibits to identify all the hearsay materials on which they rely.  Rather, it is the Trustee's burden to demonstrate that his summaries are drawn exclusively from admissible evidence.  *See* Blum Motion at 30.

otherwise admissible.'") (citations omitted).   Thus, the admissibility of the Trustee's summary exhibits turn on whether the supporting documents are each admissible.   As shown, *supra*, they are not.

### D.  The Professionals' Testimony Is Inadmissible Under Fed. R. Evid. 702 and 703.

The Trustee argues that he is entitled to rely on professionals to assist him in reconstructing the debtor's records in order to determine the appropriate treatment of customer claims.   This may be true, but it is irrelevant.   The question is not whether the Trustee can employ professionals to assist him:  rather, the issue is whether, in a judicial proceeding where they are asked to testify as experts, the professionals' proffered testimony and opinions satisfy Federal Rules of Evidence 702 and 703.   They do not.

First, both Collura and Greenblatt's analysis of the PW issue suffers from significant data and methodological issues that go beyond simple questions as to what weight their testimony should be given.   The professionals, who the Trustee asked to "synthesize" Madoff Securities' books and records as part of his due diligence, examined the available records—and their conclusions are limited to a period that is largely not at issue here.   *See* Tr. Resp. at 2; Blum Motion at 5-8.   Further, their manipulation of the data to exclude PW notations that were wrong and to include transactions that were not coded as PW may be justified for an individual account determination but are not a sufficient basis for the opinion that all PW notations accurately record cash withdrawals sent to customers.   The professionals may not rely on hearsay where, as here, the fraudulent records are not the sort of materials on which experts in the field routinely rely.   Finally, the experts' self-serving speculation about the existence and content of missing bank records is beyond the scope of any reasonable expert opinion, and should be excluded.

    **1.  The Professionals' Proposed Testimony Is Based on Irrelevant Ten-Year Data and Unverifiable Assumption that the Relevant Practices Were the Same in Earlier Times.**

    As detailed previously, Collura's data set was extremely limited and focussed on a time period that is largely irrelevant here.  *See*, *e.g.*, Blum Motion at 38.  Her reconciliation of the Ten Year Period is not relevant to this case as the notations produced during that time period were treated in a markedly different fashion.  *See, e.g.*, *GE v. Joiner*, 522 U.S. 136, 147 (1997) (court must exclude opinion where there is "too great an analytical gap between the data and the opinion offered"); *Raskin v. Wyatt Co.*, 125 F.3d 55, 67-68 (2d Cir. 1997) (evidence upon which expert relies must be relevant to the specific factual issue).  The Trustee fails to address this time period issue head on, detailing instead the examination conducted in this later period and insisting that his experts examined transactions "as far back as records allow."   Tr. Resp. at 4; *see also id*. at 9 (referencing 1995-2008 period in passing).  But an expert cannot simply assume – in the absence of verifying evidence and in the face of all contrary evidence – that observed patterns in one time period apply to an earlier period.

    The Trustee cites *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 74 F. Supp. 3d 639, 651-53 (S.D.N.Y. 2015), to argue that a party may rely on evidence from other time periods. This argument misses the mark.  Evidence regarding PW notations in the Ten Year Period is improper not simply because the notations involved a different time period.   Rather, this evidence is irrelevant because the notations were created differently during that time period.  As the court in *Nomura* made clear, parties can look at "evidence derived from the period following the origination of the loan" only so long as "it is probative of a relevant characteristic of the loan at the period of time at issue here."  *Id*. at 653.  Where as here, there is no reason to believe that the notations in the Ten Year Period were treated in the same manner as those at issue in this case, such evidence is irrelevant.

Greenblatt's conclusions about the consistency with which Madoff Securities recorded PW notations—and whether they indicate that profit checks were requested, sent out and cashed by customers—is expressly based on the Collura Report and evidence from an irrelevant period. Greenblatt glosses over these issues, apparently assuming that the pattern existing in the Ten Year Period must have been the same beforehand.  He provides no evidence for this assumption, nor is there any evidence in the record to support it.  On the contrary, the testimony shows that this period was marked by very different practice.[16]  The Trustee asserts that Greenblatt's review was not a "one-time ad hoc inspection," but this does not address the real issue.  No matter how much time Greenblatt spent reviewing Madoff Securities' records, his carte blanche conclusion that Collura's analysis would hold true for all prior periods is not sufficient basis for expert opinion.

In addition to examining a largely irrelevant period, Collura's analysis demonstrated that the PW notations do not in fact carry a uniform meaning.  *See* Blum Motion at 34-35.  Her limited most successful reconciliation examined only *six* percent of the total PW notations, nearly all of which occurred *after* the notations at issue here.  *Id*. at 34.  When Collura examined the relevant period, her reconciliation rate plummeted to 57%.  *Id*.  However, even this low rate is questionable as these notations were not necessarily reconciled to third party bank records. They were "reconciled" by employing a very liberal reading of customer communications.  The Blums' Motion in Limine discusses these flaws in depth.  *See*, *e.g.*, Blum Motion at 34-39.  The Trustee does not answer these arguments.

---

[16] *See* Blums' Pre-Hearing Brief in Opposition to Trustee's Profit Withdrawal Motion, at 13 (detailing changes in accounting practices).

**2.  The Professionals' Testimony Is Misleading and Unreliable Because of the Rampant Bias in Data Collection.**

An expert must rely only on reasonable data and control for any relevant variables that could undermine his theory or skew his findings. *In re Omnicom Grp., Inc. Sec. Litig.,* 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (rejecting expert opinion that did not account for important confounding factors); *In re Exec. Telecard Sec. Litig.,* 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997) (excluding expert on the grounds that he did not consider the effect of a company's proposed spin-off on findings); *In re Oracle Sec. Litig.,* 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (rejecting an expert report for not using an event study to "more accurately [] isolate the influence of information specific to Oracle which defendants allegedly have distorted"); *In re Xcelera.com Sec. Litig.,* NO. 00-11649-RWZ, 2008 U.S. Dist. LEXIS 77807 (D. Mass. Apr. 25, 2008).

The Trustee argues that his professionals are nevertheless entitled to intentionally exclude relevant data and rely on records that do not exist. *See* Tr. Resp. at 33-34.  For example, the Trustee admits that his professionals excluded roughly 800 PW notations from their analyses because they found evidence that these PW notations did not result in a customer receiving and cashing a check.[17]  Again, the Trustee ignores the importance of this Court's role as a gatekeeper when it comes to expert opinion.  While some narrowing and expanding of the dataset may be a standard exercise of professional judgment, the opinions offered here are analytical leaps, unsupported by any verifiable process.  This is precisely the kind of testimony that the rules were designed to bar.

The Trustee also argues that the deliberate exclusion of these notations does not unduly bias the dataset because, in most instances, the *debit* made as a result of this erroneous entry was

---

[17] Tr. Resp. at 18.  *See also* Greenblatt Supp. PW Rep. ¶ 16, n.5.

later cancelled out in the customer statements. Therefore, considering these PW notations as proof of cash out, would "misrepresent" the actual transactions. This is precisely the issue: the PW notations admittedly are not accurate. To carry his burden under his chosen cash in cash out methodology, the Trustee must demonstrate that a customer made the withdrawal he seeks to deduct from their net equity. The roughly 800 notations that represent cancelled and uncashed checks directly contradict the assertion that a PW debit notation is dispositive on that question – just as a trading profit credit notation is not dispositive as to a customer's increased equity.

Likewise, the Trustee's professionals encountered thousands of other errors in the Madoff Securities records. The professionals found nearly a thousand instances where "CW" notations were internally treated in a similar matter to "profit withdrawal transactions"; over 52,000 purported profit withdrawal transactions were incorrectly coded; and at least other 96 transactions were coded improperly and needed to be completely updated. [18] Yet, the professionals did not alter their hypothesis to account for these problems. Instead, they merely shoehorned these erroneous entries into their original theory, actually using the improper notations to argue that PW notations are reliable. This is impermissible. *See, e.g.*, *In re Exec. Telecard Ltd., Sec. Litig.*, 979 F. Supp. at 1026 (failure to account for alternative causes may be provide a basis for exclusion).

The Trustee fails to offer a reasonable explanation for the inclusion of the hundreds of improperly coded "CW" notations in the PW population, other than his professionals' belief that they were treated as debits. The professionals also included roughly 55,000 notations in their PW population even though they were clearly erroneous entries. The professionals' analyses found that of the 91,138 "PW" notations only 34,574 follow the instructions required by he

---

[18] *See* Blums Motion at 19 (discussing errors). *See also* Greenblatt Supp. PW Rep. ¶ 16, n.5.

House 17 Manual.    The Manual requires all "PW" transactions to be accompanied by a "description type 'check & stock name." *See* Blums Motion at 19 (discussing House 17 Manual at MADTSS00336547).  However, 52,000 of the purported PW notations have no stock name, merely stating "check."   This data is evidence of a severely flawed record keeping practice, which does not address the Trustee's burden to prove a consistent and reliable *cash out* pattern.[19]

In justifying these data alterations, the Trustee misstates the purpose for which the information is being offered.  Again, it is the Trustee's burden to show that Madoff Securities followed such a uniform, consistent routine that the Court should trust that PW notations uniformly represent the transfer of profits, and that this assumption should outweigh the contrary sworn testimony of customers.  The fact that Madoff Securities' records and statements either improperly treated CW notations in the same manner as PW notations or improperly coded "PW Transactions" as CW transactions refutes that notion, and expert testimony that purports to ignore such data should not be admitted.  At best, the professionals assert that all of the PW notations corresponded to verified cash withdrawals – except for the hundreds that did not – and that CW/Jrnal notations were treated differently than PW notations – except for the hundreds that were not.  This sort of gerrymandered data is not helpful to the trier of fact and prohibited by Rule 702.

The Trustee's arguments also completely ignore Rule 702's prohibition on *ipse dixit* testimony.  While experts are allowed to base opinions on their professional judgment, these judgments must incorporate *some* demonstrable principle that can serve as an indicator of reliability.  *Daubert* provides three examples of such indicators: testability, peer review, and

---

[19] The Trustee's explanations for the "update" of 96 transactions is similarly misleading.  Tr. Resp. at 18.  The "update" of four categories: "date, amount, type, and description" for almost 100 transactions is not ministerial.

publication; potential rate of error and the existence of standards for employing a technique; and general acceptance in the community. Greenblatt employs none of these, nor does the Trustee specifically offer any indicator of reliability. He provides only the conclusory assertion that the "methodology employed by Mr. Greenblatt is one of the methodologies employed by forensic accountants and fraud examiners." Tr. Resp. at 32. The issue is not whether the Blums agree with the experts' conclusions, but whether the offered opinions are based on valid reasoning or reliable methodologies. The Trustee offers no defense or explanation to the specific challenges raised to his experts' assumptions as to time periods pre-dating 1998, other than records don't exist. Such general *ipse dixit* assurances are not enough to meet a Rule 702 challenge.

The Trustee's assurances that the errors in his professionals' methodology and inconsistencies in Madoff Securities records are mistakes that do not conflict with the purported balance in the customer statements are completely beside the point.[20] *See* Tr. Resp. at 18. The Trustee did not calculate customer claims based on the balance shown on account statements, and has in fact argued that the statements are wholly unreliable records of fictitious trades. *In re Bernard Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 24, 25 (2012). Rather, the *sole* method the Trustee has elected to use in determining customer claims is the cash-in cash-out methodology. His burden, therefore, is not to prove there were debit entries on a phony account statement but that the internal account entries of "PW notations" in the relevant Blum accounts actually resulted in cash being received by the Blums. He can satisfy this burden only by proving that a PW notation means that checks were sent to and received by

---

[20] The Trustee's own summary of Greenblatt's methodology confirms that Greenblatt did not review *any* records to determine that the notations actually caused outflows. Rather, Greenblatt reviewed "documents supporting the PW Transactions as debits" and the "impact of the PW transactions on the purported equity balances." Tr. Resp. at 5. This does not address the issue presented here: debit and credit entries related to fictional trades do not establish – under the Trustee's own methodology -- that a check was actually sent out or received.

the Blums.  In light of the acknowledged inconsistency in the use of the term PW, and in the absence of any independent third-party verification that such checks were sent and received, it advances nothing to point to the PW notation alone as sufficient to prove the truth of the matter asserted.  No amount of the Trustee post hoc explanations alter this stark conclusion.

### 3. Both Professionals Fail to Satisfy the Requirements of Rule 703 Because their Opinions Are Based on Inadmissible Hearsay Not Usually Relied upon by Experts in the Field.

Courts allow professionals to base their opinions on inadmissible testimony *only* if the proponent demonstrates that such statements are normally relied upon by experts in the field. Notations of unknown authorship and produced in order to effectuate a fraudulent scheme are not the sort of evidence relied upon by reasonable experts in the field of forensic accounting.  *See* Blum Motion at 12-13 (collecting cases).  These problems are especially acute here, where there is a dearth of reliable documentation demonstrating that any PW notations in the relevant time period actually mean cash out, and no independent proof that the notations at issue here resulted in such checks.

The Trustee does not respond to these arguments as they relate to the requirements of Rule 703.  Instead, he argues that "expert witnesses are routinely permitted to rely on hearsay, provided that the hearsay reviewed is ordinarily a source of information for an expert in the field." Tr. Resp. at 36.  The Trustee's own authorities undermine his contention.  For example, in *Stenger v. World Harvest Church, Inc.*, 2006 U.S. Dist. LEXIS 15108, *34 (N.D. Ga. Mar. 31, 2006), the court admitted evidence only upon a showing that the documents created during a Ponzi scheme were independently verified by third party bank records.  This the Trustee cannot show.

4.  **Greenblatt and Collura's Speculation Regarding the Content of Missing Records Is Improper Under Federal Rule of Evidence 1004.**

Both of the Trustee's professionals speculate about the content of third party documents that are missing or never existed.  Greenblatt, in particular, makes the bald assertion that third party bank records (long destroyed) would categorically confirm his conclusions.  Principal Balance Calculation Rep. of Matthew B. Greenblatt, at 12 n.13. This sort of wild speculation about the content of missing documents goes well beyond any reasonable professional inference and  Rule 1004 bars such speculation.  *See* Blum Motion at 27-30.

Recognizing the "formidable burden"[21] that Rule 1004 imposes, the Trustee argues that Greenblatt's statements are not speculation as to the existence and content of missing records but rather conclusions based upon his experience and forensic analysis.  Tr. Resp. at 33.  This argument ignores Greenblatt's actual assertions.  *See, e.g.*, Principal Balance Calculation Rep. of Matthew B. Greenblatt, at 12 n.13 ("[Based on analysis of notations after December 1998] I can reasonably infer that the cash transactions on Customer Statements prior to December 1998 would reconcile to third-party bank records had such records been available."); Collura PW Rep. at 7, 8, 12, 14, 18 (asserting that she can "reasonably infer" that missing documents would support reconciliation).  These are obviously speculative statements regarding the content of missing documents, and should not be permitted.  Adding the word "reasonably" in the sentence does not make the inference any less speculative.  Even if these statements were inferences based on expertise, they are barred by Rule 1004 because neither professional has actual knowledge regarding the existence or the content of the missing records.  *United States v. Wells*, 262 F.3d

---

[21] *Doucet v. Drydock Coal Co. (In re Oakley)*, 397 B.R. 36, 49 (Bankr. S.D. Ohio 2008) (citing *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1021 (6th Cir. 1995) ("[W]e cannot state that a party can never prove the terms of [an insurance] policy without a copy of the policy or a reasonable facsimile thereof.  But the party trying to do so certainly faces a formidable burden.")).

455, 462 (5th Cir. 2001) ("If we allowed this testimony, we would, in effect, be allowing an end

run around the rule against hearsay and the requirements of the business records exception. This

we are unwilling to do.").

The Trustee argues that Greenblatt's speculation about the content of third party bank

records "fall[s] squarely within" his expertise in "reconstructing and analyzing the books and

records and determining how much is owed, if any, to a Madoff Securities customer." Tr. Resp.

at 30. The Trustee vastly overstates the extent to which Greenblatt (or any expert witness) can

be qualified to offer an "opinion" on the content of missing records. The proponent of expert

testimony must do more than establish that the witness possesses expertise in the general subject

matter. *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). He must show that the

expertise is *specifically* relevant to the testimony offered. *Davis v. Caroll*, 937 F. Supp. 2d 390,

413 (S.D.N.Y. 2013) (court's "admission of an expert does not provide that individual with *carte

blanche* to opine on every issue in the case"). In other words, it is not enough that an expert is

qualified in the field generally; he must be specifically qualified with respect to the issue upon

which he opines. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642

(S.D.N.Y. 2007) ("[A]n expert qualified in one subject matter does not thereby become an expert

for all purposes.").

The Trustee attempts to distinguish this case from *Louis Vuitton* on the grounds that a

forensic accountant is qualified to offer estimations as to the probability that certain records exist

*and* that those records contain specific information. While it may be within the professional's

expertise to opine that it is likely that bank records prior to 1998 existed at one time, and that

those records, if they had been available, would likely contain entries that could have confirmed

or refuted the PW notations, Greenblatt's testimony goes far beyond such topics into speculation

33

about the actual content of the missing records.  The Trustee provides no case supporting the proposition that a forensic account can engage in such forms of analysis.  The law is to the contrary.  *See, e.g.*, *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 *195 (S.D.N.Y. 2002) ("[W]here the proffered testimony is based on a methodology transposed from one area to a completely different context, and there is no independent research supporting the transposition, the 'fit' requirement may not be satisfied").

Further, Greenblatt's speculation about third party records does not require any particular expertise and therefore his testimony fails to satisfy Rule 702's requirement that an expert's testimony be based on specialized knowledge.  The Trustee does not directly respond to this fatal defect.  Instead, he generally asserts that Greenblatt's "experience in forensic accounting is frequently considered 'specialized knowledge' sufficient to form a basis to qualify expert testimony, particularly in cases involving the reconstruction of a defunct company's books and records." Tr. Resp. at 29.  Expert testimony is not analyzed in such a broad and general fashion, however.  Rather, when evaluating whether a conclusion is within the expert's area of expertise, the court should examine whether the specific opinion is within that specific area of expertise.  Here, the speculation should about the content of missing records should be precluded.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in their in limine motions, the Blums request that the Court issue an order granting the relief requested in their opening papers Part V, so as to streamline the pending hearing and limit the evidentiary submissions to relevant and admissible materials.

Dated: December 9, 2016

Respectfully submitted,

_/s/ Laura K. Clinton_
Richard A. Kirby, _pro hac vice_
Laura K. Clinton, _pro hac vice_
Graham R. Cronogue, _admission forthcoming_
BAKER & McKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 452-7020
Email: richard.kirby@bakermckenzie.com
Email: laura.clinton@bakermckenzie.com
Email: graham.cronogue@bakermckenzie.com

35