**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Email: dsheehan@bakerlaw.com

Seanna R. Brown

Email: sbrown@bakerlaw.com

Heather R. Wlodek

Email: hwlodek@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

Hearing Date: January 12, 2017

Hearing Time: 10:00 A.M. (EST)

Objection Deadline: January 5, 2017

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |

**MOTION FOR AN ORDER APPROVING EIGHTH ALLOCATION OF PROPERTY TO THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING EIGHTH INTERIM DISTRIBUTION TO CUSTOMERS**

300425728.3

# TABLE OF CONTENTS

**Page**

I.     EXECUTIVE SUMMARY ................................................................................1

II.    THE LIQUIDATION PROCEEDING ...........................................................5

III.   ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ............7

    A.    Allocation of Property........................................................................7

    B.    Distributions Under SIPA ....................................................................9

    C.    Allocation Of Assets To The Customer Fund And Related Reserves .................10

        i.    Assets in Trustee's Possession as of November 30, 2016 ........................13

        ii.   Chais ...............................................................................14

        iii.  Other Recoveries to the BLMIS Estate Since The Seventh
            Allocation and Seventh Interim Distribution...............................14

    D.    Determination Of Allowable Net Equity Claims & Related Reserves .................15

IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR
       EIGHTH ALLOCATION AND EIGHTH INTERIM DISTRIBUTION.........................16

    A.    No Interim Distribution Of General Estate ..............................................19

V.     MISCELLANEOUS ..............................................................................19

    A.    Notice ..............................................................................19

    B.    Record Date ..........................................................................20

VI.    CONCLUSION....................................................................................20

300425728.3

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated Chapter 7 case of Bernard

L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the eighth allocation of property ("Eighth Allocation") to the fund of customer

property ("Customer Fund"); and (2) authorizing an eighth pro rata interim distribution ("Eighth

Interim Distribution") to customers whose claims for customer protection under SIPA have been

allowed for amounts exceeding the SIPA statutory advance limits and which have not already

been fully satisfied by the first through seventh pro rata interim distributions.  This Court has

jurisdiction over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157

and 1334, and Bankruptcy Rule 5005.  This Motion is based upon the law set forth below as well

as the facts set forth in the affidavit of Vineet Sehgal ("Sehgal Aff."), filed herewith.  In support

of this Motion, the Trustee represents as follows:

## I.    <u>EXECUTIVE SUMMARY</u>

1.     In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's

estate.  The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate.    Customers holding allowable claims are entitled to share pro rata in the

Customer Fund based on each customer's "net equity" as of the filing date, to the exclusion of

general creditors.  SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must

determine or be able to sufficiently estimate: (a) the total value of customer property available

for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total

net equity of all allowed claims, or the "denominator" (including reserves for disputed claims).

The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate

resolution of disputed amounts will not adversely affect any customers' allowed or disputed net

equity distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any

amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method"

or the "Trustee's Net Investment Method").    Some claimants argued that the Trustee was

required to allow customer claims in the amounts shown on the November 30, 2008 customer

statements (the "Last Statement Method," creating the "Net Equity Dispute").    Litigation over

the Net Equity Dispute proceeded through this Court,[2] the Second Circuit,[3] and the Supreme

Court of the United States (the "Supreme Court").[4]    The Trustee's Net Investment Method was

upheld.

---

[2] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff Inv. Sec., LLC), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654

2

4.      The Trustee previously filed seven motions seeking entry of orders approving

allocations of property to the Customer Fund and authorizing pro rata interim distributions of

Customer Property.  This Court entered orders approving those motions:

| No. of Distribution | Date of Distribution | Amount Allocated | Amount Distributed | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|---|---|
| 1 | 10/05/2011 | $2.618 billion | $685.498 million | 4.602% | 4048 | 4217 |
| 2 | 09/19/2012 | $5.501 billion | $4.980 billion | 33.556% | 4930 | 4997 |
| 3 | 03/29/2013 | $1.198 billion | $696.491 million | 4.721% | 5230 | 5271 |
| 4 | 05/05/2014 | $477.504 million | $468.362 million | 3.180% | 6024 | 6340 |
| 5 | 02/06/2015 | $756.538 million[5] | $403.529 million | 2.743% | 8860 | 9014 |
| 6 | 12/04/15 | $345.472 million[6] | $1.209 billion[7] | 8.262% | 9807 and 11834 | 12066 |
| 7 | 06/30/16 | $247.013 million | $190.263 million | 1.305% | 13405 | 13512 |

5.      On November 18, 2016, this Court approved an approximately $269 million

settlement between the Trustee and the Estate of Stanley Chais, et al.  *Picard v. Estate of Chais,*

*et. al.*, Adv. No. 09-01172 (SMB) (Bankr. S.D.N.Y.) (ECF No. 157).  Under the settlement,

certain of the *Chais* defendants agreed to pay the Trustee approximately $234 million in cash

---

F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012).  A third petition for writ of certiorari was dismissed.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

[5] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58.  Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[6] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015.  The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

[7] The amount distributed for the Sixth Interim Distribution is greater than the amount allocated due to the fact that the previously allocated Time-Based Damages Reserve was utilized in addition to new recoveries received subsequent to the Fifth Interim Distribution.

payments and an estimated $30 million in other assets, including hedge fund and private equity investments, amounting to substantially all of the assets of Stanley Chais' estate and his widow and to the total alleged fictitious profit transfers received in the two years prior to the Filing Date by other settling defendants affiliated with Mr. Chais.

6.      With these and other additional funds, the Trustee stands ready to make an eighth significant distribution to customers with allowed claims—approximately 1.729% on each allowed claim.   The practical effect of this determination is to permit an eighth interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective accounts as of the Filing Date[8] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First, Second, Third, Fourth, Fifth, Sixth or Seventh Interim Distributions.

7.      Thus, by way of this Motion, the Trustee seeks to distribute approximately $251.590 million (with an additional $57.089 million available for distribution to certain "net loser" accounts in litigation, if the claims relating to their accounts become allowed prior to the time the distribution is made, or reserved, if not yet allowed).[9]  The Eighth Interim Distribution, when combined with the First through Seventh Interim Distributions, will provide up to 60.098% of each customer's allowed claim amount, plus the SIPC advance of up to $500,000. The proposed distribution will be paid on claims relating to 953 BLMIS accounts.  The average payment amount to those 953 BLMIS accounts will be $263,998.40.  Fifteen payments will go to claimants who qualified for hardship status under the Trustee's claims Hardship Program.  If

---

[8] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B).

[9] If all of these "net loser" accounts were allowed prior to the distribution, the total distribution to claimants would be approximately $308.679 million ($308,679,362.02), based on the net equity amount for deemed determined accounts.

approved, and when combined with the SIPC payment and the amounts from the First through Seventh Interim Distributions, 1,333 accounts (relating to 1,539 claims) will be fully satisfied (all accounts with a net equity of up to $1,253,018.77).

8.       The Trustee proposes to continue maintaining a general reserve of $200,000,000.00 for unknown contingencies.

9.       The proposed Eighth Allocation and Eighth Interim Distribution are interim in nature. The Trustee anticipates recovering additional assets through litigation and settlements. Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future. The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[10]

## II.      THE LIQUIDATION PROCEEDING

10.      Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

11.      SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment"). The amounts owed to each

---

[10] The Trustee seeks permission to include in the Eighth Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Eighth Interim Distribution.

customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

12. The Trustee has received 16,519 customer claims. (Sehgal Aff. ¶ 4). To date, the Trustee has determined 16,459 of those claims. (*Id*. ¶ 4). The remaining 60 claims are discussed in Paragraph 13 below. To date, the Trustee has allowed 2,608 claims and committed to pay approximately $839.631 million in funds advanced to him by SIPC. (*Id*.). To date, the allowed claims total approximately $15.086 billion. (*Id*.). The Trustee denied 13,432 claims, including 10,732 claims purporting to be customer claims but were in fact claims filed on behalf of third parties or indirect investors. Twelve other claims were filed that asserted no claim. Another 407 claims have been withdrawn. *(Id*.).

13. Sixty claims (relating to 42 accounts)[11] are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants. (*Id*. ¶ 5). The complaints filed by the Trustee in those litigations set forth the express grounds for disallowance of customer claims under section 502(d) of the Bankruptcy Code. Accordingly, such claims will not be allowed until the avoidance action is resolved by settlement or otherwise and any judgment rendered against the claimant in the avoidance action is satisfied.

14. To date, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion. The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms. Of these 449 claims, 94 are general creditor claims and 49

---

[11] This includes two net winner accounts (3 claims) that will not be eligible to participate in the Trustee's interim distributions.

300425728.3

are broker-dealer claims, which together total approximately $265 million of the $1.7 billion.[12]
(*Id.* ¶ 6).

15.    2,043 docketed objections have been filed to the Trustee's claims determinations
relating to 3,621 claims, which will be noticed for hearing as necessary.  (*Id.* ¶ 7).  These 2,043
objections relate to 968 BLMIS accounts.  (*Id.*).  The objections raise various issues, including
the proper interpretation of "net equity" (now resolved), the right to interest or time value of
money (now resolved), and whether the Trustee's calculation of allowed claims amounts are
correct.  1,210 of the 2,043 docketed objections have been fully resolved.  833 objections are
still subject to court review.

## III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

### A.    Allocation of Property

16.    SIPA sets forth a bipartite statutory framework that gives customers priority over
general creditors of the broker-dealer.  Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with
allowed claims share ratably in the fund of customer property.  Pursuant to SIPA § 78fff-2(c),
general creditors and customers, to the extent of their respective unsatisfied net equities, share
in any general estate.   Estate property not allocable to the fund of customer property is
distributed in the order of priority established in section 726 of the Bankruptcy Code.  SIPA §
78fff(e).  Any property allocated to the fund of customer property that is not necessary to satisfy
customer and other priority claims will become part of the general estate.  SIPA § 78fff-2(c).

---

[12] The 449 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor
and service claims.  (Sehgal Aff. ¶ 6).  They do not include "customer" claims, even though each "customer"
claim—both those allowed and denied—has a "general creditor" component.  All BLMIS creditors, including
customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims
as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed
claims).  Customers who filed customer claims need not have specifically filed claims as general creditors to protect
such rights.

17.    According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

18.    Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ." SIPA § 78*lll*(4)(D). Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property. *See Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.").

19.    Thus, if a trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

20.    SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property. For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property. See Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[13]    Consistent with prior liquidations, the Trustee

---

[13] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A,

expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

### B.    Distributions Under SIPA

21.    The SIPA distribution scheme, while complex, can be distilled to a simple equation. Each customer is entitled to his or her pro rata share of customer property. To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the Trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowable by the Trustee. The percentage result is then to be applied to each net equity claim to determine a customer's pro rata share. The equation is as follows:

$$\frac{\text{Fund of Customer Property (``Numerator'')}}{\text{Allowable Customer Net Equity Claims (``Denominator'')}} = \text{Customer Pro Rata Share}$$

22.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property. The second and third priorities of distribution are relevant here. The second priority is to distribute customer property among customers based on their filing date net equities. SIPA § 78fff-2(c)(1)(B). The third priority is to distribute customer property to SIPC as subrogee. SIPA § 78fff-2(c)(1)(C). Thereafter, any customer property remaining becomes part of the general estate.

---

Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

9

23.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection. The SIPC advance does not reduce the customer's net equity or his claim against customer property. If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess. In effect, SIPC becomes subrogated to the claims of customers to the extent it has made advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied. SIPA §§ 78fff-3(a), 78fff-2(c)(1).

C.    **Allocation Of Assets To The Customer Fund And Related Reserves**

24.    As the Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers. Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate a Ponzi scheme. Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds. In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

25.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers. *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[14] At this time, the assets of BLMIS and Madoff are insufficient to cover those obligations.

---

[14] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers. Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78o(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance. The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

10

26.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated -- $342.322 million.  ECF Nos. 4217, 4997, 5271, 6340, 9014, and 12066; *see also First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

27.    The Trustee previously sought and obtained approval to allocate the following amounts to the Customer Fund:

| No. of Allocation | Amount Allocated | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|
| 1 | $2.618 billion | 4.602% | 4048 | 4217 |
| 2 | $5.501 billion | 33.556% | 4930 | 4997 |
| 3 | $1.198 billion | 4.721% | 5230 | 5271 |
| 4 | $477.504 million | 3.180% | 6024 | 6340 |
| 5 | $756.538 million[15] | 2.743% | 8860 | 9014 |
| 6 | $345.472 million[16] | 8.262% | 9807 and 11834 | 12066 |
| 7 | $247.013 million | 1.305% | 13405 | 13512 |

28.    The amounts previously distributed as outlined in each of the First through Seventh Allocation Motions change as additional accounts are determined.  Below is a summary of the amounts allocated and distributed:

---

[15] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58.  Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[16] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015.  The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

300425728.3

| No. | Amount Allocated | Reserve From Previous Allocations[17] | Amount Available for Distribution | Allocation for Allowed Claims[18] | Allocation for Deemed Determined Claims[19] | SIPC Subrogation | Other Reserves[20] |
|---|---|---|---|---|---|---|---|
| 1 | $2.618 billion | N/A | $2.618 billion | $685.498 million | $152.223 million | $8.746 million | $1.772 billion |
| 2 | $5.501 billion | $1.772 billion | $7.273 billion | $4.980 billion | $1.110 billion | $82.268 million | $1.101 billion |
| 3 | $1.198 billion | $1.101 billion | $2.299 billion | $696.491 million | $156.160 million | $15.705 million | $1.430 billion |
| 4 | $477.504 million | $1.430 billion | $1.908 billion | $468.362 million | $105.187 million | $11.363 million | $1.323 billion |
| 5 | $756.538 million[21] | $1.323 billion | $2.080 billion | $403.529 million | $90.732 million | $10.272 million | $1.575 billion |
| 6 | $345.472 million[22] | $1.575 billion | $1.921 billion | $1.209 billion | $273.287 million | $37.216 million | $400.885 million |
| 7 | $247.013 million | $400.885 million | $647.898 million | $190.263 million | $43.166 million | $6.605 million | $407.863 million |

29.    As reflected in the table above, the amount reserved through the Seventh Interim Distribution is $407,863,413.24.  This previously reserved amount, plus the $342,321,897.89 that the Trustee seeks to allocate in this Motion, constitutes the total amount available for distribution.  Therefore, the total amount available for the Eighth Interim Distribution will be $750,185,311.13.  Of this amount, $232,130,120.42 must be held in reserve for the non-

---

[17] Reserve from Previous Allocations represents amounts that were reserved in prior allocations.

[18] Allocation for Allowed Claims represents the amount allocated for claims that have been allowed.

[19] Allocation for Deemed Determined Claims represents amounts allocated and reserved for claims that are currently in litigation with the Trustee.

[20] Other Reserves represents all monies that are reserved for various issues.

[21] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58.  Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[22] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015.  The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

12

preference- related settlement payments for accounts with net equity clauses, as well as certain other settlements, leaving a total of $518,055,190.71 available for distribution.

30.     The Trustee will maintain a general reserve of $200,000,000.00, bringing the amount available for the Eighth Interim Distribution to $318,055,190.71.

31.     Of the $318,055,190.71 numerator, $251,590,477.57 will be distributed as part of the Eighth Interim Distribution to allowed accounts, and SIPC subrogation for allowed accounts in the amount of $9,220,274.21[23] will be released to SIPC.  For deemed determined accounts, $57,191,228.68 will be reserved.  (Sehgal Aff. ¶ 16).

32.     The Trustee does not seek to allocate any funds to the General Estate at this time.

        **i.      <u>Assets in Trustee's Possession as of November 30, 2016</u>**

33.     The Form SIPC 17 completed by the Trustee each month lists all of the recoveries and assets in the Trustee's possession.  In the Trustee's Form SIPC 17 for the period ending on November 30, 2016 ("November 30 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee reports that he has recovered approximately $11.252 billion.[24]  These funds were primarily derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market accounts.

34.     In addition to the recoveries reflected on the November 30 SIPC 17 Form attached as Exhibit A, the Trustee has also recovered an additional $234.287 million thus far from the Chais settlement.  These additional recoveries are included in the $342.322 million that the Trustee seeks to allocate in this Motion.

---

[23] An additional $21,020.69 of SIPC subrogation associated with the Eighth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

[24] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

300425728.3

35.    To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

### ii.    Chais

36.    On November 18, 2016, this Court approved an approximately $269 million settlement between the Trustee and the Estate of Stanley Chais, et al. *Picard v. Estate of Chais, et. al.*, Adv. No. 09-01172 (SMB) (Bankr. S.D.N.Y.) (ECF No. 157).    Under the settlement, certain of the *Chais* defendants agreed to pay the Trustee approximately $234 million in cash payments and an estimated $30 million in other assets, including hedge fund and private equity investments, amounting to substantially all of the assets of Stanley Chais' estate and his widow and to the total alleged fictitious profit transfers received in the two years prior to the Filing Date by other settling defendants affiliated with Mr. Chais.    The Court also approved the Trustee's limited participation in two separate settlements between certain *Picard v. Chais* defendants and various third party plaintiffs who brought claims in the State of California related to investment partnerships formed by Stanley Chais that were invested with BLMIS; the terms of those settlements include the creation of a restitution fund administered by the Attorney General for the State of California to restore funds to Mr. Chais' investors.

### iii.    Other Recoveries to the BLMIS Estate Since The Seventh Allocation and Seventh Interim Distribution

37.    In the Motion on the Seventh Allocation and Seventh Interim Distribution, the Trustee reported total recoveries of $247,012,857.10 that were not previously allocated.    When combined with recoveries of $345,472,293.08 reported in the Sixth Allocation and Sixth Interim Distribution, recoveries of $756,538,231.45 reported in the Fifth Allocation and Fifth Interim Distribution, recoveries of $477,503,824.33 reported in the Fourth Allocation and Fourth

14

Interim Distribution, recoveries of $1,198,067,071.04 reported in the Third Allocation and Third Interim Distribution, recoveries of $5,501,375,994.66 reported in the Second Allocation and Second Interim Distribution, and recoveries of $2,617,974,430.26 reported in the First Allocation and First Interim Distribution, the total recoveries as of the Seventh Allocation and Seventh Interim Distribution were $11,143,944,701.92.  The Trustee has recovered additional funds for the estate from multiple parties and sources since that time.

38.    The Trustee has recovered approximately $342,321,897.89 since the Seventh Allocation and Seventh Interim Distribution as a result of preference settlements, litigation and pre-litigation settlements, interest income, and other miscellaneous recoveries.  (Sehgal Aff. ¶ 10).  Therefore, the Trustee seeks approval to allocate the full amount of these recoveries to the Customer Fund.

### D.    Determination Of Allowable Net Equity Claims & Related Reserves

39.    For distribution purposes, the Customer Fund numerator is only one half of the equation.  In order to calculate each customer's pro rata share of customer property, the Trustee also needs to establish the denominator, or the amount of allowable net equity claims.

40.    If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the amount of allowed claims.  Because the Trustee seeks to make an Eighth Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date.  Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future.  Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly eligible

15

claimants receive a pro rata distribution, should their claims be allowed.  In order to do so, he must maintain sufficient reserves.

41.     Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims.  The statutory bar date to file claims was July 2, 2009.  SIPA § 78fff-2(a)(3).  Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts.  No reserves are maintained for these accounts.

42.     Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute.  No reserves are maintained for these accounts.

## IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR EIGHTH ALLOCATION AND EIGHTH INTERIM DISTRIBUTION

43.     SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property.  To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property.  In that manner, a customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

44.     As set forth above and in the Sehgal Affidavit, the Trustee proposes to allocate $342,321,897.89 to the Customer Fund at this time and release $251,590,477.57 for distribution.

45.     Of the $318,055,190.71 numerator, $251,590,477.57 will be distributed as part of the Eighth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts

300425728.3

in the amount of \$9,220,274.21[25] will be released to SIPC.  For deemed determined accounts, \$57,191,228.68 will be reserved.  (Sehgal Aff. ¶ 16).

46.     The Denominator is \$18,393,464,489.04.  (Sehgal Aff. ¶ 19).  To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the Denominator, resulting in the following percentage:

$$\frac{\$318,055,190.71}{\$\ 18,393,464,489.04} = 1.729\%$$

47.     Under this scenario, a total of 953 accounts will receive a distribution up to 1.729% of their net equity claims.  (Sehgal Aff. ¶ 20).  Of these 953 accounts (relating to 1,110 claims), 31 accounts (relating to 42 claims) will become fully satisfied, bringing the total of fully satisfied account holders to 1,333 (all accounts with a net equity of up to \$1,253,018.77). 922 accounts will remain partially satisfied and will be entitled to participate in future distributions.  (*Id*.).

48.     An additional 40 accounts[26] (relating to 57 claims) that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed.  (*Id*. ¶ 21).  Twenty-one of the 40 accounts would be fully satisfied by the SIPC advance.  The remaining 19 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and the Eighth Allocation and Eighth Interim Distribution.  (*Id*.).  2 of the remaining 19 accounts would be fully satisfied by the First through Eighth Interim Distributions.  (*Id*.).

---

[25] An additional \$21,020.69 of SIPC subrogation associated with the Eighth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance was held in reserve.

[26] This does not include two net winner accounts (3 claims) that will not be eligible to participate in the Trustee's interim distributions.

300425728.3

49.    SIPC is entitled to receive repayment as to any given customer to the extent the customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's distributions.  *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).  SIPC, as subrogee, is entitled to receive partial repayment of its cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1).  A SIPC subrogation payment was made on March 29, 2013 in the amount of $102,805,012.23, on May 5, 2014 in the amount of $11,299,366.89, on February 6, 2015 in the amount of $11,226,253.72, on January 6, 2016 in the amount of $38,193,864.82, and on June 30, 2016 in the amount of $7,309,329.92 for a total of $170,833,827.58 in subrogation payments to SIPC.  Based on the "net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this Eighth Interim Distribution, SIPC's subrogation claim is approximately $9.852 million ($9,851,538.34).  The $9.852 million is comprised of $9.220 million ($9,220,274.21)[27] of SIPC subrogation from the Eighth Interim Distribution and $631,264.13 of SIPC subrogation associated with the First through Seventh Interim Distributions (this $631,264.13 represents SIPC subrogation for accounts determined after the January 6, 2016 payment was made).  This amount will be released to SIPC.

50.    Unless otherwise noted, the numbers contained herein are based on recoveries and claims allowed as of November 30, 2016.  To the extent additional claims are allowed, the Trustee will distribute funds consistent with the formulas set forth in this Motion.

---

[27] An additional $730,654.29 of SIPC subrogation associated with the First through Eighth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

18

300425728.3

### A.    No Interim Distribution Of General Estate

51.    Under SIPA § 78fff(e), funds from the general estate satisfy the administrative costs and expenses of a Debtor's estate and a liquidation proceeding.  To the extent the general estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and expenses.  SIPA § 78fff-3(b)(2).  All administrative advances made by SIPC are recoverable from the general estate under section 507(a)(2) of the Bankruptcy Code.  SIPA §§ 78eee(b)(5)(E), 78fff(e).  The general estate is distributed in accordance with section 726 of the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[28]  SIPA § 78fff(e).

52.    As noted previously, the Trustee has received 427 timely and 22 untimely filed secured priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion.  The claimants include vendors, taxing authorities, employees, and customers filing claims on non-customer proof of claim forms.  Of these 449 claims, 94 are general creditor claims and 49 are broker-dealer claims which together total approximately $264.9 million of the $1.7 billion.  Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there are no funds in the General Estate from which to make a distribution to general creditors at this time.  Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.  See 11 U.S.C. § 704(5).

## V.    MISCELLANEOUS

### A.    Notice

53.    Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim.  Pursuant to the Order Establishing Notice Procedures (ECF No.

---

[28] There are no § 507(a)(1) expenses in this liquidation proceeding.

300425728.3

4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S.

Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney

for the Southern District of New York; and (v) all persons who have filed notices of appearance

in the BLMIS proceeding.  The Trustee believes that no further notice need be given of this or

any further matter in the proceeding.

        **B.**    **Record Date**

    54.    The Eighth Interim Distribution will be made to all record holders as of January

12, 2017.

**VI.**    **CONCLUSION**

    55.    This Motion and the relief requested by the Trustee are consistent with the policy

and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the

Estate, and its creditors.

    56.    No prior application for the relief sought herein has been made to this or any other

Court.

300425728.3

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving: (i) the proposed Eighth Allocation of Property to the Customer Fund and to the General Estate; (ii) the proposed Eighth Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated: December 14, 2016               Respectfully submitted,
      New York, New York

                                     */s/ David J. Sheehan*
                                     **Baker & Hostetler LLP**
      45 Rockefeller Plaza
      New York, New York  10111
      Tel: (212) 589-4200
      Fax: (212) 589-4201
      David J. Sheehan
      Email: dsheehan@bakerlaw.com
      Seanna R. Brown
      Email: sbrown@bakerlaw.com
      Heather R. Wlodek
      Email: hwlodek@bakerlaw.com

      *Attorneys for Irving H. Picard, Trustee*
      *for the Substantively Consolidated SIPA*
      *Liquidation of Bernard L. Madoff Investment*
      *Securities LLC and Estate of Bernard L. Madoff*

300425728.3