# EXHIBIT A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/24/17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
In re BERNARD L. MADOFF INVESTMENT                          :
SECURITIES LLC.                                             :
                                                            :          1:16-cv-2058-GHW
                                              Debtor.       :          1:16-cv-2065-GHW
------------------------------------------------------------X
                                                            :
A & G GOLDMAN PARTNERSHIP and                               :          MEMORANDUM OPINION
PAMELA GOLDMAN,                                             :          AND ORDER
                                                            :
                                          Appellants,       :
                                                            :
                       v.                                   :
                                                            :
CAPITAL GROWTH COMPANY, *et al.*                            :
                                                            :
                                          Appellees.        :
------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

        These consolidated bankruptcy appeals arise out of the third attempt by A&G Goldman

Partnership and Pamela Goldman (the "Appellants" or "Goldman Parties") to side step a permanent

injunction entered by the bankruptcy court in 2011 in connection with its approval of a $7.2 billion

settlement between the Trustee of Bernard L. Madoff Investment Securities ("BLMIS") and a

number of parties affiliated with Jeffry M. Picower (the "Picower Parties"). The bankruptcy court

enjoined the prosecution of the complaint, and these appeals followed. For the reasons stated

below, the order of the bankruptcy court is AFFIRMED.

**I.    BACKGROUND**

        As noted by Judge Stuart M. Bernstein in his decision enjoining prosecution of the Goldman

Parties' third complaint, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284, 288

(Bankr. S.D.N.Y. 2016) ("*Goldman III*"), the background to these proceedings has been recounted in

*A&G Goldman P'ship v. Picard (In re BLMIS)*, No. 12-cv-6109 (RJS), 2013 WL 5511027, at *1-3

(S.D.N.Y. Sept. 30, 2013) ("*Goldman I District Court Opinion*") and *Picard v. Marshall (In re BLMIS)*, 511

B.R. 375, 379-386 (Bankr. S.D.N.Y. 2014) ("*Fox II BK Opinion*"), *aff'd sub nom. In re Madoff*, 531 B.R.

345 (S.D.NY. 2015) ("*Fox II District Court Opinion*"). This Court assumes familiarity with these

decisions, as well as familiarity with Bernard Madoff's infamous Ponzi scheme, and therefore,

provides below only a brief discussion of the background facts necessary to provide context for the

Court's resolution of this appeal.

### A. Bernard Madoff's Ponzi Scheme

Over many years, Bernard Madoff "represented to customers that he invested their funds

according to a 'split-strike' investment strategy." *Goldman I District Court Opinion*, 2013 WL 5511027,

at *1 (citation omitted). This strategy purportedly entailed investing in S&P 100 stocks and hedging

the investments through the use of options. In fact, however, "customer funds were rarely invested

and used mainly to pay withdrawals for other customers." *Id.* Madoff was arrested in December

2008 and "[i]n March 2009, Madoff pleaded guilty to securities fraud and admitted that he had used

[BLMIS] as a vast Ponzi scheme." *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec.*

*LLC)*, 721 F.3d 54, 59 (2d Cir. 2013). As Judge Bernstein noted in *Goldman III*, Madoff "conducted

the largest Ponzi scheme in history through BLMIS until its collapse and his arrest." 546 B.R. at

288.

Following Madoff's arrest, upon application by the Securities Investment Protection

Corporation, the United States District Court for the Southern District of New York entered a

protective order placing BLMIS—the investment "firm" used to effectuate Madoff's Ponzi

scheme—in liquidation under the Securities Investor Protection Act ("SIPA") and appointing Irving

Picard as the Trustee. The district court then referred the case to the bankruptcy court. The

Trustee thereafter "brought approximately 1,000 adversary proceedings to avoid and recover the

transfers from BLMIS to its customers." *Id.*

### B.  The SIPA Liquidation of BLMIS

SIPA "establishes procedures for the expeditious and orderly liquidation of failed broker-dealers, and provides special protections to their customers." *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 85 (2d Cir. 2014) ("*Marshall*").  A trustee's "primary duty under SIPA is to liquidate the broker-dealer and, in doing so, satisfy claims made by or on behalf of the broker-dealer's customers for cash balances." *Id.* (citation omitted); *see also In re Madoff*, 848 F. Supp. 2d 469, 473 (2012) ("*Fox I District Court Opinion*") ("Under SIPA, Picard has the powers and duties of a bankruptcy trustee, and is charged with, among other things, recovering the property of BLIMIS' customers, and distributing those assets.") (citing 15 U.S.C. §§ 78fff-1(a)-(b)).

"A SIPA liquidation confers priority on customer claims by an expeditious alternative to a traditional bankruptcy proceeding." *JPMorgan*, 721 F.3d at 59.  "In a SIPA liquidation, a fund of 'customer property' is established—consisting of cash and securities held by the broker-dealer for the account of a customer, or proceeds therefrom . . . for priority distribution exclusively among customers," and property is allocated by the trustee so that customers "share ratably in such customer property . . . to the extent of their respective net equities." *Marshall*, 740 F.3d at 85.

In order to calculate a customer's "net equity" in the liquidation of BLMIS, Picard chose the "'net investment method,' under which the amount owed to each customer by BLMIS was 'the amount of cash deposited by the customer into his BLMIS customer account less any amounts already withdrawn by him.'" *Marshall*, 740 F.3d at 85 (quoting *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125 (Bankr. S.D.N.Y. 2010)).  The decision to use the net investment method was approved by the Bankruptcy Court on March 1, 2010, and later affirmed by the Second Circuit.  *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 135, 140, *aff'd sub nom. In re Bernard L. Madoff Inv. Securities LLC*, 654 F.3d 229 (2d Cir. 2011).  "BLMIS customers who had withdrawn more from their BLMIS accounts than their principal investments, so-called 'net winners,' are not entitled to a share of the property recovered by the

Trustee until all 'net losers' have received back their principal investments." *Fox I District Court Opinion*, 848 F. Supp. 2d at 473-74 (internal citations omitted); *see also Marshall*, 740 F.3d at 85 ("BLMIS customers had net equity only to the extent that their total cash deposits exceeded their total cash withdrawals.").

### C. The Trustee's Settlement with the Picower Parties and Entry of the Permanent Injunction

In May 2009, the Trustee filed an adversary proceeding against the Picower Parties seeking to recover the proceeds of hundreds of allegedly improper withdrawals they had made from BLMIS between 1995 and the collapse of the Ponzi scheme. The Trustee asserted claims for fraudulent transfers, avoidable preferences, and turnover under the Bankruptcy Code and New York's Uniform Fraudulent Conveyance Act. Among other things, the Trustee's complaint alleged that the "Picower Parties knew or should have known that BLMIS was a Ponzi scheme, and actively participated by giving directions to BLMIS to create fictitious trading records for their accounts." *Goldman III*, 546 B.R. at 289.

On December 17, 2010, the Trustee and the Picower Parties entered into a settlement agreement under which the Picower Parties agreed to return $5 billion to the BLMIS estate and forfeit $2.2 billon to the Government. This sum represented 100% of the net withdrawals from the Picower Parties' BLMIS accounts. In return, the Trustee agreed to release any other claims he might have had against the Picower Parties. The Trustee also agreed to seek a permanent injunction "barring claims against the Picower Parties by BLMIS investors that are duplicative or derivative of the claims that were brought, or could have been brought, by Picard." *Fox I District Court Opinion*, 848 F. Supp. 2d at 476. In connection with its approval of the settlement, on January 3, 2011, Judge Burton R. Lifland of the bankruptcy court issued the following permanent injunction:

> Any BLMIS customer or creditor of the BLMIS estate who filed or could have filed a claim in liquidation, anyone acting on their behalf or in concert or participation with them, or anyone whose claim in any way arises from or is related to BLMIS or the Madoff Ponzi scheme, is hereby permanently enjoined

> from asserting any new claim against the Picower BLMIS Accounts of the
> Picower Releasees that is duplicative or derivative of the claims brought by the
> Trustee, or which could have been brought by the Trustee against the Picower
> BLMIS Accounts of the Picower Releasees . . . .

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 10549389, at *4 (Bankr. S.D.N.Y. Jan.

13, 2011) (the "Permanent Injunction"). The Trustee also agreed, as part of the settlement with the

Picower Parties, to "use his reasonable best efforts to oppose challenges to the scope, applicability,

or enforceability of the Permanent Injunction." *Goldman III*, 546 B.R. at 289.

### D. Prior Actions Challenging or Held Barred by the Permanent Injunction

Since the bankruptcy court's issuance of the Permanent Injunction, "various former BLMIS

customers have attempted, without success, to side step the restrictions imposed by the injunction

and sue the Picower Parties to recover their lost investments." *Id.* at 288. The Court briefly

summarizes the history of those prior actions, the *Goldman III* complaint, and the opinion below.

### (1) Fox I

Prior to the Trustee's settlement with the Picower Parties, former BLMIS customers Adele

Fox and Stone Marshall filed putative class actions against the Picower Parties in the United States

District Court for the Southern District of Florida, alleging claims under Florida state law for

conversion, unjust enrichment, conspiracy, and state RICO violations. The Trustee commenced an

adversary proceeding to enjoin the Fox/Marshall actions pending the bankruptcy court's final

approval of the Trustee's settlement with the Picower Parties, and on the ground that the actions

were barred by the automatic stay provisions of 11 U.S.C. § 362(a). The bankruptcy court enjoined

the actions, finding that they violated the automatic stay imposed by operation of the SIPA

liquidation of BLMIS because they "usurp[ed] causes of action belonging to the estate . . . [under]

the Code" because the complaints did not "seek[] to redress a particularized injury or alleg[e] harm

caused directly to them by the Picower Defendants." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec.

LLC*, 429 B.R. 423, 430-31 (Bankr. S.D.N.Y. 2010) ("*Fox I BK Opinion*"). The bankruptcy court also

employed its equitable powers under Section 105(a) of the Code to enjoin the actions on the ground that the purported claims would "have an immediate adverse economic consequence for the debtor's estate." *Id.* at 434 (quoting *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003)). The threat to the estate was "particularly imminent" because the Trustee was "on the brink of a settlement" with the Picower Parties, and the Fox and Marshall actions would have undermined the "integrity of the SIPA proceedings and the Trustee's settlement negotiations for the benefit of the BLMIS estate and all of its customer claimants." *Id.* at 435-36.

On appeal to the district court, Judge Koeltl noted that the "central issue in [the] appeal [was] whether the Bankruptcy Court had the power to declare the Florida Actions void and otherwise to enjoin the Appellants from prosecuting them" and reasoned that "[t]hat question hinges on the nature of the Florida Actions—whether they are independent actions, or whether they are derivative or duplicative of claims that were property of the BLMIS estate." *Fox I District Court Opinion*, 848 F. Supp. 2d at 479. Judge Koeltl based his analysis on the principle stated by the Second Circuit Court of Appeals in *St. Paul Fire & Marine Insurance Co. v. PepsiCo., Inc.*, 884 F.2d 688, 701 (2d Cir. 1989), that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *Id.* at 480.

Judge Koeltl found that the "complaints contain[ed] no additional allegations of acts by the Picower defendants that were directed toward the Appellants specifically, or any duty owed specifically to the Appellants by the Picower defendants" and that, in light of the principle stated in *St. Paul*, "the alleged wrongful acts harmed every BLMIS investor (and BLMIS itself) in the same way: by withdrawing billions of dollars in customer funds from BLMIS and thus substantially diminishing the assets available to BLMIS to pay its customers and creditors, and to continue to function." *Id.* As a result, he concluded that the claims were "substantively duplicative of the Trustee's fraudulent transfer action," and that the bankruptcy court "correctly found that the claims

asserted [in those actions] were the property of the estate" which could only be asserted by the Trustee, and not the Fox/Marshall plaintiffs. *Id.* at 481. Judge Koeltl observed that the putative claims of the Fox/Marshall plaintiffs and those asserted by the Trustee against the Picower Parties were "based upon the same conduct by the Picower Defendants: involvement in the Madoff Ponzi scheme, and the transfer of billions of dollars in BLMIS-held customer funds to the Picower Defendants," which led Judge Koeltl to conclude that, "[p]ut bluntly, the wrongs pleaded in the Florida Actions and in the Trustee's actions are the same." *Id.* at 479.

Fox and Marshall appealed and the Second Circuit affirmed. *Marshall*, 740 F.3d 81. The Second Circuit opined that the complaints "impermissibly attempt[ed] to 'plead around' the Bankruptcy Court's injunction barring all claims 'derivative' of those asserted by the Trustee" and failed to allege "'particularized' conduct directed at BLMIS customers." *Id.* at 84. The court explained that a "derivative injury" is "based upon a secondary effect of harm done to the debtor," while an "injury is said to be particularized" when it "can be directly traced to the third party's conduct." *Id.* at 89 (citing *St. Paul*, 884 F.2d at 704) (internal quotation marks and brackets omitted). In the Court of Appeals' view, Fox and Marshall had not "allege[d] that the Picower defendants made any . . . misrepresentations to BLMIS customers" and had instead "allege[d] nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS." *Id.* at 84, 92.

### (2) *Goldman I*

While the Fox/Marshall litigation was ongoing, the Goldman Parties sought leave from the bankruptcy court to file a putative class action complaint in Florida district court. The *Goldman I* complaint asserted a claim under Section 20(a) of the Securities Exchange Act of 1934, alleging that Jeffry Picower was a "control person" with respect to BLMIS and that Picower had participated with BLMIS in violations of section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.

The bankruptcy court concluded that the claims in the *Goldman I* complaint were "derivative of the Trustee's," rather than independent claims which could be brought notwithstanding the Permanent Injunction, because the Goldman Parties had not suffered "any injury *significantly different* from the injuries to creditors in general."  *Sec. Inv. Prot. Corp v. Bernard L. Madoff Inv. Sec. LLC*, 477 B.R. 351, 356 (Bankr. S.D.N.Y. 2012) (quoting *Fox I BK Opinion*, 429 B.R. at 431) (emphasis in original).  As had the district court in the *Fox I* appeal, the bankruptcy court relied on the guiding principle established in *St. Paul*, namely that "[i]f a claim is a general one, with no *particularized injury* arising from it, and if that claim *could be brought by any creditor* of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."  *Id.* (emphasis in original).  As a result, the bankruptcy court denied the Goldman Parties' motion seeking a determination that the putative class action complaint could proceed notwithstanding the Permanent Injunction.

On appeal, Judge Sullivan affirmed the bankruptcy court's decision.  *Goldman I District Opinion*, 2013 WL 5511027.  Judge Sullivan began by observing that it "is well established that a debtor estate's claims against a third party and an estate creditor's claims against the same party are not duplicative or derivative merely because they are based on the same facts" and that as a result, it is "possible for creditors of the BLMIS estate, like Appellants, to raise independent legal claims against third parties like the Picower Defendants, even if the estate itself has already recovered from those parties."  *Id.* at *4.  Judge Sullivan therefore agreed with Appellants that "they could conceivably assert non-derivative securities claims based on control person liability," but noted that a "mere examination of the nominal cause of action" is not all that is required, since "such a formalistic approach would allow parties to easily plead around the protections of the Bankruptcy Code by deceptively labeling their claims."  *Id.* at *6.  Judge Sullivan therefore "examine[d] whether [the *Goldman I* complaint] actually plead[ed] the non-derivative securities fraud claims Appellants assert[ed] they d[id]."  *Id.*

On review of the proposed complaint, Judge Sullivan found that the Goldman Parties were not pressing "bona fide securities fraud claims," but rather, claims based on "the Picower Defendants' fraudulent withdrawals." *Id.* That is, the *Goldman I* complaint pleaded "nothing more than that the Picower Defendants traded on their *own* BLMIS accounts, knowing that such 'trades' were fraudulent, and then withdrew the 'proceeds' of such falsified transactions from BLMIS," or, in other words, "nothing more than that the Picower Defendants fraudulently withdraw money from BLMIS." *Id.* at *7. At bottom, "[r]egardless of what Appellants [called] their claims, [they] plead[e]d fraudulent conveyance claims" which were "clearly derivative of the Trustee's already-settled claims." *Id.* at *9. It was "irrelevant" that the Trustee lacked standing to bring federal securities law claims, because Appellants had "in fact pleaded fraudulent conveyance claims, however labeled." *Id.*

### (3) *Goldman II* and *Fox II*

In January 2014, the Goldman Parties and the Fox/Marshall plaintiffs filed a declaratory judgment action in Florida district court seeking, among other things, a declaration that two proposed class action complaints did not violate the Permanent Injunction. The Trustee commenced an action to enjoin prosecution in this district's bankruptcy court, and the bankruptcy court granted that motion. *Fox II BK Opinion*, 511 B.R. 375. The bankruptcy court noted at the outset that the claims in the proposed new complaints "will be considered derivative, regardless of their labeling, if they plead nothing more than the Picower Defendants fraudulently withdrew money from BLMIS." *Id.* at 390.

The *Goldman II* complaint pleaded one claim of control person liability under Section 20(a) of the Securities Exchange Act. The bankruptcy court concluded, however, that the *Goldman II* complaint "alleged injuries [that] are inseparable from, and predicated upon, a legal injury to the estate[,] namely, the Picower defendants' fraudulent withdrawals from their BLMIS accounts of what turned out to be other BLMIS customers' funds." *Id.* at 393 (citation omitted). Accordingly, the complaint merely pleaded a "derivative claim barred by the Permanent Injunction for the same

reasons articulated by Judge Sullivan" in *Goldman I*.  *Id*.

The bankruptcy court's decision regarding the *Goldman II* complaint was issued in the same

opinion as its decision finding that the *Fox II* complaint was also barred by the permanent

injunction.  The bankruptcy court concluded that, like the *Goldman II* complaint, the claims in the

*Fox II* complaint "echo those made by the Trustee" in his complaint against the Picower Parties, and

"impermissibly attempted to 'plead around' the Bankruptcy Court's injunction barring all 'derivative'

claims in that [it] allege[d] nothing more than steps necessary to effect the Picower defendants'

fraudulent withdrawals of money from BLMIS."  *Id*. at 394-95 (quoting *Marshall*, 740 F.3d at 96).

The Goldman Parties did not pursue an appeal of the bankruptcy court's order enjoining the

prosecution of *Goldman II*, but the Fox/Marshall plaintiffs appealed the decision as to their

complaint to the district court.  On appeal, Judge Koeltl concluded that the bankruptcy court was

correct in finding the proposed complaint to be derivative of the Trustee's claims "on behalf of all

the creditors of BLMIS."  *Fox II District Court Opinion*, 531 B.R. 345, 347.  Judge Koeltl noted that

the claims were "based on legal theories" that "could qualify *theoretically* as independent" claims but

the appellants had "merely repackaged the same facts underlying the Trustee's claims without any

new particularized injuries of the appellants that are directly traceable to the Picower defendants."

*Id*. at 354.

**E.  *Goldman III***

On August 28, 2014, the Goldman Parties filed yet another class action complaint in Florida

district court.  Dkt. No. 26, Appendix, Case No. 16-cv-2058-GHW ("Compl.").  The new complaint

contains many of the same allegations as the *Goldman II* complaint, the prosecution of which was

enjoined by the bankruptcy court.  The *Goldman II* complaint "alleged that Picower controlled

BLMIS based on (i) his close business and social relationship with Madoff, (ii) his knowledge of the

Ponzi scheme, (iii) causing BLMIS to disseminate false and misleading financial information to its

customers, (iv) directing the recording of phony transactions, including backdated trades, in his own

accounts, and (v) his ability to obtain an improper $6 billion margin loan." *Goldman III*, 546 B.R. at 293.  In their new complaint, the Goldman Parties maintain their claim that Jeffry Picower was a "control person" of BLMIS under Section 20(a) of the Securities Exchange Act and liable for BLIMIS' primary violations of the federal securities laws.  The *Goldman III* complaint, however, alleges control person liability based on two categories of conduct by Picower which were not alleged in the *Goldman II* complaint:  that Picower "propped up" the Ponzi scheme through the provision of fraudulent loans to BLMIS, and that Picower agreed to be listed as a counterparty on phony options trades.

### (1)  "Propping Up" Allegations

The complaint alleges that in "order to prop up the Ponzi scheme," Picower "engaged in a series of 'lending' transactions amounting to more than $200 million" and that "[b]ut for these 'loans,' BLMIS would have been unable to pay off redeeming investors and the Ponzi scheme would have collapsed."  Compl.¶ 67.  Specifically, in 1992, one of BLIMIS' largest feeder funds, Avellino & Bienes, failed and was under SEC investigation; the complaint alleges that "BLMIS needed cash to pay back Avellino investors and deflect suspicion away from the Ponzi scheme" and that "[a]fter conferring with Madoff, Picower sent $76 million . . . worth of securities from a non-BLMIS account to BLMIS, without consideration."  *Id.* ¶ 68.  The complaint alleges that these securities were held in a BLMIS "general account" and were then pledged as security to obtain a bank loan or multiple loans to repay the Avellino clients.  *Id.*  ¶ 69.  The securities that Picower had "loaned" to BLMIS "perpetuated the fraud and allowed BLMIS to continue to bring[] new victims into the Ponzi scheme."  *Id.*

The complaint also alleges that in April 2006, Picower made a $125 million "loan" "in order to keep BLMIS afloat when it was short on cash to pay its redeeming customers."  *Id.* ¶ 70.  Like the alleged 1992 loan, this loan was made without consideration, and "was necessary to perpetuate the Ponzi scheme by concealing BLMIS' inability to pay its redeeming customers their fictitious gains."

*Id.* ¶¶ 70-71. The complaint alleges that this loan was "quickly repaid" when BLMIS wired Picower $125 million in September 2006. *Id.* ¶ 70.

With respect to the 1992 and 2006 "loans," the complaint alleges that it was "essential to both Picower and BLMIS" that they remained "secret" because "they were improper and inconsistent with applicable laws, rules, and regulations of the SEC and [FINRA]." *Id.* ¶ 72. The complaint alleges that through these "bailouts," Picower "had the power to coerce BLMIS to do what he wanted, as he could have pulled the loans or refused them at any time, causing BLMIS to fail." *Id.* ¶ 73. And through these "secret and illegal 'loans,'" Picower "directly caused the dissemination of material misrepresentations and omissions to prospective and existing BLMIS customers about the legitimacy and solvency of BLMIS, which BLMIS customers relied upon in investing with, or staying invested with, BLMIS." *Id.* ¶ 74.

### (2) Counterparty Allegations

In addition to the "propping up" allegations, the complaint also alleges that, consistent with Madoff's purported split-strike strategy, a "critical aspect of the Ponzi scheme was the creation of the appearance of legitimate trading records to induce prospective and existing BLMIS customers to invest and stay invested with BLMIS." *Id.* ¶ 76. However, because "BLMIS did not actually engage in any real stock or options transactions," "fabrication of the trading records was essential to the Ponzi scheme, as was the cooperation of the partners in the fraud who would agree to act as a 'counterparty' to the phony options contracts with BLMIS." *Id.* ¶ 77. Concerned that identifying institutional broker-dealers as options counterparties would cause BLMIS to "become subject to heightened scrutiny from regulators and from large institutions that did business with BLMIS," Madoff "believed that BLMIS needed to frequently name new counterparties for its fake options trades to continue tricking regulators, and the public and prospective and existing customers, into believing BLMIS was actually engaged in large scale options trading necessary to implement BLMIS' purported split-strike options strategy." *Id.* ¶ 78.

To that end, BLMIS and Picower agreed that Picower "would be listed on BLMIS's fabricated books and records as a counterparty for a large volume of options trading." *Id.* ¶ 79. Picower knew there was no such options trading, "but agreed to participate in this falsification of BLMIS trading records to deceive auditors, regulators, and BLMIS customers and potential investors to preserve the Ponzi scheme," and he "agreed not to disclose the counterparty fraud and that he would warn Madoff if he was questioned by regulators or anyone else about the options transactions." *Id.* By agreeing to act as a party to fraudulent options transactions, "Picower knowingly controlled the falsification of the books of BLMIS and participated in the preparation of false information and material omissions about the legitimacy of the split-strike options strategy used to induce BLMIS customers to invest." *Id.* ¶ 80. This "made Picower an essential element of the Ponzi scheme." *Id.*[1]

The complaint alleges that Picower's fraudulent "propping up" and "counterparty" transactions "directly resulted in the falsification of BLMIS' financial statements provided to regulators and relied upon by BLMIS customers." *Id.* ¶ 91. As a result of "Picower's control, he caused BLMIS to present Plaintiffs with false and misleading information (i.e., inflated account values and inflated capital values for BLMIS), in order to induce those investors to remain invested in BLMIS and to continue to attract new investments in BLMIS." *Id.* ¶ 96. The Goldman Parties "seek damages against Defendants resulting from Plaintiffs' reliance upon misrepresentations made by BLMIS and fraud committed by BLMIS under the direct or indirect control of Picower." *Id.* ¶ 99. The complaint alleges that "BLMIS customers lost at least $11 billion in excess of the $7.2 billion transferred to Picower" and that "Picower is responsible for the entire $11 billion loss as a control person who participated in and caused the dissemination of material misrepresentations and

---

[1] The *Goldman III* complaint also contains a set of allegations based upon Picower's "extensive direct contact with BLMIS employees" and his concomitant "power to direct their actions." Compl. ¶¶ 82-90. However, because Appellants do not pursue arguments on appeal based upon these allegations, the Court does not discuss them further.

omissions and directed the fraudulent scheme." *Id.*

### F. The Decision on Appeal

In response to the filing of the *Goldman III* complaint, the Trustee and the Picower Parties filed an adversary proceeding requesting, *inter alia*, that the bankruptcy court enjoin the complaint as barred by the Permanent Injunction. On February 17, 2016, the bankruptcy court issued such an order. *Goldman III*, 546 B.R. 284.

Judge Bernstein found that the "gravamen of the [*Goldman III* complaint] is that Madoff and Picower were partners in a fifteen-year conspiracy to perpetuate the Ponzi scheme in order to allow Picower to profit while BLMIS was driven deeper into insolvency." *Id.* at 299. The "thrust of the new allegations . . . is that Picower controlled the falsification of BLMIS' financial records and participated in their preparation and dissemination to BLMIS' customers because he entered into transactions with BLMIS which caused BLMIS to prepare and disseminate false financial information." *Id.* at 295-96. The "principal difference" between the *Goldman II* and *Goldman III* complaints, according to Judge Bernstein, is that "he was able to do this based on transactions that, at least according to the Goldman Parties, did not involve trading in the Picower Parties' accounts." *Id.* at 296. Thus, the *Goldman III* complaint "alleges that Picower directly caused BLMIS to disseminate material misrepresentations and omissions to BLMIS customers regarding the legitimacy and solvency of BLMIS, and BLMIS customers relied on this information to invest in BLMIS and overpay for BLMIS securities and remain invested in BLMIS." *Id.*

The bankruptcy court then evaluated whether the complaint "asserts a *bona fide* section 20(a) claim, or instead, a claim that is derivative or duplicative of the claims asserted or that could have been asserted by the Trustee against the Picower Parties." *Id.* at 298-99. The court concluded that "the propping up loans, the counterparty conspiracy and everything else the [*Goldman III* complaint] alleges Picower did were incident to the fraudulent withdrawals of $7.2 billion." *Id.* at 301.

The court also found that "the propping up loans and counterparty fraud injured the BLMIS

estate and indirectly affected all creditors in the same way." *Id.* at 300. More specifically, the "propping up loans rendered BLMIS insolvent . . . and BLMIS's inability to satisfy its investors' redemption calls ultimately drove BLMIS into bankruptcy." *Id.* Similarly, "the fictitious option trading records allowed the scheme to continue driving BLMIS deeper into insolvency." *Id.*

With respect to Appellants' attempt to "divorce the section 20(a) claims from the Trustee's claims" by "contending that the Propping Up and Counterparty Allegations do not relate to the Picower Parties' own accounts," the bankruptcy court found, in effect, that the issue of whether the conduct concerned the Picower Parties' own accounts was immaterial: "[i]n truth, the [*Goldman III* complaint] alleges 'nothing more than steps necessary to effect the Picower defendants' fraudulent withdrawals of money from BLMIS, instead of 'particularized' conduct directed at BLMIS customers.'" *Id.* at 300-01 (quoting *Marshall*, 740 F.3d at 84). At bottom, Judge Bernstein concluded, the *Goldman III* complaint alleges "that Picower controlled BLMIS to perpetuate the Ponzi scheme so that he could steal $7.2 billion through the fraudulent withdrawals from the Picower Parties' accounts, the very claim the Trustee settled and conduct that harmed all creditors in the same way." *Id.* at 301. The bankruptcy court further concluded that "every investor could assert the same claim." *Id.* (citing *Fox I District Court Opinion*, 848 F. Supp. 2d at 480) ("[I]t is plain that every BLMIS customer suffered the same types of damages asserted by the Appellants in the Florida Actions.").

Finally, the bankruptcy court took issue with the *Goldman III* complaint's attempts to "tie" Picower's transactions to BLMIS' misrepresentations to its customers. *Id.* at 301. While Appellants attempted to plead that Picower's conduct affected the financial information that BLMIS sent to its customers, the "allegations the Picower's transactions with BLMIS were reflected in or affected the financial information that BLMIS sent to its customers, or influenced their decisions to invest or stay invested in BLMIS, are wholly conclusory." *Id.* at 302. More specifically, the bankruptcy court found that the complaint "does not include any particularized allegation that Picower ever prepared

15

a BLMIS record or told Madoff what information to put into the financial information that BLMIS
sent to its customers, that he sent or participated in the transmission of such a statement by BLMIS
to a customer, that he interacted with any customer or that any BLMIS customer relied on any such
information." *Id.*

## II.    STANDARD OF REVIEW

A district court reviews a bankruptcy court's findings of fact for clear error and its
conclusions of law *de novo*. *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000).

## III.    DISCUSSION

On appeal, the issue is whether the claim asserted by the Appellants is duplicative or
derivative of the claims the Trustee brought or could have brought, and is therefore barred by the
Permanent Injunction, or whether Appellants have asserted a *bona fide* Section 20(a) claim which is
not barred by the Permanent Injunction.  Appellants argue that the "propping up" allegations and
the "counterparty" allegations, which were not included in the *Goldman II* complaint, suffice to state
a *bona fide* control person claim against the Picower Parties that is not barred by the Permanent
Injunction.  Appellants argue that the bankruptcy court erred in enjoining the prosecution of the
*Goldman III* complaint and that the bankruptcy court's order should be reversed.

In deciding whether past complaints or proposed complaints violated the Permanent
Injunction, courts have asked whether the claims at issue are general claims, common to all BLMIS
investors, that are substantively duplicative of claims belonging to the estate and therefore
exclusively held by the Trustee to the exclusion of individual creditors.  *See, e.g.*, *Fox I District Court
Opinion*, 848 F. Supp. 2d at 481.  The Court evaluates that issue below.

### A.    The *Goldman III* Complaint Asserts a General Claim

Despite the label given to it by Appellants, the claim asserted in the *Goldman III* complaint is
derivative:  it could be brought by any BLMIS creditor and is not based on conduct by the Picower
Parties that was directed to the Goldman Parties or the putative class members in particular.  The

16

*Goldman III* complaint is therefore barred by the Permanent Injunction.

The Second Circuit has defined "derivative claims" in the context of a bankruptcy as "ones that 'arise from harm done to the estate' and that 'seek relief against third parties that pushed the debtor into bankruptcy.'" *Marshall*, 740 F.3d at 89 (quoting *JPMorgan* 721 F.3d at 70) (brackets omitted). On the other hand, a claim is "particularized" when "it can be 'directly traced to the third party's conduct.'" *Id.* (quoting *St. Paul*, 884 F.2d at 704). "Particularized claims . . . are specific to that plaintiff, in that his injury is 'directly traced to' the non-debtor's conduct." *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 334 (S.D.N.Y. 2015) (quoting *St. Paul*, 884 F.2d at 704). Moreover, a particularized claim is one in which the defendant "owed a separate duty, or caused a separate harm, particularly to [the plaintiffs]." *Fox I BK Opinion*, 429 B.R. at 431-32; *accord Ritchie*, 121 F. Supp. 2d at 336 ("Indeed, claims that arise in the aftermath of a Ponzi scheme are classic examples of generalized harm.") (citing *Fox I BK Opinion*, 429 B.R. at 431-32).

"If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul*, 884 F.2d at 701 (citations omitted).[2] This passage from *St. Paul* "voices the maxim that only a trustee, not creditors, may assert claims that belong to the bankrupt estate." *JPMorgan*, 721 F.3d at 70. As a result, "when a creditor seeks relief against third parties that pushed the debtor into bankruptcy, the creditor is asserting a derivative claim that arises from harm done to the estate." *Id.* Moreover, a "debtor's claim against a third party is 'general' if it seeks to augment the fund of customer property and thus affects all creditors in the same way." *Id.* at 71.

By way of example, in *JPMorgan*, the Trustee sought to "assert claims on behalf of thousands of customers against third-party financial institutions for their handling of individual investments

---

[2] "This reasoning applies to claims against a non-debtor third party." *Fox I District Court Opinion*, 848 F. Supp. 2d at 479 (citing *St. Paul*, 884 F.2d at 701).

made on various dates in varying amounts," alleged wrongful acts which "could not have harmed all

customers in the same way," and therefore could not be "common" or "general." *Id.* at 71. The

Second Circuit there contrasted the Trustee's asserted claims, which were not "general," with the

claims in the *Fox I* complaint, which sought recovery for injuries which were "'general' in the sense

articulated in *St. Paul* in that they arose from a single set of actions that harmed BLMIS and all

BLMIS customers in the way and for the same reason." *Id.* at 71 n.20 (quoting *Fox I District Court

Opinion*, 848 F. Supp. 2d at 469) (internal quotation marks omitted).

This Court agrees with the bankruptcy court's conclusion that the *Goldman III* complaint

asserts a claim that seeks recovery for a general claim that affected all BLMIS investors in the same

way. Even with the addition of the "propping up" and "counterparty" allegations, pleaded to thread

the eye of the needle outlined by the prior decisions in this line of cases, the *Goldman III* complaint is

functionally similar to prior complaints held to have been barred by the Permanent Injunction.

First, in concluding that the *Goldman III* complaint does not plead a *bona fide* Section 20(a)

claim that is not barred by the Permanent Injunction, the bankruptcy court concluded:

> [T]he propping up loans and counterparty fraud injured the BLMIS estate and
> indirectly affected all creditors in the same way. The propping up loans rendered
> BLMIS insolvent . . . and BLMIS' inability to satisfy its investors' redemption calls
> ultimately drove BLMIS into bankruptcy . . . . Similarly, the fictitious option
> trading records allowed the scheme to continue driving BLMIS deeper into
> insolvency.

*Goldman III*, 546 B.R. at 300 (internal citations omitted); *accord id.* at 301 ("Moreover, every investor

could assert the same claim."). This Court agrees with the bankruptcy court's conclusion that the

complaint asserts a general claim, rather than a particularized one. The *Goldman III* complaint alleges

that Picower engaged in various categories of fraudulent conduct which had the purpose and effect

of further effectuating Madoff's Ponzi scheme; the complaint itself is replete with assertions that

Picower's fraudulent activity deceived customers, as a group, into investing and staying invested with

BLMIS. *See, e.g.*, Compl. ¶ 74 (Picower's "loans" deceived "prospective and existing BLMIS

customers about the legitimacy and solvency of BLMIS, which BLMIS customers relied upon in investing with, or staying invested with, BLMIS."); *id.* ¶ 79 (Picower's involvement in allegedly fraudulent options trading "deceive[d] . . . BLMIS customers and potential investors" and "preserve[d] the Ponzi scheme").

The bankruptcy court also properly found that the propping up loans and the counterparty conspiracy "were incident to the [Picower Parties'] fraudulent withdrawals of $7.2 billion," *Goldman III*, 546 B.R. at 301, because the alleged injuries from this conduct arose "from the secondary effect of a harm done to the debtor," and at its core, those actions amounted to two generalized categories of conduct that "pushed the debtor into bankruptcy," *Marshall*, 740 F.3d at 89. What the complaint does *not* allege are particular instances in which Picower, through the conduct described in the complaint, directed BLMIS to provide false or misleading information to Appellants (or the proposed class members) in particular; rather, the complaint alleges claims that are "at bottom, 'general one[s],'" *St. Paul*, 884 F.2d at 701, that seek to recover for an injury that was inflicted not by specified acts of the Picower Parties directed toward the Appellants themselves . . . by a *single set of actions* that harmed BLMIS and all BLMIS customers in the same way and for the same reason." *Fox I District Court Opinion*, 848 F. Supp. 2d at 480 (emphasis added).

With respect to whether the Picower Parties violated a "separate duty" owed by them to Appellants, Appellants would have this Court look only to the titular cause of action asserted in the *Goldman III* complaint. But that is not the proper analysis. As Judge Sullivan reasoned in *Goldman I*, a "mere examination of the nominal cause of action" is not all that is required and "Appellants cannot expect that the mere invocation" of a non-derivative claim "requires the Court to ignore the substance of what their complaints actually allege." 2013 WL 5511027, at *6.

Appellants assert that the "injuries suffered by the Appellants also occurred at different times than the injuries suffered by BLMIS," Appellants' Brief, Dkt. No. 26, Case No. 16-cv-2058-GHW ("App. Br."), at 19, but even if true, this distinction does not serve to transform Picower's

"single set of actions" into a set of actions particularly aimed at Appellants or the putative class members themselves, or to support the conclusion that their claim was particularized rather than general. Simply put, the "alleged wrongful acts harmed every BLMIS investor (and BLMIS itself) in the same way." *Fox I District Court Opinion*, 848 F. Supp. 2d at 480. And tellingly, Appellants do not even cite—much less discuss the application of—the Circuit's holding in *St. Paul*.

Appellants also rely on *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) in support of their position that the bankruptcy court erred in finding that the "propping up loans and the options trading fraud injured the BLMIS estate and indirectly affected all customers in the same way driving BLMIS into deeper insolvency." App. Br. at 24. Appellants argue that in *Hirsch*, the "trustee of a bankruptcy estate sued the accountants and law firms of entities engaged in a Ponzi scheme," alleging that the "defendants' participation in the scheme caused the Debtors to incur extraordinary liabilities consisting of contingent financing obligations, guarantee obligations, and trade debt . . . ." *Id.* (citation and quotation marks omitted). Appellants assert that the Second Circuit held that the trustee did not have standing to bring claims predicated upon the accountants' role in the fraud, and that *Hirsch* demonstrates that "only BLMIS investors have standing to sue [the] Picower Parties for their participation in the fraud, regardless of whether BLMIS was theoretically harmed by the continuation of the Ponzi scheme." *Id.* at 25.

Appellants' reliance on *Hirsch* is misplaced. The court in *Hirsch* stated that "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." 72 F.3d at 1093. With respect to claims asserted by the trustee that were predicated upon the defendant's distribution of misleading private placement memoranda to investors in a Ponzi scheme, the court held that the claims were the "property of those investors, and may be asserted only by them and to the exclusion of [the trustee]." *Id.* at 1094. That portion of *Hirsch*, however, was based on the trustee's allegations that the defendant accounting firm "took the lead in preparing the false and misleading private

placement memoranda . . . and financial forecasts by means of which the Ponzi schemes were

primarily carried forward" and further, "placed . . . investors in these deals." *Id.* at 1089.

Here, by contrast, the bankruptcy court found that the allegations "that Picower's

transactions with BLMIS were reflected in or affect financial information that BLMIS sent to its

customers, or influenced their decisions to invest or stay invested in BLIMS, are wholly conclusory."

*Goldman III*, 546 B.R. at 302. This Court agrees with that conclusion. In *Marshall*, the Second

Circuit held that *Hirsch* did not support the appellants' arguments that their claims alleged

"'particularized' injuries traceable to the Picower defendants" because the appellants had "not

alleged that the Picower defendants took any such 'particularized' actions aimed at BLMIS

customers." 740 F.3d at 93. The court reasoned that the appellants had "not alleged, for instance,

that the Picower defendants made any misrepresentations to appellants," even where the appellants

had alleged that the "Picower defendants . . . effected [fraudulent] withdrawals through backdating

trades and recording fictional profits" which were alleged to "ensure the fraud's success by inducing

[the appellants] and other customers to invest (and remain invested) in BLMIS." *Id.* Having

independently reviewed the *Goldman III* complaint in light of the Second Circuit's reading of *Hirsch*

in *Marshall*, this Court agrees with the bankruptcy court's conclusion that the complaint "does not

include any particularized allegation that Picower ever prepared a BLMIS record or told Madoff

what information to put into the financial information that BLMIS sent its customers, that he sent

or participated in the transmission of such a statement by BLMIS to a customer, that he interacted

with any customer or that any BLMIS customer relied on any such information." *Id.* *Hirsch*,

therefore, is distinguishable.[3]

---

[3] Appellants also protest that the bankruptcy court erred to the extent that it required Appellants to allege that Picower
made "direct misrepresentations" because "direct misrepresentations are not required to state a Section 20(a) claim."
App. Br. at 22-23. This argument is unfounded, however, because the bankruptcy court did not rule on whether
Appellants had stated a claim under Section 20(a), as would be the analysis were the court faced with a motion to dismiss
under Fed. R. Civ. P. 12(b)(6). Rather, the bankruptcy court found that the "linking" allegations were "wholly
conclusory" in connection with its conclusion that the *Goldman III* complaint does not include "particularized"
allegations of wrongful conduct by Picower and directed at Appellants, sufficient to find that Appellants' claim was

Finally, to the extent that Appellants argue that their purported Section 20(a) claim is non-derivative just because it alleges conduct that does not strictly concern activity in the Picower Parties' own accounts, *see, e.g.*, App. Reply Brief, Dkt. No. 43, Case No. 16-cv-2058-GHW, at 1 ("[I]f the Claim alleges conduct other than fraudulent transfers or the conduct necessary to effect the transfers themselves, it is *not* a 'disguised' fraudulent transfer claim . . . . Appellants have pled what Judge Sullivan said they must."), that such conduct may not have strictly concerned activity in those accounts does not, *ipso facto*, mean that the claim is non-derivative. It is correct that Judge Sullivan concluded that the *Goldman I* complaint pleaded only that the Picower Parties "directed trades in their own BLMIS accounts knowing that no such trades were in fact taking place." *Goldman I District Court Opinion*, 2013 WL 5511027, at *10. But Judge Sullivan did *not* conclude that allegations involving conduct that goes beyond trading in the Picower Parties' own accounts would therefore be non-derivative; only that the asserted claims based upon such trading were derivative inasmuch as those claims were, in essence, fraudulent conveyance claims which belonged exclusively to the Trustee.

### B. The Doctrine of *In Pari Delicto* Does Not Support Appellants' Position

Appellants attempt to find support in *JPMorgan*, 721 F.3d 54, arguing that their claims are "functionally identical to the claims examined" in that case. App. Br. at 20. In *JPMorgan*, the Trustee had attempted to sue several banks for unjust enrichment, breach of fiduciary duty, aiding and abetting fraud, and negligence, "among others," because the banks, when confronted with evidence of Madoff's scheme, had allegedly "looked away" or failed to perform due diligence that "would have revealed the fraud." 721 F.3d at 57-58. The Second Circuit held that the Trustee lacked standing to bring those claims on the grounds that Picard "stands in the shoes of BLMIS and may not assert claims against third parties for participating in a fraud that BLMIS orchestrated." *Id.*

---

"particularized" and not "general." *Goldman III*, 546 B.R. at 301-02.

at 64.  That ruling was based on the doctrine of *in pari delicto*, which holds that "one wrongdoer may not recover against another."  *Id.* at 63; *accord id.* ("A 'claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not the guilty corporation.'") (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991)).

*JPMorgan* does not support Appellants' position.  To apply the *in pari delicto* doctrine here, "where the Trustee did not bring" the claim asserted in the *Goldman III* complaint "would perversely require ruling on a hypothetical controversy over the Trustee's standing to bring an action that the Trustee never brought when the Trustee had the right and the standing to bring" the claims he has already settled with the Picower Parties.  *Fox I District Court Opinion*, 848 F. Supp. 2d at 485.  But even were the Court to engage in this hypothetical analysis and reach the conclusion that the Trustee would lack standing to bring Appellants' purported Section 20(a) claim, this conclusion would not advance Appellants' position.  Judge Sullivan's reasoning in *Goldman I* is apropos:  "[T]he mere fact that the Trustee would lack standing to bring a securities fraud claim (and such a claim would therefore be non-derivative) does not help Appellants . . . . The fact that the Trustee would lack standing to bring securities fraud claims, even if true, is irrelevant here, since the Goldman Complaints do not truly allege securities claims."  *Goldman I*, 2013 WL 5511027, at *10.

## IV.   CONCLUSION

The *Goldman III* complaint seeks recovery for alleged wrongs that affected all creditors in the same way and therefore, presses a claim that belongs exclusively to the Trustee.  Accordingly, the Permanent Injunction bars Appellants' complaint, and the judgment of the bankruptcy court is AFFIRMED.

The Clerk of Court is directed to terminate these consolidated appeals and to close case

numbers 1:16-cv-2058 and 1:16-cv-2065.

     SO ORDERED.

Dated:  January 24, 2017
New York, New York

                                   GREGORY H. WOODS
                             United States District Judge