

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-99000-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   ADMINISTRATIVE CASE RE: 08-1789 (SECURITIES INVESTMENT

8   ADVERSARY PROCEEDING),

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  Adv. Case No. 08-01789-smb

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14  SECURITIES INVESTOR PROTECTION CORPORATION,

15              Plaintiff,

16          v.

17  BERNARD L. MADOFF INVESTMENT SECURITIES, L.L.C.,

18              Defendants.

19  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25

Page 2

1    Adv. Case No. 10-05390-smb

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                    Plaintiff,

6             v.

7    1096-1100 RIVER ROAD ASSOCIATION,

8                    Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                  U.S. Bankruptcy Court

12                  One Bowling Green

13                  New York, NY  10004

14

15                  December 21, 2016

16                  10:01 AM

17

18

19

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 3

```
 1    Hearing re:  Interim Fee Application of Browne Jacobson, LLP

 2    As Special Counsel To The Trustee

 3

 4    Hearing re:  Interim Fee Application of Triay Stagnetto

 5    Neish As Special Counsel To The Trustee

 6

 7    Hearing re:  Interim Fee Application of UGGC & Associes As

 8    Special Counsel To The Trustee

 9

10    Hearing re:  Interim Fee Application of Graf & Pitkowitz

11    Rechtsanwalte GMBH As Special Counsel To The Trustee

12

13    Hearing re:  Interim Fee Application of Werder Vigano As

14    Special Counsel To The Trustee

15

16    Hearing re:  Interim Fee Application of Williams, Barristers

17    & Attorneys As Special Counsel To The Trustee

18

19    Hearing re: Interim Fee Application Of Cochran Allan As

20    Special Counsel To The Trustee

21

22    Hearing re:  Interim Fee Application of Eugene F. Collins As

23    Special Counsel to the Trustee

24

25    Hearing re:  Interim Fee Application of Soroker Agmon
```

Page 4

1     Nordman As Special Counsel To The Trustee

2

3     Hearing re:   Interim Fee Application of SCA Creque As

4     Special Counsel To The Trustee

5

6     Hearing re:   Interim Fee Application of Young Conaway

7     Stargatt & Taylor LLP As Special Counsel to the Trustee

8

9     Hearing re:   Interim Fee Application of Trustee And Baker &

10    Hostetler LLP

11

12    Hearing re:   Interim Fee Application of Munari Giudici

13    Maniglio Panfili e Associati As Special Counsel To The

14    Trustee

15

16    Hearing re:   Interim Fee Application of Higgs & Johnson

17    (Formerly Higgs Johnson Truman Bodden & Co.) As Special

18    Counsel to the Trustee

19

20    Hearing re:   Interim Fee Application of Kelley, Wolter &

21    Scott, Professional Association As Special Counsel To The

22    Trustee

23

24    Hearing re:   Interim Fee Application of Schiltz & Schiltz As

25    Special Counsel To The Trustee

Page 5

1    Hearing re:   Interim Fee Application of Windels Marx Lane &

2    Mittendorf, LLP

3

4    Hearing re:   Trustees Motion to Affirm His Determinations

5    Denying Claims of Claimants Holding an Interest in Sienna

6    Partnership, L.P., Katz Group Limited Partnership and

7    Fairfield Pagma Associates, L.P.

8

9    Hearing re:   Hearing on Attorney Substitution

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   BAKERHOSTETLER

 4        Attorney for

 5        45 Rockefeller Plaza

 6        New York, NY 10111

 7

 8   BY:  STEPHANIE A. ACKERMAN

 9        JACQLYN ROVINE

10        DAVID J. SHEEHAN

11        KEITH R. MURPHY

12

13   GIBBONS P.C.

14        Attorney for

15        One Gateway Center

16        Newark, NJ 07102

17

18   BY:  MARK B. CONIAN

19

20   SECURITIES INVESTOR PROTECTION CORPORATION

21        Attorney for SIPC

22        1667 K Street, Suite 1000

23        Washington, D.C. 20006

24

25   BY:  KEVIN H. BELL
```

```
 1    ALSO PRESENT TELEPHONICALLY:

 2

 3    PATRICK MOHAN

 4    DAVID J. SHEEHAN

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              CLERK:  Please be seated.

 3              THE COURT:  Good morning.  Madoff?

 4              MR. SHEEHAN:  Good morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. SHEEHAN:  David Sheehan, Baker Hostetler for

 7    the Trustee.  And we're here today on the 22nd application

 8    for interim compensation by the Trustee and associated

 9    counsel working with the Trustee both here as conflict

10    counsel, and around the world, I guess in terms of other

11    colleagues that help us out.

12              Your Honor, there are no objections, I'll note

13    that at the outset, to the application before you today, or

14    any of the applications.  So that if I could just cover a

15    few things, and highlight the items that are in the report.

16              THE COURT:  And it's a good time to give an update

17    on the case.

18              MR. SHEEHAN:  Sure.  Sure.  Happy to.

19              Starting first with something we don't talk very

20    much about, we do have a lot of claims that are still to be

21    determined, and Your Honor's heard many of those but there

22    will still be more determinations, several hundred in the

23    multi-claim capacity that Your Honor's heard many on

24    already.  But we've grouped them differently based on their

25    relationships to each other.  And then there are several
```

Page 9

1    hundred more of not multi-claim, but an individual direct

2    claim capacity that are a variety of things.  They might

3    include antecedent debt or something that's already been

4    decided by the Court, but their claim has not been

5    determined and therefore we have to bring them before Your

6    Honor to finalize it.

7            THE COURT:  How many of those are direct, active

8    objections?

9            MR. SHEEHAN:  Several hundred.  I'm not sure of an

10   exact amount, I think it's about 3 or 400, Your Honor.  So

11   we should be able to start mustering those together and

12   getting them before you as soon as possible.

13           I think a significant amount that we should

14   announce to the Court is is that customer claims that have

15   been allowed by the Trustee now exceed over $15 billion.  So

16   while we've collected 11.4, we're still well short of the

17   amount that we've allowed, so even though with our next

18   distribution, which Your Honor will hear in January will go

19   over 60 cents, we still have a long way to go, just based on

20   the claims.

21           And there are 48 deemed determined.  And Your

22   Honor, by way of explanation, a deemed determined claim, by

23   way of example would be Kingate where there is an $825,000 -

24   - $825 million claim where we've determined that we will,

25   you know, reach an accommodation with them.  We can either

Page 10

1   settle, or if we lose we pay.  So we reserved for that.  So

2   we deemed them determined to be allowed, and when we make a

3   distribution of, for example, the next distribution will

4   have a reserve in it, that will take into account the 48

5   deemed determined claims so that in the unlikely outcome

6   that we should lose, that we will, at the end of the day,

7   have to pay them and we have to have that money in reserve.

8          With regard to the litigation itself, I'm giving

9   Your Honor an update.  The cases themselves are moving along

10  as well as can be expected, given the fact that our

11  adversaries are pushing hard back on discovery.  Your

12  Honor's familiar with that.  So -- and with the decision

13  that Your Honor recently rendered on extraterritoriality, a

14  number of the subsequent transferees have now become third

15  parties, so we're pursuing them through The Hague and other

16  avenues of discovery that are available to us.  So the

17  Trustee's busy there trying to gather that.

18         And of course we're also preparing, as Your Honor

19  might suspect, an appeal, which we're working on our

20  colleagues with so we can have a single order before Your

21  Honor hopefully in the near term, if not before the

22  holidays, certainly shortly thereafter.  And the thought

23  there is is that we want to continue that discovery in the

24  event that the decision is reversed and we're turned back

25  down, so that we don't waste time here, while we can be

Page 11

1    progressing the cases.

2            And in the event that we can't move forward some

3    of that discovery, for example, in Kingate we do have a

4    protective action that we've filed in the United Kingdom

5    against the now third party defendants or, you know, Ceretti

6    and Grosso and other third parties.  That case has been

7    stayed, pending the decision here by Your Honor, nothing yet

8    has happened to unstay that.  We have prepared an amended

9    bill of particulars that we're ready to file should the stay

10   be lifted.  We're not focusing on that right now, we're

11   actually focusing more on the appeal itself and getting that

12   ready to move forward.  Nor have our adversaries moved to

13   release that stay either.

14           THE COURT:  I have to enter orders in these

15   adversary proceedings, though, based on the

16   extraterritoriality decision.

17           MR. SHEEHAN:  Yes.

18           THE COURT:  Or reports and recommendations, if

19   they haven't -- nobody's consented to the final order.

20           MR. SHEEHAN:  I can give Your Honor a report on

21   that.  We've been very successful, and everyone has

22   consented.  I think we had the cooperation of the liaison

23   committee led by Sullivan and Worcester and they worked

24   cooperatively among the majority of the defendants.  And we

25   are not only doing that, just to further report to Your

Page 12

1    Honor on the status of that, there were certain non-moving

2    defendants who feel as though under Your Honor's order, with

3    regard to comity, that they would be allowed to move before

4    Your Honor.  The thought on our part and theirs, was to just

5    -- and you will see this in the order we're preparing, is a

6    stipulation and order that if they had moved, Your Honor

7    would have granted it, just so we can include them on the

8    appeal and not have further proceedings after the appeal

9    comes down, or while the appeal is pending have them making

10   motions, et cetera.

11            So we're trying to clean that off as well so that

12   the landscape before Your Honor will simply be those cases

13   that are direct, such as Kingate, we -- obviously as an

14   initial transferee, in cases of that quality will be the

15   ones Your Honor will be hearing motions on, et cetera.

16   And there are quite a few of those and we will be moving

17   forward on them.

18            The principal one is Tremont where Your Honor held

19   that it was not subject to extraterritoriality decisions, so

20   there are a number of significant subsequent transferees

21   there, and we are moving forward with that case as well.

22   That's all happening, so.

23            Now -- and that's why you'll see, if Your Honor

24   looks at the summary that we have of our foreign counsel,

25   that a few -- one may not be of -- Schlitz & Schlitz in

Page 13

1    Luxembourg, that's Alpha Prime, Your Honor just on the same

2    day issued that decision, that is a very active litigation,

3    as Your Honor well knows.  It is moving forward and we are

4    actively participating in it, but more or less on the

5    sidelines.  We keep a watchful eye on it, in the sense that

6    it may help us in terms of discovery that takes place there.

7             The other two significant ones are Soroker Agmon.

8    Soroker Agmon is the Magnify litigation in Israel.  There we

9    have filed a complaint, it's being actively -- there's an

10   active motion process, there's a pending motion to dismiss.

11   There are actually two complaints there, one is a complaint

12   against the individual, Yair Green and certain of his family

13   members for transfers they received, and now we have a

14   separate action against the subsequent transferees from

15   Magnify through the Yeshaya Horowitz Association to

16   ultimately defendants such as Hebrew University, et cetera.

17            There our cause of action is predicated upon

18   unjust enrichment which is allowed there, there is no in

19   pari delicto in Israel.  That's part of what's being

20   litigated.  If we can't bring an in pari delicto bar

21   (indiscernible) in here, should be allowed to bring one in

22   Israel?  So comity is everywhere in this case at this point.

23            So we're litigating that.  It will probably most

24   likely be tried next year.  The Israeli courts move quite

25   rapidly and they have a different discovery system there,

Page 14

```
 1    it's quite like England, you are required to produce all

 2    discovery, you know, and there is no depositions.  And you

 3    just go to court and more often than not the affidavit

 4    becomes the direct testimony and cross examination then

 5    transpires.  So the case will move faster, I think, than the

 6    case here because we're facing still some motion practice

 7    here as well.  So -- but we are going to move on both

 8    fronts, and if the case gets started here first, it gets

 9    started here first.

10              THE COURT:  Do you have any cases teed up for

11    trial?

12              MR. SHEEHAN:  Pardon?

13              THE COURT:  Any cases teed up for trial?

14              MR. SHEEHAN:  Your Honor, I think the only one

15    that's teed up is Merkin which is under Your Honor's

16    consideration on a motion for summary judgment.  That's

17    ready to go.

18              THE COURT:  None of the innocent investor cases?

19              MR. SHEEHAN:  Oh, oh, yes.  What we're doing there

20    is --

21              THE COURT: -- like Kohn and Auberbach and those?

22              MR. SHEEHAN:  Yeah, all those are teed up.  And as

23    a matter of fact, at this point, following -- what we've

24    done is we've teed up and we've reached out to Mr. Kirby and

25    his colleagues, that on those cases that we feel as though
```

Page 15

1    we have summary judgment capability, we are asking them to

2    do that.

3           Because Your Honor will recall, at the last

4    hearing we had the -- you know, an FOB case and do you

5    remember that?

6           THE COURT:  FOB?

7           MR. SHEEHAN:  FBO, I'm sorry, I always say FOB,

8    I'm backing into my international stuff.  But anyway, you

9    know, for the benefit of, I don't know if you recall that

10   case, but I don't want to get into details here, because Ms.

11   Chaitman isn't.  But I think there are going to be cross

12   motions for summary judgment there.  And Your Honor

13   suggested that perhaps we should look at other cases for

14   that purposes.  We have done that; we've got four that we're

15   working on right now that we're looking to tee up with the

16   idea that eventually in that context we'll also have an

17   omnibus hearing on the insolvency Ponzi issue.

18          We did take Mr. Madoff's dep yesterday, I could --

19          THE COURT:  What did he say?

20          MR. SHEEHAN:  -- we didn't finish.  I think Ms.

21   Chaitman and I are in agreement that we need another day, at

22   least.

23          THE COURT:  Okay.

24          MR. SHEEHAN:  We will submit a letter to Your

25   Honor requesting approval for that.  But in the meantime

1  we're working on all of those fronts to try to get those

2  cases in front of Your Honor in a fashion that can --

3  there's about 350-odd, maybe 367 more precisely, that are

4  left but those cases can all, I think, start moving now.

5  And I can report to you that we're doing very well with

6  Judge Moss.  I don't know if he gives you reports, I would

7  assume --

8           THE COURT:  No.

9           MR. SHEEHAN:  -- he does.

10           THE COURT:  I haven't spoken to him.

11           MR. SHEEHAN:  But it's been very successful. I

12  think we're moving forward there.  We intend to bring more.

13  We've asked some adversaries, they haven't agreed to go

14  there, so the more we can get in front of Judge Moss it

15  would be beneficial to us, Your Honor, and to the whole

16  process, rather than, you know, untidy your court with this

17  stuff.

18           THE COURT:  I have a question about the summary

19  judgment motions.  Isn't there a question, though, about

20  when the Ponzi Scheme began?

21           MR. SHEEHAN:  Yes.  What we're doing is there,

22  there's a number of these cases where the -- it started --

23  I'm sorry.  It's after 1992, it goes back to the first day

24  of principal, so we're targeting those cases.  There are

25  actually not a lot of them that actually go back, the good

Page 17

1    faith cases that go back prior to 1992, so -- and we are

2    focusing on those.  Obviously the '92 issue will get

3    resolved down the road.

4            I think that may end up -- you know, that's

5    something to think about down the road is whether that ends

6    up in some kind of an omnibus proceeding because of the

7    nature of it, it affects a lot of people, I think.  So we'll

8    have to look at that, we'll structure that for Your Honor.

9            The other firm that's been fairly busy is Williams

10   Barristers, they're in Bermuda.  The reason for that is is

11   that that's Kingate.  There's active litigation proceeding

12   there, as Your Honor is aware from your opinion, that is

13   being litigated by the Kingate management against other

14   third parties, such as Ceretti and Grosso, et cetera.

15           So we had separate litigation, very similar to

16   ours, as a result of a motion to dismiss that was brought by

17   the others.  Because initially it was a mistake of fact case

18   and that wasn't going anywhere, so then they flipped it into

19   more of a case similar to our own which I think they were

20   having trouble with balancing, because they were sort of

21   arguing both sides there.  You know, arguing that there was

22   a fraud but then saying to us there wasn't (indiscernible).

23   So in any event, that's an interesting thing that we have to

24   keep track of.  It's actively being litigated, and I

25   understand there are settlement negotiations.

Page 18

1          Our problem there is lack of transparency.  We

2     cannot be in the courtroom when those -- it's kind of an odd

3     system.  I still don't understand the British system, I must

4     tell you, there's a lot of lack of transparency there.  For

5     example, I said earlier about all that discovery that goes

6     back and forth, we can't get access to any of that discovery

7     until its actually published in court, and then it becomes a

8     public document and then you get access to it.

9          Whereas here, we're having skirmishes over a lot

10    of third party documents we've gathered as a result of

11    2004s, and there's confidentiality associated with that, et

12    cetera.  Whereas in England, no one would get any of that

13    until it was published in court.  So our barristers there

14    are pretty active watching that and staying on top of it.

15          As you can see from the list of other foreign

16    counsel there is activity in many jurisdictions.  In France,

17    that's mostly in -- even though the hours are significant,

18    we have no claim in France, what is going on there is there

19    are a lot of criminal proceedings, which unlike the United

20    States, we can participate in.  We've been allowed to

21    participate in several of those which are proceeding against

22    parties that we have not sued, but were -- people that were

23    organizing the funds and putting them together, and

24    therefore we get access to information.  So that's how we

25    use our French counsel for that, and it's been very

Page 19

1   effective.

2            And of course we have our local counsel here,

3   Windels Marx, Young Conaway, Cochran Allan and Kelly Walter.

4            As Your Honor knows, you're familiar of course

5   with Windels Marx, they appear before Your Honor on a

6   regular basis, they've not done nothing but a superb job

7   since the beginning of the case.  I can say the same for

8   their other colleagues.  A significant amount of work is

9   done by them on all these cases.  And it's through their

10  efforts, as well as some of our own, that this year we were

11  able to assemble a package of around $400 million, round

12  numbers, which is the substance of our distribution network

13  now taking place, the big money there being, of course,

14  Chase and then -- which Your Honor's heard, and

15  (indiscernible), of course, and then other cases that were

16  (indiscernible) Windels.

17           I think you'll continue to see that activity.

18  There are cases that are in, you know, formation towards

19  settlement.  It takes time.  I think Your Honor's decision,

20  you know, sort of loosened it up a bit both ways, so we'll

21  see where that goes.

22           But overall I think that summarizes a lot of what

23  our activities have been that bring us here today.  And in

24  light of all that, Your Honor, and the work done by all of

25  our outside counsel, I'd recommend that the applications be

Page 20

1     approved.

2              THE COURT:  Thank you.

3              MR. SHEEHAN:  Thank you.

4              THE COURT:  Does anyone else want to be heard?

5              MR. BELL:  Kevin Bell on behalf of the Securities

6     Investor Protection Corporation.  A couple of addenda to Mr.

7     statement.  You -- on the motion that was filed last week

8     you will see that there is about $11 million -- a billion

9     dollars involved and the Trustee's distributing about 9.7.

10    There's about -- a reserve of about $2.4 billion for deemed

11    determined and customers whose claims are in the objection

12    phase.

13             The Circuit just kicked the appeal from Judge

14    Engelmayer's decision out to March from January.  And there

15    are a number of dollars reserved with regard to claims

16    associated with that issue.

17             THE COURT:  That's the interaccount transfer

18    issue?

19             MR. BELL:  Interaccount transfer.  Yes, Your

20    Honor.  So --

21             THE COURT:  And when is the argument?

22             MR. BELL:  Well, it was supposed to be the week of

23    January 9 and there was just a notice from the Circuit to

24    put it out to sometime in March at the earliest.

25             THE COURT:  Okay.

Page 21

1           MR. BELL:  So -- but a number of the dollars that

2      are tied up and a number of the customer objections all flow

3      from that guidance that Your Honor has issued and Judge

4      Engelmayer affirmed and hopefully the Circuit does also.

5           SIPC has supported -- has filed a recommendation

6      in support of all of the fee applications that have been

7      submitted.  As I have said on the prior 21 applications,

8      SIPA reviews every entry on every page, makes comments on a

9      number of them, gets into dialogue with each and every

10     counsel that files an application.

11          You will see, at Paragraph 5 of SIPC's

12     recommendation on Baker Hostetler, that were -- that there

13     is, beyond the ten percent discount that we get from all

14     counsel, that the reduction is something in between 2 and

15     14.5 percent, including the ten percent in discussions with

16     SIPC.  On Windels Marx, you will see at Paragraph 3 that the

17     reduction is 15.86.

18          So you know, SIPC's oversight, this is a no asset

19     case, there's no possibly of -- at this moment in time,

20     although there is always hope, which as we showed last week

21     when the Trustee filed his allocation motion this case is

22     past 60 percent in -- that will be distributed after the

23     Court's hearing on the 12th, if it's so fortunate to get the

24     Court's support or approved, and no appeal is taken, the

25     Trustee will be distributing later in the month, if not the

Page 22

1    first day of February, 60.098 cents on the dollar of every

2    allowed claim.  That will take it down to only 922 allowed

3    but not fully satisfied claims, which have a range.

4            You know, you can tell there's a range.  When you

5    look at the minimum payment being made of $271 and the

6    maximum payment almost $43 million, that proration has a way

7    of only allowing 31 customers to be fully satisfied, moving

8    from the not fully satisfied to the fully satisfied cases.

9            It's sort of the objection that you asked Mr.

10   Sheehan about.  They're all -- there's really no straight

11   intersection on this case, it goes -- the profit withdrawal

12   that will be before Your Honor is tied up in a number of

13   other customer objections.  So as we resolve the legal

14   matters up through the Supreme Court, and we've had time

15   based damages, though on a petition I would imagine

16   interaccount transfer will have a similar petition filed by

17   the same counsel, we will move them, because that is one of

18   SIPC's main concerns is that customer claims get resolved.

19           Clearly 1,333 of the 25 -- 2,200 plus allowed

20   claims, 1,333 will be fully satisfied after Your Honor

21   enters the order on or about January 12th, which is a

22   significant step SIPC has advanced almost $850 million to

23   the Trustee and it's been paid back some of its subrogation

24   as customers have been allocated money to satisfy their

25   claims and SIPC advance wouldn't have been necessary if we

Page 23

1    did back to the future, but clearly this case is extremely

2    successful.  And that is all on the backs of the counsel

3    whose applications are before the Court.

4              You know, we are dealing with, when you figure,

5    almost 80 months' worth -- 80 invoices, 80 months' worth of

6    invoices by Baker Hostetler in this case and about maybe six

7    fewer by Windels when they were taking on in June, July of

8    2009.  So the effort is significant, as you have seen in the

9    Trustee's report and the amount of funds that SIPC has

10   advanced to pay for this, but that is the congressional

11   intent, is that 1978, the statute was amended to take it out

12   of the situation that existed in the New York Stock Exchange

13   member Weiss, Voisin where the costs were pro-rataed against

14   allowed claims.

15             And Congress -- our board and Congress worked

16   together to create a statute that SIPC would fund all

17   expenses.  And that is one of the reasons why you see

18   litigation about things you may not normally see in a

19   bankruptcy because the statutory intent is to try and get

20   the customers fully satisfied.  And we still haven't gotten

21   (indiscernible) an F.  I remember being in school when a 60

22   was an F so I would like us to see if we can get maybe to an

23   A+, you know, but that's what I said since the beginning,

24   but clearly 60 cents is significant.

25             In that context I would ask the Court to approve

Page 24

1  the fee applications and enter orders approving them.  Thank

2  you, Your Honor.

3            THE COURT:  Thank you.  Does anyone else want to

4  be heard?

5            All right. I'll approve the fee applications in

6  light of SIPC's recommendation and the representation,

7  something I think we all know, that there will not be a

8  distribution to general creditors in this case.

9            Now in the past what have I allowed, 90 percent?

10           MR. SHEEHAN:  Pardon, Your Honor?

11           THE COURT:  What have I allowed, 90 percent of the

12  fees sought, and held back ten percent?  I just don't

13  remember.

14           MR. SHEEHAN:  No, I think that the ten percent

15  holdback is -- SIPC does that.  We only get 90 percent of it

16  anyway.

17           THE COURT:  Is that what I've done in the past,

18  just whatever the award is you --

19           MR. SHEEHAN:  That's right.

20           THE COURT:  All right.

21           MR. BELL:  There's a ten percent discount before

22  the application is submitted to the Court and then there's a

23  ten percent holdback on the applications.

24           THE COURT:  All right.  You can submit an order.

25  Thank you very much.

Page 25

1          MR. SHEEHAN:  Thank you, Your Honor.

2          MR. BELL:  Thank you.

3          THE COURT:  Next we have the motion to affirm the

4    terminations and one objection, I believe.

5          MS. ACKERMAN:  Good morning, Your Honor.

6    Stephanie Ackerman on Baker & Hostetler on behalf of Irving

7    Picard, the Madoff Trustee.  We're here today on the

8    Trustee's motion to affirm the determination of 18 claims

9    which were filed by individuals who invested in one of three

10   limited partnerships.  One was based in New York, one in

11   Wyoming and one in the Cayman Islands.  These are Sienna

12   Partnership, LP, the Katz Group Limited Partnership and

13   Fairfield Pagma Associates, LP.

14          The objecting claimants invested money in one of

15   the limited partnerships which in turn invested in BLMIS.

16   The objecting claimants had no financial relationship with

17   BLMIS, and did not own the assets that were entrusted to

18   BLMIS for the purpose of trading securities.  The claimants

19   here, like those in prior motions before this Court, are not

20   customers, because in addition to not owning the assets

21   entrusted to BLMIS, they had no control over the funds

22   invested and were unknown to BLMIS.  Thus, denial of these

23   claims is consistent with the many prior decisions in this

24   liquidation and the Second Circuit's decisions in Cruz and

25   Morgan Kennedy.

Page 26

1           Your Honor, none of the objecting claimants

2    objected to the relief requested by the Trustee in the

3    pending motion.  There was one objection filed by a

4    nonparty, Mr. Lamar Ellis filed an objection on behalf of

5    SIPC's memorandum in support of the Trustee's motion, on

6    behalf of the Lamar Ellis Trust.  Mr. Ellis claims that SIPC

7    has failed to resolve the Trust's $1 billion in identity --

8    the identity theft losses, excuse me and therefore the Court

9    should ignore SIPC's support and deny the Trustee's motion.

10          We feel the objection should be overruled for

11   several reasons.  First, neither Mr. Ellis nor the Ellis

12   Trust are objecting claimants who invested in one of the

13   three limited partnerships at issue in the Trustee's motion,

14   therefore they do not have a direct financial stake in the

15   outcome of today's motion.

16          Second, neither the Trust nor Mr. Ellis has a

17   pecuniary interest in the SIPA liquidation.  Their claims

18   were disallowed and their objections expunged in 2012 by

19   this Court's order granting the Trustee's third omnibus

20   motion.

21          Final -- further, Mr. Ellis has admitted that

22   neither he nor the Trust ever held an account with BLMIS and

23   therefore they have no claim to the BLMIS customer fund.

24          Finally, the relief sought by Mr. Ellis in his

25   objection is far from clear, but appears, again, to be

Page 27

1    related to his claim against the Madoff Victim Fund.  As

2    such, no outcome related to the Trustee's motion today could

3    resolve his objection or his claim, in other words the harm

4    he claims cannot be redressed by this Court nor is it

5    traceable to this liquidation.

6         For these reasons, Your Honor, Mr. Ellis and the

7    Ellis Trust lacks standing as parties in interest to object

8    to the current motion.  AS such, we respectfully request

9    that the objection be overruled and the Trustee's motion be

10   granted.

11        And one item -- one further item, Your Honor, Mr.

12   Ellis and the Ellis Trust are not parties in interest to the

13   SIPA liquidation and as such, we believe the irrelevant

14   notices that he continues to receive as being listed on the

15   master service list are contributing greatly to his

16   confusion.  And as such, the Trustee would like to remove

17   Mr. Ellis and the Ellis Trust from the master service list

18   in the main case.

19        THE COURT:  Well, you'll have to make a motion on

20   notice to Mr. Ellis for that one.

21        MS. ACKERMAN:  Sure.  Certainly, thank you.

22        THE COURT:  All right.  Does anyone want to be

23   heard in connection with this objection?

24        MR. BELL:  Your Honor, SIPC supports the Trustee's

25   position both on the motion on the multi-claims on Mr.

Page 28

1     Ellis's not being a party in interest.

2              THE COURT:  Thank you.  I'll grant the motion and

3     overrule the objection.  The motion itself deals with a

4     situation which has become familiar where people who are

5     entities that invest in a fund that then invests with BLMIS

6     and have asserted customer claims, but they're not customers

7     consistent to the readings of this Court, the District Court

8     and the Second Circuit because they didn't entrust money to

9     BLMIS and had no contact with BLMS -- BLMIS.

10             As far as Mr. Ellis is concerned, I'll overrule

11    his objection for all the reasons you stated.  Unfortunately

12    he seems to be confused but in any event whatever claim he

13    might have is not implicated here because there's no

14    allegation that he was an investor in any of the funds that

15    are the subject of the current motion.  So you can submit an

16    order, maybe send a copy to Mr. Ellis after it's signed.

17    Okay?

18             MS. ACKERMAN:  Thank you, Your Honor.

19             THE COURT:  Okay?  Thank you.

20             Picard versus 1096-1100 River Road.  The reason I

21    scheduled a hearing on the substitution motion is I wanted

22    to disclose that a few months ago my son joined Gibbons as

23    counsel.  I don't think that that -- unless my impartiality

24    might be reasonably questioned.  He's an M&A lawyer, not a

25    litigator and as far as I know he has nothing to do with

Page 29

1    this case and wants nothing to do with this case.

2            So obviously you are free if you disagree, to make

3    a motion, that is your right.  But I don't intend to do this

4    -- to take this any further, except I did want to make that

5    disclosure.

6            So I'll approve the substitution.  Do I have an

7    order?

8            MR. CONLAN:  Good morning, Your Honor.  Mark

9    Conlan with Gibbons.  I can hand one up, if you'd like?

10           THE COURT:  Yeah, but I need either a disk or you

11   can email an order to chambers.  We'll give you the chambers

12   email address.

13           MR. CONLAN:  I believe our paralegal did that.

14           THE COURT:  Yeah, but if I don't get it at the

15   hearing or after the hearing it just gets separated from the

16   rest of the papers.  But then it sounds like you have the

17   email address.  Let me just see whether -- it's easier if

18   you just email it to chambers, in a Word format.  Okay?

19           MR. CONLAN:  Yes, sir.

20           MR. MURPHY:  Your Honor, Keith Murphy, Baker

21   Hostetler for the Trustee.  No objection to the

22   substitution, of course, and no issue with the relationship

23   at all.

24           THE COURT:  You don't have to tell me that now,

25   you reserve the right to make whatever motion you deem

Page 30

1    appropriate.

2              MR. MURPHY:  Thank you, Your Honor.

3              THE COURT:  All right?  Thanks very much.

4              MR. MURPHY:  Thank you, Your Honor.

5              (Whereupon these proceedings were concluded at

6    10:31 AM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I N D E X

2

3                         RULINGS

4                                        Page        Line

5

6    Fee Applications Approved              24          5

7

8    Trustees Motion to Affirm His Determinations

9    Denying Claims of Claimants Holding an

10   Interest in Sienna Partnership, L.P.,

11   Katz Group Limited Partnership and Fairfield

12   Pagma Associates, L.P. Granted           28          2

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 32

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5
     Sonya                  Digitally signed by Sonya Ledanski Hyde
                            DN: cn=Sonya Ledanski Hyde,
6                           o=Veritext, ou,
     Ledanski Hyde          email=digital@veritext.com, c=US
7                           Date: 2016.12.22 16:19:50 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 22, 2016