UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :          Adv. P. No. 08-01789 (SMB)
                                        :
            Plaintiff,                  :          SIPA LIQUIDATION
                                        :
        – against –                     :          (Substantively Consolidated)
                                        :
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
            Defendant.                  :
-------------------------------------------------------X
In re:                                  :
                                        :
BERNARD L. MADOFF,                      :
                                        :
            Debtor.                     :
-------------------------------------------------------X
IRVING H. PICARD, Trustee for the       :
Liquidation of Bernard L. Madoff Investment :
Securities LLC, and Bernard L. Madoff,  :          Adv. P. No. 11-02732 (SMB)
                                        :
            Plaintiff,                  :
                                        :
        – against –                     :
                                        :
BUREAU OF LABOR INSURANCE,              :
                                        :
            Defendant.                  :
-------------------------------------------------------X

## MEMORANDUM DECISION REGARDING CLAIMS TO RECOVER FOREIGN SUBSEQUENT TRANSFERS

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Regina Griffin, Esq.
        Thomas L. Long, Esq.

Seanna R. Brown, Esq.
Amanda E. Fein, Esq.
Catherine E. Woltering, Esq.
Of Counsel

*Attorneys for Plaintiff, Irving H. Picard, Trustee
for the Liquidation of Bernard L. Madoff
Investment Securities LLC*

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

Robinson B. Lacy, Esq.
Of Counsel

- and -

SULLIVAN & WORCHESTER LLP
1633 Broadway
New York, NY 10019

Franklin B. Velie, Esq.
Jonathan G. Kortmansky, Esq.
Mitchell C. Stein, Esq.
Of Counsel

*Liaison Counsel for All Subsequent Transferee Defendants[1]*

LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY 10022

Michael B. Himmel, Esq.
Amiad M. Kushner, Esq.
Lauren M. Garcia, Esq.
Of Counsel

*Attorneys for Bureau of Labor Insurance*

**STUART M. BERNSTEIN
United States Bankruptcy Judge:**

Bankruptcy Code § 550(a)(2) permits a trustee to recover an avoided fraudulent

transfer or its value from "any immediate or mediate transferee," *e.g.*, a subsequent

---

[1]        Other Defense Counsel listed on attached Appendix.

transferee of the initial transferee or prior subsequent transferee.  Relying on this provision, Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), sued numerous subsequent transferees to recover the value of fraudulent transfers made by BLMIS in connection with the Ponzi scheme conducted by Bernard L. Madoff.  In many cases, the initial transferee was a foreign feeder fund and the subsequent transferee was also a foreign entity.  The proceedings before the Court primarily concern the application of section 550(a)(2) to subsequent transfers between foreign parties.

I do not write on a clean slate.  Judge Rakoff of the United States District Court previously withdrew the reference and laid down some basic ground rules for determining whether the subsequent transfer claims should be dismissed.  The parties to the proceedings before Judge Rakoff are referred to as the "Participating Subsequent Transferees."  Judge Rakoff held that the Trustee could not pursue recovery of "purely foreign subsequent transfers" due to the application of the presumption against extraterritoriality.  *SIPC v. BLMIS* (*In re BLMIS*), 513 B.R. 222, 231 (S.D.N.Y. 2014) ("*ET Decision*"), *supplemented by*, No. 12- mc- 1151 (JSR), 2014 WL 3778155 (S.D.N.Y. July 28, 2014).  Alternatively, considerations of international comity supported dismissal.  *Id.* at 231-32.  The District Court did not dismiss any of the claims, and instead, returned the adversary proceedings to this Court for further proceedings consistent with its decision.  *Id.* at 232.

The Participating Subsequent Transferees now seek dismissal of Trustee's claims. In addition, many similarly-situated subsequent transferees that did not participate in

3

the proceedings before Judge Rakoff (the "Non-Participating Subsequent Transferees") also seek dismissal under the *ET Decision*. In total, motions to dismiss are pending in eighty-eight adversary proceedings. The Trustee, in turn, seeks leave to amend many of his complaints to add allegations of domestic connections relating to the subsequent transfers. Finally, the Bureau of Labor Insurance (the "BLI"), a defendant in a separate adversary proceeding styled *Picard v. Bureau of Labor Insurance*, Adv. P. No. 11-02732, moves for judgment on the pleadings pursuant to Federal Civil Rule 12(c) relying on the *ET Decision*. The Participating Subsequent Transferees, the Non-Participating Subsequent Transferees and BLI are sometimes collectively referred to as the "Subsequent Transferees."

A majority of the Trustee's claims against Subsequent Transferees were made by and/or originated from the Fairfield Funds or the Kingate Funds (both defined below), the initial transferees of BLMIS. These funds are debtors in foreign insolvency proceedings and their liquidators have sought or could have sought to recover substantially the same transfers from the same transferees under the powers granted by the foreign insolvency courts. These subsequent transfer claims are dismissed on grounds of international comity without reaching the issue of extraterritoriality. As to the balance, where the Trustee is seeking to recover subsequent transfers between two foreign entities using foreign bank accounts (without consideration of a U.S. correspondent bank account), those claims are dismissed. Furthermore, because the Court has reviewed the Trustee's proffers regarding these transfers and found them wanting, the Trustee's motions for leave to amend his pleadings to incorporate the facts

alleged in the proffers are denied as futile. The remaining motions to dismiss and for leave to amend are resolved in accordance with the discussion that follows.

## BACKGROUND

### A.    Introduction

The facts underlying the infamous Ponzi scheme perpetrated by Bernard L. Madoff are well-known and have been recounted in many reported decisions. *See, e.g.*, *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 414-15 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015); *Picard v. JPMorgan Chase & Co.* (*In re BLMIS*), 721 F.3d 54, 58-59 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2895 (2014); *SIPC v. BLMIS* (*In re BLMIS*), 424 B.R. 122, 125-32 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 25 (2012). Prior to his arrest in December 2008, Madoff perpetrated the largest Ponzi scheme ever discovered through the investment advisory side of BLMIS. He did not engage in any securities transactions on behalf of his customers, and sent them bogus customer statements and trade confirmations showing fictitious trading activity and profits. When customers requested redemptions from their accounts, BLMIS distributed cash from a commingled bank account that included other customers' investments.

While many individuals and entities invested with BLMIS directly, others did so through "feeder funds," which, in turn, invested with BLMIS. The feeder funds were often organized as foreign entities. The largest network of foreign feeder funds was operated by two entities: Fairfield Greenwich Group ("FGG") and Tremont Group Holdings, Inc. ("Tremont"). Even though they operated out of New York, FGG and

Tremont created multiple feeder funds organized in the British Virgin Islands ("BVI") and the Cayman Islands, respectively.

Following the commencement of BLMIS' liquidation, the Trustee sued the feeder funds to avoid and recover as fraudulent transfers distributions they received from BLMIS as initial transferees. He also sued the subsequent transferees, including feeder fund investors, management and service providers. Like the feeder funds, the subsequent transferees were often foreign individuals or entities.

**B.    The Presumption Against Extraterritoriality**

Although the majority of claims are being dismissed on the ground of comity, the parties have focused most of their attention on the issue of extraterritoriality. In addition, the District Court focused on extraterritoriality, and a discussion of that issue first will assist the reader. The "presumption against extraterritoriality" is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*") (internal quotation marks and citations omitted); *accord RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) ("*Nabisco*"); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 248 (2010) ("*Morrison*"). The presumption "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Aramco*, 499 U.S. at 248.

In *Morrison*, the Supreme Court clarified the presumption in a dispute involving the extraterritorial reach of 10(b) of the Securities and Exchange Act of 1934 ("Exchange

6

Act").  There, Australian investors sued National Australia Bank Limited ("National") for violations of the Exchange Act in connection with their investment in National stock traded on the Australian Stock Exchange.  Although National was an Australian bank, it owned HomeSide Lending, Inc. ("HomeSide"), a mortgage service provider based in Florida.  *Morrison*, 561 U.S. at 251.  The complaint alleged that HomeSide and its executives manipulated HomeSide's financials to cause it to appear more valuable than it really was, and that National was aware of the deception but failed to act.  *Id.* at 252.  In other words, the wrongful conduct occurred in the United States.  The United States District Court for the Southern District of New York dismissed the complaint for lack of subject matter jurisdiction because the acts that occurred in the United States were only a link in a securities fraud scheme that culminated abroad, and the Second Circuit affirmed on similar grounds.  *Id.* at 253.

The Supreme Court affirmed, but on different grounds.  It criticized the Second Circuit's use of the "conduct" and "effects" tests (sometimes referred to as a single test, the "conduct and effects test") to determine the applicability of § 10(b) claims.[2]  The "effects" test asked "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens," and the "conduct" test asked "whether the wrongful conduct occurred in the United States."  *Id.* at 257 (quoting *SEC v. Berger*, 322 F.3d 187, 192-93 (2d Cir. 2003)).  Justice Scalia described these standards as "complex in formulation and unpredictable in application."  *Id.* at 248.

---

[2]    The Court also explained that the presumption against extraterritoriality implicated dismissal based upon the failure to state a claim, FED. R. CIV. P. 12(b)(6), rather than dismissal for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1).  *Morrison*, 561 U.S. at 253-54.

Instead, the presumption against extraterritoriality involves an exercise in statutory interpretation and a two-step analysis which can be examined in either order. "At the first step, we ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Nabisco*, 136 S. Ct. at 2101; *accord Morrison*, 561 U.S. at 255 ("When a statute gives no clear indication of an extraterritorial application, it has none."). The first step does not impose a "clear statement rule," because even absent a "clear statement," the context of the statute can be consulted to give the most faithful reading. *Morrison*, 561 U.S. at 265. If the first step yields the conclusion that the statute applies extraterritorially, the inquiry ends.

If it does not, the court must turn to the second step to determine if the litigation involves an extraterritorial application of the statute:

> If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*Nabisco*, 136 S. Ct. at 2101; *accord Morrison*, 561 U.S. at 266-67 (court must look to the "'focus' of congressional concern," *i.e.*, the "objects of the statute's solicitude"). Courts however, must be wary in concluding too quickly that some minimal domestic conduct means the statute is being applied domestically:

> [I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.

*Morrison*, 561 U.S. at 266 (emphasis in original).

The *Morrison* Court first concluded that the plaintiffs had failed to rebut the presumption against the extraterritorial application of section 10(b) of the Exchange Act. *See id.* at 265. Having then held that the focus of Section 10(b) was upon the purchase and sales of securities in the United States, *id.* at 266, the Court concluded that the plaintiffs had failed to state a claim on which relief could be granted and affirmed the dismissal of the complaint on this ground. *Id.* at 273.

## C.    Extraterritoriality and the Trustee's Recovery Efforts

After *Morrison*, the issue of whether the Bankruptcy Code's avoidance and recovery provisions reached foreign transfers was first addressed in these cases in *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501 (Bankr. S.D.N.Y. 2012) ("*BLI*"). BLI, a Taiwanese entity, invested in Fairfield Sentry, a large BLMIS feeder fund organized in the BVI. BLI submitted a redemption request to Fairfield Sentry and provided wire instructions. Pursuant to those instructions, Fairfield Sentry sent $42,123,406 from a Dublin bank account to a New York JP Morgan Account specified by BLI, and the redemption payment was then sent on to BLI's JP Morgan account in London. *Id.* at 509. Following his appointment, the Trustee sought to recover the subsequent transfers made by Fairfield Sentry to BLI pursuant to section 550 of the Bankruptcy Code. BLI moved to dismiss arguing, *inter alia*, that the Trustee's claims were barred by the presumption against extraterritoriality.[3]

---

[3]    BLI did not argue that comity barred the claim and the Court did not address it. *BLI,* 480 B.R. at 526 n. 24.

Denying the motion, the Bankruptcy Court began with *Morrison*'s second step. Judge Lifland held that the "focus" of "the avoidance and recovery sections [of the Bankruptcy Code] is on the initial transfers that deplete the bankruptcy estate and not on the recipient of the transfers or the subsequent transfers." *Id.* at 524; *accord Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58 (1990) (stating that "the purpose of the [preference] avoidance provision is to preserve the property includable within the bankruptcy estate – the property available for distribution to creditors"); *French v. Liebmann (In re French),* 440 F.3d 145, 154 (4th Cir.) ("[T]he Code's avoidance provisions protect creditors by preserving the bankruptcy estate against illegitimate depletions."), *cert. denied*, 549 U.S. 815 (2006).  The depletion of the BLMIS estate occurred domestically because the transfers at issue originated from BLMIS' JPMorgan account in New York and went to Fairfield Sentry's New York account at HSBC.  *BLI*, 480 B.R. at 525.  "As the focus of Section 550 occurred domestically, the fact that BLI received BLMIS's fraudulently transferred property in a foreign country does not make the Trustee's application of this section extraterritorial." *Id.*[4]

While this conclusion was dispositive, Judge Lifland also addressed the first step in the inquiry and concluded that Congress expressed a clear intention that § 550 should apply extraterritorially.  *Id.* at 526.  A statute does not require a "clear statement" that it applies abroad, and the court may consider the statutory context "in searching for a

---

[4]        The Court added that pragmatic considerations supported its conclusion.  "In particular if the avoidance and recovery provisions ceased to be effective at the borders of the United States, a debtor could end run the Code by 'simply arrang[ing] to have the transfer made overseas,' thereby shielding them from United States law and recovery by creditors."  *BLI*, 480 B.R. at 525 (quoting *Maxwell Commc'n Corp. plc v. Societe General plc (In re Maxwell Commc'n Corp. plc)*, 186 B.R. 807, 816 (S.D.N.Y.1995) ("*Maxwell I*"), *aff'd on other grounds,* 93 F.3d 1036 (2d Cir.1996) ("*Maxwell II*")).

clear indication of statutory meaning." *Id.* at 526 (quoting *United States v. Weingarten,* 632 F.3d 60, 65 (2d Cir.2011)).  "Congress demonstrated its clear intent for the extraterritorial application of Section 550 through interweaving terminology and cross-references to relevant Code provisions." *Id.* at 527.  Specifically, the term "property of the estate" includes property "wherever located, and by whomever held" that was property of the debtor at the commencement of the case."  11 U.S.C. § 541(a)(1).  Thus, "property of the estate" extends to property located worldwide. *Id.*; *accord* 28 U.S.C. § 1334(e)(1) (granting the District Court exclusive jurisdiction "of all the property, wherever located, of the debtor as of the commencement of [the bankruptcy] case, and of property of the estate").

The avoidance provisions of the Bankruptcy Code grant a trustee the power to avoid certain prepetition transfers "of an interest of the debtor in property," *e.g.,* 11 U.S.C. § 548(a)(1), the same term used in Bankruptcy Code § 541 to define the scope of "property of the estate." *BLI*, 480 B.R. at 527.  For this reason, the concepts of "property of the estate" and "property of the debtor" are the same, separated only by time.  As the Supreme Court explained in *Begier*, § 541 "delineates the scope of 'property of the estate' and serves as the postpetition analog to § 547(b)'s 'property of the debtor.'" *Id.* (quoting *Begier,* 496 U.S. at 58–59) (internal quotation marks omitted).  Accordingly, "(i) 'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings" and (ii) "the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate." *Id.* (quoting *Begier*, 496 U.S. at 58); *accord French*, 440 F.3d at 151

11

("Section 541 defines 'property of the estate' as, *inter alia,* all 'interests of the debtor in property.' 11 U.S.C. § 541(a)(1). In turn, § 548 allows the avoidance of certain transfers of such 'interest[s] of the debtor in property.' 11 U.S.C. § 548(a)(1). By incorporating the language of § 541 to define what property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any transfer of property that *would have been* 'property of the estate' prior to the transfer in question—as defined by § 541—even if that property is not 'property of the estate' *now.*") (emphasis in original); *contra Maxwell I,* 186 B.R. at 820-21 (concluding that Congress did not clearly express its desire that Bankruptcy Code § 547 applies to foreign transfers of the debtor's property); *Barclay v. Swiss Fin. Corp. Ltd.* (*In re Midland Euro Exch. Inc.*), 347 B.R. 708, 718 (Bankr. C.D. Cal. 2006) (concluding that Congress did not intend for § 548 to apply extraterritorially).

Section 550, in turn, allows the trustee to recover the avoided transfer from the initial transferee, the person for whose benefit the transfer was made or the subsequent transferee:

> [B]y incorporating the avoidance provisions by reference, Section 550 expresses the same congressional intent regarding extraterritorial application. Thus, Congress expressed intent for the application of Section 550 to fraudulently transferred assets located outside the United States and the presumption against extraterritoriality does not apply.

*BLI*, 480 B.R. at 528.

**D.    The *ET Decision***

**1.    Extraterritoriality**

Less than two years after the issuance of the *BLI* decision, District Judge Rakoff reached the opposite conclusion in the *ET Decision*.[5]  As mentioned above, the *ET Decision* was issued in connection with consolidated motions to dismiss filed by the Participating Subsequent Transferees.  Since the District Court was looking at multiple cases, it described the complaint in *Picard v. CACEIS Bank Luxembourg*, Adv. P. No. 11-02758 ("*CACEIS Complaint*") as an example.  There, the two CACEIS defendants (collectively, "CACEIS") were organized and operating in Luxembourg or France.  *ET Decision*, 513 B.R. at 225.  They invested in two foreign feeder funds, Fairfield Sentry Limited ("Fairfield Sentry"), a BVI company in liquidation in the BVI, and Harley International (Cayman) Limited ("Harley"), a Cayman Islands company in liquidation in the Cayman Islands.  (*CACEIS Complaint* at ¶¶ 2, 24-25.)  Fairfield Sentry and Harley invested substantially all of their assets with BLMIS, received initial transfers from BLMIS and subsequently transferred some or all of those funds directly or indirectly to CACEIS.  (*Id.* at ¶¶ 2, 37, 44, 46, 49, 58.)  The Trustee sued the feeder funds to avoid and recover the initial transfers they had received from BLMIS.  He settled with one of the feeder funds, obtained a default judgment against the other, and pursued CACEIS to recover subsequent transfers in the amount of $50 million received from the feeder funds.  *ET Decision*, 513 B.R. at 225-26.

---

[5]    The motions to dismiss before Judge Rakoff were briefed before Judge Lifland issued the *BLI* decision, and the *ET Decision* did not mention it.

Judge Rakoff first considered whether the Trustee was attempting to apply § 550 extraterritorially. He initially cautioned that "a mere connection to a U.S. debtor, be it tangential or remote, is insufficient on its own to make every application of the Bankruptcy Code domestic." *Id.* at 227. He then looked to the "regulatory focus" of the Bankruptcy Code's avoidance and recovery provisions, and concluded that both § 548 and § 550(a) focused on the property transferred and the fact of the transfer, not the debtor. *Id.*; *but see French*, 440 F.3d at 150 ("§ 548 focuses not on the property itself, but on the fraud of transferring it."). "Accordingly, under *Morrison,* the transaction being regulated by section 550(a)(2) is the transfer of property to a subsequent transferee, not the relationship of that property to a perhaps-distant debtor." *ET Decision*, 513 B.R. at 227.

To determine whether the subsequent transfers occurred extraterritorially, "the court considers the location of the transfers as well as the component events of those transactions." *Id.* (quoting *Maxwell I,* 186 B.R. at 817). Returning to the *CACEIS Complaint*, Judge Rakoff observed that "the relevant transfers and transferees are predominately foreign: foreign feeder funds transferring assets abroad to their foreign customers and other foreign transferees." *Id.* Under similar factual circumstances, the *Maxwell* and *Midland* courts had found transfers between foreign entities "to implicate extraterritorial applications of the Bankruptcy Code's avoidance provisions." *Id.* at 227-28. Finally, the fact that the chain of transfers originated with BLMIS in New York or that the subsequent transferees allegedly used correspondent banks in the United States to process the dollar-denominated transfers was insufficient "to make the recovery of these otherwise thoroughly foreign subsequent transfers into a domestic application of

14

section 550(a)." *Id.* at 228 & n. 1. Accordingly, the Trustee was seeking to recover

foreign transfers that required the extraterritorial application of § 550(a). *Id.* at 228.

The District Court then turned to the question of whether Congress intended the

extraterritorial application of section 550(a). Here too, the *ET Decision* disagreed with

*BLI*. First, "[n]othing in [the language of section 550(a)] suggests that Congress

intended for this section to apply to foreign transfers. . . ." *Id.* at 228. Judge Rakoff next

looked to context and surrounding Bankruptcy Code provisions. *Id.* The Trustee had

argued that § 541's definition of "property of the estate," which included property held

worldwide, indicated Congress' intent to allow the Trustee to recover "property of the

debtor" that, but for the fraudulent transfer, would have been "property of the estate" as

of the commencement of the bankruptcy case. *Id.* at 228-29. Judge Rakoff rejected the

Trustee's argument for the same reason the District Court rejected a similar argument in

*Maxwell I;* fraudulently transferred "property of the debtor" only becomes "property of

the estate" *after* recovery, *ET Decision*, 513 B.R. at 229 (citing *Fed. Deposit Ins. Corp. v.

Hirsch* (*In re Colonial Realty Co.*)*,* 980 F.2d 125, 131 (2d Cir.1992)), "so section 541

cannot supply any extraterritorial authority that the avoidance and recovery provisions

lack on their own." *Id.*; *accord Maxwell I,* 186 B.R. at 820; *Midland,* 347 B.R. at 718.[6]

Furthermore, the use of the phrase "wherever located" in § 541 indicating Congress'

intent to apply that section extraterritorially, undercut the conclusion that § 548 or SIPA

---

[6]    The District Court also rejected Trustee's argument that provisions of SIPA and policy concerns
support extraterritorial application of section 550(a). *ET Decision*, 513 B.R. at 230-31.

§ 78fff-2(c)(3),[7] which did not include similar language, also applied extraterritorially.
*ET Decision*, 513 B.R. at 230.

Based on those observations, the District Court "conclude[d] that the
presumption against extraterritorial application of federal statutes ha[d] not been
rebutted [and] the Trustee therefore may not use section 550(a) to pursue recovery of
purely foreign subsequent transfers." *Id.* at 231.

### 2.    Comity

In the alternative, the District Court ruled that "the Trustee's use of section
550(a) to reach these foreign transfers would be precluded by concerns of international
comity." *Id.* at 231.  Comity "is the recognition which one nation allows within its
territory to the legislative, executive or judicial acts of another nation, having due regard
both to international duty and convenience, and to the rights of its own citizens or of
other persons who are under the protection of its laws." *Id.* (quoting *Maxwell II*, 93
F.3d at 1046 (in turn quoting *Hilton v. Guyot,* 159 U.S. 113, 163–64 (1895))).  A comity
inquiry requires a "choice-of-law analysis to determine whether the application of U.S.

---

[7]    SIPA § 78fff-2(c)(3) authorizes the SIPA trustee to recover pre-filing transfers of customer
property even though customer property was not property of the SIPA debtor at the time of the transfer
under applicable non-bankruptcy law.  It provides:

> Whenever customer property is not sufficient to pay in full the claims set forth in
> subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property
> transferred by the debtor which, except for such transfer, would have been customer
> property if and to the extent that such transfer is voidable or void under the provisions of
> Title 11.  Such recovered property shall be treated as customer property.  For purposes of
> such recovery, the property so transferred shall be deemed to have been the property of
> the debtor and, if such transfer was made to a customer or for his benefit, such customer
> shall be deemed to have been a creditor, the laws of any State to the contrary
> notwithstanding.

law would be reasonable under the circumstances, comparing the interests of the United

States and the relevant foreign state." *ET Decision*, 513 B.R. at 231 (citing *Maxwell II*,

91 F.3d at 1047-48).

Judge Rakoff observed that many feeder funds, such as Fairfield Sentry Limited

and Harley International (Cayman) Limited, the two initial transferees in *CACEIS*, were

also in liquidation proceedings abroad, and had their own rules governing the recovery

of transfers. *Id.* at 232. The BVI courts in Fairfield Sentry had already rejected the

liquidators' common law claims to reclaim the transfers made to its own investors, and

the "Trustee [wa]s seeking to use SIPA to reach around such foreign liquidations in

order to make claims to assets on behalf of the SIPA customer-property estate — a

specialized estate created solely by a U.S. statute, with which the defendants here have

no direct relationship." *Id.* These investors had no reason to expect that U.S. law would

govern their relationships with their feeder funds, and "[g]iven the indirect relationship

between [BLMIS] and the transfers at issue here, these foreign jurisdictions have a

greater interest in applying their own laws than does the United States." *Id.*

Accordingly, as the Second Circuit found in *Maxwell II*, "the interests of the affected

forums and the mutual interest of all nations in smoothly functioning international law

counsel against the application of United States law in the present case." *Id.* (quoting

*Maxwell II*, 93 F.3d at 1053).

Although the District Court ultimately ruled that the "Trustee's recovery claims

are dismissed to the extent that they seek to recover purely foreign transfers," *id.*, the

District Court did not actually dismiss any of the complaints. Instead, the District Court

concluded:

> Here, to the extent that the Trustee's complaints allege that both the
> transferor and the transferee reside outside of the United States, there is no
> plausible inference that the transfer occurred domestically. Therefore,
> unless the Trustee can put forth specific facts suggesting a domestic
> transfer, his recovery actions seeking foreign transfers should be dismissed.

*ET Decision*, 513 B.R. at 232 n. 4.

The District Court returned the cases to this Court "for further proceedings consistent with this Opinion and Order." *Id.* at 232. Accordingly, I view my task as entailing the review of the subsequent transfer allegations to determine whether they survive dismissal under the extraterritoriality or comity principles enunciated in the *ET Decision*.

## E.    Post-*ET Decision* Proceedings

After the adversary proceedings were returned to this Court, the parties stipulated to the *Scheduling Order*.[8]   Exhibit A to the *Scheduling Order* listed those defendants that were parties to the proceedings before Judge Rakoff and to the *ET Decision*, *i.e.*, the Participating Subsequent Transferees.  Exhibit B listed defendants who were not parties to the *ET Decision* but contended that they were similarly situated, *i.e.,* the Non-Participating Subsequent Transferees.  The *Scheduling Order* set forth a briefing schedule to address whether the Trustee's existing claims against the Subsequent Transferees should be dismissed and whether the Trustee should be permitted to amend the complaints.  The Trustee and the Participating and Non-Participating Subsequent Transferees were also permitted to file pleadings relevant to each individual adversary proceeding, including short supplemental briefs and, in the

---

[8]     *Order Concerning Further Proceedings on Extraterritoriality Motion and Trustee's Omnibus Motion for Leave to Replead and for Limited Discovery* which the Court so ordered on December 10, 2014 (as amended, the "*Scheduling Order*") (ECF Doc. # 8800).

case of the Trustee, either a proposed amended complaint or proffered allegations supporting an amended complaint.  (*See Scheduling Order* at ¶¶ 3-5, 8.)  To facilitate the Court's and the Defendant's review and analysis, the Trustee was required to include a chart (the "Chart") summarizing the Trustee's position as to why the motions should be denied.  (*Id.* at ¶ 6.) [9]

Importantly, the *Scheduling Order* included certain stipulations relating to the place of formation or citizenship of the subsequent transferors and Subsequent Transferees.  (*Scheduling Order* at ¶ M ("Exhibits A and B list as the party's 'Location' the jurisdiction under whose laws the transferors and transferees that are not natural persons are organized, and the citizenship of the transferors and transferees that are natural persons, in each case as of the time of the transfers, as alleged in the complaints or as agreed by the Trustee and the respective transferees.").) [10]  According to Exhibits A and B, none of the subsequent transferors were "located" in the United States, but some of the Subsequent Transferees were.

The Subsequent Transferees filed their supplemental motion to dismiss on December 31, 2014.  (*See Consolidated Supplemental Memorandum of Law In Support of the Transferee Defendants' Motion to Dismiss Based on Extraterritoriality* on

---

[9]    The first adversary proceeding listed on the Chart was dismissed after briefing.  (*Stipulation and Order for Voluntary Dismissal of Adversary Proceeding with Prejudice*, dated Feb. 12, 2016 (Adv. Pro. No. 09-01154 ECF # 132).)  The motion to dismiss the subsequent transfer claim asserted in that proceeding against Vizcaya Partners Limited and the Trustee's motion to amend the complaint are denied as moot.

[10]    No party was precluded from arguing that the stipulated "Location" was or was not preclusive in determining whether the transferor or transferee was "foreign" for purpose of the motions or otherwise.  (*Scheduling Order* at ¶ M.)

December 31, 2014 ("*Subsequent Transferees Brief*") (ECF Doc. # 8903).)  The parties

seeking dismissal were listed in Appendix A.  (*See Subsequent Transferees Brief* at 1.)

The Trustee filed his response on June 26, 2015.  (*Trustee's Memorandum of Law In*

*Opposition to the Transferee Defendants' Motion to Dismiss Based on*

*Extraterritoriality and in Further Support of Trustee's Motion for Leave to Amend*

*Complaints* ("*Trustee Brief*") (ECF Doc. # 10287).)  The response was limited to the

defendants listed in Exhibit 1 to the *Trustee Brief.*

Meanwhile, BLI, whose dismissal motion had been denied by the Bankruptcy

Court in *BLI*, asked to be included as a Non-Participating Subsequent Transferee in the

returned proceedings.  The Trustee opposed the request, and the Court denied it

explaining that unlike the Subsequent Transferees, BLI had "litigated the

extraterritoriality [issue] and . . . lost it."  (Transcript of 11/19/2014 Hr'g at 31:10-15

(ECF Doc # 9542).)  BLI subsequently moved for judgment on the pleadings pursuant to

Federal Civil Rule 12(c) based on the holdings of the *ET Decision*.[11]  After extended

colloquy with the Trustee's counsel who argued, among other things, that the complaint

in *BLI* should not be dismissed under the *ET Decision*, counsel expressed the

willingness that I decide the BLI motion on the merits as part of the omnibus motion

raising the same issues.  (Transcript of 7/29/2015 Hr'g at 20:7-18 (ECF Doc # 11158).)

---

[11]    *See Memorandum of Law In Support of Defendant Bureau of Labor Insurance's Motion for*
*Judgment on the Pleadings*, dated Apr. 9, 2015 (ECF Adv. P. No. 11-02732 Doc. # 86).

**D.    Parties' Legal Arguments**

The Subsequent Transferees and the Trustee disagree about the scope of the *ET Decision*.  Initially, the Trustee argues that the *ET Decision* was limited to resolving the "purely legal" issue of whether SIPA and the Bankruptcy Code apply extraterritorially to allow the Trustee to recover purely foreign transfers.  (*Trustee Brief* at 14-16.)  The Subsequent Transferees responds that the *ET Decision* was not limited to an abstract legal issue and was issued upon consideration of both factual and legal arguments. Thus, the *ET Decision* was binding on the Participating Subsequent Transferees and persuasive as to the Non-Participating Subsequent Transferees.  (*Reply Consolidated Supplemental Memorandum of Law In Support of Transferee Defendants' Motion to Dismiss Based on Extraterritoriality*, dated Sept. 30, 2015, at 6-7 ("*Subsequent Transferees Reply*") (ECF Doc. # 11542).)

Next, the Subsequent Transferees assert that their motions to dismiss the *existing* claims should be granted because the Trustee failed to respond to those arguments and relied solely on new allegations in his proposed amended complaints. Accordingly, the Court should grant the branch seeking dismissal.  (*Subsequent Transferees Reply* at 4.)  The Trustee, however, sought leave to amend many of the complaints to avoid dismissal under the *ET Decision* by adding allegations that implied domestic "components" to the subsequent transfers.  He broke these allegations down into nineteen categories (the "Chart Factors"), summarized them in the Chart annexed to the *Trustee Brief* as Ex. 2, and the Chart showed which factors applied to specific Subsequent Transferees.  The Trustee argues that all of these factors were relevant to determining whether the subsequent transfers were extraterritorial because the *ET*

*Decision* instructed the Court to consider the location of the transfers as well as the "component events of those transactions." (*Trustee Brief* at 18.) The Subsequent Transferees respond that none of the Trustee's nineteen factors say anything about the location of the transfers which comprised the crux of the *ET Decision*. (*Subsequent Transferee Reply* at 8, 18-33.) They also add that the holistic approach endorsed by the Trustee was rejected by the Supreme Court in *Morrison*. (*Id.* at 17-18.)

Lastly, the Trustee argues that the branch of the *ET Decision* that addressed comity applied only to the extent the subsequent transfers were foreign transfers, and Judge Rakoff's decision was limited to comity's "potential application" to the cases. (*Trustee Brief* at 33-34.) The Trustee also attacks the comity ruling on the merits arguing that the cases fail the applicable two-prong test requiring a parallel proceeding and a true conflict of law and facts sufficient to justify abstention. (*Id.* at 34-37.) The Subsequent Transferees respond that the comity ruling provides an alternative basis for dismissal to the presumption against extraterritoriality. Moreover, the Trustee's merits attack on Judge Rakoff's comity holding confuse two separate doctrines — "comity of courts" and "comity of nations." (*Subsequent Transferee Reply* at 36-40.)

## DISCUSSION

### A.    Effect of the *ET Decision*

The parties offer dramatically different interpretations of the scope and effect of the *ET Decision*. The Subsequent Transferees view the *ET Decision* as a "mandate" that requires the dismissal of the Trustee's claims to the extent subsequent transfers were made between two parties residing outside of the United States. (*Subsequent Transferees Reply* at 1.) The Trustee, on the other hand, argues that the *ET Decision*

decided a "purely legal" issue and "recognized that the inquiry is whether the *conduct* alleged in the complaints is extraterritorial." (*Trustee Brief* at 2 (emphasis in original).)

The truth lies somewhere between. The *ET Decision* did not simply decide that § 550(a)(2) did not apply extraterritorially, one prong of the two prong test. Judge Rakoff also considered the second prong, concluding that the "focus" of the statute was the subsequent transfer. Using the *CACEIS Complaint* as an example, he held that a complaint required extraterritorial application of § 550(a)(2) if "the relevant transfers and transferees are predominantly foreign: foreign feeder funds transferring assets abroad to their foreign customers and other foreign transferees." *ET Decision*, 513 B.R. at 227.

He did not, however, dismiss any complaints, including the *CACEIS Complaint*. Instead, he returned the cases involving the Participating Subsequent Transferees to this Court "for further proceedings consistent with this Opinion and Order." *Id.* at 232. Consequently, the Court must examine the allegations in the complaints or the proposed amendments involving the Participating Subsequent Transferees to determine if the alleged transfers require the extraterritorial application of § 550(a)(2), or, as the *Nabisco* Court explained, whether "the conduct relevant to the statute's focus occurred in the United States," *Nabisco*, 136 S. Ct. at 2101, bearing in mind that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Morrison*, 561 U.S. at 266 (emphasis in original). Moreover, the Court must decide whether any particular subsequent transfer claim should be dismissed on the ground of international comity.

23

The District Court's re-referral did not involve the Non-Participating Subsequent Transferees, and the Court is not similarly bound. The Non-Participating Subsequent Transferees nevertheless argue that the *ET Decision* should govern the outcome of their motions to dismiss under the law of the case doctrine. The *ET Decision* was decided in the context of the BLMIS SIPA liquidation, and "different adversary proceedings in a bankruptcy case do not constitute different 'cases.'" (*Subsequent Transferees Brief* at 7-8 (quoting *Bourdeau Bros. v. Montagne* (*In re Montagne*), No. 08-1024 (CAB), 2010 WL 271347, at *6 (Bankr. D. Vt. Jan. 22, 2010)).)

The Court considers the *ET Decision* highly persuasive in the Non-Participating Subsequent Transfer cases, and notes that the parties have approached the disposition of the motions by applying the dictates of the *ET Decision* to the Participating and Non-Participating Subsequent Transferees in the same manner. Furthermore, even if I would reach a conclusion different from Judge Rakoff, applying different rules would lead to conflicting decisions on the same facts. Finally, although the Trustee successfully opposed BLI's efforts to be included with the other Non-Participating Subsequent Transferees, he effectively conceded its inclusion when his counsel stated that the Court should decide BLI's motion for judgment on the pleadings in accordance with the *ET Decision*. Accordingly, all of the motions to dismiss the complaints, and BLI's motion for judgment on the pleadings, will be governed by the *ET Decision*.

## B.    International Comity

Although the District Court relied on international comity as an alternative basis to dismiss the subsequent transfer claims, I begin there because it presents a more straightforward analysis. The District Court held that "even if the presumption against

24

extraterritoriality were rebutted, the Trustee's use of section 550(a) to reach these

foreign transfers would be precluded by concerns of international comity." *ET Decision*,

513 B.R. at 231.  Dismissing an action based on comity is a form of abstention, *JP*

*Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 422 (2d Cir.

2005), by which "states normally refrain from prescribing laws that govern activities

connected with another state 'when the exercise of such jurisdiction is unreasonable.'"

*Maxwell II*, 93 F.3d at 1047-48 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS §

403(1)).

> Whether so legislating would be "unreasonable" is determined "by
> evaluating all relevant factors, including, where appropriate," such factors
> as the link between the regulating state and the relevant activity, the
> connection between that state and the person responsible for the activity
> (or protected by the regulation), the nature of the regulated activity and its
> importance to the regulating state, the effect of the regulation on justified
> expectations, the significance of the regulation to the international system,
> the extent of other states' interests, and the likelihood of conflict with
> other states' regulations.

*Id.* at 1048 (citing RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 403(2)).  When

considering a motion to abstain, a "court is not restricted to the face of the pleadings,

but may review affidavits and other evidence to resolve factual disputes concerning its

jurisdiction to hear the action." *Kingsway Fin. Servs., Inc. v. Pricewaterhousecoopers,*

*LLP*, 420 F. Supp. 2d 228, 233 n.5 (S.D.N.Y. 2005) (quoting *DeLoreto v. Ment*, 944 F.

Supp. 1023, 1028 (D. Conn. 1996)).

   International comity is especially important in the context of the Bankruptcy

Code.  *Maxwell II*, 93 F.3d at 1048.  First, deference to foreign insolvency proceedings

promotes the goals of fair, equitable and orderly distribution of the debtor's assets.  *Id.*;

*accord Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987)

("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings."); *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 458 (2d Cir.1985) ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.").  Second, Congress has explicitly recognized the central concept of comity under chapter 15 of the Bankruptcy Code when providing additional assistance to foreign representatives under 11 U.S.C. § 1507(b).[12]  *Cf. Maxwell II*, 93 F.3d at 1048 ("Congress explicitly recognized the importance of the principles of international comity in transnational insolvency situations when it revised the bankruptcy laws.  *See* 11 U.S.C. § 304.").

In reaching the conclusion that claims based on foreign transfers should be dismissed out of concern for international comity, the District Court emphasized that many of the foreign BLMIS feeder funds were in liquidation proceedings in their home

---

[12]    Section 1507(b) provides:

> (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure-
>
> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

Comity was one of six factors under former Bankruptcy Code § 304, but under § 1507(b), "comity [has been] raised to the introductory language to make it clear that it is the central concept to be addressed."  H.R. REP. No. 109-31, at 1507 (2005).

countries subject to their own rules relating to the disgorgement of transfers, the BVI court had already decided in the case of the "Fairfield Funds" – Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda") – that the liquidators could not reclaim transfers to the feeder fund investors under certain common law theories.  The Trustee was attempting to reach around the foreign liquidations to make claims on behalf of a SIPA estate with whom the feeder fund investors – here, the Subsequent Transferees – had no reason to expect that U.S. law would apply to their relationships with the debtor feeder funds.  *ET Decision*, 513 B.R. at 232.

The Trustee argues that the District Court did not decide this issue "beyond its potential application to purely foreign subsequent transfers," and its decision is not implicated at all if this Court finds that the transfers were "sufficiently domestic to apply United States law."  (*Trustee Brief* at 33 ("[I]f this Court determines after analyzing the component events and transactions that the transfers are not foreign but sufficiently domestic to apply United States law, then the District Court's alternative rationale of comity is not implicated.").)  However, the *ET Decision* plainly stated the opposite, holding that comity considerations required dismissal "even if the presumption against extraterritoriality were rebutted."  *ET Decision*, 513 B.R. at 231; *accord Maxwell II*, 93 F.3d at 1047 (international comity is separate from the presumption against extraterritoriality, and may be applied to preclude the application of a U.S. statute to conduct clearly subject to that statute).

The Trustee next implies that Judge Rakoff got it wrong.  He argues that for comity to apply, the defendants must demonstrate that "(i) parallel proceedings in the

United States and overseas constitute a true conflict between American law and that of a

foreign jurisdiction and (ii) the specific facts . . . are sufficiently *exceptional* to justify

abstention' to outweigh the district court's general obligation to exercise its

jurisdiction." (*Trustee Brief* at 34 (citations and quotation marks omitted) (emphasis in

original).)  According to the Trustee, BLMIS is not the subject of a parallel liquidation

proceeding overseas and no exceptional circumstances support the application of

comity.  (*Id.* at 34-37.)

Judge Rakoff plainly ruled that comity applies at least where the feeder fund that

was the initial transferee was the subject of a foreign liquidation proceeding with its own

rules of disgorgement.  Moreover, the Trustee misapprehends the branch of the comity

doctrine invoked by Judge Rakoff.  The Second Circuit has recognized that

"international comity" describes two distinct doctrines: first, "as a canon of

construction, it might shorten the reach of a statute; second, it may be viewed as a

discretionary act of deference by a national court to decline to exercise jurisdiction in a

case properly adjudicated in a foreign state, the so-called comity among courts."

*Maxwell II*, 93 F.3d at 1047; *accord Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir.

2006) (Rakoff, J., sitting by designation), *cert. denied*, 549 U.S. 1282 (2007).

The Trustee's dual factors (parallel proceedings and exceptional facts) apply to

the latter branch of comity – comity among courts.  *See, e.g.*, *Royal & Sun Alliance Ins.

Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92-97 (2d Cir. 2006).  Comity

among courts is inapplicable here because there are no parallel foreign avoidance

actions in which the Trustee seeks to recover from the Subsequent Transferees.  Instead,

Judge Rakoff was referring to comity among nations, a canon of construction that limits

28

the reach of the Bankruptcy Code's avoidance and recovery provisions. *ET Decision*, 513 B.R. at 231 ("Courts conducting a comity analysis must engage in a choice-of-law analysis to determine whether the application of U.S. law would be reasonable under the circumstances . . . .").

Comity among nations does not require parallel proceedings, and Judge Rakoff was not referring to the existence or nonexistence of parallel proceedings involving BLMIS. Instead, the reference to foreign proceedings in which the liquidators asserted claims for similar relief against the feeder fund investors informed his conclusion that those foreign jurisdictions had a greater interest in the application of their own laws than the United States had in the application of U.S. law. *See ET Decision*, 513 B.R. at 232 ("Given the indirect relationship between [BLMIS] and the transfers at issue here, these foreign jurisdictions have a greater interest in applying their own laws than does the United States.").

The District Court illustrated this conclusion with references to the Fairfield Sentry liquidation in the BVI. Fairfield Sentry had invested 95% of its funds with BLMIS, and went into liquidation in the BVI shortly after the disclosure of Madoff's Ponzi scheme. Prior to the disclosure of Madoff's fraud and the Fairfield Sentry liquidation, Fairfield Sentry shareholders who redeemed their shares were paid redemption prices based upon the Net Asset Value ("NAV") of their shares, which, in turn, was based on the assumed total value of Fairfield Sentry's assets. In computing NAVs, Fairfield Sentry assigned substantial value to its investment in BLMIS, but the subsequent revelation of Madoff's Ponzi scheme, and the worthlessness of the BLMIS

investments, meant that the earlier computations of NAV and the redemption prices were wrong and grossly inflated.

Fairfield Sentry, acting at the behest of the BVI liquidators, sued the redeeming shareholders in the BVI (the "BVI Redeemer Actions") to recover the redemption payments. It argued that the shareholders had redeemed their investments at an inflated price based upon an erroneous computation of the NAV that governed the redemption price of their shares. The defendants in the BVI Redeemer Actions are the immediate Subsequent Transferees of Fairfield Sentry, the initial transferee of BLMIS in many of the cases before this Court.

In *Fairfield Sentry Ltd. v. Migani*, [2014] UKPC 9, the Privy Council affirmed the lower courts and dismissed Fairfield Sentry's claims against the redeemers. The Privy Council concluded that the redemption price was determined at the time of the redemption based on the facts then known and not upon information that subsequently became available. *See id.* at ¶¶ 2, 24, 30-31. The court further concluded that although the subscription agreements signed by the redeemers contained a New York choice of law provision, New York law was irrelevant. Fairfield Sentry's right to recover the redemptions depended on the articles of association and was governed by BVI law. *Id.* at ¶ 20.

The Fairfield Sentry liquidators also brought redeemer actions in New York (the "US Redeemer Actions," and with the BVI Redeemer Actions, the "Redeemer Actions"). The background to the US Redeemer Actions is discussed in *In re Fairfield Sentry Ltd.*, 458 B.R. 665 (S.D.N.Y. 2011). In April 2010, the liquidators began filing lawsuits in

New York state court against banks that had purchased shares in Fairfield Sentry and against their customers to whom they had resold the shares – the unknown beneficial owners. *Id.* at 671-72. The liquidators initially asserted only state law claims for money had and received, unjust enrichment, mistaken payment and constructive trust, advancing the same theory of recovery as the BVI Redeemer Actions. *Id.* at 672.

In June 2010, the liquidators filed a chapter 15 proceeding which was recognized by this Court. The liquidators subsequently commenced substantially similar US Redeemer Actions in this Court, and removed the state court actions to this Court. *Id.* As of today, there are 305 US Redeemer Actions pending before the Court, (*see Notice of Status Conference*, dated July 8, 2016 (ECF Adv. Proc. No. 10-03496 Doc. # 898)), involving 747 defendants. (*Transcript of July 28, 2016 Hr'g.* at 8 (ECF Adv. Proc. No. 10-03496 Doc. # 906).)[13] In addition to their original state law claims, the liquidators have amended or propose to amend many of the complaints in the US Redeemer Actions to assert statutory claims under the BVI Insolvency Act (the "BVI Act").

The Amended Complaint in *Fairfield Sentry Ltd. (in Liquidation) v. UBS Fund Servs. (Ireland) Ltd.* (*In re Fairfield Sentry Ltd.*), Adv. Proc. No. 11-01258 (Bankr. S.D.N.Y.) is typical. It asserts claims to recover unfair preferences under section 245 of the BVI Act[14] paid to UBS Ireland and the beneficial shareholders. It also asserts claims

---

[13]    The defendants in forty-one removed actions moved to remand those actions to state court. The proceedings ordered by the District Court in connection with those motions has been held in abeyance while litigation proceeded in the BVI.

[14]    Section 245 of the BVI Insolvency Act provides in pertinent part:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into

31

against the same defendants to recover "undervalue" transactions, which correspond to

U.S. constructive fraudulent transfer claims, under section 246 of the BVI Act.[15]  If the

liquidators prevail on their BVI statutory claims, the court may avoid the transaction in

whole or in part, restore the parties to the position they would have been in if they had

not entered into the transaction,  BVI Act § 249(1)(a), (b), and under certain

circumstances, follow the property into the hands of third parties.  *See* BVI Act §§ 249,

250.  In short, the Fairfield Sentry liquidators have brought substantially the same

claims against substantially the same group of defendants to recover substantially the

same transfers brought by the Trustee against the Fairfield Sentry Subsequent

Transferees.

Although the District Court did not specifically mention the "Kingate Funds" –

Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. – its liquidators have also

brought actions that mirror the Trustee's claims in this Court.  The Kingate Funds were

BLMIS feeder funds that suffered the same fate as the Fairfield Funds, and wound up in

---

insolvent liquidation, will be better than the position he would have been in if the
transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary
course of business. . . .

[15]      Section 246 of the BVI Insolvency Act provides in pertinent part:

(1) Subject to subsection (2), a company enters into an undervalue transaction with a
person if (a) the company makes a gift to that person or otherwise enters into a
transaction with that person on terms that provide for the company to receive no
consideration; or (b) the company enters into a transaction with that person for a
consideration the value of which, in money or money's worth, is significantly less than the
value, in money or money's worth, of the consideration provided by the company; and (c)
in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is
entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the
company enters into the transaction in good faith and for the purposes of its business;
and (b) at the time when it enters into the transaction, there were reasonable grounds for
believing that the transaction would benefit the company. . . .

liquidation in Bermuda and the BVI.  Acting through their liquidators, the Kingate

Funds brought suit in Bermuda against several service providers (Kingate Management

Limited ("KML")[16] and FIM Limited and FIM Advisors (collectively, "FIM")) and their

direct and indirect shareholders and affiliates, as the ultimate recipients, to recover

overpaid fees based on erroneous NAVs under both legal and equitable theories.  (*See*

*Amended Statement of Claim*, dated Feb. 12, 2012, annexed as Exhibit A to the *Reply*

*Declaration of Anthony M. Gruppuso, Esq.*, dated May 31, 2016 (ECF Adv. Proc. No.

09-01161 Doc. # 273).)  The Kingate Funds also asserted tort and breach of contract

claims against the service providers and their ultimate owners, Messrs. Carlo Grosso

and Federico Ceretti.

In a decision dated September 25, 2015, the Supreme Court of Bermuda rendered

its Judgment on Preliminary Issues.  *See Kingate Global Fund Ltd.* (*In Liquidation*) *v.*

*Kingate Management Ltd.*, [2015] SC (Bda) 65 Com (Bermuda).  Adhering to the Privy

Council's decision in *Fairfield Sentry*, the Bermuda court concluded that monthly NAV

determinations were binding on the Kingate Funds and their members in the absence of

bad faith or manifest error for the purpose of calculating subscription and redemption

prices, *id.* at ¶ 81, and were similarly binding with respect to the fees paid to KML.  *Id.* at ¶

116.  Furthermore, BLMIS' bad faith or manifest error which led to the erroneous

calculation of the NAVs did not affect KML's right to fees, *id.* at ¶ 142, but if KML

induced the Funds' mistake, KML's contractual entitlement to fees was no defense to the

unjust enrichment claim to the extent the payment exceeded the true NAV.  *Id.* at ¶ 163.

---

[16]    KML is in liquidation in Bermuda.

The Trustee has sued the same defendants as well as the Kingate Funds and two additional service providers, Citi Hedge Fund Services Limited and HSBC Bank Bermuda Limited.  (*See Picard v. Ceretti* (*In re BLMIS*), Adv. Proc. No. 09-01161.)  He seeks to avoid the initial transfers to the Kingate Funds, and recover the initial transfers and subsequent transfers from the immediate and mediate transferees of the Kingate Funds.  In connection with his efforts, the Trustee sought, *inter alia*, to compel the Bermuda liquidators to produce the discovery that the Bermuda defendants had produced to them.  Referring to the Bermuda action during his motion to compel discovery, the Trustee argued that "[i]n this proceeding, the Trustee seeks to recover the same moneys from the same parties."  (*Reply Memorandum of Law in Support of the Trustee's Motion to Compel Defendants to Produce Documents and Participate in Discovery,* dated May 31, 2016, at 7 (ECF Adv. Proc. # 09-01161 Doc. # 272).)

The Trustee's subsequent transfer claims arising from initial transfers to the Fairfield Funds and the Kingate Funds (together, sometimes referred to as the "Funds") duplicate the actions brought by the respective liquidators, with limited success, against substantially the same defendants to recover substantially the same transfers.  In this respect, the Trustee's claims against the Subsequent Transferees of those funds attempt to reach around the proceedings in those foreign insolvency courts, and subject the common defendants to duplicative claims by different plaintiffs.

As between the United States on the one hand and the BVI and Bermuda on the other, the latter jurisdictions have a greater interest in regulating the activity that gave rise to the common claims asserted by the Trustee and the liquidators.  The Funds were formed under foreign law, and their liquidation, including the marshaling of assets and

the payment of claims, is governed by local insolvency law, to which particular deference

is due under our own jurisprudence. The United States has no interest in regulating the

relationship between the Funds and their investors or the liquidation of the Funds and

the payment of their investors' claims. The United States' interest is purely remedial;

the Bankruptcy Code allows the Trustee to follow the initial fraudulent transfer into the

hands of a subsequent transferee, although the presumption against extraterritoriality,

discussed in the next section, may dictate otherwise. In fact, the Trustee has

successfully argued that the investors in feeder funds have no recourse under SIPA

against the BLMIS customer property estate because they were not customers of BLMIS.

*See Kruse v. Bricklayers & Allied Craftsman Local 2 Annuity Fund* (*In re BLMIS*), 708

F.3d 422, 426-28 (2d Cir. 2013); *SIPC v. Jacqueline Green Rollover Account,* 12 Civ.

1039 (DLC), 2012 WL 3042986, at *13 (S.D.N.Y. July 25, 2012), *SIPC v. BLMIS* (*In re*

*BLMIS*), 515 B.R. 161, 169 (Bankr. S.D.N.Y. 2014).

Finally, although the subscription agreements, at least in the case of Fairfield

Sentry, were governed by New York law, the Privy Council in *Fairfield Sentry* ruled that

the redemptions were governed by the Articles of Association and BVI law. *Migani*,

UKPC 9, at ¶ 10. Thus, if the shareholders had any expectations relating to which law

governed redemptions, they should have expected BVI law to govern. Furthermore,

forum selection and choice of law clauses in agreements do "not preclude a court from

deferring on grounds of international comity to a foreign tribunal where deference is

otherwise warranted." *Altos Hornos de Mexico*, 412 F.3d at 429. And since the Trustee

has not argued that New York law governed any aspect of the relationships between the

Kingate Funds and their service providers or their shareholders, there is no basis to

conclude that these transferees should have expected United States or New York law to govern the payments made to them or the recovery of the payments in the event of the Kingate Funds' liquidation.

Accordingly, the recovery of Subsequent Transfers under 11 U.S.C. § 550(a)(2) arising from the avoidance of initial transfers made by BLMIS to the Fairfield Funds or the Kingate Funds is barred under the doctrine of comity as interpreted in the *ET Decision*, and if the initial transfers cannot be avoided, there can be no recovery from subsequent transferees. 11 U.S.C. § 550(a) ("to the extent a transfer is avoided . . . the trustee may recover . . . "). This category includes all of the claims identified in the Chart pertaining to the following adversary proceedings: 09-01161, 09-01239, 10-05346, 10-05348, 10-05351, 10-05355, 11-02149, 11-02493, 11-02537, 11-02538, 11-02539, 11-02540, 11-02541, 11-02542, 11-02553, 11-02554, 11-2568, 11-02569, 11-02570, 11-02571, 11-02572, 11-02573, 11-02730, 11-02731, 11-02762, 11-02763, 11-02910, 11-02922, 11-02923, 11-02925, 11-02929, 12-01002, 12-01004, 12-01005, 12-01019, 12-01021, 12-01022, 12-01023, 12-001025, 12-01046, 12-01047, 12-01194, 12-01195, 12-01202, 12-01205, 12-01207, 12-01209, 12-01210, 12-01211, 12-01216, 12-01512, 12-01513, 12-01565, 12-01566, 12-01577, 12-01669, 12-01676, 12-01677, 12-01680, 12-01690, 12-01693, 12-01694 and 12-01695. In addition, the claims against BLI are based on subsequent transfers from Fairfield Sentry, the initial transferee. *See BLI*, 480 B.R. at 506-07. Furthermore, all of the subsequent transfers alleged in Adv. Proc. Nos. 12-01697 and 12-01700 and identified in the Chart originated with Fairfield Sentry or Fairfield Sigma. These claims are dismissed on comity grounds and leave to amend is denied.

In several multi-defendant, multi-transferor adversary proceedings, the following defendants received subsequent transfers only from the Fairfield Funds or the Kingate Funds:

**Table 1**

| Adv. Proc. No. | Subsequent Transferee |
|---|---|
| 09-01364 | HSBC Private Bank (Suisse) S.A. |
| 10-05120 | BGL BNP Paribas S.A. |
| 10-05353 | Natixis; Tensyr Ltd. |
| 11-02758 | Caseis Bank |
| 11-02784 | Somers Nominees (Far East) Ltd. |
| 12-01576 | BGL BNP Paribas Luxembourg S.A.; BNP Paribas (Suisse); BNP Paribas S.A. |
| 12-01698 | Banque Internationale a Luxembourg (Suisse) S.A. (f/k/a Dexia Private Bank (Switzerland) Ltd.); Banque Internationale a Luxembourg S.A. (f/k/a Dexia Banque Internationale a Luxembourg S.A.), individually and as successor in interest to Dexia Nordic Private Bank S.A.; RBC Dexia Investor Services Bank S.A.; RBC Dexia Investors Services España, S.A. |
| 12-01699 | Royal Bank of Canada; Royal Bank of Canada Trust Company (Jersey) Ltd.; Royal Bank of Canada (Asia) Ltd.; Royal Bank of Canada (Suisse) S.A.; RBC Dominion Securities Inc. |

These subsequent transfer claims are dismissed, and leave to amend is denied.

Finally, the Chart indicates that the following Subsequent Transferees received subsequent transfers from the Kingate Funds and/or the Fairfield Funds as well as another transferor:

**Table 2**

| Adv. Proc. No. | Subsequent Transferee |
|---|---|
| 10-05120 | BNP Paribas Securities Services S.A. |
| 11-02758 | Caceis Bank Luxembourg |
| 11-02784 | Somers Dublin Ltd. |
| 12-01273 | Mistral (SPC) |
| 12-01278 | Zephyros Ltd. |
| 12-01576 | BNP Paribas Arbitrage SNC; BNP Paribas Bank & Trust Cayman Ltd.; BNP Paribas Securities Services, S.A.; BNP Paribas Securities Services Succursale de Luxembourg |
| 12-01699 | Guernroy Ltd.; Royal Bank of Canada (Channel Islands) Ltd. |
| 12-01702 | Dove Hill Trust |

These claims are dismissed (and the Trustee's motions for leave to amend are denied), to the extent the Fairfield Funds or the Kingate Funds received the initial transfers, again for the same reasons.

Judge Rakoff also observed that Harley International ("Harley") was in liquidation in the Cayman Islands, *ET Decision*, 513 B.R. at 225 (citing *CACEIS Complaint*). According to the Chart, Harley made transfers to the following defendant Subsequent Transferees:

**Table 3**

| Adv. Proc. No. | Subsequent Transferee |
|---|---|
| 09-01364 | HSBC Bank PLC |
| 10-05353 | Bloom Asset Holdings Fund |
| 11-02758 | CACEIS Bank Luxembourg |
| 11-02759 | Nomura International PLC |
| 11-02760 | ABN AMRO Bank N.V. |

| 11-02761 | KBC Investments Ltd. |
| 11-02784 | Somers Dublin Ltd. |
| 11-02796 | BNP Paribas Arbitrage SNC |

By order dated Feb. 5, 2010, the Cayman Islands Grand Court, Financial Services Division ("Grand Court"), recognized the Trustee as the sole representative of the BLMIS estate in the Cayman Islands. *In re BLMIS*, 2010 (1) CILR 231, at ¶ 6 (Grand Ct. Cayman Is.). He subsequently issued a summons seeking disclosure, information and documents from the official liquidators relevant to potential causes of action that Harley might have had against any Fortis entity, and in particular, its former administrator, Fortis Prime Fund Solutions (IOM) Ltd. ("Fortis"), now known as ABN AMRO Fund Services (IOM) Ltd. *In re Harley Int'l (Cayman) Ltd.*, 2012 (1) CILR 178, at ¶ 5 (Grand Ct. Cayman Is.). The Grand Court dismissed the Trustee's application, because it was "the function of Harley's official liquidators, not the trustee, to investigate whether or not Harley has any cause of action against its former professional service providers." *Id.* After the official liquidators rendered their report and served a copy on the Trustee, the Trustee filed an application to seal it, but the Grand Court denied the sealing application. *Id.* at ¶ 20.

It is not clear whether the Trustee pursued any further relief in the Harley liquidation, but he actively litigated avoidance claims in connection with the Cayman Islands liquidation of two funds operated by the Primeo Fund. One of the Primeo Funds was a feeder fund with its own BLMIS account, but following a restructuring in April 2007, both Primeo Funds operated strictly as sub feeder funds of two BLMIS feeder funds, Alpha Prime Fund Ltd. and Herald Fund SPC. *Picard v. Primeo Fund (In*

*Liquidation)*, 2014(1) CILR 379 ("*Primeo*"), at ¶ 3 (Ct. App. Cayman Is.).  The Trustee

commenced proceedings against the Primeo Fund as an initial and subsequent

transferee to recover preferential and fraudulent transfers under U.S. bankruptcy law

and to recover preferences under § 145 of the Cayman Islands Companies Law (or

equivalent common law rules).  *Id.* at ¶ 5.  The Cayman Islands Court of Appeal

ultimately ruled that the Trustee was entitled to pursue claims against the Primeo Funds

under the avoidance provisions of Cayman Islands law, but not under U.S. law.  *Id.* at ¶¶

55, 57, 59.

     As in the case of the Fairfield Funds and the Kingate Funds, the Cayman Islands

has a greater interest in regulating the activities that gave rise to the Trustee's

subsequent transfer claims, particularly the validity or invalidity of payments by Harley

to its investors and service providers.  The United States, on the other hand, has no

interest in regulating the transfers from a foreign fund to its investors or service

providers.  The only U.S. connection to those transfers is the Trustee's right under the

Bankruptcy Code to follow BLMIS' fraudulent transfers into the hands of third parties

who did not deal with BLMIS directly.  Moreover, the Trustee has asserted claims

against other transferees in Cayman Islands liquidation proceedings, and the Cayman

Islands Court of Appeal has acknowledged his right to sue in the Cayman Islands and

invoke Cayman Islands avoidance law.  Finally, those who invested in Harley and lost

their investments have no rights against BLMIS, and must seek to recoup their

investments through the Cayman Islands liquidation proceedings.

     The Subsequent Transferees have also identified three subsequent transferors

that are in liquidation in Luxembourg: Luxalpha SICAV, Oreades SICAV and

Luxembourg Investment Fund U.S. Equity Plus.  Although the principles discussed above might suggest that any Subsequent Transfer claims emanating from transfers by these debtors should also be barred, the Court is not prepared to reach this conclusion on the current state of the record.  The Court has not been directed to any information regarding those liquidations, whether Luxembourg law allows the liquidator to avoid and recover preferences or fraudulent transfers (regardless of what they are called) and whether the Trustee is attempting to make an end-run around those proceedings. Accordingly, the Court declines to dismiss those claims or deny leave to amend on the basis of comity, without prejudice to any party's right to supplement the record through an appropriate motion.

## C.    Extraterritoriality

### 1.    Introduction

The Court next considers the balance of the claims under the doctrine of extraterritoriality and whether the allegations supplied in the complaints and/or proffers rebut the presumption against extraterritoriality by alleging, in each case, a domestic transfer.  The rules that govern motions to dismiss under Federal Civil Rule 12(b)(6) apply to this branch of the motions to dismiss.  To state a legally sufficient claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556.  Courts do not

decide plausibility in a vacuum.  Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556.  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

The *ET Decision* was concerned with foreign transfers.  It did not, however, define or provide a test to determine when a transfer was "foreign" except that "purely foreign transfers" – transfers between two foreign entities that do not reside in the United States using non-U.S. bank accounts (or correspondent U.S. bank accounts) – are obviously "foreign."  The Subsequent Transferees argue that a party is "foreign" if it was formed under foreign law, as all of the non-individual Subsequent Transferees were, or is the citizen of another nation as are the two individual Subsequent Transferees discussed below.  (*Subsequent Transferees Brief* at 12.)  However, the *ET Decision* never mentioned "citizenship" or "domicile," although it did highlight the place of organization as the *sine qua non* of foreignness.  *See ET Decision*, 513 B.R. at 227-28 (discussing the facts in *Midland Euro Exchange*).  In addition, the District Court stated that "to the extent that the Trustee's complaints allege that both the transferor and the transferee reside outside of the United States, there is no plausible inference that the transfer occurred domestically."  *ET Decision*, 513 B.R. at 232 n. 4.  While meant as an admonition directed to the Trustee, the statement suggests that a transfer between two

entities organized under foreign law might nonetheless be domestic if the parties

"resided" in the United States.

The District Court did not explain what it meant by "reside," but it meant

something more than mere presence. "[E]ven where the claims touch and concern the

territory of the United States, they must do so with sufficient force to displace the

presumption against extraterritorial application. See *Morrison,* 561 U.S. 247, 130 S. Ct.

at 2883–2888. Corporations are often present in many countries, and it would reach

too far to say that mere corporate presence suffices." *Kiobel v. Royal Dutch Petroleum

Co.*, 133 S. Ct. 1659, 1669 (2013).

In addition, it does not appear that that the District Court equated residence for

purposes of extraterritoriality with the test for personal jurisdiction as the Trustee

seems to do. First, the tests for personal jurisdiction and extraterritoriality are not the

same. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir.

2012) ("Ewing's lack of contact with the United States may provide a basis for

dismissing the case against him for lack of personal jurisdiction . . . but the transactional

test announced in *Morrison* does not require that each defendant alleged to be involved

in a fraudulent scheme engage in conduct in the United States.").

Second, the *CACEIS Complaint* included numerous allegations relating to

personal jurisdiction:

> 6.      The CACEIS Defendants are subject to personal
> jurisdiction in this judicial district because they purposely
> availed themselves of the laws and protections of the United
> States and the state of New York by, among other things,
> knowingly directing funds to be invested with New York-
> based BLMIS through the Feeder Funds. The CACEIS

Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

7.     By directing investments through Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund, the CACEIS Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.  Upon information and belief, the CACEIS Defendants entered, or caused their agent to enter, into subscription agreements with Fairfield Sentry under which they submitted to New York jurisdiction, sent copies of the agreements to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York.  In addition, the CACEIS Defendants are part of the CACEIS Group, which maintains an office in New York City.  The CACEIS Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

(*CACEIS Complaint* at ¶¶ 6-7.)  Despite these allegations, the District Court held that

the "subsequent transfers that the Trustee seeks to recover are foreign transfers."  *ET*

*Decision*, 513 B.R. at 228.[17]  The District Court also discounted the allegation that "the

---

[17]     The Trustee points out that the *ET Decision* did not mention the personal jurisdiction allegations, (*Trustee's Brief* at 21-22), and adds that the District Court erroneously concluded that the *CACEIS Complaint* did not allege a New York choice of law provision.  (*Id.* at 22 n. 93.)  The text in the *CACEIS Complaint* spanned just nineteen pages.  Judge Rakoff undoubtedly read it, and his failure to mention the allegations relating to personal jurisdiction implies that he deemed them to be irrelevant to the issue of extraterritoriality.

In addition, the Trustee is wrong when he says that the *CACEIS Complaint* alleged that the CACEIS subscription agreements contained New York choice of law clauses and that Judge Rakoff wrongly concluded that they did not.  Rather, the *CACEIS Complaint* alleged that subscription agreements that the CACEIS defendants signed included a submission to New York jurisdiction.  (*CACEIS Complaint* ¶ 7 ("Upon information and belief, the CACEIS Defendants entered, or caused their agent to enter, into subscription agreements with Fairfield Sentry under which they submitted to New York jurisdiction. . . .").)  In fact, the Fairfield Sentry liquidators have sued the CACEIS defendants in this Court to recover the same subsequent transfers/redemptions under both New York and BVI law, asserting personal jurisdiction, *inter alia*, under subscription agreements that include a provision containing a submission to jurisdiction in New York without mentioning that New York law governs.  *See Fairfield Sentry Ltd. (In Liquidation) v. CACEIS Bank Luxembourg*, Adv. Pro. No. 10-03624 (SMB) (Bankr. S.D.N.Y.) (ECF Adv. Pro. No. 10-03624 Doc. # 31, at ¶ 21); *Fairfield Sentry Ltd. (In Liquidation) v. CACEIS Bank EX IXIS IS*, Adv. Pro. No. 10-03871 (SMB) (Bankr. S.D.N.Y.) (ECF Adv. Pro. No. 10-03871 Doc. # 22, at ¶ 21).  Finally, the reference to the absence of a New York choice of law provision and

CACEIS Defendants are part of the CACEIS Group, which maintains an office in New York City."

Rather, it appears that the District Court was concerned with where the parties conducted their operations. Its conclusion that the CACEIS defendants were foreign was based on the fact that they were organized and "operating" in foreign countries. *ET Decision*, 513 B.R. at 225. On the other hand, several of the feeder funds involved in these cases were organized in one country but maintained no operations or office other than a post office box in their home country, did not employ anyone in the home country, and were organized as exempt companies that could not solicit investors in their own countries. Instead, they were run from another location, often New York, by the employees of affiliated entities, and identified the affiliate's address as their own when conducting business. In addition, one subsequent transferor, Fairfield Greenwich Limited (Cayman), was registered to do business in New York. Where the Trustee alleges non-conclusory facts to the effect that the subsequent transferor and Subsequent Transferee conducted their principal and only operations in the United States and maintained their bank accounts in the United States, it is plausible to infer that the subsequent transfer occurred domestically.

This brings me to the critical factor – where the transfer occurred. Judge Rakoff's reference to where the parties resided was secondary. While the U.S. citizenship or residency of the parties may support the inference that the transaction is domestic, the

---

creditor expectations appeared in the portion of the *ET Decision* addressing comity, not extraterritoriality. *ET Decision*, 513 B.R. at 232.

focus is the location of the transfer and not the location of the parties to the transfer;

and a transfer from one foreign account to another foreign account is still a foreign

transfer. *See Absolute,* 677 F.3d at69 ("While it may be more likely for domestic

transactions to involve parties residing in the United States, '[a] purchaser's citizenship

or residency does not affect where a transaction occurs; a foreign resident can make a

purchase within the United States, and a United States resident can make a purchase

outside the United States.'") (quoting *Plumbers' Union Local No. 12 Pension Fund v.*

*Swiss Reins. Co.,* 753 F. Supp. 2d 166, 178 (S.D.N.Y.2010)). Furthermore, a mere

allegation that the transaction "took place in the United States" is insufficient to allege a

domestic transaction, "[a]bsent factual allegations suggesting that the Funds became

irrevocably bound within the United States or that title was transferred within the

United States, including, but not limited to, facts concerning the formation of the

contracts, the placement of purchase orders, the passing of title, *or the exchange of*

*money.*" *Id.* at 70 (emphasis added).

In addition, it is necessary to distinguish between the transfer and the steps

necessary to carry it out. In *Loginovskaya v. Batrachenko*, 764 F.3d 266 (2d Cir. 2014),

decided after the *ET Decision*, the Court dealt with the extraterritorial application of §

22 of the Commodity Exchange Act ("CEA"). There, the plaintiff was a Russian citizen

and resident; the defendant was a U.S. citizen residing in Moscow, and the CEO of the

Thor Group, an international financial services group based in New York that managed

investment programs chiefly in commodities futures and real estate. Investors would

invest in Thor United which, in turn, was supposed to invest in one of the Thor

programs. The defendant induced the plaintiff to invest in the Thor program, she

46

transferred $720,000 to Thor United's bank accounts in New York, but eventually lost her investment. *Id.* at 268-69.

The plaintiff sued the defendant alleging that he had engaged in fraudulent conduct in violation of CEA § 40.[18]  Applying its holding in *Absolute*, the Court explained that in order for the plaintiff to rebut the presumption against extraterritoriality and demonstrate that her investment was a domestic transaction, she would have to show that "the transfer of title or the point of irrevocable liability for such an interest occurred in the United States." *Id.* at 274.  The plaintiff purchased an interest in Thor United, and the investment contracts with Thor United were negotiated and signed in Russia. *Id.*  Although Thor United was incorporated in New York, "a party's residency or citizenship is irrelevant to the location of a given transaction." *Id.* (quoting *Absolute,* 677 F.3d at 70) (internal quotation marks omitted).  Furthermore, although the plaintiff transferred her funds to Thor United's bank account in New York,

> [t]hese transfers . . . were actions needed to carry out the transactions, and not the transactions themselves — which were previously entered into when the contracts were executed in Russia. The direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction.

---

[18]    Section 40 states in pertinent part as follows:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1) (2008).

*Id.* at 275.

The *ET Decision* imposed additional limitations on the Trustee's ability to allege a domestic transfer.  First, a transfer to a correspondent bank located in the United States is not a domestic transfer for purposes of extraterritoriality.  *ET Decision*, 513 B.R. at 228 n. 1.  "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions.  Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions."  *Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 56 n. 3 (2d Cir.2012) (citations and internal quotation marks omitted), *certifying questions to* 984 N.E.2d 893 (N.Y. 2012).  In this way, the use of a correspondent bank facilitates the transfer of dollar-denominated payments to a foreign country.  The District Court's pronouncement reflects the view that although the purposeful use of a correspondent bank account may support personal jurisdiction, *Official Comm. of Unsecured Creditors v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016), the routing of transfer to a U.S. bank account to facilitate the transfer to a foreign bank account is not a domestic transaction for extraterritoriality purposes.  *See Cendeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010) (concluding that RICO did not apply extraterritorially where the scheme's contacts with the United States were limited to the movement of funds into and out of U.S. based bank accounts), *aff'd*, 457 F. App'x. 35 (2d Cir. 2012); *Maxwell I*, 186 B.R. at 817 n. 5 (debtor's payment of overdraft debt owed to U.K. bank, routed through the creditor's U.S. account and

immediately credited to the U.K. overdraft, was not a domestic transfer).[19]

Second, the *ET Decision* implies that an otherwise extraterritorial subsequent transfer beyond the reach of § 550(a)(2) cannot be drawn back as the result of a later, subsequent transfer of the funds to the United States.  The Trustee had argued before the District Court that the policy of § 550(a) would be undermined if a U.S. debtor could intentionally transfer its money offshore and retransfer it to the United States to avoid the reach of the Bankruptcy Code.  *ET Decision*, 513 B.R. at 231.  Judge Rakoff rejected the policy argument, stating that in such a circumstance, "the Trustee here may be able to utilize the laws of the countries where such transfers occurred to avoid such an evasion while at the same time avoiding international discord."  *Id.*  The statement suggests that once funds have been transferred beyond the territorial reach of the recovery provisions under Bankruptcy Code § 550(a)(2), the re-transfer of those funds back to the United States cannot be recovered as a  subsequent transfer under the Bankruptcy Code.

Third, the District Court did not adopt *Maxwell I*'s "component events" test, at least as the Trustee reads it.  Trustee advocates for an expanded test to determine that a transfer is domestic, including the following "component events" he derives from *Maxwell I*:

> (i) the debtor's location; (ii) the defendants' location; (iii) where the
> defendants engaged in business regarding the transaction; (iv) what

---

[19]     The Court is bound to apply the District Court's ruling on the use of a correspondent bank account.  Nevertheless, if title to the cash passed to the Subsequent Transferee when it reached a U.S. correspondent bank account, and the Subsequent Transferee was then free to use the money as it saw fit, the transfer occurred domestically under the Second Circuit case law discussed earlier.  Moreover, the transferee may have made subsequent transfers from the U.S. correspondent bank account to other domestic transferees, and consequently, the funds may never have left the United States.

transaction and agreements the parties entered into that led to the debt
that the transfers were used to pay; (v) where the parties' relationship was
centered when conducting the transaction underlying the debt that
triggered the transfers; (vi) the law governing the parties' transactions;
and (vii) how the transaction was concluded.

(*Trustee Brief* at 18.)[20]  Initially, the continuing relevance of certain "component events"

that the Trustee culls from *Maxwell I* is open to question.  *Maxwell I* was decided when

the "conduct" and "effect" tests were controlling law in this Circuit, and several of the

"component events" identified by the Trustee refer to where conduct "relating to" the

transfer occurred rather than where the transfer itself occurred.  These include "where

the defendants engaged in business regarding the transaction" and "where the parties'

relationship was centered when conducting the  transaction underlying the debt that

triggered the transfers."  (*Trustee's Brief* at 18.)  *Morrison* subsequently abrogated the

"conduct" and "effects" tests because they led to unpredictable results, Morrison, 561

U.S. at 256, 261; *accord Loginovskaya*, 764 F.3d at 274 n. 9 (stating that *Morrison*

dispensed with the "conduct and effects" test), and the Trustee's conduct-related

"component events" call for the type of analysis that *Morrison* rejected.

Similarly, the *Maxwell I* Court distinguished certain conduct as "preparatory" to

the transfers.  *Maxwell I*, 186 B.R. at 817 ("Even assuming that the transfers were

---

[20]    I do not adopt the Trustee's characterization of the "component events" identified by the *Maxwell
I* Court.  Ruling that the transfers were extraterritorial, the *Maxwell I* Court observed that the debtor's
and the transferee banks' relationship was centered in England, the transfers satisfied antecedent debts
that arose in England, and the debtor repaid the debts by transferring the funds to the U.K.  *Maxwell I*,
186 B.R. at 817.  The U.S. sale that was the source of the funds was also a component event, but was "more
appropriately characterized as a preparatory step to the transfers," and was "insufficient—in light of the
absence of any other domestic connection—to characterize the transfers as occurring within the borders of
the U.S."  *Id.*  Notably, the District Court focused on the location of the recipients.  The debtor-transferor
was an English holding company but its United States affiliates accounted for most of the debtor's asset
pool.  *See id.* at 812.

initiated in the U.S. after the U.S. assets were sold, this conduct is more appropriately

characterized as a preparatory step to the transfers.") (citing *Gushi Bros. Co. v. Bank of*

*Guam,* 28 F.3d 1535, 1538 (9th Cir.1994) ("[C]onduct occurring within the United States

which, standing alone, is merely preparatory or incidental to the proscribed conduct

does not confer ... jurisdiction.")).  The *Morrison* Court expressly criticized the

distinction between "merely preparatory" conduct in the United States and conduct in

the United States that rendered the transaction domestic.  *Morrison*, 561 F.2d at 258.

In truth, the conduct to which the Trustee points was, at most, those "actions

needed to carry out the transactions, and not the transactions themselves."

*Loginovskaya*, 764 F.3d at 275.

### 2.    The Nineteen Chart Factors

In furtherance of his argument that the subsequent transfers in these cases were

predominately domestic, the Trustee's submission included the Chart that was required

by the *Scheduling Order*.  (*Trustee's Brief*, Ex. 2-A, 2-B.)  The Chart listed and explained

nineteen factors he argued were germane to the determination whether to dismiss a

complaint on extraterritoriality grounds, and showed which factors applied to each case.

Many of the factors are patently irrelevant under the criteria discussed in the *ET*

*Decision* and the Second Circuit cases discussed above.  Some relate to the selection of

United States governing law or venue in the agreements between the subsequent

transferor and transferee (Factors 2, 3).  These contract provisions have nothing to do

with where the parties exchanged the cash.  And alleging that a feeder fund paid a fee to

a defendant Subsequent Transferee using BLMIS customer property, (Factor 14), is just

another way of saying the feeder fund transferred customer property, an essential

element of a subsequent transfer claim.  It says nothing about the domestic nature of the transfer.

Other factors center on the Subsequent Transferee's knowledge that it was entrusting or investing assets with a foreign feeder fund that entrusted or invested the feeder fund's assets with BLMIS for the supposed purpose of investing in U.S. equity and Treasury securities in the United States.  (Factors 4-7.)  Judge Rakoff considered the U.S. origin of the initial transfer, and rejected it.  *ET Decision*, 513 B.R. at 228 ("Although the chain of transfers originated with Madoff Securities in New York, that fact is insufficient to make the recovery of these otherwise thoroughly foreign subsequent transfers into a domestic application of section 550(a).").  In addition, the *CACEIS Complaint* alleged that the defendants had knowingly invested with the New York-based BLMIS through the feeder funds, but that allegation did not affect Judge Rakoff's conclusion that the subsequent transfers were foreign.  A Subsequent Transferee's knowledge that it was investing in a foreign feeder fund that it knows will invest or entrust money with BLMIS does not, without more, render the subsequent redemption of that investment domestic.

Two other factors refer to fees received based on BLMIS' performance or fees for investing with a feeder fund or soliciting others to invest in the fund.  (Factors 14, 15.) None of these factors or their underlying allegations pertain to the factors on which Judge Rakoff focused:  the "foreignness" of the parties and the location of the sending and receiving bank accounts.

The Trustee also places significance on the fact that some Subsequent Transferees filed customer claims in the BLMIS liquidation. (Factor 17.) The Subsequent Transfers have no relevance to the customer claim. The customer's net equity claim is determined under the Net Investment Method approved by the Second Circuit in *In re BLMIS*, 654 F.3d 229 (2d Cir. 2011), *cert. denied,* 133 S. Ct. 24 (2012), and computes the difference between the amount the customer deposited and the amount he withdrew. The relevant withdrawals are the initial transfers the customer received from BLMIS, not the subsequent transfers a third-party received from a BLMIS customer such as a feeder fund. If the Subsequent Transferee was also a BLMIS investor, the third party subsequent transfers are unrelated to his net equity claim. If, on the other hand, the Subsequent Transferee was not a BLMIS investor and is asserting a BLMIS claim to recover his investment in the feeder fund, the Trustee has successfully argued that feeder fund investors were not BLMIS customers under SIPA, and as discussed above in the comity section of this opinion, do not have allowable net equity claims for that reason.

Finally, many of the factors relied on by the Trustee touch on the actions by the Subsequent Transferee in its own right or through a U.S. affiliate or U.S. service provider relating to its investment in the feeder fund and BLMIS. These include allegations that the Subsequent Transferee conducted due diligence in the United States, or used U.S. affiliates or U.S. agents for this and other purposes, in connection with the transfers or transactions at issue. (Factors 8-11.) Other factors relate more generally to a relationship between the feeder fund and the Subsequent Transferee. These include allegations that the parties "had significant U.S. connections by virtue of the Defendant's

communications with specific Feeder Fund offices, sales representatives, agents, employees, and/or other representatives located in the U.S," (Factor 13), or the Subsequent Transferee "participated in Feeder Fund management, and/or is an entity created by, or for the benefit of, Feeder Fund management."  (Factor 16.)

The proffers discussed below rely heavily on these U.S. connections and include allegations that the U.S. agents or U.S. affiliates dominated and controlled the Subsequent Transferee, and actually conducted its operations.  The Trustee cites *SEC v. Gruss*, No. 11 Civ. 2420, 2012 WL 3306166 (S.D.N.Y. Aug. 13, 2012) ("*Gruss II*") for support.  (*See, e.g.*, *Trustee's Supplemental Memorandum of Law in Opposition to the Motion to Dismiss Based on Extraterritoriality Filed by Natixis S.A., Bloom Asset Holdings Fund, and Tensyr Limited, and in Further Support of Trustee's Motion for Leave to Amend*, dated June 26, 2015, at 11 n. 9 (stating that the *Gruss* court found that "issues of fact existed regarding whether an offshore fund was "foreign" for purposes of extraterritoriality where complaint alleged that operational and investment decisions for the offshore fund were made in New York, 'such that for all intents and purposes, the [offshore fund] was based in New York.'") ECF Adv. Pro. No. 10-05353 Doc. # 101).)  *Gruss*, however, undercuts rather than supports the Trustee.

In *Gruss*, the defendant was the chief financial officer of DBZCO which managed several, separate hedge funds, including the Onshore Fund and the Offshore Fund, the latter a Cayman Islands fund.  *SEC v. Gruss*, 859 F. Supp.2d 653, 655 (S.D.N.Y. 2012) ("*Gruss I*").  The defendant transferred money without authority from the Offshore Fund to the Onshore Fund.  The transfers typically occurred between U.S. bank accounts and often involved a transfer to a U.S. entity.  *Id.* at 656.  The SEC brought an

enforcement action against the defendant alleging that the unauthorized transfers violated the Investment Advisers Act ("IAA").

The defendant moved to dismiss arguing, among other things, that the complaint was barred by the presumption against extraterritoriality.  The District Court disagreed. It distinguished the SEC action under the IAA from the private law suit under the Exchange Act in *Morrison*, and concluded that *Morrison* did not apply.  In support of its conclusion, the District Court cited section 929P(b) of the Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376 (2010). Section 929P(b), enacted after *Morrison*, which allows the SEC and U.S. Government to bring certain enforcement actions based on conduct in the United States or conduct outside the United States that has a "foreseeable substantial effect within the United States."  *Id.* at 664 & n. 4.[21]  The District Court speculated that section 929P(b) restored the "conduct and effects test" for actions brought by the SEC or the Department of Justice.  *Id.* at 664 n. 4.

The District Court next concluded that even if *Morrison* applied, the SEC had rebutted the presumption against extraterritoriality because the transactions were domestic.  The majority of Offshore Fund investors affected by the unauthorized

---

[21]    Section 929P(b) amended the Securities Act of 1933, the Exchange Act and the IAA by granting the district court jurisdiction over actions or proceedings brought by the SEC or the United States involving "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States."  In *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014), the Court of Appeals questioned the import of the post-*Morrison* amendment. *Morrison* made clear that the already district court had subject matter jurisdiction even if the presumption against extraterritoriality meant it could not reach the merits.  *Id.* at 211 n 11.

transfers were located in the United States and the investors in both funds were

impacted by the fraud. *Id.* at 665. Moreover, the inter-fund transfers occurred

domestically between U.S. bank accounts. *Id.* at 665-66.

The District Court then returned to the "conduct and effects test:" "the Complaint

alleges other relevant facts that would have been dispositive under the conduct and

effects test, which may have been revived with Section 929P(b) of the Dodd–Frank Act."

*Id.* at 666. These allegations included New York-based DBZCO's activities relating to

and control of the Offshore Fund. It made all operational and investment decisions,

monitored its performance and compliance with all regulatory requirements, negotiated

the terms of its contracts, retained and borrowed money on its behalf, distributed

offering and subscription documents to potential investors and listed the Offshore

Fund's address in care of DBZCO at DBZCO's New York address. In addition,

accounting services for the Offshore Fund's investment and other activities were

performed primarily in New York, DBZCO's investor relations personnel distributed

financial and performance information to individual investors, and the Offshore Fund's

cash was held at and paid from U.S. bank and brokerage accounts. *Id.*

The Complaint also included allegations quoting or paraphrasing statements in

the offering memoranda and financial statements that showed a relationship between

U.S.-based securities and the Offshore Fund's investors and investments. For example,

the securities were marketed "to permitted U.S. persons . . . [and] to accredited

investors and qualified purchasers, as defined by the U.S. securities laws," the

investment objectives included investing in U.S. securities, and investors would be

required to pay certain U.S. taxes for dividend income and certain other interest from

domestic investments, the auditors of the Offshore Fund were located in New York,
investors were instructed to wire their subscription payments to a Citibank account in
New York and DBZCO would send shareholders quarterly unaudited financial
information from DBZCO. *Id.* The U.S.-based control, connections and decision-
making cited by the District Court read like the Trustee's playbook; the same allegations
permeate the Trustee's proffers.

Following the denial of the motion to dismiss, the defendant sought to certify an
appeal to the Court of Appeals, arguing, *inter alia*, that the issue for certification
presented a controlling question of law regarding extraterritoriality. The District Court
denied the motion in *Gruss II*, observing that the controlling question was not purely
legal and involved factual questions under the "conducts and effects" test. "For
example, while the Offshore Fund's Offering Memoranda stated that it was a foreign
entity governed by foreign law, the Complaint alleges that the actual 'operational and
investment decisions for the Offshore Fund were all made … in DBZCO's New York
office such that for all intents and purposes, the Offshore Fund was based in New York.'"
*Gruss II*, 2012 WL 3306166, at *3. This holding is the portion of the *Gruss II* decision
cited by the Trustee to support his contention that the location of the U.S-based
management and control are relevant to the question of extraterritoriality.

The Trustee's reliance ignores that the District Court's discussion related to the
"conduct and effects" test that, it speculated, had been restored when the SEC or the
Government brought the action. As far as the Trustee's subsequent transfer claims are
concerned, the "conduct and effects test" was abrogated by *Morrison*, and he cannot rely
on the allegations in *Gruss* that the District Court highlighted as relevant to the

57

extraterritoriality issues raised in that case. While the control or the management of a
foreign transferor or transferee by a U.S. affiliate may support the inference that the
entity resides in the United States in the limited circumstances discussed earlier, that
conduct relating to the transfer occurred in the United States or occurred outside the
United States with foreseeable U.S. effects is irrelevant to the extraterritorial analysis.

In the end, the *ET Decision* identifies only four possibly relevant facts to consider
in determining whether the Trustee has rebutted the presumption against
extraterritoriality: (i) the location of the account from which the transfer was made, (ii)
the location of the account to which the transfer was made, (iii) the location or residence
of the subsequent transferor and (iv) the location or residence of the Subsequent
Transferee. The single most important factor in determining whether the presumption
against extraterritoriality has been rebutted is obvious; where did the subsequent
transfer – the exchange of cash and passage of title – occur.[22] If the subsequent transfer
occurred domestically – from a U.S. account to a U.S. account (excluding a
correspondent account) – it is a domestic subsequent transfer. As the Second Circuit
explained in *Absolute*, foreign entities can engage in domestic transfers. Conversely, a
foreign subsequent transfer between domestic entities is still a foreign subsequent
transfer. In addition, where the situs of the subsequent transfer is not alleged, but the
Trustee alleges that it occurred between U.S. residents, the *ET Decision* permits the
Court to infer that the subsequent transfer was domestic.

---

[22]    The Trustee did not include a factor addressing where the Subsequent Transferor became
irrevocably bound to make the transfer to the Subsequent Transferee, presumably because the District
Court focused exclusively on the location of the transfer.

Finally, I conclude that a transfer by a U.S. resident from a U.S. account even to a foreign transferee rebuts the presumption against extraterritoriality. The *ET Decision* did not address this possibility. This type of transfer is analogous to the initial transfers by BLMIS to foreign feeder funds. It is true that BLMIS was a U.S. citizen and made initial rather than subsequent transfers, but BLMIS' U.S. citizenship and the subsequent transferor's U.S. residence are analytically the same. No one has suggested that BLMIS' recovery of an avoided transfer from an initial transferee foreign feeder fund is barred by the presumption against extraterritoriality, and there is no reason to treat subsequent transfers by a U.S. resident from a U.S. bank account differently.

The relevant Chart factors are, therefore, few. Only one factor in the Chart, Factor 12, purports to identify instances in which the "Defendant utilized U.S. bank account to receive transfers (includes correspondent accounts maintained by Defendants in their own name at U.S. banks)." As noted, the District Court rejected the notion that the transfer using a U.S. correspondent account made the transfer domestic, and I am bound by that conclusion. The Chart does not include a corresponding factor that the subsequent transferor used a U.S. bank account in connection with the transfer, but the Trustee's proffers include numerous allegations to that effect. Two others touch on the location or residence of the transferor and the Subsequent Transferee. Factor 1 purports to identify the transferors that maintained their principal operations in the United States, suggesting that the United States was their principal place of business. Factor 19 corresponds to those transferees that the Trustee asserts maintained a U.S. office utilized in connection with the transfer. Finally, Factor 18 identifies U.S. citizens that received subsequent transfers.

### 3.    The Disposition of the Motions to Dismiss and Leave to Amend

A substantial number of the Subsequent Transfer claims that were not dismissed on the ground of comity are subject to dismissal based on extraterritoriality and require scant comment.  They do not include allegations that the Subsequent Transferee used a U.S. bank in connection with the transactions,[23] that the transferor maintained its principal operations in the United States, that the transferee is a U.S. citizen or that the transferee maintained a U.S. office utilized in connection with the transfer.  The following subsequent transfer claims are dismissed on this basis of extraterritoriality:

### Table 4

| A.P. No. | Defendant-Transferee | Transferor |
|---|---|---|
| 09-01364 | Thema Fund Ltd. | Thema Wise Investments |
| 09-01364 | HSBC Securities Services (Luxembourg) S.A. | Alpha Prime Fund Ltd. (Bermuda); Hermes International Fund (BVI); Lagoon Investment Ltd. (BVI); Thema Fund Ltd. (BVI); Lagoon Investment Trust (BVI); Thema Wise Investments (BVI) |
| 09-01364 | HSBC Institutional Trust Services (Ireland) Ltd. | Thema International (Ireland) |
| 09-01364 | HSBC Securities Services (Ireland) Ltd. | Thema International Fund (Ireland) |
| 09-01364 | HSBC Institutional Trust Services (Bermuda) Limited | Alpha Prime Fund Ltd. (Bermuda); Hermes International Fund (BVI); Thema Fund Ltd. (BVI); Thema Wise Investments (BVI); Lagoon Investment Limited (BVI) |
| 09-01364 | HSBC Securities Services (Bermuda) Limited | Alpha Prime Fund Ltd. (Bermuda); Thema Fund Ltd. (BVI); Thema Wise Investments (BVI); Lagoon Investment Limited (BVI); Hermes International Fund (BVI); |
| 09-01364 | HSBC Fund Services (Luxembourg) S.A. | Hermes International Fund Ltd. (BVI) |

---

[23]    Although the Chart indicates in some cases that the defendant used a U.S. bank account in connection with the transaction, the relevant proffer or pleading does not allege that the subsequent transfer was made to a U.S. account.

| A.P. No. | Defendant-Transferee | Transferor |
|---|---|---|
| 09-01364 | HSBC Bank Bermuda Limited | Alpha Prime Fund Ltd. (Bermuda); Hermes International Fund (BVI); Thema Fund Ltd. (BVI); Thema Wise Investments (BVI); Lagoon Investment Limited (BVI) |
| 09-01364 | Hermes International Fund Limited | Lagoon Investment Ltd. (BVI) |
| 09-01364 | Lagoon Investment Trust | Lagoon Investment Ltd. (BVI) |
| 09-01364 | Equus Asset Mgmt. Ltd | Thema Fund Ltd. (BVI); Thema International (Ireland); Thema Wise Investments (BVI) |
| 09-01364 | Hermes Asset Management Limited | Hermes International Fund (BVI); Lagoon Investment Ltd. (BVI); Lagoon Investment Trust (BVI) |
| 09-01364 | Thema Asset Mgmt. (Bermuda) | Thema Fund Ltd. (BVI); Thema Wise Investments (BVI) |
| 09-01364 | Thema Asset Management Limited (BVI) | Thema International (Ireland) |
| 10-04285 | UBS Third Party Management Company SA | Luxalpha SICAV (Lux.) |
| 10-04285 | Access International Advisors Ltd. | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |
| 10-04285 | Access Management Luxembourg SA (f/k/a Access International Advisors (Luxembourg) SA) as Represented by its Liquidator Maitre Fernand Entringer | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |
| 10-04285 | Access Partners SA as represented by its Liquidator Maitre Fernand Entringer | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |
| 10-05120 | Inter Investissements S.A. (f/k/a Inter Conseil S.A.) | Oreades SICAV (Lux.) |
| 10-05311 | M&B Capital Advisers Sociedad de Valores, S.A. | Landmark Investment Fund Ireland (Ireland); Luxembourg Investment Fund U.S. Equity Plus (Lux) |
| 10-05311 | Reliance Management (Gibraltar)Limited | Luxembourg Investment Fund U.S. Equity Plus (Lux.) |
| 10-05311 | UBS Third Party Management Company SA | Luxembourg Investment Fund U.S. Equity Plus (Lux.) |

a.    *Picard v. UBS AG*, Adv. Pro. No. 10-04285

The Chart identifies the following remaining subsequent transfer claims in this adversary proceeding:

**Table 5**

| A.P. No. | Defendant-Transferee | Transferor |
|---|---|---|
| 10-04285 | UBS AG | Luxalpha SICAV (Lux.); Groupement Financier Ltd. (BVI) |
| 10-04285 | UBS (Luxembourg) SA | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |
| 10-04285 | UBS Fund Services (Luxembourg) SA | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |
| 10-04285 | Patrick Littaye | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |
| 10-04285 | Pierre Delandmeter | Groupement Financier Ltd. (BVI); Luxalpha SICAV (Lux.) |

Luxalpha and Groupement Financier were BLMIS feeder funds. (*Proffered Second Amended Complaint*, dated June 26, 2015 at ¶2 ("*UBS Proffered SAC*") (ECF Adv. P. No. 10-04285 Doc. # 210).) According to the Chart, the Trustee does not contend that they maintained their principal operations in the United States or were citizens of the United States. (Factors, 1, 18.) Moreover, the *UBS Proffered SAC* alleges that Luxalpha was a Luxembourg fund, (*UBS Proffered SAC* at ¶ 55), and Groupement Financier was a BVI investment fund. (*Id.* at ¶ 61.) In addition, and with three exceptions discussed below, the Chart also indicates that the Subsequent Transferees did not use a U.S. office in connection with the transfers. Hence, the transfers took place between non-U.S. residents. To overcome the presumption against extraterritoriality, the Trustee must therefore allege facts showing that the actual transfer of funds occurred domestically.

62

The *UBS Proffered SAC* says little about the location of the subsequent transfers. It alleges that "[r]edemptions in U.S. dollars for Groupement Financier, Groupement Levered and Luxalpha were also processed through UBS S.A.'s account at UBS AG in Stamford, Connecticut," (*id.* at ¶ 97), and BLMIS sent Luxalpha redemption payments to UBS SA's account in Stamford, Connecticut and then to Luxalpha's bank account at UBS SA. (*Id.* at ¶ 173.) The proffer does not explain what "processing" a redemption means; either the redemptions were paid from a U.S. account to a U.S. account or they were not. Furthermore, where Luxalpha received its redemption payments from BLMIS relates to the initial transfer, not the subsequent transfer. The Trustee apparently assumes that if the feeder fund received the redemption in a U.S. account, it must have made the subsequent transfer from that U.S. account. The Trustee does not, however, allege that the subsequent transfers were made from the Connecticut account or another U.S. account or received in a U.S. account. Since the Trustee has failed to allege that these subsequent transfers between foreign entities was made domestically, he has failed to rebut the presumption against extraterritoriality and the claims are dismissed.

As to the exceptions, the Chart indicates that UBS AG maintains a U.S. office "utilized in connection with the transaction." The *UBS Proffered SAC* alleges that "UBS AG is a Swiss public company with registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and Aeschenvorstadt 1, CH-4051 Basel, Switzerland. UBS AG is the parent company of the global UBS bank, and is present in New York, with offices at 299 Park Avenue, New York, NY 10171 and 101 Park Avenue, New York, NY 10178. It also conducts daily business activities in Stamford, Connecticut and other locations in the United States." (*Id.* at ¶ 42.) In essence, the Trustee alleges that UBS AG is a foreign

corporation doing business in New York although he does not allege that it is registered
to do business in New York or anywhere else in the United States.  Furthermore, he does
not allege that any subsequent transfer occurred domestically, and as the Subsequent
Transferor was plainly foreign, he has failed to overcome the presumption that these
transfers were extraterritorial.

The last two defendant Subsequent Transferees identified on the Chart are Pierre
Delandmeter and Patrick Littaye.  The *UBS Proffered SAC* alleges that Delandmeter is a
citizen of Belgium, (*id.* at ¶ 53), a director of defendants Access Management
Luxembourg S.A. and Access Partners S.A., each of which is a Luxembourg limited
liability company (*id.* at ¶¶ 48, 49), and a director of non-party Access International
Advisors Inc. ( "AIA Inc."), a New York corporation.  (*Id.* at ¶ 50.)  He was also a "Legal
Advisor" to Groupement and Groupement Levered, both foreign funds, and a "Director
and Legal Advisor" to Luxalpha, a Luxembourg fund.  (*See id.* at ¶¶ 53, 55.)  The Trustee
alleges that Delandmeter received legal fees from Luxalpha and Groupement, (*id.* at ¶
292), and "upon information and belief," also received subsequent transfers from
subsequent transferees AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)).  (*Id.* at
¶ 292.)

The *UBS Proffered SAC* alleges Littaye is "a citizen of France," (*id.* at ¶ 50), but
the parties have stipulated that he is located in Belgium.  (*Scheduling Order*, Ex. 2, at 4.)
Littaye was a co-founder, Partner, Chairman, and Chief Executive Officer and co-owner
of AIA LLC, a director of Luxalpha and Groupement and Groupement Levered and co-
owner of AIA Ltd., AML and Access Partners.  (*UBS Proffered SAC* at ¶ 50.)  According
to the Trustee, Littaye "received millions of dollars of Subsequent Transfers, in an

amount to be proven at trial," "[a] significant amount of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Littaye . . . either directly or indirectly, in the form of distributions, payments, or other transfers of value," and "upon information and belief," Littaye received at least $6.5 million in compensation "from bank accounts controlled by Access's New York office." (*Id.* at ¶ 291.)

As with the case of the other subsequent transfers, the *UBS Proffered SAC* does not allege the location of the transferor or transferee accounts or that the subsequent transfers occurred domestically.

Consequently, all of the Subsequent Transfer claims appearing on the Chart that relate to this adversary proceeding are dismissed.

### b.    Tremont and the Rye Funds

Tremont operated a group of BLMIS feeder funds all of which had some variation of a name that included "Rye Select Broad Market" (collectively, the "Rye Funds"). Certain Rye Funds that included "Portfolio" in their names – Rye Select Broad Market Portfolio Limited ("Rye Portfolio"), Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio") and Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance Portfolio") – were registered in the Cayman Islands, and are sometimes collectively referred to as the "Rye Cayman Funds." Three other Rye funds – Rye Select Broad Market Fund L.P. ("Rye Broad Market"), Rye Select Broad Market XL Fund L.P. ("Rye XL") and Rye Select Broad Market Prime Fund L.P. ("Rye Prime Fund") – were formed in Delaware, and are sometimes collectively referred to as the "Rye Delaware Funds,"

and with the Rye Cayman Funds, the "Rye Funds." (*See Proffered Second Amended Complaint*, dated June 26, 2015 ("*HSBC Proffered SAC*") at ¶¶ 388-90 (ECF Adv. P. No. 09-01364 Doc. # 399).)

The Rye Cayman Funds exemplify feeder funds organized under foreign law that had no connection, from an operational standpoint, with their country of organization. Several proffered pleadings submitted by the Trustee discuss their principal places of operations. The *HSBC Proffered SAC* is typical. According to the Trustee, the Rye Funds were managed from and maintained their principal places of business and headquarters in Rye, New York. (*Id.* at ¶ 392.) Tremont's New York employees, among other things, conducted the Rye Funds' marketing, operations, diligence, and their communications with investors, (*id.* at ¶ 393), and served on their boards. (*Id.* at ¶ 395.) The Rye Cayman Funds had "registered offices" in the Cayman Islands, but had no operating offices or operations there, (*id.* at ¶ 392), and as "exempted" companies, could not solicit or accept investments from Cayman Island investors. (*Id.* at ¶ 394.) Finally, Rye Funds maintained their accounts at the Bank of New York where they received subscriptions and from which they paid redemptions. (*See id.* at ¶ 396; *see also Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Mistral (SPC)*, dated June 26, 2015 ("*Mistral Proffer*"), at ¶ 46 (alleging that beginning in the fall of 2006 if not earlier, Tremont closed the Rye Cayman Funds' Bermuda-based bank accounts, and thereafter made every redemption payment from the fund's New York-based accounts at the Bank of New York) (ECF Adv. Pro. No. 12-01273 Doc. # 57).)

The Rye Cayman Funds had to operate from somewhere if not the Cayman Islands. Although the Trustee does not allege that the Rye Cayman Funds were

registered to do business in New York, the Court concludes that the Trustee has

adequately alleged that they maintained their principal and only operations in New York

and that they therefore resided in New York.  In addition, they made the subsequent

transfers at issue at least since the fall of 2006 if not earlier from an account located in

New York.

Furthermore, and with certain exceptions discussed in footnotes 27 and 32, the

proffers allege that the subsequent transfers were received in a U.S.-based bank account

or support the inference that they were received in a U.S.-based account based on the

provisions of the subscription/redemption agreements requiring that redemptions be

paid to a U.S.-account.  The following table summarizes the latter group of transfers:

**Table 6**

| A.P. No. | Transferee | ECF Doc. No. of Proffer | Proffer Reference |
|----------|------------|-------------------------|-------------------|

| 09-01364[24] | HSBC Bank plc | 399 | ¶ 421[25] |
|---|---|---|---|
| 10-05120 | BNP Paribas Securities Services, S.A. | 73 | ¶ 92[26] |
| 12-01576 | BNP Paribas Securities Services, S.A.; BNP Paribas Bank & Trust Cayman Ltd.; BNP Paribas Arbitrage SNC[27] | 64 | ¶ 92 |
| 10-05354 | ABN AMRO BANK N.V., p/k/a Royal Bank of Scotland, N.V. | 101 | ¶¶ 65-69[28] |

[24]      According to the Chart, this adversary proceeding also involves a subsequent transfer from Thema International Fund plc ("Thema") to HSBC Bank plc.  Although the Chart indicates that Thema International maintained its principal operations in the United States, Thema International is an Irish entity, (*HSBC Proffered SAC* at ¶ 64), and I have been unable to locate a factual allegation in the 141-page *HSBC Proffered SAC* that Thema International maintained its principal operations in New York.  Furthermore, the Chart does not indicate that HSBC Bank plc used a U.S. office in connection with the transaction.  Accordingly, the subsequent transferor and Subsequent Transferee are foreign entities that did not reside in the United States.  According to the *HSBC Proffered SAC*, following a redemption request, Thema received $14,094,388.97 in a N.Y.-based HSBC Bank USA account for the benefit of HSBC Bank plc, (*id.* at ¶¶ 540-41), and subsequently transferred the same amount to HSBC plc.  (*Id.* at ¶¶ 542-43.)  It is not entirely clear whether the *HSBC Proffered SAC* is alleging that HSBC Bank plc was BLMIS' initial transferee with Thema acting as its agent, or Thema's subsequent transferee.  If the latter, the Trustee has failed to rebut the presumption against extraterritoriality and the claim is dismissed.  Although the *HSBC Proffered SAC* implies that Thema made the subsequent transfer from a N.Y.-based custodial account, it does not identify the location of the transferee account.  Thus, the only U.S. connection is the source of the subsequent transfer, and this is insufficient based on the criteria discussed earlier.

The Chart also lists two transfers from BLMIS to Thema International and Lagoon Investment.  These appear to be initial transfers, not Subsequent Transfers, and are beyond the scope of the *ET Decision*, which interpreted 11 U.S.C. § 550(a)(2).

[25]      Paragraph 421 states in relevant part:  "HSBC Bank plc received at least $53,000,000 from Rye XL Portfolio to HSBC Bank plc's account at HSBC Bank USA."

[26]      Paragraph 92, which applies to all of the BNP entities listed in the table, states in relevant part:  "Defendants executed subscription agreements for investments in the Tremont Funds that were domestic in nature.. . . . [T]he subscription agreements requested that Tremont direct redemptions to BNP's bank account in New York."

[27]      Despite its listing in the Chart, the Complaint does not allege that any Rye Cayman Fund made a subsequent transfer to BNP Paribas Securities Services Succursale de Luxembourg, and it is not mentioned in the Trustee's Proffer.   This defendant was included in the motion to dismiss, and accordingly, any claims arising from alleged subsequent transfers by a Rye Cayman Fund to this BNP entity are dismissed.

In addition, Complaint alleges claims arising from subsequent transfers by a Rye Cayman Fund to BNP Paribas Bank & Trust (Canada) ("BNP Canada"), a Canadian entity, which was also included in the motion to dismiss but omitted from the Trustee's opposition and the Proffer.  These subsequent transfer claims are also dismissed.

[28]      Paragraphs 65-69 state in relevant part:

65.  ABN/RBS instructed Tremont to make all transfers in connection with the 2006 Transactions to ABN/RBS's bank account in New York.  In the 2006 Swap Confirmation, ABN/RBS instructed Tremont to make all payments to ABN/RBS via a bank account that ABN/RBS held at its New York branch; ABN/RBS received all payments from Rye Portfolio Limited XL in its New York account.  In connection with ABN/RBS's investment

| 12-01273 | Mistral (SPC) | 57 | ¶¶ 18-19[29] |
| 12-01278 | Zephyros Limited | 58 | ¶¶ 20-21[30] |
| 12-01698 | RBC Dexia Investor Services Trust | 57 | ¶ 28[31] |

---

in Rye Portfolio Limited, Subscription Agreements provided that redemption payments would be made to ABN/RBS's bank account at its New York branch; ABN/RBS received all payments from Rye Portfolio Limited in its New York account. Accordingly, every one of the subsequent transfers at issue was sent from the Tremont Funds' bank accounts in New York to ABN/RBS's bank account in New York.

**66.** ABN/RBS maintained a bank account at its ABN AMRO Bank NV New York Branch in New York, which was a "resident of the United States" according to its July 2008 USA Patriot Act Certification. ABN/RBS designated that account . . . in the 2006 Transactions to receive both collateral and redemption payments – the subsequent transfers at issue – from the Tremont Funds.

**67.** With respect to the 2006 Transactions, Rye Portfolio Limited XL utilized its bank account at the Bank of New York to transfer each of the collateral payments at issue to ABN/RBS's bank account at its New York Branch.

**68.** Likewise, Rye Portfolio Limited utilized its account at the Bank of New York to transfer each redemption payment to ABN/RBS at its New York bank account.

**69.** Similarly, with regard to the transfers sent and received in connection with the 2007 Transactions, ABN/RBS designated its bank account at its ABN AMRO Bank NV New York Branch to receive both collateral and redemption payments from the Tremont Funds. Utilizing their bank accounts at the Bank of New York, Rye Broad Market XL and Rye Broad Market – the Tremont Funds involved with the 2007 Transactions – made transfers of collateral and redemption payments to ABN/RBS's bank account at its New York Branch.

[29]    Paragraphs 18-19 state in relevant part: "New York or New Jersey was the situs selected by Mistral for making and receiving such transfers. Specifically, Mistral used a bank account at the Northern Trust International Banking Corporation in New York or New Jersey to effect such payments (the "U.S. Account"). . . . With respect to Rye Portfolio Limited, Mistral designated such use of this U.S. Account in subscription and redemption documents. . . ."

[30]    Paragraphs 20-21 state in relevant part: "The United States was the situs selected by Zephyros for making and receiving such transfers. Specifically, Zephyros used the bank account of its U.S.-based administrator/custodian SEI at Wachovia National Bank in the United States to effect such payments (the "U.S. Account"). . . . Zephyros designated such use of the U.S. Account in a Fairfield Sentry subscription agreement and in Rye Portfolio Limited redemption documents . . . ."

[31]    Paragraph 28 states: "Upon information and belief based on the other RBC-Dexia entities' designations of their own U.S. bank account (by and large at Citibank in New York), RBC-Dexia Trust similarly designated and received its redemptions from Rye Portfolio Limited into a bank account in the United States."

| 12-01699 | Guernroy Limited[32] | 54 | ¶¶ 28-29[33] |

Several of the Subsequent Transferees contend that the Trustee failed to allege

that the bank accounts used to effect the subsequent transfers were not correspondent

accounts, and he therefore failed to allege a domestic transaction.[34]    (*See Reply*

*Memorandum in Further Support of the BNP Paribas Defendants' Motion to Dismiss*

*Based on Extraterritoriality*, dated Sept. 30, 2015, at 2, 10, 25 (ECF Adv. Pro. No. 10-

04457 No. Doc. # 93).)  The *ET Decision* does not suggest that the Trustee must allege

---

[32]    The Chart includes the defendant Royal Bank of Canada (Channel Islands) Limited ("RBC-CI"), and the Complaint, Ex. N, alleges that Rye Portfolio subsequently transferred $4,637,106 to "Guernroy or RBI-CI." (*See also Complaint*, dated June 6, 2012 at ¶ 86 (ECF Adv. P. No. 12-01699 Doc. # 1).)  The Proffer alleges that the RBC-CI's New York accounts at Deutsche Bank and JP Morgan Chase Bank received redemptions for other entities, (*Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Royal Bank of Canada*, dated June 26, 2015 at¶ 29(ECF Adv. P. No. 12-01699 Doc. # 54)), but does not allege that RBC-CI received any redemptions in its own name.  The motion to dismiss included claims alleging subsequent transfers from Rye Portfolio to RBC-CI; these claims are dismissed and leave to amend is denied.

[33]    Paragraphs 28-29 state in relevant part:  "New York was the situs repeatedly selected by Defendants for both receiving redemptions and remitting subscriptions. . . .  RBC-Guernroy also used an account in RBC-CI's name at JPMorgan Chase Bank in New York to receive redemptions from . . . Rye Portfolio Limited. . . ."

[34]    After briefing, the Trustee apprised the Court of the decision in *Official Comm. of Unsecured Creditors of Arcapita, Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56 (S.D.N.Y. 2016), and implied that it undercut the *ET Decision*'s conclusion that the use of a correspondent bank account did not support a domestic transfer. (*Letter from David J. Sheehan, Esq. to the Court*, dated Apr. 7, 2016 (ECF Doc. # 13051).)  In *Arcapita*, the Official Committee of Unsecured Creditors (the "Committee") brought a preference action, seeking to avoid and recover preferential transfers that had been made to the defendants' New York correspondent bank accounts.  The defendants moved to dismiss for lack of personal jurisdiction.  The District Court concluded that the use of New York correspondent accounts supported the assertion of personal jurisdiction, *id.* at 68; *accord Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 900 (N.Y. 2012), and added that "if preferential transfers are found to have occurred, they occurred at the time the funds were transferred into the New York correspondent bank accounts." *Arcapita*, 549 B.R. at 70.

As the Second Circuit indicated in *Absolute,* whether sufficient contacts with the United States support the assertion of personal jurisdiction is a different question from whether a transaction is domestic for purposes of extraterritoriality.  The use of a U.S. correspondent bank account to process a dollar-denominated transaction may confer personal jurisdiction over the transferee but under the *ET Decision*, does not render an otherwise foreign transfer domestic.  *Arcapita* does not modify the District Court's conclusion.

the use of a non-correspondent bank account to survive the dismissal of his subsequent

transfer claims. While the claims may not ultimately survive for this reason, that must

await future development of the facts which go outside the record and cannot be

considered on this motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure. Accordingly, the motions to dismiss the claims included in Table 6 are

denied and leave to amend is granted to the extent of these claims.

### c.    Fairfield Greenwich

Two of the adversary proceedings (Nos. 12-01701 and 12-01702) involve

subsequent transfers by Fairfield Greenwich (Bermuda) Ltd. ("Fairfield Bermuda") and

Fairfield Greenwich Ltd. (Cayman Islands) ("Fairfield Cayman"), both organized under

foreign law (Bermuda and the Cayman Islands, respectively). They were part of FGG.

They received fees from FGG feeder funds, including Greenwich Sentry, L.P., and

Greenwich Sentry Partners, L.P. (collectively, "Greenwich Sentry") and Fairfield Sentry,

and distributed the fees to FGG partners. (*Trustee's Proffered Allegations Pertaining to

the Extraterritoriality Issue as to Defendants SafeHand Investments, Strongback

Holdings Corporation, and PF Trustees limited in its Capacity as Trustee of RD Trust*,

dated June 26, 2015 ("*SafeHand Proffer*"), at ¶¶ 2-4 (ECF Adv. Proc. No. 12-01701 Doc.

# 62); *see Proffered Allegations Pertaining to the Extraterritoriality Issue as to

Defendants Dove Hill Trust and FG Investors Ltd.*, dated June 26, 2015 ("*Dove Hill

Proffer*"), at ¶¶ 3-5 (ECF Adv. Proc. No. 12-01702 Doc. # 61).) To the extent they

received fees from or originating with the Fairfield Sentry (or Fairfield Lambda or

Fairfield Sigma*)*, the subsequent transfer claims are barred under the doctrine of

comity. The balance of the discussion concerns the transfers that originated with other

71

feeder funds, including Greenwich Sentry, that were not the subject of foreign liquidation proceedings.[35]

Fairfield Cayman maintained its principal place of business in New York, (*SafeHand Proffer* at ¶ 13; *Dove Hill Proffer* at ¶¶ 4, 32), and "operated out of FGG's New York headquarters." (*SafeHand Proffer* at ¶ 3, *accord id.* at ¶ 6.)  Although "formed under foreign law, it reported its principal place of business as FGG's New York headquarters, *registered to do business in the State of New York*, and listed its principal executive office as FGG's New York headquarters," (*SafeHand Proffer* at ¶ 40 (emphasis added); *accord* (*Dove Hill Proffer* at ¶ 36; *Fairfield Proffered SAC* ¶ 258))[36], and never had employees or an office in the Cayman Islands or in Ireland, where it was initially organized.  (*Dove Hill Proffer* at 36.)  Fairfield Cayman is similar to the Rye Cayman Funds, and accordingly, the Trustee has alleged that Fairfield Cayman resides in New York.

On the other hand, the Trustee has failed to allege that Fairfield Bermuda maintained its principal operations or principal place of business in New York or the United States.  Fairfield Bermuda provided risk management services and acted as placement agent to a number of FGG investment vehicles and feeder funds and also allegedly provided investment advisory services to Fairfield Sentry.  (*Fairfield Proffered*

---

[35]    The Greenwich Sentry entities were both Delaware limited partnerships, and debtors in jointly administered chapter 11 proceedings in this Court.  (*See In re Greenwich Sentry, L.P.*, Case No. 10-16229 (SMB).)

[36]    The *Fairfield Proffered SAC* refers to the *Proffered Second Amended Complaint*, dated June 26, 2015 (ECF Adv. P. No. 09-1239 Doc. # 187).  The allegations in the *Fairfield Proffered SAC* are incorporated by reference in the *SafeHand Proffer* at ¶ 47 and the *Dove Hill Proffer* at ¶ 60.

*SAC* at ¶ 56.)  Although the Trustee avers that Fairfield Bermuda "operated out of FGG's New York headquarters," (*SafeHand Proffer* at ¶ 3; *accord id.* at ¶ 6; *see id.* at ¶ 42), he also alleges that it had a small number of employees in Bermuda and rented a small office there.  (*SafeHand Proffer* at ¶ 42; *Dove Hill Proffer* at ¶ 43; *Fairfield Proffered SAC* at ¶¶ 273-74.)  The Bermuda employees performed some risk analysis on the Fairfield Sentry assets but reported to FGG New York personnel.  (*Fairfield Proffered SAC* at ¶ 199.)  Fairfield Bermuda also maintained a bank account in Bermuda.  (*Id.* at ¶ 272.)  Unlike Fairfield Cayman, Fairfield Bermuda did not report its principal place of business as New York, and in a marketing publication entitled "The Firm and Its Capabilities," at 7, FGG listed Fairfield Bermuda's office address as Suite 606, 12 Church Street, Hamilton Bermuda HM11.[37]  Finally, the Trustee alleged in the Amended Complaint, dated July 20, 2010, at ¶ 121 (Adv. Pro. No. 09-01239 ECF Doc. # 23) filed in *Picard v. Fairfield Sentry Limited*, that Fairfield Bermuda maintained its principal place of business in Hamilton, Bermuda.

### i.    *Picard v. SafeHand Inv.*, Adv. Pro. No. 12-01701

### A.    The Parties

The Chart identifies three defendant Subsequent Transferees, SafeHand Investments ("SafeHand"), Strongback Holdings ("Strongback") and PF Trustees Limited in its capacity as trustee of RD Trust ("PF" and collectively with SafeHand and Strongback, the "Piedrahita Entities").  The Piedrahita Entities were formed by Andrés

---

[37]    A copy of "The Firm and Its Capabilities" is attached to the *Declaration of Jeffrey E. Baldwin in Support of FG Foreign Defendant Motion to Dismiss Based on Extraterritoriality*, dated Sept. 30, 2015, as Exhibit 3 (ECF Adv. Proc. No. 12-01701 Doc. # 68).  The Trustee quoted from it in the *Fairfield Proffered SAC* at ¶¶ 426-27.

Piedrahita, a founding partner of FGG, to receive his partnership distributions from FGG. (*SafeHand Proffer* at ¶ 1.) The fees charged investors in Fairfield Sentry and Greenwich Sentry were funneled to Fairfield Cayman and Fairfield Bermuda, and then distributed to Piedrahita through SafeHand, Strongback and PF. (*Id.* at ¶¶ 3-5, 7, 14.) To protect the hundreds of millions of distributions he ultimately received, Piedrahita moved his profit distributions into entities like these three defendants created in foreign countries. (*Id.* at ¶ 15.) According to the Trustee, the Piedrahita Entities and Piedrahita received $219,004,944. (*Id.* at ¶ 14.)

Piedrahita was a citizen of the Republic of Colombia and the United Kingdom, but resided in the United States for most of his adult life and obtained permanent resident status. (*SafeHand Proffer* at ¶¶ 9-10.) At all relevant times, the Piedrahita Entities were Cayman Island entities. (*Id.* at ¶¶ 16, 21, 25.)[38] The *SafeHand Proffer* indicates that Piedrahita controlled the Piedrahita Entities. It further alleges that SafeHand maintained a P.O. Box as its registered address in the Cayman Islands, and implies that it did not have any employees or offices other than the post office box. (*Id.* at ¶ 16.) Furthermore, as an exempt company, it could not engage in business in the Cayman Islands except to further its business interests outside of the Cayman Islands, (*id.*), and when Piedrahita formed SafeHand he indicated to the U.S. Government that SafeHand was a "foreign eligible entity with a single owner electing to be disregarded as a separate entity." (*Id.* at ¶ 17 (internal quotation marks omitted).) The Trustee concludes form this election that SafeHand effectively served as Piedrahita's later ego.

---

[38]    Strongback was formed in the Cayman Islands in November 2001, but was subsequently deregistered in December 2011 and reregistered in Malta. All of the subsequent transfers at issue occurred while it was a Cayman Islands entity.

(*Id.*)  These allegations imply that SafeHand conducted no operations in the Cayman Islands, and to the extent it conducted any operations, it did so through Piedrahita in the United States.

The *SafeHand Proffer* did not include similar allegations regarding Strongback and PF that would support the conclusion that they reside in the United States. Although it includes the conclusory allegation that Strongback served as Piedrahita's alter ego, (*id.* at ¶ 22), it does not allege where it maintained an office or whether it had any employees.  PF was also a Cayman Islands entity with a registered office at the same address as SafeHand, (*id.* at ¶ 26), and is now the sole owner of SafeHand.  (*Id.* at ¶ 28.) The *SafeHand Proffer* does not otherwise include allegations pertaining to its operations, offices or employees, if any.

## B.    The Subsequent Transfers

The allegations regarding the transfers are confusing.  Initially, the *SafeHand Proffer* alleges that Fairfield Cayman made the subsequent transfers from a New York account, (*id.* at ¶ 13), but does not identify the location of the account that was the source of the Fairfield Bermuda payments.  The Trustee alleges that SafeHand received $212,777,342 in distributions from Fairfield Cayman and $6,227,602 in distributions from Fairfield Bermuda, (*id.* at ¶ 20), and SafeHand received those payments in a New York *correspondent* account in New York.  (*Id.* at ¶ 18.)  The amount allegedly paid to SafeHand corresponds to the amounts allegedly received by all three Piedrahita

Entities.[39]  (*See id.* at ¶ 14.)  In addition, although the *SafeHand Proffer* states that

subsequent transfers were deposited in Strongbacks' New York account at Wachovia

Bank in New York, (*id.* at ¶ 24), the proffer does not allege the amount of those

subsequent transfers, and the schedule of subsequent transfers made to Strongback that

is attached to the Amended Complaint is blank.  (*See Amended Complaint*, App'x III,

Ex. B.)  Accordingly, the Trustee does not identify any subsequent transfers made to

Strongback.  The Trustee's failure to allege any domestic subsequent transfers to

Strongback fails to rebut the presumption against extraterritoriality, and any such

claims are dismissed.

     The claims against PF seemed to be based solely on its status as the parent of

SafeHand.  (*See SafeHand Proffer* at ¶ 28 ("RD Trust is now the sole owner of Safehand.

Thus, PF Trustees in its capacity as trustee of RD Trust, owns and is in possession of all

transfers that were received by Safehand.").)  The *SafeHand Proffer* does not identify

any subsequent transfers to PF in its own name, and an exhibit to the Amended

Complaint indicates that SafeHand "and/or" PF received $172,631,780 in subsequent

transfers.  (*Amended Complaint*, App'x III, Ex. A.)  The Trustee has not alleged a

domestic subsequent transfer to PF, and has not articulated a basis to pierce SafeHand's

corporate veil, which is presumably governed by Cayman Islands law, and hold PF liable

for the transfers to SafeHand.  Accordingly, the Trustee has failed to rebut the

---

[39]     Much of this amount originated from fees paid by Fairfield Sentry.  (*See Amended Complaint*,
dated May 31, 2013 ("*Amended Complaint*"), App'x II, Ex. C; App'x II, Ex. D (ECF Adv. P. No. 12-01701
Doc. # 13).)

presumption against extraterritoriality, and the subsequent transfer claims asserted against PF are also dismissed.

This leaves SafeHand. As noted, the transfers that originated with the Fairfield Funds are dismissed on grounds of comity. The transfers from Fairfield Cayman were made by a U.S. resident from a U.S. account. Although SafeHand received the subsequent transfers in a correspondent account, the allegations are sufficient under the criteria discussed above to rebut the presumption against extraterritoriality. Hence, the motion to dismiss these claims is denied.

The claims alleging subsequent transfers from Fairfield Bermuda are dismissed. They were made by a foreign entity, the Trustee does not allege that they were made from a U.S. bank account, and they were made to correspondent bank account. SafeHand's residence, the only connection to the United States, is insufficient to rebut the presumption of extraterritoriality.

### ii.    *Picard v. Barreneche, Inc.*, Adv. Pro. No. 12-01702

### A.    FG Investors

FG Investors was created by Charles Murphy, an FGG partner, to receive distributions from FGG, (*Dove Hill Proffer* at ¶ 1), and operated in the same manner and for the same purposes as the Piedrahita Entities. (*See id.* at ¶¶ 4-5.) FG Investors was formed under Cayman Islands law but controlled by Murphy, a U.S. citizen and New York resident, from New York. (*Dove Hill Proffer* at ¶¶ 9-12.) The *Dove Hill Proffer* does not allege where or whether it maintained offices or operations, or whether it employed anyone.

According to the *Dove Hill Proffer*, FG Investors received at least $5,941,335 from Fairfield Cayman to FG Investors and at least $675,700 from FG Bermuda. A substantial portion of the transfers originated from Fairfield Sentry, (*Complaint*, dated June 6, 2012, ("*Complaint*") App'x II C (ECF Adv. P. No. 12-01702 Doc. # 1)), and are not recoverable on grounds of comity. As in SafeHand's case, the Fairfield Cayman subsequent transfers were made from its New York account at JP Morgan Chase. (*Dove Hill Proffer* at ¶ 17; *see id.* at ¶ 37.) The *Dove Hill Proffer* does not, however, allege where FG Investors received the subsequent transfers. Nevertheless, the Trustee alleges that the transfers were made by an entity registered to do business in New York from a New York account, and as in the case of SafeHand, the allegations are sufficient to rebut the presumption against extraterritoriality. Hence, the motion to dismiss these claims is denied.

The claims alleging subsequent transfers from Fairfield Bermuda to FG Investors are dismissed for the same reasons discussed in connection with SafeHand. Unlike Fairfield Cayman, *Dove Hill Proffer* does not allege facts showing that Fairfield Bermuda resided in the United States or made the subsequent transfers from a U.S. account, and as noted, does not allege where FG Investors received the transfers.

### B.    Dove Hill Trust

Dove Hill Trust ("DHT") was created by Yanko della Schiava, a FGG sales employee, to receive salary and bonus payments from FGG. (*Dove Hill Proffer* at ¶¶ 1, 22, 27.) He was also a Fairfield Sentry investor, and DHT received a redemption payment. (*Id.* at ¶ 22.) The proffer does not allege where DHT was formed or maintained its principal place of business. However, the *Complaint* alleged that Asiaciti

Trust Singapore Pte Ltd. acted as DHT's trustee and maintained its location at 163

Penang Road, #02-01 Winsland House II, Singapore, 238463.  (*Complaint* at ¶ 76.)

The proffer alleges that Fairfield Cayman transferred at least $400,000 to DHT,

(*Dove Hill Proffer* at ¶ 7), although an exhibit annexed to the *Complaint* identifies only

one transfer in the amount of $59,039.  (*Complaint*, App'x III, Ex. B.)  As noted earlier,

Fairfield Cayman was registered to do business in New York and made its subsequent

transfers from New York-based bank accounts.  (*Dove Hill Proffer* at ¶ 30.)  The *Dove*

*Hill Proffer* further alleges that DHT used New York bank accounts "in connection with

the transfers at issue," (*id.* at ¶ 29), but does not allege, unlike the allegations in many

other proffers, that Dove Hill received the transfers in a U.S. Account.  Nevertheless, the

transfers were made by a U.S. resident from a N.Y. account, the Trustee has rebutted the

presumption against extraterritoriality and the motion to dismiss these claims is denied.

### d.    Remaining Claims

#### i.    *Picard v. Cardinal Mgmt., Inc.*, Adv. Pro. No. 10-04287

The parties have stipulated that Cardinal Management, the subsequent

transferor, and Dakota Global Investments, the Subsequent Transferee, are foreign

entities, (*Scheduling Order*, Ex. A at 8), and neither the Chart nor the proffer, (*see*

*Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Dakota*

*Global Investments, Ltd.*, dated June 26, 2015 (ECF Adv. P. No. 10-04287 Doc. # 69)),

indicates that either maintained offices in the United States.  The only arguably

pertinent allegation in the proffer is that "Dakota's agents also had Cardinal on occasion

utilize a U.S. branch of Wachovia Bank to facilitate its transfers of money from BLMIS."

(*Id.* at ¶ 19.)  This statement refers to the initial transfer from BLMIS to Cardinal, not

the subsequent transfers from Cardinal to Dakota.  The Trustee has failed to rebut the presumption against extraterritoriality, and the claim is dismissed.

### ii.    *Picard v. Equity Trading Portfolio, Ltd.*, Adv. Pro. No. 10-04457

The Trustee alleges that Equity Trading Portfolio Ltd. ("Equity Portfolio"), a BVI entity, (*BNP Proffer* at ¶ 147 (ECF Adv. P. No. 10-04457 Doc. # 90)),[40] and a BLMIS customer, subsequently transferred $15 million to BNP Paribas Arbitrage SNC ("BNP Arbitrage").  (*Id.*)  The Trustee does not indicate in the Chart that Equity Portfolio maintained its principal operations in the United States (Factor 1), and the *BNP Proffer* does not allege otherwise.

The Trustee alleges that BNP Arbitrage resides in New York with offices located at 787 Seventh Avenue.  (*Id.* at ¶ 5.)  However, the Trustee alleged in the Complaint, dated Nov. 30, 2010 (ECF Adv. P. No. 10-04457  Doc. # 2), that BNP Arbitrage was organized under the laws of France and maintained an office in Paris with no mention of New York.  (Complaint at ¶ 13.)  Furthermore, the *BNP Proffer* incorporated the Complaint by reference, (*BNP Proffer* at ¶ 158), and thus, the Trustee has made contradictory allegations on this point without any effort to explain the contradiction.

Nevertheless, even if the transferor and transferee did not reside in the United States, the *BNP Proffer* alleges that the subsequent transfer was wholly domestic.  BLMIS wired a $15 million redemption payment to an HSBC account in New York "held in the name of Citco Bank Nederland N.V., Dublin Branch for the benefit of Equity

---

[40]     This is the same *BNP Proffer* referred to earlier.  The Trustee submitted this proffer in four adversary proceedings.

Portfolio," and "Equity Portfolio transferred $15 million into an account held by BNP in New York on behalf of BNP Arbitrage." (*Id.* at ¶ 162.)  As noted in an earlier citation to their response, BNP Defendants contend that the Trustee did not allege the use of non-correspondent accounts, but I do not read the *ET Decision* to impose that pleading burden on the Trustee.  Accordingly, the motion to dismiss this subsequent transfer claim is denied, and leave to amend is granted.

### iii.    *Picard v. Radcliffe Inv., Ltd.*, Adv. Pro. No. 10-04517

The Trustee contends that Radcliffe Investments Limited made a subsequent transfer to Rothschild Trust Guernsey Limited ("Rothschild Trust").  As alleged in the *Proposed First Amended Complaint*, dated June 26, 2015 ("*Radcliffe Proposed FAC*")(ECF Adv. P. No. 10-04517 Doc. # 46), Radcliffe opened an account number 1FR-100 (the "Account")  with BLMIS, but was a "mere passive investment vehicle," (*id.* at ¶ 44), and Rothschild Trust managed, controlled and actually owned the Account.  (*Id* at ¶¶ 8-9.)  Radcliffe was formed under the laws of the Cayman Islands, and maintained its registered office in Georgetown, Cayman Islands.  (*Id.* at ¶ 8.)  Rothschild Trust was incorporated under the laws of Guernsey, and maintained its principal place of business in Guernsey.  (*Id.* at ¶ 9.)  The defendant Robert D. Salem, a London businessman, was the ultimate beneficiary of the transfers at issue.  (*Id.* at ¶ 10.)  Mr. Salem is in default, (*id.* at ¶ 10 n. 2), and will not be mentioned further.  The *Radcliffe Proposed FAC* further alleges, "[u]pon information and belief, that Radcliffe was owned by a Guernsey-based trust, and Rothschild Trust was the trustee of the Guernsey-based trust.  (*Id.* at ¶ 8.)  The *Radcliffe Proposed FAC* does not allege, and the Chart does not indicate, that either Radcliffe or Rothschild maintained an office or conducted business operations in the

United States other than the ownership of and the activities relating to Radcliffe's
BLMIS account.

On or about May 31, 2007, Rothschild Trust directed BLMIS to close the Account
and transfer the proceeds to the Rothschild Trust account at JP Morgan Chase Bank.
"Upon information and belief, the routing number for the [Rothschild] Trust Account is
only used for accounts opened in New York with U.S. banking institutions." (*Id.* at ¶¶
46-47.)  On June 5, 2007, BLMIS wired $7,120,054, of which $2,120,054 represented
fictitious profits. (*Id.*, Ex. B, at 7.)  The Trustee alleges that a similar letter was sent to
BLMIS on or about October 31, 2007, (*id.* at ¶ 46), but the last transfer occurred on
September 20, 2007, (*id.*, Ex. B, at 8), and no transfer was made in response to the
October letter.

Under Bankruptcy Code § 550(a), the Trustee can recover an avoided transfer
from the initial transferee or the entity that benefitted from the initial transfer, *id.*
§550(a)(1), or from a subsequent transferee.  *Id.*, § 550(a)(2).  The Trustee asserts all
three theories against Rothschild Trust; the initial transfer was made to the Rothschild
Trust, (*Radcliffe Proposed FAC* at ¶ 39), (2) the initial transfer was made for the benefit
of the Rothschild Trust, (*id.* at ¶ 39), and (3) upon information and belief, the
Rothschild Trust is the subsequent transferee of Radcliffe. (*Id.* at ¶ 41.)  The three
theories are mutually exclusive, *see Bonded Fin. Servs., Inc. v. European Am. Bank*, 838
F.2d 890, 895-966 (7th Cir. 1988); *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 474
(Bankr. S.D.N.Y. 2015), and Rothschild Trust's possible status as the initial transferee or
the entity for whose benefit the initial transfer was made is beyond the scope of the *ET
Decision.*

The *Radcliffe Proposed FAC* does not identify a subsequent transfer because it does not identify a transfer from Radcliffe to Rothschild Trust; BLMIS transferred the cash directly to Rothschild Trust.  Accordingly, any subsequent transfer claim is dismissed.  Since the *ET Decision* did not address the question of extraterritoriality in connection with initial transfers or the entities for whose benefit the initial transfers were made, this disposition does not affect those claims.

### iv.    *Picard v. UBS AG*, Adv. Pro. 10-05311

According to the Chart, Luxembourg Investment Fund U.S. Equity Plus ("Luxembourg Fund") made subsequent transfers to UBS AG, UBS (Luxembourg) S.A. ("UBS Lux") and UBS Fund Services (Luxembourg) SA ("UBS Fund Services").[41]  The Luxembourg Fund is a sub-fund of Luxembourg Investment Fund, a Luxembourg corporation, and both are in liquidation in Luxembourg.  (*Amended Complaint*, dated June 26, 2015 ("*UBS Proffered AC*") at ¶¶ 41-42 (ECF Adv. P. No. 10-05311 Doc. # 221).) The Chart does not indicate that the Luxembourg Fund conducted its principal operations in New York (Factor 1), and I infer that it is a foreign entity that did not reside in the United States.

As to the Subsequent Transferees, the Chart does not indicate that either UBS Lux or UBS Fund Services used an office in connection with the transaction (Factor 19), and the *UBS Proffered AC* alleges that both were formed under Luxembourg law and maintained their registered offices there.  (*UBS Proffered AC* at ¶¶ 49-50.)  The Chart indicates that UBS AG used a U.S. office in connection with the transaction, and the

---

[41]    The Trustee also alleged a subsequent transfer claim against UBS Third Party Management Company SA, but that claim has been dismissed for the reason noted earlier.

*UBS Proffered AC* alleges that UBS AG is a Swiss public company with its principal

offices in Basel, Switzerland.  In addition, it also maintains offices at 299 Park Avenue,

New York, NY 10171 and 101 Park Avenue, New York, NY 10178 and it conducts daily

business activities in Stamford, Connecticut and other locations in the United States.

(*Id.* at ¶ 48.)  Accordingly, UBS AG resides in the United States, but UBS Lux and UBS

Fund Services are foreign transferees without any domestic connection.

Although the Chart indicates that the UBS defendants received the transfers from

the Luxembourg Fund, the *UBS Proffered AC* includes slightly different allegations.  It

avers that UBS Lux received approximately $5.5 million in fees from the Luxembourg

Fund, (*id.* at ¶ 303(a)), UBS Fund Services received at least $748,000 from the

Luxembourg Fund, (*id.* at ¶ 303(b)), and UBS AG received at least $1.7 million from

UBS Lux and UBS Fund Services which was comprised, in part, of amounts they had

received from the Luxembourg Fund.  (*Id.* at ¶ 303(d).)  In other words, UBS AG was an

immediate transferee of UBS Lux and UBS Fund Services.  It further alleges that UBS

Fund Services received the Luxembourg Fund's redemption payments from BLMIS at

UBS Fund Services' account at UBS AG's Stamford, Connecticut branch which then

went to the Luxembourg Fund's bank account at UBS SA, (*id.* at ¶ 274), but these

allegations relate to the initial transfers from BLMIS to the Luxembourg Fund, and not

the subsequent transfers.

In fact, the Court is unable to locate any allegations within the four corners of the

ninety-seven page *UBS Proffered AC* that identify the location of the subsequent

transfers and the *UBS Proffered AC* does not imply that they occurred in the United

States.  Moreover, if the subsequent transfers to UBS Lux and UBS Fund Services

cannot be recovered on grounds of extraterritoriality, the subsequent transfers from those entities to UBS AG are also beyond the reach of Bankruptcy Code § 550(a)(2). Accordingly, the Trustee has failed to rebut the presumption against extraterritoriality, and these subsequent transfer claims are dismissed.

### v.    *Picard v. Natixis*, Adv. Pro. No. 10-05353

The Trustee alleges that Bloom Asset Holdings Fund ("Bloom") received subsequent transfers in the sum of $191 million from Groupement and $18 million from Alpha Prime Fund Limited ("Alpha Prime").[42] (*Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to Natixis S.A., Bloom Asset Holdings Fund, and Tensyr Limited*, dated June 26, 2015 ("*Natixis Proffer*"), at ¶ 68 (ECF Adv. P. No. 10-05353 Doc. # 102).) As noted earlier, the Trustee did not take the position that Groupement or Alpha Prime maintained their principal operations in the United States, but the Trustee now contends that they did. In fact, Groupement, Alpha Prime and Bloom are all foreign entities, and the *Natixis Proffer* does not allege that they maintained offices or resided in the United States.

Instead, the Trustee attempts to tie Bloom to the United States through allegations relating to Natixis FP, a domestic corporation. According to the *Natixis Proffer*, Bloom is an indirect subsidiary of Natixis, S.A., a corporate and investment bank created in November 2006 under the laws of France, (*id.* at ¶ 5), and Natixis is the parent of "an international network of financial institutions, service providers, and banks that maintained operations and offices in the United States through numerous

---

[42]    The Trustee also alleges claims in this adversary proceeding relating to subsequent transfers by Fairfield Sentry and Harley that have already been dismissed on comity grounds.

subsidiary entities, including Defendants Natixis FP and Bloom. (*Id.*) Bloom's "corporate function was to act as a non-U.S. taxpayer on behalf of Natixis FP to invest in BLMIS Feeder Funds and other hedge funds that did not permit direct investments by U.S. taxpayers like Natixis FP." (*Id.* at ¶ 14; *accord id* at ¶ 15.) Two affiliates of Natixis, including Natixis FP, operated from the "same principal place of business in New York," (*id.* at ¶ 11), and controlled and directed the transactions on behalf of Bloom with the Subsequent Transferor-feeder funds. (*Id.* at ¶¶ 13-24.) The substance of these allegations is that Natixis F.P., a New York entity, ran Bloom for its own benefit, and utilized Bloom letterhead that listed Bloom's address as 9 West 57th Street in Manhattan. (*Id.* at ¶ 79.)

The underlying Complaint does not identify the subsequent transfers to Bloom or any of the other subsequent transferees. (*See Picard v. Natixis*, *Complaint*, dated Dec. 8, 2008, at ¶¶ 223-36 (ECF Doc. # 1).) The *Natixis Proffer* refers to only one subsequent transfer to Bloom. Access International Advisors, LLC ("Access"), Groupement's manager, (*Natixis Proffer* at ¶ 44), wired Bloom more than $150 million in Groupement redemption proceeds through a New York correspondent account at State Street Bank & Trust Co., N.A. (*Id.* at ¶ 80.) The proffer does not identify the location of the transferor account, and since the transferee account is a correspondent account, it does not allege a domestic transfer.[43] Furthermore, Groupement does not reside in the United States.

---

[43]    In contrast, the *Natixis Proffer* alleges that Natixis requested that Fairfield Sentry send redemptions to a Deutsche Bank account in New York, (*Natixis Proffer* at ¶ 114), and Harley paid its redemptions to a New York-based Northern Trust bank account. (*Id.* at ¶ 187.)

Accordingly, the Trustee has failed to rebut the presumption against extraterritoriality, and the subsequent transfer claims against Bloom are dismissed.

The parties are directed to confer for the purpose of submitting consensual orders consistent with the dispositions of the motions in each adversary proceeding.  If they cannot submit consensual orders, they should settle orders on notice to the other parties in those adversary proceedings.

Dated:New York, New York
November 21, 2016

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

## APPENDIX

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020

> Michael S. Feldberg, Esq.
> Of Counsel

ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, DC 20004

> Scott B. Schreiber, Esq.
> Of Counsel

BAKER & MCKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201

> David W. Parham, Esq.
> Of Counsel

CHALOS & CO, P.C.
55 Hamilton Avenue
Oyster Bay, New York 11771

> George M. Chalos, Esq.
> Of Counsel

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

> Thomas J. Moloney, Esq.
> Lawrence B. Friedman, Esq.
> David E. Brodsky, Esq.
> Carmine D. Boccuzzi, Jr., Esq.
> Breon S. Peace, Esq.
> Ari D. Mackinnon, Esq.
> Elizabeth E. Vicens, Esq.
> Of Counsel

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, NY 10019-7475

> Richard Levin, Esq.

David Greenwald, Esq.
     Of Counsel

DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019

     Joseph Cioffi, Esq.
     Bruce Ginsberg, Esq.
     James R. Serritella, Esq.
        Of Counsel

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017

     Elliot Moskowitz, Esq.
     Andrew Ditchfield, Esq.
        Of Counsel

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036

     Gary J. Mennitt, Esq.
        Of Counsel

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza
New York, NY 10006

     John F. Zulack, Esq.
     Elizabeth O'Connor, Esq.
        Of Counsel

FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue
31st Floor
New York, NY 10022

     David J. Onorato, Esq.
     David Y. Livshiz, Esq.
        Of Counsel

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
7 Times Square
New York, NY 10036

     Robert J. Lack, Esq.
        Of Counsel

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York,

  Marshall R. King, Esq.
  Gabriel Herrmann, Esq.
   Of Counsel

GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018

  Christopher Newcomb, Esq.
  William P. Weintraub, Esq.
   Of Counsel

HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022

  Marc. J. Gottridge, Esq.
  Benjamin J.O. Lewis, Esq.
  Erin Marie Meyer, Esq.
   Of Counsel

JONES DAY
222 East 41st Street
New York, NY 10017


  Thomas E. Lynch, Esq.
  Julie R. Gorla, Esq.
   Of Counsel


KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585

  Anthony Paccione, Esq.
  Bruce Sabados, Esq.
  Brian Muldrew, Esq.
  Mark Ciani, Esq.
  Allison Wuertz, Esq.
   Of Counsel

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178

Daniel Schimmel, Esq.
Of Counsel

KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003

Richard A. Cirillo, Esq.
Of Counsel

LATHAM & WATKIN LLP
885 Third Avenue
New York, NY 10022

Thomas J. Giblin, Esq.
Christopher Harris, Esq.
Of Counsel

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036

William J. Sushon, Esq.
Shiva Eftekhari, Esq.
Daniel S. Shamah, Esq.
Of Counsel

OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169

Peter Feldman, Esq.
Andrew S. Halpren, Esq.
Of Counsel

PAUL HASTINGS LLP
75 East 55th Street
New York, NY 10022

Barry Sher, Esq.
Jodi Kleinick, Esq.
Mor Wetzler, Esq.
Of Counsel

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036

Gregg M. Mashberg, Esq.
Richard L. Spinogatti, Esq.
Of Counsel

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036

   Robert S. Fischler, Esq.
   Martin J. Crisp, Esq.
     Of Counsel

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022

   Brian H. Polovoy, Esq.
     Of Counsel

SHEPPARD MULLIN RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112

   Malani J. Cademartori, Esq.
   Blanka K. Wolfe, Esq.
     Of Counsel

STEPTOE & JOHNSON LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067

   Seong J. Kim, Esq.
     Of Counsel

WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
New York, NY 10007

   Charles C. Platt, Esq.
   Andrea J. Robinson, Esq.
   George W. Shuster, Jr., Esq.
     Of Counsel

WILMER CUTLER PICKERING HALE & DORR LLP
60 State Street
Boston, MA 02109

   Benjamin Loveland, Esq.
     Of Counsel

WROBEL SCHATZ & FOX
1040 Avenue of the Americas, Suite 1101
New York, NY 10018

   Philip R. Schatz, Esq.
     Of Counsel

WUERSCH & GERING
100 Wall Street, 10 Fl.
New York, NY 10005

Samuel D. Levy, Esq.
Of Counsel