# EXHIBIT 2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
SECURITIES INVESTOR PROTECTION           :
CORPORATION,                             :
                                         :
        Plaintiff,                       :
                                         :      12-mc-115 (JSR)
            -v-                          :
                                         :      OPINION AND ORDER
BERNARD L. MADOFF INVESTMENT             :
SECURITIES LLC,                          :
                                         :
        Defendant.                       :
----------------------------------------x
In re:                                   :
                                         :
MADOFF SECURITIES                        :
----------------------------------------x
PERTAINS TO:                             :
                                         :
Consolidated proceedings on              :
extraterritoriality issues               :
----------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

The question here presented is whether section 550(a)(2) of the Bankruptcy Code applies extraterritorially in the context of this proceeding. Specifically, Irving H. Picard (the "Trustee"), the trustee appointed under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa-78lll, to administer the estate of Bernard L. Madoff Investment Securities LLC ("Madoff Securities"), here seeks to recover funds that, having been transferred from Madoff Securities to certain foreign customers, were then in turn transferred to certain foreign persons and entities that comprise the defendants here at issue. These defendants seek to dismiss the Trustee's claims against them, arguing that 11 U.S.C. § 550(a)(2),

1

the Bankruptcy Code provision allowing for such recovery, does not apply extraterritorially. The Court assumes familiarity with the underlying facts of the Madoff Securities fraud and ensuing bankruptcy and recounts here only those facts that are relevant to the instant issues.

Central to the question here presented is the role of the so-called "feeder funds," foreign investment funds that pooled their own customers' assets for investment with Madoff Securities. As customers of Madoff Securities, the feeder funds at times withdrew monies from Madoff Securities, which they subsequently transferred to their customers, managers, and the like. When Madoff Securities collapsed in late 2008, many of these funds — which had invested all or nearly all of their assets in Madoff Securities — likewise entered into liquidation in their respective home countries. The Trustee seeks to recover not only the allegedly avoidable transfers made to the feeder funds but also subsequent transfers of alleged Madoff Securities customer property made by those funds to their immediate and mediate transferees. It is the recovery of those subsequent transfers — transfers made abroad between a foreign transferor and a foreign transferee — that is the subject of the instant consolidated proceeding.

For example, in October 2011, the Trustee filed an adversary proceeding against CACEIS Bank Luxembourg and CACEIS Bank (together, "CACEIS"), seeking $50 million in subsequent transfers of alleged Madoff Securities customer property. See Decl. of Jaclyn M.

2

Metzinger dated Mar. 23, 2013, Ex. A ("CACEIS Compl.") ¶ 2, No. 12 Civ. 2434, ECF No. 2 (S.D.N.Y. filed Apr. 2, 2012). CACEIS Bank Luxembourg is a Luxembourg société anonyme operating there, while CACEIS Bank is a French société anonyme operating in France. Id. ¶¶ 22-23. Both entities serve as custodian banks and engage in asset management for "corporate and institutional clients." Id. ¶¶ 3, 22-23.

The Trustee seeks to recover alleged Madoff Securities customer funds received by CACEIS. However, CACEIS did not invest directly with Madoff Securities; instead, it invested funds with Fairfield Sentry Limited and Harley International (Cayman) Limited, two Madoff Securities feeder funds that in turn invested CACEIS's assets in Madoff Securities. Id. ¶ 2. Fairfield Sentry is a British Virgin Islands ("BVI") company that had invested more than 95% of its assets in Madoff Securities. Id. It is currently in liquidation in the BVI and has settled the Trustee's avoidance and recovery action against it for a fraction of the Trustee's initial claim. See id. ¶¶ 24, 43. Harley is a Cayman Islands company that was also one of Madoff Securities' largest feeder funds, and it is now in liquidation in the Cayman Islands. Id. ¶ 25. The Trustee obtained a default judgment against Harley for more than $1 billion in November 2010. Id. ¶ 53. The Trustee alleges that CACEIS received $50 million in recoverable subsequent transfers as a customer of Fairfield Sentry and Harley, and he asserts a right to reclaim those transfers under 11 U.S.C. § 550(a)(2). See id. ¶¶ 60-69.

3

CACEIS and the other consolidated defendants have moved to dismiss the Trustee's complaints in their respective adversary proceedings, arguing that section 550(a)(2) of the Bankruptcy Code does not apply extraterritorially and therefore does not reach subsequent transfers made abroad by one foreign entity to another. These defendants previously moved to withdraw the reference to the Bankruptcy Court, and the Court granted that motion on a consolidated basis with respect to the following issue: "whether SIPA and/or the Bankruptcy Code as incorporated by SIPA apply extraterritorially, permitting the Trustee to avoid the initial Transfers that were received abroad or to recover from initial, immediate, or mediate foreign transferees." See Order at 3, No. 12 Misc. 115, ECF No. 167 (S.D.N.Y. June 7, 2012). The Court received briefing on this issue from the defendants, the Trustee, and the Securities Investor Protection Corporation ("SIPC") and heard oral argument on September 21, 2012. The Court concludes that (1) the application of section 550(a)(2) here would constitute an extraterritorial application of the statute, and (2) Congress did not clearly intend such an application. Moreover, given the factual circumstances at issue in these cases, even if section 550(a)(2) could be applied extraterritorially, such an application would be precluded here by considerations of international comity. This Opinion and Order addresses these issues in turn and directs further proceedings upon return to the Bankruptcy Court.

"It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" Morrison v. Nat'l Australia Bank Ltd., 130 S. Ct. 2869, 2877 (2010) (quoting EEOC v. Arabian American Oil Co. ("Aramco"), 499 U.S. 244, 248 (1991)). This presumption against extraterritorial application of federal statutes "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." Aramco, 499 U.S. at 248.

In determining whether the presumption against extraterritoriality applies, the Court must determine, first, whether the factual circumstances at issue require an extraterritorial application of the relevant statutory provision; and second, if so, whether Congress intended for the statute to apply extraterritorially. See, e.g., Morrison, 130 S. Ct. at 2877-88 (engaging in this analysis with respect to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)); In re Maxwell Commc'n Corp. ("Maxwell I"), 186 B.R. 807, 816 (S.D.N.Y. 1995) (setting out this two-step inquiry in analyzing section 547 of the Bankruptcy Code).

The Court turns first to the question of whether the Trustee's use of section 550(a) here is in fact an extraterritorial application of the statute. In Morrison, when determining whether an underlying U.S.-based deception was sufficient to make application of section 10(b) of the Exchange Act domestic, rather than

5

extraterritorial, the Supreme Court looked to "the 'focus' of congressional concern," or, in other words, the "transactions that the statutes seeks to 'regulate.'" 130 S. Ct. at 2884.

The Trustee and SIPC argue that the "focus" of congressional concern in a SIPA liquidation is the regulation of the SIPC-member U.S. broker-dealer, so that the application of any of the incorporated provisions of the Bankruptcy Code is inherently domestic. But this argument proves too much. It cannot be that any connection to a domestic debtor, no matter how remote, automatically transforms every use of the various provisions of the Bankruptcy Code in a SIPA bankruptcy into purely domestic applications of those provisions. On the level of policy, this approach could raise serious issues of international comity, as discussed below. And, as a matter of precedent, Morrison suggests that such a sweeping approach fails to engage in the necessary analysis of the way in which the statutes are utilized, as "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States." 130 S. Ct. at 2884. Accordingly, a mere connection to a U.S. debtor, be it tangential or remote, is insufficient on its own to make every application of the Bankruptcy Code domestic. Cf. Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 33 (2d Cir. 2010) (per curiam) (stating, in the context of a RICO claim, that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application").

6

The Court therefore looks to the regulatory focus of the Bankruptcy Code's avoidance and recovery provisions specifically. On a straightforward reading of section 550(a), this recovery statute focuses on "the property transferred" and the fact of its transfer, not the debtor. See 11 U.S.C. § 550(a) (allowing a trustee to recover "the property transferred . . . to the extent that a transfer is avoided" under one of the Bankruptcy Code's avoidance provisions). Moreover, section 548, the avoidance provision that is primarily at issue in these proceedings, similarly focuses on the nature of the transaction in which property is transferred, not merely the debtor itself. See, e.g., 11 U.S.C. § 548(c) (allowing a transferee who "takes for value and in good faith . . . [to] retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer"); cf. In re Maxwell Commc'n Corp. ("Maxwell II"), 93 F.3d 1036, 1051 (2d Cir. 1996) (noting that "scrutiny of the transfer is at the heart of" an avoidance action). Accordingly, under Morrison, the transaction being regulated by section 550(a)(2) is the transfer of property to a subsequent transferee, not the relationship of that property to a perhaps-distant debtor.

To determine whether the transfers at issue in this consolidated proceeding occurred extraterritorially, "the court considers the location of the transfers as well as the component events of those transactions." Maxwell I, 186 B.R. at 817. Here, the relevant transfers and transferees are predominantly foreign:

7

foreign feeder funds transferring assets abroad to their foreign customers and other foreign transferees. See, e.g., CACEIS Compl. ¶ 2. This scenario is similar to circumstances found to implicate extraterritorial applications of the Bankruptcy Code's avoidance provisions in other cases. See, e.g., Maxwell I, 186 B.R. at 815 (finding application of 11 U.S.C. § 847 to be extraterritorial where "the antecedent debts were incurred overseas, the transfers on account of those debts were made overseas, and the recipients . . . [are] all foreigners"); In re Midland Euro Exch. Inc., 347 B.R. 708, 717 (Bankr. C.D. Cal. 2006) (noting that the parties agreed that the trustee's "claims would result in extraterritorial application of [11 U.S.C.] § 548" where "[t]he transferor was a Barbados corporation, the transferee was an English corporation, the funds originated from a bank account in London and, although transferred through a bank account in New York, eventually ended up in another bank account in England"). Although the chain of transfers originated with Madoff Securities in New York, that fact is insufficient to make the recovery of these otherwise thoroughly foreign subsequent transfers into a domestic application of section 550(a).[1] See Maxwell I, 186 B.R. at 816-17 (rejecting the claim that

---

[1] Nor is the fact that some of the defendants here allegedly used correspondent banks in the United States to process dollar-denominated transfers sufficient to make these foreign transfers domestic. See, e.g., Cedeno v. Intech Grp., Inc., 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010) (dismissing a RICO claim as impermissibly extraterritorial where "[t]he scheme's contacts with the United States, however, were limited to the movement of funds into and out of U.S.-based bank accounts").

8

the alleged preferential transfers were domestic because the funds for the transfers derived from the sale of U.S. assets); cf. Morrison, 130 S. Ct. at 2886 (rejecting the notion that the section 10(b) claim at issue was domestic because a significant portion of the fraudulent conduct occurred in the United States). Accordingly, the Court concludes that the subsequent transfers that the Trustee seeks to recover here are foreign transfers and thus would require an extraterritorial application of section 550(a).

The Court therefore turns to the second prong of the extraterritoriality inquiry: whether such an extraterritorial application was intended by Congress. The Supreme Court has explained that "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'" Morrison, 130 S. Ct. at 2877 (quoting Aramco, 499 U.S. at 248). "When a statute gives no clear indication of an extraterritorial application, it has none." Id. In deciding whether Congress has "clearly expressed" such an intent, the Court looks first to the language of section 550(a), which reads:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> > (2) any immediate or mediate transferee of such initial transferee.

9

11 U.S.C. § 550(a).

Nothing in this language suggests that Congress intended for this section to apply to foreign transfers, and the Trustee does not argue otherwise. Cf. Maxwell I, 186 B.R. at 819 ("[N]othing in the language or legislative history of [11 U.S.C.] § 547 expresses Congress' intent to apply the statute to foreign transfers."); Midland, 347 B.R. at 717 ("Nothing in the text of [11 U.S.C.] § 548 indicates congressional intent to apply it extraterritorially."). The Court therefore looks to "context," Morrison, 130 S. Ct. at 2883, including surrounding provisions of the Bankruptcy Code, to determine whether Congress nevertheless intended that section 550(a) apply extraterritorially.

Attempting to rebut the presumption against extraterritoriality, the Trustee focuses on section 541 of the Bankruptcy Code, which defines "property of the estate" to include certain specified property "wherever located and by whomever held." 11 U.S.C. § 541(a). It is uncontested here that the phrase "wherever located" is intended to give the Trustee title over all of the debtor's property, regardless of whether it is physically present in the United States. See H.R. Rep. No. 82-2320, at 10, reprinted in 1952 U.S.C.C.A.N. 1960, at 1976. According to the Trustee, section 541 is incorporated into the avoidance and recovery provisions of the Bankruptcy Code, which use the phrase "an interest of the debtor in property" to define the transfers that may be avoided, a phrase

10

that is repeated in section 541 in defining "property of the estate." See, e.g., 11 U.S.C. § 548(a) (allowing a trustee to "avoid any transfer . . . of an interest of the debtor in property"); see also Begier v. I.R.S., 496 U.S. 53, 58-59 (1990) (looking to section 541's definition of "property of the estate" in defining "property of the debtor" under section 547). Under the Trustee's theory, section 541's reference to "wherever located and by whomever held" is thereby indirectly incorporated into the Bankruptcy Code's avoidance and recovery provisions, indicating that Congress intended that those provisions apply extraterritorially as well.

Though clever, the theory is neither logical nor persuasive. That section 541's definition of "property of the estate" may be relevant to interpreting "property of the debtor" does not necessarily imply that transferred property is to be treated as "property of the estate" under section 541 prior to recovery by the Trustee. As the Court of Appeals for the Second Circuit has explained,

> In accordance with 11 U.S.C. § 541(a)(1) (1988), the property of a bankruptcy estate includes (with exceptions not presently pertinent) "all legal or equitable interests of the debtor in property as of the commencement of the case;" and pursuant to 11 U.S.C. § 541(a)(3) (1988), the property of a bankruptcy estate also includes "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, including 11 U.S.C. § 550 (1988). . . . "If property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions." Further, "the inclusion of property recovered by the trustee pursuant to his avoidance powers in a separate definitional

11

> subparagraph clearly reflects the congressional intent
> that such property is not to be considered property of
> the estate until it is recovered."

In re Colonial Realty Co., 980 F.2d 125, 131 (2d Cir. 1992) (citation omitted) (quoting In re Saunders, 101 B.R. 303, 305 (Bankr. N.D. Fla. 1989)).

Under the logic of Colonial Realty, whether "property of the estate" includes property "wherever located" is irrelevant to the instant inquiry: fraudulently transferred property becomes property of the estate only after it has been recovered by the Trustee, so section 541 cannot supply any extraterritorial authority that the avoidance and recovery provisions lack on their own. See Maxwell I, 186 B.R. at 820 ("Because preferential transfers do not become property of the estate until recovered, § 541 does not indicate the Congress intended § 547 to govern extraterritorial transfers." (citing Colonial Realty, 980 F.2d at 131)); Midland, 347 B.R. at 718 (finding that "neither the plain language of the statute nor its reading in conjunction with other parts of the Code establish[es] congressional intent to apply § 548 extraterritorially," in part because "allegedly fraudulent transfers do not become property of the estate until they are avoided").[2]

---

[2] The Trustee asks the Court to adopt the Fourth Circuit's decision in In re French, 440 F.3d 145, 152 (4th Cir. 2006), which holds that the presumption against extraterritoriality does not apply to avoidance and recovery actions. However, the logic of French is inconsistent with the Second Circuit's decision in Colonial Realty, as French relies on a notion that the foreign property "would have been property of the debtor's estate" absent a fraudulent transfer, id., whereas Colonial Realty implies that section 541 would not

12

Indeed, the fact that section 541, by virtue of its "wherever located" language, applies extraterritorially may cut against the Trustee's argument. In Morrison, the Supreme Court similarly contrasted section 10(b) with another provision of the Exchange Act, noting that the other section "contains what [section] 10(b) lacks: a clear statement of extraterritorial effect. . . . [W]hen a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." 130 S. Ct. at 2883; see also Norex, 631 F.3d at 33 ("Morrison . . . forecloses Norex's argument that because a number of RICO's predicate acts possess an extraterritorial reach, RICO itself possesses an extraterritorial reach.").

Nor does section 78fff-2(c)(3) of SIPA, which empowers a SIPA trustee to utilize the Bankruptcy Code's avoidance and recovery provisions to reclaim customer property, overcome the presumption against extraterritorial application. As with section 550(a) of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA does not expressly provide for extraterritorial application; rather, it primarily incorporates the avoidance and recovery provisions of the Bankruptcy Code, suggesting that whatever limitations apply to an ordinary

---

apply until after property has been recovered. In any event, French is also factually distinguishable, as "[m]ost of the activity surrounding [the relevant] transfer took place in the United States . . . [and] almost all of the parties with an interest in this litigation — the debtor, the transferees, and all but one of the creditors — are based in the United States, and have been for years." Id. at 154. Accordingly, the Court declines to adopt either French's reasoning or its ultimate determination.

13

bankruptcy likewise limit a SIPA liquidation. <u>See</u> 15 U.S.C. § 78fff-2(c)(3) (empowering a SIPA trustee to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11"). As a more general matter, SIPA's predominantly domestic focus suggests a lack of intent by Congress to extend its reach extraterritorially. <u>Cf.</u> <u>Morrison</u>, 130 S. Ct. at 2878 (finding that the Exchange Act's focus is the purchase and sale of securities in the United States). For example, SIPA expressly excludes from SIPC membership brokers whose primary business is conducted outside of the United States, <u>see</u> 15 U.S.C. § 78ccc(a)(2)(A)(i), and likewise excludes as a "customer" any person whose claim arises out of transactions with a foreign subsidiary of a SIPC member, <u>see</u> 15 U.S.C. § 78*lll*(2)(C)(i). Furthermore, although the Trustee points to SIPA section 78eee(b)(2)(A)(i), which provides for "exclusive jurisdiction of such debtor and its property wherever located (including property located outside the territorial limits of such court . . .)," the effect of this provision is no different from that of section 841 of the Bankruptcy Code. <u>See</u> 15 U.S.C. § 78eee(b)(2)(A)(iii) (providing a SIPA trustee with "the jurisdiction, powers, and duties conferred upon a court of the United States having jurisdiction over cases under Title 11"). That is, although section 78eee(b)(2)(A)(i) uses the phrase "wherever located," this phrase relates only to property

14

of the debtor, which, as discussed above, includes transferred property only after it has been recovered by the Trustee.[3]

Finally, the Trustee contends that policy concerns require that section 550(a) of the Bankruptcy Code apply extraterritorially; that is, the Trustee argues that a contrary result would allow a U.S. debtor to fraudulently transfer all of his assets offshore and then retransfer those assets to avoid the reach of U.S. bankruptcy law. However, as other courts have found, the desire to avoid such loopholes in the law "must be balanced against the presumption against extraterritoriality, which serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." Midland, 347 B.R. at 718. Assuming that any such intentional fraud occurred, the Trustee here may be able to utilize the laws of the countries where such transfers occurred to avoid such an evasion while at the same time avoiding international discord. Furthermore, although the Trustee argues that finding no extraterritorial application would undermine the primary policy objective of SIPA — the equitable distribution of customer funds to customers of the debtor — the Trustee has long insisted that indirect customers of Madoff Securities, like many of

---

[3] To the extent that the district court in In re Bevill, Bresler & Schulman, Inc., 83 B.R. 880 (D.N.J. 1988), found that SIPA applies extraterritorially, that case relied on an analysis that is outdated in light of the Supreme Court's decision in Morrison. See, e.g., id. at 896 (stating that "[e]xtraterritorial application of SIPA is also consistent with the extraterritorial application of other federal securities laws," including section 10(b)).

15

the defendants here, are not themselves creditors of the customer-property estate. See In re Bernard L. Madoff Inv. Sec. LLC, 708 F.3d 422, 427 (2d Cir. 2013) (adopting this position). Therefore, the Trustee's claim that the defendants here are being treated somehow more favorably than customer-beneficiaries of the SIPA estate — who are not similarly situated to these non-beneficiaries — is disingenuous, especially since the defendants here stand to benefit little, if at all, from the customer-property estate through their now-defunct feeder funds. In sum, the Court concludes that the presumption against extraterritorial application of federal statutes has not been rebutted here; the Trustee therefore may not use section 550(a) to pursue recovery of purely foreign subsequent transfers.

While the foregoing is dispositive, the Court further concludes, in the alternative, that even if the presumption against extraterritoriality were rebutted, the Trustee's use of section 550(a) to reach these foreign transfers would be precluded by concerns of international comity. Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Maxwell II, 93 F.3d at 1046 (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)); see also id. at 1047 (noting that "international comity is a separate notion from the 'presumption

16

against extraterritoriality,' and may "preclude the application" of an otherwise extraterritorial statute). Courts conducting a comity analysis must engage in a choice-of-law analysis to determine whether the application of U.S. law would be reasonable under the circumstances, comparing the interests of the United States and the relevant foreign state. See id. at 1047-48.

The Second Circuit has previously stated that "[c]omity is especially important in the context of the Bankruptcy Code." Id. at 1048. The facts underlying the instant proceeding illustrate why this is so. As is the case with Fairfield Sentry and Harley, many of the feeder funds are currently involved in their own liquidation proceedings in their home countries. These foreign jurisdictions have their own rules concerning on what bases the recipient of a transfer from a debtor should be required to disgorge it. See, e.g., In re Fairfield Sentry Ltd. Litig., 458 B.R. 665, 672 (S.D.N.Y. 2011) (noting that the foreign representative of Fairfield Sentry's estate had filed against its investors "statutory claims under BVI law for 'unfair preferences' and 'undervalue transactions'"). Indeed, the BVI courts have already determined that Fairfield Sentry could not reclaim transfers made to its customers under certain common-law theories — a determination in conflict with what the Trustee seeks to accomplish here. See Decl. of Marco E. Schnabl dated July 13, 2012, Ex. C., No. 12 Misc. 115, ECF No. 236 (S.D.N.Y. filed July 13, 2012).

17

The Trustee is seeking to use SIPA to reach around such foreign liquidations in order to make claims to assets on behalf of the SIPA customer-property estate — a specialized estate created solely by a U.S. statute, with which the defendants here have no direct relationship. Without any agreement to the contrary (which the Trustee does not suggest exists), investors in these foreign funds had no reason to expect that U.S. law would apply to their relationships with the feeder funds. Cf. Maxwell II, 93 F.3d at 1051 (finding that, for purposes of the comity analysis, "England has a much closer connection to these disputes than does the United States" where the transfer occurred in England and "English law applied to the resolution of disputes arising under" the credit agreements under which the relevant transfers were made). Given the indirect relationship between Madoff Securities and the transfers at issue here, these foreign jurisdictions have a greater interest in applying their own laws than does the United States. Accordingly, as the Second Circuit found in Maxwell II, "the interests of the affected forums and the mutual interest of all nations in smoothly functioning international law counsel against the application of United States law in the present case." Id. at 1053.

In sum, the Court finds that section 550(a) does not apply extraterritorially to allow for the recovery of subsequent transfers received abroad by a foreign transferee from a foreign transferor. Therefore, the Trustee's recovery claims are dismissed to the extent

18

that they seek to recover purely foreign transfers.[4] Except to the extent provided in other orders, the Court directs that the following adversary proceedings be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order: (1) those cases listed in Exhibit A of item number 167 on the docket of 12-mc-115; and (2) those cases listed in the schedule attached to item number 468 on the docket of 12-mc-115 that were designated as having been added to the "extraterritoriality" consolidated briefing.

SO ORDERED.

Dated: New York, NY
July 6, 2014

JED S. RAKOFF, U.S.D.J.

---

[4] The Trustee argues that dismissal at this stage is inappropriate because additional fact-gathering is necessary to determine where the transfers took place. However, it is the Trustee's obligation to allege "facts giving rise to the plausible inference that" the transfer occurred "within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 69 (2d Cir. 2012). Here, to the extent that the Trustee's complaints allege that both the transferor and the transferee reside outside of the United States, there is no plausible inference that the transfer occurred domestically. Therefore, unless the Trustee can put forth specific facts suggesting a domestic transfer, his recovery actions seeking foreign transfers should be dismissed.

19