# EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | 12-mc-00115 (JSR) |
| v. | ECF Case |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | Electronically Filed |
| Defendant. | |
| In re: | |
| MADOFF SECURITIES | |

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF**
**EXTRATERRITORIAL DEFENDANTS' MOTION TO DISMISS, AS ORDERED BY**
**THE COURT ON JUNE 6, 2012**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 3

ARGUMENT ....................................................................................... 3

I. THE *MORRISON* DECISION ............................................................. 3

II. THE CODE PROVISIONS AUTHORIZING AVOIDANCE AND RECOVERY OF PRE-PETITION TRANSFERS HAVE NO EXTRATERRITORIAL REACH ............... 6

    A.    These Provisions Contain No Clear Indication Of Extraterritorial Reach, And Therefore They Have None .................................................... 6

    B.    The Geographic Focus Of These Provisions Confirms That They Were Not Intended To Apply Extraterritorially .......................................... 9

    C.    The Trustee's Possible Reliance On Section 541 Is Likewise To No Avail ......... 13

III. THE RELEVANT PROVISIONS OF SIPA HAVE NO EXTRATERRITORIAL APPLICATION ................................................................................ 16

    A.    Under *Morrison*, Section 78fff-2(c)(3) Has No Extraterritorial Reach: On That Ground Alone, The Trustee's Claims Against The Extraterritorial Defendants Fail ...................................................................... 16

        1.    The Plain Text Of Section 78fff-2(c)(3) Confirms That It Has No Extraterritorial Scope ................................................. 16

        2.    The Focus Of SIPA Confirms That It Was Not Intended To Apply Extraterritorially .......................................................... 19

        3.    The Domestic Activity Allegedly At Issue Here Is Insufficient To Overcome *Morrison's* Presumption Against Extraterritoriality In The SIPA Context ........................................................ 22

    B.    The Presumption Against Extraterritoriality Is Not Otherwise Negated By Any Other SIPA Provision ......................................................... 24

CONCLUSION .................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Banco Santander Securities-Optimal Litigation*, 732 F. Supp. 2d 1305 (S.D.
    Fla. 2010), *aff'd sub nom. Inversiones Mar Octava Limitada v. Banco
    Santander S.A.*, 439 F. App'x 840 (11th Cir 2011) ..........................................4, 23

*Banque Worms v. BankAmerica International*, 77 N.Y.2d 362 (1991) .......................10

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .................................................12

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975), *abrogated by
    Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010) ............................4

*Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th
    Cir. 1988) .............................................................................................10

*Cedeño v. Intech Group, Inc.*, 733 F. Supp. 2d 471 (S.D.N.Y. 2010), *aff'd sub
    nom. Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012) ..............................5, 23

*Commissioner of Internal Revenue v. Asphalt Products Co.*, 482 U.S. 117 (1987) ..............12

*EEOC v Arabian American Oil Co.*, 499 U.S. 244 (1991) .............................................20

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ......................10, 12

*In re Fairfield Sentry Ltd. Litigation*, 458 B.R. 665 (S.D.N.Y. 2011) .........................11

*FDIC v. Hirsch* (In re Colonial Realty Co.), 980 F.2d 125 (2d Cir. 1992) ............8, 14, 17, 25

*First Merchant Bank OSH, Ltd. v. Villiage Roadshow Pictures (U.S.A.) Inc.*, No.
    01 CIV. 8370(GEL), 2002 WL 1423063 (S.D.N.Y. June 28, 2002) ...........................23, 24

*French v. Liebmann* (In re French), 440 F.3d 145 (4th Cir. 2006) ..................................8

*Gelzer v. Fur Warehouse, Ltd.* (In re Furs by Albert & Marc Kaufman, Inc.),
    Bankr. No. 03-41301 (SMB), 2006 WL 3735621 (Bankr. S.D.N.Y. Dec. 1,
    2006) ....................................................................................................6

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ..........................................................21

*Hill v. Spencer Savings & Loan Association* (In re Bevill, Bresler & Schulman,
    Inc.), 83 B.R. 880 (D.N.J. 1988) .................................................................18

*Hilton v. Guyot*, 159 U.S. 113 (1895) ....................................................................10

*Johnson Electric North America, Inc. v. Bank of Wales, PLC*, No. 90 Civ. 6683,
    1991 WL 20006 (S.D.N.Y. Feb. 8, 1991) ........................................................24

*Lamie v. United States Trustee*, 540 U.S. 526 (2004)................................................................12

*Maxwell Communication Corp. v. Barclays Bank plc* (In re Maxwell
    Communication Corp.), 170 B.R. 800 (Bankr. S.D.N.Y. 1994), *aff'd*, 186
    B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir. 1996)....................................7, 8, 9

*Maxwell Communication Corp. v. Sociéte Generale* (In re Maxwell
    Communication Corp.), 93 F.3d 1036 (2d Cir. 1996) ....................................................8, 12

*Maxwell Communication Corp. v. Société Generale PLC* (In re Maxwell
    Communication Corp.), 186 B.R. 807 (S.D.N.Y. 1995), *aff'd on other
    grounds*, 93 F.3d 1036 (2d Cir. 1996) ................................................................2, 8, 10, 15

*Midland Euro Exchange Inc. v. Swiss Financial Corp.* (In re Midland Euro
    Exchange Inc.), 347 B.R. 708 (Bankr. C.D. Cal. 2006) .................................................8, 13

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)..................................... *passim*

*NewMarket Corp. v. Innospec Inc.*, No. 3:10CV503-HEH, 2011 U.S. Dist. LEXIS
    54901 (E.D. Va. May 20, 2011).....................................................................................5

*Norex Petroleum Ltd. v. Access Industries, Inc.*, 631 F.3d 29 (2d Cir. 2010), *cert.
    dismissed*, 80 U.S.L.W. 3016 (U.S. June 29, 2011) (No. 10-1310)...............................4, 5

*Northrop Grumman Overseas Service Corp. v. Banco Wiese Sudameries*, No. 03
    Civ. 1681(LAP), 2004 WL 2199547 (S.D.N.Y. Sept. 29, 2004).....................................23

*Official Committee of Unsecured Creditors v. JP Morgan Chase Bank* (In re M.
    Fabrikant & Sons, Inc.), 394 B.R. 721 (Bankr. S.D.N.Y 2008) .........................................6

*In re Optimal U.S. Litigation*, No. 10 Civ. 4095 (SAS), 2012 U.S. Dist. LEXIS
    77311 (S.D.N.Y. June 4, 2012)...................................................................................4, 21

*Picard v. HSBC Bank Plc*, 450 B.R. 406 (S.D.N.Y. 2011) ............................................19

*Picard v. Merkin* (In re Bernard L. Madoff Investment Securities LLC), 440 B.R.
    243 (Bankr. S.D.N.Y. 2010) ...................................................................................17, 18

*Savage & Associates, P.C. v. Mandl* (In re Teligent, Inc.), 325 B.R. 134 (Bankr.
    S.D.N.Y. 2005) .........................................................................................................14

*SEC v. Berger*, 322 F.3d 187 (2d Cir. 2003), *abrogated by Morrison v. National
    Australia Bank*, 130 S. Ct. 2869 (2010)..........................................................................4

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities*
    (In re Madoff Securities), No. 12-mc-00115 (JSR), 2012 U.S. Dist. LEXIS
    78804 (S.D.N.Y. May 15, 2012).................................................................................1, 14

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC* (In re Madoff Securities), No. 12-mc-00115 (S.D.N.Y. June 7, 2012) ......................1

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC* (In re Madoff Sec.), No. 12-mc-00115 (S.D.N.Y. June 26, 2012) ............................1

*Securities Investor Protection Corp. v. Bernard L. Madoff Investor Securities LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011), *aff'd sub nom. Aozora Bank Ltd. v. Securities Investor Protection Corp.* (In re Aozora Bank Ltd.), No. 11 Civ. 5683(DLC), 2012 WL 28468 (S.D.N.Y. Jan. 4, 2012)......................................22

*Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999) .........................................................................25

*Smith v. United States*, 507 U.S. 197 (1993) .................................................................4

*Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119 (2005)......................................19

*Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720 (S.D.N.Y. 2010) ...............................24

*In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011) .................................5

*Trefny v. Bear Stearns Securities Corp.*, 243 B.R. 300 (S.D. Tex. 1999) ....................18

*United States v. Davidson*, 175 F. App'x 399 (2d Cir. 2006) .......................................23

*United States Lines, Inc. v. GAC Marine Fuels Ltd.* (In re McLean Industries, Inc.), 68 B.R. 690 (Bankr. S.D.N.Y. 1986) .......................................................14

*Weinman v. Simons* (In re Slack-Horner Foundries Co.), 971 F.2d 577 (10th Cir. 1992) ...........................................................................................................3, 6

**Statutes**

11 U.S.C. §§ 101-1532 .......................................................................................1

11 U.S.C. § 1501(a) ..........................................................................................9

11 U.S.C. § 546(e)-(g) ....................................................................................10

11 U.S.C. § 550(a) ............................................................................................6

11 U.S.C. § 550(b)(2) ......................................................................................3

14 U.S.C. § 89(a) ............................................................................................20

15 U.S.C. § 78aaa to 78*lll* ...............................................................................1

15 U.S.C. § 78bbb ..........................................................................................19

15 U.S.C. § 78ccc(a)(2)(A)(i) ...................................................................................22

15 U.S.C. § 78ddd(i) ...............................................................................................22

15 U.S.C. § 78eee(b)(2)(A)(i) .................................................................................25

15 U.S.C. § 78dd ....................................................................................................13

15 U.S.C. § 78dd(b) ...............................................................................................13

15 U.S.C. § 78ddd(g) ..............................................................................................22

15 U.S.C. § 78fff-2(c)(1) ...........................................................................................2

15 U.S.C. § 78fff-2(c)(3) ...............................................................................2, 16,17

15 U.S.C. § 78lll(2)(C)(i) ........................................................................................22

15 U.S.C. § 78j(b) .....................................................................................................2

18 U.S.C. § 7 ..........................................................................................................20

19 U.S.C. § 1701 ....................................................................................................20

28 U.S.C. § 1334 ....................................................................................................24

50 App. U.S.C. § 2415(2) .......................................................................................20

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
        203, 124 Stat. 1376 (2010) ..........................................................................20

**Other Authorities**

156 Cong. Rec. H5,237 (daily ed. June 30, 2010) ................................................20

H.R. Rep. No. 75-1409, pt. 2 (1937) ......................................................................17

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .....................6

Hr'g Tr. p. 4:18-21, July 28, 2011, *Picard v. Greiff*, 11 Civ. 3775, Kevin Bell,
        Senior Associate General Counsel for Dispute Resolution, Securities
        Investor Protection Corporation .................................................................21

John A. Gilchrist, *Stockbrokers' Bankruptcies: Problems Created by the Chandler
        Act*, 24 Minn. L. Rev. 52 (1939-1940) .......................................................17

Memorandum of Law of the Securities Investor Protection Corporation
        Addressing Issues Raised in the Court's Order Entered April 13, 2012, 12-
        mc-00115 (JSR) (S.D.N.Y. May 25, 2012) ................................................17

S. Rep. No. 95-763 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764 ................................................26

Trustee's Memorandum of Law in Opposition to Consolidated Brief on Behalf of
Stern Withdrawal Defendants, 12-mc-00115 (JSR) (S.D.N.Y. May 25,
2012) ......................................................................................................................17

Trustee's Memorandum of Law in Opposition to Defendant's Motion to Withdraw
the Reference, *Picard v. Banco Bilbao Vizcaya Argentaria, S.A.*, 11 Civ.
07100 (JSR) (S.D.N.Y. Jan. 31, 2012) ..............................................................20

Trustee's Memorandum of Law in Opposition to Defendants' Motions to
Withdraw the Reference, *Picard v. Oreades Sicav*, 11 Civ. 07763 (JSR)
(S.D.N.Y. Feb. 21, 2012) ....................................................................................20

Trustee's Memorandum of Law in Opposition to Primeo Fund's Motion to
Withdraw the Reference, *Picard v. HSBC*, 11 Civ. 06524 (JSR) (S.D.N.Y.
Dec. 7, 2011) ......................................................................................................20

The "Extraterritorial Defendants" encompassed by the Extraterritoriality Order[1]

respectfully submit this memorandum of law in support of their consolidated motion to dismiss

the Complaints filed against them by Irving H. Picard, the trustee (the "Trustee") appointed

under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), for the

liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"),

substantively consolidated with the estate of Bernard L. Madoff.

## PRELIMINARY STATEMENT

In withdrawing the issue here, this Court noted that it was required to analyze title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Code") and SIPA to determine whether

the Code's relevant avoidance and recovery provisions incorporated by SIPA, or SIPA itself, in

fact reach transfers that took place abroad. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff*

*Inv. Sec. LLC* (In re Madoff Sec.), No. 12-mc-00115 (JSR), 2012 U.S. Dist. LEXIS 78804, at

*27-28 (S.D.N.Y. May 15, 2012). We show here that they do not. Neither the SIPA provision

nor the Code provisions on which the Trustee relies reach extraterritorially to allow him to avoid

transfers received abroad or to recover from initial, immediate or mediate foreign transferees the

transfers that are at issue in these litigations.

---

[1]  This submission is made on behalf of all defendants whose motions to withdraw the
reference and joinders were granted by (i) the Extraterritoriality Order dated June 6, 2012, or
(ii) the Consent Order dated June 26, 2012. *See* Order, *Sec. Investor Prot. Corp. v. Bernard
L. Madoff Inv. Sec. LLC* (In re Madoff Sec.), No. 12-mc-00115, Order (S.D.N.Y. June 7,
2012), ECF No. 167, at 8-22 (the "Extraterritoriality Order") annexed as Exhibit A to the July
13, 2012 Declaration of Marco E. Schnabl, submitted herewith, exhibits to which are cited as
"Ex. __."; Consent Order, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re
Madoff Sec.), No. 12-mc-00115 (S.D.N.Y. June 26, 2012), ECF No. 203, at 7-9 (Ex. B). As
provided in paragraph 13 of the Extraterritoriality Order, nothing herein or in these
proceedings waives or resolves any issue raised or that could be raised by any party save for
the question of the extraterritorial reach of the relevant provisions of the Bankruptcy Code
and/or SIPA, all such other issues having been reserved. Extraterritoriality Order at 5-6.

The Trustee relies on SIPA section 78fff-2(c)(3) which grants him the power to pursue what would have been "customer property" while in the hands of BLMIS so that, if recovered, it can be distributed as "customer property" under SIPA's priority scheme set out in section 78fff-2(c)(1).  Indeed, the Trustee concedes that but for section 78fff-2(c)(3) he would have no power to seek such customer property from the Extraterritorial Defendants.  Nothing in that section, however, even suggests that it is intended to apply extraterritorially and, under the most elemental application of *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), it does not.  Like section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), at issue in *Morrison*, section 78fff-2(c)(3) of SIPA offers nothing in its plain meaning, context or otherwise that suggests it has extraterritorial scope.  (*See* Point III.)  The Trustee's claims fail on that ground alone.

The Trustee's claims fail for the separate and independent reason that the isolated provisions in the Code on which he relies (ostensibly to effect the recoveries he believes may be within the reach of section 78fff-2(c)(3)) do not have extraterritorial reach either.  In fact, this Court (Scheindlin, J.) has already concluded that one of the Code provisions on which the Trustee relies has no extraterritorial reach.  *See Maxwell Commc'n Corp. v. Sociéte Generale PLC* (In re Maxwell Commc'n Corp.), 186 B.R. 807 (S.D.N.Y. 1995), *aff'd on other grounds*, 93 F.3d 1036 (2d Cir. 1996).  In the wake of *Morrison* (which we discuss in Point I), the same conclusion applies to all the Code's avoidance and recovery provisions on which the Trustee relies, including section 547 ("preferences"), section 548 ("fraudulent transfers"), and section 550(a) ("liability of transferee of avoided transfers").  These too have no extraterritorial reach, which dooms the Trustee's claims independently of the absence of extraterritorial scope in SIPA section 78fff-2(c)(3).  (*See* Point II.)

2

## BACKGROUND

The Extraterritorial Defendants are foreign persons and entities, virtually all of whom (or which) are alleged to be immediate or mediate transferees of alleged initial transferees of what was customer property in the hands of BLMIS. The Extraterritorial Defendants are mostly non-U.S. "subsequent transferees" that either invested in (or served as conduits for investments in) foreign investment vehicles, such as investment funds, which in turn invested (directly or indirectly) with BLMIS, or provided services to such vehicles in exchange for fees. In this regard, the sole arguable nexus to the U.S. alleged in conclusory fashion in the vast bulk of cases is that some initial transfers must have originated from BLMIS in New York,[2] and that certain Extraterritorial Defendants paid or received dollar-denominated funds through wire transfers that passed through correspondent bank accounts in New York. Certain Extraterritorial Defendants are also said to be defendants in Madoff-related litigations in multiple *foreign* jurisdictions.

## ARGUMENT

## I.
## THE *MORRISON* DECISION

*Morrison* held, indeed confirmed, that the long-established presumption against extraterritorial application of a statute can only be overcome by a "clear indication of an extraterritorial application." 130 S. Ct. at 2878. *See also Norex Petroleum Ltd. v. Access Indus.,*

---

[2]    The complaints fall far short of adequately pleading facts that would support a connection (i.e. "tracing") between any initial transfers from BLMIS and the subsequent transfers occurring abroad between and among foreign subsequent transferees that are at issue here. Moreover, to the extent that entirely foreign subsequent transfers were followed by further domestic transfers, those later domestic subsequent transfers are subject to additional defenses, including a shelter defense. *See* 11 U.S.C. § 550(b)(2); *Weinman v. Simons* (In re Slack-Horner Foundries Co.), 971 F.2d 577 (10th Cir. 1992). In any event, we regard the tracing, the shelter defense and similar issues as beyond this application and they are, therefore, fully reserved for later consideration.

*Inc.*, 631 F.3d 29, 32 (2d Cir. 2010) (rejecting RICO's extraterritorial application, and noting that *Morrison* "wholeheartedly embraces application of the presumption against extraterritoriality"), *cert. dismissed*, 80 U.S.L.W. 3016 (U.S. June 29, 2011) (No. 10-1310).  "'[U]nless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, '[a court] must presume it is primarily concerned with domestic conditions.'"  *Morrison*, 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).[3]

In refusing to give section 10(b) of the Exchange Act extraterritorial application, *see Morrison*, 130 S. Ct. at 2881-83, the Supreme Court expressly disavowed decades of judicially engrafted tests of extraterritoriality ("conduct" or "effects"), *see SEC v. Berger*, 322 F.3d 187, 192-93 (2d Cir. 2003), *abrogated by Morrison v. Nat'l Australia Bank*, 130 S. Ct. 2869 (2010), that were based, not on legislative history or statutory text, but on the judiciary's "best judgment as to what Congress would have wished if these problems had occurred to it."  *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir. 1975), *abrogated by Morrison v. Nat'l Australia Bank*, 130 S. Ct. 2869 (2010); *see also id.*  ("We freely acknowledge that if we were asked to point to language in the statutes, or even in the legislative history, that compelled these conclusions, we would be unable to respond.").[4]

---

[3]   This follows from the "'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'"  *Morrison*, 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  This "presumption is rooted in a number of considerations, not the least of which is the commonsense notion that Congress generally legislates with domestic concerns in mind."  *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993).

[4]   Thus, in the wake of *Morrison*, courts have uniformly concluded that federal securities law claims in Madoff-related actions cannot be asserted extraterritorially.  *See In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), 2012 U.S. Dist. LEXIS 77311 (S.D.N.Y. June 4, 2012); *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d 1305 (S.D. Fla. 2010), *aff'd sub nom. Inversiones Mar Octava Limitada v. Banco Santander S.A.*, 439 F. App'x 840 (11th Cir 2011); *In re Merkin*, 817 F. Supp. 2d 346 (S.D.N.Y. 2011).

The Supreme Court in fact disavowed any mode of statutory interpretation that did not focus on plain statutory language, on which courts must rely first, *Morrison*, 130 S. Ct. at 2877-78, and then, if appropriate, on whether the statute even focuses on foreign transactions. *Id.* at 2884. "'[U]nless there is the *affirmative* intention of the Congress *clearly expressed* ' to give a statute extraterritorial effect, '[courts] must presume it is primarily concerned with domestic conditions.'" *Id.* at 2877 (emphasis added; citation omitted); *see also id.* at 2878 ("When a statute gives no *clear* indication of an extraterritorial application, *it has none.*" (emphases added)). The Supreme Court held that "the presumption [against extraterritorial application] applies in *all cases*, preserving a stable background against which Congress can legislate." *Id.* at 2873 (emphasis added). *See Norex Petroleum*, 631 F.3d at 32 (holding that RICO has no extraterritorial effect as it is silent as to its extraterritorial reach); *see also Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473-74 (S.D.N.Y. 2010) (same), *aff'd sub nom. Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 915, 923 (C.D. Cal. 2011) (no extraterritorial reach for RICO and Magnuson-Moss Act; and questioning the extraterritorial application of certain California consumer protection statutes); *NewMarket Corp. v. Innospec Inc.*, No. 3:10CV503-HEH, 2011 U.S. Dist. LEXIS 54901 (E.D. Va. May 20, 2011) (foreign bribes and kickbacks not reached by Robinson-Patman Act under *Morrison*). Those provisions of the Code and SIPA on which the Trustee relies are equally constrained to the domestic sphere.

## II.

## THE CODE PROVISIONS AUTHORIZING AVOIDANCE AND RECOVERY OF PRE-PETITION TRANSFERS HAVE NO EXTRATERRITORIAL REACH

**A.    These Provisions Contain No Clear Indication Of Extraterritorial Reach, And Therefore They Have None**

Code sections 547 and 548 are "avoidance" provisions, whereas section 550 is a

"recovery" provision.[5]  It is hornbook law that only *after* a transfer has been "avoided," pursuant

to the relevant avoidance provision, is the Trustee then empowered (subject to appropriate

limitations) to seek recovery from the "initial" transferee under section 550(a)(1) or from a

"subsequent" transferee under section 550(a)(2).[6]  That is, "avoidance" does not in and of itself

result in "recovery," which only *follows* avoidance, subject to the separate limitations in section

550.  *See, e.g., Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank* (In re M.

Fabrikant & Sons, Inc.), 394 B.R. 721, 741 (Bankr. S.D.N.Y. 2008) ("The Bankruptcy Code

separates the concepts of avoidance and recovery."); *see also* H.R. Rep. No. 95-595, at 375

(1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6331 ("Section 550 prescribes the liability of a

transferee of an avoided transfer, and enunciates the separation between the concepts of avoiding

---

[5]    The Trustee also brings state law avoidance claims under section 544 of the Code.  All arguments made here in connection with the reach of sections 547, 548 and 550 apply equally to section 544.

[6]    Indeed, recovery from subsequent transferees is conditioned on the alleged initial transfers having been avoided first, else subsequent transfers are not recoverable, irrespective of whether SIPA or the Code reach extraterritorially.  *See* 11 U.S.C. § 550(a) (permitting recovery only "to the extent that a transfer is avoided"); *see also Weinman v. Simons* (In re Slack-Horner Foundries Co.), 971 F.2d 577, 580 (10th Cir. 1992); *Gelzer v. Fur Warehouse, Ltd.* (In re Furs by Albert & Marc Kaufman, Inc.), Bankr. No. 03-41301 (SMB), 2006 WL 3735621, at *8 (Bankr. S.D.N.Y. Dec. 1, 2006).  Thus, subsequent transfers alleged to have originated with initial transfers from, for example, BLMIS to Fairfield Sentry Limited ("Sentry"), are not recoverable because the Trustee settled with Sentry, rather than "avoided" the alleged initial transfers to Sentry under SIPA, the Code, or NYDCL, and the period for avoidance under section 546(a) has now expired.  *See Picard v. Caceis Bank Luxembourg*, No. 12-cv-00234, (S.D.N.Y. April 2, 2012), ECF No. 2, Exhibit D.

a transfer and recovering from the transferee.").  Under *Morrison*, nothing in any of these

avoidance or recovery provisions permits the Trustee to avoid transfers that were received

abroad or later to recover those transfers from foreign transferees, much less avoid or recover

entirely foreign transfers received by foreigners from other foreign subsequent transferees.  As in

the case of the relevant sections of SIPA discussed below, nothing in the plain text of these

provisions even hints at an extraterritorial reach, when it would have been elemental for

Congress expressly to specify such scope.  The Court in *Morrison* contrasted the many instances

in which Congress expressly legislated the extraterritorial application of a statute with the failure

to do so in section 10(b) of the Exchange Act, a failure that is just as apparent in the context of

the avoidance and recovery sections arguably at issue here.

It is therefore not surprising that, more than a decade before *Morrison*, in *Maxwell

Communication Corp. v. Barclays Bank plc* (In re Maxwell Communication Corp.), 170 B.R.

800 (Bankr. S.D.N.Y. 1994), *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir.

1996), the Bankruptcy Court held that transfers made in the United Kingdom could *not* be

recovered under the Code, despite their having involved proceeds of asset sales in the United

States.  The Court noted:

> There is nothing in either the language or legislative history of section 547 which
> demonstrates a clearly expressed congressional intent that this particular Code
> provision apply extraterritorially. The fact that the term "transfer," as used in
> section 547, has been interpreted quite broadly does not change this conclusion.
> The definition of transfer found in section 101(54) of the Code is undeniably
> broad but makes no reference whatsoever to the place where the transfer occurred
> or the place where the property is now found.

170 B.R. at 811.  The Court reasoned, under canons of statutory interpretation that of course long

preceded *Morrison*, that "where a foreign debtor makes a preferential transfer to a foreign

transferee and the center of gravity of that transfer is overseas, the presumption against

extraterritoriality prevents utilization of section 547 to avoid the transfer."  *Id*. at 814.

7

On appeal, this Court (Scheindlin, J.) agreed, holding that neither the text of the relevant provisions, nor the structure or purpose of the Code reflected any intent that they be applied extraterritorially.  *In re Maxwell Commc'n Corp.*, 186 B.R. at 819-21.  The Court concluded, in words that presage *Morrison*, "[b]ecause Congress has not 'clearly expressed' its desire that section 547 govern extraterritorial conduct, that section cannot apply to the foreign transfers."  *Id.* at 820-21 (citation omitted).  On further appeal, the Second Circuit, at the time bound by latitudinarian precedents on how to determine extraterritoriality later overruled in *Morrison*, declined to decide whether section 547 had extraterritorial effect, but affirmed on the ground that section 547 should not be applied on international comity grounds.  *See Maxwell Commc'n Corp. v. Societe Generale* (In re Maxwell Commc'n Corp.), 93 F.3d 1036, 1055 (2d Cir. 1996); *see also Midland Euro Exch. Inc. v. Swiss Fin. Corp.* (In re Midland Euro Exch. Inc.), 347 B.R. 708, 717-18 (Bankr. C.D. Cal. 2006) (holding that neither the plain language of section 548 nor other parts of the Code establish congressional intent to apply it extraterritorially).[7]  The conclusion reached by Judge Scheindlin is even "more correct" today in the wake of *Morrison* than it was seventeen years ago.

---

[7]  In *In re Midland Euro Exchange*, the court discussed and rejected a holding that arguably gave extraterritorial effect to section 548 in *French v. Liebmann* (In re French), 440 F.3d 145 (4th Cir. 2006).  The court noted that the decision in *In re French* was based on the view that property that was the subject of a voidable transfer is nonetheless property of the estate within the meaning of 11 U.S.C. § 541, and it rejected that holding because it accepted the view of the majority of the Courts of Appeals, including the Second Circuit, *see FDIC v. Hirsch* (In re Colonial Realty Co.), 980 F.2d 125, 131 (2d Cir. 1992), that such property does not become part of the estate until the transfer has been avoided and recovered.  *See In re Midland Euro Exch.*, 347 B.R. at 717-18  (*See* discussion below.)  In any event, *In re French* involved a transfer by a U.S. domiciliary to U.S. domiciliaries, *see* 440 F.3d at 148, and the decision provides no precedent for applying the avoidance provisions to foreign defendants.

8

**B.    The Geographic Focus Of These Provisions Confirms That They Were Not Intended To Apply Extraterritorially**

The comity concerns that led the Second Circuit to affirm in *Maxwell* anticipated

*Morrison* fourteen years later, in its recognition that, as a principle of *statutory interpretation*,

limiting U.S. legislation to the domestic sphere is particularly appropriate where the possibility

of incompatibility between domestic and foreign legislation is apparent yet Congress has

remained silent on how to address such obvious conflicts.  *Morrison* said,

> [W]e reject the notion that the Exchange Act reaches conduct in this country
> affecting exchanges or transactions abroad . . . .  The probability of
> incompatibility with the applicable laws of other countries is so obvious that if
> Congress intended such foreign application "it would have addressed the subject
> of conflicts with foreign laws and procedures."

*Morrison*, 130 S. Ct. at 2885 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 256 (1991));

*see also id*. at 2883-84.  *Morrison* reminds us that the absence in the Code of any provisions to

account for the obvious conflicts here is, in and of itself, a statutory interpretation basis that

compels restricting to the domestic sphere the geographical reach of the Code and SIPA

provisions on which the Trustee relies in these proceedings.[8]

It is beyond dispute that Bernard Madoff's misdeeds have had effects on persons and

entities worldwide, many of which are businesses regulated by foreign laws and persons and

entities under the supervision of different courts and laws.  *See F. Hoffman-La Roche Ltd. v.*

---

[8]    Indeed, the Code increasingly displays express deference to the interests of competing
jurisdictions.  Section 304 in the Bankruptcy Code of 1978, dealing with proceedings
ancillary to foreign insolvency proceedings, was regarded as a major step toward
international cooperation.  *See In re Maxwell Commc'n Corp.*, 170 B.R. at 816.  In 2005,
Congress amended the Code by replacing section 304 with Chapter 15 and made clear that
"[t]he purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so
as to provide effective mechanisms for dealing with cases of cross-border insolvency with
the objectives of – (1) cooperation between [United States and foreign courts]; and (2)
greater legal certainty for trade and investment."  11 U.S.C. § 1501(a).

*Empagran S.A.*, 542 U.S. 155, 164-65 (2004) (statutes to be construed to avoid interference with foreign sovereigns, particularly in "today's highly interdependent commercial world"); *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). The principles on which avoidance is to be based, the terms on which recovery is to be allowed following avoidance, the extension of avoidance burdens to subsequent transferees, and the limitations and scope of recoveries embodied in Code provisions such as 547, 548 and 550, all reflect sensitive commercial policies, *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 896-97 (7th Cir. 1988), which each jurisdiction is entitled to accommodate as it sees fit.[9] Foreign jurisdictions are entitled to establish their own rules concerning when and on what basis the recipient of a transfer in those jurisdictions should be required to disgorge it. Likewise, foreign recipients of transfers made abroad should be able to rely on local law to determine the finality of transactions with other non-U.S. persons, without being required to risk that finality under standards foisted on them by U.S. law after the fact and that local markets could not plausibly regard as relevant. *See, e.g.*, *In re Maxwell Commc'n Corp.*, 186 B.R. at 820 (discussing differences in preference law between the U.S. and U.K.); *Morrison*, 130 S. Ct. at 2884-85 ("[W]e know of no one . . . who even believed that under established principles of international law Congress had the power to 'regulate' [foreign exchanges or transactions] . . . foreign countries regulate their domestic . . . transactions occurring within their territorial jurisdiction.").

---

[9]   Protection of transferees from the consequence of avoidance is even more vital in financial and other liquid markets, as Congress has recognized in the domestic sphere when enacting safe harbors for transfers relating to securities transactions, commodity and futures contracts, repurchase agreements and swaps. *See* 11 U.S.C. § 546(e)-(g); *see also Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 372 (1991) (the need for finality in the settlement of cash transfers is "a singularly important policy goal," and to permit the recovery of settled transactions "'would disorganize all business operations and entail an amount of risk and uncertainty which no enterprise could bear'" (quoting *Hatch v. Fourth Nat'l Bank*, 147 N.Y. 184, 192 (1895))).

These are not simply theoretical concerns. The alleged foreign transfers that the Trustee

seeks to recover include redemption payments from foreign funds to their own (non-U.S.)

redeeming shareholders, and service payments by foreign funds to foreign service-providers, all

subject to the laws and regulations of the British Virgin Islands (the "BVI"), the Cayman Islands,

Luxembourg, Switzerland and many other countries. (HSBC Compl. ¶¶ 57- 59, 64, 81-84.) For

example, three of these foreign funds, Fairfield Sentry Limited, Fairfield Sigma Limited and

Fairfield Lambda Limited (the "Fairfield Funds"), which are BVI funds, are now subject to

liquidation proceedings under court supervision in the BVI in the wake of their Madoff-related

reverses. The court-appointed liquidator in those proceedings (the "Liquidator") has filed claims

in the BVI and in New York, seeking to recover redemption payments made to the Fairfield

Funds' foreign shareholders under common law claims of "mistake" and also pursuant to BVI

insolvency statutes. *See In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 671-72 (S.D.N.Y. 2011).

Both the BVI trial court and its appellate court rejected the attempt to recover or rescind these

payments on common law grounds of "mistake," concluding that redeeming shareholders gave

good consideration when they surrendered their shares and that no grounds for rescission existed,

particularly because of the need for certainty in modern commercial transactions having "a

global dimension with far reaching consequences." Judgment, Eastern Caribbean Court of

Appeal, Territory of the Virgin Islands, *Quilvest Fin. Ltd. v. Fairfield Sentry Ltd. (In

Liquidation)*, HCVAP 2011/Q41 (entered June 13, 2012), a copy of which is submitted as Ex. C

(the "BVI Judgment").

Against this very real background, the conflict stemming from the Trustee's multiple

extraterritorial efforts to recover here from foreign investors in the Fairfield Funds the same

redemption payments that the Liquidator of the Fairfield Funds seeks to recover becomes

apparent. To permit the extraterritorial application of SIPA or the Code, so as to extract from

foreign investors in the Fairfield Funds amounts that are already being sought under BVI law

(and which the BVI courts have held that shareholders are entitled to keep, at least to the extent

they are not subject to recovery under mistake theories) is precisely the sort of interference that

comity is meant to avoid, *Empagran*, 542 U.S. at 164, and that *Morrison* commands courts to

take into account in limiting a statute to its proper geographical reach. *Morrison*, 130 S. Ct. at

2883-85; *see also In re Maxwell Commc'n Corp.*, 93 F.3d at 1048 (noting that "comity is

especially important in the context of bankruptcy law"). Transfers between foreigners abroad,

subject to foreign law, should not be subject to SIPA or the Code. That is consistent with the

"principle that statutes should be read in accord with the customary deference to the application

of foreign countries' laws within their own territories." *Empagran*, 542 U.S. at 176 (Scalia, J.,

concurring in the judgment).

      Furthermore, no argument that this would be "inequitable," which the Trustee may

deploy in response, trumps the plain meaning of the statute. Where words in a statute are clear,

"judicial inquiry is complete." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002).

Twenty-five years ago, the Supreme Court already noted that although "policy" arguments may

inform the reading of an *ambiguous* statute, they may not justify disregarding the language

expressly used by Congress. *See Comm'r of Internal Revenue v. Asphalt Prods. Co.*, 482 U.S.

117, 121 (1987). The Court in *Lamie v. United States Trustee*, 540 U.S. 526 (2004) noted,

> If Congress enacted into law something different from what it intended, then it
> should amend the statute to conform it to its intent. "It is beyond our province to
> rescue Congress from its drafting errors, and to provide for what we might
> think . . . is the preferred result." *United States v. Granderson*, 511 U.S. 39, 68
> (1994) (concurring opinion). This allows both of our branches to adhere to our
> respected, and respective, constitutional roles. In the meantime, we must
> determine intent from the statute before us.

*Id.* at 542. Speculation about what the Trustee or SIPC may think is the right "policy" did not

overcome the longstanding presumption against extraterritoriality twenty-five years ago when

*Lamie* was decided, much less today in the wake of *Morrison*. *See In re Midland Euro Exch.*,

347 B.R. at 720 (stating that "Congress is the ultimate arbiter of the laws it enacts and it has the

power to alter the language of the statute to clearly manifest its intent" and that "[t]his is

particularly so given that Congress recognizes the need to verbalize its intent in order to

overcome the presumption against extraterritoriality").

**C.     The Trustee's Possible Reliance On Section 541 Is Likewise To No Avail**

In holding that section 10(b) of the Exchange Act lacks extraterritorial effect, the

Supreme Court in *Morrison* pointedly contrasted section 10(b) with the text of section 30 of the

Exchange Act (Foreign Securities Exchanges), 15 U.S.C. § 78dd, observing:

> Subsection 30(a) contains what § 10(b) lacks: a clear statement of extraterritorial
> effect. Its explicit provision for a specific extraterritorial application would be
> quite superfluous if the rest of the Exchange Act already applied to transactions
> on foreign exchanges—and its limitation of that application to securities of
> domestic issuers would be inoperative.

*Morrison*, 130 S. Ct. at 2883-84. Moreover, although section 30(a) of the Exchange Act, 15

U.S.C. § 78dd(b), could be interpreted to apply abroad, "the presumption against

extraterritoriality operates to limit that provision *to its terms*." *Id.* at 2882-83 (emphasis added).

That is, the extraterritorial reach of section 30(a) did *not* extend to *other* sections of the

Exchange Act by virtue of the application of the presumption against extraterritoriality alone.

In that light, section 541, far from aiding the Trustee's claim of extraterritoriality, in fact

hinders it. Indeed, the limited (but express) reference to some form of "extraterritoriality" in *that*

section underscores the absence of any extraterritoriality suggestion elsewhere, and the inference

which *Morrison* sets out compels that none was intended in any other provisions, such as the

avoidance and recovery sections at issue here. That is, the conclusion that the avoidance and

13

Case 1:12-mc-05340-JSR   Document 125   Filed 07/13/12   Page 27 of 50

recovery provisions on which the Trustee relies here do *not* have extraterritorial application is
confirmed by juxtaposing them to section 541(a) of the Code, which provides that the
commencement of a case under certain provisions of the Code creates an "estate . . . comprised
of all the [listed] property . . . wherever located."[10]  Courts have interpreted the words "wherever
located" to encompass within the "estate" property located abroad.  *See United States Lines, Inc.
v. GAC Marine Fuels Ltd.* (In re McLean Indus., Inc.), 68 B.R. 690, 694 (Bankr. S.D.N.Y. 1986).
In contrast, no similar language, or language otherwise clearly expressing an intention to grant
them extraterritorial reach, appears in the Code's avoidance and recovery provisions on which the
Trustee relies in these proceedings.  Under *Morrison*, that alone sufficiently demonstrates
absence of extraterritorial scope for those avoidance and recovery provisions.  *Morrison*, 130 S.
Ct. at 2882-83.

  Apart from the foregoing, the property that the Trustee is seeking to recover is not *now*
part of the estate defined by section 541, and would not become part of the estate unless and until
the transfer had been successfully avoided and the property has been recovered, as noted above.
*See In re Colonial Realty*, 980 F.2d at 131; *Savage & Assocs., P.C. v. Mandl* (In re Teligent,
Inc.), 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005) (fraudulently transferred property "does not
become property of the estate until it has been recovered").[11]  As the *In re Maxwell
Communication Corp.* Court explained, section 541(a) "by its terms only applies to property

---

[10] The cognate notion giving courts at the commencement of a case jurisdiction over property
of the debtor "wherever located" can also be found in 28 U.S.C. § 1334(e)(1) and 15 U.S.C.
§ 78eee(b)(2)(A)(i).  Neither alters the result here; indeed, they confirm the absence of
extraterritorial reach of the relevant Code sections and of SIPA section 78fff-2(c)(3).

[11] The same is true for property subsequently transferred, as section 550(a) permits recovery of
a subsequent transfer only "'to the extent that a transfer is avoided under' . . . some . . .
avoidance statute."  *In re Madoff Sec.*, 2012 U.S. Dist. LEXIS 78804, at *24 n.2 (quoting 11
U.S.C. § 550(a)).

which is property of the estate.  Because preferential transfers do not become property of the

estate until recovered, . . . section 541 does not indicate the Congress intended [the avoidance

and recovery provisions] to govern extraterritorial transfers."  *In re Maxwell Commc'n Corp.*,

186 B.R. at 820.

   In other words, there is no disagreement that if an insolvent estate owned a building in,

for example, London the estate would include that building in London at the commencement of

the bankruptcy case pursuant to section 541.  That inclusion, however, has no real bearing on

(i) whether a trustee may reach out extraterritorially under, for example, section 548, to avoid a

prepetition transfer of property (property that is *not* part of the estate until after it has been

"recovered") that took place abroad between foreigners, much less on (ii) whether he can reach

out extraterritorially and "recover" under section 550 (having first "avoided" extraterritorially)

property in London or elsewhere abroad.  That the debtor's estate should include property located

beyond the U.S. border (i.e., "wherever located") says nothing about whether a trustee can reach

out abroad and seek, by the extraterritorial application of U.S. law, to avoid transfers of property

that is not part of the estate, let alone to recover the property from foreign recipients who

received transfers from other foreign transferees abroad, under the protection of legal regimes for

whom the U.S. laws governing avoidance and recovery actions are entirely alien.  That freight

cannot be carried by the two words "wherever located" in section 541.  To the extent these words

convey any notion of "extraterritoriality," they simply confirm that the estate at the

commencement of a case includes property located abroad, and, by the statutory contrast which

*Morrison* applied, in fact confirm the absence of extraterritorial reach in the *other* (recovery and avoidance) provisions on which the Trustee relies.[12]

### III.
### THE RELEVANT PROVISIONS OF SIPA HAVE NO EXTRATERRITORIAL APPLICATION

A.      **Under *Morrison*, Section 78fff-2(c)(3) Has No Extraterritorial Reach: On That Ground Alone, The Trustee's Claims Against The Extraterritorial Defendants Fail**

  1.      **The Plain Text Of Section 78fff-2(c)(3) Confirms That It Has No Extraterritorial Scope**

Section 78fff-2(c)(3) offers not a hint that it applies extraterritorially, much less the "clear indication" to that effect required under *Morrison* to overcome the presumption against extraterritoriality.  It therefore has no such foreign scope.  The absence of extraterritorial reach in that SIPA provision dooms all claims against the Extraterritorial Defendants, irrespective of the geographical scope of any Code section on which the Trustee may also rely to give effect to section 78fff-2(c)(3).  It states as follow:

> [T]he trustee may recover any property transferred by the debtor which, except
> for such transfer, would have been customer property if and to the extent that such
> transfer is voidable or void under the provisions of title 11.  Such recovered
> property shall be treated as customer property.  For purposes of such recovery, the
> property so transferred shall be deemed to have been the property of the debtor
> and, if such transfer was made to a customer or for his benefit, such customer
> shall be deemed to have been a creditor, the laws of any State to the contrary
> notwithstanding.[13]

15 U.S.C. § 78fff-2(c)(3).

---

[12]    We further note below (*see* Point III) that it is unnecessary to determine the geographic reach of the Code sections on which the Trustee may rely in light of the absence of extraterritorial reach in SIPA section 78fff-2(c)(3), without which the Trustee concededly lacks standing to assert *any* claims here.

[13]    Under the plain language of that provision, as in the case of section 550 of the Code, here too the property at issue becomes "customer property" only after it has been recovered.  *See In re Colonial Realty*, 980 F.2d at 131.  In any event, all section 78fff-2(c)(3) deals with is "customer property."

There is no debate that section 78fff-2(c)(3) governs – indeed, is indispensable to – the

recovery of customer property at issue here:  SIPA and the Trustee plainly concede the point.[14]

Judge Lifland came to the same conclusion.  *See Picard v. Merkin* (In re Bernard L. Madoff Inv.

Sec. LLC), 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010) (Lifland, J.)("*Merkin*").[15]  But section

78fff-2(c)(3) does not mention or suggest extraterritorial application.  Under *Morrison* this

compels only one conclusion: it has none.  Nothing in its legislative history is to the contrary, if

inspection of that history were still relevant in the face of the clear statutory interpretations

guidelines set out in *Morrison*.  *See* H.R. Rep. No. 75-1409, pt. 2, at 31 (1937).  *See also* John A.

Gilchrist, *Stockbrokers' Bankruptcies: Problems Created by the Chandler Act*, 24 Minn. L. Rev.

52 (1939-1940).  Accordingly, section 78fff-2(c)(3) does not reach abroad, or "abrogate"

---

[14]  *See* Trustee's Memorandum of Law in Opposition to Consolidated Brief on Behalf of Stern Withdrawal Defendants, 12-mc-00115 (JSR) (S.D.N.Y. May 25, 2012), ECF No. 141, at 30. ("But for the SIPA statute, 'there would be no legal basis for the [avoidance] actions' . . . . [S]ection 78fff-2(c)(3) 'allows the SIPA trustee to avoid . . . transfers in spite of the fact that a broker-dealer liquidation technically does not involve the debtor-creditor relationship.'" (alterations in original) (citations omitted)); Memorandum of Law of the Securities Investor Protection Corporation Addressing Issues Raised in the Court's Order Entered April 13, 2012, 12-mc-00115 (JSR) (S.D.N.Y. May 25, 2012), ECF No. 136, at 14-15 ("As has long been noted, the purpose of [section 78fff-2(c)(3)] is to ensure that a SIPA trustee can use the avoidance powers conferred by the Bankruptcy Code to recover customer property, even though, prior to the commencement of the liquidation, such property was not 'property of the debtor' and the debtor's brokerage customers were not its 'creditors' under state fraudulent transfer law.").

[15]  *Merkin* makes crystal-clear that without section 78fff-2(c)(3) no provision of the Code alone would vouchsafe the Trustee power to assert claims for the recovery of "customer property." In rejecting the Trustee's argument that under section 78fff-2(c)(3) he was seeking to recover property of the "debtor" (i.e., of BLMIS), the Court observed that "[i]n a SIPA proceeding . . . property held by a broker-debtor for the account of a customer is *not property of the broker-debtor*," and therefore absent section 78fff-2(c)(3) "a SIPA trustee would *lack standing to utilize the[] avoidance sections* [of the Code]." *Merkin*, 440 B.R. at 272 (emphasis added). The Court held, in short, that in a SIPA proceeding the Trustee may assert the claims at issue here – for recovery of customer property disposed of by the insolvent broker – *only* because section 78fff-2(c)(3) permits it.  *Id.* at 272-73.

*Morrison* in the SIPA context, or otherwise provides the Trustee with the power to recover abroad from the Extraterritorial Defendants.[16]

As noted, rather than demonstrating any extraterritorial reach, that provision has been read only to grant the Trustee standing to bring avoidance actions under the Code, despite the property at issue being "customer property" and not property in which the insolvent estate itself would otherwise have an interest. *See Picard*, 440 B.R. at 272; *see also Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 321 (S.D. Tex. 1999). In other words, section 78fff-2(c)(3) only allows the segregation of "customer property" to coexist with the Trustee's power to seek avoidance and recovery of transfers that the insolvent broker may have effected from what is otherwise regarded as property of customers. Read in this light, the reference to "the laws of any State" in the last sentence of section 78fff-2(c)(3) simply rejects the application of domestic state law to argue that, solely for purposes of the actions authorized by section 78fff-2(c)(3), the customer/defendant is *not* to be deemed a "creditor" thus barring recovery on that ground. There is *nothing* in that provision that explicitly or implicitly expands the geographic scope of section 78fff-2(c)(3) or of SIPA to reach the extraterritorial transfers at issue here with the transparency required to overcome the presumption that *Morrison* compels us otherwise to recognize in "all cases." In fact, the last sentence of section 78fff-2(c)(3) demonstrates Congressional intent to supersede domestic *state* laws; nothing, however, is said about foreign law, to which Congress could easily have expressly referred. *Morrison*, 130 S. Ct. at 2885. Accordingly, the Trustee

---

[16] *But see Hill v. Spencer Sav. & Loan Ass'n* (In re Bevill, Bresler & Schulman, Inc.), 83 B.R. 880 (D.N.J. 1988), the only Court to conclude, long before *Morrison*, that SIPA has extraterritorial effect on grounds that the "[e]xtraterritorial application of SIPA is also consistent with the extraterritorial application of other federal securities laws" – a rationale overruled by *Morrison*. *Id*. at 896.

lacks any basis to assert claims against the Extraterritorial Defendants simply because section

78fff-2(c)(3) has no extraterritorial reach.[17]

## 2. The Focus Of SIPA Confirms That It Was Not Intended To Apply Extraterritorially

In determining geographic scope, *Morrison* enjoins the Court to give consideration to the

scope of concerns addressed by the statute (i.e., "context") in addition to plain meaning. We

respectfully submit that the "context" separately confirms that, plain meaning aside, SIPA and in

particular section 78fff-2(c)(3) should not be given extraterritorial reach.

SIPA is an express amendment to the Exchange Act, and is in fact codified in title 15.

*See* 15 U.S.C. § 78bbb; *Picard v. HSBC Bank Plc*, 450 B.R. 406, 410 (S.D.N.Y. 2011). Like

section 10(b) of the Exchange Act at issue in *Morrison*, neither SIPA nor section 78fff-2(c)(3) in

particular provides affirmative indications of extraterritorial scope. Thus, the same conclusion

the Supreme Court reached in *Morrison* for another provision in the Exchange Act should apply

here too. *See Morrison*, 130 S. Ct. at 2878; *see also Spector v. Norwegian Cruise Line Ltd.*, 545

U.S. 119, 139 (2005) ("[T]he absence of a clear congressional statement is, in effect, equivalent

to a statutory qualification saying, for example, '[n]otwithstanding any general language of this

statute, this statute shall not apply extraterritorially . . . .'"). Tellingly, the Trustee has relied

exclusively on the Code in his attempt to invest SIPA with extraterritorial reach, not on SIPA's

own text.[18] This is surely a grudging concession under *Morrison* that SIPA and in particular

---

[17]  All comity concerns discussed in Point II in connection with the reach of the relevant provisions of the Code, apply equally to SIPA and to section 78fff-2(c)(3) in particular.

[18]  *See, e.g.*, Trustee's Memorandum of Law in Opposition to Primeo Fund's Motion to Withdraw the Reference, *Picard v. HSBC*, 11 Civ. 06524 (JSR) (S.D.N.Y. Dec. 7, 2011), ECF No. 18, at 16-17 (stating that SIPA incorporates certain Code provisions, "[a]nd those provisions, which include the power to avoid fraudulent transfers and preferences, may be applied both in the United States and beyond"); Trustee's Memorandum of Law in

*(cont'd)*

section 78fff-2(c)(3) lack extraterritorial scope, in the absence of which reliance on the supposed

extraterritoriality of any Code provision avails the Trustee nothing, as shown above.

This conclusion is underscored by Congress' unwillingness to vouchsafe SIPA the scope

that the Trustee asserts it has, despite the numerous occasions on which it "has *expressly*

legislated the extraterritorial application of a statute."[19]  *EEOC v. Arabian Am. Oil Co.*, 499 U.S.

244, 258 (1991) (emphasis added).  In fact, Congress responded to *Morrison* in fewer than three

weeks by adding section 929P(b) (unambiguously titled "Extraterritorial Jurisdiction of the

Antifraud Provisions of the Federal Securities Laws") to Title IX of the Dodd-Frank Act to

provide what Congress believed was an affirmative indication of extraterritoriality for certain

antifraud actions brought by the Securities and Exchange Commission ("SEC") and the

Department of Justice ("DOJ").  *See* Dodd-Frank Wall Street Reform and Consumer Protection

Act, Pub. L. No. 111-203, § 929P(b), 124 Stat. 1376, 1862 (2010).[20]

--------

*(cont'd from previous page)*
> Opposition to Defendant's Motion to Withdraw the Reference, *Picard v. Banco Bilbao
> Vizcaya Argentaria, S.A.*, 11 Civ. 07100 (JSR) (S.D.N.Y. Jan. 31, 2012), ECF No. 15, at 16-
> 18 (same); Trustee's Memorandum of Law in Opposition to Defendants' Motions to
> Withdraw the Reference, *Picard v. Oreades Sicav*, 11 Civ. 07763 (JSR) (S.D.N.Y. Feb. 21,
> 2012), ECF No. 17, at 19-21 (same).  (Copies of these Memoranda of Law are annexed
> hereto as Ex. D, Ex. E and Ex. F, respectively).

[19]  *See, e.g.*, the Export Administration Act of 1979, 50 App. U.S.C. § 2415(2) (defining "United
States person" to include "any domestic concern (including any permanent domestic
establishment of any foreign concern) and any foreign subsidiary or affiliate (including any
permanent foreign establishment) of any domestic concern which is controlled in fact by
such domestic concern"); Coast Guard Act, 14 U.S.C. § 89(a) (Coast Guard searches and
seizures upon the high seas); 18 U.S.C. § 7 (Criminal Code extends to high seas); 19 U.S.C.
§ 1701 (Customs enforcement on the high seas).

[20]  In direct response to *Morrison*, the amendment sought to "*clearly* indicat[e] that Congress
intends extraterritorial application in cases brought by the SEC or the Justice Department."
156 Cong. Rec. H5,237 (daily ed. June 30, 2010) (emphasis added).  Section 929(P)(b)
amends section 27 of the Exchange Act and speaks of reviving in its subsections (b)(1) and
(b)(2) the "conduct" and "effects" tests for cases brought by the SEC or the DOJ under the

*(cont'd)*

Thus, the Exchange Act, as amended in the wake of *Morrison*, now seeks *expressly* to overcome the presumption against extraterritorial reach in the antifraud provisions of the Exchange Act, but *only* to the extent *Morrison* would have barred foreign actions brought by the SEC and the DOJ. *See In re Optimal U.S. Litig.*, 2012 U.S. Dist. LEXIS 77311, at *13 n.28. That was the *sole* Congressional response to *Morrison*, a response which by its clear terms does not extend to any other provision of the securities laws, including SIPA.[21]  Had Congress wished this (or any other) amendment to extend to the entire Exchange Act (or to SIPA, or to section 78fff-2(c)(3) in particular), it could have said so.  It did not.  Instead, Congress specifically chose to amend *only* section 27 of the Exchange Act in response to *Morrison*.  That deliberate choice alone demonstrates that SIPA has no extraterritorial reach.  *See Morrison*, 130 S. Ct. at 2883 (concluding that section 30(a)'s "explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the Exchange Act [of which SIPA is a part] already applied to transactions on foreign exchanges"); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (explaining that a court should "avoid a reading which renders some words altogether redundant").

Likewise, SIPA's primarily domestic concerns, like those generally of the Exchange Act of which SIPA is a part, indicate an absence of extraterritorial reach.  *See Morrison*, 130 S. Ct. at 2878 (Exchange Act's focus is the purchase and sale of securities *in the United States*).  For

---

*(cont'd from previous page)*

antifraud provisions of the Exchange Act.  *See* Dodd–Frank Wall Street Reform and Consumer Protection Act, § 929P(b), 124 Stat. at 1862.

[21]  Congress did not likewise grant private actors like SIPC (or the trustees appointed by SIPC) extraterritorial powers.  *See* Hr'g Tr. p. 4:18-21, July 28, 2011, *Picard v. Greiff*, 11 Civ. 3775 ("I think we're constrained by the words of Congress in the statute, which are very plain, that we're a DC nonprofit corporation and not an agency or establishment of the United States government . . . ."), Kevin Bell, Senior Associate General Counsel for Dispute Resolution, Securities Investor Protection Corporation.

example, SIPA expressly excludes from SIPC membership brokers or dealers whose principal

business is conducted outside of the United States. *See* 15 U.S.C. § 78ccc(a)(2)(A)(i). SIPA

also excludes from the definition of "customer" a person whose claim arises out of transactions

with a foreign subsidiary of a member of SIPC. *See* 15 U.S.C. § 78*lll*(2)(C)(i). Indeed, the

Trustee has rejected any net equity claims made by those, primarily non-U.S. persons, who

invested in foreign funds that in turn invested with BLMIS, and thus were not regarded as

"customers" of BLMIS under SIPA. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.

LLC*, 454 B.R. 285, 307 (Bankr. S.D.N.Y. 2011) (affirming Trustee's determinations denying

claims of claimants without BLMIS accounts in their names, namely, investors in funds which in

turn invested with BLMIS), *aff'd sub nom. Aozora Bank Ltd. v. Sec. Investor Prot. Corp.* (In re

Aozora Bank Ltd.), No. 11 Civ. 5683 (DLC), 2012 WL 28468 (S.D.N.Y. Jan. 4, 2012). Further,

SIPA excludes, for purposes of calculating gross revenues of SIPC members, revenues of such

members' foreign subsidiaries. *See* 15 U.S.C. § 78ddd(i). Finally, SIPA permits the SEC to loan

money to SIPC *only* if "such loan is necessary for the protection of customers of brokers or

dealers and the maintenance of confidence in the *United States* securities markets." 15 U.S.C.

§ 78ddd(g) (emphasis added). Entirely aside then from plain text, all indicia of "concerns" or

"context," express or implied, by which the Supreme Court in *Morrison* concluded that the reach

of section 10(b) of the Exchange Act was only domestic compels the same conclusion here with

respect to SIPA and, in particular, section 78fff-2(c)(3).

### 3. The Domestic Activity Allegedly At Issue Here Is Insufficient To Overcome *Morrison'*s Presumption Against Extraterritoriality In The SIPA Context

That in some instances the Trustee alleges that certain Extraterritorial Defendants may

have wired dollar-denominated payments to an off-shore investment fund through correspondent

banks[22] in New York changes nothing. SIPA and section 78fff-2(c)(3) in particular still have no

extraterritorial reach, and the Trustee's allegations do nothing to expand the geographic reach of

those statutory provisions.

At least two courts, including this one, have followed *Morrison* and refused to apply U.S.

law to foreign transactions even where correspondent banks in the U.S. were involved in the

processing of dollar funds.[23] *See Cedeño*, 733 F. Supp. 2d at 472 (dismissing RICO claim even

though scheme allegedly "'utilized New York-based U.S. banks to hold, move and conceal the

fruits of fraud, extortion, and private abuse of public authority'"); *In re Banco Santander Sec.-*

*Optimal Litig.*, 732 F. Supp. 2d at 1317-19 (precluding application of U.S. securities laws in

Madoff-related fraud claims against foreign funds, despite custodian's use of a correspondent

bank to receive fees from the funds).

---

[22] Correspondent banks "'are used to facilitate international financial transactions and money transfers.'" *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*, No. 03 Civ. 1681(LAP), 2004 WL 2199547, at *8 (S.D.N.Y. Sept. 29, 2004) (quoting *Int'l Hous., Ltd. v. Rafidain Bank Iraq*, 712 F. Supp. 1112, 1118 (S.D.N.Y. 1989), *rev'd in part, dismissed in part*, 893 F.2d 8 (2d Cir. 1989)). Without them, it would often be impossible for banks to attend to the vital task of transferring money internationally by wire. *United States v. Davidson,* 175 F. App'x 399, 401 n.2 (2d Cir. 2006) (summary order). Because foreign banks typically cannot maintain branch offices in the United States, they maintain accounts in their own name at banks that are doing business in the United States to effect dollar transactions. *First Merch. Bank OSH, Ltd. v. Vill. Roadshow Pictures*, 01 Civ. 8370(GEL), 2002 WL 1423063, at *1 n.4 (S.D.N.Y. June 28, 2002). For such transactions, "neither the originator who initiates payment nor the beneficiary who receives it holds title to the funds at the correspondent bank." *Id.* (citation omitted).

[23] Furthermore, having a New York correspondent bank account is not even sufficient to subject a foreign bank, much less its foreign customer, to personal jurisdiction in New York under the "transaction of business" test. *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) (citing *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 762 (S.D.N.Y. 2004)); *Johnson Elec. N. Am., Inc. v. Bank of Wales, PLC*, No. 90 Civ. 6683, 1991 WL 20006, at *2 (S.D.N.Y. Feb. 8, 1991) ("[T]he mere existence of a correspondent bank relationship between a foreign bank and a New York correspondent bank is an insufficient basis for asserting personal jurisdiction over the foreign bank . . . under the less demanding 'transaction of business' test.").

Simply put, such "domestic" links are wholly insufficient to overcome the *Morrison* presumption, which can give way only where there is *express* and clear statutory evidence of extraterritorial reach, which both SIPA and the Code plainly lack. The connection to the United States provided by certain Extraterritorial Defendants' use of correspondent bank accounts is far less substantial than the domestic links roundly rejected by the Supreme Court in *Morrison* as a basis to apply U.S. law. There, the defendant's wholly owned subsidiary was headquartered in Florida, and the allegedly misleading statements were made within the domestic jurisdiction of the U.S. *See Morrison*, 130 S. Ct. at 2875-76. Yet *Morrison* reminds us that "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States . . . the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved." *Morrison*, 130 S. Ct. at 2884 (emphasis in the original). Simply put, relying on tangential domestic connections, which can always be unearthed where BLMIS was located in New York, to argue for the extraterritorial application of SIPA or the Code despite the absence of any express indication of extraterritoriality or any other indicia of extraterritoriality identified in *Morrison*, would simply resuscitate the very conduct or effects tests that *Morrison* buried.

**B.     The Presumption Against Extraterritoriality Is Not Otherwise Negated By Any Other SIPA Provision**

To be sure, SIPA section 78eee(b)(2)(A)(i) provides that on the filing of an application with a court for a protective decree with respect to a broker/debtor, the court "shall have . . . jurisdiction of such debtor and its property wherever located."[24] 15 U.S.C. § 78eee(b)(2)(A)(i). The Trustee's anticipated reliance on the coda "wherever located" to imbue section 78fff-2(c)(3),

---

[24]     Although this appears to parallel section 541's description of the estate at the commencement of a bankruptcy case, it is only a *jurisdictional* clause. *Cf.* 28 U.S.C. § 1334(e)(1)(same).

or SIPA generally, with extraterritorial reach is just as misguided under SIPA as it is under the Code. This carries us no farther than the similar discussion of section 541 above.

In other words, at issue here is whether section 78fff-2(c)(3) has extraterritorial reach – which we answered above in the negative. As we noted in the context of section 541 of the Code, this conclusion is likewise untethered to the *jurisdictional* reach of section 78eee(b)(2)(A)(i). In any event, that "estate" over which the court is granted jurisdiction under section 78eee(b)(2)(A)(i) does not yet include any property sought in these claims, which (a) the Trustee could seek only under the aegis of section 78fff-2(c)(3), itself lacking extraterritorial reach, and which (b) would come to augment "customer property" only *after* the application of relevant avoidance and recovery provisions that, as discussed above, also have no extraterritorial reach themselves.[25] Simply put, section 78eee(b)(2)(A)(i) has no more a bearing on whether section 78fff-2(c)(3) can be applied beyond the domestic sphere than the estate definition of section 541 has on the extraterritorial reach of the Code's relevant avoidance and recovery provisions. Nothing in how the insolvent broker's estate is defined under section 78eee(b)(2)(A)(i) affords the trustee the power to reach abroad and avoid and recover from the Extraterritorial Defendants foreign property that is not yet part of any such "estate."

Indeed, in amending SIPA's "Exclusive Jurisdiction" provision to include the debtor's "property wherever located," 15 U.S.C. § 78eee(b)(2)(A)(i), it was Congress' intention to "give the court authority to protect property located outside the territorial limits of the court *but within*

---

[25]   As noted above, property sought from the Extraterritorial Defendants does not become part of the "estate" until *after* it might otherwise have been recovered under the relevant avoidance and recovery provisions, none of which have extraterritorial reach. *See In re Colonial Realty*, 980 F.2d at 131. Indeed, the rule that avoidance must precede recovery applies equally in the SIPA context. *See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999).

*the actual or constructive possession of the debtor*." S. Rep. No. 95-763, at 10 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 773. This says nothing as to whether the Trustee has power to resort to other avoidance and recovery provisions in the Code, let alone have standing which only SIPA section 78fff-2(c)(3) grants him, extraterritorially to avoid and recover property that was transferred prepetition and that is therefore plainly *not* within the actual or constructive possession of the debtor. It would be completely circular to rely on an expansive definition of "estate" as the source of the express and unambiguous grant of extraterritorial power that *Morrison* requires be reflected in section 78fff-2(c)(3) or the relevant avoidance and recovery provisions on which the Trustee relies.

[*Remainder of Page Intentionally Left Blank*]

Case 1:12-mc-00340-JSR Document 235 Filed 07/13/12 Page 34 of 36

## CONCLUSION

The Trustee's complaints fail to plead adequately any substantial domestic nexus for transfers made and received abroad by the Extraterritorial Defendants. Combined with the presumption against extraterritoriality, the insufficiency of the Trustee's allegations cannot be cured, and constitute ample and immediate grounds for dismissal with prejudice of the Trustee's avoidance actions under Fed. R. Civ. P. 12(b)(6).

For the foregoing reasons, the Extraterritorial Defendants respectfully request that the Court enter an order dismissing with prejudice the claims seeking recovery against the Extraterritorial Defendants.

Dated: New York, New York
July 13, 2012

Respectfully submitted,

**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**

  /s/ Marco E. Schnabl
Marco E. Schnabl
  (Marco.Schnabl@Skadden.com)
Susan L. Saltzstein
  (Susan.Saltzstein@Skadden.com)
Stephanie R. Feld
  (Stephanie.Feld@Skadden.com)
Jason C. Putter
  (Jason.Putter@Skadden.com)

Four Times Square
New York, New York 10036
(212) 735-3000

**SULLIVAN & CROMWELL LLP**

  /s/ Robinson B. Lacy
Robinson B. Lacy
  (Lacyr@sullcrom.com)
Joshua J. Fritsch
  (Fritschj@sullcrom.com)

125 Broad Street
New York, New York 10004
(212) 558-4000

**SULLIVAN & WORCESTER LLP**

  */s/ Franklin B. Velie*
Franklin B. Velie
  (fvelie@sandw.com)
Jonathan G. Kortmansky
  (jkortmansky@sandw.com)
Mitchell C. Stein
  (mstein@sandw.com)

1633 Broadway
New York, New York 10019
(212) 660-3000

Of counsel:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

Evan A. Davis
Thomas J. Moloney
Lawrence B. Friedman
Breon S. Peace

One Liberty Plaza
New York, NY 10006

**CRAVATH, SWAINE & MOORE LLP**

Richard Levin
David Greenwald
Benjamin M. Smith

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

**DEBEVOISE & PLIMPTON LLP**

Michael E. Wiles
Shannon Rose Selden
Joseph P. Moodhe
Mark P. Goodman

919 Third Avenue
New York, NY 10022

**KELLEY DRYE & WARREN LLP**

Thomas B. Kinzler
Jonathan K. Cooperman
Daniel Schimmel
Jaclyn M. Metzinger

101 Park Avenue
New York, NY 10178

**PAUL HASTINGS LLP**

Jodi A. Kleinick
Barry G. Sher
Mor Wetzler

75 East 55th Street
New York, NY 10022

**SHEARMAN & STEARLING LLP**

Heather Lamberg Kafele
Joanna Shally
Jessica Lyn Bartlett

599 Lexington Avenue
New York, NY 10022

**SIMPSON THACHER & BARTLETT LLP**

Mark G. Cunha
Peter E. Kazanoff
Andrew D. W. Cattell

425 Lexington Avenue
New York, NY 10017

**WILLKIE FARR & GALLAGHER LLP**

Mary K. Warren
Douglas Mishkin

787 Seventh Avenue
New York, NY 10019