Exhibit 5

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
Facsimile: (212) 610-6399
*Attorneys for ABN AMRO Bank N.V. (presently
known as The Royal Bank of Scotland, N.V.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | (Substantively Consolidated) |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 11-02760 (BRL) |
| Plaintiff, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.); and ABN AMRO BANK (SWITZERLAND) AG (f/k/a ABN AMRO BANK (SCHWEIZ)), | |
| Defendants. | |

**DECLARATION OF MICHAEL S. FELDBERG IN SUPPORT OF THE MOTION OF
ABN AMRO BANK N.V. (PRESENTLY KNOWN AS THE ROYAL BANK OF
SCOTLAND, N.V.) TO WITHDRAW THE BANKRUPTCY COURT REFERENCE**

MICHAEL S. FELDBERG declares under penalty of perjury as follows:

1.      I am an attorney admitted to practice before this Court and am a partner with Allen & Overy LLP, counsel for the defendant ABN AMRO Bank N.V., presently known as the Royal Bank of Scotland, N.V. ("RBS/ABN"), in the above-captioned action.  I submit this declaration in support of RBS/ABN's Motion to Withdraw the Bankruptcy Court Reference.

2.      Attached hereto as "Exhibit A" is a true and correct copy of the Complaint against RBS/ABN filed in this adversary proceeding.

3.      Attached hereto as "Exhibit B" is a true and correct copy of the Complaint filed in Picard v. Harley Int'l (Cayman) Ltd., Adv. Pro. No. 09-01187 (BRL) (Bankr. S.D.N.Y. May 12, 2009) (Docket No. 1).

4.      Attached hereto as "Exhibit C" is a true and correct copy of the Amended Standing Order of Reference M-431 of the Chief Judge of the United States District Court for the Southern District of New York dated January 31, 2012.

5.      Attached hereto as "Exhibit D" is a true and correct copy of the Memorandum Order dated September 6, 2011 in Picard v. Kohn, No. 11 Civ. 1181 (JSR) (S.D.N.Y. Sept. 6, 2011) (Docket No. 55).

6.      Attached hereto as "Exhibit E" is a true and correct copy of the Memorandum Order dated February 29, 2012 in Picard v. Avellino, No. 11 Civ. 3882 (JSR) (S.D.N.Y. Feb. 29, 2012) (Docket No. 54).

7.      Attached hereto as "Exhibit F" is a true and correct copy of the transcript of the proceedings before the Honorable Jed S. Rakoff on July 1, 2011 in Picard v. Katz, No. 11 Civ. 03605 (JSR) (S.D.N.Y. July 1, 2011) (Docket No. 33).

I declare under penalty of perjury that the foregoing is true and correct.

Executed:     March 14, 2012
              New York, New York

                                        /s/ Michael S. Feldberg
                                        Michael S. Feldberg

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Thomas L. Long
Mark A. Kornfeld
Elizabeth A. Scully
Deborah A. Kaplan
Michelle R. Kaplan
Torello H. Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>             Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>             Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>             Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff,<br><br>             Plaintiff,<br><br>    v.<br><br>ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.) and ABN AMRO BANK (SWITZERLAND) AG (f/k/a ABN AMRO BANK (SCHWEIZ)),<br><br>             Defendants. | Adv. Pro. No. _____ (BRL)<br><br><br><br><br><br>**COMPLAINT** |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa

*et seq.*, for this Complaint against ABN AMRO Bank N.V. ("ABN Bank") (presently known as

The Royal Bank of Scotland, N.V.) and ABN AMRO Bank (Switzerland) AG (f/k/a ABN

AMRO Bank (Schweiz)) ("ABN Switzerland," and together, the "ABN Defendants"), alleges the

following:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS Customer Property[1] that was stolen as part of the massive Ponzi scheme perpetrated by

Bernard L. Madoff ("Madoff") and others.

2.    With this Complaint, the Trustee seeks to recover the equivalent of at least

$25,469,129 in subsequent transfers of Customer Property made to the ABN Defendants.  The

subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry

Limited ("Fairfield Sentry") and Harley International (Cayman) Limited ("Harley") (collectively,

the "Feeder Funds").  Fairfield Sentry is a British Virgin Islands ("BVI") company that is in

liquidation in the BVI.  Harley is a Cayman Islands company that is in liquidation in the Cayman

Islands.  The Feeder Funds had direct customer accounts with BLMIS's investment advisory

business ("IA Business") for the purpose of investing assets with BLMIS, and each of the Feeder

Funds maintained in excess of 95% of their assets in their BLMIS customer accounts.  Some of

the subsequent transfers from Fairfield Sentry came through Fairfield Sigma Limited ("Fairfield

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

Sigma"), which invested 100% of its assets in Fairfield Sentry. Fairfield Sigma also is in liquidation in the BVI.

3. When the ABN Defendants received the subsequent transfers of BLMIS Customer Property, ABN Bank serviced retail, private, and commercial banking clients, and ABN Switzerland provided private banking products and services, as well as portfolio management, custody, and investment advice.

## II. **JURISDICTION AND VENUE**

4. The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the ABN Defendants as subsequent transferees of funds originating from BLMIS.

5. This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

6. The ABN Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with

New York-based BLMIS through the Feeder Funds. The ABN Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

7.    By directing investments through Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund, Defendant ABN Switzerland knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Defendant ABN Switzerland entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent copies of the agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. In addition, Defendant ABN Switzerland is part of the ABN Group, which maintains an office in New York City. Defendant ABN Bank maintains representative offices in New York City, and also maintains a Chicago, Illinois branch and a Miami, Florida agency. The ABN Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

8.    The ABN Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules §§ 301 and 302 (McKinney 2001) and Bankruptcy Rule 7004.

9.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

10.    Venue in this District is proper under 28 U.S.C. § 1409.

III.    **BACKGROUND**

11.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS.

The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.  The District Court Proceeding remains pending.

12.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

13.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

14.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

15.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50),

Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *Id.* at 23.  Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  *Id.*  On June 29, 2009, Madoff was sentenced to 150 years in prison.

17.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.  *Id.* at 46.

## IV.    TRUSTEE'S POWERS AND STANDING

18.     As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway.  However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years.  Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

Case 1:12-cv-07935-JA   Document 171   Filed 03/15/12   Page 73 of 18

19.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

20.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

21.     The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.     **THE DEFENDANTS AND RELEVANT NON-PARTIES**

22.     Defendant ABN Bank, now known as The Royal Bank of Scotland, N.V., is a Dutch commercial bank located at Gustav Mahleraan 10, 1082 PP Amsterdam, the Netherlands. Defendant ABN Bank maintains a representative office at 565 Fifth Avenue, 25th floor, New York, New York 10017.

23.     Defendant ABN Switzerland, formerly known as ABN Amro Bank (Schweiz) AG, is a Swiss corporation located at Beethovenstrasse 33, 8002 Zurich, Switzerland.

24.     Non-party Fairfield Sentry is a BVI company that is currently in liquidation in the BVI.  Fairfield Sentry maintained customer accounts at BLMIS and was one of BLMIS's largest feeder funds and sources of investor principal.

25.     Non-party Harley is a Cayman Islands company that is currently in liquidation in the Cayman Islands.  Harley maintained a customer account at BLMIS and was also one of BLMIS's largest feeder funds and sources of investor principal.

## VI.    THE PONZI SCHEME

26.     BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

27.     Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

28.     The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

29.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

30.     Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

31.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

32.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS

accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

33.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

34.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

35.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

36.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

VII.   **THE TRANSFERS**

37.    The Feeder Funds received initial transfers of BLMIS Customer Property.  Some or all of those initial transfers were subsequently transferred directly or indirectly to the ABN Defendants.

A.    **FAIRFIELD SENTRY**

1.    **Initial Transfers From BLMIS To Fairfield Sentry**

38.    The Trustee filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.,* Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint").  The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

39.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers").  The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

40.    The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers").  The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

41.     The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

42.     The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers."  Charts setting forth these transfers are attached as Exhibits A and B.

43.     Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement").  As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000.  Under the terms of the Settlement Agreement, Fairfield Sentry is obligated to pay $70,000,000 to the Trustee for the benefit of the consolidated BLMIS estate.

## 2.     Subsequent Transfers From Fairfield Sentry To Defendant ABN Switzerland

44.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant ABN Switzerland and is recoverable from Defendant ABN Switzerland pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $2,808,105 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant ABN Switzerland (the "Fairfield Sentry Subsequent

Transfers").  A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

45.     The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

### 3.     Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To Defendant ABN Switzerland

46.     A portion of the Fairfield Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant ABN Switzerland and is recoverable from Defendant ABN Switzerland pursuant to section 550 of the Bankruptcy Code.  Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. Thereafter, the equivalent of at least $861,104 was transferred by Fairfield Sigma to Defendant ABN Switzerland (the "Fairfield Sigma Subsequent Transfers").  Charts setting forth the presently known Fairfield Sigma Subsequent Transfers are attached as Exhibits D and E.

47.     The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Initial Transfers, Fairfield Sigma Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

48.     The Fairfield Sentry Subsequent Transfers and the Fairfield Sigma Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

### B.    HARLEY

#### 1.    Initial Transfers From BLMIS To Harley

49.    The Trustee filed an adversary proceeding against Harley in the Bankruptcy Court under the caption *Picard v. Harley Int'l (Cayman) Ltd.,* Adv. Pro. No. 09-01187 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Harley in the amount of approximately $1,072,800,000 (the "Harley Complaint"). The Trustee incorporates by reference the allegations contained in the Harley Complaint as if fully set forth herein.

50.    On November 10, 2010, the Bankruptcy Court entered a default judgment against Harley in the amount of $1,072,820,000. Of this amount, $1,066,800,000 was awarded in a default summary judgment against Harley. The Trustee has not recovered any monies as a result of the November 10, 2010 judgment.

51.    During the six years preceding the Filing Date, BLMIS made transfers to Harley of approximately $1,072,800,000 (the "Harley Six Year Initial Transfers"). The Harley Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

52.    The Harley Six Year Initial Transfers include approximately $1,066,800,000 which BLMIS transferred to Harley during the two years preceding the Filing Date (the "Harley Two Year Initial Transfers"). The Harley Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

13

53.  The Harley Two Year Initial Transfers include approximately $425,000,000 which BLMIS transferred to Harley during the 90 days preceding the Filing Date (the "Harley Preference Period Initial Transfers").  The Harley Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

54.  The Harley Six Year Initial Transfers, Harley Two Year Initial Transfers, and the Harley Preference Period Initial Transfers are collectively defined as the "Harley Initial Transfers."  Charts setting forth these transfers are attached as Exhibits F and G.

**2.  Subsequent Transfers From Harley To Defendant ABN Bank**

55.  A portion of the Harley Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant ABN Bank and is recoverable from Defendant ABN Bank (now known as The Royal Bank of Scotland, N.V.) pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $21,799,920 of the money transferred from BLMIS to Harley was subsequently transferred by Harley to Defendant ABN Bank (the "Harley Subsequent Transfers").  A chart setting forth the presently known Harley Subsequent Transfers is attached as Exhibit H.

56.  The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Harley Initial Transfers, Harley Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## COUNT ONE
## RECOVERY OF FAIRFIELD SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

57.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

58.     Defendant ABN Switzerland received the Fairfield Sentry Subsequent Transfers, totaling approximately $2,808,105, and the Fairfield Sigma Subsequent Transfers, totaling the equivalent of approximately $861,104 (collectively, as defined above, the "Fairfield Subsequent Transfers").   The Fairfield Subsequent Transfers, totaling the equivalent of approximately $3,669,209, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

59.     Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant ABN Switzerland.

60.     Defendant ABN Switzerland is an immediate or mediate transferee of the Fairfield Initial Transfers.

61.     As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant ABN Switzerland recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## RECOVERY OF HARLEY SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

62.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

63.     Defendant ABN Bank received the Harley Subsequent Transfers, totaling approximately $21,799,920, which are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

64.     Each of the Harley Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant ABN Bank.

65.     Defendant ABN Bank is an immediate or mediate transferee of the Harley Initial Transfers.

66.     As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant ABN Bank (presently known as The Royal Bank of Scotland, N.V.) recovering the Harley Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the ABN Defendants as follows:

(a)     On the First Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant ABN Switzerland recovering the Fairfield Subsequent Transfers, or the value thereof, in an amount to be proven at trial, but no less than $3,669,209, for the benefit of the estate of BLMIS;

(b)     On the Second Claim for Relief, pursuant to sections 550 and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant ABN Bank (presently known as The Royal Bank of Scotland, N.V.)

recovering the Harley Subsequent Transfers, or the value thereof, in an amount to be proven at

trial, but no less than $21,799,920, for the benefit of the estate of BLMIS;

(c)        Awarding the Trustee all applicable fees, interest, costs, and disbursements of this

action; and

(d)        Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.


Dated: October 6, 2011                          /s/ David J. Sheehan
       New York, New York                  **Baker & Hostetler LLP**
                                             45 Rockefeller Plaza
                                           New York, New York 10111
                                           Telephone:  (212) 589-4200
                                           Facsimile:  (212) 589-4201
                                           David J. Sheehan
                                           Mark A. Kornfeld
                                           Deborah A. Kaplan
                                           Michelle R. Kaplan
                                           Torello H. Calvani

                                           **Baker & Hostetler LLP**
                                           65 East State Street, Suite 2100
                                           Columbus, Ohio 43215
                                           Telephone:  (614) 228-1541
                                           Facsimile:  (614) 462-2616
                                           Thomas L. Long

                                           **Baker & Hostetler LLP**
                                           Washington Square, Suite 1100
                                           1050 Connecticut Avenue, NW
                                           Washington, D.C. 20036
                                           Telephone:  (202) 861-1500
                                           Facsimile:  (202) 861-1783
                                           Elizabeth A. Scully

                                           *Attorneys for Irving H. Picard, Trustee*
                                           *for the Substantively Consolidated SIPA*
                                           *Liquidation of Bernard L. Madoff Investment*
                                           *Securities LLC and Bernard L. Madoff*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>v.<br><br>HARLEY INTERNATIONAL (CAYMAN) LIMITED,<br>        Defendant. | Adv. Pro. No. _____ (BRL) |

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et. seq.* ("SIPA"), by and through his undersigned counsel,

for his Complaint, states as follows:

## NATURE OF PROCEEDING

1.     This adversary proceeding arises from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff"). In early December 2008, BLMIS generated client account statements for its nearly 7,000 client accounts at BLMIS. When added together, these statements purportedly show that clients of BLMIS had approximately $64.8 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts. Defendant Harley International (Cayman) Limited ("Defendant Harley" or "Defendant") received avoidable transfers from BLMIS, and the purpose of this proceeding is to recover the avoidable transfers received by the Defendant.

2.     Defendant Harley knew or should have known that its account statements at BLMIS did not reflect legitimate trading activity and that Madoff was engaged in fraud. From at least 1996 until 2008, Defendant Harley received unrealistically high and consistent annual returns, approximating 13.5%, in contrast to the vastly larger fluctuations in the S & P 100 Index on which Madoff's trading activity was purportedly based during the time period. Between 1998 and 2008, at least 148 purported trades reflected on Defendant's monthly customer account statements were allegedly exercised at prices outside the daily range for such securities traded in the market on the days in question, a fact that easily could have been confirmed by any investment professional managing the account. In just the 90 days prior to Madoff's public disclosure of the Ponzi scheme, Defendant Harley withdrew $425 million from BLMIS, which it knew or should have known was non-existent principal and other investors' money. Defendant Harley knew or should have known that BLMIS was engaged in fraud based on these facts and the numerous other indicia of fraud described herein.

300010834

2

09-01789-smb   Doc 1   Filed 03/27/17   Entered 03/27/17 11:19:55   Main Document
Pg 25 of 110

3.      This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3) sections 105(a), 542, 544, 547, 548(a), 550(a) and 551 of 11 U.S.C. §§ 101, *et. seq.* (the

"Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. § 270, *et.

seq*. (McKinney 2001)), and other applicable law, for turnover, accounting, preferences,

fraudulent conveyances, damages in connection with certain transfers of property by BLMIS to

or for the benefit of Defendant.  The Trustee seeks to set aside such transfers and preserve the

property for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding brought in this Court, the Court in which the

main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.

The SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment

Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C.

§§ 78eee(b)(2)(A), (b)(4).

5.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (F), (H) and

(O).

6.      Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND, THE TRUSTEE AND STANDING

7.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment

adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange

Commission ("SEC") filed a complaint in the District Court which commenced the District

Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending

in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud

through the investment advisor activities of BLMIS.

8.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order, which appointed Lee S. Richards, Esq., as receiver for the assets of BLMIS.

9.    On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed

an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.

10.    Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS

pursuant to 15 U.S.C. § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15

U.S.C. § 78eee(b)(3); and

(c)    removed the case to this Bankruptcy Court pursuant to 15 U.S.C.

§ 78eee(b)(4).

11.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

12.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff,* Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (Plea Hr'g Tr. at 23: 14-17.)  Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  (*Id.* at 23: 20-21.)

13.    As the Trustee appointed under SIPA, the Trustee has the job of recovering and paying out customer property to BLMIS' customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway.  However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences, non-existent principal and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme.  Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

14.    Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by

09-01789-cgm    Doc 1 2cv-01388-cm Document Filed/Mexico 3/255/28 Page 6 Document
Pg 3 of 110

SIPA pursuant to 15 U.S.C. § 78fff(b).  Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

15.     Pursuant to 15 U.S.C. § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

16.     The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1 and the Bankruptcy Code, including (11 U.S.C. § 101, *et seq*.), including sections 323(b) and 704(a)(1) because, among other reasons:

    (a)     BLMIS incurred losses as a result of the claims set forth herein;

    (b)     The Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes; and

    (c)     The Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders").  As of this date, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Defendants.  As assignee, the Trustee stands in the shoes of persons who have suffered injury, in fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages.

09-01789-cgm   Doc 1   Filed 09/01/10   Entered 09/01/10 11:19:51   Main Document
Pg 7 of 120

## THE FRAUDULENT PONZI SCHEME

17.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Founded in 1960, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees.  BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

18.     Outwardly, Madoff ascribed the IA Business' consistent investment success to his investment strategy called the "split-strike conversion" strategy.  Madoff promised clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest publicly traded companies.  The basket of stocks would be intended to mimic the movement of the S&P 100 Index.  Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market.  During these times, Madoff asserted that the funds would be invested in United States issued securities.  The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts.  Madoff purported to purchase and sell option contracts corresponding to the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

19.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in, or had been traded through, their accounts, and the growth of and profit from those accounts over time, these statements were a complete fabrication.  The security purchases and sales depicted in the account statements never occurred and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.

09-01780-smb    Doc 1    Filed 03/31/11    Document    Pg 8 of 19

Indeed, based on the Trustee's investigation to date, there is no record of BLMIS having cleared

a single purchase or sale of securities in connection with the split/strike conversion strategy at

the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any

other trading platform on which BLMIS could have reasonably traded securities.

20.    Prior to his arrest, Madoff assured clients and regulators that he conducted trades

on the over-the-counter market, after hours.  To bolster that lie, Madoff periodically wired tens

of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a

London based entity wholly owned by Madoff.  There are no records that MSIL ever used the

wired funds to purchase securities for the accounts of the IA Business clients.

21.    Additionally, based on the Trustee's investigation to date, there is no evidence

that the IA Business ever purchased or sold any of the options that Madoff claimed on customer

statements to have purchased.  All traded options related to S&P 100 companies, including

options on the index itself, clear through the Options Clearing Corporation ("OCC").  Based on

the Trustee's investigation to date, the OCC has no records of the IA Business having transacted

in any exchange-listed options.

22.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme

and Madoff and BLMIS concealed the ongoing fraud in an effort to hinder and delay other

current and prospective customers of BLMIS from discovering the fraud.  The money received

from investors was not set aside to buy securities as purported, but instead, was primarily used to

make the distributions to, or payments on behalf of, other investors.  The money sent to BLMIS

for investment, in short, was simply used to keep the operation going and to enrich Madoff, his

associates and others, including the Defendant, until such time as the requests for redemptions in

December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of
the Ponzi scheme.

23.    During the scheme, certain investors requested and received distributions of the
"profits" listed for their accounts which were nothing more than fictitious profits.  Other
investors, from time to time, redeemed or closed their accounts, or removed portions of them,
and were paid consistently with the statements they had been receiving.  Some of those investors
later re-invested part or all of those withdrawn payments with BLMIS.

24.    When payments were made to or on behalf of these investors, including the
Defendant, the falsified monthly statements of accounts reported that the accounts of such
investors included substantial gains.  In reality, BLMIS had not invested the investors' principal
as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby
hinder, delay, and defraud other current and prospective investors, BLMIS paid to or on behalf of
certain investors the inflated amount reflected in the falsified financial statements, including non-
existent principal and fictitious profits, not such investors' true depleted account balances.

25.    BLMIS used the funds deposited from investors or investments to continue
operations and pay redemption proceeds to or on behalf of other investors and to make other
transfers.  Due to the siphoning and diversion of new investments to pay requests for payments
or redemptions from other account holders, BLMIS did not have the funds to pay investors on
account of their new investments.  BLMIS was able to stay afloat only by using the principal
invested by some clients to pay other investors or their designees.

26.    In an effort to hinder, delay and defraud authorities from detecting the fraud,
BLMIS did not register as an Investment Advisor until September 2006.

27. In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

28. Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three person accounting firm in Rockland County, New York. Of the three employees at the firm, one employee was an assistant and one was a semi-retired accountant living in Florida.

29. At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all times relevant hereto, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities, (ii) it could not meet its obligations as they came due, and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

30. This and similar complaints are being brought to recapture monies paid to or for the benefit of certain investors so that this customer property can be equitably distributed among all of the victims of BLMIS in accordance with the provisions of SIPA.

## THE DEFENDANT AND THE TRANSFERS

31. Defendant Harley International (Cayman) Limited is an international business company organized under the laws of the Cayman Islands, with a principal place of business at P.O. Box 156, North Quay, Douglas, Isle of Man, 1M99 I NR, care of Fortis Prime Fund Solutions (IOM) Limited.

32. At all times relevant hereto, Defendant was a client of the IA Business. According to BLMIS' records, Defendant maintained an account with BLMIS, which was designated account 1FN094 (the "Account"). The Account was opened on or about April 24, 1996 in the name of Harley International Limited, a Bahamian international business company. Thereafter, Harley International Limited ceased to be a Bahamian registered company and changed its place of organization to the Cayman Islands. Defendant executed a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options, (the "Account Agreements") and delivered such papers to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

33. By their terms, the Account Agreements were deemed to be entered into in the State of New York, and were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were held in New York, New York, and the Defendant consistently wired funds to the BLMIS Bank Account in New York, New York for application to the Account and the conducting of trading activities.

34. Between April 24, 1996 and the Filing Date, the Defendant invested over two billion dollars with BLMIS through 133 separate wire transfers directly into BLMIS' account at JPMorgan Chase & Co., Account #000000140081703 (the "BLMIS Bank Account"). The BLMIS Bank Account was maintained at a JPMorgan Chase & Co. branch in New York, New York. Defendant has intentionally taken advantage of the benefits of conducting transactions in the State of New York and has submitted itself to the jurisdiction of this Court for purposes of this proceeding.

35.     Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") to the Defendant. The Transfers were made to or for the benefit of the Defendant and include, but are not limited to, the Transfers listed on Exhibit A.

36.     Upon information and belief, Defendant knew or should have known that Madoff's IA Business was predicated on fraud. Hedge funds and fund of funds like the Defendant's were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff. The Defendant failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme. Among other things, the Defendant was on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

(a)     Financial industry press reports, including a May 27, 2001 article in Barron's entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in MAR/Hedge, a semi-monthly newsletter that is widely read by hedge fund industry professionals, entitled "Madoff Tops Charts; Skeptics Ask How," raised serious questions about the legitimacy of BLMIS and Madoff and their ability to achieve the IA Business returns they purportedly had achieved using the split-strike conversion strategy Madoff claimed to employ.

(b)     Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.

(c)     BLMIS did not provide its customers with electronic real-time online access to their accounts, which was and is customary in the industry for hedge fund and fund of

funds investors.  BLMIS also utilized outmoded technology, including paper trading confirmations.  The use of paper confirmations created after the fact was critical to Madoff's ability to perpetuate his Ponzi scheme.

(d)     BLMIS functioned as both investment manager and custodian of securities.  This arrangement eliminated another frequently utilized check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS to investors, regulators, and other outside parties.

(e)     BLMIS produced returns that were too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amount that was simply not credible.  Specifically, there were only about four months of any negative returns during the 152 months of reported operations in which Defendant was a customer of BLMIS.  Returns this good could not be reproduced by other skilled hedge fund managers, and those managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed even to approximate its results.

(f)     The Defendant received far higher purported annual rates of return on its investments with BLMIS, approximating 13.5%, as compared to the interest rates BLMIS could have paid to commercial lenders during the relevant time period.  Upon information and belief, the Defendant never questioned why Madoff accepted its investment capital in lieu of other available alternatives that would have been more lucrative for BLMIS.

(g)     At times the Defendant's monthly account statements reflected trades purchased or sold on behalf of Defendant's account in certain securities that were allegedly

09-01178   Case 1:Doc 1-5   Filed 04/17/09   Document   Entered 04/06/09 12:55:22   Main Document
Pg 36 of 110

executed at prices outside the daily price range of prices for such securities traded in the market on the days in question. The Defendant received purported trade confirmations from BLMIS matching the securities transactions reported on the monthly account statements which, if verified with the prices in the market on the trade dates in question, would have revealed that the trades could not have been executed at the prices reported. For example, Defendant's October 2003 monthly account statement reported a purchase of 385,693 shares of Intel Corporation (INTC) with the settlement date of October 7, 2003, which was purportedly executed on the trade date of October 2, 2003 at a price of $27.63. The daily price for Intel Corporation stock on October 2, 2003 ranged from a low of $28.41 to a high of $28.95, which made the reported price impossible. Similar impossibilities were reported in connection with purported sales of securities in Defendant's account. Defendant's December 2006 account statement reported a sale of 236,663 shares of Merck & Co. (MRK) at a purported executed price of $44.61 on the Trade Date of December 22, 2006 with a Settlement Date of December 28, 2006. However, the daily price range for Merck stock on the purported trade date of December 22, 2006 ranged from a low of $42.78 to a high of $43.42, more than $1 below the price reported on the statement.

(h)     The Trustee's investigation to date has revealed at least 148 instances between February 1998 to November 2008 in which Defendant's account statements displayed trades purportedly executed at a price outside the daily price range. This pattern in Defendant's account should have caused a sophisticated hedge fund like Defendant Harley and its managers to independently verify the trades with the public exchanges and demand more transparency into the operations of BLMIS.

(i)     BLMIS would have had to execute massive numbers of options trades to implement its purported split-strike conversion strategy. In order to implement this strategy,

09-01178-smb    Doc 1   Filed 05/12/09    Entered 05/12/09 12:05:22    Main Document
Pg 15 of 19

BLMIS purportedly purchased options on the S&P 100 index ("OEX") – which are traded on the

Chicago Board Options Exchange ("CBOE") – in combination with purchases of select

underlying stocks that are components of that index.  At times, the option volume BLMIS

reported to its customers was simply impossible if those options had been exchange-traded.  For

example, on January 23, 2008, BLMIS purportedly bought a total of 22,641 OEX put options

(with February expiration and a strike price of 600) for Defendant Harley when the total volume

traded on the CBOE for such contracts was 8,645.  Similarly, BLMIS purportedly bought a total

of 22,641 OEX call options (with February expiration and a strike price of 610) for Defendant

Harley when the total volume traded on the CBOE for such contracts was 631.  In each of these

instances, Defendant knew or should have known that the option trading volumes reported by

BLMIS were impossible if exchange-traded.

       (j)     BLMIS had purportedly told its investors that it purchased these options in

the over-the-counter ("OTC") market.  Trading options in the OTC market would likely have

been more expensive than trading over the CBOE, yet those costs did not appear to be passed on

to BLMIS' investors.  The absence of such costs, together with BLMIS' representation that it

was trading in the OTC market, should have prompted a sophisticated hedge fund like Defendant

Harley and its managers to request verification of the trades and demand more transparency into

the operations of BLMIS.

       (k)     BLMIS's statements to investors reflected a consistent ability to trade

stocks near their monthly highs and lows to generate consistent and unusual profits (or, if

requested by customers, to generate losses to do the opposite).  No experienced investment

professional could have reasonably believed that this could have been accomplished legitimately.

(l)      BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall.  No experienced investment professional could have reasonably believed it possible for any such firm to have competently audited an entity the size of BLMIS.

(m)      The compensation system utilized by BLMIS was atypical, in that BLMIS, the entity purportedly employing the hugely-successful proprietary trading system, was compensated only for the trades that it executed, while Defendant, whose only role was to funnel money to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS.  This compensation arrangement, together with the lack of transparency and other factors listed herein, should have caused an experienced investment entity like the Defendant and its managers to question the legitimacy of Madoff's operation.

(n)      Despite its immense size, BLMIS was substantially a family-run operation, employing many of Madoff's relatives, and virtually no outside professionals.

(o)      On information and belief, at no time did the Defendant conduct a performance audit of BLMIS or match any trade tickets provided by BLMIS with actual trades executed through any domestic or foreign public exchange despite the fact the Defendant fund had hundreds of millions of dollars in assets and easily could have afforded to do this.

(p)      BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS's purported trading activities from scrutiny.

(q)     Based on all of the foregoing factors, many banks, industry advisors and insiders who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that their IA Business operations were not legitimate.  At a minimum, these factors, in combination with the indicia of fraud in Defendant Harley's own customer account statements, should have caused the Defendant to inquire further.

37.     The Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78lll(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

38.     The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the Accounts ("Fictitious Profits").

39.     The Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. CPRL 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273 – 276 (McKinney 2001).

40.     Of the Transfers, at least fourteen transfers in the collective amount of $1,072,800,000 (the "Six Year Transfers") were made during the six years prior to the Filing Date and are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273 – 276.

41.     Of the Six Year Transfers, at least thirteen in the collective amount of $1,066,800,000 (the "Two Year Transfers") were made during the two years prior to the Filing

Date, and are additionally recoverable under sections 548(a)(1), 550(a)(1) and 551 of the
Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

42.     Of the Two Year Transfers, at least six in the collective amount of $425,000,000
(the "90 Day Transfers") were made during the 90 days prior to the Filing Date, and are
additionally recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code and
applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

43.     To the extent that any of the recovery counts may be inconsistent with each other,
they are to be treated as being pled in the alternative.

44.     The Trustee's investigation is on-going and the Trustee reserves the right to
(i) supplement the information on the Transfers and any additional transfers, and (ii) seek
recovery of such additional transfers.

**COUNT ONE**
**TURNOVER AND ACCOUNTING – 11 U.S.C. § 542**

45.     The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

46.     The Transfers constitute property of the estate to be recovered and administered
by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

47.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the
Trustee is entitled to the immediate payment and turnover from the Defendant of any and all
Transfers made by BLMIS, directly or indirectly, to Defendant.

48.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the

Trustee is also entitled to an accounting of all such Transfers received by Defendant from

BLMIS, directly or indirectly.

## COUNT TWO
## PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550, AND 551

49.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

50.     At the time of each of the 90 Day Transfers (hereafter, the "Preference Period

Transfers"), the Defendant was a "creditor" of BLMIS within the meaning of section 101(10) of

the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

51.     Each of the Preference Period Transfers constitutes a transfer of an interest of

BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant

to 15 U.S.C. § 78fff-2(c)(3).

52.     Each of the Preference Period Transfers was to or for the benefit of the

Defendant.

53.     Pleading in the alternative, each of the Preference Period Transfers was made on

account of an antecedent debt owed by BLMIS before such transfer was made.

54.     Each of the Preference Period Transfers was made while BLMIS was insolvent.

55.     Each of the Preference Period Transfers was made during the preference period

under section 547(b)(4) of the Bankruptcy Code.

56.     Each of the Preference Period Transfers enabled Defendant to receive more than the receiving Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

57.     Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Defendant pursuant to section 550(a).

58.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

59.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

60.     The Two Year Transfers were made on or within two years before the filing date of BLMIS' case.

61.     The Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

09-01789-smb   Doc 1 Filed 06/12/09   Document   Entered 06/12/09 12:05:27   Main Document
Pg 43 of 110

62.     The Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendant pursuant to section 550(a).

63.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550, AND 551

64.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

65.     The Two Year Transfers were made on or within two years before the Filing Date.

66.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

67.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

68.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

69.     At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

70.     The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendant pursuant to section 550(a).

71.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

72.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

73.     At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

74.     The Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Transfers to or for the benefit of the Defendant in furtherance of a fraudulent investment scheme.

75.     As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant.

## COUNT SIX
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107

76.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

77.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

78.     BLMIS did not receive fair consideration for the Six Year Transfers.

79.     BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

80.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278 and 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551, AND 1107

81.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

82.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

83.     BLMIS did not receive fair consideration for the Six Year Transfers.

84.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

85.     As a result of the foregoing, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS.

## COUNT EIGHT
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

86.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

09-01789-smb Doc Y-U Filed 06/12/09 Entered 06/12/09 12:55:27 Main Document
Pg 25 of 110

87.     At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code, or that were and are not allowable only under section

502(e).

88.     BLMIS did not receive fair consideration for the Six Year Transfers.

89.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred,

was intending to incur, or believed that it would incur debts beyond its ability to pay them as the

debts matured.

90.     As a result of the foregoing, pursuant to sections 275, 278 and/or 279 of the New

York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, the

Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b)

directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or

the value thereof,  from the Defendant for the benefit of the estate of BLMIS.

## COUNT NINE
### UNDISCOVERED FRAUDULENT TRANSFER – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

91.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

92.     At all times relevant to Transfers, the fraudulent scheme perpetrated by BLMIS

was not reasonably discoverable by at least one unsecured creditor of BLMIS.

93.     At all times relevant to the Transfers, there have been one or more creditors who

have held and still hold matured or unmatured unsecured claims against BLMIS that were and

09-01178   Case 1:12-cv-... Document... Entered 03/27/17 11:19:51   Page 26 of 28

are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

94.     The Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Defendant in furtherance of a fraudulent investment scheme.

95.     As a result of the foregoing, pursuant to NY CPLR 203(g) sections 276, 276-a, 278 and/or 279 of the and New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant.

  **WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendant as follows:

i.      On the First Claim for Relief, pursuant to sections 542, 550(a), and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by the Defendant of the property that was the subject of the Transfers or the value of such property;

ii.     On the Second Claim for Relief, pursuant to sections 547, 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

iii.     On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

iv.     On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

v.     On the Fifth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant;

vi.     On the Sixth Claim for Relief, pursuant to sections 273, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, and  551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS;

vii.     On the Seventh Claim for Relief, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551, and 1107 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be

set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendant for the benefit of the state of BLMIS;

viii.     On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law sections 275, 278 and/or 279 and Bankruptcy Code sections 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof,  from the Defendant for the benefit of the estate of BLMIS;

ix.     On the Ninth Claim for Relief, pursuant to NY CPLR 203(g) and sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and section 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Defendant for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendant;

x.     On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001, 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xi.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

xii.     On all Claims for Relief, assignment of Defendant's rights to seek refunds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

xiii.    Awarding the Trustee all applicable interest, costs, and disbursements of this

action; and

xiv.    Granting Plaintiff such other, further, and different relief as the Court deems just,

proper, and equitable.

Date:   New York, New York
        May 12, 2009

|  |  |
|---|---|
| Of Counsel: | s/David J. Sheehan_____ |
|  | Baker & Hostetler LLP |
|  | 45 Rockefeller Plaza |
| Elizabeth A. Scully | New York, New York 10111 |
| Michael Powell | Telephone: (212) 589-4200 |
| Baker & Hostetler LLP | Facsimile: (212) 589-4201 |
| Washington Square, Suite 1100 | David J. Sheehan |
| 1050 Connecticut Avenue, N.W. | Email: dsheehan@bakerlaw.com |
| Washington, D.C. 20036 | Marc E. Hirschfield |
| Telephone: (202) 861-1500 | Email: mhirschfield@bakerlaw.com |
| Facsimile: (202) 861-1783 | Thomas M. Wearsch |
| Elizabeth A. Scully | Email: twearsch@bakerlaw.com |
| Email: escully@bakerlaw.com |  |
| Michael Powell | *Attorneys for Irving H. Picard, Esq.,* |
| Email: mpowell@bakerlaw.com | *Trustee for the SIPA Liquidation of Bernard L.* |
|  | *Madoff Investment Securities LLC* |

M-431

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 2·1·2012

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

12 MISC 00032

In the Matter of:                                :          AMENDED
                                                 :    STANDING ORDER
    Standing Order of Reference                  :      OF REFERENCE
    Re: Title 11                                 :
                                                 :       M10-468
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Pursuant to 28 U.S.C. Section 157(a) any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district.

If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under this order and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district court. The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.

SO ORDERED.

                                    /s/ Loretta A. Preska
                          _____
                                    Loretta A. Preska
                                       Chief Judge

Dated:              New York, New York
                    January 31, 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

IRVING H. PICARD,                           :

           Plaintiff,          :

           -v-                  :

SONJA KOHN, ERWIN KOHN, ROBERT KOHN, RINA :
HARTSTEIN, MOISHE HARTSTEIN, MORDECHAI    :
LANDAU, ERKO, INC., EUROVALEUR, INC.,     :
INFOVALEUR, INC., TECNO DEVELOPMENT &     :
RESEARCH S.R.L., TECNO DEVELOPMENT &      :
RESEARCH LTD., SHLOMO AMSELEM, HASSANS    :
INTERNATIONAL LAW FIRM, HERALD ASSET      :
MANAGEMENT LTD., 20:20 MEDICI AG, PETER   :
SCHEITHAUER, ROBERT REUSS, UNICREDIT BANK :
AUSTRIA AG, GERHARD RANDA, STEFAN         :
ZAPOTOCKY, BANK AUSTRIA WORLDWIDE FUND    :          11 Civ. 1181 (JSR)
MANAGEMENT LTD., URSULA RADEL-            :
LESZCZYNSKI, UNICREDIT S.p.A., ALESSANDRO :
PROFUMO, PIONEER GLOBAL ASSET MANAGEMENT, :
S.P.A., et al., PALLADIUM CAPITAL         :
ADVISORS LLC, WINDSOR IBC, Inc.,          :
MARIADELMAR RAULE, FRANCO MUGNAI, PAUL de :          MEMORANDUM ORDER
SURY, DANIELE COSULICH, ABSOLUTE          :
PORTFOLIO MANAGEMENT LTD., MEDICIFINANZ   :
CONSULTING GmbH, MEDICI S.R.L., MEDICI    :
CAYMAN ISLAND LTD., BANK MEDICI AG        :
(GIBRALTAR), REVITRUST SERVICES EST.,     :
HELMUTH FREY, MANFRED KASTNER, JOSEF      :
DUREGGER, ANDREAS PIRKNER, WERNER         :
TRIPOLT, ANDREAS SCHINDLER, FRIEDRICH     :
KADRNOSKA, WERNER KRETSCHMER, WILHELM     :
HEMETSBERGER, HARALD NOGRASEK, BANK       :
AUSTRIA CAYMAN ISLANDS LTD., GIANFRANCO   :
GUTTY, SOFIPO AUSTRIA GmbH, M-Tech        :
SERVICES GmbH, BRERA SERVIZI AZIENDIALE   :
S.R.L., REDCREST INVESTMENTS, INC., LINE  :
GROUP LTD., LINE MANAGEMENT SERVICES      :
LTD., LINE HOLDINGS LTD., HERALD CONSULT  :
LTD., JOHN AND JANE DOES 1-100,           :

           Defendants.         :

                        :

------------------------------------- x

JED S. RAKOFF, U.S.D.J.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

On May 31, 2011, the Court, after receiving full briefing from the parties, heard oral argument on the motion by defendant UniCredit S.p.A. ("UniCredit") to withdraw the bankruptcy reference of adversary proceeding No. 10-5411 (BRL) (the "Kohn Action") filed by Irving Picard (the "Trustee"), the trustee appointed pursuant to the Securities Investment Protection Act of 1970 ("SIPA") for the liquidation of Bernard L. Madoff Investment Securities LLC ("Madoff Securities").  On June 3, 2011, the Court issued a "bottom-line" Order granting the motion to withdraw the bankruptcy reference for the purpose of resolving the following issues: (1) whether the Trustee has standing to bring the Kohn Action against UniCredit; (2) whether the Trustee's common law claims brought against UniCredit are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"); and (3) whether the Trustee's RICO claims against UniCredit are barred because those claims are extraterritorial in nature, are barred by the Private Securities Litigation Reform Act ("PSLRA"), are barred by proximate causation principles, or fail to plausibly allege the elements of a RICO claim.  As stated in open court on May 31, 2011, see Tr., the Court granted UniCredit's motion to withdraw the reference to the Bankruptcy Court in order to address the issues of standing and SLUSA preemption for the same reasons enumerated in Picard v. HSBC Bank PLC,

450 B.R. 406 (S.D.N.Y. 2011).[1]  This Memorandum Order explains the
reasons for withdrawing the reference in order to address the
threshold issues concerning the Trustee's RICO claims against
UniCredit.

By way of background, on December 10, 2010, the Trustee filed
a complaint which named UniCredit in claims alleging, inter alia, RICO
violations, Am. Compl. ¶¶ 413-33, as well as common law claims,
including unjust enrichment, id. ¶¶ 573-77, and conversion, id. ¶¶
578-581.  The Trustee alleges that UniCredit and the other defendants
named in the complaint were all part of an international "Illegal
Scheme" masterminded by Sonja Kohn – dubbed the "Medici Enterprise" --
to feed $9.1 billion of "other people's money into Madoff's Ponzi
scheme."  See id. ¶¶ 1-6.  The complaint alleges that by providing
Madoff with a "constant influx of fresh capital," the defendants
caused the entirety of the $19.6 billion in damages caused by Madoff's
scheme.  See id. ¶ 8.  The Trustee alleges that these losses should be
tripled pursuant to RICO and thus seeks approximately $59 billion.
Id.

---

[1] While the Opinion and Order issued in Picard v. HSBC Bank
PLC, 450 B.R. 406 (S.D.N.Y. 2011), only discusses the Trustee's
standing to bring common law claims, whether the Trustee has
standing to bring RICO claims notwithstanding the fact that such
authority is not expressly provided by SIPA similarly raises
difficult issues of non-bankruptcy federal law.  See Picard v.
HSBC Bank PLC, --- B.R. ----, 2011 WL 3200298 (S.D.N.Y.
2011)(concluding that the Trustee lacks standing to bring claims
not available to an ordinary bankruptcy trustee absent express
authorization from SIPA).

3

District courts have original jurisdiction over bankruptcy
cases and all civil proceedings "arising under title 11, or raising in
or related to cases under title 11."  28 U.S.C. § 1334.  Pursuant to
28 U.S.C. § 157(a), the district court may refer actions within its
bankruptcy jurisdiction to the bankruptcy judges of the district.  The
Southern District of New York has a standing order in place that
provides for automatic reference.

Notwithstanding the automatic reference, 28 U.S.C. § 157(d)
describes circumstances in which the district court is authorized or
required to withdraw the reference to the bankruptcy court:

> The district court may withdraw, in whole or in part, any case
> or proceeding referred under this section, on its own motion
> or on timely motion of any party, for cause shown.  The
> district court shall, on timely motion of a party, so withdraw
> a proceeding if the court determines that resolution of the
> proceedings requires consideration of both title 11 and other
> laws of the United States regulating organizations or
> activities affecting interstate commerce.

28 U.S.C. § 157(d).

Withdrawal is required where the proceedings would require "a
bankruptcy court judge to engage in significant interpretation, as
opposed to simple application, of federal laws apart from the
bankruptcy statutes."  City of New York v. Exxon Corp., 932 F.2d 1020,
1026 (2d Cir. 1991).

As an initial matter, it is clear that RICO is a federal non-
bankruptcy statute, that is, a federal statute falling outside of the
Bankruptcy Court's expertise.  Moreover, the Court concludes that
resolving the issues raised by UniCredit will require significant

4

interpretation of RICO, particularly in light of recent decisions
addressing the extraterritorial application of RICO and the scope of
the PSLRA's so-called "RICO Amendment," which bars RICO claims that
are premised on securities violations.  Specifically, the Court
concludes that the following issues will require substantial and
material interpretation of non-bankruptcy federal law: (1) whether
RICO can be applied extraterritorially in this case, which primarily
involves foreign actors; (2) whether the RICO claims are barred by the
so-called "RICO Amendment" promulgated as part of the PSLRA; (3)
whether the complaint adequately alleges proximate causation and the
structural elements of a RICO claim.

Turning first to extraterritoriality, the Court concludes that
determining whether the Trustee's RICO claims are extraterritorial in
nature will require substantial interpretation of RICO.  In response
to the Supreme Court's decision in Morrison v. National Australia Bank
Ltd., --- U.S. ----, 130 S. Ct. 2869 (2010), the Second Circuit
recently held that RICO cannot be applied territorially.  See Norex
Petroleum v. Access Indus., Inc., 621 F.3d 29, 31 (2d Cir. 2010) (per
curiam) (finding that RICO does not apply to actions that "primarily
involve[] foreign actors and foreign acts"); see also Cedeno v. Intech
Group, Inc., 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (holding that
RICO does not apply extraterritorially).  UniCredit contends that
since forty-nine of the fifty-seven RICO defendants, including
UniCredit and its affiliates, are foreign defendants and since the

5

complaint in the Kohn Action focuses on actions committed abroad by
actors subject to foreign laws, whether the Kohn Action "primarily
involves foreign actors and foreign acts" or "claims that are
essentially extraterritorial in focus" will require substantial and
material interpretation of new Second Circuit and Supreme Court
jurisprudence.  While it is now settled law that RICO cannot be
applied extraterritorially, the Court agrees with UniCredit that
determining the precise contours of this relatively new doctrine will
require significant interpretation of RICO.

        Turning to whether the RICO claims are barred by the PSLRA's
RICO Amendment, the Court concludes that this issue also warrants
withdrawal of the reference to the Bankruptcy Court.  The RICO
Amendment provides that "no person may rely upon any conduct that
would have been actionable as fraud in the purchase or sale of
securities to establish a violation of [RICO]."  18 U.S.C. § 1964(c).
It is clear from the plain language of the RICO Amendment that a
complaint expressly alleging violations of the federal securities laws
cannot form the basis for a RICO claim.  In this case, however, it is
undisputed that the Trustee has not expressly pled allegations of
securities fraud.  The issue then becomes whether the allegations in
the Kohn Action effectively amount to securities fraud and thus
trigger the RICO Amendment.  UniCredit contends that notwithstanding
the Trustee's "artful" pleading, the RICO claims are barred by the
RICO Amendment because the complaint alleges conduct that would be

6

actionable under the federal securities laws.  Specifically, the
Trustee's complaint alleges the existence of an "Illegal Scheme"
designed to "feed" investor money into Madoff's Ponzi scheme while
"conceal[ing] the fact that the Medici Enterprise Feeder Funds were
100% invested through [Madoff Securities]" so that defendants could
"avoid regulator and investor scrutiny."  See, e.g., Am. Compl. ¶¶ 1,
5-6, 16, 18.

      Courts in this Circuit have reached different conclusions
about how broadly the RICO Amendment should be applied.  Compare
Cohain v. Klimley, 08 Civ. 5047 (PGG), 2010 WL 3701362, at *10
(S.D.N.Y. Sept. 20, 2010) ("[T]he PSLRA bars all RICO claims based on
any conduct that could be actionable under the securities laws,
including conduct that constitutes aiding and abetting securities
fraud.") and Thomas H. Lee Equity Fund V, L.P., v. Mayer Brown, Rowe &
Maw LLP, 612 F. Supp. 2d 267, 283 (S.D.N.Y. 2009) ("[T]he RICO
Amendment bars claims based on conduct that could be actionable under
the securities laws even when the plaintiff, himself, cannot bring a
cause of action under the securities laws."), with OSRecovery, Inc. v.
One Groupe Int'l, Inc., 354 F. Supp. 2d 357, 368-71 (S.D.N.Y. 2005)
(holding that RICO claims based on purported aiding and abetting
securities violation were not barred by RICO Amendment because they
were not actionable by the same plaintiff who brought the RICO
claims).  Given that there is disagreement about the scope of the RICO
Amendment and given that UniCredit's alleged misconduct is arguably

7

actionable under the federal securities laws, the Court concludes that
determining whether the RICO Amendment bars the Trustee's RICO claims
against UniCredit will require more than a "simple application" of the
PSLRA, see City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d
Cir. 1991), and thus needs to be resolved by an Article III judge.

Finally, the Court concludes that determining whether the
Trustee sufficiently alleges proximate causation and the structural
elements of a RICO claim also mandates withdrawal of the reference.
With respect to proximate causation, "the RICO statute requires that
the pattern of racketeering activity or the individual predicate acts
impose a direct injury on plaintiffs" and thus that "a person is not
liable to all those who may have been injured by his conduct, but only
to those with respect to whom his acts were a substantial factor in
the sequence of responsible causation." Lerner v. Fleet Bank, N.A.,
318 F.3d 113, 123 (2d Cir. 2003) (internal citations and quotations
omitted) (emphasis supplied). Here, there is a serious question as to
whether UniCredit can be said to have directly caused injury to Madoff
investors (who have no relationship with UniCredit) given the
intervening misconduct of the two primary bad actors, Madoff and his
now-defunct company Madoff Securities.

Determining whether the Trustee has plausibly alleged the
structural elements of a RICO claim, such as the existence of an
"enterprise" and UniCredit's participation in the "operation or
management" of such enterprise, will also require substantial

8

interpretation of federal non-bankruptcy law.  See, e.g., First
Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d
Cir. 2004) ("[O]ne is liable under RICO only if he 'participated in
the operation or management of the enterprise itself.").  "[A]n
association-in-fact enterprise must have at least three structural
features: (1) a purpose, (2) relationships among those associated with
the enterprise, and (3) longevity sufficient to permit these
associates to pursue the enterprise's purpose."  Boyle v. United
States, 129 S. Ct. 2237, 2244 (2009).  Here, there is a serious
question as to whether the disparate group of individuals and
corporate entities named in the Kohn Action can plausibly be said to
constitute an "enterprise" with a "common purpose" within the meaning
of RICO.  Even assuming arguendo that the complaint adequately pleads
the existence of an enterprise, there is a serious question as to
whether the amended complaint plausibly alleges that UniCredit
participated in the "operation or management" of the enterprise, that
is, that UniCredit played "some part in directing the enterprise's
affairs."  First Capital, 385 F.3d at 176 (internal quotation marks
omitted) (emphasis supplied).  Here, while the Trustee alleges that
the purported RICO enterprise was "conceived" and "largely directed"
by Kohn who "masterminded" the "vast illegal scheme to exploit her
privileged relationship with Madoff," Am. Compl. ¶¶ 1, 5, the amended
complaint suggests that UniCredit's role was much more limited.  The
core allegations concerning UniCredit are that UniCredit, in an effort

9

to generate fees, "fed" investor money into the Madoff Securities and
"disguised" these investments by making them indirectly through feeder
funds.  Id. ¶¶ 19, 338-44.  Thus, whether the Trustee's complaint
sufficiently alleges that UniCredit played a role in the operation or
management of the purported enterprise is another issue mandating
withdrawal of the reference to the Bankruptcy Court.

         Accordingly, for the foregoing reasons the Court affirms its
June 3, 2011 Order withdrawing the reference to the Bankruptcy Court
for the limited purpose of addressing the following threshold issues:
(1) whether the Trustee has standing to bring the Kohn Action against
UniCredit; (2) whether the Trustee's common law claims brought against
UniCredit are preempted by SLUSA; and (3) whether the Trustee's RICO
claims against UniCredit are barred because those claims are
extraterritorial in nature, are barred by the PSLRA, are barred by
proximate causation principles, or fail to plausibly allege the
elements of a RICO claim.

         The Clerk of the Court is hereby directed to close document
number 1 on the docket of the case.

         SO ORDERED.

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        September 6, 2011

10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/11/2

IRVING H. PICARD,
         Plaintiff,       :

                            :

         -v-            :      11 Civ. 3882 (JSR)

                            :

FRANK J. AVELLINO et al.,    :
         Defendants.     :
------------------------------------ x
IRVING H. PICARD,         :
         Plaintiff,       :

                            :

         -v-            :
                            :      11 Civ. 4772 (JSR)

ELINS FAMILY TRUST et al.,   :
       Defendants.     :
------------------------------------ x
IRVING H. PICARD,         :
         Plaintiff,       :

                            :

         -v-            :
                            :      11 Civ. 4928 (JSR)

ROBERT GREENBERGER and PHYLLIS :
GREENBERGER,              :
         Defendants.     :
------------------------------------ x
IRVING H. PICARD,         :
         Plaintiff,       :

                            :

         -v-            :
                            :      11 Civ. 6244 (JSR)

THE M&B WEISS FAMILY LIMITED  :
PARTNERSHIP et al.,         :
         Defendants.     :
------------------------------------ x
IRVING H. PICARD,         :
         Plaintiff,       :

                            :      11 Civ. 5835 (JSR)

         -v-            :

                            :

STANLEY SHAPIRO et al.,     :
         Defendants.     :      <u>MEMORANDUM ORDER</u>
------------------------------------ x

JED S. RAKOFF, U.S.D.J.

Each of the defendants in the above captioned cases seeks mandatory withdrawal of the reference to the bankruptcy court of the underlying adversarial proceeding brought against each of them respectively by plaintiff Irving H. Picard, the trustee appointed pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq. Because these motions raise identical questions of law, albeit in different combinations, the Court issues this one Memorandum Order to decide which aspects of the underlying proceedings will be withdrawn, and which not. In large part, the Court relies on the reasoning set forth in its opinion in Picard v. Flinn Inv., LLC, 2011 WL 5921544 (S.D.N.Y. Nov. 28, 2011), which withdrew the reference in still other adversarial proceedings in the underlying bankruptcy of Bernard L. Madoff Investment Securities ("Madoff Securities").

District courts have original jurisdiction over bankruptcy cases and all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334. Pursuant to 28 U.S.C. § 157(a), the district court may refer actions within its bankruptcy jurisdiction to the bankruptcy judges of the district. The Southern District of New York has a standing order that provides for automatic reference.

Notwithstanding the automatic reference, the district court may, on its own motion or that of a party, withdraw the reference, in whole or in part, in appropriate circumstances. Withdrawal is mandatory "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States

2

regulating organizations or activities affecting interstate commerce."
28 U.S.C. § 157(d).  Notwithstanding the plain language of this
section, however, the Second Circuit has ruled that mandatory
"[w]ithdrawal under 28 U.S.C. § 157(d) is not available merely
whenever non-Bankruptcy Code federal statutes will be considered in
the bankruptcy court proceeding, but is reserved for cases where
substantial and material consideration of non-Bankruptcy Code federal
statutes is necessary for the resolution of the proceeding."  In re
Ionosphere Clubs, Inc., 922 F.2d 984, 995 (2d Cir. 1990).

      The defendants in these cases identify many issues that they
believe require "substantial and material consideration" of non-
bankruptcy federal laws regulating organizations or activities
affecting interstate commerce, including important unresolved issues
under SIPA itself, a statute that has both bankruptcy and non-
bankruptcy aspects and purposes.  See In re Bernard L. Madoff
Investment Securities, 654 F.3d 229, 235 (2d Cir. 2011) ("SIPA serves
dual purposes:  to protect investors, and to protect the securities
market as a whole."); Picard v. HSBC Bank PLC, 450 B.R. 406, 410
(S.D.N.Y. 2011).  The Court considers defendants' contentions in turn.

      First, Shapiro and Greenberger argue that the Court must withdraw
the reference to consider whether SIPA and other securities laws alter
the standard that the Trustee must meet in order to show that a
defendant did not receive transfers in "good faith" under 11 U.S.C.
§ 548(c).  Cf. In re New Times Sec. Servs., Inc., 371 F.3d 68, 87 (2d
Cir. 2004) ("[A] goal of greater investor vigilance, however, is not

3

emphasized in the legislative history of SIPA."). In its prior
decisions, the Court has found not only that this issue merits
withdrawal, but also that the securities laws do in fact alter the
applicable standard. See <u>Picard v. Katz</u>, 2011 WL 4448638, at *5
(S.D.N.Y. Sept. 27, 2011) ("Just as fraud, in the context of federal
securities law, demands proof of scienter, so too 'good faith' in this
context implies a lack of fraudulent intent."). Specifically, the
Court has held that, because the securities laws do not ordinarily
impose any duty on investors to investigate their brokers, those laws
foreclose any interpretation of "good faith" that creates liability
for a negligent failure to so inquire. <u>Id.</u> Thus, to establish a lack
of "good faith" on the part of securities customers under § 548(c) in
the context of a SIPA bankruptcy, the trustee must show that the
customer either actually knew of the broker's fraud or "willfully
blinded" himself to it.

Determining whether the different allegations in each of the
Trustee's complaints plausibly suggest "willful blindness"——which has
historically been one of the law's most difficult concepts——will
continue to require substantial and material consideration of the
securities laws. Accordingly, the Court withdraws the reference in
<u>Shapiro</u> and <u>Greenberger</u> in order to address the issue of how the
securities laws affect what constitutes "good faith" in each case.

Second, each of the defendants argues that § 546(e) of the
Bankruptcy Code prevents the Trustee from avoiding transfers as
fraudulent except under § 548(a)(1)(A) of that Code. For

4

substantially the reasons stated in Picard v. Flinn Inv., LLC, the Court withdraws the reference in each case in order to address this issue. Notwithstanding the Court's decision in Flinn, the Trustee continues to claim that resolution of how § 546(e) applies to these cases does not require substantial and material consideration of the securities laws. Nonetheless, the Trustee's arguments in previously withdrawn cases belie this claim. For example, in Picard v. Blumenthal, the Trustee argued that applying § 546(e) would conflict with SIPA. See Trustee's Memorandum of Law in Opposition to Blumenthal's Motion to Dismiss at 16–17, Picard v. Blumenthal, 11 Civ. 4293 (JSR). Moreover, when arguing that transfers from Madoff Securities fall outside the ambit of § 546(e) because they do not complete a securities transaction, the Trustee has referred the Court to 17 C.F.R. § 240.15c1-1, a securities regulation that defines the term "the completion of the transaction." Because the Court must consider these provisions of securities law as well as those identified in Flinn, the Court again concludes that the issue of § 546(e)'s application merits withdrawal.[1]

---

[1] The Trustee and SIPC argue that § 546(e) does not apply to those who allegedly knew of Madoff Securities' fraud. According to the Trustee and SIPC, such alleged "cognoscenti" could not believe that transfers from Madoff Securities settled securities transactions. Moreover, the Trustee and SIPC claim that alleged cognoscenti cannot receive any protection from securities contracts if they intended to defraud others when they entered into those contracts. Cf. In re FBN Food Service, Inc., 175 B.R. 671, 682 (Bankr. N.D. Ill. 1994) ("A document which is a clear embodiment of the intent of the parties which has the purpose or effect of defrauding creditors of the bankruptcy estate is not protected by the parol evidence rule. A transferee of fraudulently conveyed funds cannot hide behind a contract which in fact defrauds creditors."). Nonetheless, the question before the Court is not whether § 546(e) applies, but whether resolving that

5

Third, Greenberger, the M & B Weiss Family Limited Partnership, Shapiro, and the Elins Family Trust argue that the Trustee cannot avoid transfers that, under applicable securities laws, satisfied antecedent debts.  The Court considered this issue at length in <u>Picard v. Flinn Inv., LLC</u>, 2011 WL 5921544 (S.D.N.Y. Nov. 28, 2011), and concluded that it merited withdrawal of the reference.  For the same reasons, the Court withdraws the reference in each case in order to address this issue.[2]

Fourth, each of the defendants argues that the Supreme Court's decision in <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011), prevents the bankruptcy court from finally resolving fraudulent transfer actions because resolution of such actions requires an exercise of the "judicial Power" reserved for Article III courts.  For substantially the reasons stated in <u>Flinn</u>, the Court withdraws the reference in each case in order to address this issue.[3]

---

issue will require substantial and material consideration of non-bankruptcy law, which it plainly does.

[2] In connection with his arguments regarding antecedent debt, Greenberger notes that the Trustee apparently seeks to avoid transfers that occurred beyond the relevant limitations periods.  <u>See</u> 11 U.S.C. § 548(a)(1) (two years); N.Y. C.P.L.R. § 213 (six years).  Indeed, the Trustee's complaint includes a claim against Greenberger for recovery of "all" fraudulent transfers under N.Y. C.P.L.R. §§ 203(g) & 213(8), each of which provides that, for claims such as fraud, the statute of limitations begins to run only after a plaintiff, with reasonable diligence, could have discovered certain critical facts.  Nonetheless, the issue of whether the Trustee may invoke N.Y. C.P.L.R. §§ 203(g) & 213(8) to extend the relevant limitations period is separate and distinct from the issue of whether he may avoid transfers that purportedly satisfied antecedent debts, and thus the Trustee and SIPC did not address this separate issue in their opposition briefs.  The Court finds that Greenberger has not properly presented this issue and declines to address it.

[3] The Elins Family Trust defendants do not argue that the question raised by

6

Next, Avellino argues that the Trustee cannot bring avoidance actions under SIPA because that statute permits him to do so only "[w]henever customer property is not sufficient to pay in full the claims." 15 U.S.C. § 78fff-2(c)(3). The Court considered this issue in Flinn, and found that its resolution did not require substantial and material consideration of non-bankruptcy law. For the same reasons, the Court declines to withdraw the reference in Avellino to address this issue.

Avellino further argues that the Court should withdraw the reference to determine whether the Trustee has standing to bring fraudulent transfer claims. While the Trustee had initially brought common law claims against Avellino, the parties, in light of the Court's holding in Picard v. HSBC Bank PLC, thereafter stipulated to the dismissal of those claims. See Stipulation and Order dated September 19, 2011. This stipulation mooted any issues related to the common law claims in Avellino's motion to withdraw the reference. Nonetheless, Avellino maintains that his challenge to the Trustee's

---

Stern requires mandatory withdrawal, but instead that, under In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993), the Court should withdraw the reference for cause. Under Orion, a court deciding whether to withdraw for cause should consider "questions of efficient use of judicial resources, delay and costs to the parties, [and] uniformity of bankruptcy administration." 4 F.3d at 1101. Because what powers the bankruptcy court has to adjudicate fraudulent transfer claims ineluctably affects considerations such as how to efficiently use judicial resources and whether bankruptcy courts can uniformly administer the relevant laws, the Court follows its approach from Flinn and withdraws the reference to consider the question of the bankruptcy court's power. Once the Court has resolved the issue of the bankruptcy court's power to adjudicate fraudulent transfer claims, it will address the arguments put forth by the Elins Family Trust defendants concerning withdrawal for cause.

7

standing applied not only to the common law claims, but also to the Trustee's avoidance claims.

"It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991). While the Trustee's avoidance claims are "held by the bankrupt corporation itself" under the relevant provisions of the Bankruptcy Code, see, e.g., 11 U.S.C. § 548 ("The trustee may avoid any transfer . . . ."), Avellino argues that mere invocation of a bankruptcy statute alone does not suffice to create standing under Wagoner. Cf. In re Stanwich Financial Services Corp., 2011 WL 1331926, at *2 (Bankr. D. Conn. 2011) ("Moreover, Second Circuit Wagoner jurisprudence does not forestall, per se, the application of the rule simply because a bankruptcy trustee (or another representative of the bankruptcy estate) has invoked a statute to bring a claim."). The court in Stanwich, however, found a lack of standing only because the plaintiff sought to portray a claim brought on behalf of creditors as a fraudulent transfer claim. Id. ("The plaintiff's deletion of the phrase 'aiding-and-abetting' is a mere cosmetic change and does not alter the fact that the plaintiff continues to assert its fraudulent transfer action against Bear Stearns and Hinckley Allen (and others) on the basis that . . . they participated in the alleged scheme to defraud the debtor's creditors."). In other words, the Court found that the plaintiff could not invoke the statute as a pretext, not that

8

the plaintiff would lack standing to bring an avoidance claim on
behalf of the estate.  Simply put, Avellino has cited no case holding
that a Trustee lacks standing to bring an avoidance claim on behalf of
an estate.  Nor has Avellino identified any persuasive reason why a
court might reach that conclusion.  See In re Housecraft Indus. USA,
Inc., 310 F.3d 64, 71 (2d Cir. 2002) (noting that a challenge to
standing would be "meritless because §§ 548 and 549 both expressly
provide that the 'trustee may avoid' the fraudulent transactions
described in each provision").  In the absence of such reasons, the
Court concludes that resolution of this issue will require no more
than simple application of existing precedent and thus does not
warrant withdrawal.

For the foregoing reasons, the Court withdraws the reference of
these cases to the bankruptcy court for the limited purposes of
deciding:  (i) whether SIPA and other securities laws alter the
standard the Trustee must meet in order to show that a defendant did
not receive transfers in "good faith" under 11 U.S.C. § 548(c); (ii)
whether the Trustee may, consistent with non-bankruptcy law, avoid
transfers that Madoff Securities purportedly made in order to satisfy
antecedent debts; (iii) whether, in light of this Court's decision in
Picard v. Katz, 11 U.S.C. § 546(e) applies, limiting the Trustee's
ability to avoid transfers; (iv) whether, after the United States
Supreme Court's recent decision in Stern v. Marshall, 131 S. Ct. 2594
(2011), final resolution of claims to avoid transfers as fraudulent
requires an exercise of "judicial Power," preventing the bankruptcy

9

court from finally resolving such claims; and (v) whether, if the
bankruptcy court cannot finally resolve the fraudulent transfer claims
in this case, it has the authority to render findings of fact and
conclusions of law before final resolution.  In all other respects,
the motions to withdraw are denied.

The parties should convene a separate conference call for each
case no later than March 5, 2011 to schedule further proceedings.  The
Clerk of the Court is hereby ordered to close document number 1 on the
docket of each case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        February 29, 2011

10

```
                                                              1
    1715pic1                 argument
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   IRVING PICARD,
3
4                 Plaintiff,
4
5           v.                          11 Civ. 3605 (JSR)
5
6   SAUL B. KATZ, et al.,
6
7                 Defendants.
7
8   ------------------------------x
8
9                                    July 1, 2011
9                                    4:40 p.m.
10  Before:
10
11                    HON. JED S. RAKOFF,
11
12                                      District Judge
12
13                    APPEARANCES
13
14  BAKER HOSTETLER
14       Attorneys for Plaintiff
15  BY:  DAVID J. SHEEHAN
15       FERNANDO A. BOHORQUEZ, JR.
16
16  DAVIS, POLK & WARDWELL, LLP
17       Attorneys for Defendants
17  BY:  KAREN E. WAGNER
18       DANA M. SESHENS
18
19  SECURITIES INVESTOR PROTECTION CORPORATION
19       Attorneys for Intervenor
20  BY:  CHRISTOPHER H. LaROSA
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

2

1715pic1                     argument

```
 1              (Case called)
 2              MS. WAGNER:  Good afternoon, your Honor.  Karen
 3    Wagner, member of the firm of Davis, Polk & Wardwell for the
 4    Katz defendants.
 5              THE COURT:  Good afternoon.
 6              MS. SESHENS:  Dana Seshens, also with Davis, Polk &
 7    Wardwell also for the Katz defendants.
 8              THE COURT:  Good afternoon.
 9              MS. SESHENS:  Good afternoon.
10              MR. SHEEHAN:  Good afternoon, your Honor.  David
11    Sheehan with Baker Hostetler for the trustee.
12              THE COURT:  Good afternoon.
13              MR. BOHORQUEZ:  Good afternoon, your Honor.  Fernando
14    Bohorquez for the trustee.
15              THE COURT:  Good afternoon.
16              MR. LaROSA:  Christopher LaRosa for the Security
17    Investor Protection Corporation.
18              THE COURT:  We are here on the motion to withdraw the
19    bankruptcy reference.  Let me hear first from moving counsel.
20              MS. WAGNER:  Thank you, your Honor.
21              Your Honor, we are here to withdraw the reference
22    because the case that is pending in the bankruptcy court, the
23    adversary proceedings, raise a number of issues that require
24    significant interpretation of SIPA and that also require
25    significant interpretation of how SIPA interacts with other
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                3
        1715pic1                  argument
 1   laws including security, state law and the bankruptcy code.  So
 2   we believe withdrawal of the reference is mandatory.
 3          THE COURT:  This mostly comes up by way of your
 4   defenses.
 5          MS. WAGNER:  Correct.
 6          THE COURT:  Does that matter?
 7          MS. WAGNER:  I don't think it matters at all, your
 8   Honor.  I think the -- we are saying that there is no basis for
 9   the adversary proceedings because the avoidance laws cannot be
10   applied in the way that the trustee is seeking to apply them
11   and therefore we believe withdrawal of the reference is
12   mandated now because all of the papers are before you.  This
13   might be an issue, I think it is one reason we didn't
14   immediately move to withdraw the reference.  There might be an
15   issue if the only thing pending in front of you was a complaint
16   for awardance.  But you now have pending before you a completed
17   motion to dismiss and, indeed, for summary judgment dismissing
18   the complaint, which lays out all of the legal arguments
19   related to that complaint.  So, I do not think that that is
20   relevant.  I think this case is absolutely ripe and it is
21   appropriate to consider all of these issues at this time.
22          THE COURT:  Go ahead.
23          MS. WAGNER:  Thank you, your Honor.
24          As your Honor is well aware, the issue before the
25   Court right now is very narrow, it is due to legal questions
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

4
                1715pic1                    argument
1   presented by the underlying motion require that the presiding
2   Judge engage in a significant interpretation of federal laws
3   apart from the bankruptcy statute, Title 11 of the U.S. Code.
4   We do contend, as I said, that they certainly do.
5          The trustee is seeking a billion dollars from the
6   plaintiffs which constitute sums withdrawn from their brokerage
7   accounts over more than two decades.  These payments, when they
8   were made, were protected by state and federal laws that are
9   well established and that govern the relationship between a
10  broker and its customer and there would have been no question
11  that no SIPA case commenced, but these transfers were entirely
12  legally valid and appropriate and, indeed, had a customer at
13  any time prior to the filing of the SIPA case, had the broker
14  refused to make these payments, the customer could have gone to
15  a Court and gotten a judgment requiring the broker to make the
16  payments.
17         THE COURT:  So, what are you saying, in part, as I
18  read your papers, is that the trustee is seeking to impose on
19  you, after the fact, duties that you would not have had at the
20  time of the underlying events and that his purported basis for
21  doing so is the bankruptcy law but it places, in your view,
22  that law in conflict with the laws that actually created your
23  duties at the time of the events.
24         MS. WAGNER:  That's absolutely true, your Honor.  And
25  we further would argue that the laws that govern at the time
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

5

```
        1715pic1                  argument
  1  were such that when the payments were made, they discharged
  2  antecedent debt, to use the terms that are used in the
  3  bankruptcy and SIPA context.  They discharged antecedent debt
  4  and I think we are very definitely arguing that you cannot have
  5  avoidance of any transfer that does discharge a valid
  6  antecedent debt.  So, that is another of our arguments.
  7           And, of course, finally we are arguing that a
  8  provision of the bankruptcy code, Section 546E, also limits
  9  very strongly the kinds of avoidance actions that can be
 10  brought in this case.  That's correct, your Honor.  But, our
 11  principal argument certainly is that the laws that were in
 12  effect at the time that all of this occurred, the laws were not
 13  SIPA, obviously, and SIPA, we argue, does not have any
 14  retroactive effect.
 15           The trustee is arguing that because this is a SIPA
 16  case -- and I think he is arguing that it is because it is a
 17  Ponzi scheme that commenced, was the cause for the trigger of
 18  this SIPA proceeding -- that none of these laws can be
 19  considered to apply anymore, that he is permitted to go back in
 20  time, redo everything under a scheme which is unprecedented in
 21  any court before this, and he can reallocate people's rights
 22  and he can take away the antecedent debt defense because he is
 23  going to recalculate what that debt was at the time when it was
 24  discharged and on that basis he can engage in this effort to
 25  recalibrate everybody's rights.
```

Case 1:12-cv-07935-JA Document 176 Filed 03/16/12 Page 6 of 35 Exhibit 5

```
                                                          6
        1715pic1                    argument
1            Whether or not he can do that of course is the
2       question that will be before the Court that hears this.  The
3       question before your Honor is does this raise a huge question
4       of interpreting a law other than Title 11.  And of course we
5       argue that it does.  Trustee's argument is based principally, I
6       believe, on the provisions in SIPA that govern net equity and
7       customer.  Those are definitions that he uses to contend that
8       he can in fact go back and recalculate all these claims so that
9       he can even out customers losses over time and to do that by
10      recovering from some people to pay other people.  This is an
11      unprecedented interpretation of SIPA.  By itself I think it
12      would mandate withdrawal.
13            THE COURT:  I don't think he is saying quite that.
14            What he is saying, at least to the extent that I was
15      able to read his 373-page complaint without falling asleep but
16      I do admire his Tolstoy-like rhetoric, was that your clients
17      knew from if not the beginning, certainly early on during their
18      25-year relationship with the Madoff company, that this was a
19      Ponzi scheme and because your clients had, if you will, the
20      inside track, they were reasonably comfortable in going along
21      with the scheme figuring they would be the most likely not to
22      be left holding the bag when the scheme came tumbling down.  Of
23      course, as it turns out, you lost what, a half billion dollars
24      or something like that.  But I'm not sure that's quite the same
25      as your theory of let's redistribute the wealth.
```

```
                                                              7
      1715pic1                    argument
 1              MS. WAGNER:  Your Honor, first of all, of course we
 2    take issue with all of that.  Secondly --
 3              THE COURT:  No, I understand.  These are just
 4    allegations.
 5              MS. WAGNER:  Absolutely.
 6              Secondly, I think even the trustee doesn't allege
 7    exactly that.  He alleges that we should have known starting at
 8    some point in --
 9              THE COURT:  He says you were willfully blind.
10              MS. WAGNER:  He does say that.
11              THE COURT:  It is not quite should have known and it
12    is not quite did know, it is in between.
13              MS. WAGNER:  That's correct, your Honor.  And we have
14    disputed all of that.  But even if that were -- if there were
15    some world in which that were true, there is still a question
16    that is raised on this motion for summary judgment which is
17    what law applies to that analysis.  Is the law the law of the
18    bankruptcy code that says according to the trustee, first of
19    all, I can avoid this debt for, quote unquote, fictitious
20    profits; and secondly, I can avoid it all because these people
21    should have known.
22              What is the law that governs that?  We argue that at
23    the time these transfers occurred it was the securities laws
24    that governed it and the securities laws do not impose upon a
25    customer any obligation to investigate his broker.  In fact,
```

Case 1:12-cv-01939-GA  Document 176  Filed 03/16/12  Page 8 of 38

8

1715pic1                    argument

1    the securities laws are quite the opposite, they protect the
2    customer.  And I think fairly read --
3            THE COURT:  Are you saying that under the securities
4    laws one sued by a customer could not assert an in pari delicto
5    defense based on willful blindness?
6            MS. WAGNER:  Your Honor, I think if you are positing
7    that the customer would sue the broker for returning the
8    securities on his statement but the broker would say that you
9    are in pari delicto.
10           THE COURT:  You knew or willfully blinded yourself to
11   what was going on in our Ponzi scheme, therefore --
12           MS. WAGNER:  Your Honor, I think in that situation
13   probably the law would leave everybody where they are, I think,
14   at that point.  But, if that were the situation that was
15   presented, I do think what they would have to prove is that the
16   customer, when the customer made the investment with the
17   broker, the customer knew at that point that there was a Ponzi
18   scheme going on.  That is not the allegation being made here.
19           The avoidance principles depend upon the transfer
20   itself being avoidable and we are arguing that that transfer is
21   not avoidable on the good faith basis alleged in the bankruptcy
22   code, it has to be -- they have to prove that the customer knew
23   at the time of the investment that Madoff was engaged in a
24   Ponzi scheme, knew that they were involving themselves in a
25   fraudulent scheme, and if they can prove that the customer was
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

9

1715pic1                              argument

1 therefore complicit then maybe there is an argument that there
2 was no antecedent debt to back up the transfer had they got the
3 money.
4          This is all governed by the bankruptcy code.  The
5 complaint, it is an avoidance complaint under the bankruptcy
6 code and their position is, in the complaint, that the
7 transfers were taken in bad faith because we should have known
8 or were willfully blind that the transfers were transfers of
9 other people's money.  Our argument is you can't -- that is not
10 a valid analysis where the transfers are from a broker to a
11 customer based on a regularly issued statement.  At that point
12 you have to prove that the customer knew when the customer put
13 in the money that the broker was engaged in a fraudulent
14 scheme, so the customer is effectively --
15          THE COURT:  There is a duty imposed.
16          MS. WAGNER:  Correct.
17          THE COURT:  And that's where you say the conflict
18 between the alleged interpretation of the bankruptcy law
19 invoked by the trustee and your interpretation of what your
20 duty was under the securities laws, that's the issue that you
21 think needs to be resolved by an Article 3 Court.
22          MS. WAGNER:  There are several parts of that package
23 but, yes, that is fundamentally the issue.  Yes, your Honor.
24          THE COURT:  Let me hear from your adversary.  Thank
25 you.

10

1715pic1                    argument
```
 1              MS. WAGNER:  Thank you, your Honor.
 2              MR. SHEEHAN:  Your Honor, not surprisingly, we
 3    disagree.  I don't think there is an iota of an issue that
 4    requires Article 3 firepower here.  Indeed, what we have before
 5    your Honor is a classic case that is brought every day in the
 6    bankruptcy court resolved by a bankruptcy judge involving
 7    issues that he deals with every day including antecedent debt
 8    which is part and parcel of every proof of claim in front of a
 9    judge that he deals with every day.
10              THE COURT:  Well, let me ask you this:  Your complaint
11    substantially asserts a theory of willful blindness, yes?
12              MR. SHEEHAN:  Yes, your Honor.
13              THE COURT:  And willful blindness is a function, in
14    part, of what there was a duty to look at.  For example, in all
15    the great accounting cases involving willful blindness the
16    theory of the law is that an accountant has a duty to probe
17    beyond what the average person would be probing and therefore
18    if the accountant fails, purposefully or consciously fails to
19    look for stuff that the average person would have no reason to
20    look for but which an accountant has a duty to look for, then
21    the accountant is engaged in willful blindness and may be
22    liable in the same way as an intentional participant.
23              So, in this case is there not an issue of what was the
24    duty to look of a customer situated in the position of the
25    defendants here, and isn't that a function of non-bankruptcy
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                      11
        1715pic1                   argument
 1    law?
 2              MR. SHEEHAN:  Absolutely not.
 3              First of all, the accountant analogy --
 4              THE COURT:  I am glad it is absolutely not as opposed
 5    to just no.
 6              MR. SHEEHAN:  I suspect, your Honor, that it sounded a
 7    little bit overstated there but I can't react to it more
 8    strongly, your analogy than that, because we are not talking
 9    about accountants here or the decades and decades of law
10    evolved through statute and decisional law surrounding
11    accountant liability has no application here to begin with.
12              Secondly --
13              THE COURT:  No, no.  The analogy was designed to raise
14    the question of whether willful blindness, by its very nature,
15    can only be determined if one knows what duty there was, if
16    any, to look.
17              MR. SHEEHAN:  Yes.
18              THE COURT:  Willful blindness means turning away
19    from -- purposefully turning away from what one should have
20    been looking at.  And if the law, for example, was in a given
21    situation then one had no duty to look at anything.  Then there
22    could never, in that hypothetical, be any willful blindness
23    theory.
24              So, doesn't -- don't you have to determine, in any
25    willful blindness case, what law determines what you need --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```

12

1715pic1                    argument

     what the duty is to look?
1              MR. SHEEHAN:  That was my second point.
2              THE COURT:  Yes.
3              MR. SHEEHAN:  I believe that you are absolutely right
4  and there is a body of law, it is well-established, been in
5  force for decades called the Bankruptcy Law.  It is now
6  embodied in Bankruptcy Code that has within it the law that
7  provides that if you, as a creditor, operated on inquiry notice
8  that you, during the course of the existence -- pre-bankruptcy
9  the existence of that company had reason to know that something
10 untoward was occurring without necessarily knowing exactly what
11 it was, that you stand in a different position vis-a-vis the
12 body of innocent creditors who had no reason to know, no
13 inquiry notice.  That is the body of law which is why I said at
14 the outset we are in the bankruptcy world here, we are dealing
15 with bankruptcy law and the bankruptcy code and these issues
16 are dealt with there every day.  None of this requires your
17 Honor to get involved using Article 3 power to make that
18 decision.  It is done on a routine basis.
19             If you go through each and every one of the elements
20 raised by my adversary whether it is antecedent debt, as you
21 suggested to, you're dealt with every day, part and parcel of
22 what the bankruptcy court does in determining what?  A proof of
23 claim.  A proof of claim is the quintessential -- it is the
24 essence of what goes on in the bankruptcy court.
25           SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

13

1715pic1                     argument

 1          What we have here is our adversaries file proofs of
 2   claim, we file adversary proceedings against them suggesting,
 3   no, you are not entitled under 502D of the Bankruptcy Code to
 4   get paid.  Why?  Because two reasons.  One, under certain
 5   sections of the code you have received fictitious profits in
 6   the context of a Ponzi scheme other people's money.  You cannot
 7   keep it, you never gave fair value.  Another unique bankruptcy
 8   code law.
 9          Then, beyond that, we say you acted in bad faith.
10   What does bad faith mean in a bankruptcy context?  You are in
11   inquiry notice.  The litany of things in the perhaps overly
12   long complaint but we think it is just right, outlines what was
13   exactly going on, what was going on over decades that puts
14   those folks on notice that makes them stand out differently
15   than the other body of creditors.
16          THE COURT:  Is there not a difference, now, since you
17   are suggesting, between a situation where a creditor says I
18   want to be paid money that I've not previously been paid and
19   you say, well, under the bankruptcy law the remaining assets of
20   the debtor have to be apportioned taking account of all the
21   things you just mentioned, so you may be out of luck.
22          MR. SHEEHAN:  Yes.
23          THE COURT:  Isn't that very different from a situation
24   where you say we are going to go back 25 years and claw back
25   from you monies that you got years and years ago on a theory
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1715pic1                    argument
 1   that because the happenstance occurred that the person who paid
 2   you ultimately went into bankruptcy decades later, the
 3   bankruptcy standard governs whether we can get back from you or
 4   not the money you were paid as opposed to what the law would
 5   have been if there had been no bankruptcy decades later.
 6            Isn't that a very different question?
 7            MR. SHEEHAN:  I may have lost the thread of your
 8   question there, your Honor.
 9            THE COURT:  Well, my fault in making it too wordy.
10            What I am trying to suggest is it seems to me there
11   might well be a difference in saying that if a debtor goes into
12   bankruptcy and you want to get money out of the estate of that
13   debtor, you have to meet the requirements of the bankruptcy law
14   as opposed to saying we, the trustee, can go back and get from
15   you a billion dollars for conduct that you took years before
16   there was any remote possibility or likelihood of bankruptcy
17   and yet apply the bankruptcy law to your conduct post facto.
18            MR. SHEEHAN:  I understand the distinction, your
19   Honor, and I do see those as two different situations, but I
20   still think in the context of what we are arguing here today,
21   the bankruptcy code controls both of those situations because
22   the bankruptcy code anticipates the latter illustration.  It
23   anticipates that there can be pre-petition conduct that is
24   going on within an organization that would give you inquiry
25   notice that there is something untoward occurring and the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

```
     1715pic1                    argument
 1   bankruptcy code gives the authority to the trustee to look
 2   back, to look back on that conduct and say, look, if we are
 3   going to have the equality of distribution of these assets
 4   those who are seeking relief like the first guy in your
 5   illustration, the guy who had been --
 6           THE COURT:  It is not equality of distribution of the
 7   assets, it is equality of distribution of sums that you are
 8   seeking to recover.
 9           MR. SHEEHAN:  Well, yes and no.  I think you're right
10   but I think I am too.  I think we both are.
11           The reason I said equality of distribution is this --
12           THE COURT:  Well, that's comforting.
13           MR. SHEEHAN:  I feel good about it.  I certainly do.
14           What I meant by that, your Honor, is this:  Is that
15   the estate happens, lights go out.  Everybody is standing still
16   looking around, where do we stand vis-a-vis this estate?  The
17   trustee comes in and what is his job?  His job, which has gone
18   on for decades, this is not a new unprecedented approach by a
19   trustee, this is exactly what trustees have done going back, as
20   we said to the Cunningham case in 1924; they take a look at it
21   and they say, okay, we have a vast body of people all seeking
22   to partake in the estate that has now been created by a
23   function of the bankruptcy law.  He then has to, or she has to
24   look at it and say, okay, we have to evaluate these claims and
25   then part of evaluating it is are there distinctions between
```

16

1715pic1                          argument

1   them.  If all that was doing was during the course of
2   bankruptcy -- and he is different than perhaps somebody who is
3   perhaps dealing with it and was taking money out during a
4   pre-satisfaction and that person is on an unequal footing
5   vis-a-vis the estate frozen in period of time they're ahead of
6   the game, they got more money than they should have.  That's
7   what the code is saying.  That's what the bankruptcy law is
8   saying.
9          So, the trustee creates this pool of money and then
10  redistributes it.  That doesn't mean that, for example, in the
11  Katz/Wilpon situation where a claim has been filed and it is a
12  net loser claim that ultimately Katz/Wilpon will participate in
13  the distribution, they will, upon resolution of this litigation
14  because it is all within the context, just as Chief justice
15  Roberts taught us in Stern v. Marshall, when you in fact have
16  the resolution of the claim resolving all of their issues and
17  it all gets resolved at once, where does it belong?  In the
18  bankruptcy court.  It is not before an Article 3 Judge.  There
19  are no such issues here before your Honor today.
20         What is 546E but a bankruptcy code provision.  What
21  did we learn the other day from the Enron decision?  Did anyone
22  say that justice Gonzalez did not have jurisdiction, that he
23  went beyond his powers.  Of course not.  He didn't like it,
24  they reversed it.  I think Judge Koeltl was right, not the
25  majority, but that's my opinion.  The point is, at the end of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                                17
          1715pic1                    argument
  1     the day they didn't say there was no jurisdiction.  Why?
  2     Because it was the bankruptcy code.  And Judge Gonzalez had
  3     every right and did the right thing and he decided that,
  4     ultimately got reversed but he was in the right ballpark, he
  5     had jurisdiction.
  6              THE COURT:  Was that issue raised?
  7              MR. SHEEHAN:  It is raised here that that is an issue.
  8              THE COURT:  No, no.  I'm saying in the Second Circuit
  9     decision that you are referencing, the Enron decision, was the
 10     issue of whether Judge Gonzalez had jurisdiction and that there
 11     should have been mandatory withdrawal to a district court?  I
 12     don't recall that issue being raised.
 13              MR. SHEEHAN:  And of course it wasn't.
 14              THE COURT:  So, what is the relevance?
 15              MR. SHEEHAN:  Because it would be inappropriate to do
 16     so.
 17              THE COURT:  No, no, no.  This is a funny argument.
 18              What you are saying is that a Court, in this case the
 19     Second Circuit, didn't decide an issue that was never presented
 20     to them.  Yes, indeed.  And in fact that's their job not to
 21     decide issues that are not presented to them except in the most
 22     extraordinary circumstances.
 23              I don't see what the relevance of that case is.
 24              MR. SHEEHAN:  I think it is only relevant in this
 25     sense:  That it represents traditionally whether it has been
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

18

1715pic1                     argument
1   dealt with in 546E.  There is no change, there is no
2   unprecedented nature of a 546E application.  It represents only
3   that.  I'm not suggesting otherwise, that if your Honor looks
4   back at the history of 546E and the cases that dealt with that,
5   they've never said that that belongs not -- and your Honor may
6   say well, it was never raised and the reason it was never
7   raised is because it appropriately belongs -- belongs with the
8   bankruptcy judge.  He resolves that issue.  Yes, it is
9   appealed, yes, it is reviewed, but there is no basis for
10  suggesting that somehow this requires the presence of five --
11          THE COURT:  I still find it, forgive me, a funny
12  argument that because an issue has -- your argument essentially
13  because an issue has not been raised previously therefore the
14  issue is without merit.  On that theory, of course, there would
15  never be any changes in the law whatsoever.
16          MR. SHEEHAN:  I understand that, your Honor, and
17  perhaps I am making more of it than I should and your Honor's
18  admonition is well understood.  I was simply suggesting that in
19  fact there is no basis -- let me just abandon that, since it is
20  clearly unappealing.
21          The thing that I was trying to get through to your
22  Honor is this, is that 546E is part of the code.  It gets
23  resolved on a daily basis by bankruptcy judges.
24          THE COURT:  That I do understand.
25          MR. SHEEHAN:  And there is no basis here for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

19

1715pic1                      argument

1   suggesting that that somehow reaches out and requires Article 3
2   firepower.  It just doesn't.  And the same thing is true with
3   the other issues that are raised.  Think about it.  What was
4   being argued to your Honor here copiously in the briefs is
5   Article 8 of the UCC.  Last time I looked that does not trigger
6   157 D firepower.  It just doesn't.  That's a state law issue.
7             And, by the way, the very state law, interestingly
8   enough, anticipate a bankruptcy filing.  And what does that
9   very state law tell you?
10            THE COURT:  You mean the debtor/creditor law?
11            MR. SHEEHAN:  No, not Article 8 itself.
12            THE COURT:  Article 8 of the UCC.
13            MR. SHEEHAN:  Right, suggest -- doesn't suggest, it
14  states -- all these rules in there, antecedent debt, what the
15  broker owes based on the statement, all of that gets trumped --
16  trumped -- by the filing of the SIPA proceeding and SIPA takes
17  over and controls.  Two reasons, one, it says so; secondly,
18  supremacy clause.
19            So, is that, again, the kind of issue that requires
20  the Article 3 Judge to step in and resolve?  We suggest not.
21  It is something that clearly was dealt with and very readily so
22  by Judge Lifland along with the antecedent debt issues which he
23  dealt with.  All of those things are things that are dealt
24  with, traditionally, by the Court every day.  These are not
25  unique issues, they're quite frankly, respectfully, we can call

20

1715pic1                    argument
1  them core but another term can be run of the mill.  They're
2  there every day and every bankruptcy judge deals with them and
3  nothing that has been raised here changes any of that other
4  than to suggest, in sort of a conclusory fashion, it is
5  unprecedented.  It is novel.  In what sense is it novel?  It is
6  not novel at all.  It is the kind of thing, as I said more than
7  once and I am repeating myself, are dealt with every day in the
8  bankruptcy court.
9          THE COURT:  You are saying that all they're saying, in
10 your view, is that because it is big bucks it is novel and that
11 doesn't -- that's a distinction without difference.
12         MR. SHEEHAN:  No, I don't think it is just big bucks,
13 your Honor.  I think -- and I value my colleague's opinion and
14 their positions here, I understand what they're saying.  I
15 think what they're trying to suggest, your Honor, is that
16 somehow because there is a SIPA statute involved that that
17 somehow creates a federal question issue for your Honor to
18 reach out and deal with.  And that might be so in another
19 context such as you recently decided in HSBC which they
20 referred to.
21         THE COURT:  There is no doubt in my mind that this is
22 a very different situation from HSBC and that, to be frank, in
23 my view, is an easy case for withdrawal.  This is a much closer
24 case.  So, I agree with you that that involved issues that are
25 not remotely triggered here.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

1715pic1                     argument
1    MR. SHEEHAN:  And, your Honor, obviously I'm
2    advocating my position that it is beyond remote, they're not
3    even in the ballpark.  No pun intended.
4        At the end of the day what we are looking at here, and
5    as your Honor studies this and looks at it, and I know you
6    will, each of those issues raised by --
7        THE COURT:  I think that is a terrible slight to a now
8    winning team.
9        MR. SHEEHAN:  4 out of 5, they're looking pretty good,
10   Judge.  They're looking pretty good.
11       But, the point is that as we study the law with regard
12   to mandatory withdrawal of the reference -- and that is what we
13   are talking about here, we are talking about mandatory
14   withdrawal of the reference -- and so I get it right, I'm going
15   to treat and I am reading from the Ionosphere case we are
16   talking about, the Ionosphere decision in the Second Circuit,
17   it says that it should be construed narrowly to begin with.
18   And I don't think there is anything here that would suggest you
19   should go beyond that, and that mandatory material
20   consideration of non-bankruptcy federal issues that are
21   necessary for resolution, I submit to your Honor as your Honor
22   canvasses these issues and looks at these issues as I just have
23   done, I won't repeat it, none of those reach that level, reach
24   that criteria that require you to reach out and bring them to
25   you.  I believe that all of those issues, and many of them as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

1715pic1                    argument
1    we have outlined to your Honor, and I don't want to get into
2    that part of the brief, have already been dealt with.  Many of
3    these issues have been dealt with in the context of the net
4    equity dispute.  Clearly in the net equity dispute those issues
5    of antecedent debt, state law, UCC, all were argued before
6    Judge Lifland, before the Second Circuit.  All of those issues
7    were dealt with there because they're appropriately dealt with
8    in that context.  There is no need to then go to this Court and
9    suggest that there is a need to review them again.
10            THE COURT:  All right.  Thank you very much.
11            MR. SHEEHAN:  Thank you.
12            THE COURT:  Did counsel for SiPC want to say anything?
13            MR. LaROSA:  Just a couple of comments, your Honor.
14            First of all, it seems to me that there may actually
15    be two issues that are raised here, not one.  The first issue
16    is whether or not, as we see it whether or not the existence of
17    whether or not the account balances that are reflected on
18    fraudulent account statements issued as part of the Ponzi
19    scheme can qualify as antecedent debt for purposes of the
20    bankruptcy code and that's clearly a bankruptcy code question.
21            The second question is the one that wasn't much
22    discussed in the papers but one which I think your Honor has
23    raised today which is what significance, if any, does a pre
24    liquidation duty or lack of duty stemming from some
25    non-bankruptcy securities law have for purposes of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

```
                                                    23
        1715pic1                    argument
 1   bankruptcy code.
 2           THE COURT:  Yes.  And you correctly state -- it was
 3   interesting to me that although this was raised by the movants,
 4   neither the movants nor the respondents spent as much time on
 5   that issue as on the other issues but it does seem to me to be
 6   at least a colorable issue and that's why I wanted to hear what
 7   you had to say to that.
 8           MR. LaROSA:  We think perhaps it is a colorable issue
 9   but we think if it is, it is a colorable issue under the
10   bankruptcy code.
11           The question is, for example, assuming arguendo that
12   there were no duty, what effect, if any, would that have under
13   the avoidance provisions.  That would be the issue.  And so it
14   is really --
15           THE COURT:  Well, I am looking, for example, at what
16   the Second Circuit said in In Re: New Times Security Services,
17   Inc., 371 F.3d 68, (2d Cir. 2004) that is referenced in the
18   papers, "A goal of greater investor diligence is not emphasized
19   in the legislative history of SIPA.  Instead, the drafters'
20   emphasis was on promoting investor confidence in the securities
21   market and protecting broker/dealer customers."
22           So, one reading of that, and certainly not
23   self-evident but one reading of that would be that Congress
24   envisioned that SIPA would not be used to impose the kind of
25   duty that allegedly would trigger the willful blindness
```

Case 1:12-cv-01959-JA Document 3-6 Filed 03/18/12 Page 24 of 38

                                                                    24
      1715pic1                      argument
 1    avoidance of duty that's asserted here in the complaint.  And I
 2    guess my question to you is, assuming that's a reasonable
 3    interpretation of SIPA and of what the Second Circuit said
 4    about SIPA but assuming that it is by no means a slam dunk
 5    interpretation given that it wasn't exactly what was being or
 6    even in the same context when it was raised in the New Times
 7    Securities case as it is in this case, isn't the determination
 8    of what duty or not there is which is the premise on which any
 9    willful blindness deviation from that duty would fall a
10    question of non-bankruptcy law and important question of
11    non-bankruptcy law, a non-obvious question of non-bankruptcy
12    law that needs to be resolved by the District Court?
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

25

171Wpic2

1          MR. LA ROSA:  Your Honor, that case came up in the
2  context of whether or not to allow a customer claim, and that's
3  a very different scenario --
4          THE COURT:  I agree.
5          MR. LA ROSA:  -- than the one we're involved in here.
6          Obviously SIPA is a remedial statute.  While the
7  customers provisions do have to be construed narrowly, and
8  we're not even sure the statute is properly applied, it is a
9  remedial statute and I think the feeling was in that case that
10  one shouldn't penalize claimants too much or require too much
11  of them in making a decision about whether or not to allow the
12  claims.  That's a totally different context than what we're
13  dealing with here, which is a situation where someone has
14  received essentially transfers of other people's money.
15          THE COURT:  What law do you say --
16          MR. LA ROSA:  And extends the Bankruptcy Code, by the
17  way.  SIPA incorporates by reference --
18          THE COURT:  Yes.  So what law do you say determines
19  the duty of inquiry, if any, of a customer of a securities
20  brokerage firm of the kind that Mr. Madoff had here?
21          MR. LA ROSA:  In the context of the causes of action
22  brought by the trustee?
23          THE COURT:  Yes.
24          MR. LA ROSA:  It would be the avoidance provisions of
25  the Bankruptcy Code.

26

171Wpic2

1          THE COURT:  I must say I find that very difficult to
2    understand, and forgive me, I certainly want to hear your
3    response.
4          MR. LA ROSA:  Sure.
5          THE COURT:  How can it be that the law governing
6    someone's duty to inquire at a given moment in time is
7    determined not by what the governing laws in place at that
8    moment in time were as to what in the normal course would be
9    that person's duty, but by the happenstance that, decades
10   later, the entity involved went into bankruptcy?
11         MR. LA ROSA:  That's the nature of bankruptcy law,
12   your Honor.
13         THE COURT:  I'm not sure I agree with that.  That is
14   clearly the nature of bankruptcy law to the extent that a
15   creditor is making claims for what the creditor has not
16   previously received.  It's clearly the nature of bankruptcy law
17   with respect to preferences within the 90-day period.  I'm not
18   so sure that that's the established law governing duty of
19   inquiry with respect to claims made by the trustee for events
20   that occurred 20 years earlier.  What's your authority on that?
21         MR. LA ROSA:  It would be the Bankruptcy Code itself.
22   By the way, your Honor --
23         THE COURT:  Where do you find that in the Bankruptcy
24   Code?
25         MR. LA ROSA:  Let me point your Honor to a case
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

27

171Wpic2
1  decided about four years ago by the Bankruptcy Court in this
2  district.  It's called In re Bayou Group LLC, 362 B.R. 624.
3  It's a Ponzi scheme, of course, very much like this case.  It
4  was a case involving fictitious account statements that were
5  issued, very much like this case, that showed fictitious
6  account balances, very much like this case, and, of course, the
7  trustee attempted to, in that case, recover redemption payments
8  that were made on the basis of the balances shown in these
9  fraudulent account statements, and there was a motion to
10 dismiss filed.
11             THE COURT:  Was it a willful blindness case?
12             MR. LA ROSA:  The words willful blindness were not
13 used.
14             THE COURT:  Because I think it's totally different.
15 You don't need the bankruptcy law at all if you're dealing with
16 a coconspirator or thief.  That law, I think, goes back about
17 500 years.  But willful blindness, by contrast, has been one of
18 the most controversial areas in the law, both bankruptcywise
19 and nonbankruptcywise, for at least the last four decades.
20             MR. LA ROSA:  I guess my point, your Honor, is what
21 the court decided in that case was not to give effect to the
22 balances shown on these account statements despite the fact
23 that it's quite possible that the recipients of these
24 redemption payments could have enforced what purported to be
25 their right to the assets shown on those statements prior to
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

28

171Wpic2
1   the commencement of the bankruptcy.  In other words, the
2   bankruptcy law, in effect, vitiated a prior right that existed
3   prior to the bankruptcy.  And that doesn't seem to me to be
4   dissimilar to what's going on here.  In fact, what we're saying
5   is the bankruptcy law now determines whether or not you can get
6   away with willful blindness when you could before.
7           THE COURT:  I understand that argument.  I think that
8   is different from saying that the bankruptcy law determines
9   what is willful blindness in a particular context.  That is, I
10  think, not inherently a function of the bankruptcy law, at
11  least I haven't yet been persuaded it is.  It's one thing to
12  say if you were in fact willfully blind under whatever the
13  appropriate legal standard was, then you may owe money to the
14  bankruptcy trustee.  It's quite something else to say, And
15  we're going to determine after the fact, so to speak, under the
16  bankruptcy law, what the definition of willful blindness in any
17  given context is oblivious to any other federal laws that may
18  set the standard.
19          MR. LA ROSA:  I don't think it would be oblivious to,
20  your Honor.  I think it would merely be, in effect, the
21  Bankruptcy Code ultimately sort of resolves the issue.  It
22  might be, for example, that they would present evidence and
23  make the argument that they had no duty under preliquidation
24  law and that should be taken into account in determining, for
25  example, whether or not they were willfully blind for purposes

Case 1:12-cv-01959-VA   Document 1-6   Filed 03/18/12   Page 25 of 35

```
                                                              29
       171Wpic2
 1     of the application of the avoidance provisions, but it wouldn't
 2     be determinative.  It would be bankruptcy law that would be
 3     determinative.  It would be, in a sense, a piece of evidence
 4     that they would offer and an argument that they would make, but
 5     it wouldn't settle the matter.
 6             THE COURT:  Thank you very much.
 7             Let me hear in rebuttal from counsel for the
 8     defendants.
 9             MS. WAGNER:  Thank you, your Honor.
10             I think that this argument has resulted in a focus on
11     a number of things that are very important to this discussion,
12     a key one being we are not here before your Honor to discuss
13     the merits of our proof of claim in this bankruptcy.  That is
14     an issue which is in fact in front of the Second Circuit, and
15     that is an extremely different issue, as your Honor has pointed
16     out, from how you judge the actions of a party 20 years before
17     a SIPC proceeding was filed, and those are extremely different
18     issues.  I think that it is impossible to say, especially when
19     you're dealing with a regulated broker-dealer whose customers
20     have the benefits of the federal securities laws, it's
21     impossible to say, or at least I should say an Article III
22     judge should decide whether the protections of the federal
23     securities laws somehow are vitiated by the ultimate filing of
24     a SIPC proceeding.  That seems to me very unlikely, but it is
25     what is being presented to you today.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

30

171Wpic2

```
 1              If I could just address a couple of other things that
 2    were discussed.  First of all, the 546(e) issue in Enron.
 3    There's no question that the issue in Enron was does 546(e)
 4    cover redemptions on commercial paper.  That is definitely a
 5    bankruptcy question because it's a 546(e) is part of the
 6    Bankruptcy Code.  That is not issue that is involved in this
 7    case.  The issue in this case is:  In a SIPA case, does 546(e)
 8    apply, and the position that has been taken is it does not
 9    apply because it is not consistent with what we are trying to
10    achieve here, which is equality.  So that is clearly a question
11    that is withdrawable because that has SIPA and the Bankruptcy
12    Code at odds.  So I believe that is clearly withdrawable and
13    it's very different from what was decided in Enron.
14              In the Ivy case, Ivy did not involve a registered
15    broker-dealer.  The redemptions there were equity redemptions
16    from a hedge fund, a whole different body of law.  We are very
17    focused here on the fact that this is a registered
18    broker-dealer who issued regular statements who said he was
19    taking money from customers in order to buy Blue Chip
20    securities.  He sent statements to say that's what he had done.
21    There's no other way for a customer to determine what he's
22    done.  He then sold them.  There were cash in the accounts.
23    People took the cash out.  This is fundamental to the whole
24    system of broker-dealer regulations.  It would be a shock to
25    the system to be told, Maybe, one day if we find out your
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

171Wpic2

```
 1    broker was engaged in a Ponzi scheme, all of this is going to
 2    come back to haunt you.  All of the money you put in there
 3    you're going to have to give back.  It's a complete conflict
 4    between the securities laws and the Bankruptcy Code, your
 5    Honor.
 6              Finally, on the UCC and supremacy clause, if there
 7    were a conflict between SIPA and the UCC, clearly the notion
 8    would come into play.  But there is no conflict, and there is
 9    surely no conflict found in the UCC.  The UCC says if there is
10    a bankruptcy, the bankruptcy will determine distribution on the
11    claims.  It certainly does not say that the UCC has nothing
12    more TO DO with what the claims are.  In fact, in normal
13    bankruptcies, the existence and value of the claim are
14    determined by nonbankruptcy law.  The allowance and division
15    are determined by bankruptcy law.  That is normally what
16    happens and that is what we're saying should happen in this
17    case.  But, in any event, we're not asking to have our claims
18    allowed; we're asking to have a huge lawsuit against us
19    dismissed on the grounds that we are governed by the securities
20    laws, and the Bankruptcy Code cannot reach back to SIPA in
21    particular.  It's not the bankruptcy law, it's SIPA changing
22    the bankruptcy law.
23              Your Honor, just one final point.  As you heard, I
24    think, in the trustee's argument, he's objecting to equality,
25    and he cites to the Supreme Court Cunningham case.  Equality
```

Case 1:12-cv-01959-JA   Document 3-6   Filed 03/18/12   Page 32 of 38

         171Wpic2
 1   and Cunningham are preference matters.  Preference law in the
 2   Bankruptcy Code is something that has nothing to do with
 3   knowledge or intent.  It is an absolute statute.  If you get
 4   something more than I got during the 90 days preceding
 5   bankruptcy, you have to give it back, and that's all there is
 6   to it.  It doesn't matter what either of us knew about
 7   anything, but that's a 90-day period.  That's not a 25-year
 8   period.
 9             So what my colleague is arguing here is is that
10   somehow the 90 days should be stretched to be 25 years.  And
11   what's the basis for that?  That's SIPA.  He's saying SIPA
12   allows him to do that, so again that's a huge interpretation of
13   SIPA that I think merits withdrawal of the reference.
14             THE COURT:  Thank you all for this very helpful
15   argument.
16             I have thought a lot about this issue even before this
17   argument, and it seems to me that part of what we have here is,
18   in effect, one of the dangers that you sometimes have when you
19   have specialized courts dealing with only one particular area
20   of federal law, and that is something of a tunnel vision.  It
21   does not seem to me to be self-evident at all that the
22   bankruptcy law sets the parameters of the duty of inquiry that
23   a customer in a securities brokerage investment situation has.
24   The area of willful blindness or the concept of doctrine of
25   willful blindness, which is the premise of the voluminous
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

Case 1:12-cv-01959-JSA    Document 1-6    Filed 03/18/12    Page 33 of 38

                                                                    33
        171Wpic2
1    complaint in this action has been among the most difficult and
2    controversial areas of the law for at least half a century.
3    Judges as great as Learned Hand and Henry Friendly have
4    struggled with this concept, which is somewhat between
5    negligence and purposefulness but where in between is a
6    function of what is the duty of inquiry, and the duty of
7    inquiry varies from situation to situation but also from legal
8    context to legal context.
9            Here, the movants have made, in the Court's view, a
10   more than plausible argument that the duty of inquiry of their
11   clients in a securities context is governed by securities law
12   and cannot be overridden after the fact by the bankruptcy law
13   or by the interpretation of a nonbankruptcy law, SIPA, being
14   asserted by the trustee.  Now, they may be totally wrong about
15   that.  But it seems to me on its face to raise a highly
16   material issue of interpretation not just of bankruptcy law,
17   which is for the Bankruptcy Court in the first instance, but of
18   nonbankruptcy law, securities law of SIPA, and indeed, there
19   are even intimations, though not raised by the movants, of
20   constitutional issues.
21           So I think that the Court, though finding this not
22   nearly as easy a situation as the previous ones I've had to
23   deal with involving the trustee, is obliged and mandated to
24   withdraw the reference, not forever, but to make a
25   determination of the threshold issues, and I include in that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

Case 1:12-cv-01958-SA    Document 3-6    Filed 03/16/12    Page 34 of 35

34

171Wpic2

1  all three issues raised by the movants.  I have considered the
2  other objections to withdrawal raised by the trustee, such as
3  untimeliness and waiver and the like, and I find them, to be
4  frank, entirely without merit.  The difficult issue here was
5  the one that has been the source of this excellent argument
6  from all parties here this afternoon.  But in the end, I think
7  withdrawal is mandated.
8          So let me ask counsel for the movants when you can
9  submit your brief on the three issues that this Court will now
10 consider.
11         MS. WAGNER:  Your Honor, the briefing on the
12 underlying motion's all done already, so you have it all.  But
13 if you would like us to submit, you know, take out the parts of
14 it that --
15         THE COURT:  I think there has to be a formal motion
16 here of some sort.  This is, in effect, a motion to dismiss, is
17 it not?
18         MS. WAGNER:  I guess my conception of it, your Honor,
19 was that the motion that is already pending and briefed is now
20 before you.
21         THE COURT:  I'm happy to take it on those terms.
22         Let me ask counsel for the trustee and SIPA.  Do you
23 want to put in further responses, or do you want the Court to
24 decide this on the papers you've submitted?
25         MR. SHEEHAN:  I would like to do a further submission

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

171Wpic2
1    based on your Honor's comments this afternoon.
2              THE COURT:  Very good.  When would you like to do
3    that?
4              MR. SHEEHAN:  Two, three weeks, whatever.  I don't
5    know.  Whatever your Honor thinks is appropriate.
6              THE COURT:  That's fine.  I'm anxious to move these
7    things along not only because there's the need to have
8    threshold issues resolved promptly but also because if I
9    resolve them negatively to the movants, I can't wait to send
10   the case back to Judge Lifland to get it off my calendar.
11   Three weeks would be fine.
12             MR. SHEEHAN:  I might have spoken too quickly, but
13   I'll try to work on it.  I was thinking here, reflecting on
14   what your Honor said about these issues being troubling to
15   Judges Friendly and Hand, whether three weeks will be enough
16   time.  But we'll work with three weeks.
17             THE COURT:  Okay.  That would be July 22.
18             Does that work for SIPA as well?
19             MR. LA ROSA:  It does, and we would reserve the right
20   to file something.  We may or may not.  But we would reserve
21   the opportunity.
22             THE COURT:  Very good.  How about a response from the
23   movants?
24             MS. WAGNER:  We would like to respond, your Honor.
25   It's sort of the in the middle of vacation period, but I don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                        36

        171Wpic2
 1    want to hold you up.
 2              THE COURT:  How many lawyers are there at Davis Polk?
 3              MS. WAGNER:  There are a lot.
 4              THE COURT:  I bet they're not all taking vacation.
 5              MS. WAGNER:  We wish we were.
 6              Your Honor, I would like three weeks.
 7              Your Honor, if I may.
 8              THE COURT:  Just let me get the schedule set.  So that
 9    would be August 12 and we will have oral argument on August 19
10    at 4 p.m.
11              MS. WAGNER:  Your Honor, that's what I was going to
12    ask you.  There is argument set on this motion in the
13    Bankruptcy Court.  So I'm assuming that is, you've got it now
14    before you.
15              THE COURT:  I'm staying everything --
16              MS. WAGNER:  Exactly.
17              THE COURT:  -- in the Bankruptcy Court.  When was the
18    argument set?
19              MS. WAGNER:  August 17.
20              THE COURT:  I can't guarantee this, of course, but my
21    tendency is to try to get quick decisions.  So it won't delay
22    things, and assuming I find in favor of your adversary, it
23    won't delay things very long in the Bankruptcy Court, in any
24    event.
25              MS. WAGNER:  It won't.
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

37

171Wpic2

1          THE COURT:  Anyway, yes, everything is stayed in the
2    Bankruptcy Court until I decide this motion.
3          MS. WAGNER:  Thank you, your Honor.
4          THE COURT:  All right.  Anything else we need to take
5    up?
6          MR. SHEEHAN:  No.  Thank you, Judge.
7          THE COURT:  Thanks so much.
8          (Proceedings adjourned)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25