Exhibit 13

C91dsipa
                              ARGUMENT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES INVESTOR PROTECTION
    CORPORATION, IRVING H. PICARD,
4
                    Plaintiffs,              New York, N.Y.
5
                 v.                          12 Misc. 115 (JSR)
6
    BERNARD L. MADOFF INVESTMENT
7   SECURITIES, LLC,

8                   Defendant.

9   ------------------------------x

10                                           September 21, 2012
                                             4:36 p.m.
11
    Before:
12
                          HON. JED S. RAKOFF,
13
                                             District Judge
14
                              APPEARANCES
15
    SECURITIES INVESTOR PROTECTION CORPORATION
16       Attorneys for Plaintiff SIPC
    BY:  CHRISTOPHER H. LaROSA
17
    BAKER & HOSTETLER LLP
18       Attorneys for Plaintiff
         Trustee Irving H. Picard
19  BY:  REGINA L. GRIFFIN
         THOMAS L. LONG
20

21  YOUNG CONAWAY STARGATT & TAYLOR, LLP
         Conflicts Counsel for the Trustee
22  BY:  ANDREW L. MAGAZINER

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C91dsipa

ARGUMENT

1                    APPEARANCES CONTINUED

2


3    IVAN & WORCESTER LLP
          Attorneys for Bank Austria
4    BY:  FRANKLIN B. VELIE
          JONATHAN G. KORTMANSKY
5         MITCHELL C. STEIN

6
     SULLIVAN & CROMWELL LLP
7         Attorneys for Standard Chartered Bank
          Bank J. Safra (Gibraltar) Ltd.
8         Banque J. Safra (Suisse) SA
     BY:  ROBINSON B. LACY
9

10   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Attorneys for UniCredit and Pioneer
11   BY:  JEREMY A. BERMAN

12
     KELLEY DRYE & WARREN LLP
13        Attorneys for CACEIS Bank and
          CACEIS Bank Luxembourg SA
14   BY:  DANIEL SCHIMMEL

15
     BECKER, GLYNN, MELAMED & MUFFLY LLP
16        Attorneys for Sumitomo Trust & Banking
     BY:  MICHELLE R. MUFICH
17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

ARGUMENT

1          THE CLERK:  This is September 21, 2012.  This is SIPC,

2     Irving Picard v. Bernard L. Madoff Investment Securities,

3     Docket Number 12 Miscellaneous 115.

4          Will everyone please be seated, and will the parties

5     please identify themselves for the record.

6          MS. GRIFFIN:  Good afternoon, your Honor.  Regina

7     Griffin, Baker Hostetler, counsel for the SIPC Trustee, Irving

8     Picard.

9          THE COURT:  Good afternoon.

10          MR. LaROSA:  Chris LaRosa from SIPC.

11          THE COURT:  Good afternoon.

12          MR. LONG:  Your Honor, Thomas Long, also on behalf of

13     the Trustee.

14          THE COURT:  Good afternoon.

15          MR. VELIE:  Good afternoon, your Honor.  Frank Velie,

16     of Sullivan & Worcester.  I represent Bank Austria, and I will

17     be speaking here today on behalf of the extraterritoriality

18     defendants.

19          THE COURT:  Good afternoon.

20          MR. KORTMANSKY:  Good afternoon, your Honor.  Jonathan

21     Kortmansky, also from Sullivan & Worcester, also representing

22     Bank Austria.  I will be assisting Mr. Velie and Mr. Velie will

23     be speaking.

24          THE COURT:  All right.

25          MR. LACY:  Your Honor, I'm Rob Lacy, from Sullivan &

C9ldsipa
ARGUMENT

1  Cromwell.  I represent about six different defendants, and I am

2  here because I may have something to add about the Bankruptcy

3  Code when Mr. Velie gets done.

4          THE COURT:  I'm sorry?

5          MR. LACY:  I may have something to add about the

6  Bankruptcy Code when Mr. Velie is done.

7          THE COURT:  OK.

8          MR. BERMAN:  Jeremy Berman, from Skadden, Arps,

9  Meagher & Flom, on behalf of UniCredit and Pioneer.

10          THE COURT:  Good afternoon.

11          All right.  So let me hear from whoever wants to speak

12  on behalf of moving counsel.

13          MR. VELIE:  May it please the Court?  I'm Frank Velie.

14  As I said, I represent Bank Austria and I'm speaking here for

15  numerous extraterritorial defendants.

16          The motion which is before the Court is to dismiss

17  certain claims brought by the Trustee to recover under Section

18  550 of the Bankruptcy Code subsequent to transfers.  The

19  subsequent transfers issued here, your Honor, are wholly

20  foreign.  They are from foreign persons.  They are to the

21  defendants, all of whom are foreign persons.  They all took

22  place abroad, pursuant to foreign law.

23          Unless you particularly ask me to, Judge, I am going

24  to try to avoid matters that are laid out in the briefs, as I

25  understand it is your practice to have read them and you don't

ARGUMENT

1    want me to repeat.

2              The remarkable thing about this motion, your Honor, is

3    that the Trustee's claims are absolutely unprecedented.   There

4    is no precedent whatever offered by the Trustee or by SIPC

5    where a Court reached out and recovered for a trustee foreign

6    transfers of this type.   There are only two instances -- in all

7    the briefing, there are only two cases that deal with a similar

8    issue; that is the <u>Maxwell</u> case and the <u>Midland Euro</u> case.   The

9    <u>Maxwell</u>, as I'm sure the Court is aware, three courts here --

10   the Bankruptcy Court, the United States District Court for the

11   Southern District and the United States Court of Appeals for

12   the Second Circuit -- all held that a person in the shoes of a

13   trustee, and there he was an examiner, was not permitted to

14   extend the recovery or, actually, the avoidance of the section

15   in that case to extraterritorial transfer.   And in the <u>Midland</u>

16   <u>Euro</u> case -- that's the Bankruptcy Court for the Central

17   District of California -- the same result.

18             What's remarkable about those two cases is in both

19   cases the transferor was the debtor.   It was a foreign debtor,

20   and in both cases the transferee was an initial transferee.

21   This is a distinction from our case, but an important one which

22   cuts in our favor.   Because, as I'm sure the Court will

23   recognize, an initial transferee takes something out of the

24   pocket of the estate that harms the estate, whereas it's no

25   skin off the nose of the trustee if the initial transferee

Case 1:12-mc-00115-JSR Document 357 Filed 09/28/12 Page 8 of 33

C9ldsipa

ARGUMENT

1    gives something to somebody else.  That does not take anything

2    out of the pocket of the debtor.  In any event, there is no

3    precedent and so this Court is being invited to do what I would

4    claim is a very radical thing, which is to undo these wholly

5    foreign transfers.

6         Not only is the case unprecedented but it appears to

7    fly -- the claims are unprecedented, but they appear to fly

8    directly into the Morrison decision of the Supreme Court.  I

9    don't have to rehearse that here, but the obvious thing about

10   Morrison is it is a bright-line test.  If the statute doesn't

11   say it has extraterritorial reach, it has none.

12        Here, as we showed in the briefs, and I will not go

13   into this in detail, neither of the statutes at issue here --

14   neither Section 550 of the Code nor 78fff-2(c)(3) of SIPA --

15   say that they have extraterritorial reach, and that should be

16   the ball game.

17        Surprisingly, the Trustee and SIPC argue:  No problem.

18   We're not in the way of Morrison.  This is a domestic

19   application here.  We are not reaching out extraterritorially.

20        I actually find that very surprising because, as I

21   started out by saying, these are claims to recover subsequent

22   transfers made by foreign persons to the foreign defendants

23   overseas under foreign law.  I would think that their argument

24   falls of its own weight, and I am going to give it little bit

25   of a shove.

ARGUMENT

1        Without authority, what we are offered is a syllogism,

2    and the syllogism goes like this.  It has three premises.

3        Number one:  The Code and SIPC have only one focus.

4        The second premise:  That focus is to replenish the

5    estate of domestic debtors.

6        And number three:  What we have here is a domestic

7    debtor.  It made a transfer.  Therefore, we can go all over the

8    world and recover anything that was transferred initially by

9    the debtor.

10        That's the syllogism.

11        Number one.  Morrison does not suggest or hold that a

12    doorstopper, like the Code, or even a relatively

13    narrowly-focused statute like SIPA would have only one focus.

14    In fact, in Morrison, the focus was on 10b.  And there was a

15    contrary, a contrasting focus on Sections 30a and 30b, which

16    are extraterritorial.  The Court naturally finding that since

17    Congress knows how to write extraterritoriality into a statute

18    when it wants to, it didn't put it in 10b and it did put it in

19    30a and 30b.

20        Second, as we've laid out in the briefs -- and I will

21    not, unless you ask me to, go into this in any detail -- the

22    proper transfer here under Absolute Activist and in Morrison is

23    obviously the transfers, the transfers at issue.  And we point

24    that all out in the brief.

25        The third point is that the transfers here are not

ARGUMENT

```
1    domestic in any regard; they are wholly foreign.  As an
2    example, this is a miniaturized version of the HSBC Complaint
3    in which Bank Austria is sued.  Count One talks about
4    preferential transfers (initial transferees), that's against
5    the feeder fund defendants except for Primeo.  Count Two is
6    preferential transfers of subsequent transferees.  This is what
7    we are focusing on.  It is counts such as this in which we are
8    sued and which should be the proper focus of the Court in this
9    matter.  So all three of the premises of the syllogism don't
10   hold up under analysis.
11        But the conclusion doesn't, either.  And it certainly
12   doesn't follow and it probably stands the presumption against
13   extraterritoriality on its head to say, well, if we have a
14   domestic debtor and it is domestic focus, we can go all over
15   the globe and undue transfers that have any commercial practice
16   between commercial parties in other countries and take their
17   money away.  It's the impact of this which seems to us to be
18   wholly unreasonable.
19        This Court is being asked -- again, without any
20   precedent -- this Court is being asked, first, to go out and to
21   say in effect to foreign persons forget your law, forget that
22   you may have litigated with a liquidator in the country where
23   you live and you may have even prevailed against that
24   liquidator on certain claims and have gotten to keep the
25   transfer at issue, a broker-dealer in the United States went
```

Case 1:12-mc-00115-JSR   Document 357   Filed 08/28/12   Page 51 of 53

C91dsipa

ARGUMENT

1    bankrupt.  And when a broker dealer goes bankrupt, a special

2    statute springs into effect and after-the-fact this special

3    statute under U.S. law -- you would be saying to these foreign

4    persons -- this legal fiction springs into effect after the

5    fact and it gives the trustee a right to claim your money.  And

6    we're going to take your money, and we're going to take your

7    money and we're going to give it to that trustee so he can

8    share it out among customers of his bankrupt.  And, oh, by the

9    way, you're not customers of his bankrupt so you are not going

10   to get anything.

11        They're asking you to say, and to be the very first

12   court to have done this, to say to foreign sovereigns, in the

13   person of foreign courts in their court-appointed liquidators,

14   forget your liquidation, forget that you are trying to get

15   assets for the purpose of doing something for the creditors of

16   the feeder funds, these hedge funds in various places where

17   there are liquidations going on in these foreign countries

18   under the supervision of foreign courts, forget all of that.

19   We've got this legal fiction, and we're going to take every

20   penny and we're going to give it to our bankrupt to share among

21   its creditors.

22        This seems to me a radical intrusion into foreign

23   matters, into matters which are the concern of foreign

24   sovereigns, foreign courts, foreign liquidators, and the like,

25   as well as foreign commercial persons.

Case 1:12-mc-00433-JSR Document 57 Filed 09/28/12 Page 51 of 53

C9ldsipa

ARGUMENT

```
 1          I am going to leave to your reading of the briefs

 2    exegesis of SIPA and the Code, but I think it is plain when you

 3    look there you will see that there is no mention of

 4    extraterritoriality and, in particular, in SIPA, a mention of a

 5    very domestic focus.  SIPA Section 78fff-2(c)(3), which is the

 6    recovery section, is a very important section which says for

 7    purposes of the transfers, for the purpose of such transfer,

 8    state law will not apply; state law is superseded.  Obviously,

 9    the people who wrote that had a domestic concern.  They did not

10    say all that they could have:  Disregard foreign law, this

11    fiction will spring into effect.

12          I want to say a quick word about the concept of

13    comity.  Here we're talking about legislative or prescriptive

14    comity.  This is basically a canon of legislative

15    interpretation.  And it says even if the trustee were to have a

16    plausible reading of these statutes which gives it

17    extraterritorial reach, if the impact, as it is here, is to

18    unreasonably interfere with the activities of foreign

19    commercial persons, or the activities of a foreign sovereign,

20    then the court must find some other reading of the statute to

21    avoid that.

22          Comity, of course, as the Court will recall, was the

23    grounds on which the Second Circuit upheld the decision of the

24    District Court and the Bankruptcy Court in the Maxwell case.

25          And then a final word.
```

Case 1:12-mc-00438-JSR Document 157 Filed 09/28/12 Page 51 of 53

C9ldsipa

ARGUMENT

1    The Trustee says that the result we argue for is

2  absurd.  I was tempted, in preparing this argument, to say, oh,

3  no, their argument is absurd.  But that's not the right word

4  for it.  It's aggressive.  It goes far too far.  It is radical

5  is what it is.  Their argument is a radical one.  This Court is

6  being invited to do something that no other court has done, and

7  it is a radical result.

8    I also wanted to say, and we did say this in the

9  briefs but I'll finish with this:  It is never absurd to read a

10  statute for what it holds and what it does not hold.

11    Unless you have any questions for me, your Honor --

12    THE COURT:  No.  But I do want to hear if there is

13  anything else that any moving counsel wants to say before I

14  hear from responding counsel.

15    MR. LACY:  No, your Honor.

16    MR. BERMAN:  No, your Honor.

17    THE COURT:  OK.  Let me hear from Trustee's counsel.

18    MS. GRIFFIN:  Your Honor, would you have any objection

19  to me arguing from here?

20    THE COURT:  No.  But just be sure -- a lot of folks

21  are here to hear what you have to say.  Some of them are even

22  your friends, so speak loudly enough.

23    MS. GRIFFIN:  Your Honor, I will do my best.

24    Your Honor, we heard a lot about how there is no

25  precedent.  Your Honor, Morrison came down about two years ago,

C9ldsipa

ARGUMENT

1   and I don't think the Trustee disputes that this is the first

2   time that the Court is really being asked to address the issues

3   that were raised about presumption against extraterritoriality

4   that were raised in Morrison with regard to the Bankruptcy Code

5   SIPA.  But, your Honor, it's very clear that the defendants'

6   briefs do not engage in any meaningful analysis or focus of the

7   Code or SIPA as Morrison instructs.

8          And, your Honor, Morrison very clearly directs that

9   you look to the Act as a whole, the Bankruptcy Code or SIPA,

10  you look to the object of solicitude of the statute, you look

11  to what activity Congress is seeking to regulate, and you look

12  to what parties the statute was meant to protect.  And, your

13  Honor, it's not about parsing the words of a particular

14  statute; it is looking to what was Congress's -- what was the

15  heart of what Congress was trying to regulate when it enacted

16  the Code?  And when the Supreme Court looked in Morrison at

17  10b, it concluded that essentially Congress' focus was on

18  regulating the transactions -- the purchase-and-sale

19  transactions of securities on a domestic exchange.

20         And, your Honor, if you apply that analysis here to

21  the Bankruptcy Code and SIPA, you will absolutely see that it

22  is not a syllogism.  The heart of what the Bankruptcy Code is

23  seeking to regulate is the liquidation of a debtor.  The object

24  of solicitude of the -- but, actually, the purpose of the

25  Bankruptcy Code, it does have more than one purpose.  It has

C9ldsipa

ARGUMENT

1   two purposes, one of which is not relevant, which is to provide

2   a debtor a fresh start; but the other is the maximization of

3   the estate's assets for distribution to creditors.

4           And, your Honor, the avoidance and recovery provisions

5   of the Code effectuate that purpose by essentially righting the

6   wrongs committed by debtors, domestic debtors, who deplete

7   their estate's assets by fraudulently conveying them to other

8   parties.  And, your Honor, what parties of the statutes are

9   meant to protect are the defrauded creditors of the debtor

10  here.

11          And, your Honor, the defense's analysis, if you look

12  in their papers, it is all over the map.  As a matter of fact,

13  they don't even address the issue in their moving papers.  They

14  talk about -- they seem to suggest that the focus is on the

15  transferees, where they live or where they reside.  But, your

16  Honor, it's clear that under the Morrison focus analysis, not

17  the statute's language but the focus analysis, that Congress

18  wasn't focused on the recipients of fraudulent transfers.  And

19  if you apply Morrison's analysis here, it's very clear that all

20  the Trustee is doing is using the Bankruptcy Code to remedy the

21  fraudulent conveyances of a domestic debtor here and that using

22  the Morrison analysis, that is nothing more than a domestic

23  application of the avoidance and recovery --

24          THE COURT:  But doesn't that argument cut more

25  strongly in the case of initial transfers, as opposed to

ARGUMENT

1   secondary transfers?

2          MS. GRIFFIN:  Well, your Honor, essentially, that's

3   another point we were about to make.  The focus of Congress on

4   the avoidance and recovery provisions is not on subsequent

5   transfers.  If you very clearly look at 548, it is talking

6   about the avoidance of the debtor's transfers.  And counsel is

7   right, we are talking about the initial transfers.  And what

8   550 permits is the recovery of those transfers from any

9   particular recipient.

10         And so, again, focusing on Congress's focus in

11  enacting those provisions, it's on recovering that property

12  that was fraudulently conveyed by this debtor; it was not on

13  the particular type of transferee.  It certainly wasn't on any

14  potential subsequent transfer because it could be recovered

15  from the initial transferee.

16         And, your Honor, if you look at the investment advisor

17  cases that we point to in our brief, I think it is <u>SEC v. Gruss</u>

18  and <u>SEC v. ICP Asset Management</u>, in those cases the Court

19  looked to the Investment Advisor Act.  And while the companies

20  there pointed to the fact that they thought the focus was on

21  the client and where the client might be located, the reality

22  is the Court said when they looked at the Investment Advisor

23  Act, it was, of course, what was Congress concerned with and

24  focused on?  The investment advisor.

25         So it comes down to this, your Honor.  Under <u>Morrison</u>,

Case 1:12-mc-00433-JSR  Document 57  Filed 09/28/12  Page 51 of 58

C9ldsipa

ARGUMENT

1     once you determine what Congress's focus is, whatever other

2     facts that are outside that focus are not really relevant to

3     the analysis here.  So the fact of where particular recipients

4     of the fraudulent transfers may reside are not within

5     Congress's focus.  The fact of where particular subsequent

6     transfers may have taken place is not within Congress's focus.

7     Those facts may be relevant to other defenses -- personal

8     jurisdiction; it could have to do with whether or not the

9     Trustee's judgment obtained here may be enforceable somewhere

10    else -- but it does not go to the heart of the issue before the

11    Court, and that is whether the presumption against the

12    extraterritorial application of statutes applies here because

13    this involves a purely domestic application of the statute.

14              And, your Honor, a word on Maxwell.

15              Maxwell was, of course, decided before the Morrison

16    decision came out, but that case involved a foreign debtor.

17    And so, your Honor, that would arguably the quintessential

18    example of what would be the extraterritorial application of

19    the Bankruptcy Code and the avoidance and recovery provisions.

20    Where it was a foreign company, an English company, that had

21    liquidation proceedings going on in London.  They had the very

22    unusual circumstances of having dual primary liquidation

23    proceedings going on in both the U.S. and in London.  But Judge

24    Brosnan focused on the fact that there, using a

25    center-of-gravity test, the English company had made

Case 1:12-mc-00115-JSR Document 357 Filed 09/28/12 Page 14 of 53
C91dsipa

ARGUMENT

1   preferential transfers overseas to English and French banks and

2   basically in response to debts that were incurred by those

3   banks overseas.

4          And, your Honor, pre-<u>Morrison</u> it was a

5   center-of-gravity test.  Post-<u>Morrison</u> that would probably be a

6   situation where that English company cannot use the U.S.

7   Bankruptcy Code and avoidance and recovery provisions to

8   recover those transfers.  That is not what we're talking about

9   here.

10         And as a matter of fact, your Honor, counsel for the

11  defendants brings up the liquidation in the BVI, and we're

12  getting into a whole comity analysis, which, by the way,

13  wasn't, you know, for the briefing before your Honor.  We

14  merely pointed out in our brief that the defendants' analysis

15  of <u>Morrison</u> was flawed and it appeared to be more like a comity

16  analysis.

17         I'm going to get into a very brief discussion -- I

18  know you've read our papers; I'm not going to belabor the

19  issue.  But the very fact that the Fairfield liquidators are

20  pursuing avoidance actions elsewhere in their insolvency

21  proceedings -- and BVI is not surprising -- in a fraud as

22  massive as this one, there are litigations involving multiple

23  laws, multiple parties in various jurisdictions.  Investors are

24  suing feeder funds.  Investors are suing the managers of those

25  funds.  Auditors are being sued all over the world.  Insolvency

ARGUMENT

1    proceedings everywhere.  But, your Honor, one of the things

2    defendants didn't say is that the BVI didn't decide that the

3    bankruptcy causes of action of those feeder funds were

4    dismissed.  Those causes of action of that feeder fund are

5    actually pending right now.  Those avoidance actions of the

6    Fairfield liquidators, the Madoff feeder funds, are pending

7    before Judge Lifland.

8            And you know what, your Honor, they're being brought

9    in an ancillary proceeding here using the laws of the debtor's

10   home country, the BVI.  They're using their own country's laws,

11   their Bankruptcy Code and avoidance and recovery provisions,

12   because that's what the international community has decided to

13   do.

14           Essentially, your Honor -- and I am drifting into

15   comity, and, I'm sorry, I am just going to head in that general

16   direction.  But that's what Chapter 15 and the countries that

17   adopted this model insolvency code say.  Basically, those

18   countries that have signed onto UNCITRAL have decided that they

19   are going to aid the main proceeding of a bankrupt debtor and

20   they are going to decide that that main proceeding is where the

21   center of main interest of the debtor is -- generally, your

22   Honor, where the debtor's principal place of business is.  And

23   so, your Honor, if you look at all the comity factors that are

24   listed in the Restatement 403 that deal with the Restatement on

25   Foreign Relations 403 and you look at them here, and it is very

C9ldsipa

ARGUMENT

1    clear that even under a comity analysis there is no other

2    country that has more of an interest in ensuring that its

3    bankruptcy code and avoidance provisions are applied to its

4    debtor in the United States.

5              Certainly -- as a matter of fact, defendants don't

6    even proffer another country's avoidance action or bankruptcy

7    code that should apply to this debtor.  And right there that's

8    the rub, your Honor.  The very case they cite to you, that

9    feeder fund is using its own laws because that's the way it is

10   supposed to work.  There is no conflict.

11             But if you go through all of these factors -- the link

12   of the activity to the territory of the regulating state, the

13   extent to which the activity takes place within the territory

14   or has substantial direct and foreseeable effect upon or in the

15   territory -- obviously, your Honor -- and the connections such

16   as the nationality, residence, or economic activity between the

17   regulating state and the person principally responsible for the

18   activity to be regulated -- without a doubt, your Honor,

19   certainly the United States has a very significant interest in

20   regulating the conduct of the debtor here, headquartered in the

21   U.S., that orchestrated the most massive Ponzi scheme ever, out

22   of New York, transferred all of its property out of a bank

23   account in New York.  So that factor clearly militates in favor

24   here.  Again, nothing pointed to by the other parties in that

25   regard.

Case 1:12-mc-00433-JSR   Document 57   Filed 03/28/12   Page 51 of 58

C9ldsipa

ARGUMENT

1          The character of the activity to be regulated, the

2     importance of regulation to the regulate state.  Obviously, the

3     Bankruptcy Code and SIPA are two separate acts that are very

4     concerned with this.  Congress was very concerned and had a

5     very serious interest in ensuring that and, including SIPA, the

6     expedited return of customer property that is fraudulently

7     conveyed by a financially-troubled in this case bankrupt

8     broker-dealer.

9          I could go on, your Honor:  The importance of the

10    regulation to the international, political, legal, or economic

11    system; the extent to which the regulation is consistent with

12    the traditions of the international system; the extent to which

13    another state may have any interest in regulating the activity.

14         The only law that the defendants point to is really a

15    point that their own home residence might possibly be more

16    interested in protecting the defendants in these particular

17    actions.

18         And essentially, your Honor, with all due respect,

19    comity is not the issue here, and it is certainly not the

20    analysis under Morrison.

21         And, frankly, your Honor, even were this to be a

22    situation where you concluded that this was a situation that

23    requires extraterritorial application of the Code or SIPA, the

24    decision in French that we point to in our brief, which

25    essentially says, look, the Supreme Court has decided that to

Case 1:12-mc-00438-JSR   Document 157   Filed 03/28/12   Page 21 of 53

C9ldsipa

ARGUMENT

 1   determine what property or transfers that a trustee may attempt

 2   to recover and avoid, we have to look to essentially Section

 3   541 of the Code, which has language, you know, essentially that

 4   defines what the property of the estate is, as wherever

 5   located; and that has been held to apply territorial without

 6   doubt, your Honor.

 7          And as the <u>French</u> Fourth Circuit Court pointed out,

 8   because Congress intended to essentially determine what

 9   property could be transferred by referring to that statute, you

10   have to look at what property was property of the debtor,

11   wherever it was situated, as if before it was filed.  An easier

12   way for me to explain this, your Honor, is to give a hard

13   example because I get caught up in the language when speaking.

14          Bernard Madoff had a yacht in France.  And before the

15   bankruptcy, just before we see the fraud -- and this is an

16   example, it is not a fact -- he, before the fraud is revealed

17   and before the bankruptcy proceeding is commenced, he

18   fraudulently transfers that yacht in France to his nephew.

19   Subsequently the bankruptcy proceeding is brought here in the

20   United States.

21          Now, all the <u>French</u> court is saying is that but for

22   that transfer that yacht would have been property of the

23   debtor's estate here, and <u>French</u> is saying essentially that

24   because Congress indicated its intent, you have to refer to

25   Section 541 in order to determine what you can avoid, it would

Case 1:12-mc-00433-JSR Document 157 Filed 09/28/12 Page 21 of 33

C9ldsipa

ARGUMENT

1    make sense that the Trustee should be permitted to avoid that

2    transfer in order to recall that to the estate that which

3    should have been part of the estate but for that fraudulent

4    transfer.

5              And so, your Honor, I guess what I would like to

6    conclude with is a point that we weren't saying that

7    defendants' arguments were absurd.  We're saying that to stop

8    the efficacy of the Bankruptcy Code at the borders would have

9    absurd results.  And we gave an instance of just before the

10   bankruptcy what would have happened if Bernard Madoff had

11   transferred billions of dollars of the customers' property to a

12   cousin in Europe and then subsequently transfer it to another

13   cousin in Switzerland.  And, your Honor, that simply cannot be

14   the result of that once the property leaves the jurisdictional

15   territory of the United States, that somehow the doctrine of

16   the presumption against extraterritoriality is going to stop

17   that from happening.

18             And the other thing is, your Honor, as we pointed out

19   in our papers, is the Code doesn't splice between who is a

20   foreign resident and who is a domestic residence.  And

21   certainly claims of the customers, despite statements in the

22   defendants' papers that somehow the Trustee has denied claims

23   based on a party's foreign status, that is completely not the

24   case.  Two of biggest creditors in this case who got

25   distributions this week are foreign creditors.

ARGUMENT

1    Your Honor, it has absolutely nothing to do with it.

2    The fact that they were denied their customer claim had only to

3    do with the fact that they didn't fit within the definition of

4    "customer" under SIPA because they were an indirect investor.

5    So, your Honor, it would be absurd to use just the

6    mere happenstance of a party's residence to define the analysis

7    of extraterritoriality when those same parties could come in,

8    and some of these same parties have, as we pointed out, filed

9    claims in this very proceeding.  So how does it work that we

10    can't go out but they can come in?

11    So, your Honor, unless you have any further questions?

12    THE COURT:  No.  Thank you very much.

13    Let me hear from SIPC, if they want to be heard.

14    MR. LaROSA:  We don't, actually, your Honor.  We will

15    stand on our papers, and I would be happy to answer any

16    questions your Honor wants.

17    THE COURT:  Very good.  Let's go back to moving

18    counsel.

19    MR. VELIE:  Thank you, your Honor.

20    I still haven't heard any precedent, and the important

21    point is not -- the starting point is not Morrison.

22    Extraterritoriality and the presumption against

23    extraterritoriality has been in our law since 1909, when

24    Justice Holmes wrote the American Banana case.  In the entire

25    history of the Code, from 1978 forward, and the bankruptcy law

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

ARGUMENT

1   before that, there is no instance when a court has said to a

2   trustee, it's OK, go recover a foreign transfer.  Not one.

3   Never.  You would be the first..

4            That's the first point.

5            The second point is I thought I heard something about

6   Section 550 saying that if you can avoid you can recover

7   immediate and subsequent transfers and so on.  We all know that

8   that doesn't mean that you can't impose or look at defenses.

9   The defense from 546(e), for example, the safe harbor for

10  securities settlement payments, has to be interposed between

11  that moment when there is an avoidance and a recovery.  The

12  defenses in 550 may be imposed.  So the defense of

13  extraterritoriality also needs to be looked at and imposed.

14           Because in the final analysis what we're being offered

15  is a way to read the statute, and if the Trustee's counsel is

16  correct and you read the statute this way, you will have all

17  that impact on foreign sovereigns and foreign individual

18  commercial transactions that I described earlier.  When you

19  have something like that, that was what the presumption against

20  extraterritoriality was supposed to deal with, and that's why

21  Morrison put in a bright-line test.  And the bright-line test

22  is very simple -- if it is not in the statute, that's it.

23           Finally, a word about the "absurd" result.

24           I think what the Trustee is trying to say here is that

25  the Trustee will be without a remedy in the event you rule for

C9ldsipa

ARGUMENT

```
 1    us, but that's not the case.  Number one, there is a remedy

 2    which is provided in the Code in Section 1505, which we pointed

 3    out in our papers.  He can go to foreign courts and go to the

 4    foreign court and ask for whatever relief the foreign court is

 5    willing to give him.

 6          In fact, not only is that the case from the Code,

 7    showing that the drafters of the Code perceived that there

 8    might be this problem and solved it by legislating comity, just

 9    the way they legislate the permission for foreign liquidators

10    to come here and open ancillary proceedings, they can open, as

11    happened in Maxwell, a full-blown Chapter 11 or Chapter 7 case.

12    Similarly, a Trustee here can go into foreign court and go

13    there and ask for what the foreign law permits, and that would

14    be the appropriate thing to do.  It is not only the appropriate

15    thing to do, the Trustee knows about it and is doing it and has

16    brought proceedings in various countries around the world.

17          With your permission, I am going to read from the

18    International Law Practicum, which is a publication of the

19    International Section of the New York State Bar Association,

20    and in it is an article in which Mr. Sheehan, who is Trustee's

21    counsel, is one of the principal authors.  And here he is

22    speaking to a symposium, and he says -- he had been talking

23    about foreign actions that he has brought and going into

24    foreign courts and seeking relief in the foreign courts.

25    "Almost every one of the foreign actions has a parallel
```

Case 1:12-mc-00433-JSR Document 157 Filed 09/28/12 Page 23 of 58

C9ldsipa
ARGUMENT

1    proceeding here in the U.S. Bankruptcy Court.  The reason for

2    that is fairly obvious.  That is, what if we were just to rest

3    on our laurels in the Bankruptcy Court and it turns out we lose

4    the extraterritoriality issue, the personal jurisdiction issue,

5    or whatever that issue may be?  Are we therefore, what?  Out of

6    luck?  We can't go anywhere?  So what we're doing is parallel

7    proceedings, and we participated, as I said earlier" -- this is

8    Sheehan speaking -- "throughout the Caribbean Islands and in

9    the U.K."

10           And that is what he was doing.  He has a remedy.  It

11   is not absurd at all.

12           THE COURT:  I don't actually see how the issue of

13   whether he has or has not a remedy is relevant.  Maybe I have

14   missed something.

15           If he has a right to bring the lawsuit here, he has a

16   right to bring the lawsuit here.  If he doesn't, the fact that

17   it would or would not deprive him of a remedy seems to me

18   neither here nor there.

19           MR. VELIE:  I am not arguing with you on that Judge.

20           Who I'm arguing with is Trustee's counsel who says

21   that we are arguing for an absurd result, a result in which the

22   Trustee would be without a remedy, and the answer is that that

23   happens to be incorrect --

24           THE COURT:  As I understood the Trustee -- and this is

25   a gross oversimplification, but, I mean, let's take an example

Case 1:12-mc-00438-JSR Document 157 Filed 09/28/12 Page 28 of 53

C91dsipa

ARGUMENT

1  that has nothing do with this case or even the laws here

2  involved; it is just an abstraction.

3       So I steal your cow and I give it to my son.  This is

4  clearly a hypothetical since I only have daughters.

5       MR. VELIE:  You don't have a cow either.

6       THE COURT:  Not the last I checked.

7       And my son takes it to Europe and he sells it to

8  someone there.  And now you bring an action for the recovery of

9  the cow or its value and you bring it to get the person who now

10  has the cow.  And that may not be an enforceable judgment,

11  which is the point your adversary was making, but she's saying

12  there is something absurd that you shouldn't be able to bring

13  an action for recovery of the cow in the hands of -- we could

14  make it even an easier case for her -- let's say that the

15  person to whom the cow was sold in Europe knows that it is a

16  stolen cow.  So that's kind of absurdity I think she is trying

17  to suggest.

18       MR. VELIE:  Perhaps.  But I think what we need to put

19  into this discussion, Judge, is the distinction in the law

20  between chattels and money.  A stolen chattel does not deprive

21  the owner of his title, and he can go anywhere and say I'm

22  owner.  That is not the case with money.  There is the money

23  rule, which allows the person who receives the transfer of

24  money to put up all manner of defenses.

25       So I just want to try to help you in your thinking

C9ldsipa
ARGUMENT

 1   about this.  Don't be thinking about stolen chattels, stolen

 2   artwork or the like; it is a completely different ballgame.

 3   What we have here is a question of statutory interpretation

 4   purely, and that is that pursuant to the money rule can this

 5   Trustee ask this Court to undo a transfer that took place in

 6   the Cayman Islands, say, or in Europe between foreign persons

 7   and under foreign law?

 8         And the following observations:  No judge has ever

 9   done it before.  The Bankruptcy Code seems to tell the Trustee

10   if you want to go abroad, go to a foreign court and get your

11   remedy there.  <u>Morrison</u> tells us look to the statute and see if

12   this is permitted, because it is plainly extraterritorial.  And

13   there is nothing in the statute that says that Congress

14   intended this.

15         So in the final analysis, if you read it the way the

16   Trustee reads it, we have this terrific, in the sense of full

17   of terror, impact on foreign sovereigns, courts and persons --

18   never before permitted by a court from 1978 on or even before,

19   as far as we could find.  So you are being invited to do

20   something new and, I submit, radical.

21         THE COURT:  All right.  Thank you very much.

22         All right --

23         MR. LACY:  Your Honor, could I say a word?

24         THE COURT:  Yes, but it had better be responsive to

25   what the Trustee just said because you had your opportunity to

C9ldsipa
ARGUMENT

1   be heard in the beginning.

2            MR. LACY:  Yes, your Honor.

3            I wanted to draw together three things that the

4   Trustee's counsel said.

5            The first, of course, is that the Trustee's counsel

6   treated this entire question in terms of whether United States

7   Bankruptcy Code allows the avoidance of the initial transfer,

8   and that is not the issue.  The issue is whether Section

9   550(a)(2) of the Bankruptcy Code allows the recovery of money

10   from a subsequent transferee.  So the question you have to

11   answer is does 550(a)(2) fly outside the United States.

12            Now, I want to emphasize the importance of that

13   distinction by referring to another thing the Trustee's counsel

14   said.  The Trustee's counsel said there is no rule that says a

15   foreign customer cannot submit a claim in a SIPC liquidation.

16   That has nothing to do with this.

17            The rule, which the Trustee has enforced vigorously,

18   is that the investor in a feeder fund which was a customer of

19   BLMIS cannot submit a claim in a SIPC proceeding.  And that's

20   who the subsequent transferees are.  The subsequent transferees

21   who we are moving on behalf of cannot assert claims in the

22   bankruptcy case because they were not customers of BLMIS, and

23   the Trustee, with now the support of this Court and the Second

24   Circuit, established that those subsequent transferees, because

25   they are not customers, cannot assert a claim in a SIPA

ARGUMENT

1   proceeding and will never share in any of the recoveries that

2   the Trustee accomplishes by avoiding transfers.

3           The third point is that we heard an astonishing

4   discussion concerning the importance and value of the Fairfield

5   Funds' assertion of claims under the BVI Insolvency Act.  I

6   wanted to go back to that.

7           Section 550(a)(1) gives the Trustee the right to

8   recover by avoided transfer from the initial transferee; that

9   would be the feeder fund in these cases.  Section 550 says you

10  can't get a double recovery; if you get it from the initial

11  transferee, you can't get it from anybody else.

12          Now, suppose that a judgment is obtained against the

13  feeder fund, against the initial transferee.  Why shouldn't the

14  satisfaction of that judgment end the case against the

15  subsequent transferee?  The reason it won't end the case

16  against the subsequent transferee, if the Trustee is allowed to

17  assert these claims, is because, of course, the initial

18  transferee turns out to be insolvent.  There isn't enough money

19  there.

20          But what happens then?  That insolvent initial

21  transferee, in the cases we are talking about, is a foreign

22  entity.  It's winding up.  Its insolvency proceeding should

23  proceed under the law where it's organized, and I take it that

24  the Trustee's counsel endorses that.

25          Well, if the Trustee gets a judgment against a feeder

ARGUMENT

1  fund, an initial transferee, based on the avoidance of the

2  transfer, he becomes a creditor in the foreign solvency

3  proceeding.  He will share in any recoveries that the Fairfield

4  liquidator obtains as a result of these things you have heard

5  about under the BVI Insolvency Act.  Why isn't that enough?

6          The Trustee is here saying but we're not satisfied

7  with that, because whereas all the other creditors in the BVI

8  insolvency proceeding have to share and share alike, we can go

9  straight to somebody who received a transfer from that foreign

10  entity and we can recover the whole thing ourselves.  We can go

11  around the liquidator.  We don't have to rely on the

12  liquidator's insolvency proceeding and the liquidator's

13  recovery actions, and we don't have to share with the other

14  creditors.  We are going to go straight around the liquidation

15  straight to the remote transferee and recover.  That seems to

16  me to put the comity issue in very sharp relief, but I think it

17  also affects the extraterritoriality question, the <u>Morrison</u>

18  question, because in <u>Morrison</u> and in <u>EEOC v. Arabian American</u>

19  <u>Oil</u>, the Supreme Court has made clear that one of the things

20  you think about when you answer the question concerning

21  extraterritoriality is whether you are going to be doing

22  something seriously disruptive to affairs that are supposed to

23  be governed by foreign law.  And it seems to me that the

24  Trustee's argument today has demonstrated that the claims they

25  are trying to assert here would have exactly that effect.

C9ldsipa
ARGUMENT

1          Thank you, your Honor.

2          THE COURT:  Thank very much.

3          Anyone else on the moving counsel's side who wants to

4     be heard

5          MR. BERMAN:  No, your Honor.

6          THE COURT:  All right.  I will give the Trustee an

7     opportunity to have the final word, if you would like.

8          MS. GRIFFIN:  Thank you, your Honor.  It will be very

9     brief.

10          Your Honor, I guess all I would ask you to do when you

11     hear these analyses that drill down to these very esoteric

12     issues is to back up and look at the two issues that are before

13     your Honor, and they are is this a domestic application of the

14     Bankruptcy Code to a U.S. debtor to replenish the estate of

15     property that rightfully belongs here, and is the Trustee using

16     the Code as it was intended by Congress?

17          Two, your Honor, just to point out a little factual

18     inaccuracy.  In those actions that the Trustee is pursuing

19     abroad, he is bringing claims brought under the U.S. Bankruptcy

20     Code.  He is pursuing them in the event -- in the alternative

21     under foreign law in the event that the defendants either

22     default here and -- you know, it is to preserve his rights in

23     case a party tests jurisdiction or the enforceability of a

24     default judgment.  And, your Honor, frankly, that is what the

25     defendants are really trying to do here.  They are really

Case 1:12-mc-00438-JSR Document 157 Filed 09/28/12 Page 32 of 53

C9ldsipa

ARGUMENT

1  trying to cloak what are jurisdictional issues or

2  enforceability issues in the guise of a statutory construction

3  issue, and that is not what Congress intended.

4          Thank you, your Honor.

5          THE COURT:  All right.  Well, I want to thank all

6  counsel for excellent argument.

7          The Court will take the matter sub judice.  Thanks

8  very much.

9          (Pause)

10         THE COURT:  So I spoke too soon.  There is one other

11  lawyer who wants to be heard.

12         MR. SCHIMMEL:  Thank you.  Your Honor, I represent

13  CACEIS Bank and CACEIS Bank Luxembourg, which are --

14         THE COURT:  You need to identify yourself.

15         MR. SCHIMMEL:  Daniel Schimmel, of Kelley Drye &

16  Warren, for defendants CACEIS Bank and CACEIS Bank Luxembourg.

17         I wanted to add one point that goes to the cow example

18  that your Honor raised and one of the cases that's cited in the

19  brief, which is the Midland case.  I think that case is

20  actually on point and responds to your question, because it

21  involved a massive Ponzi scheme organized in the United States.

22  The perpetrators of that Ponzi scheme were convicted in the

23  Central District of California.  The debtor in that case

24  comprised both entities in the U.S., including California

25  corporations and foreign entities.  The transferor was a

Case 1:12-mc-00438-JSR Document 57 Filed 09/28/12 Page 35 of 53

C9ldsipa

ARGUMENT

1  Barbados corporation.  And the Court in that case looked at the

2  extraterritorial application of the avoidance provisions of the

3  Bankruptcy Code and said they do not apply extraterritorially

4  to these transfers, that the presumption against

5  extraterritoriality applied even though it was a crime in the

6  United States, a Ponzi scheme in the United States, and the

7  debtor comprised some U.S. entities, and the Court looked at

8  where the transfer took place.  That was the key factor.

9        THE COURT:  All right.  Thank you very much.

10       Does the Trustee want to add anything on that?

11       MS. GRIFFIN:  Your Honor, that was pre-Morrison and so

12  that would be my only -- was it post?

13       (Counsel conferred)

14       MR. SCHIMMEL:  It is pre.

15       MS. GRIFFIN:  And, your Honor, if the Court were to

16  apply the Morrison analysis, I think the result would be as the

17  Trustee submits.

18       THE COURT:  All right.  Thank you all very much.

19       This is an easy case.  I'm being asked to make an

20  everyday application that has never been done before, if I

21  understand the competing arguments of counsel.

22       So I will take it sub judice.

23

24                              -  -  -

25