EXHIBIT A

LAW OFFICE OF

# RICHARD E. SIGNORELLI

## ATTORNEY AT LAW

799 Broadway, Suite 539, New York, New York  10003

Telephone: (212) 254-4218  Cellular: (917) 750-8842  Facsimile: (212) 254-1396

rsignorelli@nycLITIGATOR.com℠

www.nycLITIGATOR.com℠

January 6, 2017

**BY ECF & E-MAIL (bernstein.chambers@nysb.uscourts.gov)**
Honorable Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

   Re: <u>Picard v. The Lustig Family 1990 Trust</u>, Adv. Pro. No. 10-4417 ("Trust Case")
     <u>Picard v. David Ivan Lustig</u>, Adv. Pro. No. 10-4554 ("IRA Case")

Dear Judge Bernstein:

   We are counsel in the above-referenced cases for defendants David Lustig and
The Lustig Family 1990 Trust ("Trust"), innocent good-faith investors who have been devastated
by the total loss of millions of dollars that they had invested with Bernard L. Madoff Investment
Securities LLC ("BLMIS").  I respectfully write to request an informal conference pursuant to
Local Bankruptcy Rule 7007-1(b) to discuss the motion to compel discovery from the Trustee
that we anticipate making in each of these cases.

   We are seeking judicial intervention because the Trustee's responses to Mr.
Lustig's and the Trust's document requests and interrogatories in both the IRA Case and the
Trust Case are seriously deficient.  As discussed below, the Trustee has unjustifiably failed and
refused to provide information and documents requested by Mr. Lustig and the Trust that are
critical to their defenses in these cases.

A.  <u>The IRA Case</u>

   The Trustee is seeking in the IRA Case to avoid and recover a withdrawal of
$2,000,000 made from an IRA direct account held by Mr. Lustig at BLMIS.  This withdrawal
was made by Mr. Lustig solely and specifically for the purpose of immediately reinvesting the
money back into BLMIS through a third-party sub-feeder fund called Lakeview Investment, LP
("Lakeview").  Mr. Lustig's answer to the complaint asserts several important, potentially case-
dispositive legal and equitable defenses based on the fact that this entire sum of $2,000,000 was
subsequently reinvested back into BLMIS, where it remained invested until all of it was lost as a
result of BLMIS's fraud.  Regrettably, it is this very $2,000,000 sum which the Trustee seeks to

recover in this action despite the fact that Mr. Lustig lost the entire investment in his indirect BLMIS investment.

One of the defenses raised by Mr. Lustig is that the Trustee's attempt to recover from him money that had already been returned to BLMIS violates the single satisfaction rule codified at 11 U.S.C. § 550(d).  See In re Cybridge Corp. (Dobin v. Presidential Fin. Corp. of Del. Valley), 312 B.R. 262, 271 (D.N.J. 2004) (single satisfaction rule "empowers courts to prohibit a trustee from recovering under Section 550(a) from a transferee that has already returned to the estate that which was taken in violation of the Code").  Mr. Lustig also has asserted an equitable defense on the theory that the Court should exercise its equity powers under 11 U.S.C. § 105(a) to grant him an "equitable credit" to the extent the money that the Trustee is seeking to recover had already been returned to BLMIS.  See id. at 272-73.  Other defenses raised by Mr. Lustig which relate to the fact that the money the Trustee is seeking to recover had already been returned to BLMIS include defenses based on the theory of recoupment and the right of set-off.  See New York State Elec. and Gas Corp. v. McMahon, 129 F.3d 93, 95-96 (2nd Cir. 1997) (recoupment is an equitable defenses that may be raised in cases involving fraudulent investment schemes where the transferee reinvested with the debtor the payments that the transferee received from the debtor); Official Committee of Unsecured Creditors v. Manufacturers and Traders Trust Co., 146 F.3d 136, 140 (2nd Cir. 1998) (The right of setoff . . . allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'").

Information and documents concerning the flow of the $2,000,000 out of BLMIS and ultimately back into BLMIS are thus absolutely critical to Mr. Lustig's defenses in the IRA Case.  Based on information and documents currently available to Mr. Lustig, it appears that, after it was withdrawn from Mr. Lustig's IRA account, this $2,000,000 was transferred several times and ultimately reinvested back into BLMIS as follows:

      (1) the money was transferred to Lakeview upon its withdrawal from Mr. Lustig's IRA direct account at BLMIS;

      (2) Lakeview then transferred the money to Wailea Partners, LP ("Wailea") for investment in a swap transaction that used the BLMIS feeder fund Senator Equity Segregated Portfolio One ("Senator Fund") as the reference fund;

      (3) Wailea then transferred the money to HSBC Bank USA, N.A. ("HSBC"), the counterparty to the swap transaction;

      (4) HSBC then transferred the money to the Senator Fund to purchase a direct investment in the Senator Fund to hedge HSBC's exposure in the swap transaction; and

      (5) the Senator Fund invested the money that it received from HSBC back into BLMIS.

The information and documents sought by Mr. Lustig which the Trustee has failed and refused to provide concern these various transfers of the $2,000,000 at issue and the ultimate reinvestment of the money back into BLMIS. As such, they pertain to matters that are extremely relevant to Mr. Lustig's defenses, are clearly "proportional to the needs of the case," and must be produced pursuant to Fed. R. Civ. P. 26(b)(1).

B.    The Trust Case

The Trustee is seeking in the Trust Case to avoid and recover, among other things, a $5,000,000 withdrawal made from an account held by the Trust at BLMIS. Just like the $2,000,000 withdrawal at issue in the IRA Case, this $5,000,000 withdrawal was made solely and specifically for the purpose of immediately reinvesting the money back into BLMIS through Lakeview. Mr. Lustig's and the Trust's answer in the Trust Case asserts the same potentially case-dispositive legal and equitable defenses as those asserted in the IRA Case based on the fact that the entire sum of $5,000,000 that was withdrawn was subsequently reinvested back into BLMIS, where it remained invested until all of it was lost as a result of Madoff's fraud (these defenses are discussed above in connection with the IRA Case). Again, as in the IRA Case, it is this very $5,000,000 sum which the Trustee seeks to recover in this action despite the fact that Mr. Lustig lost the entire investment in his indirect BLMIS investment.

Information and documents concerning the flow of this $5,000,000 out of BLMIS and ultimately back into BLMIS are thus absolutely critical to Mr. Lustig's and the Trust's defenses in the Trust Case. Based on information and documents currently available to us, it appears that, after it was withdrawn from the Trust's account at BLMIS, this $5,000,000 was transferred several times and ultimately reinvested back into BLMIS as follows:

(1) upon its withdrawal from the Trust's account at BLMIS, the money was transferred to Lakeview;

(2) Lakeview then transferred the money to Rye Select Broad Market XL Fund, L.P. ("Rye XL") for investment in a swap transaction that used the BLMIS feeder fund Rye Select Broad Market Fund ("Broad Market Fund") as the reference fund;

(3) Rye XL then transferred the money to the counterparty to the swap transaction, i.e., HSBC Bank USA, N.A., ABN AMRO Bank N.V. (presently known as The Royal Bank of Scotland, N.V.), ABN AMRO Bank (Ireland) Ltd. (formerly known as Fortis Prime Fund Solutions Bank (Ireland) Ltd., and/or some other financial institution;

(4) the swap counterparty then transferred the money to the Broad Market Fund to purchase a direct investment in the Broad Market Fund to hedge its exposure in the swap transaction; and

(5) the Broad Market Fund then invested the money that it received from the swap counterparty back into BLMIS.

3

The information and documents requested by Mr. Lustig and the Trust which the Trustee has failed and refused to provide pertain to these various transfers of the $5,000,000 at issue and the ultimate reinvestment of that money back into BLMIS. As such, they concern matters that are extremely relevant to Mr. Lustig's and the Trust's defenses, are clearly "proportional to the needs of the case," and must be produced pursuant to Fed. R. Civ. P. 26(b)(1).

As Your Honor may recall, at the last court conference, Your Honor expressly indicated that the flow of the money out of and back into BLMIS is a potentially relevant issue in these cases. Disclosure of these materials by the Trustee is especially warranted given the fact that the Trustee has access to these materials and given the vast resources available to the Trustee in contrast to Mr. Lustig's limited resources. See Fed. R. Civ. P. 26(b)(1).

It bears emphasizing that Mr. Lustig is an innocent, good-faith investor whose life has been totally upended by BLMIS's fraud. He is seventy-one years old and is being forced to spend a substantial portion of his limited remaining financial assets during his retirement years on these regrettable litigations. There is much at stake here. If the Trustee succeeds on his claims, an entirely innocent investor will be bankrupted due to suffering, in effect, a doubling of his Madoff losses, since the very money that the Trustee is seeking to recover from Mr. Lustig has already been lost as a result of Mr. Lustig's indirect investments in BLMIS. The discovery that Mr. Lustig is seeking here may potentially dispose of significant issues in both the IRA Case and the Trust Case and result in a reasonable resolution of these cases.

Accordingly, we respectfully request that the Court schedule an informal conference pursuant to Local Bankruptcy Rule 7007-1(b) to discuss and hopefully resolve the discovery issues outlined above and thereby obviate the need for formal motion practice on these issues. Thank you for your consideration of these matters.

Respectfully submitted,

/s/ Richard E. Signorelli
/s/ Bryan Ha

_____
Richard E. Signorelli
Bryan Ha

cc (by ECF and by e-mail):

Dean D. Hunt, Esq. (dhunt@bakerlaw.com)
Nicholas J. Cremona, Esq. (ncremona@bakerlaw.com)

# EXHIBIT B

**LAW OFFICE OF
RICHARD E. SIGNORELLI**
799 Broadway, Suite 539
New York, NY 10003
Telephone: 212-254-4218
Facsimile: 212-254-1396
rsignorelli@nycLITIGATOR.com℠
www.nycLITIGATOR.com℠
Richard E. Signorelli
Bryan Ha
*Attorneys for Defendant David Ivan Lustig*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

SECURITIES INVESTOR PROTECTION
CORPORATION,                                                    Adv. Pro. No. 08-01789 (BRL)

                       Plaintiff-Applicant,            SIPA LIQUIDATION
v.                                                             (Substantively Consolidated)

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                       Defendant.
-------------------------------------------------------------x
In re:
BERNARD L. MADOFF,

                       Debtor.
-------------------------------------------------------------x
IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                       Plaintiff,
v.                                                             Adv. Pro. No. 10-4554 (BRL)

NTC & CO. LLP, as former custodian of an
Individual Retirement Account for the benefit of
David Ivan Lustig; and DAVID IVAN LUSTIG,

                       Defendants.
-------------------------------------------------------------x

L2

## DECLARATION OF DAVID IVAN LUSTIG

David Ivan Lustig, declares under the penalties of perjury, pursuant to Title 28, United States Code, Section 1746, as follows:

1. I am a defendant in the above-captioned avoidance action. I respectfully make this declaration in support of my request that this action be discontinued against me.

2. The complaint alleges that Bernard L. Madoff Investments Securities LLC ("Madoff") made transfers constituting fictitious profits to my Individual Retirement Account ("IRA") and/or to me in the amount of least $1,863,225 and that these transfers were other people's money. (Compl. ¶¶ 3, 38). In this declaration, I will correct and clarify these allegations as well as provide additional information in connection with my request that this action be discontinued against me.

3. I have been financially devastated by the Madoff fraud. I am a significant net loser when one looks at the totality of my Madoff investments, both direct and indirect. In addition, I immediately reinvested back into another Madoff account all of the money that I withdrew from the account which held the IRA ("Subject Account") and I made additional and significant investments all of which I lost when the fraud was discovered.

4. I would also like to emphasize that I am an innocent crime victim of the Madoff fraudulent scheme. Until Bernard Madoff's arrest was publicly announced, I never had any idea that he was operating a Ponzi or a fraudulent scheme of any kind.

5. I am sixty-six years old and was born in San Jose, California. I have two adult children. Since my divorce in 1999, I have been single. I am in reasonably good health other than the usual ailments that come with getting older. I graduated from San Jose State University

2

L3

in 1968. For about three years after graduating from college, I was a police officer with the San Jose Police Department. After serving as a police officer, I was employed as a life insurance agent with Northwestern Mutual Life Insurance Company to about 1974. After this position, I was a vice-president of BFI Business Company ("BFI"), an accounts receivable financing and factoring business. From 1983 to 2001, I was the president and owner of BFI until I sold the company to the employees of the company. I retired in 2001 after the sale of this company.

6. The Subject Account was my IRA. The only withdrawal that I ever made from this account was $2,000,000 on July 25, 2007. This withdrawal is reflected in Exhibit B to the Complaint. I specifically made this withdrawal to make another investment with Madoff. Along with the sum of $5,000,000 from my family trust account which is the subject of a separate avoidance action, the entire $2,000,0000 withdrawal amount was almost immediately reinvested right back into Madoff through a third party feeder fund called Lakeview Investment, LP. ("Lakeview"), which in turn invested the entirety of this sum of money into the Madoff feeder funds of the Tremont Capital Group and Wailea which in turn invested in Madoff through the Luxembourg/Senator Fund. Attached to this declaration as Exhibit A are documents pertaining to this reinvestment. This $2,000,000 deposit, as well as the $5,000,000 that I transferred from my family trust account and other assets, were lost when the Madoff fraud was discovered. Attached to this declaration as Exhibit B is my 2008 Schedule K-1 form for my Lakeview IRA account which demonstrates this loss.

7. In conclusion, as discussed above, I am a significant net loser from the Madoff fraud when one looks at the direct and indirect IRA Madoff investments. In addition, I immediately reinvested right back into Madoff the entire $2,000,000 withdrawal that I made on

3

L4

July 27, 2007. All of my Madoff investments were subsequently lost when the fraud was discovered.

8. For the foregoing reasons, I respectfully request that this action be discontinued against me since I reinvested the withdrawn funds right back into Madoff and because I am a significant net loser from the Madoff fraud.

Dated: Pescadero, California
     April 28, 2011

David Ivan Faistig

4

15

EXHIBIT C

**Lakeview Investment, LP**
100 Smith Ranch Road, Suite 116
San Rafael, CA 94903
tel. 415.492.3414      fax 492.3454

# FAX

To: David Lustig        Fax # 408-395-2220        6 pgs

From: Barbara Smith

Date: 7-26-07

Re:

Richard asked me to forward the enclosed document from Fiserv in order for you to facilitate getting your funds from Fiserv wired to Lakeview Investment LP. Please review the document attached for completeness and enter your account number as indicated on page 3 of 6, and then sign at page 4 of 6. (I left pages 1 & 6 and 2 of 6 out because you don't need them).

If you have any questions, I'm in the office until 5:30 today at 415-492-11614, otherwise Dechen can help you tomorrow and her number is 415-492-3414.

s:\wpw8\basmyfiles\MOTfaxsht

L237

# Wiring Instructions
## For Lakeview Investment, LP

| | |
|---|---|
| To | : Wells Fargo Bank |
| ABA# | : #121000248 |
| Credit Account No. | : #▪▪▪-▪▪5028 |
| Account Name | : Lakeview Investment LP |



**Fiserv.** *Investment Support Services*

# Private Equity/
# Private Debt
# Investment Authorization

**Investment Administration Services**

717 17th Street
Suite 1700
Denver, CO 80202-3331
www.fiserviss-iaservices.com

Please direct IRA mail to:
Team H
P.O. Box 17105
Denver, CO 80217-0105
Toll Free. 1-800-862-4238

Please direct
Qualified Plan mail to:
P.O. Box 5508
Denver, CO 80217-5508
Toll Free 1-800-831-8875

**Important Instructions! Read before completing this form.**
(Note: "you" and "your" refer in the Account Owner.) Please use this form for the following investments only. Private Limited Partnerships (LP), Limited Liability Companies (LLC), Private REITs, Private Stock, Private Debt, Offshore Fund and Hedge Fund Investments Forms and/or procedures for other types of investment transactions are available upon request from our Relationship Managers or on our website at: www.fiserviss-iaservices.com Please review the Terms and Conditions contained in your plan establishment documents applicable to your account for more information about the types of investments you may direct to be purchased in your account

Prior to directing Fiserv Trust to process your investment instructions please be sure that the issuer or sponsor of your investment has provided Fiserv Trust with a completed Private Investment Notification Form and related materials. Please refer to the Private Equity/Private Debt Checklist on page 1 If the sponsor has not provided that information to Fiserv Trust, your investment instructions may be delayed

By signing this form, you acknowledge that Fiserv Trust Company (Fiserv Trust) has not reviewed, recommended or commented on the investment merits, risks, suitability or management of the investment(s) you have selected, and you authorize Fiserv Trust to process the following transactions

Account Owner **DAVID LUSTIG**

Account Number ███████████ **2300**

You authorize and direct Fiserv Trust to:
☒ Purchase    ☐ Transfer/Rollover

Provide the following
☐ Complete and sign this form
☐ Complete, sign and forward the Applicable Subscription Agreement or enrollment documents (Fiserv Trust will execute the documents as retirement plan trustee, however, suitability standards/questionnaires (investor accreditation) must be completed and signed by the retirement plan owner before being submitted )

Name of Investment **LAKeview Investment LP**

Number of Units/Shares

Total Amount of Investment $ **2,000,000.00**

Maturity Date *(Private Debt only)*

Interest Rate *(Private Debt only)*

**FUNDING INSTRUCTIONS** *(select one)*
☒ Wire funds per attached wiring instruction and mail documents by:
☐ Regular Mail
☐ Overnight Mail and bill my Fiserv Trust account
☐ Overnight Mail and bill 3rd party overnight account number

☐ Send funds by check and mail documents and check by:
☐ Regular Mail
☐ Overnight Mail and bill my Fiserv Trust account
☐ Overnight Mail and bill 3rd party overnight account number

_____

Check Payee Name

_____

Mail documents to
Street Address

_____

City/State/ZIP

_____

Telephone Number  (      )

*If the address information is incomplete, checks and paperwork will be forwarded to the address we have on record.*

 **READ THOROUGHLY BEFORE SIGNING**

**ACKNOWLEDGEMENTS**

1  You acknowledge that Fiserv Trust does not perform any type of due diligence determination for any investment

2  You acknowledge that Fiserv Trust does not conduct any investigation of investment sponsors or their selling agents at any time (including prior to funding an investment or after purchases have been made), and that they do not verify whether or not any investment sponsor or their selling agent(s) have complied with state and/or federal securities laws  You understand that any such review or investigation is your responsibility

3.  You verify that you have consulted with tax, financial and legal professionals, or have elected not to do so prior to directing Fiserv Trust to make this investment on behalf of your account

4.  You verify that you have received and read all pertinent information relating to the investment(s) named herein (i.e , private placement memorandum, purchase agreement, subscription documents, etc.)

5  You understand Fiserv Trust is not related to or affiliated with the management or selling agent(s) of the investment(s) and does not comment on the merits of any offering

6  You have consulted with a tax advisor concerning possible tax implications, and agree that such implications (or required tax filings) are your responsibility and any payments calculated will be deducted from your retirement plan

7.  You understand Fiserv Trust's valuation reporting policy printed on this form

8  You agree to the Arbitration Statement printed on this form

9.  You attest that the investment does not constitute a prohibited transaction as defined in the Internal Revenue Code Section 4975 and outlined in the plan documents, and the Prohibited Transactions section on this form.

## Private Equity/Private Debt Investment Authorization *(continued)*

10 You have read and agree to the Indemnity of Trustee and/or Custodian provisions that are provided in the establishment documents

11 You understand and agree to the Employee Retirement Income Security Act and Unrelated Business Taxable Income Notice printed on this form.

12 Offshore Fund Investments

You understand that offshore entities are not organized under the laws of the United States and, most likely, are not subject to US regulations and/or legal system. You are aware that you are responsible for all legal matters concerning your account, and that Fiserv Trust may resign as directed trustee in the event of future legal proceedings.

The investment sponsor of the fund in which you are investing may require that you provide additional documentation or other information pursuant to the anti-money laundering or other laws applicable to the investment sponsor in the country in which it operates. The particular requirements of each country and each investment sponsor may differ. It is your responsibility to determine these requirements prior to authorizing this investment, and by signing this document you acknowledge that you have done so.

Additionally, the investment sponsor may impose similar requirements for Fiserv Trust relating to the processing of your purchase. Fiserv Trust's policy is that it will provide a certification of compliance with United States anti-money laundering/anti-terrorism regulations applicable to Fiserv Trust. If the investment sponsor requires additional information beyond the certification, Fiserv Trust reserves the right to decline to provide such information and to instead characterize the investment as administratively unfeasible for your account. You understand and acknowledge that Fiserv Trust will not be responsible for any consequences resulting from such a determination".

13 Loan Servicing Information For Private Debt Investments

Fiserv Trust is not responsible for servicing any loan, promissory note or debt investment. Fiserv Trust will not monitor whether or not a borrower has defaulted; therefore, it will not provide notice to Account Owners if a default occurs. Account Owners are responsible for reviewing the terms of any debt investment prior to directing Fiserv Trust to fund the investment, and identifying whether or not there is a Servicing Agent for the debt investment.

Generally, a Servicing Agent (sometimes referred to as a Collateral Agent, Indenture Trustee or Paying Agent) is responsible for collecting the proceeds in accordance with the terms of the loan agreement for the debt investment; maintaining account records of each individual investor; collecting and paying over principal and interest from the borrower to the investors; and pursuing any available remedy in the event of a default by the borrower on behalf of investors.

Fiserv Trust does not perform these services for your account. If you determine there is not a Servicing Agent for your debt investment, it is your responsibility to monitor whether or not the borrower complies with the terms of the loan agreement for your debt investment. By signing below, you acknowledge these facts, and verify that you have made your own determination about loan servicing for your investment.



**READ THOROUGHLY BEFORE SIGNING**

SIGNATURE

I agree to all terms and conditions contained in the plan documents applicable to my account and to Acknowledgements 1 through 13 and the related disclosures on this form.



Account Owner Signature

X

Date

## ARBITRATION STATEMENT

The Account Owner hereby agrees that all claims and disputes of every type and matter between the Account Owner and Fiserv Trust, including but not limited to claims in contract, tort, common law claims, or alleged statutory violations, shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association, when the total damages by all claimants in an Arbitration Demand exceed $75,000 the proceedings and hearings in the case shall take place only in Denver, Colorado when the total damages by all claimants in an Arbitration Demand are $75,000 or less, the arbitration proceedings and hearings in the case shall take place only in the city with a United States District Court nearest to the residence of one or more of the Account Owner(s). To the extent not preempted by federal law, Colorado law (including without limitation Colorado statutes governing arbitration proceedings) shall control during the arbitration. The Account Owner expressly waives any right he/she may have to institute or conduct litigation or arbitration in any other forum or location, or before any other body, whether individually, representatively or in another capacity. Arbitration is final and binding on the parties. An award rendered by the arbitrator(s) may be confirmed in any court having jurisdiction over the parties. In an arbitration the parties are entitled to a fair hearing, but arbitration procedures are simpler and more limited than rules applicable in court. The arbitrator's award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrator is strictly limited

The Account Owner agrees to the Arbitration Statement above and to the Indemnification of Trustee and Sponsor contained in the plan documents. The indemnification obligation specifically applies to claims brought by the Trustee and Sponsor

## FISERV TRUST VALUATION REPORTING POLICY

Each account statement you receive reflects the reported value of the Account Owner's Retirement Plan assets, all transactions that have taken place and all fees (if any) that have been charged. Fiserv Trust reports the value of account assets as accurately as possible using the resources available to it. The values listed on the Fiserv Trust account statement may differ from the values listed on the Account Owner's brokerage account or other investment sponsor statements.

Individual values for securities that have publicly-quoted prices are reported based solely on such quoted prices, which are obtained from a quotation service or other source generally available to the public. Fiserv Trust does not guarantee the accuracy

© Fiserv Trust Company, 2007

IA-3555b (5/07)

1 240

## Private Equity/Private Debt Investment Authorization (continued)

of prices obtained from quotation services or other sources, or the length of availability of such prices

Values for alternative assets are generally reported at their original offering price to investors. Fiserv Trust classifies alternative assets into two types. Alternative equity and alternative debt. Investments that Fiserv Trust has classified as alternative equities include, but are not limited to, non-service-priced limited partnerships, private common and preferred stock, and private real estate investment trusts. Investments that Fiserv Trust has classified as alternative debt include, but are not limited to, mortgages/deeds of trust, corporate and limited partnership notes, and other private debt offerings. Information regarding whether an alternative asset has been classified as equity or debt is available upon request. On an annual basis (or more frequently if requested), Fiserv Trust requests updated valuation information from such persons as general partners of limited partnerships, officers of private corporations and sponsors of other investments it has classified as alternative equities. Fiserv Trust will normally adjust the reported value of an alternative equity investment if the general partner, officer or sponsor provides Fiserv Trust with an updated value. If Fiserv Trust has not received an updated value from the general partner, officer or sponsor within two years from the date it last received updated valuation information, it will begin reporting the value as "N/A" or "Not Available." Fiserv Trust does not request updated valuation (or outstanding loan balance) information for investments it has classified as alternative debt. However, Fiserv Trust will normally adjust the reported value (or outstanding loan balance) of an alternative debt investment if it receives updated valuation (or outstanding loan balance) information from the Servicing Agent or from the alternative debt investment sponsor.

Fiserv Trust does not conduct appraisals of investments and does not seek to verify the prices or values provided to it. The reported value of any asset may differ materially from its actual value. Fiserv Trust does not guarantee the accuracy of reported values or whether you will be able to obtain the reported value in the event of a sale, redemption or surrender.

Values reported as N/A indicate that either 1) updated valuation information has not been received within two years of the last update, 2) valuation information was not available at the time of reporting, or 3) the asset has no value. Valuation information or other information provided or reported by Fiserv Trust should not be used as a basis for making retaining, or disposing of an investment. Please refer to reports (or other information) provided by brokers, general partners, corporate officers, or other investment sponsors (or contact these sources directly) with regard to the current operation and status of any chosen investment(s). The frequency with which Fiserv Trust updates prices depends upon the asset type and the frequency with which asset sponsors provide updated valuation information. This means that a price might be updated monthly, quarterly, semi-annually, annually or on the specific date the updated valuation information was received. This may also mean that, while the number of shares or other information regarding an asset has been updated, the price may not have been updated.

Unconfirmed ("pending") purchase transactions for assets that have been determined to have no value must first be confirmed ("settled") before the asset can be removed from the account. When settling a purchase transaction in order to remove the valueless asset from the account, Fiserv Trust in no way represents

that it has received a confirmation of the purchase or that the asset has any value.

Note: Mutual funds and other investments sometimes pay dividends or distribute income on or shortly before quarter-end. Such transactions generally will not be reflected on the account statement until the quarter in which Fiserv Trust receives payment or confirmation from the investment sponsor verifying the transaction and share position. Please keep this in mind when reviewing the Account Owner security positions and account value.

### EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA), THE INTERNAL REVENUE CODE

It is your responsibility to review the Private Placement Memorandum and other offering materials and determine whether or not the investment is acceptable under the Employee Retirement Income Security Act (ERISA) and the Internal Revenue Code to ensure that it falls within one of the exceptions or "safe harbor" to the plan asset regulation, DOL reg. Sec. 2510.3-101. If it does not the general partner/managing member and certain other persons may be considered "fiduciaries" of your account which may cause prohibited transactions and lead to the loss of tax exempt status of your account or excise taxes.

### UNRELATED BUSINESS TAXABLE INCOME

If this investment generates unrelated business taxable income (UBTI), you are responsible for filing an IRS form 990-T. Fiserv Trust is not responsible for determining whether or not an unrelated taxable income has been generated by this investment

Generally, IRAs (Traditional, SEP and Roth) that receive $1,000 or more of gross UBTI during a single tax year must file Form 990-T with the IRS on or before the April 15th tax-filing deadline, and all applicable taxes should be paid from trust assets. Accounts that receive less than $1,000 of gross UBTI are not required to file

Information concerning UBTI is generally reported on the Schedule K-1 (or its attachment), which is prepared by the investment sponsor. Any Schedules K-1 received by Fiserv Trust will be forwarded to the investor.

Any income or loss reflected on the Schedule K-1 for your retirement account(s) should not be combined and/or reported on your personal tax return. The Schedules K-1 for your account with Fiserv Trust should reflect our tax identification number (20-2054042), not your Social Security number. Please inform Fiserv Trust immediately if the Schedules K-1 for your Fiserv Trust assets do not reflect the appropriate taxpayer identification number.

### PROHIBITED TRANSACTIONS

You acknowledge that you have determined that the investment does not violate IRS rules related to "self-dealing," and therefore, does not constitute a prohibited transaction as defined in the Internal Revenue Code Section 4975, and outlined in the plan documents

Generally, a prohibited transaction is any improper use of your IRA account by you or any "disqualified person."

Disqualified persons include you, your fiduciary and members of your family (spouse, ancestor, lineal descendant, and any spouse of a lineal descendant).

The following are examples of prohibited transactions with a traditional IRA.

I 241

## Private Equity/Private Debt Investment Authorization *(continued)*

- Borrowing money from it.
- Selling property to it.
- Receiving unreasonable compensation for managing it
- Using it as security for a loan.
- Buying property for personal use (present or future) with IRA funds
- Additionally certain types of investments may not be made within an IRA, including the purchase of life insurance or collectibles.

Fiduciary For these purposes, a fiduciary includes anyone who does any of the following:

- Exercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets.
- Provides investment advice to your IRA for a fee, or has any authority or responsibility to do so.
- Has any discretionary authority or discretionary responsibility in administering your IRA.

Effect on an IRA account Generally, if the IRS determines that you have engaged in a prohibited transaction in connection with your traditional IRA account at any time during the year, the account stops being an IRA as of the first day of that year.

Taxes on prohibited transactions If someone other than the owner or beneficiary of a traditional IRA engages in a prohibited transaction, that person may be liable for certain taxes. In general, there is a 15% tax on the amount of the prohibited transaction and a 100% additional tax if the transaction is not corrected.

Loss of IRA status If the traditional IRA ceases to be an IRA because of a prohibited transaction by you or your beneficiary, you or your beneficiary are not liable for these excise taxes. However, you or your beneficiary may have to pay other taxes.

**You acknowledge and understand that if the transaction violates these IRS rules, it may result in adverse tax consequences as described above. Please consult with your tax advisor to obtain more information pertaining to these rules, especially as they apply to you and your IRA investments.**

L242

EXHIBIT D

**Lakeview Investment, LP**
**100 Smith Ranch Road, Suite 116**
**San Rafael, CA 94903**
tel. 415.492.3414      fax 492.3454

# FAX



**To:** John @ Fiserv   Fax # 720-920-4728   33 pap

**From:** Barbara Smith

**Date:** 7-31-07

**Re:**

Per Mr. Lustig's instructions, enclosed is our Subscription Agreement.

Note: The Pension Subscription was incorrectly sent to Fiserv, We're getting corrected one

s:\wpw8\basmyfiles\MOTfaxsht

EXHIBIT E

**FISERV** | Investment
Support
Services

PO Box 173859, Denver, CO 80217-3859
Toll Free: 800-962-4238

August 1, 2007

Lakeview Investment LP
100 Smith Ranch Road, suite 116
San Rafael, CA 94903

RE:    Retirement Accounts Inc TTEE FBO: David Lustig
       Retirement Accounts Inc Account #████████2300

Dear Sir or Madam:

On 08/1/2007 we issued funds in the amount of $2,000,000.00 to purchase Lakeview
Investment LP for the above referenced client. Please provide proof of ownership
verifying the investment is registered as follows:

Retirement Accounts Inc TTEE FBO:   David Lustig
Account #████████2300
P.O. Box 173785
Denver, CO  80217-3785
Tax ID#██████2088

We are requesting that you sign and return this letter as verification of ownership. You
can fax the confirmation to (720) 920-4723.

Please contact at Jennifer Candland (800) 325-4352 ext 22288. if you have any
questions.

Sincerely,

Retirement Accounts Inc

---

### COMPLETE THIS SECTION

Account /Policy Number: ████████2300  Date Purchased 8/1/07

Number of shares/units: 2,000,000.⁵⁰
   or
Value of purchase:  $ 2,000,000.⁰⁰

Asset Name (if Different than Above)_____

Signature and Title _____    8/10/07
                                                Date

Printed Name: Barbara Smith

Fiserv Trust Company
Fiserv Investment Support Services
is a marketing name of
Fiserv Trust Company, member FDIC.

# EXHIBIT F

WELLS FARGO BANK, N.A.
P.O. BOX 6995
PORTLAND, OR 97228-6995

Page 1 of 4

Account Number: ████5028
Statement Period: Jul 26, 2007
Statement Period: Aug 23, 2007

Image Count: 1

LAKEVIEW INVESTMENT LP
100 SMITH RANCH RD STE 116
SAN RAFAEL CA 94903-1979

For Customer Assistance:
Call 800-225-5935 (1-800-CALL-WELLS).

----------------------------------------------------------------

| Account Number | Beginning Balance | Ending Balance |
|---|---|---|
| Choice IV Commercial Checking ████5028 | 988.00 | 0.00 |

----------------------------------------------------------------

## News from Wells Fargo

Effective August 17, 2007, the Bank's Funds Availability Policy will change to provide faster availability on certain checks deposited to your Account. Funds from checks drawn on a California bank account and deposited in California are local items and will be available the next Business Day unless otherwise provided under the Funds Availability Policy. These changes are being made as a result of changes in the offices of the Federal Reserve Bank of San Francisco that process checks. For a complete copy of the Bank's Funds Availability Policy as amended by these changes, please visit us online at <https://www.wellsfargo.com/jump/checking/account_addenda>. You may also request a copy of the policy at a Wells Fargo store.

----------------------------------------------------------------

### Credits
#### Deposits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Jul 27 | 10,500,000.00 | Deposit |
| | Jul 27 | 1,000,000.00 | Deposit |
| | Aug 09 | 1,000,000.00 | Deposit |
| | Aug 13 | 970,000.00 | Deposit |
| | Aug 23 | 260,000.00 | Deposit |
| | | 13,730,000.00 | Total Deposits |

#### Electronic Deposits/ Bank Credits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Jul 27 | 750,000.00 | Deposit Made In A Branch/Store |
| | Jul 30 | 6,000,000.00 | WT Fed#00002 First Republic Ban /Org=mot Family Investors Ltd Lp Srf# 07072715021595Yn Trn#070730023588 Rfb# |
| | Jul 30 | 5,000,000.00 | WT Fed#01344 City National Bank /Org=david I Lustig Srf# 2007073000000981 Trn#070730086049 Rfb# |

----------------------------------------------------------------

Continued on next page

LAKEVIEW INVESTMENT LP

Page 2 of 4
Account Number: 5028
Statement End Date: 08/23/07

Electronic Deposits/ Bank Credits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Aug 01 | 2,000,000.00 | WT Fed#00184 Bank Of NEW York M /Org=first Trust Corporation Srf# FTJ0708014110244 Trn#070801106073 Rfb# |
| | Aug 01 | 700,000.00 | WT Fed#01871 Comerica Bank /Org=eileen Dingle Srf# 070801006505 Trn#070801062209 Rfb# |
| | Aug 07 | 3,000,918.00 | Stagecoach Sweep Credit |
| | Aug 07 | 338.73 | Stagecoach Sweep Interest Payment |
| | Aug 08 | 3,001,256.73 | Stagecoach Sweep Credit |
| | Aug 08 | 338.77 | Stagecoach Sweep Interest Payment |
| | Aug 09 | 3,001,595.50 | Stagecoach Sweep Credit |
| | Aug 09 | 338.81 | Stagecoach Sweep Interest Payment |
| | Aug 10 | 3,001,934.31 | Stagecoach Sweep Credit |
| | Aug 10 | 343.78 | Stagecoach Sweep Interest Payment |
| | Aug 13 | 3,002,278.09 | Stagecoach Sweep Credit |
| | Aug 13 | 1,016.66 | Stagecoach Sweep Interest Payment |
| | Aug 14 | 3,973,294.75 | Stagecoach Sweep Credit |
| | Aug 14 | 448.49 | Stagecoach Sweep Interest Payment |
| | Aug 15 | 2,973,743.24 | Stagecoach Sweep Credit |
| | Aug 15 | 325.89 | Stagecoach Sweep Interest Payment |
| | Aug 16 | 2,974,069.13 | Stagecoach Sweep Credit |
| | Aug 16 | 325.93 | Stagecoach Sweep Interest Payment |
| | Aug 17 | 2,974,395.06 | Stagecoach Sweep Credit |
| | Aug 17 | 750,000.00 | WT Fed#04792 Bank Of NEW York M /Org=first Trust Corporation Srf# FTJ0708172891744 Trn#070817069642 Rfb# |
| | Aug 17 | 330.04 | Stagecoach Sweep Interest Payment |
| | Aug 20 | 3,724,725.10 | Stagecoach Sweep Credit |
| | Aug 20 | 750,000.00 | WT Fed#01541 Comerica Bank /Org=john Robbins Srf# 070820007148 Trn#070820060927 Rfb# |
| | Aug 20 | 200,000.00 | WT Fed#00157 First Hawaiian Ban /Org=frank Rothschild Srf# 2007082000004280 Trn#070820063861 Rfb# |
| | Aug 20 | 1,255.18 | Stagecoach Sweep Interest Payment |
| | Aug 21 | 4,675,980.28 | Stagecoach Sweep Credit |
| | Aug 21 | 525.25 | Stagecoach Sweep Interest Payment |
| | Aug 22 | 4,676,505.53 | Stagecoach Sweep Credit |
| | Aug 22 | 1,000,000.00 | WT Fed#06291 Bank Of NEW York M /Org=first Trust Corporation Srf# FTJ0708227275844 Trn#070822070499 Rfb# |
| | Aug 22 | 525.31 | Stagecoach Sweep Interest Payment |
| | Aug 23 | 5,677,030.84 | Stagecoach Sweep Credit |

--------------------------------------------------------------------------------

Continued on next page


LAKEVIEW INVESTMENT LP

Electronic Deposits/ Bank Credits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Aug 23 | 657.91 | Stagecoach Sweep Interest Payment |
| | | 63,814,497.31 | Total Electronic Deposits/ Bank Credits |
| | | 77,544,497.31 | Total Credits |

Debits
Electronic Debits/ Bank Debits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Jul 30 | 10.00 | Wire Trans Svc Charge - Sequence: 070730023588 Srf# 07072715021595Yn Trn#070730023588 Rfb# |
| | Jul 30 | 10.00 | Wire Trans Svc Charge - Sequence: 070730086049 Srf# 2007073000000981 Trn#070730086049 Rfb# |
| | Jul 31 | 30.00 | Wire Trans Svc Charge - Sequence: 070731072854 Srf# FW00531211483331 Trn#070731072854 Rfb# |
| | Jul 31 | 22,950,000.00 | WT Fed#02277 Bank Of NEW York /Ftr/Bnf=rye select broad market xl fund, Lp Srf# FW00531211483331 Trn#070731072854 Rfb# |
| | Aug 01 | 10.00 | Wire Trans Svc Charge - Sequence: 070801062209 Srf# 070801006505 Trn#070801062209 Rfb# |
| | Aug 01 | 10.00 | Wire Trans Svc Charge - Sequence: 070801106073 Srf# FTJ0708014110244 Trn#070801106073 Rfb# |
| | Aug 06 | 3,000,918.00 | Stagecoach Sweep Debit |
| | Aug 07 | 3,001,256.73 | Stagecoach Sweep Debit |
| | Aug 08 | 3,001,595.50 | Stagecoach Sweep Debit |
| | Aug 09 | 3,001,934.31 | Stagecoach Sweep Debit |
| | Aug 10 | 3,002,278.09 | Stagecoach Sweep Debit |
| | Aug 13 | 3,973,294.75 | Stagecoach Sweep Debit |
| | Aug 14 | 1,000,000.00 | Online Transfer Ref #Ibefqjhpzb To Business Dividend Checking XXXXXX8815 On 08/14/07 |
| | Aug 14 | 2,973,743.24 | Stagecoach Sweep Debit |
| | Aug 15 | 2,974,069.13 | Stagecoach Sweep Debit |
| | Aug 16 | 2,974,395.06 | Stagecoach Sweep Debit |
| | Aug 17 | 3,724,725.10 | Stagecoach Sweep Debit |
| | Aug 20 | 4,675,980.28 | Stagecoach Sweep Debit |
| | Aug 21 | 4,676,505.53 | Stagecoach Sweep Debit |
| | Aug 22 | 5,677,030.84 | Stagecoach Sweep Debit |
| | Aug 23 | 5,937,688.75 | Stagecoach Sweep Debit |
| | | 76,545,485.31 | Total Electronic Debits/ Bank Debits |

Continued on next page

LAKEVIEW INVESTMENT LP

Page 4 of 4
Account Number:                    5028
Statement End Date:          08/23/07

Checks Paid

| Check # | Date | Amount | Check # | Date | Amount |
|---------|------|--------|---------|------|--------|
| 1001 | Aug 09 | 1,000,000.00 | | | |

1,000,000.00   Total Checks Paid

77,545,485.31   Total Debits

Daily Ledger Balance Summary

| Date | Balance | Date | Balance |
|------|---------|------|---------|
| Jul 25 | 988.00 | Aug 13 | 0.00 |
| Jul 27 | 12,250,988.00 | Aug 14 | 0.00 |
| Jul 30 | 23,250,968.00 | Aug 15 | 0.00 |
| Jul 31 | 300,938.00 | Aug 16 | 0.00 |
| Aug 01 | 3,000,918.00 | Aug 17 | 0.00 |
| Aug 06 | 0.00 | Aug 20 | 0.00 |
| Aug 07 | 0.00 | Aug 21 | 0.00 |
| Aug 08 | 0.00 | Aug 22 | 0.00 |
| Aug 09 | 0.00 | Aug 23 | 0.00 |
| Aug 10 | 0.00 | | |

Average Daily Ledger Balance          0.00

# EXHIBIT G

**Lakeview Investment, L.P.**
**100 Smith Ranch Road, Suite 116**
**San Rafael, CA 94903**
tel. 415.492.3414    fax 415.492.3454

October 23, 2007

David Lustig
P.O.Box 532
Pescadero, CA 94060

Re: Investment in Lakeview

Dear Investor:

We have received funds for investment as follows:

$ 2,000,000. - Date of deposit: 8/01/07

The name on record for these funds is as follows:

# 002 -David Lustig IRA

Thank you for participating in Lakeview Investment , L.P.  Please feel free to contact us if we can be of further assistance.

Very truly yours,
Lakeview Investment, L.P.
Vista Management Co, General Partner

Dechen Lama
Office Manager

S:wp8/Lakeview Investment LP\Lakeview thankyouletters2007

L7

# EXHIBIT H

WELLS FARGO BANK, N.A.
P.O. BOX 6995
PORTLAND, OR 97228-6995

Page 1 of 2

Account Number:            ████████5028
Statement Period:    Aug 24, 2007-
Statement Period:    Sep 26, 2007

Image Count:                    3

LAKEVIEW INVESTMENT LP
100 SMITH RANCH RD STE 116
SAN RAFAEL CA 94903-1979

For Customer Assistance:
Call 800-225-5935 (1-800-CALL-WELLS).

----------------------------------------------------------------------

| Account Number | Beginning Balance | Ending Balance |
|---|---|---|
| Choice IV Commercial Checking ████5028 | 0.00 | 40,452.68 |

----------------------------------------------------------------------

News from Wells Fargo

----------------------------------------------------------------------

Credits
Deposits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Aug 24 | 665,000.00 | Deposit |
| | Sep 21 | 36,000.00 | Deposit |
| | | 701,000.00 | Total Deposits |

Electronic Deposits/ Bank Credits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Aug 24 | 5,937,688.75 | Stagecoach Sweep Credit |
| | Aug 24 | 400,000.00 | WT Seq#80413 Macher Family Trust /Org= Srf# FW00440236655872 Trn#070824080413 Rfb# |
| | Aug 24 | 675.11 | Stagecoach Sweep Interest Payment |
| | Aug 27 | 7,003,363.86 | Stagecoach Sweep Credit |
| | Aug 27 | 2,388.82 | Stagecoach Sweep Interest Payment |
| | | 13,344,116.54 | Total Electronic Deposits/ Bank Credits |
| | | 14,045,116.54 | Total Credits |

----------------------------------------------------------------------

Continued on next page

L4221

LAKEVIEW INVESTMENT LP

Page 2 of 2
Account Number:                    5028
Statement End Date:            09/26/07

---------------------------------------------------------------------

**Debits**
Electronic Debits/ Bank Debits

| Effective Date | Posted Date | Amount | Transaction Detail |
|---|---|---|---|
| | Aug 24 | 7,003,363.86 | Stagecoach Sweep Debit |
| | Aug 27 | 7,000,000.00 | WT Fed#01642 Northern Trust Int /Ftr/Bnf=fortis prime fund solutions bank Srf# FW00531239882582 Trn#070827053753 Rfb# |

.....................................................................
14,003,363.86   Total Electronic Debits/ Bank Debits

Checks Paid

| Check # | Date | Amount | Check # | Date | Amount |
|---|---|---|---|---|---|
| 1002 | Aug 29 | 100.00 | 1004 | Aug 29 | 200.00 |
| 1003 | Aug 29 | 1,000.00 | | | |

.....................................................................
1,300.00   Total Checks Paid

.....................................................................
14,004,663.86   Total Debits

---------------------------------------------------------------------

**Daily Ledger Balance Summary**

| Date | Balance | Date | Balance |
|---|---|---|---|
| Aug 23 | 0.00 | Aug 29 | 4,452.68 |
| Aug 24 | 0.00 | Sep 21 | 40,452.68 |
| Aug 27 | 5,752.68 | | |

Average Daily Ledger Balance          10,489.20

---------------------------------------------------------------------

EXHIBIT I

Memorandum Number _____

# Confidential
# Private Placement Memorandum

*Class A and Class B*
*Limited Partner Interests*
*in*

# Wailea Partners, LP

*General Partner*

# Wailea Capital GP, LLC

*Investment Manager*

# Wailea Advisors, LP

**Minimum Investment US$250,000**

**August 1, 2007**

**Wailea Partners, LP**
**A Delaware Limited Partnership**

## EXECUTIVE SUMMARY

The objective of Wailea Partners, LP (the "Partnership") is to achieve capital appreciation through investment in the Senator Fund SPC ("Senator") and/or funds or managed accounts that have an investment strategy substantially similar to that of Senator (together with Senator, the "Investment Vehicles"). The Partnership was created by Wailea Capital GP, LLC, a Delaware limited liability company (the "General Partner"), which acts as general partner of the Partnership and will manage its investments. Wailea Capital Advisors, LP, a Delaware limited partnership (the "Investment Manager"), acts as investment manager to the Partnership.

The purpose of the Partnership is to acquire interests in the Investment Vehicles. To be fully informed about an investment in the Partnership, an investor must first understand the terms of an investment in Senator, as all Investment Vehicles in which the Partnership invests are anticipated to have trading strategies substantially similar to that of Senator. Prospective investors in the Partnership are therefore urged to carefully review the Offering Memorandum of Senator Equity Segregated Portfolio One issued in July 2006 (as amended and/or supplemented from time to time, the "Senator Offering Memorandum"). A copy of the Senator Offering Memorandum was provided to investors or is being provided to prospective investors with this Memorandum. The Senator Offering Memorandum describes the material terms of an investment in Senator; however, while the investment strategies employed by Senator and other Investment Vehicles in which the Partnership invests are anticipated to be substantially similar to one another, the material terms of an Investment Vehicle other that Senator will likely vary from the terms outlined in the Senator Offering Memorandum. No representation is made that Senator's terms will not change prior to its final closing and without notice to the investors in the Partnership.

The Partnership is seeking subscriptions from "accredited investors" (as defined in the Partnership's subscription application materials), generally in minimum amounts of at least US$250,000. The Partnership will accept initial subscriptions on the initial closing date and generally will be open for additional subscriptions on the last Business Day of each fiscal month thereafter. The General Partner and its affiliates intend to make an initial commitment to the Partnership's investment program, either through an investment in the Partnership or through co-investment arrangements.

Currently, the Partnership is offering two classes of limited partner interests: class A interests (the "Class A Interests") and class B interests (the "Class B Interests"). References herein to "Interests" shall include the Class A Interests and the Class B Interests unless otherwise specified or context so requires.

*Class A Interests.* For its services to the Partnership, the Investment Manager is entitled to an annual management fee of one percent (1%), charged monthly at one-twelfth (1/12th) of

2

one percent (1%), of each limited partner's capital account balance attributable to Class A Interests. Additionally, the General Partner is entitled to a quarterly performance-based profit allocation at the end of each fiscal quarter equal to fifteen percent (15%) of the Partnership's annual net profits attributable to Class A Interests to the extent that such profits exceed any losses carried forward from prior quarters, based on a "high water mark" formula as described herein.

*Class B Interests.*   The General Partner is entitled to a quarterly performance-based profit allocation at the end of each fiscal quarter equal to twenty percent (20%) of the Partnership's annual net profits attributable to Class B Interests to the extent that such profits exceed any losses carried forward from prior quarters, based on a "high water mark" formula as described herein. No management fee is charged with respect to Class B Interests.

A limited partner is permitted to make withdrawals on twenty (20) day's prior notice at the close of each calendar month. Withdrawal requests may be subject to reserves for contingencies, hold-back pending audit and suspension restrictions as discussed further in this Private Placement Memorandum.

3

## INVESTMENT PROGRAM

### Investment Objective

The primary investment objective of the Partnership is to achieve capital appreciation through investing, on a leveraged basis in funds or managed accounts that employ the "split strike" option strategy as described below and in the Senator Offering Memorandum dated July 2006 (as amended and/or supplemented) attached hereto as Appendix A.

### Investment Strategy

The Investment Manager will seek to achieve the Partnership's objective by investing substantially all of the assets of the Partnership in the Investment Vehicles. The Partnership intends to make investments in the Investment Vehicles on a leveraged basis in order to increase the Partnership's potential return. The Partnership may obtain this leverage through loans made by broker-dealers, commercial banks or other lenders, or through other financial arrangements which have the effect of leveraging the Partnership's investment in Investment Vehicles. The Investment Manager will determine the amount of leverage the Partnership will employ.

At the present time the Partnership anticipates that it will obtain leverage through the use of an option contract, total return swap or leverage facility to be entered into between the Partnership and a reputable, international bank with an established presence in hedge fund lending. If implemented, this contract will allow the Partnership to make an investment in Investment Vehicles which is up to four times larger than the assets of the Partnership available for investment. The use of leverage increases the risks to investors.

*The foregoing discussion includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.* **There can be no assurance that the Partnership's investment strategy will achieve profitable results.**

4

EXHIBIT J

# WAILEA PARTNERS, LP

### SUBSCRIPTION AGREEMENT

Wailea Partners, LP
c/o Fortis Prime Fund Solutions (IOM) Limited
P.O. Box 156, 18-20 North Quay,
Douglas, Isle of Man,
Great Britain, IM99 1NR

Ladies and Gentlemen:

1.    **Documents Received**

(a)    The undersigned (the "Subscriber") hereby acknowledges having (i) received and read the current Confidential Private Placement Memorandum, as supplemented (the "Private Placement Memorandum"), of Wailea Partners, LP, a limited partnership organized under the laws of the State of Delaware (the "Partnership"), and the Limited Partnership Agreement of the Partnership, as amended to date (the "Partnership Agreement") five days prior to the relevant acceptance date, (ii) received a copy of Part II of Form ADV of Wailea Advisors, LP, as amended to date (the "ADV") not less than 48 hours prior to delivering this Subscription Agreement to the Partnership and (iii) been given the opportunity to (A) ask questions of, and receive answers from, the general partner of the Partnership (the "General Partner") or one of its affiliates concerning the terms and conditions of the offering and other matters pertaining to an investment in the Partnership and (B) obtain any additional information which the General Partner can acquire without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Partnership.

(b)    Appendix A hereto contains the definitions of certain capitalized terms used but not otherwise defined herein and should be read by the Subscriber prior to entering into this Subscription Agreement. All other terms shall bear the meanings given to them in the Private Placement Memorandum.

(c)    All Subscription applications must be received by the Administrator at least five (5) business days prior to the relevant acceptance date. In the case of an investor's initial subscription into the Partnership, the application may be sent by fax and the original must follow by next day courier. Any additional subscription, to be made using the "Additional Subscriptions Form", may be made by fax only or by sending by courier delivery addressed to the Administrator on behalf of the Partnership. In the case of any application sent by fax, the Administrator will send an acknowledgement, by fax, to the Subscriber. If the Subscriber does not receive such acknowledgement within 48 hours, or receives an acknowledgement which differs from the subscription/withdrawal, it must contact the Administrator immediately. In the event that the Subscriber does not so contact the Administrator, any unacknowledged subscription/withdrawal application shall have no validity and any acknowledgement which the Subscriber believes differs from the subscription/withdrawal submitted shall be final and

14

conclusive. Please note that a fax transmission report indicating that a fax has been sent by the [investor] will not be considered as an acknowledgement from the Administrator that it has received a subscription/withdrawal and shall not constitute proof of such receipt.

## 2. Subscription Commitment

(a)    The Subscriber hereby irrevocably subscribes for a limited partner interest in the Partnership (the "Interest") and agrees to contribute in cash to the capital of the Partnership, the amount set forth on the Signature Page of this Subscription Agreement. Such amount shall be payable in full in readily available funds by wire transfer to the bank account of the Partnership at least one business day prior to the proposed date of subscription.

(b)    The Subscriber understands that this subscription is not binding on the Partnership until accepted by the General Partner, and may be rejected, in whole or in part, by the General Partner in its absolute discretion. If and to the extent rejected, the Partnership shall return to the Subscriber, without interest or deduction, any payment tendered by the Subscriber, and the Partnership and the Subscriber shall have no further obligation to each other hereunder.

## 3. Representations, Warranties and Covenants – all Subscribers

To induce the Partnership to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Partnership's general and limited partners:

(a)    The information set forth in the subscriber information form attached hereto, which shall be considered an integral part of this Subscription Agreement (the "Subscriber Information Form"), is accurate and complete as of the date hereof, and the Subscriber will promptly notify the Partnership of any change in such information. The Subscriber consents to the disclosure of any such information, and any other information furnished to the Partnership, to any governmental authority, self-regulatory organization or, to the extent required by law or deemed (subject to applicable law) by the General Partner to be in the best interest of the Partnership, to any other person.

(b)    Except as disclosed in the Subscriber Information Form, the Subscriber is acquiring the Interest for the Subscriber's own account, does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the Interest, and is not acquiring the Interest with a view to or for sale in connection with any distribution of the Interest.

(c)    The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Interest (including the risks set forth in the Private Placement Memorandum) and to make an informed investment decision with respect thereto.

Subscription Agreement

6093621 v1

(d)    The Subscriber understands that the Interests have not been and will not be registered under the Securities Act of 1933, as amended, or any state law and that the Partnership is not registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Subscriber agrees to notify the Partnership prior to any proposed sale, transfer, distribution or other disposition of the Interest or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of the Interest without the consent of the Partnership, which may be granted or withheld in the Partnership's sole discretion, and unless the Interests are registered or such sale, transfer, distribution or other disposition is exempt from registration. The Subscriber understands that the Partnership has no intention to register the Partnership or the Interests with the Securities and Exchange Commission or any state and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration. The Partnership may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor furnish a legal opinion satisfactory to the Partnership and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the Interests and appropriate stop transfer instructions may be placed with respect to the Interests.

(e)    In formulating a decision to invest in the Partnership, the Subscriber has not relied or acted on the basis of any representations or other information purported to be given on behalf of the Partnership or the General Partner except as set forth in the Private Placement Memorandum or the Partnership Agreement or the ADV (it being understood that no person has been authorized by the Partnership or the General Partner to furnish any such representations or other information).

(f)    The Subscriber recognizes that there is not now any public market for Interests and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Partnership other than through a withdrawal from the Partnership as provided in the Partnership Agreement.

(g)    If the Subscriber is a natural person, the Subscriber is qualified to become a limited partner in the Partnership and has the legal capacity to execute, deliver and perform this Subscription Agreement and the Partnership Agreement.

(h)    If the Subscriber is a corporation, partnership, limited liability company, trust or other entity, it is authorized and qualified to become a limited partner in, and authorized to make its capital contribution to, the Partnership and otherwise to comply with its obligations under the Partnership Agreement; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms. In addition, such Subscriber will, upon request of the General Partner, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in the Partnership and the authority of the person executing this Subscription Agreement on behalf of the Subscriber which may be requested by the General Partner.

16

Subscription Agreement

6093621 v1

(i)    Upon the request of the General Partner, the Subscriber shall provide such information and execute such documents as may be required in connection with any loan to the Partnership.

(j)    The Subscriber has carefully reviewed and understands the various risks of an investment in the Partnership, as well as the fees and conflicts of interest to which the Partnership is subject, as set forth in the Private Placement Memorandum.  The Subscriber hereby consents and agrees to the payment of the fees so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(k)    The Subscriber believes that the compensation terms of the Partnership Agreement represent an "arm's-length" arrangement and the Subscriber is satisfied that it has received adequate disclosure from the General Partner to enable it to understand and evaluate the compensation and other terms of the Partnership Agreement and the risks associated therewith.

(l)    The Subscriber represents and warrants that no holder of any beneficial interest in the Interest (each a "Beneficial Interest Holder") and, in the case of a Subscriber which is an entity, no Related Person is:

(1)    A person or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control from time to time;

(2)    A Foreign Shell Bank; or

(3)    A person or entity resident in or whose subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.

The Subscriber agrees promptly to notify the General Partner or the person appointed by the General Partner to administer the Partnership's anti-money laundering program, if applicable, of any change in information affecting this representation and covenant.

(m)    The Subscriber represents that (except as otherwise disclosed to the General Partner in writing):

(1)    Neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is a Senior Foreign Political Figure, any member of a Senior Foreign Political Figure's Immediate Family or any Close Associate of a Senior Foreign Political Figure;

(2)    Neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is resident in, or organized or chartered under the laws of, a jurisdiction that has been designated by the

Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;[4]

    (3)    Its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a Non-Cooperative Jurisdiction.

    (n)    The Subscriber acknowledges and agrees that any amounts paid to it will be paid to the same account from which its subscription funds were originally remitted, unless the General Partner agrees otherwise.

    (o)    If the Subscriber is purchasing the Interest as agent, representative, intermediary/nominee or in any similar capacity for any other person, or is otherwise requested to do so by the General Partner, it shall provide a copy of its anti-money laundering policies ("AML Policies") to the General Partner. The Subscriber represents that it is in compliance with its AML Policies, its AML Policies have been approved by counsel or internal compliance personnel reasonably informed of anti-money laundering policies and their implementation and has not received a deficiency letter, negative report or any similar determination regarding its AML Policies from independent accountants, internal auditors or some other person responsible for reviewing compliance with its AML Policies.

## 4.    Representations, Warranties and Covenants – ERISA Subscribers

If the Subscriber is, or is acting on behalf of, an employee benefit plan (a "Plan") which is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), to induce the Partnership to accept this subscription, the Subscriber hereby makes the following additional representations, warranties and covenants to the Partnership and to the Partnership's general and limited partners:

    (a)    The person executing this Subscription Agreement on behalf of the Subscriber either is a "named fiduciary" (within the meaning of ERISA) of the Subscriber, or is acting on behalf of a named fiduciary of the Subscriber pursuant to a proper delegation of authority, and in such capacity and in accordance with the constituent documents of the Subscriber, in the event that the assets of the Partnership at any time constitute "Plan Assets" of the Subscriber, hereby appoints Wailea Advisors, LP, the Investment Manager, as an "investment manager" (within the meaning of ERISA) with authority to manage the assets of the Partnership.

    (b)    The person executing this Subscription Agreement on behalf of the Subscriber represents and warrants on behalf of such person or the Subscriber, as applicable, as follows:

---

[4]    The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") issues advisories regarding countries of primary money laundering concern. FinCEN's advisories are posted at http://www.fincen.gov/pub_main.html.

(1)    The Subscriber is (w) an employee benefit plan subject to the fiduciary
provisions of the Employee Retirement Income Security Act of 1974, as
amended ("ERISA"), (x) a "plan" subject to Section 4975 of the Internal
Revenue Code of 1986, as amended (the "Code"), (y) an entity that
otherwise constitutes a "benefit plan investor" within the meaning of any
department of Labor regulation promulgated under Section 3(42) of
ERISA, (a party described in (w), (x), or (y), a "Plan"), or (z) an entity
whose underlying assets include "plan assets" for purposes of ERISA by
reason of a Plan's investment in the Subscriber (a "Plan Asset Entity").

(2)    The execution and delivery of this Subscription Agreement and the
consummation of the transactions contemplated hereunder, and in the
Private Placement Memorandum and the Partnership Agreement will not
result in a breach or violation of any charter or organizational documents
pursuant to which the Subscriber was formed, or any statute, rule,
regulation or order of any court or governmental agency or body having
jurisdiction over the Subscriber or any of its assets, or in any material
respect, any mortgage, indenture, contract, agreement or instrument to
which the Subscriber is a party or otherwise subject.

(3)    The investment in the Partnership is permitted by the documents of the
Subscriber and such documents permit the Subscriber to invest in limited
partnerships which will engage in the investment program described in the
Private Placement Memorandum.

(c)    The Subscriber is not in any way affiliated with (i.e., does not own or control, is
not owned or controlled by, nor is under common ownership or control with) any person or
entity which will receive compensation, directly or indirectly, from the Partnership, as
specifically identified and described in the Private Placement Memorandum.

(d)    The Subscriber acknowledges and agrees that the decision to invest in the
Partnership and the review of the terms of the Partnership must be made solely and
independently by a fiduciary of the Subscriber who has no affiliation with the General Partner or
any of its affiliates or employees, without relying on any recommendation of the General Partner
or any of its affiliates or employees as a primary basis for its decision.

(e)    The appropriate fiduciaries of the Subscriber have considered the investment in
light of the risks relating thereto and fiduciary responsibility provisions of ERISA applicable to
the Subscriber and have determined that, in view of such considerations, the investment is
appropriate for the Subscriber and is consistent with such fiduciaries' responsibilities under
ERISA, and the appropriate fiduciaries: (i) are responsible for the Subscriber's decision to invest
in the Partnership, including the determination that such investment is consistent with the
requirement imposed by Section 404 of ERISA that employee benefit plan investments be
diversified so as to minimize the risk of large losses; (ii) are independent of the General Partner
and any of its affiliates and employees and of any person or entity which will receive
compensation, whether directly or indirectly, from the Partnership, as specifically identified and

Subscription Agreement

6093621 v1

described in the Private Placement Memorandum; (iii) are qualified and authorized to make such investment decision; and (iv) in making such decision, have not relied on the recommendation of the General Partner or any of its affiliates or employees.

(f)     The Subscriber through the appropriate fiduciaries has been given the opportunity to discuss the Subscriber's investment in the Partnership, and the structure and operation of the Partnership with the General Partner and has been given all information that the Subscriber or the appropriate fiduciaries have requested and which the Subscriber or the appropriate fiduciaries deemed relevant to the Subscriber's decision to participate in the Partnership.

5.     **Representation, Warranty and Covenant – Insurance Company General Account and Plan Asset Entity Subscribers**

(a)     If the Subscriber is acquiring an Interest with the assets of the general account of an insurance company, the Subscriber represents, warrants and covenants that on each day the Subscriber owns an Interest either (i) the assets of such general account are not considered to be plan assets within the meaning of Department of Labor Regulations Section 2510.3-101 or Department of Labor regulations issued pursuant to Section 401(c)(1)(A) of ERISA, or (ii) the execution and delivery of this Subscription Agreement, and the acquisition and withdrawal of the Interest, is exempt from the prohibited transaction rules of Section 406(a) of ERISA and Section 4975(c)(1)(A) - (D) of the Code by virtue of Department of Labor Prohibited Transaction Class Exemption 95-60 or some other exemption of such rules.

(b)     By signing this Subscription Agreement, each Subscriber that is either a Plan Asset Entity or is using the assets of an insurance company general account, hereby covenants that if, after its initial acquisition of the Interests, at any time during any calendar month the percentage of the assets of such general account (as reasonably determined by the Subscriber) or Plan Asset Entity, as applicable, that constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code exceeds the percentage specified by the Subscriber in Question 2(d) of Part A.III. of the Subscriber Information Form, then such Subscriber shall promptly notify the Partnership of such occurrence and the Partnership may require the Subscriber to redeem or dispose of all or a portion of the Interests held in such general account or by such Plan Asset Entity, as applicable, by the end of the next following calendar month (or such other time as may be determined by the General Partner).

6.     **Indemnification**

The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby, if accepted by the General Partner, will be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Partnership, the General Partner and their affiliates, and the partners, members, managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (the "Indemnified Persons") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber

20

Information Form) not having been true when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Partnership.

The Administrator shall not be responsible to the Partnership or any other person for acting upon/in accordance with forged or fraudulent document containing instructions, transfers or applications, be they received by fax, e-mail or otherwise, or for the consequences of any action taken by the Administrator upon the faith of any such forged or fraudulent document in any case where, had the document not been forged or fraudulent, the action taken by the Administrator would have been a normal and reasonable action to be taken.

7.    Miscellaneous

(g)    The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights or interest herein or hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any Interest acquired pursuant hereto shall be made only in accordance with the provisions hereof, the Partnership Agreement and all applicable laws.

(h)    The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(i)    All of the representations, warranties, covenants, agreements, indemnities and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any Interest.

(j)    This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(k)    Within ten days after receipt of a written request therefor from the Partnership, the Subscriber agrees to provide such information and to execute and deliver such documents as the Partnership may deem reasonably necessary to comply with any and all laws and ordinances to which the Partnership is or may be subject.

(l)    The Subscriber agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its investment in the Partnership) or disclose to any person, any information or matter relating to the Partnership and its affairs and any information or matter related to any investment of the Partnership (other than disclosure to the Subscriber's authorized representatives); provided that (i) the Subscriber may make such disclosure to the extent that (A) the information to be disclosed is publicly known at the time of proposed disclosure by the Subscriber, (B) the information otherwise is or becomes legally known to the Subscriber other

21

than through disclosure by the Partnership, or (C) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) the Subscriber may make such disclosure to its Beneficial Interest Holders to the extent required under the terms of its arrangements with such persons; and (iii) the Subscriber will be permitted, after written notice to the Partnership, to correct any false or misleading information which becomes public concerning the Subscriber's relationship to the Partnership. Prior to making any disclosure required by law, the Subscriber shall use its best efforts to notify the Partnership of such disclosure. Prior to any disclosure to any authorized representative or Beneficial Interest Holder, the Subscriber shall advise such persons of the confidentiality obligations set forth herein and each such person shall agree to be bound by such obligations. Notwithstanding the foregoing, the Subscriber may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Partnership and all materials of any kind (including opinions or other tax analyses) that are provided in connection with this Subscription Agreement to the Subscriber relating to such tax treatment or tax structure.

(h)    The Subscriber hereby agrees that the Partnership and the Administrator, or any other party on behalf of the Partnership, shall be entitled to, and shall, supply all and any information regarding the Partnership and the Subscriber's investment in the Partnership to the General Partner. Further, the Subscriber acknowledges and accepts that the Partnership, the Administrator and the General Partner may be required to and shall be entitled to reveal any information regarding the Partnership and the Subscriber's investment in the Partnership, including details of the Subscriber's identity, to their regulators and/or any other government agency within their jurisdiction, which the Partnership, the Administrator or the General Partner shall, in their sole discretion, consider appropriate.

(i)    The Subscriber acknowledges that prior to the issue of an Interest in the Partnership the Administrator may transfer subscription funds into an account in the name of the Partnership or if Partnership or the General Partner directs the Administrator to an account in the name of any underlying Investment Vehicle, a broker of the Partnership or any other account ("Transfer"), the Administrator shall make such Transfer; provided that in the event that the Administrator makes such Transfer the Administrator shall attract no liability in respect of any losses arising from such Transfer and the Partnership shall indemnify the Administrator out of the assets of the Partnership to the fullest extent permitted by law against any and all actions, costs, claims, damages, demands or expenses (including but without limitation any reasonable attorneys' fees) suffered or incurred by the Administrator as a result of such Transfer.

8.    **Power of Attorney**

Subject only to the acceptance of this Subscription Agreement by the General Partner, the Subscriber hereby (a) joins in and agrees to be bound by the Partnership Agreement as a limited partner; and (b) makes, constitutes and appoints the General Partner, acting through any of its authorized partners and officers and with power of substitution, the Subscriber's true and lawful agent and attorney, with full power and authority in such Subscriber's name, place and stead, to

Subscription Agreement

6093621 v1

execute the Partnership Agreement. The power of attorney granted hereby is a special power of attorney coupled with an interest and shall be irrevocable to the fullest extent permitted by law.

9.    Notices

Any notice required or permitted to be given to the Subscriber in relation to the Partnership shall be sent to the address specified in Part A.I. of the Subscriber Information Form or to such other address as the Subscriber designates by written notice received by the General Partner.

10.    Governing Law

This Subscription Agreement shall be governed by the laws of the State of Delaware.

# APPENDIX A

## DEFINITIONS

Close Associate: With respect to a Senior Foreign Political Figure, a person who is widely and publicly known internationally to maintain an unusually close relationship with the Senior Foreign Political Figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the Senior Foreign Political Figure.

FATF: The Financial Action Task Force on Money Laundering.

FATF Country: A country that is a member of FATF.  As of July 1, 2007, the countries that are members of FATF are: Argentina; Australia; Austria; Belgium; Brazil; Canada; Denmark; Finland; France; Germany; Greece; Hong Kong; Iceland; Ireland; Italy; Japan; Luxembourg; Mexico; Kingdom of the Netherlands; New Zealand; Norway; Portugal; Russian Federation; Singapore; South Africa; Spain; Sweden; Switzerland; Turkey; United Kingdom and United    States.    For    a    current    list    of    FATF    members    see http://www1.oecd.org/fatf/Members_en.htm.

Foreign Bank: An organization that (i) is organized under the laws of a country outside the United States; (ii) engages in the business of banking; (iii) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations; (iv) receives deposits to a substantial extent in the regular course of its business; and (v) has the power to accept demand deposits, but does not include the U.S. branches or agencies of a foreign bank.

Foreign Shell Bank: A Foreign Bank without a Physical Presence in any country, but does not include a Regulated Affiliate.

Government Entity: Any government or any state, department or other political subdivision thereof, or any governmental body, agency, authority or instrumentality in any jurisdiction exercising executive, legislative, regulatory or administrative functions of or pertaining to government.

Immediate Family: With respect to a Senior Foreign Political Figure, typically includes the political figure's parents, siblings, spouse, children and in-laws.

Non-Cooperative Jurisdiction: Any foreign country or territory that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as FATF, of which the United States is a member

6093621 v2

and with which designation the United States representative to the group or organization continues to concur. See http://www1.oecd.org/fatf/NCCT_en.htm for FATF's list of non-cooperative countries and territories.

Physical Presence: A place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank: (a) employs one or more individuals on a full-time basis; (b) maintains operating records related to its banking activities; and (c) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

Publicly Traded Company: An entity whose securities are listed on a recognized securities exchange or quoted on an automated quotation system in the U.S. or country other than a Non-Cooperative Jurisdiction or a wholly-owned subsidiary of such an entity.

Qualified Plan: A tax qualified pension or retirement plan in which at least 100 employees participate that is maintained by an employer that is organized in the U.S. or is a U.S. Government Entity.

Regulated Affiliate: A Foreign Shell Bank that: (a) is an affiliate of a depository institution, credit union, or Foreign Bank that maintains a Physical Presence in the U.S. or a foreign country, as applicable; and (b) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or Foreign Bank.

Related Person: With respect to any entity, any interest holder, director, senior officer, trustee, beneficiary or grantor of such entity; provided that in the case of an entity that is a Publicly Traded Company or a Qualified Plan, the term "Related Person" shall exclude any interest holder holding less than 5% of any class of securities of such Publicly Traded Company and beneficiaries of such Qualified Plan.

Senior Foreign Political Figure: A senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a Senior Foreign Political Figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a Senior Foreign Political Figure.

USA PATRIOT Act: The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

## AUTHORIZATION OF SIGNERS:

### WAILEA PARTNERS, LP

Set forth below are the names of persons authorized by the Investor to give and receive instructions between the Partnership and the **Lakeview Investment, LP**, together with their respective signatures. Such persons are the only persons so authorized until further notice to the Partnership signed by one or more of such persons.

Name                          Signature

Richard M. Glantz

Austin G. Bosarge

ADDITIONAL INFORMATIN UNDER PART B OF THE SUBSCRIPTION
AGREEMENT FOR WAILEA PARTNERS, LP

**GENERAL PARTNERS**

Vista Management, Co, a California Corporation

**BENEFICIAL OWNERSHIP INFORMATION**

List of owners of Lakeview Investment, LP with an interest of 10% of more

David Lustig          Retired

COPY No. 1

## SIGNATURE PAGE

(Complete and sign two copies)

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of the Subscription Agreement and the Partnership Agreement and (3) requests that the records of the Partnership reflect the Subscriber's admission as a limited partner.

Dated: _8/24____, 2007

Subscriber to indicate Class of Interest for which subscription is being made:

☑ Class A Interest
  or
☐ Class B Interest

**AMOUNT OF SUBSCRIPTION**

$ __7,000,000_____

_Lakeview Investment, LP_
Name of Subscriber

_(signature)_
Signature

_Austin G Bosarge , Vice President_
_Vista Management Co. - General Partner_
Name and title or representative capacity, if applicable

The Subscriber's subscription is accepted and is hereby issued an Interest subject to the provisions of the Subscription Agreement and the Partnership Agreement.

Wailea Capital GP, LLC, General Partner

By: _____
Name:
Title: Manager

Dated: _____, 200__

Dated: _____, 200__

Signature Page

COPY No. 2

### SIGNATURE PAGE

(Complete and sign two copies)

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of the Subscription Agreement and the Partnership Agreement and (3) requests that the records of the Partnership reflect the Subscriber's admission as a limited partner.

Dated: __8/24__, 200_7_

Subscriber to indicate Class of Interest
for which subscription is being made:

☑ Class A Interest
    or
☐ Class B Interest

**AMOUNT OF SUBSCRIPTION**

$ __7,000,000__

__Lakeview Investment, LP__
Name of Subscriber

_Austin G. Bosarge_
Signature

_Austin G. Bosarge, Vice President_
_Vista Management Co. - General Partner_
Name and title or representative
capacity, if applicable

The Subscriber's subscription is accepted and is hereby issued an Interest subject to the provisions of the Subscription Agreement and the Partnership Agreement.

Wailea Capital GP, LLC, General Partner

By: _____
Name:
Title:  Manager

Dated: _____, 200__

Dated: _____, 200__

Signature Page

6093621 v1

EXHIBIT K



California Business Banking Group
MAC A0103-056
Post Office Box 7675
San Francisco, CA 94120-9378

Date: August 27, 2007

To:   *Wailea Partners LP*
      c/o Fortis Prime Fund Solutions (Cayman) Limited
      PO Box 2003 GT
      Grand Pavilion Commercial Centre
      802 West Bay Road, Grand Cayman
      Cayman Islands, British West Indies

Attention: Investor Services Department (Middle Office)
           Tel: 1 345 949 7942
           Fax: 1 345 914 9965

Dear: Sirs

RE: **Wailea Partners, LP**

Name of Remitting Financial Institution: Wells Fargo Bank
Address of Remitting Financial Institution:   1203 4th Street, San Rafael, CA 94901
Name of Subscriber:                    Lakeview Investment LP
Address of Subscriber:          100 Smith Ranch Road, Ste 116 San Rafael, CA 94903
Name of Subscriber Account Being Debited:   Lakeview Investment LP
Account Number Being Debited:        ▉▉▉▉5028

We have wired funds to your account at NTIBC, Account Number ▉▉▉▉0230,
Sub account name: Wailea Partners LP and sub account number ▉▉▉▉0901 for
7,000,000.00 by order of Lakeview on August 27, 2007.

The above information is given in strictest confidence for your own use only and without any
guarantee, responsibility or liability on the part of the institution or its officials.

Yours faithfully,

Greg P. Blos
Business Relationship Manager

# EXHIBIT L



HSBC Bank USA, NATIONAL ASSOCIATION
452 Fifth Avenue
New York, NY 10018

Date: September 4, 2007

| | | | |
|---|---|---|---|
| To: | Wailea Partners LP | From: | HSBC Bank USA, National Association |
| Attention: | William Belhumeur | Contact: | Swap Documentation |
| Phone Number: | 415-986-8040 | Phone Number: | (212) 525-3138 |
| Facsimile Number: | 415-986-8041 | Facsimile Number: | (212) 525-0673 |

HBUS Ref No: 278515

### SHARE SWAP TRANSACTION CONFIRMATION

The purpose of this communication is to set forth the terms and conditions of the Share Swap Transaction entered into between HSBC Bank USA, National Association ("Party A") and Wailea Partners LP ("Party B") on the Trade Date specified below (the "Transaction"). This communication constitutes a Confirmation as referred to in the Agreement described below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," and, together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

This Confirmation together with all other documents referring to the ISDA Form evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, Party A and Party B agree that an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") (as may be amended, modified or supplemented from time to time, the "Agreement"), with such modifications as Party A and Party B in good faith agree will supplement, form a part of, and be incorporated by reference into this Confirmation forming part of the Agreement as if Party A and Party B had executed an agreement in the form of the ISDA Form on the Trade Date of the first such Transaction between them and in such form with the Schedule thereto specifying (i) that the governing law is the law of the State of New York, without reference to choice of law doctrine, (ii) the Termination Currency is U.S. Dollars, (iii) Loss and Second Method and (iv) further modifications to the ISDA Form indicated below.

This Transaction constitutes a Swap Transaction for purposes of the Swap Definitions and a Share Swap Transaction for purposes of the Equity Definitions. The terms of the Transaction to which this Confirmation relates are as follows:

1.    **GENERAL TERMS**

Trade Date:                         September 4, 2007

Effective Date:                     September 4, 2007

Termination Date:                   The final Cash Settlement Payment Date.

Calculation Agent:                  HSBC Bank USA, National Association ("HSBC").
                                    All determinations and calculations of the Calculation
                                    Agent determined in good faith and in a commercially
                                    reasonable manner shall be conclusive and binding for
                                    all purposes absent manifest error.

                                    Upon the occurrence of an Event of Default or
                                    Termination Event in which Party A is the Defaulting
                                    Party or the sole Affected Party, Party A and Party B
                                    shall mutually agree on a third-party financial
                                    institution to act as Calculation Agent until such Event
                                    of Default or Termination Event is no longer
                                    occurring.

Business Day:                       New York

Business Day Convention:            Modified Following (which shall apply to any date
                                    referred to in this Confirmation that falls on a day that
                                    is not a Business Day).

Reference Shares:                   The number of limited partnership interests of the
                                    Reference Fund that would be received by the
                                    Reference Holder had the Reference Holder invested
                                    USD 31,000,000 in the Reference Fund effective as of
                                    the Effective Date (as may be amended from time to
                                    time), subject to adjustment in accordance with
                                    Section 6.

Reference Fund:                     Senator Equity Segregated Portfolio One

Party B Initial Payment:            USD 8,870,000

2.    **EQUITY AMOUNTS**

Equity Amount Payer:                Party A

Equity Amount Receiver:             Party B

Equity Notional Amount:             As of the Effective Date, USD 31,000,000, and
                                    thereafter as of any date of determination, the amount
                                    as determined by the Calculation Agent.

Equity Amount:                      As of any date of determination, the amount as
                                    determined by the Calculation Agent equal to the
                                    Equity Notional Amount less the Floating Notional
                                    Amount, and with respect to any Cash Settlement

-2-

Date, the cumulative Reference Fund Redemption Payments as of such Cash Settlement Payment Date less the Floating Notional Amount. Notwithstanding Section 8.6 of the Equity Definitions, the Equity Amount, if negative, shall be deemed zero until the final Cash Settlement Payment Date.

Reference Fund
Redemption Payments:

As of any date of determination, the cumulative amount of cash a Reference Holder would actually receive, on or before the third Business Day prior to such day, as determined by the Calculation Agent, as a result of a redemption or other disposition of an investment in the Reference Shares had the Reference Holder delivered a timely redemption notice in accordance with the schedule indicated in the Reference Fund's operating documents, to such Reference Fund to receive the Net Asset Value of such Reference Shares as of the Valuation Date (assuming that the Reference Holder elected to reinvest dividends (if any) that it would have received as a holder of Reference Shares), net of any accrued management, load, administrative and any other per share fees or costs and net of any taxes payable by the Reference Holder in connection with such a redemption or other disposition of such Reference Shares.

"**Reference Holder**" means a holder of Reference Shares as determined by the Calculation Agent. The Reference Holder is used solely to compute the Reference Fund Redemption Payments and the Cash Settlement Payment Date and does not represent an investment in Reference Shares of the Reference Fund.

Equity Notional Reset:                Not Applicable

Type of Return:                       Price Return

Valuation Dates:                      The earlier of (i) August 31, 2009 (the "**Scheduled Valuation Date**") and (ii) the Business Day designated by the Calculation Agent as a Valuation Date upon (A) mutual request by parties hereto or (B) the occurrence of an Early Termination Date or Extraordinary Event. .

Section 6.2 of the Equity Definitions is hereby amended by deleting the words after the parenthetical in the first sentence and replacing them with a ".".

|                                      | Notwithstanding anything to the contrary in the Equity Definitions, Section 6.3 of the Equity Definitions shall not apply to this Transaction. |

Return of Equity Amount:    If a Reference Holder is required to repay any portion of the redemption or other proceeds received from the Reference Fund, then Party B shall promptly pay to the Equity Amount Payer such portion, including, without limitation, any taxes, accrued management, load, administrative and any other per share fees or costs payable in respect of such proceeds. The foregoing obligations shall survive any termination or assignment of this Transaction.

Dividend Amount:    Notwithstanding anything to the contrary in the Equity Definitions, Section 10.1 or 10.4 of the Equity Definitions shall not apply to this Transaction.

## 3.    FLOATING AMOUNTS

Floating Amount Payer:    Party B

Floating Notional Amount:    As of the Effective Date, USD 22,130,000, and thereafter such amount as may be adjusted pursuant to the terms of this Confirmation; provided that the Floating Notional Amount shall not exceed the Maximum Notional Amount.

Floating Amount Payment Date:    The final Cash Settlement Payment Date.

Calculation Period:    The period from and including the Effective Date to but excluding the Termination Date.

Floating Rate Option:    USD-LIBOR-BBA

Designated Maturity:    One month; provided that if a Notional Upsize Date or Notional Downsize Date is effected during a Calculation Period that causes an increase or decrease in the Floating Notional Amount, the Calculation Agent will compute the Floating Rate Option for the remainder of the Calculation Period based on USD-LIBOR-BBA (or such other index that may be appropriate for shorter durations) for the remainder of such Calculation Period, using Linear Interpolation or such other factors it deems necessary.

Spread:    1.10%

Floating Rate Day Count Fraction:    Actual/360

Reset Dates:    The first day of each Compounding Period.

Compounding:    Applicable

| | |
|---|---|
| Compounding Dates: | The last calendar day of each month commencing in September 2007 and ending on the last calendar day of the month immediately preceding the final Cash Settlement Payment Date. |
| Minimum Spread Payment: | Notwithstanding the foregoing or upon the occurrence of (i) an Event of Default, Termination Event, Additional Termination Event or other termination of this Agreement (other than a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates) where Party B is the Defaulting Party or an Affected Party or (ii) an Extraordinary Event, in the event that Party B has not previously paid to Party A an amount equal to the product of (x) USD 15,000,000, (y) the Spread and (z) the Floating Rate Day Count Fraction (such amount, the "**Minimum Spread Payment**") with respect to the period between the Effective Date and August 31, 2009, Party B shall pay to Party A the difference between the Minimum Spread Payment and any amount paid for such period (other than, for the avoidance of doubt, all such amounts payable pursuant to the Floating Rate Option). Party B's obligations with respect to this "Minimum Spread Payment" shall survive the termination of this Transaction. |

## 4.   SETTLEMENT TERMS

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Cash Settlement Payment Date: | For the Valuation Date, thirty (30) Business Days after such Valuation Date and the final Business Day of each month thereafter; until such date, determined by the Calculation Agent in its sole discretion, on which a Reference Holder of Reference Shares would have actually received all the proceeds from a redemption of the Reference Shares. |
| | If a Reference Holder of Reference Shares would not actually receive all the proceeds from a redemption or other disposition of the Reference Shares within three months after such Valuation Date, such date shall be the final Cash Settlement Payment Date; provided that upon the occurrence of an Event of Default or Termination Event under the Agreement, the Calculation Agent may designate the final Cash Settlement Payment Date on any date following the applicable Valuation Date. |

**5.    SHARE ADJUSTMENTS**

  Method of Adjustment:      Calculation Agent Adjustment

                Notwithstanding anything to the contrary in the Equity
                Definitions, Section 11.2 (e)(iii) of the Equity
                Definitions is hereby amended such that the words
                "**Extraordinary Dividend**" mean "any cash or non-
                cash dividend".

**6.    NOTIONAL ADJUSTMENTS**

    (i)  Party B may designate any Compounding Date as a "**Notional Upsize Date**"
provided that the following conditions are satisfied:

      (A)  Party B shall provide Party A five (5) Business Days' prior written notice
in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of (i)
its intention to designate a Compounding Date as a Notional Upsize Date and (ii) the
amount by which the Equity Notional Amount (which may be effected by an increase in
the Floating Notional Amount and/or a payment of cash by Party B) shall increase on the
related Notional Upsize Date, the "**Notional Upsize Amount**";

      (B)  Before and after giving effect to the increase in the Equity Notional
Amount on the Notional Upsize Date, an Event of Default or Termination Event shall not
have occurred and be continuing or will not occur; and

      (C)  Before and after giving effect to the increase in the Equity Notional
Amount on the Notional Upsize Date, the Leverage Ratio shall be less than the Maximum
Leverage Ratio and the Floating Notional Amount shall be less than the Maximum
Notional Amount.

    (ii)  Party B may designate any Compounding Date as a "**Notional Downsize Date**"
provided that the following conditions are satisfied:

      (A)  Party B shall provide Party A five (5) Business Days' prior written notice
in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of
(i) its intention to designate a Compounding Date as a Notional Downsize Date and
(ii) the amount by which the Equity Notional Amount (which may be effected by a
reduction of the Floating Notional Amount and/or a redemption of a number of Reference
Shares and subsequent cash payment to Party B) shall decrease on the related Notional
Downsize Date, the "**Notional Downsize Amount**;"

      (B)  After giving effect to the decrease in the Equity Notional Amount on the
Notional Downsize Date, an Event of Default or Termination Event shall not have
occurred and be continuing or will not occur; and

      (C)  After giving effect to the decrease in the Equity Notional Amount on the
Notional Downsize Date, the Leverage Ratio shall be less than the Maximum Leverage
Ratio.

Notwithstanding Section 6(ii)(A) above, the Notional Downsize Date shall be the date Party A
shall have received cash or a Reference Holder would have actually received cash as a result of a

redemption of Reference Shares, as determined by the Calculation Agent, in an amount equal to the Notional Downsize Amount. If a Notional Adjustment is effected by a redemption of Reference Shares, the Calculation Agent may designate multiple Notional Downsize Dates on such dates as a Reference Holder would have actually received cash as a result of a redemption of Reference Shares.

    (iii)    Party A may designate any date as a "Notional Downsize Date" and reduce the Notional Amount such that the Leverage Ratio will be less than 3.5, Party A shall promptly give notice to Party B following the designation of such Notional Downsize Date.

    Notwithstanding anything to the contrary above, in the event that a Reference Holder would be unable to acquire Shares of the Reference Fund upon the occurrence of a Notional Upsize Date, Party B shall not be permitted to effect such Notional Upsize.

7.    **INVESTMENT GUIDELINES**

    As set forth on Annex II

8.    **REPORTING REQUIREMENTS**

    Party B hereby covenants to provide to Party A or to cause Party A to be provided with the following information in accordance with the time frames set forth below:

    (a)    Semi-monthly NAV reports within 10 days;

    (b)    Fully completed HSBC Risk Report (as set forth on Annex III) within 10 Business Days of the end of each calendar month;

    (c)    Annual audited financial statements of the Reference Fund from the auditor within 180 calendar days of the end each calendar year; and

    (d)    Monthly statements from the Administrator showing all assets and trading activity for each month within 10 Business Days

9.    **EXTRAORDINARY EVENTS**

    Notwithstanding anything to the contrary in Sections 12.1 or 12.6 of the Equity Definitions, the occurrence of a Merger Event, Tender Offer, Nationalization or Insolvency shall be deemed to be effective on the Announcement Date of such event. With respect to this Transaction, Sections 12.2-12.5, 12.6(c) and 12.7 of the Equity Definitions shall not apply.

    Following the Announcement Date of a Merger Event, Tender Offer, Nationalization or Insolvency, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter (subject to the definition thereof) and determine the Reference Fund Value as described above. The occurrence of an Extraordinary Event shall be deemed an Additional Termination Event for purposes of Section 7 hereof, and Party B shall be deemed the Affected Party.

    Section 12.6(a)(ii) of the Equity Definitions is deleted in its entirety and replaced with the following: "Insolvency" means (i) that by reason of the voluntary or involuntary liquidation,

hankruptcy, insolvency, dissolution or winding up of or any analogous proceeding affecting the Reference Fund, (A) all the Reference Shares of the Reference Fund are required to be transferred to a trustee, liquidator or other similar official or (B) holders of the Reference Shares of the Reference Fund become legally prohibited from transferring them or (ii) that the Reference Fund institutes or has instituted against it a proceeding seeking a judgment of insolvency or hankruptcy, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation by it or such regulator, supervisor or similar official or it consents to such a petition, provided that proceedings instituted or petitions presented by creditors and not consented to by the Reference Fund shall not be deemed an Insolvency.

The provisions of Article 12 of the Equity Definitions relating to "Delisting" shall not apply to this Transaction.

**10.    ADDITIONAL DISRUPTION EVENTS.**

| | |
|---|---|
| Change in Law: | Applicable |
| Insolvency Filing: | Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |

Following the termination of this Transaction because of an Additional Disruption Event, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter and determine the Reference Fund Value as described above. For the avoidance of doubt, the occurrence of an Additional Disruption Event shall be deemed an Additional Termination Event for purposes of Section 7 hereof as described under "Extraordinary Events" above, and Party B shall be the Affected Party.

**11.    ADDITIONAL TERMINATION EVENTS.**

(a)    Each of the following shall be Additional Termination Events in respect of Party B (at the option of Party A):

(i)    any event shall occur which has had a material adverse change in, or will have a material adverse effect upon, the business, properties, assets, operations, liabilities (actual or contingent), condition (financial or otherwise) of Party B or the Reference Fund and which may affect the ability of Party B to perform its obligations under the Agreement,

(ii)    any formal charge, complaint, or proceeding with respect to Party B or the Reference Fund by any governmental authority (other than any governmental authority in its capacity as an investor or counterparty of Party B) shall have been made which (x) alleges any impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing related to the performance of services by such person and (y) if successful, could have a materially adverse effect on Party B or the Reference Fund,

-8-

08-01789-cgm    Doc 15573-1    Filed 04/03/17    Entered 04/03/17 10:34:45    Exhibit A -
Sep 04 2009 Case 3:11-cv-03544-SC   Document 1   Filed 07/19/11   Page 30 of 85

P.9

(iii)    any judgment or order shall be entered (and either such judgment or order has not been overturned or dismissed within 30 days after such entry or there has been any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, has not been in effect) in any investigative, administrative or judicial proceeding involving a determination that Party B, the Reference Fund shall have violated in any material respect any civil or criminal law or regulation applicable to it in the performance of its duties in connection with itself or a Reference Fund, as the case may be,

(iv)    any of the memorandum of association, articles of association or prospectus of Party B or the Reference Fund shall be amended in any manner which could reasonably be expected to materially and adversely affect the rights, the economic bargain or the risk profile of Party A under this Transaction or its ability to enforce the same unless Party A shall have given its prior written consent to such amendment,

(v)    the Reference Fund effects a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates, or

(vi)    if Party A fails to receive any report required to be delivered to it in accordance with the Reporting Requirements and such default is not cured within two (2) Business Days of Party B's receipt of notice of such default.

(b)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination, the Leverage Ratio is equal to or greater than the Maximum Leverage Ratio and Party B has not (with the consent of Party A) taken irrevocable corrective action within three business days of receiving notice.

(c)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Floating Notional Amount is greater than the Maximum Notional Amount.

(d)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Annualized Volatility exceeds 15%.

(e)    It shall be an Additional Termination Event (at the option of Party A) with Party B as the sole Affected Party if as of any date of determination the Calculation Agent determines that a Net Asset Value Decline Event shall occur with respect to the Reference Fund.

(f)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the liquidity of the Reference Fund shall be less frequent than monthly upon 15 calendar day notice.

(g)    Party B may elect, upon 90 calendar days' prior written notice to Party A, to terminate the Transaction in whole or in part on such date as indicated by Party B (such termination, a "Party B Termination Event"). Any such Party B Termination Event shall be an Additional Termination Event, with Party B as the sole Affected Party.

12.   **REPRESENTATIONS**

Non-Reliance:                    Applicable

Agreements and
Acknowledgements
Regarding Hedging Activities:    Applicable

Additional Acknowledgements:     Applicable

Each party (or such party as specified below) hereby represents and warrants and
acknowledges to the other party as of the date hereof:

(a)   Each party retains complete freedom to determine, in its individual unfettered discretion,
      whether, or to what extent and in what manner, to hedge their respective obligations with
      respect to this Transaction. This Transaction does not create any further obligation on the
      part of Party A and/or any affiliates thereof to hedge or otherwise make any investment,
      directly or indirectly, in the Reference Fund. However, if and to the extent that any such
      investment in the Reference Fund is made at any time by Party A and/or any affiliate
      thereof, such investment will be on its own behalf only, Party B will have no interest or
      right, directly or indirectly, in respect of such investment (whether by way of third party
      beneficiary, security interest, or otherwise), and Party B acknowledges that this
      Transaction will not create either a direct or indirect obligation of the Reference Fund
      owing to Party B. Party B will be a general unsecured creditor of Party A with respect to
      Party A's obligations relating to this Transaction. Any amounts payable by Party A with
      respect to this Transaction will be satisfied solely out of the general assets of Party A
      subject to the claims of its creditors.

(b)   Each party has the capability to make its own legal, regulatory, tax, investment, financial,
      accounting and business evaluation of and to understand, and has evaluated and does
      understand on its own behalf, the terms, conditions and risks of entering into this
      Transaction and is willing to accept those terms and conditions and to assume (financially
      and otherwise) those risks.

(c)   Each party has made its own independent decision to enter into this Transaction and as to
      whether this Transaction is appropriate and proper for it. Neither party or any affiliate
      thereof will bear any responsibility or liability if the legal, regulatory, tax, investment,
      financial, accounting, business or credit effects or consequences of this Transaction are
      other than those contemplated by the other party.

(d)   Neither party is relying on any communication (written or oral) from the other party or
      any of its affiliates or representatives as investment or other advice or as a
      recommendation to enter into this Transaction, it being understood and agreed that any
      information, commentary and explanations related to the terms and conditions of this
      Transaction provided by one party or an affiliate or representative thereof to the other
      party or an affiliate or representative thereof, shall not be considered investment or other
      advice or a recommendation, and is not being relied upon by the other party or forming
      the basis, primary or otherwise, of that party's decision to enter into this Transaction. No
      compensation or other amount (including any amount otherwise payable under this
      Confirmation) is being paid by or on behalf of one party to the other or any affiliate
      thereof for any advice or information in respect of this Transaction.

-10-

(e)    Each party acknowledges that it has been offered an opportunity to ask questions of, and receive answers from the other party concerning the other party and that any request for such information has been fully complied with to the extent the other party possesses such information or can acquire it without unreasonable effort or expense.

(f)    Party B has been, and will at all times continue to be, solely responsible for making an independent appraisal of and investigation into the financial condition, prospects, creditworthiness, affairs, status and business of the Reference Fund.

(g)    Neither Party A or any affiliate or representative thereof is making, and has not made, in connection with this Transaction any representation or warranty whatsoever as to the Reference Fund or as to any information contained in any document provided by the Reference Fund to Party A or any affiliate or representative thereof or to any other person or filed by the Reference Fund with any exchange or with any governmental or regulatory authority regulating the purchase and sale of securities.

(h)    Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business with, the Reference Fund or its affiliates or any other person or entity having obligations relating to the Reference Fund and may act with respect to such business in the same manner as if this Transaction did not exist.

(i)    Party B has received and reviewed the offering, subscription, organizational and all other relevant documents with respect to the Reference Fund. Party B meets all eligibility and suitability standards imposed by the Reference Fund and applicable law with respect to a direct investment in the Reference Fund, meets all of the requirements of a "Third Party" as defined in the Subscription Document of the Reference Fund, can make (and hereby makes) all of the representations and warranties required to be made by investors of Reference Shares, and is capable of making a direct investment in the Reference Fund. Party B understands the nature of making an investment in the Reference Fund, and has concluded that such an investment would be suitable for it in light of its own investment objectives, financial capabilities and expertise. Party B is not entering into the Transaction for the purpose or as a means of gaining economic exposure to a fund in which it would not be able to invest directly for any reason.

(j)    Party B acknowledges and agrees that it is (i) an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated by the U.S. Securities and Exchange Commission; (ii) a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended; (iii) an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended (the "CEA"); and (iv) an "eligible contract participant" as defined in rule 4.7 promulgated under the CEA.

(k)    Party B represents to Party A that the Transaction described herein is not, and does not form part of, a listed transaction or a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service has identified as a listed transaction for purposes of section 6011, 6111 or 6112 of the U.S. Internal Revenue Code of 1986, as amended (the "Code").

(l)    For U.S. federal income tax purposes, each party agrees that, (A) to the extent that Party A or an affiliate hedges its obligations under this Agreement by holding the Reference Fund, or enters into a substantially similar transaction with a party that owns the

-11-

08-01789-cgm   Doc 15573-1   Filed 04/03/17   Entered 04/03/17 10:34:45   Exhibit A -
Case 3:11-cv-03544-SC   Document 1   Filed 07/19/11   Page 33 of 85

Sep 04 2007 2:31PM   HP LASERJET FAX                                             P.12

Reference Fund, they will treat (i) the arrangement represented by the Agreement as a debt instrument of Party B that provides for interest at a rate equal to 1-month USD-LIBOR-BBA plus the Spread, the proceeds of which are used by Party B to purchase the Reference Fund for its own account and (ii) Party B as the beneficial owner of the Reference Fund for U.S. federal income tax purposes, and (B) to the extent that neither Party A nor an affiliate hedges its obligations under this Agreement by holding the Reference Fund or enters into an offsetting transaction with a party that owns the Reference Fund, they will treat the arrangement represented by the Agreement as a constructive ownership transaction, as defined in Section 1260 of the Code, with respect to the Reference Fund, and each party agrees not to take any position that is inconsistent with this treatment for U.S. federal income tax purposes, unless required by law.

13.   **ADDITIONAL PROVISIONS**

Reserved

14.   **DEFINITIONS AND INTERPRETATION**

For the purpose of this Confirmation:

"**Adjusted Reference Fund Value**" or "**ARFV**" as of any date of determination, the Reference Fund Value less any reductions made pursuant to Section 8 herein.

"**Delta Event**" means, as of any date of determination, the absolute value of the aggregated "delta exposure" of the Reference Fund as set forth in the report delivered pursuant to Section 15 is greater than 50%.

"**Leverage Ratio**" means an amount equal to:



$$\frac{ARFV}{ARFV - FNA}$$

*where* "**FNA**" means the Floating Notional Amount, as of any date of determination.

"**Maximum Leverage Ratio**" means 3.75.

"**Maximum Notional Amount**" means USD 30,000,000

"**Net Asset Value**" means as of any date of determination and with respect to the Reference Fund, the market value of the Reference Shares of the Reference Fund based on the weekly reports as set forth in the Reporting Requirements (after giving effect to any redemptions as determined by the Calculation Agent); provided that if such weekly reports are not delivered to Party A or are, in the Calculation Agent's commercially reasonable determination, inaccurate, the Calculation Agent shall determine the market value of the Reference Fund in its sole discretion.

"**Net Asset Value Decline Event**" means with respect to the Reference Fund, Reference Fund's Net Asset Value as of the last Business Day of any calendar month (x) declines by 6% or more from its Net Asset Value as of the last Business Day of the immediately

preceding calendar month or (y) declines by 8% or more during any three month calendar period.

"Reference Fund Value" means, as of any date of determination, the market value of the Reference Shares of the Reference Fund as determined by the Calculation Agent based on the most recent weekly estimated Net Asset Value.

## 15.    MODIFICATIONS TO THE ISDA MASTER AGREEMENT

(a)    "Specified Transaction" means, (a) any transaction (including an agreement with respect thereto) which currently exists or which is entered into at any time in the future between one party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) which is an interest rate, basis, bond, emerging market instrument, foreign exchange, currency, bullion, other commodity (including a lease, loan or consignment of bullion or other commodity), equity, equity linked, index linked or credit linked transaction; cap, collar, floor, swap or option transaction; forward rate transaction; purchase, sale, repurchase, buy/sell back, stock lending or EFP (exchange for physical) transaction; or any similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions, and (c) any other transaction identified as a Specified Transaction in this Agreement.

(b)    The "Cross Default" provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(c)    "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

(d)    "Automatic Early Termination" provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(e)    Delivery of Documents.  For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | United States Internal Revenue Services Forms W-9, and renewal and replacement forms. | (i) Upon Request of Party A. |

Other documents to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Evidence as to (i) authority of Party B to enter into this Agreement and Transactions, and (ii) authorized signatories. | At execution of this Agreement. | Yes |
| Party B | A trading authorization for the persons or entities trading on behalf of Party B, if any. | At execution of this Agreement. | Yes |
| Party B | Legal opinion regarding certain corporate matters and enforceability regarding Buyer's execution of this Agreement | At execution of this Agreement. | No |

(f)     **Jury Waiver.** Each party, knowingly, and voluntarily waives any right either of them may have to trial by jury in any litigation based upon or arising out of this Agreement or the Transaction contemplated by this Agreement or any course of conduct, dealing, performance, usage of trade, statements (whether oral or written) or actions of either of them. Neither party shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial cannot be or has not been waived. These provisions shall not be deemed to have been modified in any respect or relinquished by either party except by written instrument executed by each of them.

**Affiliates.** For the purposes of Section 3(c) Party A will be deemed to have no Affiliates.

(g)     Additional Representations of Party B.

(i)     **Status of Parties.** Neither Party A nor any of its affiliates is acting as a fiduciary or an advisor for Party B in respect of the Transaction.

(ii)     **Private Transaction.** Party B is entering into the Transaction solely for its own account as principal for investment and not with a view to resale or distribution. Party B understands that the Transaction has not been registered under the Securities Act of 1933, as amended (the "Act"), or any other state securities law, and will not be so registered. Party B shall not permit any other person to have any beneficial interest in its interest in the Transaction, and shall not assign, transfer, convey or encumber all or any portion of its interest in the Transaction, without the consent of Party A. Party B agrees that its interest in the Transaction shall not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Act.

(iii)     **Investment Company Act.** Party B is not an investment company registered under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"), or a business development company as defined in section 202(a)(22) of the U.S. Investment Advisers Act of 1940, as amended.

(iv)    Party B represents to Party A that the transaction described herein is not, and
does not form part of, a listed transaction or a transaction that is the same as or
substantially similar to one of the types of transactions that the Internal Revenue
Service has identified as a listed transaction for purposes of section 6011, 6111 or
6112 of the Internal Revenue Code.

## 16.    NOTICE AND ACCOUNT DETAILS

Notice Information for Party A:

HSBC Bank USA, National Association
452 Fifth Avenue - 8th Floor
New York, New York 10018
Contact: Julie Y. Mei - Swap Documentation
Tel: 212-525-5616
Fax: 212-525-0673
Email: julie.y.mei@us.hsbc.com

Payments to Party A:

HSBC Bank USA, NA
ABA: 021001088
Swift: MRMDUS33
A/C: ●●●●9298

Notice Information for Party B:

Wailea Partners, LP
Attn: William Belhumeur
One Front St., Suiute 3300
San Francisco, CA 94111
415-986-8040

Payments to Party B:
Bank: Northern Trust International Banking Corporation
Swift Address: CNORUS33
ABA: 026 001 122
A/C No.: ●●●●●●●0230
Fortis Prime Fund Solutions Bank (Ireland)
Fortis Prime Fund Solutions Cayman-Client Escrow
A/C No.: ●●●●0000
FFC: Wailea Partners, LP
A/C No.: [____]

## 17.    TRANSFER

Notwithstanding anything to the contrary in Section 7 of the Agreement, for avoidance of doubt,
Party A shall have the right to assign its this Transaction to any affiliate of Party A without the
consent of Party B.

-15-

08-01789-cgm   Doc 15573-1   Filed 04/03/17   Entered 04/03/17 10:34:45   Exhibit A -
Sep 04 2007 2:32PM HP LASERJET FAX   Case 2:11-cv-03544-SC   Document 72 of 99   Filed 07/19/11   Page 37 of 85

P.16

**18.   NETTING OF PAYMENTS**

All amounts payable on the same date, in the same currency and in respect of the same Transaction shall be netted in accordance with Section 2(c) of the Agreement. The election contained in the last paragraph of Section 2(c) of the Agreement shall not apply for the purposes of the Agreement.

**19.   SET-OFF**

The parties agree to amend Section 6 by adding a new Section 6(f) as follows:

"(f)  Upon the occurrence of an Event of Default or Termination Event under Section 5(b)(iv) with respect to a party ("X"), the other party ("Y") will have the right (but not be obligated), without prior notice to X or any other person, to set-off or apply any obligation of X owed to Y (or any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (or any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y will give notice to the other party of any set-off effected under this Section 6(f).

Amounts (or the relevant portion of such amounts) subject to set-off may be converted by Y into the Termination Currency at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If any obligation is unascertained, Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

**20.   OTHER ACKNOWLEDGMENTS**

(a)     The Transaction does not create any obligation on the part of Party A any of its affiliates or any other person or entity to make an investment in a Reference Fund or to otherwise hedge its obligations hereunder. To the extent that any investment in a Reference Fund is made by Party A or any of its affiliates or any other person or entity, such investment will be made on behalf of Party A only, and each of Party A and Party B acknowledges that the Transaction shall not create either a direct or indirect obligation of a Reference Fund owing to Party A.

(b)     Party A and its affiliates may, whether by virtue of the types of relationships described above or otherwise, at the date hereof or at times hereafter, be in possession of information in relation to the Reference Fund that is or may be material in the context of the Transaction and that may or may not be publicly available or known to Party B. Party A shall have no obligation to disclose to Party B any such relationship or information (whether or not confidential).

-16-

## 21.   CONFLICTS DISCLOSURE, WAIVER AND EXCULPATION

Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business (including the provision of advisory services) with the Reference Fund or its affiliates or any other person or entity having obligations relating to a Reference Fund and may act with respect to such business in the same manner as if the Transaction did not exist (including in a way that may be directly or indirectly adverse to the interests of Party B). Party B hereby waives any claim in respect of any such potential or actual conflict and holds Party A and its affiliates harmless from, and agrees that it shall not seek to hold Party A or any of its affiliates liable for, any losses or obligations of Party B that may result from such business.

08-01789-cgm    Doc 15573-1    Filed 04/03/17    Entered 04/03/17 10:34:45    Exhibit A
Case 3:11-cv-03544-SC    Document 1    Filed 07/19/11    Page 39 of 85

Sep 04 2007 2:33PM    HP LASERJET FAX                                                    p.18

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to Party A.

Yours sincerely,

**HSBC BANK USA, NATIONAL ASSOCIATION**

By: _____
    Name:
    Title:

Confirmed as of the date hereof:

**WAILEA PARTNERS, LP**

By: _____
    Name: William Belhumeur
    Title: Managing Member of the General Partner

ANNEX I

## NOTIONAL ADJUSTMENT NOTICE

date

To:                 HSBC Bank USA, NATIONAL ASSOCIATION
452 Fifth Avenue
New York, NY 10018

Attn: Shui Wong
Tel: 212-525-5616
julie.y.mei@us.hsbc.com

Re:                 **Wailea Total Return Swap Transaction
(the "Transaction")**

Terms with initial capitals used, but not otherwise defined herein, shall have the meanings given to them in the Confirmation for the Transaction.

The undersigned hereby notifies HSBC that it wishes:

to adjust and increase reduce the Equity Notional Amount by USD ** to take effect on date.

This Notification is given upon and subject to the terms and conditions set out in the Agreement.

Dated this ** day of month year.

WAILEA PARTNERS, LP
By:     _____
Title:    _____

_____

Annex I - 1

Investment Guidelines

ANNEX II

| | |
|---|---|
| **Reference Fund** | The Reference Fund will invest substantially all of its assets in a managed account (the "Managed Account") at all times during the term of this Transaction. The Investment Manager will use a split-strike conversion strategy. |
| **Eligible securities** | The Reference Fund will only invest in 1) stocks in the S&P 100 index, 2) option on S&P 100 index, and/or 3) Money Market / US Treasury Bills. |
| **Volatility Constraint:** | The annualized standard deviation of the most recent 12-months return of the Reference Fund in aggregate, as calculated by Calculation Agent. must be less 10%. |
| **Strategy:** | The equity portfolio (including groups or baskets of equities), if any, of the Reference Fund (the "Stock Portfolio"), must include 25 or more members of Standard & Poor's 100 Stock Index (ticker OEX, the "S&P 100") at the time of purchase of the Stock Portfolio. The Reference Fund may also use Split Strike Conversion strategies on additional equity investments in the Stock Portfolio. The Reference Fund may also invest, from time to time, in money market funds or Treasury Bills. |
| | On the same Business Day as the purchase of the Stock Portfolio the Reference Fund will purchase S&P put options (the "Put Options"). The notional value of the Put Options shall not be less than 95% of the market value of the Stock Portfolio. The time to expiration of the Put Options shall not exceed 60 days at the time of purchase. |
| | The strike price of the Put Options shall be at least 94% of the S&P 100 market value at the time of purchase. |
| | Upon or after establishing the Stock Portfolio and the Put Options, the Reference Fund may sell S&P 100 call options (the"Call Options"). The notional value of the Call Options shall not exceed the market value of the Stock Portfolio (in equivalent OEX shares) at the time of purchase. There is no restriction on the strike price of the Call Options to be sold. |
| | The Stock Portfolio shall have a correlation to the S&P 100 of not less than 90% at the time of purchase of the Stock Portfolio. Correlation shall be calculated using the most recent 24 month prices of the Stock Portfolio using its current composition, versus contemporaneous prices of the S&P 100. |
| **Leverage** | The Reference Fund may not incur negative balances of cash and cash equivalents in aggregate. The Reference Manager may, however, allocate up to 5% of the NAV of the Reference Fund to other alternative investments managers who may use modest leverage, as determined by Part A. |
| **Stress Test** | A stress test on the Stock Portfolio, using options valuation techniques acceptable to Party A, shall result in simulated losses of no more than 3% of the NAV of the Reference Fund loss for a corresponding 10% hypothetical loss in the S&P 100. |

08-01789-cgm    Doc 15573-1    Filed 04/03/17    Entered 04/03/17 10:34:45    Exhibit A -
Sep 04 200Case: 3:11-cv-09644 SC RJM Pg 77 of 99 iled 07/19/11    Page 42 of 85

P.21

ANNEX III

**Fund**

**Report as of**

| | | |
|---|---|---|
| **Eligible Securities** | Yes / No | Please list ineligible securities |
| **Stock Portfolio** | | |
| Include >= 25 members of OEX | Yes / No | what is the number included in OEX? |
| Correlation of the Stock Portfolio to OEX >= 90% the most recent 24 months | Yes / No | What is the correlation? |
| **Put Options (at time of purchase)** | | |
| Notional Value of Put Options >= 95% of Market Value of Stock Portfolio | Yes / No | What is the %? |
| Strike Price of Put Options >= 94% of the OEX Market Value | Yes / No | What is the %? |
| Maturity of Put Options <= 60 days | Yes / No | What is the maturity? |
| **Call Options (at time of purchase)** | | |
| Call Options sold <=100% of the market value of Stock Portfolio | Yes / No | What is the %? |
| No negative balance of cash and cash equivalent | Yes / No | Please provide the amount. |
| No more than 5% of the NAV may use modest leverage | Yes / No | What is the %? |
| **Stress Test** | | |
| If OEX drop by 10%, simulated loss <= 3% of the NAV | Yes / No | What is the simulated loss? |

EXHIBIT M

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Anjula Garg
Adam B. Oppenheim
Jennifer M. Walrath
Geoffrey A. North
Keith R. Murphy
Marc S. Skapof

*Attorneys for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) <br><br> **AMENDED COMPLAINT** |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, | Adv. Pro. No. 09-1364 (BRL) |

v.

HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC SECURITIES SERVICES
(LUXEMBOURG) S.A.; HSBC INSTITUTIONAL
TRUST SERVICES (IRELAND) LIMITED;
HSBC SECURITIES SERVICES (IRELAND)
LIMITED; HSBC INSTITUTIONAL TRUST
SERVICES (BERMUDA) LIMITED; HSBC
BANK USA, N.A.; HSBC SECURITIES
SERVICES (BERMUDA) LIMITED; HSBC
BANK (CAYMAN) LIMITED; HSBC PRIVATE
BANKING HOLDINGS (SUISSE) S.A.; HSBC
PRIVATE BANK (SUISSE) S.A.; HSBC FUND
SERVICES (LUXEMBOURG) S.A.; HSBC
BANK BERMUDA LIMITED; HERALD FUND
SPC; HERALD (LUX) SICAV; PRIMEO FUND;
ALPHA PRIME FUND LIMITED; SENATOR
FUND SPC; HERMES INTERNATIONAL FUND
LIMITED; LAGOON INVESTMENT LIMITED;
THEMA FUND LTD.; THEMA WISE
INVESTMENTS LTD.; THEMA
INTERNATIONAL FUND PLC; GEO
CURRENCIES LTD. S.A.; HERALD ASSET
MANAGEMENT LIMITED; 20:20 MEDICI AG;
UNICREDIT BANK AUSTRIA AG; BA
WORLDWIDE FUND MANAGEMENT
LIMITED; EUROVALEUR, INC.; PIONEER
ALTERNATIVE INVESTMENT
MANAGEMENT LIMITED; ALPHA PRIME
ASSET MANAGEMENT LTD.; REGULUS
ASSET MANAGEMENT LIMITED; CARRUBA
ASSET MANAGEMENT LIMITED;
GENEVALOR, BENBASSAT ET CIE; HERMES
ASSET MANAGEMENT LIMITED; THEMA
ASSET MANAGEMENT (BERMUDA) LTD.;
THEMA ASSET MANAGEMENT LTD.; EQUUS
ASSET MANAGEMENT LTD.; EQUUS ASSET
MANAGEMENT PARTNERS, L.P.; AURELIA
FUND MANAGEMENT LIMITED; URSULA
RADEL-LESZCZYNSKI; SONJA KOHN;
ERWIN KOHN; MARIO BENBASSAT;
ALBERTO BENBASSAT; STEPHANE
BENBASSAT; DAVID T. SMITH; ROBERTO
NESPOLO; LAURENT MATHYSEN-GERST;
OLIVIER ADOR; PASCAL CATTANEO;
VLADIMIR STEPCZYNSKI; JEAN-MARC

WENGER; LAGOON INVESTMENT TRUST;
UNICREDIT S.p.A.; INTER ASSET
MANAGEMENT, INC.; GTM MANAGEMENT
SERVICES CORP. N.V.; T+M TRUSTEESHIP &
MANAGEMENT SERVICES S.A.; AURELIA
ASSET MANAGEMENT PARTNERS; CAPE
INVESTMENT ADVISORS LIMITED; AND
TEREO TRUST COMPANY LIMITED,

     Defendants.

of the Ponzi scheme, convincing investors in the Madoff Feeder Funds that these funds were a
safe place to invest their money.

244.    In their various roles as administrators, custodians, and investment managers of
the Feeder Fund Defendants, the HSBC Defendants received over \$25 million in fees.

### *The Defendants Created Structured Products to Facilitate Additional Investment in the IA Business*

245.    Beginning in approximately 2006, the HSBC Defendants created structured
financial products (the "Madoff Structured Products"), which directed hundreds of millions of
dollars into Madoff's Ponzi scheme through the Feeder Fund Defendants. Because of the
leverage employed, the Madoff Structured Products offered investors the opportunity to earn a
multiple of the returns generated by a Madoff Feeder Fund without the upfront capital necessary
for a direct investment of that size.

246.    The Madoff Structured Products created a "win-win-win" situation, as all
participants exploited Madoff's "success" for their own gains. The HSBC Defendants, who
internally stated that these transactions involved "close to nil risk," earned significant structuring
and financing fees in connection with the Madoff Structured Products. The Feeder Fund
Defendants earned significant management and performance fees because their assets under
management increased as the HSBC Defendants invested in the Feeder Fund Defendants to
hedge their exposure under the Madoff Structured Products. Investors, using borrowed funds,
received multiples of the returns generated by the reference asset.

247.    There were two main types of Madoff Structured Products: total return swaps
("swaps") and structured notes ("notes"). A swap is a bilateral financial transaction created to
"swap" the cash flows of an asset or basket of assets for cash flows of another asset. Swaps
enable investors to achieve multiples of the returns from a reference asset—here, a Madoff

-94-

Feeder Fund—without having to own the asset. In exchange for paying the leveraged return on the reference fund at maturity, the financing institution—here, HSBC—collected significant structuring and financing fees on the leveraged amount. A structured note is a financial transaction in which a financial institution issues a note to an investor in exchange for a future payment based on the performance of an underlying reference fund, or index. Like swaps, notes typically employ leverage to provide investors with the possibility of multiples of the returns from the reference asset.

248.    Typically, in both swaps and notes, the financing institution that has promised a leveraged return on the performance of a reference funds will hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty or note purchaser directly in the reference fund. A note or swap investor makes a synthetic investment in a reference fund, because it is entitled at maturity to the leveraged returns generated by the reference fund, but it is the financing institution that is the actual owner of the reference fund shares.

249.    In connection with the marketing and sale of the Madoff Structured Products, the HSBC Defendants were once again confronted by serious red flags that BLMIS's IA Business— and the Madoff Feeder Funds which served as reference funds to the Madoff Structured Products—were not what they purported to be. For example, HSBC admitted its inability to confirm trade data by comparison to an independent data set.

> Calculations on investment guidelines for the underlying funds for these transactions such as risk measures, position and sector concentration percentages are being calculated by Madoff and sent to Product Control [at HSBC]. This process, which differs from the normal process . . . is due to lack of transparency of detailed fund information.

250.    Similarly, HSBC Bank conceded that a swap done in 2007 needed to be hedged "entirely (no delta exposure) . . . [because] we do not currently monitor Madoff Strategy trades with sufficient granularity to meet restrictions outlined in the risk mandate . . . ."

251.    In 2008, members of HSBC's Structured Products Group visited Fix Asset Management ("FIX") to conduct a due diligence review of Harley and FIX. Harley was a Madoff Feeder Fund and was the reference fund of the structured product transaction under review. HSBC concluded that it was "very familiar" with Madoff's operations and SSC Strategy and was "comfortable with the strategy's risk", so it could "proceed with the transaction." This recommendation came despite the fact that, on multiple occasions, HSBC's own due diligence had raised significant concerns about investing in BLMIS through other channels. Upon information and belief, HSBC turned a blind eye to red flags of possible fraud at BLMIS, and moved forward with the creation of Madoff Structured Products.

252.    HSBC was aware of ongoing and significant concerns regarding Madoff, yet continued to solicit investors for the Madoff Structured Products. In 2005, D. Smith, an officer of a Madoff Feeder Fund that served as a reference fund for one of the total return swaps discouraged HSBC from intruding upon BLMIS through due diligence, and warned that doing so would risk angering Madoff and could endanger the Madoff Feeder Funds' ability to invest in BLMIS.

253.    Upon information and belief, that Madoff Feeder Fund did not perform adequate due diligence upon BLMIS and invested in BLMIS, despite being aware of many significant red flags. In an email to HSBC, D. Smith acknowledged that Madoff was not a registered investment adviser, that Madoff declined to work with custodians, and that experts in the industry had repeatedly tried, but were unable to replicate BLMIS's strategy and returns.

325.    Defendant Senator (account number 1FR128) received two year transfers totaling approximately $95.4 million, of which the entire amount constituted a return of principal (the "Two Year Senator Transfers"). See Exhibit B, columns 10 and 11.

326.    Defendant Herald (Lux) (account number 1FR135) received the benefit of two year transfers totaling approximately $134,000, of which the entire amount constituted a return of principal (the "Two Year Herald (Lux) Transfers"). See Exhibit B, columns 10 and 11.

327.    Defendants Hermes, Lagoon, and/or Lagoon Trust (account numbers 1FN021, 1FN066, 1FN096, 1FR015, and 1FR016) received two year transfers totaling approximately $166.8 million, of which approximately $84.6 million constituted a return of principal (the "Two Year Hermes/Lagoon Principal Transfers"), and $82.2 million represented fictitious profits from the Ponzi scheme (the "Two Year Hermes/Lagoon Fictitious Profit Transfers," and, together with the Two Year Hermes/Lagoon Principal Transfers, the "Two Year Hermes/Lagoon Transfers"). See Exhibit B, columns 10 and 11.

328.    Defendants Thema Fund and/or Thema Wise (account number 1FR093) received two year transfers totaling approximately $117.6 million, of which the entire amount constituted a return of principal (the "Two Year Thema Fund/Thema Wise Transfers"). See Exhibit B, columns 10 and 11.

329.    Defendant Thema International (account number 1FN095) received two year transfers totaling approximately $65.7 million, of which the entire amount constituted a return of principal (the "Two Year Thema International Transfers"). See Exhibit B, columns 10 and 11.

330.    Defendant Geo Currencies (account number 1FN079) received the benefit of two year transfers totaling approximately $130,000, of which the entire amount constituted a return of principal (the "Two Year Geo Currencies Transfers"). See Exhibit B, columns 10 and 11.

-116-

preference payments (the "Thema Fund/Thema Wise Preference Period Transfers"). See Exhibit B, column 9.

349.    Defendant Thema International (account number 1FN095) received 90 day transfers totaling approximately $355.5 million, of which the entire amount constituted preference payments (the "Thema International Preference Period Transfers"). See Exhibit B, column 9.

350.    Defendant Geo Currencies (account number 1FN079) received 90 day transfers totaling approximately $17,000, of which the entire amount constituted preference payments (the "Geo Currencies Preference Period Transfers"). See Exhibit B, column 9.

351.    The Preference Period Transfers are avoidable and recoverable under sections 547, 550 and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

### *The Transfers Were Subsequently Transferred to Other Defendants*

352.    Upon information and belief, the Management Defendants, the HSBC Defendants, the Beneficial Owners, the Individual Defendants Primeo, and, in the alternative, also Hermes, Thema Fund, and Lagoon Trust (the "Subsequent Transferee Defendants") received subsequent transfers of the avoidable transfers referenced above (the "Subsequent Transfers").

353.    The Subsequent Transfers, or the value thereof, are recoverable from the Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

354.    The Transfers and Subsequent Transfers were and continue to be Customer Property within the meaning of section 78*lll*(4) of SIPA.

355.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

(collectively, the "Non-Party Subsequent Transfers"), or the value thereof, are recoverable from the HSBC Defendants pursuant to section 550 of the Bankruptcy Code.

## CUSTOMER CLAIMS

387.   Certain Defendants filed customer claims (the "Customer Claims") as reflected in Exhibit C.

388.   The Trustee has not yet determined the Customer Claims on Exhibit C.

389.   On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedure Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedure Order.

## COUNT ONE:
## PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES)
## 11 U.S.C. §§ 547(b), 550(a)(1), AND 551

### *Against All Feeder Fund Defendants Except Primeo*

390.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

391.   At the time of each of the Preference Period Transfers, the Feeder Fund Defendants each were a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

-129-

392.   Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

393.   Each of the Preference Period Transfers was to or for the benefit of the Feeder Fund Defendants.

394.   Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

395.   Each of the Preference Period Transfers was made while BLMIS was insolvent.

396.   Each of the Preference Period Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

397.   The Preference Period Transfers enabled each of the Feeder Fund Defendants to receive more than it would receive if: (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferees received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

398.   Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants as initial transferees, or from the entities for whose benefit such transfers were made, pursuant to section 550(a).

399.   As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Transfers; (b) directing that the Preference Period Transfers be set aside; and (c) recovering the Preference Period Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT TWO:
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES)
## 11 U.S.C. §§ 547(b), 550(a), AND 551

### *Against The Management Defendants, The HSBC Defendants,*
### *The Beneficial Owners, The Individual Defendants Primeo, and, in the Alternative,*
### *Hermes, Lagoon, and Lagoon Trust*

400.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

401.     Each of the Preference Period Transfers is avoidable under section 78fff-2(c)(3)

of SIPA and section 547(b) of the Bankruptcy Code. Furthermore, each of the Preference Period

Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section

101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

402.     Upon information and belief, the Management Defendants, the HSBC

Defendants, the Beneficial Owners, the Individual Defendants Primeo and, in the alternative,

Hermes, Lagoon, and Lagoon Trust were immediate or mediate transferees of some portion of

the Preference Period Transfers pursuant to section 550(a) of the Bankruptcy Code (the

"Preference Period Subsequent Transfers").

403.     Each of the Preference Period Subsequent Transfers was made directly or

indirectly to or for the benefit of the Management Defendants, the HSBC Defendants, the

Beneficial Owners, the Individual Defendants Primeo or, in the alternative, Hermes, Lagoon, or

Lagoon Trust.

404.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the

Preference Period Subsequent Transfers, or the value thereof, from the Management Defendants,

the HSBC Defendants, the Beneficial Owners, the Individual Defendants Primeo and, in the

alternative, Hermes, Lagoon, and Lagoon Trust for the benefit of the estate of BLMIS.

## COUNT THREE:
## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### *Against The Feeder Fund Defendants*

405.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

406.    Each of the Two Year Transfers were made on or within two years before the Filing Date.

407.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

408.    Each of the Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

409.    Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

410.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR:
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### *Against The Feeder Fund Defendants*

411.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

412.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

413.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

414.    BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

415.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent, as a result of the Two Year Transfers.

416.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

417.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

418.    Each of the Two Year Transfers constitutes fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

-133-

419.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers to be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

### COUNT FIVE:
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279, AND U.S.C. §§ 544, 550(a)(1), AND 551

*Against The Feeder Fund Defendants*

420.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

421.    At all times relevant to the Six Year Transfers, there have been one or more creditors have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that are not allowable only under section 502(e) of the Bankruptcy Code.

422.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

423.    Each of the Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Six Year Transfers to, or for the benefit of, the Madoff Fund Defendants in furtherance of a fraudulent investment scheme.

424.    The Six Year Transfers were received by the Feeder Fund Defendants with actual intent to hinder, delay, or defraud creditors and/or future creditors of BLMIS at the time of each of the transfers.

425.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the

Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS, and to return to injured customers, and (d) recovering attorney's fees from the Feeder Fund Defendants.

**COUNT SIX:**
**FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

***Against The Feeder Fund Defendants***

426.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

427.     At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

428.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

429.     BLMIS did not receive fair consideration for the Six Year Transfers.

430.     BLMIS was insolvent at the time that it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

431.     As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

<u>COUNT SEVEN:</u>
<u>FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW</u>
<u>§§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551</u>

### *Against The Feeder Fund Defendants*

432.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the Complaint as if fully rewritten herein.

433.    At all relevant times, there was and is at least one or more creditors who held and
hold matured or unmatured unsecured claims against BLMIS that were and are allowable under
section 502 of the Bankruptcy Code, or that were and are not allowable only under section
502(e).

434.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined
under DCL section 270.

435.    BLMIS did not receive fair consideration for the Six Year Transfers.

436.    At the time that BLMIS made each of the Six Year Transfers, BLMIS was
engaged or about to engage in a business or transaction for which the property remaining in its
hands after each of the Six Year Transfers was an unreasonably small capital.

437.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279,
sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the
Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Transfers; (b)
directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or
the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT EIGHT:
## FRAUDULENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against The Feeder Fund Defendants*

438.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

439.   At all relevant times, there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code, or that were and are not allowable only under section 502(e).

440.   BLMIS did not receive fair consideration for the Six Year Transfers.

441.   At the time that BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

442.   As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT NINE:
## RECOVERY OF ALL FRAUDULENT TRANSFERS NEW YORK CIVIL PRACTICE LAW AND RULES 203(g) AND 213(8), AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, 11 U.S.C. §§ 544, 550(a), AND 551

### *Against The Feeder Fund Defendants*

443.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

-137-

444.   At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

445.   At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code, or that are not allowable only under section 502(e) of the Bankruptcy Code.

446.   Each of the Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

447.   Each of the Transfers was made by BLMIS with the actual intend to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

448.   Each of the Transfers was received by the Feeder Fund Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

449.   As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g), 213(8), DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Feeder Fund Defendants:  (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; and (d) recovering attorney's fees from the Feeder Fund Defendants.

**COUNT TEN:**
**RECOVERY OF SUBSEQUENT TRANSFERS**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279**
**AND 11 U.S.C. §§ 544, 547, 548, 550(a), AND 551**

*Against The Management Defendants, The HSBC Defendants,*
*The Beneficial Owners, The Individual Defendants Primeo and, In The Alternative,*
*Hermes, Thema Fund, and Lagoon Trust*

450.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

451.    Each of the Transfers are avoidable under sections 544, 547, and 548 of the Bankruptcy Code, DCL sections 273-279, and SIPA § 78fff-2(c)(3).

452.    Upon information and belief, the Subsequent Transferee Defendants received Subsequent Transfers, which are recoverable pursuant to Section 550(a) of the Bankruptcy Code.

453.    Each of the Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Subsequent Transferee Defendants.

454.    The Subsequent Transferee Defendants are immediate or mediate transferees of the Subsequent Transfers.

455.    Each of the Subsequent Transfers was received by the Subsequent Transferee Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS, and/or future creditors of BLMIS, at the time of each of the Subsequent Transfers.

456.    As a result of the foregoing, pursuant to DCL sections 278 and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, and attorneys' fees, for the benefit of the estate of BLMIS.

09-01364-brl    Doc 170-2    Filed 12/05/10    Entered 01/31/12 11:57:41    Exhibit A

SUMMARY OF TRANSFERS (Redacted Account) 09-1, FEEDER FUND DEFENDANTS

| Column 1 Account Number | Column 2 Account Name / Feeder Fund Defendant | Column 3 90 Day Preferential Transfers | Column 4 Two Year Fictitious Profit Transfers | Column 5 Two Year Principal Transfers | Column 6 Six Year Fictitious Profit Transfers | Column 7 Six Year Principal Transfers | Column 8 Full History Fictitious Profit Transfers | Column 9 Full History Principal Transfers |
|---|---|---|---|---|---|---|---|---|
| 1FN021 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT LAGOON INVESMANT C O MRS R SCOTT B | | | | | | | 1,210,000 |
| 1FN060 | PRIMEO FUND ATTN MRS R SCOTT B REDACTED | | | | | | | |
| 1FN061 | BK OF BERMUDA LTD A S UNIVERSAL ATTN MRS R SCOTT B | | | | | | | |
| 1FN062 | PRIMEO FUND CLASS B REDACTED | | | | | | | |
| 1FN079 | GEO CURRENCES LTD S A C O GENEVALOR, BENBASSAT & CIE EDIFICIO SALDUBA | 16,976 | | 129,924 | | 416,540 | 1,529,820 | 522,015 |
| 1FN091 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT FOR PRIMEO FUND CLASS B | | | | | | | |
| 1FN095 | THE BANK OF BERMUDA LIMITED HAMILTON, SPECIAL CUSTODY ACCT FOR THE EXCLUSIVE BENEFIT OF | 355,512,918 | | 565,677,990 | | 692,269,062 | | 751,965,969 |
| 1FN096 | LAGOON INVESTMENT C O MSR SCOTT BANK OF BERMUDA | | | | | | | |
| 1FN097 | LAGOON INVESMANT C O MRS R SCOTT B | | | | | | | |
| 1FR015 | LAGOON INVESTMENT C C O MRS R SCOTT BANK OF BERMUDA LUXEMBOURG SA | | | | | | 2.301 | 5,435,979 |
| 1FR016 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT LAGOON INVESMANT C O MRS R SCOTT B | 450,568 | | | | | | |
| 1FR090 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT FOR TIEDMA WISE INVESTMENTS LTD | 103,971,880 | | 117,556,073 | | 132,067,486 | | 132,067,486 |
| 1FR092 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT FOR VL PEAKP IN FLTD | 90,046,506 | | | | | | |
| 1FR109 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT FOR HERALD FUND SPC-HERALD USA | 537,487,933 | | 563,476,826 | | 578,033,847 | | 578,033,847 |

Page 1 of 2 - Feeder Fund Defendants

MADC1124_00000001

09-01364-brl   Doc 170-2   Filed 12/05/10   Entered 01/31/12 11:57:41   Exhibit A

SUMMARY OF TRANSFERS FROM BLMIS ACCOUNTS TO FEEDER FUND DEFENDANTS

| Column 1 Account Number | Column 2 Account Name / Feeder Fund Defendant | Column 3 90 Day Preferential Transfers | Column 4 Two Year Fictitious Profit Transfers | Column 5 Two Year Principal Transfers | Column 6 Six Year Fictitious Profit Transfers | Column 7 Six Year Principal Transfers | Column 8 Full History Fictitious Profit Transfers | Column 9 Full History Principal Transfers |
|---|---|---|---|---|---|---|---|---|
| 1FR135 | HSBC SECURITIES SERVICES (LUXEMBOURG) SA SPEC CUST ACCT FBO HERALD (LUX) US ABSOLUTE | 5 | - | 133,957 | - | 133,957 | - | 133,957 |
| | | $ 1,194,076,678 | $ 82,243,605 | $ 1,531,283,727 | $ 82,243,605 | $ 1,896,499,719 | $ 83,778,071 | $ 2,089,876,385 |

MADC1124_00000002