# EXHIBIT 1

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
Andrew J. Levander
andrew.levander@dechert.com
Gary J. Mennitt
gary.mennitt@dechert.com
Neil A. Steiner
neil.steiner@dechert.com

*Attorneys for Defendants J. Ezra Merkin
and Gabriel Capital Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- X
In re:                                      :
                                            :
BERNARD L. MADOFF INVESTMENT                : SIPA LIQUIDATION
SECURITIES LLC,                             :
                                            : No. 08-01789 (BRL)
                                            :
            Debtor.                         :
------------------------------------------- X
IRVING H. PICARD, Trustee for the Liquidation :
of Bernard L. Madoff Investment Securities LLC, :
                                            :
            Plaintiff,                      :
                                            :
       v.                                   : Adv. Proc. No. 09-01182 (BRL)
                                            :
J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,      :
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,      :
GABRIEL CAPITAL CORPORATION,                :
                                            :
            Defendants.                     :
------------------------------------------- X

**DEFENDANTS J. EZRA MERKIN AND GABRIEL CAPITAL CORPORATION'S
SUPPLEMENTAL RESPONSES TO PLAINTIFF'S SECOND SET OF
INTERROGATORIES AND REQUESTS FOR ADMISSIONS
<u>IN ACCORDANCE WITH DECISION #3</u>**

15019907

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure (made applicable by Rules 7026 and 7033 of the Federal Rules of Bankruptcy Procedure), Rule 7033-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and Judge Cyganowski's Decision #3, Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC" and with Merkin, "Defendants"), by their attorneys, Dechert LLP, hereby supplement their responses to Interrogatories No. 1, 2, 3, 7, 8, 9, 10, 11, 13, 15 and 16 of Plaintiff's Second Set of Interrogatories and Request No. 9 of Plaintiff's Requests for Admissions. These supplemental responses incorporate by reference the General Objections and each of the Specific Objections set forth in Defendants' Answers and Objections to Plaintiff's Second Set of Interrogatories and Responses to Plaintiff's Requests for Admissions, as if fully set forth herein, and are made without waiver of any such objections.

**SUPPLEMENTAL ANSWER TO INTERROGATORY NOS. 1, 2, 3, 7, 8, 9, 10, 11 AND 13:**

Subject to and without waiving their objections, and expressly preserving the right to supplement this Interrogatory Response, Defendants state as follows:

Prior to investing with Mr. Madoff, Mr. Merkin had conversations with a number of sophisticated investors who were clients of Mr. Madoff and had accounts with his firm, Bernard L. Madoff Investment Securities, LLC ("BLMIS"), concerning Mr. Madoff's reputation, trading strategy and risks. Those investors included Leon Meyers (at the time the manager of the Scheuer family office), Sandra Manske (at the time a senior executive of the Tremont funds and later the founder of the Maxam funds), David Gottesman (the founder of First Manhattan Corporation and a director of Berkshire Hathaway), Gedale Horowitz (who at the time ran Salomon Brothers' municipal bond department), and Daniel Hoffert (a successful Wall Street investor), all of whom spoke very highly of Mr. Madoff and his investment

2

strategies. Mr. Merkin also had conversations with customers of BLMIS's market-making operations. And Mr. Merkin discussed Mr. Madoff with his father, Hermann Merkin (a successful businessman and investor), who told his son that "I know Bernie, and he's okay," which Ezra Merkin understood to be high praise coming from his father.

In addition, prior to investing with Mr. Madoff, Mr. Merkin met with Mr. Madoff in Mr. Madoff's offices, and discussed Mr. Madoff's trading strategies as well as Mr. Madoff's market-making activities. Mr. Madoff also explained that BLMIS operated a significant wholesale business, in which its customers included Charles Schwab and Fidelity. They also discussed Mr. Madoff's and his brother's involvement in industry affairs. As Mr. Merkin understood, Mr. Madoff at that time had a sterling reputation; was heavily involved in industry affairs; and his firm was a very dominant market maker with an extraordinary share of the trading in certain NYSE stocks, particularly heavily traded, large cap stocks. Indeed, Mr. Madoff subsequently became the chairman of NASDAQ.

Mr. Merkin first invested with Mr. Madoff and BLMIS through Mr. Meyers and the Scheuer family's account with Mr. Madoff. After a period of time and gaining additional comfort with Mr. Madoff and his trading strategies, Mr. Merkin thereafter opened managed accounts with BLMIS on behalf of Gabriel Capital L.P., Ariel Fund Limited, Ascot Fund Limited (which was subsequently transferred to the account of Ascot Partners, L.P., in connection with a reorganization of the domestic and offshore Ascot funds), and Ascot Partners, L.P. (collectively, the "Funds"), and delegated trading authority over those accounts to Mr. Madoff.

As an additional part of his due diligence on and monitoring of Mr. Madoff and BLMIS, Mr. Merkin maintained a file that included newspaper articles and profiles of Mr.

3

Madoff, notes of certain of his meetings with Mr. Madoff, and information concerning other funds that had significant investments with Mr. Madoff and BLMIS. For example, Mr. Merkin reviewed and retained a 1989 article from *Forbes* describing how BLMIS made markets in 250 of the largest, most actively traded stocks and identifying some of its biggest customers, including A.G. Edwards, Charles Schwab, and Fidelity. Another *Forbes* article, from 1992, similarly described Mr. Madoff and his firm as one of the biggest of the new age traders on Wall Street who were competing with the New York Stock Exchange for trades, and an April 1993 *International Herald Tribune* likewise discussed how Mr. Madoff was gaining the upper hand in a competition with the New York and American Stock Exchanges. And a very significant *New York Times* article from 1992 discussed the United States Securities and Exchange Commission's ("SEC") investigation into unregistered notes being marketed by Avellino & Bienes, a Florida accounting firm, and reported on the SEC's relief that all of the money that had been raised from the sale of the notes -- $440 million -- had been deposited in an account with BLMIS and managed by Mr. Madoff, and was able to be liquidated and returned to the note purchasers almost immediately.

Moreover, Mr. Madoff was widely credited with breaking the New York Stock Exchange's hegemony over Wall Street trading. Thus, by 1999 -- as reflected in *New York Times* and *Wall Street Journal* articles that Mr. Merkin read and retained in his file -- BLMIS entered into a joint venture with Goldman Sachs, Morgan Stanley, Salomon Smith Barney, and Merrill Lynch to establish the first electronic trading platform for NYSE stocks. That those four well-established Wall Street firms were willing to enter into a joint venture with BLMIS further enhanced Mr. Madoff's reputation and provided additional comfort to Mr. Merkin. Moreover, as Mr. Merkin knew, Mr. Madoff frequently met with industry leaders at

4

the SEC and regularly testified in Congress about developments in the securities industry and the ongoing transformation of the U.S. financial markets.

As an additional part of his due diligence and monitoring of the Funds' investments, Mr. Merkin met with Mr. Madoff ten to fifteen times a year by phone or in person to discuss trading strategies. These conversations ranged from general discussions of Mr. Madoff's trading strategies, to potential changes in or refinements of the trading strategies, to discussions about the market, then-current market trends, and other market participants. From time to time, Mr. Merkin arranged and participated in meetings between Mr. Madoff and certain investors in the Funds, including Gedale Horowitz, Ludwig Bravmann, Alec Hackel, Christof Reichmuth, Patrick Erne, Michael Matlin, and Roman Igilnikov and others from Union Bancaire Privee. Mr. Merkin also discussed Mr. Madoff and his investment strategy with many other customers of Mr. Madoff and BLMIS, including Ludwig Jesselson, David Gottesman, and Leon Meyers, as well as with other sophisticated investors including people who served on the Yeshiva University Investment Committee. Mr. Merkin also discussed Mr. Madoff, his trading strategy and BLMIS with representatives of BNP Paribas as part of their due diligence in connection with a proposal to create a levered version of Ascot.

Mr. Merkin also knew that BLMIS was a registered broker-dealer and later registered as an investment advisor, and therefore was subject to periodic and surprise inspections by its primary regulator, the SEC. The fact that Mr. Madoff and his firm were regularly inspected by the SEC and the SEC had never raised any significant issue about the firm's operations -- in one of their many conversations, Mr. Madoff reported that the SEC had visited BLMIS's offices to conduct reviews eight times in sixteen years -- gave Mr. Merkin additional comfort about Mr. Madoff's bona fides.

5

As a further part of the due diligence on and monitoring of the Funds' investments, Mr. Merkin had complete transparency to what he -- and many others -- understood was the trading being conducted by Mr. Madoff in the Funds' accounts. BLMIS sent confirmations of every trade supposedly made in the accounts, which were reviewed by GCC employees and input into GCC's portfolio management system ("PMS"). GCC employees then reconciled GCC's accounting records against to the monthly statements received from BLMIS. The PMS system enabled GCC employees to generate daily reports showing any transactions as well as profit and loss information for the portfolio, which Mr. Merkin would review on a daily basis. Mr. Merkin also regularly checked the portfolio to ensure that there were a sufficient number of put options to cover the value of the equities owned when the account was invested in the market.

Another important part of Defendants' due diligence and monitoring of the Funds' investments was the annual audit of the Funds' financial statements conducted by BDO Seidman LLP ("BDO"). BDO was given unfettered access to GCC's employees and records to conduct its audits of the financial statements in accordance with generally accepted auditing standards. As part of its audit, BDO reviewed and tested various trade confirmations and monthly statements, and communicated directly with BLMIS concerning the value of the Funds' investments. In addition, BDO requested and received copies of audited financial statements and statements of internal controls certified by BLMIS's auditor, and never raised any issue about either the contents of those statements or the identity or qualifications of BLMIS's auditor (Mr. Madoff had explained to Mr. Merkin that he used a small accounting firm because they understood his business and provided superior customer service and partner-level attention compared to a larger firm).

6

Perhaps most significantly, Mr. Merkin had a nearly two-decade track record of receiving timely withdrawals on demand from the Funds' BLMIS accounts, and was aware that other clients of Mr. Madoff had a similar experience. The ability timely to withdraw capital from the BLMIS accounts provided additional comfort as part of Mr. Merkin's due diligence and monitoring of the Funds' investments.

### SUPPLEMENTAL ANSWER TO INTERROGATORY NOS. 15 AND 16:

Subject to and without waiving their objections, Defendants state that information responsive to this request can be found in documents produced to Plaintiff, including Defendants' tax returns for the years 2000 to 2008, as part of Defendants' May 22, 2013 production. These tax returns can be located in documents bearing Bates numbers GCC-P 0602380-0605295 and GCC-P 0628856-0636284.

### SUPPLEMENTAL RESPONSE TO REQUESTS FOR ADMISSION NO. 9:

Denied.

Dated: New York, New York
August 30, 2013

                                        DECHERT LLP

                                        By: _____
                                        Andrew J. Levander
                                        Gary J. Mennitt
                                        Neil A. Steiner
                                        1095 Avenue of the Americas
                                        New York, New York 10036
                                        (212) 698-3500
                                        andrew.levander@dechert.com
                                        gary.mennitt@dechert.com
                                        neil.steiner@dechert.com

                                        *Attorneys for Defendants J. Ezra Merkin*
                                        *and Gabriel Capital Corporation*