# EXHIBIT 5

CONFIDENTIAL

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

In re:

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        Debtor.

SIPA LIQUIDATION

No. 08-01789 (SMB)

------------------------------------------------- X

IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

        Plaintiff,

v.

J. EZRA MERKIN, GABRIEL CAPITAL, L.P.,
ARIEL FUND LTD., ASCOT PARTNERS, L.P.,
ASCOT FUND LTD., GABRIEL CAPITAL
CORPORATION,

        Defendants.

Adv. Proc. No. 09-01182 (SMB)

------------------------------------------------- X

## Expert Report of Jeffrey M. Weingarten

### I. Scope of Assignment

If called as an expert to testify in this action, I anticipate that my testimony would concern the matters addressed in this report, the opinions that I have formed, and the materials that I have relied upon in forming my opinions. Furthermore, I anticipate that my testimony would also address any response or rebuttal by any experts testifying on behalf of the Trustee.

### II. Background and Qualifications

My background includes over 40 years of education and experience in finance, investment research, fund management and investing.

I received a BS Economics from the Wharton School of the University of Pennsylvania in 1970. Immediately upon graduation, I worked as a securities analyst for Scheinman, Hochstin & Trotta and then Wertheim & Co. until I joined Goldman Sachs in 1977.

CONFIDENTIAL



My career at Goldman Sachs included tenure in the US research department both as an analyst and in charge of recruiting and training. I then went to work in London as head of International Equity Research and a Global Investment Strategist. Shortly after becoming a Partner in 1990, I became CEO of Goldman Sachs Asset Management International and Chief Investment Officer of Global Equities. In 1996, I again became a Global Investment Strategist.

I retired as a General Partner in 1998 to form Buttonwood Capital Partners, a fund management company that ran European equity hedge funds. I ran that company and those funds until 2008.

After retiring from the hedge fund business, I became a consultant and later Chairman of Grosvenor Fund Management, a property fund management business based in London. With the retirement of the CEO, I took on those responsibilities on an interim basis from 2011 to 2013. I am currently on the Board of Grosvenor Group Limited and on the Board of Aviva Investors. From 2010 to 2014, I also served on the foundation Board of the College of Charleston and on its Finance and Investment Committees.

In the course of my career, I have performed due diligence on companies, investment managers and of course had due diligence performed on me and the many funds which I managed. A copy of my curriculum vitae is attached at Exhibit A.

### III.    Materials Considered

In forming my opinions, I considered and relied on my forty year experience analyzing investments and twenty-plus years as a hedge fund manager. In addition, I relied on knowledge of investment fund prospectuses and performance data accumulated over the course of my career. Further, I considered the documents and testimony listed on Exhibit B.

### IV.    Compensation

I am being compensated at a rate of $800 per hour. My fee is neither contingent on the outcome of this matter nor on the opinions provided herein. A list of all cases in the last four years in which I have provided expert testimony, either in deposition or at trial, is attached at Exhibit C.

### V.    Summary of Conclusions

Having been retained to opine on the adequacy of the due diligence on Bernard Madoff and his organization, Bernard L. Madoff Investment Securities ("BLMIS") (collectively "Madoff"), I have reached the conclusion that the due diligence performed by J. Ezra Merkin and Gabriel Capital Corporation (collectively "Merkin Defendants") met or exceeded industry standards. The due diligence performed considered and evaluated all of the relevant investment factors normally associated with a money manager including: Investment Philosophy, Process and Procedures. Mr. Merkin also carefully considered the People involved in generating the investment returns and whether or not those returns were proportional to both the level of expected returns and the amount of risk incurred. This due diligence process was undertaken on an ongoing basis throughout the time of Gabriel Capital, L.P.'s, Ariel Fund Limited's, Ascot Partners, L.P.'s and Ascot Fund Limited's (collectively, the "Funds") investment with Madoff. Moreover, Mr. Merkin was aware that various regulators, auditors, administrators, and

2

sophisticated institutional and individual investors were also looking at many of these factors and reached the conclusion that nothing was untoward about the activities in which Madoff was purportedly engaged. With the benefit of hindsight, much has been made about a lack of due diligence, when, in reality, this was a very elaborate fraud spanning decades that was never uncovered by a myriad of agencies, auditors, regulators and sophisticated investors.

As I will discuss below, there is no precise formula or written rules for adequate due diligence. Over the many years during which I have performed or been the subject of such reviews, it is clear that certain information about prospective investments need to be adequately obtained and verified.

In my experience, due diligence has been done in a wide variety of ways and included a wide variety of information, and, particularly in the area of hedge funds, has changed over the years, most notably since the collapse of Lehman Brothers and the revelation of Madoff's fraud in 2008. Due diligence has run the gamut from lengthy (as many as 20 page) questionnaires at one extreme to as little as a fairly brief conversation with minimal, if any, written materials at the other. Some involved several face-to-face meetings and others just a single telephone conversation or just the sending of a prospectus.

Adequate due diligence of an investment manager, in my opinion, with many years of experience in this regard, involves the determination of the five following characteristics: **Philosophy**, what is the manager trying to achieve in his strategy; **Process**, how does the manager go about the strategy; **Procedures**, how is the process executed; **People**, who is the principal for executing the investment strategy and what is his background and reputation; and finally **Performance**, what have been the investment returns and are those returns consistent with the strategy.

In my opinion, Mr. Merkin obtained and reinforced all of this information over the years in which the Funds invested with Madoff. All of this was in various degrees documented in Mr. Merkin's files and notes.

It is very clear that Mr. Merkin had a clear understanding of the investment **Philosophy** of Mr. Madoff and his investment advisory operations. There were notes in Mr. Merkin's files from others who invested in this strategy and there were conversations which reinforced the notion that Madoff was investing to achieve good returns (better than T-bill returns) with substantially below average risk. Mr. Merkin's notes referenced Mr. Madoff's objective to achieve capital appreciation within a defined risk parameter. It is also clear that the philosophy would forgo potential higher profit opportunities in order to avoid risk of loss. For example, being out of the market around highly volatile periods during which options expire would be part of the philosophy. This is a strategy to which many market practitioners adhere. It is clear that the philosophy of preventing risk of loss was more important than the reach for gain.

The **Process** by which this investment philosophy was to be achieved was the Split Strike Conversion strategy but with added "benefits". The Split Strike Conversion strategy is adequately described elsewhere so I will not discuss it here except to say that the process is consistent with the philosophy of reduced risk. The "with benefits" part of the process was understood to be how the majority of the returns were to be generated. It is clear from the

3

CONFIDENTIAL

documents and testimony I have reviewed that Mr. Merkin understood that Madoff had the ability to predict short-term trends in the market as a result of a proprietary model and access to order flow. Mr. Merkin understood that Mr. Madoff had, by virtue of his long experience, the knowledge and ability to take advantage of both market timing and stock selection to improve returns over that which would have been generated by a formulaic putting on of the trades.

The Process was consistent with the philosophy in that the Split Strike Conversion strategy was a risk controlled strategy and the knowledge and ability of Mr. Madoff could permit returns to be generated above what an ordinary "dumb" Split Strike Conversion strategy would generate. It was, as others have described, a relatively simple process, but one that could and would be executed in an uncommon way.

The **Procedures** were also clearly and transparently (or so Mr. Merkin had reason to believe) adhered to. The Merkin Defendants continually received both literal and figurative confirmations. Although, in my experience, it is almost never the case that an investor can access and scrutinize the individual trades of any manager, the information about the trades that Madoff purported to have done was available. This made Madoff's procedure, in my opinion, more transparent than that of a typical fund manager. Although we now know that these were fabricated, almost no amount of due diligence at the time would have made that obvious. Others, including the SEC and many other investors, had looked over the procedures and found no fault with them.

Consistent with good due diligence practice, on several occasions, Mr. Merkin reviewed both Process and Procedures with Madoff. I noted that Mr. Merkin had regular meetings and calls with Mr. Madoff and documented many of those reviews and updates in his file.

It was clear from the outset that Mr. Merkin knew the **People** who were going to do the investing. Mr. Madoff was well known to Mr. Merkin because of a long-term relationship with his business—dating back to the early 1990s—and Mr. Madoff was well known to the finance community at large. He was widely reputed to be a pioneer in his field and had of course been the Chairman of NASDAQ. He was the vice-chairman and a member of the board of governors of the NASD. He had a joint venture with the most reputable Wall Street firms, Goldman Sachs and Merrill Lynch, to develop a trading system as an alternative to the New York Stock Exchange, which Mr. Merkin noted with articles in his file. What is more important from a due diligence perspective is that Mr. Merkin knew that Mr. Madoff's experience and reputation was entirely consistent with what he was being asked to do from a fund manager's perspective. Mr. Madoff knew the markets and understood how information regarding "flow" could be put to good use in managing money. In my opinion, the People part of the due diligence process is critical. In knowing what he knew about Mr. Madoff, Mr. Merkin had every reason to believe that he was highly reputable, highly regarded and had direct and relevant experience in managing money in precisely the manner in which he intended to do.

The **Performance** data that was available as part of the initial and ongoing due diligence process was both reasonable relative to the mandate in the aggregate and consistent with the Philosophy, Process and Procedures outlined above. The returns were not volatile and better than would be

4

CONFIDENTIAL

expected from a typical Split Strike Conversion strategy. When the market was down, the fund outperformed the overall market. When the market was up sharply, the fund underperformed.

Much has been made after the fact that the returns achieved by Madoff were too good. That of course is easy to say now. The after-the-fact logic is that the returns were not consistent with the low volatility. It is clear that these returns were uncommon, but why would anyone invest with someone who had common returns? Although uncommon, in my experience, these returns were not implausible. Over the course of my career, I have seen many reports comparing fund managers and observed many fund managers' results where the returns were high and volatility was proportionately low. The oft referred to Sharpe ratio was relatively high for Madoff, but I have counted many funds with very high Sharpe ratios (return per unit of volatility). Madoff's results were above average, yes, but certainly they were achievable.

Another, but absolutely critical, part of the due diligence process was the determination that the performance was realizable. By that I mean could you get your money back. Without question, from the evidence in the Merkin Defendants' files, until December 11, 2008, Madoff was always able to meet redemption requests on time and in the full amount. Based on this redemption history, there would have been no reason to doubt that the performance as depicted was real or that the funds that were invested were actually there. For example, Mr. Merkin knew that in 1992, Madoff met a $440 million redemption without hesitation, following an investigation by the SEC against third parties who had invested the funds with Madoff. Mr. Merkin retained a copy of the news article about that investigation and Madoff's prompt return of the investor funds in his file. It is also worth noting that in connection with that government investigation Mr. Madoff was not charged with any wrongdoing.

Although not usually part of the formal due diligence I performed, I often applied the plausibility rule. Is it plausible that these people doing this process in this way could achieve these results? It would appear from all the documents made available to me that the Merkin Defendants at the time believed this, and that reasonable belief was reinforced repeatedly over many years. Madoff's "plausibility" would also be reinforced because Mr. Merkin knew that many other highly sophisticated and experienced investors were clients of Madoff. As former chairman of the SEC, Harvey Pitt said, "there were a lot of people who were duped and that happens a great deal when you've had somebody decide to be unscrupulous."

It is clear now that this was a very elaborate fraud involving many people capable of avoiding detection by many organizations for many years. In my opinion, the Merkin Defendants performed more than adequate due diligence on Mr. Madoff and his organization. They adequately understood the investment Philosophy; they understood and carefully examined the Process; had transparent knowledge of the Procedures; and knew Mr. Madoff both personally and by reputation. The Performance, both in terms of the results and in terms of realizing the cash from those results were entirely consistent. Moreover, this due diligence was not a one off event but was continued through the life of the Funds' investments.

5

CONFIDENTIAL

## VII. Conclusion

Taken on the whole, the Merkin Defendants, in my opinion, pursued what would certainly be described as adequate due diligence on Madoff, his investment strategy and his operations. The due diligence process was thorough in its construct dealing with the key issues of Philosophy, Process, Procedures, People and Performance. This diligence was both ongoing and broad. Questions that were raised were all addressed.

Indeed, no one found sufficient issue with Mr. Madoff to bring him any form of justice. He turned himself in.

Jeffrey M. Weingarten
March 19, 2015

6

CONFIDENTIAL

# Exhibit A

CONFIDENTIAL

# JEFFREY M. WEINGARTEN

## Education

| | |
|---|---|
| 1970 | BS Economics with Honors<br>The Wharton School of the University of Pennsylvania |

## Work Experience

| | |
|---|---|
| 1970-1971 | Securities Analyst Sheinman, Hochstin & Trotta<br>New York |
| 1971-1977 | Securities Analyst Tobacco & Beverages, Wertheim & Co<br>New York |
| 1977-1987 | Food Beverage and Tobacco Analyst, Goldman Sachs<br>Director of Recruiting and Training for Research Company<br>New York |
| 1987-1991 | Director of International Equity Research, Goldman Sachs<br>Global Investment Strategist<br>London |
| 1990-1998 | Partner, Goldman Sachs |
| 1991-1997 | CEO Goldman Sachs Asset Management International<br>CIO Goldman Sachs Asset Management International Equities |
| 1997-1998 | Global Investment Strategist, Goldman Sachs |
| 1999-2008 | Founder and Managing Director, Buttonwood Capital Partners |

## Awards and Honors

| | |
|---|---|
| 1976-1986 | Institutional Investor #1 Tobacco Analyst |
| 1977-1986 | Institutional Investor #2 – #3 Beverage Analyst |
| 1989-1991 | Institutional Investor #3 Investment Global Strategist |

## Other Interests

| | |
|---|---|
| 1998 to 2005 | The Wharton School of the University of Pennsylvania Advisory Board |
| 1995 to 2005 | Development Council National Theatre |
| 2004 to present | Student Disability Services Advisory Board at the University of Pennsylvania |
| 2009 to present | Consultant/Chairman of Grosvenor Fund Management/Member of Grosvenor Group Ltd. Board |
| 2009 to present | Member, Board of Advisors, School of Languages, Cultures, and World Affairs at the College of Charleston |
| 2010 to 2014 | Member, Foundation Board, College of Charleston |
| 2015 to present | Non-executive Director of Aviva Investors |

CONFIDENTIAL

**Jeffrey M. Weingarten**

Jeffrey M. Weingarten has almost 40 years of investment experience in investment research and fund management.

Jeffrey began his career as a securities analyst at Sheinman Hochstein & Trotta from 1970-1971 moving to Wertheim & Co from 1971-1977 as a securities analyst and Vice President. In 1977 he joined the research division at Goldman Sachs & Co in New York and over the next ten years was voted Institutional Investor's top tobacco and beverage analyst in the US. In 1987 he became Director of Research in London responsible for all non-US research activities as well as the International Portfolio Strategist. He became a general partner of Goldman Sachs & Co in 1990. From 1991-1997 Jeffrey was the Chief Investment Officer and Managing Director of Goldman Sachs Asset Management International. In 1997 he returned to International Equity Research as the Global Strategist and retired as a General Partner in order to form Buttonwood in 1998.

Buttonwood was principally a European long short equity fund which produced superior returns for almost 10 years. During that time Buttonwood Fund outperformed the European Index almost three times with much less volatility.

Jeffrey holds a BS Economics cum laude from The Wharton School, University of Pennsylvania, is a Certified Financial Analyst and was a member of the New York Society of Security Analysts and International Investment Analysts Group.

Jeffrey was a board member of the Wharton Executive Board for EMEA, board member of the Student Disability Services Advisory Board at the University of Pennsylvania and Chairman of Grosvenor Fund Management in London. He is also on the Board of Advisors, School of Languages, Cultures, and World Affairs at the College of Charleston and was a member of the Foundation Board of the College.

Jeffrey is a director of Grosvenor Group Ltd. and a director of Aviva Investors.

CONFIDENTIAL

# Exhibit B

CONFIDENTIAL

# JEFFREY M. WEINGARTEN
# DOCUMENTS CONSIDERED

Third Amended Complaint in this action
Complaints filed by Picard in other actions including, *Picard v. ABN Amro Bank N.V. et. al.*, Adv. Pro. No. 10-05354 (Bankr. S.D.N.Y.), *Picard v. Citibank N.A. et. al.*, Adv. Pro. No. 10-05345 (Bankr. S.D.N.Y.), *Picard v. Defender Limited et. al.*, Adv. Pro. No. 10-05229 (Bankr. S.D.N.Y.), *Picard v. Natixis et. al.*, Adv. Pro. No. 10-05353, and *Picard v. Nomura Bank International PLC et. al.*, Adv. Pro. No. 10-05348 (Bankr. S.D.N.Y.).
Merkin's file on Madoff
Audio files produced by Defendants
Emails produced by Defendants
Trade confirmations and monthly statements from Madoff
PMS data
Excel file on Madoff Investment History
Transcript of Autera Testimony in this action (individual and as 30(b)(6) designee)
Transcript of Merkin Testimony in this action
Transcript of Merkin Testimony in NYAG litigation
Transcript of Merkin Testimony in NYU litigation
November 7, 2005 Submission to the SEC by Harry Markopoulos
August 31, 2009 Report by the SEC Office of the Inspector General

CONFIDENTIAL

# Exhibit C

CONFIDENTIAL

## JEFFREY M. WEINGARTEN
### DEPOSITION, TRIAL AND ARBIRATON TESTIMONY
### IN THE PAST FOUR YEARS

| Case Name | Date(s) | Testimony Type |
|---|---|---|
| *Born et. al. v. Merkin*, Arbitration No. 13 148 Y 01799 10 | July 19, 2011 | Arbitration Testimony |
| *Massachusetts Mutual Life Insurance Company, et al. v. Certain Underwriters at Lloyd's of London Subscribing to Bond Nos. B0391/FD020720G AND B0391/FD020730G, et al.*, C.A. No. N10C-11-219 FSS CCLD | August 21, 2014 | Deposition Testimony |

CONFIDENTIAL