# EXHIBIT B

1
2          UNITED STATES BANKRUPTCY COURT
3          SOUTHERN DISTRICT OF NEW YORK
4     ---------------------------------X
      In re:                              SIPA LIQUIDATION
5
      BERNARD L. MADOFF INVESTMENT        No. 08-01789(SMB)
6     SECURITIES LLC.,
                                          (Substantively
7                                         Consolidated)
                    Debtor.
8     ---------------------------------X
      IRVING H. PICARD, Trustee of the
9     Liquidation of Bernard L. Madoff
      Investment Securities LLC.,
10
                    Plaintiff,
11                                        Adv. Pro. No.
                                          09-01182(SMB)
12              VS.
13    J. EZRA MERKIN, GABRIEL
      CAPITAL, L.P., ARIEL FUND LTD.,
14    ASCOT PARTNERS, L.P., GABRIEL
      CAPITAL CORPORATION,
15
                    Defendants.
16    ---------------------------------X
17              **   REVISED   **
18
19     VIDEOTAPED DEPOSITION OF BRUCE G. DUBINSKY
20             Monday, April 27, 2015
21           1095 Avenue of the Americas
22               New York, New York
23
24    Reported by:
      AYLETTE GONZALEZ, RPR, CLR, CCR
25    JOB NO. 92955

Page 14

1  BRUCE G. DUBINSKY
2  issued the current report.
3      Q.  What changes did you make from that
4  report to this report?
5      A.  I could tell you in -- in overall
6  generalities; I can't go through line by line.
7  I could, but I don't have them here in front
8  of me.
9          There was much more work done
10 looking at what I refer to in the report as
11 House 5, which was the prop trading and
12 market-making side of the business,
13 Mr. Madoff's business; looking at the
14 profitability of House 5 or the lack thereof;
15 looking at the fraud that occurred in House 5;
16 and ultimately rendering a conclusion that the
17 fraud was pervasive all throughout BLMIS.
18     Q.  And that's contrary to the opinion
19 that you offered in Katz/Wilpon?
20     A.  No, it's not contrary to the
21 opinion.
22     Q.  How does that differ from the
23 opinion that you offered in your initial
24 report?
25     A.  I just explained to you that my

Page 15

1  BRUCE G. DUBINSKY
2  work continued.  At the time I issued the
3  initial report, which was November 2011, I had
4  only been hired about five or six months at
5  that point, and there were deadlines to get
6  the report out so I did the work that I had
7  done up to the point of issuing that report.
8  And then my work continued and I focused more
9  deeply on the House 5 side of the business.
10 And that's what -- the report that we keep
11 talking about that you have.
12     Q.  And there's another report in
13 between?
14     A.  There was.  It was the same report
15 that was issued in November 2011, I think it
16 was amended in January 2012.  There was a
17 slight amendment on one -- one schedule in the
18 report, the back of the report.
19     Q.  And what case was that issued in
20 connection with?
21     A.  I think the -- the case caption --
22 and I'd have to go back to those reports -- I
23 think are just a general caption for the --
24 the Madoff bankruptcy.  So again, without
25 looking at that report, I don't have it in

Page 16

1  BRUCE G. DUBINSKY
2  front of me, I'd have to look at the case
3  caption.
4          But my understanding is, my reports
5  are going to be used across all of the cases.
6  And so, for instance, in this case, the Merkin
7  case, my report that you have was not amended
8  or added to for purposes of this specific
9  case.
10         So the reports, my understanding,
11 are kind of a -- a report that will be used
12 across all of the bankruptcy cases if need be.
13     Q.  So is there anything specific to
14 the Merkin case that you did in rendering your
15 opinions in the report that you issued in this
16 case?
17     A.  I wouldn't say specific to the
18 Merkin says.  It's no different than any other
19 case.  I could tell you there are
20 Merkin-related accounts that were subsumed in
21 analysis in -- in the report.  That was in the
22 report that was issued again that's being used
23 in all cases.
24         So just to clarify, there was
25 nothing that I added specifically for the

Page 17

1  BRUCE G. DUBINSKY
2  Merkin case or took away.  The report is the
3  report.
4      Q.  Did you consider adding anything
5  specific to the Merkin case?
6      A.  No.  My -- my role for the trustee
7  was kind of an omnibus role across all of the
8  bankruptcy cases to look at the -- to look and
9  see if there was fraud at BLMIS, to determine
10 if it was a Ponzi scheme, to look at the
11 solvency, and to look at whether MSIL, which
12 was the European entity of Madoff, was
13 involved.  So again, it wasn't case specific
14 to any particular Defendant across the board.
15     Q.  Do you -- have you formed any
16 opinions that are not reflected in the report
17 that you issued in this case?
18     A.  Talking about expert opinions?
19     Q.  In -- in your capacity as an expert
20 in this case, have you formed any opinions
21 that aren't reflected in your written report
22 that you've issued in this case?
23     A.  No.  Everything that -- all of my
24 opinions are embodied in the report.
25     Q.  And I take it you don't intend to

Page 30

1        BRUCE G. DUBINSKY
2  up from there.
3      Q.  In terms of your work on this case,
4  how much have you been paid in connection with
5  the Madoff cases?
6      A.  It would be an estimate, I don't
7  know exactly, but it's probably presently
8  about 31- to $32 million.
9      Q.  That you've personally been paid?
10      A.  No.  When you say me, personally, I
11  work for a firm called Duff & Phelps, and the
12  firm is engaged, I'm an employee of the
13  company.  No, I don't get that money
14  personally.
15      Q.  So Duff & Phelps has been paid
16  about 31- or $32 million in connection with
17  the Madoff cases?
18      A.  That's an approximation, yes.
19      Q.  Is there work that Duff & Phelps is
20  doing aside from work in connection with your
21  provision of expert witness services?
22      A.  There is another team that's
23  providing support to Dr. Pomerantz.
24      Q.  And to your knowledge, that's the
25  only two areas where Duff & Phelps is engaged

Page 31

1        BRUCE G. DUBINSKY
2  is to you and your support team and then a
3  support team for Dr. Pomerantz?
4      A.  As far as Duff & Phelps is
5  concerned, yes.
6      Q.  And does the 31- or $32 million
7  include the work on both parts of the
8  engagement or is that the work in connection
9  with your services?
10      MS. KOSACK:  Object to form.
11      A.  That's total for the firm, Duff &
12  Phelps.
13      Q.  How much relates to the work that
14  you've performed versus the work that the team
15  supporting Dr. Pomerantz has performed?
16      A.  I would be guessing at this point,
17  I don't know.
18      Q.  Do you have an approximation?
19      A.  I don't.
20      Q.  How many people are working -- is
21  there any overlap in the team that's
22  supporting Dr. Pomerantz and then your team?
23      A.  No, there's not.
24      Q.  How many people are working on the
25  team supporting Dr. Pomerantz?

Page 32

1        BRUCE G. DUBINSKY
2      A.  To the best of my knowledge, three,
3  could have been four people at -- at a time,
4  but I think there's three people that are
5  working on it.
6      Q.  And how many people are working on
7  the team supporting you?
8      A.  Presently I think the team is down
9  to about four to five people.
10      Q.  Has it been bigger than that over
11  time?
12      A.  Yes.
13      Q.  Okay.  How big has it been at its
14  biggest?
15      A.  At its biggest, I had about 75 to
16  80 people working on the case.
17      Q.  How long did you have 75 to 80
18  people working on the case?
19      A.  I would say probably about eight
20  months initially and then the team started
21  getting smaller.
22      Q.  And you had about 75 to 80 people
23  working on the case in relation to the three
24  or four opinions that we've talked about,
25  which is that it was a fraud, it was a Ponzi

Page 33

1        BRUCE G. DUBINSKY
2  scheme, it was insolvent, and then that MSIL
3  was somehow used in connection with the
4  scheme?
5      A.  That is correct.
6      Q.  And the 75 to 80 people weren't
7  working on anything else other than those four
8  topics?
9      A.  During the time they were working
10  on this case; no, those are the topics they
11  were focusing on.
12      Q.  How much -- and then are there
13  unpaid fees that have either been billed or
14  there's unbilled dollars owed to Duff & Phelps
15  on top of the 31- or $32 million that's been
16  paid?
17      A.  I think there were two questions in
18  there.  Let me take the first one.
19          There are always unpaid bills
20  because I send a bill out that takes about 60
21  to 90 days to get paid, so there are always
22  unpaid bills.
23          And your second question was
24  whether I think there's work in process.  And
25  there currently is work in process.  Again, we

9 (Pages 30 to 33)

TSG Reporting - Worldwide    877-702-9580

Page 34

1     BRUCE G. DUBINSKY
2  continue to do work, and then that gets billed
3  in the subsequent month when we do our
4  billing.
5     Q.  So in terms of unbilled time and
6  work in progress, how much of that is there on
7  the Madoff cases?
8     A.  So to clarify, the unbilled time
9  and work in process is the same.  And I
10 wouldn't know, I haven't looked at the
11 billing.
12    Q.  Did you separate your work on the
13 case for the Merkin-related litigation
14 separate from any of the other work on the
15 Madoff cases?
16    A.  I'm not sure I understand what --
17    Q.  Did you separate -- did you or
18 members of your team separate their billing on
19 your work on the Merkin case separate and
20 apart from the other work that you were doing
21 on the Madoff cases?
22        MS. KOSACK:  Object to form.
23    A.  So just to clarify, I didn't do any
24 separate work for the Merkin case.  The
25 report, again, is a report that is being

Page 35

1     BRUCE G. DUBINSKY
2  issued and has been issued in many of the
3  bankruptcy cases.  So I have a regular billing
4  code for the -- for the BLMIS case and that's
5  where my time goes.
6     Q.  And so you can't tell how much of
7  the 31- or $32 million that Duff & Phelps has
8  billed has been for work on the Merkin case as
9  opposed to the cases generally; is that right?
10    A.  Well, now you asked a different
11 question.  Before you were asking me and my
12 time.  There is a separate billing code for
13 the support team for the Merkin case that's
14 supporting Dr. Pomerantz, so that is kept
15 separately.
16        But as to my time, no, or people
17 that work for me on the general -- what I call
18 the general Madoff work, no, there's nothing
19 specific to Merkin.
20    Q.  Have you ever sought to testify or
21 been proffered as an expert witness and had
22 your testimony excluded?
23    A.  I haven't had my testimony
24 excluded; I was proffered in a case, the USA
25 vs. Nagle case, it was on the list of cases.

Page 36

1     BRUCE G. DUBINSKY
2  I was proffered for I believe six opinions,
3  the judge qualified me on five.  The sixth he
4  said in his written opinion that it wasn't
5  that I wasn't qualified, but it was more in
6  the province of the jury.
7         At cross-examination the prosecutor
8  from DOJ opened the door to that opinion and
9  then I was able to testify to that opinion.
10    Q.  Okay.  And what was -- what was
11 that case about?
12    A.  That was a bankruptcy case.  It was
13 a lawyer charged with fraud in his personal
14 bankruptcy filing mand I was working for --
15 hired by the defense team and the -- I think
16 it was a combination of a pro bono defense by
17 WilmerHale and the Federal Public Defenders
18 office in Washington, D.C.
19    Q.  And in the -- were you proffered as
20 an expert in the Katz/Wilpon case?
21    A.  Yes, I was.
22    Q.  And was your -- I know that case
23 settled; was your testimony going to be
24 allowed in that case?
25    A.  It was.  I believe the judge had

Page 37

1     BRUCE G. DUBINSKY
2  ruled on that.
3     Q.  Had ruled that you could testify?
4     A.  That is correct.  Let me just add
5  one -- one other thing to the -- that last
6  answer.
7         There was a case, I think it was
8  Wins- -- I'd have to see the list, but there
9  was a case in front of Judge Lee in the
10 District Court in the Eastern District of
11 Virginia, I was proffered was a rebuttal
12 witness.  The other side's witness was
13 excluded after a Daubert hearing.  I was
14 stricken as being moot at that point, but I
15 guess you could call it technically stricken,
16 but it was because all I had was rebuttal
17 opinions at that point and their expert was --
18 was removed by the Court, had nothing to do
19 with my qualifications or the opinion.
20    Q.  Have you ever investigated
21 something where your hypothesis or the theory
22 that you're testing was whether it was a Ponzi
23 scheme and concluded that it was not?
24        MS. KOSACK:  Objection to form.
25    A.  Yes.

Page 66

BRUCE G. DUBINSKY

1 Dr. Pomerantz's report?
2     A.  No, I did not.  And again, just to
3 clarify, you're talking about the report he
4 issued in this -- in this matter?
5     Q.  Yeah.  Did you review drafts of
6 Dr. Pomerantz's report in any of the
7 Madoff-related matters?
8     A.  I don't think so.  It's possible in
9 the Katz/Wilpon case I saw a draft.
10     Q.  And how many times have you worked
11 with Dr. Pomerantz before?
12     A.  Before what?
13     Q.  Before the Madoff cases.
14     A.  I would say probably three prior
15 cases.
16     Q.  Which were those?
17     A.  Three or four.
18         They -- there was a series of
19 cases.  I worked for the Department of
20 Justice, tax shelter cases and
21 Dr. Pomerantz -- that's how I came to know
22 Dr. Pomerantz, through some tax shelter cases
23 he was retained on.  And I think there were
24 one, two -- might have been three cases for

Page 67

BRUCE G. DUBINSKY

1 the Department of Justice where they retained
2 him as an expert and I was retained as an
3 expert as well, different areas, but retained.
4     Q.  And those were all tax shelter
5 cases?
6     A.  Yes.
7     Q.  Now, am I correct that Ezra Merkin
8 isn't mentioned at all in your expert report
9 in this case?
10     A.  I -- reading it last night, I don't
11 recall seeing his name specifically.  Again,
12 as I mentioned earlier, I think there are --
13 in the work that was done, there were Merkin
14 accounts subsumed as part of the overall
15 account analysis for all the investors and
16 funds that invested in Madoff.
17         But I -- I would agree with you, I
18 don't recall seeing his name specifically
19 mentioned in the report.
20     Q.  And did you specifically review or
21 consider anything, any of the account
22 statements or account analysis relating to any
23 of the Merkin funds accounts in connection
24 with your work on this case?

Page 68

BRUCE G. DUBINSKY

1     MS. KOSACK:  Object to form.
2     A.  Again, as I describe, when I did
3 the analysis, whether it was equities trading
4 out of range, things trading on weekends, all
5 of the accounts for the customers at that
6 particular time period of BLMIS were analyzed.
7         So I know there were, I believe,
8 six accounts from Merkin and the related
9 funds, those would have been part of that
10 analysis.  They weren't singled out, I didn't
11 single out or pull out any -- any specific
12 ones from Merkin to look at in addition to the
13 overall analysis.  Does that make sense as I
14 was explaining?
15     Q.  And am I also right, that Gabriel
16 Fund Limited isn't specifically mentioned
17 anywhere in your report?
18     A.  I would agree with you.
19     Q.  And likewise, Ascot Partners, L.P.
20 and Ascot Fund Limited, neither of those
21 entities are mentioned?
22     A.  That is correct.
23     Q.  And Gabriel Capital, L.P., that's
24 not mentioned?

Page 69

BRUCE G. DUBINSKY

1     A.  That is correct.
2     Q.  And Gabriel Capital Corporation
3 isn't mentioned either, right?
4     A.  That is correct.
5     Q.  All right.  When you were reviewing
6 your report, did you notice any errors in your
7 report?
8     A.  No, I did not.
9     Q.  At any time since you issued either
10 the report that's Dubinsky Exhibit 1 or the
11 two prior reports in the Madoff cases, did you
12 discover any errors in any of the reports?
13     A.  Again to clarify, I think there
14 were -- if my recollection serves me there
15 were four reports; one, there were a couple of
16 corrections made in footnotes.  So the first
17 one was, I believe, November 2011.  There was
18 one in January 2012, corrected some footnotes.
19 There was one in November 2012, which was the
20 first time I expanded the -- or wrote and
21 issued the opinion expanding the House 5
22 opinion, and then the current report that's
23 marked as Dubinsky Exhibit 1.
24         And in one of those, again, there

18 (Pages 66 to 69)

Page 74

1    BRUCE G. DUBINSKY
2  either explicitly stated in the report, put in
3  a footnote or in the documents considered.
4        So there's nothing that I would
5  have been told as a factual matter that is not
6  referenced -- to the best of my knowledge
7  that's not referenced in one of those three
8  places.
9        Q.  Well, regardless of whether it's
10  referenced somewhere, were there facts that
11  were provided you by counsel that you then
12  considered in forming your opinions?
13        A.  Sure.  A document, for instance, is
14  a fact, right?  So there were documents
15  provided to me, there was a database of
16  documents, there were backup tapes, there were
17  e-mails.  Those are all facts.  And -- and so
18  all of those are detailed in the report.
19        Q.  If we could go -- I think it's
20  attached.  Tell me, does your -- does your
21  Exhibit 1 end with your signature page?
22        A.  It does.  Yes, it does.
23        Q.  And you signed this on August 20th
24  of 2013; is that right?
25        A.  That's correct.

Page 75

1    BRUCE G. DUBINSKY
2        Q.  Okay.  And so since that time, have
3  you done any work in connection with the
4  trustee's case against Mr. Merkin -- strike
5  that.
6        From August of 2013 when you issued
7  this report until you began to prepare for
8  your deposition in this case, have you done
9  any work in connection with the trustee's
10  claims against Mr. Merkin?
11        A.  No, I have not.
12        Q.  Have any of the people on your team
13  done work in connection with the trustee's
14  claims against Mr. Merkin during that period
15  of time?
16        A.  Just to clarify, the answer is not
17  to my knowledge.  There's a separate team, as
18  I said earlier, supporting Dr. Pomerantz on
19  this case, so they've clearly from Duff &
20  Phelps done work.  But on the team that is
21  supporting me, no.
22        Q.  And you did not -- by the way, on
23  the documents considered, there's a long list
24  of depositions, for example?
25        A.  Correct.

Page 76

1    BRUCE G. DUBINSKY
2        Q.  Did you -- did you personally
3  review all of those deposition transcripts?
4        A.  I did.  I use a program called Case
5  Notebook, it used to be called LiveNote.  So
6  the deposition transcripts are imported into
7  that and then I can read at length, I can
8  search across them.  So yes, I do go through
9  the depositions.
10        MR. STEINER:  Let's have this
11    marked.
12        (Dubinsky Exhibit 3, Appendix B to
13    Bruce Dubinsky's Expert Report was
14    marked for identification, as of this
15    date.)
16  BY MR. STEINER:
17        Q.  Mr. Dubinsky, the Court Reporter
18  has handed you a document that has been marked
19  as Dubinsky Exhibit 3, which was I think
20  Appendix B to your report in this case.  Do
21  you have that?
22        A.  I do have it.  I just -- it is
23  Appendix B.  I don't know if it was the actual
24  one attached to the report.  Again, there have
25  been different reports.  If that's what you're

Page 77

1    BRUCE G. DUBINSKY
2  representing to me on the record and for
3  purposes of your questions, I'll assume it is,
4  but I don't know.
5        Q.  And do you have appendices in your
6  binders that are in front of you somewhere?
7        A.  I don't think the appendices -- let
8  me see.  Let me check one other place.  No,
9  these don't have the appendix.  They would
10  have been attached as part of the report.
11        Q.  Well, I will represent to you that
12  this, to the best of my knowledge, is
13  Exhibit B that was from the report produced by
14  the -- or sent to us by the trustee, but
15  attached to your report that's Exhibit 1.
16        A.  Okay.
17        Q.  And is this -- you said that you
18  had provided a detailed list of the documents
19  that you considered.  Assuming this is in fact
20  the Exhibit B that was attached to the report
21  in this case, would this be that list?
22        A.  Yes, it is.
23        Q.  And it has a long list.  For
24  example, it starts with some articles and
25  books, and it goes to a list of pleadings; is

Page 78

1        BRUCE G. DUBINSKY
2  that right?
3     A.  It does.
4     Q.  And, for example, you've never
5  reviewed the trustee's Complaint or any of the
6  Amended Complaints against Mr. Merkin or the
7  funds in this case; is that right?
8     A.  I have subsequently read those.
9  Subsequent to the issuing of this report I did
10 read those.
11    Q.  When did you read those?
12    A.  At some point probably in the last
13 two months.
14    Q.  I take it you didn't find it
15 important to review any of those allegations
16 prior to forming your opinions in this case;
17 is that right?
18    A.  No, it was just for general
19 knowledge.
20    Q.  And then after the list of
21 pleadings, there's -- somewhere here there's a
22 list of depositions and interview transcripts,
23 do you see that?
24    A.  I do see that.
25    Q.  It starts with Item No. 187 and

Page 79

1        BRUCE G. DUBINSKY
2  goes to 216?
3     A.  I see that.
4     Q.  And so each of those, if my math's
5  right, 30 deposition transcripts, you
6  personally reviewed or searched for
7  information in each of those; is that right?
8     A.  That is correct.
9     Q.  And these were the depositions that
10 you -- or interview notes that you thought
11 important to consider in forming your
12 opinions; is that right?
13    A.  These are the ones that -- well, I
14 had asked for deposition transcripts and
15 interviews, this is what was provided to me by
16 the trustee's counsel.  So whether -- and
17 again, these are listing of documents
18 considered, so I might have read something,
19 not seen anything in that -- that bore
20 directly on my opinions, but nonetheless I
21 referenced it here as a document considered
22 because I did look at it.
23    Q.  The -- I take it you did not review
24 or consider any of the depositions taken in
25 the Picard vs. Merkin action; is that right?

Page 80

1        BRUCE G. DUBINSKY
2     A.  At the time I issued the report,
3  that's correct.  And sitting here today, I
4  don't even recall if I went through any of
5  them.  But again, those aren't needed for the
6  report as I described what was the purpose of
7  my report.
8     Q.  And, for example, you've never read
9  Mr. Merkin's testimony in -- in this case; is
10 that right?
11    A.  I believe that's correct.
12    Q.  And you've never read any of
13 Mr. Merkin's testimony in any of the other --
14 any of the other transcripts that have been
15 produced to the trustee; is that right?
16    A.  That's correct.
17    Q.  And you said that this was what was
18 available to you at the time that you issued
19 your report in August of 2013; is that right?
20    A.  Correct.
21    Q.  And were you aware that the
22 deadline for issuing expert reports was
23 sometime in the -- I won't have the date
24 exactly right, but the March -- February,
25 March, April of 2015 time period?

Page 81

1        BRUCE G. DUBINSKY
2     A.  That general time period, that's
3  what I understood, yes.
4     Q.  So you --
5     A.  In this case.
6     Q.  So you -- you issued your report
7  something in the neighborhood of 18 months
8  before it was due; is that right?
9     A.  Exhibit 1, that's correct.
10    Q.  And I take it if it was important
11 to you in any of your opinions, you could have
12 reviewed testimony that was issued subsequent
13 to the August 13th -- the August 2013 report
14 that you had signed and updated or amended
15 your report; is that right?
16    A.  I could have done so, yes.
17    Q.  And you as expert made the decision
18 that that wasn't necessary; is that right?
19    A.  That's correct.  The opinions I had
20 reached in the report were to a reasonable
21 degree of accounting certainty, felt
22 comfortable with them and haven't seen
23 anything that would change my opinions.
24    Q.  You just said something about being
25 to a reasonable degree of accounting

21 (Pages 78 to 81)

Page 86

1           BRUCE G. DUBINSKY
2  consider that nonpublic data; is that right?
3      A.  I think it's important of all the
4  data.  I don't single out a piece of data or a
5  certain fact as being the -- the smoking gun,
6  so to speak; it's the totality of everything
7  that I looked at in conducting the
8  investigation for me as an expert in rendering
9  the report to reach that reasonable degree of
10 accounting certainty, to render that BLMIS,
11 the fraud was pervasive there, the IA business
12 was a Ponzi and the other opinions that I
13 issue.
14     Q.  Could you take a look at
15 paragraph 35 of your report for a minute.
16     A.  Okay.
17     Q.  And you reference the fact that
18 BLMIS was registered as a broker-dealer with
19 the Securities and Exchange Commission
20 starting in January of 1960 --
21     A.  Correct.
22     Q.  -- do you see that?
23         And what was the significance of
24 that, the fact that BLMIS was registered with
25 the SEC to your work or opinions in this case?

Page 87

1           BRUCE G. DUBINSKY
2      A.  This is laying out the factual
3  background so I understood it and then a
4  reader going into the -- the report would
5  understand the basic facts of the situation
6  and the entities involved and people that --
7  that were there.
8         So no independent piece of
9  significance just to that one fact, but in
10 totality, again, it tells a story.
11     Q.  And did you form an opinion as to
12 when the Ponzi scheme started?
13     A.  I say that the Ponzi scheme -- I
14 don't have a particular -- a specific date,
15 but I go back many years, as I said in the
16 report, that the fraud likely started in the
17 late '70s.  The testing that I do takes it all
18 the way back to that point.
19        There's been pleas, plea
20 allocutions, people pled guilty after that
21 that have dated it back to the early '70s.  So
22 that's the time period, but I don't put a
23 specific start date on the actual Ponzi.
24     Q.  So your opinion would be at least
25 30 years and possibly longer?

Page 88

1           BRUCE G. DUBINSKY
2      A.  That's a -- that's a fair
3  assumption, yes.
4      Q.  In terms of duration, how does that
5  compare to other Ponzi schemes that you're
6  familiar with that you either studied or
7  investigated?
8          MS. KOSACK:  Objection to form.
9      A.  It's probably the longest one that
10 I'm aware of in duration.
11     Q.  What -- after the Madoff Ponzi
12 scheme, what's the next longest duration Ponzi
13 scheme that you're aware of?
14     A.  I don't know specifically.  I think
15 I said the FirstPay was six to eight years.  I
16 don't know.
17     Q.  Is it difficult for a Ponzi scheme
18 to go on for that long?
19         MS. KOSACK:  Objection to form.
20     A.  Is it difficult for a Ponzi scheme
21 to go on that long?  It takes work.  It takes
22 work.
23     Q.  What type of work does it take?
24     A.  It takes people collaborating
25 together typically.  I mean, one person

Page 89

1           BRUCE G. DUBINSKY
2  obviously couldn't -- couldn't pull off a
3  Ponzi scheme like this because of the volume
4  of work that's involved.  But it takes a team
5  of -- of closely collab- -- closely -- close
6  collaborators to keep it going, the moving
7  parts.  That's what it would take to keep it
8  going that long.
9      Q.  The -- now in your report -- and
10 I'll just give you as an example in -- if you
11 could turn to paragraph 96 and starting at 96
12 for the next bunch of paragraphs at least up
13 to, say, paragraph 104, you're talking about
14 convertible arbitrage transactions in the
15 1980s; is that right?
16     A.  The '70s and '80s, that's correct.
17     Q.  And you --
18     A.  Up -- up until the early '90s.
19     Q.  Okay.  And you understand that, for
20 example, these examples you give in 1982 and
21 1985, that's before any of the Merkin
22 funds had accounts with BLMIS, right?
23     A.  That's my general understanding,
24 yes.
25     Q.  And then in paragraph 96 you talk

23 (Pages 86 to 89)

Page 90

BRUCE G. DUBINSKY
about testing -- you say 582 unique trade prices were tested; do you see that?
 A. Yes.
 Q. And why would you test that number of trade prices?
 A. Again, going through I wanted to look at all -- all of the unique trades, and it didn't serve me any good to look at the trade that was replicated across accounts.
   So Mr.- -- Mr. Madoff or BLMIS had many accounts, they obviously got much larger in the '92, '93 time period. But what I wanted to look at was the unique trades, look at -- separate those, look at the market price of those and compare it to the actual market price.
 Q. So when you say "unique trades," that's a reference to a particular trade; even if that same trade is done in a hundred different accounts, you account that as one unique trade?
 A. That is correct, yes.
 Q. If you can look at paragraph 117. And Mr. Dubinsky, I know that you

Page 91

BRUCE G. DUBINSKY
have expertise in a lot of things; do you have expertise in trade confirmations?
 A. I would say yes. I've gone through -- I told you earlier I was a registered investment advisor registered with the SEC in the state of Maryland, had clients, dealt with institutional accounts, so yes.
 Q. So in paragraph 117, you say that the trade confirmations show stock being bought when in fact it was sold?
 A. Correct.
 Q. Okay. And if you look at the trade confirmation that you have in figure 8, right, did you create this figure?
 A. Yes, I did.
 Q. You personally?
 A. Yes.
 Q. So you say that Aetna was sold from this particular account and you blacked out the account name, right?
 A. That's correct.
 Q. And again, this is in 1980, so this is before the Merkin funds had accounts, right?

Page 92

BRUCE G. DUBINSKY
 A. To my understanding, yes.
 Q. And you say this says without -- or this says -- sorry. This says sold when in fact it was bought on that confirm in figure 8, right?
 A. That is correct.
   MS. KOSACK: Which paragraph are you referring to?
   MR. STEINER: He's still in 117 in figure 8.
 Q. Now, and maybe you explained it to me, but doesn't it say we, Madoff, sold, which would mean that the customer bought?
 A. Again, BLMIS was not acting as a principal in the transactions. These were again all purported transaction, so let's have that predicate first, none of this went on as far as actual trading.
   But what was purported, what -- what the -- when the customer opened an account statement with BLMIS, BLMIS was -- was acting as an agent which would mean there would be another counterparty on the other side, not BLMIS.

Page 93

BRUCE G. DUBINSKY
   So in fact, what this is -- what BLMIS represented on the account opening statements to its customers and these trans- -- and these confirmations, they don't sync up.
   So it's -- it's -- basically what they were doing was printing these up, it was being printed as if Madoff was the principal, which was not occurring anyway, and then used to support the statement and it was backwards.
 Q. So if -- if the customer bought from Madoff, this would be okay?
 A. If Madoff had acted as a -- as a principal and took shares out of its own kitty, if you will, then this would have been one side of the confirm because then Madoff would have been a true counterparty, a principal counterparty. There would have been another trade ticket generated for the purchaser; in this case whichever account was redacted, there would have been two trade confirms.
   So just like if you trade stock and you're selling it, somebody else on the other

Page 102

1    BRUCE G. DUBINSKY
2  A.  Over different periods of time.
3  Yeah, the point is, you can't just look at one
4  day and say, Mr. Steiner, you did a great job
5  today because you bought four trades and they
6  were all three -- three points below the VWAP
7  average.
8      Q.  So -- right, so they grade over
9  some period of time?
10     A.  Correct.
11     Q.  And it's your opinion that you,
12 over a period of time, should be hitting
13 roughly at 50 percent of VWAP; is that right?
14     A.  Give or take a little bit, yes.
15     Q.  So how does a trader get a good
16 grade or a bad grade?
17     A.  Well, if they're -- if they're
18 executing -- again, if they're executing all
19 the buys above the average price, something's
20 going on.  So maybe they're not, you know,
21 reacting quick enough to something in the news
22 and they're coming in five minutes later after
23 a news story broke and they're buying it after
24 it's ticked up.  And it could be the converse,
25 they're selling, you know, at a point in time

Page 103

1    BRUCE G. DUBINSKY
2  below what the average is.
3      Q.  And I take it if there's a range of
4  grades, that over time some brokers do better
5  and some brokers do worse?
6      A.  That's true.  Again, the concept is
7  no one can time the market.  I mean, that's
8  been proven time and time again, and that over
9  time all traders -- I mean, unless they're
10 idiots -- should kind of fall into that
11 pattern of being close to the VWAP.
12     Q.  Let's go back to my question.  If
13 that's the case, what's the point of grading
14 the traders or how is it that some traders get
15 good grades and some traders get bad grades?
16     A.  So yeah, again in my example, say a
17 trader's asleep at the switch and they're
18 always buying things after a news story
19 breaks, it's too late, right.  You can't
20 capture the Ys in the market, this algorithmic
21 trading that happens instantaneously the
22 minute a story breaks.
23          If you're five minutes to the
24 terminal and place an order for your client,
25 you're going to be off -- because the volume

Page 104

1    BRUCE G. DUBINSKY
2  that's already traded is so great.  So it
3  depends on the broker.
4      Q.  And I take it you'd want to be on
5  the opposite side of the person who's always
6  five minutes late?
7      A.  Wouldn't that be ideal.  If I could
8  do that, you and I wouldn't be having this
9  conversation right now, I can assure you of
10 that.
11     Q.  $31 million is a lot of fees.
12        MS. KOSACK:  Objection.
13     A.  Not compared to what you -- not
14 compared to what you could make if you really
15 had that kind of clairvoyance in the market.
16     Q.  What is -- I just didn't
17 understand; what's -- what's the relevance of
18 MSIL to your work on this case?
19     A.  Again, in -- in rendering the
20 opinion that BLMIS was fraud there was
21 pervasive at BLMIS, I was looking at --
22 because it was basically a sister corporation
23 or sister entity to BLMIS, what was its
24 involvement because there was a tremendous --
25 as I detail in the report, a tremendous amount

Page 105

1    BRUCE G. DUBINSKY
2  of money being round-tripped using MSIL as a
3  device to perpetrate the fraud.  So it was
4  part of the fraud.
5      Q.  And did any of the Merkin funds
6  have any accounts or dealings with MSIL?
7      A.  I -- I don't think so, but I don't
8  know one way or another.
9      Q.  Now, you described in your report
10 fake DTC screens --
11     A.  Yes.
12     Q.  -- that were created by -- by
13 BLMIS?
14     A.  That is correct.
15     Q.  Had you ever heard of fake DTC
16 screens being created before?
17     A.  No, this is the first time I -- I
18 saw that.
19     Q.  So prior to Madoff's confession,
20 how -- how would you have gone about detecting
21 that something was a fake DTC screen?
22     A.  The same way that I did it in this
23 case.  I looked at the metadata on it, I was
24 able to determine how and when it was created,
25 and I would have done that -- say, I was

Page 110

1    BRUCE G. DUBINSKY
2  alternative investments, hedge funds, private
3  equity, I mean a wide range.
4    Q.  So when you say you did the initial
5  due diligence, what did you do?
6    A.  So I would gather initial
7  information about the fund, I may go on to
8  Bloomberg, Morningstar, start to read the
9  diligence that was done from those sources,
10  get prospectuses.
11       The initial due diligence, almost
12  all of the investments that I can remember
13  were pretty much already vetted by the company
14  I worked for, so I wasn't going out on my own
15  and finding things.  I could certainly go on
16  to -- and I did, would go on to Morningstar
17  and look at different funds and then could
18  recommend from that.
19       But there was a -- for each of the
20  firms, kind of an investment advisory
21  committee for each firm had already approved
22  kind of a list of funds and investments.  And
23  to do that then, they went through due
24  diligence and -- and I'm pretty sure in both
25  cases they used an outside company to do -- to

Page 111

1    BRUCE G. DUBINSKY
2  conduct due diligence.
3    Q.  And you weren't involved as part of
4  that process?
5    A.  I wasn't the third-party company
6  doing the due diligence, no.
7    Q.  And you weren't involved in
8  whatever the third-party company was doing?
9    A.  That is correct.
10    Q.  You got the list after they had
11  vetted?
12    A.  That is correct.
13    Q.  If you could look at paragraphs 199
14  to 213 of your report, this is a -- a longer
15  discussion of the schtupping of certain
16  returns?
17    A.  That is correct.
18    Q.  Okay.  And just to confirm, I think
19  you refer it to a bunch of different years,
20  2002, '3, '4, '5, '6 and '7?
21    A.  Correct.
22    Q.  Right.  And in none of those years
23  or ever were any of the Merkin funds the
24  beneficiaries of this schtupping, right?
25    A.  From the information that I saw,

Page 112

1    BRUCE G. DUBINSKY
2  no, I don't know factually beyond that if they
3  were one way or another.
4    Q.  And neither you or your team did a
5  thorough review of the information about the
6  different accounts, correct?
7    A.  That is correct.
8    Q.  So you would be surprised at
9  least -- you're not aware of any schtupping of
10  the Merkin funds accounts and you would expect
11  it not to be the case because your team didn't
12  uncover it?
13       MS. KOSACK:  Objection to form.
14    A.  Again, I think there were four
15  questions buried in there, but the reality is,
16  the information I reviewed, I didn't see any.
17       You asked me do I know for a fact;
18  all I can answer is what I saw or didn't see.
19  If there is -- for instance, you have
20  documentation that that happened that I don't,
21  I don't know about that.  So I'm just
22  clarifying for you in that context.
23    Q.  And had there been any, you would
24  have expected your team to point it out to
25  you?

Page 113

1    BRUCE G. DUBINSKY
2    A.  Well, I would -- yes, had we found
3  it, it would have been in the report, that's
4  correct.
5    Q.  You say in your report that BLMIS
6  should have registered as an investment
7  advisor starting in 1979?
8    A.  That's -- what paragraph are you
9  on?
10    Q.  I'm on 240.
11    A.  That's correct.
12    Q.  And what's the basis for that?
13    A.  That's my understanding of the time
14  that the application for investment
15  advisers -- let me just look at this.  Yes,
16  that was the time that -- based on my
17  understanding of the regulations, that they
18  should have -- that BLMIS should have
19  registered.  They were operating as an
20  investment advisor providing investment advice
21  and should have been registered.
22    Q.  Okay.  And so on what do you --
23  have you ever advised anyone on whether or not
24  they're required to register as an investment
25  advisor?