# EXHIBIT C

```
 1                  MATTHEW GREENBLATT
 2            UNITED STATES DISTRICT COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4    ------------------------------------x
      In re:                              SIPA LIQUIDATION
 5
      BERNARD L. MADOFF INVESTMENT        No. 08-01789(BRL)
 6    SECURITIES LLC,
 7                                        (Substantively
                                          Consolidated)
 8               Debtor.
      ------------------------------------x
 9    IRVING H. PICARD, Trustee of the
      Liquidation of Bernard L. Madoff
10    Investment Securities LLC,
11               Plaintiff,
                                          Adv. Pro. No.
12         vs.                            09-01182(BRL)
13    J. EZRA MERKIN, GABRIEL
      CAPITAL, L.P., ARIEL FUND LTD.,
14    ASCOT PARTNERS, L.P., GABRIEL
      CAPITAL CORPORATION,
15
                 Defendants.
16    ------------------------------------x
17
18     VIDEOTAPED DEPOSITION OF MATTHEW GREENBLATT
19                 New York, New York
20                  August 17, 2015
21
22
23    Reported by:
24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25    JOB NO. 96625
```

Page 34

MATTHEW GREENBLATT
doesn't appear in your March 20 or November 15 reports?
 A.   The only thing I can think of is the treatment of the IRS refund, which was -- which is included in the March 20, '15 report.
 Q.   How did your analysis -- did your analysis -- how did your analysis change as to the tax payments --
      MR. SONG:  Object to the form.
 Q.   -- over time?
 A.   In the Principal Balance Calculation Report, for foreign account holders dollars were withheld or moneys -- funds were withheld from foreign account holders by BLMIS and paid directly to the IRS.
      As a result, those have been considered reductions in principal for those foreign account holders because payments were made by the estate on their behalf.  As I understand it, two of the Merkin-related funds received direct refunds from the IRS, separate from the refund that the IRS paid back to the trustee and the estate for the full six-year period of withdrawals.

Page 35

MATTHEW GREENBLATT
So because the estate recovered those six-year withdrawals, the calculation has reversed those transactions and, therefore, they are no longer being deducted from accounts.
      And at one point we had made an adjustment for the two Merkin Funds that I believed had gotten a direct refund, but because we haven't been able to tie out -- I don't have the information to tie those out directly, counsel had instructed me to treat the refunds the same as I had for every other account.
 Q.   And how did counsel instruct you to treat those refunds?
 A.   I was instructed to not consider those holdings during the six-year period as deductions of principal.
 Q.   Did you consider all tax holdings to be deductions of principal?
 A.   Only when payments were made by BLMIS on behalf of the account holder.
 Q.   For all time periods?
 A.   Initially, yes, and then when the IRS refunded the six-year balance back to the estate, the calculation basically zeros those

Page 36

MATTHEW GREENBLATT
transactions out and eliminates the deduction.  Therefore, there is no longer a deduction to principal because the money left the estate but came back into the estate.
 Q.   What was your basis for deducting certain payments from the principal balance?
 A.   The determination of everyone's net equity balance is essentially a legal conclusion.  I was tasked by the trustee and his counsel to identify and prepare schedules of all of the cash and principal transactions, and so every deposit, every withdrawal, and every payment made on behalf of a customer was identified as additions and deductions to principal.
 Q.   So you deducted those payments at the request of counsel?
      MR. SONG:  Object to the form.
 A.   Well, the -- they are considered one of the outflows of funds that are part of the calculation of an individual account's principal balance, which was -- which has been outlined in the methodology of the calculation.
 Q.   Isn't it true that the tax payments to

Page 37

MATTHEW GREENBLATT
the IRS were necessitated by fictitious activity in the accounts?
      MR. SONG:  Object to the form.
 A.   I would say yes.
 Q.   And those tax payments were not made at the request of account holders, correct?
      MR. SONG:  Object to the form.
 A.   I don't know whether or not they ever said, "Pay them on my behalf or not."  The calculation, though, goes to the books and records and a reconstruction of the items on the books and records as to what transactions actually transpired with respect to cash and principal.  So those payments were made on behalf of account holders by BLMIS and, therefore, have been concluded were reductions of their principal.
 Q.   And you're not offering an opinion as to the appropriateness of deductions of the tax payments from the net equity; that was determined by counsel, right?
      MR. SONG:  Object to the form.
 A.   As I said before, the net equity determinations are essentially a legal

10

Page 38

1           MATTHEW GREENBLATT
2   conclusion, and from the very beginning, I was
3   asked by counsel to the trustee to identify cash
4   and principal transactions and to apply this
5   methodology of inflows and outflows.
6       Q.   You're not offering an opinion as to
7   the appropriateness of that methodology,
8   correct?
9       A.   That's correct.
10      Q.   Was there any other analysis that you
11  had done that was altered before -- before
12  issuing your final reports?
13          MR. SONG:  Object to the form.
14      A.   I don't think -- I can't think of any,
15  no.
16      Q.   Are you being compensated for your
17  time spent on the Merkin and Madoff cases?
18      A.   Yes.
19      Q.   How are you being compensated?
20      A.   Me, personally, or my firm?
21      Q.   How are you personally being
22  compensated?
23      A.   I draw a salary and bonus over time.
24      Q.   How is the amount of your bonus
25  determined?

Page 39

1           MATTHEW GREENBLATT
2       A.   It's subjective based on an overall
3   contribution to the firm.
4       Q.   How is FTI being compensated in
5   connection with this case?
6       A.   FTI bills on an hourly basis each
7   month.
8       Q.   And what is the hourly billing rate
9   for the Madoff matter?
10          MR. SONG:  Object to the form.
11      A.   For whom?
12      Q.   For FTI.
13      A.   For whom?  Each employee -- each team
14  member from FTI has a different billing rate,
15  depending on skill level and expertise and
16  experience.
17      Q.   I apologize.  What is your hourly --
18  what is your time billed out as?
19      A.   We are currently billing my time at
20  $554 an hour.
21      Q.   Has that rate changed over time?
22      A.   It has changed one time, yes.
23      Q.   When was that?
24      A.   In 2010 when I was promoted to senior
25  managing director.

Page 40

1           MATTHEW GREENBLATT
2       Q.   And what was your time billed out as
3   prior to -- prior to that promotion?
4       A.   I think it was $530 per hour.
5       Q.   How many -- how much has FTI billed
6   for you in connection with this case?
7       A.   For my time, specifically?
8       Q.   Yes.
9           MR. SONG:  And which case are you
10  referring to?
11          MS. BRONEN:  The Madoff case.
12          THE WITNESS:  I don't know that
13  number.
14  BY MS. BRONEN:
15      Q.   How much has FTI billed in connection
16  with the Merkin matter for your time?
17      A.   I don't know.  I don't know that
18  number.
19      Q.   More than $500,000?
20      A.   For my time personally?  I don't think
21  so, no.
22      Q.   More than $100,000?
23      A.   I would think so, yes.
24      Q.   How much has FTI billed in connection
25  with the Merkin matter for the time spent by

Page 41

1           MATTHEW GREENBLATT
2   your team?
3       A.   I think for the whole team it's
4   probably -- I don't know an exact number, but I
5   think it's around 500 or 600,000 for the whole
6   team.
7       Q.   Do you know how much FTI has billed in
8   connection with the entire Madoff matter?
9       A.   I don't know an exact number.
10      Q.   Do you have an approximation?
11      A.   I think it's approximately $150
12  million.
13      Q.   Are there any outstanding bills for
14  your time in connection with the Merkin matter?
15      A.   Not outside the ordinary course.  I
16  can't say "no" to that because we bill for
17  time -- we bill at inter -- we bill for time in
18  prior months when we get our bills out, so there
19  are time spent -- there is time spent for me,
20  but not outside the ordinary course of those
21  bills being outstanding.
22      Q.   Do you know approximately how much is
23  outstanding?
24      A.   I don't.
25      Q.   Are all of the materials you

Page 50

MATTHEW GREENBLATT

chronological listings of all of the cash and principal transactions.

So, in developing that methodology, it was determined that the appropriate means with which to calculate net equity for determination were the inflows and outflows that I summarized in my Global Report, the November 15 report. So those are the calculations -- those are the elements of the calculation.

Specifically excluded from that I was instructed to not account for, in these principal balance calculations, any of the fictitious trading, fictitious gains, or fictitious securities.

Q. So it wasn't you that determined the appropriate means to calculate net equity, correct?

A. The appropriate means to calculate net equity is a legal conclusion, and I have been asked to accumulate the data and prepare the calculation so that the net equity determinations can be made by the trustee and his counsel.

Q. But you're not offering any opinion as

Page 51

MATTHEW GREENBLATT

to the appropriateness of the method to calculate -- used to calculate net equity, correct?

A. You have asked that before, and I have answered it's a legal determination. It's not -- that's not what the opinions in my report are.

Q. And what do you mean "not account for fictitious securities"?

A. So, as I was instructed, I believe it's paragraph 18 in the Global Report, I was instructed to exclude in the principal balance calculation all things related to the fictitious trading. So the fictitious trading -- no credit is given for the portion of inter-account transfers -- I'm reading one sentence too far.

So no credit is given for gains or losses resulting from trades reflected on customer statements, and the principal balance calculation does not include any impact of the trading activity that was reflected on customer statements.

Q. Please turn to page 1 of your November 15 report.

Page 52

MATTHEW GREENBLATT

A. Yes.

Q. Does paragraph 5 accurately state the scope of your engagement in this matter?

MR. SONG: Object to the form.

A. What was the specific question? Does it accurately reflect?

Q. The scope of your engagement in the Merkin matter.

A. Well, with respect to this report, yes. I mean, there are other -- other components of the engagement that are not related to the Merkin matter, but for the Merkin matter and for the Principal Balance Calculation Report, yes, that summarizes the scope.

Q. Have you formed any professional opinions in connection with your work in the Merkin matter that are not set forth in your November 15 or March 20 reports?

A. With regard to principal balance or --

Q. With regard to anything. Have you formed any professional opinions in connection with your work on the Merkin matter that are not set forth in your November 15 or March 20 reports?

Page 53

MATTHEW GREENBLATT

MR. SONG: Object to the form.

A. With respect to the Merkin matter, no, I think the professional opinions that I have put forth are included here in this report.

Q. Do you intend to offer any opinions beyond what's contained in your November 15 and March 20 reports if you are called upon to testify at trial?

A. I don't think so, no.

Q. If called upon to testify at trial, do you intend to offer any opinions about the documents you have reviewed in connection with the Merkin matter that go beyond the opinions in your reports?

A. I don't think so, no.

Q. If called upon to testify, do you intend to offer any opinions about the testimony you have reviewed that go beyond the opinions in your reports?

A. I don't think so, no.

Q. Do you intend to offer any additional summary exhibits if called to testify at trial?

MR. SONG: Object to the form.

A. I may use certain demonstratives to

Page 58

MATTHEW GREENBLATT

1
2  A. Yes.
3  Q. What are some of the additional
4  transactions that you factored into the
5  principal balance calculation?
6  A. The inter-account transfers to and
7  from one BLMIS customer account to another and
8  the cash withdrawals in the form of payments
9  made by BLMIS on behalf of the account holders.
10 Q. Can you describe some of the
11 inter-account transfers that you factored into
12 your principal balance calculation?
13 A. Sure. In many instances, within the
14 BLMIS customer accounts, there are transfers of
15 funds from one account to another, and the
16 analysis requires that we identify the amount of
17 principal available in the account at the time
18 those funds are attempted to be transferred from
19 Account A to Account B, and so it'll show up on
20 a line item on a customer statement that says
21 transfer to Account XXX, and then on the other
22 account, it'll show a transfer from Account ZZZ,
23 and it'll have a dollar amount of an attempted
24 amount of funds to be transferred. It'll show
25 up that way on a customer statement.

Page 59

MATTHEW GREENBLATT

1
2  We have identified all of those line
3  items where funds were attempted to be
4  transferred from one to the other, and then we
5  look at how much principal was available in the
6  account at the time of that transfer and move
7  over only those funds up to the balance of
8  principal available in the transferor's account
9  at the time.
10 Q. What about the transfer of securities
11 between BLMIS accounts, did you factor that into
12 the principal balance calculation?
13 A. Those have all been reviewed and
14 considered, but as the fictitious trading has
15 been identified within Madoff, the securities
16 were not actually purchased, no securities
17 actually existed, so the securities could not be
18 moved from one account to another because they
19 didn't exist. So those have all been considered
20 and excluded from the calculation.
21 Q. And did you make the determination to
22 exclude the transfer of securities between BLMIS
23 accounts?
24 A. It was not my decision to be made. It
25 was part of the methodology that the trustee and

Page 60

MATTHEW GREENBLATT

1
2  his team had determined was the appropriate
3  method with which to calculate the net equity
4  balances.
5      So I identified all of those instances
6  of inter-account transfers of funds and
7  identified principal available in everybody's
8  account, and I identified all the instances of
9  transfers of reportedly held but fictitious
10 securities; and the decision was made that the
11 fictitious trading activity and the fictitious
12 securities, any fictitious gains generated, all
13 of the fictitious activity couldn't be moved
14 from one account to another, and only funds in
15 the form of principal could be moved in the
16 inter-account transfers.
17 Q. And you're not offering any opinion as
18 to the appropriateness of excluding the transfer
19 of securities between BLMIS accounts, correct?
20 A. It calls for a legal conclusion, so
21 all I'm offering is the calculation of the
22 methodology that accounts only for principal.
23 Q. Did you ever discuss factoring in the
24 transfer of securities between BLMIS accounts
25 into your principal balance calculation?

Page 61

MATTHEW GREENBLATT

1
2  MR. SONG: Object to the form.
3  A. It was part of the overall discussions
4  that took place during the reconstruction of the
5  books and records and the calculation of
6  principal balance, yes.
7  Q. And you discussed that with counsel?
8  MR. SONG: I caution the witness not
9  to divulge anything that's privileged, but
10 you can that question yes or no.
11 A. Yes.
12 Q. Did you discuss that decision -- the
13 decision to exclude the transfer of securities
14 between BLMIS accounts with anyone at FTI?
15 MR. SONG: Same caution.
16 A. Yes.
17 Q. And as a result of your discussions
18 with counsel, you decided to exclude the
19 transfer of securities between BLMIS accounts
20 from your calculations, correct?
21 MR. SONG: Object to the form.
22 A. So you say -- the question said I
23 decided?
24 Q. As a result of your discussions with
25 counsel, yes.

16

Page 62

MATTHEW GREENBLATT

A. I performed the calculation where it was determined that the appropriate method to calculate net equity or determine net equity was to account for all actual cash and principal transactions on the face of the BLMIS documents on the books and records that we were reconstructing in an effort to calculate the reality of the Madoff situation and to disallow any of the fictitious trading activity.

Q. You're the expert who signed these reports, correct?

A. Yes.

Q. And as the expert, you made the determination to exclude those transactions from the principal balance calculation, correct?

MR. SONG: Object to the form. Asked and answered.

A. I don't agree with that, no.

Q. Where in your report do you say that you're excluding the transfer of securities between BLMIS accounts from your principal balance calculation?

A. It's captured in paragraph 18, where it says, "The principal balance calculation does

Page 63

MATTHEW GREENBLATT

not include trading activity reflected on customer statements. At the direction of Trustee's counsel, no credit is given or removed for gains or losses resulting from trades reflected on customer statements."

Q. Is the transfer of securities from one BLMIS account to another a trade?

MR. SONG: Object to the form.

A. No, I wouldn't call it a trade.

Q. So where in your report do you say that you're excluding the transfers of securities between BLMIS accounts from your principal balance calculation?

A. It's implied in that sentence. It doesn't use the words, but the principal balance calculation doesn't include the trading activity. The direction I was provided was to prepare a calculation based on the inflows and the outflows that are in paragraph 17 and to not give any credit to any of the fictitiously purchased securities or any of the fictitious gains from fictitious sales of securities or any of that related trading activity.

So, in situations where securities

Page 64

MATTHEW GREENBLATT

that don't exist are attempted to be moved from Account A to Account B, the principal that exists in an account is not ignored; it's left in the transfer -- the principal is left in the transferor's account because the securities can't be moved.

Q. Paragraph 17 says you considered non-cash deposits, correct?

A. It says that, yes.

Q. Is a security that's being transferred from one BLMIS to another a non-cash deposit of principal?

A. In certain cases, yes. There are instances where BLMIS customers deposited real bonds or real securities from other brokerage accounts, and those were granted as principal to those account holders because they represented real non-cash deposits.

The fictitiously reported purchases of securities are treated differently because the fictitious trading never took place, so the securities listed on the vast majority of customer statements that were falsely reported as purchased, those securities never existed,

Page 65

MATTHEW GREENBLATT

BLMIS never had custody of those shares, and therefore, those shares couldn't be moved from Account A to Account B.

Q. When cash was transferred from one BLMIS account to another, was there actual cash being transferred?

A. And I never used the word "cash" being transferred because, no, cash was not transferred in inter-account transfers. It was a book entry, where liquid -- liquidly-available-looking funds were moved, but no cash ever changed hands.

Q. So it was just a book entry that you included in your principal balance calculation?

A. For the inter-account transfers? Question mark.

Q. Yes, for the inter-account transfers, it was just a book entry that you included in your principal balance calculation, correct?

A. Those inter-account transfers that are reflected in the principal balance calculation are book entries made to move funds from one account to another, and then the analysis that I described earlier was put on each one of those.

Page 74

1     MATTHEW GREENBLATT
2  B, whether Account B thought they were getting
3  them or not.  And in the situation of
4  fictitiously held securities that are attempted
5  to be delivered to the transferee, those
6  securities don't exist so the entire transaction
7  is considered to be part of the false reporting
8  within BLMIS, and so in that transaction,
9  nothing moves over and the principal stays with
10 the transferor.
11     Q.   In how many accounts did you observe
12 the transfer of fictitious securities?
13          MR. SONG:  Object to the form.
14          Are you referring to overall in BLMIS?
15          MS. BRONEN:  Yes.
16          THE WITNESS:  Overall, within BLMIS,
17    relative to the total number of accounts, a
18    very small percentage.  Of the 8,000-plus
19    accounts, I believe we identified it in less
20    than 50 or 60 of the accounts.  It was rare.
21 BY MS. BRONEN:
22     Q.   Did you maintain a list of those 50 or
23 60 accounts?
24     A.   Within the data that we have
25 collected, we have that information from the

Page 75

1     MATTHEW GREENBLATT
2  trading activity readily available from the
3  electronic record period.
4          If you remember, we talked earlier
5  about the December 1995 time period forward.  So
6  from December 1995 time period forward, we have
7  all of the fictitious trading electronically.
8  In the microfilm period, from November 1995
9  prior, we have the cash and principal
10 transactions available and included in our data.
11         So from December 1995 forward, yes, we
12 have all of the instances in which accounts
13 attempted to transfer or deliver fictitiously
14 held securities.
15     Q.   Are you aware of any instances in
16 which the trustee gave credit to the
17 transferor -- transferee of any portion of
18 fictitious securities?
19          MR. SONG:  Object to the form.
20     A.   When you say the trustee has given
21 credit, in what capacity?  Because I can tell
22 you that the calculations of principal balance
23 that were used to determine net equity, I don't
24 believe that to be the case.
25     Q.   Are there any other situations in

Page 76

1     MATTHEW GREENBLATT
2  which the trustee gave the transferee of
3  fictitious securities any benefit as a result of
4  those transfers?
5      A.   I mean, I'm not subject -- I'm not
6  privy to settlement discussions or any
7  negotiations that take place, but I suppose in
8  certain situations, the trustee could have
9  discussions like that.  But I can tell you that
10 in the calculations there is no credit granted
11 to any customer, Merkin or outside of
12 Merkin-related accounts, where any credit is
13 granted for the delivery of fictitiously held
14 securities.
15     Q.   Are there instances where you think it
16 would be appropriate to give credit for the --
17 to the transferee of a portion of the value of
18 the fictitious securities transferred?
19          MR. SONG:  Object to the form.
20     A.   And I'm not sure it's my place to
21 opine on appropriateness, but I believe that
22 this is the correct way to exclude the delivery
23 of fictitious securities from Account A to
24 Account B.  It's the correct way to account for
25 it under this methodology.

Page 77

1     MATTHEW GREENBLATT
2      Q.   Did you consider using any other
3  methodologies?
4      A.   No.
5      Q.   Did you discuss using any other
6  methodologies?
7      A.   I don't think so.  I think that, from
8  the very beginning of this case, I was tasked
9  with identifying cash and principal transactions
10 to calculate net equity consistent with this
11 methodology.
12     Q.   Why didn't you consider any other
13 methodologies?
14     A.   For the same reason I would say
15 before, which is the determination of net
16 equity, which is what these principal balance
17 calculations are used for, is a legal
18 conclusion, and I was taking my direction from
19 the trustee and his counsel.
20     Q.   You performed the principal balance
21 calculation for each of the Merkin Funds' BLMIS
22 accounts, correct?
23     A.   Correct.
24     Q.   And you determined that Ascot
25 Partners, Ariel Fund Limited, Gabriel Capital,

20

Page 78

MATTHEW GREENBLATT

L.P. were each net losers as of December 2008, correct?

A. And I want to say "yes" to that, but the term "net loser" I guess is a term of art in that situation. So when you say "net loser," what do you mean?

Q. What do you think I mean?

A. I think you mean that they had deposited more than they had withdrawn when the Ponzi scheme came to an end.

Q. And do you agree that Ascot Partners, Ariel Fund Limited, Gabriel Capital, L.P. had all deposited more than they had withdrawn?

A. I'm just going to confirm that answer, but "yes" is my answer. When you say Ariel Fund, Ariel -- did you say Ariel Fund or Ariel Capital?

Q. Ariel Fund Limited.

A. Yes.

Q. And turning to Exhibit 3D in your March 20 report.

A. Yes.

Q. You found that Ascot Partners had over $226 million of principal left in its account in

Page 79

MATTHEW GREENBLATT

December 11, 2008, correct?

A. Correct.

Q. And turning to Exhibit 3E, you determined that Ariel Fund had more than $175 million of principal left in its account on December 11, 2008, correct?

A. The -- and there were several Ariel funds, some of which ended previously with zero balances, but Ariel Fund Account 1FR070, yes.

Q. And turning to Exhibit 3F, you determined that Gabriel Capital, L.P. had more than $163 million of principal left in its account on December 11, 2008, correct?

A. Correct.

Q. And so, as you defined it, all three of these accounts were net losers, correct?

A. Correct.

Q. And turning to paragraph 96 of your report, your March 20 report, you also determined that of the more than $974 million in total principal invested in Ascot Partners' account, only about $490 million was ever withdrawn, correct?

MR. SONG: Object to the form.

Page 80

MATTHEW GREENBLATT

A. Yes. In --

Q. And --

A. In cash. Was withdrawn in cash.

Q. And turning to paragraph 117 of your March 20 report, you also determined that of the more than $226 million in total principal invested in Ariel Fund account, only about $16.5 million was ever withdrawn, correct?

A. There are three components to withdrawals. So, yes, I agree that approximately $16.2 million was withdrawn in direct cash payments from BLMIS, and then additional amounts of principal were withdrawn for payments made on their behalf to the IRS and other amounts of principal were withdrawn via inter-account transfer.

So if you are asking about cash payments, then I would clarify that a portion of that were payments made directly to the IRS on their behalf and a portion of it was paid to the account holder.

Q. Okay. And turning to paragraph 135 in your March 20 report, you determined that of the more than $283 million of principal invested in

Page 81

MATTHEW GREENBLATT

Gabriel Capital, L.P.'s BLMIS account, only $17.4 million in cash was ever withdrawn, correct?

A. Correct.

Q. And given that you stated that Ascot Partners, Ariel Fund and Gabriel Capital, L.P. lost $22- -- $226 million, $175 million and $163 million, respectively, when the BLMIS fraud was uncovered, you agree that, collectively, the funds lost -- the Merkin Funds lost more than $565 million in principal as a result of the fraud, correct?

MR. SONG: Object to the form.

A. Well, that's the math of adding those three across, but when you say lost as a result of the fraud, ultimately, if they're able to recover any, but at the moment, as that was -- I will testify that, yes, that was the amount of net losses as of December 11, 2008.

Q. And do you know what portion of those net losses belonged to Mr. Merkin and his family personally?

A. I do not.

Q. Please turn to Exhibit 4P of your

21

Page 82

1          MATTHEW GREENBLATT
2   March 20 report.
3       A.   Okay.
4       Q.   Turning to the last page of your
5   report, what we just discussed is that you
6   calculated that the net equity as of the time
7   the fraud was exposed was over $226 million,
8   correct?
9       A.   Correct.
10      Q.   And a portion of this net equity --
11      A.   Well, may I interrupt?  The principal
12  balance, because I am not computing net equity
13  claims here, I am computing principal balance
14  because, again, as we talked about, net equity
15  is a legal conclusion, so if we change my last
16  answer to yes, the ending principal balance was
17  more than $226 million.
18          The net equity, it's not for me to say
19  what the net equity claim is, as that's a legal
20  conclusion.  So I'm calculating principal
21  balances, and to the best of my knowledge, those
22  are then used to determine net equity; but I'm
23  not here to opine on net equity.
24      Q.   And what's the difference between net
25  equity and principal balance?

Page 83

1          MATTHEW GREENBLATT
2       A.   From my perspective, they're one and
3   the same because the principal balance is what's
4   used to make those net equity determinations,
5   but it's a legal conclusion and not one for me
6   to make.
7       Q.   So a portion of the principal balance
8   remaining in the Ascot Partners account is
9   attributable to a transfer from Account Number
10  1FN00530 on January 8, 2003; do you see that?
11      A.   I do.
12      Q.   And do you know that that account
13  number is an Ascot Fund account?
14      A.   I believe so, but let me please
15  confirm.
16          MR. SONG:  It's O.  Tab O.
17      A.   Yes, Ascot Fund Limited.
18      Q.   And if I'm reading your chart
19  correctly, according to the customer statements,
20  Ascot Fund transferred 5 -- over $551 million to
21  Ascot Partners on January 8, 2003, correct?
22      A.   The transaction listed on the customer
23  statement reflected that, yes, that was the
24  amount transferred on the BLMIS customer
25  statement.

Page 84

1          MATTHEW GREENBLATT
2       Q.   But you only credited just over $221
3   million to the Ascot Partners' account principal
4   balance because that was the available principal
5   balance that you had calculated to be in Ascot
6   Fund's account as of January 8, 2003, correct?
7       A.   Correct.
8       Q.   Okay.  Please turn to Exhibit 4O of
9   your March 20 report.
10      A.   Okay.
11      Q.   And do you see that on the last page
12  of that exhibit, there is the other side of that
13  transaction, where Ascot Partners is
14  transferring funds -- I mean where Ascot Fund is
15  transferring funds to Ascot Partners, correct?
16      A.   I see it, yes.
17      Q.   And columns 7 and 8 show the total
18  principal balance that you had calculated Ascot
19  Fund to have on January 8, 2003, correct?
20          MR. SONG:  Object to the form.
21      A.   Yes, column 8 shows the principal
22  available.  Column 7 shows the principal then
23  that was transferred to the transferee.
24      Q.   Okay.  And one of the transfers that
25  you factored into that total of $221 million in

Page 85

1          MATTHEW GREENBLATT
2   principal available in January of 2003 appears
3   on page 2 of Exhibit 4O at the top; it's a
4   transfer from account number 1FN0430 dated
5   January 4, 1993, correct?
6       A.   It was -- I think you missed one zero.
7   1FN00430, yes.
8       Q.   Okay.  And was this a transfer from
9   Ariel Fund to Ascot Fund?
10      A.   Yes.
11      Q.   And this transfer, according to the
12  customer statements, was in the amount of $35
13  million, correct?
14      A.   And change, yes.
15      Q.   And but you only credited about $13.6
16  million to Ascot Fund's principal balance,
17  correct?
18      A.   Correct.
19      Q.   And you only attributed that amount
20  because you had calculated that, as of January
21  4, 1993, Ariel Fund only had $13 --
22  approximately $13.6 million in principal balance
23  on that date, correct?
24      A.   Correct.
25      Q.   Okay.  Let's turn to Exhibit 4A of

22

Page 86

1  MATTHEW GREENBLATT
2  your March 20 report, and on page 3, toward the
3  bottom, is that transfer from Ariel Fund of
4  about $35 million to Ascot Fund on January 4,
5  1993, correct?
6      A.   Yes.
7      Q.   And then in column 8 is your
8  calculation of the principal balance available
9  in Ariel Fund in January of 1993, correct?
10     A.   Correct.
11     Q.   Please turn to page 2 of Exhibit A,
12 4A, of your March 20 report.
13     A.   Okay.
14     Q.   You credit a number of inter-account
15 transfers to Ariel Fund in calculating its
16 principal balance, correct?
17     A.   A number of transfers into?
18     Q.   You calculate -- yes.  In
19 calculating -- in calculating the principal
20 balance available in Ariel Fund in January 1993,
21 there are two transfers of principal credited to
22 Ariel Fund, correct?
23     A.   There are two transfers of principal
24 in, yes.
25     Q.   One of these transfers is a March 31,

Page 87

1  MATTHEW GREENBLATT
2  1992 transfer from BLMIS Account 1FN033?
3      A.   Correct, which you will see from that
4  line item at the time had the Account Number
5  105121-3-0.
6      Q.   And that's a Shalvah account, correct?
7      A.   That is correct.
8      Q.   And did you credit any other transfers
9  from Shalvah Fund to Ariel Fund --
10     A.   Yes.
11     Q.   -- in calculating the principal
12 balance?
13     A.   Yes.
14     Q.   Okay.  Where is that?
15     A.   The last line item, on May 29, 1992,
16 the last line item on page 2.
17     Q.   Were there any other transfers from
18 Shalvah to Ariel Fund included in your principal
19 balance calculation to Ariel Fund?
20     A.   Those were the only two transfers of
21 funds from Shalvah to Ariel Fund.  There was, as
22 we've been talking about for a while, there was
23 a transfer or a delivery of fictitiously
24 reported securities from Shalvah to Ariel, but
25 the securities didn't exist and, therefore,

Page 88

1  MATTHEW GREENBLATT
2  aren't included on this calculation.
3      Q.   Did the funds exist?
4      A.   The column 8 will tell you how much
5  principal was available in the account at the
6  time of each of those transfers.  So, yes, there
7  were -- they were in a positive principal
8  balance at the time, but, as we discussed
9  earlier, because the fictitious securities
10 didn't exist, they couldn't be delivered.
11     Q.   And you understand that Shalvah's
12 account was closed in about 1992, correct?
13         MR. SONG:  Object to the form.
14     A.   I know that the account activity
15 ceased, and I'm not sure whether or not it was
16 closed officially within Madoff's system or not,
17 but I know the account activity ceased and that
18 this was the account holder's final -- final set
19 of transactions within that account.
20     Q.   And as BLMIS operated, there was
21 nothing left in the account as of 1992, correct?
22         MR. SONG:  Object to the form.
23     A.   I believe that's the case, yes.  I'm
24 not sure when in 1992.  I believe in October or
25 November of 1992, yes.

Page 89

1  MATTHEW GREENBLATT
2      Q.   But you calculated that Shalvah had a
3  principal balance of 9. -- about $9.7 million in
4  October of 1992, correct?
5      A.   Correct.
6      Q.   And based on your calculations, you
7  would credit a principal balance of $9.7 million
8  to Shalvah as of December 11, 2008, correct?
9      A.   Correct, that's their principal
10 balance from October of 1992 continuing through
11 to December 11 of 2008.
12     Q.   And that's because you didn't reduce
13 that balance based on the securities transferred
14 out of the Shalvah account, correct?
15     A.   Because the fictitious securities
16 didn't exist, correct.
17     Q.   And you did not give Ariel Fund credit
18 for the transfer of those securities, correct?
19     A.   Correct.
20         MS. BRONEN:  Let's take a five-minute
21 break.
22         THE VIDEOGRAPHER:  We are going off
23 the record.  The time is 1:19 p.m.
24         (Recess.)
25         THE VIDEOGRAPHER:  The time is 1:33

23