# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF<br>    Debtor, | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>v.<br><br>J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., GABRIEL CAPITAL CORPORATION,<br><br>    Defendants. | Adv. Pro. No. 09-1182 (SMB) |

# DECLARATION OF
# DR. STEVE POMERANTZ

I, Steve Pomerantz, hereby declare, under penalty of perjury:

1. I am president of Steve Pomerantz LLC, an economic and financial consulting firm located in New York, NY, where I provide economic and investment management consulting, economic damage assessment and litigation support.

2. I was retained in this matter by Irving H. Picard, Trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff") and by Baker & Hostetler, LLP ("Baker"), counsel for the Trustee.[1]  Attached as **Exhibit 1** is a true and correct copy of my Initial Expert Report and certain appendices dated March 20, 2015, and submitted to Defendants on or about March 20, 2015 (and a corrected version submitted on April 13, 2015) (the "Expert Report").[2]  Attached as Exhibit 9(a) to the Declaration of Neil A. Steiner in Support of Defendants' Motions for Summary Judgment, dated October 7, 2015, is a true and correct copy of my Rebuttal Expert Report and appendices dated May 15, 2015 (the "Rebuttal Report").  I hereby incorporate by reference the contents of the Expert Report, Rebuttal Report, and all appendices attached thereto as my sworn testimony as if fully set forth herein.  All capitalized terms not defined herein shall have the meaning assigned to them in the Expert Report and Rebuttal Report.

3. The opinions rendered in the Expert Report and the bases thereof are detailed in various sections of the Expert Report, including, but not limited to, Section V, Section VI and Appendix II which identify (a) the methodology I employed and/or supervised in connection with the analyses performed, and (b) the sources of information and data that form the basis of my findings, conclusions, and opinions.

4. I received a Ph.D. in Mathematics from the University of California at Berkeley and a B.A. in Mathematics from Queens College of the City University of New York.  My experience in the investment management industry spans nearly 30 years.  During my career, I have held positions in research and management for fixed income, equities, derivatives, and alternative investments at major firms including Morgan Stanley, Citibank, and Weiss Peck & Greer LLC. I have also consulted for alternative investment

---

[1] I retained Duff & Phelps, LLC, a valuation and corporate finance advisory firm ("D&P") to assist me in the preparation of this report. Employees of D&P worked under my direction and supervision in the preparation of work supporting my opinions contained herein.

[2] Included as part of Exhibit 1 to this declaration are Appendices I – XII to the Expert Report.  Appendices XIII – XVI are voluminous electronic files and are therefore available upon request.

1

management firms including New York Life Investment Management. A true and correct description of my background and qualifications is set forth in the Expert Report at ¶¶7-19 and Appendix I. Attached as **Exhibit 2** is a current and accurate copy of my curriculum vitae and a list of court and deposition appearances.

5. I reviewed the Joint Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1 in Support of Defendants' Motions for Summary Judgment ("JSOMF"), the Defendants J. Ezra Merkin and Gabriel Capital Corporation's Memorandum of Law in Support of their Motion for Summary Judgment, the Memorandum of Law in Support of the Motion for Summary Judgment of Defendants Ascot Partners, L.P., and Ascot Fund Ltd., and the Declaration of Neil A. Steiner in Support of Defendants' Motions for Summary Judgment, filed October 8, 2015. I submit this declaration in support of the Trustee's Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment.

6. In the investment management industry, a comprehensive template or framework for conducting due diligence centers around the Five Ps – consisting of Process, Portfolio, People, Performance, and Price. The Five Ps framework is an organization of the due diligence tools typically used to evaluate an investment in accordance with the customs and practices of the investment management industry. The specific tools used to evaluate a particular investment depend on the amount of information available to the Fund Manager, as well as the results of due diligence. (Pomerantz Dep. 189:12-191:21; Expert Report at ¶¶49-76). For example, if due diligence reveals a red flag that is an indicia of fraud or creates an opportunity for fraud, it is industry custom and practice for the Fund Manager to perform additional due diligence to determine whether that red flag leads to yet another red flag. However, not every due diligence tool is required (or possible) with every due diligence analysis. For example, it may not be possible or necessary to use certain tools in the framework if there is not sufficient information available or if returns are consistent with expected returns for the strategy. (Expert Report at ¶¶49-76).

7. In 2005, I performed due diligence on a client's investment in a BLMIS feeder fund. Using the information available to me at that time, I applied the Five Ps framework to that investment. My analysis showed that the returns for that feeder fund were not consistent with the strategy as stated by BLMIS. I then presented my findings to the client—that Madoff was likely engaged in front running or some other fraud—and that my client should divest from the feeder fund.

2

8. Reverse engineering, part of the Portfolio analysis, is a due diligence tool that can be used under appropriate circumstances. (*See, e.g.*, Expert Report ¶23, ¶83). For example, when performing due diligence on the Madoff SSC strategy in 2005, I observed that the stated monthly returns were entirely inconsistent with this strategy. Through reverse engineering, I attempted to replicate the strategy so that I could evaluate the risks and returns of the investment. In doing so it became apparent to me that the reported returns were not consistent with the Madoff SSC strategy. Specifically, the reported BLMIS-based returns were less volatile than they should have been based on the elements of the Madoff SSC strategy. As a result, I became convinced that Madoff was not performing any version of the SSC strategy and was likely engaged in front-running or some other fraud. I ultimately recommended that my client divest. (Expert Report at ¶28).

9. The due diligence that I performed on an index fund on behalf of IFIC[3] is not a relevant comparison to Merkin's purported due diligence on BLMIS. An index fund's strategy is to match the returns of an index. A basic tenet of due diligence is to confirm whether an investment performs as it should. Unlike BLMIS, where the returns did not match the stated strategy, the performance of the index fund I analyzed was consistent with the performance of the index it was supposed to match. The Russell 3000 index fund performed as expected, and therefore I did not need to look at trade confirmations for it or verify that the fund owned all 3,000 holdings in the index. (Pomerantz Dep. 61:5-23).

10. Similarly, Goldman Sachs acting as its own broker-dealer with respect to an index fund is not comparable to BLMIS acting as its own broker-dealer. Unlike BLMIS, Goldman Sachs is a large multi-national entity with multiple divisions, each with separate responsibilities and leadership. Specifically, the broker-dealer and the asset management businesses are two distinct entities at Goldman Sachs led by different people. Alternatively, Madoff served as his own broker-dealer, custodian and administrator. (Pomerantz Dep. 59:24-60:10; Expert Report at ¶¶46-48, 169).

11. In conducting ongoing due diligence on behalf of IFIC, I based my activities on my consistent findings that the funds were performing consistent with the stated strategy, a crucial component of due diligence. (Pomerantz Dep. 61:22-23). As such, I did not rely solely on Goldman Sachs' reputation and my meetings with staff, but used those as tools to continue to monitor the investment according to industry customs and practices. My meetings with Goldman Sachs included several people, many of whom were PhD's,

---

[3] ¶194 of the JSOMF confuses my work performed on behalf of Verizon with that performed on behalf of IFIC. The index fund at Goldman Sachs discussed in ¶194 related to my due diligence on behalf of IFIC.

3

including Goldman Sachs partner Fischer Black, co-author of the Black-Scholes equation, Goldman Sachs partner Bob Litterman, co-author of the Black-Litterman model, and Emanuel Derman, professor at Columbia, PhD in physics, and co-author of the Black-Derman-Toy model.

12. Prior to September 2006, the back of trade confirmations for the Merkin BLMIS Accounts stated that the trade price "includes a commission equivalent of $.04 per share."[4] (*See, e.g.*, BS00013594 at 595). Therefore, conducting any analysis based on share prices prior to September 2006 would require removing this commission from the reported price.

13. As such, in order to conduct my analyses, I adjusted reported prices prior to September 2006 by $0.04 to account for the commission purportedly included in the prices reported by BLMIS. Failure to remove the $0.04 commission from the reported trade price is commensurate with assuming that BLMIS did not charge any fees for the purported investment advisor services. That is, if the reported trade prices were not adjusted for commissions, it would imply that Madoff did not make any money from the Merkin BLMIS Accounts, which is inconsistent with Merkin's testimony. (*In re Madoff Charities Investigation*, Merkin Dep. 42:14-24, January 30, 2009).

14. Furthermore, even if the pre-September 2006 reported prices are not adjusted for the commissions included in the price, the out-of-range and VWAP analyses still result in red flags. As stated below, the difference is negligible whether accounting for commissions or not. Specifically, even when not adjusting the prices for commissions:

- There are 462 transactions across the Merkin BLMIS Accounts with reported equity prices outside of the daily price range on the day the trade was made.
- The total dollar amount purportedly gained through out-of-range equity transactions is still over $8.8 million (compared to $10.3 million when accounting for commissions).
- 78.3% of the purported buy transactions were executed below VWAP for the Merkin BLMIS Accounts from January 1996 to November 2008 (as compared to 81.3% when accounting for commissions), and 70.4% of purported sell transactions were executed above VWAP (as compared to 74.9% when accounting for commissions).

---

[4] Beginning in September 2006, when BLMIS registered as an RIA, commissions were reflected on customer statements and trade confirms, rather than in the reported share price.

4

- On average, BLMIS purportedly bought shares $0.38 per share below VWAP and purportedly sold shares $0.29 per share above VWAP (as compared to buying shares $0.39 below VWAP and selling shares $0.30 above VWAP when accounting for commissions).
- There were no errors or manipulation of the trade data. As discussed here and in my report, I adjusted for the $0.04 commission based on the representation on the BLMIS trade confirmations and Mr. Merkin's testimony.

15. Most of the investment opportunities I have performed due diligence on do not provide trade confirmations to investors. However, in the situations where trade confirmations are available to me as part of my due diligence process, the relevant information is inputted from the trade confirmations into spreadsheets or other computer programs in order for me to perform my analysis. (Pomerantz Dep. 100:9-18).

16. It has also been my experience that the availability of trade level data varies based on the type of investment. In those situations where trade level data is available – as was the case for the Merkin BLMIS Accounts – I have compared transaction prices to VWAP as part of my due diligence process. (Pomerantz Dep. 101:12-16). I have never had a need to look at stock transaction prices compared to daily highs and lows where trade level data is available because, in each of these situations, the results of my VWAP analysis, as well as other due diligence I performed, showed that the investments performed consistently with how the strategies were expected to perform. However, had the results of due diligence raised red flags, including that the returns were inconsistent with how the strategies were expected to perform, as was the case with the Merkin BLMIS Accounts, then I would have conducted additional due diligence, which may have included a comparison of transaction prices to daily highs and lows.

17. Performance data for Princeton/Newport was not publicly available. Ridgeline[5] was not included in my Hedge Fund Peer Group because returns were only available from August 1994 through September 2000 (i.e., less than 10 years). Even over this shortened time period, the Merkin BLMIS Accounts still outperformed Ridgeline across all of the metrics that I analyzed.

---

[5] The JSOMF refers to "Princeton/Newport" and "Ridgewood." There was a fund in the BarclayHedge database named Ridgewood Asset Management, Inc., but there were no returns available. I instead considered Ridgeline, a fund managed by Edward Thorp, who managed Princeton/Newport. Thorp Dep. 158:18-159:10.

5

18. As part of my Performance analysis, in my peer analysis of Elite Investment Advisors, I included Renaissance, Soros and Millennium.[6] The Merkin BLMIS Accounts outperformed these funds across all metrics. (Expert Report ¶¶282-291). I considered including Elliott Associates and SAC Capital in my analysis, but ultimately did not include them because performance data was not publicly available. (Expert Report ¶282). Baupost and Princeton/Newport were also not included because performance data was not publicly available. SMN Diversified Futures Fund, Eclectica Fund and Episode Inc. were not included in my Hedge Fund Peer Group because they did not implement comparable strategies to the Madoff SSC strategy. (*See* Expert Report ¶¶248-250). Even if these funds were included, their Sharpe Ratios were still lower than the Sharpe Ratio for the Merkin BLMIS Accounts, and the Merkin BLMIS Accounts outperformed the funds across all of the metrics that I analyzed. As discussed above, Ridgeline was not included in my analysis because returns were only available from August 1994 through September 2000, though even over this shortened time period, the Merkin BLMIS Accounts still outperformed Ridgeline across all of the metrics that I analyzed.

19. The peer analysis presented in the Expert Report includes six metrics: (i) Sharpe Ratio; (ii) Sortino Ratio; (iii) number or percent of positive months; (iv) number or percent of negative months; (v) maximum drawdown; and (vi) number of months in drawdown. BLMIS outperformed its peers to a degree of statistical improbability, if not impossibility, across all six performance metrics, all peer groups, and for all time periods considered. BLMIS's outperformance of all peers over the observed time periods was a red flag that should have prompted additional quantitative due diligence. While a higher Sharpe Ratio, for example, is preferable, it is a statistical improbability that any fund manager could maintain such a high Sharpe Ratio over the period maintained by BLMIS.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America, to the best of my knowledge that the foregoing is true and correct.

Executed on this 24th day of November, 2015 in New York, New York.

_____

By: Dr. Steve Pomerantz

---

[6] Monthly returns for the Renaissance Medallion Fund were not publicly available. I instead used returns for Renaissance Institutional Equities Fund, LLC – Series BB as representative of returns for Jim Simons in my peer analysis of Elite Investment Advisors.

6