# EXHIBIT H

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 09-01182 (SMB) |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

## TRUSTEE'S RESPONSE TO DEFENDANTS' JOINT STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL BANKRUPTCY RULE 7056-1

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of

the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities

Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*,[1] and the estate of Bernard L. Madoff

---

[1] For convenience, all subsequent references to SIPA shall omit "15 U.S.C."

("Madoff"), respectfully submits the following Response to the Joint Statement of Material Facts submitted by Defendants J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC") (collectively, "Merkin Defendants"), and Ralph C. Dawson, as Receiver for Ascot Partners, L.P. ("Ascot Partners"), and Ascot Fund Limited ("Ascot Fund") (Ascot Partners and Ascot Fund, collectively "Ascot Defendants").

## I.    Procedural History

1.    On December 11, 2008, Bernard L. Madoff ("Madoff") was arrested and the Securities and Exchange Commission ("SEC") initiated a fraud action against him after learning that he had confessed to committing fraud in connection with his business, Bernard L. Madoff Investment Securities LLC ("BLMIS"). *United States v. Madoff*, 586 F. Supp. 2d 240, 244-45 (S.D.N.Y. 2009).

**Trustee's Response:**  Disputed as incomplete.  The SEC's action also was asserted against BLMIS.  Compl., *SEC v. Madoff*, No. 08 CIV 10791 (S.D.N.Y. 2008), ECF No. 1.  On December 15, 2008, under § 78eee (a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Application of SIPC at 10, *SEC v. Madoff*, No. 08 CIV 10791 (S.D.N.Y. 2008), ECF No. 5. Thereafter, SIPC filed an application in the District Court for the Southern District of New York that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protection afforded by the Securities Investor Protection Act ("SIPA").  *Id.* at 2-3.  Additionally, on December 11, 2008, the United States Government initiated a criminal action against Madoff for criminal violations of federal securities laws, including, *inter alia*, securities fraud, investment advisor fraud, and mail and wire fraud. Compl., *United States v. Madoff*, No. 08 MJ 02735 (S.D.N.Y. 2008), ECF No. 1.

2.      Less than a week later, the United States District Court for the District of New York appointed Irving H. Picard as Trustee for BLMIS, and the Securities Investor Protection Corporation ("SIPC") then removed the case ("the SIPA Proceeding") to this Court.  Order, *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Dec. 16, 2008), ECF No. 1.

**Trustee's Response:**  Disputed as incomplete.  It is undisputed that, upon SIPC's application to the Court, Irving H. Picard was appointed as the Trustee for the liquidation of the business of BLMIS on December 15, 2008.  Order at II, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Dec. 15, 2008).  As set forth in the Order, the Trustee was vested with all of the duties and powers of a trustee prescribed in SIPA.  *Id.*  The District Court, not SIPC, removed the SIPA Proceeding to this Court.  *Id.* at IX.

3.      On December 23, 2008, Bankruptcy Judge Burton R. Lifland entered a Claims Procedures Order, which directed creditors to file claims with the Trustee no later than July 2, 2009.  Order, *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC* , No. 08-1789 (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.

**Trustee's Response:**  Disputed as incomplete.  It is undisputed that on December 23, 2008, this Court entered the Claims Procedures Order.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.  The Claims Procedure Order directed the Trustee to, among other things, mail claims forms by January 9, 2008 and that the bar date for all claims would be six months from the date of mailing.  *Id.* at 2, 7.

4.      The Merkin Defendants did not file customer claims or any other claims in the proceeding.  *See* Declaration of Neil A. Steiner ("Steiner Decl.") at ¶ 3.

**Trustee's Response:**  Not disputed.


5.      Ascot Partners filed a customer claim on March 3, 2009.   Steiner Decl. Ex. 82 (Ascot claim form).

**Trustee's Response:**  Not disputed.


6.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. Involuntary Petition, *In re Bernard L. Madoff*, 09-11893 (Bankr. S.D.N.Y. Apr. 13, 2009), ECF No. 1.

**Trustee's Response:**  Not disputed.


7.      On June 10, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the SIPA Proceeding.  Consent Order, *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252.

**Trustee's Response:**  Not disputed, but the Trustee notes the Consent Order was signed on June 9, 2009.


8.      The Trustee filed an initial complaint against the Merkin Defendants on May 7, 2009.  Complaint, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. May 7, 2009), ECF No. 1.

**Trustee's Response:**  Not disputed.

9.      The Trustee filed the Amended Complaint on August 6, 2009.  Am. Compl.,

*Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Aug. 6, 2009), ECF No. 10.

**Trustee's Response:**  Not disputed.


10.      The Trustee filed the Second Amended Complaint on December 23, 2009. Second

Am. Compl., *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Dec. 23, 2009), ECF No. 49.

**Trustee's Response:**  Not disputed.


11.      On August 30, 2013, the Trustee filed the Third Amended Complaint ("TAC"),

alleging 13 claims for, *inter alia*, avoidance of preferential and fraudulent transfers, recovery of

subsequent transfers, and disallowance and equitable subordination of the net equity claims of

the Defendant Funds.  Third Am. Compl., *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y.

Aug. 30, 2013), ECF No. 151.

**Trustee's Response:**  Disputed as incomplete.  The TAC added Ascot Fund as a

defendant to this action.


12.      Defendants moved to dismiss the TAC on October 11, 2013.  Defendants J. Ezra

Merkin's and Gabriel Capital Corporation's Notice of Motion, *Picard v. Merkin*, No. 09-01182

(Bankr. S.D.N.Y. Oct. 11, 2013), ECF No. 165; Defendant Ascot Partners, L.P.'s Notice of

Motion to Dismiss, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Oct. 11, 2013), ECF

No.168.

**Trustee's Response:**  Disputed as incomplete and inaccurate.  Defendant Ascot Fund did

not file its motion to dismiss the TAC until December 20, 2013.  Motion to Dismiss Adversary

Proceeding and to Sever, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Dec. 20, 2013),

ECF No. 182.

13.    On August 12, 2014, this Court dismissed nine of the Trustee's claims.

Memorandum Decision, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Aug. 12, 2014), ECF

No. 212.

**Trustee's Response:**  Not disputed.

14.    The Court held that the TAC failed to plead factual allegations that, if true, would

show that Merkin had actual knowledge of Madoff's scheme.  *Id.* at 29-30.

**Trustee's Response:**  Disputed as it mischaracterizes the actual knowledge standard and

this Court's conclusion that the TAC did not plausibly allege that Merkin had "actual knowledge

of Madoff's Ponzi scheme."  Memorandum Decision at 30, *Picard v. Merkin*, No. 09-01182

(Bankr. S.D.N.Y. Aug. 12, 2014), ECF No. 212.

15.    The Court therefore limited the Trustee's avoidance claims to alleged fraudulent

transfers made within a two-year period after the SIPA Proceeding was filed.  *Id.* at 50-51.  The

Court denied the motion to dismiss the Trustee's claims to recover all or a portion of any avoided

transfers from the Merkin Defendants as subsequent transferees and from Merkin as the general

partner of Ascot Partners.  *Id.* at 51.  The Court allowed the Trustee to maintain his equitable

subordination claim as an alternative remedy to his claims for monetary damages.  *Id.* at 66.  All

of the Trustee's other claims were dismissed.  *Id.* at 3.

**Trustee's Response:**  Disputed as incomplete and inaccurate.  The Court allowed the Trustee to pursue alleged fraudulent transfers made during the two years *before* the Filing Date. *Id.* at 51 (emphasis added).  Additionally, the Court further allowed the Trustee to pursue, *inter alia*, the recovery of all or a portion of avoided transfers Ascot Fund received as a subsequent transferee.  *Id.* at 50-51.

## II.    The Parties Have Engaged in Extensive Discovery

16.    Over the past six years, Defendants and the Trustee have engaged in extensive discovery.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.

17.    The parties have produced more than 15 million pages of discovery.  The parties have taken 40 depositions in this case, including seven expert depositions.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.

18.    The Trustee's experts have involved more than 100 people in investigations related to the SIPA proceeding, including 75-80 experts that spent approximately eight months assisting Dubinsky on his analysis.  Steiner Decl. Ex. 1 (Collura Dep.) at 14:17-22; Ex. 4 (Dubinsky Dep.) at 32:6-33:11.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  The statement is also

disputed as incomplete and misleading as it misattributes work that FTI and Duff & Phelps performed in connection with the entire SIPA Proceeding, not just this adversary proceeding. Declaration of Lan Hoang, dated November 25, 2015 ("Hoang Decl."), Exhibit 1 (Dubinsky Dep.) at 17:6-8; Collura Decl., Ex. 1 (Collura Expert Report) ¶¶ 11, 20.  Additionally, this statement is disputed as not supported by the evidence, as Bruce G. Dubinsky ("Dubinsky") did not testify that the 75-80 people supporting him were "experts."  Hoang Decl. Ex. 1 (Dubinsky Dep.) at 32:6-33:11.


19.     The Trustee spent approximately $31-32 million on expert services from the firm Duff & Phelps, Steiner Decl. Ex. 4 (Dubinsky Dep.) at 30:3-31:12, which provided support to Dubinsky in his effort to determine whether "there was fraud at BLMIS, to determine if it was a Ponzi scheme, to look at the solvency, and to look at whether MSIL, which was the European entity of Madoff, was involved." Steiner Decl. Ex. 4 (Dubinsky Dep.) at 17:6-14.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  Dubinsky and his team were retained to render certain expert opinions and conclusions in accordance with applicable professional standards.  Declaration of Bruce G. Dubinsky, dated November 25, 2015 ("Dubinksy Decl."), Exhibit 1 (Dubinsky Expert Report) ¶¶ 1, 7-8, 10, 13.  They reviewed numerous sources of information related to all aspects of BLMIS's businesses.  *Id.* ¶ 13.  The work that Dubinsky performed to reach his conclusions to a degree of reasonable certainty has no relevance to the issue of whether the Defendants willfully blinded themselves to Madoff's fraudulent scheme based on the information that was available to them.  This statement is further disputed as incomplete and misleading as the figure also includes work Duff & Phelps performed

for Dr. Steve Pomerantz.  Hoang Decl. Ex. 1 (Dubinsky Dep.) at 31:6-12.

### III.    BLMIS's Wide-Ranging Fraud

20.    Madoff founded BLMIS in 1960.  BLMIS was an SEC-registered broker-dealer and had a market making business in an off-exchange trading of New York Stock Exchange ("NYSE") stocks.  Steiner Decl. Ex. 5 (Dubinsky Report), at ¶ 35; Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

**Trustee's Response:**  Disputed as incomplete and misleading.  It is undisputed that Madoff founded BLMIS in 1960 as a sole proprietorship.  Dubinsky Decl. Ex. 1 (Dubinsky Expert Report) ¶ 35.  BLMIS was registered as a broker-dealer with the SEC as of January 19, 1960.  *Id.* It purported to operate three business units: (i) a market-making business; (ii) a proprietary trading business; and (iii) an investment advisory business (the "IA Business").  *Id.* ¶ 35.  Madoff operated a Ponzi scheme through the IA Business.  *Id.* ¶¶ 264-89.  The proprietary trading business provided executions for broker-dealers, banks, and financial institutions.  *Id.* ¶ 45.  The market-making business was a market maker primarily in S&P 500 stocks, U.S. convertible bonds, preferred stocks, warrants, units and rights.  *Id.* The assertion that BLMIS's market-making business traded solely in NYSE stocks is disputed as incomplete and misleading. BLMIS's website from 1998 states, "The firm is not only a leading market-maker in all of the S&P 500 stocks as well as over 100 NASDAQ issues . . . ."  *Id.* ¶ 45 n.28.

21.    BLMIS registered as an investment advisor with the SEC in August of 2006.  *See* Steiner Decl. Ex. 75 at 8 (BLMIS Form ADV dated Aug. 25, 2006).

**Trustee's Response:**  Disputed as incomplete and misleading.  BLMIS should have registered with the SEC as an investment advisor beginning in 1979, when the Uniform Application for Investment Adviser Registration ("Form ADV") was required for investment advisors.  Dubinksy Decl. Ex. 1 (Dubinsky Expert Report) ¶ 240.  Investment advisors with 15 or more clients must register with the SEC by filing Form ADV.  *Id.* ¶ 241.  BLMIS did not register as an investment advisor until August 2006.  *Id.*

22.    In 2008, BLMIS reported approximately $17.1 billion in assets under management.  *See* Steiner Decl. Ex. 76 at 8 (BLMIS Form ADV dated Jan. 7, 2008).

**Trustee's Response:**  Disputed as incomplete and misleading.  It is not disputed that BLMIS reported $17.1 billion in assets under management on January 7, 2008.  BLMIS publicly reported that it managed approximately $11.7 billion in assets under management on its August 25, 2006 Form ADV and $13.2 billion in assets under management on its 2007 Annual Amendment to its Form ADV.  Hoang Decl. Ex. 2 (August 25, 2006 BLMIS Form ADV) at PUBLIC0003736; Hoang Decl. Ex. 3 (January 24, 2007 BLMIS Form ADV) at PUBLIC0003771.

23.    As of December 31, 2007, BLMIS had approximately 4,900 active customer accounts with a purported value of $74 billion under management.  Steiner Decl. Ex. 4 at (Dubinsky Report) ¶ 242.

**Trustee's Response:**  Not disputed.

24.    Over the life of the business, Madoff had over 8,000 customer accounts.  *Id.*

**Trustee's Response:**  Not disputed.


25.    One portion of BLMIS's business involved managing investments in customer

accounts on a discretionary basis (the "IA Business").  Steiner Decl. Ex. 4 (Dubinsky Report), at

¶ 35.

**Trustee's Response:**    Disputed as incomplete and misleading.    BLMIS purported to

"manage" customers' investments in the IA Business.  Dubinksy Decl. Ex. 1 (Dubinsky Expert

Report) ¶ 18.


26.    Madoff purportedly followed a "split-strike conversion" strategy in managing

customer accounts.  *Id.* at ¶¶ 40-41.

**Trustee's Response:**  Disputed as incomplete.  The split-strike conversion strategy

("SSC strategy") was among the strategies that were purportedly implemented at BLMIS during

various time periods.  Dubinksy Decl. Ex. 1 (Dubinsky Expert Report) ¶ 40.  BLMIS never

engaged in the split-strike conversion securities trades reported on customer statements between

the 1990s and 2008.  *Id.* ¶¶ 127-53.


27.    The split-strike conversion strategy purportedly entailed purchasing a basket of

common stocks from within the Standard & Poor's ("S&P") 100 Index, buying a put on the S&P

100 Index and selling a call on the S&P 100 Index.  *Id.* at ¶ 43.

**Trustee's Response:**  Disputed as incomplete.  BLMIS initially purported to execute the

SSC strategy using individual stocks and options on individual stocks.  Declaration of Dr. Steve

Pomerantz, dated November 25, 2015 ("Pomerantz Decl."), Exhibit 1 (Pomerantz Expert Report)

¶ 105.  This is reflected in the Merkin Funds' BLMIS customer account statements through 1991.  *Id.* ¶ 105 n.117.  Beginning in 1991, Madoff purportedly began to implement the strategy using a basket of stocks in the S&P 100 Index, selling call options on the Index, and buying put options on the Index.  *Id.* ¶ 158; *see infra* ¶ 110.

28.    A split-strike conversion strategy reduces a portfolio's volatility (and risk) by limiting the investor's possible gains and losses.  *See id.* at ¶¶ 128-29.

**Trustee's Response:**  Disputed as incomplete.  A SSC strategy cannot completely eliminate risk.  A properly designed and executed SSC strategy would trade with the same or very similar volatility as the S&P 100 Index (or other market index) anytime the market value of the equity portfolio falls between the exercise prices of the options.  Dubinsky Decl. Ex. 1 (Dubinsky Expert Report) ¶¶ 129-30; Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 115, 120.

29.    As Merkin understood the strategy, Madoff was buying a basket of fully hedged positions.  So, while the strategy was not riskless, it was hedged, such that Ascot Partners "had limited risk and limited upside." Steiner Decl. Ex. 84 (Merkin Dep.) at 110:21-112:19.

**Trustee's Response:**  Disputed as incomplete.  As Merkin saw from the statements for the Merkin BLMIS Accounts[2], there were over 300 occasions where changes to the basket of equities purportedly purchased for the Defendants' BLMIS accounts did not reflect

---

[2]  Gabriel's, Ariel's, Ascot Partners', and Ascot Fund's BLMIS accounts are collectively referred to herein as the "Merkin BLMIS Accounts."

corresponding changes to the options used to hedge the equity position. Pomerantz Decl. Ex. 1

(Pomerantz Expert Report) ¶ 137.


30.    BLMIS used sophisticated software that was created and built in-house to

facilitate the fraud. *See* Steiner Decl. Ex. 4 (Dubinsky Report), at ¶¶ 214-35.

**Trustee's Response:**  Disputed as incomplete and misleading.  The IA Business relied on

an AS/400 computer along with a local area network of personal computers to generate the

documentation necessary to support the fictitious trading activity.  Dubinsky Decl. Ex. 1

(Dubinsky Expert Report) ¶ 216.  The software used by IA Business employees was not

"sophisticated."  It was primarily built in-house but supported partially by commercially

available, off-the-shelf software, and utilized code developed in the late 1970s through the early-

to-mid 1980s.  *Id.* ¶¶ 217, 220.  Further, the IA Business's Report Program Generator software,

the software used to maintain the information related to customer accounts, did not communicate

with any of the standard platforms typically found in a trading and / or investment environment.

*Id.* ¶¶ 80, 217.


31.    The software "mimicked and back-filled the output that normally would be the

result of trades actually being executed by a system using trading algorithms," and provided

customers with hundreds of thousands of falsified customer statements and trade confirmations

in furtherance of the fraudulent scheme.  *See id.* at ¶¶ 221, 224.

**Trustee's Response:**  Not disputed.

32.    The IA Business custom-written software enabled the assignment of prices and volumes for securities transactions to individual customer accounts. The code allowed the IA Business to back into data that, in a legitimate business, would be generated through an order or time slicing trading system. *See id.* at ¶ 221.

**Trustee's Response:**  Not disputed.


33.    BLMIS informed customers that it conducted some trades on the over-the-counter ("OTC") market after hours, bolstered by BLMIS's periodic wires of tens of millions of dollars to a BLMIS affiliate.  TAC, ECF No. 151, ¶ 31.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  The phrase "some trades" is vague and does not state any particulars as to the dates, types, or quantities of the trades.  The statement does not provide that Merkin had personal knowledge of the extent to which Madoff was purportedly trading over-the-counter trades.  The Trustee does not dispute that ¶ 31 of the TAC states that "[p]rior to Madoff's arrest, BLMIS purportedly conducted trades on the over-the-counter ("OTC") market after hours.  To bolster that lie, BLMIS periodically wired tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity owned by Madoff.  There are no records that MSIL ever used the wired funds to purchase securities or options for customers of the IA Business."  The Defendants further have not put forth any evidence that Merkin was under the impression that over-the-counter trades were being performed "after-hours."

34.     "Madoff's unprecedented fraud stretched far and wide," and is among the largest in the world.  Steiner Decl. Ex. 33 (Messages from SIPA Trustee's Chief Counsel, David J. Sheehan).

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.


35.     The BLMIS fraud involved the participation of more than a dozen BLMIS employees, all of whom painstakingly carried out the fraudulent business.  *See* Steiner Decl. Ex. 4 (Dubinsky Report), at ¶¶ 48-75; Ex. 3 (Dubinsky Dep.) at 23:21-24:7, 88:11-89:8; Ex. 35 (transcript of Frank DiPascali plea hearing); Ex. 36 (transcript of Eric Lipkin plea hearing).

**Trustee's Response:**  Disputed as incomplete.  The United States Attorney brought charges against Madoff, Peter Madoff, Frank DiPascali, Eric Lipkin, David Kugel, Craig Kugel, Enrica Cotellessa-Pitz, Irwin Lipkin, David Friehling, and Paul J. Kongisberg, who all pleaded guilty.  Dubinsky Decl. Ex. 1 (Dubinsky Expert Report) ¶¶ 47, 49, 54-55, 57, 59, 65, 67, 69, 75; Transcript at 34, *United States v. Paul J. Konigsberg*, No. S11 10-CR-228 (LTS) (S.D.N.Y. June 24, 2014), ECF No. 1090.  The United States Attorney also brought indictments against Annette Bongiorno, Daniel Bonventre, Joann "Jodi" Crupi, Jerome O'Hara, and George Perez, who were tried to conviction on multiple counts of the respective indictments.  Dubinsky Decl. Ex. 1 (Dubinsky Expert Report) ¶¶ 61, 63, 71, 73; Jury Verdicts as to Annette Bongiorno, Daniel Bonventre, Joann "Jodi" Crupi, Jerome O'Hara, and George Perez, *United States v. O'Hara*, No. 10-CR-228 (LTS) (S.D.N.Y. Mar. 24, 2014).  The statement is additionally disputed as the phrase "painstakingly carried out" is vague.

36.    Madoff solicited billions of dollars from sophisticated investors.  *See supra* ¶¶ 23-24; *see infra* ¶¶ 39-41.

**Trustee's Response:**  Disputed as incomplete and misleading.  Investors in BLMIS included a variety of investors including individuals, investment partnerships, charities, educational institutions, retirement funds, hedge funds, and fund of funds.  The Trustee agrees that financial industry professionals who managed, advised, or otherwise administrated the investments are "sophisticated investors."


37.    Madoff deceived investors and regulators for more than 30 years until admitting to operating a Ponzi scheme in December 2008.   *See* Steiner Decl. Ex. 3 (Dubinsky Dep.) at 87:24-88:3.

**Trustee's Response:**  Disputed as incomplete and misleading.  It is undisputed that Madoff's fraud lasted at least 30 years and that Madoff deceived some investors and regulators. It is disputed in that many parties either knew of Madoff's fraud or were aware of facts suggesting a high probability of fraud.


38.    On March 12, 2009, Madoff pleaded guilty to an 11-count criminal information and was later sentences to 150 years in prison.  Steiner Decl. Ex. 4 (Dubinsky Report), ¶ 47.

**Trustee's Response:**  Not disputed.

## IV.    Many Sophisticated Individuals and Entities Invested With BLMIS

39.    Many sophisticated individuals and entities invested with BLMIS and thought Madoff was a very good money manager.  *See* Steiner Decl. Ex. 104 (Sloan Dep.) at 172:25-173:15 (dismissing possibility that "Madoff might be engaged in fraudulent activity" and stating that he "did not believe Madoff was a fraud up until the time that the fraud was revealed"); Ex. 98 (Research Company A Principal Dep.) at 171:8-21 (similar).

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  The fact that other parties invested with BLMIS is immaterial to Merkin's knowledge of facts suggesting a high probability of fraud.

Additionally, the statement that the cited individuals and entities thought Madoff was a "very good money manager" is not supported by the evidence.  Both individuals had concerns regarding where the monies were being held, the aggregate amounts of money under management by all BLMIS's feeder funds, and about Madoff himself.  Hoang Decl. Ex. 4 (Research Company A Principal Dep.) at 49:23-50:21; Hoang Decl. Ex. 5 (Sloan Dep.) at 182:1-23, 205:19-25, 215:8-19.

40.    "There were a lot of sophisticated investors who thought [Madoff] was very good, and I was aware that Jack Nash had invested with him and recommended him to others."  Steiner Decl. Ex. 101 (Rosenkranz Dep.) at 40:23-41:4; 104:16-105:14 (listing sophisticated investors who invested with Madoff, including Jack Nash and Richard Eldin).

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  Specifically, the

statement by a third party of who he was aware invested with BLMIS is immaterial to Merkin's

knowledge of facts suggesting a high probability of fraud.  Simply knowing of or talking to other

investors does not rise to the level of due diligence consistent with industry customs and

practices.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 54.  The statement is further

based on inadmissible evidence, as it is based on Robert Rosenkranz's speculation regarding

unnamed third parties' states of mind as to their opinions on Madoff.  Further, Rosenkranz's

testimony does not provide any basis for his knowledge of these facts or any independent basis to

support these assertions.  Hoang Decl. Ex. 6 (Rosenkranz Dep.) at 22:4-6, 41:5-15 (testifying

that "he [did not] remember exactly" how he knew Jack Nash had an investment with BLMIS,

that he never had any conversations with Nash regarding BLMIS, and that he did not know

whether Nash ever redeemed his Madoff investment).


41.      JPMorgan, Deutsche Bank, BNP Paribas, Zev Wolfson and his family, UBP,

Aozora, Yeshiva University, David S. Gottesman, Saul Katz, Fred Wilpon, and Societe Generale

all had significant investments with BLMIS.  *See* Steiner Decl. Ex. 105 (Steffens Dep.) at

139:10-14; 150:17-152:8, 161:8-162:7; Ex. 84 (Merkin Dep.) at 407:7-408:20; 421:17-423:18.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any

claims or defenses to the Defendants' motions for summary judgment.  Specifically, the

investments of third parties are immaterial to Merkin's knowledge of facts suggesting a high

probability of fraud.  Simply knowing of or talking to other investors does not rise to the level of

due diligence consistent with industry customs and practices.  Steiner Decl. Ex. 9(a) (Pomerantz

Rebuttal Report) ¶ 54.  Further, the statement is disputed as inadmissible to the extent it is based

on hearsay or is without any independent evidentiary basis.  Hoang Decl. Ex. 7 (Steffens Dep.) at

159:11-14, 161:19-25 (testifying that his knowledge of JPMorgan's investment was based on "public information," that he "believe[d]" Societe Generale had a Madoff investment, and that he "[did not] believe" that he ever discussed Madoff with Sandy Gottesman); Hoang Decl. Ex. 8 (Merkin Dep.) at 407:2-408:20, 422:5-16 (testifying that he "could not recall" discussing with Edgar de Picciotto of UBP whether he had an investment with Madoff, and stating the basis for this information was Madoff himself and other UBP employees, and providing conversations with Zev Wolfson as the only basis for Merkin's knowledge of his Madoff investment).  It is further disputed as incomplete and misleading, as Aozora Bank, JPMorgan, BNP Paribas, Societe Generale, and Deutsche Bank did not have direct investments with BLMIS.  Yeshiva University also did not have a direct Madoff investment, and public sources indicate its Madoff exposure was limited to its investment with Ascot Partners.  Janet Frankston Lorin, *Yeshiva's Madoff Losses Based on 'Fictitious' Profits*, BLOOMBERG (Dec. 30, 2008), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a3kDPcOCZ5gE.

## V.    Ascot's Investments With BLMIS

42.    Ascot Partners is a Delaware limited partnership formed in 1992.  *See* Steiner Decl. Ex. 15 at i, 1 (Confidential Offering Memorandum of Ascot Partners, L.P.).

**Trustee's Response:**  Not disputed.

43.    Ascot Fund is a Cayman Islands corporation formed in 1992.  *See* Steiner Decl. Ex. 17 at i, 1 (Confidential Offering Memorandum of Ascot Fund Ltd.).

**Trustee's Response:**  Disputed to the extent that the referenced exhibit identifies Ascot

Fund as a Cayman Islands exempted company.  Steiner Decl. Ex. 17 (Ascot Fund October 2006

Confidential Offering Memorandum) at GCC-P0335118, 126.


44.    Ascot Partners was formed to operate as a private investment partnership for U.S.

investors.  *See* Steiner Decl. Ex. 15 at i, 1 (Confidential Offering Memorandum of Ascot

Partners, L.P.).

**Trustee's Response:**  Disputed as incomplete.  The referenced exhibit indicates that

Ascot Partners was "organized to operate as a private investment partnership for the benefit of

U.S. taxable investors and U.S. Tax-Exempt U.S. Persons."  Steiner Decl. Ex. 15 (Ascot Partners

October 2006 Confidential Offering Memorandum) at GCC-P0335404, 410.


45.    Ascot Fund's investors are exclusively non-U.S. persons and certain tax-exempt

U.S. persons.  *See* Steiner Decl. Ex. 17 at i, 1 (Confidential Offering Memorandum of Ascot

Fund Ltd.).

**Trustee's Response:**  Disputed as inaccurate.  The referenced exhibit indicates that

Ascot Fund was "organized to operate as a private investment fund to facilitate investment by

non-US Persons and any investors that the Fund's board of directs deems appropriate."  Steiner

Decl. Ex. 17 (Ascot Fund October 2006 Confidential Offering Memorandum) at GCC-P

0335117, 126.


46.    Prior to 2003, Ascot Partners and Ascot Fund were operated as stand-alone

entities.  TAC, ECF No. 151, at ¶ 55; Answer and Affirmative Defenses of Defendants J. Ezra

Merkin and Gabriel Capital Corporation, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. Feb. 5, 2015), ECF No. 261 ("Answer"), at ¶ 55.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  Prior to being reorganized into a "master-feeder structure in 2003, Ascot Partners and Ascot Fund were organized as separate, independent corporate entities.  Hoang Decl. Ex. 9 (Ascot Fund February 1996 Prospectus); Hoang Decl. Ex. 10 (Ascot Partners February 1996 Confidential Offering Memorandum).  Yet, at all times, Merkin had ultimate control over the investment decisions of both entities and they were managed *pari passu*.  Hoang Decl. Ex. 11 (Autera Dep.) at 91:5-92:9; Hoang Decl. Ex. 12 (November 11, 2002 Letter) (Merkin stating in a letter to investors that Ascot Partners and Ascot Fund have operated with "substantially identical investment strategies").  Additionally, GCC performed back office services for both funds.  Hoang Decl. Ex. 13 (Autera 30(b)(6) Dep.) at 40:13-17, 43:15-44:4.

47.    On January 1, 2003, Ascot and Ascot Fund were reorganized into a "master-feeder" structure in which Ascot Fund invested all of its assets in Ascot.  TAC, ECF No. 151, ¶55; Answer, ECF No. 261, at ¶ 55.

**Trustee's Response:**  Disputed as incomplete and misleading.  The statement omits that at or around the same time, Ascot Fund transferred the full balance of its BLMIS account to the BLMIS account of Ascot Partners and ceased activity in its account with BLMIS.  Declaration of Matthew B. Greenblatt, dated November 25, 2015 ("Greenblatt Decl."), Exhibit 3 (Greenblatt Expert Report) ¶ 70, Ex. 4O.

48.     Merkin was the general partner of Ascot Partners from its inception until the
appointment of a Receiver in 2009.  TAC, ECF No. 151, at ¶ 51; Answer, ECF No. 261, at ¶ 51.

**Trustee's Response:**  Not disputed.


49.     Ascot Partners had an account with BLMIS continuously from 1993  through
Madoff's confession in December 2008.  TAC, ECF No. 151, at ¶¶ 65, 68; Answer, ECF No.
261, at ¶¶ 65, 68.

**Trustee's Response:**  Not disputed.


50.     Ascot Fund opened an account with BLMIS in January 1992, and maintained that
account continuously until Ascot Partners and Ascot Fund were reorganized in a "master-feeder"
structure on January 1, 2003.  TAC, ECF No. 151, at ¶¶ 55, 64; Answer, ECF No. 261, at ¶¶ 55,
64.

**Trustee's Response:**  Not disputed.


51.     From January 1992 until January 2003, Ascot Fund invested at least a majority of
its assets with BLMIS.  Autera Dep. at 106:4-15; Ex. 85 (Merkin Dep. dated Jan. 30, 2009 in *In
the Matter of Madoff Charities Investigation*) at 178:17-180:2.

**Trustee's Response:**  Disputed as incomplete and misleading.  The percentage of capital
that Ascot Fund maintained with BLMIS is listed in ¶ 50 of the Trustee's Statement of
Additional Material Facts Pursuant to L. Bankr. R. 7056-1.

52.    The Trustee's expert determined that, at the time Ascot Fund invested with Ascot

Partners, it transferred net equity of at least $221,487,622.  Steiner Decl. Ex. 6 (Greenblatt

Report) at Ex. 4O.

**Trustee's Response:**  Disputed as inaccurate and not supported by the evidence.

Matthew B. Greenblatt determined that, on January 8, 2003, Ascot Fund's customer statement

reflected an inter-account transfer of $551,296,800 to Ascot Partners but only $221,487,622 of

that amount was principal and the rest was fictitious profits under the court-approved Principal

Balance Calculation.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 70, Exs. 4O, 4P.


53.    All investors in Ascot Partners and Ascot Fund invested pursuant to an Offering

Memorandum and signed Subscription Agreements and related documents in connection with

their investments.  *See* Steiner Decl. Ex. 13 (undated Subscription Agreement for Ascot Partners,

L.P.); Ex. 14 (undated Subscription Documents for Non-U.S. Investors for Ascot Fund Limited).

It is not disputed that certain Ascot Partners and Ascot Fund investors invested pursuant to an

Offering Memorandum.

**Trustee's Response:**  Disputed as not supported by the evidence.  Other than the

referenced exhibits, there is no evidence for the statement that all investors in fact invested

pursuant to an offering memorandum.  Further, the phrase "related documents" is also disputed

as vague.


54.    The Ascot Offering Memoranda explicitly identified Madoff as a principal prime

broker and custodian of the Fund in two places.  *See* Steiner Decl. Ex. 15 at 8, 28 (Confidential

Offering Memorandum of Ascot Partners, L.P.); Ex. 17 at 13, 31 (Confidential Offering

Memorandum of Ascot Fund Limited).

**Trustee's Response:**  Disputed as incomplete and misleading.  Ascot Fund did not

identify Madoff as a principal prime broker or custodian until October 2006, when the Ascot

Offering Memorandum was issued.  Steiner Decl. Ex. 17 (Ascot Fund Confidential Offering

Memorandum, October 2006) at GCC-P 0335117, 156; Steiner Decl. Ex. 15 (Ascot Partners

Confidential Offering Memorandum, October 2006) at GCC-P 0335417-418, 437.  Ascot

Partners' offering memorandum provided:

> [Ascot Partners] will execute its trades through unaffiliated brokers, who
> may be selected on a basis other than that which will necessarily result in
> the lowest cost for each trade.  Clearing, settlement and custodial services
> will be provided by one or more unaffiliated brokerage firms.  Morgan
> Stanley & Co., Inc. and Bernard L. Madoff Investment Securities, LLC
> (the 'Prime Brokers') currently serve as the principal prime brokers and
> custodians for the [Ascot Partners], and clear (generally on the basis of
> payment against delivery) the [Ascot Partners'] securities transactions that
> are effected through other brokerage firms.  The Partnership is not
> committed to continue its relationship with the Prime Brokers for any
> minimum period and the General Partner may select other or additional
> brokers to act as prime brokers for the Partnership.

*Id.*  There is no evidence that Ascot Partners "execute[d] its [own] trades" through BLMIS that

were "effected through other brokerage firms," or that BLMIS settled or custodied such trades.

Merkin testified that "substantially all of the assets of Ascot [Partners]. . . were managed by the

Madoff organization and Bernie Madoff specifically."  Hoang Decl. Ex. 8 (Merkin Dep.) at 58:5-

9.  Ascot Fund's and Ascot Partners' offering documents never identified BLMIS as an

investment advisor or money manager.  This statement is further disputed as incomplete and

misleading, as Ascot Fund's and Ascot Partners' offering documents did not identify BLMIS as

a "prime broker" or "custodian" until 2006, even though Ascot Fund and Ascot Partners started

24

investing with BLMIS in 1992 and 1993, respectively.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 8, 54, 75, Exs. 4O, 4P).

55.    Ascot Partners' Offering Memorandum gave Merkin "ultimate responsibility" for all decisions, including investment decisions.  *See* Steiner Decl. Ex. 15 at i, 3, 13 (Confidential Offering Memorandum of Ascot Partners, L.P.).

**Trustee's Response:**  Not disputed.

56.    Merkin had the "sole discretion" to seek out investments and to "engage in investment strategies that are not described herein, but that [Merkin] considers appropriate."  *See id.* at 3, 13.

**Trustee's Response:**  Disputed as incomplete and misleading.  Ascot Partners' offering memorandum provided:

> Generally, the Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options.  These strategies are used to take advantage of price disparities among related securities.  The partnership primarily follows a strategy in which the Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100.  In order to hedge its exposure to these securities, the Partnership simultaneously purchases a put option and sells a call option on the S&P 100, each with notional value that approximates the value of the Partnership's long portfolio.  The purchase of the put option allows the Partnership to partially hedge its portfolio against downward movement in the S&P 100.  The sale of the call option allows the Partnership to partially finance the purchase of the put option while at the same time partially hedging the Partnership's portfolio against any downward movement in the S&P 100.

Steiner Decl. Ex. 15 (Ascot Partners October 2006 Confidential Offering Memorandum) at GCC-P 0335404, 410.  Further, the language in Ascot Partners' offering memorandum did not permit it to misrepresent its strategy to its investors.  *See supra* ¶¶ 54-55.

57.    Merkin "reserve[d] the right to alter or modify some or all of the Partnership's investment strategies . . . where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors." *See id.* at 3, 13.

**Trustee's Response:**  Disputed as incomplete and misleading.  Ascot Partners' offering memorandum stated that it would primarily engage in the practice of index and options arbitrage. *See supra* ¶ 56.  Further, the language in Ascot Partners' offering memorandum did not permit it to misrepresent its strategy to its investors.  *See supra* ¶ 56.

58.    Merkin also reserved the right to invest with and to delegate investment decisions to other money managers.  *See id.* at 17.

**Trustee's Response:**  Disputed as incomplete and misleading.  Ascot Partners' offering memorandum stated that Ascot Partners' "success depends to a great degree on the skill and experience of Mr. Merkin."  Steiner Decl. Ex. 15 (Ascot Partners October 2006 Confidential Offering Memorandum) at GCC-P 0335404, 426.  Further, Ascot Partners' offering memorandum stated that it would primarily engage in the practice of index and options arbitrage. *See supra* ¶ 56.  Additionally, the language in Ascot Partners' offering memorandum did not permit it to misrepresent its strategy to its investors.  *See supra* ¶ 56.

59.    At all relevant times, as permitted by its Offering Memoranda and Limited Partnership Agreement, Ascot Partners invested at least a significant portion of its assets with BLMIS, and as of December 2008 had invested substantially all of its assets in its BLMIS account. *See id.* at i, 3, 13, 17 (Confidential Offering Memorandum of Ascot Partners, L.P.); Steiner Decl. Ex. 84 (Merkin Dep.) at 58:5-9, 110:23-111:2; Ex. 92 (Castro Dep.) at 163:17-20.

**Trustee's Response:**  Disputed to the extent the statement suggests that investments in BLMIS were "permitted" by the Offering Memoranda and Limited Partnership Agreement, which speaks for itself and is referenced in *supra* ¶ 56.

60.    Those assets were held in Ascot Partner's brokerage account at BLMIS.  Steiner Decl. Ex. 15 at 8-9, 28 (Confidential Offering Memorandum of Ascot Partners, L.P.).

**Trustee's Response:**  Disputed as incomplete and misleading.  Ascot Partners' assets were not held in a "brokerage account" at BLMIS, but rather a bank account at JPMorgan Chase ending in the number -703 (the "703 Account"), which was the primary bank account through which the BLMIS fraud was conducted.  Dubinksy Decl. Ex. 1 (Dubinsky Expert Report) ¶ 76; Collura Decl. Ex. 1 (Collura Expert Report) ¶ 24.  The statement is further unsupported by the evidence, as the portion of Ascot Partners' offering memorandum that is cited does not support the statement.  The statement describes BLMIS performing "[c]learing, settlement and custodial services" for trades Ascot Partners "effected through other brokerage firms."  Steiner Decl. Ex. 17 (Ascot Partners October 2006 Confidential Offering Memorandum) at GCC-P 0335117; Hoang Decl. Ex. 11 (Autera Dep.) at 113:10-114:6.

61.     The Funds had Trading Authorization Directives that delegated discretion to

Madoff to trade equity and option securities in the Funds' BLMIS accounts on the Funds' behalf.

*See* Steiner Decl. Ex. 37 (November 2002 Trading Authorization Directive for Ascot Partners,

LP); Ex. 38 (November 2002 Trading Authorization Directive for Gabriel Capital, L.P.).

**Trustee's Response:**  Disputed as incomplete and misleading.  There is no evidence that

the Merkin Funds had Trading Authorization Directives with BLMIS prior to 2002.


62.     The Trustee concedes that Ascot Partners is a substantial "net loser" in Madoff's

fraud.  *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶ 95, Exs. 3D, 4P; Ex. 5 (Greenblatt Dep.)

at 78:12-79:3.

**Trustee's Response:**  Disputed as the characterization of "substantial" is vague.  The

Trustee does not dispute that there were 31 cash deposits in the aggregate amount of

$552,335,889 and that 35 inter-account transfers with a total of $422,027,224 in principal were

made into Ascot Partners' BLMIS account for a total of $974,363,113 of principal.  Greenblatt

Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 88-91.  Ascot Partners withdrew $489,840,000 and

made 20 inter-account transfers to the BLMIS accounts of Ascot Fund, Ariel, and Gabriel of

$258,504,709 from the inception of its BLMIS Account to December 11, 2008, at which time it

had a principal balance of $226,018,404.  *Id.* ¶¶ 92-95.  Ascot Partners made no redemptions

from BLMIS starting in Year End 1998, 1999, 2000, 2001, 2002, or 2004.  Collura Decl. Ex. 1

(Collura Expert Report) Exs. 10, 17, 17.1; Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) at

Schedule 1.

63.     As of November 2008, Ascot had approximately 300 investor accounts with approximately $1.8 billion under management.  TAC, ECF No. 151, ¶ 68.

**Trustee's Response:**  Not disputed.


64.     The Trustee acknowledges that Ascot had net equity in its BLMIS account of at least $226 million as of December 11, 2008.  *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶ 96, Exs. 3D, 4P; Ex. 5 (Greenblatt Dep.) at 78:24-79:3.

**Trustee's Response:**  Disputed as incomplete and misleading.  The Trustee does not acknowledge that Ascot Partners had net equity in the purported amount.  As set forth in the reports of his experts, the specific amount of the principal balance in Ascot Partners' BLMIS account on December 11, 2008 was $226,018,404.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Exs. 3D, 4P.  Further disputed as the phrase "at least" is vague.


65.     The Ascot Receiver claims net equity of more than $560 million giving full credit to the intra-account transfer from Ascot Fund to Ascot Partners in connection with the "master-feeder" reorganization in January 2003, and net equity of $235,734,338 using the Trustee's methodology for intra-account transfers.  Steiner Decl. Ex. 82 (Ascot Partners Customer Claim).

**Trustee's Response:**  Disputed as incorrect and misleading.  Ascot Partners' "net equity" calculation of $235,734,338 is not supported by the evidence and does not follow the court-approved methodology for inter-account transfers.  Ascot Partners had a principal balance in the amount of $226,018,404, which was based on deposits, withdrawals, and inter-account transfers into and out of the account.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 81-96, Exs. 3D, 4P.  Ascot Partners' BLMIS account had cash deposits totaling $552,335,889.  *Id.* ¶ 94, Ex.

3D.  There were inter-account transfers of principal to Ascot Partners' BLMIS account totaling

$422,027,224.  *Id.*  Ascot Partners' BLMIS account had total cash withdrawals of $489,840,000,

and it had inter-account transfers of principal from its account of $258,504,709.  *Id.*  Based on

the cash and principal transactions in Ascot Partners' BLMIS account, there was $226,018,404

of principal in the account as of December 11, 2008.  *Id.* ¶ 95, Ex. 3D.


66.     The approximately $9.7 million difference in the Trustee's and the Ascot

Receiver's calculation of net equity using the Trustee's methodology is attributable to a

purported transfer of $9.7 million worth of securities from Shalvah Fund to Ascot Fund in 1992

when Shalvah Fund closed its account.  Ex. 5, (Greenblatt Dep.) at 88:11-89:19.

**Trustee's Response:**  Disputed as incorrect and not supported by the evidence.  Any

transfers of principal from Shalvah Fund to any of the Merkin Funds were credited in the Fund's

principal balance.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) Ex. 4A; Hoang Decl. Ex.

14 (Greenblatt Dep.) at 86:18-88:2.  Specifically, two inter-account transfers of principal from

Shalvah Fund to Ariel on March 31, 1992 and May 29, 1992, respectively, were credited to

Ariel's principal balance calculation.  *Id.*  While there was also a transfer of fictitiously reported

securities from Shalvah Fund to Ariel in 1992, these securities did not exist, and therefore were

not included in Ariel's principal balance calculation.  Hoang Decl. Ex. 14 (Greenblatt Dep.) at

64:20-65:4, 70:13-24, 87:17-88:10, 89:6-11.  The court-approved principal-calculation

methodology does not include crediting purported transfers of fictitious securities because there

were no securities and no value indicated on the statements for the securities and one cannot

transfer what is not there and does not have value.  *Id.* at 59:10-60:16, 62:20-63:6, 64:20-65:4,

70:13-24; Greenblatt Decl. Ex. 1 (Greenblatt Expert Report) ¶ 18.  This methodology has been

approved by the Second Circuit. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 241 (2d

Cir. 2011), *cert. denied*, 133 S. Ct. 24, 133 S. Ct. 25 (2012) ("*Net Equity Decision*") ("The

Trustee properly declined to calculate 'net equity' by reference to impossible transactions.").

The methodology does not require the Trustee's experts to perform a trading and market analysis

to determine a value for the fictitious securities and to credit the value of fictitious securities.

Hoang Decl. Ex. 14 (Greenblatt Dep.) at 59:10-60:16; Greenblatt Decl. Ex. 3 (Greenblatt Expert

Report) ¶ 18. Further, the principal calculation methodology does not factor any account

holder's intent or expectations in any transaction. Hoang Decl. Ex. 14 (Greenblatt Dep.) at

67:21-68:4, 72:22-24. Thus, when Ariel transferred approximately $35 million on January 4,

1993, the transfer of fictitious securities from Shalvah Fund was not included in calculating

Ascot Fund's principal balance calculation. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report)

Ex. 4A; Hoang Decl. Ex. 14 (Greenblatt Dep.) at 84:24-86:6. Shalvah Fund's account (Account

No. 1FN033 in the name of Shalvah Fund Ltd c/o Pierson Heldring & Pierson Cayside) was

credited as having a principal balance from October 1992 through December 11, 2008 of

approximately $9.7 million. Hoang Decl. Ex. 14 (Greenblatt Dep.) at 89:2-11.


67.    The Trustee refuses to give any credit for that transfer because it purported to be

of a specifically identified but fictitious security, despite the fact that $10 million in cash had

been deposited into the Shalvah account. *Id.* at 89:2-19.

**Trustee's Response:**  Disputed as incorrect and not supported by the evidence. The

evidence cited states that Shalvah Fund's BLMIS account had $9.7 million in principal as of

October 1992; there is no mention of a $10 million deposit into Shalvah Fund's BLMIS account.

Hoang Decl. Ex. 14 (Greenblatt Dep.) at 89:2-19. The statement is further disputed as

incomplete and misleading. As detailed in *supra* ¶ 66, the Trustee has not been crediting transfers of fictitious securities for any BLMIS account holders. When there is a transfer of fictitious securities, the principal still exists within the four corners of the BLMIS estate—it remains with the transferor of the fictitious securities. *Id.* at 72:3-15. Thus, Shalvah Fund was eligible to file a customer claim for the remaining balance in its BLMIS account (1FN033) of $9,707,831; it was properly noticed regarding this but no claim was filed with the Trustee by the July 2, 2009 deadline. Affidavit of Mailing, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Feb. 4, 2009), ECF No. 76.

68.     The Trustee's expert admitted that, had a book entry at Shalvah fictitiously changed the securities to cash directly before transferring that equity to Ariel Fund Limited, he would have considered that an inter-account transfer. *Id.* at 95:7-19.

**Trustee's Response:** Disputed as incomplete. Greenblatt acknowledged that the principal calculation methodology does not include crediting purported transfers of fictitious securities because there were no securities and no value indicated on the statements for the securities and one cannot transfer what is not there and does not have value. Hoang Decl. Ex. 14 (Greenblatt Dep.) at 59:10-60:16; Greenblatt Decl. Ex. 2 (Methodology for Principal Balance Calculation Report) ¶ 18. The methodology does not require the Trustee's experts to perform trading and market analysis to determine a value for the fictitious securities and to credit the value of fictitious securities. Hoang Decl. Ex. 14 (Greenblatt Dep.) at 59:10-60:16; Greenblatt Decl. Ex. 2 (Methodology for Principal Balance Calculation Report) ¶ 18. Had the book entries changed the securities to cash directly before the transfer, Greenblatt would have determined if the cash value was present in the principal balance of the account and therefore would have

considered only the principal amount available for the inter-account transfer.  Hoang Decl. Ex.
14 (Greenblatt Dep.) at 65:21-67:20, 87:17-89:19.

69.    Merkin was also the general partner of Gabriel Capital L.P. ("Gabriel") and GCC
was the investment advisor of Ariel Fund Ltd. ("Ariel") (with Ascot, Ascot Fund, and Gabriel,
the "Funds") until Receivers were appointed for those funds in 2009.  TAC, ECF No. 151, at
¶¶45, 47; Answer, ECF No. 261, at ¶¶ 45, 47.

**Trustee's Response:**  Disputed as misleading.  A Receiver was never appointed for
Ascot Fund.  Hoang Decl. Ex. 15 (Stipulation and Order Appointing Receiver for Ascot Partners,
L.P.).

70.    From 2000 through 2008, Ariel and Gabriel had brokerage accounts with BLMIS
that were managed by Bernard Madoff.   *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶ 8;
TAC, ECF No. 151, at ¶¶ 57, 61; Answer, ECF No. 261, at ¶¶ 57, 61.

**Trustee's Response:**  Disputed as incomplete and misleading.  It is undisputed that Ariel
and Gabriel had customer accounts 1FR070 and 1G032, respectively, beginning in August 2000.
However, they also held prior BLMIS accounts.  Greenblatt Decl. Ex. 3 (Greenblatt Expert
Report) ¶ 8.  Ariel held BLMIS Account No. 1FN004 from October 1990 through February
1993, before ceasing activity in this account and transferring its assets to BLMIS account
1FN005, which was held in the name of Ascot Fund.  *Id.* ¶¶ 8, 20, 26, 33-34, Ex. 4A.
Additionally, from October 1990 through February 1993, Ariel Capital L.P., Gabriel's
predecessor entity, held BLMIS Account No. 1A0042, before transferring its assets to BLMIS

Account No. 1A0058, which was held in the name of Ascot Partners, and ceasing activity in its account. *Id.* ¶¶ 8, 35, 41, 46-47, Ex. 4E.

It is further disputed that BLMIS "managed" these customer accounts, as there is no evidence that the purported investment transactions for IA Business customers ever occurred at least as far back as the 1970s. Dubinsky Decl. Ex. 1 (Dubinsky Expert Report) ¶ 18.


71.    Those two funds allocated a portion of their assets, ranging from zero to approximately 30 percent, to their respective BLMIS accounts. *See* Steiner Decl. Ex. 92 (Castro Dep.) at 163:21-164:1; Ex. 72 (June 17, 2004 email from Michael Autera) at GCC-P 0155286.

**Trustee's Response:** Disputed as not supported by the evidence. Neither of the sources cited by the Defendants support that Ariel or Gabriel invested less than 7.96% and 7.13% of their respective assets under management in their respective BLMIS accounts. Merkin and GCC previously admitted that from 2001 to 2008 between 16% and 30% of the assets of Ariel and Gabriel were managed by BLMIS. Hoang Decl. Ex 17 (NYAG Merkin Defendants Response to the NYAG SJ, Index No. 450879/2009, Dkt. No. 195, ¶ 20). Merkin further admitted that the table below reflects the percentage of Ariel's and Gabriel's assets managed by BLMIS in each of the noted years[3]:

| Year | Ariel | Gabriel |
|------|-------|---------|
| 2000 | 7.96% | 7.13% |
| 2001 | 21.15% | 21.35% |
| 2002 | 29.18% | 30.32% |
| 2003 | 22.19% | 23.45% |
| 2004 | 20.86% | 19.54% |
| 2005 | 16.24% | 16.24% |
| 2006 | 23.35% | 23.76% |
| 2007 | 24.42% | 24.04% |

---

[3] The Trustee reserves the right to dispute the data set forth in the chart as not supported by the evidence.

Hoang Decl. Ex. 16 (Madoff Investment History); Hoang Decl. Ex. 17 (Merkin

Responses and Obj. to NYAG Statement of Undisputed Facts) ¶ 39.

72.    Ariel and Gabriel were also "net losers" in the Madoff fraud.  *See* Steiner Decl.

Ex. 6 (Greenblatt Report), at ¶¶ 116, 134, Exs. 3E, 3F; Ex. 5 (Greenblatt Dep.) at 78:12-20, 79:4-

18.

**Trustee's Response:**  Disputed as incomplete and misleading.  The Trustee does not

dispute that there were four cash deposits with a total of $144,300,000 of principal in Ariel's

BLMIS account and six inter-account transfers of $122,600,000 of principal from Ascot

Partners, Ascot Fund, and Gabriel to Ariel's BLMIS account for an aggregate total of

$266,900,000 in principal.  Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶¶ 103-09, Ex. 3E.

Ariel withdrew $16,200,000 and made ten inter-account transfers to Ascot Partners and Gabriel

in the aggregate amount of $74,400,000 from August 2000 to December 11, 2008, at which time

it had a principal balance of $175,906,797.[4]  *Id.* ¶¶ 110-17.

The Trustee does not dispute that there were five cash deposits with a total of $126,700,000 of principal in Gabriel's BLMIS account and ten inter-account transfers of

$156,700,000 of principal from Ascot Partners, Ascot Fund, and Ariel to Gabriel's BLMIS

account for an aggregate total of $283,400,000 of principal.  *Id.* ¶¶ 124-30, Ex. 3F.  Gabriel

withdrew $17,400,000 and made ten inter-account transfers to Ascot Fund, Ascot Partners, and

Ariel in the aggregate amount of $102,300,000 from August 2000 to December 11, 2008, at

which time it had a principal balance of $163,700,000.  *Id.* ¶¶ 131-35, Ex. 3F.

---

[4] This amount does not include any erroneous payments made to Ariel from the IRS related to tax withholdings
made on its behalf to the IRS.  Greenblatt Decl. Ex. 3 (Greenblatt Report) ¶¶ 15-19.

73.     The Trustee recognized that they had net equity claims of at least $175 million and $163 million, respectively, at the time the Madoff fraud was exposed. *See* Steiner Decl. Ex. 6 (Greenblatt Report), at ¶¶ 116, 134, Exs. 3E, 3F; Ex. 5 (Greenblatt Dep.) at 78:12-20, 79:4-18.

**Trustee's Response:**  Disputed as misleading.  The Trustee did not recognize Ariel's or Gabriel's claims at the time the fraud was exposed.  Further disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  In settlement, the Trustee recognized Ariel as having a net equity claim of $174,107,054.52 and Gabriel as having a net equity claim of $163,700,000.  Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement Between the Trustee and Gabriel Capital, L.P., Ariel Fund Ltd., and Bart M. Schwartz as the Appointed Receiver of Gabriel Capital, L.P. and Ariel Fund Ltd. (the "Settlement Motion") Ex. A ¶¶ F, G, *Picard v. Merkin*, No. 09-01182 (Bankr. S.D.N.Y. May 29, 2015), ECF No. 266.


74.     Ariel and Gabriel recently settled this action with the Trustee, paying the Trustee 100% of the initial two-year transfers alleged against them by the Trustee and receiving allowed net equity claims in full, as well as 85% of their payment to the Trustee under 11 U.S.C. § 502(h).  The initial net payouts from the SIPA estate to Ariel and Gabriel at closing of the settlement totaled more than $144 million.  *Picard v. Merkin*, No. 09-01182 (SMB), Dkt. 266.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  In settlement, it was agreed that Gabriel withdrew $17,400,000.00 over the life of BLMIS Account No. 1G0321 (the

"Gabriel Transfers") and Ariel withdrew $17,999,742.00 over the life of BLMIS Account No.

1FR070 (the "Ariel Transfers"), and that

- Gabriel and Ariel shall pay the Trustee the full amount of the Gabriel Transfers and the Ariel Transfers;

- Neither Gabriel nor Ariel will be entitled to the benefit of a SIPC customer advance under § 78fff-2(a) of SIPA;

- Gabriel shall have an Allowed Claim in the amount of $178,490,000.00, which is the amount of Gabriel's net equity ($163,700,000.00) plus 85% of the Gabriel Settlement Payment;

- Ariel shall have an Allowed Claim in the amount of $189,406,835.22.00, which is the amount of Ariel net equity ($174,107,054.52) plus 85% of the Ariel Settlement Payment;

- At Closing, the Trustee shall pay Gabriel $69,706,689.80, consisting of the total amount of the catch-up distribution owed to Gabriel for its Allowed Claim, which as of the Date of the Settlement Motion, is equal to 48.802%.

- At Closing, the Trustee shall pay Ariel $74,434,581.72, consisting of the total amount of the catch-up distribution owed to Ariel for its Allowed Claim, which as of the Date of the Settlement Motion, is equal to 48.802%.

Settlement Motion ¶¶ 5, 6, 18.


75.    The Trustee's expert on the inter-account transfers between the Defendant Funds does not have an opinion as to the appropriateness of the method he applied to calculate net equity.  *See* Steiner Decl. Ex. 5 (Greenblatt Dep.) at 50:16-51:8; 77:12-19.

**Trustee's Response:** Disputed as incomplete and misleading. Greenblatt is not the Trustee's "expert on the inter-account transfers between the Merkin Funds," but was retained by the Trustee to, among other things, reconstruct the books and records of BLMIS. Greenblatt Decl. Ex. 3 (Greenblatt Expert Report) ¶ 2. The appropriate methodology to calculate net equity was judicially approved. *Net Equity Decision*, 654 F.3d at 231-33. Greenblatt testified that he applied the court-approved methodology to inflows and outflows from customer accounts in order to determine each customer account's principal balance. Hoang Decl. Ex. 14 (Greenblatt Dep.) at 37:19-38:5, 50:16-51:8, 77:12-19.

76.     The Trustee's expert on subsequent transfers, Lisa Collura, did not opine, and her report did not contain, any analysis or reference to subsequent transfers to Ascot Partners. *See* Steiner Decl. Ex. 2 (Collura Report); Ex. 1 (Collura Dep.) at 98.

**Trustee's Response:** Not disputed.

77.     Ms. Collura testified that "it wouldn't make much sense in [her] mind to identify a subsequent transfer from an initial transferee." Steiner Decl. Ex. 1 (Collura Dep.) at 98.

**Trustee's Response:** Disputed as incomplete and misleading. When asked whether her report addressed any subsequent transfers to Ascot Partners, Lisa Collura explained that she did not trace subsequent transfers to Ascot Partners because the initial transfer would have also originated from Ascot Partners. Steiner Decl. Ex. 1 (Collura Dep.) at 98:7-18 ("[T]o trace from an initial transferee to a subsequent transferee, and they are the same parties, in my mind that doesn't make much sense.").

## VI.     **Defendants' Extensive Due Diligence into Madoff**

78.     Prior to December 11, 2008, Madoff "was a prominent and respected member of the investing community."  *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 393 (S.D.N.Y. 2010); Steiner Decl. Ex. 101 (Rosenkranz Dep.) at 39:6-40:6 ("[J]ust anybody who was a professional investor in hedge funds would have heard of Madoff," who had "been a known name in the financial world for at least a couple of decades."); Ex. 92 (Castro Dep.) at 163:8-12 (agreeing that BLMIS was "a substantial, well-known broker-dealer"); Ex. 105 (Steffens Dep.) at 149:16-18 (Madoff "was certainly in [the investment] community well respected, well thought of."); Ex. 98 at 18:18-23 (deposition transcript of Research Company A Principal) (Madoff "was a name known on the street because [] Madoff Securities is one of the big market makers."); Ex. 106 (Teicher Dep.) at 135:6-12 (Madoff was "a very large market maker").

**Trustee's Response:**  Disputed as misleading and immaterial.  Further disputed as it relies upon inadmissible evidence (*In re Beacon Assocs. Litig.*).  Rosenkranz's testimony does not support the statement that Madoff was a "respected member" of the investment community. He simply states that "a professional investor in hedge funds *would have heard* of Madoff." Hoang Decl. Ex. 6 (Rosenkranz Dep.) at 40:4-6 (emphasis added).  Rosenkranz goes on to state that his own understanding of Madoff's reputation changed around 2002 when he was considering investing with him and conducted his own due diligence.  He states, "[T]hat's what you're charging people money for.  If you're managing their money and putting people's money into hedge funds, it's your basic obligation, is to allocate that money after reasonable diligence." *Id.* at 47:19-23.  As a result of his due diligence around 2002, Rosenkranz uncovered many indicia of fraud including Madoff's purported strategy not matching the consistency of his returns, the impossibility of consistently trading at daily highs and lows, volumes of trades

exceeding the market, Madoff's unusual account and fee structure, and Madoff's auditing firm,

amongst others.  Rosenkranz "then came to the conclusion that in fact it was fraudulent."  *Id.* at

37:6-40:22, 50:3-73:12.

Robert Castro, Research Company A Principal, and Victor Teicher were discussing

Madoff's reputation as a market maker, not an investment advisor.  Steiner Decl. Ex. 92 (Castro

Dep.) at 163:8-12; Ex. 98 (deposition transcript of Research Company A Principal) at 18:18-23.

Furthermore, other individuals' opinions about Madoff are immaterial to Merkin's knowledge of

facts suggesting a high probability of fraud.


79.    Madoff "had served as a member of the NASDAQ stock market's Board of

Governors and as the vice-chairman of the National Association of Securities Dealers."  *In re

Beacon*, 745 F. Supp. 2d at 393.

**Trustee's Response:**  Disputed as it relies upon inadmissible evidence (*In re Beacon

Assocs. Litig.*).


80.    Merkin knew that Madoff also served as the chairman of NASDAQ and a

committee head for the Security Industry Association.  *See* Steiner Decl. Ex. 105 (Steffens Dep.)

at 149:10-21, 150:6-8; Ex. 84 (Merkin Dep.) at 157:16-25.

**Trustee's Response:**  Disputed as the evidence does not support that "Merkin knew" that

Madoff served as a committee head for the Security Industry Association.


81.    Merkin knew that Madoff frequently met with industry leaders at the SEC and

regularly testified in Congress about developments in the securities industry and the ongoing

transformation of the U.S. financial markets.  Steiner Decl. Ex. 84 (Merkin Dep.) at 213:7-12;

Ex. 98 (Research Company A Principal Dep.) at 143:5-7; Ex. 80 (Merkin Defendants' Supp.

Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 4-5.

**Trustee's Response:**  Disputed as the evidence cited does not support that "Merkin

knew" that Madoff "frequently met with industry leaders at the SEC" or that he testified "about

developments in the securities industry and the ongoing transformation of the U.S. financial

markets."  The statement is further disputed because it relies only on Merkin's uncorroborated

testimony.


82.    Merkin knew that Madoff regularly did business with sophisticated market

participants including Charles Schwab & Co. and Fidelity Brokerage Services, and broke the

NYSE's monopoly on Big Board trading.  *See* Steiner Decl. Ex. 19 at 48 (*Forbes* article dated

January 6, 1992); Ex. 20 at 66 (*Forbes* article dated July 10, 1989).

**Trustee's Response:**  Disputed as misleading.  The cited evidence is in reference to

Madoff's market making business, not his IA Business.  Madoff's reputation as a market maker

is immaterial to Merkin's knowledge of facts suggesting a high probability of fraud at BLMIS's

IA Business.


83.    Merkin knew that BLMIS was ranked as one of the top three market makers in

NASDAQ stocks, reputed as an active market maker in European and Asian equity markets, and

a pioneer in over-the-counter trading in NYSE-listed stocks.  *See* Steiner Decl. Ex. 21 at 1

(*MAR/Hedge* article dated May 2001); Ex. 101 (Rosenkranz Dep.) at 39:10-17; Ex. 105 (Steffens

Dep.) at 149:19-21.

**Trustee's Response:**  Disputed as misleading. The cited evidence is in reference to Madoff's market making business and does not support Merkin's knowledge that BLMIS was "a pioneer in over-the-counter trading in NYSE-listed stocks."  Madoff's reputation as a market maker is immaterial to Merkin's knowledge of facts suggesting a high probability of fraud at BLMIS's IA Business.  The cited evidence is further disputed as Rosenkranz and John Steffens were testifying about their own knowledge, not Merkin's knowledge.

84.    Before investing with Madoff, Merkin was aware of Madoff's sterling reputation as a leading market maker with an extraordinary share of the trading in certain NYSE stocks, particularly heavily traded, large cap stocks.  Merkin also understood the regulatory structure governing Madoff's operations, and knew that the SEC and other regulators regularly reviewed Madoff's business.  *See* Steiner Decl. Ex. 85 (Merkin Dep. dated Jan. 30, 2009 in *In the Matter of Madoff Charities Investigation*), at 9:5-10:14; 128:21-134:3; Ex. 84 (Merkin Dep.) at 157:16-158:22, 181:9-22, 188:20-189:13, 213:7-23; Ex. 80 (Merkin Defendants' Supp. Resps.  To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3.

**Trustee's Response:**  Disputed as misleading and not supported by admissible evidence. The cited evidence purports to equate Merkin's own belief of Madoff's reputation as material fact.  Furthermore, Madoff's reputation as a market maker is immaterial to Merkin's knowledge of facts suggesting a high probability of fraud at BLMIS's IA Business.

85.    Before investing with Madoff, Merkin had several meetings with Madoff himself and meetings with several of Madoff's customers concerning Mr. Madoff's reputation, trading strategy and risks.  Those investors included Leon Meyers (at the time the manager of the

Scheuer family office), Sandra Manske (at the time a senior executive of the Tremont funds and later the founder of the Maxam funds), David Gottesman (the founder of First Manhattan Corporation and a director of Berkshire Hathaway), Gedale Horowitz (who at the time ran Salomon Brothers' municipal bond department), and Daniel Hoffert (a successful Wall Street investor), all of whom spoke very highly of Mr. Madoff and his investment strategies. *See* Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 2-3; Ex. 85 (Merkin Dep. dated Jan. 30, 2009 in *In the Matter of Madoff Charities Investigation*), at 9:5-10:14; 128:21-134:3; Ex. 84 (Merkin Dep.) at 147:11-16, 153:17-22, 154:11-156:9, 183:2-9, 255:25-256:20; Ex. 10 (Weingarten Dep.) at 117:17-118:24.

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no evidentiary support that any of these conversations took place other than Merkin's own vague recollections.  When pressed about what due diligence each of the individuals listed conducted on BLMIS, Merkin largely could not recall or cite to any due diligence conducted.  Hoang Decl. Ex. 8 (Merkin Dep.) at 374:5-16 (Merkin has no recollection of whether or not Meyers ever told him that Meyers conducted due diligence on BLMIS); *Id.* at 382:3-14 (when asked about Sandra Manske, Merkin stated that he had no recollection of any due diligence performed by Manske other than "forming an impression that she had been to the office, that she knew Bernie, that she'd had conversations about the strategies."); *Id.* at 385:12-386:9 (Merkin had no recollection of any due diligence performed by David Gottesman); *Id.* at 387:19-391:17 (Merkin testified that he did not know whether Gedale Horowitz ever had a direct account with BLMIS and he does not recall Horowitz ever telling him that he conducted due diligence on Madoff); *Id.* at 396:1-401:10 (Merkin did not recall any conversation he had with Hoffert regarding due diligence).  Simply knowing of or talking to other investors does not rise to the level of due diligence

consistent with industry customs and practices.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal

Report) ¶ 54.

86.     Merkin also had conversations with customers of BLMIS's market-making

operations.  *See* Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of

Interrogatories dated Aug. 30, 2013), at 3.

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no

evidentiary support that any of these conversations took place other than Merkin's vague and

incomplete recollections.  *See* Hoang Decl. Ex. 8 (Merkin Dep.) at 402:3-20.  Furthermore, these

purported conversations with customers of BLMIS's market making operation are immaterial to

Merkin's knowledge of facts suggesting a high probability of fraud at BLMIS's IA Business.

87.     Merkin found that Madoff's customers had "very positive things to say" about

Madoff.  Steiner Decl. Ex. 84 (Merkin Dep.) at 174:3-17 (discussing Merkin's conversations

with Madoff's customers, including Fidelity).

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no

evidentiary support that any of these conversations took place other than Merkin's vague and

incomplete recollections.  Hoang Decl. Ex. 8 (Merkin Dep.) at 402:3-20.  Furthermore,

conversations with customers of BLMIS's market making operation are immaterial to Merkin's

knowledge of facts suggesting a high probability of fraud at BLMIS's IA Business.

88.     Prior to investing with Madoff, Merkin knew that his father, Hermann Merkin (a

successful businessman and investor), had invested money with Madoff "and had a very

constructive opinion of Mr. Madoff and his investing abilities." Steiner Decl. Ex. 84 (Merkin

Dep.) at 149:18-21; Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of

Interrogatories dated Aug. 30, 2013), at 3.

**Trustee's Response:** Disputed as not supported by admissible evidence. There is no

evidentiary support that any of these conversations took place other than Merkin's own

recollections.


89.     Merkin's father told Merkin "I know Bernie, and he's okay" – which Merkin

understood to be high praise coming from his father, a savvy Wall Street investor. *Id.* at 147:20-

148:1, 149:15-150:7.

**Trustee's Response:** Disputed as not supported by admissible evidence. There is no

evidentiary support that any of these conversations took place other than Merkin's own

recollections. The statement also mischaracterizes Merkin's opinion about his father as material

fact.


90.     Prior to investing with Madoff, Merkin met with Madoff in Madoff's offices, and

discussed Madoff's trading strategies as well as Madoff's market-making activities. Ex. 80

(Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013),

at 3.

**Trustee's Response:** Disputed as not supported by admissible evidence. There is no

evidentiary support that any of these conversations took place other than Merkin's own

recollections. Additionally, Merkin testified that he does not recall whether he began his

45

investments with BLMIS before or after his first meeting with Madoff.  Hoang Decl. Ex. 8
(Merkin Dep.) at 153:8-15.

91.    Madoff also explained that BLMIS operated a significant wholesale business, in
which its customers included Charles Schwab and Fidelity.  *Id.*

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no
evidentiary support that any of these conversations took place other than Merkin's own
recollections.  Furthermore, conversations about customers of BLMIS's market making
operation are immaterial to Merkin's knowledge of facts suggesting a high probability of fraud at
BLMIS's IA Business.

92.    They also discussed Madoff's and Madoff's brother's involvement in industry
affairs.  *Id.*

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no
evidentiary support that any of these conversations took place other than Merkin's own
recollections.  The statement is further disputed as vague as to "involvement in industry affairs."

93.    Merkin first invested with Madoff and BLMIS through Meyers and the Scheuer
family's account with Madoff.  *Id.*

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no
evidentiary support cited other than Merkin's own recollections.  *See* Trustee's Statement of
Additional Material Facts Pursuant to L. Bankr. R. 7056-1 ("Tr. SOF"), ¶¶ 9-10.

94.     After a period of time and gaining additional comfort with Madoff and his trading strategies, Merkin thereafter opened managed accounts with BLMIS on behalf of the Funds and delegated trading authority over those accounts to Madoff.   *Id.*; Steiner Decl. Ex. 84 (Merkin Dep.) at 149:11-14, 152:3-153:22.

**Trustee's Response:**  Disputed as not supported by admissible evidence.  There is no evidentiary support cited other than Merkin's own recollections.  *See* Tr. SOF, ¶¶ 11-17.

95.     The Trustee alleges that Merkin had a close business and personal relationship to Madoff and touted such relationship to others.  TAC, ECF No. 151, ¶¶ 3, 84, 86.

**Trustee's Response:**  Not disputed.

96.     Madoff attended at least one of Merkin's children's bar or bat mitvahs.  Steiner Decl. Ex. 84 (Merkin Dep.) at 609:19-610:4.

**Trustee's Response:**  Not disputed.

97.     Merkin would also see Madoff occasionally at meetings of the Gift of Life Foundation, of which Madoff was the Chairman.  Steiner Decl. Ex. 84 (Merkin Dep.) at 432:2-11.

**Trustee's Response:**  Not disputed.  Merkin was closely associated with Madoff on a business and social level since at least the late 1980s.  In addition to the Gift of Life Foundation, Merkin and Madoff were also involved with Jewish philanthropies together and both sat on the board of trustees of Yeshiva University.  Hoang Decl. Ex. 8 (Merkin Dep.) at 212:24-213:6, 428:2-429:3.

98.     The SEC examined and inspected BLMIS, including in 1992, 2006, and 2007, but did not uncover the fraud.  *See* Steiner Decl. Ex. 24 at A1 (Dec. 19, 2008 *Washington Post* article).

**Trustee's Response:**  Disputed as immaterial to Merkin's knowledge of facts suggesting a high probability of fraud in BLMIS's IA Business.  Additionally disputed as Merkin's purported knowledge of the SEC's examination of BLMIS was limited to what he learned from discussions with Madoff.  Hoang Decl. Ex. 8 (Merkin Dep.) at 187:23-189:21.  Further disputed as there is no evidence that Merkin was aware of the SEC examinations in 2006 and 2007, that he knew of the nature of the examination, and/or the findings of the examination.

99.     The SEC Office of Investigations acknowledged that "the fact the SEC had conducted examinations and investigations and did not detect the fraud, lent credibility to Madoff's operations and had the effect of encouraging additional individuals and entities to invest with him." Steiner Decl. Ex. 34 at 25, 429 (OIG Report).

**Trustee's Response:**  Disputed as immaterial to Merkin's knowledge of facts suggesting a high probability of fraud in BLMIS's IA Business.

100.    Merkin had meetings and telephone calls with Madoff approximately ten to fifteen times per year to discuss Madoff's trading strategy and execution.  Steiner Decl. Ex. 84 (Merkin Dep.) at 115:12-15, 186:8-187:1, 212:8-213:6, 255:25-256:20, 428:18-431:13; Exs. 39-49 (Merkin's handwritten notes and call transcripts on discussions with Madoff).

**Trustee's Response:**  Disputed as incomplete and misleading.  Merkin testified that he spoke with Madoff 10 to 15 times per year, which equates to approximately 180 to 270 times

over the 18-year investment history of the Merkin BLMIS Accounts.  Of these hundreds of

meetings, Merkin's files reveal notes and transcripts for only 13 conversations or calls with

Madoff and two partial recordings of conversations.  Hoang Decl. Ex. 19 (Trustee Ex. 363) at

GCC-P 0393139, 144-48, 156-60, 173, 211, 259, 317, 364-73, & 384-87; Hoang Decl. Ex. 20

(Trustee Ex. 368); Hoang Decl. Ex. 21 (Trustee 369); Hoang Decl. Ex. 8 (Merkin Dep.) at

493:24-510:3.


101.    As an additional part of his due diligence on and monitoring of Madoff and

BLMIS, Merkin maintained a file that included newspaper articles and profiles of Madoff, notes

of certain of his meetings with Mr. Madoff, and information concerning other funds that had

significant investments with Madoff and BLMIS.   Steiner Decl. Ex. 80 (Merkin Defendants'

Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 3-4.

**Trustee's Response:**  Disputed as incomplete and misleading.  Merkin's "Madoff file"

consists of approximately 500 pages of documents, purportedly accumulated over the 18-year

investment history of the Merkin BLMIS Accounts.  Hoang Decl. Ex. 19 (Trustee Ex. 363).  To

the extent the information, newspaper articles, and profiles of Madoff concern BLMIS's

proprietary trading and market making businesses, Merkin's reliance on this information is not

relevant to an assessment of BLMIS's IA Business and is inconsistent with due diligence

customs and practices.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 57.


102.    For example, Merkin reviewed and retained a 1989 article from Forbes describing

how BLMIS made markets in 250 of the largest, most actively traded stocks and identifying

some of its biggest customers, including A.G. Edwards, Charles Schwab, and Fidelity.  *See Id.*

**Trustee's Response:** Disputed as immaterial to Merkin's knowledge of facts suggesting a high probability of fraud in BLMIS's IA Business. Merkin's reliance on this information is not relevant to an assessment of BLMIS's IA Business and is inconsistent with due diligence customs and practices. Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 57.

103.    Another Forbes article, from 1992, similarly described Madoff and his firm as one of the biggest of the new age traders on Wall Street who were competing with the New York Stock Exchange for trades, and an April 1993 International Herald Tribune likewise discussed how Madoff was gaining the upper hand in a competition with the New York and American Stock Exchanges. *See Id.*

**Trustee's Response:** Disputed as immaterial to Merkin's knowledge of facts suggesting a high probability of fraud in BLMIS's IA Business. Merkin's reliance on this information is not relevant to an assessment of BLMIS's IA Business and is inconsistent with due diligence customs and practices. Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 57.

104.    Other articles reviewed and retained by Merkin included one published in MARHedge and another in Barron's in 2001. *See id.*; Steiner Decl. Ex. 21 at 3 (*MARHedge* article dated May 2001); Ex. 25 (*Barrons* article dated May 7, 2001).

**Trustee's Response:** Not disputed.

105.    A *New York Times* article from 1992 discussed the United States Securities and Exchange Commission's investigation into unregistered notes being marketed by Avellino & Bienes, a Florida accounting firm, and reported on the SEC's relief that all of the money that had

50

been raised from the sale of the notes—$440 million—had been deposited in an account with

BLMIS and managed by Madoff, and was able to be liquidated and returned to the note

purchasers almost immediately.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To

Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 4.

> **Trustee's Response:**  Disputed as not supported by admissible evidence.  The referenced
>
> article was not included in Merkin's records and was never produced.  A 1992 Wall Street
>
> Journal article in Merkin's records regarding Avellino & Bienes states that the "biggest
>
> question" regarding the situation was how Avellino & Bienes, who invested their clients' money
>
> with Madoff—who himself was "scoring investment returns that comfortably exceeded the hefty
>
> returns Avellino & Bienes was promising its noteholders"—could "promise to pay high interest
>
> rates on a steady annual basis, even though annual returns on stocks fluctuate drastically."
>
> Hoang Decl. Ex. 19 (Trustee 363) at GCC-P 0393125-126.  The article further notes that "[i]n
>
> 1984 and 1991, for example, the stock market delivered a negative return, even after counting
>
> dividends.  Yet Avellino & Bienes—and Mr. Madoff—maintained their double digit returns."
>
> *Id.* at 3126.

106.    Madoff was widely credited with breaking the New York Stock Exchange's

hegemony over Wall Street trading.  By 1999—as reflected in New York Times and Wall Street

Journal articles that Merkin read and retained in his file—BLMIS entered into a joint venture

with the major Wall Street firms Goldman Sachs, Morgan Stanley Dean Witter, Citigroup's

Salomon Smith Barney, and Merrill Lynch to establish the first electronic platform to trade

stocks listed on the New York Stock Exchange, American Stock Exchange, and NASDAQ.  That

those four well-established Wall Street firms were willing to enter into a joint venture with

BLMIS further enhanced Madoff's reputation and provided additional comfort to Merkin.  *See* Steiner Decl. Ex. 22 (*New York Times* article dated June 8, 1999); Ex. 23 (*New York Times* article dated September 14, 1999); Exs. 26-32 (newspaper and media articles covering the electronic trading platform and Madoff); Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 4.

**Trustee's Response:**  Disputed as immaterial to Merkin's knowledge of facts suggesting a high probability of fraud in BLMIS's IA Business.


107.    The Funds promptly received payments for hundreds of millions of dollars in redemptions whenever requested over a 15-year period.  Steiner Decl. Ex. 90 (Achilarre Dep.) at 51:16-18; Ex. 84 (Merkin Dep.) at 216:10-217:21.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  Ariel and Gabriel each received one payment respectively in 2008, nearly eight years after opening their accounts in 2000.  Collura Decl. Ex. 1 (Collura Expert Report) Ex. 10.  Ascot Partners made no redemptions from BLMIS for nearly a five year period between December 1998 and December 2003; and then again for nearly a two year period from December 2003 to December 2005.  *Id.*  Instead, the funds undertook a complicated system of intra-account transfers between them in order to meet liquidity needs and avoid taking withdrawals from BLMIS.  *See* Tr. SOF ¶¶ 245-62.


108.    Merkin testified that "it was certainly a lot easier to get money out than it was to get money in." Steiner Decl. Ex. 84 (Merkin Dep.) at 217:1-3.

**Trustee's Response:** Disputed as not supported by admissible evidence.  The statement is further disputed as incomplete and misleading, as, on at least one occasion, Madoff contacted GCC's offices after a redemption by Ascot Partners and was questioned by Madoff; Merkin then spoke with Madoff to "apologize" and "smooth things over."   Hoang Decl. Ex. 22 (Trustee 373).

109.    Defendants had complete transparency to Madoff's purported trading and received written confirmations of each trade.  *See ¶ 96-99, infra*.

**Trustee's Response:** Disputed as incomplete, misleading, not supported by the evidence.  Defendants never had real-time access to their accounts and instead received written confirmations three to five days after the dates of the purported trades.  Dubinsky Decl. Ex. 1 (Dubinsky Expert Report) ¶ 44; Hoang Decl. Ex. 23 (Autera testimony-Jesselson arbitration) at 1719:15-23; Hoang Decl. Ex. 24 (Merkin testimony-Weiss arbitration) at 300:16-303:23; Hoang Decl. Ex. 25 (Achilarre Dep.) at 33:19-34:7; Hoang Decl. Ex. 11 (Autera Dep.) at 84:2-15. Merkin purportedly understood that Madoff used a "black box" or "algorithm" as part of his trading strategy, yet Merkin never asked to speak to any BLMIS employee who was responsible for it.  Hoang Decl. Ex. 8 (Merkin Dep.) at 433:3-434:6.  Merkin did not have any transparency as to how the algorithm or black box allowed Madoff to time the market.  *Id.* at 167:14-23, 308:2-20.  Merkin further did not have transparency as to when Madoff was going to enter or exit the market.  *Id.* at 375:15-376:19; Hoang Decl. Ex. 26 (Merkin testimony-Jesselson arbitration) at 1533:14-22.  Additionally, Merkin did not use any of this transparency to perform quantitative due diligence.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 45 ("It is consistent with industry customs and practices to perform quantitative analyses with trade level data particularly when there are outstanding questions regarding how an investment advisor

generates returns or if there is an inconsistency between the returns reported by the advisor and the strategy purportedly followed.").

110.    GCC employees entered each trade into GCC's portfolio management system. Steiner Decl. Ex. 90 (Achilarre Dep.) at 32:8-33:6, 95:9-22, 96:18-97:13; Ex. 84 (Merkin Dep.) at 168:5-169:21, 445:19-446:6; Ex. 91 (Autera Dep.) at 177:18-178:15.

**Trustee's Response:** Not disputed.

111.    GCC employees checked the BLMIS trade confirmations on a daily basis and resolved any discrepancies with BLMIS. *See* Steiner Decl. Ex. 96 (Gordon Dep.) at 44:22-45:15, 48:21-49:5; Ex. 94 (Hess Dep.) at 86:6-87:18.

**Trustee's Response:** Disputed as incomplete and misleading. GCC received trade confirmations days after the purported trades were made. Hoang Decl. Ex. 23 (Autera testimony- Jesselson arbitration) at 1719:15-23; Hoang Decl. Ex. 24 (Merkin testimony-Weiss arbitration) at 300:16-303:23; Hoang Decl. Ex. 25 (Achilarre Dep.) at 33:19-34:7; Hoang Decl. Ex. 11 (Autera Dep.) at 84:2-15. At times, GCC received trade confirmations late. Hoang Decl. Ex. 27 (Gordon Dep.) at 52:12-53:6 ("Meaning that the trade ticket came late. It didn't come that month. It came a little bit after the month."). GCC employees reconciled the BLMIS trade confirmations against the BLMIS month-end statements. *Id.* at 36:15-37:1. GCC employees did not reconcile BLMIS trade confirmations on a daily basis and as a result, "wouldn't know middle month if there was an issue" with the confirmations. *Id.* at 47:22-48:13. When the trade confirmations did not match the monthly statements, there were times when BLMIS would send "supplemental" tickets "to make the numbers tie." *Id.* at 44:3-46:7. Additionally, GCC

employees did not check the prices reported on the trade confirmations and the monthly

statements against the prices reported in the market.  Hoang Decl. Ex. 25 (Achilarre Dep.) at

37:9-18; Hoang Decl. Ex. 11 (Autera Dep.) at 202:22-204:7.


112.    GCC's portfolio management system generated profit-and-loss reports that

Merkin and others at GCC reviewed on a daily basis.  *See* Steiner Decl. Ex. 96 (Gordon Dep.) at

12:21-14:4; Ex. 94 (Hess Dep.) at 89:17-90:19, 113:2-9; Ex. 84 (Merkin Dep.) at 168:5-169:21,

201:15-16.

**Trustee's Response:**  Not disputed.


113.    Each month, the Funds received monthly statements from Madoff, which GCC

employees reviewed and reconciled against GCC's books and records.  Steiner Decl. Ex. 90

(Achilarre Dep.) at 34:22-24, 45:6-21; Ex. 80 (Merkin Dep.) at 232:6-239:13.

**Trustee's Response:**  Not disputed.


114.    No GCC employee thought that there was anything amiss with BLMIS's

statements.  *See* Steiner Decl. Ex. 90 (Achilarre Dep.) at 98:8-10, 115:20-116:2.

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by

admissible evidence.  Michael Achilarre cannot testify as to the states of mind of other GCC

employees.  It is further disputed as incomplete and misleading as GCC employees did notice

issues with BLMIS's statements and confirmations.  *See supra* ¶ 111, which is incorporated as

though fully set forth herein.  Additionally, the trade confirmations that were reviewed by GCC

were backwards, meaning that when BLMIS purportedly bought a security for one of the Merkin

BLMIS Accounts, GCC would receive trade confirmations reflecting a "sale" of a security. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 186-89, Fig. 9.  Conversely, when BLMIS purportedly sold a security from one of the Merkin BLMIS Accounts, GCC would receive a trade confirmation reflecting a "buy" of a security.  *Id.* Fig. 10.  Prior to September 2006, the trade confirmations never reported commissions payable to BLMIS, a basic requirement.  *Id.* ¶¶ 190-91.  The customer statements also reported securities not available for purchase and reported a "Balance Forward" that was inconsistent with industry customs and practices.  *Id.* ¶¶ 192-96.


115.    BDO Seidman, LLP ("BDO") is the fifth-largest accounting firm in the country and a recognized leader in the audits of hedge funds.  *See* Steiner Decl. Ex. 73 (BDO "About Us"); Ex. 74 (*Audit Analytics* post dated May 14, 2014).

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by admissible evidence.  The cited evidence does not support the statement that BDO was "the fifth-largest accounting firm in the country" and further does not provide when during the relevant time period of 1990 through 2008 that BDO was the fifth-largest accounting firm.  The cited source lists audit firms that were cited by "hedge funds" in their Form ADVs, without any regard to how the term "hedge fund" is defined.  Further, BDO is only cited in this document as auditing approximately 2% of the total hedge fund audit market share and is not listed in the document as being one of the top five audit firms by market share.  The document also notes the top five audit firms have approximately 75% of the total hedge fund audit market share.


116.    BDO had a team of employees audit each of the Funds every year.  *See* Steiner Decl. Ex. 92 (Castro Dep.) at 26:2-9; Ex. 90 (Achilarre Dep.) at 86:6-8.

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by admissible evidence.  BDO's team consisted of "a senior, either a manager or senior manager, and a partner."  Hoang Decl. Ex. 28 (Castro Dep.) at 26:10-27:12.  The day-to-day execution of the audit only consisted of a senior manager or manager supervising the senior and the overall execution of the audit.  *Id.* at 27:23-28:2.

117.     The BDO audits took approximately six weeks, with the bulk of that time spent at GCC's offices.  *See* Steiner Decl. Ex. 92 (Castro Dep.) at 138:2-15.

**Trustee's Response:**  Disputed as incomplete and misleading.  The statement omits that during the four to six weeks spent auditing the funds, BDO did not spend "more than a couple of days" examining records from BLMIS, such as account statements or trade tickets.  Hoang Decl. Ex. 28 (Castro Dep.) at 139:19-140:5.

118.     BDO's yearly audits of the Funds included a review of Madoff's trading activity for the Funds, confirmation of the Funds' account balances with Madoff and review of Madoff's auditor's statement of internal controls as deemed necessary by BDO.  *See* Steiner Decl. Exs. 50-59 (showing auditor communication between BDO and funds).

**Trustee's Response:**  Disputed as inaccurate and misleading.  BDO audited the books and records of GCC and the Merkin Funds and their audit therefore was not intended to detect fraud at BLMIS.  *See, e.g.*, Hoang Decl. Ex. 29 (Trustee Ex. 27) at BDO_T004900 ("an audit is not designed to detect errors or fraud."); Hoang Decl. Ex. 28 (Castro Dep.) at 56:19-57:18 ("We have no ability to go outside the entity, to start auditing other entities for which it does business with.").  Castro, who served as the engagement partner for BDO Seidman and Merkin's Funds,

stated that "the financial statements are the company's responsibilities, and safeguarding and

recording of the books is the company's responsibilities." Hoang Decl. Ex. 28 (Castro Dep.) at

53:17-54:7. Castro went on to testify that BDO would test a "random sample" of "no more than

a handful [of trade confirmations] on each engagement," and did not audit the entities with which

GCC did business, including BLMIS. *Id.* at 56:19-57:18, 104:25-105:7, 117:7-11. Other than

tying the BLMIS-issued trade confirmation back to the BLMIS-issued brokerage statement,

BDO did not conduct any testing to see if the trades at BLMIS actually occurred. *Id.* at 116:6-

22. Further, over the course of a four-six week audit, "probably not more than a day or two" was

spent examining BLMIS's records. *Id.* at 139:19-140:22. BDO did not ever conduct any

examination of the trading volumes reported in the Merkin Funds' BLMIS statements. *Id.* at

117:12-21. Finally, Castro testified that BDO "never provided due diligence services or

investigated the reputation of an investment advisor or a broker dealer." *Id.* at 144:13-24.


119.    BDO issued clean audit opinions each year for the Funds, with the exception of

one presentation item in 2001 related to the condensed schedule of investments. *See* Steiner

Decl. Ex. 92 (Castro Dep.) at 170:9-19.

**Trustee's Response:** Disputed as incomplete and misleading. *See supra* ¶ 118. It is not

disputed that BDO issued an audit opinion each year for the Merkin Funds based on a limited

review of the Funds' books and records of GCC and the Funds.


120.    BDO was well-aware of the Funds' investments with BLMIS, including that

Ascot Partners had invested substantially all of its assets in a managed account with BLMIS. *See*

Steiner Decl. Ex. 92 (Castro Dep.) at 163:17-164:1; Ex. 109 (Gershengoren Dep. dated May 18,

2009 in In the Matter of Madoff Charities Investigation), at 13:4-16, 38:10-18.

**Trustee's Response:**  Disputed as not relevant to any claims or defenses to the

Defendants' motions for summary judgment and to Merkin's knowledge of facts suggesting a

high probability of fraud in BLMIS's IA Business.  The scope of BDO's audit was limited to the

Merkin Funds and therefore not intended to detect fraud at BLMIS.  *See, e.g.*, Hoang Decl. Ex.

29 (Trustee Ex. 29) at BDO_T_0004900 ("an audit is not designed to detect errors or fraud.");

Hoang Decl. Ex. 28 (Castro Dep.) at 56:19-57:18 ("We have no ability to go outside the entity,

to start auditing other entities for which it does business with."); *see supra* ¶ 118.

Further, to the extent that BDO was aware of Ascot Partners' strategy, BDO only confirmed that

it was not potentially in violation of the funds' offering memoranda and did not perform any

evaluation of Madoff's investment strategy, as this was not required under Generally Accepted

Accounting Principles.  Hoang Decl. Ex. 28 (Castro Dep.) at 101:24-103:22.  The statement is

further disputed as it is not based on admissible evidence to the extent that it is based on the

deposition testimony of Irina Gershengoren in a third-party action to which the Trustee was not a

party.


121.    Defendants provided BDO complete access to all requested documentation,

including copies of Madoff's trading confirmations and monthly statements, and access to

GCC's books and records.  *See* Steiner Decl. Ex. 94 (Castro Dep.) at 91:22-92:3, 104:6-105:2,

105:19-106:3, 164:2-5, 167:15-20; Ex. 102 (Seymour Dep.) at 117:15-19; Ex. 84 (Merkin Dep.)

at 191:16-193:11.

**Trustee's Response:**  Disputed as incomplete and misleading.  *See supra* ¶ 118.

122.    BDO did not note any BLMIS trades listed outside the possible range.  *See*

Steiner Decl. Ex. 94 (Castro Dep.) at 175:5-8.

**Trustee's Response:**  Disputed as incomplete and misleading.  *See supra* ¶ 118.  BDO

performed a price test on securities to determine whether the valuation agreed with the valuation

as recorded in the company's books and records at the end of the year.  Hoang Decl. Ex. 28

(Castro Dep.) at 90:5-25.  Since BLMIS was purportedly in cash at year end, BDO would not

have tested BLMIS's securities pricing.  *Id.* at 91:1-16.  BDO did not test to see how often

BLMIS trades occurred at the highs and lows of the day.  *Id.* at 176:2-7.


123.    BDO had confirmed the balances in the BLMIS accounts directly with the SEC-

registered broker-dealer.  *See* Steiner Decl. Ex. 94 (Castro Dep.) at 89:3-7, 89:25-90:4, 164:6-21.

**Trustee's Response:**  Disputed as inaccurate and misleading.  *See supra* ¶ 118.  BDO, as

part of its audit process, did nothing more than confirm the BLMIS-related balances that

appeared on the Merkin Funds' books and records with written confirmations from BLMIS.

Hoang Decl. Ex. 28 (Castro Dep.) at 164:2-21.


124.    BDO was aware that Madoff was audited by Friehling & Horowitz.  Steiner Decl.

Ex. 94 at 132:5-16 (Castro Dep.); Ex. 110 (BDO_S_0003891).

**Trustee's Response:**  Disputed as incomplete and misleading.  *See supra* ¶ 118.  The

identity of BLMIS's auditor was irrelevant to BDO.  Hoang Decl. Ex. 28 (Castro Dep.) at 132:5-

20 ("[W]e're not really taking note whether it's Eisner, BDO or Friehling & Horowitz" because

the identity of the auditor "wasn't the relevant purpose of getting the internal control letter.").

The identity of the auditor who drafted the internal control letter was not significant to BDO

because "we weren't relying on the auditor for anything" and "didn't use his report in

determining—to the extent or the timing or the nature of our substantive tests." *Id.* at 135:9-

136:6.  BDO did not verify whether or not Friehling & Horowitz's internal control letter was

accurate because "we'd have to do the audit of Madoff ourselves." *Id.* at 134:14-25.  The

statement is further disputed as incomplete and misleading to the extent that it suggests that BDO

was engaged to do anything more than audit the books and records of GCC and the Merkin

Funds.


125.    BDO was not troubled by the size or qualifications of Madoff's auditor.  Steiner

Decl. Ex. 94 (Castro Dep.) at 135:16-25.

**Trustee's Response:**  Disputed as misleading and not supported by the evidence.

Castro's testimony does not refer to the size or qualifications of Friehling & Horowitz.  Further

disputed for the reasons stated in *supra* ¶ 124.

The statement is further disputed as misleading and immaterial to Merkin's knowledge of

facts suggesting a high probability of fraud in BLMIS's IA Business, particularly where

investors raised concerns directly to Merkin about BLMIS's auditor.  Hoang Decl. Ex. 30 (Nash

Dep.) at 51:10-52:8 (testifying  that the "lack of a major accounting firm to me was a red flag,"

and that he voiced this concern to Merkin).  The fact that BLMIS, with public estimates of assets

under management as much as $7 billion by 2001, did not have a well-known, well-established,

and well-equipped auditor was a red flag because it is easier for an investment advisor to produce

fictitious numbers or fraudulent financial statements if the auditor is not equipped or does not

have the requisite expertise to identify fraudulent activity.  Pomerantz Decl. Ex. 1 (Pomerantz

Expert Report) ¶ 172.

126.    BDO never expressed concerns about any of the materials reviewed from or about Madoff, and never suspected that BLMIS was operating a fraud.  Steiner Decl. Ex. 94 (Castro Dep.) at 170:20-24.

**Trustee's Response:**  Disputed as not supported by the evidence.  *See supra* ¶¶ 118, 124. The cited testimony does not state that BDO never expressed concerns about any of the materials reviewed from or about Madoff.  Castro testified that he did not consider the testing and analysis that BDO conducted on the Merkin Funds to be due diligence on BLMIS.  Hoang Decl. Ex. 28 (Castro Dep.) at 148:18-149:3.  The statement is further disputed as incomplete and misleading to the extent that it suggests that BDO was engaged to do anything more than audit the books and records of GCC and the Merkin Funds.

127.    BDO referred investors to Ascot knowing it was a "Madoff feeder product."  *See* Steiner Decl. Ex. 71 (email from Michael Autera to J. Ezra Merkin dated May 29, 2003); Ex. 84 (Merkin Dep.) at 600:24-601:10.

**Trustee's Response:**  Disputed as not supported by the evidence and based on inadmissible hearsay.  The email does not indicate that BDO, as a corporate entity, referred any investors to Ascot Partners or Ascot Fund.  The statement is also incomplete and misleading. The BDO employee referenced in the email, Michael Andreola, testified, in a third-party action against Merkin, that he never recommended "Ascot" as an investment to any client or associate and that he did not know Keith Rosenbloom or his firm.  Hoang Decl. Ex. 31 (Andreola testimony) at BDO_T_0043034.

128.    A BDO partner recommended Ascot to at least one investor.  *See* Steiner Decl.

Ex. 71 (email from Michael Autera to J. Ezra Merkin regarding "FW: Contact Information"

dated May 29, 2003).

**Trustee's Response:**  Disputed as based on inadmissible hearsay.  Further disputed for

reasons set forth in *supra* ¶ 127.


129.    There is no set formula for due diligence.  *See* Steiner Decl. Ex. 11 (Weingarten

Report), at 2; Ex. 94 (Castro Dep.) at 148:8-15 ("'[D]ue diligence' is a term of art.  It doesn't

have any prescribed methodologies.  They differ from firm to firm, people to people . . . ."); Ex.

9 (Pomerantz Dep.) at 39:17-41:11, 88:16-21 ("I mean the five P's are the objective standard,

and then it is incumbent on a fiduciary to accomplish the due diligence into each of those P's to

the extent that data and tools are available, and circumstances warrant."); *see also* Ex. 9(a)

(Pomerantz Rebuttal Report) at ¶ 6; Ex. 9 (Pomerantz Dep.) at 39:19-23.

**Trustee's Response:**  Disputed as incomplete and misleading.  When a fund manager

allocates investments to another investment advisor, it is industry custom and practice for the

fund manager to evaluate the investment opportunity by performing due diligence.  Pomerantz

Decl. Ex. 1 (Pomerantz Expert Report) ¶ 31.  The purpose of due diligence is to understand the

advisor's investment process, to determine whether the resulting investment fits the fund

manager's goals and risk tolerance, and to make a determination about the sustainability of the

investment advisor and strategy.  *Id.*  Industry custom and practice is to perform due diligence

elements such as performance attribution, peer analysis, alpha analysis, reverse engineering, risk-

adjusted and style-adjusted analyses, scenario analysis, drawdown analysis, and correlation

analysis among other analyses.  *Id.* ¶ 32.  In the investment management industry, a

comprehensive template or framework for conducting due diligence centers around the Five Ps—

consisting of Process, Portfolio, People, Performance, and Price.  Pomerantz Decl. ¶ 6;

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 33.  The Five Ps framework is an

organization of the due diligence tools typically used to evaluate an investment in accordance

with the customs and practices of the investment management industry.  Pomerantz Decl. ¶ 6;

Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 76-77.  The specific tools used to evaluate

a particular investment depend on the amount of information available to the fund manager, as

well as the results of due diligence.  Pomerantz Decl. ¶ 6; Hoang Decl. Ex. 32 (Pomerantz Dep.)

at 39:17-40:14, 189:12-191:21.  For example, if due diligence reveals a red flag that is an indicia

of fraud or creates an opportunity for fraud, it is industry custom and practice for the fund

manager to perform additional due diligence to determine whether that red flag leads to yet

another red flag.  Pomerantz Decl. ¶ 6.  However, not every due diligence tool is required (or

possible) with every due diligence analysis.  *Id.*  For example, it may not be possible or

necessary to use certain tools in the framework if there is not sufficient information available or

if returns are consistent with expected returns for the strategy.  Pomerantz Decl. ¶ 6; Pomerantz

Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 49-76.

Further disputed to the extent that it relies on Castro's testimony.  Castro testified that

BDO "never provided due diligence services or investigated the reputation of an investment

advisor or an underwriter or a broker/dealer or any other entity including investments at our

client's request or anybody else's."  Hoang Decl. Ex. 28 (Castro Dep.) at 144:13-24.  The scope

of BDO's retention and audit of the books and records of GCC and the Merkin Funds is set forth

*supra* in ¶ 118.

130.    Pomerantz admitted that he manufactured virtually all of the pricing discrepancies by "adjusting" every pre-2006 stock transaction by four cents per share from the price reported on the BLMIS trade confirmation by subtracting four cents per share from the purchase price reported on the BLMIS confirmation sent to Ascot Partners for every stock purchase, and adding four cents per share to the sale price reported on the BLMIS confirmation for every stock sale. Steiner Decl. Ex. 9 (Pomerantz Dep.) at 226:25-227:9.  He used the "adjusted" prices in his comparison to the reported daily high-low range and his VWAP analysis. *Id.* at 230:6-23, 234:18-23.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  As early 1993, there had been 124 equity transactions and 152 options transactions across the Merkin BLMIS Accounts that reported prices outside of the daily price range.  Pomerantz Decl. Ex. 1 (Pomerantz Report) ¶ 359.  By the end of 1995, there were cumulatively 265 out-of-range equity transactions and 247 out-of-range option transactions.  *Id.* ¶ 362.  The out-of-range equity transactions increased from 501 to 961 and the out-of-range options transactions increased from 299 to 362 between May 2001 and August 2005.  *Id.* ¶¶ 366, 372.

Prior to September 2006, the back of BLMIS trade confirmations stated that the trade price "includes a commission equivalent of $.04 per share."[5]  Pomerantz Decl. ¶ 12; Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 190-91.  Therefore, conducting any analysis based on share prices prior to September 2006 would require removing this commission from the reported price.  Pomerantz Decl. ¶ 12.  In order to conduct his analysis, Pomerantz adjusted reported prices prior to September 2006 by $0.04 to account for the commission purportedly included in the prices reported by BLMIS.  *Id.* ¶ 13.  Failure to remove the $0.04 commission from the

---

[5]  Beginning in September 2006, when BLMIS registered as an RIA, commissions were reflected on customer statements and trade confirms, rather than in the reported share price.

reported trade price is commensurate with assuming that BLMIS did not charge any fees for the purported investment advisor services. *Id.* That is, if the reported trade prices were not adjusted for commissions, it would imply that Madoff did not make any money from the Merkin BLMIS Accounts, which is inconsistent with Merkin's testimony. *Id.* (citing Hoang Decl. Ex. 63 (*In re Madoff Charities Investigation*, Merkin Dep.) at 42:14-24). The Defendants do not provide a reason for why the four cent per share commission should not be taken into account. Additionally, even if the pre-September 2006 reported prices are not adjusted for the commissions included in the price, the out-of-range and VWAP analyses still result in red flags. *Id.* ¶ 15. The difference is negligible whether accounting for commissions or not. *Id.* Even when not adjusting the prices for commissions:

- There are 462 transactions across the Merkin BLMIS Accounts with reported equity prices outside of the daily price range on the day the trade was made.

- The total dollar amount purportedly gained through out-of-range equity transactions is still over $8.8 million (compared to $10.3 million when accounting for commissions).

- 78.3% of the purported buy transactions were executed below VWAP for the Merkin BLMIS Accounts from January 1996 to November 2008 (as compared to 81.3% when accounting for commissions), and 70.4% of purported sell transactions were executed above VWAP (as compared to 74.9% when accounting for commissions).

- On average, BLMIS purportedly bought shares $0.38 per share below VWAP and purportedly sold shares $0.29 per share above VWAP (as compared to buying

shares $0.39 below VWAP and selling shares $0.30 above VWAP when accounting for commissions).

*Id.*

131.    In conducting due diligence, Pomerantz reviewed transaction-level data but never looked at trade confirmations.  *See* Steiner Decl. Ex. 9 (Pomerantz Dep.) at 100:4-13.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  Pomerantz testified that he did not need to look at trade confirmations because he had transaction-level data (from the trade confirmations) inputted into a system to perform his analyses.  Hoang Decl. Ex. 32 (Pomerantz Dep.) at 100:4-18; Pomerantz Decl. ¶ 15.

132.    In conducting due diligence, Pomerantz never looked at stock transaction prices compared to daily highs and lows.  Steiner Decl. Ex. 9 (Pomerantz Dep.) at 101:5-20.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  Pomerantz testified that in "the circumstances that I have worked in, I never had a need to do that," because his objective in conducting due diligence was to "understand things as best as I could, and I felt that I always reached that objective by using the tools that were necessary."  Hoang Decl. Ex. 32 (Pomerantz Dep.) at 101:21-102:7.  Additionally, Pomerantz testified that he compared stock transaction prices against VWAP (volume weighted average price), and therefore did not need to look at daily highs and lows.  *Id.* at 100:25-101:16.  In those situations where trade level data is available—as was the case for the Merkin BLMIS Accounts—Pomerantz compared transaction prices to VWAP as part of his due diligence process.  *Id.*  If the returns were inconsistent with how the strategies were expected to perform, as was the case with the Merkin BLMIS Accounts,

then Pomerantz would have conducted additional due diligence, which may have included a comparison of transaction prices to daily highs and lows.  Pomerantz Decl. ¶ 16.

133.    The Trustee's expert acknowledged that reverse engineering of fund's strategy is not standard due diligence procedure.  Steiner Decl. Ex. 7 (Hirsch Dep.) at 63:22-64:14.

**Trustee's Response:**  Disputed as misleading and not supported by the evidence.  Amy Hirsch did not testify that reverse engineering a fund's investment strategy was "not standard due diligence."  Rather, she testified that one would "not necessarily" need to reverse engineer a strategy because "there are different ways to get factors and correlation analysis done to find out what footprints are."  Hoang Decl. Ex. 33 (Hirsch Dep.) at 63:22-64:14.  Reverse engineering is a due diligence tool that can be used under appropriate circumstances.  Pomerantz Decl. ¶ 8 ("For example, when performing due diligence on the Madoff SSC strategy in 2005, I observed that the stated monthly returns were entirely inconsistent with this strategy.  Through reverse engineering, I attempted to replicate the strategy so that I could evaluate the risks and returns of the investment.  In doing so it became apparent to me that the reported returns were not consistent with the Madoff SSC strategy.  Specifically, the reported BLMIS-based returns were less volatile than they should have been based on the elements of the Madoff SSC strategy.  As a result, I became convinced that Madoff was not performing any version of the SSC strategy and was likely engaged in front-running or some other fraud.  I ultimately recommended that my client divest."); Pomerantz Decl. Ex. 1 (Pomerantz Report) ¶¶ 23, 83.

134.    The Merkin Defendants' due diligence expert, Jeffrey Weingarten, was a senior executive of Goldman Sachs and a successful hedge fund manager.  *See* Steiner Decl. Ex. 11 (Weingarten Report), at 1, Ex. A.

**Trustee's Response:**  Disputed as incomplete, misleading, and not based on admissible evidence.  Jeffrey Weingarten admitted that he did not conduct due diligence on hedge funds as a fund manager.  Hoang Decl. Ex. 34 (Weingarten Dep.) at 19:15-19, 23:3-11, 49:9-50:18, 62:15-23 ("at Goldman Sachs I didn't have a hedge fund product.").

135.    After an exhaustive review of relevant documents and deposition testimony, Weingarten concluded that Merkin had obtained a clear understanding of each of the key characteristics essential to making a determination of whether to invest in a fund manager (Philosophy, Process, Procedures, People and Performance).  *See* Steiner Decl. Ex. 11 (Weingarten Report), at 6.

**Trustee's Response:**  Disputed as incomplete, misleading, and not based on admissible evidence.  Weingarten cannot offer an opinion as to Merkin's state of mind.  The statement is further not supported by the evidence because Weingarten's review was limited to a small portion of the Defendants' documents and only the testimony of Merkin and Michael Autera. Hoang Decl. Ex. 35 (Weingarten Report) Ex. B.

136.    Weingarten concluded that "the due diligence performed by [the Merkin Defendants] met or exceeded industry standards."  Steiner Decl. Ex. 11 (Weingarten Report), at 2.

**Trustee's Response:** Disputed as incomplete, misleading, not based on admissible evidence, and that the statement improperly sets forth a legal conclusion as a statement of fact. Merkin did not perform due diligence in accordance with the customs and practices of the investment management industry. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report); Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report).

## VII.    Defendants' Transparency

137.    The Trustee alleges that, as a result of Merkin's knowledge of the BLMIS fraud, Merkin "misled certain investors as to Madoff's role in the operation of the Defendant Funds, and in fact sought to conceal from investors Madoff's involvement in the Defendant Funds' investments and/or the amount of investment with BLMIS." (TAC ¶ 109).

**Trustee's Response:** Not disputed.

138.    Merkin arranged for many investors in the Funds to meet with Madoff and do their own direct due diligence. Steiner Decl. Ex. 95 (Ehrenkranz Dep.) at 43:6-18; Ex. 84 (Merkin Dep.) at 183:2-20, 184:13-17, 306:23-307:6 ("[A]s part of what they were doing and part of what [Research Company A Principal] was doing, he asked for a visit and we set up a visit."); Ex. 98 (Research Company A Principal Dep.) at 19:24-20:6; Ex. 12 (Weingarten Dep.) at 218:2-13; Ex. 62 (J. Ezra Merkin calendar); Ex. 63-70 (Various emails).

**Trustee's Response:** Disputed as incomplete, misleading, and not supported by the evidence. The evidence does not support that Merkin arranged for "many investors in the Funds to meet with Madoff."

The Defendants cite Merkin's calendar, which spans 12 years but only has three appointments that indicate Merkin brought investors to meet with Madoff: Gedale Horowitz on February 13, 2003; Roman Igolnikov on February 8, 2004; and Patrick Erne on October 19, 2007. The emails that the Defendants cite refer to meetings Merkin arranged for Erne and Igolnikov, along with a meeting that was arranged for Research Company A's Principal and Merkin's discussions with Ahron Green that he was "working on" a date with Madoff. The Defendants have put forth no evidence regarding whether a meeting between Green and Madoff was ever arranged.

Additionally, Joel Ehrenkranz testified that he originally met with Madoff in 1991 or 1992 at Merkin's suggestion to consider directly investing with BLMIS before Ehrenkranz had any knowledge of the Merkin Funds' investments with BLMIS. Hoang Decl. Ex. 36 (Ehrenkranz Dep.) at 43:6-44:11. After this meeting, Ehrenkranz decided not to invest with BLMIS because he was concerned that BLMIS self-cleared and lacked independent verification. *Id.* at 48:4-49:7, 55:5-7. Ehrenkranz informed Merkin of his concerns. *Id.* at 55:16-56:17. Merkin enticed Ehrenkranz to instead invest in Ascot Partners by claiming that he would provide independent verification. *Id.* at 58:1-20. Based on Merkin's representations, Ehrenkranz made a seed investment in Ascot Partners but redeemed the investment in 1995, informing Merkin that the "stability of the returns began to belie any understanding of how it was possible to achieve, and we just became sufficiently uncomfortable with the whole idea of his ability to do this." *Id.* at 64:22-65:18. Ehrenkranz informed Merkin that "it was very hard to achieve these kinds of returns and just almost impossible." *Id.* at 65:19-66:8. Additionally, Ehrenkranz maintained investments in Gabriel and Ariel but Merkin never informed him of Gabriel's and Ariel's exposure to BLMIS. *Id.* at 98:11-99:20.

Research Company A Principal testified that Research Company A made multiple requests over the years to Merkin to arrange a meeting with Madoff and was only provided a meeting once.  Hoang Decl. Ex. 4 (Research Company A Principal Deposition, November 21, 2013) at 138:2-14.  Research Company A Principal went on to testify that Merkin stated, "Madoff doesn't like to meet with investors."  *Id.* at 138:15-24.  Research Company A's client made a redemption in its investment after this meeting.  *Id.* at 145:2-9.

With regard to Igolnikov, there is no evidence that supports that he was conducting due diligence on BLMIS.  Merkin testified that the purpose of the meeting was "Roman wanted to meet with Madoff," but does not recall attending the meeting.  Hoang Decl. Ex. 8 (Merkin Dep.) at 529:6-530:11.

Erne testified that Merkin made numerous misrepresentations to him regarding Reichmuth & Co's investments with Ascot Fund and Ariel.  Erne and his colleagues at Reichmuth & Co. were under the impression that Madoff was an "executing broker" for Ascot Fund, and they were unaware that Ariel invested with Madoff.   Hoang Decl. Ex. 37 (Erne Dep.) at 57-59, 66, 68, 76, 78-79, 81, 103-106.  Erne testified that the meeting with Madoff was a "general discussion" about "the brokering business of Madoff Securities."  *Id.* at 146.  Erne "can't remember talking about any investments at all, or an investment strategy or any returns . . . I don't think I even knew that there was an investment advisory business unit."  *Id.* at 147.  Erne "never actually [performed] due diligence on Madoff Securities.  As far as we understood, Madoff Securities was a broker."  *Id.* at 150.  He "did not know at the time that Madoff Securities had an advisory business.  And [he] never, in any way analyzed or saw BLMIS products."  *Id.* at 73.  Erne testified that "the main reason for the meeting was, in fact, to get a feeling or an impression of the brokering business of Madoff Securities."  *Id.* at 151.

Merkin testified that he believed that Horowitz and Madoff had a pre-existing relationship. Hoang Decl. Ex. 8 (Merkin Dep.) at 393:3-14 ("[The meeting] started with, you know, you son of a gun, do you remember what you did to me in whatever year it was…it didn't sound like these were exactly two people meeting for the first time"). When asked if he was the one who arranged the meeting for Horowitz, Merkin testified that he "[thought] so" and then clarified that he was "not sure I was at the meeting or this is my memory of what they told me about the meeting. They meaning mostly Gedale." *Id.* at 394:14-19.

Additionally, there were numerous investors to whom Merkin refused to provide access to Madoff.

In June 2003, Noreen Harrington met with Merkin to conduct due diligence on Ascot Partners. Hoang Decl. Ex. 38 (Harrington Dep.) at 117:18-118:22. During this meeting, Harrington requested to meet with Madoff. *Id.* at 129:1-132:10. In response, Merkin told her that she "didn't get it" and that she did not "get to ask questions," stating that "this [investing with BLMIS] was a privilege." *Id.*

Representatives of Aozora Bank asked Merkin for a meeting with Madoff on multiple occasions but it was never arranged. Hoang Decl. Ex. 39 (Orchard Dep.) at 78:1-7, 84:18-23, 125:13-126:20.

While conducting their due diligence on behalf of an investor in Ascot Partners, Cambridge Associates stated, "We requested to have a meeting with anybody on the Madoff team." Hoang Decl. Ex. 40 (Kim Dep.) at 59:21-62:19. Merkin did not provide access to Madoff stating that "they weren't taking meetings." *Id.* Cambridge found this to be unacceptable as they could not complete their due diligence and recommended that the client redeem their investment. *Id.* at 84:1-85:3.

The statement is further disputed to the extent that it relies upon the testimony of Weingarten, who is not a fact witness and has no personal knowledge. *See* FED. R. EVID. 701, 703.

Additionally, simply knowing of or talking to other investors does not rise to the level of due diligence consistent with industry customs and practices. Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 54.

139.    The largest single investor in Ascot was Union Bancaire Privee ("UBP"), a sophisticated Swiss bank. *See* Steiner Decl. Ex. 91 (Autera Dep.) at 166:2-9.

**Trustee's Response:** Disputed as vague and misleading. The statement does not state the time period in which UBP was the largest investor in Ascot. Additionally, the statement does not differentiate between Ascot Partners and Ascot Fund.

140.    UBP had total investments in Ascot of more than $487 million as of November 30, 2008 and net capital investments of $380 million across several different accounts in both the domestic and offshore funds. *See* Steiner Decl. Ex. 77 (Ascot Fund Investor Capital Accounts, GCC-P 0878185) at GCC-P 0878185, -92, -99; Ex. 79 (Ascot Partners Investor Capital Accounts, GCC-P 0878213) at GCC-P 0879316, -880408, -880434, -880512, -880564, -881006.

**Trustee's Response:** Disputed as vague and not supported by the evidence. With regard to the first half of the statement that "UBP had total investments in Ascot of more than $487 million as of November 30, 2008," the statement is ambiguous as it does not differentiate between Ascot Partners and Ascot Fund and that the second half of the statement related to net capital differentiates between "domestic and offshore funds." Further, the evidence cited does

not support that UBP had "total investments in Ascot of more than $487 million," but instead provides its investments as of December 31, 2007, not November 30, 2008.  The statement is further disputed, as the term "net capital investments" is vague and undefined.  The statement is further incomplete and misleading, as these figures do not take into account redemption requests that UBP submitted but were not paid before November 30, 2008.  Hoang Decl. Ex. 23 (Autera testimony-Jesselson arbitration) at 1833:20-1834:14.

141.    Merkin twice took representatives of UBP to meet with Madoff as part of UBP's due diligence on Ascot.  Steiner Decl. Ex. 87 (Merkin Dep. dated July 1, 2010), at 20:9-18; Ex. 91 (Autera Dep.) at 164:20-170:24.

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by the evidence.  The first UBP meeting with Madoff was only arranged for one employee, Igolnikov, and there is no evidence that supports that he was conducting due diligence on BLMIS on behalf of UBP.  Merkin testified that the purpose of the meeting was "Roman wanted to meet with Mr. Madoff," but does not recall attending the meeting.  Hoang Decl. Ex. 8 (Merkin Dep.) at 529:6-530:11.

The Trustee does not dispute that representatives of UBP met with Madoff and Merkin in November 2008.  This meeting was arranged less than one month before the fraud was revealed and was done so only after UBP threatened to redeem almost their entire investment in Ascot Fund.  Hoang Decl. Ex. 23 (Autera testimony-Jesselson Arbitration) at 1833:20-1834:14.

142.    One of these meetings was on November 25, 2008 and included Madoff, Merkin,

GCC's chief financial officer Michael Autera, and a team of four people from UBP.  *See* Steiner

Decl. Ex. 91 (Autera Dep.) at 164:20-170:24.

**Trustee's Response:**  Disputed as incomplete and misleading.  *See supra* ¶ 141.


143.    Following that meeting, UBP decided to continue to invest hundreds of millions

of dollars in Ascot.  *See* Steiner Decl. Ex. 91 (Autera Dep.) at 164:20-170:24.

**Trustee's Response:**  Disputed as incomplete and misleading.  The second meeting

between UBP took place on November 25, 2008.  BLMIS collapsed on December 11, 2008, less

than two weeks later.  UBP attempted to redeem 50% of its investment after the November 25,

2008 meeting.  Hoang Decl. Ex. 23 (Autera testimony-Jesselson Arbitration) at 1833:20-

1834:14.


144.    Merkin also took employees of another Swiss bank, Reichmuth & Co., to meet

with Madoff on two separate occasions.  On one of those occasions, Merkin also brought a

representative from "Research Company A" to the meeting with Madoff.  Steiner Decl. Ex. 64

(email from Patrick Erne to J. Ezra Merkin regarding "RE: Meeting Request" dated October 3,

2007); Ex. 84 (Merkin Dep.) at 514:6-515:9, 516:16-517:22.

**Trustee's Response:**  Disputed as incomplete and misleading.  Erne attended a meeting

with Merkin and Madoff in October 2007 and testified that Merkin made numerous

misrepresentations to him regarding Reichmuth & Co's investments with Ascot Fund and Ariel.

*See supra* ¶ 138.  Erne and his colleagues at Reichmuth & Co. were under the impression that

Madoff was an "executing broker" for Ascot Fund, and they were unaware that Ariel invested

with Madoff.  Hoang Decl. Ex. 37 (Erne Dep.) at 57-59, 66, 68, 76, 78-79, 81, 103-106.  Erne

testified that the meeting with Madoff was a "general discussion" about "the brokering business

of Madoff Securities."  *Id.* at 146.  Erne "can't remember talking about any investments at all, or

an investment strategy or any returns . . . I don't think I even knew that there was an investment

advisory business unit."  *Id.* at 147.  Erne "never actually [performed] due diligence on Madoff

Securities.  As far as we understood, Madoff Securities was a broker."  *Id.* at 150.  He "did not

know at the time that Madoff Securities had an advisory business.  And [he] never, in any way

analyzed or saw BLMIS products."  *Id.* at 73.  Erne testified that "the main reason for the

meeting was, in fact, to get a feeling or an impression of the brokering business of Madoff

Securities."  *Id.* at 151.  With regard to the other meeting that Merkin "took employees of

Reichmuth & Co" to meet with Madoff, the statement is disputed as incomplete and misleading,

as, when asked if he himself attended this meeting, Merkin did not confirm that he did and

testified that he was "not sure I remember this one specifically."  Hoang Decl. Ex. 8 (Merkin

Dep.) at 515:4-515:9.

It is undisputed that Research Company A Principal attended the meeting that Erne was

present at with Madoff and Merkin.  However, the statement is incomplete and misleading.

Research Company A Principal testified that Research Company A made multiple requests over

the years to Merkin to arrange a meeting with Madoff and was only provided a meeting once.

Hoang Decl. Ex. 4 (Research Company A Principal Dep.) at 138:2-14.  Research Company A

Principal went on to testify that Merkin stated, "Madoff doesn't like to meet with investors."  *Id.*

at 138:15-24.  The statement is further incomplete and misleading, as it omits that employees of

Research Company A had numerous issues with regard to Madoff, and that Merkin made

numerous misrepresentations to these employees.  *See infra* ¶¶ 145-146, 156.  Additionally,

Research Company A's client made a redemption in its investment after this meeting.  Hoang Decl. Ex. 4 (Research Company A Principal Dep.) at 145:2-9.

145.    As part of Research Company A's due diligence, it not only spoke to Merkin and met with Madoff, but also reviewed several years' worth of BLMIS statements and trade confirmations in Merkin's office.  *See* Steiner Decl. Ex. 98 (Research Company A Principal Dep.) at 19:24-20:6.

**Trustee's Response:**  Disputed as not supported by the evidence.  The evidence cited does not support that Research Company A reviewed several years' worth of BLMIS statements and trade confirmations in Merkin's office.  Research Company A Director of Research testified that he reviewed Ascot Fund's statements from January 1, 2002 through December 31, 2002 and Ascot Partners' statements from January 1, 2003 through June 30, 2003.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 20:9-14, 86:4-7; Hoang Decl. Ex. 45 (Trustee Ex. 222).  As a result of the review, Research Company A Director of Research concluded, "I didn't believe that the statements were reality."  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 22:21-23:8, 87:4-88:1.  He wanted to redeem the investment with Ascot Fund and was "convinced this will end badly."  *Id.* at 90:18-91:16; Hoang Decl. Ex. 42 (Trustee Ex. 209).  Both Research Company A Principal and the Director of Research had concerns regarding Madoff, including that it could be a fraud or Ponzi scheme.  Hoang Decl. Ex. 4 (Research Company A Principal Dep.) at 157:18-158:8; Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 54:12-18.

146.    One of the clients advised by Research Company A invested at least $20 million in Ascot following June 2003 conversations with Merkin and maintained those investments through the time of Madoff's confession.  *See* Steiner Decl. Ex. 98 (Research Company A Principal Dep.) at 168:14-17.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  During the June 2003 conversations, Research Company A Director of Research testified that Merkin made all of the following statements during the meeting, which he transcribed in his notes:

- That "Charles Ponzi would lose out because it would be called the 'Madoff scheme.'"  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep. Tr.) at 53:18-23.

- That Merkin saw the "total Treasury run" for all of Madoff's accounts at year end, meaning all of Madoff's investments that were being held in Treasuries.  *Id.* at 59:17-60:5.

- That Merkin would attempt to see what option volumes looked like and that the "S&P option market is 'much, much bigger enough to accommodate.'"  *Id.* at 48:13-17, 48:23-49:13.

- That Madoff's feeders were "on a strict diet."  *Id.* at 51:17-52:9.

- That Madoff was the executor of Merkin's father's will.  *Id.* at 61:13-16.

- That Merkin's brother-in-law worked for Madoff.  *Id.* at 62:6-9.

- That "Ezra's family has had an account with Mr. Madoff since 1978."  *Id.* at 62:17-23.

- That Merkin is a trustee for Madoff's kids and has a role in the will.  *Id.* at 62:24-63:3.

- That, "he audits Bernie for fraud." *Id.* at 63:4-8.

- That none of the charities he is involved in are invested in Ascot due to a conflict of interest. *Id.* at 65:9-14.

- That Merkin checks the daily highs and lows on the NYSE. *Id.* at 66:3-8.

- That Madoff consistently buys near the lows of the day and is never more than 3/8ths outside the NYSE price range for the day. *Id.* at 66:16-21.

- That "9 percent of Ascot belongs to Bernie through his wife Ruth. Over 80M and increasing on July 1st." *Id.* at 67:24-68:6.

- That Merkin stated that Research Company A could not speak to BDO. *Id.* at 68:25-69:20; Hoang Decl. Ex. 43 (Trustee Ex. 208).

Research Company A Principal agreed that he had "reasons to question whether BLMIS might be engaged in . . . a fraud," and testified that he "got comfortable relying on . . . in big part . . . on my conversations with Mr. Merkin." Hoang Decl. Ex. 4 (Research Company A Principal Dep.) at 157:18-158:8. Furthermore, as a result of the June 2003 conversation, Director of Research formed the opinion that Madoff was a fraud. Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 22:11-23:8.

147. Yeshiva University was another investor in Ascot. The University had a net capital investment of approximately $14.5 million purportedly worth approximately $109 million as of November 30, 2008. *See* Steiner Decl. Ex. 78 (Ascot Partners Investor Capital Accounts, GCC-P 0882913) at GCC-P 0882927.

**Trustee's Response:** Disputed as incomplete, inaccurate, and misleading. It is undisputed that Yeshiva University was another investor in Ascot Partners but the term "net capital investment" is vague and undefined.

148.    Merkin was Chairman of the Investment Committee of Yeshiva and a member of the University's Board of Trustees. Steiner Decl. Ex. 84 (Merkin Dep.) at 395:2-10; 428:2-17; TAC, ECF No. 151, at ¶ 41; Answer, ECF No. 261, at ¶ 41.

**Trustee's Response:** Disputed as incomplete and misleading. It is undisputed that Merkin was the Chairman of the Investment Committee of Yeshiva University and a member of the University's Board of Trustees, but the statement does not provide the time periods when Merkin served in these positions.

149.    Until December 11, 2008, Madoff was a Trustee of Yeshiva University as well as its Treasurer and Chairman of the Business School. Steiner Decl. Ex. 84 (Merkin Dep.) at 395:1-10; 426:18-24; TAC, ECF No. 151, at ¶ 85; Answer, ECF No. 261, at ¶ 85.

**Trustee's Response:** Disputed as incomplete and misleading. It is undisputed that Merkin was a Trustee of Yeshiva University as well as its Treasurer and Chairman of its Business School, but the statement does not provide the time periods as to which Merkin served in these positions.

150.    In 2003, Merkin arranged a meeting for himself, Gedale Horowitz, himself an Ascot investor and also the head of Salomon Brothers Municipal Department and chairman of the investment committee of Investment Committee of Yeshiva University, and Madoff. Steiner

Decl. Ex. 57 (email from J. Ezra Merkin to Naomi Ferro regarding "Odds and Ends" dated

February 9, 2003) at 20:9-18; Ex. 84 (Merkin Dep.) at 387:16-389:14.

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by

admissible evidence.  The evidence cited is a request by Merkin to arrange a meeting—it is not

evidence that a meeting actually occurred.  Merkin testified that he did not recall Horowitz

stating that Horowitz had ever conducted due diligence on BLMIS.  Hoang Decl. Ex. 8 (Merkin

Dep.) at 391:9-22.  Merkin further testified that he believed that Horowitz and Madoff had a pre-

existing relationship.  *Id.* at 393:3-19 ("[The meeting] started with, you know, you son of a gun,

do you remember what you did to me in whatever year it was . . . it didn't sound like these were

exactly two people meeting for the first time").  Merkin could not recall any details from the

meeting other than Horowitz and Madoff discussed mutual acquaintances and traded "old war

stories."  *Id.* at 393:3-394:3.  When asked if he was the one who arranged the meeting for

Horowitz, Merkin testified that he "[thought] so" and then clarified that he was "not sure I was at

the meeting or if this is my memory of what they told me about the meeting.  They meaning

mostly Gedale."  *Id.* at 394:14-19.  The statement is additionally disputed as incomplete and

misleading as it does not state the time period that Horowitz served as Chairman of the

Investment Committee of Yeshiva University.


151.    Merkin also arranged meetings with Madoff for Alec Hackel, a sophisticated

investor involved in the commodities industry at Philipp Brothers, at Marc Rich & Company,

and on the board of Reichmuth & Company.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp.

Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 5; Ex. 84 (Merkin Dep.) at

513:10-514:12.

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by the evidence cited.  Christof Reichmuth testified that he recalled attending one meeting between Merkin, Madoff, and Alec Hackel in the end of the 1990s but could not recall who set up the meeting or why it was arranged.  Hoang Decl. Ex. 44 (Reichmuth Dep.) at 114.  Further, Reichmuth testified that he understood that BLMIS was only the "executing broker," not the investment manager, for Ascot.  *Id.* at 53, 62, 66-69, 89-90, 107.

152.    Other sophisticated investors for whom Merkin arranged and with whom Merkin participated in due diligence meetings with Madoff included Ludwig Bravmann, Patrick Erne, and Roman Igolnikov and others from Union Bancaire Privee.  Steiner Decl. Ex. 80 (Merkin Defendants' Supp. Resps. To Trustee's 2d Set of Interrogatories dated Aug. 30, 2013), at 5.

**Trustee's Response:**  Disputed as misleading to the extent the statement suggests that Merkin arranged additional meetings for Erne, who is associated with Reichmuth & Co., that are not already referenced in *supra* ¶¶ 138 and 144.  The statement is further disputed as incomplete and misleading, as Erne testified that he was under the impression that BLMIS was merely the "executing broker" for Ascot, and that the conversation with Madoff was a general discussion about the "brokering business of Madoff Securities"; Erne could not recall discussing "investments at all, or an investment strategy or any returns" and Erne did not even know that there was "an investment advisory business unit" at BLMIS.  *See supra* ¶¶ 138, 144.

It is undisputed that Merkin arranged for a meeting between Igolnikov and Madoff.  It is disputed as the statement "with whom Merkin participated in due diligence meetings with Madoff" is not supported by admissible evidence.  Merkin testified that the purpose of the

meeting was "Roman wanted to meet with Madoff," but does not recall attending the meeting. Hoang Decl. Ex. 8 (Merkin Dep.) at 529:6-530:11.

Disputed as to any meeting between Ludwig Bravmann and Madoff having taken place, as this is not supported by any admissible evidence. Further, when asked, Merkin stated that he does not recall the circumstances of the purported meeting, when the meeting took place, or if he even attended the meeting. *Id.* at 512:5-513:5.

Additionally, simply knowing of or talking to other investors does not rise to the level of due diligence consistent with industry customs and practices. Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 54.

153.    Merkin openly discussed his conversations with Madoff with others. *See* ¶ 154, *infra*.

**Trustee's Response:**  Disputed as the evidence cited does not support the assertion that Merkin "openly discussed his discussions with Madoff with others." *See infra* ¶ 154.

154.    John Steffens, the founder of Spring Mountain Capital, testified that he and Merkin "discussed numerous times the conversations that [Merkin] had with Bernie Madoff in terms of looking at how Ascot was structured and whether Bernie was going to change some of his particular views and whether Ezra agreed with that or didn't agree with that." Steiner Decl. Ex. 105 (Steffens Dep.) at 40:14-41:9, 80:12-21 ("Ezra related some of those meetings [with Madoff] or the results of some of those meetings to me").

**Trustee's Response:** Disputed as incomplete and misleading.  Steffens testified as to many misrepresentations made to him by Merkin over the years.  For example, he stated that he

08-01789-cgm    Doc 15692-8    Filed 04/07/17    Entered 04/07/17 20:26:17    Exhibit H
Pg 86 of 113

understood that with Ascot, Merkin made "some of the decisions as to whether they were in the market or out of the market, and it was up to Mr. Madoff to basically execute it." Hoang Decl. Ex. 7 (Steffens Dep.) at 66:9-67:2. Steffens also testified that Merkin told him that there were times when Madoff was 100% in the market and Ascot was not, based on Merkin's independent decision having "overrode what Madoff was doing." *Id.* at 68:3-13. Further, Steffens stated that he discussed the positions held by Gabriel and Ariel at length with Merkin, yet he was not told of any exposure to Madoff. *Id.* at 40:14-41:9, 90:22-95:5. Additionally, Steffens testified that Merkin informed him that Ascot's trades were cleared through Morgan Stanley. *Id.* at 71:17-72:11.

155.    Merkin also provided multiple years of BDO's audited statements of the Funds to investors and potential investors. Steiner Decl. Ex. 105 (Steffens Dep.) at 69:7-22 ("BDO Seidman had been [the Funds'] auditor I believe for 10 or 12, 15 years. So a very long time. And so they provided audited statements every year that said the securities were there. And I reviewed seven to ten years of those audit statements in conjunction with making those investments. I thought that it was interesting, they were very specific. It said it had $225 million worth of these treasury bills and they were responsible to be Ascot's auditors and they've been doing it for a long time, and so I took great comfort in that.").

**Trustee's Response:** Disputed as incomplete, misleading, and immaterial. Whether Merkin provided BDO's audited statements of the Merkin Funds to investors or potential investors is immaterial to the claims or defenses in this action. Further, the evidence cited does not support the proposition that Merkin provided BDO's audited statements to "potential investors." *See supra* ¶ 118.

156.    Merkin provided copies of BLMIS trade confirmations as well as profit and loss statements generated by GCC's portfolio management system to investors.  Steiner Decl. Ex. 105 (Steffens Dep.) at 75:7-18 ("[Merkin] got trade notification from Madoff.  He put them into his own forms, which I saw on numerous occasions, which outlined the positions that Ascot had at any given time.  And I saw those trade sheets . . . that Ezra produced fairly frequently."); Ex. 98 (Research Company A Principal Dep.) at 44:19-45:5 ("We examined all the documents that [] were provided by Ascot Fund as offering documents, articles, the statements. . . .  We were looking at the trade tickets of Ascot Funds to get better idea of the execution of those trades and if it makes sense."); Ex. 97 (Research Company A Director of Research Dep.) at 20:3-19 (discussing visit to GCC offices "to obtain further transparency into the investment by looking at monthly statements and trade tickets from Mr. Madoff").

**Trustee's Response:**  Disputed as misleading as the evidence cited only supports the proposition that Merkin provided BLMIS account statements to Research Company A on one occasion.  Research Company A Director of Research testified that he reviewed Ascot Fund's statements from January 1, 2002 through December 31, 2002 and Ascot Partners' statements from January 1, 2003 through June 30, 2003.  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 20:9-14, 86:4-7; Hoang Decl. Ex. 45 (Trustee Ex. 222).  As a result of the review, Director of Research concluded, "I didn't believe that the statements were reality."  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 22:21-23:8, 87:4-88:1; Hoang Decl. Ex. 45 (Trustee Ex. 222).  Director of Research wanted to redeem the investment with Ascot and was "convinced that this will end badly."  Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 90:18-91:16; Hoang Decl. Ex. 42 (Trustee Ex. 209).

157.    Merkin regularly spoke to investors and potential investors regarding Madoff and the Funds.  Steiner Decl. Ex. 98 (Research Company A Principal Dep.) at 44:25-45:1, 67:21-68:2, 136:24-137:1.

**Trustee's Response:**  Disputed as misleading.  Merkin misrepresented the nature of the relationship between Ascot and BLMIS to many investors.  *See supra* ¶¶ 56, 138, 144, 146, 151, & 154; Tr. SOF, ¶¶ 150-99.  Additionally, Merkin failed to disclose any relationship between BLMIS and Ariel and Gabriel to many investors.  Hoang Decl. Ex. 36 (Ehrenkranz Dep.) at 97:25-98:14 (testifying that he did not know of any Madoff exposure in Ariel or Gabriel); Hoang Decl. Ex. 30 (Nash Dep.) at 47:4-16 (testifying that he learned of Madoff exposure in Gabriel for the first time after the fraud was revealed, "I was shocked because I thought I knew Ezra well and thought I knew what he did and didn't expect to have Madoff in that fund."); Hoang Decl. Ex. 46 (Gottlieb Dep.) at 86:23-87:16 (testifying that Merkin did not disclose that Gabriel was invested in Madoff); Hoang Decl. Ex. 47 (Surh Dep.) at 22:23-24:8 (testifying that "Merkin represented" that he was managing Ariel and that NYU was not made aware of any exposure to Madoff."); Hoang Decl. Ex. 48 (Smith Dep.) at 24:6-25:1, 68:8-69:2 (testifying that Merkin never indicated that he would be using third-party managers to implement Gabriel's strategy and that he never knew of any Madoff exposure prior to the revelation of the fraud).  Additionally, simply knowing of or talking to other investors does not rise to the level of due diligence consistent with industry customs and practices.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 54.

158.    Merkin was "obviously quite distressed" and "very emotional" after Madoff's confession.  Steiner Decl. Ex. 105 (Steffens Dep.) at 130:18-131:3; Ex. 99 (Mayer Dep.) at 113:23-114:7; Ex. 100 (Nash Dep.) at 46:4-11.

**Trustee's Response:**  Not disputed that Steffens so testified.  Disputed as misleading as neither Jack Mayer's nor Nash's testimony suggest that Merkin was "distressed" or "emotional" after Madoff's confession.

159.    At the time of Madoff's confession, Merkin and his family lost more than $110 million as a result of their own personal investments with Madoff (through the Funds). *See* Steiner Decl. Ex. 84 (Merkin Dep.) at 635:23-636:7.

**Trustee's Response:**  Disputed as inaccurate and misleading.  When asked, Merkin himself was unable to explain how the $110 million is calculated.  Hoang Decl. Ex. 8 (Merkin Dep.) at 635:15-650:8.  Further disputed as the only evidence cited is Merkin's uncorroborated testimony which was unclear on the issue as he could not identify all of the limited partners in Ascot Partners whose losses he included to reach the purported $110 million.  *Id.* at 640:16-641:7.  There is no evidence that Merkin or his family lost any principal or that this purported $110 million did not completely derive from the fictitious profits reported by BLMIS.

160.    Michael Autera invested between $600,000 and $700,000 with Madoff through Ascot Partners, which was worth approximately $1,800,000 as of December 2008.  Steiner Decl. Ex. 91 (Autera Dep.) at 111:6-112:1.

**Trustee's Response:**  Disputed as immaterial and not supported by admissible evidence.

161.    Mr. Autera also was an investor in Gabriel.  His Gabriel investment was worth approximately $1,500,000 prior to Madoff's confession, and he knew that approximately a quarter of that was invested with Madoff.  Steiner Decl. Ex. 91 (Autera Dep.) at 117-14-118:22.

**Trustee's Response:**  Disputed as immaterial to the claims or defenses in this action.

162.    Merkin never restricted access to Madoff nor concealed Madoff's role.  *See* ¶¶126, 129, 132, 139, 141, 142-44, *infra*.

**Trustee's Response:**  Disputed as inaccurate.  *See supra* ¶¶ 56, 138, 144, 146, 151, 154, 157; Tr. SOF, ¶¶ 150-99.

**VIII.   Defendants Did Not Intentionally Disregard Red Flags**

163.    "Merkin had every reason to believe that [Madoff] was highly reputable, highly regarded and had direct and relevant experience in managing money in precisely the manner in which he intended to do." Steiner Decl. Ex. 11 (Weingarten Report), at 4.

**Trustee's Response:**  Disputed as not based on admissible evidence.  Weingarten, Merkin's purported expert, cannot testify as to Merkin's state of mind.

164.    Merkin "always or almost always [had] an opportunity to ask him [Madoff] something that I wasn't sure about in terms of where the strategy -- whether it had been executed properly or where the strategy might be headed to next."  Steiner Decl. Ex. 84 (Merkin Dep.) at 212:22-213:6.

**Trustee's Response:**  Not disputed.

165.    The Trustee does not allege that Merkin ever received a payment from Madoff or BLMIS; that Merkin had an account separate from the Funds that earned higher returns; that the Funds' accounts earned outsized annual returns of approximately 100 percent or more; or that Merkin requested or caused Madoff to backdate trades or direct winning or losing trades at different points in time.  *See generally* TAC.

**Trustee's Response:**  Disputed as immaterial to the claims or defenses in this action.

166.    The Trustee alleges that Merkin's conversation with Madoff concerning the disclosure of the Bayou Group Ponzi scheme indicates that Merkin believed Madoff might have been a fraud.  (TAC ¶ 93).

**Trustee's Response:**  Disputed as incomplete and inaccurate.  The Trustee does not dispute that ¶ 93 of the TAC alleges that Merkin articulated concerns about fraud to Madoff. After the Bayou Fund was exposed as a Ponzi scheme in 2005, Merkin also circulated an email stating  "Issues we should be asking each of our money managers," in which he lists the following items: "(1) Clearing firm; (2) Unusual, unconventional, or self-owned broker-dealer relationships; (3) Auditing firm; (4) Law Firm; (5) Use of leverage; and (6) Pricing of Fund (level of marketable securities, marketable but thin, and privates)."  Hoang Decl. Ex. 49 (Sept. 7, 2005 Email) at BS00224244.

Additionally, there were several process-related due diligence concerns that were present in both Bayou and BLMIS, including consistent returns, lack of a well-known and established auditor, lack of an offering memorandum, and lack of a third-party broker-dealer.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 371.  Most funds do not serve as their own prime broker because the absence of a third-party prime broker creates the opportunity for fraud.  *Id.* ¶

165.  Similarly, where funds are managed by an investment advisor and that advisor is executing the trades, a separate third-party custodian is used to hold the funds or securities and as a check on the investment advisor.  *Id.* ¶ 166.  When an investment management firm also operates as its own service provider, rarely does it provide all services of a broker-dealer, custodian, and administrator.  *Id.* ¶ 164.  In those instances, investment management firms maintain adequate segregation of employees and duties in order to provide checks and balances between the broker-dealer services, the custodian services, and the administrative services, to safeguard against opportunities for fraud.  *Id.* ¶ 169.  No such segregation or checks and balances were in place at BLMIS.  *Id.* ¶¶ 164-69.

Instead of conducting additional due diligence as a result of Bayou, Merkin had a conversation with Madoff "about the issues that related to Bayou," but did not otherwise perform any additional due diligence on BLMIS.  Hoang Decl. Ex. 8 (Merkin Dep.) at 508:15-510:10.  Instead, Merkin stated to Madoff that "as soon as there is a scam in the hedge fund industry, someone's gonna call about Bernie," adding "it's guaranteed."  Hoang Decl. Ex. 21 (Trustee Ex. 369).

167.    Merkin discussed Bayou with Madoff because an issue with a fund like Bayou "might provoke questions about other funds." Steiner Decl. Ex. 84 (Merkin Dep.) at 508:20-509:23.

**Trustee's Response:**  Disputed as incomplete.  *See supra* ¶ 166.

168.    The Trustee asserts that the trade confirmations issued by BLMIS reflected

several hundred transactions (out of the tens of thousands of transactions in the Funds' accounts)

that occurred outside of the daily high-low price range for the stock at issue.  TAC ¶ 169.

**Trustee's Response:**  Disputed as incomplete and misleading.  The Trustee does not

dispute that several hundred transactions were outside of the daily high-low price range.  The

hundreds of transactions were significant red flags where the only reasonable explanation was

fraud because there was never a trade in the market at the prices BLMIS reported.  Pomerantz

Decl. Ex. 1 (Pomerantz Expert Report) ¶ 129.


169.    The Trustee's expert, Dr. Pomerantz, testified that those "outside the range"

trades were the result of his manipulation of the actual trade confirmations – adjusting every pre-

2006 transaction by four cents per share – and that in the absence of his adjustments (and a few

other errors in his calculations) there would be virtually no trades outside of the reported high-

low range.  Ex. 9 (Pomerantz Dep.) at 227:2-9, 230:6-234:17.

**Trustee's Response:**  Disputed as inaccurate and misleading.  There were no errors or

manipulation of the trade data. Prior to September 2006, the back of the BLMIS trade

confirmations stated that the trade price "includes a commission equivalent of $.04 per share."

Pomerantz Decl. ¶ 12.  Therefore, conducting any analysis based on share prices prior to

September 2006 would require removing this commission from the reported price.  *Id.*  As such,

Pomerantz adjusted reported prices prior to September 2006 by $0.04 to account for the

commission purportedly included in the prices reported by BLMIS.  *Id.* ¶ 13.  Failure to remove

the $0.04 commission is commensurate with assuming that BLMIS did not charge any fees for

the purported investment advisor services.  *Id.*  That is, if the reported trade prices were not

adjusted for commissions, it would imply that Madoff did not make any money from the Merkin

BLMIS Accounts, which is inconsistent with Merkin's testimony.  *Id.* (citing Hoang Decl. Ex. 63

(*In re Madoff Charities Investigation*, Merkin Dep.) at 42:14-24).

Furthermore, even if the pre-September 2006 reported prices are not adjusted for the

commissions included in the price, the out-of-range and VWAP analyses still result in red flags.

*Id.* ¶ 14.  As stated below, the difference is negligible whether accounting for commissions or

not.  Even when not adjusting the prices for commissions:

- There are 462 transactions across the Merkin BLMIS Accounts with reported equity prices outside of the daily price range on the day the trade was made.

- The total dollar amount purportedly gained through out-of-range equity transactions is still over $8.8 million (compared to $10.3 million when accounting for commissions).

- 78.3% of the purported buy transactions were executed below VWAP for the Merkin BLMIS Accounts from January 1996 to November 2008 (as compared to 81.3% when accounting for commissions), and 70.4% of purported sell transactions were executed above VWAP (as compared to 74.9% when accounting for commissions).

- On average, BLMIS purportedly bought shares $0.38 per share below VWAP and purportedly sold shares $0.29 per share above VWAP (as compared to buying shares $0.39 below VWAP and selling shares $0.30 above VWAP when accounting for commissions).

*Id.*

170.    Pomerantz further acknowledged that his manipulation of the trade data similarly impacted his analysis of volume weighted average price.  Ex. 9 (Pomerantz Dep.) at 234:20-240:17.

**Trustee's Response:**  Disputed as inaccurate and misleading.  *See* Response to ¶ 169.

171.    The Trustee also alleges that Merkin "acknowledged he was 'aware'" of "the fact that the options market lacked the volume necessary to sustain BLMIS's trading."  (TAC ¶ 99.) The Trustee contends that Merkin responded to challenges by explaining that "[U]nderstanding Madoff is like finding Pluto . . . you can't really see it . . . you do it through inference, its effect on other objects"; and by commented that "Toto is still tugging at the curtain," to which Merkin replied, "I would say that the curtain is winning."  (TAC ¶¶ 100-101.)

**Trustee's Response:**  Not disputed except to the extent that the statement incorrectly recites the allegations in ¶¶ 100-01 of the TAC.

172.    Merkin discussed options volume with Madoff and was told that Madoff conducted a substantial part of the options trading in the over-the-counter market.  Steiner Decl. Ex. 84 (Merkin Dep.) at 173:14-174:2, 203:12-205:16.

**Trustee's Response:**  Disputed as not supported by the evidence cited.  Further disputed as the trade confirmations for the Funds' BLMIS accounts indicated that the purported options transactions were exchange-traded.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 127. For example, virtually all of the option securities that BLMIS reported to purchase between 2000 and 2008 included a CUSIP that was assigned to the Chicago Board Options Exchange and therefore could not have been purchased over-the-counter.  *Id.*

173.    It is not unusual that BLMIS cleared its own trades and had custody of its own

assets because BLMIS was an SEC-registered broker-dealer, not a hedge fund or pooled

investment vehicle.  Steiner Decl. Ex. 90 (Achilarre Dep.) at 36:2-7, 59:24-60:4; Ex. 86 (Merkin

Dep. dated March 4, 2010 in *State of New York v. J. Ezra Merkin et. al*), at 411:24-412:15.

**Trustee's Response:**  Disputed as incomplete, misleading, and not supported by the

evidence.  The statement is vague as to what "unusual" means in this context.  The statement is

further disputed to the extent that it relies on inadmissible evidence.  Additionally, the statement

is disputed as misleading and irrelevant because Madoff was functioning as an investment

advisor for the Merkin Funds since Madoff had the authority and responsibility to select the

stocks to purchase, determine the options to incorporate, as well as the timing for entering and

exiting the market.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 46-47.  Due diligence

should be performed on an investment advisory business regardless of its operational structure.

*Id.* ¶ 61.  Whether the investment vehicle is a fund, a managed account, a pooled investment

fund, a discretionary brokerage account, or any other type of business where assets are managed

by a third party, due diligence is necessary.  *Id.*

Further, Merkin was repeatedly warned about Madoff's self-clearing.  Teicher warned

Merkin about the fact that BLMIS self-cleared, stating that "[t]here have been cases in the past

that were frauds that the people were self-clearing."  Hoang Decl. Ex. 50 (Teicher NYU Dep.) at

44:2-45:22; Hoang Decl. Ex. 51 (Teicher NYU errata) at 2.  After meeting with Madoff,

Ehrenkranz decided not to invest with BLMIS because he was concerned that BLMIS self-

cleared and lacked independent verification.  Hoang Decl. Ex. 36 (Ehrenkranz Dep.) at 48:4-

49:7, 55:5-7.  Ehrenkranz informed Merkin of his concerns.  *Id.* at 55:16-56:17.  Tina Surh

testified that Merkin acknowledged that the fact that BLMIS self-cleared was a "significant

negative" and that she informed Merkin that the lack of a third-party administrator "would be a non-starter" and would make the opportunity to invest with BLMIS "unpalatable" for NYU. Hoang Decl. Ex. 47 (Surh Dep.) at 43:25-46:3; *see supra* ¶¶ 39, 138; *infra* ¶ 199.

174.    Goldman Sachs, Morgan Stanley and other brokerage firms regularly cleared their own trades and custodied their customers' assets. Steiner Decl. Ex. 84 (Merkin Dep.) at 173:2-13; Ex. 86 (Merkin Dep. dated March 4, 2010 in *State of New York v. J. Ezra Merkin et. al*), at 411:24-412:15; Ex. 93 (Harrington Dep.) at 168:3-11; *see also* Ex. 9 (Pomerantz Dep.) at 173:16-22; Ex. 103 (Sherman Dep.) at 46:21-23 ("[I]f somebody really has the intent to defraud you, I'm not sure if a prime broker is going to stand in the place.").

**Trustee's Response:**  Disputed as not supported by admissible evidence. Additionally, disputed as misleading to the extent the statement tries to equate BLMIS to "Goldman Sachs, Morgan Stanley and other brokerage firms." Pomerantz explained that, Goldman Sachs acting as its own broker-dealer with respect to an index fund is not comparable to BLMIS acting as its own broker-dealer. Pomerantz Decl. ¶ 10. Unlike BLMIS, Goldman Sachs is a large multi-national entity with multiple divisions, each with separate responsibilities and leadership. *Id.* Specifically, the broker-dealer and the asset management businesses are two distinct entities at Goldman Sachs led by different people. *Id.* Alternatively, Madoff served as his own broker-dealer, custodian and administrator. *Id.*

175.    Given that Madoff's market making business handled more than 10 percent of the volume of stock traded on the New York Stock Exchange, it would have been surprising if

Madoff did not clear his own trades. Steiner Decl. Ex. 86 (Merkin Dep. dated March 4, 2010 in *State of New York v. J. Ezra Merkin et. al*), at 411:24-412:15; Ex. 104 (Sloan Dep.) at 130:15-22.

**Trustee's Response:** Disputed to the extent that the statement is based on the deposition testimony of Merkin in a third-party action to which the Trustee was not a party. The statement is vague as to what the term "surprising" means. The statement is further disputed as it mischaracterizes Merkin's opinion as a material fact.

176.    BLMIS's steady returns did not cause Defendants any concern. Steiner Decl. Ex. 90 (Achilarre Dep.) at 90:5-15, 91:22-24.

**Trustee's Response:** Disputed as incomplete, misleading, and not based on admissible evidence. Achilarre was a controller for GCC, who was responsible for accounting and recordkeeping, not due diligence. Hoang Decl. Ex. 25 (Achilarre Dep.) at 10:18-12:10, 41:4-23. Achilarre had never heard of the SSC strategy before December 2008. *Id.* at 74:21-23. The statement is further disputed as it mischaracterizes Achilarre's opinion as a material fact.

The reported returns for the Merkin BLMIS Accounts were inconsistent with the expectations under the SSC strategy and: (i) were not correlated with the S&P 100 Index; (ii) were almost always positive even when the S&P 100 Index returns were negative; and (iii) displayed a lack of volatility. Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) § VI.B.2, § VI.A.2.a, §VI.D.3.

In addition, Merkin was repeatedly warned about the consistency of the returns. As early as 1992 or 1993, Teicher told Merkin that he "felt that [what Madoff was doing] was just not possible" and that Madoff's "track record didn't sound right, didn't smell right." Hoang Decl. Ex. 50 (Teicher NYU Dep.) at 40:25-41:15; Hoang Decl. Ex. 52 (Teicher Dep.) at 51:1-52:10,

109:2-7. Ehrenkranz redeemed an investment with Ascot Partners because the "stability of the returns began to belie my understanding how it was possible to achieve, and we just became sufficiently uncomfortable with the whole idea of [Madoff's] ability to do this." Hoang Decl. Ex. 36 (Ehrenkranz Dep.) at 64:22-65:18. Ehrenkranz informed Merkin that "it was very hard to achieve these kinds of returns and just almost impossible." *Id.* at 65:19-66:8.


177.    Other funds had consistently positive returns, including Princeton/Newport and Ridgewood. Steiner Decl. Ex. 108 (Thorp Dep.) at 158:18-159:10.

**Trustee's Response:** Disputed as incomplete and misleading. When asked about the consistency of Madoff's returns compared to others, Ed Thorp stated, "But I would like to add something, another comment. I think if we looked at some of the records that were mentioned, you will find that there were significant number of down months amongst almost all these people we talked about, not just an occasional month every couple years, but you know, higher frequency to that. I don't think you'll find anybody that was up month after month every month." He went on to state, "When I saw Madoff returns, it was the most extreme thing that I had ever encountered as far as the tradeoff between risk and return. The amount of return you are getting, and the fact that there weren't any down months, so it seemed very improbable. And my prior experience with records that appeared to be that way were the ones I looked at, all turned out to be frauds when they never had down months." Hoang Decl. Ex. 53 (Thorp Dep.) at 162:1-163:10. Additionally, performance data for Princeton/Newport and Ridgewood Asset Management, Inc. are not available (Pomerantz Decl. ¶ 18) and Defendants have offered no evidence that Merkin knew their returns during the relevant time period.

178.    It was not unusual and was not a cause of concern that Defendants did not have electronic access to BLMIS.  Steiner Decl. Ex. 90 (Achilarre Dep.) at 90:12-15.

**Trustee's Response:**  Disputed as incomplete and misleading.  Achilarre was a controller for GCC, who was responsible for accounting and recordkeeping, not due diligence.  Hoang Decl. Ex. 25 (Achilarre Dep.) at 10:18-12:10, 41:4-23.  The statement is further disputed as it mischaracterizes Achilarre's opinion as a material fact.

The Defendants did not have electronic access to the Merkin BLMIS Accounts but instead received paper statements three to five days after the trade or later.  *Id.* at 33:23-34:7, 49:18-19.  Teicher warned Merkin that delayed trade confirmations was "troublesome."  Hoang Decl. Ex. 50 (Teicher NYU Dep.) at 48:16-49:24.  The lack of electronic access and use of paper trade confirmations provided opportunities for fraud, particularly the manufacturing of fictitious trades and the manipulation and/or adjustment of reported prices.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 173-82.


179.    Defendants never had any issues withdrawing money from the Funds' BLMIS accounts.  Steiner Decl. Ex. 90 (Achilarre Dep.) at 51:17-18.

**Trustee's Response:**  Disputed as incomplete and misleading.  The ability of an investment manager to fulfill redemption requests is the normal course of business for investment managers and is not due diligence.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 33.  As further explained in the Trustee's Statement of Additional Material Facts Pursuant to L. Bankr. R. 7056-1, Ascot Partners purposely avoided taking redemptions from BLMIS and instead used incoming subscription money and inter-account transfers to meet redemption and management fee payments.  *See* Tr. SOF, ¶¶ 245-62.  Additionally, Merkin's

sensitivity to redeeming from BLMIS is evidenced in a March 31, 2006 email between Merkin

and Autera regarding a $76 million redemption.  Autera tells Merkin, "[A]pproximately 10

minutes after I spoke to Frank about pulling out the money, Bernie called me to find out what the

story was.  I told him we were dealing with redemptions in Ascot."  Merkin then responded a

few hours later that he "spoke to Bernie, apologized, and smoothed things over."  Hoang Decl.

Ex. 22 (March 31, 2006 email) at BS00340382.


180.    If BDO was concerned in any way with Madoff, it would have notified

Defendants.  With the exception of one presentation item in 2001, BDO issued unqualified audit

opinions every year and understood that Defendants might rely on those audits as evidence that

BLMIS was not engaged in a fraud.  Steiner Decl. Ex. 94 (Castro Dep.) at 169-71.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  *See supra* ¶¶

118-26.


181.    Defendants relied upon BDO's audits as evidence that Madoff was not engaged in

a fraud.  Steiner Decl. Ex. 96 (Gordon Dep.) at 36.

**Trustee's Response:**  Disputed as not supported by admissible evidence.  Further

disputed as discussed in *supra* ¶¶ 118-26.


182.    Merkin respected Madoff as an investment advisor and often spoke very highly of

him.  Steiner Decl. Ex. 83 (Balsam Dep.) at 91:6-9 ("I recall Merkin saying that he has been

fortunate to be able to work professionally with two very astute managers, one of them is Steven

Feinberg and the other one was Bernard Madoff."))

**Trustee's Response:**  Disputed to the extent that Jerome Balsam's recollection of Merkin's opinion and state of mind are offered as an undisputed fact.

183.    The only negative thing Balsam ever heard from Merkin regarding Madoff was "that the returns have been good, but that doesn't guarantee they will be in the future."  Steiner Decl. Ex. 83 (Balsam Dep.) at 128:21-24.

**Trustee's Response:**  The Trustee does not dispute that this was Balsam's testimony, but disputes the statement to the extent that it implies that the Merkin BLMIS Accounts had significant negative returns.  *See* Response to *supra* ¶ 176.

184.    BLMIS's structure of maintaining separately managed accounts for each of its customers was transparent and allowed investors to see all trades in their account.  Steiner Decl. Ex. 104 (Sloan Dep.) at 96:9-97:25  (testifying he felt there was "perfect transparency"); Ex. 95 (Ehrenkranz Dep.) at 47:20-48:3 (stating that a Madoff sample report to a client was "very clear" and "wonderfully transparent").

**Trustee's Response:**  Disputed as incomplete and misleading.  While Merkin received trade confirmations and customer statements for the Merkin BLMIS Accounts, he did not perform any quantitative analyses with trade level data consistent with the customs and practices of the investment management industry.  Steiner Decl. Ex. 9(a) (Pomerantz Rebuttal Report) ¶ 44-45.  Additionally, the fact that Madoff chose to run his investment advisory operation through the use of managed accounts was atypical, suspicious, and inconsistent with industry customs and practices.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶¶ 339-48.

185.    Madoff's high Sharpe ratio was not unusual or concerning.  *See* Steiner Decl. Ex. 12 (Weingarten Rebuttal Report), at 4.

**Trustee's Response:**  Disputed as inaccurate and misleading.  The Sharpe Ratio measures the amount of return above a risk free rate per unit of risk.  Pomerantz Decl. Ex. 1 (Pomerantz Expert Report) ¶ 241.  A higher Sharpe Ratio indicates that the investment is generating more return for the same amount of risk.  *Id.*  As explained by Pomerantz, the Sharpe Ratio for the Merkin BLMIS Accounts were consistent outliers against peers in the hedge fund industry from 1991 through 2008, *id.* ¶¶ 251-58; the mutual fund industry from 1996 through 2008, *id.* ¶¶ 269-73; and against elite investment advisors, *id.* ¶¶ 282-86.  While a higher Sharpe Ratio is preferable, it is a statistical improbability that any fund manager could maintain such a high Sharpe Ratio over the period maintained by BLMIS.  Pomerantz Decl. ¶ 19.


186.    Other funds had high Sharpe ratios, including the Renaissance Medallion Fund, Soros, Elliott Associates, Millennium Partners, SAC Capital, Baupost, SMN Diversified Futures Fund, Eclectica Fund, Episode Inc., Princeton/Newport and Ridgewood.  Ex. 7 (Hirsch Dep.) at 87:1-18; Ex. 12 (Weingarten Rebuttal Report) at 4; Ex. 108 (Thorp dep.) at 159:17-19.

**Trustee's Response:**  Disputed as inaccurate and misleading.  Pomerantz included Renaissance, Soros, and Millennium in his peer analysis of Elite Investment Advisors.  The Merkin BLMIS Accounts outperformed these funds across all metrics.  Pomerantz Decl. ¶¶ 18-19.  Additionally, performance data for Elliott Associates, SAC Capital, Baupost, Ridgewood, and Princeton/Newport are not publicly available.  *Id.* ¶ 17 n.5.  Defendants have offered no evidence that Merkin knew this data during the relevant time period.  SMN Diversified Futures Fund, Eclectica Fund, and Episode Inc. did not implement comparable strategies to the SSC

strategy. *Id.* However, even if these funds were included, their Sharpe Ratios were still lower

than the Sharpe Ratio for the Merkin BLMIS Accounts, and the Merkin BLMIS Accounts

outperformed the funds across all of the metrics that Pomerantz analyzed. *Id.* ¶¶ 18-19.

Additionally, while it is possible to have a high Sharpe Ratio for a short period of time, it

is increasingly difficult and uncommon to maintain a high Sharpe Ratio for an extended period

of time. *Id.* ¶ 19. This is conceded by the Defendants' own expert, who notes that the returns in

the Merkin BLMIS Accounts were "uncommon." Hoang Decl. Ex. 35 (Weingarten Expert

Report) at 5.

187.    One of the Trustee's experts, Amy Hirsch, explained that investors generally look

for a higher Sharpe ratio and that she does not rely on Sharpe ratios in isolation. Steiner Decl.

Ex. 7 (Hirsch Dep.) at 86:20-87:7.

**Trustee's Response:** Disputed as incomplete and misleading. *See supra* ¶¶ 185-86.

Hirsch testified that the Sharpe Ratio is "one of the tools we look at" and that "it's a great tool

for using on most of the equity strategies" that she would look at "in conjunction with a lot of

other performance indicators." Hoang Decl. Ex. 33 (Hirsch Dep.) at 86:6-87:7.

188.    A lack of understanding of a strategy often leads some people to leap to speculate

that it is fraud, even when it is not. Steiner Decl. Ex. 103 (Sherman Dep.) at 118:2-8 ("I've also

– by the way, it's possible I might have heard things like front running or insider trading or Ponzi

scheme with Steve Cohen. I mean, when people don't understand certain investment techniques

skepticism arises and from there you get all kinds of people sometimes making connections

correctly or incorrectly.").

**Trustee's Response:**  Disputed as immaterial and not supported by admissible evidence. The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  The statement is also disputed to the extent it mischaracterizes David Sherman's opinion as a material fact.

189.    Defendants were not obligated to obtain DTC records.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.

190.    The Trustee's expert had never heard of anyone in the investment industry obtaining DTC records.  Steiner Decl. Ex. 3 (Dubinsky Dep.) at 96:20-97:24.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.

191.    The Trustee's expert had never heard of a manager creating fake DTC screens before this case.  Steiner Decl. Ex. 3 (Dubinsky Dep.) at 105:15-18.

**Trustee's Response:**  Disputed as immaterial.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.

192.    None of the Trustee's experts in this case have offered an opinion as to whether Defendants were willfully blind to the BMIS fraud.  Steiner Decl. Ex. 3 (Dubinsky Dep.) at 19:24-21:14; 146:22-147:12.

**Trustee's Response:** Disputed as the issue of whether the Defendants were willfully blind to the BLMIS fraud is a question for the trier of fact and not appropriate for expert testimony.

193.    Hirsch does not offer an opinion on the appropriateness of the due diligence performed by Merkin on Madoff or BLMIS.  Steiner Decl. Ex. 7 (Hirsch Dep.) at 31:5-12.

**Trustee's Response:** Disputed as inaccurate.  Hirsch testified that all of her opinions are contained within her report.  Hoang Decl. Ex. 33 (Hirsch Dep.) at 30:2-7.  Hirsch's report further explains her own attempt to conduct due diligence on the Merkin Funds' investments with BLMIS.  *Id.* at 48:19-50:8.  The statement is further disputed as the evidence cited is Hirsch's response specifically to "Opinion I."

194.    Dr. Pomerantz did no further due diligence on some of his investments than Merkin did on BLMIS.  For example, he helps manage Verizon's defined benefit plan, a portion of the funds in the plan have been placed into a comingled account at Goldman Sachs, which is an index fund.  Steiner Decl. Ex. 9 (Pomerantz Dep.) at 52:5-23, 57:6-14).  Dr. Pomerantz assumes that the index fund is managed by a computer and that Goldman Sachs acts as its own broker-dealer with respect to that fund.  *Id.* 59:9-22.  Dr. Pomerantz explained that this is not a problem because "Goldman Sachs is a large entity." *Id.* 59:21-60:10.

**Trustee's Response:** Disputed as is immaterial and misleading.  The statement is not relevant to any claims or defenses to the Defendants' motions for summary judgment.  The statement is further disputed as the due diligence that Pomerantz performed on an index fund on

behalf of IFIC[6] is not a relevant comparison to Merkin's purported due diligence on BLMIS.  An

index fund's strategy is to match the returns of an index.  A basic tenet of due diligence is to

confirm whether an investment performs as it should.  Unlike BLMIS, where the returns did not

match the stated strategy, the performance of the index fund Pomerantz analyzed was consistent

with the performance of the index it was supposed to match.  The Russell 3000 index fund

performed as expected, and therefore Pomerantz did not need to look at trade confirmations for it

or verify that the fund owned all 3,000 holdings in the index.  Pomerantz Decl. ¶ 9.

Similarly, Goldman Sachs acting as its own broker-dealer with respect to an index fund is

not comparable to BLMIS acting as its own broker-dealer.  Pomerantz Decl. ¶ 10.  Unlike

BLMIS, Goldman Sachs is a large multi-national entity with multiple divisions, each with

separate responsibilities and leadership.  *Id.*  Specifically, the broker-dealer and the asset

management businesses are two distinct entities at Goldman Sachs led by different people.  *Id.*

Alternatively, Madoff served as his own broker-dealer, custodian and administrator.  *Id.*

195.    Dr. Pomerantz receives monthly statements for this account and has never asked

to see trade confirmations.  *Id.* 60:11-24, 96:3-6.

**Trustee's Response:**  Disputed as incomplete, inaccurate, and misleading.  Pomerantz

does not state that he "never asked to see trade confirmations."  Instead, Pomerantz explained

that his goal in conducting due diligence is to "understand things as best as I could, and I felt that

I always reached that objective by using the tools that were necessary."  Hoang Decl. Ex. 32

(Pomerantz Dep.) at 101:17-102:7.  Pomerantz further explained that in conducting due diligence

on hedge funds and investment advisors, he did not need to look at the trade confirmations"

---

[6] Paragraph194 of the JSOMF confuses the work Pomerantz performed on behalf of Verizon and IFIC.  The index
fund at Goldman Sachs discussed in ¶ 194 related to the due diligence on behalf of IFIC.

because he reviewed the transaction level data that had been inputted into systems to perform

analyses. *Id.* at 100:4-13. Unlike BLMIS, where the returns did not match the stated strategy,

the performance of the index fund Pomerantz analyzed was consistent with the performance of

the index it was supposed to match. Pomerantz Decl. ¶ 9. The Russell 3000 index fund

performed as expected, and therefore Pomerantz did not need to look at trade confirmations for it

or verify that the fund owned all 3,000 holdings in the index. *Id.*


196.    Dr. Pomerantz feels comfortable that the account in fact owns all 3,000 stocks

that he thinks it owns because Goldman Sachs has "represented to [him] that it owns 3,000. It

performs like it owns 3,000. The returns match the returns of the index. [He has] no reason to

believe that it doesn't own 3,000. It behaves exactly the way [he] expect[s] it to behave." *Id.*

61:13-23.

**Trustee's Response:** Disputed as incomplete, inaccurate, and misleading. Pomerantz

explained that these facts alone are not sufficient but through his due diligence he has "no reason

to believe that something is happening that is not as being represented." Hoang Decl. Ex. 32

(Pomerantz Dep.) at 61:24-62:12; *see also* Responses to *supra* ¶¶ 194-95.


197.    Dr. Pomerantz also relies on the fact that Goldman Sachs is a well-known brand,

and that he goes to Goldman Sachs' offices periodically and that he meets with a lot of people.

*Id.* 61:24-62:12.

> Q       So in terms -- I understand the "trust," and I understand people
> trust Goldman Sachs. In terms of the "verify," what do you do to verify
> those representations, other than go to their offices and meet with people?

A        I mean, this relationship has been going on for about seven years. I do get statements.  I know how the funds are performing. They are performing in line with what I expect.

I talk to people there who all seem pretty competent to me at being able to do the job that they are there to do.  I don't have -- I don't have any reason to think otherwise.

I get a statement from Chase Manhattan every month that tells me how much money is in my checking account.  I don't go to Chase Manhattan and see the actual dollar bills.   They probably don't even exist; right? Shares of stock don't really exist.

So I do what I can do and I do what I think I need to do.

*Id.* 62:18-63:17.

**Trustee's Response:**  Disputed as incomplete, immaterial, and misleading.  In conducting ongoing due diligence on behalf of IFIC, Pomerantz based his activities on his consistent findings that the funds were performing consistent with the stated strategy, a crucial component of due diligence.  Pomerantz Decl. ¶ 11.  As such, Pomerantz did not rely solely on Goldman Sachs' reputation and his meetings with staff, but used those as tools to continue to monitor the investment according to industry customs and practices.  *Id.*  His meetings with Goldman Sachs included several people, many of whom were PhD's, including Goldman Sachs partner Fischer Black, co-author of the Black-Scholes equation, Goldman Sachs partner Bob Litterman, co-author of the Black-Litterman model, and Emanuel Derman, professor at Columbia, PhD in physics, and co-author of the Black-Derman-Toy model.  *Id.*

198.    The Trustee alleges that one of Merkin's money managers, Victor Teicher, "warned Merkin about investing with BLMIS" and told Merkin that BLMIS "'could be a Ponzi scheme." (TAC ¶¶ 101-105.)

**Trustee's Response:**  Not disputed.

199.    Teicher does not remember telling Merkin that Madoff was operating a Ponzi scheme, and Merkin does not recall Teicher ever saying that.  Steiner Decl. Ex. 106 (Teicher Dep.) at 119:12-17; Ex. 89 (Merkin Dep. dated June 21, 2011 in *Straus v. Merkin*) at 130:21-131:25 ("Not a single individual . . . prior to December 11th, 2008, told me that they thought Madoff was conducting a Ponzi scheme . . . .").

**Trustee's Response:**  Disputed as incomplete, misleading, and based on inadmissible evidence.  When Teicher was asked, "But the possibility of fraud may have come up?," he responded, "Yea, the possibility that it wasn't what it seemed to be."  Hoang Decl. Ex. 52 (Teicher Dep.) at 119:18-21.  Teicher warned Merkin about the fact that BLMIS self-cleared, stating that "[t]here have been cases in the past that were frauds that the people were self-clearing."  Hoang Decl. Ex. 50 (Teicher NYU Dep.) at 44:2-45:22; Hoang Decl. Ex. 51 (Teicher NYU errata) at 2.  As early as 1992 or 1993, Teicher told Merkin that he "felt that [what Madoff was doing] was just not possible" and that Madoff's "track record didn't sound right, didn't smell right."  Hoang Decl. Ex. 50 (Teicher NYU Dep.) at 40:25-41:15; Hoang Decl. Ex. 52 (Teicher Dep.) at 51:2-52:10, 109:2-7.  In addition, Teicher warned Merkin on the issue of delayed trade confirmations.  Hoang Decl. Ex. 50 (Teicher NYU Dep.) at 48:16-49:24.

200.    Jack Mayer, an employee who supposedly overheard Teicher's comment, testified that Teicher's concerns about Madoff lessened over time.  Ex. 99 (Mayer Dep.) Tr. at 71:10-21.

**Trustee's Response:**  Disputed as incomplete and misleading.  Mayer testified that he recalled a conversation from the early 1990's between himself, Merkin and Teicher "in which [Teicher] expressed concerns that it could be Ponzi scheme."  Hoang Decl. Ex. 54 (Mayer Dep.)

at 64:12-65:4.  Teicher testified that his conversations with Merkin never alleviated his concerns

with Madoff.  Hoang Decl. Ex. 50 (Teicher NYU Dep.) at 214:8-14.

201.    Teicher also testified that he never analyzed or attempted to understand Madoff's

strategy; rather, his concerns stemmed from Madoff's name and the fact that his office was in the

Lipstick building.  Ex. 107 (Teicher's Feb. 9, 2009 Dep. in *New York Univ. v. Ariel Fund Ltd.*) at

74:10-75:15.

**Trustee's Response:**  Disputed as incomplete and misleading.  The evidence does not

support the statement.  Teicher testified that his concerns from the early 1990's stemmed from a

variety of factors, including consistency of the returns, self-custody, and corrected trade tickets.

*See supra* ¶¶ 173, 199.

202.    The Trustee alleges that Merkin "conceded that BLMIS might be a Ponzi scheme

in a 2003 meeting between Merkin and Research Company A," when Merkin "quipped that

'Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme.'''"  (TAC

¶¶94-95.)

**Trustee's Response:**  Not disputed.

203.    The founder of Research Company A denied  that  Merkin  suggested  that  he

thought Madoff was engaged in a fraud:

> A       I think he sarcastically implied that if Madoff would ever be a
> fraud,  then  it  would  be  much bigger than -- than  Ponzi, than Charles
> Ponzi.  But it just was a sarcastic, you know, the way he talks, it's typical
> of him to express himself.

Q        Well, in connection with the same conversation, the bullet immediately preceding that is advice from Mr. -- a tribute that -- [Research Company A Employee] is attributing to Mr. Merkin stating that – advising that you shouldn't have too much exposure to Madoff. Correct?

A        Yes.

Q        Was Mr. Merkin stating that one of the reasons why you shouldn't have too much exposure to Madoff is because it could be a Ponzi scheme?

A        I think as I mentioned before, he was teaching me a lesson that it's important to be -- it's important to be well diversified. It doesn't matter how much you love the investment.  You just -- it's just the rule, one of the, you know, main rules of the investment, you have to be diversified.

Steiner Decl. Ex. 98 (Research Company A Principal Dep.) at 84:15-85:11.

**Trustee's Response:**  Disputed as incomplete and misleading.  The record does not indicate that "The founder of Research Company A denied that Merkin suggested that he thought Madoff was engaged in a fraud."  Research Company A Principal, a former GCC employee, confirmed that the statement regarding Charles Ponzi losing out to Madoff was, in fact, stated by Merkin.  Additionally, Research Company A Director of Research, who was also on the same phone call with Merkin on June 27, 2003, testified, "During the June 2003 call, did Merkin speculate that BLMIS may be a Ponzi scheme?"  To which he replied, "Yes." When pressed on whether he thought Merkin was being sarcastic he confirmed, "That was not my interpretation of his comment."  Furthermore, as a result of the call with Merkin, Director of Research stated that he "did form an opinion about Madoff and I thought there was a possibility that it could be a Ponzi Scheme."  Hoang Decl. Ex. 4 (Research Company A Principal Dep.) at 83:24-84:8; Hoang Decl. Ex. 41 (Research Company A Director of Research Dep.) at 54:12-18, 82:13-16, 122:4-12; Steiner Decl. Ex. 98 (Research Company A Principal Dep.) at 19:3-16.

Dated:  New York, New York
        November 25, 2015

Respectfully submitted,

BAKER & HOSTETLER LLP


By: *s/ David J. Sheehan*_____
      Baker & Hostetler LLP
      45 Rockefeller Plaza
      New York, New York 10111
      Telephone: (212) 589-4200
      Facsimile: (212) 589-4201
      David J. Sheehan
      Email: dsheehan@bakerlaw.com
      Lan Hoang
      Email: lhoang@bakerlaw.com
      Seanna R. Brown
      Email: sbrown@bakerlaw.com
      Brian W. Song
      Email: bsong@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*