# EXHIBIT F

# ASCOT PARTNERS, L.P.

*A Delaware Limited Partnership*

## CONFIDENTIAL OFFERING MEMORANDUM

**October 2006**

450 Park Avenue
32nd Floor
New York, New York 10022

ANY REPRODUCTION OR DISTRIBUTION OF THIS CONFIDENTIAL OFFERING MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ANY OF ITS CONTENTS, MAY VIOLATE APPLICABLE SECURITIES LAWS AND IS PROHIBITED WITHOUT THE EXPRESS PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EACH INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF (I) THE PARTNERSHIP AND (II) ANY OF ITS TRANSACTIONS, AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE INVESTOR RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.

The information contained herein is confidential and is furnished for informational purposes only. This Confidential Offering Memorandum supersedes all earlier disclosure concerning the Partnership.

10105509.12

CONFIDENTIAL

GCC-NYAG0000334

CONFIDENTIAL                                                                    GCC-P 0335404

# CONFIDENTIAL OFFERING MEMORANDUM

## ASCOT PARTNERS, L.P.

450 Park Avenue
32nd Floor
New York, New York 10022

Ascot Partners, L.P., a Delaware limited partnership formed on August 17, 1992 (the "Partnership"), was organized to operate as a private investment partnership for the benefit of U.S. taxable investors and U.S. Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons. The Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. Generally, the Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities. The Partnership will make investments through third-party managers using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the Partnership's (collectively, "Other Investment Entities"). The Partnership may utilize leverage when deemed appropriate by the General Partner (as defined below), including to enhance the Partnership's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Partnership's investment objective will be achieved.** (See "Investment Program.").

The Partnership will act as a "master fund" for Ascot Fund Limited (the "Offshore Fund"), an exempted company incorporated in the Cayman Islands, which will invest substantially all of its capital in the Partnership. The Offshore Fund is an investment vehicle established to facilitate investment by foreign investors in the Partnership. The Offshore Fund has invested in the Class B limited partnership interests of the Partnership (the "Class B Interests").

J. Ezra Merkin serves as the general partner of the Partnership (the "General Partner"). The General Partner has ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership.

This Confidential Offering Memorandum relates to an offering of Class C limited partnership interests in the Partnership (the "Interests") to certain investors that, if accepted, will become limited partners of the Partnership. Class A limited partnership interests were issued to certain investors prior to February 1, 2006 and will no longer be offered to prospective investors.

10105509.12

The Partnership may offer Interests to prospective new Limited Partners as of the beginning of each quarter (or at such other times as the General Partner in its sole discretion may allow).

Investors in the Partnership must be "accredited investors" as defined in Rule 501 under the Securities Act of 1933, as amended, "qualified purchasers" as such term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended, (the "Company Act"), and must meet other suitability requirements. Interests may not be purchased by nonresident aliens, foreign corporations, foreign partnerships, foreign trusts or foreign estates, all as defined in the Internal Revenue Code of 1986, as amended (the "Code"). Such investors may be eligible to invest in the Offshore Fund. The General Partner, in its sole discretion, may decline to admit a prospective investor for any reason or for no reason, even if it satisfies the Partnership's suitability requirements.

Interests in the Partnership are suitable only for sophisticated investors (i) that do not require immediate liquidity for their investments; (ii) for which an investment in the Partnership does not constitute a complete investment program; and (iii) that fully understand and are willing to assume the risks involved in the Partnership's investment program. The Partnership's investment practices, by their nature, may be considered to involve a substantial degree of risk. (See "Investment Program" and "Certain Risk Factors").

Prospective investors should carefully read this Confidential Offering Memorandum. The contents of this Confidential Offering Memorandum, however, should not be considered legal or tax advice, and each prospective investor should consult its own counsel and advisers as to all matters concerning an investment in the Partnership.

There will be no public offering of the Interests. No offer to sell (or solicitation of an offer to buy) will be made in any jurisdiction in which such offer or solicitation would be unlawful.

This Confidential Offering Memorandum has been prepared solely for the information of the person to whom it has been delivered on behalf of the Partnership and may not be reproduced or used for any other purpose. The dissemination, distribution, reproduction or other use of all or any portion of this Confidential Offering Memorandum or the divulgence of any of its contents other than to the prospective investor's financial, tax or legal advisors, without the prior written approval of the General Partner, is prohibited. Any person that receives this Confidential Offering Memorandum and does not purchase Interests is requested to promptly return this Confidential Offering Memorandum to the General Partner. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of such investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of (i) the Partnership and (ii) any transactions described herein, and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Each person accepting this Confidential Offering Memorandum agrees to return it to the General Partner promptly upon request. This Confidential Offering Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

10105509.12

-ii-

CONFIDENTIAL

GCC-NYAG0000336

The Partnership will not be registered as an investment company under the Company Act and, therefore, will not be required to adhere to certain operational restrictions and requirements under the Company Act. The General Partner is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended.

———————————

WHILE THE PARTNERSHIP MAY TRADE COMMODITY FUTURES AND/OR COMMODITY OPTIONS CONTRACTS, THE GENERAL PARTNER IS EXEMPT FROM REGISTRATION WITH THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AS A COMMODITY POOL OPERATOR ("CPO") PURSUANT TO CFTC RULE 4.13(a)(4). THEREFORE, UNLIKE A REGISTERED CPO, THE GENERAL PARTNER IS NOT REQUIRED TO DELIVER A CFTC DISCLOSURE DOCUMENT TO PROSPECTIVE LIMITED PARTNERS, NOR IS HE REQUIRED TO PROVIDE LIMITED PARTNERS WITH CERTIFIED ANNUAL REPORTS THAT SATISFY THE REQUIREMENTS OF CFTC RULES APPLICABLE TO REGISTERED CPOs.

THE GENERAL PARTNER QUALIFIES FOR THE EXEMPTION UNDER CFTC RULE 4.13(a)(4) ON THE BASIS THAT, AMONG OTHER THINGS (I) EACH LIMITED PARTNER IS EITHER (A) A NATURAL PERSON WHO IS A "QUALIFIED ELIGIBLE PERSON" AS DEFINED IN CFTC RULE 4.7(a)(2) OR (B) A NON-NATURAL PERSON THAT IS EITHER AN "ACCREDITED INVESTOR" AS DEFINED UNDER SECURITIES AND EXCHANGE COMMISSION RULES OR A "QUALIFIED ELIGIBLE PERSON" AS DEFINED UNDER CFTC RULE 4.7; AND (II) INTERESTS IN THE PARTNERSHIP ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 AND OFFERED AND SOLD WITHOUT MARKETING TO THE PUBLIC IN THE UNITED STATES.

———————————

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM WILL BE EMPLOYED IN THE OFFERING OF THE INTERESTS EXCEPT FOR THIS CONFIDENTIAL OFFERING MEMORANDUM, STATEMENTS CONTAINED HEREIN AND WRITTEN MATERIALS SPECIFICALLY APPROVED BY THE GENERAL PARTNER. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THE INTERESTS, EXCEPT FOR THE INFORMATION CONTAINED HEREIN.

THE INTERESTS HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL AGENCY OR REGULATORY AUTHORITY OR ANY NATIONAL SECURITIES EXCHANGE. NO SUCH AGENCY, AUTHORITY OR EXCHANGE HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL OFFERING MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE PARTNERSHIP INTERESTS OFFERED HEREBY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

10105509.12

-iii-

CONFIDENTIAL

GCC-NYAG0000337

---

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE PARTNERSHIP AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

---

EACH PROSPECTIVE INVESTOR IS INVITED TO MEET WITH THE GENERAL PARTNER TO DISCUSS WITH, ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, THE GENERAL PARTNER CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF THE INTERESTS, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE GENERAL PARTNER POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE INFORMATION CONTAINED HEREIN.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*    *    *    *

10105509.12

-iv-

CONFIDENTIAL

GCC-NYAG0000338

## TABLE OF CONTENTS

|                                                                          | Page |
|--------------------------------------------------------------------------|------|
| SUMMARY OF TERMS                                                         | 1    |
| THE PARTNERSHIP                                                          | 12   |
| INVESTMENT PROGRAM                                                       | 12   |
| THE GENERAL PARTNER AND THE MANAGEMENT COMPANY                          | 13   |
| THE INTERESTS                                                           | 14   |
| SALES CHARGES                                                           | 14   |
| FISCAL YEAR                                                             | 14   |
| ALLOCATIONS OF GAINS AND LOSSES                                         | 15   |
| MANAGEMENT FEE; EXPENSES                                                | 15   |
| CERTAIN RISK FACTORS                                                    | 16   |
| CONFLICTS OF INTEREST                                                   | 27   |
| BROKERAGE COMMISSIONS                                                   | 28   |
| OUTLINE OF PARTNERSHIP AGREEMENT                                        | 29   |
| TAX ASPECTS                                                             | 33   |
| ERISA CONSIDERATIONS                                                    | 48   |
| ANTI-MONEY LAUNDERING REGULATIONS                                       | 52   |
| LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS                | 52   |
| COUNSEL                                                                 | 54   |
| AUDITOR; REPORTS                                                        | 54   |
| SUBSCRIPTION FOR INTERESTS                                              | 54   |
| ADDITIONAL INFORMATION                                                  | 54   |

10105509.12

-v-

CONFIDENTIAL

GCC-NYAG0000339

# ASCOT PARTNERS, L.P.

## SUMMARY OF TERMS

The following is a summary of the principal terms of the Partnership (as defined below). The following summary is qualified in its entirety by the more detailed information set forth in this Confidential Offering Memorandum and by the terms and conditions of the Limited Partnership Agreement of the Partnership, as the same may be amended from time to time. This summary should be read in conjunction with such detailed information.

**THE PARTNERSHIP:**

Ascot Partners, L.P., a Delaware limited partnership formed on August 17, 1992 (the "Partnership"), was organized to operate as a private investment partnership for the benefit of U.S. taxable investors and Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. Persons. (See "The Partnership.")

The Partnership will act as a "master fund" for Ascot Fund Limited (the "Offshore Fund"), an exempted company incorporated in the Cayman Islands, which will invest substantially all of its capital in the Partnership. The Offshore Fund is an investment vehicle established to facilitate investment by foreign investors in the Partnership. The Offshore Fund has invested in the Class B limited partnership interests of the Partnership (the "Class B Interests").

**INVESTMENT PROGRAM:**

The Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. Generally, the Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities.

The Partnership primarily follows a strategy in which the Partnership purchases a portfolio of large-cap U.S.

10105509.12

CONFIDENTIAL

GCC-NYAG0000340

Pg 9 of 61

equities drawn from the S&P 100. In order to hedge its exposure to these securities, the Partnership simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the Partnership's long portfolio. The purchase of the put option allows the Partnership to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the Partnership to partially finance the purchase of the put option while at the same time partially hedging the Partnership's portfolio against any downward movement in the S&P 100.

The Partnership will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the Partnership's (collectively, "Other Investment Entities"). The Partnership may utilize leverage when deemed appropriate by the General Partner (as defined below), including to enhance the Partnership's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Partnership's investment objective will be achieved.** (See "Investment Program" and "Certain Risk Factors.")

When the Partnership engages in investments through Other Investment Entities, fees, including performance-based fees, may be payable by the Partnership, in addition to the fees payable to the General Partner (as defined below) discussed below. In such cases, the General Partner will retain overall investment responsibility for the portfolio of the Partnership (although not the investment decisions of any independent money managers managing Other Investment Entities). Such arrangements are subject to periodic review by the General Partner and are terminable at reasonable intervals in the General Partner's discretion. The Partnership may withdraw from or invest in different investment funds and terminate or enter into new investment advisory agreements without prior notice to or consent of the Limited Partners (as defined below). (See "Certain Risk

10105509.12

2

CONFIDENTIAL

GCC-NYAG0000341

CONFIDENTIAL

GCC-P 0335411

Factors – Independent Money Managers.")

The General Partner reserves the right to alter or modify some or all of the Partnership's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors.

**The Partnership's investment program is speculative and may entail substantial risks. Since market risks are inherent in all investments to varying degrees, there can be no assurance that the Partnership's investment objectives will be achieved. In fact, certain investment practices described above can, in some circumstances, substantially increase the adverse impact on the Partnership's investment portfolios. (See "Certain Risk Factors.")**

**THE GENERAL PARTNER:**

J. Ezra Merkin will serve as the general partner of the Partnership (the "General Partner"). The General Partner has ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership.

**THE INTERESTS:**

This Confidential Offering Memorandum relates to an offering of Class C limited partnership interests in the Partnership (the "Interests") to certain investors that, if accepted, will become limited partners of the Partnership (each, a "Class C Limited Partner").

Class A limited partnership interests ("Class A Interests") were issued to certain investors (each, a "Class A Limited Partner) prior to February 1, 2006. Class A Interests will no longer be issued by the Partnership.

Class B Interests are held solely by the Offshore Fund (the "Class B Limited Partner" and collectively with Class A Limited Partners and Class C Limited Partners, the "Limited Partners").

The General Partner may issue other classes of interests in the future that differ in terms of, among other things, rights, powers and duties, including rights, powers and duties senior to existing classes of Limited Partners. The

10105509.12

3

CONFIDENTIAL

GCC–NYAG0000342

CONFIDENTIAL                                          GCC-P 0335412

General Partner may establish new classes of interests, and determine the terms of such classes, without approval of the existing Limited Partners. (See "The Interests.")

**MINIMUM SUBSCRIPTION:**

The Partnership may offer Class C Interests to prospective new Class C Limited Partners as of the beginning of each quarter (or at such other times as the General Partner in its sole discretion may allow).

The minimum initial subscription is $500,000 for Class C Interests, subject to the discretion of the General Partner to accept lesser amounts.

**ADDITIONAL CAPITAL CONTRIBUTIONS:**

Class C Limited Partners of the Partnership may make additional capital contributions in amounts of at least $250,000 with the consent of the General Partner and subject to his discretion to accept other amounts. Each capital contribution of a Limited Partner will be credited to such Limited Partner's capital account (each, a "Capital Account").

**SALES CHARGES:**

There are no sales charges payable to the General Partner or the Partnership in connection with the offering of Interests. (See "Sales Charges.")

**FISCAL YEAR:**

The fiscal year of the Partnership will end on December 31 of each calendar year.

**ALLOCATION OF GAINS AND LOSSES:**

Partnership loss for each accounting period will be allocated among the Partners in proportion to the balance in their respective Capital Accounts at the start of such period. At the end of each accounting period, each Partner's Capital Account will be increased proportionately to reflect Partnership income for each accounting period. Income and loss for this purpose will include unrealized appreciation and depreciation on investments.

**MANAGEMENT FEE; OPERATING AND OTHER EXPENSES:**

On the last Business Day of each fiscal year of the Partnership and upon dissolution, an amount equal to 1.5% (prorated for periods of less than a year) of each Limited Partner's Capital Account balance at the end of such year will be charged against such Limited Partner's Capital Account and paid to the General Partner (or to a designee as he shall direct) (the "Management Fee").

10105509.12

4

CONFIDENTIAL

GCC-NYAG0000343

GCC-P 0335413

If a withdrawal occurs as of any date other than the end of the year, a Management Fee will be charged and paid to the General Partner in respect of the withdrawal proceeds as if such withdrawal occurred as of the end of such year.

At his discretion, the General Partner may waive or modify the Management Fee with respect to any particular Limited Partner.

The Partnership shall (i) pay, or cause to be paid, all costs, fees (including the Management Fee), operating expenses and other expenses of the Partnership (including the costs, fees and expenses of attorneys, accountants or other professionals incurred in organizing the Partnership and in pursuing and conducting, or otherwise related to, the activities of the Partnership; and (ii) reimburse the General Partner for any out-of-pocket costs, fees and expenses incurred by him in connection therewith. The amount of any direct costs, fees and expenses incurred in connection with the purchase, sale or carrying of any security, including, but not limited to, brokerage and other transaction costs and margin interest expenses and fees, including performance-based fees payable to investment managers or partners of private investment partnerships, closed-end funds or other pooled investment vehicles, will be paid by the Partnership.

If any of the above expenses are incurred jointly for the account of the Partnership and any other investment funds or trading accounts sponsored or managed by the General Partner or his affiliates, such expenses will be allocated to the Partnership and such other funds or accounts in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable. (See "Management Fee; Expenses.")

**WITHDRAWALS:**

A Class C Limited Partner may withdraw all or part of such Class C Limited Partner's Capital Account on the date immediately preceding the one-year anniversary of the date such Interests were purchased (the "First Withdrawal Date"), and, thereafter, on each anniversary of the First Withdrawal Date upon 45 days prior written notice to the General Partner.

10105509.12

5

CONFIDENTIAL

GCC-NYAG0000344

A Class A Limited Partner may withdraw all or part of his Capital Account from the Partnership on 45 days prior written notice on December 31 of any year.

A Class B Limited Partner may withdraw all or part of its Capital Account from the Partnership on 25 days prior written notice on the last Business Day of each March, June, September and December of any fiscal year.

Each date as of which a Limited Partner withdraws all or a portion of its Capital Account or withdraws from the Partnership is herein referred to as a "Withdrawal Date."

The withdrawing Limited Partner will receive the amount of his Capital Account to be withdrawn (less reserves determined by the General Partner for contingent liabilities) within 90 days after withdrawal. All amounts remaining unpaid (less reserves) will begin to bear interest at a rate equal to a specified broker's call rate for the period beginning 30 days after the effective date of such withdrawal and ending 90 days after the effective date of such withdrawal.

A distribution in respect of a withdrawal may be made in cash or in kind, as determined by the General Partner in its discretion. In-kind distributions will be made to withdrawing Limited Partners on a *pro rata* basis valued as of the date of distribution. The General Partner may waive notice requirements or permit withdrawals under such other circumstances and conditions as it, in its sole discretion, deems appropriate.

Limited Partners may not otherwise make withdrawals, and the Partnership does not plan to make *pro rata* distributions to Partners on an on going basis.

**ADDITIONAL WITHDRAWAL RIGHTS:**

Limited Partners may request more frequent withdrawal rights upon written request to the General Partner. The General Partner shall seek, but is not required, to accommodate all such withdrawal requests as it deems appropriate in its sole discretion.

**COMPULSORY WITHDRAWAL; SUSPENSION**

The General Partner may, in its sole discretion, terminate the Interest of any Limited Partner, in whole or in part,

10105509.12

6

CONFIDENTIAL

GCC-NYAG0000345

**OF WITHDRAWAL RIGHTS:**

upon at least thirty days prior written notice.

In addition, the General Partner, by written notice to any Limited Partner, may suspend the withdrawal rights of such Limited Partner if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Partnership, the General Partner or any of the Partnership's other service providers. (See "Anti-Money Laundering Regulations" and "Outline of Partnership Agreement.")

**DISSOLUTION:**

The Partnership will dissolve upon the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days; (iii) December 31, 2015; or (d) any event causing the dissolution of the Partnership under the laws of the State of Delaware. Upon dissolution of the Partnership, no further business shall be done in the Partnership's name except completion of any incomplete transactions and the taking of such action as shall be necessary for the winding up of the affairs of the Partnership and the distributions of its assets.

**RESTRICTIONS ON TRANSFER:**

No Limited Partner or transferee thereof shall, without the prior written consent of the General Partner, which may be withheld in his sole and absolute discretion, create, or suffer the creation of, a security interest in such Limited Partner's Interest. Except for sales, transfers, assignments or other dispositions (i) by last will and testament, (ii) by operation of law, or (iii) to an affiliate of a Limited Partner, without the prior written consent of the General Partner, which may be withheld in his sole and absolute discretion, no Limited Partner shall sell, transfer, assign, or in any manner dispose of such Limited Partner's Interest, in whole or in part, nor enter into any agreement as the result of which any person shall become interested with such Limited Partner therein. (See "Limitations on Transferability; Suitability Requirements.")

**CERTAIN RISK FACTORS:**

There can be no assurance that the investment objective

10105509.12

7

CONFIDENTIAL

GCC-NYAG0000346

of the Partnership will be achieved. Investments in illiquid securities and the use of short sales, options, leverage, futures, swaps, and other derivative instruments may create special risks and substantially increase the impact of adverse price movements on the Partnership's portfolio. Moreover, an investment in the Partnership provides limited liquidity since the Interests are not freely transferable, and the Partners will have limited withdrawal rights. (See "Certain Risk Factors.")

**LEVERAGE:**

The Partnership has the power to borrow and may do so when deemed appropriate by the General Partner, including to enhance the Partnership's returns and meet withdrawals that would otherwise result in the premature liquidation of investments. The use of leverage can, in certain circumstances, substantially increase the losses to which the Partnership's investment portfolios may be subject. Currently, the General Partner does not intend to employ leverage. (See "Certain Risk Factors.")

**BROKERAGE COMMISSIONS:**

Portfolio transactions for the Partnership will be allocated to brokers on the basis of best execution and in consideration of a broker's ability to effect the transactions, its facilities, reliability and financial responsibility and the provision or payment by the broker of the costs of research and research-related services which are of benefit to the Partnership, the General Partner or related funds and accounts. Accordingly, the commission rates (or dealer markups and markdowns arising in connection with riskless principal transactions) charged to the Partnership by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services. The General Partner has not entered into, and does not expect to enter into, any written soft dollar arrangements.

The Partnership will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms. Morgan Stanley & Co., Inc. and Bernard L. Madoff Investment Securities, LLC (the "Prime Brokers") currently serve as the principal

10105509.12

8

CONFIDENTIAL

GCC-NYAG0000347

CONFIDENTIAL

GCC-P 0335417

prime brokers and custodians for the Partnership, and clear (generally on the basis of payment against delivery) the Partnership's securities transactions that are effected through other brokerage firms. The Partnership is not committed to continue its relationship with the Prime Brokers for any minimum period and the General Partner may select other or additional brokers to act as prime brokers for the Partnership. (See "Brokerage Commissions.")

**CONFLICTS OF INTEREST:**

The General Partner and his affiliates will provide investment management services to managed accounts and other investment partnerships or funds, some of which have similar investment objectives to those of the Partnership. Such activities may raise conflicts of interest. However, the General Partner or his affiliates, as applicable, will undertake to provide such investment management services in a manner that is consistent with their respective fiduciary duties to the Partnership. (See "Conflicts of Interest.")

**REGULATORY MATTERS:**

The Partnership is not registered as an investment company and, therefore, is not required to adhere to certain operational restrictions and requirements under the Investment Company Act of 1940, as amended (the "Company Act").

The Partnership relies on the exclusion provided in Section 3(c)(7) of the Company Act, which permits private investment companies to sell their interests, on a private placement basis, to an unlimited number of "qualified purchasers," as defined in Section 2(a)(51) of the Company Act.

The General Partner has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(4) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Partnership that would otherwise be applicable absent such an exemption.

The General Partner is not registered as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "The General Partner" and "Limitations on Transferability; Suitability Requirements.")

10105509.12

9

CONFIDENTIAL

GCC-NYAG0000348

CONFIDENTIAL
GCC-P 0335418

**SUITABILITY:**

Investors in the Partnership must be "accredited investors" as defined in Rule 501 under the Securities Act of 1933, as amended, "qualified purchasers" as such term is defined in Section 2(a)(51) of the Company Act and must meet other suitability requirements. Interests may not be purchased by nonresident aliens, foreign corporations, foreign partnerships, foreign trusts or foreign estates, all as defined in the Internal Revenue Code of 1986, as amended (the "Code"). Such investors may be eligible to invest in the Offshore Fund which maintains a substantially similar investment program as that of the Partnership.

The General Partner, in its sole discretion, may decline to admit a prospective investor for any other reason or for no reason, even if it satisfies the Partnership's suitability requirements. (See "Limitations on Transferability; Suitability Requirements.")

**TAXATION:**

The Partnership operates as a partnership and not as an association or a publicly traded partnership taxable as a corporation for Federal tax purposes. Accordingly, the Partnership should not be subject to Federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Partnership's taxable income or loss. (See "Tax Aspects.")

**ERISA AND OTHER TAX-EXEMPT ENTITIES:**

Entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") may purchase Interests. Trustees or administrators of such entities are urged to carefully review the matters discussed in this Confidential Offering Memorandum. Investment in the Partnership by entities subject to ERISA requires special considerations. In particular, the Partnership may utilize leverage in connection with its trading activities, which could give rise to "unrelated business taxable income". The Partnership does not intend to permit investments by "benefit plan investors" (as defined in Section 3(42) of ERISA and any regulations promulgated thereunder) to equal or exceed 25% of the net asset value of any class of the Interests. (See "ERISA Considerations".)

**AUDITORS:**

BDO Seidman, LLP serves as the Partnership's auditor. The Partnership will provide to the Limited Partners

10105509.12

10

CONFIDENTIAL

GCC-NYAG0000349

unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 90 days after year end, and tax information as soon thereafter as practicable. Certain Limited Partners may have access to certain information regarding the Partnership that may not be available to other Limited Partners. Such Limited Partners may make investment decisions with respect to their investment in the Partnership based on such information.

**LEGAL COUNSEL:**

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, acts as counsel to the Partnership in connection with this offering of Interests. Schulte Roth & Zabel LLP also acts as counsel to the General Partner and his affiliates. In connection with the Partnership's offering of Interests and subsequent advice to the Partnership, the General Partner and his affiliates, Schulte Roth & Zabel LLP will not be representing the Limited Partners of the Partnership. No independent counsel has been retained to represent the Limited Partners of the Partnership.

**SUBSCRIPTION FOR INTEREST:**

Persons interested in subscribing for Interests will be furnished with, and will be required to complete and return to the General Partner, subscription documents and other certain documents.

10105509.12

11

CONFIDENTIAL

GCC-NYAG0000350

GCC-P 0335420

## THE PARTNERSHIP

Ascot Partners, L.P., a Delaware limited partnership formed on August 17, 1992 (the "Partnership"), was organized to operate as a private investment partnership for the benefit of U.S. taxable investors and U.S. Tax-Exempt U.S. Persons (as defined herein) including entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended, and other entities exempt from payment of U.S. Federal income tax, and entities substantially all of the ownership interests in which are held by Tax-Exempt U.S. persons.

The Partnership will act as a "master fund" for Ascot Fund Limited (the "Offshore Fund"), an exempted company incorporated in the Cayman Islands, which will invest substantially all of its capital in the Partnership. The Offshore Fund is an investment vehicle established to facilitate investment by foreign investors in the Partnership. The Offshore Fund has invested in the Class B limited partnership interests of the Partnership (the "Class B Interests").

## INVESTMENT PROGRAM

The Partnership's investment objective is to provide limited partners with a total return on their investment consisting of capital appreciation and income by investing in a diverse portfolio of securities. Generally, the Partnership engages primarily in the practice of index arbitrage and options arbitrage, in which individual or baskets of securities are purchased and/or sold against related securities such as index options or individual stock options. These strategies are used to take advantage of price disparities among related securities.

The Partnership primarily follows a strategy in which the Partnership purchases a portfolio of large-cap U.S. equities drawn from the S&P 100. In order to hedge its exposure to these securities, the Partnership simultaneously purchases a put option and sells a call option on the S&P 100, each with a notional value that approximates the value of the Partnership's long portfolio. The purchase of the put option allows the Partnership to partially hedge its portfolio against downward movement in the S&P 100. The sale of the call option allows the Partnership to partially finance the purchase of the put option while at the same time partially hedging the Partnership's portfolio against any downward movement in the S&P 100.

The Partnership will make investments through third-party managers, using managed accounts, mutual funds, private investment partnerships, closed-end funds and other pooled investment vehicles (including special purpose vehicles), each of which is intended to engage in investment strategies similar to the Partnership's (collectively, "Other Investment Entities"). The Partnership may utilize leverage when deemed appropriate by the General Partner (as defined below), including to enhance the Partnership's returns and meet redemptions that would otherwise result in the premature liquidation of investments. **There can be no assurance that the Partnership's investment objective will be achieved.**

When the Partnership engages in investments through Other Investment Entities, fees, including performance-based fees, may be payable by the Partnership, in addition to the fees payable to the General Partner (as defined below) discussed below. In such cases, the General Partner will retain overall investment responsibility for the portfolio of the Partnership

10105509.12

12

CONFIDENTIAL

GCC-NYAG0000351

(although not the investment decisions of any independent money managers managing Other Investment Entities). Such arrangements are subject to periodic review by the General Partner and are terminable at reasonable intervals in the General Partner's discretion. The Partnership may withdraw from or invest in different investment funds and terminate or enter into new investment advisory agreements without prior notice to or consent of the Limited Partners (as defined below). (See "Certain Risk Factors – Independent Money Managers.")

The General Partner intends, to the extent circumstances permit, to adopt a selective approach in evaluating potential investment situations, generally concentrating on relatively fewer transactions that he can follow more closely. The General Partner is expected to engage in hedging and short sales. There can be no assurance that any of the hoped-for benefits of the foregoing approach will be realized. Moreover, the General Partner reserves the right to deviate from the foregoing approach to the extent he deems appropriate. To the extent that the Partnership trades in commodities and futures and related options, the Partnership will incur additional risks. Because of the low margin deposits normally required in futures trading, the same risks as those resulting from leverage described below will be particularly present. In addition, due to market and regulatory factors, commodities and futures and related options may be less liquid than other types of investments.

The General Partner reserves the right to alter or modify some or all of the Partnership's investment strategies in light of available investment opportunities to take advantage of changing market conditions, where the General Partner, in his sole discretion, concludes that such alterations or modifications are consistent with the goal of maximizing returns to investors, subject to what the General Partner, in his sole discretion, considers an acceptable level of risk.

* * *

The descriptions contained herein of specific strategies that the Partnership may engage in should not be understood as in any way limiting the Partnership's investment activities. The Partnership may engage in investment strategies that are not described herein, but that General Partner considers appropriate.

The Partnership's investment program is speculative and may entail substantial risks. Since market risks are inherent in all investments to varying degrees, there can be no assurance that the Partnership's investment objectives will be achieved. In fact, certain investment practices described above can, in some circumstances, substantially increase the adverse impact on the Partnership's investment portfolios. (See "Certain Risk Factors.")

## THE GENERAL PARTNER AND THE MANAGEMENT COMPANY

J. Ezra Merkin serves as the general partner of the Partnership (the "General Partner"). The General Partner has ultimate responsibility for the management, operations and investment decisions made on behalf of the Partnership.

10105509.12

13

CONFIDENTIAL

GCC-NYAG0000352

CONFIDENTIAL                                                                GCC-P 0335422

Mr. Merkin is currently general partner of Gabriel Capital, L.P. and is involved in managing several offshore funds (including the Offshore Fund). Mr. Merkin was formerly the General Partner of Ariel Capital, L.P. from January 1, 1989 until December 31, 1991. Prior to that, Mr. Merkin served as a Managing Partner of Gotham Capital, L.P., an investment partnership, from 1985 to 1988. Mr. Merkin was associated with Halcyon Investments from 1982 to 1985 and with the law firm of Milbank, Tweed, Hadley & McCloy from 1979 to 1982. Mr. Merkin was graduated from Columbia College magna cum laude and is a member of Phi Beta Kappa. He is an honors graduate of Harvard Law School. Mr. Merkin currently serves as chairman of the investment committee of two private endowment funds.

## THE INTERESTS

This Confidential Offering Memorandum relates to an offering of Class C Limited Partnership Interests in the Partnership (the "Interests") to certain investors that, if accepted, will become limited partners of the Partnership (each, a "Class C Limited Partner").

Class A limited partnership interests ("Class A Interests") were issued to certain investors (each, a "Class A Limited Partner") prior to February 1, 2006. Class A Interests will no longer be issued by the Partnership.

Class B Interests were issued solely to the Offshore Fund (the "Class B Limited Partner" and collectively with Class A Limited Partners and Class C Limited Partners, the "Limited Partners").

The minimum initial subscription is $500,000 for an Interest in the Partnership, subject to the discretion of the General Partner to accept lesser amounts. Limited Partners of the Partnership may make additional capital contributions in amounts of at least $250,000 with the consent of the General Partner and subject to his discretion to accept other amounts. Each capital contribution of a Limited Partner will be credited to such Limited Partner's capital account (each, a "Capital Account").

The General Partner may issue other classes of interests in the future that differ in terms of, among other things, rights, powers and duties, including rights, powers and duties senior to existing classes of Limited Partners. The General Partner may establish new classes of interests, and determine the terms of such classes, without approval of the existing Limited Partners.

## SALES CHARGES

There are no sales charges payable to the General Partner, or the Partnership in connection with the offering of Interests.

## FISCAL YEAR

The fiscal year of the Partnership will end on December 31 of each calendar year.

10105509.12

14

CONFIDENTIAL

GCC-NYAG0000353

## ALLOCATIONS OF GAINS AND LOSSES

Partnership loss for each accounting period will be allocated among the Partners in proportion to the balance in their respective Capital Accounts at the start of such period. At the end of each accounting period, each Partner's Capital Account will be increased proportionately to reflect Partnership income for each accounting period. Income and loss for this purpose will include unrealized appreciation and depreciation on investments.

## MANAGEMENT FEE; EXPENSES

### Management Fee

On the last Business Day of each fiscal year of the Partnership and upon dissolution, an amount equal to 1.5% (prorated for periods of less than a year) of each Limited Partner's Capital Account balance at the end of such year will be charged against such Limited Partner's Capital Account and paid to the General Partner (or to a designee as he shall direct) (the "Management Fee").

If a withdrawal occurs as of any date other than the last day of the year, a Management Fee will be charged and paid to the General Partner in respect of the withdrawal proceeds as if such withdrawal occurred as of the end of such year.

At his discretion, the General Partner may waive or modify the Management Fee with respect to any particular Limited Partner.

### Partnership Expenses

The Partnership shall (i) pay, or cause to be paid, all costs, fees, operating expenses and other expenses (including the Management Fee) of the Partnership (including the costs, fees and expenses of attorneys, accountants or other professionals incurred in organizing the Partnership and in pursuing and conducting, or otherwise related to, the activities of the Partnership, and (ii) reimburse the General Partner for any out-of-pocket costs, fees and expenses incurred by him in connection therewith. The amount of any direct costs, fees and expenses incurred in connection with the purchase, sale or carrying of any security, including, but not limited to, brokerage and other transaction costs and margin interest expenses and fees, including performance-based fees payable to investment managers or partners of private investment partnerships, closed-end funds or other pooled investment vehicles, will be paid by the Partnership.

If any of the above expenses are incurred jointly for the account of the Partnership and any other investment funds or trading accounts sponsored or managed by the General Partner or his affiliates, such expenses will be allocated to the Partnership and such other funds or accounts in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

10105509.12

15

CONFIDENTIAL

GCC-NYAG0000354

CONFIDENTIAL

GCC-P 0335424

## CERTAIN RISK FACTORS

PARTICIPATION BY INVESTORS IN THE PARTNERSHIP SHOULD BE CONSIDERED A HIGH RISK INVESTMENT. THE FOLLOWING SPECIAL CONSIDERATIONS AND RISKS TOGETHER WITH OTHER MATTERS SET FORTH ELSEWHERE IN THIS CONFIDENTIAL OFFERING MEMORANDUM SHOULD BE CONSIDERED CAREFULLY, BUT ARE NOT INTENDED TO BE AN EXHAUSTIVE LISTING OF ALL POTENTIAL RISKS ASSOCIATED WITH AN INVESTMENT IN THE PARTNERSHIP.

Risk Factors. The principal activity of the Partnership will be index arbitrage, option arbitrage and investments in other securities. Because of the inherently speculative nature of these activities, the results of the Partnership's operations may be expected to fluctuate from period to period. There can be no assurance that the Partnership's investments will generate a profit or that material losses may not be incurred.

Restrictions on Transferability and Withdrawal. Each investor who becomes a Limited Partner will be required to represent that he is acquiring the Interests for investment and not with a view to distribution or resale; that he understands he must bear the economic risk of an investment for an indefinite period of time because the Interests have not been registered with the Securities and Exchange Commission ("SEC") or any other state or governmental agency; and that he understands the Interests cannot be sold unless an exemption from such registration is available. Transfers of Interests without consent of the General Partner will be permitted only in limited circumstances. None of the Partnership, other than pursuant to a withdrawal as described herein, the General Partner or any of his affiliates has agreed to purchase or otherwise acquire from any Limited Partner any Interests or assumes the responsibility for locating prospective purchasers of such Interests. In no event may transfers be made which would cause a violation of any federal or state securities laws or which are likely to result in a termination of the Partnership for federal income tax purposes. Consequently, the purchase of Interests should be considered only as a long-term and illiquid investment.

A Class C Limited Partner may withdraw all or part of such Class C Limited Partner's Capital Account on the date immediately preceding the one-year anniversary of the date such Interests were purchased (the "First Withdrawal Date"), and, thereafter, on each anniversary of the First Withdrawal Date upon 45 days prior written notice to the General Partner.

Registration and Qualification. Neither the Partnership nor the General Partner has registered with any governmental or regulatory agency. Therefore, the Partnership will not be subject to the limitations imposed on entities regulated under the various federal securities laws, which include, among other limitations, restrictions on transactions between a fund, its adviser or other affiliates, the use of leverage and limitations on borrowing. In addition, private rights of action against the Partnership arising under various federal securities laws may not be available to investors in the Partnership. The General Partner, in the course of the conduct of the Partnership's activities, will evaluate his obligations to register or comply with any rules which may be imposed upon the Partnership, or its General Partner, by any governmental or regulatory agency having jurisdiction over the activities being pursued by or on behalf of the Partnership. However, no assurance can be given that compliance with all such rules will be undertaken or if

10105509.12

16

CONFIDENTIAL

GCC-NYAG0000355

GCC-P 0335425

undertaken will comply fully with such requirements. Compliance with such rules could adversely affect the Partnership's operations and the Limited Partners' ability to withdraw capital from the Partnership.

Absence of Regulatory Oversight. The Partnership is not required nor does it intend to register as an investment company under the Investment Company Act of 1940, as amended (the "Company Act"), and, accordingly, the provisions of the Company Act (which, among other protections, require investment companies to have a majority of disinterested directors, require securities held in custody at all times to be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company, and regulate the relationship between the adviser and the investment company) will not be applicable.

Dependence on the General Partner. All decisions with respect to the management of the capital of the Partnership are made exclusively by J. Ezra Merkin. Consequently, the Partnership's success depends to a great degree on the skill and experience of Mr. Merkin.

Independent Money Managers. The General Partner may delegate investment discretion for all or a portion of the Partnership's funds to money managers, other than the General Partner, or make investments with Other Investment Entities. Consequently, the success of the Partnership may also be dependent upon other money managers or investment advisors to Other Investment Entities. Although the General Partner will exercise reasonable care in selecting such independent money managers or Other Investment Entities and will monitor the results of those money managers and Other Investment Entities, the General Partner may not have custody over the funds invested with the other money managers or with Other Investment Entities. Hence, the actions or inactions on the part of other money managers or the investment advisors to Other Investment Entities may affect the profitability of the Partnership. The risk of loss of the funds invested with other money managers or with Other Investment Entities may not be insured by any insurance company, bonding company, governmental agency, or other entity and the General Partner is not liable for any such loss. Independent money managers and managers of Other Investment Entities selected by the General Partner may receive compensation based on the performance of their investments. Performance-based compensation usually is calculated on a basis which includes unrealized appreciation of the Partnership's assets, and may be greater than if such compensation were based solely on realized gains. Further, a particular independent money manager or manager of an Other Investment Entity may receive incentive compensation in respect of its portfolio for a period even though the Partnership's overall portfolio depreciated during such period. The independent money managers and Other Investment Entities may trade wholly independently of one another and may at times hold economically offsetting positions.

Arbitrage Transactions. The Partnership may purchase securities at prices often only slightly below the anticipated value to be paid or exchanged for such securities in a merger, exchange offer or cash tender offer which the Partnership determines is probable and substantially above the prices at which such securities traded immediately prior to announcement of the merger, exchange offer or cash tender offer. If the proposed transaction appears likely not

10105509.12

17

CONFIDENTIAL

GCC-NYAG0000356

to be consummated or in fact is not consummated or is delayed, the market price of the security to be tendered or exchanged may be expected to decline sharply, which would result in a loss to the Partnership. Moreover, where a security to be issued in a merger or exchange offer has been sold short as a hedge in the expectation that the short position will be covered by delivery of such security when issued, failure of the merger or exchange offer to be consummated may force an arbitrageur to cover his short position in the market at a higher price than his short sale, with a resulting loss.

Options Transactions. The Partnership may engage from time to time in various types of options transactions, including hedging and arbitrage in options on securities. This activity is designed to reduce the risks attendant in short-selling and in taking long positions in certain transactions and may involve stock options on a registered option exchange and offsetting transactions in the underlying stock, or offsetting transactions in one or more options for stock. The Partnership also may take positions in options on stock of companies which may, in the judgment of the General Partner, be potential acquisition candidates in merger, exchange offer or cash tender offer transactions. If the potential acquisition candidate does not become the subject of a merger, exchange offer or cash tender offer, the Partnership may suffer a loss.

When the Partnership purchases an option, it must pay the price of the option and transaction charges to the broker effecting the transaction. If the option is exercised by the Partnership, the total cost of exercising the option may be more than the brokerage costs which would have been payable had the underlying security been purchased directly. If the option expires, the Partnership will lose the cost of the option. The ability to trade in or exercise options may be restricted in the event that trading in the underlying issue becomes restricted. Options trading may also be illiquid with respect to contracts with extended expirations.

In certain transactions the Partnership may not be "hedged" against market fluctuations or, in liquidation situations, the hedge may not accurately value the assets of the company being liquidated. This can result in losses, even if the proposed transaction is consummated.

Other Transactions. The Partnership may also make certain purchases of securities as to which no extraordinary corporate transaction has been announced. Such purchases may include securities which the General Partner believes to be undervalued, or where a significant position in the securities of the particular company has been taken by one or more other persons or where other companies in the same or a related industry have been the subject of acquisition attempts. If the Partnership purchases securities in anticipation of an acquisition attempt or reorganization, and an acquisition attempt or reorganization does not in fact occur, the Partnership may sell the securities at a substantial loss. Further, when securities are purchased in anticipation of an acquisition attempt or reorganization, a substantial period of time may elapse between the Partnership's purchase of the securities and the acquisition attempt or reorganization. During this period, a portion of the Partnership's capital would be committed to the securities purchased, and the Partnership may finance such purchases with borrowed funds on which it will have to pay interest.

Futures Contracts. The value of futures depends upon the price of the instruments, such as commodities, underlying them. The prices of futures are highly volatile,

10105509.12                                          18

CONFIDENTIAL

GCC-NYAG0000357

and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Partnership's positions trade or of its clearinghouses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Partnership from promptly liquidating unfavorable positions and subject the Partnership to substantial losses or from entering into desired trades. In extraordinary circumstances, a futures exchange or the CFTC could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.

Forward Trading. Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade, and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in forward markets due to unusually high trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward (and futures) trading to less than that which the General Partner would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in significant losses to the Partnership.

Swap Agreements. The Partnership may enter into swap agreements. Swap agreements may be individually negotiated and structured to include exposure to a variety of different types of investments or market factors. It is anticipated that the Partnership will use swap agreements primarily to hedge against macroeconomic factors associated with investing in a particular country or credit risk associated with the debt of a particular company.

There can be no assurance that swap transactions, if undertaken, will be an effective hedging technique.

Short Selling. Short selling involves selling securities which are not owned by the short seller and borrowing them for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the investor to profit from a decline

10105509.12

19

CONFIDENTIAL

GCC-NYAG0000358

GCC-P 0335428

in market price to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. The extent to which the Partnership engages in short sales will depend upon the General Partner's investment strategy and opportunities. A short sale creates the risk of a theoretically unlimited loss, in that the price of the underlying security could theoretically increase without limit, thus increasing the cost to the Partnership of buying those securities to cover the short position. There can be no assurance that the Partnership will be able to maintain the ability to borrow securities sold short. In such cases, the Partnership can be "bought in" (*i.e.*, forced to repurchase securities in the open market to return to the lender). There also can be no assurance that the securities necessary to cover a short position will be available for purchase at or near prices quoted in the market. Purchasing securities to close out a short position can itself cause the price of the securities to rise further, thereby exacerbating the loss.

<u>Market Risk and Lack of Diversification</u>. Substantial risks are involved in the acquisition or disposition of securities. Securities and their issuers are affected by, among other things: changing supply and demand; Federal, state and governmental laws, regulations and enforcement activities; trade, fiscal and monetary programs and policies; and national and international political and economic developments. The concentration of assets in particular types of investments could subject the assets of the Partnership to increased volatility. The Partnership's investment plan does not constitute a balanced investment plan. The securities in which the Partnership may invest may be regarded as of high risk. Such securities are subject to a number of risk factors, including market volatility, creditworthiness of the issuer, liquidity of the secondary trading market, and availability of market quotations.

<u>Leverage</u>. The Partnership's investment in derivative securities and the use of repurchase agreements create certain risks to the Partnership. The use of leverage may increase the Partnership's risk of loss of capital or securities. As a relatively small price movement in an instrument may result in immediate and substantial loss. For example, should the securities pledged to brokers to secure the Partnership's margin accounts decline in value, the Partnership could be subject to a "margin call," pursuant to which the Partnership must either deposit additional funds with the broker or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden, precipitous drop in value of the Partnership's assets occasioned by a market "crash" such as the one that took place in October 1987, the Partnership might not be able to liquidate assets quickly enough to pay off its margin debt. Consequently, fluctuations in the value of the Partnership's portfolio will have a significant effect in relation to the Partnership's capital. Although currently the Partnership does not intend to utilize leverage, as investment opportunities change (*e.g.*, arbitrage opportunities increase) the General Partner may decide to implement short-term borrowings to facilitate the Partnership's investment program. In addition, the level of interest rates generally, and the rates at which the Partnership can borrow in particular, will be an expense of the Partnership and therefore affect the operating results of the Partnership.

<u>Derivatives</u>. Derivative securities, in addition to being highly volatile and speculative, may be internally leveraged such that each percentage change in Interest rates will have a multiple effect on the derivative security. Certain positions therefore may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. Certain transactions in derivatives may expose the Partnership to potential

10105509.12

20

CONFIDENTIAL

GCC-NYAG0000359

losses that exceed the amount originally invested by the Partnership. Reverse Repurchase agreements are structured so that the Partnership sells securities to another party, usually a bank or other securities firm, and agrees to repurchase them at an agreed upon price and date. a reverse repurchase agreement is the equivalent of borrowing money and pledging securities as collateral.

Counterparty Risk. Some of the markets in which the Partnership may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to the same credit evaluation and regulatory oversight as are members of "exchange-based" markets. In addition, many of the protections afforded to participants on some organized exchanges, such as the performance guarantee of an exchange clearinghouse, might not be available in connection with such "over-the-counter" transactions. This exposes the Partnership to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a credit or liquidity problem, thus causing the Partnership to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Partnership has concentrated its transactions with a single or small group of counterparties. The General Partner is not restricted from dealing with any particular counterparty or from concentrating any or all of the Partnership's transactions with one counterparty. Moreover, the General Partner has no formal credit function which evaluates the creditworthiness of the Partnership's counterparties. The ability of the Partnership to transact business with any one or number of counterparties, the lack of any meaningful and independent evaluation of such counterparties' financial capabilities and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Partnership.

In addition, the counterparties with which the Partnership effects transactions may, from time to time, cease making markets or quoting prices in certain of the instruments. In such instances, the Partnership may be unable to enter into a desired transaction in currencies, or to enter into an offsetting transaction with respect to an open position, which might adversely affect its performance. Further, in contrast to exchange-traded instruments, forward, spot and option contracts and swaps on currencies do not provide a trader with the right to offset its obligations through an equal and opposite transaction. For this reason, in entering into forward, spot or options contracts or swaps, the Partnership may be required, and must be able, to perform its obligations under the contract.

Portfolio Turnover. The Partnership currently does not have high portfolio turnover, however, to the extent certain strategies become a larger part of the Partnership's investment strategy, portfolio turnover may be high. Typically, high portfolio turnover results in correspondingly high transaction costs, including brokerage commission expenses.

Overall Investment Risk. All securities investments risk the loss of capital. The nature of the securities to be purchased and traded by the Partnership and the investment techniques and strategies to be employed by it may increase such risk. Moreover, the identification of investment opportunities is a difficult task, and there can be no assurance that such opportunities will be successfully recognized by the Partnership. While the General Partner will devote his best efforts to the management of the Partnership's portfolio, there can be no

10105509.12

21

CONFIDENTIAL

GCC-NYAG0000360

GCC-P 0335430

assurance that the Partnership will not incur losses. Returns generated from the Partnership's investments may not adequately compensate Limited Partners for the business and financial risks assumed. A Limited Partner should be aware that it may lose all or a substantial part of its investment in the Partnership. Many unforeseeable events, including actions by various government agencies and domestic and international economic and political developments, may cause sharp market fluctuations that could adversely affect the Partnership's portfolio and performance.

Effect of Limited Partner Withdrawal. The exercise by Limited Partners of their right to withdraw under the Partnership's limited partnership agreement (the "Partnership Agreement") may cause the Partnership to be unable to carry out a particular investment strategy. The obligation of the Partnership to honor one or more withdrawal requests may adversely affect the Partnership's ability to accomplish its economic objectives and may cause the General Partner to dissolve the Partnership as a means of meeting the withdrawal requests of Limited Partners.

Liquidity of Investments. The Partnership may invest in unregistered securities of publicly held companies, securities of privately held companies and other illiquid securities. Such investments may be difficult to value. They may, by their nature, entail a prolonged investment horizon from the initial investment date to final disposition. It may not be possible to sell such securities on short notice and, if possible, such sales may require substantial discounts.

Lack of Management Control. The management of the affairs of the Partnership will be vested exclusively in the General Partner. He will have wide latitude in making investment decisions and, subject to certain limitations discussed herein, may withdraw his own capital, admit new Limited Partners or terminate the Partnership at any time. Generally, the Limited Partners will have no right to participate in the decisions of the General Partner or otherwise in the affairs of the Partnership, to remove the General Partner, to approve the admission of any new General Partner or to dissolve the Partnership. The General Partner may require any Limited Partner to withdraw from the Partnership at any time.

Exculpation of the General Partner from Liability. The Partnership Agreement provides that the General Partner will not be liable for, and will be indemnified by the Partnership against, any act or omission unless such act or omission constitutes bad faith, gross negligence, recklessness, fraud or intentional misconduct. As a result, Limited Partners may be entitled to a more limited right of action against the General Partner than they would otherwise have had absent such a limitation in the Partnership Agreement.

Conflicts of Interest. The General Partner has broad powers to conduct investment and money management activities outside the Partnership. These activities, which include management of one or more other domestic investment partnerships and one or more offshore managed funds (the "Managed Funds"), may create conflicts of interest with the Partnership with regard to such matters as allocation of opportunities to participate in particular investments. Other accounts affiliated with the General Partner may hold positions opposite to positions maintained on behalf of the Partnership. The Partnership will obtain no interest in any such outside investments or activities. The Partnership Agreement does not require the General Partner or his employees to devote all or any specified portion of their time to managing the

10105509.12                           22

CONFIDENTIAL                  GCC-NYAG0000361

CONFIDENTIAL                                  GCC-P 0335431

Partnership's affairs, but only to devote so much of their time to the Partnership's affairs as they reasonably believe necessary in good faith. The Partnership Agreement does not prohibit the General Partner or his affiliates from engaging in any other existing or future business, and the General Partner or his affiliates currently provide and anticipate continuing to provide investment management services to other clients. In addition, the General Partner or his employees may invest for their own accounts in various investment opportunities, including in investment partnerships. The General Partner may determine that an investment opportunity in a particular investment partnership is appropriate for a particular account, or for him, but not for the Partnership.

      Other Activities. In addition to managing the Partnership, the General Partner manages the Managed Funds, which may have similar or different investment objectives to the Partnership. The General Partner may allocate overhead expenses among the Partnership and the Managed Funds on a fair basis, as determined by the General Partner. These other activities will require a substantial amount of the General Partner's time and effort.

      Liability for Return of Distributions. Under Delaware law, any Limited Partner who receives a distribution from the Partnership shall be liable to the Partnership for the amount of the distribution to the extent such amount was distributed at a time that the liabilities of the Partnership exceeded the fair value of its assets and the Limited Partner knew of the state of the Partnership's financial condition at the time of such distribution.

      Business and Regulatory Risks of Hedge Funds. Legal, tax and regulatory changes could occur during the term of the Partnership that may adversely affect the Partnership. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Partnership and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies. The SEC, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. In addition, the regulation of derivatives transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on the Partnership could be substantial and adverse.

      Terrorist Action. There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in global markets. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

The Partnership

      Limited Liquidity. An investment in the Partnership provides limited liquidity since Interests in the Partnership are not freely transferable and the withdrawal rights of holders of the Interests are restricted.

      The General Partner may suspend withdrawal rights, in whole or in part, when there exists in the opinion of the General Partner a state of affairs where disposal of the

10105509.12

23

CONFIDENTIAL

GCC-NYAG0000362

Partnership's assets, or the determination of the value of a Limited Partner's capital account, would not be reasonably practicable or would be seriously prejudicial to the non-withdrawing Limited Partners. Such limitations on liquidity must be considered significant.

Valuation of the Partnership's Assets. All securities, liabilities and other property will be assigned such values as the General Partner will reasonably determine to be their fair market value and such values shall be binding upon the Partners; provided that in the event a majority in interest of the Class A Limited Partners does not agree with any such determination, such disagreement will be submitted for resolution to a firm of independent certified public accountants (other than the partnership's auditors) which shall be mutually agreed upon by the General Partner and the majority in interest of the Class A Limited Partners. Any determination made by such firm of independent certified public accountants shall be final and binding upon the General Partner and Class A Limited Partners.

Required Withdrawals. The General Partner may cause any Limited Partner to withdraw from the Partnership in whole or in part. The withdrawal of such Limited Partner will be effective as of the date specified in such notice, which date shall not be less than 30 days after the date such notice is given. Such mandatory withdrawal may create adverse tax and/or economic consequences to the Limited Partner depending on the timing thereof in respect of the Partnership and the Limited Partner.

Cross Class Liability. All liabilities, irrespective of whatever class they are attributable to, shall (in the event of a winding up of the Partnership or a withdrawal of all of the Interests of a class), unless otherwise agreed upon with the creditors, be binding on the Partnership as a whole and, accordingly, liabilities of one class may impact on and be paid out of one or more other classes.

Layering of Fees. The Partnership may invest in Other Investment Entities. To the extent the Partnership invests in such Other Investment Entities, Limited Partners may be subject to management fees, incentive fees and expenses at both the level of the Partnership and the level of the underlying Other Investment Entities.

Reports to Limited Partners. The Partnership may offer certain Limited Partners additional information and reporting that other Limited Partners may not receive, and such information may affect a Limited Partner's decision to request a withdrawal of its Interests.

Competition. The securities industry generally, and the business of investing in reorganization related securities or instruments in particular, is extremely competitive, and is expected to remain so in the foreseeable future. As a result, the Partnership may underperform funds with similar investment strategies, or the market in general.

In-Kind Distributions. A withdrawing Limited Partner may, at the sole and absolute discretion of the General Partner, receive property other than cash. Any investments distributed in-kind may not be readily marketable or saleable and may have to be held by such Limited Partner for an indefinite period of time.

10105509.12

24

CONFIDENTIAL

GCC-NYAG0000363

CONFIDENTIAL

GCC-P 0335433

<u>Statutory Regulations and Non-Registration</u>.  The financial services industry generally, and the activities of hedge funds and their managers, in particular, have been subject to intense and increasing regulatory scrutiny.  Such scrutiny may increase the Partnership's exposure to potential liabilities and to legal, compliance and other related costs.  Increased regulatory oversight can also impose administrative burdens on the General Partner, including, without limitation, responding to investigations and implementing new policies and procedures.  Such burdens may divert the General Partner's time, attention and resources from portfolio management activities.

While the Partnership may be considered similar to an investment company, it is not required and does not intend to register as such under the Company Act.  The Partnership relies on the exclusion provided in under Section 3(c)(7) of the Company Act for entities whose securities are owned exclusively by "qualified purchasers," as defined in Section 2(a)(51) of the Company Act, and that do not publicly offer their securities.  Investors in either Partnership must also be "accredited investors," as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act").  The General Partner, in its discretion, may decline to admit any investor.  Accordingly, the provisions of the Company Act (which may provide certain regulatory safeguards to investors) will not be applicable.  For example, the Partnership is not required to maintain custody of its own securities or place its securities in the custody of a bank or a member of a U.S. securities exchange, as required of registered investment companies under rules promulgated by the SEC.  A registered investment company that places its securities in the custody of a member of a U.S. securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and which contains other provisions complying with SEC regulations.  The General Partner generally maintains such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies.  Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Partnership than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

<u>Liability for Return of Distributions</u>.  Under Delaware law, any Limited Partner who receives a distribution from the Partnership shall be liable to the Partnership for the amount of the distribution to the extent such amount was distributed at a time that the liabilities of the Partnership exceeded the fair value of its assets and the Limited Partner knew of the state of the Partnership's financial condition at the time of such distribution.  Under Delaware law, a Limited Partner that receives a distribution from the Partnership will have no liability for the amount of the distribution after the expiration of three years from the date of the distribution.

<u>Tax and Other Risks</u>.  Although the General Partner believes that the Partnership will be treated as a partnership for federal income tax purposes, no ruling has been, or will be, obtained from the Internal Revenue Service, to that effect and no opinion of counsel has been sought.  If the Partnership is taxed not as a partnership but as a corporation it will, among other things, have to pay income tax on its earnings in the same manner and at the same rates as a corporation, and Partners would be subject to an additional tax on earnings distributed.  If the

10105509.12

25

CONFIDENTIAL

GCC-NYAG0000364

CONFIDENTIAL                GCC-P 0335434

Partnership is treated as a partnership for tax purposes, Partners will be taxed on the Partnership's taxable income whether or not it is distributed. The General Partner does not intend to make distributions to the Limited Partners that reflect the taxable income of the Partnership and is not required to make any distributions except upon the withdrawal of capital by a Partner pursuant to the Partnership Agreement. Furthermore, a Limited Partner who withdraws capital from the Partnership in accordance with the Partnership Agreement may receive the amount so withdrawn in kind. Accordingly, in either such event, a Limited Partner may not receive sufficient liquid assets to pay income taxes attributable to his distributive share of Partnership income. Thus, Limited Partners may have to rely upon resources independent of their Interests to pay their obligations to the federal, state and local tax authorities. (See "Tax Aspects.")

Factors Affecting Investments. There are a number of factors which may adversely affect the ability of the Partnership to pursue its investment strategy. There is a limited availability of debt financing for takeovers of highly leveraged companies. Mergers of a certain size require approval of the U.S. Federal Trade Commission (the "FTC") or other government agencies because of potential antitrust implications. It is possible at any time for the FTC or other governmental agency to more vigorously enforce the antitrust laws affecting mergers. In addition, there are state laws aimed at curbing takeovers and courts have given management greater authority to employ defensive measures in the face of hostile takeover attempts where management believes doing so is in the long-term interests of the company. Many companies generally have adopted various measures aimed at making takeovers more difficult and expensive. Similarly, changing economic conditions, accounting standards and tax and securities laws (among other factors) may impair the profitability of the types of transactions in which the Partnership intends to invest, adversely affecting its operations.

PAST RESULTS MAY NOT BE INDICATIVE OF FUTURE PERFORMANCE. NO ASSURANCE CAN BE MADE THAT PROFITS WILL BE ACHIEVED OR THAT SUBSTANTIAL LOSSES WILL NOT BE INCURRED.

The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Partnership. Prospective investors should read this entire Confidential Offering Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Partnership.

10105509.12

26

CONFIDENTIAL

GCC-NYAG0000365

## CONFLICTS OF INTEREST

The General Partner and his affiliates will provide investment management services to managed accounts and other investment partnerships or funds, some of which may have similar investment objectives to those of the Partnership. The portfolio strategies the General Partner and his affiliates may use for other investment funds or accounts could conflict with the transactions and strategies employed by the General Partner in managing the Partnership and affect the prices and availability of the securities and other financial instruments in which the Partnership invests.

The General Partner has agreed to devote substantially his entire time and effort during normal business hours to the management of the Partnership and other investment entities managed by the General Partner, or their respective successors; provided, however, that the General Partner may act, consistent, however, with the foregoing, as a director, officer or employee of any corporation (including any corporation in which the Partnership is invested), a trustee of any trust, an executor or administrator of any estate, a partner of any partnership (including a partnership in which the Partnership is invested) or an administrative official of any other business entity, and may receive compensation and participate in profits in connection with any of the foregoing, and may trade in securities for his own account or for other accounts for investors including securities which are the same or different from those traded in or held by the Partnership. The terms of the Partnership Agreement do not restrict the General Partner or his affiliates from forming additional investment funds, from entering into other investment advisory relationships, or from engaging in other business activities, even though such activities may be in competition with the Partnership and/or may involve substantial time and resources of the General Partner or his affiliates. In the event the General Partner or any of his affiliates decide to engage in such activities in the future, the General Partner or his affiliates, as applicable, will undertake to engage in such activities in a manner that is consistent with their fiduciary duties, to the Partnership. Nevertheless, these activities could be viewed as creating a conflict of interest in that the time and effort of the General Partner and his affiliates will not be devoted exclusively to the business of the Partnership but will be allocated between the business of the Partnership and the management of the monies of other advisees of the General Partner and his affiliates.

When it is determined that it would be appropriate for the Partnership and one or more other funds and managed accounts managed by the General Partner or his affiliates to participate in an investment opportunity, the General Partner will seek to execute orders for all of the participating investment accounts, including the Partnership, on an equitable basis, taking into account such factors as the relative amounts of capital available for new investments, relative exposure to short-term market trends, and the investment programs and portfolio positions of the Partnership and the affiliated entities for which such participation is appropriate. Orders may be combined for all such accounts, and if any order is not filled at the same price, they may be allocated on an average price basis. Similarly, if an order on behalf of more than one account cannot be fully executed under prevailing market conditions, securities may be allocated among the different accounts on a basis that the General Partner considers equitable.

10105509.12

27

CONFIDENTIAL

GCC-NYAG0000366

The General Partner may share office space with third-party money managers. If the managers were to acquire inside information with respect to certain securities, the Partnership will be precluded from purchasing securities to which such inside information relates or be precluded from selling securities held by the Partnership that were purchased before the inside information was acquired.

Subject to internal compliance policies and approval procedures, the General Partner and his employees as well as members and employees of his affiliates, may engage, from time to time, in personal trading of securities and other instruments, including securities and instruments in which the Partnerships may invest. Any such trading will be effected after the Partnerships have effected their transactions.

### BROKERAGE COMMISSIONS

Portfolio transactions for the Partnership will be allocated to brokers on the basis of best execution and in consideration of a broker's ability to effect the transactions, its facilities, reliability and financial responsibility and the provision or payment by the broker of the costs of research and research-related services which are of benefit to the Partnership, the General Partner or related funds and accounts. Accordingly, the commission rates (or dealer markups and markdowns arising in connection with riskless principal transactions) charged to the Partnership by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services. The General Partner has not entered into, and does not expect to enter into, any written soft dollar arrangements.

Investors in the Partnership may include fund of funds affiliated with brokers or, possibly, brokerage firms themselves. The fact that any such investor has invested in the Partnership will not be taken into consideration in selecting brokers (including prime brokers).

The Partnership's securities transactions can be expected to generate a substantial amount of brokerage commissions and other compensation, all of which the Partnership, not the General Partner, will be obligated to pay. The General Partner will have complete discretion in deciding what brokers and dealers the Partnership will use and in negotiating the rates of compensation the Partnership will pay.

The Partnership will execute its trades through unaffiliated brokers, who may be selected on a basis other than that which will necessarily result in the lowest cost for each trade. Clearing, settlement and custodial services will be provided by one or more unaffiliated brokerage firms. Morgan Stanley & Co., Inc. and Bernard L. Madoff Investment Securities, LLC (the "Prime Brokers") currently serve as the principal prime brokers and custodians for the Partnership, and clear (generally on the basis of payment against delivery) the Partnership's securities transactions that are effected through other brokerage firms. The Partnership is not committed to continue its relationship with the Prime Brokers for any minimum period and the General Partner may select other or additional brokers to act as prime brokers for the Partnership.

From time to time, brokers (including the Prime Brokers) may assist the Partnership in raising additional funds from investors, and representatives of the General Partner

10105509.12

28

CONFIDENTIAL

GCC-NYAG0000367

CONFIDENTIAL                                                                    GCC-P 0335437

may speak at conferences and programs sponsored by the Prime Brokers for investors interested in investing in hedge funds. Through such "capital introduction" events, prospective investors in the Partnership and the Offshore Fund have the opportunity to meet with the General Partner. Neither the General Partner nor the Partnership compensate the Prime Brokers for organizing such events or for any investments ultimately made by prospective investors attending such events. However, such events and other services (including, without limitation, capital introduction services) provided by the Prime Brokers may influence the General Partner in deciding whether to use such prime broker in connection with brokerage, financing and other activities of the Partnership. However, the General Partner will not commit to a broker to allocate a particular amount of brokerage in any such situation.

## OUTLINE OF PARTNERSHIP AGREEMENT

The following outline summarizes the material provisions of the Limited Partnership Agreement that are not discussed elsewhere in this Confidential Offering Memorandum. This outline is only a summary and is not definitive, and each prospective Limited Partner should carefully read the Partnership Agreement in its entirety.

Limited Liability. No Limited Partner will be bound by or be liable for the repayment, satisfaction or discharge of any debts, liabilities or obligations of the Partnership except to the extent of (i) such Partner's Capital Account, and (ii) as may otherwise be required by applicable law.

Term. The Partnership will continue indefinitely the first to occur of the following: (i) a determination by the General Partner that the Partnership should be dissolved or (ii) the death, bankruptcy, retirement or insanity of the General Partner which prevents him from devoting substantially his entire time, skill and attention to the Partnership and other funds and managed accounts for a period of 90 days; (iii) December 31, 2015; or (iv) any event causing the dissolution of the Partnership under the laws of the State of Delaware.

Management. The management of the Partnership will be vested exclusively in the General Partner. Except as authorized by the General Partner, the Limited Partners will have no part in the management of the Partnership and will have no authority or right to act on behalf of the Partnership in connection with any matter. The General Partner and his affiliates may engage in any other business venture, and neither the Partnership nor any Limited Partner will have any rights in or to such ventures or the income or profits derived therefrom.

Capital Accounts. Each Partner will have a Capital Account equal initially to the amount of cash or the value of property contributed by him. The General Partner may permit additional capital contributions and may admit new Limited Partners. The General Partner will not be personally liable for the return of capital contributions, and no interest will be payable thereon.

Withdrawals of Capital. A Class C Limited Partner may withdraw all or part of such Class C Limited Partner's Capital Account on the First Withdrawal Date, and, thereafter, on each anniversary of the First Withdrawal Date upon 45 days prior written notice to the General Partner.

10105509.12

29

CONFIDENTIAL

GCC-NYAG0000368

GCC-P 0335438

A Class A Limited Partner may withdraw all or part of his Capital Account from the Partnership on 45 days prior written notice on December 31 of any year.

A Class B Limited Partner may withdraw all or part of its Capital Account from the Partnership on 25 days prior written notice on the last Business Day of each March, June, September and December of any fiscal year.

The withdrawing Partner will receive the amount of his Capital Account to be withdrawn (less reserves determined by the General Partner for contingent liabilities) within 90 days after withdrawal. All amounts remaining unpaid (less reserves) will begin to bear interest at a rate equal to a specified broker's call rate for the period beginning 30 days after the effective date of such withdrawal and ending 90 days after the effective date of such withdrawal.

A distribution in respect of a withdrawal may be made in cash or in kind, as determined by the General Partner in its discretion. In-kind distributions will be made to withdrawing Limited Partners on a *pro rata* basis. The General Partner may waive notice requirements or permit withdrawals under such other circumstances and conditions as it, in its sole discretion, deems appropriate.

Limited Partners may not otherwise make withdrawals, and the Partnership does not plan to make *pro rata* distributions to Partners on an on going basis.

Additional Withdrawal Rights. Limited Partners may request more frequent withdrawal rights upon written request to the General Partner. The General Partner shall seek, but is not required, to accommodate all such withdrawal requests as it deems appropriate in its sole discretion.

Required Withdrawals. The General Partner may, in its sole discretion, terminate the Interest of any Limited Partner, in whole or in part, upon at least thirty days prior written notice.

Suspension of Withdrawal Rights. The General Partner, by written notice to any Limited Partner, may suspend the withdrawal rights of such Limited Partner if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Partnership, the General Partner or any of the Partnership's other service providers. (See "Anti-Money Laundering Regulations.")

General Partner Withdrawals. The General Partner may withdraw any or all of his Capital Account at any time; provided, however, that at all times the General Partner, will maintain at least a 1% interest in the Partnership. In addition, the General Partner may withdraw from his Capital Account each year, as advances against any future withdrawals by the General Partner, amounts which in the aggregate do not exceed approximately 50% of the General Partner's share of the profits of the Partnership at the time of such withdrawal, all as estimated by the General Partner. Withdrawals pursuant to the preceding sentence will not reduce the General Partner's Capital Account until the end of the year.

10105509.12

30

CONFIDENTIAL

GCC-NYAG0000369

CONFIDENTIAL                                                        GCC-P 0335439

<u>Withdrawal, Death, Disability, Etc. of a Limited Partner</u>.  In the event of the death, bankruptcy or adjudicated incompetency of a Limited Partner, the Interest of such Limited Partner shall continue until the later of (a) the first to occur of the last day of the fiscal year of the Partnership in which such event takes place (the "Year of Determination") or the earlier termination of the Partnership, and (2) the day 60 days after the date of such Limited Partner's death, bankruptcy or incompetency.  If the Partnership shall be continued after the expiration of the Year of Determination, such Limited Partner shall be deemed to have withdrawn from the Partnership as of the later of the last day of the Year of Determination and 60 days after the date of such Partner's death, bankruptcy or incompetency.

<u>Types of Securities in which the Partnership May Invest</u>.  The Partnership Agreement authorizes the Partnership to engage in any and all activities permitted under applicable law, including trading equity securities (including restricted equity securities), equity options, equity related convertible securities, interest-bearing or interest rate sensitive marketable securities (including those issued or guaranteed by the United States Government or its agencies or instrumentalities) and other instruments or evidences of ownership interest, bonds, trade creditor claims and other instruments evidencing debt obligations, currency and commodities contracts, options, futures and forward contracts with respect to any of the foregoing, and any other instruments which are traded in normal channels of trading for securities, debt instruments, and to engage in transactions in connection with mergers, consolidations, acquisitions, transfers of assets, tender offers, exchange offers, recapitalizations, proxy fights, liquidations, bankruptcies or other similar transactions.

<u>Valuation of Partnership Assets and Liabilities</u>.  All securities, liabilities and other property shall be assigned such values as the General Partner will reasonably determine to be their fair market value and such values will be binding upon the Partners; provided that in the event a majority in interest of the Class A Limited Partners does not agree with any such determination, such disagreement shall be submitted for resolution to a firm of independent certified public accountants (other than the partnership's auditors) which shall be mutually agreed upon by the General Partner and the majority in interest of the Class A Limited Partners. Any determination made by such firm of independent certified public accountants shall be final and binding upon the General Partner and the Class A Limited Partners.  No value will be attributable to the goodwill, if any, of the business and for the firm name of the Partnership.  The costs of retaining such accountants shall be paid by the Partnership].

<u>Assignability of Interests</u>.  No Limited Partner or transferee thereof will, without the prior written consent of the General Partner, which may be withheld in his sole discretion, create, or suffer the creation of, a security interest in such Limited Partner's Interest.  Except for sales, transfers, assignments or other dispositions (i) by last will and testament, (ii) by operation of law, or (iii) to an affiliate of a Limited Partner, without the prior written consent of the General Partner, which may be withheld in his sole discretion, no Limited Partner will sell, transfer, assign, or in any manner dispose of such Limited Partner's Interest, in whole or in part, nor enter into any agreement as the result of which any person becomes interested with such Limited Partner therein.  (See "Limitations on Transferability; Suitability Requirements.")

10105509.12                                            31

CONFIDENTIAL                                       GCC-NYAG0000370

CONFIDENTIAL                                                           GCC-P 0335440

<u>Admission of New Partners</u>.  The General Partner may admit one or more additional Limited Partners at any time in its sole and absolute discretion. The General Partner may do all things appropriate or convenient in connection with the admission of any additional Limited Partner. Additional Limited Partners will be required to execute an agreement pursuant to which it becomes bound by the terms of the Partnership Agreement.

<u>Amendments to The Partnership Agreement</u>.  The Partnership Agreement may not be amended except by a writing executed by the General Partner and by a majority in interest of the Limited Partners; *provided, however,* that (a) without the consent of all the Partners, no such amendment will change the Partnership to a general partnership, reduce the liabilities, obligations or responsibilities of the General Partner or increase the liabilities, obligations or responsibilities of the Limited Partners, and (b) without the consent of each Partner affected thereby, no such amendment will reduce the Capital Account of any Partner or alter or modify his interest in Partnership income, distributions or Partnership Losses; and *provided further, however,* that the General Partner may amend the Partnership Agreement without the consent of any of the other Partners to reflect changes validly made in the membership of the Partnership; to reflect changes in the Capital Accounts of the Partners resulting from operation of the Partnership Agreement and, subject to other provisos of the Partnership Agreement, to reflect the creation of additional classes of Limited Partners.   Notwithstanding any of the foregoing provisions, the Partnership Agreement shall be amended from time to time in each and every manner to comply with the then existing requirements of the Code, the Treasury Regulations and the rulings of the Internal Revenue Service affecting the status of the Partnership as a partnership for federal income tax purposes, and no amendment will be proposed which shall directly or indirectly affect or jeopardize the then status of the Partnership as a partnership for federal income tax purposes.

<u>Reports to Partners</u>.  The Partnership will provide to the Partners unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 90 days after year end, and tax information as soon thereafter as practicable.

<u>Indemnification</u>.  The Partnership Agreement provides that the Partnership will indemnify, defend and hold the General Partner and, if expressly directed by the General Partner, the Partnership's agents, employees, advisors and consultants, harmless from and against any loss, liability, damage, cost or expense, including reasonable attorneys' fees, in defense of any demands, claims or lawsuits against the General Partner or such other persons, in or as a result of or relating to his capacity, actions or omissions as General Partner or as an agent, employee, advisor, or consultant, concerning the business, or activities undertaken on behalf, of the Partnership, including, without limitation, any demands, claims or lawsuits initiated by a Limited Partner or resulting from or relating to the offer and sale of the Interests, provided that the acts or omissions of such General Partner or other person are not the result of bad faith, gross negligence, recklessness, fraud or intentional misconduct, or such a lesser standard of conduct as under applicable law prevents indemnification hereunder, or were taken in the knowledge that such actions were not within the stated purposes and powers of the Partnership.

10105509.12

32

CONFIDENTIAL

GCC-NYAG0000371

 GCC-P 0335441

The General Partner, and any other indemnified person, will be entitled to receive, upon application therefor, advances to cover the costs of defending any claim or action against him; provided that such advances will be repaid to the Partnership if the General Partner or other person violated any of the standards set forth in the preceding paragraph. All rights of the General Partner and others to indemnification will survive the dissolution of the Partnership and the death, retirement, removal, dissolution, incompetency or insolvency of either the General Partner or an agent, employee, or advisor, or others, provided that notice of a potential claim for indemnification hereunder is made by or on behalf of the person seeking such indemnification prior to the time distribution in liquidation of the property of the Partnership is made.

If the Partnership is made a party to any claim, dispute or litigation or otherwise incurs any loss, liability, damage, cost or expense (i) as a result of or in connection with the General Partner's obligations or liabilities unrelated to the Partnership business, or (ii) by reason of his bad faith, gross negligence, recklessness, fraud or intentional misconduct, or by reason of actions taken in the knowledge that such actions were not within the stated purposes and powers of the Partnership, the General Partner shall indemnify and reimburse the Partnership for all loss, liability, damage, cost and expense incurred, including reasonable attorneys' fees.

## TAX ASPECTS

CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a summary of certain aspects of the income taxation of the Partnership and its Limited Partners which should be considered by a prospective Limited Partner. The Partnership has not sought a ruling from the Internal Revenue Service (the "Service") or any other Federal, state or local agency with respect to any of the tax issues affecting the Partnership, nor has it obtained an opinion of counsel with respect to any tax issues.

This summary of certain aspects of the Federal income tax treatment of the Partnership is based upon the Internal Revenue Code of 1986, as amended (the "Code"), judicial decisions, Treasury Regulations (the "Regulations") and rulings in existence on the date hereof, all of which are subject to change. This summary does not discuss the impact of various proposals to amend the Code which could change certain of the tax consequences of an investment in the Partnership. This summary also does not discuss all of the tax consequences that may be relevant to a particular investor or to certain investors subject to special treatment under the Federal income tax laws, such as insurance companies.

10105509.12

33

CONFIDENTIAL

GCC-NYAG0000372

GCC-P 0335442

EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT WITH ITS OWN TAX ADVISER IN ORDER FULLY TO UNDERSTAND THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.

In addition to the particular matters set forth in this section, tax-exempt organizations should review carefully those sections of the Memorandum regarding liquidity and other financial matters to ascertain whether the investment objectives of the Partnership are consistent with their overall investment plans. Each prospective tax-exempt Limited Partner is urged to consult its own counsel regarding the acquisition of Interests.

<u>Tax Treatment of Partnership Operations</u>

<u>Classification of the Partnership</u>. The Partnership operates as a partnership for Federal tax purposes that is not a publicly traded partnership taxable as a corporation. If it were determined that the Partnership should be taxable as a corporation for Federal tax purposes (as a result of changes in the Code, the Regulations or judicial interpretations thereof, a material adverse change in facts, or otherwise), the taxable income of the Partnership would be subject to corporate income tax when recognized by the Partnership; distributions of such income, other than in certain redemptions of Interests, would be treated as dividend income when received by the Partners to the extent of the current or accumulated earnings and profits of the Partnership; and Partners would not be entitled to report profits or losses realized by the Partnership.

UNLESS OTHERWISE INDICATED, REFERENCES IN THE FOLLOWING DISCUSSION OF THE TAX CONSEQUENCES OF PARTNERSHIP INVESTMENTS, ACTIVITIES, INCOME, GAIN AND LOSS, INCLUDE THE DIRECT INVESTMENTS, ACTIVITIES, INCOME, GAIN AND LOSS OF THE PARTNERSHIP, AND THOSE INDIRECTLY ATTRIBUTABLE TO THE PARTNERSHIP AS A RESULT OF IT BEING AN INVESTOR IN OTHER INVESTMENT ENTITIES.

As a partnership, the Partnership is not itself subject to Federal income tax. The Partnership files an annual partnership information return with the Service which reports the results of operations. Each Partner is required to report separately on its income tax return its distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss and all other items of ordinary income or loss. Each Partner is taxed on its distributive share of the Partnership's taxable income and gain regardless of whether it has received or will receive a distribution from the Partnership.

<u>Allocation of Profits and Losses</u>. Under the Partnership Agreement, the Partnership's net capital appreciation or net capital depreciation for each accounting period is allocated among the Partners and to their capital accounts without regard to the amount of income or loss actually recognized by the Partnership for Federal income tax purposes. The Partnership Agreement provides that items of income, deduction, gain, loss or credit actually recognized by the Partnership for each fiscal year generally are to be allocated for income tax purposes among the Partners pursuant to the principles of Regulations issued under Sections 704(b) and 704(c) of the Code.

10105509.12

34

CONFIDENTIAL

GCC-NYAG0000373

CONFIDENTIAL                                                   GCC-P 0335443

Under the Partnership Agreement, the General Partner has the discretion to allocate income, gains, losses, deductions and credits to take into account the differences between income for tax purposes and for Partnership book purposes. There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation. If such allocation is successfully challenged by the Service, the Partnership's gains allocable to the Partners would be increased.

Tax Elections; Returns; Tax Audits.    The Code generally provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make or refrain from making such an election. Any such election, once made, cannot be revoked without the Service's consent. The actual effect of any such election may depend upon whether any Other Investment Entities also make such an election. As a result of the complexity and added expense of the tax accounting required to implement such an election, the General Partner presently does not intend to make such election.

The General Partner decides how to report the partnership items on the Partnership's tax returns, and all Partners are required under the Code to treat the items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Partnership's items have been reported. In the event the income tax returns of the Partnership are audited by the Service, the tax treatment of the Partnership's income and deductions generally is determined at the limited partnership level in a single proceeding rather than by individual audits of the Partners. The General Partner, designated as the "Tax Matters Partner", has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items.

Mandatory Basis Adjustments.    Under new legislation, the Partnership is generally required to adjust its tax basis in its assets in respect of all Partners in cases of partnership distributions that result in a "substantial basis reduction" (i.e., in excess of $250,000) in respect of the partnership's property. The Partnership is also required to adjust its tax basis in its assets in respect of a transferee, in the case of a sale or exchange of an interest, or a transfer upon death, when there exists a "substantial built-in loss" (i.e., in excess of $250,000) in respect of partnership property immediately after the transfer. For this reason, the Partnership will require (i) a Partner who receives a distribution from the Partnership in connection with a complete withdrawal, (ii) a transferee of an Interest (including a transferee in case of death) and (iii) any other Partner in appropriate circumstances to provide the Partnership with information regarding its adjusted tax basis in its Interest.

10105509.12

35

CONFIDENTIAL

GCC-NYAG0000374

Tax Consequences to a Withdrawing Limited Partner

A Limited Partner receiving a cash liquidating distribution from the Partnership, in connection with a complete withdrawal from the Partnership, generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such Limited Partner and such Limited Partner's adjusted tax basis in its partnership interest. Such capital gain or loss will be short-term, long-term, or some combination of both, depending upon the timing of the Limited Partner's contributions to the Partnership. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Limited Partner's allocable share of the Partnership's "unrealized receivables" exceeds the Limited Partner's basis in such unrealized receivables (as determined pursuant to the Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Partnership will be treated as an unrealized receivable, with respect to which a withdrawing Limited Partner would recognize ordinary income. A Limited Partner receiving a cash nonliquidating distribution will recognize income in a similar manner only to the extent that the amount of the distribution exceeds such Limited Partner's adjusted tax basis in its partnership interest.

Distributions of Property. A partner's receipt of a distribution of property from a partnership is generally not taxable. However, under Section 731 of the Code, a distribution consisting of marketable securities generally is treated as a distribution of cash (rather than property) unless the distributing partnership is an "investment partnership" within the meaning of Section 731(c)(3)(C)(i) and the recipient is an "eligible partner" within the meaning of Section 731(c)(3)(C)(iii). The Partnership will determine at the appropriate time whether it qualifies as an "investment partnership." Assuming it so qualifies, if a Limited Partner is an "eligible partner", which term should include a Limited Partner whose contributions to the Partnership consisted solely of cash, the rule treating a distribution of property as a distribution of cash would not apply.

Tax Treatment of Partnership Investments

In General. The Partnership expects to act as a trader, and not as a dealer, with respect to its securities transactions. A trader is a person who buys and sells securities for its own account. A dealer, on the other hand, is a person who purchases securities for resale to customers rather than for investment or speculation. The Partnership has taken the position that its securities trading activity constitutes a trade or business for Federal income tax purposes. However, there can be no assurance that the Service will agree that the Partnership's securities activities will constitute trading rather than investing.

Generally, the gains and losses realized by a trader on the sale of securities are capital gains and losses. Capital gains and losses recognized by the Partnership may be long-term or short-term depending, in general, upon the length of time the Partnership maintains a particular investment position and, in some cases, upon the nature of the transaction. Property held for more than one year generally will be eligible for long-term capital gain or loss treatment. The application of certain rules relating to short sales, to so-called "straddle" and

10105509.12

36

CONFIDENTIAL

GCC-NYAG0000375

"wash sale" transactions and to Section 1256 Contracts (defined below) may serve to alter the treatment of the Partnership's securities positions.[1]

The Partnership may also realize ordinary income and losses with respect to its transactions. The Partnership may hold debt obligations with "original issue discount." In such case the Partnership would be required to include amounts in taxable income on a current basis even though receipt of such amounts may occur in a subsequent year.

The maximum ordinary income tax rate for individuals is 35%[2] and, in general, the maximum individual income tax rate for "Qualified Dividends"[3] and long-term capital gains is 15%[4] (unless the taxpayer elects to be taxed at ordinary rates - see "Limitation on Deductibility of Interest and Short Sale Expenses" below), although in all cases the actual rates may be higher due to the phase out of certain tax deductions, exemptions and credits. The excess of capital losses over capital gains may be offset against the ordinary income of an individual taxpayer, subject to an annual deduction limitation of $3,000. Capital losses of an individual taxpayer may generally be carried forward to succeeding tax years to offset capital gains and then ordinary income (subject to the $3,000 annual limitation). For corporate taxpayers, the maximum income tax rate is 35%. Capital losses of a corporate taxpayer may be offset only against capital gains, but unused capital losses may be carried back three years (subject to certain limitations) and carried forward five years.

Section 1256 Contracts. In the case of Section 1256 Contracts, the Code generally applies a "mark-to-market" system of taxing unrealized gains and losses on such contracts and otherwise provides for special rules of taxation. A Section 1256 Contract includes certain regulated futures contracts and certain other contracts. Under these rules, Section 1256 Contracts held by the Partnership at the end of each taxable year of the Partnership are treated for Federal income tax purposes as if they were sold by the Partnership for their fair market value on the last business day of such taxable year. The net gain or loss, if any, resulting from such deemed sales (known as "marking to market"), together with any gain or loss resulting from actual sales of Section 1256 Contracts, must be taken into account by the Partnership in computing its taxable income for such year. If a Section 1256 Contract held by the Partnership at the end of a taxable year is sold in the following year, the amount of any gain or loss realized on such sale will be adjusted to reflect the gain or loss previously taken into account under the "mark-to-market" rules.

---

[1] Generally, in the absence of Regulations requiring it, the Partnership will not treat positions held through different investment advisory agreements or Other Investment Entities as offsetting positions for purposes of the straddle rules.

[2] This rate is scheduled to increase to 39.6% in 2011.

[3] A "Qualified Dividend" is generally a dividend from certain domestic corporations, and from certain foreign corporations that are either eligible for the benefits of a comprehensive income tax treaty with the United States or are readily tradable on an established securities market in the United States. Shares must be held for certain holding periods in order for a dividend thereon to be a Qualified Dividend.

[4] The maximum individual long-term capital gains tax rate is 20% for sales or exchanges on or after January 1, 2011. The 15% maximum individual tax rate on Qualified Dividends is scheduled to expire on December 31, 2010.

10105509.12

37

CONFIDENTIAL

GCC-NYAG0000376

CONFIDENTIAL                                                                 GCC-P 0335446

With certain exceptions, capital gains and losses from such Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof. If an individual taxpayer incurs a net capital loss for a year, the portion thereof, if any, which consists of a net loss on Section 1256 Contracts may, at the election of the taxpayer, be carried back three years. Losses so carried back may be deducted only against net capital gain to the extent that such gain includes gains on Section 1256 Contracts. A Section 1256 Contract does not include any "securities futures contract" or any option on such a contract, other than a "dealer securities futures contract" (See "Certain Securities Futures Contracts").

Certain Securities Futures Contracts. Generally, a securities futures contract is a contract of sale for future delivery of a single security or a narrow-based security index. Any gain or loss from the sale or exchange of a securities futures contract (other than a "dealer securities futures contract") is treated as gain or loss from the sale or exchange of property that has the same character as the property to which the contract relates has (or would have) in the hands of the taxpayer. If the underlying security would be a capital asset in the taxpayer's hands, then gain or loss from the sale or exchange of the securities futures contract would be capital gain or loss. Capital gain or loss from the sale or exchange of a securities futures contract to sell property (i.e., the short side of a securities futures contract) generally will be short term capital gain or loss.

A "dealer securities futures contract" is treated as a Section 1256 Contract. A "dealer securities futures contract" is a securities futures contract, or an option to enter into such a contract, that (1) is entered into by a dealer (or, in the case of an option, is purchased or granted by the dealer) in the normal course of its trade or business activity of dealing in the contracts and (2) is traded on a qualified board of trade or exchange.

Mixed Straddle Election. The Partnership has elected to establish a mixed straddle account for its trading positions. The Code allows a taxpayer to elect to offset gains and losses from positions which are part of a "mixed straddle." A "mixed straddle" is any straddle in which one or more but not all positions are Section 1256 Contracts. It is anticipated that a substantial portion of the Partnership's trading positions will involve one or more Section 1256 Contracts and one or more positions which are not Section 1256 Contracts, and that these positions will be considered to be offsetting.

The mixed straddle account rules require a daily "marking to market" of all open positions in the account and a daily netting of gains and losses from positions in the account. At the end of a taxable year, the annual net gains or losses from the mixed straddle account are recognized for tax purposes.[5] As a result, the Partnership will recognize gain or loss on

---

[5]    The gains and losses of all positions in the mixed straddle account are netted on a daily basis into net Section 1256 gains or losses or net non-Section 1256 gains or losses. The daily net Section 1256 gains or losses will be characterized as long-term capital gain to the extent of 60% thereof and short-term capital gain to the extent of 40% thereof; the daily net non-Section 1256 gain or loss will be treated as short-term capital gain or loss. These daily net amounts are then totaled at year end to arrive at an annual net short-term or long-term gain or loss. However, no more than 50% of the net gain in the mixed straddle account can be characterized as long-term (any excess net gain is treated as short-term), and no more than 40% of the net loss can be treated as short-term (any excess net loss is treated as long-term).

10105509.12

38

CONFIDENTIAL

GCC-NYAG0000377

GCC-P 0335447

substantially all of its trading activities, including open positions, under the "mark to market" system of taxation. As described above, the Partnership does not intend to utilize leverage. However, if, in the future, the Partnership utilizes leverage, the deductibility of interest expense allocable to the positions comprising a straddle may be limited if the interest expense is greater than the dividend received on the underlying position. The application of the Temporary Regulations' mixed straddle account rules is not entirely clear. Therefore, there is no assurance that the mixed straddle account election made by the Partnership will be accepted in its entirety by the Service. If the Service successfully made adjustments to the Partnership's election, among other things, the "mark to market" system of taxation might not apply to all of the positions in the Partnership's mixed straddle account.

<u>Possible "Mark-to-Market" Election</u>.  To the extent that the Partnership is directly engaged in a trade or business as a trader in "securities," it may elect under Section 475 of the Code to "mark-to-market" the securities held in connection with such trade or business. Under such election, securities held by the Partnership at the end of each taxable year will be treated as if they were sold by the Partnership for their fair market value on the last day of such taxable year, and gains or losses recognized thereon will be treated as ordinary income or loss. Moreover, even if the Partnership determines that its securities activities will constitute trading rather than investing, there can be no assurance that the Service will agree, in which case the Partnership may not be able to mark-to-market its positions.

<u>Short Sales</u>.  Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Partnership's hands. Except with respect to certain situations where the property used to close a short sale has a long-term holding period on the date the short sale is entered into, gains on short sales generally are short-term capital gains. A loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Partnership for more than one year. In addition, these rules may also terminate the running of the holding period of "substantially identical property" held by the Partnership.

Gain or loss on a short sale will generally not be realized until such time that the short sale is closed. However, if the Partnership holds a short sale position with respect to stock, certain debt obligations or partnership interests that has appreciated in value and then acquires property that is the same as or substantially identical to the property sold short, the Partnership generally will recognize gain on the date it acquires such property as if the short sale were closed on such date with such property. Similarly, if the Partnership holds an appreciated financial position with respect to stock, certain debt obligations, or partnership interests and then enters into a short sale with respect to the same or substantially identical property, the Partnership generally will recognize gain as if the appreciated financial position were sold at its fair market value on the date it enters into the short sale. The subsequent holding period for any appreciated financial position that is subject to these constructive sale rules will be determined as if such position were acquired on the date of the constructive sale.

<u>Effect of Straddle Rules on Limited Partners' Securities Positions</u>.  The Service may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as "straddles" for Federal income tax

10105509.12

39

CONFIDENTIAL

GCC-NYAG0000378

GCC-P 0335448

purposes. Investors should consult their tax advisors regarding the application of the "straddle" rules to their investment in the Partnership.[6]

   Limitation on Deductibility of Interest and Short Sale Expenses.  For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest or short sale expenses for "indebtedness properly allocable to property held for investment").  Investment interest is not deductible in the current year to the extent that it exceeds the taxpayer's "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses).  For this purpose, Qualified Dividends and long-term capital gains are excluded from net investment income unless the taxpayer elects to pay tax on such amounts at ordinary income tax rates.

   For purposes of this provision, the Partnership's activities (other than certain activities that are treated as "passive activities" under Section 469 of the Code) will be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a noncorporate Limited Partner's share of the interest and short sale expenses attributable to the Partnership's operation.  In such case, a noncorporate Limited Partner would be denied a deduction for all or part of that portion of its distributive share of the Partnership's ordinary losses attributable to interest and short sale expenses unless it had sufficient investment income from all sources including the Partnership.  A Limited Partner that could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation.  The investment interest limitation would also apply to interest paid by a noncorporate Limited Partner on money borrowed to finance its investment in the Partnership.  Potential investors are advised to consult with their own tax advisers with respect to the application of the investment interest limitation in their particular tax situations.

   Deductibility of Partnership Investment Expenditures and Certain Other Expenditures.  Investment expenses (e.g., investment advisory fees) of an individual, trust or estate are deductible only to the extent they exceed 2% of adjusted gross income.[7]  In addition, the Code further restricts the ability of an individual with an adjusted gross income in excess of a specified amount (for 2006, $150,500 or $75,250 for a married person filing a separate return) to deduct such investment expenses.  Under such provision, there is a limitation on the deductibility of investment expenses in excess of 2% of adjusted gross income to the extent such excess

---

[6]   The Partnership will not generally be in a position to furnish to Partners information regarding the securities positions of the Other Investment Entities which would permit a Partner to determine whether its transactions in securities, which are also held by such Other Investment Entities, should be treated as offsetting positions for purposes of the straddle rules.

[7]   However, Section 67(e) of the Code provides that, in the case of a trust or an estate, such limitation does not apply to deductions or costs which are paid or incurred in connection with the administration of the estate or trust and would not have been incurred if the property were not held in such trust or estate.  There is a disagreement among three Federal Courts of Appeals on the question of whether the investment advisory fees incurred by a trust are exempt (under Section 67(e)) from the 2% of adjusted gross income floor on deductibility.  Limited Partners that are trusts or estates should consult their tax advisors as to the applicability of these cases to the investment expenses that are allocated to them.

CONFIDENTIAL                                          GCC-NYAG0000379

CONFIDENTIAL                                                    GCC-P 0335449

expenses (along with certain other itemized deductions) exceed the lesser of (i) 3% of the excess of the individual's adjusted gross income over the specified amount or (ii) 80% of the amount of certain itemized deductions otherwise allowable for the taxable year.[8]  Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a noncorporate taxpayer in calculating its alternative minimum tax liability.

Pursuant to Temporary Regulations issued by the Treasury Department, these limitations on deductibility should not apply to a noncorporate Limited Partner's share of the expenses of the Partnership to the extent the Partnership is engaged, as it expects to be, in a trade or business within the meaning of the Code.  These limitations will apply, however, to a noncorporate Limited Partner's share of the investment expenses of the Partnership (including the Management Fee, payments made on certain derivative instruments (if any) and any fee payable to the managers of Other Investment Entities), to the extent such expenses are allocable to Other Investment Entities that are not in a trade or business within the meaning of the Code.  The Partnership intends to treat its expenses attributable to the Other Investment Entities that are engaged in trade or business within the meaning of the Code or to the trading activity of the Partnership as not being subject to the foregoing limitations on deductibility, although there can be no assurance that the Service may not treat such expenses as investment expenses which are subject to the limitations.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, noncorporate Limited Partners should consult their tax advisers with respect to the application of these limitations.

A Limited Partner will not be allowed to deduct syndication expenses attributable to the acquisition of an Interest paid by such Limited Partner or the Partnership.  Any such amounts will be included in the Limited Partner's adjusted tax basis for its Interest.

Recently enacted legislation includes a provision (adding a new Section 470 of the Code) which may defer certain deductions of the Partnership to the extent any direct or indirect investors of the Partnership are tax exempt persons, non-U.S. persons, and any domestic government organizations or instrumentalities thereof.  If applicable, this provision could have an adverse effect on taxable investors in the Partnership.  There is some uncertainty regarding the scope of the new provision and its applicability to the Partnership, which may be addressed in future guidance or legislation.  Investors should consult their tax advisors regarding the consequences of this new provision with respect to an investment in the Partnership.

<u>Application of Rules for Income and Losses from Passive Activities</u>.  The Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity.  This restriction applies to individuals, personal service corporations and certain closely held corporations.  Pursuant to Temporary Regulations issued by the Treasury Department, income or loss from the Partnership's securities investment and

---

[8]    Under recently enacted legislation, the latter limitation on itemized deductions has been reduced starting in calendar year 2006, will be further reduced starting in 2008, and will be completely eliminated in 2010.  However, this legislation contains a "sunset" provision that will result in the limitation on itemized deductions being restored in 2011.

10105509.12

41

CONFIDENTIAL

GCC-NYAG0000380

trading activity generally will not constitute income or loss from a passive activity. Therefore, passive losses from other sources generally could not be deducted against a Limited Partner's share of such income and gain from the Partnership. Income or loss attributable to certain activities of the Partnership, including investments in partnerships engaged in certain trades or businesses, certain private claims or certain fundings of reorganization plans may constitute passive activity income or loss.

<u>Application of Basis and "At Risk" Limitations on Deductions</u>. The amount of any loss of the Partnership that a Limited Partner is entitled to include in its income tax return is limited to its adjusted tax basis in its Interest as of the end of the Partnership's taxable year in which such loss occurred. Generally, a Limited Partner's adjusted tax basis for its Interest is equal to the amount paid for such Interest, increased by the sum of (i) its share of the Partnership's liabilities, as determined for Federal income tax purposes, and (ii) its distributive share of the Partnership's realized income and gains, and decreased (but not below zero) by the sum of (i) distributions (including decreases in its share of Partnership liabilities) made by the Partnership to such Limited Partner and (ii) such Limited Partner's distributive share of the Partnership's realized losses and expenses.

Similarly, a Limited Partner that is subject to the "at risk" limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Partnership to the extent that they exceed the amount such Limited Partner has "at risk" with respect to its Interest at the end of the year. The amount that a Limited Partner has "at risk" will generally be the same as its adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Partnership or any amount borrowed by the Limited Partner on a non-recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

<u>"Phantom Income" From Partnership Investments</u>. Pursuant to various "anti-deferral" provisions of the Code (the "Subpart F" and "passive foreign investment company" provisions), investments (if any) by the Partnership in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Partnership's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

### Foreign Taxes

It is possible that certain dividends and interest directly or indirectly received by the Partnership from sources within foreign countries will be subject to withholding taxes imposed by such countries. In addition, the Partnership or the Other Investment Entities may also be subject to capital gains taxes in some of the foreign countries where they purchase and sell securities. Tax treaties between certain countries and the United States may reduce or eliminate such taxes. It is impossible to predict in advance the rate of foreign tax the Partnership will directly or indirectly pay since the amount of the Partnership's assets to be invested in various countries is not known.

10105509.12

42

CONFIDENTIAL

GCC-NYAG0000381

The Limited Partners will be informed by the Partnership as to their proportionate share of the foreign taxes paid by the Partnership or the Other Investment Entities, which they will be required to include in their income. The Limited Partners generally will be entitled to claim either a credit (subject, however, to various limitations on foreign tax credits) or, if they itemize their deductions, a deduction (subject to the limitations generally applicable to deductions) for their share of such foreign taxes in computing their Federal income taxes. A Limited Partner that is tax-exempt will not ordinarily benefit from such credit or deduction.

<u>Unrelated Business Taxable Income</u>

Generally, an exempt organization is exempt from Federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the organization directly or indirectly through a partnership in which it is a partner.[9] This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business.

This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of an exempt organization. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived (either directly or through partnerships) from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the organization's exempt purpose or function. UBTI also includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year, and (ii) gains derived by an exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of such disposition. With respect to its investments in partnerships engaged in a trade or business, or in certain private claims, or in certain fundings of reorganization plans, the Partnership's income (or loss) from these investments may constitute UBTI.

Although currently the Partnership does not intend to utilize leverage, the Partnership may in the future incur "acquisition indebtedness" with respect to certain of its transactions, such as the purchase of securities on margin. Based upon a published ruling issued by the Service which generally holds that income and gain with respect to short sales of publicly traded stock does not constitute income from debt financed property for purposes of computing UBTI, the Partnership will treat its short sales of securities as not involving "acquisition indebtedness" and therefore not resulting in UBTI.[10] To the extent the Partnership recognizes income (i.e., dividends and interest) from securities with respect to which there is "acquisition indebtedness" during a taxable year, the percentage of such income which will be treated as

---

[9]  With certain exceptions, tax-exempt organizations which are private foundations are subject to a 2% Federal excise tax on their "net investment income." The rate of the excise tax for any taxable year may be reduced to 1% if the private foundation meets certain distribution requirements for the taxable year. A private foundation will be required to make payments of estimated tax with respect to this excise tax.

[10]  Moreover, income realized from option writing and futures contract transactions generally would not constitute UBTI.

10105509.12

43

CONFIDENTIAL

GCC-NYAG0000382

CONFIDENTIAL

GCC-P 0335452

UBTI generally will be based on the percentage which the "average acquisition indebtedness" incurred with respect to such securities is of the "average amount of the adjusted basis" of such securities during the taxable year.

To the extent the Partnership recognizes gain from securities with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of their disposition, the percentage of such gain which will be treated as UBTI will be based on the percentage which the highest amount of such "acquisition indebtedness" is of the "average amount of the adjusted basis" of such securities during the taxable year. In determining the unrelated debt-financed income of the Partnership, an allocable portion of deductions directly connected with the Partnership's debt-financed property is taken into account. Thus, for instance, a percentage of losses from debt-financed securities (based on the debt/basis percentage calculation described above) would offset gains treated as UBTI.

Since the calculation of the Partnership's "unrelated debt-financed income" is complex and will depend in large part on the amount of leverage, if any, used by the Partnership from time to time,[11] it is impossible to predict what percentage of the Partnership's income and gains will be treated as UBTI for a Limited Partner which is an exempt organization. An exempt organization's share of the income or gains of the Partnership which is treated as UBTI may not be offset by losses of the exempt organization either from the Partnership or otherwise, unless such losses are treated as attributable to an unrelated trade or business (e.g., losses from securities for which there is acquisition indebtedness).

To the extent that the Partnership generates UBTI, the applicable Federal tax rate for such a Limited Partner generally would be either the corporate or trust tax rate depending upon the nature of the particular exempt organization. An exempt organization may be required to support, to the satisfaction of the Service, the method used to calculate its UBTI. The Partnership will be required to report to a Partner which is an exempt organization information as to the portion, if any, of its income and gains from the Partnership for each year which will be treated as UBTI. The calculation of such amount with respect to transactions entered into by the Partnership is highly complex, and there is no assurance that the Partnership's calculation of UBTI will be accepted by the Service.

In general, if UBTI is allocated to an exempt organization such as a qualified retirement plan or a private foundation, the portion of the Partnership's income and gains which is not treated as UBTI will continue to be exempt from tax, as will the organization's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in the Partnership generally should not affect the tax-exempt status of such an exempt organization.[12] However, a charitable remainder trust will not be

---

[11] The calculation of a particular exempt organization's UBTI would also be affected if it incurs indebtedness to finance its investment in the Partnership. An exempt organization is required to make estimated tax payments with respect to its UBTI.

[12] Certain exempt organizations which realize UBTI in a taxable year will not constitute "qualified organizations" for purposes of Section 514(c)(9)(B)(vi)(I) of the Code, pursuant to which, in limited circumstances, income from certain real estate partnerships in which such organizations invest might be treated as exempt from UBTI. A prospective tax-exempt Limited Partner should consult its tax adviser in this regard.

10105509.12

44

CONFIDENTIAL

GCC-NYAG0000383

exempt from Federal income tax under Section 664(c) of the Code for any year in which it has UBTI. A title-holding company will not be exempt from tax if it has certain types of UBTI. Moreover, the charitable contribution deduction for a trust under Section 642(c) of the Code may be limited for any year in which the trust has UBTI. A prospective investor should consult its tax adviser with respect to the tax consequences of receiving UBTI from the Partnership. (See "ERISA Considerations.")

<u>Certain Issues Pertaining to Specific Exempt Organizations</u>

    <u>Private Foundations</u>. Private foundations and their managers are subject to excise taxes if they invest "any amount in such a manner as to jeopardize the carrying out of any of the foundation's exempt purposes." This rule requires a foundation manager, in making an investment, to exercise "ordinary business care and prudence" under the facts and circumstances prevailing at the time of making the investment, in providing for the short-term and long-term needs of the foundation to carry out its exempt purposes. The factors which a foundation manager may take into account in assessing an investment include the expected rate of return (both income and capital appreciation), the risks of rising and falling price levels, and the need for diversification within the foundation's portfolio.

    In order to avoid the imposition of an excise tax, a private foundation may be required to distribute on an annual basis its "distributable amount," which includes, among other things, the private foundation's "minimum investment return," defined as 5% of the excess of the fair market value of its nonfunctionally related assets (assets not used or held for use in carrying out the foundation's exempt purposes), over certain indebtedness incurred by the foundation in connection with such assets. It appears that a foundation's investment in the Partnership would most probably be classified as a nonfunctionally related asset. A determination that an interest in the Partnership is a nonfunctionally related asset could conceivably cause cash flow problems for a prospective Limited Partner which is a private foundation. Such an organization could be required to make distributions in an amount determined by reference to unrealized appreciation in the value of its interest in the Partnership. Of course, this factor would create less of a problem to the extent that the value of the investment in the Partnership is not significant in relation to the value of other assets held by a foundation.

    In some instances, an investment in the Partnership by a private foundation may be prohibited by the "excess business holdings" provisions of the Code. For example, if a private foundation (either directly or together with a "disqualified person") acquires more than 20% of the capital interest or profits interest of the Partnership, the private foundation may be considered to have "excess business holdings." If this occurs, such foundation may be required to divest itself of its interest in the Partnership in order to avoid the imposition of an excise tax. However, the excise tax will not apply if at least 95% of the gross income from the Partnership is "passive" within the applicable provisions of the Code and Regulations. There can be no assurance that the Partnership will meet such 95% gross income test.

    A substantial percentage of investments of certain "private operating foundations" may be restricted to assets directly devoted to their tax-exempt purposes. Otherwise, generally, rules similar to those discussed above govern their operations.

10105509.12

45

CONFIDENTIAL

CONFIDENTIAL

<u>Qualified Retirement Plans</u>. Employee benefit plans subject to the provisions of ERISA, Individual Retirement Accounts and Keogh Plans should consult their counsel as to the implications of such an investment under ERISA. (See "ERISA Considerations.")

<u>Endowment Funds</u>. Investment managers of endowment funds should consider whether the acquisition of an Interest is legally permissible. This is not a matter of Federal law, but is determined under state statutes. It should be noted, however, that under the Uniform Management of Institutional Funds Act, which has been adopted, in various forms, by a large number of states, participation in investment partnerships or similar organizations in which funds are commingled and investment determinations are made by persons other than the governing board of the endowment fund is allowed.

## Excise Tax on Certain Reportable Transactions

Under new legislation, a tax-exempt entity (including a state or local government or its political subdivision) may be subject to an excise tax equal to the greater of (i) 100% of the net income or (ii) 75% of the proceeds, attributable to certain "reportable transactions", including "listed transactions", if any, in which it participates. The scope of this legislation, and the manner in which it may apply to a tax-exempt investor in the Partnership, is not entirely clear. Tax-exempt investors should discuss with their own advisors the applicability of these rules to their investment in the Partnership. (See "Tax Shelter Reporting Requirements" below.)

## Tax Shelter Reporting Requirements

The Regulations require the Partnership to complete and file Form 8886 ("Reportable Transaction Disclosure Statement") with its tax return for any taxable year in which the Partnership participates in a "reportable transaction." Additionally, each Partner treated as participating in a reportable transaction of the Partnership is generally required to file Form 8886 with its tax return. The Partnership and any such Partner, respectively, must also submit a copy of the completed form with the Service's Office of Tax Shelter Analysis. The Partnership intends to notify the Partners that it believes (based on information available to the Partnership) are required to report a transaction of the Partnership or the Other Investment Entities, and intends to provide such Limited Partners with any available information needed to complete and submit Form 8886 with respect to the transactions of the Partnership and the Other Investment Entities. In certain situations, there may also be a requirement that a list be maintained of persons participating in such reportable transactions, which could be made available to the Service at its request.

A Partner's recognition of a loss upon its disposition of an interest in the Partnership could also constitute a "reportable transaction" for such Partner requiring such Partner to file Form 8886.

Under new legislation, a significant penalty is imposed on taxpayers who participate in a "reportable transaction" and fail to make the required disclosure. The penalty is generally $10,000 for natural persons and $50,000 for other persons (increased to $100,000 and $200,000, respectively, if the reportable transaction is a "listed" transaction). Investors should

10105509.12

CONFIDENTIAL

GCC-NYAG0000385

CONFIDENTIAL

GCC-P 0335455

consult with their own advisors concerning the application of these reporting obligations to their specific situations.

<u>State and Local Taxation</u>

In addition to the Federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Partnership. State and local laws often differ from Federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident. A partnership in which the Partnership acquires an interest may conduct business in a jurisdiction which will subject to tax a Partner's share of the partnership's income from that business and may cause Partners to file tax returns in those jurisdictions. Prospective investors should consult their tax advisers with respect to the availability of a credit for such tax in the jurisdiction in which that Partner is a resident.

One or more states may impose reporting requirements on the Partnership and/or its Partners in a manner similar to that described above in "Tax Shelter Reporting Requirements." Investors should consult with their own advisors as to the applicability of such rules in jurisdictions which may require or impose a filing requirement.

The Partnership should not be subject to the New York City unincorporated business tax, which is not imposed on a partnership which purchases and sells securities for its "own account." (This exemption may not be applicable to the extent a partnership in which the Partnership invests, directly or through an Other Investment Entity, conducts a business in New York City.) By reason of a similar "own account" exemption, it is also expected that a nonresident individual Partner should not be subject to New York State personal income tax with respect to his share of income or gain realized directly by the Partnership.

Individual Limited Partners who are residents of New York State and New York City should be aware that the New York State and New York City personal income tax laws limit the deductibility of itemized deductions and interest expense for individual taxpayers at certain income levels. However, as described above, the Partnership expects to be in a trade or business within the meaning of the Code. Accordingly, although there can be no assurance, the foregoing limitations should not apply to a Limited Partner's share of any of the Partnership's expenses.

For purposes of the New York State corporate franchise tax and the New York City general corporation tax, a corporation generally is treated as doing business in New York State and New York City, respectively, and is subject to such corporate taxes as a result of the ownership of a partnership interest in a partnership which does business in New York State and New York City, respectively.[13] Each of the New York State and New York City corporate taxes

---

[13] New York State (but not New York City) generally exempts from corporate franchise tax a non-New York corporation which (i) does not actually or constructively own a 1% or greater limited partnership interest in a

CONFIDENTIAL

GCC-NYAG0000386

CONFIDENTIAL

GCC-P 0335456

are imposed, in part, on the corporation's taxable income or capital allocable to the relevant jurisdiction by application of the appropriate allocation percentages. Moreover, a non-New York corporation which does business in New York State may be subject to a New York State license fee. A corporation which is subject to New York State corporate franchise tax solely as a result of being a limited partner in a New York partnership may, under certain circumstances, elect to compute its New York State corporate franchise tax by taking into account only its distributive share of such partnership's income and loss. There is currently no similar provision in effect for purposes of the New York City general corporation tax.

Regulations under both the New York State corporate franchise tax and New York City general corporation tax, however, provide an exception to this general rule in the case of a "portfolio investment partnership," which is defined, generally, as a partnership which meets the gross income requirements of Section 851(b)(2) of the Code. New York State (but not New York City) has adopted regulations that also include income and gains from commodity transactions described in Section 864(b)(2)(B)(iii) as qualifying gross income for this purpose. The qualification of the Partnership as a "portfolio investment partnership" with respect to its investments through advisory accounts and Other Investment Entities must be determined on an annual basis and, with respect to a taxable year, the Partnership and/or one or more Other Investment Entities may not qualify as portfolio investment partnerships. Therefore, a corporate limited partner may be treated as doing business in New York State and New York City as a result of its interest in the Partnership or its indirect interest in nonqualifying Other Investment Entities.

New York State has enacted legislation that imposes a quarterly withholding obligation on certain partnerships with respect to partners that are individual non-New York residents or corporations (other than "S" corporations). Accordingly, the Partnership may be required to withhold on the distributive shares of New York source partnership income allocable to such partners to the extent such income is not derived from trading in securities for the Partnership's or the Other Investment Entities' own account.

Each prospective Partner should consult its tax adviser with regard to the New York State and New York City tax consequences of an investment in the Partnership.

## ERISA CONSIDERATIONS

CIRCULAR 230 NOTICE – THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE

---

partnership doing business in New York and (ii) has a tax basis in such limited partnership interest not greater than $1 million.

10105509.12

48

CONFIDENTIAL

GCC–NYAG0000387

TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO THE PARTNERSHIP OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE PARTNERSHIP AND THE INVESTOR.

### General

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "ERISA Plan"), an individual retirement account or a Keogh plan subject solely to the provisions of the Code[14] (an "Individual Retirement Fund") should consider, among other things, the matters described below before determining whether to invest in the Partnership.

ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("DOL") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, including the fact that the returns may be subject to federal tax as unrelated business taxable income, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in the Partnership, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Partnership may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

---

[14] References hereinafter made to ERISA include parallel references to the Code.

CONFIDENTIAL

GCC-NYAG0000388

CONFIDENTIAL

GCC-P 0335458

**Plan Assets Defined**

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("Benefit Plan Investors") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, the term Benefit Plan Investors is defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the Code, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors.

Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security;" nor (b) a security issued by an investment fund registered under the Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that: (i) the entity is an "operating company;" or (ii) the equity participation in the entity by Benefit Plan Investors is limited.

Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of any class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets" for purposes of ERISA. The Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

**Limitation on Investments by Benefit Plan Investors**

It is the current intent of the General Partner to monitor the investments in the Partnership to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the Interests in the Partnership (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of the Partnership will not be treated as "plan assets" under ERISA. Interests held by the General Partner and its affiliates are not considered for purposes of determining whether the assets of the Partnership will be treated as "plan assets" for the purpose of ERISA. If the assets of the Partnership were treated as "plan assets" of a Benefit Plan Investor, the General Partner would be a "fiduciary" (as defined in ERISA and the Code) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by

10105509.12

50

CONFIDENTIAL

GCC-NYAG0000389

GCC-P 0335459

ERISA. In such circumstances, the Partnership would be subject to various other requirements of ERISA and the Code. In particular, the Partnership would be subject to rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries which might result in a violation of ERISA and the Code unless the Partnership obtained appropriate exemptions from the DOL allowing the Partnership to conduct its operations as described herein. The General Partner reserves the right to require the withdrawal of any Limited Partner, including, without limitation, to ensure compliance with the percentage limitation on investment in the Partnership by Benefit Plan Investors as set forth above. The General Partner reserves the right, however, to waive the percentage limitation on investment in the Partnership by Benefit Plan Investors and thereafter to comply with ERISA.

**Representations by Plans**

An ERISA Plan proposing to invest in the Partnership will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Partnership's investment objectives, policies and strategies, and that the decision to invest plan assets in the Partnership was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

WHETHER OR NOT THE ASSETS OF THE PARTNERSHIP ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN THE PARTNERSHIP BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE PARTNERSHIP.

**ERISA Plans and Individual Retirement Funds Having Prior Relationships with the General Partner or its Affiliates**

Certain prospective ERISA Plan and Individual Retirement Fund investors may currently maintain relationships with the General Partner or other entities that are affiliated with the General Partner. Each of such entities may be deemed to be a party in interest to and/or a fiduciary of any ERISA Plan or Individual Retirement Fund to which any of the General Partner or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which it or certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the Code with respect to Individual Retirement Funds. ERISA Plan and Individual Retirement Fund investors should consult with counsel to determine if participation in the Partnership is a transaction that is prohibited by ERISA or the Code.

The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Potential investors should consult with their legal advisors regarding the consequences under ERISA of the acquisition and ownership of Interests.

J0105509.12

51

CONFIDENTIAL

GCC-NYAG0000390

CONFIDENTIAL

GCC-P 0335460

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Partnership's responsibility for the prevention of money laundering, the Administrator, the General Partner and his affiliates may require a detailed verification of a Limited Partner's identity, any beneficial owner underlying the account and the source of the payment.

The General Partner or the Administrator reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a Limited Partner's Interest in the Partnership. In the event of delay or failure by the subscriber or Limited Partner to produce any information required for verification purposes, the General Partner may refuse to accept a subscription or may cause the withdrawal of any such Limited Partner from the Partnership. The General Partner, by written notice to any Limited Partner, may suspend the withdrawal rights of such Limited Partner if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Partnership, the General Partner or any of the Partnership's other service providers.

Each subscriber and Limited Partner will be required to make such representations to the Partnership as the Partnership, the General Partner and the Administrator will require in connection with such anti-money laundering programs, including, without limitation, representations to the Partnership that such subscriber or Limited Partner is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such Limited Partner will also represent to the Partnership that amounts contributed by it to the Partnership were not directly or indirectly derived from activities that may contravene Federal, state or international laws and regulations, including anti-money laundering laws and regulations.

The General Partner, by written notice to any Limited Partner, may suspend the withdrawal rights of such Limited Partner if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering laws and regulations applicable to the Partnership, the General Partner or any of the Partnership's other service providers.

## LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS

No Limited Partner or transferee thereof will, without the prior written consent of the General Partner, which may be withheld in his sole and absolute discretion, create, or suffer the creation of, a security interest in such Limited Partner's Interest in the Partnership. Except for sales, transfers, assignments or other dispositions (i) by last will and testament, (ii) by operation of law, or (iii) to an affiliate of a Limited Partner, without the prior written consent of the General Partner, which may be withheld in his sole and absolute discretion, no Limited Partner shall sell, transfer, assign, or in any manner dispose of such Limited Partner's interest in the Partnership, in whole or in part, nor enter into any agreement as the result of which any Person shall become interested with such Limited Partner therein. In no event will a Limited Partner's interest in the Partnership, or any part thereof, be assigned or transferred to any Person

10105509.12

52

CONFIDENTIAL

GCC-NYAG0000391

unless the transferee executes documentation reasonably satisfactory to the General Partner pursuant to which the transferee agrees to be bound by this Agreement and the General Partner is satisfied that such assignment or transfer (i) is not in violation of any applicable federal or state securities laws; (ii) will not result in the Partnership being considered to have terminated within the meaning of Section 708 of the Code; (iii) will not result in any General Partner being required to register under the Investment Advisers Act of 1940, as amended; (iv) will not result in the Partnership being required to register under the Investment Company Act of 1940, as amended; and (v) will not cause the Partnership to be treated as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes. In connection with the preceding sentence, the General Partner shall have the right to require a legal opinion of counsel satisfactory to him. Unless the foregoing conditions are met no attempted assignment or transfer of a Limited Partner's interest in the Partnership, or part thereof, shall be valid or binding on the Partnership. All expenses incurred in connection with any transfer pursuant to this Section 6.03 or Section 6.04 shall be paid by the transferring Limited Partner. Notwithstanding any other provision of this Agreement to the contrary, no unit of Partnership Interest may be subdivided for resale into units smaller than a unit the initial offering price of which would have been at least $20,000.

Each purchaser of an Interest must bear the economic risk of the investment for an extended period of time (subject to a limited right to withdraw capital from the Partnership or to transfer or assign Interests in the Partnership) because the Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and, therefore, cannot be sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available. It is not contemplated that any such registration will ever be effected, or that certain exemptions provided by rules promulgated under the Securities Act (such as Rule 144) will ever be available. The foregoing restrictions on transferability must be regarded as substantial.

Each purchaser of an Interest is required to represent that the Interest is being acquired for its own account, for investment and not with a view to resale or distribution. The Interests are suitable investments only for sophisticated investors for whom an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume and who have the financial resources necessary to withstand, the risks involved in the Partnership's specialized investment program and to bear the potential loss of their entire investment in the Interests.

Investors in the Partnership must be "accredited investors" as defined in Rule 501 under the Securities Act, "qualified purchasers" as such term is defined in Section 2(a)(51) of the Company Act and must meet other suitability requirements.

Each prospective purchaser is urged to consult with its own advisors to determine the suitability of an investment in the Interests, and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of an Interest is required to further represent that, after all necessary advice and analysis, its investment in an Interest is suitable and appropriate in light of the foregoing considerations. Prior to any subscription of Interests, each prospective purchaser must represent in writing, by

10105509.12

53

CONFIDENTIAL

GCC-NYAG0000392

CONFIDENTIAL

GCC-P 0335462

completing and signing the subscription documents, that it meets the suitability standards referred to in this Confidential Offering Memorandum. The General Partner has the right to reject a subscription for any reason or for no reason.

Interests may not be purchased by nonresident aliens, foreign corporations, foreign Partnership, foreign trusts or foreign estates, all as defined in the Code. Foreign investors may be eligible to invest in the Offshore Fund.

## COUNSEL

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, acts as counsel to the Partnership in connection with this offering of Interests. Schulte Roth & Zabel LLP also acts as counsel to the General Partner and his affiliates. In connection with the Partnership's offering of Interests and subsequent advice to the Partnership, the General Partner and his affiliates, Schulte Roth & Zabel LLP will not be representing the Limited Partners of the Partnership. No independent counsel has been retained to represent the Limited Partners of the Partnership.

## AUDITOR; REPORTS

BDO Seidman, LLP serves as the Partnership's auditor. The Partnership will provide to the Limited Partners unaudited financial statements within 35 days after the end of each calendar quarter (other than the last) and will furnish to them annual audited financial statements within 90 days after year end, and tax information as soon thereafter as practicable. Certain Limited Partners may have access to certain information regarding the Partnership that may not be available to other Limited Partners. Such Limited Partners may make investment decisions with respect to their investment in the Partnership based on such information.

## SUBSCRIPTION FOR INTERESTS

Persons interested in subscribing for Interests will be furnished with, and will be required to complete and return to the General Partner, subscription documents and other certain documents.

## ADDITIONAL INFORMATION

Representatives of the General Partner are available for a discussion of the terms and conditions of this offering and will provide any additional information, to the extent they possess it or can acquire it without unreasonable effort or expense, necessary to verify the information contained in this Confidential Offering Memorandum.

10105509.12

54

CONFIDENTIAL

GCC-NYAG0000393

GCC-P 0335463