# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:
BERNARD L. MADOFF,

Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01182 (SMB) |
| Plaintiff, | |
| v. | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

## EXPERT REPORT OF
## AMY B. HIRSCH

### Expert Report on Fund Operations

March 20, 2015

# TABLE OF CONTENTS

**Page**

I.      Summary of Opinions ................................................................................. 2

II.     Industry Experience .................................................................................. 4

III.    Compensation ............................................................................................ 6

IV.     Applicable Standards and Guidelines ...................................................... 6

V.      Opinion I .................................................................................................... 9

        A.      Fund Structure: ............................................................................. 10

                1.      The On-Shore Hedge Fund ................................................ 10

                2.      The Off-Shore Hedge Fund ............................................... 11

        B.      The Master-Feeder Structure: ...................................................... 12

        C.      Fund-of-Funds: ............................................................................. 13

        D.      Investment Management Company: .............................................. 14

                1.      Fund Manager/Investment Adviser .................................... 16

                2.      Investors ............................................................................. 19

                3.      Investments: Subscriptions and Redemptions ................... 21

                4.      Accounting and Recordkeeping .......................................... 23

                5.      Segregation of Investor Assets ........................................... 24

VI.     Opinion II ................................................................................................. 29

        A.      Ascot Partners and Ascot Fund .................................................... 30

        B.      Ariel Fund .................................................................................... 34

        C.      Gabriel Fund ................................................................................ 36

        D.      The Defendant Funds' Investments with BLMIS ......................... 38

        E.      GCC .............................................................................................. 39

        F.      Management and Incentive Fees ................................................... 39

## TABLE OF CONTENTS
### (continued)

**Page**

    G.    Defendant Funds and GCC Books and Records .................................................... 41

        1.    Inter-Fund Transfers ..................................................................................... 41

        2.    "Loans" ......................................................................................................... 46

        3.    Transfers Between the Funds and GCC ....................................................... 47

VII.    Conclusion ......................................................................................................... 53

I have been retained by Baker & Hostetler, LLP, counsel for Irving H. Picard, Trustee for the substantively consolidated SIPA liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff.[1]

I have been active in the financial industry since 1980, focusing on alternative investments, futures, managed futures, derivatives, and hedge funds.  During my 34 years in alternative investments, I have held senior positions in brokerage firms, hedge funds, and fund-of-funds.  I have conducted general and operational reviews on numerous types of hedge funds, feeder funds, and fund-of-funds, as well as strategies, including convertible arbitrage, event driven, merger arbitrage, macro, systematic, long/short equity, long bias, short sellers, market neutral, and relative value.  I have also assisted with fund structuring, operations reviews, asset allocation, monitoring, and general due diligence.  My experiences are set forth in Section II, and my curriculum vitae is attached as Appendix 2 to this report.

In this report, I have been asked to:

A.    Opine on whether transfers of fund assets and investor subscriptions of one hedge fund or fund-of-funds to another fund or entity is consistent with industry standards, customs, and practices between 1990 and 2008.

B.    Opine on the transfers of fund assets and investor subscriptions by and between Ascot Partners L.P., Ascot Fund Ltd., Gabriel Capital, L.P., Ariel Fund Ltd. and Gabriel Capital Corporation.[2]

---

[1] Assumptions and Limitations are attached hereto as Appendix 1.

[2] The entities are referred hereinafter as: Ascot Partners L.P. – "Ascot Partners"; Ascot Fund Ltd. – "Ascot Fund"; Gabriel Capital, L.P. – "Gabriel Fund"; Ariel Fund Ltd. – "Ariel Fund"; and Gabriel Capital Corporation – "GCC." (Ascot Partners, Ascot Fund, Gabriel Fund, and Ariel Fund are collectively, the "Defendant Funds").

I.      <u>**Summary of Opinions**</u>

I have reviewed information and documentation produced in this case, as well as publicly available information.  A complete list of the documents I considered in connection with this report is included as Appendix 3.  In addition, I have reviewed and relied upon the Expert Report of Lisa M. Collura, CPA, CFE, CFF, dated March 20, 2015 ("Collura Report").  To the extent that additional information becomes available, I reserve the right to amend or supplement my opinions.

Based upon my review of the foregoing information and documents, and my education and experience, my opinions are as follows:

<u>**Opinion I.**</u>

A hedge fund is a legal corporate structure formed for the purpose of investing assets.  Similar to a hedge fund, a fund-of-funds is also a legal corporate structure but typically formed for the purpose of investing assets in two or more funds.  By industry standards, customs and practices, hedge funds and fund-of-funds require certain documents to set forth and disclose the structure of the fund, the authority of the investment adviser, the strategy of the fund, the risks associated with the strategy, and how investments are monitored and accounted for.  In both hedge funds and fund-of-funds, each fund stands alone or in a master-feeder structure, and must be treated as an independent corporate entity accountable to its independent and unique investors.

The bookkeeping and record keeping requirements of hedge funds and fund-of-funds are also governed by industry standards, customs, and practices.  These industry standards, customs, and practices ensure that investor records are accurate, increase the speed of reporting to the investor, and increase the transparency of the investment to the

investor.  There is a fundamental duty to safeguard investor assets.  It is inviolate, and requires segregation of investor funds and assurance that assets intended for investment are actually invested.  This duty extends to the prohibition against misuse of fund assets or commingling of the assets of one fund with the assets of another fund or entity.

To the extent that fund assets and investor subscriptions are used for purposes other than the intended investment or are commingled, the transfer of the assets must always be documented.  Such documentation must provide specific protections to the respective funds and their investors, including but not limited to (1) identification of the owner of the assets being transferred; (2) reconciliation of transferor fund's equity interests (and investor interests) in the respective transferee fund or entity; (3) safeguards for the transferor fund and investors against exposure to the transferee fund's liquidity risk, market risk or fraud risk; (4) terms for the repayment of the transfer and payment of interest or other remuneration for the use of funds; and, (5) terms for the resolution of the transfer.  Further, every transfer must be disclosed to the investors because it is a significant material change in the risks and intended investment in the fund.

## Opinion II.

Based on my review of documents and information related to the Defendant Funds and GCC, it is my opinion that certain transfers between and among the Defendant Funds were a misuse of fund assets and/or resulted in commingling of the assets of the funds, particularly investor subscriptions.  These transfers were not authorized by the governing documents of each of the funds, were an unintended use of the Defendant Funds' assets and investor subscriptions, and inconsistent with the applicable industry standards, customs, and practices in place between 1990 and 2008.

In addition, in my review of the record, I did not see any documentation by the

Defendant Funds, other than book entries, that recorded the unintended use of the assets

or subscriptions; identified the owner of the assets being transferred; reconciled the

transferor fund's equity interests (and investor's interests) in the respective transferee

fund or entity; safeguarded the transferor fund and investors against exposure to the

transferee fund's or entity's liquidity risk, market risk or fraud risk; provided terms for

the repayment of the transfer and payment of interest or other remuneration for the use of

funds; or provided terms for the resolution of the transfer.  Additionally, I did not see any

disclosures of the transfers to the respective investors of the Defendant Funds.  The

failure to document or disclose the transfers by and between the Defendant Funds and

GCC was inconsistent with applicable industry standards, customs, and practices in place

between 1990 and 2008.

## II.    Industry Experience

1.      I have extensive experience in alternative investments in managing fund-of-fund

assets (over $1 billion in assets at peak); operational and general due diligence of hedge funds

and Commodity Trading Advisers (CTAs); advising significant institutional investors; asset

raising; and compliance.  Relative to alternative investments, I have 19 years of experience

managing a hedge fund/alternative investment consultancy firm known for its extensive due

diligence expertise and work, and monitoring of funds.

2.      My experience also includes structuring and restructuring hedge funds and fund-

of-funds, implementing new policies, procedures, and documentation for a hedge fund, and

creating operational and general due diligence plans for investors.

3.      Furthermore, I have conducted operational, qualitative, and quantitative due diligence on hundreds of hedge funds and managed futures managers (*i.e.*, CTAs) on behalf of institutional investors, such as insurance companies, foundations, fund-of-funds, family offices (*e.g.*, multi-family pooled structures and single family structures created for investment purposes), and brokerage houses.

4.      In 1995, I was asked to conduct due diligence on GCC and Ariel Fund on behalf of a client.  I sent a letter to Mr. Merkin requesting certain documents in advance of a scheduled meeting.  The letter requested the following documents: all Ariel Fund weekly and monthly performance numbers; the assets under management since the inception of the fund; audited financials; all marketing materials; a list of appropriate registrations for GCC; a list of key personnel (their responsibilities and brief backgrounds); a copy of historical Ariel Fund letters sent to investors; a list of brokers; a description of GCC as a "firm" (*e.g.*, organizational charts and ownership); and the identity of and contact information for Ariel Fund's administrator, custodian, auditor, prime broker, and attorney.  Mr. Merkin did not send the documents as requested in advance of the meeting.  During the meeting, I again requested the documents and attempted to discuss Ariel Fund's strategy, but Mr. Merkin was reluctant to share much information.  As a result of the meeting and the failure to receive the requested documents and information, I recommended that the client fully redeem their investment.

5.      In 2003, I conducted due diligence on behalf of an investor in Tremont Advisers' American Master Broad Market Prime Fund, L.P. ("Tremont").  This fund had significant concentrations of its investment with BLMIS and Mr. Bernard L. Madoff was identified as the sub-manager.  Based on my due diligence, I raised concerns regarding lack of transparency, lack of volume relative to the amount of assets that Madoff was purported to manage, lack of ability

to verify the vendors, and uneasiness in the industry.  I therefore recommended that the investor fully redeem its investment in Tremont.

### III.    Compensation

6.      I am being compensated at a rate of $360.00 per hour, plus expenses.  My compensation is not contingent upon my opinions, the testimony I intend to offer in this case, or the outcome of this litigation.

### IV.    Applicable Standards and Guidelines

7.      In 1993, long before mandatory SEC registration and regulation was imposed on hedge funds, the Association for Investment Management and Research ("AIMR"), now known as the CFA Institute, created guidelines, titled Performance Presentation Standards (AIMR-PPS). The primary mission of AIMR was to implement a standard code of conduct of ethics, best practices guidelines and a standard method for calculating and presenting investment performance.  The guidelines included specific guidance on disclosures to investors, investor rights, and investment manager ethics.  "These standards help ensure all investment professionals place client interests first."[3]

8.      At least since 1999, AIMR required its members, and recommended that non-members, disclose to clients where the client's assets are to be maintained, as well as where or when they are moved, and to separate the client's assets from any other party's assets, including the member's own assets.[4]

---

[3] CFA Institute, http://www.cfainstitute.org (last accessed March 17, 2015).

[4] *See Standards of Practice Handbook,* Association for Investment Management and Research at 96-97 (8th ed. 1999); *see also Standards of Practice Handbook*, CFA Institute at 85-86 (11th ed. 2014) (available at http://www.cfapubs.org/doi/pdf/10.2469/ccb.v2014.n4.1 (last accessed March 17, 2015)).

9.      The AIMR standards were utilized by most hedge funds starting in the early to mid-1990s.  Any professional with a Certified Financial Analyst (CFA) designation was required to follow the AIMR standards.  Most hedge funds not only employed professionals with the CFA designation, but encouraged employees to obtain certification.  Furthermore, managers were urged to adopt these standards regardless of whether they were registered investment managers or their employees held a CFA title.

10.      On February 19, 1995, AIMR formally adopted the Global Investment Performance Standards ("GIPS"), a rigorous set of investment performance measurement standards adopted in 37 countries and recognized around the world to ensure full and fair disclosure of performance results and information necessary to enable potential investors to compare investment firms.[5]

11.      In 2006**,** the AIMR-PPS standards were merged into GIPS.[6]

12.      In addition to GIPS, fund managers are guided by the Asset Manager Code of Professional Conduct ("Code of Conduct"), which outlines the ethical and professional responsibilities of firms that manage assets on behalf of clients, whether the assets are managed

---

[5] *See AIMR-PPS Standards* at 2; Crystal Detamore-Rodman, *A Novel Concept*, CFA Magazine, September-October 2007 (available at http://www.cfapubs.org/doi/pdf/10.2469/cfm.v18.n5. 4822?prevSearch=$%7bresultBean.text%7d) (last accessed March 16, 2015); *See GIPS: Global Investment Performance Standards*, CFA Institute, (available at http://www.cfainstitute.org/ethics/Code of Conducts/gipsstandards/Pages/index (last accessed March 17, 2015)); *See AIMR Performance Presentation Standards (AIMR-PPS),* CFA Institute (2001), (available at http://www.cfainstitute.org/ethics/Documents/Code of Conducts%20Documents/redraft_aimrpps.pdf (last accessed March 16, 2015) (hereinafter "*AIMR-PPS Standards*")).

[6] *See* Asset Manager Code of Professional Conduct, CFA Institute, (2d. ed. 2010), (available at http://www.cfapubs.org/doi/pdf/10.2469/ccb.v2009.n8.1 (last accessed March 16, 2015) (hereinafter "*Asset Manager Code of Conduct*")).

as separate accounts or pooled funds.[7]  This Code of Conduct was first introduced in 2004, and

formally adopted by the CFA Centre for Financial Market Integrity in 2005.[8]

      13.     The goal of the Code of Conduct is to set forth a useful framework for all asset

managers to provide services in a fair and professional manner and to fully disclose key elements

of those services to clients, regardless of whether individual managers are required to register or

comply with applicable securities laws or regulations.  Unregistered hedge fund managers, in

particular, are encouraged to adopt the Code of Conduct and implement its provisions to ensure

fair dealing and integrity, and to promote self-regulation.[9]

      14.     The Code of Conduct provides that fund managers must:

- place client interests before their own;

- use reasonable care and prudent judgment when managing client assets;

- provide adequate disclosures and information on investment strategies;

- develop and maintain policies and procedures to ensure that their activities comply with the provisions of this Code of Conduct and all applicable legal and regulatory requirements;

---

[7] *See Asset Manager Code of Conducts*, http://www.cfainstitute.org/ethics/Code of Conducts/ gipsstandards/Pages/index.aspx (last accessed March 16, 2015).

[8] *See Asset Manager Code of Conduct*, Exposure Draft, European Corporate Governance Institute (Nov. 2004), http://www.ecgi.org/Code of Conducts/documents/asset_manager_CodeofConduct.pdf (last accessed on March 17, 2015); *See also* CFA Institute, *Asset Manager Code of Conduct* (2005), (available at http://hawkamah.org/wpcontent/uploads/2014/02/CFAInstituteAssetManagerCodeofConduct.pdf (last accessed on March 16, 2015)); *From Practice to Profession*, CFA Institute (2007), (available at http://www.cfainstitute.org/Timeline%20Documents/aimr_history_brochure.pdf. (last accessed March 17, 2015)).

[9] *See* Alicia Licata, *Calculating and Reporting Performance – the Self-Regulatory Approach*, The Alternative Investment Management Association Limited Journal 1-3 (June 2004), (available at http://www.gipsstandards.org/resources/Documents/ix_Calculating_and_Reporting_Performace.pdf (last accessed March 16, 2015)).

- communicate with clients on an ongoing and timely basis and include any material facts when making disclosures or providing information to clients regarding themselves, their personnel, investments, or the investment process;

- disclose conflicts of interests generated by any relationships with brokers or other entities, other client accounts, fee structures, or other matters; and

- disclose investment risk factors and information.[10]

15.    GIPS guidelines and the Code of Conduct apply to fund managers and investment advisers regardless of whether they are registered with the SEC.[11]

## V.    __Opinion I__

16.    The transfer of fund assets and investor subscriptions from one hedge fund or fund-of-funds to another fund or entity is inconsistent with industry standards, customs, and practices between 1990 and 2008. Familiarity with the organization and infrastructure of hedge funds and fund-of-funds is a necessary predicate to fully understand this concept.

---

[10] *See Asset Manager Code of Conduct* at 5-7; See *also Sound Practices for Hedge Fund Managers,* Managed Funds Association, Chapter 1: Disclosure and Investor Protection 1-12, Chapter 5: Compliance, Conflicts, and Business Practices pp. 1, 3-5, 10-11 (2009)*, (*available at *https://www.managedfunds.org /wp-content/uploads/2011/06/Final_2009_complete.pdf (last accessed on March 17, 2015)* (hereinafter "*Sound Practices for Hedge Fund Managers*")).

[11] *See AIMR-PPS Standards* at 8-9; *see also Asset Manager Code of Conduct.* In December 2004, the SEC issued a rule change that required most hedge fund advisers to register by February 1, 2006 as investment advisers under the Investment Advisers Act of 1940. The requirement applied to firms managing in excess of $25 million with more than 15 investors, and subjected them to additional reporting and compliance regulations. Among other things, the rule change emphasizes that advisers have a fiduciary duty to manage clients' portfolios in the best interest of their clients, particularly to fully disclose any material conflicts and to seek best execution for client transactions. Registration Under the Advisers Act of Certain Hedge Fund Advisers, 17 CFR §§ 275, 279 (2004). The prohibitions and disclosures are consistent with the mandates of GIPS and the Code of Conduct. *See also supra*, Sec. IV, Applicable Standards and Guidelines.

A.    **Fund Structure:**

17.    A hedge fund is a flexible investment vehicle.  Hedge funds are open to a limited type of investor and undertake a broader range of investment activities than compared to a traditional long-only fund, which holds highly liquid securities but have limited tools to hedge risks and exposures.[12]

18.    Fund managers/investment advisers have their own investment strategy and style that determines the types of investments and the investment process used.  They can choose from a broad array of investments along the capital structure in equities, bonds, commodities, derivatives, futures, and cash products.  The fund's governing and organizational documents, particularly the partnership agreement, offering memorandum, or prospectus (collectively, the "governing documents") codify the permitted strategies.[13]  The fund's strategy, particularly risks, should be detailed in the fund's marketing material.[14]

### 1.    The On-Shore Hedge Fund

19.    U.S. domiciled investors invest in a domestic or on-shore hedge fund, typically formed as a limited liability company, a limited partnership, or a sole proprietorship.[15]

20.    Figure 1 below shows the structure of a typical domestic hedge fund formed as a limited partnership and the associated vendors or responsible entities.

---

[12] *See* Joseph G. Nicholas, *Investing in Hedge Funds: Strategies for the New Market Place* 24, 50-51(1st ed. 1999); *See also SEC Investor Bulletin,* Hedge Funds, SEC Pub. No. 139 (2/13) (available at http://www.sec.gov/answers/hedge.htm).

[13] *See* Nicholas at 48-51.

[14] *See Navigating the Regulation of Hedge Fund Marketing,* Managed Funds Association Reporter, 2, March/April 2008.

[15] *See* Francois-Serge Lhabitant, *Handbook of Hedge Funds*, 109-110 (2007).

### Figure 1



### 2.    The Off-Shore Hedge Fund

21.    Non-U.S. residents typically invest in foreign or off-shore hedge funds, domiciled in countries such as the Cayman Islands, Bermuda, Ireland, and Luxembourg.  These jurisdictions offer greater confidentiality, limited reporting responsibilities, and a benign level of taxes.[16]

22.    Figure 2 below shows the structure of a typical off-shore hedge fund and the associated vendors or responsible entities.

---

[16] *See* Lhabitant at 85-87.

**Figure 2**



B.    **The Master-Feeder Structure:**

23.    A master-feeder fund is a two-tiered hedge fund structure in which investors may subscribe to a "feeder" fund, which then invests in a "master" fund, which in turns invests in the market or underlying investments.  The master fund then allocates profit and loss on a pro-rata basis to the feeder funds.[17]

24.    The purpose of a master-feeder structure is to simplify trade clearing, the settlement process, and the allocation process.  It is also implemented to reduce trading costs, and obtain better financing and leverage.[18]

---

[17] *See id.* at 109-110.

[18] *See id.* at 110.

25.    Figure 3 shows the typical structure of a master-feeder fund.

**Figure 3**



26.    The choice of domicile for the master-feeder fund is selected by the fund manager/investment adviser.  The decision is based, in part, on the type of disclosure the manager wants to give to the regulators of the domicile as well as their own investors.  The primary choices of domicile for off-shore vehicles managed by U.S.-based investment managers are The British Virgin Islands, Cayman Islands, and Bermuda.[19]

**C.    Fund-of-Funds:**

27.    A fund-of-funds is an investment vehicle that typically invests in two or more funds.  Fund-of-funds provide investors with a method for investing in a diversified pool of hedge funds.  It further employs industry professionals to provide risk management, monitoring, due diligence, and asset allocation oversight.

---

[19] *See id.* at 87. Ariel Fund and Ascot Fund are domiciled in the Cayman Islands.

28.    The fund manager/investment adviser of a fund-of-funds has discretion to allocate

the assets of the fund to sub-managers.

29.    Figure 4 shows the typical structure of a fund-of-funds.

**<u>Figure 4</u>**



**D.    Investment Management Company:**

30.    An investment management company oversees the hedge fund or the fund-of-

funds consistent with the governing documents and goals of the fund.[20]

---

[20] *See* Stefano Lavinio, *The Hedge Fund Handbook: A Definitive Guide for Analyzing and Evaluating Alternative Investments* 157 (2000).

31.    Figure 5 is a typical structure of a fund management company.

### Figure 5



32.    Each department within a management company has a segregated role and respective authority within that role.  Figure 6 illustrates the typical organization and separation of roles within a hedge fund management company.

### Figure 6

33.    In a fund-of-funds management company, the trading role and duties are replaced by the duty to perform operational and general due diligence on the underlying funds and investment advisers.

34.    The purpose of segregated roles is to ensure checks and balances, and to reduce risk within the management company and the managed fund.  For example, in the accounting and finance department, there should be levels of authority pertaining to transfer of funds, check-writing, and banking.  Within the levels of authority, there should be a dual signature system for transfers or checks over a pre-determined amount.  These types of controls should be in place to safeguard investor assets, and to mitigate the risk of fraud.[21]

### 1.    Fund Manager/Investment Adviser

35.    A fund manager or investment adviser, typically the same individual, directs the management of a fund, implements the fund strategy, and directs the investment decisions of the fund.

36.    An administrator is responsible for handling the day-to-day operations of the fund, subject to the oversight and control by the fund manager/investment adviser.[22]

37.    The fund manager/investment adviser has a contractual obligation and fiduciary duty to invest the investor's assets as intended and to safeguard those assets.  Contractually, the terms and scope of these obligations are set forth in the subscription agreement, offering memoranda, and disclosures of the fund.[23]

---

[21] *See also* Richard Horwitz, *Hedge Fund Risk Fundamentals: Solving the Risk Management and Transparency Challenge* 104-107 (2004); *See also Sound Practices* at *Chapter 4: Trading and Business Operations*, pp. 1, 9.

[22] *See* Lhabitant at 99.

[23] *See* Nicholas at 48-51; *See also Lavinio* at 158-59.

38.     The fiduciary duty of the fund manager/investment adviser is an affirmative duty of utmost good faith and full disclosure to clients.  Lori A. Richards, Director of Compliance Inspections and Examinations for the SEC, explained:

> Fiduciary duty is the *first principle* of the investment adviser — because the duty comes not from the SEC or another regulator, but from common law. Some people think "fiduciary" is a vague word that's hard to define, but it's really not difficult to define or to understand. Fiduciary comes from the Latin word for "trust."
>
> The Investment Advisers Act does not call an adviser a fiduciary. In fact, that word does not appear in the Act. But, the Supreme Court recognized congressional intent and held that the Advisers Act: "*reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser - consciously or unconsciously - to render advice which was not disinterested.*"  And, the Court said that: investment advisers are fiduciaries with" *an affirmative duty of 'utmost good faith and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' … clients.*"
>
> ***
>
> I would suggest that an adviser, as that trustworthy fiduciary, has five major responsibilities when it comes to clients.  They are:
>
> 1.     to put clients' interests first;
> 2.     to act with utmost good faith;
> 3.     to provide full and fair disclosure of all material facts;
> 4.     not to mislead clients; and
> 5.     to expose all conflicts of interest to clients.

(Emphasis in original, internal footnotes omitted).[24]

39.     The duties of a fund manager/investment adviser are further guided by AIMR, the CFA Institute, GIPS, and the Code of Conduct.  Applicable to fund managers/investment

---

[24] Lori A. Richards, Speech at the Eighth Annual Investment Adviser Compliance Summit, Washington, D.C. Fiduciary Duty: Return to First Principles (February 27, 2006) (transcript available at http://www.sec.gov/news/speech/spch022706lar.htm (last accessed Mar. 18, 2015)).

advisers, these standards, customs, and practices reiterate that investor interests be placed before

that of the fund and its agents, that reasonable care and prudent judgment must be exercised

when managing investor assets, that investors are provided with adequate disclosures regarding

the investment, and that facts material to the investment are disclosed to the investor.[25]

40.      Part and parcel of these duties is the requirement that a fund and its manager or

adviser must avoid conflicts of interest. This means that the fund manager/investment adviser

must ensure that investments and related decisions must not put the interests of one investor

before another, the interests of the fund and its management before that of the investor, or the

interests of other entities before that of the investor.[26]

41.      In return for these contractual obligations and fiduciary duties, investors pay a

management fee and a performance or incentive fee to the fund manager/investment adviser.

Funds charge a management fee in order to pay for administrative and operational infrastructure.

This infrastructure includes the staff and technology necessary to identify market opportunities

and protect investors from risk.  The management fee is calculated as a flat percentage of net

asset value ("NAV") at a time set forth in the offering documents.  Management fees vary, but

the most common fees are 1% and 1.5% of the fund's NAV.[27]

42.      The incentive fee is based on the performance of the fund and is used to induce or

motivate fund managers/investment advisers to meet certain profitability or performance

---

[25] *See Sound Practices for Hedge Fund* Managers, Chapter 1: Disclosure and Investor Protection at 1-12.

[26] *See id.* at Chapter 5: Compliance, Conflicts, and Business Practices at 10-11.

[27] *See* Nicholas at 29-30.

benchmarks. The incentive fee is most commonly 20%, and is calculated based on the profit of investment returns on an annual basis.[28]

### 2. Investors

43.    The types of investors in the hedge fund and fund-of-fund industry are:

- High-net-worth individuals and Family Offices

- Endowments

- Foundations

- Corporations

- Pension Plans (public and private)[29]

44.    These investors, regardless of size and experience, rely on fund information in the governing documents and the timely disclosures provided by the fund manager/investment adviser. It is through the information, disclosures, and the authorities set forth in the governing documents that an investor can assess the risks associated with the investment, and make an informed decision to either purchase an investment in a hedge fund or fund-of-funds, or to redeem the investment.[30]

45.    While each fund or fund-of-funds may vary based on the strategy employed, the size of assets managed, complexity of the investment strategy, implementation of the investment strategy, and complexity of trade clearing and operations, each fund should provide, at a minimum, its investors with the following documents:

---

[28] *See* Nicholas at 29-30.

[29] Alexander M. Ineichen, *Absolute Returns: The Risk of Opportunities of Hedge Fund Investing* 40-41 (2003).

[30] *See Sound Practices for Hedge Fund Managers,* Chapter 1 at 1-12.

- prospectus, subscription and redemption documents;

- articles of association or incorporation;

- investment management agreement;

- audited financial statements;

- marketing materials;

- procedures and policies;

- compliance manual;

- SEC or NFA registration or proof of exemption from registration;

- prospectus for an off-shore vehicle;

- offering memorandum for an on-shore vehicle;

- subscription agreements;

- tax forms;

- wiring instructions;

- redemption instructions; and

- investor reporting documentation and communications.[31]

46.    Each of the above documents outlines the relationship between the investor and the fund manager/investment adviser.  The documents provide initial and on-going disclosure of the investment and operational activities of the fund, and set forth the express authority of the fund manager/investment adviser with regard to the strategy of the fund, the implementation of the strategy, and authority to conduct transactions on behalf of the fund and its investors.[32]

---

[31] *See* Nicholas at 50-51.  *See also Sound Practices for Hedge Fund Managers*, Chapter 1: Disclosure and Investor Protections at 1-16, Chapter 4: Trading and Business Operations at 9.

[32] *See* Lhabitant at 91-108.

47.    In addition to these documents, each fund must maintain proper infrastructure, including personnel, systems and protocol, which include, at a minimum, the following:

- portfolio management;

- legal and compliance;

- operations and information technology;

- finance and accounting;

- client services/marketing & administration;

- sufficient hardware, software, and capacity for management of investment strategy and asset size; and,

- disaster recovery technology and offsite storage/recovery.[33]

48.    Each of these systems and protocols ensures that the fund operates and functions consistent with its investment purpose and strategy, it's offering documentation, and (based on disclosures) with the investment and risk expectations of the investor.[34]

### 3.    Investments: Subscriptions and Redemptions

49.    An investor invests monies with a fund via the subscription and redemption process.  The investor typically sends a wire transfer to the custodian bank account of the fund as stated in the fund's subscription agreement and is booked as an entry of shares purchased at par value.  The timing of when a fund is accepting subscriptions is typically set forth in the fund's offering documents.[35]

---

[33] *See Sound Practices for Hedge Fund Managers,* Chapter 4, Trading and Business Operations at 1-2; Chapter 7, Business Continuity/Disaster Recovery Principles at 1-10.

[34] *See Sound Practices for Hedge Fund Managers*, Chapter 1, Disclosure and Investor Protection, at 1-6.

[35] *See Guide to Sound Practices for Hedge Fund Administrators*, Alternative Investment Management Association, 7 (September 2004).

50.    Figure 7 below illustrates the flow of subscriptions monies.

### Figure 7

Basic flow of cash through Hedge Fund



51.    It is industry standard, custom, and practice for investor subscriptions to be wired directly to the custodian bank account for the fund in which they invest, and not to the bank account of the management company or any other entity.  This ensures that investor subscriptions and assets are used for their intended purpose – *i.e.*, investment in the fund.[36]

52.    Upon redemption, the investor sends a notice of redemption to the fund manager (or administrator) requesting the amount to be withdrawn.  The timing of redemption requests is set forth in the fund's offering documents (*e.g.*, quarterly, biannually, or annually) depending on

---

[36] *See Sound Practices for Hedge Fund Administrators* at 7 (September 2004); s*ee also* 17 C.F.R. § 1.25 (2014).

the fund's strategy.  After approval of the request to redeem the shares, a wire transfer is made

from the fund's custodial bank account to the investor's bank account.[37]

### 4.    Accounting and Recordkeeping

53.    A fund should have an accounting and finance structure with appropriate systems

and protocols to support the fund and the management company, while taking into consideration:

- the type of strategy or strategies traded;

- size of the firm (gross assets);

- number of investors;

- number of accounts;

- number of transactions;

- investor segregation requirements;

- limited partnership accounting; and

- NAV calculation.[38]

54.    All information compiled by the fund and tracking the investor's assets and

investments from subscriptions to redemptions should be set forth in the fund's accounting and

bookkeeping records.[39]

55.    Hedge funds, particularly large ones with hundreds of millions of dollars under

management, typically have accounting and bookkeeping systems from vendors such as Advent

Software or Investment Management System (IMS).  These systems enable immediate

---

[37] *See Sound Practices for Hedge Fund Administrators*, Alternative Investment Management Association 7 (September 2004); *See also Sound Practices for Hedge Fund Managers* at Appx. IV, 16.

[38] *See Sound Practices for Hedge Fund Managers,* Chapter 4: Trading and Business Operations at 8-10.

[39] *See id.* at Chapter 1: Disclosure and Investor Protection at 1-12, Chapter 5: Compliance, Conflicts, and Business Practices at 1, 3-5, 10-11.

reconciliation of investments, provide faster reporting capabilities, and greater transparency to investors of trades and accounting.[40]

56.    Along with providing greater ease in the management of investments, these systems provide a better safeguard for investor assets and an accurate calculation of the investor's NAV.[41]

### 5.    Segregation of Investor Assets

57.    It is imperative that investor subscriptions and assets are segregated and never misused or commingled by the fund or fund-of-funds.[42]

58.    The "misuse" of assets is the use of fund assets inconsistent with their intended purpose or in an unauthorized manner.[43]

59.    "Commingling" is the act of combining the assets belonging to one fund or its investor with those of another fund or entity without prior authorization and without specific identification of the ownership of the transferred asset.[44]

---

[40] *See id.* at 1-15.

[41] *See id.* at 1-15.

[42] *See id.* at 8-10. However, investor monies in a pooled vehicle are combined within the fund and each investor is allocated an interest in the total investment. *See also* Horwitz at 262. Based on my definition of commingling, *supra*, I do not consider the combination of monies within a pooled vehicle as commingling.

[43] *See, e.g.*, Custody of Funds or Securities of Clients by Investment Advisers. 17 C.F.R.§ 275.206(4)-2; *See also* Futures Customers Funds to be Segregated and Properly Accounted For, 17 C.F.R. § 1.20; Commodity Exchange Act § 4d(a)(2), 7 U.S.C. § 6d(a)(2). *See also* Certified Financial Planner Board of Standards, Sec. 3.8 A, 3.9 A, 3.10 (available at http://www.cfp.net/for-cfp-professionals/professional-standards-enforcement/standards-of-professional-conduct/rules-of-conduct (last accessed March 16, 2015) ("*CFP Standards*"));

[44] *See CFP Standards* at Sec. 3.8 A, 3.9 A, 3.10.

60.     Commingling represents a conflict of interest when the withdrawal of the commingled funds puts the interests of one investor over those of another investor, or the interests of a fund or entity are put before those of the investor of the fund.[45]

61.     The transfer of subscription monies to or from the fund's management company, or between two funds is misuse when it is contrary to the subscription agreement or without prior authorization.[46]

62.     The primary reason for segregation of investor assets is to safeguard the investor assets.  Misuse or commingling of fund assets and investor subscriptions creates exposure to different risks which impact each investor, regardless of the duration or repayment of the transfer.

### Counterparty Risks

63.     These risks, termed "counterparty risks," include potential market risk, liquidity risk, investor concentration risks, and fraud risk.  There is simply no way to know at what exact point in time risks will change, a market will collapse, a country will alter interest rates, or a fraud may occur.  These types of risks may have an immediate impact on the liquidity of a fund or management company, thereby "trapping" the investor in an entity he or she never subscribed to invest in and exposing the investor to the risks associated with that entity.[47]

---

[45] *See* CFTC Regulation 1.20, 17 C.F.R. § 1.20; Commodity Exchange Act Sec. 4d(a)(2); *See also Sound Practices for Hedge Fund Managers,* Chapter 5: Compliance, Conflicts, and Business Practices at 10-12.

[46] *See Sound Practices for Hedge Fund Administrators,* Alternative Investment Management Association 7 (September 2004)*; See also Sound Practices for Hedge Fund Managers* at Appx. IV, 16.

[47] *See Sound Practices for Hedge Fund Managers*, Chapter 3: Categories of Risk at 7-16.

### *Market Risk*

64.    Market risk means factors that affect the performance of the asset caused by events or adverse movements in the market. Market risk is based upon, but not limited to, the complexity of the underlying investment, adverse changes in interest rates, foreign exchanges rates, commodity prices, or equity prices.[48]

### *Liquidity Risk*

65.    Liquidity risk can occur when the positions of the underlying investment are not easily liquidated due to volume constraints or supply and demand.  Liquidity risk can also occur in a fund when redemption requests exceed the capital on hand or the underlying investments are illiquid during the redemption period (*e.g.*, trade claims and certain distressed debt).[49]

### *Investor Concentration and Mass Redemption Risks*

66.    Investor concentration risks are the potential for a fund to suspend redemptions or collapse if there is a redemption by a large investor.  The fund also has mass redemption risk if a majority of investors redeem simultaneously.   For example, in December 2008, Fortress Investment Group announced that it had suspended redemptions from its largest hedge fund and three of its feeder funds because of a rush by investors to redeem.[50]

---

[48] *See* Supervisory Policy and Guidance Topics, Market Risk Management, Federal Reserve, (available at http://www.federalreserve.gov/bankinforeg/topics/market_risk_mgmt.htm (last accessed March 17, 2015)).

[49] *See* Keith H. Black, *Managing a Hedge Fund, A Complete Guide to Trading, Business Strategies, Risk Management, and Regulations* 66-71 (2004).

[50] *See White Papers: Agecroft Partners Predicts Hedge Fund Industry Trends for 2012*, Agecroft Partners LLC, http://www.agecroftpartners.com/papers-predicts_2012.html; Lawrence Cohen and Thomas M. Griffin, *A Run on Hedge Funds: Redemption Strategies And Responses, Finalternatives*, December 30, 2008, (available at http://www.finalternatives.com/node/6474).

*Fraud Risks*

67.     Fraud risks are the existence of opportunities for the commission of fraud on the entity holding the underlying asset.  Examples of fraud include false accounting entries and/or misrepresentations of financial condition, fraudulent trades designed to inflate profits of hidden losses, illicit transactions designed to evade regulatory oversight, and misuse of corporate property for personal gains.[51]

68.     The most common operational issues related to hedge fund failures are losses due to fraud; misrepresentation of fund investments, misappropriation of investor funds, and unauthorized trading.   Inadequate resources have also been cited as a cause for hedge fund failures.[52]

69.     The following hypothetical scenarios illustrate the risks associated with commingling or misuse of investor assets:

*Scenario 1: Investor assets commingled with management company assets*

The investor signed a subscription agreement and was legally invested in a hedge fund, not a management company.  The fund's manager transfers the investor's subscription monies to the management company. Through the transfer, the investor now has counterparty risk with the management company.  If the management company is sued or is unable to pay its debts and expenses, the investor's assets may be frozen or lost.

*Scenario 2: Investor assets of Fund A commingled with investor assets of Fund B*[53]
Investor X owns shares in Fund A, while Investor Y owns shares in Fund B.  A transfer of assets occurs from Fund A to Fund B.  This transfer of assets shifts ownership of the

---

[51] *See* Samuel W. Buell, *What is Securities Fraud*, 61 Duke L.J. 511, 520-22 (2011); *See also White-Collar Crime, Corporate Fraud*, Federal Bureau of Investigation, (available at http://www.fbi.gov/about-us/investigate/white_collar/corporate-fraud (last accessed March 17, 2015)).

[52] *See* A Capco White Paper and Capital Mkts. Co. Ltd., *Understanding and Mitigating Operational Risk in Hedge Fund Investments*, 5 (March 2003).

[53] This scenario assumes that the investors in Fund A are different in number, equity interest, and have varying identities from those in Fund B.

underlying asset, and is effectively a transfer of ownership of Investor's X's interest to Investor Y. Fund B employs a strategy that invested in event-driven investments such as distressed companies, mergers and acquisitions. The risks involved in this strategy include duration risk, liquidity risk, market risk, break-up risk, and regulatory risk. Fund A employs a strategy that invests in the equity market in a liquid long/short strategy, which may have market risk and selection risk, but not duration, break-up or regulatory risk. Investors of Fund A now have the counterparty risks of Fund B—liquidity risks, market risks, break-up risks, and regulatory risks. And, if Fund B has massive redemptions or collapses, Fund A may not be able to recover the transferred assets from Fund B.

### *Scenario 3: Commingling and Conflicts of Interest*

Fund A transfers $10 million to Fund B, leaving Fund A with a balance of $2 million and providing Fund B with a total balance of $10 million. The balance of Fund B's account is subsequently diminished to $5 million. Both Fund A and Fund B receive redemption requests in the amount of $4 million each. Fund B pays its full redemptions and sends Fund A the remaining $1 million. Fund A then only has limited cash on hand--$3 million—to pay its redemptions. It decides to pay only certain redemptions and to hold other redemption requests. The result is that the interests of Fund B's investors are put over the interests of Fund A's investors, and then the interests of Fund A's investors who were paid redemptions are put over those investors' interests whose redemption requests were held.

70.      To the extent that fund assets or investor subscriptions are used for purposes other than the intended investment or are commingled, the transfer of assets must be documented and such documentation must provide specific protections to the respective funds and their investors. Examples of such protections include, but are not limited to, identification of the owner of the assets being transferred; reconciliation of transferor fund's equity interests (and investor interests) in the respective transferee fund or entity; safeguards for the transferor fund and investors against exposure to the transferee fund's liquidity risk, market risk or fraud risk; terms for the repayment of the transfer and payment of interest or other remuneration for the use of funds; and terms for the resolution of the transfer. Further, the transfer must be disclosed to

investors because it is a significant material change in the risks and intended investment of the fund.[54]

71.     A fund manager/investment adviser has a contractual obligation and a fiduciary duty to put the investors' interests first and to act with the utmost good faith.  This affirmative duty requires the exercise of reasonable care and prudent judgment when managing investor assets and to provide adequate disclosures regarding the investment.  The duty to segregate and safeguard investor assets is imperative, and prohibits the misuse of fund assets and commingling of fund assets or investor subscriptions and redemptions with assets of another fund or entity.  Any transfer of funds resulting in such misuse or commingling is, at minimum, inconsistent with industry standards, customs, and practices.

## VI.    Opinion II

72.     The books, records, and bank account statements of the Defendant Funds and GCC reflect certain transfers of assets between the Defendant Funds and between the Defendant Funds and GCC.  These transfers include transfers of investor subscriptions and distribution monies as well as undocumented loans.  Based on the analysis herein, I have identified transfers of assets between the Defendant Funds and between the Defendant Funds and GCC that were a misuse of fund assets and resulted in the commingling of assets.  Additionally, the transfer of investor subscriptions and distribution monies into GCC and between the Defendant Funds and

---

[54] *See* Capital Mkts. Co. Ltd. at 4-10; Miriam Bensman, *Hedge Funds Discover Investor Relations*, December 1995, at 91-94 ("'Now we take much more time to make sure the investor-partner is informed and is as comfortable as he can be with the process.  Then he can decide whether to stick around.'"); *Information for Newly-Registered Investment Advisers*, SEC.Gov. (available at https://www.sec.gov/divisions/investment/advoverview.htm (last visited March 19, 2015)).

GCC is a failure to segregate and safeguard investor assets.  These identified transfers were, at minimum, inconsistent with industry standards, customs, and practices.

### A.    Ascot Partners and Ascot Fund

73.    Ascot Partners is a domestic fund formed by Mr. Merkin in 1992.  From inception through December 2008, Mr. Merkin was the General Partner of Ascot Partners and was ultimately responsible for the investment decisions made on behalf of the fund.[55]

74.    Figure 9 below shows the structure of Ascot Partners.

### Figure 9



Ascot Partners L.P.
Based on Offering Memorandum dated November 1992

75.    Ascot Fund is an off-shore fund incorporated in the Cayman Islands in 1992.  GCC (formerly known as Ariel Management Group), which is owned solely by Mr. Merkin, served as the investment adviser to Ascot Fund from 1992 to 2002.[56]

---

[55] *See* Ascot Partners Confidential Offering Memorandum, March 2006, BS00319494 at 512.

[56] Ascot Fund Limited Prospectus, February 1996, BS00306056 at 59-60.

76.     Figure 10 below shows the structure of Ascot Fund from 1992 to 2002.

### Figure 10



77.     From 1992 through 2002, Ascot Partners and Ascot Fund essentially invested *pari passu*, mirroring each other's investments.  In January 2003, Ascot Fund entered into a "master-feeder" relationship with Ascot Partners.[57]  Ascot Fund transferred substantially all of its capital to Ascot Partners and became a limited partner in that fund.[58]  After 2002, notwithstanding termination of a formal investment advisory agreement, Mr. Merkin continued to direct Ascot

---

[57] Letter from Gabriel Capital Group, dated November 11, 2002 (Trustee Exhibit 8, GCC-NYAG 0031102) (Notice to Ascot Fund Limited investors, informing them of Mr. Merkin's intent to unify "Ascot Fund and its domestic counterpart, Ascot Partners, L.P." into a single "master-feeder structure."); Letter from Ascot Partners, L.P.  to Investor, dated November 11, 2002 (Trustee Exh. 240, BS00451097) (Notice to Ascot Partners, L.P. investors, informing them of Mr. Merkin's intent to unify "Ascot Partners and its off-shore counterpart, Ascot Fund Limited" into a "master-feeder structure, with Ascot Partners acting as the central investing mechanism in which Ascot Fund will invest as a limited partner."); Termination Agreement between Gabriel Capital Corporation and Ascot Fund Limited, December 19, 2002 (Trustee Exh. 334, AF00000187).

[58] Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 55, Dkt. No. 261.

Fund's investments as the General Partner of Ascot Partners, and was ultimately responsible for the investment decisions of both Ascot Partners and Ascot Fund.[59]

78.    Figure 11 shows the structure of Ascot Fund from 2002 through 2008:

### Figure 11



79.    Investors in Ascot Partners were domestic individuals or entities, while investors in Ascot Fund were foreign individuals or certain tax-exempt entities.[60]

80.    From 1996 through 2008, Ascot Partners and Ascot Fund employed several strategies, including index arbitrage, convertible arbitrage, and options arbitrage.[61]

---

[59] Ascot Fund Limited Prospectus, January 2003, (Trustee Exh. 336, BS00020958 at 61-63); Dep. of Aldo Ghisletta, 26:3-T27:11, 78:21-T80:2 (January 14, 2015).

[60] Ascot Fund Limited Prospectus, January 2003, (Trustee Exh. 336, BS00020958 at 59).

81.     Index arbitrage is a strategy that attempts to profit by buying individual stocks that make up an index while selling a derivative (most commonly a futures contract) that tracks the index, then subsequently selling the individual stocks while buying the derivative contract. Profits are made on the difference in the prices of the stock based on timing.  Risks of index arbitrage include selling constraints, market volatility, and timing of the execution.[62]

82.     Convertible arbitrage entails buying convertible bonds of a company that can be converted to common stock, while selling short the common stock of the same company that issued the bond.  Money is made from the bond's yield if the stock goes up and on the short sale if the stock goes down.  The risk of convertible arbitrage occurs in the execution.  A determination must be made as to when and if market conditions will coincide with the time frame in which the bonds can be converted to stock.  If the bond cannot be converted at optimal market conditions or must be converted at sub-optimal market conditions, this will result in a loss.  Convertible arbitrage is also impacted by market volatility such as a market crash where convertible bonds decline more than the stocks into which they could be converted, or where stock prices are affected by a company's debt, liquidity, or down-grade in credit ratings.[63]

---

[61] *See* Ascot Partners, L.P., Confidential Offering Memorandum, February 1996, GCC-SEC 0000140 at 144-45.  *See also* Ascot Fund Ltd. Prospectus, February 1996, BS00278044 at 48-49, Ascot Partners, L.P., Confidential Offering Memorandum, December 2002, GCC-SEC 0076501 at 505-507; Ascot Fund Ltd. Prospectus, January 2003, BS00020958 at 961-62; Ascot Partners, L.P., Confidential Offering Memorandum, March 2006, GCC-SEC 0047477 at 483-85; Ascot Fund, Ltd., Confidential Offering Memorandum, September 2006, GCC-SEC 0079238 at 247-49.

[62] *See Index Arbitrage Definition,* NASDAQ (2011), *http://www.nasdaq.com/investing/glossary/i/index-arbitrage* (last accessed March 17, 2015).

[63] *See* Hedge Fund Strategy - Convertible Arbitrage, BarclayHedge (2015), http://www.barclayhedge.com/research/educational-articles/hedge-fund-strategy-definition/hedge-fund-strategy-convertible-arbitrage.html (last accessed on March 19, 2015).

83.    Options arbitrage involves simultaneously buying underpriced stocks and selling the equivalent options positions, or selling overpriced stocks and buying the equivalent options positions.  While it is relatively risk-free, profits are relatively marginal.[64]

**B.    Ariel Fund**

84.    Ariel Fund was formed in the Cayman Islands in 1988.  GCC was at all relevant times the sole investment adviser to Ariel Fund and had full discretionary authority over the assets of Ariel Fund.[65]  Mr. Merkin was ultimately responsible for Ariel Fund's investment decisions.

85.    Figure 12 shows the structure of Ariel Fund.

## Figure 12



**Ariel Fund Limited**
Structure based on Ariel Fund Limited Prospectus
January 1, 1989

---

[64] *See* Horwitz at 110.

[65] Dkt No. 261, Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 47; Ariel Fund Limited Confidential Offering Memorandum, November 1990, BS00045255; Autera Dep. Ex. 12, October 19, 2011, Ariel Fund Limited Confidential Offering Memorandum, March 2006, GCC-SEC0000649 at 0650.

86.     Ariel Fund was primarily engaged in investing and trading in marketable securities and debt of distressed companies or companies in bankruptcy.[66]

87.     Marketable securities are bonds or stocks that can be sold on an active market. They are highly liquid and can be quickly converted to cash.[67]  Marketable securities are not risk-free.  Risks include, for example, default risk, in which the issuer of the security cannot pay the principal or interest on the due date; and,  interest rate risk, in which the risk of declines in the value of the price is due to rising interest rates.[68]

88.     Investment in distressed debt refers to investment in the debt of a company that is in financial distress, potentially heading towards bankruptcy.  The debt of a distressed company is purchased at a reduced price.  The investment relies on the distressed company's ability to improve operations and to successfully reorganize, which in turn permits the company to pay the debt at its full value.  There is significant risk in investing in distressed debt because the distressed company may end up filing for bankruptcy or is unable to reorganize, thus rendering the debt worthless.[69]

---

[66] Ariel Fund Limited Prospectus, January 1989, BS00278625 at 25-29.

[67] *See Marketable Securities Definition,* NASDAQ (2011), (available at http://www.nasdaq.com/ investing/glossary/m/marketable-security (last accessed Mar. 18, 2015)).

[68] *See* Horwitz at 29-30.

[69] *See* Investing in Distressed Securities, BarclayHedge (2015), (available at http://www.barclayhedge. com/research/educational-articles/hedge-fund-strategy-definition/hedge-fund-strategy-distressed-securities.html (last accessed March 19, 2015)).

89.     Investors in Ariel Fund are foreign individuals or entities.[70]

## C.     Gabriel Fund

90.     Gabriel Fund, originally known as Ariel Capital, L.P., is a U.S. fund formed in or around 1989.[71]  Gabriel Fund is the domestic version of Ariel Fund and basically invests *pari passu* with Ariel Fund.

91.     Mr. Merkin served as the sole General Partner of Gabriel Fund and was ultimately responsible for Gabriel Funds' investment decisions.[72]

---

[70] Ariel Fund Ltd., Prospectus, November 1993, BS00042509, at 2510; Ariel Fund Ltd., Prospectus, February 1996, BS00278044, at 8045; Ariel Fund Ltd., Prospectus, October 2001, (Trustee Exh. 339, BS00038182, at 8184); Ariel Fund Ltd., Prospectus, November 2002, (Autera Dep. Exh. 11, GCC-NYAG0000621), Ariel Fund Ltd., Confidential Offering Memorandum, March 2006, (A Exh. 12, GCC-SEC0000649).

[71] Dkt No. 261, Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 44.

[72] Gabriel Capital L.P. Confidential Offering Memorandum, May 1997, GCC-SEC 0027822 at 829; Gabriel Capital, L.P. Confidential Offering Memorandum, March 2006 (Autera Dep. Exh. 14, GCC-SEC0000874); Gabriel Capital, L.P. Confidential Offering Memorandum, November 2002, (Autera Dep. Exh. 13, GCC-SEC0000847).

92.    Figure 13 shows the structure of Gabriel Fund.

### Figure 13



93.    Gabriel Fund engaged primarily in securities arbitrage and investments in private

debt claims and publicly traded securities of bankrupt and distressed companies.[73]

94.    Risk arbitrage, also called merger arbitrage, refers to an investment strategy that

attempts to profit from the spread between a target company's stock price and an offer price

dependent on a merger offer.  Risk arbitrage presents the risk of significant losses because of

factors that may affect the underlying merger offer, such as the timing of completion of the

merger and the amount of consideration received at completion of the merger. Factors affecting

the underlying merger offer include regulatory issues, financing, exchange rates, interest rates,

---

[73] Gabriel Capital L.P. Confidential Offering Memorandum, May 1997, GCC-SEC 0027822  at 29;
Gabriel Capital, L.P. Confidential Offering Memorandum, March 2006 (Autera Dep. Exh. 14, GCC-
SEC0000874); Gabriel Capital, L.P. Confidential Offering Memorandum, November 2002, (Autera Dep.
Exh.13 GCC-SEC0000847).

commodity prices, and market volatility.[74]   Investment in distressed debt and its risks are set

forth above.

### D.    The Defendant Funds' Investments with BLMIS

95.    Each of the Defendant Funds maintained an account at BLMIS.[75]   Ascot Fund

invested directly with BLMIS from 1992 to 2002.[76]   Ascot Partners invested directly with

BLMIS from 1993-2008.[77]   Ariel Fund invested directly with BLMIS from October 1990

through February 1993 and then again from August 2000 through December 2008.[78]   Gabriel

Fund invested directly with BLMIS from October 1990 through February 1993, and then again

from August 2000 through December 2008.[79]

---

[74] *See* Mark Mitchell and Todd Pulvino, *Characteristics of Risk and Return in Risk Arbitrage*, The Journal of Finance, Vol. LVI, No. 6, (December 2001); *See also Managing Hedge Fund Risk, From The Seat of the Practitioner, Views from Investors, Counterparties, Hedge Funds and Consultants* Ch. 16 (John Paulson, *The "Risk" in Risk Arbitrage*) (Virginia Reynolds Parker ed., 2000).

[75] Four of the BLMIS customer accounts discussed herein include: 1G0321 under the name "Gabriel Capital, L.P."; 1FR070 under the name "Ariel Fund Ltd"; 1A0058 under the name "Ascot Partners, L.P."; and 1FN005 under the name "Ascot Fund Ltd."

[76] Resp. of Defs J. Ezra Merkin and Gabriel Capital Corporation to Plaintiff's Statement of Undisputed Material Facts, and Statement of Additional Facts in Opp'n to Pltf's Mot. for Summ. J. and in Supp. of Defs' Cross-Motion for Summ. J. at 3; *N.Y Att'y Gen. v. J. Ezra Merkin*, No. 450879/2009 (N.Y. Sup. Ct. Apr. 6, 2009) (No. 0195).

[77] Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 55, Dkt. No. 261.

[78] Dkt No. 261, Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 56-57.

[79] Dkt No. 261, Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 60-61.

### E.    GCC

96.    GCC is an investment management company incorporated in December 1988 as Ariel Management Corporation and changed its name to Gabriel Capital Corporation in January 1998.[80]

97.    Mr. Merkin was the sole shareholder for GCC.[81]

### F.    Management and Incentive Fees

98.    Pursuant to Ascot Partners' Offering Memoranda from the fund's inception through 2002, Mr. Merkin was entitled to a management fee equal to 1% (pro-rated for periods of less than a year) of each limited partner's capital account balance at the end of the year, as adjusted to take account of capital contributed or withdrawn during such year.[82]    As of January 1, 2003, Ascot had increased its management fee to 1.5%.[83]

99.    Similarly, Ascot Fund paid a management fee to GCC as its investment adviser. Prior to January 1, 2003, the investment advisory fee was equal to 1% (pro-rated for periods of

---

[80] Dkt No. 261, Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation at ¶ 42; Gabriel Capital Corporation, Seventh Amended and Restated Investment Advisory Agreement – December 2008, BS00278976 at 77; *N.Y. Att'y General v. J. Ezra Merkin et al.*, No. 450879/2009, Response of Defendants J. Ezra Merkin and Gabriel Capital Corporation to Plaintiff's Statement of Undisputed Material Facts, and Statement of Additional Facts in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, Docket No. 0195 (N.Y. Sup. Ct. April 6, 2009) at ¶ 105.

[81] Dkt No. 261, Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation.

[82] Gabriel Capital, L.P., Confidential Offering Memorandum, November 2002, (Autera Dep. Exh. 13, GCC-SEC 0000847 at 863). Gabriel Capital, L.P. Confidential Offering Memorandum, January 2002, BS00062969 at 986.

[83] Ascot Fund, Ltd., Prospectus, January 2003, (Trustee Ex. 336, BS00306058 at 80).

less than a year) of the NAV of each series of "participating shares" on the last day of such year.[84]

100.     Pursuant to Ariel Fund's governing documents, Ariel Fund was to pay GCC, as its investment adviser, a management fee equal to 1% of the beginning NAV attributable to each series of shares, and an incentive fee equal to 20% of the increase, if any, in the NAV per share on the last business day of the year over the first business day of the year.[85]

101.     Likewise, Gabriel Fund's governing documents authorized the payment of a management fee equal to 1% (pro-rated for periods of less than a year) of each limited partner's capital account balance at the beginning of each year plus such partner's contributed capital during such year to Mr. Merkin as its General Partner.[86]

102.     From 1998 through 2008, GCC and Mr. Merkin received management fees from Ascot Partners in the amount of at least $146,184,547.[87]

103.     From 1999 through 2002, Mr. Merkin received or was entitled to receive fees from Ascot Fund in the amount of $23,378,095.[88]  From 1991 through 2007, Mr. Merkin

---

[84] Ascot Fund, Ltd., Prospectus, January 2003, BS00020970 at 982.

[85] Gabriel Capital Corporation, Seventh Amended and Restated Investment Advisory Agreement – December 2008, BS00278976 at 77; *N.Y. Att'y General v. J. Ezra Merkin et al.*, No. 450879/2009, Response of Defendants J. Ezra Merkin and Gabriel Capital Corporation to Plaintiff's Statement of Undisputed Material Facts, and Statement of Additional Facts in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, Docket No. 0195 (N.Y. Sup. Ct. April 6, 2009), p. 3, Exhibits 5 to 17.

[86] Gabriel Capital, L.P. Confidential Offering Memorandum, January 2002, BS00062969 at 986; Trustee Ex. 107 (Gabriel Capital, L.P. Confidential Offering Memorandum, March 2006) (09-01182-GOTR-0000002 at 12).

[87] *See* Collura Report, Section XI, Exs.17 & 17.1.

received or was entitled to receive fees from Ariel Fund in the amount of $240,319,864; and, from 1990 through 2007, Mr. Merkin received or was entitled to receive fees from Gabriel Fund in the amount of $276,649,764.[89]

### G.    Defendant Funds and GCC Books and Records

#### 1.    Inter-Fund Transfers

104.    As set forth in the Collura Report, the records from the QuickBooks financial program produced by Mr. Merkin and GCC ("QuickBooks") and bank records of the Defendant Funds[90] from June 1998 to February 2009 reflect transfers between the Defendant Funds totaling over one billion dollars.[91]

105.    For example, during the year 2006, there were approximately 19 transactions in which at least $193 million was transferred between the Defendant Funds.[92]  During the period between July 1998 and November 2003, there were 48 transfers between Gabriel Fund and Ascot Partners of at least $124 million.[93]

---

[88] *See N.Y. Att'y General v. J. Ezra Merkin et al.*, No. 450879/2009, Response of Defendants J. Ezra Merkin and Gabriel Capital Corporation to Plaintiff's Statement of Undisputed Material Facts, and Statement of Additional Facts in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, Docket No. 0195 (N.Y. Sup. Ct. April 6, 2009) ¶ 91.

[89] *See id.*

[90] The bank accounts discussed herein include: Ascot Partners, L.P., Morgan Stanley xx-x3021; Ariel fund Ltd., Morgan Stanley, xx-x3001; Gabriel Capital, L.P., Morgan Stanley, xx-x3003; Gabriel Capital Corporation, Morgan Stanley, xx-x3007; Gabriel Capital Corporation, JPMorgan Chase xxx-xx2994.

[91] *See* Collura Report, Sec. VIII, Ex. 11.1.

[92] *See id.*

[93] *See id.*

106.    Numerous transfers appeared to be made from one fund's bank account with a positive balance to another fund's bank account with a balance close to zero or even negative.[94] Some of these transfers had the description of "Madoff Reallocation" or some variation.[95]

107.    In many instances, the transfers between the bank accounts of Ascot Partners, Ariel Fund, and Gabriel Fund corresponded with transfers in their respective BLMIS accounts of the funds,[96] and were, most often, used to pay investor redemptions.[97]

108.    For example, on January 4, 2007, Ascot Partners' bank account had approximately $2.3 million and it received additional inflows from investors in the amount of $425,000.00, for a balance of less than $3 million.  On the same day, Ascot Partners had outflows for investor distributions of $33.3 million (including $12.8 million for a distribution to Ascot Fund).  Ascot Partners could not have paid the investor distributions without the inflow of two transfers from the bank accounts of Ariel Fund and Gabriel Fund in the amounts of $18.5 million and $26.5 million, respectively.  To offset these transactions, Ascot Partners transferred $18.5 million and $26.5 million from its BLMIS account to Ariel Fund's and Gabriel Fund's BLMIS accounts, respectively.  The QuickBooks records for Ascot Partners described these

---

[94] *See* Collura Report, Sec. VIII, ¶¶ 63-64, Ex. 11.1.

[95] *See id.* at ¶¶ 63, 67-69.

[96] Four of the BLMIS customer accounts discussed herein include: 1G0321 under the name "Gabriel Capital, L.P."; 1FR070 under the name "Ariel Fund Ltd"; 1A0058 under the name "Ascot Partners, L.P."; and 1FN005 under the name "Ascot Fund Ltd."

[97] *See* Collura Report, Sec. VIII, ¶¶ 63, 67-69.

transfers as "Withdrawal from Madoff(AF)" and "Withdrawal from Madoff(GC)."[98]  Other

examples of corresponding transfers are further set forth in the Collura Report.[99]

109.    By virtue of the transfers, Ariel Fund and Gabriel Fund are effectively paying

redemptions to the investors of Ascot Partners.   These inter-fund transfers are inconsistent with

industry, customs, and practices as they were not authorized by governing documents for Ascot

Partners, Ariel Fund or Gabriel Fund, and resulted in commingling.

110.    As discussed previously, when a fund receives redemptions, it typically submits a

request to withdraw money from the underlying investment—here, the request would have been

to BLMIS.  If the fund has insufficient assets to pay redemptions, it can suspend redemptions,

postpone redemptions, or take out a loan or credit line from a financial institution to pay the

investor redemptions.  In my review of the documents, I found no documentation, other than

book entries, that identified and safeguarded the equity interests of the different investors of the

respective funds of the transfers between Ascot Partners, Ariel Fund, and Gabriel Fund.

111.    Defendant Funds are each independent, unique, and legally distinct investment

vehicles with different strategies, different investors, and different risk exposures.  Whenever a

transfer of fund assets occurs between legally separate entities, the equity interest of the different

investors of the respective funds also shifts, particularly based on which fund has entitlement to

the transfer, when the transfer is paid back and in what amounts, or if it is ever paid back.

Hypothetically, if an investor has an 8% interest in Ariel Fund, then approximately one-quarter

---

[98] *See* Collura Report, Sec. VIII, ¶68, Figures 4 & 5.

[99] *See* Collura Report, Sec. VIII, ¶¶69-73, Figures 6-10.

or 2% of that interest is invested with BLMIS.[100]  Ariel Fund then transfers $18.5 million to Ascot Partners, which is almost 100% invested with BLMIS.  That investor's allocation of 2% with BLMIS now needs to be adjusted to reflect a share of the 100% investment of $18.5 million with BLMIS.  If the transfer is paid back, then the allocation of equity needs to be re-calculated.

112.    This equity shift also shifts the risk exposure of the different investors of the respective funds, regardless of the duration or repayment of the transfer.  For example, transfers of assets from Ariel Fund to Ascot Partners exposed the investors of Ariel Fund to the counterparty risks of Ascot Partners.

113.    As another example, transfers of assets from Gabriel Fund to Ascot Partners exposed the investors of Gabriel Fund to counterparty risks and the risks of market volatility of investments in convertible arbitrage or index arbitrage by Ascot Partners.

114.    Transfers of assets from Ascot Partners to Ariel Fund or Gabriel Fund exposed investors of Ascot Partners and Ascot Fund (as a feeder into Ascot Partners) to duration risk, counterparty risks, bankruptcy regulatory risks, and fraud risks associated with companies underlying the investments in distressed debts by Ariel Fund and Gabriel Fund.

115.    Transfers of assets from Gabriel Fund to Ascot Partners exposed investors of Gabriel Fund to the risk of failure or liquidation of Ascot Partners in the event an investor or investors with high concentrations redeemed their investment and left Ascot Partners with the inability to re-pay the amount transferred from Gabriel Fund.

---

[100] Ariel Fund invested between 10% to 30% of its assets with BLMIS.  Ascot Fund invested substantially all of its assets with BLMIS. *See N.Y. Att'y General v. J. Ezra Merkin et al.*, No. 450879/2009, Response of Defendants J. Ezra Merkin and Gabriel Capital Corporation to Plaintiff's Statement of Undisputed Material Facts, and Statement of Additional Facts in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, Dkt No. 0195 (N.Y. Sup. Ct. April 6, 2009), ¶ 39.

116.    The governing documents of the Defendant Funds contain the fund's authorities, the authorized amount of fees, the permissible strategies of the fund, and the authority of the fund manager/investment adviser.  Investors rely heavily on these documents as they create the legal relationship between the investor and the fund, and set the expectation of the investor from both a risk and reward perspective.[101]

117.    Given these risks, if any of the funds required monies in order to pay expenses or redemptions, the particular fund could have more easily obtained such monies through loans or credit lines from banks or other financial institutions.  By doing so, investors would not have been exposed to the unintended risks of another fund or entity and could have limited exposure to the amount of the loan or extended monies.

118.    For example, on July 6, 2006, Gabriel Fund's bank account transferred $26 million to Ascot Partner's bank account.  On that same day, Ascot Partners paid distributions to investors in the amount of at least $26 million.[102]  On the next day, July 7, 2006, Ascot Partners' BLMIS account transferred $26 million to Gabriel Fund's BLMIS account in a reallocation. However, if the Ponzi scheme at BLMIS had been publicly revealed at the close of business on July 6, 2006, Ascot Partners' BLMIS account would have been frozen and Gabriel Fund would have been exposed to an additional loss of $26 million. This is perhaps the starkest example of counter-party risk and fraud risk.[103]

---

[101] *See Sound Practices for Hedge Fund Managers*, Chapter 1: Disclosure and Investor Protection, Responsibility to Investors at 7-12.

[102] MSMERKIN-00006531-6540.

[103] See Collura Report, Sec. VIII, ¶ 72, Figure 9.

### 2. "Loans"

119. Additionally, the QuickBooks records of Ascot Partners, Ascot Fund, and Ariel Fund reflected a number of "loans." For example:[104]

Ascot Partners

| Type | Date | Num | Name | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| General Journal | 07/05/2002 | | | ASF LOAN - 7/5 | DEPOSITS AT BROKERS | | RECEIVABLE - ASCOT FUND | -1,500,000.00 | -1500000.00 |
| General Journal | 07/05/2002 | | | LOAN - 7/5 | RECEIVABLE - ASCOT FUND | | DEPOSITS AT BROKERS | 1,500,000.00 | 0.00 |

Ascot Fund

| Type | Date | Num | Name | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| General Journal | 07/15/2002 | | | FROM ASP - LOAN 7/5 | DEPOSIT - MISCO PZENA | | -SPLIT- | 1,500,000.00 | 1,500.00000 |
| General Journal | 07/15/2002 | | | LOAN 7/5 | PAYABLE ASCOT PARTNERS | | DEPOSIT - MISCO PZENA | -1,500,000.00 | 000 |

Ariel Fund

| Type | Date | Num | Name | Memo | Account | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| General Journal | 09/00/1999 | | | LOAN TO SB | LOANS RECEIVABLE - SB | | LOANS PAYABLE - GABRIEL | 980730000 | -21250000 |
| General Journal | 10/27/1999 | | | PAYDOWN ABLECO LOAN | DEPOSITMISCO/GS/OTHER | | -SPLIT- | 429966667 | 429966667 |
| General Journal | 10/27/1999 | | | PAYDOWN LOAN - 10/25 | LOANS PAYABLE - GABRIEL | | DEPOSITMISCO/GS/OTHER | 425000000 | -39686667 |
| General Journal | 10/27/1999 | | | ABLECO LOAN INTEREST | SB RELATED EXPENSE | | DEPOSITMISCO/GS/OTHER | 39686667 | 000 |
| General Journal | 10/05/2000 | | | FROM GC - LOAN | DEPOSIT AT MEESPIERSON | | LOANS PAYABLE - GABRIEL | 500000000 | 500000000 |
| General Journal | 10/05/2000 | | | LOAN FROM GC - 10/5/00 | LOANS PAYABLE - GABRIEL | | DEPOSITMISCO/GS/OTHER | -500000000 | 000 |
| General Journal | 12/09/2000 | | | GABRIEL LOAN - 2000 INT | INTEREST EXPENSE | | LOANS PAYABLE - GABRIEL | 128671527 | 128671527 |
| General Journal | 12/09/2000 | | | 2000 INTEREST - GABRIEL LOAN | LOANS PAYABLE - GABRIEL | | INTEREST EXPENSE | -128671527 | 000 |
| General Journal | 02/08/2001 | | | JAN 2001 GC LOAN INTEREST | DEPOSITMISCO/GS/OTHER | | DEPOSITMISCO/GS/OTHER | -13798611 | -13798611 |
| General Journal | 02/08/2001 | | | JAN 2001 GC LOAN INTEREST | INTEREST EXP - GC/ABLECO | | DEPOSITMISCO/GS/OTHER | 40127083 | 26328472 |
| General Journal | 02/08/2001 | | | JAN 2001 GC LOAN INTEREST | LOANS PAYABLE - GABRIEL | | DEPOSITMISCO/GS/OTHER | -26328472 | 000 |
| General Journal | 05/04/2011 | | | INTEREST DUE ON GC LOAN | LOANS PAYABLE - GABRIEL | | INTEREST EXP - GC/ABLECO | -539269976 | 000 |
| General Journal | 05/04/2011 | | | LOAN PAYDOWN | LOANS PAYABLE - GABRIEL | | -SPLIT- | 5279023308 | 5279023308 |
| General Journal | 04/26/2012 | | | LOAN TO DARCHEY NOAM | DEPOSITMISCO/GS/OTHER | | OTHER ASSETS | -1300000000 | -1300000000 |
| General Journal | 04/26/2012 | | | LOAN RECEIVABLE - DARCHEY NOAM | OTHER ASSETS | | DEPOSITMISCO/GS/OTHER | 1300000000 | 000 |
| General Journal | 07/11/2012 | | | LOAN FROM GABRIEL LP | DEPOSITMISCO/GS/OTHER | | -SPLIT- | 300000000 | 300000000 |
| General Journal | 07/11/2012 | | | LOAN - 7/8 | LOANS PAYABLE - GABRIEL | | DEPOSITMISCO/GS/OTHER | -300000000 | 000 |
| General Journal | 07/11/2012 | | | DNF LOAN PAYDOWN - 7/11 | OTHER ASSETS | | DEPOSITMISCO/GS/OTHER | -1300000000 | -700 |
| General Journal | 07/24/2012 | | | INTEREST - DNF LOAN | INTEREST INCOME | | DEPOSITMISCO/GS/OTHER | 7578400 | 7578400 |
| General Journal | 07/24/2012 | | | DARRCHEY NOAM LOAN INT | INTEREST INCOME | | DEPOSITMISCO/GS/OTHER | -7578400 | 000 |
| General Journal | 08/01/2012 | | | REPAY GCLP LOAN | DEPOSITMISCO/GS/OTHER | | -SPLIT- | -300000000 | -3000000000 |
| General Journal | 08/01/2012 | | | GCLP LOAN INTEREST | DEPOSITMISCO/GS/OTHER | | DEPOSITMISCO/GS/OTHER | 4041096 | -3009041096 |
| General Journal | 08/01/2012 | | | REPAY GCLP LOAN | LOANS PAYABLE - GABRIEL | | DEPOSITMISCO/GS/OTHER | 300000000 | -9041096 |
| General Journal | 08/01/2012 | | | INT ON GCLP LOAN | INTEREST EXP - GC/ABLECO | | DEPOSITMISCO/GS/OTHER | 9041096 | 000 |
| General Journal | 12/01/2008 | 1494 | | GALLC temp loan back | DEPOSITMISCO/GS/OTHER | | INVESTMENT - GABRIEL ALT ASSETS | 800000000 | #REF! |
| General Journal | 12/01/2008 | 1494 | | GALLC temp loan back | INVESTMENT - GABRIEL ALT ASSETS | | DEPOSITMISCO/GS/OTHER | -800000000 | #REF! |

120. Other than the QuickBooks entries, I have seen no documentation reflecting the loans. If these transfers were "loans," at a minimum, loan documentation should have existed to identify the parties to the loan, the principle amount, the interest rate, the duration, and any penalties for late payment. Without documentation and safeguards, there is no evidence of the obligation to repay the loan, and the investors of the respective funds are at risk of non-repayment of the transferred amount.

---

[104] See Ascot Partners QuickBooks MWPPDD0000222-334; See also Ascot Fund QuickBooks MWPPDD0000159-221; Ariel Fund QuickBooks MWPPDD0000001-158.

### 3.    Transfers Between the Funds and GCC

121.    The QuickBooks records, bank account records of the Defendant Funds and GCC, and Exhibits 11.1 and 11.2 of the Collura Report further reflected transfers between the Defendant Funds and GCC, including investor subscriptions and "distributions" into GCC and the transfers of those assets between GCC and the respective funds.

122.    Those records and exhibits reflect over 100 transfers (other than fees and operating expenses) between the Defendant Funds and GCC from June 1998 to December 2008 for over $80 million.  These transfers ranged from a few hundred dollars to as much as ten million dollars.  For example, during the year 2000, there are approximately 19 transactions in which at least $24 million was transferred between the Defendant Funds and GCC.[105]

123.    Of those transfers, the QuickBooks entries show the following transfers of investor subscriptions or contributions, "distributions," or reimbursements for investor subscriptions/contributions or distributions:[106]

| TxnID | TxnDate | Amount | QuickBooks Account | Memo | Fund / Entity |
|---|---|---|---|---|---|
| EF6-1105570039 | 1/12/2005 | (13,000) | DEPOSITS AT BROKERS | 1/1/05 TO SOLOVEITCHIK | Ascot_pa |
| A1B8-1105553201 | 1/10/2005 | 13,000 | DEPOSIT AT MORGAN STANLEY | JEM FROM SOLOVEITCHIK - VIA ASP - CERBERUS ASIA | Arielmgt |
| EF6-1105570039 | 1/12/2005 | (180,000) | DEPOSITS AT BROKERS | 1/1/05 TO FROMME IRA | Ascot_pa |
| A1B8-1105553201 | 1/10/2005 | 180,000 | CHASE MANHATTAN - NEW | FROM ASP - FROMME REIMBURSE | Arielmgt |

---

[105] *See* Collura Report, Sec. VIII, Ex. 11.2.

[106] *See id.*

| TxnID | TxnDate | Amount | QuickBooks Account | Memo | Fund / Entity |
|---|---|---|---|---|---|
| B0AE-1135882714 | 12/29/2005 | (32,000) | DEPOSIT AT MORGAN STANLEY | 1/1/06 Subscriptions - ASP (Trusts) | Arielmgt |
| 1188-1135951797 | 12/29/2005 | 32,000 | DEPOSITS AT BROKERS | 1/1/06 Cont - JEM/LKM Trusts | Ascot_pa |
| 1882-1136988265 | 1/10/2006 | (859,497) | DEPOSIT MSCO/GS/OTHER | 1/1/06 Dist - Stackman | Gabriel_ |
| B0F0-1136990060 | 1/10/2006 | 859,497 | DEPOSIT AT MORGAN STANLEY | From GC for 1/1/06 Dist | Arielmgt |
| 124D-1136990380 | 1/10/2006 | (3,001,871) | DEPOSITS AT BROKERS | Reimburse GCC for 1/1 Dist | Ascot_pa |
| B0F0-1136990060 | 1/10/2006 | 3,001,871 | DEPOSIT AT MORGAN STANLEY | From ASP for 1/1/06 Dist | Arielmgt |
| B17E-1137680487 | 1/18/2006 | (61,343) | DEPOSIT AT MORGAN STANLEY | Cerb Asia II to Soloveitchik - ASP Cont | Arielmgt |
| 125F-1137680543 | 1/18/2006 | 61,343 | DEPOSITS AT BROKERS | 1/1/06 Cont - Soloveitchik | Ascot_pa |
| 19A0-1144763003 | 4/10/2006 | 750,000 | DEPOSIT MSCO/GS/OTHER | 4/1 Cont - J. Harris | Gabriel_ |
| 19A0-1144763003 | 4/10/2006 | 750,000 | DEPOSIT MSCO/GS/OTHER | 4/1 Cont - K. Harris | Gabriel_ |
| 1A0F-1148999377 | 5/30/2006 | (115,167) | DEPOSIT MSCO/GS/OTHER | Final Payout - Stackman (to gcc) | Gabriel_ |
| B74C-1149084332 | 5/30/2006 | 115,167 | DEPOSIT AT MORGAN STANLEY | Stackman reimburse from GC | Arielmgt |
| 1562-1168353904 | 1/8/2007 | (35,000) | DEPOSITS AT BROKERS | 1/1 Dist - Haar | Ascot_pa |
| C136-1168353513 | 1/8/2007 | 35,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 1/1 distributions | Arielmgt |
| 1562-1168353904 | 1/8/2007 | (25,000) | DEPOSITS AT BROKERS | 1/1 Dist - Seliger | Ascot_pa |
| C136-1168353513 | 1/8/2007 | 25,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 1/1 distributions | Arielmgt |
| 1562-1168353904 | 1/8/2007 | (100,000) | DEPOSITS AT BROKERS | 1/1 Dist - Wegier | Ascot_pa |
| C136-1168353513 | 1/8/2007 | 100,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 1/1 distributions | Arielmgt |
| 1562-1168353904 | 1/8/2007 | (210,000) | DEPOSITS AT BROKERS | 1/1 Dist - Fromme | Ascot_pa |
| C136-1168353513 | 1/8/2007 | 210,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 1/1 distributions | Arielmgt |

| TxnID | TxnDate | Amount | QuickBooks Account | Memo | Fund / Entity |
|-------|---------|--------|--------------------|------|---------------|
| 172E-1184081251 | 7/9/2007 | (4,000) | DEPOSITS AT BROKERS | 7/1 Dist - KS Family | Ascot_pa |
| C936-1184081023 | 7/9/2007 | 4,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 7/1 Dist check | Arielmgt |
| 172E-1184081251 | 7/9/2007 | (6,000) | DEPOSITS AT BROKERS | 7/1 Dist - Goldenson IRA | Ascot_pa |
| C936-1184081023 | 7/9/2007 | 6,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 7/1 Dist check | Arielmgt |
| 172E-1184081251 | 7/9/2007 | (20,000) | DEPOSITS AT BROKERS | 7/1 Dist - Haar | Ascot_pa |
| C936-1184081023 | 7/9/2007 | 20,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 7/1 Dist check | Arielmgt |
| 172E-1184081251 | 7/9/2007 | (82,230) | DEPOSITS AT BROKERS | 7/1 Dist - Horowitz | Ascot_pa |
| C936-1184081023 | 7/9/2007 | 82,230 | DEPOSIT AT MORGAN STANLEY | From ASP for 7/1 Dist check | Arielmgt |
| 172E-1184081251 | 7/9/2007 | (100,000) | DEPOSITS AT BROKERS | 7/1 Dist - Wegier | Ascot_pa |
| C936-1184081023 | 7/9/2007 | 100,000 | DEPOSIT AT MORGAN STANLEY | From ASP for 7/1 Dist check | Arielmgt |
| 17D9-1193406925 | 10/25/2007 | (6,000) | DEPOSITS AT BROKERS | 10/1 Dist - Goldenson | Ascot_pa |
| CE6B-1193406575 | 10/25/2007 | 6,000 | DEPOSIT AT MORGAN STANLEY | From ASP for Goldenson dist | Arielmgt |
| 1859-1199460999 | 1/3/2008 | (50,000) | DEPOSITS AT BROKERS | 1/1 Dist - Haar | Ascot_pa |
| D18D-1199460311 | 1/3/2008 | 50,000 | DEPOSIT AT MORGAN STANLEY | ASP reimburse for 1/1 Dist | Arielmgt |
| 1859-1199460999 | 1/3/2008 | (100,000) | DEPOSITS AT BROKERS | 1/1 Dist - Weiger | Ascot_pa |
| D18D-1199460311 | 1/3/2008 | 100,000 | DEPOSIT AT MORGAN STANLEY | ASP reimburse for 1/1 Dist | Arielmgt |
| 1859-1199460999 | 1/3/2008 | (150,000) | DEPOSITS AT BROKERS | 1/1 Dist - Gordian Ltd | Ascot_pa |
| D18D-1199460311 | 1/3/2008 | 150,000 | DEPOSIT AT MORGAN STANLEY | ASP reimburse for 1/1 Dist | Arielmgt |
| 2250-1207837299 | 4/9/2008 | (50,000) | DEPOSIT MSCO/GS/OTHER | 4/1 Dist - P. Ross | Gabriel_ |

| TxnID | TxnDate | Amount | QuickBooks Account | Memo | Fund / Entity |
|---|---|---|---|---|---|
| D5A3-1207838071 | 4/9/2008 | 50,000 | DEPOSIT AT MORGAN STANLEY | GC reimburse for 4/1 dist | Arielmgt |
| 19C1-1207838165 | 4/9/2008 | (100,000) | DEPOSITS AT BROKERS | 4/1 Dist - Rosner | Ascot_pa |
| D5A3-1207838071 | 4/9/2008 | 100,000 | DEPOSIT AT MORGAN STANLEY | ASP reimburse for 4/1 dist | Arielmgt |
| 19C1-1207838165 | 4/9/2008 | (18,000) | DEPOSITS AT BROKERS | 4/1 Dist - Horowitz | Ascot_pa |
| D5A3-1207838071 | 4/9/2008 | 18,000 | DEPOSIT AT MORGAN STANLEY | ASP reimburse for 4/1 dist | Arielmgt |
| 1A80-1215698538 | 7/9/2008 | (100,000) | DEPOSITS AT BROKERS | 7/1 Dist - Wegier | Ascot_pa |
| D98A-1215698456 | 7/9/2008 | 100,000 | DEPOSIT AT MORGAN STANLEY | From ASP - Wegier dist | Arielmgt |
| 1B34-1223568398 | 10/8/2008 | (20,730) | DEPOSITS AT BROKERS | 10/1 Dist - Horowitz | Ascot_pa |
| DCF8-1223568328 | 10/8/2008 | 20,730 | DEPOSIT AT MORGAN STANLEY | From ASP for Horowitz 10/1 Dist | Arielmgt |

124.    GCC was not authorized to receive investor subscriptions in accordance with the

funds' subscription documents.  As set forth in the subscription agreements of each of the funds,

subscriptions were to be wired directly to the bank account held in the name of the fund in which

the investor intended to invest.[107]  The title to those assets belonged to the respective fund—

Ascot Partners, Ascot Fund, Ariel Fund or Gabriel Fund—not GCC.  Likewise, the title of assets

---

[107] *See* Ascot Partners, L.P., Subscription Agreement, 2005, GCC-SEC 0022095 at 129; *See also* Ascot Partners, L.P., Subscription Agreement, 2006, (Gottlieb Dep. Exh. 1, GCC-P 0434370)Ascot Partners, L.P., Subscription Agreement, 2007, GCC-SEC 0024988 at 111; Ascot Partners, L.P., Subscription Agreement, 2008, NYGSAA0162711 at 734; Ariel Fund Limited, Subscription Agreement, BS00051802 at 812; Gabriel Capital, L.P., Subscription Agreement, BS00096642 at 665; Ascot Fund Limited, Subscription Documents, BS00025309 at 330; Ascot Fund, Ltd., Subscription Documents, GCC-NYAG 0160237 at 259; Ascot Fund Ltd., Subscription Agreement, 2007, GCC-NYAG 0147207 at 229; Ascot Fund Ltd., Subscription Documents, 2006, Ascot Fund Ltd., Subscription Documents, 2006, GCC-NYAG 0128894 at 917; Dep. of Michael Autera as 30(b)(6) Representative, 29:23-30:7 (Oct. 23, 2014).

intended for distribution belonged to the investor once it left the bank account of the respective fund—not GCC.

125.    Aside from legal title of assets being the primary reason for segregation of investor funds, the receipt of investor subscriptions and assets in GCC creates exposure to different risks which impact each investor.  Transferring investor assets into the accounts of the management company, even for a moment, places the investor at risk that GCC collapses, its bank accounts are seized, or is otherwise unable to transfer the subscriptions to the funds or the distributions to the investor.

126.    For the same reasons, assets of the Defendant Funds which were transferred to and from GCC were further exposed to additional risks from Mr. Merkin's personal assets, maintained in GCC's bank account.  For example, the records reflect transfers totaling at least $277 million for the benefit of Mr. Merkin from GCC during the period between December 2003 and February 2009.[108]  For that same period, GCC transferred to Mr. Merkin at least $26 million.[109]  The Defendant Funds' investors risk a withdrawal by Mr. Merkin from GCC, which could render GCC unable to repay the transfers to the Defendant Funds.

127.    Other than book entries in QuickBooks files of the Defendant Funds and GCC, I have not seen any documentation of any of the foregoing transfers.[110]  Particularly, there was no documentation of the terms governing the transfer of assets, repayment of the transfer, resolution

---

[108] *See* Collura Report, Sec. X, ¶¶ 112-118, Exs.16.2, 16.4.

[109] *See id.* ¶¶ 112-118, Exs. 16.1, 16.3.

[110] Some of the transfers reflected in the bank account records were not reflected in the QuickBooks records. *See* Collura Report, Ex. 11.1 & 11.2.

of the transfer, payment of interest on the transfer, or terms setting forth safeguards against the exposures of risks of one fund and its investors to the other fund and its investors.

128.    The inclusion of a provision in the governing documents that granted GCC and/or Mr. Merkin the discretion to delegate assets to different money managers or to employ other investments strategies did not permit the transfer of assets between the Defendant Funds.  The transfer of investor subscriptions and assets between GCC and the respective funds was not permitted under the governing documents.  The commingling of fund assets or investor subscriptions with Mr. Merkin's personal assets was not permitted.

129.    Nor does the discretion permit or excuse Mr. Merkin, GCC, or the respective Defendant Funds from failing to disclose the fact of the transfers to the investors of the funds. The transfers exposed the investors to strategies and risks to which they did not intend, and raised a conflict as to the interests of one fund over another.  Consistent with industry standards, customs, and practices, the transfers were material and should have been disclosed to investors.

VII.    <u>Conclusion</u>

The transfers of assets by and between the Defendant Funds and GCC were a misuse of fund assets that was inconsistent with the intended investments and contrary to the authorization provided in the governing documents of the respective funds.  The transfers resulted in commingling of assets and, specifically, the lack of segregation of investor subscriptions and assets.  Other than book entries, there was no documentation of the transfers, particularly documents to safeguard the interests of the investors of the respective funds.  These transfers, the failure to properly document them, and the failure to disclose them are inconsistent with industry standards, customs and practices.

All opinions set forth in this report are based upon my experience in the hedge fund, fund-of-funds, and alternative investment industry, and in particular, my comprehensive knowledge of the investor operational and investment due diligence process for hedge funds, operational structure and processes of hedge funds and fund-of-funds, as well as overall knowledge of industry regulations, standards, customs, and practices.  All of the opinions in this report are statements that are based upon a reasonable degree of professional certainty.

March 20, 2015

Amy B. Hirsch

# APPENDIX 1

**APPENDIX 1**

---

### Amy Hirsch
*Assumptions and Limiting Conditions*

---

1. The conclusions arrived at herein are valid only for the stated purpose of this report.

2. Public information and industry and statistical information have been obtained from sources I believe to be reliable. However, I make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information. All information obtained from databases is deemed to be complete and accurate unless otherwise noted.  All performance numbers are estimates until final audit.

3. Financial statements, portfolio information, track records, marketing material, and other related information in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the portfolio, fund, or program's financial performance and/or operating results and/or AUM, etc., for the respective period, except as specifically noted herein.

4. This report is for the exclusive use in the referenced matter for the sole and specific purposes noted herein. It may not be used for any other purpose or by any other party for any purpose. Furthermore the report is not intended by the author or should not be construed by the reader to be investment advice in any manner whatsoever.

5. Neither all nor any part of the contents of this report should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without our prior written consent and approval.

6. No change of any item in this report shall be made by anyone other than me, and I shall have no responsibility for any such unauthorized change.

7. My compensation is fee-based and is not contingent on the outcome of the litigation.

8. I have no obligation to update the report or the opinion for information that comes to our attention after the date of the report. However, I reserve the right to amend or supplement this report should documents or information come to my attention which would have a material impact on our analysis and/or conclusions.

9. I am not and attorney or legal expert. Nothing contained in this report shall be construed to constitute legal advice or legal opinion.

# APPENDIX 2

| **Amy Hirsch** |
| :--- |
| *Thirty-four years of experience in Alternative Investments* |

## Professional Experience

### *Vice President, Merrill Lynch & Co.* **(1980-1992)** and *Assistant Vice President, Manager, Analyst, Merrill Lynch Futures Investment Partners (1980-1985)*

- In 1980, I began my Wall Street career in Branch Office Operations of Merrill Lynch Futures. I was trained in all areas of fund operations and respective industry regulations, standards, customs and practices, including, but not limited to, opening of new accounts (*e.g.,* opening documentation, coordination with legal review, verification of client information), bookkeeping and record keeping requirements, margin accounts and trading, clearing of trades, reconciliation of trades and analysis of investment portfolios.

- I worked for Merrill Lynch Futures and Merrill Lynch Futures Investment Partners until 1992 and held senior level positions where my responsibilities included the management of the futures margin department, global branch support, compliance, and manager of trading services for the Commodity Pool Operator.

- As both an analyst and then Manager of Branch Support, I was responsible for the back office operational audits of the Merrill Lynch Futures branch offices, as well as targeted operational and compliance audits of branch offices engaging in large volumes of futures trading. These reviews included bookkeeping, opening of new accounts (including documentation and compliance review), order entry, administration, and clearing/reconciliation of trades.

- As Vice President and Manager of Trading Services at Merrill Lynch, I was charged with the set-up and oversight of the trading desk responsible for all CTAs, transactional business from the inception of the account opening to trade execution. I was involved with the structuring of the funds as well as selection of investment managers. I interacted with some of the largest hedge funds and CTAs in the world (circa 1986-1992), including Moore Capital Management, Caxton Associates, Tudor Investments, John Henry & Co, Millburn Ridgefield Corporation, Sunrise Capital Partners, as well as numerous smaller managers.

- During my tenure at Merrill Lynch (1985), I was also responsible for the operational set-up of Merrill Lynch Futures, Japan. This included, but was not limited to, training of account executives in matters of operation and compliance, training of sales assistants in opening new accounts/legal documentation, coordinating with General Counsel and Compliance, executing and clearing of trades, implementing management standards and procedures, as well as compliance and general best practices in fund operations and infrastructure.

### *Senior Vice President, Smith Barney, Harris Upham (1992-1993)*

- In 1992-1993, I served as Senior Vice President in charge of Managed Futures for Smith Barney, Harris Upham. I structured a fund which was managed by Millburn Ridgefield Corporation, and was responsible for the CTA Trading Group.

### *Chief Operating Officer, Link Strategic Investors (1993-1995)*

- In 1993-1994, I served as Chief Operating Officer for Link Strategic Investors, a fund-of-funds and hedge fund consultancy. While at Link, I was one of four partners who created Paradigm LDC (1994-1996), a hedge fund and managed futures consultancy. I was the partner responsible for general and operational due diligence, and was a co-portfolio manager. In this capacity, I conducted general and operational due diligence on numerous hedge funds, including Tiger Asset Management Corp. (the

"Jaguar Fund"), Argonaut Capital Management, Zelus Capital Management, Soros Fund Management LLC, Moore Capital Management, LP, and Omega Capital, to name a few.

***Founding Partner, Manager of Due Diligence, Paradigm, LDC (1994-1996) and***

***CEO, CIO, Paradigm Consulting Services, LLC.( 1996-Present)***

- Since 1996, I have been the sole owner, CEO, and CIO of Paradigm Consulting Services. I have conducted extensive investment and operational due diligence on almost every type of hedge fund manager from emerging managers to the largest hedge fund managers such as Kingdon Capital Management LLC, Glenview Capital Management, Paulson & Co., Eton Park Capital Management, Citadel Investment Group, Davidson Kempner Partners, Avenue Capital Group, The Clinton Group, and Amaranth Advisors LLC. Paradigm's work was conducted on behalf of institutional quality investors and included asset allocation, due diligence, and on-going monitoring.

- In 1999, I was responsible for creating a managed futures portfolio in excess of $100 million for a large North American pension plan.

- Between 2000 and 2006, as CIO of Paradigm Consulting Services, LLC, I was responsible for managing a $1 billion dollar fund-of-funds portfolio on behalf of a large North American pension plan in which I allocated assets to over 45 hedge fund managers. During the course of managing this portfolio, I conducted and oversaw both general and operational due diligence.

## Committees and Boards

### *Independent Member, RD Legal Funding Offshore Fund, Ltd.*

- I am currently an independent member of the Investment Committee for RD Legal Funding Offshore Fund, Ltd., an offshore hedge fund. I am responsible for approving the investments which will be placed in the fund. This includes a review of all operational and investment work conducted on the investment, a review of the obligor rating, and ensuring that the transaction meets the requirements as stated in the Offering Memorandum of the Fund.

### *Chair, Board of Directors, Storm Mountain Development Corp.*

- I am currently Chair of the Board of Directors of Storm Mountain Development Corporation, a real estate development work-out company located in Vancouver, Canada. In 2011, at the request of an institutional client in Europe, I conducted an operational and general review of a mortgage investment company in Alberta to identify certain portfolio positions, to create a real estate development company to limit the impaired or "distressed" portfolio positions, and to monetize the investments in an effort to add value to the portfolio positions.

## Education

- Fordham University, B.S., Economics *(cum laude)*
- New York Institute of Finance (Circa 1980's short courses)
    - Brokerage Operations
    - Bookkeeping and Accounting
    - Foreign Exchange

**APPENDIX 2**

## Case Experience

I have been retained as an expert witness in the following matters:

- *Katarina Markovic vs. Progressive Select Insurance Company*, No. CACE08057301 (Fla. 17th Cir. November 20, 2008)

- *Nuwave Investment Corp., Troy Buckner and John S. Ryan, Plaintiffs vs. Hyman Beck & Company, Alexander Hyman, Richard A. Defalco, First Advantage (f/k/a Backtrack Reports, Inc.)*, No.: MRS-L-041-06 (Superior Court of New Jersey, 2006)

- *The Hammerman and Fisch Foundation by Stephen L. Hammerman, Trustee and Kenridge, LLC vs. J. Ezra Merkin*, Arb. No.: 13 512 Y 0252411

## Publications

### *HFM: Hedge Fund Weekly*

- I have been a contributing writer to HFM: Hedge Fund Weekly, an industry publication.

### *Author, "Risk Obsession", Risk Budgeting (2000)*

- Author of "Risk Obsession," a chapter in Risk Budgeting.

## Speaking Engagements

- I am a frequent speaker at hedge fund and investment conferences, often speaking on hedge fund due diligence, hedge fund management and operations, compliance, marketing, reconciliation and accounting, and ethics.  (See attached for specific engagements.)

**APPENDIX 2**

| Amy Hirsch | | | |
| --- | --- | --- | --- |
| *Speaking Engagements* | | | |
| **PROGRAM TITLE** | **LOCATION** | **DATE** | **TOPICS COVERED** |
| Opal Endowment and Foundation Conference | Boston | November 2014 | Manager Selection: Tracking Your Investments—What and How Should You Monitor |
| 16th Annual Endowment Foundation Forum | Boston | November 18, 2014 | Manager Selection; Tracking Your Investments—What and How Should You Monitor |
| 15th Annual US Real Estate Opportunity & Private Fund Investing Forum | NYC | June 12, 2014 | Track Record, Performance, Risk Management |
| 14th Annual US Real Estate Opportunity & Private Fund Investing Forum | NYC | May 29, 2013 | Evaluating Managers |
| Real Estate Opportunity Fund Investing | NYC | June 1, 2011 | Measuring Fund Performance |
| 7th Strategic Investments Sector Meeting | Chicago | May 16, 2011 | What does good Due Diligence actually look like? |
| Real Estate Investing | NYC | April 19, 2011 | Surviving a first time fund |
| Connex | Dallas | December 6, 2010 | Due Diligence Boot Camp: Operations and Investment practices |
| Endowment Foundation | Boston | November 1, 2010 | Panel—Investing in Alternatives |
| Opal Financial | Rhode Island | July 21, 2010 | What is the role of risk management? |
| Opal Financial | NYC | March 1, 2010 | What lessons have investors learned in the last 12 months and what do investors expect from managers and their consultants going forward? |
| Endowment Foundation | NYC | October 25, 2009 | HF 2008—what happened, Madoff, etc.? |
| HFM | Toronto | April 8, 2009 | Due North DD: Can Canadian Investors learn from DD Practices Abroad, or Visa-Versa? |

APPENDIX 2

| Amy Hirsch | | | |
|---|---|---|---|
| *Speaking Engagements* | | | |
| Consultants in Alternatives—Best practices in Manager Selection | NYC | September 26, 2008 | Best practices in manager selection |
| Public Funds East Panel | NYC | July 9, 2008 | Panel-Manager/ Investor Questions |
| HFM Live | Montreal | June 10, 2008 | Capital Raising—why is it so difficult for HF to attract and retain capital? |
| Alternative Investment Roundup | Arizona | January 27, 2008 | Chairman—Blue Ribbon HF Track |
| HF World Bahamas 2007 | Bahamas | November 14, 2007 | Family Offices and private banks respond to the institutionalization of the hedge fund |
| Canadian Alternative Investment Forum 2007 | Canada | June 7, 2007 | Due North Due Diligence: Can Canadian Investors learn from DD Practices Abroad, or Visa-Versa? |
| Hedge Fund Replication | Boston | June 4, 2007 | Replicating Hedge Fund Performance (Debate vs. Dr. Harry Kat) |
| HF World Asian Managers Forum | Singapore | May 24, 2007 | Conference Chair - Overview of Global HF Market |
| Pension Bridge | San Francisco | February 28, 2007 | HF Panel |
| The Annual Hedge Fund Business Operations Forum | NYC | December 13-14, 2006 | HF blow ups, what you can learn from mistakes of others |
| HF DD Conference | NYC | November 14, 2006 | Strategy Comparisons |
| Mar Hedge SF | San Francisco | May 6, 2006 | What Institutional Investors want |
| Stars and Stripes | Key West | April 1, 2006 | Operational Due Diligence |
| Real Return Summit: Hedging Against Inflation While Boosting Returns | Arizona | November 8, 2005 | Commodities: The True Risks & Drivers in Commodity Investments |

**APPENDIX 2**

| Amy Hirsch<br>*Speaking Engagements* | | | |
|---|---|---|---|
| Hedge 2005 UK'S Premier HF Event | London | October 11, 2005 | Practical tips for Due Diligence (risk culture vs. risk management, transparency, can fraud be detected through due diligence?) |
| Hedge Fund World – Asia 2005 | Hong Kong | September 28, 2005 | Conference Chair - Hedge Funds: The Good, the Bad and the Ugly |
| GAIM NY Consultants Roundtable | | June 21, 2005 | Regulatory Standards for Fiduciary Responsibility; how to structure a hedge fund |
| Alpha Bets | California | June 13, 2005 | CTA's, Why Bother? Analyzing the role of managed futures in your portfolio |
| HF SYMPOSIUM | Florida | April 26, 2005 | Conference Chair- Where's the HF Industry Going? |
| HF World Australia | Sydney, Australia | March 15, 2005 | Capacity—How is the industry coping with the billions pouring in around the world? |
| 3rd Annual FofF Forum | NYC | October 27, 2004 | Topic Covered: Due Diligence—Elements of a strong Due Diligence program |
| Profit and Loss | NYC | July 22, 2004 | Recognizing Risk |
| The 11th Annual HF Forum | NYC | June 22, 2014 | Monitoring Manager Risk and Performance |
| Infovest | NYC | April 1, 2004 | Hedge Funds |
| MFA Panel | Chicago | February 5, 2004 | Business Risk Assessment |
| Managed Funds Association 2001 | NYC | July 12, 2001 | Marketing HF's to Institutional Investors |
| Absolute Return Strategies Summit | Bermuda | April 12, 1999 | CTA's, Are They Worth the Fees? |
| Alternative Asset Class | NYC | February 23, 1999 | Analyzing and Truly Understanding Risks in Differing Strategies |

**APPENDIX 2**

| Amy Hirsch | | | |
| --- | --- | --- | --- |
| *Speaking Engagements* | | | |
| Alternative Investing Summit | California | November 16, 1998 | State of the Union Address: Managed Futures and HF |

# APPENDIX 3

**APPENDIX 3**

| | **Amy Hirsch**<br>*Documents Considered List* |
|---|---|
| | **Books & Articles** |
| 1 | *AIMR, AIMR Performance Presentation Standards Handbook, 1997* (2d ed. 1996) |
| 2 | Bensman, Miriam, Hedge Funds Discover Investor Relations, December 1995 |
| 3 | Black, Keith H., *Managing a Hedge Fund: A Complete Guide to Trading, Business Strategies, Risk Management, and Regulations* (New York, New York: McGraw-Hill, 2004) |
| 4 | Capital Mkts. Co. Ltd.,  Understanding and Mitigating Operational Risk in Hedge Fund Investments (March 2003) |
| 5 | Dorsey, Alan H., *Active Alpha: A Portfolio Approach to Selecting and Managing Alternative Investments* (Hoboken, New Jersey: John Wiley & Sons 2007) |
| 6 | *Frequent Compliance Issues Under the SEC's Custody Rule under the Investment Advisers Act*, Edwin C. Laurenson, Practical Comliance & Risk Management for the Securities Industry, September-October 2013 |
| 7 | *Guide to Sound Practices for Hedge Fund Administrators*, Alternate Investment Management Association, September 2004 |
| 8 | Horwitz, Richard, *Hedge Fund Risk Fundamentals: Solving the Risk Management and Transparency Challenge* (Princeton, New Jersey: Risk Fundamentals, LLC., Bloomberg Press, 2004) |
| 9 | Hudson, Matthew, *Funds: Private Equity, Hedge and All Core Structures* (United Kingdom: John Wiley & Sons Ltd., 2014) |
| 10 | Ineichen, Alexander M., *Absolute Returns: The Risk and Opportunities of Hedge Fund Investing* (Hoboken, New Jersey: John Wiley & Sons, 2007) |
| 11 | Jaffer, Sohail, Editor, *Alternative Investment Strategies*  (London, United Kingdom: Euromoney Publications PLC., 1998) |
| 12 | Jaffer, Sohail, Editor, *Fund of Hedge Funds: For Professional Investors and Managers*, (London, United Kingdom: Euromoney Institutional Investor  PLC., 2003) |
| 13 | Lake, Ronald, Editor, *Evaluating and Implementing Hedge Fund Strategies: The Experience of Managers and Investors* (London, United Kingdom: Euromoney Publications PLC., 1999) |
| 14 | Licata, Alicia, *Calculating and Reporting Performance – the Self-Regulatory Approach,* The Alternative Investment Management Association Limited Journal, June 2004 |
| 15 | Lo, Andrew W., *Hedge Funds: An Analytical Perspective* (Princeton, New Jersey and Oxfordshire, United Kingdom: Princeton University Press, 2008) |
| 16 | Mitchell, Mark & Todd Pulvino, *Characteristics of Risk and Return in Risk Arbitrage*, LVI J. FIN. no. 6, 2135 (2001), available at http://www.people.hbs.edu/estafford/papers/jf_riskarb.pdf |
| 17 | Shain, Randy, Hedge Fund Due Diligence. Professional Tools to Investigate Hedge Fund Managers (Hoboken, New Jersey: John Wiley & Sons, 2008) |
| 18 | *Significant Deficiencies Involving Adviser Custody and Safety of Client Assests*, National Exam Program Risk Alert, Volume III, Issue 1, March 4, 2013 |

APPENDIX 3

| 19 | *Standardization of Securities Regulation: Rehypothecation and Securities Commingling in the United States and the United Kingdom,* Standardization of Securities Regulation, Boston University School of Law, Volume 29: Fall 2009-Spring 2010 available at http://www.bu.edu/rbfl/files/2013/09/Deryugina.pdf (last accessed March 17, 2015) |
|---|---|
| 20 | Standards of Practice Handbook, CFA INSTITUTE (11th ed. 2014), p. 85-86, first published in 1982. http://www.cfapubs.org/doi/pdf/10.2469/ccb.v2014.n4.1 (last accessed March 17, 2015) |
| 21 | Swenson, David F., Pioneering Portfolio Management: An Unconventional Approach to Institutional Investment (New York, New York: Simon & Schuster, The Free Press Division, 2000) |
| 22 | Weiss, David M., *After The Trade is Made: Processing Securities Transactions,* (Paramus, New Jersey: New York Institute of Finance, 1993, 1986) |
| | **Cases** |
| 23 | *CFTC v. Bayou Management, LLC, et al.*, No. 05-Civ-8374 (S.D.N.Y. Sept. 29, 2005) |
| 24 | *CFTC v. MF Global Inc., et al.*, No. 13 CIV 4463 (S.D.N.Y. June 27, 2013) |
| 25 | *New York Attorney General v. J. Ezra Merkin et al.*, No. 450879/2009 (N.Y. Sup. Ct. April 6, 2009) |
| 26 | *SEC v. Beacon Hill Asset Mgmt., L.L.C.*, No. Civ. A. 02-8855 (S.D.N.Y. Oct. 28, 2004) |
| 27 | *SEC v. Manhattan Investment Fund Ltd., et al.* (Civ. A. No. 00-0333) (S.D.N.Y. January 18, 1999) |
| | **Online Resources** |
| 28 | CFA Institute, Asset Manager Code of Professional Conduct, HAWKAMAH (2005), http://hawkamah.org/wp-content/uploads/2014/02/CFAInstituteAssetManagerCode.pdf (last accessed March 19, 2015) |
| 29 | Hedge Fund Strategy - Convertible Arbitrage, BARCLAYHEDGE (2015), http://www.barclayhedge.com/research/educational-articles/hedge-fund-strategy-definition/hedge-fund-strategy-convertible-arbitrage.html (last accessed March 19, 2015) |
| 30 | Hedge Fund Strategy - Convertible Arbitrage, BARCLAYHEDGE (2015), http://www.barclayhedge.com/research/educational-articles/hedge-fund-strategy-definition/hedge-fund-strategy-convertible-arbitrage.html (last accessed on March 19, 2015) |
| 31 | GIPS:Global Investment Performance Standards, CFA Institute (last accessed March 16, 2015) |
| 32 | AIMR Performance Presentation Standards (AIMR-PPS), CFA INSTITUTE (2001), http://www.cfainstitute.org/ethics/Documents/Codes%20Documents/redraft_aimrpps.pdf (last accessed March 19, 2015) |
| 33 | From Practice to Profession: A History of the Financial Analysts Federation and the Investment Profession, CFA INSTITUTE (1997), http://www.cfainstitute.org/Timeline%20Documents/aimr_history_brochure.pdf. (last accessed March 19, 2015) |
| 34 | Asset Manager Code of Professional Conduct, CFA Institute (2d. ed. 2010) http://www.cfapubs.org/doi/pdf/10.2469/ccb.v2009.n8.1 (last accessed March 19, 2015) |
| 35 | CFA INSTITUTE, STANDARDS OF PRACTICE HANDBOOK (11th ed. 2014)(first published in 1982) available at http://www.cfapubs.org/doi/pdf/10.2469/ccb.v2014.n4.1 (last accessed March 17, 2015) |

| | |
|---|---|
| 36 | CFA Institute, Asset Manager Code of Professional Conduct, Exposure Draft, EUROPEAN CORPORATE GOVERNANCE INSTITUTE (Nov. 2004), available at http://www.ecgi.org/codes/documents/asset_manager_code.pdf  (last accessed on March 17, 2015) |
| 37 | White-Collar Crime, Corporate Fraud, FEDERAL BUREAU OF INVESTIGATION, http://www.fbi.gov/about-us/investigate/white_collar/corporate-fraud (last accessed March 17, 2015) |
| 38 | Supervisory Policy and Guidance Topics, Market Risk Management, FEDERAL RESERVE, http://www.federalreserve.gov/bankinforeg/topics/market_risk_mgmt.htm (last accessed March 17, 2015) |
| 39 | James R. Hedges, Charlotte Luer, & Patricia C. O'Prey, Navigating the Regulation of Hedge Fund Marketing, MANAGED FUNDS ASS'N REP., Mar.-Apr. 2008 available at http://www.ljhfm.com/documents/NavigatingtheRegulationofHFMktg_LJHFM_MarApr08_001.pdf (last accessed Mar. 18, 2015) |
| 40 | Index Arbitrage Definition, NASDAQ (2011), http://www.nasdaq.com/investing/glossary/i/index-arbitrage (last accessed March 17, 2015) |
| 41 | Marketable Securities Definition, NASDAQ (2011), http://www.nasdaq.com/investing/glossary/m/marketable-security (last accessed Mar. 18, 2015) |
| 42 | Registration Under the Advisers Act of Certain Hedge Fund Advisers, Investment Advisors Act Release No. IA-2333; File No.: S7-30-04 69 Fed. Reg. 72,054 (Dec. 10, 2004), available at http://www.sec.gov/rules/final/ia-2333.htm (last accessed Mar. 16, 2015) |
| 43 | Information for Newly-Registered Investment Advisers, https://www.sec.gov/divisions/investment/advoverview.htm |
| 44 | Agecroft Partners Predicts Hedge Fund Industry Trends for 2012, Agecroft Partners LLC, http://www.agecroftpartners.com/papers-predicts_2012.html |
| 45 | Managed Funds Ass'n, Sound Practices for Hedge Fund Managers (2009), https://www.managedfunds.org/wp-content/uploads/2011/06/Final_2009_complete.pdf (last accessed on March 17, 2015) |
| | **Agency Resources** |
| 46 | CFA Institute, http://www.cfainstitute.org |
| 47 | Commodity Trading Advisor - http://www.nfa.futures.org/nfa-registration/cta/index.html |
| 48 | Federal Accounting Standards Advisory Board - http://www.fasab.gov/ |
| 49 | Financial Industry Regulatory Authority (FINRA) - http://www.finra.org/ |
| 50 | Global Investment Performance Standards - http://www.gipsstandards.org/Pages/index.aspx |
| 51 | National Futures Assocation - https://www.nfa.futures.org/index.asp |
| 52 | Securities Exchange Commission - http://www.sec.gov/ |
| | **Depositions, Testimony and Exhibits** |

APPENDIX 3

| 53 | *Jesselson v. Merkin*, Arb. No. 13 148 Y 01912 10, September 12 - 19, 2011 |
|----|------|
| 54 | *Berman v. Merkin*, Arb. Deposition of Ezra Merkin, Dated November 14, 2011 |
| 55 | *Born v. Merkin*, Arb. No. 13 148 Y 01799 10, Deposition of Merkin, Ezra, Dated July 14, 2011 |
| 56 | *Calibre Fund, LLC,  v. Merkin*, Arb. No. 13 148 Y 00384 09, Deposition of Ezra Merkin, Dated November 17, 2010 |
| 57 | *JJS Associates, L.P. v. Merkin*, Arb. No. 13 148 Y 012802 10, Deposition of Ezra Merkin, Dated November 17, 2011 |
| 58 | *People of N.Y. v. Merkin*, Index No. 450879/2009, Deposition of Ezra Merkin, Dated March 3, 2010 |
| 59 | *Picard v. Merkin et al.,* Deposition of Joshua Nash, Dated October 18, 2012 |
| 60 | *Picard v. Merkin et al.*, Deposition of Andrew Gordon, Dated August 16, 2011 |
| 61 | *Picard v. Merkin et al.*, Deposition of Daniel Hess, Dated October 11, 2012 |
| 62 | *Picard v. Merkin et al.*, Deposition of Donald Seymour, Dated January 13, 2015 |
| 63 | *Picard v. Merkin et al.*, Deposition of Edward Thorp, Dated May 22, 2012 |
| 64 | *Picard v. Merkin et al.*, Deposition of Ezra Merkin, Dated February 24 & 25, 2015 |
| 65 | *Picard v. Merkin et al.*, Deposition of Fred Sloan, Dated October 16, 2012 |
| 66 | *Picard v. Merkin et al.*, Deposition of Jack Mayer, Dated October 11, 2011 |
| 67 | *Picard v. Merkin et al.*, Deposition of James Mnookin, Dated November 19, 2013 |
| 68 | *Picard v. Merkin et al.*, Deposition of Jason Orchard, Dated October 8, 2013 |
| 69 | *Picard v. Merkin et al.*, Deposition of Jerome Balsam, Dated October 25, 2011 |
| 70 | *Picard v. Merkin et al.*, Deposition of Joel Ehrenkranz, Dated May 20, 2014 |
| 71 | *Picard v. Merkin et al.*, Deposition of John L. Steffens, October 9, 2012 |
| 72 | *Picard v. Merkin et al.*, Deposition of Michael Achilarre, Dated August 9, 2011 |
| 73 | *Picard v. Merkin et al.*, Deposition of Michael Autera as Designated Rule 30(b)(6) Corporate Representative of Gabriel Capital Corporation, Ascot Partners L.P., Ascot Fund Ltd., Gabriel Capital L.P. and Ariel Fund |

| | Ltd., Dated October 22 & 23, 2014 |
|---|---|
| 74 | *Picard v. Merkin et al.*, Deposition of Michael Autera, Dated September 26, 2011 & October 19, 2011 |
| 75 | *Picard v. Merkin et al.*, Deposition of Michael Mahagan, Dated November 22, 2013 |
| 76 | *Picard v. Merkin et al.*, Deposition of Aldo Ghisletta, Dated January 14, 2015 |
| 77 | *Picard v. Merkin et al.*, Deposition of Stephen A. Feinberg, Dated October 4, 2011 |
| 78 | *Picard v. Merkin et al.*, Deposition of Noreen Harrington, Dated October 1, 2013 |
| 79 | *Picard v. Merkin et al.*, Deposition of Steven Askling, Dated August 8, 2011 |
| 80 | *Picard v. Merkin et al.*, Deposition of Tina Surh, Dated September 19, 2013 |
| 81 | *Picard v. Merkin et al.*, Deposition of Victor Teicher, Dated October 29, 2013 |
| 82 | *Picard v. Merkin et al.*, Deposition of Michael Matlin, Dated November 21, 2013 |
| 83 | *Picard v. Merkin, et al.*, Deposition of Robert Castro, Dated October 10, 2012 |
| 84 | *Sandalwood Debt Fund A, L.P. v. Merkin*, Arb. No. 13 148 Y 01046 09, Deposition of Ezra Merkin, Dated April 23, May 12 & 13, 2010 |
| 85 | *Straus v. Merkin*, Arb. No. 13 148 Y 01800 10, Deposition of Ezra Merkin, Dated June 21 & 22, 2011 |
| 86 | *Wiederhorn v. Merkin*, Arb. No. 13 148 Y 02937 08, Deposition of Ezra Merkin, Dated December 3 - 8, 2009 |
| 87 | *Wiess v. Merkin*, Arb. No. 13 148 Y 01803 10, Deposition of Ezra Merkin, Dated August 10 - 12, 2011 |
| **Data** | |
| 88 | Defendants' QuickBooks Database |
| 89 | Defendants' Portfolio Management System |
| **Case Documents** | |
| 90 | Resp. of Defs J. Ezra Merkin and Gabriel Capital Corporation to Plaintiff's Statement of Undisputed Material Facts, and Statement of Additional Facts in Opp'n to Pltf's Mot. for Summ. J. and in Supp. of Defs' Cross-Motion for Summ. J.; N.Y Att'y Gen. v. J. Ezra Merkin, No. 450879/2009 (N.Y. Sup. Ct. Apr. 6, 2009) (No. 0195). |
| 91 | Answer and Affirmative Defenses of Defendants J. Ezra Merkin and Gabriel Capital Corporation, Dkt. No. 261. |