# Exhibit B

Page 1

1                   AMY B. HIRSCH
2           UNITED STATES DISTRICT COURT
3           SOUTHERN DISTRICT OF NEW YORK
4    ----------------------------------x
     In re:                        SIPA LIQUIDATION
5
     BERNARD L. MADOFF INVESTMENT      No. 08-01789(BRL)
6    SECURITIES LLC,
7                                      (Substantively
                                        Consolidated)
8              Debtor.
     ----------------------------------x
9    IRVING H. PICARD, Trustee of the
     Liquidation of Bernard L. Madoff
10   Investment Securities LLC,
11                  Plaintiff,
                                      Adv. Pro. No.
12         vs.                        09-01182(BRL)
13   J. EZRA MERKIN, GABRIEL
     CAPITAL, L.P., ARIEL FUND LTD.,
14   ASCOT PARTNERS, L.P., GABRIEL
     CAPITAL CORPORATION,
15
               Defendants.
16   ----------------------------------x
17
18      VIDEOTAPED DEPOSITION OF AMY B. HIRSCH
19             New York, New York
20             June 16, 2015
21
22
23   Reported by:
24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25   JOB NO. 94520

AMY B. HIRSCH

1

2   the transfers between and among the Defendant

3   Funds and the management company.   That's what

4   it relates to.

5       Q.    And are you able to answer my question

6   as to whether that relates in any way to the due

7   diligence performed by Merkin, GCC, or the

8   Defendant Funds on Madoff or Madoff securities?

9       A.    I'm only able to tell you what my

10  opinion is and what I've been asked to opine on,

11  and the opinions that are set forth in here are

12  regarding the transfers and appropriateness

13  between and among the Defendant Funds and the

14  management company.

15      Q.    And you perform due diligence for a

16  living, right, ma'am?

17      A.    Yes, I do.

18      Q.    And you've been doing that for 20

19  years?

20      A.    Longer.

21      Q.    Thirty years?

22      A.    A while, yes.

23      Q.    At least 20?

24      A.    At least 20.

25      Q.    And you consider yourself good at your

1        AMY B. HIRSCH

2   job?

3        A.    I would hope that I'm good at my job.

4        Q.    Do you consider yourself an expert on

5   due diligence?

6        A.    I have deep expertise in due

7   diligence.

8        Q.    So are you able to tell me whether

9   your Opinion II relates in any way to the due

10  diligence performed by Merkin, GCC, or the

11  Defendant Funds on Madoff or Madoff securities?

12       A.    I am only able to tell you what the

13  opinion is that I was asked to provide, which is

14  in this report, and that relates to accounting

15  and bookkeeping procedures and the impact of

16  transfers.

17       Q.    And you're not able to tell me one way

18  or the other whether it relates to due

19  diligence; is that right, ma'am?

20            MS. HOANG:   Objection.

21       A.    At this time, I'm not prepared to give

22  an opinion, nor was I asked to give an opinion,

23  on the relevance of due diligence to this

24  particular opinion.  This opinion, again, is

25  only regarding the transfers between the

Page 36

1                    AMY B. HIRSCH

2   Defendant Funds and the management company.

3        Q.    And likewise, you're not able to tell

4   me one way or the other whether your Opinion I

5   relates in any way to the due diligence

6   performed by Merkin, GCC, or the Defendant Funds

7   on Madoff or Madoff securities, right?

8        A.    Again, it's --

9             MS. HOANG:   Objection.

10            Go ahead.

11       A.    I'm sorry.   Again, it's really -- it's

12  only related to the opinion I was asked to give,

13  which is on the transfers between funds.

14       Q.    And you can't tell me, despite your

15  experience performing due diligence, you can't

16  tell me one way or the other whether Opinion I

17  relates in any way to the due diligence

18  performed by Merkin, GCC, or the Defendant Funds

19  on Madoff or Madoff securities?

20       A.    I'm --

21            MS. HOANG:   Objection.

22            Just give me a second.

23            THE WITNESS:   I'm sorry.

24            I'm not prepared to give an opinion on

25       that.   I was not asked to provide an opinion

Page 37

1                    AMY B. HIRSCH

2        on that.

3    BY MR. STEINER:

4        Q.    And you were not asked to provide an

5    opinion on the adequacy of the diligence -- of

6    the due diligence performed by Merkin, GCC, or

7    the Defendant Funds on Madoff or Madoff

8    securities, correct?

9        A.    Once again, all the opinions I was

10   asked to give are in my report that's in front

11   of us.

12       Q.    And the two opinions you were asked to

13   give don't mention the words "due diligence,"

14   correct?

15       A.    They do not mention the words "due

16   diligence," that is correct.

17       Q.    And you have not performed -- you have

18   not, in connection with your work on this

19   matter, formed a professional opinion as to the

20   adequacy of the due diligence performed by

21   Merkin, GCC, or the Defendant Funds on Madoff or

22   Madoff securities, correct?

23           MS. HOANG:   Objection to form.

24       A.    I have formed the opinions with

25   respect to the transfers that took place in the

Page 39

1                        AMY B. HIRSCH

2          A.     Uh-huh.

3          Q.     And this is your CV; is that right?

4          A.     Yes, sir.

5          Q.     And this was current as of March 20

6     when you issued your report?

7          A.     It was current as of then, yes, that's

8     correct.

9          Q.     And is it still correct as of today,

10    or are there any updates that you would need to

11    make with respect to the CV?

12         A.     I would make one correction.  Well,

13    one thing has changed since this was issued in

14    that I'm no longer a member of the RD Legal

15    Funding Investment Committee.

16         Q.     And why is that?

17         A.     I resigned in April.

18         Q.     Was there a reason that you resigned?

19         A.     Just business reasons.

20         Q.     So you have been, since 1996, a -- the

21    sole owner of Paradigm Consulting Services; is

22    that right?

23         A.     Yes, sir.

24         Q.     And how big a company is Paradigm

25    Consulting Services?

Page 40

AMY B. HIRSCH

1

2    A.    Right now, as of today, it is a few

3   people.

4    Q.    So, aside from yourself, how many

5   other employees are there?

6    A.    There are two other.

7    Q.    And are they -- are both of those

8   other two junior to you or --

9    A.    Yes.

10   Q.    -- or are they other partners of

11  yours?

12   A.    There are no other partners.

13   Q.    Have you -- at its biggest, how big

14  was Paradigm?

15   A.    At its biggest, it was between 17 and

16  20 people.

17   Q.    What is the business of Paradigm

18  today?

19   A.    The business of Paradigm is to advise

20  institutional investors on alternative

21  investments.

22   Q.    And what type of work does Paradigm do

23  for those institutional investors?

24   A.    It varies based on the need of the

25  investor.

1            AMY B. HIRSCH

2      Q.    What's the range of services that

3  Paradigm provides?

4      A.    The range of services would be

5  anything from due diligence to portfolio

6  construction and monitoring to managing assets.

7      Q.    And does Paradigm today manage assets

8  for any institutional --

9      A.    No, we do not.

10     Q.    -- investors?

11     A.    Not currently.

12          MS. HOANG:  I just want to direct the

13     witness to let Mr. Steiner complete his a

14     question before you start.

15          THE WITNESS:  I'm sorry.

16  BY MR. STEINER:

17     Q.    Now, during what time period -- I

18  think you said, at its biggest, it was 17 to 20

19  people.

20          During what timeframe was that?

21     A.    That was probably between 2000 and

22  2008 or '09.

23     Q.    And what was the reason for the

24  reduction in the size of Paradigm?

25     A.    Well, we stopped managing large assets

Page 42

1                    AMY B. HIRSCH

2    in 2008 or '09.

3         Q.    Why was that?

4         A.    Our -- we ran a fund that allocated to

5    managers that was for a large North American

6    pension plan, and the tax rule changed, so they

7    repatriated their funds back.  So, as we gave

8    them back their assets, we didn't need as much

9    staff.

10        Q.    So when you ran -- it was roughly a

11   billion-dollar portfolio; is that right?

12        A.    It was, yes.

13        Q.    And so when you ran that fund of

14   funds, it was essentially a single investor fund

15   of funds?

16        A.    That was, yes.

17        Q.    And who was that for?

18        A.    That was for a large North American

19   pension plan.

20        Q.    Can you identify who that was for?

21        A.    I cannot.  I cannot.

22        Q.    When you made -- and you were the

23   chief investment officer --

24        A.    Yes.

25        Q.    -- of Paradigm running that fund; is

1          AMY B. HIRSCH

2    that right?

3         A.    Yes, I was.

4         Q.    And then it says on your CV that that

5    fund had investments in approximately 45

6    different hedge funds; is that right?

7         A.    At one point, yes.

8         Q.    And is that the largest number that

9    the billion dollars was allocated to, or is that

10   the total number of hedge funds including some

11   that you would come out of and go into a

12   different fund?

13            MS. HOANG:   Objection.

14        A.    I'm sorry, could you clarify that?

15        Q.    Sure.   Was it at its biggest there

16   were 45 different investments at any given time,

17   or that was the total of the number of

18   investments during a six- or seven-year period?

19        A.    No, you're --

20            MS. HOANG:   Same objection.

21            Go ahead.

22        A.    At its biggest, it was allocated to 45

23   managers.

24        Q.    And did -- did any of those 45

25   managers have investments with Madoff?

Page 44

1                      AMY B. HIRSCH

2        A.    No.

3        Q.    Did any of those 45 different managers

4    involve any of the Defendant Funds?

5        A.    No.

6        Q.    Who was responsible for making the

7    decision to invest with a particular manager?

8        A.    Ultimately, it was myself.

9        Q.    Who was responsible for conducting the

10   due diligence in connection with any potential

11   investment?

12       A.    It could have been any number of staff

13   that were in the Due Diligence Team.

14       Q.    If you could turn to the next page of

15   your -- of your CV, you have Case Experience, do

16   you see that?

17       A.    Yes.  Uh-huh.

18       Q.    You say, "I have been retained as an

19   expert witness in the following matters," and

20   you list three?

21       A.    Yes, sir.

22       Q.    Do you see that?

23             Now, I'm going to guess correctly that

24   the one time that you testified in deposition as

25   an expert in 2010 in New Jersey, did that relate

1                       AMY B. HIRSCH

2          Q.     Sure.

3          A.     -- appendix.

4               It doesn't seem to be in my Documents

5     Considered list, so I would say that if -- since

6     everything that I did consider is here, it would

7     not have been.

8          Q.     Now, if you turn to paragraph 4 of

9     your report, the -- you talk about due diligence

10    that you performed in 1995 on the Ariel Fund.

11              Do you see that?

12         A.     Yes, sir.

13         Q.     And so that was prior to the creation

14    of Paradigm, is that right?

15         A.     No, Paradigm was created in 1994 as an

16    LDC.  In 1996, it became my company, and it was,

17    actually, LDC was put in mothballs and Paradigm

18    Consulting Services was -- was formed.

19              So, beginning in January of '96 is

20    when it's Paradigm Consulting Services.  Prior

21    to that, it would have been Paradigm LDC, in

22    which I did have partners.

23         Q.     What's LDC?

24         A.     Limited duration company.

25         Q.     The -- so the due diligence that you

Page 59

1                         AMY B. HIRSCH

2    performed in 1995, was that in connection with

3    Paradigm or was that in connection with Link?

4         A.    That was in connection with Paradigm

5    LDC.

6         Q.    And what client was that on behalf of?

7         A.    That was actually on behalf of a

8    client's client.  So I don't have the name of

9    the client.

10        Q.    So you don't know who it was who

11   invested in Ariel that you were --

12        A.    Well, it was a custodial --

13              I'm sorry.  Go ahead, continue.

14        Q.    -- that you were performing due

15   diligence for?

16        A.    It was a custodial relationship, so it

17   would have been for my client, ultimately, you

18   know, but I don't know who was beneath it.

19        Q.    And you say that you recommend the

20   client fully redeem their investment.  Do you

21   see that?

22        A.    Yes.

23        Q.    Do you know whether the client in fact

24   redeemed?

25        A.    I do, actually.

Page 60

AMY B. HIRSCH

1

2      Q.      Okay.  And what did they do?

3      A.      They redeemed.

4      Q.      But you don't know who the client is?

5      A.      I don't know the name of the

6   underlying custodianship, no.

7      Q.      In paragraph 5, you talk about due

8   diligence that you conducted on behalf of an

9   investor in the Tremont Fund, do you see that?

10     A.      American Master Broad Market Prime

11  Fund, yes.

12     Q.      And that Tremont Fund, in turn,

13  invested with Madoff?

14     A.      Yes.

15     Q.      And you knew that at the time?

16     A.      I did, yes.

17     Q.      And it says you recommended the

18  investor redeem?

19     A.      That's correct.

20     Q.      Okay.  Do you know whether that

21  investor redeemed?

22     A.      Yes, they did.

23     Q.      Okay.  Which investor was that?

24     A.      It was a -- a foundation.

25     Q.      What was the name of the foundation?

AMY B. HIRSCH

1

2    A.    I don't believe that I can discuss the

3    names of my clients due to confidentiality.

4    Q.    Well, did you have an engagement with

5    the client that imposed the confidentiality

6    obligation?

7    A.    I did, yes.

8    Q.    You have a written letter that imposed

9    that?

10   A.    I have confidentiality agreements with

11   most of my clients.

12   Q.    How big was the investment?

13   A.    I don't recall exactly, but I know it

14   was in excess of $10 million.

15        (Hirsch Exhibit 4, a Letter from

16        Paradigm L.P. to Ezra Merkin with attached

17        notes and preliminary draft, marked for

18        identification, as of this date.)

19   BY MR. STEINER:

20   Q.    Ms. Hirsch, the reporter has handed

21   you a document marked Hirsch Exhibit 4.  Do you

22   see that?

23   A.    I do.

24   Q.    And this is the due diligence report

25   that -- well, this is -- the first page is a

1          AMY B. HIRSCH

2     letter to Mr. Merkin, and then the following

3     three pages are your notes and preliminary draft

4     of a due diligence report; is that right?

5          A.    They are the observations and

6     preliminary report, yes.

7          Q.    Aside from -- and ABH, that's you?

8          A.    That's me.

9          Q.    Aside from this preliminary report on

10    Ariel, was there any other work that was

11    performed in connection with the due diligence

12    on Ariel that your firm performed?

13         A.    No.

14         Q.    Why not?

15         A.    As I recall, we were never given the

16    materials to continue or conduct the full due

17    diligence.

18         Q.    What else would one of your due

19    diligence reports typically contain?

20         A.    Well, this is not --

21         MS. HOANG:    Objection.

22         A.    I'm sorry.  This is not a due

23    diligence report.  This is just the beginning of

24    a -- of a draft.

25               A full due diligence report would

AMY B. HIRSCH

1

2  contain an analysis of the firm and its

3  personnel, all of the products that it has under

4  management, it would contain a review of the

5  strategy in its totality and a review of the

6  underlying investments in the strategy to the

7  best of our -- of our knowledge.

8         It would contain an analysis of risk

9  management, portfolio construction, execution,

10 risk management, operational efficiencies and

11 insufficiencies.

12        It would contain a complete

13 performance analysis and peer analysis, if

14 appropriate.  It would contain a variety of

15 different correlation analysis and market

16 analysis versus the performance.

17        Those are just some of the things that

18 a full report would contain.

19    Q.    Would it -- are you familiar with the

20 term "reverse engineering"?

21    A.    Yes, I'm familiar with it.

22    Q.    And would -- when you perform due

23 diligence, do you do reverse engineering of a

24 strategy?

25    A.    Not necessarily.

Page 64

1              AMY B. HIRSCH

2      Q.    Why not?

3      A.    We don't necessarily need to do

4  reverse engineering because you can find out --

5  there are different ways to get factors and

6  correlation analysis done to find out what

7  footprints are.  So in rare cases do we do --

8  will we do, or have to do, reverse engineering.

9      Q.    That's -- reverse engineering is

10  something that you do rarely?

11           MS. HOANG:  Objection.

12      A.    We -- we have not found a reason to,

13  to do it.  So it's not something that is done on

14  a standard basis, no.

15      Q.    As part of your standard due

16  diligence, do you try and do a quantitative

17  breakdown of the sources of a fund's return?

18      A.    Yes.

19      Q.    How do you do that?

20      A.    Well, it's done either through a

21  correlation analysis, factor analysis.  There

22  are a number of ways to achieve it.  There's a

23  breakdown of beta and alpha analysis,

24  footprinting, et cetera.

25      Q.    What's footprinting?

<sup></sup>

                    AMY B. HIRSCH

1

2        A.     Footprinting is -- is similar to

3   factor analysis.  You're trying to ascertain,

4   based on a benchmark, where you're seeing the

5   greatest correlation and where you're seeing

6   footprints in the performance.

7              So if you take a short seller, for

8   example, and you do an analysis of the market

9   and you're seeing a lot of alpha in a bull

10  market, you know that there's something, you

11  know, very wrong, because he's a short seller

12  and it's a bull market.  So you're looking for

13  where -- where the manager actually is placing

14  their bets.

15       Q.    And with respect to the work that you

16  did on the Tremont Fund, was that a -- did you

17  do a complete due diligence analysis of the

18  Tremont Fund?

19       A.     It was not necessary, no.  We did an

20  analysis of performance and we reviewed the

21  document that we were given, but we never got

22  the information that we needed to do a complete

23  due diligence.

24       Q.    And when you did that work in 2003,

25  you certainly didn't identify that Mr. Madoff

Page 66

1                     AMY B. HIRSCH

2   was running a Ponzi scheme, correct?

3       A.    In 2003, we were doing the due

4   diligence to ascertain whether the investment

5   was appropriate or not for the investor, and

6   based on the information we got from Tremont, we

7   decided that we would issue a full redemption.

8       Q.    And your conclusion with respect to

9   Tremont was that, although it could return

10  somewhere around 10 percent a year to investors,

11  the risks outweighed the potential returns; is

12  that right?

13      A.    If I could see that report, I believe

14  in its -- in general terms, yes, that's what

15  it -- that's what it said.

16      Q.    And --

17      A.    That's in a written report.

18      Q.    And you certainly didn't tell your

19  client with respect to Tremont that you believed

20  that Mr. Madoff was running a Ponzi scheme,

21  correct?

22      A.    I verbally told my client that I did

23  not believe that this -- the returns were --

24  were real.

25      Q.    But you didn't write that in your

Page 67

1                          AMY B. HIRSCH

2      report?

3          A.     No.

4          Q.     So why did you not write that in your

5      report?

6          A.     The report is going -- because the

7      report, unfortunately, is sometimes e-mailed

8      around.  So we are very careful with what we

9      write in our reports for -- for the fact that if

10     you don't have precise proof of something, you

11     can be -- you don't want that information out

12     there.

13         Q.     So your reports are sometimes not a

14     complete reflection of your opinions?

15         A.     The recommendations -- the --

16                MS. HOANG:  Objection.

17                Let him finish and then...

18         Q.     The reports sometimes are not a

19     complete reflection of your opinions?

20                MS. HOANG:  Objection.

21         A.     The recommendation is complete.  The

22     object of the due diligence is to get to the

23     recommendation, and the recommendation is in

24     fact complete.

25         Q.     Well, did you believe in 2003 that the

1                AMY B. HIRSCH

2       A.    No, I believe I said that it could,

3  but the -- but it was problematic because the

4  prospectus didn't name the manager so they could

5  change the manager at any time, and so you can't

6  make a full recommendation if the manager has

7  changed.  So it could have returned 10 percent,

8  it's possible, but our recommendation is based

9  on probability, not possibility.

10           MR. STEINER:  Why don't we take a

11      break.

12           THE VIDEOGRAPHER:  The time is 2:02

13      p.m.  We're going off the record.

14           (Recess.)

15           THE VIDEOGRAPHER:  The time is 2:23

16      p.m.  We're back on the record, video number

17      2.

18  BY MR. STEINER:

19      Q.    Ms. Hirsch, with respect to your

20  Opinion I on page 2 to 3 of your report?

21      A.    Yes, sir.

22      Q.    Now, I take it this is your statement

23  of the general structure in the fund industry as

24  opposed to anything specific to the Defendant

25  Funds; is that correct?

Page 70

AMY B. HIRSCH

1

2     A.     Yes, that's correct.

3     Q.     And then in the section of your

4  report -- I guess it's Section 5 of your report

5  is your explanation of Opinion No. I; is that

6  right?

7     A.     And what page would that be, sir?

8     Q.     It starts on page 9 and goes to page

9  29.

10     A.     Yes.

11     Q.     And in that explanation of Opinion No.

12  I, there's no -- you don't make any attempt to

13  apply that in -- within Opinion I to any of the

14  Defendant Funds; is that correct?

15          MS. HOANG:  Objection to form.

16          Go ahead.

17     A.     This is -- this is a general

18  discussion with regard to industry customs and

19  practices, and I believe that in Opinion II I

20  speak specifically about the Defendant Funds.

21     Q.     Right.  So Opinion I doesn't speak

22  specifically to the Defendant Funds, correct?

23     A.     Opinion I speaks to industry standards

24  and practices, so yes.

25     Q.     And you're not a lawyer, right, ma'am?

1                    AMY B. HIRSCH

2    you would have specific regulatory requirements.

3    If you are registered with the SEC, you would

4    have --

5              Is that what you mean by "included" in

6    that?

7        Q.    Well, what I'm asking is, in your

8    Opinion I, are you offering an opinion as to the

9    requirements of, whether it's the CFTC or the

10   SEC or any state where an investment fund

11   manager may operate, are you including any of

12   that in your discussion with respect to Opinion

13   I?

14       A.    I'm not offering --

15             MS. HOANG:  Objection.

16             Just give me a second.

17             Objection.

18             Go ahead.

19       A.    I'm not offering a legal opinion in

20   any of this report.  I'm offering an opinion

21   with respect to industry custom and practices

22   between the time period of 1998 and 2008,

23   basically.

24       Q.    And do you have an understanding of

25   any relationship between legal requirements and

1                    AMY B. HIRSCH

2    industry customs?

3        A.    "Relationship" meaning what,

4    specifically?

5        Q.    As an example, would you agree with me

6    if there's any conflict between a law, rule, or

7    regulation and what you describe as an industry

8    custom, that the legal requirement would trump

9    what you have described as an industry custom?

10        MS. HOANG:   Objection.

11        A.    Well, again, I'm not a lawyer, so I

12    can't answer that question the way you have

13    asked it.  I believe that fiduciary

14    responsibility trumps everything else, and most

15    of the codes that have been created are based on

16    acting as a good fiduciary, which I, you know,

17    if you are -- if you are paid to look over the

18    assets of someone else, you are bound to those

19    fiduciary obligations.

20            So, in that regard, I would say I

21    can't answer that legally, but I can -- I can

22    tell you that most of the customs that I speak

23    to in the industry stem from that.

24        Q.    During the time that you operated the

25    fund of funds at Paradigm, would you agree that,

1                    AMY B. HIRSCH

2        Q.    And what about Kingdon?

3        A.    I would imagine that -- I can't recall

4    precisely, but again, based on his strategy, it

5    would be unlikely that it would be a very high

6    Sharpe ratio because he has a lot of volatility.

7        Q.    What about, did you ever look at --

8    it's not listed here, but D.E. Shaw?

9        A.    I have looked at D.E. Shaw, yes.

10        Q.    Are you familiar with what their

11    Sharpe ratios have been?

12        A.    No, I don't recall what his Sharpe is.

13        Q.    If we can flip to your Opinion II,

14    starting at paragraph 72.

15        A.    I'm sorry, starting at 72?

16        Q.    72 on page 29.

17            Now, do I understand correctly that

18    these -- that Opinion II and then the

19    explanation that's in paragraphs 72 to 129 is,

20    in essence, your attempt to apply your Opinion I

21    to the facts of this case?

22            MS. HOANG:  Objection.

23        A.    Opinion II is directly related to the

24    Defendant Funds and the management company.

25        Q.    And that's an attempt to apply kind of

Page 90

1                    AMY B. HIRSCH

2    the general discussion that you had in Opinion I

3    to the Defendant Funds?

4          MS. HOANG:   Same objection.

5       A.    It's on application of Opinion I.  It

6    is, in some cases, outlining the differences

7    between what was industry practice and customs

8    and what occurred at the Defendant Funds and the

9    management company, and it's specific to the

10   books and records of the Defendant Funds and the

11   management company.

12      Q.    Now, you say in paragraph 72, "I have

13   identified transfers of assets between the

14   Defendant Funds and between the Defendant Funds

15   and GCC that were a misuse of fund assets and

16   resulted in the commingling of assets."

17          Do you see that?

18      A.    Yes, sir.

19      Q.    What did you do to identify those

20   transfers?

21      A.    In general, the approach, or

22   specifically for a specific --

23      Q.    I'll start with your general approach.

24   What did you do to -- to, you know, form the

25   conclusion that you wrote in that sentence?

Page 161

1                    AMY B. HIRSCH

2

3                    CERTIFICATE

4   STATE OF NEW YORK )
                           :  ss

5   COUNTY OF NEW YORK)

6        I, Kathy S. Klepfer, a Registered

7   Merit Reporter and Notary Public within and

8   for the State of New York, do hereby

9   certify:

10       That AMY B. HIRSCH, the witness whose

11  deposition is herein before set forth, was

12  duly sworn by me and that such deposition is

13  a true record of the testimony given by such

14  witness.

15       I further certify that I am not

16  related to any of the parties to this action

17  by blood or marriage and that I am in no way

18  interested in the outcome of this matter.

19       In witness whereof, I have hereunto

20  set my hand this 18th day of June, 2015.

21

22       --------------------------------

         KATHY S. KLEPFER, RPR, RMR, CRR, CLR

23

24

25