# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

**MANDATE**

N.Y.S.D. Case #
11-cv-4212(CM)

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 20th day of June, two thousand and thirteen.

Before: DENNIS JACOBS,
   *Chief Judge,*
   RALPH K. WINTER,
   SUSAN L. CARNEY,
   *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __July 11, 2013__

In Re: Bernard L. Madoff Investment Securities, LLC.

------------------------------------------------------------------------------------

Iriving H. Picard,

    Plaintiff-Appellant,

    v.

JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, J.P. Morgan Securities Ltd.,

    Defendants-Appellees,

    and

Securities Investor Protection Corporation,

    Intervenor.

**JUDGMENT**
Docket No. 11-5044

In Re: Bernard L. Madoff Investment Securities, LLC,

    Debtor.

------------------------------------------------------------------------------------

Irving H. Picard,

    Plaintiff-Appellant,

    and

Securities Investor Protection Corporation,

    Intervenor,

Docket No. 11-5051

**MANDATE ISSUED ON 07/11/2013**

v.

UBS Fund Services (Luxembourg) SA, Access International Advisors LLC,
Access International Advisors Europes Limited, Access International
Advisors Ltd., Access Paterns (Suisse) SA, Access Management Luxembourg
SA (FKA Access International Advisors (Luxembourg) SA) as represented by
its Liquidator Maitre Ferdinand Entringer, Access Partners SA, as
represented by its Liquidator Maitre Ferdinand Entringer, Patrick
Littaye, Claudine Magon de la Villehuchet (AKA Claudine de la Villehuchet)
 in her capacity as Executrix under the Will of Theirry Magon de
la Villehuchet (AKA Rene Thierry de la Villehuchet), Claudine Magon de
la Villehuchet (AKA Claudine De la Villehuchet) individually
and as the sole beneficiary under the will of Thierry Magon de la
Villehuchet (AKA Rene Thierry de la Villehuchet), Pierre Delandmeter,
Theodore Dumbauld, Luxalpha Sicav, as represented by its Liquidators
Maitre Alain Rukavina and Paul Laplume, Roger Hartmann, Ralf
Shroeter, Rene Egger, Alain Hondequin, Hermann Kranz, Bernard Stiehl,
Groupement Financier Ltd., UBS AG, UBS (Luxembourg) SA, Maitre Alain
Rukavina, in his capacity as liquidator and representative of Luxalpha Sicav, Paul Laplume, in his
capacity as liquidator and representative of Luxalpha Sicav, UBS Third Party Management
Company SA,

     Defendants-Appellees.

---

In Re: Bernard L. Madoff Investment Securities LLC,         Docket No. 11-5175

     Debtor.

-----------------------------------------------------------------------------------

Irving H. Picard,

     Plaintiff-Appellant,

     v.

HSBC Bank, PLC, HSBC Securities Services (Luxembourg) SA,
HSBC Bank Bermuda Limited, HSBC Fund Services (Luxembourg)
SA, HSBC Private Bank (Suisse) SA, HSBC Private Banking
Holdings (Suisse) SA, HSBC Bank (Cayman) Limited, HSBC
Securities Services (Bermuda) Limited, HSBC Bank USA, NA, HSBC
Institutional Trust Services (Bermuda) Limited, HSBC Securities
Services (Ireland) Limited, HSBC Institutional Trust Services (Ireland)
Limited, HSBC Holdings PLC, UniCredit SpA, Pioneer Alternative
Investment Management Limited, UniCredit Bank Austria AG,
Alpha Prime Fund Limited,

     Defendants-Appellees,

     and

Securities Investor Protection Corporation,

Case 1:11-cv-07306-CM    Document 40    Filed 02/11/13    Page 3 of 63

Intervenor.

_____

In Re: Bernard L. Madoff Investment Securities LLC,                    Docket No. 11-5207

     Debtor.

-----------------------------------------------------------------------------------------

Irving H. Picard,

     Plaintiff-Appellant,

     v.

HSBC Bank, PLC, HSBC Securities Services (Luxembourg) SA,
HSBC Bank Bermuda Limited, HSBC Fund Services (Luxembourg)
SA, HSBC Private Bank (Suisse) SA, HSBC Private Banking
Holdings (Suisse) SA, HSBC Bank (Cayman) Limited, HSBC
Securities Services (Bermuda) Limited, HSBC Bank USA, NA, HSBC
Institutional Trust Services (Bermuda) Limited, HSBC Securities
Services (Ireland) Limited, HSBC Institutional Trust Services (Ireland)
Limited, HSBC Holdings PLC, HSBC Fund Services (Luxembourg) SA,

     Defendants-Appellees,

Securities Investor Protection Corporation,

     Intervenor.

_____

     The appeals in the above captioned cases from judgments of the United States District
Court for the Southern District of New York were argued on the district court's record and the
parties' briefs.  Upon consideration thereof,

     IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgments of the
district court are AFFIRMED in accordance with the opinion of this court.

               For The Court:

               Catherine O'Hagan Wolfe,
               Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

11-5044; 11-5051; 11-5175; 11-5207
In re: Bernard L. Madoff Investment Securities
Picard v. JP Morgan Chase & Co., 11-5044
Picard v. Egger, 11-5051
Picard v. UniCredit Bank Austria AG, 11-5175
Picard v. HSBC Bank PLC, 11-5207


**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012


(Argued: November 21, 2012     Decided: June 20, 2013)

Docket Nos. 11-5044
11-5051
11-5175
11-5207

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD,

             Plaintiff-Appellant,

        - v.-

JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN
SECURITIES LLC, J.P. MORGAN SECURITIES LTD.,

             Defendants-Appellees,

        and

SECURITIES INVESTOR PROTECTION CORPORATION,

             Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
 1    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
 2
 3    IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,
 4
 5                  Debtor.
 6
 7    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
 8
 9    IRVING H. PICARD,
10
11                  Plaintiff-Appellant,
12
13           and
14
15    SECURITIES INVESTOR PROTECTION CORPORATION,
16
17                  Intervenor,
18
19           - v.-
20
21    UBS FUND SERVICES (LUXEMBOURG) SA, ACCESS INTERNATIONAL
22    ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS EUROPES LIMITED,
23    ACCESS INTERNATIONAL ADVISORS LTD., ACCESS PARTNERS (SUISSE)
24    SA, ACCESS MANAGEMENT LUXEMBOURG SA, as represented by its
25    Liquidator MAITRE FERDINAND ENTRINGER, FKA ACESS
26    INTERNATIONAL ADVISORS LUXEMBOURG SA, ACCESS PARTNERS SA, as
27    represented by its Liquidator MAITRE FERDINAND ENTRINGER,
28    PATRICK LITTAYE, CLAUDINE MAGON DE LA VILLEHUCHET, in her
29    capacity as Executrix under the WILL OF THIERRY MAGON DE LA
30    VILLEHUCHET (AKA Rene Thierry de la Villehuchet),
31    individually and as the sole beneficiary under the WILL OF
32    THIERRY MAGON DE LA VILLEHUCHET (AKA Rene Thierry de la
33    Villehuchet), AKA CLAUDINE DE LA VILLEHUCHET, PIERRE
34    DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICA V, as
35    represented by its Liquidators MAITRE ALAIN RUKAVINA and
36    PAUL LAPLUME, ROGER HARTMANN, RALF SHROETER, RENE EGGER,
37    ALAIN HONDEQUIN, HERMANN KRANZ, BERNARD STIEHL, GROUPEMENT
38    FINANCIER LTD., UBS AG, UBS (LUXEMBOURG) SA, MAITRE ALAIN
39    RUKAVINA, in his capacity as liquidator and representative
40    of LUXALPHA SICA V, PAUL LAPLUME, in his capacity as
41    liquidator and representative of LUXALPHA SICA V, UBS THIRD
42    PARTY MANAGEMENT COMPANY SA,
43
44                  Defendants-Appellees.
```

2

```
1   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
2
3   IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,
4
5                    Debtor.
6
7   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
8
9   IRVING H. PICARD,
10
11                    Plaintiff-Appellant,
12
13           - v.-
14
15  HSBC BANK PLC, HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.,
16  HSBC BANK BERMUDA LIMITED, HSBC FUND SERVICES (LUXEMBOURG)
17  S.A., HSBC PRIVATE BANK (SUISSE) S.A., HSBC PRIVATE BANKING
18  HOLDINGS (SUISSE) S.A., HSBC BANK (CAYMAN) LIMITED, HSBC
19  SECURITIES SERVICES (BERMUDA) LIMITED, HSBC BANK USA, N.A.,
20  HSBC INSTITUTIONAL TRUST SERVICES (BERMUDA) LIMITED, HSBC
21  SECURITIES SERVICES (IRELAND) LIMITED, HSBC INSTITUTIONAL
22  TRUST SERVICES (IRELAND) LIMITED, HSBC HOLDINGS PLC,
23  UNICREDIT S.p.A., PIONEER ALTERNATIVE INVESTMENT MANAGEMENT
24  LIMITED, UNICREDIT BANK AUSTRIA AG, ALPHA PRIME FUND
25  LIMITED,
26
27                    Defendants-Appellees,
28
29           and
30
31  SECURITIES INVESTOR PROTECTION CORPORATION,
32
33                    Intervenor.
34
35  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
36
37  IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,
38
39                    Debtor.
40
41  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
42
43
44
```

3

```
 1    IRVING H. PICARD,
 2
 3                   Plaintiff-Appellant,
 4
 5           - v.-
 6
 7    HSBC BANK PLC, HSBC SECURITIES SERVICES (LUXEMBOURG) S.A.,
 8    HSBC BANK BERMUDA LIMITED, HSBC PRIVATE BANK (SUISSE) S.A.,
 9    HSBC PRIVATE BANKING HOLDINGS (SUISSE) S.A., HSBC BANK
10    (CAYMAN) LIMITED, HSBC SECURITIES SERVICES (BERMUDA)
11    LIMITED, HSBC BANK USA, N.A., HSBC INSTITUTIONAL TRUST
12    SERVICES (BERMUDA) LIMITED, HSBC SECURITIES SERVICES
13    (IRELAND) LIMITED, HSBC INSTITUTIONAL TRUST SERVICES
14    (IRELAND) LIMITED, HSBC HOLDINGS PLC, HSBC FUND SERVICES
15    (LUXEMBOURG) S.A.,
16
17                   Defendants-Appellees,
18
19    SECURITIES INVESTOR PROTECTION CORPORATION,
20
21                   Intervenor.
22
23    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
24
25          Before:        JACOBS, Chief Judge, WINTER and CARNEY,
26                         Circuit Judges.
27
```

28    A trustee appointed pursuant to the Securities Investor

29    Protection Act appeals from the dismissal of his claims

30    brought on behalf of the debtor and the debtor's customers,

31    asserting that various financial institutions and other

32    defendants aided and abetted the debtor's fraud.  The United

33    States District Court for the Southern District of New York

34    (McMahon and Rakoff, JJ.) held that the claims were barred

35    by the doctrine of in pari delicto and that the trustee

36    lacked standing to pursue claims on behalf of customers.  We

37    affirm.

4

```
 1                            OREN J. WARSHAVSKY (David J.
 2                            Sheehan, Deborah H. Renner, Lan
 3                            Hoang, Geoffrey A. North on the
 4                            brief) Baker & Hostetler LLP,
 5                            New York, New York for
 6                            Plaintiff-Appellant.
 7
 8                            CHRISTOPHER H. LAROSA (Josephine
 9                            Wang, Kevin H. Bell, on the
10                            brief) Securities Investor
11                            Protection Corporation,
12                            Washington, D.C. for Intervenor
13                            Securities Investor Protection
14                            Corporation.
15
16                            JOHN F. SAVARESE (Douglas K.
17                            Mayer, Stephen R. DiPrima, Emil
18                            A. Kleinhaus, Lauren M. Kofke,
19                            Jonathon R. La Chapelle on the
20                            brief) Wachtell, Lipton, Rosen &
21                            Katz, New York, New York for
22                            Defendant-Appellee JPMorgan
23                            Chase & Co., et al.
24
25                            THOMAS J. MOLONEY (Evan A.
26                            Davis, David E. Brodsky, Marla
27                            A. Decker, Charles J. Keeley,
28                            Jason B. Frasco on the brief)
29                            Cleary Gottlieb Steen & Hamilton
30                            LLP, New York, New York for
31                            Defendant-Appellee HSBC Bank
32                            plc, et al.
33
34                            MARCO E. SCHNABL (Susan L.
35                            Saltzstein, Jeremy A. Berman on
36                            the brief) Skadden, Arps, Slate,
37                            Meagher & Flom LLP, New York,
38                            New York for Defendants-
39                            Appellees UniCredit S.p.A. and
40                            Pioneer Alternative Investment
41                            Management Ltd.
42
43                            MARSHALL R. KING, Gibson, Dunn &
44                            Crutcher LLP, New York, New York
45                            for Defendant-Appellee UBS AG,
46                            et al.
```

5

```
 1
 2                          FRANKLIN B. VELIE (Jonathan G.
 3                          Kortmansky, Mitchell C. Stein on
 4                          the brief) Sullivan & Worcester
 5                          LLP, New York, New York for
 6                          Defendant-Appellee UniCredit
 7                          Bank Austria AG.
 8
 9                          Robert W. Gottlieb, Katten
10                          Muchin Rosenman LLP, New York,
11                          New York for Defendant-Appellee
12                          Access International Advisers,
13                          LLC, et al.
14
15                          Brett S. Moore, Porzio Bromberg
16                          & Newman P.C., New York, New
17                          York for Defendant-Appellee
18                          Luxalpha Sicav, et al.
19
20                          Robert Knuts, Park & Jensen LLP,
21                          New York, New York for
22                          Defendant-Appellee Theodore
23                          Dumbauld.
24
25
26   DENNIS JACOBS, Chief Judge:
```

27      Irving Picard ("Picard" or the "Trustee") sues in his

28   capacity as Trustee under the Securities Investor Protection

29   Act ("SIPA") on behalf of victims in the multi-billion-

30   dollar Ponzi scheme worked by Bernard Madoff.  The four

31   actions presently before this Court allege that numerous

32   major financial institutions aided and abetted the fraud,

33   collecting steep fees while ignoring blatant warning signs.

34   In summary, the complaints allege that, when the Defendants

35   were confronted with evidence of Madoff's illegitimate

1 scheme, their banking fees gave incentive to look away, or

2 at least caused a failure to perform due diligence that

3 would have revealed the fraud.  The Trustee asserts claims

4 for unjust enrichment, breach of fiduciary duty, aiding and

5 abetting fraud, and negligence, among others.  The Trustee's

6 position is supported by the Securities Investor Protection

7 Corporation ("SIPC"), a statutorily created nonprofit

8 corporation consisting of registered broker-dealers and

9 members of national securities exchanges, which intervened

10 to recover some or all of the approximately $800 million it

11 advanced to victims.

12  As we will explain, the doctrine of in pari delicto

13 bars the Trustee (who stands in Madoff's shoes) from

14 asserting claims directly against the Defendants on behalf

15 of the estate for wrongdoing in which Madoff (to say the

16 least) participated.  The claim for contribution is likewise

17 unfounded, as SIPA provides no such right.  The decisive

18 issue, then, is whether the Trustee has standing to pursue

19 the common law claims on behalf of Madoff's customers.  Two

20 thorough well-reasoned opinions by the district courts held

21 that he does not.  See Picard v. HSBC Bank PLC, 454 B.R. 25

22 (S.D.N.Y. 2011) (Rakoff, J.); Picard v. JPMorgan Chase &

23 Co., 460 B.R. 84 (S.D.N.Y. 2011) (McMahon, J.).

1    Our holding relies on a rooted principle of standing: A

2  party must "assert his own legal rights and interests, and

3  cannot rest his claim to relief on the legal rights or

4  interests of third parties." Warth v. Seldin, 422 U.S. 490,

5  499 (1975).  This prudential limitation has been

6  consistently applied in the bankruptcy context to bar suits

7  brought by trustees on behalf of creditors.  See, e.g.,

8  Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416

9  (1972); Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d

10  114, 118 (2d Cir. 1991).

11    Picard offers two theories for why a SIPA liquidation

12  is a different creature entirely, and why therefore a SIPA

13  trustee enjoys third-party standing: (1) He is acting as a

14  bailee of customer property and therefore can pursue actions

15  on customers' behalf to recover such property; and (2) he is

16  enforcing SIPC's rights of equitable and statutory

17  subrogation to recoup funds advanced to Madoff's customers.

18  Neither is compelling.  Although a SIPA liquidation is not a

19  traditional bankruptcy, a SIPA trustee is vested with the

20  "same powers and title with respect to the debtor and the

21  property of the debtor . . . as a trustee in a case under

22  Title 11." 15 U.S.C. § 78fff-1(a).  At best, SIPA is silent

8

1   as to the questions presented here.  And analogies to the

2   law of bailment and the law of subrogation are inapt and

3   unconvincing.[1]

4

5                        **BACKGROUND**

6       In December 2008, federal agents arrested Bernard L.

7   Madoff, who had conducted the largest Ponzi scheme yet

8   uncovered.  Madoff purported to employ a "split-strike

9   conversion strategy" that involved buying S&P 100 stocks and

10  hedging through the use of options.  In reality, he engaged

11  in no securities transactions at all.[2]

12

---

[1] The Defendants also argue that the Trustee has not
met constitutional standing requirements, violates the
Securities Litigation Uniform Standards Act, and fails to
plead with particularity SIPC's purported subrogation
claims.  Given our holding, we decline to address these
arguments.

[2] Although Madoff simply appropriated his clients'
money without ever purchasing securities on their behalf, we
have held that Madoff's victims are nonetheless "customers"
under the Act.  See In re Bernard L. Madoff Inv. Sec. LLC,
654 F.3d 229, 236 (2d Cir. 2011) ("SIPA . . . ensur[es] that
claimants who deposited cash with a broker for the purpose
of purchasing securities, are treated as customers with
claims for securities.  This is so because the critical
aspect of the 'customer' definition is the entrustment of
cash or securities to the broker-dealer for the purposes of
trading securities.") (internal citations and quotation
marks omitted), cert. denied, 133 S. Ct. 25 (2012).

9

1    In March 2009, Madoff pleaded guilty to securities

2    fraud and admitted that he had used his brokerage firm,

3    Bernard L. Madoff Investment Securities LLC ("BLMIS"), as a

4    vast Ponzi scheme.   The details of Madoff's fraud have been

5    recounted many times.   See, e.g., In re Bernard L. Madoff

6    Inv. Sec. LLC, 654 F.3d 229, 231–32 (2d Cir. 2011), cert.

7    denied, 133 S. Ct. 25 (2012); In re Bernard L. Madoff Inv.

8    Sec. LLC, 424 B.R. 122, 126–32 (Bankr. S.D.N.Y. 2010).

9    Following Madoff's arrest, SIPC filed an application

10    under SIPA, 15 U.S.C. § 78eee(a)(4)(B), asserting that BLMIS

11    required protection.   The district court appointed Picard as

12    the firm's Trustee and referred the case to the bankruptcy

13    court.

14    SIPA was enacted in 1970 to speed the distribution of

15    "customer property" back to investors following a firm's

16    collapse.[3]   Customer property is cash and securities held

17    separately from the general estate of the failed brokerage

18    firm.   "SIPA serves dual purposes: to protect investors, and

19    to protect the securities market as a whole."   In re Bernard

20    L. Madoff Inv. Sec. LLC, 654 F.3d at 235.   A SIPA

---

[3] For a succinct overview of the statute's history, see
Securities Investor Protection Corp. v. BDO Seidman, LLP, 49
F. Supp. 2d 644, 649 (S.D.N.Y. 1999).

10

1    liquidation confers priority on customer claims by an

2    expeditious alternative to a traditional bankruptcy

3    proceeding.  Under SIPA, each customer shares ratably in the

4    fund of customer property according to the customer's "net

5    equity."

6        If (as is often the case) the assets are not enough to

7    satisfy all net equity claims, SIPC advances money (up to

8    $500,000 per customer) to the SIPA trustee, who is charged

9    with assessing customer claims and making the ratable

10   distributions.  At the time of this appeal, SIPC had

11   advanced approximately $800 million.

12       A trustee also has authority to investigate the

13   circumstances surrounding the insolvency and to recover and

14   distribute any remaining funds to creditors.  Picard alleges

15   that his investigation has uncovered evidence of wrongdoing

16   by third parties who aided and abetted Madoff, and seeks to

17   replenish the fund of customer property by taking action

18   against various financial institutions that serviced BLMIS.

19       Picard presses claims against JPMorgan Chase & Co., UBS

20   AG, UniCredit Bank Austria AG, HSBC Bank plc, and affiliated

21   persons and entities.  The allegations against each are

22   summarized one by one.  We distill the detailed allegations

11

1    from the consolidated complaints, and recount only the

2    background needed to understand our analysis.  At this stage

3    of the litigation, the allegations are assumed to be true.

4    See Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir.

5    2009).

6        **JPMorgan**.  Madoff maintained a checking account at

7    JPMorgan Chase & Co. ("JPMorgan")[4] for more than twenty

8    years, beginning in 1986.  In the years prior to BLMIS's

9    bankruptcy, JPMorgan collected an estimated half billion

10   dollars in fees, interest payments, and revenue from BLMIS.

11   The Trustee alleges that JPMorgan was "at the very center"

12   of Madoff's fraud and was "thoroughly complicit" in it.  A

13   662 ¶ 1.[5]  Madoff's primary account with JPMorgan, the "703

14   Account," was where hundreds of billions of dollars of

15   customer money were "commingled and ultimately washed."  A

16   663 ¶ 2.  The customer funds deposited into the 703 Account

17   for "split-strike" securities transactions were instead

18   funneled to other customers to sustain the illusion of large

19   and reliable returns on investment.

---

[4] Throughout this brief, "JPMorgan" refers to the four
JPMorgan defendants: JPMorgan Chase & Co., JPMorgan Chase
Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan
Securities Ltd.

[5] Record citations refer to the joint appendix filed in
the action under discussion.

12

1      The 703 Account was a retail checking account, not a

2  commercial account.  Billions of dollars from thousands of

3  investors were deposited without being segregated or

4  transferred to separate sub-accounts.  These accounts

5  exhibited, on their face, a "glaring absence of securities

6  activity."  A 714 ¶ 190.  At the same time, numerous multi-

7  million-dollar checks and wire transfers having no apparent

8  business purpose were exchanged between Madoff and his close

9  friend, Norman Levy (now dead).

10     In 2006, due diligence conducted by JPMorgan revealed

11  strong and steady yields by Madoff's feeder funds during a

12  time when the S&P 100 dropped thirty percent.  As one money

13  manager later acknowledged, that was too good to be true.

14  In June 2007, JPMorgan's Chief Risk Officer John Hogan

15  learned at a lunch with JPMorgan money manager Matt Zames

16  that "there is a well-known cloud over the head of Madoff

17  and that his returns are speculated to be part of a [P]onzi

18  scheme."  A 695 ¶ 119.  Hogan asked a junior analyst to run

19  a Google search on Madoff, and made no further inquiries

20  when the search yielded no hard evidence.

21     Faced with "numerous indications of Madoff's fraud," in

22  the fall of 2008 JPMorgan redeemed $276 million of its

13

1    investments in Madoff's feeder funds.  A 705 ¶¶ 156-60; A

2    710 ¶ 178.  But the company failed to tip off regulators or

3    other investors.  Though JPMorgan was uniquely positioned to

4    put an end to Madoff's fraud, it quietly continued

5    collecting its large fees.

6         **UBS and Access.**  Defendants UBS AG[6] ("UBS") and Access

7    International Advisors LLC[7] ("Access") are sued for aiding

8    and abetting Madoff's fraud by creating feeder funds and

9    collecting investments from abroad.  UBS acted as sponsor,

10   manager, administrator, custodian, and primary banker of the

11   funds.  UBS reaped at least $80 million in fees as it

12   facilitated investments in BLMIS, despite clear indicia of

13   fraud.  The "prestigious name" of UBS was used "to

14   legitimize and attract money to Madoff's fraud," but UBS

---

[6] "UBS" includes UBS AG, UBS (Luxembourg) S.A., UBS Fund Services (Luxembourg) S.A., UBS Third Party Management Company S.A., Roger Hartmann, Ralf Schroter, Rene Egger, Bernd Stiehl, Alain Hondequin, and Hermann Kranz.

[7] "Access" includes Access International Advisors LLC, Access International Advisors Europe Limited, Access International Advisors Ltd., Access Partners (Suisse) S.A., Access Management Luxembourg S.A., Access Partners S.A., Patrick Littaye, Claudine Magnon de la Villehuchet (in her capacities as Executrix and sole beneficiary of the Will of Thierry Magnon de la Villehuchet), Pierre Delandmeter, and Theodore Dumbauld.  The Trustee also sues feeder funds created by UBS and Access such as Defendants Luxalpha SICA V and Groupement.

14

Case 1:11-cv-04212-CM    Document 40    Filed 07/11/13    Page 18 of 63

1    agreed to "look the other way and to pretend that they were

2    truly ensuring the existence of assets and trades when in

3    fact they were not and never did."  A 916 ¶ 5.

4         UBS observed but ignored Madoff's lack of transparency

5    and his uncanny ability to generate consistently high

6    returns, except insofar as UBS declined to invest its own

7    money in BLMIS or endorse Madoff's funds to its clients.

8    In 2009, the Luxembourg regulator, the Commission de

9    Surveillance du Secteur Financier, indicated that the

10   failure of UBS to identify Madoff as a possible fraud was a

11   violation of Luxembourg law.

12        Access was also alerted to Madoff's suspicious

13   investment activities.  In 2006, internal managers at Access

14   became worried about the volume of options trades being

15   reported by Madoff, and hired an independent consultant to

16   investigate.  The consultant concluded that Madoff could not

17   possibly have executed the volume of options or equities

18   trades he reported, and that his trading revealed "either

19   extremely sloppy errors or serious omissions" that suggest

20   he "doesn't really understand the costs of the option

21   strategy."  A 977 ¶ 218 (emphasis removed).  Access

22   concealed the consultant's findings and continued active

15

1   recruitment of investors for Madoff's feeder funds in order

2   to keep churning its fees.

3   **Unicredit**.  Madoff's fraud drew billions from abroad.

4   With the help of UniCredit Bank Austria AG ("Bank Austria")

5   and 20:20 Medici AG ("Bank Medici"), one Sonja Kohn

6   established several Madoff feeder funds (the "Medici

7   Funds").  Together, they funneled nearly $3 billion into

8   BLMIS.  UniCredit S.p.A. and its two subsidiaries, Pioneer

9   Alternative Investment Management Limited ("Pioneer") and

10  Bank Austria (collectively, the "UniCredit entities"),

11  helped to promote the Medici Funds and thereby facilitated

12  the fraud.

13  The UniCredit entities and their affiliates made a lot

14  of money servicing the Medici funds: Bank Medici took more

15  than $15 million in fees; and BA Worldwide, more than $68

16  million.  The UniCredit entities were well aware that

17  Madoff's returns were highly suspicious, and that the extent

18  of BLMIS's trading activities was facially impossible.  Yet

19  they continued to aggressively market the Madoff feeder

20  funds to new customers while purporting to provide

21  oversight.  Among the signs overlooked by the UniCredit

22  entities were Madoff's failure to identify counterparties to

16

1    BLMIS's options transactions, BLMIS's atypical fee

2    structure, and Madoff's impossibly high volume of

3    transactions.   Shortly after Madoff's arrest, a senior

4    research analyst at Pioneer wrote, "[w]e should be the

5    professionals protecting investors from this fraud . . .

6    [but] there is not one [due diligence] report in the files

7    except for one in May 2005."   A 136 ¶ 314 (brackets in

8    original).

9        **HSBC**.   HSBC Bank plc ("HSBC")[8] established Madoff

10   feeder funds (at least eighteen in seven different

11   countries) that injected capital into the Ponzi scheme while

12   ignoring obvious warning signs.   As custodian and

13   administrator of the funds, HSBC was required to hold the

14   fund assets and handle day-to-day operations.   HSBC also

15   created derivative products, such as notes and swaps, to

16   increase the flow of investment.   These funds fed at least

---

[8] The HSBC Defendants include HSBC Bank plc, HSBC
Holdings plc, HSBC Securities Services (Luxembourg) S.A.,
HSBC Institutional Trust Services (Ireland) Limited, HSBC
Securities Services (Ireland) Limited, HSBC Institutional
Trust Services (Bermuda) Limited, HSBC Bank USA, N.A., HSBC
Securities Services (Bermuda) Limited, HSBC Bank (Cayman)
Limited, HSBC Private Banking Holdings (Suisse) S.A., HSBC
Private Bank (Suisse) S.A., HSBC Fund Services (Luxembourg)
S.A., and HSBC Bank Bermuda Limited.

17

1    $8.9 billion into Madoff's scheme, a sum representing nearly

2    forty percent of BLMIS's capital under management.

3         HSBC represented to customers that it exercised

4    supervision and control over fund assets, whereas BLMIS

5    itself took the role of custodian.  Had HSBC performed

6    oversight diligently, it would have seen thousands of

7    instances in which Madoff's purported trades exceeded the

8    total market volume of such trades on the given day.

9    Repeatedly, industry analysts and HSBC's own due diligence

10   team openly questioned Madoff's extraordinary success, lack

11   of transparency, and incredible trading volume.

12        In September 2005, HSBC commissioned KPMG LLP to detect

13   potential fraud in BLMIS's operations.  Resulting reports in

14   2006 and 2008 warned that BLMIS's role as custodian of its

15   own funds posed a risk that the trades were "a sham in order

16   to divert client cash."  A 89 ¶ 168.  Nonetheless, HSBC

17   continued to "enable[]" Madoff in order to reap a windfall.

18   A 35 ¶ 1.  In sum, HSBC "engineered a labyrinth of hedge

19   funds, management companies, and service providers that, to

20   unsuspecting outsiders, seemed to compose a formidable

21   system of checks and balances," yet, in reality, "it

22   provided different modes for directing money to Madoff while

23   avoiding scrutiny and maximizing fees."  A 36 ¶ 4.

18

1          **Procedural History**.  On July 15, 2009, the Trustee

2    commenced an adversary proceeding in the United States

3    Bankruptcy Court for the Southern District of New York

4    against HSBC and thirty-six others, including UniCredit and

5    Pioneer.[9]  The Amended Complaint sought recovery of $2

6    billion in preferential or fraudulent transfers (Counts 1

7    through 19), and asserted four common law causes of action:

8    aiding and abetting fraud, aiding and abetting breach of

9    fiduciary duty, unjust enrichment, and money had and

10   received (collectively, the "common law claims").  These

11   common law claims sought $6.6 billion from HSBC and $2

12   billion from the remaining defendants.  A contribution claim

13   was asserted under New York law.

14        On a motion by the UniCredit entities, the district

15   court withdrew the reference to the bankruptcy court, for

16   the limited purpose of deciding two threshold issues: (1)

17   the Trustee's standing to assert the common law claims, and

18   (2) preemption of these claims by the Securities Litigation

19   Uniform Standards Act ("SLUSA").

20        The common law claims and the contribution claim were

21   dismissed by Judge Rakoff in July 2011, on the grounds that

---

[9] This proceeding consolidated two actions, one against
HSBC and one against UniCredit and Pioneer.

19

1    the Trustee was <u>in pari delicto</u> with the defendants, lacked

2    standing to assert the common law claims on customers'

3    behalf, and could not demonstrate a right to contribution.

4    <u>See</u> <u>Picard v. HSBC Bank PLC</u>, 454 B.R. 25, 37 (S.D.N.Y.

5    2011).  The court did not reach the question whether SLUSA

6    bars the Trustee's claims.  <u>Id.</u>

7        The Trustee's adversary proceeding against JPMorgan was

8    commenced in December 2010.  As in the proceedings against

9    HSBC and UniCredit, the Trustee asserted common law claims

10    seeking $19 billion for, <u>inter alia</u>, aiding and abetting

11    fraud, aiding and abetting breach of fiduciary duty, unjust

12    enrichment, and conversion.

13        The adversary proceeding against UBS followed.  Also

14    named were Access, several of its affiliates, and two feeder

15    funds.  Again, the Trustee asserted common law claims for

16    aiding and abetting fraud, aiding and abetting breach of

17    fiduciary duty, unjust enrichment, and conversion, among

18    others.  Damages of approximately $2 billion were sought on

19    behalf of the customers of BLMIS (rather than BLMIS itself).

20        All Defendants (except Luxalpha and two individual

21    Defendants) moved to dismiss the common law claims and the

22    contribution claim.  In November 2011, Judge McMahon granted

23    the motions.  <u>See</u> <u>Picard v. JPMorgan Chase & Co.</u>, 460 B.R.

20

1    84 (S.D.N.Y. 2011).  Judge McMahon concluded (as did Judge

2    Rakoff) that the Trustee lacks standing to bring an action

3    on behalf of third parties and has no valid claim for

4    contribution.  <u>Id.</u> at 106.

5                              **DISCUSSION**

6        We review <u>de novo</u> a district court's dismissal of

7    causes of action for failure to state a claim for relief or

8    lack of standing.  <u>See</u> <u>Fulton v. Goord</u>, 591 F.3d 37, 41 (2d

9    Cir. 2009).  Point I considers the Trustee's claims as

10   asserted by him on behalf of BLMIS itself; Point II

11   considers claims asserted by the Trustee on behalf of

12   BLMIS's customers.

13                                 **I**

14       We agree with the district courts that the Trustee's

15   common law claims asserted on behalf of BLMIS are barred by

16   the doctrine of <u>in pari delicto</u>.

17                                 **A**

18       Under New York law,[10] one wrongdoer may not recover

19   against another.  <u>See</u> <u>Kirschner v. KPMG LLP</u>, 938 N.E.2d 941,

---

    [10] "In a bankruptcy proceeding, state law . . .
    determines whether a right to sue belongs to the debtor or
    to the individual creditors." <u>Wight v. BankAmerica Corp.</u>,
    219 F.3d 79, 86 (2d Cir. 2000) (citation and internal
    quotation marks omitted).  New York law governs here.

                                 21

1   950 (N.Y. 2010).  The principle that a wrongdoer should not

2   profit from his own misconduct "is . . . strong in New

3   York."  Id. at 964.  The New York Appellate Division, First

4   Department, has long applied the doctrine of in pari delicto

5   to bar a debtor from suing third parties for a fraud in

6   which he participated.  See Barnes v. Hirsch, 212 N.Y.S.

7   536, 539 (App. Div. 1st Dep't 1925) ("The bankrupts could

8   not recover against these defendants for bucketing orders

9   because they were responsible for the illegal transaction

10  and parties to the fraud."), aff'd, 152 N.E. 424 (N.Y.

11  1926).

12      A "claim against a third party for defrauding a

13  corporation with the cooperation of management accrues to

14  creditors, not to the guilty corporation."  Shearson Lehman

15  Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991)

16  (citing Barnes, 212 N.Y.S. at 537).  The debtor's misconduct

17  is imputed to the trustee because, innocent as he may be, he

18  acts as the debtor's representative.  See Wight v.

19  BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000)

20  ("[B]ecause a trustee stands in the shoes of the

21  corporation, the Wagoner rule bars a trustee from suing to

22  recover for a wrong that he himself essentially took part

22

1 in."); accord Breeden v. Kirkpatrick & Lockhart LLP (In re

2 Bennett Funding Grp., Inc.), 336 F.3d 94, 99-100 (2d Cir.

3 2003) (applying Wagoner rule in the context of "the greatest

4 Ponzi scheme [then] on record" and holding that "the

5 defrauded investors and not the bankruptcy trustee" were

6 entitled to pursue malpractice claims against attorneys and

7 accountants arising from the fraud).[11]

8     Picard alleges that the Defendants were complicit in

9 Madoff's fraud and facilitated his Ponzi scheme by providing

10 (well-paid) financial services while ignoring obvious

11 warning signs. These claims fall squarely within the rule

12 of Wagoner and the ensuing cases: Picard stands in the shoes

13 of BLMIS and may not assert claims against third parties for

14 participating in a fraud that BLMIS orchestrated.

15

---

[11] See also Kirschner v. Grant Thornton LLP, No. 07
Civ. 11604 (GEL), 2009 WL 1286326, at *10 (S.D.N.Y. Apr. 14,
2009) (applying Wagoner rule to dismiss fraud and breach of
fiduciary claims where the debtor "participated in, and
benefitted from, the very wrong for which it seeks to
recover"), aff'd, 626 F.3d 673 (2d Cir. 2010); Hirsch v.
Arthur Andersen & Co., 72 F.3d 1085, 1094-95 (2d Cir. 1995)
(holding that even though "there [was] at least a
theoretical possibility that some independent financial
injury to the Debtors might be established," the Wagoner
rule precluded standing "because of the Debtors'
collaboration with the defendants-appellees in promulgating
and promoting the Colonial Ponzi schemes").

23

1        Picard's scattershot responses are resourceful, but

2    they all miss the mark.  He contends that a SIPA trustee is

3    exempt from the <u>Wagoner</u> rule, but adduces no authority.  He

4    argues that the rationale of the <u>in pari delicto</u> doctrine is

5    not served here because he himself is not a wrongdoer; but

6    neither were the trustees in the cases cited above.[12]  He

7    contends that <u>in pari delicto</u> should not impede the

8    enforcement of securities laws, citing <u>Bateman Eichler, Hill</u>

9    <u>Richards, Inc. v. Berner</u>, 472 U.S. 299 (1985); but <u>Bateman</u>

10    <u>Eichler</u> is inapposite.  <u>See</u> <u>id.</u> at 315-16 (holding that <u>in</u>

11    <u>pari delicto</u> would not prevent defrauded tippee from

12    bringing suit against defrauding tipper, at least absent

13    further inquiry into "relative culpabilities" of tippee and

14    tipper).[13]  He invokes the "adverse interest" exception,

---

[12] Relatedly, he argues that in a typical bankruptcy <u>in pari delicto</u> is designed to bar corporate malefactors, including shareholders, from recovering, whereas in a SIPA liquidation the trustee marshals assets for the benefit of the customer property estate.  Accordingly, there is no similar concern here that funds collected by the trustee would be distributed to wrongdoers.  But, in <u>Kirschner v. KPMG LLP</u>, the New York Court of Appeals declined to make an exception to the <u>in pari delicto</u> doctrine despite the trustee's urging that proceeds would "benefit blameless unsecured creditors . . . and shareholders."  <u>Kirschner v. KPMG LLP</u>, 938 N.E.2d 941, 958 (N.Y. 2010).

[13] Like the Supreme Court in <u>Bateman Eichler</u>, we recently declined to apply <u>in pari delicto</u> to bar suit in a private civil antitrust action, "where private actions play

1   which directs a court not to impute to a corporation the bad

2   acts of its agent when the fraud was committed for personal

3   benefit.  See The Mediators, Inc. v. Manney (In re

4   Mediators, Inc.), 105 F.3d 822, 827 (2d Cir. 1997).

5   However, "this most narrow of exceptions" is reserved for

6   cases of "outright theft or looting or embezzlement . . .

7   where the fraud is committed *against* a corporation rather

8   than on its behalf."[14]  Kirschner v. KPMG LLP, 938 N.E.2d

9   941, 952 (N.Y. 2010).  It is not possible thus to separate

---

a significant role in the enforcement scheme."  Gatt
Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 80 (2d
Cir. 2013) (dismissing action on threshold question of
antitrust standing).  Here, in contrast, barring claims
brought by Madoff's successor-in-interest would not preclude
his victims from bringing suit individually.  See infra p.
58 n.29.  In pari delicto does not apply to all wrongdoers;
the doctrine targets those who "actively participate in the
illegal scheme and who are substantially at fault."  Gatt
Commc'ns, 711 F.3d at 84 (Wesley, J., concurring).  The
pleadings here leave us with no doubt that BLMIS--in whose
shoes the Trustee stands--bore at least "substantially equal
responsibility" for the injuries the Trustee now seeks to
redress.  See Bateman Eichler, 472 U.S. at 310-11.
Accordingly, application of the rule in this context is well
established.  See, e.g., Wagoner, 944 F.2d at 120; Wight,
219 F.3d at 87.

[14] When, as here, principal and agent are "one and the
same . . . the adverse interest exception is itself subject
to an exception styled the 'sole actor' rule," which
"imputes the agent's knowledge to the principal
notwithstanding the agent's self-dealing."  In re Mediators,
Inc., 105 F.3d at 827.

1   BLMIS from Madoff himself and his scheme.  Finally, Picard

2   argues that the district courts should not have applied the

3   in pari delicto doctrine at the pleadings stage; but the New

4   York Court of Appeals has held otherwise.  See id. at 947

5   n.3; see also Wagoner, 944 F.2d at 120.  Early resolution is

6   appropriate where (as here) the outcome is plain on the face

7   of the pleadings.

8                                 **B.**

9        The Trustee's claim for contribution is the only one

10  that may escape the bar of in pari delicto.  See Barrett v.

11  United States, 853 F.2d 124, 127 n.3 (2d Cir. 1988)

12  (explaining that parties seeking contribution are

13  necessarily in pari delicto).[15]  The Trustee seeks

14  contribution for payments made to BLMIS customers under

15  SIPA, on the theory that the Defendants are joint

16  tortfeasors with BLMIS under New York law.

17

---

[15] Some courts have suggested that Wagoner nevertheless
bars a contribution claim.  See, e.g., Devon Mobile Commc'ns
Liquidating Trust v. Adelphia Commc'ns Corp. (In re Adelphia
Commc'ns Corp.), 322 B.R. 509, 529 (Bankr. S.D.N.Y. 2005);
Silverman v. Meister Seeligh & Fein, LLP (In re Agape World,
Inc.), 467 B.R. 556, 580-81 (Bankr. E.D.N.Y. 2012).  We need
not decide whether such a claim would survive a Wagoner
challenge because, as explained in text, there is no
contribution right under SIPA.

26

 1          The New York statute provides that "two or more persons

 2     who are subject to liability for damages for the same

 3     personal injury, injury to property or wrongful death, may

 4     claim contribution among them whether or not an action has

 5     been brought or a judgment has been rendered against the

 6     person from whom contribution is sought." N.Y. C.P.L.R.

 7     § 1401 (McKinney).  Section 1401 "requires some form of

 8     compulsion; that is, the party seeking contribution must

 9     have been compelled in some way, such as through the entry

10     of a judgment, *to make the payment against which*

11     *contribution is sought*." <u>N.Y. State Elec. & Gas Corp. v.</u>

12     <u>FirstEnergy Corp.</u>, No. 3:03-CV-0438 (DEP), 2007 WL 1434901,

13     at *7 (N.D.N.Y. May 11, 2007) (emphasis added).

14          However, the SIPA payments for which Picard seeks

15     contribution were not compelled by BLMIS's state law fraud

16     liability to its customers; his obligation to pay customers

17     their ratable share of customer property is an obligation of

18     federal law: SIPA.  SIPA provides no right to contribution,

19     and it is settled in this Circuit that there is no claim for

20     contribution unless the operative federal statute provides

21     one.  <u>See</u> <u>Nw. Airlines, Inc. v. Transp. Workers Union of</u>

22     <u>Am., AFL-CIO</u>, 451 U.S. 77, 97 n.38, 97-99 (1981); <u>see also</u>

27

1   Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 144 (2d Cir.

2   1999) (affirming dismissal of New York state law

3   contribution claims for liability under the Fair Labor

4   Standards Act); KBL Corp. v. Arnouts, 646 F. Supp. 2d 335,

5   341 (S.D.N.Y. 2009) ("[A] plaintiff cannot use New York

6   State common law as an end-around to make a claim for

7   contribution that it could not make under the federal

8   statutory scheme."); Lehman Bros., Inc. v. Wu, 294 F. Supp.

9   2d 504, 505 n.1 (S.D.N.Y. 2003) ("[W]hether contribution is

10  available in connection with a federal statutory scheme is a

11  question governed solely by federal law.") (citation and

12  quotation marks omitted).

13      Picard emphasizes that he is not seeking contribution

14  for violations of SIPA or any other federal statute, but

15  that is beside the point.  "The source of a right of

16  contribution under state law must be *an obligation imposed*

17  *by state law*." LNC Invs., Inc. v. First Fid. Bank, 935 F.

18  Supp. 1333, 1349 (S.D.N.Y. 1996) (emphasis added).  The

19  issue is therefore whether the payments made by the Trustee,

20  for which he is seeking contribution, are required by state

21  or federal law--an easy question.

22

28

1       The $800 million paid out to customers fulfilled an

2    obligation created by SIPA, a federal statute that does not

3    provide a right to contribution "either expressly or by

4    clear implication," Texas Industries, Inc. v. Radcliff

5    Materials, Inc., 451 U.S. 630, 638 (1981).  Unlike the

6    Bankruptcy Act, SIPA does not require customers to establish

7    a basis of liability as a prerequisite for the Trustee's

8    disbursement obligation.  The loss itself is enough.  See 15

9    U.S.C. § 78fff-2(c) (the Trustee "shall allocate customer

10   property of the debtor . . . to customers of such debtor,

11   who shall share ratably in such customer property on the

12   basis and to the extent of their respective net equities");

13   cf. Hill v. Day (In re Today's Destiny, Inc.), 388 B.R. 737,

14   753-56 (Bankr. S.D. Tex. 2008) (holding that Texas law

15   governed contribution claim where debtor sought contribution

16   for obligations set forth in proofs of claim alleging fraud

17   under state law).  Because the Trustee's payment obligations

18   were imposed by a federal law that does not provide a right

19   to contribution, the district courts properly dismissed

20   these claims.

21

22

29

1                              **II**

2        Having rejected the Trustee's claims asserted on behalf

3   of BLMIS, we consider next whether the Trustee may assert

4   such claims on behalf of BLMIS's customers.  To proceed with

5   these claims, the Trustee must first establish his standing.

6   This he cannot do.

7        Standing is a "threshold question in every federal

8   case, determining the power of the court to entertain the

9   suit." Warth v. Seldin, 422 U.S. 490, 498 (1975).  Standing

10  depends, first, on whether the plaintiff has identified a

11  "case or controversy" between the plaintiff and the

12  defendants within the meaning of Article III of the

13  Constitution.  Ass'n of Data Processing Serv. Orgs., Inc. v.

14  Camp, 397 U.S. 150, 152 (1970).  "To have standing, '[a]

15  plaintiff must [1] allege personal injury [2] fairly

16  traceable to the defendant's allegedly unlawful conduct and

17  [3] likely to be redressed by the requested relief.'"

18  Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091 (2d Cir.

19  1995) (alterations in original) (quoting Allen v. Wright,

20  468 U.S. 737, 751 (1984)).  In addition, the plaintiff must

21  comply with "prudential" limitations on standing, of which

22  the salient one here is that a party must "assert his own

30

1   legal rights and interests and cannot rest his claim to

2   relief on the legal rights or interests of third parties."

3   Warth, 422 U.S. at 499.

4        We consider below Picard's arguments that: (A) existing

5   Second Circuit precedent allows for third-party standing in

6   a SIPA liquidation; and (B) SIPA itself confers standing,

7   both by creating a bailment relationship between the Trustee

8   and the debtor's customers, and by authorizing SIPC to

9   pursue subrogation claims on customers' behalf.[16]

10                                  **A**

11       The implied prohibition in Article III against third-

12  party standing applies to actions brought by bankruptcy

13  trustees.  In Caplin v. Marine Midland Grace Trust Co. of

14  N.Y., 406 U.S. 416 (1972), the Supreme Court ruled that

15  federal bankruptcy law does not empower a trustee to collect

16  money owed to creditors.  That is because a bankruptcy

17  trustee is not empowered "to collect money not owed to the

18  estate"; the trustee's proper task "is simply to collect and

_____

[16] In proceedings before one of the district courts,
the Trustee grounded his standing argument in large part on
Section 544(a) of the Bankruptcy Code, which gives a trustee
the rights of a hypothetical lien creditor.  The court
considered this argument at length and ultimately rejected
it, see Picard v. JPMorgan Chase & Co., 460 B.R. 84, 92-97
(S.D.N.Y. 2011) (McMahon, J.), and the Trustee has abandoned
it on appeal.

31

1    reduce to money the property of the estates for which (he is

2    trustee)." Id. at 428-29 (citation and internal quotation

3    marks omitted).  "[N]owhere in the statutory scheme is there

4    any suggestion that the trustee in reorganization is to

5    assume the responsibility of suing third parties" on behalf

6    of creditors. Id. at 428.  This way, creditors can "make

7    their own assessment of the respective advantages and

8    disadvantages, not only of litigation, but of various

9    theories of litigation," id. at 431; no consensus is needed

10   as to "the amount of damages to seek, or even on the theory

11   on which to sue," id. at 432; and disputes over inconsistent

12   judgments and the scope of settlements can be avoided, id.

13   at 431-32.

14       Our Court has hewed to this principle.  In Wagoner, the

15   misappropriation of funds by the owner and president of the

16   debtor company was facilitated by stock transactions

17   effected through a third-party brokerage firm.  Shearson

18   Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 117 (2d Cir.

19   1991).  The trustee's claim that the brokerage aided and

20   abetted the fraud was dismissed on summary judgment, and we

21   affirmed, observing that "[i]t is well settled that a

22   bankruptcy trustee has no standing generally to sue third

32

1   parties on behalf of the estate's creditors, but may only

2   assert claims held by the bankrupt corporation itself." Id.

3   at 118 (citing Caplin, 406 U.S. at 434); see also Hirsch v.

4   Arthur Andersen & Co., 72 F.3d 1085, 1094 (2d Cir. 1995)

5   (holding that Chapter 11 trustee had no standing to bring

6   creditor claims against accountants and law firms that had

7   provided services to the debtor, a real estate partnership

8   operated as a Ponzi scheme); The Mediators, Inc. v. Manney

9   (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir. 1997)

10  (affirming dismissal of breach of fiduciary duty claim

11  brought by creditors' committee functioning as bankruptcy

12  trustee, against bank and law firm for allegedly aiding and

13  abetting debtor's fraud).

14      The Trustee makes little effort to explain why Caplin

15  and its progeny do not control.  Instead, he relies on a

16  single Second Circuit case that was overruled by the Supreme

17  Court, and on dicta in another.  Apart from lacking

18  precedential force, both cases are readily distinguishable.

19                              1

20      In Redington v. Touche Ross & Co., 592 F.2d 617 (2d

21  Cir. 1978), rev'd, 442 U.S. 560 (1979), a SIPA trustee sued

22  the accountant of an insolvent brokerage for violations of

33

1   record-keeping provisions of Section 17(a) of the Securities

2   Exchange Act, as well as violations of state common law.

3   The district court dismissed the Section 17(a) claim for

4   lack of an implied private right of action, and concluded

5   that it lacked jurisdiction over the common law claims.  See

6   Redington v. Touche Ross & Co., 428 F. Supp. 483, 492-93

7   (S.D.N.Y. 1977).

8       In reversing, we held that Section 17(a) did create an

9   implied private right of action.  See Redington v. Touche

10  Ross & Co., 592 F.2d 617 (2d Cir. 1978), rev'd, 442 U.S. 560

11  (1979).  We then considered the trustee's claim that "[h]e

12  is responsible for marshalling and returning [customer]

13  property; to the extent that he is unable to do so, he

14  argues, he may sue on behalf of the customer/bailors any

15  wrongdoer whom they could sue themselves."  Id. at 625.

16  Relying on the Federal Rules of Civil Procedure, Redington

17  concluded that "the Trustee, as bailee, is an appropriate

18  real party in interest," id., and that "SIPC is subrogated

19  to the right of action implied in section 17 in favor of

20  brokers' customers against third parties such as

21  accountants."  Id. at 624.  Redington would favor Picard's

22  case, except that Redington is no longer good law.

34

1        The Supreme Court granted certiorari in <u>Redington</u> to

2    decide whether Section 17(a) created an implied right of

3    action and whether a SIPA trustee and SIPC had standing to

4    assert that claim.  See <u>Touche Ross & Co. v. Redington</u>, 442

5    U.S. 560 (1979).  The Court held that no private right of

6    action existed under Section 17(a), <u>id.</u> at 579, and

7    therefore considered it "unnecessary to reach" the standing

8    issue, <u>id.</u> at 567 n.9.  The case was remanded to consider

9    whether an alternative basis for jurisdiction existed, but

10   none was found.  See <u>Redington v. Touche Ross & Co.</u>, 612

11   F.2d 68, 70 (2d Cir. 1979).

12       Picard argues that the Supreme Court left the standing

13   question "untouched" because the opinion was "limited to a

14   merits-based reversal on the issue of whether a private

15   right of action existed under section 17(a)."  Appellant Br.

16   31 (11-5044).  However, the question of who may assert a

17   right of action is presented ordinarily only if a right of

18   action has been found to exist.  See <u>Nat. R.R. Passenger</u>

19   <u>Corp. v. Nat. Assoc. of R.R. Passengers</u>, 414 U.S. 453, 456

20   (1974) ("[T]he threshold question clearly is whether the

21   Amtrak Act . . . creates a [private] cause of action . . .

22   for it is only if such a right of action exists that we need

35

1   consider whether the respondent had standing to bring the

2   action[.]").[17]   The Supreme Court's reversal on the

3   threshold question drained the Second Circuit Redington

4   opinion of force on other questions.   See Newdow v. Rio

5   Linda Union Sch. Dist., 597 F.3d 1007, 1041 (9th Cir. 2010)

6   ("[W]hen the Supreme Court reverses a lower court's decision

7   on a threshold question," the Court "effectively holds the

8   lower court erred by reaching [other issues].").

9        Following the Supreme Court's reversal, this Court

10   vacated its original judgment on the ground that subject

11   matter jurisdiction was lacking.   See Order, Redington v.

12   Touche Ross, Nos. 77-7183, 77-7186 (2d Cir. Aug. 8, 1979);

13   Appellee Br. Addendum A (11-5207).   As the Trustee concedes,

14   vacatur dissipates precedential force.   See Appellant Br. 30

---

[17] The Trustee attempts to distinguish National
Railroad on the ground that that case involved a single
federal statute without additional claims, so a
determination that the Amtrak Act did not create a private
right of action ended the case.   Because Redington also
involved state law claims over which the Court exercised
pendent jurisdiction, Picard reasons, "a determination on
the existence of a private right of action tied to a federal
statute does not end the court's inquiry into a trustee's
standing to assert state common law claims."   Appellant Br.
36 (11-5044).   In Redington, however, we did not consider
specifically whether the trustee had standing to bring
claims under common law.   As explained in text, Redington's
standing analysis was entirely dependent on the Court's
antecedent ruling that the statute created an implied
private right of action--a ruling that was later overturned.

36

1   (11-5044).  See also O'Connor v. Donaldson, 422 U.S. 563,

2   577 n.12 (1975) (observing that vacatur "deprives [the]

3   court's opinion of precedential effect"); Brown v. Kelly,

4   609 F.3d 467, 476-77 (2d Cir. 2010).

5       Since Redington, at least six judges in this Circuit

6   have questioned or rejected third-party claims brought by

7   SIPA trustees, beginning with Judge Pollack in Mishkin v.

8   Peat, Marwick, Mitchell & Co., 744 F. Supp. 531, 556-58

9   (S.D.N.Y. 1990).[18]  See also Picard v. JPMorgan Chase & Co.,

10   460 B.R. 84, 100-101 (S.D.N.Y. 2011) (McMahon, J.); Picard

11   v. HSBC Bank PLC, 454 B.R. 25, 33-34 (S.D.N.Y. 2011)

12   (Rakoff, J.); Picard v. Taylor (In re Park South Sec., LLC),

13   326 B.R. 505, 516 (Bankr. S.D.N.Y. 2005) (Drain, J.);

14   Giddens v. D.H. Blair & Co. (In re A.R. Baron & Co., Inc.),

15   280 B.R. 794, 804 (Bankr. S.D.N.Y. 2002) (Beatty, J.); SIPC

16   v. BDO Seidman, LLP, 49 F. Supp. 2d 644, 653 (S.D.N.Y. 1999)

17   (Preska, J.), rev'd on other grounds, 222 F.3d 63 (2d Cir.

18   2000).

19

---

   [18] In a hearing in the Mishkin case, Judge Pollack
concluded, as we do, that Redington "was reversed in all
respects not on other grounds" and "does not stand as the
law of this circuit."  SPA 17 (11-5175).

37

1    Yet <u>Redington</u> has enjoyed something of a half-life,

2  with several courts (including this one) assuming without

3  deciding that <u>Redington</u> retains residual force.[19]  <u>Redington</u>

4  should be put to rest; it has no precedential effect.

5    Even if <u>Redington</u> retained some persuasive value, it

6  would not decide this case.  First, <u>Redington</u> considered

7  chiefly whether the trustee and SIPC had standing to bring a

8  cause of action under Section 17 of the Exchange Act; the

9  opinion said nothing about a SIPA trustee's ability to

10  orchestrate mass tort actions against third parties.  <u>See</u>

11  <u>Redington v. Touche Ross & Co.</u>, 592 F.2d 617, 618 (2d Cir.

12  1978), <u>rev'd</u>, 442 U.S. 560 (1979) ("[W]e are presented with

13  the question whether a private cause of action exists under

14  section 17 of the Securities Exchange Act of 1934 against

---

[19] Assuming that <u>Redington</u> was still good law, Judges Drain and Beatty instead rejected SIPA trustees' standing arguments on the ground that only SIPC, not a SIPA trustee, could enforce its rights of subrogation.  <u>See</u> <u>In re Park South Sec., LLC</u>, 326 B.R. at 516; <u>In re A.R. Baron & Co., Inc.</u>, 280 B.R. at 804.  In <u>BDO Seidman, LLP</u>, Judge Preska held that although <u>Mishkin</u>'s interpretation of SIPC's subrogation power was "more faithful to the letter and purpose of the Act," she was nonetheless "bound by <u>Redington</u> to find that SIPC has standing to bring suit."  49 F. Supp. 2d at 653.  On appeal, this Court "assume[d], without deciding, that . . . SIPC has standing as the customers' subrogee," <u>SIPC v. BDO Seidman, LLP</u>, 222 F.3d 63, 69 (2d Cir. 2000), and ultimately dismissed its claims on substantive grounds, <u>id.</u> at 71-76.

38

1   accountants who prepare misleading statements of a broker's

2   financial affairs, and if so, who may maintain such an

3   action."). Second, our holding in Redington turned, in

4   part, on an analysis of Fed. R. Civ. P. 17(a), which sets

5   forth rules concerning real parties in interest, and which

6   has no application here. See id. at 625; see also infra p.

7   51 n.25. Third, Redington involved claims against a single

8   accounting firm for a few discrete instances of alleged

9   misconduct (the preparation of misleading financial

10  statements). As a result, the policy concerns we express

11  below (see infra pp. 59-69) would have been considerably

12  diminished--and, indeed, were not even addressed by the

13  Court. Fourth, and finally, in Redington the brokerage firm

14  was not complicit in the wrongdoing, but rather "an entity

15  distinct from its conniving officers [that] was directly

16  damaged by Touche Ross' unsatisfactory audit." 592 F.2d at

17  620. The Redington Court therefore did not have occasion to

18  consider whether the doctrine of in pari delicto barred all

19  or part of the suit. In sum, Redington is both non-binding

20  and inapposite.

21

22

23

39

Case Case 1:11-cv-04283-CM   Document 40   Filed 07/11/13   Page 43 of 63

**2**

1

2      The Trustee relies on <u>St. Paul Fire & Marine Insurance</u>

3   <u>Co. v. PepsiCo, Inc.</u>, 884 F.2d 688 (2d Cir. 1989), for the

4   proposition that a trustee may assert creditors' claims if

5   they are generalized in nature, and not particular to any

6   individual creditor.  However, the holding of that case has

7   no application here.

8      PepsiCo had been guarantor of bonds issued by a

9   subsidiary that later was acquired by a subsidiary of Banner

10  Industries.  When the (later) merged entity defaulted on the

11  bonds, PepsiCo sued Banner, alleging diversion of assets and

12  alter ego.  The merged entity went bankrupt, and the trustee

13  sued Banner for misappropriation.  We ruled that the

14  trustee--and not PepsiCo--could pursue Banner because Ohio

15  law allowed a subsidiary to assert an alter ego claim

16  against its parent, so that "[t]he cause of action therefore

17  becomes property of the estate of a bankrupt subsidiary, and

18  is properly asserted by the trustee in bankruptcy."  <u>Id.</u> at

19  703-04.

20     Picard directs us to a passage in <u>St. Paul</u>--stating

21  that a trustee may bring a claim if the "claim is a general

22  one, with no particularized injury arising from it, and if

40

1    that claim could be brought by any creditor of the debtor,"

2    id. at 701--and contends that the third-party claims here

3    are common to all customers because all customers were

4    similarly injured by Madoff's fraud and the Defendants'

5    facilitation.  This argument is flawed on many levels:

6         •    St. Paul decided the "specific question" whether a

7    creditor may bring an alter ego claim against the debtor's

8    parent when the debtor itself also possesses such a claim.

9    Id. at 699.  But Picard seeks to assert claims that are

10   property only of the creditors, not of the debtor.

11        •    The Trustee's broad reading of St. Paul would

12   bring the Court's holding into conflict with a line of cases

13   that came before and after it.  As discussed supra pp. 32-

14   34, it is settled that a trustee may not assert creditors'

15   claims against third parties.  See, e.g., Shearson Lehman

16   Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991).  And,

17   of course, St. Paul could not alter the Supreme Court's

18   ruling in Caplin.  Picard's argument thus conflicts with

19   Supreme Court and Second Circuit precedent.  See generally

20   In re Stanwich Fin. Servs. Corp., 317 B.R. 224, 228 n.4

21   (Bankr. D. Conn. 2004) (highlighting this tension).

22

41

1      •      The language cited by Picard from <u>St. Paul</u> is not

2    a pronouncement about third-party standing; it voices the

3    maxim that only a trustee, not creditors, may assert claims

4    that belong to the bankrupt estate.  As <u>St. Paul</u> elsewhere

5    states: "'[T]he Trustee in bankruptcy has standing to

6    represent only the interests of the debtor corporation.'

7    Our decision today goes no further than to say that causes

8    of action that could be asserted by the debtor are property

9    of the estate and should be asserted by the trustee."  <u>St.</u>

10   <u>Paul</u>, 884 F.2d at 702 n.3 (internal citation omitted)

11   (quoting <u>Bloor v. Carro, Spanbock, Londin, Rodman & Fass</u>,

12   754 F.2d 57, 62 n.4 (2d Cir. 1985)).  As illustrated by <u>St.</u>

13   <u>Paul</u>, when a creditor seeks relief against third parties

14   that pushed the debtor into bankruptcy, the creditor is

15   asserting a derivative claim that arises from harm done to

16   the estate.  Judge Posner described this distinction:

17               The point is simply that the trustee is confined
18               to enforcing entitlements of the corporation.  He
19               has no right to enforce entitlements of a
20               creditor.  He represents the unsecured creditors
21               of the corporation; and in that sense when he is
22               suing on behalf of the corporation he is really
23               suing on behalf of the creditors of the
24               corporation.  But there is a difference between a
25               creditor's interest in the claims of the
26               corporation against a third party, which are
27               enforced by the trustee, and the creditor's own
28               direct--not derivative--claim against the third

42

```
1              party, which only the creditor himself can
2              enforce.
3
4    Steinberg v. Buczynski, 40 F.3d 890, 893 (7th Cir. 1994).

5    See generally Prod. Res. Grp., L.L.C. v. NCT Grp., Inc., 863

6    A.2d 772, 792 (Del. Ch. 2004).

7         •    The customers' claims against the Defendants are

8    not "common" or "general."  A debtor's claim against a third

9    party is "general" if it seeks to augment the fund of

10   customer property and thus affects all creditors in the same

11   way.  Picard, however, seeks to assert claims on behalf of

12   thousands of customers against third-party financial

13   institutions for their handling of individual investments

14   made on various dates in varying amounts.  The Defendants'

15   alleged wrongful acts, then, could not have harmed all

16   customers in the same way.[20]
```

---

[20] A recent case arising out of the BLMIS bankruptcy provides a useful contrast.  In Fox v. Picard (In re Madoff), 848 F. Supp. 2d 469 (S.D.N.Y. 2012), the district court relied on St. Paul in holding that certain Madoff customers could not pursue fraudulent transfer claims "that were the property of the BLMIS estate."  Id. at 478.  The customer claims were "duplicative and derivative of the Trustee's fraudulent transfer claim."  Id. at 479 n.2.  Accordingly, the court found the claims to be "general" in the sense articulated in St. Paul, in that they arose from "a single set of actions that harmed BLMIS and all BLMIS customers in the same way."  Id. at 480.  Here, however, the customers' claims are not derivative of claims held by the BLMIS estate.

43

Case 1:11-cv-04232-CM   Document 40   Filed 07/11/13   Page 47 of 63

**B**

The Trustee attempts to blunt the force of <u>Caplin</u> and
its progeny by arguing that a SIPA liquidation is unique and
is therefore not controlled by precedent under the
bankruptcy code.  He advances two theories for why a SIPA
trustee enjoys standing to assert third-party claims.

**1**

Picard contends that, for SIPA purposes, the customers
of a failed brokerage are bailors, and that he--acting as
bailee--"has a sufficient possessory interest to permit him
to 'recover for the wrongful act of a third party resulting
in the loss of, or injury to, the subject of the bailment.'"
<u>United States v. Perea</u>, 986 F.2d 633, 640 (2d Cir. 1993)
(quoting <u>Rogers v. Atl., Gulf & Pac. Co.</u>, 107 N.E. 661, 664
(N.Y. 1915)).  We disagree.

First, the statute is not written or cast in terms of
bailment.  "To the extent consistent with the provisions of
this chapter, a liquidation proceeding shall be conducted in
accordance with, and as though it were being conducted under
[the Bankruptcy Code]."  15 U.S.C. § 78fff(b).  As a general
rule, SIPA vests trustees with "the same powers and title
with respect to the debtor and the property of the debtor

44

```
 1    . . . as a trustee in a case under Title 11."  15 U.S.C. §

 2    78fff-1(a).  True, a SIPA trustee has some powers not

 3    conferred on a trustee under Title 11.  Most notably, SIPA

 4    creates a fund of customer property that is separate from

 5    the debtor estate and that has priority over other

 6    creditors' claims, and authorizes the trustee to ratably

 7    distribute those funds based on customers' net equity.  See

 8    15 U.S.C. § 78fff-2(c)(1)(B); In re Bernard L. Madoff

 9    Investment Secs., 654 F.3d 229, 231 (2d Cir. 2011), cert.

10    denied, 133 S. Ct. 25 (2012).  But the statute does not

11    confer upon SIPA trustees a power, denied all other

12    bankruptcy trustees, to sue third parties on claims that

13    belong to persons other than the estate.  Nowhere does the

14    statute reference bailment, or characterize customers as

15    "bailors" or trustees as "bailees," or in any way indicate

16    that the trustee is acting as bailee of customer property.

17       Picard alternatively invokes the principle of bailment

18    under the common law.  This is dubious: courts are careful

19    to avoid overlaying common law principles onto a statutory

20    framework, even when (unlike here) the statute makes clear

21    reference to common law.  See Moore v. PaineWebber, Inc.,

22    189 F.3d 165, 179-80 (2d Cir. 1999) ("That the statute . . .
```

45

1    borrow[s] in part from the common law should not mislead us:

2    it remains the statute and its purpose that governs.").

3    This caution is especially apt here because the statute

4    creates a ramified scheme that makes no mention of common

5    law.

6         In any event, the analogy to the common law of bailment

7    is flawed from start to finish.  A bailment is "a delivery

8    of personalty for some particular purpose, or on mere

9    deposit, upon a contract express or implied, that after the

10   purpose has been fulfilled it will be redelivered to the

11   person who delivered it, or otherwise dealt with according

12   to that person's directions, or kept until it is reclaimed."

13   9 N.Y. Jur. 2d Bailments and Chattel Leases § 1 (West 2013).

14   Even assuming that the customers' investments could be

15   deemed bailed property, the only delivery that took place

16   was when customers made their investments, either in BLMIS

17   directly, or through the feeder funds.  See Pattison v.

18   Hammerstein, 39 N.Y.S. 1039, 1040 (App. Div. 1st Dep't

19   1896); see also United States v. $79,000 in Account No.

20   2168050/6749900 at Bank of N.Y., 96 CIV. 3493 (MBM), 1996 WL

21   648934, at *6 (S.D.N.Y. Nov. 7, 1996) ("Delivery to the

22   bailee is required to create a bailment.").  So: any

46

1    supposed bailment pre-dated Picard's appointment; he was not

2    entrusted with any customer property until *after* it had been

3    impaired; and he never had control over the missing funds

4    that he now seeks to recoup.  He therefore is not the proper

5    party to bring such an action.  See 9 N.Y. Jur. 2d Bailments

6    and Chattel Leases § 115 (West 2013) (explaining that bailee

7    may only "bring an action to recover for the loss of or

8    injury to the bailed property while in his or her

9    possession").[21]

10   Moreover, Picard is not seeking to recover specific

11   bailments for return to individual bailors.  See 9 N.Y. Jur.

12   2d Bailments and Chattel Leases § 82 (West 2013) ("One of

13   the most important rights of the bailor is that, on the

14   termination of the bailment, the bailor will return to him

15   or her the identical thing bailed . . . .").  Unlike

16   "customer name securities," which are separately held and

17   returned to individual customers outside the normal

18   distribution scheme,[22] Picard's claims are intended to

---

[21] Judge McMahon likened the Trustee's position to that
of a parking garage attendant who is handed the keys to a
car that was recently in an accident and decides to sue the
culpable party on the owner's behalf.  See Picard v.
JPMorgan Chase & Co., 460 B.R. 84, 104-05 (S.D.N.Y. 2011).

[22] See 15 U.S.C. § 78*lll*(4) (excluding "customer name
securities delivered to the customer" from definition of

47

1    augment the general fund of customer property so that it can

2    be distributed ratably based on customers' net equity.  This

3    arrangement is not an analog to a bailment, in which the

4    bailee is entrusted with an item that is to be recovered by

5    the bailor at some later time.

6         SIPC urges that we view the transaction as though

7    BLMIS, not the Trustee, acted as the bailee of customer

8    property, and that the Trustee is simply acting on BLMIS's

9    behalf to recover the bailed property.  The short answer is

10   that Madoff (and, by extension, BLMIS) took the investment

11   money from the customers in order to defraud them--and a

12   thief is not a bailee of stolen property.  See Pivar v.

13   Graduate Sch. of Figurative Art of the N.Y. Acad. of Art,

14   735 N.Y.S. 2d 522, 522 (App. Div. 1st Dep't 2002) (holding

15   that a bailment relationship arises if the bailee takes

---

customer property); see also In re New Times Sec. Servs.,
Inc., 371 F.3d 68, 72-73 (2d Cir. 2004).  This contrast, and
its ramifications, are illuminated by SIPC's own statements
to Congress regarding the passage of the 1978 amendments to
SIPA.  SIPC's then-Chairman, Hugh F. Owens, explained that
customer name securities "will be treated, in short, as
though they are not part of the debtor's estate, but merely
held by the debtor as bailee"--implying that most other
commingled property, such as cash, would simply become part
of the debtor's estate.  SIPA Amendments: Hearings on H.R.
8331 Before the Subcomm. on Sec., Comm. on Banking, Hous.
and Urban Affairs, 95th Cong. 41-42 (1978) (Statement by
Hugh F. Owens, Chairman of SIPC).

48

1   "lawful possession" of property "without present intent to

2   appropriate").

3       Madoff's commingling of customer funds also defeats any

4   analogy to bailment.  Notwithstanding Madoff's pretense, he

5   failed to maintain customers' investments in separate named

6   accounts.  He deposited all customer funds into a general

7   account (the 703 Account) and distributed those new

8   investments to earlier customers in lieu of actual returns.

9   This arrangement, which enabled the fraud, made a bailment

10  impossible.  See Peoples Westchester Sav. Bank v. F.D.I.C.,

11  961 F.2d 327, 330 (2d Cir. 1992) (distinguishing special

12  accounts from general accounts); see also United States v.

13  Khan, No. 97-6083, 1997 WL 701366, at *2 (2d Cir. 1997)

14  (holding that a deposit into a general bank account

15  "destroys a potential bailment" under New York law).[23]

16

---

[23] "With a few exceptions, such as commingled fungible
goods in a warehouse, the general rule is that the bailee
can only discharge his or her liability to the bailor by
returning the identical thing received, in its original or
an altered form, according to the terms of the bailment."  9
N.Y. Jur. 2d Bailments and Chattel Leases § 84 (West 2013).
Rahilly v. Wilson, a case relied on by SIPC, is not to the
contrary.  See Rahilly v. Wilson, 20 F. Cas. 179, 182 (Cir.
Ct. D. Minn. 1873) (comparing commingled bales of wheat to
"an ordinary general deposit of money in a bank" and holding
that no bailment had taken place).

49

1    SIPC attempts to obviate these difficulties by relying

2    on SEC Rule 15c, which establishes bookkeeping segregation

3    requirements for brokers.  17 C.F.R. § 240.15c3-3.  Judge

4    Rakoff was "mystified" by this argument, Picard v. HSBC Bank

5    PLC, 454 B.R. 25, 32 (S.D.N.Y. 2011), as are we.

6    Rule 15c requires brokers to maintain a minimum cash

7    balance in a reserve account and segregate all such cash for

8    customers' benefit.  See 17 C.F.R. § 240.15c3-3.  It also

9    "specifically contemplates the commingling of customer

10   monies and the lending of customer securities." Levitin v.

11   PaineWebber, Inc., 159 F.3d 698, 706 (2d Cir. 1998).

12   Whatever Rule 15c may do, it does not confer power on a SIPA

13   trustee to sue on behalf of customers.  First, the Rule is

14   not a part of SIPA.  Second, such a rule would exceed the

15   scope of agency rule-making.  See generally Alexander v.

16   Sandoval, 532 U.S. 275, 291 (2001) ("Language in a

17   regulation may invoke a private right of action that

18   Congress through statutory text created, but it may not

19   create a right that Congress has not.").  In any event, the

20   Rule does not suggest that the broker (or the Trustee)

21   serves as a bailee of customer property, or that the Trustee

22   may assert claims on behalf of customers.

50

1    Finally, SIPC and the Trustee infer a bailment

2    relationship from federal common law and the Federal Rules

3    of Civil Procedure.  The inferences are strained at best.

4    Federal common law, which does not speak to the powers of a

5    SIPA trustee, offers no useful insight.[24]  Nor do the

6    Federal Rules of Civil Procedure.[25]

7                                  **2**

8    The Trustee argues that, because SIPC advanced funds to

9    customers at the outset of the liquidation, SIPC is

---

[24] SIPC suggests that it is appropriate to resort to federal common law where a significant conflict exists between state and federal law and where the need for uniformity in the treatment of brokerage customers is paramount.  But no legal authority is offered to support the application of federal common law here.  And there is no evident conflict between New York bailment law (on the one hand) and (on the other) SIPA, Rule 15c, or some broader federal policy.

[25] The Trustee invokes Rule 17, which allows a bailee to sue "in [his] own name[] without joining the person for whose benefit the action is brought."  Fed. R. Civ. P. 17(a)(1).  But, as discussed in text, the trustee is not a bailee.  Additionally, Rule 17(a), like all rules prescribed by the Supreme Court, may not abridge, enlarge, or otherwise modify substantive rights.  See 28 U.S.C. § 2072(b); Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 49 (2d Cir. 2005) ("The procedural mechanisms set forth in Rule 17(a) for ameliorating real party in interest problems may not . . . be employed to expand substantive rights.").  It therefore cannot provide an independent basis for standing.  See generally Natural Res. Def. Council, Inc. v. EPA, 481 F.2d 116, 121 (10th Cir. 1973).

51

1    subrogated to those customers' claims against the

2    Defendants; SIPC therefore may assert those claims as

3    subrogee; and Picard is authorized to enforce that right on

4    SIPC's behalf.  But SIPC is a creature of statute, and

5    neither the plain language of the statute, nor its

6    legislative history, supports the Trustee's position.

7         True, a SIPA trustee (unlike a trustee in bankruptcy),

8    advances money to pay claims.  The statute takes this fact

9    into account by subrogating SIPC to customers' net equity

10   claims to the extent of the advances they received.  But it

11   goes no further.

12        The Trustee's subrogation theory is premised in

13   § 78fff-3(a):

14               To the extent moneys are advanced by SIPC to the
15               trustee to pay or otherwise satisfy the claims of
16               customers, in addition to all other rights it may
17               have at law or in equity, SIPC shall be subrogated
18               to the claims of such customers with the rights
19               and priorities provided in this chapter, except
20               that SIPC as subrogee may assert no claim against
21               customer property until after the allocation
22               thereof to customers as provided in section 78fff-
23               2(c) of this title.
24
25   15 U.S.C. § 78fff-3(a).  It is undisputed that the phrase

26   "claims of customers" refers (as throughout the statute) to

27   customers' net equity claims against the estate.  <u>See</u>

28   <u>generally</u> <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 654 F.3d

52

1    229, 233 (2d Cir. 2011), <u>cert. denied</u>, 133 S. Ct. 25 (2012).

2    SIPA thus allows only a narrow right of subrogation--for

3    SIPC to assert claims against the fund of customer property

4    and thereby recoup any funds advanced to customers once the

5    SIPA trustee has satisfied those customers' net equity

6    claims.

7        The Trustee urges us to conclude that § 78fff-3(a) does

8    more--much more--by creating a right of subrogation that

9    allows SIPC (and, by extension, the Trustee) to step into

10   customers' shoes and to initiate and control litigation on

11   their behalf, against any number of defendants, until SIPC

12   has been repaid in full.  As we emphasized earlier, SIPA

13   grants trustees the "same powers and title with respect to

14   the debtor and the property of the debtor" as a Title 11

15   trustee, 15 U.S.C. § 78fff-1(a), and the Supreme Court has

16   squarely rejected attempts by Title 11 trustees to capture

17   such litigation, <u>see</u> <u>Caplin v. Marine Midland Grace Trust</u>

18   <u>Co.</u>, 406 U.S. 416, 428 (1972).  As a final resort, the

19   Trustee relies on a catch-all provision included in the 1978

20   amendments to SIPA, which states that the subrogation rights

21   afforded by § 78fff-3(a) should not be read to diminish "all

22   other rights [SIPC] may have at law or in equity."  15

53

1   U.S.C. § 78fff-3(a).  From here, the Trustee claims an

2   implied right of equitable subrogation, "the principle by

3   which an insurer, having paid losses of its insured, is

4   placed in the position of its insured so that it may recover

5   from the third party legally responsible for the loss."

6   Winkelmann v. Excelsior Ins. Co., 650 N.E.2d 841, 843 (N.Y.

7   1995).  He thus claims a wide grant of authority to initiate

8   class-action lawsuits and assert any number of tort claims

9   against third parties on customers' behalf.[26]  This is a

10  long, long reach.

11      There is no sign that Congress intended an expansive

12  increment of power to SIPA trustees.  In 1973, the SIPC

13  chairman appointed a Special Task Force to consider possible

14  amendments to the 1970 Act.  The resulting July 1974 report

15  separately listed its "major policy recommendations" and its

16  proposed "technical refinements."  See Report to the Board

17  of Directors of SIPC of the Special Task Force to Consider

18  Possible Amendments to SIPA, Letter of Transmittal (July 31,

19  1974).  Recommendation II.A.9, deemed a "Major Policy

20  Recommendation," states that "claims of SIPC as subrogee

21  (except as otherwise provided), should be allowable only as

---

[26] We use the term "class-action lawsuits" loosely
here, without taking a position on the SLUSA question.

54

1    *claims against the general estate*."  Id. at 12 (emphasis

2    added); see also SIPA Amendments of 1975: Hearings on H.R.

3    8064 Before the Subcomm. on Consumer Protection and Fin. of

4    the H. Comm. on Interstate and Foreign Commerce, 94th Cong.

5    64 (1976) (hereinafter "Hearings on H.R. 8064").

6         Notably, Caplin was decided in 1972, before the Task

7    Force report and six years before Congress amended § 78fff-

8    3(a) to include "all other rights [SIPC] may have at law or

9    in equity."  If Congress sought to exempt SIPA trustees from

10   Caplin's rule and expand SIPC's subrogation rights to tort

11   actions against third parties, we would expect such intent

12   to be manifested in the statutory wording and in the

13   record.[27]

14        The wording cited by Picard was proposed by SIPC itself

15   as a "Minor Substantive or Technical Amendment[]" in order

16   to "make clear that SIPC's subrogation rights under the 1970

17   Act are cumulative with whatever rights it may have under

18   other State or Federal laws."  Hearings on H.R. 8064, 94th

---

[27] Caplin was undoubtedly on the radar of legislators
at the time, as an earlier version of Section 544 of the
Bankruptcy Code introduced with the 1978 amendments
contained a provision intended to overrule Caplin.  See In
re Ozark Rest. Equip. Co., Inc., 816 F.2d 1222, 1227 n.9
(8th Cir. 1987).  Significantly, this provision was deleted
prior to enactment.  Id.

55

1   Cong. 197, 199 (1976) (Memorandum of the Securities Investor

2   Protection Corporation in Regard to Certain Comments

3   Concerning H.R. 8064).  Congress "does not alter the

4   fundamental details of a regulatory scheme in vague terms or

5   ancillary provisions--it does not . . . hide elephants in

6   mouseholes."  <u>Whitman v. Am. Trucking Assocs., Inc.</u>, 531

7   U.S. 457, 468 (2001).

8        The Trustee adduces rules of insurance law to justify

9   his claim, an analogy with some intuitive appeal: Principles

10  of equity generally permit subrogees wide scope to sue

11  third-party tortfeasors, a claim that arises most commonly

12  with insurance.  <u>See, e.g.</u>, <u>Winkelmann</u>, 650 N.E.2d at 843.

13       But this argument succumbs to the same critique as

14  Picard's bailment theory: We avoid engrafting common law

15  principles onto a statutory scheme unless Congress's intent

16  is manifest.  <u>See</u> <u>supra</u> p. 46.  The clearest Congressional

17  intent here is that we should treat SIPA as a bankruptcy

18  statute, not as an insurance scheme.  "SIPA and FDIA are

19  independent statutory schemes, enacted to serve the unique

20  needs of the banking and securities industries,

21  respectively."[28]  <u>SIPC v. Morgan, Kennedy & Co.</u>, 533 F.2d

---

[28]  Congress rejected some early versions of the SIPA
bill "which were patterned on FDIA and which extended

56

1    1314, 1318 (2d Cir. 1976).  We have since warned against

2    oversimplified comparisons between insurance law and federal

3    statutory law: "While this Court has referred to SIPC as

4    providing a form of public insurance, it is clear that the

5    obligations imposed on an insurance provider under state law

6    do *not* apply to this congressionally-created nonprofit

7    membership corporation." In re Bernard L. Madoff Inv. Sec.

8    LLC, 654 F.3d 229, 239 (2d Cir. 2011), cert. denied, 133 S.

9    Ct. 25 (2012) (internal citations and quotation marks

10    omitted).

11        Relatedly, Picard argues under principles of equity

12    that unless he can spearhead the litigation on behalf of

13    defrauded customers, the victims will not be made whole,

14    SIPC will be unable to recoup its advances, and third-party

15    tortfeasors will reap windfalls.[29]  No doubt, there are

---

insurance coverage to certain beneficial interests
represented by customer accounts." Morgan, Kennedy & Co.,
533 F.2d at 1318.

     [29] Picard and SIPC contend that, absent his exclusive
authority to bring these customer claims, the Defendants
would in effect be immunized from suit.  But it is not
obvious why customers cannot bring their own suits against
the Defendants.  In fact, the Defendants make clear that
customers have already filed such actions. See, e.g., MLSMK
Inv. Co. v. JP Morgan Chase & Co., 431 F. App'x 17 (2d Cir.
2011) (summary order); Shapiro v. JP Morgan Chase & Co., No.
11-CV-8331 (S.D.N.Y.); Hill v. JPMorgan Chase & Co., No. 11-
CV-7961 (S.D.N.Y.).  As in Redington, "the customers on
whose behalf the Trustee seeks to maintain suit are not only

1     advantages to the course Picard wants to follow.  But equity

2     has its limits; it may fill certain gaps in a statute, but

3     it should not be used to enlarge substantive rights and

4     powers.  Cf. In re Ozark, 816 F.2d at 1230 (observing that

5     while Bankruptcy Code allows a court to apply equitable

6     principles when necessary, "[t]hese powers . . . do not

7     include the ability to award equitable relief where the

8     party asserting the cause of action for such relief does not

9     have standing under any other section of the Code").

10     As the Supreme Court observed, "SIPC's theory of

11    subrogation is fraught with unanswered questions."  Holmes

12    v. SIPC, 503 U.S. 258, 270 (1992) (ultimately declining to

13    decide subrogation issue and instead holding that link

14    between stock manipulation and harm to customers was too

15    remote to support SIPC's RICO claim).  As in Holmes, SIPC

16    has left courts "to guess at the nature of the 'common law

17    rights of subrogation' that it claims."  Id. at 271.

18     The practical skepticism voiced in Caplin in a

19    traditional bankruptcy context is justified here as well.

20    Would such suits prevent customers from "mak[ing] their own

---

entitled to bring, but have already initiated their own
action."  Redington v. Touche Ross & Co., 592 F.2d 617, 635
(2d Cir. 1978) (Mulligan, J., dissenting).

58

1    assessment of the respective advantages and disadvantages,

2    not only of litigation, but of various theories of

3    litigation"?  Caplin, 406 U.S. at 431.  Can a SIPA trustee

4    control customers' claims against third parties if SIPC has

5    not fully satisfied the customers' claims against the

6    estate?  How would inconsistent judgments be avoided, given

7    that "independent actions are still likely because it is

8    extremely doubtful that [the parties] would agree on the

9    amount of damages to seek, or even on the theory on which to

10   sue"?  Id. at 432.  Who would be bound by a settlement

11   entered into by either the Trustee or by each customer who

12   brings suit?  Id.  The size and scope of the litigation here

13   only amplify these concerns.

14        As Caplin advises, it is better to leave these

15   intractable policy judgments to Congress:

16                Congress might well decide that reorganizations
17                have not fared badly in the 34 years since Chapter
18                X was enacted and that the status quo is
19                preferable to inviting new problems by making
20                changes in the system.  Or, Congress could
21                determine that the trustee . . . was so well
22                situated for bringing suits . . . that he should
23                be permitted to do so.  In this event, Congress
24                might also determine that the trustee's action was
25                exclusive, or that it should be brought as a class
26                action on behalf of all [creditors], or perhaps
27                even that the [creditors] should have the option
28                of suing on their own or having the trustee sue on
29                their behalf.  Any number of alternatives are

59

```
1              available.  Congress would also be able to answer
2              questions regarding subrogation or timing of law
3              suits before these questions arise in the context
4              of litigation.  Whatever the decision, it is one
5              that only Congress can make.

6    Caplin, 406 U.S. at 434-35.

7                         *    *    *

8         For the foregoing reasons, the judgments are affirmed.
```