**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
SECURITIES INVESTOR PROTECTION CORPORATION,    :

           Plaintiff-Applicant,    :    SIPA Liquidation

      v.    :

         :    No. 08-01789 (BRL)

BERNARD L. MADOFF INVESTMENT SECURITIES LLC,    :

        :    (Substantively

           Defendant.    :    Consolidated)
------------------------------------------------------------------x
In re    :

        :

BERNARD L. MADOFF,    :

           Debtor.    :
------------------------------------------------------------------x
IRVING H. PICARD, Trustee for the Liquidation of Bernard L.    :
Madoff Investment Securities LLC,    :

           Plaintiff,    :

      v.    :    Adv. Pro. No. 10-04285

        :    (BRL)

UBS AG, et al.,    :

           Defendants.    :
------------------------------------------------------------------x
IRVING H. PICARD, Trustee for the Liquidation of Bernard L.    :
Madoff Investment Securities LLC,    :

           Plaintiff,    :

      v.    :    Adv. Pro. No. 10-05311

        :    (BRL)

UBS AG, et al.,    :

           Defendants.    :
------------------------------------------------------------------x

**DECLARATION OF MATTHEW K. KELSEY**
**IN SUPPORT OF UBS DEFENDANTS'**
**MOTION TO WITHDRAW THE REFERENCE**

Matthew K. Kelsey, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I am Of Counsel at the law firm of Gibson, Dunn & Crutcher LLP, counsel for

UBS AG, UBS (Luxembourg) SA, UBS Fund Services (Luxembourg) SA, and UBS Third Party

Management Company SA (together, the "**UBS Defendants**"), the defendants in the above-

captioned adversary proceedings.  As an attorney admitted to practice before this Court, I respectfully submit this declaration to provide the Court with true and correct copies of the documents listed below that are referenced in the Memorandum of Law in Support of UBS Defendants' Motion to Withdraw the Reference.

2.       Annexed hereto as **Exhibit A** is a true and correct copy of the June 3, 2011 order issued by Judge Jed S. Rakoff of the United States District Court for the Southern District of New York in *Picard v. Kohn*, No. 11 Civ. 1181 (JSR) (S.D.N.Y.), withdrawing the reference from the United States Bankruptcy Court for the Southern District of New York.

3.       Annexed hereto as **Exhibit B** is a true and correct copy of the Complaint filed on November 23, 2010 against the UBS Defendants and certain other defendants in *Picard v. UBS AG*, No. 10-04285 (BRL) (Bankr. S.D.N.Y.).

4.       Annexed hereto as **Exhibit C** is a true and correct copy of the Complaint filed on December 7, 2010 against the UBS Defendants and certain other defendants in *Picard v. UBS AG*, No. 10-05311 (BRL) (Bankr. S.D.N.Y.).

5.       Annexed hereto as **Exhibit D** is a true and correct copy of the internet site located at http://www.madofftrustee.com/, as accessed on June 10, 2011, 8:13 AM (Eastern Daylight Time).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 17, 2011.


Dated:  New York, New York
         June 17, 2011

                                                            /s/ Matthew K. Kelsey
                                                          Matthew K. Kelsey (MK-3137)


101096593.1

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
IRVING H. PICARD,                          :

              Plaintiff,                   :

         -v-                               :
                                           :
SONJA KOHN, ERWIN KOHN, ROBERT KOHN, RINA :
HARTSTEIN, MOISHE HARTSTEIN, MORDECHAI     :
LANDAU, ERKO, INC., EUROVALEUR, INC.,      :
INFOVALEUR, INC., TECNO DEVELOPMENT &      :
RESEARCH S.R.L., TECNO DEVELOPMENT &       :
RESEARCH LTD., SHLOMO AMSELEM, HASSANS     :
INTERNATIONAL LAW FIRM, HERALD ASSET       :
MANAGEMENT LTD., 20:20 MEDICI AG, PETER    :
SCHEITHAUER, ROBERT REUSS, UNICREDIT BANK :
AUSTRIA AG, GERHARD RANDA, STEFAN          :
ZAPOTOCKY, BANK AUSTRIA WORLDWIDE FUND     :
MANAGEMENT LTD., URSULA RADEL-             :
LESZCZYNSKI, UNICREDIT S.p.A., ALESSANDRO :
PROFUMO, PIONEER GLOBAL ASSET MANAGEMENT, :
S.P.A., et al., PALLADIUM CAPITAL          :
ADVISORS LLC, WINDSOR IBC, Inc.,           :
MARIADELMAR RAULE, FRANCO MUGNAI, PAUL de :
SURY, DANIELE COSULICH, ABSOLUTE           :
PORTFOLIO MANAGEMENT LTD., MEDICIFINANZ    :
CONSULTING GmbH, MEDICI S.R.L., MEDICI     :
CAYMAN ISLAND LTD., BANK MEDICI AG         :
(GIBRALTAR), REVITRUST SERVICES EST.,      :
HELMUTH FREY, MANFRED KASTNER, JOSEF       :
DUREGGER, ANDREAS PIRKNER, WERNER          :
TRIPOLT, ANDREAS SCHINDLER, FRIEDRICH      :
KADRNOSKA, WERNER KRETSCHMER, WILHELM      :
HEMETSBERGER, HARALD NOGRASEK, BANK        :
AUSTRIA CAYMAN ISLANDS LTD., GIANFRANCO    :
GUTTY, SOFIPO AUSTRIA GmbH, M-Tech         :
SERVICES GmbH, BRERA SERVIZI AZIENDIALE    :
S.R.L., REDCREST INVESTMENTS, INC., LINE   :
GROUP LTD., LINE MANAGEMENT SERVICES       :
LTD., LINE HOLDINGS LTD., HERALD CONSULT   :
LTD., JOHN AND JANE DOES 1-100,            :
                                           :
              Defendants.                  :
                                           :
---------------------------------------- x

JED S. RAKOFF, U.S.D.J.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/6/11

11 Civ. 1181 (JSR)


ORDER

On May 31, 2011, the Court, after receiving full briefing from the parties, heard oral argument on the motion by defendant UniCredit S.p.A. ("UniCredit") to withdraw the bankruptcy reference of adversary proceeding No. 10-5411 (BRL) (the "Kohn Action") filed by Irving Picard (the "Trustee"), the trustee appointed pursuant to the Securities Investment Protection Act of 1970 for the liquidation of Bernard L. Madoff Investment Securities LLC.  For reasons that will be stated in a forthcoming written opinion, the Court hereby withdraws the reference for the purpose of resolving the following issues: (1) whether the Trustee has standing to bring the Kohn Action against UniCredit; (2) whether the Trustee's common law claims brought against UniCredit are preempted by the Securities Litigation Uniform Standards Act; and (3) whether the Trustee's RICO claims against UniCredit are otherwise barred because those claims are extraterritorial in nature, are barred by the Private Securities Litigation Reform Act, are barred by proximate causation principles, or fail to plausibly allege the elements of a RICO claim.

All of the aforementioned issues will be resolved pursuant to the following schedule:  moving papers from UniCredit must be filed by July 25, 2011; opposition papers from the Trustee and the Securities Investor Protection Corporation must be filed by August 29, 2011; reply papers from UniCredit must be filed by September 12, 2011; and

2

oral argument before the Court will be held on September 19, 2011 at

4:30 P.M. Following resolution of these issues, the Court expects to

return the Kohn Action to the Bankruptcy Court, barring unforeseen

circumstances.

        SO ORDERED.

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
        June 3, 2011

3

# **EXHIBIT B**

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
E-mail:  dsheehan@bakerlaw.com
Deborah H. Renner
E-mail:  drenner@bakerlaw.com
Gonzalo S. Zeballos
Email:  gzeballos@bakerlaw.com
Benjamin D. Pergament
E-mail:  bpergament@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com
Deborah A. Kaplan
Email:  dkaplan@bakerlaw.com
Michelle K. Marck
E-mail:  mmarck@bakerlaw.com
Sammantha E. Clegg
Email:  sclegg@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) <br><br> **TO BE FILED UNDER SEAL** |
| In re: <br><br> BERNARD L. MADOFF, | |

| | |
|---|---|
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-_____ (BRL) |
| Plaintiff, | |
| v. | |
| UBS AG, UBS (LUXEMBOURG) SA, UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS EUROPE LIMITED, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS PARTNERS (SUISSE) SA, ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS (LUXEMBOURG) SA) as represented by its Liquidator MAITRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its Liquidator MAITRE FERNAND ENTRINGER, PATRICK LITTAYE, CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) in her capacity as Executrix under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) individually as the sole beneficiary under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), PIERRE DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICAV as represented by its Liquidators MAITRE ALAIN RUKAVINA and PAUL LAPLUME, ROGER HARTMANN, RALF SCHROETER, RENE EGGER, ALAIN HONDEQUIN, HERMANN KRANZ, BERNARD STIEHL, GROUPEMENT FINANCIER LTD., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 4

THE PARTIES ......................................................................................................... 5

    THE TRUSTEE'S POWER AND STANDING ................................................ 5

    THE DEFENDANTS ......................................................................................... 6

        The UBS Defendants ................................................................................... 7

        The Access Defendants ............................................................................... 8

        The Feeder Fund Defendants .................................................................... 11

            Luxalpha .............................................................................................. 11

            Luxalpha Director Defendants ............................................................. 11

            Groupement Financier ......................................................................... 12

            Groupement Financier Director Defendants ........................................ 13

MADOFF'S INVESTMENT ADVISORY,  MARKET MAKING, AND
    PROPRIETARY TRADING BUSINESSES .................................................. 13

THE SIPA LIQUIDATION ................................................................................... 19

THE DEFENDANTS AND THEIR CONNECTIONS TO MADOFF ................. 21

    THE FOUNDING OF ACCESS INTERNATIONAL ADVISORS ............... 21

    ACCESS'S CONNECTION TO BLMIS ...................................................... 23

    THE UBS DEFENDANTS' MANY CONNECTIONS TO BLMIS ............. 24

    THE ACCESS DEFENDANTS' AND THE UBS DEFENDANTS'
        CONNECTIONS TO EACH OTHER ................................................... 25

THE DEFENDANTS' ROLES IN ENABLING THE FRAUD ........................... 28

    THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING
        BLMIS ................................................................................................ 28

    KNOWING THE LIKELIHOOD OF FRAUD,  UBS KNOWINGLY
        PROVIDED A FAÇADE OF LEGITIMACY FOR BLMIS ............... 34

        UBS AG ................................................................................................... 34

        UBS SA ................................................................................................... 36

        UBSFSL ................................................................................................... 37

        UBSTPM ................................................................................................. 37

        UBS's Luxalpha Board Members ......................................................... 38

# TABLE OF CONTENTS
### (continued)

          **Page**

THE UBS DEFENDANTS ENABLED MADOFF BY PROVIDING THE
    APPEARANCE OF LEGITIMACY AND SECURITY FOR LUXALPHA
    AND GROUPEMENT FINANCIER ................................................................. 38

    The UBS Defendants Disclaimed All Responsibility and Protected
        Themselves Through a Series of Secret and Undisclosed Indemnity
        Agreements ........................................................................................ 39

    The UBS Defendants Delegated Their Luxalpha Management and
        Custodial Duties ............................................................................... 41

    UBS's Operation of Luxalpha Invited a Fraud ........................................ 45

    UBS's Role as a "Front" and Mere "Window Dressing" for Luxalpha Was
        Well Known and Understood by the Fund's Insiders ............................. 46

    UBS Defendants Were Paid Over $80 Million in Fees for Their "Work"
        on Luxalpha ...................................................................................... 48

    UBS Defendants' Operation of Groupement Financier Invited a Fraud ........... 49

THE ACCESS DEFENDANTS FACILITATED THE SCHEME THROUGH
    MISLEADING MARKETING AND SALES ...................................................... 50

    The Marketing of the Feeder Fund Defendants ........................................ 50

    Access's Due Diligence Procedures Did Not Apply to Madoff ..................... 51

WHEN FACED WITH PLAIN EVIDENCE OF A FRAUD, THE ACCESS
    DEFENDANTS CHOSE TO SUPPRESS THE INFORMATION .................... 53

    Questions Were Raised Concerning The Reported Volume Of Madoff's
        Options Trades ................................................................................... 54

    Access Brought In Chris Cutler to Do Due Diligence on BLMIS ................ 55

    Access's Inner Circle Concealed Cutler's Findings .................................. 56

THE ACCESS DEFENDANTS IGNORED ADDITIONAL RED FLAGS ................ 60

    BLMIS's Auditor Friehling & Horowitz .................................................. 61

    BLMIS Only Reported Trades Through Delayed Paper Confirmations ........... 62

    Madoff's Purported Market-Timing Ability ............................................. 63

    Madoff's Insistence On Secrecy ............................................................. 64

    BLMIS's Unusual Performance ............................................................. 65

    Unidentified Counterparties ................................................................. 65

    Lack Of An Independent Custodian ....................................................... 66

THE AFTERMATH ................................................................................ 67

# TABLE OF CONTENTS
(continued)

Page

THE TRANSFERS ........................................................................................................ 69

    TRANSFERS FROM BLMIS TO THE FEEDER FUND DEFENDANTS ................... 69

    TRANSFERS FROM THE FEEDER FUND DEFENDANTS TO THE
        LUXALPHA AND GROUPEMENT FINANCIER DIRECTOR
        DEFENDANTS, ACCESS DEFENDANTS, AND UBS DEFENDANTS ......... 71

CUSTOMER CLAIMS ................................................................................................. 72

COUNT ONE:  PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C.
    §§ 547(b), 550(a), AND 551 Against The Feeder Fund Defendants ............................. 73

COUNT TWO:  PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) 11
    U.S.C. §§ 547(b), 550(a), AND 551 Against The Feeder Fund Director
    Defendants, Access Defendants, And UBS Defendants ................................................. 75

COUNT THREE:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C.
    §§ 548(a)(1)(A), 550(a), AND 551  Against The Feeder Fund Defendants ................... 76

COUNT FOUR:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11 U.S.C.
    §§ 548(a)(1)(B), 550(a), AND 551 Against The Feeder Fund Defendants ..................... 77

COUNT FIVE:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW
    YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 Against The Feeder Fund Defendants .......... 78

COUNT SIX:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW YORK
    DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11
    U.S.C. §§ 544, 550(a), AND 551 Against The Feeder Fund Defendants ...................... 79

COUNT SEVEN:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW
    YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11
    U.S.C. §§ 544, 550(a), AND 551 Against The Feeder Fund Defendants ...................... 80

COUNT EIGHT:  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
    NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 Against The Feeder Fund Defendants .......... 81

COUNT NINE:  RECOVERY OF SUBSEQUENT TRANSFERS:  NEW YORK
    DEBTOR AND CREDITOR LAW §§ 273 - 279 AND 11 U.S.C. §§ 544, 547,
    548, 550(a) and 551 Against The Feeder Fund Director Defendants, Access
    Defendants, And UBS Defendants ................................................................................. 82

COUNT TEN:  DISALLOWANCE OF CUSTOMER CLAIMS Against Luxalpha And
    UBS SA ......................................................................................................................... 83

COUNT ELEVEN:  EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS
    Against Luxalpha And UBS SA ..................................................................................... 83

COUNT TWELVE:  AIDING AND ABETTING FRAUD Against The UBS Defendants ........ 84

## TABLE OF CONTENTS
### (continued)

**Page**

COUNT THIRTEEN:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
Against The UBS Defendants..............................................................................86

COUNT FOURTEEN:  CONVERSION Against The UBS Defendants....................................88

COUNT FIFTEEN:  UNJUST ENRICHMENT Against The UBS Defendants .........................89

COUNT SIXTEEN:  MONEY HAD AND RECEIVED Against The UBS Defendants ............90

COUNT SEVENTEEN:  AIDING AND ABETTING FRAUD Against The Access
Defendants.......................................................................................................90

COUNT EIGHTEEN:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
Against The Access Defendants........................................................................92

COUNT NINETEEN:  CONVERSION Against The Access Defendants................................93

COUNT TWENTY:  UNJUST ENRICHMENT Against The Access Defendants ...................94

COUNT TWENTY-ONE:  MONEY HAD AND RECEIVED Against The Access
Defendants.......................................................................................................95

COUNT TWENTY-TWO:  AIDING AND ABETTING BREACH OF FIDUCIARY
DUTY Against The Luxalpha Director Defendants..........................................95

COUNT TWENTY-THREE:  AIDING AND ABETTING BREACH OF FIDUCIARY
DUTY Against The Groupement Financier Director Defendants.....................96

Case 1:12-cv-03233-GM    Document 1-2    Filed 08/24/11    Page 9 of 108    Exhibit 8

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act

("SIPA") §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, as and for his Complaint, alleges as

follows:

## NATURE OF THE ACTION

1.       Madoff did not act alone in perpetrating the largest financial fraud in history.

UBS AG and its affiliated entities (collectively,  the "UBS Defendants") enabled Madoff's Ponzi

scheme through numerous international feeder funds, including Luxalpha SICAV ("Luxalpha")

and Groupement Financier Ltd. ("Groupement Financier," and together with Luxalpha, the

"Feeder Fund Defendants").  Luxalpha and Groupement Financier together withdrew

approximately $796 million in the ninety days before BLMIS filed for bankruptcy and roughly

$1.12 billion in the preceding six years.  The UBS Defendants appear to have made at least $80

million in fees from the Ponzi scheme, as they facilitated the scheme in the face of clear indicia

of fraud that cast doubt on the legitimacy of BLMIS.  Defendant Access International Advisors

LLC, its several affiliates and the associated individuals named herein (collectively, the "Access

Defendants") worked together with the UBS Defendants to extend the Ponzi scheme to European

investors, earning millions of dollars in fees for their role in the Ponzi scheme.  The UBS

Defendants and the Access Defendants are liable for at least $2 billion for their roles in masking

BLMIS's fraud and perpetuating the Ponzi scheme, with an exact amount to be determined at

trial.

2.       The UBS Defendants were well aware of indicia of fraud surrounding BLMIS.

For instance, beginning at least in 2002, the UBS Defendants questioned the consistency of

Madoff's returns, which UBS analysts could not replicate using Madoff's purported "Split Strike

Case 1:1?-cv-04233-CM   Document 3-2   Filed 06/14/11   Page 9 of 108

Conversion" strategy.  The UBS Defendants further saw other red flags, such as Madoff's lack of transparency.  In addition, the UBS Defendants could not figure out who Madoff's counterparties were.  The Private Wealth Management Group of the UBS Defendants reportedly put BLMIS on a "non-approved" list and BLMIS-related funds were not recommended to Private Wealth clients.  As one UBS analyst pointed out in 2007:  "[s]ome folks think [M]adoff could be one of the most successful schemes ever."

3.     Thus armed with the knowledge that BLMIS was likely a fraud, the UBS Defendants nevertheless chose to enable Madoff's fraud for their own gain.  The UBS Defendants outwardly assumed a number of key roles for the Feeder Fund Defendants only to delegate their roles to BLMIS and then disavow any potential liability through undisclosed indemnity agreements and insurance policies.   For example, UBS AG sponsored the formation of Luxalpha, lending its name as sponsor of that fund to lull the outside world into believing that Luxalpha was legitimate, while at the same time contracting with the Access Defendants to absolve UBS AG of any liability in its role as sponsor.  UBS (Luxembourg) S.A., a wholly-owned subsidiary of UBS AG, purported to serve as custodian for the assets of Luxalpha and Groupement Financier, but delegated its custodial duties to BLMIS, which was also the investment adviser with trading authority for the Feeder Fund Defendants.  UBS Fund Services (Luxembourg) S.A., another wholly-owned subsidiary of UBS AG, served as administrator for both Feeder Fund Defendants.  It calculated the "net asset value" ("NAV") of these funds based solely on numbers and information provided by BLMIS, with no independent verification.

4.     There were no checks and balances on BLMIS, and the UBS Defendants knew it because the system – which invited fraud – was knowingly put in place and carried out by the UBS Defendants.  Madoff's scheme could not have been accomplished unless the UBS

Defendants had agreed to look the other way and to pretend that they were truly ensuring the
existence of assets and trades when in fact they were not and never did.  The UBS Defendants
disregarded the duties they publicly assumed and improperly delegated their primary functions to
Madoff himself.  The "fees" they received in their various roles were nothing more than "fees"
for looking the other way, and lending their prestigious name to legitimize and attract money to
BLMIS's fraud.

  5. Meanwhile, the Access Defendants marketed the Feeder Fund Defendants by
touting a rigorous due diligence process and a series of antifraud measures that in reality never
applied to the Feeder Fund Defendants.  Just as the UBS Defendants allowed for special, lax
treatment of the Feeder Fund Defendants, so, too, did the Access Defendants.  Luxalpha and
Groupement Financier were treated differently from other funds and were allowed to operate as
an exception to the Access Defendants' normal policies and procedures regarding the due
diligence of funds and their managers.  Madoff was not subject to routine background checks,
did not have to allow the Access Defendants to regularly visit his office or meet with his staff,
and was allowed to report his purported trades on a delayed basis using only hard copy
confirmations that provided ample opportunity for him to commit and perpetuate his fraud.

  6. The Access Defendants and, thereby, Luxalpha's Board of Directors – which
consisted of the principals of the Access entities and of UBS (Luxembourg) SA executives –
knew that the volume of trading being reported by Madoff was impossible, but decided not to
make that information public.  The Access Defendants also knew of other red flags surrounding
BLMIS.  For example, they knew that BLMIS had a small, unknown auditor.  Furthermore, they
were aware of Madoff's implausible market-timing ability and performance, and the Access
Defendants were never able to identify any of Madoff's purported counterparties.  Together with

the UBS Defendants, the Access Defendants enabled the Ponzi scheme and were complicit in it, to their profit.

7.      The Trustee seeks the recovery of all Customer Property[1] belonging to the BLMIS estate, in the form of redemptions, fees, compensation and assets, as well as all damages, including but not limited to compensatory and punitive damages, caused by the Defendants' misconduct, and the disgorgement of all funds by which the Defendants were unjustly enriched at the expense of BLMIS's customers.

## JURISDICTION AND VENUE

8.      The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 502(d), 510, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270, *et seq.* (McKinney 2001)), and other applicable law, for avoidance and recovery of preferential transfers and fraudulent conveyances, unjust enrichment, conversion, money had and received, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, consequential and punitive damages, the Trustee's disallowance of the customer claims filed by certain Defendants, and equitable subordination.  The Trustee also seeks, among other things, to set aside all avoidable transfers, collect damages caused by the Defendants, preserve the stolen Customer Property for the benefit of BLMIS customers, and recover *all* stolen Customer Property from the Defendants, wherever it is located and in whatever form it may now or in the future exist.

9.      This is an adversary proceeding brought in the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending.  The

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A), (b)(4).

10. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

11. Venue in this district is proper under 28 U.S.C. § 1409.

### THE PARTIES

### THE TRUSTEE'S POWER AND STANDING

12. Plaintiff is the Trustee appointed, by order dated December 15, 2008, for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3). Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code. Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA § 78fff(b).

13. In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

14. The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including §§ 323(b) and 704(a)(1), because, among other reasons:

    a. the Defendants, as captioned herein, received Customer Property;

    b. BLMIS incurred losses as a result of the conduct set forth herein;

    c. BLMIS customers were injured as a result of the conduct detailed herein;

d.    SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all of their losses;

e.    the Trustee will not be able to fully satisfy all claims;

f.    the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

g.    as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.    the Trustee has the power and authority to avoid and recover transfers pursuant to §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**THE DEFENDANTS**

15.    This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to N.Y. CPLR 301 and 302, and Bankruptcy Rule 7004.  All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.  The Defendants have or had offices in New York, or are doing or did business in New York, and/or transact or transacted business in New York.  Defendants Luxalpha and Groupement Financier

Case 1:11-cv-04213-CM    Document 1-1    Filed 06/24/11    Page 24 of 106

had accounts with BLMIS in New York.  The UBS Defendants, the Access Defendants, the

Feeder Fund Defendants and the Feeder Fund Director Defendants (defined below), delivered

agreements or caused agreements to be delivered in New York relating to BLMIS.  In addition,

certain of the UBS Defendants and Access Defendants communicated regularly with persons in

New York regarding the Feeder Fund Defendants and/or BLMIS, and also sent and/or received

funds to and/or from BLMIS in New York, utilizing New York banks.  Furthermore, the

Defendants have committed tortious acts both within and without New York, causing injury in

New York, and expected or should reasonably have expected these tortious acts to have

consequences in New York, and derive substantial revenue from interstate or international

commerce.  In addition, Luxalpha filed Customer Claims in the SIPA Proceeding seeking to

recover funds it allegedly lost on its investments in BLMIS, and has thus submitted to the

jurisdiction of this Court.

### The UBS Defendants

16.    Defendant UBS AG is a public company incorporated under the laws of

Switzerland, having its registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich,

and Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  UBS AG is present in New York, with

offices located at 299 Park Avenue, New York, NY 10171 and 101 Park Avenue, New York, NY

10178.  UBS AG sponsored the formation of Luxalpha.

17.    Defendant UBS (Luxembourg) S.A. ("UBS SA"), a wholly-owned subsidiary of

UBS AG, is a *societe anonyme* (public limited company), organized under the laws of

Luxembourg and has its registered office at 33a, Avenue John F. Kennedy, BP 2, L-1855

Luxembourg.  UBS SA was the custodian of Luxalpha's assets as invested through BLMIS, and

also sponsored the formation of Luxalpha with UBS AG.  In addition, UBS SA served as

Luxalpha's portfolio manager from February 2004 through August 2006.  UBS SA also served

as the prime bank for Groupement Financier.

18.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly-owned

subsidiary of UBS AG, is a *societe anonyme* (public limited company), organized under the laws

of Luxembourg and has its registered office at 33a, Avenue John F. Kennedy, L-1855

Luxembourg.  UBSFSL served as the administrator for both Luxalpha and Groupement

Financier, charged, among other things, with the calculation of the NAV.

19.    Defendant UBS Third Party Management Company S.A. ("UBSTPM"), which is,

upon information and belief, a wholly-owned subsidiary of UBS AG, is a *societe anonyme*

(public limited company), organized under the laws of Luxembourg and has its registered office

at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.  UBSTPM served as Luxalpha's

portfolio manager beginning in August 2006, but left the management of Luxalpha's portfolio to

BLMIS.

*The Access Defendants*

20.    Defendant Access International Advisors LLC ("AIA LLC") is a Delaware

limited liability company which had its principal place of business at 509 Madison Avenue, 22nd

Floor, New York, New York 10022 during the relevant period.  AIA LLC served as Luxalpha's

portfolio advisor from August 1, 2004 to November 17, 2008, charged with primary

responsibility for marketing and monitoring Luxalpha's investments through BLMIS.

21.    Defendant Access International Advisors Europe Limited ("AIA Europe Ltd.") is

a limited company formed under the laws of England.  AIA Europe Ltd. was dissolved on

November 24, 2009.  Its last registered address was Suite 17, City Business Centre, Lower Road,

London  SE16 2XB.  AIA Europe Ltd. served as the administrative agent for Groupement

Financier and provided "back office," administrative support for Luxalpha.

22.     Defendant Access International Advisors Ltd. ("AIA Ltd.") is a limited liability company incorporated in the Bahamas with its registered office at c/o MMG Bahamas Ltd., P.O. Box CB – 13937, Suite 102, Saffrey Square, Bay Street & Bank Lane, Nassau, Bahamas.  AIA Ltd. served as the investment manager of Groupement Financier until July 2007.  At various times, AIA Ltd. also served as Groupement Financier's operator, sponsor, and investment advisor.

23.     Defendant Access Partners (Suisse) S.A. ("AP (Suisse)") is a *societe anonyme* (public limited company) registered under the laws of Switzerland with its registered address at Baarestrasse 112, 6302 Zug, Switzerland.  AP (Suisse) served as Groupement Financier's investment manager beginning in July 2007.

24.     Defendant Access Management Luxembourg S.A. ("Access Mgmt Lux") (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)")) is a *societe anonyme* (public limited company) formed under the laws of Luxembourg.  The company is represented by its liquidator, Maitre Fernand Entringer, having his offices at 34A, rue Philippe II, L-2340, Luxembourg.  Access Mgmt Lux served as portfolio manager for Luxalpha from November 17, 2008 through its liquidation.  As AIA (Lux), it served as Luxalpha's portfolio advisor from February 4, 2004 until August 1, 2004.

25.     Defendant Access Partners S.A. (Luxembourg) ("AP (Lux)") is a *societe anonyme* (public limited company) registered under the laws of Luxembourg.  The company is represented by its liquidator, Maitre Fernand Entringer, having his offices at 34A, rue Philippe II, L-2340, Luxembourg.  AP (Lux) served as investment advisor to Luxalpha from February 13, 2007 through its liquidation.  AP (Lux) also served as Groupement Financier's investment adviser.

26.     Defendant Patrick Littaye ("Littaye") co-founded AIA LLC in 1995, and served as its Partner, Chairman and Chief Executive Officer.  He served as a Director of Luxalpha and as a Director of Groupement Financier.  In addition, Littaye was a Director, Chairman and Managing Director of AIA (Lux).  Littaye is a citizen of a foreign state.

27.     Claudine Magon de la Villehuchet a/k/a Claudine de la Villehuchet, is named herein in her capacity as Executrix under the Will of Thierry Magon de la Villehuchet a/k/a René Thierry de la Villehuchet, dated November 6, 2000.  Thierry Magon de la Villehuchet ("Villehuchet") co-founded AIA LLC in 1995, and served as its Partner, Chairman, and Chief Executive Officer up until his death on December 22, 2008.  He also served as a Director of Groupement Financier.  In addition, Villehuchet was a Director of AIA (Lux).  Upon information and belief, Ms. Villehuchet is a resident of New York.

28.     Claudine Magon de la Villehuchet a/k/a Claudine de la Villehuchet, is also named herein individually, as the sole beneficiary under Article Second of the Will of Thierry Magon de la Villehuchet a/k/a René Thierry de la Villehuchet, dated November 6, 2000.  Upon information and belief, Ms. Villehuchet is a resident of New York.

29.     Defendant Pierre Delandmeter ("Delandmeter") was a board member of Access Mgmt Lux, which served as Luxalpha's portfolio manager beginning in November 2008.  He served as both a Director and Legal Advisor of Luxalpha.  In addition, he served as a Director and Managing Director of AIA (Lux).  Delandmeter is a citizen of a foreign state.

30.     Defendant Theodore Dumbauld ("Dumbauld") was a Partner at AIA LLC beginning in 2002.  He also served as Chief Investment Officer of AIA LLC until his departure in 2006.  Dumbauld is a resident of the State of Connecticut.

### The Feeder Fund Defendants

#### Luxalpha

31.     Defendant Luxalpha is a Luxembourg-based, open-ended investment fund with its registered office at 33A, Avenue J.F. Kennedy, L-1855 Luxembourg, formed by UBS AG and UBS SA.  Luxalpha was placed in liquidation by the District Court of Luxembourg on April 2, 2009, and is represented by its court-appointed liquidators, Alain Rukavina and Paul Laplume (the "Luxembourg Liquidators").  Me. Rukavina resides at 10A, bd de la Foire, L-1528 Luxembourg.  Mr. Laplume resides at 42, rue des cerises, L-6113 Junglinster.  Luxalpha opened its account (Account No. 1FR108) with BLMIS on March 22, 2004, and this account was still open when Madoff was arrested on December 11, 2008.  This account was held in the name of "UBS (Luxembourg) S.A. for the benefit of Luxalpha."  Three claims were filed with the Trustee in this SIPA proceeding.  Two of the claims, Claim Nos. 004419 and 005725, were filed by Luxalpha on March 2, 2009 and March 3, 2009 respectively.  These two claims, which are duplicative of each other, were signed by two of Luxalpha's directors, Ralf Schroeter and Alan Hondequin, and both claim the same amount of $1,537,099,731.  The third claim, Claim No. 005025, was filed by UBS SA on behalf of Luxalpha on March 2, 2009, and also claims the amount of $1,537,099,731.

#### Luxalpha Director Defendants

32.     Defendant Roger Hartmann ("Hartmann") served as chairman of the Board of Directors of Luxalpha from February 2004 to January 1, 2008.  He was the Chief Executive Officer of UBS SA until November 30, 2007.  Hartmann is a citizen of a foreign state.

33.     Defendant Ralf Schroeter ("Schroeter") served as chairman of the Board of Directors of Luxalpha from January 1, 2008 through the fund's liquidation.  He currently serves

as "Managing Director: Chief Operating Officer" of UBS SA. Schroeter is a citizen of a foreign state.

34.     Defendant Rene Egger ("Egger") served as a Director of Luxalpha from December 15, 2005 through its liquidation. He served as "Managing Director: Head of Products and Services" at UBS SA until June 2009. Egger is a citizen of a foreign state.

35.     Defendant Alain Hondequin ("Hondequin") served as a Director of Luxalpha from February 2004 through its liquidation. He formerly served as "Executive Director: Head of Legal and Compliance" at UBS SA. Hondequin is a citizen of a foreign state.

36.     Defendant Hermann Kranz ("Kranz") served as a Director of Luxalpha from February 2004 through its liquidation. He currently serves as "Managing Director: Chief Administrative Officer" of UBS SA. Kranz is a citizen of a foreign state.

37.     Defendant Bernard Stiehl ("Stiehl") served as a Director of Luxalpha from February 2004 to December 15, 2005. He was formerly an Executive Director at UBS SA. Stiehl is a citizen of a foreign state.

38.     Defendant Littaye also served as a Director of Luxalpha from February 1, 2006 through its liquidation.

39.     Defendant Delandmeter also served as both a Director of Luxalpha and as its legal advisor from February 2004 through its liquidation.

40.     Defendants Hartmann, Schroeter, Egger, Hondequin, Kranz, Stiehl, Littaye, and Delandmeter are referred to collectively as the "Luxalpha Director Defendants."

### *Groupement Financier*

41.     Defendant Groupement Financier is an investment fund organized under the laws of the British Virgin Islands ("BVI"). Groupement Financier's registered agent is Maples & Calder and its registered office is at Sea Meadow House, P.O. Box 173, Road Town, Tortola VG

1110, BVI.  Groupement Financier opened its account (Account No. 1FR096) with BLMIS on

April 8, 2003 and this account was still open when Madoff was arrested on December 11, 2008.

### Groupement Financier Director Defendants

42.    Access Defendants Littaye and Villehuchet were the Directors of Groupement

Financier, and are referred to collectively as the "Groupement Financier Director Defendants."

43.    The Luxalpha Director Defendants and the Groupement Financier Director

Defendants are collectively referred to herein as the "Feeder Fund Director Defendants."

**MADOFF'S INVESTMENT ADVISORY,
MARKET MAKING, AND PROPRIETARY TRADING BUSINESSES**

44.    BLMIS was a New York limited liability company that was wholly owned by

Madoff.  Founded in 1959, BLMIS operated its principal place of business at 885 Third Avenue,

New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS

together with several family members and a number of additional employees.  BLMIS was

registered with the Securities Exchange Commission ("SEC") as a securities broker-dealer under

§ 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By that registration,

BLMIS is a member of SIPC.  BLMIS had three business units:  market making, proprietary

trading, and investment advisory (the "IA Business").

45.    BLMIS had an active market making unit.  A market maker is a brokerage firm

that regularly offers to trade securities with other brokerage firms at posted prices.  The universe

of securities in which BLMIS made a market was comprised of approximately 80% securities

with primary listings on the NYSE, and of approximately 20% securities listed solely on

NASDAQ.

46.    BLMIS also engaged in proprietary trading, which means that BLMIS traded on its own behalf rather than on behalf of its customers.  It is very common for a market maker to also engage in proprietary trading.

47.    Madoff operated his fraudulent IA Business from the same BLMIS offices that it operated its legitimate businesses.  Outwardly, BLMIS functioned as both an investment adviser to its customers and a custodian of their securities.  Its annual audits were purportedly performed by Friehling & Horowitz, CPAs, P.C. ("Friehling"), an accounting firm of three employees, one of whom was semi-retired, with offices located in a strip mall in Rockland County, New York.  The precise date on which BLMIS began offering investment advisory services has not been established, but it appears that BLMIS was offering such services as far back as the 1960s.  The Trustee's investigation to date establishes that, to the extent records are available, BLMIS never acted as a true investment adviser in the interest of its customers.

48.    Madoff solicited billions of dollars from investors for his fraudulent IA Business.  Outwardly, Madoff ascribed the success he purported to achieve in his IA Business to the Split Strike Conversion Strategy (the "SSC Strategy").  Madoff represented that his strategy was to invest customer funds in a subset or "basket" of the common stocks that comprised the Standard & Poor's 100 Index ("S&P 100").  Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets.  Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly purchasing a basket of stocks and corresponding options hedges.  Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills") and Fidelity money market funds until the

next presumed trading opportunity arose.  At the end of most quarters, the baskets were sold and the proceeds invested in T-bills or other money market funds.

49.    As part of the SSC Strategy, Madoff also concocted a fictitious hedging strategy for the baskets of stock.  He purported to purchase and sell S&P 100 option contracts correlated to the stocks in the basket, thereby limiting both the downside risk associated with possible adverse price changes in the basket of stocks and limiting profits associated with increases in underlying stock prices.  These options contracts functioned as a "collar," limiting both the potential gains and the potential losses.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

50.    The final customer statements issued by BLMIS as of November 30, 2008, falsely recorded nearly $65 billion of net investments and related fictitious gains from those investments with BLMIS as of December 11, 2008 (the "Filing Date").

51.    Madoff himself admitted in his Plea Allocution that, "I never made the investments I promised clients, who believed they were invested with me in the split strike conversion strategy."  Instead, investors' funds were principally deposited into BLMIS's account at JPMorgan Chase & Co., Account No. xxxxxxxxxxx1703 (the "703 Account").

52.    Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his plea hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.  Indeed, based on the Trustee's investigation

Case 1:11-cv-04213-CM Document 37 Filed 08/24/11 Page 29 of 106

to date, and with the exception of isolated individual trades for certain clients other than the Defendants, there is no record of BLMIS's having cleared any purchase or sale of securities for customers of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities. Madoff's SSC Strategy was entirely fictitious.

53.     At times, prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange. Based on the Trustee's investigation to date, there is no evidence that the BLMIS IA Business ever entered into any OTC options trades on behalf of BLMIS account holders. The Options Clearing Corporation, which clears all option contracts based upon stocks of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any IA Business customers.

54.     To bolster that lie, Madoff periodically wired hundreds of millions of dollars from the 703 Account to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity wholly owned by Madoff. There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients. In fact, MSIL wired hundreds of millions of dollars back into the bank accounts of BLMIS's proprietary trading and market making businesses in an attempt to create a record of revenues purportedly related to trades in Europe.

55.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS from discovering the fraud. The money received from investors was overwhelmingly used to make the distributions to—or payments on behalf of—

other investors.  That is, BLMIS used its IA Business customers' deposits to pay redemptions by

other customers and to make other transfers, which are, of course, avoidable by the Trustee.

Many of these transfers were to enrich Madoff, his associates, and his family.  The money sent to

BLMIS for investment, in short, was simply used to keep the operation going and to enrich

Madoff, his associates and others until such time as the requests for redemptions in December

2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi

scheme.

  56. During the scheme, certain investors requested and received distributions of the

"profits" listed for their accounts which were nothing more than fictitious profits.  Other

investors, from time to time, redeemed or closed their accounts, or removed portions of the

purportedly available funds, and were paid consistent with the statements they had been

receiving.  Some of those investors later re-invested part or all of those withdrawn payments with

BLMIS.

  57. The falsified monthly account statements reported that the accounts of the IA

Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme,

BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS

was only able to survive for as long as it did by using the stolen principal invested by some

customers to pay other customers.

  58. It was essential for BLMIS to honor requests for payments in accordance with the

falsely inflated account statements, because failure to do so could promptly have resulted in

demand, investigation, the filing of a claim and disclosure of the fraud.  The payments were

necessary to validate the false account statements, and were made to avoid detection of the fraud,

to retain existing investors, and to lure other investors into the Ponzi scheme.  Each payment

Case 1:11-cv-04213-CM   Document 1-17   Filed 06/24/11   Page 29 of 106

constituted an intentional misrepresentation of fact regarding the underlying account and was an integral and essential part of the fraud.

59.     In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Adviser until August 2006.  This allowed BLMIS to avoid scrutiny from the SEC that may have uncovered the true dealings of BLMIS, exposing the billions of dollars that flowed into the company that Madoff used for the benefit of himself, his family, and his associates.

60.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration.  The application represented, among other things, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In actuality, in January 2008, BLMIS had 4,900 active customer accounts and purported assets under management of $68 billion.

61.     Based upon the Trustee's ongoing investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. In total, these statements showed that BLMIS customers had approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth a fraction of that amount. Customer accounts had not accrued any real profits because no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, investors had lost approximately $20 billion in principal.

62.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that:  (i) its assets were worth less than the value

of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE SIPA LIQUIDATION

63.     On December 11, 2008, Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC filed the District Court proceeding against Madoff, which remains pending.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the BLMIS IA Business.

64.     On December 12, 2008, The Honorable Louis L. Stanton entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

65.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

66.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

      a.     Appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

      b.     Appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

      c.     Removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

      d.     Removed the Receiver for BLMIS.

67.     By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.  By

virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out

Customer Property to BLMIS customers, assess claims, and liquidate any other assets of BLMIS

for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling

BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS customers for

the billions of dollars they invested through BLMIS.  Consequently, the Trustee must use his

broad authority as expressed and intended by both SIPA and the Bankruptcy Code to pursue

recovery for BLMIS accountholders.

68.     At a Plea Hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  Additionally, Madoff admitted that "[a]s I engaged in my fraud, I

knew what I was doing [was] wrong, indeed criminal."  Madoff was sentenced on June 29, 2009

to 150 years in prison.

69.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August 11,

2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764(RJS), DiPascali pled

guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the

Ponzi scheme had begun at BLMIS since at least the 1980's.

## THE DEFENDANTS AND THEIR CONNECTIONS TO MADOFF

### THE FOUNDING OF ACCESS INTERNATIONAL ADVISORS

70.     Access International Advisors was founded in 1995 by Defendants Littaye and

Villehuchet.  As was widely reported at the time, Defendant Villehuchet committed suicide on

December 22, 2008, shortly after the Madoff fraud was revealed.  Thus, his estate is named as a

Defendant herein.

71.     Although formerly distinct and separately organized in their various jurisdictions,

AIA LLC, AIA Europe Ltd., AIA Ltd., AP (Suisse), Access Mgmt Lux, and AP (Lux)

(collectively, "Access") were, in reality, merely alter-egos of each other.  At all times relevant

herein, these Access entities were dominated and controlled by Littaye and Villehuchet, who

marketed and used their network of Access entities as a collective whole to service their many

BLMIS portals, which included Luxalpha and Groupement Financier, among other BLMIS-

feeder funds.

72.     Originally a distributor of other entities' hedge fund products, Access later

evolved into a manager and portfolio advisor for its own hedge funds and investment products,

with offices in New York, the Bahamas, London, and throughout Europe.  Access served as the

center of a network of funds that provided the point of entry to Madoff for billions of dollars

from European investors.

73.     Prior to being a Founding Partner, Chairman and Chief Executive Officer of AIA

LLC, Defendant Littaye worked in a number of positions in the securities industry.  From 1968

until 1971, Littaye was an Assistant Vice-President at Banque Paribas in the Corporate Finance

Department.  From 1971 until 1977, Littaye was responsible for the Capital Market Products

division at Credit Agricole Segespar.  From 1977 until 1985, Littaye was Senior Vice President

at Banque NSM (ABN Group) responsible for corporate finance for fixed income issues,

Case 1:11-cv-04213-CM   Document 17   Filed 08/24/11   Page 29 of 106

including "high tech" swaps for bond issues in foreign currencies.  From 1985 until 1992, Littaye

was Managing Director for brokerage activities at Banque Pallas France.  From 1993 through

1994, Littaye was Chief Operating Officer at Credit Lyonnais Securities (USA) responsible for

syndication, brokerage activities, back-office/operations and systems.

74.     Villehuchet also worked in several positions in the securities business prior to

being a Founding Partner, Chairman and Chief Executive Officer of AIA LLC.  From 1970 until

1983, Villehuchet worked in the Capital Markets division of Banque Paribas in Paris.  From

1983 until 1987, Villehuchet founded and was President of Interfinance, an international

brokerage firm.  From 1987 through 1994, Villehuchet founded and became Chairman and CEO

of Credit Lyonnais Securities (USA) in New York.

75.     After initially serving as a marketer and distributor of hedge funds managed by

other companies, Access, under the leadership of Littaye and Villehuchet, became what is

described in its own marketing materials as a manager of "a platform of US hedge funds

specializing in absolute return investment strategies by providing a centralized approach to due

diligence, operations, distribution, compliance and most importantly, risk management."

76.     Access owned and operated a series of what it termed "single manager hedge fund

products, each with its own investment mandate."  Access's marketing materials also stated that

while Access served as the portfolio manager and risk manager for all of its funds, "Access hires

a Trading Advisor to provide specialized investment advice to each fund," and that all such

Trading Advisors were located in the U.S. and invested predominantly in U.S. assets.

77.     Access promoted itself as a link between its predominantly European clients –

consisting of high net worth individuals, family offices, fund of funds, private banks and asset

management companies – and "seasoned US managers with proven track records."

## ACCESS'S CONNECTION TO BLMIS

78.     Littaye and Madoff had a relationship going back to 1985. It was this relationship that led to the creation of the Feeder Fund Defendants – Luxalpha and Groupement Financier – both of which maintained accounts at BLMIS through Access, and which together served to feed over two billion dollars into BLMIS.

79.     Littaye's relationship with Madoff gave rise to additional feeder funds and individual accounts as well. Feeder funds Trotanoy Investment Company Ltd. and Citrus Investment Holdings Ltd. were set up through the Access entities and together funneled over $200 million into BLMIS. Littaye was also responsible for the creation of at least eight other individual managed accounts at BLMIS which, combined, contributed tens of millions more to Madoff's scheme. For these accounts, which the Trustee may pursue through separate actions or investigations, Littaye is identified in BLMIS documents as the introducing party.

80.     Littaye's relationship with Madoff was strictly preserved and well-guarded. No other person at Access had or was permitted to have any real contact with BLMIS. With the exception of some meetings attended by Villehuchet and perhaps a few choice investors on rare occasions, only Littaye was permitted to deal directly with Madoff.

81.     The relationship with Madoff was considered at Access to be the basis for the company's cash flow. The ability to provide European investors the opportunity to invest with Madoff was Access's most significant marketing and fund raising tool. While Access offered some non-Madoff funds to its investors, the vast majority of Access's assets under management (which at their peak exceeded $3 billion), were handed over to Madoff. By way of example, in 2004, Access raised assets for investment in eleven different families of funds, yet 50% of those assets were for investments at BLMIS. As of 2005, 52% of assets placed through Access were

invested at BLMIS, accounting for 61% of Access's total net revenue.  Access's relationship

with Madoff was vital to its very existence.

82.     Littaye regularly visited with Madoff at Madoff's office in New York.  These

meetings were on a quarterly basis.  Littaye also would meet with Madoff in the south of France

when Madoff would vacation there.  During these visits in France, Madoff and Littaye would

play tennis together, which provided further opportunities for Littaye and Madoff to discuss

business and Access's investments with BLMIS.

83.     Access had a staff of 20-30 employees spread among its New York and European

offices responsible for the sales, operation, due diligence and monitoring for its multiple fund

offerings.  However, any issues, questions or concerns regarding the several Access funds that

maintained accounts at BLMIS were addressed by and had to be run through Littaye, and Littaye

alone.

### THE UBS DEFENDANTS' MANY CONNECTIONS TO BLMIS

84.     Partnering with the Access Defendants, the UBS Defendants provided crucial

infrastructure for several BLMIS feeder funds.  For the Luxalpha and Groupement Financier

funds, the UBS Defendants served multiple roles, including sponsor, manager, administrator and

custodian or prime banker.  UBS entities also sponsored, managed, administered or served as

custodian for several other BLMIS-feeder funds that the Trustee is investigating or pursuing

through separate actions.  For example, UBS SA served as the custodian for Plaza Investments

International Limited, which directed investments of approximately $534 million into BLMIS.

At various times, UBS SA also served as administrator and custodian for Thybo Asset

Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited and Thybo

Stable Fund Limited, which collectively directed investments of approximately $207 million into

BLMIS.  UBS AG and UBS SA served as sponsors of Luxembourg Investment Fund ("LIF").

24

UBS SA also served as LIF's custodian, main paying agent and, for a time, as its portfolio manager. UBSTPM ultimately replaced UBS SA as portfolio manager of LIF, and UBSFSL served as administrator of LIF. LIF directed investments of approximately $759 million into BLMIS. The Trustee is pursuing these accounts and entities through separate investigations or actions. The UBS Defendants' deep involvement with Madoff and the BLMIS-feeder funds was far-reaching, extended well beyond Luxalpha and Groupement Financier, and involved billions of dollars being funneled into BLMIS.

85.     The UBS Defendants served as support for these massive BLMIS-feeder funds despite having concluded that BLMIS was not a suitable investment for marketing to their own clients.

86.     The UBS entities identified as Defendants herein operate and represent themselves to the public as a unified global entity. Upon information and belief, the UBS Defendants share a centralized structure for their core enterprise functions including compliance, risk management, legal and regulatory functions.

### THE ACCESS DEFENDANTS' AND THE UBS DEFENDANTS' CONNECTIONS TO EACH OTHER

87.     The Access Defendants and the UBS Defendants were intertwined with respect to BLMIS feeder funds, and worked closely together for purposes of creating and growing Luxalpha's and Groupement Financier's investments in BLMIS.

88.     The Luxalpha board was comprised of individuals from UBS SA and the Access Defendants.

89.     UBS SA and UBSFSL worked closely with several of the Access Defendants – including AIA LLC, AIA Ltd., Access Mgmt Lux and AIA Europe Ltd. – in the management, supervision and administration of Luxalpha and Groupement Financier.

90.    Viviane DeAngelis, a Managing Director of UBS SA, and Littaye had an

ongoing, collaborative relationship.  Together, they worked to protect Luxalpha from any inquiry

that threatened to disrupt the fund and the fees they earned off of it.  As an example, in July of

2006, Littaye entered into Access's internal database the following note regarding conversations

among himself, UBS SA's DeAngelis and an individual named Lila Seirafi.  The internal

database was commonly used by individuals at Access to share details of meetings or

conversations.  Littaye's note reads:

> LS HAD CALLED ME TO ASK IF THEY COULD
> STRUCTURE A NOTE WITH LEVERAGE ON LUX. FOR ONE
> OF THEIR CLIENTS.  THINKING THEY CAME TO US
> THROUGH UBS LUXEMBOURG, I SENT QUITE A DOC TO
> HER, THOUGH NOT MENTIONING BMI.
>
> **V DE ANGELIS STOPPED ME, EXPLAINING THAT THIS
> COULD CAUSE THE END OF OUR FUND, BECAUSE, IF
> THE ANALYSTS OF ZURICH FIND OUT BMI IS BEHIND
> THE STORY, WE WOULD BE KILLED.**
>
> SO I CALLED L. SEIRAFI, TELLING HER WE COULD NOT
> GO ANY FURTHER BECAUSE THIS IS REALLY A FAMILY
> FUND AND WE CANNOT LET THE PRODUCT SPREAD
> OUT.  I TOLD HER THAT, WHEN WE HAVE THE IXIS
> PROPOSAL, I WOULD CALL HER AGAIN.  THEN I TALKED
> TO VDA AGAIN.  SHE TOLD ME TO DROP ANY
> RELATIONSHIP.

(Emphasis added.)

91.    Later, in September of 2006, Littaye entered a note into the internal Access

database which reads in part:

> M. Neiman had a bid last July from Ixis concerning a leveraged
> position in Luxalpha (Leverage 3).  One way of the other [sic], he
> contacted UBS structured product department – Geneva to get a
> second bid.  This department was very excited.
>
> **Now V. d Angelis had told her hierarchy that Luxalpha was a
> sicav dedicated to a family.  She entered in a fundamental risk
> on her own position, because of this movement, which shows**

> **that the sicav is evidently not a dedicated sicav (huge internal
> compliance risk).**

(Emphasis added.)

92.     Subsequently, in June of 2007, Littaye entered the following note into Access's

internal database:

> V DE ANGELIS IS RESPONSIBLE OF [*sic*] THE UBS
> DEPARTMENT[]ADMINISTRATING THE FUNDS
> DEDICATED TO A FAMILY OR SOME GROUP. **UBS
> INTERNAL AUDIT ON THESE FUNDS WAS COMPLETED
> 6 WEEKS AGO.  WE FEARED FOR LUXALPHA
> SURVIVAL DUE TO THE MULTIPLICITY OF
> SUBSCRIBERS. []IT SEEMS TODAY THAT NO HARM
> WILL BE DONE.**  AN A[U]DIT ON THE DEPT ITSELF
> STARTS IN ONE WEEK.  VDA IS HIGHLY CONFIDENT.  IT
> SEEMS WE SHOULD BE TOTALLY COMFORTED AT THE
> END OF JULY.

(Emphasis added.)

93.     Taken together, these internal notes, which offer only a glimpse of the

relationship between Littaye and Viviane DeAngelis, show that Access and UBS SA were

concerned that investments into Luxalpha would be stopped because of BLMIS's involvement.

These internal notes also demonstrate that in some respects, Littaye was taking direction from

UBS SA's Viviane DeAngelis with regard to who could be permitted to establish a relationship

with the Luxalpha.

94.     These notes also suggest that UBS AG failed to adequately supervise or monitor

Luxalpha and UBS SA's involvement with the fund, or was willing to turn a blind eye to

inconsistent information about the fund, even though UBS AG was at all times willing to lend its

name to the fund and serve as its sponsor (a/k/a its "promoter").

27

## THE DEFENDANTS' ROLES IN ENABLING THE FRAUD

### THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING BLMIS

95.     Upon information and belief, because of concerns about Madoff's purported strategy and because he would not meet with their due diligence teams, the UBS Defendants refused to recommend or market BLMIS to their private bank clients, though they willingly supported and facilitated BLMIS for at least $80 million in fees, and likely much more.

96.     Upon information and belief, neither BLMIS nor any BLMIS-feeder fund was ever placed on the list of Global Wealth Management & Business Banking recommendations for direct investment maintained by the UBS Defendants for their clients.

97.     Following the revelation of the Madoff fraud, UBS AG, the parent entity of the UBS Defendants, stated publicly that it had no material exposure to BLMIS.

98.     Upon information and belief, the UBS Defendants' lack of exposure to BLMIS and the decision to not market BLMIS-feeder funds to their own private bank clients were the result of due diligence analyses performed by the UBS Defendants on Madoff and BLMIS.

99.     In November 2000, UBS AG acquired Fondvest AG ("Fondvest"), a Zurich-based company specializing in analyzing funds for institutional investors.  Fondvest served as the research unit for the UBS Defendants, providing analysis on third-party funds for the UBS business units.  Upon information and belief, Fondvest analyzed BLMIS-related funds and repeatedly declined to endorse them for distribution to UBS clients because of the lack of transparency regarding their ability to generate such high, stable returns.

100.     Fondvest was discontinued in 2004 and the Investment Solutions unit within UBS Wealth Management became responsible for providing analysis of third-party funds to the UBS Defendants.  Investment Solutions continued to refuse to endorse BLMIS-related funds.

28

According to an April 2009 *Financial Times* article, seemingly disputed by the UBS Defendants,

UBS AG's Wealth Management unit:

> had earlier looked at the Madoff funds platform from a general
> process and firm perspective, but did not receive the required
> levels of comfort and gave the funds a "non approved" status for
> internal records.  This was seen as a clear signal that Madoff funds
> should not be actively held for portfolio construction uses at UBS.

101.    The UBS Defendants decided against investing in a BLMIS feeder fund, despite

its attractive returns, as early as 2002, noting that "[t]he fund seems to do very well, but there are

voices in the industry warning because generating such consistent returns with such a strategy is

more or less impossible."  The feeder fund's promoters claimed that their "great relationship"

with Madoff provided complete transparency, yet they were never able to sufficiently answer the

UBS Defendants' questions about the strategy.  As a result, the UBS Defendants decided not to

invest in the feeder fund, saying "[w]e consider ourselves pretty smart and no one in their firm

has properly explained their strategy to match the return profile to us, so we avoid stuff like

that."

102.    Between September 2007 and December 2008, UBS AG was approached about

investing in several BLMIS related products.  Internal emails from the UBS Defendants show

that, in response to these requests, UBS AG performed extensive due diligence on BLMIS.

During this process several red flags were raised regarding BLMIS and the underlying manager,

Madoff, including Madoff's lack of transparency and his refusal to meet with UBS AG's

analysts.

103.    For example, representatives of an investment firm called Pioneer Alternative

Investment Management, Ltd., Dublin or Pioneer Global Asset Management S.p.A. in Milan

("Pioneer") approved UBS AG.  Both these entities are owned by UniCredit S.p.A., which also

owns Bank Austria, which is also the subject of separate actions and investigations by the

Case 1:11-cv-04213-CM   Document 47-2   Filed 08/24/11   Page 89 of 108

Trustee for its role with certain other BLMIS Feeder Funds.  Pioneer sought to have a Madoff

feeder fund called Primeo Select offered and promoted through UBS AG.  Ultimately, UBS AG

refused to allow the Primeo Select fund to be offered through UBS AG.  Upon information and

belief, this decision appears to have been based on due diligence done by UBS AG in London, as

well as a decision from UBS AG's asset management group in Switzerland.  UBS AG believed

that it did not have enough information on Madoff, who was the underlying fund manager for

Primeo Select, could not get comfortable with Madoff's strategy, and refused to offer any

Madoff product because Madoff would not meet with UBS AG's analysts.

104.    To approve investments in BLMIS-related products, UBS AG required its

analysts to obtain more information on the underlying fund manager, Madoff.  One of the due

diligence requirements was a "face to face meeting with the manager and a site visit to the HQ of

the firm where money is managed."  This task was assigned to a UBS AG analyst in London,

Mary Kleckner ("Kleckner").  In preparation for such a meeting, Kleckner asked her team for a

list of specific questions or topics that they would like answered.  The team responded with

concerns about the total assets BLMIS was managing and whether there was a point at which

these assets would be large enough to deteriorate the strategy's performance.  Additionally,

Kleckner's team raised questions about the potential misuse of information between BLMIS's

marketing and investment advisory arms.

105.    UBS AG's questions were never answered, as Madoff continuously thwarted

Kleckner's efforts to gain transparency, repeatedly refusing Kleckner's requests to meet with

him.  In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting.  His simple
> explanation was that if he meets with one client he would be
> obligated, perhaps even from a regulatory standpoint now that he is
> an RIA, to meet with all of them, and he would literally be forced

to build an infrastructure to support meetings and devote a huge amount of time to it.

106.    Kleckner also reached out to others for their opinions on Madoff.  On October 31, 2007, in response to her question, "What are your feelings on Madoff," Kleckner received the following response:

> I think [M]adoff is one of the most controversial funds out there. The historic returns and low vol[ume] make the [M]adoff feeders look very attractive for leveraged structured products and FAs love it.  In addition, [M]adoff is very involved with the [NASD] and on a number of committees there.  We get asked about sp's on these funds all the time, but there are a lot of folks who are concerned about the fund.  Everything is probably fine, but there are a number of things that are odd or different than the norm.  Like no prime broker, all trades done through [M]adoff securities through an ordinary brokerage account.  It's also unclear which dealers are executing the [OTC] collars for him?  They are pretty big, but no one seems to know who is trading them. The compensation for him is just through commission, no mgmt or incentive fee.  There are a couple of other flags as well but [redacted] have both written a lot of structured products on [M]adoff . . . .  I've never met him, but we did have a call with one of his risk folks some time ago.  Could be ok, but there is more risk due to the lack of transparency on this one than in many other funds.  **Some folks think [M]adoff could be one of the most successful schemes ever, I think it would be hard to do anything on them without more transparency than they have historically been willing to provide.**

(Emphasis added.)

107.    After performing extensive due diligence, UBS AG decided that it did not have enough information on Madoff to be able to get comfortable with his strategy.  UBS AG was unable to assuage its concerns as no further transparency was forthcoming, since Madoff refused to meet with any of UBS AG's analysts.   UBS AG ultimately concluded that "Madoff is not a manager that we are willing to structure products on. . . . "

108.    UBS AG also issued a series of notes linked to Momentum AllWeather Strategies II, which in turn was invested in a Madoff feeder fund, Kingate Global Fund, Ltd. (8.24%

reported as of December 2008). Upon information and belief, UBS, as issuer of these notes, would have performed due diligence on Madoff and BLMIS in the normal course of business.

109. Despite not permitting the investment of a significant amount, if any, of its own money in BLMIS and refusing to recommend any BLMIS-feeder fund to their clients, the UBS Defendants decided as early as January 2004 to create and structure the BLMIS feeder funds Luxalpha and Groupement Financier.

110. The UBS Defendants consciously disregarded the numerous red flags raised by various UBS employees and internal opposition regarding whether the UBS Defendants should be involved with a BLMIS structure in any capacity. As Bernd Stiehl, one of the directors of Luxalpha and a managing director of UBS SA, stated in response to an e-mail from UBS AG which explicitly raised concerns about getting involved with BLMIS, "Business is business. We cannot permit ourselves to lose 300 million." Upon information and belief, Mr. Stiehl was referring to anticipated fees.

111. While performing due diligence, UBS SA reached out to other UBS entities for information on BLMIS, and received significant negative feedback. For example, Mike Welch ("Welch") of UBS O'Connor LLC, a subsidiary of UBS AG, cautioned against becoming involved with Madoff due to the lack of transparency surrounding BLMIS. In a March 5, 2004 e-mail regarding BLMIS, a portion of which was entitled "Thoughts and Rationale for NOT Investing," Welch raised several red flags. First, he noted that since 1990 there were only a handful of negative months, and that the strategy generated incredibly consistent returns each year. Second, he stated that "[i]f Madoff were to run the strategy totally independently from his [broker/dealer business], it would be IMPOSSIBLE to generate the returns that he has produced since 1990." Additionally, Welch noted that Madoff did not charge fees for his hedge fund,

which "[m]akes one ask the question of why Madoff would bother to have such a product when the only revenue coming from running outside money is commission dollars." Welch concluded that "[t]he simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter in our mind."

112.    Tim Bell ("Bell"), a UBS AG employee who regularly advised on hedge fund investments, echoed Welch's concerns about BLMIS. In an e-mail dated March 5, 2004, Bell characterized the question of whether the UBS Defendants "should [] go there" as depending on the answers to the questions, "can we really get transparency and can we really get comfortable?" In response to UBS SA's inquiries about BLMIS, Bell stated:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency . . . . My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of capcity [*sic*] . . . .

113.    UBS SA itself acknowledged the serious risks involved in working with BLMIS. In response to a request in 2003 by UBS SA for feedback regarding Madoff, a UBS AG (Zurich) employee stated that one of UBS AG's biggest concerns was that Madoff was acting as both a broker and a depository at once. In addition, this same employee stated:

> We normally have to give "NO" as the answer in cases like Madoff. In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time! Such a NO is easy to comprehend for both business policy reasons and risk reasons.

In a December 17, 2003 e-mail forwarding UBS AG's feedback on Madoff, De Angelis of UBS SA concurred with this assessment, stating that "[t]he risk should not be underestimated," however, she also countered that working with BLMIS "would be advantageous on the income

side."

114.     In spite of the UBS Defendants' own policy against such a structure, BLMIS was

given "'special' handling" and permitted to function as both depository and broker.  Apparently

to give themselves comfort, UBS SA and UBS AG attempted to impose certain conditions.  For

example, they wanted to require BLMIS to report cash and security movements to UBS SA for

the purpose of daily reconciliations.  They also wanted electronic access to their accounts.  None

of these requirements was met.

115.     Rather than heeding the glaring red flags and words of warning from their own

colleagues, UBS SA merely limited its own exposure to BLMIS via insurance policies and secret

indemnity agreements and forged on with the corrupt relationship.  Indeed, upon reading Bell's

negative assessment of BLMIS, De Angelis replied, "[t]hanks, does not contribute to me having

a better feeling.  I have inquired about additional insurance."  Less than two weeks later, she and

Serge Karp forwarded Luxalpha's executed account opening documents to BLMIS.

### KNOWING THE LIKELIHOOD OF FRAUD,
### UBS KNOWINGLY PROVIDED A FAÇADE OF LEGITIMACY FOR BLMIS

*UBS AG*

116.     UBS AG is the parent entity of the UBS Defendants and a recognized leader in

global private wealth management.  UBS AG's role with respect to Luxalpha, one of the largest

of the BLMIS feeder funds, was integral to its development and promotion as a specific type of

European fund known as a UCITS fund.  A UCITS fund – an acronym for "Undertakings for

Collective Investments in Transferable Securities" – is organized under a set of European Union

("EU") directives that aim to allow collective investment schemes to operate freely throughout

the EU on the basis of a single authorization from one member state.  In the case of Luxalpha,

the authorizing member state was Luxembourg, and the approving body was the Commission de

Surveillance du Secteur Financier (the "CSSF"). Luxalpha used its approval in Luxembourg to "passport" itself and market itself elsewhere in Europe, including France, where many of its investors were located.

117. UBS AG served as the sponsor or "promoter" of Luxalpha (titles that UBS AG used interchangeably). UBS AG is named as the sponsor in a February 2004 draft prospectus sent at Luxalpha's inception as part of the approval application to the CSSF, the Luxembourg regulator. UBS AG's sponsor role was subsequently confirmed in each of Luxalpha's subsequent prospectuses issued in August 2004, August 2006, March 2007, and November 2008. For example, the November 2008 sales prospectus for Luxalpha states that, "[t]he Sponsor of the fund is UBS AG, one of the world's leading financial institutions which offers a full range of commercial, trading, risk management and investment services." UBS AG was also identified as the fund's promoter in an Operating Memorandum for Luxalpha dated October 16, 2008.

118. A fund's sponsor or promoter is essentially responsible for the creation of the fund. The promoter of a UCITS fund, including Luxalpha, must be a regulated entity with sufficient financial resources. A UCITS fund, including Luxalpha, is authorized in Luxembourg by the CSSF on the basis of the promoter's experience and financial soundness. The promoter of a UCITS, including Luxalpha, is required to have a significant capital base because it is expected to provide compensation for damages sustained by third parties as a result of fault in the management or administration of the fund.

119. By serving as the fund's sponsor and advertising that role, UBS AG gave its imprimatur to Luxalpha and led the Luxembourg regulator, as well as the public, to believe that one of the world's largest financial institutions was endorsing and standing behind the fund. By so doing, UBS AG provided a façade of legitimacy for a fund that UBS AG knew channeled all

of its investments into the custody and control of BLMIS, with no checks and balances on

BLMIS.

***UBS SA***

120.    UBS SA served in multiple roles for BLMIS feeder funds Luxalpha and

Groupement Financier.

121.    UBS SA was identified as a sponsor of Luxalpha in an approval request letter sent

to the CSSF at Luxalpha's inception.  The experience and financial soundness of UBS SA was,

upon information and belief, instrumental in the approval of Luxalpha by the CSSF, and UBS

SA assumed responsibility for providing compensation for damages sustained by third parties as

a result of fault in the management or administration of the fund.

122.    UBS SA was also the custodian and distributor of Luxalpha.  As custodian, UBS

SA was by law responsible for both the safekeeping of the fund's assets and the supervision of

the fund.  Despite earning substantial fees for serving as the fund's custodian, UBS SA delegated

its custodial functions to BLMIS in violation of relevant law.

123.    UBS SA also served as the manager of Luxalpha from February 2004 until

August 2006.  As manager of Luxalpha, UBS SA represented to the CSSF and investors that it

had assumed the responsibility for the active management of the fund's assets, as well as the

ongoing monitoring and adjusting of the fund's investments, all under the supervision of the

fund's board of directors.  Despite earning substantial fees for serving as Luxalpha's manager,

UBS SA delegated all asset management functions to BLMIS.

124.    All money invested in BLMIS through the Luxalpha fund was invested through

BLMIS Account No. 1FR108, which was held in the name of UBS SA.  All account opening

papers and agreements were completed and executed by UBS SA employees, including

Managing Director Viviane DeAngelis and Director Serge Karp.  UBS SA employees regularly

corresponded with Frank DiPascali of BLMIS for purposes of managing Luxalpha's investments and redemptions.  All redemptions requested by UBS SA for the Luxalpha fund were processed through an account held at UBS AG's Stamford, Connecticut branch.

125.   UBS SA also served as the Prime Bank for Groupement Financier, and as custodian of a related fund, Groupement Financier Levered Ltd., which did not have a direct account at BLMIS, but which offered leveraged returns based on investments in the underlying Groupement Financier fund that was directly invested with BLMIS.  As Prime Bank for Groupement Financier, UBS SA was responsible for the receipt of the fund's subscription monies and the subsequent transfer of those monies to the Bank of Bermuda, which acted as Groupement Financier's beneficiary bank.  UBS SA was also responsible for maintaining a mirror book-keeping of all transactions reported by BLMIS so as to enable UBSFSL, the fund's administrator, to calculate the fund's net asset value ("NAV").

**UBSFSL**

126.   UBSFSL served as administrator for BLMIS feeder funds Luxalpha and Groupement Financier.  As administrator of Luxalpha and Groupement Financier, UBSFSL was responsible for accounting functions, calculation of the funds' NAV, keeping the register of shareholders, handling subscriptions and redemptions, communication with investors, and preparation of financial statements for the funds.  It calculated the NAV of the Feeder Fund Defendants with information provided by BLMIS, without any independent verification of the numbers BLMIS provided.

**UBSTPM**

127.   UBSTPM served as manager of Luxalpha from August 2006 until November 2008.  As manager of Luxalpha, UBSTPM represented to the CSSF and the public that it had assumed the responsibility for the management and administration of the fund, as well as the

monitoring of investment policies and restrictions of the fund.  In reality, all management functions for Luxalpha had already been delegated to BLMIS as a result of the asset management agreement executed between UBS SA and BLMIS.

***UBS's Luxalpha Board Members***

128.    At all times, from its inception through its ultimate liquidation in 2009, the board of Luxalpha was dominated by UBS-based directors.  Luxalpha Director Defendants Hartmann, Schroeter, Stiehl, Egger, Hondequin, and Kranz were all UBS SA employees.  These UBS-based directors were responsible for all aspects of the fund, including its management and the agreements it entered into which ultimately delegated custody and management of the fund's assets to BLMIS.

## THE UBS DEFENDANTS ENABLED MADOFF BY PROVIDING THE APPEARANCE OF LEGITIMACY AND SECURITY FOR LUXALPHA AND GROUPEMENT FINANCIER

129.    Partnering with the Access Defendants, the UBS Defendants facilitated the Madoff fraud by essentially selling the UBS brand and reputation to Luxalpha and Groupement Financier so as to provide those funds with the appearance of legitimacy.

130.    While outwardly named in multiple and substantial roles for Luxalpha and Groupement Financier, the UBS Defendants in reality delegated their responsibilities for the investments, monitoring and management of the funds.  They attempted to protect themselves from liability for the delegation of their duties through a series of undisclosed indemnity agreements with the Access Defendants.  Although the UBS Defendants disclaimed all responsibility and delegated their primary functions, they nevertheless collected more than $80 million in fees from Luxalpha and Groupement Financier – fees apparently given for "looking the other way" and for the legitimacy they lent to the Ponzi scheme.

***The UBS Defendants Disclaimed All Responsibility and Protected Themselves Through a
Series of Secret and Undisclosed Indemnity Agreements***

131.    Upon information and belief, several financial institutions declined Access's

requests to service Luxalpha.  As a result, the UBS Defendants were the only financial institution

that the Access Defendants could find who was willing to serve as sponsor, administrator,

manager and custodian of Luxalpha.  The UBS Defendants were willing to do so only after

protecting themselves through a series of undisclosed indemnity agreements entered into with the

Access entities.

132.    The UBS Defendants lent their name publicly to the fund, but were to be absolved

of all responsibility for the risks associated with Luxalpha's creation and management.  Upon

information and belief, on or about February 5, 2004, AIA (Lux) entered into a series of

indemnity agreements with the UBS-based directors of Luxalpha and UBS SA, which purported

to indemnify and hold harmless the UBS-based directors and UBS SA for any liabilities resulting

from their involvement with Luxalpha.

133.    In particular, the indemnity agreement between AIA (Luxembourg) SA and UBS

SA specifically provides that UBS SA is merely acting as a "figure head" and states as follows:

> **[AIA (Luxembourg) SA] acknowledges and agrees that it has
> requested [UBS SA] to act as a figure head to third parties in
> the sponsorship and in the managementship of the Fund.**  As a
> result of which, [UBS SA], according to Luxembourg laws, may
> be liable to cover damages resulting from proved irregularities,
> inadequacies or omissions in the administration or the management
> of the Fund.  [AIA (Luxembourg) SA] acknowledges and agrees
> that [UBS SA] shall perform such services at the exclusive risks of
> [AIA (Luxembourg) SA].

(Emphasis added.)

134.    In an email dated March 11, 2004, Serge Karp of UBS SA, outlined UBS SA's

concerns of a "worst case scenario" whereby BLMIS would fail, leaving UBS SA on the hook

Case 1:11-cv-04213-CM    Document 47    Filed 08/24/11    Page 49 of 106

for investor claims.  To meet these concerns, UBS SA demanded that Access provide it with a

letter from Luxalpha's investors holding UBS SA harmless for any loss incurred as a result of

any failure of the sub-custodian (BLMIS), as well as proof of an insurance policy subscribed and

paid for by Access covering the risks of Luxalpha.  While it is currently unknown whether UBS

SA's specific demands were met, and if so in what fashion, the import of the demands is clear –

UBS SA wanted to be sure that, while it was content to sell its name for purposes of promoting

Luxalpha and earning excessive fees, it would not be liable for its total delegation of Luxalpha's

management and operation to BLMIS.

135.    The UBS Defendants sought to limit their liability for Luxalpha through

additional indemnity agreements as well.  Access Mgmt Lux, which became the manager of

Luxalpha as of November 17, 2008, executed an Indemnity Letter that same date in favor of

UBS SA (the "November 2008 Indemnity Letter").

136.    The November 2008 Indemnity Letter purported to replace and supersede an

indemnity agreement signed between AIA (Lux) and UBS SA on January 5, 2004.  Along with

agreeing that UBS SA would be indemnified and held harmless, the November 2008 Indemnity

Letter again specifically provided that UBS SA was merely acting as a "figure head" to third

parties with regard to sponsorship of Luxalpha.

137.    Access Mgmt Lux also executed indemnity agreements on November 17, 2008 –

just a month before Madoff turned himself in – in favor of UBS-based directors Kranz, Egger,

Schroeter and Hondequin, as well as Access-based director Delandmeter.

138.    The November 2008 indemnity agreements served to perpetuate the fiction that

UBS SA and Luxalpha's UBS-based directors were responsible for Luxalpha, when in reality

these Defendants were simply selling the UBS name to Luxalpha in return for lucrative fees.

**The UBS Defendants Delegated Their Luxalpha Management and Custodial Duties**

139.    From its very beginning, and continuing until Luxalpha's eventual demise, the UBS Defendants knowingly and purposefully delegated to BLMIS all of the management and custodial duties they outwardly assumed for Luxalpha.  Custody of Luxalpha's assets was at all times delegated to BLMIS.  Management of Luxalpha's assets was also delegated entirely to BLMIS, with certain of the Access Defendants serving in purported advisory capacities, although Luxalpha was at all times 100% invested in BLMIS.  Thus, despite numerous representations made in sales prospectuses and representations to the Luxembourg regulator, from the beginning of Luxalpha until its end, the UBS Defendants performed no actual management or custodial functions for Luxalpha, despite collecting fees for those services.

140.    Time and time again – in each of the February 2004, August 2004, August 2006, March 2007, and November 2008 Luxalpha sales prospectuses – it was emphasized that the rights and duties of Luxalpha's custodian had been assumed by UBS SA.  Each prospectus then went on to detail the length and breadth of UBS SA's banking experience, stating:

> UBS (Luxembourg) S.A., [is] a fully fledged bank, founded on August 20, 1973, and has its registered office at 36-38, Grand Rue, Luxembourg.  In addition to international banking, UBS (Luxembourg) S.A. is also active in private banking and offers a wide range of customer services, among them investment advisory and asset management services, time deposits as well as securities and foreign exchange.  Since the 1st July, 1998 its share capital amounts to CHF 150 Mio.

This detail on UBS SA was provided with the knowledge of UBS SA and with the intent to mislead regulators and the public into believing that an experienced and secure bank was supervising the safekeeping of Luxalpha's assets.

141.    What was not disclosed in any prospectus was the fact that UBS SA, in its capacity as Luxalpha's custodian, had entered into a Sub-Custodian Agreement, dated February

5, 2004, with BLMIS.  The Sub-Custodian Agreement put in place could not have met the

approval of the CSSF because BLMIS did not meet the criteria for officially performing the

duties of a custodian of a Luxembourg UCITS fund.

142.    On March 18, 2004, in its capacity as Luxalpha's manager, UBS SA also

executed an agreement with BLMIS entitled "Trading Authorization Limited to Purchases and

Sales of Securities and Options" in favor of BLMIS.  Under the terms of this authorization,

management of nearly all the assets of Luxalpha was delegated to BLMIS.

143.    Such a complete abdication of UBS SA's asset management responsibilities came

as a surprise even to the then Head of Portfolio Management at UBS SA, Christian Schoen, who

stated in a March 22, 2004 e-mail to another UBS SA employee:

> I am wondering how this is supposed to work and how one can
> argue that we are officially the portfolio manager but do not have a
> cent posted to our books.  To date I had assumed that Madoff
> certainly makes the trades and executes them, but that the assets lie
> with us and that in the end we settle the trades with Madoff.  This
> way I would have been in a position to exercise a certain oversight
> function.

144.    UBS SA also entered into two other agreements with BLMIS.  The first was

entitled "Option Agreement," dated March 18, 2004, and the second, "Customer Agreement,"

was undated.

145.    In addition, UBS SA entered into a "Portfolio Advisory Agreement" with AIA

(Lux) and, on August 11, 2004, entered into another "Portfolio Advisory Agreement" with AIA

LLC.  AIA LLC's involvement was noted in Luxalpha's August 2004 prospectus, which

indicated that the costs of AIA LLC's "advice" would be borne by UBS SA as portfolio

manager.

146.    Thus, from the moment Luxalpha was created, UBS SA had delegated nearly

every aspect of its custodial and asset management responsibilities to BLMIS.

147.   As a UCITS fund, Luxalpha could be marketed throughout Europe.  However, upon information and belief, the CSSF did not approve the arrangement which the UBS Defendants, the Access Defendants, and BLMIS had agreed to because all power was now concentrated in BLMIS, with no checks and balances.  Concentration of power in the hands of BLMIS violated the Luxembourg law implementing the UCITS directives that governed Luxalpha.

148.   Tellingly, no information about any delegation of UBS SA's responsibilities to BLMIS appeared in any of Luxalpha's sales prospectuses.  Not only did this nondisclosure serve to conceal the fact that an unfit manager was given custody and control of Luxalpha's assets, but the concealment of BLMIS's involvement with Luxalpha facilitated and enhanced the Ponzi scheme.

149.   Although the Access entities purportedly became more involved in the management of Luxalpha at some point later on, they nevertheless performed no management functions.  In February 2007, UBSTPM signed an "Investment Advisory Agreement" with AP (Lux), which was designated as "Investment Advisor" in the March 2007 prospectus.

150.   Even when UBSTPM was brought on board as the new Management Company of Luxalpha, the UBS Defendants continued to conceal the delegation of the fund's management to BLMIS.  In Luxalpha's August 2006 prospectus, it was noted that UBSTPM, as Management Company:

> [i]s responsible for the management, the administration and the distribution of the Fund's assets but is allowed to delegate, under its supervision and control, all or part of these duties to third parties.  In case of changes or appointment of additional third parties, the prospectus will be updated accordingly.

151.   No "update" disclosing the delegation of Luxalpha's management to BLMIS was ever provided.  Further, this provision of the August 2006 prospectus fostered the misleading

impression that no such delegation had taken place as of 2006, when in fact it already had taken

place in 2004, when Luxalpha was first launched. Nor did UBSTPM ever attempt to exercise

any "supervision" or "control" over BLMIS.

152.    Access Mgmt Lux became the new manager of Luxalpha as a result of a

"Management Company Services Agreement," dated November 17, 2008. On the same date, a

new "Investment Advisory Agreement" was signed between Access Mgmt Lux and AP (Lux),

which replaced the agreement signed in February 2007 between UBSTPM and AP (Lux).

153.    Despite the shuffling of entities serving as Luxalpha's purported manager and

investment advisor, Luxalpha's assets were at all times managed and controlled by BLMIS. The

organizational structure for Luxalpha was as follows:



**UBS's Operation of Luxalpha Invited a Fraud**

154.    The operational procedures for Luxalpha put in place by UBS SA, its custodian, and UBSFSL, its administrator, were tailor-made to accommodate Madoff's fraud and allow that fraud to thrive.  These procedures, set forth in internal operating memoranda prepared and distributed by the UBS Defendants, placed custody and trading authority solely in the hands of BLMIS, and permitted complete reliance on unverified pricing and trade confirmations issued by BLMIS, and the calculation of Luxalpha's NAV on a delayed basis.  The UBS Defendants' operating procedures for Luxalpha combined to create a scenario that enabled a fraud and enhanced Madoff's Ponzi scheme.

155.    In what the Trustee believes to be the most recent of several versions of Luxalpha's internal Operating Memorandum, dated October 16, 2008 – less than two months before the collapse of BLMIS – UBS SA notes that it appointed BLMIS to be the sub-custodian for the safekeeping of Luxalpha's assets.  The Operating Memorandum then continues to state that:

> [t]he sub-custodian is also appointed as exclusive trader of the Account and the transactions involving the assets of the Fund will be executed and settled under the responsibility of the sub-custodian.  In its capacity as Account Trader, the sub-custodian has also been authorized by the Custodian and the Fund to trade directly in securities and options transactions for the purpose of the Account, based on the rules and regulations as defined in the duly signed trading authority.

156.    BLMIS clearly had total custody and control of Luxalpha's assets with no system for any type of independent checks, balances or confirmations on what BLMIS was reporting. As an experienced and sophisticated financial institution, UBS SA knew, or should have known, that such an arrangement was problematic in that it could lead to fraud by a hedge fund manager. Moreover, such an arrangement was improper as a matter of Luxembourg law.

45

Case 1:11-cv-04213-CM    Document 47    Filed 08/24/11    Page 63 of 106

157.    The Operating Memorandum continues to provide that any cash and security movements for Luxalpha would be communicated by BLMIS on a daily basis to UBS SA, and states that, "[a]s B. Madoff is at the same time acting as investment trader, broker and sub-custodian, there will be one single confirmation form issued by BM."  The operating procedures further provide that UBSFSL, as administrator, was to take the unconfirmed and unverified information that UBS SA received from BLMIS to determine Luxalpha's NAV.

158.    With regard to the calculation of Luxalpha's NAV, the Operating Memorandum specifically notes that:

> [d]ue to the considerable delay in the dispatching of the trade confirmations and Broker statements from B. Madoff, the client has accepted that UBSFSL issues the NAV with a delay of up to 10 business days.

159.    The Operating Memorandum also provides that BLMIS, as sub-custodian, will "promptly report by fax as of each trade date the transactions entered into the Account."  These daily faxes were supposed to be sent to UBS SA.  Upon information and belief, this procedure was not followed.  Instead, BLMIS only reported trades in a delayed, hard copy-only manner.

160.    The net effect of the operating procedures put in place for Luxalpha was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of Luxalpha, to earn fees for serving in roles that actually provided no real oversight or protection for Luxalpha's assets, and which provided BLMIS with the freedom to manipulate reports as needed to perpetuate the Ponzi scheme.

### UBS's Role as a "Front" and Mere "Window Dressing" for Luxalpha Was Well Known and Understood by the Fund's Insiders

161.    The UBS Defendants' illusory role with respect to Luxalpha was widely acknowledged and freely discussed among Access's insiders.  For example, the minutes of Access's February 2007 Quarterly Executive Meeting state that "Luxalpha UCITS is a strange

entity; **UBS is window dressing or a front**.  PL [Patrick Littaye] is a fund director; he controls

everything."  (Emphasis added.)

162.    The use of the UBS entities as a front for Luxalpha was undertaken to satisfy the

requirements of the Luxembourg authorities that Luxalpha be controlled and managed by

established entities in Luxembourg.  The UBS Defendants were willing to provide this façade for

Luxalpha in return for millions of dollars in fees.

163.    When shown a copy of the minutes of Access's February 2007 Quarterly

Executive Meeting in a Bankruptcy Rule 2004 examination, Philip H. Wogsberg, who was with

AIA LLC for ten years and who served as its Director of Research, testified:  "[T]he rules are

one thing, but also there is some winks and nods in regulation in Europe, and I think this was a

wink and a nod to Patrick please sanitize this and get it all Luxembourgy-looking … "

164.    When also asked in a Bankruptcy Rule 2004 examination about the comment that

UBS was a mere front or window dressing, Theodore Dumbauld, a former Access partner and its

Chief Investment Officer, testified as follows:

> UBS was just a pass-through entity.  It really didn't have any
> responsibilities in the management of the product, whether it was
> collecting investors or maintaining a relationship with Madoff.  So,
> in that it was purely – Access was using its [*i.e.*, UBS's] balance
> sheet or its reputation in order to be compliant with the regulations
> in Luxembourg.

165.    Thus, from the very creation of Luxalpha in 2004 to its implosion as a result of

Madoff's fraud, the UBS Defendants sold their name to provide a façade of legitimacy for the

fraud.  Luxalpha was just one of several Access-related portals feeding Madoff's fraud.  The

UBS Defendants willingly perpetuated a fiction that allowed Luxalpha to operate under the

appearance of being a UCITS-compliant fund, thus enabling Madoff to sustain the Ponzi scheme

Case 1:11-cv-04213-CM Document 47 Filed 08/24/11 Page 63 of 105

by facilitating the flow of billions of dollars into the fraud. But for the deception by the UBS Defendants, the harm to BLMIS's victims would have been diminished.

***UBS Defendants Were Paid Over $80 Million in Fees for Their "Work" on Luxalpha***

166.   Even though they claimed no responsibility and purported to disclaim all liability for the investment and management of the Luxalpha fund, upon information and belief, the UBS Defendants received over $80 million in fees for their purported duties relating to Luxalpha.

167.   Upon information and belief, UBSFSL was paid a fee of .05% of fund assets for its administration services, resulting in a total of $2,624,871.

168.   Upon information and belief, UBS SA was paid $10,539,560 in fees, purportedly for "recordkeeping and jurisdiction purposes."

169.   Upon information and belief, UBS SA was also paid $14,464,523 in "management fees" for the period February 2004 until August 2006.

170.   Upon information and belief, UBS SA was also paid $13,470,388 in "performance fees" for the period February 2004 until August 2006.

171.   Upon information and belief, UBSTPM was paid $27,167,048 in "management fees" for the period August 2006 until November 2008.

172.   Upon information and belief, UBSTPM was also paid $15,482,220 in "performance fees" for the period August 2006 until November 2008.

173.   These fees were paid to the UBS Defendants for doing essentially nothing for Luxalpha because they had delegated all the custodial and asset management functions for Luxalpha to BLMIS. The UBS Defendants did not hold the assets of Luxalpha, and never verified their existence or their value. They publicly misrepresented their role and further aided and abetted Madoff's fraud and breach of fiduciary duty to BLMIS's customers.

174.    The delegation of duties to BLMIS and Madoff by the UBS Defendants and their conduct with regard to Luxalpha were authorized and approved by the Luxalpha Director Defendants – the majority of whom were employees of the UBS Defendants.

***UBS Defendants' Operation of Groupement Financier Invited a Fraud***

175.    As with their "figure head" role with respect to Luxalpha, UBSFSL and UBS SA maintained a very hands-off approach with respect to Groupement Financier.  In a Groupement Financier Operating Memorandum dated July 12, 2005, § 3.5 entitled "Not to do" reads in extra-large, bold font: "**Neither UBSL nor UBSFSL should ever enter into a direct contact with Bernard Madoff !!!**"  Upon information and belief, UBSFSL and UBS SA took this unusual step so as to avoid creating any sort of record concerning any inquiry regarding Madoff, and also to avoid any appearance that would suggest that the UBS Defendants had an active role in supervising Groupement Financier.  The UBS Defendants thus were acting contrary to their obligations.

176.    Groupement Financier was managed and supervised through the participation of several of the Access Defendants, including AIA Ltd., AIA LLC, and AIA Europe Ltd.  AIA Ltd. served as Groupement Financier's investment manager, while AIA LLC and AIA Europe Ltd. were involved, at a minimum, with the monitoring of subscriptions and redemptions for Groupement Financier.

177.    As with Luxalpha, BLMIS again had custody of Groupement Financier's assets and served as its exclusive trader, and all transactions involving the assets of Groupement Financier were permitted to be executed and settled solely by BLMIS.  The NAV for Groupement Financier was calculated by UBSFSL based on unverified and unconfirmed trade confirmations that BLMIS provided to UBS SA.  There was no third party verification of the

information provided by BLMIS.  The UBS Defendants' Operating Memorandum for Groupement Financier further accepted the "considerable delay" with which BLMIS dispatched trade confirmations and provided for "the issu[ance of] the NAV with a delay of **up to 9** business days."

178.    Acting with the Access Defendants, UBS SA and UBSFSL implemented and supported a series of operational procedures for Groupement Financier that facilitated the opportunity for Madoff to commit and perpetuate his fraud.

### THE ACCESS DEFENDANTS FACILITATED THE SCHEME THROUGH MISLEADING MARKETING AND SALES

179.    The Access Defendants facilitated and perpetuated the fraud by opening the door to substantial investments from Europe—investments that BLMIS needed to sustain the Ponzi scheme.  The Access Defendants exploited the close relationship between Madoff and Littaye to create, market and sell Luxalpha and Groupement Financier, both of which served to provide BLMIS with large infusions of money from European investors.  Access misrepresented the controls, oversight and protections in place for the Feeder Fund Defendants, and ultimately endorsed BLMIS without performing the due diligence that was promised.

### *The Marketing of the Feeder Fund Defendants*

180.    In materials issued out of their New York office, the Access Defendants marketed their platform of funds, including the Feeder Fund Defendants, by lauding the rigorous process by which the funds were allegedly created and monitored.  Access's marketing materials suggested that Access oversaw the creation of its funds by scrutinizing the background of the managers they selected for their funds and the underlying strategies employed by those managers.  Once a manager was approved, Access would proceed to create the fund and

Case 1:11-cv-04213-CM    Document 47    Filed 08/24/11    Page 63 of 106

negotiate and select the fund's service providers, including the administrator, auditor, prime broker and custodian.

181.    The Access Defendants marketed their funds by emphasizing the protection they purportedly provided "to avoid the three main risk [*sic*] to the hedge fund industry." Specifically, the Access Defendants claimed to protect against "[r]isk of fraud by doing an extensive due diligence" and against "[r]isk of drift by the implementation of an on going qualitative, operational and quantitative monitoring."

***Access's Due Diligence Procedures Did Not Apply to Madoff***

182.    The rigorous processes touted by the Access Defendants were not applied to Madoff or BLMIS.  Access's investments in BLMIS were constantly treated as exceptions to the procedures applied to Access's non-Madoff funds.

183.    As part of its stringent background checks, Access required every potential manager to complete extensive background questionnaires.  In addition, it required managers to submit to handwriting analyses done by a graphologist in Paris.

184.    Madoff was not required to complete the background questionnaire, nor was Madoff subjected to the handwriting analysis required of Access's other investment managers.

185.    In his Bankruptcy Rule 2004 examination, Phil Wogsberg – Access's Director of Research and the point person for its due diligence efforts – testified that he was unaware of any other manager with whom Access had assets under management who was excused from the background questionnaire requirement.  When asked why Madoff was excused, Mr. Wogsberg said he did not know, but suggested that it was because Madoff was a "special manager" whom Littaye treated differently.

186.    Another highly flaunted aspect of Access's due diligence and monitoring process was the requirement that each fund manager permit monthly visits from the Access staff.  The Access marketing materials stated:

> **"Qualitative Review (on a monthly basis)**
>
> Each month, at least one member of Access' portfolio and risk management department (i.e. Stephane Pinon and/or Phil Wogsberg) visits each fund manager at their offices to review investment strategy, trading activity and market conditions.  Access continuously analyzes the **investment style** employed by the manager and the investments implemented in their underlying portfolio.
>
> Access reviews the **methods** that the manager employs in identifying different investment opportunities and the trading techniques used to establish desired positions.  Access also questions the manager and examines the necessary documents to ensure that they are adhering, at all times, to the stated **investment discipline**.
>
> All **individuals** influencing the strategies are evaluated including portfolio managers, traders, research staff and administrative employees.  This assessment helps determine whether the company can effectively produce the products and results they have indicated.
>
> Access's monitoring process allows to answer [*sic*] the following two questions:
>
> > 1.  Does the manager follow the stated investment guidelines for the fund?
> >
> > 2.  Are there any warning signs that should trigger an exit by investors?''

187.    These regular visits to fund managers were very important to the Access Defendants' due diligence team.  However, Madoff and BLMIS were **not** subject to these monthly visits – a fact never made known to the public.  The regular Access due diligence team never met with Madoff or anyone else at BLMIS.  With the exception of one manager in Paris, who could not be visited monthly by the Access due diligence team because of geographical

Case 1:11-cv-04213-CM   Document 43-7   Filed 08/24/11   Page 66 of 108

reasons, Madoff was the only fund manager of Access's assets who did not receive monthly

qualitative visits and reviews from the Access team.

188.    With few exceptions, the only person from Access who would visit Madoff was

his longtime friend, Littaye, who did so on a less than monthly basis.  Any questions, suspicions,

concerns, or worries were conveyed to Littaye, who would visit with Madoff and discuss such

issues and then return with explanations.  BLMIS was the only one of Access's fund managers

for whom Littaye assumed the sole responsibility for ongoing due diligence.

189.    A significant discrepancy existed between what was represented and promised by

the Access Defendants as relates to due diligence and monitoring and what was actually

delivered with respect to BLMIS.  Treating BLMIS as a special case which was not subject to

The Access Defendants' regular claimed due diligence standards or monitoring procedures was

one of many ways in which the Access Defendants facilitated and enhanced the Ponzi scheme.

### WHEN FACED WITH PLAIN EVIDENCE OF A FRAUD, THE ACCESS DEFENDANTS CHOSE TO SUPPRESS THE INFORMATION

190.    The rigorous due diligence procedures touted by the Access Defendants did not

apply to BLMIS and Madoff.  Moreover, the Access Defendants failed to confront troubling

signs of possible fraud with regard to BLMIS.  One such red flag concerned the purported

volume of options trades being reported by Madoff on the trade confirmations issued by BLMIS.

Rather than thoroughly and independently verifying the legitimacy of BLMIS's and Madoff's

options trading, the Access Defendants, including Littaye and Delandmeter – who sat on

Luxalpha's Board of Directors with UBS executives – confirmed there was a problem, and then

purposely concealed it.  Upon discovering the significant disparity between what was being

reported by BLMIS and what was being seen in the market, the Access Defendants opted not to

press Madoff for an explanation or to exit the relationship with BLMIS.  Instead, the Access

Case 1:11-cv-04215-CM   Document 43-7   Filed 08/24/11   Page 61 of 106

Defendants quashed any discussion of the issue and hid behind a disclaimer stating that Access

does not validate the accuracy of the monthly portfolio movements reported by BLMIS.

***Questions Were Raised Concerning The Reported Volume Of Madoff's Options Trades***

191.    In the spring of 2006, one or more individuals who worked with Access on its

BLMIS investments began to raise serious questions concerning the purported volume of options

trades being reported by Madoff on the trade confirmations issued by BLMIS.  Specifically,

there was concern that the options trades being reported by BLMIS were not visible in publicly

available information or databases for such options trades.

192.    In response to these concerns, Villehuchet asked Theodore Dumbauld, a Partner

at AIA LLC and its Chief Investment Officer, to look at the options purportedly being traded by

BLMIS.  Dumbauld proceeded to take the trade confirmations received from BLMIS and

compared them to the information reflected in the Options Clearing Corporation ("OCC")

database.  Dumbauld confirmed that the trades being reported by BLMIS did not show up

anywhere in the OCC database.

193.    Dumbauld then made inquiries of people he knew in the industry to determine if

there was an explanation for why the reported options trades were not showing up in the OCC

database.  Dumbauld's sources confirmed for him that if the BLMIS trades were exchange-

traded options, then they needed to show up in the OCC database.  The trades reported by

BLMIS purported to be exchange-traded options given that the trade confirmations contained the

unique ticker symbols and CUSIP numbers (*i.e.*, "Uniform Security Identification Procedures")

associated solely with exchange-traded options.

194.    Dumbauld thus came to the conclusion that the options trades could not be

occurring as reported by BLMIS.  When Dumbauld reported his findings to Villehuchet,

Villehuchet steadfastly refused to accept that conclusion and demanded that Dumbauld get a second opinion.

### *Access Brought In Chris Cutler to Do Due Diligence on BLMIS*

195.    In order to get a second opinion on the options issue, the Access Defendants hired Chris Cutler, a consultant doing business as Manager Analysis Services LLC.  Cutler specialized in providing due diligence services on hedge funds, and he was asked to generally look at BLMIS and provide his opinion.  Cutler had previously done work for Access relating to non-Madoff funds.

196.    In doing due diligence on BLMIS, Cutler looked at a variety of information, including information on the business of BLMIS generally, its auditor, audit reports, available trade tickets and descriptions of the trading strategy.  Although he was asked to do due diligence on Madoff and BLMIS, he was specifically instructed not to speak to Madoff or anyone at BLMIS.

197.    It took Cutler the equivalent of four days' work to determine that there were serious problems with BLMIS.  In addition to confirming the impossible options volume previously identified by Dumbauld as a red flag, Cutler also identified and saw, among other things:  (i) serious problems with the feasibility of Madoff's strategy; (ii) the lack of any independent verification of trades or assets; and (iii) the opportunity for fraud caused by the delayed, paper confirmation-only way in which trades were reported to Access.

198.    With regard to the feasibility of the strategy, Cutler was rightly doubtful that Madoff could ever execute the volume of options or underlying equities trades being claimed without negatively impacting the market price and diminishing his returns or even losing money.  Cutler also raised questions about the costs of the strategy and whether they were realistic.

199.    On April 20, 2006, Cutler sent an email to Dumbauld outlining his preliminary

findings concerning BLMIS.  In that email, Cutler wrote, "Ted, if this were a new investment

product, not only would it simply fail to meet due dili standards: **you would likely shove it out**

**the door.**"  In the same email, Cutler went on to note, "EITHER extremely sloppy errors OR

serious omissions in tickets.  That's the best case ... arithmetic errors in the founder's strategy

description [found at another source], which is so basic that it suggests that the founder doesn't

really understand the costs of the option strategy."

200.    Upon the completion of his due diligence and analysis, Cutler came to the

conclusion that BLMIS certainly did not meet his standards and that the Access Defendants

should exit all of its investments with BLMIS.  Cutler was not asked to produce a formal report

or to put his findings in writing, despite having done so in the past when advising the Access

Defendants to avoid other investments.

### *Access's Inner Circle Concealed Cutler's Findings*

201.    Cutler conveyed his conclusions in an oral report given to Access's inner circle.

In late April or early May 2006, Cutler attended a lunch meeting at the University Club in New

York.  Present at the meeting were Littaye, Villehuchet, Dumbauld and Chantal Lanchon, a long-

time, trusted adviser to Littaye and Villehuchet who did work for Access from time to time.

Cutler conveyed his conclusion at this meeting that the Access Defendants should exit BLMIS

and concentrate on building other aspects of their business.

202.    As he was conveying his conclusion, Cutler was interrupted by Littaye, who said

that he questioned Cutler's "business judgment" given that the Access Defendants' BLMIS

business was "going well," while the other parts of the Access Defendants' business were not

going well.  Chantal Lanchon then declared her view that Cutler's conclusions could not be

correct because she claimed BLMIS was audited on a regular basis by the SEC and FINRA, and
that there could not possibly be a problem.

203.    Littaye thus considered the subject closed, and Cutler did not conduct any further
investigation of BLMIS.  There do not appear to have been any subsequent follow-up
discussions about Cutler's findings or his recommendations within Access.

204.    On May 9, 2006, Cutler sent an e-mail to Dumbauld concerning the University
Club lunch which stated in relevant part:

> Ted, I did my best to inject doubt in a courteous yet effective
> manner.  I would actually like to follow up with Patrick via phone.

On May 10, 2006, Dumbauld replied:

> I believe you handled the lunch perfectly.  As you could tell,
> Patrick is highly sensitive and defensive of the situation.  We have
> not had a chance to discuss post lunch; I will give you some
> feedback when I have it.  I will also let you know about a call with
> Patrick.

205.    There was never any follow-up conversation between Dumbauld and any of
Littaye, Villehuchet or Lanchon, and Cutler was never given any feedback on the options volume
indication of fraud which he had easily identified.

206.    Upon information and belief, Cutler's findings were not shared with anyone else
at the Access Defendants, including its research and marketing staff.  In his Rule 2004
Bankruptcy examination, Cutler testified that it was "understood" that his conclusion would not
be shared beyond the individuals at the University Club lunch meeting.

207.    Wogsberg, the Access Defendants' long-time director of research, who was not
present at the University Club lunch meeting, testified in his Bankruptcy Rule 2004 examination
that if Cutler had formed a conclusion with respect to BLMIS, Wogsberg would have expected to

have been informed of that conclusion, but that he was unaware of whether Cutler even finished the due diligence he was asked to undertake.

208.    The Access Defendants did not just ignore red flags.  They chose to bury them.  On May 12, 2006, the Access Products Committee held a meeting that was attended by, among others, Littaye, Villehuchet, Dumbauld and Lanchon.  The minutes from that meeting state as follows:

> **BMI**
>
> 1.  As a result of the conversations we had recently with various sources, it was decided we need to add additional disclosures to the monthly report describing monthly portfolio movements.  **The disclosure needs to make clear that AIA is dependent on the information provided to us by BMI and that we do not validate the accuracy of that information.**

(Emphasis added.)

209.    At that time, in May 2006, when Littaye and the Access inner circle decided to bury the suspicious facts about BLMIS's impossible reported options trading volume, the options trades being reported for just Luxalpha and Groupement Financier together **exceeded the total volume for all put and call options traded on the Chicago Board of Exchange ("CBOE")**.  The volume of put options Madoff falsely reported trading for the Feeder Fund Defendants

versus the volume of those same put options traded on the entire exchange was as follows:



**Cumulative Purported S&P 100 Put Options Volume for Feeder Fund Defendants Compared to Corresponding CBOE Put Options Volume (2003 – 2008)**

Solid line indicates actual CBOE options volume
Dashed line indicates Feeder Fund Defendants' purported options volume

The solid line represents the S&P 100 index put options on the entire CBOE between 2003 and 2008. The dashed line – which exceeds the solid line starting in 2006 – is the volume of purported put option trades for the Feeder Fund Defendants. These results, which are clear signs of fraud on their own, do not include the additional reported put option trades for the numerous other Access accounts that Littaye and his inner circle were provided with by BLMIS. Moreover, Littaye and the rest of the Access Defendants knew that the Access business only accounted for a portion of BLMIS's overall IA Business.

210.     The results are just as dramatic for call options:



**Cumulative Purported S&P 100 Call Options Volume for Feeder Fund Defendants
Compared to Corresponding CBOE Call Options Volume (2003–2008)**

Solid line indicates actual CBOE options volume
Dashed line indicates Feeder Fund Defendants' purported options volume

211.     The Access Defendants willfully turned a blind eye to glaring indicators of
BLMIS's fraud based on publicly available information.  The Access Defendants were on actual
notice of serious problems concerning the trades reported by BLMIS, and, in bad faith,
strategically chose to ignore and conceal that problem in order to unjustly enrich themselves
through their relationship with Madoff and BLMIS.  Upon information and belief, the UBS
Defendants had sufficient information to realize that the volume of options trades reported for
the Feeder Fund Defendants exceeded the total volume on the CBOE as well.

**THE ACCESS DEFENDANTS IGNORED ADDITIONAL RED FLAGS**

212.     The Access Defendants willfully ignored myriad other red flags that should have
served to put them on notice of BLMIS's fraud.  Such red flags included:  the small, unknown

auditor used by BLMIS; the fact that trades and positions were only reported in a hard copy, paper format and on a delayed basis, which was particularly disturbing in view of Madoff's reputation in the industry for technological sophistication; the unusual secrecy insisted upon by Madoff; the unusually steady performance of BLMIS; and the unusual ability of BLMIS to enter and exit the market so as to consistently achieve very favorable prices.  Each of these red flags was acknowledged, considered and ultimately disregarded by the Access Defendants – who sat on the Boards of Directors of both Luxalpha and Groupement Financier – as they continued their participation in the fraud to their financial benefit.

### BLMIS's Auditor Friehling & Horowitz

213.    The auditor used by BLMIS was Friehling & Horowitz, which was essentially a one-man firm from Rockland County, New York, consisting of David Friehling, a Certified Public Accountant.  The other two employees were an administrative assistant and a semi-retired accountant living in Florida.

214.    On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC, in connection with the services he performed for Madoff and BLMIS.

215.    During the course of their ongoing monitoring of BLMIS, members of the Access Defendants' due diligence and research teams became aware of the fact that BLMIS was using a small and unknown auditing firm for the reports it filed with the SEC and provided to investors, and they expressed concern after doing some preliminary research on the unknown firm.  However, those concerns were again quashed by Patrick Littaye, who directed that no further inquiry be conducted.

216.    In his Bankruptcy Rule 2004 examination, Wogsberg testified with respect to

Access's awareness of BLMIS's use of Friehling & Horowitz as its auditor:

> And so we were – I was quite worried, and so I said, Patrick, look
> what we have here.  It appears that he may have some conflicts and
> he certainly is tiny and it's always better to have a large audit firm
> do this sort of thing.  And Patrick's response was if this audit firm
> is good enough for the SEC, it's good enough for Access.  Don't
> go further.

**BLMIS Only Reported Trades Through Delayed Paper Confirmations**

217.    The Access Defendants also knew, but ultimately ignored, that the trade

confirmations received from BLMIS were only in a hard copy, paper format and were delayed

because they were sent via regular mail service, sometimes several days after the purported trade.

Both Dumbauld and Wogsberg admitted that the Access Defendants considered it "abnormal" in

the mid-2000's not to have access to such information in a more timely manner and in electronic

format.

218.    Indeed, of all the funds for which the Access Defendants were portfolio managers,

BLMIS was the lone exception in that it was the only investment for which Access did not have

immediate or next day transparency through a website or next day batch reports.

219.    In doing his due diligence on BLMIS for the Access Defendants, Cutler also

highlighted problems with the trade confirmations issued by BLMIS.  Specifically, Cutler

identified that the confirmations did not have time stamps on them, which he believed was a

standard practice of all broker/dealers.

220.    The Access Defendants were willing to look past BLMIS's delayed, paper trade

confirmation reporting because Madoff purportedly justified his atypical reporting method by

contending that it was the only way to protect his trading strategy.  The Access Defendants

blindly accepted that explanation because the alternative would have been to exit BLMIS, which

was the most lucrative part of their business and the basis for their very existence.

221.    An Operating Memorandum for Luxalpha dated October 10, 2008 prepared by

UBS SA, specifies that Luxalpha's Management Company, identified as Access Mgmt Lux,

would provide UBS SA "with a backdated monthly investment recommendation."  This

backdating procedure was made necessary and put in place as a result of the delayed, hard copy-

only way in which BLMIS reported its purported trades.

### Madoff's Purported Market-Timing Ability

222.    Another red flag known by the Access Defendants and consciously ignored by the

Access Defendants, was BLMIS's ability to consistently enter the market close to the lowest

prices of the day and to exit close to the highest prices of the day.  Within Access, there was

skepticism as to whether Madoff could legitimately achieve the types of consistent returns he

was reporting by agnostically employing the SSC Strategy that he purported to use.  The Access

Defendants believed that there had to be a market-timing edge associated with Madoff's use of

his strategy.  The Access Defendants became concerned that Madoff was engaging in illegal

front-running (trading ahead of other customers' orders) or was otherwise illicitly using his

market-making operation for insight as to when the market would move.

223.    The concerns that the Access Defendants had regarding Madoff's suspected

market timing edge were again ultimately quashed by Littaye, who reported to the rest of Access

that BLMIS had three models – short, middle and long-term models of the market – that Madoff

used to help him make his entry and exit decisions.  Access's research staff, including Wogsberg,

was never provided with any detail concerning these purported models, and the Access

Defendants merely accepted this explanation of Madoff's unusually successful market timing

ability.  The notion of short, middle, and long-term market models made no sense, especially

because Madoff purportedly moved customer funds "out of the market" at the end of each

quarter, ostensibly to avoid the disclosure requirements attendant to a 13F filing.

***Madoff's Insistence On Secrecy***

224.    The Access Defendants further acquiesced in Madoff's insistence that his name

not appear in any official offering document relating to the Feeder Fund Defendants that invested

in BLMIS.  Madoff's name was not allowed to appear as the custody broker or the manager for

any fund.  The Feeder Fund Defendants' offering documents only reflected an Access entity as

the manager.

225.    Wogsberg testified Madoff "just didn't want his name out there.  He thought it

would attract attention."

226.    In a February 17, 2000 letter from Littaye to the Access Defendants' outside legal

counsel concerning the creation of a new investment company for investment with BLMIS,

Littaye instructed that "BMI should not appear in any official document."  This was the

"standard" procedure for offering documents for Access products that invested in BLMIS.

227.    In a June 29, 2004 email from Littaye to several individuals at Access regarding a

customer's possible investment in Luxalpha, Littaye wrote, "[w]e underline [*sic*] the

confidentiality of the product and insist on the fact that BM name must never be published."

228.    The Access Defendants were willing to comply with Madoff's insistence on

secrecy despite the fact that it was, in the words of Wogsberg, "quite uncommon" for the name

of the manager not to appear in the offering documents.

229.    By complying with Madoff's demand for secrecy, the Access Defendants not only

ignored a red flag, but also assisted Madoff in concealing the size and scope of his expanding

fraud.

*BLMIS's Unusual Performance*

230.    The Access Defendants purposely ignored that Madoff's purported performance was unusually stable and consistent.  An internal October 1999 Profile and Update Manager and Fund Overview prepared by Wogsberg, notes that with regard to BLMIS, "[r]esults follow the estimated performance projections unusually closely."  Wogsberg admitted that it was unusual that BLMIS had "[n]o negative months and very stable positive performance."

*Unidentified Counterparties*

231.    The Access Defendants further purposely ignored that the purported counterparties for Madoff's options trades were never identified.  In his April 20, 2006 email to Dumbauld at Access in connection with his due diligence and review of the options volume issue, Cutler noted, "I just can't find the other side of the trade."  Wogsberg admitted that despite Madoff's explanation to Access that he was using custom, over the counter options, Access made no effort to identify any of Madoff's purported counterparties.

232.    In a note posted to Access's internal database dated October 4, 2006, Littaye wrote:

> S. RUFFINO [Stephen Ruffino of Anglo-Irish bank, administrator for Trotanoy, another of Access's BLMIS feeder funds] HAD SENT A QUERY TO F. DI PASCALI ASKING WHO THE COUNTERPARTIES WERE FOR THE OPTIONS IN OUR PROGRAM.  THERE WAS NO ANSWER.  RATHER THAN LEAVE THE SUBJECT IN LIMBO, THEY SENT AGAIN THE QUERY, WITH A COVER LETTER FROM D. MC ADAMS SAYING THIS WAS A QUERY FROM EARNST [*sic*] AND YOUNG, THEIR AUDITORS.  BM CALLS ME TO SAY THEY DISCLOSE THEIR COUNTERPARTIES FOR THE EQUITY SIDE BUT THEY CANNOT DO IT FOR THE OPTIONS.  WHAT HE CAN SAY IS THAT THERE IS NO RISK THERE BECAUSE THOSE OPTIONS ARE PART OF "PORTFOLIO ASSURANCE PROGRAMS" (AT SOME POINT IN THE CONVERSATION I HEAR "PERFORMANCE ASSURANCE").  THE ONLY MOMENT HE WOULD DISCLOSE THE INFO WOULD BE IN CASE OF DEFAULT.

*        *        *

I TELL HIM I WILL TRANSMIT THE ANSWER AND CALL
HIM BACK.

233.    As this internal note indicates, the Access Defendants were well aware of, but

decidedly ignored, that Madoff refused to identify the purported counterparties for his trades, and

that he provided a nonsensical excuse.

**_Lack Of An Independent Custodian_**

234.    The Access Defendants also ignored the obvious lack of an independent custodian

for the assets of the Feeder Fund Defendants, and thus that there was no independent verification

of those assets.  The lack of an independent custodian for the Feeder Fund Defendants' assets

was an additional red flag for the Access Defendants.  Dumbauld confirmed that within Access

"[i]t was observed that there was no independent custodian, but any concerns or red flags that

raised was always answered by the fact that Madoff was an SEC registered broker-dealer and

therefore the SEC was in there doing their monitoring and that was perceived to be sufficient."

This willingness to rely solely on the SEC's supervision of Madoff was contrary to, and

inconsistent with the Access Defendants' representations of rigorous due diligence and

monitoring.

235.    Despite numerous red flags and anomalies strongly suggesting fraud, the Access

Defendants pressed ahead with their investments and withdrawals from BLMIS.  These red flags

and the Access Defendants' intentional efforts to suppress all such indicia of fraud, demonstrate

that the Access Defendants knew or should have known that Madoff was a fraud, as they were

being unjustly enriched by the fraud.

236.    Littaye was a member of Luxalpha's Board of Directors, and the UBS-dominated

Board of Directors of Luxalpha knew or should have known that Madoff was a fraud.

## **THE AFTERMATH**

237.    Following Madoff's arrest and confession on December 11, 2008, Access

received questions from investors concerned about the safety of their assets.  The Access

Defendants and the UBS Defendants had obviously not disclosed the workings of the Feeder

Fund Defendants and the delegation of duties to Madoff.

238.    A December 11, 2008 e-mail from an individual named Luca Vaiani to Prince

Michel of Yugoslavia, who was one of Access's salespeople, asks:

> The assets of Luxalpha are segregated and their [*sic*] should be no
> risk.  True?  Are you liquidating the positions to be in cash?

A subsequent email, dated December 16, 2008, from Mr. Vaiani to Prince Michel of Yugoslavia

states:

> I would like to understand if Luxalpha American Selection is in
> some way (and if yes how much) involved in the Madoff fraud; if
> affected in any way I would like to understand what is the legal
> structure of the relation between the Sicav and Madoff.

239.    An e-mail dated December 15, 2008 from Manfredo Radicati of Trendtrust SA to

Prince Michel of Yugoslavia states in part:

> Dear Michel,
>
> Like all frauds, the collapse of Madoff is a disgrace.
>
> What is astonishing is that no one, especially firms such as AIA
> that pride themselves on the thoroughness of their due diligence
> didn't see any warning sign.  This is all the more disturbing since a
> number of "red flags" should have been seen … even more so
> since you had full transparency on the portfolios.
>
> Looking at the situation at hand, AIA, together with UBS, in their
> role as sponsor, investment manager and custodian of Luxalpha,
> should answer a number of questions as to why nothing was
> detected earlier.  The most pressing task however, is to explain to
> investors how the holdings in the portfolio proved to be virtual or
> nonexistent.  Can one speak of negligence or complicity on the part
> of UBS in this matter?

Case 1:11-cv-04213-CM    Document 47    Filed 08/24/11    Page 73 of 106

240.    An e-mail dated December 15, 2008 from an individual named Alessandro Negri to Benoit Chastel, who handled Investor Relations for Access, bears the subject "Urgent info Groupement" and states in part:

> 1) When did Access carry out the last Due Diligence on Madoff and can we please have a copy.
>
> 2) Was Access aware of the creation of sub-accounts by Ubs in favour of a company related to Madoff?
>
> 3) Based on what facts were the monthly reports(Analysis of movements of the portfolio) [*sic*] sent to investors created?
>
> 4) How long ago did the business relations start between Madoff and Access?
>
> 5) Is there any type of contract/arrangement between Access and Madoff and if so can we have a copy?
>
> 6) Can we have a copy of the CSSF circular that outlines the obligations of custodian banks towards the investors?
>
> 7) Was Access aware of whoaudited [*sic*] Madoff Investment Securities?
>
> 8) When was the last inspection by the Sec carried out on Madoff Investment Securities?
>
> 9) Was Access aware that all the transactions were carried out by Madoff Investment Securities?

241.    A letter dated December 29, 2008 from an unknown individual at Fondaco SGR S.p.A. to Access Mgmt Lux and AIA LLC, also copied to the CSSF, states in part:

> We have become aware, through various sources, that the management of assets of the sub-fund may have been involved in the Madoff case.  We are hereby requesting you [*sic*] the following:
>
> (i) what actions have taken [*sic*] the management company to preserve the interest of the Sicav.
>
> (ii) can you confirm that all assets of Luxalpha Sicav – American Selection have been duly kept segregated from any other asset or accounts? [A]nd hence

(iii) can you confirm the integrity of all such assets, irrespective of
their current evaluation[*sic*]?

**THE TRANSFERS**

**TRANSFERS FROM BLMIS TO THE FEEDER FUND DEFENDANTS**

242.     Prior to the Filing Date, the Feeder Fund Defendants, Luxalpha and Groupement

Financier, maintained two accounts, 1FR108 and 1FR096, respectively (collectively, the

"Accounts"), as set forth on Exhibit A.  Upon information and belief, for each account, the

respective Feeder Fund Defendant executed, or caused to be executed, a Customer Agreement,

an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of

Securities and Options (collectively, the "Account Agreements"), and delivered such documents,

or caused them to be delivered, to BLMIS at BLMIS's headquarters at 885 Third Avenue, New

York, New York.

243.     The Account Agreements were to be performed in New York, New York through

securities trading activities that would take place in New York, New York.  The Accounts were

held in New York, New York and the Feeder Fund Defendants sent funds to BLMIS and/or to

the 703 Account in New York, New York for application to the Accounts and the purported

conducting of trading activities.

244.     The Feeder Fund Defendants collectively invested approximately $2 billion with

BLMIS through over a hundred and fifty separate transfers via check and wire directly into the

703 Account at JPMorgan Chase in New York, New York.

245.     During the six years preceding the Filing Date, BLMIS made transfers to the

Feeder Fund Defendants in the collective amount of at least $1.12 billion (the "Six Year Initial

Transfers").  The Six Year Initial Transfers received by the Feeder Fund Defendants were made

to or for the benefit of the Feeder Fund Defendants and are set forth on Exhibits B and C.  The

69

Case 1:11-cv-04213-CM   Document 17   Filed 08/24/11   Page 79 of 106

Six Year Initial Transfers include transfers of approximately $766 million to Defendant

Luxalpha (the "Luxalpha Six Year Initial Transfers") and $356 million to Defendant

Groupement Financier (the "Groupement Six Year Initial Transfers").  The Feeder Fund

Defendants' Six Year Initial Transfers are avoidable and recoverable under §§ 544(b), 550(a),

and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA §78fff-

2(c)(3), and §§ 273-279 of New York Debtor and Creditor Law.

246.    The Six Year Initial Transfers include approximately $1.02 billion which BLMIS

transferred to the Feeder Fund Defendants during the two years preceding the Filing Date (the

"Two Year Initial Transfers").  The Two Year Initial Transfers included transfers of

approximately $743 million to Luxalpha (the "Luxalpha Two Year Initial Transfers") and

approximately $277 million to Groupement Financier (the "Groupement Two Year Initial

Transfers").  The Two Year Initial Transfers are avoidable and recoverable under §§ 548(a),

550(a), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA

§78fff-2(c)(3).

247.    The Six Year Initial Transfers and Two Year Initial Transfers include

$796 million that BLMIS transferred to the Feeder Fund Defendants during the 90 days

preceding the Filing Date (the "Preference Period Initial Transfers").  The Preference Period

Initial Transfers included transfers of approximately $536 million to Luxalpha (the "Luxalpha

Preference Period Initial Transfers") and approximately $260 million to Groupement Financier

(the "Groupement Preference Period Initial Transfers").  The Preference Period Initial Transfers

are avoidable and recoverable under §§ 547, 550(a), and 551 of the Bankruptcy Code, and

applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).  The Six Year Initial Transfers,

Two Year Initial Transfers, Preference Period Initial Transfers, and any undiscovered initial transfers, are collectively referred to herein as "Initial Transfers."

248.   Numerous indicia of fraud concerning BLMIS gave the Feeder Fund Defendants actual and/or constructive knowledge of BLMIS' fraud.  These indicia of fraud, and the Feeder Fund Defendants' willful and deliberate decision to continue investing with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent.  Give the Feeder Fund Defendants' actual or constructive knowledge of these indicia of fraud, the Feeder Fund Defendants were neither innocent nor good faith investors.

249.   The Feeder Fund Defendants had information that put them on actual and/or inquiry notice of fraud at BLMIS, or that BLMIS was insolvent and/or that the transfers might have been made with a fraudulent purpose, and strategically chose to ignore that information in order to continue to enrich themselves through their relationship with Madoff and BLMIS.

250.   The transfers were made to avoid detection of the fraud, to retain existing investors, and to lure other investors, and constituted an integral and essential element of the fraud, necessary to validate the false account statements and to avoid disclosure of the fraud.

251.   The Trustee has filed this action against the Feeder Fund Defendants to avoid and recover the Initial Transfers to the Trustee.

### TRANSFERS FROM THE FEEDER FUND DEFENDANTS TO THE LUXALPHA AND GROUPEMENT FINANCIER DIRECTOR DEFENDANTS, ACCESS DEFENDANTS, AND UBS DEFENDANTS

252.   Upon information and belief, much of the money transferred from BLMIS to the Feeder Fund Defendants was subsequently transferred by the Feeder Fund Defendants to the Luxalpha and Groupement Financier Director Defendants, Access Defendants, and UBS Defendants.  These payments from the Feeder Fund Defendants constitute subsequent transfers

Case 1:11-cv-04213-CM    Document 4-3    Filed 08/24/11    Page 79 of 105

of the Initial Transfers from BLMIS to the Feeder Fund Defendants.  Because the Luxalpha and

Groupement Financier Director Defendants, Access Defendants and UBS Defendants

(collectively, the "Subsequent Transferee Defendants") were the recipients of avoidable

transfers, all transfers from BLMIS to the Feeder Fund Defendants, which the Feeder Fund

Defendants subsequently transferred, either directly or indirectly, to the Subsequent Transferee

Defendants (collectively, the "Subsequent Transfers"), are recoverable by the Trustee pursuant to

§ 550(a) of the Bankruptcy Code.

253.    The portion of the Preference Period Initial Transfers that the Feeder Fund

Defendants subsequently transferred to the Subsequent Transferee Defendants will be referred to

as the "Preference Period Subsequent Transfers."

254.    The Subsequent Transferee Defendants had information that put them on actual

and/or inquiry notice of fraud at BLMIS and/or that the transfers might have been made with a

fraudulent purpose.

255.    To the extent that any of the recovery counts may be inconsistent with each other,

they are to be treated as being pled in the alternative.

256.    The Trustee's investigation is on-going and the Trustee reserves the right to

amend this Complaint, including but not limited to:  (i) supplementing the information on the

Initial Transfers, Subsequent Transfers, and any additional transfers; and (ii) seeking recovery of

such additional transfers.

**CUSTOMER CLAIMS**

257.    On or about March 2, 2009, Defendant Luxalpha filed a customer claim with the

Trustee that the Trustee has designated as Claim No. 004419.  On March 3, 2009, Defendant

Luxalpha filed another customer claim with the Trustee that the Trustee has designated as Claim

No. 005725.  In addition, on or about March 2, 2009, Defendant UBS SA filed an additional

customer claim on behalf of Luxalpha with the Trustee, which the Trustee has designated as

Claim No. 005025.  These three customer claims are referred to herein as the "Customer

Claims."

258.    On December 23, 2008, the Bankruptcy Court entered an Order on Application

for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices,

Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing

Other Relief (the "Claims Procedures Order.")  The Claims Procedures Order includes a process

for the determination and allowance of claims under which the Trustee has been operating.  The

Trustee intends to resolve the Customer Claims and any related objection to the Trustee's

determination of such claim through a separate hearing as contemplated by the Claims

Procedures Order.

### COUNT ONE:
**PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)**
**11 U.S.C. §§ 547(b), 550(a), AND 551**
***Against The Feeder Fund Defendants***

259.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 258 of this Complaint as if fully realleged herein.

260.    At the time of each of the Preference Period Initial Transfers, each of the Feeder

Fund Defendants was a "creditor" of BLMIS within the meaning of § 101(10) of the Bankruptcy

Code and pursuant to SIPA § 78fff-2(c)(3).

261.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest

of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and pursuant to

SIPA § 78fff-2(c)(3).

262.    Each of the Preference Period Initial Transfers was to or for the benefit of

Luxalpha or Groupement Financier.

Case 1:11-cv-04213-CM    Document 4-17    Filed 06/24/11    Page 89 of 106

263.    Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

264.    Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

265.    Each of the Preference Period Initial Transfers was made during the 90-day preference period under § 547(b)(4) of the Bankruptcy Code.

266.    Each of the Preference Period Initial Transfers enabled Luxalpha and/or Groupement Financier to receive more than each of the Feeder Fund Defendants would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

267.    Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants as initial transferees or the entities for whose benefit such transfers were made pursuant to § 550(a) of the Bankruptcy Code.

268.    As a result of the foregoing, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

269.    To the extent that either or both of the Feeder Fund Defendants are not found to have a valid antecedent debt or claim, then such transfers are avoidable and recoverable pursuant

to, *inter alia*, §§ 544, 548, 550(a), 551 of the Bankruptcy Code, §§ 273-279 of the New York

Debtor and Creditor Law, and/or SIPA § 78fff-2(c)(3).

## COUNT TWO:
### PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)
### 11 U.S.C. §§ 547(b), 550(a), AND 551
*Against The Feeder Fund Director Defendants, Access Defendants, And UBS Defendants*

270.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 269 of this Complaint as if fully realleged herein.

271.    Each of the Preference Period Initial Transfers is avoidable and recoverable

pursuant to §§ 547, 550 and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) of the

Bankruptcy Code.  Furthermore, each of the Preference Period Transfers constitutes a transfer of

an interest of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and

pursuant to SIPA § 78fff-2(c)(3).

272.    Upon information and belief, the Subsequent Transferee Defendants were

immediate or mediate transferees of some portion of the Preference Period Initial Transfers

pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, the  "Preference Period

Subsequent Transfers").

273.    Each of the Preference Period Subsequent Transfers was made directly or

indirectly to or for the benefit of the Subsequent Transferee Defendants.

274.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§

547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the

Preference Period Subsequent Transfers, or the value thereof, from the Subsequent Transferee

Defendants for the benefit of the estate of BLMIS.

## COUNT THREE:
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
## 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551
### *Against The Feeder Fund Defendants*

275.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 274 of this Complaint as if fully realleged herein.

276.     Each of the Two Year Initial Transfers were made on or within two years before the Filing Date.

277.     Each of the Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

278.     Each of the Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Initial Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

279.     Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

280.     As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

Case 1:11-cv-04213-CM    Document 4-7    Filed 08/24/11    Page 84 of 106

## COUNT FOUR:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551
### *Against The Feeder Fund Defendants*

281.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 280 of this Complaint as if fully realleged herein.

282.     Each of the Two Year Initial Transfers were made on or within two years before the Filing Date.

283.     Each of the Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

284.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

285.     At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of each of the Two Year Initial Transfers.

286.     At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

287.     At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

288.     Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

Case 1:11-cv-04213-CM    Document 17    Filed 08/24/11    Page 85 of 106    Exhibit 8

289.    As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding

and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers

be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the

Feeder Fund Defendants for the benefit of the estate of BLMIS.

**COUNT FIVE:**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a,**
**278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**
***Against The Feeder Fund Defendants***

290.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 289 of this Complaint as if fully realleged herein.

291.    At all times relevant to the Six Year Initial Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under § 502 of the Bankruptcy Code or that were and are not

allowable only under § 502(e).

292.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as

defined under § 270 of the New York Debtor and Creditor Law.

293.    Each of the Six Year Initial Transfers were made by BLMIS and transferees with

the actual intent to hinder, delay or defraud the creditors of BLMIS.  BLMIS made the Six Year

Initial Transfers to or for the benefit of Luxalpha and/or Groupement Financier in furtherance of

a fraudulent investment scheme.

294.    Each of the Six Year Initial Transfers were received by the Feeder Fund

Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each

of the transfers and/or future creditors of BLMIS.

295.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS and to return to injured BLMIS customers; and (d) recovering attorneys' fees from the Feeder Fund Defendants.

**COUNT SIX:**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278**
**AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**
***Against The Feeder Fund Defendants***

296.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 295 of this Complaint as if fully realleged herein.

297.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

298.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under § 270 of the New York Debtor and Creditor Law.

299.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

300.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

301.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six

79

Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of

the estate of BLMIS.

## COUNT SEVEN:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279,
### AND 11 U.S.C. §§ 544, 550(a), AND 551
### *Against The Feeder Fund Defendants*

302.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 301 of this Complaint as if fully realleged herein.

303.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under §

502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

304.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as

defined under § 270 of the New York Debtor and Creditor Law.

305.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

306.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was

engaged or was about to engage in a business or transaction for which the property remaining in

its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

307.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York

Debtor and Creditor Law, §§ 544(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-

2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial

Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six

Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of

the estate of BLMIS.

## COUNT EIGHT:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551
#### *Against The Feeder Fund Defendants*

308.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 307 of this Complaint as if fully realleged herein.

309.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

310.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under § 270 of the New York Debtor and Creditor Law.

311.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

312.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

313.    As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

**COUNT NINE:**
**RECOVERY OF SUBSEQUENT TRANSFERS: NEW YORK DEBTOR AND**
**CREDITOR LAW §§ 273 - 279 AND 11 U.S.C. §§ 544, 547, 548, 550(a) AND 551**
*Against The Feeder Fund Director Defendants, Access Defendants, And UBS Defendants*

314.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 313 of this Complaint as if fully realleged herein.

315.    Each of the Initial Transfers is avoidable under §§ 273 through 279 of the New

York Debtor and Creditor Law, §§ 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, and

SIPA § 78fff-2(c)(3).

316.    Upon information and belief, some or all of the Initial Transfers were

subsequently transferred to the Subsequent Transferee Defendants and Subsequent Transferee

Defendants were immediate or mediate transferees of all or some portion of the Initial Transfers

pursuant to § 550(a)(2) of the Bankruptcy Code.

317.    Each of the Subsequent Transfers were made directly or indirectly to or for the

benefit of the Subsequent Transferee Defendants.

318.    Each of the Subsequent Transfers was received by the Subsequent Transferee

Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each

of the Subsequent Transfers, and/or future creditors of BLMIS.

319.    As a result of the foregoing, pursuant to §§ 273 – 279 of the New York Debtor

and Creditor Law, §§ 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-

2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants

recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee

Defendants for the benefit of the estate of BLMIS, and recovering attorneys' fees from the

Subsequent Transferee Defendants.

### COUNT TEN:
### DISALLOWANCE OF CUSTOMER CLAIMS
*Against Luxalpha And UBS SA*

320.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 319 of this Complaint as if fully realleged herein.

321.    On or about March 2-3, 2009, Defendants Luxalpha and UBS SA, on behalf of Luxalpha, filed the Customer Claims in the SIPA Proceeding.

322.    Luxalpha is the recipient, as a direct transferee, of transfers of Customer Property. The Trustee has commenced this adversary proceeding against Luxalpha to avoid and recover the Initial Transfers under §§ 544(b), 547, 548, and 550 of the Bankruptcy Code, NY Debtor and Creditor Law 270 *et seq*., and applicable sections of SIPA, including § 78fff-2(c)(3).  Luxalpha has not returned the Initial Transfers to the Trustee.

323.    As a result of the foregoing, pursuant to § 502(d), Luxalpha's and UBS SA's Customer Claims must be disallowed unless and until Luxalpha returns the Initial Transfers to the Trustee.

324.    The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  The Trustee intends to resolve Luxalpha's and UBS SA's Customer Claims and any related objections through the mechanisms contemplated by the Claims Procedures Order.

325.    As a result of the foregoing, the Trustee is entitled to an order disallowing the Customer Claims and/or that Luxalpha is not entitled to customer status.

### COUNT ELEVEN:
### EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS
*Against Luxalpha And UBS SA*

326.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 325 of this Complaint as if fully realleged herein.

Case 1:11-cv-04213-CM   Document 48-7   Filed 08/24/11   Page 97 of 106

327.     Luxalpha and UBS SA engaged in inequitable conduct, including behavior described in this Complaint, that has resulted in injury to the customers and creditors of the estate and has conferred an unfair advantage on Luxalpha and UBS SA.

328.     Based on Luxalpha and UBS SA's inequitable conduct, as described above, the customers of BLMIS have been misled as to the true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them because of the conduct of Luxalpha and UBS SA.

329.     The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Luxalpha and/or UBS SA directly or indirectly against the estate – and only to the extent such claims are allowed –  are subordinated for distribution purposes pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code.

330.     Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

### COUNT TWELVE:
### AIDING AND ABETTING FRAUD
*Against The UBS Defendants*

331.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 330 of this Complaint as if fully realleged herein.

332.     Madoff, through BLMIS, committed a massive fraud with the substantial assistance of the UBS Defendants, who had actual knowledge of the fraud.

333.     Through their actions to accommodate Madoff's fraud while attempting to distance themselves from liability, it is clear that the UBS Defendants knew that Madoff was engaging in fraudulent activities.  The UBS Defendants lent their name to the Feeder Fund

Defendants and serviced the Feeder Fund Defendants in a variety of roles, all the while

disclaiming any liability for the funds in undisclosed indemnity agreements and all the while

delegating their key responsibility of custodian to Madoff and relying on Madoff for the numbers

underlying the NAV, without seeking independent verification of those numbers. Moreover, the

UBS Defendants conducted due diligence on BLMIS and profited for years off of the Feeder

Fund Defendants, and at the same time consistently refused to market or recommend either of the

Feeder Fund Defendants to their own clients for investment, and had no exposure, or no

significant exposure, themselves to BLMIS, and at all times designated Madoff as a non-

approved manager.

334.    At a minimum, the UBS Defendants were willfully blind to the fraud, as they

profited from it. In addition to the knowledge they obtained through due diligence on BLMIS,

the UBS Defendants, in their roles as custodian, manager and administrator, and as a result of the

procedures set forth in the Feeder Fund Defendants' Operating Memoranda, had access to and

were required to review data and information – information demonstrating that Madoff was a

fraud. The troubling information about BLMIS known by the UBS Defendants by virtue of the

roles in which they served for the Feeder Fund Defendants included, but was not limited to: (a)

the impossible volume of options and equities trading being reported by BLMIS; (b) BLMIS's

improbable rates of return; (c) the failure of BLMIS to ever identify counterparties; (d) the use of

delayed, hard copy-only trade confirmations by BLMIS; (e) BLMIS's reporting of stock trades

that were outside the range of prices for such stocks on the reported days; and (f) BLMIS's use

of a small, unknown auditing firm.

335.    The UBS Defendants actively and substantially assisted Madoff in perpetuating

the fraud, by, among other things: (a) serving as the sponsor, custodian, manager and

Case 1:11-cv-04213-CM   Document 47   Filed 06/24/11   Page 93 of 106

administrator of the Feeder Fund Defendants, thereby providing the Feeder Fund Defendants

with an appearance of legitimacy, increasing the level of investment in the Feeder Fund

Defendants as a result of marketing with the UBS brand, and providing the infrastructure for

more than a billion dollars in investments into BLMIS; (b) agreeing to serve as a mere façade for

the Feeder Fund Defendants; (c) agreeing to and implementing atypical procedures that were

tailored to accommodate Madoff's suspicious methods; and (d) ignoring the numerous red flags

that were apparent through the data and information that they had access to and were required to

review.

336.    Without the UBS Defendants' participation in the fraud, the Ponzi scheme would

have been deprived of over a billion dollars in investments, and Madoff's fraud would have been

diminished in both scope and duration.

## COUNT THIRTEEN:
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### Against The UBS Defendants

337.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 336 of this Complaint as if fully realleged herein.

338.    BLMIS owed a fiduciary duty to its customers, and Madoff held a superior

position over the Feeder Fund Defendants, which required the Feeder Fund Defendants to repose

trust and confidence in Madoff.  BLMIS breached that fiduciary duty by perpetrating a massive

Ponzi scheme, and customers lost billions of dollars as a result.

339.    The UBS Defendants knowingly participated in the breach and proximately

caused the damages suffered by BLMIS customers as a result of the breach.

340.    Through their actions to accommodate Madoff's fraud while attempting to

distance themselves from liability, it is clear that the UBS Defendants knew that Madoff was

engaging in fraudulent activities.  The UBS Defendants lent their name to the Feeder Fund

Defendants and serviced the Feeder Fund Defendants in a variety of roles, all the while

disclaiming any liability for the funds in undisclosed indemnity agreements and all the while

delegating their key responsibility of custodian to Madoff and relying on Madoff for the numbers

underlying the NAV, without seeking independent verification of those numbers.  Moreover, the

UBS Defendants conducted due diligence on BLMIS and profited for years off of the Feeder

Fund Defendants, and at the same time consistently refused to market or recommend either of the

Feeder Fund Defendants to their own clients for investment, and had no exposure, or no

significant exposure, themselves to BLMIS, and at all times designated Madoff as a non-

approved manager.

341.    At a minimum, the UBS Defendants were willfully blind to the fraud, as they

profited from it.  In addition to the knowledge they obtained through due diligence on BLMIS,

the UBS Defendants, in their roles as custodian, manager and administrator, and as a result of the

procedures set forth in the Feeder Fund Defendants' Operating Memoranda, had access to and

were required to review data and information – information demonstrating that Madoff was a

fraud.  The troubling information about BLMIS known by the UBS Defendants by virtue of the

roles in which they served for the Feeder Fund Defendants included, but was not limited to: (a)

the impossible volume of options and equities trading being reported by BLMIS; (b) BLMIS's

improbable rates of return; (c) the failure of BLMIS to ever identify counterparties; (d) the use of

delayed, hard copy-only trade confirmations by BLMIS; (e) BLMIS's reporting of stock trades

that were outside the range of prices for such stocks on the reported days; and (f) BLMIS's use

of a small, unknown auditing firm.

342.    The UBS Defendants actively and substantially assisted Madoff in perpetuating

the fraud, by, among other things: (a) serving as the sponsor, custodian, manager and

administrator of the Feeder Fund Defendants, thereby providing the Feeder Fund Defendants with an appearance of legitimacy, increasing the level of investment in the Feeder Fund Defendants as a result of marketing with the UBS brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; (b) agreeing to serve as a mere façade for the Feeder Fund Defendants; (c) agreeing to and implementing atypical procedures that were tailored to accommodate Madoff's suspicious methods; and (d) ignoring the numerous red flags that were apparent through the data and information that they had access to and were required to review.

343.    Without the UBS Defendants' participation in the fraud, the Ponzi scheme would have been deprived of over a billion dollars in investments.  Accordingly, Madoff's fraud, and thus his breach of fiduciary duty, would have been greatly diminished in both scope and duration without the assistance of the UBS Defendants.

**COUNT FOURTEEN:**
**CONVERSION**
***Against The UBS Defendants***

344.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 343 of this Complaint as if fully realleged herein.

345.    BLMIS customers have the possessory right and interest to the billions of dollars they personally invested with BLMIS.

346.    The fees derived by the UBS Defendants through the Feeder Fund Defendants were taken from monies, consisting of Customer Property, withdrawn from BLMIS.

347.    The UBS Defendants have intentionally exercised dominion and control over customer money in a manner inconsistent with and in willful disregard of their interests.  The UBS Defendants are therefore liable to customers for having wrongfully converted these monies and are now obligated to return all such monies.

## COUNT FIFTEEN:
## UNJUST ENRICHMENT
### *Against The UBS Defendants*

348.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 347 of this Complaint as if fully realleged herein.

349.    The UBS Defendants have been unjustly enriched.  The UBS Defendants have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and the Feeder Fund Defendants, for which UBS did not in good faith provide fair value.  Rather, the UBS Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

350.    The UBS Defendants benefited greatly from their involvement in Madoff's fraud. The UBS Defendants received over $80 million, and potentially much more, in fees for purportedly serving the Feeder Fund Defendants in various capacities.  The UBS Defendants acted as a mere façade for the Feeder Fund Defendants, and did so despite having done their own due diligence on Madoff that resulted in their refusal to recommend or market the very Feeder Fund Defendants from which they derived their substantial fees.

351.    The UBS Defendants chose to ignore compelling evidence of Madoff's fraud.  As a result, the UBS Defendants have pocketed a sum of at least over $80 million, and likely much more, that rightfully belongs to BLMIS's customers.  The UBS Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

352.    Equity and good conscience require full restitution of the monies received by the UBS Defendants, directly and indirectly, from BLMIS.  This includes not only the money itself that the UBS Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Trustee.

## COUNT SIXTEEN:
## MONEY HAD AND RECEIVED
### *Against The UBS Defendants*

353.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 352 of this Complaint as if fully realleged herein.

354.    The UBS Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the customer fund under the Trustee's control.  The UBS Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit and/or mistake.

355.    In equity and good conscience, the UBS Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The UBS Defendants are obligated to return all such money to the Trustee.

## COUNT SEVENTEEN:
## AIDING AND ABETTING FRAUD
### *Against The Access Defendants*

356.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 355 of this Complaint as if fully realleged herein.

357.    The Access Defendants had actual knowledge of Madoff's fraud and lent substantial assistance to BLMIS in committing the fraud.

358.    The Access Defendants knew that Madoff, through BLMIS, was engaging in fraudulent activities.  The Access Defendants treated Madoff as an exception who was not subject to their normal due diligence procedures and requirements.  The Access Defendants were aware of and intentionally hid evidence that Madoff was engaging in a fraud, including, but not limited to, the impossible volume of options trading reported by BLMIS.

359.    At a minimum, the Access Defendants were willfully blind and consciously avoided the fraud after learning about a number of red flags surrounding Madoff.  In the course

Case 1:11-cv-04213-CM    Document 1-7    Filed 06/24/11    Page 93 of 106

of their due diligence and monitoring of the Feeder Fund Defendants, and, as a result of their

positions as portfolio advisor, administrative agent, investment manager, investment advisor and

portfolio manager for the Feeder Fund Defendants, the Access Defendants had access to and

were required to review data and information demonstrating that Madoff was a fraud.  The

troubling information about BLMIS known by the Access Defendants by virtue of the roles in

which they served for the Feeder Fund Defendants included, but was not limited to:  (a) the

impossible volume of options and equities trading being reported by BLMIS; (b) BLMIS's

improbable rates of return; (c) the failure of BLMIS to ever identify counterparties; (d) the use of

delayed, hard copy-only trade confirmations by BLMIS; (e) BLMIS's reporting of stock trades

that were outside the range of prices for such stocks on the reported days; and (f) BLMIS's use

of a small, unknown auditing firm.

360.    The Access Defendants actively and substantially assisted Madoff in perpetuating

the fraud, by, among other things: (a) marketing the Feeder Fund Defendants to investors

throughout Europe; (b) serving as promoter, portfolio advisor, administrative agent, investment

manager, investment advisor, and portfolio manager for the Feeder Fund Defendants, thereby

providing the infrastructure for more than a billion dollars in investments into BLMIS; (c)

agreeing to and implementing abnormal procedures that were tailored to accommodate Madoff's

suspicious methods; (d) intentionally hiding information from investors concerning the

impossible volume of options trades being reported by BLMIS; (e) ignoring the numerous red

flags that were apparent through the data and information that they had access to and were

required to review; and (f) failing to report Madoff's fraudulent activities.

361.    Without the Access Defendants' participation in the fraud, and but for the Access

Defendants' suppression of red flags indicating fraud, the Ponzi scheme would have been

deprived of over a billion dollars in investments, and Madoff's fraud would have been
diminished in both scope and duration.

**COUNT EIGHTEEN:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
*Against The Access Defendants*

362.    The Trustee repeats and realleges the allegations contained in paragraphs 1
through 361 of this Complaint as if fully realleged herein.

363.    BLMIS owed a fiduciary duty to its customers, and BLMIS held a superior
position over the Feeder Fund Defendants, which required the Feeder Fund Defendants to repose
trust and confidence in BLMIS.  BLMIS breached that fiduciary duty by perpetrating a massive
Ponzi scheme, and customers lost billions of dollars as a result.

364.    The Access Defendants had actual knowledge that Madoff, through BLMIS, owed
a fiduciary duty to his customers, and that Madoff's fraudulent activities were a breach of that
fiduciary duty.  The Access Defendants' actual knowledge of the breach is evident because the
Access Defendants were aware of and intentionally hid evidence that Madoff was engaging in a
fraud, including but not limited to the impossible volume of options trading reported by BLMIS.
The Access Defendants, through their due diligence and monitoring of the Feeder Fund
Defendants, knew of, were willfully blind to, or consciously avoided the fact that Madoff was
breaching his fiduciary duty.

365.    The Access Defendants participated in and substantially assisted with Madoff's
breach by, among other things: (a) marketing the Feeder Fund Defendants to investors
throughout Europe; (b) serving as portfolio advisor, administrative agent, investment manager,
investment advisor, and portfolio manager for the Feeder Fund Defendants, thereby providing
the infrastructure for more than a billion dollars in investments into BLMIS; (c) agreeing to and
implementing atypical procedures that were tailored to accommodate Madoff's suspicious

92

Case 1:11-cv-04213-CM   Document 3-7   Filed 06/22/11   Page 106 of 108

methods; (d) intentionally hiding information from investors concerning the impossible volume

of options trades being reported by BLMIS; and (e) ignoring the numerous red flags that were

apparent through the data and information that they had access to and were required to review;

and (f) failing to report Madoff's fraudulent activities.

366.    Without the Access Defendants' participation in the fraud, the Ponzi scheme

would have been deprived of over a billion dollars in investments.  Accordingly, Madoff's fraud,

and thus his breach of fiduciary duty, would have been greatly diminished in both scope and

duration without the assistance of the Access Defendants.

**COUNT NINETEEN:**
**CONVERSION**
***Against The Access Defendants***

367.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 366 of this Complaint as if fully realleged herein.

368.    BLMIS customers have the possessory right and interest to the billions of dollars

they personally invested with BLMIS.

369.    The advisory and management fees derived by the Access Defendants through the

Feeder Fund Defendants were taken from monies, consisting of Customer Property, withdrawn

from BLMIS.

370.    The Access Defendants have intentionally exercised dominion and control over

customers' monies in a manner inconsistent with and in willful disregard of their interests.  The

Access Defendants are therefore liable to customers for having wrongfully converted these

monies and are now obligated to return all such monies.

## COUNT TWENTY:
## UNJUST ENRICHMENT
### *Against The Access Defendants*

371.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 370 of this Complaint as if fully realleged herein.

372.    The Access Defendants have been unjustly enriched.  The Access Defendants have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and from the Feeder Fund Defendants, for which they did not in good faith provide fair value. Rather, the Access Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected.

373.    The Access Defendants benefited greatly from their involvement in Madoff's fraud.  The Access Defendants received millions of dollars in fees for purportedly serving the Feeder Fund Defendants in various capacities.  The Access Defendants knowingly failed to perform the due diligence they promised and treated Madoff as a special exception in order to allow his fraud to thrive.  The Access Defendants knowingly hid evidence of Madoff's fraud, and willfully turned a blind eye to numerous red flags, all the while continuing to market the Feeder Fund Defendants and continuing to solicit investments for Madoff.

374.    The Access Defendants chose to ignore the compelling evidence of Madoff's fraud.  As a result, the Access Defendants have pocketed millions of dollars that rightfully belong to BLMIS's customers.  The Access Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

375.    Equity and good conscience require full restitution of the monies received by the Access Defendants, directly and indirectly, from BLMIS.  This includes not only the money

itself that the Access Defendants received, but also the proceeds of that money. Any profits earned with the money they received must be returned to the Trustee.

**COUNT TWENTY-ONE:**
**MONEY HAD AND RECEIVED**
*Against The Access Defendants*

376. The Trustee repeats and realleges the allegations contained in paragraphs 1 through 375 of this Complaint as if fully realleged herein.

377. The Access Defendants are currently in possession, or have control over, money which originated from BLMIS. This money is Customer Property and belongs to the customer fund under the Trustee's control. The Access Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit and/or mistake.

378. In equity and good conscience, the Access Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The Access Defendants are obligated to return all such money to the Trustee.

**COUNT TWENTY-TWO:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
*Against The Luxalpha Director Defendants*

379. The Trustee repeats and realleges the allegations contained in paragraphs 1 through 378 of this Complaint as if fully realleged herein.

380. BLMIS owed a fiduciary duty to its customers, and BLMIS held a superior position over the Feeder Fund Defendants, which required the Feeder Fund Defendants to repose trust and confidence in BLMIS. BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme, and customers lost billions of dollars as a result.

381. The Luxalpha Director Defendants had actual knowledge that Madoff, through BLMIS, owed a fiduciary duty to his customers, and that Madoff's fraudulent activities were a breach of that fiduciary duty. The Luxalpha Director Defendants' actual knowledge of the

95

Case 1:11-cv-04213-CM    Document 3-2    Filed 06/29/11    Page 103 of 108

breach is evident because the Luxalpha Director Defendants, who were all UBS or Access

employees with substantial fund experience, knew Luxalpha was set up to funnel huge amounts

of money to Madoff behind the façade created by the UBS Defendants even though Madoff was

not disclosed in any Luxalpha prospectus, and even though Madoff was not approved by the

CSSF as a UCITS fund manager.  The Luxalpha Director Defendants, knew of, were willfully

blind to, or consciously avoided the fact that Madoff was breaching his fiduciary duty.

382.     The Luxalpha Director Defendants participated in and substantially assisted with

Madoff's breach by, among other things: (a) authorizing the delegation of custody and control

over Luxalpha's assets to Madoff; (b) entering into agreements with the UBS Defendants that

allowed the UBS Defendants to serve as a façade for the fund which served to help conceal both

the true nature of Madoff's involvement and the scope of his operations; and (c) allowing

operational procedures to be established for Luxalpha which invited a fraud.

383.     Madoff's fraud, and thus his breach of fiduciary duty, would have been greatly

diminished in both scope and duration without the assistance of the Luxalpha Director

Defendants.

### COUNT TWENTY-THREE:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### Against The Groupement Financier Director Defendants

384.     The Trustee repeats and realleges the allegations contained in paragraphs 1

through 383 of this Complaint as if fully realleged herein.

385.     BLMIS owed a fiduciary duty to its customers, and BLMIS held a superior

position over Feeder Fund Defendants, which required the Feeder Fund Defendants to repose

trust and confidence in BLMIS.  BLMIS breached that fiduciary duty by perpetrating a massive

Ponzi scheme, and customers lost billions of dollars as a result.

386.    The Groupement Financier Director Defendants had actual knowledge that Madoff, through BLMIS, owed a fiduciary duty to his customers, and that Madoff's fraudulent activities were a breach of that fiduciary duty.  The Groupement Financier Director Defendants' actual knowledge of the breach is evident because, as principals of Access, they were aware of and intentionally hid evidence that Madoff was engaging in a fraud, including but not limited to the impossible volume of options trading reported by BLMIS.  The Groupement Financier Director Defendants knew of, were willfully blind to, or consciously avoided the fact that Madoff was breaching his fiduciary duty.

387.    The Groupement Financier Director Defendants participated in and substantially assisted with Madoff's breach by, among other things: (a) authorizing the delegation of custody and control over Groupement Financier's assets to Madoff; and (b) allowing operational procedures to be established for Groupement Financier which invited a fraud.

388.    Madoff's fraud, and thus his breach of fiduciary duty, would have been greatly diminished in both scope and duration without the assistance of the Groupement Financier Director Defendants.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i)    On the First Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(ii)      On the Second Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Subsequent Transfers; (b) directing that the Preference Period Subsequent Transfers be set aside; and (c) recovering the Preference Period Subsequent Transfers, or the value thereof, from the Feeder Fund Director Defendants, Access Defendants, and UBS Defendants for the benefit of the estate of BLMIS;

(iii)      On the Third Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(iv)      On the Fourth Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(v)      On the Fifth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Feeder Fund Defendants;

(vi)     On the Sixth Claim for Relief, pursuant to §§ 273, 278, and 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(vii)     On the Seventh Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(viii)     On the Eighth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(ix)     On the Ninth Claim for Relief, pursuant to §§ 273 – 279 of the New York Debtor and Creditor Law, §§ 544, 548, 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, from the Feeder Fund

Director Defendants, Access Defendants, and UBS Defendants for the benefit of the estate of
BLMIS;

    (x) On the Tenth Claim for Relief, the Trustee is entitled to a judgment
that the Customer Claims filed by Luxalpha and UBS AG be disallowed pursuant to § 502(d) of
the Bankruptcy Code;

    (xi) On the Eleventh Claim for Relief, the Trustee is entitled to a
judgment that the Customer Claims filed by Luxalpha and UBS AG be equitably subordinated
for distribution purposes pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code;

    (xii) On the Twelfth through Twenty-Third Claims for Relief,
compensatory, exemplary, and punitive damages of at least $2 billion, with an exact amount to
be proven at trial;

    (xiii) Awarding the Trustee all applicable interest, including pre-
judgment interest, costs, and disbursements of this action; and

    (xiv) Granting Plaintiff such other and further relief as the Court deems
just and proper.


Dated: November 23, 2010     Respectfully submitted,
    New York, New York

             /s Deborah H. Renner
             **Baker & Hostetler LLP**
             45 Rockefeller Plaza
             New York, New York 10111
             Telephone: (212) 589-4200
             Facsimile: (212) 589-4201
             David J. Sheehan
             E-mail: dsheehan@bakerlaw.com
             Deborah H. Renner
             E-mail: drenner@bakerlaw.com
             Gonzalo S. Zeballos
             Email:  gzeballos@bakerlaw.com
             Benjamin D. Pergament

*Of Counsel*:

Mark A. Kornfeld
Email:  mkornfeld@bakerlaw.com
Oren J. Warshavsky
Email:  owarshavsky@bakerlaw.com
Timothy Scott Pfeifer
Email:  tpfeifer@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com

E-mail: bpergament@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com
Deborah A. Kaplan
Email:  dkaplan@bakerlaw.com
Michelle K. Marck
E-mail: mmarck@bakerlaw.com
Sammantha E. Clegg
Email:  sclegg@bakerlaw.com

*Attorneys for Irving H. Picard,  Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

**EXHIBIT C**

Case 1:12-cv-04233-CM   Document 3-3   Filed 06/24/11   Page 2 of 105

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Keith R. Murphy
Jonathan B. New
Melissa L. Kosack
Sammi Malek

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Debtor. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>UBS AG, UBS (LUXEMBOURG) S.A., UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., M&B CAPITAL ADVISERS HOLDING, S.A., M&B CAPITAL ADVISERS GESTIÓN SGIIC, S.A., JB CAPITAL MARKETS SOCIEDAD DE VALORES, S.A. (F/K/A M&B CAPITAL MARKETS SOCIEDAD DE VALORES, S.A.), FRANCISCO JAVIER BOTIN-SANZ de SAUTUOLA O'SHEA, GUILLERMO MORENES MARIATEGUI, RELIANCE MANAGEMENT (BVI) LIMITED, | Adv. Pro. No. 10- _____(BRL)<br><br><br><br><u>**COMPLAINT**</u><br><br><u>**FILE UNDER SEAL**</u> |

Case 1:12-cv-04233-CM    Document 3-3    Filed 05/24/11    Page 9 of 105

RELIANCE INTERNATIONAL RESEARCH
LLC, RELIANCE MANAGEMENT
(GIBRALTAR) LIMITED, LUXEMBOURG
INVESTMENT FUND AND LUXEMBOURG
INVESTMENT FUND U.S. EQUITY PLUS, as
represented by their Liquidators MAITRE ALAIN
RUKAVINA and PAUL LAPLUME, MAITRE
ALAIN RUKAVINA and PAUL LAPLUME, in
their capacities as liquidators and representatives of
LUXEMBOURG INVESTMENT FUND AND
LUXEMBOURG INVESTMENT FUND U.S.
EQUITY PLUS, and LANDMARK
INVESTMENT FUND IRELAND,

                    Defendants.

# TABLE OF CONTENTS

**Page**

JURISDICTION AND VENUE .................................................................................4

BACKGROUND .....................................................................................................5

THE PONZI SCHEME ............................................................................................7

TRUSTEE'S POWER AND STANDING ...................................................................9

THE DEFENDANTS .............................................................................................11

    A.    THE UBS DEFENDANTS ........................................................11

    B.    THE M&B DEFENDANTS ........................................................13

    C.    THE RELIANCE GROUP DEFENDANTS ...................................14

    D.    LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG
            INVESTMENT FUND U.S. EQUITY PLUS SUB-FUND ...............16

    E.    LANDMARK INVESTMENT FUND IRELAND .............................17

THE DEFENDANTS' ACCESS TO MADOFF AND HIS GLOBAL NETWORK OF
FEEDER FUNDS ..................................................................................................19

THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING BLMIS .......20

FORMATION OF LIF-USEP ..................................................................................26

    A.    Knowing the Likelihood of Fraud, the UBS Defendants Knowingly
            Provided a Façade Of Legitimacy for BLMIS ....................................26

          1.    UBS AG – Sponsor .....................................................27

          2.    UBS SA – Sponsor, Custodian, and Portfolio Manager .......29

          3.    UBSTPM – Portfolio Manager ......................................29

          4.    UBSFSL – Administrator ..............................................29

    B.    The M&B Defendants and Reliance Group Defendants' Roles in
            Connection with LIF-USEP .........................................................30

THE UBS DEFENDANTS' ROLES IN ENABLING THE FRAUD ................................31

    A.    The UBS Defendants Enabled Madoff By Providing the Appearance of
            Legitimacy and Security For LIF-USEP ..........................................31

    B.    The UBS Defendants Relinquished Their LIF-USEP Management and
            Custodial Duties .......................................................................31

    C.    The UBS Defendants' Operation of LIF-USEP Invited a Fraud .........31

    D.    UBS Defendants Were Paid Millions for Their "Work" on LIF-USEP ..32

THE M&B DEFENDANTS AND THE RELIANCE GROUP DEFENDANTS' LIF-
USEP-RELATED FEES .........................................................................................32

# TABLE OF CONTENTS
(continued)

Page

THE RELIANCE GROUP DEFENDANTS WERE ON NOTICE OF INDICIA OF
    FRAUD BUT TURNED A BLIND EYE AND FAILED TO ACT ...............................33

THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF AND HIGHLIGHT
    OTC OPTIONS AS THE KEY PIECE OF THE PUZZLE ...........................................34

THE RELIANCE GROUP DEFENDANTS OBTAIN AN ACCOUNT AT BLMIS ................36

THE M&B DEFENDANTS' FORMATION OF THE LANDMARK ACCOUNT AT
    BLMIS ...............................................................................................................37

THE RELIANCE GROUP DEFENDANTS' VIEW OF MADOFF: THE SACRED COW ......37

THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF ON DECEMBER
    4, 2008 ..............................................................................................................39

DEFENDANTS WERE ON NOTICE OF RED FLAGS CONCERNING MADOFF'S
    STRATEGY, PERFORMANCE, AND OPERATIONAL INFRASTRUCTURE..........41

    A.    There Were Not Enough Options for Madoff to Implement the SSC
        Strategy ..........................................................................................................41

    B.    The Defendants Entered into Hundreds of Millions in Options Contracts
        with Unknown Counterparties ........................................................................48

    C.    The Options Trade Confirmations Contained Other Significant
        Abnormalities .................................................................................................50

    D.    Settlement Period Abnormalities...................................................................50

    E.    Madoff's Returns Were Suspiciously Consistent for Too Many Years ...............51

    F.    Madoff Demonstrated Purported Trades Inconsistent with the SSC
        Strategy ..........................................................................................................53

    G.    LIF-USEP and Landmark Had a Negative Cash Balance with BLMIS...............54

    H.    Trades Were Executed Outside of the Daily Price Range...................................55

    I.    Madoff's Ability to Buy Low and Sell High ........................................................55

    J.    Madoff Provided Paper Trade Confirmations ......................................................56

    K.    Despite Exorbitant Trading Volumes There Was Never Any Impact on the
        Market.............................................................................................................57

    L.    BLMIS's Non-Reputable Auditor .....................................................................58

    M.    BLMIS's Unusual Fee Structure ......................................................................59

    N.    No Segregation of Assets ................................................................................60

    O.    Lack of Independent Verification of Assets .......................................................60

# TABLE OF CONTENTS
(continued)

**Page**

    P.    Madoff's Insistence on Secrecy: Lack of Transparency; Non-Disclosure of Madoff's Name in Offering Material ...................................................................61

THE TRANSFERS....................................................................................................62

CUSTOMER CLAIMS .............................................................................................65

COUNT ONE PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551 ...........................................................................66

COUNT TWO PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551 ...................................................................67

COUNT THREE PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551 ...................................................................68

COUNT FOUR PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551 .......................................................69

COUNT FIVE FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551 ...........................................................70

COUNT SIX FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551 ...........................................................71

COUNT SEVEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551...........................................................73

COUNT EIGHT FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551 ...........................................................74

COUNT NINE FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551 ...................................................................75

COUNT TEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551 ...................................................................76

COUNT ELEVEN RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279, AND 11 U.S.C. §§ 544, 548, 550(a), AND 551 ...................................................................................................77

COUNT TWELVE  FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551...........................................................78

COUNT THIRTEEN FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551 .......................................................79

# TABLE OF CONTENTS
(continued)

Page

COUNT FOURTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551....................................................................80

COUNT FIFTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551 ................................................................81

COUNT SIXTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551 ......................................................................82

COUNT SEVENTEEN FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551.....................................................................83

COUNT EIGHTEEN: RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273-279, AND 11 U.S.C. §§ 544, 548, 550(a), AND 551 ...........................................................................................84

COUNT NINETEEN DISALLOWANCE OF CUSTOMER CLAIMS....................................85

COUNT TWENTY EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS ...............86

COUNT TWENTY-ONE UNJUST ENRICHMENT..................................................................87

COUNT TWENTY-TWO MONEY HAD AND RECEIVED ...................................................88

COUNT TWENTY-THREE UNJUST ENRICHMENT .............................................................88

COUNT TWENTY-FOUR MONEY HAD AND RECEIVED...................................................90

COUNT TWENTY-FIVE UNJUST ENRICHMENT .................................................................90

COUNT TWENTY-SIX MONEY HAD AND RECEIVED.......................................................91

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of

Bernard L. Madoff ("Madoff"), individually, under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa, *et seq.* ("SIPA"), by and through his undersigned counsel, as and for his

Complaint, alleges as follows:

### NATURE OF THE PROCEEDING

1.       The Defendants named in this complaint funneled more than $1 billion into the

single largest financial fraud in history predominantly through two "feeder funds."   The

Defendants' willful blindness substantially aided, enabled, and helped sustain the massive Ponzi

scheme masterminded by Madoff, in order to reap an extraordinary financial windfall for

themselves.

2.       Collectively, the Defendants received approximately $555 million in avoidable

transfers from BLMIS's investment advisory business ("IA Business").   The Defendants also

appear to have collected millions of dollars in management, performance, custodial, advisory,

subscription, and administration fees, in an amount to be determined at trial, for helping deposit

money with Madoff.   Every cent the Defendants withdrew from BLMIS, directly or indirectly,

and every cent they purportedly earned in fees, is in fact stolen Customer Property, as defined by

statute,[1] and must be returned to the Trustee for the benefit of the estate.

3.       Defendant UBS AG, an international bank based in Switzerland, is one of the

most highly-sophisticated financial institutions in the world.   UBS AG and its affiliated entities

(collectively, the "UBS Defendants"), including, but not limited to, UBS (Luxembourg) S.A.

("UBS SA"), capitalized on the Ponzi scheme in the face of clear indicia of fraud that cast doubt

---

[1]       SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities … at any time received, acquired, or held
by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such
property transferred by the debtor, including property unlawfully converted."

on the legitimacy of BLMIS.  Even though the UBS Defendants apparently had identified certain red flags of BLMIS's fraud that reportedly led the UBS Defendants' Private Wealth Management Group to refuse to recommend BLMIS-related funds to Private Wealth clients, the UBS Defendants remained undeterred.  Despite their knowledge that BLMIS was likely a fraud, the UBS Defendants sponsored the formation of Defendant Luxembourg Investment Fund U.S. Equity Plus sub-fund ("LIF-USEP"), lending its name to that sub-fund to lull the outside world into believing LIF-USEP was legitimate.  The UBS Defendants created LIF-USEP for the sole purpose of investing assets with BLMIS.  As used herein, and in other similar actions brought by the Trustee, a BLMIS Feeder Fund ("BLMIS Feeder Fund") is an investment vehicle, like LIF-USEP, which invested assets through BLMIS via direct customer accounts with BLMIS's IA Business.

4.      The UBS Defendants purported to serve various functions for LIF-USEP, such as custodian, manager, and administrator, but relinquished their custodial and managerial duties to BLMIS.  The UBS Defendants had a powerful financial incentive to turn a blind eye to the numerous indicia of illegitimate trading activity and fraud.  As they generated millions in "fees" for looking the other way, the UBS Defendants consciously and deliberately ignored the lack of checks and balances on BLMIS.  The UBS Defendants are also the subject of a separate action brought by the Trustee.

5.      The UBS Defendants did not act alone with respect to the direction of assets from LIF-USEP into BLMIS.  Defendant M&B Capital Advisers Sociedad de Valores, S.A. ("M&B") helped found LIF-USEP with the UBS Defendants and received millions of dollars for serving as the distributor of LIF-USEP.  Further, M&B's BLMIS-related investments and relationships predated its involvement with LIF-USEP.  Always searching for ways to satiate its ever-

Case 1:11-cv-04213-CM    Document 3    Filed 06/24/11    Page 90 of 105

expanding appetite for further access to BLMIS, M&B eventually formed its own BLMIS Feeder Fund, Defendant Landmark Investment Fund Ireland ("Landmark"). While M&B and its related entities (collectively, the "M&B Defendants") purportedly acted as Landmark's investment manager and herded new investors into BLMIS as Landmark's distributor, the M&B Defendants obtained millions in fees for ignoring red flags of fraud.

6.     Additionally, Defendants Reliance Management (BVI) Limited ("Reliance BVI"), Reliance International Research, LLC ("RIR"), and Reliance Management (Gibraltar) Limited ("Reliance Gibraltar") (collectively, the "Reliance Group Defendants") worked in tandem to derive millions of dollars as the so-called "investment advisor" and as another distributor of LIF-USEP. The Reliance Group Defendants had been investing assets with BLMIS for several years prior to the formation of LIF-USEP. In order to exploit the highly lucrative nature of the consistent returns delivered by BLMIS, the Reliance Group Defendants were repeatedly willing to cut corners on due diligence and consciously disregarded warnings that Madoff was engaging in fraudulent activity. The Reliance Group Defendants furthered the Ponzi scheme in their quest for coveted access to Madoff by obtaining another BLMIS Feeder Fund with M&B, Defender Limited ("Defender"), and a direct avenue to millions more in fees and profits.

7.     The Defendants' financial sophistication, as well as their extensive access to BLMIS's financial information placed them individually, and collectively, in a position to recognize indicia of fraud. Even though the Defendants were on notice of many red flags strongly indicating that BLMIS was a fraud, they continued to justify the investment of hundreds of millions with BLMIS. In the face of indicia of fraud, the Defendants were more than content to reap millions in management, advisory, and distribution fees, and a share of the profits that typically would be paid to BLMIS. This compensation arrangement, together with a lack of

transparency and other factors set forth herein, should have caused these Defendants, who were experienced investment professionals, to investigate BLMIS. Yet, it was more profitable for them to simply turn a blind eye, which they deliberately and willingly did.

8.     Through this Complaint, the Trustee seeks the return of Customer Property belonging to the BLMIS estate, in the form of withdrawals, redemptions, fees, partnership distributions, profits, and assets, as well as the disgorgement of all funds, properties, and assets by which the Defendants were unjustly enriched.

## JURISDICTION AND VENUE

9.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), sections 105(a), 502(d), 510, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270 *et. seq.* (McKinney 2001)), New York Civil Practice Law and Rules (McKinney 2001), and other applicable law, for avoidance and recovery of preferential transfers and fraudulent conveyances, unjust enrichment, money had and received, consequential damages, and the Trustee's disallowance, and equitable subordination of the customer claims filed by certain Defendants.

10.     The Trustee seeks, among other things, to avoid such transfers, preserve the Customer Property for the benefit of the estate, and recover *all* transfers, or the value thereof, from the Defendants in whatever form it may now, or in the future, exist.

11.     This is an adversary proceeding brought in the Court in which the main underlying SIPA Proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding") is pending. The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the

Case 1:11-cv-04213-CM   Document 13   Filed 08/24/11   Page 12 of 105

"District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §§ 78eee(b)(2)(A), (b)(4).

      12.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

      13.     Venue in this district is proper under 28 U.S.C. § 1409.

## BACKGROUND

      14.     On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the United States Securities and Exchange Commission ("SEC") filed a complaint in the District Court, commencing the District Court Proceeding against Madoff and BLMIS, which is pending before that Court.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

      15.     On December 12, 2008, the Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

      16.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

---

[2]    In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* Section 78*lll*(7)(B) of SIPA.

17.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree") which, in pertinent part:

a.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

c.      removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

d.      removed the Receiver for BLMIS.

18.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

19.     At a plea hearing (the "Madoff Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At his Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea Allocution"). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison, the maximum possible sentence for his crimes. Madoff began serving his sentence at a federal penitentiary in Butner, North Carolina on July 14, 2009.

20.     On August 11, 2009, a former BLMIS employee, Frank DiPascali ("DiPascali"),

pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing

on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS),

(the "DiPascali Plea Hearing") DiPascali pled guilty to a ten-count criminal information.  Among

other things, DiPascali admitted that the Ponzi scheme had begun at BLMIS since at least the

1980s.  Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764

(RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11) ("DiPascali Plea Allocution").

### THE PONZI SCHEME

21.     BLMIS was founded in 1959 by Madoff as a sole proprietorship, and, for most of

its existence, operated from its principal place of business at 885 Third Avenue, New York, New

York.  In January 2001, BLMIS became a New York limited liability company wholly-owned by

Madoff.  Madoff, as founder, Chairman, Chief Executive Officer, and sole owner, operated

BLMIS together with several of his friends and family members.  BLMIS was registered with the

SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934

(the "1934 Act"), 15 U.S.C. § 78*o*(b).  By virtue of that registration, BLMIS is a member of

SIPC.  BLMIS had three business units: the IA Business, market-making, and proprietary

trading.

22.     Outwardly, Madoff ascribed the consistent success of the IA Business to his so-

called "split-strike conversion strategy" ("SSC Strategy").  Pursuant to that strategy, Madoff

purported to invest BLMIS's IA Business customers' funds in a basket of common stocks within

the S&P 100 Index—a collection of the 100 largest publicly traded companies.  Madoff claimed

that his basket of stocks would mimic the movement of the S&P 100 Index.  He also asserted

that he would carefully time purchases and sales to maximize value, and correspondingly,

BLMIS's IA Business customers' funds would, intermittently, be out of the equity markets.

While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills. The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index options. Those options functioned as a "collar," limiting both the potential gains and the potential losses of the stock positions. Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options. Madoff also told BLMIS's IA Business customers, including the Defendants, that he would enter and exit the market between six and ten times each year.

23. BLMIS's IA Business customers received fabricated either monthly or quarterly statements showing that securities were held in—or had been traded through—their accounts. However, the securities purchases and sales shown in such account statements virtually never occurred and the profits reported were entirely fictitious. At his Plea Hearing, Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a *single* purchase or sale of securities in connection with the SSC Strategy. Madoff's SSC Strategy was entirely fictitious.

24. At times prior to his arrest, Madoff assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC"), rather than through an exchange. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold *any* of the options described in the IA Business's customer account statements. Further, the Options Clearing Corporation ("OCC"), which clears all option contracts has no record of the BLMIS IA Business having bought or sold any exchange-listed options on behalf of any of BLMIS's IA Business customers.

25. For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather, BLMIS used

its IA Business customers' deposits to pay redemptions by other customers and to make other transfers, which are, of course, avoidable by the Trustee.  Many of these transfers were used to enrich Madoff, his associates, and his family directly.

26.     The falsified monthly account statements reported that the accounts of BLMIS's IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay BLMIS's IA Business customers what their account statements reported.  BLMIS was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

27.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.

28.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

29.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**TRUSTEE'S POWER AND STANDING**

30.     As the Trustee appointed under SIPA, the Trustee has the responsibility of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the consolidated estate and its creditors.

The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. Such assets, however, will not be sufficient to reimburse the customers of BLMIS for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recovery from BLMIS accountholders who received avoidable transfers to the detriment of other customers whose money was stolen via the Ponzi scheme, and from any entities or individuals to which BLMIS accountholders subsequently transferred those funds. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

31. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b). Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case pursuant to section 78fff(b) of SIPA.

32. In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

33. The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a. the Defendants received "Customer Property" as defined in SIPA § 78*lll*(4);

b. BLMIS incurred losses as a result of the conduct detailed herein;

c. BLMIS's customers were injured as a result of the conduct detailed herein;

        d.     SIPC cannot, by statute, advance funds to the Trustee to fully reimburse all customers for all of their losses;

        e.     the Trustee will not be able to satisfy fully all claims;

        f.     the Trustee, as bailee of customer property, can sue on behalf of the customer-bailors;

        g.     as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

        h.     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such customers are referred to herein as collectively, "Accountholders"). SIPC has expressly conferred upon the Trustee the power to enforce its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

        i.     the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## THE DEFENDANTS

## A.    THE UBS DEFENDANTS

34.    Defendant UBS AG is a public company, incorporated under the laws of Switzerland, with its registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and at Aeschenvorstadt 1, CH-4051 Basel, Switzerland. UBS AG is present in New York, with offices located at 299 Park Avenue, New York, NY 10171 and 101 Park Avenue, New York, NY

Case 1:11-cv-04213-CM   Document 13   Filed 08/24/11   Page 29 of 105

10178.  UBS AG sponsored the formation of Luxembourg Investment Fund ("LIF") and served as its promoter.  UBS AG also sponsored and served as the promoter for sub-fund LIF-USEP.

35.    Defendant UBS (Luxembourg) S.A. ("UBS SA"), a wholly-owned subsidiary of UBS AG, is a *société anonyme* (public limited company), organized under the laws of the Grand Duchy of Luxembourg, and has its registered office at 33a, Avenue John F. Kennedy, BP2, L-1855 Luxembourg.  UBS SA served as promoter and custodian of LIF, which eventually included LIF-USEP.  In addition, UBS SA served as portfolio manager of LIF from December 2004 through May 2, 2006, including LIF-USEP.

36.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly-owned subsidiary of UBS AG, is a *société anonyme* (public limited company), organized under the laws of the Grand Duchy of Luxembourg, with its registered office at 33a Avenue John F. Kennedy, L-1855 Luxembourg.  UBSFSL acted as an administrator and accounting agent to LIF and LIF-USEP.

37.    Defendant UBS Third Party Management Company S.A. ("UBSTPM"), which is, upon information and belief, a wholly-owned subsidiary of UBS AG, is a *société anonyme* (public limited company), organized under the laws of the Grand Duchy of Luxembourg, with its registered office at 33a, Avenue John F. Kennedy, L-1855 Luxembourg.  On May 2, 2006, UBS SA assigned to UBSTPM its portfolio management function for LIF.  UBSTPM also acted as LIF-USEP's portfolio manager.

38.    UBS AG, UBS SA, UBSFSL, and UBSTPM are collectively referred to herein as the "UBS Defendants."

39.    On or about March 2, 2009, UBS SA filed a customer claim, on behalf of LIF-USEP with the Trustee which the Trustee has designated as Claim No. 004536.

**B.    THE M&B DEFENDANTS**

40.    Defendant M&B Capital Advisers Sociedad de Valores, S.A. ("M&B") is a securities broker-dealer organized and existing under the laws of Spain.  M&B has an office located at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou., 28020 Madrid, Spain.

41.    Defendant M&B Capital Advisers Holding, S.A. ("M&B Holding") has served as the holding company for M&B, as well as related companies Defendants M&B Capital Advisers Gestión SGIIC, S.A. and JB Capital Markets Sociedad de Valores, S.A., formerly known as M&B Capital Markets Sociedad de Valores, S.A.  M&B Holding has an office located at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou., 28020 Madrid, Spain.  Upon information and belief, M&B Capital Advisers Gestión SGIIC, S.A. and JB Capital Markets Sociedad de Valores, S.A. also have offices located at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou., 28020 Madrid, Spain.  M&B, M&B Holding, M&B Capital Advisers Gestión SGIIC, S.A., and JB Capital Markets Sociedad de Valores, S.A. are collectively referred to herein as the "M&B Defendants."

42.    M&B and M&B Holding were formed in 2000 by Defendants Francisco Javier Botin-Sanz de Sautuola O'Shea ("Botin") and Guillermo Morenes Mariategui ("Morenes").  Botin is the son of Emilio Botin-Sanz, the executive chairman of Banco Santander Central Hispano ("Santander").  Botin is a citizen of a foreign state.  Morenes is Emilio Botin-Sanz's son-in-law.  Morenes is a citizen of a foreign state.  Morenes and Botin worked at Santander until 2000, when they formed M&B and M&B Holding.  Morenes is the Chairman of M&B Holding.

43.    M&B operated as a broker under the supervision of the Spanish market regulator CNMV until it transformed into a broker-dealer and incorporated as a member of the Madrid Stock Exchange in 2004.  Upon information and belief, M&B provided asset management,

portfolio management, and financial advice services, trade execution, investment advice, IPOs and secondary placements, and private placement services, as well as company presentations reports, company notes, company visit reports, and monthly equities.

44.     Upon information and belief, the M&B Defendants, due to their close relationship with Santander, first became involved with Madoff when they began promoting Optimal Strategic U.S. Equity Limited ("Optimal").  Optimal was a fund run by Santander.  The Trustee has entered into a settlement agreement with Optimal, which has been approved by this Court.

45.     The M&B Defendants were the principal entities behind the formation of the LIF-USEP sub-fund and served as a distributor of LIF-USEP in Spain and Portugal.  In 2007, the M&B Defendants also launched Landmark, solely for the purpose of exposing more of their investor base to the Madoff product.  The M&B Defendants served as investment manager of Landmark.

46.     Upon information and belief, the M&B Defendants were used, at least in part, by Morenes and Botin for the purpose of furthering the BLMIS Ponzi scheme.  Upon information and belief, the M&B Defendants have been dominated and used as the instrument of Morenes and Botin to advance their own personal interests rather than legitimate corporate ends.  Upon information and belief, Morenes and Botin exercised complete domination and control of the M&B Defendants, including in the M&B Defendants' dealings with BLMIS, whose activities they knew or should have known were predicated on fraud.  As a result, Morenes and Botin functioned as alter egos of the M&B Defendants and no corporate veil can be maintained among them.  Accordingly, the M&B Defendants include Morenes and Botin.

C.     THE RELIANCE GROUP DEFENDANTS

47.     Defendant Reliance Management (BVI) Limited ("Reliance BVI") is a company incorporated under the laws of the British Virgin Islands on June 17, 1998.  At the time of

Madoff's arrest, Reliance BVI had its registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. Tim Brockmann ("Brockmann") created Reliance BVI, which served as portfolio manager for various hedge funds. Upon information and belief, Reliance BVI's first exposure to Madoff was not a direct investment. Rather, Reliance BVI invested through Kingate Global Fund Ltd. ("Kingate") and later through Optimal. Upon information and belief, in 2004, Reliance BVI created a wholly-owned subsidiary in Gibraltar, Reliance Gibraltar, to serve the needs of its Luxembourg-based funds, including LIF-USEP. Upon information and belief, Reliance BVI now has its office in Gibraltar.

48.     Defendant Reliance International Research LLC ("RIR") is a private limited liability company organized under the laws of New York on August 29, 2000, with an office located at 147 East 48th Street, New York, NY 10017, USA. Brockmann and childhood friend Justin Lowe ("Lowe") created RIR. Upon information and belief, RIR was the research arm of Reliance BVI and Reliance Gibraltar, and performed various research functions for Reliance BVI and Reliance Gibraltar concerning their new and existing investments, including investments with BLMIS. Lowe is currently the majority owner of RIR.

49.     Defendant Reliance Management (Gibraltar) Limited ("Reliance Gibraltar") is a company incorporated under the laws of Gibraltar on March 17, 2004, with its registered address at Suite 207, Neptune House, Marina Bay, Gibraltar. Brockmann founded Reliance Gibraltar as well. Reliance Gibraltar was the investment advisor to LIF-USEP until LIF-USEP was placed in liquidation. Upon information and belief, at all times relevant hereto, Reliance Gibraltar has been a wholly-owned subsidiary of Reliance BVI.

50.     Reliance BVI, RIR, and Reliance Gibraltar are collectively referred to herein as the "Reliance Group Defendants."   The Reliance Group Defendants are also the subject of a separate action brought by the Trustee.

51.     On or about 2007, the Reliance Group Defendants created a BLMIS Feeder Fund under the name Defender, which is the subject of a separate action brought by the Trustee.   The M&B Defendants served as the distributor for a class of shares of Defender.

## D.     LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS SUB-FUND

52.     Upon information and belief, Defendant Luxembourg Investment Fund ("LIF") was incorporated on August 26, 2002 pursuant to the laws of the Grand Duchy of Luxembourg, with its registered office at 33a Avenue John F. Kennedy, L-1855 Luxembourg.   It was registered in the Luxembourg Trade and Companies Register under No. B.88859.

53.     LIF was structured as an open-ended umbrella investment company with multiple sub-funds ("SICAV").   Upon information and belief, on August 18, 2005, Defendant Luxembourg Investment Fund U.S. Equity Plus ("LIF-USEP"), a sub-fund of LIF, was formed for the exclusive purpose of investing with BLMIS.   An account in the name of "UBS (Luxembourg) S.A. for the benefit of Luxembourg Investment Fund U.S. Equity Plus" was opened with BLMIS, and held account number 1FR123 with BLMIS.   LIF-USEP's account was still open when Madoff was arrested on December 11, 2008.

54.     LIF, including LIF-USEP, was placed in liquidation by the District Court of Luxembourg on April 30, 2009 and is represented by its court-appointed liquidators, Alain Rukavina and Paul Laplume (the "Luxembourg Liquidators").   Mr. Rukavina and Mr. Laplume are also defendants in their capacities as liquidators and representatives of LIF, including LIF-

USEP.  Mr. Rukavina and Mr. Laplume are residents of Luxembourg.  Accordingly, Defendant

LIF includes Mr. Rukavina and Mr. Laplume.

55.     All of the members of the Board of Directors of LIF are current or former

employees of UBS SA.  Roger Hartmann ("Hartmann") served as Chairman of the Board of

Directors of LIF from August 2004 to January 1, 2008.  Alain Hondequin ("Hondequin") served

as a Director of LIF from August 2004 through LIF's liquidation.  Bernd Stiehl ("Stiehl") served

as a Director of LIF from August 2004 to December 7, 2005.  René Egger ("Egger") served as a

Director of LIF from January 2, 2006 through LIF's liquidation.  Ralf Schroeter ("Schroeter")

became a Director of LIF on January 1, 2008 and served as Chairman of the Board of Directors

of LIF at the time of LIF's liquidation.  Hartmann, Hondequin, Stiehl, Egger, and Schroeter are

not parties to this Complaint and are the subject of a separate action brought by the Trustee.

56.     On or about March 2, 2009, LIF filed a customer claim with the Trustee which the

Trustee has designated as Claim No. 004417.  On or about March 3, 2009, LIF filed another

customer claim with the Trustee which the Trustee has designated as Claim No. 006182.

## E.     LANDMARK INVESTMENT FUND IRELAND

57.     Upon information and belief, Defendant Landmark Investment Fund Ireland

("Landmark") was established as a sub-fund of AA (Alternative Advantage) plc ("AA") in

Ireland, in or about October 2007.  AA had been incorporated in Ireland since November 3,

2003.  Prior to November 25, 2004, AA's name was M&B Capital plc.  Upon information and

belief, Landmark's office is located at HSBC House, Harcourt Centre, Harcourt Street, Dublin 2,

Ireland.

58.     M&B served as investment manager of AA and its sub-funds, including

Landmark, at all relevant times until April 2008, at which time the investment manager role was

handed over to another M&B-related entity, M&B Capital Advisers Gestión, SGIIC, S.A.

Case 1:11-cv-04213-CM    Document 41-13    Filed 08/24/11    Page 23 of 105

59.     At all relevant times, HSBC Institutional Trust Services (Ireland) Limited served as the custodian for AA and its sub-funds, including Landmark. HSBC Institutional Trust Services (Ireland) Limited is not a party to this Complaint and the Trustee is pursuing claims against it in a separate action.

60.     Landmark was formed for the exclusive purpose of investing with BLMIS. An account in the name of "HSBC Institutional Trust Svcs (Ireland) Ltd. for the benefit of Landmark Investment Fund Ireland" was opened with BLMIS, and held account number 1FR133 with BLMIS. Landmark's account was still open when Madoff was arrested on December 11, 2008.

61.     This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7001.

62.     All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein. The UBS Defendants, the M&B Defendants, and the Reliance Group Defendants all have transacted business in New York. Defendants LIF-USEP and Landmark had accounts with BLMIS in New York, and entered into agreements with BLMIS in New York.

63.     The UBS Defendants, the M&B Defendants, the Reliance Group Defendants, LIF, LIF-USEP, and Landmark delivered agreements or caused agreements to be delivered in New York relating to BLMIS.

64.     Certain of the UBS Defendants, M&B Defendants, and the Reliance Group Defendants communicated regularly with persons in New York regarding LIF-USEP and/or Landmark, and/or BLMIS, and also sent funds to BLMIS in New York for, among other reasons, the direction and/or purchase of securities in New York, and/or received funds from BLMIS in New York, all through the use of New York banks.

65.    Furthermore, the UBS Defendants, the M&B Defendants, and the Reliance Group Defendants have committed tortious acts both within and without New York, causing injury in New York, and the UBS Defendants, the M&B Defendants, and the Reliance Group Defendants expected or should reasonably have expected these tortious acts to have consequences in New York and derive substantial revenue from interstate or international commerce.

66.    LIF filed Customer Claims in the SIPA Proceeding seeking to recover funds it allegedly lost on LIF-USEP's investments with BLMIS, whereby it has submitted to the jurisdiction of this Court.

67.    Thus, this Court has personal jurisdiction over the Defendants based on the Defendants' contacts with the U.S.

### THE DEFENDANTS' ACCESS TO MADOFF AND HIS GLOBAL NETWORK OF FEEDER FUNDS

68.    The UBS Defendants sponsored, managed, administered, or served as custodian for several BLMIS Feeder Funds that the Trustee is investigating or pursuing through separate actions.  Indeed, the UBS Defendants provided crucial infrastructure for several BLMIS Feeder Funds.  For example, UBS SA served as the custodian for Plaza Investments International Limited ("Plaza"), which directed investments of approximately $534 million into BLMIS.  At various times, UBS SA also served as administrator and custodian for Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited, and Thybo Stable Fund Limited, which collectively directed investments of approximately $207 million into BLMIS.  Further, the UBS Defendants served in multiple roles for Luxalpha SICAV ("Luxalpha") and Groupement Financier Ltd. ("Groupement Financier") including sponsor, manager, administrator, and custodian or prime banker.  Plaza, Thybo Asset Management Limited, Thybo

19

Case 1:11-cv-04213-CM   Document 13   Filed 08/24/11   Page 29 of 105

Global Fund Limited, Thybo Return Fund Limited, Thybo Stable Fund Limited, Luxalpha, and Groupement Financier are the subject of separate actions that have been brought by the Trustee.

69.     The UBS Defendants served as support for these massive BLMIS Feeder Funds despite having concluded that BLMIS was not a suitable investment for marketing to their own clients.

70.     Upon its formation, M&B began placing investor funds with Madoff, initially investing with BLMIS Feeder Funds Optimal and Plaza.

71.     The Reliance Group Defendants commenced funneling funds to Madoff in 1999 by investing with an investment in Kingate and then increased their investment with Madoff by investing in Optimal.

**THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING BLMIS**

72.     Upon information and belief, because of concerns about Madoff's purported strategy and because he would not meet with their due diligence teams, the UBS Defendants refused to recommend or market BLMIS to their private bank clients.  Remarkably, this did not prevent the UBS Defendants from supporting and assisting BLMIS in return for millions in fees.

73.     Upon information and belief, neither BLMIS nor any BLMIS Feeder Fund was ever placed on the list of Global Wealth Management & Business Banking recommendations for direct investment maintained by the UBS Defendants for their clients.

74.     Following the revelation of the Madoff fraud, UBS AG, the parent entity of the UBS Defendants, stated publicly that it had no material exposure to BLMIS.

75.     Upon information and belief, the UBS Defendants' lack of exposure to BLMIS and the decision not to market BLMIS Feeder Funds to their own private bank clients were the result of due diligence analyses performed by the UBS Defendants on Madoff and BLMIS.

76.     In November 2000, UBS AG acquired Fondvest AG ("Fondvest"), a Zurich-based company specializing in analyzing funds for institutional investors.  Fondvest served as the research unit for the UBS Defendants, providing analysis on third-party funds for the UBS business units.  Upon information and belief, Fondvest analyzed BLMIS-related funds and repeatedly declined to endorse them for distribution to UBS clients because of the lack of transparency regarding their ability to generate such high, stable returns.

77.     Fondvest was discontinued in 2004 and the Investment Solutions unit within UBS Wealth Management became responsible for providing analysis of third-party funds to the UBS Defendants.   Investment Solutions continued to refuse to endorse BLMIS-related funds. According to an April 2009 *Financial Times* article, UBS AG's Wealth Management unit:

> had earlier looked at the Madoff funds platform from a general process and firm perspective, but did not receive the required levels of comfort and gave the funds a "non approved" status for internal records.  This was seen as a clear signal that Madoff funds should not be actively held for portfolio construction uses at UBS.

78.     The UBS Defendants decided against investing in a BLMIS Feeder Fund, despite its attractive returns, as early as 2002, noting that "[t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible."   The BLMIS Feeder Fund's promoters claimed that their "great relationship" with Madoff provided complete transparency, yet they were never able to sufficiently answer the UBS Defendants' questions about the strategy.  As a result, the UBS Defendants decided not to invest in the BLMIS Feeder Fund, saying "[w]e consider ourselves pretty smart and no one in their firm has properly explained their strategy to match the return profile to us, so we avoid stuff like that."

79.     Between September 2007 and December 2008, UBS was approached about investing in several BLMIS-related products.  Internal emails from the UBS Defendants show

that, in response to these requests, UBS AG performed extensive due diligence on BLMIS.
During this process several red flags were raised regarding BLMIS and the underlying manager,
Madoff, including Madoff's lack of transparency and his refusal to meet with UBS AG's
analysts.

80.    For example, representatives of an investment firm called Pioneer Alternative
Investment Management, Ltd., Dublin or Pioneer Global Asset Management S.p.A. in Milan
("Pioneer") approached UBS AG.  Pioneer sought to have a BLMIS Feeder Fund called Primeo
Select offered and promoted through UBS AG.  Ultimately, UBS AG refused to allow the
Primeo Select fund to be offered through UBS AG.  Upon information and belief, this decision
appears to have been based on due diligence done by UBS AG in London, as well as a decision
from UBS AG's asset management group in Switzerland.  UBS AG believed that it did not have
enough information on Madoff, who was the underlying fund manager for Primeo Select, could
not get comfortable with Madoff's strategy, and refused to offer any Madoff product because
Madoff would not meet with UBS AG's analysts.

81.    To approve investments in BLMIS related products, UBS AG required its analysts
to obtain more information on the underlying fund manager, Madoff.  One of the due diligence
requirements "was a face to face meeting with the manager and a site visit to the HQ of the firm
where money is managed."  This task was assigned to Mary Kleckner ("Kleckner"), a UBS
analyst in London.  In September 2008, as part of preparation for such a meeting, Kleckner asked
her team for a list of specific questions or topics they would like answered.  The team responded
with concerns about the total assets BLMIS was managing and whether there was a point at
which these assets would be large enough to deteriorate the strategy's performance.

Additionally, UBS raised questions about the potential misuse of information between BLMIS's

market-making and IA Business arms.

82.     UBS AG's questions were never answered, as Madoff continuously thwarted

Kleckner's efforts to gain transparency, repeatedly refusing Kleckner's requests to meet with

him.  In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting.  His simple
> explanation was that if he meets with one client he would be
> obligated, perhaps even from a regulatory standpoint now that he is
> an RIA, to meet with all of them, and he would literally be forced
> to build an infrastructure to support meetings and devote a huge
> amount of time to it.

83.     Kleckner also reached out to others for their opinions on Madoff.  On October 31,

2007, in response to her question, "What are your feelings on Madoff," Kleckner received the

following response:

> I think [M]adoff is one of the most controversial funds out there.
> The historic returns and low vol[ume] make the [M]adoff feeders
> look very attractive for leveraged structured products and FAs love
> it.  In addition, [M]adoff is very involved with the [NASD] and on
> a number of committees there.  We get asked about sp's on these
> funds all the time, but there are a lot of folks who are concerned
> about the fund.  Everything is probably fine, but there are a number
> of things that are odd or different than the norm.  Like no prime
> broker, all trades done through [M]adoff securities through an
> ordinary brokerage account.  It's also unclear which dealers are
> executing the [OTC] collars for him?  They are pretty big, but no
> one seems to know who is trading them. The compensation for him
> is just through commission, no mgmt or incentive fee.  There are a
> couple of other flags as well but [redacted] have both written a lot
> of structured products on Madoff . . . .  I've never met him, but we
> did have a call with one of his risk folks some time ago.  Could be
> ok, but there is more risk due to the lack of transparency on this
> one than in many other funds.  **Some folks think [M]adoff could
> be one of the most successful schemes ever, I think it would be
> hard to do anything on them without more transparency than
> they have historically been willing to provide.**

(Emphasis added.)

84.    Ultimately, UBS AG decided that it did not have enough information on Madoff to invest with him.  UBS AG was unable to assuage its concerns as no further transparency was forthcoming, since Madoff refused to meet with any of UBS's analysts.  UBS ultimately concluded that "Madoff is not a manager that we are willing to structure products on. . . ."

85.    UBS AG also issued a series of notes linked to Momentum AllWeather Strategies II, which in turn was partially invested in a BLMIS Feeder Fund, Kingate (8.24% reported as of December 2008).  Upon information and belief, UBS, as issuer of these notes, would have performed due diligence on Madoff and BLMIS in the normal course of business.

86.    Despite not permitting the investment of a significant amount, if any, of its own money in BLMIS and refusing to recommend any BLMIS Feeder Fund to their clients, the UBS Defendants decided as early as January 2004 to create and structure the BLMIS Feeder Funds Luxalpha and Groupement Financier.  Even more so, the UBS Defendants continued to consciously disregard the glaring indicia of Madoff's fraud to acquire additional revenue streams through the creation of the LIF-USEP as a BLMIS Feeder Fund in 2005.

87.    The UBS Defendants consciously disregarded the numerous red flags raised by various UBS employees and internal opposition regarding whether the UBS Defendants should be involved with a BLMIS structure in any capacity.  As Stiehl, one of the directors of Luxalpha, a managing director of UBS SA, and eventually a director of LIF-USEP, stated in January 2004 in response to an email from UBS AG which explicitly raised concerns about getting involved with BLMIS, "Business is business.  We cannot permit ourselves to lose 300 million."  Upon information and belief, Mr. Stiehl was referring to anticipated fees.

88.    While performing due diligence, UBS SA reached out to other UBS entities for information on BLMIS, and received significant negative feedback.  For example, Mike Welch

("Welch") of UBS O'Connor LLC, a subsidiary of UBS AG, cautioned against becoming involved with Madoff due to the lack of transparency into BLMIS. In a March 5, 2004 email regarding BLMIS, a portion of which was entitled "Thoughts and Rationale for NOT Investing," Welch raised several red flags. First, he noted that since 1990 there were only a handful of negative months, and that the strategy generated incredibly consistent returns each year. Second, he stated that "[i]f Madoff were to run the strategy totally independently from his [broker/dealer business], it would be IMPOSSIBLE to generate the returns that he has produced since 1990." Additionally, Welch noted that Madoff did not charge fees for his hedge fund, which "[m]akes one ask the question of why Madoff would bother to have such a product when the only revenue coming from running outside money is commission dollars." Welch concluded that "[t]he simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter in our mind."

89.    Tim Bell ("Bell"), a UBS AG employee who regularly advised on hedge fund investments, echoed Welch's concerns about BLMIS. In an email dated March 5, 2004, Bell characterized the question of whether the UBS Defendants "should [] go there" as depending on the answers to the questions, "can we really get transparency and can we really get comfortable?" In response to UBS SA's inquiries about BLMIS, Bell stated:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency . . . . My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of capcity [sic] . . . .

90.    UBS SA itself acknowledged the serious risks involved in working with BLMIS. In response to a request in 2003 by UBS SA for feedback regarding Madoff, a UBS AG (Zurich)

employee stated that one of UBS AG's biggest concerns was that Madoff was acting as both a broker and a depository at once. In addition, this same employee stated:

> We normally have to give "NO" as the answer in cases like Madoff. In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time! Such a NO is easy to comprehend for both business policy reasons and risk reasons.

In a December 17, 2003 email forwarding UBS AG's feedback on Madoff, Vivian De Angelis ("De Angelis") of UBS SA concurred with this assessment, stating that "[t]he risk should not be underestimated," however, she also countered that working with BLMIS "would be advantageous on the income side."

91.     In spite of the UBS Defendants' own policy against such a structure, BLMIS was given "'special' handling" and permitted to function as both depository and broker. Apparently to give themselves comfort, UBS SA and UBS AG attempted to impose certain conditions. For example, they wanted to require BLMIS to report cash and security movements to UBS SA for the purpose of daily reconciliations. They also wanted electronic access to their accounts. None of these requirements was met.

92.     Rather than heeding the glaring red flags and words of warning from their own colleagues, UBS SA forged on with the corrupt relationship with Madoff through the formation of BLMIS Feeder Funds, Luxalpha, Groupement Financier, and LIF-USEP.

## FORMATION OF LIF-USEP

**A.     Knowing the Likelihood of Fraud, the UBS Defendants Knowingly Provided a Façade Of Legitimacy for BLMIS**

93.     Upon information and belief, sometime in December 2004, Manuel Echeverria ("Echeverria"), who was at that time the head of Optimal Investment Services SA, approached UBS SA on behalf of the M&B Defendants with regard to the creation of a new account at

BLMIS.  Upon information and belief, Echeverria had been a long time friend of Madoff's and hence, had direct connections to BLMIS-related investment opportunities.  Despite their knowledge of indicia of Madoff's fraudulent activity, the UBS Defendants consciously and deliberately disregarded these red flags and sought instead to exploit even more BLMIS opportunities.  Indeed, upon information and belief, M&B, UBS AG, and UBS SA made a collective decision to create a new BLMIS Feeder Fund to be structured as a replica of another, contemporaneously "successful" BLMIS Feeder Fund, Luxalpha, which was within the UBS Defendants' BLMIS-related auspices.  In lieu of creating an entirely new fund, UBS AG and UBS SA created a sub-fund within one of their already existing, approved funds – LIF.  On July 22, 2005, the Board of Directors of LIF approved opening an account with BLMIS in the name of LIF-USEP.  LIF-USEP's sole purpose was to invest with BLMIS.  LIF-USEP was officially formed on August 18, 2005 and investments began in September 2005.

94.     Additionally, sometime in 2004, Echeverria approached the Reliance Group with an offer to become LIF-USEP's investment advisor.  Since LIF-USEP was an open-ended investment company, or a SICAV, its investment advisor had to be a European Union-based company.  Upon information and belief, to accede to Echeverria's request, on March 17, 2004, the Reliance Group founded Reliance Gibraltar.

**1.     UBS AG – Sponsor**

95.     The UBS Defendants held many roles in connection with LIF and LIF-USEP:

96.     UBS AG's role with respect to LIF was integral to developing and promoting the fund as a so-called UCITS fund.  This means that the fund was created under the "Undertakings for Collective Investments in Transferable Securities," a set of directives and laws in the EU, as well as local Luxembourg laws.  A UCITS fund may take the legal form of either a common fund, or a SICAV.  LIF was a UCITS fund and an umbrella SICAV, and as such, was open to

27

investments from the public at large, rather than limited to investments from sophisticated investors.

97.     UBS AG served as the sponsor and promoter of LIF, and eventually LIF-USEP (titles that UBS AG used interchangeably).  UBS AG was named LIF's sponsor in the draft prospectus sent to the Commission de Surveillance du Secteur Financier ("CSSF"), the Luxembourg regulator, at LIF's inception as part of its approval application in 2002.  The September 2002 LIF sales prospectus states in relevant part, "[t]he Sponsor of the Fund is UBS AG, Zurich and Basel, one of the world's leading financial institutions which offers a full range of commercial, trading, risk management and investment services."  UBS AG's sponsor role was subsequently confirmed on each LIF prospectus including all the prospectuses at, and after, the opening of the LIF-USEP sub-fund.  UBS AG was also identified as the fund's promoter in an Operating Memorandum for LIF, dated December 20, 2005.

98.     Under Luxembourg law, a fund's sponsor/promoter is responsible for the creation of the fund.  The sponsor/promoter of a UCITS fund, such as LIF-USEP, must be a regulated entity with sufficient financial resources.  A UCITS fund, such as LIF-USEP, is authorized in Luxembourg by the CSSF on the basis of the sponsor/promoter's experience and financial soundness.  Specifically, the sponsor/promoter of a UCITS fund is expected to provide compensation for damages sustained by third parties as a result of fault in the management or administration of the fund.

99.     By serving as the fund's sponsor/promoter, UBS AG explicitly gave its imprimatur to LIF-USEP, and led the Luxembourg regulator, as well as investors across Europe, to rely on UBS AG's global reputation, thus believing that one of the world's largest financial institutions was endorsing and standing behind LIF-USEP.  By acting in such a capacity, UBS

AG created the appearance of legitimacy and security for LIF-USEP, which in reality was a mere façade and a means to channel all of LIF-USEP's investments into the custody and control of Madoff; one of the very reasons UBS AG did not recommend that its own clients invest with BLMIS.

### 2.    UBS SA – Sponsor, Custodian, and Portfolio Manager

100.    UBS SA served in multiple roles for LIF, including sponsor, custodian, portfolio manager, and main paying agent.

101.    UBS SA acted as custodian of LIF, pursuant to a Custody Agreement of August 26, 2002.  As LIF's, and eventually LIF-USEP's custodian, UBS SA was by law responsible for safekeeping the fund's assets and supervising the fund.  Despite earning substantial fees for purportedly acting as a custodian, UBS SA knowingly and deliberately surrendered to BLMIS its custodial obligations with respect to LIF-USEP.

### 3.    UBSTPM – Portfolio Manager

102.    In May 2006, UBSTPM replaced UBS SA as portfolio manager of LIF and LIF-USEP.  As manager of LIF-USEP, UBSTPM represented to the CSSF and the public that it had assumed the responsibility for the management and administration of the sub-fund, as well as the monitoring of investment policies and restrictions of the sub-fund.  In reality, all management functions for LIF-USEP had already been relinquished to BLMIS as a result of the asset management agreement executed between UBS SA and BLMIS.

### 4.    UBSFSL – Administrator

103.    UBSFSL acted as administrator for LIF-USEP, meaning that it was responsible for accounting functions, calculation of the sub-fund's net asset value ("NAV"), keeping the register of shareholders, handling subscriptions and redemptions, communication with investors, and preparation of financial statements for the funds.  UBSFSL calculated the NAV of LIF-

USEP with information provided by BLMIS, without any independent verification of the numbers BLMIS provided.

**B.     The M&B Defendants and Reliance Group Defendants' Roles in Connection with LIF-USEP**

104.     Upon information and belief, during initial discussions in December 2004, UBS SA and M&B had agreed that the LIF-USEP sub-fund would be launched as a private vehicle exclusive to M&B and Reliance Group investors.

105.     Directly following the formation of the LIF-USEP sub-fund, M&B signed a Consultancy and Exclusive Introducing Agreement with UBS SA on September 1, 2005. Pursuant to this agreement, M&B was entitled to receive from UBS SA a trailing fee, which was a part of the portfolio manager fee, "with respect to the net assets held by shareholders procured to the [LIF-USEP]."  Upon information and belief, M&B also was entitled to receive from UBS SA the subscription fee provided in the prospectus of the sub-fund and had discretion to determine that amount within the limits of the subscription fee.  Upon information and belief, M&B's commercial division handled the marketing and sales of LIF-USEP.

106.     On the same day of the formation of LIF-USEP, Reliance Gibraltar signed a Portfolio Advisory Agreement with LIF, on behalf of LIF-USEP, and UBS SA.  Pursuant to this agreement, Reliance Gibraltar's duties, as Portfolio Adviser, included a broad range of advisory services, including without limitation: (i) giving recommendations to the Investment Manager and the fund for the manner in which the cash raised by the fund might be invested; (ii) advising the Portfolio Manager concerning all actions which it appears to the Portfolio Adviser the fund should consider in order to carry into effect the purchase and sale programs; and (iii) assisting the fund in obtaining necessary information to determine the NAV of the fund, etc.

### THE UBS DEFENDANTS' ROLES IN ENABLING THE FRAUD

**A.     The UBS Defendants Enabled Madoff By Providing the Appearance of Legitimacy and Security For LIF-USEP**

107.     Partnering with the M&B Defendants and the Reliance Group Defendants, the UBS Defendants knowingly or recklessly facilitated Madoff's fraud by essentially selling LIF-USEP under the banner of the UBS brand and reputation, providing the sub-fund with the appearance of legitimacy.

108.     While outwardly named in multiple and substantial roles for LIF-USEP, the UBS Defendants yielded most of their responsibilities to BLMIS and Madoff.

**B.     The UBS Defendants Relinquished Their LIF-USEP Management and Custodial Duties**

109.     On August 18, 2005, UBS SA signed a Sub-Custodian Agreement with BLMIS, entrusting all of LIF-USEP's assets to BLMIS, an unregistered investment adviser/broker-dealer, to be used at Madoff's discretion.  The Sub-Custodian Agreement put in place could not have met the approval of the CSSF because BLMIS did not meet the criteria for officially performing the duties of a custodian of a Luxembourg UCITS fund.

110.     The UBS Defendants knowingly and purposefully appointed BLMIS all of the management and custodial duties they outwardly assumed for LIF-USEP.  Custody of LIF-USEP's assets was at all times yielded to BLMIS.  UBS SA failed to ensure that the assets were kept in a segregated account.  Management of LIF-USEP's assets was also surrendered entirely to BLMIS, with Reliance Gibraltar serving in purported advisory capacities, although LIF-USEP was at all times 100% invested with BLMIS.

**C.     The UBS Defendants' Operation of LIF-USEP Invited a Fraud**

111.     The operational procedures for LIF-USEP, put in place by UBS SA and UBSFSL were tailor-made to accommodate Madoff's atypical methods perpetuating his fraud and

31

allowing it to thrive.  These procedures, set forth in an internal operating memorandum, prepared

by the UBS Defendants included a combination of custody and trading authority in the hands of

BLMIS, complete reliance on unverified pricing and trade confirmations issued by BLMIS, and

the calculation of the sub-fund's NAV on an abnormally delayed basis.

**D.** **UBS Defendants Were Paid Millions for Their "Work" on LIF-USEP**

112.    The net effect of the operating procedures put in place for LIF-USEP was to allow

UBS SA and UBSFSL, two sophisticated financial institutions that appeared to be directly

involved in the operation of LIF-USEP, to earn fees for serving in roles that actually provided no

real oversight or protection for LIF-USEP's assets, and which provided Madoff with freedom to

manipulate reports as needed to perpetuate his fraud.  Throughout the life of LIF-USEP, the UBS

Defendants collected millions.

**THE M&B DEFENDANTS AND THE RELIANCE GROUP DEFENDANTS'
LIF-USEP-RELATED FEES**

113.    Upon information and belief, M&B entered into a formal Distribution Agreement

to distribute LIF-USEP as of January 1, 2006.  M&B's distribution duties extended to Spain and

Portugal.  Pursuant to the Distribution Agreement, M&B was entitled to receive distribution fees,

which varied per the different classes of shares.

114.    At the outset, Reliance Gibraltar derived fees from its August 18, 2005 Portfolio

Advisory Agreement with LIF-USEP.   Upon information and belief, Reliance Gibraltar also

received fees for its role as a distributor of LIF-USEP.   Upon information and belief, Reliance

Gibraltar split the distribution fees with M&B in its capacity as the other distributor of LIF-

USEP.  According to LIF-USEP's Offering Memorandum, which took effect on January 1, 2007,

"[i]n principle 100% of the Portfolio Management fee will be paid to those two companies

[Reliance Gibraltar and M&B]."   Upon information and belief, the division of the portfolio

management fees was determined by invoices prepared by both distributors. LIF-USEP charged

between .6% and 1.5% for portfolio management fees based on the different classes of shares of

the sub-fund.

115. Throughout the life of LIF-USEP, the M&B Defendants collected millions.

116. Throughout the life of LIF-USEP, the Reliance Group Defendants collected

millions.

## THE RELIANCE GROUP DEFENDANTS WERE ON NOTICE OF INDICIA OF FRAUD BUT TURNED A BLIND EYE AND FAILED TO ACT

117. Upon information and belief, with the Reliance Group Defendants' personal

relationship with Echeverria and their Optimal-related investments, the Reliance Group

Defendants were in possession of a "due diligence report" Optimal had drafted after a visit with

Madoff on February 1, 2006 (the "2006 Optimal Report"). Upon information and belief, the

Reliance Group Defendants were on notice of the following red flags raised in the 2006 Optimal

Report:

> **Integrity and Enforceability of contractual arrangements with the Broker Dealer:**
>
> - . . . if you look at the trading authorisation under which our accounts are managed it is not clear who the agreement is with – whether it is Madoff the individual or Madoff the Corporation. If it is the individual then there is a significant risk to this investment and reliance cannot be place[d] on the balance sheet of the Madoff corporation.
>
> **Traceability and recovery of assets in the event of a failure of the Broker Dealer or a counter party:**
>
> - . . . nothing in the documentation reviewed to-date indicates that properly segregated client accounts have been set up for the receipt of cash and from which the transactions on an execution only basis will be managed.

- In relation to the Options strategy – the OTC counterparty risk is an area where we have to rely on the investment judg[]ment of Madoff because there is the risk that even though you may be left with liquid stocks if the option is a long put – in the event of a default you will be left with a basket of securities with falling values and have lost the premium paid to buy the downside protection.

- In addition we should consider the extent to which we should seek to have either Madoff[']s auditor or indeed the Optimal Funds auditor to carry out certain restricted procedures to confirm that segregated accounts have been properly set up and are in place and are capable of identifying our assets as belonging to us, verify their counterparty assessment procedures for the Options strategy.

**Risk of Fraud and misrepresentation of process:**

- **One of the difficulties with this account is the current inability to verify actual trading activity in the market through counterparty and other market user intelligence.**

- . . . A major issue is that the key controls are all in the hands of family members . . . .

**Reliance on a single person – Keyman risk:**

- . . . the keyman risk here is of particular note because there is considerable reliance being placed on one person in relation to the decision making process and although he is supported by a broader organisation – the Client side activities do not have the formal documentation and external service providers that one would expect with a normal hedge fund and hence some of the safeguards that those structures might provide.

(Emphasis added.)

## THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF AND HIGHLIGHT OTC OPTIONS AS THE KEY PIECE OF THE PUZZLE

118.    Upon information and belief, the Reliance Group Defendants understood that directly contacting Madoff or anyone else at BLMIS was strictly forbidden.  Instead, the principals of the Reliance Group Defendants, specifically Brockmann and Lowe, funneled all communications through Echeverria.

119.    On February 1, 2007, Echeverria brokered a meeting with Madoff during which he introduced Madoff to Lowe and Brockmann.  Lowe's February 1, 2007 note to file (the "2007 note to file") documented the following responses from Madoff and the Reliance Group Defendants' conclusions:

- We discussed the strategy and he [Madoff] confirmed that he was not using the major investment banks as counterparts on the option side as they were not competitive (they had to hedge back themselves …) but used long term clients of the firm such as US and European pension funds and life insurances.

- We discussed the sustainability of the strategy with less volume or less volatility and lower IR.  He claimed that due to the technological developments such as smart trade he could execute the entire strategy in small incremental positions without being visible in the market and without slip[p]age.  This allowed him to increase the size of the advisory accounts.  This was also the reason that he was giving the account holders an average transaction price for all trades instead of a stamp trade.

- We also briefly touched base on the fact that he had small unknown auditors and he basically said that he knew these people since the days he started . . . he believes in human relationships and their personal achievement instead of the institutionalized names (philosophy of his firm).

- Finally, when we discussed the biggest risk to the strategy he said that if we should see a major disruption in the markets and that all the put option counterparts were to default th[e]n we would be left over with a basket of the most prominent US stocks at probably depressed valuations.

**Conclusion**

- Need to dig in the next meeting further into the details as not all questions on the list answered.

- **As we knew prior to the meeting OTC options are key piece of the puzzle and important to gain comfort with the counterparts.**

(Emphasis added.)

120.    However, upon information and belief, despite their awareness of these red flags, the Reliance Group Defendants did not perform any independent, meaningful, or reasonable due diligence to access the "key" information on counterparties or to investigate any other suspicions, whether discussed or not.  After almost nine years of BLMIS-related investments, the Reliance Group Defendants began to belatedly ask basic due diligence questions, especially with respect to BLMIS's purported counterparties, they should have been independently asking prior to investing hundreds of millions with BLMIS and collecting millions in fees.  Moreover, despite the Reliance Group Defendants' dependence upon BLMIS for millions in fees, they failed to conduct an adequate investigation and chose instead to remain willfully ignorant.

### THE RELIANCE GROUP DEFENDANTS OBTAIN AN ACCOUNT AT BLMIS

121.    Despite their mounting concerns about Madoff and, upon information and belief, their awareness of red flags, in late 2006 the Reliance Group Defendants decided to open a direct account at BLMIS with the assistance of Echeverria.  In connection with these preparations, RIR hired an additional Senior Hedge Fund Analyst (the "Senior Analyst") in March 2007.  The Reliance Group Defendants' new BLMIS Feeder Fund opened an account with BLMIS in early May 2007 in the name of Defender.  Reliance BVI was Defender's manager.  Additionally, the M&B Defendants served as the distributor for a class of shares of Defender.

122.    Upon information and belief, RIR received trade confirmations in connection with the LIF-USEP BLMIS account, as well as for the Defender BLMIS account.  At the outset of the Senior Analyst's employment with the Reliance Group Defendants, he found the trade confirmations randomly stored away in a drawer, many in unopened envelopes.  The Senior Analyst began to review the trade confirmations and set up an Excel program that would, among other things, analyze the data on the trade confirmations so as to compare LIF-USEP's performance to Defender's.

36

## THE M&B DEFENDANTS' FORMATION OF THE LANDMARK ACCOUNT AT BLMIS

123.   Upon learning that UBS SA had closed off new investments into LIF-USEP in the first quarter of 2007, the M&B Defendants embarked on a path to establish their own account with BLMIS to satisfy their ever-expanding appetite for Madoff-related investments and fees. To achieve this objective, the M&B Defendants consulted with Echeverria to exploit his personal connections with Madoff.  In early 2007, upon information and belief, Echeverria introduced the M&B Defendants to Madoff.

124.   Upon information and belief, after their meeting with Madoff, the M&B Defendants decided to structure their direct account as a sub-fund of AA.  In or about October 2007, the M&B Defendants officially opened their BLMIS Feeder Fund, called Landmark.

125.   At all relevant times, M&B and/or M&B Capital Advisers Gestión SGIIC SA served as the investment manager for Landmark.  Upon information and belief, M&B also was Landmark's distributor, thereby funneling new investors into BLMIS.  Accordingly, Landmark generated millions in fees for these certain M&B Defendants.

## THE RELIANCE GROUP DEFENDANTS' VIEW OF MADOFF: THE SACRED COW

126.   In the face of the ongoing global economic meltdown (the S&P 100 had declined nearly 40% between 2007 and 2008), Madoff's continuing low volatility and near-double-digit returns were suspicious.   The Senior Analyst repeatedly raised numerous concerns to his superiors about the Reliance Group Defendants' Madoff-related investments, but to no avail. Upon information and belief, based upon the Reliance Group Defendants' responses, the Senior Analyst understood that Madoff was a "sacred cow" in that the BLMIS IA Business was a highly lucrative investment opportunity, which the Reliance Group research team was not to question. Indeed, the Reliance Group Defendants' comfort with Madoff was presumably a direct function

of the desired profits Madoff generated.  The Reliance Group Defendants turned a blind eye to information clearly signifying that Madoff may have been engaged in fraudulent activity so as to preserve their relationship with Madoff.

127.   Upon information and belief, the Senior Analyst was concerned with counterparty risk relative to Madoff's extensive options trading, particularly after the collapse of Bear Stearns in March 2008 and Lehman Brothers in September 2008.  Upon information and belief, the Senior Analyst could not ascertain who would be on the other side of Madoff's trades, as he already knew that Deutsche Bank was not doing business with BLMIS and BLMIS seemed completely unaffected by Bear Stearns and Lehman Brothers' failures.  The Senior Analyst recommended to the Reliance Group Defendants' principals to withdraw all of their BLMIS-related investments on multiple occasions in 2007 and 2008, but his advice was repeatedly rejected.

128.   On September 29, 2008, in an instant messenger exchange with Lowe, the Senior Analyst queried:

> Senior Analyst:  Given what is going on, is there any chance to use this as an opportunity to get more clarity (maybe through [M]anuel) on [M]adoff counterparties?  It makes absolutely zero sense that [L]ehman was not one given their prominence in the otc equity derivatives market (and neither is [D]eutsche as we recently heard, also a large player). I don't even want to send this by email, **but my actual opinion is that IF the whole thing is a fraud, in this environment it could/will be exposed**.  I am not trying to give you a heart attack…but my honest opinion is that it is extremely worrisome.
>
> Lowe: Manuel is coming to NY in Oct and we can visit him then. You are right not to be complacent but I am not sure how else to check.  Perhaps calling competition to cross check.
>
> Senior Analyst: Nobody seems to know (that I have spoken to).  **I am really uncomfortable with the risk….putting my FOF hat on, my recommendation is to redeem.**

> Senior Analyst: I really fear that all the account holders (ourselves included) are so hooked on the low vol returns that we are not really thinking objectively: it makes no sense.

(Emphasis added.)

## THE RELIANCE GROUP DEFENDANTS MEET WITH MADOFF ON DECEMBER 4, 2008

129.    The Reliance Group Defendants learned in mid-November 2008 that the head of Banco Santander risk management would be meeting with Madoff on Thanksgiving and had offered to inquire of Madoff on their behalf.  In response, Lowe recognized "[t]his is a unique chance so let's put something together."  Among other things, the Senior Analyst suggested the following unanswered questions regarding articulated problems with the Reliance Group Defendants' massive investments via BLMIS Feeder Funds:

- Does Madoff have insurance in excess of the SIPA protections for account holders (ie surety bonds issued by CAPCO or a similar company)?

- Who are the counterparties for the options?  Can BLM give specific examples (top 3 or top 5) even if not disclosing all?  How many counterparties are there?  What is the maximum exposure to any one counterparty?

- Are the options trades between the accounts and the broker/dealer, which may then have its own trades with counterparties?  Or, are the option trades with the counterparties directly?

130.    On December 4, 2008, merely days before the inevitable collapse of the Ponzi scheme, Brockmann and Lowe met with Echeverria and Madoff.  Lowe's December 4, 2008 note to file (the "2008 note to file") describing that meeting demonstrated the Reliance Group Defendants' concerns about Madoff, especially in light of his overall evasiveness and extreme nervousness with respect to escalating redemptions.

131.    Lowe contrasted the overall tone of this meeting with the meeting in February 2007: "BM appears extremely nervous when compared to previous encounters and very

concerned by redemptions.  **This leads us to think that perhaps something is not right**.”  2008 note to file (emphasis added.)  Further, during the meeting, Madoff seemed to suggest to the Reliance Group Defendants and Echeverria he had a new and profitable strategy that he planned to employ in the new year for which he was seeking more investments.  Lowe remarked: “Clearly the sense of urgency to launch a new variation from someone who has run the same system for years is kind of odd.”

132.    Though explicitly acknowledging in the 2008 note to file that Madoff’s “answers remain still too vague for comfort,” the 2008 note to file consisted of late reminders of just a few of the many red flags the Reliance Group Defendants had consciously and deliberately ignored for many years.  The Reliance Group Defendants decided to seek to verify that “Defender stated assets and other [BLMIS] account stated assets = total held at BLMIS DTC account” by finding someone at DTC to confirm.  The 2008 note to file asserted that the incongruity between account stated assets and assets held at a DTC account, which did not exist, “is basically the only way to commit some kind of fraud.”  They also considered hiring a private detective as a possible means to “[i]dentify option counterparts that can confirm not only that they trade with Madoff but that they do it in the appropriate size given his AUM.  This will be extremely difficult as they are unlikely to reveal size.”

133.    However, these proposed steps and previously ignored insights regarding indicia of BLMIS’s fraud were too little, too late as on December 11, 2008, the flood of redemptions finally revealed what the Defendants had suspected, that the IA Business was nothing more than a Ponzi scheme.  The trades were false.  The options contracts were false.  The profits were false.

### DEFENDANTS WERE ON NOTICE OF RED FLAGS CONCERNING MADOFF'S STRATEGY, PERFORMANCE, AND OPERATIONAL INFRASTRUCTURE

134. Numerous indicia of fraud concerning BLMIS gave Defendants actual and/or constructive knowledge of BLMIS's fraud. These indicia of fraud, and Defendants' willful and deliberate decision to continue investing with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent. Given the Defendants' actual or constructive knowledge of these indicia of fraud, the Defendants were neither innocent nor good faith investors.

135. Defendants knew or should have known that BLMIS's IA Business was predicated on potential fraud, and that LIF-USEP and Landmark's purported account activity was inconsistent with legitimate trading activity.

136. Defendants were operated by sophisticated experienced investment professionals who, upon information and belief, accepted money from their customers based on purported assets under management and/or fund performance in consideration for the due diligence they were expected to exercise in selecting and monitoring investment managers such as Madoff.

**A.    There Were Not Enough Options for Madoff to Implement the SSC Strategy**

137. An essential element of the SSC Strategy was the purchase and sale of S&P 100 Index ("S&P 100") options to hedge the investment of S&P 100 Index stocks. Madoff told customers that he purchased these options on the Chicago Board of Exchange ("CBOE"). However, even using conservative estimates of BLMIS's assets under management ("AUM"), there were not enough options on the CBOE to hedge a fund the size of BLMIS's IA Business. On many occasions (including the majority of 2008), BLMIS would have had to trade more options than were traded on the entire CBOE index to hedge the accounts of either LIF-USEP or Landmark *alone*. Indeed, the option volumes traded by BLMIS on behalf of LIF-USEP would

have exceeded the total options available on the CBOE approximately 61% of the time.
Similarly, the option volumes traded by BLMIS on behalf of Landmark would have exceeded the
total options available on the CBOE approximately 54% of the time.

138.    For example, on November 14, 2008, with a settlement date of November 19,
2008, BLMIS purportedly bought a total of 8,824 S&P 100 put options for the LIF-USEP
account and 2,404 S&P 100 put options for the Landmark account (with December expiration
and a strike price of 420).  The total volume traded on the CBOE for all such contracts that day
was 132.  Similarly, BLMIS purportedly sold a total of 8,824 S&P 100 call options for the LIF-
USEP account and 2,404 S&P 100 call options for the Landmark account (with December
expiration and a strike price of 430).  The total volume traded on the CBOE for all such contracts
that day was 255.  In each of these instances, Defendants knew or should have known that the
option trading volumes reported by BLMIS were impossible if exchange-traded.

139.    Graphical displays of the options needed to hedge *just* LIF-USEP and Landmark's
BLMIS investments are illuminating.  The below charts depict the volume of S&P 100 put
options BLMIS purported to trade on behalf of LIF-USEP and Landmark as compared to the
entire CBOE volume.

140.    As shown below in charts 1(a) and 1(b), the volume of S&P 100 put options
BLMIS purported to trade on behalf of LIF-USEP and Landmark (the red bars) completely
dwarfs the volume of S&P 100 put options traded on the entire CBOE (the black bars).

**CHART 1(a)**

LIF-USEP, 1FR123 – Historic Option Activity compared to CBOE 2007-2008 (Puts Only)



Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**CHART 1(b)**

Landmark, 1FR133 – Historic Option Activity compared to CBOE 2007-2008 (Puts Only)



Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

141.    Charts 2(a) and 2(b) below depict the volume of S&P 100 call options BLMIS purportedly traded on behalf of LIF-USEP and Landmark (the blue bars) as compared to the *entire* CBOE exchange volume (the black bars).

**CHART 2(a)**

LIF-USEP, 1FR123 – Historic Option Activity compared to CBOE 2007-2008 (Calls Only)



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

46

Case 1:11-cv-04213-CM    Document 3-3    Filed 06/24/11    Page 94 of 105

**CHART 2(b)**

Landmark, 1FR133 – Historic Option Activity compared to CBOE 2007-2008 (Calls Only)



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

142.    The Defendants did not perform independent, meaningful, or reasonable due diligence or make further inquiry regarding the impossible options volume BLMIS purported to trade.

**B.    The Defendants Entered into Hundreds of Millions in Options Contracts with Unknown Counterparties**

143.    When Madoff purportedly first began trading options pursuant to the purported SSC Strategy, he claimed he traded the options contracts on the CBOE.  When confronted by customers questioning whether the volume of his options trading activity was too large for the CBOE, Madoff shifted his story and claimed he had moved to OTC trades.  These claims should have raised great suspicion, requiring independent, meaningful, or reasonable due diligence by the Defendants.

144.    Trading OTC options would have required BLMIS to enter into private contracts with willing counterparties.  BLMIS purportedly entered into those options contracts as an agent on behalf of BLMIS's IA Business customers, such as LIF-USEP and Landmark.  Had those theoretical counterparties defaulted on those contracts, BLMIS's IA Business customers, including LIF-USEP and Landmark, would have been exposed to substantial losses.  If a counterparty failed to perform, it was LIF-USEP and Landmark, and not BLMIS, who would suffer the loss.

145.    Madoff refused to identify the counterparties, claiming he had to prevent his customers from dealing directly with the counterparties, and that the names of parties were "proprietary."  Upon information and belief, the Defendants never inquired of Madoff as to why *past* counterparties needed to be concealed to protect operations or execution of the SSC Strategy.

146.    The Defendants never reviewed, commented, modified, negotiated, or rejected any form of draft or final counterparty agreement or OTC transaction confirmation.  Indeed, the Defendants never knew the identities of these options counterparties due to Madoff's refusal to identify counterparties that did not exist.

147.    The Defendants, who were sophisticated, financially savvy professionals, recognized that LIF-USEP and Landmark had hundreds of millions of dollars in counterparty exposure, yet they had no idea whether their counterparties were reliable, well capitalized and liquid, or whom they would pursue in the event of a default.  Over time, the Defendants became increasingly concerned about their lack of knowledge and recognized Madoff's secrecy about his counterparties as a potential badge of fraud.

148.    As described above in paragraphs 118-120, during their first meeting with Madoff in February 2007, the Reliance Group Defendants specifically asked Madoff about the identities of his counterparties but received a vague and nonsensical response.  As highlighted in the 2007 note to file with respect to that meeting, the Reliance Group Defendants left the meeting believing that "OTC options are key piece of the puzzle and important to gain comfort with the counterparts."  Yet, the Reliance Group Defendants never obtained this "key" information.  After the collapse of Lehman Brothers, in September 2008, the Reliance Group Defendants desperately sought "more clarity . . . on [M]adoff counterparties."  (*Supra* ¶¶ 127-128.)  Indeed, in an instant messenger conversation with one of the principals of the Reliance Group Defendants, on or about September 29, 2008, the Senior Analyst expressed his concerns about Madoff's undisclosed counterparties and explicitly raised the specter that Madoff might be a fraud.  (*Supra* ¶ 128.)

**C.      The Options Trade Confirmations Contained Other Significant Abnormalities**

149.     Upon information and belief, the options trade confirmations for LIF-USEP and
Landmark contained other significant abnormalities that should have prompted the Defendants to
inquire further about the legitimacy of these transactions.   First, in the OTC market the
counterparty may expressly be identified on the confirmation statement.   However, upon
information and belief, the options trade confirmations received by the Defendants from BLMIS
never identified the counterparty.   Second, upon information and belief, the Defendants' trade
confirmations contained "CUSIP" (Committee on Uniform Security Identification Resources)
numbers, which are securities identification numbers that appear only on trade confirmations
pertaining to CBOE options.   Furthermore, the options that BLMIS purportedly traded expired
on the same date and had the same exercise pricing as the standardized CBOE options, and
therefore appear to be the identical options traded on the CBOE.   Additionally, the options
represented on the trade confirmations are a CBOE licensed product and should not trade in an
OTC environment.   Upon information and belief, the trade confirmations BLMIS sent to the
Defendants for review included information that supported that the options were purportedly
being traded on the CBOE.

**D.      Settlement Period Abnormalities**

150.     The Defendants also ignored that a high percentage of options transactions in their
BLMIS accounts settled in a time range outside of market practices.   It is common industry
practice for the purchase or sale of exchange-traded options to settle on the business day
following execution ("T +1").   However, trade confirmations produced by BLMIS, and upon
information and belief, sent to the Defendants, regularly showed options transactions that settled
more than one day after execution.   The frequency with which this occurred was staggering.
Upon information and belief, 80% of all of the purported options transactions for LIF-USEP, and

93% of all of Landmark's purported options transactions, settled more than one business day after execution and did not comply with standard market practices.

151.    Settlement anomalies in such high percentages were clear red flags that should have prompted sophisticated financial entities, such as the Defendants, to conduct further investigations, request verifications of the trades, and demand more transparency into BLMIS's operations.  Upon information and belief, the Defendants did not make any such independent, meaningful, or reasonable inquiry.

**E.    Madoff's Returns Were Suspiciously Consistent for Too Many Years**

152.    Madoff's SSC Strategy purported to invest in, and therefore correlate with, the S&P 100.  Yet the IA Business, LIF-USEP, and Landmark seemed impervious to market forces, remaining consistent and positive even in bad markets.

153.    Moreover, the Reliance Group Defendants had been aware that BLMIS earned extraordinarily consistent rates of return since at least 1999 based upon their investments in other BLMIS Feeder Funds.  The Reliance Group began investing in Kingate in approximately 1999 and also invested in Optimal starting in 2001.  Upon information and belief, the M&B Defendants were also privy to these funds' annual rate of return information through Optimal's investment with BLMIS and the M&B Defendants' connection to Echeverria.  Upon information and belief, the consistency of the IA Business's returns was one of the key motivating factors behind the decision of the UBS Defendants, the M&B Defendants, and the Reliance Defendants to form LIF-USEP, and the M&B Defendants' subsequent decision to create Landmark.

154.    The following chart depicts the annual rate of return on the IA Business accounts of Kingate, Optimal, LIF-USEP, and Landmark, based on information provided by BLMIS to each fund, as compared to the rate of return on the S&P 100.

**Kingate, Optimal, LIF-USEP, and Landmark v. S&P 100 Rate of Return Comparison**

| Year | Kingate Rate of Return | Optimal Rate of Return | LIF-USEP Rate of Return | Landmark Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|---|---|
| 1997 | 17.2% | 15.7% | | | 27.8% |
| 1998 | 16.6% | 16.7% | | | 31.3% |
| 1999 | 18.2% | 18.3% | | | 31.3% |
| 2000 | 14.6% | 14.4% | | | -13.4% |
| 2001 | 13.7% | 13.6% | | | -14.9% |
| 2002 | 12.2% | 12.2% | | | -23.9% |
| 2003 | 10.8% | 10.8% | | | 23.8% |
| 2004 | 10.0% | 9.9% | | | 4.5% |
| 2005 | 10.5% | 10.4% | 4.3%[3] | | -0.9% |
| 2006 | 13.2% | 13.4% | 12.4% | | 15.9% |
| 2007 | 10.9% | 11.0% | 11.2% | 2.2%[4] | 3.8% |
| 2008[5] | 9.4% | 9.2% | 9.3% | 9.2% | -36.9% |

As illustrated by the chart above, Madoff had maintained consistent—and seemingly impossible—positive returns throughout the course of events that devastated the S&P 100. For example, through the burst of the "dotcom bubble" in 2000, the September 11, 2001 terrorist attacks, and the recession and housing crisis of 2008, the SSC Strategy purported to produce positive returns, outperforming the S&P 100 by 27 to 46 percent in each instance where the S&P suffered double-digit losses. In 2008, when the S&P 100 index was down nearly 40%, LIF-USEP and Landmark showed annual positive returns of 9.3% and 9.2%, respectively.

155.   During its life from September 2005 to November 2008 (more than 35 months), LIF-USEP only experienced 1 negative month, while the S&P 100 had 16 months of negative returns. During its life from October 2007 to November 2008 (more than 12 months), Landmark

---

[3]     Since LIF-USEP began investing with BLMIS in September 2005, this data point only represents returns calculated from September 2005 through December 2005.
[4]     Since Landmark began investing with BLMIS in October 2007, this data point only represents returns calculated from October 2007 through December 2007.
[5]     All 2008 data points are calculated through November 2008.

experienced no negative months, while the S&P 100 had 9 months of negative returns. These performance results should have raised a red flag to the Defendants that Madoff's SSC Strategy was not what it purported to be.

156.    The Defendants knowingly turned a blind eye to the fact that the SSC Strategy, dependent in large part on the performance of stocks in the S&P 100, continued to yield positive returns without any correlation to the S&P 100.

## F.    Madoff Demonstrated Purported Trades Inconsistent with the SSC Strategy

157.    Upon information and belief, on a number of occasions, account statements purported to show gains on behalf of LIF-USEP and Landmark resulting from transactions inconsistent with the SSC Strategy. Certain of these transactions involved short term option trading that resulted in substantial gains for LIF-USEP and Landmark. For example, in 2008, LIF-USEP and Landmark each participated in two of these trades, which generated gains of approximately $5.9 million and $1.2 million, respectively. These transactions represented approximately 11% of the total return for LIF-USEP in 2008, and approximately 12% of the total return for Landmark in 2008. These gains were purportedly achieved through speculation in the options market, which would contradict the premise of the SSC Strategy. Between 2005 and 2008, LIF-USEP and Landmark benefitted in excess of $7 million from such trades.

158.    Another example of transactions that were not consistent with the SSC Strategy were instances when Madoff purported to sell a specific stock or stocks from a basket before the rest of the basket was liquidated. Not only was the premature sale of stock inconsistent with the SSC Strategy, but the liquidation of these positions should have caused Madoff to adjust the options collar for the basket, which he did not.

159.    Both of these trading activities contradicted Madoff's SSC Strategy and should have raised a red flag for the Defendants. The Defendants should have identified and

investigated these trading inconsistencies.  Instead, these departures from the SSC strategy were ignored.

### G.    LIF-USEP and Landmark Had a Negative Cash Balance with BLMIS

160.    Upon information and belief, LIF-USEP's cash account with BLMIS had a negative value on at least 15 separate occasions.  Similarly, upon information and belief, Landmark's cash account with BLMIS had a negative value on at least 4 separate occasions.  In these instances, purported transactions occurred in LIF-USEP's and Landmark's accounts even when the cash necessary to execute those transactions was not available.  Certain of these negative balance instances resulted from either the purchase of equities that exceeded the value of Treasurys sold to fund the purchase, the put options being purchased prior to selling the call options they were meant to fund, which was in contrast to Madoff's purported SSC Strategy, or the withdrawal of cash prior to the sale of equities to fund the redemption.  For example, in July 2006, over a seven-day period, LIF-USEP had an average negative balance of more than $9 million.  Notably, upon information and belief, the UBS Defendants highlighted this occurrence as a leverage situation for the LIF-USEP account.  Despite their recognition of this red flag, the UBS Defendants willfully turned a blind eye and continued funneling additional investments into BLMIS.

161.    Similarly, in November 2008, over a seven-day period, Landmark had an average negative balance of more than $10 million.

162.    Madoff never charged LIF-USEP or Landmark interest for this extension of credit.  Neither LIF-USEP nor Landmark had a margin account with Madoff and could not have traded on credit.  The Defendants never independently, meaningfully, or reasonably questioned this atypical practice.

**H.      Trades Were Executed Outside of the Daily Price Range**

163.    Upon information and belief, on at least 3 occasions, BLMIS sent trade confirmations for LIF-USEP's account showing stock trades that could not have occurred, because they took place outside of the range of stock prices on the day of the purported trades. For example, BLMIS's records for LIF-USEP's account reflect that 46,659 shares of Merck (MRK) were sold for $44.61 with a trade date of December 22, 2006 and settlement date of December 28, 2006.   The price range for Merck stock actually bought and sold in the marketplace on December 22, 2006 was between $42.78 and $43.42.

164.    BLMIS was reporting trades at prices that were not possible.   However, the Defendants ignored this indicia of fraudulent trading activity.

**I.      Madoff's Ability to Buy Low and Sell High**

165.    Upon information and belief, BLMIS's trades almost always appeared to occur at precisely the right time of day.  An analysis of LIF-USEP's and Landmark's trade data reveals that for approximately 81% and approximately 72%, respectively, of trades where BLMIS was purportedly purchasing shares for LIF-USEP and Landmark, the purported purchase price was below the daily midpoint price, and in the lower half of the daily price range.  A similar analysis reveals that, when purportedly selling shares for LIF-USEP and Landmark, approximately 70% and approximately 66%, respectively, of Madoff's trades were above the daily midpoint price and in the upper half of the daily price range.  It was a huge indicia of fraud for Madoff to achieve such percentages for such an extended period of time.  The improbability of Madoff buying low and selling high for all of BLMIS's IA Business customers just once a day was by itself suspicious.  Even more so, if Madoff were executing the SSC Strategy by engaging in "time slicing" within a given day, as he claimed, meaning he would have purportedly made

multiple purchases and sales throughout the day, such a practice would have resulted in BLMIS's trades being closer to the daily midpoint price.

166.    Madoff's degree of success was even more improbable given the enormous volumes BLMIS appeared to trade.  Any request to sell such a large volume of stock would have driven the price down, making it impossible for Madoff to so frequently sell above the daily midpoint.

167.    Upon information and belief, the Defendants did not perform independent, meaningful, or reasonable due diligence into how Madoff was able to deliver such consistently improbable market timing success within the days he was trading for the entirety of the IA Business, or over the life of LIF-USEP and Landmark.  To the extent any of the Defendants did perform such due diligence, they deliberately ignored the resulting indicia of fraud and continued investing with BLMIS and collecting millions in fees.

**J.    Madoff Provided Paper Trade Confirmations**

168.    Despite Madoff's reputation as a pioneer of electronic record-keeping in the market-making business, as a standard practice, Madoff did not send electronic trade confirmations to clients of BLMIS's IA Business.  The Defendants knew that Madoff provided only paper print-outs of trade confirmations for the IA Business which he sent via standard mail. Instead of receiving contemporaneous online access to their trade information, BLMIS's IA Business customers, including LIF-USEP and Landmark, had to wait several days for their paper trade confirmations to arrive by mail.

169.    An Operating Memorandum for LIF-USEP dated January 1, 2007, prepared by UBS SA, specifies that LIF-USEP's investment advisor, Reliance Gibraltar, would provide UBS SA "with a backdated monthly investment recommendation."  This backdating procedure was

made necessary and put in place as a result of the delayed, hard copy-only way in which BLMIS reported its purported trades.

170.    Rather than performing independent, meaningful, or reasonable inquiry into this red flag, the Defendants blindly accepted it and accommodated their practices to work around it.

### K.    Despite Exorbitant Trading Volumes There Was Never Any Impact on the Market

171.    Madoff told customers such as LIF-USEP and Landmark that the SSC Strategy involved moving all assets into the market over the span of a few days, and then selling off all of those securities over the same span of time.  Upon information and belief, prior to registering as an investment adviser, BLMIS Feeder Funds such as LIF-USEP and Landmark understood Madoff to have billions under his management.  When he registered as an investment adviser in 2006, Madoff represented in BLMIS's ADV Form filed with the SEC that BLMIS had approximately $11.7 billion of assets under management at the end of July 2006.  Later filings stated that BLMIS was managing $13.2 billion at the end of 2006, and $17.1 billion at the end of 2007.  Defendants, therefore, knew or should have known that BLMIS was purporting to move well over $11 billion into and out of the market over the course of a few days, a few times a year.

172.    Upon information and belief, Defendants did not ever conduct independent, meaningful, or reasonable due diligence as to how Madoff was able to perform such extraordinary trading volumes without any impact on the price of the securities he purportedly bought and sold, without any market footprint, and without anyone "on the Street" having knowledge or even a whisper of any such trading activity.

173.    When Madoff exited the market, he claimed to have placed BLMIS's IA Business customers' assets in U.S. Treasury bills or mutual funds holding Treasurys.  The movement of over $11 billion in and out of the market for Treasury bills should have affected the price of

Treasury bills.  This too never happened, and upon information and belief was not independently or reasonably investigated by Defendants.

## L.      BLMIS's Non-Reputable Auditor

174.    Upon information and belief, the Defendants knew or should have known that BLMIS's auditor was not legitimate and independent, nor reasonably capable of performing the required domestic and international auditing functions for BLMIS.  BLMIS, which purportedly had tens of billions of dollars under management, was audited not by one of the major audit firms, but by Friehling & Horowitz CPAs P.C. ("Friehling"), an accounting "firm" of three employees, including one active accountant, one (semi-retired) accountant living in Florida, and a secretary.  Friehling's offices were located in a strip mall in suburban Rockland County, New York.  Friehling's size and qualifications and the nature of the services they provided were readily accessible to the Defendants.  The Defendants had only to call Friehling's office or review the Dun & Bradstreet report on the firm.

175.    Such reasonable investigation is exactly what Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, did when it had Friehling's office physically inspected.  Aksia discovered a simple office with what appeared to be a few chairs, a reception desk, one office, and a conference table.  Furthermore, individuals that occupied office space adjacent to Friehling's told Aksia's investigator that the office did not have regular hours.  Having determined that it was hardly a facility from which one would expect the auditor of a multi-billion dollar fund to operate, Aksia advised its clients against investing with BLMIS, Madoff, or any of his feeder funds.

176.    The Defendants were on inquiry notice of this red flag, thereby triggering the need for reasonable due diligence into the legitimacy of BLMIS's relationship with Friehling.  On several occasions, the Reliance Group Defendants' Senior Analyst, for example, raised with

his superiors his suspicions that Friehling "looks so sketchy to me: why would they use an unheard of accountant in New City, New York (up near where [. . .] lives)?"  Nevertheless, the Reliance Group Defendants failed to perform any independent, meaningful, or reasonable investigation of Friehling.

177.    Upon information and belief, the Defendants did not look into Friehling's registration status with the American Institute of Certified Public Accountants ("AICPA").  Had they done so, the Defendants would have known that he was not qualified to perform audits at all.  Investigation would have revealed that Friehling had not been peer reviewed, as required, since 1993 because he had notified AICPA that he no longer performed audits.  No experienced investment professional could have reasonably believed that a firm with one accountant, particularly a firm that did not conduct audits, could have competently and independently audited an entity the size of BLMIS.

## M.    BLMIS's Unusual Fee Structure

178.    The Defendants were on inquiry notice that the fee structure between BLMIS and the BLMIS Feeder Funds was highly atypical of the hedge fund industry and was a red flag that fraud was a possibility.  BLMIS did not charge investors any traditional management or performance fees, fees that were standard in the hedge fund industry.  Madoff was purportedly satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $.04 per equity share traded.  The standard investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of any profits earned by the investment.  Fees normally run higher for investment advisers with a history of success.  Compared with industry practice, this fee structure had Madoff leaving hundreds of millions, if not billions, of dollars on the table.  Instead, BLMIS allowed investment funds investing through BLMIS to collect those lucrative fees themselves from their own

investors, as well as, the managers and advisers of BLMIS Feeder Funds, such as UBS SA, the M&B Defendants, and the Reliance Group Defendants.

179.   Other industry professionals realized that BLMIS's highly unusual fee structure was a serious red flag for fraud.  For example, the London due diligence firm Albourne Partners ("Albourne") recognized that by not charging management or performance fees for its services, BLMIS forfeited millions of dollars in fees each year.  Identifying this as a red flag of possible fraud, Albourne urged its clients to avoid BLMIS and BLMIS Feeder Funds.  The Defendants, however, having already invested millions of dollars of their clients' funds in BLMIS Feeder Funds, ignored this evidence of the possibility of fraud.

## N.   No Segregation of Assets

180.   Upon information and belief, the Defendants knew or should have known that accounts at BLMIS were not segregated, and therefore not subject to independent verification. Adequate segregation allows independent checks and balances throughout the trading cycle, the movement of cash, and the custody process, and is a fundamental area of inquiry for those performing independent and reasonable due diligence on investment managers.   Upon information and belief, the Defendants failed to perform independent, meaningful, or reasonable due diligence into the practices surrounding the segregation of assets.

## O.   Lack of Independent Verification of Assets

181.   The Defendants knew that BLMIS functioned not only as the *de facto* investment adviser and/or manager to LIF-USEP and Landmark, but also as the funds' prime broker and custodian.  This arrangement, unusual within the hedge fund industry, eliminated a key check and balance in investment management by excluding an independent custodian of securities from the process.  Without an independent party to verify the existence of assets and execution of purported securities trades, Madoff could carry out his massive fraud without detection.

182.    This clear conflict of interest was, on its face, a red flag of potential fraud that was identified by numerous industry professionals who performed basic due diligence on BLMIS. The Defendants, however, accepted this arrangement without hesitation and turned a blind eye to the possibility of fraud.

**P.    Madoff's Insistence on Secrecy: Lack of Transparency; Non-Disclosure of Madoff's Name in Offering Material**

183.    Madoff avoided questions about his IA Business operations, was consistently vague in responding to any such questions, and operated with no transparency.  The Defendants were aware of this lack of transparency and that principal employees at BLMIS provided elusive, nonsensical answers to questions about Madoff's trading.

184.    The Defendants further acquiesced to Madoff's insistence that his name not appear in any official marketing or offering document relating to the feeder funds that invested with BLMIS.

185.    The Defendants never questioned Madoff's explanation that he desired anonymity so that his day would not be spent talking to investors.  Instead, the Defendants blindly abided by his rules.  UBS SA, for example, omitted Madoff from all of LIF-USEP's offering documents – such as prospectuses and marketing materials.  UBS SA also strove to remove all Madoff-related references from their audit reports, which Ernst & Young prepared.  Thus, UBS SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship with BLMIS.

186.    The Reliance Group Defendants similarly omitted Madoff from their marketing materials to existing and potential clients.  For example, a January 2008 draft version of the Reliance Group Defendants' Due Diligence Questionnaire for LIF-USEP did not even mention that the sub-fund's assets had been entrusted to a sub-custodian (BLMIS).  Rather, the document misleadingly stated that UBS SA was the prime broker and custodian of LIF-USEP's assets.

187.    By complying with Madoff's demand for secrecy, the Defendants not only consciously ignored indicia of fraud, but also effectively assisted Madoff in concealing the size and scope of his ever-burgeoning fraud.

## THE TRANSFERS

188.    According to BLMIS's records, Defendants LIF-USEP and Landmark maintained accounts (Nos. 1FR123 and 1FR133, respectively) with BLMIS, set forth on Exhibit A (collectively, the "Accounts").  Upon information and belief, for their respective accounts, LIF-USEP and Landmark each executed, or caused to be executed, a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and delivered such documents to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

189.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and LIF-USEP and Landmark sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the purported conducting of trading activities.

190.    Prior to the Filing Date, BLMIS transferred at least $502,321,919 million to LIF-USEP in the form of withdrawals from LIF-USEP's BLMIS Account (the "LIF-USEP Initial Transfers"), as set forth in Exhibits A and B.  The LIF-USEP Initial Transfers constituted the return of principal.

191.    Prior to the Filing Date, BLMIS transferred at least $52,415,207 million to Landmark in the form of withdrawals from Landmark's BLMIS Account (the "Landmark Initial

Transfers" and, together with the LIF-USEP Initial Transfers, the "Initial Transfers"), as set forth in Exhibits A and C. The Landmark Initial Transfers constituted the return of principal.

192.    The accountholder Defendants listed on Exhibit A were initial transferees of the avoidable transfers set forth above.

193.    The Initial Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) and 213(8) (McKinney 2001) and New York Debtor and Creditor Law ("DCL") sections 273-279 (McKinney 2001).

194.    During the six years prior to the Filing Date, BLMIS made transfers to LIF-USEP in the collective amount of approximately $502,321,919 million, all of which constituted a return of principal (the "LIF-USEP Six Year Initial Transfers"). See Exhibit B, column 11.

195.    The LIF-USEP Six Year Initial Transfers are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279.

196.    During the two years prior to the Filing Date, BLMIS made transfers to LIF-USEP in the collective amount of approximately $501,663,029 million, all of which constituted a return of principal (the "LIF-USEP Two Year Initial Transfers"). See Exhibit B, column 10.

197.    During the two years prior to the Filing Date, BLMIS made transfers to Landmark in the collective amount of approximately $52,415,207 million, all of which constituted the return of principal (the "Landmark Two Year Initial Transfers" and, together with the LIF-USEP Two Year Initial Transfers, the "Two Year Initial Transfers"). See Exhibit C, column 10.

198.    The Two Year Initial Transfers are avoidable and recoverable under sections 548(a)(1), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly section 78fff-2(c)(3) and applicable provisions of DCL sections 273-279.

199.    During the 90 days prior to the Filing Date, BLMIS made payments or other transfers to LIF-USEP in the collective amount of $195,404,478 (the "LIF-USEP Preference Period Initial Transfers").  *See* Exhibit B, column 9.

200.    During the 90 days prior to the Filing Date, BLMIS made payments or other transfers to Landmark in the collective amount of $27,582,455 (the "Landmark Preference Period Initial Transfers" and, together with the LIF-USEP Preference Period Initial Transfers, the "Preference Period Initial Transfers").  *See* Exhibit C, column 9.

201.    The Preference Period Initial Transfers are avoidable and recoverable under sections 547, 550(a)(1), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

202.    Upon information and belief, LIF, the UBS Defendants, the M&B Defendants, and the Reliance Group Defendants (the "LIF-USEP Subsequent Transferee Defendants") received subsequent transfers of the LIF-USEP avoidable transfers referenced above (the "LIF-USEP Subsequent Transfers").   Upon information and belief, the M&B Defendants (the "Landmark Subsequent Transferee Defendants") received subsequent transfers of the Landmark avoidable transfers referenced above (the "Landmark Subsequent Transfers" and, together with the LIF-USEP Subsequent Transfers, the "Subsequent Transfers").

203.    The Subsequent Transfers, or the value thereof, are recoverable from the LIF-USEP Subsequent Transferee Defendants and the Landmark Subsequent Transferee Defendants

(together, the "Subsequent Transferee Defendants") pursuant to section 550(a) of the Bankruptcy Code.

204.    All the Defendants knew or should have known that the Initial Transfers made to LIF-USEP and Landmark, as well as the Subsequent Transfers made to the Subsequent Transferee Defendants, were made for a fraudulent purpose.

205.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

206.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Initial Transfers, Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## CUSTOMER CLAIMS

207.    On or about March 2, 2009, Defendant LIF filed a customer claim with the Trustee which the Trustee has designated as Claim No. 004417.  On or about March 3, 2009, LIF filed another customer claim with the Trustee which the Trustee has designated as Claim No. 006182.  In addition, on or about March 2, 2009, Defendant UBS SA filed a customer claim, on behalf of LIF-USEP with the Trustee which the Trustee has designated as Claim No. 004536. These three customer claims are referred to herein as the "Customer Claims."

208.    The Trustee has not yet determined the Customer Claims.

209.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12).  The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's

determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

**COUNT ONE**
**PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) –**
**11 U.S.C. §§ 547(b), 550(a), AND 551**

***Against LIF-USEP***

210.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

211.    At the time of each of the LIF-USEP Preference Period Initial Transfers, LIF-USEP was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

212.    Each of the LIF-USEP Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

213.    Each of the LIF-USEP Preference Period Initial Transfers was to or for the benefit of LIF-USEP.

214.    Each of the LIF-USEP Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS to LIF-USEP before such transfer was made.

215.    Each of the LIF-USEP Preference Period Initial Transfers was made while BLMIS was insolvent.

216.    Each of the LIF-USEP Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

217.    Each of the LIF-USEP Preference Period Initial Transfers enabled LIF-USEP to receive more than it would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy

Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

218.     Each of the LIF-USEP Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from LIF-USEP as an initial transferee or the entity for whose benefit such transfers were made pursuant to section 550(a) of the Bankruptcy Code.

219.     As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:   (a) avoiding and preserving the LIF-USEP Preference Period Initial Transfers; (b) directing that the LIF-USEP Preference Period Initial Transfers be set aside; and (c) recovering the LIF-USEP Preference Period Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

**COUNT TWO**
**PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) –**
**11 U.S.C. §§ 547(b), 550(a), AND 551**

***Against the LIF-USEP Subsequent Transferee Defendants***

220.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

221.     Each of the LIF-USEP Preference Period Initial Transfers is avoidable under section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of the LIF-USEP Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

222.     Upon information and belief, the LIF-USEP Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the LIF-USEP Preference Period

Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "LIF-USEP Preference Period Subsequent Transfers").

223.    Each of the LIF-USEP Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the LIF-USEP Subsequent Transferee Defendants.

224.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the LIF-USEP Preference Period Subsequent Transfers, or the value thereof, from the LIF-USEP Subsequent Transferee Defendants for the benefit of the estate of BLMIS.

### COUNT THREE
### PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) –
### 11 U.S.C. §§ 547(b), 550(a), AND 551

#### *Against Landmark*

225.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

226.    At the time of each of the Landmark Preference Period Initial Transfers, Landmark was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

227.    Each of the Landmark Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

228.    Each of the Landmark Preference Period Initial Transfers was to or for the benefit of Landmark.

229.    Each of the Landmark Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS to Landmark before such transfer was made.

230.    Each of the Landmark Preference Period Initial Transfers was made while BLMIS was insolvent.

231.    Each of the Landmark Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

232.    Each of the Landmark Preference Period Initial Transfers enabled Landmark to receive more than it would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

233.    Each of the Landmark Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from Landmark as an initial transferee or the entity for whose benefit such transfers were made pursuant to section 550(a) of the Bankruptcy Code.

234.    As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Preference Period Initial Transfers; (b) directing that the Landmark Preference Period Initial Transfers be set aside; and (c) recovering the Landmark Preference Period Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT FOUR
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE) – 11 U.S.C. §§ 547(b), 550(a), AND 551

### *Against Landmark Subsequent Transferee Defendants*

235.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

236.    Each of the Landmark Preference Period Initial Transfers is avoidable under section 78fff-2(c)(3) of SIPA and section 547(b) of the Bankruptcy Code.  Furthermore, each of the Landmark Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

237.    Upon information and belief, the Landmark Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the Landmark Preference Period Initial Transfers pursuant to section 550(a) of the Bankruptcy Code (the "Landmark Preference Period Subsequent Transfers").

238.    Each of the Landmark Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the Landmark Subsequent Transferee Defendants.

239.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Landmark Preference Period Subsequent Transfers, or the value thereof, from the Landmark Subsequent Transferee Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –
## 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### *Against LIF-USEP*

240.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

241.    Each of the LIF-USEP Two Year Initial Transfers was made on or within two years before the Filing Date.

242. Each of the LIF-USEP Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

243. Each of the LIF-USEP Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the LIF-USEP Two Year Initial Transfers to or for the benefit of LIF-USEP in furtherance of a fraudulent investment scheme.

244. Each of the LIF-USEP Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from LIF-USEP pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

245. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

### COUNT SIX
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –
### 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

#### *Against LIF-USEP*

246. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

247. Each of the LIF-USEP Two Year Initial Transfers was made on or within two years before the Filing Date.

248.    Each of the LIF-USEP Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

249.    BLMIS received less than a reasonably equivalent value in exchange for each of the LIF-USEP Two Year Initial Transfers.

250.    At the time of each of the LIF-USEP Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the LIF-USEP Two Year Initial Transfers.

251.    At the time of each of the LIF-USEP Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

252.    At the time of each of the LIF-USEP Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

253.    Each of the LIF-USEP Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from LIF-USEP pursuant to section 550(a) and SIPA § 78fff-(2)(c)(3).

254.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against LIF-USEP*

255.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

256.    At all times relevant to the LIF-USEP Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

257.    Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

258.    Each of the LIF-USEP Six Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the LIF-USEP Six Year Initial Transfers to or for the benefit of LIF-USEP in furtherance of a fraudulent investment scheme.

259.    Each of the LIF-USEP Six Year Initial Transfers was received by LIF-USEP with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the LIF-USEP Six Year Initial Transfers, and/or future creditors of BLMIS.

260.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set

aside; (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from LIF-USEP.

**COUNT EIGHT**
**FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

***Against LIF-USEP***

261.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

262.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

263.    Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

264.    BLMIS did not receive fair consideration for the LIF-USEP Six Year Initial Transfers.

265.    BLMIS was insolvent at the time it made each of the LIF-USEP Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the LIF-USEP Six Year Initial Transfers.

266.    As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c)

recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

### COUNT NINE
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against LIF-USEP*

267.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

268.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

269.    Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

270.    BLMIS did not receive fair consideration for the LIF-USEP Six Year Initial Transfers.

271.    At the time BLMIS made each of the LIF-USEP Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the LIF-USEP Six Year Initial Transfers was an unreasonably small capital.

272.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c)

recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

### COUNT TEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against LIF-USEP*

273.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

274.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

275.    Each of the LIF-USEP Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

276.    BLMIS did not receive fair consideration for the LIF-USEP Six Year Initial Transfers.

277.    At the time BLMIS made each of the LIF-USEP Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

278.    As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c)

recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS.

## COUNT ELEVEN
## RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 273-279, AND 11 U.S.C. §§ 544, 548, 550(a), AND 551

### *Against the LIF-USEP Subsequent Transferee Defendants*

279.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

280.    Each of the LIF-USEP Initial Transfers are avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273-276, and SIPA § 78fff-2(c)(3).

281.    Upon information and belief, the LIF-USEP Subsequent Transferee Defendants received some or all of the LIF-USEP Subsequent Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

282.    Each of the LIF-USEP Subsequent Transfers was made directly or indirectly to, or for the benefit of, the LIF-USEP Subsequent Transferee Defendants.

283.    The LIF-USEP Subsequent Transferee Defendants are immediate or mediate transferees of the LIF-USEP Subsequent Transfers.

284.    Each of the LIF-USEP Subsequent Transfers was received by the LIF-USEP Subsequent Transferee Defendants with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the LIF-USEP Subsequent Transfers, and/or future creditors of BLMIS.

285.    As a result of the foregoing, pursuant to DCL sections 273-279, section 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the LIF-USEP Subsequent Transferee Defendants recovering the LIF-USEP

Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS.

**COUNT TWELVE**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –**
**11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551**

*Against Landmark*

286.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

287.     Each of the Landmark Two Year Initial Transfers was made on or within two years before the Filing Date.

288.     Each of the Landmark Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

289.     Each of the Landmark Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Landmark Two Year Initial Transfers to or for the benefit of Landmark in furtherance of a fraudulent investment scheme.

290.     Each of the Landmark Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Landmark pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

291.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year

Case 1:11-cv-04213-CM   Document 13   Filed 08/24/11   Page 86 of 105

Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT THIRTEEN
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) –
## 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### *Against Landmark*

292.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

293.    Each of the Landmark Two Year Initial Transfers was made on or within two years before the Filing Date.

294.    Each of the Landmark Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

295.    BLMIS received less than a reasonably equivalent value in exchange for each of the Landmark Two Year Initial Transfers.

296.    At the time of each of the Landmark Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of the Landmark Two Year Initial Transfers.

297.    At the time of each of the Landmark Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

298.    At the time of each of the Landmark Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

299.   Each of the Landmark Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Landmark pursuant to section 550(a) and SIPA § 78fff-(2)(c)(3).

300.   As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

### COUNT FOURTEEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against Landmark*

301.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

302.   At all times relevant to the Landmark Two Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

303.   Each of the Landmark Two Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

304.   Each of the Landmark Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Landmark Two Year Initial Transfers to or for the benefit of Landmark in furtherance of a fraudulent investment scheme.

305.    Each of the Landmark Two Year Initial Transfers was received by Landmark with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Landmark Two Year Initial Transfers, and/or future creditors of BLMIS.

306.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from Landmark.

### COUNT FIFTEEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against Landmark*

307.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

308.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

309.    Each of the Landmark Two Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

310.    BLMIS did not receive fair consideration for the Landmark Two Year Initial Transfers.

311.    BLMIS was insolvent at the time it made each of the Landmark Two Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Landmark Two Year Initial Transfers.

312.    As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT SIXTEEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against Landmark*

313.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

314.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

315.    Each of the Landmark Two Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

316.    BLMIS did not receive fair consideration for the Landmark Two Year Initial Transfers.

317.    At the time BLMIS made each of the Landmark Two Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Landmark Two Year Initial Transfers was an unreasonably small capital.

318.    As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT SEVENTEEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against Landmark*

319.    The Trustee repeats and realleges the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

320.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

321.    Each of the Landmark Two Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

322.    BLMIS did not receive fair consideration for the Landmark Two Year Initial Transfers.

323.    At the time BLMIS made each of the Landmark Two Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

324.    As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS.

## COUNT EIGHTEEN:
### RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 273-279, AND 11 U.S.C. §§ 544, 548, 550(a), AND 551

### *Against the Landmark Subsequent Transferee Defendants*

325.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

326.    Each of the Landmark Initial Transfers are avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273-276, and SIPA § 78fff-2(c)(3).

327.    Upon information and belief, the Landmark Subsequent Transferee Defendants received some or all of the Landmark Subsequent Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

328.    Each of the Landmark Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Landmark Subsequent Transferee Defendants.

329.    The Landmark Subsequent Transferee Defendants are immediate or mediate transferees of the Landmark Subsequent Transfers.

330.     The Landmark Subsequent Transferee Defendants received the Landmark Subsequent Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Landmark Subsequent Transfers, and/or future creditors of BLMIS.

331.     As a result of the foregoing, pursuant to DCL sections 273-279, section 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Landmark Subsequent Transferee Defendants recovering the Landmark Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS.

## COUNT NINETEEN
## DISALLOWANCE OF CUSTOMER CLAIMS

### Against LIF, LIF-USEP, and UBS SA

332.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

333.     LIF and UBS SA, on behalf of LIF-USEP, filed Customer Claims Nos. 004417, 006182, and 004536, which have not yet been determined.

334.     LIF-USEP is the recipient, as a direct transferee, of transfers of Customer Property.  The Trustee has commenced this adversary proceeding against LIF-USEP to avoid and recover the LIF-USEP Initial Transfers under sections 544(b), 547, 548, and 550 of the Bankruptcy Code, DCL sections 273-279, and applicable sections of SIPA, including section 78fff-2(c)(3), as set forth above, and LIF-USEP has not returned the LIF-USEP Initial Transfers to the Trustee.

335.     LIF and UBS SA, who filed the Customer Claims, are the recipients of transfers of BLMIS's property which are avoidable and recoverable under sections 544, 547, 548, and/or

550(a) of the Bankruptcy Code, DCL sections 273-279, and SIPA section 78fff-2(c)(3), as set forth above, and LIF and UBS SA have not returned the transfers to the Trustee.

336.    As a result of the foregoing, pursuant to section 502(d) of the Bankruptcy Code, LIF and UBS SA's Customer Claims must be disallowed.

337.    The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee intends to resolve LIF and UBS SA's Customer Claims and any related objections through the mechanisms contemplated by the Claims Procedures Order.

**COUNT TWENTY**
**EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS**

*Against LIF, LIF-USEP, and UBS SA*

338.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

339.    LIF, LIF-USEP, and UBS SA engaged in inequitable conduct, including behavior described in this Complaint, that has resulted in injury to the customers and creditors of the estate and has conferred an unfair advantage on LIF, LIF-USEP, and UBS SA.

340.    Based on LIF, LIF-USEP, and UBS SA's inequitable conduct as described above, the customers of BLMIS have been misled as to the true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them because of the conduct of LIF, LIF-USEP, and UBS SA.

341.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by LIF and UBS SA directly or indirectly against the estate – and only to the extent such claims are

allowed – are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

342.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT TWENTY-ONE
## UNJUST ENRICHMENT

### *Against the UBS Defendants*

343.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

344.    The UBS Defendants have been unjustly enriched.  The UBS Defendants have wrongfully and unconscionably benefited from the receipt of money from BLMIS and LIF-USEP, for which UBS did not in good faith provide fair value.  Rather, the UBS Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

345.    The UBS Defendants benefited greatly from their exploitation of Madoff's returns.  The UBS Defendants received millions in fees for purportedly serving LIF-USEP in various capacities.  The UBS Defendants acted as a mere façade for LIF-USEP, and did so despite having done their own due diligence on Madoff that resulted in their refusal to recommend or market the very BLMIS Feeder Fund, LIF-USEP, from which they derived their substantial fees.

346.    The UBS Defendants chose to ignore compelling indicia of Madoff's fraud.  As a result, the UBS Defendants have pocketed millions that rightfully belong to BLMIS's customers.

The UBS Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

347.   Equity and good conscience require full restitution of the monies received by the UBS Defendants, directly and indirectly, from BLMIS.  This includes not only the money itself that the UBS Defendants received, but also the proceeds of that money.  Any profits earned with the money they received must be returned to the Trustee.

## COUNT TWENTY-TWO
## MONEY HAD AND RECEIVED

### Against the UBS Defendants

348.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

349.   The UBS Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the customer fund under the Trustee's control.  The UBS Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit, and/or mistake.

350.   In equity and good conscience, the UBS Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The UBS Defendants are obligated to return all such money to the Trustee.

## COUNT TWENTY-THREE
## UNJUST ENRICHMENT

### Against the M&B Defendants

351.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

352.   The M&B Defendants have been unjustly enriched.  The M&B Defendants have wrongfully and unconscionably benefited from the receipt of money from BLMIS and from LIF-

Case 1:11-cv-04213-CM    Document 13    Filed 08/24/11    Page 96 of 105

USEP and Landmark, for which they did not in good faith provide fair value. Rather, the M&B Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

353.    The M&B Defendants benefited greatly from their exploitation of Madoff's returns. The M&B Defendants received millions for purportedly serving LIF-USEP and Landmark in various capacities.

354.    The M&B Defendants were constantly faced with indicia of BLMIS's potential fraud. They knew the consistency of Madoff's returns were, statistically, too good to be true. (*Supra* ¶¶ 152-156.) They also knew Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible. (*Supra* ¶¶ 137-151.)

355.    The M&B Defendants chose to ignore compelling indicia of Madoff's fraud. As a result, the M&B Defendants have pocketed millions that rightfully belong to BLMIS's customers. The M&B Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

356.    Equity and good conscience require full restitution of the monies received by the M&B Defendants directly and indirectly, from BLMIS. This includes not only the money itself that the UBS Defendants received, but also the proceeds of that money. Any profits earned with the money they received must be returned to the Trustee.

Case 1:11-cv-04213-CM   Document 43   Filed 08/24/11   Page 99 of 105

## COUNT TWENTY-FOUR
## MONEY HAD AND RECEIVED

### *Against the M&B Defendants*

357.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

358.    The M&B Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the customer fund under the Trustee's control.  The M&B Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit, and/or mistake.

359.    In equity and good conscience, the M&B Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control.  The M&B Defendants are obligated to return all such money to the Trustee.

## COUNT TWENTY-FIVE
## UNJUST ENRICHMENT

### *Against the Reliance Group Defendants*

360.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

361.    The Reliance Group Defendants have been unjustly enriched.  The Reliance Group Defendants have wrongfully and unconscionably benefited from the receipt of money from BLMIS and LIF-USEP, for which they did not in good faith provide fair value.  Rather, the Reliance Group Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

362.    The Reliance Group Defendants benefited greatly from their exploitation of Madoff's returns.  The Reliance Group Defendants received millions for purportedly serving LIF-USEP in various capacities.

363.    The Reliance Group Defendants willfully turned a blind eye to many red flags, all the while continuing to market LIF-USEP, soliciting investments for Madoff.  The Reliance Group Defendants were constantly faced with indicia of BLMIS's potential fraud.  They knew the consistency of Madoff's returns were, statistically, too good to be true.  (*Supra* ¶¶ 152-156.) They also knew Madoff's purported trading structure was inconsistent with industry practices and produced trading volumes that were virtually impossible.  (*Supra* ¶¶ 137-151.)

364.    The Reliance Group Defendants chose to ignore compelling indicia of Madoff's fraud.  As a result, the Reliance Group Defendants have pocketed millions of dollars that rightfully belong to BLMIS's customers.  The Reliance Group Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

365.    Equity and good conscience require full restitution of the monies received by the Reliance Group Defendants, directly and indirectly, from BLMIS.  This includes not only the money itself that the Reliance Group Defendants received, but also the proceeds of that money. Any profits earned with the money they received must be returned to the Trustee.

## COUNT TWENTY-SIX
## MONEY HAD AND RECEIVED

### *Against the Reliance Group Defendants*

366.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

367.    The Reliance Group Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the

customer fund under the Trustee's control. The Reliance Group Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit, and/or mistake.

368. In equity and good conscience, the Reliance Group Defendants may not retain possession or control of this money, which rightfully belong to the customer fund under the Trustee's control. The Reliance Group Defendants are obligated to return all such money to the Trustee.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i. On the First Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Preference Period Initial Transfers; (b) directing that the LIF-USEP Preference Period Initial Transfers be set aside; and (c) recovering the LIF-USEP Preference Period Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

ii. On the Second Claim for Relief, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the LIF-USEP Preference Period Subsequent Transfers, or the value thereof, from the LIF-USEP Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

iii. On the Third Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Preference Period Initial Transfers; (b) directing that the Landmark Preference Period Initial Transfers be set aside; and (c) recovering

the Landmark Preference Period Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

      iv.      On the Fourth Claim for Relief, the Trustee is entitled to a judgment pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Landmark Preference Period Subsequent Transfers, or the value thereof, from the Landmark Subsequent Transferee Defendants for the benefit of the estate of BLMIS;

      v.      On the Fifth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

      vi.      On the Sixth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Two Year Initial Transfers; (b) directing that the LIF-USEP Two Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Two Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

      vii.      On the Seventh Claim for Relief, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from LIF-USEP;

viii.     On the Eighth Claim for Relief, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

ix.     On the Ninth Claim for Relief, pursuant to DCL sections, 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

x.     On the Tenth Claim for Relief, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP:  (a) avoiding and preserving the LIF-USEP Six Year Initial Transfers; (b) directing that the LIF-USEP Six Year Initial Transfers be set aside; and (c) recovering the LIF-USEP Six Year Initial Transfers, or the value thereof, from LIF-USEP for the benefit of the estate of BLMIS;

xi.     On the Eleventh Claim for Relief, pursuant to DCL sections 273-279, sections 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the LIF-USEP Subsequent Transferee Defendants recovering the LIF-USEP Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS;

xii.     On the Twelfth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xiii.     On the Thirteenth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xiv.     On the Fourteenth Claim for Relief, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from Landmark;

xv.     On the Fifteenth Claim for Relief, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark: (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xvi.     On the Sixteenth Claim for Relief, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xvii.     On the Seventeenth Claim for Relief, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Landmark:  (a) avoiding and preserving the Landmark Two Year Initial Transfers; (b) directing that the Landmark Two Year Initial Transfers be set aside; and (c) recovering the Landmark Two Year Initial Transfers, or the value thereof, from Landmark for the benefit of the estate of BLMIS;

xviii.     On the Eighteenth Claim for Relief, pursuant to DCL sections 273-279, sections 544, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Landmark Subsequent Transferee Defendants recovering the Landmark Subsequent Transfers, or the value thereof, and attorneys' fees for the benefit of the estate of BLMIS;

xix.     On the Nineteenth Claim for Relief, a judgment that the Customer Claims filed by LIF and UBS SA be disallowed pursuant to section 502(d) of the Bankruptcy Code;

xx.     On the Twentieth Claim for Relief, a judgment that the Customer Claims filed by LIF and UBS SA—only to the extent such claims are allowed—be equitably subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code;

xxi.    On the Twenty-First Claim for Relief, a judgment awarding full restitution of the monies received by the UBS Defendants, directly and indirectly, from BLMIS and any assets derived from that money;

xxii.    On the Twenty-Second Claim for Relief, a judgment against the UBS Defendants for compensatory damages in an amount to be determined at trial;

xxiii.    On the Twenty-Third Claim for Relief, a judgment awarding full restitution of the monies received by the M&B Defendants, directly and indirectly, from BLMIS and any assets derived from that money;

xxiv.    On the Twenty-Fourth Claim for Relief, a judgment against the M&B Defendants for compensatory damages in an amount to be determined at trial;

xxv.    On the Twenty-Fifth Claim for Relief, a judgment awarding full restitution of the monies received by the Reliance Group Defendants, directly and indirectly, from BLMIS and any assets derived from that money;

xxvi.    On the Twenty-Sixth Claim for Relief, a judgment against the Reliance Group Defendants for compensatory damages in an amount to be determined at trial;

xxvii.    On the Twenty-First through Twenty-Sixth Claims for Relief, compensatory and exemplary damages in an amount to be proven at trial;

xxviii.    On all Claims for Relief, pursuant to federal common law and N.Y. CPLR §§ 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Initial Transfers, Subsequent Transfers, and any additional transfers were received;

xxix.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

xxx.    Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

xxxi.   Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date:  December 7, 2010

BAKER & HOSTETLER LLP

BY:  /s/ Oren J. Warshavsky
        David J. Sheehan
        Email: dsheehan@bakerlaw.com
        Oren J. Warshavsky
        Email: owarshavsky@bakerlaw.com
        Keith R. Murphy
        Email: kmurphy@bakerlaw.com
        Jonathan B. New
        Email: jnew@bakerlaw.com
        Melissa L. Kosack
        Email: mkosack@bakerlaw.com
        Sammi Malek
        Email: smalek@bakerlaw.com

*Of Counsel*:

Mark A. Kornfeld
Email: mkornfeld@bakerlaw.com
Deborah H. Renner
Email: drenner@bakerlaw.com
Gonzalo S. Zeballos
Email: gzeballos@bakerlaw.com
Geraldine Ponto
Email: gponto@bakerlaw.com
Timothy Scott Pfeifer
Email: tpfeifer@bakerlaw.com
Marc F. Skapof
Email: mskapof@bakerlaw.com
Seanna R. Brown
Email: sbrown@bakerlaw.com
Marianna Shelenkova
Email: mshelenkova@bakerlaw.com

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

**<u>EXHIBIT D</u>**

Bernard L. Madoff Investment Securities LLC Liquidation Proceeding                                    http://www.madofftrustee.com/

08-01789-cgm   Doc 15733-10   Filed 04/11/17   Entered 04/11/17 15:09:37   Exhibit 8
Case 1:11-cv-04235-CM   Document 3-4   Filed 01/11/17   Page 2 of 4
Pg 221 of 223

## Bᴇʀɴᴀʀᴅ L. Mᴀᴅᴏғғ Iɴᴠᴇsᴛᴍᴇɴᴛ Sᴇᴄᴜʀɪᴛɪᴇs LLC Lɪqᴜɪᴅᴀᴛɪᴏɴ Pʀᴏᴄᴇᴇᴅɪɴɢ

Irving H. Picard, Trustee

Home

Claims & Recovery Status

Trustee Reports

News/Press Releases

Court Filings

Avoidance Actions

Hardship Program

FAQ

IRS Guidance

Contact Us

**Trustee Hotline**
888-727-8695

## Home

### Updates and Developments

- **TRUSTEE FOR LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES OPPOSES MOTION TO DISMISS COMPLAINT AGAINST STERLING EQUITIES**

- **THE HONORABLE THOMAS P. GRIESA'S DECISION DENYING ADELE FOX'S MOTION TO INTERVENE AND TO AMEND, MODIFY, OR RESCIND THE ORDER OF FORFEITURE OF FUNDS BY THE ESTATE OF JEFFRY PICOWER TO THE UNITED STATES.**

### News and Press Releases

**TRUSTEE FOR LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES OPPOSES MOTION TO DISMISS COMPLAINT AGAINST STERLING EQUITIES**

NEW YORK, NY – May 19, 2011 – Irving H. Picard, the Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), today filed his opposition brief in the United States Bankruptcy Court for the Southern District of New York against the motion by Sterling Equities ("Sterling"), its partners, their family members, and certain related trusts and entities (the "Sterling Defendants") seeking either the dismissal of the Trustee's complaint against them or summary judgment.

In the opposition brief, the Trustee describes two critical components of the fiduciary mandate which form the basis of his claims against the Sterling Defendants. The first is to locate and recover fictitious profits, or "other people's money," that the Sterling Defendants received from BLMIS and to redistribute those assets equitably to those who withdrew less than they deposited.

The second critical component of the Trustee's claims against the Sterling Defendants emanates from the bankruptcy law concept of good faith. A lack of good faith under the bankruptcy law does not require that the defendant actually did something illegal or knew that it was dealing with a Ponzi scheme. Instead, under bankruptcy law, a defendant did not act in good faith if what it knew about BLMIS gave it a reason to inquire further, but instead it turned a blind eye and continued to take money from an enterprise it should have known might be a fraud.

"Fred Wilpon, Saul Katz and the Sterling Partners are holding $300 million in fictitious profits consisting of 'other people's money,' stolen money that they received from Bernard Madoff. Yet they refuse to return this stolen money," said David J. Sheehan, counsel to the Trustee and a partner at Baker & Hostetler LLP, the court-appointed counsel for the Trustee.

"This case is one of many actions undertaken by the Trustee to fulfill his fiduciary obligation to return stolen money to the rightful owners, who are BLMIS customers and creditors with approved claims," said Mr. Sheehan. "As today's filing shows, the law and the facts verify the Trustee's allegations against the Sterling Defendants. There is no rationale – in law or in fact – that justifies their retention of stolen money."

The opposition brief submits evidence – including information and testimony presented for the first time – which substantiates the Trustee's allegations against the Sterling Defendants, including that they disregarded warnings from trusted advisors and their own suspicions that BLMIS might be a fraud, because they were "fixated on continuing to profit from their access to Madoff and his returns."

"The law does not permit 'bad faith' investors to retain money they received from an enterprise after indicia of possible fraud becomes apparent," said Fernando A. Bohorquez, Jr., counsel to the Trustee and a partner at Baker & Hostetler LLP. "Even if the Sterling Defendants did not specifically know that BLMIS was a Ponzi scheme, they cannot keep the hundreds of millions of dollars in principal transfers they received under circumstances indicating that they should have known of possible fraud at BLMIS."

The Sterling Defendants must return to the Trustee all of the money that they received from BLMIS if they were on notice of facts suggesting that BLMIS might be a fraud, but failed to conduct a diligent investigation. The Trustee's pre-complaint investigation yielded evidence that shows that the Sterling Defendants were aware that BLMIS might have been a fraud but failed to investigate, including:

· In 2001, the Sterling Partners explored purchasing "fraud insurance" for their BLMIS investments that

Case 1:12-cv-04233-CM    Document 3-4    Filed 06/21/11    Page 3 of 4

would cover a Ponzi scheme;

·   Sterling Partner David Katz's own testimony that by 2002, he was "screaming for diversification" of the Sterling Partners' investments away from Madoff because "we don't know what he does" and so created their own hedge fund, Sterling Stamos, to achieve "Madoff-like returns";

·   Testimony of one of the Sterling Partners that he had heard Madoff might be front-running, which he understood meant that Madoff might be taking "information and us[ing] it illegally . . . to his own benefit or to benefit his clients";

·   Testimony that the Sterling Partners were warned by their hedge fund business partners of the danger that their hundreds of millions of dollars at BLMIS could be frozen if there were an investigation into Madoff's operations.

**Sterling Stamos Documents and Testimony Show that the Sterling Partners Were Warned**

Of particular note, the opposition brief provides more detail from the testimony of Peter Stamos, the chief executive officer of Sterling Stamos, the hedge fund co-founded by Mr. Stamos and the Sterling Partners. After describing his high opinion of Madoff, Peter Stamos in the very next breath stated that Sterling Stamos's due diligence protocols would have "stopped [Madoff] at the door" and that he conveyed this information to a Sterling Partner.

Within days of the collapse of BLMIS, there were written communications from Sterling Stamos stating that they had recommended to the Sterling Partners for years that they should have taken their money out of BLMIS, but that they had refused to do so despite these warnings. In particular, a December 2008 email by Sterling Stamos's chief investment strategist read: "*In fact, we had recommended to them [Sterling Partners] to redeem [from BLMIS] for years but they kept their investment independent of our recommendation.*"

Before the collapse of the Madoff Ponzi scheme, other credible investment advisors expressed similar misgivings to the Sterling Partners about Madoff, including:

·   A Merrill Lynch executive who told Saul Katz that Madoff would not pass Merrill Lynch's due diligence process;

·   A consultant to the Sterling Defendants who told Saul Katz that he "couldn't make Bernie's math work" and "Something wasn't right."

"Instead of listening to the advice of their own, hand-picked hedge fund managers and other advisors, the Sterling Defendants restructured Sterling Stamos to accommodate Madoff's unorthodox demands for secrecy," said Mr. Sheehan. "Peter Stamos's testimony confirms that, to appease Madoff's desire to avoid disclosures regarding the Sterling Partners' investments with BLMIS, Sterling Stamos's operations and management were entirely restructured at great time and expense."

**Bayou Fund Ponzi Scheme – A Lesson Ignored**

In addition to warnings from experienced investment advisors, the Sterling Partners had previous experience with another Ponzi scheme in 2005. The Trustee's opposition brief details the lessons that the Sterling Partners should have learned from the Bayou Fund Ponzi scheme and that they should have applied to Madoff, but deliberately failed to do so.

"The facts are undeniable and inescapable. The Sterling Partners used their BLMIS accounts and the consistent, steady returns as a source of liquidity for their various businesses, including the Mets. They also used their BLMIS accounts for leverage, borrowing against them to obtain additional capital which they then reinvested into their BLMIS accounts to double their returns," said Mr. Sheehan. "As our evidence shows, the Sterling Defendants were aware of and ignored indicia of fraud, despite a series of escalating warnings about Madoff. Of this there is no doubt."

The Sterling complaint was initially filed under seal on December 7, 2010 in the United States Bankruptcy Court for the Southern District of New York. The original complaint was unsealed on February 4, 2011, at the Trustee's request, and amended on March 18, 2011.

A copy of the opposition brief and other motions in this matter are available on the Trustee's website at www.madofftrustee.com (to view the brief click here) or on the Bankruptcy Court's website at www.nysb.uscourts.gov; Docket No. 10-5287 (BRL). The Bankruptcy Court will hold a hearing on the Sterling Defendants' motion on Wednesday, June 29, 2011.

In addition to Mr. Sheehan and Mr. Bohorquez, the Trustee acknowledges the contributions of the Baker & Hostetler attorneys who worked on this filing: Lauren Resnick, Regina Griffin, Tracy Cole, Tom Warren, Keith Murphy, Kathryn Zunno, George Klidonas, and Amanda Fein.

---

### Background

Pursuant to application of the Securities Investor Protection Corporation ("SIPC") (link), on December 15, 2008, the Honorable Louis L. Stanton, a Federal Judge in the United States District court for the Southern District of New York, appointed Irving H. Picard as Trustee for the liquidation of Bernard L. Madoff Investments Securities LLC ("BLMIS") pursuant to the Securities Investor Protection Act ("SIPA") as set forth in the attached order (link).

On June 9, 2009, the Honorable Burton R. Lifland, a Federal Judge in the United States Bankruptcy court for the Southern District of New York, ordered substantive consolidation of the estate of Bernard L. Madoff into the SIPA Proceeding of Bernard L. Madoff Securities LLC. (link)

For information concerning the criminal cases arising out of this matter, please consult the website of the United States Attorney's Office for the Southern District of New York. (link).

---

### Claims Processing Status

Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, has retained AlixPartners, LLP with the Court's approval, as Claims Agent.

As of **June 3, 2011** the Trustee provides the following information regarding customer claims:

| | | |
|---|---:|---:|
| **Total Claims:** | **16,518** | |
| | | |
| **Total Determined Claims** | **16,514** | **99.98%** |
| Allowed | 2,414 | 14.61% |
| Determined - No Claim | 12 | 0.07% |
| Denied | 2,705 | 16.38% |
| Denied - Third Party | 10,976 | 66.45% |
| Withdrawn | 150 | 0.91% |
| | | |
| **In Litigation** [1] | **257** | **1.56%** |
| | | |
| **Remaining To Determine** | **4** | **.02%** |

1. Deemed Determined by the Trustee pending litigation

| | |
|---|---:|
| Amount of Allowed Claims: | **$6,883,691,021.70** |
| Amount of SIPC Coverage Committed: | **$794,890,347.19** |
| Amount by Which Allowed Claims Exceed Statutory Limits of SIPC Protection: | **$6,088,800,674.51** |

This information will be updated on a periodic basis, please check back to get the latest available status of submitted claims.

---

**Disclaimer:** The material and historical information disclosed on this site is for informational purposes only and is not intended to be legal advice or indicative of future performance.   Please consult an attorney for advice specifically relating to your legal matter.   AlixPartners LLP is not responsible for and makes no representations about the content, completeness, or accuracy of any other web sites that are accessible through this site.