

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-01789-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    SECURITIES INVESTOR PROTECTION CORPORATION,

6                   Plaintiff,

7           v.

8    BERNARD L. MADOFF INVESTMENT SECURITIES, L.L.C.,

9                   Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Case No. 10-05224-smb

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

14   MADOFF INVESTMENT SECURITIES LLC,

15                  Plaintiff,

16          v.

17   DAVID R. MARKIN, INDIVIDUALLY AND AS TRUSTEE OF THE DAVID

18   MARKIN CHARITABLE REMAINDER UNITRUST #1, AND DAVID R. MARKIN

19   CHARITABLE REMINDER UNITRUST #2

20                  Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22

23

24

25

Page 2

1    Adv. Case No. 10-05257-smb

2    - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                    Plaintiff,

6             v.

7    ZRAICK, JR., INDIVIDUALLY AND AS A JOINT TENANT et al.,

8                    Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 11-02760-smb

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

13   MADOFF INVESTMENT SECURITIES LLC,

14                   Plaintiff,

15            v.

16   ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF

17   SCOTLAND, N.V.),

18                   Defendants.

19   - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25

Page 3

1    Adv. Case No. 10-04390-smb

2    - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                    Plaintiff,

6            v.

7    BAM L.P., et al.,

8                    Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 10-04488-smb

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

13   MADOFF INVESTMENT SECURITIES LLC,

14                   Plaintiff,

15           v.

16   SOUTH FERRY BUILDING COMPANY,

17                   Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

Page 4



1    Adv. Case No. 10-04971-smb

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                     Plaintiff,

6             v.

7    ESTATE OF RICHARD M. STARK et al.,

8                     Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11

12                             U.S. Bankruptcy Court

13                             One Bowling Green

14                             New York, NY  10004

15

16                             March 29, 2017

17                             10:02 AM

18

19

20

21   B E F O R E:

22   HON. STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  MATTHEW

Page 5

1    Hearing re:  08-01789-smb Trustees Motion and Memorandum of

2    Law to Affirm His Determinations Denying Claims of Claimants

3    Holding Interests in Judy L. Kaufman et al. Tenancy in

4    Common, Richard B. Felder and Deborah Felder Tenancy in

5    Common, and Keith Schaffer, Jeffrey Schaffer, Carla R.

6    Hirschhorn Tenancy in Common

7

8    Hearing re:  10-05224-smb Conference pursuant to Local

9    Bankruptcy Rule 7056-1

10

11   Hearing re:  10-05257-smb Zraick Defendants Motion for Entry

12   of an Order (I)(A) Extending Time for Rebuttal Expert

13   Disclosures by Twelve Days or (B) in the Alternative,

14   Declaring Defendants Rebuttal Expert Report Timely Sewed;

15   and (IQ Compelling the Production of Documents Concerning

16   Securities Listed on Defendants Customer Statements

17

18   Hearing re:  11-02760-smb Motion for Certification of

19   Judgment for Direct Appeal to the United States Court of

20   Appeals for the Second Circuit Pursuant to 28 U.S.C. 158(d)

21   2 and Fed. R. Bank. P. 8006(f)

22

23   Hearing re:  10-04390-smb Pretrial Conference

24

25   Hearing re:  10-04971-smb Chambers Conference re Discovery

1    Dispute (also applies to Adv. P. No. 10-05295)

2

3    Hearing re:  10-04971-smb Chambers Conference re Discovery

4    Dispute (also applies to Adv. P. No. 10-05295)

5

6    Hearing re:  10-04488-smb Status Conference re Undisputed

7    Facts Stipulation (also applies to Adv. P. Nos. 10-04350,

8    10-04387, & 10-05110)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 7

1    A P P E A R A N C E S :

2

3    BAKERHOSTETLER

4         Attorney for the Trustee

5         811 Main Street, Suite 1100

6         Houston, TX 77002

7

8    BY:  TATIANA MARKEL

9         STEPHANIE A. ACKERMAN

10        STACY DASARO

11        CATHERINE E. WOLTERING

12        KEITH R. MURPHY

13        MAXIMILLIAN S. SHIFRIN

14

15   SECURITIES INVESTOR PROTECTION CORPORATION

16        1667 K Street N.W., Suite 1000

17        Washington, D.C. 20006

18

19   BY:  NATHANAEL S. KELLEY

20

21

22

23

24

25

```
 1   DENTONS US LLP

 2        Attorneys for Markin / BAM Adversaries

 3        1221 Avenue of the Americas

 4        New York, NY 10020

 5

 6   BY:  CAROLE NEVILLE

 7

 8   ALLEN & OVERY

 9        Attorney for RBS / ABN

10        1221 Avenue of the Americas

11        New York, NY 10020

12

13   BY:  MICHAEL S. FELDBERG

14

15   HUNTON & WILLIAMS LLP

16        Attorney for Edward A. Zraick et al

17        200 Park Avenue

18        New York, NY 10166

19

20   BY:  ROBERT A. RICH

21

22

23

24

25
```

```
 1

 2    VINSON & ELKINS LLP

 3          Counsel for Cohmad

 4          666 5th Avenue, 26th Floor

 5          New York, NY 10103

 6

 7    BY:  MARISA ANTOS-FALLON

 8

 9    OTTERBOURG PC

10          Attorneys for IDB

11          230 Park Avenue

12          New York, NY 10169

13

14    BY:  RICHARD G. HADDAD

15

16    ALSO PRESENT TELEPHONICALLY:

17

18    KEVIN H. BELL

19    CHRISTOPHER S. KOENIG

20    PATRICK MOHAN

21    DAVID J. SHEEHAN

22

23

24

25
```

Page 10

1              P R O C E E D I N G S

2          THE COURT:  Madoff.

3          MS. ACKERMAN:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MS. ACKERMAN:  Stephanie Ackerman of Baker and

6   Hostetler on behalf of Irving Picard, the Madoff Trustee.

7   We're here today on the Trustee's motion to affirm the

8   determination of five claims, which were filed by claimants

9   who claim interests in one of two BLMIS accounts, held in

10  the names of Judy L. Kaufman et al. Tenancy in Common, and

11  Keith Schaffer, Jeffrey Schaffer and Carla Hirschhorn

12  Tenancy in Common.

13          The Trustees' motion had included a third account,

14  which has since been adjourned to the April hearing.  The

15  objecting claimants were each co-tenants in one of the

16  tenancies in common, and each of the tenancies in common, in

17  turn, was an account holder with BLMIS.

18          The objecting claimants did not have individual

19  accounts in their names, and therefore, like those claimants

20  in prior motions before the Court, are not customers.

21  Specifically, under SIPC Rule 105, SIPC Rule 105 governs the

22  customer status for jointly held accounts.  And under 105,

23  an account held jointly as a tenancy in common will be

24  treated as held by a single customer for purposes of SIPA.

25          In Morgan Kennedy, the Second Circuit confirmed

Page 11

1   that Rule 105 provides that a joint account will be treated

2   as a separate customer, and further in Adler, that this

3   separate customer, the tenancy in common, is the customer.

4   And therefore, the joint account holder share any payments

5   on the account of the valid customer claim in proportion to

6   their interests in the tenancy.

7          Thus, the tenancy in commons and not the objecting

8   claimants are the customers here.  Furthermore, the

9   objecting claimants did not meet the requirements of

10  customer status under Morgan, Kennedy and Cruise, as co-

11  tenancy objecting claimants share ownership interests in the

12  underlying assets of the tenancy in common, and have not

13  entrusted their own funds to BLMIS for purposes of trading

14  securities.

15         Without entrustment of their own assets and

16  meeting this essential requirement from Morgan Kennedy, they

17  can not be considered customers.  The objecting claimants

18  responses to the Trustee's discovery responses requests

19  similarly confirm that they did -- they do not meet the

20  remaining condition of customer status under Morgan Kennedy.

21         The Trustee did receive two objections served the

22  relief requested by the motion from the Kaufman objecting

23  claimants, Daniel C. Epstein and the Robert and Rebecca

24  Epstein living trust.  The Epsteins set forth three

25  arguments for their customer status.

1          First, that they made checks payable to BLMIS, and

2     this constituted their status as customers.  Second, that a

3     letter written by Judy Kaufman, the account holder to BLMIS

4     in 2003 sought separate customer statements for all of the

5     co-tenants.

6          THE COURT:  Have you receipt -- have you found

7     that letter?

8          MS. ACKERMAN:  We found a letter in the -- there's

9     only one letter in the BLMIS books and records dated 2003,

10    related to the Kaufman tenancy in common.

11         THE COURT:  Does it request separating the

12    account?

13         MS. ACKERMAN:  It does not, Your Honor.  The

14    letter specifically requests that the Epstein living trust

15    be added as a co-tenant to the account, but there's no

16    request for separate customer statements or separate

17    accounts.

18         In fact, it asks that all of the related

19    information and customer address and social security number

20    remain the same.  Third, the Trustee is obligated, third,

21    the Epsteins argue that the Trustee is obligated to apply

22    the same standard for determining customer status that he

23    applied to identify them as defendants, and subsequently,

24    dismiss them from the adversary proceeding.

25         The Epsteins did produce canceled checks to the

Page 13

1    Trustee that were made payable to BLMIS, but by the

2    Epstein's own admissions, those checks were sent to the

3    Kaufmans and not directly to BLMIS.  They were clearly

4    identified for deposit into the Kaufman tenancy in common

5    account.

6            And the books and records of BLMIS are devoid of

7    any indication that any of the deposits should be

8    attributable to the Epsteins.  These checks again,

9    therefore, fall short of entrustment of assets on behalf of

10   the Epsteins.

11           Second, as I just discussed, the Epsteins have not

12   provided the 2003 letter that does not request specific

13   statements for the individual co-tenants.  Finally, the

14   Epstein's argument for applying a single standard for the

15   finding of customer status and seeking the return of

16   fraudulent transfers misconstrues the nature of purpose of

17   SIPA and the Bankruptcy Code.

18           Although they share a common goal of returning

19   funds to the customer -- returning customer property to the

20   customer funds, they operate differently and serve separate

21   and distinct purposes.

22           THE COURT:  Would they sue the subsequent

23   transferees in that case?

24           MS. ACKERMAN:  Daniel Epstein was sued as an

25   initial, and Robert and Rebecca Epstein were sued as

Page 14

1    subsequent.  The Trust was also sued as a direct.

2              THE COURT:  How did Daniel Epstein get an initial

3    transfer?

4              MS. ACKERMAN:  Because of his identification as

5    one of the co-tenants in the account.  This was identified

6    early on in the proceeding.  Subsequent to that, the Trustee

7    entered into a stipulation with the Epsteins, where they

8    were able to attest that they received no transfers

9    whatsoever.

10             THE COURT:  Okay.

11             MS. ACKERMAN:  Just one further point, that the

12   Epsteins are arguing that all defendants be customers, and

13   that stretches that the definition of customer wholly beyond

14   its limits.

15             THE COURT:  Okay.

16             MS. ACKERMAN:  Overall, the objecting claimants

17   have failed to meet their burden to prove that they are

18   entitled to customer status as defined by SIPA.  And

19   instead, their claims to any assets of the tenancy in common

20   lie with their co-tenants and not the Trustee.  As such, the

21   Trustee respectfully requests that the motion be granted and

22   the objections overruled.

23             THE COURT:  All right.  Does anyone want to be

24   heard in opposition to the motion?  Is Dr. Epstein on the

25   phone?  Because I got an email from him yesterday and I

Page 15

1    authorized him to appear telephonically, but he's not on the

2    phone.  I'll reserve decision.  Thank you.

3            MR. MURPHY:  Good morning, Your Honor, Keith

4    Murphy of Baker and Hostetler, Counsel for the Trustee.

5            THE COURT:  Good morning.

6            MR. MURPHY:  Your Honor, we'd like to continue on

7    in the order that we have in the agenda.

8            THE COURT:  Yes.

9            MR. MURPHY:  Okay.

10            THE COURT:  Let me hear from Ms. Neville.  It's

11    her request.  Go ahead.

12            MS. NEVILLE:  Good morning, Your Honor, Carole

13    Neville from Dentons on behalf of David Markin and Prep

14    Number 1.

15            THE COURT:  Go ahead.

16            MS. NEVILLE:  Your Honor, our request for summary

17    judgment is consistent with the position that the Trustee

18    has taken through this case all along.  David Markin was

19    sued as a subsequent transferee.  And when the complaint was

20    amended in January, again, David Markin was named as a

21    subsequent transferee.

22            And with respect to the transfers, the complaint

23    says that some or all of the transfers were subsequently

24    transferred by defendants to subsequent transferee defendant

25    David R. Markin, collectively, the subsequent transferees.

Page 16

```
1     So this sudden theory, based on a case that has, you know,

2     absolutely nothing to do with the facts of this case, I

3     mean, came up when I wrote the letter to Your Honor asking

4     for permission to file a motion for summary judgment.

5            Red Dot is really a case about a corporate

6     shareholder controlling a payment for his benefit, and

7     that's the decision that's really when they exercised

8     dominion and control over the account, it became for the

9     benefit.

10           THE COURT:  Let me ask you a question.  Are you

11    prepared to concede, at least for the purposes of your

12    motion, that the Trustees proved the initial transfer, the

13    prima facie case relating to the initial transfer?

14           MS. NEVILLE:  Yeah.

15           THE COURT:  Okay.  As I understand it, the Trustee

16    also questions evidence of value given, just by Mr. Markin?

17           MS. NEVILLE:  Well, Your Honor, it's interesting

18    because the IRS ruling, which I actually told you I was -- I

19    gave it to them in June, I actually gave it to them in

20    February of 2010, seven years ago, and then again in June,

21    and then again a few months later.  So that IRS ruling is a

22    valuation of the amount that was paid for or given in

23    exchange for the life estate in the (indiscernible).

24           THE COURT:  I think you said the value doesn't

25    matter as long as it's a peppercorn?
```

1          MS. NEVILLE:  It is a peppercorn, but you know,

2     they have questioned whether or not it's adequate value, and

3     in the Harris and IRS ruling that says the two things we're

4     looking at here is whether the transfer triggers some tax

5     liability, and two, whether there was self-dealing.

6          And the IRS ruling says, "No, here's how we

7     calculate value," and they have a whole formula in the

8     ruling, and say that the value was given.  So it could be a

9     peppercorn, but we actually gave full value.

10          THE COURT:  Is there evidence of what Mr. Markin

11     contributed to the Trust?

12          MS. NEVILLE:  Yeah.  Oh yeah.

13          THE COURT:  Oh much did he contribute to the Trust

14     over the years?

15          MS. NEVILLE:  Over the years?  I don't have an

16     exact number, but because there were different aspects of

17     his gifts, through the BLMIS, it was $4 million.  Through

18     other assets, it was much more.  It came to $24 million.

19          THE COURT:  Okay, I got it.  Let me hear from --

20          MS. MARKEL:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MS. MARKEL:  Tatiana Markel on behalf of the

23     Trustee.  Your Honor, our only position is that summary

24     judgment at this point is premature.

25          THE COURT:  But why not?  As I understand the

Page 18

1    argument, the defendant is arguing that he gave value and in

2    good faith, without any knowledge of the avoidability of the

3    transfer.  And you're not contending he's a bad faith --

4           MS. MARKEL:  No.

5           THE COURT:  -- transferee, so the only issue

6    really is value.

7           MS. MARKEL:  That is -- I agree, that's a narrow

8    issue, but if -- there are a couple of things at play here.

9           THE COURT:  What's that?

10          MS. MARKEL:  For example, David Markin was

11   dismissed as a subsequent transferee, subject to the

12   Trustee, you know, in the orders that Your Honor entered

13   after the omnibus rulings, David Markin was dismissed.

14   We've asked for consent to amend the complaint, to conform

15   with the evidence to bring all of the right parties in.

16          We haven't been granted it.  We're willing to make

17   a motion, but that's sort of a threshold issue that he's not

18   really -- you know, there's a subsequent transferee defense

19   that's on the table, and we don't have a defendant.

20          The other piece of this is the letter ruling.  So

21   I've looked through all of the documents.  2010 is before

22   this action even began.  So to the extent that a document,

23   you know, the letter ruling that really decides this issue

24   or just, you know, defendants believe is in their favor, we

25   don't have it.  It, you know --

Page 19

1           THE COURT:  I thought they said they gave it to --

2     I thought Ms. Nevins said she gave it to you.  Pardon?

3           MS. NEVILLE:  I gave it to them three times.

4           THE COURT:  Well, so she'll give it to you a

5     fourth time and then you'll have it.

6           MS. MARKEL:  Right.  So we don't know --

7           THE COURT:  The question is, what -- to what

8     extent you're bound -- to what extent that has any

9     evidentiary effect, not whether you (indiscernible) or not.

10          MS. MARKEL:  Right.  But no, I agree.  It's just

11    the letter ruling -- I don't know that it has any

12    evidentiary effect, but we haven't seen it.  We haven't

13    reviewed it.  We don't know what it is.

14          We also haven't had any discovery, so we don't

15    know -- we'd like other trust documents in connection, you

16    know, decisions in terms of distributions, investments,

17    governance.  Those are all important to this issue.

18          THE COURT:  But why is that important?  The issue

19    is whether Mr. Markin gave value.

20          MS. MARKEL:  Because it's not only that issue.

21    It's also the fact that, to the extent that Mr. Markin is

22    the settler of the Trust, the beneficiary of the Trust and

23    the Trustee of the Trust, under -- and if he exercised the

24    certain amount of dominion and control, he could be regarded

25    as the initial transferee.

1          THE COURT:  Okay, but that's a legal issue, isn't

2    it?  What are the factual issues that relate to that issue,

3    the disputed factual issues?

4          MS. MARKEL:  The dominion and control piece of it,

5    right?

6          THE COURT:  Isn't that reflected, though, in the -

7    - I mean, Mr. Markin's passed away.  He's not going to

8    testify.  Isn't that reflected in the documents?

9          MS. MARKEL:  Not necessarily.  I mean, to the

10   extent that he directed the withdrawals, directed the

11   deposits, all of those issued -- those are questions of

12   fact.  The other issue, Your Honor, is in the papers,

13   defendants discuss tracing and the fact that the --

14         THE COURT:  I'm not going to go down --

15         MS. MARKEL:  Okay.

16         THE COURT:  I suggest you make -- look, I can't

17   tell you not to make a motion for summary judgment, but it's

18   ridiculous to make one on the tracing issue.  It's an issue

19   of fact.

20         MS. NEVILLE:  (indiscernible), Your Honor.

21         MS. MARKEL:  Your Honor, our position is really,

22   you know, we'd like to make -- we'd like to get consent on

23   the complaint.  If we can't, we'll make a motion.  We'll

24   finish out the three and a half weeks of discovery.  By the

25   time Your Honor decides --

Page 21

1          THE COURT:  So why don't you start with -- you

2     need on this issue, you've identified dominion in control

3     and value.  So what's the discovery in the (indiscernible)

4     issues?

5          MS. MARKEL:  Other than amendment and some

6     stipulation as to tracing and, you know, the letter ruling -

7     -

8          THE COURT:  So forget about tracing.

9          MS. MARKEL:  Okay.

10          THE COURT:  Forget about tracing.  I understand

11     the argument that he's not a party, so he can't be making a

12     motion for summary judgment.

13          MS. MARKEL:  That's right.

14          THE COURT:  That's -- that sounds like that can be

15     remedied if you want to remedy it, or you may be content to

16     just sit there as a non-party.

17          MS. NEVILLE:  Your Honor, I opposed amending a

18     complaint to add David Markin as an initial transferee.

19          THE COURT:  Well, that's their theory, though.

20          MS. NEVILLE:  So that's the issue that has come

21     up.  It has to be dismissed, but --

22          THE COURT:  But it's dismissed, so how do you make

23     a motion for summary judgment in favor of somebody who's not

24     a party?

25          MS. NEVILLE:  Well, I could make a --

Page 22

```
 1              THE COURT:  Because that's not the real case law
 2     controversy --
 3              MS. NEVILLE:  We will amend the complaint.  We'll
 4     do what we have to do.  But you know, their idea that they
 5     need discovery is ludicrous, because we're conceding what
 6     transfers went into the Trust, what transfers came out.
 7     I've given them the bank checks from the Trust.
 8              THE COURT:  Yeah.  They have this theory of
 9     dominion in control, actual dominion in control as opposed
10     to legal dominion in control.
11              MS. NEVILLE:  Well, in this case, it doesn't make
12     sense, because this entity was governed by internal revenue
13     regulations.  So to the extent that David Markin was a
14     Trustee and one of many beneficiaries, there is a whole
15     bunch of hoops that he has to jump through in order to get
16     any distribution from that trust.  It's governed very
17     clearly by --
18              THE COURT:  Well, that was the (indiscernible)
19     made.  It's probably governed by the Trust documents.
20              MS. NEVILLE:  It is.  And there is also, it's an
21     irrevocable trust.  And I have done a lot of research to see
22     when you can actually disregard an irrevocable trust.  And
23     it's only when there's fraud, or when the beneficiary and
24     the grantor is using it to hide money.
25              THE COURT:  Right.  My own view is, this case is
```

Page 23

1    probably right.  So your defense is probably right for

2    summary judgment, provided you're a party to the action.

3    And you can figure out how to do that.

4              MS. NEVILLE:  Okay.

5              THE COURT:  But on the narrow issue we've

6    discussed whether it's a good faith purchase or for value

7    without knowledge of the voidability of the initial

8    transfer, I don't see why that can't be posed as a motion

9    for summary judgment.

10             MS. NEVILLE:  Thank you.  I agree.

11             THE COURT:  And then, if you think that there's

12   really a factual issue, and that you haven't had the

13   opportunity to take discovery on, you can seek discovery at

14   that point.  But I just don't see it.  I think the issue of

15   dominion and control is determined by the trust documents

16   and whatever IRS regulations exist.  Is he the only Trustee?

17             MS. NEVILLE:  Pardon me?

18             THE COURT:  Well, he probably exercised dominion

19   in control in his capacity as Trustee.

20             MS. NEVILLE:  But in the parameters of a fiduciary

21   and IRS regulation.

22             THE COURT:  I understand.  It doesn't sound like a

23   factual issue to me.  But you've got to figure out how to

24   become a party.  I'm not ruling -- I'm not granting summary

25   judgment, it just sounds like a legal issue.  That's all I'm

Page 24

1    saying.  She may be wrong.  She may lose, but it just sounds

2    like a legal issue.

3             MS. NEVILLE:  So Your Honor, so is it discovery

4    then should be stayed at least until we get this resolved?

5             THE COURT:  Well, you're not (indiscernible), so

6    you're not going to -- I don't know what the discovery is

7    about.

8             MS. NEVILLE:  Well, they've already sent a

9    subpoena to the banks for impact.  We're going to send it to

10   the other entities that were dismissed.  So I'm willing to

11   give them everything to --

12            THE COURT:  All right.

13            MS. NEVILLE:  Validate the facts.

14            THE COURT:  But all I'm saying is, if he's not a

15   defendant, I'm not going to entertain a motion for summary

16   judgment.

17            MS. NEVILLE:  Okay.

18            THE COURT:  All right?  Because then it's just an

19   advisory opinion, but (indiscernible) a defendant, this was

20   what the result would be.

21            MS. NEVILLE:  I'll find a way to make myself a

22   defendant.

23            THE COURT:  Okay, fine.  Thank you.  Yes?

24            MS. MARKEL:  Your Honor, just one more point.

25            THE COURT:  Sure.

1          MS. MARKEL:  The documents that we have weren't

2     provided.  I understand that it's Ms. Neville's position

3     that she's provided them earlier, but what we have in our

4     position as provided in connection with a settlement offer,

5     subject to Rule 408.  And to the extent, you know --

6          THE COURT:  Okay.

7          MS. MARKEL:  -- we'd like some --

8          THE COURT:  Stipulate that they can use them.

9          MS. MARKEL:  Right.

10         THE COURT:  Or just provide them again.

11         MS. MARKEL:  Right.  Thank you, Your Honor.

12         THE COURT:  Send an email without the reference to

13    408.

14         MS. MARKEL:  Okay, thank you, Your Honor.

15         MS. NEVILLE:  I think (indiscernible).

16         THE COURT:  Okay.

17         MR. MURPHY:  Your Honor, Keith Murphy, Baker

18    Hostetler for the Trustee.  The next matter, (indiscernible)

19    with Ms. Neville, actually, it's the Picard v. Mann case.

20    That is a good faith case, Your Honor, with fictitious

21    profits of approximately $2.8 million.  Discovery in that

22    case, Your Honor, is closed.

23         THE COURT:  All right, so it's ready for trial?

24         MR. MURPHY:  We're ready for -- actually, we're

25    ready for summary judgment.

Page 26

1              THE COURT:  You want to make a motion for summary

2      judgment?

3              MR. MURPHY:  Yes, Your Honor.  We would propose

4      the same procedure that we used in the South Ferry matters,

5      where we were going to submit a stipulation to Your Honor,

6      where Ms. Neville and I would try to work on proposed

7      stipulated facts.

8              We'd submit that to you by May 3.  And then, all

9      dates would be triggered off of that, once the Court -- only

10     once the Court enters the agreement or the stipulated facts.

11     So we could have a few this afternoon, Your Honor.

12             THE COURT:  You'll have a stipulation to me this

13     afternoon?

14             MR. MURPHY:  A stipulation with respect to the

15     dates.

16             THE COURT:  Oh.  Does that sound like it works?  I

17     don't know if it -- if you think there are any disputed

18     issues of fact?

19             MS. NEVILLE:  I don't think so.

20             THE COURT:  It's just that you just want to

21     preserve those defenses?

22             MS. NEVILLE:  I'm sorry, Your Honor?

23             THE COURT:  Is this that you want to preserve the

24     various defenses?

25             MS. NEVILLE:  Yes.

1            THE COURT:  So why don't you stipulate the

2     judgment subject to the preservation of the defenses, and

3     then you can appeal?

4            MS. NEVILLE:  I -- Your Honor, there is a

5     procedure that we've all agreed to, and I would like to

6     continue this --

7            THE COURT:  All right.  So you can submit your

8     schedule and stipulation.

9            MS. NEVILLE:  Thank you.

10           MR. MURPHY:  Thank you, Your Honor.

11           THE COURT:  What's next?

12           MR. RICH:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. RICH:  Robert Rich, Hunton & Williams LLP on

15     behalf of Edward A. Zraick et al.  This is adversary

16     proceeding 0801789.  We're here on two issues.  The first is

17     a request for what is a 12-day extension of the deadline to

18     serve a rebuttal expert report.  And just very briefly on

19     what the report is, this is --

20           THE COURT:  I read it.

21           MR. RICH:  Okay.  Yeah, and I'm sure the Court

22     found, what a lot of people found is that, you know, our

23     expert, Bill Feingold used the very same cherry-picked

24     transactions that Mr. Dubinsky, the Trustee's expert kept to

25     -- in order to prove his allegation that no transfer -- that

Page 28

```
 1    no trading took place.  And using those very same cherry-
 2    picked transactions, I think showed very strongly --
 3              THE COURT:  Well, the issue was not that, the
 4    issue was whether or not you should be permitted to use his
 5    rebuttal for it.
 6              MR. RICH:  Absolutely.  And Your Honor, we were
 7    here at a --
 8              THE COURT:  Whether or not it's credible or
 9    anything else like that is a different issue.
10              MR. RICH:  Okay.  And we were here at a conference
11    on February 7th.  It was originally scheduled for the 16th,
12    but Your Honor was gracious enough outside the conflict to
13    move it to the 7th.
14              We actually ended up serving the report.  We got
15    it done seven days later on the 14th.  It would've been
16    before what was even originally the conference.  At that
17    February 7th conference, I know Your Honor expressed
18    reservations on granting a 30-day extension because as Your
19    Honor said, you know, we could just come back at the end and
20    come back with another request for further extension.
21              But you know, and so, we worked hard, asked Mr.
22    Feingold to work around the clock to get it done.  This is
23    as quickly as possible, at great expense to us, and was able
24    to get it served on the Trustee seven days later.
25              THE COURT:  Let me -- I know the timeline.  Here's
```

1    my question.  You have a burden to show cause.  And all

2    you've said is that you were 12 days late.  But you haven't

3    explained why you weren't able to file it on time, what

4    efforts you made, when you hired the guy, why it took so

5    long.

6                MR. RICH:  Your Honor --

7                THE COURT:  Don't you have to show that under Rule

8    16?

9                MR. RICH:  We have to show cause.  I believe we

10   have, and I certainly can --

11               THE COURT:  Well, what's the cause that you've

12   shown when you -- this is no affidavit here or anything like

13   that, but it's --

14               MR. RICH:  You know, I'm the only one -- I'm the

15   one who handled this, you know, personally, so I can -- I'm

16   the one who would know all the facts.

17               THE COURT:  But I don't have a declaration or an

18   affidavit.

19               MR. RICH:  I could testify to it just as much as I

20   can --

21               THE COURT:  Let me finish.  You know, this should

22   be a relatively simple motion, but you haven't provided

23   anything that explains why you couldn't get an expert report

24   in on time.

25               MR. RICH:  I think I've explained it in the motion

Page 30

1    papers, but not --

2            THE COURT:  When did you hire this guy?

3            MR. RICH:  We hired him -- he was in discussions

4    at the chambers conference.  I'm not sure when the --

5    exactly the engagement letter dated is, but we had him,

6    prior to the engagement conference, I even -- I mentioned

7    his name, when you asked.

8            THE COURT:  That was on February 7th.

9            MR. RICH:  On February 7th, yes.

10           THE COURT:  But back in December --

11           MR. RICH:  Sure.

12           THE COURT:  -- I thought you said you had an

13   expert.

14           MR. RICH:  Sure.  Yeah, I'll tell you exactly what

15   happened.  So we were served with four expert reports on the

16   very last day, notwithstanding the fact that it was prepared

17   three years earlier.

18           THE COURT:  Well, but they served you whenever

19   they were supposed to serve you under the case management

20   order, right?

21           MR. RICH:  They did, although I, you know, I think

22   some of the expert reports are not in fact expert reports,

23   should've been done earlier.  But they wanted to, of course,

24   you know, (indiscernible) --

25           THE COURT:  But you know, look.  Everything

Page 31

1   (indiscernible) to review --

2           MR. RICH:  Your Honor, we had four expert reports,

3   you know, given the amount at issue in our adversary

4   proceeding, we thought (indiscernible) it made sense to work

5   with joint counsel to find an expert.  We immediately did

6   it.

7           THE COURT:  That's a different issue.  Are you

8   saying that the cause is that it was not economically

9   feasible for you to offer an expert?

10          MR. RICH:  I think it was -- I think we

11  immediately pursued hiring an expert with joint --

12          THE COURT:  But that's what I don't know.  There's

13  no record of any of this.  That's the problem I have.

14          MR. RICH:  It's in the papers, and I can testify

15  that --

16          THE COURT:  The papers -- a memorandum of law is

17  not evidence of anything.

18          MR. RICH:  Your Honor, I don't -- a declaration

19  from me would be -- I don't see how that's any better than

20  me testifying the same.

21          THE COURT:  Well, but that's evidence -- I'm not

22  going to take testimony today.  If you want me to schedule a

23  trial on this, I'll schedule a trial.

24          MR. RICH:  I mean, if that's, you know, what Your

25  Honor thinks is necessary --

Page 32

1             THE COURT:  I'm just say --

2             MR. RICH:  -- then sure.

3             THE COURT:  Don't tell me if that's what I think

4     is necessary.  You're supposed to show cause and I'm just

5     asking you how you showed it with no evidence.

6             MR. RICH:  Your Honor, I think I could testify to

7     the evidence or submit a declaration.

8             THE COURT:  Let me hear from the other side,

9     because I have a question for the other side.

10            MR. RICH:  Mm hmm.

11            THE COURT:  And here's my question.  I read your

12    papers.  His expert report has nothing specific to do with

13    his client's account.  It's more of the stuff that Mr.

14    Dubinsky didn't know how to read the records or made certain

15    narratives.  I thought we had -- and that really goes to the

16    issue of when the Ponzi scheme began.  I think obviously it

17    bleeds over into his case.  Is there a discovery scheduled

18    for that particular issue?

19            MR. SHIFRIN:  Your Honor, Max Shifrin on behalf of

20    the Trustee, good morning.  There is no discovery schedule

21    for this fraud proceeding because it's entirely premature to

22    have such a schedule in place.  The Madoff deposition is

23    ongoing.  There are two additional days scheduled, April

24    27th and April 28th.

25            And under the relevant deposition order, that

Page 33

1    deposition needs to be completed before any additional

2    discovery, including any fraud proceeding is brought before

3    the Court, and the merits of that proceeding is addressed.

4            And I think given the nature or given the text of

5    the deposition order, specifically Paragraph L, there needs

6    to be some justification for further discovery after the

7    deposition is completed.

8            THE COURT:  Okay, okay.  So if discovery is still

9    ongoing, on that particular issue, when the Ponzi scheme

10   began, with a view towards having some sort of proceeding,

11   to determine that, because it really affects a lot of the

12   cases, couldn't I receive this report in connection with

13   that issue?

14           MR. SHIFRIN:  Your Honor, should a fraud

15   proceeding be established, when the Madoff deposition is

16   completed.

17           THE COURT:  Well, unless everybody's going to

18   concede that it was fixed on a certain date, how can I avoid

19   that?

20           MR. SHIFRIN:  Well, I think there are numerous

21   ways to address a fraud proceeding, including who can

22   participate.  As you, as the Court is aware, we submitted a

23   declaration by Matt Greenblatt that basically says even if

24   we credit the customer statements through -- up until 1992,

25   in all of the cases that are participating in the Madoff

Page 34

```
 1    deposition, only three of the cases would be affected.

 2            So I think there is -- there should be a hearing

 3    at the end of the Madoff deposition, and the contours of any

 4    fraud proceeding could be addressed on submissions by the

 5    parties, and we can decide whether, A, Madoff's testimony

 6    justifies any further discovery, including any fraud

 7    proceeding, and B, who can participate?

 8            And I think at a minimum, the participating

 9    defendants in the cases that want to participate, they need

10    to make a showing that that proceeding is relevant and

11    proportionate to their cases.  And I think if they can't --

12            THE COURT:  Proportionate?

13            MR. SHIFRIN:  That's correct, Your Honor.  Yes.

14    Given the fact that only three cases out of 83 are affected.

15    I mean, it's arguably not even relevant in 80 of these

16    cases, right?  So I think it would be --

17            THE COURT:  So why is everybody fighting so much

18    on this issue?

19            MR. SHIFRIN:  Well, Your Honor, I know you've

20    addressed that several times, where you've inquired why we

21    are not willing to concede.  I think the core issues that

22    the Trustee's unwilling to concede anything that's just not

23    true.  That's first and foremost.  And we have hundreds of

24    claimants --

25            THE COURT:  But it sounds like we're going to have
```

Page 35

1    to have a proceeding on (indiscernible) the Ponzi scheme

2    again.  So that affects this particular case, as I

3    understand it, right?

4              MR. SHIFRIN:  Well, under Greenblatt's

5    declaration, this (indiscernible) case is not affected

6    because even if we credit the customer statements up until

7    1992, the two-year demand amount does not change.  And in

8    any event --

9              THE COURT:  But the computation of fictitious

10   profits may change, depending on whether they were inter-

11   account transfers before 1992 or any deposit or any -- was

12   there -- when were these accounts opened?

13             MR. RICH:  Your Honor, these accounts started in

14   the 80's, early 80's.

15             THE COURT:  So it was obviously --

16             MR. RICH:  And we obviously opposed this

17   Greenblatt report, that is, you know, no better -- we

18   haven't had an opportunity to cross him.

19             THE COURT:  Well, the Greenblatt report is

20   predicated on the assumption that there was no actual

21   trading ever, right?

22             MR. RICH:  I think he's referring to a separate

23   Greenblatt report, which purports that, well, even if we say

24   that, you know, the transaction's pre-'92 took place, only

25   these certain adversary proceedings are affected.  Of

Page 36

1   course, they're all affected.  He's just trying to say, it

2   doesn't change the calculation enough into --

3            THE COURT:  Oh I remember.

4            MR. RICH:  -- into change the result.

5            THE COURT:  All right.  It sounds -- my point is,

6   it sounds like this is an issue, when the Ponzi scheme

7   began, unless you're willing to give him credit for all of

8   the -- everything that occurred, you know, all the transfers

9   or actually all the profits, I guess, that were realized

10  before that date.

11           If you're telling me you're not and it's true in

12  other cases, there's going to have to be some sort of a

13  proceeding to determine for everybody, when the Ponzi scheme

14  began.

15           MR. RICH:  Your Honor, if I could just make a

16  couple of points to address that.  The Madoff deposition is

17  the precursor to any fraud proceeding --

18           THE COURT:  There may be no more discovery after

19  the Madoff deposition.  I let everybody take the Madoff --

20  Madoff's deposition, but I didn't say that I would extend

21  any other discovery.

22           MR. RICH:  Right.

23           THE COURT:  But even if that's the end of it, I

24  have Madoff's testimony on the one-hand, and I guess I have

25  the Dubinsky report on the other hand.

1          MR. RICH:  Right.

2          THE COURT:  And Mr. (indiscernible) and some other

3    people, who allocated, who might give rise to an inference

4    of an earlier Ponzi scheme.  But I don't have a trial on

5    that.

6          MR. SHIFRIN:  And I think Your Honor should --

7    once the deposition's complete, we can have a hearing and

8    begin to address all of these concerns and discuss what the

9    contours of that proceeding would be.  But I think the core,

10   from our perspective, we are concerned that the fraud

11   proceeding will be used to delay certain cases, particularly

12   cases where a 1992 finding would be irrelevant to the -- to

13   --

14         THE COURT:  Well, I agree with you.  There are

15   some cases where the accounts were opened up after that and

16   there are no inter-account transfers or anything like that.

17         MR. SHIFRIN:  That's correct.  And I think we have

18   this Greenblatt affidavit.  And I think prior to any fraud

19   proceeding, defendants should make a showing that either Mr.

20   Greenblatt's report is incorrect or otherwise demonstrate

21   that it --

22         THE COURT:  Well, you have a burden of proof, so

23   you would have to make the initial showing under burden of

24   proof, and then they would presumably cross-examine Mr.

25   Greenblatt.

Page 38

1                MR. SHIFRIN:  Right.

2                THE COURT:  Or possibly, depending on the case,

3      bring in other experts.

4                MR. SHIFRIN:  That's correct.  And again, the core

5      -- our core argument here is that this is just premature at

6      this point.  We have two days at least of Madoff testimony

7      scheduled in April, and that's --

8                THE COURT:  Right.

9                MR. SHIFRIN:  -- still under the day one

10     deposition topics.  And thus, there can be a day two

11     deposition topic, deposition date scheduled in accordance

12     with the deposition order.  We just don't know when that

13     deposition's going to be wrapped up.  And the issue of the

14     fraud proceeding should wait until that's completed.

15               THE COURT:  All right.  But couldn't I receive

16     this particular expert report in the context of that fraud

17     proceeding?

18               MR. SHIFRIN:  At that time, we can address that,

19     if --

20               THE COURT:  So you want me to put off addressing

21     this until then?

22               MR. SHIFRIN:  Well, Mr. -- again --

23               THE COURT:  And basically consider it on an issue

24     of relevance, as opposed to lateness or something else?

25               MR. SHIFRIN:  The Zraick defendants can not put in

Page 39

1    a Feingold report in connection with the fraud proceeding if

2    it's determined they can't participate for whatever that

3    reason is, including that they're unaffected by 1992 start

4    date.

5              So I think, again, the contours of the fraud

6    proceeding are critical to establish first.  And then, once

7    we're there, the participating parties can submit whatever

8    expert reports they want, in accordance with the procedures

9    that are established.

10             THE COURT:  So what should I do with this expert

11   report, since it relates to the fraud proceeding?

12             MR. SHIFRIN:  This is -- it doesn't relate to the

13   fraud proceeding, Your Honor, respectively, because there is

14   no fraud proceeding.  This would serve the connection with

15   this specific adversary proceeding.  It's untimely.  It's

16   inadmissible.

17             THE COURT:  There is a dispute as to when --

18   whether or not to count all those transactions before 1992

19   or 1993.  And that same dispute arises in a number of cases,

20   not just in the cases where the parties are participating in

21   discovery, but in a lot of the cases.  I don't know how many

22   are left, 200, 300, 400.  But that's (indiscernible) a lot

23   of these big faith cases.  And before I try the merits of

24   this particular case, I'm going to have to resolve that

25   issue, won't I?

1          MR. SHIFRIN:  Again, it depends if --

2          THE COURT:  Unless you're willing to concede, for

3     the purposes of the -- of this particular adversary

4     proceeding, that the transactions that occurred prior to

5     1992 and 1993 were legitimate.

6          MR. SHIFRIN:  Your Honor, again, once the fraud

7     proceeding is established and there are dates established

8     for the disclosure of expert reports, the participating

9     defendants and parties can submit a report.  But right now,

10    the issue is whether the Feingold report is admissible in

11    this adversary proceeding in accordance with the CMO that's

12    been entered in this adversary proceeding.

13         THE COURT:  But all I'm saying is you may be right

14    --

15         MR. SHIFRIN:  Okay.

16         THE COURT:  -- as a technical matter under the

17    CMO, but if I take additional discovery in connection with

18    the, you know, when the Ponzi scheme began, then I may

19    receive the same declaration.

20         I see that you know, your argument that there may

21    be no further discovery.  All right.  Mr. Rich, what you're

22    going to have to give me is some sort of a -- evidence which

23    will establish cause, and I'll adjourn this matter.  But I

24    just don't see it in the papers you've provided.

25         MR. RICH:  Your Honor, I'd be happy to submit a

Page 41

1    declaration.

2              THE COURT:  You'd be happy to?

3              MR. RICH:  And you know, I think I'd be subject to

4    cross, just -- I'm not sure how it would change, how -- this

5    same (indiscernible) --

6              THE COURT:  Well, how would I resolve the issue?

7    Well, how am I supposed to resolve the issue?  There's an

8    issue -- you have a burden of proof.  And they may disagree

9    with you, either on the facts or on how the law applies to

10   what you've said.

11             MR. RICH:  All right, but we would also believe

12   that --

13             THE COURT:  You're right.  There may be a factual

14   dispute.  You made certain representations.  Your

15   explanations have changed over time and they may want to

16   cross-examine you.

17             MR. RICH:  Okay.  Thank you, Your Honor.

18             MR. SHIFRIN:  Your Honor, if I may just address a

19   couple of the points that Mr. Rich made?  The core inquiry

20   here is diligence, right?  And I don't know what kind of

21   declaration Mr. Rich can submit, but based on --

22             THE COURT:  Well, let's see it.

23             MR. SHIFRIN:  Well, based on the record that's

24   before the Court, Your Honor, we think that's sufficient to

25   conclude that he hasn't acted diligently, with respect to

Page 42

1    the first deadline, with respect to the extended deadline,

2    the emails and the reasons for the --

3            MR. RICH:  Your Honor, I didn't see a declaration

4    from their side, either, and now he's testifying to facts.

5    If we're going to adjourn this and have an evidentiary

6    hearing, I think that should be subject to change --

7            THE COURT:  Well, why don't you just -- let me

8    just supplement your motion with some evidence of cause,

9    okay, under Rule 16.  I don't think Rule 9006 applies to

10   this.  That's a scheduling order that we're talking about.

11           MR. SHIFRIN:  Your Honor, to the extent he

12   supplements his submissions, the Trustee respectfully

13   requests that we be permitted to respond to anything that's

14   submitted.

15           THE COURT:  You may want to take his deposition.

16   All right, submit your declaration.  When are you going to

17   do that?

18           MR. RICH:  I'll do it within 14 days.

19           THE COURT:  14 days.

20           MR. RICH:  Your Honor, we also think that the

21   expert report is timely under the case management order.

22           THE COURT:  How can it be timely?

23           MR. RICH:  Because the case management order pegs

24   expert discovery on the end of fact discovery.  Fact

25   discovery, actually, on the specific issue of what this

1   expert report is about has been -- already been extended.

2   So by the plain terms of the order, you know, this report is

3   timely and the Trustee has interpreted the order the same

4   way in a different context.

5            THE COURT:  Well --

6            MR. SHIFRIN:  But Your Honor --

7            THE COURT:  But you're talking about the order

8   authorizing the Madoff deposition.  I made it clear that at

9   that point I was not authorizing any further other

10  discovery, where discovery was closed or would otherwise run

11  out -- the deadline would otherwise expire.  I'm certainly

12  not inclined to -- as everybody seemed to wait until the

13  last minute just to pipe up to take the Madoff deposition.

14  If it was that important, it should've been done before.

15  That issue with respect to the document demand?

16            MR. RICH:  Yeah, Your Honor --

17            THE COURT:  That is way late.  And if your, you

18  know, your prior document demand didn't seek the trading

19  records, and you knew trading was important to form the end

20  of discovery.  So --

21            MR. RICH:  Your Honor --

22            THE COURT:  You know, I would not be inclined to

23  grant a motion to compel discovery on that one.  I'll tell

24  you.

25            MR. RICH:  Your Honor, first, I think we're

Page 44

1    entitled to -- I think we would serve the same discovery in

2    the context of our SIPC claim, which is riled and subject to

3    an objection.  I think we're entitled to it there.  Or under

4    Rule 2004.  In addition, I, you know, the Trustee --

5            THE COURT:  Well, I don't have a 2004 order

6    application before me.

7            MR. RICH:  You know, and the Trustee has said he

8    has --

9            THE COURT:  Mr. Rich, if you want to make a motion

10   to compel, go ahead.  I'm probably not going to grant it.

11   If you didn't have the desire or the need for the trading

12   records before the end of discovery, I don't know what

13   suddenly occurred that makes you need the trading records.

14           MR. RICH:  Your Honor, I understood that

15   everything he obtained, the Trustee obtained from BLMIS,

16   this is what he wrote in his discovery response --

17           THE COURT:  I'm done.  I told you you could make a

18   motion to compel.

19           MR. SHIFRIN:  Your Honor, if I may clarify one

20   aspect of the record?  He has moved to compel.  Granted, it

21   was unauthorized, he --

22           THE COURT:  All right, the motion is denied, then.

23           MR. SHIFRIN:  Thank you.

24           THE COURT:  The motion is denied because the

25   trading records were not originally requested, so there was

Page 45

1   no duty to supplement.  Asking for the trading records

2   months and months after discovery is inexplicable in a case

3   like this.  I also noticed you were asking for all of the

4   trading records for all of the accounts?

5          MR. SHIFRIN:  I'd be willing to limit it to the

6   securities on our statements.  It's just that the Trustee --

7          THE COURT:  Well, then that was certainly relevant

8   from starting in 2010, when the motion -- when the case was

9   filed.

10          MR. SHIFRIN:  I'd understood that the Trustee,

11   from his response, it populated the data under all documents

12   he obtained relevant to the fraud.

13          MR. RICH:  We never made such a representation --

14          THE COURT:  But you never -- listen, listen.  You

15   never asked for the trading records.  So whether or not he

16   has all the trading records or populated the data

17   (indiscernible) all the trading records is immaterial.  He

18   never asked for them.  You can submit an order denying the

19   motion to compel (indiscernible) --

20          MR. SHIFRIN:  Thank you, Your Honor.

21          MR. RICH:  Thank you, Your Honor.

22          THE COURT:  Next.

23          MR. MURPHY:  Your Honor, Keith Murphy.  Next up on

24   the calendar, Your Honor, is the matter of Stark.  I'm not

25   sure if you want to take that later, Your Honor?

Page 46

1          THE COURT:  We'll take it later.

2          MR. MURPHY:  Okay.  Moving on.  This is the next

3    matter then, Your Honor, is the four adversary proceedings

4    regarding with -- involving Baker McKenzie.  That's the

5    South Ferry Number 2, South Ferry Building Company, James

6    Lowery, United Congregations Mesora, Your Honor.

7          Your Honor, we had submitted a stipulation where

8    we would try to submit agreed stipulated facts.  The parties

9    had been working on that.  We did seek one extension on that

10   and we said that we would report again to you today.

11         I will report that the parties are still

12   endeavoring to come up with a potential agreed fact set for

13   you to review.  I'm not sure that we will get there, but we

14   are endeavoring to do so, so we would, at this point,

15   request just another two-week extension.

16         I think at that point, we'll know one way or the

17   other whether we will be able to submit that jointly, or

18   whether we would then request separate motions for summary

19   judgment.

20         THE COURT:  Okay.

21         MR. MURPHY:  I don't know if counsel is here.  I

22   saw --

23         THE COURT:  So you're suggesting a two-week

24   extension to try to work out a stipulation?

25         MR. MURPHY:  Yes, Your Honor.

Page 47

1           THE COURT:  All right.  Why don't we adjourn this

2     one to the next omnibus date?

3           MR. MURPHY:  Okay.

4           THE COURT:  We're going to have to change that

5     date on April 26th, but just (indiscernible) chambers.  I

6     think we're going to kick it off one week.

7           MR. MURPHY:  Okay.

8           THE COURT:  But we'll adjourn it to the next

9     omnibus date.

10          MR. MURPHY:  Thank you, Your Honor.

11          THE COURT:  And you know, if you haven't worked it

12    out within a couple of weeks, you can write letters asking

13    me to treat that as a summary judgment conference.

14          MR. MURPHY:  Okay.

15          THE COURT:  All right?

16          MR. MURPHY:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18          MR. MURPHY:  The next matter, Your Honor, is the

19    ABN AMRO matter.

20          THE COURT:  Okay.  Go ahead.

21          MS. DASARO:  Good morning, Your Honor, Stacy

22    Dasaro on behalf of the Trustee.  We are in the Trustee's

23    motion for a certification of the final judgment entered in

24    the omnibus proceeding, captioned Picard v. ABN AMRO,

25    presently known as The Royal Bank of Scotland.  I'll be

1   referring to the defendant as RBS here.

2           I first wanted to thank the Court for hearing this

3   motion within the short timeframe from when we filed it.

4   Part of the reasoning behind that was that the Court has

5   maintained its jurisdiction over this matter only for 30

6   days after the filing of a notice of appeal.  So the idea

7   was to give Your Honor an opportunity to rule on this motion

8   while it still has jurisdiction.

9           THE COURT:  Well, you can make the motion in

10  District Court, also, I suppose.

11          MS. DASARO:  That's correct.

12          THE COURT:  Who is the appeal assigned to, or has

13  it been assigned for?

14          MS. DASARO:  Excuse me?

15          THE COURT:  Has the appeal been assigned?

16          MS. DASARO:  No.

17          THE COURT:  Okay.

18          MS. DASARO:  So I also want to point out that

19  there are two cases currently pending against RBS.  The case

20  that we're here on today involves the transfers from Harley

21  International.  And I'll just limit my remarks to a few

22  points this morning.

23          The applicable legal standard here actually gives

24  the Court three different avenues upon which it can base its

25  (indiscernible) to certify this motion.  If you find that

Page 49

1    one exists, you must certify the appeal.

2         So on the other side, RBS needs to disprove that

3    each of the circumstances set forth in Section 158(z)(2)(a)

4    exist.  The Trustee does submit that all three prongs are

5    satisfied here, but Your Honor can craft a narrow ruling,

6    finding that only one exists --

7         THE COURT:  Well, you rely on extraterritoriality,

8    and I didn't dismiss the RBS proceedings at issue, based on

9    extraterritoriality.  As a matter of fact, I assumed, as

10   Judge Rakoff did, that you had overcome the presumption

11   against extraterritoriality.

12        MS. DASARO:  That's correct.  But the appeal here

13   is of Your Honor's final judgment that was entered, which

14   incorporates Judge Rakoff's memorandum decision that does

15   deal with both extraterritoriality --

16        THE COURT:  Yeah, but if I was wrong on comity, it

17   would be remanded to me to decide extraterritoriality,

18   assuming nothing had changed.  So the extraterritoriality

19   issue was never decided by (indiscernible).

20        MS. DASARO:  And we don't dispute that, but we do

21   believe that the questions as presented on appeal would be

22   properly presented as both -- right at the legal rulings of

23   Judge Rakoff, with respect to extraterritoriality and comity

24   and our right.

25        THE COURT:  Well, it's my decision that's on

Page 50

1   appeal, not Judge Rakoff's, right?

2           MS. DASARO:  We believe that both are properly

3   presented on appeal, but we are appealing --

4           THE COURT:  You can make that argument on appeal.

5           MS. DASARO:  Thank you.  So I just -- I'd like to

6   point out that what the defendants are advocating for here

7   is essentially what would've been a report and

8   recommendation process.  They are advocating for a review of

9   Your Honor's application of Judge Rakoff's ruling.  And

10  there is the opportunity to do that because the --

11          THE COURT:  But that's always true if found on the

12  remand, and you know, the (indiscernible) judgment and then

13  it just goes up on appeal to the District Court.

14          MS. DASARO:  Right.  But the defendants here

15  consented to entry of a final judgment, which was

16  essentially in R&R before that consent.  So we're here today

17  before Your Honor, disputing a matter that could've been

18  essentially --

19          THE COURT:  I understand your argument that maybe

20  it doesn't make sense to go to the District Court because

21  the District Court has already at least decided the legal

22  issues, and then the argument is, even if Judge Rakoff was

23  right, I misapplied the law.

24          MS. DASARO:  That's correct.  And this case

25  certainly will not benefit from any further percolation.

Page 51

1    The District, as you point out, the District Court has

2    already spoken on what I believe the law is, with respect to

3    international comity.

4             And with due respect, there were limited factual

5    findings with respect to international comity in this case.

6    The only ones predicated on the fact of parlay is

7    international insolvency and a few other matters.  But this

8    is not like -- this is actually distinct from what Your

9    Honor endeavored with respect to the extraterritory

10   analyses, where you have analyzed --

11            THE COURT:  That's why I did comity first.

12            MS. DASARO:  And we appreciate that.  And the

13   defendants actually agree in their papers that the District

14   Court would be limited in its review.  And keeping that in

15   mind, this case is certainly going to the Second Circuit no

16   matter what happens.

17            THE COURT:  Well, it's already going to the Second

18   Circuit in other cases.  The issue is going to the Second

19   Circuit.

20            MS. DASARO:  It is.  And we believe that given the

21   coordinated --

22            THE COURT:  Assuming the Second Circuit

23   (indiscernible), I should say.

24            MS. DASARO:  Right, of course.  And in fact, the

25   elements of Section 158 are going to be presented to the

Page 52

1   Second Circuit in our petition.  So even if Your Honor

2   grants this motion today, RBS can still go before the Second

3   Circuit and raise these same arguments.

4           THE COURT:  And tell them that I'm wrong again.

5   That's a reassuring argument to go on.

6           MS. DASARO:  Just another quick point, is you

7   know, Weber teaches us that the standards applicable that

8   govern this motion.  And Page 158 of that decision, they

9   talk about material advancement, and the fact that where an

10  aggrieved litigant is unlikely to give up until the Court of

11  Appeals (indiscernible) --

12          THE COURT:  But can't you make that argument to

13  every single appeal?  Certainly one that has a lot of money

14  involved.  I mean, that's an argument that can be made in

15  every case, and it's an argument, by the way, for cutting

16  out into (indiscernible) appellate review bankruptcy cases,

17  which has been going on now for years, and just skip the

18  District Court or bankruptcy appeal panel review.

19          MS. DASARO:  Right.  And I don't necessarily

20  disagree with that, but because of the limited review, that

21  would be undertaken by the District Court, and the fact that

22  this case has been pending for so many years, we do believe

23  that expeditious review, or at least the opportunity to

24  conduct that expeditious review, should be presented to the

25  circuit.

Page 53

1          And if the circuit thinks that further review by

2     the District Court is warranted, it can say so.  And it will

3     be saying so within due course.  And if you disagree with

4     the material advancement argument, it's all set forth in our

5     papers, but we do believe there are conflicts within this

6     circuit, with respect to both extraterritoriality and

7     international comity.

8          THE COURT:  Okay.  But extraterritoriality aside,

9     what are the (indiscernible) in comity?  I read Judge Batts'

10    decision.  She didn't site to Judge Rakoff's decision, and

11    she didn't site to Maxwell, either.

12         MS. DASARO:  Right.  Well, the reasoning

13    underlying Judge Batts' decision for denying the motion to

14    dismiss on international comity grounds was premised on the

15    idea that although there were foreign funds in

16    international's insolvency proceedings, and that they could

17    have brought similar claims against the defendants in that

18    case, the parties were different, the claims were slightly

19    different, and she -- and he pointed out that the ordinary

20    circumstances for applying international comity might not

21    apply in that case.

22         And I submit, Your Honor, that those facts are on

23    point with what we have here.  And that clearly is at odds

24    with Judge Rakoff's ruling in Your Honor's application of

25    that ruling in this case.

1          And I would just point out again that we -- the

2     motion to dismiss was filed almost five years ago, and well,

3     the District Court has already spoken in this case.  So I

4     think that there -- if there is any case that would satisfy

5     at least material advancement, this is that case.

6          And the worst case scenario is that RBS goes

7     before the Second Circuit, makes these same arguments and

8     the circuit can determine whether or not it believes that

9     this is a proper appeal for direct review.

10         THE COURT:  Okay.  Thank you.

11         MS. DASARO:  Thank you.

12         MR. FELDBERG:  Your Honor, Michael Feldberg from

13    Allen & Overy for Royal Bank of Scotland.  The District

14    Court has spoken, but has spoken in terms of the -- its view

15    of the broad legal principles that govern these various

16    disputes.  The application of those legal principles to the

17    facts of particular cases is what's at issue here.

18         MS. DASARO:  Are you assuming that Judge Rakoff

19    will get this appeal, and how -- does it change your

20    argument, if it just is randomly assigned to some other

21    Judge who's going to read Judge Rakoff's decision?

22         MR. FELDBERG:  It does not change our argument,

23    Your Honor, because our view is having Your Honor or having

24    granted our motion in the Harley action on comity grounds,

25    having denied our motion in the Rye action on

Page 55

1    extraterritoriality grounds.

2              We intend to seek leave to appeal in Rye.  We --

3    our view is that both cases should be heard together because

4    they raise many of the same, if not all of the same issues.

5    And it makes sense for both cases to be reviewed at the same

6    time.  The logical spot for that is the District Court.

7              THE COURT:  But if the Second Circuit accepts this

8    certification of all these other cases, you're never really

9    going to have a case before the District Court.

10             MR. FELDBERG:  Well, we will, because it deals --

11   the Second Circuit will issue a ruling on the law.  At some

12   point, someone has to -- what we're seeking here is a review

13   of the application of the law as it now stands.

14             THE COURT:  But other Harley cases are going up

15   and the application is the same in all of the cases, and in

16   the kind of breakdown that I did in the extraterritorial

17   issue.  So isn't your review really going to be foreclosed

18   if the Second Circuit accepts certification?

19             MR. FELDBERG:  It could be.  And we recognize that

20   we're an outlier here.  The facts of our circumstances are

21   different than the facts of many of the other parties,

22   because we won one and we lost one before Your Honor.  That

23   said, we don't know that the Second Circuit will take the

24   appeal --

25             THE COURT:  I wanted to ask if anybody knows what

Page 56

1    the timing is on these types of motions or certifications in

2    the other cases to the Second Circuit?

3              MR. FELDBERG:  I do not, Your Honor.  Counsel may.

4              MS. DASARO:  Sorry, Your Honor, the petition --

5              THE COURT:  I mean, I guess they do what they're

6    going to do whenever they do it, but that's the short

7    answer.

8              MS. DASARO:  We'll be filing a subsequent

9    application in the 86 other cases in due course in the next

10   several weeks or so.  And the petition is due 30 days

11   thereafter.

12             THE COURT:  Okay.  My question is, and I know what

13   your answer's going to be, Mr. Feldberg, no.  But, does it

14   make sense to see if the circuit takes the certification of

15   all of the other cases, since it sounds like it's

16   (indiscernible) to your argument that they should take this

17   one, too, because it's the same issue on the Harley

18   dismissals?  Conversely, if the circuit doesn't accept the

19   certification, it's -- I wouldn't certify this.

20             MS. DASARO:  Well, we believe that there would be

21   no difference if Your Honor certifies this appeal and we

22   wait for the circuit to rule on it.  There would be no

23   difference, other than that Your Honor would lose

24   jurisdiction to actually make the decision whether or not

25   this appeal should be certified.

Page 57

1          MR. FELDBERG:  And the (indiscernible) argument, I

2    agree.

3          THE COURT:  You agree, what?

4          MR. FELDBERG:  That if probably does not make a

5    lot of sense, to wait to see what the circuit does.

6          THE COURT:  Okay.

7          MR. FELDBERG:  In our view, we have some time

8    constraints.  We have time constraints to seek leave, to

9    take an appeal on the Rye action.  A judge, in our view,

10   will have to review the application of Your Honor's decision

11   to the facts of our particular cases.

12          We think it belongs in the District Court.  Having

13   come to that conclusion, that caused us to actually take a

14   look at the law on direct certification in Section 158.  And

15   quite frankly, we don't see how the Trustee meets any of the

16   three standards set forth in 158(d).

17          The first standard is a judgment order or decree.

18   It involves a question of law as to which there is no

19   controlling decision of the Court of Appeals or involves a

20   matter of public importance.

21          The Trustee argues controlling question of law.

22   There's a controlling question of law, which might be the

23   standard under 1292(b), but is not the standard under

24   158(d).  158(d) says, "No controlling decision of the Court

25   of Appeals."  There is a controlling decision of the Court

1  of Appeals.  Maxwell II I don't think we have a dispute

2  about that.

3          THE COURT:  Well, Maxwell II really had a

4  different issue, and a parallel proceedings, there was a

5  parallel proceedings case.  This is more of an extension

6  type of case.

7          MR. FELDBERG:  Yes, I know it may lead to the same

8  result, but I think it does and there's --

9          THE COURT:  I mean, the -- I guess the question

10 is, can the Trustee, as well as the liquidator in the

11 foreign insolvency proceeding sue the same defendants

12 essentially for the same transfer?

13         MR. FELDBERG:  And that's the argument that we

14 make that says Judge Batts' decision at Kingate is a

15 different fact pattern because these are clawback actions.

16 The money sought can only be clawed back once.  Judge Batts'

17 decision in --

18         THE COURT:  No, but that's not what they're

19 arguing.  Here's -- you know, the liquidators in Harley

20 could argue that the transferees paid Harley.  And the

21 Trustee could be arguing that -- and you (indiscernible).

22         MR. FELDBERG:  And, well --

23         THE COURT:  I have the transferee's been suing --

24 and there was very little information and I was able to find

25 information about Kingate and Fairfield, but there was very

Page 59

1    little information about whether there were these redeemer

2    actions involving Harley.

3                MR. FELDBERG:  To the best of my knowledge, we

4    have not been, Your Honor.

5                THE COURT:  I know the statute is just a

6    preference statute, essentially.  There's no fraudulent

7    transfer statute, is there?

8                MR. FELDBERG:  As far as I know, there is not.

9                THE COURT:  It's just Section 145?  Okay.

10               MR. FELDBERG:  So you know, in our view, Your

11   Honor, the question of -- there is a controlling decision in

12   our view of Maxwell II.  The Trustee doesn't disagree with

13   that.  They argue, well, there's a controlling question of

14   law.  That's a different standard.  That's not the standard

15   of Section 158.

16               They argue it's a matter of public importance.

17   Yes, it's a matter of public importance, but we learned from

18   the Weber case that not everything that affects the public

19   requires skipping the ordinary appellate process.  I

20   appreciate the comment Your Honor made earlier, that there's

21   a debate about whether there should be this rather

22   attenuated appellate process, but while that depends --

23               THE COURT:  Well, that's been resolved by 158.

24   That's what 158 was supposed to do.

25               MR. FELDBERG:  Yeah, yeah.  We have the process we

Page 60

1    have.  We don't think there are conflicting decisions for

2    the reasons we site in our brief, and as noted here.  We

3    think Judge Batts' decision in Kingate involves a different

4    set of facts.

5              The other decisions that the Trustee relies upon

6    involve different statutes.  And then, as to whether,

7    permitting the appeal will materially advance the progress

8    of the case, well, it could make it go faster, to be sure.

9    But that can be said of every case.  Skipping a procedural

10   step will make the case go faster.

11             But that, at least as we understand the Weber

12   decision, isn't the end all and the be all of how this

13   process works.  We think the Court of Appeals would actually

14   benefit from the District Court's review of the decision,

15   both in Harley, and, if we can persuade the District Court

16   to take it, the Rye action.

17             So in our view, the normal appellate process makes

18   sense here.  We're prepared to proceed as expeditiously as

19   possible.  We think both of our cases should be reviewed at

20   the same time, and we don't think any of the standards of

21   Section 158(d) have been met in the Trustee's motion.

22             THE COURT:  And but the procedure is not too here

23   interlocutory appeals in arguing about the procedural setup.

24   And just as appeals normally go from bankruptcy to District

25   Court, the general rule is you don't hear interlocutory

Page 61

1    piecemeal appeals.

2              MR. FELDBERG:  Generally, but there is a procedure

3    in which you can seek leave to take an interlocutory appeal,

4    and we think we -- particularly since the other cases on

5    extraterritoriality and comity are going up somewhere.  And

6    in our view, it makes sense to address the Rye issue.  Now,

7    we have to persuade some courts that we're right on that.

8    But that's an effort that we'll attempt.

9              THE COURT:  Okay.

10             MR. FELDBERG:  Thank you, Your Honor.

11             THE COURT:  Thank you.  I'll reserve a decision.

12   Thank you.  Finally, we have Stark.

13             MR. MURPHY:  Do you want to do Stark here, Your

14   Honor?

15             THE COURT:  Yeah.

16             MR. MURPHY:  Okay.

17             THE COURT:  No reason to adjourn.

18             MR. MURPHY:  I don't --

19             THE COURT:  Mr. Haddad is here.  He's working his

20   way in from the left.

21             MR. MURPHY:  Your Honor, Keith Murphy.  This is

22   the Stark matter.  There are two cases in that matter, the

23   estate of Richard Stark and as well, the case of Thomas

24   Stark.  The cases were filed in 2010.  Answers were filed in

25   2011.

1              THE COURT:  Were these cases part of all those

2      omnibus proceedings that you've been talking about for the

3      last few years?

4              MR. MURPHY:  I don't --

5              MR. HADDAD:  Yes, insofar as they went up with

6      respect to the two-year, six-year, we were -- the Starks

7      were a part of that.  And so, the scope of the potential

8      liability has been defined, set by those decisions.

9              THE COURT:  Go ahead.

10             MR. MURPHY:  We had an initial case conference in

11     April 2014.  I was not at the helm of the case at the time,

12     so I'm just reporting on this to some degree.  However,

13     there was efforts made to move the case toward discovery

14     with a case management order.

15             Putting everything aside on the letters, I would

16     say at this point, it appears that the parties are willing

17     to go for discovery.  I haven't spoken with Mr. Haddad, but

18     I think from his letter, I gathered that a case management

19     order might be around here.

20             THE COURT:  I thought there was an issue with a

21     third party complaint that has never been answered?

22             MR. MURPHY:  That's correct, Your Honor.  Counsel

23     for Cohmad Group is here with us today.  At this point,

24     pursuant to a conversation I had with her, Cohmad is willing

25     to engage in discovery now as well.

1           THE COURT:  Well, Cohmad's in default, isn't it?

2           MR. MURPHY:  I'm not sure what the agreements are

3   between Your Honor --

4           THE COURT:  Well, I never approved any extensions

5   beyond whatever else is reflected in the record, so --

6           MR. HADDAD:  Oh I didn't hear you.

7           THE COURT:  Cohmad's in default.

8           MR. MURPHY:  Yes.

9           THE COURT:  All right, so are we going to --

10          MS. ANTOS-FALLON:  Your Honor, I'm Counsel for

11  Cohmad and I'd like to speak --

12          THE COURT:  Well, we haven't gotten to that yet.

13  Are you going to seek temporary default judgment?

14          MR. HADDAD:  You know, we've thought about that,

15  and then, we thought that the Court might be inclined to

16  just let things go towards a, you know, to allow it.  I

17  wasn't stipulating to permit them to file an answer.  It's

18  now many, many years in default, pursuant to orders entered

19  by Judge Lifland, going back to 2012.  So the answer is, you

20  know, we would ask for the Court --

21          THE COURT:  Well, you don't think it's worth the

22  effort because --

23          MR. HADDAD:  Well, and I wasn't sure if it was

24  going to be worth the effort because we were kind of

25  watching what was going to happen with respect to the main

Page 64

1    case.  And we've watched that happen.  We now find ourselves

2    here, where we are.  Certainly, as indicated in my letter,

3    of what we thought there was an agreement on the schedule a

4    couple of years ago, as to which the Trustee and not Mr.

5    Murphy, but other counsel actually wrote up, sent it to us,

6    and then said -- reneged on it.  And the prior counsel for

7    Mr. Paradise from (indiscernible) was there as well.

8           THE COURT:  So what's the schedule of

9    (indiscernible) --

10          MR. MURPHY:  Yes, let me just address that one

11   point, Your Honor, with respect to the agreement referring

12   to it separate from the case management order.  Years ago,

13   back in 2014, and maybe at the latest, 2015, there was some

14   discussion back and forth between the parties as to whether

15   if the Trustee went forward with his case, against the

16   defendants, would he wait to actually enforce any judgment

17   until the litigation between Cohmad, the side litigation

18   between Cohmad and what's resolved.

19          It was back and forth at that time, but that was

20   abandoned.  It was never presented to Your Honor.  We said

21   we ultimately could not agree with it.  But since that time,

22   so I think this agreement he says that we reneged on, but

23   since that time, there were extensive efforts to show -- I

24   sent him new case management orders.  Nothing's been entered

25   at this point, which is why we're here, Your Honor.

Page 65

1           THE COURT:  Okay.  Okay.  Have you discussed a

2    case management order?

3           MR. HADDAD:  Not recently with Mr. Murphy.  We

4    have not.  I mean, I've seen what case management orders

5    have been entered in other somewhat similar proceedings.

6           THE COURT:  What do you propose, Mr. Murphy?

7           MR. MURPHY:  Your Honor, we'd like to actually

8    have a chance.  I haven't spoken with Mr. Haddad --

9           THE COURT:  Well, but you haven't spoken for

10   years.  I'll do it right now, if you want.

11          MR. MURPHY:  Your Honor, we would do initial

12   disclosures in 30 days.  And then, move fallback and we can

13   work with Mr. Haddad to set the typical discovery schedule

14   that we do in other cases, and would follow from that.  I

15   don't know the dates offhand, Your Honor.

16          THE COURT:  Any problem with that?

17          MR. HADDAD:  No.

18          THE COURT:  All right.  Now let me hear from

19   Cohmad.

20          MS. ANTOS-FALLON:  Good morning, Your Honor.  I'm

21   Marisa Antos-Fallon with Vinson & Elkins.  What happened

22   here in connection with Mr. -- with the (indiscernible)

23   complaint, a third party compliant against Cohmad, is that

24   we had had several agreements with Mr. Haddad to extend the

25   deadline by which Cohmad was to respond to the complaint.

Page 66

1          In the April 2014, around April 2014, we had

2    additional discussions about extending the time to respond.

3    And our position was that the action as against Cohmad, the

4    third party action should be stayed as were many other cases

5    that were brought against Cohmad, pending the completion of

6    the Trustee's case against Cohmad.

7          We had extensive discussions with Mr. Haddad and

8    Dominic Gentile, who was our contact with the Trustee at

9    that time.  Our understanding at that time was that both

10   parties, both the Trustee and the Stark parties were

11   amenable to a stay of the action as against Cohmad under

12   specific circumstances.

13         But as between the Trustee and the Stark parties,

14   there were certain disagreements about the implications of

15   that.  We had extensive discussions, and how we left it was

16   that the Trustee and the Stark parties were going to work

17   out those differences and get back to us.

18         And we have correspondence on this, Your Honor.

19   And we made clear in that correspondence that we were

20   willing to set agreed upon dates, both for our date to

21   answer, or otherwise respond, as well as to participate in

22   discovery, and that they should just let us know when they

23   reached an agreement on the stay.

24         At the time, a plan was to move to stay or to

25   dismiss.  And it, honest to Your Honor, we never heard back

Page 67

1    from them, and our understanding that there was effectively

2    a stay of the action against us.

3           THE COURT:  And not by court order.  And you know

4    that unless a court judge so orders a stipulation extending

5    the time to answer, it doesn't exist.

6           MS. ANTOS-FALLON:  I understand that, Your Honor.

7    But --

8           THE COURT:  So when are you going to move or

9    answer?

10          MS. ANTOS-FALLON:  We can do that within 30 days.

11          THE COURT:  What's the theory of the third party

12   complaint?

13          MS. ANTOS-FALLON:  Oh --

14          THE COURT:  I questioned whether there was

15   supplemental jurisdiction over it.

16          MR. HADDAD:  I mean, I --

17          THE COURT:  I'm not hearing that motion now, but -

18   -

19          MR. HADDAD:  Your Honor's question may be part of

20   what counsel was suggesting has been respectively of a

21   motion.  I'm not precisely sure.  The theory is that in

22   connection with these very specific investments that are the

23   subject of the Trustee's action, the third -- the

24   defendants, the Starks have pleaded that they were

25   specifically advised to make these investments, both prior

Page 68

1    to and after the death of Dr. Stark, the -- one of the --

2    whose estate is one of the defendant's.

3              And that, had the Cohn's, and we've pleaded, in

4    clawback, we've attached very detailed allegations, had the

5    information that the Cohn's had available to them been

6    provided to our clients who we claim have a direct, a

7    relationship with Cohmad and the Cohns, they would have

8    removed their investments from Madoff well in advance of the

9    two years, so as to not face any liability whatsoever for

10   the clawback of the Trustee.  So in our view, it's --

11             THE COURT:  Go ahead.

12             MR. HADDAD:  I'm sorry.  So in our view, it's

13   sufficiently intertwined with the primary case, so as to

14   permit, you know, supplemental jurisdiction for this Court

15   to hear.

16             THE COURT:  Is this an innocent customer case?

17             MR. HADDAD:  Yes.

18             MR. MURPHY:  It is, Your Honor.  It's a good faith

19   case.

20             THE COURT:  I don't know how it's intertwined with

21   the case or any of the defenses.  They're assuming you acted

22   in good faith.

23             MR. HADDAD:  Right.

24             THE COURT:  So they're not trying to impute any

25   knowledge that Mr. Cohn may have.

Page 69

1          MR. HADDAD:  No, I -- and we thought about that at

2     the time, and we hear it.

3          THE COURT:  You know, it seems it's a little far

4     fetched from that HSBC situation with Alpha, right?  Go

5     ahead.  What?  It just sounds -- I really question whether I

6     have supplemental jurisdiction.  It sounds like you have to

7     file the dispute.  With Cohmad, whatever, the merits, and

8     it's not something that really has to be resolved in

9     connection with the Trustee's action.  That's my reaction to

10    it.

11         MR. HADDAD:  No, we hear that.  And you know, we

12    thought about that at the time of the pleading, and

13    ultimately concluded that because of the nature of these

14    very specific transactions falling at the time that they did

15    in response to the comments that were made and direct

16    statements and representations by the third party

17    defendants, that that was sufficient to fall within the

18    scope of this Court's jurisdiction.

19         THE COURT:  Okay.  Why don't you file your motion

20    or answer it within 21 days.  It's been long enough.  Let's

21    move this case along.

22         MS. ANTOS-FALLON:  Thank you, Your Honor.

23         MR. HADDAD:  Thank you, Your Honor.

24         THE COURT:  You can submit answer -- an order

25    fixing the time to -- or you should, I guess, fix an order,

Page 70

1    submit an order fixing your time to respond 21 days from

2    today.  Move or answer.  Okay.

3                MR. MURPHY:  Your Honor, I believe that's all on

4    the Madoff docket.

5                THE COURT:  Okay, you can continue to work.  You

6    can still do your initial disclosures within the next 30

7    days.  I'm really not confident that your third party action

8    is going to survive in this court.  But you can do whatever

9    you think is appropriate.

10               MR. MURPHY:  Thank you.

11               THE COURT:  Thanks.

12        (Whereupon these proceedings were concluded at 11:10 AM)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1                              C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4      transcript is a true and accurate record of the proceedings.

5
       Sonya                    Digitally signed by Sonya Ledanski
                                Hyde
6      Ledanski Hyde            DN: cn=Sonya Ledanski Hyde,
                                o=Veritext, ou,
                                email=digital@veritext.com, c=US
7                               Date: 2017.04.10 13:47:47 -04'00'

8      Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  March 30, 2017