Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 08-01789-smb

4   - - - - - - - - - - - - - - - - - - - x

5   SECURITIES INVESTOR PROTECTION

6   CORPORATION

7   v.

8   BERNARD L. MADOFF INVESTMENT

9   SECURITIES, LLC, et al,

10          Debtors.

11  - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17                  April 18, 2017

18                  2:05 PM

19

20

21  B E F O R E :

22  HON. STUART M. BERNSTEIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  Unidentified

Page 2

1    Trustee's Motion in Limine Excluding Certain Testimony from

2    the Blums

3

4    Trustee's Motion in Limine Excluding Testimony of Aaron

5    Blecker

6

7    Trustee's Motion in Limine Excluding Himself as Witness

8

9    Participating Claimants' Motions in Limine Precluding

10    Experts Greenblatt and Collura

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

```
 1    A P P E A R A N C E S :

 2    BAKER & HOSTETLER, LLP

 3         Attorneys for BLMIS, Trustee

 4         45 Rockefeller Plaza

 5         New York, NY  10111

 6

 7    BY:  AMY E. VANDERWAL, ESQ.

 8         LAN HOANG, ESQ.

 9         AMANDA E. FEIN, ESQ.

10

11    BAKER & HOSTETLER, LLP

12         Attorneys for BLMIS, Trustee

13         Capitol Square, Suite 2100

14         65 east State Street

15         Columbus, Ohio 43215

16

17    BY:  CATHERINE E. WOLTERING, ESQ.

18

19    SECURITIES INVESTOR PROTECTION CORPORATION

20         For SiPC

21         1667 K Street, N.W.

22         Suite 1000

23         Washington, DC  20006

24

25    BY:  KEVIN H. BELL, ESQ.
```

Page 4

1    BAKER & MCKENZIE, LLP

2         Attorneys for Dr. Joel Blum & Dr. Norman Blum

3         815 Connecticut Avenue, NW

4         Washington, DC 20006

5

6    BY:  RICHARD A. KIRBY, ESQ.

7         GRAHAM R. CRONOGUE, ESQ.

8         LAURA CLINTON, ESQ.

9

10   CHAITMAN, LLP

11        Attorneys for Unspecified

12        465 Park Avenue

13        New York, New York 10022

14

15   BY:  HELEN DAVIS CHAITMAN, ESQ.

16

17

18

19

20

21

22

23

24

25

Page 5

```
  1                      P R O C E E D I N G S

  2            THE COURT:  Madoff.

  3            MS. VANDERWAL:  Good afternoon, Your Honor.

  4            THE COURT:  Good afternoon.

  5            MS. VANDERWAL:  Amy Vanderwal of Baker Hostetler

  6   for the Madoff trustee.

  7            As you're aware we're here today before you on

  8   several in limine motions as part of the proper withdrawal

  9   proceedings.  The parties have conferred, and subject to any

 10   preference the Court we have, we agree to an order of

 11   argument for the motions.  They were -- it was sent in the

 12   notice of agenda that was filed yesterday.

 13            Before we begin with Norman and Joel Blum's motion

 14   there is just one initial issue to raise now because it

 15   comes up in --

 16            THE COURT:  Yeah.  Can you --

 17            MS. VANDERWAL:  -- a bunch --

 18            THE COURT:  -- keep your voice up?  It's very --

 19            MS. VANDERWAL:  Sure.

 20            THE COURT:  It's very noisy outside.

 21            MS. VANDERWAL:  It comes up in a bunch of the

 22   motions so I thought I would just touch briefly now on the

 23   scope of the proceedings when we get to trial.

 24            THE COURT:  Maybe we should talk about that first.

 25            MS. VANDERWAL:  That's what I was suggesting.
```

Page 6

1              The way that it had originally been anticipated,

2       as I think Your Honor is aware, it was an omnibus

3       proceeding, much like the inter account transfer omnibus

4       proceeding where the participating claimants opted in to

5       resolve the specific issue of whether the proper withdrawal

6       transactions on customer statements were properly treated as

7       debts.  And then once the omnibus issues was resolved the

8       claimants, like in inter account transfers, could raise any

9       specific issues they had and we would work on resolving

10      those on sort of an individual level.

11             Through the course of the briefing it seems some

12      of the participating claimants, that they're more focused on

13      whether they received the particular checks as opposed to or

14      in addition to the omnibus issue.  And though it wasn't

15      originally contemplated, if the Court was so inclined we

16      would be fine with for after the omnibus portion of the

17      trial resolving the claims of -- the objections to claims

18      determination of Mr. Blecker and the Blums.

19             There are, of course, fifty other participating

20      claimants represented by Ms. Chaitman and we haven't engaged

21      in any discovery with them so we wouldn't be in a position

22      to deal with those claimants.  But if that was something

23      that the Court was inclined to do and participating

24      claimants were interested in, the trustee has no problem

25      with that.

Page 7

```
 1              THE COURT:  That's fine with me.  It will save you

 2      another trip, I suppose.

 3              Mr. Kirby.

 4              MR. KIRBY:  Yes, Your Honor.  Richard Kirby on

 5      behalf of the Drs. Joel and Norman Blum.

 6              I'm troubled for the trust -- that the trustee

 7      raises this issue now.  And the reason is, is that the so-

 8      called omnibus proceedings have been going on for now more

 9      than two years.  There was a very specific order entered by

10      the Court in June that set up a process by which the

11      documentation would be presented and parties would opt in or

12      opt out.

13              At this point having opted in, complied with the

14      very strict rules about production and so forth, we view

15      that the proceeding at this juncture relates to those people

16      who have opted in, complied with the discovery obligations

17      that have been imposed on us by the Court.  We've engaged in

18      the extensive discovery including the extended discovery

19      that the Court authorized with respect to the employee

20      claims.

21              And at this point we think it's ripe for our

22      clients' motions to be heard.  What we --

23              THE COURT:  Well, how is that different from what

24      the trustee just said?

25              MR. KIRBY:  Well, the -- it's different only in
```

1    this respect.  What evidence the trustee puts -- chooses to

2    put on in some other proceeding relating to what they

3    perceive is their necessity to deal with claims that are not

4    the ones that are before the Court, we don't -- that's not

5    our problem.  That's not our issue.  And we would just as

6    soon have the proceedings that relate to our clients

7    narrowed to just the ones that are really at issue.

8            THE COURT:  Is it --

9            MR. KIRBY:  I don't want to have --

10           THE COURT:  Is this your argument that the trustee

11   can't rely upon what is essentially information relating to

12   profit withdrawal and corresponding disbursement records as

13   to other claimants in your case?

14           MR. KIRBY:  Yes.

15           THE COURT:  Okay.  I disagree with that.

16           MR. KIRBY:  Okay.  Then I'll --

17           THE COURT:  And let me explain why.

18           MR. KIRBY:  Yeah.

19           THE COURT:  This is essentially a statistical

20   case, and subject to being educated my understanding of what

21   the trustee is arguing is that in a, I don't want to say

22   small or relatively small percentage of later cases or later

23   transactions there is a high correlation between the profit

24   withdrawal noted on the customer statements, I guess, or the

25   trustee's books and records and actual corresponding

Page 9

1    evidence of disbursements.

2            And then the trustee is asking me, as the fact

3    finder, to extrapolate backwards, if that's the right

4    phrase, and conclude or infer from that that even when there

5    are no corresponding records that the PW still stands for a

6    disbursement.  And I don't know how the trustee proves that

7    except statistically.

8            MR. KIRBY:  Okay.  That would be great if they had

9    offered a statistician to support that claim.

10           THE COURT:  Well, the -- I -- I think one of your

11   arguments, and I agree with it, is I would not permit -- and

12   maybe we're getting ahead of ourselves.

13           MR. KIRBY:  Yeah.

14           THE COURT:  I wouldn't accept testimony from Ms.

15   Collura or Mr. Greenblatt that it's reasonable to infer that

16   the records that are missing would prove the trustee's case.

17   It seems to me that's an inference I have to draw from the

18   evidence.  They can tell me on how many instances the PW

19   notation matched the disbursement, what the universe of PW's

20   are and, you know, whatever other relative -- evidence may

21   be relevant to that determination.  And then I will either

22   draw or not draw the inference that the trustee is asking me

23   to draw.

24           MR. KIRBY:  As the finder of fact I agree.

25           THE COURT:  Right.

1          MR. KIRBY:  Okay.

2          THE COURT:  But I can't do that in your client's

3    case without hearing all of this -- you know, the universe

4    of evidence.

5          MR. KIRBY:  I understand.  But I want to make sure

6    that the Court appreciates that the very relevance of that

7    issue to our clients is an issue that we -- is one aspect of

8    our motion and we intend -- I would like to address that at

9    the -- today because I think there is -- there's a singular

10   fallacy in the even -- the very concept of what the

11   trustee's doing, but I think it is worth going through the

12   evidentiary issues to sort of parse that out.

13          And so with the Court's permission, unless you

14   want to hear further from the trustee, I would like to

15   address these evidentiary issues.

16          THE COURT:  What --

17          MS. VANDERWAL:  The only thing I would briefly

18   add, Your Honor, and I will be brief, is that if -- we're

19   not merely asking this Court -- and you'll hear more of this

20   as we go on to extrapolate.  There are books and records in

21   the debtors possession that suggest for these claimants they

22   did receive PW transactions.

23          So it's a combination of the actual records that

24   relate to the (indiscernible) claimants and other records

25   from a later time period where they're not -- they

Page 11

1    reconciled the third party claims.

2            THE COURT:  Well, whatever -- whatever the

3    trustee's records are, my recollection is that for all of

4    the PW transactions before 1998, I think, there are no

5    corresponding disbursement records because you just don't

6    have the records.  It's not that there are contradictory

7    records.  There are just no records.  And --

8            MS. VANDERWAL:  That's correct.

9            THE COURT:  -- you're asking me to conclude,

10   because the records match after that period, more or less,

11   that I should also conclude that if we had the records they

12   would confirm it all, or basically that the PW transactions

13   were actual disbursements.  That's really what this is

14   about, right?

15           MS. VANDERWAL:  That's correct.

16           THE COURT:  And let me just say at the end of this

17   proceeding, assuming I agree with the trustee, all it's

18   going to mean is that I will infer that subject to hearing,

19   you know, credit -- claimants get up and say, well, I never

20   got a check and there -- you know, and that kind of

21   evidence.

22           MS. VANDERWAL:  And I just want to bring you to

23   one other thing which is the burden of proof, which is

24   something that we've talked about --

25           THE COURT:  Right.

                                                        Page 12

1           MS. VANDERWAL:  -- at various instances and here,

2    as Your Honor is aware, in a civil proceeding the burden of

3    proof to prove their claim is on the claimant.

4           THE COURT:  Right.

5           MS. VANDERWAL:  Which means from the beginning,

6    you know, they file their claim.  They need to file

7    documentation to support it.  The trustee or in this case

8    because of its complexity the trustee's experts review the

9    book and -- books and records to see if what's on the claim

10   corresponds to those books and records and then denies,

11   allows or allows in part the claim.  And then to the extent

12   that the claimant wishes to object it's their obligation to

13   come forth with evidence as to why --

14          THE COURT:  Right.

15          MS. VANDERWAL:  -- the books and records --

16          THE COURT:  But the --

17          MS. VANDERWAL:  -- were incorrect.

18          THE COURT:  But like you take someone like Mr.

19   Blecker and he's going to say, I never got the checks.  What

20   more does he have to do?

21          MS. VANDERWAL:  Well, a self-serving statement

22   alone isn't sufficient --

23          THE COURT:  Why not?

24          MS. VANDERWAL:  -- to satisfy the burden without

25   any kind of documentation to support --

1          THE COURT:  Well, how is he support to document

2    that he never go the checks?

3          MS. VANDERWAL:  Well, he could provide -- I mean,

4    he could provide bank records.  He could provide --

5          THE COURT:  You could provide --

6          MS. VANDERWAL:  -- tax records.

7          THE COURT:  -- bank records showing that he got

8    the checks.

9          MS. VANDERWAL:  He could, you know --

10         THE COURT:  Nobody keeps 20 year old bank records.

11   And, you know, that's a question we'll get to at trial.

12         MS. VANDERWAL:  Okay.

13         THE COURT:  I just --

14         MS. VANDERWAL:  That's fair.

15         THE COURT:  You know, they're going to get up and

16   say they didn't get it and I don't know what more they have

17   to say.  I may or may not believe it, and I've express

18   reservations in Mr. Blecker's case in the past about the

19   credibility of that statement.  But --

20         MS. VANDERWAL:  I think you'll hear

21   (indiscernible) as we move on.  But I --

22         THE COURT:  Yeah.

23         MS. VANDERWAL:  -- there is SIPA case law

24   suggesting that a self-serving statement isn't sufficient to

25   carry the burden in a SIPA case.  But --

```
 1              THE COURT:  Of a non-fact?

 2              MS. VANDERWAL:  -- we can --

 3              THE COURT:  How do you prove a non-fact?

 4              MS. VANDERWAL:  We can (indiscernible) through

 5    that later.  Well, if -- you know, if they had bank records

 6    for the relevant period, if they had sought to obtain bank

 7    records --

 8              THE COURT:  How would you prove a non-fact with

 9    bank records, the absence of an entry?  All right.  Why

10    don't we start with the motions?

11              MS. CHAITMAN:  May I just make one comment?

12              THE COURT:  Yes.

13              MS. CHAITMAN:  Helen Chaitman on behalf of the --

14              THE COURT:  You have to speak into the microphone.

15              MS. CHAITMAN:  Helen Chaitman on behalf of a

16    number of the claimants, but nominally Mr. Blecker.

17              THE COURT:  Please keep your voice up.

18              MS. CHAITMAN:  You -- I think you made one

19    mistake, Your Honor, and I just wanted to --

20              THE COURT:  Only one?

21              MS. CHAITMAN:  Only one.

22              THE COURT:  We've only been out here five minutes,

23    so.

24              MS. CHAITMAN:  I know.  I just want to clarify it.

25              THE COURT:  Right.
```

1          MS. CHAITMAN:  You said that there's no

2    documentary evidence proving that anyone got the checks, and

3    that isn't true because there is documentary evidence based

4    on the depositions we've taken of the former Madoff

5    employees.  And that Bonjourno (ph) testified that every

6    check that was sent for a profit withdrawal --

7          THE COURT:  I don't want to hear the evidence now.

8          MS. CHAITMAN:  Okay.

9          THE COURT:  My recollection from the -- reading

10   the expert affidavits is there is a high correlation in the

11   post-2000 -- post-1998 Euro between a PW notation and an

12   actual evidence of disbursement.

13         MS. CHAITMAN:  There was no PW entry after 1998.

14   It doesn't exist.  What the experts have --

15         THE COURT:  I can tell --

16         MS. CHAITMAN:  -- done is --

17         THE COURT:  I thought they went beyond that.

18         MS. CHAITMAN:  No.  No.  What the experts have

19   done is taken journal entries --

20         THE COURT:  I -- please.  Let --

21         MS. CHAITMAN:  Okay.

22         THE COURT:  Let's just do this in order because if

23   everybody stands up --

24         MS. CHAITMAN:  Okay.

25         THE COURT:  -- and argues their own claim it's not

Page 16

1    going to work.

2           Mr. Kirby, you have the floor.

3           MR. KIRBY:  Okay.

4           Your Honor, on the issue of burden of proof I

5    would like to say that it is our position and we've set this

6    forth in our papers on the merits that the burden of proof

7    is at this juncture, once the -- we -- I will respect the

8    Court's decision that says that once the trustee has made

9    the decision the burden is on our clients to come forward

10   with some evidence to overcome the presumption for which the

11   trustee is entitled.

12          Once they've come forward instead we did not

13   receive the checks and they have firsthand knowledge of

14   that.  That is sufficient.  And my understanding of then the

15   question is for the Court to decide the knowable of that

16   issue.  And my understanding is, is that SiPC itself agrees

17   that that's the appropriate role.

18          Now what we're dealing with is a proceeding where

19   the trustee offers documentation from Madoff's what they

20   have termed fabricated files on which he relies to reduce

21   the amount of our client's valid (indiscernible) claims for

22   which they've submitted the necessary SiPC claim

23   documentation.

24          And our basic position is, is that the Court

25   should not permit the trustee to rely on this type of

Page 17

1    evidence.  And we've asked the Court to exclude it for three

2    reasons.

3            First, to exclude statements -- documents relating

4    to parties that are not parties to the case, and we were

5    just talking about this and I want to spend a little time

6    with that, but I just want to outline our basic position.

7            The second thing is, is to exclude hearsay

8    statements.  And there isn't any question that this so-

9    called PW entry is hearsay.

10           THE COURT:  Well, all the books and records are

11   hearsay.

12           MR. KIRBY:  Of course.

13           THE COURT:  But the trustee is supposed to

14   determine net equity claims in accordance with the books and

15   records and any other satisfactory (indiscernible).  So

16   doesn't the trustee have to look at the books and records?

17           MR. KIRBY:  He does have to look at the books and

18   records.  But what the trustee has steadfastly stated since

19   the beginning of this case is the books and records are

20   unreliable.

21           THE COURT:  That's true in all fraud cases,

22   though.

23           MR. KIRBY:  Pardon.

24           THE COURT:  It's true in all fraud cases and

25   that's why --

1           MR. KIRBY:  Yes.  But then --

2           THE COURT:  -- you hire a forensic accountant.

3           MR. KIRBY:  So then -- yeah, but what does a

4    forensic accountant do?  He verifies the existence of these

5    records notwithstanding the problem with the books and

6    records.

7           THE COURT:  Right.

8           MR. KIRBY:  Okay.  The problem here is what the

9    trustee has stated doesn't fall with any of the exceptions

10   to the hearsay rule.  They're not business records because

11   of the trustee's own determination that they are unreliable.

12          THE COURT:  Well, is there a difference between a

13   business record and an unreliable record?  In other words,

14   can a business record be unreliable and still be a business

15   record?

16          MR. KIRBY:  The case law recognizes that there's a

17   trustee where you have these fundamentally unreliable

18   records and you can verify them from third parties, for

19   example, and the --

20          THE COURT:  But isn't that --

21          MR. KIRBY:  -- that would be an appropriate way to

22   admit them.

23          THE COURT:  But isn't that with respect to the,

24   I'll call them the confirmed PW transactions, isn't that

25   what the trustee's experts have done?  And I know you take

Page 19

1    issue with experts.  But in other words they looked at the

2    books, as I understand it, they looked at the books and

3    records.  They see these PW notations and then they look for

4    corresponding evidence of actual disbursements.

5              MR. KIRBY:  Your Honor, what is the evidence be --

6    once you establish that -- remember, what the trustee has

7    stated is that there were no trades.  There were no

8    securities purchased.  There were no actual profits created.

9    And they actual -- and so any assertion that the profits,

10   that such profits were made is a false entry.

11             So then they pick and choose.  They go through

12   everything on the statement is false because this little

13   entry called PW which we're going to assert is true and it's

14   not only that PW means something, but it means that there

15   was a check issued, cut and received by our clients.  That's

16   the fallacy.  That's what they're jumping on.

17             Now where the -- what the trustee has done and his

18   experts have done is verified through third party records

19   some of the transactions.  What is the evidence?  It's the

20   verification through third party.  It's not because the PW

21   magically becomes true.  It's because they've been able to

22   verify it.

23             Now that really goes to the really essence of what

24   the problem is when you look at the expert reports, and I

25   would like to get to that.  But I would like to just outline

Page 20

1    for you the problems with the hearsay itself.

2            It doesn't make PW suddenly not hearsay.  It means

3    that it's been verified in some way, but there are 90 -- the

4    trustee represents there are 92,000 PW transactions, very

5    few of which have been verified.  And the ones that were

6    verified and we can talk about, the ones that have been

7    verified, were -- are -- relate to a handful of defendants.

8    They've verified -- been able to verify less than ten

9    percent of the, sort of what I would call non-Norman Levy

10   transactions and we can talk about that.

11           So the trustee then turns after, you know, to the

12   extent perhaps that business records don't get them there,

13   they've created this new argument that somehow the ancient

14   records rule applies.  And the problem with that is that it

15   rests on the authenticity of the records.  We've briefed

16   this extensively, but the authenticity of the records deals

17   with the truthfulness and they don't even claim that the PW

18   entry was truthful.  What they -- what I think the most fair

19   -- the most fair interpretation of what they've been able to

20   establish is that sometimes we're able to verify that

21   through third party records.

22           THE COURT:  But doesn't that really go to the

23   strength of the inference that the trustee is asking me to

24   draw?

25           MR. KIRBY:  Oh, but that -- no, because you start

Page 21

1    with the proposition that they should not be permitted to,

2    as an evidentiary matter, to offer hearsay that doesn't fit

3    within the exception.  So the -- if you take --

4                THE COURT:  Could they -- could they rely --

5                MR. KIRBY:  -- the PW out --

6                THE COURT:  Could they rely on the cash in/cash

7    out records in computing the net equity claim?

8                MR. KIRBY:  And the reason for that is, is for the

9    most part that's not disputed.  In most of our cases we've

10   --

11               THE COURT:  Well --

12               MR. KIRBY:  -- stipulated to that.  Okay.

13               THE COURT:  Except for the participating the

14   claimants the PW isn't disputed either.

15               MR. KIRBY:  Right.  The -- because what the

16   trustee did was had no third party records with respect to

17   those cash in, cash out.

18               THE COURT:  Well, then -- but then the argument is

19   that the inference is unwarranted.

20               MR. KIRBY:  That is certainly an unwarranted in

21   the case where our client sitting never got it.  Okay.  But

22   the -- finally, I just want to mention on the hearsay, they

23   asked for the residual exception.  And the problem with that

24   is, is that the burden is on the trustee to establish that

25   those are especially trustworthy.  And, again, we're dealing

Page 22

1    with whether the PW entry in and of itself means anything

2    and can be relied on.

3           The answer to that is I think clearly it cannot.

4    Where there are third party records that -- then as we

5    discussed a few minutes ago, then the question becomes

6    whether there's any reason or inference that can be drawn

7    from those third party records with respect to the

8    circumstances of our clients.  That's really what the issue

9    is.  It's not because PW means anything because they --

10           THE COURT:  Well --

11           MR. KIRBY:  -- have established that it doesn't.

12   What it means is that there are third party records --

13           THE COURT:  Well, no.  It may mean exactly what

14   the trustee says it means, right?  In other words, there are

15   certain parts of the Madoff record keeping which are

16   accurate.  There are others obviously the fictitious -- what

17   is essentially the fictitious trades and things like that

18   are not accurate.  But there are parts that are accurate and

19   the question is which side the PW falls on.

20           MR. KIRBY:  Well, there's also -- there's a

21   problem that they are seeking to prove records go from 1981

22   to 2008, 27 years.  If there was some -- if the evidence was

23   that there was a systematic method of record keeping at

24   Madoff then it -- that was consistent that might be

25   something appropriate for an inference, but the actual

1    evidence from the employees who testified was that Madoff

2    was changing the -- its -- first of all, with respect to the

3    house manual which they've trumpeted as very few of the

4    Madoff records even complied with the house manual.  The

5    trustee himself and experts acknowledged that.  And the

6    employees when asked to in person had never seen or heard of

7    the house manual.

8            So the -- the real issue is, is there any

9    systematic -- is there any ability or reasonable way for the

10   Court to infer from records keeping that was kept in 1998 to

11   2008 what the circumstances of the record keeping was under

12   --

13           THE COURT:  But, Mr. Kirby, don't I have to hear

14   the witnesses to make that determination?

15           MR. KIRBY:  I think --

16           THE COURT:  And let me just digress for a minute.

17   This whole procedure started as what looked like something I

18   was supposed to decide on papers.  And I raised the issue of

19   testimony and then I raised the issue of taking the

20   depositions of the people who might know.  And, in a sense,

21   your motion is trying to move it back to where it's just

22   being done on papers.  It seems to me that it would be

23   helpful to hear what records there were, how they were

24   created.  There are obvious witnesses.  I may ultimately

25   agree with you, but it just sounds like -- it's very

Page 24

1  difficult to make this determination without hearing those

2  witnesses.

3          THE COURT:  I think it's important before we get

4  to that and the reason for these in limine motions is to

5  address and deal with the evidentiary issues up front

6  because I think as -- as I've indicated, the hearsay

7  problems need to be addressed.  And then the expert -- the

8  problems with expert opinion and summaries need to be

9  addressed.  And then if you elect to hear the witnesses

10 first we would simply renew those motions and they're going

11 to have to be decided at a later --

12         THE COURT:  Well, it's --

13         MR. KIRBY:  -- at a future date.

14         THE COURT:  It may be more meaningful to decide

15 them in the context of a trial when I've had proof and you

16 can cross-examine their witnesses and they can redirect

17 their witnesses.

18         MR. KIRBY:  But some of those things like the

19 hearsay issues are going to have to be complied with.

20         THE COURT:  Well, but, you know, experts can rely

21 on hearsay evidence.

22         MR. KIRBY:  Well, I -- they can rely on hearsay

23 according to the standards if it is -- it is a normal thing

24 for experts to rely on hearsay and it is not normal for a

25 forensic accountant to rely on a systematic system where

Page 25

1   there are -- the records are totally missed.

2              THE COURT:  Well, you know, I would like to hear

3   from the forensic accountants on what they rely on.  I know

4   that there are many cases where forensics accountants will

5   reconstruct fraudulent records.  We wouldn't need forensic

6   accountants if we didn't have problems with fraudulent

7   records and I would like to know what it is they normally

8   rely on and how they go about doing what they do generally

9   and how they did what they did in this particular case.

10             MR. KIRBY:  I can respect that that might be

11  appropriate, but what the experts have written in their

12  reports is that they're not relying on their reconstruction

13  of missing records.  What they're relying on is an inference

14  that they've drawn from what missing records would show.

15  And that's -- that -- there's no foundation for.

16             THE COURT:  But I said that I would or would not

17  draw that inference.  They're going to tell me that they

18  found that correlation that we discussed, and they're going

19  to ask me -- the trustee's going to ask me to draw the

20  inference that PW means in all cases that that was an actual

21  disbursement.

22             MR. KIRBY:  Right.  And --

23             THE COURT:  And that's what this is really about.

24             MR. KIRBY:  Pardon.

25             THE COURT:  And that's what this is really about.

```
 1              MR. KIRBY:  I think first of all, Your Honor, we

 2    should focus on and I do want to turn to a couple of issues.

 3    But, first, let's focus on what the experts --

 4              THE COURT:  Keep your voice up.

 5              MR. KIRBY:  If there is -- what we're focusing on

 6    what we're talking about is a summary evidence, then what

 7    they have to summarize is something that's actual admissible

 8    evidence.  So that just summarizing hearsay is not going to

 9    solve the problem.

10              THE COURT:  But they provide a summary that showed

11    me the particular PW entries and the corresponding

12    disbursement record.

13              MR. KIRBY:  Sure.

14              THE COURT:  So that's -- I mean, in large part

15    that's what they're doing.

16              MR. KIRBY:  Well, yes, but what they've done and

17    if you parse it and you read what their report says, they've

18    taken a period from 1998 into 2008, verified those records,

19    which were less than five percent of the records that exist

20    on the PW transactions and then sought to draw an inference

21    about missing records --

22              THE COURT:  I understand --

23              MR. KIRBY:  -- from that.

24              THE COURT:  I understand that.  And all I'm

25    suggesting is before I decide whether or not that's an
```

Page 27

1    appropriate inference, I think it's appropriate to hear the

2    evidence about what they do and what they didn't do.

3              MR. KIRBY:   Okay.

4              THE COURT:   We're just going around in circles --

5              MR. KIRBY:   Let's -- yeah.

6              THE COURT:   -- at this point.

7              MR. KIRBY:   Yeah.  But let's just parse that for

8    minute.  Okay.  If it is hearsay as we represent, the PW is

9    hearsay, but the trustee's evidence of just summarizing

10   hearsay doesn't help you, and if there's lost or missing

11   records and Rule 1004 permits some alternative evidence when

12   they're lost or missing records, but they have to show some

13   -- put on evidence of if its admissible as to what the

14   alternative is by somebody with firsthand knowledge.  These

15   people don't have firsthand knowledge.

16              So what we're left with is an expert opinion.  And

17   what their -- they're not being -- they're not drawing the

18   inference, the alternate inference which they're -- Your

19   Honor has reserved for itself.  What they're drawing an

20   inference about is what missing records would say if they

21   existed.

22              THE COURT:   But I wouldn't accept that testimony.

23              MR. KIRBY:   Okay.  Okay.  If that's the case --

24              THE COURT:   I'm not going to --

25              MR. KIRBY:   -- then we need not discuss it --

1            THE COURT:  I'm going to --

2            MR. KIRBY:  -- further.

3            THE COURT:  -- I'm going to hear the evidence.

4    It's a statistical case.  And then I'm going to make a

5    determination about whether it's a reasonable inference of

6    the inference that they're asking what the experts have

7    drawn but really they're asking me to draw as a reasonable

8    inference.

9            MR. KIRBY:  Okay.  But as long as it's clear that

10   you're drawing the inference and not --

11           THE COURT:  I'm going to --

12           MR. KIRBY:  -- the experts.

13           THE COURT:  -- take the -- I'm not going to --

14           MR. KIRBY:  Okay, because they're not qualified --

15           THE COURT:  I'm not going to -- I agree with you.

16   The experts can't tell me what's in non-existent or missing

17   --

18           MR. KIRBY:  Okay.

19           THE COURT:  -- documents.

20           MR. KIRBY:  Okay.  I --

21           THE COURT:  Why don't you -- why don't you -- we

22   have four motions so --

23           MR. KIRBY:  I know.  Okay.  We've made three

24   motions to deal first of all with the other records and

25   you've already -- we've talked about them.  But I do think

```
 1      that some -- I would just like to highlight a particular

 2      important point on that issue.

 3                  In the Collura report, footnote 10 for principal

 4      report she --

 5                  THE COURT:  What --

 6                  MR. KIRBY:  -- mentions --

 7                  THE COURT:  What exhibit is that?

 8                  MR. KIRBY:  Footnote 10.  I think it's -- page 13

 9      of --

10                  THE COURT:  You know which -- there are a lot of

11      tabbed exhibits in there.

12                  MR. KIRBY:  It's --

13                  THE COURT:  This is -- is this her first report

14      that you're --

15                  MR. KIRBY:  Her first report.

16                  THE COURT:  -- that's in July?

17                  MR. KIRBY:  July, Your Honor.

18                  THE COURT:  Let me see if I can find it.  Oh,

19      okay.  I have it.

20                  MR. KIRBY:  She says -- and this is very

21      important.

22                  THE COURT:  Footnote 10?

23                  MR. KIRBY:  Footnote 10.

24                  THE COURT:  Oh, about Norman Levy.

25                  MR. KIRBY:  Right.  Now the important thing is, is
```

Page 30

1    that what the trustee has seen and his experts through an

2    analysis, Collura's analysis, when she factors the numbers

3    we've been able to verify some 52,000 of the 40 -- 92,000.

4    Of those, 47,000 are relate to Norman Levy.  But the trustee

5    is putting in Collura documents that she is able to verify

6    through third party records almost all of the Norman Levy

7    transactions.  Okay.

8              So I -- let -- Norman Levy settled this case six

9    years ago and dismissed his claims.  They resolved the

10   issue.  What we're talking about, then, is the subset of

11   documents that have nothing to do with Norman Levy.  They

12   have inflated their statistics by using the Norman Levy

13   information and as the trustee himself has explained the

14   circumstances of Levy's transactions are inexplicable.

15   That's their words.

16             THE COURT:  That goes to the weight, not --

17             MR. KIRBY:  Okay.

18             THE COURT:  -- not the admissibility of the --

19             MR. KIRBY:  Okay.  So my point is this --

20             THE COURT:  -- of the testimony.

21             MR. KIRBY:  -- is that when you parse through the

22   transactions which the trustee has verified that are non-

23   Levy transactions they are fewer than ten percent.  And

24   certainly --

25             THE COURT:  You're playing the same statistical

Page 31

```
1     game in reverse that the trustee is --

2              MR. KIRBY:  Well --

3              THE COURT:  -- playing.

4              MR. KIRBY:  -- yes.  But then it's one thing for

5     them to come forward and say, I infer or I'm asking you to

6     infer from the evidence that because we've been able to

7     document more than 50 percent of these, and they -- I think

8     the number they used was 57 percent.  But when you take the

9     Levy transactions out they've been able to document fewer

10    than ten percent.

11             And so that is a key statistic that I wanted to

12    highlight for you and it's one of the reasons why in our

13    motion we're suggesting that the Court should exclude the

14    evidence from people that have long since settled and are

15    not part of the case.

16             THE COURT:  I don't see a legal basis to do that.

17    That's an argument that goes to the weight, not the

18    admissibility of --

19             MR. KIRBY:  Okay.

20             THE COURT:  -- the evidence.  And let's remember

21    this is a bench trial.  There is no jury.  I know what I can

22    consider and I know what I --

23             MR. KIRBY:  Okay.

24             THE COURT:  -- shouldn't consider even if I hear

25    it.
```

```
 1              MR. KIRBY:  I -- the purpose of this motion is to

 2      -- the purpose of these motions is to get a preliminary read

 3      on these issues.

 4              Now I --

 5              THE COURT:  Why don't you wrap it up, though,

 6      because --

 7              MR. KIRBY:  Okay.  I will emphasize then we've

 8      talked about the expert testimony and I think that the key

 9      question that the Court should keep in mind in deciding --

10      you -- you know, we would ask the Court to preliminarily

11      rule on these issues because it will make the trial of this

12      and the evidentiary motions easier to deal with at trial,

13      that speculation about missing records is not something that

14      can be admitted.

15              And we're asking the Court to specifically also

16      address the hearsay issues in advance of trial because I

17      think that the hearsay issues need to be addressed because

18      if -- to the extent that the experts rely on it, let them

19      testify about that.  That's a different question from

20      whether the documents themselves can be offered for the

21      truth of the matter asserted.

22              And so we're suggesting that if the Court is

23      inclined to go and hear what the experts have to say, that

24      you do make a preliminary ruling about the hearsay.

25              Thank you, Your Honor.
```

1           THE COURT:  Thank you.

2           MS. HOANG:  Good afternoon, Your Honor.

3           THE COURT:  Good afternoon.

4           MS. HOANG:  Lan Hoang on behalf of the trustee and

5    I'll be very brief, and I won't cover any statistics.  I can

6    promise you that.

7           I want to start out with the BLIS documents that

8    the claimants have said that, you know, they're not business

9    records.  They're -- we're not sure because they're part of

10   a fraud we don't know whether they -- we don't think that

11   they should be in or out.  Let's take a step back.  The

12   trustee is a -- is a stranger to the -- to BLIS, to the

13   debtor and steps into the -- and step -- when he is

14   appointed it is his duty to come in, secure the records,

15   take custody of them, preserve the records, and that's what

16   he did here.  That was shortly after his appointment.

17          Then the trustee takes a look at the records and

18   says -- and determines which -- tries to -- based on his

19   expertise to reconstruct the records.  But this -- we're not

20   disputing that BLIS was a fraudulent entity, but fraudulent

21   entities still have business records, and that is the

22   trustee's job, which he's done here, is to assemble those

23   records in some form or manner that provides the Court with

24   rely -- provides the Court with reliable records upon which

25   to make determinations like PW, profit withdrawals, like

Page 34

1    cash additions, cash withdrawals.  I mean, that's what the

2    trustee's prepared to do here and what he has done.

3            THE COURT:  Well, I don't understand Mr. Kirby to

4    be arguing that what he did was necessarily unreasonable

5    within the meaning of the statute.  He's just saying he was

6    wrong.

7            MS. HOANG:  I'm sorry.  I --

8            THE COURT:  I mean, in other words --

9            MS. HOANG:  -- I come here and --

10           THE COURT:  I know.  The trustee could be

11   reasonable in what he does, but he could still be wrong.

12           MS. HOANG:  That's the position the trustee is in

13   based on whatever books and records come into his

14   possession.  And on that issue particularly is, you know,

15   the trustee has to put forth at trial, put forth at an

16   evidentiary hearing authentication of these documents.

17   Well, because he is a stranger to the rule -- the case law

18   provides a -- he's provided some leniency because he

19   normally can't as a CFO or a custodian of record in a debtor

20   he does not have that firsthand knowledge.

21           So what has he done here?  I've laid out what he

22   did with the chain of custody.  He's going to provide his

23   expert test -- his -- through his experts who have examined

24   all of the documents.  He's like -- and have determined

25   there is reliability across the document.  And Mr.

Page 35

1   Greenblatt has looked at the documents from 1981 to -- I'm

2   sorry.  I'm just -- to 2008.  Ms. Collura has looked from

3   1998 to 2001 and has reconciled those with third party

4   documents.

5          And what they've determined is cash in, cash out,

6   which is net equity.  Those sources of information, those

7   documents are reliable.  You can't look at anything else but

8   those --

9          THE COURT:  Well, the PW isn't -- the question is

10  whether PW falls into that category.  And the argument is

11  being made the only reason they're "reliable" for the post-

12  1998 period is because there's corroborating evidence, not

13  because they have any inherent truth -- you know, veracity.

14  But with respect to the pre-1998 transactions there is no

15  independent verification of their veracity.

16         MS. HOANG:  I would submit --

17         THE COURT:  And they're pure hearsay.

18         MS. HOANG:  I would submit they are.  I mean, I --

19  first of all, I would admit that based on the documents that

20  Mr. Greenblatt had he can trace the transactions over across

21  the BLIS documents and (indiscernible).  In the period that

22  Ms. Collura looked at she was able to verify with third

23  party documents because those were the bank records that

24  were available at the time.

25         THE COURT:  Okay.

1           MS. HOANG:  And I do -- all business records are

2     -- all company records are hearsay, but there's exceptions

3     (indiscernible) and I would submit that the trustee meets --

4     will at trial meet those -- that exception and the

5     requirements of that exception.

6           On the point that the trustee's experts should not

7     be able to come in here and provide any testimony based on

8     those records, I think Your Honor noted before even if those

9     records are hearsay, which we say we're not under the

10    business exception under the ancient documents under the

11    catchall provision, even if it is hearsay if the -- if the

12    experts, forensic accounts find that these are documents

13    that they would reasonably rely upon in the course of their

14    duties, carrying out their duties as -- to this court they

15    can rely on them and provide expert testimony to this

16    support.

17          And I would -- on that note I would say that the

18    expert testimony would be extremely helpful to this Court

19    particularly in this matter where you have a fraud that's

20    spanned 40 years and you have a loss of approximately $17

21    billion.  What the experts have done here is they've gone

22    through and secured and reconciled millions and millions of

23    documents.  And I don't think that this Court has the time

24    or wants to go have somebody stand up here and go through

25    each of those documents and try to assemble it.  And I think

Page 37

```
 1    that's where the experts can aid the Court in that regard.

 2            With regard -- just briefly, I just want to say

 3    that the fact that BLMIS was a fraud does not mean that all

 4    the records are reliable.  I know that that point was made

 5    that, well, it's a fraud so let's throw out everything.

 6            But if you throw out everything that is at BLIS,

 7    number one, what trustee can do their job.

 8            Number two, you have to throw out the credits they

 9    get for the cash deposits as well.

10            THE COURT:  I was going to ask you how he's going

11    to prove his case if --

12            MS. HOANG:  Right.

13            THE COURT:  -- if they throw everything out.

14            MS. HOANG:  I mean, you don't get to pick and

15    true.  That's why (indiscernible) document.

16            On the summaries, expert summaries of, again,

17    they're exactly what Your Honor pointed out.  Look, I'll

18    give you the here's the PW transactions.  Here's the

19    documents that they reconcile with.  If there's a document,

20    if there's not a document, then it's up to Your Honor to

21    draw the inferences from there.

22            THE COURT:  Okay.  This is not your motion.  Let

23    me --

24            MS. CHAITMAN:  I'm sorry.

25            THE COURT:  This is not your motion.  You want to
```

1    be heard briefly, Mr. Kirby?

2             MR. KIRBY:  Yeah.  I would like to follow up on

3    two points that counsel made.

4             First of all, they act as if it's just a chain of

5    custody issue.  But authenticity is much more than a chain

6    of custody.  It is truthfulness.  And when the trustee

7    started this process in 2009 and reached the conclusion that

8    the doc -- that the -- Madoff's statements were unreliable

9    they did so by and have steadfastly asserted that the

10   statements are unreliable because they are artificial

11   trades, there was no trading, they made everything up.

12            They have proceeded for eight years now in this

13   case with the proposition that these are unreliable

14   documents.

15            THE COURT:  Except for the cash in, cash out which

16   the --

17            MR. KIRBY:  Pardon.

18            THE COURT:  Except for the cash in, cash out which

19   the Second Circuit --

20            MR. KIRBY:  And --

21            THE COURT:  -- has said is reliable.

22            MR. KIRBY:  And I understand that.  But we are

23   dealing with a subset of doc -- of the issue as whether, and

24   this is really goes to the essence of our hearsay issue,

25   which is that somehow this statement on that document is

1    somehow now suddenly truthful, but everything else in the

2    document is not truthful.  It's different from the cash in,

3    cash out because for the most part that's been unable to

4    verify through third party sources.

5             THE COURT:  What if it can't be though?  Suppose

6    there's an old withdrawal and the bank records don't exist,

7    are you saying that that shouldn't be considered either?

8             MR. KIRBY:  Well, Your Honor, let's face it.  This

9    is a highly unusual case.  What makes it unusual is that

10   normally, you know, this is -- SIPA is part of the 1934 act.

11   The SEC has longstanding rules about what records brokers

12   are supposed to keep.  It's six years is what the records of

13   brokers are supposed to keep.  Banks have specific rules

14   about what bank records are supposed to be kept.  And that's

15   why what's happened is, is that it -- you know, they don't

16   have records going back before 1998.

17            The problem with this is, is that what is an

18   innocent customer like our clients caught in the middle of

19   this when the issue before the Court is what are

20   transactions that are long since passed anybody's statute of

21   limitations and what are they supposed to do.

22            What -- for the trustee -- I mean, to -- it is a

23   problem for the trustee, if I were in the trustee's shoes,

24   but the problem is, is that you have to take into account

25   what the customers can reasonably expect it to --

Page 40

1                THE COURT:  But, you know, I hear --

2                MR. KIRBY:  -- to --

3                THE COURT:  -- you, but how is this different from

4    any case where time has passed and evidence is lost --

5                MR. KIRBY:  Well --

6                THE COURT:  -- and inaccessible?

7                MR. KIRBY:  -- that's -- I totally agree.  But you

8    have to put -- at this point of the proceeding for our

9    clients what we're dealing with is the trustee has -- once

10   our clients come forward and say these -- these are wrong,

11   we did not get that cash, then it is for the Court to decide

12   based upon the evidence with the normal rules of evidence

13   that apply.

14                And that is our point and that -- you know, if the

15   Court wishes to defer that we respect that.  But it becomes

16   a strictly that the trustee has the burden of demonstrating

17   through evidence, through admissible evidence and, you know,

18   that's why we suggest that it would be best for the Court to

19   address the (indiscernible) issue first.  If you want to

20   reserve on the experts we can deal with that at -- after

21   you've heard their testimony.  But I think the hearsay issue

22   needs to be addressed --

23                THE COURT:  I still have the question, though, and

24   I'll just raise it.  You don't have to answer it --

25                MR. KIRBY:  Yeah.

1           THE COURT:  -- because I've indicated what I --

2     how I think this should be decided.

3           But if the statute says the trustee is supposed to

4     determine net equity based on the books and records or other

5     evidence to his satisfaction, what else is he supposed to do

6     in a case like this except hire forensic accountants to try

7     and confirm what the books and records show?

8           MR. KIRBY:  I understand the problem and the

9     plight of the trustee.  And -- but I think the issue is, is

10    as an administrative matter the trustee has to do his best

11    shot, take his best shot at it.  Then the way the rules work

12    is that the customer then must come forward with evidence

13    saying the trustee got it wrong.  Once we've done that, now

14    the Court is faced with having to decide it and the

15    trustee's faced with having to deal with the evidentiary

16    rules because there's no presumption anymore.  The

17    presumption is overcome.

18          And that's the issue that we are now before --

19    that's the issue that's before the Court and would be before

20    the Court at trial, whether the trustee has satisfied his

21    burden on an evidentiary basis to over -- to -- whether --

22    that the cash actually was withdrawn.

23          THE COURT:  Thank you.

24          As I've indicated I want to hear the testimony of

25    the experts and I know that there are other people who were

Page 42

1   deposed and will testify either through deposition or live

2   regarding how the trust -- how these books and records were

3   maintained, and particularly what the experts did.

4           The only thing I'll say which I'll repeat is I'm

5   not going to hear expert testimony that missing records

6   would contain certain entries or that it's reasonable to

7   infer that if you have a high correlation, therefore I can

8   -- I should infer that all PW entries represent cash

9   withdrawals.  That's an inference that I can draw or not

10  draw.  I doubt it's within the expertise of the forensic

11  accountants and, frankly, it doesn't help me at all.

12          So let's just leave it at that.

13          MR. KIRBY:  Thank you.

14          THE COURT:  Now I have the trustee's -- oh, I'm

15  sorry.  You did -- you were also -- I sat you down, but you

16  also had a --

17          MS. CHAITMAN:  I did.  And if --

18          THE COURT:  I realize you joined in the motion.  I

19  shouldn't have --

20          MS. CHAITMAN:  I actually --

21          THE COURT:  -- been so --

22          MS. CHAITMAN:  -- filed a separate motion.

23          THE COURT:  Right.

24          MS. CHAITMAN:  I also joined in.

25          THE COURT:  Right.

1    MS. CHAITMAN:  If I may, Your Honor, I just want

2    to set the framework for this because I do think that

3    there's a misunderstanding.

4         There are records that Madoff has that are

5    reliable for the period of the profit withdrawals, which is

6    the 1980s.  Most customers were put into split strike in

7    1992 or 1993.  There were a small number of customers who

8    stayed in convertible arbitrage which is where the profit

9    withdrawals were until, I think, the end of 1997.

10        But we're primarily dealing with a period of the

11   1980s.

12        THE COURT:  But I'm told that -- I understand

13   that.  But I'm told -- you had said that there were no

14   profit withdrawals after, I think, 1998.

15        MS. CHAITMAN:  After 1998 there were cash

16   withdrawals.  There were journal entries which constituted

17   cash withdrawals.  But there was no entry on a statement

18   saying PW.

19        THE COURT:  I thought there was.

20        MS. CHAITMAN:  I do not believe so.  But the thing

21   is that I --

22        THE COURT:  Because there was something like over

23   5,000 profit withdrawal entries in that 1998 to 2008 period.

24        MS. CHAITMAN:  The problem is if you -- if you

25   look at the Collura report she defines the profit withdrawal

1    as a profit withdrawal, a PW, a journal entry, JRNL or a

2    cash withdrawal, CW.  Well, once you expand the universe to

3    include other terms where -- which were used in a different

4    trading strategy in a different time period it's not

5    applicable to the definition of a profit withdrawal.

6              THE COURT:  I don't know what it means that's why

7    I need testimony for that.

8              MS. CHAITMAN:  I understand that.  But I just want

9    to explain one thing.  The testimony of the Madoff

10   employees, which Your Honor suggested we take, did establish

11   some very interesting facts.

12             Number one, Madoff required when anyone wanted to

13   withdraw funds that they send a letter saying they wanted

14   withdrawals.  And he required that if they wanted to now

15   stop taking the withdrawals they had to send a letter

16   saying, I no longer want my withdrawals.

17             For many, many customers including many of my

18   clients for whom I have not asserted this objection, they

19   wrote letters asking for profit withdrawals, wrote letters

20   saying, I don't want them anymore.  There are no such

21   records with respect to Blecker.  There isn't any letter

22   from him ever asking for a profit withdrawal or then saying,

23   I don't want them anymore.

24             And the -- there's another piece of evidence

25   that's absent in Blecker.  Annette Bonjourno (ph) testified

Page 45

1   that with respect to every check that was sent out as a

2   profit withdrawal the document consisted of the check and

3   then a serrated edge with a confirmation on the bottom of it

4   which a lot of businesses have.

5          She said that the bottom half of that was put into

6   each customer file.  And, again, for many of my clients

7   there is in their files the bottom half, that edge, that

8   serrated edge half is in their files going back to the

9   1980s.  So Madoff actually kept detailed records in every

10  file and the -- all the employees testified that they had to

11  maintain the records and they believe that all of those

12  records were maintained from the 1980s until Mr. Card (ph)

13  was appointed so that there are documentary records to

14  support the payment of profit withdrawals to the people who

15  received them.

16         But in the case of the Blums, I believe, and

17  certainly in the case of Mr. Blecker there's no documentary

18  evidence.  And that, I think, is important.  I totally

19  understand what Your Honor is saying, but I just wanted to

20  make that point.

21         THE COURT:  Thank you.

22         What's the next motion?  The trustee's motion in

23  limine to exclude the testimony of Joel and Norman Blum.

24     (Pause)

25         THE COURT:  Go ahead.

1           MS. WOLTERING:  Good afternoon, Your Honor.

2    Catherine Woltering on behalf of the trustee.  We're here

3    today on all the motions in limine, but I am here to talk

4    about motion in limine number 2 seeking to exclude certain

5    testimony of participating claimants, Joel and Norman Blum.

6           I'll be using first names where necessary to

7    identify otherwise just generally as Blums.  I'll keep this

8    brief.  I promise.

9           We're here today asking the Court to exclude

10   certain testimony offered by Joel and Norman Blum about

11   subjects where they lack personal knowledge, attempt to

12   offer inadmissible character evidence or hearsay evidence by

13   an exception.

14          Because the Blums have not identified whether or

15   not they will be testifying live --

16          THE COURT:  I thought the Blums did not offer any

17   character evidence.  They're offering (indiscernible)

18   evidence, right?

19          MR. KIRBY:  Right.

20          THE COURT:  Okay.  So we agree on character

21   evidence.

22          MS. WOLTERING:  Yes.  Because they're -- they have

23   not identified whether or not they're testifying live or by

24   deposition designation the trustee seeks alternative relief.

25          First, if they testify by a deposition designation

1    for an order striking the portions of the testimony

2    identified in the chart contained at Exhibit 2 of the

3    Sheehan (ph) declaration, or alternatively if they testify

4    live for an order prohibiting the Blums to testify about

5    subjects for which they lack personal knowledge.

6              THE COURT:  Well, wouldn't I have to hear their

7    testimony to figure out if they lack personal knowledge?

8              MS. WOLTERING:  Based on the deposition

9    transcripts it's clear that they lack personal knowledge and

10   --

11             THE COURT:  But --

12             MS. WOLTERING:  -- they --

13             THE COURT:  But normal procedure -- you know, I

14   have a problem with motions in limine in these bench cases

15   where it's based on relevance or something like that.

16             Normally, they would designate -- if they're going

17   to testify by deposition they would designate the testimony

18   they wanted and you would designate what you object to and I

19   -- you know, I would deal with it.  I don't understand the

20   purpose of --

21             MS. WOLTERING:  And --

22             THE COURT:  -- a motion in limine.  Are --

23             MS. WOLTERING:  These --

24             THE COURT:  -- they going to testify live because

25   if they're going to testify live this is all a waste of

Page 48

1    time.

2             MR. KIRBY:  Your Honor, Joel Blum for sure.

3    Norman Blum is 86.  Depending on when we have this

4    proceeding I hope he's going to be able to testify.

5             THE COURT:  All right.

6             MR. KIRBY:  But I can't -- you know, I -- to be

7    truthful I -- you know --

8             THE COURT:  Where do they live?

9             MR. KIRBY:  Pardon.

10            THE COURT:  They live in Florida?

11            MR. KIRBY:  He lives in Florida.  It's going to be

12   a challenge for him to come.

13            THE COURT:  Okay.  Go ahead.

14            MS. WOLTERING:  Your Honor, I submit and I'll -- I

15   have a chart to show you.

16            THE COURT:  Where is that chart?

17            MS. WOLTERING:  I actually -- I sent it to counsel

18   yesterday and I'm going to pass it up.  May I --

19            THE COURT:  Okay.

20            MS. WOLTERING:  -- I have a motion to

21   (indiscernible).

22        (Pause)

23            THE COURT:  So as you'll see from this chart I

24   just wanted to look through why specifically in this

25   instance personal knowledge is so relevant.

Page 49

1              The Blums challenged 322 PWs that occurred in four

2    accounts at BLMIS all between 1986, it's the top four

3    accounts, 1986 and 1997.  249 of those 322 profit

4    withdrawals occurred in their parents' accounts.  So Joel

5    and Norman were not the customer.  They received inter-

6    account transfers from those.  And those are the -- those

7    are the transactions that form the basis to which they must

8    have personal knowledge.

9              We're not objecting to Norman's ability to

10   challenge the 73 profit withdrawals that occurred in his

11   account, just the 249 that occurred in their parents'

12   accounts.

13             And it's well settled law that it's the Blums'

14   burden to establish a sufficient foundation for admission of

15   evidence including personal knowledge under 602.  This is

16   the threshold issue.  If the Court finds that the Blums lack

17   personal knowledge of the matter, the 249 profit withdrawals

18   in their parents' accounts in this proceeding, then Your

19   Honor doesn't need to get to the question of hearsay or

20   character or habits.  Without personal knowledge no

21   testimony, even testimony that would otherwise be admissible

22   as an exception to hearsay or as habit can be admitted.

23   This can be done from their -- we know this from their

24   deposition that they lack personal knowledge.

25             When Joel was asked he testified that he never

Page 50

1    assisted his parents with their investments, but that rather

2    he corroborated with his brother Norman in the late 1990s

3    into early 2000s, but it was a gradual escalation that

4    probably occurred within the last four or five years of his

5    life.

6            Norris (sic) passed away in 2000, their father, so

7    that last four or five years would be at the earlier 1998.

8    Norman testified that he didn't assist his father with his

9    BLMIS accounts or financial transactions until around 2000.

10   I didn't assist him.  I didn't assist him in 1997.  As I

11   have said before he was totally independent.  It wasn't

12   until after 2000.

13           He also explains in his customer claim that he had

14   a severe stroke in April of 1994 that affected both is short

15   and long-term memory.  In part, this is why he has no

16   personal knowledge of what occurred during the relevant

17   profit withdrawal period.

18           Joel and Norman also concede at their deposition

19   that they never discussed profit withdrawal transactions

20   with their parents, had no real time knowledge of the PW

21   transactions occurring in their parents' accounts and did

22   not have access to information about their parents' finances

23   or financial planning during that period that would allow --

24   give them an independent basis for personal knowledge.

25           Joel was asked at least three times at his

Page 51

1    deposition if he knew whether or not his father received

2    checks in connection with the BLMIS accounts.  And each time

3    he testified that he didn't know and had no personal

4    knowledge:

5            "Question:  Did you discuss with your father

6    whether he received checks from BLMIS?"

7            "Answer:  I don't recall discussing that."

8            "Question:  Do you know if your father received

9    checks from BLMIS in connection with his investments?

10           "Answer:  I don't know."

11           "Question:  DO you know if your father received

12   checks in connection with his BLMIS investments?"

13           "Answer:  I don't know."

14           He also testified that he did not know what

15   purpose his father had for opening the accounts.  He never

16   assisted with his parents' investments.  He never reviewed

17   his parents' BLMIS statements or their bank records and he

18   never witnessed and has no knowledge of whether his father

19   spoke or had any communications with BLMIS employees.

20           Norman's testimony has similar fatal flaws.  When

21   he was asked, "And did you discuss with your father what

22   withdrawals he was taking from BLMIS" he answered, "I cannot

23   tell you specifically what we talked about or did not."  And

24   even Mr. Kirby recognized Norman's lack of personal

25   knowledge and objected to our question.  "Question" --

Page 52

1           THE COURT:  But he knew about the quarterly

2    withdrawals, right?

3           MS. WOLTERING:  He knows about the quarterly

4    withdrawals for the 2000 and after period, not for the pre-

5    2000 period.

6           "Question:  But if he did do it" -- check out

7    profit withdrawals -- "prior to 2000, you wouldn't have seen

8    the deposits, correct?"

9           "Kirby:  Objection.  Calls for speculation.  You

10   can answer it."

11          "Answer:  Well, I -- look at the -- find it from

12   the -- look at the checkbook, see if there's any money in

13   there.  He just didn't take out that kind of withdrawal as

14   far as I'm concerned.  Can I prove it?  No."

15          And just like his brother he also testified that

16   he never received or reviewed his parents' BLMIS statements

17   during the relevant time period.  He never balanced his

18   father's checking account or assisted with check deposits.

19   He never witnessed and had no knowledge of who is father

20   spoke with at BLMIS or if he ever called or sent letters to

21   BLMIS.

22          In Levy versus Bessimer (ph) Trust we learned that

23   where a deposition testimony establishes that a witness

24   lacks personal knowledge required by 602 and would simply be

25   testifying about what he or she heard from others or

Page 53

1    speculation the witness should be precluded from testifying

2    at trial.

3            This deposition testimony clearly establishes that

4    the Blums lack the personal knowledge required by 602 and

5    they have the burden to prove that they have a foundation of

6    evidence sufficient to make this admissible.  And they have

7    put forth no other evidence except their own self-serving

8    statements.  But their deposition testimony is clear.  They

9    had no involvement during the relevant period.  They weren't

10   the account holder.  They wouldn't have received the checks,

11   and they can't offer anything except what they think their

12   parents would have done or speculate about why they would

13   have done it.

14           Such speculation does not make personal knowledge

15   as Your Honor found in In Enviro Solutions of NYC.  A

16   claimant or witness about personal knowledge is unlikely to

17   be able to offer any admissible testimony.

18           The truth is Joel and Norman have no idea if their

19   parents received the 249 profit withdrawal checks at issue

20   and can offer no evidence to the contrary beyond their own

21   self-serving speculation.  When you look at the customer

22   files there is communication between their parents and BLMIS

23   which reference profits or remitting proceeds of

24   transactions.  So it actually counts against them.

25           Rather, what they offer are statements like, as

1   far as I'm concerned he would never take -- he would have

2   never done things like that, or I just can't imagine he

3   would have done it that way; I can't imagine that knowing

4   him he would have done this; I'm certainly not aware of him

5   ever doing this.

6           While the Blums claim that their knowledge is

7   somehow permissible based on repeated interactions or

8   discussions with their parents, their testimony shows it's

9   clearly not.  They admit that they never discussed profit

10  withdrawals with their parents.  They never assisted with

11  their parents' finances.  They never balanced their parents'

12  checkbooks.  They didn't assist in the deposit, and they

13  have no idea what communications they had.

14          And even if they could show any independent

15  evidence to support what they think their parents did, the

16  law is clear that even when a witness has personal knowledge

17  they can't opine on somebody else's motives or why they do

18  what they do, only the acts that they witnessed.  So their

19  parents' motives as to why they would have done what they

20  did can't fall within the scope of personal knowledge.

21          So the Blums have not met their burden to show

22  personal knowledge of the 249 profit withdrawal transactions

23  occurring between 1986 and 1997 in their parents' accounts.

24  And as such, regardless of any of the other arguments about

25  habit or hearsay, you don't need to get there.  It's a

1   threshold issue.  Their testimony should be excluded.

2          But, and I promised to keep it brief, as to habit,

3   habit is the type of evidence where your behavior is semi-

4   automatic.  So how you answer the telephone, whether you

5   walk up the stairs two at a time, it requires observing

6   somebody on a frequent basis in the same situation that

7   you're then trying to testify it was their habit to respond

8   almost automatically to.  It's conduct that is specific and

9   particularized and capable of almost identical reproduction

10  in every situation.

11         The Blums' burden to establish this has not been

12  met.  They say that they never saw their parents do this.

13  They never saw those interactions or transactions.  They

14  weren't -- so they never would have had the opportunity to

15  develop the foundation required to prove a habit.

16         Thus Norris's purported disposition for saving or

17  spending money is simply character evidence under 404 that

18  we can all agree is precluded.

19         And as to hearsay I don't need to go on very long.

20  I promise this is my last point.  In order for any hearsay

21  exception to apply the Blums must still show that they had

22  personal knowledge about the matter to which they're

23  speaking.  A factual assertion based on conjecture or

24  surmise to which the declarant would not be allowed to

25  testify if called to the witness box does not become

Page 56

1    admissible under an exception to the hearsay rule.

2          And they raise the residual exception which

3    requires a very high threshold for circumstantial guarantees

4    of trustworthiness.

5          THE COURT:  You raised it also, though, huh?

6          MS. WOLTERING:  But the trustee has other books

7    and records that support his claims.  They've offered

8    nothing.  They could have submitted a proffer in connection

9    with these motions, some evidence, anything beyond their own

10   self-serving statements to show that they have the knowledge

11   or that the statements, the hearsay statements are

12   inherently trustworthy.  But they haven't.  And those types

13   of evidence are whether the declarant was under oath, the

14   voluntariness of his statement, whether it was made based on

15   personal knowledge, the proximity and time to the events,

16   whether the statements are corroboratory (sic), the

17   declarant's motive to (indiscernible), whether it's self-

18   serving, whether it was prepared in anticipation of

19   litigation, whether the declarant's memory or conception is

20   faulty.  In Norman's case he says his memory is faulty.

21          So it doesn't fall within the residual exception.

22   And the only other exception that they put forth is 803,

23   state of mind.  And 803 state of mind is clear that it can't

24   -- you can't offer the hearsay statement as to state of mind

25   to prove the fact remembered.  So state of mind can't be

Page 57

1    used to prove the fact that they say they are remembering or

2    memory.  It's usually used --

3              THE COURT:  That's not coming out so clear.

4              MS. WOLTERING:  It's usually used to talk about

5    somebody's feelings.  So I feel scared --

6              THE COURT:  Are you arguing that his state of mind

7    is not relevant to the proceeding?

8              MS. WOLTERING:  Yes.

9              THE COURT:  Thank you.

10             MS. WOLTERING:  Thank you, Your Honor.

11             MR. KIRBY:  Your Honor, these issues really

12   clearly go to the weight.  Our clients --

13             THE COURT:  Well, they're saying -- here's the

14   issue I have.  I think it's -- well, I won't say that.

15   Well, I was going to say if Norris had said to Joel or

16   Norman, I never got a profit withdrawal check and they tried

17   to testify to that would clearly be hearsay.

18             MR. KIRBY:  Right.

19             THE COURT:  Okay.

20             MR. KIRBY:  I accept that.

21             THE COURT:  So on less evidence they're really

22   testifying to the same thing or trying to testify to the

23   same thing, aren't they?

24             MR. KIRBY:  No.  You're trying to prove a

25   negative.  Let's assume for a moment what the trustee can't

1    prove which really goes to the first point that we raised at

2    issue is that there weren't any profit withdrawals checks.

3    As Ms. Chaitman said, file with (indiscernible) Blums

4    doesn't have any receipts and they've identified hundreds of

5    supposed checks went to Norris and there are no receipts in

6    Norris's account.

7              So there's something amiss here.  Okay.  Now the

8    question is, is what our client --

9              THE COURT:  But you don't need Norman or Joel to

10   testify to that.  We'll ask the trustee's expert whether

11   they found that --

12             MR. KIRBY:  Well --

13             THE COURT:  -- and --

14             MR. KIRBY:  -- they have not produced --

15             THE COURT:  All right.

16             MR. KIRBY:  We have had an elaborate discovery

17   process.  There have been no records with respect that

18   Norris Blum produced and Collura identifies that there are

19   no such records.

20             THE COURT:  But you don't -- you don't need their

21   testimony.  So what does their testimony do?

22             MR. KIRBY:  Their testimony does this.  They are

23   able to explain what -- because they describe at length the

24   discussions they had about what their father's program --

25   investment program was and what his intent was.  And they

Page 59

1    can testify as to firsthand knowledge about that.  And it --

2    what they're saying is that the Madoff accounts were

3    established for the purpose of long-term savings, especially

4    their mother's account was exclusively done for that

5    purpose.  When their -- the account -- they were the

6    trustees for their mother's account upon her death.

7              And so they are clearly in a position to know

8    about this.  Now that Norris was also involved, but they --

9    they are -- can testify and they will explain and they have

10   explained the foundation for their testimony.  They conclude

11   that such checks would not -- they would certainly have

12   detected them based upon their interactions with their

13   father over time.

14             THE COURT:  Well, that's what I wanted to ask you,

15   which isn't really clear.  The extent to which they actually

16   prepared his deposit slips or wrote checks for him and would

17   have seen his checkbook on a regular basis and would have

18   gone to the bank for him, that I could understand if, for

19   example, and the timing may be off, but I know that he and

20   Norman lived together for a while.

21             MR. KIRBY:  Right.

22             THE COURT:  Although Norman was incapacitated --

23             MR. KIRBY:  Right.

24             THE COURT:  -- at the time.  But let's assume that

25   they lived together and during that period the father was

Page 60

```
1    growing old, Norman is helping him.  He's taking the mail.

2    He's opening the mail.  He's preparing the deposits.  To me

3    that would indicate some personal knowledge about what was

4    going on.  I just didn't see it in the portions of the

5    deposition that I was pointed to that you --

6             MR. KIRBY:  Your --

7             THE COURT:  -- cited.

8             MR. KIRBY:  Your Honor, he -- Norman's testified

9    and will testify that after his stroke his father left his

10   practice of medicine in New York, came down, nursed him back

11   to health eventually over a period of time and then his

12   father relocated into -- in Florida.

13            At that point Norman became fully functional

14   eventually over time.  The details of that are very vivid as

15   you can imagine.  But over time his father, who was 103 I

16   think when he passed away, lived in Florida and over time

17   Norman became more and more involved in his financial

18   affairs.

19            Joel testified that he met -- he came down every

20   quarter to -- and his father was very candid about what his

21   financial planning was.

22            THE COURT:  But isn't that testimony just simply

23   hearsay about what the father told them?

24            MR. KIRBY:  No, because that's the foundation for

25   what they understood.  They -- I mean, and that's -- that
```

Page 61

1   lays the foundation.  They're not testifying what their

2   father told them.  They're testifying what their conclusion

3   was that cashing hundreds of checks was not within his

4   program for the long term savings, what these accounts were

5   used for.  He -- they both testified that their father used

6   these accounts as long-term savings accounts.  There was a

7   period of time where they took regular quarterly --

8          THE COURT:  But did they know that because that's

9   what the father told them or do they know that because they

10  independently found that out?

11         MR. KIRBY:  Because they ultimately were the

12  heirs.  He explained to them the estate that he was leaving

13  them.  He had many interchanges with them.  They were

14  ultimate -- they were both -- remember, they were not only

15  just heirs, they were trustees for living trusts.  So they

16  went over his financial affairs at some length and they were

17  responsible ultimately as trustees for the living trust for

18  those -- for all of his finances.

19         And so they have a foundation for that testimony.

20  We think the issue really goes to weight.  And, you know,

21  hope -- we're sure, I think Joel Blum will be able to come

22  to the testimony.  He's still a practicing doctor.  And

23  hopefully if we can get -- we can work together with the

24  trustee and schedule the hearing and be able to bring Norman

25  Blum himself to --

Page 62

1          THE COURT:  All right.

2          MR. KIRBY:  -- to the --

3          THE COURT:  Well, if Norman and Joel are going to

4    attend, then I don't have to decide this motion because

5    they're going to be questioned.  And if it turns out that

6    there's, you know, a lack of foundation through the

7    testimony I'll just sustain the objection.

8          MR. KIRBY:  Right.  But I do think there is a

9    foundation for that.  And it really goes back to the thing I

10   said in the earlier time.  We're dealing with a very

11   difficult situation where we're -- the trustee -- there's no

12   independent third party evidence of these checks.  And the

13   question is, is how does an innocent customer like these

14   people, how do they defend against something like this?  Are

15   they just supposed to take whatever the trustee says?

16   That's what you get.  Tough.

17          How are -- this is a customer protection statute.

18   It's intended to have some benefit for the customers who are

19   active and to suggest that somehow that each customer must

20   look back and keep records for 30 years including their

21   deceased parents in case the broker that ultimately -- you

22   know, the registered broker ultimately fails.  That's kind

23   of not what --

24          THE COURT:  As you --

25          MR. KIRBY:  -- we think --

Page 63

1              THE COURT:  -- advised me in the last argument,

2      the rules of evidence will apply to these proceedings and

3      that cuts both ways.

4              MR. KIRBY:  We're fine with that.

5              THE COURT:  Okay.

6              MS. WOLTERING:  Your Honor, just one brief point.

7              The question is not whether or not they can

8      testify about their own personal knowledge as to their

9      accounts.  The question is really whether they have personal

10     knowledge during the relevant time period as to their

11     parents' receipt of profit withdrawals.

12             So all of the conduct and interactions he's

13     talking about and trying to say form the basis occurred

14     after the last profit withdrawal and in July of 1997.

15             So they weren't engaged in any capacity during the

16     relevant time period to have the personal knowledge to

17     testify about whether or not their parents received those

18     profit withdrawals, which is the very limited issue that

19     they themselves are advocating we should be sticking to.

20             THE COURT:  Well, suppose -- and I don't know if

21     this is the case -- that after what you define as the

22     relevant period Norman looked at a statement and asked his

23     father, what's this PW and the father said, I don't know,

24     could he testify to that?

25             MS. WOLTERING:  If it fell within a hearsay

Page 64

1    exception --

2            THE COURT:  Well, that's my question.  Is it

3    hearsay or is it just that it's irrelevant because it

4    doesn't relate to a period that the profit withdrawals

5    relate to.

6            MS. WOLTERING:  So personal knowledge and hearsay

7    are often two sides to the same objection.  They're just

8    procedurally slightly different depending on how the

9    deponent testifies.

10           So if it's, I don't know, then it's lack of

11   personal knowledge.  If it's, I only know because they said

12   this, it's hearsay.  But raising the objection on either

13   grounds is under the case law sufficient for both.

14           THE COURT:  Okay.  Thank you.

15           MS. WOLTERING:  Thank you.

16           THE COURT:  I'll reserve decision on that one.

17           MS. FEIN:  Good afternoon.  I'm Amanda Fein, Baker

18   Hostetler on behalf of the trustee in connection with motion

19   in limine 3, and this is a narrow evidentiary question

20   whether Mr. Blecker's deposition testimony is admissible at

21   the parties upcoming evidentiary hearing.

22           We're sympathetic to Mr. Blecker.  Our motion was

23   not intended to cause him any undue stress which is why the

24   week after we filed our motion we approached Mr. Blecker's

25   counsel with a limited factual stipulation regarding the

1   authenticity of these documents.  If he would agree to his

2   documents' authenticity and agree that the -- or confirm

3   that the handwriting on those documents that he produced was

4   his own we agreed to withdraw the motion.

5           We didn't hear right after we provided that offer.

6   We reiterated the offer earlier this month and we were told

7   there would be no factual agreement.  So we're looking at an

8   admissibility issue, whether his testimony is admissible in

9   this proceeding or not.

10          The party advancing the testimony bears the burden

11  of proving it's admissible.  We do not agree that Mr.

12  Blecker's son's declaration de facto is proof of Mr.

13  Blecker's unavailability.  That's something that --

14          THE COURT:  He's 105 years old.  What do you

15  expect?

16          MS. CHAITMAN:  Six.

17          MS. FEIN:  We -- certainly, the issue that he's

18  105 is very relevant to whether he's available or not --

19          THE COURT:  You think?

20          MS. FEIN:  -- available to testify.  The way that

21  Rule 32 was crafted is the fact that -- the fact that

22  someone is a certain age I don't think they necessarily had

23  105 in mind to be honest.  The fact that someone is a

24  certain age must be the reason they can't provide testimony.

25          THE COURT:  Let's assume he's not available.  What

Page 66

1    next?

2           MS. FEIN:  Okay.  If you do decide that he's not

3    available, then it becomes a question of prejudice.  Is the

4    trustee more prejudiced by the fact that his testimony is

5    entered and that testimony is unchallenged or --

6           THE COURT:  Haven't we gone through this before,

7    though?  You made a motion -- this is something I wanted to

8    ask you about I think in July or I heard it in July, that

9    you wanted to take his deposition.  And so his deposition

10   was taken.  The profit withdrawal issue was out there based

11   on an April, I guess, 1990 -- 2004 or 2014 declaration.

12   Whoever was there asked a couple of questions and reserved

13   their rights to continue the deposition of a 103 year old

14   man at that point.

15          It now appears from the motion that's been made

16   that after that deposition documents were turned over and

17   those documents contained handwritten notations which

18   indicated that in your view Mr. Blecker computed his returns

19   based upon the profit withdrawals.  Why wasn't that raised

20   when you came back and wanted to take his deposition?

21          MS. FEIN:  Are you -- you're speaking about the

22   July 2016 hearing?

23          THE COURT:  Yeah.  That was never raised before.

24          MS. FEIN:  That's true.  I --

25          THE COURT:  Don't you think that's important,

Page 67

1   though?

2           MS. FEIN:  I do.

3           THE COURT:  I don't understand.  I --

4           MS. FEIN:  So my understanding about that

5   production is that it was produced in connection with the

6   multi-claimants at that time because Mr. Blecker's

7   deposition was taken in connection with the inter-account

8   transfer litigation.  That production was turned over in

9   2014 as a part of that litigation.

10          THE COURT:  It was after his depo -- after his

11  deposition to reserve his testimony.

12          MS. FEIN:  Yes.  Yes.

13          THE COURT:  And what I'm saying is when you came

14  back two years later and you wanted to take his deposition

15  nobody said, hey, you know, after we took his deposition the

16  last time he turned over these documents and they indicate

17  that he was treating the profit withdrawals as a return.

18          MS. FEIN:  So I think that what had changed

19  between these two periods of time is that currently we

20  understand that -- or we would like to have -- we understand

21  that the Court's amenable to having the claim determined as

22  in connection in part of the omnibus proceeding.

23          THE COURT:  You've got evidence -- but you got

24  this evidence he's 105.  What were you waiting for?

25          MS. FEIN:  I think, you know, because the

1    proceeding did change over time and we did -- initially we

2    did think this was going to be heard on the papers.  We

3    understood it was going to encompass testimony after that

4    point.  And at that point we did --

5              THE COURT:  But that was -- how long ago did we

6    start down this road of additional depositions of Madoff --

7              MS. FEIN:  So --

8              THE COURT:  -- and other people.

9              MS. FEIN:  -- the depositions --

10             THE COURT:  This is going on for two years.

11             MS. FEIN:  The depositions were first raised last

12    year, February 2016.  We deposed the Blums in May of 2016

13    and that's when we requested Mr. Blecker's testimony.  So --

14             THE COURT:  I understand you requested his

15    testimony, but when you requested his testimony you never

16    said -- and the only issue with Mr. Blecker frankly is

17    whether or not these PW notations or profit withdrawals are

18    actual disbursements.  But you never said at that time when

19    you wanted to take his deposition a second time or renew it

20    or whatever that after the first deposition he turned over

21    these documents and they're important and we want to ask him

22    about them, and we didn't have the opportunity then to do it

23    because obviously he hadn't turned over the documents.

24             I'm asking --

25             MS. FEIN:  Right.

Page 69

1           THE COURT:  -- why it wasn't raised at that time?

2           MS. FEIN:  So --

3           THE COURT:  And you're telling me -- you haven't

4    answered me.

5           MS. FEIN:  Okay.  At that hearing my understanding

6    was that it was about the omnibus proceeding and here's why

7    that mattered.  You're right.  It was important to me

8    anyway, why it was important to us.  You mentioned that Mr.

9    Blecker's testimony wasn't relevant to the omnibus

10   proceeding and should he have relevant information related

11   to his claim we would be entitled to take that testimony in

12   connection with his claim.  But because it was an omnibus

13   proceeding and because we were deposing the employees Mr.

14   Blecker's testimony about his own individual claim wasn't

15   relevant.  And that was my understanding of how that hearing

16   --

17          THE COURT:  So you want to take the testimony --

18          MS. FEIN:  -- transpired.

19          THE COURT:  -- now with respect to his individual

20   claim, not the omnibus proceeding?

21          MS. FEIN:  That's correct.  We don't believe -- we

22   agree with you that his testimony isn't relevant to the

23   omnibus proceeding and we actually narrowed it to three

24   topics because we don't think that it's necessarily, you

25   know, in anyone's best interest to have a long deposition of

Page 70

1    him.  There are three things that we think are open, live,

2    factual issues that we would like to address.

3              THE COURT:  What's that?

4              MS. FEIN:  The fact that his account balances were

5    flat over time.  It's his testimony that profits accumulated

6    in his accounts, but for the periods of the profit

7    withdrawals, which were from 1981 on one account, 1986 on

8    another account all the way through 1997 his account

9    balances remained flat.  So we want to ask him about that.

10             The second thing is explaining the handwritten

11   notes, confirming that the handwriting is his, if it is his

12   and what they intend to show.  That's something that really

13   -- Mr. Blecker can provide and we could get in a stipulation

14   if anyone would agree to stipulate to us.  But otherwise

15   it's going to be difficult to understand that.  And we can

16   certainly try to prove that.  But he's really the best

17   source of that information.

18             And the last item is just his sources of income

19   and banking practices in the 1980s and 1990s.

20             THE COURT:  Why do you have to ask him about that?

21             MS. FEIN:  That's really an issue of -- that's the

22   period that he was receiving the profit withdrawal

23   transactions.  We don't have an understanding of -- at the

24   time he was in his 70s and 80s.  We don't know what his

25   other sources of income were.  We don't know who else was

Page 71

 1    working with his bank accounts, who had access to them, who

 2    else could have deposited checks.  Those are just issues

 3    that we don't have any understanding about.

 4              THE COURT:  So you want to ask him if somebody

 5    else deposited checks that he got?

 6              MS. FEIN:  I think we're interested to know

 7    whether there were other people that also used his same bank

 8    accounts, for example, his wife that could have potentially

 9    deposited checks.  I think it's an issue because the records

10    don't seem to match up with Mr. Blecker's testimony and

11    that's one way of --

12              THE COURT:  Oh, I've raised that before, but I --

13    let me hear from Ms. Chaitman.

14              What's that?

15              MS. FEIN:  This is a chart.  It just -- it shows

16    the (indiscernible) account balance if you would like to

17    take a look at it --

18              THE COURT:  I know.  I've seen it --

19              MS. FEIN:  -- you can turn it over --

20              THE COURT:  I've seen the account balance.

21              MS. FEIN:  Okay.  Understood.  Thank you.

22              MS. CHAITMAN:  Your Honor, I had made a motion for

23    summary judgment in the spring of 2014 on Mr. Blecker's

24    claim on the profit withdrawal issue.  That's what it was.

25    It wasn't an inter-account issue.  It was the profit

1    withdrawal --

2              THE COURT:  No.  I remember.

3              MS. CHAITMAN:  -- issue.  You denied the motion

4    because you found there were factual issues and you

5    suggested that Mr. Blecker's deposition be taken to preserve

6    his testimony.  His deposition was taken on July 1st, 2014.

7    The trustee attended and asked very few questions.  Then the

8    trustee wrote to me and said, we would like to continue Mr.

9    Blecker's deposition, and I said fine and we set the date

10   for August 7th.

11             And then for whatever reason the trustee wrote to

12   me and said they didn't want to take his deposition.

13             THE COURT:  But now they do so what -- why

14   shouldn't they do it then?

15             MS. CHAITMAN:  Well, let me just --

16             THE COURT:  Why were you willing to let them do it

17   then and not now?

18             MS. CHAITMAN:  I can explain that.  In September I

19   produced the documents.  September 2014 I produced the

20   documents that they're now claiming are the reason they need

21   to take his deposition.  He was 103 years old then.  He's

22   106 years old now.  He's deteriorated.  He's not -- he --

23   you're going to ask a 106 year old man what he did in 1980?

24   I mean, why isn't the trustee bound by their rules of civil

25   procedure and why aren't they held to a standard or

1   reasonable diligence, particularly when they're dealing with

2   a customer to whom they owe a fiduciary duty who was 103

3   years old in 2014.

4           THE COURT:  I'm not sure they owe a fiduciary duty

5   to individual customers.  If they did they could never

6   object to their claims or sue them.  It's like a trustee.

7   They owe a fiduciary duty to the estate, not to individuals.

8           MS. CHAITMAN:  Okay.  The point is that they owe

9   him at least a duty of courtesy.  The man was 103 years old.

10  They made a deliberate decision having received these

11  records and the issue was profit withdrawals.  It was never

12  inter-account transfers.  It was profit withdrawals.

13          THE COURT:  The only issue I have is with these

14  documents that were subsequently produced.

15          MS. CHAITMAN:  In September 2014.

16          THE COURT:  Right.  Okay.  And you -- and at that

17  point you were willing to let -- to continue the deposition.

18  They said they didn't want to and my question is well, now

19  they want to so why not?

20          MS. CHAITMAN:  Because I -- my -- I'm terribly

21  prejudiced at this point.  I have a man who is no longer

22  mentally competent to respond to questions.

23          THE COURT:  Well --

24          MS. CHAITMAN:  So, I mean, how can you take

25  advantage of someone who is that elderly.

Page 74

1           THE COURT:  I appreciate that he's elderly.

2    Believe me.  But I don't know whether he's mentally

3    competent or not.  He --

4           MS. CHAITMAN:  I can --

5           THE COURT:  -- he was --

6           MS. CHAITMAN:  I will give you a doctor's

7    affidavit.

8           THE COURT:  But won't that show up in the

9    deposition that he would just be confused and, you know --

10          MS. CHAITMAN:  You know, Judge, I want to -- I

11   want to explain something to you.  I will not take the

12   responsibility that this man will have a stroke because of

13   the stress.  I -- you know, that's just -- to me it's

14   unconscionable.  If the trustee -- the trustee has a team of

15   lawyers.  They have to take responsibility for their own

16   conduct.  They have an army of people who could have

17   reviewed these documents in 2014 and asked for his

18   deposition then.  I would have said yes as Your Honor

19   understands.   I cannot say yes now.  I cannot put him

20   through that.  I'm not going to take responsibility for him

21   dying because the trustee waited three and a half --

22          THE COURT:  Do you have the documents --

23          MS. CHAITMAN:  -- years.

24          THE COURT:  -- with the handwritten notations?

25          MS. CHAITMAN:  Huh?

1          THE COURT:  Do you have the documents with the

2    handwritten notations?

3          MS. FEIN:  Yeah.  Yes.

4       (Pause)

5          MS. FEIN:  We have -- permission to approach?

6       (Pause)

7          MS. CHAITMAN:  You know, Judge, I just want to say

8    something.  I have to check because I'm not sure these were

9    -- under the pretrial order the trustee had to designate

10   exhibits by a certain date and the trustee then supplemented

11   that without a court order.  And I would oppose admission of

12   any documents that were not included in the exhibit list at

13   the time it was required to be served.  I don't know if

14   these are within that category.

15         MS. FEIN:  No.  These are (indiscernible).

16         THE COURT:  I --

17         MS. FEIN:  (Indiscernible).

18      (Pause)

19         THE COURT:  Where does it say that a transaction

20   is a PW transaction on this?

21         MS. FEIN:  PW transaction --

22         THE COURT:  Oh, I see.

23         MS. FEIN:  -- (indiscernible).

24         THE COURT:  Is this the form in which they were

25   turned over by Mr. Blecker or Mr. Blecker's --

Page 76

1            MS. FEIN:  That's correct.  And some of these

2     documents not from the relevant time period, but some

3     statements from 2007 have identical handwritten notes that

4     were in connection with Mr. Blecker's customer claim in

5     February 2009 and are on Ms. Chaitman's pretrial exhibit

6     list as well in connection with that claim.

7            THE COURT:  Well, you know, if this is the way

8     they were turned over I will receive them in evidence and

9     the two of you can argue about what they mean.  I'll give

10    you the option to have Mr. Blecker testify.  I realize he's

11    106.

12           MS. CHAITMAN:  He can't testify.

13           THE COURT:  Well --

14           MS. CHAITMAN:  His son can testify if that's --

15           THE COURT:  Well, can his son testify about the

16    handwritten notations?

17           MS. CHAITMAN:  Possibly.  I would have to ask him.

18           THE COURT:  Okay.  All I'm saying is if that's the

19    way they turned over, I'll receive them and you can talk

20    about what they mean.

21           And I'll reiterate that I had a problem with Mr.

22    Blecker's testimony because he testified that, you know, he

23    never took a withdrawal from that account.  The money was on

24    deposit for something like 15 years.  I don't remember the

25    time.  And then he pulled out $206,000 at the time.

```
 1              MS. CHAITMAN:  Here's the thing, Your Honor --

 2              THE COURT:  I just -- I just want you to know

 3     that.

 4              MS. CHAITMAN:  No.  No.  No.

 5              THE COURT:  And I've said it before.

 6              MS. CHAITMAN:  I know.  I understand that.  But

 7     you have to appreciate that when the trustee filed their

 8     papers in this case -- on these motions they did not

 9     disclose that Mr. -- they represented in their papers that

10     Blecker opened an account in 1986.  In fact, now they've

11     conceded that he opened an account in 1981.  And they've

12     never produced a full set of the documents for that account.

13     So there's a mystery as to what happened with that account

14     that was started in 1981.  The trustee, I assume, doesn't

15     have the records.  I only got four or five statements in a

16     mass of documents.

17              So we don't have complete records.  And I think

18     it's unfair to draw a conclusion for -- about what Mr.

19     Blecker is saying --

20              THE COURT:  Well --

21              MS. CHAITMAN:  -- because let me just say this,

22     Your Honor.

23              THE COURT:  Go ahead.  All I'm saying is --

24              MS. CHAITMAN:  Imagine if --

25              THE COURT:  -- if that's all the testimony that
```

Page 78

1    I'm going to hear on this or see on this, I raised this

2    issue before.  We're talking about a single account,

3    $200,000 was deposited over a period of years.  He said

4    that.  He never withdrew anything because it was such a good

5    investment and at the end of the day he withdrew $206,000.

6    It just doesn't quite jive.

7              MS. CHAITMAN:  But the -- in the entire -- we

8    don't know what transfers were made to this other account

9    which the trustee had never produced documents on except for

10   four statements.

11             THE COURT:  This other account being some account

12   other than the $200,000 account?

13             MS. CHAITMAN:  Yes.  He had a separate account.

14             THE COURT:  Well, does the $200,000 account

15   reflect any transfers to that account?

16             MS. CHAITMAN:  In the statements that I have no,

17   but I don't know.  We -- how do you reconstruct something

18   from 1981?  The fact is the trustee has not produced a

19   complete set of the records --

20             THE COURT:  But --

21             MS. CHAITMAN:  -- for that account.

22             THE COURT:  -- I thought he opened the account we

23   were discussing in 1986.

24             MS. CHAITMAN:  He had a joint account in 1981.

25             THE COURT:  Right.

1         MS. CHAITMAN:  He opened a new joint account that

2     wasn't a transfer into from the other account.

3         THE COURT:  Was that the $200,000?

4         MS. CHAITMAN:  Right.  And the -- he's -- the

5     trustee has never produced, I assume the trustee doesn't

6     have them, the records showing what happened with that other

7     account.  So we're dealing with events that occurred 20, you

8     know, seven years ago and the trustee doesn't have a

9     complete record.

10        And, you know, interestingly enough, Judge, other

11    than the PWs that the trustee is claiming for which there's

12    no documentary evidence, not a shred of evidence and Collura

13    admits this, Blecker never took any withdrawals.  The

14    trustee doesn't claim he took any withdrawals.  The only

15    withdrawals that the trustee claims he took were profit

16    withdrawals.  And that's -- this man has always taken the

17    position long before I even knew him that he never took

18    money out of this account.

19        THE COURT:  I know that's his position.

20        All right.  As I said, I'll -- you know, if he

21    can't testify then I'll just receive those documents in the

22    manner in which they were produced and you can argue over

23    what they mean.

24        MS. CHAITMAN:  And I will speak to his son and see

25    if his son has any personal knowledge.

Page 80

1              THE COURT:  Is he on the witness list?

2              MS. CHAITMAN:  No, he's not, but I'm producing him

3     in lieu of --

4              THE COURT:  And by the way, I don't know if this

5     -- and I raised this the last time, this doesn't really

6     relate to the omnibus proceeding so much as it relates to

7     his individual proceeding.

8              As I said all that will come out of the omnibus

9     proceeding is I will or will not accept an inference that,

10    you know, the PW means what it says subject to hearing from

11    individual customers in other cases.

12             MS. CHAITMAN:  We've actually done that already

13    because we went through an opt-out procedure where all --

14    the only people who were before you on this issue are the

15    people who've said we didn't take out withdrawals.  So --

16             THE COURT:  Well, if you want me to try -- the

17    trustee has offered to try this case right after your --

18    right after the -- or as part of this proceeding.

19             MS. CHAITMAN:  Yes.  And that's what I --

20             THE COURT:  You want to do that?

21             MS. CHAITMAN:  Yes.

22             THE COURT:  Okay.

23             MS. CHAITMAN:  Yes.

24             THE COURT:  So we'll do Blecker, but not the Blums

25    as part of this proceeding.

1           MS. CHAITMAN:  Okay.  And what I would suggest,

2    Your Honor, is I will talk to Mr. Blecker's son and if he

3    has personal knowledge of this then I'll offer his

4    deposition --

5           THE COURT:  Well, they'll --

6           MS. CHAITMAN:  -- to the trustee.

7           THE COURT:  Okay.

8           MS. CHAITMAN:  Okay.

9           THE COURT:  As long as they have an opportunity to

10   depose him.

11          MS. CHAITMAN:  I beg your pardon.

12          THE COURT:  As long as they have an opportunity to

13   depose him.

14          MS. CHAITMAN:  Yes.  Yes.

15          THE COURT:  All right.  So with respect to your

16   motion -- this motion I've resolved it.  I'm just saying

17   that I'll take the documents.  You know, you're arguing

18   whether he's unavailable.  If you want to put in evidence

19   upon availability, fine, but he is 106 years old.

20          MS. CHAITMAN:  I can get a doctor's letter if you

21   want that, Your Honor.

22          THE COURT:  All right.

23          MS. FEIN:  One item.

24          THE COURT:  Oh, take your documents back.

25          MS. FEIN:  Okay.  Certainly.

Page 82

```
 1              We would be happy to accept a doctor's note.  That

 2    hasn't been put forward yet.  But we did have -- we included

 3    a document that was an article that he was featured in about

 4    his potential (indiscernible).  He's been --

 5              THE COURT:  So if it's in the press it must be

 6    true.

 7         (Laughter)

 8              MS. FEIN:  I certainly wouldn't ascribe to that

 9    philosophy.

10              THE COURT:  Last time I said that I got in a

11    little trouble.

12              MS. FEIN:  He was interviewed again in an article

13    published in 2017.  He said he enjoyed very good health.  I

14    certainly wouldn't hold that against him.  I mean, he's

15    fortunate that hopefully he's in that position that he

16    doesn't take any medications, except baby aspirin and he was

17    making doctor's appointments 4/20/17.  So that informed, you

18    know, our basis for moving forward with this.  It was not

19    intended to harass Mr. Blecker.

20              THE COURT:  But you said you would accept a

21    doctor's note?

22              MS. FEIN:  Depending on the context of the note

23    and depending on what it said, that was part of our

24    stipulation.

25              THE COURT:  Well, why don't we deal with this
```

Page 83

1    issue at trial?  Take your documents back, though.

2           Okay.  Last, this is the motion to exclude the

3    trustee as a witness.

4           MS. VANDERWAL:  Good afternoon again, Your Honor.

5    Amy Vanderwal for the trustee.

6           We have reached the final motion of today.  The

7    participating claimants represented by Chaitman, LLP

8    indicated in pretrial disclosures that they intend to call

9    the trustee as a witness at trial.

10          Your Honor, this Court should exclude such

11   testimony because it is cumulative and duplicative of

12   testimony that will be offered by the experts.  It should be

13   excluded under Federal Rule of Evidence 403.

14          To the extent it's not cumulative it is -- the

15   trustee's personal knowledge relates to his legal position

16   which is either privileged or as has already been made

17   available to this Court in our papers.  And finally the

18   request for such testimony is from the face of Mr. Blecker

19   it was intended to harass the trustee.

20          THE COURT:  Is the trustee going to testify at

21   trial?

22          MS. VANDERWAL:  No.  Well, our -- we do not

23   identify him as a witness.  We do not believe he has

24   personal knowledge regarding the omnibus issue regarding --

25   that he could provide testimony on.

1            THE COURT:  I thought the trustee was going to

2      testify about the books and records he inherited and what he

3      did.

4            MS. VANDERWAL:  The experts are going to testify

5      as to the contents of the books and records, their analysis,

6      and then another representative of the forensic accountants

7      will testify as to the chain of custody.  They -- the

8      forensic accountants and claims agents were involved in the

9      case from the first day.  So they were there and they'll

10     testify to the preservation of the records, the maintenance

11     of the records.

12            THE COURT:  Okay.

13            MS. VANDERWAL:  And then the analysis and

14     reconstruction of the books and records.  And it's that

15     analysis and reconstruction that forms the basis for both

16     the decision to treat profit withdrawals as evidence and the

17     specific claims determinations, the -- it's the same math

18     obviously.

19            So the experts in this case will provide the best

20     testimony particularly in this case where as we've mentioned

21     the fight went on for 40 years.  The records are voluminous.

22     They've spent daily, they've spent years analyzing these

23     books and records and they will present that to Your Honor

24     as the basis for the decisions that have been made in terms

25     of claims.

Page 85

1          As I mentioned, to the extent that the trustee has

2    knowledge not derived from his experts that knowledge

3    relates to his legal positions.  So in terms of his

4    communications with counsel that would be privileged.  In

5    terms of positions on the legal issues in this proceeding

6    that's been presented to the board.

7          And finally I -- and importantly I would just like

8    to note that the participating claimants shouldn't -- on the

9    face of their papers it suggests that their motivation in

10   attempting to examine the trustee is harassment.  There are

11   baseless statements in those papers that have been repeated

12   throughout this proceeding.  For example, that the trustee

13   is slowly acting to enrich SIPA or that the trustee is

14   motivated to increase his fees.  They are irrelevant to

15   these proceedings, harassing and the -- his testimony should

16   not be permitted for that reason as well.

17          Okay.  Thank you.

18          MS. VANDERWAL:  Thank you, Your Honor.

19          MS. CHAITMAN:  Your Honor, the trustee made the

20   determination to disallow all profit withdrawals regardless

21   of whether there were any internal records as existed with

22   many, many of the profit withdrawal customers.

23          The trustee made that decision in 2009, long

24   before he retained the experts --

25          THE COURT:  But that's not what they say.  They

Page 86

1      say the experts were in there day one.

2              But let me get to the question I have.  Suppose

3      the trustee didn't have any records at that time and he had

4      the motivations that you ascribe to.  If he's still right

5      about the PW what difference does it make?

6              MS. CHAITMAN:  Well, the -- first of all, I'm

7      convinced that he's wrong about the PW.

8              THE COURT:  Okay.  That I understand --

9              MS. CHAITMAN:  And --

10             THE COURT:  -- but that's really the issue.

11             MS. CHAITMAN:  And -- but the point is, he has an

12     obligation as the trustee to examine the books and records

13     and make a reasonable determination.  And the question that

14     I would like to clarify through his testimony is that he

15     actually had no basis whatsoever for charging customers with

16     profit withdrawals where there was no request for them, from

17     them.  There was nothing in the file as there were in

18     hundreds of the files.  There were no check stubs showing

19     that they had gotten checks.  There was nothing in Mr.

20     Blecker's file.  And --

21             THE COURT:  But assuming that he had no basis, if

22     he now has a basis and he's right what difference does it

23     make as a legal matter?  That's what I'm asking.  Why is it

24     -- in other words, why is it relevant or material?

25             MS. CHAITMAN:  Well, first of all, you're assuming

Page 87

1    that he has a basis now and I --

2              THE COURT:  But that's what I'm going to decide.

3              MS. CHAITMAN:  Right.

4              THE COURT:  In other words I'm saying what do I

5    care what is motivation is.  He's either right or he's

6    wrong.

7              MS. CHAITMAN:  Well, if you were to determine that

8    he didn't have a proper motivation I think that there were

9    other remedies that would be available.  I mean, after all

10   it's cost Mr. Blecker as one example a fortune to try to

11   achieve the result that he believes he is entitled to and

12   that I believe he is entitled to.  And I think the Court

13   would have the discretion to deal with that expense --

14             THE COURT:  Now you're saying he should be

15   sanctioned for some sort of bad faith, but there's no

16   evidence --

17             MS. CHAITMAN:  Well --

18             THE COURT:  -- of bad faith.

19             MS. CHAITMAN:  Well, we haven't cross-examined him

20   yet.

21             THE COURT:  So you're going to go fish for some

22   bad faith?

23             MS. CHAITMAN:  Whether he had a basis for the

24   determination that he made, whether you decide -- whether

25   you say he didn't have a basis or you say that he did --

1    made a determination in bad faith, that's for you to

2    determine.  But I think I can establish that he had no

3    legitimate basis to make that determination.

4             THE COURT:  And I come back to the same question

5    in terms of the PW proceeding why does it matter if he now

6    has a basis?

7             MS. CHAITMAN:  I think it matters because although

8    the law generally does not permit the payment of interest to

9    customers whose claims are allowed after a tortuous

10   litigation process, if the Court finds that the trustee made

11   this decision in bad faith without any factual basis I think

12   this would be ripe for a determination that Mr. Blecker

13   should not be penalized for the loss of his money from 2009

14   on.

15            THE COURT:  Okay.  Anything else?

16            MS. VANDERWAL:  The only thing I want to say, Your

17   Honor, is that the only records that counsel for Mr. Blecker

18   made that actually relates to the scope of these proceedings

19   is letters in customer files.  And two things.

20            The testimony that you'll hear from employees who

21   worked at BLMIS during relevant period and worked daily with

22   those files will show that written authorization was not

23   required for profit withdrawal transactions.  You would set

24   up your account.  You would say whether you wanted profits

25   or not, and then if you needed to change your accounts from

Page 89

1    a send to a reinvest for example, then you would send in the

2    letter.

3            THE COURT:  Are you suggesting that Ms. Chaitman

4    should be able to question the trustee on what he knew in

5    2009?

6            MS. VANDERWAL:  Well, no.  That's the second part

7    of what I was getting to is the person who was -- who went

8    through and analyzed those customer files will testify.  We

9    said Collura went through, looked at the customer files,

10    looked at what was in those files and how it related to the

11    -- to their status as a receiving profit withdrawals or not.

12    She will provide that testimony.  She did that analysis.

13    You will hear about that from her.

14            THE COURT:  What I understand Ms. Chaitman's

15    argument to be that no matter what the facts now show in

16    2009 when the trustee denied the claim based on profit

17    withdrawal or reduced the claim he had no basis to do that,

18    no reasonable basis.

19            And the question is whether that's relevant to the

20    proceeding.

21            MS. VANDERWAL:  Well, it's not correct.

22            THE COURT:  I understand.  But let's assume for

23    the moment it is.

24            MS. VANDERWAL:  So the books and records at the

25    time of the claims determination indicated that these were

Page 90

1    profit withdrawal transactions.  Subsequent to that time at

2    your -- at Your Honor's request we have done things like

3    take employee depositions that have confirmed that that

4    analysis that we did at the beginning that was based on the

5    books and records as it was required to be by SIPA was

6    accurate.

7              THE COURT:  But are you saying that the basis of

8    the trustee's knowledge in 2009 is relevant to this

9    proceeding, the basis -- his knowledge for the basis of his

10   denying the claims in 2009?

11             MS. VANDERWAL:  Well, it wasn't based on the

12   trustee's personal knowledge.  That's what I'm saying.  The

13   denial of the claims was based on the analysis completed by

14   the experts then --

15             THE COURT:  Are you saying it's --

16             MS. VANDERWAL:  -- who were there --

17             THE COURT:  Are you saying it's relevant but if he

18   were asked the question he would say, I don't know, you

19   know, I listened to my experts.

20             MS. VANDERWAL:  I think that the time at which he

21   determined the claim is relevant and I think that claims

22   determination was accurate on the books and records and

23   that's been confirmed.  But he's not the person to testify

24   on that.  The experts are because they --

25             THE COURT:  Well, his testimony may be based on

Page 91

1    what the experts told him.  That's the position --

2              MS. VANDERWAL:  Right.  Well, that just means

3    that's cumulative and it should be excluded --

4              THE COURT:  But how do we know that's what he's

5    going to say?

6              MS. VANDERWAL:  Well, the other thing that they

7    could -- the claimants have available to them is their

8    determination letter which sets out the analysis that the

9    experts did.  So they know what the -- what the basis was

10   because it was communicated to them.

11             THE COURT:  Well, Ms. Chaitman's raising a

12   different issue.  She's saying these claimants were denied

13   in bad faith even if he's right now, although she disagrees

14   that he's right.  Even if he's right now he had no basis to

15   disallow the claim in 2009.  You seem to be saying, well, in

16   2009 he had information, but then it sounds like it's

17   relevant and that's what I don't understand.

18             I would have thought that his subjective

19   motivation is irrelevant --

20             MS. VANDERWAL:  His perspective --

21             THE COURT:  -- but you're telling me it is

22   relevant.

23             MS. VANDERWAL:  No.  That's not what I'm telling

24   you, Your Honor.

25             THE COURT:  Well, that's why I'm asking you.

1            MS. VANDERWAL:  His subjective motivation is

2    irrelevant to these proceedings.  It's an objective standard

3    of the claims determination.

4            THE COURT:  All right.  I'll reserve decision on

5    this.

6            Thank you.

7        (Proceedings concluded at 3:47 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                        R U L I N G S

4

5    IDENTIFICATION                                    PAGE

6    Trustee's Motion in Limine Excluding Certain

7    Testimony from the Blums                          --

8

9    Trustee's Motion in Limine Excluding Testimony

10   of Aaron Blecker                                  --

11

12   Trustee's Motion in Limine Excluding Himself

13   as Witness                                        --

14

15   Participating Claimants' Motions in Limine

16   Precluding Experts Greenblatt and Collura         --

17

18

19

20

21

22

23

24

25

Page 94

1                           CERTIFICATE

2

3        I, Sherri L. Breach, certify that the foregoing

4   transcript is a true and accurate record of the proceedings.

5   **Sherri L.**          Digitally signed by Sherri L.
                           Breach
6   **Breach**            DN: cn=Sherri L. Breach,
                          o=Veritext, ou,
                          email=digital@veritext.com, c=US
7   _____   Date: 2017.04.19 16:12:30 -04'00'

8   Sherri L. Breach

9   AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11

12  DATE:   April 18, 2017

13

14

15

16

17

18

19

20

21

22  Veritext Legal Solutions

23  330 Old Country Road

24  Suite 300

25  Mineola, NY 11501