Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    SECURITIES INVESTOR

5    PROTECTION CORPORATION,

6                      Plaintiff,

7    v.                          Adv. Case No. 08-01789(SMB)

8    BERNARD L. MADOFF

9    INVESTMENT SECURITIES,

10   LLC, ET AL.,

11                     Defendant.

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   IRVING H. PICARD, TRUSTEE

14   FOR THE LIQUIDATION OF B,

15                     Plaintiff,

16   v.                          Adv. Case No. 10-05257(SMB)

17   ZRAICK, JR., INDIVIDUALLY

18   AND AS JOINT TENANT, ET AL.,

19                     Defendant.

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23

24

25

Page 2

1    IRVING H. PICARD, TRUSTEE

2    FOR THE LIQUIDATION OF B,

3                    Plaintiff,

4    v.                              Adv. Case No. 10-04488(SMB)

5    SOUTH FERRY BUILDING COMPANY,

6                    Defendant.

7    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

8

9                    U.S. Bankruptcy Court

10                   One Bowling Green

11                   New York, New York

12

13                   May 3, 2017

14                   10:04 AM

15

16

17

18

19

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 3

1    Hearing re:  08-01789 - Application of Windels Marx Lane &

2    Mittendorf, LLP for Allowance of Interim Compensation for

3    Services Rendered and Reimbursement of Actual and Necessary

4    Expenses Incurred from August 1, 2016 through November 30,

5    2016 for Windels Marx lane & Mittendorf, LLP, Special

6    Counsel, period: 8/1/2016 to 11/30/2016, fee: $2,374,541.50,

7    expenses: $15,499.56

8

9    Hearing re:  08-01789 - Application of Trustee And Baker &

10   Hostetler LLP for Allowance of Interim Compensation for

11   Services Rendered and Reimbursement of Actual and Necessary

12   Expenses Incurred from August 1, 2016 through November 30,

13   2016 for Baker & Hostetler, L.L.P., Trustee's Attorney,

14   period: 8/1/2016 to 11/30/2016, fee: $35,390,309.40,

15   expenses: $236,780.39

16

17   Hearing re:  08-01789 - Application of Young Conaway

18   Stargatt & Taylor, LLP as Special Counsel to the Trustee for

19   Allowance of Interim Compensation for Services Rendered and

20   Reimbursement of Actual and Necessary Expenses Incurred from

21   August 1, 2016 through November 30, 2016 for Young Conaway

22   Stargatt & Taylor LLP, Special Counsel, period: 8/1/2016 to

23   11/30/2016, fee: $47,996.10, expenses: $1,011.68

24

25   Hearing re:  08-01789 - Application of Kelley, Wolter &

Page 4

1    Scott, Professional Association as Special Counsel to the

2    Trustee for Allowance of Interim Compensation for Services

3    Rendered from August 1, 2016 through November 30, 2016 for

4    Kelley, Wolter & Scott, Professional Association, Special

5    Counsel, period: 8/1/2016 to 11/30/2016, fee: $4,185.00,

6    expenses: $0.00

7

8    Hearing re:  08-01789 - Application of Williams, Barristers

9    & Attorneys as Special Counsel to the Trustee for Allowance

10   of Interim Compensation for Services Rendered from August 1,

11   2016 through November 30, 2016 for Williams, Barrister &

12   Attorneys, Special Counsel, period: 8/1/2016 to 11/30/2016,

13   fee: $277,992.88 , expenses: $0.00

14

15   Hearing re:  08-01789 - Application of Cochran Allan as

16   Special Counsel to the Trustee for Allowance of Interim

17   Compensation for Services Rendered Incurred from August 1,

18   2016 through November 30, 2016 for Cochran Allan, Special

19   Counsel, period: 8/1/2016 to 11/30/2016, fee: $5,013.45,

20   expenses: $0.00

21

22   Hearing re:  08-01789 - Application of UGGC & Associates as

23   Special Counsel to the Trustee for Allowance of Interim

24   Compensation for Services Rendered and Reimbursement of

25   Actual and Necessary Expenses Incurred from August 1, 2016

Page 5

1    through November 30, 2016 for UGGC & Associates, Special

2    Counsel, period: 8/1/2016 to 11/30/2016, fee: $68,829.74,

3    expenses: $3,462.80

4

5    Hearing re:  08-01789 - Application of Triay Stagnetto Neish

6    as Special Counsel to the Trustee for Allowance of Interim

7    Compensation for Services Rendered from August 1, 2016

8    through November 30, 2016 for Triay Stagnetto Neish, Special

9    Counsel, period: 8/1/2016 to 11/30/2016, fee: $851.65,

10   expenses: $0.00

11

12   Hearing re:  08-01789 - Application Soroker Agmon Nordman as

13   Special Counsel to the Trustee for Allowance of Interim

14   Compensation for Services Rendered and Reimbursement of

15   Actual and Necessary Expenses Incurred from August 1, 2016

16   through November 30, 2016 for Soroker Agmon, Special

17   Counsel, period: 8/1/2016 to 11/30/2016, fee: $713,757.20,

18   expenses: $92,102.77

19

20   Hearing re:  08-01789 - Application Schiltz & Schiltz as

21   Special Counsel to the Trustee for Allowance of Interim

22   Compensation for Services Rendered and Reimbursement of

23   Actual and Necessary Expenses Incurred from August 1, 2016

24   through November 30, 2016 for Schiltz & Schiltz, Special

25   Counsel, period: 8/1/2016 to 11/30/2016, fee: $47,168.20,

1    expenses: $3,065.93

2

3    Hearing re:  08-01789 - Application of SCA Creque as Special

4    Counsel to the Trustee for Allowance of Interim Compensation

5    for Services Rendered and Reimbursement of Actual and

6    Necessary Expenses Incurred from August 1, 2016 through

7    November 30, 2016 for SCA Creque, Special Counsel, period:

8    8/1/2016 to 11/30/2016, fee: $15,510.00, expenses: $0.00

9

10   Hearing re:  08-01789 - Application of Interim Professional

11   Compensation Application of Higgs & Johnson (Formerly Higgs

12   Johnson Truman Bodden & Co.) as Special Counsel to the

13   Trustee for Allowance of Interim Compensation for Services

14   Rendered and for Higgs & Johnson, Special Counsel period:

15   8/1/2016 to 11/30/2016, fee: $4,029.51, expenses: $89.17

16

17   Hearing re:  08-01789 - Application of Werder Vigano as

18   Special Counsel to the Trustee for Allowance of Interim

19   Compensation for Services Rendered from August 1, 2016

20   through November 30, 2016 for Werder Vigano, Special

21   Counsel, period: 8/1/2016 to 11/30/2016, fee: $1,878.07,

22   expenses: $0.00

23

24   Hearing re:  08-01789 - Application of Eugene F. Collins as

25   Special Counsel to the Trustee for Allowance of Interim

1    Compensation for Services Rendered and Reimbursement of

2    Actual and Necessary Expenses for Eugene F. Collins, Special

3    Counsel, period: 8/1/2016 to 11/30/2016, fee: $4,538.37,

4    expenses: $1.61

5

6    Hearing re:  08-01789 - Application of Browne Jacobson, LLP

7    as Special Counsel to the Trustee for Allowance of Interim

8    Compensation for Services Rendered and Reimbursement of

9    Actual and Necessary Expenses Incurred from August 1, 2016

10   through November 30, 2016 for Browne Jacobson, Special

11   Counsel, period: 8/1/2016 to 11/30/2016, fee: $1,045,836.83,

12   expenses: $79,958.30

13

14   Hearing re:  08-01789 - Application of Graf & Pitkowitz

15   Rechtsanwalte GmbH as Special Counsel to the Trustee for

16   Allowance of Interim Compensation for Services Rendered and

17   Reimbursement of Actual and Necessary Expenses Incurred from

18   August 1, 2016 through November 30, 2016 for Graf &

19   Pitkowitz Rechtsanwalte GmbH, Special Counsel, period:

20   8/1/2016 to 11/30/2016, fee: $19,739.12, expenses: $158.30

21

22   Hearing re:  10-05257 - Zraick Defendants Motion for Entry

23   of an Order (I)(A) Extending Time for Rebuttal Expert

24   Disclosures by Twelve Days or (B) in the Alternative,

25   Declaring Defendants Rebuttal Expert Report Timely Served,

Page 8

1    and (II) Compelling the Production of Documents Concerning

2    Securities Listed on Defendants Customer Statements

3

4    Hearing re:   10-04488 - Status Conference re Undisputed

5    Facts Stipulation (also applies to Adv. P. Nos. 10-04350,

6    10-04398, & 10-05110)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

Page 9

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3         Attorneys for the Trustee

 4         45 Rockefeller Plaza

 5         New York, NY 10111

 6

 7   BY:  DAVID J. SHEEHAM, ESQ.

 8         KEITH R. MURPHY, ESQ.

 9         MAXIMILLIAN S. SHIFRIN, ESQ.

10         IRVIN H. PICARD, ESQ.

11

12   SIPC

13         Attorney for SIPC

14         1667 K. Street, N.W.

15         Suite 1000

16         Washington, D.C. 20006-1620

17

18   BY:  KEVIN H. BELL, ESQ.

19

20

21

22

23

24

25
```

```
1    BAKER MCKENZIE LLP

2          Attorney for South Ferry #2 LP, South Ferry Building

3          Company, James Lowrey, United Congregation Mesora,

4          et al.

5          452 Fifth Avenue

6          New York, NY 10018

7

8    BY:  DEBRA A. DANDENEAU, ESQ.

9

10   HUNTON & WILLIAMS LLP

11         Attorney for Defendants

12         200 Park Avenue

13         New York, NY 10166-0091

14

15   BY:  ROBERT A. RICH, ESQ.

16

17   WINDELS MARX LANE & MITTENDORF LLP

18         156 West 56th Street

19         New York, 10019

20

21   BY:  HOWARD L. SIMON, ESQ.

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Please be seated.  Madoff.

 3              MR. SHEEHAN:  Good morning, Your Honor.

 4              THE COURT:  Good morning.

 5              MR. SHEEHAN:  David Sheehan from Baker & Hostetler

 6     for the trustee in the Bernard L. Madoff Securities

 7     liquidation proceeding.

 8              This is the thirty-third fee application this

 9     morning, Your Honor.

10              THE COURT:  And I know Mr. Belcher is going to

11     tell me the day.

12              MR. SHEEHAN:  Yeah, I --

13              THE COURT:  So don't steal his thunder.

14              MR. SHEEHAN:  I was actually thinking about it,

15     but I actually couldn't figure out the days.

16              THE COURT:  That's his specialty.

17              MR. SHEEHAN:  Yeah.  It is indeed.  And I want --

18     this doesn't happen here, I want you to know that, so.

19              In any event, the -- as I usually do I'll just

20     kind of talk very briefly as an overview of what's been

21     going on during the reporting period, I may step outside of

22     that because it tends to blend with me as time progresses.

23              For example, this is the recording period that

24     goes through November of last year, that four-month period

25     that started in July, October, November, and -- November I
```

1    should say.  So it doesn't catch or proceed a tee decision,

2    which has been what we've been spending a lot of our time on

3    as Your Honor knows over the last couple months.

4            But prior to that what was really going on is let

5    me cover three areas.

6            One is good faith, which Your Honor is very

7    familiar with and there's lots of activity not only now

8    before Your Honor but before Judge Moss where we have his

9    work and the discovery proceedings.  And as a result those

10   cases are moving at pace, but we're down to from over at one

11   point 900 cases we've down 269 cases.  As I stand here today

12   we're just shy of $700 million.  So there's still real value

13   there from the trustee's perspective, we are still pushing

14   those cases.

15           THE COURT:  What's the 700 million figure?

16           MR. SHEEHAN:  The 700 million is the aggregate

17   number there for the --

18           THE COURT:  Potential liability?

19           MR. SHEEHAN:  Yeah, potential liability in those

20   269 cases.

21           We settle a good many of these, Your Honor.  We

22   average about 10- to $12 million a month, some months are

23   more generous than that, some are somewhat leaner, but the

24   average over the last two to three years has been about

25   $10 million a month, and we continue to settle cases using

Page 13

1    the device of mediation with Judge Cyganowski and others

2    that are principally involved in that endeavor.

3            So that consume as lot of time of our good faith

4    team, and then of course the (indiscernible) practice, et

5    cetera, Your Honor is intimately familiar with, so I need

6    not go through that.

7            The other aspect of the case obviously are all the

8    bad faith cases, and prior to the issuance of the ET

9    decision what we were working on was anticipation of the

10   decision, whichever way it went where would we be, because

11   we knew what cases would be affected by extraterritoriality

12   and which wouldn't, so we've been preparing amended

13   complaints where it's appropriate, applications for

14   discovery, and all of those things are now being discussed

15   with our adversaries and hopefully be presented to Your

16   Honor in an orderly fashion over the next several weeks.  So

17   that's our hope.

18           As much as we work hard at that sometimes we can't

19   reach agreement on certain things where we need Your Honor's

20   assistance, but I think overall we have a pretty good sense

21   of where we want to go.

22           We have, as you know, 86 of the cases are on

23   appeal, 87 is RBS, RBS is now making its way through the

24   District Court --

25           THE COURT:  I saw that.

1          MR. SHEEHAN:  -- and we're obviously on top of

2    that as well.

3          In terms of the former proceedings there's three

4    major firms that have been, you know, the principle among

5    them of course is always Browne & Jacobson in England.  And

6    the reason for that is several -- or the reasons are

7    several.

8          And that is first of all they are -- have an

9    action pending there, we have always had what we call the

10   protective action just in case we could not bring the action

11   here in the United States, and that action is -- sort of

12   mirrors what we do here, so we've been updating that

13   complaint and working on it all the time, or as they call it

14   their bill of particulars.  So that takes a good bit of

15   time.

16         We also have a lot of activity in the islands that

17   since it's in the Commonwealth we reach out to them and get

18   assistance through them.  There's been a good deal of

19   activity in the King Gate matter and more so offshore

20   activities including not only discovery but settlement

21   activities and real litigation going on among that group.

22         And then of course there's always the Fairfield

23   case, which is it still active there, actively being

24   litigated and potentially settled, so we're very much

25   involved in that as well.  Not only through our settlement

1  with the liquidator but also as an adversary to the

2  (indiscernible) themselves.  So that occupies a lot of their

3  time.

4          Then we have the firm in Israel.  We are pursuing

5  that very vigorously there and there is active resistance as

6  Your Honor might suspect, but as I've said before this

7  involves approximately $130 million that went into a charity

8  there and then was spread about among universities and other

9  institutions.  One would think well that's charity why would

10  we go there, but it was not placed there my way, it was

11  placed there in sort of an endeavor that was going to take

12  advantage of the intellectual property there, try to harness

13  it and then make money off of it.  And as a matter of fact

14  at one point $700,000 did come back to the charity as a

15  result of one of those arrangements.

16          So it's a very complicated and intricate problem

17  that we have there as being as I say actively litigated, and

18  Surok Argman (ph) is our counsel there, and you'll see that

19  they're substantial as well.

20          And then the last two are in Liechtenstein and in

21  France.  There they're ongoing actions that we are not

22  directly participating in, but in France it's a criminal

23  proceeding, we've gained a good deal of knowledge there with

24  regard to other causes of action such as Thema (ph) and

25  somewhat what I would call the bombastic cases, et cetera.

Page 16

1     And the same thing is true with regard to King Gate as well.

2              So then we go to Liechtenstein.  Liechtenstein

3     there's active litigation going on there between Alpha Prime

4     and a number of the others, and as a result of that they've

5     become an active part of your settlement negotiations.  And

6     so -- because we are trying to work now with -- well we have

7     always worked with foreign counsel -- but foreign counsel to

8     reach results that as we get closer towards hopefully the

9     end of the case the light becomes clearer to us as to how to

10    resolve it, and I think our adversaries see the same thing.

11             So that sums up the situation (indiscernible)

12    foreign (indiscernible).  Overall I'd say that the case is

13    progressing.  I know from Your Honor's perspective it must

14    seem like, you know, a long endeavor, but it's been around

15    for over eight years, or as many days as Mr. Bell will now

16    tell us, but I think overall, you know, the work across the

17    board not just by obviously trustee's counsel, who I

18    represent, but all of our other counsel, the first among

19    them of course being Mr. Simon is here today and his firm

20    Windels, that have done a fantastic job for us, as well as

21    all the other counsel that we have as well.  You've seen

22    their work and appreciate it as I'm sure as much as we do.

23             So --

24             THE COURT:  I have a question which came up in one

25    of the decisions I wrote.  Who is the trustee of the

1   individual estate?

2          MR. SHEEHAN:  It is in fact the partner of

3   Mr. Simon --

4          THE COURT:  So --

5          MR. SHEEHAN:  -- Alan Nisselson.

6          THE COURT:  -- Nisselson is still a trustee,

7   right?

8          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

9          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

10          THE COURT:  So because many of the pleadings

11   (indiscernible) that they're asserted by Mr. Picard on

12   behalf of the SIPA estate --

13          MR. SHEEHAN:  Right.

14          THE COURT:  -- and the individual estate of

15   Madoff, and I was just wondering where that standing comes

16   from.  Is that from the consent order?

17          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

18          THE COURT:  So he's the trustee just for the

19   purpose of --

20          UNIDENTIFIED SPEAKER:  He's still in place in case

21   there was a need for an individual trustee, but at that --

22   as a consolidated estate it operates --

23          THE COURT:  Okay.

24          UNIDENTIFIED SPEAKER:  -- through Mr. Picard.

25          MR. SHEEHAN:  The -- I feel compelled to share a

Page 18

1    little history, if I might.  Most of what Your Honor is --

2              THE COURT:  Well I know --

3              MR. SHEEHAN:  Yeah.

4              THE COURT:  -- the germ of the consent order.

5              MR. SHEEHAN:  All of that.  But the idea was --

6    and I think you'll understand it given the fact that it was

7    Judge Lifland involved, is -- who oversaw this at the very

8    beginning -- what happened was is at the very beginning

9    there was an involuntary petition served that resulted in

10   Mr. Nisselson's appointment.  At the same time the U.S.

11   Attorney forfeited $170 million of the assets so there was

12   nothing for Mr. Nisselson to do.  And at that point Mr. --

13   Judge Lifland said, well why can't he continue as that

14   individual trustee not likely after some substantive

15   consolidation there would be a role for him, but in the, you

16   know, unlikely event given the fact that Madoff seems to be

17   the case of unintended consequences that we would perhaps be

18   able to use his services.  And it resolves only around the

19   estate itself.  The -- it does not involve the SIPA

20   proceeding at all, because quite frankly there are no

21   customers in the earlier proceeding.  The only customers are

22   in the SIPA case.  Because once the transfer took place when

23   he became an LLC there are no customers in the individual,

24   they all became active customers of the LLC.

25              So from that perspective, which is why we sort of

Page 19

1    went back and forth, and I think to say we mangled the --

2    you know, might as well be open here -- I think we really

3    mangled the reargument of the A&B case when we came back to

4    Your Honor and suggested maybe it really shouldn't -- we

5    shouldn't be cut off there, and our adversaries have now

6    mangled that even further by suggesting it involves

7    interaccount transfers, which I don't think it does, and

8    Your Honor made that plain, so the whole thing is sort of a

9    (indiscernible) at this point.  So -- which we'll deal with

10   at some point, but right now I think it's almost irrelevant.

11   You know, in terms of not only SIPA claims but also the

12   individual claims that we might have, so.

13              And one last thing I would report to Your Honor

14   is, is that -- and Ms. Jacobs is not here so I'm not going

15   to report substantively, but I think Your Honor would be

16   interested -- we did go down for two days last week, we had

17   finished the first day, so I won't say anything further

18   then, although I don't think we need anymore, but you will

19   hear about it I'm sure from Ms. Chapin as to whether we need

20   anymore, and we'll make the transcripts available to Your

21   Honor or we ask the Picard counsel to make that, you know,

22   to waive off.  There was nearly a mention of Mr. Picard in

23   those two days.

24              THE COURT:  Okay.

25              MR. SHEEHAN:  Thank you, Your Honor.

Page 20

1           THE COURT:  Thank you.

2           MR. BELL:  Good morning, Your Honor.

3           THE COURT:  Good morning.

4           MR. BELL:  Kevin Bell on behalf of the Securities

5    Investor Protection Corporation.

6           Last Saturday was the 100th day of the presidency

7    of Donald J. Trump, and I found out that there were 1361

8    days remaining.  This case began before the presidency of

9    Barack Obama, 3,065 days ago.  So just putting that in

10   context it shows how long this effort has been.

11          As I reported in December the trustee still has

12   another 40 percent of the principle belonging to the victims

13   who haven't been fully satisfied to get.  These are the

14   people intended by the congressional legislation that was

15   enacted and signed by President Nixon on December 30th,

16   1970.

17          This case is by far four or five -- I think it's

18   almost five times larger than the other 330 SIPA cases that

19   I have worked on a number of them in my 40 -- almost 44

20   years with SIPC, so it's a little challenging.

21          But I am happy to report, you know, as I always

22   do, that I think we're moving forward.  When the end is I

23   don't know, I didn't know I'd get to 3,065 when I got

24   involved on December 11, 2008, but I think there were those

25   who did not think we'd get above 10 percent in the biggest

Page 21

1    financial fraud in this country's history, this Ponzi, self-

2    admitted by Mr. Madoff in the early days to me when I got

3    him to sign the consent.  But clearly it's been very

4    beneficial.

5          And Mr. Sheehan articulates the effort of the

6    lawyers, the 15 special counsel of foreign nature, the three

7    or four or five American counsel, three of whom are -- have

8    applications before Your Honor.  I put Windels in a special

9    category, they are a special counsel, but they have been

10   around since Judge Lifland suggested and SIPC agreed that we

11   put Humpty Dumpty back together in a certain way, as

12   Mr. Sheehan calls mangled maybe, and Baker Hostetler that's

13   been there for the beginning.

14         Not in this period, but I've just finished reading

15   the ninety-ninth invoice of Baker Hostetler for the month of

16   March, which --

17         THE COURT:  Must be fascinating.

18         MR. BELL:  -- which will be the subject of the

19   next fee hearing.

20         But clearly SIPC, myself, and the general counsel

21   review each and every entry, when we have comments we let

22   them be known, and as you see, as I always say, in

23   paragraphs 5 of Baker Hostetler's application, you can see

24   the 14.25 percent reduction from their normal charges that

25   have occurred, the 10 percent holdback that we agreed in the

Page 22

1     beginning, the 10 percent reduction in fees, plus a little

2     more, that is the result of our overview and comments.

3              Windels Marx is slightly higher at paragraph 3 of

4     the SIPC recommendation, it's 15.59.

5              And as my notes show as I've crossed out numbers

6     and write them again, we've been in this range for almost

7     all my appearances before Your Honor.  So there's a

8     consistency to the reductions and the overview.

9              Because as the statute charges my corporation, the

10    Securities Investor Protection Corporation, which is

11    oversight from Congress and the SEC, where there's no

12    reasonable expectation of a general estate or SIPC -- and

13    that means SIPC getting paid back over $2 billion that its

14    advanced for administrative expenses in this case as the

15    second priority, the first one doesn't really count because

16    there's no alimony and others in this case, but clearly

17    there's a responsibility and we exercise that

18    responsibility.

19             And it is with total confidence SIPC has filed its

20    recommendations with the court and it strongly recommends

21    that these -- all these applications be approved by the

22    Court and the trustee pay all the applicants what they are

23    seeking.

24             And you know, I am available for questions if you

25    have, Your Honor, any that you wish to raise.

```
 1              THE COURT:  Okay.  Thank you.

 2              Does anyone else want to be heard in connection

 3     with the applications?  Let the record reflect there's no

 4     response.

 5              In light of SIPC's recommendation and the

 6     substantial likelihood that there's not going to be 100

 7     percent distribution for the customers, I'll approve the

 8     applications, you can submit an order.

 9              MR. BELL:  Thank you, Your Honor.

10              MR. SHEEHAN:  Thank you very much, Your Honor.

11              THE COURT:  All right.  Next I'll do the status

12     conference on the undisputed fact stipulations.

13              MR. MURPHY:  Good morning, Your Honor.

14              THE COURT:  Good morning.

15              MR. MURPHY:  Keith Murphy, Baker Hostetler for the

16     trustee.

17              MS. DANDENEAU:  Good morning, Your Honor.  Debra

18     Dandeneau from Baker McKenzie.  I'm here for the various

19     defendants in this -- the adversary proceedings that are the

20     subject of the status conference.

21              THE COURT:  Okay.  As I recall the last we were

22     together you were trying to put together a stipulation of

23     facts --

24              MR. MURPHY:  That's correct, Your Honor.

25              THE COURT:  -- with a view towards moving for
```

Page 24

1   summary judgment.  If you could put together that

2   stipulation it would make sense.

3            MR. MURPHY:  That's correct, Your Honor.

4            We are here on a status conference on four cases.

5   Picard versus South Ferry #2, Picard versus South Ferry

6   Building Company, Picard versus James Lowrey, and Picard

7   versus United Congregations Mesora, all represented by Baker

8   McKenzie.

9            THE COURT:  I only have three on my calendar so

10  let me just ask you -- I'll tell you the adversary

11  proceeding numbers I have --

12           MR. MURPHY:  Sure.

13           THE COURT:  -- if we can do it that way.  4350.

14           MR. MURPHY:  Yes.

15           THE COURT:  4387, 5110.  What am I missing?

16           MR. MURPHY:  I think there may have been some

17  confusion, Your Honor.  The other one is also named South

18  Ferry.

19           THE COURT:  Oh, I have it separately for some

20  reason.

21           MR. MURPHY:  Okay.  So we have -- also the one

22  that's missing, Your Honor, is 4488, and that is Picard

23  versus South Ferry Building Company.

24           THE COURT:  Oh, okay.  Okay.

25           MR. MURPHY:  Okay, great.

1           So, Your Honor, we are here on a status conference

2     on that.  As you know, as we mentioned, the parties have

3     been working towards a stipulation for purposes of

4     submitting it to the Court for review for potential summary

5     judgment.

6           The parties, we've been working with Baker

7     McKenzie on one of the stipulations, the Picard versus South

8     Ferry Building Company case.

9           I'm happy to report that the attorneys have

10    reached agreement on a set of stipulated facts.  Baker

11    McKenzie is reviewing that to get client approval

12    ultimately, and the goal among the parties was to then apply

13    the same stipulation across the other three cases as well

14    and to submit that.

15          There may be some minor differences just given

16    some of the different facts; however, they would be

17    substantially the same.

18          Your Honor, our goal at this point I think we have

19    hopefully finish up the remaining stipulations and hopefully

20    Baker McKenzie can get client sign off such that we would be

21    able to submit the stipulations by next week some time, and

22    then the Court would review them, and if it's satisfied with

23    what we've done the prior order would go into effect and the

24    dates would then be set off of that for, for example,

25    briefing.

1            THE COURT:  Okay.  So your proposal then is to

2    schedule another conference, which will eventually -- which

3    will I guess will be essentially a status conference on

4    whether it makes sense to move for summary judgment --

5            MR. MURPHY:  After your review.

6            THE COURT:  -- based upon the stipulated facts.

7            MR. MURPHY:  Correct, Your Honor.

8            THE COURT:  All right.  So want to push it out a

9    month?

10            MR. MURPHY:  Yes.

11            THE COURT:  All right.

12            MR. MURPHY:  Thank you, Your Honor.

13            I will add as well, Your Honor, with respect to

14    other cases in a similar procedural posture, not necessarily

15    with Baker McKenzie, but the goal would be to use the same

16    or substantially similar stipulated facts so there's

17    consistency with the cases going forward for summary

18    judgment, Your Honor.

19            THE COURT:  All right.

20            MR. MURPHY:  That's our goal.

21            THE COURT:  How about Wednesday, June 7th?

22            MR. MURPHY:  Yes, Your Honor.

23            THE COURT:  10 o'clock.

24            MR. MURPHY:  Thank you, Your Honor.

25            THE COURT:  Okay.  Thanks very much.

Page 27

1          MS. DANDENEAU:  Thank you, Your Honor.  May I be

2      excused?

3          THE COURT:  Yes.  Thank you.

4          MS. DANDENEAU:  Thank you.

5          THE COURT:  And last we have Picard v. Zraick.

6          MR. RICH:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. RICH:  Robert Rich, Hunton & Williams LLP on

9      behalf of defendants Edward A. Zraick, Nancy Zraick,

10     Patricia Deluca, and Karen Rich.  This is adversary

11     proceeding number 10-05257.

12          Just hearing the comments from Mr. Sheehan earlier

13     about the remaining cases, 700 million liability -- alleged

14     liability left really puts this case in perspective, 285,000

15     in alleged liability across two separate accounts.

16          I was also surprised to hear Mr. Sheehan's

17     comments about the strategy of using the device of

18     mediation, because of course after the 546(e) decision we

19     specifically suggested perhaps mediation might be helpful in

20     this case, and received in writing a written response from

21     trustee's counsel that they would be looking for the full

22     amount and so did not think any mediations would serve any

23     purpose.

24          All that being said, we're here on a motion for an

25     extension of time, 12 days, for which to serve an expert

1    report that was served 12 days after the deadline.

2              There's been some dispute as to whether Bankruptcy

3    Rule 9006 applies or whether Federal Rule 16 applies.  Under

4    either standard the primary focus is whether there's any

5    prejudice to the other side.

6              THE COURT:  That's not true.  The Second Circuit

7    has said that the most important consideration under 9006 is

8    the reason for the delay.

9              MR. RICH:  I was going to use -- say that that was

10   the other primary.

11             THE COURT:  Well that's -- according to the Second

12   Circuit in Enron that's the primary issue.

13             MR. RICH:  Okay, Your Honor.  I don't think

14   there's any --

15             THE COURT:  Which I guess is similar to diligence

16   when you get right down to it.

17             MR. RICH:  Okay.  I don't think there's any

18   dispute on the prejudice issue.  I haven't heard any

19   allegations from the trustee that there's any prejudice by

20   the delay, and certainly Mr. Bell's comments about this

21   going on for 13,000 some odd days suggests the same.  I'm

22   sure I'll hear otherwise if that's not the case.

23             As far as diligence, the defendants immediately

24   pursued an expert or the potential expert as soon as

25   receiving the report.  We received the Dubinski (ph) report

1    on November 17th, 2016, and as I've mentioned in prior

2    hearings, this is a massive report.

3            THE COURT:  Can I ask you a question?  How long

4    after you received the Kalora (ph) and Greenblatt (ph)

5    reports did you determine that you wouldn't need a rebuttal

6    report for those reports because they weren't experts?

7            MR. RICH:  You know, I don't remember exactly,

8    Your Honor, but you know, not -- maybe within a week or so.

9            THE COURT:  Okay.  The reason I ask is because in

10   your December 16th letter to the Court you were still

11   considering the possibility of a rebuttal report for Kalora

12   and Greenblatt, which based on what you just said sounds

13   like you didn't start looking at these reports until around

14   December 9th.

15           MR. RICH:  Well no, we were certainly looking at

16   them.  You know, we didn't want to be -- have to make a

17   determination before we were required to.  We certainly were

18   looking at them right away, as soon as they were served on

19   us.

20           THE COURT:  Okay.

21           MR. RICH:  In any case, we've -- as soon as we

22   reviewed the reports we very quickly found -- you know,

23   started working with other defense counsel, there was

24   actually a consultant already looking at the Dubinski

25   report, and the Dubinski report is a massive report, one

1    that according to Mr. Dubinski took over $30 million and an

2    enormous amount of time to complete.  So as you can imagine

3    we knew it would take some time for the analyst to get

4    through it, although certainly urging that it be completed

5    as quickly as possible.

6              When we came to Your Honor with the request to

7    extend the deadline --

8              THE COURT:  Were your clients involved in

9    convertible debenture trading?

10             MR. RICH:  Yes, Your Honor.  These are -- not

11   these clients specifically, but the accounts from which

12   money was transferred into those accounts.

13             So we came to Your Honor requesting an extension

14   to the end of the Madoff deposition.  At the time we came

15   into your chambers had not yet received the transcript of

16   the deposition, but I've heard reports of some general ideas

17   what was said that might -- that could have been assistance

18   in expediting the review.

19             THE COURT:  So before you read the Madoff

20   deposition you had no reason to believe that you needed an

21   expert rebuttal report?

22             MR. RICH:  Well we certainly -- there was a lot of

23   things in the Dubinski report that we thought were

24   potentially objectionable and had some reviewing, it's a

25   massive report.  The Madoff deposition just helped focus it.

1              I think there's going to be issues in the future

2      that we're going to want to raise and that, you know, we'll

3      deal with it at that time as to whether we can do it via

4      expert or whether we just have to cross Mr. Dubinski or just

5      put on evidence.  But certainly the Madoff deposition

6      brought this specific issue to light and it felt that it's

7      one that if we focused on the convertible bond issue it's

8      something we can get in before the deadline, although

9      ultimately we were 12 days late on that.

10             But in any case, we received the Madoff deposition

11     transcript on January 3rd.  Shortly after that while we were

12     still working with that -- hoping that that same consultant

13     would be able to produce a report, especially with the

14     benefit of the Madoff deposition, we then started searching

15     for other potential experts with the specific expertise in

16     the convertible bond field, and even more specific ones that

17     have been involved since early on, because the issues here

18     were how convertible bond trades were reported in the '80s.

19     So that was important.

20             You know, we spoke -- we had a few suggestions

21     internally.  We had to make financial arrangements.  These

22     are -- you know, these are individual defendants where it

23     was difficult to put the money together.  Eventually we

24     spoke with a bond trader at -- I'm not sure I should mention

25     the firm -- but we spoke with a bond trader, he had some

Page 32

1    suggestions, a few have -- of the suggestions were

2    interested, but couldn't do it for various reasons, their

3    firm wouldn't let them.

4            Before the end of January we spoke with

5    Mr. Finegold (ph), although he wasn't formally engaged until

6    I believe it was the 3rd when we signed the engagement

7    letter and actually got the security deposit over to him.

8            And you know, we had been discussing the issues,

9    the specific issue of the convertible bonds since the end of

10   January, told him about the deadlines.

11           THE COURT:  Have you computed -- gone back and

12   looked at the old client statements to figure out what

13   portion of the profits fictitious or otherwise are due to

14   convertible bond trading and what aren't?

15           MR. RICH:  In general it looks like all of the

16   statements from around 1992 and 1993 are all convertible

17   bond trades.  The statements look very different after that.

18           THE COURT:  After '93 or during '93?  Because

19   there's an issue in the case when --

20           MR. RICH:  Yeah.

21           THE COURT:  -- when the Ponzi scheme began, and

22   Madoff testified that he started doing it some time in 1962

23   -- I'm sorry -- 1992.

24           MR. RICH:  There are a number of accounts at issue

25   here.  There's a number of accounts that transferred to

Page 33

```
1    other accounts.  So it's not uniform, there's not one set

2    date that applies to all of them.  But you know, in general

3    it's around that time period where you see the change

4    between convertible bond trades and what they're calling the

5    split strike strategy.

6              THE COURT:  Okay.  But so have you gone back and

7    computed what difference it would make in this case?

8              MR. RICH:  Well I've -- I haven't gotten through

9    all of the statements yet, I've looked at the trustee's

10   computations of what his declarations provide, but you know,

11   there are a number of assumptions and ways they computed

12   that have never been approved or -- like, for example,

13   they'll take an interaccount transfer where there's one

14   Madoff account to another Madoff account and assume that all

15   the principle was transferred even if it was never withdrawn

16   from the account it was transferred to.

17             THE COURT:  Well --

18             MR. RICH:  And none of this has ever been

19   addressed.  The first time we've ever seen it is in these

20   expert reports.

21             THE COURT:  I'm sorry, wasn't that the subject of

22   the interaccount transfer decision?  Were you involved in

23   that?

24             MR. RICH:  I am, and we have an appeal.  We have

25   oral argument next week in the Second Circuit.
```

1           THE COURT:  Okay.  But -- well I mean all the

2      trustee did was then he computed what under his approach was

3      the balance in the account and if the transfer exceeded that

4      balance the credit was given just for that balance.

5      Basically it was an investment method applied to the

6      transfer account.

7           MR. RICH:  Yeah.  Well -- yeah --

8           THE COURT:  I don't understand your statement that

9      it's never been approved.  It's been considered by this

10     Court, been considered by the District Court.

11          MR. RICH:  But here I'm talking about a transfer

12     where there's one Madoff account to two other Madoff

13     accounts.

14          THE COURT:  Right.

15          MR. RICH:  One just before another.  And the

16     assumption is all the principle went first into the other

17     account, all fictitious profit went next regardless of

18     whether either was withdrawn.

19          THE COURT:  No.  He didn't make that distinction.

20     Just figured out what the balance of the account was,

21     eliminated fictitious profits, and the only thing that could

22     be transferred really is the principle, you can't transfer

23     fictitious profits.  And I know he's transferring the

24     bankruptcy sense.

25          Go ahead.  I don't understand what your argument

1    is, but --

2          MR. RICH:  And you know, there's a lot of other

3    issues that will become important based on how much

4    principle we calculate as of the '92, '93 period.

5          THE COURT:  I understand that.  I mean I'm looking

6    at the 0020 account in 1997 supposedly $253,325 was

7    transferred, but all that they transferred was accounted for

8    was $5,000.  So that's -- you know, that's a big difference.

9          MR. RICH:  Right.  That's correct, Your Honor.

10         THE COURT:  I understand what the issue is, I just

11   didn't understand when you said it's never been considered.

12         MR. RICH:  There's also the -- you know, the issue

13   -- we're learning that Madoff held a substantial amount of

14   treasury bills and these are the exact securities that

15   appear on our statements, and so you know, we think that

16   that is going to add to our principle calculation.  I don't

17   think that's an issue for today, but it's another reason

18   that all this is relevant.

19         So there was some dispute as to whether this was

20   going to be an evidentiary hearing, I'm not sure if you'd

21   like me to proffer the declaration.  Trustee counsel has --

22         THE COURT:  Well I have your declaration as part

23   of the record.

24         MR. RICH:  Okay.

25         THE COURT:  Does the trustee want to cross-examine

Page 36

1    the witness?

2              MR. SHIFRIN:  Good morning, Your Honor.  Max

3    Shifrin on behalf of the trustee.

4              No, we think that the declaration in and of itself

5    is completely deficient --

6              THE COURT:  Okay.

7              MR. SHIFRIN:  -- we have no reason to cross-

8    examine.

9              THE COURT:  So I have your declaration.

10             MR. SHIFRIN:  Thank you, Your Honor.

11             THE COURT:  Thank you.  Anything else?  Thank you.

12             Yes, sir.  You know, I'm curious that you told me

13   the last time that none of this makes any difference in this

14   case.

15             MR. SHIFRIN:  Right.  You're referring to -- good

16   morning again, Your Honor.  You're referring to the

17   Greenblatt declaration that we submitted back in August of

18   2016 that basically stated with respect to all the

19   defendants in cases participating in the Madoff deposition

20   if we adjusted or credited the accounts up until 1992 then

21   only three of the cases -- in only three of the cases would

22   the demand amount change.

23             THE COURT:  So isn't this one of them?

24             MR. SHIFRIN:  No, it's not one of them.  That was

25   my whole point.

Page 37

1            THE COURT:  Well I mention that account, the 0020

2     account, which was opened in November of 1986.

3            MR. SHIFRIN:  Uh-huh.

4            THE COURT:  I assume that there was trading

5     between 1986 and let's just say the middle of 1992 --

6            MR. SHIFRIN:  Uh-huh.

7            THE COURT:  -- just to pick to date, and that the

8     Ponzi scheme was not in effect until mid-1992 let's say,

9     presumably the trades and the profits before then were

10    legitimate, right?

11           MR. SHIFRIN:  Right.  And what the declaration

12    concludes is that even if we credit all of that the

13    defendants' accounts, the net equity they were so far under

14    water at that point that it wouldn't effect the two-year

15    demand.

16           THE COURT:  Okay.  But I'm looking -- you still

17    can't demand more than the amount of the fictitious profits.

18    You're limited to what was transferred in two years.

19           MR. SHIFRIN:  That's correct.

20           THE COURT:  But you're also limited to fictitious

21    profits.  So when I -- in this particular account it appears

22    that an attempt to transfer $253,325 occurred on July 8th,

23    1997, but the account was only credited with $5,000.

24           MR. SHIFRIN:  Right.

25           THE COURT:  So if those prior transactions were

Page 38

1    legitimate this account should be, you know, $248,000

2    larger.

3              MR. SHIFRIN:  Your Honor, I don't want to

4    mischaracterize what our expert concluded in his

5    declaration, but I would simply refer you to that

6    declaration.

7              THE COURT:  I read the declaration.

8              MR. SHIFRIN:  Okay.

9              THE COURT:  All I'm saying is you told me it

10   didn't make a difference, and I don't understand that if

11   there are legitimate trades that form part of that

12   disallowed --

13             MR. SHIFRIN:  Right.

14             THE COURT:  -- transfer.  So, for example, well

15   let me see, maybe -- well maybe -- okay.  I see what you're

16   saying because the two-year transfers were $180,000 and the

17   fictitious profits might still be in excess of $180,000.  Is

18   that what you're saying?

19             MR. SHIFRIN:  Your Honor, I missed part of your

20   question, I'm sorry, but --

21             THE COURT:  You're saying the two-year -- I think

22   I understand what you're saying, the two-year transfers were

23   $180,000 of this particular account.

24             MR. SHIFRIN:  Uh-huh.

25             THE COURT:  And even if you credited back the 200

Page 39

1    some odd thousand dollars, assume those dollars to be

2    legitimate profits, the balance of the principle would still

3    be negative 210-.

4              MR. SHIFRIN:  That's effectively our position,

5    yes.

6              THE COURT:  I understand.  Okay.

7              MR. SHIFRIN:  And again, the --

8              THE COURT:  So why don't you just assume for the

9    purposes of the case --

10             MR. SHIFRIN:  Right.

11             THE COURT:  -- that, you know, this particular

12   case that the Ponzi scheme began in 1992 and just let's deal

13   with it?  Why are we arguing over this?

14             MR. SHIFRIN:  The reason we can't do that, Your

15   Honor, is because the trustee has a commitment to the truth

16   and he is reluctant to stipulate to anything that is at odds

17   with the facts.

18             The seconds reason and perhaps more important is

19   there can be unforeseen circumstances or unforeseen --

20             THE COURT:  But yesterday I had a motion for

21   summary judgment where I assumed for the purposes of

22   analysis that a former customer could trace his money out of

23   the LMIS into other feeder funds and then back into the

24   LMIS.  We're assuming that for the purposes of analysis --

25             MR. SHIFRIN:  Uh-huh.

Page 40

1          THE COURT:  -- for a summary judgment motion.

2          MR. SHIFRIN:  I think the start date of the fraud

3     is perhaps a bit more of a sensitive, delicate issue with

4     the number of defendants we have, the number of claimants,

5     but we take Your Honor's point as it is and we will consider

6     -- we'll continue considering it, but at this point we're

7     just not ready to make that concession.

8          THE COURT:  All right.

9          MR. SHIFRIN:  Returning to the issue that's before

10    the Court today.  I think there was a lot that opposing

11    counseling stated that requires some response, but just to

12    crystallize what's actually before the Court here, and that

13    is whether in the supplemental declaration that this Court

14    permitted Mr. Rich to submit adequately demonstrates

15    diligence.  And I think the answer to that is clearly no.

16          If you look through the declaration, the specific

17    paragraphs that the trustee articulated in its response

18    letter filed last week, there is simply no specifics

19    provided in the declaration.  There are no specific steps.

20    There are no specific dates.  There was no information or

21    facts on which the Court can conclude that defense counsel

22    acted diligently in an effort to comply with either the

23    original deadline or the extended deadline.

24          And now the important fact we're here to consider,

25    Your Honor, is that defense counsel has had numerous

1    opportunities to do so.  He's had -- he failed to make the

2    showing in his initial request for an extension to the

3    trustee in his initial emails or in his initial letters to

4    the Court.  He failed to make the showing in his original

5    motion papers.  He failed to make the showing in his

6    declaration.  And he continues to fail to make the showing

7    in all these unauthorized filings that he's making.  His

8    unauthorized reply, his unauthorized letter to the Court,

9    and the latter of which was made with the benefit of the

10   trustee's opposition to the declaration.  All he had to do

11   was fill in the holes and he still can't do it.

12            I think at this point we have to conclude that

13   opposing counsel just doesn't have the facts and cannot

14   under oath say that he diligently attempted to comply with

15   the deadline.  And that should end the inquiry and that is

16   sufficient to deny this motion once and for all.

17            Everything else here that Mr. Rich just discussed

18   is essentially a side show.  I mean this is a very narrow

19   inquiry, and as this Court has stated several times, this

20   was a simple, straightforward motion.

21            Now, Mr. Rich has had numerous chances to make and

22   to adequately make and now he is raising the potential for

23   an evidentiary hearing.  You don't need an evidentiary

24   hearing on a motion to extend the scheduling order.  You

25   simply have to file a motion, complete with the papers that

Page 42

```
1    you need to make your case, and that's it.  And I think

2    given the five-month period now we've had since the initial

3    rebuttal deadline and where we are now the trustee has

4    indisputably been prejudiced.  The case has already been

5    delayed.  Even if you deny the motion here and now he's --

6    we've already been prejudiced by a five-month delay in this

7    case.  If you grant the motion it's only going to delay the

8    case further.  We're going to have to reopen expert

9    discovery, depose Mr. Rich's expert.

10             THE COURT:  Isn't discovery complete in this case?

11             MR. SHIFRIN:  Well it is --

12             THE COURT:  Other than this issue.

13             MR. SHIFRIN:  Yes.  But if the Court decides to

14   permit the expert report to be entered to be submitted into

15   the case then we're going to have to depose Mr. Finegold,

16   right?  Justice would demand that, and I think that's going

17   to extend the case further.  And as Your Honor is aware this

18   case has been proceeding for eight years and delay is truly

19   the Achilles heel for the trustee.

20             That's what all these defendants do constantly,

21   and they're in the business of delaying these cases as much

22   as they can.  Mr. Rich has been doing this for the last

23   year.  Ms. Shavin (ph), who he's coordinating with

24   closely --

25             THE COURT:  So why don't you just withdraw your
```

Page 43

1   opposition, take Finegold's deposition, and we'll try the

2   case?

3           MR. SHIFRIN:  Because that would basically mean

4   that deadlines don't mean anything in these cases.  We have

5   to have some settlements of procedure here.  He had a

6   deadline, he failed to meet it.  If we permit that to slide

7   then we have hundreds of other cases that we have to treat

8   similarly.

9           THE COURT:  There is an underlying theme in your

10  papers that in order to satisfy the diligence requirement

11  you have to say on this day I did this, on this day I did

12  this, on this day I did this.  What's the authority for

13  that?

14          MR. SHIFRIN:  I think it's -- well the authority

15  is just the definition of the term diligence, right?

16          THE COURT:  No, I understand what diligence is,

17  but we're talking about proof of diligence.

18          MR. SHIFRIN:  Right.

19          THE COURT:  And you know, he's saying during the

20  30 or 60-day period that we're really talking about I did

21  all these things, I didn't tell you what I did on this

22  particular date and I didn't tell you the date I picked up

23  the Dubinski report to read it, but --

24          MR. SHIFRIN:  Right.

25          THE COURT:  -- you know, it's an 1100 page report,

Page 44

1    I read it, and these are the things I tried to do, and --

2              MR. SHIFRIN:  Right.

3              THE COURT:  -- this is what happens.  Why does he

4    have to say more than that?  That's my question.

5              MR. SHIFRIN:  I can address that.

6              The first answer is that without those dates he

7    could have presumably done all those things or most of those

8    things in the week leading up to the deadline.  That is

9    fundamentally not diligent.  Right?  We need those dates to

10   know when he took the specific steps.

11             The second thing, Your Honor, that you just raised

12   which is worth noting is that on the face of the declaration

13   the steps -- the generalized steps that he said he took

14   basically can be boiled down to I needed to read the report,

15   I needed to identify an expert, I needed to figure out cost

16   constraints, and I needed to possibly coordinate with

17   defense counsel.  How is that remarkable in any way?  This

18   is something that defendants in litigations have to do every

19   single day.  None of this is unusual.  And if you look at

20   the cases there has to be some sort of -- there has to be

21   more than that.

22             So even if he provided dates the actual reasons

23   for the delay are just on their face not satisfactory for an

24   extension.

25             And the other thing, Your Honor, is that the

Page 45

1    declaration is ripe with inconsistencies.  So just now

2    Mr. Rich was saying that he needed time to read the report

3    because the Dubinski report was so long.  If you look at the

4    December 16th letter, which you yourself just cited earlier,

5    there's no reference of that.  There's no -- that's not the

6    reason -- that wasn't the reason for the initial request for

7    an extension.  He said in his letter and to the -- and in

8    the email to the trustee that he was considering the

9    retention of an expert and he was considering coordinating

10   with opposing counsel.  There was nothing about the length

11   of the report, there was nothing about the forthcoming

12   Madoff deposition.  All of these reasons were invented on

13   the fly, and his reasons have changed several times.

14         Now he just stated, and this is clear from the

15   declaration as well, that he didn't identify Mr. Finegold --

16   excuse me -- until the end of January.  The extended

17   deadline was February 2nd, and he also just said that he

18   retained Mr. Finegold on February 3rd.  If you recall at the

19   December 29th chamber's conference he stated that he already

20   had somebody who was reviewing the Dubinski report.  Now it

21   turns out that he quote/unquote switched gears after that,

22   started the process from scratch, and didn't identify anyone

23   until the end of January.  This is not diligent.

24         And the reasons for starting from scratch, as he

25   put it, are without merit, because he's attempting to say

Page 46

1    that the Madoff deposition and Madoff's focus on convertible

2    R and all that stuff made him realize that he should focus

3    on that, but he knew that his position was pre '92, there

4    were no real -- there was real trading going on, and pre '92

5    everyone knows that Madoff was engaged in convertible R.  He

6    had everything he needed at the time to focus his inquiry on

7    the convertible R strategy.  Nothing in Madoff's testimony

8    gave him anything new.

9            All of this is just I think smoke and mirrors,

10   he's throwing everything on the wall to see what can stick,

11   and there's no coherence to his story, and there's clearly

12   no evidence of diligence, and I think under the case law and

13   under the rule the motion must be denied.

14           THE COURT:  Thank you.  Anything further?

15           MR. RICH:  Yeah, please.

16           THE COURT:  Can I ask you a question, Mr. Rich?

17   Do you maintain contemporaneous time records in this case?

18           MR. RICH:  It's a non-billable case, you know, I'm

19   not sure.  I don't --

20           THE COURT:  You don't know if you maintain --

21           MR. RICH:  I keep time records, I don't keep them

22   like I do, I bill it from there.

23           THE COURT:  So your records would reflect when you

24   spoke to somebody, right?  When you're --

25           MR. RICH:  Can dig up some dates?  I could

Page 47

1    certainly dig up some dates.

2             THE COURT:  This is it, you know, you've had a lot

3    of chances.  I'm going to decide the motion based on the

4    record, but I was just --

5             MR. RICH:  Your Honor, trustee's counsel said they

6    don't know what the word immediately means.  It means I

7    immediately started searching for a consultant.  I had -- we

8    had one reviewing the Dubinski report within, I mean I don't

9    know exactly, within a couple weeks of getting served,

10   certainly before the conference because we talked about it

11   at the chamber's conference.

12            THE COURT:  The chamber's conference was almost a

13   month after you got the Dubinski -- about four weeks after

14   you got the Dubinski report.

15            MR. RICH:  Right.

16            THE COURT:  And one of the points made is in your

17   letter of December 16th you didn't mention the length of the

18   Dubinski report as a reason for needing additional time.

19            MR. RICH:  Well I didn't mean it for the length as

20   far as me needing time, but for an expert to review the

21   whole Dubinski report.

22            THE COURT:  You didn't say that in the letter

23   though.

24            MR. RICH:  I'm not sure if I said it in the letter

25   or maybe I said it at the conference, I'm sure I did.  I

Page 48

1    mean I think that the length of the Dubinski report was

2    always an issue.  I don't think that's inconsistent just

3    because I didn't have that in the letter requesting a

4    chamber's conference.

5            MR. SHIFRIN:  Your Honor, if I can just address

6    that one point.  Excuse me.

7            THE COURT:  Well let him finish --

8            MR. SHIFRIN:  Sorry.

9            THE COURT:  -- then I'll hear you --

10           MR. SHIFRIN:  Sure.

11           THE COURT:  -- on that one point.

12           MR. RICH:  And this whole bit about prejudice and

13   the fact that this has been delayed, and first of all expert

14   discovery is not closed.  I've noticed depositions for both

15   of their experts and they've still not given me dates.  They

16   said, oh, we're going to give you dates.  It's been months.

17   And they're saying this is delaying things?  They're

18   delaying things.  We wanted this to go to mediation, they

19   said no.  We want our expert discovery they haven't given it

20   to me yet.  So that -- I mean that's all I have to say about

21   that.

22           You know, trustee's counsel says he need to make

23   some, he used the word unremarkable, I mean I'm not sure I

24   have to make some remarkable efforts.  I mean I need to make

25   diligent efforts to find an expert and that's what I've

1   done.  And like I said, this only addresses a small point in

2   the Dubinski report.  I've -- it's just impossible to

3   address all the things that need to be addressed in the

4   Dubinski report within the amount of time I had.  That's

5   something we'll have to deal with and it'll be brought

6   another day

7              THE COURT:  What do you mean?

8              MR. RICH:  I mean the Dubinski it doesn't just

9   talk about convertible arbitrage strategy, it --

10             THE COURT:  Are you saying now you want to put in

11  another expert report?

12             MR. RICH:  Well I'm not sure I'm going to be able

13  to get it in, but I'm certainly going to go on to challenge

14  the opinions in the Dubinski reports that are beyond the

15  arbitrage strategy.

16             THE COURT:  You're certainly free to do that on

17  cross-examination I would assume.

18             All right.  Thank you.  What did you want to say

19  on that last point, the one point?

20             MR. SHIFRIN:  Sure.  The point I want to make is

21  just to reemphasize that his initial email to us on the eve

22  of the initial deadline was that defendants are still

23  considering whether to retain an expert.  That is --

24             THE COURT:  What was the date of that email?

25             MR. SHIFRIN:  I believe it was December 14th or

Page 50

1    15th.   It's Exhibit H to defendants' motion.   That entire

2    email thread is in there and I think it's very illuminating

3    because it reveals what the true motivations are.

4          The other things to consider, Your Honor, is that

5    both requests -- and we made this clear in our briefing and

6    in our letters -- both requests were accompanied by

7    collateral requests.   This was never an issue of my expert

8    is reviewing the report, he's in the process of finalizing

9    his report, we need an X number of days.   The trustee would

10   have clearly granted such a courtesy, we grant courtesies

11   like that all the time.   There was always a collateral

12   request.

13         In the first instance it was we need to first file

14   a motion in limine to preclude the trustee's experts and

15   then we'll deal with the rebuttal expert deadline.

16         The second time it was to submit -- that he wanted

17   to constitute a fraud proceeding so that he can serve more

18   discovery.   It was never a good faith request for more time

19   so he could finalize the report.   No such request was ever

20   made.

21         THE COURT:   Let me just touch on something else.

22   He wants to take the depositions of Kalora and Greenblatt as

23   I understand it.

24         MR. SHIFRIN:   Yeah.

25         MR. RICH:   Yes, Your Honor.

Page 51

```
 1            THE COURT:  Have they been noticed?  And what's
 2     the problem with that?
 3            MR. SHIFRIN:  I can explain that, Your Honor.
 4            After the December 29th chamber's conference
 5     Mr. Rich left open the possibility that he was going to
 6     submit rebuttal experts with respect to Mr. Greenblatt and
 7     Ms. Kalora's report, and he refused to tell us whether he
 8     would actually disclose those rebuttal experts by the
 9     extended deadline.
10            THE COURT:  All right.  But that's now water under
11     the bridge, he's not going to do that.
12            MR. SHIFRIN:  Right.  He did notice --
13            THE COURT:  So he wants to take their depositions.
14            MR. SHIFRIN:  Well he noticed their depositions in
15     January, we said we will give you a date once we know
16     whether you're going to serve rebuttal experts, because we
17     wanted to see the benefit of -- we want to have the benefit
18     of his rebuttal reports before we make our experts
19     available.
20            THE COURT:  I understand.  But are you ready to
21     give him a date now since he's not going to submit rebuttal
22     reports on Kalora and Greenblatt?
23            MR. SHIFRIN:  Your Honor, this was five months
24     ago.  Discovery -- expert discovery is closed.  He refused
25     to follow up on those notices, he never said --
```

1          MR. RICH:  Your Honor, that's absurd.  I told

2    him --

3          THE COURT:  Okay.

4          MR. RICH:  -- there's not going to be a rebuttal

5    report, and now they're going to claim that my notice is no

6    more good?

7          THE COURT:  Look --

8          MR. RICH:  I have emails from them saying we're

9    going to send you dates.

10          MR. SHIFRIN:  We haven't heard anything since.

11          THE COURT:  Arrange for dates for Kalora and

12    Greenblatt.  He requested them before the termination of

13    discovery.  You said you wanted to wait to see if there were

14    rebuttal reports, maybe that decision was made after the

15    technical close of discovery, but he made the request before

16    and he wants to take their depositions.

17          MR. SHIFRIN:  This is the first he's said anything

18    about it since that initial request in January.

19          THE COURT:  All right.

20          MR. SHIFRIN:  He's clearly trying to pull

21    something.

22          THE COURT:  Well just schedule the depositions.

23          MR. SHIFRIN:  Okay.

24          MR. RICH:  Your Honor, I'm trying to take their

25    depositions.

1          THE COURT:  All right.  When you hit oil stop

2   drill -- you know, stop drilling, okay?

3          MR. SHIFRIN:  Can I say one thing unrelated to

4   this, Your Honor?

5          THE COURT:  Unrelated.

6          MR. SHIFRIN:  Unrelated.  It just came up.

7          I just want to clarify for the record, I think

8   there was some discussion about trading prior to 1992.

9          THE COURT:  Right.

10          MR. SHIFRIN:  I just want to be clear on the

11   record that is not the trustee's position that there was

12   legitimate trading prior to 1992.

13          THE COURT:  I understand that.

14          MR. SHIFRIN:  Okay.

15          THE COURT:  But my point is --

16          MR. SHIFRIN:  I understand, Your Honor.

17          THE COURT:  -- and I hate to say it this way, if

18   you had a private client paying you to litigate an issue --

19   a private client would never pay you to litigate an issue

20   that makes absolutely no difference in this particular case.

21          And I understand the argument now, I didn't

22   understand it before, that even if you credit him or his

23   clients with every profitable trade up through the end of

24   1992 it doesn't make a difference because the fictitious

25   profits still exceed the transfers within two years.

Page 54

1          Let's just try the case.  Look at all the time

2     that's been spent on this particular issue that I'm being

3     told doesn't make a difference.

4          And as I've said, the trustee in other cases has

5     assumed for the purposes of argument a particular -- or

6     conceded a particular position for the purposes of argument

7     so we can brush aside some of the issues in these cases,

8     like the case I had yesterday.  I just don't understand this

9     approach.

10          MR. SHIFRIN:  Thank you, Your Honor.

11          THE COURT:  All right.  I'll reserve decision on

12     the motion.  In the meantime schedule the other two

13     depositions.

14          MR. SHIFRIN:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16     (Whereupon these proceedings were concluded at 10:56

17     a.m.)

18

19

20

21

22

23

24

25



Page 55

1                              I N D E X

2

3                             RULINGS

4                                                          PAGE

5    Fee Applications                                      23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 56

1                        C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital1@veritext.com, c=US
6    _____    Date: 2017.05.04 11:27:06 -04'00'

7    Dawn South

8    AAERT Certified Electronic Transcriber CET**D-408

9

10

11

12   Date:  May 4, 2017

13

14

15

16

17

18

19

20

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501