# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>               Debtor, | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>               Plaintiff,<br>v.<br><br>J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND, LTD., GABRIEL CAPITAL CORPORATION,<br><br>               Defendants. | Adv. Pro. No. 09-1182 (SMB) |

**REBUTTAL EXPERT REPORT OF**

**DR. STEVE POMERANTZ**

# TABLE OF CONTENTS

I.    Assignment and Summary of Opinion ................................................................... 1

II.    MR. WEINGARTEN IS INCORRECT THAT MERKIN AND GCC PERFORMED
DUE DILIGENCE THAT MET OR EXCEEDED INDUSTRY STANDARDS .................... 2

   A.  Initial and Ongoing Due Diligence ................................................................. 3

   B.  Weingarten's Five Ps ....................................................................................... 3

      1.  Process ..................................................................................................... 4

      2.  Performance ............................................................................................. 6

      3.  Philosophy ............................................................................................. 11

      4.  Procedures ............................................................................................. 13

      5.  People ..................................................................................................... 14

   C.  Merkin's Purported Due Diligence ............................................................. 18

III.   Conclusion ......................................................................................................... 21

## LIST OF APPENDICES AND SCHEDULES

Appendix I          Recent Appearances

Appendix II         Documents Considered

Appendix III        Schedules

      Schedule 1          Defendant Funds' BLMIS Account Redemptions

      Schedule 2          30-Day Average Volatility (1990 – 1999)

      Schedule 3          30-Day Average Volatility (2000 – 2008)

1. This report is offered pursuant to Federal Rule of Civil Procedure 26(a)(2) and is authored by Dr. Steve Pomerantz, president of Steve Pomerantz LLC (collectively, "Pomerantz"), an economic and financial consulting firm located in New York, NY. Pomerantz was retained in this matter by Irving H. Picard, Trustee ("Trustee") for the substantively consolidated Securities Investor Protection Act ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff") and by Baker & Hostetler, LLP ("Baker"), counsel for the Trustee.[1] I submitted a report in the above-captioned proceeding on March 20, 2015, and a corrected version on April 13, 2015 (collectively, the "Pomerantz Report" or "Initial Report"). The opinions that I rendered in the Pomerantz Report, the documents that I considered in connection with that Report, and the accompanying Appendices to that Report, are all incorporated by reference. All capitalized terms not defined herein shall have the meaning assigned to them in the Pomerantz Report.

## I.    Assignment and Summary of Opinion

2. In this report, I respond to the Expert Report of Jeffrey Weingarten ("Weingarten") dated March 19, 2015 and served on March 20, 2015 in the above-captioned proceeding (the "Weingarten Report"). Based on my review of the Weingarten Report, my nearly 30 years of professional experience, my independent review of documents and testimony, my own independent analysis, as well as customs and practices of the investment management industry, it is my opinion that Weingarten is incorrect that J. Ezra Merkin ("Merkin") and Gabriel Capital Corporation ("GCC") performed due diligence that met or exceeded industry standards.[2] Specifically:

---

[1]    I retained Duff & Phelps, LLC, a valuation and corporate finance advisory firm ("D&P") to assist me in the preparation of this report. Employees of D&P worked under my direction and supervision in the preparation of work supporting my opinion contained herein.

[2]    As used in this report, "Merkin" refers to: (i) Merkin individually; (ii) Merkin as General Partner of defendant Gabriel Capital, L.P. ("Gabriel") and defendant Ascot Partners, L.P. ("Ascot"); and (iii) Merkin as owner and manager of GCC, the Investment Advisor for Ariel Fund Limited ("Ariel") and Ascot Fund Limited ("Former Ascot Fund"). Gabriel, Ariel, Ascot, and Former Ascot Fund are collectively referred to herein as the "Defendant Funds." References to Merkin in this report include GCC.

- Weingarten's assessment of Merkin's Process-related due diligence and Madoff's purported investment strategy (the "Madoff SSC" strategy)[3] focuses on "benefits" yet he provides no definition of these benefits, no assessment of Madoff's ability to implement these benefits, nor any analysis of how these benefits contributed to the overall returns;

- Weingarten's assessment of Merkin's Performance-related due diligence is incorrect and insufficient, relying heavily on the availability of redemptions;

- Weingarten's assessment of Merkin's Philosophy-related due diligence is incorrect and includes a component that is irrelevant to the Madoff SSC strategy, was never claimed to be part of the Madoff SSC strategy, and was never purportedly implemented as part of the Madoff SSC strategy;

- Weingarten's assessment of Merkin's Procedures-related due diligence relies on Merkin's receipt of information from Madoff, yet disregards the importance of using that information to perform due diligence;

- Weingarten's assessment of Merkin's People-related due diligence relies too heavily on Madoff's reputation and the actions and words of other investors, and does not rise to a level of due diligence consistent with industry customs and practices; and

- Weingarten selectively omits a number of areas that Merkin identified as his purported due diligence. In my opinion, these activities do not constitute due diligence consistent with industry customs and practices.

## II.    MR. WEINGARTEN IS INCORRECT THAT MERKIN AND GCC PERFORMED DUE DILIGENCE THAT MET OR EXCEEDED INDUSTRY STANDARDS

3. Weingarten claims at page 2 that "the due diligence performed by [Merkin and GCC] met or exceeded industry standards." However, Weingarten provides no analysis or references to specific documents to support this conclusion. Based on my review of the documents and my analyses, none of the activities performed by Merkin and/or identified by Weingarten exceeded, or even met, industry customs and practices for due diligence in the investment management industry.

---

[3]    All discussions of and opinions related to the Madoff SSC strategy, BLMIS trading activities, positions, or returns in the Merkin BLMIS Accounts are assumed herein to be purported.

### A.    Initial and Ongoing Due Diligence

4.    As noted in my Initial Report at § V.A, due diligence typically includes both an initial
and an ongoing component.  With respect to initial due diligence, Weingarten states at
page 3 that "certain information about prospective investments need to be adequately
obtained and verified."  While I agree that information about prospective investments
needs to be adequately obtained and verified, Weingarten does not indicate what due
diligence analyses Merkin performed as part of initial due diligence or refer to any
documents suggesting that Merkin performed any due diligence prior to the Defendant
Funds' investments with BLMIS.

5.    Regarding ongoing due diligence, Weingarten opines at page 3 that Merkin "obtained and
reinforced all of this information over the years in which the [Defendant] Funds invested
with Madoff."[4]  Weingarten also states at page 4 that Merkin had performance data
available "as part of the initial and ongoing due diligence process."  Based on my review
of the documents, the limited activities performed by Merkin and discussed below in
§ II.B and § II.C were cursory, insufficient, and lacked any substantive analyses.  Merkin
did not perform ongoing due diligence that met or exceeded industry customs and
practices.

### B.    Weingarten's Five Ps

6.    Weingarten's assessment of Merkin's due diligence centers around five "characteristics,"
or "Ps": Process, Performance, Philosophy, Procedures, and People.  While Weingarten's
Ps ("Weingarten Ps") are different than the Five Ps used in my Initial Report (Process,
Portfolio, People, Performance and Price),[5] they follow the same general framework.[6]
My response to Weingarten's assessment of Merkin's due diligence is organized around

---

[4]    Weingarten notes at page 3 that this information was "in various degrees documented in Mr. Merkin's files and notes."

[5]    *See* Pomerantz Report § V.B.

[6]    Weingarten does not address Price, a key component of due diligence in the investment management industry.

the Weingarten Ps.

### 1.    Process

7.    Process is both one of the Weingarten Ps as well as one of the Five Ps I discussed in my
Initial Report.

### a)    Returns with "benefits"

8.    In Weingarten's assessment of Merkin's Process-related due diligence, he states at page 3
that the Madoff SSC strategy was a "Split Strike Conversion strategy but with added
'benefits.'"  Weingarten does not describe the Madoff SSC strategy in his report, and
states at page 3 that "[t]he 'with benefits' part of the process was understood to be how
the majority of the returns were to be generated."  While Weingarten does not define
these "benefits," he states at page 4 that "Mr. Merkin understood that Mr. Madoff
had…the knowledge and ability to take advantage of both market timing and stock
selection."[7]  Weingarten subsequently states at page 4 that the "Process was consistent
with the philosophy" of the Madoff SSC strategy.  Weingarten is incorrect in his
assessment of Madoff's "Process" for at least two reasons.

9.    First, if Madoff was generating the majority of returns through Weingarten's "benefit" of
market timing, Madoff should have invested in securities without hedges (or a collar).
Successful market timing[8] would obviate the need for hedges or collars because the
investment manager would only be investing in the market during periods of positive
returns.

10.   Second, if a Fund Manager, such as Merkin, was invested in a strategy with Weingarten's
"benefits," it would be consistent with industry customs and practices to identify what
those benefits were and what impact they had on the investment strategy.  Identifying
those benefits would have been even more important given the lack of expected volatility

---

[7]    I have not seen the word "benefits" referenced in any of the Defendants' documents discussing the Madoff SSC
strategy.

[8]    As discussed below in § II.B.1.b, Madoff was not successful at market timing.

and correlation to the market that somehow produced significant appreciation in down markets.  (*See* my Initial Report at § VI.B.2, § VI.D.3 and § VI.A.2.a.)  Yet, Weingarten does not identify any due diligence performed by Merkin to identify these "benefits" or their purported impact on the returns.

11. Weingarten suggests that the Madoff SSC strategy could not itself have generated the purported returns without these additional benefits, and claims that these nebulous benefits were the source of the performance.  However, a due diligence process that parrots back a description of the purported strategy does not meet industry customs and practices.  My Initial Report makes it clear that the returns reported in the Merkin BLMIS Accounts were not generated by the Madoff SSC strategy, and Weingarten does not suggest otherwise.

### b)    Market Timing

12. Weingarten claims at page 4 that "Mr. Merkin understood that Madoff had the ability to predict short-term trends in the market," and Merkin has claimed that Madoff was successful at market timing.[9]  However, had Merkin performed due diligence related to market timing, he would have found that, for at least two reasons, Madoff could not time the market much better than if he had been flipping a coin.

13. First, as a trading strategy, it is undeniable that there are enormous potential gains to be made from successfully timing the market.  That is, the ability to predict when the market will go up and when it will go down could generate significant returns for an investor.  However, I am not aware of any investment manager implementing market timing as a successful trading strategy over the long term.[10]

---

[9]    Merkin Dep. 158:12-167:13, February 24, 2015; *New York v. Ascot Partners, LP et al.*, Merkin Dep. 150:11-19, July 1, 2010; *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 137:17-22, February 9, 2009.  A Fairfield Sentry document in the Madoff File also describes the Madoff SSC strategy as a "market timing strategy."  Trustee Ex. 363 (Fairfield Sentry Limited Semi-Annual Update, 3rd and 4th Quarters, 2005, March 14, 2006) (GCC-P 0393268-271).

[10]    *See, e.g.*, William F. Sharpe, *Likely Gains from Market Timing*, 31 FIN. ANALYSTS J. 60, 60-69 (1975).  The Sharpe Ratio is named after William F. Sharpe.  Robert H. Jeffrey, *The Folly of Stock Market Timing*, HARV.

14. Second, and equally important, as discussed in my Initial Report at § VI.D.4.b, an analysis of trading activity for the Merkin BLMIS Accounts would have shown that the purported returns were not generated by market timing.  For example, less than 5.5% of the purported returns between 1991 and 2008 were generated by market timing.

15. Weingarten has not indicated that Merkin performed any due diligence to test whether Madoff timed the market well.  Instead, Weingarten claims at page 4 that Merkin understood Madoff's access to "order flow" contributed to Madoff's purported ability to time the market.  However, the Merkin BLMIS Accounts were purportedly invested in the market for weeks at a time, and access to order flow on a daily basis would not have facilitated predicting long-term trends in the market.

16. Weingarten also states at page 4 that Merkin understood that a proprietary model contributed to Madoff's purported ability to time the market.  However, it does not appear that Merkin performed any due diligence on a purported proprietary model, particularly to determine whether the proprietary model in fact predicted market movements with any success.[11]

### c)    Stock Selection

17. In his report at page 4, Weingarten claims that Madoff had the "knowledge and ability to take advantage of…stock selection."  Stock selection (or "stock picking") would involve Madoff picking stocks within the S&P 100 that performed better than others.  However, as discussed in my Initial Report at § VI.D.4.c, Madoff was not successful at stock picking.  The stocks picked for only 17 out of 52 baskets (i.e., 33%) outperformed the S&P 100 between 2000 and 2008.

### 2.    Performance

18. Performance is both one of the Weingarten Ps as well as one of the Five Ps I discussed in

---

BUS. REV., July-Aug. 1984, at 102, 102-110; Richard J. Bauer & Julie R. Dahlquist, *Market Timing and Roulette Wheels*, 25 FIN. ANALYSTS J. 37, 37-38 (2001).

[11] *See, e.g.*, Merkin Dep. 433:3-434:6, February 25, 2015.

my Initial Report.  Weingarten's assessment of Performance-related due diligence includes an assessment of the "plausibility" of the returns, cursory peer analysis, and emphasis on redemptions as an "absolutely critical" part of due diligence.  As discussed below: (i) the returns were not plausible; (ii) peer analysis consistent with industry customs and practices would have revealed a red flag; and (iii) the availability of redemptions is the normal course of business, and not "absolutely critical" to due diligence.

### a)    Plausibility

19. Weingarten claims at page 5 that while not part of his "formal" due diligence, he "often applied the plausibility rule.  Is it plausible that these people doing this process in this way could achieve these results?"  Weingarten states that, based on the documents he reviewed, as well as the fact that Merkin knew other investors who were clients of Madoff, Merkin had a "reasonable belief" that the returns reported in the Merkin BLMIS Accounts were plausible.  However, Weingarten's "plausibility rule" fails when applied to the Madoff SSC strategy and the returns.

20. I am not aware of any defined "plausibility rule" as part of any due diligence customs or practices.  I have worked in the investment management industry for almost 30 years, and Weingarten's discussion of a defined "plausibility rule" is the first time I have ever heard the term.  Additionally, Weingarten has not indicated which documents he reviewed to determine plausibility, or which investors Merkin knew or what they told Merkin.

21. Weingarten's plausibility rule appears to require at least two parts.  First, the strategy must be understood.  Second, the results reported for the strategy must be compared against the range of expectations under the strategy.  My analysis below follows these two parts.

22. Weingarten does not provide a description of the Madoff SSC strategy nor describe what returns would be plausible under the Madoff SSC strategy.  Weingarten instead notes at page 3 that the strategy is "adequately described elsewhere," failing to cite any sources he relies upon.  Weingarten also notes at page 5 that Madoff's returns were "uncommon" but "not implausible," yet does not provide any support for this statement.

23. There are certain expectations given the Madoff SSC strategy (described in my Initial
Report at § VI.A.1).  First, there should be some relationship between the purported
returns of the Madoff SSC strategy and the returns of the underlying stock or the S&P
100 Index.  Second, by way of the collar, the put option should create a floor for the
returns and the call option should create a ceiling.  As a result, the Madoff SSC strategy
was structured in a way for investors to reduce (but not eliminate) volatility by limiting
gains and losses.[12]

24. With this understanding of the strategy, we can now review the reported results from
implementing the strategy, and consider whether the results are plausible.  Weingarten
claims beginning at page 4 that "[t]he returns were…better than would be expected from
a typical [SSC] strategy.  When the market was down, the fund outperformed the overall
market."  It is correct that when the market was down, the Merkin BLMIS Accounts
should have reported losses that were less than the market (because of the collar), and
therefore the returns could be said to outperform the market.  However, the Merkin
BLMIS Accounts did not just report smaller losses than the market – they consistently
reported positive returns even when the market was down, which is not plausible given
the strategy.

25. Based on my review, the reported returns for the Merkin BLMIS Accounts: (i) were not
correlated with the S&P 100 Index; (ii) were almost always positive even when the S&P
100 Index returns were negative; and (iii) displayed a lack of volatility.[13]  All of these
results are inconsistent with the expectations under the Madoff SSC strategy; therefore, it
was not plausible that this strategy was used to achieve the returns reported in the Merkin
BLMIS Accounts.  Industry custom and practice would have been to perform additional
due diligence, including performance attribution, to understand how Madoff was
generating the purported returns.  Had Merkin performed this analysis he would have
identified additional red flags, including an impossibility where the only reasonable

---

[12]    *See* Pomerantz Report § VI.A.1.
[13]    *See* Pomerantz Report § VI.B.2, § VI.A.2.a, § VI.D.3.

explanation was fraud.  I discuss these red flags in my Initial Report at § VI.D.4.

**b)    Peer Analysis**

26. In addition to the plausibility rule, Weingarten claims to have assessed peer analysis due diligence.  Specifically, he states at page 5 that while the "Sharpe ratio was relatively high for Madoff," he has "counted many funds with very high Sharpe ratios."  However, Weingarten does not offer the number of funds he counted, the types of funds, Sharpe Ratios of those funds, the time period over which he calculated the Sharpe Ratios, or any analysis whatsoever regarding Sharpe Ratios.

27. In my Initial Report at § VI.D.1, I calculated the Sharpe Ratios for the Merkin BLMIS Accounts, and compared those Sharpe Ratios to other funds as well, detailing my screening process and analysis.[14]  Based on my analyses, the Sharpe Ratios for the Merkin BLMIS Accounts were higher than the maximum Sharpe Ratio of any fund in the peer groups for every period for which data was analyzed.[15]

28. While it is possible to have a high Sharpe Ratio for a short period of time, it is increasingly difficult and uncommon to maintain a high Sharpe Ratio for an extended period of time.  Weingarten acknowledges this, and states at page 5 that the returns in the Merkin BLMIS Accounts were "uncommon."  However, the Sharpe Ratios for the Merkin BLMIS Accounts were higher than any other peer analyzed over any 10 year time period during the Defendant Funds' investments with BLMIS.[16]  This level of performance is more than just "uncommon," it is statistically improbable, if not impossible.  As discussed in my Initial Report at § VI.D.1, this level of performance was a red flag.

29. Even among the Elite Investment Advisors discussed in my Initial Report at § VI.D.1.c, the returns reported in the Merkin BLMIS Accounts were an outlier.  The Sharpe Ratios

---

[14]    For example, I provided the number of funds, the type of funds, and the time period over which I calculated the Sharpe Ratios.

[15]    *See* Pomerantz Report § VI.D.1.

[16]    *See* Pomerantz Report § VI.D.1.

for the Merkin BLMIS Accounts were higher than any of the Elite Investment Advisors by at least 44%.[17]

30. To further demonstrate the extent to which the returns reported in the Merkin BLMIS Accounts were an outlier, I assessed the cumulative Sharpe Ratios for the Merkin BLMIS Accounts and for a subset of the Hedge Fund Peer Group beginning in 1990.[18]  As Figure 1 illustrates, while it is possible to have uncommon performance in the short-term, it is not sustainable over a long period of time.

**Figure 1**
**Sharpe Ratio for Hedge Fund Peer Group v. Merkin BLMIS Accounts**
**Cumulative Periods October 1990 – July 2007[19]**



31. The Sharpe Ratios in Figure 1 illustrate the concept of "mean reversion."[20]  As illustrated, the maximum Sharpe Ratio for the peer group falls and the minimum Sharpe Ratio for the peer group rises as the period of time increases over which Sharpe Ratios are calculated.  However, the Sharpe Ratios for the returns reported in the Merkin BLMIS

---

[17]   *See* Pomerantz Report Fig. 30.

[18]   *See* Pomerantz Report § VI.D.1.a for a definition of the Hedge Fund Peer Group.

[19]   October 1990 through July 2007 is the longest time period with at least 30 funds reporting historical performance.  This subset of the Hedge Fund Peer Group contains the same 30 funds for each cumulative period.

[20]   Mean reversion refers to the tendency of a time series to "fall when its level is above its mean and rise when its level is below its mean." CFA Institute, *Ethical and Professional Standards, Quantitative Methods, and Economics CFA Curriculum Level II, Vol.1,* 312 (2015).

Accounts remained consistently high from year to year.

### c)      Redemptions

32. Weingarten states at page 5 that an "absolutely critical" part of due diligence is the "determination that the performance [is] realizable," and defines it as the ability to "get your money back" (i.e., redemptions).  Weingarten then highlights at page 5 that Madoff was "always able to meet redemption requests on time and in the full amount" for the Defendant Funds.

33. Based on my almost 30 years of experience, redemptions are not an "absolutely critical" part of due diligence.  While investors should be able to make redemptions pursuant to the terms of their investment or fund agreement, the ability of an investment manager to fulfill redemptions is not due diligence.  Further, the ability to fulfill redemptions does not indicate that reported "performance as depicted [is] real."[21]  Meeting redemption requests is the normal course of business for investment managers.

34. Based on Weingarten's assessment that redemptions are an absolutely critical part of due diligence, I reviewed the history of redemptions for the Defendant Funds to determine how frequently redemptions were met by BLMIS.  **Schedule 1** shows the redemptions for the Merkin BLMIS Accounts from 1995 to 2008.

35. I found that the Defendant Funds went almost six years without making a single redemption request for any of the Merkin BLMIS Accounts.  Therefore, over this time period, Weingarten's "absolutely critical" part of the due diligence process provided no "determination that the performance was realizable."

### 3.      Philosophy

36. According to Weingarten at page 3, Philosophy addresses what "the manager [is] trying to achieve in his strategy."  Weingarten's use of Philosophy is most closely related to the Process and Portfolio areas of due diligence I discuss in my Initial Report under the Five

---

[21]    Weingarten Report 5.

Ps.

37. Weingarten's assessment of Philosophy-related due diligence at page 3 is limited and appears to rely on Merkin's understanding of the strategy, particularly the "notion that Madoff was investing to achieve good returns…with substantially below average risk." Weingarten states at page 3 that the philosophy of the Madoff SSC strategy was that it "would forgo potential higher profit opportunities in order to avoid risk of loss. For example, being out of the market around highly volatile periods during which options expire would be part of the philosophy."

38. Weingarten's assessment of the Philosophy is incorrect and irrelevant to the Madoff SSC strategy. The example he uses was never claimed to be part of the Madoff SSC strategy, and based on my review of the data, was never implemented as part of the Madoff SSC strategy.

39. First, being out of the market around highly volatile periods is not a correct explanation of how the Madoff SSC strategy would forgo profit to avoid loss. The exact opposite is true. If Madoff was *in* the market during highly volatile times, it would more likely demonstrate the philosophy of the Madoff SSC strategy of forgoing profit to avoid loss. The collar would limit some of the losses in the Merkin BLMIS Accounts when the market was down, at the expense of giving up larger gains when the market was up.

40. Second, being out of the market during highly volatile periods is not part of any SSC strategy I am aware of. The Madoff SSC strategy was intended to reduce wide fluctuations in returns over time; as such, the volatility of the market is irrelevant to the decision of when to enter or exit the market. Volatility has no bearing on the implementation of the Madoff SSC strategy other than contributing to the price of the options.

41. Third, while Weingarten's example is claimed to be an activity that would be "part of the philosophy," neither Merkin nor Madoff ever claimed this to be the case for the Madoff

SSC strategy.[22]

42. Finally, Madoff was not always out of the market when options expired,[23] let alone out of the market around highly volatile periods during which options expired as illustrated in **Schedules 2** and **3**.[24]

### 4. Procedures

43. Procedures-related due diligence, according to Weingarten at page 3, addresses "how…the process [is] executed." While Procedures is not one of the Five Ps discussed in my Initial Report, Procedures overlaps with certain Five Ps, including Process and Portfolio. In his assessment of Procedures, Weingarten focuses solely on transparency.

44. Weingarten claims at page 4 that "[p]rocedures were also clearly and transparently…adhered to," noting that Merkin received "both literal and figurative [trade] confirmations."[25] Weingarten further claims that the availability of these trade confirmations "made Madoff's procedure…more transparent than that of a typical fund manager," and "almost no amount of due diligence at the time would have made [it] obvious" that the trade confirmations were fabricated. While Madoff provided trade confirmations, simply receiving this information, or any information, is not due diligence. What one does with the information is due diligence.

45. Weingarten fails to distinguish between having information and using it. Because Merkin received trade confirmations and customer statements for the Merkin BLMIS

---

[22] Merkin testified that the Madoff SSC "strategy needed volatility to work." *Wiederhorn v. Merkin*, Hearing Transcript 336:23, December 3, 2009.

[23] Examples include instances in which the rollover occurred before the expiration of the options (i.e., existing option positions were closed out through buy and sell transactions, and option positions were established with different expiration dates), as well as instances in which the rollover occurred at expiration (i.e., existing options expired, and new option positions were established to replace them). As such, Madoff was often still in the market when the options expired.

[24] **Schedules 2** and **3** use the 30-day average price for the S&P 100 Volatility Index (Ticker: VXO), a measure of market expectations of near-term volatility conveyed by S&P 100 stock index option prices. Using the 7-day average produces similar results.

[25] It is unclear what Weingarten means by "figurative" trade confirmations.

Accounts, he would have had the data available to perform all of the quantitative analyses described in my Initial Report as part of due diligence. However, Merkin did not use any of this transparency to perform quantitative due diligence. It is consistent with industry customs and practices to perform quantitative analyses with trade level data particularly when there are outstanding questions regarding how an investment advisor generates returns or if there is an inconsistency between the returns reported by the advisor and the strategy purportedly followed (i.e., Weingarten's "plausibility test"). In either of these cases (both of which existed for Merkin), it would be consistent with due diligence customs and practices in the investment management industry to further analyze returns and/or transaction level data.

### 5.    People

46. The category of People is both one of the Weingarten Ps as well as one of the Five Ps I discussed in my Initial Report. Weingarten's assessment of People-related due diligence purportedly performed by Merkin relies heavily on Madoff's reputation, and the actions and existence of other investors to suggest that Merkin's due diligence met or exceeded customs and practices.[26] However, Madoff's reputation outside of investment management contributes little to due diligence, and relying on the actions or existence of others is never sufficient due diligence when managing investor funds. Furthermore, Weingarten's assessment is insufficient because it fails to recognize People-related due diligence that would be important if there was a "black box" behind the trading decisions.[27]

### a)    Madoff's Reputation

47. Weingarten states at page 4 that "Madoff was well known to Mr. Merkin" because of

---

[26]    In a response to interrogatories surrounding Merkin's due diligence, the majority of Merkin's response centered around Madoff's reputation and people Merkin spoke to about Madoff. Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[27]    Trustee Ex. 363 (Handwritten Notes of Call between Merkin and UBP, November 7, 2008) (GCC-P 0393138).

both Madoff's reputation in the "finance community at large" as well as Merkin's relationship with Madoff. Reputation itself is a small component of due diligence and reliance on it is not a substitute for due diligence consistent with industry customs and practices.

48. First, Merkin relied heavily on Madoff's reputation in deciding to invest, and continuing to invest, with BLMIS.[28] When Merkin initially came to know Madoff, Madoff had a reputation as a broker-dealer on Wall Street and was an acquaintance of Merkin's father.[29] Merkin appears to have relied on these facts in deciding to invest with BLMIS.[30] Subsequent information about Madoff was relied on as Merkin continued to invest with BLMIS.[31] For example, Merkin testified he relied on Madoff's position as chairman of NASDAQ.[32] However, serving as chairman of NASDAQ does not indicate that someone is capable of managing money.

49. Additionally, Merkin testified that it gave him "some sense of security and understanding as to…Bernie's ability to time small market swings up and Bernie's ability to do the executions that he required to give us these kinds of returns" that large firms, such as Goldman Sachs, Salomon, Merrill Lynch, and Smith Barney, were willing to join Madoff on a new trading platform endeavor.[33] This trading platform, however, was entirely separate and apart from BLMIS's IA Business. That is, these parties were not giving

---

[28] *New York v. Ascot Partners, LP et al.*, Merkin Dep. 20:19-23, July 1, 2010; *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009; Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[29] *In re Madoff Charities Investigation*, Merkin Dep. 7:21-8:15, January 30, 2009.

[30] Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[31] Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[32] *Wiederhorn v. Merkin*, Hearing Transcript 171:4-18, December 3, 2009; Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[33] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009.

money to BLMIS to invest.  The fact that these parties would join Madoff on a new

trading platform unrelated to the IA Business has no relevance from a due diligence

perspective.

50.  Second, Weingarten states at page 4 that it was "clear from the outset that Mr. Merkin

knew the [p]eople who were going to do the investing" based on Madoff and Merkin's

"long-term relationship…dating back to the early 1990s."  However, having a personal or

business relationship with an individual does not absolve a Fund Manager from

performing due diligence.  As discussed in my Initial Report at § V.A, while the

investment management industry is built on relationships, it is not an industry where

"blind trust" prevails.  In my experience, Fund Managers typically follow the "trust but

verify" approach given the risk to which a Fund Manager exposes himself and his

investors by investing their money with an investment advisor.

### b)    BLMIS Employees

51.  The People-related "due diligence" listed in the Weingarten Report only pertains to

Madoff and ignores the rest of the People (or lack thereof) in BLMIS's IA Business.

This is consistent with Merkin's claims that he only spoke to Madoff.[34]  However,

People-related due diligence should include an assessment of individuals with key roles,

the reporting structure of the business, and whether all team members understand the

philosophy and process they are supposed to be implementing.[35]

52.  Weingarten does not mention any employees of BLMIS other than Madoff.  Had Merkin

performed any People-related due diligence on BLMIS rather than just on Madoff, he

would have seen that BLMIS was listed as having no more than five employees who

performed investment advisory functions.[36]

---

[34]   Merkin Dep. 431:8-13, February 25, 2015.

[35]   *See* Pomerantz Report § V.B.3.

[36]   SEC Form ADV, Bernard L. Madoff Investment Securities, August 25, 2006 (PUBLIC0003729 at 734).
BLMIS listed one-to-five total employees performing investment advisory functions.  This is inconsistent with

53. An evaluation of the people at BLMIS, other than Madoff, would be even more important if BLMIS was employing a black box or algorithm as part of its strategy. Testimony by Merkin and handwritten notes from Merkin discuss the use of a black box at BLMIS.[37] If BLMIS was employing a black box or algorithm it would require someone, most likely even a team, qualified to create, run, and maintain the model. As discussed in my Initial Report at § VI.C.2, due diligence would have revealed that BLMIS had a limited number of personnel, with no advanced education or training, purportedly implementing a multi-billion dollar investment strategy.

### c)    Other BLMIS Investors

54. Weingarten states at page 5 that "Merkin knew that many other highly sophisticated and experienced investors were clients of Madoff." Simply knowing of or talking to other investors does not rise to the level of due diligence consistent with industry customs and practices.

55. Merkin listed the following people that he spoke with: Leon Meyers, Sandra Manzke, David Gottesman, Gedale Horowitz, and Daniel Hoffert.[38] In Merkin's testimony, he did not recall whether these conversations involved a discussion of due diligence that these people may have performed on BLMIS.[39]

56. Merkin also testified that he discussed Madoff with other professionals over the period of time in which the Defendant Funds invested with BLMIS.[40] Merkin stated that he had heard that there were skeptics of Madoff's operation, but Merkin claimed that there

---

other information Madoff told Merkin's investors at a meeting Merkin attended. Meeting notes indicated that Madoff had 12 people "dedicated to the [SSC] strategy." UBPAMERKIN00001711 at 711.

[37]  Trustee Ex. 363 (Handwritten Notes of Call between Merkin and UBP, November 7, 2008) (GCC-P 0393138); Merkin Dep. 308:8-20, February 24, 2015; Merkin Dep. 417:16-25, 433:3-434:6, 562:2-14, 574:8-13, February 25, 2015.

[38]  Trustee Ex. 354 (Defendants J. Ezra Merkin and Gabriel Capital Corporation's Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Admissions in Accordance with Decision #3, August 30, 2013).

[39]  Merkin Dep. 374:13-16, 380:8-382:17, 382:22-387:15, 391:9-11, 401:8-10, February 25, 2015.

[40]  *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009.

would always be skeptics, implying that the existence of skeptics was not alarming.[41]  In addition, Merkin indicated that the number of supporters outnumbered the number of skeptics.[42]  Regardless of the number of skeptics, the fact that there were skeptics should have prompted Merkin to perform due diligence beyond reliance on reputation alone.

### C.    Merkin's Purported Due Diligence

57. Weingarten also selectively omits a number of areas that Merkin identified as his purported due diligence.  In my opinion, these activities do not constitute due diligence consistent with industry customs and practices.

- Merkin testified that, "we looked at Mr. Madoff's returns in our office and reached the conclusion that his returns were achievable…given what we thought was the Madoff executions."[43]  I have not identified any documents that show any analysis related to execution or that reveal what Merkin "thought was the Madoff executions."[44]

- Merkin testified that he had a discussion with Madoff, "about those aspects of the strategy that permitted him to generate the level of returns that he did with the consistency that he was able to provide."[45]  For example, in Merkin's handwritten notes of an October 2008 conversation with Madoff, Merkin noted that when BLMIS is fully invested (in the market), "[Madoff] can catch a return of -1% to 2%…six to eight times a year.  With some luck, [he] can be fully invested six to eight times a year with a 50 b.p. profit locked in, which can be helpful in lean months."[46]  There are no indications that Merkin asked any questions regarding precisely how Madoff earned these gains or what events or information led to him going in and out of the market 6 to 8 times a year.

---

[41] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 154:8-157:13, February 9, 2009.

[42] *Wiederhorn v. Merkin*, Hearing Transcript 137:24-138:9, December 3, 2009; *In re Madoff Charities Investigation*, Merkin Dep. 201:25-202:14, January 30, 2009.

[43] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 115:12-116:11, February 9, 2009.

[44] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 115:12-116:11, February 9, 2009.

[45] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 144:23-145:7, February 9, 2009.

[46] Trustee Ex. 363 (Handwritten Notes of Meeting between Madoff, UBP, and Merkin, October 30, 2008) (GCC-P 0393146-148).

- Merkin testified that Madoff told him that he was using over-the-counter ("OTC") options in addition to listed options.[47]  In this arrangement there is significant counterparty risk because there is no formal clearing house for the trade.  Therefore, if certain trades were performed OTC, it would have been industry custom and practice to perform due diligence related to these OTC transactions.  For example, it would have been customary to obtain, review for reasonableness, and verify as necessary the names of counterparties, as well as obtain copies of option agreements.  Merkin, however, never verified counterparties,[48] and never obtained copies of any option agreements with counterparties.[49]

- Merkin testified that he discussed the posting of margin for OTC transactions with Madoff, and stated that he "went through [BLMIS's]…internal program of how they required margin posted."[50]  Yet I have not identified any documents suggesting how Merkin specifically "went through" Madoff's margin requirements, how these margin requirements were calculated, or if Merkin attempted to verify any of the information Madoff provided to him.  Additionally, it is not clear whether Merkin ever asked Madoff why the Defendant Funds never had to post margin for the OTC transactions since they were a party to these trades.[51]

---

[47]  *New York v. Ascot Partners, LP et al.*, Merkin Dep. 353:7-14, March 4, 2010.  Based on the trade confirmations provided to Merkin, Madoff was purportedly trading options on the Chicago Board Options Exchange ("CBOE"), where the Options Clearing Corporation ("OCC") would have cleared the trades. *See* Pomerantz Report § VI.A.2.b.

[48]  In October 2008, Merkin was asked various questions by Union Bancaire Privée ("UBP") to provide information regarding Ascot's investment with BLMIS.  Trustee Ex. 363 (Letter from UBP to Merkin, October 10, 2008) (GCC-P 0393142-143). In response, Merkin asked Madoff for a list of counterparties with which Madoff was purportedly executing OTC option transactions.  Merkin testified that he did not verify (or ask anyone to verify) that any of the institutions that Madoff mentioned were in fact trading options with BLMIS. *New York v. Ascot Partners, LP et al.*, Merkin Dep. 46:4-13, July 1, 2010.

[49]  *New York v. Ascot Partners, LP et al.*, Merkin Dep. 87:5-16, July 1, 2010; *Wiederhorn v. Merkin*, Hearing Transcript 243:18-244:3, December 3, 2009.

[50]  *In re Madoff Charities Investigation*, Merkin Dep. 134:13-135:24, January 30, 2009.

[51]  At minimum, it would have been consistent with industry customs and practices to have a netting agreement that would allow the Defendant Funds to use their stock to collateralize the short option position.

- Merkin claims to have performed something he calls "paper trading."[52] According to Merkin, this analysis was performed when Madoff entered the market to estimate how much Merkin could possibly lose (i.e., the maximum loss) and how much he could possibly gain (i.e., the maximum gain) given the reported trades that Madoff made in executing the Madoff SSC strategy.[53] This type of analysis is typically called "scenario analysis." I have not seen any documentation supporting the analysis purportedly performed by Merkin. However, based on his description of the analysis, Merkin omitted a key component, comparing the *range of possibilities* with the *actual results*. As discussed in my Initial Report at § VI.D.5, had Merkin performed this part of his "paper trading" he would have seen that the returns for the Merkin BLMIS Accounts were outside the range of possibilities.

- It appears from the documents that Merkin asked Madoff about the lack of volatility. Madoff's purported response did not explain the lack of volatility. As discussed in my Initial Report at § VI.B.2, the lack of volatility in the Merkin BLMIS Accounts was a red flag that should have prompted additional due diligence, yet according to the documents and testimony, Merkin did not ask any additional questions and did not perform any analysis regarding the source of the returns.[54] It would have been industry custom and practice to perform independent quantitative analyses (e.g., performance attribution) to confirm Madoff's response or help answer Merkin's own questions regarding volatility. (*See* my Initial Report at § VI.D.4 and § VI.B.2.)

- Merkin testified that "we tried" to replicate Madoff's returns.[55] I have not seen any documentation supporting the analysis purportedly performed by Merkin, and

---

[52] *In re Madoff Charities Investigation*, Merkin Dep. 109:6-10, January 30, 2009.

[53] *In re Madoff Charities Investigation*, Merkin Dep. 109:6-25, January 30, 2009.

[54] *See, e.g.*, Trustee Ex. 363 (Telephone Conversation Transcript between E. Merkin and B. Madoff, January 14, 2002) (GCC-P 0393364-373).

[55] *N.Y.U. v. Ariel Fund Ltd. et al.*, Merkin Dep. 115:9-15, February 9, 2009. Merkin also testified that he did not try to replicate the strategy. *Wiederhorn v. Merkin*, Hearing Transcript 252:23-253:2, December 3, 2009.

Merkin testified that he did not perform any quantitative analysis to replicate the strategy and did not "build a trading model."[56]

- Merkin claims he relied on the favorable press coverage received by BLMIS's Proprietary Trading Business.[57]  However, Merkin's reliance on another BLMIS business unit is inconsistent with due diligence industry customs and practices, and not relevant to an assessment of BLMIS's IA Business.  (*See* my Initial Report at  § V.A.)

## III.    Conclusion

58. Based on the analyses discussed above, it is my opinion that Weingarten's conclusion is incorrect.  Merkin's activities did not meet or exceed industry customs and practices related to due diligence.  Merkin primarily relied on Madoff's reputation, discussions with Madoff and the existence of, or discussions with, other BLMIS investors to reach the conclusion that the returns for the Merkin BLMIS Accounts were achievable.  There is no indication that Merkin performed any quantitative analysis, any returns comparison of the Madoff SSC strategy to other investment strategies, or any comparison of expected results with actual results.

59. Specifically, Merkin did not perform any of the following due diligence activities, which would have been industry custom and practice:

- Peer analysis;
- Performance attribution;
- Correlation analysis;
- Performance in periods of market stress;
- Quantitatively review Madoff's ability to time the market;

---

[56]  *Wiederhorn v. Merkin*, Hearing Transcript 252:23-253:3, December 3, 2009; *New York v. Ascot Partners, LP et al.*, Merkin Dep. 111:16-112:21, July 1, 2010.

[57]  *Straus v. Merkin*, Merkin Dep. 607:24-616:11, June 22, 2011; Trustee Ex. 363 (Richard L. Stern, *Living off the spread*, FORBES, July 1989) (GCC-P 0393118-119) ; Trustee Ex. 363 (Gary Slutsker, *If you can't beat 'em...*, FORBES, January 1992) (GCC-P 0393172).  Merkin also testified that he spoke with customers of BLMIS's Proprietary Trading Business, including Fidelity and Charles Schwab.  *Straus v. Merkin*, Merkin Dep. 577:8-578:7, June 22, 2011.

- Quantitatively review Madoff's ability to pick stocks;
- Ask for and review OTC counterparty contracts;
- Verify information related to margin requirements at BLMIS;
- Replicate the strategy for purposes of understanding expected returns and determining feasibility of returns reported for the Merkin BLMIS Accounts;
- Monitor the purported performance of the Merkin BLMIS Accounts relative to benchmarks in order to determine how much of the reported return for the Merkin BLMIS Accounts was due to general market behavior as opposed to active management;
- Conduct alpha analysis;
- Assess the individuals with key roles (other than Madoff), including the individual(s) responsible for any black box or algorithm; or
- Determine whether BLMIS team members understand the philosophy and process they are supposed to be implementing.

60. Therefore, it is my opinion that Weingarten is incorrect that Merkin and GCC performed due diligence that met or exceeded industry standards.

_____

Dr. Steve Pomerantz

May 15, 2015

# APPENDICES

## Appendix I: Recent Appearances

I have testified three times since my Initial Report was submitted, as listed below.

Direct and Cross-Examination Testimony in Re: US Airlines, Pilots Board of Adjustment, 401(k) Analysis, April 2015

Deposition in Spano et al v. The Boeing Company, US District Court –Southern District of Illinois, 401(k) Analysis, April 2015

Deposition in Re: J.P. Morgan Stable Value Fund, US District Court – Southern District of New York, Investment Analysis, March 2015

**Appendix II: Documents Considered**

In addition to the documents listed in Appendix II of my Initial Report, I have considered the pleadings in this case, as well as documents and other information produced by the parties to this case and gathered during my research.  Accordingly, my report contains various footnote references and discussion of documents specifically relied upon by me in issuing my expert opinion in this case.  In addition to the documents cited in my report, the following documents were considered by me in issuing my expert opinion in this report.  Documents identified below are to be considered inclusive of any and all exhibits to the particular document.

| Bates Begin | Bates End | Bates Begin | Bates End |
|---|---|---|---|
| 09-01182-BAMD-0055762 | 09-01182-BAMD-0055770 | GCC-P 0201921 | GCC-P 0201935 |
| 09-01182-BAMD-0072438 | 09-01182-BAMD-0072447 | GCC-P 0206960 | GCC-P 0206989 |
| 09-01182-BAMD-0082025 | 09-01182-BAMD-0082027 | GCC-P 0213041 | GCC-P 0213043 |
| 09-01182-BAMD-0093758 | 09-01182-BAMD-0093761 | GCC-P 0237755 | GCC-P 0237777 |
| 09-01182-BAMD-0097481 | 09-01182-BAMD-0097489 | GCC-P 0237811 | GCC-P 0237833 |
| 09-01182-BAMD-0097555 | 09-01182-BAMD-0097555 | GCC-P 0244665 | GCC-P 0244665 |
| 09-01182-HBEKER-0000223 | 09-01182-HBEKER-0000247 | GCC-P 0244700 | GCC-P 0244701 |
| 09-01182-HBEKER-0000248 | 09-01182-HBEKER-0000274 | GCC-P 0244902 | GCC-P 0244902 |
| 09-01182-HBEKER-0000288 | 09-01182-HBEKER-0000294 | GCC-P 0245104 | GCC-P 0245104 |
| BS00034648 | BS00034740 | GCC-P 0246091 | GCC-P 0246094 |
| BS00160930 | BS00160956 | GCC-P 0264472 | GCC-P 0334736 |
| BS00173660 | BS00173660 | GCC-P 0399139 | GCC-P 0399161 |
| BS00210984 | BS00210984 | GCC-P 0428837 | GCC-P 0428851 |
| BS00236966 | BS00237008 | GCC-P 0429179 | GCC-P 0429201 |
| BS00247488 | BS00247491 | GCC-P 0493162 | GCC-P 0493202 |
| BS00268136 | BS00268136 | GCC-P 0495348 | GCC-P 0495380 |
| BS00268724 | BS00268724 | GCC-P 0513191 | GCC-P 0513195 |
| BS00268744 | BS00268744 | GCC-P 0730818 | GCC-P 0730842 |
| BS00452912 | BS00452912 | GCC-P 0730843 | GCC-P 0730867 |
| BS00453763 | BS00453767 | GCC-P 0731045 | GCC-P 0731069 |
| BS00525906 | BS00525909 | GCC-P 0760903 | GCC-P 0760915 |
| BS00528297 | BS00528308 | GCC-P 0760932 | GCC-P 0760954 |
| BS00528392 | BS00528396 | GCC-P 0813366 | GCC-P 0813397 |
| BS00599620 | BS00599642 | GCC-P0367450 | GCC-P0367490 |
| BS00599676 | BS00599698 | GCC-P0367549 | GCC-P0367560 |
| CA027889 | CA028051 | GCC-P0367640 | GCC-P0367651 |
| CA028226 | CA028226 | GCC-P0367652 | GCC-P0367666 |
| CA028229 | CA028229 | GCC-P0367667 | GCC-P0367676 |
| CA028232 | CA028232 | GCC-P0367730 | GCC-P0367752 |
| CA028235 | CA028235 | GCC-P0367766 | GCC-P0367787 |
| CA028241 | CA028241 | GCC-P0367986 | GCC-P0368011 |
| GCC-P 0003239 | GCC-P 0003240 | GCC-P0368012 | GCC-P0368023 |
| GCC-P 0004291 | GCC-P 0004292 | GCC-P0368075 | GCC-P0368167 |
| GCC-P 0004293 | GCC-P 0004294 | GCC-P0368204 | GCC-P0368223 |
| GCC-P 0085412 | GCC-P 0085506 | GCC-P0368224 | GCC-P0368259 |
| GCC-P 0125101 | GCC-P 0125102 | GCC-P0368260 | GCC-P0368317 |
| GCC-P 0149343 | GCC-P 0149354 | GCC-P0368424 | GCC-P0368437 |
| GCC-P 0149856 | GCC-P 0149869 | GCC-P0378435 | GCC-P0378460 |
| GCC-P 0155053 | GCC-P 0155053 | GCC-P0386908 | GCC-P0386917 |
| GCC-P 0156398 | GCC-P 0156412 | GCC-P0389478 | GCC-P0389504 |
| GCC-P 0175190 | GCC-P 0175191 | GCC-P0389914 | GCC-P0389927 |
| GCC-P 0189926 | GCC-P 0189949 | GCC-P0389991 | GCC-P0390003 |
| GCC-P 0199332 | GCC-P 0199332 | GCC-SEC 0067675 | GCC-SEC 0067679 |

Rebuttal Expert Report of Dr. Steve Pomerantz
Appendix II: Documents Considered

| Bates Begin | Bates End |
| --- | --- |
| GCC-NYAG 0052069 | GCC-NYAG 0052073 |
| GCC-NYAG 0175539 | GCC-NYAG 0175543 |
| GCC-NYAG 0264840 | GCC-NYAG 0264879 |
| GCC-NYAG 0264926 | GCC-NYAG 0264938 |
| SSKW00019094 | SSKW00019254 |
| SSMT01371455 | SSMT01371496 |
| SSMT02082806 | SSMT02082969 |
| SSMT02091181 | SSMT02091257 |
| SSMT02124151 | SSMT02124228 |
| SSMT02174772 | SSMT02175510 |
| SSMT02192450 | SSMT02192543 |
| SSMT02197860 | SSMT02198601 |
| SSMT02205125 | SSMT02205162 |
| SE_T564912 | SE_T565074 |

# Appendix III: Schedules

Rebuttal Expert Report of Dr. Steve Pomerantz
Appendix III: Schedules

**Schedule 1**: **Defendant Funds' BLMIS Account Redemptions**

> **The Defendant Funds went as long as 5.6 years without redemptions**



- The chart above shows the total redemptions per year from 1995 through 2008 for the Merkin BLMIS Accounts.

**Schedule 2**: **30-Day Average Volatility (1990 – 1999)**

**The Merkin BLMIS Accounts were not always out of the market during volatile times**



- The chart above shows the 30-day average price for the S&P 100 Volatility Index (Ticker: VXO) from 1990 through 1999.
- VXO is a measure of market expectations of near-term volatility conveyed by S&P 100 stock index option prices.
- The black dotted sections of the line represent periods when the Merkin BLMIS Accounts were purportedly out of the market. The red solid sections of the line represent periods when the Merkin BLMIS Accounts were purportedly in the market.

Rebuttal Expert Report of Dr. Steve Pomerantz
Appendix III: Schedules

**Schedule 3**: **30-Day Average Volatility (2000 – 2008)**

> **The Merkin BLMIS Accounts were not always out of the market during volatile times**



- The chart above shows the 30-day average price for the S&P 100 Volatility Index (Ticker: VXO) from 2000 through 2008.
- VXO is a measure of market expectations of near-term volatility conveyed by S&P 100 stock index option prices.
- The black dotted sections of the line represent periods when the Merkin BLMIS Accounts were purportedly out of the market. The red solid sections of the line represent periods when the Merkin BLMIS Accounts were purportedly in the market.