# Exhibit 6

**Picard v. Merkin**                                    **Tina Surh  9-18-13**

1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
In Re:

BERNARD L. MADOFF INVESTMENT            Adv.Pro.No.
SECURITIES LLC,                         08-01789(BRL)
            Debtor.
----------------------------------x
IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,

            Plaintiff,                   Adv.Pro.No.
                                         09-1182(BRL)

            v.

J. EZRA MERKIN, GABRIEL CAPITAL,
L.P., ARIEL FUND LTD., ASCOT
PARTNERS, L.P., GABRIEL CAPITAL
CORPORATION,

            Defendants.
----------------------------------x


        Videotaped Deposition of TINA HYUNG SURH,
as taken by and before NANCY C. BENDISH, Certified
Court Reporter, RMR, CRR, RSA and Notary Public of
the States of New York and New Jersey, at the
offices of Scott & Scott, 405 Lexington Avenue, New
York, New York on Wednesday, September 18, 2013,
commencing at 10:10 a.m.

**Picard v. Merkin**                                    **Tina Surh  9-18-13**

10

10:16:53  1    question about your personal knowledge to say "you"

10:16:55  2    in my question, and if I'm asking about NYU's

10:16:59  3    knowledge, I'm going to specify NYU.  Does that make

10:17:02  4    sense?

10:17:02  5          A.      Yes.

10:17:03  6          Q.      Okay.  And if at any time you're

10:17:04  7    confused, please let me know.

10:17:06  8          A.      Okay.

10:17:07  9          Q.      I'll do my best to fix it.

10:17:16  10               Could you please state your full name

10:17:18  11   for the record.

10:17:19  12         A.      Tina Hyung Surh.

10:17:22  13         Q.      Can you briefly walk me through your

10:17:24  14   educational history.

10:17:25  15         A.      I graduated from Tufts University in

10:17:28  16   1993 with a BA, and I graduated from Harvard

10:17:31  17   Business School in 1999 with an MBA.

10:17:36  18         Q.      Any other degrees?

10:17:38  19         A.      No.

10:17:40  20         Q.      What is your current profession?

10:17:42  21         A.      I am an investment manager for New

10:17:46  22   York University.

10:17:48  23         Q.      Is that your title at New York

10:17:50  24   University?

10:17:51  25         A.      Chief investment officer.

**BENDISH REPORTING, INC.**
**877.404.2193**

**Picard v. Merkin**                                    **Tina Surh   9-18-13**

11

| | | |
|---|---|---|
| 10:17:54 1 | Q. | How long have you held that title? |
| 10:17:57 2 | A. | Since 2010. |
| 10:18:01 3 | Q. | What was your title prior to 2010? |
| 10:18:05 4 | A. | Acting chief investment officer. |
| 10:18:06 5 | Q. | Also at NYU? |
| 10:18:08 6 | A. | At NYU. |
| 10:18:09 7 | Q. | When did you begin employment at NYU? |
| 10:18:12 8 | A. | 2005. |
| 10:18:13 9 | Q. | And what was your title at that time? |
| 10:18:15 10 | A. | Director of investments. |

10:18:17 11          Q.          Have you held any additional titles

10:18:20 12   during your time at NYU?

10:18:22 13          A.          No.  Well, actually deputy chief

10:18:25 14   investment officer.  So there's a progression.

10:18:29 15          Q.          Understood.

10:18:29 16                       And the approximate date range of the

10:18:32 17   time you held that title?

10:18:36 18          A.          From March of 2005 through to

10:18:40 19   beginning '08, I was the director of investments,

10:18:43 20   then I was promoted to deputy CIO.

10:18:48 21          Q.          Can you describe for me the extent to

10:18:54 22   which your roles and responsibilities at NYU may

10:18:57 23   have changed over time since you began employment.

10:19:01 24          A.          Well, in my initial capacity I was a

10:19:05 25   member of the investment office staff responsible

**Picard v. Merkin**                                      **Tina Surh   9-18-13**

24

| | |
|---|---|
| 10:36:33 | 1 |
| 10:36:34 | 2 |
| 10:36:38 | 3 |
| 10:36:47 | 4 |
| 10:36:49 | 5 |
| 10:36:52 | 6 |
| 10:36:54 | 7 |
| 10:36:58 | 8 |
| 10:37:08 | 9 |
| 10:37:10 | 10 |
| 10:37:15 | 11 |
| 10:37:17 | 12 |
| 10:37:18 | 13 |
| 10:37:22 | 14 |
| 10:37:30 | 15 |
| 10:37:33 | 16 |
| 10:37:38 | 17 |
| 10:37:41 | 18 |
| 10:37:42 | 19 |
| 10:37:46 | 20 |
| 10:37:51 | 21 |
| 10:37:54 | 22 |
| 10:37:59 | 23 |
| 10:38:01 | 24 |
| 10:38:07 | 25 |

Q.        When you say "never been discussed,"
do you mean discussed with NYU?

A.        Correct.  Or rather, I should say
disclosed.  Maybe that's a better -- a better -- you
know, a better term.

Q.        Was -- is it your understanding that
that external money manager was Bernard Madoff?

A.        It is now.

Q.        Okay.  Can you provide on behalf of
NYU the history of NYU's investment with Ariel?

MR. LAUGHLIN:  Objection, vague,
but...

A.        NYU invested with -- in the Ariel
Fund beginning in 1994 and made two, I'd say two
investments, in terms of injections of capital,
first in 1994 and then in 1997.

Q.        What were the amounts of capital
invested in those years?

A.        I believe it was 20 million in 1994
and an additional 10 million in 1997.

Q.        Can you describe the circumstances
under which NYU came to invest with Ariel?

MR. LAUGHLIN:  Objection, vague.

A.        My understanding is that Ariel was
considered to be an appropriate investment for the

**Picard v. Merkin**                                    **Tina Surh  9-18-13**

33

| | |
|---|---|
| 10:57:40 1 | that you believe is inaccurate? |
| 10:57:43 2 | A.       No. |
| 10:57:45 3 | MS. PRINC:  Object to form. |
| 10:57:46 4 | A.       No. |
| 10:57:47 5 | Q.       Is there anything -- are there any |
| 10:57:49 6 | factual allegations in the affidavit that NYU has |
| 10:57:52 7 | reason to believe are inaccurate? |
| 10:57:55 8 | MS. PRINC:  Object to form. |
| 10:57:56 9 | A.       No. |
| 10:58:10 10 | Q.       When did you personally first become |
| 10:58:13 11 | aware that NYU had an investment with the Ariel |
| 10:58:16 12 | Fund? |
| 10:58:19 13 | A.       Shortly after I joined NYU. |
| 10:58:25 14 | Q.       Do you recall the circumstances of |
| 10:58:27 15 | precisely when you learned about that investment? |
| 10:58:32 16 | A.       No.  It would have been part -- it's |
| 10:58:35 17 | part -- as a part of the portfolio I would have seen |
| 10:58:38 18 | it. |
| 10:58:43 19 | Q.       Prior to 2008, so between the years |
| 10:58:47 20 | 2005 and 2008 while you were employed at NYU, did |
| 10:58:51 21 | you personally, as part of your roles and |
| 10:58:56 22 | responsibilities, do any work in connection with |
| 10:59:01 23 | monitoring that investment? |
| 10:59:05 24 | A.       Modest level. |
| 10:59:08 25 | Q.       Can you describe in as much detail as |

**Picard v. Merkin**                          **Tina Surh  9-18-13**

34

10:59:11  1   you can what you mean by a modest level.

10:59:15  2            A.      I would have read Ezra's letters,

10:59:18  3   which were generally quarterly, and I recall

10:59:22  4   assisting our external auditors in -- across the

10:59:29  5   portfolio, but as a part of the portfolio, with some

10:59:32  6   additional follow-up research or follow-up data that

10:59:35  7   we wanted to request from the manager.

10:59:41  8            Q.      Who was the external auditor?

10:59:44  9            A.      I believe it was PWC.

10:59:47 10            Q.      And you mentioned that you read

10:59:50 11   Ezra's letters.  I understand that to mean

10:59:54 12   Mr. Merkin?

10:59:55 13            A.      Yes.

10:59:57 14            Q.      Okay.

         15            A.      Yes.

10:59:58 16            Q.      And is my understanding correct that

11:00:00 17   you -- NYU received quarterly newsletters from

11:00:04 18   Mr. Merkin regarding the Ariel Fund?

11:00:06 19            A.      Quarterly manager -- management

11:00:07 20   letters which included a breakdown of the portfolio,

11:00:11 21   how it's invested, summary of all of -- all of his

11:00:18 22   investment strategies which corresponded to the

11:00:23 23   table of investments.

11:00:31 24            Q.      Did NYU receive any other regular

11:00:35 25   communications from Mr. Merkin or the Ariel Fund

**BENDISH REPORTING, INC.**
**877.404.2193**

**Picard v. Merkin**                                    **Tina Surh   9-18-13**

35

11:00:38   1   regarding its investment?

11:00:39   2           A.        Yes.

11:00:39   3           Q.        What were those?

11:00:41   4           A.        Financial statements.

11:00:42   5           Q.        How frequently?

11:00:43   6           A.        At least annually -- well, audited

11:00:46   7   financials would be delivered annually.

11:00:49   8           Q.        Any others?

11:00:50   9           A.        Possibly unaudited quarterly

11:00:52  10   financials.  I haven't gone back to the files to

11:00:57  11   review that there -- but we should have received

11:01:01  12   them.

11:01:01  13           Q.        Okay.  Understood.

11:01:06  14                     Any other regular communications?

11:01:11  15           A.        Statements from Fortis, the

11:01:13  16   third-party administrator.

11:01:16  17           Q.        Fortis being the third-party

11:01:18  18   administrator of the Ariel Fund?

11:01:20  19           A.        Um-hum, right.  They're the keeper of

11:01:22  20   the books and records -- or rather, the shareholder

11:01:25  21   registry.  And so our state -- our account

11:01:27  22   statements would come from them.

11:01:34  23           Q.        Anything else that you recall?

11:01:39  24           A.        Not offhand.

11:01:44  25           Q.        Okay.  Did you -- between -- let me

**BENDISH REPORTING, INC.**
**877.404.2193**

Picard v. Merkin                                    Tina Surh  9-18-13

37

11:03:21  1    to monitoring the investment in Ariel during that

11:03:25  2    three-year window.

11:03:27  3         A.      Um-hum.

11:03:27  4         Q.      Did anyone else at NYU monitor NYU's

11:03:31  5    investment with Ariel during that period?

11:03:35  6         A.      In a similarly modest fashion, I

11:03:40  7    think Ray Oquendo, our director of investments at

11:03:43  8    the time, would have also reviewed documents such as

11:03:47  9    the financial -- such as our account statements or

11:03:50 10    the financials.

11:03:56 11         Q.      Anyone else?

11:04:00 12         A.      To my knowledge -- well, can you

11:04:03 13    clarify what you mean by monitor?  Because in a

11:04:09 14    broad sense, of course, our --

11:04:11 15         Q.      Right.

11:04:12 16         A.      -- committee is responsible with

11:04:14 17    oversight of the entire portfolio, which one could

11:04:16 18    say is monitoring the --

         19         Q.      Right.

11:04:17 20         A.      -- portfolio, and as a part of the

11:04:19 21    portfolio that would be included in periodic review

11:04:21 22    of returns, for example.

11:04:25 23         Q.      Understood.

11:04:26 24                 During that three-year window, was

11:04:29 25    anybody conducting any due diligence on the

**Picard v. Merkin**                                          **Tina Surh   9-18-13**

38

| | | |
|---|---|---|
| 11:04:30 | 1 | investment? |
| 11:04:31 | 2 | MR. LAUGHLIN:  Objection, vague. |
| 11:04:32 | 3 | MS. PRINC:  Objection. |
| 11:04:38 | 4 | A.      Ongoing due diligence? |
| 11:04:39 | 5 | Q.      Yes. |
| 11:04:40 | 6 | A.      So the -- so the -- yes, so the |
| 11:04:41 | 7 | conversations that Maury, the chief investment |
| 11:04:45 | 8 | officer at the time, would have had and our review |
| 11:04:49 | 9 | of all of the documents provided to us by the |
| 11:04:51 | 10 | manager. |
| 11:05:10 | 11 | Q.      You stated that you personally met |
| 11:05:12 | 12 | with Mr. Merkin in October 2008; is that correct? |
| 11:05:16 | 13 | A.      Yes. |
| 11:05:19 | 14 | Q.      What were the circumstances of that |
| 11:05:22 | 15 | meeting? |
| 11:05:23 | 16 | A.      In terms of why we met or -- |
| 11:05:25 | 17 | Q.      Correct.  I'm just -- I'm trying to |
| 11:05:28 | 18 | gain an understanding of why did the meeting occur. |
| 11:05:31 | 19 | A.      Well, it was October of 2008 and that |
| 11:05:35 | 20 | was a very dynamic time in the market. |
| 11:05:38 | 21 | Q.      I remember. |
| 11:05:39 | 22 | A.      Lehman Brothers had gone under. |
| 11:05:42 | 23 | There was a lot to -- to try to get your arms |
| 11:05:45 | 24 | around, and -- and so it was appropriate to meet |
| 11:05:51 | 25 | with Ezra as a manager in the NYU portfolio to -- to |

**Picard v. Merkin**                                                **Tina Surh**  **9-18-13**

40

11:07:32  1           Q.          Had Mr. Maertens had in-person

11:07:35  2    meetings with Mr. Merkin prior to this date?

11:07:38  3           A.          Probably.

11:07:41  4           Q.          Any that you are specifically aware

11:07:43  5    of?

11:07:49  6           A.          I'm aware of an in-person meeting

11:07:52  7    that took place in front of -- with our investment

11:07:54  8    committee, which would have involved Mr. Maertens.

11:08:00  9    As to other specific dates, I couldn't cite the

11:08:05 10    specific dates.

11:08:09 11           Q.          The meeting with the investment

11:08:10 12    committee you just referenced, were you -- did you

11:08:13 13    participate in that meeting?

11:08:14 14           A.          It was 2000.

11:08:15 15           Q.          So it was prior to your employment?

11:08:17 16           A.          It was prior to my joining NYU.

11:08:24 17           Q.          Do you know what the purpose of that

11:08:25 18    meeting was with the investment committee?

11:08:35 19           A.          It would have been part of normal --

11:08:39 20    normal practices of the investment committee, so

11:08:43 21    nothing out of the ordinary.

11:08:46 22           Q.          Did Mr. Merkin give a presentation to

11:08:49 23    the investment committee?

11:08:51 24           A.          I believe so.

11:09:01 25           Q.          Can you tell me in as much detail as

**Picard v. Merkin**                                    **Tina Surh   9-18-13**

43

11:12:36   1      two -- as two places we should -- we could consider

11:12:38   2      investing our capital.

11:12:39   3                  He did mention a third group near the

11:12:42   4      end of the meeting as another, but that I don't

11:12:45   5      recall if it was in the context of a place that the

11:12:48   6      university might invest or if it was in the context

11:12:51   7      of someone else that he respects, and that's Lonnie

11:12:54   8      Steffens who he had respect for as a -- I suppose as

11:13:00   9      a money manager.  Spring Mountain Capital, or

11:13:07   10     something like that.

11:13:08   11                 All three of those were groups that

11:13:09   12     we really didn't have much knowledge of.  I'd say of

11:13:11   13     the three, Millennium was the one that we had the

11:13:15   14     most familiarity with, just at least having heard

11:13:18   15     the name before.

11:13:20   16          Q.      Okay.  Prior to this meeting, had you

11:13:23   17     ever heard Bernie Madoff's name?

11:13:25   18          A.      Prior to the October 23rd meeting?

11:13:27   19          Q.      Correct.

11:13:28   20          A.      No.

11:13:29   21          Q.      Prior to that meeting, did you have

11:13:31   22     any familiarity at all with his investment advisory

11:13:35   23     business?

11:13:35   24          A.      None.

11:13:40   25          Q.      What did Mr. Merkin tell you about

**Picard v. Merkin**                                    **Tina Surh   9-18-13**

44

| | | |
|---|---|---|
| 11:13:42 | 1 | Mr. Madoff in that meeting? |
| 11:13:45 | 2 | A.       Well, he said he had a family trust |
| 11:13:53 | 3 | that was invested with Mr. Madoff, that he knew |
| 11:14:00 | 4 | Mr. Madoff quite well as a fellow member of the |
| 11:14:03 | 5 | board at Yeshiva, I believe it was, that he's an |
| 11:14:14 | 6 | exceptionally consistent performer, something like |
| 11:14:18 | 7 | 30 quarters and -- or some extraordinarily long |
| 11:14:21 | 8 | period of time with no down quarters.  So he was a |
| 11:14:27 | 9 | very stable performer.  And, again, that he had a |
| 11:14:30 | 10 | family -- a family trust that was invested with -- |
| 11:14:34 | 11 | with said individual, with Bernie Madoff, and that |
| 11:14:40 | 12 | he thought it was something that we might consider. |
| 11:14:46 | 13 | Q.       Did you or Mr. Maertens respond? |
| 11:14:51 | 14 | A.       Yes. |
| 11:14:53 | 15 | Q.       Can we start with your response? |
| 11:14:55 | 16 | A.       Sure.  Well, I should -- |
| 11:14:57 | 17 | Q.       Or if there was one. |
| 11:14:59 | 18 | A.       The prompt to the response.  So |
| 11:15:03 | 19 | Mr. Merkin stylistically in the -- he can talk -- he |
| 11:15:10 | 20 | can expound for quite a while, so we were listening, |
| 11:15:13 | 21 | and -- and he volunteered near the end of his -- our |
| 11:15:18 | 22 | interaction, near the end of that description of |
| 11:15:22 | 23 | this opportunity, that the only significant negative |
| 11:15:25 | 24 | is that he prints his own tickets.  He said, he |
| 11:15:31 | 25 | prints his own tickets. |

Picard v. Merkin                                    Tina Surh   9-18-13

45

11:15:33  1             And so I asked, to clarify, do you

11:15:37  2    mean he clears his own trades?  To which he said,

11:15:41  3    yes, they're on his own stationery.  And then I

11:15:44  4    clarified further, so there's no third-party

11:15:46  5    administration involved?  And he -- he confirmed

11:15:50  6    that that was true.

11:15:53  7             And so, you know, being a maybe

11:16:02  8    impolite visitor in his office, I -- I then

11:16:08  9    volunteered for his edification, I suppose, that

11:16:11  10   while we were very appreciative of the

11:16:20  11   recommendation and respected his long relationship

11:16:22  12   with this individual, what he just had described to

11:16:26  13   us from an institutional standpoint would have been

11:16:30  14   a -- would be a non-starter, meaning the lack of a

11:16:34  15   third-party administrator.  The idea that a person

11:16:39  16   clearing his own trades, right, it would just make

11:16:42  17   it -- it would make it unpalatable for us.  So we

11:16:48  18   wouldn't pursue the opportunity.

11:16:51  19        Q.        Why would clearing one's own trades

11:16:54  20   be -- make it an unpalatable opportunity?

11:16:57  21        A.        Well, as I -- as I described, as I

11:17:03  22   have described to the university's auditors as an

11:17:07  23   anecdote, that's the kind of situation in which

11:17:11  24   fraud can occur.

11:17:14  25        Q.        Can you explain why?

**Picard v. Merkin**                                    **Tina Surh   9-18-13**

48

11:19:52  1          Q.        Right.

11:19:53  2          A.        Right.  And it really was -- but

11:19:56  3    there's no question that Maury and I saw the problem

11:20:00  4    in that recommendation the same way and -- and very

11:20:05  5    clearly.  So...

11:20:09  6          Q.        Got it.

11:20:10  7                    After you had -- after you expressed

11:20:13  8    your concern about Mr. Madoff to Mr. Merkin --

11:20:15  9          A.        Yes.

11:20:15  10         Q.        -- did Mr. Merkin respond to you?

11:20:19  11                   MS. PRINC:  Object to form.

11:20:22  12         A.        That's to form.  I can answer that?

11:20:27  13         Q.        Yes.

11:20:28  14         A.        So, he did not disclose that we had

11:20:32  15   exposure to this investment through Ariel Fund,

11:20:37  16   which is hard to believe.

11:20:40  17         Q.        Why is that hard to believe?

11:20:46  18         A.        Because it's so incongruous with the

11:20:49  19   fact pattern up till that -- up until that point.

11:20:51  20         Q.        Meaning -- and this is my

11:20:54  21   understanding, correct me if I'm wrong -- Mr. Merkin

11:20:57  22   has said he understands the concerns of the

11:20:59  23   endowment as -- as making recommendations for

11:21:01  24   possible additional money managers for the -- in

11:21:06  25   which the endowment might place money; you've

**Picard v. Merkin**                                          **Tina Surh  9-18-13**

62

12:02:17   1          Q.        Okay.  You write -- there's an

12:02:20   2     asterisk written onto the copy?

12:02:23   3          A.        Um-hum.

12:02:23   4          Q.        And next to it a statement that says,

12:02:25   5     "Again, I'm pretty shocked this fund was in Ariel's

12:02:29   6     portfolio given how we told him that we could never

12:02:32   7     invest in a fund like that.  The guy was doing his

12:02:34   8     own marks from an institutional perspective."

12:02:38   9          A.        Um-hum.

12:02:38  10          Q.        Is this statement referring to the

12:02:40  11     October meeting with Mr. Merkin?

12:02:43  12                    MS. PRINC:  Object to form.

12:02:45  13          A.        Yeah, yes.  How we told him we could

12:02:49  14     never invest, that statement refers to our

12:02:52  15     interaction in the October meeting, yes.

12:02:54  16          Q.        Right.

12:02:55  17                    So just to be clear, where you say

12:02:58  18     "given how we told him," you're referring to

12:03:01  19     Mr. Merkin?

12:03:01  20          A.        Him being Mr. Merkin.

12:03:02  21          Q.        "That we could never invest in a fund

12:03:05  22     like that," the "we" being NYU?

12:03:09  23          A.        Right.

12:03:10  24          Q.        And "fund like that" referring to --

          25          A.        Madoff.

**Picard v. Merkin**                                    **Tina Surh   9-18-13**

63

12:03:14   1          Q.          -- a recommendation from Mr. Madoff?

12:03:16   2                      Because Mr. Merkin indicated he

12:03:18   3   self-clears?

12:03:20   4          A.          Correct.

12:03:37   5          Q.          You mentioned that you had

12:03:39   6   anecdotally told PWC about your meeting with

12:03:45   7   Mr. Merkin.  Can you elaborate on the -- on any of

12:03:51   8   the details of that discussion?

12:03:53   9          A.          Sure.  You would like me to?

12:03:56  10          Q.          Yes.

          11          A.          Okay.

12:03:57  12          Q.          So let me start you off:  Did -- what

12:04:02  13   was the occasion -- was there an occasion -- was

12:04:06  14   there a particular reason why you were talking to

12:04:12  15   PWC at that time?

12:04:13  16          A.          Yes.

12:04:14  17          Q.          What was the reason?

12:04:15  18          A.          PWC was conducting its annual meeting

12:04:18  19   with us to cover fraud and other -- it's a specific

12:04:24  20   meeting that they hold each year, and the topic is

12:04:27  21   fraud.

12:04:32  22          Q.          Was this an in-person meeting?

12:04:34  23          A.          Yes.

12:04:35  24          Q.          In your offices?

12:04:36  25          A.          Yes.

**Picard v. Merkin**                                          **Tina Surh   9-18-13**

70

12:14:10  1          Q.          I'm handing you what I will mark as

12:14:12  2     the Trustee's Exhibit 119.

12:14:21  3                      (Exhibit Trustee 119 marked for

12:14:24  4     identification.)

12:14:25  5     BY MR. JACOBS:

12:14:25  6          Q.          Do you recognize this?

12:14:27  7           A.         My calendar.

12:14:28  8          Q.          And is this your calendar indicating

12:14:34  9     a call or a meeting with Mr. Merkin on Tuesday,

12:14:37 10     December 16th, 2008?

12:14:39 11           A.         Yes, a telephone call.

12:14:41 12          Q.          Is this the call you just referred

12:14:44 13     to?

12:14:44 14           A.         Yes.

12:14:49 15          Q.          Okay.  Can you describe for me in as

12:14:51 16     much detail as you can what was discussed on that

12:14:53 17     call.

12:14:57 18           A.         Hum, I think Maury did much of the

12:15:03 19     talking and he expressed surprise, disappointment,

12:15:06 20     asked some clarifying questions.  So it was a -- an

12:15:19 21     opportunity to speak to our manager who had just

12:15:22 22     delivered extremely disappointing news.

12:15:35 23          Q.          Do you recall any additional specific

12:15:39 24     details about questions Mr. Maertens might have

12:15:45 25     asked Mr. Merkin?