# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01182 (SMB) |
| Plaintiff, | |
| v. | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

<u>**EXPERT REPORT OF**</u>
<u>**LISA M. COLLURA, CPA, CFE, CFF**</u>

**Proof of Transfers**
**To Defendants J. Ezra Merkin,**
**Gabriel Capital L.P., Ariel Fund Ltd.,**
**Ascot Partners, L.P., Ascot Fund Ltd., and**
**Gabriel Capital Corporation**

March 20, 2015

# TABLE OF CONTENTS

I. PROFESSIONAL BACKGROUND...................................................................................................................2

II. SCOPE OF ASSIGNMENT ...........................................................................................................................2

III. METHODOLOGY ........................................................................................................................................4

IV. SUMMARY OF FINDINGS ..........................................................................................................................6

V. RECONCILIATION OF CASH TRANSACTIONS FOR ALL BLMIS CUSTOMERS ..................................9

    A.     OVERVIEW    9
    B.     BLMIS BANK ACCOUNTS    9
    C.     RESULTS OF RECONCILIATION    12

VI. RECONCILIATION OF CASH TRANSACTIONS FOR THE MERKIN ACCOUNTS ...............................13

    A.     OVERVIEW    13
    B.     BLMIS BANK ACCOUNTS    13
    C.     BLMIS CUSTOMER FILES    14
    D.     MERKIN DEFENDANTS' QUICKBOOKS DATA    15
    E.     DOCUMENTS PRODUCED BY THE MERKIN DEFENDANTS TO THE TRUSTEE    15
    F.     RESULTS OF RECONCILIATION    16

VII. TRACING CASH TRANSACTIONS IN THE MERKIN ACCOUNTS...........................................................16

    A.     OVERVIEW    16
    B.     RESULTS OF TRACING    17

VIII. COMMINGLING OF FUNDS ..................................................................................................................18

    A.     OVERVIEW    18
    B.     RESULTS OF ANALYSIS    20

IX. SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO THE MERKIN DEFENDANTS ...........................29

    A.     OVERVIEW    29
    B.     LAST IN, FIRST OUT ("LIFO")    31
    C.     FIRST IN, FIRST OUT ("FIFO")    32
    D.     LOWEST INTERMEDIATE BALANCE RULE ("LIBR")    34
    E.     RESTATED TRACING RULES ("RESTATED LIBR")    36
    F.     PROPORTIONALITY    38

X. SUBSEQUENT SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO/FBO DEFENDANT J.EZRA MERKIN ......................39

    A.     OVERVIEW    39
    B.     LAST IN, FIRST OUT ("LIFO")    41
    C.     FIRST IN FIRST OUT ("FIFO")    42
    D.     LOWEST INTERMEDIATE BALANCE RULE ("LIBR")    43
    E.     RESTATED TRACING RULES ("RESTATED LIBR")    44
    F.     PROPORTIONALITY    45

XI. MANAGEMENT FEES FROM DEFENDANT ASCOT PARTNERS TO DEFENDANT GCC...........................47

    A.     OVERVIEW    47
    B.     RESULTS OF ANALYSIS    47

XII. SIGNATURE AND RIGHT TO MODIFY..................................................................................................49

XI. LIST OF EXHIBITS.....................................................................................................................................50

## I. PROFESSIONAL BACKGROUND

1.          I am a Senior Managing Director in the Forensic and Litigation Consulting practice of FTI
Consulting, Inc. ("FTI"), with more than 20 years of experience in accounting, auditing and litigation
consulting services.  I specialize in providing forensic accounting and financial fraud investigative services in
connection with internal investigations on behalf of trustees, boards of directors and audit committees of
companies.

2.          I have extensive experience in conducting large-scale, fact-finding investigations into fraudulent
financial transactions, including tracing significant flows of funds between accounts and entities.  During my
career at FTI, I have assisted in the investigation of several of the largest fraud cases in the United States.

3.          I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), a member of the
American Institute of Certified Public Accountants (AICPA) and am Certified in Financial Forensics (CFF) by
the AICPA.  My curriculum vitae, attached as **Exhibit 1** to this report, further describes my professional
credentials, experience and qualifications, including my testimony in the last four years.


## II. SCOPE OF ASSIGNMENT

4.          Bernard L. Madoff Investment Securities LLC ("BLMIS") was an investment firm owned and
operated by Bernard L. Madoff ("Madoff").  On December 11, 2008, Madoff was arrested for violating
multiple securities laws in connection with running a Ponzi scheme.   On December 15, 2008, Irving H. Picard
was appointed as the Trustee for the liquidation of the business of BLMIS, and Baker & Hostetler LLP was
retained as his counsel.  Shortly thereafter, FTI was retained by Baker & Hostetler LLP, on behalf of the
Trustee, to analyze, among other things, the financial affairs of BLMIS and to assist the Trustee with the
liquidation of BLMIS.  As part of our engagement, FTI was tasked with the exercise of reconstructing the
books and records of BLMIS, including all records of the "cash in/cash out" transactions related to the BLMIS
customer accounts as far back as the records allow.

5.          Matthew B. Greenblatt, also a Senior Managing Director at FTI, and a team of professionals
working under his supervision, were specifically tasked with creating chronological listings of all cash and
principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer
account, as set forth more fully in the Expert Report of Matthew B. Greenblatt regarding the Methodology for
the Principal Balance Calculation, dated November 15, 2012 (the "Principal Balance Calculation Report").

6.          The sources of cash deposit and withdrawal transactions related to BLMIS customer accounts
consist of customer statements and other relevant information available within BLMIS's records, including

Portfolio Management Reports, Portfolio Management Transaction Reports, spiral-bound notebooks, and a data table from BLMIS's computer system referred to as the "Checkbook File," which is the only available BLMIS record of cash transactions for the time period from December 1, 2008 through December 11, 2008. *See* Principal Balance Calculation Report for further discussion regarding these sources. For purposes of my report, I use the term "customer statements" to refer to these sources collectively.

7.    I, along with a team working under my supervision, was specifically tasked with performing forensic analyses to determine the following:

- Whether the cash deposit and withdrawal transactions as reflected on the customer statements (as defined in paragraph 6) for *all* BLMIS customers reconciled (as further explained in paragraph 8) to available BLMIS bank records;

- Whether the cash deposit and withdrawal transactions reflected on the customer statements for *four* of the customer accounts at BLMIS that are at issue in this matter (the "Merkin Accounts"[1]) reconcile to available documentation;

- Whether, based on my review of available bank account records, the cash withdrawals (*i.e.*, transfers from BLMIS) reflected on the customer statements for the Merkin Accounts (the "Initial Transfers") could be traced (as further explained in paragraph 8) *to* bank accounts held by, or for the benefit of, the Merkin Defendants,[2] and whether cash deposits reflected on the customer statements for the Merkin Accounts could be traced *from* bank accounts held by, or for the benefit of, the Merkin Defendants;

- Whether there were sources of funds other than from BLMIS and therefore, commingling of funds, in certain bank accounts held by the Merkin Defendants;

- Whether any of the Initial Transfers of BLMIS funds were subsequently transferred to, or for the benefit of, the Merkin Defendants (the "Subsequent Transfers");

- Whether any of the Subsequent Transfers of BLMIS funds received by Defendant GCC were further transferred to, or for the benefit of, Defendant J. Ezra Merkin (the "Subsequent Subsequent Transfers"); and,

---

[1] Four of the BLMIS customer accounts that are at issue in this matter include: 1G0321 under the name "Gabriel Capital, L.P."; 1FR070 under the name "Ariel Fund Ltd"; 1A0058 under the name "Ascot Partners, L.P."; and 1FN005 under the name "Ascot Fund Ltd"(collectively, the "Merkin Accounts").

[2] The Defendants in this matter are J. Ezra Merkin, Gabriel Capital, L.P., Ariel Fund Ltd, Ascot Partners, L.P., Ascot Fund Ltd. and Gabriel Capital Corporation ("GCC"), (collectively, the "Merkin Defendants"). Defendants Gabriel Capital, L.P. ("Gabriel Capital"), Ariel Fund Ltd ("Ariel Fund"), Ascot Partners, L.P. ("Ascot Partners") and Ascot Fund Ltd. ("Ascot Fund") are also collectively referred to herein as the "Merkin Funds."

- Whether management fees were paid by Defendant Ascot Partners to Defendant GCC, and if so, quantify the amount of those management fees and identify what portion of those fees are Subsequent Transfers of BLMIS funds.

8.    For purposes of this report, I use the term "reconciled" to indicate when I have matched, agreed and/or determined consistency between cash deposits and withdrawals reflected on BLMIS customer statements to information or data per another source (*e.g.*, amounts on BLMIS bank records, correspondence between the customer and BLMIS regarding incoming deposits and/or requests for withdrawals, or documents produced by the Merkin Defendants to the Trustee). For purposes of my report, I use the term "traced" to indicate when I have followed the flow of funds from one bank account (*e.g.*, BLMIS's bank account) to another bank account (*e.g.*, the Merkin Defendants' bank accounts).

9.    This report has been prepared in connection with the above-captioned litigation and is to be used only for the specific purposes of this lawsuit. It is not to be used for any other purpose without the express written consent of FTI. If called upon to testify in this matter, I intend to provide testimony regarding my analyses and conclusions consistent with this report.

10.    FTI is being compensated at a rate of $554 per hour for my professional time incurred in performing the work necessary to prepare this report. FTI's fees are not contingent on the conclusions reached in this report or the outcome of this subject litigation.


## III. METHODOLOGY

11.    To determine whether the cash deposit and withdrawal transactions reflected on the customer statements for *all* BLMIS customers reconciled to available BLMIS bank records, I, using my experience as a forensic accountant and investigator, along with my staff, first identified and gathered the relevant and available records related to the BLMIS bank accounts. We then performed the following procedures:

- Reviewed hundreds of thousands of pages of records related to BLMIS's bank accounts, including monthly bank statements, cancelled checks and deposit slips, obtained from BLMIS's files and/or produced by third-party financial institutions, which cover a ten-year period from December 1998 to December 2008;

- Analyzed close to 150,000 transactions reflected within these bank records; and

- Reconciled the cash deposit and withdrawal transactions reported in the available BLMIS bank records to the cash transactions reflected on the customer statements related to *all* BLMIS customer accounts.

12.        Next, to determine specifically whether the cash transactions reflected on the customer statements for the Merkin Accounts reconciled to available documentation, I used the results of the forensic analysis of the available BLMIS bank records as described above.  I also reviewed and analyzed other documents and records maintained at BLMIS, including, but not limited to, documents contained in the customer files related to the Merkin Accounts.  In addition, my team and I reviewed certain documents and data received by the Trustee from the Merkin Defendants, including the following:

- Millions of pages of documents produced to date by the Merkin Defendants; and
- Tens of thousands of records of data from a QuickBooks financial program produced by the Merkin Defendants ("QuickBooks").

Based on my review and analysis of these materials, I identified the cash transactions related to the Merkin Accounts that reconciled to these documents and data.

13.        Next, to determine whether the Initial Transfers of BLMIS funds (*i.e.*, cash withdrawals reflected on the customer statements for the Merkin Accounts) could be traced to bank accounts held by, or for the benefit of, the Merkin Defendants, I again used the available information from the BLMIS bank records as discussed above.  I also reviewed records produced to the Trustee by the Merkin Defendants as well as by third-party financial institutions related to bank accounts held by, or for the benefit of, the Merkin Defendants.  Using these available bank records, I identified the recipients of the Initial Transfers from BLMIS.  In addition, using these available bank records, I identified the sources of transfers to BLMIS (*i.e.*, cash deposits reflected on the customer statements for the Merkin Accounts).

14.        Next, to determine whether there were sources of funds other than from BLMIS, and therefore, commingling of funds in certain bank accounts held by the Merkin Defendants, I reviewed and analyzed available records related to these bank accounts that were produced to the Trustee in this matter, and identified, quantified and determined the purpose of, whenever possible, the transfers between and among these Merkin Defendants' bank accounts.

15.        Next, to determine whether any of the Initial Transfers of BLMIS funds were subsequently transferred to the Merkin Defendants, I reviewed records produced by third-party financial institutions, as well as by the Merkin Defendants, related to bank accounts held by the Merkin Defendants, including bank accounts that received Initial Transfers of BLMIS funds.  I also reviewed records of data from QuickBooks that were produced by the Merkin Defendants to the Trustee.  I understand from counsel to the Trustee that there are several tracing methods available within the court's discretion to trace funds through commingled bank accounts.  I was directed by counsel to the Trustee to review and apply the following tracing methods to

5

the transactional data that I derived from the available bank records to identify Subsequent Transfers of BLMIS funds:

- Last In, First Out ("LIFO")
- First In, First Out ("FIFO")
- Lowest Intermediate Balance Rule ("LIBR")
- Restated Tracing Rules (referred to as "Restated LIBR" for purposes of this report)
- Proportionality

16.     Next, to determine whether any of the Subsequent Transfers of BLMIS funds received by Defendant GCC were subsequently transferred to Defendant J. Ezra Merkin, I again reviewed records received by the Trustee from the Merkin Defendants as well as by third-party financial institutions related to bank accounts held by Defendant GCC.  I also reviewed data from the Merkin Defendants' QuickBooks records produced by the Merkin Defendants.  I was again directed by counsel to the Trustee to review and apply the five tracing methods listed above to the transactional data that I derived from the available bank records to identify any Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to Defendant J. Ezra Merkin.

17.     Finally, to identify and quantify the management fees paid by Defendant Ascot Partners to Defendant GCC, I reviewed records related to bank accounts held by Defendant Ascot Partners, as well as data from the Merkin Defendants' QuickBooks records.  I then identified the portion of these fees that are Subsequent Transfers of BLMIS funds.

18.     The documents and data that I considered in connection with this report are listed in **Exhibit 2**.  I reserve the right to supplement my report based on any additional documents or information received.

## IV. SUMMARY OF FINDINGS

19.     Based on the forensic analyses performed, as described above and throughout this report, as well as my skills, knowledge, experience, education and training that I applied to the documents and information available to me as of the date of this report, my findings are summarized as follows:

- My team and I reconciled 99% of the approximately 225,000 cash deposit and withdrawal transactions reflected on *all* BLMIS customer statements during the time period of December 1998 to December 2008 to the available BLMIS bank records for the same time period.  The remaining 1% that we were unable to reconcile consists primarily of withdrawal transactions for which copies of the related cancelled checks were not available.  Based on the results of our reconciliation of 99% of the

cash transactions, I can reasonably infer that my team and I would have been able to reconcile these withdrawal transactions had copies of the related cancelled checks been available. Only 13 transactions of this remaining 1% (representing less than 0.006% of the approximately 225,000 cash transactions) were reflected on the customer statements, but could not be reconciled to available BLMIS bank records.

- From January 1992 to December 2008, the customer statements for the Merkin Accounts reflected 89 cash deposit and withdrawal transactions. I reconciled all but five (or approximately 94%) of these 89 cash transactions reflected on the customer statements for the Merkin Accounts to available BLMIS bank records, documents and records maintained at BLMIS, and/or documents and data produced by the Merkin Defendants to the Trustee. I was unable to complete my reconciliation for the remaining five cash transactions reflected on the customer statements for the Merkin Accounts due to the unavailability of records related to cash transactions dated prior to December 1998. However, based on my review of documents maintained at BLMIS related to the Merkin Accounts, I have not found any instance of the Merkin Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash deposit or withdrawal transactions reflected on the customer statements for the Merkin Accounts.

- Based on available bank records from both BLMIS records and records produced to the Trustee from Morgan Stanley, I traced approximately 89% of the total dollar amount of Initial Transfers of BLMIS funds (consisting of 100% of the Initial Transfers in the ten year period for which BLMIS bank records are available) to bank accounts held by the Merkin Defendants. I was not able to trace the remaining 11% of the total cash withdrawals from the Merkin Accounts (consisting of cash withdrawals dated prior to December 1998) because the relevant bank records were not available. Based on the results of my tracing, I can reasonably infer that, to the extent additional bank records related to the cash withdrawals from the Merkin Accounts were to become available to me, these records would further support the results of my tracing and that I would be able to trace the additional cash withdrawals from BLMIS to bank accounts held by the Merkin Defendants. In addition, the results of my tracing support that 82% of the total dollar amount of cash deposits reflected on the customer statements for the Merkin Accounts came from bank accounts held by, or the benefit of, the Merkin Defendants. Further, I noted that over $100 million of the cash deposits sent to BLMIS for the benefit of one of the Merkin Accounts came from a bank account held by, or for the benefit of, one of the other Merkin Defendants.

- Based on my analysis of activity in five bank accounts held by the Merkin Defendants, I determined that there were sources of funds other than from BLMIS, and therefore, commingling of funds in these five bank accounts. Specifically, there were sources of funds in three bank accounts held by the Merkin Funds other than from BLMIS funds, including transfers between and among these three bank accounts. In addition, there were sources of funds in two bank accounts held by Defendant GCC other than BLMIS funds, including transfers from the three bank accounts held by the Merkin Funds (for purposes other than payment of fees or operating expenses).

- I identified the following amounts of Subsequent Transfers of BLMIS funds to Merkin Defendants under each of the tracing methods applied:

| Tracing Method | Subsequent Transfers since December 2003 | Subsequent Transfers in the Two Year Period[3] |
|---|---|---|
| LIFO | $135,205,256 | $32,487,075 |
| FIFO | $130,795,332 | $45,416,196 |
| LIBR | $126,691,488 | $38,420,211 |
| Restated LIBR | $161,242,358 | $51,121,812 |
| Proportionality | $135,789,024 | $37,530,921 |

- I identified the following amounts of Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin under each of the tracing methods applied:

| Tracing Method | Subsequent Subsequent Transfers since December 2003 | Subsequent Subsequent Transfers in the Two Year Period |
|---|---|---|
| LIFO | $13,060,921 | $6,351,125 |
| FIFO | $14,642,299 | $7,325,524 |
| LIBR | $13,033,005 | $5,420,503 |
| Restated LIBR | $21,859,325 | $9,957,970 |
| Proportionality | $12,548,019 | $4,746,330 |

- I identified $146,184,547 in management fees paid from Defendant Ascot Partners to Defendant GCC between 1998 and 2008 ($47,706,995 during the Two Year Period), of which the following amounts are Subsequent Transfers of BLMIS funds under each of the tracing methods applied:

---

[3] The Two Year Period is the period between and including December 11, 2006 and February 28, 2009.

| Tracing Method | Total Fee Payments Identified as Subsequent Transfers (1998 – 2008) | Total Fee Payments Identified as Subsequent Transfers (Two Year Period) |
|---|---|---|
| LIFO | $48,473,696 | $10,903,034 |
| FIFO | $46,637,220 | $10,887,171 |
| LIBR | $45,141,029 | $8,432,437 |
| Restated LIBR | $56,521,450 | $15,092,833 |
| Proportionality | $47,340,743 | $10,238,324 |

## V. RECONCILIATION OF CASH TRANSACTIONS FOR ALL BLMIS CUSTOMERS

### A. OVERVIEW

20.        As set forth in the Principal Balance Calculation Report, a team from FTI working under Mr. Greenblatt's supervision created chronological listings of all cash and principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer account.  I was tasked with reconciling the customer cash deposit and withdrawal transactions to available BLMIS bank records to assist in the determination of whether the cash transactions reported on the customer statements for all BLMIS customers were fairly and accurately represented.

### B. BLMIS BANK ACCOUNTS

21.        My team and I reviewed available bank account records for more than 90 bank and brokerage accounts in the name of either BLMIS or Bernard L. Madoff,[4] and found that only the following three bank accounts were used by BLMIS for customer deposits and withdrawals during at least the ten-year period from December 1998 to December 2008:[5]

- JPMorgan Chase account #xxxxx1703 (the "703 Account")[6]
- JPMorgan Chase account #xxxxxxxxx1509 (the "509 Account")
- Bankers Trust account #xx-xx0-599 (the "BT Account")

[4] See **Exhibit 3** for a listing of known bank accounts held by BLMIS and/or Bernard L. Madoff.
[5] Between January 2006 and April 2006, there were four customer withdrawal transactions totaling $262,000,000 that were paid from account #xxx-xxx6-621 held at the Bank of New York (the "BONY 621 Account").  The BONY 621 Account was one of the primary operating bank accounts used by BLMIS's Proprietary Trading and Market Making businesses.  In June 2006, there were two transfers totaling $261,816,950 from the 703 Account to the BONY 621 Account, presumably to reimburse the BONY 621 Account for funding the withdrawals to customers.  A cash withdrawal from one of the Merkin Accounts was one of the four customer withdrawal transactions that were paid from the BONY 621 Account.  See **Exhibit 10** for further detail (transaction dated 4/4/2006).
[6] Personal Identifying Information has been redacted throughout this report and the accompanying exhibits in compliance with Fed. R. Bankr. P. 9037 and applicable federal and state law.

22.        Records for these three accounts consist of monthly bank statements, copies of deposited checks, deposit slips and cancelled checks.  Records related to the 703 Account and the 509 Account were available from December 1998 to December 2008 and were obtained from BLMIS's files as well as from JPMorgan Chase & Co. ("JPMC").[7]  In addition to hard copy documents, JPMC produced an electronic file that provides details of wire transfers in and out of the 703 Account from January 1, 2002 to December 11, 2008 (the "JPMC Wire File").[8]  Records related to the BT Account were available from December 1998 to May 1999 and were obtained from BLMIS's files.[9]

23.        In the aggregate, FTI had available bank records related to the BLMIS bank accounts used for customer deposits and withdrawals for a ten-year period from December 1998 to December 2008.  To assist in our analysis of these bank records, which included copies of monthly bank statements and cancelled checks, we captured the transaction information from these records and converted the information into an electronic format through the use of a combination of Optical Character Recognition (OCR) software and manual entry.  This electronic data, which accurately reflects the underlying records, became the basis for our reconciliation of the cash transactions reported in the BLMIS bank records to the cash deposits and withdrawals reflected on BLMIS customer statements.

**The 703 Account**

24.        Based on my review of the available BLMIS bank records, I determined that the 703 Account was the primary bank account used for BLMIS customer deposits and withdrawals.  My team and I reviewed and analyzed every one of the transactions reported in the available monthly bank statements for the 703 Account

---

[7] The October 1999 bank statement for the 509 Account could not be located.  However, I was able to use other available documents, such as the 703 Account statements, to estimate the activity in the 509 Account during October 1999.  In addition, there is activity reflected on the monthly bank statements for the 703 Account and 509 Account for which corresponding copies of deposited checks, deposit slips and/or cancelled checks were missing from the documents produced by JPMC and/or could not be located in BLMIS's records.  As reflected in my summary of findings and other results described throughout my report, these missing documents had a minimal impact on my overall analysis and reconciliation.

[8] This file was missing data for transactions dated December 11, 2004 to December 31, 2004.  However, we were able to use other available documents, such as the 703 Account statements, to obtain the necessary information to complete our analysis and reconciliation.

[9] Statements for June through August 1999, October 1999, December 1999 and July 2000 for the BT Account were also found in BLMIS's records.  However, May 1999 appears to be the last month of significant activity in the BT Account.  There was no activity in the account during the months of June through August 1999, and the statements for these months showed an ending balance of $26,523.  In October 1999, the only transaction in the account was to transfer the $26,523 remaining balance to the 703 Account and zero out the BT Account.  The December 1999 and July 2000 statements for the BT Account both showed a zero balance.

from December 1998 to December 2008 to determine, among other things, whether the transactions were related to a BLMIS customer deposit or withdrawal.

25.     The results of our analysis of the activity in the 703 Account from the available bank records for December 1998 to December 2008 are set forth in an Excel spreadsheet titled "JPMC 703 Account Activity – December 1998 to December 2008" which is attached as **Exhibit 4**.

26.     In conducting our reconciliation of the cash transactions reported in the 703 Account bank records to the cash transactions reflected on the BLMIS customer statements, we first matched transactions based on the transaction date and amount, but also manually reviewed thousands of transactions to confirm our results.  In addition, there were instances when we reconciled multiple transactions on the BLMIS customer statements to a single transaction on the BLMIS bank statements.  For example, a deposit into the 703 Account that related to multiple BLMIS customers appeared as one transaction on the monthly bank statement for the 703 Account.  In that case, we reconciled the 703 Account transaction to a combination of multiple BLMIS customer transactions.[10]

27.     FTI assigned a unique identification number to each of the transactions reported on the available 703 Account bank statements.  *See* "703 ID" in the first column of the detail tab of Excel spreadsheet "JPMC 703 Account Activity – December 1998 to December 2008" (attached as **Exhibit 4**).  FTI also assigned a unique identification number to each one of the customer deposit and withdrawal transactions for every BLMIS customer account.  *See* "CM ID" in a separate column of the detail tab of **Exhibit 4**.  Once a specific transaction reported in a 703 Account statement was matched to a specific customer deposit or withdrawal transaction reflected on the BLMIS customer statements, we recorded the corresponding unique CM ID in the respective column of **Exhibit 4**.  This matching formed a link between the cash transactions per the bank records and the cash transactions per the customer statements.  This link ensured that no two customer cash transactions were incorrectly matched to the same cash transaction per the bank records or vice versa.

28.     Based on my review of the activity in the 703 Account from December 1998 to December 2008, I determined that approximately 97% of the inflows into the account during this period related to customer deposits and approximately 98% of the outflows from this account during this period related to customer withdrawals.

---

[10] As another example, BLMIS withheld certain amounts from foreign and other account holders and made payments to the Internal Revenue Service on behalf of these BLMIS customers.  In these cases, we reconciled one payment from the 703 Account to multiple related transactions per the BLMIS customer statements.  Two of the Merkin Accounts (Ascot Fund and Ariel Fund) included these tax withholding transactions.

**The 509 Account**

29.        Based on my review of the available bank records related to the 509 Account, I determined that the 509 Account was a checking account funded by the 703 Account.   From December 1998 to December 2008, the inflows into the 509 Account consisted solely of transfers from the 703 Account and the outflows from the 509 Account were solely in the form of checks.

30.        My team and I performed an analysis of the activity in the 509 Account, similar to the analysis we performed with respect to the 703 Account, to determine whether the outflows from the 509 Account were related to BLMIS customer withdrawals.  However, in this case, our analysis relied more heavily on our review of the cancelled checks because the statements themselves lacked the necessary detail.  The results of our analysis of the activity in the 509 Account from the available bank records for December 1998 to December 2008 are set forth in an Excel spreadsheet titled "JPMC 509 Account Activity – December 1998 to December 2008" which is attached as **Exhibit 5**.

31.        Based on my review of the activity in the 509 Account, I determined that approximately 99% of the checks written from the 509 Account from December 1998 to December 2008 were related to customer withdrawals.

**The BT Account**

32.        Based on my review of the available bank records related to the BT Account, from at least December 1998 through May 1999, the BT Account was also funded by transfers from the 703 Account. Outflows from the BT Account were in the form of both checks and wire transfers.

33.        My team and I performed a reconciliation analysis of the activity in the BT Account, similar to those described above, to determine whether the outflows from the BT Account were related to BLMIS customer withdrawals.  The results of our analysis of the activity in the BT Account from the available bank records for December 1998 to May 1999 are set forth in an Excel spreadsheet titled "BT 599 Account Activity – December 1998 to May 1999" which is attached as **Exhibit 6**.

34.        Based on my review of the activity in the BT Account during this period, I determined that over 97% of the outflows from the BT Account were related to customer withdrawals.

*C.   RESULTS OF RECONCILIATION*

35.        My team and I reconciled 99% of the approximately 225,000 cash deposit and withdrawal transactions reflected on *all* BLMIS customer statements during the time period of December 1998 to December 2008 to the available BLMIS bank records for the same time period.  The majority of the remaining

1%, or approximately 2,200 transactions, consist primarily of withdrawal transactions for which copies of the related cancelled checks were not available.  Based on the results of our reconciliation of 99% of the cash transactions, I can reasonably infer that my team and I would have been able to reconcile these withdrawal transactions had the related cancelled checks been available.  Only 13 transactions of this remaining 1% (representing less than 0.006% of the approximately 225,000 cash transactions) were reflected on the customer statements, but could not be reconciled to available BLMIS bank records.  The cash transactions in the Merkin Accounts are not among those included in the 1% of cash transactions that could not be reconciled to available BLMIS bank records.

## VI. RECONCILIATION OF CASH TRANSACTIONS FOR THE MERKIN ACCOUNTS

### A.  OVERVIEW

36.        The chronological listings of all cash and principal transactions for every BLMIS customer account compiled by FTI include the cash transactions for the Merkin Accounts.  From January 1992 to December 2008, the customer statements for the Merkin Accounts reflected 89 cash deposit and withdrawal transactions, which consisted of 68 deposits into the Merkin Accounts totaling $1,066,100,000[11] and 21 withdrawals from the Merkin Accounts totaling $557,880,000.[12]  I was tasked with reconciling these 89 cash transactions to available BLMIS bank records, documents in BLMIS files and/or documents and data received from the Merkin Defendants.  *See* **Exhibit 7** for a list of these cash deposit and withdrawal transactions; *see also* **Exhibit 10** – "Reconciliation and Tracing Results – Merkin Accounts."

### B.  BLMIS BANK ACCOUNTS

37.        Of the 89 cash transactions reflected on the customer statements for the Merkin Accounts, 47 occurred in the ten-year period for which there were available bank records for the three BLMIS bank accounts described above.  I have reconciled 100% of these 47 cash deposit and withdrawal transactions

---

[11] Two cash deposit transactions reflected on the customer statements for the Merkin Accounts were subsequently cancelled and are therefore excluded from the count of total cash deposit transactions.

[12] In addition to these 21 cash withdrawal transactions, there were nearly two thousand transactions that represented purported tax obligations being withheld from two of the Merkin Accounts - Ascot Fund (1FN005) and Ariel Fund (1FR070).  Over the life of these two Merkin Accounts, the amount of tax withholding transactions totaled $5,146,622 and $3,318,697 for Ascot Fund and Ariel Fund, respectively.  BLMIS withheld certain amounts from foreign and other account holders and made combined payments to the Internal Revenue Service (IRS), generally on a monthly basis, on behalf of these BLMIS customers.  More specifically, BLMIS made one monthly payment from the 703 Account to the IRS related to multiple tax withholding transactions across multiple BLMIS customer statements (including Ascot Fund and Ariel Fund). The count of total withdrawals from the Merkin Accounts excludes these tax withholding transactions.

reflected on the customer statements during the period December 1998 to December 2008 to available BLMIS bank records, including monthly bank statements, detail contained in the JPMC Wire File and wire detail related to the BONY 621 Account.

38.        The 47 cash transactions were reconciled to the BLMIS bank accounts as follows:

- 703 Account – 46 transactions (36 deposits via wire transfer and 10 withdrawals via wire transfer)
- BONY 621 Account – one withdrawal via wire transfer

39.        Based on these results, I can reasonably infer that if BLMIS bank records prior to December 1998 were available to me, I would be able to reconcile the remaining pre-December 1998 cash transactions in the Merkin Accounts.


C.  *BLMIS CUSTOMER FILES*

40.        In addition to reconciling the cash transactions for the Merkin Accounts to the available BLMIS bank records as described above, I also reviewed documents from BLMIS's records, including customer files, to identify correspondence related to the cash deposit and withdrawal transactions reflected on the customer statements for the Merkin Accounts.

41.        Customer files related to customer accounts were maintained in BLMIS's records and were generally organized by BLMIS account number.  These customer files contained documents including, but not limited to, correspondence between the customer and BLMIS employees regarding incoming deposits and/or requests for withdrawals, customer contact information, and customer, trust and other agreements.

42.        As part of my analysis, I identified the customer files related to the Merkin Accounts within BLMIS's records.[13]  I reviewed the documents contained in these customer files to identify correspondence that related to the cash transactions reflected on the customer statements for the Merkin Accounts.  I also reviewed other files from BLMIS records that contained correspondence related to the Merkin Accounts.  I identified letters and/or other correspondence in BLMIS's files to support 31 of the 89 cash transactions reflected on the customer statements for the Merkin Accounts.  One of these letters, which is a request for a cash withdrawal from one of the Merkin Accounts, is attached as **Exhibit 8.1** and is described further below:

- Correspondence, dated December 23, 2003, addressed to Frank DiPascali from Michael E. Autera Jr., requesting a wire in the amount of $12,000,000 from Defendant Ascot Partners'

---

[13] I identified two customer files in the BLMIS records related to the Merkin Accounts – one labeled 1FN005 for the Ascot Fund (AMF00069999-AMF00070063) and one labeled 1FR070 for the Ariel Fund (AMF00076284-AMF00076314). However, these customer files include documents related to cash transactions in all four of the Merkin Accounts.

BLMIS customer account (1A0058) to Defendant Ascot Partners' bank account at Morgan Stanley (account # xxx-x3021).

43.        Furthermore, based on my review of the documents contained in the customer files for the Merkin Accounts, I have not found any instance of the Merkin Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash deposit or withdrawal transactions reflected on the customer statements for the Merkin Accounts.

## D. *MERKIN DEFENDANTS' QUICKBOOKS DATA*

44.        The Merkin Defendants have produced over 60,000 records of electronic data that were generated from QuickBooks, the accounting program used by the Merkin Defendants to account for financial activity, including, but not limited to, activity in the Merkin Accounts and other cash transactions related to the Merkin Funds.[14]  The QuickBooks data provided by the Merkin Defendants covers the period from January 1995 to January 2009.  I reconciled the accounting entries included in this data to the cash transactions recorded in the BLMIS customer statements for the Merkin Accounts, and identified the accounting entries to record 76 of the 89 total cash transactions in the Merkin Accounts, which are all the transactions within the time period covered by the QuickBooks records.

## E. *DOCUMENTS PRODUCED BY THE MERKIN DEFENDANTS TO THE TRUSTEE*

45.        As of the date of this report, millions of pages of documents have been produced by the Merkin Defendants to the Trustee.  My team and I conducted targeted searches to locate documentation regarding the cash transactions in the Merkin Accounts.  We identified letters, other correspondence, and/or schedules regarding cash transactions in the Merkin Accounts (titles of schedules include, "Summary of Account Allocations", "Summary of Capital Changes," and other similar titles) within the documents produced by the Merkin Defendants that support 79 of the 89 cash deposit and withdrawal transactions reflected on the BLMIS customer statements for the Merkin Accounts.  An example of correspondence, which is a letter requesting a cash withdrawal from one of the Merkin Accounts, is attached as **Exhibit 8.2** and is described further below:

- Correspondence dated September 30, 2008, addressed to Frank DiPascali from Michael E. Autera Jr., which states, "Following up on my conversation with Jodi earlier today, we need to withdraw $45,000,000 from the Ascot Partners account…" and includes instructions to

---

[14] Deposition of Michael Autera as designated Rule 30(b)(6) representative ("Autera Dep."), 102:12-20, Oct. 22, 2014.

wire the amount to Defendant Ascot Partners' bank account at Morgan Stanley (account # xxx-x3021).

## F. *RESULTS OF RECONCILIATION*

46.        In total, based on the analyses described above, I reconciled 84, or approximately 94%, of the 89 cash transactions reflected on the customer statements for the Merkin Accounts to available BLMIS bank records, documentation contained in BLMIS files, the Merkin Defendants' QuickBooks records and/or other documents produced by the Merkin Defendants to the Trustee. **Exhibit 7**, which is a chart that lists each of the 89 cash transactions for the Merkin Accounts, contains four columns that indicate the results of my reconciliation to each of these sources of information.

47.        I was unable to complete my reconciliation for the remaining five cash transactions reflected on the customer statements for the Merkin Accounts due to the unavailability of records related to cash transactions dated prior to December 1998.[15]  However, as noted above, I have not found any instance of the Merkin Defendants communicating to BLMIS any disagreement with respect to the accuracy of any cash deposit or withdrawal transactions reflected on the customer statements for the Merkin Accounts.

## VII. TRACING CASH TRANSACTIONS IN THE MERKIN ACCOUNTS

## A. *OVERVIEW*

48.        I also used the available BLMIS bank records, as described above, to determine whether I could trace the funds that left BLMIS's bank accounts (*i.e.*, the Initial Transfers) to accounts held by, or for the benefit of, the Merkin Defendants.  To make this determination, I performed a "Receiving Bank" analysis, which traces transfers from BLMIS's bank accounts to bank accounts that received funds from BLMIS.

49.        The withdrawal transactions reflected on the customer statements for the Merkin Accounts were in the form of wire transfers from the 703 Account and the BONY 621 Account.  My tracing of withdrawals via wire transfers was based on the transaction description contained on the monthly bank statements.  Often, the description on the bank statements included the identification of both the banking institution that received the cash transfer as well as the beneficiary of the transfer.  In some cases, the description also included the corresponding bank account number.  The JPMC Wire File produced to the Trustee by JPMC detailing the activity in the 703 Account and wire detail provided to the Trustee detailing the activity in the

---

[15] *See* **Exhibit 7** for five transactions labeled "*n/a*" across all four "Reconciliation Results" columns.  All five of these transactions were cash deposit transactions.

BONY 621 Account contained the same, and in some cases, additional detail related to the transactions via wire transfers. Therefore, I also relied on this wire transfer detail to identify information regarding the flow of funds related to wire transfers in and out of the 703 Account and the BONY 621 Account.

50.        Further, to trace the cash withdrawals as reflected on the customer statements for the Merkin Accounts, I also reviewed documents related to the Merkin Defendants' bank accounts that were produced to the Trustee by the Merkin Defendants and by Morgan Stanley, one of the banking institutions used by the Merkin Defendants.

51.        In addition, as part of my tracing analysis, based on the same bank records described above, I also identified the source bank accounts from which cash deposits reflected on the customer statements for the Merkin Accounts were sent to BLMIS from the Merkin Defendants. The cash deposit transactions reflected on the customer statements for the Merkin Accounts were in the form of wire transfers into the 703 Account. I followed the same tracing methodology used to trace cash withdrawals from BLMIS to the Merkin Defendants (as explained above) to trace cash deposits from the Merkin Defendants to BLMIS.

## B.  *RESULTS OF TRACING*

52.        **Figure 1** below summarizes the results of my Receiving Bank analysis and lists the bank accounts identified by tracing the Initial Transfers from BLMIS.[16]

**FIGURE 1**
**Initial Transfers Tracing Results**
**December 1998 – December 2008**

| Account Holder | Banking Institution | Account Number | Total Amount Traced |
|---|---|---|---|
| Ascot Partners, LP | Morgan Stanley | xx-x3021 | $461,000,000 |
| Ariel Fund Ltd | Morgan Stanley | xx-x3001 | $16,200,000 |
| Gabriel Capital, LP | Morgan Stanley | xx-x3003 | $17,400,000 |

53.        Based on available bank records from both BLMIS records and records produced to the Trustee by Morgan Stanley, I traced approximately 89% of the total dollar amount of Initial Transfers of BLMIS funds (consisting of 100% of the Initial Transfers in the ten year period for which BLMIS bank records are available) to bank accounts held by the Merkin Defendants.

54.        I was not able to complete this tracing analysis for the remaining cash withdrawals related to the Merkin Accounts because the relevant bank records for periods prior to December 1998 were not available.

---

[16] *See also* **Exhibit 9.1** and **Exhibit 10**.

However, based on the results of my tracing of the Initial Transfers from BLMIS, I can reasonably infer that, to the extent additional bank records related to the Merkin Defendants' cash withdrawals become available to me, these records would further support the results of my tracing and that I would be able to trace the remaining cash withdrawals from BLMIS to bank accounts held by the Merkin Defendants.

55.        **Exhibit 9.2** summarizes the results of my tracing analysis of the source of cash deposits reflected on the customer statements for the Merkin Accounts (based on both available BLMIS bank records and records related to the Merkin Defendants' bank accounts that were produced to the Trustee in this matter) and lists the source bank accounts identified by tracing cash deposits from the Merkin Defendants to BLMIS. The results of my tracing support that 82% of the total dollar amount of cash deposits reflected on the customer statements for the Merkin Accounts came from bank accounts held by, or for the benefit of, the Merkin Defendants.  I was not able to trace the remaining 18% of cash deposits from the Merkin Defendants to BLMIS due to the unavailability of bank records related to cash transactions dated prior to June 1998, the earliest month of available bank records related to the Merkin Defendants' bank accounts.

56.        **Exhibit 9.2** also shows that over $100 million of the cash deposits sent to BLMIS for the benefit of one of the Merkin Defendants came from a bank account held by, or for the benefit of, one of the other Merkin Defendants.  For example, $25,000,000 of cash deposits into Defendant Ascot Partners' BLMIS customer account came from a bank account held by Defendant Gabriel Capital.


**VIII. COMMINGLING OF FUNDS**


*A.  OVERVIEW*

57.        I was also asked to determine whether there were sources of funds other than from BLMIS funds and therefore, commingling of funds, in five bank accounts[17] held by the Merkin Defendants, as listed in **Figure 2**.  For purposes of this report, counsel to the Trustee has defined commingling as the combination of BLMIS funds (Initial Transfers and/or Subsequent Transfers) and other sources of funds in these five bank accounts, such that BLMIS funds become unidentifiable and/or inseparable.

---

[17] One or more of these five accounts may be considered brokerage accounts.  For purposes of my report, I will refer to these accounts as bank accounts.

**FIGURE 2**

| Account Holder | Banking Institution | Account Number | Months of Available Bank Statements |
|---|---|---|---|
| Ascot Partners, LP | Morgan Stanley | xx-x3021 | June 1998 – Feb 2009[18] |
| Ariel Fund Ltd | Morgan Stanley | xx-x3001 | June 1998 – Feb 2009[19] |
| Gabriel Capital, LP | Morgan Stanley | xx-x3003 | June 1998 – Feb 2009[20] |
| Gabriel Capital Corporation[21] | Morgan Stanley | xx-x3007 | June 1998 – Feb 2009[22] |
| Gabriel Capital Corporation | JPMC | xxx-xx2994 | Dec 1999 – Dec 2008[23] |

58.        The first three accounts listed in **Figure 2** are collectively referred to as the "Merkin Funds Bank

Accounts" and are the same three accounts that I identified in **Section VII** above as ones that received Initial

Transfers of BLMIS funds.  As I will describe further in this section of the report, the Merkin Funds Bank

Accounts also received funds from other sources, including transfers between and among the three Merkin

Funds Bank Accounts.

59.        The last two accounts listed in **Figure 2** are held by Defendant GCC and are referred to as the

"GCC MS Account" and the "GCC JPMC Account," respectively (collectively referred to as the "GCC Bank

Accounts").  Defendant GCC provides administrative and accounting services on behalf of the Merkin

Funds.[24]  The GCC Accounts received Subsequent Transfers of BLMIS funds (as discussed in **Section IX**

---

[18] *See* MSMERKIN-00015831-MSMERKIN-00015958; MSYSAF0001128-MSYSAF0001485; MSYSAA0004859-MSYSAA0005067.

[19] *See* MSMERKIN-00008015-MSMERKIN-00011096; MSYSAF0000001-MSYSAF0001127; MSYSAA0000363-MSYSAA0000704.

[20] *See* MSMERKIN-00011097-MSMERKIN-00015689; MSYSAF0001486-MSYSAF0002925; MSYSAA0001427-MSYSAA0001941.

[21] The name on this account was Ariel Management Corporation prior to August 2001.  *See* MSMERKIN-00023349; MSMERKIN-00023352.

[22] *See* MSMERKIN-00023207-MSMERKIN-00024058.

[23] *See* GCC-P 0886934-GCC-P 0886984; GCC-P 0646975-GCC-P 0646992; GCC-P 0647013-GCC-P 0647028; GCC-P 0647034-GCC-P 0647050; GCC-P 0647056-GCC-P 0647059; GCC-P 0646935-GCC-P 0646962; GCC-P 0838683-GCC-P 0838686; GCC-P 0838987-GCC-P 0838991; GCC-P 0838954-GCC-P 0838958; GCC-P 0837777-GCC-P 0837780; GCC-P 0837739-GCC-P 0837742; GCC-P 0837675-GCC-P 0837678; GCC-P 0837450-GCC-P 0837454; GCC-P 0837348-GCC-P 0837352; GCC-P 0837273-GCC-P 0837277; GCC-P 0837028-GCC-P 0837032; GCC-P 0836998-GCC-P 0837001; GCC-P 0836795-GCC-P 0836799; GCC-P 0836724-GCC-P 0836727; GCC-P 0836648-GCC-P 0836651; GCC-P 0832841-GCC-P 0832844; GCC-P 0831708-GCC-P 0831712; GCC-P 0831784-GCC-P 0831786; GCC-P 0831895-GCC-P 0831898; GCC-P 0831947-GCC-P 0831951; GCC-P 0832011-GCC-P 0832016; GCC-P 0832117-GCC-P 0832121; GCC-P 0832133-GCC-P 0832137; GCC-P 0832239-GCC-P 0832298; GCC-P 0828014-GCC-P 0828144; GCC-P 0829257-GCC-P 0829274; GCC-P 0886911-GCC-P 0886928; JPMCMERK-0062-JPMCMERK-1137.

[24] Autera Dep. 40:13-21, 42:21-44:4, 58:2-59:11; 81:5-14, 101:2-17, Oct. 22, 2014.

below).  As I will describe further in this section of the report, the GCC Accounts also received funds from other sources including the Merkin Funds Bank Accounts.[25]

60.        To analyze the activity in these five bank accounts in order to identify sources of funds other than from BLMIS and therefore, commingling of funds in the bank accounts, my team and I first identified and gathered the relevant and available bank account records related to these bank accounts.  We then performed the following:

- Reviewed documents and data related to activity in and out of the five bank accounts, including thousands of pages of monthly bank statements, as well as electronic data containing detail of wire transfer activity, produced to the Trustee by Morgan Stanley and JPMC;

- Converted the information contained in the monthly bank statements to electronic data through Optical Character Recognition (OCR) software and/or manual data entry;

- Organized the electronic data by relevant bank account and incoming and outgoing cash transactions in chronological order;[26]

- Matched the related transactions from the wire transfer detail and the Defendants' QuickBooks records to the corresponding transactions from the monthly bank statements whenever possible; and,

- Determined, based on available bank records, wire transfer detail and Merkin Defendants' QuickBooks records, the source of incoming funds and the recipient of outgoing funds, as applicable.

61.        Next, in the chronological listings of transactions, I specifically identified transfers between and among the Merkin Funds Bank Accounts and the GCC Bank Accounts (which represent sources of funds other than from BLMIS).  I then used the Merkin Defendants' QuickBooks records to identify the purpose of each transfer, whenever possible.


B.    *RESULTS OF ANALYSIS*

62.        Based on the analysis described above, and based on the definition provided to me by counsel to the Trustee, I determined that there was commingling of funds in the five bank accounts held by the Merkin Defendants.  Specifically, there were sources of funds in the Merkin Funds Bank Accounts other than from

---

[25] Counsel to the Trustee has instructed me to disregard transfers from the Merkin Funds Bank Accounts to the GCC Bank Accounts that were for payments of fees or operating expenses.
[26] For purposes of our analyses, same day transactions followed the order that the transactions appeared on the monthly bank statements.

BLMIS, including transfers between and among the three Merkin Funds Bank Accounts.[27]  In addition, there were sources of funds in the GCC Bank Accounts other than from BLMIS, including transfers from the Merkin Funds Bank Accounts (for purposes other than payment of fees or operating expenses).[28]

**Transfers Between and Among the Merkin Funds Bank Accounts**

63.        Between June 1998 and February 2009, there were millions of dollars of funds transferred between the three Merkin Funds Bank Accounts.  Based on my review of the descriptions of the related transactions per the bank statements and the Merkin Defendants' QuickBooks records, some of these transfers appear to have been made in order to transfer investor money from one of the Merkin Funds to another one of the Merkin Funds.  For other transfers, based on the available information, it appears that transfers were made from one Merkin Fund Bank Account with a positive account balance to another Merkin Fund Bank Account that had a balance close to zero or even negative.  For some transfers, the description per QuickBooks contains a reference to "Madoff Reallocation" or some variation.  For other transfers, the QuickBooks records reflect that an intercompany balance was recorded.  In many cases, based on my review of the Merkin Defendants' QuickBooks records, the purpose of the transfer between the Merkin Funds Bank Accounts is unclear.

64.        **Figure 3** below summarizes the transfers between and among the three Merkin Funds Bank Accounts during the time period from June 1998 to February 2009 (the time period of available bank statements related to the Merkin Funds Bank Accounts).[29]  *See also* **Exhibit 11.1** for a list of these transfers.

---

[27] These other sources of funds also include, among other things, investor contributions and other unidentifiable sources.

[28] These other sources of funds also include, among other things, investor contributions, inflows from Defendant J. Ezra Merkin's personal bank accounts and other unidentifiable sources.

[29] The transfers between and among the Merkin Funds Bank Accounts include ones that I have identified as potential transfers of investor funds based on the description of the corresponding records in the Merkin Defendants' QuickBooks (*i.e.*, records referencing "CONT" or "DIST").  These potential transfers of investor funds consist of transfers between Defendant Ascot Partners and Defendant Gabriel Capital (approximately $39.2 million from Ascot Partners to Gabriel Capital and approximately $13.7 million from Gabriel Capital to Ascot Partners).  *See* **Exhibit 11.1** for details of these transfers.

**FIGURE 3**
**Transfers Between and Among the Merkin Funds Bank Accounts**
**June 1998 – February 2009**



65.       An example of the transfers between the three Merkin Funds Bank Accounts occurred in October 2001. The balance in Defendant Gabriel Capital's bank account at Morgan Stanley was approximately $2 million as of October 29, 2001. The next day, on October 30, 2001, Defendant Ariel Fund transferred $24 million from its account at Morgan Stanley to Defendant Gabriel Capital's account at Morgan Stanley. The Merkin Defendants' QuickBooks records reflect this transaction as a reduction of a loan from Defendant Gabriel Capital.[30]

66.       Another example of transfers between Defendant Ariel Fund and Defendant Gabriel Capital occurred in October 1999. Specifically, on October 6, 1999, Defendant Gabriel Capital transferred $17 million from its bank account at Morgan Stanley to Defendant Ariel Fund's bank account at Morgan Stanley, which was reflected in the Merkin Defendants' QuickBooks records for Defendant Gabriel Capital as "TO AF 10/6." Approximately two weeks later, on October 25, 1999, Defendant Ariel Fund transferred $17 million from its bank account at Morgan Stanley back to Defendant Gabriel Capital's bank account at Morgan Stanley. This transaction was reflected in the Merkin Defendants' QuickBooks records for Defendant Gabriel Capital as "FROM AF 10/21."

67.       Another example of transfers between the three Merkin Funds Bank Accounts occurred on January 4, 2007, as depicted in **Figure 4** and further described in the following paragraph:

---

[30] On October 4, 2001, Defendant Gabriel Capital transferred $24 million to Defendant Ariel Fund's bank account held at MeesPierson/Fortis when the balance in this bank account was only $1.4 million. *See* GCC-P 0834156. The $24 million from Defendant Gabriel Capital was reflected as a loan to Defendant Ariel Fund in the Merkin Defendants' QuickBooks records. *See* TxnID F2C-1004383915.

**FIGURE 4**

**January 4, 2007**



68.      The balance in Defendant Ascot Partners' bank account at Morgan Stanley at the beginning of January 4, 2007 was approximately $2.3 million.  During the day, there were outflows for investor distributions of $33.3 million (including $12.8 million for a distribution to Defendant Ascot Fund), which exceeded the balance in the account at the beginning of the day.  Also during the day, in addition to a small amount of inflows from investors totaling $425,000, Defendant Ariel Fund transferred $18.5 million and Defendant Gabriel Capital transferred $26.5 million from their respective accounts at Morgan Stanley to Defendant Ascot Partners' account at Morgan Stanley.  Without the transfers from Defendant Ariel Fund and Defendant Gabriel Capital, Defendant Ascot Partners would not have had enough money in its bank account at Morgan Stanley to fund the investor redemptions.  Further, these two transfers were recorded as transfers *to* Defendant Ariel Fund and Defendant Gabriel Capital *from* Defendant Ascot Partners in their respective BLMIS customer accounts, as shown in **Figure 5**, and the Merkin Defendants' QuickBooks records for Defendant Ascot Partners described these transfers as "Withdrawal from Madoff(AF)" and "Withdrawal from Madoff(GC)," respectively.

**FIGURE 5**

**January 4, 2007**

1A0058
Ascot
Partners LP

$18.5M        $26.5M

1FR070
Ariel Fund Ltd.

1G0321
Gabriel
Capital LP

69.    Based on my review of the BLMIS customer statements for the Merkin Accounts, I found many instances of transfers between the Merkin Accounts at BLMIS that corresponded to transfers between the Merkin Funds Bank Accounts.  **Figure 6** summarizes the transfers between the Merkin Accounts at BLMIS held by Defendants Ascot Partners, Gabriel Capital and Ariel Fund that correspond with transfers between their respective bank accounts at Morgan Stanley.[31]  *See also* **Exhibit 11.1** for the identification of these transfers.

**FIGURE 6**

**Summary of Transfers Between the Merkin Funds' BLMIS Customer Accounts
That Correspond with Transfers Between the Merkin Funds Bank Accounts at Morgan Stanley**

70.    An example of corresponding transfers occurred on January 5, 2006, as depicted in **Figure 7**.

---

[31] The direction of the flowchart in **Figure 6** reflecting the transfers between the Merkin Funds' BLMIS customer accounts is opposite that of the direction of the flowchart reflecting the transfers between the Merkin Funds Bank Accounts.  For example, the total transfers of $52M *from* Defendant Ascot Partner's bank account at Morgan Stanley *to* Defendant Ariel Fund's bank account at Morgan Stanley is reflected as $52M *to* Defendant Ascot Partner's BLMIS customer account *from* Defendant Ariel Fund's BLMIS customer account.  In addition, there are transfers between the Merkin Funds' BLMIS customer accounts that do not correspond with transfers between the three Merkin Funds Bank Accounts (the corresponding cash transfers occurred between bank accounts outside of the three Merkin Funds Bank Accounts).  These transfers include $13.2 million from Defendant Ariel Fund's BLMIS customer account to Defendant Ascot Partner's BLMIS customer account (consisting of a $6.7 million transfer million dated 7/15/2002 and a $6.5 million transfer dated 1/8/2003) and $17.4 million from Defendant Gabriel Capital's BLMIS customer account to Defendant Ascot Partner's BLMIS customer account (consisting of a $200,000 transfer dated 7/15/2002 and $17,203,000 of a $19,500,000 transfer dated 1/8/2003).  These transfers are excluded from the flowchart in **Figure 6**.

**FIGURE 7**

January 5, 2006



71.        The balance in Defendant Ascot Partners' bank account at Morgan Stanley at the beginning of

January 5, 2006 was approximately $2.4 million.  During the day, Defendant Ascot Partners made

distributions to investors totaling approximately $93 million, which exceeded the beginning balance in

Defendant Ascot Partners' bank account.  On the same day, in addition to inflows from investors of $13

million, Defendant Ariel Fund transferred $38 million and Defendant Gabriel Capital transferred $59 million

from their respective bank accounts at Morgan Stanley to Defendant Ascot Partners' bank account at Morgan

Stanley.  Without the $38 million and $59 million transferred from Defendant Ariel Fund and Defendant

Gabriel Capital, respectively, Defendant Ascot Partners would not have had enough funds in its bank account

at Morgan Stanley to fund the approximately $93 million in distributions to investors.  Further, as shown in

**Figure 8**, there was a corresponding transfer of $38 million from Defendant Ascot Partners' BLMIS customer

account to Defendant Ariel Fund's BLMIS customer account.  Similarly, there was a corresponding transfer of

$59 million from Defendant Ascot Partners' BLMIS customer account to Defendant Gabriel Capital's BLMIS

customer account.  The descriptions per the Merkin Defendants' QuickBooks records for these transactions

were "Madoff Withdrawal" for Defendant Ascot Partners and "Additional capital to Madoff" for Defendants

Ariel Fund and Gabriel Capital.  However, there were no cash deposits or cash withdrawals to or from

BLMIS for $38 million or $59 million on January 5, 2006.

**FIGURE 8**

January 5, 2006



72.       Another example of the corresponding transfers, as depicted in **Figure 9**, is on July 6, 2006, when the balance in Defendant Ascot Partners' bank account at Morgan Stanley was approximately negative $20 million.  Defendant Gabriel Capital transferred $26 million from its bank account at Morgan Stanley to Defendant Ascot Partners' bank account at Morgan Stanley.  The next day, on July 7, 2006, Defendant Ascot Partners' BLMIS customer account transferred $26 million to Defendant Gabriel Capital's BLMIS customer account.  The descriptions per the Merkin Defendants' QuickBooks records for these transactions were "Decrease Madoff position" for Defendant Ascot Partners and "Increase Madoff position" for Defendant Gabriel Capital.

**FIGURE 9**



73.       Further, approximately one week later, on July 11, 2006, when the balance in Defendant Ascot Partners' bank account at Morgan Stanley had a balance of approximately $11 million, Defendant Gabriel

Capital transferred $25 million to BLMIS that was reflected as a cash deposit on the customer statements for Defendant Ascot Partners' BLMIS customer account. The next day, on July 12, 2006, Defendant Ascot Partners' bank account at Morgan Stanley received $25 million from Defendant Ascot Fund's bank account at MeesPierson/Fortis. Defendant Ascot Partners then transferred $25 million to Defendant Gabriel Capital, which was described in the Merkin Defendants' QuickBooks records as "Wire to GC MDFF Investment." These transactions are depicted in **Figure 10**:

**FIGURE 10**



#### Transfers Between the Merkin Funds Bank Accounts and the GCC Bank Accounts

74.       In addition to the transfers of funds between and among the three Merkin Funds Bank Accounts, as described above, there were also millions of dollars of funds transferred between the Merkin Funds Bank Accounts and the GCC Bank Accounts. The Merkin Funds paid management and other fees to Defendant GCC. In addition, the Merkin Funds paid Defendant GCC for certain operating expenses.[32] At the direction of counsel to the Trustee, I have disregarded transfers related to fees and operating expenses for purposes of my analysis.[33]

75.       **Figure 11** summarizes the transfers between the Merkin Funds Bank Accounts and the GCC Bank Accounts that were not related to fees or operating expenses.[34] *See also* **Exhibit 11.2** for a list of these transfers.

---

[32] Autera Dep. 30:12-25, 36:13-38:18, 39:21-40:05, Oct. 22, 2014.

[33] I identified payments of expenses and/or fees based on the transaction description per the Morgan Stanley bank account statement and/or the memo field from the Merkin Defendants' QuickBooks records. In addition, I analyzed the activity in specific general ledger accounts in the Merkin Defendants' QuickBooks records, including "RECEIVABLE – GABRIEL CAPTL CORP" and "PAYABLE TO INVESTMENT ADVISOR" for Defendant Ariel Fund, "REC – GABRIEL CAPITAL CORP" and "PAYABLE TO INVESTMENT ADVISOR" for Defendant Ascot Partners, and "PAYABLE – GABRIEL CAPITAL CORP" for Defendant Gabriel Capital.

[34] In addition to what is shown in **Figure 11**, there were millions of dollars of funds transferred from the GCC MS Account to the GCC JPMC Account. *See* **Exhibit 16.5** for a list of these transactions from December 2003 to December 2008 that totaled approximately $110 million during this time-period.

**FIGURE 11**
**Transfers Between the Merkin Funds Bank Accounts and the GCC Bank Accounts**
**Excluding Transfers Related to Fees and Operating Expenses**
**June 1998 – February 2009**



76.      Based on my review of the descriptions per the bank statements and the Merkin Defendants' QuickBooks records related to these transactions, in some cases, it appears that the transfers from the Merkin Funds Bank Accounts to the GCC Bank Accounts were made to pay redemptions to investors, which would not normally be paid by Defendant GCC.[35]

77.      For example, as shown in **Figure 12**, on January 3, 2008, Defendant Ascot Partners made three transfers to Defendant GCC totaling $300,000. The descriptions in the Merkin Defendants' QuickBooks records for each of these three transactions indicate that the transfers were related to investor distributions (*i.e.*, the descriptions included a reference to "1/1 Dist"). Five days later, on January 8, 2008, Defendant GCC transferred $1 million from the GCC MS Account to the GCC JPMC Account, which was reflected as an "ASCOT PARTNERS REDEMPTION – 12/31/07" in the Merkin Defendants' QuickBooks records. Corresponding distributions to three investors were made from the GCC JPMC Account between January 3, 2008 and February 29, 2008.

---
[35] Autera Dep. 28:19-28:23, Oct. 22, 2014.

**FIGURE 12**



Accounting by GCC: "ASCOT PARTNERS
REDEMPTION - 12/31/07"

78.         In other cases, based on my review of the Merkin Defendants' QuickBooks records, there were transfers between the Merkin Funds Bank Accounts and the GCC Bank Accounts where Defendant GCC was advancing money to the Merkin Funds. For example, on October 2, 2000, when the balance in Defendant Ascot Partners' bank account at Morgan Stanley was not enough to fund an investor distribution, Defendant GCC transferred $3.5 million to Defendant Ascot Partners on October 2, 2000. This transfer from Defendant GCC was reflected in the Merkin Defendants' QuickBooks records as an "ADVANCE TO ASP." Approximately three weeks later, on October 27, 2000, Defendant Ascot Partners transferred $3.5 million back to Defendant GCC.

79.         There were also transfers between the Merkin Funds Bank Accounts and the GCC Bank Accounts where it appeared that the Merkin Funds were advancing or loaning money to Defendant GCC. For example, on December 30, 2003, when the balance in the GCC MS Account was negative, Defendant Ascot Partners transferred $5 million from its bank account at Morgan Stanley to the GCC MS Account. The next day, on December 31, 2003, when the balance in the GCC MS Account was positive, Defendant GCC transferred $5 million from its bank account at Morgan Stanley back to Defendant Ascot Partners' bank account at Morgan Stanley. I was unable to identify transactions in the Merkin Defendants' QuickBooks records related to these transfers between Defendants Ascot Partners and Defendant GCC.

## IX. SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO THE MERKIN DEFENDANTS

*A.    OVERVIEW*

80.         I was also asked to identify whether any of the Initial Transfers of BLMIS funds, identified in **Section VII** above, were subsequently transferred to, or for the benefit of, the Merkin Defendants. If so, I was

then instructed to identify the pathways through which such Subsequent Transfers of BLMIS funds took place and to identify the dates and amounts of such Subsequent Transfers.

81.     To identify Subsequent Transfers of BLMIS funds to, or for the benefit of, the Merkin Defendants, I again used the chronological listings of transactions, as discussed above, related to the Merkin Funds Bank Accounts that received Initial Transfers of BLMIS funds, as listed on **Exhibit 9.1**.  I also reviewed records of data from QuickBooks that were produced by the Merkin Defendants to the Trustee.

82.     I understand from counsel to the Trustee that there are several tracing methods available within the court's discretion to trace funds through commingled bank accounts.  I was directed by counsel to review and apply the following tracing methods to the chronological listings of transactions that I derived from the available bank records to identify Subsequent Transfers of BLMIS funds:

- Last In, First Out ("LIFO")

- First In, First Out ("FIFO")

- Lowest Intermediate Balance Rule ("LIBR")

- Restated Tracing Rules (referred to as "Restated LIBR" for purposes of this report)

- Proportionality

83.     Based on my review of the relevant bank records produced by Morgan Stanley to the Trustee, the balances in the bank accounts at Morgan Stanley for Defendant Gabriel Capital (account #xx-x3003) and Defendant Ariel Fund (account #xx-x3001) were negative at the time the accounts received the Initial Transfers from BLMIS.[36]  I have assumed that the Initial Transfers from BLMIS were used to fund the negative balances in Defendants Gabriel Capital's and Ariel Fund's bank accounts at Morgan Stanley, and, therefore, I have not applied the tracing methods listed above to these two bank accounts.  I have only applied the tracing methods to the activity in Defendant Ascot Partners' bank account at Morgan Stanley (#xx-x3021) (the "Ascot Partners MS Account") to identify Subsequent Transfers of BLMIS funds.  The transactions in the Ascot Partners MS Account from December 2003 through February 2009[37] and the results

---

[36] I traced the cash withdrawal dated 7/7/2008 for $17.4 million reflected on the customer statements for Defendant Gabriel Capital's customer account at BLMIS (1G0321) from BLMIS to Defendant Gabriel Capital's bank account at Morgan Stanley (account #xx-x3003).  *See* **Exhibit 10**.  The balance in Defendant Gabriel Capital's bank account at Morgan Stanley just prior to the receipt of $17.4 million from BLMIS was approximately negative $40 million.  *See* MSYSAA0001821-22.  Similarly, I traced the cash withdrawal dated 7/7/2008 for $16.2 million reflected on the customer statements for Defendant Ariel Fund's customer account at BLMIS (1FR070) from BLMIS to Defendant Ariel Fund's bank account at Morgan Stanley (account #xx-x3001).  *See* **Exhibit 10**.  The balance in Defendant Ariel Fund's bank account at Morgan Stanley just prior to the receipt of $16.2 million from BLMIS was approximately negative $23 million.  *See* MSYSAA0000610-11.

[37] The first Initial Transfer from BLMIS that I traced to the Ascot Partners MS Account was on December 2, 2003 (*see* **Exhibit 10**) and the last monthly bank statement related to the Ascot Partners MS Account that the Trustee received from Morgan Stanley is February 2009.

of my analyses of these transactions using the five tracing methods are set forth in an Excel spreadsheet titled "Ascot Partners MS Account Activity and Analysis" (attached as **Exhibit 12**).

## B.  LAST IN, FIRST OUT ("LIFO")

84.          The LIFO method is an accounting practice used to determine the cost of inventory.  LIFO assumes that the inventory sold during a certain period comes from the most recent inventory purchased. Simply, under LIFO, the last units of inventory purchased are the first units to be sold.  LIFO is also a method applied to trace funds in and out of a commingled bank account.  Using LIFO, the last money deposited into a commingled bank account is considered to be the first money disbursed from that bank account.

85.          As discussed above, there was commingling of funds in the Ascot Partners MS Account. Accordingly, I have been instructed by counsel to the Trustee to apply the LIFO tracing method to the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place.

86.          Based on applying the LIFO tracing method, I identified **$32,487,075** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 13**.  *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

**FIGURE 13[38]**

| Time Period | Subsequent Transfers from Ascot Partners (*under LIFO*) | | | | |
|---|---|---|---|---|---|
| | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[39] | TOTAL |
| Since Dec 2003 | $81,120,927 | $        - | $118,000 | $53,966,328 | $135,205,256 |
| Two Year Period | $21,081,296 | $        - | $        - | $11,405,779 | $32,487,075 |

87.          **Figure 14** is an example of Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account using the LIFO tracing method and illustrates the pathway through which the Subsequent Transfers took place.

---

[38] Any differences are due to rounding.

[39] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the LIFO method, $48,473,696 was for payments of management fees ($10,903,034 during the Two Year Period).  *See* **Exhibit 17**.

**FIGURE 14**



88.　　　The application of the LIFO tracing method in this example is shown in **Figure 15**, which includes an excerpt from the activity in the Ascot Partners MS Account on December 29, 2006:

**FIGURE 15**

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|------|--------|-----------------|----------------------------------------------------------------|-------------|-------------|
| | | 4,310,201 | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (10,000,000) | (104,539) |
| | **Balance** | **4,205,662** | | - | **4,205,662** |

89.　　　The Initial Transfer from BLMIS of $10 million occurred on 12/29/2006 (*see* **Exhibit 10**).  The transfer from Defendant Ascot Partners to Defendant GCC on 12/29/2006 was the next transaction[40] after the inflow of $10 million from BLMIS.  Under LIFO, the last money in (in this case, the $10 million from BLMIS) is the first money to be disbursed from the account.  Therefore, under LIFO, $10 million of the total transfer from Defendant Ascot Partners to Defendant GCC for management fees is considered a Subsequent Transfer of BLMIS funds.  (*See also* **Exhibit 13.4**).

## C.　*FIRST IN, FIRST OUT ("FIFO")*

90.　　　The FIFO method is another accounting practice used to determine the cost of inventory.  FIFO assumes that the inventory sold during a certain period comes from the oldest inventory purchased.  Simply, under FIFO, the first units of inventory purchased are the first units to be sold.  FIFO is also a method applied to trace funds in and out of a commingled bank account.  Using FIFO, the first money deposited into a commingled bank account is considered to be the first money disbursed from that bank account.  I have been

---

[40] As noted above, I have assumed that transactions occurring on the same day took place in the order that they appeared on the monthly bank statements.

instructed by counsel to the Trustee to apply the FIFO tracing method to the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place.

91.    Based on applying the FIFO tracing method, I identified **$45,416,196** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 16**. *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

FIGURE 16

| Time Period | Subsequent Transfers from Ascot Partners (*under FIFO*) | | | | |
|---|---|---|---|---|---|
| | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[41] | TOTAL |
| Since Dec 2003 | $76,365,000 | $150,000 | $418,000 | $53,862,332 | $130,795,332 |
| Two Year Period | $33,365,000 | $    - | $    - | $12,051,196 | $45,416,196 |

92.    **Figure 17** shows the Subsequent Transfers of BLMIS funds (the same Initial Transfer of $10 million on 12/29/2006) from the Ascot Partners MS Account using the FIFO tracing method and illustrates the pathway through which the Subsequent Transfers took place.

FIGURE 17



93.    The application of the FIFO tracing method in this example is shown in **Figure 18**, which includes an excerpt from the activity in the Ascot Partners MS Account on December 29, 2006:

---

[41] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the FIFO method, $46,637,220 was for payments of management fees ($10,887,171 during the Two Year Period). *See* **Exhibit 17**.

FIGURE 18

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|---|---|---|---|---|---|
| | | 4,310,201 | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (5,794,338) | (4,310,201) |
| | **Balance** | 4,205,662 | | 4,205,661 | - |

94.        Under FIFO, the first money in the account is the first money to be disbursed from the account. In this example, the transfer from Defendant Ascot Partners to Defendant GCC on 12/29/2006 for management fees is taken first from the balance in the account prior to the Initial Transfer of $10 million from BLMIS ($4,310,201), which consists of non-BLMIS funds.  Once the non-BLMIS funds are used, the remainder of the transfer to Defendant GCC ($10,104,539 less $4,310,201 = $5,794,338) is considered a Subsequent Transfer of BLMIS funds under FIFO.  Further, under FIFO, the remaining BLMIS funds were used for other disbursements.

D.  _LOWEST INTERMEDIATE BALANCE RULE ("LIBR")_

95.        The Lowest Intermediate Balance Rule ("LIBR") is a tracing principal used to determine the rights to funds remaining in a commingled bank account (_e.g._, the rights of a trust beneficiary or the rights of a secured party).  LIBR assumes that trust or secured funds deposited into a commingled bank account are the last funds disbursed from that account, and any disbursements made from the account are taken first from funds other than the trust or secured funds until the balance in the account dips below the amount of those trust or secured funds.  In other words, under LIBR, trust or secured funds are assumed to fall to the bottom of the commingled bank account and subsequent disbursements made from the commingled account are taken off the top first.

96.        I have been instructed by counsel to the Trustee to apply LIBR in this case to identify Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account.  I have assumed that the BLMIS funds are equivalent to the trust or secured funds referred to in my explanation of LIBR above.  In this case, BLMIS funds remain in the Ascot Partners MS Account until all non-BLMIS funds are disbursed from that account.  Non-BLMIS funds deposited into the Ascot Partners MS Account under LIBR will sit on top of the BLMIS funds and will be used first for subsequent disbursements.  Subsequent disbursements will be taken from the

BLMIS funds only when the non-BLMIS funds are used up and the balance in the Ascot Partners MS Account (*i.e.*, the lowest intermediate balance) falls below the amount of the BLMIS funds in the account.

97.      Based on applying the LIBR tracing method, I identified **$38,420,211** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 19**. *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

FIGURE 19

| Time Period | Subsequent Transfers from Ascot Partners (*under LIBR*) | | | | |
|---|---|---|---|---|---|
| | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[42] | TOTAL |
| Since Dec 2003 | $73,255,395 | $ - | $919,972 | $52,516,121 | $126,691,488 |
| Two Year Period | $29,064,189 | $ - | $ - | $9,356,021 | $38,420,211 |

98.      Again, using the Initial Transfer of $10 million on 12/29/2006, **Figure 20** shows the Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account using the LIBR tracing method and illustrates the pathway through which the Subsequent Transfers took place.

FIGURE 20



99.      The application of the LIBR tracing method in this particular example yields the same results as the application of the FIFO tracing method described above, and is shown in **Figure 21**.

---

[42] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the LIBR tracing method, $45,141,029 was for payments of management fees ($8,432,437 during the Two Year Period). *See* **Exhibit 17.**

**FIGURE 21**

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|------|--------|-----------------|----------------------------------------------------------------|-------------|-------------|
| | | 4,310,201 | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (5,794,338) | (4,310,201) |
| | **Balance** | **4,205,662** | | **4,205,661** | - |

100.        Under LIBR, the BLMIS funds deposited into the Ascot Partners MS Account on 12/29/2006 fall to the bottom of the account and the non-BLMIS funds in the account get disbursed first. Similar to FIFO, in this example, the transfer from Defendant Ascot Partners to Defendant GCC on 12/29/2006 for management fees is taken first from the balance in the account prior to the Initial Transfer of $10 million from BLMIS ($4,310,201), which consists of non-BLMIS funds. Because the non-BLMIS funds are now completely used and the balance in the account (*i.e.*, $4,205,662) has fallen below the $10 million of BLMIS funds in the account, the remainder of the transfer to Defendant GCC ($5,794,338) is considered a Subsequent Transfer of BLMIS funds under LIBR. Further, under LIBR, the remaining BLMIS funds ($4,205,662) were used for other disbursements.

E.   *RESTATED TRACING RULES ("RESTATED LIBR")*

101.        Counsel to the Trustee has advised me that certain rules regarding tracing of funds through a commingled bank account were restated in 2011. I have been instructed by counsel to apply these restated tracing rules to the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place. For purposes of this report, I have referred to the application of these restated tracing rules as the "Restated LIBR" tracing method.

102.        Pursuant to these restated tracing rules, withdrawals from a commingled bank account can be "marshaled so far as possible in favor of the claimant" (here, the Trustee), and the claimant can "claim the entire advantage of beneficial withdrawals that can be attributable to the claimant's funds" (*i.e.*, BLMIS funds). Further, the claimant can trace to his benefit any withdrawal from the commingled bank account that does not exceed the lowest balance reached in that commingled account between 1) the point at which the Trustee's funds (*i.e.*, BLMIS funds) are deposited into the commingled bank account and 2) the point at which the withdrawal is made.

103.      Based on applying the Restated LIBR tracing method, I identified **$51,121,812** in Subsequent
Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure
22**. *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these
Subsequent Transfers to the Merkin Defendants by date and amount.

### FIGURE 22

| Time Period | Subsequent Transfers from Ascot Partners (*under Restated LIBR*) | | | | |
|---|---|---|---|---|---|
| | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[43] | TOTAL |
| Since Dec 2003 | $93,615,000 | $300,000 | $2,630,910 | $64,696,449 | $161,242,358 |
| Two Year Period | $33,365,000 | $    - | $    - | $17,756,812 | $51,121,812 |

104.      Again, using the Initial Transfer of $10 million on 12/29/2006, **Figure 23** shows the Subsequent
Transfers of BLMIS funds from the Ascot Partners MS Account using the Restated LIBR tracing method and
illustrates the pathway through which the Subsequent Transfers took place.

### FIGURE 23



105.      The application of the Restated LIBR tracing method in this particular example yields the same
results as the application of the LIFO tracing method described above, and is shown in **Figure 24**.

### FIGURE 24

| Date | Amount | Running Balance | Description Per Ascot Partners Morgan Stanley Account Statement | BLMIS Funds | Other Funds |
|---|---|---|---|---|---|
| | | 4,310,201 | | | |
| 12/29/2006 | 10,000,000 | 14,310,201 | ICE // REC FROM MORGAN STANLEY FUNDS RECEIVED | 10,000,000 | 4,310,201 |
| 12/29/2006 | (10,104,539) | 4,205,662 | ASP 2006 MF FUNDS PAID | (10,000,000) | (104,539) |
| | **Balance** | 4,205,662 | | - | 4,205,662 |

---

[43] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the Restated LIBR tracing
method, $56,521,450 was for payments of management fees ($15,092,833 in the Two Year Period). *See* **Exhibit 17**.

106.        Under the Restated LIBR tracing method, as the balance of BLMIS funds in the Ascot Partners MS Account at the time of the transfer to Defendant GCC for management fees was $10 million, all $10 million is considered a Subsequent Transfer of BLMIS funds.

### F.   PROPORTIONALITY

107.        Proportionality (also known as pro rata) is another tracing method used to trace funds in and out of a commingled bank account.  This method calculates the proportion of the balance in a bank account between sources each time a deposit is made and applies that proportion to the next disbursement from the account.

108.        I have been instructed by counsel to the Trustee to apply the proportionality tracing method to the transactions in the Ascot Partners MS Account to specifically identify Subsequent Transfers of BLMIS funds to the Merkin Defendants, and to identify the pathways through which such Subsequent Transfers of BLMIS funds took place.  In this case, I calculated the proportion of the balance in the Ascot Partners MS Account that was attributable to deposits from BLMIS verses deposits from other sources.  I then identified the source of each disbursement according to the proportion in the bank account balance at the time of the disbursement.

109.        Based on applying the proportionality tracing method, I identified **$37,530,921** in Subsequent Transfers of BLMIS funds to the Merkin Defendants during the Two Year Period, as summarized in **Figure 25**.  *See also* **Exhibit 13** for a summary of these Subsequent Transfers and **Exhibits 13.1-13.4** for a list of these Subsequent Transfers to the Merkin Defendants by date and amount.

### FIGURE 25

| Time Period | Subsequent Transfers from Ascot Partners (*under Proportionality*) | | | | |
|---|---|---|---|---|---|
| | Ascot Fund | Ariel Fund | Gabriel Capital | GCC[44] | TOTAL |
| Since Dec 2003 | $80,439,874 | $79,060 | $757,381 | $54,512,709 | $135,789,024 |
| Two Year Period | $25,984,614 | $        - | $        - | $11,546,306 | $37,530,921 |

110.        Using the Initial Transfer of $10 million on 12/29/2006, the following describes how the proportionality tracing method is applied in the Ascot Partners MS Account:

- The balance in the account just prior to a deposit from BLMIS on December 29, 2006 was **$4,310,201**, which was comprised of 100% of funds from other sources

---

[44] Of the total Subsequent Transfers of BLMIS funds to Defendant GCC identified under the Proportionality tracing method, $47,340,743 was for payments of management fees ($10,238,324 in the Two Year Period).  *See* **Exhibit 17**.

- A deposit from BLMIS of $10,000,000 was then received into the account, bringing the account balance to **$14,310,201**

- The total account balance is now comprised of **70% BLMIS funds** ($10,000,000 divided by $14,310,201) and **30% other sources** ($4,310,201 divided by $14,310,201)

- The next disbursement from the account was **$10,104,539** to Defendant GCC for management fees

- Applying the proportion of the balance in the account (70% BLMIS / 30% other sources) results in allocating the transfer of $10,104,539 to Defendant GCC for management fees as follows:

  ➢ $7,061,074 – Subsequent Transfer of BLMIS funds

  ➢ $3,043,465  - transfer from other sources

- The remaining BLMIS funds ($10,000,000 less $7,061,074 = $2,938,926) were used for other disbursements

111.    The results of this example are depicted in **Figure 26**, which also illustrates the pathway through which the Subsequent Transfers took place:

**FIGURE 26**



## X. SUBSEQUENT SUBSEQUENT TRANSFERS OF BLMIS FUNDS TO/FBO DEFENDANT J.EZRA MERKIN

*A.  OVERVIEW*

112.    Counsel to the Trustee also asked me to identify whether any of the Subsequent Transfers of BLMIS funds to Defendant GCC, calculated under the five tracing methods explained in **Section IX** above, were subsequently transferred to, or for the benefit of, Defendant J. Ezra Merkin (as previously defined, "Subsequent Subsequent Transfers").  If so, I was then instructed to identify the pathways through which such Subsequent Subsequent Transfers of BLMIS funds took place and to identify the dates and amounts of such Subsequent Subsequent Transfers.

113.    To identify Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin, I again used the chronological listings of transactions, as discussed

above, related to the two GCC Bank Accounts, both of which received Subsequent Transfers of BLMIS funds, as listed on **Exhibit 13.4**.[45]

114.        The transactions in the GCC MS Account from December 2003 through February 2009[46] and the results of my analyses of these transactions using the LIFO and FIFO tracing methods are set forth in an Excel spreadsheet titled "GCC MS Account Activity and Analysis – LIFO and FIFO" (attached as **Exhibit 14.1**).  The same set of transactions in the GCC MS Account, and the results of my analyses of these transactions using the LIBR, Restated LIBR and Proportionality tracing methods are set forth in an Excel spreadsheet titled "GCC MS Account Activity and Analysis – LIBR, Restated LIBR and Proportionality" (attached as **Exhibit 14.2**).  The transactions in the GCC JPMC Account from December 2003 through January 2009[47] and the results of my analyses of these transactions using the LIFO and FIFO tracing methods are set forth in an Excel spreadsheet titled "GCC JPMC Account Activity and Analysis – LIFO and FIFO" (attached as **Exhibit 15.1**).  The same set of transactions in the GCC JPMC Account, and the results of my analyses of these transactions using the LIBR, Restated LIBR and Proportionality tracing method are set forth in an Excel spreadsheet titled "GCC JPMC Account Activity and Analysis – LIBR, Restated LIBR and Proportionality" (attached as **Exhibit 15.2**).

115.        From these chronological listings of transactions in the GCC Bank Accounts, I specifically identified the incoming cash transactions reflecting the Subsequent Transfers of BLMIS funds from the Ascot Partners MS Account (as well as the Subsequent Subsequent Transfers from the GCC MS Account to the GCC JPMC Account).  Pursuant to instructions from counsel to the Trustee, I then identified Subsequent Subsequent Transfers of BLMIS funds to, or for the benefit of, Defendant J. Ezra Merkin, based on the same five tracing methods (LIFO, FIFO, LIBR, Restated LIBR and Proportionality).

116.        **Figure 27** depicts generally the pathways through which Subsequent Subsequent Transfers of BLMIS funds took place.

---

[45] In addition, there were transfers from the GCC MS Account to the GCC JPMC Account that I identified as Subsequent Subsequent Transfers of BLMIS funds under each of the five tracing methods.  *See* **Exhibit 16.5**.

[46] The first Subsequent Transfer from the Ascot Partners MS Account to the GCC MS Account that I identified was on December 2, 2003 (*see* **Exhibit 13.4**) and the last monthly bank statement related to the GCC MS Account that the Trustee received from Morgan Stanley is February 2009.

[47] The first Subsequent Transfer from the Ascot Partners MS Account to the GCC JPMC Account that I identified was January 2008 (*see* **Exhibit 13.4**).  However, the first Subsequent Subsequent Transfer from the GCC MS Account to the GCC JPMC Account that I identified was on December 3, 2003 (*see* **Exhibit 16.5**).  In addition, the last monthly bank statement that the Trustee received related to the GCC JPMC Account ends January 12, 2009.

**FIGURE 27**



117.        To identify the transfers that were for the benefit of Defendant J. Ezra Merkin, I reviewed and analyzed the Merkin Defendants' QuickBooks Records, including activity in the "REC - J. EZRA MERKIN" account maintained in the records for Defendant GCC (the "JEM Receivable Account"). I understand that the JEM Receivable Account was maintained to record transfers of funds that were for the benefit of Defendant J. Ezra Merkin and basically functioned as a loan from Defendant GCC to Defendant J. Ezra Merkin.[48] An increase to the JEM Receivable Account reflects a payment from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin. A decrease to the JEM Receivable Account reflects a reduction of the receivable balance (*i.e.*, loan balance) owed to Defendant GCC. Any increase to the JEM Receivable Account was therefore identified as a transfer to, or for the benefit of, Defendant J. Ezra Merkin.

118.        In addition, to determine the transfers to Defendant J. Ezra Merkin, I also reviewed and analyzed the "COMPENSATION – OWNER" account maintained in the records for GCC. This account recorded compensation paid by Defendant GCC to Defendant J. Ezra Merkin (through ADP Payroll Services).

*B.    LAST IN, FIRST OUT ("LIFO")*

119.        Based on applying the LIFO tracing method, as described in **Section IX** above, I identified **$6,351,125** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 28**. *See also* **Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

---

[48] Autera Dep. 91:23-92:6, Oct. 22, 2014; Autera Dep. 262:22-263:8, 326:17-329:3, Oct. 23, 2014.

**FIGURE 28**

| | Subsequent Subsequent Transfers from GCC (*under LIFO*) | | |
|---|---|---|---|
| Time Period | J. Ezra Merkin | For the Benefit of J. Ezra Merkin | TOTAL |
| Since Dec 2003 | $1,238,798 | $11,822,124 | $13,060,921 |
| Two Year Period | $224,508 | $6,126,617 | $6,351,125 |

120.    In addition, I identified $4,752,917 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the LIFO tracing method. *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

121.    **Figure 29** shows the Subsequent Subsequent Transfers of BLMIS funds (again, using the Initial Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts to, or for the benefit of, Defendant J. Ezra Merkin using the LIFO tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 29**



### C.    *FIRST IN FIRST OUT ("FIFO")*

122.    Based on applying the FIFO tracing method, as described in **Section IX** above, I identified **$7,325,524** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 30**. *See also* **Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

**FIGURE 30**

|  | Subsequent Subsequent Transfers from GCC (*under FIFO*) | | |
| --- | --- | --- | --- |
| **Time Period** | **J. Ezra Merkin** | **For the Benefit of J. Ezra Merkin** | **TOTAL** |
| Since Dec 2003 | $2,071,026 | $12,571,273 | $14,642,299 |
| Two Year Period | $188,111 | $7,137,413 | $7,325,524 |

123.      In addition, I identified $13,599,607 of Subsequent Subsequent Transfers of BLMIS funds from the
GCC MS Account to the GCC JPMC Account using the FIFO tracing method. *See* **Exhibit 16.5** for a detailed
list of these transfers by date and amount.

124.      **Figure 31** shows the Subsequent Subsequent Transfers of BLMIS funds (again, starting with the
Initial Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts for the benefit of Defendant J. Ezra
Merkin using the FIFO tracing method and illustrates the pathway through which the Subsequent
Subsequent Transfers of BLMIS funds took place.

**FIGURE 31**



*D.   LOWEST INTERMEDIATE BALANCE RULE ("LIBR")*

125.      Based on applying the LIBR tracing method, as described in **Section IX** above, I identified
**$5,420,503** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of,
Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 32**. *See also* **Exhibit 16** for a
summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these
Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

**FIGURE 32**

| | Subsequent Subsequent Transfers from GCC (*under LIBR*) | | |
|---|---|---|---|
| **Time Period** | **J. Ezra Merkin** | **For the Benefit of J. Ezra Merkin** | **TOTAL** |
| Since Dec 2003 | $1,065,668 | $11,967,337 | $13,033,005 |
| Two Year Period | $ - | $5,420,503 | $5,420,503 |

126.    In addition, I identified $5,155,721 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the LIBR tracing method. *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

127.    Again, using the Initial Transfer of $10 million on 12/29/2006, **Figure 33** shows the Subsequent Subsequent Transfers of BLMIS funds from the GCC Bank Accounts to, or for the benefit of, Defendant J. Ezra Merkin using the LIBR tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 33**



E.    *RESTATED TRACING RULES ("RESTATED LIBR")*

128.    Based on applying the Restated LIBR tracing method, as described in **Section IX** above, I identified **$9,957,970** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 34**. *See also* **Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these Subsequent Subsequent Transfers to, or for the benefit of, Defendant J. Ezra Merkin by date and amount.

**FIGURE 34**

|  | Subsequent Subsequent Transfers from GCC (*under Restated LIBR*) | | |
|---|---|---|---|
| **Time Period** | **J. Ezra Merkin** | **For the Benefit of J. Ezra Merkin** | **TOTAL** |
| Since Dec 2003 | $5,263,334 | $16,595,991 | $21,859,325 |
| Two Year Period | $903,510 | $9,054,460 | $9,957,970 |

129.        In addition, I identified $18,057,895 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the Restated LIBR tracing method. *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

130.        **Figure 35** shows an example of Subsequent Subsequent Transfers of BLMIS funds (again, using the Initial Transfer of $10 million on 12/29/2006) from the GCC Bank Accounts to, or for the benefit of, Defendant J. Ezra Merkin using the Restated LIBR tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 35**



*F.   PROPORTIONALITY*

131.        Based on applying the Proportionality tracing method, as described in **Section IX** above, I identified **$4,746,330** in Subsequent Subsequent Transfers of BLMIS funds from Defendant GCC to, or for the benefit of, Defendant J. Ezra Merkin during the Two Year Period, as summarized in **Figure 36**. *See also* **Exhibit 16** for a summary of these Subsequent Subsequent Transfers and **Exhibits 16.1-16.4** for detailed lists of these Subsequent Subsequent Transfers by date and amount.

**FIGURE 36**

| | Subsequent Subsequent Transfers from GCC (*under Proportionality*) | | |
|---|---|---|---|
| Time Period | J. Ezra Merkin | For the Benefit of J. Ezra Merkin | TOTAL |
| Since Dec 2003 | $2,812,219 | $9,735,800 | $12,548,019 |
| Two Year Period | $292,663 | $4,453,667 | $4,746,330 |

132.        In addition, I identified $8,097,125 of Subsequent Subsequent Transfers of BLMIS funds from the GCC MS Account to the GCC JPMC Account using the Proportionality tracing method. *See* **Exhibit 16.5** for a detailed list of these transfers by date and amount.

133.        **Figure 37** shows an example of Subsequent Subsequent Transfers of BLMIS funds (again, using the Initial Transfer of $10 million on 12/29/2006)  from the GCC Bank Accounts for the benefit of Defendant J. Ezra Merkin using the Restated LIBR tracing method and illustrates the pathway through which the Subsequent Subsequent Transfers of BLMIS funds took place.

**FIGURE 37**



## XI. MANAGEMENT FEES FROM DEFENDANT ASCOT PARTNERS TO DEFENDANT GCC

*A.  OVERVIEW*

134.        Finally, I was asked to determine whether management fees were paid by Defendant Ascot
Partners to Defendant GCC, and if so, quantify the amount of those management fees and identify what
portion of those fees are Subsequent Transfers of BLMIS funds.  I reviewed records related to the Ascot
Partners MS Account, as well as the GCC Bank Accounts, to identify when Defendant Ascot Partners paid
management fees to Defendant GCC and the amounts paid.  I also reviewed the Merkin Defendants'
QuickBooks records to identify the transactions related to management fee payments.  Further, based on the
results of my application of the five tracing methods as described above, I identified the portion of the total
management fees paid by Defendant Ascot Partners to Defendant GCC that are Subsequent Transfers of
BLMIS funds.

*B.  RESULTS OF ANALYSIS*

135.        Based on my review of the available bank records for the Ascot Partners MS Account and the
Merkin Defendants' QuickBooks records, I identified $146,184,547 management fees paid by Defendant Ascot
Partners to Defendant GCC between 1998 to 2008 ($47,706,995 during the Two Year Period), as summarized
in **Figure 38** and **Figure 39**.  These figures also identify the portion of the management fees that are
Subsequent Transfers of BLMIS Funds under each of the five tracing methods that I applied.[49] *See also*
**Exhibits 17** and **17.1**.

---

[49] The earliest Subsequent Transfer of BLMIS funds from the Ascot Partners MS Account to Defendant GCC was in
December 2003.

**FIGURE 38**
**Management Fees Paid By Defendant Ascot Partners to Defendant GCC**
**1998 - 2008**

| Year | Total Fees | Subsequent Transfers of BLMIS Funds Under Each Tracing Method | | | | |
|------|-----------|------|------|------|------|------|
| | | LIFO | FIFO | LIBR | Restated LIBR | Proportionality |
| 1998 | $ 2,637,267 | n/a | n/a | n/a | n/a | n/a |
| 1999 | $ 3,341,820 | n/a | n/a | n/a | n/a | n/a |
| 2000 | $ 3,786,520 | n/a | n/a | n/a | n/a | n/a |
| 2001 | $ 4,094,673 | n/a | n/a | n/a | n/a | n/a |
| 2002 | $ 4,607,053 | n/a | n/a | n/a | n/a | n/a |
| 2003 | $ 18,083,968 | $ 15,616,261 | $ 16,079,576 | $ 15,063,791 | $ 16,629,643 | $ 15,251,454 |
| 2004 | $ 20,872,693 | $ - | $ - | $ - | $ - | $ - |
| 2005 | $ 30,463,559 | $ 21,954,401 | $ 18,805,555 | $ 18,682,489 | $ 22,174,444 | $ 19,529,185 |
| 2006 | $ 26,004,162 | $ 10,000,000 | $ 6,659,256 | $ 8,756,650 | $ 12,624,530 | $ 9,382,854 |
| 2007 | $ 28,292,833 | $ 903,034 | $ 1,092,833 | $ 903,034 | $ 1,092,833 | $ 1,002,147 |
| 2008 | $ 4,000,000 | $ - | $ 4,000,000 | $ 1,735,065 | $ 4,000,000 | $ 2,175,102 |
| **Total:** | **$ 146,184,547** | **$ 48,473,696** | **$ 46,637,220** | **$ 45,141,029** | **$ 56,521,450** | **$ 47,340,743** |

**FIGURE 39**
**Management Fees Paid By Defendant Ascot Partners to Defendant GCC**
**Two Year Period**

| Year | Total Fees | Subsequent Transfers of BLMIS Funds Under Each Tracing Method | | | | |
|------|-----------|------|------|------|------|------|
| | | LIFO | FIFO | LIBR | Restated LIBR | Proportionality |
| 2006[50] | $ 15,414,162 | $ 10,000,000 | $ 5,794,338 | $ 5,794,338 | $ 10,000,000 | $ 7,061,074 |
| 2007 | $ 28,292,833 | $ 903,034 | $ 1,092,833 | $ 903,034 | $ 1,092,833 | $ 1,002,147 |
| 2008 | $ 4,000,000 | $ - | $ 4,000,000 | $ 1,735,065 | $ 4,000,000 | $ 2,175,102 |
| **Total:** | **$ 47,706,995** | **$ 10,903,034** | **$ 10,887,171** | **$ 8,432,437** | **$ 15,092,833** | **$ 10,238,324** |

---

[50] The Two Year Period begins on December 11, 2006.

## XII. SIGNATURE AND RIGHT TO MODIFY

136.    This report and the exhibits contained herein present my findings and the bases thereof.  To the extent that any additional information is produced by any party, I reserve the right to incorporate such additional information into my report or to modify my report as necessary.

By:

*Lisa M. Collura*

Lisa M. Collura, CPA, CFE, CFF

March 20, 2015

## XI. LIST OF EXHIBITS

Exhibit 1        Curriculum Vitae
Exhibit 2        Documents Considered
Exhibit 3        List of Known BLMIS/Bernard L. Madoff Bank and Brokerage Accounts
Exhibit 4        Excel Spreadsheet "JPMC 703 Account Activity – December 1998 to December 2008"
Exhibit 5        Excel Spreadsheet "JPMC 509 Account Activity – December 1998 to December 2008"
Exhibit 6        Excel Spreadsheet "BT 599 Account Activity – December 1998 to May 1999"
Exhibit 7        List of All Cash Transactions in the Merkin Accounts
Exhibit 8.1      Letter from BLMIS Files for Merkin Accounts
Exhibit 8.2      Letter from Merkin Defendants' Produced Documents for Merkin Accounts
Exhibit 9.1      Summary of Receiving Bank Analysis – Merkin Accounts
Exhibit 9.2      Summary of Source Bank Accounts – Merkin Accounts
Exhibit 10       Reconciliation and Tracing Results – Merkin Accounts
Exhibit 11.1     Transfers Between and Among Merkin Funds Bank Accounts
Exhibit 11.2     Transfers Between Merkin Funds Bank Accounts and GCC Bank Accounts
Exhibit 12       Excel Spreadsheet "Ascot Partners MS Account Activity and Analysis"
Exhibit 13       Summary of Subsequent Transfers from Ascot Partners
Exhibit 13.1     Subsequent Transfers from Ascot Partners to Ascot Fund
Exhibit 13.2     Subsequent Transfers from Ascot Partners to Ariel Fund
Exhibit 13.3     Subsequent Transfers from Ascot Partners to Gabriel Capital
Exhibit 13.4     Subsequent Transfers from Ascot Partners to GCC
Exhibit 14.1     Excel Spreadsheet "GCC MS Account Activity and Analysis – LIFO and FIFO"
Exhibit 14.2     Excel Spreadsheet "GCC MS Account Activity and Analysis – LIBR, Restated LIBR and
                 Proportionality"
Exhibit 15.1     Excel Spreadsheet "GCC JPMC Account Activity and Analysis – LIFO and FIFO"
Exhibit 15.2     Excel Spreadsheet "GCC JPMC Account Activity and Analysis – LIBR, Restated LIBR and
                 Proportionality"
Exhibit 16       Summary of Subsequent Subsequent Transfers from GCC Bank Accounts
Exhibit 16.1     Subsequent Subsequent Transfers from GCC MS Account to Defendant J. Ezra Merkin
Exhibit 16.2     Subsequent Subsequent Transfers from GCC MS Account For the Benefit of Defendant J. Ezra
                 Merkin
Exhibit 16.3     Subsequent Subsequent Transfers from GCC JPMC Account to Defendant J. Ezra Merkin
Exhibit 16.4     Subsequent Subsequent Transfers from GCC JPMC Account For the Benefit of Defendant J.
                 Ezra Merkin
Exhibit 16.5     Subsequent Subsequent Transfers from GCC MS Account to GCC JPMC Account
Exhibit 17       Summary of Management Fees Paid from Ascot Partners to GCC
Exhibit 17.1     Detail of Management Fees Paid from Ascot Partners to GCC