# Exhibit B

```
 1
 2           UNITED STATES DISTRICT COURT
 3           SOUTHERN DISTRICT OF NEW YORK
 4    ----------------------------------x
      In re:                              SIPA LIQUIDATION
 5
      BERNARD L. MADOFF INVESTMENT        No. 08-01789(BRL)
 6    SECURITIES LLC,
 7                                        (Substantively
                                          Consolidated)
 8                Debtor.
      ----------------------------------x
 9    IRVING H. PICARD, Trustee of the
      Liquidation of Bernard L. Madoff
10    Investment Securities LLC,
11                Plaintiff,
                                          Adv. Pro. No.
12         vs.                            09-01182(BRL)
13    J. EZRA MERKIN, GABRIEL
      CAPITAL, L.P., ARIEL FUND LTD.,
14    ASCOT PARTNERS, L.P., GABRIEL
      CAPITAL CORPORATION,
15
                  Defendants.
16    ----------------------------------x
17
18     VIDEOTAPED DEPOSITION OF LISA M. COLLURA
19              New York, New York
20                June 18, 2015
21
22
23    Reported by:
24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25    JOB NO. 94537
```

Page 56

1                    LISA M. COLLURA

2    equity -- the results of the net equity

3    calculation.

4             MS. ARCHER:  Let's take a break for a

5        few minutes at this point.

6             MR. SONG:  Sure.

7             THE VIDEOGRAPHER:  The time is 1:37

8        p.m.  We're going off the record.

9             (Recess.)

10            THE VIDEOGRAPHER:  The time is 1:52

11       p.m.  We're back on the record, video number

12       2.

13   BY MS. ARCHER:

14       Q.   Ms. Collura, can I direct you to your

15   report, paragraph 15, page 5.  Actually, before

16   we -- before we go there, go to paragraph 19 on

17   page 6, the bottom of page 6.

18            Are you there?

19       A.   Uh-huh.

20       Q.   Okay.  Now, you state, "My team and I

21   reconciled 99 percent of the approximately

22   225,000 cash deposit and withdrawal

23   transactions," et cetera, and then you go on to

24   say, "The remaining 1 percent that we were

25   unable to reconcile consists primarily of

1            LISA M. COLLURA

2     withdrawal transactions for which copies of the

3     related canceled checks were not available."

4            Based on the results -- you say,

5     "Based on the results of our reconciliation of

6     99 percent of cash transactions, I can

7     reasonably infer that my team and I would have

8     been able to reconcile these withdrawal

9     transactions had copies of the related canceled

10    checks been available."

11           Why is that a reasonable inference?

12       A.   Because for every time that we did

13    have a copy of a canceled check, it -- it

14    reconciled to a cash transaction on the

15    customer's statement.  So, based on that result,

16    I can reasonably infer that if I were to have

17    copies of canceled checks for the remaining 1

18    percent, that those would also indeed reconcile.

19       Q.   Those are separate transactions that

20    you didn't have canceled checks for, correct?

21       A.   Correct.

22       Q.   So it's possible that they would not

23    have reconciled?

24       A.   Based on everything that I looked at,

25    I would -- it would be highly unlikely that they

Page 58

1                LISA M. COLLURA
2    would not reconcile.
3         Q.    Why?
4         A.    Because of all over 200,000
5    transactions that did reconcile where we did
6    have a record, I would -- it's a reasonable
7    inference in my mind that if I were to have a
8    copy of the canceled check, it would also
9    reconcile.
10        Q.    But it's possible that it would not
11   have reconciled?
12              MR. SONG:  Object to the form.
13        Q.    You don't know one way or the other,
14   correct?
15        A.    I would say it's highly unlikely that
16   it would not reconcile.
17        Q.    But you don't know one way or the
18   other?
19              MR. SONG:  Object to the form.
20        A.    I don't know because I don't have a
21   copy of the canceled check, but if I had it, I
22   would say that it would reconcile.
23        Q.    Have you ever had situations where
24   some transactions had reconciled and some didn't
25   when you were reviewing transfers in connection

1                LISA M. COLLURA

2    with an investigation?

3        A.    Reconciled to what?

4        Q.    To bank statements and canceled

5    checks.

6        A.    Can you be more specific about an

7    instance?

8        Q.    You were reconciling transactions here

9    by looking at the bank statements and canceled

10   checks, and you were verifying the variety of

11   transactions, correct?

12       A.    Correct.

13       Q.    Have you had other situations where

14   you have conducted an investigation and found

15   that some transactions have reconciled and some

16   have not?

17       A.    To BLMIS bank records?

18       Q.    Or other ones.  It doesn't have to be

19   limited to your work on BLMIS.

20       A.    Where there was a discrepancy?

21       Q.    Yes.  There are times where you find a

22   discrepancy, correct?

23       A.    In reconciling to -- to transactions

24   on customer statements to bank records?

25       Q.    Yes.

1   LISA M. COLLURA

2   A.   I mean, in this case, in my overall
3   reconciliation for the times that we had bank
4   records, I didn't find discrepancies.
5   Q.   But there were some bank records that
6   were not available and, therefore, you were not
7   able to complete a reconciliation?
8   A.   Correct, that's what's listed here.
9   Q.   And so that's where you drew your
10  inference that, regardless of the fact that you
11  didn't have certain records before a certain
12  time period, you believed that it all would have
13  reconciled?
14  A.   That's correct.
15  Q.   But again, you have no way of knowing
16  one way or the other whether it would have?
17       MR. SONG:   Object to the form.
18  Q.   Of being certain?
19  A.   I can't be certain without the
20  documents.
21  Q.   Looking at paragraph 15 in your report
22  on the prior page, toward the bottom of the
23  page, you say, "I understand from counsel to the
24  trustee that there are several tracing methods
25  available within the court's discretion to trace

Page 67

1        LISA M. COLLURA

2  different because LIFO and FIFO are really more

3  of an accounting method, and so I knew that from

4  my training and education and background in

5  accounting.

6            The restated tracing rules was

7  specifically based on the restatement that I

8  have included in my Exhibit 2 that I reviewed

9  and interpreted for purposes of this report.  I

10 wasn't familiar with that prior to this case.

11           And proportionality really is, in my

12 mind, a pretty straightforward application of

13 the tracing method, so I didn't need to do

14 further research on that.

15      Q.   Have you ever used the FIFO tracing

16 methodology previously?

17      A.   For tracing?

18      Q.   Yes.

19      A.   No, just in -- in accounting.

20      Q.   And in what way have you either used

21 it or come across it in your accounting

22 background?

23      A.   It was when I was auditing back in

24 my -- the time when I was working for Deloitte &

25 Touche.

1              LISA M. COLLURA
2      Q.    Is the same true for LIFO?
3      A.    Yes.
4      Q.    Have you used or incorporated LIFO or
5   FIFO in connection with any of your prior
6   engagements as an expert?
7      A.    No, I have not.
8      Q.    In connection with any of your fraud
9   investigations?
10     A.    No, I don't believe I have.
11     Q.    Have you ever used the proportionality
12  tracing method previously?
13     A.    No.
14     Q.    Have you used proportionality in
15  connection with any of your work at FTI?
16     A.    I think the concept of proportionality
17  I would say that I have used in the past, not in
18  the same scenario of tracing subsequent
19  transfers, but the concept of applying things
20  proportionate is -- I would say I've used in my
21  practice in other cases.
22     Q.    Can you give me an example of how you
23  would have used it in another case?
24     A.    I'm trying to think if something
25  was -- I used something in the Refco matter.  I

Page 69

1                LISA M. COLLURA
2    can't think of a good example now.
3        Q.    So none of your prior expert reports
4    or testimony have involved either FIFO or LIFO
5    or proportionality as a tracing method?
6        A.    Correct.
7        Q.    What about what you have identified as
8    LIBR, have you employed that previously in
9    connection with any of your work at FTI?
10       A.    Not in the form of an expert report,
11   no.
12       Q.    Otherwise, other than an expert
13   report, have you used the LIBR method?
14       A.    I have looked into the use of LIBR in
15   other -- in other cases.  If I remember, though,
16   it was more discussions with my colleagues in
17   having them apply it in the case that they were
18   working on, so it was -- you know, I have
19   certainly come across the LIBR method.  I
20   personally had never applied it to bank account
21   activity, but I was aware of it, and through
22   discussions with my colleagues, you know, I
23   certainly was aware of the tracing method.
24       Q.    So it wasn't the first time you heard
25   of LIBR was from the trustee's counsel?

Page 70

1                LISA M. COLLURA

2     A.    Correct.

3     Q.    What about restated LIBR, when was --
4  were you familiar with that term and methodology
5  before your work on this matter?

6     A.    No, I was not.

7     Q.    Had you ever heard the term "restated
8  LIBR"?

9     A.    No.

10    Q.    I'm going to direct your attention to
11 paragraph 96 in your report.  It starts on page
12 34.

13          In the second sentence of that
14 paragraph, you state, "I have assumed that the
15 BLMIS funds are equivalent to the trust or
16 secured funds referred to in my explanation of
17 LIBR above."

18          Can you tell me why you made that
19 assumption?

20    A.    My understanding is that LIBR is a
21 method that's used to determine who has rights
22 to the balance in an account, or in my -- an
23 example of that is to -- for a trust fund, for
24 example, or if there's secured parties that have
25 certain rights to funds, and my understanding of

Page 74

1            LISA M. COLLURA

2       A.    No, I did not.

3       Q.    Did you ask the trustee's counsel any

4  questions about that?

5       A.    I don't recall having those

6  discussions, no, not specifically.

7       Q.    Did you understand, before you

8  conducted your application of the different

9  methodologies, that the restated LIBR would

10 reach a different result than the LIBR method?

11           MR. SONG:  Object to the form.

12      A.    I didn't have that in my mind when I

13 applied the different methods, but after

14 applying them, they came up with two different

15 results.

16      Q.    Do you intend to offer an opinion in

17 this matter that any one of the methodologies is

18 more appropriate than the others?

19      A.    No.

20      Q.    Do you intend to offer any opinion

21 that one or more of the methodologies is less

22 appropriate than the others?

23      A.    No.

24      Q.    Do you have an opinion on that?

25      A.    No, I was not asked to opine on that.