**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>DEFENDANTS IN THE ADVERSARY PROCEEDINGS IDENTIFIED ON EXHIBIT A,<br><br>Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO NOTICES OF REQUEST TO DEPOSE BERNARD L. MADOFF ON DAY 2 DEPOSITION TOPICS

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

I.      PROCEDURAL HISTORY...............................................................................................2

II.     FACTUAL BACKGROUND ...........................................................................................5

           1.     The 1992 Issue .....................................................................................5

           2.     Treasuries.............................................................................................8

           3.     Trading Records..................................................................................10

III.    LEGAL STANDARD....................................................................................................12

IV.    ARGUMENT ................................................................................................................13

      A.     Additional Testimony Would be Cumulative and Unnecessarily
              Duplicative ...............................................................................................13

      B.     Topics About Which Madoff Lacks Knowledge And For Which
              Relevant Information Is Best Sought From Other Witnesses....................15

      C.     Topics That Are Not Relevant to the Issues Before the Court .................19

      D.     The Loeb Parties' Request to Participate in Madoff's Deposition is
              Untimely ...................................................................................................20

CONCLUSION.............................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*287 Franklin Ave. Residents' Ass'n v. Meisels*,
No. 11-cv-976, 2012 WL 1899222 (E.D.N.Y. May 24, 2012) ................................................19

*Braham v. Lantz*,
No. 08-cv-1564, 2011 WL 4809032 (D. Conn. Oct. 11, 2011) ........................................18, 20

*Chen-Oster v. Goldman, Sachs & Co.*,
293 F.R.D. 557 (S.D.N.Y. 2013) ............................................................................................12

*Copantitla v. Fiskardo Estiatorio, Inc.*,
No. 09-cv-1608, 2010 WL 1327921 (S.D.N.Y. Apr. 5, 2010) ................................................20

*Harris v. Best Buy Stores, L.P.*,
No. 15-cv-00657, 2015 WL 6085307 (N.D. Cal. Oct. 16, 2015) ...........................................15

*Houghtaling v. Tirado-Montes*,
No. 8:03-cv-2733, 2008 WL 2385511 (M.D. Fla. June 9, 2008) ...........................................12

*Miller v. Bluff*,
131 F.R.D. 698 (M.D. Pa. 1990).............................................................................................12

*Sahu v. Union Carbide Corp.*,
262 F.R.D. 308 (S.D.N.Y. 2009) ............................................................................................19

**Statutes**

Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* .........................................................1

**Rules**

Fed. R. Civ. P. 26 ............................................................................................ *passim*

Fed. R. Civ. P. 30 .........................................................................................................2, 12

Plaintiff Irving H. Picard, as trustee (the "Trustee") under the Securities Investor

Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.,* for the substantively consolidated

liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the

estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel respectfully

submits this Memorandum of Law in Opposition to the Notices of Request to Depose Bernard L.

Madoff on Day 2 Deposition Topics[1] filed by the Participating Customers and parties

represented by Loeb & Loeb (the "Loeb Parties" together with the Participating Customers, the

"Requesting Parties"), and the Declaration of David J. Sheehan in Support of this Memorandum

of Law (the "Sheehan Decl.").

## PRELIMINARY STATEMENT

This Court permitted the deposition of Bernard L. Madoff for the purpose of exploring

whether Madoff operated a Ponzi scheme prior to 1992 (the "1992 Issue"). When Madoff's

deposition was ordered by this Court on September 29, 2016 (the "Madoff Deposition Order"),[2]

it was approved on a set of topics surrounding the 1992 Issue (the "Day 1 Deposition Topics").

The Madoff Deposition Order permitted seven hours of testimony on the Day 1 Deposition

Topics. However, after three full days of testimony and more than eight months after Madoff's

deposition was ordered, "Day 1" finally concluded on April 27, 2017.

Recently, several requests for Day 2 Deposition Topics (the "Proposed Day 2 Topics")

were filed. Of the Proposed Day 2 Topics, the Trustee does not object to questioning concerning

statements made by Madoff in connection with his December 16, 2008 proffer agreement

memorialized by the Federal Bureau of Investigation ("FBI") form FD-302 ("302 Statement").

---

[1] *See SIPC v. BLMIS*, No. 08-01789 (SMB), ECF Nos. 16099, 16101, 16104, 16105, 16106, and 16110) (the "Notices of Request"). For convenience, all ECF record citations will be to the main bankruptcy case 08-01789 unless otherwise noted.
[2] ECF No. 14213. Capitalized terms used but not defined herein shall have the meaning ascribed in the Madoff Deposition Order.

The FBI did not produce that statement in time for the Trustee's cross-examination of Madoff at the final day of Day 1 Deposition Topics questioning, and the parties agree that Madoff should be further questioned about the 302 Statement now. All other Proposed Day 2 Topics should be prohibited ("Disputed Topics") because they run afoul of the limits on discovery imposed by Federal Rules of Civil Procedure 26 and 30.

First, certain Disputed Topics have already been or could have been covered during Day 1 of Madoff's deposition. Other Disputed Topics seek testimony on areas that Madoff has already admitted he has no knowledge of and that concern information best sought from other witnesses. As to the remaining Disputed Topics, Requesting Parties fail to articulate a basis for discovery on these topics. At bottom, the requests broadly seek much of the same testimony sought in connection with Madoff's Day 1 deposition, and rely on sweeping topics such as how BLMIS conducted its market-making, propriety trading, and investment advisory business units for all periods of time. Finally, in addition to rejecting the Loeb Parties' request for the reasons stated herein, they also do not have standing to participate in the Day 2 Deposition because they are not Participating Customers as defined by the Madoff Deposition Order.

Madoff's deposition should not be used as a platform to further delay resolution of the 83 cases involved in the Madoff deposition. After three days of testimony more than seven years after the commencement of these cases, the Participating Customers must—at a minimum—articulate a valid basis as to how the requested additional testimony is relevant and proportionate to their affirmative defenses pursuant to Federal Rule of Civil Procedure 26. Otherwise, it remains a mere fishing expedition.

## I.    PROCEDURAL HISTORY

The Participating Customers' request to depose Madoff in connection with the BLMIS fraud was initially addressed by this Court nine months ago at an August 24, 2016 hearing

("August 24th Hearing") on the Motion For An Order Authorizing the Deposition of Bernard L.

Madoff.[3]  At that hearing, Ms. Chaitman raised two general areas of inquiry on which Madoff

could testify: (1) when the Ponzi scheme actually began; and (2) and the scope and extent of the

Ponzi scheme.[4]  The Court also agreed that certain questions about account statements could be

asked at Madoff's deposition, as well as other recordkeeping questions, including with respect to

documents showing allocations or trades to particular accounts that may have evidenced

legitimate trades after the Ponzi scheme started.[5]

On September 29, 2016, the Court entered the Madoff Deposition Order, which

established the Day 1 Deposition Topics.[6]  The order further provides a procedure for the Court

to consider permitting additional testimony following the conclusion of Day 1.[7]  The Day 1

Deposition Topics identified in the Madoff Deposition Order include:

- The trading activities of Madoff's market making, proprietary trading, and investment advisory units during the period prior to January 1, 1992 and thereafter.
- The number of employees, profitability, and revenue-generating activities of each Madoff unit in the period prior to January 1, 1992 and thereafter.
- The nature, extent and scope of Madoff's legitimate and illegitimate activities at various time periods, including *inter alia*, when Madoff began operating a "Ponzi" scheme and how it came about that he began operating a "Ponzi" scheme and which trading strategies were involved with legitimate or illegitimate activities.
- The record-keeping procedures of each unit of Madoff's operations, including but not limited to records indicating the purported purchase and sale of securities and the purported allocation of securities to investment advisory customers and how Madoff's account records can be interpreted.[8]

Madoff's testimony on the Day 1 Deposition Topics lasted three days.  Madoff was

deposed by the Participating Customers on December 20, 2016, and the majority of April 26,

---

[3] Mot. for Leave to Depose Madoff, July 7, 2016 (ECF No. 13603).
[4] Hr'g Tr. Aug. 24, 2016 at 11:6-9 (ECF No. 13967).
[5] *Id.* at 26:7-27:25.
[6] *See* Madoff Deposition Order at 2–3.
[7] *Id.*
[8] *Id.* at 2-3.  The Madoff Deposition Order lists seven Day 1 topics.  They have been summarized here for ease of reference.

2017.  Trustee's counsel cross-examined Madoff for a limited time on April 26, 2017.  On April

27, 2017, Madoff was further cross-examined by Trustee's counsel, and the Participating

Customers conducted redirect examination.  Both parties concluded their examination on the

Day 1 Deposition Topics on April 27, 2017.

The Participating Customers addressed topics permitted under the Madoff Deposition

Order.  Several questions, however, appeared designed to expand the areas of inquiry beyond the

scope of the 1992 Issue and what was contemplated when the Madoff Deposition Order was

entered.

On May 30 and 31, the Requesting Parties identified the following Proposed Day 2

Topics:[9]

> 1.    The extent to which Madoff or Bernard L. Madoff Investment Securities
>       LLC bought, sold, and held actual securities shown on the customer
>       statements.
>
> 2.    The extent to which Madoff or BLMIS used customer funds to purchase
>       securities shown on the customer statements.
>
> 3.    The indemnification agreements Madoff had with the Four Families.
>
> 4.    Interpretation of Madoff's or BLMIS's account records sent to customers,
>       including the Defendants.
>
> 5.    Areas of inquiry specific to the Defendants' accounts held with Madoff
>       and BLMIS, including, without limitation, the history of those accounts
>       and the extent to which Madoff and BLMIS were directed to and did buy,
>       sell, and hold actual securities on behalf of the Defendants, including
>       through the use of margin.
>
> 6.    The involvement of various Madoff personnel in the handling of each
>       Defendant's account.
>
> 7.    Madoff's relationship with FISERV.

---

[9] *See* ECF Nos. 16099, 16101, 16104, 16106, 16110.  Of the five notices filed by the Requesting Parties, the Trustee
has identified nine unique topics.  Because the requests filed by Dentons US LLP, Hunton and Williams,
McDermott Will & Emery, and Loeb & Loeb each contain reference to requests filed by other Requesting Parties,
the Trustee treats each of the Proposed Day 2 Topics as filed by the entire population of Requesting Parties.

4

8.    Other questions that may arise as Defendants' counsel reviews the hundreds of thousands of pages of Madoff trading records that were first produced by the Trustee in 2017.

9.    The redacted FBI 302 recently produced by the Trustee.

## II.    FACTUAL BACKGROUND

A brief background regarding the 1992 Issue, Treasury securities, and trading records may provide context for the Court's determination of the Day 2 Deposition Topics. A summary of each is discussed below.

### 1.    The 1992 Issue

In the summer of 2016, Ms. Chaitman initially sought Madoff's deposition to explore his claim that he began the fraud in the early 1990s.[10] Now, Ms. Chaitman appears to have abandoned the 1992 Issue and attempted to mischaracterize Madoff's testimony to support her current request to go far beyond the inquiry contemplated in the Madoff Deposition Order and preceding hearings on the 1992 Issue. Ms. Chaitman pursued lines of questioning seemingly aimed at the idea of challenging the $65 billion fraud and related insolvency at BLMIS beyond the 1992 Issue. For example, contrary to Madoff's actual testimony, Ms. Chaitman stated "Mr. Madoff, you've testified that the investment advisory fraud did not begin until either late 1993 or early 1994"[11] and "[d]id you believe that the focus reports were accurate prior to 1994 when you stopped buying the split strike securities?"[12] Ms. Chaitman's version of events, delivered through her own statements are clearly inadmissible, and distort the record in this case. Even

---

[10] *See* Defendants' Memorandum of Law in Support of Motion for an Order Authorizing the Deposition of Bernard L. Madoff at 3 (ECF No. 13605). Ms. Chaitman requested Madoff's deposition to inquire into the "factual dispute" with the Trustee regarding the start date of the fraud, and to support the legal argument that the Trustee "is bound by the statement balances of each defendant through January 31, 1991." Ms. Chaitman based her assertion on Madoff's plea allocution where he stated that he "began the fraud in the 1990s," Madoff's deposition in another matter where he simply agreed with Ms. Chaitman, who claimed the fraud started in 1992; and the plea allocution of former BLMIS employee Frank DiPascali, who stated that he first became aware of the fraud at BLMIS in the "late 1980s or early 1990s." *Id.* at 3-4.
[11] Sheehan Decl. Ex. 2, Deposition of Bernard L. Madoff dated April 26, 2017 (the "Madoff Apr. 26 Dep.") 81:21-23.
[12] *Id.* 91:3-5.

Madoff took a moment to instruct Ms. Chaitman that her newest and latest theory that the fraud

began *after* 1992 was wrong:

> And you see, you're using the '94, '93, '92, so I want to make sure
> there. I said that the fraud began in '92 because that was when we
> weren't completing all of the transactions in this split strike. All
> right. There was some - - there were some transactions in the split strike
> done, you know, through 1993. All right. **But I'm not comfortable
> saying that everything was done . . . I'm comfortable saying that
> everything was done correctly, you know, prior to '92.**[13]

In fact, Madoff admitted during his deposition that he began committing fraud at BLMIS

at least by the 1980s in connection with backdated trades and, potentially, filing fraudulent

financial statements.[14]  His testimony on whether BLMIS's financial statements were accurate is

similarly inconsistent.  After Madoff told Ms. Chaitman that the FOCUS reports (a mandatory,

periodic SEC filing) accurately reported, *inter alia*, BLMIS's assets and liabilities through

1992,[15] Madoff contradicted himself during cross-examination:

> Q: I believe your testimony was, and correct me if I'm wrong, prior to
> 1992 your FOCUS reports were always accurate?
> A: No.
> ***
> Q: . . . I'm pretty sure your testimony was that prior to 1992 all of your
> FOCUS reports were accurate.  Is that true?
> A: Okay.
> Q: Is that true?
> A: No.
> Q: And what about your FOCUS reports prior to 1992 would not have
> been true?

---

[13] *Id.* 91:6-12.

[14] *See, e.g.,* Deposition of Bernard L. Madoff dated December 20, 2016 (the "Madoff Dec. 20 Dep.") 15:5-17:24 (Q:
Mr. Madoff, can you tell us in your own words whether you had ever - - prior to the split-strike conversion strategy
ever misrepresented a purchase or a sale on a customer's statement so that the customer was misled? A: Yes. Q:
When? A: . . . after the market crashed in 1987, certain customers that were not doing the split-strike conversion
strategy . . . It was a violation for probably the SEC regulations on my part, but it was not a fraud.").

[15] Madoff Apr. 26 Dep. 92:1-6 ("[Madoff]: Focus reports were accurate through 1992 for sure. Q: Through 1992? A:
Yes.").

> A: The customer debit - - the customer debit balances and credit
> balances.[16]

Similar to his inconsistent testimony about BLMIS's financial statements, Madoff's testimony

regarding what constitutes "fraud" is also unreliable.  Indeed, when asked whether making

misrepresentations to customers is fraud, he responded "Well, depends upon how you define

fraud."[17]

The Trustee maintains his position that Madoff's testimony regarding the 1992 Issue is

belied by the evidence demonstrating the Ponzi scheme began far earlier than 1992.  Not only is

Madoff's testimony on the 1992 fraud start date contradicted by contemporaneous documents

and statements from former BLMIS employees and their plea allocutions, it is contradicted by

his own prior statements.  On May 23, 2017, the United States Attorney for the Southern District

of New York produced a copy of the 302 Statement to the Trustee.[18]  The 302 Statement was

prepared by the FBI to memorialize a proffer session between Madoff, the FBI, the U.S.

Attorney's Office, and other interested parties held on December 16, 2008—days after Madoff's

arrest.  The 302 Statement details the start date of the fraud as beginning soon after Madoff

began his retail business, stating:

> The fraud entailed MADOFF taking in funds from investors, holding those
> funds, and paying them out to investors seeking redemptions.  It was
> essentially a Ponzi scheme.  Customers received both monthly account
> statements and trade confirmation reflecting trades th[at] never took place.
> **MADOFF began engaging in fraud in earnest in the 1970s**.  The 1980s
> saw a large expansion in the retail (i.e. fraudulent) portion of the business.
> **As there was no actual trading, nothing cleared through DTCC or any**

---

[16] Sheehan Decl. Ex. 3, Deposition of Bernard L. Madoff dated April 27, 2017 (the "Madoff Apr. 27 Dep.") 331:8-332:3.

[17] Madoff Apr. 26 Dep. 16:25.  *See also* Madoff Dec. 20 Dep. 149:10-19 ("Q. Okay.  So what you're saying is that the fact that the split-strike conversion strategy was carried out from sometime in 1992 until December of 2008 without your actually owning the securities that showed up on the statements, that was not a fraud, but the fraud was that you didn't disclose to the SEC on your focus reports— A.  That's correct. Q. – that you had debt? A. Right.").

[18] The United States Attorney's Office originally produced a more redacted version of the 302 on May 17, 2017. *See* Letter dated May 17, 2017 (ECF No. 16046-3).  The current version, with fewer redactions, was produced on May 23, 2017.  *See* Letter Dated May 23, 2017 (ECF No. 16046-4).

**clearing firm, and the only records of the purported trades are paper confirmations.**[19]

Thus, days after Madoff's Ponzi scheme was revealed, he admitted the fraud began "in earnest in the 1970s" to federal authorities under the auspices of a proffer agreement.[20]  The only evidence supporting the Requesting Parties' contention that the BLMIS fraud began in or after 1992 is the testimony of a witness who admits to lying for a living.[21]  Aside from Madoff's contradictory statements, Ms. Chaitman offers no evidence to support her theory that the fraud began in 1992.  In fact, Ms. Chaitman has conceded that BLMIS was a fraud beginning, at the latest, in 1992:  "[o]nce Mr. Madoff says the fraud started in 1992, I'm not going to argue that it started later.  Right.  So I'm only focusing on the period prior to 1992."[22]

### 2.    Treasuries

Ms. Chaitman has also been attempting to advance the theory that BLMIS purchased United States Treasury securities ("Treasuries") using customer property and argues that Madoff's testimony supports this theory.[23]  Relying on a compilation of Bloomberg screenshots, she surmises that the Treasuries were purchased by BLMIS and match Treasuries reflected on unspecified customer statements.[24]  Madoff's testimony during his deposition does not bear out this theory.  Rather, Ms. Chaitman's representations about BLMIS's use of Treasuries are grounded in her own unsupported assumptions, not Madoff's testimony.

---

[19] 302 Statement at 4 (emphasis added).  A copy of the 302 Statement is appended to the Trustee's Letter Dated May 23, 2017, ECF No. 16046-2.

[20] *Id.*

[21] *See* Madoff Apr. 27 Dep. 366:13-18 (Q: Mr. Madoff, for the last 16 years of your professional life by your own admission you lied for a living; isn't that true? A: For the last 16 years, yeah. Q: Yeah. You lied for a living? A: Yeah.).

[22] Sheehan Decl. Ex. 4 (Excerpts from December 13, 2016 Arbitration Transcript at 221:18-21).

[23] *See* Hr'g Tr. May 31, 2017 at 14:10-16:20.

[24] *Id.* 15:1-16:20 ("He testified that he instructed the people on the 17th floor to maintain a portfolio of $6 billion of Treasury securities.  We've been able to match up some of those Treasury securities to the customer statements, it's a massive process.")

8

Ms. Chaitman questioned Madoff at length about these purported Treasury transactions

on April 26, 2017.[25]  She showed Madoff several documents that purportedly reflect purchases of

Treasury securities.[26]  At no point did Madoff confirm that the Treasuries were actually

purchased and allocated to IA business customers.  Indeed, Madoff explained the purpose of

investing cash in Treasuries as "we would never keep the money in cash.  So if we weren't

buying the securities, we would put it into . . . treasuries."[27]  He explained that the Treasuries

were held to maturity and then "rolled over" into new investment.[28]  And when asked whether an

exemplar purchase of Treasuries would have been held for the benefit of an investment advisory

customer, Madoff stated "it would have been held at the firm for the benefit of the firm.  We

didn't segregate, you know, these securities."[29]  Ms. Chaitman has not produced a single

example of a trade reflected on a customer statement that correlates to any purported Treasury

purchase or sale.

Similarly, Ms. Chaitman represented at the hearing on May 31, 2017, that BLMIS held

accounts aggregating in value of $6 billion in Treasuries.[30]  When first asked about this issue at

his deposition, Madoff surmised that he held up to $500 million in Treasuries each of five firms,

which Madoff testified was the maximum permitted.[31]  When answering Ms. Chaitman's

question "to the best of your recollection at any given time, how much investment advisory

customers' money was held in U.S. treasuries," Madoff responded based on his computation: if

---

[25] *See, e.g.,* Madoff Apr. 26 Dep. 19:9-20:1; 27:23-30:4; 38:11-44:22; 46:3-47:12; 65:17-67:11; 70:4-74:4; 100:20-102:6.

[26] *Id.* 38:20-44:15.

[27] *Id.* 44:8-15.

[28] *See id.*

[29] *Id.* 39:24-40:6.

[30] Hr'g Tr. May 31, 2017 14:10-16:20.

[31] Madoff Apr. 26 Dep. 46:20-47:7 ("[Treasuries] were rarely sold unless they matured and then we repurchased, you know, different, you know, Treasury bills.  Yes, I mean, for the most part the monies in those accounts built and became you know, more and more up to the maximum, which was, I think, $500 million pretty much in each account.")

9

$500 million each was held at 5 firms, then the total outstanding would be $2.5 billion.[32]

However, he later provided a much larger figure without explaining how he could exceed what

he described as the maximum allotment of Treasuries per financial firm, stating:

> [w]ell, I would say basically the maximum that we had was between five
> firms we had about two-and-a-half billion dollars between Morgan
> Stanley, Lehman Brothers, Bear Stearns and Fidelity. Was that five firms?
> Four firms. And JP Morgan. . . . So I would say probably the maximum
> was probably about $6 billion held in treasuries.[33]

Madoff's testimony on this point is inconsistent at best, and demonstrates that what Ms.

Chaitman represents to this Court as clear-cut testimony from Madoff is anything but.  Ms.

Chaitman's claim that BLMIS held $6 billion in Treasuries is based on Madoff's less-than-clear

testimony.  In any event, as Madoff admitted, a few billion dollars in treasuries held for the

benefit of BLMIS pales in comparison to Madoff's admission that he owed his customers $60

billion when BLMIS collapsed.[34]

### 3.    Trading Records

The Requesting Parties identified as proposed Day 2 Deposition Topic number 8

questions concerning "trading records" produced by the Trustee in 2017.  Because BLMIS was

operated as a Ponzi scheme, a "trading record" as it relates to BLMIS is a record that reflects

verifiable trading activity.  For the market-making and proprietary trading business, BLMIS did

conduct actual securities trades, which is confirmed by third-party data, including data from the

Depository Trust & Clearing Corporation ("DTCC").  Years ago, in connection with Ms.

Chaitman's request for such documents, the Trustee produced and/or made available in E Data-

Room 1 all available third-party documents reflecting verifiable trading conducted by the

market-making and proprietary trading businesses that were obtained from the third parties or

---

[32] *Id.* 28:4-14.
[33] *Id.* 28:4-11.
[34] *Id.* 28:23–25.

were in the possession of BLMIS.  However, the Trustee never located similar records for IA

customers for any period of time.

In addition to those earlier documents made available, the Trustee produced additional

DTCC records and other documents yielded from a broad search for related records,[35] though

many similar records were already provided in E-Data Room 1.[36]  These records do not relate to

the IA business, the only arm of BLMIS of which the Requesting Parties were customers.

Although Ms. Chaitman seems to characterize BLMIS reports reflecting purported

trading activity in the  IA business as "trading records," they are not.  The books and records of

BLMIS do not evidence actual trading for the IA business, nor has the Trustee found DTCC or

other third party records corresponding to trades purportedly executed by the IA

business.   Indeed, Madoff confirmed this absence of evidence of actual trading for the IA

business, as reflected in his 302 Statement:

> As there was no actual trading, nothing cleared through DTCC or any
> clearing firm, and the only records of the purported trades are paper
> confirmations.[37]

Notwithstanding this fact, in response to Ms. Chaitman's continued requests, the Trustee

restored microfilm reels that the Trustee identified as likely containing information regarding

trading in the pre-1992 period.  In connection with this project undertaken in late 2016 and early

2017, the Trustee has provided thousands of additional records from the restored microfilm reels

on a rolling basis as new microfilm became available.  In addition to Madoff's own admissions,

---

[35] *Id.* The Trustee has also provided to Ms. Chaitman an index of all BLMIS hard copy documents and electronic
media found at BLMIS.  Ms. Chaitman has not identified any specific documents from these indices that she claims
the Trustee has failed to produce.
[36] *Id.*  This production consisted of 95 NSCC reports found within the BLMIS hard copy data, but that appear to
include third-party data, and 18,306 additional documents responsive to the search terms "Depository Trust" or
"National Securities."  Of the 95 NSCC reports, two were already provided in E-Data Room 1, and of the documents
from the word search, 2,264 of 18,306 were available in E-Data Room 1.
[37] 302 Statement at 4.

these more recent productions support the Trustee's position that: (i) the IA business did not conduct actual securities trading, and (ii) that no trading reports with confirmable third party data for the IA business exists.

## III.    LEGAL STANDARD

The deposition of a person confined in prison may only be taken with leave of court on such terms as the court prescribes.  Fed R. Civ. P. 30(a)(2)(B); *see Miller v. Bluff*, 131 F.R.D. 698, 699-700 (M.D. Pa. 1990).  In considering a motion for leave to depose an incarcerated deponent, the court considers the limitations placed on discovery as outlined in Rule 26(b)(2), which permits limitations on depositions in three circumstances: (1) the deposition requested is unreasonably cumulative or duplicative, or if the information sought is obtainable from some other more convenient source; (2) the party seeking the deposition has had ample opportunity to obtain the information sought; or (3) the proposed discovery is outside the scope permitted by Rule 26(b)(1).[38]  Fed. R. Civ. P. 26(b)(2)(C), 30(a)(2).

If the party objecting to a requested deposition can show that the deposition meets one of the three circumstances outlined in Rule 26(b)(2), the court should not grant leave to depose the incarcerated witness.  *See Houghtaling v. Tirado-Montes*, No. 8:03-cv-2733, 2008 WL 2385511, at *1 (M.D. Fla. June 9, 2008).  Courts have "significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources."  *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 562 (S.D.N.Y. 2013) (citations omitted).

---

[38] Rule 26(b)(1) limits discovery that is not relevant to any party's claim or defense and proportional to the needs of the case, or where the burden or expense outweighs its likely benefit.  Fed. R. Civ. P. 26(b)(1).

## IV.    ARGUMENT

The Disputed Topics should not be permitted because they (i) are cumulative and/or duplicative; (ii) can be sought from another more convenient source because Madoff has not demonstrated knowledge of them; or (iii) are irrelevant to the issues before the court. [39] *See* Rule 26(b)(2).  Finally, in addition to their failure to meet the legal standard to depose Madoff, the Loeb Parties have no standing to request Day 2 Deposition Topics or participate in Madoff's deposition because they are not Participating Customers as defined by the Madoff Deposition Order.

### A.    Additional Testimony Would be Cumulative and Unnecessarily Duplicative

Proposed Day 2 Topics numbers 1 through 3 identified above are recycled Day 1 Deposition Topics which were adequately explored at Madoff's prior depositions.  Ms. Chaitman, acting as lead counsel to *all* Participating Customers, questioned Madoff for three days on the Day 1 Deposition Topics, which should not be re-addressed at any Day 2 Deposition and should not be permitted to re-address them at the Day 2 deposition. [40]

The Requesting Parties request Day 2 deposition testimony on "the extent to which Madoff or BLMIS bought, sold, or held actual securities shown on the customer statements."  Ms. Chaitman identifies an additional proposed Day 2 deposition topic described as "the extent to which Madoff or BLMIS used customer funds to purchase securities shown on the customer statements."  These topics are merely variations on the Day 1 Deposition Topics identified as "the trading activities for Madoff's investment advisory customers prior to January 1, 1992 and

---

[39]  The Trustee does not object to asking Madoff about the 302 Statement, since it was produced after Day 1 was completed, relates directly to the intent of the deposition as stated by Ms. Chaitman and other Participating Customers, and is central to the issue of Madoff's credibility on when the fraud began.

[40] The December 20, 2016 deposition lasted approximately 5 and a half hours.  The April 26, 2017 deposition also lasted approximately 5 and a half hours.  The April 27, 2017 deposition began at 9:11 AM and concluded at 1:24 PM.  Ms. Chaitman had the opportunity for redirect examination at the April 27 deposition, and indicated she concluded her examination on the record (Madoff Apr. 27 Dep. 384:4).

thereafter;" and "the extent to which different trading strategies were involved with legitimate or illegitimate activities."[41]  Ms. Chaitman already pursued lines of questioning around BLMIS's use of customer funds and securities on December 20, 2016 and April 26, 2017.[42]

The Requesting Parties also seek testimony related to Proposed Day 2 Topic number 3: "indemnification agreements Madoff had with the Four Families." But Madoff has already testified about these purported agreements.  Ms. Chaitman inquired about these same "hold harmless agreements" at the December 20, 2016 deposition.[43]  She then followed up on this line of questioning during the April 26 deposition when she asked Madoff about the "hold harmless agreements."[44]  Ms. Chaitman had the opportunity to ask about them, did ask about them, and Madoff delivered testimony on this very topic.  Indeed, Trustee's counsel acknowledged searching for these agreements at Ms. Chaitman's request:

> Q.  You know, we've looked everywhere.  [Helen] has actually asked us for the hold harmless agreements.  We can't find them. Would Price Waterhouse Cooper as you mentioned have yours?[…]
>
> A.  No.  I mean, you know, Ed Kostin, unfortunately, has been dead a long time by now.  He did it.[45]

---

[41] Madoff Deposition Order ¶¶ 2, 5.

[42] *See, e.g.,* Madoff Dec. 20 Dep. 14:18-25 (". . .when you developed the split-strike conversion strategy, your intention was to carry it out . . . honestly?  . . . But you didn't have the money to do that, and so you . . ."); 35:1-4 ("Now, with respect to the convertible arbitrage trading that you did for the investment advisory customers from . . . the 1980s, was that all actual trading that was conducted?").  *See also, e.g.,* Madoff Apr. 26 Dep. 12:12-13 ("So it was only in the split strike that you stopped buying the securities?"); 26:13-14 ("Now you've explained that the fraud was in the split strike, but if you had an investment advisory customer who instructed you to buy a specific position for them and you gave them a margin loan to do that, did you actually execute those sales?").

[43] Madoff Dec. 20 Dep. 213:20-22 ("you then have to work through with the big four an indemnification, because you're going to assume their short positions?").

[44] Madoff Apr. 26 Dep. 79:19-81:19 (Q: Now, again, I don't want you to mention any individual names, but you testified previously that the four families entered into hold harmless agreements with you? A: Right. Q: Do you recall who was involved in drafting those hold harmless agreements? A: One of the partners at Price Waterhouse . . . Q: And, again, I don't want you to mention any names, but were the hold harmless agreements signed by members of all the four families?).

[45] Madoff Apr. 26 Dep. 204:13-25.

The Trustee has found no evidence that these agreements exist or transactions arising out of these agreements ever transpired as Madoff has described.  There is no reason for the parties to spend additional time on a subject that has been exhausted during two separate days of Madoff's testimony.

**B.    Topics About Which Madoff Lacks Knowledge And For Which Relevant Information Is Best Sought From Other Witnesses**

Proposed Day 2 Topics numbers 4 through 6[46] were not only addressed at the Day 1 deposition, but also are areas of inquiry about which Madoff has no knowledge and are best presented to other former BLMIS employees, if at all.  *Cf. Harris v. Best Buy Stores, L.P.*, No. 15-cv-00657, 2015 WL 6085307, at *7 (N.D. Cal. Oct. 16, 2015) (denying request for certain topics to be covered at 30(b)(6) deposition because inquiries were better answered by witnesses that the specific documents related to).

Requesting Parties seek testimony concerning "interpretation of Madoff's or BLMIS's account records sent to customers, including the Defendants."  This topic should be denied because the Requesting Parties and the Trustee have already examined Madoff on account records sent to customers.[47]  On December 20, Ms. Chaitman reviewed a trade confirmation with Madoff,[48] and went on to elicit further testimony regarding how to interpret that confirmation.[49] Ms. Chaitman also questioned Madoff about a particular customer statement purporting to reflect convertible bond trading.[50]  On April 27, 2017, the Trustee reviewed a number of customer statements with Madoff,[51] and Ms. Chaitman followed up with  redirect examination.[52]  When

---

[46] *See infra* at 4.
[47] Madoff Deposition Order ¶ 7 ("The interpretation of Madoff's or BLMIS' account records, including but not limited to monthly account statements.").
[48] Madoff Dec. 20 Dep. 97:13-98:15.
[49] *Id.* 98:16-101:3.
[50] *Id.* 163:24-165:4.
[51] Madoff Apr. 27 Dep. 230:11-234:4; 234:25-247:22; 299:14-305:9; 305:16-310:5; 310:6-329:8.
[52] *Id.* 379:13-381:5.

pressed by Trustee's counsel to explain certain entries on a customer statement, Madoff could

not do so.  Rather, he consistently responded that he had no understanding of the operational

aspect of creating the customer statements.  When asked to explain anomalies, he testified:

- "you know, I can't really tell you because I didn't handle the operations side of the business"[53]

- "I can't give you the answer to that because I don't know what the procedure was. That's an operations department procedure of what - - of how they handled the fractional shares"[54]

- "I'm not sure how they handled the fractional shares.  . . . I'm not familiar with the operations side of the business, so I don't know how they physically handle that."[55]

- "I'm responding the same way I said before.  I don't know whether it was converted or whether - - I don't know how they handled fractional shares. . . . I can't respond to that. I don't know how they handled that. I'm not an operations person."[56]

The Requesting Parties also seek to inquire into their "accounts held with Madoff and

BLMIS, including the history of those accounts and the extent to which Madoff and BLMIS

were directed to and did buy, sell, and hold actual securities on behalf of the [Requesting

Parties], including through the use of margin."[57]  Not only is this simply another variation on

whether Madoff purchased securities for IA customers, but Madoff has already testified that

BLMIS only managed discretionary accounts, whereby a customer could not direct trading:

> Q:  Okay.  But where a customer made a specific instruction to you to buy a specific stock, are you saying that you always executed those instruction?
>
> A: The customer didn't usually give us instructions.  These accounts are handled basically as sort of discretionary accounts.  So once the customer opened the account to go into this particular strategy, the firm had the - -

---

[53] *Id*. 217:8-15.
[54] *Id*. 227:18-21.
[55] *Id*. 233:7-21.
[56] *Id*. 247:9-21.
[57] *See infra* at 4 (Deposition Topic 5).

had the, you know, allowance to be able to execute the strategy whenever he saw fit.

Q:  No, but I'm thinking of customers who were not in split strike, investment advisory customers who had you as their investment advisor but they instructed you as to what stocks to buy and sell.

A:  We didn't - - we basically did not do that kind of business.[58]

Later on in the deposition, Ms. Chaitman asked similar questions, but was met with the same response from Madoff:

Q:  When did you start what we call the investment advisory business?

A: Probably '70s.

Q: And you would not characterize that as a customer oriented business?

A: Not really. I knew, yes, it would be.

Q: Right.

A: It would be, but it was never - - I never had a business where a customer would call me up and say I want to buy stock or what I should buy. In other words, when I started my business it was always sort of like a discretionary-type business where people would give me - - you know, basically it was a family and friends who would give me a certain amount of money. And I would invest, started doing convertible bond arbitrage. I never did retail business, like if you called me up and said I want to buy IBM.[59]

Based on this testimony, it is apparent that Madoff can offer nothing further on Proposed Deposition Topic 5.[60] He has already explained that he does not believe that BLMIS conducted the type of trading activities that seem to be the topic of inquiry in Proposed Deposition Topic 5. Unless the Requesting Customers can provide reference to specific documents or evidence suggesting that Madoff would possess such knowledge, they should be barred from asking

---

[58] Madoff Apr. 26 Dep. 26:25-27:15.
[59] *Id.* 136:12-137:4.
[60] The Trustee reserves his right to examine other former BLMIS employees, and proffer documents that suggest that trades were reflected on customer statements at the direction of customers. However, Madoff is an improper witness to explain the facts and circumstances surrounding such trading activities.

questions about a topic that Madoff has already discussed, and disclaimed personal knowledge.

*See Braham v. Lantz*, No. 08-cv-1564, 2011 WL 4809032, at *1 (D. Conn. Oct. 11, 2011)

(denying request for prisoner deposition because moving party failed to establish the

"discoverable information the proposed deponents might have.") (citation omitted).

Similarly, Madoff is not knowledgeable about "Defendants' accounts held with Madoff

and BLMIS, including . . . the history of those accounts . . ." Madoff admitted that he was not

involved in the customer statements or discussing customer statements with individual

customers.[61]  Madoff was unable to recognize a form included in every customer's file

maintained by BLMIS.[62]  The testimony he has provided so far demonstrates he lacks knowledge

regarding specific customer accounts and the account history.

The Proposed Day 2 Topic dealing with "the involvement of various Madoff personnel in

the handling of each Defendant's account," will yield equally futile testimony from Madoff.

Throughout his testimony, Madoff identified other witnesses who compiled customer-specific

reports and records who may be appropriate witnesses for this topic.[63]  On April 27, 2017,

Madoff explained that others, including Mr. Dan Bonventre, were responsible for the operational

work for which he repeatedly expressed his lack of knowledge.[64] Madoff also testified that Ms.

Annette Bongiorno was "responsible for the client.  She handles the client business."[65]  Madoff

also described Ms. Bongiorno as a bookkeeper, who "handled the customers.  She spoke to them

---

[61] Madoff Apr. 27 Dep. 298:14-16 ("I spoke to the customers.  I didn't physically handle the bookkeeping transaction for the customers ever.").

[62] *Id.* 342:14-24, (reviewing a customer maintenance file); 345:8–9 ("Q. What, if anything, does this mean to you? A. I'm not familiar with this, with any of this.").

[63] Madoff Apr. 26 Dep. 49:20-25 (Q. Who was responsible within the firm for generating these reports? A. Well, depends upon, you know, where they were executed.  Basically, Dan Bonventre was the operations director, so he had final responsibility"); Madoff Apr. 27 Dep. 244:5-6 ("[Annette's] responsible for the client.  She handles the client business."); 258:3–259:17 (Annette's responsibilities including handling customers); 259:18–23 (Jodi Crupi handled checkbook); *see also* Madoff Dec. 20 Dep. 32:16-33:1 (identifying Jodi Crupi as being involved in working on account statements).

[64] Madoff Apr. 27 Dep. 244:12-18.

[65] *Id.* 244:1-9.

on the telephone.  They got instructions.  She answered questions about their accounts and so on

and so forth . . . she handled the big four clients was her particular role. And also ran a whole

department of other bookkeepers, you know, that handled - - that were involved in doing the

processing of the split strike trades."[66]  Madoff himself acknowledges that he is not the correct

witness to testify about these topics.

### C.    Topics That Are Not Relevant to the Issues Before the Court

Finally, Proposed Day 2 Topics numbers 7 and 8 bear no relation to issues before the

court or any viable defenses to the Trustee's claims to avoid and recover fictitious profits.  *See*

Fed. R. Civ. P. 26(b)(2)(C)(iii) (discovery not permitted where it is not "relevant to any party's

claim or defense and proportional to the needs of the case."); *Sahu v. Union Carbide Corp.*, 262

F.R.D. 308, 317 (S.D.N.Y. 2009) ("Courts deny or modify discovery requests that are fashioned

so broadly that they would require the production of irrelevant material.").

The Participating Customers have requested testimony about Madoff's relationship with

FISERV.  Ms. Chaitman has not explained what FISERV is; how if at all FISERV is relevant to

the Trustee's avoidance claims; and/or how FISERV relates to any affirmative defense.

Therefore, Ms. Chaitman has not articulated any basis for seeking this testimony.  *287 Franklin*

*Ave. Residents' Ass'n v. Meisels*, No. 11-cv-976, 2012 WL 1899222, at *4 (E.D.N.Y. May 24,

2012) ("The party seeking the discovery must make a *prima facie* showing, that the discovery

sought is more than merely a fishing expedition.") (citing Fed. R. Civ. P. 26(b)(2)(C)).

Additionally, the Participating Customers include a catch-all request designed to cover

anything they wish to discuss at the Day 2 Deposition.  This is not permitted under Rule 26, nor

should this Court permit a continual fishing expedition that is wasting time and resources of the

parties and this Court.  *Id*.  The proposed topic is framed as "other questions that may arise" in

---

[66] *Id.* 258:3-259:17 (detailing Ms. Bongiorno's employment history and responsibilities over time).

connection with hundreds of thousands of trading records.  This request is too broad and vague

to be an appropriate topic for the deposition of a prisoner.  *Cf. Copantitla v. Fiskardo Estiatorio,*

*Inc.*, No. 09-cv-1608, 2010 WL 1327921, at *8 (S.D.N.Y. Apr. 5, 2010) (rejecting four proposed

deposition topics for a 30(b)(6) witness as "grossly overbroad."); *see also Braham*, 2011 WL

4809032, at *1.

> ### D.    The Loeb Parties' Request to Participate In Madoff's Deposition Is Untimely

On May 31, 2017, the Loeb Parties filed the Notice of Request to Depose Bernard L.

Madoff on Day 2 Deposition Topics.[67]  However, the Loeb Parties are not Participating

Customers, as that term is defined in the Madoff Deposition Order.  On July 22, 2016, the

Trustee filed the Trustee's Notice to Defendants Establishing Deadline to File Requests to

Depose Bernard L. Madoff (the "Madoff Deposition Notice"),[68] which was served on Loeb &

Loeb in its capacity as counsel to the Loeb Parties the same day.[69]  The Madoff Deposition

Notice required any "good faith" defendant seeking to depose Madoff to file a *Notice of Request*

*to Depose Bernard L. Madoff* no later than August 5, 2016.  Only those parties who filed such a

request are defined as "Participating Customers" under the Madoff Deposition Order.[70]  The

Loeb Parties did not file the required notice to participate in the Madoff deposition on or prior to

August 5, 2016 and therefore are not Participating Customers.  Because the Madoff Deposition

Order only permits Participating Customers to seek leave to depose Madoff on Day 2 Deposition

Topics,[71] the Loeb Parties should be precluded from participation in any Day 2 Deposition of

Madoff.

---

[67] ECF No. 16110.  Exhibit A to the Loeb Parties' request includes the following adversary proceedings: 10-04342;
10-04933; 10-04512; 10-04952; 10-0514; 10-04945; and 10-04354.
[68] ECF No. 13786.
[69] *See* Affidavit of Service at 39-40; 67 (ECF No. 13787).
[70] *See* Madoff Deposition Order at 2.
[71] *Id.* at 3-4.

## CONCLUSION

Wherefore, the Trustee respectfully requests the Court deny the Participating Customers'

request to depose Madoff on the Disputed Topics and preclude the Loeb Parties from

participating in the Day 2 Deposition.

Dated: New York, New York                        Respectfully submitted,
       June 6, 2017

                                         */s/ David J. Sheehan*

                                         David J. Sheehan
                                         Email: dsheehan@bakerlaw.com
                                         Amanda E. Fein
                                         Email: afein@bakerlaw.com
                                         Stacy Dasaro
                                         Email: sdasaro@bakerlaw.com

                                         **BAKER & HOSTETLER LLP**
                                         45 Rockefeller Plaza
                                         New York, New York 10111
                                         Telephone: 212.589.4200
                                         Fax: 212.589.4201

                                         *Attorneys for Irving H. Picard, Trustee for the*
                                         *Substantively Consolidated SIPA Liquidation*
                                         *of Bernard L. Madoff Investment Securities*
                                         *LLC and the Estate of Bernard L. Madoff*

# **Exhibit A**

## **Adversary Proceedings**

Adversary Proceedings Participants in Day 1 Day 2 of Madoff Deposition

| Adv. Pro. No. | Case Name | Defendant Counsel | Day 1 | Day 2 |
|---|---|---|---|---|
| 10-04292 | Robert Roman | Chaitman LLP | x | x |
| 10-04302 | Joan Roman | Chaitman LLP | x | x |
| 10-04306 | Angela Tiletnick | Chaitman LLP | x | |
| 10-04321 | Herbert Barbanel, et al. | Chaitman LLP | x | x |
| 10-04327 | Gertrude E. Alpern RevocableTrust, et al. | Chaitman LLP | x | x |
| 10-04335 | Aspen Fine Arts Co., et al. | Milberg LLP/Seeger Weiss LLP | x | |
| 10-04336 | The Estate (Succession) of Doris Igoin, et al. | Kelley Drye & Warren LLP | x | |
| 10-04342 | Kenneth Evenstad Trust, et al. | Loeb & Loeb LLP | | x |
| 10-04344 | Alexander Sirotkin | Chaitman LLP | x | |
| 10-04354 | Fiterman Investment Fun, et al. | Loeb & Loeb LLP | | x |
| 10-04362 | Sage Associates, et al. | McDermott Will & Emery LLP | x | |
| 10-04367 | Benjamin T. Heller | Chaitman LLP | x | x |
| 10-04397 | Fern C. Palmer, individually and in her capacity as trustee for the Fern C. Palmer Revocable Trust dtd 12/31/91, as amended, et al. | Chaitman LLP | x | x |
| 10-04400 | Sage Realty, et al. | McDermott Will & Emery LLP | x | x |
| 10-04415 | Barbara J. Berdon | Dentons US LLP | x | |
| 10-04438 | Estate of Seymour Epstein, et al. | Chaitman LLP | x | x |
| 10-04446 | Trust Under Agreement Dated 12/6/99 for the benefit of Walter and Eugenie Kissinger, et al. | Chaitman LLP | x | x |
| 10-04469 | Carol L. Kamenstein, et al. | Chaitman LLP | x | x |
| 10-04474 | Roger Rechler Revocable Trust, et al. | Chaitman LLP | x | |
| 10-04486 | The Norma Shapiro Revocable Declaration of Trust Under Agreement Dated 9/16/08, et al. | Dentons US LLP | x | |
| 10-04487 | Estate of Audrey Weintraub, et al. | Chaitman LLP | x | x |
| 10-04503 | Judd Robbins | Chaitman LLP | x | x |
| 10-04512 | Mark Evenstad Trust, et al. | Loeb & Loeb LLP | | x |
| 10-04514 | Serene Warrant Trust | Loeb & Loeb LLP | | x |
| 10-04541 | Kenneth W Perlman, et al. | Chaitman LLP | x | x |
| 10-04545 | Jerome Goodman, et al. | Chaitman LLP | x | x |
| 10-04570 | Jacob M. Dick Rev Living Trust DTD 4/6/01, et al. | Chaitman LLP | x | x |
| 10-04576 | Norton A. Eisenberg | Milberg LLP/Seeger Weiss LLP | x | |
| 10-04582 | Gerald Blumenthal | Milberg LLP/Seeger Weiss LLP | x | |
| 10-04599 | The Estate of Alvin E. Shulman | Chaitman LLP | x | |
| 10-04606 | Estate of Florence W. Shulman, et al. | Chaitman LLP | x | |
| 10-04614 | Robert S. Whitman | Chaitman LLP | x | x |
| 10-04655 | Jaffe Family Investment Partnership, et al. | Chaitman LLP | x | x |
| 10-04668 | Timothy Shawn Teufel and Valerie Ann Teufel Family Trust U/T/D 5/24/95, et al. | Chaitman LLP | x | |
| 10-04702 | S&L Partnership, a New York partnership, et al. | Dentons US LLP | x | |
| 10-04718 | The Jordan H. Kart Revocable Trust, et al. | Chaitman LLP | x | x |
| 10-04728 | Bruno L. Digiulian | Chaitman LLP | x | x |
| 10-04748 | Mark Horowitz | Chaitman LLP | x | x |
| 10-04749 | Philip F. Palmedo | Chaitman LLP | x | x |
| 10-04752 | Kuntzman Family LLC, et al. | Chaitman LLP | x | x |
| 10-04762 | Estate of James M. Goodman, et al. | Chaitman LLP | x | x |
| 10-04798 | Janet Jaffe Trust UA dtd 4/20/90, et al. | Chaitman LLP | x | x |
| 10-04803 | The Estelle Harwood Family Limited Partnership, et al. | Chaitman LLP | x | x |
| 10-04806 | Kenneth M. Kohl, et al. | Chaitman LLP | x | x |
| 10-04809 | Edyne Gordon, et al. | Chaitman LLP | x | x |
| 10-04818 | Toby Harwood | Chaitman LLP | x | x |
| 10-04823 | Frank DiFazio, et al. | Chaitman LLP | x | x |
| 10-04826 | Estate of Boyer Palmer, et al. | Chaitman LLP | x | x |
| 10-04852 | Alvin E. Shulman Pourover Trust, et al. | Chaitman LLP | x | |
| 10-04859 | Bert Margolies Trust, et al. | Chaitman LLP | x | |
| I0-04861 | Harold J. Hein | Dentons US LLP | x | |
| I0-04878 | Lisa Beth Nissenbaum Trust, et al. | Chaitman LLP | x | x |
| I0-04882 | Laura E. Guggenheim or Cole | Dentons US LLP | x | |
| I0-04912 | Harry Smith Revocable Living Trust, et al. | Chaitman LLP | x | x |
| 10-04920 | Glenhaven Limited, et al. | Chaitman LLP | x | x |
| 10-04931 | Estate of Muriel B. Cantor, et al. | Chaitman LLP | x | x |
| 10-04933 | Kenneth Evenstad Trust, et al. | Loeb & Loeb LLP | | x |
| 10-04945 | SEW Preferred Ltd. Partnership, et al. | Loeb & Loeb LLP | | x |

The "Day 1" column indicates those parties who participated in Day 1 of Madoff's deposition.
The "Day 2" column indicates parties who noticed a request for Day 2 Deposition Topics.

Adversary Proceedings Participating in Day 1 Day 2 of Madoff Deposition

| Adv. Pro. No. | Case Name | Defendant Counsel | Day 1 | Day 2 |
|---|---|---|---|---|
| I0-04946 | Stephen R. Goldenberg | Milberg LLP/Seeger Weiss LLP | x | |
| I0-04951 | Harold A. Thau | Milberg LLP/Seeger Weiss LLP | x | |
| I0-04952 | MBE Preferred Ltd. Partnership, et al. | Loeb & Loeb LLP | | x |
| I0-04956 | Denis M. Castelli | Chaitman LLP | x | x |
| I0-04961 | Sylvan Associates LLC f/k/a Sylvan Associates Limited Partnership, et al. | Chaitman LLP | x | x |
| I0-04966 | Onesco International, LTD., et al. | Milberg LLP/Seeger Weiss LLP | x | |
| I0-04978 | Estate ofIra S. Rosenberg, et al. | Milberg LLP/Seeger Weiss LLP | x | |
| I0-04979 | James M. New Trust dtd 3/19/01, et al. | Chaitman LLP | x | x |
| I0-04991 | Guiducci Family Limited Partnership, et al. | Chaitman LLP | x | x |
| I0-04995 | Trust u/art Fourth o/w/o Israel Wilenitz, et al. | Chaitman LLP | x | x |
| I0-05026 | Walter Freshman Trust A, a Florida trust, et al. | Chaitman LLP | x | x |
| I0-05037 | Barbara L. Savin | Chaitman LLP | x | x |
| I0-05069 | Potamkin Family Foundation Inc. | Milberg LLP/Seeger Weiss LLP | x | |
| I0-05079 | Estate of James M. Goodman, et al. | Chaitman LLP | x | x |
| I0-05104 | The Gloria Albert Sandler and Maurice Sandler Revocable Living Trust, et al. | Chaitman LLP | x | x |
| I0-05124 | The Lawrence J. Ryan and Therese R. Ryan Revocable Living Trust, et al. | Chaitman LLP | x | x |
| I0-05128 | JABA Associates LP, et al. | Chaitman LLP | x | x |
| I0-05130 | Barbara Kotlikoff Harman | Chaitman LLP | x | x |
| I0-05133 | Fern C. Palmer, et al. | Chaitman LLP | x | x |
| I0-05135 | Reckson Generation, et al. | Chaitman LLP | x | |
| I0-05151 | Palmer Family Trust, et al. | Chaitman LLP | x | x |
| I0-05157 | The Harnick Brothers Partnership, et al. | Chaitman LLP | x | x |
| I0-05184 | Laura Ann Smith Revocable Living Trust, et al. | Chaitman LLP | x | x |
| I0-05196 | Irene Whitman 1990 Trust U/A DTD 4/13/90, et al. | Chaitman LLP | x | x |
| I0-05209 | Lapin Children LLC | Dentons US LLP | x | |
| I0-05236 | Toby T. Hobish, et al. | Dentons US LLP | x | |
| I0-05257 | Edward A. Zraick, Jr., et al. | Hunton & Williams LLP | x | x |
| I0-05309 | William Pressman, Inc., et al. | Chaitman LLP | x | |
| I0-05312 | Doron Tavlin Trust U/A 2/4/91, et al. | Chaitman LLP | x | x |
| I0-05377 | Richard G. Eaton | Chaitman LLP | x | x |
| I0-05420 | Gunther K. Unflat | Chaitman LLP | x | x |
| I0-05435 | Keith Schaffer, et al. | Chaitman LLP | x | x |

The "Day 1" column indicates those parties who participated in Day 1 of Madoff's deposition.
The "Day 2" column indicates parties who noticed a request for Day 2 Deposition Topics.