**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01182 (SMB) |
| Plaintiff, | |
| v. | |
| J. EZRA MERKIN, GABRIEL CAPITAL, L.P., ARIEL FUND LTD., ASCOT PARTNERS, L.P., ASCOT FUND LTD., GABRIEL CAPITAL CORPORATION, | |
| Defendants. | |

**TRUSTEE'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION *IN LIMINE* NUMBER 3
TO EXCLUDE THE OPINIONS AND TESTIMONY OF JEFFREY M. WEINGARTEN**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

    I.    DEFENDANTS' OPPOSITION DOES NOT MEET THEIR BURDEN TO SHOW WEINGARTEN'S TESTIMONY IS ADMISSIBLE EXPERT OPINION ...............................................................2

        A.    Absence of Verifiable Methodologies and Analyses ..................................2

        B.    The 5Ps Framework Is Neither a Methodology Nor Analyses ....................4

    II.    DEFENDANTS CONCEDE WEINGARTEN CANNOT TESTIFY AS TO MERKIN'S STATE OF MIND OR PROVIDE A FACTUAL NARRATIVE ..................................................................................................11

    III.    WEINGARTEN'S OPINIONS AND TESTIMONY CANNOT AID THE COURT WHERE IT IS NOT BASED ON RELIABLE AND VERIFIABLE METHODOLOGIES AND ANALYSES .......................................15

CONCLUSION ......................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d Cir. 2002)..................................................................................................4

*Cerbelli v. City of N.Y.*,
 No. 99 CV 6846(ARR)(RML), 2006 WL 2792755 (E.D.N.Y. Sept. 27, 2006).....................2

*Daubert v. Merrell Dow Pharm., Inc.*,
 43 F.3d 1311 (9th Cir. 1995) .................................................................................................3

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993).........................................................................................................1, 2

*DiBella v. Hopkins*,
 403 F.3d 102 (2d Cir. 2005)...........................................................................................15, 16

*Feinberg v. Katz*,
 No. 01 Civ. 2739(CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) ...............................15

*In re Fosamax Prods. Liab. Litig.*,
 645 F. Supp. 2d 164 (S.D.N.Y. 2009)..................................................................................15

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997)...............................................................................................................3

*Heller v. Shaw Indus., Inc.*,
 167 F.3d 146 (3d Cir. 1999)...................................................................................................4

*Highland Capital Mgmt., L.P. v. Schneider*,
 379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................................................................................16

*Estate of Jaquez v. City of N.Y.*,
 104 F. Supp. 3d 414 (S.D.N.Y. 2015)..................................................................................16

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
 No. 11-cv-681 (KBF), 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015)....................................2

*Marvel Characters, Inc. v. Kirby*,
 726 F.3d 119 (2d Cir. 2013)..................................................................................................15

*Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*,
 No. 98 Civ. 6907(MBM), 2001 WL 863552 (S.D.N.Y. July 30, 2001) ..................................3

*In re Rezulin Prods. Liab. Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................................14, 16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sharkey v. J.P. Morgan Chase & Co.*,
　978 F. Supp. 2d 250 (S.D.N.Y. 2013) ................................................................................ 16

*Thomas v. City of Chattanooga*,
　398 F.3d 426 (6th Cir. 2005) .......................................................................................... 2, 3

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
　No. 13 Civ. 7884 (AT), 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ............................... 2

*Weisfelner v. Blavatnick* (*In re Lyondell Chem. Co.*),
　558 B.R. 661 (Bankr. S.D.N.Y. 2016) ........................................................................ 13, 14

**Statutes**

15 U.S.C. § 78aaa *et seq.* .......................................................................................................... 1

**Rules**

Federal Rule of Evidence 702 ............................................................................................. 1, 2, 3

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.*, and the chapter 7 estate of Bernard L. Madoff ("Madoff"), respectfully submits this reply memorandum of law in further support of Motion *in Limine* Number 3 to Exclude the Opinions and Testimony of Jeffrey M. Weingarten and the Supplemental Declaration of Lan Hoang in Further Support of the Trustee's Motions *in Limine* 1, 3, and 4 ("Hoang Suppl. Decl."). For the reasons set forth herein, the Trustee's motion should be granted.

## INTRODUCTION

The entirety of Defendants'[1] opposition is based on the erroneous assumption that the 5 Ps framework is the equivalent of an acceptable and reliable methodology under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). It is not. While the 5 Ps framework provided Weingarten—and Trustee's expert, Dr. Steve Pomerantz—with the areas of inquiry for due diligence, the various methodologies explained in Pomerantz's opinions identify what analyses must be performed, how those analyses are performed, the data used and relied upon in each analysis, the conclusions drawn from the analyses, and how the analyses correlate to conclusions regarding Defendants' due diligence. In contrast, Weingarten offers conclusions and observations—the returns in the Merkin Funds'[2] BLMIS accounts were consistent with the purported split strike conversion strategy, that the returns were achieved through Madoff "exiting around highly volatile periods during which options expire," and that the returns were the result of Madoff's "market timing and stock selection"—without relying on

---

[1] J. Ezra Merkin ("Merkin"), Gabriel Capital Corporation ("GCC"), Ascot Partners, L.P. ("Ascot Partners"), and Ascot Fund Ltd. ("Ascot Fund") are referred to herein as Defendants.

[2] Gabriel Capital, L.P., Ariel Fund Ltd., Ascot Partners, and Ascot Fund (collectively, the "Merkin Funds").

any methodologies or having performed any analyses. Such conclusions are not based on the requisite reliable foundation of a replicable and verifiable methodology, analyses, and data mandated by Fed. R. Evid. 702 and *Daubert*. Accordingly, this Court should exclude the opinions and testimony of Jeffrey M. Weingarten at trial.

## ARGUMENT

### I. DEFENDANTS' OPPOSITION DOES NOT MEET THEIR BURDEN TO SHOW WEINGARTEN'S TESTIMONY IS ADMISSIBLE EXPERT OPINION

At its essence, Defendants' position is that Weingarten should be permitted to testify because he is experienced in due diligence and offers conclusions based on the 5 Ps framework for due diligence. These arguments miss the point of reliable expert testimony under Fed. R. Evid. 702 and *Daubert*.

#### A. Absence of Verifiable Methodologies and Analyses

Defendants argue that Weingarten's experience *alone*, without any verifiable methodologies and analyses, is sufficient "to qualify him to opine on the adequacy of the Defendants' due diligence on BLMIS" because experience is the predominant, if not the sole factor for reliable expert testimony. However, experience alone cannot sustain the admissibility of Weingarten's testimony. While experts may testify based on their experience, there must be a verifiable way of demonstrating the validity of each step of their method or process. *U.S. Commodity Futures Trading Comm'n v. Wilson*, No. 13 Civ. 7884 (AT), 2016 WL 7229056, at *9–11 (S.D.N.Y. Sept. 30, 2016) (citing *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681 (KBF), 2015 WL 5459662, at *8 (S.D.N.Y. Sept. 16, 2015)); *Cerbelli v. City of N.Y.*, No. 99 CV 6846(ARR)(RML), 2006 WL 2792755, at *2 (E.D.N.Y. Sept. 27, 2006) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir.

2

2005)) (noting that an expert "must explain how that experience leads to the conclusions reached . . . and how that experience is reliably applied to the facts").

Defendants' reliance on the Advisory Committee Notes to the 2000 Amendments to Fed. R. Evid. 702 and *Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*, No. 98 Civ. 6907(MBM), 2001 WL 863552, at *3 n.1 (S.D.N.Y. July 30, 2001) overreaches on this very point. While Fed. R. Evid. 702's Advisory Committee Notes state that "an expert may be *qualified* on the basis of experience," the next paragraph clarifies that if the expert intends to rely "solely or primarily" on his experience, he "must [then] explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes 2000 amendments (emphasis added). The trial court's gatekeeping function requires more than simply "taking the expert's word for it." *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). Equally misplaced is Defendants' reliance on *Page Mill Asset Management*. Even there the district court noted that "although it is permissible for [the expert] to base his opinion on his own experience . . . , he must do more than aver conclusively that his experience led to his opinion." 2001 WL 863552, at *3 n.1.

Here, Defendants' admit that Weingarten did not utilize a methodology or conduct any analyses. Thus, failing to bridge the gap between his recited facts and his conclusions, the sum and substance of Weingarten's opinions are based solely on his say so and are exactly the type of unverifiable *ipse dixit* conclusions that should be excluded at trial. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the

3

*ipse dixit* of the expert."); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).

### B.  The 5Ps Framework Is Neither a Methodology Nor Analyses

The 5Ps framework for due diligence is exactly that—a framework of five areas where methodologies and analyses are applied to evaluate the performance and returns of a particular investment. Defendants concede as much. They do not identify any methodology applied or analyses conducted by Weingarten, but rather attempt to bolster Weingarten's anecdotal consideration of Merkin's due diligence by comparing it to the analysis undertaken by the Trustee's expert, Pomerantz. The opinions of Pomerantz and Weingarten are not comparable.

For example, Weingarten opines that Madoff's "returns were not volatile and better than would be expected from a typical Split Strike Conversion strategy" because "[w]hen the market was down, the fund outperformed the overall market" and, "[w]hen the market was up sharply, the fund underperformed."[3] Weingarten concludes that these returns were "uncommon" but "were not implausible."[4] By his own admission, Weingarten performed no analyses on the Merkin Funds' BLMIS returns to arrive at this conclusion.[5] Instead, by looking at "two or three" unidentified transactions from sometime around 2004 and 2007, Weingarten observed that he "was able to see exactly how [Madoff] was able to . . . generate returns."[6]

In contrast, Pomerantz performed quantitative analyses to compare BLMIS's returns to comparable market indices and peers, and to determine how BLMIS was able to generate its returns. Specifically, to determine how often Madoff was able to purportedly buy low and sell

---

[3] Declaration of Lan Hoang in Support of Trustee's Motions *In Limine* Numbers 1 Through 4 dated April 7, 2017, ECF No. 337 ("Hoang Decl."), Ex. 5 (Expert Report of Jeffrey M. Weingarten ("Weingarten Rpt.")) § V at 4–5.

[4] *Id*. § V at 5.

[5] Hoang Suppl. Decl., Ex. 21 (Excerpts from the Deposition Transcript of Jeffrey M. Weingarten dated July 15, 2015 ("Weingarten Dep.")) at 141:25–142:23, 143:16–144:16, 160:4–18.

[6] *Id.* at 153:22–154:17.

4

high, Pomerantz compared the stock prices reported on the Merkin Funds' BLMIS Account statements from January 1996 through November 2008 to the Volume Weighted Average Price ("VWAP")—as reported by Bloomberg—for those stocks.[7] VWAP is a trading metric that calculates the average price for a particular stock, weighted against the volume of the transactions for a particular period.[8]



The industry goal is to trade at VWAP, meaning that one would expect 50% of shares would be above VWAP and 50% would be below VWAP.[9] However, VWAP analysis from January 1996 to November 2008 shows that 81.3% of the Merkin Funds' BLMIS accounts purported buy transactions by share volume were executed below VWAP, while 74.9% of purported sell transactions by share volume were executed above VWAP.[10] BLMIS's ability to purportedly buy and sell at a level well below and above the industry norm of 50%, respectively, is virtually

---

[7] Declaration of Lan Hoang in Support of Trustee's Opposition to Defendants' Motions *In Limine* dated May 10, 2017 ("Hoang Opp'n. Decl."), Ex. 9 (Initial Expert Report of Dr. Steve Pomerantz with errata dated April 13, 2015 ("Pomerantz Rpt.") § VI.D.4, ¶¶ 318–28.

[8] *Id.* ¶ 319, Fig. 43 at 137.

[9] *Id.* at ¶ 321.

[10] *Id.* at ¶ 320.

5

impossible. This analysis supports Pomerantz's conclusion that BLMIS's ability to consistently outperform others in the market was a significant red flag that would have been evident through due diligence.[11]

In another example, Weingarten opines that "[t]he [Merkin Funds' BLMIS] returns were not volatile and better than would be expected from a typical Split Strike Conversion strategy."[12] When questioned as to how he arrived at this conclusion, Weingarten confirmed that he did not perform any analyses but rather "looked at some of the transactions" in the Merkin Funds' BLMIS accounts.[13]

In contrast here, in order to determine if the Merkin Funds' BLMIS returns were consistent with the BLMIS split strike conversion strategy, through reverse engineering, Pomerantz attempted to replicate the Merkin Funds' returns.[14] The strategy that Madoff purportedly employed was a variation of the split-strike conversion strategy involving buying a basket of stocks in the S&P 100 index, sell call options on the Index, and buying put options on the S&P 100 Index. Selling the call and buying the put is referred to as implementing a "collar."[15] Because the collar simultaneously limits the losses and caps the gains in the portfolio based on the put and call prices,[16] the Madoff split-strike conversion strategy should have produced returns correlated (*i.e.*, related from a statistical perspective) to the returns of the S&P 100 Index.[17] To determine whether the Merkin returns were consistent with the strategy,

---

[11] *Id.* § VI.D.4, ¶ 323.

[12] Weingarten Rpt. § V at 4–5.

[13] Weingarten Dep. at 141:25–142:23, 143:16–144:16, 160:4–18.

[14] Pomerantz Rpt. § II.B, ¶ 28.

[15] *Id.* § VI.A.1, ¶ 104. Prior to 1991, Madoff purportedly implemented the split-strike strategy using individual stocks from the S&P 100 instead of the baskets of stocks. *Id.* § VI.A.1, ¶¶ 105, 110.

[16] *Id.* § VI.A.1, ¶ 104.

[17] *Id.* § VI.A.1, ¶ 112.

6

Pomerantz performed various quantitative analyses to compare the Merkin Funds' BLMIS account data to the S&P 100 Index. These analyses confirmed that the Merkin BLMIS account returns consistently and significantly outperformed the S&P 100 Index, generating consistently positive returns even when the S&P Index was down.[18]



In addition, relying on the trading data reported on the Merkin Funds' BLMIS statements for the relevant period, Pomerantz calculated the volatility of the Merkin Funds' BLMIS accounts to determine if they were consistent with the stated strategy. He modeled the volatility based on the market risks inherent in the implementation of a split-strike conversion strategy on the S&P 100: (i) risk due to the movements of the stocks in the S&P 100 within the pre-determined collar; and (ii) the risk that the subset of the 100 stocks BLMIS purportedly purchased did not perform as well as the S&P 100 overall.[19] When taken together, these two market risks represent the risk of the strategy as a whole. But, when compared with the volatility

---

[18] *Id.* § VI.D.2, ¶¶ 306–08, Fig. 38 at 128.

[19] *Id.* § VI.B.2, ¶ 210.

7

exhibited by the Merkin Funds' BLMIS accounts, this analysis revealed that the volatility in the Merkin Funds' BLMIS accounts was significantly lower than what was expected.[20]



Based on his analyses, Pomerantz opined: "this stark difference between expected and actual volatility indicates that Madoff was not implementing the Madoff [split-strike conversion] strategy."[21]

In yet another example, Weingarten concludes that the Merkin Funds' BLMIS accounts achieved returns that were better than what would have been expected from a "formulaic putting on of the trades" because Madoff took "advantage of . . . market-timing."[22] Again, Weingarten provides no analysis to support this conclusion, citing only to what he believes that Merkin believes.[23]

Pomerantz also considered whether market timing impacted the Merkin Funds' BLMIS returns but ultimately concluded that market timing could not explain the returns in the Merkin

---

[20] *Id.* § VI.B.2, ¶¶ 210–13, Fig. 17 at 89.

[21] Pomerantz Rpt. ¶ 212.

[22] Weingarten Rpt. § V at 4.

[23] Weingarten Dep. at 161:7–162:14.

8

Funds' BLMIS accounts. Pomerantz came to his conclusion by conducting an analysis of the performance of the S&P 100's during the times when BLMIS purportedly entered and exited the market.[24] Specifically, Pomerantz analyzed all 84 baskets that BLMIS purportedly "put on" between December 1991 and November 2008 and compared the timing of BLMIS's entry and exit from the market to the S&P 100's performance at those times to determine whether Madoff was in the market when it went up and was out of the market when it went down.[25] This analysis revealed that Madoff's entry and exit from the market was only effective around half of the time.



Thus, Pomerantz concluded that market timing was a minimal factor in BLMIS's excess returns, a conclusion that would have been evident to Weingarten had he performed any analysis.[26]

Weingarten's opinions regarding BLMIS's Sharpe Ratio are similarly unsupported. He opines that "[t]he oft referred to Sharpe ratio was relatively high for Madoff, but I have counted many funds with very high Sharpe ratios (return per unit of volatility). Madoff's results were

---

[24] Pomerantz Rpt. § VI.D.4, ¶¶ 329–30.

[25] *Id.*

[26] *Id.* § VI.D.4, ¶¶ 329–30, Fig. 42 at 135.

9

above average, yes, but certainly they were achievable."[27] And as rebuttal to Pomerantz's initial report, Weingarten concludes that "[a] number of funds identified in Bloomberg had Sharpe ratios greater than 2.5, including SMN Diversified Futures Fund (4.68), the Eclectica Fund (3.80), and Episode Inc. (2.61), as of April 20, 2015."[28] Yet, a comparison here necessarily requires calculation of the Sharpe Ratios for the Merkin Funds' BLMIS accounts, which are absent from Weingarten's reports.

In contrast, Pomerantz identified appropriate peers groups, *i.e.*, "funds that exhibited similar characteristics to BLMIS as related to strategy, asset classification, and/or skill of the investment advisor"[29] and compared BLMIS performance to each of them across six performance metrics, including Sharpe Ratio. Pomerantz calculated the Sharpe Ratio for the Merkin Funds' BLMIS accounts and each peer group for all periods available, and compared them. The result was not that the Merkin Funds' BLMIS Sharpe Ratio was "above average" but that it outperformed its peers to a degree of statistical improbability across all peer groups and for all time periods considered.[30] Based on this analysis, Pomerantz opines that "due diligence in these areas would have revealed significant red flags where the only reasonable explanation was fraud."[31]

Certainly, the fact that both Pomerantz and Weingarten apply the 5Ps framework does not offer Weingarten a pass on the required verifiable methodologies and analyses required of expert testimony. Pomerantz's opinions demonstrate the requisite methodologies and analyses required

---

[27] Weingarten Rpt. § V at 5.

[28] Declaration of Lan Hoang in Support of Trustee's Motions *In Limine* Numbers 1 Through 4 dated April 7, 2017, ECF No. 337 ("Hoang Decl."), Ex. 6 (Rebuttal Expert Report of Jeffrey M. Weingarten ("Rebuttal Rpt.")) at 4.

[29] Pomerantz Rpt. § VI.D.1, ¶ 238.

[30] *See id.* ¶ 246.

[31] *Id.* ¶ 247.

10

to determine the consistency of the returns, the source of the returns, and the plausibility or implausibility of the returns in the Merkin Funds' BLMIS accounts. Whether Defendants agree or disagree with Pomerantz's analysis or conclusions, they unquestionably can independently verify or refute those conclusions based on the methodologies applied and analyses conducted by Pomerantz. The same cannot be said for Weingarten—he applied no methodology and performed no analyses. Indeed, Defendants' comparison of Weingarten and Pomerantz's opinions is a false equivalency and does not support the admission of Weingarten's testimony.

## II.  DEFENDANTS CONCEDE WEINGARTEN CANNOT TESTIFY AS TO MERKIN'S STATE OF MIND OR PROVIDE A FACTUAL NARRATIVE

Defendants first contend that Weingarten is not being offered to opine on "whether Merkin subjectively believed that there was a high probability of fraud at BLMIS." Yet, the very first example in Defendants' opposition brief involves Weingarten's opinion of Merkin's state of mind. Specifically, Weingarten states that: "In knowing what he knew about Mr. Madoff, Mr. Merkin had every reason to believe that he was highly reputable, highly regarded and had direct and relevant experience in managing money in precisely the manner in which he intended to do." Weingarten's Reports and his deposition testimony are replete with similar statements and opinions about Merkin's state of mind:

- "In my opinion it is very clear that Merkin had a clear understanding of the investment Philosophy of Madoff and his investment advisory operations."[32]

- "Merkin knew that Mr. Madoff's experience and reputation was entirely consistent with what he was being asked to do from a fund manager's perspective."[33]

- "[Defendants] adequately understood the investment Philosophy[.]"[34]

---

[32] Weingarten Rpt. § V at 3.

[33] *Id.* § V at 4.

11

- "Most investors, including Mr. Merkin, were aware that there often were some time lapses in effecting the split strike conversion strategy and these time lapses would have permitted returns to exceed, even modestly, the results that would have resulted from a simultaneous implementation of the trades."[35]

- "Mr. Merkin understood that he was investing with Madoff to achieve better than t-bill returns with substantially below average risk. It was clear to Mr. Merkin that foregoing potential higher returns was, or could be, the cost of avoiding volatility."[36]

- "Mr. Merkin was aware that various regulators, auditors, administrators, and sophisticated institutional and individual investors were also looking at many of [the investment] factors . . . ."[37]

- "Mr. Merkin understood that Mr. Madoff had . . . the knowledge and ability to take advantage of both market timing and stock selection . . . ."[38]

- "Merkin had reason to believe" that the "[p]rocedures were also clearly and transparently . . . adhered to."[39]

- "Madoff's 'plausibility' would also be reinforced because Mr. Merkin knew that many other highly sophisticated and experienced investors were clients of Madoff."[40]

- Weingarten "inferred" what Merkin "believed" about Madoff's market timing and stock selection by reviewing Merkin's notes.[41]

- Weingarten also testified that "Mr. Merkin believed, understood, that Madoff's ability to predict short-term market movements was some combination of a model, access to order flow and his vast experience in the marketplace."[42]

- Weingarten testified, "I don't know what Mr. Merkin might have done but I, again, as I said, in various things that I had read, Mr. Merkin believed

---

[34] *Id.* § V at 5.

[35] Rebuttal Rpt. § III at 2.

[36] *Id.* § III at 3.

[37] Weingarten Rpt. § V at 2–3.

[38] *Id.* § V at 4.

[39] *Id.*

[40] *Id.* § V at 5.

[41] Weingarten Dep. at 161:7–163:22.

[42] *Id.* at 161:7–162:3.

12

that through some combination of experience in the markets, access to order flow, that he was able to time the pricing of securities in a way that would allow him to generate returns."[43]

- Weingarten "inferred" that Madoff generated superior returns based on his understanding "that Mr. Merkin knew that Mr. Madoff had, by virtue of his long experience in the markets and potentially by virtue of his access to order flow."[44]

Weingarten even acknowledged reservation as to whether it was permissible for him to provide such testimony, changing his testimony to explain that his testimony regarding Madoff's reputation was what he understood, "not necessarily [Merkin's] understanding."[45] Also, while Weingarten concluded that "Mr. Merkin understood that Madoff had the ability to predict short-term trends in the market as a result of a proprietary model and access to order flow,"[46] Weingarten backtracked, stating, "I don't know . . . how Mr. Merkin confirmed that. As I said, *I inferred from his many comments that that is certainly what he believed. I could certainly imagine*, for example . . . he would have certainly seen that there were times when the market was down and Madoff did make money, *but exactly how he confirmed them in his own mind, I'm not entirely sure*."[47]

Any opinions or testimony by Weingarten regarding Merkin's beliefs and state of mind are inadmissible. "[T]estimony about a party's motivation, reason for acting, or intent without supporting evidence is speculation and therefore an inappropriate subject for expert testimony." *Weisfelner v. Blavatnick* (*In re Lyondell Chem. Co.*), 558 B.R. 661, 670 (Bankr. S.D.N.Y. 2016)

---

[43] *Id.* at 210:15–212:11.

[44] *Id.* at 212:20–213:10.

[45] *Id.* at 217:3–24.

[46] Weingarten Rpt. § V at 4.

[47] Weingarten Dep. at 162:19–163:9 (emphasis added); *see also id.* at 215:21–216:12 (unsure of whether Merkin considered pricing a component of market timing in his understanding of Madoff's ability to produce superior returns); *id.* at 213:11–22 (again inferring Merkin's belief regarding whether Madoff generated superior returns based on access to order flow); *id.* at 228:17–229:12 (same).

13

(citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)). Indeed, by Defendants' own concession that Weingarten is not offering testimony on Merkin's beliefs and state of mind, those portions of Weingarten's opinions and testimony must be excluded.

Likewise, Weingarten's testimony constructing a factual narrative should also be excluded. While Defendants offer that Weingarten's testimony "goes beyond merely constructing a factual narrative," the examples they posit only further confirm that exclusion of such testimony is proper. Those examples include:

- "Consistent with good due diligence practice, on several occasions, Mr. Merkin reviewed both Process and Procedures with Madoff;"

- "Although uncommon, in my experience, [BLMIS'] returns were not implausible. Over the course of my career, I have seen many reports comparing fund managers and observed many fund managers' results where the returns were high and volatility was proportionately low;" and

- "Based on [Madoff's] redemption history, there would have been no reason to doubt that the performance as depicted was real or that the funds that were invested were actually there."

These statements are nothing more than a regurgitation of Defendants' arguments. As set forth in the Trustee's opening brief and further above, Weingarten admittedly applied no methodologies and conducted no analyses. Thus, other than his recitation of Defendants' factual narrative or his *ipse dixit* conclusions, Weingarten has no reliable or verifiable basis to opine that Merkin had a "good due diligence process," or that the returns in the Merkin Funds' BLMIS accounts were comparable to the returns of other unidentified and undisclosed fund managers. Indeed, Weingarten's recitation of a factual narrative—Defendants' factual narrative—is nowhere clearer than on the redemption issue. While he posits that Madoff's redemptions are proof of performance, Weingarten testified:

> Q. Have you reviewed the redemption history of the Merkin funds?

14

> A. I have not gone through ever (sic) request for redemption to see if it was met.[48]

The types of conclusory statements that Weingarten offers are nothing more than factual narratives that mimic Defendants' legal arguments and posturing. The law is clear that an expert cannot be presented solely for the purpose of constructing a factual narrative based upon record evidence. *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding testimony of factual narrative, finding "to the extent such evidence is admissible, it should be presented to the jury directly"); *Feinberg v. Katz*, No. 01 Civ. 2739(CSH), 2007 WL 4562930, at *4 (S.D.N.Y. Dec. 21, 2007). Accordingly, Weingarten's factual narratives must be excluded.

## III. WEINGARTEN'S OPINIONS AND TESTIMONY CANNOT AID THE COURT WHERE IT IS NOT BASED ON RELIABLE AND VERIFIABLE METHODOLOGIES AND ANALYSES

Defendants posit that Weingarten's testimony is relevant to whether Merkin's due diligence was well within industry standards and therefore, Weingarten's opinions and testimony should be admissible. This claim misses the point of the Trustee's motion *in limine* that Weingarten's testimony would not aid the court and therefore should not be admissible. While Weingarten does conclude that Merkin's due diligence was sufficient, that conclusion and any related conclusions are unsupported by any analysis, data or reliable methodology, improperly purport to advance testimony as to Merkin's state of mind, and/or advance an inadmissible factual narrative. Such testimony, in the false guise of expert opinion, does not aid the court and should be excluded. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) ("[E]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson." (quoting *DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir.

---

[48] Weingarten Dep. at 230:8–11.

15

2005))); *Estate of Jaquez v. City of N.Y.*, 104 F. Supp. 3d 414, 432 (S.D.N.Y. 2015) (finding expert testimony unhelpful that usurps the role of the fact finding and is based largely on common sense); *Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 253–54 (S.D.N.Y. 2013) (holding that expert could not provide an assessment of the documentary and factual evidence related to the case); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469–70 (S.D.N.Y. 2005) (quoting *Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 551 (rejecting portions of plaintiffs' expert's testimony that should be "properly presented through percipient witnesses and documentary evidence")).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court enter an order granting his motion *in limine* to exclude the opinions and testimony of Jeffrey M. Weingarten.

Dated:  June 13, 2017
         New York, New York

**BAKER & HOSTETLER LLP**

*/s/ David J. Sheehan*
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Brian W. Song
Email: bsong@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*