# EXHIBIT H

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4            v.                           10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                           Jury Trial
 8                Defendants.

 9   ------------------------------x
                                           New York, N.Y.
10                                         October 30, 2013
                                           9:10 a.m.
11
     Before:
12
              HON. LAURA TAYLOR SWAIN
13
                                           District Judge
14

15
              APPEARANCES
16

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20        Assistant United States Attorneys

21

     GORDON MEHLER
22   SARAH LUM
          Attorneys for Defendant O'Hara
23

24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              APPEARANCES

 2

   ANDREW J. FRISCH
 3 GARY VILLANUEVA
   AMANDA BASSEN
 4      Attorney for Defendant Bonventre

 5

   ROLAND G. RIOPELLE
 6 MAURICE H. SERCARZ
   ARIELLE PANKOWSKI
 7      Attorneys for Defendant Bongiorno

 8

   ERIC R. BRESLIN
 9 MELISSA S. GELLER
        Attorneys for Defendant Crupi

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (Jury present)
2    BRUCE DUBINSKY, resumed.
3           THE COURT: Good morning, members of the jury.
4    Welcome back. Please take your seats. Please be seated
5    everyone.
6           Mr. Breslin.
7           MR. BRESLIN: Thank you, your Honor.
8           Good morning, ladies and gentlemen.
9           THE JURY: Good morning.
10   CROSS-EXAMINATION
11   BY MR. BRESLIN:
12   Q.   Good morning, Mr. Dubinsky.
13   A.   Good morning, Mr. Breslin.
14   Q.   We have not spoken in the interim between yesterday
15   afternoon and this morning?
16   A.   We have not.
17   Q.   Let's talk a little bit about your expert report and the
18   analysis that backs it up.
19   A.   OK.
20   Q.   I think you testified on direct, and perhaps also in your
21   deposition, that this analysis took an enormous amount of time
22   and effort to put together. Is that a fair statement?
23   A.   That is correct.
24   Q.   And a tremendous amount of expertise as well?
25   A.   That is correct.

```
 1   Q.  Multiple kinds of expertise really, actually, correct?
 2   A.  I would agree with you.
 3   Q.  Not just accounting expertise, but legal expertise?
 4   A.  The lawyers may have looked at it.  But people on my team
 5   that had JDs, we weren't applying legal analysis to the report.
 6   It was financial analysis that we were reporting.
 7   Q.  Let's approach it a different way.  You had accountants
 8   working on your team?
 9   A.  That is correct.
10   Q.  You had lawyers working on your team even though they were
11   not functioning as lawyers?
12   A.  That is correct.
13   Q.  You had people with law degrees?
14   A.  Yes, sir.
15   Q.  You had multiple people with computer expertise?
16   A.  That is correct.
17   Q.  And fraud expertise as well?
18   A.  That is correct.
19   Q.  Can you estimate for us this morning how many man hours
20   went into doing your report and the entire analysis that Duff &
21   Phelps did of Madoff Securities?
22   A.  It would be a total estimation, but I would say thousands
23   and thousands of hours, man hours.
24   Q.  Let's see if we can get a little closer, because I think it
25   is instructive.  I think you testified previously that Duff &
```

```
 1   Phelps has been paid $30 million for its services to date?
 2   A.   Thereabout, that's correct.
 3   Q.   Is that the amount that Duff & Phelps has billed or the
 4   amount that it's been paid?
 5   A.   The amount that it's been paid.
 6   Q.   Are there bills outstanding?
 7   A.   There may be one or two small bills that are outstanding
 8   presently, a couple hundred thousand dollars.
 9   Q.   Small bills of a couple of hundred thousand dollars?
10   A.   Yes, sir.
11   Q.   I think you testified yesterday that your hourly rate for
12   the work that you did on this analysis was $775 an hour?
13   A.   That is correct.
14   Q.   The other people who worked on that, were some of them
15   higher or some of them lower in terms of what hourly rate they
16   charged?
17   A.   They were all lower.
18   Q.   So you sort of stood at the peak of the pyramid in terms of
19   billing?
20   A.   That is correct, yes.
21   Q.   Everyone else under you billed less?
22   A.   Either had a similar rate or most people had a rate that
23   was underneath my rate.
24   Q.   Do you have a calculator with you?
25   A.   I do.
```

1 Q. Let's take your hourly rate, even though, as you have
2 testified, it is at the top of the pyramid. If you could,
3 divide the number 30 million by 775. Tell me what number you
4 get.
5 A. That's 38,709.
6 Q. The work that was done so far on this report and the
7 analysis, and we will leave aside the question of expenses till
8 the end, represents over 38,000 Bruce Dubinsky hours, for lack
9 of a better term?
10 A. They weren't all my hours. I had a team of people. But in
11 total that would be roughly the total man hours over the
12 several-year period that people worked on this case, that's
13 correct.
14 Q. Bruce Dubinsky rate hours would probably be a better way of
15 putting it?
16 A. The formula you just had me divide by was my rate.
17 Q. With that hour 38,000 number, if you could divide that by
18 8, which is I think what is considered the average workday.
19 Tell me what number you get.
20 A. 4,750.
21 Q. Is that you rounding off a little bit?
22 A. A little bit, yes.
23 Q. The amount of work done by Duff & Phelps on this analysis
24 at $775 an hour equates to 4,750 workdays, is that correct?
25 A. That's approximate, that's correct.

```
 1   Q.  Can you divide that number by 5, since 5 is the average
 2   work week.
 3   A.  950.
 4   Q.  You're rounding off a little bit?
 5   A.  No.  I think that's the division.
 6   Q.  OK.  At your rate, which is the high rate, the amount of
 7   work done by Duff & Phelps is about 950 hours of work 8 hours a
 8   day 5 days a week?
 9   A.  That is correct.
10   Q.  How many years of work would that be if you divide that
11   number by 52?
12   A.  18 years.
13   Q.  At your rate, which is the high rate, Duff & Phelps
14   employees expended approximately 18 years of work preparing
15   this analysis and expert report?
16   A.  If you put it in context, it would have been one person for
17   18 years.  But I had multiple people on the team working, so
18   obviously we didn't work for 18 years.
19   Q.  I'm not saying you worked for 18 years.  But the time
20   expended multiplied over the entire cast of characters comes to
21   18 years worth of work?
22   A.  Yes.  The professionals that worked on this, that was the
23   amount of hours that we put into this examination.
24   Q.  Is it fair to say that there were multiple drafts of your
25   report, your expert report, generated before it was filed in
```

1 bankruptcy court?

2 A. There were drafts of the report, that is correct.

3 Q. About how many drafts were done?

4 A. There was a working document. As I went through the

5 working document, I would make changes to it. It was kind of a

6 living and breathing document. There weren't separate,

7 distinct drafts. At the very end there might have been one

8 distinct draft before it was filed.

9 Q. This was a collaborative effort?

10 A. Yes, sir.

11 Q. How many people at Duff & Phelps were involved in the

12 collaborative effort of writing the expert report?

13 A. I would say the team that spent most of the time writing

14 it, there were probably about 5 to 10 individuals that

15 contributed to the writing of the report. Then that went to

16 me. The different sections of the report went to me for

17 review, for editing, and ultimately my pen was put to the

18 signature on the report after I reviewed it.

19 Q. Did you share drafts with Baker & Hostetler, counsel for

20 the trustee?

21 A. There were drafts that were shared, yes.

22 Q. Without telling me the content of any of the comments that

23 were exchanged back and forth, were there comments given to

24 Duff & Phelps by Baker & Hostetler?

25 A. There were.

1  Q. And reactions from Duff & Phelps to Baker Hostetler to
2  their comments?
3  A. That's correct.
4  Q. Within the confines of this collegial effort, Baker &
5  Hostetler was a player in this as well?
6  A. They were who I was working for. Like any law firm, when
7  I'm hired and retained by a law firm, the lawyers want to look
8  at the work product that I'm doing, and they have comments,
9  sure.
10 Q. Were there portions of the report that you actually drafted
11 yourself?
12 A. Yes, sir.
13 Q. You were among these five to ten people, you were one of
14 the scriveners?
15 A. That is correct, yes.
16 Q. I know this is probably an unfair question, but can you
17 give us a ballpark of how much of the report you wrote as
18 opposed to how much of the report you edited?
19 A. At the end of the day I would say that the whole report was
20 mine. I went through line by line, page by page, made edits,
21 corrections, some sections I wrote the entire section. But at
22 the end of the day, when I put my name to that report, those
23 are my opinions, my conclusions.
24 Q. I understand, and that I think is appropriate. At the end
25 of the day you signed it. In signing it, you adopt all the

```
 1  work that was done even though you may not have done it, at
 2  least as scrivener, yourself?
 3  A.  That is correct.
 4  Q.  I think that is appropriate.  My question was --
 5          MR. ZACH:  Objection to form.
 6          THE COURT:  Please consult.
 7          (Counsel conferred.)
 8  Q.  Can you estimate how much of the report you were the
 9  scrivener of as opposed to how much you were the editor of?
10  A.  I wouldn't be able to do that.
11  Q.  We saw during your direct testimony approximately 140
12  slides.  Was the process in drafting the slides the same as the
13  process for drafting the report?
14  A.  I would say similar.  I had people working on drafting the
15  slides.  Some I prepared myself.  Some were prepared by other
16  people at Duff & Phelps.  Ultimately, I reviewed those slides,
17  made sure I agreed with them, and finalized the slides for the
18  direct testimony.
19  Q.  You testified yesterday you were first retained by Mr.
20  Picard's firm in June of 2011?
21  A.  That is correct.
22  Q.  When did the first iteration of this or when was your
23  report filed in bankruptcy court?
24  A.  I don't recall exactly the date.  I think somebody
25  yesterday said it was November of 2011.  There were two
```