

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Andrew B. Kratenstein
Attorney at Law
akratenstein@mwe.com
+1 212 547 5695

June 26, 2017

BY ECF, FEDERAL EXPRESS AND EMAIL TO
BERNSTEIN.CHAMBERS@NYSB.USCOURTS.GOV

The Honorable Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

Re:    *Secs. Inv. Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 08-1789 (SMB);
       *Picard v. Sage Assocs., et al.*, Adv. Pro. No. 10-04362 (SMB);
       *Picard v. Sage Realty, et al.*, Adv. Pro. No. 10-04400 (SMB)

Dear Judge Bernstein:

This law firm represents Defendants Sage Associates, Sage Realty, Malcolm H. Sage, Martin A. Sage, Ann M. Sage Passer, and the Estate of Lillian M. Sage (collectively, the "Sages") in the above-referenced adversary proceedings (the "Sage Adversary Proceedings").   I write to reply to the Memorandum of Law in Opposition to Notice of Request to Depose Bernard Madoff on Day 2 Deposition Topics (ECF No. 16135).

The Sages join in the arguments advanced by Chaitman LLP in Defendants' Memorandum of Law in Further Support of Their Request to Depose Bernard L. Madoff on Day Two Deposition Topics, dated June 26, 2017 (ECF No. 16263).  We write briefly to address the points raised by the Trustee regarding so-called "directed" trading on pages 16-18 of the Trustee's Memorandum of Law, which pertain to one of the topics on which the Sages have sought to question Mr. Madoff.

The Trustee claims that Mr. Madoff disclaimed during Day One of his deposition any knowledge of customers directing either how their accounts should be managed or specific trading activity. But it is clear from the testimony cited by the Trustee that Mr. Madoff was not saying that either his sole proprietorship or his firm, Bernard L. Madoff Investment Securities LLC ("BLMIS"), *never* engaged in such directed trading on behalf of customers.  Rather, Mr. Madoff testified that "we *basically* did not do that kind of business."  (Trustee Mem. at 17) (citing Madoff Apr. 26 Dep. at 26:25-27:15).  In other words, Mr. Madoff and BLMIS *generally* did not engage in directed trading.

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue New York New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444   www.mwe.com

The Honorable Stuart M. Bernstein
June 26, 2017
Page 2

That testimony is true.  Mr. Madoff and BLMIS did not generally engage in directed trading.  They did so only rarely.  In fact, two of the Trustee's experts, Bruce Dubinsky and Joseph Looby, have already acknowledged that Mr. Madoff and BLMIS did, in fact, engage in directed trading on behalf of a small number of customers.

Specifically, Mr. Looby stated in his Declaration, "A relatively small amount of a single customer's IA Business transactions were similar to House 5 transactions, ***and there was evidence of directed trades***."  (Ex. A, Looby Decl. ¶ 95) (emphasis added).  Similarly, Mr. Dubinsky states in his Report, "A small, limited group of IA Business customer accounts did not follow either the purported convertible arbitrage strategy or the [split-strike conversion] strategy.  Instead, securities (typically equities) were purportedly purchased, held for a certain duration, and then purportedly sold for a profit."  (Ex. B, Dubinsky Report ¶ 24, *see also* ¶ 153.)

The evidence will establish that the Sages directed Mr. Madoff and BLMIS as to how to trade in the Sage Associates account.  For example, attached hereto as Exhibit C is a letter produced by the Trustee from Malcolm Sage to Mr. Madoff in which Mr. Sage instructs Mr. Madoff to execute the "following plan" concerning the Sage Associates and Sage Associates II accounts and then directs Mr. Madoff to execute eight specific transactions.  The Sages will also testify that they regularly gave Mr. Madoff instructions about what securities to buy, sell, and hold.

As Chaitman LLP explains in its Memorandum of Law, the Trustee initially withheld and then recently produced when forced to do so hundreds of thousands of documents consisting of millions of pages concerning Mr. Madoff's and BLMIS's trading activity, which Defendants recently learned is not even close to a complete production of all Madoff and BLMIS trading and banking records.[1]  These document productions – which the Trustee's counsel did not bother to review before producing – contain many plainly non-responsive documents (including take-out menus, magazines, and travel guides) through which defendants must incur the burden and expense of wading.  (*See, e.g.*, Exhibits D-E.)

Fortunately, needles in this massive haystack corroborate that stock positions held in the Sage Associates account were real.  For example, attached hereto as Exhibit F is a statement of stocks held by Madoff on May 31, 1985 at The National Westminster Bank.  The statement includes 34,780 shares of Disney stock.  Attached hereto as Exhibit G is a list of stocks held on May 31, 1985 by Madoff Investment Advisory customers.  The document shows 9,000 shares of Disney in the Sage Associates account and 5,000 shares in another Sage account.  Together with several other Investment Advisory customers, the document shows holdings of 34,780 shares of Disney – the same number shown as being held at The National Westminster Bank.

---

[1] For example, as explained in Chaitman LLP's Memorandum of Law and accompanying exhibits, the Trustee is in possession of 5,300 reels of Madoff and BLMIS microfilm and has restored only approximately 600 of those reels, leaving approximately 4,700 unrestored reels that have apparently never been scanned, reviewed, or produced. (Chaitman Decl. Ex. AA.)

The Honorable Stuart M. Bernstein
June 26, 2017
Page 3

The Trustee's recent document productions also contain a ledger listing a portfolio of various stock positions – in Asarco, Alcan, Reynolds Metals, AT&T, Kaiser, Dr. Pepper, Skyline, and Central Penn National Corporation, an RCA – which the Sages inherited from their father, Maurice Sage, after he died in 1976.  In 1979, the Sages delivered this stock to Mr. Madoff and instructed him to sell the stock, which he did.  As reflected in Exhibit H, Mr. Madoff sold the stock to National Bank of North America ("NBNA").  The Sages also inherited and delivered to Mr. Madoff an RCA bond, which they did not sell until 1986 and which Mr. Madoff kept at NBNA.  (*See* Exhibit I.)

Litigation is supposed to be a search for the truth.  The Trustee should not be permitted to continue to shroud the truth by preventing defendants such as the Sages – who have not had an opportunity to question Mr. Madoff yet – from doing so.  The rules made by this Court concerning the Madoff deposition were clear that the Sages and other Participating Customers would have an opportunity to ask Mr. Madoff questions about their accounts.  It would be fundamentally inequitable to change the rules now.

Respectfully,

Andrew B. Kratenstein

Enclosures
cc:      All counsel (*by ECF*)

DM_US 82475720-1.100255.0011