# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                   Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>               Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>              Debtor. | |

## EXPERT REPORT OF BRUCE G. DUBINSKY
## MST, CPA, CFE, CVA, CFF, MAFF

19.    There was no trading using the so-called "convertible arbitrage trading strategy" purportedly
       implemented by BLMIS in the 1970s. In many instances, purported trades exceeded the
       entire reported market volume for particular securities on the days they were purportedly
       traded. On numerous trading days, trades were recorded at prices that were outside the range
       of market reported trading prices on a given day.

20.    Convertible securities were reported by the IA Business as being traded on days after the
       actual date of conversion reported by the issuing corporation, thereby evidencing the fictitious
       nature of the purported trades. Further, dividend payments and/or accrued interest were not
       reported by the IA Business on many customer statements even though the real convertible
       securities paid such dividends and/or interest. Lastly, there was no evidence that the
       purported convertible securities were ever actually converted, again supporting the fictitious
       nature of the purported trading activity.

21.    Similarly, no trading occurred under the so-called "split-strike conversion" ("SSC") strategy,
       purportedly put into place by BLMIS in the 1990s. Many purported trades exceeded the
       entire reported market volume for particular securities on numerous trading days and were
       recorded at prices that were outside the range of reported trading prices on the days at issue.

22.    The prices at which the IA Business supposedly bought and sold shares also evidenced the
       fictitious nature of the trades. The IA Business purportedly executed 83% of the buy
       transactions by share volume below the Volume Weighted Average Price ("VWAP") and
       executed 72% of the sell transactions by share volume above the VWAP.

23.    Further evidence that trading did not occur is that certain purported trades were recorded as
       being settled on weekends or holidays when the U.S. stock and option exchanges were closed.
       Many trades were also supposedly settled after the industry mandated time period of T+1 (for
       options) or T+3 (for equities).[13] In addition, billions of dollars of purported dividends that
       were reported on IA Business customer statements were fictitious and were never received by
       BLMIS, again showing the fictitious nature of the trades.

24.    A small, limited group of IA Business customer accounts did not follow either the purported
       convertible arbitrage strategy or the SSC strategy. Instead, securities (typically equities) were

---

[13] As described *infra*, the industry requirement for the settlement of options is one day after the trade date, or T+1,
and the industry requirement for the settlement of equity transactions is three days after the trade date, or T+3.

purportedly purchased, held for a certain duration, and then purportedly sold for a profit. Trading anomalies reflected in these customer accounts also show how these purported trades could not have been executed and were therefore fictitious.

25.    Other evidence of fraud in the IA Business was the creation of fake reports from the DTC trading clearinghouse.  IA Business customer statements contained fictitious trades that were backdated using special software modified in-house to reprint customer statements after the fact.  Extensive in-house computer programs were created and used to generate the fictitious investment transactions.

26.    The IA Business was propping up, or "schtupping,"[14] certain IA Business customers' purported investment returns by providing those customers with extra fictitious trades that were intended to generate additional fictitious gains.  This was done in order to reach predetermined rate of return thresholds.  The process involved a careful monitoring of certain accounts to attain levels of reported investment returns throughout the year.  Those accounts that were falling short were given additional fictitious trades, typically in December of that year, in order to bump the purported yearly returns to levels that Madoff had targeted for those customers.

27.    Additionally, various regulatory reports reflected false financial and other information.

**B.  The IA Business was a Ponzi Scheme**

28.    The IA Business was a Ponzi scheme, utilizing new customer monies to fund BLMIS's operations, as well as to fund the withdrawal of fictitious profits and principal for its older customers.  The Ponzi scheme had been operating for many years, as evidenced by the fact that the IA Business was not generating any legitimate profits since no trading activity was taking place.  Additionally, the IA Business was not receiving legitimate financial support from the Proprietary Trading Business in amounts sufficient to satisfy the cash requirement needs of the IA Business customer withdrawals.  Nor was the IA Business receiving any legitimate outside financial support vis-à-vis loans or otherwise.

---

[14] See infra (discussing the context surrounding the "schtupping" of certain IA Business customer returns).

to the fact that, unlike the market indices, the IA Business accounts <u>do not show a negative annual rate of return in any year during the period</u>. Because the IA Business SSC strategy was supposedly engineered around the S&P 100, the returns the strategy would have necessarily generated should have been highly, positively correlated to the relevant indices discussed above. This clearly was not the case.

153. The lack of volatility in the annual rates of return for the purported IA Business investments, and the fact that the rates of returns never exhibited a negative period, lend further support that the trades in the IA Business did not occur.

### d. Non-convertible arbitrage strategy and non-SSC strategy customer accounts - evidence shows that these transactions were fictitious

154. As described above, a small number of IA Business customer accounts did not follow either the purported convertible arbitrage strategy or the SSC strategy. Instead, securities (typically equities) were purportedly purchased, held for a certain duration, and then purportedly sold for a profit.

155. These accounts also reflected similar trading discrepancies that were identified for those accounts following the purported convertible arbitrage and SSC strategies. That is, these accounts also showed trading volumes of securities that exceeded the daily market trading volume, purported purchases and sales of securities at prices that were beyond the daily market highs or lows, backdated trades, trade settlement anomalies, and trades on weekends and holidays. Such trading discrepancies are further evidence that these purported transactions also could not have occurred.

### e. There are no records from the DTC evidencing any legitimate trades occurring from the IA Business

156. Transfers of securities between licensed brokers are conducted by the DTC through automated book-entry changes to the broker's accounts.[167] Instead of trading paper stock

---

[167] The Depository Trust & Clearing Corporation ("DTCC") was formed in 1999 by combining the DTC and the NSCC. The DTCC, through its subsidiaries, provides clearance and settlement for almost all equity, bond,