DENTONS US LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
carole.neville@dentons.com

*Attorneys for Participating Customers*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC | |
| Plaintiff, | |
| v. | |
| DEFENDANTS LISTED ON EXHIBIT A ON SEPTEMBER 29 ORDER, | |
| Defendants. | |

## DENTONS PARTICIPATING CUSTOMERS' RESPONSE TO TRUSTEE'S OPPOSITION TO NOTICE OF REQUEST TO DEPOSE BERNARD L. MADOFF ON SECOND DAY DEPOSITION TOPICS

Certain Participating Customers represented by Dentons US LLP, through their counsel, hereby respond to the Trustee's Opposition to the Notices of Request to Depose Bernard L. Madoff On Day 2 Deposition Topics and respectfully state as follows:

1.    The Order Authorizing the Deposition of Bernard L. Madoff  [Docket No. 14213] entered on September 29, 2017 (the "Order"), *inter alia*, authorized the Participating Customers to depose Madoff on a series of topics primarily aimed at determining when the fraud began, how extensive or limited it was throughout the firm's operations, and how certain customer accounts were treated by Madoff and/or BLMIS.  Madoff's deposition testimony, recently produced trading documents and other evidence to support the Participating Defendants contention  that the 30 year Ponzi scheme story hatched in the first days of the SIPC proceedings without an iota of diligence and regularly repeated by the Trustee, the press and courts is, at best, an oversimplification and more likely, in some important respects, false.

2.    For example, consistent with his plea allocution, Madoff testified repeatedly that the fraud of not purchasing securities for Investment Advisory customer accounts began in the 1990's with the split-strike conversion accounts, not, as the Trustee insists, in the 1970's. Moreover, Madoff has repeatedly testified that he continued to trade for customer accounts managed in other investment strategies, such as the arbitrage accounts, after he ceased trading for the split strike conversion accounts.  In addition, Madoff did not have to solicit new customers to meet redemptions as in the classic Ponzi scheme.  According to his testimony and recently produced trading records, Madoff kept between $2.5 to $6 billion in Treasury bills in the firm account that had been purchased with customer money to meet redemptions until the last weeks in December 2008.  He may have "sold" these securities to customers in the Investment Advisory business.  Yet, the Trustee's key expert on the fraud, based a review of limited documents provided to him by the Trustee, concluded that Madoff held at most $80,000,000 in

these securities at any time, which he tested against the securities held customer statements to prove that no trading occurred.  It is also clear from the Madoff testimony and the Trustee's questions of him that the Trustee's experts did not understand common trading practices.  Thus, they failed to account for the fact that trading in convertible securities regularly involved trading each of the bond or stock at separate times without a conversion of the bond, securities were traded over the counter or from firm holdings for which there would have been no DTC record, and stock prices listed on customer statements, when trading did occur, reflect an average trading price for block purchases over days not a single day of trading, to cite a few examples of the experts' errors.

3.    To be clear, Madoff defrauded most of the innocent investment advisory customers beginning sometime in the early 1990's.  However, the fraud was far less extensive than the Trustee's factual recitation he's led everyone to believe and it lacks a number of the significant characteristic of a Ponzi scheme.  Among other things, Madoff purchased billions of dollars of Treasury bills with customer funds, which actually did allow BLMIS to meet redemptions until the last weeks in December 2008.  He apparently had a back stop in the form of the four family indemnifications that might have covered all of the innocent customers' redemptions.   Madoff did not solicit new customers to meet redemptions; he turned new investors away.  Early depositors did not redeem with later customers' money.  Instead, customers typically used these accounts as anyone would use a brokerage account to deposit and with funds as their finances and living expenses required.

4.    The Ponzi scheme label that every fraudster is required to adopt without any understanding of its implications and the fiction perpetuated by the Trustee provide the Trustee with a number of presumptions that are difficult to rebut by individual defendants who have limited resources.  In addition, by labeling the fraud a Ponzi scheme at the outset and

3

withholding certain information[1], the Trustee tapped into Ponzi scheme case law that limited the

value defense to rescission claims for principal invested.  The Trustee and this Court have

rejected the securities law cases that permit a broader range of recovery.  *See e.g. Freeman v.*

*Marine Midland Bank-New York*, 419 F. Supp. 440 (E.D. N.Y. 1976) ("[Section 29(b)] make[s]

[fraudulent] contracts voidable at the option of the innocent party.  This interpretation has

permitted the investor, at his option, to void the contract as a defense to a lender's suit, to sue on

the contract for damages, to enforce the contract, or to seek rescission."); *Kardon v. National*

*Gypsum Co.,* 69 F. Supp. 512, 514 (E.D. Pa. 1946) ("Congress meant the original statute to be

interpreted as providing for civil suits under it. .... [And] such suits would include not only

actions for rescission but also for money damages."); *Cant v. AG Becker & Co., Inc*., 384 F.

Supp. 814, 816 (N.D. Ill. 1974) (in lieu of the rescission remedy under Section 29(b), the

plaintiff is entitled to an award of monetary damages, interest, and costs to restore him to the

position he would have been had it not been for the defendant's wrongful activity, *i.e.*, to be

"placed in a posture which assumes that he had the opportunity to utilize his funds in a

reasonable manner."); *Visconsi v. Lehman Bros*., 244 F. Appx. 708, 713 (6th Cir. 2007) (" [T]he

out-of-pocket theory, which seeks to restore to Plaintiffs only the $21 million they originally

invested less their subsequent withdrawals, is a wholly inadequate measure of damages.")

Madoff's testimony, albeit coming late in the history of the SIPA adversary proceedings is a

critical component of the innocent defendants' defenses.

5.      Pursuant to the Order, the Participating Customers designated a lead lawyer to

conduct the questioning.  Although there was a great deal of collaboration on the questioning

before the deposition, the Participating Customers did not have the opportunity to follow up on

specific areas relevant to customer accounts that was available for the first day testimony.  As

---

[1] In addition to trading records, the Trustee did not disclose until fairly late in the discovery process that he lacked in many cases third party records to meet his burden of demonstrating that transactions in the accounts occurred and he intended to establish the facts of missing transactions with expert testimony.

4

shown below, the designated second day topics are aimed at clarifying some major issues and are not inconsistent with the Order.  It should be noted that the Order contemplated that there might be a second day of testimony, but it does not designate or limit the areas for the second day of testimony.

6.    The Trustee is not opposed to a second day of testimony to the extent that it provides him with an opportunity to question Madoff again about the FBI 302 statements.  These are statements purportedly taken from FBI notes of a meeting eight days after Madoff's arrest. The Trustee already badgered Madoff at length about the 302 statements during his turn to question the witness, notwithstanding the fact that Madoff testified that he did not know what the statements were, and he did not see the FBI taking notes.[2]  The Trustee obviously plans to use these statements to establish when the fraud began and to discredit Madoff's current testimony. The Participating Customers designated the 302 statements solely to establish their limitation as reliable evidence.

7.    The Trustee spent a full day and a third questioning Madoff on a range of topics, including Madoff's relationship with Cohmad, which was neither a designated topic nor one relevant to the customer accounts.  The thrust of the Trustee's questioning and his lengthy opposition to a second day of questioning currently before the Court is to rehabilitate the implausible theory that Madoff conducted a Ponzi scheme for more than thirty years rather than finding out what actually happened.[3]  This was the Trustee's first and only time questioning Madoff under oath about the firm's business practices.

---

[2] See April 27 transcript pp. 357-364.  Madoff testified that the FBI was not focused on the discussion during that meeting as follows:
> "I think the FBI was standing at my piano. They didn't seem to taking notes because I remember they looking through pictures of my family at the piano.  They didn't seem to have much of an interest in what was going on.  I
> Don' know why they were there, quite frankly."

[3] See April 27, Transcript 366-7.  A small sampling  of Mr. Sheehan's lengthy questioning illustrates the point:
> Sheehan:  Mr. Madoff, for the last 16 years of your professional life by your own admission you lied for a living, isn't that true.

104046750\V-1

8.      After the transcripts became available for review, the Participating Customers determined that follow up questions would be beneficial.  The procedures for noticing a request for a second day of testimony required a notice but did not require the requesting parties to provide an explanation of the designated topics.  The Participating Customers provide the following brief explanation for their requests.

A.      The extent to which BLMIS bought, sold, and held actual securities shown on the customer statements from and after 1992 through December 2008.

Madoff admitted trading for certain accounts at times during that period.  In particular, the Participating Customers would seek clarification of the extent to which the Treasury bills held in the firm account were sold or allocated to customer accounts.

B.      The redacted FBI 302 recently produced by the Trustee.  Explained above.

C.      The indemnification agreements Madoff had with the Four Families.

The Participating Customers are not interested in raising any issue with the Four Families.  Rather, the Participating Customers seek additional information to establish their existence and the extent to which they provided a back stop to Madoff to meet redemptions.

D.      Interpretation of Madoff's or BLMIS's account records sent to customers, including the Defendants.

Certain Participating Customers' account records include monthly reports called portfolio

---

Madoff: For the last 16 years, yeah.
Sheehan: Yeah. You lied for a living?
Madoff: Yeah
Sheehan: Right. But now we're supposed to believe that you're telling us the truth?
Madoff: No.
Sheehan: Aren't you trying to rehabilitate yourself?
Madoff:  No.
Sheehan: You're trying to make everyone think that you were a good guy until '92 until the big four put the screws to you?
Madoff: That's correct.
Sheehan: Yeah. But that wasn't true, was it?
Madoff: No. It was true.
Sheehan: You were a phony in the 80s?
Madoff: No. It's not true.

104046750\V-1

management reports for various periods.  These records at times conflict with the customer

account statements.  The Participating Customers would question the witness about these reports.

    E.    Day Two Deposition Topics listed by Helen Chaitman and Authorized Counsel

for the Participating Customers.

    The Participating Customers would question the witness regarding accounts held by

custodians, including FISERV, to determine if these accounts were managed or treated

differently than other customer accounts, for example.

    9.    Based upon the above, the Participating Customers request that the Court permit a

second day of deposition of Bernard Madoff, subject to the limitations governing the prior day of

deposition.

Dated: June 27, 2017
    New York, New York

DENTONS US LLP

By: _/s/ Carole Neville_____
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
carole.neville@dentons.com

*Attorneys for Defendants*

104046750\V-1

## CERTIFICATE OF SERVICE

I, hereby certify that a true and accurate copy of the following was served this 27th day of

June, 2017 by electronic mail and as further described below upon the following:

**By Hand Delivery**
Nicholas J. Cremona
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111-0100
Telephone:  212.589.4200
Facsimile:  212.589.4201
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
David J. Sheehan
Email: dsheehan@bakerlaw.com


**By FedEx**
Kevin H. Bell
Securities Investor Protection Corp
1667 K Street, N.W.
Suite 1000
Washington, DC 20006
Telephone:  202.371.8300
Facsimile:  202.223.1679
Email:  kbell@sipc.org


                                    By: */s/ Carole Neville*
                                         Carole Neville

94400121