LAW OFFICE OF
RICHARD E. SIGNORELLI
799 Broadway, Suite 539
New York, NY 10003
Telephone:    212 254 4218
Facsimile:    212 254 1396
rsignorelli@nycLITIGATOR.com℠
www.nycLITIGATOR.com℠
*Attorneys for Defendants David I. Lustig, individually*
*and in his capacity as Trustee for The Lustig Family*
*1990 Trust, and The Lustig Family 1990 Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SECURITIES INVESTOR PROTECTION
CORPORATION,                                           Adv. Pro. No. 08-01789 (SMB)

                         Plaintiff-Applicant,          SIPA LIQUIDATION

                v.                                     (Substantively Consolidated)

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
                                                       **MEMORANDUM OF LAW**
                         Defendant.                    **IN SUPPORT OF DEFENDANTS'**
------------------------------------------------------------x   **MOTION FOR LEAVE TO APPEAL**
In re:

BERNARD L. MADOFF,

                         Debtor.
------------------------------------------------------------x
IRVING PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                         Plaintiff,                    Adv. Pro. No. 10-4554 (SMB)

                v.

DAVID IVAN LUSTIG,

                         Defendant.

---------------------------------------------------------------x

IRVING PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

        Plaintiff,                      Adv. Pro. No. 10-4417 (SMB)

      v.

THE LUSTIG FAMILY 1990 Trust, et al.,

        Defendants.

---------------------------------------------------------------x

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES....................................................................................................iv

PRELIMINARY STATEMENT ............................…....................................................................1

RELEVANT FACTUAL BACKGROUND...........................................................................2

    A.    The IRA CASE (ADV. PRO. NO. 10-4554).........…...............................................2

        1.    The Trustee's Claim In The IRA Case .......…..................................................2

        2.    The Entire $2,000,000 That Was Withdrawn From The IRA Account Has Already Been Returned To BLMIS…............................3

            a.    Transfer Of The $2,000,000 From BLMIS To Fiserv And From Fiserv To Lakeview ……......................................................3

            b.    Transfer Of The $2,000,000 From Lakeview To Wailea ……...........................................................................................4

            c.    Transfer Of The $2,000,000 From Wailea To HSBC...............................5

            d.    Transfer Of The $2,000,000 From HSBC To Senator And Reinvestment Of That Money Into BLMIS...........................................6

            e.    Withdrawal Of The $2,000,000 From BLMIS And The Trustee's Subsequent Recovery Of That Money Pursuant To The Settlement Agreement With Senator...................................................................................................8

    B.    THE TRUST CASE (ADV. PRO. NO. 10-4417).....…...............................................9

        1.    The Trustee's Claim In The Trust Case .......…..................................................9

        2.    The Entire $5,000,000 That Was Withdrawn From The Trust Account On July 24, 2007 Has Already Been Returned To The BLMIS Estate ...…...............................................10

            a.    Transfer Of The $5,000,000 From BLMIS To City National Bank And From City National Bank To Lakeview…............................................................................................10

i

       b.   Transfer Of The $5,000,000 From Lakeview To Rye
           XL…….…............................................................................................11

       c.   Transfer Of The $5,000,000 From Rye XL To The
           Financial Institution Leverage Provider As Cash
           Collateral...........................................................................................12

       d.   Transfer Of The $5,000,000 From The Financial
           Institution Leverage Provider To Broad Market
           Fund And Reinvestment Of That Money Into
           BLMIS......................................................................................13

RELEVANT PROCEDURAL BACKGROUND.................................…............................14

    A.    The Affirmative Defenses At Issue.........…........................................................14

       1.    Eight And Ninth Affirmative Defenses (Based On The
           Court's Equitable Powers Under 11 U.S.C. § 105(a)).....................................15

       2.    Tenth Affirmative Defense (Based On The Single
           Satisfaction Rule Under 11 U.S.C. § 550(d) ….......................................16

       3.    Eleventh Affirmative Defense (Based On The Theory
           Of Recoupment)..................................... ….…......................................16

    B.    The Bankruptcy Court's Order Granting The Trustee's
         Motion To Strike The Affirmative Defenses At Issue.......…...........................16

QUESTIONS WHICH SHOULD BE SUBJECT TO IMMEDIATE APPEAL............................18

ARGUMENT......................................…............…....................................................18

    THE ISSUES PRESENTED ON THIS
    APPEAL MEET THE STANDARD
    FOR GRANTING LEAVE TO APPEAL.........…….................................................19

    POINT ONE

    THE BANKRUPTCY COURT'S ORDER
    INVOLVES CONTROLLING QUESTIONS OF LAW.................................................20

POINT TWO

THERE ARE SUBSTANTIAL GROUNDS
FOR DIFFERENCES OF OPINION REGARDING
THE ISSUES PRESENTED ON THIS APPEAL..................….........................................23

A.    The Affirmative Defense Based On The Single Satisfaction
      Rule Under § 550(d) Is Viable And Should Not Have Been
      Dismissed................................................................................................24

B.    The Affirmative Defenses Based On The Bankruptcy Court's
      Equitable Powers Under § 105(a) Are Viable And Should Not
      Have Been Dismissed..............................................................................28

      1.    The Equitable Credits Sought By Defendants Are
            Entirely Consistent With The Bankruptcy Code And
            SIPA................................................................................29

      2.    The Bankruptcy Court's Equitable Powers May Be
            Invoked To Avoid The Patent Unreasonableness And
            Injustice Of The Trustee's Actions ...........................................31

C.    The Affirmative Defense Based On The Theory Of
      Recoupment Is Viable And Should Not Have Been Dismissed ...........................34

POINT THREE

AN IMMEDIATE APPEAL FROM THE
BANKRUPTCY COURT'S ORDER WILL
MATERIALLY ADVANCE THE ULTIMATE
TERMINATION OF THIS LITIGATION......................................................................36

POINT FOUR

"EXCEPTIONAL CIRCUMSTANCES" EXIST THAT
WARRANT IMMEDIATE APPELLATE REVIEW..........…….........................................36

CONCLUSION..................……................................................................................38

## TABLE OF AUTHORITIES

### Cases

Bakst v. Sawran (In re Sawran), 359 B.R. 348 (Bankr. S.D. Fl. 2007)............................26, 27, 32

Consub Del. LLC v. Schahin Engenharia Limitada,
    476 F.Supp.2d 305 (S.D.N.Y. 2007)...................................................................................23

Dobin v. Presidential Fin. Corp. of Delaware Valley (In re Cybridge Corp.),
    312 B.R. 262 (Bankr. D.N.J. 2004)........................................................................24-25, 31

Enron Corp. v. Avenue Special Situations Fund II (In re Enron Corp.),
    2006 WL 2548592 (S.D.N.Y. Sep. 5, 2006).......................................................36

Friedman v. Vinas (In re Trauger), 109 B.R.502 (Bankr. S.D. Fla. 1989)....................................26

Gallo v. Prudential Res. Svcs. Ltd. P'ship, 22 F.2d 1219 (2d Cir. 1994).....................................20

Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),
    33 B.R. 334 (Bankr. S.D.N.Y. 1983)..............................................................................32, 33

Huffman v. Brandon (In re Harbour), 845 F.2d 1254 (4th Cir. 1988)............................................31

In re Alexander, 248 B.R. 478 (S.D.N.Y. 2000)............................................................................23

In re Calpine Corp., 356 B.R. 585 (S.D.N.Y. 2007)......................................................................20

In re Enron Creditors Recov. Corp., 2009 WL 3349471 (S.D.N.Y. Oct. 6, 2009)..................20-21

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1968)..............................19-20

McCord v. Agard (In re Bean), 252 F.3d 113 (2nd Cir. 2001)...................................................24, 25

Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843 (D. Utah 1987).............35

New York State Elec. and Gas Corp. v. McMahon, 129 F.3d 93 (2nd Cir. 1997)..........................34

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    499 B.R. 416 (S.D.N.Y. 2013)..........................................................................................30

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
    522 B.R. 41 (Bankr. S.D.N.Y. 2014).................................................................................30

Styler v. Jean Bob Inc., 154 B.R. 581 (D. Utah 1993)..................................................34

Terry v. Meredith (In re Meredith), 367 B.R. 558 (E.D. Va. 2007)..........................24, 25

Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138 (2nd Cir. 2002)......................34-35

Yerushalmi v. Shibolelth, 405 B.R. 44 (E.D.N.Y. 2009).......................................20, 37

**Statutes**

11 U.S.C. § 105(a) ....................................................................15, 18, 21, 22, 28, 33

11 U.S.C. § 548(a)(1)(A) ......................................................................................3, 10

11 U.S.C. § 550(a)..................................…….................3, 8, 10, 18, 24, 26, 31, 33

11 U.S.C. § 550(a)(1)..................................................…….......................................32

11 U.S.C. § 550(d)..................................…….................16, 21, 24, 25, 26, 27, 28

28 U.S.C. § 158(a)(3)................................…….........................................................1, 20

28 U.S.C. § 1292(b)...............................................................................................20, 36

**Rules**

Fed. R. Bankr. P. 8002................................…….....................................................1

Fed. R. Bankr. P. 8003................................…….....................................................1

Fed. R. Bankr. P. 8004.................................…….....................................................1

Fed. R. Civ. P. 12(f)................................…….........................................................16

**Treatise**

Wright, Miller & Cooper, Federal Practice and Procedure (2nd Ed. 1996)...................21

Defendants David I. Lustig ("Mr. Lustig") and The Lustig Family 1990 Trust ("Trust") (Mr. Lustig and the Trust are sometimes referred to collectively as "Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to 28 U.S.C. § 158(a)(3) and Rules 8002, 8003, and 8004 of the Federal Rules of Bankruptcy Procedure, for leave to appeal the Order Granting Partial Summary Judgment Striking Affirmative Defenses ("Order") entered on June 13, 2017 in <u>Irving H. Picard v. David Ivan Lustig</u>, Adv. Pro. No. 10-4554 ("IRA Case") (Dkt. # 85) and in <u>Irving H. Picard v. The Lustig Family 1990 Trust and David I. Lustig</u>, Adv. Pro. No. 10-4417 ("Trust Case") (Dkt. # 83).[1]

## PRELIMINARY STATEMENT

The IRA Case and the Trust Case are unlike any other case in which the Trustee is seeking avoidance and recovery of allegedly fraudulent transfer made within two years of Bernard L. Madoff Investment Securities LLC's ("BLMIS") collapse. They are totally unique because in these cases the Trustee is seeking to recover money <u>that has already been returned to BLMIS</u>. Mr. Lustig and the Trust never actually received any of the money that the Trustee is now seeking to recover from them.

The Trustee's actions are particularly egregious given that Mr. Lustig and the Trust are innocent good faith investors who have been totally devastated by BLMIS's fraud. They lost all their direct and indirect investments in BLMIS as a result of the fraud. Essentially, the Trustee is seeking to recover from them money that they never actually received that has

---

[1] The bankruptcy reference was previously withdrawn with respect to the IRA Case and the Trust Case for the purpose of adjudicating certain issues in the District Court. Both actions were assigned to Judge Rakoff upon the withdrawal of the bankruptcy reference. <u>Picard v. The Lustig Family 1990 Trust, et al.</u>, Docket No. 12 CV 2782 (JSR); <u>Picard v. Lustig</u>, Docket No. 12 CV 2783 (JSR). Because these actions were previously assigned to Judge Rakoff, this appeal and the instant motion for leave to appeal should also be assigned to Judge Rakoff.

already been returned to BLMIS.  If the Trustee were to succeed, Mr. Lustig will be bankrupted

due to sustaining, in effect, a doubling of his BLMIS losses, since he has already lost the money

that the Trustee is now seeking to recover from him and the Trust.

      The affirmative defenses asserted in the IRA Case and the Trust Case that are at

issue here are based on well-established law and equitable principles aimed at preventing a

bankruptcy trustee from recovering from a transferee money that had already been returned to the

debtor.  They are viable and meritorious defenses that totally defeat the Trustee's claims in both

cases.  The Bankruptcy Court's Order striking and dismissing these defenses as a matter of law is

clearly erroneous and warrants immediate appellate review.

## RELEVANT FACTUAL BACKGROUND[2]

### A.   THE IRA CASE (ADV. PRO. NO. 10-4554)

#### 1.   The Trustee's Claim In The IRA Case

      Mr. Lustig held an individual retirement account with BLMIS, Account No.

IZR297 ("IRA Account").  (First Amended Complaint in the IRA Case ("FAC-IRA") ¶ 31; Exh.

A to FAC-IRA).[3]  On July 25, 2007, a withdrawal of $2,000,000 was made from the IRA

Account.  (Exh. B to FAC-IRA).  This was the only withdrawal ever made from the account.

---

[2]The facts set forth herein are based on information and documents currently available to Defendants.  Discovery has not yet been completed in either the IRA Case or the Trust Case. Unless otherwise indicated, the exhibits referenced herein are attached to the Declaration of Bryan Ha dated March 31, 2017, previously filed in the Bankruptcy Court in opposition to the Trustee's motion to strike the affirmative defenses at issue ("Ha Decl. Mtn. Strike Defenses").  A copy of the Ha Decl. Opp. Mtn. Strike Defenses, with exhibits, is attached as Exhibit 1 to the Declaration of Bryan Ha in Support of Motion for Leave to Appeal dated June 27, 2017 ("Ha Decl. Mtn. Leave Appeal") submitted herewith.

[3]A copy of the FAC-IRA is attached as Exhibit 2 to the Ha Decl. Mtn. Leave Appeal.

2

(Id.).  There is no allegation that the withdrawal was not made in good faith.  The Trustee does

not allege that Mr. Lustig knew or should have known of BLMIS's fraud.  He is, indisputably, an

innocent party.

According to the Trustee, $1,863,225 of the $2,000,000 that was withdrawn

"represented fictitious profits from the Ponzi scheme."  (FAC-IRA ¶ 2; Exh. B to FAC-IRA).

The FAC-IRA contains a single cause of action in which the Trustee seeks to avoid this

withdrawal as an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and to recover the

withdrawn money from Mr. Lustig pursuant to 11 U.S.C. § 550(a).  (FAC-IRA ¶¶ 43-48).

### 2.     The Entire $2,000,000 That Was Withdrawn From The IRA Account Has Already Been Returned To BLMIS

As discussed below, the entire sum of $2,000,000 that was withdrawn from the

IRA Account on July 25, 2007, has already been returned to BLMIS.  All the money was

ultimately lost as a result of BLMIS's fraud.  Mr. Lustig never actually received any of the money

that was withdrawn from the account.

### a.     Transfer Of The $2,000,000 From BLMIS To Fiserv And From Fiserv To Lakeview

Mr. Lustig withdrew the $2,000,000 from the IRA Account solely and specifically

for the purpose of immediately reinvesting the money back into BLMIS through a third-party

feeder fund called Lakeview Investment, LP ("Lakeview").  (Exh. B, ¶ 6).

Upon its withdrawal from the IRA Account, the entire sum of $2,000,000 was

transferred to the custodian for Mr. Lustig's IRA account, Fiserv Investment Support Services (or

a subsidiary thereof) ("Fiserv").  (Exh. C).  The next day, on or about July 26, 2007, Mr. Lustig

instructed Fiserv to wire that entire sum to Lakeview for the purpose of investing the money with

Lakeview. (Id.). A copy of Mr. Lustig's subscription agreement for the Lakeview investment was then sent to Fiserv. (Exh. D).

On August 1, 2007, pursuant to Mr. Lustig's direction, Fiserv transferred the $2,000,000 by wire to Lakeview "to purchase Lakeview Investment LP for [Mr. Lustig's retirement account]." (Exh. E). The funds were received by Lakeview in its bank account at Wells Fargo Bank, N.A. ("Wells Fargo"). (Exh. F). Lakeview confirmed that the money was received for investment on behalf of Mr. Lustig. (Exh. G).

Notably, in addition to the $2,000,000 from Mr. Lustig, deposits were also made into Lakeview's account by other investors for investment with Lakeview during the period from August 1, 2007 through August 24, 2007. (Exh. F; Exh. H).

### b. Transfer Of The $2,000,000 From Lakeview To Wailea

Lakeview invested the $2,000,000 that it received from Mr. Lustig (through Fiserv) with Wailea Partners, LP ("Wailea"), an investment partnership whose primary objective was to make leveraged investments in BLMIS feeder funds managed by Senator Fund SPC ("Senator"). (Exh. I at 2, 4). Wailea's strategy was to "obtain leverage through the use of an option contract, total return swap or leverage facility to be entered into between [Wailea] and a reputable, international bank with an established presence in hedge fund lending." (Id. at 4).

On August 24, 2007, Lakeview executed a Subscription Agreement with Wailea whereby it agreed to invest $7,000,000 in Wailea. (Exh. J). On August 27, 2007, Lakeview transferred the $2,000,000 that it received from Mr. Lustig together with $5,000,000 from other investors – a total of $7,000,000 – to Wailea pursuant to the Subscription Agreement. (Exh. K).

4

Notably, the Subscription Agreement identified Mr. Lustig as having a 10% or more interest in

Lakeview.  (Exh. J).

### c.  Transfer Of The $2,000,000 From Wailea To HSBC

On or about September 4, 2007, consistent with its stated investment objective,

Wailea entered into a total return swap transaction with HSBC Bank USA, N.A. ("HSBC")

("Wailea-HSBC Swap").  (Exh. L).  As part of the transaction, Wailea was required, as the swap

counterparty, to pay cash collateral to HSBC in the amount of $8,870,000.  (Id. at 2).  The

reference fund for the swap was a BLMIS feeder fund managed by Senator called the Senator

Equity Segregated Portfolio One ("Senator Fund").  (Id. at 2).

The Trustee has described total return swaps such as the Wailea-HSBC Swap as

follows:

> A swap is a bilateral financial transaction created to "swap" the
> cash flows of an asset or basket of assets for cash flows of
> another asset.  Swaps enable investor to achieve multiples of
> the returns from a reference asset – here, a Madoff Feeder Fund
> [e.g., the Senator Fund]– without having to own the asset.  In
> exchange for paying the leveraged return on the reference fund
> at maturity, the financing institution – here, HSBC – collected
> significant structuring and financing fees on the leveraged
> amount.

(Exh. M, ¶ 247).   Such swap transactions "directed hundreds of millions of dollars into

Madoff's Ponzi scheme through" BLMIS feeder funds (such as the Senator Fund) that served as

the reference funds for the swaps.  (Id. ¶ 245).   That is because, in connection with the swaps,

"the financing institution [i.e., HSBC] that has promised a leveraged return on the performance

of a reference fund[] will hedge its risk by investing both its own money and the cash collateral

provided by the swap counterparty. . . directly into the reference fund."  (Id. ¶ 248).

On or about September 4, 2007, Wailea transferred $8,870,000 to HSBC as cash

collateral for the Wailea-HSBC Swap. This sum consisted of the $7,000,000 that Wailea had

received from Lakeview (which sum included the $2,000,000 from Mr. Lustig as discussed

above), plus some additional money from other investors. (Exh. N, ¶ 24).

> ### d. Transfer Of The $2,000,000 From HSBC To Senator And Reinvestment Of That Money Into BLMIS

As noted above, in connection with total return swap transactions like the Wailea-

HSBC Swap which required HSBC to pay the swap counterparty leveraged returns based on the

performance of the reference fund, HSBC "[would] hedge its risk by investing both its own

money and the cash collateral provided by the swap counterparty. . . directly into the reference

fund." (Exh. M, ¶ 248).

HSBC thus invested all of the cash collateral that it received from Wailea (which

included the $2,000,000 from Mr. Lustig as discussed above), along with its own money, directly

into the Senator Fund to hedge its risk under the Wailea-HSBC Swap. This investment was

effectuated through HSBC's affiliate HSBC Bank plc ("HSBC plc"). As explained in a

complaint filed by Wailea:

> . . . In August 2007, to hedge HSBC USA's anticipated swap
> with Wailea, HSBC USA's banking affiliate in England and
> Wales, HSBC Bank plc ("HSBC plc") executed a Subscription
> Agreement providing for its own direct investment in Senator
> Fund. On August 27, 2007, Senator and HSBC plc entered into
> a side letter regarding HSBC plc's investment. . . . The side
> letter [] included Senator's acknowledgment that "HSBC may
> issue structured products to third party investors, the return of
> which may be substantially linked to the return of the [Senator]
> Fund."
>
> . . . HSBC plc effected its initial investment in Senator Fund on

6

or about September 4, 2007.  To fund HSBC plc's investment, HSBC [] transferred capital to Senator Fund's custodian, HSBC Securities Services (Luxemboug) S.A. [].

(Exh. N ¶¶ 36-37).

The Senator Fund, as noted, was a BLMIS feeder fund.  The Trustee has acknowledged that this fund "invested exclusively with BLMIS."  (Exh. O, ¶ 5).  Accordingly, the money that HSBC plc invested in Senator Fund (which included the $2,000,000 from Mr. Lustig) was in turn invested into BLMIS, through Senator's direct account with BLMIS, Account No. 1FR128.  (Id. ¶ 6). This was confirmed in a letter from Senator stating that Senator Fund "is fully invested . . . [in] a managed account in Senator's name at [BLMIS]." (Exh. P).  <u>Mr. Lustig's $2,000,000, which was withdrawn from his BLMIS account on July 25, 2007, was thus reinvested back into BLMIS and returned to BLMIS.</u>

Mr. Lustig ultimately lost his entire investment in Lakeview as a result of BLMIS's fraud.  He never actually received any of the $2,000,000 that was withdrawn from the IRA Account and subsequently reinvested back into and returned to BLMIS through the Senator Fund.  (Exh. B, ¶¶ 3, 6).[4]

---

[4] Mr. Lustig has since received some compensation for a small fraction of his Lakeview investment losses from Lakeview's settlement with the BLMIS feeder funds in which its money was invested.  Mr. Lustig has provided the Trustee with information concerning all such compensation that he has received.  In determining Mr. Lustig's net investment losses, the compensation that he has received should be taken into account so that he is not compensated twice for his losses.

e.  **Withdrawal Of The $2,000,000 From BLMIS And
The Trustee's Subsequent Recovery Of That Money
Pursuant To The Settlement Agreement With
Senator**

In or about late October 2008, HSBC plc redeemed all or substantially all of its

direct investments in Senator Fund.   (Exh. N, ¶ 39; Exh. Q, ¶¶ 69-71).  Approximately $95

million was thus withdrawn from Senator's BLMIS Account No. 1FR128 and transferred to

Senator.  The money was then subsequently transferred from Senator to HSBC plc (and/or some

other HSBC-related entity).  (Exh. A to Amended Complaint (Exh. M) in  Picard v. HSBC Bank

PLC, et al., U.S. Bankr. Ct., S.D.N.Y., Adv. Pro. No. 09-1364 (SMB) ("Picard v. HSBC Adv.

Pro."); Exh. M, ¶¶  325, 352).

Because the approximately $95 million withdrawn from Senator's BLMIS

Account No. 1FR128 in or about late October 2008 constituted all or substantially all of HSBC

plc's direct investments in Senator Fund, it necessarily included the $2,000,000 from Mr. Lustig

that was part of those direct investments as discussed above.

In 2009, the Trustee commenced the Picard v. HSBC Adv. Pro. in which it

asserted claims against HSBC and Senator and HSBC-related entities for avoidance and recovery

of the approximately $95 million that was withdrawn from Senator's BLMIS Account No.

1FR128 and subsequently transferred to HSBC plc (and/or some other HSBC-related entity).

The Trustee sought to recover the money from Senator as an initial transferee and from HSBC

(and other HSBC-related entities) as a subsequent transferee pursuant to 11 U.S.C. § 550(a).

(Exh. M, ¶¶  390-456).

On or about November 13, 2014, the Trustee entered into a settlement agreement

with Senator in the Picard v. HSBC Adv. Pro. whereby Senator agreed to pay $95 million to the

Trustee "in full and final settlement and satisfaction of all Avoiding Power Claims, Disallowance

and Subordination Claims, and any other claims of the Trustee or the BLMIS Estate of every

kind and nature whatsoever . . . that the Trustee or the BLMIS Estate may have against Senator."

(Exh. R, ¶ 1).

       Significantly, the Trustee acknowledged that this settlement amount represents

"100%" of the money withdrawn from Senator's BLMIS Account No. 1FR128 over the life of

the account. (Id. ¶ 13). Thus with this settlement payment from Senator the Trustee achieved

full recovery of the approximately $95 million (which includes the $2,000,000 from Mr. Lustig)

that was withdrawn from Senator's BLMIS Account No. 1FR128.

## B.    THE TRUST CASE (ADV. PRO. NO. 10-4417)

### 1.    The Trustee's Claim In The Trust Case

       The Trust held an account with BLMIS, Account No. 1ZB268 ("Trust Account").

(First Amended Complaint in the Trust Case ("FAC-Trust") ¶ 32; Exh. A to FAC-Trust).[5] Over

the life of the account withdrawals totaling $25,950,000 were allegedly made from the account.

(Exh. B to FAC-Trust). The withdrawals included a $5,000,000 withdrawal made on July 24,

2007, that, as discussed below, has already been returned to BLMIS. (Id.). There is no allegation

that any of the withdrawals from the Trust Account was not made in good faith. The Trustee

does not allege that Defendants knew or should have known of BLMIS's fraud. They are,

indisputably, innocent parties.

       According to the Trustee, of the total amount withdrawn from the Trust Account,

_____

[5]A copy of the FAC-Trust is attached as Exhibit 3 to Ha Decl. Mtn. Leave Appeal.

9

$22,608,664 represented principal that had been deposited into the account. (Id.). The Trustee

claims that the remaining $4,241,336 "represented fictitious profits from the Ponzi scheme."

(FAC-Trust ¶ 2; Exh. B to FAC-Trust). However, this net equity calculation assumes that the

$5,000,000 withdrawal made on July 24, 2007, has not been returned to BLMIS. If that money

has in fact been returned to BLMIS as discussed below, then Defendants did not actually receive

any fictitious profits as the Trustee claims. They would actually be net losers in the amount of

$758,664.

The FAC-Trust contains a single cause of action in which the Trustee seeks: (1) to

avoid the $5,000,000 withdrawal made on July 24, 2007, and other withdrawals made from the

Trust Account within two years of December 11, 2008, as actual fraudulent transfers under 11

U.S.C. § 548(a)(1)(A); and (2) to recover the money that was withdrawn from the account from

Defendants pursuant to 11 U.S.C. § 550(a). (FAC-Trust ¶¶ 47-53).

**2.    The Entire $5,000,000 That Was Withdrawn From The
Trust Account On July 24, 2007 Has Already Been
Returned To The BLMIS**

As discussed below, the $5,000,000 that was withdrawn from the Trust Account

on July 24, 2007, has already been returned to BLMIS. All the money was ultimately lost as a

result of BLMIS's fraud. Defendants never actually received any of the $5,000,000 that was

withdrawn from the account.

**a.    Transfer Of The $5,000,000 From BLMIS To City
National Bank And From City National Bank To
Lakeview**

Defendants withdrew the $5,000,000 from the Trust Account on July 24, 2007,

solely and specifically for the purpose of immediately reinvesting the money back into BLMIS

10

through Lakeview. (Exh. S, ¶ 6). Upon its withdrawal from the Trust Account, the entire sum of $5,000,000 was transferred to Mr. Lustig's account at City National Bank. (Exh. T). On or about July 30, 2007, pursuant to Mr. Lustig's instruction, the $5,000,000 was transferred from City National Bank to Lakeview's bank account at Wells Fargo. (Exh. F). The money was transferred to Lakeview for the purpose of purchasing an investment in Lakeview. (Exh. U).

Notably, in addition to the $5,000,000 deposit from Defendants on July 30, 2007, deposits were also made into Lakeview's account by other investors for investment with Lakeview at around the same time prior to July 31, 2007. (Exh. F).

### b. Transfer Of The $5,000,000 From Lakeview To Rye XL

Lakeview invested the $5,000,000 that it received from Defendants with Rye Select Broad Market XL Fund, L.P. ("Rye XL"). Rye XL was an investment partnership whose investment objective was to provide "a return linked to a 3 times levered exposure to the Rye Select Broad Market Fund, L.P. [("Broad Market Fund")]." (Exh. V). Its strategy was to enter into total return swap transactions with financial institutions that would provide it with three times the return of the Broad Market Fund (the "reference fund"). (Id.; Exh. W, ¶ 61). The Broad Market Fund is a BLMIS feeder fund that invests all or almost all of its assets with BLMIS through its direct account with BLMIS, Account No. 1T0027. (Exh. W, ¶ 36).

On or about July 25, 2007, Lakeview executed a Subscription Agreement with Rye XL whereby it agreed to invest $22,950,000 in Rye XL. (Exh. X). On July 31, 2007, Lakeview transferred the $5,000,000 that it received from Mr. Lustig together with $17,950,000 from other investors – a total of $22,950,000 – to Rye XL to invest with Rye XL pursuant to the

11

Subscription Agreement. (Exh. Y). Notably, the Subscription Agreement identified Mr. Lustig as having a 10% or more interest in Lakeview. (Exh. X).

### c. Transfer Of The $5,000,000 From Rye XL To The Financial Institution Leverage Provider As Cash Collateral

Consistent with its stated investment objective, Rye XL "entered into total return swaps with other financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia Bank, and ABN Amro, which provided a synthetic investment for [Rye XL] in the Broad Market Fund[.]" (Exh. W, ¶ 63). The Broad Market Fund, the "reference fund" in these swap transactions, was, as noted above, a BLMIS feeder fund.

In connection with the swaps, Rye XL was required to pay cash collateral to the financial institution leverage providers, which it did using the money that it received from its investors (such as Lakeview). (Exh. Z, ¶ 71; Exh. AA, ¶ 62; Exh. M, ¶ 248). Rye XL "could increase or 'upsize' the value of the swap transaction by providing [the financial institution] with additional collateral." (Exh. AA, ¶ 71). Such swap transactions "directed hundreds of millions of dollars into Madoff's Ponzi scheme through" BLMIS feeder funds (such as the Broad Market Fund) that served as the reference funds for the swaps. (Exh. M, ¶ 247). That is because, in connection with the swaps, "the financing institution that has promised a leveraged return on the performance of a reference fund[] will hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty. . . directly into the reference fund." (Id., ¶ 248; Exh. Z, ¶¶ 74-76; Exh. AA, ¶¶ 65-67).

As discussed above, Lakeview transferred the $5,000,000 that it received from Mr. Lustig along with money from other investors to Rye XL on July 31, 2007, for investment

12

with Rye XL.  Rye XL, in turn, transferred this money to one of the financial institution leverage

providers with whom it had entered into total return swap transactions as cash collateral for a

swap, as it was required to under the terms of the swap.[6]

> ### d.  Transfer Of The $5,000,000 From The Financial Institution Leverage Provider To Broad Market Fund And Reinvestment Of That Money Into BLMIS

As discussed above, in connection with a total return swap, "the financing

institution that has promised a leveraged return on the performance of a reference fund[] will

hedge its risk by investing both its own money and the cash collateral provided by the swap

counterparty. . . directly into the reference fund."  (Exh. M, ¶ 248).  That was what the financial

institution leverage providers that entered into the total return swap transactions with Rye XL

(which required them to pay Rye XL leveraged returns based on the performance of the Broad

Market Fund) did.  They invested all of the cash collateral that they received from Rye XL

(which included the $5,000,000 from Defendants) along with their own money directly into the

Broad Market Fund in order to hedge their risks under those swaps.  (Exh. Z, ¶¶ 74-76; Exh. AA,

¶¶ 65-67; Exh. M, ¶ 248).

The Broad Market Fund was a BLMIS feeder fund that invested all or almost all

of its assets with BLMIS through its direct account with BLMIS, Account No. 1T0027.  (Exh. W,

¶ 36).  Accordingly, the money that the financial institution leverage providers invested in Broad

---

[6] At this time, without additional discovery (including discovery from the Trustee which the Trustee has refused to provide), Defendants do not know to which particular financial institution leverage provider this money was transferred, or for which particular swap transaction it was transferred as collateral.  What is reasonably certain, however, is that the money was transferred to one of the financial institution leverage providers that did swap transactions with Rye XL as cash collateral for a swap.

Market Fund (which included the $5,000,000 from Defendants) to hedge their swap risks was in

turn invested into BLMIS through Broad Market Fund's direct account with BLMIS.  The

$5,000,000 from Defendants that was withdrawn from the Trust Account on July 24, 2007, was

thus reinvested back into BLMIS and returned to BLMIS.[7]

Defendants ultimately lost their entire investment in Lakeview as a result of

BLMIS's fraud.  They never actually received any of the $5,000,000 that was withdrawn from the

Trust Account and subsequently reinvested back into and returned to BLMIS through the Broad

Market Fund.  (Exh. S, ¶¶ 3, 6).[8]

## RELEVANT PROCEDURAL BACKGROUND

### A.    The Affirmative Defenses At Issue

Defendants filed their answers to the FAC in the IRA Case and the FAC in the

Trust Case on May 2, 2016.[9]  In their answers, Defendants asserted several affirmative defenses

based on the fact that the $2,000,000 withdrawal from the IRA Account on July 25, 2007, and the

$5,000,000 withdrawal from the Trust Account on July 24, 2007, were reinvested back into

BLMIS and thus have already been returned to BLMIS. Those defenses are as follows:

---

[7] To the extent any of this money was withdrawn from BLMIS prior to its collapse after it was reinvested back into BLMIS, it appears that the Trustee has recovered that money pursuant to the Settlement Agreement that he entered into on or about July 25, 2011, with Broad Market Fund and the other defendants in Picard v. Tremont Adv. Pro.  (Exh. BB)

[8] See footnote 4.

[9] Copies of the Answer and Affirmative Defenses filed in the IRA Case and in the Trust Case are attached as Exhibit 4 and Exhibit 5, respectively, to the Ha Decl. Mtn. Leave Appeal.

14

1.     **Eighth And Ninth Affirmative Defenses (Based On The Bankruptcy Court's Equitable Powers Under 11 U.S.C. § 105(a))**

The Eighth Affirmative Defense and the Ninth Affirmative Defense asserted in both the IRA Case and the Trust Case are based on the Bankruptcy Court's equitable powers under 11 U.S.C. § 105(a).  In connection with their Eighth Affirmative Defense (for dismissal as a matter of equity), Defendants alleged that the withdrawals in question were

> immediately reinvested back into BLMIS through third-party feeder fund Lakeview and thereafter remained invested with BLMIS until all of it was lost as a result of Madoff's fraud. Mr. Lustig [and the Trust], therefore, did not actually receive any fictitious profits and, in fact, lost money as a result of Madoff's fraud.  The Trustee's attempt to recover any portion of this money from Mr. Lustig [and the Trust] even though all of it had been returned to BLMIS and subsequently lost as a result of Madoff's fraud is unreasonable and unconscionable. Under these circumstances, the Court should exercise its equitable powers under 11 U.S.C. § 105(a) and dismiss the Trustee's claim.

In connection with their Ninth Affirmative Defense (for an equitable credit), Defendants alleged that the withdrawals in question were

> immediately reinvested back into BLMIS through third-party feeder fund Lakeview and thereafter remained invested with BLMIS until all of it was lost as a result of Madoff's fraud. Mr. Lustig [and the Trust], therefore, did not actually receive any fictitious profits and, in fact, lost money as a result of Madoff's fraud.  Under these circumstances, the Court should exercise its equitable powers under 11 U.S.C. § 105(a) and grant Mr. Lustig [and the Trust] an "equitable  credit" in the full amount (i.e., $2,000,000 [in the IRA Case and $5,000,000 in the Trust Case]) that [they] had returned to BLMIS through [their] Lakeview investment[s].

15

2.      **Tenth Affirmative Defense (Based On The Single
        Satisfaction Rule Under 11 U.S.C. § 550(d))**

The Tenth Affirmative Defense asserted in both the IRA Case and the Trust Case

is based on the single satisfaction rule under 11 U.S.C. § 550(d).  In connection with this defense,

Defendants alleged that the Trustee's attempts to avoid and recover withdrawals that have

already been returned to BLMIS "violate[] the single satisfaction rule codified at 11 U.S.C. §

550(d)[.]"

3.      **Eleventh Affirmative Defense (Based On The Theory Of
        Recoupment)**

The Eleventh Affirmative Defense asserted in both the IRA Case and the Trust

Case is based on the theory of recoupment.  In connection with this defense, Defendants alleged

that, because the withdrawals in question were "immediately reinvested back into BLMIS"

through Lakeview and remained invested there "until all of it was lost as a result of Madoff's

fraud", they "are entitled to an offset or credit under the theory of recoupment in the full amount

(i.e., $2,000,000 [in the IRA Case and $5,000,000 in the Trust Case]) that [they] had returned to

BLMIS through [their] Lakeview investment[s]."

B.      **The Bankruptcy Court's Order Granting The Trustee's
        Motion To Strike The Affirmative Defenses At Issue**

On March 1, 2017, prior to the completion of discovery, the Trustee filed a

motion to strike the Eight, Ninth, Tenth and Eleventh Affirmative Defenses as legally insufficient

pursuant to Fed. R. Civ. P. 12(f).[10]  Defendants opposed the motion.  At the Bankruptcy Court's

suggestion, the parties agreed to treat the Trustee's motion as one for summary judgment

---

[10]The Trustee also moved to dismiss the Twelfth Affirmative Defense.  Defendants
consented to the withdrawal of that defense, however, so it is not at issue here.

16

dismissing those affirmative defenses.

On June 1, 2017, the Bankruptcy Court issued a Memorandum Decision Granting Partial Summary Judgment Striking Certain Affirmative Defenses ("Decision").[11] The Bankruptcy Court found all the affirmative defenses at issue insufficient as a matter of law.

Notably, in adjudicating the Trustee's motion, and with the parties' consent, the Bankruptcy Court assumed "that the series of transfers occurred as the Lustig Defendants claim, the fictitious profits they withdrew were subsequently deposited by the Funds [i.e., Senator and Rye Broad Market] in their own BLMIS accounts, and the value of those accounts was effectively zero when the Madoff scandal was revealed." (Decision at 5). In other words, it was assumed as true for purposes of the motion that the $2,000,000 withdrawn from the IRA Account and the $5,000,000 withdrawn from the Trust Account were deposited/reinvested back into BLMIS through the Senator Fund and the Broad Market Fund (sometimes referred to collectively herein as the "Senator/Broad Market Feeder Funds") and thus returned to BLMIS, and that all the money was lost when Madoff's fraud was discovered and Defendants never actually received any of the money.

On June 13, 2017, pursuant to the Decision, the Bankruptcy Court entered the Order Granting Partial Summary Judgment Striking Affirmative Defenses ("Order") striking and dismissing the Eight, Ninth, Tenth and Eleventh Affirmative Defenses as a matter of law in both the IRA Case and the Trust Case.[12] The Decision was incorporated in and made a part of the Order. (Order at 3).

---

[11] A copy of the Decision is attached as Exhibit 6 to the Ha Decl. Mtn. Leave Appeal.

[12] A copy of the Order is attached as Exhibit 7 to the Ha Decl. Supp. Mtn. Leave Appeal.

17

Defendants timely filed a notice of appeal from the Order in both the IRA Case

and the Trust Case on June 26, 2017.[13]

## QUESTIONS WHICH SHOULD BE SUBJECT TO IMMEDIATE APPEAL

In light of the Bankruptcy Court's Order, the following issues are ripe for an

immediate appeal as they meet the standard for granting leave to appeal:

1.    Whether the affirmative defense based on the single satisfaction rule under §

550(a) is viable given that the $2,000,000 withdrawn from the IRA Account and the $5,000,000

withdrawn from the Trust Account were reinvested back into BLMIS and returned to BLMIS

through the Senator/Broad Market Feeder Funds and Defendants never actually received any of

the money.

Answer below: The Bankruptcy Court held in the negative.

2.    Whether the affirmative defenses based on the Bankruptcy Court's equitable

powers under§ 105(a) seeking equitable credits and dismissal of the Trustee's claims as a matter

of equity are viable given that the $2,000,000 withdrawn from the IRA Account and the

$5,000,000 withdrawn from the Trust Account were reinvested back into BLMIS and returned to

BLMIS through the Senator/Broad Market Feeder Funds and Defendants never actually received

any of the money.

Answer below: The Bankruptcy Court held in the negative.

3.    Whether the affirmative defense based on the theory of recoupment is viable

given that the Trustee's claims arise out of the $2,000,000 withdrawal from the IRA Account and

---

[13]Copies of the Notice of Appeal and Statement of Election filed in the IRA Case and the Trust Case are attached as Exhibit 8 and Exhibit 9, respectively, to the Ha Decl. Mtn. Leave Appeal.

the $5,000,000 withdrawal from the Trust Account and those withdrawals were made solely and specifically for the purpose of immediately reinvesting the money back into BLMIS and all the money was in fact reinvested back into BLMIS and returned to BLMIS through a series of inter-connected transactions.

   <u>Answer below</u>: The Bankruptcy Court held in the negative.

## ARGUMENT

### THE ISSUES PRESENTED ON THIS
### APPEAL MEET THE STANDARD
### FOR GRANTING LEAVE TO APPEAL

   The Bankruptcy Court made several critical errors in striking and dismissing the affirmative defenses at issue. Immediate appellate review is necessary because the Bankruptcy Court's rulings essentially left Defendants defenseless against the Trustee's manifestly unreasonable and unjust attempts to recover from them money that has already been returned to BLMIS. All the issues presented on this appeal meet the standard for granting leave to appeal.

   As an initial matter, for purposes of this appeal and this motion for leave to appeal, this Court must assume, as the Bankruptcy Court did below with the parties' consent, that: (1) the $2,000,000 withdrawn from the IRA Account and the $5,000,000 withdrawn from the Trust Account were reinvested/deposited back into BLMIS through the Senator/Broad Market Feeder Funds and thus returned to BLMIS; (2) all the money was lost when Madoff's fraud was discovered; and (3) Defendants never actually received any of the money. Further, insofar as the Trustee's motion to strike was treated as one for summary judgment dismissing the affirmative defenses as a matter of law, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, <u>i.e.</u>, Defendants. <u>See</u> <u>Matsushita Elec.</u>

19

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1968) (citation omitted).  Summary

judgment is appropriate only where no rational finder of fact "could find in favor of the non-

moving party because the evidence to support its case is so slight."  Gallo v. Prudential Res.

Svcs. Ltd. P'ship, 22 F.2d 1219, 1223 (2d Cir. 1994).

The United States District Court has discretionary appellate jurisdiction over

interlocutory orders of the Bankruptcy Court.  See 28 U.S.C. § 158(a)(3).  In evaluating a motion

for leave to appeal such an order, "the majority of courts have applied the analogous standard for

certifying an interlocutory appeal set forth in 28 U.S.C. § 1292(b)."  In re Calpine Corp., 356

B.R. 585, 592-93 (S.D.N.Y. 2007).  Under this standard, leave to appeal should be granted if: (1)

the "order involves a controlling question of law"; (2) "there is substantial ground for difference

of opinion" on that question; and (3) "an immediate appeal from the order may materially

advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  In addition to these

three factors, some courts also require a showing of "exceptional circumstances" that would

"warrant a departure from the basic policy of postponing appellate review until after entry of a

final judgment."  Yerushalmi v. Shibolelth, 405 B.R. 44, 47 (E.D.N.Y. 2009) (citations and

internal quotation marks omitted).

## POINT ONE

### THE BANKRUPTCY COURT'S ORDER
### INVOLVES CONTROLLING QUESTIONS OF LAW

The Bankruptcy Court's Order clearly involves controlling questions of law.

A "controlling question of law" is one where "either (1) reversal of the [lower] court's order

would terminate the action, or (2) determination of the issue on appeal would materially affect

the outcome of the litigation."  In re Enron Creditors Recov. Corp., 2009 WL 3349471, at *5

20

(S.D.N.Y. Oct. 6, 2009) (citation omitted); see Wright, Miller & Cooper, Federal Practice and Procedure § 3930, at 423 (2nd Ed. 1996) ("[A] question is controlling, even though its disposition might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants.").

The issues presented on this appeal are whether Defendants have viable affirmative defenses to the Trustee's claims based on: (1) the single satisfaction rule under § 550(d); (2) the Bankruptcy Court's equitable powers under § 105(a); and (3) the theory of recoupment. There can be no doubt that the determination of these issues would materially affect the outcome of both the IRA Case and the Trust Case and that reversal of any of the Bankruptcy Court's rulings on these issues would likely lead to the termination of these cases.

With respect to the affirmative defense based on the single satisfaction rule under § 550(d), the Bankruptcy Court ruled that § 550(d) is not applicable here because the Trustee did not recover the $2,000,000 withdrawal and the $5,000,000 withdrawal from the Senator/Broad Market Feeder Funds as subsequent transferees of the initial transfers to Defendants. (Decision at 12-13). The determination of this issue on appeal would materially affect the outcome of the IRA Case because, if applicable, § 550(d) would bar the Trustee from seeking recovery of the $2,000,000 withdrawal at issue in that case from Mr. Lustig. That would effectively terminate the IRA Case because that is the only transfer that the Trustee is seeking to avoid and recover in that case. Similarly, if § 550(d) is found to be applicable in the Trust Case, it would bar the Trustee from seeking recovery of the $5,000,000 withdrawal at issue in that case from Defendants. That would effectively terminate the Trust Case because that $5,000,000 exceeds the total alleged fictitious profits that the Trustee is seeking to recover in that case. If the

21

$5,000,000 withdrawal is removed from the net equity calculation in the Trust Case, then Defendants would actually be net losers in the amount of $758,664.

As for the affirmative defenses based on the Bankruptcy Court's equitable powers under § 105(a), the Bankruptcy Court rejected these equitable defenses on the ground that "the credits that the Lustig Defendants seek are inconsistent with express provisions of the Bankruptcy Code and SIPA which give the credit they seek to the entity that gave value to the debtor." (Decision at 9). The determination of this issue on appeal would materially affect the outcome of and may effectively terminate both the IRA Case and the Trust Case because if these defenses are viable, then the Trustee's claims may be subject to dismissal as a matter of equity and Defendants may be entitled to equitable credits for the $2,000,000 withdrawal and the $5,000,000 withdrawal at issue which would effectively negate the Trustee's claims.

The same is true with respect to the affirmative defense based on the theory of recoupment. A determination on appeal as to whether Defendants are entitled to recoupment credits for the $2,000,000 withdrawal and the $5,000,000 withdrawal that would negate the Trustee's claims would obviously materially affect the outcome of and may effectively terminate both the IRA Case and the Trust Case.

In sum, the Bankruptcy Court's Order clearly involves controlling questions of law.

22

## POINT TWO

## THERE ARE SUBSTANTIAL GROUNDS
## FOR DIFFERENCES OF OPINION REGARDING
## THE ISSUES PRESENTED ON THIS APPEAL

There are substantial grounds for differences of opinion regarding the issues presented on this appeal.  A substantial ground for difference of opinion "must arise out of a genuine doubt as to whether the . . . court applied the correct legal standard," such as when there is "conflicting authority" or when the issue is "particularly difficult" and a matter of "first impression" in the jurisdiction.  Consub Del. LLC v. Schahin Engenharia Limitada, 476 F.Supp.2d 305, 309 (S.D.N.Y. 2007) (quotation marks omitted).  "[T]his prong will be satisfied if the issue is difficult and of first impression."  In re Alexander, 248 B.R. 478, 483 (S.D.N.Y. 2000) (citation and internal quotation marks omitted).

The issues presented here are difficult and of first impression.  The IRA Case and the Trust Case are totally unique in how utterly unfair the Trustee's claims are as a matter of law, equity, and basic common sense: essentially, the Trustee is seeking to clawback from Defendants money withdrawn from their BLMIS accounts even though all the money that was withdrawn was reinvested back into BLMIS and thus returned to BLMIS and Defendants never actually received any of the money.  Defendants are not aware of any other adjudicated case with facts and circumstances similar to those present here.  The particular issues raised on this appeal have not been ruled upon by any court in this or any other jurisdiction of which Defendants are aware.

Moreover, as discussed below, the Bankruptcy Court's rulings are erroneous in crucial respects.   At the very least, there is genuine doubt as to whether the Bankruptcy Court correctly applied the law in its rulings.

23

A.    **The Affirmative Defense Based On The Single Satisfaction
Rule Under § 550(d) Is Viable And Should Not Have Been
Dismissed**

The first issue presented on this appeal is whether Defendants have a viable

affirmative defense to the Trustee's claims based on the single satisfaction rule under § 550(d).

The Bankruptcy Court ruled that § 550(d) is not applicable here because the Trustee did not

recover the $2,000,000 withdrawal and the $5,000,000 withdrawal from the Senator/Broad

Market Feeder Funds as subsequent transferees of the initial transfers to Defendants.  (Decision

at 12-13).  Essentially, the Bankruptcy Court read § 550(d) as applying only where a trustee is

seeking to recover the same initial transfer from the initial transferee and the subsequent

transferee(s) of that initial transfer.  (Decision at 12 (holding that § 550(d) only "applies to limit a

trustee's recovery in those situations where he sues multiple defendants to recover the value of

the avoided initial transfer").   However, there is nothing in § 550(d) that supports this overly

narrow and technical interpretation.  Moreover, the Bankruptcy Court is mistaken in finding that

the Senator/Broad Market Feeder Funds returned the money to BLMIS as initial transferees of

the money and not as subsequent transferees of the initial transfers to Defendants.

Section 550(a) provides that, "to the extent that a transfer is avoided . . . the

trustee may recover . . . the property transferred, or, if the court so orders, the value of such

property[.]"  Section 550(d) states that "[t]he trustee is entitled to only a single satisfaction under

[§ 550(a)]."  This rule "bars double recovery of avoidable transferred property."  Terry v.

Meredith (In re Meredith), 367 B.R. 558, 563 (E.D. Va. 2007); see McCord v. Agard (In re

Bean), 252 F.3d 113 (2nd Cir. 2001).  It "empowers courts to prohibit a trustee from recovering

under Section 550(a) from a transferee that has already returned to the estate that which was

taken in violation of the Code." <u>Dobin v. Presidential Fin. Corp. of Delaware Valley (In re
Cybridge Corp.)</u>, 312 B.R. 262, 271 (Bankr. D.N.J. 2004); <u>see</u> <u>Meredith</u>, 367 B.R. at 563
(recovery against transferee barred because "[t]he Trustee has already taken possession of, and
liquidated, the very property that it now seeks the 'value' of from" the transferee); <u>McCord</u>, 252
F.3d at 117 (recovery of equity the debtor held in the property barred because the trustee had
already recovered the value of the equity from the sale of the property).

Section 550(d) thus unequivocally bars a trustee from seeking to recover from a
transferee where the transferred property or the value thereof has already been returned to the
debtor. <u>See</u> <u>McCord</u>, 252 F.3d at 116. That is exactly what the Trustee is seeking to do here in
both the IRA Case and the Trust Case. As discussed above, it must be assumed for purposes of
this appeal and this motion for leave to appeal that the $2,000,000 withdrawn from the IRA
Account and the $5,000,000 withdrawn from the Trust Account were in fact deposited/reinvested
back into BLMIS through the Senator/Broad Market Feeder Funds and thus returned to BLMIS.
Assuming those facts to be true, the Trustee's attempts to recover those withdrawals <u>again</u> from
Defendant clearly violates § 550(d).

The Bankruptcy Court through an overly narrow and technical reading of § 550(d)
somehow came to the conclusion that the statute does not bar the Trustee from seeking a double
recovery here, <u>i.e.</u>, seek to recover the $2,000,000 and $5,000,000 withdrawals from Defendants
even though all that money has already been returned to BLMIS through the Senator/Broad
Marker Feeder Funds. Specifically, the Bankruptcy Court held that § 550(d) does not bar the
Trustee from seeking to recover the money again from Defendants because the Senator/Broad
Marker Feeder Funds had returned the money to BLMIS in their capacity as initial transferees

25

and not in their capacity as subsequent transferees of the initial transfers to Defendants. (Decision at 12-13).

Respectfully, the Bankruptcy Court's ruling defies common sense and is incorrect for at least two reasons. First, the Bankruptcy Court erred in finding that the Senator/Broad Market Feeder Funds returned the money to BLMIS as initial transferees. As discussed in detail above, the Senator/Broad Market Feeder Funds received the $2,000,000 and the $5,000,000 withdrawn from Defendants' BLMIS accounts as subsequent transferees in connection with the underlying total return swap transactions. They returned all that money to BLMIS as subsequent transferees of the money when they deposited/reinvested all the money into their own accounts at BLMIS.

The Bankruptcy Court's ruling is also incorrect because it unfortunately elevates form over substance. "It has long been recognized that in applying Section 550(a), courts should eschew a literal interpretation of this section and temper its application by examining all the facts and circumstances of that case." Friedman v. Vinas (In re Trauger), 109 B.R.502, 504 (Bankr. S.D. Fla. 1989). What matters here is the fact that the withdrawals at issue have been returned to BLMIS, not what hats the Senator/Broad Market Feeder Funds were wearing when they returned the money to BLMIS. Quite simply, because the money has already been returned to BLMIS, the Trustee is barred by the single satisfaction rule under § 550(d) from seeking to recover it again from anyone else.

The case of Bakst v. Sawran (In re Sawran), 359 B.R. 348 (S.D. Fl. 2007), is instructive here. In Sawran, prior to filing for bankruptcy, the debtor made an initial transfer of $20,000 to her father from the proceeds of the settlement of a personal injury claim. The father

26

in turn agreed to disburse the money to the debtor (his daughter) "on an as needed basis because he was concerned about her excessive spending." Id. at 350. Shortly thereafter, because of concerns that his deteriorating health would prevent him from properly disbursing the $20,000 to his daughter, the father transferred $10,000 to his son and daughter-in-law and $10,000 to his daughter and instructed them to "disburse the money to the Debtor for rent and living expenses." Id. at 350-51. His son, daughter-in-law, and daughter – the subsequent transferees of the initial transfer to the father – ultimately returned a total of $12,000 to the debtor before she filed for bankruptcy. See id. at 351.

The initial transfer of $20,000 to the father was later found to be an avoidable preferential transfer. See Sawran, 359 B.R. at 350. But the Sawran Court held that, to the extent the subsequent transferees (i.e., the father's son, daughter-in-law, and daughter) "made prepetition payments to the Debtor [totaling $12,000], the preferential transfer to the initial transferee [i.e., the father] has been satisfied." Id. at 353. Insofar as the initial preferential transfer to the father was thus partially satisfied, the trustee was barred by the single satisfaction rule under § 550(d) from seeking to recover that money again from the father. See id. at 353. As the Sawran Court explained: because "[i]t is undisputed" that $12,000 had been returned to the debtor prepetition by the subsequent transferees, "[a]llowing the Trustee to recover the entire $20,000.00 . . . would be a result wholly unintended under section 550" and "would create a windfall of $12,000.00 that violates the single satisfaction rule of section 550(d)." Id. at 353.

Here, the $2,000,000 and the $5,000,000 withdrawn from Defendants' BLMIS accounts were returned to BLMIS prepetition when the money was deposited/reinvested back into BLMIS by the Senator/Broad Market Feeder Funds (who were subsequent transferees of the

money as discussed above). As in Sawran, to the extent the feeder funds thus returned this money to BLMIS, the initial allegedly fraudulent transfers to Defendants were satisfied. Just as the trustee in Sawran was barred by § 550(d) from seeking to recover from the initial transferee-father money that had already been returned to the debtor by the subsequent transferees, so too here the Trustee should be barred from seeking to recover from Defendants (the alleged initial transferees) the money that was withdrawn from their BLMIS accounts since that money has already been returned to BLMIS by subsequent transferees of the money (Senator/Broad Market Feeder Funds).

In sum, the Bankruptcy Court's ruling that § 550(d) is not applicable here and that the Trustee may seek to recover from Defendants money withdrawn from their BLMIS accounts even though all the money has already been returned to BLMIS is erroneous. At the very least, there is substantial ground for a difference of opinion on this issue.

**B.    The Affirmative Defenses Based On The Bankruptcy Court's Equitable Powers Under § 105(a) Are Viable And Should Not Have Been Dismissed**

The second issue presented on this appeal is whether the affirmative defenses based on the Bankruptcy Court's equitable powers under § 105(a) seeking equitable credits and dismissal of the Trustee's claims as a matter of equity are viable given that the $2,000,000 and the $5,000,000 withdrawn from Defendants' BLMIS accounts were reinvested back into BLMIS and thus returned to BLMIS and Defendants never actually received any of the money.

As discussed below, the Bankruptcy Court's analysis rejecting these equitable defenses is fundamentally flawed.

1.     **The Equitable Credits Sought By Defendants Are
Entirely Consistent With The Bankruptcy Code And
SIPA**

The Bankruptcy Court held that the equitable credits that Defendants are seeking

"are inconsistent with express provisions of the Bankruptcy Code and SIPA which give the credit

they seek to the entity that gave value to the debtor." (Decision at 9).  According to the

Bankruptcy Court, since the Senator/Broad Market Feeder Funds "gave the value" to BLMIS

when they deposited/reinvested the $2,000,000 and the $5,000,000 back into BLMIS through

their own BLMIS accounts, these feeder funds "are entitled to the credit for those deposits" under

the Bankruptcy Code and under SIPA.  (Decision at 9-10).  The Bankruptcy Court then

continued: under the Net Investment Method for calculating net equity approved by the Second

Circuit Court of Appeals, these feeder funds "are entitled to net equity based on the difference

between the amount they deposited and the amount they withdrew from their BLMIS accounts.

The deposits increased the allowable net equity claims asserted by the [feeder funds]." (Decision

at 10).  The Bankruptcy Court concluded that, since the Senator/Broad Market Feeder Funds are

entitled to the credits for the $2,000,000 and the $5,000,000 deposits/reinvestments,

"Defendants' invocation of equity [seeking equitable credits for those deposits] would force the

BLMIS estate to give a second round of credits based on the same deposits." (Decision at 10).

Accordingly, the Bankruptcy Court ruled that the equitable credits sought by Defendants are

inconsistent with the Bankruptcy Code and SIPA and dismissed Defendants' equitable defenses

as a matter of law. (Decision at 9-10).

This ruling is incorrect.  The fundamental flaw in the Bankruptcy Court's analysis

is the court's mistaken assumption that the $2,000,000 and the $5,000,000 deposits made by the

Sentator/Broad Market Feeder Funds into their BLMIS accounts were "cash deposits" consisting

of principal for which the funds are entitled to credits under the Bankruptcy Code and SIPA.

Under the Net Investment Method, a BLMIS direct investor is only entitled to a credit for

principal deposited into his account – i.e. "cash deposits". He is not entitled to a credit for

deposits that consist of fictitious profits. See Securities Inv. Prot. Corp. v. Bernard L. Madoff

Inv. Sec. LLC, 522 B.R. 41, 47 (Bankr. S.D.N.Y. 2014) (under Net Investment Method, "each

customer's net equity [is calculated] solely with reference to the customer's cash deposits and

withdrawals ignoring the fictitious profits depicted in the statements").

The $2,000,000 withdrawn from the IRA Account and the $5,000,000 withdrawn

from the Trust Account that the Senator/Broad Market Feeder Funds subsequently deposited into

their own BLMIS accounts were not comprised solely of principal. According to the Trustee,

$1,863,225 of the money withdrawn from the IRA Account consisted of fictitious profits and

$4,241,336 of the money withdrawn from the Trust Account consisted of fictitious profits. (FAC-

IRA ¶ 2; Exh. B to FAC-IRA; FAC-Trust ¶ 2; Exh. B to FAC-Trust). Depositing these fictitious

profits into the feeder funds' BLMIS accounts did not transform them into principal:

> [T]he true substance of transfers of fictitious profits from one
> account to another remains the same: The funds at issue are
> still other people's money, and shifting them among accounts,
> whether those accounts are owned by the same person or entity
> . . . does not morph those funds into actual new principal[.]

Securities Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 499 B.R. 416, 428-29 (S.D.N.Y.

2013). The Senator/Broad Market Feeder Funds are not entitled to credits for the deposit of

these fictitious profits into their BLMIS accounts.

Because the Bankruptcy Court incorrectly assumed that the Senator/Broad Market

30

Feeder Funds are entitled to full credits for the $2,000,000 and the $5,000,000 deposited into

their BLMIS accounts, the court also incorrectly concluded that granting Defendants the

equitable credits they seek "would force the BLMIS estate to give a second round of credits

based on the same deposits." (Decision at 10). Granting Defendants the equitable credits they

seek will <u>not</u> force the Trustee to give two rounds of credits for the same deposits.

      The Bankruptcy Court clearly erred in dismissing the equitable defenses based on

its fundamentally flawed "double credit" analysis.

      **2.**      **The Bankruptcy Court's Equitable Powers May Be**
               **Invoked To Avoid The Patent Unreasonableness And**
               **Injustice Of The Trustee's Actions**

      The Bankruptcy Court's analysis rejecting the equitable defenses is also flawed

because it completely ignores the patent unreasonableness and injustice of the Trustee's attempts

to recover from Defendants money that they never actually received and that has already been

returned to BLMIS and lost by the Defendants.

      It is well-established that a bankruptcy court may and ought to exercise "its

equitable power to prevent an unjust result[.]" <u>Huffman v. Brandon (In re Harbour)</u>, 845 F.2d

1254, 1256 (4th Cir. 1988); <u>Dobin</u>, 312 B.R. at 269 ("Bankruptcy courts have long possessed

equity jurisdiction in order to safeguard against unjust results."). Such equitable powers have

been invoked "to the end that fraud will not prevail, that substance will not give way to form, that

technical considerations will not prevent substantial justice from being done." <u>Dobin</u>, 312 B.R.

at 269.

      Courts have recognized that unjust results may occur in avoidance actions where §

550(a) is applied literally and that the equitable powers of a bankruptcy court should be invoked

31

in those situations "to prevent an inequitable result":

> In some circumstances, a literal application of section 550(a)
> would permit the Trustee to recover from a party who is
> innocent of wrongdoing and deserves protection. In such
> circumstances the bankruptcy court should exercise its
> discretion to use its equitable powers under section 105(a) [] to
> prevent an inequitable result.

Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.), 33 B.R. 334, 337 (Bankr. S.D.N.Y.

1983) (quoting 4 Collier on Bankruptcy ¶ 550.02, at 550-7 (15th ed. 1983)); see Sawran, 359 B.R.

at 353.

        The Trustee's claims against Defendants here depend on a literal application of §

550(a)(1). In the Trustee's view, Defendants were initial transferees of the money withdrawn

from their BLMIS accounts and are therefore liable for those transfers, and no further analysis is

necessary. However, this literal application of § 550(a)(1) would lead to a patently unjust and

unreasonable result. Defendants are innocent good faith investors who have been totally

devastated by BLMIS's fraud. They have already lost all the money that the Trustee is seeking to

recover from them as a result of the fraud. They withdrew the $2,000,000 and the $5,000,000

from their BLMIS accounts solely and specifically for the purpose of immediately reinvesting the

money back into BLMIS through a third-party feeder fund. All the money was in fact ultimately

deposited/reinvested back into BLMS and thus returned to BLMIS. Defendants never actually

received any of the money. When the fraud was uncovered, they lost all of their direct and

indirect investments in BLMIS. Allowing the Trustee to pursue these actions to clawback from

them money that they had already returned to BLMIS and lost as a result of the fraud would

effectively double their BLMIS losses and force them into bankruptcy and financial ruin.

        The Gropper case is instructive here. In Gropper, a law firm received a payment

32

from the debtor to settle a dispute with the firm's client and then transferred the money to the client. The Trustee brought an avoidance action against the law firm claiming that the firm was an "initial transferee" of the transfer from the debtor and therefore was liable for the transfer. See Gropper, 33 B.R. at 335. The Gropper Court held that, even if the law firm may be deemed to be an "initial transferee" based on a literal application of § 550(a), "the circumstances of this case . . . would permit this Court to exercise its equitable discretion and prevent the Trustee from recovering a preference from the [] firm." Id. at 337. Specifically, the court concluded that the law firm "should not be the subject of recovery efforts by the Trustee" because it was "a mere conduit of funds" from the debtor to the client and only the client "received the benefit of the payment[.]" Gropper, 33 B.R. at 337.

Here, as in Gropper, even if Defendants may be deemed to be "initial transferees" of the withdrawals from their BLMIS accounts under a literal application of § 550(a), they were in reality no more than mere conduits of the money since all the money was immediately transferred to other entities for reinvestment back into BLMIS and Defendants never actually received any of the money and got no benefit from it. Under these circumstances, it is manifestly unjust to allow the Trustee to seek to recover the money from them as "initial transferees" under § 550(a).

In sum, the Bankruptcy Court erred in dismissing the affirmative defenses based on the court's equitable powers under § 105 (a). At the very least, there is substantial ground for a difference of opinion on this issue.

33

C.     **The Affirmative Defense Based On The Theory Of
       Recoupment Is Viable And Should Not Have Been Dismissed**

   The third issue presented on this appeal is whether the affirmative defense based

on the theory of recoupment is viable given that the Trustee's claims arise out of withdrawals

from Defendants' BLMIS accounts that were made solely and specifically for the purpose of

immediately reinvesting the money back into BLMIS and all the money was in fact reinvested

back into BLMIS and returned to BLMIS through a series of inter-connected transactions.  The

Bankruptcy Court held that the recoupment defense

> is not available to the Lustig Defendants because the
> parties' claims arise from different transactions.  The
> Trustee's claims against the Lustig Defendants arise from
> their withdrawal of fictitious profits from their BLMIS
> accounts.  Their recoupment credit is based on their
> investment of the withdrawn funds in Lakeview which is an
> entirely different transaction.  Even if one accepted that the
> credit arises from the Funds' reinvestment of money
> traceable back to those withdrawals, the reinvestment is
> still a separate transaction governed by whatever account
> agreements had with BLMIS.

(Decision at 14).  This holding is erroneous.

   Recoupment is an equitable defense that may be invoked in bankruptcy

proceedings.  See New York State Elec. and Gas Corp. v. McMahon, 129 F.3d 93, 95-96 (2nd Cir.

1997).  Essentially, "[a] 'recoupment' is an offset based upon a claim for relief arising from the

same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement

or reduction of such claim."  Styler v. Jean Bob Inc., 154 B.R. 581, 586 n.3 (D. Utah 1993).  A

recoupment defense may be raised where the offsetting claims arise out of "a single contract or

transaction or a single set of transactions", McMahon, 129 F.3d at 96, or  "a single integrated

transaction[.]" Westinghouse Credit Corp. v. D'Urso, 278 F.3d 138, 147 (2nd Cir. 2002)

34

(quotation marks, citation, and emphasis omitted).

        The recoupment defense may be raised in cases involving Ponzi schemes or other fraudulent investment schemes.  It is applicable where the transferee reinvested with the debtor the payments that he received from the debtor.  See Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 877-78 (D. Utah 1987) ("[e]ven if equity did not counsel against" a rule that would deny victims of financial fraud the right of recoupment, there is "no legal theory supporting such a [rule]").

        The recoupment defense is applicable and viable in both the IRA Case and the Trust Case.  In the IRA Case, the Trustee's claim arises out of the $2,000,000 withdrawal from the IRA Account, which was immediately reinvested into Lakeview for reinvestment back into BLMIS through the Senator Fund pursuant to a total return swap transaction.  These constitute a "single set of transactions" or a "single integrated transaction" whereby, essentially, money was taken out of a BLMIS account and reinvested into BLMIS with none of it being retained by Mr. Lustig.  The same is true with respect to the Trustee's claim in the Trust Case, which seeks avoidance and recovery of, among other things, the $5,000,000 withdrawal that was immediately reinvested into Lakeview for reinvestment back into BLMIS through the Broad Market Fund pursuant to a total return swap transaction.  Defendants never actually received any of the money. See Merrill, 77 B.R. at 878 ("If Van Sant can prove that her total investment with the debtors was one transaction and that she did not retain payments made to her by the debtors but rather reinvested those funds with the debtors, she is entitled to either a reduction in or an abatement of the damages.").

        In short, the Bankruptcy Court erred in dismissing the affirmative defense based

on the theory of recoupment.  At the very least, there is substantial ground for a difference of opinion on this issue.

## POINT THREE

### AN IMMEDIATE APPEAL FROM THE BANKRUPTCY COURT'S ORDER WILL MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION

The third factor in the § 1292(b) analysis is whether "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Courts view this factor as significant in determining whether leave to appeal an interlocutory order should be granted under § 1292(b).  See Enron Corp. v. Avenue Special Situations Fund II (In re Enron Corp.), 2006 WL 2548592, at *3 (S.D.N.Y. Sep. 5, 2006) ("Courts place particular emphasis on this last factor.").

This factor is easily met here.  As discussed above in Point I, determination of the issues presented on this appeal would materially affect the outcome of both the IRA Case and the Trust Case, and reversal of any of the Bankruptcy Court's rulings on these issues will likely lead to the termination of these actions.  For all the same reasons, an immediate appeal from the Order will materially advance the ultimate termination of these actions.

## POINT FOUR

### "EXCEPTIONAL CIRCUMSTANCES" EXIST THAT WARRANT IMMEDIATE APPELLATE REVIEW

The requisite "exception circumstances" exist here.  In both the IRA Case and the Trust Case the Trustee is seeking to recover money that has already been returned to BLMIS.  As a result of the Bankruptcy Court's rulings dismissing their affirmative defenses, Defendants are

36

now facing the unfathomable nightmare of having to disgorge to the Trustee money that they

never actually received and that they had already lost as a result of BLMIS's fraud.  Mr. Lustig is

a seventy-one year old retiree who has been totally devastated by the fraud.  If the Trustee were to

succeed, Mr. Lustig will be bankrupted due to sustaining, in effect, a doubling of his BLMIS

losses.

Defendants respectfully submit that these are "exceptional circumstances" that

"warrant a departure from the basic policy of postponing appellate review until after entry of a

final judgment."  Yerushalmi, 405 B.R. at 47 (citations and internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, and especially given the unique and compelling facts presented in these cases, the Court should: (1) grant the instant motion for leave to appeal the Bankruptcy Court's Order; and (2) grant such other and further relief as the Court may deem to be just and proper.

Dated:  New York, New York
        June 27, 2017

<div style="margin-left:40%;">

Respectfully submitted,

LAW OFFICE OF
RICHARD E. SIGNORELLI

By:     /s/ Richard E. Signorelli
        /s/ Bryan Ha
        _____
        Richard E. Signorelli
        Bryan Ha
        799 Broadway, Suite 539
        New York, NY 10003
        Telephone:     212 254 4218
        Facsimile:     212 254 1396
        rsignorelli@nycLITIGATOR.com[SM]
        www.nycLITIGATOR.com[SM]
        Attorneys for Defendants David I. Lustig
        and the Lustig Family 1990 Trust

</div>

FILING AND SERVICE VIA ELECTRONIC FILING