EXHIBIT 1 (Part 2 of 3)

# EXHIBIT N

1  ROZWOOD & COMPANY APC
2  S. BENJAMIN ROZWOOD (Cal. Bar #181474)
3  503 North Linden Drive
   Beverly Hills, CA 90210
4  Telephone: (310) 246-1451
   Facsimile: (310) 246-9576
5  brozwood@rozcolaw.com

6  Counsel for Plaintiff
7  WAILEA PARTNERS, LP

**FILED**

JUL 1 9 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9              UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  WAILEA PARTNERS, LP,                 )   Case No. __11__ __3544__
    a Delaware limited partnership,      )
13                                       )
                                         )   COMPLAINT FOR RESCISSION
14              Plaintiff,               )   AND OTHER RELIEF BASED ON:
                                         )
15        vs.                            )   1. Mutual Mistake;
                                         )   2. Unilateral Mistake;
16  HSBC BANK USA, N.A.,                 )   3. Innocent Misrepresentation;
    a national banking association,      )   4. Failure of Condition; and
17                                       )   5. Violations of Cal. Corp. Code
                                         )      §§25401 et seq.
18              Defendant.               )
                                         )
19                                       )
                                         )
20                                       )

21

22

23

24

25

26

27

28

COMPLAINT FOR RESCISSION AND OTHER RELIEF

L3972

## SUMMARY OF THE ACTION

1.      This case involves a group of investors who pooled their capital into a limited partnership, Wailea Partners, LP ("Wailea"). Wailea's investment objective was to achieve long-term capital appreciation by investing in structured financial products linked to the performance of hedge funds utilizing a specific trading strategy, known as the "split-strike conversion" strategy. The split-strike conversion strategy is designed to limit the risk of any significant capital loss through (1) ownership of large-cap equities (such as the publicly-traded stock of S&P 100 companies) together with (2) concurrent hedge transactions in exchange-traded put and call options involving the same underlying large-cap equities.

2.      To further minimize risk, Wailea sought to enter into its structured financial transactions with large and reputable international financial institutions with an established market presence and significant experience working with hedge funds whose risk and return from investment ultimately was based on the split-strike conversion strategy. In this case, Wailea entered into precisely such an investment contract with the defendant, or so it thought.

3.      Pursuant to their investment contract, as it was amended and restated over time, Wailea agreed to pay the defendant interest and fees in exchange for the right to receive specified returns to be calculated based on the performance of a "reference fund" that was required to invest its capital pursuant to the split-strike conversion strategy. To secure its obligations under the investment contract, Wailea transferred approximately $16 million in capital to the defendant.

4.      As it turns out, despite the specifically negotiated and clearly stated condition concerning the type of investments to be made by or on behalf of the reference fund, none of the reference fund's capital was ever invested pursuant to the split-strike conversion strategy. Accordingly, because the essential condition and, indeed, essence of the parties' contract never was satisfied, Plaintiff is entitled to rescission and other relief as set forth herein.

COMPLAINT FOR RESCISSION AND OTHER RELIEF

L3973

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. *See* 28 U.S.C. §§1331(a)(1), 1348; *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006).  Supplemental jurisdiction also exists in this Court pursuant to 28 U.S.C. §1367(a).

6.     Venue is proper in this Court under 28 U.S.C. §1391(a)(1) and (c) because, at all relevant times, HSBC USA has been registered with the California Secretary of State to do business, and has done business, as a foreign corporation in California; at all relevant times, HSBC USA has operated multiple bank branches and provided Internet banking within the Court's jurisdictional district; and, at all relevant times, HSBC USA has continuously and systematically provided a full range of banking and other financial services to persons located in the Court's jurisdictional district and other residents of California sufficient to subject it to the general and personal jurisdiction of the Court.

## THE PARTIES

7.     Wailea is a limited partnership organized under the laws of the State of Delaware on June 19, 2007. Wailea Capital GP, LLC ("Wailea GP"), is a Delaware limited liability company that is and always has been Wailea's sole general partner. During all relevant times, Wailea and Wailea GP have shared offices, with their principal operating office located at One Market Street, Steuart Tower, Suite 2650, San Francisco, California 94105, and their registered office located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The majority of Wailea's investors are based in Northern California, and these California-based investors contributed more than 80% of Wailea's capital.

8.     Defendant HSBC Bank USA, N.A. ("HSBC USA") is a national bank chartered by the United States Office of the Comptroller of the Currency with its principal operating office located at 452 Fifth Avenue, New York, New York 10018

- 2 -

L3974

and its nominal head office (as designated on its charter) located at 1800 Tysons
Boulevard, Suite 50, McLean, Virginia 22102. HSBC USA is the U.S. affiliate of
an international banking company, and is a member of HSBC Group, a worldwide
organization of banks and financial services companies parented by HSBC
Holdings plc ("HSBC Holdings"). HSBC Holdings is a public limited corporation
organized under the laws of England and Wales, with its principal operating office
at 8 Canada Square, London E14 5HQ, United Kingdom. HSBC USA operates
more than 40 bank branches in California, at least 15 of which are located within
the jurisdictional district of this Court.

## ADDITIONAL FACTUAL ALLEGATIONS

### The Wailea-HSBC Swaps

9.     Hedge funds are pooled investment funds that participate in a variety
of strategies intended to protect the funds' investors from market uncertainty, while
generating positive returns in both up and down markets. Hedge fund investments
are typically managed by a professional investment manager, or fund manager, who
theoretically offers the prospects of better returns and superior risk management.

10.     In and prior to 2007, HSBC USA offered structured financial products
linked to the performance of hedge funds whose capital under management was
invested pursuant to a specific strategy, known as the "split-strike conversion
strategy," or "SSC Strategy." Compared with other investment strategies, the split-
strike conversion strategy was designed to generate safer and steadier returns, with
a lower risk of loss of capital regardless of market direction or volatility.

11.     HSBC USA offered many different structured investment contracts
linked to the performance of funds with capital invested using the SSC Strategy,
including total return swap contracts. A swap is a bilateral financial transaction
created to "swap" the value and cash flows of an asset or basket of assets for the
value and cash flows of another asset. HSBC swap contracts offered counterparties

- 3 -

the prospect of achieving the return (or multiples of the return) generated by a reference asset—here, a hedge fund—without having to own the asset itself.

12.    In exchange for agreeing to pay the specified amounts based on the return of the reference fund at maturity, HSBC USA required swap counterparties to deposit significant amounts of capital or collateral, and collected structuring fees, financing charges, and interest on the amount of leverage it provided.

13.    In or about May 2007, Wailea and HSBC USA began negotiating the terms of an investment contract to be linked to the performance of an investment portfolio of Senator Fund SPC ("Senator"). Senator is an open-ended multi-class mutual fund company incorporated in or about 2006 as an exempted limited liability company and registered as a segregated portfolio company under the Companies Law (2004 Revision) of the Cayman Islands.

14.    The parties considered the Senator Equity Segregated Portfolio One ("Senator Fund") to be a suitable reference fund under the swap contract because all or substantially all of Senator Fund's capital had been deposited with Bernard L. Madoff Investment Securities LLC ("BLMIS") to be managed and invested in accordance with the SSC Strategy. As stated in Senator's July 2006 Offering Memorandum for Senator Fund (the "2006 Senator Fund OM"):

> The Fund's objective is to provide investors with long-term capital growth while minimizing risks through the use of a very active trading style....
>
> [S]ubstantially all of the Fund's Portfolio One assets are managed by one Manager, who utilizes a "split-strike conversion strategy" approach with respect to investment and management of its assets. The strategy invests primarily in the United States and utilizes a non-traditional strategy that is a variation of the traditional "option conversion" strategies (generally consisting of the purchasing of equity shares, the selling of related options representing a number of underlying shares equal to the number of shares purchased, and the buying of related put options representing the same number of underlying shares). The strategy utilized by the Fund's Portfolio One is called "split-strike conversion" and entails:

- 4 -

L3976

(a)     purchasing a basket of thirty (30) to sixty (60) large capitalization S&P 100 stocks, which together account for the greatest weight of the index and therefore, when combined, present a high degree of correlation with the general market;

(b)     selling or of the money S&P 100 Index call options representing a solar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased; and

(c)     purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount.

In structuring the portfolio for the Fund's Portfolio One, the Manager will attempt to minimize risk by choosing investments from a broad range of securities and by taking into consideration various factors such as, for example, the issuer, its performance and the industry in which it principally engages in business or market volatility.

15.     The investment of Senator Fund's capital in accordance with the SSC Strategy was an essential, core condition of the parties' proposed swap transaction. To ensure that Senator would continue deploying Senator Fund's capital in accordance with the stated SSC Strategy, both Wailea and HSBC USA demanded and received assurances from Senator that its investment strategy for Senator Fund would continuously comply with the above-described SSC Strategy as set forth in the 2006 Senator Fund OM. The parties likewise conditioned their own contractual rights and duties on the requirement that Senator Fund would invest its capital in accordance with the specified SSC Strategy.

16.     In response to Wailea's demands to "more clearly state that [Senator Fund] is Split Strike Conversion only," Senator amended the 2006 Senator Fund OM to eliminate references to "multiple investment strategies" and to emphasize the relatively low-risk nature of the SSC Strategy described therein. As revised, Senator Fund's June 2007 Offering Memorandum (the "2007 Senator Fund OM") confirmed that its capital would be invested by a single manager pursuant to the stated SSC Strategy; it omitted certain multi-strategy language to which Wailea and HSBC USA had objected; and it emphasized the safety of the stated SSC Strategy,

- 5 -

L3977

1  e.g., by explaining that "[t]he primary purpose of the long put options [under the
2  stated SSC Strategy] is to limit the market risk of the stock basket at the strike price
3  of the long puts."

4      17.    On July 10, 2007, HSBC USA sent Wailea and Senator a copy of its
5  "Portfolio Guidelines" for swaps and other structured investment products (the
6  "HSBC Investment Guidelines"), and it requested assurances that these guidelines
7  would be followed if HSBC USA and Wailea were to enter into a swap linked to
8  Senator Fund. The HSBC Investment Guidelines included, first and foremost,
9  the following terms and conditions for investment contracts involving a reference
10  fund: (a) *The Reference Fund will invest substantially all of its assets in a*
11  *managed account ... at all times during the term of th[e] Transaction," and*
12  *"[t]he Investment Manager will use a split-strike conversion strategy"*; and
13  (b) "The Reference Fund will only invest in 1) stocks in the S&P 100 index,
14  2) option on S&P 100 index, and/or 3) Money Market / US Treasury Bills."

15      18.    On or about July 12, 2007, Senator sent Wailea a letter "confirm[ing]
16  that Senator is fully invested (with the exception of cash reserves kept for payment
17  of expenses) in the 'split-strike' hedged equity strategy...."

18      19.    On or about September 4, 2007, Wailea and HSBC USA entered into
19  an investment contract, referred to as a swap contract, linked to the performance of
20  Senator Fund. The terms of the parties' swap contract were set forth in a document
21  entitled Share Swap Transaction Confirmation, dated September 4, 2007
22  (the "Initial Swap"), with reference to definitions and provisions contained in
23  the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity
24  Derivatives Definitions (the "Equity Definitions" and, together with the Swap
25  Definitions, the "Definitions"), as published by the International Swaps and
26  Derivatives Association, Inc. The Initial Swap is attached as "Exhibit 1" hereto.

27      20.    Section 7 of the Initial Swap, entitled "INVESTMENT GUIDELINES,"
28  states: "As set forth on Annex II." Annex II of the Initial Swap specifies the

- 6 -

L3978

1   following contractual requirements and express conditions, which mirror the

2   language in the HSBC Investment Guidelines:

3       (a)   *"The Reference Fund will invest substantially all of its*

4       *assets in a managed account (the "Managed Account") at all times*

5       *during the term of this Transaction. The Investment Manager will*

6       *use a split-strike conversion strategy.*"

7       (b)   "The Reference Fund will only invest in 1) stocks in the

8   S&P 100 index, 2) option on S&P 100 index, and/or 3) Money

9   Market/US Treasury Bills."

10      21.   Pursuant to Sections 1 and 2 of the Initial Swap, defining "Reference

11   Shares" and "Equity Notional Amount," the amount of Wailea's initial synthetic

12   investment in Senator Fund (*i.e.*, the "Equity Notional Amount") was

13   approximately $31 million. Section 1 also required Wailea to make the "Party B

14   Initial Payment" (*i.e.*, transfer collateral) in the amount of $8,870,000 to secure

15   Wailea's contractual obligations. On or about September 4, 2007, in satisfaction of

16   its obligation to make the Party B Initial Payment, Wailea transferred to HSBC

17   USA the agreed upon initial swap collateral in the amount of $8,870,000.

18      22.   On or about November 2, 2007, Wailea and HSBC USA amended and

19   restated their investment contract, as reflected by that certain Amended and

20   Restated Share Swap Transaction Confirmation (the "Second Swap"). The parties

21   increased the "Maximum Notional Amount" stated in Section 14 of the Initial Swap

22   from the initial amount to $38 million in the Second Swap, meaning that Wailea

23   could increase its total synthetic leveraged "investment" in Senator Fund under the

24   swap contract up to $38 million. While the Second Swap made certain other

25   changes to the Initial Swap terms, the parties reaffirmed the essential conditions and

26   requirements set forth in Section 7 and Annex II without modification. A copy of

27   the Second Swap is attached as "Exhibit 2" hereto.

28

- 7 -

L3979

23.     On or about July 18, 2008, Wailea and HSBC USA amended and restated their investment contract, as reflected by that certain Third Amended and Restated Share Swap Transaction Confirmation (the "Third Swap").  The parties further increased the Maximum Notional Amount to $39 million in the Third Swap, meaning that Wailea could increase its total synthetic leveraged "investment" in Senator Fund under the swap contract up to $39 million.  While the parties made certain other changes to the terms of the Second Swap, they once again reaffirmed the essential conditions and requirements set forth in Section 7 and Annex II without modification.  A copy of the Third Swap is attached as "Exhibit 3" hereto.

24.     From October 2007 through December 2008, Wailea, from time to time, adjusted the amount of collateral it provided to HSBC USA under the swap contracts; this had the effect of adjusting the amount of Wailea's synthetic "investment" in Senator Fund (i.e., the Equity Notional Amount). "Table 1" below shows the dates and amounts of Wailea's collateral transfers and adjustments, and the aggregate amount of collateral transferred by Wailea (and that HSBC USA is holding) pursuant to the Initial Swap, the Second Swap, and the Third Swap.

**Table 1**
**(Wailea Swap Collateral)**

| DATE | COLLATERAL |
|---|---|
| September 4, 2007 | $8,870,000 |
| October 30, 2007 | 4,950,000 |
| February 1, 2008 | 200,000 |
| February 4, 2008 | 250,000 |
| June 27, 2008 | 100,000 |
| June 30, 2008 | 100,000 |
| July 18, 2008 | 50,000 |
| September 15, 2008 | (50,000) |
| December 9, 2008 | 1,500,000 |
| TOTAL | $15,970,000 |

- 8 -
L3980

25.     In October 2007 and in each subsequent month through and until December 2008, HSBC USA prepared and sent Wailea a "Month-end Valuation" which purportedly stated the net asset value ("NAV") of (i) individual units of Senator Fund and (ii) Wailea's swap investment, for the month-end date immediately preceding the date of the Month-end Valuation.  Each Month-end Valuation also purportedly stated the amount of accrued interest allegedly owed by Wailea under the parties' initial and amended and restated swap contracts.

26.     Each additional transfer of collateral to HSBC USA was predicated upon Wailea's belief that the values reported on the Month-end Valuations received from HSBC USA were accurate and, but for these Month-end Valuations, Wailea would not have transferred any additional collateral to HSBC USA.

27.     On December 11, 2008, federal agents arrested Bernard L. Madoff ("Madoff"), the principal of BLMIS.  Madoff was the investment "Manager" described in the 2006 Senator Fund OM and the 2007 Senator Fund OM and, as HSBC USA knew and required, was the person responsible for investing Senator Fund's capital pursuant to the SSC Strategy.

28.     The day of his arrest, the United States Securities and Exchange Commission (the "S.E.C.") filed a complaint against Madoff and BLMIS in the States District Court for the Southern District of New York, alleging that Madoff had been operating a Ponzi scheme through BLMIS's investment advisory business. *See S.E.C. v. Madoff, et al.*, S.D.N.Y. No. 08-CV-10791 (the "Civil Action").

29.     On December 15, 2008, upon application of the Securities Investor Protection Corporation, the District Court granted an order in the Civil Action placing all BLMIS accounts, including Senator Fund, under the protections of the Securities Investor Protection Act and appointing Irving Picard as trustee for the liquidation of BLMIS.  The same day, Senator sent a letter to its Shareholders stating that: "The Board of Directors of the Fund have determined that, pursuant to the power afforded under Article 18 of the Articles of Association of the Fund...,

- 9 -

the calculation of the Net Asset Value of Participating Shares in all Classes of the Fund, and the issue and redemption of shares in all Classes of the Fund be suspended from 17.00 (CET) on 12 December 2008 (the 'Suspension')." Senator's letter also stated that Shareholders would be informed "in writing as soon as practicable after the Suspension comes to an end."

30. On March 12, 2009, Madoff pled guilty to federal felony charges against him, *see U.S. v. Madoff*, S.D.N.Y. No. 09-CR-213, Docket No. 57, Plea Hrg. Tr. 23:14-17, and he read a six-page plea allocution in which he acknowledged that *he never invested any of his advisory clients' funds pursuant to his claimed "split strike conversion strategy."*

### HSBC's Knowledge

### *KPMG's Diligence Reports on BLMIS*

31. On or about July 16, 2007, a representative of Wailea, William Belhumeur, sent an email to HSBC USA inquiring about Madoff's historical compliance with the HSBC Investment Guidelines. Mr. Belhumeur knew that HSBC Group affiliates had made substantial investments in hedge funds using the SSC Strategy and that HSBC Group affiliates were or had been custodians of several other large hedge funds with billions of dollars under management at BLMIS for investment pursuant to the SSC Strategy. Mr. Belhumeur also knew from conversations with representatives of HSBC USA that, as an investor in, and as custodian for, many of BLMIS's largest clients, HSBC Group had special access to BLMIS and Madoff, access that other Madoff investors did not have. For instance, Mr. Belhumeur was told that HSBC had retained KPMG to conduct an extensive due diligence review of BLMIS operations.

32. On July 19, 2007, HSBC responded to Mr. Belhumeur's inquiry whether Madoff had ever "either breached or nearly breached" the HSBC

- 10 -

COMPLAINT FOR RESCISSION AND OTHER RELIEF

L3982

1   Investment Guidelines. HSBC stated, "[a]s far as we know," the HSBC Investment

2   Guidelines "have not been breached historically" by Madoff.

3       33.     The statement that Madoff had not breached the HSBC Investment

4   Guidelines historically was untrue. In or about September 2005, HSBC Group

5   engaged KPMG to conduct a due diligence review of BLMIS for "fraud and related

6   operational risk" in connection with HSBC Group's role as primary custodian of at

7   least seven hedge funds that had deposited billions of dollars of capital with BLMIS

8   to be invested pursuant to the SSC Strategy. The results of KPMG's diligence

9   investigation were documented in a February 16, 2006 report titled "Review of

10  fraud risk and related operational risks at Bernard L. Madoff Investment Securities

11  LLC" (the "2006 KPMG Report"). The 2006 KPMG Report noted several material

12  risks of fraud and operational risks observed with respect to the management and

13  investment of BLMIS clients' money. On information and belief, these material

14  risks included, among many others: (i) failure to segregate client funds from

15  BLMIS funds; and (ii) use of client funds to make trades that deviated from SSC

16  strategy. These findings evidence violations of the HSBC Investment Guidelines.

17      34.     In or about March 2008, unbeknownst to Wailea, HSBC Group

18  engaged KPMG to conduct a second due diligence review of BLMIS in connection

19  with HSBC Group's (i) direct investments in Senator and BLMIS hedge-fund

20  clients and (ii) role as custodian for over ten different BLMIS hedge-fund clients.

21      35.     On or about September 9, 2008, after an extensive review of BLMIS,

22  KPMG delivered a report to HSBC Group entitled "Review of fraud risk and

23  related operational risks at Bernard L. Madoff Investment Securities LLC" (the

24  "2008 KPMG Report"). The 2008 KPMG Report noted numerous material risks of

25  fraud and other operational risks associated with BLMIS, including the two set

26  forth in the preceding paragraph as well as, *inter alia*: (i) falsification of client

27  mandates; (ii) embezzlement of client funds; and (iii) diversion of client funds for

28  Madoff's personal gain.

- 11 -

L3983

### *HSBC Redeems Madoff-Related Investments*

36.     In August 2007, to hedge HSBC USA's anticipated swap with Wailea, HSBC USA's banking affiliate in England and Wales, HSBC Bank plc ("HSBC plc"), executed a Subscription Agreement providing for its own direct investment in Senator Fund. On August 27, 2007, Senator and HSBC plc entered into a side letter regarding HSBC plc's investment. The side letter provided that HSBC plc may "transfer, at any time, … its investment in shares of Shares of the Fund … to any affiliate of HSBC [plc]." The side letter also included Senator's acknowledgement that "HSBC may issue structured products to third party investors, the return of which may be substantially linked to the return of the Fund."

37.     HSBC plc effected its initial investment in Senator Fund on or about September 4, 2007. To fund HSBC plc's investment, HSBC USA transferred capital to Senator Fund's custodian, HSBC Securities Services (Luxembourg) S.A. ("HSBC Lux").

38.     As KMPG was completing its second diligence review of BLMIS in 2008, and during the months after the 2008 KPMG Report was issued, HSBC Group affiliates began a massive liquidation of their global investments in BLMIS hedge-fund clients. On information and belief, during the 90-day period leading up to Madoff's arrest, HSBC USA and its affiliates redeemed more than $400 million that HSBC Group affiliates had invested in BLMIS hedge-fund clients.

39.     When Wailea inquired about HSBC Group's efforts to liquidate substantially all of HSBC plc's investment in Senator Fund and to redeem more than $400 million from BLMIS hedge-fund clients, HSBC USA told Wailea that there was no reason for concern and that the redemptions were made for "market reasons." When making these assurances, HSBC USA did not disclose any of the diligence findings or other content of the KPMG reports, and did not disclose anything about the material risks of fraud and other operational risks discovered during KPMG's 2006 or 2008 due diligence reviews of BLMIS.

COMPLAINT FOR RESCISSION AND OTHER RELIEF

L3984

1      *The Picard v. HSBC Complaint*

2          40.    In the months following Madoff's arrest, HSBC Group affiliates,

3      including HSBC USA, portrayed HSBC Group as an innocent victim of Madoff's

4      fraud. HSBC Group did not publicly disclose the findings and conclusions stated in

5      the 2006 and 2008 KPMG Reports. HSBC Group also did not disclose publicly

6      that, in the 90-day period preceding Madoff's arrest, HSBC Group affiliates cashed

7      out more than $400 million that they had invested in BLMIS hedge-fund clients.

8          41.    On December 5, 2010, Irving Picard, as trustee for the liquidation of

9      BLMIS, filed a complaint (the "Picard Complaint") against several HSBC Group

10     affiliates, including HSBC USA and HSBC plc, as well as other defendants. *See*

11     *Picard v. HSBC plc, et al.*, S.D.N.Y. No. 09-CV-01364. The Picard Complaint sets

12     forth detailed allegations regarding each defendant's role involvement in Madoff's

13     investment scheme. With respect to HSBC USA, the Picard Complaint alleges,

14     among other things:

15          "1.    Madoff did not act alone in perpetrating the largest financial
       fraud in history. For more than a decade, HSBC Holdings plc, HSBC
16     Bank plc, and their affiliates (collectively, the "HSBC Defendants" or
       "HSBC") enabled Madoff's Ponzi scheme by encouraging investment
17     into an international network of feeder funds, including several named
       as defendants herein (the "Feeder Fund Defendants"). Ultimately, the
18     HSBC Defendants directed over $8.9 billion into BLMIS's fraudulent
       investment advisory business (the "IA Business").... The HSBC
19     Defendants aided, enabled, and sustained the massive Ponzi scheme
       masterminded by Madoff in order to reap an extraordinary financial
20     windfall.
21
22          11.    The [HSBC] Defendants were well aware of the indicia of
       fraud surrounding BLMIS. In yearly due diligence reports, certain of
23     the HSBC Defendants identified numerous badges of fraud, including:
       Madoff's secrecy, his insistency on retaining custody of all its assets
24     under management, his seemingly supernatural trading performance,
       BLMIS's untraditional fee structure, and the lack of a qualified
25     auditor.
26
27          14.    The HSBC Defendants twice retained KPMG to perform
       due diligence on BLMIS; KPMG twice reported serious fraud risks
28     and deficiencies, many already known to the HSBC Defendants.

- 13 -
COMPLAINT FOR RESCISSION AND OTHER RELIEF

L3985

"Knowing that BLMIS was likely a fraud, the HSBC Defendants nevertheless continued to enable Madoff's fraud for their own gain. No longer satisfied with being a mere marketing tool, the HSBC Defendants developed derivative structured financial products that poured even more money into BLMIS's IA Business, providing Madoff with the substantial assistance he needed to keep the Ponzi scheme going."

42.    It was not until December 5, 2010, when the Picard Complaint was publicized in the news and the allegations concerning HSBC USA were publicly reported, that Wailea learned of facts showing that: (i) HSBC USA lacked a good faith basis for believing that Madoff was complying with the SSC Strategy with respect to BLMIS's investment of Senator Fund's capital; and (ii) HSBC USA itself may have engaged in wrongdoing with respect to Senator Fund.

## FIRST CAUSE OF ACTION

### (Rescission Due to Mutual Mistake)

43.    Wailea repeats and realleges each allegation set forth in paragraphs 1 through 30 herein.

44.    The essence of the parties' initial and amended and restated swap contracts is the parties' mutual understanding and belief that the capital of the "Reference Fund" (*i.e.*, Senator Fund) historically had been invested, and at all times would be invested, pursuant to the "split strike conversion strategy" described in the two Senator Fund OMs as set forth under Section 7 and Annex II of the Initial Swap, the Second Swap, and the Third Swap.

45.    In fact, Senator Fund's assets were never placed in a managed account and invested in accordance with the specified SSC Strategy condition.  Instead, Senator Fund's money was commingled with funds from other BLMIS clients and misappropriated, with no investments occurring at all.

46.    Wailea would not have entered into the Initial Swap, the Second Swap, or the Third Swap, or transferred its initial and additional collateral to HSBC USA, if Wailea had known that Senator Fund's capital was not being invested, and would

1    not be invested, in accordance with the SSC Strategy and the other contractual
2    conditions set forth in Annex II of the three swap contracts.

3         47.    Because Wailea was mistaken about the actual manner in which
4    Senator Fund's capital was being used and would be used, and because Wailea
5    would not have entered into the Initial Swap, the Second Swap, or the Third Swap,
6    or delivered its initial and additional collateral to HSBC USA, if it had knowledge
7    of this material mistake going to the essence of the parties' investment contracts,
8    Wailea is entitled to rescission of the parties' swap contracts and to receive from
9    HSBC USA all of the initial and additional collateral that Wailea transferred to
10   HSBC USA pursuant to the Initial Swap, the Second Swap and the Third Swap, in
11   the approximate amount of $15,970,000 or such other amount as may be proven in
12   this action, plus interest at the legal rate.

13                     **FOURTH CAUSE OF ACTION**
14                   **(Rescission Due to Unilateral Mistake)**

15        48.    Wailea repeats and realleges each allegation set forth herein.

16        49.    At all times, HSBC USA's conduct encouraged Wailea to invest with
17   HSBC USA pursuant to the Initial Swap, the Second Swap and the Third Swap and
18   to increase the aggregate amount of its investment and transfer additional swap
19   collateral to HSBC.

20        50.    To the extent that either (i) HSBC USA knew that Senator Fund's
21   capital was not being invested and/or would not be invested in the manner expressly
22   contemplated and expected by the parties, as set forth in the two Senator Fund OMs
23   and as required under Section 7 and Annex II of the parties' swap contracts, or
24   (ii) HSBC USA had no reasonable ground for believing that Senator Fund's capital
25   was being invested and/or and would be invested in said manner, such that Wailea
26   was unilaterally mistaken about this mistake going to the essence of the parties'
27   contracts, Wailea is entitled to rescission of the parties' swap contracts and to
28   receive from HSBC USA all of the initial and additional collateral that Wailea

- 15 -

L3987

transferred to HSBC USA pursuant to the Initial Swap, the Second Swap and the Third Swap, in the approximate amount of $15,970,000 or such other amount as may be proven in this action, plus interest at the legal rate.

### THIRD CAUSE OF ACTION

### (Rescission Due to Innocent Misrepresentation)

51. Wailea repeats and realleges each allegation set forth in paragraphs 1 through 30 herein.

52. Verbally and in writing, representatives of HSBC USA made materially misleading statements to Wailea. These misleading statements include, *inter alia*, the following:

(a) Verbally and in writing, HSBC USA represented and promised that the capital of Senator Fund—which is the "Reference Fund" under the parties' swap contracts—historically had been invested, and at all relevant times would be invested, in accordance with the "split strike conversion strategy" described in the 2006 and 2007 Senator Fund OMs and in accordance with the conditions set forth in Section 7 and Annex II of the First Swap, the Second Swap and the Third Swap; in fact, Senator Fund's capital never was invested pursuant to the SSC Strategy; and

(b) Each Month-end Valuation that HSBC USA sent Wailea materially misstated the net asset value ("NAV") of individual units of Senator Fund and the NAV of Wailea's swap investment, as of the specified month-end date.

53. The materially misleading statements specified in paragraph 52 above, which Wailea believed to be true at all relevant times prior to Madoff's arrest, actually and reasonably induced Wailea to enter into the Initial Swap, the Second Swap, and the Third Swap and to transfer its initial and additional collateral to HSBC USA from time to time from September 2007 through December 2008.

- 16 -

L3988

54. The materially misleading statements specified in paragraph 52 pertain to the essence of the parties' swap contracts and, but for those statements, Wailea would not have entered into the Initial Swap, the Second Swap, or the Third Swap, and Wailea would not have transferred any swap collateral to HSBC USA.

55. Because Wailea was actually and reasonably induced to enter into the Initial Swap, the Second Swap and the Third Swap, and to deliver its initial and additional collateral to HSBC USA, in reliance upon material misleading statements pertaining to the essence of the parties' swap contracts, and Wailea would not have entered into the Initial Swap, the Second Swap, or the Third Swap, or delivered its initial or additional collateral to HSBC USA, if it had known that these statements were not true, Wailea is entitled to rescission of the swap contracts and to receive from HSBC USA all of the initial and additional collateral that Wailea transferred to HSBC USA pursuant to the Initial Swap, the Second Swap and the Third Swap, in the approximate amount of $15,970,000 or such other amount as may be proven in this action, plus interest at the legal rate.

## FOURTH CAUSE OF ACTION
### (Failure of Condition)

56. Wailea repeats and realleges each allegation set forth in paragraphs 1 through 30 herein.

57. As an express condition to Wailea's entry into the subject investment contracts with HSBC USA and as a condition to its obligations and performance thereunder, Section 7 and Annex II of the Initial Swap, the Second Swap, and the Third Swap each contained the following requirements:

> (a) "The Reference Fund [*i.e.*, Senator Fund] will invest substantially all of its assets in a managed account (the "Managed Account") at all times during the term of this Transaction," and "[t]he Investment Manager will use a split-strike conversion strategy."

- 17 -

L3989

(b) "The Reference Fund will only invest in 1) stocks in the S&P 100 index, 2) option on S&P 100 index, and/or 3) Money Market/US Treasury Bills."

58. None of the foregoing express and explicit conditions to the parties' investment contracts, as amended and restated over time, or Wailea's performance thereunder, were satisfied at any time.

59. Wailea has performed all acts, obligations, and conditions required of it under the Initial Swap, the Second Swap and the Third Swap, except those acts, obligations, and conditions, if any, it was prevented or excused from performing.

60. Because express conditions to Wailea's contractual performance were not satisfied, Wailea is excused from performance, and Wailea is entitled to receive from HSBC USA all of the initial and additional collateral that Wailea transferred to HSBC USA to secure its performance and obligations under the Initial Swap, the Second Swap and the Third Swap, in the approximate amount of $15,970,000 or such other amount as may be proven in this action, plus interest at the legal rate, and to receive any and all monetary damages that, in the ordinary course of things, were likely to, and did, result therefrom.

## FIFTH CAUSE OF ACTION

### (For Violations of Cal. Corp. Code §§25401 *et seq.*)

61. Wailea repeats and realleges each allegation set forth herein.

62. The swaps with HSBC USA depended upon the honesty and skill of others in managing Wailea's investment. As "investment contracts," the initial and the amended and restated swaps described herein fall within the definition of "securities" under the California Corporate and Securities Law of 1968.

63. HSBC USA marketed, sold, entered into, and repeatedly amended, restated, and reconfirmed investment contracts, known as swaps, by means of materially misleading statements and omissions. These materially misleading statements and omissions include, *inter alia*, the following:

- 18 -

COMPLAINT FOR RESCISSION AND OTHER RELIEF

L3990

1    (a)    Verbally and in writing, HSBC USA represented that the

2    capital of Senator Fund—which is the "Reference Fund" under the

3    parties' swap contracts—historically had been invested, and at all

4    relevant times would be invested, in accordance with the "split strike

5    conversion strategy" described in the 2006 and 2007 Senator Fund

6    OMs and in accordance with the conditions set forth in Section 7 and

7    Annex II of the First Swap, the Second Swap, and the Third Swap; in

8    fact, Senator Fund's capital never was invested pursuant to the SSC

9    Strategy; and

10    (b)    Each Month-end Valuation that HSBC USA sent Wailea

11    materially misstated the net asset value ("NAV") of individual units of

12    Senator Fund and the NAV of Wailea's swap investment, as of the

13    specified month-end date.

14    64.    Pursuant to California Corporations Code §25501, HSBC USA's

15    violation of §24401 entitles Wailea to rescission of the parties' swap contracts.

16    Upon rescission, Wailea is entitled to receive from HSBC USA all of the

17    consideration (*i.e.*, swap collateral) that Wailea transferred to HSBC USA pursuant

18    to the Initial Swap, the Second Swap and the Third Swap, in the approximate

19    amount of $15,970,000 or such other amount as may be proven in this action, plus

20    interest at the legal rate.

21                              **PRAYER**

22    WHEREFORE, Wailea respectfully requests equitable and legal relief,

23    in the form of a judgment entered in its favor and against HSBC USA, as follows:

24    A. Rescinding the Initial Swap, the Second Swap, and the

25    Third Swap, and each of them;

26    B. Requiring HSBC USA to return all of the consideration

27    provided pursuant to the parties' swap contracts, in the approximate

28    amount of $15,970,000 or such other amount as may be proven in this

- 19 -

L3991

1   action, plus pre-judgment interest and post-judgment interest thereon

2   at the legal rate;

3          C.  Awarding Wailea the costs and disbursements of this action,

4   including reasonable attorneys' and expert fees and expenses, as well

5   as pre-judgment interest and post-judgment interest thereon at the

6   legal rate; and

7          D.  Granting such other and further relief as the Court deems

8   just and proper.

9

10  DATED: July 19, 2011

11

12                                  *Benjamin Rozwood*

13                                   BENJAMIN ROZWOOD

14                                  Counsel for Plaintiff

15                                  WAILEA PARTNERS, LP

16

17

18

19

20

21

22

23

24

25

26

27

28

- 20 -

COMPLAINT FOR RESCISSION AND OTHER RELIEF



**HSBC Bank USA, NATIONAL ASSOCIATION**
452 Fifth Avenue
New York, NY 10018

Date: September 4, 2007

| | | | |
|---|---|---|---|
| To: | Wailea Partners LP | From: | HSBC Bank USA, National Association |
| Attention: | William Belhumeur | Contact: | Swap Documentation |
| Phone Number: | 415-986-8040 | Phone Number: | (212) 525-3138 |
| Facsimile Number: | 415-986-8041 | Facsimile Number: | (212) 525-0673 |

HBUS Ref No: 278515

### SHARE SWAP TRANSACTION CONFIRMATION

The purpose of this communication is to set forth the terms and conditions of the Share Swap Transaction entered into between HSBC Bank USA, National Association ("Party A") and Wailea Partners LP ("Party B") on the Trade Date specified below (the "Transaction"). This communication constitutes a Confirmation as referred to in the Agreement described below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," and, together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

This Confirmation together with all other documents referring to the ISDA Form evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, Party A and Party B agree that an agreement in the form of this Confirmation relates. In addition, Party A and Party B agree that an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") (as may be amended, modified or supplemented from time to time, the "Agreement"), with such modifications as Party A and Party B in good faith agree will supplement, form a part of, and be incorporated by reference into this Confirmation forming part of the Agreement as if Party A and Party B had executed an agreement in the form of the ISDA Form on the Trade Date of the first such Transaction between them and in such form with the Schedule thereto specifying (i) that the governing law is the law of the State of New York, without reference to choice of law doctrine, (ii) the Termination Currency is U.S. Dollars, (iii) Loss and Second Method and (iv) further modifications to the ISDA Form indicated below.

This Transaction constitutes a Swap Transaction for purposes of the Swap Definitions and a Share Swap Transaction for purposes of the Equity Definitions. The terms of the Transaction to which this Confirmation relates are as follows:

L3993

1. **GENERAL TERMS**

Trade Date:                          September 4, 2007

Effective Date:                      September 4, 2007

Termination Date:                    The final Cash Settlement Payment Date.

Calculation Agent:                   HSBC Bank USA, National Association ("HSBC").
                                     All determinations and calculations of the Calculation
                                     Agent determined in good faith and in a commercially
                                     reasonable manner shall be conclusive and binding for
                                     all purposes absent manifest error.

                                     Upon the occurrence of an Event of Default or
                                     Termination Event in which Party A is the Defaulting
                                     Party or the sole Affected Party, Party A and Party B
                                     shall mutually agree on a third-party financial
                                     institution to act as Calculation Agent until such Event
                                     of Default or Termination Event is no longer
                                     occurring.

Business Day:                        New York

Business Day Convention:             Modified Following (which shall apply to any date
                                     referred to in this Confirmation that falls on a day that
                                     is not a Business Day).

Reference Shares:                    The number of limited partnership interests of the
                                     Reference Fund that would be received by the
                                     Reference Holder had the Reference Holder invested
                                     USD 31,000,000 in the Reference Fund effective as of
                                     the Effective Date (as may be amended from time to
                                     time), subject to adjustment in accordance with
                                     Section 6.

Reference Fund:                      Senator Equity Segregated Portfolio One

Party B Initial Payment:             USD 8,870,000

2. **EQUITY AMOUNTS**

Equity Amount Payer:                 Party A

Equity Amount Receiver:              Party B

Equity Notional Amount:              As of the Effective Date, USD 31,000,000, and
                                     thereafter as of any date of determination, the amount
                                     as determined by the Calculation Agent.

Equity Amount:                       As of any date of determination, the amount as
                                     determined by the Calculation Agent equal to the
                                     Equity Notional Amount less the Floating Notional
                                     Amount, and with respect to any Cash Settlement

-2-

L3994

Date, the cumulative Reference Fund Redemption Payments as of such Cash Settlement Payment Date less the Floating Notional Amount. Notwithstanding Section 8.6 of the Equity Definitions, the Equity Amount, if negative, shall be deemed zero until the final Cash Settlement Payment Date.

Reference Fund
Redemption Payments:

As of any date of determination, the cumulative amount of cash a Reference Holder would actually receive, on or before the third Business Day prior to such day, as determined by the Calculation Agent, as a result of a redemption or other disposition of an investment in the Reference Shares had the Reference Holder delivered a timely redemption notice in accordance with the schedule indicated in the Reference Fund's operating documents, to such Reference Fund to receive the Net Asset Value of such Reference Shares as of the Valuation Date (assuming that the Reference Holder elected to reinvest dividends (if any) that it would have received as a holder of Reference Shares), net of any accrued management, load, administrative and any other per share fees or costs and net of any taxes payable by the Reference Holder in connection with such a redemption or other disposition of such Reference Shares.

"Reference Holder" means a holder of Reference Shares as determined by the Calculation Agent. The Reference Holder is used solely to compute the Reference Fund Redemption Payments and the Cash Settlement Payment Date and does not represent an investment in Reference Shares of the Reference Fund.

Equity Notional Reset:

Not Applicable

Type of Return:

Price Return

Valuation Dates:

The earlier of (i) August 31, 2009 (the "Scheduled Valuation Date") and (ii) the Business Day designated by the Calculation Agent as a Valuation Date upon (A) mutual request by parties hereto or (B) the occurrence of an Early Termination Date or Extraordinary Event. .

Section 6.2 of the Equity Definitions is hereby amended by deleting the words after the parenthetical in the first sentence and replacing them with a ".".

-3-

|  | Notwithstanding anything to the contrary in the Equity Definitions, Section 6.3 of the Equity Definitions shall not apply to this Transaction. |
|---|---|
| Return of Equity Amount: | If a Reference Holder is required to repay any portion of the redemption or other proceeds received from the Reference Fund, then Party B shall promptly pay to the Equity Amount Payer such portion, including, without limitation, any taxes, accrued management, load, administrative and any other per share fees or costs payable in respect of such proceeds. The foregoing obligations shall survive any termination or assignment of this Transaction. |
| Dividend Amount: | Notwithstanding anything to the contrary in the Equity Definitions, Section 10.1 or 10.4 of the Equity Definitions shall not apply to this Transaction. |

## 3. FLOATING AMOUNTS

| Floating Amount Payer: | Party B |
|---|---|
| Floating Notional Amount: | As of the Effective Date, USD 22,130,000, and thereafter such amount as may be adjusted pursuant to the terms of this Confirmation; provided that the Floating Notional Amount shall not exceed the Maximum Notional Amount. |
| Floating Amount Payment Date: | The final Cash Settlement Payment Date. |
| Calculation Period: | The period from and including the Effective Date to but excluding the Termination Date. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | One month; provided that if a Notional Upsize Date or Notional Downsize Date is effected during a Calculation Period that causes an increase or decrease in the Floating Notional Amount, the Calculation Agent will compute the Floating Rate Option for the remainder of the Calculation Period based on USD-LIBOR-BBA (or such other index that may be appropriate for shorter durations) for the remainder of such Calculation Period, using Linear Interpolation or such other factors it deems necessary. |
| Spread: | 1.10% |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Compounding Period. |
| Compounding: | Applicable |

-4-

L3996

| | |
|---|---|
| Compounding Dates: | The last calendar day of each month commencing in September 2007 and ending on the last calendar day of the month immediately preceding the final Cash Settlement Payment Date. |
| Minimum Spread Payment: | Notwithstanding the foregoing or upon the occurrence of (i) an Event of Default, Termination Event, Additional Termination Event or other termination of this Agreement (other than a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates) where Party B is the Defaulting Party or an Affected Party or (ii) an Extraordinary Event, in the event that Party B has not previously paid to Party A an amount equal to the product of (x) USD 15,000,000, (y) the Spread and (z) the Floating Rate Day Count Fraction (such amount, the "**Minimum Spread Payment**") with respect to the period between the Effective Date and August 31, 2009, Party B shall pay to Party A the difference between the Minimum Spread Payment and any amount paid for such period (other than, for the avoidance of doubt, all such amounts payable pursuant to the Floating Rate Option). Party B's obligations with respect to this "Minimum Spread Payment" shall survive the termination of this Transaction. |

## 4.    SETTLEMENT TERMS

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Cash Settlement Payment Date: | For the Valuation Date, thirty (30) Business Days after such Valuation Date and the final Business Day of each month thereafter; until such date, determined by the Calculation Agent in its sole discretion, on which a Reference Holder of Reference Shares would have actually received all the proceeds from a redemption of the Reference Shares. |
| | If a Reference Holder of Reference Shares would not actually receive all the proceeds from a redemption or other disposition of the Reference Shares within three months after such Valuation Date, such date shall be the final Cash Settlement Payment Date; provided that upon the occurrence of an Event of Default or Termination Event under the Agreement, the Calculation Agent may designate the final Cash Settlement Payment Date on any date following the applicable Valuation Date. |

-5-

5.  **SHARE ADJUSTMENTS**

Method of Adjustment:    Calculation Agent Adjustment

Notwithstanding anything to the contrary in the Equity Definitions, Section 11.2 (e)(iii) of the Equity Definitions is hereby amended such that the words "Extraordinary Dividend" mean "any cash or non-cash dividend".

6.  **NOTIONAL ADJUSTMENTS**

(i)    Party B may designate any Compounding Date as a "Notional Upsize Date" provided that the following conditions are satisfied:

(A)    Party B shall provide Party A five (5) Business Days' prior written notice in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of (i) its intention to designate a Compounding Date as a Notional Upsize Date and (ii) the amount by which the Equity Notional Amount (which may be effected by an increase in the Floating Notional Amount and/or a payment of cash by Party B) shall increase on the related Notional Upsize Date, the "Notional Upsize Amount";

(B)    Before and after giving effect to the increase in the Equity Notional Amount on the Notional Upsize Date, an Event of Default or Termination Event shall not have occurred and be continuing or will not occur; and

(C)    Before and after giving effect to the increase in the Equity Notional Amount on the Notional Upsize Date, the Leverage Ratio shall be less than the Maximum Leverage Ratio and the Floating Notional Amount shall be less than the Maximum Notional Amount.

(ii)    Party B may designate any Compounding Date as a "Notional Downsize Date" provided that the following conditions are satisfied:

(A)    Party B shall provide Party A five (5) Business Days' prior written notice in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of (i) its intention to designate a Compounding Date as a Notional Downsize Date and (ii) the amount by which the Equity Notional Amount (which may be effected by a reduction of the Floating Notional Amount and/or a redemption of a number of Reference Shares and subsequent cash payment to Party B) shall decrease on the related Notional Downsize Date, the "Notional Downsize Amount;"

(B)    After giving effect to the decrease in the Equity Notional Amount on the Notional Downsize Date, an Event of Default or Termination Event shall not have occurred and be continuing or will not occur; and

(C)    After giving effect to the decrease in the Equity Notional Amount on the Notional Downsize Date, the Leverage Ratio shall be less than the Maximum Leverage Ratio.

Notwithstanding Section 6(ii)(A) above, the Notional Downsize Date shall be the date Party A shall have received cash or a Reference Holder would have actually received cash as a result of a

-6-

08-01789-smb    Doc 156-2    Filed 04/03/17    Entered 04/03/17 23:39:40    Exhibit 1 -
Sep 04 2002 Case 32 PV-03544 SAGE Document 3  Filed 07/19/11    Page 28 of 85    p.7
(Part 2 of 8)    Pg 29 of 40

redemption of Reference Shares, as determined by the Calculation Agent, in an amount equal to the Notional Downsize Amount. If a Notional Adjustment is effected by a redemption of Reference Shares, the Calculation Agent may designate multiple Notional Downsize Dates on such dates as a Reference Holder would have actually received cash as a result of a redemption of Reference Shares.

(iii)    Party A may designate any date as a "Notional Downsize Date" and reduce the Notional Amount such that the Leverage Ratio will be less than 3.5, Party A shall promptly give notice to Party B following the designation of such Notional Downsize Date.

Notwithstanding anything to the contrary above, in the event that a Reference Holder would be unable to acquire Shares of the Reference Fund upon the occurrence of a Notional Upsize Date, Party B shall not be permitted to effect such Notional Upsize.

7.    **INVESTMENT GUIDELINES**

As set forth on Annex II

8.    **REPORTING REQUIREMENTS**

Party B hereby covenants to provide to Party A or to cause Party A to be provided with the following information in accordance with the time frames set forth below:

(a)    Semi-monthly NAV reports within 10 days;

(b)    Fully completed HSBC Risk Report (as set forth on Annex III) within 10 Business Days of the end of each calendar month;

(c)    Annual audited financial statements of the Reference Fund from the auditor within 180 calendar days of the end each calendar year; and

(d)    Monthly statements from the Administrator showing all assets and trading activity for each month within 10 Business Days

9.    **EXTRAORDINARY EVENTS**

Notwithstanding anything to the contrary in Sections 12.1 or 12.6 of the Equity Definitions, the occurrence of a Merger Event, Tender Offer, Nationalization or Insolvency shall be deemed to be effective on the Announcement Date of such event. With respect to this Transaction, Sections 12.2-12.5, 12.6(c) and 12.7 of the Equity Definitions shall not apply.

Following the Announcement Date of a Merger Event, Tender Offer, Nationalization or Insolvency, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter (subject to the definition thereof) and determine the Reference Fund Value as described above. The occurrence of an Extraordinary Event shall be deemed an Additional Termination Event for purposes of Section 7 hereof, and Party B shall be deemed the Affected Party.

Section 12.6(a)(ii) of the Equity Definitions is deleted in its entirety and replaced with the following: "Insolvency" means (i) that by reason of the voluntary or involuntary liquidation,

-7-

bankruptcy, insolvency, dissolution or winding up of or any analogous proceeding affecting the Reference Fund, (A) all the Reference Shares of the Reference Fund are required to be transferred to a trustee, liquidator or other similar official or (B) holders of the Reference Shares of the Reference Fund become legally prohibited from transferring them or (ii) that the Reference Fund institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation by it or such regulator, supervisor or similar official or it consents to such a petition, provided that proceedings instituted or petitions presented by creditors and not consented to by the Reference Fund shall not be deemed an Insolvency.

The provisions of Article 12 of the Equity Definitions relating to "Delisting" shall not apply to this Transaction.

10. **ADDITIONAL DISRUPTION EVENTS.**

| | |
|---|---|
| Change in Law: | Applicable |
| Insolvency Filing: | Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |

Following the termination of this Transaction because of an Additional Disruption Event, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter and determine the Reference Fund Value as described above. For the avoidance of doubt, the occurrence of an Additional Disruption Event shall be deemed an Additional Termination Event for purposes of Section 7 hereof as described under "Extraordinary Events" above, and Party B shall be the Affected Party.

11. **ADDITIONAL TERMINATION EVENTS.**

(a) Each of the following shall be Additional Termination Events in respect of Party B (at the option of Party A):

(i) any event shall occur which has had a material adverse change in, or will have a material adverse effect upon, the business, properties, assets, operations, liabilities (actual or contingent), condition (financial or otherwise) of Party B or the Reference Fund and which may affect the ability of Party B to perform its obligations under the Agreement,

(ii) any formal charge, complaint, or proceeding with respect to Party B or the Reference Fund by any governmental authority (other than any governmental authority in its capacity as an investor or counterparty of Party B) shall have been made which (x) alleges any impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing related to the performance of services by such person and (y) if successful, could have a materially adverse effect on Party B or the Reference Fund,

-8-

(iii)    any judgment or order shall be entered (and either such judgment or order has not been overturned or dismissed within 30 days after such entry or there has been any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, has not been in effect) in any investigative, administrative or judicial proceeding involving a determination that Party B, the Reference Fund shall have violated in any material respect any civil or criminal law or regulation applicable to it in the performance of its duties in connection with itself or a Reference Fund, as the case may be,

(iv)    any of the memorandum of association, articles of association or prospectus of Party B or the Reference Fund shall be amended in any manner which could reasonably be expected to materially and adversely affect the rights, the economic bargain or the risk profile of Party A under this Transaction or its ability to enforce the same unless Party A shall have given its prior written consent to such amendment,

(v)    the Reference Fund effects a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates, or

(vi)    if Party A fails to receive any report required to be delivered to it in accordance with the Reporting Requirements and such default is not cured within two (2) Business Days of Party B's receipt of notice of such default.

(b)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination, the Leverage Ratio is equal to or greater than the Maximum Leverage Ratio and Party B has not (with the consent of Party A) taken irrevocable corrective action within three business days of receiving notice.

(c)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Floating Notional Amount is greater than the Maximum Notional Amount.

(d)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Annualized Volatility exceeds 15%.

(e)    It shall be an Additional Termination Event (at the option of Party A) with Party B as the sole Affected Party if as of any date of determination the Calculation Agent determines that a Net Asset Value Decline Event shall occur with respect to the Reference Fund.

(f)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the liquidity of the Reference Fund shall be less frequent than monthly upon 15 calendar day notice.

(g)    Party B may elect, upon 90 calendar days' prior written notice to Party A, to terminate the Transaction in whole or in part on such date as indicated by Party B (such termination, a "Party B Termination Event"). Any such Party B Termination Event shall be an Additional Termination Event, with Party B as the sole Affected Party.

L4001

12.    **REPRESENTATIONS**

Non-Reliance:                                    Applicable

Agreements and
Acknowledgements
Regarding Hedging Activities:                    Applicable

Additional Acknowledgements:                     Applicable

Each party (or such party as specified below) hereby represents and warrants and acknowledges to the other party as of the date hereof:

(a)    Each party retains complete freedom to determine, in its individual unfettered discretion, whether, or to what extent and in what manner, to hedge their respective obligations with respect to this Transaction. This Transaction does not create any further obligation on the part of Party A and/or any affiliates thereof to hedge or otherwise make any investment, directly or indirectly, in the Reference Fund. However, if and to the extent that any such investment in the Reference Fund is made at any time by Party A and/or any affiliate thereof, such investment will be on its own behalf only, Party B will have no interest or right, directly or indirectly, in respect of such investment (whether by way of third party beneficiary, security interest, or otherwise), and Party B acknowledges that this Transaction will not create either a direct or indirect obligation of the Reference Fund owing to Party B. Party B will be a general unsecured creditor of Party A with respect to Party A's obligations relating to this Transaction. Any amounts payable by Party A with respect to this Transaction will be satisfied solely out of the general assets of Party A subject to the claims of its creditors.

(b)    Each party has the capability to make its own legal, regulatory, tax, investment, financial, accounting and business evaluation of and to understand, and has evaluated and does understand on its own behalf, the terms, conditions and risks of entering into this Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks.

(c)    Each party has made its own independent decision to enter into this Transaction and as to whether this Transaction is appropriate and proper for it. Neither party or any affiliate thereof will bear any responsibility or liability if the legal, regulatory, tax, investment, financial, accounting, business or credit effects or consequences of this Transaction are other than those contemplated by the other party.

(d)    Neither party is relying on any communication (written or oral) from the other party or any of its affiliates or representatives as investment or other advice or as a recommendation to enter into this Transaction, it being understood and agreed that any information, commentary and explanations related to the terms and conditions of this Transaction provided by one party or an affiliate or representative thereof to the other party or an affiliate or representative thereof, shall not be considered investment or other advice or a recommendation, and is not being relied upon by the other party or forming the basis, primary or otherwise, of that party's decision to enter into this Transaction. No compensation or other amount (including any amount otherwise payable under this Confirmation) is being paid by or on behalf of one party to the other or any affiliate thereof for any advice or information in respect of this Transaction.

-10-

(e)    Each party acknowledges that it has been offered an opportunity to ask questions of, and receive answers from the other party concerning the other party and that any request for such information has been fully complied with to the extent the other party possesses such information or can acquire it without unreasonable effort or expense.

(f)    Party B has been, and will at all times continue to be, solely responsible for making an independent appraisal of and investigation into the financial condition, prospects, creditworthiness, affairs, status and business of the Reference Fund.

(g)    Neither Party A or any affiliate or representative thereof is making, and has not made, in connection with this Transaction any representation or warranty whatsoever as to the Reference Fund or as to any information contained in any document provided by the Reference Fund to Party A or any affiliate or representative thereof or to any other person or filed by the Reference Fund with any exchange or with any governmental or regulatory authority regulating the purchase and sale of securities.

(h)    Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business with, the Reference Fund or its affiliates or any other person or entity having obligations relating to the Reference Fund and may act with respect to such business in the same manner as if this Transaction did not exist.

(i)    Party B has received and reviewed the offering, subscription, organizational and all other relevant documents with respect to the Reference Fund. Party B meets all eligibility and suitability standards imposed by the Reference Fund and applicable law with respect to a direct investment in the Reference Fund, meets all of the requirements of a "Third Party" as defined in the Subscription Document of the Reference Fund, can make (and hereby makes) all of the representations and warranties required to be made by investors of Reference Shares, and is capable of making a direct investment in the Reference Fund. Party B understands the nature of making an investment in the Reference Fund, and has concluded that such an investment would be suitable for it in light of its own investment objectives, financial capabilities and expertise. Party B is not entering into the Transaction for the purpose or as a means of gaining economic exposure to a fund in which it would not be able to invest directly for any reason.

(j)    Party B acknowledges and agrees that it is (i) an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated by the U.S. Securities and Exchange Commission; (ii) a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended; (iii) an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended (the "CEA"); and (iv) an "eligible contract participant" as defined in rule 4.7 promulgated under the CEA.

(k)    Party B represents to Party A that the Transaction described herein is not, and does not form part of, a listed transaction or a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service has identified as a listed transaction for purposes of section 6011, 6111 or 6112 of the U.S. Internal Revenue Code of 1986, as amended (the "Code").

(l)    For U.S. federal income tax purposes, each party agrees that, (A) to the extent that Party A or an affiliate hedges its obligations under this Agreement by holding the Reference Fund, or enters into a substantially similar transaction with a party that owns the

-11-

08-01789-smb    Doc 156-2    Filed 04/03/17    Entered 04/03/17 23:34:49    Exhibit 1 -
Case 3:11-cv-03544-spanDocument 18-4of 04/19/11    Page 33 of 85

Sep 04 2007 2:31PM    HP LASERJET FAX                                    p. 12

Reference Fund, they will treat (i) the arrangement represented by the Agreement as a debt instrument of Party B that provides for interest at a rate equal to 1-month USD-LIBOR-BBA plus the Spread, the proceeds of which are used by Party B to purchase the Reference Fund for its own account and (ii) Party B as the beneficial owner of the Reference Fund for U.S. federal income tax purposes, and (B) to the extent that neither Party A nor an affiliate hedges its obligations under this Agreement by owning the Reference Fund or enters into an offsetting transaction with a party that owns the Reference Fund, they will treat the arrangement represented by the Agreement as a constructive ownership transaction, as defined in Section 1260 of the Code, with respect to the Reference Fund, and each party agrees not to take any position that is inconsistent with this treatment for U.S. federal income tax purposes, unless required by law.

13. **ADDITIONAL PROVISIONS**

Reserved

14. **DEFINITIONS AND INTERPRETATION**

For the purpose of this Confirmation:

"**Adjusted Reference Fund Value**" or "**ARFV**" as of any date of determination, the Reference Fund Value less any reductions made pursuant to Section 8 herein.

"**Delta Event**" means, as of any date of determination, the absolute value of the aggregated "delta exposure" of the Reference Fund as set forth in the report delivered pursuant to Section 15 is greater than 50%.

"**Leverage Ratio**" means an amount equal to:



$$\frac{ARFV}{ARFV - FNA}$$

*where* "FNA" means the Floating Notional Amount, as of any date of determination.

"**Maximum Leverage Ratio**" means 3.75.

"**Maximum Notional Amount**" means USD 30,000,000

"**Net Asset Value**" means as of any date of determination and with respect to the Reference Fund, the market value of the Reference Shares of the Reference Fund based on the weekly reports as set forth in the Reporting Requirements (after giving effect to any redemptions as determined by the Calculation Agent); provided that if such weekly reports are not delivered to Party A or are, in the Calculation Agent's commercially reasonable determination, inaccurate, the Calculation Agent shall determine the market value of the Reference Fund in its sole discretion.

"**Net Asset Value Decline Event**" means with respect to the Reference Fund, Reference Fund's Net Asset Value as of the last Business Day of any calendar month (x) declines by 6% or more from its Net Asset Value as of the last Business Day of the immediately

-12-

L4004

preceding calendar month or (y) declines by 8% or more during any three month calendar period.

"**Reference Fund Value**" means, as of any date of determination, the market value of the Reference Shares of the Reference Fund as determined by the Calculation Agent based on the most recent weekly estimated Net Asset Value.

15.   **MODIFICATIONS TO THE ISDA MASTER AGREEMENT**

(a)   "**Specified Transaction**" means, (a) any transaction (including an agreement with respect thereto) which currently exists or which is entered into at any time in the future between one party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) which is an interest rate, basis, bond, emerging market instrument, foreign exchange, currency, bullion, other commodity (including a lease, loan or consignment of bullion or other commodity), equity, equity linked, index linked or credit linked transaction; cap, collar, floor, swap or option transaction; forward rate transaction; purchase, sale, repurchase, buy/sell back, stock lending or EFP (exchange for physical) transaction; or any similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions, and (c) any other transaction identified as a Specified Transaction in this Agreement.

(b)   The "**Cross Default**" provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(c)   "**Credit Event Upon Merger**" provisions of Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

(d)   "**Automatic Early Termination**" provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(e)   **Delivery of Documents.** For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | United States Internal Revenue Services Forms W-9, and renewal and replacement forms. | (i) Upon Request of Party A. |

-13-

L4005

Other documents to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Evidence as to (i) authority of Party B to enter into this Agreement and Transactions, and (ii) authorized signatories. | At execution of this Agreement. | Yes |
| Party B | A trading authorization for the persons or entities trading on behalf of Party B, if any. | At execution of this Agreement. | Yes |
| Party B | Legal opinion regarding certain corporate matters and enforceability regarding Buyer's execution of this Agreement | At execution of this Agreement. | No |

(f)     **Jury Waiver.** Each party, knowingly, and voluntarily waives any right either of them may have to trial by jury in any litigation based upon or arising out of this Agreement or the Transaction contemplated by this Agreement or any course of conduct, dealing, performance, usage of trade, statements (whether oral or written) or actions of either of them. Neither party shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial cannot be or has not been waived. These provisions shall not be deemed to have been modified in any respect or relinquished by either party except by written instrument executed by each of them.

**Affiliates.** For the purposes of Section 3(c) Party A will be deemed to have no Affiliates.

(g)     Additional Representations of Party B.

(i)     **Status of Parties.** Neither Party A nor any of its affiliates is acting as a fiduciary or an advisor for Party B in respect of the Transaction.

(ii)    **Private Transaction.** Party B is entering into the Transaction solely for its own account as principal for investment and not with a view to resale or distribution. Party B understands that the Transaction has not been registered under the Securities Act of 1933, as amended (the "Act"), or any other state securities law, and will not be so registered. Party B shall not permit any other person to have any beneficial interest in its interest in the Transaction, and shall not assign, transfer, convey or encumber all or any portion of its interest in the Transaction, without the consent of Party A. Party B agrees that its interest in the Transaction shall not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Act.

(iii)   **Investment Company Act.** Party B is not an investment company registered under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"), or a business development company as defined in section 202(a)(22) of the U.S. Investment Advisers Act of 1940, as amended.

-14-

08-01789-smb   Doc 156767-2   Filed 04/03/17   Entered 04/03/17 23:39:40   Exhibit 1 -
Sep 04 2009 3:13PM 03544-S Part 8 of Part 9 of 9 Pg 07/19/11   Page 36 of 85

p. 15

(iv)   Party B represents to Party A that the transaction described herein is not, and does not form part of, a listed transaction or a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service has identified as a listed transaction for purposes of section 6011, 6111 or 6112 of the Internal Revenue Code.

16.   **NOTICE AND ACCOUNT DETAILS**

Notice Information for Party A:

HSBC Bank USA, National Association
452 Fifth Avenue - 8th Floor
New York, New York 10018
Contact: Julie Y. Mei - Swap Documentation
Tel: 212-525-5616
Fax: 212-525-0673
Email: julie.y.mei@us.hsbc.com

Payments to Party A:

HSBC Bank USA, NA
ABA: 021001088
Swift: MRMDUS33
A/C: ████9298

Notice Information for Party B:

Wailea Partners, LP
Attn: William Belhumeur
One Front St., Suiute 3300
San Francisco, CA  94111
415-986-8040

Payments to Party B:
Bank:  Northern Trust International Banking Corporation
Swift Address: CNORUS33
ABA: 026 001 122
A/C No.: ████0230
Fortis Prime Fund Solutions Bank (Ireland)
Fortis Prime Fund Solutions Cayman-Client Escrow
A/C No.: ████0000
FFC: Wailea Partners, LP
A/C No.: [_____]

17.   **TRANSFER**

Notwithstanding anything to the contrary in Section 7 of the Agreement, for avoidance of doubt, Party A shall have the right to assign its this Transaction to any affiliate of Party A without the consent of Party B.

-15-

**18.    NETTING OF PAYMENTS**

All amounts payable on the same date, in the same currency and in respect of the same Transaction shall be netted in accordance with Section 2(c) of the Agreement. The election contained in the last paragraph of Section 2(c) of the Agreement shall not apply for the purposes of the Agreement.

**19.    SET-OFF**

The parties agree to amend Section 6 by adding a new Section 6(f) as follows:

"(f) Upon the occurrence of an Event of Default or Termination Event under Section 5(b)(iv) with respect to a party ("X"), the other party ("Y") will have the right (but not be obligated), without prior notice to X or any other person, to set-off or apply any obligation of X owed to Y (or any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (or any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y will give notice to the other party of any set-off effected under this Section 6(f).

Amounts (or the relevant portion of such amounts) subject to set-off may be converted by Y into the Termination Currency at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If any obligation is unascertained, Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

**20.    OTHER ACKNOWLEDGMENTS**

(a)    The Transaction does not create any obligation on the part of Party A any of its affiliates or any other person or entity to make an investment in a Reference Fund or to otherwise hedge its obligations hereunder. To the extent that any investment in a Reference Fund is made by Party A or any of its affiliates or any other person or entity, such investment will be made on behalf of Party A only, and each of Party A and Party B acknowledges that the Transaction shall not create either a direct or indirect obligation of a Reference Fund owing to Party A.

(b)    Party A and its affiliates may, whether by virtue of the types of relationships described above or otherwise, at the date hereof or at times hereafter, be in possession of information in relation to the Reference Fund that is or may be material in the context of the Transaction and that may or may not be publicly available or known to Party B. Party A shall have no obligation to disclose to Party B any such relationship or information (whether or not confidential).

L4008

21.    **CONFLICTS DISCLOSURE, WAIVER AND EXCULPATION**

Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business (including the provision of advisory services) with the Reference Fund or its affiliates or any other person or entity having obligations relating to a Reference Fund and may act with respect to such business in the same manner as if the Transaction did not exist (including in a way that may be directly or indirectly adverse to the interests of Party B). Party B hereby waives any claim in respect of any such potential or actual conflict and holds Party A and its affiliates harmless from, and agrees that it shall not seek to hold Party A or any of its affiliates liable for, any losses or obligations of Party B that may result from such business.

-17-

L4009

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to Party A.

Yours sincerely,

**HSBC BANK USA, NATIONAL ASSOCIATION**

By: _____
    Name:
    Title:

Confirmed as of the date hereof:

**WAILEA PARTNERS, LP**

By: _____
    Name: William Belhumeur
    Title: Managing Member of the General Partner

L4010

08-01789-smb    Doc 16276-2    Filed 06/27/17    Entered 06/27/17 08:08:18    Exhibit 1
(part 2 of 2)    Pg 42 of 147
Case 3:11-cv-03544    Document 9    Filed 07/19/11    Page 40 of 85
Sep 04 2007 2:33PM    HP LASERJET FAX                                        P.19

## NOTIONAL ADJUSTMENT NOTICE

date

To:    HSBC Bank USA, NATIONAL ASSOCIATION
       452 Fifth Avenue
       New York, NY 10018

       Attn: Shui Wong
       Tel: 212-525-5616
       julie.y.mel@us.hsbc.com

Re:    **Wailea Total Return Swap Transaction
       (the "Transaction")**

Terms with initial capitals used, but not otherwise defined herein, shall have the meanings given to them in the Confirmation for the Transaction.

The undersigned hereby notifies HSBC that it wishes:

to adjust and increase reduce the Equity Notional Amount by USD ** to take effect on date.

This Notification is given upon and subject to the terms and conditions set out in the Agreement.

Dated this ** day of month year.

WAILEA PARTNERS, LP
By: _____
Title:

_____

Annex I - 1

Investment Guidelines

## ANNEX II

| | |
|---|---|
| **Reference Fund** | The Reference Fund will invest substantially all of its assets in a managed account (the "Managed Account") at all times during the term of this Transaction. The Investment Manager will use a split-strike conversion strategy. |
| **Eligible securities** | The Reference Fund will only invest in 1) stocks in the S&P 100 index, 2) option on S&P 100 index, and/or 3) Money Market / US Treasury Bills. |
| **Volatility Constraint:** | The annualized standard deviation of the most recent 12-months return of the Reference Fund in aggregate, as calculated by Calculation Agent, must be less 10%. |
| **Strategy:** | The equity portfolio (including groups or baskets of equities), if any, of the Reference Fund (the "Stock Portfolio"), must include 25 or more members of Standard & Poor's 100 Stock Index (ticker OEX, the "S&P 100") at the time of purchase of the Stock Portfolio. The Reference Fund may also use Split Strike Conversion strategies on additional equity investments in the Stock Portfolio. The Reference Fund may also invest, from time to time, in money market funds or Treasury Bills. |
| | On the same Business Day as the purchase of the Stock Portfolio the Reference Fund will purchase S&P put options (the "Put Options"). The notional value of the Put Options shall not be less than 95% of the market value of the Stock Portfolio. The time to expiration of the Put Options shall not exceed 60 days at the time of purchase. |
| | The strike price of the Put Options shall be at least 94% of the S&P 100 market value at the time of purchase. |
| | Upon or after establishing the Stock Portfolio and the Put Options, the Reference Fund may sell S&P 100 call options (the "Call Options"). The notional value of the Call Options shall not exceed the market value of the Stock Portfolio (in equivalent OEX shares) at the time of purchase. There is no restriction on the strike price of the Call Options to be sold. |
| | The Stock Portfolio shall have a correlation to the S&P 100 of not less than 90% at the time of purchase of the Stock Portfolio. Correlation shall be calculated using the most recent 24 month prices of the Stock Portfolio using its current composition, versus contemporaneous prices of the S&P 100. |
| **Leverage** | The Reference Fund may not incur negative balances of cash and cash equivalents in aggregate. The Reference Manager may, however, allocate up to 5% of the NAV of the Reference Fund to other alternative investments managers who may use modest leverage, as determined by Part A. |
| **Stress Test** | A stress test on the Stock Portfolio, using options valuation techniques acceptable to Party A, shall result in simulated losses of no more than 3% of the NAV of the Reference Fund loss for a corresponding 10% hypothetical loss in the S&P 100. |

ANNEX III

**Fund**
**Report as of**

| | | |
|---|---|---|
| **Eligible Securities** | Yes / No | Please list ineligible securities |
| | | |
| **Stock Portfolio** | | |
| Include >= 25 members of OEX | Yes / No | what is the number included in OEX? |
| Correlation of the Stock Portfolio to OEX >= 90% the most recent 24 months | Yes / No | What is the correlation? |
| | | |
| **Put Options (at time of purchase)** | | |
| Notional Value of Put Options >= 95% of Market Value of Stock Portfolio | Yes / No | What is the %? |
| Strike Price of Put Options >= 94% of the OEX Market Value | Yes / No | What is the %? |
| Maturity of Put Options <= 60 days | Yes / No | What is the maturity? |
| | | |
| **Call Options (at time of purchase)** | | |
| Call Options sold <=100% of the market value of Stock Portfolio | Yes / No | What is the %? |
| | | |
| No negative balance of cash and cash equivalent | Yes / No | Please provide the amount. |
| No more than 5% of the NAV may use modest leverage | Yes / No | What is the %? |
| | | |
| **Stress Test** | | |
| If OEX drop by 10%, simulated loss <= 3% of the NAV | Yes / No | What is the simulated loss? |

L4013

HSBC SECURITIES INC.                                    Sep 4 2007  17:00        P. 01

# HSBC ⟨X⟩

**HSBC Bank USA, NATIONAL ASSOCIATION**
452 Fifth Avenue
New York, NY 10018

Date: September 4, 2007

| To: | Wailea Partners LP | From: | HSBC Bank USA, |
| | | | National Association |
| Attention: | William Balkenaur | | Swap Documentation |
| Phone Number: | 415-984-2040 | Contact: | (212) 525-5616 |
| Facsimile Number: | 415-984-2041 | Phone Number: | (212) 525-0975 |
| | | Facsimile Number: | |

HBUS Ref No: 278313

## SHARE SWAP TRANSACTION CONFIRMATION

The purpose of this communication is to set forth the terms and conditions of the Share Swap Transaction entered into between HSBC Bank USA, National Association ("Party A") and Wailea Partners LP ("Party B") on the Trade Date specified below (the "Transaction"). This communication constitutes a Confirmation as referred to in the Agreement described below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," and, together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

This Confirmation together with all other documents referring to the ISDA Form evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, Party A and Party B agree that an agreement in the Form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") (as may be amended, modified or supplemented from time to time, the "Agreement"), with such modifications as Party A and Party B in good faith agree will supplement, form a part of, and be incorporated into this Confirmation forming part of the Agreement as if Party A and Party B had executed an agreement in the form of the ISDA Form on the Trade Date of the first such Transaction between them and in such form with the Schedule thereto specifying (i) that the governing law is the law of the State of New York, without reference to choice of law doctrine, (ii) the Termination Currency is U.S. Dollars, (iii) Loss and Second Method and (iv) further modifications to the ISDA Form indicated below.

This Transaction constitutes a Swap Transaction for purposes of the Swap Definitions and a Share Swap Transaction for purposes of the Equity Definitions. The terms of the Transaction to which this Confirmation relates are as follows:

---

HSBC SECURITIES INC.                                    Sep 4 2007  17:10        P. 02

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to Party A.

Yours sincerely,

**HSBC BANK USA, NATIONAL ASSOCIATION**

By: _____
Name: JULIE V. BEI
Title: ASSISTANT VICE PRESIDENT
ID # 14537

Confirmed as of the date hereof:

**WAILEA PARTNERS, LP**

By: _____
Name: William Balkenaur
Title: Managing Member of the General Partner

-18-

L4014



**HSBC Bank USA, NATIONAL ASSOCIATION**
452 Fifth Avenue
New York, NY 10018

Date: November 2, 2007

| To: | Wailea Partners LP | From: | HSBC Bank USA, National Association Swap Documentation |
|---|---|---|---|
| Attention: | William Belhumeur | Contact: | Swap Documentation |
| Phone Number: | 415-986-8040 | Phone Number: | (212) 525-5616 |
| Facsimile Number: | 415-986-8041 | Facsimile Number: | (212) 525-0673 |

HBUS Ref No: 278515

## AMENDED AND RESTATED SHARE SWAP TRANSACTION CONFIRMATION

This Amended and Restated Share Swap Transaction Confirmation, dated as of November 2, 2007 (the "Restatement Date"), amends and restates the Share Swap Transaction Confirmation between the parties hereto dated as of September 4, 2007 (the "Original Confirmation").

The parties desire to amend and restate the Original Confirmation. In consideration of the mutual covenants contained herein, the parties hereby agree to amend and restate, as of the Restatement Date, the Original Confirmation in its entirety to read as follows:

The purpose of this communication is to set forth the terms and conditions of the Share Swap Transaction entered into between HSBC Bank USA, National Association ("Party A") and Wailea Partners LP ("Party B") on the Trade Date specified below (the "Transaction"). This communication constitutes a Confirmation as referred to in the Agreement described below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

This Confirmation together with all other documents referring to the ISDA Form evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, Party A and Party B agree that an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") (as may be amended, modified or supplemented from time to time, the "Agreement"), with such modifications as Party A and Party B in good faith agree will supplement, form a part of, and be incorporated by reference into this Confirmation forming part of the Agreement as if Party A and Party B had executed an agreement in the form of the ISDA Form on the Trade Date of the first such Transaction between them and in such form with the Schedule thereto specifying (i) that the governing law is the law of the State of New York,

without reference to choice of law doctrine, (ii) the Termination Currency is U.S. Dollars, (iii) Loss and Second Method and (iv) further modifications to the ISDA Form indicated below.

This Transaction constitutes a Swap Transaction for purposes of the Swap Definitions and a Share Swap Transaction for purposes of the Equity Definitions. The terms of the Transaction to which this Confirmation relates are as follows:

1. **GENERAL TERMS**

| | |
|---|---|
| Trade Date: | September 4, 2007 |
| Effective Date: | September 4, 2007 |
| Termination Date: | The final Cash Settlement Payment Date. |
| Calculation Agent: | HSBC Bank USA, National Association ("HSBC"). All determinations and calculations of the Calculation Agent determined in good faith and in a commercially reasonable manner shall be conclusive and binding for all purposes absent manifest error. |
| | Upon the occurrence of an Event of Default or Termination Event in which Party A is the Defaulting Party or the sole Affected Party, Party A and Party B shall mutually agree on a third-party financial institution to act as Calculation Agent until such Event of Default or Termination Event is no longer occurring. |
| Business Day: | New York |
| Business Day Convention: | Modified Following (which shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Shares: | The number of limited partnership interests of the Reference Fund that would be received by the Reference Holder had the Reference Holder invested USD 31,000,000 in the Reference Fund effective as of the Effective Date (as may be amended from time to time), subject to adjustment in accordance with Section 6. |
| Reference Fund: | Senator Equity Segregated Portfolio One |
| Party B Initial Payment: | USD 8,870,000 |

2. **EQUITY AMOUNTS**

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |

-2-

L4016

Equity Notional Amount:      As of the Effective Date, USD 31,000,000, and thereafter as of any date of determination, the amount as determined by the Calculation Agent.

Equity Amount:      As of any date of determination, the amount as determined by the Calculation Agent equal to the Equity Notional Amount less the Floating Notional Amount, and with respect to any Cash Settlement Date, the cumulative Reference Fund Redemption Payments as of such Cash Settlement Payment Date less the Floating Notional Amount. Notwithstanding Section 8.6 of the Equity Definitions, the Equity Amount, if negative, shall be deemed zero until the final Cash Settlement Payment Date.

Reference Fund
Redemption Payments:      As of any date of determination, the cumulative amount of cash a Reference Holder would actually receive, on or before the third Business Day prior to such day, as determined by the Calculation Agent, as a result of a redemption or other disposition of an investment in the Reference Shares had the Reference Holder delivered a timely redemption notice in accordance with the schedule indicated in the Reference Fund's operating documents, to such Reference Fund to receive the Net Asset Value of such Reference Shares as of the Valuation Date (assuming that the Reference Holder elected to reinvest dividends (if any) that it would have received as a holder of Reference Shares), net of any accrued management, load, administrative and any other per share fees or costs and net of any taxes payable by the Reference Holder in connection with such a redemption or other disposition of such Reference Shares.

"Reference Holder" means a holder of Reference Shares as determined by the Calculation Agent. The Reference Holder is used solely to compute the Reference Fund Redemption Payments and the Cash Settlement Payment Date and does not represent an investment in Reference Shares of the Reference Fund.

Equity Notional Reset:      Not Applicable

Type of Return:      Price Return

Valuation Dates:      The earlier of (i) August 31, 2009 (the "Scheduled Valuation Date") and (ii) the Business Day designated by the Calculation Agent as a Valuation Date upon (A) mutual request by parties hereto or (B)

-3-

L4017

the occurrence of an Early Termination Date or Extraordinary Event: .

Section 6.2 of the Equity Definitions is hereby amended by deleting the words after the parenthetical in the first sentence and replacing them with a ".".

Notwithstanding anything to the contrary in the Equity Definitions, Section 6.3 of the Equity Definitions shall not apply to this Transaction.

Return of Equity Amount:    If a Reference Holder is required to repay any portion of the redemption or other proceeds received from the Reference Fund, then Party B shall promptly pay to the Equity Amount Payer such portion, including, without limitation, any taxes, accrued management, load, administrative and any other per share fees or costs payable in respect of such proceeds.    The foregoing obligations shall survive any termination or assignment of this Transaction.

Dividend Amount:    Notwithstanding anything to the contrary in the Equity Definitions, Section 10.1 or 10.4 of the Equity Definitions shall not apply to this Transaction.

3.    **FLOATING AMOUNTS**

Floating Amount Payer:    Party B

Floating Notional Amount:    As of the Effective Date, USD 22,130,000, and thereafter such amount as may be adjusted pursuant to the terms of this Confirmation; provided that the Floating Notional Amount shall not exceed the Maximum Notional Amount.

Floating Amount Payment Date:    The final Cash Settlement Payment Date.

Calculation Period:    The period from and including the Effective Date to but excluding the Termination Date.

Floating Rate Option:    USD-LIBOR-BBA

Designated Maturity:    One month; provided that if a Notional Upsize Date or Notional Downsize Date is effected during a Calculation Period that causes an increase or decrease in the Floating Notional Amount, the Calculation Agent will compute the Floating Rate Option for the remainder of the Calculation Period based on USD-LIBOR-BBA (or such other index that may be appropriate for shorter durations) for the remainder of such Calculation Period, using Linear Interpolation or such other factors it deems necessary.

-4-

| | |
|---|---|
| Spread: | 1.10% |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Compounding Period. |
| Compounding: | Applicable |
| Compounding Dates: | The last calendar day of each month commencing in September 2007 and ending on the last calendar day of the month immediately preceding the final Cash Settlement Payment Date. |
| Minimum Spread Payment: | Notwithstanding the foregoing or upon the occurrence of (i) an Event of Default, Termination Event, Additional Termination Event or other termination of this Agreement (other than a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates) where Party B is the Defaulting Party or an Affected Party or (ii) an Extraordinary Event, in the event that Party B has not previously paid to Party A an amount equal to the product of (x) USD 15,000,000, (y) the Spread and (z) the Floating Rate Day Count Fraction (such amount, the "Minimum Spread Payment") with respect to the period between the Effective Date and August 31, 2009, Party B shall pay to Party A the difference between the Minimum Spread Payment and any amount paid for such period (other than, for the avoidance of doubt, all such amounts payable pursuant to the Floating Rate Option). Party B's obligations with respect to this "Minimum Spread Payment" shall survive the termination of this Transaction. |

**4.    SETTLEMENT TERMS**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Cash Settlement Payment Date: | For the Valuation Date, thirty (30) Business Days after such Valuation Date and the final Business Day of each month thereafter, until such date, determined by the Calculation Agent in its sole discretion, on which a Reference Holder of Reference Shares would have actually received all the proceeds from a redemption of the Reference Shares. |
| | If a Reference Holder of Reference Shares would not actually receive all the proceeds from a redemption or other disposition of the Reference Shares within three months after such Valuation Date, such date shall be the final Cash Settlement Payment Date; provided that |

-5-

L4019

upon the occurrence of an Event of Default or
Termination Event under the Agreement, the
Calculation Agent may designate the final Cash
Settlement Payment Date on any date following the
applicable Valuation Date.

5.   **SHARE ADJUSTMENTS**

Method of Adjustment:              Calculation Agent Adjustment

Notwithstanding anything to the contrary in the Equity
Definitions, Section 11.2 (c)(iii) of the Equity
Definitions is hereby amended such, that the words
"Extraordinary Dividend" mean "any cash or non-
cash dividend".

6.   **NOTIONAL ADJUSTMENTS**

(i)      Party B may designate any Compounding Date as a **"Notional Upsize Date"**
provided that the following conditions are satisfied:

(A)      Party B shall provide Party A five (5) Business Days' prior written notice
in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of (i)
its intention to designate a Compounding Date as a Notional Upsize Date and (ii) the
amount by which the Equity Notional Amount (which may be effected by an increase in
the Floating Notional Amount and/or a payment of cash by Party B) shall increase on the
related Notional Upsize Date, the "Notional Upsize Amount";

(B)      Before and after giving effect to the increase in the Equity Notional
Amount on the Notional Upsize Date, an Event of Default or Termination Event shall not
have occurred and be continuing or will not occur; and

(C)      Before and after giving effect to the increase in the Equity Notional
Amount on the Notional Upsize Date, the Leverage Ratio shall be less than the Maximum
Leverage Ratio and the Floating Notional Amount shall be less than the Maximum
Notional Amount.

(ii)      Party B may designate any Compounding Date as a **"Notional Downsize Date"**
provided that the following conditions are satisfied:

(A)      Party B shall provide Party A five (5) Business Days' prior written notice
in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of
(i) its intention to designate a Compounding Date as a Notional Downsize Date and
(ii) the amount by which the Equity Notional Amount (which may be effected by a
reduction of the Floating Notional Amount and/or a redemption of a number of Reference
Shares and subsequent cash payment to Party B) shall decrease on the related Notional
Downsize Date, the "Notional Downsize Amount;"

(B)      After giving effect to the decrease in the Equity Notional Amount on the
Notional Downsize Date, an Event of Default or Termination Event shall not have
occurred and be continuing or will not occur; and

-6-

L4020

08-01788-scc   Doc 156272-2   Filed 04/03/17   Entered 04/03/17 10:34:45   Exhibit N -
Case 3:11-cv-03544-SI   Part Document B   Filed 07/19/11   Page 50 of 85

Nov 16 2007 4:24PM   HP LASERJET FAX   P.7

(C)     After giving effect to the decrease in the Equity Notional Amount on the Notional Downsize Date, the Leverage Ratio shall be less than the Maximum Leverage Ratio.

Notwithstanding Section 6(ii)(A) above, the Notional Downsize Date shall be the date Party A shall have received cash or a Reference Holder would have actually received cash as a result of a redemption of Reference Shares, as determined by the Calculation Agent, in an amount equal to the Notional Downsize Amount.   If a Notional Adjustment is effected by a redemption of Reference Shares, the Calculation Agent may designate multiple Notional Downsize Dates on such dates as a Reference Holder would have actually received cash as a result of a redemption of Reference Shares.

(iii)     Party A may designate any date as a "Notional Downsize Date" and reduce the Notional Amount such that the Leverage Ratio will be less than 3.5, Party A shall promptly give notice to Party B following the designation of such Notional Downsize Date.

Notwithstanding anything to the contrary above, in the event that a Reference Holder would be unable to acquire Shares of the Reference Fund upon the occurrence of a Notional Upsize Date, Party B shall not be permitted to effect such Notional Upsize.

7.     INVESTMENT GUIDELINES

As set forth on Annex II.

8.     REPORTING REQUIREMENTS

Party B hereby covenants to provide to Party A or to cause Party A to be provided with the following information in accordance with the time frames set forth below:

(a)     Semi-monthly NAV reports within 10 days;

(b)     Fully completed HSBC Risk Report (as set forth on Annex III) within 10 Business Days of the end of each calendar month;

(c)     Annual audited financial statements of the Reference Fund from the auditor within 180 calendar days of the end each calendar year; and

(d)     Monthly statements from the Administrator showing all assets and trading activity for each month within 10 Business Days

9.     EXTRAORDINARY EVENTS

Notwithstanding anything to the contrary in Sections 12.1 or 12.6 of the Equity Definitions, the occurrence of a Merger Event, Tender Offer, Nationalization or Insolvency shall be deemed to be effective on the Announcement Date of such event.  With respect to this Transaction, Sections 12.2-12.5, 12.6(c) and 12.7 of the Equity Definitions shall not apply.

Following the Announcement Date of a Merger Event, Tender Offer, Nationalization or Insolvency, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter (subject to the definition thereof) and determine the Reference Fund

-7-

Value as described above. The occurrence of an Extraordinary Event shall be deemed an Additional Termination Event for purposes of Section 7 hereof, and Party B shall be deemed the Affected Party.

Section 12.6(a)(ii) of the Equity Definitions is deleted in its entirety and replaced with the following: "Insolvency" means (i) that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding up of or any analogous proceeding affecting the Reference Fund, (A) all the Reference Shares of the Reference Fund are required to be transferred to a trustee, liquidator or other similar official or (B) holders of the Reference Shares of the Reference Fund become legally prohibited from transferring them or (ii) that the Reference Fund institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation by it or such regulator, supervisor or similar official or it consents to such a petition, provided that proceedings instituted or petitions presented by creditors and not consented to by the Reference Fund shall not be deemed an Insolvency.

The provisions of Article 12 of the Equity Definitions relating to "Delisting" shall not apply to this Transaction.

10. **ADDITIONAL DISRUPTION EVENTS.**

| | |
|---|---|
| Change in Law: | Applicable |
| Insolvency Filing: | Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |

Following the termination of this Transaction because of an Additional Disruption Event, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter and determine the Reference Fund Value as described above. For the avoidance of doubt, the occurrence of an Additional Disruption Event shall be deemed an Additional Termination Event for purposes of Section 7 hereof as described under "Extraordinary Events" above, and Party B shall be the Affected Party.

11. **ADDITIONAL TERMINATION EVENTS.**

(a)     Each of the following shall be Additional Termination Events in respect of Party B (at the option of Party A):

(i)     any event shall occur which has had a material adverse change in, or will have a material adverse effect upon, the business, properties, assets, operations, liabilities (actual or contingent), condition (financial or otherwise), of Party B or the Reference Fund and which may affect the ability of Party B to perform its obligations under the Agreement,

-8-

L4022

(ii)     any formal charge, complaint, or proceeding with respect to Party B or the Reference Fund by any governmental authority (other than any governmental authority in its capacity as an investor or counterparty of Party B) shall have been made which (x) alleges any impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing related to the performance of services by such person and (y) if successful, could have a materially adverse effect on Party B or the Reference Fund,

(iii)    any judgment or order shall be entered (and either such judgment or order has not been overturned or dismissed within 30 days after such entry or there has been any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, has not been in effect) in any investigative, administrative or judicial proceeding involving a determination that Party B, the Reference Fund shall have violated in any material respect any civil or criminal law or regulation applicable to it in the performance of its duties in connection with itself or a Reference Fund, as the case may be,

(iv)    any of the memorandum of association, articles of association or prospectus of Party B or the Reference Fund shall be amended in any manner which could reasonably be expected to materially and adversely affect the rights, the economic bargain or the risk profile of Party A under this Transaction or its ability to enforce the same unless Party A shall have given its prior written consent to such amendment,

(v)     the Reference Fund effects a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates, or

(vi)    if Party A fails to receive any report required to be delivered to it in accordance with the Reporting Requirements and such default is not cured within two (2) Business Days of Party B's receipt of notice of such default.

(b)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination, the Leverage Ratio is equal to or greater than the Maximum Leverage Ratio and Party B has not (with the consent of Party A) taken irrevocable corrective action within three business days of receiving notice.

(c)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Floating Notional Amount is greater than the Maximum Notional Amount.

(d)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Annualized Volatility exceeds 15%.

(e)    It shall be an Additional Termination Event (at the option of Party A) with Party B as the sole Affected Party if as of any date of determination the Calculation Agent determines that a Net Asset Value Decline Event shall occur with respect to the Reference Fund.

(f)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the liquidity of the Reference Fund shall be less frequent than monthly upon 15 calendar day notice.

-9-

L4023

08-01789-smb   Doc 156-2   Filed 04/03/17   Entered 04/03/17 10:39:40   Exhibit 1 -
Case 3:11-cv-03544-SI   Part 2 of 5   Pg 40 of 73   Filed 07/19/11   Page 53 of 85

Nov 16 2007 4:28PM   HP LASERJET FAX                                      P.10

(g)     Party B may elect, upon 90 calendar days' prior written notice to Party A, to terminate the Transaction in whole or in part on such date as indicated by Party B (such termination, a "Party B Termination Event"). Any such Party B Termination Event shall be an Additional Termination Event, with Party B as the sole Affected Party.

## 12.   REPRESENTATIONS

Non-Reliance:                       Applicable

Agreements and
Acknowledgements
Regarding Hedging Activities:       Applicable

Additional Acknowledgements:        Applicable

Each party (or such party as specified below) hereby represents and warrants and acknowledges to the other party as of the date hereof:

(a)     Each party retains complete freedom to determine, in its individual unfettered discretion, whether, or to what extent and in what manner, to hedge their respective obligations with respect to this Transaction. This Transaction does not create any further obligation on the part of Party A and/or any affiliates thereof to hedge or otherwise make any investment, directly or indirectly, in the Reference Fund. However, if and to the extent that any such investment in the Reference Fund is made at any time by Party A and/or any affiliate thereof, such investment will be on its own behalf only, Party B will have no interest or right, directly or indirectly, in respect of such investment (whether by way of third party beneficiary, security interest, or otherwise), and Party B acknowledges that this Transaction will not create either a direct or indirect obligation of the Reference Fund owing to Party B. Party B will be a general unsecured creditor of Party A with respect to Party A's obligations relating to this Transaction. Any amounts payable by Party A with respect to this Transaction will be satisfied solely out of the general assets of Party A subject to the claims of its creditors.

(b)     Each party has the capability to make its own legal, regulatory, tax, investment, financial, accounting and business evaluation of and to understand, and has evaluated and does understand on its own behalf, the terms, conditions and risks of entering into this Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks.

(c)     Each party has made its own independent decision to enter into this Transaction and as to whether this Transaction is appropriate and proper for it. Neither party or any affiliate thereof will bear any responsibility or liability if the legal, regulatory, tax, investment, financial, accounting, business or credit effects or consequences of this Transaction are other than those contemplated by the other party.

(d)     Neither party is relying on any communication (written or oral) from the other party or any of its affiliates or representatives as investment or other advice or as a recommendation to enter into this Transaction, it being understood and agreed that any information, commentary and explanations related to the terms and conditions of this Transaction provided by one party or an affiliate or representative thereof to the other

-10-

L4024

party or an affiliate or representative thereof, shall not be considered investment or other advice or a recommendation, and is not being relied upon by the other party or forming the basis, primary or otherwise, of that party's decision to enter into this Transaction. No compensation or other amount (including any amount otherwise payable under this Confirmation) is being paid by or on behalf of one party to the other or any affiliate thereof for any advice or information in respect of this Transaction.

(e)     Each party acknowledges that it has been offered an opportunity to ask questions of, and receive answers from the other party concerning the other party and that any request for such information has been fully complied with to the extent the other party possesses such information or can acquire it without unreasonable effort or expense.

(f)     Party B has been, and will at all times continue to be, solely responsible for making an independent appraisal of and investigation into the financial condition, prospects, creditworthiness, affairs, status and business of the Reference Fund.

(g)     Neither Party A or any affiliate or representative thereof is making, and has not made, in connection with this Transaction any representation or warranty whatsoever as to the Reference Fund or as to any information contained in any document provided by the Reference Fund to Party A or any affiliate or representative thereof or to any other person or filed by the Reference Fund with any exchange or with any governmental or regulatory authority regulating the purchase and sale of securities.

(h)     Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business with, the Reference Fund or its affiliates or any other person or entity having obligations relating to the Reference Fund and may act with respect to such business in the same manner as if this Transaction did not exist.

(i)     Party B has received and reviewed the offering, subscription, organizational and all other relevant documents with respect to the Reference Fund. Party B meets all eligibility and suitability standards imposed by the Reference Fund and applicable law with respect to a direct investment in the Reference Fund, meets all of the requirements of a "Third Party" as defined in the Subscription Document of the Reference Fund, can make (and hereby makes) all of the representations and warranties required to be made by investors of Reference Shares, and is capable of making a direct investment in the Reference Fund. Party B understands the nature of making an investment in the Reference Fund, and has concluded that such an investment would be suitable for it in light of its own investment objectives, financial capabilities and expertise. Party B is not entering into the Transaction for the purpose or as a means of gaining economic exposure to a fund in which it would not be able to invest directly for any reason.

(j)     Party B acknowledges and agrees that it is (i) an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated by the U.S. Securities and Exchange Commission; (ii) a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended; (iii) an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended (the "CEA"); and (iv) an "eligible contract participant" as defined in rule 4.7 promulgated under the CEA.

(k)     Party B represents to Party A that the Transaction described herein is not, and does not form part of, a listed transaction or a transaction that is the same as or substantially

-11-

L4025

08-01789-smb    Doc 156-72    Filed 04/03/17    Entered 04/03/17 10:33:40    Exhibit N -
Case 3:11-cv-02544-GPB Document 6 Filed 04/19/11    Page 55 of 85

Nov 16 2007 2:27PM    LASER JET FAX

P.12

similar to one of the types of transactions that the Internal Revenue Service has identified as a listed transaction for purposes of section 6011, 6111 or 6112 of the U.S. Internal Revenue Code of 1986, as amended (the "Code").

(l)    For U.S. federal income tax purposes, each party agrees that, (A) to the extent that Party A or an affiliate hedges its obligations under this Agreement by holding the Reference Fund, or enters into a substantially similar transaction with a party that owns the Reference Fund, they will treat (i) the arrangement represented by the Agreement as a debt instrument of Party B that provides for interest at a rate equal to 1-month USD-LIBOR-BBA plus the Spread, the proceeds of which are used by Party B to purchase the Reference Fund for its own account and (ii) Party B as the beneficial owner of the Reference Fund for U.S. federal income tax purposes, and (B) to the extent that neither Party A nor an affiliate hedges its obligations under this Agreement by holding the Reference Fund or enters into an offsetting transaction with a party that owns the Reference Fund, they will treat the arrangement represented by the Agreement as a constructive ownership transaction, as defined in Section 1260 of the Code, with respect to the Reference Fund, and each party agrees not to take any position that is inconsistent with this treatment for U.S. federal income tax purposes, unless required by law.

13.    **ADDITIONAL PROVISIONS**

Reserved

14.    **DEFINITIONS AND INTERPRETATION**

For the purpose of this Confirmation:

"Adjusted Reference Fund Value" or "ARFV" as of any date of determination, the Reference Fund Value less any reductions made pursuant to Section 8 herein.

"Leverage Ratio" means an amount equal to:



$$\frac{ARFV}{ARFV - FNA}$$

where "FNA" means the Floating Notional Amount, as of any date of determination.

"Maximum Leverage Ratio" means 3.75.

"Maximum Notional Amount" means USD 38,000,000

"Net Asset Value" means as of any date of determination and with respect to the Reference Fund, the market value of the Reference Shares of the Reference Fund based on the weekly reports as set forth in the Reporting Requirements (after giving effect to any redemptions as determined by the Calculation Agent); provided that if such weekly reports are not delivered to Party A or are, in the Calculation Agent's commercially reasonable determination, inaccurate, the Calculation Agent shall determine the market value of the Reference Fund in its sole discretion.

-12-

L4026

"Net Asset Value Decline Event" means with respect to the Reference Fund, Reference Fund's Net Asset Value as of the last Business Day of any calendar month (x) declines by 6% or more from its Net Asset Value as of the last Business Day of the immediately preceding calendar month or (y) declines by 8% or more during any three month calendar period.

"Reference Fund Value" means, as of any date of determination, the market value of the Reference Shares of the Reference Fund as determined by the Calculation Agent based on the most recent weekly estimated Net Asset Value.

15.  **MODIFICATIONS TO THE ISDA MASTER AGREEMENT**

(a)  "Specified Transaction" means, (a) any transaction (including an agreement with respect thereto) which currently exists or which is entered into at any time in the future between one party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) which is an interest rate, basis, bond, emerging market instrument, foreign exchange, currency, bullion, other commodity (including a lease, loan or consignment of bullion or other commodity), equity, equity linked, index linked or credit linked transaction; cap, collar, floor, swap or option transaction; forward rate transaction; purchase, sale, repurchase, buy/sell back, stock lending or EFP (exchange for physical) transaction; or any similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions, and (c) any other transaction identified as a Specified Transaction in this Agreement.

(b)  The "Cross Default" provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(c)  "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

(d)  "Automatic Early Termination" provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(e)  Delivery of Documents. For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | United States Internal Revenue Services Forms W-9, and renewal and replacement forms. | (i) Upon Request of Party A. |

-13-

08-01789-smb   Doc 156-2   Filed 04/03/17   Entered 04/03/17 23:32:49   Exhibit 1 -
Case 3:11-cv-03544   Part 3 of 5   Document 55-5   Filed 07/19/11   Page 57 of 85

Nov 16 2007 3:26PM   LASERJET FAX   P.14

Other documents to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Evidence as to (i) authority of Party B to enter into this Agreement and Transactions, and (ii) authorized signatories. | At execution of this Agreement. | Yes |
| Party B | A trading authorization for the persons or entities trading on behalf of Party B, if any. | At execution of this Agreement. | Yes |
| Party B | Legal opinion regarding certain corporate matters and enforceability regarding Buyer's execution of this Agreement | At execution of this Agreement. | No |

(f)     **Jury Waiver.** Each party, knowingly, and voluntarily waives any right either of them may have to trial by jury in any litigation based upon or arising out of this Agreement or the Transaction contemplated by this Agreement or any course of conduct, dealing, performance, usage of trade, statements (whether oral or written) or actions of either of them. Neither party shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial cannot be or has not been waived. These provisions shall not be deemed to have been modified in any respect or relinquished by either party except by written instrument executed by each of them.

**Affiliates.** For the purposes of Section 3(c) Party A will be deemed to have no Affiliates.

(g)     Additional Representations of Party B.

     (i)     **Status of Parties.** Neither Party A nor any of its affiliates is acting as a fiduciary or an advisor for Party B in respect of the Transaction.

     (ii)     **Private Transaction.** Party B is entering into the Transaction solely for its own account as principal for investment and not with a view to resale or distribution. Party B understands that the Transaction has not been registered under the Securities Act of 1933, as amended (the "Act"), or any other state securities law, and will not be so registered. Party B shall not permit any other person to have any beneficial interest in its interest in the Transaction, and shall not assign, transfer, convey or encumber all or any portion of its interest in the Transaction without the consent of Party A. Party B agrees that its interest in the Transaction shall not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Act.

     (iii)     **Investment Company Act.** Party B is not an investment company registered under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"), or a business development company as defined in section 202(a)(22) of the U.S. Investment Advisers Act of 1940, as amended.

-14-

(iv)   Party B represents to Party A that the transaction described herein is not, and does not form part of, a listed transaction or a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service has identified as a listed transaction for purposes of section 6011, 6111 or 6112 of the Internal Revenue Code.

## 16.   NOTICE AND ACCOUNT DETAILS

Notice Information for Party A:

HSBC Bank USA, National Association
452 Fifth Avenue - 8th Floor
New York, New York 10018
Contact: Julie Y. Mei - Swap Documentation
Tel: 212-525-5616
Fax: 212-525-0673
Email: julie.y.mei@us.hsbc.com

Payments to Party A:

HSBC Bank USA, NA
ABA: 021001088
Swift: MRMDUS33
A/C: ▉▉▉9298

Notice Information for Party B:

Wailea Partners, LP
Attn: William Belhumeur
One Front St., Suiute 3300
San Francisco, CA 94111
415-986-8040

Payments to Party B:
Bank: Northern Trust International Banking Corporation
Swift Address: CNORUS33
ABA: 026 001 122
A/C No.: ▉▉▉▉0230
Fortis Prime Fund Solutions Bank (Ireland)
Fortis Prime Fund Solutions Cayman-Client Escrow
A/C No.: ▉▉▉▉0000
FFC: Wailea Partners, LP
A/C No.: [_____]

## 17.   TRANSFER

Notwithstanding anything to the contrary in Section 7 of the Agreement, for avoidance of doubt, Party A shall have the right to assign its this Transaction to any affiliate of Party A without the consent of Party B.

-15-

L4029

18. **NETTING OF PAYMENTS**

All amounts payable on the same date, in the same currency and in respect of the same Transaction shall be netted in accordance with Section 2(c) of the Agreement. The election contained in the last paragraph of Section 2(c) of the Agreement shall not apply for the purposes of the Agreement.

19. **SET-OFF**

The parties agree to amend Section 6 by adding a new Section 6(f) as follows:

"(f) Upon the occurrence of an Event of Default or Termination Event under Section 5(b)(iv) with respect to a party ("X"), the other party ("Y") will have the right (but not be obligated), without prior notice to X or any other person, to set-off or apply any obligation of X owed to Y (or any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (or any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y will give notice to the other party of any set-off effected under this Section 6(f).

Amounts (or the relevant portion of such amounts) subject to set-off may be converted by Y into the Termination Currency at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If any obligation is unascertained, Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

20. **OTHER ACKNOWLEDGMENTS**

(a)     The Transaction does not create any obligation on the part of Party A any of its affiliates, or any other person or entity to make an investment in a Reference Fund or to otherwise hedge its obligations hereunder. To the extent that any investment in a Reference Fund is made by Party A or any of its affiliates or any other person or entity, such investment will be made on behalf of Party A only, and each of Party A and Party B acknowledges that the Transaction shall not create either a direct or indirect obligation of a Reference Fund owing to Party A.

(b)     Party A and its affiliates may, whether by virtue of the types of relationships described above or otherwise, at the date hereof or at times hereafter, be in possession of information in relation to the Reference Fund that is or may be material in the context of the Transaction and that may or may not be publicly available or known to Party B. Party A shall have no obligation to disclose to Party B any such relationship or information (whether or not confidential).

-16-

L4030

21.    **CONFLICTS DISCLOSURE, WAIVER AND EXCULPATION**

Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business (including the provision of advisory services) with the Reference Fund or its affiliates or any other person or entity having obligations relating to a Reference Fund and may act with respect to such business in the same manner as if the Transaction did not exist (including in a way that may be directly or indirectly adverse to the interests of Party B). Party B hereby waives any claim in respect of any such potential or actual conflict and holds Party A and its affiliates harmless from, and agrees that it shall not seek to hold Party A or any of its affiliates liable for, any losses or obligations of Party B that may result from such business.

-17-

L4031

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to Party A.

Yours sincerely,

**HSBC BANK USA, NATIONAL ASSOCIATION**

By: _____
    Name:
    Title:    JULIE Y. MEI
         ASSISTANT VICE PRESIDENT
         ID # 14537
Confirmed as of the date hereof:


**WAILEA PARTNERS, LP**

By: _____
    Name: William Belhumeur
    Title: Managing Member of the General Partner


-18-

L4032

08-01789-smb   Doc 156-2   Filed 04/03/17   Entered 04/03/17 10:34:49   Exhibit 1 -
Case 3:11-cv-03544   part 5 of 8   Pg 63 of 85   Filed 07/19/11   Page 62 of 85

Nov 16 2007 4:36PM   LASERJET FAX   P.19

## NOTIONAL ADJUSTMENT NOTICE

date

To:              HSBC Bank USA, NATIONAL ASSOCIATION
                 452 Fifth Avenue
                 New York, NY 10018

                 Attn: Julie Y Mei
                 Tel: 212-525-5616
                 Julie.y.mei@us.hsbc.com

Re:              Wailea Total Return Swap Transaction
                 (the "Transaction")

Terms with initial capitals used, but not otherwise defined herein, shall have the meanings given to them in the Confirmation for the Transaction.

The undersigned hereby notifies HSBC that it wishes:

        to adjust and increase reduce the Equity Notional Amount by USD ** to take effect on date.

This Notification is given upon and subject to the terms and conditions set out in the Agreement.

        Dated this ** day of month year.

                 WAILEA PARTNERS, LP

                 By:    _____
                 Title: _____

                        _____

L4033

## ANNEX II

**Reference Fund**

The Reference Fund will invest substantially all of its assets in a managed account (the "Managed Account") at all times during the term of this Transaction. The Investment Manager will use a split-strike conversion strategy.

**Eligible securities**

The Reference Fund will only invest in 1) stocks in the S&P 100 index, 2) option on S&P 100 index, and/or 3) Money Market / US Treasury Bills.

**Volatility Constraint:**

The annualized standard deviation of the most recent 12-months return of the Reference Fund in aggregate, as calculated by Calculation Agent, must be less 10%.

**Strategy:**

The equity portfolio (including groups or baskets of equities), if any, of the Reference Fund (the "Stock Portfolio"), must include 25 or more members of Standard & Poor's 100 Stock Index (ticker OEX, the "S&P 100") at the time of purchase of the Stock Portfolio. The Reference Fund may also use Split Strike Conversion strategies on additional equity investments in the Stock Portfolio. The Reference Fund may also invest, from time to time, in money market funds or Treasury Bills.

On the same Business Day as the purchase of the Stock Portfolio the Reference Fund will purchase S&P put options (the "Put Options"). The notional value of the Put Options shall not be less than 95% of the market value of the Stock Portfolio. The time to expiration of the Put Options shall not exceed 60 days at the time of purchase.

The strike price of the Put Options shall be at least 94% of the S&P 100 market value at the time of purchase.

Upon or after establishing the Stock Portfolio and the Put Options, the Reference Fund may sell S&P 100 call options (the "Call Options"). The notional value of the Call Options shall not exceed the market value of the Stock Portfolio (in equivalent OEX shares) at the time of purchase. There is no restriction on the strike price of the Call Options to be sold.

The Stock Portfolio shall have a correlation to the S&P 100 of not less than 90% at the time of purchase of the Stock Portfolio. Correlation shall be calculated using the most recent 24 month prices of the Stock Portfolio using its current composition, versus contemporaneous prices of the S&P 100.

**Leverage**

The Reference Fund may not incur negative balances of cash and cash equivalents in aggregate. The Reference Manager may, however, allocate up to 5% of the NAV of the Reference Fund to other alternative investments managers who may use modest leverage, as determined by Part A.

**Stress Test**

A stress test on the Stock Portfolio, using options valuation techniques acceptable to Party A, shall result in simulated losses of no more than 3% of the NAV of the Reference Fund loss for a corresponding 10% hypothetical loss in the S&P 100.

ANNEX III

**Fund**
**Report as of**

| | | |
|---|---|---|
| Eligible Securities | Yes / No | Please list ineligible securities |
| | | |
| Stock Portfolio | | |
| Include >= 25 members of OEX | Yes / No | what is the number included in OEX? |
| Correlation of the Stock Portfolio to OEX >= 90% the most recent 24 months | Yes / No | What is the correlation? |
| | | |
| Put Options (at time of purchase) | | |
| Notional Value of Put Options >= 95% of Market Value of Stock Portfolio | Yes / No | What is the %? |
| Strike Price of Put Options >= 94% of the OEX Market Value | Yes / No | What is the %? |
| Maturity of Put Options <= 60 days | Yes / No | What is the maturity? |
| | | |
| Call Options (at time of purchase) | | |
| Call Options sold <= 100% of the market value of Stock Portfolio | Yes / No | What is the %? |
| | | |
| No negative balance of cash and cash equivalent | Yes / No | Please provide the amount. |
| No more than 5% of the NAV may use modest leverage | Yes / No | What is the %? |
| | | |
| Stress Test | | |
| If OEX drop by 10%, simulated loss <= 3% of the NAV | Yes / No | What is the simulated loss? |



# HSBC ◀X▶

**HSBC Bank USA, NATIONAL ASSOCIATION**
452 Fifth Avenue
New York, NY 10018

---

Date: July 18, 2008

| | | | |
|---|---|---|---|
| To: | Wailea Partners LP | From: | HSBC Bank USA, National Association |
| Attention: | William Belhumeur | Contact: | Swap Documentation |
| Phone Number: | 415-986-8040 | Phone Number: | (212) 525-5616 |
| Facsimile Number: | 415-986-8041 | Facsimile Number: | (212) 525-0673 |

HBUS Ref No: 278515

---

### THIRD AMENDED AND RESTATED SHARE SWAP TRANSACTION CONFIRMATION

This Amended and Restated Share Swap Transaction Confirmation, dated as of July 18, 2008 (the "Restatement Date"), amends and restates the Share Swap Transaction Confirmation between the parties hereto dated as of September 4, 2007 (the "Original Confirmation").

The parties desire to amend and restate the Original Confirmation. In consideration of the mutual covenants contained herein, the parties hereby agree to amend and restate, as of the Restatement Date, the Original Confirmation in its entirety to read as follows:

The purpose of this communication is to set forth the terms and conditions of the Share Swap Transaction entered into between HSBC Bank USA, National Association ("Party A") and Wailea Partners LP ("Party B") on the Trade Date specified below (the "Transaction"). This communication constitutes a Confirmation as referred to in the Agreement described below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Swap Definitions") and the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," and, together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

This Confirmation together with all other documents referring to the ISDA Form evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, Party A and Party B agree that an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") (as may be amended, modified or supplemented from time to time, the "Agreement"), with such modifications as Party A and Party B in good faith agree will supplement, form a part of, and be incorporated by reference into this Confirmation forming part of the Agreement as if Party A and Party B had executed an agreement in the form of the ISDA Form on the Trade Date of the first such Transaction between them and in such form with the Schedule thereto specifying (i) that the governing law is the law of the State of New York,

without reference to choice of law doctrine, (ii) the Termination Currency is U.S. Dollars, (iii) Loss and
Second Method and (iv) further modifications to the ISDA Form indicated below.

This Transaction constitutes a Swap Transaction for purposes of the Swap Definitions and a Share Swap
Transaction for purposes of the Equity Definitions. The terms of the Transaction to which this
Confirmation relates are as follows:

## 1.    GENERAL TERMS

| | |
|---|---|
| Trade Date: | September 4, 2007 |
| Effective Date: | September 4, 2007 |
| Termination Date: | The final Cash Settlement Payment Date. |
| Calculation Agent: | HSBC Bank USA, National Association ("HSBC"). All determinations and calculations of the Calculation Agent determined in good faith and in a commercially reasonable manner shall be conclusive and binding for all purposes absent manifest error. |
| | Upon the occurrence of an Event of Default or Termination Event in which Party A is the Defaulting Party or the sole Affected Party, Party A and Party B shall mutually agree on a third-party financial institution to act as Calculation Agent until such Event of Default or Termination Event is no longer occurring. |
| Business Day: | New York |
| Business Day Convention: | Modified Following (which shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |
| Reference Shares: | The number of limited partnership interests of the Reference Fund that would be received by the Reference Holder had the Reference Holder invested USD 31,000,000 in the Reference Fund effective as of the Effective Date (as may be amended from time to time), subject to adjustment in accordance with Section 6. |
| Reference Fund: | Senator Equity Segregated Portfolio One |
| Party B Initial Payment: | USD 8,870,000 |

## 2.    EQUITY AMOUNTS

| | |
|---|---|
| Equity Amount Payer: | Party A |
| Equity Amount Receiver: | Party B |

-2-

L4037

08-01789-smb Doc 156272-2 Filed 04/03/17 Entered 04/03/17 10:34:45 Exhibit N -
Aug 13 2009 3:10PM Case 3:10-cv-03514-CRB Document 8 Filed 04/19/11 Page 67 of 85

P.3

| | |
|---|---|
| Equity Notional Amount: | As of the Effective Date, USD 31,000,000, and thereafter as of any date of determination, the amount as determined by the Calculation Agent. |
| Equity Amount: | As of any date of determination, the amount as determined by the Calculation Agent equal to the Equity Notional Amount less the Floating Notional Amount, and with respect to any Cash Settlement Date, the cumulative Reference Fund Redemption Payments as of such Cash Settlement Payment Date less the Floating Notional Amount. Notwithstanding Section 8.6 of the Equity Definitions, the Equity Amount, if negative, shall be deemed zero until the final Cash Settlement Payment Date. |
| Reference Fund Redemption Payments: | As of any date of determination, the cumulative amount of cash a Reference Holder would actually receive, on or before the third Business Day prior to such day, as determined by the Calculation Agent, as a result of a redemption or other disposition of an investment in the Reference Shares had the Reference Holder delivered a timely redemption notice in accordance with the schedule indicated in the Reference Fund's operating documents, to such Reference Fund to receive the Net Asset Value of such Reference Shares as of the Valuation Date (assuming that the Reference Holder elected to reinvest dividends (if any) that it would have received as a holder of Reference Shares), net of any accrued management, load, administrative and any other per share fees or costs and net of any taxes payable by the Reference Holder in connection with such a redemption or other disposition of such Reference Shares. |
| | "Reference Holder" means a holder of Reference Shares as determined by the Calculation Agent. The Reference Holder is used solely to compute the Reference Fund Redemption Payments and the Cash Settlement Payment Date and does not represent an investment in Reference Shares of the Reference Fund. |
| Equity Notional Reset: | Not Applicable |
| Type of Return: | Price Return |
| Valuation Dates: | The earlier of (i) August 31, 2009 (the "Scheduled Valuation Date") and (ii) the Business Day designated by the Calculation Agent as a Valuation Date upon (A) mutual request by parties hereto or (B) |

-3-

L4038

the occurrence of an Early Termination Date or
Extraordinary Event. .

Section 6.2 of the Equity Definitions is hereby
amended by deleting the words after the parenthetical
in the first sentence and replacing them with a ".".

Notwithstanding anything to the contrary in the Equity
Definitions, Section 6.3 of the Equity Definitions shall
not apply to this Transaction.

**Return of Equity Amount:**   If a Reference Holder is required to repay any portion
of the redemption or other proceeds received from the
Reference Fund, then Party B shall promptly pay to
the Equity Amount Payer such portion, including,
without limitation, any taxes, accrued management,
load, administrative and any other per share fees or
costs payable in respect of such proceeds. The
foregoing obligations shall survive any termination or
assignment of this Transaction.

**Dividend Amount:**   Notwithstanding anything to the contrary in the Equity
Definitions, Section 10.1 or 10.4 of the Equity
Definitions shall not apply to this Transaction.

## 3.   FLOATING AMOUNTS

**Floating Amount Payer:**   Party B

**Floating Notional Amount:**   As of the Effective Date, USD 22,130,000, and
thereafter such amount as may be adjusted pursuant to
the terms of this Confirmation; provided that the
Floating Notional Amount shall not exceed the
Maximum Notional Amount.

**Floating Amount Payment Date:**   The final Cash Settlement Payment Date.

**Calculation Period:**   The period from and including the Effective Date to
but excluding the Termination Date.

**Floating Rate Option:**   USD-LIBOR-BBA

**Designated Maturity:**   One month; provided that if a Notional Upsize Date or
Notional Downsize Date is effected during a
Calculation Period that causes an increase or decrease
in the Floating Notional Amount, the Calculation
Agent will compute the Floating Rate Option for the
remainder of the Calculation Period based on USD-
LIBOR-BBA (or such other index that may be
appropriate for shorter durations) for the remainder of
such Calculation Period, using Linear Interpolation or
such other factors it deems necessary.

-4-

L4039

| | |
|---|---|
| Spread: | 1.10% |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Compounding Period. |
| Compounding: | Applicable |
| Compounding Dates: | The last calendar day of each month commencing in September 2007 and ending on the last calendar day of the month immediately preceding the final Cash Settlement Payment Date. |
| Minimum Spread Payment: | Notwithstanding the foregoing or upon the occurrence of (i) an Event of Default, Termination Event, Additional Termination Event or other termination of this Agreement (other than a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates) where Party B is the Defaulting Party or an Affected Party or (ii) an Extraordinary Event, in the event that Party B has not previously paid to Party A an amount equal to the product of (x) USD 15,000,000, (y) the Spread and (z) the Floating Rate Day Count Fraction (such amount, the "Minimum Spread Payment") with respect to the period between the Effective Date and August 31, 2009, Party B shall pay to Party A the difference between the Minimum Spread Payment and any amount paid for such period (other than, for the avoidance of doubt, all such amounts payable pursuant to the Floating Rate Option). Party B's obligations with respect to this "Minimum Spread Payment" shall survive the termination of this Transaction. |

## 4.    SETTLEMENT TERMS

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | USD |
| Cash Settlement Payment Date: | For the Valuation Date, thirty (30) Business Days after such Valuation Date and the final Business Day of each month thereafter, until such date, determined by the Calculation Agent in its sole discretion, on which a Reference Holder of Reference Shares would have actually received all the proceeds from a redemption of the Reference Shares. |
| | If a Reference Holder of Reference Shares would not actually receive all the proceeds from a redemption or other disposition of the Reference Shares within three months after such Valuation Date, such date shall be the final Cash Settlement Payment Date; provided that |

-5-

L4040

upon the occurrence of an Event of Default or Termination Event under the Agreement, the Calculation Agent may designate the final Cash Settlement Payment Date on any date following the applicable Valuation Date.

## 5. SHARE ADJUSTMENTS

Method of Adjustment:

Calculation Agent Adjustment

Notwithstanding anything to the contrary in the Equity Definitions, Section 11.2 (e)(iii) of the Equity Definitions is hereby amended such that the words "**Extraordinary Dividend**" mean "any cash or non-cash dividend".

## 6. NOTIONAL ADJUSTMENTS

(i)     Party B may designate any Compounding Date as a "**Notional Upsize Date**" provided that the following conditions are satisfied:

(A)     Party B shall provide Party A five (5) Business Days' prior written notice in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of (i) its intention to designate a Compounding Date as a Notional Upsize Date and (ii) the amount by which the Equity Notional Amount (which may be effected by an increase in the Floating Notional Amount and/or a payment of cash by Party B) shall increase on the related Notional Upsize Date, the "**Notional Upsize Amount**";

(B)     Before and after giving effect to the increase in the Equity Notional Amount on the Notional Upsize Date, an Event of Default or Termination Event shall not have occurred and be continuing or will not occur; and

(C)     Before and after giving effect to the increase in the Equity Notional Amount on the Notional Upsize Date, the Leverage Ratio shall be less than the Maximum Leverage Ratio and the Floating Notional Amount shall be less than the Maximum Notional Amount.

(ii)     Party B may designate any Compounding Date as a "**Notional Downsize Date**" provided that the following conditions are satisfied:

(A)     Party B shall provide Party A five (5) Business Days' prior written notice in the form of an Adjustment Notice (a form of which is attached as Annex I hereto) of (i) its intention to designate a Compounding Date as a Notional Downsize Date and (ii) the amount by which the Equity Notional Amount (which may be effected by a reduction of the Floating Notional Amount and/or a redemption of a number of Reference Shares and subsequent cash payment to Party B) shall decrease on the related Notional Downsize Date, the "**Notional Downsize Amount;**"

(B)     After giving effect to the decrease in the Equity Notional Amount on the Notional Downsize Date, an Event of Default or Termination Event shall not have occurred and be continuing or will not occur; and

-6-

L4041

08-01789-smb Doc 156-2 Filed 04/03/17 Entered 04/03/17 10:33:40 Exhibit 1 - Aug 13 2008 3:33PM-03104 HSBC Bank Pg 71 of 85

Case 3:11-cv-03104-HSBC Document 1-7 Filed 07/19/11 Page 71 of 85

P.7

(C)    After giving effect to the decrease in the Equity Notional Amount on the Notional Downsize Date, the Leverage Ratio shall be less than the Maximum Leverage Ratio.

Notwithstanding Section 6(ii)(A) above, the Notional Downsize Date shall be the date Party A shall have received cash or a Reference Holder would have actually received cash as a result of a redemption of Reference Shares, as determined by the Calculation Agent, in an amount equal to the Notional Downsize Amount. If a Notional Adjustment is effected by a redemption of Reference Shares, the Calculation Agent may designate multiple Notional Downsize Dates on such dates as a Reference Holder would have actually received cash as a result of a redemption of Reference Shares.

(iii)    Party A may designate any date as a "Notional Downsize Date" and reduce the Notional Amount such that the Leverage Ratio will be less than 3.5, Party A shall promptly give notice to Party B following the designation of such Notional Downsize Date.

Notwithstanding anything to the contrary above, in the event that a Reference Holder would be unable to acquire Shares of the Reference Fund upon the occurrence of a Notional Upsize Date, Party B shall not be permitted to effect such Notional Upsize.

7.    INVESTMENT GUIDELINES

As set forth on Annex II

8.    REPORTING REQUIREMENTS

Party B hereby covenants to provide to Party A or to cause Party A to be provided with the following information in accordance with the time frames set forth below:

(a)    Semi-monthly NAV reports within 10 days;

(b)    Fully completed HSBC Risk Report (as set forth on Annex III) within 10 Business Days of the end of each calendar month;

(c)    Annual audited financial statements of the Reference Fund from the auditor within 180 calendar days of the end each calendar year; and

(d)    Monthly statements from the Administrator showing all assets and trading activity for each month within 10 Business Days

9.    EXTRAORDINARY EVENTS

Notwithstanding anything to the contrary in Sections 12.1 or 12.6 of the Equity Definitions, the occurrence of a Merger Event, Tender Offer, Nationalization or Insolvency shall be deemed to be effective on the Announcement Date of such event. With respect to this Transaction, Sections 12.2-12.5, 12.6(c) and 12.7 of the Equity Definitions shall not apply.

Following the Announcement Date of a Merger Event, Tender Offer, Nationalization or Insolvency, the Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible thereafter (subject to the definition thereof) and determine the Reference Fund

-7-

Value as described above. The occurrence of an Extraordinary Event shall be deemed an
Additional Termination Event for purposes of Section 7 hereof, and Party B shall be deemed the
Affected Party.

Section 12.6(a)(ii) of the Equity Definitions is deleted in its entirety and replaced with the
following: "Insolvency" means (i) that by reason of the voluntary or involuntary liquidation,
bankruptcy, insolvency, dissolution or winding up of or any analogous proceeding affecting the
Reference Fund, (A) all the Reference Shares of the Reference Fund are required to be transferred
to a trustee, liquidator or other similar official or (B) holders of the Reference Shares of the
Reference Fund become legally prohibited from transferring them or (ii) that the Reference Fund
institutes or has instituted against it a proceeding seeking a judgment of insolvency or
bankruptcy, or it consents to a proceeding seeking a judgment of insolvency or bankruptcy or any
other relief under any bankruptcy or insolvency law or other similar law affecting creditors'
rights, or a petition is presented for its winding up or liquidation by it or such regulator,
supervisor or similar official or it consents to such a petition, provided that proceedings instituted
or petitions presented by creditors and not consented to by the Reference Fund shall not be
deemed an Insolvency.

The provisions of Article 12 of the Equity Definitions relating to "Delisting" shall not apply to
this Transaction.

10. **ADDITIONAL DISRUPTION EVENTS.**

| | |
|---|---|
| Change in Law: | Applicable |
| Insolvency Filing: | Applicable |
| Hedging Disruption: | Applicable |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Party A |
| Determining Party: | Party A |

Following the termination of this Transaction because of an Additional Disruption Event, the
Calculation Agent will, in its sole discretion, designate the Valuation Date as soon as possible
thereafter and determine the Reference Fund Value as described above. For the avoidance of
doubt, the occurrence of an Additional Disruption Event shall be deemed an Additional
Termination Event for purposes of Section 7 hereof as described under "Extraordinary Events"
above, and Party B shall be the Affected Party.

11. **ADDITIONAL TERMINATION EVENTS.**

(a) Each of the following shall be Additional Termination Events in respect of Party B (at the
option of Party A):

(i) any event shall occur which has had a material adverse change in, or will have a
material adverse effect upon, the business, properties, assets, operations, liabilities (actual
or contingent), condition (financial or otherwise) of Party B or the Reference Fund and
which may affect the ability of Party B to perform its obligations under the Agreement,

-8-

(ii)     any formal charge, complaint, or proceeding with respect to Party B or the Reference Fund by any governmental authority (other than any governmental authority in its capacity as an investor or counterparty of Party B) shall have been made which (x) alleges any impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing related to the performance of services by such person and (y) if successful, could have a materially adverse effect on Party B or the Reference Fund,

(iii)    any judgment or order shall be entered (and either such judgment or order has not been overturned or dismissed within 30 days after such entry or there has been any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, has not been in effect) in any investigative, administrative or judicial proceeding involving a determination that Party B, the Reference Fund shall have violated in any material respect any civil or criminal law or regulation applicable to it in the performance of its duties in connection with itself or a Reference Fund, as the case may be,

(iv)    any of the memorandum of association, articles of association or prospectus of Party B or the Reference Fund shall be amended in any manner which could reasonably be expected to materially and adversely affect the rights, the economic bargain or the risk profile of Party A under this Transaction or its ability to enforce the same unless Party A shall have given its prior written consent to such amendment,

(v)    the Reference Fund effects a compulsory redemption of the shares of the Reference Fund held by Party A and/or any of its affiliates, or

(vi)    if Party A fails to receive any report required to be delivered to it in accordance with the Reporting Requirements and such default is not cured within two (2) Business Days of Party B's receipt of notice of such default.

(b)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination, the Leverage Ratio is equal to or greater than the Maximum Leverage Ratio and Party B has not (with the consent of Party A) taken irrevocable corrective action within three business days of receiving notice.

(c)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Floating Notional Amount is greater than the Maximum Notional Amount.

(d)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the Calculation Agent determines that the Annualized Volatility exceeds 15%.

(e)    It shall be an Additional Termination Event (at the option of Party A) with Party B as the sole Affected Party if as of any date of determination the Calculation Agent determines that a Net Asset Value Decline Event shall occur with respect to the Reference Fund.

(f)    It shall be an Additional Termination Event (at the option of Party A), with Party B as the sole Affected Party, if as of any date of determination the liquidity of the Reference Fund shall be less frequent than monthly upon 15 calendar day notice.

L4044

(g)    Party B may elect, upon 90 calendar days' prior written notice to Party A, to terminate the Transaction in whole or in part on such date as indicated by Party B (such termination, a "Party B Termination Event"). Any such Party B Termination Event shall be an Additional Termination Event, with Party B as the sole Affected Party.

## 12.    REPRESENTATIONS

| | |
|---|---|
| Non-Reliance: | Applicable |
| Agreements and Acknowledgements Regarding Hedging Activities: | Applicable |
| Additional Acknowledgements: | Applicable |

Each party (or such party as specified below) hereby represents and warrants and acknowledges to the other party as of the date hereof:

(a)    Each party retains complete freedom to determine, in its individual unfettered discretion, whether, or to what extent and in what manner, to hedge their respective obligations with respect to this Transaction. This Transaction does not create any further obligation on the part of Party A and/or any affiliates thereof to hedge or otherwise make any investment, directly or indirectly, in the Reference Fund. However, if and to the extent that any such investment in the Reference Fund is made at any time by Party A and/or any affiliate thereof, such investment will be on its own behalf only, Party B will have no interest or right, directly or indirectly, in respect of such investment (whether by way of third party beneficiary, security interest, or otherwise), and Party B acknowledges that this Transaction will not create either a direct or indirect obligation of the Reference Fund owing to Party B. Party B will be a general unsecured creditor of Party A with respect to Party A's obligations relating to this Transaction. Any amounts payable by Party A with respect to this Transaction will be satisfied solely out of the general assets of Party A subject to the claims of its creditors.

(b)    Each party has the capability to make its own legal, regulatory, tax, investment, financial, accounting and business evaluation of and to understand, and has evaluated and does understand on its own behalf, the terms, conditions and risks of entering into this Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks.

(c)    Each party has made its own independent decision to enter into this Transaction and as to whether this Transaction is appropriate and proper for it. Neither party or any affiliate thereof will bear any responsibility or liability if the legal, regulatory, tax, investment, financial, accounting, business or credit effects or consequences of this Transaction are other than those contemplated by the other party.

(d)    Neither party is relying on any communication (written or oral) from the other party or any of its affiliates or representatives as investment or other advice or as a recommendation to enter into this Transaction, it being understood and agreed that any information, commentary and explanations related to the terms and conditions of this Transaction provided by one party or an affiliate or representative thereof to the other

L4045

party or an affiliate or representative thereof, shall not be considered investment or other advice or a recommendation, and is not being relied upon by the other party or forming the basis, primary or otherwise, of that party's decision to enter into this Transaction. No compensation or other amount (including any amount otherwise payable under this Confirmation) is being paid by or on behalf of one party to the other or any affiliate thereof for any advice or information in respect of this Transaction.

(e)     Each party acknowledges that it has been offered an opportunity to ask questions of, and receive answers from the other party concerning the other party and that any request for such information has been fully complied with to the extent the other party possesses such information or can acquire it without unreasonable effort or expense.

(f)     Party B has been, and will at all times continue to be, solely responsible for making an independent appraisal of and investigation into the financial condition, prospects, creditworthiness, affairs, status and business of the Reference Fund.

(g)     Neither Party A or any affiliate or representative thereof is making, and has not made, in connection with this Transaction any representation or warranty whatsoever as to the Reference Fund or as to any information contained in any document provided by the Reference Fund to Party A or any affiliate or representative thereof or to any other person or filed by the Reference Fund with any exchange or with any governmental or regulatory authority regulating the purchase and sale of securities.

(h)     Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business with, the Reference Fund or its affiliates or any other person or entity having obligations relating to the Reference Fund and may act with respect to such business in the same manner as if this Transaction did not exist.

(i)     Party B has received and reviewed the offering, subscription, organizational and all other relevant documents with respect to the Reference Fund. Party B meets all eligibility and suitability standards imposed by the Reference Fund and applicable law with respect to a direct investment in the Reference Fund, meets all of the requirements of a "Third Party" as defined in the Subscription Document of the Reference Fund, can make (and hereby makes) all of the representations and warranties required to be made by investors of Reference Shares, and is capable of making a direct investment in the Reference Fund. Party B understands the nature of making an investment in the Reference Fund, and has concluded that such an investment would be suitable for it in light of its own investment objectives, financial capabilities and expertise. Party B is not entering into the Transaction for the purpose or as a means of gaining economic exposure to a fund in which it would not be able to invest directly for any reason.

(j)     Party B acknowledges and agrees that it is (i) an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated by the U.S. Securities and Exchange Commission; (ii) a "qualified purchaser" as defined in Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended; (iii) an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended (the "CEA"); and (iv) an "eligible contract participant" as defined in rule 4.7 promulgated under the CEA.

(k)     Party B represents to Party A that the Transaction described herein is not, and does not form part of, a listed transaction or a transaction that is the same as or substantially

L4046

08-01789-smb    Doc 156-22    Filed 04/03/17    Entered 04/03/17 10:34:45    Exhibit N -
Aug 13 2009 4:31PM    03-11A (Part 3 of 7)    Pg 77 of 147    P.12
Case 8:11-cv-03111-GES    Document 43    Filed 07/19/11    Page 76 of 85

similar to one of the types of transactions that the Internal Revenue Service has identified as a listed transaction for purposes of section 6011, 6111 or 6112 of the U.S. Internal Revenue Code of 1986, as amended (the "Code").

(l)     For U.S. federal income tax purposes, each party agrees that, (A) to the extent that Party A or an affiliate hedges its obligations under this Agreement by holding the Reference Fund, or enters into a substantially similar transaction with a party that owns the Reference Fund, they will treat (i) the arrangement represented by the Agreement as a debt instrument of Party B that provides for interest at a rate equal to 1-month USD-LIBOR-BBA plus the Spread, the proceeds of which are used by Party B to purchase the Reference Fund for its own account and (ii) Party B as the beneficial owner of the Reference Fund for U.S. federal income tax purposes, and (B) to the extent that neither Party A nor an affiliate hedges its obligations under this Agreement by holding the Reference Fund or enters into an offsetting transaction with a party that owns the Reference Fund, they will treat the arrangement represented by the Agreement as a constructive ownership transaction, as defined in Section 1260 of the Code, with respect to the Reference Fund, and each party agrees not to take any position that is inconsistent with this treatment for U.S. federal income tax purposes, unless required by law.

## 13.    ADDITIONAL PROVISIONS

Reserved

## 14.    DEFINITIONS AND INTERPRETATION

For the purpose of this Confirmation:

"Adjusted Reference Fund Value" or "ARFV" as of any date of determination, the Reference Fund Value less any reductions made pursuant to Section 8 herein.

"Delta Event" means, as of any date of determination, the absolute value of the aggregated "delta exposure" of the Reference Fund as set forth in the report delivered pursuant to Section 15 is greater than 50%.

"Leverage Ratio" means an amount equal to:



$$\frac{ARFV}{ARFV - FNA}$$

where "FNA" means the Floating Notional Amount, as of any date of determination.

"Maximum Leverage Ratio" means 3.75.

"Maximum Notional Amount" means USD 39,000,000

"Net Asset Value" means as of any date of determination and with respect to the Reference Fund, the market value of the Reference Shares of the Reference Fund based on the weekly reports as set forth in the Reporting Requirements (after giving effect to any redemptions as determined by the Calculation Agent); provided that if such weekly reports are not delivered to Party A or are, in the Calculation Agent's commercially

-12-

reasonable determination, inaccurate, the Calculation Agent shall determine the market value of the Reference Fund in its sole discretion.

"Net Asset Value Decline Event" means with respect to the Reference Fund, Reference Fund's Net Asset Value as of the last Business Day of any calendar month (x) declines by 6% or more from its Net Asset Value as of the last Business Day of the immediately preceding calendar month or (y) declines by 8% or more during any three month calendar period.

"Reference Fund Value" means, as of any date of determination, the market value of the Reference Shares of the Reference Fund as determined by the Calculation Agent based on the most recent weekly estimated Net Asset Value.

15.  **MODIFICATIONS TO THE ISDA MASTER AGREEMENT**

(a)  "Specified Transaction" means, (a) any transaction (including an agreement with respect thereto) which currently exists or which is entered into at any time in the future between one party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to the Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) which is an interest rate, basis, bond, emerging market instrument, foreign exchange, currency, bullion, other commodity (including a lease, loan or consignment of bullion or other commodity), equity, equity linked, index linked or credit linked transaction; cap, collar, floor, swap or option transaction; forward rate transaction; purchase, sale, repurchase, buy/sell back, stock lending or EFP (exchange for physical) transaction; or any similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions, and (c) any other transaction identified as a Specified Transaction in this Agreement.

(b)  The "Cross Default" provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(c)  "Credit Event Upon Merger" provisions of Section 5(b)(iv) will not apply to Party A and will not apply to Party B.

(d)  "Automatic Early Termination" provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(e)  Delivery of Documents. For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party B | United States Internal Revenue Services Forms W-9, and renewal and replacement forms. | (i) Upon Request of Party A. |

-13-

08-01789-smb    Doc 156-2    Filed 04/03/17    Entered 04/03/17 13:34:40    Exhibit 1
Case 3:11-cv-03514    Document 5-8    Filed 07/19/11    Page 78 of 85

P. 14
Aug 13 2008 03:35 PM FR SOTA B'way F INC 617 ... ... ...

Other documents to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Evidence as to (i) authority of Party B to enter into this Agreement and Transactions, and (ii) authorized signatories. | At execution of this Agreement. | Yes |
| Party B | A trading authorization for the persons or entities trading on behalf of Party B, if any. | At execution of this Agreement. | Yes |
| Party B | Legal opinion regarding certain corporate matters and enforceability regarding Buyer's execution of this Agreement | At execution of this Agreement. | No |

(f)     **Jury Waiver.** Each party, knowingly, and voluntarily waives any right either of them may have to trial by jury in any litigation based upon or arising out of this Agreement or the Transaction contemplated by this Agreement or any course of conduct, dealing, performance, usage of trade, statements (whether oral or written) or actions of either of them. Neither party shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial cannot be or has not been waived. These provisions shall not be deemed to have been modified in any respect or relinquished by either party except by written instrument executed by each of them.

**Affiliates.** For the purposes of Section 3(c) Party A will be deemed to have no Affiliates.

(g)     Additional Representations of Party B.

(i)     **Status of Parties.** Neither Party A nor any of its affiliates is acting as a fiduciary or an advisor for Party B in respect of the Transaction.

(ii)     **Private Transaction.** Party B is entering into the Transaction solely for its own account as principal for investment and not with a view to resale or distribution. Party B understands that the Transaction has not been registered under the Securities Act of 1933, as amended (the "Act"), or any other state securities law, and will not be so registered. Party B shall not permit any other person to have any beneficial interest in its interest in the Transaction, and shall not assign, transfer, convey or encumber all or any portion of its interest in the Transaction, without the consent of Party A. Party B agrees that its interest in the Transaction shall not be sold, transferred or otherwise disposed of except pursuant to an exemption from registration under the Act.

(iii)     **Investment Company Act.** Party B is not an investment company registered under the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act"), or a business development company as defined in section 202(a)(22) of the U.S. Investment Advisers Act of 1940, as amended.

-14-

08-01789-cgm    Doc 16276-2    Filed 04/03/17    Entered 04/03/17 10:34:49    Exhibit 1 -
Case 3:11-cv-03184-SC    Document 21    Filed 07/19/11    Page 79 of 85

P. 15

(iv)    Party B represents to Party A that the transaction described herein is not, and
does not form part of, a listed transaction or a transaction that is the same as or
substantially similar to one of the types of transactions that the Internal Revenue
Service has identified as a listed transaction for purposes of section 6011, 6111 or
6112 of the Internal Revenue Code.

## 16.    NOTICE AND ACCOUNT DETAILS

Notice Information for Party A:

HSBC Bank USA, National Association
452 Fifth Avenue - 8th Floor
New York, New York 10018
Contact: Julie Y. Mei - Swap Documentation
Tel: 212-525-5616
Fax: 212-525-0673
Email: julie.y.mei@us.hsbc.com

Payments to Party A:

HSBC Bank USA, NA
ABA: 021001088
Swift: MRMDUS33
A/C: ████9298

Notice Information for Party B:

Wailea Partners, LP
Attn: William Belhumeur
One Front St., Suiute 3300
San Francisco, CA 94111
415-986-8040

Payments to Party B:
Bank: Northern Trust International Banking Corporation
Swift Address: CNORUS33
ABA: 026 001 122
A/C No.: ████0230
Fortis Prime Fund Solutions Bank (Ireland)
Fortis Prime Fund Solutions Cayman-Client Escrow
A/C No.: ████0000
FPC: Wailea Partners, LP
A/C No.: [____]

## 17.    TRANSFER

Notwithstanding anything to the contrary in Section 7 of the Agreement, for avoidance of doubt,
Party A shall have the right to assign its this Transaction to any affiliate of Party A without the
consent of Party B.

-15-

L4050

Case 3:08-cv-03445-WHA   Document 26-2   Filed 04/03/17   Entered 04/03/17 10:33:49   Exhibit 1 - Part 4   Pg 81 of 85   Filed 07/19/11   Page 80 of 85

P.16

## 18.   NETTING OF PAYMENTS

All amounts payable on the same date, in the same currency and in respect of the same Transaction shall be netted in accordance with Section 2(c) of the Agreement. The election contained in the last paragraph of Section 2(c) of the Agreement shall not apply for the purposes of the Agreement.

## 19.   SET-OFF

The parties agree to amend Section 6 by adding a new Section 6(f) as follows:

"(f) Upon the occurrence of an Event of Default or Termination Event under Section 5(b)(iv) with respect to a party ("X"), the other party ("Y") will have the right (but not be obligated), without prior notice to X or any other person, to set-off or apply any obligation of X owed to Y (or any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (or any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation). Y will give notice to the other party of any set-off effected under this Section 6(f).

Amounts (or the relevant portion of such amounts) subject to set-off may be converted by Y into the Termination Currency at the rate of exchange at which such party would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

If any obligation is unascertained, Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) shall be effective to create a charge or other security interest. This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

## 20.   OTHER ACKNOWLEDGMENTS

(a)   The Transaction does not create any obligation on the part of Party A any of its affiliates or any other person or entity to make an investment in a Reference Fund or to otherwise hedge its obligations hereunder. To the extent that any investment in a Reference Fund is made by Party A or any of its affiliates or any other person or entity, such investment will be made on behalf of Party A only, and each of Party A and Party B acknowledges that the Transaction shall not create either a direct or indirect obligation of a Reference Fund owing to Party A.

(b)   Party A and its affiliates may, whether by virtue of the types of relationships described above or otherwise, at the date hereof or at times hereafter, be in possession of information in relation to the Reference Fund that is or may be material in the context of the Transaction and that may or may not be publicly available or known to Party B. Party A shall have no obligation to disclose to Party B any such relationship or information (whether or not confidential).

-16-

L4051

## 21.  CONFLICTS DISCLOSURE, WAIVER AND EXCULPATION

Party A and its affiliates may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking business (including the provision of advisory services) with the Reference Fund or its affiliates or any other person or entity having obligations relating to a Reference Fund and may act with respect to such business in the same manner as if the Transaction did not exist (including in a way that may be directly or indirectly adverse to the interests of Party B). Party B hereby waives any claim in respect of any such potential or actual conflict and holds Party A and its affiliates harmless from, and agrees that it shall not seek to hold Party A or any of its affiliates liable for, any losses or obligations of Party B that may result from such business.

L4052

08-01789-smb Doc 15276-2 Filed 04/03/17 Entered 04/03/17 10:34:45 Exhibit 4
Aug 13 2008 3:35PM HSU ...  Case 3:10-cv-03581-GEB Document 3 Filed 04/19/11 Page 82 of 85

P.18

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Confirmation and returning it to Party A.

Yours sincerely,

**HSBC BANK USA, NATIONAL ASSOCIATION**

By: _____
    Name:
    Title:

Confirmed as of the date hereof:

**WAILEA PARTNERS, LP**

By: _____
    Name:  William Belhumeur
    Title:  Managing Member of the General Partner

L4053

08-01789-smb    Doc 15276-2    Filed 04/03/17    Entered 04/03/17 10:34:45    Exhibit N -
Part 3 of 3 Pg    Pg 83 of 147
Case 3:11-cv-03041-RS    Document 1    Filed 07/19/11    Page 83 of 85

Aug 13 2009  4:37PM    HP LASERJET FAX                                    p.19

ANNEX I

## NOTIONAL ADJUSTMENT NOTICE

date

To:   HSBC Bank USA, NATIONAL ASSOCIATION
452 Fifth Avenue
New York, NY 10018

Attn: Julie Y Mei
Tel: 212-525-5616
julie.y.mei@us.hsbc.com

Re:   **Wailea Total Return Swap Transaction**
**(the "Transaction")**

Terms with initial capitals used, but not otherwise defined herein, shall have the meanings given to them in the Confirmation for the Transaction.

The undersigned hereby notifies HSBC that it wishes:

to adjust and increase reduce the Equity Notional Amount by USD ** to take effect on date.

This Notification is given upon and subject to the terms and conditions set out in the Agreement.

Dated this ** day of month year.

WAILEA PARTNERS, LP

By: _____

Title: _____

_____

Annex I - 1

L4054

**Investment Guidelines**

**ANNEX II**

| | |
|---|---|
| **Reference Fund** | The Reference Fund will invest substantially all of its assets in a managed account (the "Managed Account") at all times during the term of this Transaction. The Investment Manager will use a split-strike conversion strategy. |
| **Eligible securities** | The Reference Fund will only invest in 1) stocks in the S&P 100 index, 2) option on S&P 100 index, and/or 3) Money Market / US Treasury Bills. |
| **Volatility Constraint:** | The annualized standard deviation of the most recent 12-months return of the Reference Fund in aggregate, as calculated by Calculation Agent. must be less 10%. |
| **Strategy:** | The equity portfolio (including groups or baskets of equities), if any, of the Reference Fund (the "Stock Portfolio"), must include 25 or more members of Standard & Poor's 100 Stock Index (ticker OEX, the "S&P 100") at the time of purchase of the Stock Portfolio. The Reference Fund may also use Split Strike Conversion strategies on additional equity investments in the Stock Portfolio. The Reference Fund may also invest, from time to time, in money market funds or Treasury Bills. |

On the same Business Day as the purchase of the Stock Portfolio the Reference Fund will purchase S&P put options (the "Put Options"). The notional value of the Put Options shall not be less than 95% of the market value of the Stock Portfolio. The time to expiration of the Put Options shall not exceed 60 days at the time of purchase.

The strike price of the Put Options shall be at least 94% of the S&P 100 market value at the time of purchase.

Upon or after establishing the Stock Portfolio and the Put Options, the Reference Fund may sell S&P 100 call options (the "Call Options"). The notional value of the Call Options shall not exceed the market value of the Stock Portfolio (in equivalent OEX shares) at the time of purchase. There is no restriction on the strike price of the Call Options to be sold.

The Stock Portfolio shall have a correlation to the S&P 100 of not less than 90% at the time of purchase of the Stock Portfolio. Correlation shall be calculated using the most recent 24 month prices of the Stock Portfolio using its current composition, versus contemporaneous prices of the S&P 100.

| | |
|---|---|
| **Leverage** | The Reference Fund may not incur negative balances of cash and cash equivalents in aggregate. The Reference Manager may, however, allocate up to 5% of the NAV of the Reference Fund to other alternative investments managers who may use modest leverage, as determined by Part A. |
| **Stress Test** | A stress test on the Stock Portfolio, using options valuation techniques acceptable to Party A, shall result in simulated losses of no more than 3% of the NAV of the Reference Fund loss for a corresponding 10% hypothetical loss in the S&P 100. |

Aug 13 2008 4:27PM    HP LASERJET FAX    P.21

**ANNEX III**

**Fund**
**Report as of**



| | | |
|---|---|---|
| Eligible Securities | Yes / No | Please list ineligible securities |
| **Stock Portfolio** | | |
| Include >= 25 members of OEX | Yes / No | what is the number included in OEX? |
| Correlation of the Stock Portfolio to OEX >= 90% the most recent 24 months | Yes / No | What is the correlation? |
| **Put Options (at time of purchase)** | | |
| Notional Value of Put Options >= 95% of Market Value of Stock Portfolio | Yes / No | What is the %? |
| Strike Price of Put Options >= 94% of the OEX Market Value | Yes / No | What is the %? |
| Maturity of Put Options <= 60 days | Yes / No | What is the maturity? |
| **Call Options (at time of purchase)** | | |
| Call Options sold <=100% of the market value of Stock Portfolio | Yes / No | What is the %? |
| No negative balance of cash and cash equivalent | Yes / No | Please provide the amount. |
| No more than 5% of the NAV may use modest leverage | Yes / No | What is the %? |
| **Stress Test** | | |
| If OEX drop by 10%, simulated loss <= 3% of the NAV | Yes / No | What is the simulated loss? |

# EXHIBIT O

Baker & Hostetler LLP                    **Hearing Date: December 17, 2014 at 10 a.m.**
45 Rockefeller Plaza                     **Objection Deadline: December 10, 2014**
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Oren J. Warshavsky
Geoffrey A. North
Carrie Longstaff
Tatiana Markel
Dominic Gentile

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of the*
*estate of Bernard L. Madoff Investment Securities LLC*
*and the estate of Bernard L. Madoff*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01364 (SMB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, et al., | |
| Defendants. | |

## MOTION FOR ENTRY OF ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND RULES 2002 AND 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE APPROVING A SETTLEMENT AGREEMENT BY AND BETWEEN THE TRUSTEE AND SENATOR FUND SPC

TO:    THE HONORABLE STUART M. BERNSTEIN
       UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa-*lll* ("SIPA")[1] and the substantively consolidated estate of Bernard L.

Madoff ("Madoff," and together with BLMIS, the "Debtors"), by and through his

undersigned counsel, submits this motion (the "Motion") seeking entry of an order (the

"Approval Order"), pursuant to section 105(a) of the United States Bankruptcy Code, 11

U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002 and 9019 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement, the terms and

conditions of which are set forth in an agreement (the "Agreement")[2] by and between the

Trustee and Senator Fund SPC ("Senator"). In support of the Motion, the Trustee

respectfully represents as follows:

### PRELIMINARY STATEMENT

The Agreement represents a good faith, complete settlement of all disputes between

the Trustee and Senator and the customer claim Senator submitted in connection with

BLMIS Account No. 1FR128. The settlement will benefit the customer property fund by

---

[1] Further citations to SIPA will omit "15 U.S.C." and refer only to the relevant sections of SIPA.

[2] The form of Agreement is attached hereto as Exhibit "A."

2

approximately $95,000,000, and even accounting for a claim under Bankruptcy Code
section 502(h) will increase the distribution to BLMIS customers with allowed claims by
0.295%. The Trustee therefore respectfully requests that the Court approve this settlement.

## BACKGROUND

1.      On December 11, 2008 (the "Filing Date"),[3] the Securities and Exchange
Commission (the "Commission") filed a complaint in the United States District Court for the
Southern District of New York (the "District Court") against the Debtors (Case No. 08 CV
10791). In the complaint, the Commission alleged that the Debtors engaged in fraud
through the investment advisor activities of BLMIS.

2.      On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the
Commission consented to a combination of its own action with an application of the
Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section
78eee(a)(3) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that
BLMIS was not able to meet its obligations to securities customers as they came due and,
accordingly, its customers needed the protection afforded by SIPA.

3.      On that date, the District Court entered the Protective Decree, to which
BLMIS consented, which, in pertinent part:

(i)     appointed the Trustee for the liquidation of the business of BLMIS
        pursuant to section 78eee(b)(3) of SIPA;

(ii)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant
        to section 78eee(b)(3) of SIPA; and

(iii)   removed the case to this Court pursuant to section 78eee(b)(4) of
        SIPA.

---

[3]   In this case, the Filing Date is the date on which the Commission commenced its suit against
BLMIS, December 11, 2008, and a receiver was appointed for BLMIS. *See* section 78*lll*(7)(B) of
SIPA.

4.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff. On June 9, 2009, this Court entered an order substantively consolidating Madoff's Chapter 7 estate with the BLMIS SIPA proceeding.

## THE TRUSTEE'S CLAIMS AGAINST SENATOR

5.    Senator was a Cayman Islands investment fund invested exclusively with BLMIS.

6.    On or about September 6, 2006, BLMIS Account No. 1FR128 was opened in the name "HSBC Securities Services (Luxembourg) SA Spec Cust Acct For Senator Fund SPC (the "Account") on behalf of Senator. Over the life of the Account, Senator withdrew approximately $95,000,000 from the Account (the "Life-to-Date Transfers"). The Life-to-Date Transfers are solely withdrawals of principal.

7.    On December 5, 2010, the Trustee filed an amended complaint in this adversary proceeding (the "Amended Complaint") against Senator, among others, seeking to (a) avoid, preserve, and recover the Transfers under sections 547, 548, 550 and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA; (b) recover subsequent transfers under section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA; (c) disallow Senator's customer claim against the BLMIS estate under section 502(d) of the Bankruptcy Code; and (d) equitably subordinate Senator's Customer Claim against the BLMIS estate under section 510(c) of the Bankruptcy Code (collectively, the "Avoidance Claims").

8.    On May 27, 2011, Senator filed an Answer to the Amended Complaint, and asserted cross-claims against various HSBC entities, including HSBC Securities Services (Luxembourg), S.A. ("HSSL"), which served as the custodian and administrator for Senator, alleging (a) fraud; (b) fraudulent concealment; (c) negligent misrepresentation; (d) breach of fiduciary duty; (e) breach of contract; (f) gross negligence; (g) negligence; (h) unjust

4

enrichment; and (i) various breaches of Luxembourg statutory law, including violations of the Undertaking for Collective Investments in Transferable Securities ("UCITS") (collectively, the "Cross-claims"). The Adversary Proceeding is pending in this Court.[4]

9.        Senator will be filing additional claims against HSSL in Luxembourg for, among other things, HSSL's liability arising out of, or relating to, its role as Senator's custodian and administrator ("Senator's Luxembourg Claims").

## SENATOR'S CUSTOMER CLAIM

10.        On February 2, 2009, Senator timely filed customer claim number 001504 (the "Customer Claim") with the Trustee, asserting losses based on account number 1FR128, as reflected on Senator's November 30, 2008 BLMIS customer account statement. On March 16, 2009, Senator supplemented its claim with a chart containing a calculation of Senator's net equity.

## SETTLEMENT DISCUSSIONS AND MEDIATION

11.        Since 2011, the Parties have, on multiple occasions, engaged in good faith discussions aimed at resolving the Trustee's Avoidance Claims and the amount of Senator's Customer Claim. These discussions proved unsuccessful, in part, because the Trustee's investigation of Senator's principals and shareholders was ongoing, and because the District Court issued opinions that affected the pleading standards for the Trustee's Avoidance Claims.

12.        On April 14, 2014, on Senator's motion, the Court directed the Parties to engage in mediation. Once the Parties had agreed upon mediation protocols and selected a

---

[4] Terms not otherwise defined shall have the meaning ascribed to them in the Agreement.

mediator (the "Mediator"), the Parties actively engaged in mediation, including exchanging
mediation statements and supplemental materials, and participating in approximately seven
formal in-person mediation sessions, and many more informal discussions with the Parties
and/or the Mediator. Through the mediation process, the Parties reached a compromise, and
in light of the delay, expense, and uncertainties associated with litigation, have decided to
settle the Adversary Proceeding.

## OVERVIEW OF THE AGREEMENT

13.    The principal terms and conditions of the Agreement are generally as follows
(as stated above, the Agreement is attached as Exhibit "A" and should be reviewed for a
complete account of its terms):[5]

- Senator shall pay the Trustee 100% of the Life-to-Date Transfers.

- Senator shall have an allowed customer claim in the SIPA Proceeding
  in the amount of $238,753,482 and shall be entitled to the full benefit
  of a SIPC customer advance under section 78fff-3(a) of SIPA. The
  Allowed Claim is equal to 88.6% of Senator's net equity of
  $162,249,980 ($143,753,482), plus an increase of $95,000,000 under
  section 502(h) of the Bankruptcy Code.

- At Closing, Senator shall pay or cause to be paid to the Trustee, for the
  benefit of the customer property fund, $95,000,000 in full and final
  satisfaction of the Trustee's Avoidance Claims, as follows: (i)

---

[5] Terms not otherwise defined shall have the meaning ascribed in the Agreement. In the event of
any inconsistency between the summary of terms provided in this section and the terms of the
Agreement, the Agreement shall prevail.

$500,000 from the SIPC advance; and (ii) $94,500,000 from the catch-up distribution owed to Senator based on its Allowed Claim.[6]

- As part of Senator's consideration for this settlement, Senator agrees to share with the Trustee 50% of the proceeds from any judgment it obtains through (i) Senator's Cross-claims; (ii) Senator's Luxembourg Claims; and (iii) any other claims that Senator brings against HSSL, HSBC Bank plc, or a related entity which relate to, or arise from, the same facts and circumstances that give rise to Senator's Cross-claims and Senator's Luxembourg Claims.

- At Closing, the Trustee shall pay Senator $15,467,466, consisting of the balance of the catch-up distribution owed to Senator under its Allowed Claim.

- The Trustee will release, acquit, and absolutely discharge Senator, on the specific terms set forth in the Agreement.

- Senator will release, acquit, and absolutely discharge the Trustee and all his agents and BLMIS and its consolidated estate, on the specific terms set forth in the Agreement.

---

[6] As of the date of the Agreement, the Bankruptcy Court has approved four *pro rata* interim distributions to BLMIS customers with allowed customer claims of 4.602%, 33.556%, 4.721%, and 3.180%, respectively (46.059% in total). Accordingly, in order to catch-up Senator's distribution to that of other customers with allowed claims, at the Closing, the Trustee will pay Senator 46.059% of its allowed claim, or $109,967,466. The amount that Senator owes the Trustee on account of the Life-to-Date Transfers ($95,000,000) will be deducted from the catch-up payment and the SIPC Advance.

- The Parties shall submit to the Bankruptcy Court a stipulation
  requesting dismissal of the Adversary Proceeding as against Senator,
  on the specific terms set forth in the Agreement.

## RELIEF REQUESTED

14.    By this Motion, the Trustee respectfully requests that the Court enter an order
substantially in the form of the proposed Order attached as Exhibit "B" approving the
Agreement.

## LEGAL BASIS

15.    Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the
trustee and after notice and a hearing, the court may approve a compromise or settlement."
Courts have held that in order to approve a settlement or compromise under Bankruptcy
Rule 9019(a), a bankruptcy court should find that the compromise proposed is fair and
equitable, reasonable, and in the best interests of a debtor's estate. *In re Ionosphere Clubs,
Inc.*, 156 BR 414, 426 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994) (citing *Protective
Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424
(1968)).

16.    The Second Circuit has stated that a bankruptcy court, in determining
whether to approve a compromise, should not decide the numerous questions of law and fact
raised by the compromise, but rather should "canvass the issues and see whether the
settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Liu v. Silverman
(In re Liu)*, 1998 U.S. App. LEXIS 31698, at *3 (2d Cir. Dec. 18, 1998) (quoting *In re W.T.
Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Masonic Hall & Asylum Fund v.
Official Comm. of Unsecured Creditors (In re Refco, Inc.)*, 2006 U.S. Dist. LEXIS 85691, at
*2122 (S.D.N.Y. Nov. 16, 2006); *In re Ionosphere Clubs*, 156 B.R. at 426. "[T]he court

need not conduct a 'mini-trial' to determine the merits of the underlying litigation." *In re Purified Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993).

17.    In deciding whether a particular compromise falls within the "range of reasonableness," courts consider the following factors:

(i)     the probability of success in the litigation;

(ii)    the difficulties associated with collection;

(iii)   the complexity of the litigation, and the attendant expense, inconvenience, and delay; and

(iv)    the paramount interests of the creditors (or in this case, customers).

*In re Refco, Inc.*, 2006 U.S. Dist. LEXIS 85691 at *22; *Nellis v. Shugrue*, 165 B.R. 115, 122 (S.D.N.Y. 1994) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992), *cert. denied*, 506 U.S. 1088 (1993)).

18.    The bankruptcy court may credit and consider the opinions of the trustee or debtor and their counsel in determining whether a settlement is fair and equitable. *See In re Purified Down Prods.*, 150 B.R. at 522; *In re Drexel Burnham Lambert Grp.*, 134 B.R. at 505. Even though the Court has discretion to approve settlements and must independently evaluate the reasonableness of the settlement, *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009), the business judgment of the trustee and his counsel should be considered in determining whether a settlement is fair and equitable. *In re Chemtura Corp.*, 439 B.R. at 594. The competency and experience of counsel supporting the settlement may also be considered. *Nellis*, 165 B.R. at 122. Finally, the court should be mindful of the principle that "the law favors compromise." *In re Drexel Burnham Lambert Grp.*, 134 B.R. at 505 (quoting *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976)).

19.    The Agreement furthers the interest of BLMIS customers by (a) adding

$95,000,000 to the fund of customer property, thereby increasing it by 0.295%; (b)

recovering 100% of the transfers from BLMIS to Senator during the life of the Account; (c)

reducing the amount of the Allowed Claim to 88.6% of Senator's net equity, resulting in a

benefit to the BLMIS estate of $18,496,498. Furthermore, the Agreement resolves all

claims among the parties and avoids the cost and delay of what could otherwise be lengthy

and contentious litigation. (Affidavit of the Trustee in Support of the Motion (the "Picard

Affidavit"). (A true and accurate copy of the Picard Affidavit is attached as Exhibit "C".).

## CONCLUSION

20.     In sum, the Trustee submits that the Agreement should be approved to avoid

lengthy, burdensome, and expensive litigation and because it represents a fair and

reasonable compromise of the Avoidance Claims and the Customer Claim. Since the

Agreement is well within the "range of reasonableness" and confers a benefit on the estate,

the Trustee respectfully requests that the Court enter an Order approving the Agreement.

## NOTICE

21.     In accordance with Bankruptcy Rules 2002 and 9019, notice of this Motion

has been given to (i) SIPC; (ii) the Commission; (iii) the Internal Revenue Service; (iv) the

United States Attorney for the Southern District of New York; and (v) Todd E. Duffy,

DuffyAmedeo LLP, 275 Seventh Avenue, 7th Floor, New York, New York 10001. Notice

of this motion will also be provided via email and/or U.S. Mail to all persons who have filed

notices of appearance in the BLMIS proceeding and to all defendants in this adversary

proceeding pursuant to the Order Establishing Notice Procedures and Limiting Notice, ECF

No. 4560. The Trustee submits that no other or further notice is required.

WHEREFORE, the Trustee respectfully requests entry of an Order substantially in

the form of Exhibit "B" granting the relief requested in the Motion.

Dated:  New York, New York                    Respectfully submitted,
        November 18, 2014

                                              BAKER & HOSTETLER LLP

                                              By:    *s/ Oren J. Warshavsky*
                                                     David J. Sheehan
                                                     Email: dsheehan@bakerlaw.com
                                                     Oren J. Warshavsky
                                                     Email: owarshavsky@bakerlaw.com
                                                     Geoffrey A. North
                                                     Email: gnorth@bakerlaw.com
                                                     Carrie Longstaff
                                                     Email: clongstaff@bakerlaw.com
                                                     Tatiana Markel
                                                     Email: tmarkel@bakerlaw.com
                                                     Dominic Gentile
                                                     Email: dgentile@bakerlaw.com

                                              45 Rockefeller Plaza
                                              New York, New York 10111
                                              Telephone: (212) 589-4200
                                              Facsimile: (212) 589-4201

                                              *Attorneys for Irving H. Picard,*
                                              *Trustee for the Substantively Consolidated*
                                              *SIPA Liquidation of the estate of Bernard L.*
                                              *Madoff Investment Securities LLC and the*
                                              *estate of Bernard L. Madoff*

EXHIBIT P



## REGULUS Asset Management Ltd
## CARRUBA Asset Management Ltd

July 12, 2007

Wailea Advisors, LP
c/o Access Capital Management
100 Tamal Plaza, Suite 106
Corte Madera, CA 94925

<u>CONFIDENTIAL</u>

Re: Investment in Senator Fund by Wailea Partners, LP and/or Wailea Offshore Fund, Ltd (the "Wailea Funds")

To Whom It May Concern:

We are pleased to confirm the following conditions for investment in the Senator Fund SPC's Senator Equity Segregated Portfolio One, US$ Class B ("Senator") by either of the funds referenced above:

1. 0.65% annual management fee for the first US$100 million invested in Senator. For any amounts over US$100 million, the annual management fee will be reduced to 0.55%. This is subject to available capacity in the underlying brokerage account.
2. The investment will be charged the regular 1.5% annual management fee, with the management fee discount given in the form of a rebate to the Wailea Funds or to Wailea Advisors, LP on a quarterly basis within 15 business days of the end of each quarter.
3. No subscription or redemption fees will be charged for any subscriptions or redemptions from the Fund.
4. We confirm that Senator is fully invested (with the exception of cash reserves kept for payment of expenses) in the "split-strike" hedged equity strategy through a managed account in Senator's name at Bernard L. Madoff Investment Securities. The investment is on a non-leveraged basis, and none of Senator's assets have been or will be pledged as collateral for any borrowing or leveraging.
5. Reporting: Senator will provide performance estimates on a weekly basis, and will provide unaudited reports of Senator's performance on a monthly basis within 20 days of the end of each calendar month.
6. Subscription documents and subscription proceeds from the Wailea Funds will be accepted on a monthly basis up until 5PM Luxembourg time on the last business day of the month immediately preceding the Subscription Day.

Kindly let us know if we can be of any further assistance.

Kind regards,

Senator Fund SPC

EXHIBIT Q

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,<br><br>Defendant. | Adv. Pro. No. 08-1789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re<br><br>BERNARD L. MADOFF<br><br>Debtor. | : |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>- against -<br><br>ALPHA PRIME FUND LIMITED, et al.,<br><br>Defendants. | :<br>:<br><br>Adv. Pro. No. 09-01364 (BRL)<br>:<br><br>:<br>:<br>: |

## ANSWER, AFFIRMATIVE DEFENSES AND AMENDED CROSS-CLAIM OF ALPHA PRIME FUND LIMITED AND SENATOR FUND SPC

Defendants Alpha Prime Fund Limited ("Alpha Prime" or "Alpha Prime Fund") and Senator Fund SPC ("Senator" or "Senator Fund"), by and through their undersigned counsel, answer the Amended Complaint filed by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC (the "Trustee") upon knowledge as to its own acts and upon information and belief as to all other matters as follows:

meeting we had with them. ....[BLMIS] purchases the stocks in bulk through their trading side and settle them into their DTC proprietary account and then transfer them to their client account at DTC which ensures segregation of client and proprietary assets." Based on this and other answers regarding Madoff, Stoffel hoped "that the above will assist you in securing your investor into the Herald fund."

68.     KPMG issued its second report on September 8, 2008 with similar distressing findings as the 2006 report, which HSBC Bank again refused to disclose.

69.     By e-mail dated October 28, 2008 Wailea/Access Capital Management informed Senator of the fact that HSBC Bank made at the end of last week a decision "that has come as a complete shock to us". "HSBC informed us that they are redeeming USD 90 million from Senator in an effort to essentially short a portion of their Madoff exposure". "They are betting on (or at least protecting against) Senator losing money". In a further e-mail exchange dated the same date, Access Capital Management stated: "Regarding the overall shorting by HSBC it appears that this might just be the beginning for this particular hedging strategy".

70.     Rather, upon information and belief, the HSBC Defendants learned that BLMIS was nothing more than a Ponzi scheme and withdrew HSBC Bank's investment in Senator Fund in order to avoid losing its entire investment and at the expense of the remaining investors.

71.     At the same time HSBC Bank was attempting to redeem the entirety of its investments in Senator, knowing that BLMIS was in serious trouble, HSBC client relationship manager for Alpha Prime and Senator communicated to Peter Fischer (who served as a director to both Alpha Prime and Senator) stating that they are bullish on the asset growth of Alpha and Senator for the year to come.

EXHIBIT R

# AGREEMENT

This Agreement, dated as of November 13, 2014 ("Agreement"), is made by and between Irving H. Picard, in his capacity as the trustee ("Trustee") for the liquidation proceedings under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. § 78aaa et seq. ("SIPA"), of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated Chapter 7 case pending before the United States Bankruptcy Court for the Southern District Court of New York (the "Bankruptcy Court") of Bernard L. Madoff ("Madoff"), and Senator Fund SPC ("Senator"). The Trustee and Senator collectively shall be referred to herein as the "Parties."

# BACKGROUND

A.    BLMIS and its predecessors were registered broker-dealers and members of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Madoff.

C.    On December 15, 2008, the District Court entered an order under SIPA, which, in pertinent part, appointed the Trustee for the liquidation of the business of BLMIS under section 5(b)(3) of SIPA and removed the case to the Bankruptcy Court under section 5(b)(4) of SIPA, where it is pending as Case No. 08-01789 (SMB) (the "SIPA Proceeding"). The Trustee is duly qualified to serve and act on behalf of the BLMIS estate (the "BLMIS Estate"). By Order dated June 9, 2009, the estate of Madoff was substantively consolidated with the BLMIS Estate.

D.    Senator maintained an account with BLMIS, designated account no. 1FR128 ("Account"), that was opened on or around September 6, 2006. Over the life of the Account, Senator withdrew from its BLMIS account approximately Ninety-Five Million United States Dollars ($95,000,000.00) (the "Transfers").

E.    On or about February 2, 2009, Senator filed a customer claim with the Trustee, which the Trustee has designated as Claim No. 001504 (the "Customer Claim"). The Customer Claim is included as Attachment A to this Agreement. The Customer Claim asserts that Senator is entitled to the securities reflected on its Account statement for the period ending November 30, 2008. On March 16, 2009, Senator supplemented its claim with a chart depicting a calculation of Senator's net equity. The Parties agree that Senator's net equity equals $162,249,980 ("Net Equity").

F.    On December 5, 2010, the Trustee filed an Amended Complaint ("Amended Complaint") in an adversary proceeding captioned Picard v. HSBC Bank plc, et al., Adv. Pro. No. 09-1364 (SMB) (the "Adversary Proceeding"). In the Amended Complaint, the Trustee asserted claims to avoid and recover the Transfers under 11 U.S.C. §§ 544, 547, 548, 550, or 551, SIPA § 78fff-2(c)(3), and the New York Debtor and Creditor Law §§ 270–281 ("Avoiding Power Claims"). The Trustee also asserted claims to disallow Senator's Customer Claim,

pursuant to 11 U.S.C. § 502(d), and to equitably subordinate Senator's Customer Claim, pursuant to 11 U.S.C. §§ 510(c) and 105(a) ("Disallowance and Subordination Claims").

G.      On May 27, 2011, Senator filed an Answer to the Amended Complaint, and a cross-claim against various HSBC entities, including HSBC Securities Services (Luxembourg), S.A. ("HSSL"), which acted as custodian and administrator to Senator, for fraud, fraudulent concealment, negligent misrepresentation, breach of fiduciary duty, breach of contract, gross negligence, negligence, unjust enrichment, breach of Luxembourg statutory law, and failure to act according to Articles 17(1) and 18(2) of the Law dated 20.12.2002 Concerning the Undertakings of Collective Investments (collectively, "Senator's U.S. Claims").

H.      Senator will be filing claims against HSSL in Luxembourg for, among other things, HSSL liability arising out of or relating to its role as Senator's custodian and administrator ("Senator's Luxembourg Claims").

## AGREEMENT

1.      **Payment to Trustee.** At the Closing (as defined in paragraph 8) Senator shall pay or cause to be paid to the Trustee, pursuant to the conveyances, assignments, endorsements, and transfers set forth in paragraph 8, the sum of Ninety-Five Million United States Dollars ($95,000,000) (the "Settlement Payment") in full and final settlement and satisfaction of all Avoiding Power Claims, Disallowance and Subordination Claims, and any other claims of the Trustee or the BLMIS Estate of every kind and nature whatsoever, whether known or unknown (as described in paragraph 5), that the Trustee or the BLMIS Estate may have against Senator.

2.      **Allowance of Senator's Customer Claim.** Upon the Closing (as defined in paragraph 8), Senator's Customer Claim shall be deemed conclusively allowed pursuant to section 502(h) of the Bankruptcy Code and 15 U.S.C. § 78lll(11), equal in priority to other allowed customer claims against the BLMIS Estate, in the amount of Two Hundred Thirty-Eight Million Seven Hundred Fifty-Three Thousand Four Hundred Eighty-Two Dollars ($238,753,482) (the "Allowed Claim"). As of the date of this Agreement, the initial amount to be paid by the Trustee to Senator allocable to the Allowed Claim in respect of a catch-up distribution is $109,967,466 (46.059% of the Allowed Claim).

3.      **Release by the Trustee.** In consideration for the terms herein, except with respect to the obligations, rights, and considerations arising under this Agreement, upon the Closing (as defined in paragraph 8), the Trustee on behalf of himself, BLMIS, and its consolidated estates, shall release, acquit, and forever discharge Senator, including its successors and/or assigns from any and all past, present, or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity, or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts) of whatever kind, nature, or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, or otherwise (including attorneys' fees, costs, or disbursements), known or unknown, existing as of the date of the Closing that are, have been, could have been, or might in the future be asserted by the Trustee based on, arising out of, or in

any way related to Senator's relationship with BLMIS, including, without limitation, the claims against Senator in the Adversary Proceeding, except for any and all claims to enforce Senator's obligations under this Agreement. The release granted by the Trustee hereunder shall extend to Regulus Asset Management Ltd, Carruba Asset Management Ltd, Tereo Trust Company Limited, Ursula Radel-Leszczynski, and all of their respective current and former directors, officers, employees, indirect or direct shareholders, limited partners, principals, members, successors, assigns, accountants, attorneys, agents, representatives, including, without limitation, Peter Fischer, Roger Hanson, and Adam Zielinski ("Additional Releasees") only concerning direct or indirect transfers of money from Senator to the Additional Releasees but not for any claims that the Trustee may otherwise have. For the avoidance of doubt, the Parties agree that the Trustee's release granted herein shall not in any way extend to the other defendants in the Adversary Proceeding or any transfers of money the Additional Releasees received from any other defendants.

4.      Release by Senator.  In consideration for the covenants and agreements in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to the obligations, rights, and considerations arising under this Agreement, upon the Closing (as defined in paragraph 8), Senator hereby releases, acquits, and forever discharges the Trustee and all his agents, representatives, attorneys, employees, and professionals, and BLMIS and its consolidated estate, from any and all past, present, or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity, or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, in law, equity, or arbitration, absolute or contingent, in tort, contract, statutory liability, or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty, or otherwise (including attorneys' fees, costs or, disbursements), known or unknown, existing as of the date of the Closing, based on, arising out of, or in any way related to BLMIS, except for Senator's rights to enforce the Trustee's obligations under this Agreement. For the avoidance of doubt, nothing in this release shall release the right or claim of any Defendant to any and all distributions such Defendant receives from (i) the forfeiture fund established by the U.S. Department of Justice and (ii) the class action settlement in *Shapiro v. JP Morgan Chase & Co.*, No. 11 Civ. 8331 (CM) (S.D.N.Y.) and *Hill v. JP Morgan Chase & Co.*, No. 11 Civ. 7961 (CM) (S.D.N.Y.).

5.      Unknown Claims.  Unknown Claims shall mean any released claims pursuant to paragraphs 3 and 4 of the Agreement, as defined herein, that the Parties do not know or suspect to exist in their favor at the time of giving the release in this Agreement that if known by them, might have affected their settlement and release in this Agreement.  With respect to any and all released claims in paragraphs 3 and 4 of this Agreement, the Parties shall expressly waive or be deemed to have waived, the provisions, rights and benefits of California Civil Code section 1542 (to the extent it applies herein), which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING
> THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE

MATERIALLY AFFECTED HIS SETTLEMENT WITH THE
DEBTOR.

The Parties expressly waive, and shall be deemed to have waived, any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law or foreign law, that is similar, comparable, or equivalent in effect to California Civil Code section 1542. The Parties may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but the Parties shall expressly have and be deemed to have fully, finally, and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or noncontingent, whether or not concealed or hidden, that now exist or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including conduct that is negligent, reckless, intentional, with or without malice, or a breach of any duty, law, or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge and shall be deemed to have acknowledged that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

6.    Dismissal of Adversary Proceedings. Within five days of the Closing (as defined in paragraph 8), the Parties shall submit to the Bankruptcy Court a stipulation requesting the dismissal of the Adversary Proceeding, with prejudice, as against Senator, with each party bearing its own costs, attorneys' fees, and expenses.

7.    Court Approval; Effective Date; Termination. This Agreement is subject to, and shall become effective and binding on the Parties upon the Bankruptcy Court's approval of this Agreement in the SIPA Proceeding by an order that is no longer subject to appeal, review, or rehearing (the "Effective Date"). The Trustee shall use his reasonable efforts to obtain approval of the Agreement in the SIPA Proceeding as promptly as practicable after the date of this Agreement. If this Agreement has not become effective as provided in this paragraph within 360 days after the date of this Agreement (or within such additional time as mutually agreed upon by the Parties), then (a) this Agreement (other than this paragraph) shall terminate and be void; (b) all of the statements, concessions, consents, and agreements contained in the Agreement (other than this paragraph) shall be void; and (c) neither the Trustee nor Senator may use or rely on any such statement, concession, consent, or agreement in any public statement or litigation involving the SIPA Proceeding, or any case or proceeding relating to Senator, BLMIS, or Madoff.

8.    Closing. There shall be a closing ("Closing") within five business days after the Effective Date of this Agreement. At the Closing simultaneously:

(a)    Senator shall satisfy the Settlement Payment by:

(i)    conveying, assigning, endorsing, and transferring to the Trustee the funds to be advanced by SIPC in the amount of Five Hundred Thousand Dollars ($500,000.00); and

4

(ii)    conveying, assigning, endorsing, and transferring to the Trustee from the catch-up distribution the sum of Ninety-Four Million Five Hundred Thousand Dollars ($94,500,000) owed to Senator under the Allowed Claim.

(b)    The Trustee shall pay Senator Fifteen Million Four Hundred Sixty-Seven Thousand Four Hundred Sixty-Six Dollars ($15,467,466), consisting of the balance of the catch-up distribution owed to Senator under the Allowed Claim pursuant to payment instructions to be provided by Senator to the Trustee; and

(c)    The releases contained in paragraphs 3 and 4 shall become effective without any further action by any of the Parties.

9.    Senator's Claims Against HSBC.    As part of Senator's consideration for this settlement, Senator agrees to share with the Trustee 50% of proceeds of (a) Senator's U.S. Claims; (b) Senator's Luxembourg Claims; and (c) any other claims that Senator asserts against HSSL, HSBC Bank plc, or a related entity which are related to or arise from the same facts and circumstances that give rise to Senator's Luxembourg Claims and Senator's U.S. Claims.

10.    Cooperation and Discovery Obligations.    A Party shall respond to reasonable discovery requests served by another Party as though it remained a party to the Adversary Proceeding.    Service of discovery requests upon a Party shall be complete when made by delivery to its United States counsel.    Discovery requests shall be governed by the Federal Rules of Civil Procedure; by entering into this Agreement, the Parties expressly reserve, and are not waiving, any and all rights available under the Federal Rules to object to discovery requests or to move for a protective order as appropriate.

11.    Senator's and Trustee's Authority.    Senator represents and warrants to the Trustee that, as of the date hereof, it has the full power, authority, and legal right to execute and deliver, and to perform its obligations under this Agreement and has taken all necessary action to authorize the execution, delivery, and performance of its obligations under this Agreement.    The Trustee represents and warrants to Senator that, as of the date hereof, and subject to the approval of the Bankruptcy Court as set forth in paragraph 7 above, he has the full power, authority, and legal right to execute and deliver, and to perform his obligations under this Agreement and has taken all necessary action to authorize the execution, delivery, and performance of his respective obligations under this Agreement.    Senator represents and warrants that it owns and controls the Customer Claim as of the date of this Agreement.

12.    Further Assurances.    The Parties shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate the intent of this Agreement.

13.    Entire Agreement.    This Agreement constitutes the entire agreement and understanding between and among the Parties and supersedes all prior agreements, representations, and understandings concerning the subject matter hereof.

14.    No Admission.    This Agreement and all negotiations, statements, and proceedings in connection therewith are not, will not be argued to be, and will not be deemed to be a presumption, concession, or admission by any Party of any fault, liability, or wrongdoing

5

whatsoever. This Agreement and any matter relating thereto may not be offered or received in evidence or otherwise referred to in any civil, criminal, or administrative action or proceeding as evidence of any fault, liability, or wrongdoing whatsoever.

15.    Amendments, Waiver. This Agreement may not be terminated, amended, or modified in any way except in a writing signed by all of the Parties. No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision hereof, whether or not similar, nor shall such waiver constitute a continuing waiver.

16.    Assignability. No party hereto may assign its rights under this Agreement without the prior written consent of each of the other Parties hereto, except that nothing in this Agreement shall prevent Senator from assigning all or part of the Allowed Claim, without the prior written consent of the Trustee, pursuant to the Bankruptcy Court's November 10, 2010 Order Establishing Procedures for the Assignment of Allowed Claims.

17.    Successors Bound. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

18.    No Third Party Beneficiary. Except as expressly provided in paragraphs 3 and 4, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted assigns.

19.    Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without regard to its conflict of laws provisions.

20.    Exclusive Jurisdiction. The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all disputes between or among the Parties, whether in law or equity, arising out of or relating to this Agreement, or any provision thereof, and the Parties hereby consent to and submit to the jurisdiction of the Bankruptcy Court for any such action. In the event the BLMIS proceeding is closed by a final decree and not reopened, the Parties agree that any dispute arising out of this Agreement, or any provision thereof, may be brought in the United States District Court for the Southern District of New York or the Supreme Court of New York, in New York County.

21.    Captions and Rules of Construction. The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit, or describe the scope of this Agreement or the scope or content of any of its provisions. Any reference in this Agreement to a paragraph is to a paragraph of this Agreement. "Includes" and "including" are not limiting.

22.    Counterparts, Electronic Copy of Signatures. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document. The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures with the same effect as the delivery of an original signature

23.    Negotiated Agreement. This Agreement has been fully negotiated by the Parties. Each Party acknowledges and agrees that this Agreement has been drafted jointly, and the rule that ambiguities in an agreement or contract may be construed against the drafter shall not apply in the construction or interpretation of this Agreement.

24.    Severability. In the event that any term or provision of this Agreement or any application thereof is deemed to be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

25.    Notices. Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax, or by electronic transmission to:

If to the Trustee:

Irving H. Picard
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Email: ipicard@bakerlaw.com

If to Senator, c/o:

Todd E. Duffy
E-mail: tduffy@duffyamedeo.com
DuffyAmedeo LLP
275 Seventh Avenue, 7th Floor
New York, NY 10001


with copies to:

Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Geoffrey A. North
Email: gnorth@bakerlaw.com
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
F: (212) 589-4201

*[Signature pages follow]*

7

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

_____
IRVING H. PICARD
Trustee for Bernard L. Madoff
Investment Securities LLC

Sworn to and subscribed before me
this 13th day of November, 2014

_____
Notary Public

SONYA M. GRAHAM
Notary Public, State of New York
No. 01GR6133214
Qualified in Westchester County
Commission Expires: 9/12/2017

SENATOR FUND SPC

By: _____

Name: Peter Fischer

Title: Director


By: _____

Name: Helmut Randl

Title: Director

EXHIBIT S

**LAW OFFICE OF**
**RICHARD E. SIGNORELLI**
799 Broadway, Suite 539
New York, NY 10003
Telephone: 212-254-4218
Facsimile: 212-254-1396
rsignorelli@nycLITIGATOR.com$^{SM}$
www.nycLITIGATOR.com$^{SM}$
Richard E. Signorelli
Bryan Ha
*Attorneys for Defendants The Lustig Family 1990 Trust, David I. Lustig, and Eileen A. Dingle,*
*sued herein as Eileen A. Lustig*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

SECURITIES INVESTOR PROTECTION
CORPORATION,

                            Plaintiff-Applicant,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                            Defendant.
-------------------------------------------------------------x
In re:
BERNARD L. MADOFF,

                            Debtor.
-------------------------------------------------------------x
IRVING H. PICARD, Trustee for the Liquidation
of Bernard L. Madoff Investment Securities LLC,

                            Plaintiff,

v.

THE LUSTIG FAMILY 1990 TRUST;
DAVID I. LUSTIG, individually and in his
capacity as Trustee for The Lustig Family 1990
Trust; and EILEEN A. LUSTIG,

                            Defendants.
-------------------------------------------------------------x

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION
(Substantively Consolidated)

Adv. Pro. No. 10-4417 (BRL)

L12

# DECLARATION OF DAVID I. LUSTIG

David I. Lustig, declares under the penalties of perjury, pursuant to Title 28,

United States Code, Section 1746, as follows:

1. I am a defendant in the above-captioned avoidance action.  I respectfully make

this declaration in support of my request that this action be discontinued against me.

2. The complaint alleges that Bernard L. Madoff Investments Securities LLC

("Madoff") made transfers constituting fictitious profits to the Lustig Family 1990 Trust

("Trust") and/or to me in the amount of least $4,241,336 and that these transfers were other

people's money. (Compl. ¶¶ 2, 38).  In this declaration, I will correct and clarify these allegations

as well provide additional information in connection with my request that this action be

discontinued against me and the other defendants

3. I have been financially devastated by the Madoff fraud. I am a significant net

loser when one looks at the totality of my Madoff investments, both direct and indirect, even

before accounting for unrecovered tax payments.  In addition, I immediately reinvested back into

another Madoff account the amount of $5,000,000 that I withdrew from the account which held

the Trust ("Subject Account") and I made additional and significant investments all of which I

lost when the fraud was discovered.

4. I would also like to emphasize that I am an innocent crime victim of the

Madoff fraudulent scheme. Until Bernard Madoff's arrest was publicly announced, I never had

any idea that he was operating a Ponzi or a fraudulent scheme of any kind.

5. I am sixty-six years old  and was born in San Jose, California. I have two adult

children.  Since my divorce in 1999 from Eileen A. Dingle who has also been sued herein under

2

the name of Eileen A. Lustig, I have been single. I am in reasonably good health other than the

usual ailments that come with getting older. I graduated from San Jose State University in 1968.

For about three years after graduating from college, I was a police officer with the San Jose

Police Department. After serving as a police officer, I was employed as a life insurance agent

with Northwestern Mutual Life Insurance Company to about 1974. After this position, I was a

vice-president of BFI Business Company ("BFI"), an accounts receivable financing and factoring

business. From 1983 to 2001, I was the president and owner of BFI until I sold the company to

the employees of the company. I retired in 2001 after the sale of this company.

6. The Subject Account held assets belonging to the Trust. The largest

withdrawal that I made from this account, and the one which according to the allegations of the

Complaint makes me a supposed net winner, was $5,000,000 on July 24, 2007. This withdrawal

is reflected in Exhibit B to the Complaint. I specifically made this withdrawal to make another

investment with Madoff. Along with the sum of $2,000,000 from my Individual Retirement

Account which is the subject of a separate avoidance action, the entire $5,000,0000 withdrawal

amount from the Subject Account was almost immediately reinvested right back into Madoff

through a third party feeder fund called Lakeview Investment, LP ("Lakeview"), which in turn

invested the entirety of this sum of money into the Madoff feeder funds of the Tremont Capital

Group and Wailea which in turn invested in Madoff through the Luxembourg/Senator Fund.

Attached to this declaration as Exhibit A are documents pertaining to this reinvestment in

Lakeview. This $5,000,000 deposit, as well as the $2,000,000 that I transferred from my IRA

and other assets, were lost when the Madoff fraud was discovered. Attached to this declaration as

Exhibit B is my 2008 Schedule K-1 form for my Lakeview Trust account which demonstrates

3

L14

this loss.

7. Eileen Dingle had no role or connection with the Trust after our 1999 divorce. She also never received any transfers from the Trust after our divorce including any of the transfers taking place in the six years prior to Madoff's arrest.

8. In conclusion, as discussed above, I and the Trust are significant net losers from the Madoff fraud when one looks at the direct and indirect Trust Madoff investments. In addition, I immediately reinvested right back into Madoff the entire $5,000,000 withdrawal that I made on July 24, 2007. All of my Madoff investments were subsequently lost when the fraud was discovered. Ms. Dingle had no connection with the Trust or any of the transfers after we divorced in 1999.

9. For the foregoing reasons, I respectfully request that this action be discontinued against me, Ms. Dingle, and the Trust.

Dated: Pescadero, California
    April 28, 2011

                      David I. Lustig

4

# EXHIBIT T

# CITY NATIONAL BANK
## The way up.®

This statement: July 31, 2007
Last statement: June 29, 2007

**Contact us:**
800 773-7100

Palo Alto Banking Center
3000 El Camino Real, Suite 100
Palo Alto CA  94306

cnb.com

441                          0830L

DAVID I LUSTIG
PO BOX 532
PESCADERO CA 94060

A CITY NATIONAL GIFT CARD MAKES A GREAT GIFT FOR WEDDINGS, BIRTHDAYS, ANNIVERSARIES, AND MORE! USE IT ANYWHERE VISA DEBIT CARDS ARE ACCEPTED. TALK TO YOUR LOCAL CITY NATIONAL BANKER, OR CALL US AT (800) 773-7100.

## Personal Checking Account

| Account Summary | | Account Activity | | |
|---|---|---|---|---|
| Account number | ████1231 | Beginning balance  (6/29/2007) | | $13,678.83 |
| Minimum balance | $-7,995.78 | | | |
| Average balance | $947,236.16 | Credits  Deposits     (0) | + 0.00 | |
| Avg. collected balance | $947,236.00 | Electronic cr  (1) | + 5,000,000.00 | |
| | | Other credits (5) | + 125,000.00 | |
| | | Total credits | | + $5,125,000.00 |
| | | | | |
| | | Debits  Checks paid  (6) | - 2,410.14 | |
| | | Electronic db  (26) | - 5,052,295.04 | |
| | | Other debits  (6) | - 55,053.00 | |
| | | Total debits | | - $5,109,758.18 |
| | | | | |
| | | Ending balance  (7/31/2007) | | $28,920.65 |

## ELECTRONIC CREDITS

| Date | Description | Credits |
|---|---|---|
| 7-24 | Incoming Wire-Dom | 5,000,000.00 |

## OTHER CREDITS

| Date | Description | Reference | Credits |
|---|---|---|---|
| 7-3 | Transfer From Loan LOAN ADVANCE ███469-1 | | 50,000.00 |
| 7-10 | Transfer From Loan LOAN ADVANCE ███469-1 | | 10,000.00 |
| 7-16 | Transfer From Loan LOAN ADVANCE ███469-1 | | 10,000.00 |
| 7-20 | Transfer From Loan LOAN ADVANCE ███469-1 | | 25,000.00 |

L4671

# CITY NATIONAL BANK
## The way up.®

DAVID I LUSTIG
July 31, 2007

Page 2
Account #: ▓▓▓▓1231

## ELECTRONIC DEBITS

| Date | Description | Debits |
|------|-------------|--------|
| 7-2 | Automatic Ln Paymt AUTOMATIC LOAN PAY | 9,960.94 |
| 7-2 | Automatic Ln Paymt AUTOMATIC LOAN PAY | 11,713.67 |
| 7-5 | Preauthorized Debit JOHN NEALE BILL PAYMT 070703 N/A | 1,546.97 |
| 7-6 | Preauthorized Debit GREENPOINT MORTG BILL PAYMT 070705 | 6,253.85 |
| 7-11 | Preauthorized Debit WASHINGTON MUTUA BILL PAYMT 070710 | 5,118.75 |
| 7-12 | Preauthorized Debit PRIMUS TELECOMMU BILL PAYMT 070711 81752448 | 5.14 |
| 7-12 | Preauthorized Debit PACIFIC GAS & EL BILL PAYMT 070711 | 95.33 |
| 7-12 | Preauthorized Debit DISH NETWORK - M BILL PAYMT 070711 | 97.09 |
| 7-12 | Preauthorized Debit AT&T / SBC BILL PAYMT 070711 | 107.24 |
| 7-12 | Preauthorized Debit VERIZON WIRELESS BILL PAYMT 070711 | 176.18 |
| 7-12 | Preauthorized Debit SAN JOSE WATER C BILL PAYMT 070711 3321890 | 208.16 |
| 7-12 | Preauthorized Debit SIMMS PLUMBING BILL PAYMT 070711 DAVID LUSTI | 227.82 |
| 7-12 | Preauthorized Debit AMERIGAS INC BILL PAYMT 070711 | 811.38 |
| 7-12 | Preauthorized Debit CHASE MASTERCARD BILL PAYMT 070711 | 7,000.00 |
| 7-18 | Preauthorized Debit WEST VALLEY BILL PAYMT 070717 22761 | 47.64 |
| 7-18 | Preauthorized Debit VERIZON BILL PAYMT 070717 | 70.80 |
| 7-18 | Preauthorized Debit BORGES SECURITY BILL PAYMT 070717 N/A | 75.00 |
| 7-18 | Preauthorized Debit COMCAST - SAN RA BILL PAYMT 070717 | 98.13 |
| 7-18 | Preauthorized Debit PACIFIC GAS & EL BILL PAYMT 070717 | 299.55 |
| 7-27 | Preauthorized Debit HOUSEHOLD RETAIL BILL PAYMT 070726 | 381.40 |
| 7-30 | Domestic Wire | 5,000,000.00 |
| 7-30 | Preauthorized Debit TERESA SCHNEIDER BILL PAYMT 070728 NOACCTGIVEN | 400.00 |
| 7-30 | Preauthorized Debit PHOEBE OSBORNE BILL PAYMT 070728 LUSTIG | 1,000.00 |
| 7-30 | Preauthorized Debit KAYLIN LUSTIG BILL PAYMT 070728 N/A | 1,000.00 |
| 7-30 | Preauthorized Debit SUSANAH PARRISH BILL PAYMT 070728 N/A | 1,100.00 |
| 7-30 | Preauthorized Debit EGEE SIEGEL BILL PAYMT 070728 NOACCTGIVEN | 4,500.00 |

## OTHER DEBITS

| Date | Description | Reference | Debits |
|------|-------------|-----------|--------|
| 7-3 | Transfer Debit TRANSFER TO DEPOSIT ACCOUNT ▓▓▓▓3188 | | 25,000.00 |
| 7-16 | Transfer Debit TRANSFER TO DEPOSIT ACCOUNT ▓▓▓▓3188 | | 5,000.00 |
| 7-20 | Transfer Debit TRANSFER TO DEPOSIT ACCOUNT ▓▓▓▓3188 | | 25,000.00 |
| 7-24 | Service Charge INCOMING WIRE-DOM | | 12.00 |
| 7-24 | Wires-Phone Notify REF #070724-001053 | | 6.00 |
| 7-30 | Service Charge DOMESTIC WIRE | | 35.00 |

## DAILY BALANCES

| Date | Amount | Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|------|--------|
| 6-29 | 13,678.83 | 7-6 | 8,053.40 | 7-16 | 8,611.31 | 7-27 | 5,006,955.65 |
| 7-2 | -7,995.78 | 7-10 | 18,053.40 | 7-18 | 7,670.19 | 7-30 | 28,920.65 |
| 7-3 | 17,004.22 | 7-11 | 12,934.65 | 7-20 | 7,355.05 | | |

L4670

# EXHIBIT U

# LAKEVIEW INVESTMENT, LP

## SUBSCRIPTION AGREEMENT

1.    <u>SUBSCRIPTION</u>.  The undersigned (the "Subscriber") hereby irrevocably subscribes for a limited partner interest ("Interests") in Lakeview Investment, LP a Delaware limited partnership (the "Partnership"), in the amount indicated on the signature page of this Subscription Agreement.  In payment for the Interests, the Subscriber is concurrently sending a check in that amount payable in immediately available funds or is wire transferring that amount to the custodian for the Partnership in accordance with the Subscription Instructions furnished by the Partnership to the Subscriber.  Such subscription, when and if accepted by the general partner of the Partnership, Vista Management, Co, a California corporation (the "General Partner"), will constitute the initial Capital Contribution by the Subscriber to the Partnership, in accordance with the First Amended and Restated Agreement of Limited Partnership of the Partnership (the "Agreement"), in the form furnished by the General Partner to the Subscriber as Exhibit A of the Confidential Offering Circular dated July 24, 2007 (including the Appendices and Exhibits thereto, the "Offering Circular"), relating to the Partnership and its business.  Capitalized terms used and not otherwise defined in this Subscription Agreement have the meanings respectively ascribed to them in the Offering Circular.

2.    <u>REPRESENTATIONS, WARRANTIES AND AGREEMENTS BY SUBSCRIBER</u>. The Subscriber hereby represents, warrants and agrees as follows:

(a)    The Interests are being purchased by the Subscriber and not by any other person, with the Subscriber's own funds and not with the funds of any other person, and for the account of the Subscriber, not as a nominee or agent and not for the account of any other person.  On acceptance of this Subscription Agreement by the General Partner, no person other than the Subscriber will have any interest, beneficial or otherwise, in the Interests.  The Subscriber is not obligated to transfer Interests or any part thereof or interest therein to any other person nor does the Subscriber have any agreement or understanding to do so.  The Subscriber is purchasing the Interests for investment for an indefinite period, not with a view to the sale or distribution of any part or all thereof by public or private sale or other disposition.  The Subscriber has no intention of selling, granting any participation in or otherwise distributing or disposing of any Interests.  The Subscriber does not intend to subdivide the Subscriber's purchase of Interests with any person.

(b)    The Subscriber understands that the Interests have not been registered or qualified under the 1933 Act or any other securities law or regulation, on the ground, among others, that no distribution or public offering of the Interests is to be effected and the Interests will be issued by the Partnership in connection with a transaction that does not involve any public offering within the meaning of section 4(2) of the 1933 Act or applicable provisions of other securities laws and regulations, under the respective rules and regulations of the SEC and the administrators of such other laws and regulations thereunder.  The Subscriber understands that the Partnership is relying in part on the Subscriber's representations herein for purposes of claiming such exemptions and that the basis for such exemptions may not be present if, notwithstanding the Subscriber's representations, the Subscriber has in mind merely acquiring Interests for resale on the occurrence or non-occurrence of some predetermined event.  The Subscriber has no such intention.

(c)    The Subscriber, either alone or with the Subscriber's professional advisers who are unaffiliated with, have no equity interest in and are not compensated by the Partnership or any Affiliate or selling agent of the Partnership, directly or indirectly, has such knowledge and experience in financial and business matters that the Subscriber is capable of evaluating the merits and risks of an

investment in the various series of Interests and has the capacity to protect the Subscriber's own interests in connection with the Subscriber's proposed investment in Interests.

(d)　　The Subscriber either has furnished to the General Partner a completed and signed Offering Questionnaire or has completed and signed the Offering Questionnaire attached hereto as Appendix I. The information in the Subscriber's most recently completed and signed Offering Questionnaire previously delivered or being delivered to the General Partner, which is incorporated herein by reference, is true, correct and complete in all respects as of the date hereof.

(e)　　The Subscriber acknowledges that under U.S., international and other anti-money laundering laws, rules, regulations, treaties or other restrictions, the General Partner or the Partnership may require further identification of the Subscriber before they will process a subscription or withdrawal and that the Subscriber's subscription or withdrawal may be delayed if the Subscriber does not provide such required information on a timely basis. The Subscriber agrees to provide to the General Partner any additional information regarding the Subscriber that the General Partner or the Partnership deems necessary or convenient to ensure compliance with all applicable laws concerning money laundering and similar illicit activities.

(f)　　The Subscriber understands that the Partnership is prohibited from accepting a subscription for Interests by any person or entity that is acting, directly or indirectly, in violation of any anti-money laundering laws, rules, regulations, treaties or other restrictions, or on behalf of any suspected terrorist or terrorist organization, including any person, entity or organization that is included on any so-called "watch list" maintained by any governmental agency of the U.S. (including, but not limited to, the U.S. Central Intelligence Agency, the U.S. Department of the Treasury, the U.S. Federal Bureau of Investigation, the IRS, the U.S. Office of Foreign Assets Control and the SEC) (each such person or entity being called herein a "Prohibited Investor"):

(1) Neither the Subscriber nor any agent, representative, nominee or intermediary for any other person, entity or other beneficial owner for whom the Subscriber is acting (each such person, entity or owner being called herein an "Underlying Beneficial Owner"), is a Prohibited Investor or a senior foreign political figure,[1] an immediate family member[2] of a senior foreign political figure or a close associate[3] of a senior foreign political figure.

(2) If the Subscriber is a corporation, partnership, limited liability company, trust, association or other entity, the Subscriber (A) has established the identity of each director, officer and beneficial owner of the Subscriber (including, but not limited to, each shareholder, member, partner, trustee and beneficiary), (B) will maintain all evidence identifying such persons for at least five years after the date the Subscriber terminates its entire interest in the Partnership, (C) has made such information available to the General Partner in the Offering Questionnaire or will provide such information to the General Partner immediately on the General Partner's request and (D) has no intention or obligation to distribute, assign, transfer or sell all or any portion of the Interests to any Underlying Beneficial Owner.

---

[1] A "senior foreign political figure" is a senior official in the executive, legislative, administrative, military or judicial branch of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. A "senior foreign political figure" also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[2] The "immediate family of a senior foreign political figure" typically includes the figure's parents, siblings, spouse, children and in-laws.

[3] A "close associate of a senior foreign political figure" is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

(3) If the Subscriber is an investment entity (such as an investment pool organized as a limited partnership, limited liability company, corporation or other entity), (A) the Subscriber has established and applies anti-money laundering practices and procedures that comply with all applicable laws, rules and regulations and are designed to detect and report any activity that raises suspicion of money laundering activities and (B) none of the Subscriber's directors, officers, managers, members, partners, shareholders or other beneficial owners is a Prohibited Investor, a senior foreign political figure, an immediate family member of a senior foreign political figure or a close associate of a senior foreign political figure.

(4) The assets used to subscribe for the Interests hereby were not derived, directly or indirectly, from any illegal activity or source.

(g)    The Subscriber agrees to notify the General Partner immediately if any of the representations, warranties or agreements in section 2(e) or (f) becomes false, inaccurate or incomplete in any respect at any time that the Subscriber holds any Interests. The Subscriber understands and agrees that if the General Partner believes that any of the representations, warranties or agreements in section 2(e) or (f) or any other information that the Subscriber has supplied to the General Partner or the Partnership is or becomes false, inaccurate or incomplete in any respect, the General Partner or the Partnership may be required to expel the Subscriber from the Partnership, freeze the assets of the Subscriber, suspend the Subscriber's withdrawal rights, request additional information, deliver the Subscriber's assets invested in the Partnership to a governmental agency, report any such action and the Subscriber's identity to a governmental agency or take any combination of the foregoing actions or any other action as required by applicable law. The Subscriber hereby (1) waives and releases any known or unknown claim that the Subscriber might now or at any future time have against the Partnership, the General Partner or any of their respective Affiliates, controlling persons, shareholders, members, managers, partners, directors, officers, employees and agents in connection with such action by the General Partner or the Partnership and (2) agrees that, in connection with such action by the General Partner or the Partnership, the General Partner may segregate and manage any portion or all of the Subscriber's investment in the Partnership separate and apart from the Partnership's assets, in the General Partner's absolute discretion, including without limitation, by selling or otherwise disposing of such assets of the Subscriber and reinvesting the proceeds therefrom. The rights and obligations of the General Partner under this section 2(g) shall supersede any duties that the General Partner may have to the Subscriber under the Agreement or otherwise.

(h)    Unless otherwise approved by the General Partner, distributions of the Partnership's assets to the Subscriber (whether as a result of a distribution to all Limited Partners or in connection with a withdrawal by the Subscriber) shall be made (1) only to the Subscriber (as reflected on the Partnership's books and records) and (2) only through accounts held at a U.S. bank or non-U.S. bank organized within a jurisdiction, territory or region approved by the FATF.

(i)    The Subscriber acknowledges receipt of the Offering Circular and acknowledges that the Subscriber has been furnished with such financial and other information concerning the Partnership, the General Partner and the business and proposed business of the Partnership (including information about the various Series of Interests) as the Subscriber considers necessary in connection with the Subscriber's investment in Interests and the Subscriber's selection of the particular Series of Interests for which the Subscriber is subscribing. The Subscriber has carefully reviewed the Offering Circular and is thoroughly familiar with the existing and proposed business, operations, management, properties and financial condition of the Partnership, including the respective investment strategies of the various Series of Interests, and has discussed with representatives of the General Partner any questions the Subscriber may have had with respect thereto. The Subscriber understands:

3

(1)    The risks involved in this offering, including the speculative nature of the investment;

(2)    The financial hazards involved in this offering, including the risk of losing the Subscriber's entire investment;

(3)    That the Partnership may establish a credit facility secured by the Partnership assets;

(4)    The lack of liquidity and restrictions on transfers of Interests; and

(5)    The tax consequences of this investment.

The Subscriber has consulted with the Subscriber's own legal, accounting, tax, investment and other advisers with respect to the tax treatment of an investment by the Subscriber in Interests and the merits and risks of an investment in Interests, and, more particularly, an investment in the particular Series selected by the Subscriber.

(j)    The Subscriber understands that the investment in Interests is highly speculative, and is able to bear the economic risk of such investment. The Subscriber is an "accredited investor" as defined in the Offering Questionnaire attached hereto as Appendix I. If the Subscriber has indicated category (13) in Part E of such Offering Questionnaire, all direct and indirect equity owners of the Subscriber are also accredited investors.

(k)    The Subscriber has a net worth in excess of $1,500,000. Each direct or indirect ultimate equity owner of the Subscriber has a net worth in excess of $1,500,000, if the Subscriber is (1) a private investment company (a company that would be defined as an investment company under the ICA, but for the exception from that definition provided by ICA section 3(c)(1)), (2) an investment company registered under the ICA or (3) a business development company as defined in Advisers Act section 202(a)(22).

(l)    If the Subscriber is an individual, the Subscriber is a citizen of the U.S., or a resident alien taxable as a citizen of the U.S., over twenty-one years of age (or the age of majority in the Subscriber's state of residence) and if the Subscriber is an unincorporated association, all of its members are such citizens or resident aliens of such age. The requirements of the preceding sentence will be deemed met if the Subscriber is such a citizen or resident alien of such age who is acting as a custodian, trustee or legally appointed personal representative for the beneficial investor (who may be under such age). The Subscriber agrees to notify the Partnership within sixty days of becoming a nonresident alien.

(m)    If the Subscriber is a corporation, limited liability company, partnership, trust or other entity:

(1) Unless otherwise indicated on the Subscriber's Offering Questionnaire, the Subscriber is not a foreign corporation, foreign limited liability company, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and the Regulations). The Subscriber agrees to notify the Partnership within sixty days of the date that the Subscriber becomes any such foreign person.

(2) The Subscriber was not formed for the purpose of investing in Interests. Less than forty percent of the Subscriber's total assets will be invested in the Partnership. The Subscriber has or will have other substantial business or investments.

4

(3) If the Subscriber is an "investment company", as that term is defined in the ICA, or it relies on the exclusion from the definition of "investment company" provided by ICA section 3(c)(1) or 3(c)(7), the Subscriber understands and agrees that the Subscriber's subscription hereby may be reduced by the General Partner to an amount that is less than ten percent of the total amount of Interests held by all Limited Partners.

(4) Other than as may be required with respect to the allocation of profits and losses from New Issues, the governing documents of the Subscriber require that each beneficial owner of the Subscriber, including, but not limited to, shareholders, members, partners and beneficiaries, participate through such beneficial owner's interest in the Subscriber in all of the Subscriber's investments and that the profits and losses from each such investment are shared among such beneficial owners in the same proportions as all other investments of the Subscriber. No such beneficial owner may vary such beneficial owner's share of profits and losses or the amount of such beneficial owner's contribution for any particular investment made by the Subscriber.

The Subscriber understands that the Subscriber's certification in section 2(l) or (m)(1) above regarding non-foreign status may be disclosed to the IRS by the Partnership, and any false statement may be punishable by fine, imprisonment or both.

(n)     If the Subscriber is a corporation, limited liability company, partnership, trust or other entity and is not an Employee Benefit Plan, less than twenty-five percent of the value of each class of equity interests in the Subscriber (excluding from the computation non-Employee Benefit Plan interests of any individual or entity with discretionary authority or control over the assets of the Subscriber) is held by benefit plan investors, as defined in the Department of Labor's "plan asset" regulations at 29 C.F.R. §2510.3-101 ("Benefit Plan Investors"). If the Subscriber is as described in the preceding sentence and at any time twenty-five percent or more of the value of any class of equity interests in the Subscriber (computed as described in the preceding sentence) is or becomes held by Benefit Plan Investors (in which event, the Subscriber shall be or become a "25% Subscriber"), the Subscriber shall immediately disclose such fact to the Partnership. If the Subscriber is or becomes a 25% Subscriber or an Employee Benefit Plan, the person signing this Subscription Agreement on behalf of the Subscriber hereby represents and warrants as follows:

(1) If the Subscriber is an Employee Benefit Plan that is subject to Title I of ERISA, such person is either a named fiduciary of the Employee Benefit Plan (as defined in ERISA section 402(a)(2)) or an investment manager of the Employee Benefit Plan (as defined in ERISA section 3(38)) with full authority under the terms of the Employee Benefit Plan and full authority from all Employee Benefit Plan beneficiaries, if required, to cause the Employee Benefit Plan to invest in the Partnership. Such investment has been duly approved by all other named fiduciaries whose approval is required, if any, and is not prohibited or restricted by any provision of the Employee Benefit Plan or of any related instrument.

(2) If the Subscriber is an Employee Benefit Plan that is subject to Title I of ERISA or a 25% Subscriber whose assets include assets of an Employee Benefit Plan under the "plan asset" regulations, such person has determined independently that the investment by the Employee Benefit Plan or 25% Subscriber in the Partnership satisfies all requirements of ERISA section 404(a)(1), specifically including the "prudent man" standards of ERISA section 404(a)(1)(B) and the "diversification" standard of section 404(a)(1)(C), and will not be prohibited under any provision of ERISA section 406 or Code section 4975(c)(1). Such person has requested and received all information from

5

the General Partner that such person, after due inquiry, considered relevant to such determinations. In determining that the requirements of ERISA section 404(a)(1) are satisfied, such person has taken into account the risk of loss of part or all of the Employee Benefit Plan's or 25% Subscriber's investment and that an investment in the Partnership will be relatively illiquid, and funds so invested will not be readily available for the payment of employee benefits. Taking into account these factors and all other factors relating to the Partnership, the undersigned has concluded that investment in the Partnership constitutes an appropriate part of the Employee Benefit Plan's or 25% Subscriber's overall investment program.

(3) Such person will notify the General Partner, in writing, of any alteration in the identity of any named fiduciary or investment manager, including such person, who has the authority to approve investments in the Partnership.

(4) Neither the General Partner nor any Affiliate of the General Partner has rendered any investment advice (within the meaning of section 3(21) of ERISA and the regulations thereunder) to the Subscriber (or, if the Subscriber is a 25% Subscriber, to any Employee Benefit Plan investing in the 25% Subscriber) with respect to the assets that will be invested in the Partnership on a regular basis pursuant to a mutual understanding, arrangement or agreement, written or otherwise, between the Subscriber (or, if the Subscriber is a 25% Subscriber, between any Employee Benefit Plan investing in the 25% Subscriber) and any of such parties who will act in regard to the Partnership, and none of such parties renders any investment advice to the Subscriber or to any such Employee Benefit Plan that furnishes a primary basis for investment decisions with respect to assets of the Subscriber or of any such Employee Benefit Plan.

If the General Partner or any Affiliate, director, officer, member, manager, partner, employee or agent of the General Partner is ever held to be a fiduciary, it is agreed that, in accordance with ERISA sections 405(c)(1), 405(c)(2) and 405(d), the fiduciary responsibilities of that person shall be limited to such person's duties in administering the business of the Partnership, and such person shall not be responsible for any other duties with respect to any Employee Benefit Plan or any Employee Benefit Plan investing in the 25% Subscriber (specifically including evaluating the initial or continued appropriateness of any such Employee Benefit Plan's investment in the Partnership under ERISA section 404(a)(1)). The General Partner may, but shall not be required to, elect to report the Partnership's underlying assets directly to the DOL pursuant to 29 C.F.R. 2520.103-12.

(o)     This Subscription Agreement constitutes a legal, valid and binding agreement of the Subscriber enforceable against the Subscriber in accordance with its terms. The Subscriber, if not an individual, is empowered and duly authorized to enter into this Subscription Agreement (including the power of attorney herein) under any governing document, operating agreement, partnership agreement, trust instrument, pension plan, charter, articles or certificate of incorporation or organization, bylaw provision or the like. The person, if any, signing this Subscription Agreement on behalf of the Subscriber is empowered and duly authorized to do so by the governing document, trust instrument, operating agreement, partnership agreement, pension plan, charter, articles or certificate of incorporation or organization, bylaw provision, board of directors or stockholder resolution, or the like.

(p)     The Partnership communicated the offer to sell Interests directly to the Subscriber in a manner such that the Subscriber was able to ask questions of and receive answers from the General Partner concerning the terms and conditions of this transaction. At no time was the Subscriber presented with or solicited by any leaflet, public promotional meeting, newspaper, magazine or similar medium (including, without limitation, any internet site that does not comply with procedures required to

6

prevent a public solicitation of Interests), or any radio or television article or advertisement, or any other form of advertising or general solicitation. The Subscriber has not reproduced, duplicated or delivered to any other person the Offering Circular or any part thereof or excerpt therefrom, including, without limitation, this Subscription Agreement, except to the Subscriber's own advisers, and shall not do so without the General Partner's prior consent.

(q)     The Subscriber understands that insofar as indemnification for liabilities arising under the 1933 Act may be permitted to directors, officers or persons controlling the Partnership pursuant to the Agreement or this Subscription Agreement, the Partnership has been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the 1933 Act and is therefore unenforceable.

(r)     The Subscriber understands and agrees that the General Partner and the Partnership may release and disclose to proper governmental authorities confidential information about the Subscriber and, if applicable, its directors, officers and beneficial owners, if the General Partner is required to do so by applicable law, rule, regulation, subpoena or court order or if the General Partner believes it is in the best interest of the Partnership in light of the applicable laws, rules and regulations regarding Prohibited Investors.

(s)     Except as modified by any schedule of exceptions provided at the time the offer is made, any offer to purchase additional Interests that the Subscriber may make after becoming a Limited Partner shall be deemed to have been made subject to all of the terms and conditions of this Subscription Agreement, and the Subscriber shall be deemed at the time each additional subscription is accepted to have reaffirmed all of the representations, warranties and agreements contained herein for the benefit of the Partnership and the General Partner, and each of their respective affiliates and direct and indirect members, partners, directors, officers, managers, employees, controlling persons and agents.

3.     **AGREEMENT TO REFRAIN FROM RESALES.**  The Subscriber agrees that the Subscriber shall in no event pledge, hypothecate, sell, transfer, assign or otherwise dispose of any Interests, nor shall the Subscriber receive any consideration for Interests from any person, unless and until prior to any proposed pledge, hypothecation, sale, transfer, assignment or other disposition, the Subscriber shall have complied with all requirements and conditions in the Agreement.

4.     **CERTIFICATES TO BE LEGENDED.**  The Subscriber understands and agrees that any instrument or certificate representing or relating to Interests may bear such legends as the Partnership may consider necessary or advisable to facilitate compliance with the 1933 Act and any other applicable securities law or regulation, including, without limitation, legends stating that the Interests have not been registered or qualified under the 1933 Act or any other securities law and setting forth the limitations on dispositions imposed hereby and by the Agreement.

5.     **UNITS WILL BE RESTRICTED SECURITIES.**  The Subscriber understands that the Interests will be "restricted securities" as that term is defined in Rule 144 under the 1933 Act and, accordingly, that the Subscriber must hold the Interests indefinitely unless they are subsequently registered or qualified under the 1933 Act and any other applicable securities law or exemptions from such registration and qualification are available. The Subscriber understands that the Partnership is under no obligation so to register or qualify Interests under the 1933 Act or any other securities law, or to comply with the Regulation A or any other exemption under the 1933 Act or any other law.  The Subscriber understands that Rule 144 is not available for any sale of Interests and will not be available for at least several years.

6.     **PARTNERSHIP MAY REFUSE TO TRANSFER.**  If, in the opinion of counsel for the General Partner or an officer of the General Partner, the Subscriber has acted or at any time hereafter shall

7

have acted in a manner inconsistent with the representations and warranties in this Subscription Agreement, the General Partner may refuse to transfer the Interests until such time as such counsel is of the opinion that such transfer will not require registration or qualification of Interests under the 1933 Act or any other securities law or registration of the Partnership under the ICA. The Subscriber understands and agrees that the Partnership may refuse to acknowledge or permit any disposition of Interests that does not comply in all respects with the Agreement and this Subscription Agreement and that the Partnership intends to make an appropriate notation in its records to that effect.

7.     <u>INDEMNIFICATION</u>. The Subscriber agrees to indemnify and defend the Partnership, the General Partner, each person, if any, who controls the General Partner within the meaning of the 1933 Act or the 1934 Act, and each of their respective Affiliates, controlling persons, shareholders, members, managers, partners, directors, officers, employees and agents and hold them harmless from and against any and all claims, liabilities, losses, damages, settlements and expenses (including, without limitation, attorneys' fees and expenses, expert witnesses' fees and expenses and court costs) as and when suffered or incurred on account of or arising out of:

    (a)     Any breach of or inaccuracy in the Subscriber's representations, warranties or agreements herein, including, without limitation, the defense of any claim based on any allegation of fact inconsistent with any of such representations, warranties or agreements;

    (b)     Any disposition of Interests contrary to any of such representations, warranties or agreements;

    (c)     Any action, suit or proceeding based on (1) a claim that any of such representations, warranties or agreements were inaccurate or misleading or otherwise cause for obtaining damages or redress under the 1933 Act or any other securities law, or (2) any disposition of any Interests or any part thereof or interest therein; or

    (d)     Any delay in the Subscriber's subscription, any freezing of the assets of the Subscriber, any suspension or delay of the Subscriber's withdrawal rights, any delivery of the Subscriber's assets invested in the Partnership to a governmental agency, or any other action, delay or disclosure, pursuant to section 2(e), (f), (g) or (r).

8.     <u>POWER OF ATTORNEY</u>. The Subscriber hereby irrevocably constitutes and appoints the General Partner, with full power of substitution and resubstitution, the Subscriber's true and lawful attorney, for the Subscriber and in the Subscriber's name, place and stead and for the Subscriber's use and benefit to sign, execute, deliver, certify, acknowledge, swear to, file, record and publish:

    (a)     The Agreement and the Partnership's certificate of limited partnership, and any amendments to either of such documents in accordance with the Agreement;

    (b)     Any other certificates, instruments, agreements and documents necessary to qualify or continue the Partnership as a limited partnership or a partnership wherein limited partners have limited liability in the states or other jurisdictions where the said attorney-in-fact deems necessary or advisable;

    (c)     All conveyances, assignments, documents of transfer or other instruments and documents necessary to effect the assignment of Interests or the dissolution and termination of the Partnership in accordance with the Agreement;

(d)     All filings and submissions pursuant to any applicable law, regulation, rule, order, decree or judgment which, in the opinion of said attorney-in-fact, may be necessary or advisable in connection with the business of the Partnership, and

(e)     Any amendment to the Limited Partnership Agreement necessary to qualify or continue the Partnership's qualification as exempt from registration as an investment company under the Investment Company Act of 1940, or to qualify or continue the General Partner's exemption from registering under the Investment Advisors Act of 1940.

The power of attorney granted herein is coupled with an interest, shall be irrevocable, shall survive the death, disability or incapacity of the Subscriber, shall be deemed given by each and every assignee and successor of the Subscriber and may be exercised by said attorney-in-fact by listing, or attaching a list of, the names of the Subscriber and other persons for whom the said attorney-in-fact is acting and signing the Agreement and such other certificates, instruments and documents with the single signature of an authorized signatory on behalf of the said attorney-in-fact acting as such for all of the persons whose names are so listed.

9.     ARBITRATION.  **The parties waive their rights to seek remedies in court, including any right to a jury trial.**  The parties agree that any dispute between or among any of the parties or any of their Affiliates arising out of, relating to or in connection with this Subscription Agreement or the Partnership or its formation, organization, capitalization, business or management, shall be resolved exclusively through binding arbitration conducted under the auspices of JAMS pursuant to its Arbitration Rules and Procedures.  The arbitration hearing shall be held in the county and state of the principal office of the Partnership at the time that the dispute arises.  Disputes shall not be resolved in any other forum or venue.  The arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business.  The parties agree that the arbitrator shall apply the substantive law of the State of Delaware to all state claims, that limited discovery shall be conducted in accordance with JAMS' Arbitration Rules and Procedures, and that the arbitrator may not award punitive or exemplary damages, unless (but only to the extent that) such damages are required by law to be an available remedy for any of the specific claims asserted. In accordance with JAMS' Arbitration Rules and Procedures, the arbitrator's award shall consist of a written statement as to the disposition of each claim and the relief, if any, awarded on each claim.  The award shall not include or be accompanied by any findings of fact, conclusions of law or other written explanation of the reasons for the award.  The parties understand that the right to appeal or to seek modification of any ruling or award by the arbitrator is severely limited under state and federal law.  Any award rendered by the arbitrator shall be final and binding, and judgment may be entered thereon in any court of competent jurisdiction in the county and state of the principal office of the Partnership at the time the award is rendered or as otherwise provided by law.

10.     SUCCESSORS.  The representations, warranties and agreements in this Subscription Agreement shall be binding on the Subscriber's successors, assigns, heirs and legal representatives and shall inure to the benefit of the respective successors and assigns of the Partnership and the General Partner, any other person that shall hereafter be admitted to the Partnership as a general partner thereof in accordance with the Agreement, and their respective Affiliates.

11.     GOVERNING LAW.  This Subscription Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware.

12.     NUMBER AND GENDER.  The use of the singular number shall be deemed to include the plural and vice versa, and each gender shall be deemed to include each other gender, as the context may require, and "person" shall be deemed to include natural person, corporation, limited liability company, partnership, trust or other legal entity.

9

13.   ENTIRE AGREEMENT. This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.  The representations, warranties, covenants and agreements in this Subscription Agreement shall survive the execution and delivery of this Subscription Agreement and the Agreement and shall continue in full force and effect notwithstanding anything to the contrary in the Agreement, except only to the extent otherwise provided in a written amendment of this Subscription Agreement, specifically referring hereto, that is signed by or on behalf of the General Partner and the Subscriber.

14.   SEVERABILITY.  If any provision of this Subscription Agreement or the application thereof to any person or in any circumstances shall be held to be invalid, unlawful, or unenforceable to any extent, the remainder of this Subscription Agreement, and the application of such provision other than to the persons or in the circumstances deemed invalid, unenforceable or unlawful, shall not be affected thereby, and each remaining provision hereof shall continue to be valid and may be enforced to the fullest extent permitted by law.

**LAKEVIEW INVESTMENT, LP**

**SUBSCRIPTION AGREEMENT SIGNATURE PAGE**

Amount of Check or Simultaneous Wire Transfer:    $ 5,000,000

**Series of Interests subscribed for:** _____

**(if more than one, specify the portion the total subscription amount above that is to be allocated to each Series)**

### TYPE OF OWNERSHIP (Check One)

___ INDIVIDUAL OWNERSHIP
(One signature required)

___ JOINT TENANTS WITH RIGHT
OF SURVIVORSHIP
(Both parties must sign)

___ CORPORATION
(Turn to page 12)

✓ TRUST (Including employee benefit plan
and individual retirement account trusts)
(Turn to page 13)

___ COMMUNITY PROPERTY
(One signature required)

___ TENANTS-IN-COMMON
(Both parties must sign)

___ PARTNERSHIP OR LIMITED
LIABILITY COMPANY
(Turn to page 12)

___ CUSTODIAN FOR MINOR
(Turn to page 13)

___ OTHER
(Please specify and include appropriate
documentation)

### INDIVIDUAL(S):

The General Partner may require that you furnish a certified or notarized copy of your drivers license or passport.

Dated: July 27, 2007

Investor #1:

_____
Signature

David I Lustig
Print or Type Name

Address: PO Box 532
Pescadero CA 94060
▬▬▬▬▬▬ - 7421
Social Security Number

Investor #2 (if any):

_____
Signature

_____
Print or Type Name

Address: _____

_____

_____
Social Security Number

11

**LAKEVIEW INVESTMENT, LP**

**SUBSCRIPTION AGREEMENT SIGNATURE PAGE**
(continued)

**TRUST:**

The General Partner may require that you furnish a certified copy of the trust agreement or other instrument and any other documentation necessary to establish the authority of the person signing this Subscription Agreement.

Dated: _July 27_, 20_07_      _Lustig Family 1990 Trust_
                                        Name of Trust

Address: _PO Box 532_      _California , 1990_
_Pescadero CA 94060_      State and Date of Formation

_____      By _____      *
                                        Signature of Trustee or Other Authorized
                                        Person
                                        _DAVID I Lustig, Trustee_
                                        Print Name and Title of Signatory
                                        _██████████ - 7421_
                                        Tax Identification Number

*       All documents must be signed by or on behalf of the trustee or, in the case of an individual
        retirement account, the custodian, not by or on behalf of a participant or beneficiary.

**CUSTODIAN FOR MINOR:**

Dated: _____, 20____      _____
                                                          Print Name of Custodian

Address:_____      _____, as
                                                          Signature of Custodian

_____      Custodian for

_____      _____
                                        Print Name of Minor

                                        under the _____ Uniform Transfers to
                                                          (State)
                                        Minors Act.

                                        _____
                                        Social Security Number of Minor

13

**ACKNOWLEDGMENT**

| | |
|---|---|
| STATE OF _CALIFORNIA_ )<br><br>COUNTY OF _SANTA CLARA_ )<br><br>On _July 27, 2007_, before me,<br>_WAFFA MANSOUR_, Notary Public,<br>personally appeared _DAVID I. LUSTIG_<br><br>☐ personally known to me – **OR** – ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument<br><br>WITNESS my hand and official seal.<br><br>_Waffa Mansour_<br>_____<br>(SIGNATURE OF NOTARY) | **CAPACITY CLAIMED BY SIGNER**<br><br>☐ INDIVIDUAL<br>☐ CORPORATE OFFICER(S)<br>_____<br><br>TITLE(S)<br><br>☐ PARTNER(S)        ☐ LIMITED<br>                              ☐ GENERAL<br><br>☐ ATTORNEY-IN-FACT<br>☒ TRUSTEE(S)<br>☐ GUARDIAN/CONSERVATOR<br>☐ OTHER: _____<br><br>**SIGNER IS REPRESENTING:**<br>(Name of Person(s) or Entity(ies))<br>_____<br>_____<br><br>WAFFA MANSOUR<br>COMM #1705451<br>Notary Public-California<br>SANTA CLARA COUNTY<br>My Comm. Exp. Dec. 14, 2010 |

14

EXHIBIT V

L4312



# Rye Select Broad Market XL Fund, LP

July 1, 2007



# Rye Investment Management

※ A division of Tremont Group Holdings, Inc.

※ Origins within the firm dating back to 1994

※ Provides exclusive access to select hedge fund managers

※ Dedicated product, marketing, sales and investor services

※ Shared legal, compliance, administration and technology resources

※ Develops, manages and promotes the Rye Select Funds

Confidential. The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to acquire, or any recommendation revealing process in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3

L4313



# Rye Select Funds

- Select group of the industry's most experienced and proven investment talent

- Generally unavailable hedge fund managers

- Offered to 3(C)(7) eligible Qualified Purchasers

- 3 investment strategies

- 12 funds (onshore and offshore)

- Over 400 investors

- Over $3 billion in assets

Confidential. The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to acquire, of any recommendation including interests in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3.

L4314

# Product Offerings

## RYE
### Investment Management
A Division of Tremont Group Holdings, Inc.

**Broad Market**

(Equity Market Neutral)

- 13 years of consistent positive returns
- A hedged option trading strategy
- Defined risk and return parameters

Rye Select Broad Market Fund, L.P. *

Rye Select Broad Market Prime Fund, L.P.

Rye Select Broad Market XL Fund, LP *

**Equities**

(Long/Short Equity)

- Renaissance Institutional Equities Fund
- Strict adherence to mathematical and statistical methods
- Model designed to manage $100 billion of publicly-traded U.S. equities

Rye Select Equities Fund *

**Activist**

(Event Driven)

- Trian Partners, L.P.
- Over 20 year record of value creation
- "Operational Activism" with under-managed, under-valued and mis-capitalized public companies

Rye Select Activist Fund *

* Offshore funds available

Confidential. The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to acquire, or any recommendation involving interests in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3.

L4315



# Rye Select Broad Market XL Fund, L.P.

**Investment Objective**

* a return linked to a 3 times levered exposure to the Rye Select Broad Market Fund, L.P. (the "Reference Fund"), a fund affiliated with XL

**Key Facts**

* Structure — Delaware Limited Partnership
* Inception — September 1, 2006
* Administration — The Bank of New York
* Auditor — KPMG LLP
* Legal Counsel — Tannenbaum Helpern Syracuse & Hirschritt LLP
* Minimum Subscription — $500,000
* Subscriptions — Monthly
* Redemptions — Quarterly
* Notice Period — 45 Days

Confidential. The material presented herein is informational only, and none of such information constitutes an offer to sell or a solicitation of an offer to acquire, or any recommendation involving interests in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3

L4316

# Structure

RYE Investment Management
A Division of Tremont Group Holdings, Inc.



- XL enters into total return swap ("TRS") with counterparty to deliver Reference Fund return

- generally $3 exposure to Reference Fund for each $1 invested

- TRS terms include interest and fees

Confidential. The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to acquire, or any recommendation involving interests in any of the Rye Select Funds. Such an offer, if made, is made solely to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3

L4317



Reference Fund* – Investment Strategy

* **"Split Strike Conversion"**

  * a hedged, market timing strategy with defined risk and return parameters

  * designed to profit from short periods of growth in U.S. equities

  * the 'position' generally consists of:

    * the purchase of a basket of equities that are components of the S&P 100

    * the purchase of S&P 100 Index put options (value approx. equal to stocks)

    * the sale of S&P 100 Index call options (value approx. equal to stocks)

* **The S&P 100, often known by its ticker symbol OEX, measures large-cap company performance. This market capitalization weighted index was introduced in 1983 and is a subset of the S&P 500, and is made up of 100 major, blue chip companies across diverse industry groups.**

---

* Information appearing on this page has been furnished for use herein by the Reference Fund

**Confidential.** The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to acquire or any recommendation involving interests in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3

L4318

# Reference Fund – Return Expectations

**RYE**
Investment Management
A Division of Tremont Group Holdings, Inc.

* ## Return Expectations

* writing out-of-the-money OEX call options establishes a ceiling in which further gains on the basket of equities (see below) are offset by liabilities to these short calls

* the purchase of a basket of large cap U.S. equities establishes the position

* buying OEX put options establishes a floor that limits the value of a decline in the basket of equities (see above) as it is offset by gains on the long puts

* market exposure has historically been 1% - 2%



S&P 100 Index ("OEX") level

645    650    655

* Information appearing on this page has been furnished for use herein by the Reference Fund

**Confidential.** The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to acquire, or any recommendation involving interests in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant funds information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3

L4319



# Fund Administration

**The BANK of NEW YORK**

# RYE
Investment Management
A Division of Tremont Group Holdings, Inc.

## * The Bank of New York ("BNY")

* Founded in 1784 by Alexander Hamilton

* Oldest bank in the United States and is the principal subsidiary of The Bank of New York Mellon Corporation (NYSE:BK)

* Established leader in global fund administration with over $877 billion in assets under administration

* Provides a complete range of banking and other financial services to corporations and individuals worldwide through its basic businesses, namely, Securities Processing and Global Payment Services, Corporate Banking, BNY Asset Management and Private Client Services, Retail Banking, and Global Market Services

* $2 trillion in total assets as of December 2006

## * Alternative Investment Services

* A division of BNY

* Offices in Hamilton, Bermuda; New York, New York; Dublin, Ireland; Orlando, Florida and San Francisco, California

* Specialize in providing administration and related services to alternative investment entities

* Work with over 90 hedge funds and money management firms and service over 401 entities representing net assets of approximately $105.6 billion

Confidential. The material presented herein is informational only and none of such information constitutes an offer to sell, or a solicitation of an offer to buy or acquire, or any recommendation involving interest in any of the Rye Select Funds. Such an offer, if made, is made only to qualified investors by the relevant fund's information memorandum, which should be read in its entirety. Please read disclaimer on Page 2 and Risks of Hedge Fund Investing on Page 3.

L4320

# RYE
Investment Management
*A Division of Tremont Group Holdings, Inc.*

Rye Select Broad Market XL Fund, L.P. (Class A)

## Fund Detail

Rye Select Broad Market XL Fund, L.P. (the "Fund") is a Delaware limited partnership which was launched on September 1, 2006. The Fund seeks to provide investors with long-term capital growth and a return linked to a three times levered exposure to the economic performance of the Rye Select Broad Market Fund, L.P. (the "Reference Fund").

The Reference Fund allocates substantially all of its assets to a manager who utilizes a non-traditional investment strategy described as "synthetic split strike conversion". This strategy generally entails the purchase of a basket of large cap U.S. equities, buying related equity index put options, and selling related out-of-the-money equity index call options. Information relating to the Reference Fund is available upon request.

## Historical Performance

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | YTD |
|------|-----|-----|-----|-----|-----|-----|-----|-----|------|-----|-----|-----|-----|
| 2007 | 0.29 | 1.41 | 5.03 | 2.02 | 2.71 | 0.35 | 0.08 | 0.27 | 1.91 | | | | 9.82 |
| 2006 | | | | | | | | | 1.07 | 0.10 | 2.18 | 1.50 | 4.93 |

## Monthly Commentary

The Rye Select Broad Market XL Fund, L.P. (Class A) posted another positive return during the month of September of 1.91%. The Fund has gained 9.82% year-to-date and 14.02% on a rolling one-year basis.

Having entered the month in cash, the Reference Fund's 'split strike conversion' position was established during the second week of the month. The trade was later unwound over the course of a few days during the third week of the month, after the United States FOMC announced its intention to drop the Federal Funds rate by 50 bps. The Reference Fund benefited from strong equity performance from financials (e.g., Goldman Sachs) and energy (e.g., Schlumberger, Exxon Mobil). The Reference Fund remained in cash for the remainder of September.

## Risks

Investing in hedge funds may be considered speculative, illiquid and may involve a significant degree of risk. It is only appropriate for consideration by qualified persons who can evaluate the risks associated with an investment in hedge funds and can bear the financial risks involved.

Such an investment is suitable only for a limited portion of the risk segment of a subscriber's portfolio. Prospective investors should read carefully the Fund's offering documents in its entirety and consider the risk factors discussed therein in evaluating the merits and suitability of an investment in the Fund.

## Important Notice

Past performance as described herein is not necessarily indicative of future results. Returns for the current year are un-audited, estimated and net of fees and expenses. They are not considered final and are subject to adjustment pending the outcome of the annual audit.

The foregoing is intended solely for informational purposes and is not intended to be, nor should it be considered as an offer to sell, or a solicitation of an offer to purchase, any security or investment products. Shares in the Fund are offered only by the Fund's Information Memorandum to certain qualified investors.

None of the content of this publication, either in whole or in part, may be reproduced, shared in a data retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopy, reproduction, via recording or otherwise, without the express written authorization of Tremont Group Holdings, Inc.

Rye Investment Management is the division within Tremont Group Holdings, Inc. that develops, manages and promotes the firm's platform of select manager funds - the Rye Select Funds.